The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3

4   DONNA CURLING, ET AL.,          :
                                    :
5           PLAINTIFFS,             :
    vs.                             :   DOCKET NUMBER
6                                   :   1:17-CV-2989-AT
    BRAD RAFFENSPERGER, ET AL.,     :
7                                   :
            DEFENDANTS.             :
8

9


10        TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS

11          BEFORE THE HONORABLE AMY TOTENBERG

12          UNITED STATES DISTRICT SENIOR JUDGE

13                 SEPTEMBER 26, 2022

14                    12:30 P.M.

15

16

17

18

19

20

21    MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22               TRANSCRIPT PRODUCED BY:

23

    OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                  2394 UNITED STATES COURTHOUSE
                                    75 TED TURNER DRIVE, SOUTHWEST
25                                  ATLANTA, GEORGIA  30303
                                    (404) 215-1383
```

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2   FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
     SCHOENBERG:
 3

 4        DAVID D. CROSS
          MORRISON & FOERSTER, LLP
 5
          ADAM SPARKS
 6        KREVOLIN & HORST

 7

 8   FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
     WILLIAM DIGGES, III, AND RICARDO DAVIS:
 9

10        BRUCE P. BROWN
          BRUCE P. BROWN LAW
11

12   FOR THE STATE OF GEORGIA DEFENDANTS:

13
          VINCENT ROBERT RUSSO, JR.
14        CAREY A. MILLER
          JAVIER PICO PRATS
15        ALEXANDER DENTON
          ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC
16
          BRYAN TYSON
17        BRYAN JACOUTOT
          TAYLOR ENGLISH DUMA
18
     FOR FULTON COUNTY, GEORGIA:
19

20        DAVID LOWMAN
          OFFICE OF FULTON COUNTY ATTORNEY
21

22   FOR CATHY LATHAM:

23        HOLLY A. PIERSON
          PIERSON LAW, LLC
24
          BOB CHEELEY
25        CHEELEY LAW GROUP, LLC
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; September 26, 2022.)**

1  
2  
3           COURTROOM DEPUTY CLERK:  We're here for the

4  teleconference in Curling v. Raffensperger, Civil Action Number

5  17-CV-2989.

6           Judge?

7           THE COURT:  Good afternoon.  Thank you-all for being

8  here at such short notice.

9           Before we dive into this matter, let me just say a

10 few words.  To the extent we have individuals present who are

11 not going to be -- we're not expecting you to speak or members

12 of the Coalition or members of the public, just I would ask you

13 to please be sure to -- if you have any noise in your

14 background just actually to keep yourself mute.

15           We're not looking for participation from anyone who

16 is not counsel unless I ask for any information directly from

17 Ms. Latham.  Hopefully people will stop joining us because this

18 will be very distracting.

19           I had a question before we begin, which was simply

20 since I have -- a number of the lead counsel in this matter are

21 present with me and we were very kindly invited to also --

22 counsel were invited to attend the replacement -- the process

23 of replacement of some of the equipment and voting machines in

24 Coffee County today, as I understand, I want to -- are any --

25 are any of your colleagues down there, whether from the State

1   or from any of the plaintiffs?

2            MR. CROSS:  Your Honor, this is David Cross.  For

3   Curling plaintiffs, we don't have anyone there.  There wasn't

4   sufficient notice for it.

5            THE COURT:  Okay.

6            MR. CROSS:  We just -- I'll just say on the record:

7   I mean, we raised a concern with the State on Friday with the

8   fact that they are doing a partial replacement as opposed to

9   replacing the EMS server and the ICC, which had been used with

10   the peripherals that are being replaced in at least three

11   elections.

12            That issue is not before Your Honor today.  But we

13   have raised that concern with the State.  We don't think it

14   makes sense to replace some of the equipment and not all of it.

15   As the presumption is that some of it may have been

16   compromised, all of it would have been compromised at this

17   point.

18                    **(Unintelligible cross-talk)**

19            THE COURT:  All right.  I misunderstood the State's

20   notice then because I thought it was everything that was being

21   replaced.  But --

22            MR. CROSS:  No.  It excludes the EMS server --

23            THE COURT:  Let me just confirm that with the State.

24            MR. CROSS:  Sure.

25            THE COURT:  Okay.  Mr. -- anyone from the State,

1    could you just confirm that the EMS server and ICC are not

2    among the items to be replaced?

3                MR. TYSON:  Yes, Your Honor.  This is Bryan Tyson.

4                So since the ICC and the EMS server were previously

5    replaced after the improper access, they are not being replaced

6    again.  But all the other peripherals that are listed in our

7    filing are being replaced.

8                We conveyed Mr. Cross' concerns to the Secretary's

9    office.  And they believe that they just needed to proceed with

10   the replacement this morning.

11               That truck was supposed to arrive in Douglas at

12   11:00 today with a Secretary investigator and law enforcement,

13   POST certified officer with it.  So those are the individuals

14   who are on site for the State.  But none of our counsel are

15   present in Douglas while this is going on today.

16               THE COURT:  All right.  We'll deal with that and the

17   EMS server and ICC issue on -- on a separate point.  It doesn't

18   make sense to try to do it right now.

19               All right.  So we're here both on the plaintiffs'

20   motion to compel and Ms. Latham's motion to quash.  And it

21   would be helpful, I think, if Ms. Latham's counsel would

22   explain a few more things to me in terms of the affidavit and

23   response.

24               But we have a response that is at Document 1495,

25   Latham response to court request for information regarding

1    response to subpoenas.

2           And the first question I had about it was:  Who is

3    the independent IT vendor?

4           MS. PIERSON:  Your Honor, somebody that Bob Cheeley's

5    firm uses.  His name is -- I have forgotten the name of the

6    company.  I'm sorry.  I don't have that for you.  It is Mariano

7    something.  We were operating pretty quickly, as you can

8    imagine, this weekend once we got plaintiffs' specific

9    responses and outlines and names and things.

10          We can certainly get that information to the Court.

11   But it is an outside IT vendor that Mr. Cheeley's firm -- who

12   Mr. Cheeley uses.  And I don't know if Mr. Cheeley is on the

13   phone and can provide that information or not.  But I can

14   certainly get it to you.

15          COURT REPORTER:  This is Shannon, the court reporter.

16   I need each person to state your name when you speak.  And

17   there is someone that is using a keyboard in the background,

18   and I need you to mute or stop.

19          MS. PIERSON:  I'm sorry.  That was Holly Pierson for

20   Cathy Latham.

21          COURT REPORTER:  Thank you.

22          MR. CHEELEY:  Your Honor, this is Bob Cheeley,

23   C-H-E-E-L-E-Y.

24          That's correct.  I prefer not to give out the IT

25   individual's last name because of -- I've received some --

1  since I have entered an appearance on behalf of Ms. Latham, I

2  have been receiving some threatening emails and I don't want my

3  IT guy to receive threatening emails.

4          THE COURT:  Well, you're going to need to --

5          MR. CHEELEY:  But I'll be happy to --

6          THE COURT:  You're going to need to at least send it

7  to Mr. Martin when we are through with the phone call and the

8  name of the firm and share it with counsel for the State and

9  for the plaintiffs here.  All right?

10          MR. CHEELEY:  With the understanding --

11                     **(Unintelligible cross-talk)**

12          MS. PIERSON:  -- the same, which I understand is sort

13  of part of the process.

14          This is Holly Pierson.  Sorry.

15          But if we could have some agreement that Ms. Marks

16  and/or other people with the Coalition or other people involved

17  will not then take that information and tweet it out

18  everywhere, that would also be helpful.

19          MR. BROWN:  This is Bruce Brown for the Coalition.

20  We will not tweet out the identity.

21          THE COURT:  I don't think the Curling folks have had

22  an active tweeting presence in any way.

23          MR. CROSS:  Sorry.  This is David Cross.  I can

24  confirm no one will tweet the name.

25          THE COURT:  All right.  But it is not 100 percent

1  clear to me what your -- the vendor did actually when I'm

2  trying to decode Paragraph -- the Paragraphs 3 and 4.

3           MS. PIERSON:  Your Honor, this is Holly Pierson

4  again.

5           We have every intention of having him put together

6  and he is in the process of compiling a report that we would be

7  happy to file with the Court and, of course, provide to

8  opposing counsel.

9           But given the very short turnaround, we wanted to get

10  the information of what was found in front of the Court and

11  then we can provide a more detailed report of exactly what was

12  done, what wasn't done, what we would still like to do, you

13  know, what we -- you know, if there are things that the Court

14  wants us to go back and do, we can do that altogether.

15           But we have every intention of providing you a more

16  comprehensive report on exactly what was done and how it was

17  done.  We just haven't had the time to do that in the time that

18  we had.

19           THE COURT:  So when would you anticipate presenting

20  the report to us?

21           MS. PIERSON:  You know, whenever you tell us, Your

22  Honor.

23           THE COURT:  Well, time is of the essence.  I had

24  extended the discovery for three weeks.  And the end of this

25  week is the third week.  And that is why -- I mean, even if I

1    were to extend it another week just for a limited purpose, I

2    would need to know what -- you know, I would need to have this

3    information.  So --

4         MS. PIERSON:  I would say by close of business

5    tomorrow, Your Honor, would be realistic unless in our call

6    there are additional items that we need to add to his plate to

7    do.  And then it might be, you know, Wednesday morning or late,

8    late Tuesday night.  But I feel like we could get that done in

9    a relatively short time.

10        THE COURT:  All right.  Well, I assume that you --

11   there's some confusion to me particularly in Paragraph 4 about

12   what you did -- the undersigned counsel personally did as

13   opposed to what the expert did.  Because you represent on

14   Page 2, Paragraph 4 of Document 1495 that you personally

15   searched Ms. Latham's email for responsive non-privileged

16   communications and documents for each of the individuals listed

17   on Page 3.

18        So does that mean that you did that but the IT vendor

19   did not?

20        MS. PIERSON:  That's correct, Your Honor.  Again,

21   this is Holly Pierson.

22        I did the personal search of her Gmail.  I think

23   there is a footnote there that tells you we no longer have

24   access to a Proton mail for her, which is why there is no

25   Proton mail being produced.

1              But I did personally the searches through her Gmail,

2    and the vendor did the other -- the texts and the Signal.  And

3    I'm more than happy for him to go back in and validate my

4    findings.  I don't have any objection to having two people do

5    it, other than the obvious time and cost.

6              But I think we're sort of in that now.  But, you

7    know, we were trying to divide and conquer, given the time we

8    had.

9              THE COURT:  And did you make any effort to contact

10   Proton to be able to recover her old email?

11             MS. PIERSON:  She has made that effort, Your Honor.

12   And, you know, we are going to go back and make the effort

13   again.  She was first told that she could not reaccess it.  And

14   I know Proton mail has some screwy protocols, et cetera,

15   because of its high security.  But we are -- we have tried to

16   do that, and we will continue to try to do that.  But so far,

17   that has not borne fruit.

18             THE COURT:  Well, it would be pretty unusual not to

19   be able to reactivate an account and be able to access the

20   data.

21             So I would -- and what about her indication that

22   she's -- basically everything that she did earlier up through

23   May of '21 was in the cloud and she doesn't have access to it

24   now -- have you -- the iCloud?  Have you contacted Apple to

25   determine can you get -- what could be done so she could, in

1    fact, reactivate access to that portion?

2           MS. PIERSON:  Yes, Your Honor.  That is a little

3    bit -- the facts on that are a little bit different.  It is not

4    that she had deactivated it.  I think because she's not a super

5    tech savvy person, she didn't realize she had an iCloud.  So

6    not very much stuff is backed up in the iCloud because, you

7    know, you have to turn that on for stuff to automatically get

8    backed up.

9           But one of the things that the vendor is supposed to

10   do -- we do now have access to the iCloud, and he is going to

11   review it to make sure that there is nothing else in it.  But I

12   don't want to raise anyone's expectations because not much was

13   being backed up in the iCloud because it wasn't, quote-unquote,

14   set up or linked for automatic saving.

15          THE COURT:  What phone -- what type of phone did she

16   have at that time?  Was it a 6, 7, 8, 9?

17          MS. PIERSON:  That I don't know, Your Honor.

18          THE COURT:  Because some of them are automatic and

19   you don't -- it is more that you've got to decline it rather

20   than that you've got to enroll in automatic cloud updating.

21          MS. PIERSON:  I don't know the answer to that, Your

22   Honor.  But I do know that we now have access to her OneDrive

23   or iCloud account.  And the outside independent expert will be

24   reviewing that for all the terms that we have delineated from

25   the various pleadings and anything else that you tell us that

1  we have to look for if that is where the Court wants us to go.

2          THE COURT:  Did Ms. Latham maintain her phone?  I

3  mean, I realize that she stopped using that phone.  But did she

4  keep her phone?

5          MS. PIERSON:  I don't know the answer to that.

6          Ms. Latham, when you replaced your phone in May of

7  '21, did you keep the old phone or did you turn it in or

8  otherwise give it away?

9          MS. LATHAM:  I turned it in.

10         MS. PIERSON:  Okay.

11         MS. LATHAM:  This is Cathy Latham speaking.

12         THE COURT:  And what -- Ms. Latham, what were you --

13  at that time, were you seeking some sort of credit on the phone

14  or were you -- was there a problem with the phone?  Was there a

15  reason you were turning it in at that time?

16         MS. LATHAM:  Yes, Your Honor.  I had, I think it was,

17  an iPhone 6.  The screen had stopped working.  So I went to the

18  AT&T place and exchanged the phone for a newer phone.

19         THE COURT:  Okay.  Do plaintiffs' or the State's

20  counsel have any questions regarding -- or concerns regarding

21  the completeness of the bulleted individuals identified on

22  Page 3 of the Latham response, Document 1495?

23         MR. CROSS:  Yes, Your Honor.  This is David Cross.

24  And Bruce Brown is going to have comments as well.

25         But there are folks who are missing that we have

1    identified specifically.  And we can walk through those.

2            I want to take a step back for a moment if I could.

3    We have a broader concern with the IT consultant issue that has

4    come up.  And it really comes down to concerns -- one is the

5    timing.  We think that it is really untimely to raise that now,

6    to come into the Court after a full round of briefing on the

7    motion to say now that they have certainly gone out and gotten

8    an IT vendor.  We have no details really on any specific level

9    about what was done.

10           But the more important concern, Your Honor, is, you

11    know, all we know is it is someone that works regularly with

12    Latham's counsel -- one of the lawyers.  And we think it is

13    important that whoever does this work should be an independent

14    vendor that the parties agree on.

15           And I would say, Your Honor, the principal objection

16    that was in the briefing from Ms. Latham was that having an IT

17    vendor access her devices' data would be intrusive.  That

18    objection is now waived because they have had someone to do

19    that we're told.

20           But if they had wanted to resolve this, the way to do

21    that would have been to reach out to us last week and say, hey,

22    we're waiving that objection, we're prepared to --

23                    **(Unintelligible)**

24           COURT REPORTER:  I'm sorry, Mr. Cross.  You are

25    breaking up.  You're going to need to repeat at least the last

```
 1   sentence.
 2             MR. CROSS:  Sorry.  Sorry, Shannon.
 3             COURT REPORTER:  Thank you.
 4             MR. CROSS:  I was saying the -- what we understand
 5   now is that they had a vendor come in.  So the principal
 6   objection in the briefing has been waived because the principal
 7   objection was that this is private data and no independent
 8   vendor should be looking at it.
 9             If they wanted to resolve this, the path forward
10   would have been last week to say they are withdrawing that
11   objection, they are now prepared to have a vendor do sort of
12   access and searches that we've been asking for.  But let's
13   figure out who that is and someone the parties agree on so
14   everyone trusts that this is a vendor that has the capability
15   to do what needs to get done.
16             We have a vendor in particular that we trust, that
17   the State has trusted to copy the KSU server and now the EMS
18   server and the ICC from Coffee County.  So we think we have a
19   vendor that is perfectly positioned for that.  They also have a
20   history in the case.
21             So what I would say is that really should be the path
22   forward.  It seems everybody is in agreement that a vendor
23   should do this.  We can work out the scope of what that is.
24   But it should be a vendor that we are also approving and
25   comfortable with.
```

```
 1              MS. PIERSON:  Your Honor, this is Holly Pierson.

 2   Just to respond to that, I think that is not at all -- we are

 3   not on the same page about that.  We have not waived anything.

 4              What we have tried to do in the face of what we

 5   regard as entirely irrelevant and over-expansive requests that

 6   are dangerous to our client to have her personal information

 7   where she is already being threatened, she is under criminal

 8   investigation -- to have her personal data imaged by groups

 9   that are routinely tweeting out information and saying that

10   they are sharing all their information with Fani Willis, we

11   decided to try because, Your Honor, I appear in front of you

12   often, I know you like to be reasonable, and you like counsel

13   to be reasonable.

14              We tried to take a path that would be able to assure

15   the Court that there is not, in fact, as multiple times

16   represented by the plaintiffs but not accurately -- there is

17   not any wealth of information here.  In fact, there is nothing

18   that we found so far at all that is responsive to all these

19   incredibly detailed and as far as I can tell irrelevant

20   categories of information.

21              But in an abundance of caution in trying to be

22   cooperative and to appear cooperative to the Court, we have

23   taken the step of taking people that we trust with limited

24   amounts of access to certain data.  Me, the email, as I am her

25   counsel; the trusted IT person to do the rest.
```

1     And candidly I would have done all of it had we had

2   time.  So the vendor is really a tool of timeliness, not of

3   anything that needs to be done here.  This is a nonparty

4   subpoena.  And as we have spilled a lot of ink arguing, this is

5   way more than anybody should have to do.  By doing it we have

6   not conceded at all that it needs to be done, that it should be

7   done, or that it has to be done.

8     But we instead have gone ahead and done what we can

9   do in the time that we have been allotted so that we can assure

10  the Court that these outlandish allegations of discovery

11  misconduct and hiding information and being a ringleader are

12  all completely not true.

13     And they -- you know, I understand that the

14  plaintiffs believe that there are.  But the evidence shows that

15  they aren't.  She has testified to her limited knowledge and

16  her limited role.  And just repeatedly calling her a ringleader

17  doesn't make her one.

18     And doing this process is not any concession that her

19  private individual devices as a nonparty witness should be

20  imaged and gone through by anyone other than trusted

21  individuals with limited access to be places of information

22  where we might find these things.

23     So that is not at all what we think is appropriate.

24  We don't think we should have had to do this.  But, Your Honor,

25  I candidly convinced my client to do it so we could show the

1    Court that we are, in fact, acting in good faith and that we do

2    not, in fact, have any of these things that plaintiffs have

3    speculated that we might have.

4           So no, a vendor is not appropriate.  It is -- for all

5    the reasons and all the cases that we have cited in our brief,

6    it is disfavored, it is extraordinary, it is extreme, even when

7    you are talking about parties; even more so when you are

8    talking about nonparties; even more so when you are talking

9    about nonparties who are under criminal investigation in

10   multiple, you know, areas -- I think ridiculously but

11   nonetheless it is happening.

12          And so no.  That is not a fair characterization of

13   where we are, nor is it a proper path forward under all the

14   case law.

15          COURT REPORTER:  This is Shannon again, the court

16   reporter.  There is still background noise.  Please mute if you

17   are not speaking.

18          And, Ms. Pierson, I need you to slow down greatly.

19          MS. PIERSON:  I am sorry.  I am a quick talker.

20          MR. CROSS:  Your Honor, this is David Cross.

21          What we just heard from Ms. Pierson confirms why this

22   needs to be an independent vendor.  The claims that Ms. Latham

23   and her counsel are making even in the hearing are just

24   demonstrably not accurate.  I mean, to continue to tell the

25   Court in light of the surveillance video we have both inside

now, not just externally, the sworn testimony of

SullivanStrickler, the 30(b)(6) witness testifying for the

firm, which has been incredibly cooperative and forthcoming,

the testimony of Jil Riddlehoover who was there that day, all

of whom show Ms. Latham not just in the office but as a key

pivotal person organizing the events, like coordinating

directly with Paul Maggio on getting Scott Hall there.  She is

the one that welcomes the two teams into the office.

           And then now we see in the most recent video she is

in the office actively engaged with all of those individuals,

including taking photos and making video on her phone, which we

had never seen from her.

           So really the challenge here, Your Honor -- and this

is not something I say lightly -- is we have had now three

filings from Ms. Latham and her counsel and now a hearing in

which they are continuing to make a claim that is just so

demonstrably inaccurate to say that she is just sort of an

innocent bystander here and that she testified truthfully in

her deposition.  Those are not claims that can be sustained by

any fair reading --

           THE COURT:  All right.  Well, I'm going to just jump

ahead for a moment.

           First of all, I think it would be helpful if

Mr. Cheeley could go ahead and email Mr. Martin with a copy to

counsel of the name of the contractor and -- both the

1   individual and the firm.

2          Mr. Cheeley, is that feasible for you?

3          MR. CHEELEY:  Yes.  When would you like me to do

4   that, Your Honor?

5          THE COURT:  Now.  Now.

6          MR. CHEELEY:  By email?

7          THE COURT:  Yes.

8          MR. CHEELEY:  Okay.

9          THE COURT:  And I don't think it is going to help us

10  since I've read everything for either counsel for the parties

11  or counsel for Ms. Latham to again address the broader concerns

12  that all have and their respective positions.  I have heard it

13  loud and clear.

14         So let's just get on so that I can sort of just deal

15  with the practical issues here.

16         And who -- who did -- was missing according to at

17  least the Curling plaintiffs on this list?

18         MR. CROSS:  Bruce, do you want to take that?

19         MR. BROWN:  Yes, Your Honor.

20         The background noise is not mine, I promise.

21         THE COURT:  I believe you.

22         MR. BROWN:  The people who are -- the people who are

23  missing from our list --

24         THE COURT:  Well, whoever is moving -- is flipping

25  pages, you have to stop.  I mean, basically anyone who is not

1    counsel in this matter needs to mute your phone.

2            I'm going to just simply start again and not allow

3    anyone else on and change the number if this continues.  You

4    know, we try to -- this is a matter of public interest, so I

5    try to be open about this.  But it is not to the point that we

6    can't function.

7            Thank you.  All right.

8            MR. BROWN:  Thank you, Your Honor.  The individuals

9    that are on our list that Ms. Latham did not search for are

10   Phil Wildron, Michael Flynn, Kevin --

11           THE COURT:  Go slower.  Phil Waldron was the first.

12   Then who is the next person?

13           MR. BROWN:  I'm sorry.  Michael Flynn, Kevin Moncla,

14   M-O-N-C-L-A, and Robert Cheeley to the extent there are

15   non-privileged communications with him.

16           And those are the -- the names of the particular

17   individuals.

18           THE COURT:  All right.

19           MR. BROWN:  In addition, there are topics that we had

20   listed that might not have corresponded to specific search

21   terms or might have -- that we would like to have searched and

22   could potentially agree with with whatever third party IT

23   vendor Your Honor would select to search much in the manner

24   that is set forth in the original subpoena that is the subject

25   of the motion to quash.

THE COURT:  Okay.

MR. CROSS:  Your Honor, this is David Cross.  One thing I would add to that list is that there are some things we're looking for that we know should exist or at least existed in the past from the surveillance video that aren't text searchable, which is part of the challenge with the approach that Latham -- Ms. Latham has proposed.  And that's going to be things like photo and video.

Again, we know that she was using her phone to take pictures or video in the office on the 7th.  My understanding is you can't capture that with search terms.  So there is another way -- there are other ways the vendor will have to get at that as well.

And then we would also want to make sure to what is being searched -- and Your Honor touched on this earlier.  But just to be clear, it is not just what is locally on the devices but also would be in cloud storage, whether that is an iCloud account, an email account in the cloud.

And, lastly -- and the last two things, Your Honor, are, one, figuring out what might be recoverable.  So things that no longer readily appear on a device or in cloud storage might still be recoverable.  And there are vendors that are very capable at recovering that.

And then, lastly, it is looking to see when things were deleted, whether they were deleted before or after the

1   subpoena was issued.

2          MR. BROWN:  Your Honor, if I could add, the list that

3   I gave was a comparison of the list that Ms. Pierson provided

4   in her pleading.  I understand that her search was simply

5   through emails.  We have also, of course, asked for a text

6   search.  And apparently none of that has been done or at

7   least --

8          THE COURT:  Well, I thought the text search was what

9   Ms. Pierson indicated that her -- that Mr. Cheeley's vendor was

10  going to be working on.

11         MS. PIERSON:  That's correct.  That is what -- Your

12  Honor, that is correct.  Not just texts but also Signal.

13         And, Your Honor, without going further down this

14  road, the fact that we've been generous in trying to find these

15  things should not be mistaken for the fact that we think the

16  law allows us to be ordered to do all of this mishegoss around

17  the subpoenas.  She is a nonparty.  We have now validated --

18         THE COURT:  All right.  Wait a second.  Wait a

19  second.  I just -- you've made that argument.  I have heard it.

20         MS. PIERSON:  Okay.

21         THE COURT:  You've made it orally here today.  I

22  heard it also in your briefs in the motion to quash.  So I

23  don't think it is going to be helpful for me to hear it again.

24         MS. PIERSON:  Okay.  Fair enough.

25         THE COURT:  So I'll make my decision.  But I need to

1   understand what exactly is in process and potentially in

2   process and what other alternatives also there may be.

3            But that is different than hearing argument.  I

4   wasn't looking for argument.  Everyone's argued.

5            MS. PIERSON:  Fair.

6            To the practical point, Mr. Cheeley has confirmed to

7   me and I have confirmed through my email review -- I don't

8   think we have looked in texts and Signal for him.  But we can.

9   But he has had no non-privileged conversations with Ms. Latham.

10  Everything that he has done with her has been in the context of

11  serving as her attorney.  So those would all be privileged

12  communications.

13           And the same with Mr. Dal Burton, who I don't think

14  they mentioned but is also mentioned in their list.  So I just

15  wanted to let you know we had addressed those.

16           And as an aside, I do believe I searched for the

17  four -- or the other three, Waldron, Moncla, and Flynn.  But

18  because they are buried in a paragraph there in their listing

19  that they served yesterday morning, I think I forgot to include

20  them in our terms.

21           But in an abundance of caution, I will go back and

22  verify that.  And that would be in probably my supplement to

23  the report as to what I did that will come with the IT person's

24  report.

25           But yes, they have gone through texts and Signal.

1    And I do believe that he plans to and will go through all these

2    cloud drives to look both for photos, which she's capable of

3    doing, in date ranges, which should take care of any concerns

4    there and also for these text terms.

5         I wasn't clear what text terms or search terms

6    opposing counsel was talking about that are outside of this --

7    that there was some subject matters they wanted searched but I

8    don't know what those terms are.

9         COURT REPORTER:  Ms. Pierson, this is Shannon.  I

10   need you to slow down, or I am not going to get your record.

11        MS. PIERSON:  Sorry.

12        THE COURT:  All right.  So if the -- do the

13   plaintiffs feel that they have formulated any search terms?  I

14   mean, it doesn't matter for -- relative to this provider or any

15   other provider, have you -- have you formulated other

16   independent search terms?

17        I know that there were topics that were identified in

18   the subpoena -- from the original subpoena.  But I'm just

19   trying to say -- I mean, a topic may be still different than a

20   search term.

21        MR. BROWN:  Your Honor, we will do so.  I do not have

22   them in a (unintelligible) but understand the process and will

23   reduce -- as best we can to reduce those to search terms.

24        THE COURT:  All right.

25        MR. CROSS:  Your Honor, this is David Cross.

1              Could I just ask whether Ms. Pierson or

2    Mr. Cheeley -- if they have a proposal for how a vendor -- how

3    their vendor will search non-text searchable data, such as

4    photos and videos -- if that is something they have explored

5    and are prepared to do?

6              THE COURT:  Sure.

7              MS. PIERSON:  I think we can provide that in the

8    report of what he has already done, or we can call him about

9    that and report back to the Court.  But, you know, this is

10   not -- this is not intended as a full forensic imaging or

11   search.  This is to go look for the things that you-all have

12   raised that you believe are relevant, even though we disagree.

13             And so I think that, you know, he would look for the

14   terms we have outlined -- search terms, you know, if the Court

15   agrees to them or ultimately they do identify and photos stored

16   in these various places in certain time periods.  But I'm not

17   an IT vendor.  So I don't -- I can't speak more specifically

18   than that.  But I'm sure they can.

19             MR. CROSS:  Your Honor, David Cross again.  That is

20   helpful.

21             The other issue that we have not talked about is the

22   time period.  And it was a little unclear from their filing

23   whether they were focused just on January 7.  And the time

24   period for us is broader.

25             And in particular, Your Honor, one of the things that

1    we have learned during the course of the deposition was that

2    Ms. Latham was at the Willard Hotel in mid-December of 2020.

3    That is where the Trump campaign had what they call their -- I

4    think it was war room or some terminology to that effect --

5    where folks like Giuliani and Steve Bannon and others were

6    meeting specifically about the Presidential election.

7         And one of the things that we know through the press

8    reports that came out of those meetings were the two draft

9    executive orders dated December 16 and December 17, one or both

10   of which were directed at getting access to the voting

11   equipment around the country.

12        And so it is only about two or three weeks after that

13   the breach occurs on January 7.  And so we just want to make

14   sure the time period covers whatever discussions may have

15   occurred with individuals in the months of November and

16   December.  Because based on the evidence we have seen, it seems

17   likely that there was a lead-up to the breach in January that

18   was likely discussed while Ms. Latham was at the Willard at the

19   same time those folks were there, including folks like Sidney

20   Powell.

21        MS. PIERSON:  Your Honor, this is Holly Pierson.  Let

22   me take off my tinfoil hat before I say I have also been to the

23   Willard.  I was not involved in any conspiracy.  That is not

24   why Ms. Latham was there.  We have made that clear.  She had no

25   discussions with any of those people about anything.  She was

1    utterly uninvolved in that.  And to even suggest it is

2    outrageous, especially given the threats and harassment she's

3    already being subjected to.

4            Our time period started November 4 and went for six

5    months.  So that is covered, and it is very clear from our

6    results that there were no such communications with any of

7    those people.

8            But let me put it very plainly on the record:  She

9    had nothing to do with that.  She was involved in no way in

10   that.  And that suggestion outside of the court setting would

11   be defamatory.

12           MR. CROSS:  Your Honor, this is David Cross.

13           The only thing I will say is that's absolutely not

14   what she testified.  She pled the Fifth on every question about

15   why she was in DC, whether she met with anyone at the Willard,

16   and whether she while she was in DC spoke with people like

17   Steve Bannon.

18           And so while Ms. Pierson may be free to make her own

19   representations, Ms. Latham pled the Fifth on those specific

20   questions.  And so there is no record that supports what

21   Ms. Pierson just said, and I will leave it at that.

22           MS. PIERSON:  Nor is there any record that refutes

23   it.  And I'm telling you as an officer of the Court that that

24   is not true.  It is absolutely not true.  It is outrageous.  It

25   is very inflammatory in this context.

```
 1              MR. BROWN:  Your Honor --

 2              MS. PIERSON:  And the Fifth Amendment -- by the way,

 3    Your Honor, they make much of the Fifth Amendment.  But as you

 4    well know and we have briefed, the Fifth Amendment is intended

 5    to protect the innocent as much or more as the guilty.

 6              And so it won't stand up under any kind of

 7    implication that that makes her guilty of anything because

 8    under the law it clearly does not.

 9              MR. BROWN:  Your Honor, we're put in a very

10    difficult -- this is Bruce Brown.

11              We're put in a difficult position because, of course,

12    we believe Ms. Pierson as an officer of the Court.  But we

13    already know that what she was being told by her client is not

14    the whole truth.  Because had her client told her the whole

15    truth that is revealed in the video, Ms. Pierson would never

16    have said what she said in the letters to David Cross or in the

17    pleadings to this Court.

18              So plaintiffs, doing the right thing investigating

19    and doing discovery, we would be foolish to believe not

20    Ms. Pierson but Ms. Pierson's accounts of what Ms. Latham did

21    or did not do.  That would be foolish for us to believe that

22    Ms. Latham is now telling Ms. Pierson the whole truth.

23              We do have independent evidence or would not have

24    suggested what Mr. Cross outlined.  There is an abundance of

25    evidence that connects Ms. Latham beyond what Ms. Pierson has
```

1    been told.  And we're entitled to discovery on it.

2              THE COURT:  All right.

3              MS. PIERSON:  Well, that is utter nonsense in my

4    opinion.  And I think that the -- Your Honor, the

5    characterization of my client as not being truthful as opposed

6    to what has actually happened is that she has been forthcoming,

7    she did not remember things.  She still doesn't remember

8    everything.

9              I know that the plaintiffs have been living in this

10   case for all these years, and they are very focused on this.

11   What happened on January 7 in Coffee County was not a big deal

12   to Ms. Latham.  And it is not at all crazy that somebody who is

13   a very busy person, whose son had just gotten married, who just

14   went through that runoff election that we had for Senate in

15   Georgia would not be focused on this and it would not be

16   imprinted on her memory.

17             So to call her a liar when she simply has served this

18   state as a teacher and been a good citizen her entire life and

19   just doesn't happen to remember what they want her to remember

20   is really offensive and unsustainable.

21             Their position is as unsustainable as they claim ours

22   is.  And I see no evidence that suggests that she was involved

23   with this Willard war room.  That is sensational nonsense.  It

24   is outrageous to suggest it.  It is absolutely false.  And we

25   know that because our search parameters have included the time

1   period that they allege those communications would have

2   happened, and there are none.  So you don't have to take our

3   word for it or hers.

4           THE COURT:  Well, all right.  You know, we don't even

5   have the phone, as you have said, from part of this period.  So

6   let's -- I'm not jumping to any conclusions.  But right now we

7   don't even have the phone from that period.  I don't know how

8   much time she spends on her phone versus a laptop versus

9   anything else.

10          You know, I don't -- and maybe those questions were

11  pursued during the deposition.  I don't know.  But people spend

12  a lot of time on their phones.

13          So -- and I don't know -- I don't have any

14  documentation of what efforts were made to obtain the phone at

15  this -- the cloud information, and we know we don't have the

16  phone.  So that's some of the tension that is going on here,

17  among other things.

18          And that is why I started by asking what exact

19  efforts have been made to secure information from the cloud or

20  otherwise that would reflect this.  And, you know, we just --

21  at this juncture, I don't have that.  So I can't -- I don't

22  really know.  I don't have any of that listed or identified.

23  And, you know, I don't know what all the devices that

24  Ms. Latham had.

25          But with all due deference to counsel, the one thing

1    I do know is that she did testify -- apparently testify that

2    she was there only a short period of time the day of the Coffee

3    County on the 7th and that doesn't seem to be true.

4          Now, she may have forgotten, and it is true.  But it

5    is -- you know, people were specially flying in and being --

6    coming in for this.  So it is a little bit strange to just say

7    it is outrageous when, in fact, something happened that was

8    going on for the better part of the day.

9          Obviously the issues around the computers and

10   functioning of the election system was something also of

11   concern to Ms. Latham because, after all, she testified in

12   front of the state legislature.

13         So, you know, let's -- I am not jumping to any

14   conclusions any which way.  But obviously this is a matter that

15   was important to her.  It is obviously a matter of importance

16   to the plaintiffs and the security of the systems and an

17   important issue for the State.

18         And I'm going to leave it at that and say I do not

19   want to have people -- any counsel revisiting anyone's being

20   up -- you know, basically impugning each other's integrity.  It

21   doesn't help -- it doesn't help me move forward here.  And

22   really the purpose of this phone conference is for me to be

23   able to understand the situation better and to help you-all

24   resolve this and to be able to move forward.

25         So just sort of stepping back here, were all of

1   the -- have all of the devices been, in fact, identified?  I

2   mean, when you say -- when you represent that you went through

3   the email, were you going through the email on a phone?  Were

4   you going through the email on her -- on a hard drive?  What

5   was happening so we at least understand what devices we're

6   talking about that have had already at least some initial

7   review from counsel?

8           MS. PIERSON:  Your Honor, she has web-based Gmail.

9   So I logged into her Gmail as her and performed these searches.

10          THE COURT:  And those went back to a time in -- the

11  full time in '21 and in December and November of '20?

12          MS. PIERSON:  They did, Your Honor.  For my searches,

13  the original subpoena, as I read it, said any time after

14  November 3rd.  So I put in November 4th and did -- 2020 and did

15  a six-month time window.

16          THE COURT:  And has anything occurred after that --

17  any search been done for the period after that six-month

18  period?

19          MS. PIERSON:  There are some searches that I didn't

20  do time limited.  I just put somebody's name in, and it would

21  bring up all emails in which they were mentioned or whether it

22  is to or from them.  You obviously can imagine like Rudy

23  Giuliani is mentioned in a bunch of Republican emails over

24  time.  And so I would pull up just his name and then go look at

25  the emails that are in that window from November 4 to sometime

1   late in February.  And in many cases, I looked at all of them.

2   But that is the general parameter of my search.

3           My understanding from the emails was, you know, that

4   with regard to the communications leading up to and about

5   January 7 that that -- you know, that that time frame was not

6   cut off on January 7 but it didn't go until, you know, August

7   of 2022.

8           THE COURT:  What was the plaintiff -- what was your

9   intention as to a cutoff date?

10          MR. CROSS:  Your Honor, this is David Cross.  I don't

11  have the subpoena in front of me.  I thought we had it in

12  there.  But --

13          THE COURT:  We have it.  I can look.

14          MS. PIERSON:  We tried to go way beyond the dates in

15  question, Your Honor.  I think there are some allegations about

16  some people coming in later.  Doug, whatever his last name

17  is -- the guys from Cyber Ninjas.

18          THE COURT:  Yeah.

19          MS. PIERSON:  And --

20          UNIDENTIFIED SPEAKER:  Doug Logan.

21          MS. PIERSON:  Doug Logan.  And somebody had

22  identified Ms. -- Ms. Latham as the person in the picture

23  letting them in.  And that was not, in fact, her.

24          But, you know, I think that you heard later in

25  January or maybe February -- so we tried to go well beyond any

1    dates that were identified as perhaps having relevant

2    conversations about that, which under the circumstances we

3    thought was above and beyond.

4           MR. CROSS:  Your Honor, this is David.  The new

5    election supervisor, James Barnes, started April 1st.  So

6    unless Bruce disagrees, I think going through the end of March

7    would be agreeable.

8           MS. PIERSON:  Well, then the searches I have

9    performed would already do that because they went for six

10   months from November 4.

11          MR. CROSS:  Yeah.  I think the -- this is David

12   again.  The issue that we have -- two issues we have, I guess,

13   with the searches that have been performed is, one, the search

14   capability of Google is pretty limited.  It doesn't have the

15   capability that a vendor would have once they have extracted

16   that data.

17          The other is we also know that at least some of the

18   people involved used code words.  We have not seen, you know,

19   texts or emails or anything from Ms. Latham that indicated to

20   us that she was using code words, to be clear about that.  But

21   we do know that some did, like Ms. Hampton and Mr. Chaney.

22   They refer to measuring the desk as code for what they were

23   doing in the office scanning ballots and similar work.

24          So we also have some concern about the ability to

25   capture everything.  That is a lesser concern because we have

1    not seen that with Ms. Chaney -- I'm sorry -- with Ms. Latham.

2              The primary concern would be -- the way we really

3    need to do this is to have the vendor extract the data so that

4    they can run sort of robust searches.  Just to give you an

5    example, in Gmail -- I mean, Gmail and Microsoft are sort of

6    both notorious for this.  That the search functionalities are

7    very, very limited.

8              And so you can run a search for a name, and it just

9    won't show up, even though the emails are there, because you

10   haven't written it exactly the right way.  You can't do, you

11   know, what are called Boolean searches where you would have

12   like first name within so many letters of a second name or you

13   could have different iterations where you have an expander at

14   the end of a word.

15             So, again, we appreciate that Ms. Pierson has done

16   this.  But really all of the searches I would submit, Your

17   Honor, is something that a vendor should do because they will

18   have more capability.

19             THE COURT:  Let me just ask you, Ms. Pierson:  Did

20   you -- were you also reviewing the trash folder and the deleted

21   folder?

22             MS. PIERSON:  Yes.  And spam.

23             THE COURT:  Okay.

24             MS. PIERSON:  And, you know, I'm not an IT expert, so

25   I can't testify to that.  But Google does have an advanced

1    search function that allows you to search for individual words

2    within date ranges.  And I did a number of different types of,

3    you know, people's names, email addresses, if we knew them,

4    (unintelligible) if we knew them, et cetera.

5         And I think this is how discovery is typically done.

6    It is not typically done by a forensic analysis.  It is

7    typically done by people searching their own files, and that is

8    what we did.

9         And I feel very confident that we got anything in

10   there, which was nothing other than what she's already produced

11   so far.

12        THE COURT:  All right.  I mean, the plaintiffs also

13   have identified a variety of documents in their response to the

14   Court's inquiry as to information that -- that they are still

15   seeking and documents that they are still seeking.  And that

16   is -- now we're talking about Document Number 1494.

17        So, Ms. Pierson, can you describe for me what type of

18   other independent document review you have gone through to

19   obtain this sort of -- the information that has been requested?

20        And let me just precede this for a second by asking

21   plaintiffs' counsel:  Did you get actually physical documents

22   from Ms. Latham, and how many roughly?

23        MR. CROSS:  Yes, Your Honor.  This is David Cross.

24   We did receive some documents.  The filing that went in I think

25   yesterday -- I think we went ahead and put both filings in

1  yesterday morning.

2              **(Unintelligible cross-talk)**

3              THE COURT:  Right.

4              MR. CROSS:  That provides the categories and a review

5  of the documents we got.  We did receive some documents.

6              THE COURT:  Okay.

7              MS. PIERSON:  Yes.  So, Your Honor, this is Holly

8  Pierson.  What I did is search for the terms that -- identified

9  in our response to your request.  I could not -- and it sounds

10 like plaintiffs had not yet either -- identified any search

11 terms other than the one I used and the company names that I

12 used like SullivanStrickler, Cyber Ninja, audit, forensic

13 audit, that sort of thing.

14             They didn't provide any additional search terms that

15 we could use to look.  But my understanding is and was then

16 that searching for these people's names and/or for these

17 companies' names should bring up any of the communications or

18 documents that they are looking for.

19             And that is why I was asking earlier if there are

20 additional terms they want searched.  You know, I think that an

21 initial search was done by Ms. Latham.  And as it turns out, it

22 looks like other than the one email that she showed them on her

23 phone during the deposition that has turned out to be the sum

24 total of the documents that could reasonably be found.

25             But if there are additional terms as opposed to

1    people whose names would show up in the documents that they are

2    talking about here, you know, I don't mind doing additional

3    searches in my own client's email or documents for that.

4          I don't think they are going to bear any fruit.  I do

5    think that that would have come up with the names that are --

6    you know, that very long list of names.  But they haven't

7    identified any other terms that I could search, and so I

8    haven't.

9          THE COURT:  Now, again, what -- I want to just

10   know -- you have been searching Gmail.  You said you would --

11   so you were doing universal search of Gmail.

12         But did you look on any other devices for other

13   storage of documents?

14         MS. PIERSON:  No, Your Honor.  The IT expert looked

15   on her phone and on her Signal app for text messages and Signal

16   messages.  And we have now access to her, I think, iCloud that

17   we will search for these same terms and also OneDrive.

18         THE COURT:  Okay.  All I'm really asking you:  What

19   are the devices that Ms. Latham has?  She has a phone.  She has

20   what else?  A laptop?

21         MS. PIERSON:  She will have to answer that, Your

22   Honor.  I believe she has a phone and a laptop.  I don't know

23   if she has an iPad.

24         THE COURT:  Ms. Latham, can you tell me what computer

25   devices you have?

```
 1              MS. PIERSON:  Cathy, she's asking you what devices
 2   you have.
 3              THE COURT:  Maybe she's off the phone now.
 4              MS. LATHAM:  I'm sorry.  I muted instead of unmuted.
 5   I'm sorry.
 6              THE COURT:  That's fine.
 7              MS. LATHAM:  I was sitting here talking.  This is
 8   Cathy Latham.  I have an iPad that I watch movies on.  I don't
 9   have anything on it but movies.  And I have a laptop, and I
10   have a phone.
11              THE COURT:  You don't have an old hard computer -- a
12   hard drive computer?
13              MS. LATHAM:  No, ma'am, I don't.  No, Your Honor, I
14   do not.
15              THE COURT:  And do you store any -- I mean, do you
16   store any of the documents that you -- when you download a
17   document, do you store the document?
18                  (Extraneous background noise)
19              MS. LATHAM:  Excuse me?
20                  (Extraneous background noise)
21              MS. PIERSON:  Hang on, Cathy.  Somebody is
22   intervening.
23              Judge, is that --
24              THE COURT:  So I guess the question was -- I mean,
25   most of us do at some point download on our laptops at minimum
```

```
 1    documents that we might want to be able to go back and look at
 2    even though they were attachments.
 3            Have you done that?
 4            MS. LATHAM:  I am so sorry, Your Honor.  I don't
 5    understand your question I guess because of the interruption.
 6            Can you repeat that, please?
 7            THE COURT:  What I said was and asked about is that
 8    most of us download documents that are attached to emails if
 9    they are of any significance to us.
10            And have you downloaded documents to your laptop or
11    to your phone?  But to your laptop in particular?
12            MS. LATHAM:  Yes, ma'am, I would have downloaded to
13    my laptop if I needed to use it after you did the preview.  And
14    I would download it to my desktop.  I don't tend to download to
15    anything but my desktop because I can't find it then.  It is
16    just easy to have it on my desktop.  And then when I don't need
17    it, I trash it or whatever is needed, Your Honor.
18            I have --
19            THE COURT:  All right.  I'm going to just stop for a
20    second.  The court reporter says she needs to take a two-minute
21    break just for one moment.
22                    (A brief break was taken.)
23            THE COURT:  All right.  We're back.  We just had a
24    little electrical issue.
25            So have -- Ms. Latham, have you or, Ms. Pierson, have
```

 1    you looked at the laptop for those documents?

 2            MS. PIERSON:  Your Honor, I'll let Cathy answer for

 3    your original search that she did and whether she covered those

 4    in the original search.  We have not --

 5                    **(Extraneous background noise)**

 6            MS. PIERSON:  -- documents on her laptop.  Because,

 7    A, there was an original search that was done and, B, the focus

 8    of the -- although certainly not the sum total, but the focus

 9    of plaintiffs' complaints was about communications that they

10    believe exist that don't -- that have not been produced.  So we

11    focused first on communications.

12            But we certainly can do that.  And Ms. Latham can

13    answer whether she searched her laptop originally, if that is

14    important to the Court.  But I think we can just agree that

15    whether she did or not, we'll go back and do it again.

16            THE COURT:  All right.  Thank you.  And I haven't

17    gone to see Mr. Martin who is in another room yet.

18            But, Mr. Cheeley, have you sent the information about

19    the vendor?

20            MS. PIERSON:  Your Honor, he sent it to me.  And

21    every time I go to send it, I get distracted saying something.

22    So let me do it right now before I forget.

23            MR. CHEELEY:  I did send it to Mr. Martin.

24            COURTROOM DEPUTY CLERK:  Yes, I have received it.

25            MS. PIERSON:  Oh, okay.  Okay.

```
 1          THE COURT:  And you sent it -- did you send it as
 2   well to counsel?
 3          MS. PIERSON:  Oh, no.  We'll send it now.
 4          David and Bruce, is it okay if I just send it to you?
 5          MR. CROSS:  Yeah.  That is fine.  Thanks, Holly.
 6          MR. BROWN:  Sure.
 7          MR. CROSS:  And obviously for the State and Fulton
 8   County too.
 9          MS. PIERSON:  So, Bryan, I don't have Fulton County's
10   email right now.
11          MR. BROWN:  I'll send it to you.  This is Bruce.
12          MS. PIERSON:  Bryan, is it okay if I send it to you
13   or do you need me to send it to Vince or others as well?
14          MR. RUSSO:  Holly, this is Vincent Russo.  I think
15   Bryan had to drop off.  It is fine.  Whoever you send it to on
16   our side will make sure everybody gets it who needs it.
17          THE COURT:  All right.  And, Mr. Cheeley, you gave
18   the name of an individual.  But is there a company name?
19          MR. CHEELEY:  Yes, Your Honor.
20          THE COURT:  Can you send that as well to all,
21   including Mr. Martin?
22          MR. CHEELEY:  I will.
23          THE COURT:  Thank you.
24          MR. CHEELEY:  He is a sole proprietor, Your Honor.
25          THE COURT:  Well, if he has a company name, let's
```

1    just find out the company name.  All right?

2              MR. CHEELEY:  All right.

3              THE COURT:  Do counsel for the parties have any

4    further questions as a matter of follow-up for Ms. Pierson or

5    her client or Mr. Cheeley?

6              MR. CROSS:  Your Honor -- sorry, Your Honor.  This is

7    David Cross.  A couple of things.

8              One, unless I'm misremembering, my understanding is

9    that Ms. Latham had an iPad as well.  I think she shows up in

10   the elections office maybe on election night with an iPad.

11             So we were wondering if that still exists and if it

12   was searched.  And --

13             THE COURT:  Well, she said she watches movies on the

14   iPad.

15             So is that the same iPad, Ms. Latham, that you would

16   have shown up at earlier events with?

17             MS. LATHAM:  I don't remember an iPad.  I mean, I

18   only have one iPad.

19             MS. PIERSON:  Yes.  I think there was just a

20   misunderstanding, David.  I don't think you heard her say that

21   she has an iPad that she watches movies on.  But she did.  So

22   we would verify that there is nothing on that.

23             MR. CROSS:  Okay.  That search too.

24             And then my understanding is for Proton mail it has

25   its own cloud storage for documents.  I think it is called

1    Proton Drive or something similar in a dropbox.  I don't know

2    if she's ever used that.  But, again, just searching any kind

3    of cloud storage that may have been used as well.

4              THE COURT:  And did -- have there actually been

5    any -- Ms. Pierson or Mr. Cheeley, have you actually had any

6    formal communications with Proton software or with the -- what

7    is the other one?  This -- the other one referenced, Signal --

8    Signal?

9              MS. PIERSON:  Your Honor, she searched her Signal or

10   not she searched.  The IT person searched her Signal.  So they

11   were able to get into that.  And whatever is there is there.

12             I have not personally spoken to Proton mail.  I know

13   Ms. Latham before -- before all this came up was trying to get

14   back into her Proton mail, which our understanding is she used

15   for, you know, primarily a different campaign.  But I

16   understand if we can get into it we can do the same searches.

17             But I don't know the status of that, but I'm happy to

18   take the helm on that and reach out to them personally with

19   Cathy on the phone and see if we can't get that worked out.

20             THE COURT:  Okay.  Anything -- anything else from

21   other counsel?

22             MS. PIERSON:  Your Honor, this is Holly Pierson.  I

23   guess I would just say in wrapping up is:  One of the reasons

24   we object so strongly to having it imaged by anybody, including

25   our own IT person who is imaging anything, is that as you know

1   there has been lots of things leaked out in the public, not

2   just in this case but all over.  And I think that given the

3   sensitivity of information in her phone and all the other

4   things we said that I don't need to repeat it is exceedingly

5   dangerous for her to have her phone and computers imaged.

6           And, you know, as the Court noted, whether it is

7   inadvertent or intentional disclosure, once it is out there, it

8   is out there.  And we just can't see anything that would

9   justify that, which is why we haven't done it and why we so

10  strongly object to it being done.

11          And we do think as the Court has worked through this

12  there are alternative ways to get at the majority of any

13  information that would be even arguably relevant to the claims

14  and defenses here.

15          So I just wanted to make that clear.

16          MR. CROSS:  Your Honor, this is David Cross.  I think

17  the only thing worth noting is that there has been nothing

18  disclosed pursuant to the protective order in this case that

19  has been released beyond the bounds of the protective order by

20  any party to this case that I'm aware of.

21          THE COURT:  All right.  Mr. Cheeley, have you gotten

22  the name of the firm out yet?

23          MR. CHEELEY:  I sent it to Mr. Martin.

24          THE COURT:  All right.  I'm just looking right now.

25  Just a second.  Because let me just say there are a lot of

1   people with the name that you have sent -- the name itself of

2   doing many different things in the world.

3          All right.  Well, I'm going to need to know something

4   more about the firm before I make a decision about the

5   individual's consulting firm.  And -- but time really is of the

6   essence.

7          I understand why the plaintiffs want an independent

8   review of it.  But I think it is a more -- this is -- I'm not

9   sure if he can -- he or she or this vendor can turn things

10  around this fast, then -- and we start getting response, I

11  think it would be -- that is a positive good.

12         I'm not really comfortable yet with the process that

13  is being followed exactly.  But it might end up being helpful

14  to talk to the vendor and have at least me talk to the vendor.

15  I wouldn't exclude anyone else from -- counsel from being

16  there -- but I wouldn't do anything more.  I think that that is

17  about all that I would authorize -- and get a comfort level.

18         So I think that once I can get some more information

19  about the vendor and -- and whether it is possible to set up a

20  phone call, I would ask Mr. Cheeley to look into that.  I don't

21  know what anyone else's schedule is, but I have a hearing at

22  2:30.  But I could do it after that, or I could do it before

23  that.

24         And I would just simply ask one of you -- I know any

25  of the -- both the counsel for the State and counsel for the

 1    plaintiffs' counsel at least have an independent phone number

 2    we can use.

 3            MR. CROSS:  One idea that occurs to me -- and Bruce

 4    may shoot me for saying this.

 5            THE COURT:  I hope not.  That would be a crime.

 6            MR. CROSS:  One idea that might work is -- since it

 7    seems like the concern that Ms. Latham is the substance of what

 8    is on her devices in the cloud or wherever, one way maybe to

 9    get at that would be to have our vendor, who again has gotten

10    access to necessarily the ICC in Coffee County and other things

11    -- he is an individual who has shown that he is fully in

12    compliance with the protective order -- to work with this

13    vendor.  Assuming we get to a point where everyone is

14    comfortable that this vendor is appropriate, maybe the way to

15    do it would be to have our vendor just coordinate directly with

16    this person, sit alongside them, so that everyone is

17    comfortable sort of what is being searched, the way it is being

18    searched, all the necessary tools and techniques are being

19    utilized, but that he wouldn't get direct access to the data

20    itself.  And then they would work through again sort of what

21    the search parameters and protocol are to narrow down whatever

22    is pulled to figure out whether there is responsive stuff to

23    get produced.

24            I would have to talk to our vendor as well to figure

25    out to what extent that is doable.  But I will just float that

1     for folks to think about as maybe a way to bridge the gap.

2             THE COURT:  That sounds like a constructive

3     suggestion.

4             MS. PIERSON:  Your Honor, this is Holly Pierson.  I

5     mean, that certainly is more palatable than having my

6     client's -- her personal devices imaged.  And we certainly

7     don't object to, you know, reasonable parameters, reasonable

8     searches.

9             But we do stand -- I'm not going to go through it

10    because you have told me twice now not to, so I'm not going to.

11    But we do stand on our briefing about the scope and the

12    appropriateness here.

13            THE COURT:  All right.  Well, why don't we then -- I

14    think it is a reasonable proposition so -- so plaintiffs'

15    counsel should go ahead and talk with your expert.  And I don't

16    have to be on that call.

17            Why don't they -- why doesn't the two experts talk

18    with each other.  And counsel can be present on that phone

19    call.  I mean, it is more money.  But I mean, if you want to

20    be, you could be.  And try to make that happen today as soon as

21    possible.

22            And then just know that I'll be likely available

23    from -- from 4:00 onward.  And then if that could happen this

24    afternoon before then, then we could check in with each other.

25    And Morrison & Foerster could set up the phone call then.

```
1              MR. CROSS:  Yes, Your Honor.

2              THE COURT:  Give us -- send Mr. Martin a call --

3    everybody a call-in information of counsel.  Okay.

4              MR. CROSS:  Thank you, Your Honor.

5              THE COURT:  All right.  Well, let's hope that we can

6    get that done that way then.  Thank you.

7              MR. CROSS:  Thank you.

8              THE COURT:  All right.

9              MS. PIERSON:  Thank you, Judge.

10             THE COURT:  Take care.  We'll talk to you later this

11   afternoon.

12             MS. PIERSON:  Okay.  Bye-bye.

13             THE COURT:  All right.  We're adjourned then.

14                  **(The proceedings were thereby concluded at 1:49**

15                  **PM.)**

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


    I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of the United States District Court, for the Northern District of Georgia, Atlanta Division, do hereby certify that the foregoing 49 pages constitute a true transcript of proceedings had before the said Court, held in the City of Atlanta, Georgia, in the matter therein stated.

    In testimony whereof, I hereunto set my hand on this, the 28th day of September, 2022.




_____
SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT