The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

1     IN THE UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF GEORGIA
2        ATLANTA DIVISION

3

4 DONNA CURLING, ET AL.,     :
                :
5    PLAINTIFFS,     :
 vs.           : DOCKET NUMBER
6            : 1:17-CV-2989-AT
 BRAD RAFFENSPERGER, ET AL.,  :
7            :
    DEFENDANTS.     :
8

9

10   **TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS**

11    **BEFORE THE HONORABLE AMY TOTENBERG**

12    **UNITED STATES DISTRICT SENIOR JUDGE**

13      **SEPTEMBER 30, 2022**

14       **10:42 A.M.**

15

16

17

18

19

20

21 *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*

22     *TRANSCRIPT PRODUCED BY:*

23

 *OFFICIAL COURT REPORTER:*  *SHANNON R. WELCH, RMR, CRR*
24           *2394 UNITED STATES COURTHOUSE*
           *75 TED TURNER DRIVE, SOUTHWEST*
25           *ATLANTA, GEORGIA  30303*
           *(404) 215-1383*

**A P P E A R A N C E S   O F   C O U N S E L**

**FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY SCHOENBERG:**

    DAVID D. CROSS
    MORRISON & FOERSTER, LLP

    ADAM SPARKS
    KREVOLIN & HORST

**FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES, WILLIAM DIGGES, III, AND RICARDO DAVIS:**

    BRUCE P. BROWN
    BRUCE P. BROWN LAW

**FOR THE STATE OF GEORGIA DEFENDANTS:**

    VINCENT ROBERT RUSSO, JR.
    CAREY A. MILLER
    JAVIER PICO PRATS
    ALEXANDER DENTON
    ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

    BRYAN TYSON
    BRYAN JACOUTOT
    TAYLOR ENGLISH DUMA

| | **P R O C E E D I N G S** |
|---|---|
| 1 | |
| 2 | **(Atlanta, Fulton County, Georgia; September 30, 2022.)** |
| 3 | THE COURT:  Good morning.  This is -- I'm sorry.  We |
| 4 | must have had a miscommunication.  Because this morning when I |
| 5 | saw how much had been filed, I had written the office.  And |
| 6 | obviously my email must have fallen out of the system because I |
| 7 | really couldn't then begin until 10:45. |
| 8 | So I have not read everything.  And that is the best |
| 9 | I can do.  I have read some of what you-all submitted.  So that |
| 10 | is the best I can do under the circumstances.  You'll have to |
| 11 | repeat some things. |
| 12 | Mr. Martin, can you tell me who is present on the |
| 13 | phone call?  And this is Curling, et al. v. Raffensperger, Case |
| 14 | Number 17-CV-2989. |
| 15 | COURTROOM DEPUTY CLERK:  Yes, ma'am.  For the State |
| 16 | of Georgia, we have Mr. Tyson, Mr. Russo, Mr. Denton, |
| 17 | Mr. Jacoutot, and Mr. Pico Prats. |
| 18 | THE COURT:  Okay. |
| 19 | COURTROOM DEPUTY CLERK:  For the Curling plaintiffs, |
| 20 | we have Mr. Cross and Mr. Adam Sparks.  For the Coalition, |
| 21 | Mr. Brown. |
| 22 | Has anyone from Fulton County joined in? |
| 23 | It appears we don't have anyone from Fulton County. |
| 24 | THE COURT:  All right.  Well, I have read the |
| 25 | letters.  I have read one of the submissions, and that is it. |

1    So I'm sorry.

2            So tell me -- are you -- from what I can tell from

3    the correspondence, there are some issues about whether the --

4    about a privilege log and I don't know what else there is at

5    this point.

6            MR. CROSS:  Your Honor, this is David Cross for

7    Curling plaintiffs.

8            The -- I don't know if you had a chance to read the

9    email I sent in and --

10            THE COURT:  I did.  I read that.

11            MR. CROSS:  That is really sort of the gist of it.  I

12    think just to kind of net it out, our understanding is that

13    there are -- and let's take a step back.

14            It seems like there was just a different

15    understanding that the parties had in coming out of one of the

16    prior hearings back to June where I gather from the discussion

17    we had this week the State defendants came away with the

18    understanding that Your Honor was directing them that the only

19    thing that they had to either produce or log was this handful

20    of reports that they had discussed in one of those hearings.

21            That was not our understanding.  Our understanding

22    was that they had raised those specific documents as a handful

23    of documents they had identified.  Your Honor directed them to

24    either produce or log those, which they did.

25            But we have always been seeking the broader

1    collection of documents related to any investigation by the

2    State into any unauthorized access, obviously in particular in

3    Coffee County.  And we have never understood Your Honor to

4    resolve that.

5              And, in fact, our understanding was part of the

6    purpose of the briefing that you ordered in July on the

7    investigative privilege was to address that broader set of

8    documents that had to deal with that.  And our position remains

9    that they have not complied with the requirements of the

10   investigative privilege.

11             I'm happy to walk through those again.  I mean, the

12   short of it is in the *Navarro* case that we cite from the Middle

13   District of Georgia is directly on point where it was the same

14   thing.  The State came in, broadly asserted investigative

15   privilege over documents related to an ongoing criminal

16   investigation, and the court identified the specific

17   requirements.  None of those requirements are met here.

18   Literally not one, Your Honor.  Not one requirement is met.

19   And the court said that resolves it.  That is the end of it.

20             And so that is our position here, having failed to

21   meet those requirements.  And, again, I'm happy to talk through

22   them, if Your Honor needs to hear them.  They need to produce

23   any and all documents that relate to any investigation and to

24   unauthorized access.

25             The last point I'll make, Your Honor, just in

1   response to the filing that I saw this morning, the State seems

2   to be arguing that we don't need the documents because we have

3   a 30(b)(6) deposition coming up.  And I guess a couple of quick

4   thoughts on that.

5            One, the prior depositions had not been particularly

6   enlightening, as Your Honor found before.  Certainly we're

7   hoping the next deposition is more fruitful in terms of

8   learning information.

9            But the second is, Your Honor, depositions are not a

10  substitute for document discovery.  That is never the case.

11  And, in fact, the reason why document discovery typically

12  precedes depositions is because the documents themselves are

13  critical exhibits for the deposition testimony so that we can

14  come into that deposition, you know, already with some base

15  level information about the facts and to be able to use

16  documents to lay foundation for those as exhibits going into

17  the merits of the case at some point.

18           And so I think they are setting up a dichotomy that

19  has never been recognized by any court that I can think of as

20  document discovery testimony.  One precedes the other, and the

21  documents should be produced, again in particular in a

22  situation where you just have not gotten discovery from the

23  other side despite numerous 30(b)(6) depositions on this topic.

24                    **(Extraneous background noise)**

25           MR. CROSS:  -- information.  And to be clear, this is

1  not a criticism of the counsel on the other side.  The reality

2  is that the Secretary of State's office and the Secretary

3  himself have provided very different narratives on what they

4  learned and when.  And getting the documents as opposed to just

5  relying on the 30(b)(6) deponent is a critical part for us to

6  make sure we get the full set of facts on what happened or when

7  and what didn't happen.

8          And the last point is, you know, we deposed

9  Mr. Sinners, who is now the director of communications -- the

10  days just run together.  It was sometime this week in Atlanta.

11  And, you know, even he, who is the third most senior official

12  in the office, who reports directly to Mr. Sterling and who

13  then reports to the Secretary -- even he testified under oath

14  he does not know basic details about any investigation.  He

15  does not know even when the Secretary's office learned of the

16  allegations regarding Coffee County.

17          And, again, there have been, you know,

18  representations even recently according to the station the

19  Secretary did the interview with -- you know, the Secretary

20  himself first said they learned about it immediately after the

21  breach.  Then one of his aides jumped in and said no, no, it

22  was in May of 2021, which would be consistent with the email

23  from James Barnes to Chris Harvey that we talked about before.

24          And then later they were told by someone it sounds

25  like in the Secretary's office that no, we didn't learn about

1    it until July of this year.  But that is not consistent with at

2    least having learned about it in the deposition of Mr. Sterling

3    in February.  And there have been different representations on

4    when investigations were opening and what has happened with

5    them.  So --

6              THE COURT:  Let me just say:  One of the things is --

7    let me just stop you for a second.  This is something very

8    different at the moment.  So I'm just trying to switch gears.

9              I really -- reading everything -- sort of running

10   through reading all this, I'm not 100 percent sure.  Are you

11   asking for a formal invocation of the privilege?  Are you

12   asking for -- saying it is not proper here, or are you asking

13   for documents?  Are you asking for the full investigative file

14   even though as you have recognized before there was now at

15   least a criminal investigation proceeding as well?

16             That is what I'm -- and when we had our conversation,

17   I thought, in August, there seemed to be a recognition on your

18   part that the posture of the case had changed -- had changed

19   some because of the information that was provided via counsel

20   from the chair of the board.  And so I'm just -- I'm not clear

21   whether you are asking for a better log or you're looking for

22   the documents or what.

23             MR. CROSS:  I'm sorry, Your Honor.

24                   **(Unintelligible cross-talk)**

25             THE COURT:  All right.

```
 1              MR. CROSS:  Sorry.  My apologies.  Let me clarify
 2     that.
 3              So what we are seeking -- let me put it this way.
 4     What we understand is that there is now -- there is, in fact,
 5     now an ongoing investigation that was opened at the direction
 6     of the SEB, Judge Duffey in coordination with the Secretary's
 7     office, and the GBI sometime in August.  It sounds like that
 8     was maybe mid-August.
 9              We are not from my group -- I don't know if Bruce and
10     I have talked about it in this level of detail.  But my
11     understanding of where are is we are not seeking documents with
12     respect to that investigation.  That is an ongoing criminal
13     investigation.  We're not seeking anything with respect to that
14     investigation that would be properly covered by the
15     investigative privilege.  And certainly there would be some
16     documents that are.
17              But before -- going back before August, which is the
18     earliest indication we have that Judge Duffey as the head of
19     the SEB opened an investigation, which is a requirement for the
20     investigative privilege -- there is no evidence that meets any
21     of the elements of the investigative privilege going back
22     before that.
23              And so what we're saying is whatever documents exist
24     either with the SEB or with the Secretary of State's office
25     involving an investigation into unauthorized access for the
```

1  voting system in Coffee County or elsewhere -- the call with

2  Ben Cotton says he looked at this for Fulton County -- those

3  are the documents we want because there again has not been

4  evidence of an ongoing investigation or any investigation going

5  back before that time before the August time period and

6  certainly not anything that meets the rigid requirements of

7  privilege.

8          And on that, Your Honor, again it has to be asserted

9  by the head of the office.  And it also has to be asserted as

10 to each document.  And the head of the office has to testify

11 him or herself that they individually have reviewed each

12 document and identified the specific portions that fall within

13 that narrow scope that protects things like methods for the

14 investigative privilege.  And we don't have that at all.

15         Does that answer your question?

16         THE COURT:  Okay.  All right.  So I know we may be

17 retreading ground here.

18         But, Mr. Tyson, are you speaking on behalf of the

19 State, or is somebody else?

20         MR. TYSON:  Yes, Your Honor.  Bryan Tyson.  I will --

21 I'll start, and then if Mr. Russo has something to add he can.

22         THE COURT:  All right.  So just sort of -- just to

23 start with where we just ended up.

24         MR. TYSON:  Sure.

25         THE COURT:  You know, looking at *Navarro*, it doesn't

1   appear that I do have a formal invocation of the privilege in

2   front of me in a way that *Navarro* speaks about it.  Maybe you

3   think *Navarro* is not really controlling law.  But it does refer

4   to the binding Fifth Circuit case back to '69 binding now in

5   the Eleventh Circuit.  So talk to me about that.

6              MR. TYSON:  Yes, Your Honor.  So I'll begin here, and

7   Mr. Russo can jump in.

8              I think that from our perspective -- and I understand

9   this is probably where we have a difference of opinion with

10  plaintiffs -- the investigation that the Secretary's office

11  undertakes is undertaken by law enforcement officers on behalf

12  of the Secretary.  So we don't see the same distinction between

13  GBI and the Secretary's investigation that Mr. Cross is

14  explaining here.

15             So from the Secretary's perspective when the matter

16  was reopened, that is a matter that the Secretary's

17  investigators can bring to the SEB that can result in a

18  referral for a criminal prosecution carried out by POST

19  certified law enforcement officers.

20             So from our perspective, I don't see a distinction

21  between the GBI investigation and the Secretary's

22  investigation.  And our issue there is we have an active

23  criminal investigation happening.  We have the -- I mean, we

24  have submitted, I think, everything we have that is public on

25  that so far.  But anything further would be documents that are

1    part of a criminal investigation so -- or potential criminal

2    investigation, I guess I should say.

3           So if the request is go get whatever documents the

4    Secretary has, log those, and assert the privilege as to those,

5    I think that is a different conversation than, you know, we

6    want to have documents that are part of an active investigation

7    that is still underway by the Secretary, State Election Board,

8    and GBI.

9           THE COURT:  Well, obviously Mr. Cross needs to speak

10   for himself about that.  But as I understood it though, what he

11   in part was saying was that there was an -- to the extent there

12   was an investigation before this matter was referred to -- in

13   some ways referred for a criminal investigation that he

14   believes that it is -- it wouldn't be privileged but to the

15   extent it is privileged that you would have to properly invoke

16   the privilege.

17          Is that your position, Mr. Cross, or have I misstated

18   it?

19          MR. CROSS:  Yes, Your Honor.  You captured it well.

20          MR. TYSON:  So I guess that helps me -- this is Bryan

21   Tyson.  I guess that helps me understand kind of what is being

22   asked for at least.  I think we would still have a relevance

23   issue in terms of kind of scope here just because I'm a little

24   bit at a loss of we know an access happened of the Coffee

25   County equipment.  I'm unclear what other documents related to

1    the investigation into that access have to do with the

2    plaintiffs' claims.

3          So I mean, if they want to impeach us, I guess that

4    is what the idea is they want to show that there was no

5    investigation.  I guess I'm just a little bit at a loss to

6    understand kind of the relevance of all these additional

7    documents when we have established that there was unauthorized

8    access and I guess the point that is relevant for the

9    plaintiffs' claims here.

10         THE COURT:  Well, one thing I heard him say was that

11   they were asking for any other also investigations into -- that

12   were conducted as to access issues, whether it is Coffee County

13   or elsewhere.

14         Mr. Cross, was that your request?

15         MR. CROSS:  That is certainly part of it, Your Honor,

16   yeah.

17         THE COURT:  And, secondly, that they were asking for

18   if you weren't -- I think -- as I understand their position,

19   they think it is relevant if it was ignored for -- for some

20   period of time and was not properly attended to from their

21   perspective and that it only genuinely started an investigation

22   many months after the events that occurred and so that that

23   would be relevant as well from their perspective.

24         And I'll leave it to Mr. Cross to articulate why you

25   think that that is relevant, the lack of -- if there was

1    nothing that occurred in those months.

2           MR. CROSS:  Yes, Your Honor.  One of the key

3    defenses -- and, again, it may be the only really remaining

4    defense for the State -- in this case is when we point out the

5    vulnerabilities of the system that have been validated is to

6    say that, well, no one can get access to the system and if they

7    did they, of course, should be held accountable and that

8    accountability is what is supposed to enforce the protected

9    mechanisms that are in place.  Right?

10          The idea being we put walls in place.  No one can get

11   beyond those walls.  But in the unlikely event they ever did,

12   it would be criminally prosecuted.  They would be held

13   accountable.  And that exposure is what is meant to help sort

14   of enforce those laws.  Right?  The idea that no one is going

15   to try to breach the law because they would face severe

16   consequences if they did.

17          That has been a real focus of the defense in this

18   case since Dr. Halderman's July 2021 report.  And so this is

19   relevant to us because it refutes that defense in our mind to

20   show that, one, the laws are not what has been represented and,

21   two, when there has been, I think, a breach that I think we

22   would probably all agree that no one ever imagined would occur

23   to be now a year and a half later and no one has been held

24   accountable and there are open questions about what was

25   investigated and when that, we would submit, undermines this

1  notion that there is a strong disincentive for folks not to

2  breach whatever walls might be in place, which goes to the

3  security and reliability of the system.

4      And the other point I'll make, Your Honor, is the

5  other reason why these documents are relevant to us is there

6  may be additional details in there that we don't yet have.  As

7  Bryan points out, yes, we know there was an access.  But, for

8  example, in the Secretary's interview, as I mentioned in my

9  email, he indicated they learned at some point that Ms. Hampton

10 had shared her password to a third-party company.  We're not

11 sure what that is.  I hazard at a guess.  We have other

12 guesses.

13      He also mentioned the folks testifying before a grand

14 jury or at least one of them.  And so there is -- we suspect

15 there may be facts -- because, again, we're not looking for the

16 methods.  There may be factual information that the Secretary's

17 office has uncovered that has not yet been disclosed to us that

18 bears on the scope of the breach, how it happened, and the full

19 risk it presents.

20      MR. TYSON:  Your Honor, this is Bryan Tyson.

21      And I guess maybe I'm a little bit at a loss still

22 about why is a document needed if we're not looking for sources

23 and methods but we are looking for facts.

24      The discussion of the Secretary's interview -- I

25 think that can very easily be addressed in 30(b)(6) testimony

1    from -- that is going to be happening next week explaining what

2    is going on there.

3            Mr. Sinners explained some of the pieces of kind of

4    what happened with that in his deposition.  But I think that at

5    the end of the day, I'm not sure how we're going to distinguish

6    between, you know, sources and methods in terms of what

7    decisions the Secretary's office made about how they went about

8    investigating this versus, you know, not revealing kind of

9    those methods as we go along.

10           And I mean, maybe the answer is we log it and assert

11   it.  But we have a deposition coming up on Tuesday.  And so I'm

12   just trying to think through practically speaking if we log

13   every document and we say, hey, these are all documents that

14   show sources and methods and we show that there are documents

15   but we don't want to reveal kind of what they show because we

16   believe that would compromise the investigation, I think we're

17   kind of still back at the same point.

18           And I'm just trying to think logistically what do we

19   do with the deposition in a 30(b)(6).  I think that the

20   questions that Mr. Cross has raised can all be asked in the

21   course of the 30(b)(6).  And we have already said he is going

22   to be able to ask questions about, you know, when the

23   investigation began and kind of what was happening -- what the

24   initial things were happening, the factual things that he wants

25   to find out.

1          I just don't see why we need more than a 30(b)(6) to

2    get at those pieces if we truly don't need to -- if the goal

3    isn't to look at sources and methods while we're undergoing

4    this process.

5          THE COURT:  Okay.  Mr. Cross, what do you mean by

6    sources and methods?

7          MR. CROSS:  Well, it is a good question, Your Honor.

8    And I -- unfortunately I think it is a better question for the

9    State.  And it is why, I think, the *Navarro* and the

10   *Polypropylene* cases are on point.

11         The obligation is for the head of the department to

12   go through each individual document and determine for him or

13   herself what would be sensitive information like sources or

14   methods.  Right?

15         So it might be something like if you had an

16   undercover agent -- obviously you don't want that disclosed --

17   or if you have a technical method you are using to gather

18   information, you might have a bug in place, any variety of

19   sensitive methods.

20         It would not be however we sent an investigator down

21   and the investigator spoke with people.  That is not a

22   sensitive proprietary method.  And that is why it is incumbent

23   upon the head of the department to do that review individually.

24         And I would say, Your Honor, we have gone through

25   multiple rounds of briefs.  We have dealt with this for months.

1    In the *Navarro* case, the court resolved this by simply saying,

2    you had an opportunity to do what you needed to do.  You didn't

3    do it.  Produce all the documents.  And I think that is really

4    where we are.

5            But the other point on this, Your Honor, that is also

6    getting lost is the investigative privilege is about public

7    disclosure.  The courts are very clear on this.  We have a

8    protective order in this case.  There has never been throughout

9    the entirety of this case any leak of any information

10   designated confidential that I'm aware of.  And so there is no

11   reason to think that that protective order is not sufficient.

12           And so really the investigative privilege is the

13   wrong place for us to be at because no one is suggesting public

14   disclosure.  We're talking about disclosure only to counsel or

15   clients, depending on the nature of it, and experts that would

16   then get used in a deposition with the State's own 30(b)(6)

17   witness.

18           And so we are kind of in the wrong framework to even

19   be talking about this privilege because it is about public

20   disclosure, and that is not what we're asking for.  But at the

21   very least, the elements have not been met.

22           MR. TYSON:  Your Honor, this is Bryan Tyson.  On

23   sources and methods, I think this is where we get to the not

24   needing the document versus asking questions.

25           THE COURT:  I'm sorry.  I didn't hear the last part.

1    That is where we get to --

2          MR. TYSON:  I'm sorry.  Get to not needing documents

3    versus asking the questions in the deposition.  Because, for

4    example, one of the things we heard from the plaintiffs early

5    on was, well, nobody has interviewed anybody in Coffee County.

6    So therefore we know there is no investigation.

7          Well, the Secretary's investigator, then the

8    Secretary's office's selection of kind of what order they

9    proceed in with an investigation is in our mind a disclosure of

10   the particular methods they are using.

11         We have witnesses to -- at least potential witnesses

12   to what at least the scope and communications with other people

13   in Coffee County communicating with the plaintiffs in this

14   case -- the Coalition plaintiffs.

15         And so the Secretary's selection of the method of

16   investigation, I don't see how that is different than kind of

17   getting in a source and methods.  If Mr. Cross wants to ask in

18   the 30(b)(6) what steps has the Secretary's office taken to

19   investigate and what dates did those occur, I think those are

20   questions he can ask and that we can answer at a level that is

21   going to be enough information.

22         I'm not sure we can get much beyond that though

23   into -- without getting into particular methods by which the

24   Secretary's office and his investigators chose to investigate

25   the case and move this thing along.

```
 1            So as to other investigations too, I just wanted to
 2   make sure the Court was aware that Judge Duffey announced
 3   yesterday that the SEB has opened an investigation into
 4   contacts between SullivanStrickler and Spalding County.  That
 5   is a new investigation that is just beginning and a separate
 6   investigation of SullivanStrickler generally to look at other
 7   potential counties they may have had contact with.
 8            So this is an ongoing active process.  It is not like
 9   there is some sort of static universe that we're in right now.
10            THE COURT:  And were there any -- any other access
11   ones that there was -- that information also requested --
12   information as to any other investigations into access to the
13   election system?
14            MR. TYSON:  The equipment?  Yes, Your Honor.  Bryan
15   Tyson again.
16            I think that what we did before -- remember the
17   investigative summaries that we produced were related to --
18            THE COURT:  Right.
19            MR. TYSON:  -- anything that had to do with election
20   security.  I don't recall -- and Mr. -- I think Mr. Miller is
21   able to join us.  Mr. Miller and Mr. Russo may be able to
22   correct me.
23            But I don't recall any other investigations as to
24   equipment access of the nature of Coffee County.  There might
25   have been an investigation into, you know, somebody left a door
```

1   unlocked.  And we've had situations before where somebody had a

2   Poll Pad in a vehicle or something like that years ago.  It

3   wasn't a Poll Pad.  It was an old pollbook.

4         But I don't recall any others of the nature of an

5   allegation to access the equipment like in Coffee County with

6   the exception of the potential access in Spalding, which we

7   believe didn't occur.  But that is to what Judge Duffey

8   announced yesterday the SEB is investigating.

9         MR. MILLER:  Your Honor, this is Carey Miller.  I'm

10   sorry for joining late here.

11         THE COURT:  That's all right.  I did too.

12         MR. MILLER:  But the discovery seems to be the topic

13   de jure for me today.

14         But Mr. Tyson's description is accurate.  You know,

15   when we reviewed the investigative reports and summaries, we

16   took a pretty expansive view of relevance to try and capture

17   any similarly relevant documents.  So the plaintiffs have the

18   investigative summaries for all those matters that indicate

19   kind of in broader strokes what the topic is of a particular

20   investigation.

21         But Mr. Tyson is correct that the Coffee County

22   situation is certainly unique.

23         MR. CROSS:  Your Honor, this is David Cross.  Just a

24   couple of quick thoughts.

25         One, Mr. Tyson is saying that we can ask these

1   questions and get the answers in a 30(b)(6), including asking

2   what they did to investigate.  But that means that it is not

3   privileged.  So if we can get it in testimony, we also should

4   get it in documents.  But we should get the documents first for

5   the reason I already articulated.

6          And then, Your Honor, the idea that the order in

7   which they speak with witnesses, that that would be a

8   privileged source, there is no evidence for that.  Mr. Tyson is

9   saying it doesn't satisfy the requirements under *Navarro* or

10  *Polypropylene* -- that is a hard word for me -- in any of the

11  other cases that we have seen on the investigative privilege.

12  And they have had an opportunity to put that forward.

13         And I will say from a common sense standpoint that

14  just doesn't sound right.  And a key point is that everyone

15  involved has said that they were not investigated -- I'm

16  sorry -- that they were not interviewed.  And so it seems like

17  it is less an issue of the order and whether they did it and

18  when.

19         But there certainly is no factual predicate, I think,

20  for the Court to find that the order in which witnesses are

21  spoken with by the investigator or when -- that that is

22  privileged.

23         MR. TYSON:  Your Honor, this is Bryan Tyson.  Just to

24  clarify -- Mr. Cross may have misunderstood what I was saying.

25  What I'm saying is questions like, you know, what the State was

1   doing at a general level are not getting into sources and

2   methods and those kinds of things.

3          This -- the issue is -- so, for example, who did the

4   State speak with, I think, is a question you could ask.  How

5   did you determine that person was somebody you wanted to speak

6   with, that gets into your sources and methods.

7          So I think that from our perspective the documents

8   are going to show those types of details.  The Secretary's

9   office isn't revealing anything that is privileged by

10  explaining or answering those questions in a general level.

11         So that is, I think, an important distinction here

12  and why I think the deposition makes more sense than the

13  documents, especially given the timeline, you know, Friday

14  before a Tuesday deposition.

15         MR. CROSS:  Your Honor --

16         THE COURT:  Go ahead.

17         MR. CROSS:  Sorry, Your Honor.  I don't think

18  anybody -- I'm sorry.  Obviously you picked the people you went

19  about picking.  I think it is really just understanding what

20  they did.

21         But to the document point -- I think it is easy to

22  envision a concrete example.  Right?  When investigators

23  conduct interviews, in every experience I've ever had, they

24  take notes.  Those notes are going to be largely factual.  Now,

25  there may be some discrete aspect in there where an

1  investigator writes down, you know, here is my method -- my

2  sensitive method for how I'm doing something.

3          But the document itself is going to have factual

4  information.  They are going to come back, and they are going

5  to prepare reports on what they have done.  That is all fact

6  information that we are entitled to.

7          Again, it is -- I hate to keep harping on it.  But it

8  is why the courts have approached this issue in the way they

9  have.  It is a recognition that very little information is

10 going to be sensitive.  It is mostly going to be factual

11 information.  And that is why the head of the department is

12 supposed to come in and look at these documents and say, here

13 are specific portions in here.  Right?  I have looked at these

14 interview notes, and here are a couple of lines that I think

15 get into our methods.  And we don't want to disclose that.  But

16 here is the factual information.  And it hasn't been done.

17         And I -- Mr. Tyson is right.  We have a deposition on

18 Tuesday.  But they have had years in discovery to deal with

19 this, including several months with multiple rounds of briefs.

20         So at this point, I would just encourage the Court to

21 do what the court did in *Navarro* and let's get the documents.

22         THE COURT:  Well, I think there is another option

23 which is simply if the State can't do it by Tuesday to delay

24 the deposition -- to -- we have a lot of stuff going on here.

25 So the alternative is simply to -- they need to do a proper --

25

```
 1    I think they need to do the log as in -- and assert the
 2    privilege in the way set forth in the Middle District case.
 3            But, you know, I don't know what the -- what the
 4    challenges are.  I mean, I don't know whether some of the
 5    documents should be made available so that we're not -- we
 6    don't have endless disputes.
 7            But I -- but if Navarro's requirements can't be met
 8    by Tuesday, then you should find a different date and we're
 9    just going to extend it by then.
10            I don't know -- hopefully that is not so.  Because,
11    you know, didn't we all agree that I would be available to you
12    during the course of the deposition?  And I have a trial
13    starting -- a criminal trial starting on Wednesday.
14            But I don't -- you know, it could resolve.  It might
15    not.  And I would always make my -- could make myself available
16    at lunch or at a break.  But I'm not going to just simply say
17    that you get it because they failed to assert it properly.
18            Obviously these issues have been whirling for some
19    time.  But this is obviously also a very significant issue to
20    the State, but very significant to the plaintiffs.  And so I
21    can understand why you don't -- why the plaintiffs don't want
22    to go in there without having some of the documents or some
23    portion of the documents.  And I can also understand why --
24    that the State might need more time even if it has been raised
25    for some time.  But a lot has been going on, in all candor.
```

```
 1              MR. TYSON:  Your Honor, this is -- I'm sorry.

 2              THE COURT:  Go ahead.

 3              MR. TYSON:  I'm sorry, Your Honor.  This is Bryan

 4   Tyson.  I just had two -- I hear you loud and clear.  I just

 5   had two kind of practical questions concerning trying to figure

 6   out what to do here.

 7              First, in terms of the log we're talking about, is

 8   this a log specifically to the Coffee County breach

 9   investigation?  Is it a log of any election security file

10   investigation?  Does it include the Spalding investigation that

11   just got opened, which I don't expect there will be a lot?  I

12   just want to make sure we understand scope, Number 1, on that.

13              Number 2, on the scheduling issues, Mr. Sterling is

14   our 30(b)(6) deponent.  He is the current Deputy Secretary of

15   State --

16              THE COURT:  Right.

17              MR. TYSON:  -- with a lot of responsibilities related

18   to the election.  And just if we delay further into October,

19   we're getting into early voting, we're getting into the

20   election itself.  And I just get concerned about his ability to

21   be --

22              THE COURT:  Be available.

23              MR. TYSON:  Have the ability to do that.  To be

24   available, yes, Your Honor.

25              THE COURT:  Well, there may -- frankly, I mean, I
```

1   don't remember precisely all of documents -- the summaries that

2   you gave me on election access.  There wasn't -- it seems to me

3   most of them, as you said, were not relevant.  There might have

4   been one other that was a little bit relevant.  And I would

5   have to go back and look at it.  And I can do that this

6   afternoon.

7         But it seems to me that -- so that it shouldn't be,

8   in fact, so hard and Tuesday would be better.  But then it just

9   means -- today is Friday -- that you have got to get it -- that

10   as well as any documents or portions of documents that you're

11   preparing to issue to the plaintiffs by -- you know, by like

12   11:00 on Monday so they can have read them before -- before

13   Tuesday.  I mean, Tuesday works best but --

14         MR. CROSS:  Sorry, Your Honor.  This is David Cross.

15   I was just going to help clarify for Bryan.  It is not every

16   election security issue.  It is only documents where the State

17   defendants are asserting the investigative privilege with

18   respect to allegations of unauthorized access to the system.

19         The three that we are aware of is Coffee County,

20   Fulton County, and potentially Spalding County where there is

21   information that the SullivanStrickler team may have been

22   engaged to do a similar copying there.  Unclear whether that

23   happened.  But that would be the more narrow focus.  Documents

24   related to investigations into that type of allegation.

25         Does that help, Bryan?

```
 1            MR. TYSON:  This is Bryan.  It helps a little bit.

 2   But I guess that type of allegation is the problem I guess.

 3   Because in terms of like us going to these files -- and y'all

 4   have the summaries that kind of covered election security.  Our

 5   understanding, we were asserting privilege over the reports of

 6   investigation, if you'll recall, associated with those

 7   different investigations.

 8            So I mean, if we can say like it is Coffee, Fulton,

 9   and Spalding, like allegations of access into those three

10   counties, then I think that is something we can do.  If it is

11   anything that might be related to a possible access, well,

12   that -- I mean, I was thinking that could include a State

13   Election Board case involving someone who left the door

14   unlocked on an EMS -- where the EMS is stored.

15            I want to make sure that we're being responsive but

16   also that we're not -- I just want to know exactly what we're

17   supposed to be producing here because I'm struggling with what

18   responses that we're responding to to be able to assert a

19   privilege, if that makes sense.

20            MR. CROSS:  Yeah.  What if -- what if we try to make

21   it more concrete?  What if it was just limited to allegations

22   of unauthorized access to the voting equipment in Fulton,

23   Coffee, and Spalding?  And the idea would be unauthorized

24   access to the voting equipment, the software, the data.

25   Something more than just somebody left the door open.  Right?
```

1          The idea is there has been some allegation or reason

2     to believe that third-party actors who weren't allowed to have

3     access to the voting system or data -- they didn't have

4     authorization of the State -- may have come in and accessed the

5     equipment or the software or the data.

6          MR. TYSON:  Okay.  I think -- I think that works.  I

7     just -- I think that works and helps in scope.  I just don't

8     know, you know, from a timeline perspective if we can get that

9     done between, you know, noon on Friday and 11:00 on Monday as

10    far as production.

11         That gives me a scope I can work with.  So I

12    appreciate that.

13         MR. CROSS:  Okay.  We are certainly open to moving

14    the 30(b)(6) by, you know, a period of days, not weeks, in part

15    for the reason we point out.  Right?  We recognize there is an

16    election coming up.

17         So if you guys want to talk and you are willing to

18    figure out what timing works, then we could revisit the

19    deposition date.

20         MR. TYSON:  Okay.  I think we're going to have to

21    look for -- we're going to have to figure out kind of

22    logistically -- because I don't know that, for example, we're

23    going to have a file-file that is going to have like here are

24    100 documents.  That it may be here are 100 documents in a file

25    and there is a, you know, file folder in the investigator's

1  email.

2         We're just going to have to figure out how -- exactly

3  how that is stored to know what that is.  But I think we can

4  work through trying to figure out what that is in a reasonable

5  time frame with that scope.

6         And then as far as the deposition goes, I think that

7  is going to depend on the Judge's availability in a lot of

8  ways, in addition to Mr. Sterling.

9         MR. CROSS:  You know, one other -- I guess just to

10  throw an idea out -- always dangerous.  But one thing you guys

11  might think about, Bryan, is -- and I have done this in other

12  cases with similar privilege issues.

13         If the concern is sort of producing the documents,

14  getting them out the door, to expedite things we could talk on

15  our side on whether it would be feasible for us to send someone

16  to actually do what we call a quick peek where we could look --

17  like you said, for example, say it is an investigative file of

18  100 documents.  It may be that we could send someone to look

19  through those documents, identify what we think is relevant,

20  and then you would have an opportunity to say, well, we're

21  going to assert the privilege over that or we're going to

22  redact it.

23         Just an idea to think about that might -- you would

24  be preserving all your privilege rights.  We would shoulder at

25  least some of the initial review to maybe expedite things.

1   Just an idea.

2          MR. TYSON:  We'll have to talk to the Secretary's

3   office on that.  I don't know what their parameters are.  So

4   we'll check.  Yeah.

5          THE COURT:  Well, if anything materializes on my

6   criminal case, I'll let you know.  But I'm not totally hopeful.

7   So, you know, things can happen at the last moment.

8          And the only other suggestion I have for you about

9   that in terms of schedule is there is always the evening.  And

10  I mean, it is not pleasant but there is also -- there is always

11  doing it on a Saturday or something like that.

12         So all right.  Well, it seems like we have gone as

13  far as we can go.  And once counsel gets to talk -- defense

14  counsel gets to talk with the Secretary's office and among

15  yourselves about how much work this involves -- it may not be

16  that much work because I don't know how many documents there

17  are.

18         It may be you are just going to begin at noon rather

19  than at 9:00 and it will just go later in the day on Tuesday.

20  That is not a problem for me.  And if you need to shift your

21  times around, y'all discuss that a little bit.  You know, you

22  may be able to do it on Tuesday too.  Just start later and go

23  later.

24         But, anyway, you-all know how to do that.  You know

25  how to reach me.  And apologies for running a little bit late.

```
 1              Is there anything else we need to address?

 2              MR. CROSS:  No, Your Honor.

 3              MR. TYSON:  This is Bryan Tyson for the State.

 4              THE COURT:  Go ahead --

 5              MR. TYSON:  I'm sorry.  Go ahead.

 6              THE COURT:  -- Mr. Tyson.

 7              MR. TYSON:  I was just going to raise, Your Honor, I

 8    think we had referenced to in regards with Mr. Brown

 9    separately.  We're just trying to make sure we complete the CGG

10    supplemental production.  I think that was the only other thing

11    we had on our list.  We can raise that with Mr. Brown if we

12    need to.

13              THE COURT:  Okay.  Once you-all determine what the

14    schedule would be or how you are proceeding, would somebody let

15    me know?  Let us know.  Write Mr. Martin so that we can make

16    appropriate adjustments.

17              MR. TYSON:  Yes, Your Honor.

18              MR. CROSS:  Thank you, Your Honor.

19              THE COURT:  All right.

20              MR. BROWN:  Thank you, Your Honor.

21              THE COURT:  All right.  Bye-bye.

22              **(The proceedings were thereby concluded at**

23              **11:29 AM.)**

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3   UNITED STATES OF AMERICA

 4   NORTHERN DISTRICT OF GEORGIA

 5

 6        I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7   the United States District Court, for the Northern District of

 8   Georgia, Atlanta Division, do hereby certify that the foregoing

 9   32 pages constitute a true transcript of proceedings had before

10   the said Court, held in the City of Atlanta, Georgia, in the

11   matter therein stated.

12        In testimony whereof, I hereunto set my hand on this, the

13   30th day of September, 2022.

14

15

16

17                        _____
                          SHANNON R. WELCH, RMR, CRR
18                        OFFICIAL COURT REPORTER
                          UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT