[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

Nos. 20-13730 & 20-14067

_____

DONNA CURLING,
DONNA PRICE,
JEFFREY SCHOENBERG,
COALITION FOR GOOD GOVERNANCE,
a nonprofit corporation organized and existing
under Colorado law,
LAURA DIGGES, et al.,

                                        Plaintiffs-Appellees,

*versus*

BRAD RAFFENSPERGER,
in his official capacity as Secretary of State and
the Chair of the Georgia State Election Board,
REBECCA N. SULLIVAN,
in her official capacity as a Member

of the Georgia State Election Board,
DAVID J. WORLEY,
in his official capacity as a Member
of the Georgia State Election Board,
AHN LE,
in her official capacity as a Member
of the Georgia State Election Board,
MATTHEW MASHBURN,
in his official capacity as a Member
of the Georgia State Election Board, et al.,

                                        Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:17-cv-02989-AT

_____

Before GRANT, LUCK, and ANDERSON, Circuit Judges.

GRANT, Circuit Judge:

Though the most recent and well-publicized election challenges relate to the 2020 presidential election, those were not the first.  Here, we consider the fruit of an earlier set.  A voting advocacy group and some of its members doubted that their

favored candidate lost a 2017 congressional runoff, and challenged the election's outcome. The group was especially concerned about hacking risks and similar threats that it saw as inherent in Georgia's electronic voting system; that system, in turn, had been implemented by the State after the 2000 election revealed certain infirmities in paper balloting. Over time the State again replaced its voting system, but the plaintiffs' lawsuit expanded, eventually including a variety of new claims.

Two are at issue here. *First*, the plaintiffs say that Georgia should print hard-copy backup lists of voters only after early voting has completed—not sooner, as occurs under current state practice. That way, the argument goes, wait times will be shorter if the electronic check-in system fails; because the list will have more complete information on who has already voted, fewer provisional ballots or double-checks to confirm voter eligibility will be required. The district court agreed, and ordered the State to set a new date for printing and distributing backup voter lists. Perhaps on a blank slate this would be a reasonable idea. Or perhaps the State is right that the administrative burdens of the later print date outweigh the benefits. Either way, because the plaintiffs did not show that the State's current print-date policies severely burden the right to vote, deciding which policy to implement is not our call. As with other reasonable, nondiscriminatory voting rules, we consider not what the best policy would be, but whether the State's administrative concerns justify the one in place. Here, they do.

*Second*, the plaintiffs say that the State's ballot scanners should be set to recognize, or at least flag for review, even very slight marks—despite ballot instructions directing voters to fill in the ovals rather than check or cross through them—because some voters might not read the instructions.  Again, the district court agreed with the plaintiffs' contentions.  But this time, the court did not issue injunctive relief; it said that it would consider proposals after the parties had conferred.  Because the district court never issued the promised injunction, we have nothing to review, so we dismiss the State's appeal on that front.

## I.

In April 2017, after the representative from Georgia's Sixth Congressional District was appointed to serve as a cabinet secretary, the State held an out-of-cycle election to fill the seat.[1] The Coalition for Good Governance—a national voting advocacy organization—did not trust the results.  It organized several lawsuits targeting Georgia elections, including the one here: an action contending that the "precise outcome" of the runoff for the Sixth District seat was unknowable because the State's electronic voting system was vulnerable to hacking, perhaps even to a

---

[1] Certified election results reflect that Republican candidate Karen Handel won the June 2017 runoff election with 51.78% of the vote; her opponent, Democratic candidate (and now Senator) Jon Ossoff, received 48.22% of the vote.  *See June 20, 2017 Special Election Runoff: Official Results*, GA – Election Night Reporting (June 26, 2017, 5:37 PM), https://results.enr.clarityelections.com/GA/70059/Web02-state/#/.

Russian cyberattack.  For that reason the Coalition (along with several individual plaintiffs) asked for a declaration that the runoff election was void and for an injunction against the system's future use.  The replacement, they suggested, should be an all-paper balloting system—in their view, "the only safe method for conducting the election."

While the suit was pending, the State replaced its entirely electronic voting machines with new machines from a new vendor: "electronic ballot markers" that print out paper ballots "marked with the elector's choices in a format readable by the elector." O.C.G.A. § 21-2-300(a)(2).  The paper ballots are then "tabulated by using ballot scanners." *Id.*  In other words, the new machines allow voters to select their choices electronically, confirm those choices on a printed ballot, and then insert the ballot into a scanner for tabulation.

So Georgia had moved on from the voting machines that were the target of the original challenge.  No matter—the plaintiffs amended their complaint and moved to enjoin the use of the new election equipment instead.  The Coalition's top request remained that the State must return to a paper-only balloting system because of hacking risks.  During the litigation, though, the Coalition and some of its members expanded their targets beyond the original security-based challenges to the voting machines.  The Coalition added alternative requests for significant changes to the voting system, even if not the complete overhaul that an all-paper mandate would entail.  These included requiring the State to

disable any software that might collect identifying information, create a plan to resolve mismatches between electronic voter check-in lists and the voter registration database, change the print date for the hard-copy backup check-in lists used at polling places, increase the sensitivity of the scanners that tabulate ballots, and implement "meaningful pre-certification audits of election results."

The district court's reaction was mixed; it granted some but not all of the requested relief. Two of the court's decisions are relevant here: its rulings on print dates and scanner settings.

Shortly after the district court entered its partial relief, we stayed the district court's judgment pending appeal. Now we vacate the district court's preliminary injunction on the state's paper backup check-in list, as well as its related directives on provisional and emergency ballots, and we dismiss the appeal with respect to the scanner order.

## A.

The district court first ordered the State to change the date on which it prints and distributes backup lists for checking in voters on Election Day. The State's primary way to check in voters is with computer tablets containing lists of eligible voters in each precinct. These are also known as "PollPads." To create the PollPad check-in lists, the State transfers information from voter-registration applications—each voter's "name, address, date of birth, and district combination information"—into an electronic database. As early voting proceeds during the weeks before Election Day, the

database (and, by extension, the PollPads) are updated to reflect whether voters have requested absentee ballots, voted absentee, or voted early.

The Coalition offered evidence of a wide variety of problems with the PollPads in various precincts during various elections. *See, e.g.*, Doc. 755, at 104–05 (PollPad incorrectly indicated that a woman had already voted, requiring the poll manager to call the county office before allowing her to vote); *id.* at 146–47 (PollPads in one precinct would not validate voter access cards because the PollPads were plugged in incorrectly); Doc. 802 at 11–12 (poll workers needed to reset the Wi-Fi and Bluetooth connections of the PollPads to get them to sync with each other). Some of these issues were true glitches in the system. Others were user error.

In any event, Georgia has a process for dealing with PollPad malfunctions: state law requires each precinct to have a "paper backup list." Ga. Comp. R. & Regs. 183-1-12-.19(1). Counties may order their lists over a monthlong period spanning from the Friday after the voter-registration deadline to the week before the election.

The Secretary of State's office provides the list, divided by precinct, to each of Georgia's 159 counties, and each county then distributes the sub-lists to its precincts. The volume can be huge— a given precinct's list may fill several boxes.

Because the paper lists are sometimes printed before the close of early voting, and always printed before the absentee ballot deadline (Election Day), they are necessarily less up to date than the PollPads—by how much depends on the timing of a county's request.  The Coalition wanted to narrow that gap.  It asked the district court to issue a preliminary injunction that would require the hard-copy backup list to be an exact duplicate of the data in the PollPad, as updated at the close of early voting.

It also wanted any voters marked as eligible on the hard-copy list to be allowed to cast emergency ballots instead of provisional ballots.  Provisional ballots are used as a matter of course whenever poll workers cannot confirm a person's identity or eligibility to vote.  *See id.* §§ 21-2-417(b), 21-2-418(a).  In that situation, a voter can fill out a paper ballot and swear or affirm that she is eligible to vote.  *Id.* §§ 21-2-418(b), 21-2-419(a).  Officials then examine the ballot and any documentation of the voter's eligibility. *See id.* § 21-2-419(b).  If the local election board can determine that the voter is eligible, the vote is added to the tally.  *See id.* § 21-2-419(c).

Poll workers also use paper ballots when an "emergency situation" makes it "impossible or impracticable" to use the electronic ballot markers.  *Id.* §§ 21-2-281, 21-2-334; Ga. Comp. R. & Regs. 183-1-12-.11(2)(c).  "Emergency situation" is a broad category; it includes "power outages, malfunctions causing a sufficient number of electronic ballot markers to be unavailable for use, or waiting times longer than 30 minutes."  Ga. Comp. R. &

Regs. 183-1-12-.11(2)(d).  No matter the emergency, though, the backup plan is the same.  Poll workers issue paper ballots to anyone who they can verify is a registered voter of the precinct.  Ga. Comp. R. & Regs. 183-1-12-.11(2)(c).  Unlike provisional ballots, emergency ballots are counted right away because the voters who cast them are already known to be eligible.  *See id.*

With that background, we return to the claims in this case. The district court agreed with the Coalition that "using unreliable and unsecure" electronic PollPads "without an updated paper backup disenfranchises voters."  The court echoed the concern that PollPad malfunctions could cause long lines, which would lead some voters to leave their polling places without voting.  The court also worried that poll workers would direct voters to cast provisional ballots, and that those provisional ballots ultimately might not be counted.

The State argued that the Coalition's print-date proposal would cause administrative headaches and interfere with other necessary preparations during the days immediately preceding the election—but the court disagreed.  In its view, the State's interests would be furthered, not frustrated, by the new plan.  Concluding that the other requirements for a preliminary injunction had been met, the court ordered the Secretary of State to provide, on the Coalition's timeline, a hard copy of the check-in list for each polling place—ready for use as a backup if the PollPads malfunctioned.[2]

---

[2] That order was stayed by this Court pending appeal.

The court added that any voter who appeared on that hard-copy list must be allowed to vote with an emergency ballot instead of a provisional ballot, with a few extra steps for any voters who had requested an absentee ballot.

### B.

The court later announced that the State needed to change its scanner settings to be more sensitive when tabulating paper ballots. Instructions for those ballots (whether provisional, emergency, or absentee) direct voters to "blacken the Oval" next to their choice, and include a picture of an oval completely filled in. *See* O.C.G.A. § 21-2-480(b)(1). For whatever reason, some voters instead check or cross through the ovals, and the Coalition argued that those marks should also qualify as votes. It therefore asked the court to order the State to change the settings on its scanners so that "all perceptible votes" on hand-marked ballots would be counted or, at the very least, flagged for review.

The court acknowledged that the burden "to read and follow the instructions" to fill in the oval was "minimal." Even so, it found that some voters would instead check the ovals or draw an "X" through them, and that the "average voter" is "likely unaware" that the scanner might not count those selections. The court decided that because the settings imposed a burden that was "more than minimal but less than severe," it should "apply an intermediate level of scrutiny." Under that standard, the court said, the scanner settings failed; the burden on voters "outweighed" the State's interests in its existing settings.

But the district court was not ready to set the exact contours for relief. Rather than specify what actions the State needed to take to adjust its scanners, the court asked the Coalition to propose injunctive relief targeting the deficiencies identified in the court's order. The Coalition submitted its proposal promptly, but the district court never ruled on it—despite a follow-on motion from the Coalition asking the court to resume consideration of its proposed injunction. While a decision on that filing was still pending, the state defendants appealed both orders.

## II.

We review questions of subject matter jurisdiction de novo. *Holston Invs., Inc. B.V.I. v. LanLogistics Corp.*, 677 F.3d 1068, 1070 (11th Cir. 2012). We review a grant of a preliminary injunction for abuse of discretion, but review any underlying legal conclusions de novo. *Gonzalez v. Governor of Georgia*, 978 F.3d 1266, 1270 (11th Cir. 2020). A district court can grant a preliminary injunction only if the moving party establishes, among other things, that "it has a substantial likelihood of success on the merits." *Id.* at 1270–71. And a court abuses its discretion in granting a preliminary injunction if, in determining whether success is likely, it incorrectly or unreasonably applies the law. *See id.*

## III.

The state defendants begin by arguing that the Coalition and its members lack standing to challenge Georgia's voting systems. But as long as the Coalition or one of its members has standing to

sue for the injunctive relief sought below, we have jurisdiction over this case. *See Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1650–51 (2017). Here, the Coalition gives us reason to exercise our jurisdiction. We have recognized that voting advocacy organizations like the Coalition have standing to sue when a policy will force them "to divert personnel and time to educating volunteers and voters" and to resolving problems that the policy presents "on election day." *Florida State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1165–66 (11th Cir. 2008); *see also, e.g., Georgia Ass'n of Latino Elected Offs., Inc., v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022). Because the Coalition credibly made that assertion, the district court had jurisdiction to hear the Coalition's and its members' requests for injunctive relief.

## IV.

With standing confirmed, we consider the two orders appealed.

### A.

We start with the order about backup voter lists.[3] In that order, the district court set a new timeline for printing hard-copy

---

[3] The state defendants contend that they have immunity from a suit for this injunctive relief under a narrow exception to *Ex parte Young*, 209 U.S. 123 (1908), for suits that implicate "special sovereignty interests." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281, 287–88 (1997). We disagree—suits challenging election procedures are routine. *Curling v. Sec'y of State of*

voter lists; the state defendants ask us to reject that timeline.  The district court acted in response to the Coalition's claim that Georgia's print schedule for its hard-copy voter list severely burdens the right to vote; it says a more up-to-date list would allow for smoother proceedings on Election Day.  We evaluate that claim under what is known as the *Anderson-Burdick* test, weighing "the character and magnitude of the asserted injury" to voting rights "against the precise interests put forward by the State as justifications for the burden imposed by its rule."  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983) (internal quotation marks omitted)).[4]

---

*Georgia*, 761 F. App'x 927, 934 (11th Cir. 2019) (unpublished); *see, e.g., Black Voters Matter Fund v. Sec'y of State for Georgia*, 11 F.4th 1227, 1230 (11th Cir. 2021); *Greater Birmingham Ministries v. Sec'y of State for Alabama*, 992 F.3d 1299, 1304 (11th Cir. 2021); *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1280 (11th Cir. 2020).  So the State is not immune to suits seeking this relief; nor does this suit, as the state defendants suggest, present a political question beyond this Court's reach.

[4] Contrary to the Coalition's suggestion, the severity of the burden and the weight of the State's justification are reviewed de novo.  *See Cowen v. Georgia Sec'y of State*, 960 F.3d 1339, 1346 (11th Cir. 2020) (*Anderson* balancing is "not a pure question of fact"); *see also U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 966–67, 967 n.4 (2018) ("In the constitutional realm . . . we have often held that the role of appellate courts in marking out the limits of a standard through the process of case-by-case adjudication favors *de novo* review even when answering a mixed question primarily involves plunging into a factual record.") (alteration adopted and quotation omitted).

14            Opinion of the Court        20-13730, 20-14067

If we conclude that the State's policy imposes a severe burden on the right to vote, we subject the policy to strict scrutiny—meaning that the rule survives only if it is narrowly tailored to serve a compelling state interest. *New Georgia Project*, 976 F.3d at 1280. When the burden is more modest, though, so is the inquiry. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 452 (2008). So long as a policy is "reasonable and nondiscriminatory," the State's "important regulatory interests in conducting orderly elections" will generally be enough to justify it. *Grizzle v. Kemp*, 634 F.3d 1314, 1322 (11th Cir. 2011) (quotations omitted); *Indep. Party of Florida v. Sec'y, State of Florida*, 967 F.3d 1277, 1281 (11th Cir. 2020) (quotation omitted). That examination offers no license for "second-guessing and interfering with" state decisions; the Constitution charges States, not federal courts, with designing election rules. *New Georgia Project*, 976 F.3d at 1284.

The Coalition peppered the record with many examples of PollPad failure—but most are unrelated to the relief that the Coalition seeks. To be sure, these incidents show why a hard-copy backup list may be useful. But a hard-copy list is already required by law. *See* Ga. Comp. R. & Regs. 183-1-12-.19(1). The dispute, in other words, turns on whether the list is helpful enough when printed according to state policy. The Coalition says it is not; without complete early-voting information, the Coalition argues, the paper backup is not "useable" because too many names must be double-checked with the county office, which may lead to

longer lines.  The crucial issue in this case is whether there is evidence that the State's print date for the paper backup has caused a burden of any significance on the right to vote.

The Coalition also finds it troubling that more voters will need to cast provisional ballots if the paper backup lists do not contain the latest early voting information.  The problem with overuse of provisional ballots, the Coalition claims, is that they are not automatically tabulated.  *See* O.C.G.A. § 21-2-419(a)–(c). Instead (as Georgia law requires) local registrars will determine whether those voters were eligible to cast their ballots and, accordingly, whether their votes may be counted. *Id.* § 21-2-419(c). But whatever the merits of the Coalition's concern regarding provisional ballots, that concern hinges on the State's early print date for the hard-copy backup list.  In other words, the provisional ballot argument presents the same print date issue—whether the evidence shows that unnecessary use of provisional ballots has been caused by the State's print date for the paper backup.

The district court held that these burdens were severe because "disenfranchisement" would result if a delay deterred a person from voting, or if the state improperly declined to count a provisional ballot.  There is case law suggesting that any rule imposing order on the election process "will invariably impose some burden upon individual voters." *Burdick*, 504 U.S. at 433. Indeed, if federal courts were to flyspeck every election rule and apply strict scrutiny no matter how limited the burden on voters, our enforcement practices would bar States from carrying out their

constitutional responsibility to prescribe election rules. *See* U.S. Const. art. I, § 4, cl. 1; *New Georgia Project*, 976 F.3d at 1279–80, 1284. The case law suggests that the plaintiffs must show, at the very least, that the burdens imposed "represent a significant increase over the usual burdens of voting." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (plurality opinion); *see also id.* at 205 (Scalia, J., concurring in the judgment) ("Burdens are severe if they go beyond the merely inconvenient.").

The Coalition says that delays when the tablets malfunctioned "led to long lines and waiting periods of hours" that "caused voters to leave" (quotations omitted). No doubt—as we have said, the Coalition submitted serious evidence of long lines. But plaintiffs must show that the relief they seek has some relationship to the burden they identify. Though the record here is lengthy, it does not show that the lines were attributable to the fact that the State's paper backup list does not include updated information covering the last several days of early voting. Nor is it obvious that a better list would clear up the problem. In one cited example, the lines grew long because no one was even using the existing backup list and the precinct operated only one provisional voting station. In another, the poll manager at first refused to switch to a paper balloting system at all.

The evidence here does not show that delays or wait times at the polling places were related at all to the State's print date for the paper backup. It thus is not possible on this evidence to conclude that the State's print date has caused a burden on the right

to vote.  For the purposes of this case, we can assume that if
excessive wait times result in many voters leaving their polling
places before voting, and doing so with a likelihood that they will
not return to vote, that may well rise to the level of a severe
burden.  Here, however, we need not consider that issue; nor do
we need to decide the standard for determining when evidence
might rise to the level of a severe burden on the right to vote.
Indeed, as explained below, we need not even decide whether the
evidence offered by the Coalition (unrelated as it is to the State's
print date) rises to the level of a severe burden on the right to vote.

　　In its pollbook order, the district court ordered relief with
respect to the Coalition's challenge to the State's print date for the
paper backup for the pollbook.  That relief merely delays the print
date for the paper backup by a few days such that the paper backup
reflects voting activity through the end of early voting.  So the relief
ordered simply includes—as information available at each voting
place in the paper backup—a few more days of data concerning
early voting.

　　As noted above, the crucial issue before us is whether the
State's print date for the paper backup caused a burden of any
significance on the right to vote.  The problem for the Coalition in
this appeal is that their evidence of delays and wait times at voting
places—in other words, their evidence of burdens on voting—is
not related at all to the fact that the State's paper backup lacked
information about a few additional days of early voting.  At the
least, any delays that one might speculate could result from the

State's print date do not warrant the administrative difficulties that would be imposed on the State in having to organize and distribute updated information to the multiple precincts in 159 counties in the short time between the end of early voting and election day.

The same goes for the Coalition's argument that the hard-copy print date leads to an excessive number of provisional ballots. Here too the Coalition's evidence with respect to any burden on voting associated with the use of provisional ballots is wholly unrelated to the State's print date for the paper backup. That is, the evidence does not show unnecessary use of provisional ballots attributable to the State's print date.

The Coalition nonetheless insists that the burden identified here is the "disenfranchisement" that results when a provisional voter's ballot is not counted because she was ineligible to vote where she cast it. But the failure to permit an ineligible voter to cast a ballot is not disenfranchisement—it is election administration. It is a bridge too far to suggest that a federal court may force a state to allow voting in the wrong precinct. And in any event, the mix-up that concerns the Coalition would occur for only two reasons: a voter made a mistake and showed up at the incorrect precinct, or the precinct information given to the voter did not match the information on the elector list. Neither of these problems would be solved by a more updated backup list. The first is simply voter error, which cannot be attributed to the State and has nothing at all to do with the PollPads or paper backups. As for the second, the district court order itself says that the hard-copy list

matches the information in the PollPads.  So a later-printed list would reproduce the same precinct errors as the earlier-printed one; the only updates intended to be included in the new list relate to early voting and the return of absentee ballots.[5]

In short, the Coalition has not demonstrated a severe burden on the right to vote attributable to the State's print date for the paper backup.  The district court erred in treating that print date as such and abused its discretion when it reviewed the State's backup practices under strict scrutiny.  *See New Georgia Project*, 976 F.3d at 1281.

That means that we need only confirm that the State's policies are reasonable and nondiscriminatory, and that "relevant and legitimate state interests" justify the limitations the State imposes.  *Indep. Party of Florida*, 967 F.3d at 1281–82 (quotation omitted).  They are, and they do.

To start, the existing backup list is not discriminatory; it does not draw classifications between different voters, and no one even alleges that the timing of the list is motivated by any discriminatory intent.  *See Greater Birmingham Ministries v. Sec'y of State for Alabama*, 992 F.3d 1299, 1321 (11th Cir. 2021); *Jones v. Governor of Florida*, 975 F.3d 1016, 1029–30 (11th Cir. 2020).  The State has

---

[5] One more point.  In a separate order that the State does not appeal, the district court has already directed the State to develop and implement a plan that addresses errors in the electors list that make voters appear ineligible to vote in their precinct.

explained that its hard-copy print date is driven by administrative factors—the need to distribute a large number of lengthy lists while also managing other preparation tasks in advance of Election Day.

As for whether the State's printing policy is reasonable, the answer is yes.  Again, the existing paper backup list contains substantially the same information as the list in the PollPads—it is simply less current to account for the State's need to print and distribute it before the election starts.  The Coalition's challenge to these policies is, in essence, that the State could do better; its printed copy of the list could contain more up-to-date early-voting information.

Whether a later print date for the hard-copy list would be a better choice is not our call to make—that choice is one for elected officials.  More early-voting information would of course be helpful.  But the proposed alternative is resource-intensive.  It involves either printing or electronically distributing lists of electors for 159 counties, and doing so all on a single day.  In all, then, the State seeks to use its resources effectively—to give poll workers the information they need to check in voters if the PollPads malfunction while also managing its other election-administration responsibilities.  Those interests are enough to justify its choice of when to print the backup list, especially when the burdens identified flow (at best) indirectly from that decision.

Ultimately, the Coalition is asking the courts to redline the already reasonable voting policy the State has in place.  That is not our role.  The district court thus erred when it replaced those

policies with the "better" option offered by the plaintiffs: a mandate to use an electors list that is updated and printed on a somewhat later date.  We therefore vacate the preliminary injunction relating to hard-copy printing and provisional balloting.

## B.

We next consider the scanner order.  In that order, the district court held that the Coalition was entitled to a preliminary injunction that would force the State to recalibrate its scanner settings.  But because the parameters of the relief sought by the Coalition were "at once broader than what [was] called for to address the specific injury identified and on the other hand, insufficiently precise," the district court directed the Coalition to "submit a proposed injunctive relief order that delineates the specific measures or course of action they are seeking that the Court adopt to address this vote counting issue" (footnote omitted).  The district court recognized that the State, the Coalition, and the manufacturers of voting machines might need to confer about what software and setting changes could count "a fuller range of voter markings."

The state defendants ask us to review and reject the court's order, claiming that it qualifies as a preliminary injunction.  The Coalition disagrees.  We cannot review the order, it says, because even though the district court said that it granted a preliminary injunction, it never entered one.

22                    Opinion of the Court           20-13730, 20-14067

We generally can hear an appeal "only after final judgment." *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005); *see* 28 U.S.C. § 1291.   Injunctions, however, are an exception.   Congress—likely recognizing the "need to permit litigants to effectually challenge interlocutory orders of serious, perhaps irreparable, consequence"—allows immediate appeals for district court orders "granting, continuing, modifying, refusing or dissolving injunctions," including preliminary ones.   *Balt. Contractors v. Bodinger*, 348 U.S. 176, 180–81 (1955) (quotation omitted); 28 U.S.C. § 1292(a).   But merely saying that an injunction has been granted is not enough.   The order appealed must, at the very least, give a "clearly defined and understandable directive" to "act or to refrain from a particular action."   *Alabama*, 424 F.3d at 1128.

Here, that clear directive is missing.   Although the district court determined that the plaintiffs were entitled to injunctive relief and decided to "grant" it, the court never fixed its remedy. The court's order notes that the State had changed its scanner settings while the litigation was pending.   Those new settings were "an improved mechanism" in the court's view—but also an "incomplete remedy."   What remedy would be complete, though, it was unprepared to say.   It noted some possibilities—changing the adjudication software to better catch checked or crossed ovals, for example.   It recognized that the State's adoption of new scanner settings had already changed the inquiry, and that "any course of action that is not deliberate and properly researched" could create

"administrative confusion and serious vote mishaps."  So even though the district court held that "injunctive relief" was "warranted," it said that "there will not be an 'instant fix' of this issue."  Rather than enter relief, the court directed the Coalition to submit a proposed injunction.

The court's order set just one thing: a timeline for putting that future relief into effect.  It told the parties that "the expanded method(s)" beyond the new settings—whatever they might be— "must be in place no later than the next election cycle following the conclusion of the January 2021 runoffs."  With that timeline in place, the court said that it would "enter a further relief order upon receipt of Plaintiffs' proposed remedy . . . and Defendants' response."

The plaintiffs soon submitted their proposal.  But the January elections came and went with no further action from the district court—despite the Coalition's follow-up request that the court consider its submission.  Nor has the court entered any scanner relief since.  As for the order the court did issue, it carried no "clearly defined and understandable directive" for the defendants to follow, just a deadline for carrying out the as-yet undefined order.  *Id.*  We therefore conclude that the order entered no preliminary injunction.  And with no preliminary injunction, the state defendants have no room to appeal, at least for now.

24                    Opinion of the Court        20-13730, 20-14067

                          *       *       *

        It would be difficult to overstate the importance of the right
to vote.  But in our efforts to protect that right, federal courts must
resist the temptation to step into the role of elected representatives,
weighing the costs and benefits of various procedures when the
State has already done so in a reasonable and nondiscriminatory
way.  Because this suit invites us to do just that—and because the
district court accepted that invitation—we **VACATE** its
preliminary injunction on the State's paper backup check-in list, as
well as its related directives on provisional and emergency ballots.
We **DISMISS** the rest of the appeal.

# GEORGIA SECRETARY OF STATE BRIAN P. KEMP

SPECIAL ELECTION RUNOFF

## Official Results

## RESULTS

| U.S. Representative, District 6 | Click to see the Contest Details Map () | |
| --- | --- | --- |
| Counties/Precincts Reporting: **100 %** | | |
| KAREN HANDEL (REP) | 51.78% | 134,799 |
| JON OSSOFF (DEM) | 48.22% | 125,517 |



### Counties/Precincts Reporting

- 🟩 Completely Reported
- 🟨 Partially Reported
- ⬜ Not Reporting

100%

| COUNTIES COMPLETE | **3**/3 |
| --- | --- |
| PRECINCTS COMPLETE | **208**/208 |

### Voter Turnout

| TOTAL | 58.16% |
| --- | --- |
| Ballots Cast | 260,455 |
| Registered Voters | 447,826 |

Copyright 2015 - www.scytl.com

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

October 05, 2022

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number:  20-13730-AA   ; 20-14067 -AA
Case Style:  Donna Curling, et al v. Secretary of State, et al
District Court Docket No:  1:17-cv-02989-AT

Electronic Filing
All counsel must file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause. Although not required, non-incarcerated pro se parties are permitted to use the ECF system by registering for an account at www.pacer.gov. Information and training materials related to electronic filing are available on the Court's website. Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

Each party to bear their own costs.

Please use the most recent version of the Bill of Costs form available on the court's website at www.ca11.uscourts.gov.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call T. L. Searcy, AA at (404) 335-6180.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Jenifer L. Tubbs
Phone #: 404-335-6151

OPIN-1A Issuance of Opinion With Costs