2022 WL 4725887
Only the Westlaw citation is currently available.
United States District Court,
N.D. Georgia, Atlanta Division.

FAIR FIGHT ACTION, INC., et al., Plaintiffs,

v.

Brad RAFFENSPERGER, et al., Defendants.

CIVIL ACTION FILE No. 1:18-CV-5391-SCJ

|

Signed September 30, 2022

**OPINION AND MEMORANDUM OF DECISION**

STEVE C. JONES, UNITED STATES DISTRICT JUDGE

 **\*1**  This is a voting rights case that resulted in wins and
losses for all parties over the course of the litigation and
culminated in what is believed to have been the longest voting
rights bench trial in the history of the Northern District of
Georgia. "[B]earing in mind that these circumstances involve
'one of the most fundamental rights of ... citizens: the right
to vote,' " the Court now, in accordance with applicable law,
approaches this case with caution to render its Opinion and
Memorandum of Decision, inclusive of findings of fact and
conclusions of law. Ga. State Conf. of NAACP v. Fayette
Cty. Bd. of Comm'rs, 775 F.3d 1336, 1343 (11th Cir. 2015)
(citations omitted).

**TABLE OF CONTENTS**

I. FINDINGS OF FACT...——
A. Procedural History...——

B. The Named Parties...——

  1. Plaintiffs...——

  2. The Named Defendants...——

C. The Issues and Challenged Practices...——

  1. Training on Absentee Ballot Cancelations...——

  2. Exact Match...——

  3. The Secretary of State's Alleged Mismanagement of
Voter Rolls...——

  4. Plaintiffs expert witnesses...——

  5. Other Evidence Considered...——

II. CONCLUSIONS OF LAW...——
A. Jurisdictional Considerations...——

  1. Standing...——

  2. Political Question Doctrine...——

  3. Mootness...——

B. Count I: Fundamental Right to Vote Claim...——

  1. Legal Standard...——

  2. Issue: Absentee Ballot Cancelation Procedures...——

  3. Issue: The Secretary of State's Alleged Mismanagement
of the Voter Rolls...——

  4. Issue: Exact Match...——

C. Count II: Fifteenth Amendment...——

  1. Legal Standard...——

  2. Issue and Challenged Practices: Exact Match (MIDR and
Citizenship Match)...——

D. Count III: Equal Protection...——

  1. Legal Standard...——

  2. Racial Discrimination...——

  3. Geographic Discrimination...——

E. Count V: Section 2 of the Voting Rights Act...——

  1. Analysis of the Applicable Factors
and Guideposts...——

F. Remaining Affirmative Defenses...——

III. CONCLUSION...——

# I. FINDINGS OF FACT

Having considered the evidence at trial, the parties' presentations (pursuant to Federal Rule of Civil Procedure 52(c)), and closing arguments, this Court makes the following findings of fact. [1]

### A. Procedural History

A review of the record shows that on November 27, 2018, Fair Fight Action and Care in Action filed a Complaint in this Court for declaratory and injunctive relief in which they alleged "serious and unconstitutional flaws in Georgia's elections process." Doc. No. [1], ¶ 2. The Complaint has since been amended twice, first as a matter of right on February 19, 2019, and again with permission of the Court on December 3, 2020. See Doc. Nos. [41]; [570]; [582]. Four faith-based organizations—Sixth Episcopal District of the A.M.E. Church, Ebenezer Baptist Church, Baconton Missionary Baptist Church, and Virginia-Highland Church —subsequently joined the Amended Complaint as Plaintiffs. Doc. No. [41]. [2]

**\*2** In the operative Second Amended Complaint, Plaintiffs sue Secretary of State Brad Raffensperger in his official capacity. [3] Doc. No. [582]. Plaintiffs also sue the State Election Board ("SEB") itself and members of the SEB in their official capacities. Id. Plaintiffs allege violations of federal law related to: the fundamental right to vote secured by the First and Fourteenth Amendments to the United States Constitution (Count I); the ban on racial discrimination in voting secured by the Fifteenth Amendment (Count II); violation of equal protection secured by the Fourteenth Amendment (Count III); violation of procedural due process secured by the Fourteenth Amendment (Count IV); [4] and violation of Section 2 of the Voting Rights Act of 1965 (Count V). Id.

The Court has issued a number of substantive orders in this case. First, on May 30, 2019, the Court ruled on a Motion to Dismiss brought by Defendants. Doc. No. [68]. The Court granted the Motion to the extent it sought to dismiss the claims against the SEB premised on 42 U.S.C. § 1983 and on the Help America Vote Act (which Plaintiffs subsequently eliminated from the case with respect to all Defendants by the filing of the Second Amended Complaint). See Doc. Nos. [68], 84; [570]; [582]. The Court denied the Motion to the

extent it sought to dismiss the remaining counts against all Defendants or to dismiss the Voting Rights Act claim against the SEB. Doc. No. [68], 83–84. The Court found all elements of standing were satisfied. Id. at 22.

Second, on December 27, 2019, the Court issued its decision on Plaintiffs' Motion for Preliminary Injunction, which concerned Georgia's list maintenance process and the changing of the status of a large number of Georgia voters on the State's inactive voter list to canceled status. Doc. No. [188]. The motion initially concerned 120,561 voters; however, "[s]ubsequent to the filing of Plaintiffs' motion, the Secretary of State returned 22,000 of the 120,561 voters [at issue] to the voting roll (after review of Plaintiffs' briefing and based upon the definition of a calendar year)." Doc. No. [188], 2–3. The Court eventually denied Plaintiffs' motion on Eleventh Amendment and state sovereignty grounds. Id. at 32. At the conclusion of the order, the Court exercised its inherent authority to control the conduct of the parties and ordered Defendants to make additional diligent and reasonable efforts (through notices on the Secretary of State's website and press releases) to inform the general public of the voter list maintenance process and the need for the canceled voters to reregister to vote during the applicable registration time period. Id. at 188.

**\*3** Third, on February 16, 2021, the Court issued a decision on Defendants' Motion for Summary Judgment with respect to jurisdictional issues. Doc. No. [612]. The Court dismissed Plaintiffs' claims about changes in precincts and polling places on standing grounds, and it dismissed Plaintiffs' claims as they pertained to security of the voter registration database, dates of birth on absentee ballots, and failure to notify voters of absentee ballot rejections for mootness. Id. at 71–72. The standing dismissal was based largely on a recent opinion from the Eleventh Circuit, Jacobson v. Florida Secretary of State, 957 F.3d 1193 (11th Cir.), opinion vacated and superseded, 974 F.3d 1236 (11th Cir. 2020). The mootness dismissal was based upon the State of Georgia's significant change to its election laws in the form of HB 316 and HB 392 and cessation of the behavior on which Plaintiffs' claims were based. As stated in the Court's prior orders:

> During the 2019 Legislative Session, the Georgia General Assembly passed HB 316 and HB 392. HB 316, which was signed into law by the Governor on April 2, 2019, amends the Georgia Election Code to, among other things, provide for more notice under Georgia's voter-list-maintenance process; to provide that a voter registration is

not automatically rejected under the Exact Match policy; to provide for the implementation of new voting machines; to prohibit the superintendent of a county from changing a polling place less than thirty days before a general primary or general election; to authorize the Secretary of State to become a member of a nongovernmental entity whose purpose is to share and exchange information in order to improve the accuracy and efficiency of voter registration systems; and to change the way which provisional ballots and absentee ballots are counted

....

HB 392, which was signed into law by the Governor on April 29, 2019, requires the Secretary of State to promulgate a regulation establishing industry-based security standards and to annually certify that Georgia is substantially complying with its own security regulations.

Doc. No. [68], 23–24; see also Doc. No. [612], 58–64.

Fourth, the Court issued a decision on Defendants' Motion for Summary Judgment on the merits on March 31, 2021. Doc. No. [617]. The Court dismissed claims relating in general to provisional ballots, absentee ballot rejections, the untimely mailing of absentee ballots, and the "voter purge" process.[5] Id. at 24. The Court also dismissed Fifteenth Amendment claims and equal protection claims based on racial discrimination (other than those pertaining to Exact Match);[6] equal protection claims relating to disparities based on geography or residence (other than those pertaining to Exact Match and in-person absentee ballot cancelation); and a procedural due process claim relating to list maintenance. Id. at 94–95. The Court stayed its consideration of Plaintiffs' Voting Rights Act claim pending the United States Supreme Court's decision in Arizona Republican Party v. Democratic National Committee, —— U.S. ——, 141 S. Ct. 221, 207 L.Ed.2d 1165 (Mem.) (2020) (No. 19-1258). Doc. No. [617], 95.

**\*4** Finally, on November 15, 2021, the Court issued a decision on Defendants' Renewed Motion for Summary Judgment on Plaintiffs' Voting Rights Act claim following the Supreme Court's July 1, 2021, decision in Brnovich v. Democratic National Committee, —— U.S. ——, 141 S. Ct. 222, 207 L.Ed.2d 1165 (2020), which was consolidated with Arizona Republican Party. See 🔖 —— U.S. ——, 141 S. Ct. 2321, 210 L.Ed.2d 753 (2021). This Court denied

Defendants' Renewed Motion for Summary Judgment as to Plaintiffs' Voting Rights Act claim. See Doc. No. [636], 47.

After the summary judgment proceedings concluded, the Court entered a series of pretrial orders, and the Court's Amended-Final Consolidated Pretrial Order (Doc. No. [753]) governed the issues for trial. In Plaintiffs' Statement of the Case for purposes of the Pretrial Order, Plaintiffs described their remaining claims as follows:

Plaintiffs contend that Defendants the Georgia Secretary of State (SOS), the State Election Board (SEB) and the SEB members are denying and abridging Georgians' right to vote through: (1) the SOS's "Exact Match" policy and its application; (2) extensive mismanagement of the statewide voter registration list; and (3) non-uniform and improper practices regarding in-person cancellation of absentee ballots. These three policies and practices violate federal law, as follows:

- The Exact Match policy and its application: (a) violate the fundamental right to vote as guaranteed by the First and Fourteenth Amendments; (b) racially discriminate against Georgians of color in violation of the Fifteenth Amendment and the Equal Protection Clause of the Fourteenth Amendment; (c) discriminate against Georgians based on where they live and based on naturalized citizenship status in violation of the Equal Protection Clause of the Fourteenth Amendment; and (d) deny or abridge the right to vote in violation of the Voting Rights Act.

- Defendants' extensive mismanagement of the statewide voter registration list violates Georgians' fundamental right to vote in violation of the First and Fourteenth Amendments.[7]

- The non-uniform and improper practices regarding in-person cancellation of absentee ballots (a) violate Georgians' fundamental right to vote in violation of the First and Fourteenth Amendments; and (b) discriminate against Georgians based on where they live, in violation of the Equal Protection Clause of the Fourteenth Amendment.

Doc. No. [753-1], 1–2.

**\*5** In Defendants' Statement of the Case for purposes of the Pretrial Order, Defendants presented the following affirmative defenses: (1) failure to state a claim upon which

relief can be granted; (2) failure to name necessary and indispensable parties; (3) lack of standing; (4) mootness; (5) Eleventh Amendment bar; and (5) Political Question Doctrine. Doc. No. [753], 2–3.

After a delay in the start of trial due to the Omicron variant of COVID-19, trial began on April 11, 2022. Doc. Nos. [694]; [703]; [789]. Trial concluded on June 23, 2022.

Collectively, the parties presented over fifty witnesses, including Plaintiffs' expert witnesses, current and former employees of the Secretary of State's Office, and members of the SEB. Among the witnesses who testified at trial were Georgia voters whom this Court recognizes with gratitude. It is no small undertaking to sit for a deposition, to travel to a federal courthouse, or to swear an oath and testify in public before a federal court. The participation of these witnesses merits recognition, and the Court further finds that these voters provided credible testimony useful to this Court's consideration of the issues presented at trial.

At the close of Plaintiffs' case-in-chief on May 11, 2022, the Court heard Plaintiffs' remedies presentation, laying out the remedies sought and the basis for granting such relief. See Tr. 3181:20–3232:12 (remedies).

On May 12, 2022, the Court heard Defendants' argument for granting their oral motion for a Judgment on Partial Findings pursuant to Federal Rule of Civil Procedure 52(c). Tr. 3294. The Court also heard Plaintiffs' arguments for denying the Rule 52(c) motion. Tr. 3335. During Plaintiffs' presentation, Plaintiffs, through Counsel, specifically delineated the issues and challenged practices as follows:

| Issues | Challenged Practices |
| --- | --- |
| **Absentee Ballot Cancellations** | • Lack of proper training on absentee ballot cancellations |
| **Exact Match** | • Missing Identification Required ("MIDR") Match<br><br>• Citizenship Match |
| **The Secretary of State's Mismanagement of Voter Rolls** | • Removal of eligible voters in the felon match process<br><br>• Removal and changes to the information of eligible voters in the duplicate match process<br><br>• Removal of eligible voters in the "vitals" process |

Tr. 3335–3410.
On May 16, 2022, the Court ruled on Defendants' Rule 52(c) motion, "exercis[ing] its discretion to decline to render any judgment until the close of all of the evidence." See Doc. No. [839], 2.

On June 13, 2022, Defendants began their case-in-chief. Defendants presented six fact witnesses and no expert testimony. On June 21, 2022, Plaintiffs presented their rebuttal case, followed by the parties' closing arguments on June 23, 2022. Doc. Nos. [848-1]; [849]; [850]; [851]; [852]; [853].

**B. The Named Parties**

The Court will now set forth evidence presented at trial concerning the parties. [8]

### 1. Plaintiffs

#### a) Fair Fight Action, Inc.

Originally founded in 2014 under the name "Voter Access Institute," Fair Fight Action, Inc. ("Fair Fight") is a nonprofit advocacy group operating nationwide. Tr. 1383:22–1384:1, 1395:12–17 (Stewart-Reid). The heart of Fair Fight's activities are based in and focus on the State of Georgia. Tr. 1383:22–25 (Stewart-Reid).

Fair Fight offered three representative witnesses at trial: Lauren Groh-Wargo, Cianti Stewart-Reid, and Liza Conrad. Lauren Groh-Wargo served as Fair Fight's Executive Director from 2014 to November 2021. Tr. 3847:15–23 (Groh-Wargo). Cianti Stewart-Reid is the current Executive Director of Fair Fight. She has held this role since December 2021. Tr. 1383:20–21, 1384:4–6 (Stewart-Reid). Liza Conrad currently serves under Ms. Stewart-Reid as Deputy Executive Director for Fair Fight. Ms. Conrad was previously Fair Fight's Voter Protection Director and served in that role from April 2019 until she was elevated to Deputy Executive Director in February 2022. Tr. 1048:14–1049:8 (Conrad).

### b) Care in Action, Inc.

**\*6** Care in Action, Inc. ("Care in Action") is a nonprofit advocacy group that operates nationwide, with substantial focus on efforts in Georgia. Tr. 83:20–23 (Livoti).

Jessica Livoti testified on behalf of Plaintiff Care in Action at trial. Executive Director of Care in Action from August 2017 until January 2021, Ms. Livoti now serves as a Care in Action board member. Tr. 80:24–81:1 (Livoti).

### c) Baconton Missionary Baptist Church, Inc.

Baconton Missionary Baptist Church, Inc. ("Baconton") is a church located in Walthourville, Georgia in Liberty County. Tr. 2526:1–2 (Scott). The church is affiliated with the General Missionary Baptist Convention of Georgia and the Zion Missionary Baptist Association, the oldest African American Association in North America. Tr. 2526:1–8, 2531:13–17 (Scott). Founded in 1869 by newly freed slaves, Baconton's congregation is presently approximately 400 members strong. Tr. 2532:23–2533:10, 2545:24 (Scott).

Pastor Hermon Scott, who has served as the church's pastor since July 1997, testified on behalf of Baconton at trial. Tr. 2531:18–19 (Scott).

### d) Ebenezer Baptist Church of Atlanta, Georgia, Inc.

Ebenezer Baptist Church of Atlanta, Georgia, Inc. ("Ebenezer") is a historic church located in Atlanta, Georgia in Fulton County. PX. 2053, Tr. 87:17 (Warnock Dep.). [9]

At trial, United States Senator Reverend Raphael Warnock [10] testified via deposition, and Reverend John Vaughn testified in person for Ebenezer. Reverend Warnock has been Senior Pastor for Ebenezer since 2005. PX. 2053, Tr. 16:1–2 (Warnock Dep.). Reverend Vaughn is Ebenezer's Executive Pastor and has been with the church for two-and-a-half-years. Tr. 2941:12–16, 2941:21–22 (Vaughn). He describes his role within the church as akin to a chief operating officer, or "COO." Tr. 2941:18–20 (Vaughn).

### e) The Sixth Episcopal District, Inc.

The African Methodist Episcopal ("A.M.E.") Church was founded by a small group of African Americans in Philadelphia, Pennsylvania in 1816. Tr. 2978:24–25 (Jackson). Today, the A.M.E. Church has over two-and-a-half million members in thirty-three countries. Tr. 2978:9–2979:3 (Jackson). One of twenty A.M.E. Church districts globally, the Sixth Episcopal District, Inc. ("Sixth District") serves the State of Georgia, with its headquarters in Atlanta. Tr. 2972:22–24, 2974:12–13 (Jackson). The Sixth District includes more than 500 A.M.E. churches and more than 96,000 members statewide. Tr. 2974:7–13, 2980:19–20 (Jackson).

Bishop Reginald Jackson, who has served as the Sixth District's Bishop since 2016, testified on behalf of the Sixth District at trial. Tr. 2973:2–10 (Jackson).

### f) Virginia-Highland Church, Inc.

Founded in 1923, Virginia-Highland Church, Inc. ("Virginia-Highland") is a church located in the Virginia-Highland neighborhood of Atlanta, Georgia in Fulton County. DX. 731 at 2. [11] Originally part of the Southern Baptist Convention, Virginia-Highland has been associated with the United Church of Christ since 2002. Tr. 527:11–528:23 (Laney). Virginia-Highland has roughly 300 members in its congregation; twenty percent of the congregation are people of color, and forty percent are LGBTQIA. [12] Tr. 529:9–18 (Laney).

**\*7** Pastor Matt Laney testified on behalf of Virginia-Highland at trial. Pastor Laney has been the church's pastor since January 2018. Tr. 524:21–22, 525:18–20 (Laney).

### 2. The Named Defendants

#### a) The Secretary of State

During the years relevant to this lawsuit, Georgia had three Secretaries of State: Brian Kemp, who is currently Georgia's Governor; Secretary Brad Raffensperger; and Secretary Robin Crittenden, who served briefly between Secretary Kemp's resignation in November 2018 and Secretary Raffensperger's inauguration in January 2019. Tr. 3461:21–3462:2 (Harvey).

The Secretary of State is a constitutional officer elected by Georgia voters every four years. Ga. Const. Art. 5, Sec. 3, Par. 1. In addition to other duties and obligations, the General Assembly designated the Secretary as the State's "chief election official" under the Help America Vote Act of 2002 ("HAVA"). O.C.G.A. § 21-2-50.2(a); see also 52 U.S.C. § 20509 ("Each State shall designate a State officer or employee as the chief State election official to be responsible for the coordination of State responsibilities under this chapter."). Under Georgia law, the Secretary shall "maintain the official list of registered voters for this state and the list of inactive voters required by this chapter." O.C.G.A. § 21-2-50(a)(14). Georgia law also requires that the "Secretary of State shall exercise all the powers granted to the Secretary of State ... [t]o conduct training sessions at such places as the Secretary of State deems appropriate in each year, for the training of registrars and superintendents of elections." O.C.G.A § 21-2-50(a)(11).

As relevant to this case, the Secretary maintains two divisions that impact elections: the Elections Division and the Investigations Division. Tr. 3462:3–5, 3461:5–17, 3492:10–19 (Harvey).

The Elections Division had about sixteen employees during the relevant time of this lawsuit. Tr. 3462:3–5 (Harvey). It includes at least a training group, four to six county liaisons, [13] legal counsel, and an Elections Division Director. Tr. 3509:10–12 (Harvey); Tr. 826:2–20 (Hallman); PX. 2054, Tr. 11:8–18 (Rayburn Dep.).

Most investigators are certified by the Georgia Peace Officer Standards and Training Council ("P.O.S.T."). Tr. 3461:5–17 (Harvey). Two to four investigators would generally focus on

elections, and they would handle multiple cases at a time. Tr. 3492:10–19 (Harvey).

This Court heard testimony from the following former and current employees of the Secretary of State's Office concerning their employment, job duties, and policies and practices of the Secretary of State's Office: Chris Harvey, Gabriel Sterling, Ryan Germany, Kevin Rayburn, Melanie Frechette, and John Hallman.

Chris Harvey served as the deputy-inspector general/chief investigator for the Secretary of State's Office from 2007 until July 2015 and then as the Elections Division Director from July 2015 until his departure from the Secretary of State's Office in July 2021. He now serves as the Deputy Director at P.O.S.T. Tr. 3459:25–3460:6 (Harvey).

**\*8** Gabriel Sterling is the current chief operating officer for the Secretary of State's Office. Tr. 4177:10–15. He has a political science degree from the University of Georgia and has worked in Georgia elections, in both volunteer and paid capacities, in most election cycles since 1986. Tr. 4177:16–18, 4175:2–6 (Sterling).

Ryan Germany is the General Counsel for the Secretary of State's Office. Tr. 1517:7–9 (Germany). He has held that position since 2014. Tr. 1517:10–11 (Germany). As General Counsel, Mr. Germany works with every division of the Secretary of State's Office, including but not limited to the Elections Division, on legal issues. Tr. 1517:16–17 (Germany). He also spends time on the promulgation of rules and regulations for the SEB. Tr. 1522:1–3 (Germany).

Kevin Rayburn was the Deputy Elections Director and Deputy General Counsel at the Georgia Secretary of State's Office at the times relevant to this lawsuit. PX. 2054, Tr. 11:7–11:9 (Rayburn Dep.). He began working at the Georgia Secretary of State's Office in July of 2016. PX. 2054, Tr. 10:11–10:22 (Rayburn Dep.). Mr. Rayburn's job responsibility as Deputy Elections Director was to support the Director, Mr. Harvey, in managing the Elections Division. PX. 2054, Tr. 16:2–16:9 (Rayburn Dep.).

Melanie Frechette was employed with the Secretary of State's Office from February 2017 through February 2020 as a county liaison and then as the training administrator. Tr. 1216:7–23 (Frechette). In her role at the Secretary of State's Office, one of Ms. Frechette's responsibilities was to receive and respond to questions from county election officials, as well as to provide

guidance on certain aspects of election administration. Tr. 1220:6–13 (Frechette).

John Hallman was employed by the Secretary of State's Office from 2013 to 2020. Tr. 758:12–20 (Hallman). Mr. Hallman was the Election Systems Manager of the statewide voter registration system known as eNet from July 2016 to February 2020. Tr. 759:3–18 (Hallman).

#### b) The State Election Board

The Georgia General Assembly created the SEB in O.C.G.A. § 21-2-30(a). It consists of five members, including a representative of each of the two major political parties. O.C.G.A. § 21-2-30(c). [14]

The General Assembly imposed ten statutory duties on the SEB, which range from promulgating rules and regulations to making recommendations to the General Assembly. O.C.G.A. § 21-2-31; see also Tr. 4095:2–6 (Mashburn); PX. 2051, Tr. 11:7–15 (Kemp Dep.). Among the SEB's statutorily enumerated duties are the duties to (a) promulgate rules and regulations to obtain uniformity in county practices (O.C.G.A. § 21-2-31(1)), and (b) formulate, adopt, and promulgate rules and regulations conducive to the fair, legal, and orderly conduct of elections (O.C.G.A. § 21-2-31(2)).

Significant testimony was dedicated to the SEB's statutory duty to investigate and address violations of the Georgia Election Code. O.C.G.A. § 21–2‑31(5). When exercising this authority and obligation, the SEB would hear and decide cases of alleged violations of statutory law or regulations by individuals or counties. Id.; see also Tr. 3607:12–20 (Harvey).

**\*9** This Court heard testimony from three recent SEB members—Seth Harp, Rebecca Sullivan, and Anh Le—and one active SEB member, Matt Mashburn. All were attorneys. All had either some significant state government experience before being appointed to the SEB (Harp, Sullivan, Le, and Lindsey), or had practiced election law well before their appointment (Sullivan and Mashburn). Tr. 3975:11–3976:12, 3977:1–10, 3989:9–17 (Sullivan); Tr. 4075:16–4077:18 (Mashburn); Tr. 1765:19–1766:1–24 (Le).

#### C. The Issues and Challenged Practices

#### 1. Training on Absentee Ballot Cancelations

Plaintiffs contend that Defendants are responsible for adequate training of county election officials, that Defendants' training in absentee ballot cancelation procedures is inadequate, and that this deficiency has caused voters to be severely burdened when trying to vote in person after having requested absentee ballots. Plaintiffs assert that Defendants' failure to train on absentee ballot cancelation procedures violates the fundamental right to vote and generates a lack of adequate statewide standards in violation of the Equal Protection Clause of the Fourteenth Amendment.

Plaintiffs' claim here focuses mainly on absentee ballot procedures related to voters who want to cancel their absentee ballots so they can vote in person but do not have their absentee ballots with them at the polling place. This situation can arise, for example, when a voter has requested an absentee ballot but has not received the absentee ballot in time to cast it and have it counted.

Plaintiffs assert that Defendants' inadequate training of county election superintendents and registrars means county election personnel do not know the correct procedures for canceling absentee ballots, causing voters not to be able to vote at all or to be able to vote only after significant effort.

The process for canceling absentee ballots has changed during the pendency of this case. Prior to HB 316's passage in April 2019, Georgia law required, in pertinent part, that voters who had requested absentee ballots (but later went to the polls to vote in person and did not have their absentee ballots with them) to appear before the county registrar, deputy registrar, or absentee ballot clerk to cancel their absentee ballots. O.C.G.A. § 21-2-388(2) (2007), amended by 2019 Ga. Laws 24 (HB 316).

When HB 316 was passed, it changed the absentee ballot cancelation procedure by providing, in essence, that voters who want to vote in person but do not have their absentee ballots with them need not go to the main election office to cancel their absentee ballot. Rather, someone at the polling place can call the registrar's office and obtain approval to cancel voters' absentee ballots. See O.C.G.A. § 21-2-388 (effective Apr. 2, 2019).

### a) Training generally

At the outset, based on the testimony provided in this lawsuit and the relevant testimony of Defendants' fact witnesses and Plaintiffs' training expert (Mr. Kevin Kennedy), this Court finds that—as a matter of fact—the counties train poll workers and the State trains county election superintendents and registrars, including on the cancelation of absentee ballots. Tr. 3469:4–22 (Harvey); Tr. 2864:22–2865:4 (Kennedy). Former Elections Division Director Chris Harvey testified that this training structure is a "train the trainer" scenario. Tr. 1871:8–22 (Harvey).

More specifically, "all county and municipal election superintendents, chief registrars, and absentee ballot clerks or, in the case of a board of elections or a board of elections and registration, the designee of such board charged with the daily operations" are required to become certified in election administration within six months of their appointment. O.C.G.A. § 21-2-101(a); Tr. 1569:13–18, 24 (Germany). The Secretary of State's Office provides the certification training materials. Tr. 1865:19–1866:12 (Harvey). According to Mr. Harvey, the Secretary also has a policy of trying to make the election certification materials accurate. Tr. 3538:23–25 (Harvey).

 **\*10**  The Secretary of State's Office also makes a poll worker training manual online for counties to use. Tr. 3537:11–3538:7 (Harvey). According to Mr. Harvey, the Secretary has a policy of trying to make the poll worker manual accurate. Tr. 3538:15–17 (Harvey). However, that policy is not written down anywhere. Tr. 3538:18–19 (Harvey). Mr. Harvey did not know "to what extent" the counties use the poll worker manual and indicated that "it varies widely from county to county." Tr. 3538:8–14 (Harvey).

During either late 2018 or early 2019, the Secretary hired Melanie Frechette to become the training director. Tr. 3520:10–15. Ms. Frechette came to the Secretary of State's Office already familiar with Georgia elections and county implementation of elections; prior to joining the Secretary of State's Office, she served with the Gwinnett County election office for six to eight years and the Hall County election office for a year or more. Tr. 3523:15–22 (Harvey).

### b) Impact of the COVID-19 Pandemic on training

Training efforts in 2020, after the election law changes in HB 316, were significant both in terms of frequency and quantity of topics to discuss. For example, the training division began providing information and training on the State's new Dominion Ballot Marking Devices, which represented the first time that Georgia returned to using paper ballots in over 15 years. Tr. 4192:15–4193:6 (Sterling); Tr. 3520:20–3521:3 (Harvey). The COVID-19 pandemic also necessitated significant training efforts, as many of the efforts to address the virus's impact on elections were unprecedented. Tr. 4193:2–16 (Sterling); Tr. 3521:13–17 (Harvey).

Prior to the 2020 election, absentee ballot by mail was a method of voting in Georgia that "was not really growing." Tr. 3528:15 (Harvey). Instead, it seemed to peak around the 2008 election and "generally hovered around four or five percent of the votes." Tr. 3528:12–20 (Harvey); DX. 781.

One consequence of the COVID-19 pandemic was the dramatic increase in the use of absentee ballots during the 2020 elections. Tr. 3524:21–3525:13 (Harvey); DX. 781. This was caused, in part, by the Secretary's decision to mail every active Georgia voter an absentee ballot request form. Tr. 3529:1–29 (Harvey).

During the pandemic, and in addition to the webinars and other trainings that were taking place, communications between the Secretary of State's Office and county election officials increased significantly: there were "at least weekly" conference calls between the two parties, and the calls were frequently divided between counties in North Georgia, South Georgia, and metro Atlanta counties independently. Tr. 3649:10–23 (Harvey).

In the light of Secretary's decision to issue all active voters absentee ballot request forms, the Secretary of State's Office increased training on absentee cancelation procedures. Tr. 3530:10–3531:3, 3649:24–3650:1 (Harvey).

In 2020, Georgians were to have numerous elections: (1) a Presidential Preference Primary (slated for March); (2) a general primary of state elected officials, candidates for both seats to the United States Senate, and primaries for some congressional seats; (3) a general election; and (4) potential general runoff elections. Tr. 4190:12–13; Doc. Nos. [829-6], [829-7], [829-8].

The 2020 elections also marked the first time that the State's new Dominion Ballot Marking Device technology would be used across the state. Tr. 3652:7–8 (Harvey).

Because of the COVID-19 pandemic, the Secretary exercised his existing authority to postpone the presidential preference primary, then combine it with the general primary, and postponed both again to the latest possible time that would allow compliance with federal election laws. Tr. 4188:7–4190:9 (Sterling); Tr. 3647:13–17 (Harvey).

**\*11** One reason for the postponement was the real concern that there would be an insufficient number of poll workers available to work during the pandemic. Tr. 3647:13–17; 3651:2–7 (Harvey). At that time, the Secretary of State's Office began to understand that some county election offices were getting infected and could not administer the primary election. Tr. 3647:19–25 (Harvey).

Fulton County was hit particularly hard: one of their employees died of COVID relatively early; the registration director was out with COVID for some time; and the office had to be shut down for three to four days for disinfecting after further spread of the virus. Tr. 3648:6–16 (Harvey). Adding to these health concerns was the "push" of absentee ballot requests coming into Fulton County, which led to jammed servers and an inability to print and download applications and ballots. Tr. 3648:17–25 (Harvey).

In response to the pending poll worker shortage, the Secretary began to undertake efforts to recruit poll workers by reaching out to various groups like the ACLU, State Bar of Georgia, private businesses, and others. Tr. 3651:8–3650:3 (Harvey). The end result was "a lot" of new poll workers in the 2020 election. Tr. 3652:4–6 (Harvey).

The testimony further indicated that even the best trained superintendents can still make mistakes in the training of poll workers. Tr. 3511:6–15 (Harvey).

### c) Errors in Secretary of State training documents

The Secretary of State's Office did not update the election certification materials to reflect the change to the absentee ballot cancelation process after the passage of HB 316 in 2019. Tr. 2118:13–2119:11 (Harvey). Mr. Harvey acknowledged that these Secretary of State certification training materials are incorrect. Tr. 2103:22–

2105:20 (Harvey) (confirming these trainings included the pre-HB 316 version of the statute); see also Tr. 3700:20–3701:17 (Harvey) (describing the failure to update as a "mistake"). Defendants proffered no certification materials showing that they have been corrected.

The poll worker manual developed by the Secretary of State's Office also was not updated to show the changes in absentee ballot cancelation procedures for the 2019 and 2020 elections. Tr. 2131:9–28 (Harvey). The poll worker manual has since been updated (in May 2021) with the correct information. PX. 1315 at 55–56; Tr. 2131:9–21 (Harvey).

In addition, there was evidence of two training presentations that were available to county superintendents and registrars in which post-HB 316 absentee ballot cancellation information was referenced. See PX. 1076, PX. 1189, Tr. 2119:16–22, 2121:4–5.

### d) Plaintiffs' absentee ballot witnesses

Plaintiffs presented the following witnesses to testify about how absentee ballot issues burdened voters: Aria Aaron (PX. 2057 (Aaron Dep.)); Deborah Allen (Tr. 623–648); Patricia Andros (Tr. 2690–2709); Dayle Bennett (Tr. 2709–2724); Saundra Brundage (Tr. 1236–1253); Emily Huskey (Tr. 1141–1168); Aaron Karp (Tr. 601–622); Margaret Whatley (PX. 2050 (Whatley Dep.)). [15]

### e) Webster County

The June 2019 election in Webster County, Georgia was discussed by several witnesses and is relevant to Plaintiffs' absentee ballot claim. This local election was one of the first elections held after the change in the absentee ballot cancelation process by HB 316. Specifically, HB 316 became effective on April 2, 2019, and the Webster County election took place on or around June 20, 2019. PX. 1117.

**\*12** On June 20, 2019, a voter submitted a complaint to the Secretary of State's Office stating that she was denied the right to vote three times in Webster County. PX. 1117. The voter stated that she was told she had to return her absentee ballot before she would be allowed to vote in person. DX. 791 at 167; PX. 1117.

The Secretary of State's Office investigated the complaint, which revealed that the voter did attempt to vote on two separate occasions and that the voter was told both times that she needed to surrender her absentee ballot. DX. 791 at 167. The investigation further revealed that the Webster County Elections Supervisor and Deputy Registrar indicated that they were unaware of the proper procedure to cancel an absentee ballot at the time of the incident and believed a voter had to surrender the ballot. Id. at 167–168. They indicated that they were now aware of the proper procedure. Id. at 168.

The election at issue resulted in a tie. Id. A court challenge was filed and ended with a consent agreement to void the election results and hold a second election. Id. The investigation revealed that the second election was "due to the one ... voter that was erroneously turned away for not having her absentee ballot with her to surrender when she presented to vote at the polls." Id. at 168.

The case was presented to the SEB at a February 17, 2021 meeting. DX. 791. SEB member Matt Mashburn referred to a situation where a voter is wrongfully turned away as "the nightmare scenario" and made a motion to refer the case to the Attorney General's Office, which motion carried. Id. at 170.

The events in Webster County, while unfortunate, appear to be an anomaly, and the circumstances of the election also appear to have been unique. Tr. 3553:6–9 (Harvey).

### 2. Exact Match

Plaintiffs challenge two policies under the umbrella of "Exact Match." Both policies relate to how the Secretary of State handles voter registration applications. In short, both policies match certain information from voter registration applications against either the Georgia Department of Driver Services ("DDS") or Social Security Administration ("SSA") databases. The policies differ on the particular information being matched.

The first policy Plaintiffs challenge relates to the matching of certain identification information provided on voter registration applications. If this information on the voter registration application does not exactly match, character by character, to the information in the DDS or SSA databases, the voter registration applicant is given "Missing ID Required" ("MIDR") status. Plaintiffs refer to this policy as "**Exact Match MIDR**."

Plaintiffs' second policy challenge relates to the matching of the voter registration applicant's citizenship information. Under this policy, voter registration applicants who provide a Georgia driver's license number or state identification card number on their voter registration applications will have their citizenship status matched against the DDS database. Plaintiffs refer to this policy as "**Exact Match Citizenship**."

### a) Exact Match MIDR

#### (1) MIDR history, process, and purpose

DDS currently has a Memorandum of Understanding ("MOU") with the Secretary of State's Office dated March 27, 2007, regarding the transmission of "voter registration data between the parties for verification pursuant to the provisions of HAVA." PX. 1751; see also Tr. 1189:1–23, 1190:21–22 (McClendon); Tr. 497:12–17 (Mayer). The matching process considers information in both the DDS database and the federal SSA database. Tr. 3576:24–3577:8 (Harvey).

**\*13** The purpose of the MOU is to "enable[ ] the Secretary of State and DDS to transmit voter registration data between the parties for verification pursuant to the provisions of HAVA." Tr. 1189:18–20; see also PX. 1751. The process for verification generally proceeds as follows.

First, the Secretary of State sends a new registering voter's information to DDS for verification. Tr. 1191:22–24 (McClendon). Pursuant to the MOU, the Secretary of State transmits voter registration information to DDS for verification on a daily basis. Tr. 1190:23–1191:7 (McClendon); see also PX. 1751.

Second, DDS takes the new registering voter's information and determines whether the record can be checked against DDS information or if it needs to go to the SSA. If the record has a driver's license or state ID number, it will be checked against DDS records. If a record does not have a driver's license number, it will be sent to the SSA for validation, with whom DDS has an agreement to verify information as required by HAVA. Tr. 1194:20–1196:18 (McClendon).

If a record has certain uncurable defects, such as an invalid date of birth or non-numeric characters in the last four digits of the applicant's social security number, DDS will stop the verification process, flag, and return the application

to the Secretary of State's Office. Tr. 1196:19–1197:15 (McClendon); PX. 1753.

Third, for records that it can process for verification, DDS checks the following criteria in the record against the information it has on file to determine if it is a match:

    a. Driver's license number, first twenty characters of the last name, first initial, and date of birth (if no social security number is provided); or

    b. Driver's license number, first twenty characters of the last name, first initial, date of birth, and last four digits of the social security number (if provided); or

    c. First twenty characters of the last name, first initial, and date of birth (if no social security number is provided and license number is not found); or

    d. First twenty characters of the last name, first initial, date of birth, and last four digits of the social security number (if last four digits of social security number are provided and license number is not found).

PX. 1753 at 1; see also Tr. 1197:16–1199:18 (McClendon).

A prior version of the verification process involved comparing the first twenty characters of the first name. PX. 1752; see also Tr. 1201:9–25 (McClendon). The change was made sometime after 2017. Tr. 1202:1–4 (McClendon).

For records verified by the SSA, the SSA automatically returns to DDS the exact information provided to them. PX. 1753 at 2; see also Tr. 1200:20–8 (McClendon). These responses can include any of the following: invalid input data; multiple matches – all deceased; multiple matches – all alive; multiple matches – at least one alive and one deceased; single match – alive; single match – deceased; no match found; or system error. PX. 1753 at 2.

Fourth, and finally, after it has performed the verification process, DDS transmits the voter information back to the Secretary of State with a determination of whether the information was verified or not and, if not, the reasons therefor. Tr. 1191:11–21, 1199:19–1200:7 (McClendon); Tr. 3574:4–19 (Harvey); see also PX. 1751. DDS takes no further action regarding a voter's registration information after it returns the verification to the Secretary. Tr. 1192:7–9 (McClendon). [16]

**\*14** If the information processed by DDS does not come back as a match, e.g., Jonathan William Smith registers to vote as Billy Smith, a name that he goes by, the eNet system will flag the person in what is called Active-MIDR (missing identification requirement) status. Id.; see also Tr. 3577:18–20 (defining MIDR) (Harvey). The matching is fully automated and binary: a voter is either flagged or not based on whether the information returns and is verified. Tr. 1950:12–1951:14 (Harvey); see also PX. 2054, Tr. 156:2–156:24 (Rayburn Dep.).

Persons flagged as Active-MIDR status are deemed to be registered voters in Georgia. Tr. 3581:4–8 (Harvey); see O.C.G.A. § 21-2-220.1. Regardless of the flag, these voters can vote in person so long as they present a form of acceptable identification. Tr. 3574:20–22 (Harvey); Tr. 399:12–20, 505:16–21 (Mayer). They can vote absentee by mail only by providing some form of required identification; the absentee ballot will otherwise be treated as a provisional ballot and can be cured within the three-day period by, again, providing the required identification. Tr. 3575:2–4, 9–14 (Harvey).

When persons in Active-MIDR status vote for the first time, they can use more types of information—including a copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of such elector—to prove their identity than are permitted under the photo identification requirement of registered voters who are not in the MIDR status. Compare O.C.G.A. § 21-2-417(c) with O.C.G.A. § 21-2-417(a); see also Tr. 1614:20–22; 4137:23–24, 4141:11–17 (Germany). These forms of identification are referred to as HAVA ID, which is broader than the photo ID requirement for voters who previously have voted. Tr. 4137:3–10, 4141:21–25, 4142:1–7 (Germany).

Plaintiffs' expert, Dr. Mayer, concurred with this understanding, stating that "[a] registrant who's been flagged as MIDR is required to clear that flag before they are given a ballot, and they could clear that flag by showing a form of I.D. that is otherwise required by Georgia's voter I.D. law, but it's also possible for certain registrants, particularly first-time registrants, to clear that flag with a different set of identification documents." Tr. 399:14–20 (Mayer).

One purpose of MIDR is to prevent the same person from registering various aliases and proving that the registering

voter is an actual person. Tr. 3604:11–19, 3606:14–24 (Harvey). A similar purpose of the match policy is to filter out false registrations. Tr. 3605:20–3606:8 (Harvey).

Importantly, an MIDR flagging also signals to the poll worker that this voter is permitted to use HAVA ID to vote. Tr. 4141:7–25, 4142:1–11, 4145:8–18, Tr. 4146:7–12 (Germany). Mr. Germany provided uncontested testimony that this notice is necessary for compliance with HAVA; without it, poll workers would be unable to identify which voters were allowed to alternatively provide a HAVA ID, as opposed to one of the photo IDs usually required by Georgia law, to vote. Tr. 4146:4–12 (Germany). In other words, another purpose of the Active-MIDR status is to ensure that those first-time voters eligible under federal law to provide HAVA ID can do so. Tr. 4145:15–18 (Germany). [17]

**\*15** If the voter does not have any of those forms of identification, they are permitted to cast a provisional ballot. O.C.G.A. § 21-2-417(c); Tr. 3578:5–10, 3604:20–3605:18 (Harvey); Tr. 4145:19–25 (Germany).

Other than being eligible to provide the aforementioned additional forms of identification—HAVA ID—when voting for the first time, there are no practical differences between a registered voter in Active-MIDR status and one that is not. Tr. 4146:13–17 (Germany).

Persons on Active-MIDR status may also vote by absentee ballot once they have provided one of the broader forms of identification to a county election office; if the voter has yet to provide the identification, the absentee ballot will be treated as provisional and can be cured within the three-day period by, again, providing the required identification. Tr. 3575:2–4, 9–14 (Harvey); Tr. 4145:19–25 (Germany).

Persons who are flagged in Active-MIDR status receive a letter from their county election office notifying them of the kinds of identification they will need to vote. Tr. 399:21–24 (Mayer); see also PX. 1900.

The letter sent to voters in Active-MIDR status informs them that they need to provide one of two forms of identification: (1) a photo ID that complies with Georgia's photo ID law (such as a driver's license) or (2) one of the alternative identification forms permitted under HAVA. PX. 1900; see also Tr. 401:22–402:5 (Mayer).

The Secretary of State's Deputy Elections Director and Deputy General Counsel explained that the requirement to provide ID would also apply to voters in MIDR status requesting an absentee ballot. Such voters would be sent a provisional absentee ballot with instructions to show ID before their vote will be counted. PX. 2054, Tr. 197:10–197:16 (Rayburn Dep.).

The placement of an individual in Active-MIDR represents a change in this process due to HB 316. Tr. 3576:24–3577:17 (Harvey); see also O.C.G.A. §§ 21-2-220.1(b), 21-2-216(g)(7); Tr. 3576:18–24 (Harvey) (reviewing DX. 42 (O.C.G.A. § 21-2-220.1)); Tr. 3580:8–23 (Harvey) (reviewing DX. 46 (O.C.G.A. § 21-2-216)). Prior to the enactment of HB 316, someone who failed the matching process would be identified as "pending registration" and not on the active list of voters. Tr. 3576:24–3577:17, 3603:14–15 (Harvey); PX. 2054, Tr. 196:16–196:22 (Rayburn Dep.). Consequently, the voter would not receive a precinct card (Tr. 3577:13–17 (Harvey)), and their time to take action to remain on the active voter list was shorter than for persons who were deemed active voters. See, e.g., O.C.G.A. § 21-2-235. Persons in pending status may have "a slight delay" to vote because the poll worker may need to call the poll manager over for "some entry to update" the voter's status. Tr. 3577:21–3578:4 (Harvey).

### (2) The Impact of MIDR

Prior to the passage of HB 316, the Secretary of State's Office conducted a demographic study and concluded that 70% of those in pending status were African American. Tr. 3601:14–3602:2 (Harvey). Plaintiffs' expert evidence showed that 60,477 registrants were in MIDR status as of January 2020. PX. 1278 at 16, 18; Tr. 508:4–5 (Mayer). Of those, 69.4% were African American; 11.4% were white non-Hispanic; 5.7% were Hispanic; 3.3% were Asian or Pacific Islander; 3.4% were other or two or more demographic categories; and 7% were unknown. PX. 1278 at 18. This translates to 2.03% of registered African American voters in Georgia; 0.19% white non-Hispanic; 1.50% Hispanic; 1.19% Asian or Pacific Islander; and 1.71% other or two or more demographic categories. Id. at 19.

**b) Exact Match Citizenship**

*(1) The citizenship verification process and purpose* [18]

**\*16** In Georgia, only United States citizens are eligible to vote. 🔖 O.C.G.A. § 21-2-216(a)(2); see also Tr. 3581:1–3 (Harvey). The Election Code requires the Secretary of State to "establish procedures to match an applicant's voter registration information to the information contained in the data base maintained by [DDS] for the verification of the accuracy of the information provided on the application for voter registration, including whether the applicant has provided satisfactory evidence of United States citizenship."

🔖 O.C.G.A. § 21-2-216(g)(7); see also Ga. Comp. R. & Regs. 590-8-1-.02.

All voters must demonstrate citizenship at the time of registration, and the SEB has promulgated a rule establishing the types of acceptable proof for voter registration purposes. Tr. 3585:12–21 (Harvey) (considering DX. 777 (Ga. Comp. R. & Regs. 183-1-6-.06)).

In Georgia, when a voter registers using a driver's license or an ID card number, they go through a citizenship verification process. Tr. 359:8–14 (Mayer). The data used for the verification process is that which is on file with DDS. Tr. 359:19–23 (Mayer). [19]

If during the citizenship verification process, a match does not occur with the voter's DDS file, they are flagged as needing to provide evidence of citizenship and are placed in pending status. Tr. 364:5–25 (Mayer), Tr. 3582:12–16 (Harvey).

To this end, voters in pending status are then sent a letter by a local election official by U.S. mail. Tr. 364:20–25 (Mayer). The letter indicates that a registrant placed in pending status may provide confirmation of their citizenship at the polls or while requesting an absentee ballot and be able to vote. Specifically, the letter states that the registrant may vote by providing, in addition to the valid photo ID required under Georgia law, a birth certificate issued by a U.S. State or the U.S. Department of State; a U.S. Passport; a Certificate of Citizenship; a Naturalization Certificate; a U.S. Citizen ID card; or any of the fifteen other forms of verification allowed under Georgia law. PX. 1231 at STATE-DEFENDANTS-00742580.

Individuals who are in pending status for citizenship can vote if they go to their polling place and provide proof of citizenship. Tr. 1683:5–11 (Germany). These individuals will be on the voter list at the polling location as someone who had registered but is just pending their citizenship verification. Id.

A Secretary of State regulation, Ga. Comp. R. & Regs. 590-8-1-.02, provides that if the DDS cannot determine citizenship, the county election office must make sure that the driver's license identification number or identification card was entered properly before deciding on that individual's eligibility as a voter. Tr. 3583:1–21, 3584:1–18 (Harvey); DX. 780.

**\*17** The same regulation refers to the SAVE system, which the Secretary began to use after the 2020 election. DX. 780. "SAVE" stands for Systematic Alien Verification for Entitlements. Tr. 1708:14–17 (Germany). [20] Outside the elections and voter registration context, states are required to use SAVE to check the citizenship status of individuals applying for public benefits. Tr. 282:23–25 (McCrary). SAVE is a different system than E-Verify. Tr. 282:18–22 (McCrary). In 2021, the Secretary of State's Office used SAVE to audit the voter rolls and records from DDS. Tr. 1680:15–16, 1680:20–22 (Germany). The range of dates for the registrations that the Secretary of State's Office identified during the audit was from 1997 until February 24, 2022. Tr. 1728:1–2 (Germany). During that audit, the Secretary of State's Office looked at the entire voter roll. Tr. 1682:3–5 (Germany). The Secretary of State's Office worked with DDS to compare data and see what the Secretary of State's Office could do to add driver's license numbers where it did not have them. Tr. 1681:1–4 (Germany). The Secretary of State's Office also had a special process through DDS to get the alien ID numbers of voters. Tr. 1709:6–9 (Germany).

Upon receiving from DDS the alien registration numbers for voters for whom they had not been able to verify citizenship, the Secretary of State's Office ran those registration numbers through the SAVE process. Tr. 1681:21–24 (Germany). As a result of this audit, 63% of people who had been listed as pending for citizenship verification came back with their citizenship confirmed and were put into active status. Tr. 1690:13–14 (Germany).

Voters who were not verified as citizens based solely or in part on SAVE were sent a letter from the Secretary of State's Office stating the following, which Mr. Germany paraphrased

at trial: "[W]e were unable to verify you. Here's how you can show your citizenship, including you can show it when you go vote ...." Tr. 1724:7–20 (Germany). The Secretary of State's Office is currently in discussions about implementing more frequent uses of SAVE to verify voters' citizenships going forward. Tr. 1710:2–5 (Germany).

### (2) The impact of Exact Match Citizenship

At trial, Plaintiffs presented the expert testimony of Dr. Mayer. In his initial report, Dr. Mayer identified 3,073 registrants flagged as pending for citizenship verification as of January 2020. PX. 1278 at 21. Of those, 31.6% (972) were African American; 13.0% (400) were white non-Hispanic; 20.9% (642) were Hispanic; 23.2% (714) were Asian or Pacific Islander; 5.2% (159) were other or two or more demographic categories; and 6.1% (168) were unknown. Id. at 18. The African American registrants flagged as pending for citizenship verification represent about 0.9% of the African American voting age naturalized citizens living in Georgia at approximately the same time; along with about 0.5% of white non-Hispanic voting age naturalized citizens; 0.7% of Hispanic voting age naturalized citizens; 0.5% of Asian or Pacific Islander voting age naturalized citizens; and 0.4% or other or two or more demographic categories voting age naturalized citizens. Id.

In his supplemental report, Dr. Mayer compared people in pending status in a voter file dated January 28, 2020, with a voter registration file from November 2021. Tr. 365:17–366:5 (Mayer); PX. 1999 at 6. Dr. Mayer testified that of the 3,073 voters who were in pending status for citizenship verification in the January 28, 2020 voter file, 43.1% were no longer in pending status in the November 2021 voter file. Tr. 366:4–12 (Mayer); PX. 1999 at 6. In other words, 1,323 people in pending status moved to active status, and 1,750 people remained in pending status. Tr. 370:18–24 (Mayer); PX. 1999 at 6. In Dr. Mayer's view, this indicates that the verification process misidentifies citizens as noncitizens with an "error rate" of 43.1%. Tr. 365:12–14 (Mayer). Dr. Mayer admitted that he did not know whether the 1,750 registrants who remained in pending status for citizenship verification as of November 2021 were, in fact, citizens. Tr. 438:4–7 (Mayer). The Court notes that Dr. Mayer's findings pre-date the Secretary of State's SAVE audit, which found that 63% of voters in pending status were citizens. Tr. 1690:13–14 (Germany).

### c) Plaintiffs' Exact Match witnesses

**\*18**  Plaintiffs presented the following witnesses to testify about their voting experiences in an effort to show how the Exact Match issue burdened voters: Dr. Benjamin Ansa (PX. 2096 (Ansa Dep.)); Cam Ashling (Tr. 294–326); Kia Carter (Tr. 2482–2516); Dr. Carlos del Rio (Tr. 467–485); Rosa Hamalainen (PX. 2048 (Hamalainen Dep.)); Dr. Ali Kefeli (PX. 2049 (Kefeli Dep.)). [21]

### 3. The Secretary of State's Alleged Mismanagement of Voter Rolls

Plaintiffs next contend that the Secretary of State and SEB are in violation of the First and Fourteenth Amendments of the United States Constitution due to their affirmative mismanagement of the voter registration database, which is the database that houses the registration records of eligible voters in the State of Georgia. More specifically, Plaintiffs point to three list maintenance processes that they allege fall within the Secretary of State's responsibility for managing the voter registration database: (1) the cancelation of records on the basis that the voter is convicted of a disqualifying felony; (2) the merger of voter registration records based on the belief that two records are duplicative and represent only one eligible voter; and (3) the cancelation of records on the basis that the voter is deceased.

### a) Maintaining the official list of registered voters

Georgia law charges the Secretary of State with "maintain[ing] the official list of registered voters for this state and the list of inactive voters." [22]  See O.C.G.A. § 21-2-50(a)(14). The State's voter registration list is housed in a system known as "eNet." Tr. 759:13–21 (Hallman). In Georgia, counties enter voter registration data into the statewide voter database, including when a voter moved within the state. Tr. 1629:12–15 (Germany); Tr. 3555:9–18 (Harvey) (addressing voter moves). The Secretary of State's Office would not change data even upon a voter's request or if it knew the information was inaccurate; instead, the Secretary of State's Office would contact the county directly or inform the voter how to contact the county. Tr. 3556:6–24 (Harvey).

When a county user logs into eNet, they are presented with a dashboard listing "buckets" of information on the number of DDS applications and online voter registrations to process along with items such as duplicate matches, felon records, and death records. Tr. 772:6–773:1, 764:25–765:5 (Hallman). The county user then selects a "bucket" and is presented with a list of individual matches to process. Tr. 765:5–12 (Hallman). Ultimately, the decision of whether or not a "potential" match is a "true" match is made by the counties. Tr. 899:10–12, 899:23–900:4 (Hallman).

### b) The felon matching process [23]

In Georgia, persons convicted of felonies who have not completed their sentence are not eligible to vote. 📁 O.C.G.A. § 21-2-216(b). An individual who is convicted of or who pled to a felony but is on parole or probation will not be deemed as having completed their sentence for voting purposes. Tr. 3795:25–3796:3 (Harvey). The felony status does not, however, impair their ability to obtain a driver's license. Tr. 3796:6–9 (Harvey). Consequently, many persons who are ineligible to vote because of felony status—purposefully or inadvertently—register to vote when they obtain their driver's license and fail to opt out of the registration system. Tr. 3796:10–13 (Harvey).

 **\*19** The Secretary of State's Office receives information from the Department of Corrections ("DOC") and the Department of Community Supervision ("DCS") on a regular basis. Tr. 3567:5–13 (Harvey); 📁 O.C.G.A. § 21-2-231(a) ("Unless otherwise notified by the Secretary of State, the Georgia Crime Information Center shall, on or before the tenth day of each month, prepare and transmit to the Secretary of State and The Council of Superior Court Clerks of Georgia a complete list of all persons, including dates of birth, social security numbers, and other information as prescribed by the Secretary of State or The Council of Superior Court Clerks of Georgia, who were convicted of a felony in this state **since the preceding reporting period**.") [24] (emphasis added).

Under Georgia law, "[u]pon receipt" of the felon list and "the lists of persons convicted of felonies in federal courts received pursuant to 📁 52 U.S.C. Section 20507(g), the Secretary of State shall transmit the names of such persons whose names appear on the lists of electors to the appropriate county board of registrars." 📁 O.C.G.A. § 21-2-231. The

Secretary's current practice is to run the felon list information through eNet for potential matches to provide to the counties. Tr. 862:15–18 (Hallman); Tr. 3567:13–17 (Harvey); Tr. 1329:12–20 (Frechette). The Secretary has the discretion to determine what matching criteria will be used in eNet. Tr. 3733:19–22 (Harvey).

The Secretary has programmed eNet to conduct a monthly comparison between those monthly lists and the list of registered voters in eNet. PX. 800 at 19. [25] The file from DOC is run at the end of the month, and the file from DCS is run in the middle of the month. Id. at 20.

Potential matches between the felon lists and existing voter registration records are displayed on the county dashboard for review by the county. Tr. 1329:21–1330:1 (Frechette). Matches are highlighted if certain criteria are the same, and the Secretary of State establishes the criteria that will highlight a potential match of someone on the voter database with someone who is also on the list of felons supplied by the state and federal governments. Tr. 3720:5–9 (Harvey). eNet provides counties with "tight" felon matches listed first and then "loose" matches, which become looser as the user goes down the list. Tr. 871:8–18, 872:12–18 (Hallman). The Secretary of State's training documents provide the following comparison criteria used by the Secretary of State to highlight a potential match for the counties to process, listed from tightest to loosest:

a. Last Name, First Name, Last 4 SSN, Date of Birth – Active, Inactive, Pending, Reject

b. Last Name, First Name, Last 4 SSN, Date of Birth— Cancelled

c. Last Name, Last 4 SSN, Date of Birth

d. First Name, Last 4 SSN, Date of Birth

e. Last Name, First Name, Date of Birth

f. Last Name, Date of Birth, Race, Gender

PX. 800 at STATE-DEFENDANTS-00115960; Tr. 1337:6–23, 1337:24–1338:2 (Frechette); see also PX. 800 at STATE-DEFENDANTS-00115961.

There was evidence of eNet repeatedly flagging one voter, Elizabeth Bauer, as a felon. PX. 658. [26] The evidence also showed that another voter, Andre Smith, was repeatedly canceled. DX. 724.

**\*20** According to the Secretary of State's Office, each county is responsible for setting its own county-wide policy to apply to potential matches sent by the Secretary of State's Office to determine whether it is a true match; some counties will do extra research on their own to determine if the person who is a potential match is an actual ineligible felon. Tr. 3570:5–10 (Harvey); Tr. 1351:16–1352:11 (Frechette).

Different counties have different resources and staff available; accordingly, Mr. Hallman testified that it is difficult to choose a single procedure that fits the needs of all counties. Tr. 869:19–22 (Hallman). As such, the counties are expected to establish a uniform procedure for processing felon matches that is fair, utilizing the resources and staff available in that county, and treating each record in the same manner with no preference for one over the other. Tr. 870:3–15 (Hallman); PX. 541.

Some larger counties, such as Fulton County, told the Secretary of State's Office they found reviewing looser matches difficult due to the large number of potential matches in that bucket. Many of the smaller counties, however, find the looser matches to be a useful tool. Tr. 871:7–873:20, 873:24–874:16 (Hallman); Tr. 1359:19–23, 1360:14–25, 1361:9–12 (Frechette); PX. 1151.

Previously, in 2017, the Secretary of State eliminated a potential match filter consisting of only the last four digits of the social security number and date of birth because it was "showing too many false positives and all the good matches will be caught by other filters." Tr. 1359:12–18 (Frechette); PX. 365.

Ms. Frechette testified that she was not aware of any current issue with eNet producing "a lot of false matches" for felons. Tr. 1355:14–19 (Frechette). When the structure of the DOC was changed and split into two agencies, namely the Department of Community Services and the Department of Community Supervision, however, the number of individual felon records listed for the counties to process was higher than usual. Tr. 876:7–20 (Hallman); PX. 1151.

County election offices review these potential matches sent over by the Secretary of State and make determinations as to whether the person on the voter list is ineligible to vote by reason of a felony conviction. Tr. 3568:2–19, 3569:14–25, 3572:21–3573:6 (Harvey).[27]

In other words, under current practices, regardless of the criteria used for identifying potential matches, the counties are the ones who make the choice as to what information is, in fact, a true match. Tr. 873:3–5 (Hallman).

Additional testimony from Mr. Harvey and 2019 training materials (PX. 1903) established that the "[t]he record when marked as a Felon match is flagged as a Challenged—Felon." PX. 1903. The training materials further indicate that if the county eNet user is "unsure" if there is a felon match when processing the Felon Dashboard Report, "the Challenge button can be used to handle those records following O.C.G.A. § 21-2-228." PX. 1903. Said Code section involves the right of registrars to reexamine the qualifications of electors. O.C.G.A. § 21-2-228(a). It also gives the county board of registers the right to subpoena documents and witnesses and serve summonses and notices. O.C.G.A. § 21-2-228(b).

**\*21** Before a county cancels a voter for felony status, the county board of registrars is required, by statute, to mail the voter a letter thirty days in advance. O.C.G.A. § 21-2-231(c)(2). Pursuant to Georgia law, the letter is supposed to state "that the board of registrars has received information that such person has been convicted of a felony and will be removed from the list of electors 30 days after the date of the notice unless such person requests a hearing before the board of registrars on such removal." O.C.G.A. § 21-2-231(c)(2). To this regard, if a voter objects to the felon designation, the voter is entitled to a hearing. Id.

During his trial testimony, former Elections Director Harvey reviewed O.C.G.A. § 21-2-231 (DX. 787) and testified that he was familiar with the § 231(c)(2) hearings. He further testified that the burden of proof at these hearings is on "the entity that is challenging the elector." Tr. 3828:6–12, 3842:12–18 (Harvey).

However, Mr. Harvey also confirmed that 2019 training materials tell the counties that the voter must provide proof to remove the felon challenge flag. Tr. 3738:23–25–3739:1–2, 3842:24–25, 3843:1–2; see also PX. 1903 at STATE-DEFENDANTS-00068941 ("If the voter provides proof to remove the Felon Challenged flag or if matched in error .... The record should be removed from the 40day Felon clock and the Challenged flag removed").[28] In addition, Ms. Frechette testified that a voter who is challenged for any reason has "the responsibility to clear up the issue" before

the voter could vote. Tr. 1328:1–5 (Frechette). However, Ms. Frechette also testified that she did not "remember the exact guidelines for a hearing" when asked if the voter needed to seek a hearing. Tr. 1327:16–25.

Considering witness credibility and Mr. Harvey's level of experience and familiarity with the § 231(c)(2) hearings, the Court will resolve the conflicting evidence and trial testimony by giving greater weight to Mr. Harvey's testimony that the burden at the § 231(c)(2) hearing is on "the entity that is challenging the elector," which would be the county in a felon challenge context. Also, Defendants note in their proposed findings that the training materials appear to be contrary to law, and they cite 🚩 O.C.G.A. § 21-2-229(c) to support this statement. Doc. No. [855], ¶ 444. 🚩 O.C.G.A. § 21-2-229(c) imposes the burden of challenging a voter's eligibility on the "elector" making the challenge. Said Code Section is not mentioned in the Secretary of State's felon matching training materials and utilizes the term "elector"[29] as opposed to the terms "county" or "board of registrars." The Georgia Supreme Court has stated that: "OCGA § 21–2–228 permits a county or municipal board of registrars to challenge a person's right to register to vote or to remain on the list of electors, and 🚩 OCGA § 21–2–229 permits an elector to bring the same type of challenge." Cook v. Bd. of Registrars of Randolph Cty., 291 Ga. 67, 71, 727 S.E.2d 478, 482 (2012). If it is "the same type of challenge," it is conceivable that the § 229 burden language may apply to the present circumstances under the doctrine of in para materia, but it is not necessary for the Court to make a definitive statutory interpretation ruling for purposes of resolving the felony match issue.

*22  Regardless of the applicability of § 229, there was no evidence put forth of any accused felon having made a formal showing (or offer of proof) in a § 231(c)(2) hearing that he or she was not a felon. However, none of Plaintiffs' felon match witnesses ever proceeded to a § 231(c)(2) hearing; it is important to note that the evidence at trial showed that some Georgia voters found themselves incorrectly canceled as persons convicted of disqualifying felonies, without receiving any advance notice—and thus, there was no § 231(c)(2) hearing process. Those voters are Dale Thomas, Jean Duncan, Douglas Miller, and Andre Smith (discussed above). PX. 89 at 1–2, PX. 1715, PX. 2071. Furthermore, three voters, Andre Smith, Elizabeth Bauer, and Chris Warren, were either asked to provide or did provide proof that they were not felons. Tr. 2438:10–14; PX. 658, PX. 900, PX. 912, PX. 2019.[30]

Plaintiffs' felon match evidence at trial also showed that in 2018 and 2020, the Election Administration and Voting Survey ("EAVS"), published by the Election Assistance Commission, identified Georgia as the state with the most felon removals (68,249 and 54,730, respectively). PX. 1904; PX. 1981 at 167.

### c) The duplicate matching process

In general, a potential duplicate match occurs when eNet identifies people who may be the same person, e.g., Jonathan William Smith living in Fulton County and DeKalb County. Tr. 3575:22–3576:13 (Harvey). Duplicate matches can be identified either when a new registration is processed or when counties review batches of potential matches provided by the Secretary of State's Office. Tr. 1300:8–21 (Frechette).

In either instance, the Secretary of State's Office distinguishes between "tight" and "loose" potential matches and provides both for county registrars to process. Tr. 793:18–794:9 (Hallman). A "tight" potential match is one involving a "unique identifier," like a social security number or a driver's license number, "and a lot of other information matching first name, last name, date of birth." Tr. 793:18–20 (Hallman). A "loose" potential match may include matches on one or two criteria, for example, first initial and last name. Tr. 791:6–10, 793:12–794:6 (Hallman); see also PX. 1878 at 55.

Loose matches are often used to find records where an existing voter record needs to be corrected. Tr. 793:22–794:6 (Hallman). If loose match criteria were not used, it would run the risk of permitting the system to contain multiple registrations with multiple errors. Tr. 793:18–794:4 (Hallman). Because it is a unique identifier, if two records had the same driver's license number but different first or last names or a different date of birth, it would still be treated as a potential match for comparison by the county user. Tr. 767:25–768:5 (Hallman).

When a new voter's registration information is initially entered into eNet by a county user, the system automatically searches existing voter records to identify whether there are any existing records for that voter and to avoid the creation of duplicate records. Tr. 762:15–763:1, 787:4–13 (Hallman); Tr. 1221:5–12 (Frechette).

If there is a match between certain criteria in the new application and existing record, the records are sent to the county's dashboard for review and determination of whether the records are a true match for the same person. Tr. 1222:23–1223:5 (Frechette). These criteria include, for example, first name, last name, and date of birth. Tr. 1290:10–21 (Frechette).

If the county official determines that the records are a true match for the same person, the information from the new application replaces the information in the existing record so there is only one surviving record. Tr. 1223:6–12 (Frechette). The purpose of this process is to, where necessary, update an existing voter record rather than create a new, duplicate record for the voter. Tr. 1222:1–5 (Frechette).

**\*23** Ms. Frechette testified that in reviewing potential matches between a new registration and an existing voting record, county officials also conduct independent research to determine whether a true match exists. Tr. 1257:7–14 (Frechette). Ms. Frechette testified that the Secretary of State's Office does not provide a minimum number of identifiers that must match between a new application and an existing record before a county official should decide that the two records are a true match for the same voter. Tr. 1264:3–7 (Frechette). Ms. Frechette would, however, help county officials find resources and information at their disposal to resolve their questions about potential matches. Tr. 1259:18–22, 1260:8–12 (Frechette).

Ms. Frechette testified that it was not typical for a county official, in reviewing potential matches, to automatically assume there was a true match for the same voter based solely on a matching driver's license number. Tr. 1257:7–14 (Frechette). Regardless, like the felon match process, under current practices, the Secretary does not make the final determination of whether the potential duplicates are, in fact, the same person. That process is completed by the county election offices. Tr. 3576:14–19 (Harvey); Tr. 1315:23–1316:2 (Frechette).

The eNet system also runs various batch processes on a daily, weekly, and monthly schedule to identify potential duplicates, and the results appear on the dashboard for county registrars to process. Tr. 772:6–773:1 (Hallman); Tr. 1295:25–1296:13, 1300:2–4 (Frechette). eNet is programmed to apply four criteria to check for potential duplicate records: (1) first name, date of birth, and last four digits of social security number; or (2) full social security number; or (3) driver's license number; or (4) first name, date of birth,

and last four digits of social security number. PX. 1903 at STATE-DEFENDANTS-00068944; see also Tr. 1300:5–7 (Frechette).

The process for handling these potential match batches is structurally similar to that used during new registration; the eNet system displays on a county worker's dashboard the existing voter registration information and the new data side-by-side for the county registrar to determine whether it is the same person. Tr. 765:13–18, 21–24 (Hallman); see also PX. 1903 at STATE-DEFENDANTS-00068944.

When there are duplicate records, the system does not automatically override an existing record; eNet requires a county user to look at the screen and make that determination manually. Tr. 765:19–766:1 (Hallman); Tr. 1305:9–16 (Frechette). Under current practices, it is the counties' responsibility to implement practices on how to process such potential duplicate records for review. Tr. 1296:14–15, 1297:14–15 (Frechette); Tr. 765:19–766:1, 772:1–773:1, 773:11–14, 774:7–15 (Hallman).

As a precautionary measure, if a county cancels a voter from another county in the duplicate merge process, the other county will be notified of the cancelation on their dashboard because that county is required to send the voter a letter. Tr. 825:21–826:4 (Hallman).

The system is designed to strike a balance between using business logic to prevent mistakes and allowing flexibility for registrars to correct errors. Tr. 805:4–806:3 (Hallman). Mr. Hallman testified that "[y]ou don't want to make the system too restrictive because then you can't fix problems or even identify problems." Tr. 805:20–22 (Hallman). Mr. Hallman also testified that adding additional criteria to the potential matching process would put more demand on the system and potentially slow down the process of voter registration applications, which is a problem the State's vendor has warned against. Tr. 848:11–849:2 (Hallman).

**\*24** If a county user mistakenly merges a potential duplicate match that is not a match, the resulting voter registration file will contain errors. Tr. 794:14–21 (Hallman); Tr. 1223:13–24 (Frechette). Mr. Hallman testified that it is uncommon for county users to incorrectly merge duplicate voter records, but he stated that it has happened more than once. Tr. 798:2–5, 12–14, 818:18–25 (Hallman). Where such did occur, Mr. Hallman testified that it would likely be treated as an

individual training issue for that particular county user. Tr. 803:16–22 (Hallman).

Training guides are limited in scope and do not include every aspect of election procedure, although the county users were reminded during training sessions to double check their screens and make sure they were not making mistakes. Tr. 805:22–807:4 (Hallman). None of the Secretary of State's training materials contain any best practices about which values must match, or the proper procedures to follow when evaluating two different records. See, e.g., PX. 50; PX. 800; PX. 1878; PX. 1903. The Secretary's policy is that "it's the responsibility of the county office to review the two records to determine if it is the same person or not." Tr. 1324:10–12 (Frechette). Indeed, Ms. Frechette testified: "Minimal standards just wasn't part of our vocabulary. It was review the records and make the decision for your county registrations." Tr. 1324:22–24 (Frechette).

Mr. Hallman testified that ultimately, if a county user mistakenly canceled a registered voter and that person went to his or her polling place to vote, it is "supposed to be handled" by issuing that person a provisional ballot to vote and the county going back and researching "what happened with that person's record." Tr. 812:17–813:6 (Hallman).

### d) Vital records matching process

Unlike the duplicate and felon matching processes, the Secretary does remove from the voter database voters who appear on lists submitted by the Georgia Department of Public Health who are deceased. 🏷️ O.C.G.A. §§ 21-2-231(d), 🏷️ (e); Tr. 3597:2–8 (Harvey). eNet identifies deceased voters by comparing the voter registration rolls with vital records from the Georgia Department of Health on a weekly basis. Tr. 884:14–24 (Hallman).

To prevent incorrect deletions of voter records, the Secretary utilizes what is called a "tight match," which compares a (possibly deceased) voter's and recently-deceased's last name, date of birth, and Social Security Number. Tr. 3597:9–13 (Harvey); Tr. 1321:22–1322:5 (Frechette); see also PX. 800 at 12.

If those factors match, the registrant is automatically canceled in eNet. Tr. 3597:9–13 (Harvey); Tr. 1322:22–1323:11 (Frechette). Counties are sent a list of persons who have been

canceled pursuant to this process so they may doublecheck the Secretary's work. Tr. 3597:16–25 (Harvey).

Counties have an independent obligation to remove from the voter registration database persons they know to be deceased based on information from "obituaries published by local newspapers, death certificates, verifiable knowledge of the death, and information provided in writing and signed by a family member or members of the deceased person." 🏷️ O.C.G.A. § 21-2-231(e.1)

To facilitate this process, in addition to the automatic cancelation of "tight" vitals matches, the Secretary of State's Office also provides "loose" potential vitals matches to counties for manual review. Tr. 885:20–24, 886:5–7 (Hallman).

A loose potential vitals match is flagged when either of the following sets of criteria matches between records: (1) last name and date of birth; or (2) last name and social security number. Tr. 1323:12–21 (Frechette); PX. 800 at 13.

**\*25** As with the felon and duplicate matching processes, if eNet identifies a loose match, the potential match will be displayed on the county dashboard for review by county registrars. Tr. 1323:17–21 (Frechette).

Also like these other matching processes, Ms. Frechette testified that the Secretary of State's Office does not tell the county how to make the decision of whether a true match exists between death records and existing voter registration records. Tr. 1327:3–12, 1329:4–11 (Frechette). It is, again, the counties' responsibility to review the information in the potential match, decide if there is a true match, and cancel the record. Tr. 1324:1–3, 10–12 (Frechette). Plaintiffs put forth no evidence from county officials to show that the criteria used by the Secretary of State to identify potential matches definitively led to errors occurring in counties' determinations, either due to the volume of the batches or otherwise.

Counties are encouraged to perform audits on their vital records canceled automatically by the system to ensure the files have been removed from their active voter files. Tr. 893:3–11, 894:13–15 (Hallman).

### e) List Accuracy witnesses

Witnesses who testified about list accuracy burdens include the following: Kia Carter (Tr. 2482–2516); Dasia Holt (PX. 2103 (Holt Dep.)); Kelly Dermody (PX. 2101 (Dermody Dep.)); Nicole Freemon (Tr. 1494–1515); Julian Grill (PX. 2056 (Grill Dep.)); Alkhealasharteula Harrison (Tr. 2665–2690); Emily Huskey (Tr. 1141–1168); Antoinette Johnson (PX. 2105 (Johnson Dep)); Brenda Lee (PX. 2095 (Lee Dep.)); Anthony McKissic (Tr. 2723–2749); Meridith Rose (Tr. 2765–2819); Andre Smith (Tr. 2429–2481); Jayme Wills (PX. 2052 (Wills Dep.)).

### 4. Plaintiffs expert witnesses

At trial, Plaintiffs offered expert testimony from the following experts: Dr. Adrienne Jones; Mr. Kevin J. Kennedy; Dr. Ken Mayer; Dr. Peyton McCrary; and Dr. Lorraine Minnite. The Court will now provide an overview of the expert testimony presented at trial.

### a) Dr. Adrienne Jones

Dr. Adrienne Jones received her J.D. from the University of California, Berkley. Tr. 937:7–8 (Jones). After graduating law school, she pursued a Ph.D. in political science at the City University of New York; her graduate work focused on the Voting Rights Act of 1965. Tr. 937:17–23 (Jones). Dr. Jones has been a professor of political science at various institutions for around twenty-two years. Tr. 936:7–19 (Jones). She is currently in her sixth year as a Professor of Political Science at Morehouse College, where her academic focus is on African American political development. Tr. 936:12–19, 938:13–19 (Jones). In addition to her dissertation, Dr. Jones has published two peer-reviewed articles on the VRA, and she is currently working on another peer-reviewed article and a book on the VRA. Tr. 940:1–6, 13–19 (Jones).

This Court qualified Dr. Jones as an expert of historical review. Tr. 950:3–10. At trial, Dr. Jones testified about the history of voting and voter suppression, specifically as it related to the history of African American voting in Georgia. Tr. 951:19–22 (Jones). This Court credits the testimony of Dr. Jones inasmuch as her expert report provides a historical backdrop pertinent to cases brought under Section 2 of the VRA. However, this Court ascribes only limited weight to Dr. Jones's testimony concerning the matters addressed in her report that occurred after 1990. Likewise, this Court attributes limited weight to testimony that did not connect Dr. Jones's

historical backdrop to the present practices at issue. The Court gives no evidentiary weight to Dr. Jones's statements about polling place closures as this Court has already found that Plaintiffs lack standing to assert their polling place closure claims against Defendants. Doc. No. [612], 36–42.

### b) Mr. Kevin J. Kennedy

**\*26** Mr. Kevin Kennedy served as Wisconsin's chief election officer from 1982 through 2016. Tr. 2820:15–19 (Kennedy). [31] He was a member of the National Association of State Election Directors ("NASED") from 1990 to 2016 and served as the organization's president in 2006. Tr. 2825:23–2826:15 (Kennedy). He was also involved with the Election Center, a nationwide training organization for state and local election officials, from the 1980s to 2016. Tr. 2827:9–15 (Kennedy).

After concluding his time as chief election officer in 2016, he became an "inspector" for Wisconsin elections; in Georgia, this is equivalent to a poll worker. Tr. 2824:17–25 (Kennedy). He is currently Madison, Wisconsin's chief election inspector, and in that role, he is responsible for overseeing the smooth and proper administration of elections at the municipal level. See Tr. 2825:5–15 (Kennedy). The role also requires him to receive training. Tr. 2825:16–18 (Kennedy).

This Court qualified Mr. Kennedy as an expert on election training; at trial, he was permitted to testify as to the threshold level of election training in Georgia and supervision regarding election training. Tr. 2847:5–6.

At trial, Mr. Kennedy offered his expert opinion on the inadequacy of training for poll workers in Georgia regarding absentee ballot cancelation. He did not offer an opinion as to other issues in this case. This Court finds Mr. Kennedy credible. The Court will weigh his testimony in its Conclusions of Law.

### c) Dr. Ken Mayer

Dr. Kenneth "Ken" Mayer has a bachelor's degree and a doctorate in political science; he received his B.A. from University of California San Diego in 1982 and his Ph.D. from Yale University in 1988. While at the University of California, he also minored in applied mathematics, and much of his coursework focused on applied statistics and

quantitative methods used in political science. Tr. 327:24–328:4 (Mayer). Since 1989, Dr. Mayer has been a professor of political science at the University of Wisconsin in Madison, Wisconsin. Tr. 328:6–11 (Mayer). He is also an affiliate professor at the La Follette School of Public Affairs, located in Madison, Wisconsin. Tr. 328:7–8 (Mayer).

This Court qualified Dr. Mayer as an expert on election administration, including the analysis of voter registration files; voter verification processes; and the impact of those verification process, as far as they relate to statistical analyses. Tr. 342:18–342:1.

At trial, Dr. Mayer offered his expert opinion on Georgia's Exact Match policy and citizenship verification requirements. [32]

Dr. Mayer testified that HAVA does not require states to implement the Exact Match policy Georgia follows. Tr. 358:13 (Mayer). His testimony indicated that while HAVA requires "that states go through a verification process by comparing registration information with information [in] driver's license or Social Security Administration files ... it doesn't say how [states] do that. That method is left up to the state." Tr. 358:4–8 (Mayer). Dr. Mayer explained that there were other methods of voter verification available to states that still met baseline HAVA requirements. Tr. 358:16–21 (Mayer).

**\*27** After an intensive statistical analysis, Dr. Mayer concluded that Exact Match did not affect voters uniformly across the state. Tr. 415:14–15 (Mayer). Dr. Mayer found "a relationship between the percentage of a county that is non-Hispanic white and the percentage of those registrants in MIDR status." Tr. 416:2–4 (Mayer). The higher the percentage of inhabitants that are non-Hispanic white in a particular county, the lower the percentage of voters in that county in MIDR status. Tr. 416:5–8 (Mayer).

Dr. Mayer also found a wide variation in the percentage of voters in MIDR in counties with similar demographics. Tr. 416:9–16 (Mayer). The variations in these comparable counties could not be explained by other factors, which Dr. Mayer felt was "consistent with and suggestive of different administrative practices in different counties." Tr. 416:17–19 (Mayer).

Furthermore, Dr. Mayer concluded that Exact Match "overwhelmingly disproportionally" impacted voters of color. Tr. 413:25–414:1 (Mayer). In examining county-level data files of registered voters as of January 2020, Tr. 412:25–413:2 (Mayer), he found that though white voters made up over half of all registered voters, only 11.4% of voters flagged for MIDR were white. Tr. 413:12–15 (Mayer). African Americans, meanwhile, made up approximately 30% of the overall voter file but nearly 70% of voters placed in MIDR status. Tr. 413:18–21 (Mayer). Using his experience in statistical analysis, he calculated that an African American voter is more than ten times likely to be placed in MIDR status under Exact Match than a white non-Hispanic voter. Tr. 414:5–9 (Mayer). In all, Dr. Mayer opined, based on data he gathered and analyzed, that voters of color were far more likely to be flagged and put in MIDR status under Exact Match than white voters. Tr. 408:10–12 (Mayer).

Dr. Mayer stated that based on relevant academic literature, it was "certainly plausible, if not likely" that being flagged as MIDR could "trigger a poll worker into thinking that they have to subject or should subject or must subject [the flagged] registrant to a higher level of scrutiny than they do other voters." Tr. 403:16–24 (Mayer). Dr. Mayer testified that another aspect of that line of academic literature suggested that poll workers "frequently" and are "more likely to" subject voters of color to a higher level of scrutiny than white voters; voters of color are also more likely to be "asked to do things the law doesn't actually require them to do" when poll workers place them under this scrutiny. Tr. 404:11–16 (Mayer). However, Dr. Mayer did not directly observe this phenomenon in Georgia. Tr. 404:24–405:1 (Mayer).

Dr. Mayer also testified that in his opinion, there was no valid reason for placing voters who fail Exact Match in MIDR status from an election administration perspective. Tr. 405:23–406:1 (Mayer).

Dr. Mayer also evaluated Georgia's citizenship verification process, and opined that the process "routinely misidentifies U.S. citizens as noncitizens." Tr. 365:12–13 (Mayer). He concluded that the verification process had an "error rate" of 43.1%; of the 3,073 people on the voter rolls flagged for noncitizenship as of January 2020, 43.1% of them had been able to provide documentation proving that they were, in fact, citizens by November 2021. Tr. 365:12–14; 366:6–12 (Mayer); PX. 1999 at 7. It was Dr. Mayer's opinion that Georgia's method of relying on driver's license data to verify citizenship was "known to produce inaccurate results and can produce errors that approach 100% in terms of every person

they ... flag as a noncitizen is actually a citizen." Tr. 366:16–20 (Mayer).

**\*28**  However, Dr. Mayer acknowledged that it was possible that persons in pending status for citizenship could indeed be noncitizens. Tr. 504:9–12 (Mayer). He did not conduct an analysis to determine whether any of the 1,750 registrants remaining in pending status for citizenship verification as of November 2021 were actually citizens. Tr. 439:25–440:4 (Mayer).

Dr. Mayer believes that the SAVE program would likely bring down the number of voters in pending status for citizenship. Tr. 441:21–24 (Mayer). [33]

In addition to identifying potential accuracy issues, Dr. Mayer's study of citizenship verification led him to conclude that Georgia's citizenship verification process applies overwhelmingly to voters of color. Tr. 387:9–16 (Mayer).

When compared to their overall demographic representation in the voter file, Hispanics were between four and five times more likely to be flagged as noncitizens. Tr. 389:23–390:5 (Mayer). Asian and Pacific Islander registrants were between seven and eight times more likely to be flagged as noncitizens. Tr. 390:8–14 (Mayer). African American registrants were also slightly more likely to be flagged as noncitizens. Tr. 390:15–23 (Mayer).

Furthermore, Dr. Mayer found that white registrants were both the least likely to be flagged for noncitizenship and the most likely "to be able to overcome that or to take steps to move their registration into active status." Tr. 393:13–15 (Mayer). African American registrants flagged for noncitizenship were "least likely to be able to take the steps to ... move their registration into active status." Tr. 393:18–21 (Mayer).

In Dr. Mayer's opinion, Georgia's citizenship "verification process overwhelmingly and disproportionately flags voters of color[,] who are more likely to be flagged and more likely to have remained in pending status." Tr. 398:7–10 (Mayer).

This Court finds Dr. Mayer credible. The Court will weigh his testimony in its Conclusions of Law.

#### d) **Dr. Peyton McCrary**

Dr. Peyton McCrary received a bachelor's and master's degrees in history from the University of Virginia; the focus of his master's program was the "History of the South." Tr. 186:14–187:3 (McCrary). Dr. McCrary went on to receive his Ph.D. in history from Princeton University, again focusing on Southern history, this time with an emphasis on the Civil War and Reconstruction Era. Tr. 187:5–9 (McCrary). Since completing his Ph.D., he has taught at various universities. Tr. 187:15–21 (McCrary). He consistently taught courses on the history of the South for twenty years. Tr. 188:7–11 (McCrary).

This Court qualified Dr. McCrary as an expert in history. Tr. 198:5–10, 22–23; 289:15. At trial, Dr. McCrary offered his expert opinion on the history of voter discrimination in Georgia; the history of racial polarization in voting in Georgia; the history of voter registration processes in Georgia; and the history of "the way in which the Georgia party system evolved over time and what that has to say about the context in which decision-making about, particularly the operation of the voter registration system, both before and after the state began to implement ... HAVA [ ] in the 21[st] century." Tr. 200:15–201:16 (McCrary). [34]  In sum, it was Dr. McCrary's opinion that today's political context and voter registration and verification processes in Georgia resemble the political context and voter registration and verification processes in place during the Jim Crow era. PX. 1289 at 7–8. However, Dr. McCrary did not testify or speculate as to the motivations behind implementing certain voter verification processes still in use today in Georgia at trial. Tr. 231:25–232:5 (McCrary). This Court finds Dr. McCrary credible. The Court will weigh his testimony in its Conclusions of Law.

#### e) **Dr. Lorraine Minnite**

**\*29**  Dr. Lorraine Minnite has a bachelor's degree in American history, two master's degrees, and a Ph.D. in political science. Tr. 2332:6–7 (Minnite). She is an associate professor of Public Policy and chair of the Department of Public Policy and Administration at Rutgers University. Tr. 2331:20–22 (Minnite). Her area of academic interest is in American politics, with a special focus on elections and, more specifically, voter fraud in American elections; this has been her focus for more than twenty years. Tr. 2337:13–19 (Minnite). Drawing on her years of academic study, in

2010, Dr. Minnite wrote the peer-reviewed The Myth of Voter Fraud, published by Cornell University Press. Tr. 2339:11–13, 22–23, 2340:1–4 (Minnite). In addition to her book, she has also written four peer-reviewed academic articles on voter fraud. Tr. 2341:3–4 (Minnite). Dr. Minnite has previously testified in other cases regarding voter fraud. Tr. 2332:20–24 (Minnite).

This Court qualified Dr. Minnite as an expert "in the area of political science, specializing in elections, the political process[,] and voter fraud in American elections." Tr. 2344:19–2345:1. At trial, Dr. Minnite offered her expert opinion regarding incidents of voter fraud nationally and in Georgia. In researching and forming her expert opinions for this case, Dr. Minnite defined "voter fraud" as "the process whereby voters *intentionally* corrupt the voting or the electoral process." Tr. 2350:13–15 (Minnite) (emphasis added). Dr. Minnite concluded that empirical evidence showed that incidents of voter fraud are exceedingly rare nationally and in Georgia; this conclusion applied both to incidents of fraud at the polls on Election Day and to incidents of fraud in voter registration. Tr. 2346:3–6 (Minnite). She also found that "a review of the available evidence in Georgia finds no cases of voter impersonation at the polling place, and in addition there is minimal evidence of other forms of fraud intentionally committed by voters, such as what Georgia calls 'repeat' voting or voting when knowing one is ineligible to vote." Tr. 2346:10–15 (Minnite); PX. 1038 at 3. Dr. Minnite reaffirmed these opinions following the 2020 Election in Georgia. Tr. 2346:19–22 (Minnite); PX. 2098 at 4.

Dr. Minnite did not offer an opinion on Georgia's implementation of HAVA or on Georgia's election administration processes generally. Tr. 2404:14–18, 2405:13–15 (Minnite). As such, her research did not involve examining the amount of improper or invalid voter registration in Georgia. Tr. 2406:8–10 (Minnite). Dr. Minnite also testified that she was not opining that Georgia does not have an interest in preventing voter fraud. Tr. 2410:25–2411:5 (Minnite).

This Court finds Dr. Minnite credible. The Court will weigh her testimony in its Conclusions of Law.

### 5. Other Evidence Considered

Plaintiffs also presented discriminatory purpose evidence that included the troubling and powerful story of Dr. Nancy Dennard, who, in 2010, was arrested and charged with felony charges relating to absentee ballots following the election of the first-ever majority-Black school board. Tr. 683:7–684:12, 676:1–728:7, 745:8–755:3 (Dennard). The prosecution of Dr. Dennard and others was prompted by the Secretary of State's Office, which initiated an investigation and then asked the Georgia Bureau of Investigations to become involved. Tr. 683:7–684:12, 676:1–728:7, 745:8–755:3 (Dennard). The charges were eventually dismissed after then-Attorney General Sam Olens issued an opinion interpreting 🔖 O.C.G.A. § 21-2-385(a) or § 21-2-574 as not prohibiting the conduct Dr. Dennard had been accused of engaging in—merely possessing another voter's sealed absentee ballot to help have it delivered. Tr. 649:7–728:7, 745:8–755:3 (Dennard); see also PX. 2000, 2038, 2047; DX. 736.

Other asserted evidence of discriminatory purpose included 2014 and 2018 campaign speeches by then-Secretary Kemp—in one speech, he urged his supporters to register voters who would vote for Republican candidates and encourage them to vote in the same way that Democrats had previously done with minority voters. DX. 740; PX. 2051, Tr. 86:9–17, 88:9–17, 92:18–22 (Kemp Dep.). Plaintiffs thereafter attempted to tie these campaign statements to investigations into the New Georgia Project, an organization focused on registering people of color to vote. PX. 97 at 6. In May 2014, the Secretary of State's Office commenced an investigation into the New Georgia Project. The investigation began after election officials in Butts County complained to the Secretary of State's Office about a voter registration drive and the manner in which it was being conducted. Tr. 3622:21–3623:13 (Harvey). Specifically, based on the questions being asked—about personal identifiable information, social security number, driver's licenses, etc.—the elections office and sheriff's office believed that there was an identity theft ring at work. Tr. 3623:1–4 (Harvey). As the investigation developed, it became focused on forgery, making false statements on election documents, false voter registration, and providing fraudulent information on election documents. Tr. 3625:22–3626:3 (Harvey). The New Georgia Project was later dropped as a respondent in the matter because the Secretary's investigators could not find a causal link between New Georgia Project and the canvassers the investigators thought had committed forgeries. Tr. 2029:6–23 (Harvey).

### a) Judicial notice of Georgia voting and voter registration statistics

**\*30**  Defendants moved this Court, pursuant to Rules 201(b)(2) and 201(c)(2) of the Federal Rules of Evidence, to take judicial notice of certain voter registration and election statistics maintained by the Secretary of State's Office. Doc. No. [829]. As indicated during trial, that motion was granted by this Court in the Docket Order entered June 13, 2022. Tr. 3297:10–12. Specifically, for purposes of this Opinion, this Court takes judicial notice of the following:

As of the November 3, 2020 general election, there were 7,638,898 registered voters in Georgia. Doc. No. [829-9], 4.

As of the June 9, 2020 primary election, there were 7,340,261 registered voters in Georgia. Id.

As of the November 6, 2018 general election, there were 6,935,816 registered voters in Georgia. Id.

As of the May 22, 2018 primary election, there were 6,694,441 registered voters in Georgia. Id.

As of the November 8, 2016 general election, there were 6,637,939 registered voters in Georgia. Id.

In the January 2021 runoff election between former Senator David Perdue and now-Senator Jon Ossoff, 1,084,138 absentee by mail ballots were cast. Doc. No. [829-8], 3.

In the January 2021 runoff election between former Senator Kelly Loeffler and now-Senator Raphael Warnock, 1,084,021 absentee by mail ballots were cast. Doc. No. [829-7], 3.

In the November 2, 2020 presidential election between former President Donald Trump and now-President Joe Biden, 1,316,943 absentee by mail ballots were cast. Doc. No. [829-6], 3.

In the November 6, 2018 gubernatorial election between Governor Brian Kemp and Stacey Abrams, 223,576 absentee by mail ballots were cast. Doc. No. [829-5], 3.

## II. CONCLUSIONS OF LAW

The Court now sets forth its conclusions of law, which will include consideration of jurisdictional principles followed by consideration of the preponderance of the evidence as to the remaining causes of action and affirmative defenses.

See Langston ex rel. Langston v. ACT, 890 F.2d 380, 383–84 (11th Cir. 1989) (noting that the plaintiff in a §

1983 suit bears the burden of "prov[ing] his case by a preponderance of the evidence" at trial); League of United Latin Am. Citizens #4552 (LULAC) v. Roscoe Indep. Sch. Dist., 123 F.3d 843, 846 (5th Cir. 1997) (indicating that in the Voting Rights Act context, the plaintiff was "required to prove by a preponderance of the evidence that all of the Gingles preconditions were satisfied"); Swaters v. Osmus, 568 F.3d 1315, 1323–24 (11th Cir. 2009) ("The [affirmative] defense must be established by a preponderance of the evidence."). [35]

### A. Jurisdictional Considerations

#### 1. Standing

"Standing is the threshold question in every federal case, determining the power of the court to entertain the suit." CAMP Legal Def. Fund, Inc. v. City of Atlanta, 451 F.3d 1257, 1269 (11th Cir. 2006) (internal quotation omitted). Article III of the United States Constitution limits courts to hearing actual "Cases" and "Controversies." U.S. Const. Art. III § 2; Lujan v. Defs. of Wildlife, 504 U.S. 555, 559–60, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The standing requirement arising out of Article III seeks to uphold separation-of-powers principles and "to prevent the judicial process from being used to usurp the powers of the political branches." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 408, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013). Standing is typically determined when the complaint is filed. Focus on the Fam. v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1275 (11th Cir. 2003) (collecting authorities).

**\*31**  To establish standing, a plaintiff must show three things:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before

the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

Lujan, 504 U.S. at 560–61, 112 S.Ct. 2130 (internal quotations, citations, and alterations omitted). The party invoking jurisdiction bears the burden of establishing standing "with the manner and degree of evidence required at the successive stages" of litigation. Id. at 561, 112 S.Ct. 2130; see Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater, 777 F.2d 598, 607 n.24 (11th Cir. 1985) (standing "is a legal determination based on the facts established by the record"). At trial, facts concerning standing must be supported by evidence. Lujan, 504 U.S. at 561, 112 S.Ct. 2130; see Langston, 890 F.2d at 383–84 (noting that plaintiff in a § 1983 suit must prove his case by a preponderance of the evidence at trial). While standing is determined when the plaintiff's complaint is filed, "it must persist throughout a lawsuit." G. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cty. Bd. of Registration & Elections, 36 F.4th 1100, 1113 (11th Cir. 2022).

The Court will now consider the three requisites that the organizational plaintiffs must establish: injury in fact, traceability, and redressability.

### a) Injury-in-fact

To establish an injury in fact, a plaintiff must show that it "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." Spokeo, Inc. v. Robins, 578 U.S. 330, 339, 136 S.Ct. 1540, 194 L.Ed.2d 635 (2016) (internal quotations omitted). "A 'concrete' injury is one that actually exists—it is 'real,' as opposed to 'abstract.'" Ga. Ass'n of Latino Elected Offs., Inc., 36 F.4th at 1114 (citations omitted).

Organizations may have standing under a "diversion-of-resources" theory when they divert financial resources or personnel time to counteract unlawful acts of a defendant, thereby impairing the organizations' ability to engage in

typical projects. Havens Realty Corp. v. Coleman, 455 U.S. 363, 379, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); Arcia v. Fla. Sec'y of State, 772 F.3d 1335, 1341 (11th Cir. 2014) ("Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response."); Common Cause/Ga. v. Billups, 554 F.3d 1340, 1350 (11th Cir. 2009) (finding an organization had standing because it diverted "resources from its regular activities to educate and assist voters in complying with" a challenged statute); Common Cause Ind. v. Lawson, 937 F.3d 944, 952–53 (7th Cir. 2019) (listing cases finding standing for voter-advocacy groups that diverted resources to counteract unlawful election activity). [36] A diversion of resources constitutes an Article III injury in fact. See Browning, 522 F.3d at 1165 n.14.

*32 In the Eleventh Circuit, a litigant can establish organizational standing to challenge election laws by showing it has diverted or anticipates having to divert time, personnel, or other resources from its usual projects to assist voters whose ability to vote is affected by state action. See Arcia, 772 F.3d at 1341; Browning, 522 F.3d at 1165–66 (finding organizational standing when a plaintiff diverted resources from election-day education and monitoring to educating volunteers and voters on compliance with a new election law). To create a concrete injury, the diversion must cause a perceptible impairment of organizational activities. Jacobson, 974 F.3d at 1249 (11th Cir. 2020). And to show a concrete injury, the organization must identify the specific activities from which it diverted or is diverting resources. Id. at 1250; see also Ga. Ass'n of Latino Elected Offs., Inc., 36 F.4th at 1114 (an organization establishes diversion-of-resources standing by showing what it would have to divert resources away from to address the effects of the defendant's alleged conduct); Ga. Latino All. for Hum. Rights v. Governor of Ga., 691 F.3d 1250, 1260 (11th Cir. 2012) (finding standing for an immigration organization that "cancelled citizenship classes to focus on" increased inquiries about a new law).

As this Court stated in its summary judgment order concerning standing, a plaintiff may show a diversion of resources even if it diverts from one activity aimed at

achieving an organizational mission to a different activity aimed at that same mission. See, e.g., Common Cause/ Ga., 554 F.3d at 1350 (finding standing for organization that diverted resources from its regular voting-related activities to educate and assist voters in complying with a challenged statute). Similarly, when an organization diverts its resources to achieve its typical goal in a different or amplified manner, the organization may still gain standing. See Ga. Ass'n of Latino Elected Offs., Inc., 36 F.4th at 1115 (finding that an organization diverted resources if it reassigned personnel to help Spanish-speaking voters understand English-only materials); Browning, 522 F.3d at 1166 (finding standing when organization anticipated it would "expend many more hours than it otherwise would have" on specific election-related activity).

Notably, if this Court finds that one Plaintiff has standing with respect to a challenged practice, there is standing sufficient for the Court to consider the challenge, regardless of whether any other Plaintiff has standing with respect to that challenged practice. See Town of Chester, N.Y. v. Laroe Ests., Inc., ––– U.S. ––––, 137 S. Ct. 1645, 1651, 198 L.Ed.2d 64 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint."), Ga. Ass'n of Latino Elected Offs., Inc., 36 F.4th at 1113–14 ("We need not parse each Plaintiff's standing, however, because one—GALEO— has standing, under a diversion of resources theory, to assert all of the claims in the second amended complaint.").

Eight witnesses testified to support Plaintiffs' organizational standing: Bishop Reginald Jackson (the Sixth District); Reverend Raphael Warnock and Reverend Dr. John H. Vaughn (Ebenezer); Jessica Livoti (Care in Action); Liza Conrad and Cianti Stewart-Reid (Fair Fight); Pastor Hermon Scott (Baconton); and Reverend Matt Laney (Virginia-Highland). The Court finds each of these witnesses credible and specifically credits their testimony summarized below.

### (1) The Sixth District has suffered an injury-in-fact caused by Defendants.

The Sixth District is an A.M.E. church in Georgia with a long history of involvement in civil rights, particularly voting rights. Tr. 2974:7–11, 2979:15–2982:18 (Jackson). Bishop Reginald Jackson is the Bishop of the Sixth District, a role he assumed in 2016. Tr. 2973:2–10 (Jackson). Bishop Jackson has undertaken the task of ensuring that "every eligible person

in the Sixth District who is 18 and above is registered to vote, and ... actually votes." Tr. 2982:11–18 (Jackson).

**\*33**  In 2018, the Sixth District diverted resources to address Exact Match MIDR, voter roll inaccuracies, and absentee ballot cancelation procedures. Tr. 2999:4–12 (Jackson). Bishop Jackson diverted time preaching and communicating with his congregation about the Sixth District's voter initiatives, early voting, and voter roll inaccuracies. Tr. 2998:23–2999:12 (Jackson); PX. 741 (2018 email urging early voting). Other Sixth District staff and volunteers devoted time in 2018 to oppose challenged practices in this litigation and to update Bishop Jackson on their work. Tr. 2995:1–14, 2996:6–16, 2997:4–9 (Jackson). Similarly, the Sixth District diverted resources to address concerns with Exact Match MIDR, mismanagement of the voter rolls, and absentee ballot cancelation procedures during the 2020 election cycle. See Tr. 2984:4–2985:12 (Jackson). For example, the Sixth District focused on verifying voters' registration status, creating a voter empowerment program to assist in mobilizing voters among individual congregations, helping voters understand how to handle mail-in applications, and helping voters work through new issues relating to voting roll errors and absentee voting that differed from issues the church had addressed in "routine registration effort[s]." Tr. 2986:6–20, 3008:17–3013:19, 3031:5–13 (Jackson); PX. 1908 (document announcing church voter protection plan); PX. 1909 (showing voter registration trainings). The Sixth District also held workshops to address issues with inaccurate voter registrations, Exact Match, and canceling absentee ballots. Tr. 3024:20–3025:18 (Jackson); PX. 1992. Thousands of AME church volunteers assisted with these efforts during the 2018 and 2020 election cycles. Tr. 2997:4–9, 3018:22–3019:15 (Bishop Jackson). Also, significant financial resources and staff time were devoted to these efforts. Tr. 3019:10–15 (Jackson); PX. 1909 (listing a staff member's outreach duties).

The evidence adduced at trial showed that resources— including personnel and volunteer time—were diverted from the Sixth District's other anticipated or regular activities, such as focusing staff time on Christian education, addressing other social issues like youth outreach, and focusing on church efforts related to COVID-19 or the census. Tr. 2995:19–2996:3, 2999:4–12 (Jackson).

After carefully reviewing the evidence adduced at trial, the Court finds that the Sixth District has demonstrated by a preponderance of the evidence that it suffered a concrete

injury-in-fact by diverting its organizational resources from its core mission and other anticipated projects to counteract Exact Match MIDR, voter roll inaccuracies, and absentee ballot cancelation procedures.

### (2) Ebenezer has suffered an injury-in-fact caused by Defendants.

Ebenezer has long been involved in voting rights efforts, and its Senior Pastor, Reverend Raphael Warnock, testified in deposition that protecting voting rights is core to the church's mission. PX. 2053 Tr. 35:10–36:9, 39:1–10, 41:3–6, 72:8–10 (Warnock Dep.). [37] The church's efforts have included registering, educating, and mobilizing voters, as well as challenging barriers to voting. PX. 2053, Tr. 35:10–36:9, 44:10–23, 71:15–23, [38] 93:2–17 (Warnock Dep.). Before the 2018 election cycle, Ebenezer devoted its voting efforts to general get-out-the-vote activities, consistent with the church's focus on voter registration, education, and mobilization. See PX. 2053, Tr. 46:6–13, 49:1–3 (Warnock Dep.).

 **\*34**  But Ebenezer expanded its voting rights efforts in 2018 to counteract the effects of Defendants' challenged voting practices, such as perceived issues with the voter roll and the Exact Match MIDR policy. PX. 2053 Tr. 47:7–49:5, 104:15–18 (Warnock Dep.). Reverend Warnock testified in deposition that this new work was "much harder" than prior voting rights efforts. See PX. 2053, Tr. 108:12–16 (Warnock Dep.). To address these voting issues in 2018, the church newly focused resources—including volunteer, staff, and worship time—on verifying voter registration. PX. 2053, Tr. 49:1–20, 107:11–108:6, 185:8–24 (Warnock Dep.). Also, Ebenezer provided church space for new programs, such as a voter registration verification hotline, to assist voters grappling with issues caused by Defendants' challenged voting practices. PX. 2053, Tr. 51:7–53:12, 70:25–72:1, [39] 111:10–21 (Warnock Dep.). Ebenezer also devoted financial resources, volunteer time, and worship time to educate voters regarding options to vote early or by absentee ballot. PX. 2053, 49:12–50:8, 103:3–10, 106:22–107:25, 183:12–185:14 (Warnock Dep.). Ebenezer continued and expanded these efforts during the 2020 election cycle by, among other things, devoting church space and time during ministry meetings and prayer sessions for projects to increase voter turnout and educate voters. See, e.g., PX. 2053, Tr. 59:3–8 (Warnock Dep.); see also Tr. 2944:9–2946:8, 2948:6–2949:5, 2952:1–2953:23 (Vaughn).

These programs diverted volunteer and staff time away from Ebenezer's other projects and "areas of church life." PX. 2053, Tr. 106:22–107:25 (Warnock Dep.). For instance, diverting volunteer time to these voting rights projects affected other church programs that rely on the same volunteers, such as Ebenezer's soup kitchen, programs for youth, or one of the church's other "dozens of programs." PX. 2053, Tr. 107:15–25 (Warnock Dep.). Ebenezer would otherwise devote these resources to other kinds of church outreach. PX. 2053, Tr. 190:8–16 (Warnock Dep.). [40]

After carefully reviewing the evidence adduced at trial, the Court finds that Ebenezer has demonstrated by a preponderance of the evidence that it has suffered a concrete injury-in-fact by diverting its organizational resources from the church's core mission and other anticipated projects to counteract voter roll inaccuracies and the Exact Match MIDR policy. Ebenezer's efforts in 2018 and thereafter to have voters check their registration status and vote by mail sufficiently differ from Ebenezer's prior voting activities to constitute a diversion of resources. Ebenezer had not previously engaged in voter registration verification, and its typical get-out-the-vote campaigns were not only different in nature but also involved less work. Under Eleventh Circuit jurisprudence concerning diversion of resources, the Court finds that even if the church had engaged in prior efforts relating to voter turnout and education, the evidence showed enough of a difference in the work undertaken in 2018 and 2020 to demonstrate a diversion of resources sufficient to establish an injury in fact.

### (3) Care in Action has suffered an injury-in-fact caused by Defendants.

Care in Action is a nationwide nonprofit organization with a focus in Georgia. Tr. 83:20–23 (Livoti). It aims to assist domestic workers, and its mission includes helping such workers exercise their right to vote. Tr. 83:7–12 (Livoti). Care in Action's prior voting efforts focused on increasing voter turnout among domestic workers; voter protection was not part of its mission before 2018. Tr. 91:2–93:23 (Livoti).

In 2018, Care in Action planned for its voting-related work in Georgia to end on Election Day. Tr. 94:6–10 (Livoti). But because some voters were unable to cast their ballots, the organization's voting work continued past Election Day to ensure provisional ballots were cured and counted. Tr. 94:19–

95:21 (Livoti). Care in Action directly engaged with voters, diverting resources and volunteer time from typical activities such as immigration matters to undertake provisional ballot training, door-to-door communications, phone banks, text message campaigns, and social media efforts. Tr. 95:9–98:12 (Livoti). To facilitate these efforts, Care in Action paid for the housing, travel, and meal expenses of staff members who stayed in Georgia to assist with the unanticipated post-election activities. See PX. 915; PX. 916; PX. 922; PX. 940; PX. 1006 (receipts and invoices for Care in Action's post-election expenditures, including transportation, housing, and meals for staff). Similarly, Care in Action spent $107,500 on post-election digital advertisements to reach potentially affected voters who had cast provisional ballots. Tr. 96:4–12 (Livoti); PX. 902.

*35  In 2020, Care in Action expanded its scope of voting work and began voter outreach and education earlier than in prior election cycles. Tr. 108:4–16, 146:10–21 (Livoti). Care in Action incurred additional costs to develop training programs for staff and canvassers, and it devoted more staff time to voting activities than it had in the past. See Tr. 108:7–16, 115:15–117:22 (Livoti). For example, Care in Action trained its canvassers to educate voters about the Exact Match MIDR and Citizenship policies because the organization serves a population with a high number of immigrants and naturalized citizens who commonly have multiple or hyphenated last names and who thus are likely to encounter issues under these systems. Tr. 114:22–115:10, 131:10–18, 149:10–16, 150:1–4, 158:4–6, 161:21–162:1, 179:1–11, 180:18–25 (Livoti). Also, Care in Action has trained its canvassers to educate voters about challenges they may face due to voter roll inaccuracies, including being registered under the wrong name. Tr. 119:1–17; 130:5–15; 151:4–7; 158:4–6; 175:6–16; 181:1–4 (Livoti); see also Tr. 89:11–12 (Livoti) (discussing voter address issues that domestic workers face as a transient population). Care in Action has also undertaken voter education, including through a new voter hotline, regarding issues with absentee ballots and voter registration inaccuracies. Tr. 118:22–119:17, 141:17–24, 151:1–7, 160:20–25 (Livoti).

Care in Action could have reached out to more voters had it not diverted resources from its traditional get-out-the-vote work, where conversations with voters are less complex and time consuming. Tr. 115:17–23; 117:12–22 (Livoti). Further, these expanded voting efforts caused Care in Action to divert resources from other programs. Tr. 123:6–124:3 (Livoti). For example, its provisional ballot work in 2018 prevented Care in

Action from sending staff to Mexico to work on immigration issues. Tr. 97:13–24 (Livoti). More broadly, voter protection efforts divert Care in Action's resources from its core work of organizing, advocating for, and providing on-the-job training for domestic workers—all of which Care in Action contends it would refocus on if the practices at issue were discontinued. Tr. 123:6–124:11 (Livoti).

The Court finds that Care in Action has demonstrated by a preponderance of the evidence that it has suffered a concrete injury-in-fact by diverting its organizational resources to counteract Defendants' Exact Match MIDR and citizenship policies.

### (4) Fair Fight has suffered an injury-in-fact caused by Defendants.

Fair Fight is a nationwide nonprofit with its primary activities in Georgia. Tr. 1383:22–1384:1 (Stewart-Reid). Its mission has long focused on voter education, voter turnout, and progressive issue research. Tr. 1395:18–20, 1396:5–7 (Stewart-Reid); Tr. 3852:20–3853:5, 3857:20–3858:3 (Groh-Wargo). Fair Fight is particularly focused on supporting marginalized communities, voters of color, young voters, and low-income voters. Tr. 1396:8–13 (Stewart-Reid). But it also commits resources to research on non-voting progressive issues, such as Medicaid expansion and reproductive rights. Tr. 1414:6–15 (Stewart-Reid).

Because of what it observed in the 2018 election, Fair Fight began expending resources to mitigate voter suppression to protect its core missions of educating and mobilizing voters. Tr. 3858:4–3859:5, 3895:20–3896:3, 3930:25–3931:4 (Groh-Wargo). Thus, while Fair Fight was still addressing voting issues, it diverted resources away from core missions to address a new concern—perceived voter suppression. Tr. 1395:25–1398:4, 1459:3–24 (Stewart-Reid); Tr. 3858:4–17, 3930:25–3931:4 (Groh-Wargo). For example, the organization's work to counteract Defendants' acts has caused it to divert resources from other programs, such as get-out-the-vote campaigns and support of other progressive causes. Tr. 1424:16–22, 1459:3–14 (Stewart-Reid) (testifying that volunteers now have less time to conduct get-out-the-vote calls or have more voter interactions because they are spending time having longer conversations with voters about the challenged practices).

Also, to combat the challenged practices, Fair Fight has devoted substantial staff, volunteer, and financial resources to several new initiatives. Tr. 1399:9–18 (Stewart-Reid); Tr. 1066:6–8 (Conrad); Tr. 3870:21–3871:5 (Groh-Wargo). For example, Fair Fight devoted staff time and financial resources to create the "Fair Fight U" program, which trains college students about voter roll inaccuracies, absentee ballot cancelation, and other voting issues to prepare those students to check their registration status and exercise their right to vote. Tr. 1399:20–1402:18 (Stewart-Reid); Tr. 3870:11–17 (Groh-Wargo). After the 2018 election, Fair Fight diverted resources to create and run similar programs to address voter registration and absentee ballot cancelation issues, which were more complicated than prior voting projects and consumed more volunteer time. E.g., Tr. 1402:14–1405:8 (Stewart-Reid) (discussing Democracy Warriors program); PX. 1858 (showing $33,711 budget for Atlanta Democracy Warriors Summit); PX. 1859 (showing $9,256 budget for Macon Democracy Warriors Summit); see Tr. 1059:12–1084:20 (Conrad) (discussing Voter Protection Department that collects stories from voters, addresses voter registration issues arising from citizenship verification, ensures voters' registration information is accurate, and trains poll observers); Tr. 1408:12–1409:12 (Stewart-Reid) (discussing the new Organizing Department, which manages volunteers who conduct voter outreach regarding voter suppression issues).

**\*36** Beyond the new initiatives, Fair Fight's existing communications and research departments have diverted resources to address new voting issues by drafting and releasing press statements and social media content, creating a website to facilitate voter registration verification, and monitoring media to track relevant issues. Tr. 1069:2–12 (Conrad); Tr. 1411:14–1414:18 (Stewart-Reid); see also Tr. 1425:1–8 (Stewart-Reid) (discussing how the organization's research team has diverted resources to "media monitoring" concerning "issues with absentee ballots or Exact Match or the list inaccuracies" instead of other research for progressive issues such as reproductive health). The group has also diverted resources from its standard voter education to educate voters about proper absentee ballot cancelation. Tr. 1398:7–19 (Stewart-Reid). Thus, as shown above, Fair Fight's programs and efforts to address new voting issues have diverted attention, staff, and financial resources from the organization's other projects, including voter engagement and education efforts that are central to the organization's mission. Tr. 1404:25–1405:3, 1409:16–18, 1414:12–18, 1426:6–15 (Stewart-Reid); Tr. 3861:19–24 (Groh-Wargo); Tr. 1086:10–

1087:15 (Conrad) (discussing civics programming to educate young voters of color that would receive more resources if they were not diverted to address voter registration issues and absentee ballot cancelation issues).

The Court finds that Fair Fight has demonstrated by a preponderance of the evidence that it has suffered a concrete injury-in-fact by diverting its organizational resources from its typical voter turnout and voter education activities to counteract Defendants' challenged practices relating to Exact Match MIDR and citizenship policies, management of the voter rolls, and absentee ballot cancelation training. To that tend, the Court credits and gives weight to the testimony of Ms. Groh-Wargo, Ms. Stewart-Reid, and Ms. Conrad regarding issues relating to the organization's diversion of resources.

### (5) Baconton has suffered an injury-in-fact caused by Defendants.

Baconton, a Georgia church affiliated with the general Missionary Baptist Convention, maintains a deep commitment to civil rights and social justice issues. Tr. 2531:13–17, 2541:18–2542:14 (Scott). Voting issues have been a core part of the church's organizational mission, and it has long promoted voter education, registration, and participation. Tr. 2549:1–2550:24 (Scott). Before 2018, the church's voting efforts focused on encouraging people to vote because the church and its Senior Pastor, Reverend Doctor Hermon Scott, "[took] for granted" that once voters were registered, they were on the rolls and would be able to vote. Tr. 2553:18–2554:4, 2560:13–22 (Scott). But during the 2018 election cycle, the church changed its focus after hearing about issues with voter registration status. Tr. 2553:18–2557:17 (Scott). Pastor Scott was especially concerned about voters being unable to vote due to issues with identification cards not matching with voter registration information. Tr. 2554:5–2556:5 (Scott).

As a result of the above concerns, Pastor Scott began diverting time during weekly bible studies and sermons to discuss voting issues and the need to verify voting registration information, which took time away from religious and other topics usually discussed. See Tr. 2558:1–2561:2, 2574:7–12 (Scott). The church also diverted resources to host countywide meetings to discuss the importance of voter registration, education, and participation, including a new emphasis on checking voter registration. Tr. 2561:12–

2566:12 (Scott); see PX. 634 at 4 (2018 worship bulletin announcing prayer meeting at Baconton). The church provided space, volunteers, and staff and printed materials to help host the countywide meetings. Tr. 2563:17–2564:17 (Scott). Baconton also diverted volunteer time in 2018 for events to help church members verify their voter registration, which differed from prior voter registration efforts. Tr. 2558:7–12, 2575:22–2578:17 (Scott). Pastor Scott continued diverting his and the church's time to efforts regarding voter registration verification in 2022, which the church states will continue to occur unless the alleged voting practices will ended. See Tr. 2579:6–2580:3, 2654:14–25 (Scott).

Pastor Scott testified at trial that if the church's volunteers and staff had not diverted resources toward verifying voter registration, they would have been involved in other activities in line with Baconton's mission, such as feeding the hungry, assisting the poor, and visiting prisoners. Tr. 2573:2–17, 2578:3–12, 2587:2–5 (Scott). He also testified that if the challenged voting practices were ended, his church would reduce time spent on voter registration verification to discussing those issues only when the State is removing voters from voting roles, rather than weekly. Tr. 2656:2–24 (Scott).

**\*37** The Court finds that Baconton has demonstrated by a preponderance of the evidence that it has suffered a concrete injury-in-fact by diverting its organizational resources from the church's core mission to counteract issues relating to Exact Match MIDR policy and voter roll inaccuracies, by educating and assisting voters with respect to voter registration issues and verification. If the Court grants relief to Plaintiffs, Baconton would be able to refocus its diverted resources on its core activities.

### (6) Virginia-Highland has suffered an injury-in-fact caused by Defendants.

Virginia-Highland is an Atlanta church that is part of the United Church of Christ. Tr. 527:11–528:23 (Laney). Its mission focuses on combatting racism and representing marginalized people. Tr. 530:4–12 (Laney). In 2018, the church diverted resources to address issues with Exact Match MIDR and citizenship status, voter roll accuracy, and absentee ballot cancelation. Tr. 535:13–536:8, 540:4–541:7 (Laney). For example, while the church has had a "Voting Rights Ministry" since 2008 that originally focused only on registering voters, the church expanded the program's reach in 2018 to include voter registration

verification. Tr. 532:8–536:8 (Laney). The church then had to spend more time training volunteers. Tr. 536:23–537:1 (Laney). Similarly, volunteers had to devote more time with each voter to address potential issues due to voter roll irregularities and Defendants' policies. Tr. 535:13–537:11 (Laney). Since 2018, the church has continued to divert resources to counteract Defendants' policies by increasing volunteer numbers, devoting significantly more staff time to the Voting Rights Ministry, and adding discussions of Defendants' policies during voter registration drives. See Tr. 533:22–540:21, 569:11–572:13 (Laney).

To undertake these new or enhanced voting-related activities, Virginia-Highland has had to divert resources from its other projects, such as the church's LGBTQIA ministry. Tr. 543:4–544:15 (Laney). For example, one church volunteer resigned from leadership positions in other ministries so she could devote that time to the voting rights work. Tr. 581:24–582:11 (Laney). Virginia-Highland anticipates that if this Court does not resolve the challenged practices in Plaintiffs' favor, the church will continue to divert resources in future elections, and away from other ministries, due to the challenged practices. Tr. 547:20–548:3, 577:2–9 (Laney).

The Court finds that Virginia-Highland has shown by a preponderance of the evidence that it has suffered a concrete injury-in-fact by diverting its resources from other core church programs to counteract Defendants' Exact Match MIDR and citizenship policies, management of the voter rolls, and training concerning absentee ballot cancelation procedures.

### b) Traceability and redressability

"To establish causation [for standing,] a plaintiff need only demonstrate, as a matter of fact, a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant." Charles H. Wesley Educ. Found., Inc. v. Cox, 408 F.3d 1349, 1352 (11th Cir. 2005) (emphasis in original) (internal quotations omitted). An organizational plaintiff proceeding under a diversion-of-resources theory establishes traceability by showing that resources were diverted to counteract the defendant's allegedly illegal practices. Browning, 522 F.3d at 1166. The traceability requirement is not stringent and can be satisfied even with a showing that the alleged injury is indirectly caused by

the defendant. See 🚩Cordoba v. DIRECTV, LLC, 942 F.3d 1259, 1271 (11th Cir. 2019).

**\*38** An injury is traceable to an election official responsible for the election administration process or rule that allegedly has caused the plaintiff's injury. Compare Ga. Ass'n of Latino Elected Offs., Inc., 36 F.4th at 1116 (finding traceability requirement met with allegations that state election official's failure to provide bilingual voting materials and information caused the organizational plaintiff's diversion of resources) with 🚩Jacobson, 974 F.3d at 1253 (finding no traceability to election official who was not responsible for the allegedly injurious policy). Establishing traceability is sufficient to establish causation, but only for purposes of standing.[41] See Ga. Ass'n of Latino Elected Offs., Inc., 36 F.4th at 1116.

An injury is redressable when "a decision in a plaintiff's favor would significantly increase the likelihood that she would obtain relief." 🚩Lewis v. Gov. of Ala., 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (cleaned up). That is true so long as the court's judgment may remedy the plaintiff's injury, "whether directly or indirectly." Id. (quotation marks omitted); see also Ga. Ass'n of Latino Elected Offs., Inc., 36 F.4th at 1116 (stating it must be "likely," not merely "speculative," that the alleged injury will be redressed by a favorable decision). Thus, if a state election official lacks the authority to redress the alleged injury, the court cannot enter a judgment that may remedy the plaintiff's injury, which means the plaintiff lacks standing. See, e.g., 🚩Jacobson, 974 F.3d at 1269 (finding the plaintiffs lacked standing because the defendant election official did not control the complained-of ballot-listing injury, which meant she could not redress the alleged injury).

After careful consideration of the evidence adduced at trial, the Court finds that Plaintiffs have standing to pursue their remaining claims because those claims are traceable to and redressable by Defendants.

### (1) Exact Match MIDR and Citizenship are traceable to and redressable by Defendants.

The Court finds based on the evidence adduced at trial that Defendants are legally responsible for the Exact Match MIDR and citizenship policies, and that those policies are traceable to and redressable by Defendants. State law

explicitly assigns responsibility for the voter verification and matching processes to the Secretary. See O.C.G.A. § 21-2-50(a)(14) (requiring the Secretary to "maintain the official list of registered voters for this state and the list of inactive voters required by this chapter"); O.C.G.A. § 21-2-50.2(a) (stating that the Secretary is the state's chief election official under HAVA and thus is "responsible for coordinating the obligations of the state under" HAVA); 🚩O.C.G.A. § 21-2-216(g)(7) (stating the Secretary "shall establish procedures to match an applicant's voter registration information to the information contained in the data base maintained by the Department of Driver Services for the verification of the accuracy of the information provided on the application for voter registration, including whether the applicant has provided satisfactory evidence of United States citizenship"). Evidence adduced at trial showed that the Secretary directs or is involved in many aspects of the relevant processes. See, e.g., PX. 1900 (letter that is drafted by the Secretary and that is sent by counties to registrants in MIDR status); PX. 2021 at 7, PX. 2022 at 5 (discussing Secretary's citizenship audit).

**\*39** Moreover, HAVA does not mandate the precise requirements of Exact Match MIDR in a way that precludes Exact Match from being traceable to or redressable by Defendants. For example, HAVA does not require comparison of a registration applicant's first name, last name, date of birth, or citizenship information. 🚩52 U.S.C. § 21083(a)(5). Nor does it require identifying information to match exactly. Id. Rather, HAVA requires states to compare voter registration applicants' driver's license numbers or the last four digits of their social security numbers against that information in the applicants' DDS or SSA files. 🚩52 U.S.C. § 21083(a)(5); Tr. 358:4–12 (Mayer). HAVA does not require that such identifying information match exactly. 🚩52 U.S.C. § 21083(a)(5); see Tr. 214:6–10 (McCrary); Tr. 357:20–358:8 (Mayer) ("Th[e] method is left up to the state."); Tr. 508:15–510:3 (Mayer). Plaintiffs presented evidence of other, less stringent ways to verify names in voter registration databases that would comply with HAVA. See Tr. 358:16–359:7 (Mayer); PX. 1278 (Mayer Report) at 10. Thus, the Court finds that HAVA is not a bar to finding traceability and redressability here.

Similarly, HAVA is not a bar to finding traceability and redressability with respect to the challenged citizenship verification process. Evidence in the record showed not only that HAVA itself does not require citizenship verification

but also that other states have adopted alternative means of confirming citizenship for purposes of voting. PX. 66 at 2 (citations omitted); see also Tr. 363:24–365:4 (Mayer) (discussing states that rely on registrant's citizenship attestation without otherwise verifying citizenship status). Also, the evidence at trial showed that the Secretary exercises oversight of the citizenship verification process. E.g., PX. 1231, PX. 1779 (citizenship verification letters drafted by the Secretary).

Finally, state law tasks the SEB and its members with promulgating rules and regulations to obtain uniformity in county practices, O.C.G.A. § 21-2-31(1), and formulate, adopt, and promulgate rules and regulations conducive to the fair, legal, and orderly conduct of elections, O.C.G.A. § 21-2-31(2). The SEB must investigate, or authorize the Secretary to investigate, the administration of election laws. O.C.G.A. § 21-2-31(5); see also Tr. 1742:16–1743:13 (Harvey) &. 4032:7–18 (Sullivan) (discussing SEB in context of complaints concerning election administration). Other statutory duties obligate the SEB to undertake significant oversight responsibilities regarding the administration of elections and election laws. See O.C.G.A. §§ 21-2-31(10), 21-2-33.1(a). The SEB also has enforcement powers under Georgia law. See O.C.G.A. § 21-2-33.1. And the SEB can have the Secretary of State provide support and assistance to carry out the SEB's duties. O.C.G.A. § 21-2-33.1(h); see also Tr. 4017:18–21 (Sullivan), Tr. 4093:14–17 (Mashburn), & Tr. 1852:1–19 (Harvey) (discussing the SEB's ability to instruct the Secretary of State to issue Official Election Bulletins to provide instructions to the counties). Given this significant oversight authority and based on the evidence adduced at trial, the Court finds that Exact Match MIDR and citizenship policies are traceable to the Board and its members.

For the above reasons, the Court finds that Defendants are sufficiently responsible for the Exact Match MIDR and citizenship policies such that those policies are traceable to and redressable by Defendants.

### *(2) Some list maintenance practices are traceable to and redressable by Defendants.*

At summary judgment, the Court ruled that Plaintiffs' list maintenance claims are fairly traceable to the Secretary of State because "the law itself contemplate[s] [a] role

for' the Secretary—i.e., maintaining accurate registration rolls under HAVA." Doc. No. [612], 43. None of the parties briefing that proceeded the Summary Judgment Order addressed O.C.G.A. §§ 21-2-221, 226, 228, or 231, as support for their traceability arguments. Doc. Nos. [441], [489], [553]. At trial, however, there was extensive testimony and argument regarding these statutes and their relationship to the Secretary of State's list maintenance responsibilities. See, e.g., Tr. 423:22–424:11, 2245:23–2248:1, 3203:10–3209:21, 3350:19–3351:20, 3353:3–7, 3355:8–18, 3580:8–3584:15, 3709:25–3710:10, 3735:25–3736:10, 3737:10–3739:21, 3757:14–3766:6, 3773:24–3776:1, 3796:20–3799:15, 3800:20–3801:15, 3827:18–3831:10. In light of the evidence adduced at trial, the Court now determines whether Plaintiffs' list maintenance claim is fairly traceable to the Secretary of State. "If an action proceeds to trial, the facts necessary to establish standing 'must be supported adequately by the evidence adduced at trial.'" Jacobson, 974 F.3d at 1245 (quoting Lujan, 504 U.S. at 561, 112 S.Ct. 2130).

**\*40** In Jacobson, the Eleventh Circuit held that the challenged practice was not fairly traceable to the Florida Secretary of State because "Florida law tasks the Supervisors, independently of the Secretary" with conducting the challenged practice. Jacobson, 974 F.3d at 1253. The Eleventh Circuit reasoned that even though the Florida Secretary of State has general supervision of the administration of election laws, where "Florida law expressly gives a different, independent official control over the order in which candidates appear on the ballot," the challenged practice is not traceable to the Florida Secretary of State. Id. at 1254. Accordingly, the Court will review the relevant statutory authority regarding list maintenance to determine whether the challenged practices are traceable to the Secretary of State or to the counties.

Upon review of the relevant Code sections, the Court construes the duties of the county registrars and the Secretary of State as follows.

### (a) List Maintenance statutory overview

State law explicitly assigns responsibility for maintenance of the official list of registered voters to the Secretary. See O.C.G.A. § 21-2-50(a)(14) (requiring the Secretary to

"maintain the official list of registered voters for this state and the list of inactive voters required by this chapter"); O.C.G.A. § 21-2-50.2(a) (indicating that the Secretary of State shall be responsible for coordinating the obligations of the state under HAVA; see also 52 U.S.C. § 21083(a)(1), (4) (setting forth each state's duties under HAVA; stating that each state "shall implement ... a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name and registration information of every legally registered voter in the State"; and stating that "[t]he State election system shall include provisions to ensure that voter registration records in the State are accurate and updated regularly ...."). Indeed, Chris Harvey testified that the Secretary is the state official in charge of ensuring "that the HAVA requirements [are] met." Tr. 3485:6–11 (Harvey).

When an individual attempts to register to vote, the county registrar has a duty to determine whether the individual is eligible to vote. O.C.G.A. § 21-2-226(a). Once an individual is deemed an eligible elector, the county registrar has the duty of placing the elector in the proper districts. Id. at 226(b). The counties then have the duty to "from time to time [examine] the qualifications of each elector of the county or municipality whose name is entered upon the list of electors." O.C.G.A. § 21-2-228(a). If after notice and an opportunity for a hearing, "the registrars find that the elector is not qualified to remain on the list of electors, the registrars shall remove the name of such elector from the list of electors." O.C.G.A. § 21-2-228(e).

In addition to the counties' general duty to examine the qualifications, on or before the tenth day of every month, the Secretary of State receives "a complete list of all persons, including dates of birth, Social Security numbers, and other information as prescribed by the Secretary of State or The Council of Superior Court Clerks of Georgia, who were convicted of a felony in this state since the proceeding reporting period." O.C.G.A. § 21-2-231(a). Upon receipt of that list and the list of individuals convicted of felonies in federal court, "the Secretary of State shall transmit the names of such person whose names appear on the lists of electors to the appropriate county board of registrars." O.C.G.A. § 21-2-231(c)(2). The county registrar then "shall mail a notice to the last known address of each such person" stating that the person was listed as having a felony and will be removed from the list of electors thirty days after the notice, unless the individual requests a hearing. Id.

*41  On or before the tenth day of every month, the Secretary of State receives "a complete list of all persons, including addresses, ages, and other identifying information as prescribed by the Secretary of State, who died during the preceding calendar month in the county." O.C.G.A. § 21-2-231(d). The Secretary of State then has the duty to remove said persons from the list of electors and notify the county registrar about the elector's death. Id. § 21-2-231(e). The County registrar also has a duty to remove individuals from the list of electors, if the county registrar obtains information about the individual's death from obituaries, death certificates, or other verifiable knowledge of the death. Id. § 21-2-231(e.1).

If the county registrar fails to "initiate appropriate action regarding the right of an elector to remain on the list of qualified registered voters" after receiving the felon list or information about an elector's death, "such action may subject the registrars ... to a fine by the State Election Board." O.C.G.A. § 21-2-231(f).

At trial, Mr. Harvey testified that the process by which the Secretary of State maintains the list of voters, with respect to deceased and felon electors, is by programming eNet with certain criteria; eNet then flags the electors whose information matches the criteria. Tr. 3716:15–3717:9; 3720:13–20.

### (b) Traceability for the specific challenged practices

#### i) vitals matching

With respect to vital records, the Secretary of State receives information from certain government agencies containing the list of deceased individuals (Tr. 3715:20–3716:7), then the Secretary of State programs eNet to apply certain matching criteria to the list of deceased persons against the electors on the voter registration database (Tr. 3717:1–3), then eNet automatically cancels electors whose information matches that of a deceased person (Tr. 3717:4–13). eNet will cancel an elector only if there is a "tight match," which was defined as match in last name, Social Security number and date of birth. Tr. 3719:7–18.

Mr. Hallman testified that once the Secretary of State cancels an elector, it sends the counties "loose matches." Tr. 886:8–

15. Loose matches include: (1) last name and date of birth, and (2) last name and SSN. PX. 800 at 13.

Under both the statutory language and the testimony developed at trial, the Secretary of State is responsible for matching the lists of deceased individuals against the voter roll. The Secretary of State is then responsible for canceling the voters that match. The Secretary of State then sends the name of electors that loosely match the list of deceased electors. The counties then cancel voters who are loosely matched or if they obtain certain types of proof that the voter is deceased.

### *ii)* felon matching

With respect to felon matching, the Court first reviews the governing statute and then discusses how the Secretary of State and counties undertake the process of attempting to identify felons and remove them from voter rolls.

Under Georgia law, the Secretary of State receives a monthly list from the Georgia Crime Information Center "of all persons, including dates of birth, social security numbers, and other information as prescribed by the Secretary of State ... who were convicted of a felony in this state since the preceding reporting period." O.C.G.A. § 21-2-231(a). Pursuant to 52 U.S.C. § 20507(g), the Secretary of State also receives "lists of persons convicted of felonies in federal courts." See O.C.G.A. § 21-2-231(c)(2). Upon receiving these lists of felons,

> the Secretary of State shall transmit the names of such persons whose names appear on the lists of electors to the appropriate county board of registrars who shall mail a notice to the last known address of each such person by first-class mail, stating that the board of registrars has received information that such person has been convicted of a felony and will be removed from the list of electors thirty days after the date of the notice unless such person requests a hearing before the board of registrars on such removal.

**\*42** Id. (emphasis added).

In practice, the Secretary of State receives from the DOC and the DCS a list containing names of recently convicted felons. Tr. 3719:23–3720:1. The Secretary of State

then runs the list through eNet to identify voters whose information matches certain criteria that the Secretary of State has developed for matching purposes. Tr. 862:15–18 (Hallman); Tr. 3567:13–17, 3720:5–9 (Harvey); Tr. 1329:12–20 (Frechette). Specifically, eNet runs six different sets of criteria for felon matching: (1) Last name, first name, last four digits of Social Security number, and date of birth for voters in active, inactive, pending, or reject status; (2) last name, first name, last four digits of Social Security number, and date of birth for voters in canceled status; (3) last name, last four digits of Social Security number, and date of birth; (4) first name, last four digits of Social Security number, and date of birth; (5) last name, first name, and date of birth; and (6) last name, date of birth, race, [42] and gender. PX. 800 at 21. These matching criteria are listed in descending order from "tight" matches to "loose" matches. See Tr. 871:8–18, 872:12–18 (Hallman).

Although the governing statute provides that "the Secretary of State shall transmit the names of [felons] whose names appear on the lists of electors to the appropriate county board of registrars," O.C.G.A. § 21-2-231(c)(2), the process unfolds more circuitously in practice. [43] Namely, once the Secretary of State has run the above criteria and developed lists of potential matches between the felon lists and existing voter registration records, the Secretary of State transmits the list of *potential matches* to the counties by displaying them on the county dashboard for review by the county. Tr. 1329:21–1330:1 (Frechette).

At that point in the process, the governing statute provides that once the county receives from the Secretary of State the names of felons who appear on the county's voter rolls, the county "shall mail a notice to the last known address of each such person by first-class mail" informing such persons that they have been identified as a felon and will removed from the voter rolls absent further action from the person. O.C.G.A. § 21-2-231(c)(2). But the evidence at trial showed that under the system in place, the counties do more than simply mail notices to those identified by the Secretary of State. Rather, each county must establish its own county-wide policy to apply to each potential match provided by the Secretary of State to determine whether it is a true match. Tr. 3570:5–10 (Harvey); Tr. 1351:16–1352:11 (Frechette). In other words, under current practices intended to comport with O.C.G.A. § 21-2-231, regardless of the criteria used for identifying potential matches, the counties are the ones who ultimately

decide whether individuals in their voter rolls are in fact felons. See Tr. 873:3–5 (Hallman). And if the county decides that someone identified as a potential match is indeed a felon, then the county must transmit to that individual the notice letter and follow the remaining, related procedures provided under the governing statute to remove the person identified as a felon from the voter rolls. See 🚩 O.C.G.A. § 21-2-231(c)(2).

**\*43**  As to traceability, Defendants argue that the counties —not the Secretary of State—are responsible for erroneous felon cancelations. Specifically, Defendants contend that "[t]he state is not making anyone take someone off the roll." Tr. 4437:1–3. Mr. Harvey testified that once eNet processes the list, the Secretary of State then sends the list of matches to the counties, and the counties decide which electors need to be removed as felons. Tr. 3720:21–3721:6. And, a potential match does "not necessarily [mean] cancellation ... the county should look at and see if there is information that the person should be canceled." Tr. 3725:1–4. Once the county gets the potential matches, the county determines whether the individual should be removed as a felon; thus, in practice, the Secretary of State does not make that final determination. Tr. 3567:7–3568:1.

For purposes of standing, the Court disagrees that the burdens caused by the felon matching process are not traceable to the Secretary of State because the counties ultimately decide who is a felon.[44]  As Defense Counsel argued, "how does this list accuracy work in terms of felon matching? It's, again, controlled by the statute." Tr. 4435:23–25. And as discussed above, the governing statute provides that the Secretary of State sends the list of felons to the counties, which in practice is sent in the form of "matches." Then, per the governing statute, the counties must send a notice to the impacted voters informing them that they have been deemed a felon. But in practice, before that step occurs, counties use the information that they receive from the Secretary of State to determine whether matched individuals are indeed felons.

When outlining the duties for the counties and the Secretary of State, 🚩 O.C.G.A. § 21-2-231 uses the word "shall." The Court acknowledges that there is debate as to the meaning of the word "shall"[45] ; however, in this Circuit "[t]he word 'shall' is ordinarily the language of a command." 🚩 In re Tennyson, 611 F.3d 873, 878 (11th Cir. 2010)) (quoting 🚩 Alabama v. Bozeman, 533 U.S. 146, 153, 121 S.Ct.

2079, 150 L.Ed.2d 188 (2001)); see also 🚩 Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26, 27, 118 S.Ct. 956, 140 L.Ed.2d 62 (1998) ("[T]he mandatory 'shall,' ... normally creates an obligation impervious to judicial discretion."); 🚩 U.S. v. Peters, 783 F.3d 1361, 1364 (11th Cir. 2015) ("Using the verb 'shall in a statute is a command. 'Shall' creates an obligation not subject to judicial discretion.") (internal citations omitted).

**\*44**  Having considered the express terms of 🚩 O.C.G.A. § 21-2-231(c)(2) and the procedure for felon matching as outlined at trial, the Court finds that the injury is sufficiently traceable to the Secretary of State for purposes of standing. To start, the Secretary of State has developed a system in which it generates lists of potential felon matches that it sends to the counties. Thus, the Secretary of State starts the felon identification process by identifying "potential" matches and sending those to the counties. At that point, the counties, relying on the potential matches that the Secretary of State sent them, undertake the process of identifying correct matches. And, per 🚩 O.C.G.A. § 21-2-231(c)(2), the counties "shall" then start the process of removing voters identified as felons. Because counties are required by statute to send notice letters and either conduct a hearing or remove the elector thirty-days after the notice is mailed, the Court finds that under the plain language of the statute, the counties have no discretion over whether to send the notice, and must either hold a hearing or cancel a voter. While the Court acknowledges that in practice the counties do not automatically send the notice letter to the impacted voter, see infra, the Court finds that for purposes of traceability, the Georgia statute does not give the counties discretion over whether to send a notice letter. See 🚩 Jacobson, 974 F.3d at 1254 (requiring courts to look to the specific language of the statute to determine whether an action is traceable to the secretary of state).

Accordingly, certain burdens created by the felon matching process are traceable to the Secretary of State.[46]  Moreover, for the reasons discussed supra with respect to the SEB's oversight responsibilities in ensuring fair elections and promulgating rules and regulations in accordance with that responsibility, the Court finds that this matter is also traceable to the SEB.

### iii) duplicate matching

The Court finds that the duplicate matching process is not traceable to the Secretary of State. "[T]here must be a causal connection between the injury and the conduct complained of—the injury has to be 'fairly ... trace[able] to the challenged action of the defendant, and not ... th[e] result [of] the independent action of some third party not before the court.' " 🚩 Lujan, 504 U.S. at 560, 112 S.Ct. 2130; see also 🚩 Jacobson, 974 F.3d at 1253–54 (holding that the challenged practices were not traceable to the Florida Secretary of State because state law assigned authority over the challenged practice to the counties). With respect to duplicate matching, the Court finds that the causal link between Defendants and the voters was broken by the counties' actions.

Unlike felon and vital record matches, the Georgia Code does not outline the procedure by which the duplicate matches are evaluated. O.C.G.A. § 21-2-228(a) requires the county registrars to "from time to time" examine "the qualification of each elector of the county or municipality whose name is entered upon the list of electors." The statute does not expressly dictate the method that the counties must take to re-examine an elector's qualifications.

 **\*45**  At trial, Mr. Hallman testified that "[w]hen a voter registration application comes in through either [DDS or OLVR], [e]Net is programmed by the Secretary of State to run automatically a search of existing voter records that are already in [e]Net." Tr. 762:15–19. As with vital records and felon matching, the Secretary of State establishes the criteria for what is determined to be a duplicate match. Tr. 761:2–4. The following is the criteria used to determine a duplicate match: (1) driver's license number; (2) last name, first name, date of birth and Social Security number; and (3) last name, first name, and date of birth. PX. 50, 39. Mr. Hallman testified that once eNet determines that there is a possible duplicate match, the counties would see a list of potential matches based upon the different matching criteria and then would determine whether the voters are in fact a match or two different people. Tr. 765:13–766:1, 766:9–16.

Unlike with vital and felon matching, the statutes state that when a county deems that an elector does meet the registration requirements, the county "shall remove the name of such elector." O.C.G.A. § 21-2-228(e). As stated above, the use of

the word "shall" requires the counties to (1) evaluate whether the voters on the list of electors are qualified to vote and (2) remove any elector who is not qualified to vote. See O.C.G.A. § 21-2-228(a). Under the current statutory framework, the Georgia legislature has expressly delegated the authority to determine the qualifications of electors and remove electors to the counties, with the exception of felons and vitals, where the Georgia legislature reserved certain duties for the Secretary of State. See infra. Although, the Secretary of State has general authority to maintain the list, "[Georgia] law expressly gives a different, independent official [general] control" over determining which electors are qualified to vote and removing electors that are not qualified to vote. 🚩 Jacobson, 974 F.3d at 1254.[47] As a result, the challenge to duplicate matching is not traceable to the Secretary of State because the counties have deliberative autonomous decision-making authority, not the Secretary of State.

By comparison, with respect to vital matches, the counties are empowered to remove a voter from the voter rolls only if the county has physical proof that the voter is deceased, and with felons the statute requires the counties to send a notice to all voters who are on the Secretary of State's list and either hold a hearing or remove all electors who are on the list. The Georgia legislature abrogated the counties' deliberative autonomous decision-making authority with respect to the cancelation process for electors who appear on the Secretary of State's vitals and felons list. Accordingly, the Court finds that there is not sufficient causation to tie a burden caused by duplicate matching to Defendants. Accordingly, Plaintiffs' First and Fourteenth Amendment claim with respect to the duplicate matching process fails as a matter of law.[48]

For the above reasons, the Court finds that Plaintiffs' List Maintenance Claim with respect to felon matching and vitals matching are traceable to Defendants. However, Plaintiffs' List Maintenance Claim with respect to Duplicate Matching is not traceable to Defendants.

### c) Inadequate training on absentee ballot cancelation is traceable to and redressable by Defendants.

As to training related to provisional and absentee ballots, state law requires that the Secretary "conduct training sessions at such places as the Secretary of State deems appropriate in each year, for the training of registrars and superintendents of elections." O.C.G.A. § 21-2-50(a)(11). The Secretary must

train and select trainings for county election superintendents, registrars, and other county election officials. See O.C.G.A. §§ 21-2-100(a), 101(a). Former Elections Division Director Chris Harvey testified that this training structure is a "train the trainer" scenario because the individuals the Secretary must train then go on to train other county elections officials and personnel. See Tr. 1871:8–22 (Harvey). Mr. Harvey also conceded that if the higher-level county elections officials are not well trained regarding absentee ballot procedures, then they will not be able to adequately train their personnel on those matters. See Tr. 1873:19–25 (Harvey). That inadequate training can in turn implicate uniformity and other concerns in the Secretary's and the Board's province. See Tr. 1830:12–20, 1835:21–23, 1838:17–24, 1865:7–10 (Harvey); O.C.G.A. § 21-2-31.

 **\*46** Given the above-cited authorities and trial evidence, the Court finds that Plaintiffs have standing to pursue their claims regarding the training of superintendents and registrars given the Secretary's and Board's direct statutory responsibilities. O.C.G.A. §§ 21-2-31, 21-2-50(a)(11). Further, the facts adduced at trial showed that failures by lower-level county officials and poll workers are attributable to inadequate training of their supervisors. In other words, the evidence at trial showed that claims related to the training of lower-level county officials and poll workers are directly traceable to and redressable by Defendants because Defendants' training of superintendents and registrars directly led to the issues complained of. Thus, Plaintiffs have standing for the absentee ballot training claims.

### 2. Political Question Doctrine

Satisfied that Plaintiffs have standing to bring this action, the Court now turns to the Political Question Doctrine.

As stated above, Defendants have raised the doctrine of political question as an affirmative defense to Plaintiffs' claims. Doc. No. [753-2], 3. More specifically, Defendants state: "Plaintiffs' federal claims against Defendants are barred as they raise political questions that should not be addressed by the Court." Id. Additional political question arguments were raised in Defendants' Rule 52(c) presentation.

Federal courts will generally refuse to hear a case if they find it presents a "political question." In this context, a political question is generally one that either is best left to the political branches of government or that lacks judicially manageable

standards. In Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court "set out the six indicia of a political question." McMahon v. Presidential Airways, Inc., 502 F.3d 1331, 1357 (11th Cir. 2007). Under Baker, any one of the following indicia removes an issue beyond the scope of justiciability:

> (1) a textually demonstrable constitutional commitment of the issue to a coordinate political department; (2) a lack of judicially discoverable and manageable standards for resolving it; (3) the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; (4) the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; (5) an unusual need for unquestioning adherence to a political decision already made; or (6) the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

Aktepe v. United States, 105 F.3d 1400, 1402–03 (11th Cir. 1997) (quoting Baker, 369 U.S. at 217, 82 S.Ct. 691).

As the Supreme Court explained in Rucho v. Common Cause, —— U.S. ——, 139 S. Ct. 2484, 204 L.Ed.2d 931 (2019):

Chief Justice Marshall famously wrote that it is "the province and duty of the judicial department to say what the law is." Sometimes, however, the law is that the judicial department has no business entertaining the claim of unlawfulness—because the question is entrusted to one of the political branches or involves no judicially enforceable rights. In such a case the claim is said to present a "political question" and to be nonjusticiable—outside the courts' competence and therefore beyond the courts' jurisdiction. Among the political question cases the Court has identified are those that lack judicially discoverable and manageable standards for resolving [them].

Id. at 2494 (internal quotations and citations omitted). The political question doctrine acts as a jurisdictional bar. See McMahon, 502 F.3d at 1365.

After review, the Court agrees with Defendants' general premise that it is not the place of federal courts to decide complex and subtle questions of election administration. However, federal courts are equipped and empowered to address claims that individuals' voting rights are being burdened. At bottom, the case *sub judice* is about individual voting rights and whether Georgia's election laws and policies unduly burden individuals' right to vote. Clearly, there are judicially manageable standards for evaluating such complaints—the Anderson-Burdick framework exists for precisely this purpose. See Jacobson, 974 F.3d at 1262 ("If the statute burdened voting or associational rights even slightly, we could apply legal standards to determine whether the burden was unconstitutional. Under Anderson and Burdick, we would weigh the burden imposed by the law against the state interests justifying that burden.").

**\*47** Without more, Defendants have not carried their burden of establishing a jurisdictional bar based on a political doctrine affirmative defense.

### 3. Mootness

As indicated above, "[u]nder Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." Lewis v. Cont'l Bank Corp., 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990).[49] "[T]he doctrine of mootness derives directly from the case-or-controversy limitation because an action that is moot cannot be characterized as an active case or controversy." De La Teja v. United States, 321 F.3d 1357, 1361–62 (11th Cir. 2003) (citations omitted). "Simply stated, a case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496–97, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969) (citation omitted). More specifically, "[i]f events that occur subsequent to the filing of a lawsuit ... deprive the court of the ability to afford the plaintiff ...

meaningful relief, then the case becomes moot and must be dismissed." De La Teja, 321 F.3d at 1362.

One "event" that may moot a claim is when the governmental defendant ceases the behavior on which a claim is based, through the repeal or amendment of a challenged statute, rule, or policy. Coral Springs St. Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1328–29 (11th Cir. 2004). The Supreme Court and the Eleventh Circuit "have repeatedly indicated that 'the repeal of a challenged statute is one of those events that makes it absolutely clear that the allegedly wrongful behavior ... could not reasonably be expected to recur.' " Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs, 868 F.3d 1248, 1256 (11th Cir. 2017) (citations omitted). It also appears that the Eleventh Circuit has established an exception to the general rule that the burden of proving mootness falls on the party asserting it. Id. "As a result, 'once the repeal of an ordinance has caused [the Court's] jurisdiction to be questioned, [the plaintiff] bears the burden of presenting affirmative evidence that its challenge is no longer moot.' " Id. " 'The key inquiry' is whether the plaintiff has shown a 'reasonable expectation'—or ... a 'substantial likelihood'— that the government defendant 'will reverse course and reenact' the repealed rule." Keohane v. Fla. Dep't of Corr. Sec'y, 952 F.3d 1257, 1268 (11th Cir. 2020) (citations omitted).

Three broad factors guide courts conducting this inquiry: (1) whether the government's change in conduct resulted from substantial deliberation or is merely an attempt to manipulate jurisdiction; (2) whether the government's decision to terminate the challenged conduct was unambiguous; and (3) whether the government has consistently maintained its commitment to the new policy or legislative scheme. Flanigan's Enters., Inc. of Ga., 868 F.3d at 1257. The Eleventh Circuit has also stated:

> **\*48** When considering a full legislative repeal of a challenged law—or an amendment to remove portions thereof—these factors should not be viewed as exclusive nor should any single factor be viewed as dispositive. Rather, the entirety of the relevant circumstances should be considered and a mootness finding

should follow when the totality of those circumstances persuades the court that there is no reasonable expectation that the government entity will reenact the challenged legislation.

Id.

In their Statement of the Case for purposes of the Pretrial Order, Defendants argued that this Court "lacks jurisdiction over Plaintiffs' claim as to training of county election officials on absentee ballot cancellation procedures because this claim is moot." Doc. No. [753-2], 2. As discussed infra, the Court is unable to conclude that the absentee ballot issue is moot. [50]

### B. Count I: Fundamental Right to Vote Claim [51]

#### 1. Legal Standard

Count I of Plaintiffs' Second Amended Complaint brings voting rights claims under the First and Fourteenth Amendments. Doc. No. [582], p. 69. Count I claims Defendants' [52] following conduct imposed the following severe burdens: (a) failing to train adequately county election officials on laws governing elections; (b) failing to maintain an accurate and secure voter registration list; and (c) removing and preventing voter registrations under the "Exact Match" policy. Id. at 70, ¶ 155. Plaintiffs argue that, due to Defendants' misconduct, "voters in Georgia have suffered and will continue to suffer irreparable harm—including disenfranchisement and severe burdens on the right to vote in any and all elections and disenfranchisement." Id. at 72, ¶ 157.

"The Supreme Court has rejected a litmus-paper test for constitutional challenges to specific provisions of a State's election laws and instead has applied a flexible standard." Common Cause/Ga., 554 F.3d at 1352 (internal quotation marks omitted). Thus, a reviewing court must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate." Anderson v. Celebrezze, 460 U.S. 780, 789, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). The Court must then "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." Id. The Court must consider both

the "legitimacy and strength of each [the state] interests" and "the extent to which those interests make it necessary to burden the plaintiff's rights." Id. "Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional." Id.; see also Burdick v. Takushi, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992).

**\*49** "Ordinary and widespread burdens, such as those requiring nominal effort of everyone, are not severe." Crawford v. Marion Cty. Election Bd., 553 U.S. 181, 205, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (Scalia, J., concurring) (quotation omitted). However, burdens "are severe if they go beyond the merely inconvenient." Id. If a State's election law imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are generally sufficient to justify" the restrictions. Burdick, 504 U.S. at 434, 112 S.Ct. 2059 (citing Anderson, 460 U.S. at 788, 103 S.Ct. 1564). But if a State's election law imposes a "severe" burden, it must be "narrowly drawn to advance a state interest of compelling importance." Id. (citing Norman v. Reed, 502 U.S. 279, 289, 112 S.Ct. 698, 116 L.Ed.2d 711 (1992)). "The more a challenged law burdens the right to vote, the stricter the scrutiny to which we subject that law." Democratic Exec. Comm. of Fla. v. Lee, 915 F.3d 1312, 1319 (11th Cir. 2019). [53] In other words, "lesser burdens ... trigger less exacting review." Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997). Notably, "[t]o establish an undue burden on the right to vote under the Anderson-Burdick test, Plaintiffs need not demonstrate discriminatory intent behind the" challenged practice." Lee, 915 F.3d at 1319.

During closing argument, Defense counsel argued that the "burdens" under Anderson-Burdick are limited to "the impact on the voter[']s rights to vote[,] [n]ot the voter individually." Tr. 4530:19–21. The Court finds that this bright-line rule is not supported by precedent. In Anderson, the Supreme Court found that the early filing deadline for small political parties or independent candidates burdens the rights of voters and candidates to vote for the

candidate of their choice. 🔖 Anderson, 460 U.S. at 792–94, 103 S.Ct. 1564. There, the Court looked at the burden on the individual voter's right to vote for their preferred candidate, not the voter's ability to cast a vote. In 🔖 Burdick, the Supreme Court held that Hawaii's ballot access law did not "interfere with the right of the voters to associate and have candidates of their choice placed on the ballot." 🔖 Burdick, 504 U.S. at 435, 112 S.Ct. 2059. Again, the Court looked at the burden on an individual voter to vote for a particular candidate, not the right to vote generally. In 🔖 Crawford, the Supreme Court noted, "in neither Norman nor Burdick did we identify any litmus test for measuring the severity of a burden that a state law imposes on a political party, *an individual voter*, or a discrete class of voters." 🔖 Crawford, 553 U.S. at 191, 128 S.Ct. 1610 (emphasis added). There, the Court evaluated an individual voter's hardship in obtaining a photo ID and the impact of that burden on the voter's ability to cast a vote. 🔖 Id. at 197–98, 128 S.Ct. 1610. Accordingly, the Court finds that the 🔖 Anderson-Burdick analysis requires the Court first to evaluate the burden of the challenged practice on the voter individually, and second, to evaluate the impact of that burden on the individual voter's right to vote.

Using this framework, the Court addresses each alleged violation of the right to vote in turn.

### *2. Issue: Absentee Ballot Cancelation Procedures*

#### a) Challenged practice: lack of training on absentee ballot cancelations

Plaintiffs have not met their burden in establishing an 🔖 Anderson-🔖 Burdick violation for Defendants' training in absentee ballot cancelations. The evidence adduced at trial does not support that Defendants' training of county election superintendents violated the First and Fourteenth Amendments. Plaintiffs have not sufficiently shown that the incorrect information caused a burden on voters. Additionally, 🔖 Anderson-Burdick does not apply when the challenged practices are mistakes in election administration. Finally, even if 🔖 Anderson-Burdick were to apply, the Court finds that

Plaintiff has not met its burden in providing the Court with an available remedy.

#### b) Causation

**\*50** Plaintiffs have failed to show that the Secretary of State's training on absentee ballot cancelations burdened voters. "[S]ection 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation." 🔖 Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986).

Plaintiffs argued that in 🔖 § 1983 voting rights cases, courts do not have to conduct a separate causation analysis after establishing traceability. Doc. No. [888], ¶¶ 37–41. Plaintiffs cite Luckey v. Harris, 860 F.2d 1012, 1015 (11th Cir. 1998) to establish that a lesser level of causation is required when seeking injunctive relief against a state official in their official capacity. Id. ¶ 39. However, Luckey does not stand for that proposition. The portion of Luckey cited is analyzing Ex Parte Young, not causation. "Personal action by defendants individually is not a necessary condition of injunctive relief against state officers in their official capacity. All that is required is that the official be responsible for the challenged action. As the Young court held, it is sufficient that the state officer sued must, 'by virtue of his office, ha[ve] some connection' with the unconstitutional act or conduct complained of." 🔖 Luckey, 860 F.2d at 1015–16. This section of Luckey does not mention the level of causation necessary to prove a constitutional challenge.

The Eleventh Circuit has expressly held the opposite. In 🔖 Williams v. Bennett, 689 F.2d 1370, 1380 (11th Cir. 1982), the Eleventh Circuit confirmed that "🔖 Section 1983 imposes additional proof requirements when that statute is used as the vehicle to vindicate substantive constitutional rights." And the statute's "language plainly requires proof of an affirmative causal connection between the actions taken by a particular person "under color of state law" and the constitutional deprivation." Id. at 1381. Williams cites 🔖 Rizzo v. Goode, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) and 🔖 Sims v. Adams, 537 F.2d 829, 831 (5th Cir. 1976) to support this understanding. 🔖 Id. "From 🔖 Rizzo and 🔖 Sims it is clear that the inquiry into causation must be

a directed one, focusing on the duties and responsibilities of each of the individual defendants whose acts or omissions are alleged to have resulted in a constitutional deprivation." Id. The Supreme Court and Eleventh Circuit have found that Section 1983 causation is required in other constitutional claims. See Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency, 535 U.S. 302, 344–45, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002) (Rehnquist, C.J., dissenting) ("We have never addressed the § 1983 causation requirement in the context of a regulatory takings claim, though language in Penn Central Transp. Co. v. New York City, 438 U.S. 104, 98 S. Ct. 2646, 57 L.Ed.2d 631 (1978), suggests that ordinary principles of proximate cause govern the causation inquiry for takings claims."); Thomas v. Bryant, 614 F.3d 1288, 1317 n.29 (11th Cir. 2010) ("Additionally, to prevail on an Eighth Amendment claim brought pursuant to § 1983, a plaintiff inmate must also show a causal connection between the constitutional violation and his injuries."); Manzini v. The Fla. Bar, 511 F. App'x 978, 982 (11th Cir. 2013) ("The decision of that state court judge breaks the chain of causation between [defendant's] actions and any alleged constitutional violations.").

**\*51** Although the Eleventh Circuit has not definitively held in the voting rights context that a plaintiff must establish Section 1983 causation in addition to traceability, no case law states that the Section 1983 causal analysis does not apply. Given that the Supreme Court and the Eleventh Circuit have required plaintiffs to prove Section 1983 causation and traceability in various other contexts, the Court sees no reason to avoid doing so here.

The Court finds that Plaintiffs have not sufficiently proven causation under Section 1983. Plaintiffs provided evidence that the Secretary of State's election certification materials were not updated after the passage of HB 316. Tr. 2118:13–2119:11. First, Chris Harvey testified that certification materials are reviewed only once when the superintendents obtain their initial certification. Tr. 3534:10–23. These certification materials were not, and could not have been, used statewide for all county superintendents, and each county from which Plaintiffs presented isolated problems with absentee ballot cancellations involved superintendents who were initially certified long before the materials with incorrect information. Tr. 3535:17–3537:11. For example,

the county election supervisors for Fulton, DeKalb, and Muscogee—where Deborah Allen, Aaron Karp, and Margaret Whatley voted, respectively—were certified before the 2020 elections and had no reason to see the erroneous materials. Tr. 3535:17–3537:11.

With the exception of Cobb County, the State demonstrated that none of the county election superintendents in the counties where an incident with absentee ballot training occurred would have seen the erroneous certification materials before the 2020 election. Tr. 3535:17–3537:11. Although the Cobb County election supervisor was trained on the outdated election certification materials, there was no testimony regarding the effect that those certification materials had on training poll workers on absentee ballot cancelation. Plaintiffs did not introduce testimony from anyone who worked on the 2020 election in Cobb County regarding the training that was given on absentee ballot cancelations. Accordingly, there is not sufficient evidence to state that any difficulty that a voter faced in canceling their absentee ballot was proximately caused by the incorrect certification materials. In other words, there was no connection between the materials and an actual voter issue.

Second, there was no testimony at trial that any poll worker actually received improper training in 2020 due to the content of the certification materials. Plaintiffs presented evidence that Defendants' poll workers' manual was not immediately updated after the passage of HB 316. Tr. 2131:9–28. While this Court acknowledges that the Secretary of State's 2020 poll worker manual contained an error, there was no testimony or other evidence that the manual was actually used in any of the counties where a voter experienced an issue with absentee ballot cancelation. See Tr. 3538:8–14.

Finally, there is testimony that the Secretary of State's Office provided alternate forms of training on absentee ballots. Training efforts in 2020, after the changes to HB 316, were significant both in terms of frequency and quantity of topics to discuss.

The Court finds that there is not sufficient record evidence to establish that the incorrect training materials proximately caused any injury to a voter.

### c) Applicability of *Anderson-Burdick*

**\*52** As an initial note, the Court is not persuaded that an 🚩Anderson-🚩Burdick violation has occurred with respect to absentee-ballot cancelations. At summary judgment, the Court examined whether Plaintiffs' training claims should be analyzed under 🚩Anderson-🚩Burdick or 42 U.S.C. § 1983. Doc. No. [617], 18–23. The Court ultimately concluded that 🚩Anderson-🚩Burdick is the proper vehicle for analyzing Plaintiffs' training claims because "where, as here, the plaintiff's claims are constitutional challenges alleging a generalized burden on the right to vote, 🚩Anderson-🚩Burdick squarely applies." Id. at 22. The Court maintains that 🚩Anderson-🚩Burdick is the proper mechanism for evaluating a plaintiff's constitutional challenge to generalized burdens on the right to vote, including when those burdens are caused by the Secretary of State's failure to train county election officials. However, the Court finds that 🚩Anderson-🚩Burdick does not apply when the challenged practice is not the Secretary of State's failure to properly train the counties on a state law, statute, or policy, but rather that the Secretary of State made a mistake in election administration.

🚩Anderson-🚩Burdick applies when a party challenges a state's law, statute, rule, or policy, not a mistake in election administration. "[A] court must identify and evaluate the interests put forward by the State as justifications for the burden imposed by its rule, and then make the 'hard judgment' that our adversary system demands." Crawford, 553 U.S. at 190, 128 S.Ct. 1610; see also Burdick, 504 U.S. at 433, 112 S.Ct. 2059 (applying balancing test to "voting regulations"); Anderson, 460 U.S. at 782–83, 103 S.Ct. 1564, (challenging an Ohio statute requiring an Independent Presidential candidate to file a statement of candidacy). The Eleventh Circuit in 🚩Jacobson opined that 🚩Anderson-🚩Burdick applies "[when] the statute burden[s] voting or associational rights even slightly, [in which case] we could apply legal standards to determine whether the burden was unconstitutional .... But [when] the statute does not burden the right to vote, we cannot engage in that kind of review." Jacobson, 974 F.3d at 1262.

🚩Anderson-🚩Burdick, and their progeny do not apply to accidental mistakes on the part of election officials

during the administration of elections. "Unlike systematic discriminatory laws, isolated events that adversely affect individuals are not presumed to be a violation of the equal protection clause." 🚩Gamza v. Aguirre, 619 F.2d 449, 453 (5th Cir. 1980).[54] "If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute .... [But] 🚩Section 1983 ... did not authorize federal courts to be state election monitors." Id. at 453–454.

Here, Plaintiffs argued that Defendants' absentee-ballot cancelation training materials violated the First and Fourteenth Amendments because they contained incorrect information that burdened some voters' right to vote. Tr. 4400:23–4401:14. Mr. Harvey testified that following the passage of HB 316, Plaintiff provided evidence that the Secretary of State's Office did not immediately update the election certification materials or the poll workers' manual to reflect the changes to the cancelations of absentee ballots. Tr. 2118:13–2119:11. This means that a county election superintendent appointed to the position between April 2019 and the January 2021 runoff may have been certified on incorrect materials. Tr. 3538:15–3540:2. Additionally, there was testimony that the poll worker manual developed by the Secretary of State was not updated to show the changes in absentee ballot cancelation procedures for the 2019 and 2020 elections. Tr. 2131:9–28. The poll workers' manual has since been updated with the correct information. Tr. 2131:9–28.

**\*53** Plaintiffs' challenge to Defendants' training on absentee ballot cancelations is one of an election irregularity and thus does not violate the First and Fourteenth Amendments. "To hold otherwise would effectively transform any inadvertent error in the administration of state and local elections into a federal equal protection violation." 🚩Lecky v. Va. State Bd. of Elections, 285 F. Supp. 3d 908, 919 (E.D. Va. 2018). What Plaintiffs are challenging is Defendants' failure to adequately enforce a Georgia statute, not the constitutionality of the statute itself.[55] Plaintiffs also do not assert that the absentee training materials that contained incorrect information exemplified a policy of the Secretary of State.

Therefore, the Secretary of State's failure to update the poll workers' manual and change the election certification materials were mistakes in election administration, not the implementation of a state statute, regulation, or policy.

Accordingly, the Court finds that 🚩Anderson-🚩Burdick is not applicable.

### d) *Anderson-Burdick* **framework**

#### (1) Burdens

Although 🚩Anderson-🚩Burdick is not applicable to Plaintiffs' absentee ballot cancelation claim, out of an abundance of caution, the Court will conduct an 🚩Anderson-🚩Burdick analysis.[56] Assuming *arguendo* that the 🚩Anderson-🚩Burdick framework does apply to the absentee-ballot cancelation claim, the Court finds that the burden on voters outweighs Defendants' justifications. The Court begins its analysis by identifying the burden of the absentee ballot cancelation training on the right to vote.

**\*54** Plaintiffs provided testimony from seven voters who experienced difficulty with in-person absentee ballot cancelations during the 2020 election cycle.[57] Despite the difficulty, all but one of the voters was able to cast a vote in the election. Mildred Russell of Webster County was able to cast her vote after the initial election was nullified. PX. 1589; PX. 1149, at 3; PX. 1131. Aaron Karp of DeKalb County was ultimately able to vote provisionally in the June 2020 primary after signing an affidavit swearing that he did not also submit his absentee ballot. Tr. 603:17–19, 612:15–613:1, 614:13–17. Deborah Allen, of Fulton County, was able to vote provisionally in the June 2020 primary after waiting for forty minutes. Tr. 626:18–627:25, 635:6–639:7. Margaret Whatley, of Muscogee County, was able to place her absentee ballot in a dropbox in the November 2020 general election after waiting for an hour to try to cancel her ballot. PX. 2050 at 21:8–12, 23:11–24:4, 24:10–16, 27:18–28:2. Dayle Bennett of Fulton County was able to vote in the September 2020 special election after having to return home, retrieve her absentee ballot, and surrender the ballot at the polls. Tr. 2713:4–17, 2720:8–13. Patricia Andros of Cobb County was able to vote provisionally in the June 2020 primary. Tr. 2694:12–17, 2695:22–24, 2696:5–24. Aria Aaron of Clayton County was able to vote in person in the November 2020 general election after signing an affidavit. PX. 2057 at 24:14–19, 30:14–23.[58]

The only voter who was unable to vote was Saundra Brundage of DeKalb County. Tr. 1237:22–24; 1238:23–25. Ms. Brundage testified that she requested an absentee ballot for the first time in the 2018 general election Tr. 1239:16–1240:3. Ms. Brundage never received her absentee ballot. Tr. 1240:7–8. She then went to vote in person by taking the bus to her polling place from her senior living facility. Tr. 1240:17–21; 1241:1–5. Ms. Brundage testified that a poll worker told her that she had requested an absentee ballot and that the poll worker was not "ready to let [Ms. Brundage] vote" but did not give a reason why.[59] Tr. 1240:21–25; 1241:8–16; 1241:17–21. The poll worker did not suggest that she cast a provisional ballot at that time but pointed out a man and said Ms. Brundage needed to talk to him.[60] Tr. 1241:22–1242:5. Ms. Brundage waited while the individual walked up and down the aisle talking on the telephone. Tr. 1242:6–14. Ms. Brundage stated that she tried to wait for the man to finish but was never able to talk to him. Tr. 1242:23–1243:2. Unfortunately, Ms. Brundage had to leave the polling location before the man apparently finished his phone call because she had to catch the bus that had taken her to the polling location. Tr. 1250:7–12. Ms. Brundage testified that she was at the polling location for approximately fifteen minutes. Id.

The Court finds that the burden of the Secretary of State's incorrect training materials on absentee-ballot cancelations was at most slight. The Supreme Court in 🚩Crawford held that "[b]urdens of that sort arising from life's vagaries, however, are neither so serious nor so frequent as to raise any question about the constitutionality." Crawford, 553 U.S. at 197, 128 S.Ct. 1610.

**\*55** With the exception of one voter, all of the witnesses were able to vote in the election either in-person by regular ballot, by provisional ballot, or by absentee ballot. These Plaintiffs may have experienced longer wait times; however, this is a burden arising from life's vagaries and does not amount to a substantial burden. "[W]hile the Court understands that a long commute or wait in line can be an inconvenience, courts have routinely rejected these factors as a significant harm to a constitutional right." Gwinnett Cty. NAACP v. Gwinnett Cty. Bd. of Registration and Elections, 446 F. Supp. 3d 1111, 1124 (N.D. Ga. 2020); see League of Women Voters of Fla., Inc. v. Detzner, 314 F. Supp. 3d 1205, 1216 (N. D Fla. 2018) ("[S]ome courts have characterized administrative burdens like waiting in line and commuting as not severe."); 🚩Common Cause Indiana v. Marion Cty.

Election Bd._, 311 F. Supp. 3d 949, 957–58 (S.D. Ind.), vacated and remanded, 925 F.3d 928 (7th Cir. 2019) (discussing certain administrative difficulties involved in early voting as "nonsevere, nonsubstantial, or slight burden[s] on the general right to vote as a matter of law"); Jacksonville Coal. For Voter Prot. v. Hood, 351 F. Supp. 2d 1326, 1335 (M.D. Fla. 2004) ("While it may be true that having to drive to an early voting site and having to wait in line may cause people to be inconvenienced, inconvenience does not result in a denial of meaningful access to the political process."). While the Court is sympathetic to the inconveniences resulting from a long wait to vote, the Court finds that the longer wait time was a slight burden.

The Court finds that casting a provisional ballot does not create a severe burden on the right to vote. In Crawford, the Supreme Court found that "the right to cast a provisional ballot provides an adequate remedy for problems" stemming from absentee ballots. Crawford, 553 U.S. at 197–98, 128 S.Ct. 1610. Relying on Crawford, other courts have found that casting a provisional ballot does not burden the right to vote. See South Carolina v. U.S., 898 F. Supp. 2d 30, 41 (D.D.C. 2012) ("[C]asting a provisional ballot instead of a regular ballot does not burden the right to vote."); N.C. State Conf. of the NAACP v. McCrory, 156 F. Supp. 3d 683, 701 (M.D.N.C. 2016) (finding that using a provisional ballot does not impose a material burden on the right to vote). Accordingly, the Court finds that the voters casting of a provisional ballot is, at most, a slight burden on voters.

Plaintiffs have presented evidence of one voter who was unable to vote, Ms. Brundage. While Ms. Brundage was unable to vote, her inability to cast her ballot cannot fairly be attributed to Defendants. Ms. Brundage testified that her senior care facility allotted her only fifteen minutes to vote, and she was unable to cancel her absentee ballot during that time. While the denial of the franchise is a severe burden, the evidence does not indicate that Defendants denied Ms. Brundage the franchise or that her inability to vote was caused by inadequate training on absentee ballot cancelations.

Accordingly, the Court finds that the burden caused by the Secretary of State's incorrect training materials was slight, and does not exceed the ordinary burdens of voting.

### (2) Justifications

Next, the Court turns to the Secretary of State's justification for the burden. The Court finds that the Secretary of State's only asserted justification for the burden was that it made a mistake in failing to update its training materials. Mr. Harvey testified about the incorrect materials stating:

> I can say that as far when we train the counties in person, at conference and at webinars, we were using the new information. I think–and, again, it's not an excuse, but as laws change and there are so many things that need to be updated, forms and procedures and PowerPoints, and trying to get the information out there, that we just – we just dropped the ball on that.

Tr. 2119:16–22. Mr. Harvey also testified,

> And I think when you asked about where I dropped the ball? I think it was because I was more focused on making sure that they got the newest information in their hands right now, because it was -- it was -- it was necessary. And then just didn't connect the dots and close the loop on the back end. Again, I'm not trying to minimize it or excuse it, but the – it should have been done. There's no question about it.

**\*56** Tr. 2121:6–12.

Plaintiffs' expert, Mr. Kennedy, concedes that mistakes are common in election administration.

> I think recognizing that you are dealing with a very human-driven process from the millions of voters that show

up at -- to cast their ballot either in person or absentee, the thousands of poll workers, that you are going to have misfires, mistakes made both by voters and election officials.

Tr. 2908:15–19.

### (3) Weighing the burdens

The third and final step of the 🔖 Anderson-🔖 Burdick balancing test requires the Court to "weigh" the above "factors"—the character and magnitude of the asserted injury to voter's constitutional rights weighed against the state's justifications—"to determine if the Secretary of State violated the First and Fourteenth Amendment." 🔖 Swanson v. Worley, 490 F.3d 894, 902–03 (11th Cir. 2007). When a state's practice imposes only "reasonable, nondiscriminatory restrictions" upon a plaintiff's First and Fourteenth Amendment rights, a state's "important ... interests will usually be enough to justify reasonable, nondiscriminatory restrictions." 🔖 Timmons, 520 U.S. at 358, 117 S.Ct. 1364.

The Court finds that when weighing the burdens caused by the incorrect training materials against the State's justification that this is an example of mistakes in election administration, the Court finds that the burden outweighs the justification. Although the burden to voters was slight, the State does not have an important interest in producing incorrect training materials. Accordingly, under the 🔖 Anderson-🔖 Burdick framework, Plaintiffs have met their burden in establishing that the Secretary of State violated the First and Fourteenth Amendments when training the counties on absentee-voting cancelations. [61]

### e) Remedies

Even if the Court were to find that 🔖 Anderson-🔖 Burdick applied and that Plaintiffs satisfied their burden in establishing a First and Fourteenth Amendment violation, Plaintiffs have not proposed viable remedies. "The absence of an available remedy is not only relevant at the remedial

stage of the litigation, but also precludes, under the totality of the circumstances inquiry, a finding of liability." 🔖 Nipper v. Smith, 39 F.3d 1494, 1533 (11th Cir. 1994). Plaintiffs' requested remedies include posting signs in the polling places explaining that voters can cancel their absentee ballots, even if they did not bring them to the polls (Tr. 3225:18–21); incorporating the procedure for in-person absentee ballot cancelations into mandatory trainings (Tr. 3226:16–21); informing county officials that poll workers need to be trained on absentee ballot cancelation (Tr. 3226:21–24); issuing an Official Election Bulletin regarding absentee ballot cancelation procedures (Tr. 3227:10–15); require county officials to certify that they have a plan in place to train on absentee ballot cancelation procedures (Tr. 3227:16–18).

**\*57** These are the exact kinds of remedies that the Eleventh Circuit has cautioned against. "Federal judges can have a lot of power—especially when issuing injunctions. And sometimes, we may even have a good idea or two. But the Constitution sets out our sphere of decisionmaking, and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules." New Ga. Project v. Raffensperger, 976 F.3d 1278, 1284 (11th Cir. 2020). In 🔖 Coalition for Good Governance v. Raffensperger, 1:20-cv-1677-TCB, 2020 WL 2509092, at \*4 (N.D. Ga. May 14, 2020), Chief Judge Batten stated that ordering defendants to adopt "Plaintiffs' laundry list of so-called 'Pandemic Voting Safety Measures'" would require the Court to micromanage the State's election process" and bore "little resemblance to the type of relief plaintiffs typically seek in election cases." [62] In 🔖 Coalition for Good Governance, the plaintiffs requested that the court require the State to implement certain COVID-19 safety procedures, such as adjusting the number of voting stations, expanding early voting, implementing curbside voting and temporary mobile voting centers, streamlining voter check-in, offering state provided PPE, and increasing physical distancing. 🔖 Id. at \*1.

In the case *sub judice*, like in 🔖 Coalition for Good Governance, Plaintiffs' proposed remedies include sign placement in polling locations and mandating the form of training the Secretary of State needs to give regarding absentee ballot cancelation. The Court finds that requiring signs in polling places is like the measures sought in 🔖 Coalition for Good Governance, and thus are non-justiciable. Also, the Court finds that requiring the form

of training that the Secretary is required to give is micromanaging the State's election process, which likewise is non-justiciable. Thus, even if the Court were to find that 🚩 Anderson-🚩 Burdick applies, the Court would find for Defendants because Plaintiffs have not shown a viable remedy for addressing incorrect training on absentee ballot cancelations.

\* \* \* \*

In conclusion, the Court finds that Plaintiffs failed to meet their burden in establishing First and Fourteenth Amended violation with respect to absentee ballot cancelation training because (1) there is not sufficient evidence of causation, (2) 🚩 Anderson-🚩 Burdick does not apply to challenges to incorrect training materials, and (3) no viable remedies are available to ameliorate any burden caused by the incorrect training materials.

### 3. Issue: The Secretary of State's Alleged Mismanagement of the Voter Rolls

"The second practice that [P]laintiffs challenge is the Secretary's affirmative mismanagement of Georgia statewide voter registration lists. Mismanagement that creates barriers to getting and staying on the voter rol[l]s." Tr. 37:16–19. Specifically, Plaintiffs challenge "the Secretary of State's over-inclusive criteria for matching a person's voter registration record to another record, whether a death record, a felony record, a new registration record or just another existing record elsewhere in the database." Tr. 38:20–24. As discussed above, the duplicate matching process is not traceable to Defendants. Accordingly, the Court will only evaluate whether the vitals and felon matching process violate the First and Fourteenth Amendments.

### a) Vitals

### (1) Burdens

**\*58**  With respect to vital records, the Court finds that Plaintiffs have failed to produce sufficient evidence of the burdens on voters resulting from vital record matches. Plaintiffs provided evidence of one voter who was incorrectly listed as deceased, Deborah Hall. PX. 490, 3–4. Plaintiffs did not introduce evidence into the record of whether Ms. Hall

was ultimately allowed to vote. There is also no evidence about the process that Ms. Hall went through to be reinstated onto the voter rolls. Rather, the evidence suggests that the SEB was investigating Ms. Hall for attempted voter fraud, not the county for incorrectly canceling her. Id. at 3. The Court acknowledges that there may be some burden on a voter who has been erroneously canceled as deceased; however, without more evidence, that burden is pure conjecture. Accordingly, the Court finds that Plaintiffs have not provided sufficient evidence of a burden on voters regarding the vital matches.

### (2) Justifications

The Court finds that the State has an important state interest in removing deceased electors from the voter rolls.

First, the Court finds that the State has a legitimate interest in ensuring that the voter roll does not contain deceased voters or duplicate voters. The State presented evidence that HAVA requires the Secretary of State to ensure that the voter roll does not contain ineligible voters or deceased voters. Tr. 3712:6–3714:16. HAVA requires that "the chief State election official, shall implement, in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list ... [t]he list maintenance ... shall be conducted in a manner that ensures that -- ... (ii) only voters who are not registered or who are not eligible to vote are removed from the computerized list, and (iii) duplicate names are eliminated from the computerized list." 🚩 52 U.S.C. § 21083(a)(1)(A); (a)(2)(B)(ii)–(iii). HAVA states "each State and jurisdiction shall be required to comply with the requirements of [52 🚩 § 21083](a) on and after January 1, 2004." 🚩 52 U.S.C. § 21083(d)(1)(A). Also, "[t]he Attorney General may bring a civil action against any State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief (including a temporary restraining order, a permanent or temporary injunction, or other order) as may be necessary to carry out the uniform and nondiscriminatory election technology and administration requirements under 🚩 sections 21081, 🚩 21082, and 🚩 21083 of this title." 🚩 52 U.S.C. § 21111. Because the State is subject to potential legal action by the Attorney General for failure to implement HAVA, the Court finds that State has an important interest in complying with HAVA.

Second, Defendants argue that there is an important state interest in deterring fraud. Tr. 4482:18–24. "A State indisputably has a compelling interest in preserving the integrity of its election process." Purcell v. Gonzalez, 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (internal quotation marks omitted). As the Supreme Court stated in Crawford, "there is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." 128 S. Ct. at 1619. Georgia has an interest in preventing election fraud that "provides a sufficient justification for carefully identifying all voters participating in the election process." Id. When the State provides an important state interest, the Court then looks to "the extent to which those interests make it necessary to burden' voting rights." Lee, 915 F.3d at 1322 (quoting Anderson, 460 U.S. at 789, 103 S.Ct. 1564).

Finally, Defendants have an important interest in preventing vote dilution (Tr. 4483:17–24). As stated above, the State has a compelling state interest in preventing voter fraud. The State also has an important state interest in preventing vote dilution. See Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) ("The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

### *(3) Weighing the burdens*

**\*59** The Court finds that the State's justifications for vital matching outweigh the burdens imposed by the vital matching process. Here, the Court found that Plaintiffs did not present sufficient evidence to show that the vital matching process imposes a severe burden on voters. See supra Section II(B)(2) (b)(3). In fact, the evidence adduced at trial does not establish the magnitude, if any, of the burden caused by the vital matching process. Accordingly, the burden imposed by the vital matching process is slight.

"Because the burden is 'slight,' ... the State's important regulatory interests are generally sufficient to justify' the restrictions.' " Black Voters Matter Fund v. Raffensperger, 508 F.Supp.3d 1283, 1301 (N.D. Ga. 2020) (quoting

Burdick, 504 U.S. at 439, 434, 112 S.Ct. 2059). The Court finds that the State's important regulatory interests in complying with HAVA, preventing voter fraud, and preventing vote dilution are sufficient to justify the slight burdens imposed by the vital matching process.

### b) Felon Matching

#### *(1) Burdens*

The Court finds that the felon matching process severely burdens voters. "Burdens are severe if they go beyond the merely inconvenient," Crawford, 553 U.S. at 205, 128 S.Ct. 1610 (Scalia, J., concurring), and Plaintiffs provided evidence that voters who are misidentified as felons face additional burdens when exercising their right to vote that exceed a simple inconvenience. For example, Plaintiffs introduced detailed evidence of the burdens three voters who were incorrectly listed as felons faced as they tried to remedy the felon matching mistake and exercise their right to vote.

On August 3, 2018, Chris Warren received a letter informing him that he had been identified as having a felony conviction and that he could attend a hearing on August 9, 2018, regarding his felony status. PX. 912. [63] The letter contained information for Mr. Girtman, the person to contact regarding a conflict with the hearing date. Id. During their conversation, Mr. Girtman agreed that Mr. Warren was not a felon and that the person who was a convicted felon lived 100 miles away, had a different driver's license number, and had a different Social Security number. Id.; PX. 2019. Mr. Girtman told Mr. Warren he did not need to do anything further and would be able to vote. PX. 912.

When Mr. Warren went to his polling place to vote, however, he learned that he had been removed from the voter rolls. Id. Mr. Warren was able to vote by provisional ballot. PX. 900. On November 8, 2018, Mr. Warren went to the voter registration office to "cure" his registration and provisional ballot. Id. While at the voter registration office, Mr. Warren was instructed to provide his driver's license. Id. Mr. Warren reached out to the ACLU regarding his experience, and the ACLU, in turn, emailed Mr. Germany about the situation. PX. 912; PX. 900. Ultimately, Mr. Warren's provisional ballot was counted. PX. 2019.

Andre Smith also testified that he was erroneously labeled a felon. In Mr. Smith's case, he was initially canceled as a felon on December 12, 2018. DX. 390. Mr. Smith's eNet records reflect that a letter was sent to Mr. Smith on December 20, 2018, and the comment reads "FELON." Id.

Mr. Smith testified that in May of 2020, he called the Fulton County registrar's office numerous times, and upon speaking with the Fulton County registrar, Mr. Smith was asked to provide his date of birth and Social Security number. Tr. 2434:21–2435:4; 2435:17–2436:15. Mr. Smith then testified that he was instructed by the Fulton County registrar's office to call the jail or prison where he had been held after being arrested. Tr. 2438:10–14. Mr. Smith testified that he did not know who to call because he had never been convicted of a felony. Tr. 2438:12–16; Tr. 2433:16–24. Mr. Smith then contacted Fair Fight about being listed as a felon. Tr. 2442:12–16. Mr. Smith testified that a representative at Fair Fight called the Fulton County Registrar multiple times and was able to get confirmation that Mr. Smith would be reinstated to the voter rolls. Tr. 2442:21–2443:1. When Mr. Smith arrived at the polls on Election Day in June 2020, he learned that his registration could not be verified. Tr. 2448:1–2. He was eventually allowed to vote by provisional ballot. Tr. 2249:7–8.

**\*60** On July 16, 2020, Mr. Smith received a letter informing him that he was flagged as a felon, and if this information proved incorrect, to request a hearing from the Fulton County Voter Registration office. PX. 2088. Mr. Smith's eNet record shows that he was canceled again on August 25, 2020, and the status reason was "FELON." DX. 390. On August 25, 2020, Fulton County sent a letter to Mr. Smith stating that he was reinstated and had been canceled based on an incorrect match with a different Andre Smith. PX. 2089. When Mr. Smith checked his status on MVP immediately before testifying in this case, in April of 2022, his MVP page indicated that he had once again been canceled because of a felony conviction. PX. 2097.

Elizabeth Bauer was flagged in eNet numerous times for being a felon. PX. 658. [64] Ms. Shea Hicks, the Gordon County Board of Elections Chairperson, emailed Mr. Hallman on September 27, 2018, to inform him that a voter who had been previously convicted of a misdemeanor "ke[pt] showing up on [her] dashboard," as a felon even though Ms. Hicks had rejected the voter as a felon match in past. Id. Ms. Hicks confirmed that Ms. Bauer, the voter in question, reappeared on the Secretary of State's list of felons even though the county had previously removed her as a false match. Id. Ms. Hicks told Mr. Hallman that she was "100% sure" that Ms. Bauer was not a felon; Ms. Hicks had spoken with the county's probation office to confirm as much, and Ms. Bauer brought documentary proof that she was not a felon to the county office herself. Id. Despite the fact Ms. Bauer presented evidence that she was not a felon, that Ms. Hicks investigated and confirmed Ms. Bauer's non-felon status, and that Ms. Hicks marked Ms. Bauer as a false felon match in eNet, the Secretary of State continued to list Ms. Bauer as a felon in the list of matches it sent to the country as part of the felon match process.

Other voters had similar experiences. See, e.g., PX. 89 at 1–2 (Dale Thomas and Jean Duncan, mistakenly canceled as persons convicted of a felony in 2013); PX. 2159 at 83–85 (transcript of SEB Case No. 2013-052 regarding these same voters); [65] PX. 1715 (Douglas Miller of Stuart County, canceled as a felon match with Robert Miller of Franklin County). [66] The Court infers that these voters did not receive notice from the counties that they were being removed from the voter rolls as felons, and eventually went through a process of attempting to remove the felon flag themselves.

**\*61** The Court finds that felon matching creates a severe burden on voters. The felon matching process forces individual voters erroneously caught by the Secretary's matching criteria to navigate administrative obstacles that are distinctly more burdensome than the obstacles that the Supreme Court and Eleventh Circuit have examined. For example, felon match differs from photo ID laws in several aspects. A voter erroneously listed as a felon will have to remedy that mistake to remain on the voter rolls, whereas photo ID laws apply after the voter is on the voter roll. Once a voter has been flagged as a felon, a voter must do something—i.e. request a hearing or contact the counties or the Secretary of State's Office—in order to remain on the voter roll.

Additionally, the photo ID laws examined in 🔖Crawford and 🔖Common Cause/ Georgia only applied to in-person voting, whereas the felon matching process touches on all methods of voting in Georgia. See 🔖Crawford, 553 U.S. 181, 128 S.Ct. 1610 (evaluating a photo ID law that only applied to in-person voters in Indiana); 🔖Common Cause/Georgia, 554 F.3d 1340 (evaluating a similar law in Georgia). Furthermore, in 🔖Crawford and 🔖Common Cause/Georgia, the states were required under state law to issue a *free* photo ID to

any legitimately registered voter. In Georgia, for example, voters were entitled to a free photo ID if they could provide proof that they were registered to vote and swore an oath that they did not have another acceptable form of photo ID. Common Cause/Georgia, 554 F.3d at 1346. This process is far simpler and more navigable than the processes some voters incorrectly identified as felons *sub judice*.

Take, for example, the case of Mr. Smith. While he was ultimately able to vote, Mr. Smith was erroneously listed as a felon; Mr. Smith made calls to the Fulton County Board of Registrars to contest his designation as a felon; Mr. Smith, who was never convicted of a felony, was instructed to contact the jail or prison to retrieve paperwork indicating that he was no longer serving a sentence, Fulton County later determined that Mr. Smith was not a felon and reinstated him to the voter rolls; upon arriving at the polls, however, Mr. Smith learned that his registration was canceled; Mr. Smith, then voted provisionally, and that provisional ballot was counted; but, before testifying at this trial, he discovered he was once again listed as a felon. Tr. 2431:12–13; 2432:11–22, 2435:3–7; 2436:7–12; 2437:24–2438:2; 2442:12–2443:1; 2448:1–2; 2249:7–8; PX.2097.

The burdens that Mr. Smith faced are distinct and more severe than obtaining a free photo ID prior to voting. Once a voter is issued a photo ID, the voter presumably will not experience that burden again prior to the ID's expiration date. But under the felon match process, Mr. Smith had to address administrative errors multiple times, even though he, at no time, was convicted of a felony. The process a duly registered and qualified voter must go through to correct being erroneously flagged as a felon is a far more involved, confusing, and burdensome than going to a state agency with proof of voter registration and swearing an oath.

Consider also that being accused of being a convicted felon is not a common occurrence and does not have an obvious response. There are other contexts in which an individual may be asked to present a form of photo ID. For example, "[b]efore an adult passenger can board an airplane for a commercial flight in the United States, the passenger must present to a federal official an identification card with a photograph of the passenger." Common Cause/Georgia, 554 F.3d at 1345. But it is not every day that a person is asked to provide evidence that he or she is not a felon. Though the Court found Mr. Harvey's testimony credible and the county bears the burden of proof at a felon match hearing (Tr. 3828:6–

12, 3842:12–18), none of the witnesses presented at trial ever attended a hearing, and at least two voters, Mr. Smith, and Mr. Warren stated that they were asked to provide proof that they were not felons when they contacted the county board of registers. Mr. Smith was asked by Fulton County to call the jail where he had been held to prove he had not been there serving a felony sentence. Tr. 2438:10–14. Mr. Warren said he was informed that he "had to either provide proof of [his] eligibility to remain a registered voter or attend a hearing." PX. 912. And the Court agrees with Mr. Warren that "[i]t's hard to provide documentation proving that something did not occur." Id.

**\*62** Members of the Secretary of State's Office also agree; when asked, "it's not easy to prove you're not a felon?" Mr. Harvey responded, "[n]o. You're trying to prove a negative." Tr. 3739:20–21. Asking an otherwise qualified and properly registered voter to provide documentation proving that he or she is not a felon is far more burdensome than asking a voter to provide the same kind of documentation he or she must show every time she or she takes a commercial flight.

The burdens resulting from the felon match process also differ those resulting from pre-determined absentee ballot deadlines during COVID. Voters incorrectly identified as a felon do not have "numerous avenues" available to them to "mitigate the administrative burdens placed on them that are more than just inconvenient in order to remedy the error." New Georgia Project, 976 F.3d at 1281. While voters concerned about absentee ballot deadlines during COVID could have "return[ed] their ballots through the mail, hand-delivery, or a drop box," "participate[d] in early in-person voting," or "vote in person on Election Day," there is nothing voters flagged as felons can do "differently" to avoid being burdened by their false felon status. Id. The burden resulting from the felon match process is not being caused by the voter's own failure to take reasonable steps to stop themselves from being burdened. See id. at 1282 ("Voters must simply take reasonable steps and exert some effort to ensure that their ballots are submitted on time, whether through absentee or in-person voting.");
Democratic Nat'l Comm. v. Wisconsin State Legislature, —— U.S. ——, 141 S. Ct. 28, 33, 208 L.Ed.2d 247 (2020) (Kavanaugh, J., concurring in the denial of application to vacate a stay) ("A deadline is not unconstitutional merely because of voters' 'own failure to take timely steps' to ensure their franchise.") (internal citations omitted). Unlike absentee-ballot deadlines during COVID, being erroneously flagged as a felon is not something the voter has any agency

over. There are no options available to voters except to shoulder the burden.

For the above reasons, the Court finds that voters are severely burdened by the felon matching process; the procedural hurdles voters incorrectly flagged as felons must jump through to remedy that error impose a severe burden on the right to vote. [67]

### (2) Justifications

The Court finds that Defendants have both important and compelling interests in removing felons from the voter rolls.

First, the Court finds that the State has an important interest in keeping felons from voting. Under 🚩 O.C.G.A. § 21-2-216(b), "no person who has been convicted of a felony involving moral turpitude may register, remain registered, or vote except upon completion of the sentence." "[A] State has a significant interest in enforcing its own laws." 🚩 Cameron v. EMW Women's Surgical Center, P.S.C., —— U.S. ——, 142 S. Ct. 1002, 1011 n.4, 212 L.Ed.2d 114 (2020). The felon matching process allows the Secretary of State to enforce the law that prohibits individuals from registering to vote when they have been convicted of a felony and who are currently serving their sentence. Accordingly, Defendants' interest in upholding Georgia's ban on felon voting is important.

**\*63** Second, Defendants have a compelling interest in preventing voter fraud. Defendants argue that the felon matching process deters fraud. Tr. 4482:18–24. "A State indisputably has a compelling interest in preserving the integrity of its election process." 🚩 Purcell v. Gonzalez, 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006) (internal quotation marks omitted). As the Supreme Court stated in 🚩 Crawford, "there is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters." 🚩 128 S. Ct. at 1619. Georgia has an interest in preventing election fraud that "provides a sufficient justification for carefully identifying all voters participating in the election process." 🚩 Id.

Finally, Defendants have a compelling interest in preventing vote dilution. Tr. 4483:17–24. "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government. And the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." 🚩 Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The felon matching process removes ineligible voters from the voter rolls, thereby preventing the dilution of eligible voters. Accordingly, the State has a compelling interest in preventing vote dilution.

When the State provides an important state interest, the Court then looks to "the extent to which those interests make it necessary to burden' voting rights." 🚩 Lee, 915 F.3d at 1322 (quoting 🚩 Anderson, 460 U.S. at 789, 103 S.Ct. 1564).

### (3) Weighing the burdens

The Court finds that the Defendants' justifications for using "loose matches" do not outweigh the burdens on voters. As stated above, the Court found that voters were severely burdened by the felon matching process. Specifically, the procedural hoops qualified voters must jump through to correct erroneous felon flags severely burdens the right to vote, especially given that some voters, like Mr. Smith and Ms. Bauer, must prove they are not felons multiple times. "[W]hen [a voter's] rights are subject to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.' " 🚩 Burdick, 504 U.S. at 434, 112 S.Ct. 2059. See also New Georgia Project, 976 F.3d at 1280 ("If a State's rule imposes a severe burden on the right to vote, then the rule may only survive if it is narrowly tailored and only if the State advances a compelling government interest.").

The Court finds that the felon matching process is not narrowly drawn. The Secretary of State identifies various criteria for determining whether a registered voter is also a felon. PX. 800, 21. Those are: (1) last name, first name, last four digits of Social Security number, and date of birth for voters in active, inactive, pending, or reject status; (2) last name, first name, last four digits of Social Security number, and date of birth for voters in canceled status; (3) last name, last four digits of Social Security number, and date of birth; (4) first name, last four digits of Social Security number, and date of birth; (5) last name, first name, and date of birth; and

(6) last name, date of birth, race, and gender. Id. Plaintiffs challenge the use of the last set of criteria. Doc. No. [854], ¶¶ 730, 973.

With respect to the final criteria, Mr. Hallman recommended removing this set of criteria because it was "pretty loose." PX.1151.



PX.1151 (excerpted). The email shows that the Secretary of State contemplated removing the criteria altogether. Id. In just one run of the felon match process in August 2019, the last name, race, gender, and birth date criteria identified roughly 25,000 matches of an approximate 50,000 total felon matches. Id.

**\*64**  Additionally, trial testimony shows that the Secretary of State knew that the final set of criteria—last name, date of birth, race, and gender—would likely result in "a lot" of non-matches.

> Q: That this criteria that the Secretary of State uses in its eNet system to identify potential matches against the felon list includes a criteria that you knew was pretty loose, right, and that would produce matches that would be teed up for all the counties that you are aware would likely -- would likely include a lot of non-matches, right?

> A: Correct.

Tr. 878:3–9.

"Narrow tailoring requires the government to employ the least restrictive alternative to further its interests." In re Georgia Senate Bill 202, ––– F.Supp.3d ––––, ––––, 2022 WL 3573076, *15 (N.D. Ga. 2022) (citing United States v. Playboy Ent. Grp. Inc., 529 U.S. 803, 813, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000)). Relying on the matching criteria examining only last name, date of birth, race, and gender is not the least restrictive means available to the

government to further their interest in monitoring voters' felon status; the State already employs five less restrictive matching criteria to check felon status. By a member of the Secretary's Office's own admission, the last name, date of birth, race, and gender criterion could—and even should —be removed from the felon matching process. PX. 1151. What's more, there is direct testimony from an individual who works in the Secretary of State's Office that shows that the felon matching criterion is not narrowly drawn, but is in fact, "pretty loose." Mr. Hallman's testimony and the email to Mr. Rayburn illustrate that the Secretary of State's Office knows that the felon matching process would likely result in "a lot" of non-matches. Tr. 878:3–9.

Because the loose match criteria catch "a lot" individuals who are not felons during the match process and thereby increase the likelihood that voters will be erroneously labeled as felons and suffer the resulting administrative burdens, the final matching criteria are not narrowly tailored.[68] Tr. 878:3– 9; PX. 1151.

Although the Court finds that the State has a compelling interest in restricting the list of electors to eligible voters and in preventing eligible voters' votes from being diluted by non-eligible voters being permitted to participate in the electoral process, the Court finds that the process by which voters are determined to be felons is not narrowly drawn to address that interest. Accordingly, the Court finds that the felon matching process violates the First and Fourteenth Amendments.

### (4) Causation

Despite the Court's holding that the felon matching process violates the First and Fourteenth Amendment right to vote, the Court also finds that the various burdens resulting from the felon matching process are caused by the counties and not Defendant Secretary of State. "[S]ection 1983 requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation." Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986). As stated supra Section II(B)(2)(b), Plaintiffs have the burden of proving not only that felon matching is traceable to Defendants but also that Defendants' actions concerning felon matching caused the First and Fourteenth Amendment violation under Anderson-Burdick. Plaintiffs have not carried their burden of proof as to causation.

**\*65**  The Court finds that the causal link between the burdens of felon matching and Defendants is broken. Although O.C.G.A. § 21-2-231 requires the Secretary of State to send the counties the list of electors who have been flagged as felons, and the counties are then required to transmit a notice to all electors who appear on that list, in practice, that is not how the felon matching occurs. [69] Employees of the Secretary of State testified, and the evidence shows, that eNet uses certain matching criteria to match the list of electors against the list of felons; once there is a match, eNet sends the counties a list of electors who are potentially felons; the county is then tasked with determining whether an elector is, in fact, a felon; and if the county determines either that an elector is a felon or that more information is needed, the county sends a notice to the elector that he or she was flagged as a felon. Tr. 899:10–12, 899:23–900:4; PX. 1878, at 30–31; PX. 800. Thus, once the Secretary of State, by way of eNet, sends the counties the list of potential electors who are felons, the counties take certain investigative steps to determine whether an elector is a felon before sending the notice that he or she has been flagged as a felon. Tr. 3570:7–11. These steps include, but are not limited to, comparing the voter record information on one side of an eNet screen with the felon record information on the other side of the screen. Id.; PX. 800 at 25.

The Court finds that the independent actions of the counties in investigating whether an elector is a felon and then canceling the elector are independent actions that break the causal chain to the Secretary of State. "The causal relation does not exist when the continuum between Defendant[s'] action and the ultimate harm is occupied by the conduct of deliberative autonomous decision-makers." Dixon v. Burke Cty., 303 F.3d 1271, 1275 (11th Cir. 2002). One way to determine if the causal link is destroyed is whether the defendant "exercised extraordinary influence over" the third party or whether the third party exercised "individual freedom of rational choice." Id. Here, the burdens a voter faces in attempting to correct a false felon match are caused by the county's deliberative autonomous decisions, not the Secretary of State's. Mr. Harvey testified that the counties investigate and ultimately decide whether an elector is a felon, not the Secretary of State. Tr. 3569:12–3570:10. The counties, not the Secretary of State, actually cancel voters. And testimony from voters flagged as felons at trial also showed that it is the counties, not the Secretary of State, that required voters like Mr. Smith and Mr. Warren to produce evidence proving they are not felons. Tr. 2438:10–14 (Mr. Smith testifying that

a county official asked him to contact the jail or prison where he had been detained to sort out his felon status); PX. 912 (Mr. Warren writing to the ACLU that the letter he received from the county told him to "provide proof of [his] eligibility to remain a registered voter"). Thus, the counties, not the Secretary of State, cause the voters' burdens.

Additionally, no witness testified that an error with the statewide voter database is proximately caused by the Secretary of State's criteria for felon matching. Plaintiffs never presented a county election official or other witness to substantiate Plaintiffs' assertions that the issues experienced by voters were caused by the Secretary of State's selection of certain criteria or other management efforts of the voter registration database.

For example, with regard to Mr. Smith, Plaintiffs were unable to identify or explain—through a county official, a voter, other testimony, or other evidence—that any action or inaction caused the cancelation of Mr. Smith's record by the Secretary of State. Indeed, in one exhibit letter, Fulton County admitted that it was responsible for the error and that the error occurred because it had misidentified him with another voter who had the same "first name, last name and date of birth." PX. 2089.

**\*66**  The evidence shows that in practice, the counties decide which voters to send a notice to, the counties conduct the hearings, the counties determine which voters need to be removed from the voter rolls, and the counties remove the felons from the voter roll. The voter is entirely unaware that the Secretary of State flagged him or her as a potential felon until after the county takes the initial step of determining whether the flagged elector is a "true match" for a felon. Tr. 3570:5–10; 1351:16–1352:11. Thus, the burdens caused by the felon matching process are caused not by the Secretary of State but by the counties.

The Court finds that Plaintiffs have not met their burden in proving a First and Fourteenth Amendment violation because Plaintiffs have not proven that the Secretary of State caused the burden on voters who are mislabeled and/or canceled by the felon matching process. Although the Court is finding for Defendants, the Court notes that it would be a better practice for the Secretary of State to do away with the final matching criterion—last name, date of birth, gender, and race. This statement is given as a recommendation and should not be construed as a remedy. Accordingly, Plaintiffs have not proven causation; therefore, Plaintiffs' First and Fourteenth

Amendment claims ultimately fail as to the felon matching process.

#### 4. Issue: Exact Match

Plaintiffs argue "this Secretary of State's 'exact match' policy creates unnecessary and discriminatory obstacles for eligible voters to get registered." Tr. 23:22–24. Plaintiffs challenged two different aspects of Exact Match. First, Plaintiffs challenged MIDR status that resulted from discrepancies between a voter's registration form and DDS or the SSA records. Tr. 32:12–34:3. Plaintiffs also challenged the Secretary of State's Office's citizenship matching process. Tr. 29:7–17. The Court will first evaluate whether MIDR is a constitutional violation under Anderson-Burdick. The Court will then evaluate whether citizenship matching violates Anderson-Burdick.

#### a) Challenged Practice: MIDR

#### (1) Burdens

Exact Match is the process by which the Secretary of State verifies a voter's registration. In Georgia, when an individual registers to vote, he or she is required to provide a valid Georgia Driver's License or Georgia ID Number. PX. 6; O.C.G.A. § 21-2-220.1(a). When an applicant provides a Georgia driver's license number or state identification number, it is matched against his or her information in the DDS database: driver's license number, first twenty characters of the last name, first initial of the first name, and date of birth. PX. 1753 at 1; Tr. 1197:24–1198:23; Tr. 1936:1–24. For an applicant who did not provide his or her Georgia driver's license or state identification numbers but did provide the last four digits of his or her Social Security number, the following information on his or her voter registration application is matched against his or her information in the SSA database: the last four digits of his or her Social Security number, first twenty characters of the last name, first initial of the first name, and date of birth. Id. An applicant who does not provide his or her Georgia driver's license number, state identification card number, or last four digits of their Social Security number will not have his or her information matched against any database. Failure to provide said information, however, does

not prevent an applicant from being registered to vote. Tr. 1943:6–25; 1946:2–1947:22.

Since HB 316 was passed, a registrant who fails the verification process is added to the active voter rolls and flagged as MIDR. O.C.G.A. § 21-2-220.1 (providing that in cases of an inexact match, "the applicant shall nevertheless be registered to vote but shall be required to produce proof of his or her identity ... at or before the time that such applicant requests a ballot for the first time"). When a registrant is placed into MIDR status, county officials send the voter a form letter drafted by the Secretary of State and generated through eNet, the Secretary of State's voter registration database. PX. 1900.

**\*67** An applicant may be placed in MIDR status due to typographical errors, changes in the way people spell their names, and minor changes in characters between the two databases. Tr. 408:17–409:6; PX. 1278, 6. A transposed letter or number (Tr. 1956:14–1957:2), the presence of a hyphen (Tr. 1957:3–6), or the presence of an apostrophe (Tr. 1957:7–12) can cause a match failure. See PX. 1182 (Secretary of State employee Kevin Rayburn acknowledging an applicant was in MIDR because of a missing letter at the end of the applicant's last name). Therefore, if an "applicant's last name is hyphenated on the voter registration application but not on the applicant's driver's license," he or she could fail verification. Tr. 1957:3–6. For paper applications, the Exact Match MIDR process can occur only after county election personnel type the information into eNet. Tr. 1950:7–22. The Secretary of State's Office has admitted that failures to verify "could be caused by erratic handwriting on a voter registration application or by a clerk committing a typing error when entering information." PX. 1119; Tr. 1957:15–1958:8.

At trial, Plaintiffs did not present any testimonial evidence of burdens that individual voters experienced regarding being placed in MIDR status. Dr. Carlos del Rio did testify about a difficult experience he had at the polls during the November 2018 election, which was presumably caused by discrepancies in the spelling of his last name on the voter rolls and on his driver's license. Tr. 473:8–475:19. However, Dr. del Rio's experience was not based on MIDR because it occurred prior to the passage of HB 316. [70] Accordingly, the burdens that Dr. del Rio faced are not attributable to MIDR.

Plaintiffs did provide expert testimony from Dr. Mayer that an MIDR flag at the polls could result in a burden to voters. Dr. Mayer was qualified as an expert on election management as

Fair Fight Action, Inc. v. Raffensperger, --- F.Supp.3d ---- (2022)

it relates to statistical analysis. Tr. 342:25–343:2. Dr. Mayer testified that "it is certainly plausible, if not likely, that the simple fact that there is an MIDR flag, there is something in the voter's registration record that is different than most registrants, that it could easily trigger a poll worker into thinking that they have to subject or should subject or must subject this registrant to a higher level of scrutiny than they do other voters." Tr. 403:18–24. Dr. Mayer also testified that the letter that informs voters of their MIDR status carries the impression that the voter is not registered to vote, the letter does not clearly tell a voter what form of identification is needed to clear the MIDR status. Tr. 401:15–403:3. On cross-examination Dr. Mayer conceded that he did not conduct any research in Georgia after the passage of HB 316 to determine if any voters were in fact confused about MIDR status. Tr. 458:11–14.

Without any direct testimony from a voter who experienced being in MIDR status or testimony from a poll worker about how they treat individuals in MIDR status, the Court finds that the burden on voters is relatively low. Here, Plaintiffs have not provided direct evidence of a voter who was unable to vote, experienced longer wait times, was confused about voter registration status by being in MIDR status, or experienced heightened scrutiny at the polls due to MIDR status. Also, there is no testimony about how a voter is treated by a poll worker because of the MIDR flag.

Dr. Mayer's testimony at best states that there is a statistical probability that individuals in MIDR status face these burdens. However, Dr. Mayer's testimony is based upon nationwide statistics and are not specific to Georgia's voting systems. Thus, if a burden does exist, it is minimal. Because the burden is minimal, it "may be warranted by 'the State's important regulatory interests.' " Common Cause, 554 F.3d at 1352.

### (2) Justifications

**\*68** Defendants advanced two justifications for MIDR. First, Defendants argued that MIDR is important to ensuring that voters are able to vote using the additional forms of identification under HAVA for first-time voters. Under Georgia law, voters, except for first-time voters who registered by mail, must provide a photo ID in order to vote. O.C.G.A. § 21-2-417(a). The Eleventh Circuit has already held that Georgia's voter ID law is constitutional. Common

Cause, 554 F.3d at 1355. Pursuant to HAVA, first-time voters who registered by mail may prove their residency by providing valid photo identification or an official copy of a current utility bill, bank statement, government check, paycheck, or other government document that shows the name and address of the voter. 52 U.S.C. § 21083(b)(2). Defendants asserted that MIDR status informs poll workers of who can present any of the HAVA-approved forms of identification and are not limited to showing a photo ID. Tr. 4145:15–18. Mr. Germany testified that MIDR alerts poll workers that "this person has to comply with HAVA. And the way they do so, they can provide one of those IDs, either the photo ID or the kind of broader set of non-photo ID allowed under HAVA." Tr. 4145:15–18.

As stated above, the Court finds that complying with HAVA is an important state interest. See supra Section II(B)(2)(b)(2).

Second, Defendants introduced testimony that MIDR prevents fraud. As stated above, the State has a compelling interest in preventing voter fraud. See supra Section II(B)(2)(b)(2). Mr. Harvey testified, "MIDR is, my understanding of it is, because you didn't verify. You have to show something that shows you're the actual person. And that's the – I guess protection from registering a bunch of alias people and then just showing up and saying, Oh, yeah, I'm John Smith, or I'm Chris Harvey. And by showing the I.D., you're verifying that, okay, for whatever reason they couldn't match it, you're still a bona fide person." Tr. 3604:11–19. Thus, Defendants have demonstrated that the State's compelling interest in preventing voter fraud is tied to the challenged practice.

### (3) Weighing the burdens

The Court finds that the State's justifications outweigh any potential burdens on voters. First, without an actual showing that a voter was in fact burdened by his or her status on MIDR, the Court finds that the burden on voters by being in MIDR status is minimal. Because MIDR imposes only a "reasonable, nondiscriminatory restriction" upon the First and Fourteenth Amendment rights of voters, "the State's important regulatory interests are ... sufficient to justify" the restrictions. Burdick, 504 U.S. at 434, 112 S.Ct. 2059.

The Court finds that Defendants have provided one important interest and one compelling interest that justify MIDR. First, Defendants have provided testimony that MIDR status is

necessary because it prevents voter fraud. "[D]eterring voter fraud is a legitimate policy on which to enact an election law, even in the absence of any record evidence of voter fraud." Greater Birmingham Ministries, 992 F.3d at 1334. Thus, the Court finds that the State's interest in deterring voter fraud outweighs the burden caused by MIDR.

Additionally, compliance with HAVA is an important state interest. If a State fails to comply with HAVA, "[t]he Attorney General may bring a civil action against [the] State or jurisdiction in an appropriate United States District Court for such declaratory and injunctive relief ... to carry out the uniform and nondiscriminatory election technology and administration requirements under ⚑ sections 21081, ⚑ 21082, and ⚑ 21083 of this title." ⚑ 52 U.S.C. § 21111. Accordingly, the State has an important State interest in complying with HAVA and avoiding suit by the Attorney General.

The Court finds that Plaintiffs have failed to prove that the burdens imposed by MIDR outweigh the State's interests in preventing fraud and complying with HAVA. Accordingly, MIDR does not violate the First and Fourteenth Amendments.

### b) Challenged practice: Exact Match Citizenship

#### (1) Burdens

The Court finds that the burdens imposed by Exact Match Citizenship are limited. Each voter in Georgia must demonstrate citizenship at the time of registration. Tr. 3585:12–21. When a registrant provides his or her driver's license information as a part of the registration process, the data will be processed through DDS's database. Tr. 359:19–23. If the registrant is flagged as needing to provide evidence of citizenship, the registrant is placed in pending status. Tr. 364:5–23. If the registrant can submit proof of citizenship to an election official, the election official is supposed to override the DDS flag and put the registrant into active status. Tr. 386:13–19.

**\*69** To prove his or her citizenship, a registrant may provide an acceptable form of photo identification, including (1) a Georgia driver's license, (2) a valid state or federal government-issued photo ID, (3) a valid U.S. passport, (4) a valid employee photo identification issued by either the federal government, the state, county, or other entity of this state, (5) a valid United States military photo identification card, or (6) a valid tribal identification card. PX. 1231. The registrant must also provide proof of citizenship by using one of fifteen acceptable documents; examples include (1) a birth certificate issued by the U.S., (2) a U.S. Passport, (3) a certificate of citizenship, or (4) a naturalization certificate. Id. If a registrant cannot provide sufficient proof of citizenship before an election day or at the polls, the registrant can vote provisionally and verify his or her citizenship afterward. Tr. 1724:22; 1735:1–2.

Plaintiffs provided evidence of three voters who did not vote due to the citizenship matching process and two voters who faced hurdles when voting. Two registrants testified that they did not vote because they chose not to. Ms. Hamalanian testified that she had her citizenship verification paperwork readily available. PX. 2048, Tr. 18:20–25. Still, she did not submit it to the county election official because she felt "disappointed and a little bit angry with the case." Id. Of the other witnesses, the testimony shows that they were ultimately able to vote.

As was the case in ⚑ Crawford, the record is virtually silent on the difficulty a naturalized citizen will face in obtaining proof of citizenship documents. In ⚑ Crawford, the Supreme Court was unable to find that Indiana's photo ID laws severely burdened elderly voters because the affected voters "have not indicated how difficult it would be for them to obtain a birth certificate." ⚑ Crawford, 553 U.S. at 201, 128 S.Ct. 1610. In the case sub judice, Ms. Hamalanian testified that her citizenship documentation was readily available to her, and she had access to the means to submit said information to the appropriate election officials. PX. 2048, Tr. 30:12–25. Ms. Hamalanian testified that she did not send the information because she was disappointed by an election official's statement that even if Ms. Hamalanian faxed her information that day, "it would have been too late to vote in that year's election." PX. 18:15–19. Dr. Ansa testified that he did not attempt to vote in the 2016 election because he "didn't have that kind of luxury of time" to provide the citizenship verification documents before Election Day. PX. 2096, Tr. 21:21–22:3.

Finally, concerning Ms. Ozgunes, the Court finds that her inability to vote was caused by a county's failure to provide her with a provisional ballot. Ms. Ozgunes was asked to verify her citizenship in multiple elections, and after giving said proof, she continued to be identified as a noncitizen in

Case 1:17-cv-02989-AT   Document 1515-2   Filed 10/12/22   Page 56 of 89

the voter registration database. PX. 89, 1–2. [71] However, the Court already awarded judgment to Defendants on the issue of failure to train counties on provisional ballots. "Plaintiffs have not shown" that a county's failure to provide an absentee ballot is "factually traceable to Defendants' training." Doc. No. [617], 41. While it is regrettable that Ms. Ozgunes was denied the right to vote, it cannot reasonably be said that her inability to vote was traceable to Defendants. Further, Mr. Harvey testified that in 2019, the Secretary of State updated eNet to override DDS's attempts to flag a registrant as a noncitizen if a voter application is received with a naturalization form or provides some other form of proof of citizenship. Tr. 3590:6–3591:5.

The remaining voters were all able to vote. Dr. Kefeli verified his citizenship by sending an email (PX. 2049, Tr. 33:20–23), and Ms. Tran provided her naturalization documents to a poll worker (Tr. 316:913).

**\*70** The Court agrees with Plaintiffs that naturalized citizens face more significant burdens than native-born citizens when registering to vote. Naturalized citizens must provide additional forms of proof of citizenship, a hurdle that most voters do not face. See Tr. 2036:9–23 (explaining that the DDS citizenship flags result from newly naturalized citizens with limited-term licenses; however, native-born citizens should never be issued limited-term licenses). Thus, the Court finds that the Exact Match citizenship verification process imposes a special burden on naturalized citizens.

Just as in ⚑Crawford, the Court recognizes that naturalized citizens face a special burden; however, the Court "cannot conclude that the statute imposes 'excessively burdensome requirements' on any class of voters." Crawford, 553 U.S. at 203, 128 S.Ct. 1610. The Court finds that Plaintiffs have not shown that the Exact Match Citizenship verification process severely burdens voters. In ⚑Crawford, the Supreme Court held that even if a law "imposed a special burden" on a "limited number of persons['] ... right to vote[,] ... [t]he severity of that burden is, of course mitigated by the fact that, if eligible, voters ... may cast provisional ballots that will ultimately be counted." ⚑Crawford, 553 U.S. at 199, 128 S.Ct. 1610.

Mr. Germany testified that registrants flagged as noncitizens are provided with notice of their pending status and informed of the documents they need to show that they are citizens.

Tr. 1724:22; 1735:1–2. At a minimum, the registrants are supposed to be issued a provisional ballot. Id. The testimony also shows that in 2019, the Secretary of State updated eNet to avoid registrants consistently being flagged as noncitizens. Tr. 3590:6–3591:5. Finally, the record shows that all of the voters who provided citizenship verification documents were able to vote. Thus, "consider[ing] the statute's broad application to all [Georgia] voters[,] [the Court] conclude[s] that it 'imposes only a limited burden on voters' rights.' " ⚑Crawford, 553 U.S. at 202–03, 128 S.Ct. 1610 (citation omitted).

### *(2) Justifications*

Defendants argued that the State has compelling state interest. Under Georgia law, noncitizens are not allowed to vote in elections for public office. ⚑Ga. Const. Art. 2, § 1, ¶ II; ⚑O.C.G.A. § 21-2-216(a)(2). Federal law also prohibits noncitizens from voting. See ⚑Arcia v. Fla. Sec'y of State, 772 F.3d 1335, 1344 (11th Cir. 2014) ("The National Voter Registration Act (NVRA) is premised on the assumption that citizenship is one of the requirements for eligibility to vote. See, e.g., [⚑52 U.S.C. §§ 20504, ⚑20506, ⚑20508] (requiring certain voter registration forms to state or specify 'each eligibility requirement (*including citizenship*) ....").. Plaintiffs conceded that they were not challenging this policy and agreed that pursuing this goal was a legitimate state interest. Tr. 4330:7–10 ("We are not asking that noncitizens be allowed to vote. I know this Court knows that. We have only ever agreed that Georgia has a legitimate interest in preventing noncitizens from voting.").

Defendants also asserted a compelling state interest in ensuring compliance with HAVA and limiting voter fraud. The Supreme Court has noted that preventing voter fraud is a compelling state interest. "There is no denying the abstract importance, the compelling nature, of combating voter fraud." See ⚑Purcell, 549 U.S. at 4, 127 S.Ct. 5 (acknowledging "the State's compelling interest in preventing voter fraud"); cf. ⚑Eu v. San Francisco Cty. Democratic Cent. Comm., 489 U.S. 214, 231, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989) ("A State indisputably has a compelling interest in preserving the integrity of its election process."); ⚑Crawford, 553 U.S. at 225, 128 S.Ct. 1610 (Souter, J., dissenting).

### (3) Weighing burdens

**\*71**   The Court finds that Defendants' important justifications for preventing voter fraud and complying with HAVA outweigh the limited burden caused by the citizenship matching process. "[W]hen a state election law provision imposes only 'reasonable nondiscriminatory restrictions' upon the First and Fourteenth Amendment right of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." Burdick, 504 U.S. at 434, 112 S.Ct. 2059. "When evaluating a neutral, nondiscriminatory regulation of voting procedure, [the Court] 'must keep in mind that [a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.' " Crawford, 553 U.S. at 203, 128 S.Ct. 1610 (quoting Ayotte v. Planned Parenthood of N. New Eng., 546 U.S. 320, 329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006)). The Court found that the citizenship matching process creates a limited burden on voters. Therefore, the Court must determine whether Defendants provided important regulatory interests to justify the law.

The Court finds that Defendants have shown that compliance with HAVA is an important state interest. As stated above, if a State fails to comply with HAVA, the Attorney General may bring a civil action against the State. 52 U.S.C. § 21111. Thus, Defendants have an important interest in complying with HAVA.

Also, Defendants have a compelling interest in preventing voter fraud. "[D]eterring voter fraud is a legitimate policy on which to enact an election law, even in the absence of any record evidence of voter fraud." Greater Birmingham Ministries, 992 F.3d at 1334. Even though the evidence adduced at trial shows that relatively few noncitizens attempt to vote,[72] Defendants were not required to show instances of voter fraud to justify these election laws. Id. Accordingly, the Court finds that Defendants have a compelling interest in preventing voter fraud.

The Court finds that the limited burdens placed on voters by Exact Match citizen verification are justified by the State's compelling interest in fraud and important interest in complying with HAVA. Accordingly, the Court finds that Plaintiffs have not satisfied their burden in proving that Exact Match citizenship verification violates the First and Fourteenth Amendments.

### (4) Remedies

Even if the Court were to find for Plaintiffs, the Court finds that it is prudent to abstain from awarding Plaintiffs' proposed remedy. Plaintiffs asked the Court to order the Secretary of State to implement the SAVE verification process (Tr. 3193:6–20) and maintain records of the citizenship verification conducted by SAVE (Tr. 3195:2–4). However, Mr. Germany testified that the Secretary of State is in the process of implementing SAVE. Tr. 1709:20–1711:20.

Defendants argued that the Secretary of State's implementation of SAVE meant that there was no injury to Plaintiffs. See Tr. 4459:20–22 ("If we are using SAVE, the injury is not there. Because that's what[ ] they are saying they want as a remedy.") Also, Defendants argue that SAVE is not an appropriate remedy because "[t]he testimony is that we want to continue doing this[,] [t]here is already a statute that says to do that[,] [t]here is a regulation that says to do that[,] [t]here is no indication that that's going to change."[73] Tr. 4460:1–4. The Court agrees that ordering the implementation of SAVE is not an appropriate remedy.

**\*72**   As an initial note, the Defendants' planned implementation of SAVE does not moot the issue, and the Court recognizes that absent a judicial order, things may change. But, SAVE is not dispositive of the Court's decision, and the Court has no doubt that if the State changes its policy, this Court or another will hear about it, and the issue can be addressed on another day.

First, Georgia has a regulation that requires the Secretary of State to verify an applicant's citizenship using SAVE. See Ga. Comp. R. & Regs. 590-8-1-.02(2)(a)(2) ("If the Department of Driver Services records indicate that the applicant is not a United States citizen in the Department of Driver Services database, the Secretary of State shall attempt to verify the applicant's United States citizenship status with the United States Citizenship and Immigration Services utilizing the Systematic Alien Verification for Entitlements program. Such verification will indicate whether the applicant is designated as a citizen of the United States within the Verification Information System database.").

Second, sufficient testimony and evidence establish that the Secretary of State is in the process of implementing SAVE. On August 17, 2020, the Secretary of State entered into a memorandum of understanding with the Department of Homeland Security authorizing the Secretary to implement SAVE. PX. 2022.

In 2021, the Secretary of State's Office used SAVE to audit the voter rolls and records from DDS. Tr. 1680:15–16; 1680:20–22. The range of dates for the registrations that the Secretary of State's Office identified during the audit was from 1997 until February 24, 2022. Tr. 1728:1–2. During that audit, the Secretary of State's Office looked at the entire voter roll. Tr. 1682:3–5. As of the trial, Mr. Germany testified that the Secretary of State is discussing the process for implementing more frequent uses of SAVE to verify voters' citizenship. Tr. 1710:2–5. It is a goal of the Secretary of State to be able to run voter applicants' alien registration numbers through the SAVE system in real-time. Tr. 1694:6–21.

The Court notes that Mr. Germany testified that the Secretary of State had no defined timeline for implementing SAVE. Tr. 1710:2–5, 1711:4–11, 15–20. However, Mr. Germany also testified that "I would hope that we could get it up and running within a month to three months, but I'm hesitant to say that because you know, when you start dealing with data transfers and data formatting, we can run into things that we then have to resolve. But I mean in my mind, I do think it's a one-month-to-three-month project." Tr. 1711:15–20. Given that the Secretary of State is in the process of implementing SAVE, the Court declines to order the Secretary of State to implement SAVE. [74]

**\*73** The Eleventh Circuit cautioned federal judges on using injunctions with respect to election laws. See New Ga. Project, 976 F.3d at 1284. Here, Plaintiffs ask the Court to issue an Order requiring the Secretary of State to implement SAVE even though an MOU authorizes the Secretary of State to use SAVE, a regulation requires the Secretary of State to use SAVE, and officials in the Secretary of State's Office testified that they are in the process of implementing SAVE. Accordingly, the Court finds that issuing said injunction would be "second-guessing or interfering with [the] State's reasonable, non-discriminatory election rules." New Ga. Project, 976 F.3d at 1284. Specifically, it would require the Court to second-guess the Secretary of State's timeline for implementing SAVE. [75] Thus, the Court finds that ordering the Secretary of State to implement SAVE is the type of remedy that district courts are cautioned against awarding.

The Court finds that Plaintiffs have not carried their burden in establishing that Exact Match Citizenship violates the First and Fourteenth Amendments.

## C. Count II: Fifteenth Amendment

In Count II of their Second Amended Complaint, Plaintiffs allege that "[a]cting under color of state law, Defendants deprived Georgians of the right to vote—as secured by the Fifteenth Amendment—by administering an election plagued with irregularities that disproportionally affected voters of color." Doc. No. [582], ¶ 167. More specifically, in their Statement of the Case for purposes of the Pretrial Order, Plaintiffs allege that "[t]he Exact Match policy and its application ... racially discriminate against Georgians of color in violation of the Fifteenth Amendment." Doc. No. [753-1], 1–2. As stated above, the challenged practices here are Exact Match MIDR and Exact Match Citizenship. [76]

### 1. Legal Standard

The Fifteenth Amendment provides in relevant part that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV. "The Amendment bans racial discrimination in voting by both state and nation. It thus establishes a national policy ... not to be discriminated against as voters in elections to determine public governmental policies or to select public officials, national, state, or local." Terry v. Adams, 345 U.S. 461, 467, 73 S.Ct. 809, 97 L.Ed. 1152 (1953). "The design of the Amendment is to reaffirm the equality of races at the most basic level of the democratic process, the exercise of the voting franchise." Rice v. Cayetano, 528 U.S. 495, 512, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000).

"[T]he Supreme Court has long recognized that evidence of a racially discriminatory motivation is required for Plaintiffs to prevail on a Fifteenth Amendment claim.' " Greater Birmingham Ministries v. Sec'y of State for Ala., 992 F.3d 1299, 1321 (11th Cir. 2021) (citing City of Mobile v. Bolden, 446 U.S. 55, 62, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), superseded by statute on other grounds as stated in Thornburg v. Gingles, 478 U.S. 30, 35, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)). There are two prongs to

an abridgment analysis under the Fifteenth Amendment. Greater Birmingham Ministries, 992 F.3d at 1321 (citations omitted). Plaintiffs must first show that the State's "decision or act had a discriminatory purpose and effect." Id. (citing Burton v. City of Belle Glade, 178 F.3d 1175, 1188–89 (11th Cir. 1999)). [77] "If Plaintiffs are unable to establish both intent and effect, their constitutional claims fail." Id. (emphasis omitted). "Once discriminatory intent and effect are established, the second prong provides that 'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this [racial discrimination] factor.' " Id.

**\*74** The Eleventh Circuit has held that "the fluid concept of discriminatory intent is sometimes subtle and difficult to apply." Dowdell v. City of Apopka, 698 F.2d 1181, 1185 (11th Cir. 1983). The Court must "evaluate all available direct and circumstantial evidence of intent in determining whether a discriminatory purpose was a motivating factor in a particular decision." Burton, 178 F.3d at 1189. In addition, in Village of Arlington Heights v. Metropolitan Housing Development Corporation, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), the Supreme Court suggested that relevant evidentiary factors include: (1) the impact of the challenged law; (2) the historical background; [78] (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators. [79] Greater Birmingham Ministries, 992 F.3d at 1322 (citing Arlington Heights, 429 U.S. at 267–68, 97 S.Ct. 555). The Eleventh Circuit has supplemented the Arlington Heights list to include the following additional factors: (6) the foreseeability of the disparate impact; (7) knowledge of that impact; and (8) the availability of less discriminatory alternatives. Id. (citing Jean v. Nelson, 711 F.2d 1455, 1485–86 (11th Cir. 1983), on reh'g, 727 F.2d 957 (11th Cir. 1984), aff'd on other grounds, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985)).

### 2. Issue and Challenged Practices: Exact Match (MIDR and Citizenship Match)

The Court must now undertake a sensitive inquiry and determine whether Plaintiffs have met their burden of showing that the Secretary of State's decision or act had a discriminatory purpose and effect. See Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555 ("Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.").

#### a) Impact of the challenged policy

In turning to the first prong, the Court is required "to start by determining whether the challenged law has a discriminatory impact and 'whether it bears more heavily on one race than another.' " Greater Birmingham Ministries, 992 F.3d at 1321 (citing Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555). The Court notes that the Supreme Court has "cautioned that it would be rare to find a case involving 'a clear pattern, unexplainable on grounds other than race' and that, '[a]bsent a pattern as stark as that, ... [discriminatory] impact alone is not determinative, and the Court must look to other evidence.' " Id. at 1322 (citing Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555).

In the case *sub judice*, Plaintiffs have presented evidence of discriminatory impact of the Exact Match policy and application of the MIDR and Citizenship Match challenged practices through the testimony of their expert, Dr. Mayer. See PX. 1278, PX. 2030, Tr. 398:2–10, Tr. 412:11–414:9. The Court finds Dr. Mayer's methodology of analyzing the state's voter files to be sound and credits his conclusion that, as an empirical matter, "voters of color are overwhelmingly and disproportionately in MIDR status compared to their overall composition of the voter file." Tr. 413:7–9 (Mayer). The evidence at trial also showed that in 2018, the Secretary of State's Office undertook an internal review of the voter files and concluded that approximately 70% of applicants in pending status for failed verification at DDS or SSA were Black. PX. 1887, Tr. 1993:14–1994:18 (Harvey).

**\*75** As for citizenship match, the Court again credits the methodology used by Dr. Mayer in analyzing the state's voter files. Dr. Mayer's testimony showed that non-Hispanic white registrants are far less likely to be flagged as noncitizens, as compared to their overall representation in the voter file, whereas voters of color are far more likely to be flagged as noncitizens than their overall representation in the voter file reflects. PX. 2027, Tr. 388:12–390:23 (Mayer). The Court credits Dr. Mayer's conclusion that the citizenship verification

process overwhelmingly applies to voters of color. Tr. 398:7–10 (Mayer).

However, there is no clear pattern that would be determinative, i.e., Plaintiffs' evidence, standing alone, does not establish a "pattern, unexplainable on grounds other than race." Arlington Heights, 429 U.S. at 266, 97 S.Ct. 555. Plaintiffs' own expert testified that there was substantial variation in the MIDR match numbers among counties that could not be explained by race, and he suggested "different administrative practices in different counties, even with the same overall demographics. PX. 2031, Tr. 416:9–19 (Mayer). Dr. Mayer further testified that for Citizenship Match, the numbers "are suggestive of and consistent with inconsistent administrative practices around and in different jurisdictions around the state." Tr. 418:6–13.

After review of Dr. Mayer's testimony, the Court concludes that the discriminatory impact factor is not determinative and the Court must consider the remaining Arlington Heights factors to determine if Defendants intended to discriminate when instituting Exact Match (MIDR and citizenship) practices.

### b) Historical background

The Court now considers the historical background Arlington Heights factor.

A stay-panel of the Eleventh Circuit recently cautioned that the "Arlington Heights's 'historical background' factor should be 'focus[ed] ... on the 'specific sequence of events leading up to the challenged decision' rather than 'providing an unlimited lookback to past discrimination.' " [80] League of Women Voters of Fla., Inc. v. Fla. Sec'y of State, 32 F.4th 1363, 1373 (11th Cir. 2022) (citation omitted).

Tracing the specific sequence leading up to implementation of the Exact Match MIDR and Citizenship Verification challenged practices is difficult because those policies are not contained in a single law or other legal authority; rather, they arise out of a combination of statutory and administrative procedure. Defendants also acknowledge that the Exact Match MIDR process has never been a duly adopted, published written policy [81] and has evolved over time. [82] Tr. 1936:1–14, 1940:22–24 (Harvey).

**\*76** Nevertheless, the Court credits the expert testimony of Dr. McCrary, [83] who provided a history of voter registration and a historical account of Exact Match MIDR, beginning in 2002 with the adoption of HAVA by Congress and its implementation by the fifty states. Tr. 213:2–4 (McCrary).

Dr. McCrary testified that the State of Georgia did not begin to comply with the voter verification provisions of HAVA [84] until "between 2007 and 2008"; it was his understanding "from court rulings at the time ... that Georgia believed that because it required a full Social Security number" when registering to vote "rather than just the last four digits of the Social Security number, it was not required to comply with HAVA." Tr. 216:6–14. [85]

The rulings that Dr. McCrary referenced were: (1) Schwier v. Cox, 412 F. Supp. 2d 1266 (N.D. Ga. 2005) (holding that the Secretary of State's use of an applicant's full Social Security number violated both the Privacy Act and the Voting Rights Act) and (2) Morales v. Handel, No. 08-cv-3172, 2008 WL 9401054, at *8 (N.D. Ga. Oct. 27, 2008) (holding that the State's voter verification policy required preclearance under Section 5 of the Voting Rights Act, 42 U.S.C. § 1973c). [86]

In 2007 and 2008, Georgia "followed the procedure apparently required by HAVA, which was to have the voter registration database, which the state had created by that time, compared with the driver[']s license database operated by the Department of Driver Services, or DDS, through a database matching procedure." Tr. 216:19–217:2 (McCrary). Secretary of State Handel "participated in a memorandum of understanding with DDS to carry out that function." PX. 1751, Tr. 217:3–5 (McCrary). Dr. McCrary further testified that the State of Georgia sought individual citizenship status from the SSA, through a verification program called "HAVV." [87] Tr. 221:7–14 (McCrary). Dr. McCrary testified that there was an inspector general's report from within the SSA that was "sharply critical of" HAVV's "exact match" methodology for which many of the "non-matches were in fact citizens." Tr. 221:19–24, 222:9 (McCrary). Dr. McCrary, however, had no evidence that the State of Georgia received the inspector general's report. Tr. 284:11–13 (McCrary).

**\*77** Dr. McCrary testified that Georgia continued to use the same methodology after the inspector general's report until 2009, when the United States Department of Justice ("DOJ"), reviewing the State's preclearance application, objected to the

"exact match" system of voter verification. Tr. 222:10–23; see also PX. 66.[88]  In the objection letter, the DOJ laid out its reasons for rejecting the application as follows:

- The State's process "[did] not produce accurate and reliable information" such that "thousands of citizens who [were] in fact eligible to vote under Georgia law were flagged." PX. 66 at 3.

- The impact of the errors in the State's process fell "disproportionately on minority voters." PX. 66 at 4.

- Applicants who were "Hispanic, Asian, or African American [were] more likely than white applicants, to statistically significant degrees, to be flagged for additional scrutiny." PX. 66 at 4.

The DOJ also found the process for verifying voter registration information to be "seriously flawed" in a manner that "subject[ed] a disproportionate number of African American, Asian, and/or Hispanic voters to additional and, more importantly erroneous burdens on the right to register to vote." PX. 66 at 4. The DOJ concluded "[t]hese burdens are real, are substantial, and are retrogressive for minority voters." PX. 66 at 4.

Dr. McCrary testified that Georgia later developed a revised version of its voter verification procedures that "proposed daily monitoring of all the decisions ... in which individuals were evaluated for eligibility to vote, and to provide quick notification to any individuals who were ruled to be ineligible to vote." Tr. 249:12–17 (McCrary); Tr. 1595:14–1596:2 (Germany); PX. 76 at STATE-DEFENDANTS-00078199 ("Board of registrars should check the SSVRZ791R1 report on a daily basis").[89]

Dr. McCrary testified that in 2010, Georgia sought preclearance through both administrative review and a Section 5 declaratory judgment action in the District of Columbia of the revised version of its voter verification procedures, which the DOJ "informed the court it did not find objectionable in light of the changes the State had purportedly made, and, therefore, that new version of the State's voter verification procedure was precleared." Tr. 249:4–11.[90]

Dr. McCrary testified that there was another court case, NAACP v. Kemp, involving Exact Match that the State of Georgia agreed to settle in February of 2017. Tr. 257:2–15 (McCrary).[91]  In that settlement agreement, "the State

agreed to have an unlimited time period for curing a finding of non-eligibility to register under the voting verification procedures." Tr. 257:19–23 (McCrary).[92]  Later, the Georgia legislature passed HB 268, which "essentially left in place the 'exact match' methodology that had been employed in the past, but [the State] agreed to run the records of persons found to be ineligible through the HAVA Match again." Tr. 258:12–15.[93]

**\*78**  In 2018, there was a legal challenge to HB 268 that resulted in the Honorable Eleanor Ross, United States District Judge, issuing a preliminary injunction finding that plaintiffs showed "a substantial likelihood of success on the merits of their claim that" the State had "violated the right to vote for individuals placed in pending [registration] status due to citizenship." PX. 1289, ¶¶ 100, 110 (citing Ga. Coal. for the People's Agenda v. Kemp, 347 F. Supp. 3d 1251 (N.D. Ga. 2018)). Judge Ross ordered the state "to allow county officials to permit individuals flagged and placed in pending status due to citizenship to vote a regular ballot by furnishing proof of citizenship to poll managers or deputy registrars." PX. 1289, ¶ 110.

Dr. McCrary was aware that the 2018 case remains pending and that the State of Georgia has changed its process since the preliminary injunction. Tr. 285:18–20.

Dr. McCrary states in his report that according to former elections director Harvey, "the state responded to the changes required by Judge Ross's injunction by adopting HB 316 (2019)." PX. 1289, ¶ 112. As stated in the Court's prior orders:

> HB 316, which was signed into law by the Governor on April 2, 2019, amends the Georgia Election Code to, among other things, provide for more notice under Georgia's voter-list-maintenance process; to provide that a voter registration is not automatically rejected under the Exact Match policy; to provide for the implementation of new voting machines; to prohibit the superintendent of a county from changing a polling place less than thirty days before a general primary or general election; to authorize the Secretary of State to become a member

> of a nongovernmental entity whose purpose is to share and exchange information in order to improve the accuracy and efficiency of voter registration systems; and to change the way which provisional ballots and absentee ballots are counted.

Doc. No. [68], 23–24; see also Doc. No. [612], 58–64. Dr. McCrary's expert testimony ended with the enactment of HB 316.

Plaintiffs also ask the Court to consider their evidence concerning the 2014 and 2018 campaign statements of then-Secretary Kemp, the 2014 New Georgia Project investigation, and the 2010 Dr. Dennard investigation as further historical background evidence of discriminatory purpose. However, the Court has determined that the focus of its Fifteenth Amendment historical background analysis is 2002, with the adoption of HAVA by Congress and Georgia's implementation process in 2007 to 2008, as well as the revised policies. Plaintiffs have not linked how the 2010 and 2014–2018 events tie in for consideration.[94] In essence, Plaintiffs' position is weakened significantly by the fact that the Dr. Dennard investigation (concerning absentee ballots), the New Georgia Project investigation (concerning forgeries in voter registrations), and the campaign statements evidence presented in this case are largely unconnected to the passage of the laws and actual policies in question. See Greater Birmingham Ministries, 992 F.3d at 1324 (indicating that the plaintiffs' "position is weakened significantly by the fact that the evidence presented" in the case at hand was "largely unconnected to the passage of the actual law in question").

To this regard, the Court has given no consideration to Plaintiffs' evidence concerning Dr. Dennard and the New Georgia Project in this section of the Opinion, as said evidence does not concern the specific sequence of events leading up to the creation, implementation, and revision of the laws and policies at issue.[95] The Court will consider the campaign statements in detail in the "[c]ontemporary statements of key officials" section of this Opinion.

**\*79**  After considering the historical background of Exact Match MIDR and Citizenship Verification, the Court finds that this factor is neutral. The historical background does not reveal "a series of official actions taken for invidious

purposes." 🚩 Arlington Heights, 429 U.S. at 267, 97 S.Ct. 555. Further even if the initial actions of the State of Georgia could be viewed as showing invidious intent (or purpose) based on the DOJ's preclearance objection, the Court notes that the DOJ eventually found a revised matching policy unobjectionable, and the DOJ thus precleared Georgia's matching policy. Thus, this Court hesitates to find invidious purpose for a policy precleared by the DOJ. The fact that Exact Match MIDR and Citizenship Verification continue to evolve following litigation, settlement agreements, and additional legislative action does not change this historical background conclusion. Further, to the extent that it is proper to consider the State's interests in its Exact Match MIDR and Citizenship Verification policies as a part of the historical background factor,[96] the Court notes that the evidence at trial demonstrated legitimate state interests in proving that the registered voter is an actual person, weeding out false registrations, effectuating the HAVA permissible forms of identification requirement for certain first-time voters, and preventing noncitizens from voting.[97] Tr. 3581:1–3, 3604:11–19, 3606:14–24, 3605:20–3606:8 (Harvey), Tr. 4165:7–11, 4146:13–17 (Germany).

### c) Specific sequence of events, and substantive departures

Next, the Court considers the specific sequence of events and substantive departures factors. There is nothing in the record to show a sudden change in the sequences of events leading up to the Exact Match policy "that would spark suspicion" and the record shows no substantive departures from "usual procedures." 🚩 Arlington Heights, 429 U.S. at 269, 97 S.Ct. 555. Accordingly, this factor weighs in favor of Defendants and against a discriminatory purpose finding.

### d) Contemporary statements of key officials

While not considered for the historical background factor, the Court will consider Plaintiffs' evidence concerning the 2014 and 2018 campaign statements of then-Secretary Kemp in the contemporary statements category as follows.

As noted above, Plaintiffs offer two campaign statements of then-Secretary Kemp to demonstrate a discriminatory motivation. These statements are from 2014 and 2018. In these statements, then-Secretary Kemp urged his supporters

to register voters that would vote for Republican candidates and encourage them to vote in the same way that Democrats had previously done with minority voters. DX. 740, PX. 2051, Tr. 86:9–17, 88:9–17, 92:18–22 (Kemp Dep.). At a 2018 campaign fundraiser, then-Secretary Kemp expressed concern about early voters primarily voting for Democrats and the number of absentee ballot requests. PX. 2051, Tr. 108:2–8, 109:14–1, 110:1–4, 110:11–15 (Kemp. Dep.). These statements were not contemporaneous with the adoption of the challenged MIDR and Citizenship Match practices. See Greater Birmingham Ministries, 992 F.3d at 1321 (citing Arlington Heights, 429 U.S. at 267–68, 97 S.Ct. 555).

The Court recognizes that Defendants objected to the evidentiary admission of Governor Kemp's deposition testimony concerning the speeches at issue on the ground that "[c]ampaign speech is not relevant." Doc. No. [755-7], 12. [98] In opposition, Plaintiffs assert that "as the Secretary of State and Chair of the State Election Board, Governor Kemp was chiefly responsible for the administration of Georgia's elections during the relevant time period. Therefore, statements he made throughout that same time period in his capacity as a candidate for office are certainly relevant to the constitutionality of his actions." Doc. No. [755-7], 12.

**\*80** There does not appear to be a case on point that addresses the exact context that is presented in the case *sub judice*. The Court also recognizes that in the non-voting rights class of cases/discrimination context, the Supreme Court has noted disagreement among the Justices as to whether statements made by lawmakers may properly be taken into account in determining whether a law intentionally discriminates on the basis of religion. See Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n, — U.S. —, 138 S. Ct. 1719, 1730, 201 L.Ed.2d 35 (2018) (considering religious discrimination); [99] see also Trump v. Hawaii, — U.S. —, 138 S.Ct. 2392, 2418–20, 201 L.Ed.2d 775 (2018) (considering campaign speech as extrinsic evidence that was not determinative of the Court's final ruling when analyzing whether a policy "address[es] a matter within the core of executive responsibility" and when applying rational basis review to determine whether a policy "can reasonably be understood to result from a justification independent of unconstitutional grounds").

In reviewing the limited authority concerning campaign speech and the Supreme Court Justices' noted disagreements

concerning lawmaker statements in the Masterpiece Cakeshop case, the Court perceives that the law is unsettled on consideration of statements, such as the ones at issue involving campaign speech.

In the absence of binding authority, the Court deems it proper to overrule Defendants' objection as to consideration of the 2014 and 2018 campaign statements. To the extent that it is proper to consider the campaign statements at issue, the Court after weighing the evidence and considering credibility, does not find that the speeches support a finding of "a wholesale intent" by then-Secretary Kemp to discriminate against minority voters as it relates to the Exact Match policy. Greater Birmingham Ministries, 992 F.3d at 1323. This Court is "confined to an analysis of discriminatory intent as it relates to" the Exact Match Policy and the statements Plaintiffs identify were not made about the matching policies at issue in this case, nor are they temporally connected to any of the periods when the policies were implemented or revised. See Greater Birmingham Ministries, 992 F.3d at 1323 ("Plaintiffs provide no evidence that [the senator's] comment was made at the same time, or even during the same session, as the passage of [law at issue].").

The stay-panel in the recent League of Women Voters of Florida case also indicated that it is improper to fail to "properly account for what might be called the presumption of legislative good faith" in a Fifteenth Amendment analysis. League of Women Voters of Fla., 32 F.4th at 1373. In support of the presumption of good faith statement, the stay-panel cited case law that dealt with state legislatures. Id. (citing Abbott v. Perez, — U.S. —, 138 S. Ct. 2305, 201 L.Ed.2d 714 (2018)). Plaintiffs in the case *sub judice* object to applying such a presumption. Plaintiffs assert that the presumption of good faith is restricted to the intent of the legislature (Doc. No. [854], ¶ 63) and is irrelevant to this case that involves an uncodified policy. However, this Court's independent research shows that courts have held that the good faith presumption extends to non-legislative public officials, such as the Secretary of State. See, e.g., Thompson v. Hous. Auth. of City of Miami, 251 F. Supp. 121, 124 (S.D. Fla. 1966) ("The presumption that public officials will in good faith discharge their duties and observe the law is a very strong presumption, and will prevail until overcome by clear and convincing evidence to the contrary.") (citing Barnes v. City of Gadsden, 174 F. Supp. 64 (N.D. Ala. 1958)). Accordingly, the Court will extend a good faith presumption in considering then-

Secretary Kemp's statements. Said presumption has not been rebutted or overcome by Plaintiffs' evidence.[100] Accordingly, the contemporary statements factor weighs in favor of Defendants.

### e) **Foreseeability and knowledge of the disparate impact**

**\*81** Next, the Court considers the foreseeability and knowledge of the disparate impact factors. The evidence at trial showed that the Secretary of State's Office is aware that its DDS citizenship verification process affects recently naturalized citizens rather than native-born citizens. Tr. 2036:9–2040:14 (Harvey). Georgia was put on notice of the problems with its voter verification procedure as early as 2009, when the Department of Justice objected to Georgia's adoption of an "exact match" methodology for voter verification in implementing HAVA. PX. 66 at 4.[101] The Secretary of State's own internal review in 2018 showed that 70% of applicants in pending for failed verification at DDS or SSA were Black. Tr. 1993:14–1994:18 (Harvey); PX. 1887. This factor weighs in favor of Plaintiffs and constitutes circumstantial evidence of intent.

### f) **Availability of less discriminatory alternatives**

Last, the Court considers the availability of less discriminatory alternatives. Dr. Mayer's unrebutted testimony was that states have other options to implement HAVA verification for identity that do not require an exact match. The most common alternative is typically referred to as contextual or probabilistic matching, which accounts for the possibility of differences in a small number of characters between the databases without it being a different person. PX. 1278 at 10, Tr. 358:16–359:7 (Mayer). The Court also credits Dr. Mayer's unrebutted testimony that at least three states (California, Massachusetts, and Wisconsin) rely exclusively on a registrant's attestation of citizenship, without verifying citizenship status. Tr. 363:24–364:4 (Mayer). This factor weighs in favor of Plaintiffs and constitutes circumstantial evidence of intent.

\* \* \* \*

In sum, after evaluating available direct and circumstantial evidence of intent and weighing the evidence and making credibility determinations, the Court finds that while some

Arlington Heights factors weigh in Plaintiffs' favor, the majority of the factors weigh against Plaintiffs or are neutral—or not determinative of whether a discriminatory purpose was a motivating factor in the decision to institute Exact Match MIDR and Citizenship Verification laws and policies. In addition, there are legitimate State interests in Exact Match MIDR and Citizenship Verification laws and policies. Accordingly, the Court finds that Plaintiffs have failed to show that the Exact Match MIDR and Citizenship Verification laws and policies were enacted with a racially discriminatory intent or purpose. As such, this Court does not reach the second prong of the Fifteenth Amendment analysis to consider whether Defendants have demonstrated that the laws would have been enacted without the racial discrimination factor. "[W]ithout proof of discriminatory intent, a generally applicable law with disparate impact is not unconstitutional." Crawford v. Marion Cnty Election Bd., 553 U.S. 181, 207, 128 S.Ct. 1610, 170 L.Ed.2d 574 (2008) (Scalia, J., concurring) (internal citation omitted). The Court finds against Plaintiffs and in favor of Defendants on Plaintiffs' Fifteenth Amendment claims.

### D. **Count III: Equal Protection**

In their Complaint and Statement of Claim for purposes of the Pretrial Order, Plaintiffs raise two different equal protection claims. The first claim challenges the same procedures as Counts I and II of their Second Amended Complaint. More specifically, Plaintiffs allege that "[a]cting under color of state law, Defendants[102] deprived Georgians of the right to vote on an equal basis, as secured by the Equal Protection Clause, by administering an election plagued with irregularities that disproportionately affected voters of color." Doc. No. [582], ¶¶ 181–182; see also Doc. No. [753-1], 1–2 ("The Exact Match Policy and its application ... racially discriminate against Georgians of color in violation of the Fifteenth Amendment and the Equal Protection Clause of the Fourteenth Amendment."). Plaintiffs' second equal protection challenge concerns uniformity and residency (or geographic discrimination). More specifically, Plaintiffs allege that "Georgia's voting system ... violates Equal Protection because voters are subject to arbitrary and inconsistent differences in rules, processes, and burdens depending on where voters happen to reside"—resulting in "different elections systems in different counties in Georgia." Doc. No. [582], ¶¶ 186–187; see also Doc. No. [753-1], 2 ("The Exact Match Policy and its application ... discriminate against Georgians based on where they live and based

on naturalized citizenship status in violation of the Equal Protection Clause of the Fourteenth Amendment .... The non-uniform and improper practices regarding in-person cancellation of absentee ballots ... discriminate against Georgians based on where they live, in violation of the Equal Protection Clause of the Fourteenth Amendment.").

### 1. Legal Standard

**\*82** The Fourteenth Amendment provides in relevant part that "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. "[T]he Equal Protection Clause confers a substantive right to participate in elections on an equal basis with other qualified voters." 🚩 Bolden, 446 U.S. at 62, 100 S.Ct. 1490.

### 2. Racial Discrimination

"A successful equal protection claim under the Fourteenth Amendment requires proof of *both* an intent to discriminate and actual discriminatory effect." Greater Birmingham Ministries, 992 F.3d at 1224 (citing 🚩 Davis v. Bandemer, 478 U.S. 109, 127, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986)). "Once discriminatory intent and effect are established, the second prong provides that " 'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this [racial discrimination] factor.' " " Id. at 1225 (citations omitted).

Plaintiffs' equal protection claim (racial discrimination allegations) concerning the procedures challenged in Count II of the Second Amended Complaint is subsumed in the same analysis that the Court applied to the Fifteenth Amendment claim pertaining to Count II of this Opinion. Cf. NAACP v. Austin, 857 F. Supp. 560, 572 (E.D. Mich. 1994) ("[W]e believe that the Fifteenth Amendment's prohibition against purposeful discriminatory denial or abridgement by government of the freedom to vote on account of race, color, or previous condition of servitude is subsumed in the analysis required under the Fourteenth Amendment's equal protection clause." (internal quotations omitted)); cf. also Thompson v. Merrill, 505 F.Supp.3d 1239, 1254 (M.D. Ala. 2020) ("Both a Fourteenth Amendment Equal Protection Clause claim and a Fifteenth Amendment discrimination claim require proof of intent to discriminate. Therefore, the Court applies

the same analysis to both claims."). Accordingly, for the reasons set forth in the Court's analysis concerning Count II, Plaintiffs' Count III equal protection (racial discrimination) claim concerning voting procedures (specifically, "Exact Match") fails.

### 3. Geographic Discrimination

As indicated above, Plaintiffs allege that "Georgia's voting system ... violates [the] Equal Protection [Clause] because voters are subject to arbitrary and inconsistent differences in rules, processes, and burdens depending on where voters happen to reside," resulting in "different elections systems in different counties in Georgia." Doc. No. [582], ¶¶ 186–187. Plaintiffs further allege that "Defendants have allowed the voting processes in the 159 counties in Georgia to devolve into an arbitrary and inconsistent web of actual laws, erroneous interpretations of laws, and local rules that are often unannounced until applied to a voter." Id. ¶ 188. The specific systems that Plaintiffs allege violate the Equal Protection Clause are absentee ballot cancelations and Exact Match.

There does not appear to be binding Supreme Court or Eleventh Circuit precedent that provides an applicable standard; however, the Sixth Circuit has held that "[a] plaintiff may state an equal-protection claim by alleging that lack of statewide standards results in a system that deprives citizens of the right to vote based on where they live." 🚩 Northeast Ohio Coalition for the Homeless v. Husted, 837 F.3d 612, 635 (6th Cir. Sept. 13, 2016); see also 🚩 Bush v. Gore, 531 U.S. 525, 104–05, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) ("The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."). [103]

**\*83** The central question in a lack-of-uniform standards claim appears to be whether the state lacks "adequate statewide standards" when implementing its voting laws, practices, or procedures. Cf. 🚩 Husted, 837 F.3d at 635 (citations omitted).

In addition, as stated in 🚩 Husted, "[a]rguable differences in how elections boards apply uniform statewide standards to the innumerable permutations of ballot irregularities, although

perhaps unfortunate, are to be expected, just as judges in sentencing-guidelines cases apply uniform standards with arguably different results." Id., at 636.

In the case *sub judice*, the geographical differences in applying Exact Match and absentee ballot cancelations policies are more akin to the innumerable permutations of ballot irregularities as opposed to a lack in state-wide standards.

### a) Absentee ballot cancelations

First, there is very little record evidence that there were geographic differences in the cancelation procedures for absentee ballots. Plaintiffs presented direct evidence of seven voters who experienced irregularities in canceling their absentee ballots at the polls. See supra Section II(B)(1)(c) (1). These seven instances occurred in six out of Georgia's 159 counties. Id. [104] Given the relatively few occurrences of these issues in a relatively small number of counties, the Court finds that they are not illustrative of a lack of uniform standards. Accordingly, Plaintiffs failed to carry their burden in establishing that the training on absentee ballot cancelation violated the Equal Protection Clause.

Secondly, Mr. Harvey testified that "we did a lot of training on the current law at the time. And I think that's where 95 percent of their focus was on, is making sure that they received the latest information, because we're having to do -- in 2020, we had to adjust and make so many changes." Tr. 2122:12–17. With respect to the types of training, Mr. Harvey testified that "I can say that as far as when we train counties in person, at conference and at webinars, we were using the new information" from HB 316. Tr. 2119:16–22. Additionally, "[t]he webinars that we do, the presentation at the conferences, the election bulletins [ ] have updated information." Tr. 2121:4–5.

Mr. Harvey did admit that he was aware counties in Georgia were using several different procedures or practices with respect to canceling absentee ballot. Tr. 2109:22–25. However, when he was asked to clarify what he knew about the different practices that were being used, Mr. Harvey only discussed county practices that preceded HB 316. Tr. 2110:6–18. Mr. Harvey did not testify to being aware of differing practices post-HB 316. Other than the poll workers' manual and the certification materials that contained the incorrect information, Plaintiffs have provided no evidence that the Secretary of State knowingly allowed counties to implement different practices and procedures for canceling absentee ballots following the passage of HB 316. To the contrary, there is evidence that the Secretary of State conducted webinars, presentations, conferences, phone calls, and issued election bulletins in 2020. See, e.g., Tr. 2119:16–22, 2121:4–5. When asked specifically about whether that training included information about absentee ballots, Mr. Harvey testified that he did not recall issuing an election bulletin regarding absentee ballot cancelation procedures following the passage of HB 316 (Tr. 2124:13–20), and the Secretary of State did not track which counties attended webinars or reviewed the presentations regarding absentee ballot cancelation procedures (Tr. 1889:3–1890:23).

**\*84** The evidence also shows that at least two 2019 trainings run by the Secretary of State's Office—one headed by Mr. Rayburn and another by Ms. Frechette—were explicitly dedicated to the changes to election administration in the wake of HB 316's passage. PX. 1076; PX. 1189. Though Plaintiffs argue that these optional trainings address absentee ballot cancelation only in a "cursory manner" (Doc. No. [854], ¶ 888), this Court cannot agree. Ms. Frechette's 2019 presentation in particular appears to dedicate sufficient space to proper absentee ballot cancelation procedures in various scenarios. PX. 1189 at 23–25. Mr. Harvey's testimony in regard to providing information on the "current law" throughout 2020 and the two 2019 trainings on election administration post-HB 316 demonstrate that the Secretary of State, rather than deliberately turning a blind-eye to inconsistent procedures among different counties, took steps to ensure that there were uniform standards for absentee ballot cancelations after the passage of HB 316. Tr. 2122:12–2123:22.

The Court finds that the relatively few incidents in the record of voters who experienced difficulties in canceling their absentee ballots, coupled with the evidence regarding the Secretary of State's training evidence that the Secretary of State does promulgate uniform standards regarding the cancelation of absentee ballots.

### b) Exact Match

With respect to Exact Match, the Court also finds that there is not sufficient evidence of a lack of uniform standards. At summary judgment, the Court found that Plaintiffs'

Fair Fight Action, Inc. v. Raffensperger, --- F.Supp.3d ---- (2022)

geographic equal protection claim survived because the evidence was unclear as to whether "county officials [were] guided by clear rules." Doc. No. [617], 83. However, the evidence adduced at trial established that there were sufficient standards for implementing Exact Match. Tr. 3574:4–19; Tr. 1192:2–3.

As stated underlined supra, the process for Exact Match is as follows. First, an applicant's information is uploaded to eNet. Tr. 1190:23–1191:7. Second, the information is transmitted to DDS, which determines whether it has information for the applicant or if the applicant's information needs to be sent to SSA. Tr. 1194:20–1196:18. Third, if a record has certain uncurable defects, such as an invalid date of birth or non-numeric characters in the last four digits of the applicant's social security number, DDS will stop the verification process, flag, and return the application to the Secretary of State. Tr. 1196:19–1197:15; PX. 1753. Fourth, for records that it can process for verification, DDS checks certain criteria in the record against the information it has on file to determine if it is a match. PX. 1753 at 1; see also Tr. 1197:16–1199:18. Finally, after it has performed the verification process, DDS transmits the voter information back to the Secretary of State with a determination of whether the information was verified or not and, if not, the reasons therefor. Tr. 1191:11–21; 1199:19–1200:7; 3574:4–19; see also PX. 1751; DX. 42 (🚩 O.C.G.A. § 21-2-220.1(b) (revised version of HAVA Match policy enacted by HB 316).

Dr. Mayer testified that, with respect to MIDR, "as a county has fewer voters of color, registrants of color, that the pending rate tends to go down. But it also shows that even for counties with very similar demographics ... you actually see huge differences in the pending rate, often differences that exceed a factor of ten that, again, are suggestive of and consistent with inconsistent administrative practices around and in different jurisdictions around the state." Tr. 418:3–13. Similarly, with respect to citizenship matching, Dr. Mayer opined that there is "a relationship between the racial composition of a county and the rate of pending registrations," which shows "the rate of pending registrations increases as the percentage of African American registrants goes up. PX. 1278, 31. Dr. Mayer concluded that these differences were caused by "either a lack of data validity checking protocols or the fact that those protocols were not effectively implemented." Tr. 418:21–23.

**\*85** On cross-examination, however, Dr. Mayer acknowledged that the actual matching is conducted by the DDS, and Dr. Mayer did not speak with any individuals at

DDS when preparing his report. Tr. 427:15–21. Additionally, Dr. Mayer agreed that he did not know what caused any individual to be flagged by the MIDR matching process. Tr. 503:9–12. Dr. Mayer conceded that the error rate could be due to the concentration of voters who registered by mail. Tr. 489:1–490:4. When an individual submits a voter registration application either in person or via mail, an election official is responsible for inputting that information into eNet. Tr. 1957:17–1958:3.

Similarly, Mr. Harvey testified that some of the causes of MIDR could be due to a typing error by an election official. Id. Mr. Harvey also testified that when an application is flagged by DDS for a matching failure, the counties are trained to doublecheck their data entry. Tr. 1958:9–1960:2. Mr. Harvey specifically stated that training documents list doublechecking the data entry as a best practice. 1959:5–1960:2.

The Court finds that Plaintiffs have not established that the error rate in the Exact Match process is caused by the Secretary of State's failure to promulgate uniform standards. [105] On cross-examination, Dr. Mayer conceded that the error rate could be attributed to the number of mail-in registration applications received by the counties. Tr. 489:1–490:4. However, the Court finds that Defendants have provided uniform training documents aimed at minimizing these errors. Additionally, Dr. Mayer conceded that DDS conducts the actual match against its database. Tr. 427:15–21. DDS is a statewide agency, and it is unclear from the record how its matching process would result in disparities in different counties throughout the state. Accordingly, the Court finds that Plaintiffs have not established a lack of uniform standards concerning MIDR.

Accordingly, the Court finds that Plaintiffs have not carried their burden in establishing that Exact Match violates the Equal Protection Clause because there is insufficient evidence to show that the Secretary of State failed to promulgate uniform standards for matching registrants.

### E. Count V: Section 2 of the Voting Rights Act

Plaintiffs raise a vote-denial claim in Count V of their Second Amended Complaint concerning Section 2 of the Voting Rights Act. Doc. No. [582], ¶ 204. [106]

Section 2 of the Voting Rights Act provides:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title, as provided in subsection (b).

**\*86** (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

52 U.S.C. § 10301 (emphasis in statute). "The key requirement is that the political processes leading to nomination and election (here, the process of voting) must be 'equally open' to minority and non-minority groups alike."

Brnovich, 141 S. Ct. at 2337. Because § 2(b) defines what is needed to show a violation of § 2(a), as the Supreme Court recently clarified, "equal openness and equal opportunity are not separate requirements. Instead, equal opportunity helps to explain the meaning of equal openness." Id. at 2337–38.

Thus, the Court proceeds with a totality of circumstances analysis of Plaintiffs' Exact Match claim under the relevant Brnovich guideposts and Gingles Senate factors. The Court notes that neither Brnovich nor Gingles is directly applicable to the challenged practices in this case. In Brnovich, the Supreme Court was addressing regulations that impacted the counting and collection of votes. Id. at 2330. And in Gingles, the Supreme Court was addressing reapportionment of votes. Gingles, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25. The case *sub judice* addresses

qualifications of voting. Because neither case is directly on point, out of an abundance of caution, the Court will address both Brnovich guideposts and the Gingles Senate factors.

When applying the relevant factors, the Court will give greater weight to the Brnovich guideposts than the Gingles Senate factors. "Brnovich called into question the usefulness of some of the Gingles factors in evaluating a vote denial claim under § 2 of the VRA and offered alternate factors that a court may consider." United States v. Georgia, 574 F. Supp. 3d 1245, 1252 n.5 (N.D. Ga. 2021); see also Sixth Dist. of Afr. Methodist Episcopal Church v. Kemp, 574 F. Supp. 3d 1260, 1277 (N.D. Ga. 2021) (including a similar discussion about Brnovich's greater relevance to vote denial claims under Section 2 of the VRA). Regulating voter registration and poll access is more akin to counting and collecting votes in Brnovich than to reapportionment and voter dilution in Gingles. See Sixth Dist. of Afr. Methodist Episcopal Church, 574 F. Supp. 3d at 1276–77 & n.16 (stating that when a court considers vote denial claims, the Brnovich guideposts generally are more relevant than the Gingles factors because Brnovich was a vote denial case and Gingles was a vote dilution case).

The Court will first discuss each of the Brnovich guideposts: (1) the size of the burden imposed; (2) the deviation from standard practice in 1982; (3) the size of the disparity of the burden; (4) other available means of voting; and (5) the strength of the state interest. The Court will then discuss the following relevant Gingles Senate factors: (1) the history of official discrimination in Georgia; (2) whether there is racially polarized voting in Georgia; (3) voting practices and procedures in Georgia; (4) discrimination outside the voting context in Georgia; (5) racial appeals in campaigns in Georgia; and (6) minority candidate success in Georgia. With the benefit of Brnovich's guidance, the Court's analysis remains focused on the "touchstone" of Section 2 claims: "equal openness" to voting. Brnovich, 141 S. Ct. at 2338.

### *1. Analysis of the Applicable Factors and Guideposts*

#### a) 🚩 *Brnovich* **guideposts**

#### *(1) Size of the burden imposed*

**\*87**  In 🚩 Brnovich, the Supreme Court recognized that "every voting rule imposes a burden of some sort." 🚩 141 S. Ct. at 2338. The Supreme Court also stated: "because voting necessarily requires some effort and compliance with some rules, the concept of a voting system that is 'equally open' and that furnishes an equal 'opportunity' to cast a ballot must tolerate the 'usual burdens of voting.'" 🚩 Id. (citation omitted). Although the Supreme Court did not enumerate what acts constitute "usual burdens of voting," it did state that having to identify one's own polling place and then having to travel there to vote are "unremarkable burdens" that do not exceed the usual burdens of voting. 🚩 Id. at 2344. The Court further stated that "[m]ere inconvenience cannot be enough to demonstrate a violation of § 2." 🚩 Id. at 2338. [107]

Finally, the Court notes that in conducting its burden analysis in 🚩 Brnovich, the Supreme Court reviewed evidence that showed that the state "made extensive efforts to reduce [the burden's] impact on the number of valid votes ultimately cast," such that the identified burdens were "moderate" when considering the process as a whole. 🚩 Brnovich, 141 S. Ct. at 2344.

#### (a) MIDR

The Court finds that the size of the burden imposed by MIDR is slight. See supra, Section II(B)(4)(a)(1). With respect to MIDR, the Court finds that this guidepost weighs against a Section 2 violation.

#### (b) Exact Match Citizenship

The Court finds that the size of the burden imposed by citizenship matching is limited. See supra Section II(B)(4)(b)

(1). With respect to citizenship matching, the Court finds that this guidepost weighs against a Section 2 violation.

#### *(2) Deviation from standard practice in 1982*

Second, Brnovich suggests examination of the "degree to which a [challenged] voting rule departs from what was standard practice when § 2 was amended in 1982" since, after all, it is doubtful "that Congress intended to uproot facially neutral time, place, and manner regulations that have a long pedigree or are in widespread use in the United States." 🚩 Brnovich, 141 S. Ct. at 2339.

#### (a) MIDR

The Court finds that Exact Match, with respect to MIDR, is a substantial departure from the law at the time of the 1982 congressional amendment to Section 2 of the Voting Rights Act. In 1982, Georgia law required registrants provide their local registrar or deputy registrar "proper identification" at the time of registration. 1981 Ga. L. p. 1719 (H.B. 405). [108] Such "proper identification" could be satisfied by "exhibiting a valid driver's license, birth certificate, or any other document as will reasonably reflect the true identity of the applicant." Id.

In 2002, some twenty years following congressional amendment of Section 2 in 1982, Congress enacted HAVA. 52 U.S.C. § 21803. HAVA requires the secretaries of state to conduct an electronic comparison of voter rolls to information held by DDS, 🚩 52 U.S.C. § 21083(a)(5)(B)(i), and indicates the types of proof a first-time registrant can use to vote, 🚩 52 U.S.C. § 21083(b)(2)(A).

Georgia's verification requirements under Exact Match are narrower and more exacting than the 1982 Georgia law and HAVA. Neither the 1982 Georgia law nor HAVA requires comparison of a registration applicant's first name, last name, date of birth, or citizenship information. 🚩 52 U.S.C. § 21083(a)(5); 1981 Ga. L. p. 1719 (H.B. 405). Neither law requires the identifying information to match exactly. Id. Additionally, neither law specifies the consequences for failure to match. Id.

**\*88**  With respect to MIDR, Exact Match as it exists today, cannot be fairly characterized as an extension of the 1982

Georgia law, HAVA, or longstanding general verification requirements. Accordingly, this guidepost weighs in favor of finding a Section 2 violation.

#### (b) Exact Match Citizenship

The Court finds that there is not a substantial deviation in Georgia's practice of matching noncitizens since 1982. The Georgia Constitution makes United States citizenship a requirement of voter registration. See 🚩 Ga. Const. art. 2, sec. 1, par. 2. This requirement existed in the 1976 Constitution. 🚩 Ga. Const. art. II, sec. I, par. II (1976). The use of a birth certificate as a means of establishing identification—and citizenship—speaks to the State's policy of trying to enforce the citizenship requirement prior to 1982. Accordingly, the Court finds that this guidepost weighs against finding a Section 2 violation.

### (3) Disparate impact

In 🚩 Brnovich, the Supreme Court stated that "[t]he *size* of any disparities in a rule's impact on members of different racial or ethnic groups is ... an important factor to consider." 🚩 141 S. Ct. at 2339 (emphasis added). It cautioned that small disparities may not necessarily show "that a system is not equally open or that it does not give everyone an equal opportunity to vote." 🚩 Id. The Supreme Court further advised that "[w]hat are at bottom very small differences should not be artificially magnified." 🚩 Id. And it criticized the practice of "dividing one percentage by another," which can create a "distorted picture." 🚩 Id. at 2345 (citing 🚩 Frank v. Walker, 768 F.3d 744, 752 n.3 (7th Cir. 2014)). [109]

#### (a) MIDR

The Court finds that the disparate impact of MIDR is relatively small. Dr. Mayer's report indicates that 60,477 registrants were in MIDR status as of January 2020. PX. 1278, 18. The report also indicates that as of December 2019, Georgia had 6,798,488 registered voters. Id. at 17. Thus, roughly 0.89% of registered voters are in MIDR

status. Of those in MIDR status, 69.4% were Black, 11.4% were white non-Hispanic, 5.7% were Hispanic, and 3.3% were Asian or Pacific Islander. Id. at 18. These numbers account for 2.03% of Black registered voters, 0.19% of white non-Hispanic registered voters, 1.50% of Hispanic registered voters, and 1.19% of Asian or Pacific Islander registered voters. Id. at 20. The Court finds that the disparate impact of MIDR on voters is de minimis.

In 🚩 Brnovich, there was evidence in the record that the challenged practice impacted 0.15% of voters. 🚩 Id. at 2334. Additionally, in 🚩 Brnovich, a little over 1% of Black voters, 1% of Hispanic voters, 1% of Native American voters, and 0.5% of non-Hispanic white voters were impacted by Arizona's law. 🚩 Id. at 2344. In 🚩 Brnovich, the Supreme Court held that the disparate impact of Arizona's law did not lead to a finding that voting was not equally open to all. 🚩 Brnovich, 141 S. Ct. at 2340–41.

The Supreme Court stated, "[a] policy that appears to work for 98% or more of voters to whom it applies—minority and non-minority alike—is unlikely to render a system unequally open." 🚩 Id. at 2345. The percentages of voters impacted by the Arizona law in 🚩 Brnovich are analogous to those in the case *sub judice.* Ninety-eight percent or fewer voters are impacted by MIDR, with the exception of Black voters where 97.97% of Black voters were not impacted. The Court finds that the impact of MIDR is like the impact of the Arizona law and does not render the election system unequally open. Accordingly, the Court finds that this guidepost weighs against finding a Section 2 violation with respect to MIDR.

#### (b) Exact Match Citizenship

**\*89** The Court also finds that the disparate impact of citizenship matching is small. Dr. Mayer's report indicates that 3,037 registrants were placed in pending status because of a citizenship flag. PX. 2178, 22. This number accounts for roughly 0.045% of registered Georgia voters. Id. Of those in citizenship verification pending status, 31.6% were Black, 13.0% were white non-Hispanic, 20.9% were Hispanic, and 23.2% were Asian or Pacific Islander. Id. These numbers account for approximately 0.048% of Black registered voters, 0.011% of white non-Hispanic registered voters, 0.29% of Hispanic registered voters, and 0.44% of

Asian or Pacific Islander registered voters. [110] Id. at 17, 22. Dr. Mayer reports that in January of 2022, roughly 3,073 Georgia registrants were placed in pending status for being noncitizens. Under the 2014-2018 American Community Survey 457,179 naturalized foreign-born citizens were living in the State of Georgia. Id. Assuming that all individuals flagged as noncitizens were naturalized foreign born citizens, were eligible to vote, and the overall population has not increased between 2014-2018, 0.67% of all naturalized citizens are in pending MIDR status. Id. at 22.

Under the Supreme Court's analysis in Brnovich, a challenged practice that impacts 0.045% of the total population, less than one percent of any minority group, and less than one percent of naturalized citizens, does not show that voting system is not equally open. Accordingly, the Court finds that this guidepost weighs against finding a Section 2 violation.

### (4) Other available means

Next, the Court looks to Georgia's election system "as a whole." Brnovich, 141 S. Ct. at 2339. Brnovich explained that "where a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means." Id. Unlike the policies challenged in Brnovich, Exact Match does not affect only one method of voting among several; there are no alternative means of registering to vote that avoid Exact Match. While the State provides multiple identification options for clearing both the citizenship pending and MIDR statuses, under the current law, there is no means of avoiding those statuses if a voter's registration does not exactly match DDS or SSA records or incorrectly lists them as a noncitizen. All registration applications are subject to the policy. Thus, the Court finds that this guidepost weighs in favor of finding a Section 2 violation.

### (5) Strength of state interest

"[I]n determining 'based on the totality of circumstances' whether a rule goes too far, it is important to consider the reason for the rule." Brnovich, 141 S. Ct. at 2339–40. Defendants presented evidence that both MIDR and citizenship verification are used to prevent fraud in the registration process.

Both the Supreme Court and the Eleventh Circuit have held that preventing fraud in the registration process is a legitimate state interest. "One strong and entirely legitimate state interest is the prevention of fraud." Brnovich, 141 S. Ct. at 2340. "[D]eterring voter fraud is a legitimate policy on which to enact an election law, even in the absence of any record evidence of voter fraud." Greater Birmingham Ministries, 992 F.3d at 1334; see also Purcell, 549 U.S. at 4, 127 S.Ct. 5 (internal quotation marks omitted) ("A State indisputably has a compelling interest in preserving the integrity of its election process."); Crawford, 553 U.S. at 196, 128 S.Ct. 1610 ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); Eu, 489 U.S. 214, 231, 109 S.Ct. 1013, 103 L.Ed.2d 271 ("A State indisputably has a compelling interest in preserving the integrity of its election process.").

At trial, Defendants presented evidence that tied the legitimate interest in preventing fraud to the challenged practices. The Supreme Court stated that "Section 2 does not require a State to show that its chosen policy is absolutely necessary or that a less restrictive means would not adequately serve the State's objectives." Brnovich, 141 S. Ct. at 2345–46. [111] With respect to MIDR, Mr. Harvey testified "MIDR is, my understanding of it is, because you didn't verify. You have to show something that shows you're the actual person. And that's the – I guess protection from registering a bunch of alias people and then just showing up and saying, Oh, yeah, I'm John Smith, or I'm Chris Harvey. And by showing the I.D., you're verifying that, okay, for whatever reason they couldn't match it, you're still a bona fide person." Tr. 3604:11–19. With respect to citizenship matching, Plaintiffs conceded "[w]e have only ever agreed that Georgia has a legitimate interest in preventing non-citizens from voting." Tr. 4330:7–10. Additionally, Mr. Harvey testified that the pending citizenship flag was triggered "if somebody was sort of a positive non-citizen, if that's the term. And the -- when somebody gets a Georgia driver license, obviously, non-citizens can get driver's licenses. They get a different driver's license, a limited term driver's license versus one showing that you're a citizen." Tr. 3581:21–25. In other words, the citizenship flag is supposed to attach when there is affirmative evidence that someone who registered has a noncitizen driver's license. The

Court finds that Defendants have provided evidence that ties the prevention of voter fraud with both MIDR and citizenship flags.

**\*90** Accordingly, the Court finds that this guidepost weighs against finding a Section 2 violation.

\* \* \* \*

The Court finds that under the 🚩*Brnovich* guidepost analysis neither MIDR nor the citizenship matching flags violate Section 2 of the Voting Rights Act. With respect to MIDR, the Court finds that the burden on voters, disparate impact, and strength of the State's interest weigh against finding a Section 2 violation. In 🚩*Brnovich*, the Supreme Court found that Arizona's law did not violate Section 2 of the Voting Rights Act because "of the modest burdens allegedly imposed by [the law], the small size of its disparate impact, and the State's justifications." 🚩*Brnovich, 141 S. Ct. at 2346.* The burden, disparate impact, and the State's justifications are virtually identical between MIDR and the challenged practice in 🚩*Brnovich*; accordingly, the Court finds that under 🚩*Brnovich,* MIDR does not violate Section 2 of the VRA.

With respect to citizenship matching, the Court finds that after weighing the 🚩*Brnovich* guideposts, citizenship matching also does not violate Section 2 of the VRA. The Court finds that the other available means guideposts weigh in favor of finding a Section 2 violation, but the size of the burden, disparate impact, deviation from practice in 1982 and State's justifications weigh against finding a Section 2 violation. The Court finds that Georgia's system of voting is equally open. Roughly 0.045% of Georgia voters are impacted by the citizenship pending flag. Less than one percent of any minority group was impacted by the citizenship flagging, and approximately only 0.67%[112] of naturalized citizens are impacted by the citizenship flag. As Mr. Harvey testified, the matching process is structured so that individuals are flagged as noncitizens only where "something in the DDS system ... says that this person is not a citizen." Tr. 2034:1–9. Thus, the Court finds that citizenship matching does not render an election system unequally open; therefore, it does not create a Section 2 violation.

**b)** 🚩*Gingles* **Senate factors**

The Court now turns to the relevant 🚩*Gingles* Senate factors. Those include: (1) the history of official discrimination in Georgia; (2) whether there is racially polarized voting in Georgia; (3) voting practices and procedures in Georgia; (4) discrimination outside the voting context in Georgia; (5) racial appeals in campaigns in Georgia; and (6) minority candidate success in Georgia.

**(1) History of past discrimination**

As the Court noted in its previous orders, Defendants do not contest that "prior to the 1990s, Georgia had a long sad history of racist policies in a number of areas including voting." Doc. No. [617], 70–71 (citing Doc. No. [450-1], 50 n.38). The Court takes judicial notice of this fact. *See Wright v. Sumter Cty. Bd. of Elections & Registration, 301 F. Supp. 3d 1297, 1310 (M.D. Ga. 2018),* aff'd, *979 F.3d 1282 (11th Cir. 2020)* ("Georgia has a history chocked full of racial discrimination at all levels. This discrimination was ratified into state constitutions, enacted into state statutes, and promulgated in state policy.") (citations omitted).

**\*91** The history of past discrimination factor weighs in favor of a Section 2 violation. In 🚩*Shelby County v. Holder, 570 U.S. 529, 552–53, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013),* the Supreme Court found that the coverage formula found in Section 5 of the VRA was unconstitutional because the justification largely ignored the changes that State's made in voting since 1965. The Eleventh Circuit likewise "caution[s] against allowing the old, outdated intentions of previous generations to taint [Georgia]'s ability to enact voting legislation." *Greater Birmingham Ministries, 992 F.3d at 1332.* The Court finds that Plaintiffs presented evidence at trial showing that Georgia's history of past discrimination is not simply resigned to the annals of history, but still exists today.

Between 1965 and the Supreme Court's decision in 🚩*Shelby County,* the Department of Justice objected to 177 proposed changes to election law by Georgia and its counties and municipalities (2013). Tr. 210:22–211:6 (McCrary); PX. 1289, ¶ 26 (McCrary Report).

In 2014, HB 836 changed the school board district maps in Sumpter County to dilute the strength of Black voters, a change that federal courts found to violate Section 2 of the Voting Rights Act. See Wright.

Plaintiffs also introduced evidence about Dr. Dennard's election to the Quitman School Board, her subsequent arrest, and the ensuing legal proceedings as evidence of discrimination. Tr. 683:7–684:12, 676:1–728:7, 745:8–755:3. The Court finds that Dr. Dennard's experience of being photographed in a jumpsuit on the date of her arrest and the ensuing media coverage of the incident does provide some evidence of racial animus that persists in Georgia. Tr. 696:2–8; 702:2–4; PX. 2000; PX. 2003. However, the Court also notes that this evidence is tempered by Judge Vines's legal proceedings for the same charges. Tr. 3496:5–21; 3497:2–8; 3693:18–24; 3698:14–18. While the Court is sympathetic to Dr. Dennard regarding her treatment, the Court also finds that this evidence does not carry great weight when determining whether racial discrimination persists in present-day Georgia.

Thus, the Court finds based on evidence in the record and relevant case law that Georgia's history of discrimination, at a minimum, existed within the last decade. Thus, this factor weighs in favor of finding a Section 2 violation.

### *(2) Racially polarized voting*

Under Gingles, racially polarized voting exists when there is "a correlation between the race of voters and the selection of certain candidates. Plaintiffs need not prove causation or intent to prove a prima facie case of racial bloc voting, and defendants may not rebut that case with evidence of cause or intent." Gingles, 478 U.S. at 74, 106 S.Ct. 2752.

Plaintiffs argue that voting in Georgia is—and has long been—polarized along racial lines. Their evidence at trial was that from Reconstruction through the passage of the Voting Rights Act in 1965, white Georgians overwhelmingly supported the Democratic Party, which defended racial discrimination in registration and voting and official racial segregation in all aspects of public life. PX. 1289, ¶¶ 11, 124; see also Tr. 230:4–14.

Plaintiffs provide the following evidence of racial appeals in campaigns. "In the 1990s African American congressional candidates running as Democrats enjoyed between 77 and 100 percent of black votes, but only 18-54 percent of white votes. Between 30 and 45 percent of white voters in the state supported Democratic candidates in the 1990s, but only about a quarter of whites voted Democratic beginning in 2002. Black voters favored Democratic candidates by 85 to 92 percent."[113] PX. 1289, ¶ 41; see also Tr. 229:6–232:15. "Exit polls in statewide elections for federal office from 1992 through 2006 show that African Americans supported the Democratic candidate at rates between 81 and 92 percent, whereas whites voted Democratic at rates between 23 and 45 percent." PX. 1289, ¶ 42. In a 2014 survey, 25 percent of white Georgia voters report themselves as Democrats, 59 percent as Republicans, and 17 percent as Independents. Id. ¶ 46. Whereas 73 percent of Black Georgia voters report themselves as Democrats, 12 percent as Republicans, and 15 percent as Independents. Id.

**\*92** Accordingly, the Court finds that there is racial polarization in Georgia voting. Senate Factors 2 and 8 weigh in favor of finding a Section 2 violation.

### *(3) Practices and procedures*

The third Gingles factor is effectively the same as the Brnovich third guidepost. This Gingles factor concerns "the extent to which the state or political subdivision has used ... voting practices or procedures that may enhance the opportunity for discrimination against the minority group," Gingles, 478 U.S. at 37, 106 S.Ct. 2752, and the Brnovich guidepost analyzes "the size of any disparities in a rule's impact on members of different racial or ethnic groups," Brnovich, 141 S. Ct. at 2339. Because the Brnovich decision is more recent than Gingles and evaluated Arizona's voting procedures in light of today's election procedures, the Court evaluates this Gingles factor using the standards set forth in Brnovich. As the Court discussed in depth in the disparate impact section, this Senate Factor weighs against finding a Section 2 violation.

### *(4) Discrimination in other areas*

The district court in Gingles found that historic discrimination of minorities in housing, education,

employment, and healthcare led to many minorities being in a lower socioeconomic class. 🔖 Gingles, 478 U.S. at 39, 106 S.Ct. 2752. The district court concluded that this "gives rise to special group interests and hinders blacks' ability to participate effectively in the political process and to elect representatives of their choice." 🔖 Id. The Supreme Court did not discuss or disrupt the district court's finding.

Here, Plaintiffs provide evidence of similar statistics as follows: twice as many Black Georgians as white Georgians live below the poverty line PX. 1289, ¶ 94; Tr. 255:25–256:20; Black Georgians are less likely to attain a high school or college degree (id. ¶ 93; Tr. 255:13–25); and Black Georgians die of cancer, heart disease and diabetes at a higher rate than white Georgians (PX. 2127; PX. 2128). Plaintiffs' evidence of the impact of past discrimination on Georgia's current socioeconomic demographics is similar to the evidence that the district court discussed in 🔖 Gingles. Gingles, 478 U.S. at 39, 106 S.Ct. 2752. Accordingly, this factor weighs in favor of finding a Section 2 violation.

### (5) Racial appeals in campaigns

Plaintiffs have provided evidence that racial appeals were made in recent Georgia elections. In 🔖 Gingles, the district court found, and the Supreme Court did not discuss or disturb, that "white candidates in North Carolina have encouraged voting along color lines by appealing to racial prejudice." 🔖 Gingles, 478 U.S. at 40, 106 S.Ct. 2752. The district court further held that "the use of racial appeals in political campaigns in North Carolina persists to the present day and that its current effect is to lessen to some degree the opportunity of black citizens to participate effectively in the political processes and to elect candidates of their choice." 🔖 Id.

Here, Plaintiffs presented evidence of examples of racial appeals used in recent Georgia elections. For example, Plaintiffs point to the 2018 Republican gubernatorial primary, during which candidate (and then-State Senator) Michael Williams conducted a "deportation bus" tour with a school bus emblazoned with the words "Fill this bus with illegals." The back of the bus read: "Danger! Murderers, rapists, kidnappers, child molesters, and other criminals on board." PX. 1653. In September 2016, a Douglas County commissioner was recorded making disparaging statements

to voters about Black candidates in local races, stating that a government run by African American leadership would "bankrupt you." PX. 1651. He also warned voters that a Black sheriff candidate would put unqualified Black people in high-ranking positions if elected. Id. In 2018, Georgia governor candidate Brian Kemp's campaign issued a campaign video that showed violent imagery—Kemp blowing up items, Kemp cocking a gun, and Kemp using a chainsaw—before he revs his truck and states "I got a big truck—just in case I need to round up criminal illegals and take 'em home myself. Yup I just said that." PX. 1669. [114]

**\*93** The most recent Georgia elections also use racial appeals in campaigns. In June 2020, then-Republican candidate for Georgia's 14th U.S. congressional district Marjorie Taylor Greene received national criticism for racist, Islamophobic, and anti-Semitic views expressed in a series of Facebook videos. PX. 1207. Greene suggested that Muslims do not belong in government; that Black people "are held slaves to the Democratic Party"; that George Soros is a Nazi; and that Black people should feel "proud" to see a Confederate monument because it symbolizes progress made since the Civil War. Id. In April 2020, former U.S. congressman Paul Broun, Jr., running to reclaim his former seat, posted a campaign ad in which he offered to give away an assault rifle, stating that such guns were needed to protect against the "looting hordes from Atlanta." PX. 1655.

In April 2022, Kandiss Taylor—candidate for Georgia governor—posted a graphic reflecting her endorsement by the Georgia Proud Boys, commenting that she was "proud to be the first candidate to receive an endorsement from the Georgia Chapter. Thank you for serving as I plan to serve." PX. 2165. In May 2022, when running in the Republican primary for Georgia governor, former Senator David Perdue accused Stacey Abrams of "demeaning her own race." PX. 2172. In June 2022, candidate for the U.S. House of Representatives in Georgia's Third Congressional District Rhonda Simpson posted a photo on Facebook that falsely imagines Stacey Abrams saying "I ain't even stole the election yet and people be congratulatin' me like crazy" and President Obama responding, "It's because they think you're pregnant." PX. 2164.

The Court finds that Plaintiffs provided evidence of racial appeals in recent Georgia elections and have carried their burden. Accordingly, this factor weighs in favor of finding a Section 2 violation.

#### *(6) Minority candidate success*

The Supreme Court held that the success of some Black candidates does not dispose of a Section 2 claim. Gingles, 478 U.S. at 76, 106 S.Ct. 2752. However, courts must consider the sustained success of Black candidates. Id. at 77, 106 S.Ct. 2752. Only four Black candidates have ever been elected to non-judicial statewide offices in Georgia: (1) Former Public Service Commissioner David Burgess, in 2000; (2) former Labor Commissioner Mike Thurmond, in 2002 and 2006; (3) former Attorney General Thurbert Baker, in 1998, 2002, and 2006; and (4) U.S. Senator Raphael Warnock, in 2020. See Shahar v. Bowers, 120 F.3d 211, 214 (11th Cir. 1997) (the Court can take judicial notice of these "matters of 'political history,' " which are "not subject to reasonable dispute") (quoting Fed. R. Evid. 201(b)). The Court also observes that as of the May 24, 2022, primary election, Herschel Walker received the Republican nomination for U.S. Senate and Senator Raphael Warnock received the Democratic nomination for the same office. The Court finds that the election of four Black candidates to statewide non-judicial office is the exact situation referenced by the Supreme Court when discussing the success of a select few Black candidate as not dispositive of this issue. Gingles, 478 U.S. at 76, 106 S.Ct. 2752. Accordingly, the Court finds that this factor weighs in favor of finding a Section 2 violation.

\* \* \* \*

The Court finds that the Senate Factors weigh in favor of finding a Section 2 violation. History of discrimination, racially polarized voting, discrimination in other areas, racial appeals in campaigns, and success of minority candidates all weigh in favor of finding a Section 2 violation. Although these factors weigh in favor of a violation, the Court finds that these factors are more generalized indicators of the status of minority life in Georgia as opposed to the indicators of whether Exact Match results in fewer opportunities for minority voters. While the Court acknowledges the importance of the Gingles Senate factors in determining whether a State's practices have resulted in discrimination for minority voters, they do not sufficiently relate to the challenged practices in this case. Conversely, the Gingles Senate factor dealing with practices and procedures, which

more directly relates to Exact Match, weighs against finding a Section 2 violation.

**\*94** Under the totality of the circumstances, the Court finds that Exact Match is permissible under Section 2 of the VRA.

The Brnovich factors largely weigh in favor of finding that Exact Match is permissible under Section 2 of the VRA. Although the Senate Factors overwhelmingly weigh in favor of finding a Section 2 violation, the Court finds that the one factor that is expressly tied to Exact Match, and not Georgia's entire voting schema, weighs against finding a violation.

In sum, this Court finds Plaintiffs have not met their burden under Section 2 of the VRA to demonstrate that the Exact Match or citizenship verification processes renders Georgia's elections not "equally open" when considering the totality of the circumstances as required by VRA Section 2(b). 52 U.S.C. § 10301; see also Brnovich, 141 S. Ct. at 2338. As a result, there has been no showing that the election system is not "equally open" by Georgia's compliance with federal law regarding matching processes. Brnovich, 141 S. Ct. at 2337.

### F. Remaining Affirmative Defenses

As stated above, Defendants presented the following affirmative defenses in its Statement of the Case for purposes of the Pretrial Order: (1) failure to state a claim upon which relief can be granted; (2) failure to name necessary and indispensable parties; (3) lack of standing; (4) mootness; (5) Eleventh Amendment bar; and (5) Political Question Doctrine. Doc. No. [753], 2–3.

A number of these defenses have been addressed in the context of the Court's foregoing analysis of Plaintiffs' case-in-chief. No additional rulings will issue on the remaining affirmative defenses based on Plaintiffs' failure to meet their initial burden of proof as to their claims at trial.

\* \* \* \*

As discussed above, the Court finds for Defendants on all counts. However, this Order should not be construed to mean that Georgia's election procedures are flawless. The former Chief Elections Officer for the State testified that "you are going to have misfires [and] mistakes made both by voters and election officials." Tr. 2908:18–19. And the current Chief Operating Officer for the Secretary of State testified: "have

I ever seen a perfect election? No, because it simply doesn't exist .... There is no perfect system by which you can make it perfect in such a way that the system still functions. You will always have to balance accessibility with security." Tr. 4198:7–14. Plaintiffs' expert Mr. Kennedy also testified that "I think recognizing that you are dealing with a very human-driven process from the millions of voters that show up at -- to cast their ballot either in person or absentee, the thousands of poll workers, that you are going to have misfires, mistakes made both by voters and election officials." Tr. 2908:15–19.

Although Georgia's election system is not perfect, the challenged practices violate neither the constitution nor the VRA. As the Eleventh Circuit notes, federal courts are not "the arbiter[s] of disputes' which arise in elections; it [is] not the federal court's role to 'oversee the administrative details of a local election.' " Curry v. Baker, 802 F.2d 1302, 1306 (11th Cir. 1986).

## III. CONCLUSION

Having held a non-jury trial and considered the evidence and arguments of the parties, for the foregoing reasons, the Court finds **IN FAVOR** of Defendants and against Plaintiffs on all remaining Counts of Plaintiffs' Second Amended Complaint. [115]

**\*95** Pursuant to Federal Rule of Civil Procedure 58, the Clerk is **DIRECTED** to enter judgment and close this case.

**IT IS SO ORDERED** this 30th day of September, 2022.

### All Citations

--- F.Supp.3d ----, 2022 WL 4725887

---

## Footnotes

1    All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software. In addition, pursuant to the Amended-Final Consolidated Pretrial Order, the parties submitted proposed findings of fact and conclusions of law at the conclusion of the trial. Doc. No. [753], ¶ 25. The Court has adopted and rejected portions of the parties' submissions.

2    In the Amended Complaint, Plaintiffs modified the case-style to include the corporate names of the original two Plaintiffs, i.e., "Fair Fight Action, Inc." and "Care in Action, Inc."

3    Plaintiffs also sued Secretary Raffensperger in his capacity as Chair of the State Election Board. Doc. No. [582], 1. However, the parties removed the "Chair" language from the case caption in their submission of their proposed consolidated pretrial order. Doc. No. [658]. The evidence at trial was that up until 2021, the Secretary of State was the chairman of the State Election Board. Tr. 4008:22–23. Pursuant to Federal Rule of Evidence 201, the Court also takes judicial notice that following recent legislation, Secretary Raffensperger is no longer the chair of the State Election Board. See O.C.G.A. § 21-2-30(a) ("There is created a state board to be known as the State Election Board, to be composed of a chairperson elected by the General Assembly ....").

4    Counts I, II, III, and IV cite the alleged constitutional violation and include the language "as enforced by 42 U.S.C. § 1983." "Title 42 U.S.C. § 1983 provides every person with the right to sue those acting under color of state law for violations of federal constitutional and statutory provisions." Williams v. Bd. of Regents of Univ. Sys. of Ga., 477 F.3d 1282, 1299 (11th Cir. 2007).

5    Throughout the litigation, Plaintiffs have used the term "voter purge," while Defendants have used the term "list maintenance" to refer to the process by which inactive voters are moved to canceled status in the voters

rolls upon the occurrence of certain triggering events. Doc. No. [617], 10. As this issue has been dismissed, it is not necessary to enter a ruling in this Opinion as to the proper term.

6   "Exact Match" is another term that the parties do not agree upon. For purposes of this Opinion, the Court uses the term "Exact Match." However, the Court recognizes that Defendants sometimes refer to the same practice as "HAVA Match" in reference to the Help America Vote Act, ⬚ 52 U.S.C. § 21083(a)(5) identification requirements. Plaintiffs do not agree that HAVA requires the "Exact Match" procedures in use by the State of Georgia. See Doc. No. [492], 31. At summary judgment, the Court recognized that "Georgia's verification requirements in Exact Match are much narrower than what HAVA itself requires." Doc. No. [636], 32. The Court stated: "HAVA does not require comparison of a registration applicant's first name, last name, date of birth, or citizenship information. Nor does it require identifying information to match **exactly**. Finally, HAVA does not specify the consequences for a failure to match." Id. (citing ⬚ 52 U.S.C. § 21083(a)(5)).

7   In the context of trial briefing, Plaintiffs clarified the nature of their list management claim. Doc. No. [795], 1; see also Doc. No. [816], 4. More specifically, Plaintiffs stated: "Plaintiffs' challenge to the Secretary of State's affirmative mismanagement of the statewide voter registration database concerns the Secretary of State's policy decisions governing the database and the unjustified burdens on voters that result." Doc. No. [795], 2. The policy decisions included but were not limited to: (1) choosing to delegate to the counties the ultimate decision as to whether a voter's registration is canceled without providing meaningful rules or even guidance to protect voters; (2) choosing to set overinclusive matching criteria; (3) choosing to tee up an overinclusive group of registrations for cancelation, which are too large for at least some counties to carefully evaluate; (4) choosing not to add alerts in the database alerting users of criteria that do not match when comparing records; and (5) choosing not to assist database users when they sought help deciding whether to disenfranchise registrants—including eligible voters. Doc. No. [795], 2–3. As stated in the Court's April 29, 2022 Order (Doc. No. [816]), one of Plaintiffs' clarifications concerned training county users on making cancelations decisions; however, this clarification was not within the language of the Amended-Final Pretrial Order, and the Court did not accept the clarification. Doc. No. [816], 6.

8   Additional findings of fact concerning the named plaintiffs will be discussed in the standing section of this Opinion.

9   The Court takes judicial notice that Ebenezer is in Fulton County, Georgia; this fact is generally known within the Northern District of Georgia. Fed. R. Evid. 201(b)(1).

10   This Court will refer to Senator Reverend Raphael Warnock as "Reverend Warnock" throughout the remainder of this Opinion because Reverend Warnock testified specifically in his capacity as a church leader and his testimony pertained to his church's activities and mission.

11   The Court takes judicial notice that Virginia-Highland is in Fulton County; this fact is generally known within the Northern District of Georgia. Fed. R. Evid. 201(b)(1).

12   "LGBTQIA .... refers to the broad array of self-identified sexes, genders, and sexual orientations ...." 3 Rossein, Merrick, Employment Discrimination Law and Litigation § 27:1 (database updated Aug. 2022).

13   County liaisons are personnel in the Secretary of State's Office who assist and support counties in the performance of their duties, in conjunction with other members of the Secretary of State's Office, and they act as the point-of-contact between counties and the Secretary of State's Office to assist or troubleshoot problems when they arise. Tr. 1373:11–21 (Frechette); 3472:21–25 (Harvey); Tr. 826:2–20 (Hallman).

14    As indicated above, the SEB as an entity remains a Defendant only for purposes of Plaintiffs' Section 2 Voting Rights Act claim (pertaining to Exact Match). Doc. No. [617], 3 nn.2 & 3. Other claims are brought against the SEB Members in their official capacities.

15    The Court will make specific findings regarding the testimony of these witnesses in the next section of this Opinion.

16    In general, the above-described process applies only to voters who did not register through DDS to begin with. If a voter registers through DDS, including via automatic voter registration, their information will automatically match what is on file with DDS before the registration is sent to counties to be processed. Tr. 1950:12–1951:14 (Harvey).

17    The Court recognizes that there is a conflict in the testimony as to the purpose of MIDR because, at one point, Mr. Harvey had no answer for the Court when asked why the Secretary of State needs MIDR. Tr. 1993:5–12. After review, however, the Court deems it proper to resolve the conflict by giving the greater weight to Mr. Harvey's subsequent trial testimony in which he provides a substantive purpose for MIDR. The Court also gives greater weight to the testimony of Mr. Germany (set out above).

18    For purposes of perfecting the record and consistency, all transcript references to "S.A.V.E." have been changed to "SAVE" in this Opinion.

19    Noncitizens may obtain a Georgia driver's license. Tr. 3581:18–25 (Harvey). The license is known as a "limited term" license as opposed to those that show the driver is a United States citizen. Id.; Tr. 1203:1–6, 10–17, 1204:2–4 (McClendon). Noncitizens must renew their limited term license or state ID card in person and cannot do so online. Tr. 1203:23–1204:1 (McClendon). The expiration of limited-term driver's license or state identification card is tied to the lawful duration of the noncitizen's stay in the United States. Tr. 1203:14–17 (McClendon). DDS does not know when someone becomes a citizen unless the individual informs DDS of the change in citizenship status. Tr. 1205:2–5, 1206:2–4 (McClendon). If the individual does not inform DDS of a change in citizenship status, the individual will remain in the DDS database as a noncitizen. Tr. 1205:2–5, 1203:23–24 (McClendon). Mr. Harvey testified that the DDS citizenship information is "outdated for people that don't update their citizenship status." Tr. 2038:10–14 (Harvey).

20    SAVE is a web-based program operated by the Department of Homeland Security to help other governmental entities determine the immigration status of applicants for public benefits or licenses. PX. 2021 at 4; PX. 2014.

21    The Court will make specific findings regarding the testimony of these witnesses in the next section of this Opinion.

22    The parties differ on the definition of the word "maintain" and its implications. The Court will discuss the issue and reach a conclusion in the conclusions of law (standing) section of this Opinion.

23    The particulars of the felon matching process come to the Court via testimony from the Secretary of State's Office on how known felons are actually matched with registered voters; in other words, the Court's findings of fact on the felon matching process are limited to how felon matching occurs *in practice.*

24    Mr. Harvey testified that the DOC and the DCS send a list "every month of all the people that are currently serving felony sentences in Georgia." Tr. 3567:7–13 (Harvey).

25    The specific language in the Secretary's training materials is as follows:

> The Department of Corrections (DOC) provides a file that contains the information for all inmates currently incarcerated for a felony conviction and the Department of Community Supervision (DCS) provides a file of

all of the individuals on probation and parole as the result of a felony conviction to the Secretary of State's Office. These files are compared to the information in the voter registration system each month.

PX. 800 at 19.

26   This exhibit was taken under advisement at trial and later admitted per the Court's Order at Doc. No. [915].

27   The 2019 training materials also indicated that "[t]he records that are in cancelled or rejected status will no longer be listed on the felon reports" of the county user's dashboard. PX. 1903. The training materials further state that the number of felon records shown on the county user's dashboard is for the "current day only." PX. 1903.

28   The Court recognizes that the training materials provide for a "40 day Felon clock," while ⚑O.C.G.A. § 21-2-231(c)(2) provides for felon removal after 30 days of the date of the board of registrar's notice.

29   As stated in the Georgia Election Code, the term "elector" "means any person who shall possess all of the qualifications for voting now or hereafter prescribed by the laws of this state, including applicable charter provisions, and shall have registered in accordance with" Georgia law. ⚑O.C.G.A. § 21-2-2(7).

30   The Court will make specific findings regarding these voters the next section of this Opinion.

31   Mr. Kennedy was also appointed Wisconsin's chief election officer under HAVA. Tr. 2821:11–13 (Kennedy).

32   Dr. Mayer did not offer an opinion as to whether any state officials have acted with discriminatory intent against voters of color or whether Georgia's voter registration practices and systems were adopted with discriminatory intent. Tr. 423:5–16 (Mayer). He also did not offer an opinion about training regarding cancelation of absentee ballots. Tr. 422:24–423:1 (Mayer).

33   As stated above, SAVE is a web-based program operated by the Department of Homeland Security to help other governmental entities determine the immigration status of applicants for public benefits or licenses. PX. 2021 at 4; PX. 2014.

34   While Dr. McCrary was allowed to offer expert testimony as to the history of the implementation of certain pieces of voting rights legislation in Georgia, the Court noted at trial that the portions of his testimony that were subject to objection (based upon legal conclusion) were accepted by the Court as lay witness testimony only. See, e.g., Tr. 215:4–21, 258:16–259:7.

35   Additional legal standards will be discussed, infra.

36   An organization that diverts its resources voluntarily can still have standing if the "drain on [the] organization's resources arises from the organization's need to counteract the defendants' assertedly illegal practices [because] that drain is simply another manifestation of the injury to the organization's noneconomic goals." ⚑Fla. State Conf. of NAACP v. Browning, 522 F.3d 1153, 1166 (11th Cir. 2008) (internal quotations and citation omitted).

37   The Court overrules Defendants' objections regarding Reverend Warnock's testimony on voting rights being part of Ebenezer's mission. See Doc. No. [767-1], 6–7. The testimony is not argumentative. The witness was simply responding to questions asked. As Senior Pastor of his church, the witness also has knowledge of the matters being discussed, and the surrounding testimony shows that he laid a foundation to discuss it. Further, to the extent the witness was testifying as to facts concerning the church's mission, the Court does not uphold Defendants' objection that he was providing an improper lay witness opinion. To the extent the witness was providing testimony that could better be described as theological opinions (e.g., PX. 2053,

Tr. 39:6–10 (Warnock Dep.)) (stating that "democracy is the political expression of this idea that all human beings are created in the image of God"), the Court overrules Defendants' objections but gives that testimony little weight in considering legal issues. Finally, the church's mission and its connection to voting rights is clearly relevant to this case.

38    The Court overrules Defendants' objections as to this testimony. See Doc. No. [767-1], 16–17. The witness was testifying as to phone banking and similar outreach activities that his church had undertaken. As Senior Pastor of that church, the witness had a base of knowledge to testify as to these matters, and nothing else about the facts of what the church was doing makes the testimony objectionable. To the extent Defendants are objecting to the witness's use of the term "purged" to describe voters, the Court will afford that term little weight from this witness.

39    For the reasons stated above, the Court again overrules Defendants' objections as to this testimony. See Doc. No. [767-1], 16–17.

40    The Court overrules Defendants' objections regarding this testimony. See Doc. No. [767-1], 33–34. The witness was testifying as to missions or other activities in which the church would engage if it were not diverting resources to counteract Defendants' challenged practices. That testimony is admissible here.

41    As discussed infra in Sections II(B)(2)(b) & II(B)(3)(b)(1), Plaintiffs still must show causation to prove liability.

42    Plaintiffs did not bring a race discrimination claim with respect to list maintenance, but it is worth nothing that the felon matching process is the only maintenance system where the Secretary of State uses race as a criterion.

43    It is important to note that Plaintiffs concede that the question of whether the Secretary's decision to delegate discretionary decision-making about which people on the list of felons are (or are not) on the list of registered voters complies with Georgia law "is not at issue in this suit." Doc. No. [854], ¶ 694. Plaintiffs state that "their challenge to the felon matching process is not that it violates state law, but that it is carried out in a way that burdens Georgia's voters unconstitutionally." Id.

44    The Court finds infra that the felon matching claim fails as to liability on causation grounds. The Court's finding here is limited to determining whether the actions of the Secretary of State are sufficiently connected to the alleged constitutional injury for purposes of standing. See ⚑ Yellow Pages Photos, Inc. v. Ziplocal, LP, 795 F.3d 1255, 1264–65 (11th Cir. 2015) (stating that for standing there must be a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant).

45    Black's law dictionary defines "shall," as **1.** Has a duty to; more broadly, is required to <the requester shall send notice> <notice shall be sent>. • This is the mandatory sense that drafters typically intend and that courts typically uphold. **2.** Should (as often interpreted by courts) <all claimants shall request mediation>. **3.** May <no person shall enter the building without first signing the roster>. • When a negative word such as *not* or *no* precedes *shall* (as in the example in angle brackets), the word *shall* often means *may*. What is being negated is permission, not a requirement. **4.** Will (as a future-tense verb) <the corporation shall then have a period of 30 days to object>. **5.** Is entitled to <the secretary shall be reimbursed for all expenses>. • Only sense 1 is acceptable under strict standards of drafting. SHALL, Black's Law Dictionary (11th ed. 2019).

46    Notably, the origin of the above division of responsibilities between the Secretary of State and the counties distinguishes this case from ⚑ Jacobson. In ⚑ Jacobson, the plaintiffs sued the Florida Secretary of State and argued that they were "injured because Republicans, not Democrats, appear first on the ballot in Florida's general elections." ⚑ Jacobson, 974 F.3d at 1253. The Eleventh Circuit found that there was no

traceability because the Florida Secretary of State was not tasked under Florida law "with printing the names of candidates on ballots in the order prescribed by the ballot statute." 🚩Id. Rather, a Florida statute explicitly assigned that role to county officials. 🚩Id. (citing Fla. Stat. § 99.121). Here, however, no statute explicitly assigns voter eligibility decisions to the counties. Rather, the governing statute provides that the Secretary of State "shall" transmit felon names to the counties, who then "shall" mail notices to those individuals and initiate the process to remove the voter from the rolls. To be sure, the evidence shows that there is now a system in place that delegates certain decision-making responsibilities to the counties. But the statute does not expressly provide for that. Thus, the Court finds that this set of facts is distinguishable from the straightforward statutory responsibilities that created a traceability issue in 🚩Jacobson.

47    As stated supra, the Georgia legislature, however carved out an exception that gave the Secretary of State control over determining which electors are disqualified for either being deceased or a felon.

48    Because duplicate matching is not traceable to the Secretary of State, the Court will not evaluate the duplicate matching process under the 🚩Anderson-🚩Burdick framework.

49    "The Constitution's case-or-controversy limitation on federal judicial authority, Art. III, § 2, underpins both [the] standing and ... mootness jurisprudence, but the two inquiries differ in respects critical to the proper resolution of this case, so [the Court] address[es] them separately." 🚩Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).

50    For purposes of perfecting the record, the Court notes that Plaintiffs assert that Defendants presented a "quasi-mootness" argument as to the Exact Match/Citizenship Match challenged practice and the Secretary of State's recent use of the SAVE citizenship verification process (Doc. No. [854], ¶ 521); however, in their proposed findings, Defendants acknowledge that the Exact Match/Citizenship Match challenged practice is not mooted through existing statute or regulation. Doc. No. [855], ¶ 1029. In light of this acknowledgement, the Court declines to render a mootness finding as to the Citizenship Match challenged practice.

51    "Plaintiffs filed suit under 🚩42 U.S.C. § 1983, which provides them with a federal 'cause of action for constitutional violations committed under color of state law. To prevail, plaintiffs must demonstrate both that the defendants deprived them of a right secured under the Constitution or federal law and that the deprivation occurred under color of state law.' " Greater Birmingham Ministries, 992 F.3d at 1221–22 (citations omitted). Because the Georgia laws and practices at issue fall squarely under color of state law, the Court need only address the constitutionality of the law. Id.

52    With respect to Count I, the Court uses the term "Defendants" to encompass the Secretary of State, Sarah Tindall Ghazal, Janice Johnston, Edward Lindsey, and Matthew Mashburn. "Defendants" in this section will not include the SEB, because the SEB enjoys sovereign immunity for the claims in Count I.

53    While this Court recognizes that stay-panel opinions are "tentative," "preliminary [in] nature," and are "not a final adjudication of the merits of the appeal," this Court accepts the stay-panel's opinion in Lee as persuasive authority. Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm., 950 F.3d 790, 795 (11th Cir. 2020); cf. 🚩E. Bay Sanctuary Covenant v. Trump, 950 F.3d 1242, 1265 (9th Cir. 2020) (treating the motions panel's decision as persuasive, but not binding authority).

54    In 🚩⚠Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

55   The Court has been unable to find a Supreme Court or Eleventh Circuit case where 🚩Anderson-🚩Burdick was applied to incorrect training materials. See 🚩Anderson, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (challenge to Ohio statute regarding independent candidates); 🚩Burdick, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (challenge to Hawaii's law prohibiting write-in candidates); 🚩Crawford, 553 U.S. at 181, 128 S.Ct. 1610 (challenge to Indiana's voter ID law); 🚩Clingman v. Beaver, 544 U.S. 581, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005) (challenge to Oklahoma's law that had invite-only primary system); 🚩Timmons, 520 U.S. at 351, 117 S.Ct. 1364 (challenge to Minnesota's law prohibiting candidates from appearing on more than one party's ballot); 🚩Norman, 502 U.S. at 279, 112 S.Ct. 698 (challenge to Illinois's signature requirement law); Libertarian Party of Ala. v. Merrill, No. 20-13356, 2021 WL 5407456 (11th Cir. Nov. 19, 2021) (challenge to Alabama law regarding party access to voter list); New Ga. Project v. Raffensperger, 976 F.3d 1278 (11th Cir. 2020) (challenge to Georgia's law requiring absentee ballots to be received by election day); 🚩Cowen v. Ga. Sec'y of State, 960 F.3d 1339 (11th Cir. 2020) (challenge to Georgia's law regarding ballot-access); Independent Party of Fla. v. Sec'y of State 967 F.3d 1277 (11th Cir. 2020) (challenge to Florida's law regarding signature requirements for ballot-access); 🚩Lee, 915 F.3d at 1312 (challenge to Florida's signature matching law); 🚩Common Cause/Ga., 554 F.3d at 1340 (challenge to Georgia's voter ID law); Green v. Mortham, 155 F.3d 1332 (11th Cir. 1998) (challenge to Florida's law imposing qualifying fees on candidates); 🚩Fulani v. Krivanek, 973 F.2d 1539 (11th Cir. 1992) (challenge to Florida's signature verification law).

56   Although the Court finds that Plaintiffs' Training: Absentee-Ballot Cancelation claim fails as a matter of law, the Court will out of an abundance of caution engage in the 🚩Anderson-🚩Burdick analysis. See 🚩Jacobson, 974 F.3d at 1262 ("If the statute burdened voting or associational rights even slightly, we could apply legal standards to determine whether the burden was unconstitutional. Under 🚩Anderson and 🚩Burdick, we would weigh the burden imposed by the law against the state interests justifying that burden."); New Ga. Project, 976 F.3d at 1282 (reversing the district court in part because "the district court also erred in accepting the plaintiffs' novel procedural due process argument. The standard is clear: '[W]e must evaluate laws that burden voting rights using the approach of 🚩Anderson and 🚩Burdick.' ").

57   Plaintiffs also submitted voter complaints that were received by the Secretary of State to show that the Secretary of State was on notice that counties were not correctly canceling absentee ballots at the polls. See PX. 1929, 1931 (two Clarke County voters were able to vote by casting an absentee ballot in the June 2020 primary after attempting to cancel their ballots and vote in person); PX. 1932 (Coweta County voter that was told she could not vote in person because she received an absentee ballot); PX. 1950 (Fulton County voter instructed to destroy her absentee ballot in front of the poll worker before being permitted to vote in-person); PX. 1935 (Coweta County voter instructed to destroy her absentee ballot in front of the poll worker before being permitted to vote in-person).

58   Defendants objected to PX. 2057 at Tr. 29:17–31:8 on the grounds of speculation. Doc. No. [760-1]. As to PX. 2057 at 30:14–23, this objection is overruled. Ms. Aaron's testimony is not speculative because she is testifying about her experience.

59   This statement was not admitted for its truth but was admitted for the purpose of showing course of conduct under FRE 803(3).

60    This statement was not admitted for its truth but was admitted for the purpose of showing course of conduct under FRE 803(3).

61    As the Court noted above, Plaintiffs have not met their burden for a First and Fourteenth Amendment claim concerning absentee ballot cancelations because Plaintiffs have not sufficiently established causation or that 🚩Anderson-🚩Burdick applies to errors in election administration.

62    In 🚩Coalition for Good Governance, the court ruled that the case itself was a non-justiciable political question. In 🚩Coalition for Good Governance, the plaintiffs asked the court to determine the number of COVID-19 procedures that were sufficient. Just as with the question of fairness, see 🚩Rucho, 139 S. Ct. at 2494, 🚩Jacobson, 974 F.3d at 1262, there are not justiciably manageable standards to determine how many COVID-19 procedures are enough. 🚩Coal. for Good Governance, 2020 WL 2509092, at *3. In the case *sub judice*, Plaintiffs are not challenging whether a particular statute or practice is fair; rather Plaintiffs ask the Court to decide whether a particular statute of practice unfairly burdens a voter's right to vote and whether the State has a sufficient justification for said burden. Just as the challenged practices in 🚩Anderson, 🚩Burdick, and their progeny are justiciable, these claims are justiciable. See supra Section II(A)(2)(c)(2).

63    There was significant discussion on the admissibility of PX. 912. The Court ultimately admitted PX. 912 as an adoptive admission. Tr. 1677:12–14. Accordingly, these exhibits will be evaluated for their truth.

64    At trial the Court took PX. 685 under advisement. Tr. 3104:16–3105:16. On September 22, 2022, the Court ruled that PX. 685 was admitted. The Court finds that the email exchange between Mr. Hallman and Ms. Hicks is evidence of an adoptive admission. Doc. No. [815].

65    Plaintiffs moved for the admission of PX. 2159. During the trial, the Court took the exhibit under advisement. Tr. 4050:12–4054:21. The document is admissible as a credible government record under FRE 803(8). The Court finds that this document is a public record because it is the direct transcript from the SEB Meeting on August 21, 2019. Mr. Harvey testified that SEB meetings are transcribed. Tr. 3656:15–17. Accordingly, the Court finds that PX.2159 is admissible as a public record because it (1) sets out that it the August 21, 2019 meeting of the SEB and (2) that the meeting were transcribed and placed on the Secretary of State's website. Finally, Defendants did not provide sufficient evidence to show that the official transcription lacks trustworthiness.

66    PX. 1715 was taken under advisement by the Court. Tr. 3104:16–3105:2. Defendants raised a Rule 401 objection to this document, see id. This document is relevant as an example of a voter whose "record was cancelled in error" based on data from the Department of Community Service and the Department of Community Supervision. PX. 1715 at 1.

67    The Court finds that his burden differs from the burdens resulting from list maintenance/ use it or lose it. The Court awarded summary judgment to Defendants on list maintenance/ use it or lose it because (1) all impacted voters either, made no contact with the Secretary of State for five years, or the postal service database reflected that the elector moved, (2) the voters could always re-register to vote, and (3) the cancellations applied uniformly. Doc. No. [617], 52–55. With respect to felon matching, there is sufficient evidence in the record to show that some of the impacted voters (1) were not felons and (2) were cancelled despite numerous attempts to prove that they were not felons prior to the election.

68    The Court acknowledges that provisional ballots are available to voters who are canceled because they are falsely flagged as felons. However, because the Court has determined that the burden on the voter results

from the procedural hurdles voters must clear in order to fix the felon match mistake, the Court does not find that fact compelling when weighing the State's interests against the burden to the right to vote.

69    The Court notes again that Plaintiffs concede that the question of whether the Secretary's decision to delegate discretionary decision-making about which people on the list of felons are (or are not) on the list of registered voters complies with Georgia law "is not at issue in this suit." Doc. No. [854], ¶ 694. Plaintiffs state that "their challenge to the felon matching process is not that it violates state law, but that it is carried out in a way that burdens Georgia's voters unconstitutionally." Id.

70    HB 316 was enacted on April 2, 2019 (Doc. No. [68]), and Dr. del Rio's experience occurred in November of 2018. Tr. 473:8–475:19. The placement of registrants in Active-MIDR status represents a change pursuant to HB 316. Tr. 3576:24–3577:17.

71    Although PX. 89 was initially taken under advisement, it was eventually admitted in its entirety. Tr. 2271:11.

72    "[T]he empirical evidence makes clear that fraud committed by voters either in registering to vote or at the polls on Election Day is exceedingly rare ... both nationally and in Georgia." Tr. 2346:3–6. Additionally, Mr. Harvey testified that voter fraud "was not a -- not a significant problem that [he is] aware of." Tr. 2041:10–16.

73    The Statute referenced by Defendants, 🚩 O.C.G.A. § 21-2-216, does not discuss the Secretary of State's use of SAVE to verify an applicant's citizenship. Additionally, the regulation cited by Defendants was adopted in 2010 and the Secretary of State did not receive the MOU from the DHS authorizing it to use SAVE until August 2020.

74    The Court notes that the issue of SAVE is not moot because SAVE is not yet fully operational. "To the extent that [the challenged] features remain in place, and changes in the law have not fundamentally altered the statutory framework as to render the original controversy a mere abstraction, the case its [sic] not moot." 🚩 Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta, 219 F.3d 1301, 1310 (11th Cir. 2000). To date, the Secretary of State still uses DDS as the only method for verifying citizenship; the only time SAVE was used was during a one-time audit. Accordingly, the challenged feature remains in place.

75    The Court's determination that SAVE is not an available remedy depends on the Secretary of State's affirmative testimony to the Court that SAVE is in the process of being implemented and expects that SAVE will be fully operational in 2023.

76    As previously noted, Plaintiffs' Exact Match MIDR challenge relates to the matching of certain identification information provided on voter registration applications. Plaintiffs' second policy challenge, i.e., Exact Match Citizenship, relates to the matching of the voter registration applicant's citizenship information.

77    The Supreme Court has explained that " '[d]iscriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected ... a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." 🚩 Holton v. City of Thomasville Sch. Dist., 425 F.3d 1325, 1349 (11th Cir. 2005) (citing 🚩 Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991)). This Court recognizes that 🚩 Holton was a Fourteenth Amendment/Equal Protection case; however, the Eleventh Circuit has indicated that the standard is the same for Fifteenth Amendment and Equal Protection/Fourteenth Amendment claims in the voting rights context. See Greater Birmingham Ministries, 992 F.3d at 1328 ("[I]n order 'to establish a violation of either the Equal Protection Clause of the Fourteenth Amendment or the Fifteenth Amendment, [plaintiffs] must show that [the state's] decision or act had a discriminatory purpose and effect.") (citations omitted). To

this regard, the Court will utilize both Fifteenth Amendment and Equal Protection precedent in this section of the Opinion.

78    The Eleventh Circuit has also "repeatedly recognized that evidence of [t]he historical background of the decision is relevant to the issue of discriminatory intent." Burton, 178 F.3d at 1189 (citing Williams v. City of Dothan, 745 F.2d 1406, 1415 (11th Cir. 1984) (quoting Arlington Heights, 429 U.S. at 267, 97 S.Ct. 555) (internal quotations omitted)).

79    As indicated above, the evidence at trial showed that the exact matching process is not fully codified law in Georgia's statutory scheme. Portions of the matching process at issue are actually part of a policy of the Secretary of State's Office. To this regard, in considering the first and fifth factors, the Court will also utilize the terms "policy" and "policymakers," in addition to the terms "law" and "legislators."

80    While this Court recognizes that stay-panel opinions are "tentative," "preliminary [in] nature," and are "not a final adjudication of the merits of the appeal," this Court accepts the stay-panel's opinion in League of Women Voters as persuasive authority. Democratic Exec. Comm. of Fla., 950 F.3d at 795; cf. E. Bay Sanctuary Covenant, 950 F.3d at 1265 (treating the motions panel's decision as persuasive but not binding authority).

81    To the extent the policy is memorialized in writing, it is reflected piecemeal in various documents, including training materials. PX. 1289 (Expert Report of Peyton McCrary), ¶ 78 ("The voter verification system was never adopted by the Secretary of State as a rule or policy, nor was it otherwise disclosed to the public."), PX. 1751 (DDS MOU), Tr. 1940:22–1942:13 (Harvey) (testifying that "it's not a written policy" and agreeing that the policy is reflected in Secretary of State training materials), Tr. 349:17–19 (Mayer) (testifying that there was "no indication that the policies and methods are actually written down and documented and clearly articulated").

82    For example, DDS recently switched from matching the whole first name to matching only the first letter of the first name "because [the Secretary of State] requested that." Tr. 1202:13–19 (McClendon); see also Tr. 1936:9–11 (Harvey). Also, when Plaintiffs first brought this lawsuit, Exact Match MIDR prevented voter registration applicants from being registered voters until they had taken certain steps to address the match failures generated by the Exact Match MIDR process. If the applicant did not provide the information, they would "fall off the list" and would not be registered to vote. Tr. 3603:8–11 (Harvey). In April 2019, after Plaintiffs brought this lawsuit, Georgia passed HB 316, which changed the consequences of being flagged as "MIDR." Under HB 316, people flagged as MIDR were registered to vote, but they were still labeled "MIDR" until they provided identification before or at the time they voted. Tr. 3604:3–4 (Harvey). HB 316 made no changes to the consequences of the Exact Match Citizenship policy. Tr. 2035:2–7 (Harvey).

83    While the Court credits Dr. McCrary's expert history testimony, which includes some discussion of race and political parties, the Court notes that Dr. McCrary specifically affirmed that he was not opining that any portion of Georgia's voter registration practices and systems were adopted with a discriminatory intent. Tr. 266:1–11.

84    As stated at trial, the Court accepted as lay opinion certain testimony of Dr. McCrary concerning the voter verification requirements of HAVA. Tr. 215:4–5 (McCrary). More specifically, Dr. McCrary testified that HAVA required states to create a statewide voter registration database. Tr. 213:5–10 (McCrary). He further testified that there was a HAVA "requirement ... both to establish a person's eligibility as to their place of residence and to establish their eligibility by way of establishing whether they were or were not United States citizens." Tr. 214:2–5 (McCrary). He testified that HAVA did not require states to use a particular matching methodology such as the Exact Match employed by the State of Georgia in this case. Tr. 214:6–10 (McCrary).

85    There is also a letter exhibit in the record from Counsel for the State of Georgia to the Department of Justice (dated August 17, 2010) which states: "Prior to 2006, Georgia was exempt from the data matching and verification procedures required under HAVA because the State required voters to provide their full nine-digit social security number when registering to vote. In 2006, however, a federal court enjoined the State from that requirement. The State, no longer exempt from HAVA's data matching and verification requirements, had to develop procedures to meet those requirements." PX. 76 at STATE-DEFEDANTS-00078193.

86    Prior to 2013 and the United States Supreme Court's decision in 🏴 Shelby County v. Holder, 570 U.S. 529, 133 S.Ct. 2612, 186 L.Ed.2d 651 (2013), certain states, including Georgia, needed to seek preclearance from the DOJ for new voting changes.

87    Dr. McCrary could not recall the full name of the program at trial. Tr. 221:14 (McCrary). His report states that the full title of the program is "Help America Vote Verification." PX. 1289, ¶ 72.

88    This historical evidence also applies to Exact Match Citizenship, since the DOJ raised the same concerns about the racial impact of Exact Match Citizenship.

89    The exhibit defines the SSVRZ791R1 report as an "exceptions report." PX. 76 at STATE-DEFENDANTS-00078197. This report and a second exceptions report, "display, by county, the results of the verification process and identify those applicants whose information was not successfully verified in its entirety." Id. at STATE-DEFENDANTS-00078198.

90    Dr. McCrary testified that the 2010 version is not used in Georgia today and the process has been changed several times since 2016. Tr. 279:5–8. Dr. McCrary also described how experts subsequently found the state's assurances of close, daily monitoring proved inaccurate in the years that followed preclearance. Tr. 250:2–254:17 (McCrary), PX. 1289, ¶ 84.

91    Dr. McCrary provided the full citation for the case in his report as: Georgia State Conf. NAACP v. Kemp, No. 2:16-cv-00219 (N.D. Ga.). PX. 1289 at 77 n.231.

92    Dr. McCrary testified that the 2016 and 2017 versions of the process are not used in Georgia today. Tr. 279:14–16.

93    While Dr. McCrary testified and indicated in his report that "the administrative implementation of HB 268 in 2017 would likely have been objectionable" were preclearance review still in place based upon discriminatory effect, the Court gives little weight to this evidence in light of the subsequent litigation and enactment of HB 316 concerning voter verification procedures. PX. 1289, ¶ 99, Tr. 258:16–259:17.

94    The Court notes that 2010 is the same year that the DOJ did not object to Georgia's revised Exact Match plan, leading to preclearance.

95    Even if the Court were to consider this evidence, the Court's ruling remains the same.

96    While not specifically enumerated as a factor in the Greater Birmingham Ministries case, the Court notes that the Eleventh Circuit did consider the state's interest in its Fifteenth Amendment analysis concerning the law at issue. See 992 F.3d at 1328 ("[W]hen we weigh the burden on a voter to obtain and present a photo ID against Alabama's interests underlying the voter ID law, we find the law to be a neutral, nondiscriminatory regulation of voting procedure.").

97    Additional discussion regarding the State's interests will follow in the VRA section of this Opinion. In sum, the Court declines to uphold Plaintiffs' arguments for deeming the testimony related to the asserted state interests insufficient.

98    Defendants raised additional pretrial/deposition objections (Doc. No. [755-7], 12) concerning the rule of completeness that are now moot, as the entirety of the statements were played at trial.

99    There is some Eleventh Circuit precedent on discriminatory statements in the Fifteenth Amendment context; however, the speech at issue in those cases was not campaign speech. See, e.g., Greater Birmingham Ministries, 992 F.3d at 1227 (indicating that the racist comments of the lawmaker, while not condoned under any circumstances, need to be "made about the law at issue in this case" to evidence discriminatory intent behind the law); NAACP v. Stallings, 829 F.2d 1547, 1552 (11th Cir. 1987) (concluding that the speech made by the sponsor of legislation during legislative session "was evidence of an intent to discriminate against black voters in any voting legislation before the General Assembly during that session, and that a finder of fact might well infer that such intent continued until 1951 when the bill was re-introduced under the same sponsorship").

100   The Court has considered the entirety of the evidence that Plaintiffs offered in support of their Fifteenth Amendment claim in reaching this conclusion.

101   The Court gives this notification limited weight because the DOJ later precleared a revised version of Georgia's policy.

102   With respect to Count III, the Court uses the term "Defendants" to encompass the Secretary of State, Sarah Tindall Ghazal, Janice Johnston, Edward Lindsey, and Matthew Mashburn. "Defendants" in this section will not include the SEB because the SEB enjoys sovereign immunity for the claims in Count III.

103   The Court recognizes that the Third Circuit has recently stated that Bush v. Gore is a limited holding as it "does not federalize every jot and tittle of state election law," but focused on the "lack of any standards" that empowered officials to treat ballots "arbitrarily, violating equal protection." Donald J. Trump for President, Inc. v. Sec'y of Pa., 830 F. App'x 377, 388 (3d Cir. 2020). By contrast, where the State's election code provides counties with specific guidelines, "[r]easonable county-to-county variation is not discrimination." Id.

104   Those six counties are: Clayton County, Cobb County, DeKalb County, Fulton County, Muscogee County, and Webster County.

105   Plaintiffs' geographic uniformity claim differs from its Anderson-Burdick claim. A geographic uniformity claim examines the differences in the implementations of Exact Match, whereas the Anderson-Burdick claim examines the burdens imposed by Exact Match. To establish a geographic uniformity claim, the Court must determine who conducted the matches and whether the differences in process burdened voters. But to establish an Anderson-Burdick claim, the Court must determine what burdens the statute itself had on voters.

106   "Vote denial occurs when a state, or here a municipality, employs a 'standard, practice, or procedure' that results in the denial of the right to vote on account of race." Burton v. City of Belle Glade, 178 F.3d 1175, 1197–98 (11th Cir. 1999) (citing 42 U.S.C. § 1973(a)).

107   Similarly, in the voter identification law jurisprudence (which Defendants in the case *sub judice* rely upon by analogy), the Supreme Court stated that: "[f]or most voters who need [identification cards], the inconvenience of making a trip to the [Bureau of Motor Vehicles], gathering the required documents, and posing for a

photograph surely does not qualify as a substantial burden on the right to vote, or even represent a significant increase over the usual burdens of voting." 🚩 Crawford, 553 U.S. at 198, 128 S.Ct. 1610.

108    This session law is available through the University of Georgia at: http://neptune3.galib.uga.edu/ssp/cgi-bin/legis-iDX..pl?sessionid=7f000001&type=law&byte=420472739.

109    In 🚩 Frank, the court gave the following example: "If 99.9% of whites had photo IDs, and 99.7% of blacks did, the same approach would yield the statement 'blacks are three times as likely as whites to lack qualifying ID' (0.3 ÷ 0.1 = 3), but such a statement would mask the fact that the populations were effectively identical." 🚩 768 F.3d at 753.

110    These percentages were extrapolated from the statistics contained in Table 1 and Table 5 of Dr. Mayer's Expert Report.

111    This differs from the standard applied under 🚩 Anderson- 🚩 Burdick. Under 🚩 Anderson- 🚩 Burdick, when a practice severely burdens voting, the Court must find that the practice is narrowly drawn to achieve the State's purpose. 🚩 Burdick, 504 U.S. at 434, 112 S.Ct. 2059. Accordingly, it is entirely consistent that the Court could find a challenged practice is unconstitutional under the First and Fourteenth Amendments while also finding that the same practice does not violate Section 2 of the VRA.

112    As stated above, this number is derived from the 2014-2018 American Community Survey's calculation of foreign-born naturalized citizens who are living in Georgia and the registrants marked as pending noncitizens in January 2020. The Court notes that Dr. Mayer's report does not state whether all of the individuals in that American Community Survey were eligible to vote. Additionally, the January 2020 numbers do not state whether all of the individuals were in fact naturalized citizens.

113    The Court notes that Plaintiffs' expert Dr. Minnite also provided testimony regarding the history of race discrimination in Georgia. However, the Court finds that this history was primarily focused on voting following Reconstruction and has little relevance to the more recent history of discrimination in Georgia. PX. 1038, 3–4.

114    As discussed supra, with respect to the Fifteenth Amendment, Governor Kemp's campaign speech cannot be used as evidence of the historical background 🚩 Arlington Heights factor because the statements are not tied to the sequence events leading to the enactment of Exact Match. See League of Women Voters of Fla., Inc., 32 F.4th at 1373 (stating that the " 'historical background' factor should be 'focus[ed] ... on the 'specific sequence of events leading up to the challenged decision' rather than 'providing an unlimited lookback to past discrimination' "). The 🚩 Gingles Senate factor regarding the use of racial appeals in political campaigns requires the Court to look at historic as well as present day campaign rhetoric. See 🚩 Gingles, 478 U.S. at 40, 80, 106 S.Ct. 2752 (affirming the district court's finding that the existence of racial appeals in North Carolina's campaigns that dated from 1890 to 1984 weighed in favor of finding a Section 2 violation). Accordingly, the Court finds that while Governor Kemp's campaign speech is not evidence of historical background under the Fifteenth Amendment, Governor Kemp's campaign speech is evidence of racial appeals in campaigns under Section 2 of the VRA.

115    For ease of reference, the Court cites to the Second Amended Complaint in its conclusion. As stated in the Court's April 29, 2022 "governing issues" order (Doc. No. [816]), the Second Amended Complaint has been conformed to the issues and claims presented in the Amended-Final Pretrial Order (Doc. No. [753]). In addition, as previously noted, on May 30, 2019, the Court granted Defendants' Motion to Dismiss based on

sovereign immunity as to the SEE and only the Count V (Section 2 of the Voting Rights Act of 1965) remained pending at trial against said Defendant Doc. No. [68], 84.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.