The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
1                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3

4    DONNA CURLING, ET AL.,          :
                                     :
5             PLAINTIFFS,            :
     vs.                             :  DOCKET NUMBER
6                                    :  1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,     :
7                                    :
              DEFENDANTS.            :
8

9

10          TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS

11             BEFORE THE HONORABLE AMY TOTENBERG

12            UNITED STATES DISTRICT SENIOR JUDGE

13                     OCTOBER 19, 2022

14                        1:30 P.M.

15

16

17

18

19

20

21    MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                    TRANSCRIPT PRODUCED BY:

23

     OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                   2394 UNITED STATES COURTHOUSE
                                     75 TED TURNER DRIVE, SOUTHWEST
25                                   ATLANTA, GEORGIA  30303
                                     (404) 215-1383
```

```
1              A P P E A R A N C E S   O F   C O U N S E L

2

   FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
3  SCHOENBERG:

4
        DAVID D. CROSS
5       MORRISON & FOERSTER, LLP

6       ADAM SPARKS
        KREVOLIN & HORST
7

8  FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
   WILLIAM DIGGES, III, AND RICARDO DAVIS:
9

10      BRUCE P. BROWN
        BRUCE P. BROWN LAW
11
        ROBERT A. McGUIRE III
12      ROBERT McGUIRE LAW FIRM

13

14 FOR THE STATE OF GEORGIA DEFENDANTS:

15
        CAREY A. MILLER
16      JOSH BELINFANTE
        ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC
17
        BRYAN TYSON
18      DIANE LaROSS
        BRYAN JACOUTOT
19      TAYLOR ENGLISH DUMA

20

21

22

23

24

25
```

```
 1              P R O C E E D I N G S
 2   (Atlanta, Fulton County, Georgia; October 19, 2022.)
 3           THE COURT:  Good afternoon.  This is Judge Totenberg.
 4   How are you-all?
 5           MR. BROWN:  Good afternoon, Judge.
 6           THE COURT:  Good afternoon.
 7           MR. TYSON:  Good afternoon.
 8           THE COURT:  I'm going to wait for just a minute so
 9   that the beeps won't keep on going.
10           (There was a brief pause in the proceedings.)
11           THE COURT:  All right.  Mr. Palmer on my behalf sent
12   a letter to counsel last night to clarify the scope of the
13   matters the Court wished to address at this conference.
14           And so probably -- having just been dealing with the
15   AEO issues, the first most prominent one for me is trying to
16   get clarity from the Coalition plaintiffs regarding the scope
17   of what they are actually seeking in terms of the all AEO
18   designated Coffee County-related discovery documents, which
19   then later in a footnote is described in still more embracing
20   and larger terms.
21           Would either Mr. Brown or Mr. McGuire give me some
22   assistance in that regard?
23           MR. BROWN:  Yes, Your Honor.  This is Mr. Brown.
24   Mr. McGuire is on the line and may chime in to help.  We
25   appreciate this opportunity on this motion, which is 1505, the
```

1    emergency motion.

2              Your Honor, our -- the effort here is to -- in filing

3    the motion was to present an efficient way for the AEO issues

4    relating to Coffee County to be addressed rather than dealing

5    with them on a piecemeal basis as they come up by having the

6    Court permit the designation of Ms. Marks as a consultant,

7    which is something that the parties have a right to do for

8    consultants by simply having them sign the protective order in

9    any event.

10             We believe that it is appropriate here generally to

11   Coffee County for many reasons.  When we filed the motion, Your

12   Honor, there was a lot of activity in discovery with parties

13   and nonparties designating documents AEO really for little or

14   no reason.  And there was also deposition testimony that was

15   upcoming in which the prospect of Ms. Marks being excluded from

16   the depositions because of some assertion of AEO was raised.

17             Therefore we believe that the proposed order that we

18   presented is the best definition and an appropriate definition

19   for this set of evidence that we think is appropriate for Ms.

20   Marks to be designated a consultant with respect to.  And that

21   is discovery relating to discovery on voting system breach and

22   related security issues in the aftermath of the November 2020

23   election in Coffee County, Georgia, and similar attempts and

24   unauthorized access of the voting system in the other Georgia

25   counties.

```
1              Now, the -- the reasons for allowing Ms. Marks to
2    have the designation of a consultant are numerous.  One is the
3    parties have a right to designate who they want to be a
4    consultant.  And --
5              THE COURT:  I don't think I have the -- do I have the
6    agreement someplace in the docket?
7              MR. BROWN:  The protective order is 477.
8              THE COURT:  Okay.  But is there another agreement
9    besides that that you are referencing?
10             MR. BROWN:  No.  I may have misspoke, Your Honor.  I
11   meant the protective order.  I'm sorry.
12             THE COURT:  Okay.  All right.
13             MR. BROWN:  And so the protective order leaves it to
14   the parties to designate the consultants who will execute the
15   protective order provisions.  And both sides have done that.
16   And this motion is necessary because of the resistance to
17   allowing the Coalition to designate Ms. Marks as a consultant,
18   even though it would otherwise be appropriate.
19             It is extremely necessary for the Coalition to do so
20   for a group of reasons.  One is that Ms. Marks really is one of
21   our key experts in that we have experts in various fields,
22   including Dr. Stark on audits, through Curling plaintiffs
23   Dr. Halderman on cybersecurity, Mr. Skoglund with respect to
24   election software.
25             Putting this together for counsel, we need someone
```

1    who knows about how elections work in Georgia.  And for our

2    team, that is Ms. Marks.  And we can't do that with the

3    proliferation of AEO-designated documents and the potential

4    that that continues.  And that puts us in a real prejudice

5    compared to the defendant who, because they are the only one

6    designating AEO, their clients and everybody on their team gets

7    to see every piece of evidence in the case, including documents

8    that are put under seal that Ms. Marks cannot see.

9          And so there is real asymmetry in the ability of

10   counsel to be able to prepare the evidence necessary to try the

11   matter because of this.

12         So what we have done is we have taken two tracks.

13   The first track is in 1505.  And that is as a category of

14   documents to have -- with respect to a category of documents

15   have Ms. Marks designated as a consultant.

16         And then in 1508, we fight sort of the mind-numbing

17   and extremely inefficient battle to have the State

18   appropriately designate documents as at most confidential that

19   don't deserve AEO treatment.

20         And with respect to that, part of the -- a big part

21   of the problem is that the concept of what AEO is supposed to

22   cover has been totally lost in this case.  Completely.  And

23   because AEO -- the designation of confidential is for documents

24   the release of which may damage the designating party.  These

25   documents are at most confidential.

1          The designation of AEO is reserved for an extremely

2    narrow subset of confidential documents where the release from

3    the lawyer to the party damages the disclosing party.  And in

4    the cases, the only instances you will find are properly

5    designated AEO are when it is trade secrets.  Because the

6    party -- the trade secrets are intellectual property.  Because

7    that is the instance in which the injury to the designating

8    party occurs when the other party knows it.  Not when the

9    public knows it.  That is confidential.  But when the other

10   party knows it.

11          So the CEO of Pepsi doesn't get Coke's trade secret.

12   An IP or a competitor A, the party, doesn't get to see

13   competitor B's business plan because the very act of disclosing

14   it to the party the injury is complete.  It doesn't matter if

15   it is designated to the plaintiff.

16          The way that the defendants are treating it and the

17   other nonparties, including for a moment Ms. Latham, are

18   designated -- are using AEO is simply some sort of designation

19   of confidential and we mean it, I guess.  But it has nothing to

20   do with the purpose of AEO, which is to -- to prevent harm to

21   the designating party simply by the disclosure of it from

22   lawyer to party.

23          So none of these documents -- there has not been any

24   documents in this case that have been properly designated AEO.

25   But because we've got an army of lawyers on the other side and

1    we have limited resources, it is extremely difficult for us to

2    litigate every single long laid designated piece of AEO

3    document.  We're doing it in 1508, and we can see how

4    inefficient it is both for the Court and the plaintiffs.  But

5    we shouldn't have to do that when none of those documents -- I

6    mean -- and the -- so the misdesignation of AEO goes beyond

7    what the defendants have done.  And that is, for example,

8    designate emails to the Washington Post as AEO.  That is not

9    what we're talking about.  That was illustrative of the care

10   with which the defendants designate documents.  But that is not

11   really what we're talking about.

12            We're talking about all the other ones, just

13   bread-and-butter documents, discovery documents that at most

14   should be confidential.  But none of them will -- the

15   defendants will not be injured by the disclosure from me to Ms.

16   Marks by any of those documents.

17            And so we're trying different approaches here.  We

18   have -- we are trying as a category of Coffee County documents

19   to have those treated as such that Ms. Marks can see those.

20   They can retain their AEO designation so long as Ms. Marks is

21   allowed as a consultant to see them.

22            By doing that, it would largely moot 1508, though not

23   completely because that asks for different relief.  That is for

24   the declassification of everybody, not just for Ms. Marks.

25            But for our purposes, it would for the most part moot

1    1508.  So we don't have to -- and at least with respect to

2    Coffee County, we don't have to keep fighting the defendants on

3    their document by document, deposition line by deposition line

4    designation of things as AEO.  We just can't do that.  But this

5    would take care of that problem and not involve the Court every

6    time it comes up.

7            So that is what our motions are based on.  And we

8    believe that the granting of 1505 will probably moot 1508 or

9    largely moot 1508.  We will not injure the defendants in any

10   way at all.

11           And the specific evidence that is out there I can go

12   through.  But we're talking about a category of Coffee County

13   documents that are now designated AEO and any others that would

14   be designated in the future.

15           Thank you, Your Honor.

16           THE COURT:  So let me ask the counsel for defendants

17   this question.  I don't see anywhere in the protective order

18   that gives you a veto on who the plaintiffs designate as a

19   consultant.

20           So while I have been very careful about handling of

21   genuinely confidential information in this matter, I -- at the

22   same time I see -- I do understand the grounds for -- at this

23   juncture for the Coalition's motion in terms of at least being

24   able to designate Ms. Marks as a consultant.

25           So I would like to hear from you as to why that is

1   not anticipated or would not be proper under the protective

2   order.

3           MR. TYSON:  This is Bryan Tyson.  I'll take a first

4   stab.  Mr. Miller and others may have something to add.

5           I think this takes us back to when we first were

6   going back and forth about the protective order.  We had a

7   whole, you know, set of filings and discovery disputes related

8   to the scope of the protective order.

9           And one of the key things back in July of 2019 was

10  Ms. Marks' role as having access to AEO material.  And there

11  were specific requests made by the Coalition at that point kind

12  of similar to this to have Ms. Marks designated in some way

13  that would allow her to access AEO.  And you specifically

14  denied that at that point.

15          I think the part I'm struggling a little bit with is

16  a couple of things:  Number 1, we've obviously dealt with many

17  AEO-type issues where we had to talk about scope and what

18  parties could access.  That included Dr. Halderman's report and

19  other things.

20          The other part I think from Mr. Brown's perspective

21  and what he shared is I still haven't heard exactly what it is

22  that he is saying shouldn't be designated AEO beyond the

23  documents that were still designated that way after we

24  redesignated following that initial production.  Because I

25  think the other ones by Ms. Latham and other people -- I don't

```
 1    have specific knowledge of those.
 2           In terms of how we have been handling this, we are
 3    obviously in an unusual situation as a state investigative body
 4    and then GBI carrying out an investigation while the plaintiffs
 5    have been carrying out kind of a parallel investigation through
 6    discovery in this case.
 7           And so our goal through designation at least as to
 8    Coffee County has been to protect the integrity of that
 9    investigation.  And so I think that has been the effort there.
10           There were again specific things that were explained
11    in our responses to 1508 why we believe those documents should
12    remain designated as AEO.  But if the Court wants to, you know,
13    grant Mr. Brown's motion and lift the designation there, I'm
14    not sure what other documents we're talking about at this point
15    beyond those specific ones and some unspecified documents from
16    Ms. Latham.
17           THE COURT:  Okay.  Well, I mean, there may be
18    potentially, I guess, more documents in the future.  I don't
19    know that -- I don't know anything about, you know, the
20    projected length of the investigation or the scope of the
21    investigation.
22           And I guess that is why the Coalition's counsel was a
23    little bit loose in defining what AEO -- the materials that
24    he -- that they were seeking to allow Ms. Marks in a consultant
25    capacity access to and it shouldn't be designated.
```

1          Mr. Brown, can you give us any greater clarity as to

2     what you had thought was the scope of what you are -- the

3     specific scope of the matters that you are attempting to

4     address here?

5          MR. BROWN:  Sure, Your Honor.

6               **(There was a brief pause in the proceedings.)**

7          MR. BROWN:  Two responses.  And I think Your Honor

8     will understand why there are two different responses.

9          What we're trying to do is to avoid the -- I

10    understand the need for some clarity for what we're asking, and

11    we understand that completely.

12         At the same time, what we want to avoid is having to

13    come back to the Court with respect to individual documents

14    each time there is an issue.

15         So the category of documents are documents related to

16    Coffee County, period, Number 1.

17         Number 2, there are specific documents that have been

18    designated as AEO that fall into that category that we think

19    clearly should -- Ms. Marks should have access to.  But our

20    concern -- and I can name them.  But our concern is that we

21    don't want to get relief on that only to have to run back into

22    court Friday to get relief on new stuff that is designated as

23    AEO that would fall into the same category, particularly when

24    the defendants haven't really answered Your Honor's question as

25    to why the motion shouldn't be granted apart from referencing

13

1     some pre- -- you know, some negotiation history that does not

2     appear in 477 itself, which is the order.  And the order does

3     not support the defendants' argument.  That is why they resort

4     to some prenegotiation history that led to that order.

5            The second thing, Your Honor, is that Mr. Tyson is

6     conflating the law enforcement privilege documents as AEO.

7     That is two categories, two different ideas.  The law

8     enforcement privilege allows them, if it is properly invoked,

9     to keep the documents, not to give them to Bruce or -- to me or

10    to Mr. Cross or to anybody.

11           Now, they can also -- they can do both.  They can

12    designate the law enforcement privilege documents as

13    confidential.  I'm not aware of documents that they are calling

14    law enforcement privilege documents that they have produced to

15    us that they have designated as AEO.  That would be improper I

16    would contend because the whole basis of the injury relating to

17    law enforcement privilege is not the disclosure to Ms. Marks or

18    to Donna Price or Donna Curling.  It is their disclosure

19    publicly, public release.

20           And they don't -- they have never argued otherwise.

21    They have never argued or explained how the identity of a GBI

22    agent is something that if disclosed to Ms. Marks and no one

23    else will injure the defendants.  They have never explained

24    that.

25           In fact, Ms. Marks and I will probably be meeting

1    with that GBI agent because they are doing their review and we

2    have reached out to offer them our assistance.

3           And so there is no explanation for why those

4    documents should be AEO or any documents should be AEO or any

5    artifacts, for that matter, should be AEO.  And that is really

6    what the point is.

7           Just as an example, the State designated the

8    SullivanStrickler copy of the EMS, the one that

9    SullivanStrickler on January 7th copied down there in Coffee

10   County -- after SullivanStrickler gave it to the plaintiffs

11   without any restriction, the State in accordance with the

12   protective order designated that hard drive as confidential.

13   Not as AEO.  But as confidential.  We respected that.  We did

14   not challenge that.

15          Then the State produces a copy of the EMS of --

16   copied as of when the State captured it in Coffee County.  So

17   it is four months later in June -- five months later in June of

18   2016 {sic}.  For that copy, they designated that copy as AEO.

19   But it is the same -- there is no difference between that and

20   the earlier one that is, quote, merely, close quote,

21   confidential.

22          THE COURT:  Let me stop you.  So if it is

23   confidential, it is confidential under the terms of the

24   protective order?

25          MR. BROWN:  Yes, Your Honor.

```
 1              THE COURT:  Okay.  All right.

 2              MR. BROWN:  Yeah.  Yeah.  Formally designated

 3   confidential.  Meaning, it can be disclosed to the parties but

 4   not to people outside the litigation.

 5              THE COURT:  Okay.

 6              MR. BROWN:  Now, the -- so we have an anomaly where

 7   our experts, Dr. Halderman, Mr. Skoglund, Dr. Stark, and

 8   others, may review both -- they can do whatever they want with

 9   those two copies of the EMS.  Ms. Marks and other parties may

10   do whatever they want with the first one but are not entitled

11   to any information comparing the two, which is completely

12   anomalous and not necessary.

13              And that is just an example of where the AEO

14   designation is unfair and has sort of gotten out of hand.  And

15   it is not helping -- it is not doing the State any good.

16              THE COURT:  Why don't you-all -- tell me about a

17   parallel situation -- and all of you are sophisticated -- deal

18   with sophisticated corporate clients also -- where something is

19   designated as AEO in a business setting and what would be --

20   what would you anticipate would be the rules of the game as to

21   who it could be shared with -- an AEO document.

22              MR. BROWN:  Well, Mr. Cross will have more experience

23   from his antitrust background probably.  But in my experience,

24   the type of evidence that it pertains to is so narrow that the

25   issue doesn't come up.
```

1          And that the idea -- what we're dealing with here is:

2   I'm looking at an AEO document.  And I'm thinking, wait a

3   minute.  Didn't we also get this in response to an Open Records

4   Act request?  Where that -- that sentence would never happen in

5   a commercial case because I'm looking at a business plan and

6   the litigation is over whether the defendant stole it.  You

7   have a ten-page business plan or a one-page precis of a trade

8   secret.  You're not talking about documents that are already in

9   the wild or that are shared by multiple people.

10          And so this -- frankly, this question doesn't come up

11  because the parties are allowed only to designate as AEO an

12  extremely narrow class of evidence that are -- people respect

13  it because they understand that, wait a minute, the lawsuit is

14  about the other party stealing or receiving or borrowing or

15  copying the very document that the lawyer has.  Of course, you

16  can't give it to them because the injury would be complete upon

17  the disclosure to the party.  As opposed to confidential

18  documents, where the injury is complete when it is disclosed

19  from the party to someone outside the litigation.

20          And, David, you may have a better answer to that

21  question.

22          MR. CROSS:  Yes, Your Honor.  This is David Cross.

23          That is generally consistent with my experience.

24  Although I will say that, you know, even in large corporate

25  cases that we handle, even when there is an AEO designation,

```
 1    oftentimes that is not really --
 2                    (Technical interference)
 3            THE COURT:  It is oftentimes what?  The beep
 4    interfered.
 5            MR. CROSS:  Yeah.  Sorry.  It is oftentimes not
 6    literally attorneys' eyes only.  So what we often work out, for
 7    example, in the antitrust cases that I handle is that you will
 8    have in-house counsel that has access to that, but we also will
 9    typically have maybe one or more business people -- senior
10    business people who are really important for advising their
11    counsel on the litigation.  And so they will have access even
12    at the highest levels of attorneys' eyes only as well.
13            Sometimes we will do what is called an outside
14    counsel only designation where it literally is just the outside
15    counsel.  And that is how the State is treating the AEO
16    designation here.
17            And to Bruce's point, that is extremely rare.  That
18    you are talking about trade secrets.  You are talking about,
19    you know, the recipe for Coke.  Not the kind of stuff that
20    we're talking about and looking at here.
21            And if I could, Your Honor, just a couple of quick
22    points.  One thing that I want to emphasize is obviously Ms.
23    Marks is not our client.  But she is an incredibly valuable and
24    important consultant for us in particular.  I mean, obviously
25    she is for Bruce as well.
```

1       But my clients are not as active in this space as

2   they once were.  Ms. Marks is a very active activist, which I

3   don't think is a derogatory term, as others might seem to

4   think.  I think activists are important on both ends of the

5   spectrum.

6       But what that does is that has given her unique

7   expertise on a wide variety of issues that we're dealing with

8   in this case from understanding the election laws,

9   understanding the equipment, understanding how the election

10  system works at a granular level, particularly at the county

11  level.

12      And so we -- I personally communicate with Ms. Marks

13  literally every day.  And I do mean every day, on the weekends.

14  Because there is just so much information that we need from

15  her.  And it has proven very problematic as we have tried to

16  pursue the Coffee County investigation when she does not have

17  access to the information we have.  I mean, things as simple as

18  photos.

19      By that, I mean, photos that went to -- that came

20  from SullivanStrickler.  And until just recently, we were able

21  to work it out with the State's counsel that they withdrew the

22  AEO designation and the confidentiality designations on that.

23      But for a long time, there was stuff that we couldn't

24  share with Ms. Marks that the press had.  And we couldn't get

25  an explanation on how that could be appropriate.

1          I mean, the CISA advisory that was public was

2    designated as AEO.  We couldn't get that designation withdrawn

3    when we raised it.

4          And my frustration, I guess, Your Honor -- it feels

5    like sort of the unfairness here is we asked -- right?  Early

6    on, Bruce and his team asked if Ms. Marks could have access to

7    AEO and be designated as a consultant.

8          Candidly, Your Honor, I don't think we were obligated

9    to do that.  To the point you have made, there is nothing in

10   the protective order that allows either side to strike another

11   expert or to say we can veto your consultant or your expert.

12   But as an abundance of caution because Ms. Marks is also a

13   client, I think they did the right thing.

14         But on the flip side, that hasn't happened.  And we

15   have seen how that plays out.  We now just learned that MITRE,

16   complete third party that was never disclosed to anyone, has

17   access to the unredacted version of the Halderman report.  We

18   don't know what manner of consultants the State has.  And we

19   have just learned that Fox News and I think other defendants in

20   the defamation litigation with Dominion -- they have the

21   Halderman report.

22         And so we're in this sort of really unfair and

23   prejudicial circumstance where our own clients, including Ms.

24   Marks, who really is an important consultant in this case,

25   can't read something that a lot of other folks have, including

1    individuals that we also know have access to the underlying --

2    folks at least affiliated with those who have access to the

3    underlying Dominion software and apparently wanted to do bad

4    things with it.

5           And so I guess just to net it out, Your Honor, I

6    don't see what legitimate basis the State has to say that we

7    can't pick our consultant, as they have; certainly as Dominion

8    did as a third party.

9           We should be able to do the same, and it is really

10   hurting our ability to prosecute our claims.  And we can't do

11   that, particularly coupled with the overdesignation of AEO.

12          And it is incredibly time-intensive and costly to go

13   document by document and have all the back-and-forth with the

14   emails, even if the State acquiesces, which sometimes they do.

15   You are talking hours of time just to get there.  And we really

16   shouldn't be in that position.

17          MR. TYSON:  Your Honor, this is Bryan Tyson.  I can

18   add kind of my -- what I have seen kind of AEOwise.  I think it

19   is important to kind of go back to specifically what is in the

20   protective order.  And it is for proprietary or sensitive

21   information -- it was Page 4 -- that the producing party

22   maintains as confidential in the normal course of operations

23   such that disclosure can impede legitimate operations.  And

24   there is a discussion about that.

25          Back at Document 429, which was the joint discovery

```
 1    statement on the protective order, specifically it was raised

 2    plaintiffs have asserted an intent and desire to publicly

 3    disclose as much information obtained in this litigation as

 4    possible.  And when it related to the plaintiffs' desire to

 5    include Ms. Marks, Ms. Martin, and others in the category of

 6    the people who could see AEO documents -- that is -- the

 7    redline version was filed at 429-3 at Page 12 shows where there

 8    was a disagreement there.  And this Court ultimately entered an

 9    order.

10            I mean, I agree that this is an unusual case in a lot

11    of ways.  We're dealing with critical infrastructure in

12    election equipment.  There are a lot of security issues

13    involved.

14            We have had situations even with these Coffee County

15    documents specifically where the plaintiff provided to the

16    Washington Post the documents they received from

17    SullivanStrickler before they provided them to us.  And so we

18    have tried to carefully walk the line as protecting the

19    legitimate law enforcement investigation that is going on,

20    avoiding public disclosure, and following all the different

21    pieces that go with that.

22            And as Mr. Brown would tell you, we obviously

23    designated everything from the investigative file we didn't

24    think was covered by investigative privilege as AEO.  First

25    just as for timeliness, when Bruce raised the issue to us that
```

1   he felt we had overdesignated, we went back.  And his filing

2   said we removed the designation from most of those documents.

3          And so if there were particular documents that there

4   is an allegation we have overdesignated on those, we're happy

5   to go and look at that.  Mr. Brown also explained Ms. Marks

6   obviously has had a lot of conversations with folks who were

7   involved in the Coffee County breach.  She -- we appreciate her

8   willingness to be interviewed about that as Mr. Brown

9   referenced.

10          But I think that, again, we're trying to walk a fine

11   line here of a plaintiff and someone who is involved in a

12   different side of this investigation with the other components.

13   I mean, the fact that Ms. Marks needs access to the EMS -- I

14   don't fully understand the need there, since she is not a

15   technical expert.  We have technical experts for that.

16          We're also in an unusual position where our

17   consulting expert, Mr. Persinger, was essentially unmasked

18   during this process by all the additional things that have

19   happened.  So I get it.  We're all in a strange place trying to

20   navigate through this.  But I think this is what we're dealing

21   with when we have a parallel investigation going with the

22   plaintiffs and with the law enforcement folks in addressing

23   this issue in Coffee County.

24          THE COURT:  Well, as I heard originally, the -- or

25   considered this originally when this was filed, the Coalition's

1    counsel basically made clear that they needed also Ms. Marks'

2    assistance as basically for summary judgment.  It wasn't just

3    about Coffee County and that she needed to be able to look at

4    all the documents and assist them in this process.  And so I

5    have also tried to tease out what else had been made -- had

6    been stamped as attorneys' eyes only.

7            But some of this, I think, you know, originally when

8    we were discussing the designation of who could get -- gain

9    access to this also was related to the Halderman report and

10   original concerns, which appear to be mostly mine.  But

11   original concerns were larger early on of any disclosure of the

12   report.

13           So I don't know at this point how things evolved so

14   that Dominion's consultant created a report or that something

15   was ultimately handed over to other parties such as Fox News.

16   I have no idea.  And maybe you-all do.  But I don't need to go

17   into that all.

18           I will accept for purposes of this phone call

19   counsel's representation that it has occurred.  That is all.  I

20   don't know if it is -- ultimately, you know, somebody else may

21   tell me something different later on.

22           But for purposes of our conversation today, I will

23   accept it.  And I certainly note that there is also a request

24   on the part of Dominion for me to do more and that they have

25   filed -- in the way they filed it.  And I don't -- I don't

1    understand any of that necessarily.

2         But -- and I also just note finally in this

3    connection that the State -- that the board for the Secretary

4    of State's office has also requested that I declassify

5    everything basically and put that request on the docket.  So I

6    don't even know what has, you know, necessarily been precisely

7    shared with all of the members of the board.

8         But that said, I do understand why counsel believes

9    that they need at least as to designate Ms. Marks for the

10   purpose of -- as a consultant.  And I don't see anything still

11   under the protective order at this juncture that would preclude

12   that.

13        And I think I was very careful, and I spent

14   unfortunately a significant part of last -- the prior

15   weekend -- not this last one but the one before then, which for

16   us we had a -- we nominally had a holiday on Monday that I

17   spent a good deal of time on this case just trying to look at

18   all of the documents and think about them and also not to

19   mention the other issues that were flaring up between Mr. Cross

20   and opposing -- Ms. Latham's counsel.

21        But, you know, if there is -- to me, the real issue

22   at this juncture is as we have evolved -- as things have

23   evolved, I think that Ms. Marks should be allowed to be

24   designated as a consultant.  I'm not saying she's an expert or

25   anything else.  But she should be able to be designated as a

1    consultant because she clearly is that in reality.  And it is

2    hobbling in the efficient presentation of this matter and

3    disputes.  And I don't want to have to spend as much time as I

4    have already going through AEO stuff in the future.  And that

5    is -- it doesn't make sense.

6          There may be something that comes up that is --

7    absolutely that you feel so strongly about you want to have a

8    conversation with counsel -- between counsel about and you try

9    to work that out and talk with me about it.

10          But the sort of things I was trying to look at at

11    this point doesn't -- it just doesn't really make sense.  And

12    we're dancing on the head of a pin.

13          Truthfully I think some of the concerns are still

14    because obviously Ms. Marks and other plaintiffs believe that

15    it is their public mission as well to raise these issues in the

16    public sphere.  And I understand that part of their role.

17          But if -- by accepting -- by agreeing to --

18    functioning as a consultant, there has to be a much -- there

19    has to be an understanding on the part of plaintiffs' counsel

20    that they have a greater responsibility for communicating, that

21    this doesn't mean that because she's -- that Ms. Marks is a

22    consultant that she has the same free range of public

23    communication about matters that might be deemed confidential.

24          So it actually in some ways puts some greater

25    responsibility on counsel's part to be really talking about

1    that with their consultant.

2            MR. BROWN:  Yes, Your Honor.  This is Bruce Brown,

3    Your Honor.

4            The point that it puts pressure on counsel is very

5    well taken.  And it puts the responsibility on counsel to make

6    sure that notwithstanding that the documents are shared with

7    the consultant or are confidential that we have to turn very

8    sharp corners when it comes to releasing things to the public.

9    And that distinction we have always honored, and we will

10   continue to do so very carefully.

11           THE COURT:  All right.  I mean, I'm just saying to

12   you, you know, we could be -- instead of having disputes about

13   AEO, we could end up having very other nasty -- very nasty

14   disputes here about -- and I really want to avoid that.

15           MR. BROWN:  Right.

16           THE COURT:  And I completely understand that the

17   plaintiffs' view -- in the plaintiffs' view, Ms. Marks is the

18   most knowledgeable person in terms of election operations

19   nationally and in the state that they have easily available to

20   them.  And I respect that expertise.

21           But there really is -- there has to be some judgment

22   applied as to just willy-nilly sending things out into the

23   digital and news stratosphere, even if they are public issues.

24   Things are going to be made public ultimately, no matter what.

25           But, you know, whether that is at a hearing, that is

```
 1   one thing.  But there are things that I -- I'm going to be --
 2   you are going to have a very unhappy judge if appropriate
 3   judgment is not used on an everyday basis in this connection.
 4            MR. TYSON:  Your Honor, this is Bryan Tyson.
 5            Just to clarify, I mean, maybe we could all have an
 6   agreement that at least before we release anything to the press
 7   the parties have a chance to look at it.  I think that may go a
 8   long way.  I think that is what you were saying.  But I just
 9   think making that explicit would be helpful.
10            THE COURT:  Well, part of -- I mean, I guess anything
11   is probably too broad of a statement.  That is the thing.
12            MR. TYSON:  That is a good point.
13            THE COURT:  That is a very broad statement.  So I
14   think --
15            MR. TYSON:  Third-party discovery maybe.  Yeah.
16            MR. BROWN:  Well, the --
17            THE COURT:  Go ahead.
18            MR. BROWN:  I mean, the -- this is Bruce Brown.  The
19   protective order gives the State the opportunity to designate
20   as confidential information produced by third parties.  Now,
21   there is a time issue in that they need to work quick.  And
22   sometimes they don't.  But I would think --
23            MR. TYSON:  Sometimes we don't get it until after the
24   press has it.  That is hard for us to designate it.
25            MR. BROWN:  Right.  I mean, these are documents that
```

1    they all are not kept by the State confidential.  It is odd

2    that the State would even have the opportunity to so designate

3    them because they are documents that the person who holds them

4    has decided are not confidential.  So that is the category of

5    documents that you're talking about.  And with respect to that

6    category, it is unusual that the State would be able to reach

7    into the public domain and stamp as confidential documents in

8    any event.  So I think the protective order handles that.

9            In terms of speaking with the press, I think that the

10   State needs to be careful what controls are made in that the

11   last time I checked their clients are also very active in the

12   press and very good at it.  Mr. Sterling and the Secretary and

13   Judge Duffey have been active in public and in the press

14   discussing the Coffee County incident, the investigation, the

15   implications of the Halderman report, all of those issues.

16           And there are very few topics, if any, that Ms. Marks

17   has ever talked about in public that have not also been

18   discussed by the defendants as well.

19           THE COURT:  All right.

20           MR. BROWN:  That doesn't mean it is -- I mean,

21   judgment needs to be done independently of what the State does.

22   And we don't ever take the position that just because the State

23   did something that it is okay for us too.  But I just point

24   that out as a -- to give some perspective on it.

25           Thank you.

1          THE COURT:  All right.  Here is my suggestion to you.

2    I'm not going to touch this issue about, you know, what --

3    trying to define it more at the moment.  It is something

4    you-all could talk -- try to talk through some what your

5    greatest concerns are.  And there are obviously lots of things

6    that the media and others publicize and investigate that may

7    come to your -- your client's attention that you want -- you

8    might want to do one thing or another with, which might, in

9    fact, you can't do.

10          But I don't -- I think I could be here a long time

11   and not be able to resolve this.  So I mean, I think you really

12   have to sort of try to -- and you don't -- all don't want to be

13   talking about every document that comes to your attention.

14   You'll go crazy, and then you'll end up having disputes.  And

15   then you will be having to deal with this day in and day out

16   with me.

17          So I don't think that that necessarily is a totally

18   viable solution.  But you ought to have something that is a --

19   kind of some agreement as to a red light circumstance where you

20   pause and say -- and that you are -- that you'll talk about it

21   before you -- somebody rushes to publicize something.

22          But I don't know what that is at this juncture.

23   And -- and I think you need to work that out perhaps some more

24   and talk about it and caucus among yourselves.

25          For now, my only -- my main directive is that

```
1    counsel -- I hold counsel responsible for making this
2    designation.  And that is not to be negative in any fashion
3    about your client.  A talented person.  But it is just simply
4    to say that it is a delicate balance here that we have.  And we
5    want to -- the public has a vital interest in everything that
6    relates to elections and the operation of our system.
7              And at the same time, we have had lots of -- over the
8    last number of years, an enormous amount of -- nationwide of
9    misrepresentations and issues.  So I don't want to in any way
10   encourage false information from -- also from being presented.
11             So I'm not saying anyone here is doing that in any
12   way.  But -- and the State has an absolute right and obligation
13   to conduct its own investigation in a way that is effective.
14   And often that does require complete confidentiality.
15             MR. CROSS:  Your Honor, this is David Cross.
16             THE COURT:  But --
17             MR. CROSS:  Oh, sorry.
18             THE COURT:  No.  That is it.
19             MR. CROSS:  I was just going to say there were a
20   couple of other discrete discovery issues we wanted to raise.
21   And I don't know if this is --
22             THE COURT:  That is fine.  That is as much as I can
23   say about this one as it is.
24             I had a few others myself.  Go ahead.
25             MR. CROSS:  Do you want me to go ahead, Your Honor?
```

1          THE COURT:  Go ahead.

2          MR. CROSS:  Two discrete issues.  One I think might

3    be easily dealt with, so I'll start with that.

4          One of the documents Your Honor reviewed in camera

5    and ordered produced was a report on the Coffee County

6    investigation that was opened in December of 2020.  It is an

7    investigation that concerned things like public exposure of a

8    password dealing with a YouTube video and a couple of other

9    complaints.

10          That document included a number of exhibits.  Your

11    Honor might recall that we came to you before the 30(b)(6) and

12    raised the issue over those exhibits.  And Your Honor ordered

13    some of the exhibits produced and not others.

14          One of the ones that Your Honor withheld was what we

15    understand to be a real short declaration from Misty Hampton.

16    In the deposition, the 30(b)(6), Mr. Sterling testified that he

17    reviewed that in preparation -- the declaration he reviewed in

18    preparation for his deposition.  And he spoke a little bit

19    about the content.

20          I don't know if that is confidential.  So I won't

21    describe it here.

22          THE COURT:  All right.

23          MR. CROSS:  But as we understand it, it is very

24    short.  It is a couple of sentences.  And when we met and

25    conferred -- and Bryan will correct me if I'm wrong -- it

1   sounded like the State doesn't necessarily have a problem

2   disclosing that declaration to us since Mr. Sterling relied on

3   it for his testimony but since you had withheld it --

4           THE COURT:   No.   If he talked about it, then you

5   can -- I'll allow its disclosure on a confidential basis.

6           MR. CROSS:   Okay.

7           MR. TYSON:   This is Bryan Tyson.   Thank you, Your

8   Honor.   That resolves the issue.   Mr. Cross accurately

9   characterized what we talked about.   So thank you.

10          MR. CROSS:   The other discovery issue was the

11  30(b)(6).   One of the things we raised going into the

12  deposition maybe a week or so in advance was that we wanted to

13  make sure that Mr. Sterling would be prepared to talk about the

14  knowledge of the Secretary's office regarding the equipment

15  that had been taken from Coffee County.   And we reached an

16  agreement that he would be prepared to speak on that subject.

17          When we got in, he had some insight on that subject.

18  By our measure, not much.   Again, there are specific things I

19  won't raise on this call.   But there were a variety of

20  particular questions we asked based on, for example, what our

21  own experts have seen on that data, what they found.   He was

22  not aware of those things.

23          And when we asked him the questions, he would simply

24  acknowledge that he had no information about that.   For his

25  prep, he did not speak with Mr. Persinger.   As I understood --

1   and I went back to look at the testimony to confirm.

2           As I understood his testimony, he did not speak with

3   the consultant that they are -- the Secretary's office it

4   sounds like is largely relying on to examine that equipment.

5   Mr. Sterling did not speak with him in preparation for his

6   testimony specifically.  He certainly has had some

7   conversations with him in the past.

8           It sounded like he may have had some conversation

9   with Mr. Persinger about the Poll Pads in particular.  I wasn't

10  clear if that was for the deposition or just in the ordinary

11  course.  But that was the only specific equipment that he

12  identified that he had spoken with Mr. Persinger about.

13          And so we just didn't have an opportunity to learn

14  what we think are important facts about that equipment, changes

15  to that equipment, what is on that equipment, what might not be

16  on that equipment.

17          And that is really a critical component of our case.

18  And it is important in a couple of respects.  One --

19          THE COURT:  Let me cut you off right now.

20          MR. CROSS:  Sure.

21          THE COURT:  Did you-all discuss how to proceed in

22  light of that to continue the -- I know that Mr. Sterling is

23  enormously busy at this time of year.  And this was sort of a

24  drop-dead week.

25          So I would like to hear from the State's counsel what

1    do you propose to do in light of this, if he wasn't -- if

2    Mr. Sterling wasn't, in fact, prepared to address these issues?

3              MR. TYSON:  Yes, Your Honor.  This is Bryan Tyson.

4    So we obviously -- not surprisingly, I think we're going to

5    disagree about the scope of Mr. Sterling's preparation.  The

6    information from Mr. Persinger was both work product and

7    investigative privilege.

8              Mr. Cross first asked his questions about assuming

9    certain facts is as far as I'll go about the server and about

10   the equipment.  Those drew objection.  David is correct that

11   Mr. Sterling -- that he didn't know the answer to some of

12   those.  But that was from our perspective because it was

13   assuming facts that are not correct.  And Mr. Cross and I

14   discussed we have a disagreement between our experts.  Our

15   expert regarding, you know, what the situation with that

16   equipment is.

17             So from our perspective, Number 1, I think we would

18   (unintelligible) work product and investigative privilege

19   problems if we educated Mr. Sterling on work product, which I

20   don't think we have an obligation to do for a 30(b)(6) and put

21   him back up.

22             The other challenge is it is some very technical

23   things that the plaintiffs' experts are saying they have found.

24   Our expert disagrees about that.  And so it almost -- and I

25   don't know what the answer is at this point.

1          But it almost seems like what Mr. Cross is

2     anticipating is either a spoliation motion alleging some sort

3     of interference with the equipment, which could be supported by

4     a declaration, or some sort of -- or another round of expert

5     reports, which I don't think anybody wants to do.  But I don't

6     know otherwise how we would approach it.

7          I don't think simply restarting the 30(b)(6) of

8     Mr. Sterling, having talked to Mr. Persinger on information

9     covered by work product, is going to help us get to where we

10    need to get to the extent any of that is even relevant to the

11    claims here.

12         I know we discussed that previously.  But that is

13    kind of our view on kind of where we are on those pieces of

14    equipment.

15         MR. CROSS:  Your Honor, this is David.  I think

16    Mr. Tyson crystallizes the dispute well.  I think there is not

17    a dispute between us that Mr. Sterling did not have sort of the

18    depth of factual information about the equipment that we

19    thought he would have going in, based on the agreement that he

20    would have the Secretary's knowledge on that equipment.

21         The dispute comes over what level of information he

22    should have and they should disclose.  And that comes down to

23    two arguments:  Work product, investigative privilege.

24         The work product one is not an absolute bar to facts.

25    And I don't think just because they have decided to have an

1    outside consultant do this as opposed to someone who works

2    within the office where there would be no work product

3    argument -- I think that should not prohibit us from getting

4    important facts.

5         And the disagreement here really highlights why this

6    is important.  Again, I won't get into the specifics.  But, you

7    know, our experts can see that something was changed in -- no

8    specifics.  But something was changed from the original EMS

9    server.  And that is something we need to understand.  It is

10   not spoliation or an interference issue.  Frankly, I haven't

11   thought about it from that dimension at all.

12        It is more that we need to know if a change was made,

13   why it was made, what the implications are if it has for the

14   data that is lost when that change is made.  And we can see

15   that change was made sometime this year.

16        And, you know, the other thing that I think we have

17   also conveyed to the State is Mr. Persinger himself is part of

18   the source of this.  Because when our consultant went in to

19   copy the drives, Mr. Persinger shared with our consultant that

20   he had made this change at the direction of the Secretary's

21   office.  And that is reflected in the emails that our

22   consultant sent him.

23        And so it is not clear to us why there now is a

24   different position on the other side.  But that is the whole

25   point of the deposition -- right? -- is to have a witness,

1    whether it is Mr. Sterling or someone else, who can speak

2    knowledgeably about that equipment; what has been done with it;

3    if there wasn't a change, why are we seeing what we are seeing;

4    why did Mr. Persinger say what he said.  So it is

5    understanding, you know -- even to the level of things like,

6    was malware found on it?  Was that looked for?  These are the

7    types of questions that Mr. Sterling couldn't really answer.

8              THE COURT:  Well, is there a -- Mr. Tyson, is

9    there --

10             MR. TYSON:  Yes.

11             THE COURT:  Isn't there somebody in the -- at very

12   minimum in the Secretary of State's office who is the head of

13   technology who would have been involved with this who could

14   speak at least to some of their issues without affecting work

15   product -- attorney work product?

16             MR. TYSON:  Your Honor, again, this is Bryan Tyson.

17             The short answer is the analysis that was done was by

18   our consulting expert in this litigation.  Mr. Sterling did

19   share a lot of information about the Coffee County equipment.

20             But I think -- I talked to Mr. Persinger again

21   yesterday afternoon after Mr. Cross and I spoke yesterday

22   morning.  And Mr. Persinger strongly disputes that changes were

23   made -- the specific things that have been said here regarding

24   the equipment.

25             But I think we're at a more fundamental level in some

1    ways of a disagreement between the experts.  Mr. Sterling

2    testified about what the Secretary's office knew about various

3    pieces of equipment.  The plaintiff has images that were

4    provided by Mr. Persinger who has worked extensively with the

5    GBI over the years on a lot of different cases.

6             And if there were specific things they need to

7    understand, they have the images and can look at that.  So I

8    think we're at a difficult impasse in that the expertise

9    required here is really the forensic expertise and imaging.

10   And it really is Mr. Persinger, our consulting expert, who has

11   done that work and has now handed that to the GBI.  And so I

12   don't have anybody else from the Secretary's office involved --

13            THE COURT:  Are you expecting an affidavit from

14   Mr. Persinger -- to be offering one in this case?

15            MR. TYSON:  Your Honor, I think we would be open to

16   that.  But I think it might need to be -- Mr. Cross' expert may

17   need to say what he is alleging specifically.  And then maybe

18   we could have Mr. Persinger respond specifically to that.

19            Because as of right now, it is still very general,

20   not even -- even more at a specific level than we can share on

21   this call, it is still a very general allegation with nothing

22   specific from us aside from one piece of it, which

23   Mr. Persinger strongly disagrees with based on my conversation

24   with him.

25            MR. CROSS:  In the deposition, Your Honor, one of the

1   questions I asked was about a specific file.  And our experts

2   can see that there are specific --

3             THE COURT:  All right.  Well, I don't want to go

4   into -- more into this right at this moment.

5             MR. CROSS:  Right.  And I wasn't going to get into

6   specifics.  But there is specificity that we have provided.  We

7   can provide more, if it is needed.

8             THE COURT:  Well, one way of doing this is for -- it

9   seems to me is that you delineate the question that you have,

10  what you have seen, what is -- and -- what the specific

11  question is or what the observation is and what -- and ask and

12  see.  And then the State with its expert should be able to

13  respond.

14            And if there is something that they can't -- say they

15  won't respond to, then you can come back to me and we can all

16  discuss is it really work product or is it really, in fact,

17  facts that need to be -- share facts.

18            But not -- you know, I think that would be the most

19  straightforward way, it seems to me, of proceeding right now.

20  And maybe there is --

21            MR. CROSS:  That is fine, Your Honor.

22            THE COURT:  Okay.

23            MR. CROSS:  We can do that.  The only thing I will

24  say is that there are specific questions that we can come back

25  to in the transcript to the extent we need to crystallize --

1          THE COURT:  Well, you can reference that in your
2    question.  It was discussed at whatever the page is.  And then
3    present the question again or the discussion again.
4          MR. CROSS:  We'll do that.
5          THE COURT:  And then --
6          MR. CROSS:  I definitely -- oh, go ahead.  I'm sorry.
7          THE COURT:  And I don't know how much time -- you
8    know, when you will be able to get that to the -- to counsel
9    for the defendants.
10         But I assume you could do that in the next week.
11         MR. CROSS:  I think we can probably do that this
12   week.  I need to ask -- check with our experts.  Certainly no
13   later than Monday, if the State could respond -- if a week
14   would be fair.
15         THE COURT:  I would think so because it is --
16   obviously it is not apparently going to be Mr. Sterling who is
17   doing the response, so --
18         MR. TYSON:  Your Honor, this is Bryan Tyson.  I think
19   the answer is a week makes sense.  The only thing is I need to
20   check with Mr. Persinger.
21         Sometimes he will be testifying at trials on forensic
22   issues that may interfere with his schedule.  But barring that,
23   which I don't believe he has any coming up, I think a week
24   should be sufficient for us to respond.
25         THE COURT:  Okay.

```
1              All right.  Was there something else?

2              MR. CROSS:  The only other two issues that I was just

3    going to present quickly to Your Honor -- I know Your Honor

4    does not want to address unsealing of the Halderman or MITRE

5    report.  I'm not going to get into that.

6              I did want to flag one issue, which we raised in our

7    brief in response to the Dominion filing, which is we do have

8    an ongoing concern with the fact that the Halderman report was

9    shared with MITRE.

10             And one of the things we have asked is that we get a

11   complete disclosure from Dominion on who all they shared it

12   with and what has been done with it.

13             One of the reasons we have a concern about that is

14   the MITRE report itself, as I recall -- and I just tried to

15   pull it up.  But I don't have it in front of me.  But I think

16   the MITRE report itself says on it for like public disclosure

17   or language to that effect.  But it quotes extensively from the

18   sealed report.

19             THE COURT:  I know.

20             MR. CROSS:  So we did want to come back to that.

21   Because I didn't want to have that request just kind of get

22   lost as Your Honor was sort of suspending dealing with the

23   broader issue.

24             Because we do think all the parties and the Court

25   need to understand who all has this report.  And we have
```

1    learned, like I said before, that one or more of the defendants

2    in the defamation litigation got it pursuant to court order

3    there.  We just recently learned that.

4          So it would be nice if we could get some directive

5    for Dominion to provide.  As the State has explained before, my

6    understanding is Dominion is the State's agent.  So maybe that

7    is a way to get at it.

8          But we do think we need a full disclosure of who all

9    has this report.

10          THE COURT:  Mr. Tyson, do you have any objection to

11    that?  I mean, Dominion was given it as your agent.  And I

12    don't know why they felt free to move on to the next step.

13          But that is -- I think at least we ought to know from

14    Dominion who they provided it to.

15          MR. TYSON:  Your Honor, the information about the

16    defamation case is something I'm learning as Mr. Cross is

17    saying it.  I wasn't aware of that.

18          I'm happy to ask Mr. Maguire or others from

19    Dominion -- and I don't know why they wouldn't be willing to

20    provide that.  But I am happy to make that request certainly.

21          THE COURT:  Okay.  I mean, the problem is, of course,

22    Dominion is not a party here.  And they made a request.  And,

23    you know, I've already made my decision clear on this.

24          And I hope that, Mr. Tyson, when you talk with -- I

25    mean, Dominion is still under contract with the State.  And I

```
1    well understand that they have a vital interest in this.
2              But the election and any runoffs are not so far away.
3    And their lawsuit and whatever the trial will be in the
4    Dominion litigation, it is also -- it will be after the
5    election.  So I just -- I don't know why they felt that liberty
6    to do this.
7              But that is -- I would be very appreciative if you
8    would share with them my strong concern as well.  I would like
9    to know who they gave it to --
10             MR. TYSON:  Certainly, Your Honor.
11             THE COURT:  -- and what the provisions were.  The
12   State --
13             MR. TYSON:  Yes, Your Honor.
14             THE COURT:  If the case -- the court handling the
15   defamation case has ordered it and authorized it, that is --
16   then we ought to know what the scope of that authorization was.
17             MR. TYSON:  Certainly, Your Honor.  We'll pass that
18   along with your sentiments and comments exactly.
19             THE COURT:  All right.  Because we've had all of this
20   going on, I would like to understand where we are on our
21   schedule, which is being as usual shredded to pieces.
22             But as a preliminary matter, is everything basically
23   resolved in the Curling plaintiffs' interactions with
24   Ms. Latham's counsel?  Have you gotten everything you wanted to
25   get?
```

```
 1              MR. CROSS:  Your Honor, this is David Cross.

 2              THE COURT:  Yes.

 3              MR. CROSS:  Unfortunately, no.  We are trying really

 4    hard not to come back to the Court on that.  We tend to have

 5    really cordial and productive phone calls.  And then we get

 6    follow-up emails that say we are not getting what was agreed.

 7    So we're trying to work our way through that.

 8              We're going to give it one more go, and we'll be back

 9    to the Court if we need to.

10              THE COURT:  Other than the matters we have discussed

11    today, is there anything else that is outstanding?

12              MR. BROWN:  Your Honor, this is Bruce Brown.

13              THE COURT:  Can you speak up again, Mr. Brown?  You

14    got --

15              MR. BROWN:  Yes.  Is that better?

16              THE COURT:  Much better.

17              MR. BROWN:  Hello?

18              THE COURT:  Yes.  We hear you now.

19              MR. BROWN:  Okay.  Thanks.  Sorry about that.

20              From our perspective, certainly in terms of the

21    schedule and the deadline for motions for summary judgment, we

22    are comfortable with a hard date, which is, say, mid-November

23    and the reason -- rather than it being continued to be pushed

24    off with efforts to clean up the discovery that we are trying

25    to get resolved.
```

```
1              Because if the summary judgment deadline keeps on
2    getting pushed off by our efforts to, for example, personally
3    serve Scott Hall, then we're not going to have summary
4    judgment.  We'll never get a schedule.
5              So we're comfortable with the summary judgment
6    deadline.  And we'll work as best as we can to complete the
7    discovery that was initiated within Your Honor's initial Coffee
8    County discovery exception.
9              And we're, frankly, having difficulty tagging some of
10   those people.  We have a -- but we're not seeking any relief
11   from you with respect to those issues.  And we'll continue
12   doing our best to try to capture that evidence.
13             THE COURT:  So when you say mid --
14             MR. TYSON:  Your Honor, this is Bryan Tyson.
15             THE COURT:  Go ahead, Mr. Tyson.
16             MR. TYSON:  I'm sorry.  I just want to make sure I
17   understood what Mr. Brown was saying.  My understanding was
18   there is still like a motion to compel pending in Florida about
19   Mr. Maggio or Mr. Logan.  I can't remember which one is there.
20             And it sounded like he was saying we would keep
21   completing discovery while we're briefing summary judgment.  I
22   just -- I've been trying to figure out how that would exactly
23   work if we're briefing summary judgment when they get
24   additional documents in from somebody and how we would deal
25   with that.
```

```
 1              (Unintelligible cross-talk)

 2         MR. TYSON:  I agree that I want it to be sooner

 3    rather than later.  But that is all.

 4         MR. BROWN:  I mean -- yes.  Specifically, we do have

 5    a motion pending in the Middle District of Florida in front

 6    Judge Jung compelling Mr. Logan to produce documents.  That is

 7    the Cyber Ninja founder Doug Logan.  And we're continuing to

 8    try to tag Cruce, C-R-U-C-E, and Lenberg with subpoenas for

 9    their deposition testimony.

10         In terms of straggling evidence coming in, that's

11    covered by Rule 56(f) -- or maybe it is now (g).  It got

12    renumbered -- dealing with a party's inability to respond to a

13    motion for summary judgment because they can't get an affidavit

14    from somebody.  So I think the rules are flexible and pragmatic

15    enough to cover late-arriving evidence.

16         And I don't think we're talking about any evidence

17    that the State is seeking, for example.  I don't think they are

18    doing any discovery right now.  So it is just limited to our

19    ability to support or to support either filing or responding to

20    a motion for summary judgment.  And our judgment is that it is

21    better to go ahead and keep -- you know, put a schedule in

22    place, put a stake in the ground and keep moving.

23         THE COURT:  When you said November -- mid-November,

24    you are saying is that -- you are saying that would be the due

25    date for the State -- the defendants' motion or --
```

1    MR. BROWN:  Mr. Cross, I'll let you speak to that.

2    But I would think it would be either side.

3    THE COURT:  Well, obviously if you are all filing a

4    motion for summary judgment.  But you are all the ones who

5    wanted to just have a trial.

6    All right.  So I don't -- you know, I don't know that

7    there's cross-motions at issue here.  But whatever.

8    Is that -- the date for anyone moving for summary

9    judgment would be November -- mid-November?  Is that what you

10   are proposing?

11   MR. BROWN:  Yes, Your Honor.

12   MR. CROSS:  That is fine with Curling, Your Honor.

13   MR. TYSON:  Your Honor, this is Bryan Tyson for the

14   State defendants.  Normally I would say that is fine, and I

15   want to have summary judgment sooner rather than later.

16   My only hesitancy is we have a track record of an

17   election on November 8th with a lot of litigation in a very

18   short period of time and especially if we have a four-week

19   runoff like we do now.  My only hesitancy is taking that when

20   essentially we're just wrapping up the discovery that we had

21   talked about 45 days until summary judgment motions.

22   I guess my other concern with Mr. Brown's kind of

23   proposal under 56(d) as in dog is that kind of resolution as if

24   the non-movant says I can't get evidence the resolutions and

25   the rule are the court can defer consideration, allow time to

1    get evidence, or issue other appropriate orders, which I felt

2    like we were kind of doing that already.  So I just wouldn't

3    want to get us in a situation where we end up with further

4    delays under the circumstances.

5            So my thought is, you know, late November, early

6    December might be a better timeline to stick to, the 45 days we

7    had discussed.  And that gets us through at least the initial

8    kind of post election, if anything happens.  And we hope

9    nothing does.  But we are hoping for that.

10            THE COURT:  Yeah.

11            MR. CROSS:  Your Honor, this is David Cross.  I hate

12    to throw a wrench in the works here.  I have a four-week trial

13    starting November 28th.  So getting a brief late November from

14    the other side or December would be pretty tough.

15            THE COURT:  You have a four-week trial?  Is that what

16    you said?

17            MR. CROSS:  I do, Your Honor.  The judge may cut it

18    down to three, but it is going to be a multi-week trial.

19            THE COURT:  I'm just looking at the schedule because

20    that is the day after Thanksgiving.

21            MR. CROSS:  Right.  Exactly right.  That's what our

22    client said when we told them.

23            THE COURT:  And running up to -- the fourth week

24    would be the week culminating in New Year's Eve.

25            MR. CROSS:  Right.  That is exactly right.  Yeah.  My

1    hope is it is going to be more like two to three weeks.  But

2    the ask right now from the parties, I think, is four weeks.

3                But in any event, I understand Mr. Tyson's concerns

4    that, you know, we got really close to summary judgment filing

5    earlier this spring.  There has obviously been a lot of new

6    developments.  But we're -- you know, that would give them a

7    full month if we were in mid November to --

8                THE COURT:  Well, the problem really is it is hard to

9    imagine there won't be some litigation.  I'm just being

10   realistic.  What the nature of it is I don't know.  But that is

11   the way of the world these days.

12               And the election is the 1st?

13               MR. TYSON:  November 8th, Your Honor, and the runoff

14   would be on December the 6th, if a runoff is necessary, which

15   I'm afraid looks likely from the polling at the moment.

16               THE COURT:  Yeah.  I think not knowing whether it is

17   realistic that the plaintiffs are actually going to be filing

18   their own motion for summary judgment and I'm not going to -- I

19   have no idea.

20               But are you saying then -- are defendants wanting --

21   did you say the 5th, the 12th?  What are you saying then?

22   Because obviously the -- with the election being the 8th, that

23   basically takes you into the end of December -- I mean, to the

24   week of the 5th.

25               But, of course, I mean, much of it would probably be

1    resolved in the first two or three weeks before Thanksgiving.

2          MR. TYSON:  Yes, Your Honor.

3          THE COURT:  That doesn't take care of -- I realize

4    you could have a runoff in the senate race.  Such is life.

5          MR. TYSON:  Certainly, Your Honor.  This is Bryan

6    Tyson.

7          I guess the thing -- I guess my thought is I feel

8    like we're kind of talking about two different things at the

9    moment.  We obviously have the election schedule to contend

10   with.  But I appreciate (unintelligible) Your Honor.  I think

11   there is no way to avoid litigation unless maybe there's a

12   blowout election, which I don't think happens any more in

13   Georgia.

14         But I think the other thing is:  If we still have

15   discovery hanging out there like are we going to pick an end

16   date for whenever we're finally going to get whatever -- are we

17   going to get anything from Logan or Maggio or Hall or anybody

18   else?

19         Because I am just anticipating if we pick, like, say

20   December 5th or 12th and then the response is, oh, we haven't

21   gotten the data from Maggio and Logan and so we need to wait a

22   few more months for that, then we have kind of rushed for no

23   purpose, I guess.

24         And so I'm just trying to think through -- I don't

25   know the answer to this.  I'm just trying to think through

```
 1    logistically what makes the most sense of how to handle that.
 2            MR. CROSS:  Your Honor, this is David Cross.  I
 3    wonder if maybe the way to do it is if we just set
 4    November 15th as a deadline for dispositive motions.  Everybody
 5    works towards that date.  But if we get close and there is an
 6    election issue, for example, where the State needs more time or
 7    there is some sort of outstanding discovery -- I can say from
 8    my group of clients I do not anticipate right now -- I mean, I
 9    obviously can't entirely predict the future.
10            But I do not anticipate our response being to a
11    summary judgment motion from the State that there is more
12    discovery we need.  The stuff that is outstanding, whether it
13    is Logan, Ms. Latham -- we have got some documents from her, a
14    small set.  There may be more coming.
15            But I think we'll get that resolved certainly between
16    now and then since it sounds like it is really maybe only the
17    Logan piece and I think one other thing.  There was something
18    else that Bruce mentioned.
19            That is not going to be a basis for us to say we
20    need -- we're not ready to respond.  So if we pick the 15th,
21    everybody works towards that, whether there are circumstances
22    that arise --
23            THE COURT:  All right.  I don't understand --
24    frankly, I think you are being a little cagey with me.
25            If the plaintiffs are going to be filing a motion for
```

1    summary judgment, I need to know.  I can't resolve this without

2    knowing that.  I mean, if it is -- you are just -- you want to

3    be available on a high-level, which I understand, for

4    responding to one and you need a few -- then that is a

5    different thing.  And I don't need to know that today.  But I

6    need to know it.  Because, obviously, you can't be -- if -- be

7    working on a response to the motion for summary judgment if it

8    is filed in December while you are in trial.

9            But I'm not sure what you can do, frankly, the week

10   or two before trial if it is actually a significant case

11   either.

12           So -- but it doesn't help me to resolve this if I

13   don't have any idea of whether the plaintiffs are thinking that

14   you're filing a motion also.

15           MR. CROSS:  Absolutely, Your Honor.  Sorry.  I don't

16   mean to be cagey.  We don't have a decision on that.  The

17   candid question is we are thinking about it.  It is something

18   that we're looking at.  But I don't yet know.

19           I mean, I think as I mentioned once before in a

20   hearing, I do think we could have a compelling summary judgment

21   motion of our own.  I think Your Honor could decide this in our

22   favor without a trial on the record under the summary judgment

23   standard.

24           THE COURT:  But the thing is -- the point is really

25   this though.  All right.  You can -- I don't have to make a

1    decision at this moment.  I will make a decision imminently.

2            But relative to this issue -- all of these issues, if

3    the motion, for instance, was due on Monday -- on Monday the

4    5th of December, I don't see how -- and you are not filing it,

5    then I don't see how you are damaged.  And you have able extra

6    counsel.

7            So if you basically yourselves have been working all

8    of October and November, you'll be ready, even if you are in

9    trial.  If you are not going to be filing a motion, you know,

10   I'm going to obviously give you some extra time through

11   January.  Between the trial and the Christmas holidays, it is

12   just unrealistic.  There is only so much that people can do.

13           MR. CROSS:  That's fair, Your Honor.  I understand

14   that.  That is fair.

15           THE COURT:  So you can -- I mean, I could set it that

16   way right now as the placeholder because it gives you plenty of

17   time -- I can't control when another judge is going to issue a

18   ruling on your motion.  And obviously you can get the -- you

19   can write the Court and indicate what the schedule is here so

20   that they know.  But --

21           MR. CROSS:  My two cents, Your Honor, is I would

22   rather have a hard date.  And if December 5th is the date that

23   Your Honor thinks is fair and works for the State and everyone

24   else, that is fine.  We will make that work.

25           MR. BELINFANTE:  Your Honor --

```
 1              THE COURT:  Is that date viable for --

 2              MR. BELINFANTE:  Go ahead, Your Honor.  I didn't

 3   realize you were still speaking.  This is Josh Belinfante.

 4              THE COURT:  No.  I just was asking:  Is that viable

 5   for the State?

 6              MR. BELINFANTE:  What I was -- if I may, Your Honor,

 7   suggest -- and we have done this in other cases as well.

 8   Perhaps if we had until Monday to present the Court with a

 9   proposed scheduling order -- and it could be that we have

10   competing ones, and then the Court would decide.  But I think

11   that would give us all time to think through the issues that

12   have been raised here.

13              THE COURT:  That is fine.  That is fine.

14              MR. CROSS:  That is a good idea.  That is a good

15   idea.  Thanks, Josh.

16              THE COURT:  Okay.  Is there anything else that anyone

17   has on their list?

18              MR. CROSS:  Not for Curling, Your Honor.

19              MR. BROWN:  Not from the Coalition, Your Honor.

20   Thank you.

21              MR. TYSON:  Not from the State defendants, Your

22   Honor.  Thank you.

23              THE COURT:  Mr. Tyson, I would request you advise --

24   basically talk with your client about the board's request that

25   they, you know, had you independently file their motion and say
```

1    I appreciate their concern but I haven't changed my position in

2    this regard at this time.  But -- and -- but appreciate the

3    sentiment and their focus on this, but I'm not prepared to

4    change my position at this time.

5            MR. TYSON:  Certainly, Your Honor, I'll definitely

6    pass that along.  And thank you.

7            THE COURT:  Do we have a -- can you give us a time

8    frame for also when you are going to get back to us regarding

9    the Dominion matter as to the sharing of the -- who they shared

10   the information with?

11           MR. TYSON:  Yes, Your Honor.  My next call after this

12   is to Mr. Maguire to try to get on that right now.  So I'll try

13   to get that moving as quickly as I can.

14           THE COURT:  And if there is a court order, I would

15   like you -- that you will share that as well.

16           MR. TYSON:  Certainly.

17           THE COURT:  Okay.  Thank you very much.  Good to talk

18   with you-all.

19           Take care.  Be well.

20           **(The proceedings were thereby concluded at 2:54**

21           **PM.)**

22

23

24

25

56

```
 1                    C E R T I F I C A T E

 2

 3    UNITED STATES OF AMERICA

 4    NORTHERN DISTRICT OF GEORGIA

 5

 6         I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7    the United States District Court, for the Northern District of

 8    Georgia, Atlanta Division, do hereby certify that the foregoing

 9    55 pages constitute a true transcript of proceedings had before

10    the said Court, held in the City of Atlanta, Georgia, in the

11    matter therein stated.

12         In testimony whereof, I hereunto set my hand on this, the

13    20th day of October, 2022.

14

15

16

17                         _____
                           SHANNON R. WELCH, RMR, CRR
18                         OFFICIAL COURT REPORTER
                           UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT