The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

```
1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3

4    DONNA CURLING, ET AL.,              :
                                         :
5            PLAINTIFFS,                 :
     vs.                                 :    DOCKET NUMBER
6                                        :    1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,         :
7                                        :
             DEFENDANTS.                 :
8

9

10       TRANSCRIPT OF STATUS CONFERENCE - REDACTED PROCEEDINGS

11             BEFORE THE HONORABLE AMY TOTENBERG

12            UNITED STATES DISTRICT SENIOR JUDGE

13                      NOVEMBER 15, 2022

14                        2:42 P.M.

15

16

17

18

19

20

21     MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                  TRANSCRIPT PRODUCED BY:

23

     OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                   2394 UNITED STATES COURTHOUSE
                                     75 TED TURNER DRIVE, SOUTHWEST
25                                   ATLANTA, GEORGIA  30303
                                     (404) 215-1383
```

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

      FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
 3    SCHOENBERG:

 4

           DAVID D. CROSS
 5         MORRISON & FOERSTER, LLP

 6         ADAM SPARKS
           KREVOLIN & HORST
 7

 8    FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
      WILLIAM DIGGES, III, AND RICARDO DAVIS:
 9

10         BRUCE P. BROWN
           BRUCE P. BROWN LAW
11

12    FOR THE STATE OF GEORGIA DEFENDANTS:

13

           CAREY A. MILLER
14         JOSH BELINFANTE
           JAVIER PICO PRATS
15         ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC

16         BRYAN TYSON
           DIANE LaROSS
17         BRYAN JACOUTOT
           TAYLOR ENGLISH DUMA
18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

**(Atlanta, Fulton County, Georgia; November 15, 2022.)**

THE COURT:  All right.  So we passed out an agenda.
Did you get that?

MR. CROSS:  Yes.

THE COURT:  Not wanting to deal with Mr. Sterling's
deposition forever, as it came to be, I repeat -- we are on
repeat.

I decided we just needed to go through it -- the last
set of things.  And we tried to synthesize where the disputes
are, what I could do or not do.  So that is what Number 1 is
obviously.

I think everything else is pretty clear.  I do have
now the motion on the summary judgment briefing also from the
defendants.  And I realize I don't have -- that we don't have a
response yet from the plaintiffs.  But we should talk about it
anyway.

And is there anything that y'all want to be sure to
talk about that is not here?

MR. BROWN:  Your Honor, I have two relatively small
issues.  One has to do with your order on the AEO, just a
clarification, and the other --

THE COURT:  My order on the --

MR. BROWN:  On the AEO for Ms. Marks.  And the other
is to discuss just very briefly the Eleventh Circuit remanded

```
 1    the two claims.

 2            THE COURT:  Right.

 3            MR. BROWN:  And so just our proposal for how to work

 4    that into the case now that it is back before you.

 5            THE COURT:  Okay.

 6            MR. CROSS:  Your Honor, I think the only thing we had

 7    was four on the remaining discovery disputes.  We did reach out

 8    to the defendants about supplemental discovery under Rule 26(e)

 9    either yesterday or today.  We just got the request.  We have

10    not heard back yet.

11            THE COURT:  Were you asking something specific, or

12    you were just saying supplement everything in the world?

13            MR. CROSS:  Not everything in the world, Your Honor.

14    It was an outreach to ask whether they intended to supplement

15    under Rule 26(e).  Our hope was to have dialogue about what

16    that would be.

17            The primary focus I think for us -- and Bruce can

18    speak if he has another view -- is really focused on the

19    developments that have come up with Dr. Halderman's report, the

20    CISA advisories, and the Coffee County breach that came to

21    light.

22            So if there are additional documents that we don't

23    yet have but they are on those three kind of key topics, we

24    were looking for that.  And same with discovery responses.

25            For example, to give you one concrete example --
```

```
 1              THE COURT:  Could you do the three -- you went
 2   quickly.  Say it again just simply so I know.  But I don't want
 3   to discuss it now.  I just want to know what is coming.
 4              MR. CROSS:  Sure.  The three key focuses were
 5   Dr. Halderman's report from July of '21, the CISA advisories
 6   from May and June of this year, and then the Coffee County
 7   breach, and whether there is some supplemental discovery that
 8   might be had on those three things in terms of documents we
 9   don't yet have and maybe written discovery responses.  The
10   documents would be the focus.
11              THE COURT:  And have you finished everything with the
12   people you were deposing and had under subpoena?
13              MR. CROSS:  Do you want to speak to that, Bruce?
14              MR. BROWN:  We have depositions tomorrow, Friday,
15   Monday, and Tuesday.  Everybody is under subpoena.  Everybody
16   is showing up.  So we'll be done by the 22nd.
17              THE COURT:  Okay.  Very good.
18              MR. BROWN:  I say everybody is showing up.  Everybody
19   is under subpoena.  Put it that way.  And there is no
20   indication that they will not show up.
21              THE COURT:  All right.  Very good.
22              Well, having spent almost too much time on this
23   question of the Sterling deposition, I've basically tried to
24   figure out which ones I think that should be supplemented and
25   how they should be supplemented.
```

```
1           Generally speaking, I would say though I don't think
2    it is worth going back to another deposition because then we're
3    going to go in a circle again.  I can imagine -- some of these
4    I'm going to just simply say you should have a declaration -- a
5    supplemental declaration from Mr. Persinger or maybe Mr. Barnes
6    or maybe somebody else like that.
7           But that is the -- so where I think it is appropriate
8    that some additional information be provided, it is either
9    counsel can or -- and bind the State or they can identify
10   somebody else who can.  But I just don't think it would be
11   productive to go back to having another deposition with
12   somebody else.
13           MR. CROSS:  Could I briefly speak to that, Your
14   Honor?
15           THE COURT:  Yes.
16           MR. CROSS:  The concern we have with declarations is:
17   When we've gotten declarations, including Mr. Persinger's, they
18   tend to have a lot of inaccuracies.  Mr. Persinger's most
19   recent declaration has very significant inaccuracies that we
20   can talk through today.
21           I'll just give you one example that stands out.  He
22   now acknowledges that he did change the password on the
23   original EMS server.  Your Honor may recall the State
24   defendants on numerous occasions had denied that.  We now have
25   that as an acknowledgment.
```

1        But the consequences of what -- how he describes that

2   in the declaration is he says based on his experience that

3   would only affect a single file.  He does not say that he's

4   actually done the analysis to determine that.  Our experts

5   have.  It has affected about 1400 files, just as a starting

6   point.

7        And we have confirmed that with Dr. Halderman, with

8   Kevin Skoglund who is a similar expert for the Coalition.  We

9   have confirmed that with Rob Draper, who was the person on the

10  ground who did the copying in terms of -- he hasn't done that

11  analysis.  But his reaction to Mr. Persinger's declaration was

12  similar to our forensic experts.

13       What he said was -- and he confirmed with his

14  colleague as well -- anyone with any level of computer science

15  experience would know that by changing the password and by

16  rebooting the system and doing what Mr. Persinger did, it would

17  alter or delete hundreds, if not thousands, of files, just

18  because the way the software works.

19       And so our concern with the declaration is when we do

20  that in this case going back to things like the GEMS and since

21  we get things that tend to be self-serving and not accurate.

22  Depositions and examinations are how we have been able to bring

23  those things to light.

24       And so I would propose, Your Honor, that the best

25  path forward that will be most productive in terms of getting

1    to the facts that will be useful for Your Honor is a brief

2    deposition of Mr. Persinger.

3         He clearly is the most knowledgeable about this

4    equipment, what has been done with it.  But having a dynamic

5    where we can ask questions and push and share information with

6    him that we have is going to be more productive than another

7    static declaration.

8         And that is just one example.  There are others we

9    are prepared to walk through with the declaration that are

10   objectively not accurate.

11        THE COURT:  Tell me whether Mr. Persinger pronounces

12   him name with a hard G or a ja or ga?

13        MR. TYSON:  It is Persinger.

14        THE COURT:  All right.

15        MR. TYSON:  Yes.

16        THE COURT:  Well --

17        MR. TYSON:  Oh, sorry.

18        THE COURT:  -- you are welcome to respond.  But maybe

19   it would be helpful even before we start going through all of

20   this is obviously Mr. Persinger's declaration expressed some

21   very strong views regarding the knowledge and skill level of

22   Mr. Draper.

23        And I don't know anything about Mr. Draper or who the

24   person is he was working with.  You know, this is the first

25   time other than your referencing him that I knew much about him

1  or what his role was.

2         So would you mind telling me who he is and who the --

3  is he your -- working with your folks, or is he working with

4  the Coalition's experts?  What is the story?

5         MR. CROSS:  Actually, Bruce, you have more experience

6  probably.

7         MR. BROWN:  I don't.  But I mean --

8         MR. CROSS:  Go ahead.

9         MR. BROWN:  Rob is the expert that has been

10  identified to help us with all of the transfer of the data.

11  Right?  So he has been the person on the ground.  For example,

12  he was the one --

13         THE COURT:  Rob?

14         MR. CROSS:  Draper.

15         MR. BROWN:  Draper.  He was the one that has been

16  assisting with Holly and Ms. Latham and that production.  So

17  that is his -- that is his scope.

18         With respect to the actual expertise at that level,

19  we have no reason to doubt Draper's opinions but have every

20  time run those conclusions through both Mr. Skoglund and Dr.

21  Halderman to make sure that there is a consensus as to

22  Mr. Persinger's analysis and conclusions.

23         So that is our methodology on our side.

24         MR. CROSS:  Just a little more background, Your

25  Honor.  Mr. Draper is -- there is a company called Relevant

1   Data Technologies.  My understanding is they are one of the

2   go-to e-discovery firms in the Atlanta area.  That is how we

3   found them that others -- I think, Adam, your firm has worked

4   with them on a number of cases.  Right?

5          And we've -- for example, they first came in to copy

6   the KSU server when that came back from the FBI.  So we worked

7   with the State on that.  It went seamlessly.  Both sides

8   cooperated.  It was really easy.

9          The first issue we've had was when he went to copy

10  the equipment here with Mr. Persinger.  There is a lot of

11  finger-pointing on that that I don't think is useful to get

12  into.

13         The one thing again I will say is one of the other

14  inaccuracies -- because Mr. Persinger does write a pretty

15  strident declaration about his interactions with Mr. Draper.

16  Mr. Draper contacted us while this was happening because --

17  because of the challenges he was having dealing with

18  Mr. Persinger.  So we had some real-time view into sort of the

19  difficulties that were happening.

20         But one of the things that he and one of his

21  colleagues are adamant about is that Mr. Persinger claims that

22  there was a particular conversation that was had.  Mr. Draper

23  is 100 percent adamant -- and, again, he contacted his

24  colleague who participated in all of this as well through phone

25  or Zoom.  And that person is also adamant the conversations

         1    Mr. Persinger said happened just never happened.

         2           I'm not there.  I don't know.  But what I do know is

         3    I also have a declaration that has numerous claims about the

         4    data that our own forensic experts who are not part of the

         5    finger-pointing, not part of anything can look and see

         6    objectively that it is just not accurate what he is saying.

         7           We also have the fact that the State defendants'

         8    counsel represented to us and to Your Honor on multiple

         9    occasions that they had asked him whether he had, in fact,

        10    changed the password on the original EMS server.  And on

        11    multiple occasions, they said he denied having done that.

        12           We went back.  We've pulled the references.  It is

        13    unequivocal.  We said did he change it.  They said we have

        14    asked our expert and he said no, he did not.  Now in a

        15    declaration he says he did.

        16           And so the only reason I raise this is because I

        17    think there are reliability issues with the declaration.  And I

        18    think we're better served with a deposition where we can have

        19    questions and back-and-forth than a declaration that I suspect

        20    is not going to be much more reliable than what we have.

        21           THE COURT:  All right.

        22           MR. TYSON:  Want me to take a run at that, Your

        23    Honor?

        24           THE COURT:  Yes.

        25           MR. TYSON:  Okay.  So a couple of points I think that

1    are relevant.

2          First of all, for Mr. Persinger, we have -- he has

3    been an expert witness in a number of cases, as his declaration

4    shows.  He is very particular that the role of an e-discovery

5    vendor, which is how he views Mr. Draper, is very different

6    than the role of a forensic specialist, such as he is.

7          So his trainings and certifications and things like

8    that are related to the forensic side of things.  And that has

9    been where his analysis and kind of assistance came in.

10          I think one of the struggles that I have kind of

11    thinking through like where are we in the discovery process

12    here is we have Mr. Cross saying, oh, there is inaccuracies in

13    this declaration from Mr. Persinger.  But there is no

14    declaration from Mr. Draper.  There is no declaration from

15    Dr. Halderman, no declaration from Mr. Skoglund.

16          We have -- and I don't disbelieve what Mr. Cross is

17    saying they are saying.  But we don't have something that we

18    can really kind of test and respond to.  So it almost feels

19    like we're almost at we need expert reports almost on these

20    kind of technical questions.  Because I know it is way beyond

21    my skill level and I suspect everybody else's.

22          The other piece -- and Mr. Cross said multiple times

23    we represented about the original server that the key point to

24    all this is there is a pristine version of the server that

25    exists before Mr. Persinger did anything.  And they have that

1    before anything was changed.

2         If there were thousands of files changed, that

3    original complete copy is still there and we can identify

4    exactly what those are.  They can search for malware on that.

5    They can do all the things you would need to do.

6         So I guess we have always viewed it as immaterial of

7    what exactly the password was changed on because there was a

8    pristine copy maintained.

9         THE COURT:  Let me stop you at that.

10         What is your response to that?

11         MR. CROSS:  Oh, on the copy?

12         THE COURT:  On the pristine copy and the --

13         MR. CROSS:  The challenge with that, Your Honor, is

14    the only -- we don't have any proof of that.  Right?  So we

15    have a copy that Mr. Persinger represented to Mr. Draper is a

16    copy of the original EMS server from the way it was when he

17    received it.

18         But the only evidence we have of that, which isn't

19    even evidence, is Mr. Persinger's say-so.  And in his

20    declaration, there is some inconsistencies on that.  So, for

21    example, he says that in the routine course when he gets

22    something that he understands is important evidence, the first

23    thing he does is make a forensic copy to preserve that.  But at

24    the same time, he says he didn't know that this was evidence.

25    So he didn't follow his normal procedures here because counsel

1    didn't tell him that this was evidence or related to a lawsuit.

2         It looks like the earliest he made a copy of the

3    original server is potentially weeks or months later.  It is

4    kind of unclear.  It looked like maybe it was as late as

5    September 15.  But it wasn't clear.

6         THE COURT:  September 15 of this year?

7         MR. CROSS:  Yes.  Yes.  He seems to say that he

8    waited until September 15 to create an image that they are

9    saying is the pristine image.

10         So, again, maybe it is; maybe it isn't.  We just

11    don't know because the normal processes weren't followed here.

12    And it seemed we're all in agreement.  When Mr. Draper went in

13    to make the copy of the EMS server, the reason Mr. Persinger

14    told him he couldn't on the first occasion is they had a

15    disagreement over the method.

16         Mr. Persinger took the position that Mr. Draper's

17    method might alter some files.  There was a disagreement about

18    that.  And that was fine.  So we said, all right, we'll come

19    back and do it your way.

20         And Mr. Russo acknowledged in an email that it was

21    really important to preserve that original EMS server.  We all

22    agreed on that.

23         But then we found out later that that is not actually

24    what they did.  Right?  They changed key data, really the

25    essential piece, that password piece.

1          THE COURT:  Wait a second.  But that was after they

2     supposedly copied the server?  Have you jumped a step, or am I

3     just misunderstanding?

4          MR. CROSS:  The timeline is hard for us to follow.

5     So I guess we've tried to figure that out.  It looks like he

6     received -- Mr. Persinger received the original EMS server

7     sometime around July 1st.  He changes the password on that

8     original EMS server at some point at the direction of

9     Mr. Barnes.  He also makes what they say is a pristine copy.

10    On our read of the declaration, including from our experts, it

11    looked like he doesn't make that copy until September 15.  But

12    it is unclear.

13          **(There was a brief pause in the proceedings.)**

14          MR. CROSS:  So in any event, I guess the bottom line

15    is it might be a pristine copy.  We just don't know.  And that

16    is why it is so important.  As Mr. Russo pointed out in his

17    email, you don't ever change the original.  Right?  You make

18    the copy, and then everything you want to do you do on the

19    copy.  And you make that copy in a way that doesn't change the

20    original data.

21          And here none of those processes were followed.  Not

22    only do they change the original but the way they went about

23    it --

24          THE COURT:  Well, how is it they changed -- see,

25    you're going a little bit in circles for me.  You say we don't

1  know whether they made -- this is a pristine copy or not.  But

2  then you said they changed the original.

3              MR. CROSS:  Yes.

4              THE COURT:  How do I reconcile those two statements?

5              MR. CROSS:  Well, we can see that the copy is

6  different from the original.

7              THE COURT:  All right.

8              MR. CROSS:  That we can see.  But what we don't know

9  is whether the original was also changed in some way before

10  that copy was made.

11             THE COURT:  You don't know, but you're not saying you

12  do know?

13             MR. CROSS:  That is why I'm saying it might be a

14  pristine copy.  It might be a copy exactly as the server was

15  when taken from Coffee in June of '21.  But we don't really

16  have a way to know that.  Because all we have to do is to take

17  Mr. Persinger's words on when he made that copy and what

18  changes may or may not have been made to the original server as

19  of that time.

20             And we do know there were other things done with the

21  original server before Mr. Persinger got it.  For example,

22  Mr. Barnes tried to boot it up several times.  Someone from

23  Dominion came in in April and connected a device to it.

24             The last point I'll make on this, Your Honor --

25  another reason why we're concerned about the reliability of

1    what is represented to us is our experts from Mr. Draper to

2    Dr. Halderman and to Mr. Skoglund all say the same thing:  The

3    technology on the Dominion server is very simple, basic

4    technology.  It is not encrypted.  It is very easy to change

5    the password on that server.

6           Anyone in Mr. Beavers' office almost certainly could

7    have done it.  Our experts sent us two different references

8    that you can Google and find within seconds that walk you

9    through the simple steps.  Best Buy can do it for about $20.

10          So when they tell us they tried over and over again

11   to change the password on the original server and they couldn't

12   get into it, we have not heard that from anyone in the IT

13   department in Mr. Beavers' organization, for example.  And it

14   is hard for us to believe that that would be accurate because

15   it is a very -- Your Honor could do it.  That is what our

16   expert --

17          THE COURT:  That is not true that I could do it.

18          MR. CROSS:  We could do it in this room.

19          THE COURT:  Maybe they could.

20          MR. CROSS:  The steps are really simple.  It is very

21   simple, and it is laid out in a YouTube video or in a reference

22   you can read.  And we can provide those references.  But it

23   is -- that is why all of it -- like we're told things that just

24   don't square with objective facts, objective reality.

25          And so that is why we are concerned when Your Honor

1   says let's just get another declaration.  It feels like it is

2   GEMS all over again where we're told things that end up not

3   being accurate until we are allowed to really examine someone

4   and bring that to light.

5         THE COURT:  Well, what was the -- obviously

6   Dominion -- I don't know the skills of the person who was sent

7   by Dominion.  They come in April.  They go out also to Best

8   Buy.  And they fail.

9         And I don't know.  Maybe that indicates there is

10  something that is dicey that has been done to the software.

11        MR. CROSS:  Our experts tested it.  So they created

12  an identical copy of what has been represented as the original

13  EMS server.  They then pulled up these steps from the internet.

14  And they followed those exact steps to change the password.

15  And I understand it takes minutes.  And it is really simple

16  straightforward stuff.

17        So, again, it is just hard for us to kind of

18  understand how an organization as sophisticated as the

19  Secretary's office with Mr. Beavers' group could not have

20  followed those steps.

21        And then, of course, Mr. Persinger was able to do it

22  once he was asked.  And so the story just doesn't hang

23  together.

24        MR. TYSON:  Your Honor, could I add some context on

25  that?

```
 1              THE COURT:  Yes.
 2              MR. TYSON:  So I think starting with the timeline,
 3    Mr. Persinger's declaration starting at Paragraph 17 talks
 4    about when he took possession; says that he always follows the
 5    exact same process for anything that comes into his possession.
 6    And we obviously know what happened with the GEMS server along
 7    the way.  And that is why we have a Mr. Persinger as a
 8    dynamite, you know, forensic consulting expert to make sure we
 9    had this right.
10              So he takes possession, Paragraph 17.  Paragraph 18,
11    he always forensically images anything before he reviews it.
12    And then going over to Paragraph 22, I commenced my work by
13    first creating a forensic image of the EMS server's RAID system
14    on or about July 5th.  So then he verified that and then
15    attached to the various log files that go with that.
16              So in terms of timeline, Mr. Persinger's declaration
17    is very clear that the very first thing he did was create this
18    pristine copy.
19              Mr. Cross is right that there was a period of time
20    between when the Secretary's office took possession of it,
21    didn't realize what -- just thought it was a server that wasn't
22    working, tried to log into it, wasn't successful, was booted up
23    several times, which I think even Mr. Persinger would say is
24    not something you should be doing necessarily with something
25    you thought was evidence because booting it up can have a
```

1    process.

2           But once Mr. Persinger got it, he created the image

3    first.  Then he changed the password.  And I hear what Mr.

4    Cross is saying in terms of, oh, this is easy, this could

5    easily be done.  Again, we don't have any evidence of that.  We

6    have -- their person tried it.  Maybe it is that easy and no

7    one in Mr. Barnes' office or with Dominion knew that.

8           But at this point, I mean, the -- in terms of what

9    did the Secretary's office know at this point, what the

10   Secretary's office knew is we had a server, no one could get

11   into it despite multiple attempts, gave it to Mr. Persinger.

12   He created a pristine copy and then was able to get into the

13   server after that and determine someone had accessed it.

14          So that is, again, kind of the sequence of events.

15   So I don't -- I don't see the kind of concerns for, you know,

16   the story doesn't add up.  The story is what the story is in

17   terms of how this process went down.

18          And at the end of the day, I feel like, again, we're

19   kind of moving back towards competing expert reports.  If their

20   experts say this was an easy process, we don't think it is

21   possible that you could have not changed the password, well,

22   then that's, I'm assuming, going to show up somewhere within

23   that server of what somebody was doing to it along the way.  We

24   don't have that right now.

25          And what we do have is Mr. Persinger creating this

```
 1   pristine copy.  So anything that can be done -- from his

 2   testimony in Paragraph 17, July 1st forward, we know anything

 3   that happened with that was something he was in control of and

 4   in possession of.

 5            THE COURT:  Okay.

 6            MR. TYSON:  And I think, again, as Mr. Persinger

 7   explains, his goal was did somebody access this server.  That

 8   was the question that the Secretary's office was trying to

 9   answer.  Not, you know, going into all the details of

10   everything.

11            His charge was can you get into this thing.  And then

12   once you are in it, can you determine if somebody accessed it

13   in a way that is not consistent with normal usage.

14            So that's, again, kind of his charge and what his

15   mission was here.

16            THE COURT:  So your experts -- plaintiffs' experts

17   have a different view about what happens when a password

18   changes, I gather, or -- when you are talking about 1200 files,

19   is that because of the password change or something else?

20            MR. CROSS:  That is because of the password change,

21   Your Honor.  We each have a draft declaration from our experts

22   that we were going to try to finalize and get to you before.

23            But I have a list of -- I can hand you a copy of

24   this, Your Honor, if it is helpful.  But I have a list of 1274

25   files that were changed, altered, or deleted.  185 were created
```

1  during the time that Mr. Persinger had the original EMS server;

2  349 were deleted; 21 were appended to, meaning something was

3  added to the file; and then another 719 were altered and

4  modified in some way.

5        Our experts' preliminary analysis is that that likely

6  is from the efforts to change the password and the way it was

7  done.  But it also comes from -- when I say the way it was

8  done, just to take a step back, think of your computer in your

9  office.  If you leave your computer off for, say, three months

10 and then you come back and you boot it up, the clock on that

11 computer is going to say, I've been off for three months.

12 There is a whole bunch of old data here.  I'm going to

13 overwrite and delete a bunch of data.  Because the computer is

14 designed -- the software will only keep certain things going

15 back so long.

16       The Dominion software works the same.  And so what

17 happens is in forensics you never boot up something that you

18 want to preserve.  And so if you take SullivanStrickler, for

19 example, SullivanStrickler understood that.  When they went in

20 and copied the software from the equipment in Coffee County,

21 they did it without booting up the machines themselves.

22       What you do is you take a separate device, you plug

23 it into a USB port, and you boot up the software on that system

24 through that separate device.  Don't ask me how it works.  I'll

25 tell you it is magic.  But that is how it works.

1            And so you do that because if you -- literally if all
2    you do is turn on that device, it is going to wipe out a bunch
3    of stuff, it is going to change a bunch of stuff.  And forensic
4    people know that.
5            So that's one of the concerns we have about the
6    quality and reliability of Mr. Persinger's work is because he
7    says, well, he's a forensic guy, Draper is not.  But what he is
8    doing is not consistent with basic forensics.  By even just
9    booting up that original EMS server, he has now wiped out and
10   altered dozens or potentially hundreds of files.
11           And those are important because they are log files.
12   What those log files are important for is to go back and tell
13   when did other people have access to the equipment and what
14   kind of access.
15           So those log files are critically important for
16   understanding what happened in Coffee County.  It is going to
17   be critically important for the GBI.
18           And just by turning it on, he wiped out a whole bunch
19   of data.  Then by changing the password, he wiped out other
20   data.
21           So all of that is to say -- I think -- did I answer
22   your question?  That is what explains the changes.  We're not
23   suggesting he's done something nefarious.  It seems like he --
24   I think part of it is he is taking direction from his client.
25   His client said change the password.

1          Others of it is it seems like he doesn't really

2    understand the implications or the consequences of his actions.

3    Because when he writes in his declaration, based on his

4    experience, he thinks only one file has been changed from his

5    work, I will take that as a given.  I'm not suggesting that he

6    is lying.  But it means that he is very far from competent on

7    doing the type of forensic work --

8          THE COURT:  All right.  Let's say you are correct.

9    How are you going to pursue that?  And what is the point -- if

10   your folks say that, what is the point of the deposition about

11   that?

12         MR. CROSS:  The deposition is just to nail down

13   exactly what was done, when it was done, why it was done.

14   Because there's still things about that that we don't yet

15   understand.

16         So I am confident based on my experts that if

17   Mr. Persinger is asked to go back and compare these two servers

18   and looks at the file list we have, he will find that this list

19   is correct.

20         And my question to him would then be:  You have done

21   that.  Why did you believe it was only one file?  What is it in

22   your experience that led you to believe that it is one file?

23   Because I want to understand his competence.  Then I want to

24   understand what he has done.

25         THE COURT:  All right.  He is not being offered at

```
1    this point as an expert witness.  So I understand you want to
2    understand his competence.  But I'm not sure that that is the
3    major issue in front of us.
4            I think the major issue is simply making -- as I
5    understood, was that you just really wanted to get to the
6    bottom of what was done with the computer and the server and
7    the imaging and from whence did it happen.  Did it happen
8    perhaps -- and what was deleted?  Was there any similar
9    characteristics, assuming it is just -- that everything was
10   unintentional, just simply a byproduct of whatever the
11   processes were?
12           MR. CROSS:  Right.
13           THE COURT:  And you're in a position at this point --
14   you have three different servers basically.  I mean, images.
15   You have got the --
16           MR. CROSS:  Yes.  That's correct.
17           THE COURT:  You have got two from the State and at
18   least one from SullivanStrickler; right?
19           MR. CROSS:  Yes.
20           THE COURT:  And the SullivanStrickler was taken in
21   January of --
22           MR. CROSS:  June -- sorry.  SullivanStrickler was
23   January of '01.
24           THE COURT:  '01 -- '21.
25           MR. CROSS:  '21.  Sorry.  Thank you.
```

```
 1              THE COURT:  And no one has anything from essentially
 2    between when they did that and July 5th or June of 2022?
 3              MR. CROSS:  We don't have anything between the
 4    January 7, '21, image that SullivanStrickler made and then what
 5    we're told is the original EMS server that was taken in
 6    June 8th of 2021.  So we don't have anything in that six-month
 7    window.
 8              THE COURT:  But was something -- was it imaged on
 9    June 8th, or is that just when it was taken?  Was there an
10    imaging done then?
11              MR. CROSS:  My understanding -- and they'll correct
12    me if I'm wrong.  What Mr. Persinger says is -- what we have
13    learned from the State is they took the EMS server and the ICC
14    on or around June 8th of 2021.  And it was then imaged by
15    Mr. Persinger, the server, on July 5th of 2022.
16              THE COURT:  Well, that is what I was trying to get
17    at.  All right.
18              MR. CROSS:  Yeah.  The other part of this, Your
19    Honor, is --
20              THE COURT:  So -- but that is the point.  So you've
21    got these three.  Why do you need to talk to Mr. Persinger
22    about -- you evaluated all of that.
23              And I'm not -- unless you think that you've missed
24    something and that he has some information that you don't have,
25    what is the -- what is the point of that?
```

         1          MR. CROSS:  So maybe Mr. Persinger is not the right

         2    witness.  I'm just assuming he was because he knows a lot.

         3          But I guess part of it is what we want to

         4    understand -- actually maybe Persinger is not because he is

         5    getting involved in July or May.

         6          It is important for us to understand what all was

         7    done with the server in the time -- and the ICC in the time

         8    that the State had it.  And we just don't have visibility into

         9    that because Mr. Sterling wasn't prepped on it.

        10          The only thing we know is that someone from Dominion

        11    came in and plugged something in.  We don't know anything else.

        12          And so when Mr. Persinger says he has provided us a

        13    pristine copy of the original EMS server as it was taken in

        14    June of 2021 --

        15          THE COURT:  Well, that might not be true obviously.

        16          MR. CROSS:  Exactly.  He may genuinely believe that.

        17          MR. TYSON:  I don't think he said that either.  I

        18    think he said that anything that happened before July 1st he

        19    has no idea.  He can only testify from that point forward.

        20          THE COURT:  Yeah.

        21          MR. CROSS:  That's right.  That's right.  So he

        22    doesn't know.  So what we really want is a 30(b)(6) witness --

        23    and it can be two hours, maybe even an hour -- that just is

        24    really prepped on talking to the people from Michael Barnes to

        25    others about what did they do with the server from the time

1    that it was taken until today so that we really understand were

2    any changes made to it and why were they made and then

3    understanding -- trying to understand why there are

4    representations that are made that aren't accurate.  One is

5    about the password change.  The other is the ICC.

6              THE COURT:  Let's do one thing at a time.

7              MR. CROSS:  Sure.

8              MR. TYSON:  Maybe I'm still a little lost as to what

9    it was that wasn't accurate.  But in terms of -- there is a

10   pristine copy where the password is unchanged that anybody can

11   evaluate and look at.

12             So I don't see a distinction between changing the

13   original versus changing a copy when they are forensically

14   identical, as Mr. Persinger talked about.

15             I think the other piece is Mr. Sterling testified

16   pretty extensively about what happened between the time they

17   picked up the server and the time it got into Mr. Persinger's

18   hands.  Mr. Barnes' group tried to boot it up several times.

19   They were unsuccessful.  Nicole from Dominion came down,

20   purchased the device, tried to access it.  It was unsuccessful.

21   Then it was kind of set to the side until it got into

22   Mr. Persinger's hands to be able to access it.

23             So, again, I don't know where there is something from

24   Mr. Sterling's testimony where he was unprepared on those

25   fronts because that has been covered in terms of the facts of

```
 1   what happened.
 2             THE COURT:  Well, maybe what they don't -- he knows
 3   generically that that happened, but he doesn't know anything
 4   about what they actually did, does he?
 5             MR. TYSON:  Specifically like Dominion tried to run
 6   this program on --
 7             THE COURT:  Right.
 8             MR. TYSON:  That is right.  I don't believe he got
 9   into that level of detail.  Right.
10             THE COURT:  Is that what you are interested in?
11             MR. CROSS:  That and anything else.  I mean --
12             THE COURT:  Anything else is a little -- I know you
13   are interested in anything else.
14             MR. CROSS:  Well, anything else that was done to the
15   server.  Right?  I mean, that's just -- when Mr. Tyson says
16   Mr. Sterling answered questions, that is true to an extent.
17   But his answers would be, not that I'm aware of.  Right?  One
18   of the most important questions in this case, has anyone looked
19   for malware on the equipment?  Have they found it --
20             THE COURT:  Well, I agree that is.  But that is a
21   separate question.  I mean, it is not separate.  But I'm just
22   trying to deal with the very first one about what your -- in
23   terms of -- I mean, you don't -- I don't see why you need to
24   cross-examine Persinger about the files since you have your own
25   analysis of how it changed.  You have your version of it.
```

```
 1              And they at this point are relying on Mr. Persinger
 2  and his -- which, you know, they may be enlightened later that
 3  he was wrong.  I don't know.  And I guess they can also talk to
 4  their own FBI people or GBI folks about that.
 5              But because, of course, that is real data that you
 6  have identified about how many files have been changed,
 7  altered, created, deleted, appended.  And that is a lot of
 8  numbers.  So it is a cause of concern.
 9              I'm just not sure if all of that is a result of the
10  difference between the imaging and after he adds the password.
11  I don't know what else there is to say about it at that
12  juncture.
13              MR. CROSS:  So the only thing our experts can see is
14  that those files changed between -- changed between the time
15  that Mr. Persinger received the EMS server, the original, and
16  the time that Mr. Draper made copies.
17              It may -- like I said before, it may be that the
18  password change and booting it up is responsible for some or
19  all of that.  But what we don't know is whether Mr. Persinger
20  did other things in that window.  Right?  The declaration
21  doesn't say that.
22              But, again, he also represented he hadn't changed the
23  password when, in fact, he had.
24              THE COURT:  So when did he say he hadn't changed the
25  password, so I just get clear on that?
```

1          MR. CROSS:  So we have --

2          MR. TYSON:  Because I'm not sure on that either of

3    when -- and to be clear, Your Honor, also I mean, we're not --

4    I think Mr. Persinger -- I mean, he was our consulting expert

5    for several years as his declaration indicates.

6          He has obviously submitted a declaration.  If we need

7    to get into any kind of expert world, we're not afraid of

8    making him into a testifying expert and having him testify and

9    do all the things he needs to do.

10         I think at the same time though the plaintiffs are

11   going to put forward an expert report of here is a thousand

12   files.  I think then we need to be able to test their expert

13   report on that front as well.  So I think --

14         THE COURT:  I agree.  I agree.

15         MR. TYSON:  -- we kind of keep veering back into kind

16   of expert land.

17         MR. CROSS:  So just to give Your Honor some examples,

18   we raised this in an October 16 email, our experts can see that

19   the password on the original EMS server was changed this year

20   while in the possession of the Secretary's office.  Mr. Tyson

21   responded the next day, we disagree strongly with your expert's

22   conclusions about Mr. Persinger's work.

23         In the Sterling deposition at Page --

24         THE COURT:  I'm sorry.  Where did he say -- we

25   disagree with your expert's -- but where was the discussion of

1    the password -- I'm sorry -- there?

2            MR. CROSS:  What we pointed out in our letter was

3    that he had changed the password, that was the work that we

4    raised.  We said your expert --

5            THE COURT:  And what date is that?

6            MR. CROSS:  That is an October 16 --

7            THE COURT:  Okay.

8            MR. CROSS:  -- email.  Then the next day, the

9    response was, we disagree strongly with your expert's

10   conclusions about Mr. Persinger's work.  The only conclusion we

11   had raised was that he had changed the password on the original

12   EMS server.

13           And then in the Sterling deposition at Pages 126 to

14   129, I asked, do you know why the Secretary's office directed

15   Mr. Persinger to change the password on the original Coffee

16   County EMS server?  Mr. Tyson said, I think you're factually

17   incorrect on that.  Mr. Persinger now acknowledges that.

18           In the October 19 hearing transcript at 34 to 35 --

19           THE COURT:  I mean, is the -- so do you interpret

20   this -- the question on Line 18 of 126 as, do you know why the

21   Secretary's office directed Mr. Persinger to change the

22   password on the original Coffee County EMS server?  And then

23   Mr. Tyson, first of all, objects on work product basis.

24           And I don't see how his response there though

25   indicates a response to the direction about the password.

1          MR. CROSS:  I say that's a critical component of

2     understanding the scope of the unauthorized access, what they

3     did.  Mr. Tyson clarifies, what Persinger did to the server,

4     question mark, and I say, yes.  Well, because it affects --

5     you've altered the evidence that we are ourselves are relying

6     on.  Mr. Tyson says, I just think you are factually incorrect

7     on that.

8          We're specifically talking about the direction to

9     change the password on the original server.  He then --

10          THE COURT:  Then the fact that he says, no -- are you

11     aware Mr. Persinger altered the password -- and, in fact, that

12     the answer is no?  Is that what you are relying on?

13          MR. CROSS:  That is part of it.  He doesn't know.

14          Then if you go to Docket 1522, the October 19 hearing

15     transcript at 36 to 38, Mr. Tyson says, I talked to

16     Mr. Persinger again yesterday afternoon after Mr. Cross and I

17     spoke yesterday morning.  And Mr. Persinger strongly disputes

18     that changes were made.

19          I mean, I don't know how to take that any other

20     way -- that changes were made at all, the specific things that

21     have been said here regarding the equipment.  So he represented

22     to the Court that Mr. Persinger strongly disputed that changes

23     were made to the equipment.  He now acknowledges that that is

24     not accurate.

25          MR. TYSON:  Your Honor, I think, again, in context

1    here, there is a pristine copy of the server.

2            And so to the statement in the deposition on

3    Page 127, Mr. Cross' allegation is that we've altered the

4    evidence that plaintiffs are relying on.  That is when I say, I

5    think you are factually incorrect, because there was a pristine

6    version of the server that was unaltered.

7            Why Mr. Persinger strongly disputed that things have

8    been changed that would have altered the way to analyze the

9    equipment is because he started with his forensic image that

10   was a pristine version before he ever touched the server.

11           So I hear Mr. Cross' dispute.  I think the dispute is

12   you changed the original versus you changed an exact copy.  And

13   in our view, that is indistinguishable.  In Mr. Persinger's

14   view forensically, that is indistinguishable because he had an

15   exact copy of the server that is preserved.

16           So that is where I think the point of the dispute --

17   they are saying the original matters.  We're saying it doesn't

18   matter because it is a hash value confirmed, identical

19   bit-for-bit copy.

20           MR. CROSS:  That is a valiant spin on what happened

21   here, Your Honor.

22           THE COURT:  Well, when he says -- I'm going back to

23   127.  Are you aware that Mr. Persinger altered the password on

24   the original the EMS -- of the EMS server?  No.  And then you

25   are asking about was he directed to.

```
 1                    But wasn't he changing the password on the image of
 2      the --
 3                    MR. CROSS:  The original.
 4                    THE COURT:  On the original?
 5                    MR. CROSS:  On the original.
 6                    The challenge I have here, Your Honor, is --
 7                    THE COURT:  Do you agree that he was changing the
 8      password on the original as opposed to on the image?
 9                    MR. TYSON:  Yes, Your Honor.  Right?  That is what
10      his declaration says.  His declaration also makes clear that
11      when he has a bit-for-bit copy, that is, a completely pristine
12      copy, he has forensically preserved the chain of custody.  So
13      there is a completely unaltered version there that anyone can
14      go look at.
15                    That was always Mr. Persinger's point.  I didn't
16      alter any evidence, and I didn't view it as distinguishable
17      whether it was the original or the copy because they were
18      exact.  That is Mr. Persinger's testimony in his declaration as
19      well.
20                    And I understand Mr. Cross is saying it changed the
21      original, that is the problem.  I hear that now.  But from our
22      view, that is exactly the same thing.  It didn't matter whether
23      you made -- you changed the password on the copy or on the
24      original because you had a bit-for-bit identical version of the
25      software -- of the entire computer.
```

```
 1                THE COURT:  All right.

 2                MR. CROSS:  Your Honor, it is at best parsing.

 3  Right?  I mean, we went round and round on whether there was a

 4  password change to the original EMS server.  And every time

 5  there was an unequivocal denial.  It was not, well, let us

 6  explain.  Yes, we changed the password on the original server.

 7  And yes, the Secretary's office directed that.  But it is okay

 8  because we have a copy.

 9                It was an unequivocal denial.  And so I will leave it

10  at that.

11                THE COURT:  Okay.  All right.  With that, I'm going

12  to ask the group upstairs -- a floor upstairs from me to get

13  anyone soft drinks.  I cannot easily get you water.

14                MR. CROSS:  There is a huge stack of water behind

15  you.

16                THE COURT:  Well, that's good.  Then you can have

17  that.  That's great.

18                (A discussion ensued off the record.)

19                THE COURT:  But just -- I understand the concerns.

20  But I'm just -- but what is a deposition of Mr. Persinger about

21  that issue -- about the original going to do for you then?

22                I mean, you're concerned, and I understand the

23  concern.  But at least until he is designated as an expert, I

24  don't understand.

25                I can understand why you want to take a deposition to
```

```
 1   clarify some things that just are solely factual as opposed to

 2   his opinion.

 3           MR. CROSS:  Yes.

 4           THE COURT:  But -- but if that is what you want to do

 5   in order to clarify some of these things so we can just get it

 6   done, then it would seem to me at minimum it would be -- the

 7   thing is we need to have a list of the questions, what you're

 8   trying to do.  And you could have -- it doesn't mean that you

 9   would be confined.

10           But I mean, we ought to know did he -- I mean he says

11   he evaluated that there was only one change.  I don't know

12   whether he evaluated it or he just simply says that is the only

13   thing that happened.

14           MR. CROSS:  He says based on his experience.

15           THE COURT:  And clearly one of the issues,

16   particularly in the latter questions that you posed, which I

17   don't think were waived given the scope of the questions --

18   there were some things that I thought were waived but not

19   these, as to did you find malware, did you see anything.  And

20   understanding whether he looked for that is relevant it seems

21   to me given the questions.

22           MR. TYSON:  And, Your Honor, I hear you on that.  I

23   think in Paragraph 52 of Mr. Persinger's declaration he makes

24   clear, like this is exactly what I was charged with doing and

25   what I did.
```

```
 1              So I think there may also be this idea that he was

 2    charged with, you know, go forth and find malware when his

 3    charge was very specific about access and then everything was

 4    handed to the GBI once it was determined somebody had accessed

 5    this server.  Then it became the criminal investigation with

 6    the GBI.

 7              So I don't think if we put Mr. Sterling or somebody

 8    else back up -- Mr. Persinger wasn't charged to go searching

 9    for malware.  I think if he had seen obvious malware as he went

10    along, he would have notified us.

11              But his charge and what he did are listed right there

12    in Paragraph 52 of his declaration.

13              THE COURT:  But when I read your response -- the

14    first response, I thought you, in fact, identified a broader

15    role for him.

16              MR. TYSON:  Which one was that?  I'm sorry, Your

17    Honor.  The letter?

18              THE COURT:  Yes.

19              MR. TYSON:  Let me look and see.

20              THE COURT:  I don't know which of the letters because

21    we have a lot.

22              MR. TYSON:  Is it possibly the deposition?  I don't

23    see in the letter where there is a malware-related scope.

24              THE COURT:  I mean, I may -- your letter to Mr. Cross

25    of October 26.  This was about, we will ask Mr. Persinger to
```

respond to specific allegations from your expert, but the
questions in your letter are far too general to merit a
response.  Please provide a document from Mr. Draper,
Dr. Halderman containing their written specific allegations
about the alteration of the Coffee election equipment so that
Mr. Persinger may provide precise responses that will help the
Court.  We note that you originally agreed to provide this
information.  And then there is all of that.

        And then when you originally referenced -- introduced
the fact that you had Ms. -- I think it was when you had
referenced Mr. Persinger.  But I thought that this -- even in
your response here you are indicating that -- and I thought
they had provided you enough information for you to know what
they were looking for in this, even though it wasn't signed off
on a declaration from even Mr. Draper or Dr. Halderman.  But I
think that they had identified that they saw changes.

        MR. TYSON:  Uh-huh (affirmative).

        THE COURT:  And I would have thought that was in --
from what had been described, in Mr. Persinger's bailiwick.

        MR. TYSON:  Your Honor, maybe -- I think maybe some
of the root of the misunderstanding is:  When we were in the
October 21st conference, we were talking about kind of can we
get a list of questions, those kind of things.

        I think what we had envisioned on our side and
discussed with Mr. Persinger was expert report-like things.  We

1   were going to get an expert report from Dr. Halderman and

2   Mr. Draper.  They would say, here is our analysis.

3   Mr. Persinger would then be able to kind of be charged with a

4   response to that versus just things were altered or there were

5   log files that were altered.

6          And essentially his declaration here, I think,

7   addresses those questions.  If there are more specific things,

8   like I said, we're not afraid to designate him as a testifying

9   expert and have him respond specifically to declarations.

10         Up to this point though in terms of what does the

11  Secretary's office know about his work, it is about what the

12  things that he did to enable us to determine can we get into

13  the server and then did somebody access it on the timeline that

14  Mr. Hall had alleged in that phone call.

15         So that was the initial charge and the initial work.

16  He is available to do more than that.  I think we're very open

17  to him doing more than that.

18         But at this point, that is what the Secretary's

19  office knows about what his work was at this point, if that

20  makes sense, as thinking in a 30(b)(6) context.

21         MR. CROSS:  Your Honor, to clarify, we're not asking

22  him to do additional work.  We're not opening the door here for

23  them to offer a new expert this late in the case.

24         We're only trying to understand what he has done

25  historically.  And if the answer is he did not look for

1  malware, that is fine.  That is absolutely fine.

2         It does raise the question for us when Mr. Sterling

3  testified that he was aware that the Secretary's office has

4  looked for malware then the question becomes who did that.

5  Because if not Mr. Persinger, then who, which is why --

6         MR. TYSON:  Is that in the deposition, David, that

7  the Secretary looked for malware?

8         THE COURT:  Pages 124 and 125 of the October 12

9  deposition where he says, does the Secretary's office -- has it

10  looked for whether there is any sort of malware on the EMS

11  server?  Answer, to my understanding, yes.  And that was

12  Mr. Persinger?  The answer was, yes.  And they did not find

13  any?  Not that I'm aware of.  And it goes on like that.  And

14  has anybody from the Secretary's office examined whether any of

15  the software was altered in any way on that server?  Answer, if

16  I remember correctly from the discussion, nobody from the

17  Secretary's office has.

18         MR. CROSS:  So what Mr. Sterling described --

19         THE COURT:  That was all Mr. Persinger's --

20         MR. CROSS:  Mr. Sterling described a much broader

21  scope of work than we are hearing now about what Mr. Persinger

22  did.

23         And maybe Mr. Sterling was confused.  But I think

24  that is why we need a 30(b)(6) witness who is educated on what

25  Mr. Persinger did or we just talk to Mr. Persinger about it.

1          That is really all we're trying to do is just

2    understand what is it that Mr. Persinger actually did, what did

3    he find, what changes did he make.  And I think that is

4    probably short and focused.

5          THE COURT:  Mr. Tyson, the bottom of the page, you

6    say something about this too -- 125.

7          MR. TYSON:  I do, yes, Your Honor.  Yes, I see that.

8    And what I said is I think they can testify about whether they

9    found malware or not.

10          And I think this was the awkward part where

11    Mr. Persinger is our consulting expert.  We had a lot of

12    conversations with him about what was on that server.

13          And so I'm assuming from Mr. Sterling's

14    perspective -- and I hear David's concern on this.  But if

15    Mr. Persinger had found -- like if you are looking at it and

16    you see something that's obviously malware, we would have known

17    that.  That wasn't raised to us.

18          But there was not to my knowledge -- and Carey or

19    somebody can tell me if I'm wrong -- I don't think there was a

20    specific charge to Mr. Persinger to go find -- see if there is

21    any malware on this system.

22          MR. MILLER:  That is correct, Your Honor.  And I

23    think that Mr. Persinger's most recent declaration kind of

24    makes clear as a matter of factual evidentiary value as to what

25    exactly his charge was.

1          The reality was at the point this server got into

2     Mr. Persinger's hands it was simply a confirm whether something

3     happened that was outside the normal course of work.  Because

4     at that point, it becomes a much bigger issue than just this

5     case.

6          THE COURT:  Definitely.  But I think Mr. Sterling

7     certainly gave the distinct impression through his answer

8     that -- that the Secretary's office had looked for whether

9     there was any sort of malware.  And he said, it is my

10    understanding, yes.  And then he indicated it was Mr. Persinger

11    and that they didn't find any.  So it is a very --

12         MR. TYSON:  I see the concern, Your Honor.

13         THE COURT:  It is kind of confusing.  Two things are

14    being said.  And I think that is probably one of the most

15    important issues that they are trying to get at.  So what

16    actually happened, and what did the Secretary do?

17         So who is going to speak to that I guess is the

18    question.

19         MR. TYSON:  Uh-huh (affirmative).  And I think -- I'm

20    sorry.

21         THE COURT:  No.  That is all right.

22         MR. TYSON:  And I think kind of where we are -- and

23    this is the difficulty, I think, again of a 30(b)(6) and an

24    expert is looked for malware -- I can see Mr. Sterling saying,

25    well, yeah, somebody was in there.  And if they had observed

1    it, they would have said something.  That is looking for in

2    some way.  It is not a technical look for.  I can see where he

3    was.

4           But I see your concern too.  That this sounds like

5    and gives the impression that there was some active

6    investigation into looking for malware.

7           But then Mr. Persinger's declaration, I think, makes

8    abundantly clear that is not what he was charged with doing and

9    he has not done that up to this point.  Could he do that?  Yes.

10   Has the GBI done that?  And the answer from the Secretary's

11   office's perspective is we don't know.  Because the GBI isn't

12   sharing information with the Secretary's office about the

13   investigation at this point.

14          THE COURT:  Then you have the whole discussion on the

15   rest of 125 -- which I know you, Mr. Tyson.  I'm not going to

16   say that you did anything to misrepresent what is going on

17   there.

18          But it suggests that because you are asserting sort

19   of the privilege -- it sounds like you are saying don't -- Mr.

20   Cross says to you on Line 20, you're not going to let him share

21   what Mr. Persinger has found?  And you say not at this point.

22          MR. TYSON:  Uh-huh (affirmative).

23          THE COURT:  Then you say, but he can testify whether

24   they found malware or not.  I think we can do that.  And -- but

25   you're all still talking about Persinger at that point.

1    Because Mr. Sterling has said at Line 8, if I remember

2    correctly from the discussion, nobody from the Secretary's

3    office has looked at malware, that is.  That was all

4    Mr. Persinger.  So it is kind of -- it is very messy.

5            MR. TYSON:  Certainly, Your Honor.  And I hear you,

6    and I appreciate that.

7            And I can tell you what I was thinking at this point

8    is the conversations Mr. Miller and I had had with

9    Mr. Persinger asking a lot of questions about attachment of the

10   devices to the server.  There was a lot of back-and-forth that

11   went through that in his consulting expert role.

12           So, again, I wasn't trying to obscure or confuse this

13   issue.  But I think we're very clear that Mr. Persinger was not

14   charged with looking for malware.  His declaration says that.

15   He is not going -- but he didn't discover any in the course of

16   his other work along the way.

17           But that is the state of the factual evidence.  And

18   I'm not sure the best way to clarify, address those points.  I

19   mean, I'm open to that.  I don't know why a declaration, if

20   that is the distinct issue, couldn't address that.  But --

21           THE COURT:  Well, I think the problem is:  In the

22   end, it is not just Mr. Persinger.  It is still back to

23   Mr. Sterling saying, yeah, we've covered that base.

24           MR. TYSON:  Right.

25           THE COURT:  So -- and so that is the answer he gave.

```
 1    We've taken care of that, and he is looking at that.  So then
 2    who is looking at it?
 3            I mean, that is the -- that is the problem there.
 4            MR. TYSON:  Yes.
 5            THE COURT:  But Mr. -- let's just put it this way.
 6    If Mr. Persinger hasn't looked at it, what is the -- I mean, do
 7    you want to -- do you want a deposition to ask him did he look
 8    at it?
 9            MR. CROSS:  For malware?
10            THE COURT:  Yes.
11            MR. CROSS:  No.  No.  I take as a given in his
12    declaration he didn't.
13            The only thing I think we want to talk to
14    Mr. Persinger about is, one, finding out whether he disagrees
15    with our expert's findings about the changed files.  And we're
16    happy to provide that list to them.  And then, two -- and that
17    probably could be done in a declaration.  Although if he
18    disagrees, we would want to understand why.  And so a
19    deposition might be easier for that.
20            But the other point is, again, just understanding is
21    there anything else that he did or he is aware of having been
22    done to either of the devices that he gave us between the time
23    he got them and the time we copied them.
24            Those are the two things we would want to explore
25    with him.
```

```
 1            THE COURT:  Well, he basically seems to be of the
 2    opinion in his affidavit that it was Mr. Draper who changed
 3    things because of the way he downloaded it.  That is the way I
 4    read it.
 5            MR. CROSS:  Oh, no.  I didn't -- didn't -- well, I
 6    didn't read Mr. -- I didn't read Mr. Persinger to suggesting
 7    Mr. Draper changed anything.
 8            THE COURT:  Well, I'm not saying intentionally.
 9            MR. CROSS:  No.  No.  But I guess I didn't read him
10    to be saying that Mr. Draper changed anything on -- did he say
11    that?
12            I didn't read him saying that Mr. Draper changed
13    anything on either image.  There was a disagreement.  And
14    Mr. Persinger's concern with the original method Mr. Draper was
15    going to use -- Mr. Persinger felt that would change stuff.
16    But that method was never used.
17            The way it was actually copied Mr. Draper used a
18    method and devices that Mr. Persinger agreed and signed off on.
19    So unless I misread something -- and Bryan or someone will tell
20    me if I missed it -- I don't think there was a suggestion that
21    Mr. Draper changed anything on the images.
22            MR. TYSON:  That's correct, Your Honor.  My reading
23    of Mr. Persinger's declaration was, Number 1, he stopped
24    Mr. Draper from doing something that would have made changes
25    and that Mr. Draper was looking at the wrong image -- basically
```

the wrong -- he was looking at the wrong version when he should

have been looking at the pristine version versus the

password-altered version of that.  That was my reading of the

situation.

THE COURT:  Okay.  Well, what would be the problem

with their providing you a list of the files that they think

were --

MR. BELINFANTE:  Your Honor, if I may -- and I am

probably going to get kicked under the table from all sorts of

directions on this.  But --

THE COURT:  It is hard from that one.

MR. BELINFANTE:  From these two at least.

THE COURT:  He has a suitcase protecting him.

MR. BELINFANTE:  I guess my question is:  I mean, I

think all this is helpful.  But where does it ultimately go if

we're looking at a trial and/or summary judgment?  Right?

So I mean, if Dr. Halderman and Mr. Skoglund and the

rest of the folks they talk about are going to opine about this

server, then that would be expert testimony and we're going to

need a report on that.

If Mr. Persinger, who was originally not going to be

opining but just our consultant and then for a host of

different reasons we're now where we are where he has

effectively provided, while not a robust expert opinion but

certainly something close to it in his report, I'm sure they

1    are going to want to depose him and we would not object.  If

2    we're going to have him testify, I mean, that would be their

3    right.

4              So I guess my question in terms of how we resolve

5    this now is:  What does this look like at trial when we're

6    talking about a Coffee County server?  And even that is

7    presuming, of course, Your Honor, that you wouldn't grant

8    summary judgment.  So I don't want to concede that point.

9              But looking ahead, I mean -- so I mean, I hear Mr.

10   Cross say at this late hour we can't bring in an expert.  But,

11   you know, as we've been told in prior cases or prior instances

12   there has been a new development, whether it is the CISA report

13   or Coffee County.

14             So if we're going to talk about Coffee County and

15   we're going to get down to this level of detail, do we not need

16   expert reports talking about this server?  And I understand

17   we'll argue about the relevance of it and the meaning of it and

18   all that kind of stuff.

19             But even just the factual information of what is on

20   it and what happened.  And that is where I just -- and forgive

21   me.  I don't see where this is ultimately leading us.  Either

22   they are going to testify and then we're just going to depose

23   everybody, or they are not.  And then the question is, why are

24   we talking about the Coffee County server?

25             THE COURT:  Your response?

1            MR. CROSS:  Sure.  Our view, Your Honor, is we have a

2      discovery period that cuts off on November 22nd.  Whatever

3      discovery the parties are going to produce is done by then.

4      That is the end.  That is certainly my view.

5            If there are supplemental expert reports from the

6      experts we've disclosed, they will come in then -- between now

7      and then.  Because that is the discovery cutoff.

8            In fact, when we originally sent a proposal over to

9      the State, we had put it as a fact discovery cutoff and they

10     made it a full discovery cutoff.  We agreed to that.  So we

11     understood both sides to say if there is supplemental expert

12     stuff it is coming in by November 22nd.

13           We will object strongly to an expert report from

14     Mr. Persinger or anyone else.  We are closing in on fact

15     discovery.  We're closing in on summary judgment.  And I think

16     it would be prejudicial and unfair if they suddenly were able

17     to use the Coffee County thing to bring in a whole new expert

18     and opine on issues that have been in the case for a long time.

19           THE COURT:  Well, you brought in Coffee County.

20           MR. CROSS:  True.  But we didn't bring in a new

21     expert.

22           THE COURT:  Yeah.  But you're thinking that your

23     expert is going to now supplement his viewpoints, I assume,

24     based on the information that has been examined.

25           MR. CROSS:  Sure.  They can do the same with

1    Dr. Gilbert.  I have no objection if they want --

2           THE COURT:  But that is not his area of expertise, as

3    I understand it.

4           MR. CROSS:  Well, he is their election security

5    expert.  So I don't see why he wouldn't be.

6           MR. MILLER:  Your Honor --

7           MR. CROSS:  We'll take that as a stipulation.

8           MR. MILLER:  Your Honor, in the abstract, I think

9    this points to exactly the issue, which is I can't tell you who

10   is going to respond to what and with what until I know what

11   they are responding to.

12          What I hear from Mr. Cross is that they are expecting

13   a supplemental expert report before November 22nd.  And at that

14   point, you know, is our window to depose him over?  Because Mr.

15   Cross is right.  We insisted on November 22 we're done.

16          But, of course, that wasn't expecting that we would

17   get a supplemental report on November 21, to which we were

18   foreclosed responding to.

19          MR. CROSS:  That is not accurate.  We have been

20   unequivocal about that.  I can pull it up.  We put it in

21   writing.  We have been unequivocal at every turn that our

22   experts were going to have to address the implications of the

23   Coffee County equipment.

24          And the position we got from the State on the

25   schedule was everything is done on November 22nd.  We said fact

1    discovery.  They said everything is done on November 22nd.  We

2    took that as a compromise to get the schedule agreed for Your

3    Honor.

4          MR. MILLER:  Your Honor, if they want to supplement

5    the expert report, that's fine.  I guess we took as a good

6    faith position that that would be done in time for any, you

7    know, responsive supplementation to be completed as well.

8          We're really -- setting aside the responsive

9    supplementation, if there is a new report and new opinions,

10   we're going to have to depose the expert on that new report and

11   new opinions.

12         I just presumed it was a good faith normal matter of

13   practice that we're not talking about producing an expert

14   report on the deadline for discovery and then opposing any

15   response to it or deposition of it, which is what I understand

16   the plaintiffs' position to now be.

17         MR. CROSS:  I don't understand how there is confusion

18   on this.  We had lots of discussions on the schedule.  We were

19   very explicit that experts are obviously going to have to

20   address the implications of Coffee County.

21         It is not new opinions.  What Dr. Halderman will do

22   is take his original report and simply say, all the

23   vulnerabilities I identified before, they are exacerbated by a

24   circumstance like Coffee County, and let me tell you what I

25   found on the server and why that shows that these are problems.

```
 1              It is not new opinions.  It is the same opinions he's
 2    always had using the developments that have come forward.
 3              If they wanted to have an expert discovery schedule
 4    that have reports coming in and depositions, we needed to
 5    discuss that before we put a schedule in with the Court.  And
 6    this is not a surprise to anyone.
 7              MR. MILLER:  Let me be clear, Your Honor:  We do not
 8    want a new round of expert discovery or any other discovery.
 9    We want to be done.
10              And I hear you, David.  I, frankly, was expecting
11    that report to come in a couple of months ago.  We are where we
12    are.  But that is our -- the State's position is that we want
13    to be finished with this.  But we can't be finished with it in
14    a manner in which changes the record that is before us without
15    the opportunity to respond to it.
16              THE COURT:  You-all got the disc when -- the discs?
17              MR. CROSS:  Of the EMS server?
18              THE COURT:  Yes.
19              MR. CROSS:  First week of October.
20              MR. TYSON:  September 16.
21              MR. CROSS:  No.  No.  No.  It wasn't --
22              MR. MILLER:  I think it was the middle of September.
23              MR. TYSON:  September 22nd it looks like he met with
24    Mr. Draper.
25              MR. CROSS:  Yes.  But we had to go back.  It was
```

1    September 22nd.  And then we took the 30(b)(6) of the State on

2    October 12th, I think.  Sometime around then.

3              THE COURT:  Yes.  When are you planning to supplement

4    the --

5              MR. CROSS:  Our plan was to do it by the discovery

6    deadline.  We're completing discovery on this, as Bruce just

7    explained.  Because that was the deadline that everyone agreed

8    to.

9              MR. BROWN:  Your Honor, we have -- in terms of just

10   practicalities of this, we have two witnesses coming up whose

11   testimony may be germane to expert testimony on both sides

12   because they were hands-on in Coffee County.  This is Doug

13   Logan and Jeff Lenberg.  I'm taking those depositions -- we're

14   taking those depositions Friday and Monday.

15             And it would be sensible to -- for -- it may not have

16   to come in the form of a report.  But our experts will be --

17   when they testify will be opining about all the evidence in the

18   case, including all the evidence that came in through discovery

19   and even beyond.

20             In terms of the scope of their testimony, that could

21   be updated by the 22nd.  But the content of it may be

22   unrealistic to have sort of a real-time report based upon the

23   evidence that is coming in that late.

24             But this is just -- one of our concerns is that this

25   is Coffee County expert discovery.  There's all sorts of other

1    things that we're concerned frankly the State is going to try

2    to back door, whether it is through MITRE or something else.

3            And that is part of our making sure that is fair.

4    We've disclosed our experts.  We don't have any other experts.

5    You know, they have not deposed them.  And if there is

6    additional information that would be supportive of their or

7    relevant to their testimony about what these lay witnesses

8    testify to, then, of course, that is going to be part of their

9    expert testimony.

10            MR. CROSS:  There is nothing actually really novel

11    about Coffee County other than that it happened.  And it is

12    exactly what we had predicted.  So --

13            THE COURT:  Well, I don't think you could necessarily

14    have predicted --

15            MR. CROSS:  No.  Predicted as a possibility.

16            THE COURT:  -- December or January of the last

17    election.

18            MR. CROSS:  Your Honor, I will say candidly -- Bruce

19    and I joke that there was a point -- I don't know if Your Honor

20    remembers this -- when we first asked for our experts to get

21    access to an EMS server, a county server.

22            Your Honor said the only way we would get that is if

23    we found a breach.  I remember Bruce and I said, well, we'll

24    never find that.  How will we ever find that?  Lo and behold,

25    who would have predicted this?

1          But the point being:  It is not a novel issue in the

2     case.  Right?  So it is not something like the parties could

3     not have been prepared for experts on this.  Each side retained

4     election security experts.  Each side has experts that can

5     opine on the implications of Coffee County as a factual matter

6     on how that bears on their original opinions in the case.

7     That, I think, is totally fair and appropriate.

8          To Bruce's point, I think it would be really unfair

9     if the State or Fulton County were allowed to come in with a

10     new expert or new substantive opinions that they chose not to

11     put in before because they have never really had a substantive

12     response to Dr. Halderman's July 2021 report.

13          And we have a dispute already over whether Your Honor

14     can consider the MITRE report.  We think that is unequivocally

15     hearsay.  There is no world in which this Court can properly

16     consider that.  It feels like a back door effort to try to get

17     in a response to Dr. Halderman.  And that is what we want to

18     avoid because we think it is way too late in the day for that.

19          THE COURT:  Well, you're not talking about the MITRE

20     report right now.

21          So let's just move on for now, and I will think --

22     continue to think about this.  I mean, obviously we could spend

23     the entire time on the 20 questions.  I'm going to just go

24     through briefly my view about most of them at least.

25          I do want to ask:  Is it the practice -- the normal

1    practice when a GBI investigation is being done that there is

2    no communication with the head of the department that is --

3    that they are doing it on behalf of?

4             MR. TYSON:  Your Honor, when we asked the Attorney

5    General's office about this, the answer we were given is, you

6    don't represent the GBI, you're not entitled to information

7    about the investigation.

8             So I don't know a whole lot to say beyond that as far

9    as what we were given there.  I don't think that the

10   investigation is being done on behalf of or the direction of

11   the Secretary's office.  I think originally there was going to

12   be a partnership on that.

13            And I think we at a point were given -- the answers

14   we're getting is that the GBI is taking this wholly as their

15   own at this point.

16            THE COURT:  And they don't tell you any anticipated

17   time frame?

18            MR. TYSON:  No, Your Honor.  The Attorney General's

19   office would not even say -- confirm the investigation is

20   ongoing.  We know it is ongoing.  But they wouldn't even

21   confirm that to us.

22            MR. BELINFANTE:  Your Honor, for whatever it is

23   worth, I will tell you that that is not uncommon in the

24   executive branch.  I mean, it seems odd to us.  But, you know,

25   the Governor's office and by consequence the GBI sometimes are

1    relatively siloed from other constitutional state offices.

2            And so what we're informing the Court now is not in

3    my experience -- and, Carey, you may have had the same under

4    Governor Deal -- it is not unusual.  The GBI is its own special

5    agency.

6            MR. MILLER:  Yeah.  Your Honor, I'll echo just from

7    my past experience that is not surprising, as unfortunate as it

8    is for those of us in this position now.

9            MR. CROSS:  What if the request comes from the

10   Secretary and Judge Duffey as opposed to outside counsel?

11   Because have you guys tried that?

12           MR. TYSON:  They knew who the request was being made

13   on behalf of.  So I don't think it would change the answer.

14           MR. CROSS:  Could we try?

15           MR. BELINFANTE:  I mean, not to dump on the GBI, but

16   I mean, part of their concern -- and I realize it probably

17   doesn't mean much in this context.  But it is like, today it is

18   the Secretary; tomorrow DOL.  The Department of Labor wants

19   them to go down and investigate a rollercoaster or something.

20           They have always jealously guarded their own

21   independence to conduct investigations and report solely to

22   them and to the extent required -- to the extent required to

23   the Governor.

24           But yeah.  So to put some context on what Mr. Tyson

25   said, I think that is -- I would bet the same.

```
1            THE COURT:  So let's move on to Question 3, which was
2     has the Secretary of State's office, including Mr. Persinger as
3     its agent, looked for any indication of remote access to the
4     EMS server or ICC server?  And if so, when was that done, by
5     whom, what were the findings, and what related documentation
6     exists?
7            And what Mr. Sterling said was -- at Page 124 was
8     when asked was there -- does the Secretary's office have any
9     indication of remote access to the EMS server.  And he said
10    there, not that I'm aware of.
11           Was there -- as this was after you-all had identified
12    that there was the plug-in device of unidentified variety,
13    other than it is a ████████, why would he be saying, not that
14    I'm aware of?  Was he not advised of this?
15           MR. TYSON:  So, Your Honor, Mr. Sterling testified
16    later about the ███████ device.  So the remote access -- I'm
17    assuming how Mr. Sterling would have interpreted that.
18           How I would interpret that is some sort of ability to
19    access the server without plugging something into it.  So more
20    like a back door or something that can be accessed separately.
21    Because he definitely was knowledgeable and prepared on the
22    ███████ device, the fact that it was plugged in, all those
23    types of things.
24           That to me is distinct from the remote access
25    question, which would be kind of somebody who can get access to
```

 1    the server without being physically present with it.

 2            And as Mr. Persinger's declaration indicates, he was

 3    not charged with looking for that.  And I'm not aware of

 4    anybody who has looked for that specifically in the Secretary's

 5    office.

 6            THE COURT:  Is there a reason you haven't identified

 7    the specific ███████ device?  It said ███████ device.  But

 8    there seemed later on there is a question about why can't you

 9    tell us what the ███████ device was.

10            MR. TYSON:  Your Honor, Mr. Persinger -- not to get,

11    again, too deep into his work product on that, he did try to

12    utilize various databases he had to identify that.

13            And, Carey, I believe it was an external hard drive

14    he concluded.  But I can't recall specifically.

15            MR. MILLER:  I think that is right.  Your Honor,

16    frankly, throughout this entire process, we've been tiptoeing

17    the line of protecting both work product and the unique

18    situation we're in where a non-disclosed consulting expert is

19    now, you know, providing testimony through a declaration while

20    at the same time tiptoeing around investigative matters that

21    are going to be acutely pertinent -- you know, separate from

22    just whether the investigation is happening.  But acutely

23    pertinent as to, you know, what the ultimate outcome of that

24    investigation is.  Who is tied to, for example, this ███████

25    device or who may be tied to it, I should say.

1          THE COURT:  Well, I don't -- I understand why who it

2    is tied to is important.  But how is that manifested by telling

3    me that it is a model 254 versus a 354?  I don't understand

4    that.

5          Is that what your folks are looking for?

6          MR. CROSS:  As much as we can find out about the

7    device.  I mean -- so one of the things that -- we actually had

8    not spotted -- I think that Vincent pointed out in the

9    deposition of the SullivanStrickler witness is that if you look

10   at the photos one of the devices that they used is labeled as a

11   ███████ device.  We had not caught that.

12         MR. BROWN:  It is just a little jump drive, isn't it?

13         MR. CROSS:  I think it -- well, I was just texting

14   Alex.  I think it is either a jump drive or it is one of the --

15   yeah.  It looks like it is a thumb drive.

16         So that is why we're trying to understand as much as

17   we can from the State on what they are seeing so we can figure

18   out, well, is that likely a thumb drive that SullivanStrickler

19   used, or was it something else?

20         So, for example, if Mr. Persinger thinks it was a

21   hard drive, then that would be a different device -- different

22   ███████ device.  And that might then be something that

23   Mr. Logan or Mr. Lenberg or someone else used.  And we would

24   want to understand what they are finding about that.

25         So the more specifics we can get, the better we can

 1   get to the facts.

 2            MR. TYSON:  I think an external drive is an external

 3   drive.  So I am not sure that if it is a thumb drive or an

 4   external hard drive it is going to be that distinguishable.

 5            I think maybe the larger question is:  We had a

 6   server that wasn't working.  People couldn't get into it for

 7   whatever reason.  Mr. Persinger forensically imaged it and then

 8   got into it, found evidence that there was inconsistent with

 9   normal behavior connection around the same time as these

10   individuals were in Coffee County.  At that point, that is when

11   the handoff to GBI happens.

12            So I think there may be an idea that there was some

13   continuing investigation on the Secretary's part into the

14   forensics of the server.  Where at that point, we had -- this

15   is now a criminal investigation.  We know somebody accessed

16   this thing.

17            And so in terms of future operations -- I know people

18   disagree about this.  But from the Secretary's perspective, the

19   server had not been present in Coffee County for a year at this

20   point.  And so it was out of commission.  It had been replaced.

21   So it was now a piece of evidence in a criminal investigation

22   that was handed off.

23            So I think there may be a perception that there was

24   some continuing investigation happening of where was the

25   malware, was there remote access, was this installed, was that

```
 1    installed.
 2          What happened is what happened in the sequence.  The
 3    GBI has it now.  And the main point from the Secretary's office
 4    is was what Mr. Hall was saying corroborated technologically.
 5    And when that answer was answered yes, then now we hand off to
 6    the GBI and that process continues.  Meanwhile, we still have
 7    to run elections in Coffee County.
 8          THE COURT:  Well, is there a reason Mr. Persinger
 9    would have seen what type of -- what type of device it was and
10    your folks wouldn't have?
11          I mean, that seems like you are in the same position.
12          MR. CROSS:  Yeah.  To that, Your Honor, I would say
13    two things:  One, it is possible that the different experts
14    will find different things because it is a massive undertaking.
15    There is just a huge amount of data there.
16          The other is we want to make sure we find the same
17    thing or if there is a disagreement we understand what that is.
18    So the more insight we have into their findings, the easier it
19    is -- and vice versa.  They are going to get our findings from
20    our experts.
21          But understanding that helps us get to the truth of
22    what happened.
23          MR. TYSON:  To that point, Your Honor, since the
24    plaintiffs have a copy, I mean, they can do the same analysis,
25    they can find the same things.  And I hear Mr. Cross say
```

1   experts.  I feel like again we kind of keep looping back to:

2   If this truly is expert analysis of this server and we need to

3   do that, I'm not sure that a 30(b)(6) is the way to get at an

4   expert's analysis.

5          You put an expert report up.  You depose the expert.

6   I'm sure if there was malware on there that Dr. Halderman had

7   discovered, we would have heard about that by now.

8          THE COURT:  Well, I still think if he actually has a

9   record of what type of device was connected, if that is a

10  factual matter -- he said that you basically present us, even

11  though the Secretary thought he had -- that there had been --

12  that Persinger had looked for malware, I'm going to accept the

13  representation that he was wrong.

14         But I don't know that there is anything else I can do

15  about that when -- unless you want to have them commissioned --

16  you don't want them to commission Mr. Persinger to be an expert

17  at this point.  And so I don't know what else you can do about

18  that.

19         MR. CROSS:  Yeah.

20         THE COURT:  I mean, the -- so --

21         MR. CROSS:  Right.  And I get Bryan's point.  It is a

22  fair point.  I guess we think of Persinger -- we're approaching

23  him in a fact role because there are certain things he did and

24  we want to know what he did and what he found.

25         We're not really sort of interested in digging into

1    expert analysis in terms of how he went about doing a lot of

2    things or what opinions he reached.  It is just the fact of

3    understanding what did he do so we understand when Alex and

4    Kevin are looking at the devices they have a better -- they

5    have concrete understanding of is what they are seeing the

6    result of something Mr. Persinger did or is it the result of

7    something that happened before he got it, including when Logan

8    and Lenberg and others were there or another period.

9           So it is really just being sort of able to isolate

10   and say, okay, we understand Persinger did these following

11   things.  Those following things would have these consequences.

12   So now we know that that likely is not caused by the breach.

13          So it is trying to get at that I guess is what we're

14   sort of after.  Then, of course, if he did find malware or he

15   did find remote access, we would just want to know those

16   findings.

17              THE COURT:  Well, they are saying he didn't.

18              MR. CROSS:  Right.

19              MR. TYSON:  Right.

20              MR. CROSS:  That is fine.  We take that as a given

21   that he did not.

22              THE COURT:  That he didn't look for it.

23              MR. TYSON:  Right.

24              MR. CROSS:  We take as a given that he didn't look

25   for it and he didn't find it because that seems to be what

1    world we're in.  Yes.  And if he had found it, if he had

2    happened upon it, he would have just told us.  Those are the

3    three facts that I take.

4          MR. TYSON:  Yes.  And I agree with that.

5          THE COURT:  All right.  I'm going to put a pin in

6    some of that.

7          I don't think the stuff about Michael Barnes -- the

8    inconsistency about -- that arose about Michael -- what Michael

9    Barnes said versus James Barnes said -- I'm not sure that that

10   is of such significance it is worth going back about it.

11         But you can -- this is Number 9.

12         MR. CROSS:  Oh --

13         THE COURT:  And the ICC.

14         MR. CROSS:  Yeah.  The ICC is important.  We haven't

15   really talked about it.  The reason why it matters is because

16   we believe that -- we believe that James Barnes was truthful in

17   his testimony when he testified -- and if you remember, James

18   Barnes replaced Misty Hampton as the Coffee County elections

19   person.  We believe that he was truthful when he said that

20   he -- his understanding was that the reason those two pieces of

21   equipment were being replaced -- and they are arguably the two

22   most important pieces of equipment -- was because there was a

23   concern of compromise; that it was not because you couldn't get

24   access to them; that there was --

25         THE COURT:  All right.  I got that point.

1      MR. CROSS:  Right.  But here is why it matters:  We

2  have always believed that the claim that they were replaced

3  because they were inaccessible was a ruse or a cover to explain

4  why this equipment was taken without having to acknowledge that

5  there was a concern by the State that folks like Logan -- Doug

6  Logan had breached it.

7      The password story on the EMS server has its own

8  problems, which I can talk through.  But on the ICC, it is a

9  particular problem because Mr. Barnes testified the ICC

10 password still worked when it was taken.  And our experts can

11 see that that password had not been changed when the EMS server

12 password was changed.

13     And so when Mr. Sterling learned -- Mr. Sterling

14 didn't know why the ICC password -- whether it worked, didn't

15 know why it was replaced.  Michael Barnes, I guess, conveyed

16 during a break in the deposition that it was because the

17 password was changed.  But that is not consistent with any

18 other evidence.

19     THE COURT:  I know it is not consistent.  But -- but

20 does that point to the need for a deposition of Mr. Barnes

21 versus the -- how would the Secretary of State basically

22 untangle that, I mean in his 30(b)(6) capacity?

23     He says, I'm relying on Michael Barnes.  Then Michael

24 Barnes, in fact, gives testimony that is different than the

25 people on the ground.  I got it.

1           MR. CROSS:  I guess I view it like the -- I think --

2    I think Mr. Sterling was doing his best, and he was trying to

3    give answers, and he was trying to learn what he didn't know.

4           But what we see is with things like:  He thought

5    Persinger looked for malware.  Right?  But he didn't.  He was

6    just confused.

7           I think this is similar.  They were trying to figure

8    out in the moment the answer to the question of why was the ICC

9    replaced.  But the answer that came back to us is objectively

10   not accurate.

11          THE COURT:  Well, I understand that.  But what --

12          MR. CROSS:  So we just want an answer to that

13   question.  We want the question to go back to the State to say,

14   now that you know that the ICC password was not changed in the

15   way of the EMS server, do you have another explanation for why

16   it was taken?

17          THE COURT:  All right.

18          MR. TYSON:  Your Honor --

19          MR. BROWN:  Your Honor, let me add this.  I'm sort of

20   both ways on this.  Because if a witness --

21          MR. CROSS:  You're sitting in the middle.  Is that

22   why, Bruce?

23          MR. BROWN:  Well, yeah.  If a witness gives --

24   typically if a witness gives an incorrect answer, you don't go

25   to the Judge and say, Judge, they were wrong.  You put them up

1    in front -- on the witness stand, and you impeach them.  And

2    you show that the other side's position is frail, they are not

3    prepared, they don't know what they are doing, just like what

4    we have done before.  On the other hand, if it is a

5    situation --

6              THE COURT:  That's a matter of perspective.

7              MR. BROWN:  -- if it is a situation where the

8    witness --

9              MR. CROSS:  See, I'm the nice one.

10             MR. BROWN:  If the witness is just simply not

11   prepared and hiding information that way and you don't get the

12   organizational response, then that is the 30(b)(6) issue.

13             This one -- I may sort of disagree with David on this

14   one.  This one is just they are -- we can impeach them.

15             MR. CROSS:  No.  I agree with you, Bruce.  I agree.

16             THE COURT:  I just don't know that it is worth

17   chasing.

18             MR. CROSS:  If their position remains the same, then

19   that is fine.  That is their position.  I didn't know if they

20   had a different position in light of the facts of what we have

21   seen.  But if that is your position --

22             MR. TYSON:  And to be clear, I have seen your

23   representations and I believe you.  But I have not seen

24   anything from your experts that says this is what happened

25   there.  And from Mr. Barnes -- if you ask the Secretary or

1    Mr. Barnes what does the office know, this is what the office

2    knows.

3              MR. BROWN:  It is not changing.

4              MR. TYSON:  It has not changed.  And if there is

5    something we need to see on that, I would love to see some

6    evidence on that.

7              But as of now, that is the only thing the Secretary's

8    office knows.

9              MR. CROSS:  So we can take 9 off the table, Your

10   Honor.

11             THE COURT:  Well, a lot of them are by virtue of our

12   conversation being modified.

13             Well, just relative to this, I mean, I gather the

14   answer to Question 10 actually is that no one looked at the

15   server from the Secretary of State's office or asked the county

16   to do so on the ICC server before -- in 2021?

17             MR. TYSON:  Your Honor, that is not a question I know

18   the answer to.  I don't think -- I don't think anybody has

19   asked specifically that issue of what all Mr. Bellew did when

20   he went for testing.  I know he tested the password on the

21   server.  And Mr. Sterling testified to that, as I recall.

22             I don't know specifically for the ICC, and I don't

23   believe that was a question that was asked specifically.  But I

24   honestly don't know the answer to that question.  We have to

25   check with Mr. Bellew and Mr. Barnes.

```
 1              THE COURT:  Well, I think you looked at it, and there
 2    were a number -- there were some related questions on that that
 3    I thought could have -- were adequate to say it wasn't waived.
 4    So you probably should ask.
 5              MR. TYSON:  Okay.
 6              THE COURT:  On the other hand, I don't -- we didn't
 7    see any questions about management of passwords.  I know from
 8    the past that there was a lot of issues about that.  But
 9    Question 11 didn't seem to have any.  And the plaintiffs'
10    reply --
11              MR. CROSS:  We'll take 11 off the table, Your Honor.
12              THE COURT:  -- didn't seem to get to that either.
13              All right.  I mean, Question 12 seems to be a
14    question about a chain of custody form.  What are you really
15    trying to get after?  I mean, you feel like that -- Mr. Cross,
16    that you're now looking for some type of transfer
17    documentation?
18              MR. CROSS:  Yes.  That is something we have gone
19    round and round with the State on.  And the representations
20    we've gotten is that the only documentation they have of
21    replacing those two pieces of equipment in June of 2021, Coffee
22    County, is a logic and accuracy test report for the EMS server.
23              And we were just looking to confirm with the 30(b)(6)
24    deponent that that is, in fact, the only documentation, that
25    there's no --
```

```
 1              THE COURT:  Physical pickup?  You mean, like a -- as
 2    if there was a moving van that picked it up and they got
 3    somebody to sign and then they got somebody to deliver the
 4    equipment and -- or is that --
 5              MR. CROSS:  Something like that.  So if you look --
 6    attached to Mr. Persinger's declaration, he has his own chain
 7    of custody forms.  Right?  Because that would be the normal
 8    course.
 9              We know that Mr. Bellew and I think someone else,
10    whose name I'm forgetting -- went on-site in Coffee County in
11    June of 2021 to replace the equipment.  But we have not seen
12    documentation of that.  So one is any kind of chain of custody.
13              But the other would be, like, we don't have emails.
14    Right?  There is no documentation from the State at all
15    regarding replacing this equipment.  And it is a pretty
16    extraordinary event, particularly given the context of when it
17    was happening with the Doug Logan card.  And it just strikes us
18    as odd that there is not even emails that the State has --
19              THE COURT:  That basically the State doesn't have any
20    documentation that it -- that we're coming and we're going to
21    pick this up, please be ready, don't do anything to your
22    equipment?
23              MR. CROSS:  Right.
24              THE COURT:  We'll replace it?
25              MR. CROSS:  There is just nothing.  So we're
```

1    trying --

2         THE COURT:  And the context of Mr. Sterling says that

3    he is not aware of any or doesn't know anything about it?  Is

4    that what your concern is?

5         MR. CROSS:  Right.  Because it did not seem to us

6    that he spoke with Mr. Bellew or others at CES who handled this

7    to educate himself on, for example, asking did you email with

8    James Barnes or others or did you send emails internally when

9    you picked it up?  Did you have a calendar appointment?  What

10   did you do that might have generated some documents around this

11   event, and what might be the normal course when you are doing

12   something like that?

13        MR. TYSON:  Your Honor, I think Mr. Sterling

14   testified pretty directly on Page 200 about documentation and

15   then Page 333 to 334.  And he talked about that there -- chain

16   of custody forms existed, but they weren't used up until

17   September of 2022 in the Secretary's office and that the only

18   documentation was the ICC.

19        And I understand Mr. Cross has an idea that there is

20   going to be all this kind of back-and-forth and things.  And a

21   lot of the ways in elections things get handled is:  The

22   election director picks up the phone, calls Mr. Barnes' office,

23   having a problem with my server; okay, great, we'll send

24   somebody out there.  Somebody shows up to try to work on the

25   server, attempts to work on it, replaces it, and moves on.

```
 1          So I don't think there is the documentation that
 2   exists that Mr. Cross would expect because that is just how the
 3   election process generally runs.
 4          But Mr. Sterling did testify exactly about the chain
 5   of custody forms, they weren't used for Coffee, and that logic
 6   and accuracy -- or that hash report that was in when it was
 7   installed is the documentation of that switch-out of the
 8   server.
 9          THE COURT:  All right.  If there is nothing more,
10   there is nothing more.
11          MR. CROSS:  Well, again, Your Honor, I guess I always
12   come back to what Mr. Sterling says is, I don't know off the
13   top of my head.  I asked him, well, who would you ask if you
14   wanted to know there was paperwork around this?  He said he
15   would ask Michael Barnes.  Mr. Tyson offered to check on that
16   at a break.  I don't know if that is one --
17          MR. TYSON:  And Page 333 is him after that break
18   responding to the chain of custody forms after speaking to
19   Mr. Barnes.
20          MR. CROSS:  Oh, right.  So we did get an answer on
21   general chain of custody forms but not on whether there were
22   documents specific to the June 8 event.
23          And I don't think it is quite fair to refer to that
24   as like a routine thing.  My understanding from the folks we
25   have spoken to in the county election arena, among others, is
```

1    the State doesn't typically just show up to a county with a

2    spare EMS server and ICC on a truck.  That is no small thing.

3              MR. TYSON:  I disagree on that.  I mean, when they

4    are going out to fix a server and they are driving several

5    hundred miles to get to Douglas, Georgia, they're not going to

6    make a second trip to replace a server if they can't get into

7    it.  And the original report was the password is not working.

8    We can't log in.

9              So I believe -- I can't remember if it was Mr.

10   Sterling or somewhere else, but I think it is pretty typical

11   for CES to travel with spare equipment just to save the extra

12   trip down there if they need to replace something and they

13   can't get it fixed.

14             MR. BROWN:  But it is sort of unusual.  Because they

15   are not only just taking a box, they are taking the county's

16   entire election data for the prior election leaving the county

17   unable, for example, to respond to Open Records Act requests

18   for scanned images and things like that.

19             It is a major event.  It might have been, you know,

20   that the repair people do that.  But the idea that -- you can

21   see why we think it is sort of odd that it wouldn't have

22   generated any commentary.

23             MR. BELINFANTE:  I think to your point earlier,

24   Bruce, you can think it is odd and that is something to bring

25   up on a factual dispute.  I mean, because this is not the first

time we've had questions about how much the Secretary papers up things they do.

          MR. BROWN:  True.

          MR. BELINFANTE:  So I certainly understand the perspective.  And forgive me if I sound jaded on it, but we've had this conversation in this building many times.

          MR. BROWN:  Well, the question would be -- the question would be whether we've gotten complete answers in the 30(b)(6) to these questions.  That is the --

          MR. TYSON:  I don't know what else that could be provided beyond what is on 200 and 333 and 334.  I mean, would I have recommended they use chain of custody forms a lot earlier?  Absolutely, I would have.  But were they using them?  No, they weren't.  And they started in September of 2022 for everything.

          MR. CROSS:  Again, Your Honor --

          MR. TYSON:  That is not an admission on the Secretary's part that something should have been done that they weren't doing but --

          MR. CROSS:  I mean, I don't want to overly focus on chain of custody.  It is more -- you can envision, for example, Mr. Bellew sending an email to Mr. Michael Barnes or a colleague saying, hey, we're going to go out to Coffee County, and we're likely going to replace this equipment.  Or they come back and say we have replaced it because we're concerned that

1    there is a compromise.

2           It is getting the context of why they did and why

3    they did it is important, not just that it happened on a chain

4    of custody form.  Because this happens immediately on the heels

5    of Doug -- of James Barnes alerting the Secretary's office to

6    the Cyber Ninjas card.  And then they are conducting an open

7    investigation at that time into whether there was a compromise

8    of that equipment.

9           And so it is why it just -- it always sort of rings

10   hollow to us that compromise concerns had no play in replacing

11   that equipment, which is what the State says but not what the

12   county says.

13          MR. TYSON:  And again --

14          THE COURT:  Well, I realize from Page 137 in the

15   witness' answer that it was an unusual situation.  Michael

16   Barnes told him it happened on occasion but I know we changed

17   out one server for Spalding.  Because there were concerns when

18   the board came in.  But basically he indicates that it is an

19   unusual situation and that they -- that two people from the

20   Center for Elections Security were -- where investigators were

21   like I'm going down there to work on the EMS, I'm going to

22   change out the EMS because we can't get into the EMS.  So they

23   did a normal situation and a normal office thing.  It is just a

24   normal process.

25          So would there have been -- there wouldn't have been

any documentation from the CES visit?

MR. TYSON:  Your Honor, the short answer is no.  I think Mr. Cross is kind of assuming a level of connection.  The CES is physically distinct from the Secretary's office.  So Mr. Barnes' communications to Mr. Harvey were happening to the main Secretary office downtown.  CES is a relatively small office with a large warehouse in Marietta.

And I know from Mr. Cross' perspective there should have been emails back and forth.  I can also see Chris sticking his head in Michael's office saying, hey, I am headed to Coffee County to go deal with that thing; okay, we'll see you later.

I think again we're assuming a level of sophistication and coordination that doesn't necessarily exist.  And from the plaintiffs' perspective, they are inferring, oh, there was -- we're doing this because there was a compromise.

But there has been -- I'm not aware of anything that indicates that Mr. Bellew or Mr. Barnes or anybody else knew of any of the conversations with Mr. Harvey and all the things going on with that.

MR. CROSS:  I think all we're asking, Your Honor, is just did the State undertake the effort to figure out for sure whether there are documents.

MR. TYSON:  Is there something more than what we have answered though?  I mean, I guess I -- what we said is we were not using chain of custody forms at this point.  There is no --

```
 1              THE COURT:  Well, why don't you confirm that there is
 2   nothing from the CES.
 3              MR. TYSON:  Like in terms of email traffic, that kind
 4   of thing?
 5              THE COURT:  That is right.
 6              MR. TYSON:  Okay.
 7              MR. CROSS:  I think James Barnes testified that there
 8   were text messages with Chris Bellew.
 9              Does that sound right, Bruce?
10              MR. BROWN:  I do not recall.
11              MR. CROSS:  If we could check any type of
12   communication, not just emails.
13              MR. TYSON:  Mr. Bellew's phone also?  Check that?
14              MR. CROSS:  Whoever was involved just whether they
15   had -- they still have any communications from -- regarding
16   this switch.
17              MR. TYSON:  Again, we'll go look at that.  But I just
18   want to make sure everybody is clear.  Mr. Bellew and
19   Mr. Barnes' office are in the middle of ballot building and
20   everything for the runoff right now.  And just given our -- you
21   can work with us on the timeline just because access is going
22   to be an issue.
23              THE COURT:  Yeah.  When are you going to start
24   voting?
25              MR. TYSON:  We start early voting -- if the county is
```

1    ready, they can start the Tuesday before Thanksgiving.  They

2    must start by the Monday after Thanksgiving.

3                    **(There was a brief pause in the proceedings.)**

4              THE COURT:  I didn't understand all the stuff about

5    the hash values.  You did ask about malware and hash values at

6    Page 150 and 51.  These appear again -- Questions 13 and 14.

7              But, Mr. Cross, you were getting at something.  I'm

8    not sure -- you clearly were interested in hash analysis.  But

9    I'm not sure what you think -- what were you getting after?

10             And there is no indication in any of this that they

11   ever did the supplemental method to validate hashes.  But I

12   don't have any indication that you asked that direct question,

13   either.

14             MR. CROSS:  Yes, Your Honor.

15             THE COURT:  You were asking about Pro V&V and hashes,

16   but I didn't know how that was all connected.

17             MR. CROSS:  The thought on hashes was -- one of the

18   points the State has made is that one possible way to figure

19   out whether voting equipment has been altered or compromised is

20   to see if the hash has been changed.  Because if you change

21   certain things on the equipment and you don't do it in a way

22   that preserves the hash, then the hash will change and then you

23   can look and say, well, here is the hash value when it went

24   into the field and here is the hash value now.  Something has

25   been changed.

1          So we're just trying to find out when they were

2    replaced -- either before they did the logic and accuracy

3    testing on the new equipment or what have you have they at any

4    point compared the hash values on the equipment they took to

5    the original hash values that the State would have had on file

6    to figure out whether there were material changes.

7          THE COURT:  Well, what more -- partially because you

8    were asking about malware and a little bit about hashes, what

9    more -- and he tells you a bunch of different things.

10         But what are you seeing as missing?  I'm looking at

11   both -- I don't think there is any indication as to 13 that

12   there was any question directly.  And you don't ask -- you

13   don't provide a reply in Question 13 as to -- as to the waiver

14   question.  You just say -- you didn't reply.

15         MR. CROSS:  Oh, I'm sorry.

16         THE COURT:  That might be an oversight.

17         MR. CROSS:  Yeah.  My apologies.

18         Our position on questions like 13 and 14 are those

19   are questions we would have asked if he had been prepared.  But

20   they are at a technical level that it was just clear to

21   everyone in the room there was no way he was going to know the

22   answer to that.  And we have not had a representation from the

23   State that he did know the answer to that.

24         So we feel like it is unfair to say, well, you didn't

25   ask a specific question, and so that is waived, when everybody

```
 1   knows he did not know the answer to that.  So yes, I could have
 2   spent an hour going methodically through the outline that we
 3   put together with our expert asking lots of technical questions
 4   that we were hoping to get the answers to.  But that did not
 5   seem to be a worthwhile use of anyone's time because he just
 6   did not know anything another than at a really high level about
 7   this stuff.
 8           So that was -- that was the position we took on the
 9   waiver issue, Your Honor.
10           THE COURT:  The CISA advisory came out when?
11           MR. CROSS:  Originally the first one came out
12   Memorial Day Friday and then the next one came out --
13           THE COURT:  June?
14           MR. CROSS:  June.  About a week or two later.
15           THE COURT:  But the server had already been taken?
16           MR. CROSS:  Yes.
17           MR. TYSON:  Your Honor, just on those points, I think
18   it is important to recognize too that testimony and everything
19   here is the Secretary's office couldn't get into the server.
20   So you couldn't access hash validation or any of these other
21   tests before deciding to replace them, which was 13 and 14
22   was -- there were questions on both of those.  So if you
23   couldn't get into it, you couldn't do a lot of those things
24   absent bringing in a more technical hand on that.
25           So, again, I don't know that it is worth kind of
```

```
 1   going back over that.  We know what was done and when it was
 2   done.  But --
 3             THE COURT:  All right.  I think that is --
 4             MR. CROSS:  Yeah, Your Honor.  If the answer --
 5             THE COURT:  That is correct.
 6             MR. CROSS:  If the answer is they didn't do the
 7   things we asked in 13 and 14 --
 8             THE COURT:  I mean, it is sort of obvious at this
 9   juncture.
10             MR. CROSS:  We thought so, but we just wanted to
11   confirm.
12             THE COURT:  All right.  Let's look at 15.  All right.
13   This is the resetting of the time.  Is this still an
14   outstanding issue?
15             I'm a little -- or are you concerned that he -- that
16   it was really Mr. Persinger who -- Persinger who reset the
17   time?
18             MR. CROSS:  No.  No, not at all.  Our experts, I
19   think, can tell when the time was reset, I think.  But it looks
20   like it was done in January of '21 so by folks then on both the
21   ICC and the EMS.
22             We, again, were just trying to confirm that
23   Mr. Persinger is seeing the same thing that we were seeing
24   about that time change and if he had any analysis or findings
25   related to it.
```

1          It looks like from his declaration that he

2     acknowledges that time change was done.  So I think we're good

3     on that.

4          THE COURT:  All right.  So on Question 16, knowledge

5     of the Secretary of State's office about Mr. Lenberg and his

6     activities, et cetera.  And then Mr. Sterling said that he was

7     aware that Lenberg was there but GBI was taking the lead on

8     that and the Secretary's office had no specific knowledge about

9     what Lenberg might have done.

10          MR. CROSS:  Again, Your Honor, if the answer on that

11    is the Secretary's office has no knowledge, that is fine.  But

12    the way we took Mr. Sterling's testimony was another situation

13    where he was saying he personally didn't know but we didn't

14    hear anything from him that indicated to us that he had

15    investigated that and who he would have talked to about that.

16          The other context, Your Honor, just to keep in mind

17    is remember in the spring we heard a number of times from the

18    State that they had on ongoing investigation and that is what

19    led to the investigative privilege.

20          We still have not heard anything about what that

21    investigation was.  So we're -- that was a big part of this

22    deposition was to understand -- we know Mr. Persinger didn't

23    begin what he was doing until July.

24          So what was the investigation that was happening at

25    least in the spring of this year?  Who was doing what?  Who was

1    involved?  What did they find?

2         And Mr. Sterling was not prepared to speak on that

3    other than a really high level.

4         MR. TYSON:  Your Honor, I'll just disagree on that

5    point.  I mean, he talked to Ms. Koth, who is the current

6    director of the investigation process.  I understand that there

7    was not the kind of velocity and volume of investigation the

8    plaintiffs might expect.

9         But I think Mr. Sterling was very specific about what

10   happened.  And the Secretary's office made the investigative

11   decision, as Ms. Koth outlined, to go with, let's determine

12   whether there is any fact behind this new allegation from

13   Mr. Hall before we go out and start spending resources

14   investigating.

15        So the technical part of the investigation was that

16   initial part before we got into the interviews and all these

17   other things.

18        THE COURT:  And what is the first time that the

19   Secretary of State's office has an understanding that there

20   were individuals who spent a number of days at the election

21   office?

22        MR. TYSON:  I think we learned that when -- so I

23   guess sequencingwise, we have Mr. Hall's phone call, among all

24   the other various allegations Mr. Hall made about 2020, all of

25   which didn't pan out except for this one.  Then there was a

1   confirmation in the summer that someone had accessed the server

2   at the same time like Mr. Hall said.  And I believe shortly

3   after that is when the --

4          THE COURT:  Summer of '21 or summer of --

5          MR. TYSON:  Summer of '22.  And that is when the --

6   the surveillance tapes were there and showed the entry and exit

7   of people along the way.  So that was obviously the first

8   opportunity to learn that information.

9          THE COURT:  Is there something more you are looking

10  for, I mean, if they are saying they didn't have it?

11         MR. CROSS:  No.  We just wanted to confirm whether --

12  whether there is any investigation or findings that were

13  reached about what Mr. Lenberg had been doing.

14         If the answer is no, it is none, we just wanted to

15  make sure --

16         THE COURT:  Did the investigation make any findings

17  about what Mr. Lenberg and his group was up to?

18         MR. TYSON:  No, Your Honor.  And Mr. Brown just

19  corrected me, just so the record is very clear, that the Maggio

20  documents also showed access to the server.  And I thought it

21  was surveillance tapes first and then Maggio documents.

22  Mr. Brown is reminding me it was Maggio documents, then

23  surveillance tapes, but in relatively close order there.

24         MR. MILLER:  Your Honor, just for clarity,

25  Mr. Lenberg was not part of the initial allegation of Mr. Hall

```
 1    on the phone call.  So it just kind of drifted with that

 2    information.

 3              THE COURT:  Yes.

 4              Well, I think 17 is the same as everything we have

 5    been discussing.

 6              MR. CROSS:  17 captures the same and 16.

 7              THE COURT:  And 18 is back to the ███████ device,

 8    which I said if he has a record -- if he believes he knows what

 9    the ██████ device is, I think you should identify it.  And --

10              MR. CROSS:  19 was one they agreed to answer.

11              MR. TYSON:  Yes.  And the answer to that is an

12    external hard drive.  I think the only question was how did we

13    want to best get that to you as testimony.  Was a declaration

14    going to be enough?  But it was an external hard drive.  We

15    have confirmed that with Ms. Nolette.

16              THE COURT:  Do you want anything else beyond that for

17    them to say that in writing?

18              MR. CROSS:  Yeah.  If they just want to put that in

19    writing, that is fine.

20              THE COURT:  What about 20?

21              MR. CROSS:  We would like an answer to that question.

22              MR. TYSON:  Your Honor, I mean, we can investigate

23    that, I guess.  I may ask Ms. Nolette that question.  But I

24    think again the challenge with like a question like this is it

25    assumes information that we haven't independently verified.  I
```

1    mean, it is alleging that this can be done.  I'm sure it can

2    be.

3         But we haven't had our experts kind of check and see

4    whether that is correct or not.  So it is a little weird to

5    say, Ms. Nolette, did you know that this could happen if we

6    don't know -- if no one -- all we have is the plaintiffs'

7    counsel's representation that it can happen.  We don't have a

8    declaration from anybody or an expert report or anything --

9    anything that says this can be done that we can then ask about.

10        THE COURT:  Right.  Well, you are just asking did she

11   say this information with you.  It is not vouching for the fact

12   that it is real.

13        MR. TYSON:  Okay.

14        THE COURT:  Okay.  We're going to have a five-minute

15   recess.  There is a vending machine if you're going out of your

16   mind.  Go right, turn left, go all the way to the end of the

17   hall.  I find it imperfect.  The Coke machine you have to use

18   real cash.  The one on the other side, you have to -- you can

19   use your credit card.

20        **(A brief break was taken at 4:47 PM.)**

21        THE COURT:  All right.  Just wrapping this up on the

22   matters related to items 1 and 2, the Sterling deposition

23   issues, you are following up on a number of things.  I don't

24   have --

25        MR. TYSON:  Your Honor, could I just run through the

1     list and make sure we're all in agreement?

2              THE COURT:  Yes.  All right.

3              MR. TYSON:  What I have is that we're going to verify

4     whether the ICC was tested before it was replaced.  That is

5     Number 1, as far as password goes.

6              Number 2, email and text messages related to the

7     replacement of the Coffee County server in June of '21.

8              And Number 3, identifying the ████ device to the

9     extent Mr. Persinger has anything that identifies what it was.

10             Number 4, the item in Question 19 and what

11    Ms. Nolette -- N-O-L-E-T-T-E -- from Dominion purchased -- the

12    hard drive she purchased.  We'll put that in.  And then the

13    Question 20 about for Ms. Nolette if she shared the information

14    in the question without assuming that that information is

15    correct.

16             That is my list.

17             MR. CROSS:  Did you say the communication surrounding

18    the June 8th taking of the equipment?

19             MR. TYSON:  Yes.  That was Number 2, email traffic

20    regarding the Coffee County server replacement and any text

21    messages of Mr. Bellew -- that he might have.

22             THE COURT:  Did you have anything else?

23             MR. CROSS:  That's it.

24             MR. BROWN:  That's it.

25             MR. TYSON:  And to clarify, we're doing a declaration

1    for all of these and producing any documents?  Is that how

2    we're proceeding on this?

3             THE COURT:  Sure.

4             MR. CROSS:  For those, yes.

5             MR. TYSON:  Okay.  Thank you.

6             THE COURT:  And where were you about the -- did you

7    want any -- did you want to provide a copy of -- basically

8    identify the files that you think were added and modified to

9    them?

10            MR. CROSS:  We'll do that.

11            THE COURT:  And can Mr. Persinger at least say yay or

12   nay?

13            MR. TYSON:  We can have him do that.

14            THE COURT:  That he has looked at it and he sees it,

15   he doesn't see it?

16            MR. TYSON:  We can have him do that, Your Honor.  I

17   guess kind of back to Mr. Belinfante's point, just procedurally

18   if Mr. Persinger looks at it and says, nay, I don't agree, are

19   we doing a declaration from him to that effect?

20            I guess I'm just trying to think procedurally because

21   now we're getting into kind of the technical piece of the

22   puzzle.

23            THE COURT:  What do you want?

24            MR. CROSS:  I guess if we get a declaration that says

25   what his view is and what the basis for this view is, that

1    would suffice.

2              THE COURT:  And we're talking about files that were

3    altered or disappeared?

4              MR. CROSS:  It is that 1200-something files.  It is

5    like four different categories.

6              THE COURT:  Have you provided that to them, or you

7    are going to?

8              MR. CROSS:  No.  But we can.

9              THE COURT:  I mean, they need to know.

10             MR. TYSON:  And just so everybody is clear,

11   Mr. Persinger also is very precise about like wiping out files

12   versus -- because in his view as a forensic guy, he says data

13   is very rarely actually gone.

14             And so sometimes you can access all the information

15   in the files even if they may not appear easily.  And that is

16   the limits of my technical knowledge on what he does with that.

17   But he has described that process to me, that there is maybe

18   more than just -- it's like the files are not necessarily gone

19   forever.

20             THE COURT:  Okay.  Well, you'll get it to them?

21             MR. CROSS:  Absolutely, yes.

22             THE COURT:  So which one -- which one does he view --

23   he views the copy as the pristine copy?

24             MR. TYSON:  Yes, Your Honor.  So Mr. Persinger's

25   explanation to me is that since he makes them using this

forensic process before the machine boots up that the contents
of both hard drives are exactly identical.  And so there is no
distinction in his mind between the two versions.  There is a
completely pristine version preserved before anything is
powered up or anything else happens with it.

THE COURT:  All right.  Now, I wanted to touch on the
issue of the supplementation.  You are expecting to give a
supplemental affidavit of one or more experts, or is it just
going to be Dr. Halderman?

MR. CROSS:  For Curling, only Dr. Halderman and only
limited to the Coffee County implications.

MR. BROWN:  Dr. Stark and Mr. Skoglund are the only
two witnesses.  I'm not sure if Dr. Stark has any additional
things to say.  We've traded emails on that.

Mr. Skoglund will be wrapping up his analysis of what
was done in Coffee County based upon these late depositions as
to what was taken, the implications of that, and giving his
expert sort of overview of the evidence.  And then I think that
will be helpful.

So we viewed -- meaning the Coalition plaintiffs
viewed the time for identifying witnesses -- expert witnesses
we believe is long past us.

THE COURT:  I'm just looking at here is -- just
straight.  I'm just trying to figure out whether -- I think the
time has been -- has gone.  But it doesn't mean that when they

1    get a supplemental expert witness that -- affidavit that there

2    shouldn't be some ability of the defendants at least to take an

3    abbreviated deposition of the expert concerning those --

4            MR. BROWN:  If we --

5            THE COURT:  -- that supplementation.

6            MR. BROWN:  We would -- any supplementation that we

7    would provide would be with the recognition that if they needed

8    to take a deposition that that would be acceptable.

9            David?

10           MR. CROSS:  Sure.  Of course.  Yeah.

11           THE COURT:  All right.

12           MR. BROWN:  But just to be very clear, we will do

13   that seasonably under the rules, not necessarily on the 22nd,

14   which is the -- we're not taking any more fact depositions

15   after the 22nd.  That is done.

16           But the last two depositions are germane to the

17   expert testimony.  So it will be probably by the end of the

18   month before we get it.

19           THE COURT:  Well, try to schedule when you are --

20   they may want it for their brief.  So you have got to schedule

21   it.

22           MR. BROWN:  I'll talk to them.

23           MR. MILLER:  Your Honor, you jumped to the exact

24   concern of mine, which was our concern as to the initial

25   proposal of the fact deadline is we saw this exact thing

1  happening.

2          You know, without seeing it, I can't say whether it

3  is actually supplementation or not.  But I appreciate Your

4  Honor's recognition of the concern here is that we also have to

5  read it, digest it, take a deposition, and file our brief all

6  within at most three weeks.

7          MR. BROWN:  What we're saying is that we're not going

8  to hold you to the 22nd deadline on expert discovery if we --

9  if we supplement the expert findings seasonably.  We have

10  identified the experts.  You haven't taken any depositions.

11          We have new information that the experts are going to

12  talk about.  And we will give that in the form of either a

13  supplementation to the interrogatories or in a declaration.

14  I'm not sure yet.

15          But the discovery deadline -- you know, we could take

16  the position, I guess, we can do a supplemental under the rules

17  whenever we want and you don't get any discovery on it.  We're

18  not saying that.  We're saying if we supplement it and you want

19  to take a deposition you can.

20          THE COURT:  Well, all I'm saying is I think you

21  should schedule them, especially given everyone's schedule and

22  it is Thanksgiving and holidays, et cetera, that it is

23  important -- and they have a deadline.

24          MR. BROWN:  Yes, Your Honor.

25          THE COURT:  You need to go ahead and schedule that.

```
1   I don't need to be a party of that.  But just figure out the
2   dates that you can do it.
3            MR. CROSS:  And the depositions would be limited to
4   the scope of the new reports?
5            THE COURT:  That's right, or any supplementation.
6            MR. MILLER:  We wouldn't want to do anything
7   differently than that.
8            THE COURT:  I'm sure you don't.
9            MR. MILLER:  I am very hesitant to ask you to add
10  another deposition to the list here.  Believe me.
11           MR. BROWN:  We completely agree with the need to
12  start the scheduling today so that everybody's schedule can be
13  taken care of.
14           MR. TYSON:  And, Your Honor, just so the record is
15  clear, Mr. Cross has handed me a list of files.
16           David, is there going to be like a key for what the
17  colors mean?  Is there going to be anything about who created
18  this?
19           MR. CROSS:  I believe it says it at the top.  The key
20  is at the very top.
21           MR. TYSON:  It doesn't.  It has a list of file types,
22  but it has different colors on it and no explanation for the
23  colors.
24           Is there an indication of who created this, when they
25  created it, how they created it, or anything like that?
```

```
 1            MR. CROSS:  Dr. Halderman and Kevin Skoglund prepared
 2     it together.  I thought the key was with it.
 3                (A discussion ensued off the record.)
 4            THE COURT:  Are you trying to find out?
 5            MR. CROSS:  Yes.
 6            THE COURT:  All right.  We'll move on.
 7            So then I wanted to know how you wanted to handle any
 8     confidentiality issues during summary judgment.  Because I
 9     think we finished the Persinger declaration, other than --
10     we've already discussed that.  So --
11            MR. BELINFANTE:  Your Honor, I think what we have
12     done in the past is -- and I will acknowledge that the types of
13     confidentiality issues are very different here than in the
14     prior cases.  But we had submitted fully unredacted briefs to
15     the Court under seal and then submitted ones on the record that
16     had redacted materials that were deemed confidential.  And that
17     seemed to work.
18            But I recognize that, you know, it was one thing when
19     you were talking about voters' names and personal information
20     and another one when you could have a significant amount more.
21     But I don't know of another way to do it for now.
22            THE COURT:  I don't know either.  I don't even know
23     what the information will be there.  That is the problem.  I
24     don't know whether -- for instance, on anything said about
25     Coffee County, I don't know what the parties' views are going
```

1    to be about it at that point and whether -- what the risks are

2    involved there.  It is sort of this nomad's territory.  That is

3    why I wanted to open it up.

4         Obviously I have been much more absolute about --

5    ironically on my own about the Halderman report though.  We're

6    going to at some point here be through with the election.  But

7    I still have some anxiety in conjunction with all the other

8    stuff.

9         And I don't think I ever thought we were going to --

10   I'm sure none of you did think we were going to have a whole

11   election deniers as a profession.

12        MR. CROSS:  Or campaign strategy.

13        THE COURT:  Well, I'm not sure about the buying

14   towels either in Coffee County when there are no mills there.

15        Anyway, go ahead.

16        MR. BROWN:  Your Honor, we've got some -- well, I

17   should say we tried to get some testimony about that.

18        THE COURT:  I'm not sure.  It might be absolutely 100

19   percent --

20        MR. CROSS:  Everybody is pleading the Fifth on that

21   particular point.

22        MR. BROWN:  Everybody is pleading the Fifth.

23        MR. CROSS:  On that particular point.

24        MR. BROWN:  Looking ahead -- and Your Honor is

25   familiar with this.  But the standards for governing

1  confidentiality in discovery shift in when it goes to the

2  merits.

3          THE COURT:  Right.

4          MR. BROWN:  And we -- as you know, we've had

5  difficulties even at the discovery stage agreeing with the

6  State as to what should be confidential or attorneys' eyes only

7  already, our view being that -- I'm not talking about

8  personally identified information.  It is not that kind of

9  information.  But that the confidentiality the State is

10 asserting needs to be viewed to whether it really is the kind

11 of thing currently that is going to damage or threaten

12 elections, not something that's embarrassing, not something

13 that has to do with an investigation that is long past.

14          And what is going to happen is that the -- we will be

15 advocating for as open a proceeding as possible for a number of

16 reasons.  One is just a matter of principle but also

17 particularly given the current political environment, which is

18 relevant to any balancing that Your Honor would go through in

19 determining what to keep under seal.

20          It is more important than ever that the bases for

21 Your Honor's decisions be available to the public first and

22 then same -- to put it another way is that to the extent that

23 the Court is relying on anything that the public cannot see,

24 then that will feed disinformation and distrust regardless of

25 which way Your Honor rules.  It doesn't matter.

1          And so that every effort needs to be made to -- in

2     the way that it is presented, in the way the evidence is

3     presented is to keep absolutely as much of the record that Your

4     Honor would be relying upon public.

5          And if there is anything to be -- still to be

6     reserved to be under seal -- and I'm not aware of anything that

7     would really fall in that category -- that it be extremely

8     limited.  And that is going to -- you know, the press is going

9     to be pushing for it.

10          MR. BELINFANTE:  With help.  Sorry.

11          MR. BROWN:  I mean, we would agree with them.  We're

12     not going to help -- I mean, we're not going to do anything

13     inappropriate.  They would have our support certainly because

14     we would agree with the press' position on it.  But it is a

15     fact that they will be.

16          And if you look at the case law, the case law is

17     usually, you know, Richmond Newspapers v. So-and-So.  It is

18     usually a press that does it.  And the main Eleventh Circuit

19     cases are press cases.

20          But that is the reality.  That is going to happen.

21     And to the extent that we can keep this as open as possible, it

22     will mute that inevitable intervention and give Your Honor's

23     decision either way the kind of record that the people can

24     trust and be very hard for them to shoot at because they

25     don't -- for the reasons that there is something that is not

 1    disclosed.

 2            If you look through the things that are likely to be

 3    left confidential, the Halderman report -- the parties agree

 4    that that should be public.  And it will be by the time this --

 5    I mean, I don't want to be presumptuous.  But given the

 6    election, it may be not under seal by then anyway.

 7            But I'm not certain of really what there is left that

 8    is genuinely subject to being under seal.  It may be that the

 9    State agrees.  The State, to their credit, has not taken the

10    position that they -- for example, they agree that the

11    Halderman report for the same reasons that we do should be

12    public.

13            And so we're not -- we're not presuming that the

14    State is going to overdesignate things to be under seal.  We

15    just hope that they don't and that that be looked at very

16    carefully.

17            THE COURT:  Well, I'm well aware of what the

18    standards are for summary judgment.  But I don't know really

19    what -- what are the matters that somebody is going to consider

20    so sensitive that it would be potentially confidential.

21            And I don't know if that is something whether you-all

22    could talk about in advance or you are just going to file it

23    that way and then we'll address it later.

24            MR. BELINFANTE:  If I may, I think there is both a

25    pragmatic or practical impact and a legal, if you will, or --

```
 1    we don't want to overdesignate.  What we really don't want to
 2    do though is to the extent that there is an investigation that
 3    we don't know about prejudice that investigation.
 4            And so I do think that what we've seen in the past --
 5    for example, I know we've gone back and forth about
 6    overdesignation.  Our answer was we were doing that so we could
 7    get you documents quickly and so on and so forth.
 8            From a pragmatic standpoint, I'm sure that whatever
 9    we file there will be challenges to certainly some of the
10    designations.  I'm hopeful that it will be few and far between.
11    But, you know, I'm sure in trying to get to the point of
12    getting the briefs to you there will be some things we just
13    disagree about.  I would like to think that we could work those
14    out.
15            But I think if we were to file something originally,
16    you know, with the Court that we would provide obviously to
17    counsel as attorneys' eyes only and then hopefully we can work
18    that out.
19            I don't want to take up the Court's time in resolving
20    these issues.  But I don't think that it is going to be
21    terribly significant.  But for all I know, there is going to be
22    new developments in criminal proceedings between now and, you
23    know, December anyway.
24            THE COURT:  Well, you're going to do what you are all
25    going to do.  But I would say once you designated them I would
```

```
 1   rather go through you sitting down and really trying to talk

 2   about them than having motions immediately.

 3          MR. BELINFANTE:  Sure.  Right.

 4          THE COURT:  I really don't want to have motions

 5   before you have actually conferred about them.

 6          MR. BELINFANTE:  Okay.

 7          THE COURT:  It is a lot of work.

 8          And I'm looking at the order -- well, I'm going to

 9   just stick with this for now.  There's also the transcript of

10   this conference, which I scheduled so that we would actually

11   talk.

12          Do you have a view about that?  Because we've been

13   also talking about the -- to some extent obviously about the

14   Coffee County investigation.

15          MR. CROSS:  My view, Your Honor, is there is nothing

16   that has been discussed in the transcript here that would

17   warrant sealing.

18          MR. TYSON:  I mean, the nature of the ███ device

19   I think maybe would be the main concern there.  I know that a

20   ███ device exists, which was Mr. Miller's earlier point.

21   To the extent the GBI is relying on that when they interview

22   people to see what people's knowledge is on those things, I

23   just don't want information like that --

24          THE COURT:  Why don't we just -- why don't we just

25   omit the word -- the brand name device.  Just put device --
```

```
 1              MR. TYSON:  I think that works.
 2              THE COURT:  -- in the public version that is filed.
 3              MR. TYSON:  Beyond that, Your Honor, I don't think
 4    there is anything that I have a concern about either.
 5              MR. CROSS:  Your Honor, I guess two quick thoughts on
 6    the dispositive motions.  One is:  I think it is important that
 7    the parties file redacted versions immediately.
 8              So I didn't want to interrupt.  But --
 9              THE COURT:  That is all right.
10              MR. BELINFANTE:  I think they would be simultaneous.
11              MR. CROSS:  Yeah.  Okay.  I just wanted to make sure
12    we were clear on that.
13              And then it sounds like we're all agreed that it is a
14    different standard for discovery.  The only reason I have some
15    concern that we may not be aligned on this is, for example, in
16    the Sterling deposition we do have a disagreement there on the
17    designations, which cover things that are already in the public
18    domain like, for example, his testimony about the Cyber Ninjas
19    card being found in Coffee County.  That is in the public
20    domain.  They have designated that confidential.
21              MR. TYSON:  To be clear, like for that one, that was
22    because there is also a discussion of the investigative piece
23    like what happened after that.  That was the piece we are
24    trying to protect.
25              The Cyber Ninja thing is public.  There was a
```

1    discussion about what the Secretary's office -- there was a

2    follow-up email and other stuff.  That is what we're trying to

3    protect there.  I don't think we're trying to overdesignate on

4    anything we're doing with that.

5           MR. CROSS:  Okay.  I mean, I'm not sure why that

6    would be confidential either.  But I guess we'll see how it

7    plays out in the filings.

8           THE COURT:  Okay.  Then just to circle back to --

9    there was a request in the beginning for me to follow up on the

10   remand order from the Eleventh Circuit.

11          And are you thinking what I have to do is expressly

12   vacate the prior orders?  I thought they basically got vacated

13   by the Eleventh Circuit, so I'm not --

14          MR. BROWN:  Yes and no, Your Honor.  I believe sort

15   of it is what it is.  But the order on the Poll Pads --

16          THE COURT:  Right.  It wasn't --

17          MR. BROWN:  Their ruling, incorrectly, was that that

18   should be vacated.  Their correct ruling was that the order on

19   the scanners stays in place, and they haven't touched it.  They

20   said they had no jurisdiction to touch it.  So the answer is

21   different on those two.

22          On the Poll Pads, by reversing the preliminary

23   injunction, they didn't dismiss it.  It is still in the case.

24   It is just that your ruling on the preliminary injunction is

25   obviously vacated.

 1          So our Poll Pad claim is still in the case, and we

 2   would -- we're going to present something to the Court that is

 3   streamlined and sensible and run it past you first and through

 4   Curling first as to how we work that into the case so that it

 5   doesn't push off the trial particularly in how it is done

 6   sensibly and quickly.

 7          And it will be different for the Poll Pads than for

 8   the scanners.  For the scanners, it gets tricky because there

 9   was a preliminary injunction.  But we got right to the point of

10   the remedy -- the specific remedy.  We need to revisit that to

11   refresh it, to make sure that it is consistent with the

12   existing technology.

13          And you'll recall that the -- the time pressures that

14   Your Honor recognized were such that we gave an interim

15   solution and suggested that a more robust solution was possible

16   with a little bit more investigation by Mr. Hursti.

17          The defendant said, well, if you don't have the

18   perfect solution, then the injunction should be denied.  You

19   rejected that.  But that is where we were.  That is the sort of

20   freeze frame, and then it was appealed.

21          And so the Eleventh Circuit said, well, she hadn't

22   decided -- Your Honor hadn't made a final order and therefore

23   it is not reviewable.  So that is where we are on that.

24          But what we would do would be to simply pick up where

25   we left off but with the recognition that there has been --

```
 1    what? -- a year --
 2              THE COURT:  More.
 3              MR. BROWN:  -- at least of -- we're not saying, you
 4    know, we get to start discovery way back then.  We will focus
 5    on those claims and get it done with dispatch.  And our
 6    recommendation will be -- and we don't see there is any reason
 7    not to do it -- is those claims would be tried with all the
 8    other claims as well on the merits.
 9              THE COURT:  Well, you're not seeking a remedy at this
10    point?
11              MR. BROWN:  No, Your Honor.
12              THE COURT:  That is what I want to be sure.
13              MR. TYSON:  But you're seeking more discovery, Bruce?
14              MR. BROWN:  Yeah.  Well, the discovery was stayed.
15              THE COURT:  On the remedy?
16              MR. BROWN:  Yes.
17              THE COURT:  But you are seeking discovery post --
18    you're getting the summary judgment motion in?
19              MR. BROWN:  Well, Your Honor, back when it was on
20    appeal, we tried to get discovery on this.  The State said no,
21    you can't do it while the Eleventh Circuit has it.  We frankly
22    thought they were correct technically.  So we didn't fight
23    that.
24              But we didn't get to any discovery on those claims
25    while all this other discovery was going on.  So yes, we
```

1  believe we clearly get discovery on it.  And that -- I mean,

2  I'm not sure what the State is going -- whether the State is

3  going to move for summary judgment on those claims on the

4  merits, you know, besides their standing argument again.  But

5  if they did, we would, I think, file a meritorious 56(d) or is

6  it (e) --

7          MR. TYSON:  (e), (f), something like that.

8          MR. BROWN:  But the motion you file if you're not

9  ready to respond to a motion for summary judgment.  It is (d)

10 or (e).  Sorry.  But that is -- we would be entitled to that

11 because we haven't had full discovery on it.

12         I don't think we'll need it to defeat summary

13 judgment.  You know our views on that having prevailed on the

14 summary judgment at least on the scanners.  We have a very

15 light burden of showing that we would also defeat a much easier

16 motion for summary judgment to defeat it.  But if we do need

17 additional discovery, that would be the form of it.

18         But what we're hoping to do, Your Honor, is to have a

19 proposal where we would be actually doing the discovery while

20 the defendants are finishing up their 50 pages -- 100 pages of

21 briefing now.

22         THE COURT:  Well, what sort of discovery are you

23 looking for?

24         MR. BROWN:  On the Poll Pads, the State has changed

25 the way they do it.  And so we would need to refresh our claims

1    to correspond to the new way that the State is receiving the

2    information to make our claim consistent with the moving

3    target.

4            In addition, Judge Grant's opinion particularly has

5    two pieces to it.  One, she said that the burden was not severe

6    on the right to vote and so therefore it went to a lower

7    threshold of reasonability.

8            The Eleventh Circuit then went into a remarkable

9    appellate review of the facts in a very fact-intensive inquiry

10   suggesting to us a roadmap for the facts that we needed to

11   develop to the extent we haven't already developed them.

12           I don't have a -- I do not at this moment have a very

13   tight outline of what actual discovery that we would need on

14   the Poll Pads.  A lot of it will be our own work and not

15   needing compulsory discovery from the State.

16           But that is why I was hoping to kick the can down the

17   road for about ten days to give you that list.  And then on the

18   scanner, much the same.  Although it will be a little bit

19   further along since we have already established liability of

20   that.  It is a matter of fashioning correct full relief.

21           THE COURT:  So you are saying the Poll Pads have been

22   changed but the scanners have not been changed?

23           MR. BROWN:  We believe that is correct.  Now, we

24   don't have access to everything.  I mean, you may know

25   differently.  But Your Honor may recall that the SEB made one

1    change in the settings that was not sufficient.  We proved that

2    it wasn't sufficient.

3          Whether there have been other tinkering with the

4    standards, my client or some of our experts will know.  Sitting

5    here today, I do not know.

6          MR. TYSON:  I'm not aware of any further changes to

7    the scanner thresholds.  There was a pilot program with the

8    Poll Pads.

9          Is that what you're talking about for the voter

10   certificates?

11         MR. BROWN:  No.  On the Poll Pads, it is how they are

12   updated.

13         MR. TYSON:  Oh, yes.  Okay.  That piece.  Yeah.

14         MR. BROWN:  Now, it is more real time than it used to

15   be.  Or I mean, we need to know more about how it is updated

16   because that is going to be one of the important factors.

17         So what we would --

18         THE COURT:  Well, if they are updated on a more

19   real-time basis, does that perhaps moot out some of your claims

20   on the Poll Pad?

21         MR. BROWN:  I'm not sure.  It doesn't moot out the

22   whole thing.  The Poll Pad piece of this that we might have

23   made -- not made clear enough to the Eleventh Circuit is that

24   there are different pieces of the Poll Pad difficulty.

25         One is their vulnerability to just stop.  And if they

1    stop working, everything stops.  The other is the fact that

2    they are not -- they were not updated with the current

3    information.  So that is why -- to solve both of those

4    problems, we thought get it in paper and get it up to date.

5    That would take care of both of those.

6          So recent technological changes may have improved the

7    currentness of the information but would not have improved the

8    brittleness of the technology.

9          THE COURT:  Well, everyone likes to be affirmed.  I

10   get affirmed a lot actually by the circuit court.  But, you

11   know, if they thought this was tinkering with the

12   administration of the election system, I'm not sure that that

13   general perspective will change absent some extraordinary piece

14   of evidence.

15         I mean, I think -- I think I do a good job of

16   marshaling the evidence I rely on.  If they didn't see it the

17   same way as I did, that is the way it is.

18         But, you know, I guess you have to determine what you

19   are going to -- if you are reraising this again how many pages

20   you really want to spend on it.  Because that is my concern.

21         But I think it does make sense for you to obviously

22   think about this.  And you need to really obviously sit down

23   and talk with defense counsel about what you have in mind so

24   that it is not just an enormous drag because they still have to

25   do a reply brief too.

```
1              So without expressing more of an opinion than that, I
2     mean, I have some concerns.  You would have to really define
3     what discovery you want, the length of it.  I think all those
4     sorts of things -- and the scope of it so that you could have a
5     meaningful discussion with defense counsel about it.
6              MR. BROWN:  Yes, Your Honor.
7              THE COURT:  So I think you-all do this.  But I want
8     to just remind you that if you are having a statement of
9     material facts and you are doing a reply make sure you put the
10    statement, plus your response, plus anyone else's so that by
11    the time we get to the end we've got everybody's.  Be sure to
12    be prepared to give me a physical copy as well as an electronic
13    copy.  And I don't know how many attachments are going to be
14    there.  That is sort of a little bit of a staggering thing.
15             I mean, personally I don't think I can functionally
16    deal with, even though we have notebooks that are bigger than
17    this, than something like this.  Because beyond that, we need a
18    second volume because it is just too much to deal with.
19             We'll think more about it.  But it is a lot to read,
20    a lot of work.  And I know that my law clerks read most
21    everything electronically.  I do some electronically and some
22    by paper.
23             But the question of whether we need to have every
24    single deposition printed for us is another matter.  We needed
25    it as to -- because y'all were going back and forth so much
```

```
 1    about Mr. Sterling's, we needed the pages because we just -- we
 2    really had to find every time you were going to talk about
 3    something and see if it was in context and where else it was
 4    talked about.  So as a --
 5              MR. CROSS:  Your Honor, I would suggest on that maybe
 6    wait until you see the briefs because there are a lot of
 7    transcripts and some of them are pretty long.  A lot of them
 8    are real -- some of them -- yeah, a lot of at least the Coffee
 9    County ones are pretty short.
10              But usually in my experience getting the excerpts
11    from each side is enough.  But if something is missing, we can
12    supplement.  But, otherwise, it is going to be a lot of volume.
13              THE COURT:  An enormous amount of paper.  Okay.  That
14    is fine.
15              Do you have any other suggestions?  Because you're
16    having to assemble them too and read them from each other.
17              MR. CROSS:  We could just forgo summary judgment
18    briefing.  No?
19              MR. BELINFANTE:  We have been down that road.
20              THE COURT:  I know we've got to talk about your
21    proposal that they disagree with, but I haven't been educated
22    as to what they agree with.  I'm just talking about physical
23    production.
24              MR. CROSS:  On the pages?
25              THE COURT:  On the pages --
```

```
 1              MR. CROSS:  We worked that out.

 2              THE COURT:  -- on the presentation of the exhibits.

 3   Just simply -- you worked out the pages?

 4              MR. CROSS:  We're not objecting to their page

 5   request.  We think it is probably not needed, but we're not

 6   objecting to it as long as we get no fewer pages.  Really we

 7   just defer to Your Honor's judgment as to what --

 8              THE COURT:  Well, 50 pages is not an unreasonable

 9   amount.

10              How much are you talking about on the reply briefs?

11              MR. BROWN:  It is 50 each.  It is 100.  50 for us.

12   50 for them.

13              THE COURT:  I know.  And they want to do 50 --

14              MR. CROSS:  And 25 on the reply.

15              THE COURT:  You don't want them to have a sur-reply?

16              MR. TYSON:  Right.

17              MR. BELINFANTE:  Not at this time.  I mean, if --

18   certainly if --

19              MR. CROSS:  We're not asking right now.

20              THE COURT:  Okay.  Why don't we see what -- how you

21   react.

22              Okay.  Well, but do -- to the extent -- I would like

23   to have at least one copy of the briefs and not be tied

24   completely to the computer.  I just don't like reading huge

25   volumes only on the computer.
```

1          MR. CROSS:  I'm the same way, Your Honor.

2          THE COURT:  So anything else?

3          MR. BROWN:  Your Honor, there is just one point of

4   clarification.  You quite appropriately admonished us to be

5   very careful about the boundaries of anything relating to AEO

6   and for us to bring this up.  It may not be necessary.

7          When we filed a motion with respect to Ms. Marks to

8   have access to AEO, the motion was specific to Coffee County.

9   If you -- if you -- if you review the transcript and the

10  back-and-forth and the reasoning of Your Honor, it would extend

11  to all AEO.

12         And so we wanted to get clarification that that was

13  the case.  The reasoning that Your Honor followed was that

14  there is nothing in the protective order that gave the

15  defendants the right to veto our choice of a consultant and

16  that it is just not in the protective order.

17         And therefore we would -- we had the power to

18  designate whoever we wanted as a consultant.  And we -- and you

19  remarked that Ms. Marks was a consultant and therefore she

20  should have access to the AEO.  You could read Your Honor's

21  order as allowing AEO generally.

22         However, in an abundance of caution, since our motion

23  was brought asking for it specific to Coffee County, we didn't

24  want to unilaterally take that -- and it wouldn't be an

25  aggressive position, but we didn't want to -- in an abundance

1    of caution, we want a clarification on that.

2              It is crucially necessary and even --

3              THE COURT:  Well, I understood that you think you

4    need her for your -- for writing a brief and that you're not --

5    and that she has an intimate familiarity.  And I do still think

6    that you have a right to do that.

7              I thought that -- you know, I'm not prepared to say

8    you can't.  But I would say to you when Ms. Marks assumes that

9    role there just still simply is -- there is that role, which is

10   a very important role to your effort, and I recognize that.

11   But I think that there is -- you know, while we're trying to

12   make everything public, if it becomes public before it actually

13   is filed in a public document, that that is not necessarily

14   consistent with her obligations as a member of your team.

15             It is not public at that point until it is filed.

16   And so if that is a problem for her or for you, then I need to

17   think about a different formulation of this.

18             MR. BROWN:  Your Honor, I'm not prepared to have sort

19   of a -- to -- on behalf of my client to concede to sort of a --

20   well --

21             THE COURT:  She has a right as a leader of this

22   organization to do a lot of things.  There is no question of

23   that.  It is just when you end up getting information that is

24   not yet public that she -- I mean, if it is in the public realm

25   already, she can comment on anything she wants to comment.  She

1    is a citizen of the United States.

2            MR. BROWN:  I think the answer here is that the

3    question that we raise is the AEO designation.

4            THE COURT:  I understand.

5            MR. BROWN:  And that doesn't take away all of our

6    obligations to keep documents confidential.

7            THE COURT:  Right.

8            MR. BROWN:  That is the separate piece of making

9    anything public.  She could not -- we could not now or before

10   make confidential documents public, even if she could see them.

11   So that is not an issue.

12           THE COURT:  All right.  That is what I just want to

13   just confirm that there is absolutely no -- there is no problem

14   with that because I don't -- that would be a very unfortunate

15   thing to have to be having a hearing about.

16           MR. BROWN:  Your Honor, we totally understand.  And

17   in terms of -- we genuinely understand and appreciate the way

18   you have presented the various obligations that the parties

19   have that are different than lawyers and fully appreciate that

20   and understand the implication of taking on the responsibility

21   as other implications about other things that a party might or

22   might do differently.

23           But we -- that is one of the reasons why we came to

24   you with this, even though -- to be as careful as we could with

25   it.

```
 1            THE COURT:  Well, you know, I'm just leaving you with
 2    the responsibility ultimately here to make sure it goes right.
 3            MR. BROWN:  Thank you, I think.
 4            THE COURT:  And there is no meeting or long
 5    conversation where we don't end up with plaintiffs' counsel
 6    saying, what about the fee order?  You have made a lot of work
 7    for me.
 8            You know, this is the -- I'm a busy person, and I
 9    have had a lot of trials, but you have had a lot of discovery.
10    So you have -- you used up the allocation.  We were making
11    great progress until all of this stuff happened.  So, you know,
12    we'll --
13            MR. BROWN:  I told Mr. Cross not to bring it up.
14            MR. CROSS:  Right.
15            MR. BELINFANTE:  Similar to Mr. Cross, just deny.
16            THE COURT:  That is what you told him.  Excellent.
17    That is fine.  That would be a lot faster.
18            MR. BROWN:  Take your time, Your Honor.
19            THE COURT:  All right.
20            MR. CROSS:  Just two quick discrete things.  I did
21    want to see if it looks like we have a disagreement on the
22    supplemental discovery point I started with.  I don't know if
23    you guys have had time to think about that.
24            MR. BELINFANTE:  We have not.
25            MR. TYSON:  I got it this morning, and then we were
```

1    preparing for the hearing or for this conference.  So yeah.

2            MR. CROSS:  Okay.  And then the other thing:  Just to

3    give Your Honor an update, the two motions that are pending in

4    front of you on the Cathy Latham discovery -- it is their

5    motion to quash the subpoena with protective order and then our

6    cross-motion to compel -- we will come back to you in short

7    order.

8            But we are at a point where we will either withdraw

9    those motions because we're just exhausted or we ask you to

10   rule on them because it is clear we're not getting anywhere.

11           THE COURT:  You resolved some things?  I mean, I

12   thought you had resolved quite a bit but then --

13           MR. CROSS:  We reached an agreement, but we can't get

14   them to comply.  So I'm -- frankly, Your Honor, I just -- it is

15   a strategic decision of whether we put more money into this.  I

16   will let you know in short course on what we will do with that.

17           THE COURT:  All right.  Thank you.  We look forward

18   to it.

19           MR. CROSS:  Yeah.

20           THE COURT:  Okay.  Anything from anyone else?

21           MR. BELINFANTE:  Not from this side.

22           **(A discussion ensued off the record.)**

23           THE COURT:  Thanks very much.  I know you will stay

24   in touch.  I'm positive of that.  So be well.

25           If I don't talk to you, have a good Thanksgiving.

1          MR. CROSS:  Thank you, Your Honor.

2          MR. TYSON:  Thank you, Your Honor.

3          THE COURT:  And I think it was productive.  Thank you

4    very much.

5                    **(The proceedings were thereby concluded at 5:47**

6               **PM.)**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3  UNITED STATES OF AMERICA

 4  NORTHERN DISTRICT OF GEORGIA

 5

 6       I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7  the United States District Court, for the Northern District of

 8  Georgia, Atlanta Division, do hereby certify that the foregoing

 9  119 pages constitute a true transcript of proceedings had

10  before the said Court, held in the City of Atlanta, Georgia, in

11  the matter therein stated.

12       In testimony whereof, I hereunto set my hand on this, the

13  17th day of November, 2022.

14

15

16

17                          _____
                            SHANNON R. WELCH, RMR, CRR
18                          OFFICIAL COURT REPORTER
                            UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```