

Deposition of:
# William Edward Digges , III

*September 23, 2021*

In the Matter of:

# Curling, Donna v. Raffensperger, Brad

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

1           IN THE UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF GEORGIA

2                    ATLANTA DIVISION

3

4    DONNA CURLING, et al.,        )

                                   )

5        Plaintiffs,               )

                                   )  CIVIL ACTION FILE

6    vs.                           )

                                   )  NO. 1:17-cv-2989-AT

7    BRAD RAFFENSPERGER, et al., )

                                   )

8        Defendants.               )

9

10       The remote videoconference deposition of WILLIAM

11   EDWARD DIGGES, III, taken pursuant to the

12   stipulations contained herein; the reading and

13   signing of the deposition reserved, before Charlene

14   M. Hansard, B-2341, Certified Court Reporter,

15   commencing at 10:06 a.m., on Thursday, September 23,

16   2021, with witness located in Marietta, Georgia

17   30066.

18

19

20

21

22

23

24

25

Page 2

```
 1              A P P E A R A N C E S
 2
 3         (All parties appeared remotely by Zoom
 4      videoconference.)
 5
 6   ON BEHALF OF PLAINTIFF CURLING:
 7         Hannah Elson, Esq.
           David D. Cross, Esq.
 8         Morrison & Foerster, LLP
           2100 L Street, Suite 900
 9         Washington, D.C. 20037
           (202) 926-6976
10         Helson@mofo.com
           dcross@mofo.com
11
     ON BEHALF OF PLAINTIFFS DIGGES AND MISSETT:
12
           Cary Ichter, Esq.
13         Ichter Davis, LLC
           3340 Peachtree Road, N.E.
14         Suite 1530
           Atlanta, Georgia 30326
15         (404) 869-7600
           Cichter@ichterdavis.com
16
     ON BEHALF OF STATE DEFENDANTS:
17
           Diane Festin LaRoss, Esq.
18         R. Dal Burton, Esq.
           Taylor English Duma, LLP
19         1600 Parkwood Circle
           Suite 400
20         Atlanta, Georgia 30339
           (770) 434-6868
21         Dlaross@taylorenglish.com
           dburton@taylorenglish.com
22
23
24
25
```

Page 3

```
 1              A P P E A R A N C E S
                    (continued)
 2

 3

    ON BEHALF OF FULTON COUNTY DEFENDANTS:
 4
         David R. Lowman, Esq.
 5       Office of the County Attorney
         Fulton County
 6       141 Pryor Street, SW, Suite 4038
         Atlanta, Georgia 30303
 7       (404) 612-0286
         David.lowman@fultoncountyga.gov
 8

 9  ALSO PRESENT:

10       Ms. Marilyn Marks, Executive Director
         Coalition for Good Governance
11
         Mr. Matthew Riesdorph, Veritext Concierge Tech
12

13

14

15

16

17

18

19

20
    Legend of the Transcript:
21
    (sic)          Exactly as said
22  (phonetic)     Exact spelling unknown
    . . .          Trailing off or did not complete thought
23   --            Break in speech continuity
    uh-huh         Affirmative
24  uh-uh          Negative

25
```

William Edward Digges , III                    September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 4

1

2                        I N D E X

3

WITNESS                                              PAGE

4

WILLIAM EDWARD DIGGES, III

5

        Examination By Ms. Laross ....................6

6

7                   DEFENDANT'S EXHIBITS

8    EXHIBIT
     NUMBER          DESCRIPTION                      PAGE

9

Exhibit 1      Notice of Deposition .................14

10

Exhibit 2      ENET report .........................34

11

Exhibit 3      Coalition Plaintiffs' Statement on ...40
12             William Digges
13   Exhibit 4      Declaration of William Digges, .......58
               III, dated October 20, 2019

14
Exhibit 5      Declaration of William Digges, .......58
15             III, dated September 27, 2018
16   Exhibit 6      Bullet point sheet .................68
17

18         (Originally marked exhibits attached to the

19      original of the deposition and a copy attached

20      to all copies produced.)

21

22

23

24

25

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 5

1              P R O C E E D I N G S

2                                        (10:06 a.m.)

3          (Whereupon, the court reporter complied

4      with the requirements of O.C.G.A. Section

5      9-11-28(d).)

6          THE COURT REPORTER:  Good morning,

7      everyone.  My name is Charlene Hansard.  I am

8      the court reporter.  Today's date is September

9      23, 2021, and the time is 10:06 a.m.  Due to the

10     government's order for social distancing, I will

11     ask counsel to stipulate on the record that

12     there is no objection to the court reporter

13     swearing in the witness remotely by video

14     conference.

15          MS. LAROSS:  I have no objection, Charlene.

16          MR. ICHTER:  No objection for the witness.

17          (The oath was administered to the witness

18     by the court reporter.)

19          MS. LAROSS:  Mr. Digges, my name is Diane

20     LaRoss, and I represent the Defendant, Secretary

21     of State, Brad Raffensperger.  This will be the

22     deposition -- your deposition of William Digges

23     taken by Defendant, Secretary of State, for the

24     purposes of discovery and all other purposes

25     allowable under the Federal Rules of Civil

Page 6

1       Procedure.  All objections, except those going

2       to the form of the question and the

3       responsiveness of the answer, are reserved until

4       trial or first use of the deposition.  Is that

5       agreeable to you, Cary?

6               MR. ICHTER:  Yes.

7               MS. LAROSS:  Charlene -- No, never mind.

8       So, Cary, are you -- you and the witness have --

9       is she -- is he going to reserve signature?

10              MR. ICHTER:  Yes.

11              MS. LAROSS:  Okay.

12  Whereupon,

13              WILLIAM EDWARD DIGGES, III,

14      Having been first duly sworn, was examined and

15      testified as follows:

16                      EXAMINATION

17  BY MS. LAROSS:

18      Q.   Mr. Digges, if you could just go ahead and

19  state your full name for the record, please.

20      A.   William Edward Digges, III.

21      Q.   And can you say that a little bit slower and

22  a little bit louder, please.

23      A.   William Edward Digges, III.

24      Q.   Thank you.  And you had mentioned that you're

25  located in Marietta, Georgia, this morning?

William Edward Digges , III                    September 23, 2021
Curling, Donna v. Raffensperger, Brad

                                                        Page 7

1      A.    Yes.

2      Q.    You'll need to answer verbally to my

3  questions so that the court reporter can take down your

4  testimony.  So you had mentioned that you are in

5  Marietta, Georgia, this morning; is that correct?

6      A.    Yes.

7      Q.    And are you at your home or in an office?

8      A.    My home.

9      Q.    At your home.  Okay.  Is there anybody else

10  with you there in the room where you're giving your

11  deposition from?

12      A.    No.

13      Q.    So I wanted to go over just a couple of

14  guidelines for you about how the deposition will

15  proceed.  First of all, we've sort of already talked

16  about it a little bit.  Especially because we're over

17  Zoom, it's really important that you speak loudly and

18  clearly so that the court reporter can take down your

19  testimony accurately.  So can I have your agreement to

20  do that as to the best of your ability?

21      A.    Yes.  So if I'm not coming through loud and

22  clear, I can attempt to adjust my microphone to be

23  louder.

24      Q.    Okay.  And I can hear you.

25            MS. LAROSS:  And Charlene, can you hear him

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 8

1          all right?

2                    THE COURT REPORTER:  Yes.

3     BY THE WITNESS:

4          A.    Okay.  Good.

5          Q.    Yeah.  And Mr. Digges, just so you know that

6     Charlene will pipe up if she's -- if she can't --

7          A.    Okay.

8          Q.    -- hear anything too.  So we'll let -- we'll

9     let you know.  We're not trying to be rude.  We just

10    need to make sure that have an accurate transcript.

11         A.    Okay.

12         Q.    And that's to a second point which is, if you

13    would, you'll need to wait till I complete my question

14    before you begin answering.

15         A.    Okay.

16         Q.    That way then, the two of us aren't speaking

17    at the same time and that will enable Charlene to get a

18    clear transcript.  Is that also agreeable to you?

19         A.    Yes.

20         Q.    And I mentioned earlier, it's important that

21    you respond verbally and -- again, in order to get an

22    accurate transcript or have an accurate transcript of

23    the deposition.  Nods of the head or motions like that

24    are difficult to record in the deposition.  So is that

25    also agreeable to you?

Page 9

1      A.   Yes.

2      Q.   And today, it is not my purpose to confuse

3  you.  So if I ask you a question that you don't

4  understand, can I count on you to let me know that?

5      A.   Yes.

6      Q.   And today you're being asked to testify about

7  your personal knowledge, so we're asking that you let

8  us know what you know, and then, if there's something

9  in answer to my question that you don't know, that you

10  let us know that as well.  Is that fair?

11      A.   Yes.

12      Q.   And we also ask that you not guess or

13  speculate as to any of responses to my questions.

14  Again, if you don't know the answer, feel free to just

15  let us know that as well.  Is that agreeable?

16      A.   Yes.

17      Q.   And if at any time, Mr. Digges, you would

18  like to take a break, just let us know.  It's kind of

19  sometimes a little awkward when it's on Zoom, but feel

20  free to let us know if you need to do that.  That's

21  entirely fine.  If you would, just if there's a

22  question that I've asked already, if you could complete

23  your answer before we go on break.  So is that also

24  agreeable to you?

25      A.   Yes.

William Edward Digges , III                  September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 10

1          Q.    And Mr. Digges, have you taken any medication

2     today or have any medication that you've taken that

3     would keep you from fully and truthfully participating

4     in today's deposition?

5          A.    No.

6          Q.    Okay.  And in preparation for your deposition

7     today, other than conversations with Mr. Ichter or your

8     attorneys, what did you do to prepare for your

9     deposition today, if anything?

10         A.    I went over the paperwork involved.

11         Q.    Sorry.  You said you went over the paperwork

12    and what else?

13         A.    The paperwork and -- you know, involved,

14    the -- whatever it is -- the declarations.

15         Q.    So you went over declarations?

16         A.    Yes.

17         Q.    And the declarations, were they given in this

18    case that we're here about today?

19         A.    Yes, yes.  They were in the e-mails that set

20    up the -- set up this meeting.

21         Q.    And whose declarations -- who are the

22    declarants?

23         A.    Is that in the little box?  Or is that below

24    the title?  It's me, William Digges.

25         Q.    Okay.  So it's your declaration.  Was there a

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 11

1   declaration for -- from anyone else or given by someone

2   else?

3        A.   No, just mine.

4        Q.   And in that declaration, just in general,

5   what is the -- kind of the substance generally of that

6   declaration?

7        A.   I guess the voting case.

8        Q.   Okay.  Does it concern -- Are you verifying a

9   complaint in the text of that declaration or what's the

10  subject of the declaration?

11       A.   Well, there's a lot of things in here.  I'm

12  not quite sure what you want.

13       Q.   Okay.  Okay.  Is it -- Is the --

14            MR. ICHTER:  Diane, he's referring to

15       declarations that have been filed in the case.

16       They're part of the record.

17            MS. LAROSS:  Okay.  So I know -- So the

18       only declaration that I'm aware of that he's

19       given is one verifying one of the complaints at

20       one point.  So I'm trying to figure out what --

21       which declaration he's talking about.

22  BY MS. LAROSS:

23       Q.   Is there a date on that declaration, Mr.

24  Digges?

25       A.   There are two declarations with my name on

William Edward Digges , III                    September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 12

1    it.  Okay?

2         Q.   Okay.  So the first one, what's the date on

3    it, please?

4         A.   October 2, 2018.

5         Q.   Thank you.  And what's the date of the second

6    declaration?

7         A.   October 23, 2019.

8         Q.   Okay.  Thank you.  Have you reviewed any

9    other documents in preparation for your deposition

10   today?

11        A.   Just some information about what a deposition

12   is.  I've never had one, so I needed to, you know,

13   become aware of just what this is.

14        Q.   And did you review any other documents in

15   preparation for your deposition today?

16        A.   I made a bullet sheet of, you know, things

17   that -- just to summarize what's in the declarations.

18        Q.   Okay.  And do you have that bullet sheet in

19   front of you?

20        A.   Yeah.  Is that okay?

21        Q.   I would just ask that you make that available

22   to us.  You can do that through your attorney.  Is that

23   agreeable to you?

24             MR. ICHTER:  I'll let you know once I've

25        seen it.

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 13

1    BY MS. LAROSS:

2        Q.    Okay.  Can you just make -- just make sure

3    that you send it to Mr. Ichter.

4        A.    Okay.

5        Q.    Have you reviewed anything else in

6    preparation for your deposition today?

7        A.    No.

8        Q.    Have you talked to anyone other than your

9    attorneys in preparation for your deposition today?

10       A.    Well, my wife, but she's also . . .

11       Q.    And, generally, what did you discuss about

12   the deposition?

13            MR. ICHTER:  With his wife?

14            MS. LAROSS:  Yeah.

15   BY THE WITNESS:

16       A.    Well, we're basically the same here in

17   general terms with the nature of the case, so we just

18   discussed that in getting set up for this meeting.

19       Q.    Did you and your wife discuss anything else

20   about -- in preparation for the deposition today?

21       A.    No.

22       Q.    Other than your wife and certainly your

23   attorneys, did you talk to anyone else in preparation

24   for your deposition today?

25       A.    No.

Page 14

1      Q.   And other than what you've told us thus far,

2   have -- did you do anything else in preparation for

3   your deposition today?

4      A.   No.

5      Q.   I'm going to refer you to what's been marked

6   Exhibit No. 1.  If you could look on your exhibit share

7   there.  It's got a blue sticker at the bottom which

8   says WD, which is William Digges, 0001.

9           (Exhibit No. 1, Notice of Deposition, was

10          marked for identification purposes.)

11  BY MS. LAROSS:

12     Q.   Do you have that in front of you or, I guess,

13  Matt has put it up on the screen?

14     A.   Yeah, Matt's got it up here.  I have it on a

15  separate screen.  Okay.  You guys are off to the side.

16  Okay.

17     Q.   Yes.

18     A.   Yes.

19     Q.   Yeah, Mr. Digges, you and I have access to

20  the exhibit share too.  So, okay.  Good.  I'm glad that

21  you can access the exhibit share.  And so this is your

22  Notice of Deposition for the deposition today.  Have

23  you seen this document before?

24     A.   I don't remember seeing it, but I believe it

25  should have been sent to me.  But I don't -- I'd have

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 15

1  to go look and see if I have it.  But I see it now.

2       Q.   Okay.  Great.  And do you see in that first

3  paragraph where it notifies that there'll be an

4  examination -- oral examination under oath of Plaintiff

5  William Digges, III, on Thursday, September 23, 2021,

6  beginning at 10:00 a.m.?  Do you see that --

7       A.   Yes.

8       Q.   -- on the exhibit?  Okay.  Mr. Digges, you

9  mentioned that you live in Cobb County.  How long have

10  you lived in Cobb County?

11            MS. LAROSS:  Matt, we don't need that

12       exhibit anymore.

13  BY MS. LAROSS:

14       Q.   Excuse me, Mr. Digges.  I'm sorry about that.

15  How long have you lived in Cobb County?

16       A.   Since 1996.

17       Q.   And just generally, where did you live before

18  moving to Cobb County in 1996?

19       A.   Colorado.

20       Q.   Are you originally from Colorado?

21       A.   No, ma'am.

22       Q.   Where are you originally from?

23       A.   New Jersey.

24       Q.   And in Georgia, have you lived in any other

25  counties other than Cobb County?

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 16

1       A.   No.

2       Q.   And as you know, this case has been filed in

3    the -- it is currently pending in the Federal Court in

4    the Northern District.  So my question is:  Do you have

5    any other -- Do you have any relatives whose name is

6    different from Digges that live in the Atlanta or area

7    north of Atlanta?

8       A.   No.

9       Q.   Have you ever testified by deposition before,

10   Mr. Digges?

11      A.   No.

12      Q.   Have you ever testified at trial before?

13      A.   No.

14      Q.   Have you ever been charged with a crime?

15      A.   No.

16      Q.   So have you ever been arrested?

17      A.   No.

18      Q.   Have you ever been a party in another lawsuit

19   other than the one we're here about today?

20      A.   Yes.

21      Q.   How many other lawsuits have you been a party

22   in?

23      A.   One.

24      Q.   And what's the -- what case was that?

25      A.   It had to do with an auto accident.

William Edward Digges , III                  September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 17

1          Q.    In that case did you give any testimony?

2          A.    No.

3          Q.    I'm going to ask you a few questions about

4    your educational background.  So how far did you get in

5    school in terms of high school or college?

6          A.    College.

7          Q.    And what degrees do you hold?

8          A.    I have a bachelor's degree in accounting and

9    a master's degree in information systems.

10         Q.    When did you obtain your bachelor's degree in

11   accounting?

12         A.    I think it was --

13         Q.    Are you looking at a certificate or diploma?

14         A.    Yeah, I got it on the wall.

15         Q.    Okay.

16         A.    '80 -- I can't read that crazy writing.  '82.

17         Q.    Okay.  And what school did you receive that

18   degree from?

19         A.    Fairleigh Dickinson University.

20         Q.    And your master's degree, when did you obtain

21   your master's degree?

22         A.    1995.

23         Q.    And what school did you receive that degree

24   from?

25         A.    Regis University, Colorado.

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 18

1        Q.    I'm sorry.  Can you say that again?

2        A.    Regis University.

3        Q.    Other than what you've mentioned to us, have

4   you attended any other colleges or graduate schools?

5        A.    Yes.  I went to Pace University right after

6   Fairleigh.  That would be like '83, '84, but I didn't

7   finish.

8        Q.    And what course of study did you undertake

9   there?

10        A.    Finance and information systems.  It was a

11   dual.

12        Q.    Do you have any publications associated with

13   your graduate work?

14        A.    Just my Ph.D. paper.  Nothing other than

15   that, no.

16        Q.    Where did you obtain your Ph.D.?

17        A.    Not my Ph.D.  I'm sorry.  My master's degree.

18   Excuse me.

19        Q.    Okay.  So that would have been at Regis

20   University in Colorado; correct.

21        A.    Yes, right.

22        Q.    Okay.  Any other -- Any other education since

23   high school other than what you've mentioned?

24        A.    I went to junior college for a while,

25   Rockland Community College.  I don't know if they still

William Edward Digges , III            September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 19

1    call it that.  New York State.

2        Q.    And just approximately when did you attend

3    Rockland Community College?

4        A.    '68, '69.

5        Q.    Other than your bachelor's degree and

6    master's degree as well, do you hold any licenses,

7    certificates, or other vocational training

8    certificates, those kinds of things other than your two

9    degrees?

10       A.    Just probably spreadsheet -- a couple of

11   spreadsheet classes.  You know, they were just, you

12   know, professional improvement-type classes.  They give

13   you a piece of paper at the end.  I'm not sure you

14   would call it anything significant.

15       Q.    Okay.  And that's --

16       A.    So --

17       Q.    I'm sorry.  Excuse me.  I interrupted you.

18       A.    Uh-uh.  So it's just -- just spreadsheets,

19   databases.  IBM, you know, has a pretty solid training

20   program for employees, so.  And they have their own

21   college, if you will.

22       Q.    So the spreadsheet classes and the database

23   classes, are those related to accounting or what area

24   of study would those --

25       A.    Spreadsheets are accounting.  Databases are

William Edward Digges , III                    September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 20

1    more for financial analysis and that kind of thing.

2         Q.   And the classes in database analysis, were

3    those associated with your employment?

4         A.   Yes.

5         Q.   Have you had any formal education in election

6    law or voting --

7         A.   No.

8         Q.   -- law?  So then it was correct that you

9    don't have any training in Georgia election law?

10        A.   No.

11        Q.   Have you had any training in election

12   administration or procedures in Georgia or any other

13   state?

14        A.   No.

15        Q.   Have you ever worked at a polling place

16   either as a poll worker or in any other role?

17        A.   No.

18        Q.   So you had mentioned that you've had classes

19   concerning databases.  Describe for us what training

20   that you have or training or education you have related

21   to computers or hardware or programming.

22        A.   Well, which of those?

23        Q.   Okay.  Well, then we'll take them one at a

24   time.  That -- That's fair.  Absolutely.  Okay.  So do

25   you have any training or education related to computer

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 21

1    hardware?

2          A.    No training, no.

3          Q.    Okay.  Training or education concerning

4    computer programming?

5          A.    Yes.

6          Q.    And describe for us --

7          A.    Excuse me.

8          Q.    Go ahead.  Excuse me.

9          A.    I said very little.  I mean, just general

10   programming classes.

11         Q.    Okay.  So what about training or education in

12   cybersecurity?

13         A.    None.

14         Q.    Training or education with respect to voting

15   equipment?

16         A.    None.

17         Q.    Do you have any training or education related

18   to computer hacking?

19         A.    No.

20         Q.    Do you have any training or education related

21   to the insertion of malware into a computer system or a

22   voting -- or voting machines?

23         A.    No.

24         Q.    Any training or education concerning the

25   operation or functioning of DREs which are direct

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 22

1    recording electronic voting machines?

2         A.    No training, no.

3         Q.    Any training or education concerning the

4    operation or functioning of ballot marketing devices

5    also known as BMDs?

6         A.    No.

7         Q.    Any training or education concerning the

8    operation or functioning of scanners used in

9    conjunction with ballot marking devices or BMDs?

10        A.    No.

11        Q.    And your answer was no.  Okay.

12        A.    True.

13        Q.    Had you ever voted on a DRE or a direct

14   recording device?

15        A.    Was that the older ones or the newer ones?

16        Q.    Yes, that would be the older ones here in

17   Georgia --

18        A.    Yes.

19        Q.    -- correct.  Have you ever voted on the newer

20   ones or the ballot marking devices also known as BMDs?

21        A.    No.

22        Q.    Do you have any writings or publications

23   related in any way to voting or elections?

24        A.    Excuse me.  I didn't quite --

25        Q.    Sure.  Do -- Let me ask it this way.  So do

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 23

1    you have any writings or written any publications

2    related to voting or elections?

3         A.   No.

4         Q.   I'm going to ask you some questions about

5    your employment history, and we can speak about that

6    generally.  I know you've mentioned that you worked for

7    IBM; is that correct?

8         A.   Yes.

9         Q.   And when did you work for IBM?

10        A.   From 1977 to 2010.

11        Q.   And, generally, what did you do for IBM

12   during that tenure?

13        A.   Various roles, so mostly finance, systems

14   development, analysis of various companies I guess

15   within IBM, reporting accounting structure, building

16   accounting structures.

17        Q.   Any employment after IBM?

18        A.   Yes.

19        Q.   And where did you work after leaving IBM?

20        A.   Kennesaw State University.

21        Q.   How long did you work for Kennesaw State?

22        A.   Nine years and five months.

23        Q.   Sorry.  Did you say ten years and five

24   months?

25        A.   Nine.

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 24

1      Q.   Oh, sorry.  Okay.  It was nine years and five

2   months at Kennesaw State; correct?

3      A.   (No audible response.)

4      Q.   Okay.  You'll need to say it verbally.

5      A.   Yeah.  Thought I did.

6      Q.   Okay.  And what did you do for Kennesaw State

7   University?

8      A.   Mostly accounting, just general accounting

9   tasks.

10      Q.   Any employment since Kennesaw State

11   University?

12      A.   No.

13      Q.   So fair to say that you retired after working

14   at Kennesaw State University?

15      A.   Yes.

16      Q.   Any other employment other than IBM and

17   Kennesaw State University, I guess, since, you know, in

18   the late '70s is when you started with IBM, did you

19   work for anyone else while you had either of those

20   positions?

21      A.   No.

22      Q.   And when you left IBM, was there a reason for

23   your departure?

24      A.   I retired from IBM.

25      Q.   So that was your choice to leave IBM;

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 25

1   correct?

2       A.   No.  That was -- No, I was eligible to

3   retire, and so they retired me.

4       Q.   I see.  Okay.  And with Kennesaw State

5   University, was that -- did you -- was retirement your

6   choice or --

7       A.   Yes.

8       Q.   -- was that similar?

9       A.   That was my choice.

10      Q.   Have you done any voter advocacy work?

11      A.   What is -- What would that be, I guess?

12      Q.   Okay.  Would -- Might be a membership in a

13  voting rights group or participated in any events for

14  voter groups that advocate for voting rights?

15      A.   Yeah.  I'm a member of the Coalition for Good

16  Governance.  And I've been to a couple of events, maybe

17  more than two, but, yeah.  Over the years, yeah.

18      Q.   How long have you been a member of the

19  Coalition for Good Governance?

20      A.   I want to say since late 2017.

21      Q.   And you mentioned that you attended a couple

22  of events with the Coalition.  Have you done any other

23  work with the Coalition?

24      A.   Yeah.  I went through some data for them,

25  just transcribing mostly.  Went to a few of the state

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 26

1    meetings along with other members just, you know, to be

2    there and see what was going on.

3         Q.   Did you hold any -- Were you an officer for

4    the organization or any other kind of leadership --

5         A.   No, I have --

6         Q.   -- kind of position?

7         A.   -- no title.

8         Q.   Are you a member of any other organization

9    that is related to elections or voting?

10        A.   No.

11        Q.   Have you ever been a member of any other

12   organization related to elections or voting --

13        A.   No.

14        Q.   -- other than the Coalition?

15        A.   No.

16        Q.   Okay.  And what would you say in your own

17   words is the purpose of the Coalition for Good

18   Governance?

19        A.   Well, I think they do a lot of things, so

20   they don't -- I look on them as a watchdog.  You know,

21   they're paying attention to the voting, how it's done,

22   the rules that are created about voting.  And then they

23   make commentaries, and they lobby and try to get things

24   put right to their point of view.

25        Q.   Is there any particular work that's drawn you

William Edward Digges , III         September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 27

1    to the -- to be a member of the Coalition?

2              MR. ICHTER:  His work or its work?

3              MS. LAROSS:  Its work.

4    BY THE WITNESS:

5         A.   My work?

6         Q.   No.  So let me redo the question.  What work

7    in particular of the Coalition drew you to want to

8    participate and be a member of the Coalition?

9         A.   Well, I would -- I just apply the skills that

10   I have to the needs that they have.  So if they ask me

11   to do something, if I'm capable and able, then I try to

12   do that.  Is that --

13        Q.   I'm actually referring more to just the

14   general purpose of the Coalition or general -- like the

15   specific areas that they work on.  What is it about the

16   advocacy work that they do that drew you to be a

17   member?

18        A.   Oh, they comment on -- or they speak for

19   the -- us, the members, and others, I guess, on the

20   policy issues, which I believe I mentioned:  election

21   bills in Georgia, education.  I can't be at all these

22   meetings.  I don't understand a lot of what goes on, so

23   they help me understand the laws and all of that in

24   terms of what they do.  They answer my questions if I

25   have them about how the voting systems work.  They also

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 28

1   lobby, which is good.  And I get e-mails, press

2   releases, that kind of thing, so I get information on

3   what's going on.

4        Q.   I think you've testified that your work with

5   the Coalition has been related to looking through data,

6   transcribing data.  Can you describe that more

7   specifically for me?

8        A.   Insofar as I know, they had a database that

9   was in a format that they were unable to read.  So they

10  sent it to me, and I just transcribed it to another

11  format in which they were then able to read.

12       Q.   And what information did that database

13  contain?  Was it related to voting -- any voting

14  issues?

15       A.   It was supposed to be some kind of voting

16  record.

17       Q.   And was that voting records -- was it voting

18  records of how people had voted in Georgia or what kind

19  of voting records?

20       A.   No, it didn't -- as far as I knew, it didn't

21  contain that.  I mean, it was -- it was not a very good

22  record of anything essentially.

23       Q.   Other than transcribing that record that

24  you've described, any other work for the Coalition?

25       A.   No, just attending some meetings and, you

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 29

1    know, the state meetings that were open, you know, to

2    everyone.

3          Q.    And when you attended those meetings, did you

4    speak at any of the meetings or you just attended as a

5    member?

6          A.    I was just there.

7          Q.    Have you ever given any statements to media

8    outlets concerning elections or voting?

9          A.    No.

10         Q.    I'm going to ask you some questions about the

11   claims in this case.  So for the next series of

12   questions, I'm not asking you for a legal opinion about

13   that.  That's for your lawyers to do.  I'm just -- I

14   want to get an understanding of what you understand to

15   be the claims in this case.  So first of all, what

16   is -- what was your purpose in filing the lawsuit and

17   the claims in this case?

18              MR. ICHTER:  I'm going to object to the

19         extent that that mischaracterizes what occurred.

20         He didn't file the claims.  He is a plaintiff,

21         among many plaintiffs, who participated in the

22         filing.

23              MS. LAROSS:  Okay.  So I'll change my

24         question then.

25   BY MS. LAROSS:

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 30

1       Q.    Mr. Digges, what is your purpose in

2    participating as a party in the lawsuit we're here

3    about today?

4       A.    To get the voting moved to paper ballots --

5    hand-marked paper ballots.

6       Q.    So it's your preference that here in Georgia

7    we would move to hand-marked paper ballots?

8       A.    Yes.

9       Q.    And what is your understanding of the claims

10   that are pending in this case?

11      A.    Such as?  Claims?

12      Q.    The claims are what -- or the complaints that

13   are -- or the areas that you're challenging as part of

14   the lawsuit.  We call them claims, but I understand

15   that you might not call it that.  Does that make any

16   sense?

17      A.    Well, areas?

18      Q.    Okay.  Yeah, areas would be fine.  So what

19   areas would you understand to be what's raised in the

20   lawsuit on your behalf?

21      A.    Well, I think basically that the machines are

22   insecure.  I think they're -- they can be hacked.  And,

23   therefore, they're not trustworthy.  I don't -- I don't

24   like the privacy issues that come along with those

25   large screens.  And then with the -- with the voting

William Edward Digges , III            September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 31

1    record -- individual's voting record being translated

2    to a QR code is also -- concerns me.

3        Q.   And what concerns you about that individual

4    voting record translating to a QR code?

5        A.   Well, it's a -- it's a process where you're

6    taking something that's easily read and seen and

7    turning it into something that cannot be read and seen

8    by the individual voter.  And the process that does

9    that is not visible nor do we know who's responsible

10   for it, who can change it, when is it changed.  So I

11   see no controls over that transition, and that concerns

12   me greatly.

13       Q.   And you mentioned earlier that you had voted

14   on the older machines here in Georgia which are the

15   DREs.  Do you have any evidence that any votes that you

16   cast on a voting machine here in Georgia were not

17   counted?

18       A.   No, I do not.

19       Q.   Do you have any evidence that the votes you

20   cast on a voting machine here in Georgia were changed?

21       A.   No, I do not.

22       Q.   Do you have any evidence that any DRE or

23   voting machine of the old voting machines used in

24   Georgia has ever actually been hacked?

25       A.   No.  Other than a court demonstration, no.

Page 32

1        Q.    Say it again.  No, not other than what, sir?

2        A.    I saw a demonstration in court on those

3   machines showing that they were hacked or could be

4   hacked.

5        Q.    Okay.  So is it your testimony --

6        A.    I have no personal --

7        Q.    Go ahead.  Go ahead, please.

8        A.    I have no personal knowledge.

9        Q.    So you have no personal knowledge that any of

10  the old voting machines in Georgia were actually

11  hacked; correct?

12       A.    That is correct, other than the situation

13  with the -- the Logan Lamb discovery at the KSU there.

14       Q.    And tell me about that.

15       A.    Well, that was widely publicized.  He was

16  able to get into the Georgia voting records and copy

17  them all.

18       Q.    And related to -- And related to that

19  instance, are you aware of any evidence connected to

20  that analysis that -- that there was any hacking

21  actually discovered in the system or --

22       A.    No --

23       Q.    -- was it just that it was -- Okay.  Excuse

24  me.  So let me ask it again.  I apologize.  So do you

25  have any evidence or any knowledge related to that

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 33

1   Logan Lamb -- that analysis, that there was -- there

2   was any actual hacking into the Georgia system?

3            MR. ICHTER:  I'm going to object to the

4        form of the question as being unduly

5        discombobulated.  I'm not sure what analysis

6        you're talking about.

7            MS. LAROSS:  Okay.  He's been referring to

8        an analysis concerning the -- Logan Lamb where

9        they were able to get into the voting records in

10       Georgia.

11   BY MS. LAROSS:

12       Q.   So that's the analysis, Mr. Digges, that I'm

13   referring to.  Is that clear to you?

14       A.   Well, I wouldn't call it an analysis.  I

15   mean, I think the key part of that is that he was able

16   to breach that system.

17       Q.   Okay.  And was there any evidence, to your

18   knowledge, that the Georgia system had been hacked

19   into?  Was there any finding related to the work that

20   he did that indicated that there was actual hacking

21   into the Georgia system?

22       A.   Well, Logan -- I don't know.

23       Q.   So you don't have any knowledge as to whether

24   or not he found that the Georgia system had been

25   hacked; correct?

William Edward Digges , III            September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 34

1          A.    No.

2          Q.    Do you have any knowledge of any evidence

3     that malware was inserted into any Georgia voting

4     machine?

5          A.    No.

6          Q.    Do you have any evidence that the new voting

7     machines in Georgia, the BMDs, have been hacked?

8          A.    No.

9          Q.    And just to be clear, do you have any

10    evidence that there has been malware inserted into any

11    of the new voting machines or BMDs used in Georgia

12    elections?

13         A.    No.

14         Q.    I'm going to refer you to an exhibit.  It'll

15    just take me a moment to upload it, and then I will ask

16    you to go ahead and refresh your screen.  It's not

17    there yet.  I'll let you know when it's there.

18         A.    Uh-huh.

19         Q.    Okay.  It's been uploaded so everyone can

20    refresh their screens, and they should find Exhibit No.

21    2 in the marked exhibit folder.

22         A.    Okay.

23              (Exhibit No. 2, ENET report, was marked for

24         identification purposes.)

25              THE CONCIERGE TECH:  And Ms. LaRoss, this

Page 35

1       is Matt with Veritext.  If you would like me to

2       pull it up on the screen, just let me know.

3              MS. LAROSS:  If I would like to do what?

4       Excuse me.

5              THE CONCIERGE TECH:  If you would like me

6       to pull it up and share it on the screen as

7       well.

8              MS. LAROSS:  Is there anyone who needs us

9       to do that?  Hannah, have you been able to pull

10      that up?

11             MS. ELSON:  I have been able to access the

12      online service, so I'm okay.  Thanks.

13             MS. LAROSS:  Okay.  All right.

14   BY THE WITNESS:

15      A.   This looks like my voting record, yes?

16      Q.   Correct, yeah.

17             MS. LAROSS:  Is there anyone else who is on

18      the deposition who needs the court reporter to

19      pull up the exhibit for us?  Okay.  I'll take

20      that as a no.

21   BY MS. LAROSS:

22      Q.   Okay.  Mr. Digges.  Thank you.  I'm glad you

23   had a chance to pull up Exhibit 0002 -- WD 0002.  And,

24   yes, this is a copy of your voting record here in

25   Georgia.

William Edward Digges , III             September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 36

1        A.    I have been at it a while.

2        Q.    You've been here in Georgia for a good bit.

3    Okay.  So if you would look and scroll down to the

4    bottom half of the first page.

5        A.    Bottom half first page, all right.

6        Q.    I think that -- Can you scroll on the

7    document, Mr. Digges, or --

8        A.    Yes.

9        Q.    -- do you just see what I -- Okay.  Yeah, so

10   bottom half of the document, the first page of the

11   document, if you could refer to that, please.

12       A.    Yeah, where the listings of, I guess, when I

13   voted or what I voted?

14       Q.    Yes.  Correct, correct.  So that first column

15   is a date column.

16       A.    Right.

17       Q.    Second column is election type.

18       A.    Right, 11/5.

19       Q.    Correct, so 11/5/1996 would be the first --

20       A.    Yeah.

21       Q.    -- entry there.  Okay.  And does that sound

22   about right about the first election you ever voted in

23   in Georgia?

24       A.    Yes.  That was the year we moved here.  That

25   was it, yeah.  We moved here in January of that year.

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 37

1      Q.    Okay.  All right.  Have you ever voted in any
2  other state other than Georgia?
3      A.    Oh, yeah.  Every state I have lived in, I
4  have voted.
5      Q.    Okay.  So that would -- List for me the
6  states you voted in.
7      A.    New Jersey, New York, Colorado, and Georgia.
8      Q.    Okay.  So if we could go back to Exhibit WD
9  0002 and look at the bottom half of the first page.
10     A.    Yeah.
11     Q.    Okay.  And then if you will look in the
12  column, ballot type.
13     A.    Right, regular, regular, up to the '16,
14  right, or '14?
15     Q.    2016.
16     A.    Yeah.
17     Q.    Yeah.  So would that be an accurate time
18  between the November 1996 up through November 2014 when
19  you cast regular ballots on a voting machine?
20     A.    Yes, that's about right.
21     Q.    Okay.  And then if you look at the next entry
22  on November 2016 in the general election --
23     A.    Uh-huh.
24     Q.    -- it's noted under the ballot type,
25  absentee; correct?

William Edward Digges , III            September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 38

1        A.    Correct.

2        Q.    And since that time, you've voted only

3    absentee here in Georgia; correct?

4        A.    Yes.

5        Q.    And why did you change from casting a regular

6    ballot on a voting machine to casting your ballot by

7    absentee?

8        A.    I wanted to ensure that my vote was getting

9    counted, and I wanted to have a auditable paper record

10   of my vote.

11       Q.    Do you have -- Did you -- Do you have copies

12   of the ballots that you've cast?

13       A.    Somewhere.

14       Q.    Sorry.  I didn't hear your answer, sir.

15       A.    I don't know if I have them from that far

16   ago, no.

17       Q.    Do you have them more -- from the more recent

18   years and the more recent elections you have

19   participated in?

20       A.    I don't recall.  I'd have to go dig through

21   all the papers.

22       Q.    And you'd mentioned earlier that you've never

23   voted on the new voting machines in Georgia; correct?

24       A.    Yes, that -- Yes, that is correct.

25       Q.    Okay.  Do you have any plans to vote on a

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 39

1    voting machine here in Georgia in the future?

2        A.    No.

3        Q.    If you could look back on Exhibit WD 0002 --

4        A.    Uh-huh.

5        Q.    -- and, again, the same section we were

6    looking at, if you could look across the columns to

7    counted comments.  Do you see that column?

8        A.    Counted comments, yes.

9        Q.    And underneath that, there's -- there's just

10   yeses in that column, and it -- and it actually goes

11   onto the next page.  Do you see that?

12       A.    Yeah.

13       Q.    Now, that would indicate that all of those

14   votes cast were counted.  Would that be consistent --

15   Do you have any knowledge that those votes were not

16   counted?

17       A.    No.

18       Q.    And then all -- the next column over is

19   county where the votes were casted and --

20       A.    Uh-huh.

21       Q.    -- it appears that a -- the exhibit sticker

22   is over some -- some of those.

23       A.    Spelled my name wrong too.

24       Q.    But I -- if I represented to you that

25   underneath that exhibit that it appears that all of

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 40

1   your voting occurred in Cobb County, is that consistent

2   with your experience?

3        A.   Yes.

4        Q.   Okay.  I'm going to upload another exhibit

5   for you, Mr. Digges, and I'll let you know when that

6   one's ready.

7             (Exhibit No. 3, Coalition Plaintiffs'

8        Statement on William Digges, was marked for

9        identification purposes.)

10  BY MS. LAROSS:

11       Q.   All right.  I have uploaded that exhibit.

12  It's a document from this case entitled, Coalition

13  Plaintiffs' Statement on William Digges.  Let me know

14  when you can see that exhibit.

15       A.   Exhibit 3.  Now, is this the one I have the

16  copy of?  No.

17       Q.   Mr. Digges, can you view what's been marked

18  Exhibit WD 0003?

19       A.   Yes.

20       Q.   Okay.  Is that a document that you recognize?

21       A.   No, I don't remember this document.  When was

22  this created?  2019?

23       Q.   Yeah.  Take a moment to review it.  That's

24  fine.

25       A.   All right.  This is when they wanted my

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 41

1    resume.  Okay.  Right, these are the databases they
2    gave me, yeah.  Okay.
3         Q.   Okay.  And if you would look with me on the
4    first page of Exhibit WD 0003 and there's an indented
5    paragraph there that indicates that William Digges, III
6    has substantial database experience and was expected to
7    lead the Coalition Plaintiffs' review of the database.
8    Do you see where I'm referring to?
9         A.   Of the database in question?
10        Q.   Yeah.  And you can -- if you go down to the
11   next page, it talks about the GEMS database.
12        A.   Right, the Pima County GEMS database.
13        Q.   Okay.  And -- Okay.  Do you see where I'm --
14   on the second page where it talks about GEMS databases.
15        A.   It says I'm familiar with GEMS databases.
16        Q.   Okay.  Did you do any work in this case
17   related to any GEMS database from Georgia?
18        A.   All right.  GEMS databases were -- are in the
19   format of Access, which is a Microsoft database
20   program.  So it's -- You know, GEMS is using a
21   standard -- industry standard database format.  Okay?
22   So it's not GEMS alone.  It's GEMS in Access.  So the
23   data was just dumped into Access.  Is that clear?
24        Q.   Okay.  And did you do any work with that
25   database --

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 42

1      A.    Yes.

2      Q.    -- in connection with this litigation?

3      A.    Yes.  I transcribed -- That's what I said

4   before.  It was transcribed -- I transcribed that to

5   Excel so the data could be seen in its entirety.  So I

6   took every -- every file that was in Access, used an

7   export procedure and -- to format it into the Excel

8   format which everyone else could read because they

9   didn't have a licensed copy of Access.  Okay?  It's

10  kind of a rare thing these days.  Not many people use

11  it anymore.

12     Q.    And when did you do that transcription to

13  Access?

14     A.    I don't know.  That was a while ago.  I don't

15  remember exactly when it was.  Couple of years ago, at

16  least.

17     Q.    Okay.  And I'll refer you to page 2 of

18  Exhibit 0003 where it talks in capital letter B about

19  your knowledge of GEMS databases.  In that paragraph it

20  refers to a review you did of the structure and

21  operation of 2001 and 2002 GEMS databases from Hall

22  County and Cobb County.  Do you see that reference on

23  page 2?

24     A.    Yes.  That, I don't remember.

25     Q.    Okay.  So you don't remember reviewing the

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 43

1    GEMS databases from Hall County and Cobb County in the

2    early 2000s; is that correct?

3         A.   Best I can recall is that some of them didn't

4    work at all.  I mean, the Access files were not

5    functional.  But, again, it's the same thing as I said

6    before.  It is GEMS data in an Access format.

7         Q.   Okay.  And I believe that you referred to a

8    transcription that you did of the GEMS database into

9    Access as part of this lawsuit; is that --

10        A.   No, you got it wrong.

11        Q.   I got it wrong.  Okay.  Go ahead.  Correct me

12   and tell me -- tell me the work that you did.

13        A.   As I received it, it is GEMS data -- all

14   right -- if you want to call it that.  It's not a GEMS

15   database.  GEMS data in the Access database.  Okay?

16   Access is a database tool.  Okay?

17        Q.   Uh-huh.

18        A.   And GEMS data -- GEMS, from what I

19   understand, will export data in the Access format so

20   that you can take -- take it up in Access and do

21   whatever you want to do with it.  What I did was then

22   take that data that was already in Access with my

23   Access tool and exported it -- all the files, one by

24   one, to a tab in an Excel spreadsheet and then forward

25   that to Coalition team.  So --

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 44

1      Q.    And it -- Go ahead.

2      A.    And it made it readable so that, you know,

3  they could read it and see what was there.  I think

4  that was the whole thing.

5      Q.    And what you just described, was that done as

6  part of this lawsuit that we're here about today?

7      A.    I don't know.

8      Q.    Okay.  Would it have been done within the

9  last five years, would you say?

10     A.    Oh, yes, yeah.

11     Q.    So was that work that you did, was that done

12  at the request of the Coalition for Good Governance?

13     A.    Yeah.

14     Q.    Do you know what they used that -- The Excel

15  spreadsheets that you discussed, do you know what they

16  used those for?

17     A.    No, I do not.

18     Q.    If you could look back at Exhibit WD 0003 on

19  the second page toward the bottom, the capital letter

20  C, and that talks about anticipated role.  Do you see

21  where I'm referring to?

22     A.    C, right, yeah, my anticipated role.

23  Anticipated.

24     Q.    Right.  And I'm just trying to distinguish

25  whether or not you actually undertook this role or not.

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 45

1    So the anticipated role was that you would work with

2    attorneys and experts to review non-confidential data

3    contained in the GEMS databases.  Did you ever do that

4    as part of what is being described as an anticipated

5    role?

6         A.    There was one brief phone call where I

7    explained basically what I explained to you, and that

8    was it.

9         Q.    So the brief phone call, that referred to the

10   work that you've described that you did at the request

11   of the Coalition for Good Governance; correct?

12        A.    Yeah.  Yeah.  Once -- Once it was translated

13   into Excel, you know, it was what it was.  You know,

14   there wasn't anything else you could do with it.  We

15   didn't have a -- Yeah, you know, that was it.

16        Q.    So the information on the spreadsheet, was

17   that about individual voters or what was the

18   information that was -- you were able to read --

19        A.    A lot of it -- A lot of it was gibberish.

20   You know, it didn't make any sense.

21        Q.    Do you have any understanding of what -- of

22   what any information was on those spreadsheets?

23        A.    I don't recall at this point.  That was long

24   ago.  And there were close to 100 plus files, so that

25   was a lot.

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 46

1          Q.    Okay.  Let me refer you back to the Exhibit

2     0003 where we were reading on the second page toward

3     the bottom, capital letter C.  And at the very -- the

4     last line on that page, it talks about -- and, again,

5     it's your anticipated role to lead the team of less

6     experienced analysts in their labor intensive clerical

7     review of voluminous data.  And that goes onto the

8     first line on the next page.  Do you see what I'm

9     referring to there?

10          A.    Yeah.  That -- That never happened --

11          Q.    Okay.

12          A.    -- to my recollection.

13          Q.    So other than the spreadsheets that you've

14     described, did you prepare any other kind of reports as

15     a result of the transcription work that you've

16     described?

17          A.    No.

18          Q.    In this lawsuit, Dr. Halderman has been

19     designated as an expert and has done some work as an

20     expert in this case.  Have you had -- Have you ever

21     reviewed any reports prepared by Dr. Halderman in

22     connection with this lawsuit?

23          A.    No.

24          Q.    Have you ever spoken with Dr. Halderman or

25     any other experts concerning their findings with

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 47

1    respect to the Dominion system used in Georgia?

2         A.   No.

3         Q.   And one more question back on Exhibit 0003,

4    Mr. Digges.  If you could scroll down to -- let me

5    see -- it's about the seventh page where it says

6    Exhibit A.

7         A.   Ah, my resume.

8         Q.   So that's your resume; correct?

9         A.   Yeah, one of them.

10        Q.   Okay.  And if you'd just take a moment and

11   just look at your resume and make sure that it's an

12   accurate copy of your resume or one of your resumes.

13        A.   Yeah.  Yes, looks good.

14        Q.   Okay.  When you were working at Kennesaw

15   State University, did you do any work with respect to

16   the GEMS database or GEMS information?

17        A.   No.

18        Q.   I need to ask you about some of the elections

19   here in Georgia.  Do you believe that the results of

20   the presidential election that was held here in Georgia

21   in November of 2020, do you believe that the results

22   from that election are valid?

23        A.   Yes, I do.

24        Q.   Do you believe that the results from -- of

25   any other election, other than the presidential

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 48

1    election in November of 2020, that those results are

2    valid?

3          A.   Yes, I do.

4          Q.   Do you have any evidence that any component

5    of the Georgia election system was actually hacked in

6    relation to the November 3, 2020, election?

7          A.   No, I don't have any.

8          Q.   Do you have any evidence that any malware was

9    actually inserted into any component of the Georgia

10   election system in connection with the election that

11   happened in November 2020?

12         A.   No.

13         Q.   And the same questions for the run-off that

14   happened in January.  So do you believe that results of

15   the run-off here in Georgia -- run-off election in

16   January of this year, do you believe that the results

17   from that election are valid?

18         A.   Yes.

19         Q.   Do you believe that the -- Sorry.  Strike

20   that.

21         Do you have any evidence that any component of

22   the Georgia election system was actually hacked in

23   connection with the run-off election that happened

24   earlier this year?

25         A.   No.

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 49

1      Q.   Do you have any evidence that there was any

2  malware inserted into any component of the Georgia

3  election system in connection with the run-off election

4  that happened earlier this year?

5      A.   No.

6      Q.   Do you have any evidence that any vote in the

7  presidential election in November 2020 was actually

8  switched from Donald Trump to Joseph Biden as a result

9  of an anomaly in the software?

10     A.   No.

11     Q.   Do you have any evidence that any vote in the

12 presidential election was actually switched from Donald

13 Trump to Joseph Biden as a result of an algorithm or

14 other design feature of the election system?

15     A.   No.

16     Q.   Do you have any evidence that any vote in any

17 election held in Georgia in November 2020 in the

18 general election were actually switched from any

19 candidate to another candidate as a result of an

20 anomaly in the software in the election system?

21     A.   No, I do not.

22     Q.   Do you have any evidence that any votes for

23 one candidate were switched to another candidate in the

24 November election that was the result of an algorithm

25 or other design feature in the Georgia election system?

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 50

1      A.   No.

2      Q.   Do you know of any evidence of widespread

3   voter fraud in Georgia in connection with the November

4   election held in 2020?

5      A.   No.

6      Q.   Do you have any evidence of any malfunction

7   of any component of the election system that impacted

8   the outcome of the presidential election in Georgia in

9   November 2020?

10     A.   No.

11     Q.   Do you have any evidence of any malfunction

12  of any component of the Georgia election system that

13  impacted the outcome of any of the other elections held

14  in November 2020?

15     A.   There was a pollbook problem, wasn't there,

16  at some point?  Hopefully, that was fixed.

17     Q.   And what about the pollbook problem that you

18  know of?

19     A.   They were assigning people to the wrong

20  precincts, so people were kind of having to run around.

21     Q.   Did that pollbook problem affect your voting

22  in November --

23     A.   No, it did not.

24     Q.   Do you have any evidence that the Georgia

25  election system failed to count any legal votes in the

Case 1:17-cv-02989-AT   Document 1555   Filed 01/06/23   Page 52 of 68
William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 51

1    presidential election in November 2020?

2         A.    No, I don't.

3         Q.    Do you have any evidence that the Georgia

4    election system counted any illegal votes in the

5    presidential election in November 2020?

6         A.    No.

7         Q.    Do you have any evidence that there was a

8    mismatch between QR codes on paper ballots cast in the

9    presidential election in November 2020 and the human

10   readable portion of the paper ballots?

11        A.    No.

12        Q.    And that same question for the -- any other

13   elections that occurred in November 2020.  Do you have

14   any evidence of any mismatch between QR codes on a

15   paper ballot and the human readable portion of the

16   paper ballot?

17        A.    No.

18        Q.    And explain for us how you personally have

19   been injured by the use of the old voting machines in

20   Georgia elections.

21        A.    Well, it's forcing me to use the absentee

22   ballot for one.  So I, you know, have to apply for it,

23   wait for it to get here, fill it out, make sure it gets

24   back.  You know, we've had issues with how many stamps

25   are supposed to be on it.

Page 52

```
1        And then the Post Office at the last election

2    was a little weird, so we had to actually drive to

3    the -- to the voting headquarters in Marietta there

4    and put it in the drop box.  We ran into a lot of

5    traffic on the way, so it took us much longer than

6    usual.

7        What happens when you vote that way is that you

8    do miss out on a lot of the late-breaking information

9    that comes out.  So there is also an impediment there

10   to making a good decision.  And, you know, I enjoy

11   getting out and voting.

12       We've always voted together and -- you know,

13   with people.  It's usually a happy time.  And people

14   are at least focused, and, you know, everybody's

15   there with a common goal.  So it's a -- it's a good

16   feeling.  So I miss being able to do that with my

17   full trust.

18       Q.   But for the years that you've cast a

19   ballot -- an absentee ballot here in Georgia, did you

20   have any trouble that prevented you from being able to

21   cast those ballots?

22       A.   No, I was never not able.  Is that what

23   you're saying?

24       Q.   Yes, sir.

25       A.   No.
```

William Edward Digges , III                    September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 53

1        Q.   And the -- what you described as the

2   challenges of voting by absentee, is that in any way

3   different or unique to you or is it -- or is it in any

4   way different from any other voter?

5        A.   I think a lot of that process would be the

6   same for many voters.  If you don't have a car . . .

7        Q.   And it is your personal preference that

8   Georgia would go to a hand-marked paper ballot system;

9   correct?

10       A.   Yeah.

11            MS. LAROSS:  Mr. Digges and Cary and other

12       counsel, I need to take a moment to -- to grab

13       copies of the declarations that Mr. Digges

14       referred to earlier.  So if it's all right with

15       you, I'd like to take about a five-minute break

16       or a ten-minute break, whatever would work with

17       people -- for people.

18            THE WITNESS:  Okay.

19            MR. ICHTER:  Okay.

20            MS. LAROSS:  Is that all right with you,

21       Mr. Digges, that we take a break?

22            THE WITNESS:  Yes, I'm fine with that.

23            MS. LAROSS:  Okay.  So I'm showing that

24       it's now -- it's 11:28.  Why don't we reconvene

25       at 11:40.

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 54

1           (A short break was taken from 11:28 a.m. to

2       11:46 a.m.)

3   BY MS. LAROSS:

4       Q.    All right.  Thank you, Mr. Digges.  We're

5   going to resume your deposition, and I just want to

6   remind you that you're under oath.  Is that clear?

7       A.    Yes.

8       Q.    You had talked about in your earlier

9   deposition that you've not voted on a ballot marking

10  device with the new machines that are used here in

11  Georgia; is that correct?

12      A.    Yes.

13      Q.    Have you ever had an occasion to operate a

14  ballot marking device?

15      A.    The new ones?

16      Q.    Yes.

17      A.    No.

18      Q.    Do you have any experience on one of the new

19  voting machines?

20      A.    Excuse me?

21      Q.    Do you have any experience using any of the

22  new voting machines?

23      A.    No.

24      Q.    And you talked about the voting by absentee

25  ballot here in Georgia earlier in your deposition.  Is

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 55

1   there anything about your experience in voting by

2   absentee ballot here in Georgia that you would say is

3   specific to you and would not apply to any other voter

4   in Georgia?

5       A.    No, I don't think so, no.

6       Q.    Okay.  I am still waiting on my documents to

7   be uploaded.  The -- Have you ever reviewed any of the

8   complaints that were filed in the lawsuit we're here

9   about today?

10      A.    Complaints?

11      Q.    Yes.  I mean, the formal documents that

12  were -- I'm referring to the formal documents that were

13  actually filed in the federal court as part of this

14  litigation.

15      A.    Well, I'd have to see which ones you're

16  referring to.  I don't -- There's a lot of paper.

17      Q.    Okay.  So have you -- So is it your testimony

18  then that you have reviewed some of the documents filed

19  in the court case -- in this case?

20      A.    Those that come to me I go through, yes.

21      Q.    Okay.  You had mentioned earlier in your

22  deposition concerning a bullet point sheet that you

23  prepared.  And I wanted to ask you a few questions

24  about that.  Remind me again, if you would, just what

25  is included in your bullet point sheet.

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 56

1          A.    Just basic points of -- pulled from the

2     two -- from the two declaration documents.

3          Q.    And have you had occasion during the

4     deposition to refer to your bullet point sheet?

5          A.    Yeah, it's laying right here just to help me

6     remember.

7          Q.    And what particular points did you refer to

8     the bullet point sheet for?

9          A.    Well, I don't know.  Some -- Most of them

10    I -- are stuck in my head because I wrote them all

11    down.

12         Q.    Okay.

13         A.    That's the primary purpose.  But mainly had

14    to do with the Coalition and our role and a few points

15    about the mission, just some technical things that I

16    wanted to be able to state concisely.

17         Q.    Okay.  Anything else on that bullet point

18    sheet?

19         A.    No.

20         Q.    And, again, that bullet point sheet was

21    prepared by you; correct?

22         A.    Yes.  Myself and my wife, yeah.  Remember,

23    we're in this together.

24         Q.    Did she also prepare a bullet point sheet for

25    herself or she's going to use the same one you've used?

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 57

1      A.   I think she has her own.  I haven't seen it,
2   so I can't say.
3      Q.   Can you provide that to your lawyer?
4           MS. LAROSS:  And Cary, then I'd -- I would
5      like for you to provide it to us because he's
6      referred to it in the deposition, and he said
7      that it's something that he used in preparation
8      for the deposition.  So I think it's something
9      that we're entitled to obtain a copy of.
10  BY THE WITNESS:
11     A.   So I'm going to give it to Cary and --
12          MR. ICHTER:  Yes.
13  BY THE WITNESS:
14     A.   -- you'll get it from him.
15     Q.   Yes, please.  Go ahead and do that.
16     A.   When would you like me to do that?
17     Q.   I'd actually like for you to do it now, if
18  you don't mind.
19     A.   I'll have to scan it.
20     Q.   Also, Mr. Digges, the declarations, I've got
21  those.  So I'm going to mark those as -- as exhibits,
22  and I'll let you know when to refresh your exhibit
23  share.
24     Mr. Digges, are you still working on getting
25  your bullet point sheet to --

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 58

 1        A.   Yes, it's scanned.  I just got to get Cary's
 2   e-mail here.
 3        Q.   Sure.  Okay.  Yeah, just let me know when
 4   that's done.
 5        A.   A couple more minutes, I think.
 6        Q.   Okay.  No problem.
 7        A.   There we go.  Okay.  I sent it to Cary, I
 8   think.  Now I have to figure out how to get this back.
 9   Easier than I thought.
10        Q.   Okay.  So that's -- your bullet point sheet
11   has been e-mailed to Mr. Ichter?
12        A.   Yes, I believe so.  He'll have to verify
13   that.  Nothing?
14             MS. LAROSS:  Cary, have you gotten that
15        e-mail from him yet?
16             MR. ICHTER:  Yeah, just got here.
17             MS. LAROSS:  Okay.  Great.  Okay.
18             THE WITNESS:  A long one.
19             MS. LAROSS:  Great.  And if you could just
20        send that to me, Cary, please.
21             (Exhibit No. 4, Declaration of William
22        Digges, III, dated October 20, 2019; and Exhibit
23        No. 5, Declaration of William Digges, III, dated
24        September 27, 2018, were marked for
25        identification purposes.)

William Edward Digges , III            September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 59

1   BY MS. LAROSS:

2       Q.   And Mr. Digges, go ahead and refresh your

3   marked exhibits and exhibit share, and you should see

4   two more exhibits, Nos. 4 and 5.

5       A.   Okay.

6       Q.   Do you see those exhibits, Exhibits 4 and 5?

7       A.   Yeah.  These are the declarations that I have

8   here, yeah.

9       Q.   Okay.  Great.  Other than the two

10  declarations that you see as Exhibits 4 and 5, is there

11  any other document that you reviewed in preparation for

12  your deposition?

13      A.   Just the -- Just the thing telling me what

14  depositions are.

15      Q.   Okay.  Can that thing telling you what

16  depositions are, could you hold it up to the camera so

17  I can see that that is?

18           MR. ICHTER:  No, do not hold that up to the

19      camera.  That is something that I provided to

20      Mr. Digges.  It's communication between attorney

21      and client.

22           MS. LAROSS:  Okay.  I had understood from

23      his testimony that it was something that he had

24      gotten on his own.

25           MR. ICHTER:  No.

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 60

 1             MS. LAROSS:   Okay.

 2   BY MS. LAROSS:

 3        Q.   Okay.  Mr. Digges, other than the two

 4   declarations, the document concerning depositions that

 5   you received from your attorney, is there any other

 6   documents that you reviewed in preparation for your

 7   deposition?

 8        A.   No.

 9        Q.   Okay.  Let's go ahead and look at Exhibit 4

10   which is your Declaration from 2019.

11        A.   Still spelling my name wrong.

12        Q.   What's the correct spelling of your name,

13   sir?

14        A.   Huh?

15        Q.   What's the correct spelling of your name?

16        A.   They left an "e" out.  It's "e-s."  If you

17   look up top there.

18        Q.   Okay.  So the proper spelling of your name is

19   D-i-g-g-e-s; correct?

20        A.   Yes, ma'am.

21        Q.   Okay.  Oh, is it -- I see.  Okay.  And that's

22   on the -- you're talking about on the exhibit sticker;

23   correct?

24        A.   Uh-huh.

25        Q.   Okay.  Yeah, we can fix that.

Page 61

1        MS. LAROSS:  Can -- Charlene, can we have

2     that fixed?  We'll need to ask Veritext to fix

3     that because they --

4        THE COURT REPORTER:  Yes, we can.  I'm sure

5     we can.

6        MS. LAROSS:  Okay.  Great.

7        THE CONCIERGE TECH:  Yes, ma'am,

8     absolutely.

9        MS. LAROSS:  Thank you, Matt.  Yeah, that's

10     preferable.

11  BY MS. LAROSS:

12     Q.   Okay.  Sorry, Mr. Digges.  Let's go back to

13  Exhibit 4.  So is this -- is Exhibit 4 a copy of a

14  Declaration you gave in 2019?

15     A.   Yes.

16     Q.   And is this an accurate copy of the -- of

17  your Declaration in 2019?

18     A.   Yes.

19     Q.   Okay.  If you could refer to the second page

20  of Exhibit No. 4.

21     A.   Second page.

22     Q.   And look at paragraph No. 9.

23     A.   No. 9.

24     Q.   Yeah, if you could take a look at paragraph

25  No. 9.

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 62

1      A.    Right.  This was what I was referring to

2   before about the pollbook malfunctions.

3      Q.    So in -- does -- in paragraph No. 9, the

4   electronic pollbook malfunctions you're referring to in

5   that paragraph are the same as what you've testified

6   already about in your deposition; correct?

7      A.    Yes.  Those are the only pollbook

8   malfunctions that I'm aware of.

9      Q.    Okay.  And, again, the pollbook malfunction,

10  did that affect you personally?

11     A.    Not to my knowledge, no.  I didn't go to the

12  poll -- well, was it '19?  Yeah, I didn't go to the

13  polls, so I didn't have that issue.

14     Q.    And what -- what precinct are you assigned to

15  in Cumming?

16     A.    Precinct?  I really don't know what that

17  would be.  I'm in District 6, I know that.  But that's

18  not really a precinct, is it?

19     Q.    Have you -- Have you ever gone to the

20  precinct?  I understand that you've submitted your

21  ballots by absentee ballot.

22     A.    Uh-huh.

23     Q.    But have you ever had occasion to go to

24  your -- the precinct you're currently assigned to?

25     A.    Are you referring to the polling place?

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 63

1      Q.   Yes.

2      A.   No.  They moved it since I started voting

3    absentee.  So I -- I did go there before when I was

4    actually voting, but I haven't been to the new place.

5      Q.   So you haven't gone to the precinct since you

6    stopped or gone to the polling place since you stopped

7    voting in person; is that --

8      A.   Correct, yeah.

9      Q.   -- correct?

10     A.   No need.  No -- Not necessary, you know.

11     Q.   Okay.  And if you would look at paragraph No.

12   8 in Exhibit No. 4.

13     A.   Say again.  Oh --

14     Q.   Sorry.  Exhibit No. 4 and then, yeah,

15   paragraph No. 8 on the second page there just above the

16   one we were just talking about.

17     A.   Yes.

18     Q.   Okay.

19     A.   Well, this goes with 9, really, I mean, same

20   issue.

21     Q.   Okay.  So you're referring to the same issue

22   as paragraph No. 9 in your Declaration; correct?

23     A.   Yes.

24     Q.   And in paragraph 8, you referred to people or

25   instances of people having to vote provisionally.

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 64

1          A.    Yes.

2          Q.    And, again, that didn't affect you, though;

3     correct?

4          A.    No, it did not.

5          Q.    Did that affect your wife to your knowledge?

6          A.    No.  But you would have to ask her.

7          Q.    And you and your wife both vote by absentee

8     ballot; is that correct?

9          A.    Yes.  We vote together.

10         Q.    Okay.  And if you could, I would like to

11    refer you to paragraph No. 11 which is on the next

12    page.

13         A.    Right, the metadata.

14         Q.    Okay.  And explain to me what you're

15    referring to about the metadata in paragraph No. 11.

16         A.    Well, metadata would be data about data.  So

17    that would be information about me, the individual

18    voting:  time stamps, where the vote was taken,

19    anything that the scanning machine would hold onto

20    coming from the machine probably buried in the QR code,

21    which I can't tell what is in it, so.

22         Q.    So do you have any knowledge of what metadata

23    is buried in the QR code that you've just referred to?

24         A.    No, I don't.  But I don't know that for a

25    particular reason.  I can't tell.  I can't -- I don't

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 65

1    know how it gets there, so there's -- no one can, other

2    than whoever's controlling that piece of tech.

3         Q.    Sorry.  So whoever's controlling that piece

4    of what did you say?

5         A.    That piece of technology.

6         Q.    And would that -- And is it your belief then

7    that would be the Secretary of State or who?

8         A.    Well, in an executive manner of speaking,

9    he's responsible, but I would be more thinking about

10   those that are hands-on, staff and that kind.

11        Q.    So do you have any specific knowledge of any

12   staff at the Secretary of State's office that has been

13   involved in metadata that is in the scanners that are

14   used for valid images and in the Georgia election

15   system?

16        A.    No.

17        Q.    Let's go to Exhibit No. 5.

18             THE CONCIERGE TECH:  And if everyone just

19        refreshes before going on to Exhibit 5, the

20        exhibit stickers will be changed.

21             MS. LAROSS:  Okay.  Thank you.

22   BY THE WITNESS:

23        A.    It got hung up there for a second.  All

24   right.  There we go.  Oh, look, they spelled it right.

25        Q.    I know that's important.  I apologize for

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 66

1    that.  I --

2         A.   It happens a lot.

3         Q.   Oh.

4         A.   I've seen worse.

5         Q.   Well, we want to get it accurate for you.

6    Okay.  So please take a look at what's been marked as

7    Exhibit 5, WD 0005, and go ahead and identify for me

8    what that is.

9         A.   Yeah, it looks like my signature.  This is

10   way back in '18.  All right.

11        Q.   Do you have any reason to think it's not your

12   signature?

13        A.   No.

14        Q.   So is this an accurate copy of the

15   Declaration that you gave in 2018?

16        A.   Yes.

17        Q.   Okay.  And this was -- along with Exhibit No.

18   4, this was one of the documents that you looked at in

19   preparation for your deposition today --

20        A.   Right.

21        Q.   -- correct?

22        A.   Along with the invitation.

23        Q.   Okay.  And that -- this copy of this

24   Declaration as marked as Exhibit 5 and Exhibit 4 you

25   actually have there with you during --

William Edward Digges , III          September 23, 2021
Curling, Donna v. Raffensperger, Brad

Page 67

1       A.   Yeah.

2       Q.   -- the deposition; correct?

3       A.   Yes.

4       Q.   Okay.  Okay.  So Mr. Digges, have you given

5  any declarations in any other lawsuits other than this

6  one?

7       A.   No.

8       Q.   Okay.  And with respect to this litigation,

9  to your knowledge, have your attorneys received any

10  payment for their services in this case from you or

11  anyone else?

12       A.   No.

13       Q.   And to your knowledge, have your attorneys

14  received payment for their services in this case from

15  any organization or entity that you're aware of?

16       A.   No.

17       Q.   To your knowledge, have your attorneys

18  received payment for their services in this case from

19  any voter advocacy group or group related to any

20  political party, to your knowledge?

21       A.   No.

22            MR. ICHTER:  If you know of anybody who

23       wants to pay me, though, please refer them to my

24       office.  Okay?

25            MS. LAROSS:  And I may respectfully