

Deposition of:

# Ricardo Davis

*September 29, 2021*

In the Matter of:

# Curling, Donna v. Raffensperger, Brad

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com  | 770.343.9696

Page 1

1           IN THE UNITED STATES DISTRICT COURT

2           FOR THE NORTHERN DISTRICT OF GEORGIA

3                    ATLANTA DIVISION

4      DONNA CURLING, et al.,

5            Plaintiffs,        CIVIL ACTION FILE

6      vs.                      NO. 1:17-cv-2989-AT

7      BRAD RAFFENSPERGER, et

8      al.,

9            Defendants.

10

11

12                   DEPOSITION OF

13                   RICARDO DAVIS

14              September 29, 2021

15                   9:09 a.m.

16

17        TAKEN BY REMOTE VIDEO CONFERENCE

18         LaRita J. Cormier, RPR, CCR-2578

19

20

21

22

23

24

25

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 2

1                    INDEX OF EXHIBITS

2    Exhibit No.        Description                    Page

3       Exhibit 1   Notice of Deposition               10

4       Exhibit 2   Declaration filed 10/23/19          20

5       Exhibit 3   Mr. Davis' voting record            57

6

7

8

9

10

11

12

13         I N D E X   O F   E X A M I N A T I O N

14                                                   Page

15   Examination by Mr. Jacoutot......................05

16

17

18

19

20

21

22

23

24

25

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 3

```
 1   APPEARANCES OF COUNSEL:

 2   On behalf of the Plaintiffs:

 3           CARY ICHTER, ESQUIRE

 4           Ichter Davis LLC

 5           3340 Peachtree Road NE

 6           Suite 1530

 7           Atlanta, Georgia  30326

 8           cichter@ichterdavis.com

 9

10   On behalf of the Curling Plaintiffs:

11           HANNAH ELSON, ESQUIRE

12           Morrison & Foerster, LLP

13           2000 Pennsylvania Avenue, NW

14           Washington, DC  20006

15           Helson@mofo.com

16

17   On behalf of Defendant Secretary of State Brad

18   Raffensperger:

19           DIANE FESTIN LaROSS, ESQUIRE

20           R. DAL BURTON, ESQUIRE

21           Taylor English Duma LLP

22           1600 Parkwood Circle, Suite 200

23           Atlanta, Georgia  30339

24           Dlaross@taylorenglish.com

25           Dburton@taylorenglish.com
```

Page 4

1    APPEARANCES OF COUNSEL (Cont'd):

2    On behalf of Defendant Fulton County:

3              CHERYL RINGER, ESQUIRE

4              Fulton County Attorney's Office

5              141 Pryor Street, Suite 4038

6              Atlanta, Georgia  30303

7              Cheryl.ringer@fultoncountyga.gov

8

9

10

11

12   Also present:

13             MARILYN MARKS, Coalition for Good

14              Governance

15

16

17

18

19

20

21

22

23

24

25

Ricardo Davis                                September 29, 2021
Curling, Donna v. Raffensperger, Brad

                                                        Page 5

1                  P R O C E E D I N G S

2          THE REPORTER:  Due to the need for this

3    deposition to take place remotely because of the

4    government's order for social distancing, the

5    parties will stipulate that the court reporter may

6    swear in the witness over the Veritext Virtual

7    Videoconference and that the witness has verified

8    that he is in fact Ricardo Davis.

9          MR. JACOUTOT:  This will be the deposition

10   of Ricardo Davis, taken by Defendant Secretary of

11   State Brad Raffensperger for the purpose of

12   discovery and all purposes allowed under the Federal

13   Rules of Civil Procedure.

14          Cary, is it all right if all objections

15   except for those going to the form of the question

16   and responsiveness of the answer are reserved until

17   trial or first use of the deposition?

18          MR. ICHTER:  Yes.

19          MR. JACOUTOT:  Okay.  If the court reporter

20   would please swear in the witness.

21                      RICARDO DAVIS,

22   having been first duly sworn, was examined and

23   testified as follows:

24          MR. JACOUTOT:  And Cary, you're okay with

25   reading and signing afterwards?

Page 6

1          MR. ICHTER:  Yes, he's going to read and

2      sign.

3                          EXAMINATION

4      BY MR. JACOUTOT:

5          Q.  Mr. Davis, welcome.  Thanks for your time

6      today, I appreciate it.  Would you state your full

7      name for the record?

8          A.  Ricardo C. Davis.

9          Q.  Okay.  And are you represented by counsel

10     in this deposition?

11         A.  Yes.

12         Q.  That's Mr. Ichter?

13         A.  That is correct.

14         Q.  Okay.  Have you ever taken a deposition

15     before?

16         A.  Yes, I have.

17         Q.  Okay.  Some of this will sound a little

18     routine for you, but please remember to speak loudly

19     and clearly as best you can.  I know we're on a

20     phone line and on Zoom simultaneously, so we may run

21     into some technical problems.  And we'll let you

22     know, the court reporter will let you know if we

23     have any issues hearing you.  But please try your

24     best not to talk over me, and I will try my best not

25     to talk over you.  And keep your responses verbal

Ricardo Davis                              September 29, 2021
Curling, Donna v. Raffensperger, Brad

                                                  Page 7

1    rather than just nodding your head or saying uh-huh

2    or huh-uh.  The purpose here is not to confuse you

3    in any way, so if I ask you a question that you

4    don't understand, can you agree that you'll let me

5    know?

6         A.  Yes, I will.

7         Q.  Okay.  And you're being asked to testify

8    based on your personal knowledge, so please don't

9    guess or speculate in response to any of my

10   questions.  If you don't know, that's a perfectly

11   acceptable answer.

12        A.  Understood.

13        Q.  Okay.  As far as breaks go, whenever you

14   feel you need one, just let me know.  The only thing

15   I would ask is if I have a question posed to you and

16   you want to take a break, could you please first

17   answer that question, and then we'll go off and take

18   as long a break as we need.  Is that acceptable?

19        A.  Yes, it is.

20        Q.  Okay.  Great.  Have you taken any

21   medications that would keep you from fully and

22   truthfully participating today?

23        A.  No, I do not.

24        Q.  Okay, good.  Other than conversations with

25   your attorneys, which I don't want to hear about, as

Page 8

1    they're protected by privilege, but other than

2    conversations with your attorneys, what did you do

3    to prepare for today's deposition, if anything?

4         A.   Outside of what we discussed, just thinking

5    through all the different aspects of what has

6    happened to date with regard to the case.

7         Q.   Okay.  And did you look at any documents or

8    electronic documents?

9         A.   Prior to today, no, not that I can recall,

10   other than documents that were provided to me by

11   counsel as part of official court records.

12        Q.   And you said prior to today, so then today,

13   did you look at any documents?

14        A.   The only thing I think I have again that

15   was shown to me was, again, part of the court

16   records.

17        Q.   Okay.  And what documents were those?

18        A.   My voting record.

19        Q.   Okay.  Do you have any -- did you have that

20   document with you today, or at your disposal, either

21   physical copy or on computer?

22        A.   Well, it was transmitted by computer.  I

23   don't have it up right now because I don't need it.

24   I have a general idea how I vote.

25        Q.   Understood.  Did you review the testimony

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

                                                          Page 9

1    of anyone else in this case?

2         A.  No.

3         Q.  And did you speak to anyone other than your

4    attorney about today's deposition?

5         A.  Yes.

6         Q.  And who was that?

7         A.  That would be Marilyn Marks.

8         Q.  Okay.  And what did you and Marilyn talk

9    about?

10        A.  What we talked about specifically --

11             MR. ICHTER:  I think that that is protected

12   from disclosure by a common interest privilege.

13             MR. JACOUTOT:  Okay.

14             MR. ICHTER:  Ms. Marks is the executive

15   director of the Coalition.  He is a member of the

16   Coalition.  The Coalition and he are plaintiffs in

17   this case, and I don't think that that's subject to

18   disclosure.

19             MR. JACOUTOT:  Okay.  Thank you,

20   Mr. Ichter.  I'll take note of that.

21   BY MR. JACOUTOT:

22        Q.  Mr. Davis, I'm going to direct you to what

23   I'm marking as Defendant's Exhibit 1 in this

24   deposition.  Give me one moment.

25             MR. ICHTER:  Do you have the Exhibit Share?

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 10

 1    Have you accessed that?

 2             THE WITNESS:  Yes.

 3             MR. ICHTER:  Okay.  Good.

 4             (Defendant's Exhibit 1 marked)

 5    BY MR. JACOUTOT:

 6         Q.  Are you sharing your screen?

 7         A.  Yes.  I wanted you to know I have it.

 8         Q.  All right.  I didn't want you to be

 9    accidentally sharing your computer screen.

10             This is the notice to take your deposition.

11    Can I just ask if you received this and it looks

12    accurate to you?

13         A.  Okay.  Almost done.  That is correct.

14         Q.  I'll just note for the record it states a

15    10:00 a.m. start time, but we moved it to 9:00 a.m.

16    I don't have any questions on that, Mr. Davis, just

17    wanted to get it into the record.  Appreciate it.

18         A.  All right.

19         Q.  Okay.  Can you please give me your current

20    address?

21         A.  ███████████████████  Woodstock, Georgia.

22         Q.  Is that Cherokee County?

23         A.  Yes, it is.

24         Q.  How long have you lived in Cherokee County?

25         A.  We moved here in the summer of 1999.

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 11

1       Q.   Okay.  And you mentioned that you had given

2   a deposition before.  Have you given any other

3   testimony of any kind in any cases?

4       A.   Yes.

5       Q.   How many times would you say?

6       A.   One.

7       Q.   One other time.  When was that?

8       A.   That would have been 2014-2015 time period

9   with regards to the case that the Constitution Party

10  and the Green Party had against the state.

11      Q.   Okay.  Do you happen to remember the case

12  style of that, you know, is it Constitution Party

13  versus Secretary of State?  Do you recall?

14      A.   Not precisely, no.

15      Q.   Okay.  That's fine.  What type of testimony

16  did you give in that case?

17      A.   Again, generally questions regarding the

18  matters regarding ballot access.

19      Q.   Well, what I mean is, did you give a

20  deposition?  Were you put on the stand?  Did you

21  give a declaration, all of the above?

22      A.   Well, the deposition was taken in person at

23  the Richard B. Russell Building.  It wasn't in

24  court, and it was basically in a room.

25      Q.   Okay.  And other than the deposition, did

Ricardo Davis                                        September 29, 2021
Curling, Donna v. Raffensperger, Brad

                                                              Page 12

1    you give any other testimony in that case?

2         A.  No.

3         Q.  Okay.  What --

4         A.  When you say any other testimony, you mean

5    testimony in court, testimony in writing?

6         Q.  Yeah.  I mean, any other types -- so if you

7    gave it in writing as a declaration or an affidavit,

8    that would include that.  Or if you were in court,

9    you know, on the stand, on the witness stand being

10   examined by an attorney.  So any type of testimony

11   like that.

12        A.  Yes to the former and no to the latter.

13        Q.  Okay.  So you did give a written

14   declaration?

15        A.  Yes.  There were affidavits provided.

16        Q.  Okay.  Thank you.  Do you recall what the

17   claims in that case involved?

18        A.  They focused on equal protection questions.

19        Q.  Was it equal protection questions with

20   respect to voting rights?

21        A.  Yes.

22        Q.  Did that case go to trial?

23        A.  If it did, I wasn't present for any of the

24   court proceedings, per se.

25        Q.  Okay.  Understood.  I'm sorry, I cut you

Page 13

1    off.  What was that?

2        A.  The case has been closed.

3        Q.  Okay.  Do you recall what the disposition

4    of the case was, how it concluded?

5        A.  The federal court ruled in favor of the

6    plaintiffs with regard to the requirement that the

7    State of Georgia has placed with regard to access to

8    the ballot for our presidential candidates.

9        Q.  Okay.  Have you ever been charged with a

10   crime?

11       A.  Yes.

12       Q.  Okay.  And what -- when was that, about?

13   Or was it -- let me strike that.  Yeah, let's start

14   with that.  When was that crime?  When were you

15   charged with that crime, excuse me?

16       A.  That would have been in the mid '80s.

17       Q.  And what did the charges involve?

18       A.  Trespass.

19       Q.  Was that in Georgia?

20       A.  No.

21       Q.  What state was that in?

22       A.  Texas.

23       Q.  Texas.  Do you know the county?

24       A.  Probably Travis County.

25       Q.  Okay.

Ricardo Davis                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 14

1       A.   I know it was Travis County.

2       Q.   Okay.  And for that charge of trespassing,

3   were you convicted?

4       A.   No.

5       Q.   Were you required to put in a plea in

6   court?

7       A.   Yes.

8       Q.   And how did you plea?

9       A.   Nolo.

10      Q.   Nolo?  Nolo contendere?

11      A.   Correct.

12      Q.   Okay.  Did you have to serve any time in

13   jail?

14      A.   No, other than the little bit of time when

15   I was picked up.

16      Q.   Right.

17      A.   For the alleged trespass.

18      Q.   Okay.  All right.  Have you ever been

19   charged with any other crimes?

20      A.   No.

21      Q.   Okay.  And beyond getting arrested for the

22   alleged trespass that we just spoke of, have you

23   been arrested for anything else?

24      A.   No.

25      Q.   Okay.  So then never convicted of any other

Ricardo Davis                               September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 15

1   crimes; is that correct?

2       A.  That is correct.

3       Q.  Apart from the case that we spoke about

4   with the Constitution Party, a plaintiff with the

5   Green Party, have you personally ever been a party

6   to any other lawsuits?

7       A.  Yes.

8       Q.  How many, would you say?

9       A.  One that I can recall immediately.

10      Q.  Okay.  And -- go ahead, I'm sorry.

11      A.  One class action that I can recall

12  immediately.

13      Q.  Okay.  So it was a class action.  Were you

14  the lead plaintiff in that, or one of the class

15  members?

16      A.  Class member.

17      Q.  Okay.  And what did that involve?

18      A.  It involved an agricultural chemical

19  facility.

20      Q.  Do you remember the name of that facility,

21  or the company?

22      A.  Oh, that was -- that was, like, early '80s.

23      Q.  Okay, that's fine.  And then I'm assuming,

24  then, you don't remember sort of the title of the

25  lawsuit or anything like that?

Page 16

1      A.  No.

2      Q.  Okay.  Do you recall how that case

3   resolved?

4      A.  No.

5      Q.  Okay.

6      A.  I do recall that there was some testing

7   because there was the claim of pollution in the

8   environment.  But other than that, that's all I

9   remember.

10      Q.  Do you remember what state that case was

11   filed in?

12      A.  No, I do not.

13      Q.  Were you in Georgia at the time?

14      A.  No.  I was in Texas.

15      Q.  Yeah, sorry, yeah, Texas, okay.  All right.

16   Did you attend high school?

17      A.  Yes.

18      Q.  And where was that high school?

19      A.  Parkview Senior High, Little Rock,

20   Arkansas.

21      Q.  What years, approximately, did you attend?

22      A.  '78 to '81.

23      Q.  And did you graduate?

24      A.  Yeah, with honors.

25      Q.  Thanks a lot.  Did you attend college

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 17

1    afterwards?

2         A.   Yes.

3         Q.   Where was that?

4         A.   Undergraduate at the University of

5    Arkansas, graduate at Texas A&M University.

6         Q.   Excellent.  What did you earn your

7    undergraduate degree in?

8         A.   Chemistry, with a minor in computer

9    science.

10        Q.   Okay.  Tough major definitely.  What years

11   were you at University of Arkansas?

12        A.   From 1981 to 1986.

13        Q.   And you went to grad school, so I'm

14   assuming you graduated.  What did you go to graduate

15   school for?

16        A.   Chemistry.

17        Q.   Anything in particular, any specific side

18   of chemistry, or concentration?

19        A.   Yes.  My concentration was in analytical

20   chemistry.

21        Q.   And what does that entail?

22        A.   Well, the branch of analytical chemistry

23   entailed, as the name would suggest, the specific

24   analysis made to determine what the investigator is

25   trying to discern with regard to a particular

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 18

1    problem in chemistry.

2         Q.  Okay.  And when you say "investigator," are

3    you using that term as sort of a profession, like,

4    did it focus on how criminal investigations involve

5    chemistry or how a chemist is investigating a

6    particular, you know, chemistry problem?

7         A.  The latter.

8         Q.  Okay.  And you might have already said

9    this, but when did you or did you graduate in the

10   chemistry graduate program?

11        A.  Yes.  I graduated in 1990.

12        Q.  1990.  Did you go straight from undergrad

13   in '86 to grad school, or did you take some time off

14   in between?

15        A.  Oh, I -- I went directly to.

16        Q.  Okay.  As a master's degree or Ph.D.?

17        A.  I received a master's degree.

18        Q.  Okay.  Anything beyond that master's degree

19   in terms of educational training?

20        A.  No.

21        Q.  Okay.  Any licenses or certifications that

22   you might have?

23        A.  No.

24        Q.  Okay.  And any other education that you --

25   that you have beyond what you told me?

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 19

1          A.   No formal education, no.

2          Q.   Okay.   So do you have any education in

3    election law or voting rights of any kind?

4          A.   No.

5          Q.   Okay.   Have you ever worked at a polling

6    place?

7          A.   Yes.

8          Q.   Were you a poll worker, poll manager, poll

9    monitor?

10         A.   I have served as a poll worker.

11         Q.   Okay.   Have you ever served as a poll

12   manager?

13         A.   I have not.

14         Q.   Okay.   Did you receive any training as a

15   result of your work as a poll worker?

16         A.   Of course.

17         Q.   And who did you receive that training from?

18   Do you recall?

19         A.   That would be the board of elections in

20   Cherokee County.

21         Q.   And when did you serve as a poll worker?

22         A.   I don't recall the particular election, but

23   it was in the early 2000s.

24         Q.   Okay.   Was it just one election that you

25   served as a poll worker?

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 20

1          A.   Yeah, or one election cycle, yes.

2          Q.   One election cycle?  Okay.  Did you ever

3     receive any training in casting absentee ballots?

4          A.   Clarify the question.  Was this in regard

5     to the processing of the ballots, the casting of the

6     ballots?

7          Q.   Yeah.  Have you ever received any training

8     in regards to the casting of the absentee ballots?

9          A.   I don't recall any specific training.

10         Q.   Okay.  So I'm going to go over to our

11    Exhibit Share again, introduce another exhibit for

12    you.

13              (Defendant's Exhibit 2 marked)

14         A.   Okay.

15    BY MR. JACOUTOT:

16         Q.   Okay.  This here I've just shown you is

17    being marked defense Exhibit 2.  It's your

18    declaration that you filed on, if you look here at

19    the top it says October 23rd, 2019, Document No.

20    640-1.  Do you see that?

21         A.   Yes.

22         Q.   Okay.  Thank you.  I can direct you to the

23    second page here, paragraph 6.  It starts with, "As

24    an information technology professional, I understand

25    that Georgia BMDs are hackable."  Do you see that?

Ricardo Davis                                September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 21

1        A.   Yes.

2        Q.   So what type of IT professional are you?

3    What is your -- what's your current role?  Let's

4    start with that.  What's your current role, if any,

5    in the IT industry?

6        A.   Okay.  My current title is senior

7    integration analyst.

8        Q.   How long have you -- I'm sorry, say that

9    again?

10       A.   The work is in the healthcare setting.

11       Q.   And how long have you been in information

12   technology?

13       A.   Since 1995.

14       Q.   Okay.  So that would have been about five

15   years after you graduated from Texas A&M in

16   chemistry.  What did you do in that intervening five

17   years between graduating from Texas A&M and

18   beginning your information technology role?

19       A.   I worked as a research scientist for

20   Westinghouse.

21       Q.   Okay.  And what years was your -- what

22   years were you at Westinghouse?

23       A.   From 1990 through roughly 1994.

24       Q.   Okay.  And what did that job entail as a

25   research scientist?

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

                                                    Page 22

1          A.   I was a chemical process modeler.  I won't

2     go into the weeds with you, but essentially what me

3     and my colleague did was we created models of

4     chemical processes on plants which involved not only

5     computational chemistry but also visualization.

6          Q.   Okay.  Might be getting over my head

7     already, but I appreciate that.  And so then after

8     your time at Westinghouse, you got into information

9     technology; is that correct?

10         A.   That is correct.

11         Q.   Okay.  And let's just kind of go through

12    your career in IT.  When did you begin -- what job

13    did you begin at in 1995?

14         A.   I was a help desk agent with Hewlett

15    Packard as a contractor.

16         Q.   Okay.  And what years did you do that for?

17         A.   I believe about a year and a half.

18         Q.   After that, did you stay in IT?

19         A.   Oh, yes.

20         Q.   And what was your next position?

21         A.   From there, I was a developer with --

22    again, on a contract basis -- with AT&T.

23         Q.   As a developer, what sort of job duties did

24    you have?

25         A.   These were primarily web design and web

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 23

1    application development projects.

2        Q.  Okay.  How long did you do that for?

3        A.  Again, that was about year and a half.

4        Q.  Year and a half?  So would you say you

5    finished this role around 1999?

6        A.  Probably sooner.

7        Q.  So 1998 then?

8        A.  Yeah.  You know what, though, now that

9    you -- I believe -- I will refer counsel to my

10   LinkedIn page, which I believe have many of the

11   details that you're inquiring about.

12       Q.  Okay.

13       A.  And I will defer to that resource for the

14   specifics in terms of dates and times.

15       Q.  Dates and times, okay.  Do you have any

16   reason to think that anything on your LinkedIn page

17   would be inaccurate?

18       A.  No, I don't.

19       Q.  Okay.

20       A.  I will say one comment, in that in terms of

21   my recent employment with Common Spirit Health, it

22   is not up to date.

23       Q.  Okay.  And how long have you been with

24   Common Spirit Health?

25       A.  As an employee, since December 30th, 2020.

Ricardo Davis                                September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 24

1          Q.  Were you a contractor before that?

2          A.  Yes.

3          Q.  When did you start as a contractor with

4     them?

5          A.  2015.

6          Q.  2015?  And when you say you're a

7     contractor, are you hired individually or do you

8     work with maybe a temporary staffing company or a

9     contract based staffing company that sort of you're

10    on their payroll and then you work with other

11    employers through that staffing company?

12         A.  Close.  I was a subcontractor.

13         Q.  Okay.

14         A.  To the firm Matrix Resources.

15         Q.  Okay.  So you were a subcontractor for

16    Matrix Resources, which is a staffing firm; is that

17    correct?

18         A.  Correct.

19         Q.  Okay.  And through your subcontracting at

20    Matrix Resources, you were placed at -- I'm sorry,

21    could you say that name again?  Was it --

22         A.  Common Spirit Health.

23         Q.  Common Spirit Health.

24         A.  At the time of the hire, the organization

25    was known as Dignity Health.

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 25

1        Q.   And what have you done -- what's your job

2   duties, your job role when you were a subcontractor

3   for Matrix Resources at Common Spirit?

4        A.   Common Spirit, Common Spirit Health.  Thank

5   you.

6        Q.   What were your job duties while you were

7   there?

8        A.   Well, since I'm still there and still doing

9   the same thing.

10       Q.   Well, so -- sorry to interrupt you, but

11   just to make sure my question is clear, what were

12   your job duties at Common Spirit Health while you

13   were a subcontractor through Matrix Resources?

14       A.   And to answer the question, they are the

15   same as my current duties, which are enterprise

16   application data integration between systems.

17       Q.   Okay.  What is -- what does that entail, at

18   a high level?

19       A.   At a pedestrian level?

20       Q.   Sure.

21       A.   When you walk into, let's say you go in to

22   get an x-ray, you walk into the clinic.  They

23   register you on their electronic health records

24   system.  You walk back to the room where the x-ray

25   machine is, and the technician pulls your

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 26

1    information up on the particular x-ray system.   My

2    job is to make sure that that data from the

3    registration system gets to the x-ray system.   That,

4    at a very high level, is part of the work of the

5    integration analyst.

6         Q.   Okay.   That helps.   Thank you.

7         A.   You're welcome.

8         Q.   So then I think it's fair to say you've

9    been in IT since, I believe I have '95 on here, but

10   you've been trained -- I think it's fair to say

11   you've been trained to a certain degree and have

12   education related to computers; is that right?

13        A.   I've been around the block for a while,

14   yes.

15        Q.   Okay.   Do you do any -- do you have any

16   experience with the hardware side of computers,

17   constructing hardware, deconstructing it, anything

18   like that?

19        A.   Some.

20        Q.   Is any of that experience through your job

21   as an IT professional or is it more of a hobby?

22        A.   Some.   Especially in my early days.

23        Q.   Okay.

24        A.   It was part of, you know, if you're doing

25   help desk work, you have to know something of the

Page 27

1   hardware for which people are calling and asking

2   questions.

3        Q.   And you said kind of towards the beginning

4   of your IT career.  Would you say you worked

5   professionally with any -- you know, understanding

6   hardware and being able to field questions about

7   that hardware, you know, after 2005 or so?

8        A.   After 2005, my -- my involvement in

9   day-to-day hardware troubleshooting was minimal.

10       Q.   Okay.  Now you say it was minimal.  Did you

11  do any day-to-day hardware troubleshooting after

12  2005 at all, that you can recall?

13       A.   Some, but not much.

14       Q.   Can you describe to me what type of work

15  you would do in those limited circumstances?

16       A.   Those limited circumstances, it would be

17  what I would consider isolation of problems.  So for

18  example, it's my responsibility, if I am testing a

19  data integration, if a network card was faulty, my

20  level of knowledge would have to determine okay, is

21  the problem one at the network layer, that is

22  whether or not the card was malfunctioning, or

23  there's a greater software issue involved, or

24  whether there was a transport involved, i.e., I have

25  a bad data connection.

Ricardo Davis                     September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 28

1      Q.   Uh-huh.   Okay.

2      A.   That level of troubleshooting continues to

3   this day.   Like I said, it's minimal, but it's

4   something that I have to deal with on occasion

5   regularly.

6      Q.   Okay.  So do you have any training or

7   education related to computer hacking or the

8   insertion of malware into the computer system or

9   voting machine?

10      A.   I do not.

11      Q.   Okay.  Any training or education concerning

12   the operation or functioning of direct recording

13   electronic voting machines that are commonly

14   referred to as DREs?

15      A.   No formal training.

16      Q.   Okay.  Any training or education concerning

17   the operation or functioning of ballot marking

18   devices, more commonly referred to as BMDs?

19      A.   Again, no formal training.

20      Q.   What type of informal training do you have?

21      A.   Primarily reading specs and monographs

22   regarding said system.

23      Q.   Okay.  Have you ever physically examined a

24   ballot marking device?

25      A.   Clarifying question, is this examination as

Ricardo Davis                     September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 29

1    of visual inspection?  Is it examining operating

2    characteristics of the --

3         Q.  Sure.  Let's start with visual inspection.

4    Have you ever visually inspected a ballot marking

5    device?

6         A.  Oh, yes.

7         Q.  And you did that in person or through

8    pictures?

9         A.  In person.

10        Q.  When was that?

11        A.  The last I can recall is November 3rd,

12   2020.

13        Q.  Is that when you were voting?

14        A.  That was when I was poll watching.

15        Q.  Poll watching, okay.  Have you ever voted

16   on a ballot marking device?

17        A.  No.

18        Q.  Okay.  So beyond the visual inspection

19   while you were poll watching on November 3rd, is

20   that -- I'm sorry, did I get that wrong?  You said

21   you were poll watching on November 3rd; right?

22        A.  That's correct.

23        Q.  And so you sort of -- when you say you

24   visually inspected a BMD, did you look to determine

25   how it operated or did you just see them in the

Ricardo Davis                                        September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 30

1  room?

2      A.  I saw them in the room.  I saw them being

3  used.

4      Q.  Okay.  And did you ever open up any of the

5  components on the BMD and tinker with them?

6      A.  That would be prohibited during that

7  particular role.

8      Q.  Okay.  So that would be a no, then?

9      A.  Yes.

10      Q.  Okay.  Good.  Now would you count

11  visualizing and seeing them in the election room or

12  your poll watching, would you count that among your

13  informal training of BMDs?

14      A.  Yes.

15      Q.  Okay.  Any other informal training that you

16  have with BMDs, that you can think of?

17      A.  Again, other than self-paced learning and

18  reading, no.

19      Q.  Okay.  What sort of stuff did you read

20  about BMDs?

21      A.  Well, just stuff on the Internet.

22      Q.  Have you read any of the reports, the

23  expert reports filed in this case about BMDs?

24      A.  I don't recall offhand.

25      Q.  Okay.  Would you say your reading, then,

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 31

1   was more limited to general Internet websites?

2        A.  My phone dropped.  Hang on.

3        Q.  Okay.

4        A.  We're back.

5            MR. JACOUTOT:  If the court reporter would

6   read the last question back.

7            (The reporter read the requested material.)

8   BY MR. JACOUTOT:

9        Q.  I can rephrase that, Mr. Davis, if it

10  helps.

11       A.  I can respond.  My reading was limited to

12  reports and documents that were retrieved over the

13  Internet.

14       Q.  Okay.  And would you say that it then did

15  not include the -- the docket for this case, some of

16  the reports are online as well.  So that's why I'm

17  asking, trying to determine whether you read it from

18  your -- from an expert report from this case,

19  specifically from the online docket, or if it was

20  more from, you know, a website unrelated to this

21  court system, the federal court system.

22       A.  Hmm.  I can't say for sure whether or not I

23  did or not.

24       Q.  Okay.  That's fine.  So apart from the, you

25  know, time you spent in the polling place, you know,

Ricardo Davis                         September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 32

1    observing BMDs and the reading that you've done from

2    online sources, do you have any other informal

3    education about them?

4         A.   The only thing I can probably ask of that

5    is watching other experts' testimony regarding their

6    systems.

7         Q.   Okay.  And what expert testimony did you

8    watch regarding the BMDs?

9         A.   I believe Dr. Halderman in particular comes

10   to mind, but that's the only one I can think of

11   right offhand.

12        Q.   Okay.  And when did you observe

13   Dr. Halderman testifying about BMDs?

14        A.   I don't recall.

15        Q.   Okay.  Do you recall if it was -- your

16   observing of Dr. Halderman, do you recall if it was

17   related to this particular case?

18        A.   I don't recall.

19        Q.   Okay.  Do y'all mind if we take a break

20   'til 10:05?

21        A.   A break would be very much appreciated.

22        Q.   Excellent.  Let's go ahead and do that.

23             (Recess 9:58 to 10:09 a.m.)

24        A.   Well, when we were asking questions about

25   my various legal past and legal involvement, I did

Ricardo Davis                              September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 33

1   mention the Constitution Party and Green Party case.

2   But I failed to remember, like you remember your

3   victories and forget your defeats.  I was a

4   plaintiff of an unverifiable voting challenge.

5   BY MR. JACOUTOT:

6        Q.   Okay.

7        A.   That was while Cathy Cox was still

8   Secretary of State, which would have been early

9   2000s.  Garland Favorito was a plaintiff in that

10  case as well.  And that wound its way through court

11  and got all the way to the state supreme court, and

12  we lost.

13       Q.   Okay.  Thank you for that.  Appreciate

14  that.  You said it was an unverifiable voting

15  challenge.  Was it a challenge to the DREs

16  specifically?

17       A.   Yes.

18       Q.   And you said it was early -- yeah, Cathy

19  Cox, I believe she was -- I'm not going to say when

20  she was, I'm not a hundred percent accurate, but

21  early 2000s, pre-2010, obviously; right?

22       A.   Yes.  If I remember correctly, that was --

23  I think early 2000s would have been, you know,

24  2005ish.

25       Q.   Uh-huh.  Okay.  And you were the plaintiff

Page 34

1   along with Garland Favorito.  Were there any other

2   plaintiffs?

3       A.  Oh, yeah, there were quite a few.  I don't

4   remember their names.

5       Q.  Okay.  And you said it made it to the

6   Supreme Court and you lost at the Supreme Court of

7   Georgia?

8       A.  Yes.

9       Q.  Do you recall when that ruling was, what

10  year?

11      A.  No.

12      Q.  Okay.  What did you specifically challenge

13  in that case about the DREs?

14      A.  I'm going to -- since I know this was one

15  of the cases involving Garland Favorito, I will

16  defer to the specific record on voterga.org for the

17  details of that question.

18      Q.  Okay.

19      A.  But generally, what we were dealing with

20  was the fact that there was no independently

21  verifiable means to validate a voter's intent.

22      Q.  Okay.  That's perfect.  That's all I need.

23  I appreciate it.

24      A.  Uh-huh.

25      Q.  Mr. Davis, earlier in your deposition you

Page 35

```
 1   referred me to your LinkedIn, sort of a better job
 2   history, and you verified that you don't believe
 3   there's anything inaccurate in that LinkedIn to your
 4   knowledge; is that right?
 5        A.  That is correct.
 6        Q.  The one question I would ask specifically
 7   then is, do you have any employment -- any
 8   employment history ever previously worked at an
 9   organization that is related to voting or elections
10   specifically?
11        A.  No.
12        Q.  Okay.  Perfect, thank you.
13        A.  Question, clarifying question.
14        Q.  Sure.
15        A.  Voting or elections.  Do you mean, like,
16   working for a company like Dominion as a contractor?
17   Is that what you're referring to?
18        Q.  Yeah.  And we'll -- I certainly would be
19   referring to that, and sort of broadly speaking, if
20   any company dealt specifically with elections or
21   voting as a part of their overall organizational
22   mission.
23        A.  No, never worked for a company doing that
24   kind of work.
25        Q.  Okay.  And so you have voted on the DRE
```

Page 36

1    machines previously; right?

2          A.   Yes.

3          Q.   Do you recall when the last time was that

4    you voted on a DRE?

5          A.   No.

6          Q.   And I think you may have answered this

7    already, but you never voted on a BMD, correct, the

8    new voting system that we have in Georgia?

9          A.   Correct.

10         Q.   Okay.  Now you are chairman of the Georgia

11   Constitution Party; is that correct?

12         A.   That's correct.

13         Q.   Are you a member of any other voting rights

14   or advocacy groups apart from the plaintiffs in this

15   case?

16         A.   That would be Voters Organized for Trusted

17   Election Results in Georgia.

18         Q.   Okay.  So that's VOTER GA?

19         A.   Correct.

20         Q.   Okay.  And what's your -- are you a member

21   of VOTER GA, or are you a leader, in a leadership

22   role with VOTER GA?

23         A.   Both.

24         Q.   Okay.  What's your leadership role in VOTER

25   GA?

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 37

1       A.   I am -- let's just say, how can I put this,

2   I assist Mr. Favorito and others as a volunteer

3   leader with regard to IT-related matters.

4       Q.   Okay.  Do you have a formal title at VOTER

5   GA?

6       A.   Well, Mr. Favorito calls me cofounder, but

7   that's pretty much the extent of it.

8       Q.   Okay.

9       A.   I guess I volunteer, since the beginning.

10      Q.   Okay, that is good.  All right.  Any other

11  membership in any voting rights or advocacy groups?

12      A.   No other formal membership now.

13      Q.   Okay.  When did you -- now you are a member

14  of the Georgia Coalition for Good Governance; right?

15      A.   Yes.

16      Q.   And when did you join that organization?

17      A.   Oh, that would have been late 2010 time

18  frame.  Like VOTER GA, there's no official

19  membership process.  So...

20      Q.   Late 2010 is sort of when you started

21  volunteering for Coalition for Good Governance?

22      A.   Yes.

23      Q.   Okay.  When you started, was it in your

24  individual capacity or in your capacity as chair of

25  the Constitution Party of Georgia?

Ricardo Davis                        September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 38

1        A.   Both.

2        Q.   Okay.   What sort of work do you do,

3   volunteer work do you do for the Coalition for Good

4   Governance?

5        A.   One example would be to provide assistance

6   with elections monitoring.

7        Q.   Anything else?

8        A.   Clarify the question.

9        Q.   Sure.   Apart from election monitoring

10  assistance that you provide for Coalition for Good

11  Governance in the course of your volunteer work, do

12  you provide any other work for the Coalition for

13  Good Governance?

14       A.   Primarily in the way of what I call

15  education.   For example, the party posts an election

16  integrity update briefing on a regular basis, and I

17  invite members from the Coalition for Good

18  Governance to speak to various issues to the

19  constituency, many of whom are part of the

20  Constitution Party.

21       Q.   So when you say "education," you invite the

22  Coalition for Good Governance to educate members of

23  the Constitution Party?

24       A.   Members and supporters.

25       Q.   Members and supporters, okay.   Would it be

Ricardo Davis                                 September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 39

1    fair to say that the primary goal of your work with

2    the Coalition for Good Governance is to make voting

3    by paper ballot a reality in Georgia?

4          A.   Restate the beginning of that question,

5    please.

6          Q.   Sure.  Would it be fair to say -- strike

7    that.  I'll just restate the whole question,

8    including the beginning, so there's no confusion.

9               Would it be fair to say that your primary

10   goal of your work with the Coalition for Good

11   Governance is to make voting by paper ballot a

12   reality in Georgia?

13         A.   No.

14         Q.   How would you characterize your primary

15   goal in working with the Coalition for Good

16   Governance?

17         A.   I would characterize the primary goal of

18   the relationship in being restoring constitutional

19   legal transparent elections in the state of Georgia,

20   of which the specific item that you mentioned is

21   part of that.

22         Q.   Okay.  So to make sure I understand your

23   response correctly, the primary goal of your work

24   with CGG is to make sure that there are

25   constitutional legal transparent elections in

Page 40

1    Georgia, and using paper ballots in elections would

2    achieve that goal; is that correct?

3         A.   That would be part of achieving that goal.

4         Q.   Are elections by paper ballots the only way

5    to achieve that goal?  And I'll rephrase that

6    question, so we can strike that.  You don't have to

7    answer it.

8              Are elections by paper ballot the only way

9    to achieve constitutional elections in Georgia, to

10   your knowledge?

11        A.   No, no.

12        Q.   Okay.  As a plaintiff in this case, is it

13   fair to say that you're familiar with the claims in

14   this case?

15        A.   Generally, yes.

16        Q.   Okay.  And apart from the claims in this

17   case, are there any other claims that you plan on

18   making that have not yet been made?

19        A.   No.

20        Q.   Okay.  Now you voted in numerous elections;

21   correct?

22        A.   Yes.

23        Q.   Do you have any evidence that any of the

24   votes that you cast in any Georgia election were not

25   counted?

Ricardo Davis                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 41

1      A.  Is counsel asking if I have any knowledge
2  that my ballot cast was not counted?
3      Q.  That is the question.
4      A.  I am not aware.
5      Q.  Okay.  Do you have any evidence that any
6  votes that you have cast in Georgia have ever been
7  changed from the selection that you made?
8      A.  No.
9      Q.  Do you have evidence that any DREs in any
10 election in Georgia has ever actually been hacked?
11     A.  Define hacked.
12     Q.  Manipulated in such a way as to change the
13 outcome of the voter selection.
14     A.  Are you referring to the physical hardware,
15 or are you talking about the data?
16     Q.  I'm referring to the voter selection, so
17 I'll rephrase the question.  Do you have any
18 evidence that any DRE used in any election in
19 Georgia has ever been actually manipulated by a
20 third party and, as a result of that manipulation,
21 changed a selection to a different selection than
22 that was selected by the voter?
23     A.  Yes.
24     Q.  What evidence do you have in that regard?
25     A.  I personally have no evidence.  However, I

Ricardo Davis                              September 29, 2021
Curling, Donna v. Raffensperger, Brad

                                                        Page 42

1    am aware of cases that have come before the state
2    election committee when it says activity was in
3    question.
4         Q.  So you're not referring, as you said, to
5    any personal evidence that you possess, you're only
6    referring to cases that have gone before the state
7    election committee and alleged that they have been
8    hacked and that their votes were changed?
9         A.  Correct.
10        Q.  Do you have any evidence that a BMD used in
11   any election in Georgia has been hacked?  And I'll
12   represent to you that we can use the same definition
13   for hacked for all of these that I just provided to
14   you.
15        A.  I am not aware, period.
16        Q.  Understood.  So when you say you're not
17   aware, I'm not really asking that.  I'm asking if
18   you have any evidence that BMD used in any election
19   in Georgia was hacked.
20        A.  I do not.
21        Q.  Okay.  Do you have any evidence that
22   malware was inserted in any voting machine in
23   Georgia since 2019?
24        A.  I do not have said evidence.
25        Q.  Okay.  And now this question sounds very

Ricardo Davis                           September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 43

1    similar, but there's a slight difference.  And I can

2    point it out to you if you would like, but do you

3    have any evidence that malware was inserted into any

4    BMD used in an election in Georgia since 2019?

5         A.   I do not.

6         Q.   Okay.  Now you mentioned that you've never

7    voted on a BMD; is that correct?

8         A.   That's correct.

9         Q.   Do you have any plans to vote on a BMD in

10   the future?

11        A.   No.

12        Q.   Okay.

13        A.   Clarifying point.

14        Q.   Sure.

15        A.   I do not under the current election

16   framework in the state of Georgia.

17        Q.   Okay.  Now is it -- is it fair to say that

18   the reason why you don't have any plans to vote on a

19   BMD in the future is your concern that it will not

20   be accurately tabulated?

21        A.   My concern is that there's a lack of

22   integrity by audit to independently verify that such

23   is the case.

24        Q.   So your concern deals exclusively with the

25   fact that you believe that there's not a sufficient

Ricardo Davis                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 44

1    mechanism under the current election system to

2    independently validate your vote?

3        A.  If I exclusively cast my ballot using the

4    BMD, that is correct.

5        Q.  Okay.  Now because of your concerns with

6    respect to the BMDs, you've chosen to vote by mail;

7    is that correct?

8        A.  Yes.

9        Q.  Okay.  And these concerns that you have

10   with the BMDs and their ability to be audited

11   independently, do you have these same concerns with

12   respect to all votes or just your vote specifically?

13       A.  Clarifying question.  When you say my vote,

14   are you referring to the manner in which I vote or

15   are you referring to me as an individual citizen

16   voting?

17       Q.  Yeah, I'll try and rephrase.  You are

18   concerned that if you were to vote on a BMD, that it

19   would not -- that it has the potential to not be

20   accurately cast; is that correct?

21       A.  That is a concern, yes.

22       Q.  Okay.  And then another concern that you

23   have is that if you were to cast a vote on the BMD,

24   there's no way, to your mind, that you could audit

25   the integrity of that vote after the fact; correct?

Page 45

1      A.   No, I would not agree.  I would say that

2  the current processes and procedures are

3  insufficient.

4      Q.   Okay.  So then your concern, an additional

5  concern that you have to voting on a BMD is the

6  current processes for auditing the integrity of the

7  votes cast are not sufficient to verify that

8  integrity; is that right?

9      A.   Yes.

10      Q.   Okay.  And now is that concern equally

11  valid to anyone else who casts a ballot -- casts

12  their vote on a BMD?  Do they -- does their casting

13  of the vote on a BMD trigger the same concerns in

14  you that we just spoke of with respect to your vote?

15          MR. ICHTER:  Objection.  Speculation.  But

16  he can answer.

17      A.   Well, I -- I'm not clear as to I guess the

18  congruity of the subject.  In other words, are you

19  asking me if everybody else has the same concern as

20  I do?

21  BY MR. JACOUTOT:

22      Q.   No.  I'm asking whether you have the same

23  concern with respect to every other voter on a BMD

24  that you have with yourself.

25      A.   With regard to the aspect of auditability,

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 46

1    I'm not sure.

2         Q.  Okay.  So if -- now we've established what

3    your -- you have two concerns.  Do you have any

4    other concerns about casting a vote on BMD other

5    than the ones we discussed?

6         A.  Yes.

7         Q.  Okay.  What other concerns do you have with

8    respect to voting on a BMD?

9         A.  One would be the ability to verify whether

10   the BMD has captured my intent.

11        Q.  Uh-huh.

12        A.  Another would be the secrecy of my casting

13   a ballot, which -- well, I'll just leave it.

14   Those -- those would be two that I could just start

15   with right there.

16        Q.  Well, you are a plaintiff in this case; I'd

17   like to know exactly how you feel -- exactly what

18   your concerns are with respect to voting on a BMD,

19   and not just examples, but I'd like to get through

20   all of them, if we could.

21        A.  Okay.  Do you have any specific questions

22   regarding the two that I just mentioned?

23        Q.  Not at this moment, no.

24        A.  Okay.  I mean, what I specified so far

25   would be at a high level the primary concern.

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 47

1       Q.   Are there any other concerns that you can

2   think of sitting here today?

3       A.   Not at the moment.

4       Q.   Okay.   Thank you.

5       A.   Or they would be derivative.

6       Q.   Okay.   Those concerns that you listed and

7   any derivative concerns that sort of extend

8   therefrom, do you have those same concerns with

9   respect to any voter voting on a BMD or only with

10  respect to yourself?

11      A.   Oh, no, there would be some specific issues

12  or concerns that would separate me from the general

13  voter population.

14      Q.   Okay.   And what might those be?

15      A.   With regard to secrecy of the ballot, being

16  a member of a -- and I'll put it lightly -- an

17  opposition party, secrecy of the ballot would be a

18  major concern.

19      Q.   Okay.   Okay.   So is it your testimony that

20  members of the Constitution Party have a greater

21  interest in maintaining the secrecy of their voting

22  ballot than other Georgia voters?

23      A.   Perhaps.   I'll say that unlike the

24  membership of the party, a -- an executive of the

25  party, a leader of the party has a different stake

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 48

1   in the game as opposed to a general member of the

2   party.

3        Q.   Okay.  So then I just want to clarify this.

4   So then is it your testimony that leaders of

5   political parties have a greater interest in

6   maintaining the secrecy of their ballot over those

7   who are not leaders of political parties in Georgia?

8        A.   No.  I would say that leaders of a

9   political organization not recognized by state law

10  as a political party do have said interest.

11       Q.   Do have -- I'm sorry, I missed -- before

12  you said "interest," do have what?

13       A.   They have the particular problem, the

14  particular interest.

15       Q.   Right, particular interest.

16       A.   With regard to protecting the secrecy of

17  their ballot.

18       Q.   My question isn't whether they have a

19  particular interest in ballot secrecy but whether it

20  has a greater interest than other Georgia voters.

21       A.   Yes.

22       Q.   Okay.  Anything else that might separate

23  your vote as having a greater interest in ballot

24  secrecy than others?

25       A.   I can't think of additional at the moment.

Ricardo Davis                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 49

1      Q.  Okay.  Would you say that it's easier to

2   verify the accuracy of a vote on a BMD for other

3   Georgia voters than it is to verify the accuracy of

4   your vote on a BMD?

5      A.  By what standard -- well, what do you mean

6   by verify accuracy?

7      Q.  You said that -- your first concern that

8   you listed with respect to voting on a BMD was the

9   ability to verify whether the BMD captured your

10  intent as a voter; is that correct?

11     A.  Yeah.

12     Q.  So would you say that it is easier for it

13  to verify whether a BMD captured the intent of

14  another Georgia voter who voted on a BMD than it is

15  for someone to verify that the BMD captured your

16  intent as a voter if you voted on a BMD?

17     A.  I guess I'm not understanding the question

18  very well.  My apology.

19     Q.  No, no, not your fault.  I'll try and

20  rephrase.  So it's your concern that a BMD -- strike

21  that.

22          So if it's your concern that it's -- strike

23  that again.

24          Your concern is, among your concerns is the

25  ability to verify whether a BMD captured your intent

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 50

1    as a voter, is it difficult for you -- if you're

2    concerned about the BMD capturing your intent, would

3    you also be concerned about a BMD being able to

4    capture the intent of another voter in Georgia?

5           A.   No.

6           Q.   Okay.

7           A.   Because of my political standing, I believe

8    that there would be concerns.

9           Q.   I missed that part right before "concerns"

10   you said.

11          A.   Because of my standing compared to the rest

12   of the voter population, I would have specific

13   concerns.

14          Q.   Okay, okay.  Now you mentioned earlier that

15   you observed testimony of Dr. Halderman; is that

16   correct?

17          A.   Yes.

18          Q.   Okay.  Has anyone explained to you what is

19   contained in Dr. Halderman's report on the Georgia

20   Dominion Voting System?

21          A.   I don't recall any detailed explanation

22   what was in his -- what he submitted to the court.

23          Q.   Okay.  Do you believe the results of the

24   presidential election held on November 3rd, 2020, in

25   Georgia are valid?

Ricardo Davis                          September 29, 2021
Curling, Donna v. Raffensperger, Brad

                                                        Page 51

 1          MR. ICHTER:  What do you mean by valid?
 2    BY MR. JACOUTOT:
 3      Q.  Valid as in accurately reflect the intent
 4    of the voters.
 5      A.  How would you know?
 6      Q.  Well, you can tell me whether you believe
 7    that it's valid or not, so I'll pose the same
 8    question to you again.  Do you believe the results
 9    of the presidential election held on November 3rd,
10    2020, in Georgia are valid?
11      A.  I don't know.
12      Q.  Do you have any reason to believe that the
13    results of the presidential election held on
14    November 3rd, 2020, in Georgia are invalid?
15      A.  I don't know.
16      Q.  Okay.  Do you believe the results of any of
17    the other elections held on November 3rd, 2020, in
18    Georgia are valid?
19      A.  Again, I don't know.
20      Q.  Okay.  Do you have any evidence that any
21    component of the Georgia election system was
22    actually hacked prior to or during the elections
23    held on November 3rd, 2020?
24      A.  State the question one more time, please.
25      Q.  Sure.  Do you have any evidence that any

Ricardo Davis                               September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 52

1    component of the Georgia election system was

2    actually hacked prior to or during the elections

3    held on November 3rd, 2020?

4           MR. ICHTER:  Would that include the KFC

5    computers?

6           MR. JACOUTOT:  I'm just going to object as

7    to not coach the witness on the question.

8           MR. ICHTER:  Not coaching.  I'm just asking

9    whether or not it's included.  Is that part of the

10   system?

11          MR. JACOUTOT:  The election system -- let

12   me ask the witness.

13   BY MR. JACOUTOT:

14       Q.  How would you describe your understanding

15   of what Georgia's election system is, Mr. Davis?

16       A.  Okay.  When we speak of election system,

17   we're talking about all components, whether they be

18   the electronic hardware, whether we're talking about

19   the software, are we talking about the data,

20   including any communication networks connecting

21   components of the system.

22       Q.  Okay.

23       A.  When I refer to election system, that's

24   what I have in mind.

25       Q.  Okay.  That's great.  Let's go with that

Page 53

1   definition.  So do you have any evidence that any

2   component of the Georgia election system was

3   actually hacked prior to or during the elections

4   held on November 3rd, 2020?

5        A.   I personally have no evidence.

6        Q.   Okay.  Do you have any -- and keeping with

7   that election system definition, do you have any

8   evidence that any malware was actually inserted into

9   any component of the Georgia election system or

10  prior to or during the elections held on November

11  3rd, 2020?

12       A.   I personally have no evidence.

13       Q.   Okay.  Do you have any evidence that the

14  result of any elections held in Georgia on November

15  3rd, 2020, were actually changed in any way as a

16  result of hacking or the insertion of malware into

17  any component of the election system?

18       A.   I personally have no evidence.

19       Q.   Okay.  Do you have any evidence of any

20  widespread voter fraud in Georgia in connection with

21  the elections held on November 3rd, 2020?

22       A.   State the question one more time, please.

23       Q.   Sure.  Do you have any evidence of any

24  widespread voter fraud in Georgia in connection with

25  the elections held in Georgia on November 3rd, 2020?

Ricardo Davis                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 54

1          A.   I personally have no evidence.

2          Q.   Do you have any evidence that the election

3    system in Georgia failed to count any legal votes

4    cast on November 3rd, 2020?

5          A.   No, I personally have no evidence.

6          Q.   Okay.  Do you have any evidence that the

7    election system counted any illegal votes on

8    November 3rd, 2020 -- or excuse me, that's phrased

9    improperly.  Let me ask that again.

10          Do you have any evidence that the election

11   system counted any illegal votes in the election

12   held on November 3rd, 2020, in Georgia?

13          A.   Clarifying question.  So when you say the

14   election system, you're referring to a valid ballot

15   being cast and not recorded correctly?

16          Q.   No.  So in this situation, I'm asking

17   whether an invalid ballot was cast and recorded as a

18   valid ballot.

19          A.   Okay.

20          Q.   And so I'll phrase it that way for the

21   record so it comes out cleaner.  Do you have any

22   evidence that the election system counted any

23   invalid ballots cast on the November 3rd, 2020,

24   election and were recorded as valid ballots?

25          A.   I have no such evidence.

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 55

1        Q.   Okay.  You are not contesting the outcome

2   of the presidential election held in Georgia on

3   November 3rd, 2020, in this case; is that correct?

4        A.   That is correct.

5        Q.   And you're not contesting the outcome of

6   any of the other elections held in Georgia on

7   November 3rd, 2020, in this case; is that correct?

8        A.   That is correct.

9        Q.   Okay.  Now you stated earlier that one of

10  your concerns, and correct me if I'm wrong, one of

11  your concerns is the inability, the purported

12  inability to match QR codes with the paper human

13  readable portion, is that correct, about BMDs?

14       A.   That would be one concern, yes.

15       Q.   Okay.  Do you have any evidence that there

16  was any mismatch between the QR codes on the paper

17  ballots cast in the presidential election held in

18  Georgia on November 3rd, 2020, and the human

19  readable portion of the paper ballot?

20       A.   I have no personal evidence.

21       Q.   Okay.  And that's true for all of the

22  elections, not just the presidential election on

23  November 3rd; right?

24       A.   Correct.

25       Q.   Okay.  Have you made any written statements

Ricardo Davis                        September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 56

1    to any members of the press concerning this case or

2    your allegations in this case?

3           A.   I do not recall making any statements to

4    the press.

5           Q.   Have you made any written statements to a

6    political party or voter advocacy group concerning

7    this case or your allegations in this case?

8           A.   Yes.

9           Q.   Which political parties?

10          A.   Well, to mine.

11          Q.   Makes sense.  Any others, though?

12          A.   No.

13          Q.   Okay.  And how many times have you made

14   statements to your political party concerning the

15   case or the allegations in this case?

16          A.   I don't have an exact number for you there.

17          Q.   Would you say more than five?

18          A.   Perhaps.

19          Q.   Okay.  And we've asked this of all the

20   witnesses.  To your knowledge, have your attorneys

21   received payment for their services in this case

22   from you or anyone else?

23          A.   They have not received payment from me.

24          Q.   Okay.  Do you know if they've received

25   payment from anyone else?

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 57

```
1        A.  I do not know.

2        Q.  Okay.  Okay.  I'm going to take a quick

3   break and go over my notes here.  If you guys can

4   give me, let's do the same thing we did last time.

5   You want to go 'til 11:05?

6        A.  Okay.

7        Q.  Great, thanks.

8            (Recess 10:57 to 11:05 a.m.)

9            (Defendant's Exhibit 3 marked)

10  BY MR. JACOUTOT:

11       Q.  Mr. Davis, I've just introduced what I've

12  marked Exhibit 3.  Can you pull that up for me and

13  let me know when you have it?

14       A.  Yes, I have it up.

15       Q.  Okay.  And this is the ENET report from the

16  Secretary of State's office.  Have you seen this

17  before?

18       A.  Yes.

19       Q.  Okay, great.  Well, I don't have any

20  questions on it.  Just wanted to introduce it into

21  the record and verify that you'd seen it.

22           MR. JACOUTOT:  That, Mr. Ichter, is all I

23  have.

24           MR. ICHTER:  Our questions are reserved.

25  Anybody else have any questions?
```

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

                                                            Page 58

1              MS. RINGER:  No, sir.

2              MR. JACOUTOT:  All right.

3              (Deposition concluded at 11:07 p.m.)

4              (Signature reserved.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 59

1                  VERITEXT LEGAL SOLUTIONS

2                FIRM CERTIFICATE AND DISCLOSURE

3

4     Veritext represents that the foregoing transcript as

5     produced by our Production Coordinators, Georgia

6     Certified Notaries, is a true, correct and complete

7     transcript of the colloquies, questions and answers

8     as submitted by the certified court reporter in this

9     case.  Veritext further represents that the attached

10    exhibits, if any, are a true, correct and complete

11    copy as submitted by the certified reporter,

12    attorneys or witness in this case; and that the

13    exhibits were handled and produced exclusively

14    through our Production Coordinators, Georgia

15    Certified Notaries.  Copies of notarized production

16    certificates related to this proceeding are

17    available upon request to litsup-ga@veritext.com.

18

19    Veritext is not taking this deposition under any

20    relationship that is prohibited by OCGA 15-14-37(a)

21    and (b).  Case-specific discounts are automatically

22    applied to all parties, at such time as any party

23    receives a discount.  Ancillary services such as

24    calendar and financial reports are available to all

25    parties upon request.

Ricardo Davis                                September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 60

1                          CERTIFICATE
2    STATE OF GEORGIA:
     COUNTY OF FULTON:
3

4            I hereby certify that the foregoing
     transcript was taken down, as stated in the caption,
     and the colloquies, questions and answers were
5    reduced to typewriting under my direction; that the
     transcript is a true and correct record of the
6    evidence given upon said proceeding.
7            I further certify that I am not a relative
     or employee or attorney of any party, nor am I
     financially interested in the outcome of this
8    action.
9            I have no relationship of interest in this
     matter which would disqualify me from maintaining my
     obligation of impartiality in compliance with the
10   Code of Professional Ethics.
11           I have no direct contract with any party in
     this action and my compensation is based solely on
     the terms of my subcontractor agreement.
12           Nothing in the arrangements made for this
     proceeding impacts my absolute commitment to serve
13   all parties as an impartial officer of the court.
14           This th

15
16           *LaRita J. Cormier*
17           LaRita J. Cormier, RPR, CCR No. 2578
18
19
20
21
22
23
24
25

Veritext Legal Solutions
800.808.4958                                        770.343.9696

Ricardo Davis                        September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 61

1   To:  Cary Ichter, Esquire
2   Re:  Signature of Deponent Ricardo Davis
3   Date Errata due back at our offices: 30 Days
4
5   Greetings:
6   The deponent has reserved the right to read and
    sign.  Please have the deponent review the attached
7   PDF transcript, noting any changes or corrections on
    the attached PDF Errata.  The deponent may fill out
8   the Errata electronically or print and fill out
    manually.
9
10  Once the Errata is signed by the deponent and
    notarized, please mail it to the office of Veritext
11  (below).
12
    When the signed Errata is returned to us, we will
13  seal and forward to the taking attorney to file with
    the original transcript.  We will also send copies
14  of the Errata to all ordering parties.
15
    If the signed Errata is not returned within the time
16  above, the original transcript may be filed with the
    court without the signature of the deponent.
17
18
    Please send completed Errata to:
19
    Veritext Production Facility
20
    20 Mansell Court
21
    Suite 300
22
    Roswell, GA  30076
23
    (770) 343-9696
24
25

Ricardo Davis                                September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 62

1    ERRATA
2    I, the undersigned, do hereby certify that I have
     read the transcript of my testimony and that
3
     ___ There are no changes noted.
4
     ___ The following changes are noted:
5
6    Pursuant to Rule 30(7)(e) of the Federal Rules of
     Civil Procedure and/or OCGA 9-11-30(e), any changes
7    in form or substance which you desire to make to
     your testimony shall be entered upon the deposition
8    with a statement of the reasons given for making
     them.  To assist you in making any such corrections,
9    please use the form below.  If additional pages are
     necessary, please furnish same and attach.
10
11   Page ____ Line ____ Change _____
12   _____
13   Reason for change _____
14   Page ____ Line ____ Change _____
15   _____
16   Reason for change _____
17   Page ____ Line ____ Change _____
18   _____
19   Reason for change _____
20   Page ____ Line ____ Change _____
21   _____
22   Reason for change _____
23   Page ____ Line ____ Change _____
24   _____
25   Reason for change _____

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 63

1    Page ____ Line ____ Change _____

2    _____

3    Reason for change _____

4    Page ____ Line ____ Change _____

5    _____

6    Reason for change _____

7    Page ____ Line ____ Change _____

8    _____

9    Reason for change _____

10   Page ____ Line ____ Change _____

11   _____

12   Reason for change _____

13   Page ____ Line ____ Change _____

14   _____

15   Reason for change _____

     Page ____ Line ____ Change _____

16

     _____

17

     Reason for change _____

18

19

                    _____

20                  DEPONENT'S SIGNATURE

21   Sworn to and subscribed before me this ____ day of

     _____, _____.

22

23   _____

     NOTARY PUBLIC

24

25   My Commission Expires: _____

Ricardo Davis                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

**[& - application]**                                    Page 1

| **&** |
| --- |

**&**   3:12

| **0** |
| --- |

**05**   2:15

| **1** |
| --- |

**1**   2:3 9:23 10:4
**10**   2:3
**10/23/19**   2:4
**10:00**   10:15
**10:05**   32:20
**10:09**   32:23
**10:57**   57:8
**11:05**   57:5,8
**11:07**   58:3
**13621**   60:16
**141**   4:5
**14th**   60:14
**15-14-37**   59:20
**1530**   3:6
**1600**   3:22
**1981**   17:12
**1986**   17:12
**1990**   18:11,12
  21:23
**1994**   21:23
**1995**   21:13 22:13
**1998**   23:7
**1999**   10:25 23:5
**1:17**   1:6

| **2** |
| --- |

**2**   2:4 20:13,17
**20**   2:4 61:20
**200**   3:22
**2000**   3:13
**20006**   3:14
**2000s**   19:23 33:9
  33:21,23
**2005**   27:7,8,12
**2005ish**   33:24

**2010**   33:21 37:17
  37:20
**2014-2015**   11:8
**2015**   24:5,6
**2019**   20:19 42:23
  43:4
**2020**   23:25 29:12
  50:24 51:10,14,17
  51:23 52:3 53:4
  53:11,15,21,25
  54:4,8,12,23 55:3
  55:7,18
**2021**   1:14 60:14
**206**   10:21
**23rd**   20:19
**2578**   1:18 60:17
**29**   1:14
**2989**   1:6

| **3** |
| --- |

**3**   2:5 57:9,12
**30**   61:3 62:6
**300**   61:21
**30076**   61:22
**30303**   4:6
**30326**   3:7
**30339**   3:23
**30th**   23:25
**3340**   3:5
**343-9696**   61:23
**3rd**   29:11,19,21
  50:24 51:9,14,17
  51:23 52:3 53:4
  53:11,15,21,25
  54:4,8,12,23 55:3
  55:7,18,23

| **4** |
| --- |

**4038**   4:5

| **5** |
| --- |

**57**   2:5

| **6** |
| --- |

**6**   20:23
**640-1**   20:20

| **7** |
| --- |

**7**   62:6
**770**   61:23
**78**   16:22

| **8** |
| --- |

**80s**   13:16 15:22
**81**   16:22
**86**   18:13

| **9** |
| --- |

**9-11-30**   62:6
**95**   26:9
**9:00**   10:15
**9:09**   1:15
**9:58**   32:23

| **a** |
| --- |

**a&m**   17:5 21:15
  21:17
**a.m.**   1:15 10:15,15
  32:23 57:8
**ability**   44:10 46:9
  49:9,25
**able**   27:6 50:3
**absentee**   20:3,8
**absolute**   60:12
**acceptable**   7:11,18
**access**   11:18 13:7
**accessed**   10:1
**accidentally**   10:9
**accuracy**   49:2,3,6
**accurate**   10:12
  33:20
**accurately**   43:20
  44:20 51:3

**achieve**   40:2,5,9
**achieving**   40:3
**action**   1:5 15:11
  15:13 60:8,11
**activity**   42:2
**additional**   45:4
  48:25 62:9
**address**   10:20
**advocacy**   36:14
  37:11 56:6
**affidavit**   12:7
**affidavits**   12:15
**agent**   22:14
**agree**   7:4 45:1
**agreement**   60:11
**agricultural**   15:18
**ahead**   15:10 32:22
**al**   1:4,8
**allegations**   56:2,7
  56:15
**alleged**   14:17,22
  42:7
**allowed**   5:12
**analysis**   17:24
**analyst**   21:7 26:5
**analytical**   17:19
  17:22
**ancillary**   59:23
**answer**   5:16 7:11
  7:17 25:14 40:7
  45:16
**answered**   36:6
**answers**   59:7 60:4
**anybody**   57:25
**apart**   15:3 31:24
  36:14 38:9 40:16
**apology**   49:18
**appearances**   3:1
  4:1
**application**   23:1
  25:16

Ricardo Davis                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

**[applied - changes]**                                        Page 2

**applied** 59:22
**appreciate** 6:6
  10:17 22:7 33:13
  34:23
**appreciated** 32:21
**approximately**
  16:21
**arkansas** 16:20
  17:5,11
**arrangements**
  60:12
**arrested** 14:21,23
**asked** 7:7 56:19
**asking** 27:1 31:17
  32:24 41:1 42:17
  42:17 45:19,22
  52:8 54:16
**aspect** 45:25
**aspects** 8:5
**assist** 37:2 62:8
**assistance** 38:5,10
**assuming** 15:23
  17:14
**at&t** 22:22
**atlanta** 1:3 3:7,23
  4:6
**attach** 62:9
**attached** 59:9 61:6
  61:7
**attend** 16:16,21,25
**attorney** 9:4 12:10
  60:7 61:13
**attorney's** 4:4
**attorneys** 7:25 8:2
  56:20 59:12
**audit** 43:22 44:24
**auditability** 45:25
**audited** 44:10
**auditing** 45:6
**automatically**
  59:21

**available** 59:17,24
**avenue** 3:13
**aware** 41:4 42:1
  42:15,17

**b**

**b** 11:23 59:21
**back** 25:24 31:4,6
  61:3
**bad** 27:25
**ballot** 11:18 13:8
  28:17,24 29:4,16
  39:3,11 40:8 41:2
  44:3 45:11 46:13
  47:15,17,22 48:6
  48:17,19,23 54:14
  54:17,18 55:19
**ballots** 20:3,5,6,8
  40:1,4 54:23,24
  55:17
**based** 7:8 24:9
  60:11
**basically** 11:24
**basis** 22:22 38:16
**beginning** 21:18
  27:3 37:9 39:4,8
**behalf** 3:2,10,17
  4:2
**believe** 22:17 23:9
  23:10 26:9 32:9
  33:19 35:2 43:25
  50:7,23 51:6,8,12
  51:16
**best** 6:19,24,24
**better** 35:1
**beyond** 14:21
  18:18,25 29:18
**bit** 14:14
**block** 26:13
**bmd** 29:24 30:5
  36:7 42:10,18
  43:4,7,9,19 44:4

44:18,23 45:5,12
  45:13,23 46:4,8,10
  46:18 47:9 49:2,4
  49:8,9,13,14,15,16
  49:20,25 50:2,3
**bmds** 20:25 28:18
  30:13,16,20,23
  32:1,8,13 44:6,10
  55:13
**board** 19:19
**brad** 1:7 3:17 5:11
**branch** 17:22
**break** 7:16,18
  32:19,21 57:3
**breaks** 7:13
**briefing** 38:16
**broadly** 35:19
**building** 11:23
**burton** 3:20

**c**

**c** 5:1 6:8
**calendar** 59:24
**call** 38:14
**calling** 27:1
**calls** 37:6
**candidates** 13:8
**capacity** 37:24,24
**caption** 60:4
**capture** 50:4
**captured** 46:10
  49:9,13,15,25
**capturing** 50:2
**card** 27:19,22
**career** 22:12 27:4
**cary** 3:3 5:14,24
  61:1
**case** 8:6 9:1,17
  11:9,11,16 12:1,17
  12:22 13:2,4 15:3
  16:2,10 30:23
  31:15,18 32:17

33:1,10 34:13
  36:15 40:12,14,17
  43:23 46:16 55:3
  55:7 56:1,2,7,7,15
  56:15,21 59:9,12
  59:21
**cases** 11:3 34:15
  42:1,6
**cast** 40:24 41:2,6
  44:3,20,23 45:7
  54:4,15,17,23
  55:17
**casting** 20:3,5,8
  45:12 46:4,12
**casts** 45:11,11
**cathy** 33:7,18
**ccr** 1:18 60:17
**certain** 26:11
**certainly** 35:18
**certificate** 59:2
  60:1
**certificates** 59:16
**certifications**
  18:21
**certified** 59:6,8,11
  59:15
**certify** 60:3,6 62:2
**cgg** 39:24
**chair** 37:24
**chairman** 36:10
**challenge** 33:4,15
  33:15 34:12
**change** 41:12
  62:11,13,14,16,17
  62:19,20,22,23,25
  63:1,3,4,6,7,9,10
  63:12,13,15,15,17
**changed** 41:7,21
  42:8 53:15
**changes** 61:7 62:3
  62:4,6