

Deposition of:

# Megan Missett

*September 28, 2021*

In the Matter of:

# Curling, Donna v. Raffensperger, Brad

Veritext Legal Solutions

800.808.4958 | calendar-atl@veritext.com | 770.343.9696

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF GEORGIA

3                  ATLANTA DIVISION

4     DONNA CURLING, et al.,

5           Plaintiffs,      CIVIL ACTION FILE

6     vs.                    NO. 1:17-cv-2989-AT

7     BRAD RAFFENSPERGER, et

8     al.,

9           Defendants.

10

11

12              DEPOSITION OF

13              MEGAN MISSETT

14          September 28, 2021

15              1:07 p.m.

16

17      TAKEN BY REMOTE VIDEO CONFERENCE

18       LaRita J. Cormier, RPR, CCR-2578

19

20

21

22

23

24

25

Megan Missett                                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 2

1                    INDEX OF EXHIBITS

2    Exhibit No.       Description                    Page

3        Exhibit 1    Notice of Deposition              78

4        Exhibit 2    Ms. Missett's Voting Record       06

5        Exhibit 3    Declaration of Megan Missett,     60

6                     10/20/19

7        Exhibit 4    Declaration of Megan Missett,     61

8                     5/21/19

9

10

11

12

13

14           I N D E X   O F   E X A M I N A T I O N

15                                                    Page

16   Examination by Ms. LaRoss.........................05

17   Examination by Ms. Ringer........................79

18

19

20

21

22

23

24

25

Megan Missett                            September 28, 2021
Curling, Donna v. Raffensperger, Brad

                                                           Page 3

1    APPEARANCES OF COUNSEL:

2    On behalf of the Plaintiffs:

3            CARY ICHTER, ESQUIRE

4            Ichter Davis LLC

5            3340 Peachtree Road NE

6            Suite 1530

7            Atlanta, Georgia  30326

8            cichter@ichterdavis.com

9

10   On behalf of the Curling Plaintiffs:

11           HANNAH ELSON, ESQUIRE

12           Morrison & Foerster, LLP

13           2000 Pennsylvania Avenue, NW

14           Washington, DC  20006

15           Helson@mofo.com

16

17   On behalf of Defendant Secretary of State Brad

18   Raffensperger:

19           DIANE FESTIN LaROSS, ESQUIRE

20           R. DAL BURTON, ESQUIRE

21           Taylor English DUMA LLP

22           1600 Parkwood Circle, Suite 200

23           Atlanta, Georgia  30339

24           Dlaross@taylorenglish.com

25           Dburton@taylorenglish.com

                                                    Page 4

1    APPEARANCES OF COUNSEL (Cont'd):

2    On behalf of Defendant Fulton County:

3              CHERYL RINGER, ESQUIRE

4              Fulton County Attorney's Office

5              141 Pryor Street, Suite 4038

6              Atlanta, Georgia  30303

7              Cheryl.ringer@fultoncountyga.gov

8

9

10

11

12   Also present:

13             MARILYN MARKS, Coalition for Good

14              Governance

15             MATT RIESDORPH, Veritext Concierge

16

17

18

19

20

21

22

23

24

25

Page 5

```
1                    P R O C E E D I N G S
2            THE REPORTER:  Due to the need for this
3    deposition to take place remotely because of the
4    government's order for social distancing, the
5    parties will stipulate that the court reporter may
6    swear in the witness over the Veritext Virtual
7    Videoconference and that the witness has verified
8    that she is in fact Megan Missett.
9                         MEGAN MISSETT,
10   having been first duly sworn, was examined and
11   testified as follows:
12                         EXAMINATION
13   BY MS. LaROSS:
14       Q.  Ms. Missett, I'm going to be asking you
15   some questions.  I just want to make sure I'm
16   pronouncing your name correctly.  Is Missett the
17   correct pronunciation?
18       A.  Missett is perfect, but you might see that
19   I'm registered to vote as Margaret Missett.  That's
20   the name on my birth certificate and the name I fly
21   and vote under, but everyone else calls me Megan.
22       Q.  All right, great.  I was going to clarify
23   that with you, and I appreciate that you did so.
24            So good afternoon, Ms. Missett.
25            MS. LaROSS:  This will be the deposition of
```

Page 6

1    Megan Missett taken by Defendant and Secretary of

2    State Brad Raffensperger, by counsel, via

3    videoconferencing, for the purposes of discovery and

4    all other purposes allowable under the Federal Rules

5    of Civil Procedure.  All objections except those

6    going to the form of the question and the

7    responsiveness of the answer are reserved until

8    trial or first use of the deposition, if that is

9    okay with counsel.

10               MR. ICHTER:  Stipulated.

11               MS. LaROSS:  And Cary, will Ms. Missett be

12   reading and signing her deposition?

13               MR. ICHTER:  Yes.

14   BY MS. LaROSS:

15       Q.  And Ms. Missett, you went and clarified for

16   us that the name on your birth certificate is

17   Margaret.  I wanted to ask you a question -- I'm

18   going to actually -- we're going to start right

19   away, and I'm going to put up an exhibit.  Okay.

20   I'm going to put up an exhibit which is your voting

21   record, and then I will ask you a question about it,

22   but let me go ahead and get that placed in the

23   marked exhibit folder.  And this will become Exhibit

24   Number MM 2.  Okay.  All right.

25               (Deposition Exhibit 2 marked)

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

                                                        Page 7

1            MS. LaROSS:  So I've introduced the

2    exhibit, and everyone can refresh, and hopefully

3    you'll see the exhibit.

4    BY MS. LaROSS:

5        Q.  Okay.

6        A.  I don't see it.  I see the notice to take

7    the deposition.

8        Q.  Okay.  Go ahead and refresh.

9        A.  Not yet.  Let me go back to the tree.

10           CONCIERGE RIESDORPH:  Ms. Missett, this is

11    Matt with Veritext.  If you just click that marked

12    exhibit folder right under your name.

13        A.  Now it's in effect.  There it is.

14    BY MS. LaROSS:

15        Q.  Click on that and open it up, please.  I'm

16    going to ask you a couple questions about it.

17        A.  Okay.  I'm looking at it.

18        Q.  Okay.  Have you ever seen this document

19    before?

20        A.  I saw it about a minute ago when I opened

21    the e-mail from the attorney.

22        Q.  Okay.  And so take a look at it, and if you

23    would -- and take a moment to do so; that's entirely

24    fine.  What I want to verify is that this is your

25    voting record because it does -- it is under

Page 8

1   Margaret G. Missett, and I want to make sure that's

2   you.  That's all we're doing at this point.

3        A.  Yes.  I have a question about the last box

4   with entries.  I don't know what that is.  Where it

5   says Absentee, Absentee, it looks like it has other

6   people's user IDs.  You see what I mean?

7        Q.  Yeah.  I think that was just when the staff

8   was inputting your data into the system.

9        A.  Okay.  I see.  I see there are multiple

10  entries for one voting session.  Is that correct?

11       Q.  Yes.  And that's -- I think you're looking

12  at the box that refers to the processing --

13       A.  Yes.

14       Q.  -- in terms of votes.

15       A.  Yeah.  So that was the only thing that was

16  throwing me, that I see yes.  I know I voted

17  absentee a few times; I think it's repeating.

18       Q.  Okay.  So this Exhibit No. 2 that you've

19  been looking at, this is your voting record here in

20  Georgia; correct?

21       A.  Definitely seems to be.

22       Q.  Okay.  You'll need to answer verbally.

23       A.  Yes.

24       Q.  Okay.  I just wanted to make sure we got

25  that straight.  And I'm going to ask you some

Megan Missett
Curling, Donna v. Raffensperger, Brad

September 28, 2021

Page 9

1   questions about it later in the deposition.

2        A.  Okay.

3        Q.  But I just wanted to make sure we knew that

4   we had the correct name for you.

5        A.  Yes.

6        Q.  Okay, all right.  So Ms. Missett, I'm just

7   going to go over just some guidelines about the

8   deposition and ask -- the first one we've already

9   kind of gone over.  If you could make sure that your

10  responses are verbal so rather than, you know,

11  nodding your head or shaking your head.  All verbal

12  responses are easier, and the court reporter is able

13  to take down an accurate transcript of your

14  testimony.

15       A.  Okay.

16       Q.  So can I have your agreement to answer

17  verbally?

18       A.  I will answer verbally.

19       Q.  Okay.  Thank you.  And we'll need you to

20  speak loudly and clearly.

21       A.  Okay.

22       Q.  And especially in this setting, I know it's

23  hard to do videoconferencing.  But the court

24  reporter will most certainly let us know if she's

25  not heard something that you said or, you know, and

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 10

1    I'll let you know if I need you to repeat something

2    that I've not heard.  So if you could speak loudly

3    and clearly throughout the deposition, that would be

4    very helpful.

5         A.  I will try my best to do that.

6         Q.  Okay.  Thank you.

7         A.  Let me know if you can't hear me.

8         Q.  We'll do so.  And also, if you would, if

9    you'd let me complete my question before beginning

10   your answer; and that way, again, the court reporter

11   will be able to take a clear transcript of

12   everything that I say and especially your testimony

13   here today.  So can I have your agreement to do

14   that?

15        A.  Yes.

16        Q.  And it's not my purpose in this deposition

17   to confuse you, so if I ask you a question that you

18   don't understand, can I -- can we agree that you'll

19   let me know?

20        A.  Yes.

21        Q.  And you're being asked to testify here

22   today based upon your own personal knowledge and

23   things that you know about.  So we'd ask that you

24   not guess or speculate as to any of your responses

25   to my questions.  Is that agreeable to you?

Megan Missett                     September 28, 2021
Curling, Donna v. Raffensperger, Brad

                                                    Page 11

1        A.  Yes.

2        Q.  And if there's -- if you don't have the

3    answer to a question, just let us know that.  Is

4    that okay?

5        A.  Yes.

6        Q.  If at any time you need to take a break

7    during the deposition, it's entirely fine.  I would

8    simply ask that before you do so, if, for example,

9    I've already asked a question and you've either

10   started or about to begin your answer, that you just

11   complete the answer to the question that is before

12   you and that we can -- we can take the break.  Is

13   that agreeable to you as well?

14       A.  Yes.

15       Q.  Okay.  And one more question.  Have you

16   taken any medication that would keep you from fully

17   and truthfully participating in today's deposition?

18       A.  No.

19       Q.  I'm going to ask you some questions about

20   your preparation for today's deposition.  So -- and

21   other than conversations with your attorneys, those

22   are privileged, I don't want you to disclose those

23   to us, I would ask that -- have you reviewed any

24   documents in preparation for your deposition today?

25       A.  Yes.

Megan Missett

September 28, 2021

Curling, Donna v. Raffensperger, Brad

Page 12

1        Q.   And what documents are those that you've

2    reviewed?

3        A.   I've reviewed the declarations that I

4    signed, and I also went back to refresh my memory

5    with some dates.

6        Q.   And you said you went back to refresh your

7    dates, sorry, refresh your memory as to some dates.

8    And what documents did you utilize to refresh your

9    memory?

10       A.   A variety.  Some were photos that were

11   dated at the time that I voted.  Some were, you

12   know, posts, social media posts.  Some were e-mails.

13   Anyplace where I thought -- I didn't realize I was

14   going to have my voting record here, so I was just

15   looking, you know, as a general sense.

16       Q.   And those documents, the photos and the

17   social media posts, do you have those with you here

18   today?

19       A.   I don't have them separately, but I have

20   them on my device.

21       Q.   I'm sorry, so you said you have them on

22   your device.  What are you referring to?

23       A.   On my device.

24       Q.   On your device?

25       A.   Right, so my iPad, which isn't synced to my

Page 13

1    laptop.

2        Q.   Okay.  So it's an iPad or your iPhone?

3        A.   iPad.

4        Q.   iPad.  And those, can you make those

5    documents or what you reviewed in preparation for

6    your deposition today, will you make those available

7    to your attorney today before we complete your

8    deposition?

9              THE WITNESS:  Is that okay, Attorney?

10             MR. ICHTER:  It's okay.  Call me Cary.

11   That's fine.  I'm not making any promises with

12   respect to them, but it's fine if you send them to

13   me.  I'll take a look at them.

14             MS. LaROSS:  I'm going to ask that you

15   produce them to us.

16             MR. ICHTER:  Well, you can ask that all

17   day, but you're not getting them today because I

18   haven't seen them yet, and they haven't been

19   requested prior to the deposition, so...

20             MS. LaROSS:  Yeah.  But the reason they

21   were not requested prior to the deposition was

22   because we don't know what it is that she's

23   reviewing, and I think we're entitled to see what

24   she's reviewed in preparation for the deposition.

25             MR. ICHTER:  I need some authority on that.

Page 14

1           MS. LaROSS:  Yeah, and we can talk about

2     that later.  And once you've had a chance to look at

3     it, you may not have an objection.

4     BY MS. LaROSS:

5           Q.  So Ms. Missett, did you speak with anyone

6     other than your attorneys in preparation for your

7     deposition today?

8           A.  No, not about anything other than signing

9     on.

10          Q.  I'm sure.  Did you review the testimony of

11    either Laura Digges or William Digges that was taken

12    in this case in preparation for your deposition?

13          A.  No.  Those weren't -- no.

14          Q.  Did you speak with either Laura or William

15    Digges concerning their depositions?

16          A.  I didn't.  One of those plaintiffs sent me

17    a message, don't worry, it wasn't too bad; but we

18    didn't speak any further.

19          Q.  Ms. Missett, do you live in Fulton County?

20          A.  I do.

21          Q.  And have you always lived in Georgia?

22          A.  No.

23          Q.  And tell me what other states where you've

24    lived?

25          A.  I've lived in New Jersey, New York,

Page 15

1   Mississippi.  I think that's it.

2        Q.  And are you from New Jersey?

3        A.  Originally.

4        Q.  Originally?

5        A.  (The witness nods.)

6        Q.  So are you from New Jersey originally?

7        A.  Yes.  I was born there and lived there

8   until I was a teenager.

9        Q.  And then how long did you live in New York?

10       A.  About ten years, to the best of my

11  recollection.

12       Q.  So would that have been sometime when you

13  were a teenager, and then for ten years after that?

14  Is that correct?

15       A.  Yeah.

16       Q.  And then from New York, did you move to

17  Mississippi?

18       A.  Yes.

19       Q.  How long did you live in Mississippi?

20       A.  Two years, approximately.

21       Q.  And then from Mississippi, did you move to

22  Georgia?

23       A.  Yes.

24       Q.  And what year did you move to Georgia?

25       A.  1996.

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 16

1          Q.   So during the Olympics, I guess?

2          A.   Right after the Olympics, yes.

3          Q.   And since you moved to Georgia in 1996,

4     have you always resided in Fulton County?

5          A.   Yes.

6          Q.   Do you have any relatives that live in the

7     Atlanta area?

8          A.   No, other than my immediate family, my

9     husband and children.

10         Q.   And is your husband's last name Missett as

11    well?

12         A.   No.  It's Greenwald.

13         Q.   And what are the last names of your

14    children?

15         A.   Greenwald.

16         Q.   Any other relatives north of Atlanta?

17         A.   No.

18         Q.   Have you ever given a deposition before?

19         A.   No.

20         Q.   Have you ever testified in court before?

21         A.   No.

22         Q.   Have you ever testified in the Georgia

23    legislature?

24         A.   Yes.

25         Q.   And when did you testify in the Georgia

Megan Missett                        September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 17

1   legislature?

2        A.  I don't recall the date.

3        Q.  What was -- well, let me ask this:  How

4   many times have you testified in the Georgia

5   legislature?

6        A.  I don't actually know the number, but it

7   was always in regard to something to do with voting,

8   voting legislation.

9        Q.  So it was -- you testified more than once

10  you can say?

11       A.  I believe so.

12       Q.  Okay.  And was it, you know, more than ten

13  times, or was it --

14       A.  No.  Less than ten times.  Can you tell me

15  what is defined as testifying before the

16  legislature?

17       Q.  Sure.

18       A.  We've had smaller meetings, but you know.

19       Q.  Okay, sure.  So it would be -- well, let me

20  ask it this way.  So what about at a hearing that's

21  held in the Georgia legislature?

22       A.  Uh-huh.

23       Q.  So is that the circumstance that you have

24  been referring to for your testimony before the

25  Georgia legislature?

Megan Missett                     September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 18

1          A.   Yes, I've done that.

2          Q.   Okay.  And then was there any other kind of

3     testimony that you gave in the legislature?

4          A.   I'm trying to recall whether I testified at

5     any of the citizen participation opportunities; but

6     again, I'm not sure if that would qualify, which is

7     a state committee.

8          Q.   Okay.  So what -- what committees have you

9     testified at hearings?

10         A.   Ooh, that's a good question.  Any of the

11    committees that were involved in voting legislation.

12         Q.   And when did you testify?

13         A.   I don't recall.

14         Q.   Would it have -- and what were the issues

15    that you testified about?

16         A.   Electronic voting systems; wanting, you

17    know, hand-marked paper ballots; issues with, you

18    know, fair voting, voter suppression.

19         Q.   So would you say that the occasions that

20    you testified in front of a Georgia legislative

21    committee has been within the last ten years?

22         A.   Yes.

23         Q.   And your testimony, did it concern DREs or

24    voting machines, direct recording devices?

25         A.   Yeah, DREs.

Megan Missett
Curling, Donna v. Raffensperger, Brad                September 28, 2021

Page 19

1        Q.   Okay.  So it's direct recording electronic

2   voting machines, DREs.  So you've testified

3   concerning DREs; is that correct?

4        A.   I've testified concerning trustworthy

5   voting systems.

6        Q.   Did you also give testimony concerning the

7   ballot marking devices, or BMDs?

8        A.   I don't recall the language they used.

9        Q.   Okay.  I'm just trying to get a sense of

10   what time frame your testimony was, so if you could

11   just let me know.  So did you testify in the last

12   year to a committee in the Georgia legislature?

13        A.   Yes.  I can't -- yeah, I'm not sure the

14   date; but anytime that I spoke would have been

15   between 2017 and -- and the last session.

16        Q.   And have you spoken at other meetings of

17   Georgia legislators or meetings held in the Georgia

18   capitol, other than the hearings that you talked

19   about?

20        A.   Formally, no.

21        Q.   How about informally?

22        A.   I've had discussions with people while I

23   was in the Georgia capitol.

24        Q.   Discussions with whom?

25        A.   Various -- various people who are

Page 20

1    interested in voting or other -- other things or

2    lobbying their legislators.

3         Q.  Did you speak with any particular

4    legislators?

5         A.  Not at the capitol.

6         Q.  And have you spoken with legislators

7    anywhere other than the capitol?

8         A.  Informally, and sometimes by e-mail or --

9    yeah.

10        Q.  And what topics did you speak informally to

11   the legislators?

12        A.  Usually things that concern me about

13   voting.

14        Q.  And what are those concerns that you

15   addressed with legislators?

16        A.  What are my concerns about voting?

17        Q.  Yeah, that you addressed with the

18   legislators that you've just referred to.

19        A.  I have concerns about the trustworthiness

20   of the electronic voting system in Georgia, and I

21   also have issues with -- with some systematic bias

22   and access to the ballot.

23        Q.  So describe what your issues and concerns

24   are pertaining to trustworthiness.

25        A.  Oh.  You mean with electronic voting

Page 21

1    devices?

2            Q.   Yes.

3            A.   I have trust issues with the ballot marking

4    devices because independent experts have shown them

5    to be hackable and because there isn't any

6    recoverability.  So, for example, you have an

7    electronic failure, it's a hackable device between

8    the voter and the ballot, then you've introduced

9    compromise, so it's hard to get a real audit or to

10   trust that audit; whereas if you have an electronic

11   failure down the line in counting, you can recover

12   if you've used a hand-marked paper ballot, because

13   you know you have the voter intent.  You can go back

14   and rerun it and...

15           Q.   And is it fair to say, Ms. Missett, that

16   you are an advocate for hand-marked paper ballots --

17           A.   Yes.

18           Q.   -- being used in voting?

19           A.   Yes.

20           Q.   And is that one of the -- was that the

21   primary issue that you addressed in the Georgia

22   legislature when you testified before the

23   subcommittees that you've spoken about earlier in

24   your deposition?

25           A.   I -- I believe so, but I don't recall.

Megan Missett                           September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 22

1      Q.   And when you spoke informally with the

2   legislators that you referred to earlier in your

3   deposition, is it fair to say that the primary issue

4   that you addressed with them was the use of

5   hand-marked paper ballots in Georgia?

6      A.   Not all of the time.

7      Q.   But would that have been -- the majority of

8   the time, is that what you would have addressed with

9   them?

10      A.   No.  But it would have been one of the

11   major issues, especially around the time of, you

12   know, legislation over voting systems in Georgia.

13      Q.   Would you say that the testimony that you

14   gave in the legislature or during formal

15   conversations with legislators, would you consider

16   that you were lobbying?

17      A.   I don't consider that I was lobbying, but

18   we may -- we may have a different definition.  How

19   would you define lobbying?

20      Q.   Well, yes.  So how would you define it?

21   And I just want to get a sense of what your role

22   was?

23         MR. ICHTER:  I tell you what.  Since you

24   used the word for your question, why don't you tell

25   her what you meant, instead of getting her to guess

Page 23

1   about what the question is about.

2           MS. LaROSS:  Well, I do think that -- this

3   is my deposition, Cary.

4           MR. ICHTER:  No, it isn't.  It's everyone's

5   deposition; and if you're going to ask a question,

6   tell her what the question means.

7           MS. LaROSS:  Well, I -- I wanted -- I think

8   it's fair to ask her what she understands the word

9   to mean, and then we'll go from there as to whether

10  or not --

11          MR. ICHTER:  We're not having a spelling

12  bee or a definition quiz here; we're having question

13  and answer on issues in the case.  You asked her

14  whether or not she was lobbying, and she said what

15  do you mean by lobbying.  It is a fair question to

16  understand what you are asking, so please tell her

17  what you meant by lobbying.

18  BY MS. LaROSS:

19      Q.  What I'm talking about with lobbying,

20  Ms. Missett, is advocating for a particular

21  position.

22      A.  If the definition is advocating for a

23  particular position, then yeah, giving background

24  information, then I would have been lobbying, by

25  your definition.

Megan Missett
Curling, Donna v. Raffensperger, Brad

September 28, 2021

Page 24

```
 1         Q.  And was your testimony concerning your own
 2    individual experience of voting, or were there --
 3    did your testimony cover other issues and matters?
 4         A.  Covered other issues.
 5         Q.  Did you testify about your own experience
 6    of voting, though?
 7         A.  I don't recall.
 8         Q.  You mentioned earlier that your testimony
 9    concerned issues with electronic voting; is that
10    correct?
11         A.  Yes, because -- yes, I would have spoken at
12    meetings where that was being addressed.
13         Q.  And also that you spoke about hand-marked
14    paper ballots, we've already discussed that;
15    correct?
16         A.  Yes.
17         Q.  And I think you also mentioned previously
18    in your testimony that you -- when you testified, it
19    was concerning fair voting; is that correct?
20         A.  Yes.  I'm speaking generally because I
21    don't remember each time.  I don't like to speak at
22    hearings, so I try to avoid it; but I know I've done
23    it a few times, but I can't -- I can't tell you
24    exactly what I said exactly when.  But that's the
25    general content.
```

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 25

1      Q.   Do you remember what general aspects you

2    addressed concerning fair voting?

3      A.   Electronic voting would have been part of

4    it; but also, you know, changing polling places, all

5    the things that make it harder for some people to

6    vote.

7      Q.   And when you say the other things, can you

8    tell me more specifically what those other things

9    are that you testified about in the general area of

10   fair voting?

11     A.   Voter suppression, electronic voter

12   suppression, old-fashioned voter suppression.

13     Q.   Other than the areas that you've told us

14   about thus far in your deposition, is there

15   anything, any other areas or topics that you

16   testified to the Georgia legislature about?

17     A.   I don't think so, no.

18     Q.   Am I correct to understand that your

19   testimony to the Georgia legislature, the occasions

20   when you testified before the Georgia legislature,

21   have been since the 2017 -- 2017?

22     A.   Yes, 2017 would be included.  After the

23   2016 general election.

24     Q.   Ms. Missett, have you ever been charged

25   with a crime?

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 26

1      A.  No.

2      Q.  Have you ever been arrested?

3      A.  No.

4      Q.  Other than this case, have you ever been a

5  party in a lawsuit?

6      A.  When I was in practice in Mississippi,

7  there was a relative of a patient who tried to

8  engage a bunch of mental healthcare workers in a

9  lawsuit.  That wasn't successful, but I'm not sure

10 how to categorize that.

11     Q.  Was that a lawsuit that you were a

12 plaintiff or a defendant?  Do you know what those

13 terms mean?

14     A.  Yes.  It didn't get that far.  I was given

15 the information through the Mississippi

16 Psychological Association.

17     Q.  Okay.  So it doesn't sound like a lawsuit

18 was actually filed; is that correct?

19     A.  I think not, but I can't be certain.  I

20 didn't have to, you know, testify or...

21     Q.  Any other lawsuits other than this one and

22 the matter in Mississippi that you described?

23     A.  No.

24     Q.  I'm going to ask you some questions about

25 your formal education.

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 27

1        A.   Okay.

2        Q.   And so after high school, describe for me

3    your education.

4        A.   Sure.  I left high school my senior year

5    and got a GED while attending Monmouth College,

6    which is in New Jersey, now called Monmouth

7    University.  Then I transferred to Sarah Lawrence

8    College, graduated in 1986.  That sound right?  Yes,

9    1986.  And spent a year working, and then went to

10   graduate school in clinical psych at St. John's

11   University in New York, and I got my Ph.D. in 1992

12   is when it was completed.

13       Q.   Okay.  So your study with the -- in New

14   Jersey, did you receive a degree from that

15   university as a result of your study there?

16       A.   Monmouth University?

17       Q.   Yes.

18       A.   No, because I transferred to Sarah Lawrence

19   and I got my degree from Sarah Lawrence.

20       Q.   And your study at Monmouth, what topic

21   areas or major did you have?

22       A.   It was psychology.  When I got to Sarah

23   Lawrence, it was psychology with a minor in

24   genetics.

25       Q.   And what degree did you receive from the

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 28

1    Sarah Lawrence College?

2         A.   A B.A.

3         Q.   And is it a B.A. in psychology and then a

4    minor in genetics?

5         A.   No.  It's just a bachelor of arts.  It

6    didn't specify my major or minor.

7         Q.   And you said that you went to St. John's

8    University for graduate studies?

9         A.   Uh-huh.

10        Q.   And what degrees did you receive from

11   St. Johns?

12        A.   I got a Ph.D. in psychology.

13        Q.   And was that -- did you receive that in

14   1992, or was that when you started --

15        A.   Yes.

16        Q.   Is 1992 when you graduated?

17        A.   Yes.  I defended my dissertation before I

18   went on the required internship.  So once I

19   completed the internship, I got the Ph.D., which was

20   '92.

21        Q.   Okay.  And just in general, what was the

22   topic for your dissertation?

23        A.   My dissertation was actually in

24   neuroanatomy, comparative neuroanatomy.  That wasn't

25   the clinical work I was doing.

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 29

1       Q.   In what area was the clinical work that you
2    were doing as part of your Ph.D. studies?
3       A.   I was -- we did a lot of practical
4    internships and studying and, you know, research
5    fellowships.  But the -- the areas I was in
6    generally autism, children and adults with autism,
7    children and adults with PTSD, schizophrenia, adults
8    with schizophrenia.
9       Q.   And after your getting your Ph.D. at
10   St. Johns, any further formal education?
11      A.   No.  There's a trajectory you have to go on
12   to get your license, so in a sense, that is; but
13   it's just the requirements in your state to get a
14   license.  You have to have supervised training.
15      Q.   So you met the requirements for the
16   licensure in New York; is that correct?
17      A.   Yes.
18      Q.   And did you practice in New York?
19      A.   I did.  I didn't have a private practice,
20   but I was working at After Day Treatment Center,
21   which was a joint operation between the board of
22   education and a mental health facility.
23      Q.   Okay.  And after that, where did you work?
24      A.   After that, we moved to Mississippi.
25      Q.   And did you also practice in Mississippi?

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 30

1        A.   Yes.

2        Q.   Did you have a private practice, or was it

3    similar to the work you had been doing in New York?

4        A.    It was very different because there's so

5    few services there, so it was spread around.

6    Initially, my husband and I were contracted by a

7    hospital group; and they set up our practice and

8    sent us to clinics in rural parts of Mississippi.

9    But then that hospital group went bankrupt, or fell

10   apart.  A lot of the hospitals were changed, so we

11   took over the office and the private practice and

12   continued to work at those clinics through

13   different, you know, supervision or bosses, I mean.

14   So we worked for CommuniCare once we didn't work for

15   the hospital.

16       Q.   I think you mentioned that you were in

17   Mississippi for two years; is that correct?

18       A.   Yeah.

19       Q.   And then how did you move to Georgia from

20   Mississippi?

21       A.   Why did we move to -- to Atlanta from

22   Mississippi?

23       Q.   Yes.

24       A.   We had started a family; and it was very

25   difficult to be, you know, one of the only

Megan Missett                          September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 31

1   psychologists and the only psychiatrist in Northwest

2   Mississippi and be able to have relationships with

3   people when you're seeing everybody's mother and

4   father and boss.

5            And we also, because my husband was the

6   only psychiatrist in a wide area, just saw everyone,

7   including forensic patients, so we often had -- you

8   know, we'd get an inappropriate call from one

9   patient saying, you know, so-and-so is on his way,

10   he's got a gun and he's going to kill you.  I'd run

11   up to the roof with the baby, and there were a lot

12   of instances like that, which, you know, made sense,

13   but it was too much.  So we decided to move back to

14   a city where we could be a little bit more anonymous

15   and our children could, you know, be free of that

16   burden.

17        Q.  And when you moved to Georgia, did you

18   continue to practice?

19        A.  I did not.

20        Q.  Have you returned to practice as a

21   psychologist?

22        A.  No.

23        Q.  Since your move to Georgia?

24        A.  No.

25        Q.  Any other employment here in Georgia?

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 32

1      A.   No.

2      Q.   I'm going to ask you a few more questions

3  concerning your education.  Have you had any formal

4  education concerning voting or elections?

5      A.   No.

6      Q.   Sorry, say that again?

7      A.   No, I haven't had formal education in

8  voting or elections.

9      Q.   Any formal education or training in Georgia

10  election law?

11      A.   No, I haven't had formal training.

12      Q.   Any formal education or training in Georgia

13  election administration or administration procedures

14  in Georgia?

15      A.   No formal training.

16      Q.   Have you ever worked at a polling place?

17      A.   Yes, I have worked at a polling place.

18      Q.   And what jobs have you done at polling

19  places?

20      A.   Observation, which is one of the things I

21  didn't refresh my memory dates about, so I would

22  have to go back to see, you know, where and when it

23  was.

24      Q.   How many occasions did you work in a

25  polling place?

Megan Missett                      September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 33

1          A.   At least three, but I can't be precise.

2          Q.   And was that at the same precinct, or what

3     precinct did you work at?

4          A.   Once was in DeKalb, twice it was in DeKalb.

5     I'd really have to go back and refresh myself.  I

6     don't remember the most recent place where it was.

7          Q.   Okay.  So it may or may not have been

8     DeKalb?

9          A.   No, I definitely did some poll watching in

10    DeKalb and Pleasantdale.

11         Q.   And the work that you recall doing in

12    DeKalb, what was your function at the polling place?

13         A.   The first time, I was doing it on behalf of

14    the Ossoff campaign, so I was helping voters who

15    were confused and, you know, making sure everything

16    was okay.

17         Q.   When you say helping voters who were

18    confused, what do you mean by that?

19         A.   If anyone had a problem or looked upset or

20    left the polling place because they were turned

21    away, we could provide any help.

22         Q.   What kind of help did you provide?

23         A.   That didn't -- that didn't happen in

24    Pleasantdale.  It was very smooth.

25         Q.   And the other occasions that you worked at

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 34

1    polling places, do you recall what kind of work you

2    did there?

3        A.  Yeah.  I don't remember the date and exact

4    polling place the last time, but it was much more

5    circumscribed.  They had me in a certain spot, so I

6    just watched.

7        Q.  And were there any problems that -- with

8    voting from that experience where you were watching?

9        A.  It was one of the first times they were

10   using the BMDs, so there were some issues with

11   unloading them and...

12       Q.  So do you mean actually unloading the

13   machines or -- and, you know, close --

14       A.  At the end of the night, yeah.

15       Q.  Okay.  And placed at the precinct or voting

16   place.  All right.  So on that occasion, did you

17   watch anyone voting, or was it just the placement

18   and the delivery of the machines?

19       A.  I did see some people voting, but I

20   couldn't -- it was privacy, so I couldn't see them

21   fill out, you know, I couldn't see their

22   touchscreens that occasion.  Can you hear me?

23       Q.  Yes.  Can you hear us?

24       A.  Yes.

25       Q.  You can hear me.  Okay.  Great.  So where

Megan Missett
September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 35

1    was that --

2          A.   I don't recall.

3          Q.   -- do you recall?

4          A.   (The witness shakes head.)

5          Q.   So would it have been in Fulton County, do

6    you think?

7          A.   I'm not sure.

8          Q.   And what had you being there?  You said the

9    first time you went and it was part of the Ossoff

10   campaign?

11         A.   Correct.

12         Q.   So what occasioned you to be at the polling

13   place that you just described?

14         A.   It was probably through one of CGG's, you

15   know, citizen engagement efforts.

16         Q.   And CGG, what does that stand for?

17         A.   Coalition for Good Governance.

18         Q.   And on that occasion, did you observe

19   anyone who had a problem using the ballot marking

20   device?

21         A.   I don't believe so, to the best of my

22   recollection.  I came in towards the end of voting,

23   and there's more those little -- you know, the

24   workers were just unfamiliar, understandably, with

25   the new equipment.

Megan Missett
Curling, Donna v. Raffensperger, Brad
September 28, 2021

Page 36

1      Q.  Did it appear to you that the workers were

2   having any problems with the machines?

3      A.  Yes.  But it didn't appear to me that they

4   were doing anything inappropriate.

5      Q.  Did it appear to you that the people who

6   you observed voting were able to cast ballots?

7      A.  Yes.  They did complain, though.

8      Q.  I'm sorry?

9      A.  There were complaints, though, that people

10   wanted handwritten or paper ballots, so that message

11   has been getting out.

12      Q.  And did they complain to you, or who did

13   they complain to?

14      A.  No.  They complained to the air.

15      Q.  So you heard them make statements?

16      A.  As they came in and out, yeah, or spoke to

17   a poll worker.

18      Q.  And you observed them speaking to the poll

19   worker?  Is that --

20      A.  Yes, to the best of my recollection.  But I

21   was really -- to really fully answer your question,

22   I need to look back.  I might not remember exactly

23   where and when this was in the past, you know, 2020.

24      Q.  And what notes would you have to refer to?

25      A.  Usually if I do something like that, I'll

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 37

1  jot a few things down so I don't forget, obviously I

2  have forgotten, but so that I can go back and look.

3       Q.  So is this kind of, you keep almost like a

4  diary or just a listing --

5       A.  Yes.

6       Q.  -- of what your experience was related to

7  voting?

8       A.  Nothing formal.  Sometimes I just, you

9  know, open a Word document.  And I do that after I

10 vote.  Certainly in recent years I've done it after

11 I vote as well.

12      Q.  Other than what you've described to us, any

13 other occasion where you were working at a polling

14 place that you recall today?

15      A.  No.  I think the other occasions were being

16 outside a polling place, making sure people knew

17 where to drive in, that sort of, you know, leading,

18 helpful behavior.  And then also I did organize

19 people to photograph the poll tapes that are posted

20 outside the polling places at night usually for 24

21 hours.

22      Q.  How often have you done that, assisting in

23 photographing the poll tapes?

24      A.  I've done that at least three times for at

25 least three elections, and that was one of the

Page 38

1    things that the Coalition for Good Governance was

2    involved in as well.

3         Q.  What was the purpose of taking photographs

4    of the poll tapes?

5         A.  Well, with the DREs, you get a printout

6    from each machine so you can see, you have

7    photographic evidence of what happened with that

8    machine.  So sometimes when you see anomalous, you

9    know, results when the results come in, you can go

10   and see what happened at the precinct, was there

11   something funny with one of the machines, was there,

12   you know, statistically crazy things.  And a lot of

13   people like to take these so that they can get their

14   own count on election nights.  That's one thing you

15   can do.  But the other thing is you can analyze the

16   tapes to see some of the machine behavior.  It's

17   different with the BMDs.

18        Q.  So the photographing the poll tapes, was

19   that when we were using DREs?

20        A.  Yes; it continued through using BMDs.  And

21   at this point, there are many other organizations

22   involved as well.

23        Q.  What other organizations?

24        A.  So, so many.  It's pretty -- even county

25   committees and, you know, at this point people have

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 39

1   come to see there's value in getting photographs of

2   those tapes; and they want to make sure every

3   precinct is photographed and certainly some

4   candidates want to make sure their precincts are

5   photographed, because it's great data to have.  I

6   don't recall the name of some of the -- there's a

7   few national organizations that crowd-sourced it in

8   the last election.

9           MR. ICHTER:  Diane, we've been going a

10  little over an hour.  I need to take a quick break.

11  Can we take five?

12          MS. LaROSS:  That's fine with me.

13          (Recess 2:02 to 2:10 p.m.)

14  BY MS. LaROSS:

15      Q.  Ms. Missett, I'll just remind you that

16  you're still under oath.  Is that clear to you?

17      A.  Yes.

18      Q.  And we were talking before the break

19  concerning photographing poll taping, and I have a

20  couple questions about that.  So how many occasions

21  did you participate in photographing poll taping?

22      A.  I don't recall exactly how many times, but

23  it was several.

24      Q.  Would it have been more than ten?

25      A.  No.

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 40

1      Q.   Would it have been closer to a couple, or
2   would it be closer to ten?
3      A.   I would say closer to five.
4      Q.   So approximately five occasions of
5   photographing poll taping; is that correct?
6      A.   Yeah, at least.
7      Q.   Sorry, did you just say at least?
8      A.   Yes.  I don't recall how many times
9   exactly, but...
10      Q.   And where did you do the photographing of
11   poll taping?
12      A.   Me personally, usually in Fulton County,
13   DeKalb, and then later in Southwest Georgia.
14      Q.   And where in Southwest Georgia?
15      A.   Dougherty County, Randolph County, Terrell
16   County, places where it was difficult to get people
17   to do it.
18      Q.   And which elections did you photograph poll
19   taping?
20      A.   I don't recall exactly which elections,
21   but, you know, general primary, I -- I did it for
22   the last -- the runoff and the general.
23      Q.   When you say last runoff, that would have
24   been earlier this year in 2021; correct?
25      A.   Right.

Page 41

1       Q.   And for the runoff, was that when you went

2   down to the various counties in South Georgia?  Is

3   that --

4       A.   Yes.  Also for the general.

5       Q.   And on those occasions, were you there on

6   behalf of the Coalition?

7       A.   The first few times we did that, the

8   Coalition was really the only organization that was

9   advocating for that in Georgia, to the best of my

10  knowledge.  But as time went on, it became a much

11  bigger affair.  So the last time it was certainly --

12  it was providing data to the Coalition and to anyone

13  else who wanted the ideas and to share information

14  in an open way.

15      Q.   Just a couple questions about your

16  education.  Any training or education related to

17  computer hardware or programming?

18      A.   Because of the time that I, you know, went

19  to school and got a Ph.D., I had to do FORTRAN and

20  Pascal and that stuff.

21      Q.   How about any training or education related

22  to computer hardware that's involved in voting?

23      A.   No.

24      Q.   Any training or formal education in

25  cybersecurity?

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 42

1       A.  No.

2       Q.  Any training or formal education concerning

3   voting equipment?

4       A.  No.

5       Q.  Any training or education related to

6   computer hacking or insertion of malware in a

7   computer system or voting machine?

8       A.  No.

9       Q.  Any training or education concerning the

10  operation of a DRE?

11      A.  No.

12      Q.  Any training or education concerning the

13  operation and functioning of BMDs?

14      A.  No, not other than what is available to the

15  general public, no formal classes.

16      Q.  Any training or education concerning the

17  operation or functioning of scanners used in

18  conjunction with ballot marking devices?

19      A.  No.

20          MR. ICHTER:  I missed that class too.

21  BY MS. LaROSS:

22      Q.  Now have you ever voted on a DRE?

23      A.  Yes.

24      Q.  And have you ever voted on a BMD?

25      A.  Yes.

Megan Missett                  September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 43

1       Q.   And how many occasions have you voted on a

2   BMD?

3       A.   March 2020, June 2020.  To the best of my

4   recollection, those are the two times.

5       Q.   And where did you vote on a BMD in March of

6   2020?

7       A.   That was at Scotts Crossing library, an

8   early voting location.

9       Q.   Did you have any trouble or difficulty

10  voting on a BMD on that occasion?

11      A.   I didn't have trouble operating the BMD

12  There were some issues with privacy, but operation

13  was fine.

14      Q.   And the issues with privacy, what were

15  those issues?

16      A.   The way the touchscreens are set up next to

17  each other in a line you have to go in the back and

18  pass everybody's screen to get to an empty voting

19  machine; and this was one of the earlier first times

20  they had used the BMDs, I think.

21      Q.   Do you have any knowledge that anyone

22  breached your privacy while you were voting --

23      A.   No.

24      Q.   -- on the BMD?

25      A.   I don't have any knowledge that anyone

Megan Missett
Curling, Donna v. Raffensperger, Brad

September 28, 2021

Page 44

```
 1   breached my privacy.
 2       Q.  Do you have any knowledge that anyone
 3   else's privacy was breached when you voted in March
 4   of 2020?
 5       A.  No, just the observation that they were
 6   visible to other voters, but...
 7       Q.  But you have no evidence that someone
 8   actually did breach the privacy of another voter; is
 9   that correct?
10       A.  I have no evidence that someone looked at
11   someone else's -- into their side.
12       Q.  And how about in June of 2020, did you have
13   any problems operating the BMD during that election?
14       A.  That was -- that was the time it was -- it
15   was a four-hour wait in line.  A part of that was
16   because the BMDs weren't operating and -- but when I
17   got in at the end of the night, I didn't have
18   trouble operating the BMD.  I did see I could see
19   other touchscreens.  I didn't look at them, but they
20   were visible.
21       Q.  And what was the location of the polling
22   place where you voted on a BMD?
23       A.  That was C.T. Martin Natatorium.
24       Q.  And both times that you've described voting
25   on BMDs, those were in Fulton County; correct?
```

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 45

1      A.   Yes.

2      Q.   When -- when you voted in June of 2020, did

3   you have occasion to place a paper ballot into a

4   scanner?

5      A.   The thing you go to print out?

6      Q.   Uh-huh.

7      A.   Yes.

8      Q.   Let me ask it this way:  So in March of

9   2020, describe your operation of the BMD and the

10  steps that you undertook to vote in that election.

11     A.   There was the added situation of the

12  pandemic and having to clean machines in between, so

13  that was different.  I used the touchscreen.  I made

14  my selections.  The ballot printed out.  It had a QR

15  code and some lines that showed me where I voted.  I

16  did check those, because I know to check them.  Then

17  I went over to the area where you hand in your

18  ballots to be put into the scanner.

19     Q.   Did you understand whether or not your vote

20  counted in that election?

21     A.   I don't know.

22     Q.   Do you believe that it did count?

23     A.   I don't know.

24     Q.   Let's go ahead and look at what's been

25  marked Exhibit 2.

Megan Missett
Curling, Donna v. Raffensperger, Brad

September 28, 2021

Page 46

1      A.  Are you looking at a document that's

2  already there?

3      Q.  Yes.  Your voting record, that's what we're

4  looking at.

5          Ms. Missett have you had a chance to take a

6  look at Exhibit No. 2, your voting record?

7      A.  I'm looking at it.

8      Q.  If you would look on the second page; and

9  on the far left, there's an indication where it says

10  March 24th, 2020, PPP, which is the Presidential

11  Preference Primary.  And if you follow that line

12  across, and it says "yes."  Do you see where it says

13  "yes"?

14      A.  No.  Can you direct me there?  It's the

15  second box?  Okay.  I see it.  I see where it says

16  yes.

17      Q.  Okay.  And if you go back to page 1 at the

18  top of the column where it says yes, all the way

19  through the column, do you see where it says

20  Counted?

21      A.  Yes.

22      Q.  So this report indicates that your vote

23  counted in March of 2020.  Do you have any reason to

24  dispute that information?

25          MR. ICHTER:  I'm going to object.  She was

Megan Missett
Curling, Donna v. Raffensperger, Brad

September 28, 2021

Page 47

1  not involved in the preparation of the document.

2  She has no information about how it was prepared.

3  There's no foundation for this question.  All she

4  has is a piece of paper that she saw for the first

5  time today in front of her.

6         MS. ELSON:  The Curling plaintiffs will

7  join that objection and have a standing objection to

8  any others going forward.

9  BY MS. LaROSS:

10        Q.  And so let me ask the question,

11  Ms. Missett:  Do you have any reason to believe that

12  your vote did not count in March of 2020?

13        A.  I don't feel I can be sure that it counted.

14        Q.  Do you have any evidence that it did not

15  count?

16        A.  No, I don't have evidence that it didn't

17  count.

18        Q.  As to your vote cast on a ballot marking

19  device in June of 2020, do you have any evidence

20  that that vote did not count?

21        A.  I don't have evidence that that vote didn't

22  count.  I don't have direct evidence, no.  I should

23  point out that you might not have noticed, but I

24  requested an absentee ballot at that -- during that

25  election from Fulton County, and it didn't arrive.

Page 48

1   And that's -- so that's why I think it shows a

2   request.

3        Q.  And that was a request you made to Fulton

4   County for --

5        A.  Yes.

6        Q.  -- the absentee ballot?

7        A.  Yeah.  And I did follow up with them, and

8   they tried to get it to me, but they didn't end up

9   sending it in time, so I felt like I was the most

10  devoted person on the Friday on the last day of

11  voting.

12       Q.  So you voted on the Friday during the last

13  day of early voting for that election in person?

14       A.  Right, because I waited 'til the last

15  minute to see if I could get my absentee.

16       Q.  And are you a member of the Coalition for

17  Good Governance?

18       A.  Yes.

19       Q.  Are you a member of any other voter rights

20  group?

21       A.  Affiliated with many voting rights groups.

22       Q.  So your affiliation with the other groups,

23  are you a member of the other groups?

24       A.  You have to define "member."  I mean, I

25  do --

Megan Missett                              September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 49

1      Q.  Many organizations have certain
2  requirements of becoming a member, and you mentioned
3  that you are a member of the Georgia Coalition for
4  Good Governance, so I'm asking that kind of -- are
5  you a member similarly in other organizations?
6      A.  Yes, similarly.
7      Q.  Okay.  And what are those organizations?
8      A.  You know, support organizations like Black
9  Voters Matter and Common Cause and ACLU of Georgia.
10 I'm very -- you know, I amplify their work and I
11 sometimes attend meetings and I send out information
12 about the things that they're involved in.
13     Q.  And you said something about that you
14 amplify their work.  What does that mean?
15     A.  On social media.
16     Q.  So that would involve posting some of their
17 work on social media; correct?
18     A.  Retweeting, make sure, you know, citizens
19 get engaged and know what's going on.
20     Q.  And you work for the Georgia Coalition for
21 Good Governance.  Did that -- have you held any
22 official positions with that Coalition for Good
23 Governance?
24     A.  No.
25     Q.  And when did you become a member of the

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 50

1    Coalition for Good Governance?

2         A.   I got involved with them, I think it was

3    June -- try to -- it's difficult to remember exactly

4    when it happened.  I know that I had become

5    interested in election integrity, and Coalition for

6    Good Governance was very uniquely addressing those

7    issues, so I think I heard them speak very soon

8    after the Ossoff election.  I think it was around

9    June 2017, but I'm not certain.

10        Q.   And what work have you done on behalf of

11   the Coalition for Good Governance?

12        A.   All kinds of volunteer work.  One of the

13   things I like about the organization is they're very

14   dedicated to citizen participation, education, but

15   not just, you know -- or make information available,

16   you know, cybersecurity experts say, hey, go out,

17   find out who your election board is, go to those

18   meetings.  And I really do like that, and I try to

19   help bringing that to the public.  They also do some

20   voter protection around the electronic stuff,

21   letting people know what can happen, what you should

22   do if it does happen.  I was happy to help out with

23   those sort of things.

24        Q.   In what ways did you help out?

25        A.   Usually social media, organizing

Megan Missett
Curling, Donna v. Raffensperger, Brad
September 28, 2021

Page 51

1   information in an easy way to look at on your screen

2   or to print out if you're going to the polls.

3       Q.  Anything else?

4       A.  Mostly -- mostly the social media stuff,

5   outreach, letting people know when meetings are,

6   letting people know what is happening with the

7   legislation.

8       Q.  Was that related to Democracy Spring

9   Georgia?

10      A.  Democracy Spring Georgia is one of the

11  organizations that's been involved with Good

12  Governance, I believe.

13      Q.  When you say you post information on social

14  media, describe what you're referring to there?

15      A.  I'm talking about Twitter and Facebook.

16      Q.  And on Facebook, is that your own account

17  or is there a Facebook group that you're posting

18  for?  Explain that.

19      A.  It's both.  It's from my own account, and

20  there was also a Friends of Coalition for Good

21  Governance account for a while before I believe

22  Coalition had one of their own accounts.  And that

23  would be just supportive stuff, information on

24  meetings.

25      Q.  Ms. Missett, I'm going to ask you some

Megan Missett                        September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 52

```
 1   questions concerning your claims in this case; and
 2   for these questions, I'm not asking you for a legal
 3   conclusion, I'm just asking you for your
 4   understanding.  So what is your understanding of
 5   what the claims are that are pending in this
 6   lawsuit?
 7        A.  I thought you were going to ask me what my
 8   concerns were.
 9        Q.  No.  I'm asking for your understanding of
10   what the claims are that you made in this
11   litigation.
12        A.  That I've made in this litigation.
13        Q.  As a party, the plaintiffs bring the claims
14   in the litigation.
15             MR. ICHTER:  She may be a little confused
16   thinking you're suggesting that she's made
17   individual claims.  We're talking about the claims
18   that are common to all of the plaintiffs in the case
19   and what remedies they're seeking; right?
20             THE WITNESS:  Yes, I see what you mean.
21   BY MS. LaROSS:
22        Q.  Yes, so let me ask it again.  So I want to
23   know what your understanding is of the claims that
24   have been brought in this lawsuit.
25        A.  Can you be more specific?  Because there
```

Page 53

1    have been a lot of claims in the lawsuit.  I mean, I

2    can give a general answer that what the plaintiffs

3    are looking for to see the best practices, best true

4    practices put into place in Georgia, like

5    hand-marked paper ballots, like chain of custody,

6    you know, in general, based on cybersecurity experts

7    or independents.

8         Q.  So other than what you have described, are

9    there any -- do you have any understanding of any

10   other claims or issues that are addressed in this

11   lawsuit?

12        A.  Yeah.  There's -- it's very specific

13   getting, you know, recommendations about ways to fix

14   some of the problems to increase transparency.  But

15   I don't know if I can speak to it at that level.

16        Q.  Okay.  Fair enough.  And when -- let me

17   strike that.

18             What is your purpose in participating in

19   this litigation?

20        A.  I was happy to be involved because I was

21   really worried about election security, voter

22   suppression, things that were happening with the

23   DREs and then the BMDs.

24        Q.  And what -- strike that.

25             So how did it come about that you became a

Megan Missett
Curling, Donna v. Raffensperger, Brad
September 28, 2021

Page 54

1    plaintiff in this case?

2         A.  I was asked by Marilyn Marks, who is the

3    director of Coalition for Good Governance.

4         Q.  And what did she tell you about

5    participating as a plaintiff in this litigation?

6         A.  If I recall, she -- I think the -- it was

7    a -- it's a lawsuit that was -- that was, you know,

8    reemerging, had been already in effect.

9         Q.  Do you know when it was that you became a

10   plaintiff in this case?

11        A.  It was February -- I can't remember if it

12   was 2017 or 2018.  Do you have that information?

13        Q.  Yes.  It's my understanding that you became

14   a party to the lawsuit when the third amended

15   complaint was filed in 2018.  Does that sound

16   correct?

17        A.  February 2018, okay.  Yeah.  April 2018.

18        Q.  And what was it that you were just checking

19   there to check the date?

20        A.  I think it was dates I had jotted down.

21        Q.  And what other items have you jotted down

22   on that list that you just referred to?

23        A.  Just -- just dates and, you know, voting,

24   few dates.

25        Q.  And have you referred to that document

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 55

1    previously in the deposition so far?

2         A.   No.  That's the first time I looked.

3         Q.   And was that something that you prepared on

4    your own, or was that something that was --

5    something you were requested to do?

6         A.   No; most definitely did it on my own.

7         Q.   And we're going to ask to see a copy of the

8    document you're referring to, Ms. Missett.

9         A.   Uh-huh.

10        Q.   That's something I would ask that you send

11   to Cary, and then we would expect that he would

12   forward it on to me.

13             And you voted -- you voted in numerous

14   elections here in Georgia; correct?

15        A.   Yes.

16        Q.   Have you voted in any other state?

17        A.   Yes.

18        Q.   And what other states have you voted in?

19        A.   New Jersey and New York.  Don't have a

20   recollection of voting in Mississippi.

21        Q.   Do you have any evidence that any votes

22   that you cast in any Georgia election were not

23   counted?

24        A.   I don't have evidence that they weren't

25   counted.

Megan Missett                September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 56

1      Q.  Do you have any evidence that any of the

2   votes you cast in Georgia have ever been changed?

3      A.  I don't have evidence if they've been

4   changed.

5      Q.  Do you have any evidence that any DRE used

6   in an election here in Georgia was ever actually

7   hacked?

8      A.  I wouldn't know.  I wouldn't be able to

9   tell.

10     Q.  Sorry, there was typing going on.  I

11  couldn't quite hear your answer.  Can you repeat

12  your answer, please?

13     A.  Well, my understanding is the servers were

14  erased.  But that is something that maybe could have

15  been ascertained, but I don't have evidence that my

16  votes were directly hacked.  There is evidence that

17  there was a probe of the voting system.

18     Q.  And then -- and what is that evidence?

19     A.  Well, I didn't collect the evidence.  I'm

20  not the FBI, but I think it's commonly known that

21  information is available.

22     Q.  And what election was that related to, the

23  probe that you just talked about?

24     A.  I believe it was 2016; but I'm, you know,

25  not an expert.

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 57

1      Q.   Did you have any evidence that any election
2   during 2016 was hacked?
3      A.   Can you be more specific about hacked?
4      Q.   Yes.   Just that there was some intervention
5   into the computer system, that there was
6   irregularities that happened or that some -- some
7   outside group or individual was able to get into the
8   voting system.
9      A.   There's evidence that there were issues
10  with poll books, but it's to my knowledge not
11  evidence as to who did that or why or whether it was
12  a glitch or intentional.
13     Q.   Do you have any evidence that there was
14  malware inserted in any BMD during any election in
15  Georgia?
16     A.   No.   My concerns are over the possibility,
17  meaning that that could happen; but I don't have any
18  evidence that that happened to my vote.
19     Q.   What about anyone else's vote?   Do you have
20  any evidence that there was malware inserted in
21  connection with any votes in any election on a BMD
22  here in Georgia?
23     A.   I can't really speak to that.   I don't know
24  what steps were taken to ascertain if that happened.
25  But I don't have evidence that my vote was tampered

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 58

1   with.

2        Q.   Do you have any knowledge that any votes

3   that were cast in Georgia on a BMD, that there was

4   malware inserted in relation to those votes other

5   than your own?  Do you have any evidence of any

6   other votes?

7        A.   No, not of another vote, only the

8   possibility.

9        Q.   They tell you that there's a possibility of

10  malware being inserted in voting machines in

11  Georgia, but do you have any evidence that any

12  vulnerabilities in the system, in the BMDs has

13  actually resulted in the insertion of malware?

14       A.   No, I don't have any evidence about the

15  insertion of malware.

16       Q.   And when you voted on the BMDs on the two

17  occasions that you've described, have the concerns

18  that you've talked about about the machines, have

19  they come to fruition, that you know of?

20       A.   Like what -- no.  Can you be more specific?

21       Q.   Yeah.  I just want to -- because I know you

22  mentioned that you had concerns about problems with

23  BMDs.

24       A.   Uh-huh.

25       Q.   And I'm asking you if you have any evidence

Case 1:17-cv-02989-AT  Document 1558  Filed 01/06/23  Page 60 of 68
Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 59

1    that any of those concerns actually happened.

2         A.  To my -- I would not be able to come to a

3    conclusion about that because they aren't -- they're

4    compromised, they're not auditable, so I can't say.

5         Q.  So as you sit here today, you can't say

6    that there -- any of the problems that you're

7    concerned about with the BMDs have actually

8    happened?

9         A.  I can't say whether they did or didn't.

10        Q.  And do you have any plans to vote on BMDs

11   in the future?

12        A.  I think I've finally given up on that.  I

13   was a holdout, maybe foolishly, because I like to

14   vote in person.  But for all the problems with

15   mail-in voting and how those votes are counted and

16   the chain of custody, it's still more recoverable

17   than voting on a BMD.  It's a hand-marked paper

18   ballot.

19        Q.  And then is it your testimony that it is

20   your plan in future elections here in Georgia to

21   vote by absentee ballot?

22        A.  That's my tentative plan.  The problem is

23   will I get my absentee in time, and also the mail in

24   Fulton and DeKalb has been really problematic.  So

25   if there aren't drop boxes, I have to take that into

Page 60

 1    consideration.

 2        Q.  But as long as all of those things happen

 3    correctly, you'll be voting in the future by

 4    absentee ballot; correct?

 5        A.  While there are BMDs, yeah.

 6        Q.  I'm going to introduce another exhibit.  If

 7    you would just give me a minute.

 8            (Deposition Exhibit 3 marked)

 9    BY MS. LaROSS:

10        Q.  Go ahead and refresh on Exhibit Share,

11    Ms. Missett.

12        A.  The document is 003?

13        Q.  Correct, Exhibit 003.

14        A.  Okay.

15        Q.  Do you see that?  Are you seeing that

16    exhibit, Ms. Missett?

17        A.  Yes.

18        Q.  Okay.  And let me know when you've had a

19    chance to take a look at it.

20        A.  Okay.

21        Q.  And what is that document that you've just

22    reviewed that's been marked as Exhibit 003?

23        A.  This is the Declaration of Megan Missett

24    which was filed 10/23/19.

25        Q.  And is this your declaration?

Megan Missett                          September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 61

1          A.  Yes.

2          Q.  And on the last page, is that your

3     signature --

4          A.  Yes.

5          Q.  -- at the end of the declaration?

6          A.  Yes, it is.

7          Q.  And is this one of the documents that you

8     reviewed in preparation for your deposition today?

9          A.  Yes.

10         Q.  I'm going to mark another exhibit.  Sorry,

11    it's going to take me a second.  I think I mixed

12    these up.

13              (Deposition Exhibit 4 marked)

14              MR. ICHTER:  Is there a question pending?

15              MS. LaROSS:  I'm so sorry, Ms. Missett.  I

16    wanted you to look at the exhibit.

17    BY MS. LaROSS:

18         Q.  Ms. Missett, have you had an opportunity to

19    look at what's been marked Exhibit 004?

20         A.  Yes.

21         Q.  And I apologize for the delay.  I thought

22    you were still looking at it.  Have you completed

23    your review of Exhibit 4?  You'll have to answer

24    verbally.

25         A.  Yes.

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 62

1    Q.  And is this a declaration that you gave in

2    this case, Ms. Missett?

3    A.  Yes.

4    Q.  And on the last page of the document, is

5    that your signature?

6    A.  Yes.

7    Q.  And was that the -- a declaration that you

8    referred to earlier that you reviewed in preparation

9    for your deposition?

10   A.  Can you be more specific about reviewed?

11   It was -- you know, I was given a chance to see it.

12   Q.  Okay.  It was my understanding from your

13   earlier testimony, correct me if I'm wrong, that in

14   preparation for your deposition today you reviewed

15   two declarations that you gave in this case.  Is

16   that correct?

17   A.  That's correct, they were, yes.

18   Q.  Okay.  And this Exhibit No. 4, is that the

19   second declaration that you reviewed in preparation

20   for your deposition today?

21   A.  I've reviewed both but not in order.

22   Q.  Okay.  But this is -- okay.  So now I've

23   shown you with Exhibit 3 and Exhibit 4.  Those are

24   the two declarations that you reviewed in

25   preparation for your deposition; correct?

Page 63

1      A.  Yes.

2      Q.  And that's all that I have about those two

3  exhibits at this point.  Ms. Missett, have you read

4  any reports prepared by Dr. Halderman in this case?

5      A.  Not recently but in the past.

6      Q.  And the report by Dr. Halderman, was that

7  in connection with this lawsuit?

8      A.  Yes, in connection with this lawsuit and

9  also other testimony and writings he's published

10  about BMDs.

11      Q.  And the report by Dr. Halderman, was there

12  anything contained in that report that pertained

13  specifically to the Georgia Dominion system?

14      A.  I'd have to review it, I'd have to look at

15  it again.

16      Q.  And when was it that you looked at that

17  report?

18      A.  I don't recall when it was.

19      Q.  Was it within the last year?

20      A.  Likely.

21      Q.  Did you say likely?

22      A.  Yes, it's likely it was within the last

23  year.

24      Q.  Do you recall what Dr. Halderman's findings

25  were?

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 64

1          MS. ELSON:  I'd like to caution the witness

2     not to reveal anything pertaining to conversations

3     with experts in this case as it pertains to work

4     product or the common interest privilege that we

5     hold in this case.

6          MS. LaROSS:  Again, that's not at all what

7     my question pertained to.

8     BY MS. LaROSS:

9          Q.  Ms. Missett, your review of the report that

10    you've spoken about by Dr. Halderman, what were the

11    findings that he articulated contained in the report

12    that you reviewed?

13         A.  I -- I don't recall.  I'd have to review

14    it.

15         Q.  Do you know generally what the findings

16    were?

17         A.  I don't recall.  I'd have to review it.

18         Q.  Ms. Missett, do you believe that the

19    results of the presidential election held on

20    November 3rd, 2020, in Georgia are valid?

21         A.  I couldn't say one way or the other.

22         Q.  So as you sit here today, you're not sure

23    whether or not the results for the presidential

24    election held on November 3rd, 2020, in Georgia are

25    valid?

Page 65

1          MR. ICHTER:  What do you mean by valid,

2     Diane?

3          MS. LaROSS:  That they're valid, that

4     they --

5          MR. ICHTER:  What does that mean?

6          MS. LaROSS:  That they stand.  I'm not --

7     and this is --

8          MR. ICHTER:  In order to answer the

9     question, she has to understand what the question

10    means.

11         MS. LaROSS:  Yeah, but it's not your

12    opinions today.

13         MR. ICHTER:  Do you mean legally

14    enforceable?  Is that what valid means?

15         MS. LaROSS:  Cary, if you don't understand

16    what the word means, that's one thing, or what the

17    reference is.  The witness did not indicate that she

18    did not understand what valid meant.

19       A.  I don't understand.

20         MR. ICHTER:  She's my client, and she won't

21    answer a question until you tell us what you mean by

22    what "valid" means in the context of the question.

23         MS. LaROSS:  So you're instructing her not

24    to answer my question?

25         MR. ICHTER:  I'm asking you what do you

Megan Missett                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 66

1    mean by "valid."  Is that too much to ask?  I mean,

2    if it's just too much to ask for you to define a

3    core concept in your question, let me know that.  I

4    find that troubling, but tell me that because I'd

5    like that to be on the record.

6              MS. LaROSS:  And I'd like it to be on the

7    record whether you're instructing her not to answer

8    the question.

9              MR. ICHTER:  I'm asking you what do you

10   mean by the term "valid."

11             MS. LaROSS:  Madam Court Reporter, could

12   you read back my last question, please?

13             (The reporter read the requested material.)

14             MS. LaROSS:  Was there an answer.

15             (The reporter read the requested material.)

16             THE REPORTER:  No.  "Objection.  What do

17   you mean by valid?"

18             MS. LaROSS:  Okay.  I'll withdraw the

19   question.

20   BY MS. LaROSS:

21        Q.  Ms. Missett, do you have any evidence that

22   any component of the Georgia election system was

23   actually hacked prior to or during the elections

24   held on November 3rd, 2020?

25        A.  I don't have any personal evidence that

Megan Missett                                    September 28, 2021
Curling, Donna v. Raffensperger, Brad

Page 67

1    they were hacked.

2         Q.  Do you have any evidence that any malware

3    was actually inserted into any component of the

4    Georgia election system prior to or during the

5    elections held on November 3rd, 2020?

6         A.  No.

7         Q.  Do you have any evidence that the results

8    of any election held in Georgia on November 3rd,

9    2020, were actually changed in any way?

10        A.  I don't have any direct evidence.

11        Q.  And let me ask that a little bit more

12   specifically.  Do you have any evidence that the

13   results of any election held in Georgia on November

14   3rd, 2020, were actually changed in any way as a

15   result of hacking of or insertion of malware into

16   any component of the system?

17        A.  You're asking me questions I can't answer

18   because BMDs aren't auditable, so I can't venture to

19   say that I have faith in the results when I don't

20   have evidence that they were hacked.  I don't know,

21   and neither do you.

22        Q.  Well, that's what my question is is if you

23   have evidence of actual hacking.  And I understand

24   that question to be no.  Is that correct?

25        A.  (The witness nods.)