Page 1

1           IN THE UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF GEORGIA

2                   ATLANTA DIVISION

3

4   DONNA CURLING, et al.,

5       Plaintiffs,

                                CIVIL ACTION FILE

6       vs.

                                NO. 1:17-cv-2989-AT

7   BRAD RAFFENSPERGER, et al.,

8       Defendants.

9

10   30(b)(6) VIDEO DEPOSITION of the COALITION FOR GOOD

11        GOVERNANCE, INC. through MARILYN MARKS

12                  March 17, 2022

13                   11:01 a.m.

14        TAKEN BY REMOTE VIDEOCONFERENCE

15     Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138

16

17

18

19

20

21

22

23

24

25

30(b)(6) Marilyn Marks                     March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 2

1                    INDEX TO EXHIBITS

2     EXHIBIT              DESCRIPTION                PAGE

3     Exhibit 1      Notice of Deposition                26

4     Exhibit 2      Objections to Notice of             28

5                    Deposition

6     Exhibit 3      Plaintiffs' Third Amended           49

7                    Complaint

8     Exhibit 4      First Supplemental Complaint        56

9                    of Plaintiffs Coalition for

10                   Good Governance, Laura Digges,

11                   William Digges III, Ricardo

12                   Davis, and Megan Missett

13    Exhibit 5      Supplemental Declaration of         59

14                   Marilyn Marks

15    Exhibit 6      2017 Form 990-EZ                    95

16    Exhibit 7      2018 Form 990                      100

17    Exhibit 8      2019 Form 990                      106

18    Exhibit 9      Plaintiffs' Notice of Filing       109

19                   Declaration

20    Exhibit 10     Coalition Plaintiffs' Detailed     111

21                   Specification In Support of

22                   Motion for Attorneys' Fees

23    Exhibit 11     New York correspondence from       120

24                   January 2021 citing Curling

25    Exhibit 12     NCSBOE letter from 2019            122

30(b)(6) Marilyn Marks                March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 3

|    |             |                               |     |
|----|-------------|-------------------------------|-----|
| 1  | Exhibit 13  | E-mails, 9/26/19,             | 123 |
| 2  |             | CGG2021001277506              |     |
| 3  | Exhibit 14  | 3/4/21 letter from CGG to     | 126 |
| 4  |             | Georgia Republican Leaders    |     |
| 5  | Exhibit 15  | Mission Statement - Coalition  | 136 |
| 6  |             | for Good Governance           |     |
| 7  | Exhibit 16  | Articles of Incorporation for | 138 |
| 8  |             | a Nonprofit Corporation       |     |
| 9  | Exhibit 17  | Who We Are - Coalition for    | 140 |
| 10 |             | Good Governance               |     |
| 11 | Exhibit 18  | CGG Board Discussion Package  | 150 |
| 12 | Exhibit 19  | Fundraising message           | 161 |
| 13 | Exhibit 20  | Fundraising message during    | 162 |
| 14 |             | 2020                          |     |
| 15 | Exhibit 21  | Donate - Coalition for Good   | 163 |
| 16 |             | Governance                    |     |
| 17 | Exhibit 22  | Home page - Coalition for Good | 166 |
| 18 |             | Governance                    |     |
| 19 | Exhibit 23  | Current Projects - Coalition  | 167 |
| 20 |             | for Good Governance           |     |
| 21 | Exhibit 24  | Tweets from January 24, 2021  | 168 |
| 22 | Exhibit 25  | 8/22/20 tweet                 | 171 |
| 23 | Exhibit 26  | E-mails, 1/18/18,             | 186 |
| 24 |             | CGG2021001278172              |     |
| 25 | Exhibit 27  | Supplemental Response to      | 188 |

Page 4

1                    Interrogatory No. 12

2   Exhibit 28   Coalition Plaintiffs'          190

3                Responses to Defendant Anh

4                Le's First Interrogatories

5   Exhibit 29   Joint Litigation and Common    213

6                Interest Agreement

7   Exhibit 30   Facebook advertisement from    216

8                Friends of Coalition for Good

9                Governance

10  Exhibit 31   E-mail regarding ballot image  222

11               legislation

12  Exhibit 32   E-mails, 8/24/21, Subject:     225

13               Garland's new lawsuit against

14               BMDs

15  Exhibit 33   January 1, 2021 tweet          238

16  Exhibit 34   Coalition for Good             248

17               Governance's and Coalition

18               Plaintiffs' Objections and

19               Responses to Defendant Brad

20               Raffensperger's First Request

21               for Admission

22  Exhibit 35   GA Senate Judiciary            259

23               Sub-Committee on Election Law

24               12.30.2020

25  Exhibit 36   Plaintiff Coalition for Good   266

30(b)(6) Marilyn Marks                     March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 5

1                    Governance's Objections and

2                    Responses to State Defendants'

3                    Second Request for Production

4                    of Documents

5     Exhibit 37      Response of Coalition for Good      267

6                    Governance to Brad

7                    Raffensperger's First Request

8                    for Production of Documents

9     Exhibit 38      Handwritten notes                   275

10

11

12                        INDEX TO EXAMINATION           PAGE

13    By Mr. Tyson                                         10

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1    APPEARANCES OF COUNSEL:  (All appearances via Zoom)

2    On behalf of the Coalition for Good Governance and

3    the Deponent:

4              ROBERT ALEXANDER MCGUIRE, ESQUIRE

5              Robert McGuire Law Firm

6              113 Cherry Street

7              Seattle, Washington  98104

8              ram@lawram.com

9

10   On behalf of the Curling Plaintiffs:

11             ZACHARY FUCHS, ESQUIRE

12             JENNA B. CONAWAY, ESQUIRE

13             REILEY JO PORTER, ESQUIRE

14             SONJA SWANBECK, ESQUIRE

15             HANNAH ELSON, ESQUIRE

16             Morrison & Foerster, LLP

17             2000 Pennsylvania Avenue, NW

18             Washington, DC  20006

19             zfuchs@mofo.com

20             jconaway@mofo.com

21             rporter1@mofo.com

22             sswanbeck@mofo.com

23             helson@mofo.com

24

25

Page 7

```
 1    APPEARANCES (Continued):

 2    On behalf of Defendant Secretary of State Brad

 3    Raffensperger:

 4              BRYAN TYSON, ESQUIRE

 5              BRYAN F. JACOUTOT, ESQUIRE

 6              DIANE FESTIN LAROSS, ESQUIRE

 7              Taylor English Duma LLP

 8              1600 Parkwood Circle, Suite 200

 9              Atlanta, Georgia  30339

10              btyson@taylorenglish.com

11              bjacoutot@taylorenglish.com

12              dlaross@taylorenglish.com

13    -and-

14              CAREY MILLER, ESQUIRE

15              VINCENT R. RUSSO, ESQUIRE

16              Robbins Ross Alloy Belinfante Littlefield

17              500 14th Street, N.W.

18              Atlanta, Georgia  30318

19              cmiller@robbinsfirm.com

20              vrusso@robbinsfirm.com

21

22

23

24

25
```

Page 8

1   APPEARANCES (Continued):

2   On behalf of Defendant Fulton County:

3            DAVID LOWMAN, ESQUIRE

4            Fulton County Attorney's Office

5            141 Pryor Street, Suite 4038

6            Atlanta, Georgia  30303

7            david.lowman@fultoncountyga.gov

8

9   Also Present:

10            Krishan Patel, videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 9

1          THE VIDEOGRAPHER:  Today's date is March
2     17th, 2022, and the time is 11:01 a.m.  This will be
3     the 30(b)(6) videotaped deposition of Coalition for
4     Good Governance given by Marilyn Marks.
5          Will counsel please introduce themselves
6     and any objection to the witness being sworn in
7     remotely.
8          MR. TYSON:  Good morning.  My name is
9     Bryan Tyson.  I represent the State Defendants in
10    this case, and I'm joined today by my colleagues,
11    Bryan Jacoutot and Diane LaRoss.
12          MR. MCGUIRE:  And I am Robert McGuire.
13    I'm counsel for the plaintiffs -- for the Coalition
14    Plaintiffs and Coalition for Good Governance, and
15    I'm here representing the deponent.
16          THE VIDEOGRAPHER:  Would the court
17    reporter please swear in the witness.
18          THE REPORTER:  Do we need appearance from
19    Mr. Fuchs?
20          THE VIDEOGRAPHER:  Sorry, what was the
21    question?
22          THE REPORTER:  Is that all the appearances
23    we need on the record?  Do we need to introduce any
24    other counsel?
25          MR. LOWMAN:  I will say I am David Lowman

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 10

1    here for the Fulton County Defendants.

2                        MARILYN MARKS,

3    having been first duly sworn, was examined and

4    testified as follows:

5                        EXAMINATION

6    BY MR. TYSON:

7        Q    Well, good morning, Ms. Marks.  We'll do a

8    couple of housekeeping things real quick.

9             MR. TYSON:  First of all, Mr. McGuire, are

10   you good with us reserving all objections except as

11   to form and responsiveness until trial or first use?

12            MR. MCGUIRE:  Yes, and privilege, of

13   course.

14            MR. TYSON:  Certainly, yes.

15   BY MR. TYSON:

16       Q    And, Ms. Marks, you have the choice of

17   reading and signing or waiving that, reviewing the

18   transcript after today.  I'm assuming you'd like to

19   read and sign?

20       A    Yes, that's correct.

21       Q    Okay.  Well, good morning again.  I'm

22   Bryan Tyson.  I know we know each other well.  It's

23   good to see you, Ms. Marks.  I represent, obviously,

24   the State Defendants, the Secretary of State, and

25   the State Election Board.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                                    Page 11

1            Have you ever been deposed before?  I

2     honestly can't remember.

3         A    In this case, no.

4         Q    Okay.  So I'll quickly cover our ground

5     rules so they're clear.  If you've been in a

6     deposition with me before you'll recall there are

7     times where I ask a question, and nobody understands

8     what I'm asking.  If that happens and you don't

9     understand my question, just go ahead and let me

10    know that, and I'll rephrase it.

11           I know we're starting around 11:00

12    eastern.  If you need a break at any point, just let

13    me know.  Only request is that we not take a break

14    while a question is on the table.

15           And then for Zoom, obviously it's just

16    best if we don't talk over each other and try to

17    make as clean a transcript to make Robyn's life as

18    easy as possible for our court reporter.

19           So if that works for you, we'll go ahead

20    and get rolling.

21        A    Certainly fine.

22        Q    What I'll do is begin with a few

23    background questions, we won't have to spend too

24    much time in there, and then we'll move into the

25    notice and all the different pieces we have today.

30(b)(6) Marilyn Marks                      March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 12

1          If you can just state your name again for

2     the record.

3          A     Yes, it's Marilyn Marks.

4          Q     And what is your current address?

5          A     ████████████████████████████████

6     Charlotte, North Carolina 28210.

7          Q     And how long have you lived in North

8     Carolina?

9          A     I moved -- I grew up here and left when I

10     was about 16, long time ago, and came back here in,

11     I think, 2015.

12          Q     Have you taken any medication, or do you

13     have any medical condition that would keep you from

14     fully and truthfully participating today?

15          A     No.

16          Q     I know you mentioned you hadn't been

17     deposed in this case.  Have you been deposed in any

18     case before?

19          A     Yes.  Going back to the '70s, '80s, '90s,

20     I was involved in large corporate environments and

21     with a lot of commercial litigation, so I've been

22     deposed a number of times, but not in -- not in the

23     last 20 years that I can remember.

24          Q     Got it.  I was going to say let's not go

25     beyond 20 years.  I'll make it much easier on that

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 13

1    front.

2         A    Okay.  That sounds good.

3         Q    So let me ask you about testimony in

4    trial.  Do you recall testifying in a court in the

5    last 20 years?

6         A    Yes.

7         Q    And what was the case or what were the

8    cases where you were called to testify?

9         A    Mr. Tyson, I'm sure I'm not going to

10   remember them all.  I'm going to do my best, though.

11        Q    Certainly.

12        A    Going back to about 2009 there would have

13   been a case -- I sued the City of Aspen, Colorado,

14   and I would have testified in that case.  I believe

15   I testified in a case against -- I'm going to come

16   up with the name of it in a minute.  The county seat

17   is Salida, Colorado.  It's Chaffee -- Chaffee

18   County, Colorado.  We had a trial there.  I can't

19   remember whether our organization sued or I sued,

20   but nevertheless, I think I testified there.

21             A case in Saguache County, Colorado, I

22   believe I testified there.  I testified -- wait a

23   minute.  I may not have testified in Saguache.  I

24   was in the courtroom a lot.  I can't remember

25   actually whether I took the witness stand.  This has

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 14

1    been a long time ago.  This is maybe 2010, 2011,

2    something like that.

3           Let's see.  More recently one of our state

4    cases, I believe it might have been in the case

5    related to the Amico challenge.  You know, I don't

6    think -- I'm sorry, I don't think I took the witness

7    stand.

8       Q    Was it the case with Judge Grubbs in the

9    2018 lieutenant governor contest, does that ring a

10   bell?

11      A    Yes, that's what I was thinking, but now

12   I'm not sure whether I did or not.  I can remember

13   in one of the Georgia cases taking the witness

14   stand, I believe, but I can't quite remember which

15   it was.  I'm sorry.  I have to really think about it

16   for a while.

17      Q    Totally fine.  Don't worry about that.

18      A    Okay.

19      Q    So just to quickly -- the cases that you

20   were involved with in Colorado, were those both

21   election-related cases?

22      A    There were -- there were numerous

23   election-related cases in Colorado, and I was not

24   involved in any kind of commercial litigation in

25   Colorado, but yes, those -- those were two of the

Page 15

1    cases I was involved in.

2        Q    And so what was -- how was -- how were

3    elections involved in the City of Aspen case that

4    you referenced?

5        A    I ran for mayor of Aspen, Colorado in

6    2009, and they used instant runoff voting for the

7    first time, and the software turned out to have bugs

8    in it and didn't count right.

9            I decided not to ask for a recount or to

10   contest the election but instead waited purposely

11   until after the time the deadlines had passed, and

12   then I asked to see the ballots and ballot images as

13   public records to see -- we knew that there were

14   problems with the vote count, but we wanted to see,

15   you know, exactly how those problems manifested

16   themselves.

17           And so through public records request I

18   requested the ballots and was told, oh, no, ballots

19   aren't public records.  And in Colorado legislation

20   had been passed to have ballots as public records.

21           And so I was introduced to Mr. McGuire at

22   that time, and we were both at that time living in

23   Colorado, and I engaged him to file an open records

24   lawsuit to obtain ballots as public records in this

25   election, and so that began work in litigation when

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 16

1   all else fails toward election transparency.

2        Q    Thank you.

3             And so was the case against Salida -- I'm

4   sorry, Chaffee County, I believe you said, was that

5   also related to elections?

6        A    It was.

7        Q    And how was that related to elections?

8        A    That had its roots in the same type of

9   issue as the Aspen, Colorado case did.  After the --

10  I believe it was the court of appeals in Colorado

11  ruled in the Aspen case that ballots were, indeed,

12  public records, I then requested some ballots from

13  Salida -- excuse me, Chaffee.  Forget Salida.  I

14  shouldn't have mentioned it.  I was struggling to

15  come up with the county name.

16            I requested some Chaffee County ballots,

17  and I got the response back -- and now this is

18  through open records -- got the response back,

19  sorry, you can't have them because they would show

20  how people voted.  And I remember laughing so much

21  at that answer and thinking, are they crazy?  Of

22  course ballots don't show how people voted.

23            Well, with a little more exploration I

24  found out, indeed, they did show how people voted,

25  that there were bar code serial numbers on each

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 17

1    ballot.  And that became, I believe, one of the

2    issues that was derived -- I'm a little -- I'm

3    struggling a little bit now to remember whether that

4    case itself was about secret ballot or whether it

5    was about open records because they were refusing to

6    give us the ballots, and to our surprise they were

7    right that the ballots did disclose how people voted

8    which then led to other litigation that we didn't

9    talk about in Colorado that I didn't take the

10   witness stand on where I engaged Mr. McGuire.  And I

11   say I did.  I believe it was -- it was the

12   predecessor to Coalition for Good Governance.

13          And so we engaged Mr. McGuire to sue the

14   Secretary of State in federal court on the issue of

15   ballots as secret -- excuse me, secret ballots there

16   related to what we had learned in the prior case

17   about identifiable bar codes on the ballots.

18      Q    Thank you.  That's very helpful.

19          Have you been involved in election-related

20   litigation in any states besides Colorado and

21   Georgia?

22      A    We have not filed any cases ourselves.  I

23   was just trying to think back of whether or not I've

24   been called as a witness or anybody in our -- like,

25   our board of directors might have been called as a

Page 18

1    witness.

2          Q    Let me ask a more specific question.

3          A    Okay.  All right.

4          Q    Have you personally been a plaintiff in

5    any lawsuits about election administration in states

6    other than Colorado and Georgia?

7          A    No, I have not as an individual been

8    involved in election litigation.

9          Q    Thank you.

10               Have you ever been charged with a crime

11   before?

12         A    No.

13         Q    So you've never been arrested?

14         A    No.

15         Q    So never been convicted.  That's easy

16   enough.

17         A    No.

18         Q    Have you discussed this case -- well, let

19   me actually go to a different area.  Let's do a

20   little more on background.

21         A    Okay.

22         Q    Can you briefly summarize for me your --

23   any college degrees that you have and when you

24   received those?

25         A    Yes.  I have a degree in accounting, a

30(b)(6) Marilyn Marks                           March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 19

1    bachelor of science in accounting, and I graduated

2    in 1975.

3         Q    And from what institution did you receive

4    your bachelor's of science?

5         A    University of Tennessee at the Chattanooga

6    campus.

7         Q    And do you hold any other degrees?

8         A    I knew you were going to ask that, and I

9    started looking for the name of it today, and my

10   records are not in the kind of shape that they

11   should be.  I'm going to give you -- I'm going to

12   give you something close, and it'll have to do for

13   today, but there is an advanced management degree

14   that I have from Harvard Business School, but I'm

15   not telling you the exact name of it because I can't

16   exactly remember the name of it.  But it was an

17   advanced management degree for CEOs, and I cannot

18   remember what year it was, and I couldn't find my

19   records on what year it was, but it would have

20   probably been around year 2000, something like that.

21        Q    Besides your bachelor of science and the

22   degree from Harvard Business School, we'll just call

23   it that, do you have any other degrees?

24        A    No other degrees.  I have professional

25   certification as a CPA about the same time as --

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 20

1    shortly after I graduated from college.

2        Q    That was going to be my next question, if

3    you hold any professional licenses at all.

4        A    I gave that up several decades ago, but at

5    that time, you know, in the '70s and '80s I was a

6    CPA.

7        Q    Okay.  Do you have any certifications that

8    you held?

9        A    Let me think about that.  I'm trying to

10   remember if there was something related to my

11   service on public company boards that -- if I did

12   I'm not -- I'm not quite remembering it right now.

13       Q    Okay.

14       A    Nothing that I have used extensively as a

15   certification.

16       Q    Okay.  That's helpful.  Thank you.

17            And do you recall approximately when you

18   gave up your CPA license?

19       A    It was probably the mid '80s.

20       Q    And was that a voluntary decision or were

21   you required to surrender it?

22       A    Oh, no.  Heavens, no.  It was a voluntary

23   decision because I moved out of anything that was

24   directly financial related and became a CEO of a

25   company, and I didn't really -- I had other people

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 21

1   do that kind of work.  I couldn't possibly keep up
2   with the education requirements and that sort of
3   thing for maintaining a CPA license.
4        Q    Got it.  Thank you.
5            So I know you've had, obviously, a long
6   employment history.  I don't want to dig through
7   every single thing you've done since the 1970s, but
8   could we start with maybe the year 2000 and forward
9   and just kind of summarize your employers over that
10  time?
11       A    Yes.  So that's going to be easy because I
12  retired in about 2001, something like that.  I was
13  the CEO for Dorsey Trailers, Inc., which was a truck
14  trailer manufacturer and manufacturing company, and
15  it was headquartered in Atlanta.  It was a public
16  company.  And at that same time, around that point
17  in time, I was also on the board of a New York Stock
18  Exchange company by the name of Dana, D-A-N-A,
19  Corporation, and also on the board of Eastman
20  Chemicals Corporation.  So those were the paying
21  gigs I had back in those days.
22       Q    And so you retired around 2001.  Have you
23  had any kind of formal employment since that time?
24       A    Not any kind of formal employment.  I
25  serve certainly full-time for Coalition for Good

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                                    Page 22

 1    Governance, but unfortunately at the moment it's an
 2    unpaid -- it's an unpaid gig.
 3         Q    Understood.
 4              So you've mentioned board service.  What
 5    boards are you currently serving on, if any?
 6         A    Only -- only Coalition for Good
 7    Governance.
 8         Q    In the last 10 years have you served on
 9    the boards of any other organizations?
10         A    Not in the last 10 years.
11         Q    Have you ever served on the board of any
12    other voting-related organization?
13         A    I have not.
14         Q    Do you have any specialized training that
15    you've received about elections and elections
16    administration specifically?
17         A    When you say "specialized training," I
18    would think of that as attending seminars, workshops
19    taught by experts in fields like particularly
20    auditing, sometimes election security technology,
21    technology -- public policy on technology.  Seminars
22    like that are -- I frequently attend.  I would have
23    a hard time remembering all of them for you over --
24    from the last 10 years.
25         Q    Understood.  I don't want to ask you to

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                                    Page 23

1    try to dig through all that.

2              Have any of those seminars you've attended

3    about election administration resulted in any

4    certifications?  I think the answer is no because I

5    don't think you hold any certifications, but I just

6    wanted to verify that.

7         A    That is correct, I do not.

8         Q    And you don't have any specialized or

9    any -- I'm sorry.  You don't have any certifications

10   in election security either, correct?

11        A    I'm not even aware that any exist, but if

12   I find out that some such programs do, it's

13   something I would be interested in participating in.

14        Q    Got it.

15             And you don't hold any certifications in

16   cybersecurity, right?

17        A    I do not.

18        Q    You mentioned various symposiums and

19   seminars.  I don't want to ask all the ones you've

20   attended, but can you recall maybe in the last 10

21   years any symposiums where you've spoken about

22   election security topics?

23        A    Sure.  Let me think about that for just a

24   moment.  I have been frequently involved in Election

25   Verification Network.  In fact, they are meeting

Page 24

1  today, and I had to forego the idea of presenting

2  there today.  But it's a national group that really

3  focuses on election security, and I have from time

4  to time over the years presented at panels, that

5  sort of thing.

6            I not too long ago presented at a National

7  Science Foundation educational meeting.  I couldn't

8  come up with the name of it for you right now, but I

9  presented there on -- I believe it was on election

10 auditing and making use of ballot images in

11 precursors to audits.  That may not be quite right,

12 but it's in the ballpark.

13           Let's see, where else have I done speaking

14 on this.  It seems like I've done a lot of it, it's

15 just not coming to my mind right now.  I'll think

16 about it some more in background.

17           Mr. Tyson, I feel like I've got more to

18 tell you on that, I just cannot remember right now.

19 I -- we are asked so frequently to do presentations,

20 and right now I'm just not having the time to say

21 yes to that, and -- but I've done a good bit of it

22 in the past, but being specific about that right

23 now -- it's something that, quite frankly, I didn't

24 prepare for and didn't refresh my recollections on

25 that.

Page 25

1      Q    And that's totally fine.  I'm not trying

2   to give you a memory test on this.

3      A    I will fail.

4      Q    That's helpful.  Thank you.

5           So let's go ahead and move on to our kind

6   of 30(b)(6) phase.  We finished up with the

7   background pieces.  As we're getting started here I

8   just want to confirm, Ms. Marks, do you have any

9   documents or anything in front of you that you have

10  available?

11     A    The only thingy in front of me is a bunch

12  of blank paper to take some notes, and then I have

13  one page of hand-scribbled notes about some of the

14  projects that we have going and don't have going.

15     Q    Okay.  And if we could, if it's okay with

16  Mr. McGuire, we can just mark that as an exhibit

17  once we get rolling here after the deposition if

18  you're going to use it to refresh your recollection

19  about your testimony.

20          MR. MCGUIRE:  Yeah, that's fine with me.

21  BY MR. TYSON:

22     Q    We can do that at a break, Ms. Marks.  We

23  don't have to do that right now.

24          Let me direct you to Exhibit Share,

25  Exhibit 1, which we marked, the second amended

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 26

1    notice of the 30(b)(6) deposition.

2              (Exhibit Number 1 was marked for

3    identification.)

4    BY MR. TYSON:

5         Q    You know what I can do?  Let's make it

6    easy to start with.  I can go ahead and --

7         A    You going to screen share?  Okay.  That's

8    great.

9         Q    Is that easy enough there to see?

10        A    Sure.  Uh-huh.

11        Q    Marked as Exhibit 1?

12        A    Uh-huh.

13        Q    And this document is titled the Second

14   Amended notice of 30(b)(6) Deposition of the

15   Coalition for Good Governance.  You see that?

16        A    Yes.

17        Q    I'm assuming you've seen this document

18   before?

19        A    I have.

20        Q    And you've read this document?

21        A    I have.

22        Q    So let me go to the second page, and I

23   have a kind of series of 30(b)(6) questions I'll ask

24   you that we'll get on the record about this.

25        A    Okay.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 27

1        Q     You see here in this section it indicates
2    that the organization must designate one or more
3    officers, directors, managing agents or other
4    appropriate persons to testify on behalf of the
5    organization; do you see that?
6        A     I do.
7        Q     And are you the person that the Coalition
8    for Good Governance has designated for this
9    deposition?
10       A     Yes, I am.
11       Q     Okay.  And you see the next sentence
12   there, the person or persons must be ready to
13   testify about the information known or reasonably
14   available to the organization regarding the topics
15   listed in Exhibit A; do you see that language?
16       A     I do.
17       Q     And are you the individual designated for
18   all the topics on Exhibit A?
19       A     Yes, I am.
20       Q     And you understand that as the designee of
21   the Coalition, you're testifying about what
22   information is known or reasonably available to
23   the -- the organization, not just to you
24   individually, right?
25       A     Yes, I do understand that.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 28

1          Q     And as we use the term "organization" or

2     "Coalition" or "CGG," you understand that refers to

3     the entity Coalition for Good Governance, right?

4          A     Yes, I do understand that.

5          Q     Do you have a preference?  Do you usually

6     say Coalition or CGG, or do you have a --

7          A     CGG, whatever is easy.  It's fine.

8          Q     Well, when did you first learn that you

9     were going to be testifying -- I'm sorry, let me do

10    one more thing before we change here.  We have also

11    marked as Exhibit 2 -- if I can make this work the

12    way I want it to -- the notice of objections to the

13    30(b)(6) deposition.

14               (Exhibit Number 2 was marked for

15    identification.)

16    BY MR. TYSON:

17         Q     Do you see that document?

18         A     I do see that document.

19         Q     And Mr. McGuire and I have discussed this

20    is the Coalition's objections, and we will be

21    dealing with the objections as we work through each

22    topic.

23         A     That's fine.

24         Q     Is that your understanding?

25         A     Yes.

30(b)(6) Marilyn Marks        March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 29

1    Q    Okay, great, just so we have both of those

2    marked.

3          So when did you first learn about that

4    you'd be testifying at this deposition?

5    A    Do you mean when did I first learn what

6    time it was going to be or that my deposition would

7    be -- or the Coalition's deposition would be taken?

8    Q    Let me ask a better question.

9    A    All right.

10   Q    When did you first learn you were going to

11   be the 30(b)(6) witness for the Coalition?

12   A    I knew that I would be the 30(b)(6)

13   witness for the Coalition from the moment that

14   depositions were being discussed for the Coalition.

15   How long ago that goes back I don't know, but

16   probably over a year.

17   Q    Okay.  Did you or someone else make the

18   decision that you were going to be the 30(b)(6)

19   designee, or did you just understand that was going

20   to be the case?

21   A    Well, I figured at a minimum I would be a

22   major participant, but I certainly talked to our

23   board members about it, and they concur that I have

24   the greatest depth and breadth of knowledge, and I

25   checked with a couple of them about these topics and

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                                        Page 30

1    asked if they thought they had additional knowledge

2    that maybe I did not have and that sort of thing.

3    So it was an organization decision that I would be

4    the designee.

5           Q      Thank you.

6                  Do you recall approximately when you

7    started preparing for this deposition and these

8    topics in particular?

9           A      Feel like I was a child probably when

10   that -- when I started preparing.  No, because all

11   along, of course, I've known that my -- my

12   deposition and/or the deposition of CGG would be

13   taken, you know, the preparation is kind of always

14   in the back of your mind of -- so there's no mark in

15   time where I said, this is in preparation, and

16   everything I've done to date was not.

17          Q      Got it.

18                 So can you just summarize in your own

19   words what you understand your obligations were

20   regarding this deposition?

21          A      Yes, to prepare myself for all of the

22   topics that were in the notice -- the second amended

23   notice, and to the extent that my attorneys did not

24   have objections to them to prepare myself to know as

25   much as practically possible about those topics, and

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 31

1    to testify on behalf not just to my personal

2    knowledge but knowledge of the organization.

3         Q    Well, let's talk next about how you got

4    ready then for today.

5         A    Okay.

6         Q    So I know you mentioned you spoke with the

7    board members.  As a general matter what else did

8    you do specifically to get ready for today, not all

9    your training of your life that has prepared you for

10   this moment, but specifically for today what did you

11   do to get ready?

12        A    Okay.  I had a talk with Mr. McGuire to

13   try to prepare, I had a brief conferral with

14   Mr. Cary Ichter, one of our other attorneys, I -- as

15   I mentioned to you, I chatted with a couple of our

16   board members, and I also talked to a few of our

17   very active members who work with me on so many

18   projects to see if they had anything in mind that I

19   might be forgetting or might not be aware of.  And

20   then I made a few notes about some of the projects

21   that I would consider to be quite incomplete for us,

22   and things that we are having to defer that we were

23   working on or decline.

24             So I did that, and, as I said, I tried to

25   find my -- some of the educational years and

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 32

 1  certificates and couldn't do it.  That -- I think

 2  that encompasses most of the preparation work I can

 3  remember right now.

 4       Q    Thank you.  That's helpful.

 5            Are you aware that the State originally

 6  sought to take this deposition in October of last

 7  year?

 8       A    I don't remember the dates.  I know that

 9  this CGG deposition has been talked about at various

10  times for many months.

11       Q    Are you aware that your counsel requested

12  the deposition be postponed because there were

13  additional documents that needed to be produced?

14       A    Yes.

15       Q    Do you know what those additional

16  documents were that needed to be produced?

17       A    As I sit here at this moment I don't

18  recall that, but I do know that over the last

19  several months we've had additional documents that

20  we felt were important background, and some of

21  those, I believe, have been actually put into the

22  record -- some of those that we would have been

23  thinking of would have been put into the record, I

24  guess, in other depositions as well as -- as well as

25  sent to you-all through even recent updates of

Page 33

1   our -- of our documents.

2       Q    Yes.  And so as of today is the

3   Coalition's document production complete?

4       A    Yes, but, of course, I know that we have

5   obligations to supplement as we -- as we go along,

6   and, quite frankly, every day there's some new

7   project or something that we're having to divert

8   resources or decline something to that extent that I

9   know that we are not completely finished with

10  document production because there'll be

11  supplemental.

12      Q    But those are not documents that exist

13  today; those are documents that will enter the

14  Coalition's universe in the future, right?

15      A    Right.

16      Q    So let's take -- let's talk through some

17  specific categories of documents that you looked at

18  to get ready for today specifically.

19          Did you review any financial records of

20  the Coalition for Good Governance?

21      A    I did.  I looked at our 990s.  Our -- you

22  know what I mean by our -- our Form 990s on behalf

23  of Coalition for Good Governance that have been

24  filed with the IRS.

25      Q    Did you review any other financial

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 34

1   documents besides the 990s?

2        A    No, I didn't.

3        Q    Did you review any of your prior

4   declarations in this case?

5        A    I have not looked at those for purposes of

6   this preparation.

7        Q    Have you reviewed the third amended

8   complaint or the first supplemental complaint to get

9   ready for today?

10       A    I actually looked at the first

11  supplemental complaint about two weeks ago.  I did

12  not go back and read the third amended complaint.

13       Q    And did you review e-mails to get ready

14  for today?

15       A    Yes, I did.

16       Q    Are there --

17       A    Certainly not all of my e-mails, but yes,

18  I did look at e-mails particularly to produce some

19  documents related to other activities that we were

20  having to decline or defer.

21       Q    Are there any other categories of paper

22  documents that we haven't discussed that you

23  reviewed that you can think of?

24       A    Let me think for just a second.  Nothing's

25  coming to mind right now, but I don't know.  A lot

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                                        Page 35

1   of documents pass -- pass through my computer that I

2   might have forgotten about right now.

3       Q      That's all right.

4              So did you review any prior testimony to

5   get ready for the deposition today?

6       A      Not -- not specifically for -- for today.

7       Q      I know you mentioned that you spoke to

8   some of the board members about getting ready for

9   today.  Obviously as we discussed the notice

10  requires the information known or reasonably

11  available to the organization be what the testimony

12  is about.  Were there specific topics that you spoke

13  with the board members about in order to prepare for

14  today?

15      A      It was generally talking about the

16  projects that -- some of which I had almost

17  forgotten about that they had charged me with

18  working on that didn't get done.  That was one of

19  the key things that we did talk about.

20      Q      And who are the other board members that

21  you spoke to?

22      A      Virginia Rutledge Forney is her name, one

23  name, and then Mary Eberle.  It's been a couple days

24  on that.  Few days on that.

25      Q      And are you, Ms. Rutledge, and Ms. Eberle

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 36

1   the only members of the board of the Coalition?

2         A    No.   Sorry, it's Virginia Rutledge Forney,

3   F-O-R-N-E-Y, is her name.   And no, that -- there are

4   other board members.

5         Q    Okay.   We'll get into that specifically,

6   but for the members of the board that you spoke to

7   to get ready, that was just Ms. Rutledge Forney and

8   Ms. Eberle, correct?

9         A    Correct.

10        Q    You speak with anybody else besides your

11  attorneys to prepare for today?

12        A    Yes.

13        Q    And who are those other individuals?

14        A    I talked to Ms. Jeanne Dufort,

15  D-U-F-O-R-T, and Ms. Aileen, A-I-L-E-E-N, Nakamura,

16  N-A-K-A-M-U-R-A.

17        Q    So just to make sure I've got all these

18  pieces, the individuals you spoke to besides your

19  attorneys to prepare for today are Ms. Rutledge

20  Forney, Ms. Eberle, Ms. Dufort, and Ms. Nakamura,

21  correct?

22        A    Yes.   I'm trying to think if there was

23  anyone else.   I'm thinking for just a second.   I'm

24  trying to remember if I covered some of this in a

25  conversation I had with Ms. Joy Wasson, and I might

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 37

1    have covered it very generally, but it wasn't

2    necessarily saying, hey, look, I am preparing for my

3    deposition, and can you tell me this.

4          Q    Got it.  Thank you.

5               So for Ms. Dufort, do you recall what

6    topics you needed to speak with Ms. Dufort about to

7    get ready for today?

8          A    Yes, we were talking about topics on,

9    again, projects that I have not fulfilled my

10   promises on that the organization has been unable to

11   complete, and we also were talking about the need to

12   do better communications with our members, and so

13   that's mainly what we talked about.

14         Q    Same question for Ms. Nakamura, were there

15   topics -- which topics did you need to speak with

16   Ms. Nakamura about to be prepared for today?

17         A    It was also related to where we stood on

18   various projects that we have undertaken and not

19   finished and trying to get status on some of those

20   things.

21         Q    And what role does Ms. Dufort play in the

22   Coalition?

23         A    She is one of our most active members.

24   And she does not have a formal title, she is not a

25   formal board member, but I consider her a close

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 38

1    advisor and very, very, very active in shaping the

2    work we do.

3         Q    And what is Ms. Nakamura's role in the

4    Coalition?

5         A    It would be very much the same as

6    Ms. Dufort.  I rely on her a lot for her -- for her

7    advice on community outreach, on participating in

8    some of our projects, and just very similar to

9    Ms. Dufort, they're just very active members that

10   follow.

11           She and Aileen Nakamura particularly

12   follows what's happening in Fulton County.  She

13   attends all the board meetings and that sort of

14   thing, and she is the one who keeps me most up to

15   date with -- and keeps the whole organization up to

16   date with Fulton County's Board of Elections

17   activities.

18        Q    Thank you.

19           Is there any topic in the notice of

20   deposition on which you are not prepared to testify

21   on behalf of the Coalition today?

22        A    I don't think so, but I'll take a moment

23   and read back through it if that's okay.

24        Q    Sure.

25           MR. MCGUIRE:  And, Bryan, just want to

30(b)(6) Marilyn Marks                March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 39

1   interject I don't want it to get lost she has not

2   prepared on things we have objected to.

3           MR. TYSON:  Thank you.  Thank you for that

4   clarification.  And those objections are all in

5   Exhibit 2, correct?

6           MR. MCGUIRE:  Yes, unless -- the one thing

7   I would add to that is documents -- 1203 is a

8   court's order that pertains to private

9   communications of the Curling plaintiffs, and we are

10  going to adhere to that.  I would believe the

11  rationale applies to us as well.

12          MR. TYSON:  Thank you for that

13  clarification.

14      A    I'm just scrolling back through the

15  document.

16  BY MR. TYSON:

17      Q    Take your time.  Just let me know when

18  you're finished.

19      A    Okay.  I'm not going to say my memory is

20  perfect on all of these things, but the one thing I

21  forgot to look at, but it's easily findable, you

22  asked about the exempt purpose, and I can tell you

23  generally I meant to look back at the exact words of

24  our mission statement, and I forgot to do that, but

25  that's easily findable.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                                    Page 40

1        Q    Certainly.  And that's a topic we'll

2    actually cover with exhibits, so we'll be --

3        A    Okay.  All right.

4        Q    So aside from that, any objections that

5    Mr. McGuire noted, you're prepared to testify on all

6    of these topics, correct?

7        A    Yes.

8        Q    So with that, let's go ahead and move on

9    to the topics.  Are you good?  Do you want to take a

10   break now before we --

11       A    I'm good if you guys are.

12            MR. MCGUIRE:  Actually, would you mind if

13   we took a five-minute break?  I just have something

14   I have to attend to.

15            MR. TYSON:  That's good.  8:55 for Rob,

16   11:55 for the rest of us.

17            THE VIDEOGRAPHER:  The time is 11:49 a.m.

18   We're off the record.

19            (Recess 11:49-11:54 a.m.)

20            THE VIDEOGRAPHER:  Time is 11:54 a.m.

21   We're on the record.

22   BY MR. TYSON:

23       Q    Thank you, Ms. Marks.  So we're going to

24   go ahead and begin on the various topics, and my

25   goal is for us to just kind of move through these in

                    Veritext Legal Solutions

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 41

1   order.  There are going to be some questions that

2   kind of apply to multiple topics, but I'm going to

3   try to keep us kind of just marching through Exhibit

4   A as best we can to the deposition notice.

5          I'm likely going to refer to documents as

6   we go through.  The ones I think we'll need to keep

7   handy are Exhibit 1, the notice of deposition, just

8   so we have that one available, and we may look at

9   the complaints a couple times as we work through

10  things, but we can cover that as we go.

11         So let --

12     A   Bryan, hold on just a second.  Let me make

13  sure I've got my Exhibit Share in a place I can get

14  to it.

15     Q   Sure.  And what I'll do, I'll just share

16  the screen as we go also to help make things easier

17  for you.

18     A   Okay.  Now I have screwed up the screen.

19  Let's see.  Just a second.  Let me get reorganized

20  here.

21         So am I -- am I to be seeing right now

22  Exhibit A, you're sharing that, is that what my

23  screen is supposed to be?

24     Q   Yes, I'm sharing that.  I can stop the

25  share if that helps you figure out.

Page 42

1     A     No.  I've got two screens up.  I'm going

2   to minimize the Exhibit Share then and just look at

3   your screen share.

4     Q     Great.  And then other thing is if you

5   have to refer to a document at all to answer any of

6   these questions, just let me know that so we can

7   make sure that's part of the record as well.  Most

8   of the documents I'll be presenting to you as

9   exhibits, but if you have something else you're

10  referring to, just let me know that.

11    A     Okay.  I don't have any documents, like,

12  set up to talk about, okay?

13    Q     Okay, great.

14          Let's begin with topic number 1 here.  It

15  is the organization's allocation of resources and

16  budgetary decisions from January 1, 2017, through

17  the present that reflect the diversion of funds and

18  resources the organization alleges it has undertaken

19  in its third amended complaint and first

20  supplemental complaint.

21          Do you see that topic?

22    A     I do.

23    Q     For each of these I'm going to ask you a

24  series of questions about it, so you'll hear these

25  over and over.

Page 43

1          You are the designee of CGG for topic 1,

2    correct?

3          A    Correct.

4          Q    And we discussed documents you reviewed to

5    prepare for your testimony generally.  Were there

6    documents that you reviewed specifically for topic 1

7    in preparation?

8          A    I did look at our Form 990, but not any

9    other specific documents.

10         Q    Okay.  And we've talked generally about

11   who you spoke to to get ready for your deposition

12   today.  Did you speak to anyone currently associated

13   with CGG to prepare for your testimony on topic 1

14   specifically?

15         A    For all of the people that we discussed

16   that I talked with, and I'm excluding counsel, okay,

17   from those -- from my answer, but for all of those

18   people actually what we were talking about is the

19   diversion of resources and allocation of resources

20   as we talked about the various projects that we have

21   undertaken, been unable to undertake, unable to

22   complete, and the ones that we are engaged in.  So

23   that was the main -- main topic of those

24   conversations.

25         Q    And you mentioned earlier that you had

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 44

1   spoken with Ms. Dufort and Ms. Nakamura, who were

2   members, part of those conversations related to your

3   preparation for topic number 1; is that right?

4        A    That's correct.

5        Q    And did you speak to any other members

6   about topic 1 specifically besides Ms. Dufort and

7   Ms. Nakamura?

8        A    I have recently talked with Ms. Joy

9   Wasson, but, you know, it was -- it was about this

10  topic, but I don't know that we were talking about

11  it in the context of, hey, I am preparing for

12  deposition.  It was really much -- it might have

13  been in my mind that I knew we would be discussing

14  this, but I don't know that I formalized the request

15  as, hey, this is in formal preparation.

16       Q    Got it.

17            And so what value -- I'm sorry, let me ask

18  it this way:  In speaking with Ms. Nakamura,

19  Ms. Dufort, and Ms. Wasson --

20       A    Wasson, W-A-S-S-O-N.

21       Q    -- what information did they have about

22  the Coalition that was relevant to this topic?

23       A    They were refreshing my recollection,

24  putting me on a guilt trip about some of the

25  unfinished projects that we had all agreed that were

Page 45

1   important to us that didn't get done.

2        Q    And were those projects that you were

3   charged with undertaking, is that why it was a guilt

4   trip?

5        A    These were either undertaken or providing

6   some strategic direction or providing introductions

7   to other organizations that might help or

8   reviewing -- reviewing ideas and documents,

9   something that was left either in my -- in my court

10  or the interns -- we have interns that help us from

11  time to time, and their priorities are constantly

12  getting shifted because this litigation ends up

13  taking priority over everything else most of the

14  time, and so their priorities get shifted, and so

15  sometimes our very active members like Ms. Dufort,

16  Ms. Wasson are awaiting intern work that gets backed

17  up.

18       Q    Helpful.  Thank you.  And I realize,

19  Ms. Marks, I don't think I asked you in the

20  background piece, what is your official title at

21  CGG?

22       A    Executive director, and I think I'm -- I

23  think I'm also vice president, and I am on the

24  board.  I can't remember if I'm vice chairman or

25  not.  But I'm on the board, executive director, and

30(b)(6) Marilyn Marks                     March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 46

1    vice president.

2         Q    Thank you.

3              Last kind of preparatory question on this:

4    Did you speak to anybody who was formerly associated

5    with CGG in order to prepare for topic 1?

6         A    Are you saying formally, M-A-L-L-E-Y

7    (sic), or formerly?

8         Q    Formerly, no longer associated with CGG?

9         A    No.  No.

10        Q    So let me first ask this question:  Does

11   CGG claim that it has had to divert financial

12   resources as a result of what it alleges are

13   unconstitutional or other unlawful acts of the State

14   Defendants in this case?

15        A    Yes.

16             MR. MCGUIRE:  Object to form.

17   BY MR. TYSON:

18        Q    Does CGG claim that it had to divert

19   non-financial resources as a result of what it

20   alleges are unconstitutional or other unlawful acts

21   of the State Defendants?

22        A    Yes.

23        Q    Can you identify what specific actions of

24   the State Defendants have caused CGG's diversion of

25   resources?

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 47

1      A    Well, I would certainly refer you to the

2  complaint, to our other filings, motion for

3  preliminary injunction, all the briefs, and

4  certainly there are an array of actions of the State

5  Defendants that have caused the diversion of

6  resources as it relates to the Dominion Voting

7  System and the failures of the audits to be --

8           (Simultaneous speaking.)

9      Q    So -- thank you.  I'm sorry, I didn't mean

10  to interrupt.

11     A    And I interrupted you.  I apologize.

12     Q    Just so I understand, is it correct that

13  the actions that CGG alleges the State Defendants

14  have undertaken that have caused the diversion of

15  resources are outlined in your complaints in this

16  case?

17     A    Complaints and briefs and other motions,

18  yes.

19     Q    So in order to determine the specific

20  acts, you need to kind of look at the entirety of

21  the docket; is that fair to say?

22     A    Yes, and I'm sure -- I'm sure it -- the

23  entirety of the docket still does not cover every

24  type of activity that we find objectionable that may

25  have taken place at counties, may have taken place

Page 48

1    since the last time that documents were filed, but

2    yes, the basic -- the basic objections that we have

3    are covered in the docket.

4        Q    And just so I understand, you referenced

5    actions of counties.  Is CGG diverting resources for

6    things that -- for nonparties in this case as well?

7        A    When you say "for nonparties" --

8        Q    Let me ask it this way --

9        A    Okay.

10       Q    -- if that's -- is CGG also diverting

11   resources based on the actions of nonparties to the

12   Curling case?

13       A    I'm not sure that we would know how to

14   parse out -- when we see election administration

15   problems in a county, I'm not sure we would know how

16   to parse out how much of that is attributable to a

17   County's misunderstanding, misapplication versus the

18   law and the direction of the State Defendants.  I

19   don't think we have any such precision.

20       Q    So if CGG prevailed on all of its claims

21   in the Curling case, but counties continued to have

22   election administration problems, CGG would continue

23   diverting resources to address those county

24   problems, right?

25       A    I don't know that I would call that

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 49

1   necessarily diverting resources because if we're

2   talking about, hey, if BMDs went away tomorrow and

3   the Dominion Voting System were remedied in the ways

4   that we have requested for our relief, if all of

5   that happened tomorrow morning, I expect that we

6   would still -- I know we would still be working on

7   county election administration problems and issues.

8          I wouldn't necessarily call -- I wouldn't

9   call that a diversion -- at all call that a

10  diversion of resources.  That's much more of the

11  core of the kind of work we want to do and have not

12  been able to do.

13         Do I expect that should we be successful

14  in obtaining relief on everything we ask for all

15  election administration problems go away, no, I

16  don't expect that.  And that's really much more, as

17  I say, of the kind of work we want to do is the more

18  day-to-day local-level transparency and voter

19  protection type of work.

20      Q    Thank you.

21         I've marked as Exhibit 3, I'll go ahead

22  and share this on the screen, the third amended

23  complaint, which is document number 226 in the

24  Curling case.

25              (Exhibit Number 3 was marked for

Page 50

1    identification.)

2    BY MR. TYSON:

3         Q    Do you see that document there?

4         A    Yes.  I'm seeing document 226, yes.

5         Q    Yes.  And so just for reference just so I

6    can show you, make sure we see, this is marked as

7    Exhibit 3, the third amended complaint of the

8    Coalition for Good Governance and the other parties.

9              You see that?

10        A    I do.  Remind me when that was filed.

11   Let's look at the --

12        Q    It was filed --

13        A    Thank you.  Okay.

14        Q    So what I want to do, there's some

15   specific allegations beginning on page 54 related to

16   the standing of the Coalition, and I want to ask you

17   specifically about paragraph 142, and the Coalition

18   says:  Defendants' prior and intended imminent

19   enforcement of statute in Title 21 in the State

20   Election Board Rule have caused and will cause

21   Coalition to divert resources and personnel to

22   counteract Defendants' illegal acts.

23             Is the diversion of resources that's being

24   referred to there the filing of this litigation?

25        A    Do you mind bringing up those statutes and

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 51

1   rules to remind me what -- put this in context for

2   me, if you don't mind?  It's been a long time since

3   I looked at this complaint.

4        Q    Certainly.  Let me see if I can get those

5   up here for you.  And maybe I can ask a more general

6   question while I'm pulling these up for you.

7        A    Okay.

8        Q    What specifically does the Coalition

9   allege that it is having to spend financial and

10  non-financial resources on as a result of the

11  alleged actions or the actions of the State

12  Defendants in this case?

13       A    Well, certainly litigation cost is an

14  enormous drain on our resources and all that goes to

15  support the attorneys.

16            Are you wanting me to, like, tell you

17  things like we have to buy transcripts; are you

18  asking me to list kind of litigation support cost --

19  I mean expenses?

20       Q    I'm not looking specifically for numbers.

21  What I'm looking for is kind of by category.  So the

22  allegation is that you had to divert resources from

23  something to something else.

24       A    Right.

25       Q    And my question is:  What is the Coalition

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 52

1    diverting resources to as a result of the actions

2    that are alleged in your complaints?

3         A    And you're asking right now about

4    financial resources, correct?

5         Q    Let's start with financial, and then we'll

6    do volunteer or other non-financial resources next.

7    So the record's clear let me ask the question again

8    specifically about finances.

9         A    Okay.

10        Q    What financial resources is the Coalition

11   diverting from existing projects -- I'm sorry.  I

12   turned myself around.  Let me start again.

13             So the Coalition is alleging that it

14   diverted resources from certain things to other

15   things, financial resources, correct?

16        A    Yes.

17        Q    And what specifically is the Coalition

18   diverting its financial resources to as a result of

19   the allegations in the complaint?

20        A    Okay.  And, Mr. Tyson, I'm going to answer

21   as it relates to the complaint as opposed to

22   answering based on those two citations because I

23   don't remember what those citations are right now.

24   Okay?

25        Q    That's fine.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 53

1      A     Okay.  So as you know litigation is

2   expensive, and there are way too many types of

3   expenditures we have to make to support litigation

4   that we would prefer not to be involved in.

5            One, the example I gave you for a moment

6   ago, we certainly have to buy transcripts, we have

7   to buy services that collect documents, and, for

8   example, our Logikcull subscription is expensive.

9   We have to pay the attorneys what we can, and it

10  basically absorbs almost all of the financial

11  resources that we would otherwise be spending on

12  non-litigation programs.

13           And let's see.  We have had to pay experts

14  and travel for experts, travel for our attorneys

15  back in the days before COVID when we did things in

16  person, and so it is the entire variety of things

17  that go to support litigation.

18           Our interns, we do pay our interns

19  modestly, but it's still big money to us, and they

20  spend the majority of their time on litigation

21  support, whether it's doing analytical work or doing

22  some research for us.

23           So I'm sure that is not all that we -- of

24  the types of expenditures that we have that go for

25  litigation support, but that's -- that will be

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 54

1   generally the types of expenditures we have.

2       Q    Let me ask you about some of the specifics

3   in the third amended complaint, Exhibit 3.

4       A    All right.

5       Q    You see the second part, it says:

6   Specifically, Coalition has been and will be

7   required by Defendants' past and intended conduct to

8   do the following.

9            And on the next page the first bullet

10  point relates to the topics you just discussed:

11  Paying the fees of lawyers, litigation, travel,

12  copying, all those types of expenses.

13           Do you see that?

14      A    I do, and it makes me think of some other

15  stuff that I forgot about expenses.

16      Q    Okay.  My question specifically, though,

17  is if this lawsuit was over, then you would no

18  longer have to pay for the things that are listed in

19  the first bullet on page 55, correct?

20      A    That's correct.

21      Q    And the second bullet point is a

22  non-financial allegation here, and it's 90 percent

23  your time, and I suspect it may be more -- feel like

24  more than 90 percent of your time.

25      A    It does.  I think we missed a zero there.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 55

1      Q    -- to participation and management in the

2    Coalition's litigation, educational, and

3    investigative efforts undertaken to counteract

4    Defendants' conduct in Georgia.

5           Do you see that?

6      A    I do.

7      Q    And if this lawsuit was over you would no

8    longer have to devote 90 percent of your time or

9    more to these litigation efforts at least, right?

10          MR. MCGUIRE:  Objection, misstates the

11   document.

12   BY MR. TYSON:

13     Q    You can answer if you can.

14     A    Well, if the litigation on the Dominion

15   Voting System were over, indeed my time would be

16   freed up to go do the things that we want to be

17   doing instead.

18     Q    Let me go to the last bullet point there

19   before paragraph 143, and it says that part of

20   what's happening now is you have to divert

21   Coalition's organizational personnel and financial

22   resources away from Coalition's established ongoing

23   efforts to market Coalition to new members and

24   thereby grow Coalition's membership.

25          Do you see that?

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 56

1       A    I do.

2       Q    And if this litigation was over, would you

3   be able to begin again marketing Coalition to new

4   members and thereby grow the membership?

5       A    Yes, we would.

6       Q    So let me turn next to the first

7   supplemental complaint.  Just a second.

8            (Exhibit Number 4 was marked for

9   identification.)

10  BY MR. TYSON:

11      Q    I've marked as Exhibit 4 the first

12  supplemental complaint of plaintiffs Coalition for

13  Good Governance and others.

14           Do you see that?

15      A    I see that, yes.

16      Q    This is document 628.  So let me turn to

17  the standing portions here, begin with the

18  allegations made about the Coalition specifically.

19           So in paragraph 218, the Coalition alleges

20  that the use of the -- well, these particular

21  statutes being in force, 21-2-300(a)(2) and

22  21-2-383(c) require -- and then explains what those

23  are -- I know you asked what those refer to --

24  requiring all polling-place voters to use the

25  Dominion BMD System, then you say that will force

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 57

1    Coalition to divert personnel, time, and resources

2    to educating its members and the voting public about

3    how to protect their right to cast a secret ballot

4    and equally effective vote in the upcoming BMD

5    elections, and will impair Coalition's ability to

6    engage in the organization's other projects by

7    forcing it to divert resources to counteract the

8    Defendants' illegal acts.

9          Do you see that?

10    A    I do.

11    Q    How does the Coalition educate its members

12    and the voting public about how to protect their

13    rights to cast a secret ballot?

14    A    Okay.  Because of the large touchscreens

15    that basically display people's votes to others in

16    the polling place, what we have taken a lot of time

17    to do, many times informally, sometimes with kind of

18    mass communications, is to encourage people to vote

19    by mail, which is something that as an organization

20    we are not terribly enthusiastic about is voting by

21    mail, but we think it is the better of the two

22    alternatives.

23          And so for purposes of protecting the

24    right to cast an absolutely secret ballot, we think

25    we have been -- we have been telling people that we

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 58

1    think that voting a vote-by-mail ballot is best.

2            At other times we have talked to people

3    about -- who have not been able to get their ballot

4    on time or for some reason just been unable to vote

5    by mail, we have shared with them how to go into the

6    polling places at a time in early voting that is not

7    necessarily crowded and then find a private machine

8    to vote on, how it's perfectly fine to ask the poll

9    manager if they can wait until a machine that's more

10   private is available.  It's that kind of effort that

11   we have taken to tell people it's perfectly fine to

12   demand a private voting area.

13       Q    Do you educate Coalition members

14   differently than the voting public, or is the

15   educational message the same?

16       A    The educational message would generally be

17   the same, it's just that we would have more contact

18   with people who are more active members.

19       Q    And in this particular document there's

20   not a whole lot of detail about other projects that

21   you are unable to be engaged in.  Do you recall

22   submitting a declaration in this case outlining some

23   of those other projects?

24       A    I have kind of the vague memory of that,

25   and we may have done it more than once, and

30(b)(6) Marilyn Marks            March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 59

1    certainly every week and every day that goes by that

2    list is going to shift and change.

3           I mean, there are things that happened

4    just this week that are new -- new projects that we

5    have to reject or cannot complete that -- so it's an

6    ever-growing list, I would say.

7       Q    Understood.

8           So I think just to help guide our

9    discussion a little bit what I want to introduce as

10   Exhibit 5 a document that was filed in February of

11   2021, document number 1071-2.

12          Do you see that?

13          (Exhibit Number 5 was marked for

14   identification.)

15      A    I do.

16   BY MR. TYSON:

17      Q    This document is titled Supplemental

18   Declaration of Marilyn Marks.

19      A    Right.  Do you mind reminding me kind of

20   what this was part of?  I've kind of forgotten what

21   we were doing in February of 2021.

22      Q    Others can correct me if I'm wrong, but I

23   believe this was around the first time Judge

24   Totenberg asked us to present evidence on standing

25   specifically after the 2020 elections.

Page 60

1          Does that help with the timeline?

2      A    It does.

3          MR. MCGUIRE:  Excuse me, Bryan.  Do you

4  want to let her pull it up and just flip through it

5  on her own screen so she can see it?

6          MR. TYSON:  Certainly.  Yeah.

7      A    If you don't mind, can I take 30 seconds?

8  Building security is trying to reach me, and it's

9  because I forgot to return a phone call, so can we

10 take one minute off the record while I do that?

11 BY MR. TYSON:

12     Q    Certainly.

13     A    Thanks.

14         THE VIDEOGRAPHER:  Time is 12:23 p.m.  We

15 are off the record.

16         (Recess 12:23-12:24 p.m.)

17         THE VIDEOGRAPHER:  The time is 12:24 p.m.

18 We're on the record.

19     A    Mr. Tyson, do you mind repeating what you

20 said to me when I got distracted by building

21 security there?

22 BY MR. TYSON:

23     Q    Certainly.

24     A    Okay.

25     Q    And, again, that's totally fine.

30(b)(6) Marilyn Marks                          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 61

1              So my recollection is that February of

2    2021 was around the first time Judge Totenberg asked

3    us to submit evidence on standing issues following

4    the 2020 elections.  And you can look at this on

5    your screen, but the general topics in your

6    supplemental declaration, as you can see on the

7    exhibit, are CGG activities and diversion of

8    resources, there was tabulation software problems

9    Mr. Hursti referenced in here, tabulation

10   discrepancies and audit failure.  I'm only going to

11   ask you about the activities on the first part of

12   this declaration, but does that give you the context

13   you needed?

14        A    It does.  Thank you.

15        Q    So what I'd like to do is just kind of

16   walk through the paragraphs of this declaration to

17   flesh out the activities that CGG is saying that it

18   has diverted resources from and to.  And

19   specifically, is this a declaration that you offered

20   regarding the diversion of resources of the

21   Coalition?

22        A    Diversion of resources and the other

23   topics that you referenced a while ago.

24        Q    Certainly.

25              So starting at paragraph 3, you say that

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 62

1   the Coalition for Good Governance was formerly known

2   as the Rocky Mountain Foundation; is that right?

3        A    That is correct.

4        Q    And did the Rocky Mountain Foundation have

5   a different purpose than the Coalition does?

6        A    In the big picture it related to

7   protecting constitutional rights, but its focus on

8   policies were different than what we have moved to

9   starting when we took over the management of the

10  organization in 2014.

11       Q    You anticipated my next question.  You

12  referenced that the current management of CGG

13  undertook the management in 2014 with primary work

14  focused on election integrity and transparency in

15  Colorado elections, right?

16       A    That's correct.

17       Q    And who are you referring to when you say

18  the current management of CGG?

19       A    It would be Ms. Lisa Cyriacks,

20  C-Y-R-I-A-C-K-S, who is on the board, and Ms. Mary

21  Eberle, E-B-E-R-L-E, who is on the board, and

22  that -- that's who we're referring to here.

23       Q    And so prior to 2014, the -- I guess the

24  then Rocky Mountain Foundation wasn't focused on

25  election integrity and transparency in Colorado

30(b)(6) Marilyn Marks            March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 63

1    elections; is that right?

2         A    Mr. Tyson, may I go back and make sure I

3    answered your prior question correctly?  I'm not

4    sure that I did.

5              Do you mind going back and asking -- and

6    having the court reporter read to me what you asked

7    about the prior organization?

8         Q    We can or I can just reask it.

9         A    Okay.  All right.

10        Q    Did the Rocky Mountain Foundation have the

11   same focus on election integrity and transparency in

12   Colorado elections that the Coalition did after

13   2014?

14        A    No, that organization -- and we were not

15   part of that management of that organization prior

16   to 2014.  While they generally were there to protect

17   constitutional rights, and they were interested in

18   elections, their focus was different than the focus

19   we brought to it when we took over the management in

20   2014.

21             And when I mentioned Ms. Eberle and

22   Ms. Cyriacks, I was talking about the management who

23   came in in 2014 along with me.  I was not trying to

24   say that that is the current -- those were the only

25   people still involved -- the only people involved.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 64

1   That's what I was afraid I did not answer you

2   correctly about.

3        Q    Got it.  Thank you.  And I understood it

4   as being this was the group that came in in 2014, so

5   that's --

6        A    Yes, that's what I intended to say.

7        Q    So you say next in paragraph 4 that after

8   you moved to North Carolina in late 2015, CGG's work

9   began to transition to more geographically diverse

10  projects.  Do you see that language?

11       A    I do.

12       Q    Was that change in 2015 that you

13  referenced a change in mission or just a change of

14  the activities of CGG?

15       A    It was a broadening of the geography of

16  our work.  I had really stayed busy focused on

17  Colorado, and Ms. Cyriacks and Ms. Eberle both live

18  in Colorado and are very active in election projects

19  and voting rights projects there, and so when I

20  moved to North Carolina I kept a foot in the

21  Colorado camp and began to -- I found work I wasn't

22  looking for in North Carolina when I ran into some

23  of the problems here in North Carolina.  And so it

24  wasn't necessarily intentional that we began to

25  broaden our scope, but it kind of happened.

30(b)(6) Marilyn Marks                     March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                                            Page 65

 1        Q    Okay.  And so it was really, I guess, a
 2    broadening of activities -- the geographic scope of
 3    activities; is that a fair way to characterize it?
 4        A    That is correct because much of the
 5    activity was generally around election security,
 6    open -- election transparency, open meetings and
 7    that sort of thing.
 8             And then when I came to North Carolina, I
 9    didn't actually expect that I was going to be
10    staying in North Carolina, but life has its way of
11    giving you surprises, and I ended up -- I was really
12    continuing to work quite a lot in Colorado when I
13    first came here, and then the work began to
14    transition to North Carolina, South Carolina,
15    Georgia, and then Georgia has sucked up a lot of the
16    energy.
17        Q    So I want to ask you about some of the
18    things that you reference.  You first referenced a
19    significant project in paragraph 5 to undertake
20    administrative challenges to the lack of a secret
21    ballot in early voting statewide.
22        A    Yes.
23        Q    And I'm assuming the administrative
24    challenges language means that CGG's work was not a
25    lawsuit, but it was some other administrative

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 66

1    process; is that correct?

2        A    Yes, that is correct.  The administrative

3    challenges took the form of informal complaints to,

4    for example, the Charlotte-Mecklenburg Election

5    Board, and as I recall then taking it further to I

6    believe -- I took that one to the North Carolina

7    State Board of Elections, and I believe that the

8    secret ballot was included in a what's called here

9    in North Carolina an election protest, and that's

10   what we mean by administrative challenges.

11       Q    The second paragraph -- the second

12   sentence, I'm sorry, of paragraph 5 references a

13   challenge to Charlotte-Mecklenburg County's failure

14   to conduct a required post-election audit on the

15   2016 presidential election.

16            Do you see that?

17       A    I do.

18       Q    Was that a lawsuit or was it some other

19   challenge?

20       A    No, it's called an election protest, and

21   you first protest a complaint or a violation with

22   your County Board of Elections, and then it's got an

23   escalation -- "it" meaning the North Carolina

24   procedures have an escalation to the State Board of

25   Elections, and -- where you bring a protest to them,

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 67

1  and then those are kind of typically the two stages

2  that you would have before it would actually turn to

3  an election contest or litigation.

4       Q    In paragraph 6 we reach the state of

5  Georgia in early 2017.  Do you see that language?

6       A    I do, yes.

7       Q    And so at the end of that paragraph you

8  state that you began to redirect resources and time

9  to focus on Georgia's election security issues; do

10  you see that?

11       A    I actually don't see that.

12       Q    Right here.

13       A    Yes, I do.  Sorry.

14       Q    So when you say you began to redirect

15  resources and time, was the Coalition doing that, or

16  were you personally doing that?

17       A    Well, both because I was certainly talking

18  to my directors about that at the time, and they

19  were very supportive of -- as much as they wanted to

20  continue the projects in Colorado, there was --

21  among people who follow election security work

22  nationally who are kind of in the subject matter

23  experts and actual experts, there is just a strong

24  understanding that Georgia has the weakest election

25  security in the nation.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                            Page 68

1              And I resisted -- I totally resisted this

2      idea of diving into Georgia for a long time and just

3      got so many requests after the 2016 election that I

4      spend -- spend resources there that it was with the

5      approval of the board, which was smaller than it is

6      now, but it was with the approval of the board and

7      other friends that I had in Georgia from the time

8      that I lived in Georgia that urged me to redirect

9      resources to Georgia.

10         Q    And those resources that you redirected

11     were being used in North Carolina, or were they

12     being used somewhere else?

13         A    Well, we were wrapping up some projects in

14     Colorado as I recall, and in -- many of these things

15     would have been not necessarily heavy financial

16     resources, but instead my time.

17              Both my father and my mother had just

18     passed about this time, and so there were just lots

19     of demands on my time and changes that were going

20     on, and we were not -- as I recall we were not

21     involved in any type of litigation at that point.

22         Q    Were the Colorado projects -- and I'm

23     sorry about the loss of your parents around that

24     time.  Were the Colorado projects that you were

25     wrapping up litigation oriented, or were they some

30(b)(6) Marilyn Marks                March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 69

1   other work?

2        A    I think we had already wrapped up our last

3   litigation.  I think we may have been exploring -- I

4   think we might have been looking at the --

5   Colorado's process of selecting a new voting

6   equipment vendor as one of the things that I believe

7   we were working on about that time.

8        Q    Let me move to paragraph 7.  You start

9   outlining CGG's first efforts in Georgia there.  Do

10  you see that?

11       A    I do.

12       Q    And so the first thing you reference is a

13  petition for reexamination of the DRE voting system;

14  is that right?

15       A    That's correct.

16       Q    And then a lawsuit seeking to remove DREs

17  from use in the Ossoff/Handel Congressional District

18  6 runoff, correct?

19       A    Correct.

20       Q    Then you reference the Curling lawsuit in

21  July 2017.  You see that?

22       A    Yes.

23       Q    Now, what I want to understand from kind

24  of CGG's activities in Georgia specifically is the

25  Curling lawsuit and the lawsuits that you reference

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 70

1    in paragraph 8, are those all of CGG's activities in

2    Georgia, or are there other activities CGG

3    undertakes unrelated to litigation in Georgia?

4         A    Oh, my goodness, of course.  Excuse me.

5              MR. MCGUIRE:  Marilyn, just give me time

6    to object to form.

7              THE WITNESS:  Sorry, didn't hear you.

8              MR. MCGUIRE:  Object to form.

9              You can answer.

10   BY MR. TYSON:

11        Q    You can answer.

12        A    What I was referencing in 7 and 8 with

13   respect to lawsuits was certainly not all of our

14   election-related activities.

15             It was -- those appear to be trying to lay

16   out what we did on the litigation front, but

17   certainly we are always trying to involve ourselves

18   in other types of education, helping voters,

19   administrative issues many times around things like

20   open meetings, open records with respect to county

21   election administration or state at times but that

22   do not necessarily turn into or haven't -- vast

23   majority of that stuff is not litigation related.

24        Q    And were those types of non-litigation

25   projects underway beginning in 2017 in Georgia?

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 71

1        A     As opposed to 2016?

2        Q     Just --

3              (Simultaneous speaking.)

4        Q     I'm sorry.

5        A     Are you saying were those things happening

6   in 2017?

7        Q     Yeah.  What I'm trying to understand --

8   let me be more specific here.  So in paragraph 6 you

9   reference that in early '17 group started to expand

10  to Georgia, then you say the Coalition's first

11  efforts in 2017 were petitioning Secretary Kemp for

12  a reexamination.

13             My question is:  Were -- was CGG engaged

14  in non-litigation efforts in Georgia in 2017 during

15  the period you're referring in paragraphs 6 and 7?

16       A     Can you go back to 6 for a moment?

17       Q     Certainly.

18       A     Yes.  And when I stated in my declaration

19  there first efforts in Georgia in 2017, I guess I

20  should have said more like first public efforts.

21  Certainly that wasn't the first thing we did in

22  Georgia.  We made ourselves familiar with the

23  problems of the DRE machines, some of the complaints

24  that people were having about votes being flipped on

25  touchscreens and that sort of thing.

Page 72

```
 1            So this would have been the first kind of
 2   major public outcropping of the work that we had
 3   been doing, but -- and particularly as we had been
 4   watching that 6th congressional district planning
 5   and the race take place and watched the election
 6   administration process there, that was about the
 7   time we really began to focus on Georgia.
 8        Q    Just so --
 9        A    Excuse me.  I'm sorry.
10        Q    Go ahead.
11        A    I remember having talks with both
12   Republicans and Democrats in Georgia early on about
13   poll watching and how to get more poll watchers for
14   that April and June election in 2017, and I remember
15   how it seemed that poll watching wasn't a very
16   organized activity in Georgia, and we spent a good
17   bit of time, I remember having many conference calls
18   about whether or not candidates and the parties even
19   wanted to do poll watching, and that very much
20   surprised me.
21            So I remember spending a lot of time
22   talking about transparency and citizen oversight in
23   early 2017.
24        Q    Thank you.
25            And just again so I understand the
```

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 73

1    sequence, you said you had to redirect resources to

2    Georgia from the projects that you were wrapping up

3    in Colorado; is that right?

4         A    Well, I was -- I was also working on

5    projects in North Carolina at that time that began

6    in 2015 and 2016.  Excuse me, began in 2015, and

7    there were others that began in 2016.

8              So I would say that we're kind of

9    transitioning during that period from less emphasis

10   in Colorado, more in North Carolina.  South Carolina

11   was -- some people in South Carolina were asking me

12   to help them with some things, spent some time in

13   South Carolina as well during this time period.

14        Q    Are there projects from Colorado, North

15   Carolina, and South Carolina that you started but

16   were not able to complete because you redirected

17   resources to Georgia?

18        A    Yes.  We lost momentum on the voting

19   system implementation in Colorado in terms of we had

20   been pretty active in terms of citizens' input as

21   the counties were selecting their voting system, and

22   as I came here to North Carolina and kind of

23   spreading resources too thin, we lost -- and I

24   wasn't able to go to the meetings in person.  This

25   was kind of before the days of frequent Zoom

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 74

1   meetings and that sort of thing, and I was not in a

2   place that I could run to Denver and testify, and

3   then both of our other board members don't live

4   right there in Denver and easy to get to, so we did

5   not continue the level of participation we had had

6   in the projects for voting system implementation and

7   deployment in Colorado.

8          And then when I came to North Carolina one

9   of the first things that I worked on was the

10  violation of secret ballot for early voting where

11  all of the early voting, whether it was on the DREs

12  or on absentee by mail ballots has an identifiable

13  number on it, which, of course, violates the North

14  Carolina Constitution.

15         So I spent time challenging both my

16  current election board in Charlotte-Mecklenburg as

17  well as the State Election Board on that.

18         Our intention was to do a big education

19  campaign, to do lobbying with North Carolina

20  legislators, and to file administrative challenges

21  and hope that we did not have to file litigation,

22  but that effort really did not continue.  I've still

23  got it on the back burner.  We haven't solved the

24  problem in North Carolina, and I am committed to

25  getting back to that issue at the first opportunity.

30(b)(6) Marilyn Marks                          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 75

1      Q     So let me ask you about in paragraph 8 you

2    reference some other lawsuits CGG has organized.

3    First one challenging the excess rejection of

4    absentee ballots in 2018, does that refer to the

5    Martin case filed against the State and Gwinnett

6    County?

7      A     It does.

8      Q     And you referenced COVID-related voting

9    infrastructure improvements in 2020.  Is that the

10   lawsuit that CGG filed that was before Judge Batten

11   in the 2020 elections?

12     A     That is correct.

13     Q     And you reference an election contest in

14   2018.  Was that the contest of the lieutenant

15   governor's race in the 2018 election?

16     A     Yes, it was.

17     Q     So in paragraph 9 you then say:  The

18   unpredicted complexity and protracted time

19   requirements and expenses of this litigation has

20   required CGG to consistently redirect resources of

21   funding and management and volunteer time away from

22   other desired projects that are of great interest to

23   our board members, members, and donors.

24           Do you see that?

25     A     I do.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 76

1      Q    And so is it fair to say that the

2   litigation that CGG is involved with is what has

3   caused this redirection of resources?

4           MR. MCGUIRE:  Objection to form.

5           You can answer.

6      A    It is one of the things that has caused

7   the redirection of resources, but, you know, there

8   are a lot of activities that we are engaged in that

9   relate to the Dominion Voting System, including the

10  BMD component.  We were engaged in a lot of

11  activities that are not directed to the litigation

12  support but are directed to education, member

13  communications, talking to county officials, et

14  cetera, related to the Dominion Voting System and

15  audits -- the inadequacy of audits that are, if you

16  will, parallel to the litigation support resources

17  that are required.

18  BY MR. TYSON:

19     Q    So in that list you were just beginning

20  of -- one of the other things I heard you say you

21  talked to county election officials, you engage in

22  member education.

23          Can you give me a complete list of the

24  other things that CGG is redirecting resources to

25  and taking away from the desired projects that are

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 77

1  of great interest to its board members, members, and

2  donors?

3          MR. MCGUIRE:  Objection to form.

4      A    I am sure that I cannot give you a

5  complete list.

6  BY MR. TYSON:

7      Q    Can you give me general categories of

8  activities?

9      A    I can.  I can.  And you're asking me about

10  activities that we are -- in fact -- in fact, do you

11  mind asking the question again so I have it exactly

12  right?

13      Q    Certainly.  You testified that the

14  litigation was one of the activities that required

15  CGG to redirect resources of funding and management

16  and volunteer time away from desired projects.  What

17  are other categories of activities that require CGG

18  to redirect resources?

19      A    Okay.  And we are talking about other

20  types of activities that are redirecting resources,

21  but those activities are -- and I'm asking really

22  here -- those activities are because of and focused

23  on Dominion -- Georgia Dominion Voting System and

24  BMD component, is that -- okay.

25      Q    Yes.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 78

1      A      So, yes, it would be things like our

2   communications with election officials at the county

3   level on issues like, you know, ballot secrecy, our

4   concerns for ballot secrecy and what the counties

5   should be doing about that.

6           It is obviously -- I think we mentioned

7   before talking with members, talking with also,

8   quite frankly, political parties and candidates

9   about the implications of things like ballot secrecy

10  or poll watching.

11          I've spent a good bit of time talking with

12  candidates, political parties, would-be poll

13  watchers about issues around trying to be a poll

14  watcher with the problem -- with the threats of

15  SB202 of trying to make sure that you are not

16  charged with accidentally or -- when you -- if you

17  accidentally see the screen, you know, how can you

18  try to protect yourself from being claimed to have

19  been looking at the screen.

20          So in talking with potential poll

21  watchers, voters, election officials about the

22  problems with machine setup for ballot secrecy, that

23  would be an example.

24          We've also done things like webinar

25  education directed to election officials at the

Page 79

1   county level but welcome to the public.  We've also

2   done some -- I was going to say seminar for press,

3   but I actually think that was on a different topic,

4   but the -- we are frequently answering questions

5   from voters on do -- what do you recommend?  How do

6   we vote?  Should we really trust mail ballots?

7   Should we vote on the machines?  That is a diversion

8   of resources that we would just as soon not have to

9   deal with.  We don't want -- really want to be

10  having to spend our time on those kind of voter

11  education questions.

12          Let's see what else we have done.

13  Certainly we have sent many communications on the

14  subjects related to the Dominion Voting System.

15          We have been involved in analysis of

16  problems of things like double and triple counting

17  that happened in the election not only for purposes

18  of the litigation, but also for purposes of helping

19  take -- helping some of our members and other

20  citizens take complaints to their county election

21  boards that votes were double and triple counted,

22  and they are trying to talk to their boards about

23  what can be done to avoid these kind of problems in

24  the future.  So we have been supporting those kinds

25  of efforts.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 80

1          I'm sure there are other activities that

2     are just not coming to the top of my head at the

3     moment, but in general the Dominion Voting System

4     and its lack of controls has caused us to have to

5     spend a lot of time on Georgia problems that we

6     would just as soon not spend.

7          Another thing that I'm thinking about

8     that -- we have gotten a lot of questions on the

9     so-called RLA and the problems with the counting of

10    the votes in the audit, and we have answered so many

11    members' questions about the -- how that audit was

12    put together, what the problems are, how they should

13    be talking to their election officials of their

14    counties about doing voluntary audits.

15         We helped some members in Cobb County and

16    other voters in Cobb County initiate better audit

17    and a voluntary audit for municipal -- a runoff

18    election recently, and it was particularly geared

19    toward let's make sure there is no double and triple

20    counting as we saw in the -- as we saw at the

21    November 2020 election.

22    Q     Thank you.

23         So in the categories that you mentioned

24    here, let me just kind of break down a few of them.

25    So you talk about communications with election

Page 81

1    officials that you have, county election officials?

2         A     Yes.

3         Q     And those communications are advocating

4    for things the Coalition thinks are good ideas in

5    election administration, right?

6         A     Or -- yes, or answering questions, yes,

7    absolutely.

8         Q     And the communications with parties and

9    candidates, those are also advocating for what the

10   Coalition believes are best practices in the

11   administration of elections, correct?

12        A     That would -- that would be part of the

13   communications, yes.  We certainly get a lot of

14   questions about election administration that don't

15   necessarily have to do with advocacy.

16        Q     What kinds of questions about election

17   administration do you get that don't have to do with

18   advocacy?

19        A     People wanting us to explain things like

20   what are the recount rules; when do I get a recount;

21   when do -- when would I have to go to court to get a

22   recount.  That would be an example.

23              So it's just -- you know, we certainly

24   don't hold ourselves out to be election attorneys,

25   but we can try to point people in the right

Case 1:17-cv-02989-AT   Document 1565   Filed 01/07/23   Page 82 of 721
30(b)(6) Marilyn Marks                     March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 82

1    direction.

2         Q    Let me move to paragraph 10.  You

3    reference that you've had to reduce your active

4    involvement in several important efforts that CGG

5    supports because of the time demands of this

6    litigation.

7              Do you see that statement?

8         A    I do.

9         Q    And then you go on the rest to say CGG has

10   had to curtail and decline numerous

11   organizational -- organization activities.

12             You see that?

13        A    Uh-huh.  I'm sorry, yes.

14        Q    And then continuing, you list a variety of

15   different projects, and we're not going to go

16   through all of them just for the sake of time, but

17   there's at least some projects in North Carolina

18   that you referenced, correct?

19        A    Yes.

20        Q    And --

21        A    And some of these are now out of date, and

22   others would be added.

23        Q    Okay.  And some efforts of the New York

24   State Board of Elections, correct?

25        A    Yes.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 83

1        Q     And some in Colorado?

2        A     Yes.

3        Q     I know you referenced that this is --

4     paragraph 10 is not a complete list of the projects

5     that the Coalition is unable to engage in, but it's

6     at least a substantial list of the projects

7     Coalition wouldn't be able to engage in?

8        A     It is a list.  You know, as I said, this

9     is now a year out of date, and some of these issues

10    have been resolved positively and negatively without

11    our --the level of involvement we wish, and at least

12    as many more have been added where we have either

13    done a minimal amount of what we were asked to do

14    that we would have been -- excuse me, we would have

15    preferred to do or we would have declined all

16    together to participate in things that we would like

17    to be involved in.  I mean, I have a long list just

18    from this week.

19       Q     If CGG was not involved in the Curling

20    case, could it engage in all the activities that are

21    listed in paragraph 10?

22       A     Well, some of them are no longer alive,

23    but we could have engaged more meaningfully in those

24    things, yes.

25       Q     When you say "could have engaged more

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 84

1    meaningfully" --

2         A    Okay, let me take an example.

3         Q    Okay.

4         A    We had Colorado members in Boulder who

5    asked us to testify by Zoom, to write letters, to

6    call city council members on instant runoff voting.

7    And I was kind of a well-known figure, that's

8    putting it nicely, in Colorado as an opponent of

9    instant runoff voting.

10              The mayor of Aspen race that I told you

11   about when we started talking this morning was done

12   by instant runoff voting, and it kind of went off

13   the rails, and after that, the City of Aspen chose

14   never to use instant runoff voting again.

15              But so -- because of my kind of deep

16   knowledge of what was wrong with instant runoff

17   voting, I was asked to take a very active role in

18   helping our members out there fight Boulder's

19   decision to use instant runoff voting.  I could only

20   do a minimal amount of work, and I think I might

21   have made one phone call versus testifying, sending

22   letters, et cetera.

23        Q    That inability to fully engage on that

24   particular topic was due --

25        A    Yes.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 85

1      Q      -- to the demands of the Curling case on

2    you, correct?

3      A      Both the Curling case and the other

4    related activities on Dominion BMD system that were

5    not necessarily litigation.

6      Q      And you mentioned your RLA work with Cobb

7    County was to help avoid double counting; is that

8    correct?

9      A      I didn't mean to say risk-limiting audit

10   if I did say risk -- I meant to say post-election

11   audit if I -- and I was talking with some of our

12   members and other active voters in Cobb County, and

13   I urged them to ask for a tabulation audit after the

14   runoff in a municipal -- I believe it was Marietta

15   municipal election, and I helped them create their

16   ask, and it was partly to make sure that double

17   counting did not take place as it had in Cobb County

18   in the Baker 01 precinct in November 2020.

19     Q      And so your role in that was not to work

20   with the county election officials, but to provide

21   information to individuals who wanted to work with

22   those election officials; is that correct?

23     A      Yes, yes, I provided them with support,

24   ideas, kind of the how-tos.

25     Q      And those were members and non-members,

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 86

1    correct?

2         A    Yes.  It was some people who probably

3    considered themselves members, but, you know, wasn't

4    in some kind of formal member context.

5         Q    Let me ask you, if the Coalition received

6    an injunction banning the use of Dominion BMDs, will

7    the Coalition continue to educate its members and

8    educate the voting public?

9         A    Can you be more specific?  Are you

10   limiting -- like, an injunction just about the BMDs?

11   Do you mind rephrasing the question?  It's confusing

12   to me.

13        Q    Certainly.  So my question is specifically

14   if the Coalition was to receive an injunction

15   banning just the ballot marking devices, would the

16   Coalition continue to educate its members and the

17   voting public?

18        A    Regardless of whether or not we receive an

19   injunction about just the BMDs, we will, as long as

20   we're in existence, continue to educate members and

21   voting public about election issues.

22        Q    And that's true if CGG received all the

23   relief that it's seeking in this -- in the Curling

24   case, so you win on everything, CGG would continue

25   to educate members and the voting public, right?

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                        Page 87

1        A    On -- it is one of our missions.  It may

2   not be about the issues of BMDs or the other relief,

3   but we're not going to go out of business if we got

4   all the relief we're looking for.  We would -- we

5   would always be working on educating members,

6   non-members on -- I don't expect all election issues

7   to go away if we got all the relief we're looking

8   for.  It would give us much more ability to focus on

9   a broader range of topics at a more local level,

10  which is really where we would prefer to work.

11       Q    So next I want to kind of move to

12  categories of resources under this topic to really

13  kind of dig in on.  I know we've talked about

14  financial resources that were diverted.  What are

15  the other resources that CGG does not have -- sorry,

16  let me start over that again.

17            What are the non-financial resources that

18  CGG has had to divert as a result of the actions

19  it's challenging in this lawsuit?

20       A    It's going to be primarily people's time

21  and -- volunteer time and as well as paid time like

22  our interns' pay and -- well, so much goes back to

23  financial resources.

24            For example, we'd get rid of our Logikcull

25  account.  Do you know what I mean by our Logikcull

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 88

1   account?

2        Q     Uh-huh.

3        A     We'd get rid of that, free up financial

4   resources.  I doubt we would be needing that

5   account, for example.  But, you know, it's primarily

6   the hundreds of hours every week that gets spent by

7   our team.

8        Q     And does CGG track the hundreds of hours

9   spent every week by your team?

10        A     Only for paid interns.

11        Q     So in terms of volunteer time, there

12   aren't documents that reflect what time volunteers

13   are devoting to particular activities, right?

14        A     Generally not.

15        Q     Okay.  You say "generally not."  Is there

16   any -- is there any document that would reflect the

17   amount of time volunteers were devoting to

18   particular activities?

19        A     You know, I have kind of vague

20   recollections of asking some of our volunteers in

21   the last year, hey, keep track of how many hours you

22   spend on that because at some point I'd like to know

23   just how heavily invested we are, but if you ask me

24   exactly what that was, I don't remember.

25             It might have been looking at confirming

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 89

1   some of the double- and triple-counted ballots.  I

2   think I might have asked somebody to just kind of

3   keep track of your hours as you're doing that

4   because I want to know -- because we've spent

5   hundreds of hours on that issue.  But it wasn't a

6   formal time sheet kind of thing like the interns

7   have to do.

8        Q    So for volunteer staff, again, I know you

9   said there was some projects maybe where that was

10  the case, but you can't say it was this number of

11  hours that we would not have spent on a particular

12  project, correct?

13       A    Not in total.  Certainly not.  We could --

14  if required we could certainly come up with

15  estimates of the hundreds of thousands of hours

16  we've spent.  Not hundreds of thousands.  I didn't

17  mean to say -- I didn't mean to slur my words that

18  way.  Hundreds or thousands of hours we have spent

19  on these projects, but no, any kind of formal

20  records, that we don't have.

21       Q    And so would the Coalition's volunteers

22  take all the time that they are devoting to, say,

23  the double- and triple-counting issue that you just

24  referenced, would they devote all that time to other

25  educational activities if the Dominion system was no

Page 90

1   longer in use?

2       A    Well, I certainly cannot speak for exactly

3   how they would use their own choice of volunteer

4   time, but their full indications to me are, damn, I

5   wish I could work on the improvement of the website;

6   I would like to be out re-communicating with all of

7   those people who signed our petition for

8   reexamination.

9           They've told me other things they would

10  prefer to be doing, so I assume that they would do

11  them, but I cannot commit to you that they would

12  spend exactly X number of hours doing that should

13  the opportunity take place.  They've indicated that

14  there are things that they would prefer to be

15  working on instead.

16      Q    Is it correct that all of those other

17  activities they would be working on would still

18  relate to the administration of elections?

19      A    No, not necessarily because one of the --

20  one of the core issues that we really want to work

21  on and we've done very little on is open meetings

22  both in Colorado -- Colorado, North Carolina, and

23  Georgia, and we have a lot of things that we would

24  like to do to begin to challenge the many violations

25  of open meeting laws in Georgia and North Carolina

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 91

1   at a local level, either municipal or county level.

2            And so I expect that we would be spending

3   a lot of time on that should -- if we were not

4   focused on the Dominion system issues.

5        Q     Has Coalition been involved in open

6   meetings issues at any point in its history?

7        A     Yes, in our predecessor organization we

8   have back in Colorado, and I believe -- I have vague

9   recollection of making some challenges in South

10  Carolina, although I believe it was done in a -- in

11  an oral challenge in North Carolina.  I don't know

12  that I can come up with the specifics for you on

13  that, but, yes, open meetings have long, long been

14  an interest, something we have been involved in.

15           We have not -- we have not done any

16  litigation on them, but we have threatened

17  litigation and been able to resolve some open

18  meetings issues back in Colorado by threatening

19  litigation after all administrative efforts were

20  kind of exhausted, but generally I don't believe

21  we've done any litigation on that.

22       Q     Do you have an estimate of how much of the

23  volunteers' time that is currently being utilized by

24  the Coalition is devoted to this particular case,

25  the Curling case?

Page 92

1        A    I have two questions about your question.

2   Are you asking me how much of their seven days a

3   week is devoted to the case itself as opposed to

4   other CGG activities or --

5        Q    I'm not.  Let me ask the question a

6   different way.

7        A    All right.

8        Q    So in terms of the activities that the

9   volunteers are engaged in as part of their work as

10  volunteers for CGG, do you have an estimate of the

11  percentage of that time that is devoted to the

12  Curling case?

13       A    This is just going to be a wild guess.

14  I'm going to say that probably 50 percent of it

15  would be related to the case.  Probably 30 percent

16  of it would be related to other Dominion Voting

17  System and audit issues that are not in direct

18  support of the litigation, and the remainder on

19  other types of election administration activities.

20            For example, as you probably know we often

21  go to -- haven't had a chance to do this recently --

22  State Election Board with proposed rules about

23  election administration.  Some of them would be BMD

24  related; many of them would not.

25            We didn't make it yesterday.  We had plans

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 93

1   to promote some rules that we wish they would

2   promulgate having to do with canvassing, and we

3   didn't get them pulled together in time to submit to

4   the board.

5       Q    So just kind of fleshing out a little bit,

6   so the kind of 20 percent of other types of

7   election-related activities, is that focused

8   primarily on advocacy for things the Coalition would

9   like to see in Georgia elections?

10      A    That would be -- yes, that would -- it

11  would be primarily that or answering questions.

12          Our members tell me that they're hearing a

13  lot from candidates right now with questions about

14  everything from how to -- how do the BMDs really

15  work; can I really count on them; what should I have

16  for poll watchers.

17          So there's -- you know, do you consider

18  that a real formal education program, no, but we're

19  kind of here to try to answer questions that have to

20  do with the BMD system, the Dominion system, and

21  other related election activities.  A lot -- we get

22  a lot of questions about poll watchers.

23          Oh, the other thing that we are working on

24  that we are getting a lot of questions about right

25  now is House Bill 1464 which includes ballots as

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 94

1    public records which we initiate -- we helped

2    initiate that.  And then there are, I'm sure you

3    probably know, security chain of custody issues in

4    that bill as well as poll watcher regulations in

5    that bill, and we've been getting a lot and fielding

6    a lot of questions about that and been asked to

7    prepare some amendments.

8            So that -- and you can't really divide it

9    up into exactly where does that cross over into BMD,

10   how much percentage of time did you spend talking

11   about the BMD portion versus more generally poll

12   watchers.

13       Q    Thank you.  That's helpful.

14            I'm going to move next to the 990s.  Is

15   this a -- do you want to take a break at this point,

16   Ms. Marks, or anybody?

17       A    I'm fine.  Up to you guys.

18            MR. TYSON:  Rob, are you good?

19            MR. MCGUIRE:  It might be good to take a

20   break if you think you're going to go for a while.

21            MR. TYSON:  Yeah, it is going to be a

22   little while on the 990s, so take 5, 10 minutes?

23            MR. MCGUIRE:  Yeah, can we, please?

24            MR. TYSON:  Yeah, how long you want?

25            MR. MCGUIRE:  Five is fine.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 95

1              MR. TYSON:  Let's do five minutes.

2              THE VIDEOGRAPHER:  The time is 1:20 p.m.

3     We're off the record.

4              (Recess 1:20-1:30 p.m.)

5              THE VIDEOGRAPHER:  The time is 1:30 p.m.

6     We're on the record.

7     BY MR. TYSON:

8         Q    Thank you, Ms. Marks.

9              So what I wanted to do next was continuing

10    on topic 1 and work through the 990s.  I know you

11    referenced you looked at those in preparation, and I

12    had some questions about them as well.

13             So just to get us started in your Exhibit

14    Share as Exhibit 6.  You should have the 2017 990-EZ

15    filed by Coalition.

16             (Exhibit Number 6 was marked for

17    identification.)

18    BY MR. TYSON:

19        Q    Do you see that?

20        A    I do.

21        Q    And the Coalition is a 501(c)(3)

22    organization, right?

23        A    That is correct.

24        Q    It filed a Form 990 for each year; is that

25    right?

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 96

1        A     That is correct.  I don't think we have

2    completed it for 2021.

3        Q     But the Coalition has filed a 990 for

4    2020, correct?

5        A     Yes.

6        Q     So what I want to do just kind of walk

7    through a few questions on each of these 990s, and,

8    I guess, can you kind of summarize in your own

9    words -- let me ask this:  Are you involved in

10   preparation of the 990s for the Coalition for Good

11   Governance?

12       A     No, not in the preparation of them.

13       Q     Are you involved in the review of them

14   before they're filed?

15       A     I do a very high-level review, and

16   particularly sometimes as it relates to talking

17   about our progress on projects, but our CPAs really

18   prepare the details of the -- of the 990.

19       Q     And when you said earlier you reviewed the

20   990s to get ready for topic number 1, why were the

21   990s documents that you reviewed for this topic?

22       A     Oh, just a moment.  My screen went out.

23   Hold on.  Okay.

24             I reviewed the 990s for, I believe, the

25   question about what the total expenditures were,

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 97

1    which I believe is a different topic on down the

2    line, number 8.

3        Q    Okay.  Well, let me ask, so we're still,

4    obviously, on topic 1 working through --

5        A    Okay.

6        Q    -- the diversion of resources, so I wanted

7    to ask a few questions about this.

8            So, first of all, if you go to page 2,

9    part 3, the statement of program service

10   accomplishments, do you see that?

11       A    Uh-huh.

12       Q    And there's then three lines, 28, 29, 30,

13   and 31, and then a total in number 32.  Do you see

14   that?

15       A    I do.

16       Q    And so the Coalition listed program

17   service accomplishments in lines 28, 29, and 30 but

18   didn't list anything for other program services on

19   line 31, correct?

20       A    That's correct.

21       Q    So this gets a little confusing because

22   line 28 references attachment 5, so I'm going to

23   move down to the attachment 5, and then you see it

24   says on page 14 program service accomplishment 1?

25       A    Yes, I do see that.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 98

1        Q    And the statement there is:  Advocating

2   for voters' rights to a verifiable election, CGG

3   litigated in federal court Northern District of

4   Georgia against Georgia's use of an unverifiable

5   paperless touchscreen system and educated Georgia

6   voters on the importance of using an election system

7   that either includes paper ballots or creates a

8   paper trail.

9            Do you see that?

10       A    I do.

11       Q    Is that program service accomplishment

12   referring to the Curling case?

13       A    That particular one is referring to the

14   Curling case.

15       Q    And program service accomplishment 2

16   there, attachment 6, statement that is:  Worked to

17   educate voters on the importance of election

18   security using the example of the Georgia special

19   election CD6 and the exposing vulnerability of the

20   KSU Center for Election Systems, Georgia was one

21   state identified by the NSA where voter registration

22   systems were compromised and vulnerable to hacking.

23            Do you see that?

24       A    I do.

25       Q    Is that program service accomplishment

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 99

1    also referring to the Curling case?

2        A    Well, the Curling case is one of the

3    things that would have been encompassed by that

4    statement.

5        Q    Okay.  Let me go -- ask about line 30

6    then.  The third program service accomplishment is:

7    Supported rights of all citizens to access election

8    records; paid for voting systems computer experts to

9    identify and testify on security lapses in the

10   Georgia elections system.

11           Do you see that?

12       A    I do.

13       Q    And that line -- is that line also

14   referring to the Curling case?

15       A    I believe that that was probably referring

16   to what we call -- and, Mr. Tyson, I did not try to

17   go delve into exactly which action this would have

18   been, so I'm telling you to the best of my

19   recollection, which could be wrong here, but --

20   without checking with accountants, but what I

21   believe that may be referring to is what we call

22   Curling 1 that was an action we filed in May of

23   2017, I believe it was May of 2017, in Fulton

24   Superior Court.

25       Q    Was that lawsuit also challenging the use

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 100

1    of touchscreen voting systems?

2         A    It was.

3         Q    So let me ask you on the questions here in

4    part 4, there's a question here about section

5    501(c)(3) organizations only and asking if the --

6    line 47, did the organization engage in lobbying

7    activities or have a section 501(h) election in

8    effect during the tax year, and the box is checked

9    for no.  Do you see that?

10        A    I do.

11        Q    Has CGG -- well, let me ask first:  Did

12   CGG advocate for the passage or defeat of any

13   legislation of the Georgia General Assembly in 2017?

14        A    I don't believe so.

15        Q    Do you know if CGG has ever advocated for

16   the defeat or passage of legislation in the Georgia

17   General Assembly?

18        A    We have, yes.  A minimal amount of our

19   resources are devoted to that, but we have.

20        Q    Let me mark the next 990 here.  I want to

21   look next at 2018.

22             (Exhibit Number 7 was marked for

23   identification.)

24   BY MR. TYSON:

25        Q    I've marked as Exhibit Number 7 the 2018

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 101

1    990.  You see that?

2         A    I do.

3         Q    So I first want to go to again looking at

4    the program service accomplishments, line number 2

5    says, did the organization undertake any significant

6    program services during the year which were not

7    listed on the prior Form 990 or 990-EZ, and the box

8    is checked as no.  Do you see that?

9         A    I do.

10        Q    And the next line indicates, did the

11   organization cease conducting or make significant

12   changes in how it conducts any program services, and

13   the box is checked no, correct?

14        A    Correct.

15        Q    Is it correct to say that CGG was engaged

16   in the same activities in 2018 as it was in 2017?

17        A    Generally, yes, and I -- I think we would

18   look back to part 3, item 1 up there above your

19   cursor that generally our activities have remained

20   under that umbrella, but, of course, every single

21   day there's something slightly different about our

22   activities from the prior day.

23        Q    Certainly.

24             So I want to then look -- you have in

25   lines -- line 4 asks again for program service

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                        Page 102

1    accomplishments, and all three, 4A, 4B, and 4C all

2    say, see additional data.  Do you see that?

3        A    I do.

4        Q    Let me just to expedite the process here

5    go down to page -- right here, additional data is

6    listed at the top of page 12, I believe it is, and

7    if you could just read through 4A, 4B and 4 -- 4A

8    and 4B, I'm sorry, do both of those items refer to

9    the Curling case?

10       A    Do you want me to read them aloud?

11       Q    Or you can just read them -- review them.

12       A    Okay.  All right.  Just a moment.

13            So item 4A, part of that is the Curling

14   litigation, but also the education part would not be

15   litigation.  It's still related to touchscreen

16   voting systems, but I thought your question was

17   asking me if this was referencing the Curling

18   litigation, and I'm saying in part it is.

19       Q    Okay.

20       A    And line 4B, that looks to be the election

21   contest related to lieutenant governor in 2018.  Is

22   that '18?  Yes.  And then there would have been a

23   lot of voter education that was parallel to that

24   issue, not necessarily part of that litigation.

25       Q    Both 4A and 4B relate to the use of

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 103

1    touchscreen voting systems, correct?

2         A    Yes.

3         Q    Okay.  And in 4A, at the end of that you

4    indicate, educating Georgia voters on the importance

5    of using an election system that includes either

6    paper ballots or creates a paper trail.

7              Doesn't Georgia's Dominion system fall

8    within that category?

9         A    We certainly should have said something

10   like an auditable paper trail, but it would not --

11   it does not fall in the category of what was

12   intended to mean a verifiable paper ballot.

13        Q    And then 4C references a challenge to

14   discriminatory policies on absentee ballots.  Is

15   this referencing the Martin case that we discussed

16   earlier?

17        A    It is referencing the Martin case, and it

18   is also referencing the type of work that we did

19   prior to that for both education and trying to get

20   others to make the challenge instead of us and

21   research around the issue.

22             So yes, it is a litigation and other

23   things that were related to, in particular,

24   Gwinnett's method of rejecting mail ballots.

25        Q    And so it's correct then that each of the

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 104

1    program service accomplishments listed on this 990

2    are, at least in part, litigation, correct?

3         A     Yes, in part, that is true.

4         Q     Let me take us back up to page 9.  I'll

5    try to zoom this in a little bit.  It'll be easier

6    to see.

7              So on part 8, Statement of Revenue, do you

8    see this language?

9         A     I do.

10        Q     And so there's various categories of

11   things -- of ways that money comes to the

12   organization, and there's no amount indicated for

13   membership dues, right?

14        A     Correct.

15        Q     And the only line item for revenue is all

16   other contributions, gifts, grants, and similar

17   amounts, right?

18        A     Sadly so.

19        Q     Then looking at page 10, part 9, Statement

20   of Functional Expenses, column A is Total Expenses,

21   column B is Program Service Expenses, and I wanted

22   to ask first why in 11B for legal you have $189,792

23   and all of that is part of the Program Service

24   Expenses, correct?

25        A     Uh-huh.  Yes.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 105

1      Q    Would all of those legal payments be

2   related to either the Curling case or the Martin

3   case?

4      A    No.

5      Q    What other legal expenses would have been

6   covered in this period?

7      A    I think that there were some legal

8   expenses related to getting Mr. McGuire's help in

9   North Carolina looking at some of the ballot secrecy

10  and some of the voting system security issues there.

11  And then did you actually say the lieutenant

12  governor case as you were mentioning what these

13  legal fees related to and legal services?

14     Q    Apologize, I did not.  And that's correct,

15  that was also in 2018.

16     A    And there may have been some other

17  miscellaneous legal expenses, but I'm not

18  remembering them right now.  I looked at total

19  expenditures in my preparation for this deposition.

20  I did not try to look at detailed expenditures by

21  category.

22     Q    Certainly.  Okay.  Well, that's helpful.

23         On this form, though, the total program

24  service expenses versus management and general

25  expenses we have $189,792 for program services and

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 106

1   $3,289 for kind of general and management services;

2   is that right?

3        A    Yes, I think so.

4        Q    Let me ask one more question about this

5   one.  Going to schedule A, part 2 that shows

6   contributions over time.

7        A    Yes.

8        Q    It looks like 2016 there were no

9   contributions to the organization; is that right?

10       A    That is what this form says.  Do I

11  remember, you know, whether or not that's -- I

12  assume it's accurate.

13       Q    Okay.  And 2017 was the first six-figure

14  year of contributions to CGG, right, based on this

15  form I should say, based on --

16       A    Based on this, yes, because there was a

17  six-figure year, which I thought was 2014.  Maybe it

18  was 2013.  But, yeah, on this form, 2017 was the

19  first year that there was a six-figure amount.

20       Q    And CGG raised more money in 2018 than it

21  did in 2017, right?

22       A    That is correct.

23       Q    Let's take a look at 2019.

24            (Exhibit Number 8 was marked for

25  identification.)

Page 107

1    BY MR. TYSON:

2         Q     I've marked as Exhibit 8 the 2019 990.  Do

3    you see that?

4         A     I do.

5         Q     And on this form just quickly for lines 2

6    and 3 that we discussed earlier on changes in

7    programs, the answer to both of those is no,

8    correct?

9         A     Correct.

10        Q     And we're back to additional data for 4A,

11   4B, and 4C, so let me get down to where that is.

12   And the way I read these three is that the program

13   services are basically the same in 2019 as they were

14   in 2020, Curling and some other activities in line

15   4A, Curling, maybe something else in 4B, and Martin

16   in 4C.

17              Can you just review those and see if that

18   is a correct statement?

19        A     I will.

20              Yes, with the understanding that those are

21   three places where we spent a lot of money, but

22   certainly not all of the things that we were doing.

23        Q     Let me look quickly again back to

24   statement of revenue for 2019, $365,904 through

25   contributions, gifts, grants, and similar amounts,

30(b)(6) Marilyn Marks                   March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 108

1    correct?

2        A    Correct.

3        Q    And for program expenses, the program

4    service expenses on legal fees were $369,346,

5    correct?

6        A    Correct.

7        Q    And the total -- what do we call this

8    category -- management and general expenses for 2019

9    was 34,457, correct?

10       A    That is correct.

11       Q    Do you know -- I understand that you

12   didn't look at this specific set of categories here,

13   but do you know just on a personal knowledge basis

14   whether the travel and office expense amounts were

15   related to litigation at all?

16       A    I'm thinking.

17            I'm sorry, I don't know, as we sit here,

18   whether they were or not.  And it may have been a

19   mix.

20       Q    That's totally fine.  I know you didn't

21   review that specifically so I didn't want to ask you

22   in your 30(b)(6) capacity about that.

23       A    Thank you.

24       Q    Let me next mark another exhibit here.

25   Can you see this is a document Notice of Filing

30(b)(6) Marilyn Marks            March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 109

1    Declaration from the Coalition for Good Governance

2    versus Raffensperger case; do you see that?

3         A    Yes.

4         Q    And do you recall that you provided a

5    declaration in that case about the Coalition's

6    diversion of resources in 2020?

7         A    Yes.

8         Q    And is this Exhibit 9 that declaration?

9              (Exhibit Number 9 was marked for

10   identification.)

11        A    At least it's the -- it's the -- now

12   you're showing the declaration, yes.

13   BY MR. TYSON:

14        Q    And that was document 42 in that case.

15             I just wanted to ask a couple of

16   questions.  You indicate in paragraph 6 that:  The

17   diversion of resources has continued since the

18   complaint was filed.  For example, in order to meet

19   the requirements of this litigation I was forced to

20   reject the request by North Carolina-based Coalition

21   members and voting rights groups to help design and

22   plan drive-through voting options which I had

23   initiated several weeks ago.

24             Do you see that?

25        A    I do.

Page 110

1      Q    That's one of the items that you listed in

2   your declaration of what you were unable to do

3   because of the Curling case, right?

4      A    Yes.

5      Q    And whether it was the -- this particular

6   Coalition case before Judge Batten or the Curling

7   case, it was ultimately the resources demanded of

8   the lawsuits that required the rejection of that

9   particular North Carolina request, right?

10     A    I would say not just the litigation

11  requirements, but the other type of ancillary

12  resource drain caused by -- in the case we're

13  talking about right here, SB202, or the use of the

14  Dominion Voting System, not all necessarily or not

15  at all, just the litigation support expenses.

16          You know, this would relate to things

17  we've already talked about, education and such other

18  activities as that that are not directly litigation

19  support.

20     Q    Okay.  In paragraph 8 you reference

21  another request from North Carolina members, work in

22  paragraph 9 and South Carolina, other types of the

23  thing the Coalition would have done if not for that

24  CGG case -- I'm sorry, the case before Judge Batten,

25  correct?

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 111

1        A    That's correct.

2        Q    And if the Coalition was not filing the

3    Curling case or the case before Judge Batten it

4    would have additional time to spend on other

5    activities, correct?

6        A    That's correct.

7        Q    So let's turn to another declaration from

8    this case.  Do you recall offering a declaration

9    involving the attorneys' fees that the Coalition is

10   seeking in this case?

11       A    Yes, some time ago.

12       Q    Okay.  So this is a 342-page document, so

13   I'm --

14       A    Which I didn't -- which I did not review

15   in preparation for this -- for this deposition.

16       Q    And thankfully, I'm not going to ask you

17   about all 342 pages.

18       A    Good.

19            (Exhibit Number 10 was marked for

20   identification.)

21   BY MR. TYSON:

22       Q    First, let's look -- this is document 630

23   filed in October of 2019, and it's Coalition

24   Plaintiffs' Detailed Specification in Support of

25   Motion for Attorneys' Fees.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 112

1          Do you see that?

2     A    Yes.

3     Q    So I'm going to take us to page 283.  Let

4  it have a chance to catch up.

5     A    All right.

6     Q    So this is titled Declaration of Marilyn

7  Marks.

8          Do you see that?

9     A    I do.

10     Q    Okay.  And so in this declaration you made

11  several different comments about how the Coalition

12  goes about spending its resources, and that's what I

13  want to dig into of what's going on here.

14          First, in paragraph 9 you indicate that:

15  The Coalition receives frequent requests to assist

16  in election technology controversies across the

17  country.  We decline involvement in the vast

18  majority of the requests because of the almost

19  impossible task of recruiting counsel with adequate

20  subject matter expertise.  A long learning curve

21  required for counsel in voting systems litigation

22  makes most such cases impractical to pursue.

23          Do you see that?

24     A    I do.

25     Q    So what method, if any, does CGG use to

Page 113

1  determine which requests for assistance it rejects

2  due to the difficulty of recruiting counsel and

3  which it rejects due to the lack of resources to

4  fulfill that request?

5       A    You know, I don't know that you could ever

6  parse that out in any type of objective way, you

7  know?  It's -- if the expertise was readily

8  available and a lot of people had that expertise it

9  would probably be easy to recruit attorneys to serve

10 in the capacity of helping challenge election

11 technology, election technology policy

12 controversies.  So I'm not sure how I would ever

13 parse that out.

14      Q    And I guess what I'm trying to understand

15 is there were obviously projects you didn't engage

16 in that you've testified were due to a lack of

17 resources.  Here you're indicating you don't engage

18 in some projects due to the difficulty of counsel.

19 I'm just trying to understand how you tell the

20 difference for CGG.

21      A    How do we tell the difference?  Let me see

22 if I can give you a recent example.  We were asked

23 to get involved with the new Internet voting bill in

24 DC, and -- Washington, DC, and, you know, would we

25 consider helping litigate against that, and right

30(b)(6) Marilyn Marks                   March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 114

1   now we don't even have time to write a letter, which

2   I've had to decline the ability to get involved at

3   all, and so -- because of this litigation and other

4   work we're having to do around the Dominion Voting

5   System.

6           So as we respond to a request like that,

7   how much -- how much of it is because there are not

8   free lawyers readily available versus just

9   inadequate resources of time and money, I don't know

10  that I can answer that.

11          If Rob McGuire were standing by saying,

12  hey, look, I'd really like to work pro bono on an

13  Internet voting case, you got any work for me, I'd

14  probably say, yeah, go to it.  Go to DC.

15      Q    That helps.  Thank you.

16          Let me go to paragraph 24, and this is a

17  section entitled Coalition's Case Management

18  Strategy.

19          Do you see that?

20      A    I do.

21      Q    And so paragraph 24 you say:  In the

22  numerous election-related lawsuits I have organized,

23  I have learned that for a small organization like

24  CGG, litigation like this is only affordable and

25  feasible if CGG provides full-time support to its

30(b)(6) Marilyn Marks                March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 115

1    attorneys.

2         A    Yes.

3         Q    Assisted by student -- interns paid at

4    student rates, I personally conduct research,

5    investigate facts, interview witnesses, consider

6    strategy, and provide expertise on election

7    administration and voting technology.  In doing

8    these tasks, I perform a substantial amount of work

9    generally done by attorneys in similar cases, and by

10   doing so I help my attorneys minimize their own risk

11   as well as minimizing the eventual amount of fees

12   that may be shifted to losing public defendants.  I

13   generally solicit my attorneys for ways I can be

14   helpful, and I operate under their guidance by

15   focusing on performing only those tasks that they

16   tell me need to be done and will save them time.

17              So you see that paragraph?

18        A    I do.

19        Q    Do you still agree with that statement in

20   that paragraph or the statements in that paragraph?

21        A    I'm rereading.

22        Q    Sure.

23        A    I would say when it says performing only

24   those tasks that they told me need to be done and

25   will save time that that shouldn't be read extremely

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 116

1    literally.

2          Q    Okay.

3          A    I end up doing more things than they tell

4    me that need to be done.

5          Q    Okay.  And so earlier we talked about that

6    you were having to spend 90 percent of your time on

7    items related to this case or more.  Part of the

8    reason for that is the way that the Coalition has

9    chosen to litigate this case, correct?

10               MR. MCGUIRE:   Objection to form.

11          A    Can you tell me what you mean by "chosen

12   to litigate"?

13   BY MR. TYSON:

14          Q    So you've titled this section Coalition's

15   Case Management Strategy, and in paragraph 24 you've

16   outlined kind of the approach that you take and your

17   interns take to help litigate the case.

18          A    Right.

19          Q    And my question is:  The reason why you

20   were spending as much time as you are on these cases

21   is, at least in part, due to how the Coalition has

22   chosen to litigate its cases, correct?

23          A    I'm not sure that I would -- I would state

24   it that way.  You know, the way we would choose, all

25   other things being equal, would be for much bigger

30(b)(6) Marilyn Marks        March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 117

1    teams to be working on the things that I do, but we

2    do not have the resources and the breadth of

3    organization.  It is not by choice but by just that

4    is where we are as a matter of fact.  There's no one

5    else to do it, and we don't have the resources to

6    expand greatly for legal teams, research folks.

7    It's not by choice, it's just by necessity.

8         Q    So, I guess in a perfect world you're

9    saying if you were able to have the attorneys do all

10   the typical attorney tasks you would have more time

11   for other projects of CGG, correct?

12        A    Yes, sure.

13        Q    Okay.  Go down to paragraph 37 next.  So,

14   again, further explaining kind of what CGG does, you

15   say in paragraph 37:  CGG organizes its litigation

16   activities to be conducted at the lowest possible

17   cost to make the most efficient use of attorney

18   time.  All activities that could be done by someone

19   other than very experienced senior attorneys is done

20   by CGG staff or volunteers.

21             See that, right?

22        A    Yes.

23        Q    And so you'd agree kind of I guess to our

24   perfect-world scenario, if CGG did not utilize its

25   staff or volunteers to conduct these litigation

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 118

1   activities, then that staff and volunteer time could

2   be devoted to CGG's other projects, right?

3          A     In a perfect world, yes.

4          Q     And are you saying in paragraph 37 that

5   the reason for the loss of staff and volunteer time

6   for other CGG projects is this decision to litigate

7   at the lowest possible cost?

8          A     No, not really saying that.  That would

9   really not be our choice.  My choice would be to

10  have the financial resources necessary to put legal

11  team, expert team, support team, research team on

12  without having budgetary constraints have to be an

13  every-minute consideration.

14         So, yes, we made this choice to litigate

15  given the constraints.  It's not that we chose to

16  have, oh, let's just do this the cheapest way we

17  possibly can; it's let's do this the only way we

18  can.

19         Q     Let me ask one more question about this.

20  In paragraph 49 you say:  This approach to

21  economizing has permitted Coalition's attorneys to

22  be efficient and generally only engage in activities

23  requiring their technical and litigation expertise.

24  It has, however, not been without its price, for

25  these efforts have diverted significant resources of

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 119

1   the organization, in both time and money, away from

2   other projects.

3          Do you see that?

4      A    Yes.

5      Q    And so you'd agree that this litigation is

6   what has caused the diversion of significant

7   resources of the organization away from other

8   projects, right?

9      A    It's one of the things that has, yes.

10     Q    You say that it diverted significant

11  resources of the organization, you refer to these

12  efforts have done that.  Can you quantify how much

13  of the diversion was due to the efforts you

14  reference in paragraph 49 and how much is due to

15  other factors?

16     A    No, I certainly don't have any kind of way

17  to measure that because it certainly required all --

18  you know, a large portion of the financial resources

19  we have, but it's hard to put quantifiable numbers

20  on the amount of volunteer time, for example, and

21  then my time that has to get devoted to

22  litigation -- this litigation effort as well as

23  other problems being caused by the Dominion Voting

24  System.

25          You know, we don't -- as I told you

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 120

1   before, we don't keep records of the volunteer time

2   at that level, so I don't have an estimate for you.

3        Q    Now, one of the things you indicated that

4   CGG was limited in doing was educating the New York

5   State Board of Elections on problems with BMDs.

6             Do you recall that?

7        A    I do.

8        Q    I want to have you look at what I marked

9   as Exhibit 11, document that was produced to us in

10  discovery.

11            (Exhibit Number 11 was marked for

12  identification.)

13  BY MR. TYSON:

14       Q    Do you recall a letter sent in January

15  2021 to the New York State Board about BMDs?

16       A    I recall it kind of vaguely, you know.

17  Helping me remember it a little bit as you're

18  displaying it.

19       Q    And Exhibit 11 has your signature as

20  executive director?

21       A    It does, uh-huh.

22       Q    And in this letter you reference the

23  Coalition's involvement in the Curling case and

24  Judge Totenberg's ruling from October 2020, correct?

25       A    Uh-huh.  Yes.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 121

1        Q    So being part of the Curling case helped

2    CGG's advocacy in New York, right?

3        A    Helped?  I don't know.  We could have

4    been -- we would have been advocates for exactly the

5    same thing with or without the CGG -- excuse me, the

6    Curling case.  Preferably without.

7        Q    But you're using the Curling case as part

8    of your advocacy in New York, correct?

9        A    Well, we're certainly referencing it as

10   other people, I believe, did as well who were not

11   part of the Curling case.  It's well-followed, and

12   I'm aware of the some of the other people who

13   weighed in -- who were not associated with Coalition

14   for Good Governance who weighed in using some, I

15   believe, Judge Totenberg's order when they were --

16   when they were talking to the New York State Board

17   of Elections.

18            I do remember getting a lot of calls about

19   the efforts that were being made from around the

20   country to weigh in to the New York Board and people

21   asking for references to that order.

22       Q    And you were able to engage in this effort

23   for New York despite CGG's involvement in Curling,

24   right?

25       A    I wouldn't say engage.  Just the letter is

Page 122

```
 1   the extent of what we did, and I had to decline

 2   several requests for testimony to be offered in the

 3   case -- in that particular consideration.

 4           It's one I particularly remember because I

 5   felt bad about not being able to participate because

 6   of the significance of this decision that they were

 7   planning to make.

 8       Q    Do you recall testifying that there were

 9   several North Carolina projects that CGG became

10   inactive in because of its involvement in this case?

11       A    I certainly do, and there have been more

12   since that time.

13       Q    So I've marked as Exhibit 12 a November

14   4th, 2019, letter to the North Carolina State Board

15   of Elections.

16           Do you see that?

17           (Exhibit Number 12 was marked for

18   identification.)

19       A    Yes, I do.

20   BY MR. TYSON:

21       Q    And this is a letter that you signed on

22   behalf of the Coalition; is that right?

23       A    That is correct.

24       Q    And this letter urges the board not to

25   certify ballot marking devices in North Carolina,
```

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 123

1    correct?

2         A     Particularly the ES&S ExpressVote, yes.

3         Q     Did the board ultimately certify the

4    barcode-based BMDs, the ExpressVote?

5         A     Unfortunately, they did.

6         Q     And CGG was able to engage in this effort

7    despite its involvement in Curling, right?

8         A     Certainly not to the extent that we have

9    been asked to or want to, and even today I've had to

10   decline some ongoing requests for CGG's help on this

11   very topic.  There is a source code review that we

12   helped initiate, but we have not been able to follow

13   through on supporting the efforts to a source code

14   review for the ExpressVote.

15        Q     And do you recall sending an e-mail to

16   Mecklenburg County Board of Elections in 2019 as

17   well?

18        A     I probably sent quite a few e-mails to

19   the -- to the Mecklenburg County Board on any number

20   of topics.

21              (Exhibit Number 13 was marked for

22   identification.)

23   BY MR. TYSON:

24        Q     I've marked as Exhibit 13 a document

25   produced to us in discovery, and you are

Veritext Legal Solutions

30(b)(6) Marilyn Marks                March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 124

1    Marilyn@uscgg.org, right?

2         A    That's correct, yes.

3         Q    And was this correspondence, do you

4    recall, also urging this particular county board not

5    to use the ExpressVote machines?

6         A    Yeah.  Let me take a minute and review it.

7    I'm not recalling it just --

8         Q    Sure.

9         A    -- off the top of my head.

10        Q    Take as much time as you need.

11        A    What was the date on this?

12        Q    This one, I'm sorry, I scrolled down,

13   September 26, 2019.

14        A    Okay.  All right.  Yeah, then if you'll

15   scroll so I can read the body a little more.

16        Q    Sure.  And this is in your Exhibit Share

17   if you need it there as well.

18        A    Okay.  Okay.  Do you want to scroll to the

19   next page for me?

20        Q    Certainly.

21        A    Thank you.  Okay.

22        Q    All right.  So --

23        A    Yes, I was urging against the -- CGG was

24   urging against the passage of or the use of

25   ExpressVote's machines --

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 125

1      Q    Got it.

2      A    -- in North Carolina.

3      Q    And what I want to ask about is just

4   number 11 there.  You say electronic ballot marking

5   devices such as ExpressVote are in litigation in

6   federal court in Georgia, challenging the

7   unconstitutional nature of this form of voting.

8   More lawsuits are expected soon.

9      A    Part of it is.  The other part of it when

10  it says more lawsuits are expected soon, I believe

11  that that is talking about Pennsylvania lawsuits on

12  this, and I think there was another one that was in

13  the works at that time, and I'm forgetting right

14  now.

15     Q    And CGG was able to engage in this effort

16  despite its involvement in Curling, right?

17     A    "This effort" being the advocacy in

18  Mecklenburg County --

19     Q    Yes.

20     A    -- is that what you mean?

21          Well, yes, and obviously not nearly to the

22  extent we wanted to.

23          What we wanted to do and started preparing

24  to do and then had to abort our efforts was to make

25  a series of administrative challenges to the

Page 126

1    certification that was eventually done by North

2    Carolina and then consider after -- after we

3    exhausted administrative remedies consider

4    litigation to stop this as one of the many things we

5    wanted to do, but we had to abort that and turn over

6    our documents to other organizations to essentially

7    pick up where we left off, and they did litigation

8    which we just could not -- we just didn't have the

9    bandwidth to do here in North Carolina.

10            (Simultaneous speaking.)

11       A    Yes.

12       Q    I'm sorry, I didn't mean to interrupt you

13   there.

14            I want to ask you now next about -- this

15   is another document produced to us in discovery.

16   Looks like an e-mail communication, and it's

17   addressed to Dear Georgia Republican Leaders on

18   March 4th, 2021.

19            (Exhibit Number 14 was marked for

20   identification.)

21   BY MR. TYSON:

22       Q    Do you see that?

23       A    I do.

24       Q    And this was sent, I'm assuming, to

25   officials while the legislature was considering

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 127

1    election integrity legislation; is that right?

2        A    You know what, I'll need to review it to

3    remind me what this is about.

4        Q    Okay.

5        A    Okay.  What was your question again?

6        Q    Was this e-mail sent while the legislature

7    was considering what I think they refer to as

8    election integrity legislation?

9        A    Well, it was -- it was sent during the

10   time that they were considering election

11   legislation.

12       Q    So what I want to ask you about is at the

13   very end of the e-mail you describe the Coalition

14   for Good Governance, and you say:  CGG is a small

15   but strictly nonpartisan nonprofit organization.

16   Our members and leaders represent quite diverse

17   political views as individuals but come together for

18   the nonpartisan goals of election security, voter

19   privacy, and election transparency.  Our ongoing

20   litigation seeking to have the Dominion BMD voting

21   system banned is a project of current primary focus

22   for us.

23           You see that?

24       A    Yes.

25       Q    And would you say the Curling case is a

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 128

1   project that is related to CGG's goals here of

2   election security, voter privacy, and election

3   transparency?

4        A    Well, certainly it is related to our

5   goals.  We try not to do anything that's not part of

6   our goals.  But, yes, it's certainly part of our

7   goals, but it's certainly not the way we would

8   choose to achieve our goals.  It's a last resort.

9        Q    And is the statement correct that the

10  Curling case was a project of primary focus in 2021?

11       A    Yes, just because of the consuming nature

12  of it, it had to be a primary focus for us, not

13  necessarily by choice, but by just the requirements

14  of keeping up with the demands of the case.

15       Q    And CGG was able to engage in this

16  advocacy effort despite its involvement -- for the

17  General Assembly legislation despite its involvement

18  in Curling, correct?

19       A    Yes, certainly not to the extent that we

20  should have or would like to.  Obviously as a

21  501(c)(3) our lobbying efforts are limited anyway,

22  but had we had more resources, more volunteer time I

23  would have hoped that we would have done a better

24  job of being effective at what we were trying to

25  lobby against.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 129

1          I think most of these bills made their way
2     into SB202.  I believe what -- that's what most of
3     these references are talking about.  But yes, we did
4     engage, but not nearly as extensively or effectively
5     as we would have had we not been dealing with the
6     BMD audit inadequacy Dominion Voting System issues.
7          Q    So we're finished with topic 1, which is
8     probably --
9          A    Good grief.
10         Q    I will say that's the majority of where we
11    were going to spend our time, so we'll keep on
12    trucking here.  Do you want to take a break before
13    we move to topic 2?
14         A    What is your sense of the rest of the day?
15    I mean, do you want to take a lunch break at some
16    point?
17         Q    It's really --
18         A    It really doesn't matter that much to me.
19    I really wouldn't mind having 5 or 10 minutes to
20    grab a new cup of coffee or something.  It doesn't
21    have to be now, but I don't know how long you're
22    planning to go.  Do you mind kind of giving me your
23    thoughts for the outline of time for the day?
24         Q    Sure.  So we've kind of been through --
25    this addressed half of the things we covered today,

Page 130

1   so we have a little ways to go yet, but I'm kind of

2   fine to do whatever you want to do on lunch.  If

3   you'd rather go ahead and take a longer break we can

4   do that.  This next topic is going to be relatively

5   short, but it's really up to you and Robyn.  I know

6   we need to consider our court reporter as well may

7   need a break.

8        A     I'm happy to accommodate anybody else's

9   schedule.  Let others speak up for what they want to

10  do.

11              THE REPORTER:  Should we go off the record

12  for this discussion?

13              MR. TYSON:  Certainly.

14              THE VIDEOGRAPHER:  Time is 2:25 p.m.

15  We're off the record.

16              (Recess 2:25-2:33 p.m.)

17              THE VIDEOGRAPHER:  The time is 2:33 p.m.

18  We're on the record.

19  BY MR. TYSON:

20        Q     Thank you, Ms. Marks.  We're going to

21  move to topic number 2, so referring us back to

22  Exhibit A of Exhibit 1.  Topic 2 is the changes made

23  to the organization's budgets as well as any

24  contemporaneous rationale for such changes during

25  its budget years from January 1st, 2017, through the

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                        Page 131

1   present relating to the laws, policies or protocols

2   challenged in this action.  And you were the

3   designee for CGG on topic 2, correct?

4        A    That's correct.

5        Q    And did you review any documents

6   specifically to get ready for this topic?

7        A    No, I'm not sure that there were any

8   documents that would have directly addressed this

9   question.

10       Q    And did you speak to anyone associated

11  with CGG specifically to prepare for your testimony

12  on this topic besides counsel?

13       A    Not specifically for this purpose, no.

14            MR. TYSON:  I think this one will be

15  relatively quick since my focus is on just the

16  document piece, and, Rob, I know you had some

17  objection to this topic.  I don't think we'll get to

18  the objectionable scope here, but we'll see how we

19  do.

20  BY MR. TYSON:

21       Q    Ms. Marks, does CGG maintain a written

22  annual budget?

23       A    No, we do not.

24       Q    Okay.  And so there's no way to identify

25  from an internal budget document spending on

Page 132

1    specific categories; is that correct?

2         A    That is correct, not from any type of

3    document.

4         Q    Okay.  And so then it would be correct to

5    say that there's not a document that identifies a

6    diversion of resources from one project to another

7    project within CGG, correct?

8         A    I would not say that.  I thought you were

9    asking me about a budgetary document, but we have

10   lots of documents that would indicate that, you

11   know, we had to spend money on some type of

12   expenditure that perhaps we were not expecting that

13   we -- which we could have spent on something else.

14        Q    I apologize, I was asking specifically

15   about budget documents.  I didn't add that

16   qualifier.  So --

17        A    Sorry.

18        Q    -- it's correct to say there are not

19   budget documents that demonstrate CGG spending funds

20   in a different way as a result of the allegations in

21   the Curling lawsuit, correct?

22        A    And that is because we do not prepare a

23   formal budget.  So, yes, there would not be

24   amendments to the budget because we don't have a

25   formal one.

Page 133

1    Q    And I believe we covered this already, but

2    is it correct that CGG began funding activities

3    related to touchscreen voting in Georgia in 2017?

4    A    I'm thinking about the answer.  If there

5    were spending in 2016, it would have been at the

6    very end of 2016, and those expenses would have been

7    relatively minor.  So any significant spending would

8    have started in 2017.

9    Q    Okay.  Thank you.  That takes care of

10   topic 2, so we can move along at a quicker clip

11   hopefully here.

12   A    Okay.

13   Q    So let me refer you to topic 3 back on

14   Exhibit 1, and topic 3 is the organization's exempt

15   purpose and activities it undertakes in accordance

16   with its exempt purpose.

17        Do you see that?

18   A    I do.

19   Q    And you're the designee of CGG for topic

20   number 3, correct?

21   A    I am.

22   Q    And for our purposes here just so we are

23   all clear, "exempt purpose" refers to the tax-exempt

24   purpose of CGG.

25   A    That is correct.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                                   Page 134

1        Q     So did you review any documents
2    specifically to prepare for topic 3 of the
3    deposition?
4        A     I did not, and that's when I said I forgot
5    to -- my intention was to go back and reread the
6    specific wording on the 990, and it's -- I had a
7    note to do it, and I just forgot.
8        Q     And I apologize, you did raise that
9    already, so let's go right to that.  I want to show
10   you Exhibit 8, which while I'm getting there let me
11   just clarify I'm assuming that also means you didn't
12   speak with anybody associated with CGG about this
13   particular topic, correct?
14       A     Not about this particular topic, correct.
15       Q     So on the 2019 990, page 2, line 1,
16   there's a line that says, briefly describe the
17   organization's mission.
18             Is this an accurate summary of CGG's
19   mission?
20       A     It is.
21       Q     And part of that mission --
22       A     May I correct myself there?
23       Q     Certainly.
24       A     It has expanded beyond Colorado obviously,
25   and that may have been in our kind of original

30(b)(6) Marilyn Marks                      March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                                        Page 135

1    post-2014 reorganization -- informal reorganization

2    of Rocky Mountain Foundation, and we -- we certainly

3    expanded beyond Colorado, and I guess it depends on

4    what you consider the region, but that probably

5    needs to be formally expanded in our -- in our work.

6         Q    Okay.  Thank you for that clarification.

7              On the third line there, there's an

8    indication that:  CGG will engage in litigation as

9    well as provide monetary support for legal expenses

10   to other organizations engaged in litigation on

11   these issues.

12             Do you see that sentence?

13        A    Yes.

14        Q    And so part of CGG's mission is filing

15   lawsuits, right?

16        A    Well, I wouldn't -- I wouldn't say that it

17   is our mission to file lawsuits.  We know that it

18   will be necessary at times.

19        Q    Okay.  And the lawsuits that are filed are

20   in pursuit of the interests that CGG exists to

21   protect, correct?

22        A    Well, yes.

23        Q    So let me next mark a portion of the CGG

24   website.  Are you responsible for what's posted on

25   the CGG website?

Page 136

1      A    Not me personally directly.  I don't know

2  how to do it.  But speaking for the organization,

3  yes, we as an organization are responsible for

4  what's on the website, which is often out of date.

5      Q    Well then let me ask about this to see if

6  this is in date or not.

7           (Exhibit Number 15 was marked for

8  identification.)

9  BY MR. TYSON:

10     Q    So this is a printout you can see at the

11 bottom here Exhibit 15, right,

12 coalitionforgoodgovernance.org.

13     A    Right.

14     Q    Is that the website of the Coalition?

15     A    Yes, it is.

16     Q    And this is a mission statement.  Is this

17 mission statement up to date and correct?

18     A    Let me take a look.

19     Q    Okay.

20     A    It is correct, and it looks like it was

21 taken to a great degree from that tax-exempt purpose

22 that you and I were just looking at.

23     Q    Thank you.

24          So CGG is engaged in interests related to

25 government transparency and accountability.  That's

Page 137

1    one of the things, correct?

2        A    One of the things, yes.

3        Q    And elections are listed specifically,

4    correct?

5        A    Yes.

6        Q    Does a jurisdiction's use of BMDs relate

7    both to the elections and the government

8    accountability and transparency interests of CGG?

9        A    As well as due process and equal

10   protection, yes.

11       Q    So advocacy around the use of electronic

12   voting relates to several of CGG's interests, right?

13       A    Yes.

14       Q    When you say in that second paragraph, "we

15   will engage in litigation," that litigation is a

16   major function of CGG, at least as to its activities

17   right now?

18            MR. MCGUIRE:   Objection to form.

19       A    Litigation is certainly consuming a huge

20   amount of our resources right now, but if we go

21   ahead and read the rest of that sentence, inform

22   legislative policy, and then the next sentence we

23   will be using education, communications, obviously

24   those are much preferable for any organization than

25   to engage in litigation.

30(b)(6) Marilyn Marks        March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 138

1           So yes, litigation is one avenue, but it

2    is our -- our least favorable choice.

3    BY MR. TYSON:

4        Q    Understood.

5             Now, CGG is a Colorado corporation,

6    correct?

7        A    Incorporated in Colorado, yes.

8        Q    Is CGG registered as a charity in Georgia?

9        A    We are.

10       Q    So let me next mark Exhibit 16.

11            (Exhibit Number 16 was marked for

12   identification.)

13   BY MR. TYSON:

14       Q    These are articles of incorporation for a

15   nonprofit corporation from the Colorado Secretary of

16   State.  Do you see that?

17       A    Correct.

18       Q    And this is for the corporation Rocky

19   Mountain Foundation, Inc., right?

20       A    Right.  Yes.

21       Q    Do you know, are these the original

22   articles of incorporation for what is now CGG?

23       A    I believe that they are.  At least

24   according to our records they are.  We did not -- we

25   were not management at the time they were filed.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 139

1        Q      Understood.

2               So what I wanted to ask you about, the

3    last page is entitled Rocky Mountain Foundation,

4    Inc. Attachment to Articles of Incorporation for the

5    Nonprofit Corporation, and provision 1 is the

6    purpose, and the purpose says:  Said corporation is

7    organized exclusively for charitable, religious, and

8    scientific purposes, including for such purposes,

9    the making of distributions to organizations that

10   qualify as exempt organizations under section

11   501(c)(3) of the Internal Revenue Code, or the

12   corresponding section of any future tax code.

13              Do you see that?

14       A      I do.

15       Q      Is this -- well, let me put it this way:

16   I tried to locate any other filed purpose statement

17   for the organization CGG and was not able to do so.

18   Do you know if this is the current incorporated

19   purpose statement of CGG?

20       A      I was just asking myself that as you

21   presented this, and, quite frankly, I just don't

22   remember.  I know we made some amendments to the

23   articles of incorporation a long time ago, I believe

24   we did, and by-laws, and I just can't answer that

25   question for you right now.  I don't remember.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 140

1      Q    We'll look at another provision of the

2   website related to purpose.  Mark this as Exhibit

3   17, and this is the coalitionforgoodgovernance.org

4   website, slash, bios?

5           (Exhibit Number 17 was marked for

6   identification.)

7      A    Which is definitely out of date, okay.

8   BY MR. TYSON:

9      Q    Entitled Who We Are.  You see that there?

10     A    Yes.

11     Q    That was going to be my first question is,

12  is this current?

13     A    No.  I was talking to Mary Eberle about

14  this a few weeks ago, and she said, Marilyn, it just

15  hasn't been my priority to get this updated.

16          It is not up to date for all sorts of

17  reasons, including we have two additional directors

18  who are not reflected on here.

19     Q    Understood.  We'll get to the board and

20  those pieces here in a minute.

21     A    Okay.

22     Q    I just wanted to ask a couple questions

23  about your bio.  You indicated after your loss to

24  become mayor of Aspen that you then devoted

25  full-time to election integrity litigation and

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 141

1    lobbying efforts for more transparent and verifiable

2    elections; is that right?

3         A    Yes.

4         Q    Is that a fair summation of your work at

5    CGG?

6         A    Not -- not totally today, no, because as

7    we've talked, you know, a lot of time is spent with

8    education, talking to voters, talking to candidates.

9    So it would be election administration, election

10   integrity efforts of which litigation and lobbying

11   would be two of the things, but certainly not all.

12   Today, you know.  This is -- in 2009 I then devoted

13   full-time to...

14        Q    To those efforts?

15        A    Yeah.

16        Q    Makes sense.

17             So let me ask next about the exempt

18   activities and the mission that you've listed in

19   your complaints.  So I'm going to return back to

20   Exhibit 3 here and go -- which is the third amended

21   complaint and go to paragraph number 20.

22             You see that with me?

23        A    I do.

24        Q    And so in this complaint the Coalition

25   alleges Coalition's purpose is to preserve and

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 142

1   advance the constitutional liberties and individual

2   rights of citizens with an emphasis on preserving

3   and protecting those private rights of its members

4   that are exercised through public elections.

5            Do you see that?

6       A    I do.

7       Q    And so is it correct that advancing

8   individual rights through proper election

9   administration is a key part of CGG's mission?

10      A    Yes, sure.

11      Q    Okay.  Then there's a -- paragraph 21

12  lists -- begins, "Coalition serves its purpose in

13  multiple ways, including by," and then lists out a

14  number of different things that are there, which if

15  you can just take a minute to read through those for

16  me.

17      A    Okay.  Okay.

18      Q    You'd agree with me CGG sometimes serves

19  its purpose by filing litigation, right?

20      A    Sometimes, yes.

21      Q    So what I want to do is kind of walk

22  through these different pieces you list in paragraph

23  21.  Since the filing of Curling, CGG has provided

24  information and education to its members, correct?

25      A    Yes.

Page 143

1    Q    And since the filing of Curling, CGG has
2   served as a nonpartisan and informational resource
3   for the public, press, campaigns, candidates, and
4   political parties, right?
5    A    We have.
6    Q    And since the filing of Curling, CGG has
7   monitored nationwide developments in election law
8   and technology, right?
9    A    Not nearly as much as we used to, but we
10   have done that to the extent possible.
11    Q    And since the filing of Curling, CGG has
12   provided speakers for events at educational
13   institutions, right?
14    A    Quite frankly, that has declined even
15   since this was written because we've had to -- I
16   think this year we've declined all invitations, and
17   most of last year we had to decline most
18   invitations, but we still -- when we can, we do it.
19    Q    Okay.  And CGG, since the filing of
20   Curling, has provided commentary from its leadership
21   on election issues, right?
22    A    We have done that, but we have been unable
23   to do it recently.  And what I mean by this in that
24   statement was generally op-eds, and I have been
25   asked to write many a op-ed in this last six months

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 144

1    and have been unable to.

2           So, yes, done it, but we have not done it

3    nearly as consistently and as actively as we want

4    to.

5       Q    Since the filing of Curling, CGG has

6    collaborated with voting rights and election

7    integrity initiatives with other nonpartisan profits

8    (sic) and academics, right?

9       A    Many of those activities are on hold right

10   now, but we have done some of this, yes.

11      Q    And to kind of finish out here, since the

12   filing of Curling, CGG has developed and shared

13   research about election problems, right?

14      A    That we have done extensively, yes.

15      Q    And since the filing of Curling, members

16   and prospective members of CGG have participated in

17   the electoral process through poll watching,

18   attending public meetings, and other civic

19   activities, right?

20      A    That has declined a lot in the last six

21   months, but yes, we have engaged in that, you know,

22   to some extent in every year since 2017.

23      Q    Let me move next to topic number 4.  Topic

24   4 is the organization's organizational structure,

25   including individuals who have the authority to make

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 145

1    funding and resource allocation decisions for the

2    organization from January 1, 2017, through the

3    present.

4            So you were the designee for topic number

5    4, correct?

6        A    I am.

7        Q    And did you review any documents to

8    prepare for this particular topic of the deposition?

9        A    No, I did not have any documents to really

10   look at for that.

11       Q    Did you speak to anyone about the -- about

12   the topic -- I'm sorry, start over again.

13           Did you speak to anyone who's currently or

14   formerly associated with CGG to prepare for this

15   part of your deposition?

16       A    No, not on this part.  I'm just going back

17   to read the --

18       Q    I'm sorry, I can put that back up.

19       A    No, no, no, I've got it in front -- I've

20   got it right here.  I just needed to scroll to it.

21   Okay.

22       Q    Let me know when you're finished.

23       A    I'm finished.

24       Q    All right.  So what is CGG's

25   organizational structure?

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 146

1      A    So we have a board of directors that we

2   talked about, and I think we listed the board

3   members' names.  Or maybe we didn't.

4      Q    I don't think.

5      A    All right.  So Mary Eberle is the board

6   secretary, Lisa Cyriacks is the board chairman, and

7   I believe she has the title of president, Rhonda

8   Martin is on the board, and Virginia Rutledge Forney

9   is on the board, and I'm on the board.  So that

10  makes up the formal board of directors of CGG.

11     Q    And I counted five individuals is the

12  right number for the board?

13     A    That's correct.

14     Q    When did the board expand from three to

15  five members?

16     A    I'm thinking about that.  I believe it may

17  have been in late 2019 or early 2020, sometime in

18  that time frame.  That's probably not exactly right,

19  though.

20     Q    And I guess what I'm really trying to get

21  to is at the time Curling was filed, is it correct

22  there were only three board members?

23     A    That is correct, yes.

24     Q    And those three board members were Lisa

25  Cyriacks, Mary -- I'm sorry?

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 147

1        A      Eberle.

2        Q      Eberle -- I knew I wasn't pronouncing it

3    right -- and you, correct?

4        A      That is correct.

5        Q      Okay.  How frequently does the board meet?

6        A      We do not have a particularly regular

7    meeting schedule.  I mean, we meet the requirements

8    of the by-laws on that, but we tend to call a formal

9    or informal board meeting, you know, every several

10   weeks generally when there's some either decision

11   that needs to be made or important update on some of

12   the activities.

13       Q      Did the board have to vote to approve the

14   filing of the Curling lawsuit?

15       A      We did.

16       Q      And does the board make decisions that

17   reallocate financial resources to litigation or

18   education or other areas?

19       A      Well, this kind of goes back to our

20   previous discussion about budget, and because we

21   don't keep a formal budget per se, there wouldn't be

22   a formal decision to move things from category A to

23   category B, but they are all generally aware of what

24   financial obligations we are undertaking and approve

25   them if they're significant.

30(b)(6) Marilyn Marks                 March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 148

1    Q    Do you have a particular threshold for

2    significance?

3    A    We really don't.  We don't.  If it were

4    going to be, say, undertaking a new case, you know,

5    knowing that there would be legal expenses involved,

6    then we would -- we would certainly have full board

7    approval for something like that.  If it's, like, a

8    new subscription to Constant Contact, no, we don't

9    make a big board decision on something like that.

10   Q    Did the board decide to divert the

11   resources that we discussed earlier -- financial

12   resources we discussed earlier, or is that a

13   decision somebody else made?

14   A    There wouldn't be anybody else to make

15   such a decision.  The board would have to make such

16   a decision.  We don't have another boss somewhere.

17   Q    And I guess my question was more

18   specifically did the board delegate to you the

19   ability to make those decisions, or are they always

20   made at a board level?

21   A    For something like, you know, engaging in

22   litigation, that doesn't just happen.  We -- you

23   know, election cases aren't filed overnight, you

24   know.  We talk about it, decide if it fits, can we

25   afford it, generally no, but we -- we discuss it,

30(b)(6) Marilyn Marks                     March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 149

1   and then they give me the authority to engage the

2   attorneys and get started.

3        Q    Would the board also make decisions to

4   allocate volunteer time to, for example, litigation

5   as opposed to voter education?

6        A    It's generally discussed.  It's something

7   we're always talking about is what are our

8   volunteers doing, and how can we be more efficient.

9   It wouldn't be something that we would put up for a

10  board vote, though, because, again, we can't --

11  these are volunteers.  We don't control how much

12  time they spend, and to a great degree our

13  volunteers work on things that they are passionate

14  about.  We don't necessarily say, oh, please don't

15  work on educating the Morgan County, you know,

16  candidates and instead go focus on Spalding County.

17  We don't really do that.

18       Q    Who makes the decision about the

19  allocation of interns' time?

20       A    I do the bulk of that.  Mary Eberle also

21  gets involved in that when -- particularly if they

22  are trying to do something related to website or

23  contacting donors or members.  Mary Eberle will tend

24  to get involved in that and supervise them at that

25  time.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 150

1       Q     I'm assuming that there's no kind of

2   formal documentation of those decisions; that's just

3   instruction to somebody to go do something?

4       A     Correct.  I mean, it's like -- well, for

5   example, Mary yesterday was asking an intern to

6   update ShareFile links for her to put on the

7   website.  Of course it's documented that she asked

8   her to do it, but we don't have some document that

9   says, Mary, you may ask the interns to do these

10  things, but you can't ask them to do that.  Okay?

11  It's just more informal than that.

12      Q     Informal process, I understand.

13      A     Informal process, yes.

14      Q     So I want to ask you -- I've marked as

15  Exhibit 18 what I received Tuesday evening, this

16  document titled CGG Board Discussion Package.

17            (Exhibit Number 18 was marked for

18  identification.)

19  BY MR. TYSON:

20      Q     You see that?

21      A     Yes.

22      Q     I'll confess to be a little confused.  The

23  title was 3/15/21 materials.  Is this for a meeting

24  in 2020 or 2022 -- or 2021 or 2022?

25      A     It was actually for a meeting yet to come.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 151

1    It's scheduled for next week.  We're trying to nail

2    down whether it's going to be the 21st or the 22nd,

3    and I started and titled the thing I think on the

4    15th, and I just screwed up and put '21 instead of

5    '22.

6         Q    No problem.  I just wanted to make sure I

7    hadn't missed something.

8         A    Right.  Right.

9         Q    So this is a document you created; is that

10   correct?

11        A    It is.  It is a document that I assembled.

12   I didn't create every document in there certainly,

13   but, yes, I did assemble that for the board because

14   it's been a very long time since we've had a meeting

15   to kind of comprehensively go through a lot of

16   the -- a lot of the issues surrounding this

17   litigation, and they have asked to have an extensive

18   meeting soon to do that, and so I took a lot of

19   materials and pulled them together for that purpose.

20        Q    Got it.

21             And are board discussion packages like

22   this, like Exhibit 18 created for every board

23   meeting?

24        A    Oh, heavens, no.  I wish they were, but

25   they -- because we had a lot of requests from the

Page 152

1    board for let's dive into where we stand on the

2    litigation and I had accumulated a bunch of news

3    articles, we had had the experts' reports recently,

4    no, I would not normally have this level of package

5    to go to a board, but -- and also because I had been

6    getting an awful lot of requests that I haven't

7    honored yet to explain the issues around the audit

8    and the issues around double and triple counting,

9    then I put a lot of stuff in there about this as

10   well that we got to spend time on.

11        Q    Got it.  Thank you.

12             All right.  Moving right along, let's move

13   over to topic number 5.  Back on Exhibit 1, topic 5

14   is the specific ways in which the actions of the

15   defendants that form the basis of the complaints in

16   this action caused the organization to divert

17   resources away from its organizational activities to

18   activities in which the organization had not

19   previously engaged and the identification of the

20   overall amount of the diverted resources, and then

21   A, the specific activities and projects the

22   organization was unable to engage in due to the

23   diversion of resources to activities necessitated by

24   such actions.

25             So you see that?

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 153

1        A     I do.

2        Q     And you're the designee for topic 5,

3    correct?

4        A     That is correct.

5        Q     Did you review any documents specifically

6    to prepare for topic 5?

7        A     No, I -- I just thought a little bit about

8    some of the documents that we had produced for you,

9    and then I spent a little time thinking about the

10   more recent activities and projects that we are

11   having to either stop or not engage in or slow down,

12   and I didn't really go back and review a lot of

13   e-mails for that.

14       Q     And did you also -- are these similar

15   topics that you would have spoken with Ms. Dufort

16   and Ms. Nakamura regarding?

17       A     Similar, but certainly not all.  They

18   are -- they tend to be -- tend to be more aware of

19   the Georgia issues and the Georgia activities, and

20   sometimes they get involved with -- as -- as they've

21   become more active in CGG and CGG has become more

22   known for some of this work, they also get involved

23   with some of the national organizations, but I tend

24   to have more the national relationships, and they

25   tend to have more of the Georgia relationships, if

Page 154

1    that makes any sense.

2         Q     It does.

3               Did you speak to anybody else besides

4    Ms. Dufort and Ms. Nakamura to prepare specifically

5    for this part of the deposition, this topic?

6         A     You broke up during part of that sentence.

7    It sounded like you said Ms. Dufort and

8    Ms. Nakamura; is that what you said?

9         Q     Yes, I was saying besides Ms. Dufort and

10   Ms. Nakamura, did you speak to anyone to help

11   prepare for this topic?

12        A     No, I did not.

13        Q     And I don't want us to repeat, I think

14   we've covered a lot of this ground already in terms

15   of specific activities, but I did want to just try

16   to understand do you have a sense of what percentage

17   of the organization's work is dedicated to election

18   integrity or election efforts -- not election

19   integrity, just election efforts?

20              MR. MCGUIRE:   Objection to form.

21        A     I have no documents on such, and it would

22   just be a really rough idea of probably 90 percent

23   election related.  Not necessarily BMD related or

24   Dominion voting related, but election related right

25   now probably 90 -- 90 percent, but not -- not

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 155

1    because that's the only thing we want to do.

2              As I mentioned, I really want to be doing

3    some open -- open records -- excuse me -- yes, open

4    records and open meetings issues.

5    BY MR. TYSON:

6         Q    And so the approximately 10 percent that

7    goes to other projects, what categories of -- are

8    those projects?

9         A    I would say that some of that would be

10   fundraising, some of that will be just kind of

11   general administrative stuff like getting D&O

12   insurance or getting the accountants lined up to do

13   our audit -- or excuse me, our 990, but also where I

14   have spent some time, a little bit more these past

15   two years that I did not do so much in previous

16   years has been a little more involved in lobbying

17   for some legislation in Georgia, ballots as open

18   records, ballot images, and then trying to make

19   whatever changes we could, not necessarily

20   successful at it, in bills like SB202 and its

21   predecessors.

22             So while we spend absolutely no money on

23   lobbying other than some small portion of whatever

24   an e-mail costs, we don't spend any significant

25   money on lobbying, but I do spend some time on

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 156

1    election-related bills primarily in Georgia.  Not

2    doing very much right now in North Carolina despite

3    the request.

4        Q    And I know you mentioned earlier work on

5    double-counting issues.  You recall that?

6        A    Yes.  Yes.

7        Q    And you'd agree with me that if an

8    election official is double counting ballots they're

9    counting them incorrectly, right?

10       A    Well, yes.  And when you say "an election

11   official," I don't mean to imply that it is the

12   official's fault that that is happening, but if the

13   system is counting twice or three times, that's

14   certainly wrong.

15       Q    All right.  So let's move to topic number

16   6, and topic number 6 is the specific laws,

17   policies, and protocols the organization alleges are

18   unconstitutional or violate federal law as asserted

19   in this action and the specific steps the

20   organization took to address its understanding of

21   those laws, policies, and protocols.

22            Then subpart A, specific steps the

23   organization has taken to address those laws,

24   policies, and protocols it advocates are

25   unconstitutional or violate federal law and its

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 157

1    involvement in this action and the process by which

2    those steps were determined and the specific steps

3    the organization took to address those laws,

4    policies, and protocols it advocates are

5    unconstitutional or violate federal law other than

6    its involvement in this action and the process by

7    which those steps were determined.

8              So you see that language?

9        A    I do see the language.

10       Q    And you're the designee for topic 6,

11   correct?

12       A    That's correct.

13       Q    And did you review any documents

14   specifically to prepare for topic number 6?

15       A    As I mentioned before, I looked at our

16   first supplemental complaint, but I didn't look at

17   it last night or anything.  I think I probably

18   looked at it about a week ago, and I might have

19   looked -- glanced at maybe a motion for preliminary

20   injunction.  But in more detail than that, no, I did

21   not go through all our -- all our documents.

22       Q    Certainly.

23            MR. MCGUIRE:  I just wanted to reiterate

24   that we do have objections to the major topic and to

25   part A.  Her preparation was curtailed by that, of

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 158

1    course.

2    BY MR. TYSON:

3         Q    Certainly.  I think we'll be able to

4    address that as we go, so thank you for making note

5    of that.

6              So, Ms. Marks, other than filing this

7    lawsuit, has CGG undertaken any efforts to address

8    the laws, policies, and protocols it says are

9    unconstitutional?

10        A    Yes.

11        Q    And what are those?

12        A    Well, for one, we have tried to do

13   communications with lawmakers certainly both at the

14   time that laws were being promoted in the general

15   assembly about ballot marking devices going back to

16   2018 and then 2019, we've talked to lawmakers both

17   formally in hearings, through e-mails, through

18   personal telephone conversations, through visits

19   with lawmakers.  The same would be true of we've

20   talked to election officials who we felt they need

21   to be both educated on the -- on the issues and who

22   would hopefully lobby for avoiding BMDs and

23   promoting effective audits.

24             You know, other -- other activities would

25   have included educating members on the problems with

Page 159

1    the BMDs, and not only BMDs but necessity for

2    audits.

3              Let's see.  I'm going back to the question

4    to make sure that I'm remembering all the things

5    you're asking about.

6              Okay.  So we would have done lobbying, we

7    would have done education, we would have also

8    participated in generating -- crafting ourself

9    proposed rules that we have sent to the secretary --

10   excuse me, to the State Election Board around some

11   of these topics.

12             Oh, another thing that we've done, we

13   participated in the SAFE Commission meetings.  We

14   went to almost all of the SAFE Commission meetings

15   to try to persuade the decision makers there, which

16   did not just include lawmakers but election

17   officials that the BMDs should not be required --

18   should not be accepted, and there should be

19   hand-marked paper ballots and audits, and we've also

20   talked to a variety of county election officials.  I

21   may have already covered that.  But there would have

22   been e-mails as well as personal talks to election

23   officials in the counties about these topics.

24        Q    Thank you.

25        A    Now, there could be some other -- some

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 160

1    other types of activities I'm not remembering off

2    the top of my head and that I didn't remember at the

3    time I was preparing.

4         Q    Okay.

5         A    Those are some primary ones.

6         Q    Okay.  Thank you.

7              And the efforts to -- kind of start in

8    reverse order with the SAFE Commission, the goal

9    there was to persuade the SAFE Commission not to

10   adopt ballot marking devices, correct?

11        A    I think that was a primary goal.  I'm not

12   sure it was completely limited to that, but I'm sure

13   we would have had something to say about the

14   necessity of audits as well and probably other

15   election security issues.

16        Q    And the Coalition's effort to lobby

17   lawmakers, if the Coalition could persuade a

18   majority of the General Assembly in both houses and

19   the Governor it could address the use of ballot

20   marking devices in Georgia, correct?

21        A    Yes.

22        Q    Is another step the Coalition has taken to

23   address the policies that it says are

24   unconstitutional is fundraising to fund its efforts?

25        A    Well, yes, certainly.  We would -- we

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 161

1    would be doing fundraising year in and year out

2    regardless of efforts of what we were doing, but,

3    yes, it's taken a lot of resources to get this far

4    with this litigation.

5         Q    And CGG has used its involvement in the

6    Curling case to help raise money, correct?

7         A    Yes, uh-huh, in showing the need for what

8    we were asking donors to give, certainly.

9              (Exhibit Number 19 was marked for

10   identification.)

11   BY MR. TYSON:

12        Q    Show you what we marked as Exhibit 19.

13   This is another e-mail produced to us dated August

14   20th, 2020.

15             Do you see that?

16        A    I do.

17        Q    And it opens with:  Thanks for your

18   generous donation to the Coalition.  We have great

19   progress to report.

20             Could you take a minute and look, is this

21   an update sent to donors, or do you know to whom

22   this e-mail was sent?

23        A    I assume it was sent to donors.

24        Q    Okay.  And in this e-mail there's a

25   request to consider making a donation today to help

Page 162

1   fund the efforts in the Curling case, right?

2         A    Yes.  Certainly not limited to that, but

3   yes.

4         Q    Let me -- there's another exhibit we'll

5   mark as Number 20.

6              (Exhibit Number 20 was marked for

7   identification.)

8   BY MR. TYSON:

9         Q    This is another e-mail produced to us.  I

10  believe it's September 13th, 2020.

11             Do you see that?

12        A    I do.

13        Q    And it says, Dear friends of Coalition for

14  Good Governance.  Who does that constitute, do you

15  know?

16        A    I don't.  My guess is what we did is we

17  expanded beyond people who had donated in the past,

18  and I'm guessing it would be -- I don't remember

19  right now, but I'm guessing it would be people on

20  our mailing list, other mailing lists we may have,

21  we probably even sent to legislators, et cetera.

22             And when we say "friends," that was just a

23  general category of having a friendly opening to --

24  in the salutation.

25        Q    What I want to ask here, there's an ask

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 163

1   here:  Can you make a contribution now to help with

2   attorneys' fees and experts' work.

3          You see that?

4      A    I do.

5      Q    And so CGG is asking for money to help pay

6   for attorneys' fees and experts' work, right?

7      A    As we always do, yes.

8      Q    And then you make the reference:  Can we

9   count on you to support the essential battle for

10  simple, secure, and defensible elections?

11         Do you see that?

12     A    Yes.

13     Q    And that battle for simple, secure, and

14  defensible elections is part of the work that CGG

15  undertakes, right?

16     A    It is part of the work, yes.

17     Q    So let me -- let's go back to the website

18  here.  We'll mark as Exhibit 21, this is the

19  coalitionforgoodgovernance.org/donate.

20         Do you see that?

21         (Exhibit Number 21 was marked for

22  identification.)

23     A    I do.

24  BY MR. TYSON:

25     Q    And is this the donate page that you would

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 164

1   direct recipients of e-mail requests for funds to?

2       A    Quite frankly, I haven't looked at it in a

3   while.  I assume it is the most recent one that's up

4   there, but it certainly needs to be updated.

5       Q    Okay.  So on the donate page, I see that

6   you reference the newest lawsuit challenging Senate

7   Bill 202, and you reference the Curling versus

8   Raffensperger case, right?

9       A    Yes.

10           MR. MCGUIRE:  Object to form.

11  BY MR. TYSON:

12      Q    And you can take a minute to look, but I

13  don't see any reference to any other work of the

14  Coalition on the donate page; is that right?

15           MR. MCGUIRE:  Object to form.

16      A    It doesn't mention any other project that

17  I see, but we say it will help defend election

18  transparency and security, so it's certainly not

19  meant to be limited to litigation.

20  BY MR. TYSON:

21      Q    In the middle here you say:  We rely on

22  donors -- rely on donors like you to help fund the

23  legal and experts' fees and expenses.

24           Do you see that?

25      A    I do.

30(b)(6) Marilyn Marks                     March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 165

1      Q    And so the legal and experts' fees and
2   expenses relate to litigation work, right?
3      A    Well, there's some legal expenses that do
4   not.  Like, we mentioned a while ago that
5   Mr. McGuire helped me on some administrative work in
6   North Carolina on briefs that he wrote to -- briefs
7   is probably not right, but letters, that sort of
8   thing he has helped write in North Carolina that was
9   not litigation in those, but we would have put those
10  in the category of legal expenses.
11     Q    Okay.  That's helpful.  Thank you.
12          And you close the page by saying:  Thank
13  you for supporting the fight for transparent and
14  evidence-based elections.
15          See that?
16     A    That's correct.
17     Q    And is that an accurate summation of the
18  Coalition's work?
19     A    It's one element of our work.  This is
20  just a thank you statement saying thank you for
21  supporting this part of our work, but it's certainly
22  not meant to be thank you for supporting every
23  little thing that we do.
24          If we go up above we've talked about that
25  the donations also go to support the work of our

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 166

1    incredible interns.

2        Q    Mark next Exhibit 22, which this is just

3    the home page for coalitionforgoodgovernance.org.

4            (Exhibit Number 22 was marked for

5    identification.)

6    BY MR. TYSON:

7        Q    See that?

8        A    I do.

9        Q    So I wanted to ask, there's a donate

10   button right here at the top, and the statement is

11   made:  And watch our progress in bringing effective

12   challenges to unauditable electronic voting systems

13   in Georgia assisted by your donation that will

14   exclusively support the legal and forensic work.

15           You see that?

16       A    Right.  Right.  And that is certainly out

17   of date.  I am not sure when we put that up, but I

18   think that was even before SB202.  So that -- that

19   was meant to be kind of a fundraising at that

20   moment, but it really should have been updated and

21   expanded since then.

22       Q    Okay.  So it's not accurate to say that

23   donations to CGG exclusively support the legal and

24   forensic work?

25       A    Not on an ongoing basis.  I'm sure that

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 167

1    particular fundraiser that was written at that time

2    was saying, yeah, let's -- let's divert -- not

3    divert, excuse me, let's dedicate virtually

4    everything to the legal and forensic work, but it's

5    not meant to be -- obviously it wouldn't even work

6    for it to be the only thing that we can put donors'

7    money toward.

8         Q    Okay.

9              (Exhibit Number 23 was marked for

10   identification.)

11   BY MR. TYSON:

12        Q    I've marked as Exhibit 23 the Coalition

13   for Good Governance current projects.  See that?

14        A    I do.

15        Q    I'll try to zoom in.  This one ended up

16   printing very small.  So is this the current

17   projects site of the CGG website?

18        A    To tell you the truth, I haven't looked at

19   our website.  It is not one of the things I reviewed

20   in preparation for this deposition.  I have not

21   looked at that website in a long time because I know

22   it's out of date, and it makes me feel guilty, so I

23   can't tell you whether it is or not.

24        Q    I just want to ask --

25        A    I'll take your word for it, though.

30(b)(6) Marilyn Marks                March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 168

1       Q    I just want to ask about one thing in

2   particular, which I think based on our prior

3   conversation the statement here at the end that

4   donations go only to cover our litigation support

5   expenses and modest compensation for our analysts

6   and interns, is that also an out-of-date statement

7   at this point?

8       A    It probably is an out-of-date statement

9   because, you know, I think it was meant to also be

10  probably not taken exactly literally.  Obviously

11  we've got things like D&O insurance and accounting

12  fees and stuff that are minor, but, right, it would

13  be a bit of an out-of-date statement.

14      Q    Okay.  Now, do you -- you operate the

15  Twitter account at MarilynRMarks1, correct?

16      A    That's correct, yes.

17      Q    And do you conduct fundraising activities

18  or solicit funds for CGG on that Twitter account?

19      A    To some extent, yes.

20           (Exhibit Number 24 was marked for

21  identification.)

22  BY MR. TYSON:

23      Q    So I've marked as Exhibit 24 a series of

24  tweets from January the 24th from the

25  @MarilynRMarks1 account.

Page 169

1        A     Okay.

2        Q     You see that?

3        A     I do.

4        Q     And do you recall sending these tweets?

5        A     Actually, I don't at the moment.  I'll

6     need to kind of review them to --

7        Q     Certainly.

8        A     -- refresh my recollection.

9              MR. MCGUIRE:  Bryan, is there a year on

10    that?  What year did you say it was?

11             MR. TYSON:  January 24th.  It was on

12    January 28th, 2021, that it was printed, so these

13    all relate to -- I'm not trying to keep you from

14    reviewing this, Marilyn, but they relate to the

15    Capitol riot on January 6, 2021, so it should be

16    January of 2021.

17             MR. MCGUIRE:  Bryan, I also just ask --

18    unless I don't understand, this doesn't look like

19    it's within any of the topics, so I assume she's

20    speaking personally and not on behalf of the

21    organization.

22             MR. TYSON:  In my view this is related to

23    the steps that the organization took, it's another

24    fundraising-related question, but I'm happy for her

25    to answer in her personal capacity as to her own

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 170

1    Twitter account.

2         A    Okay.  I'm not remembering all this off

3    the top of my head without a little more.

4    BY MR. TYSON:

5         Q    And maybe I can short-circuit a little

6    bit.

7         A    I'm not saying I didn't do it.  I just

8    need to remember what this is about.

9         Q    So my only question relates to these last

10   few tweets in this sequence:  We at Coalition Good

11   Gov warned of this problem in 2018, 2019, and

12   continue our federal lawsuit (Curling v.

13   Raffensperger) to seek auditable elections-no

14   hackable touchscreens.  Georgia should use

15   hand-marked ballots that cannot be manipulated.

16   Please help us, and there's a link to something

17   that's bit.ly/CGGDonate.

18            You see that?

19        A    I do.

20        Q    And so this is a request for a donation to

21   the Coalition, correct?

22        A    That's correct, yes.

23        Q    What I want to ask about is an individual

24   with the name @strategyPhD replies and says:  I just

25   donated some cash for this excellent work that

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 171

1   you-all are doing.  I know it's not a lot, but every

2   20 bucks here or there will make a difference.  Keep

3   up the democracy-saving work.

4            Then you reply:  Thank you so much.  We

5   know how to stretch a dollar and put it to critical

6   use.  We have no overhead, and all donations go for

7   direct costs of litigation.

8            Is that a correct statement of how CGG

9   uses its resources?

10      A    It is not technically correct.  Right now

11   the vast majority of the resources that we get in

12   are having to go to support the litigation, but

13   literally we have a tight -- when I say we have no

14   overhead, overhead in the way most people think of

15   overhead, offices, paid -- salary, you know, most of

16   the work our interns are doing certainly is for

17   litigation support.

18            And so my point was here that the vast

19   majority of resources are being directed to

20   litigation support, not that we don't spend a dime

21   on something like an accounting -- like accounting

22   fees.

23      Q    I'm going to mark what I marked as 25.

24            (Exhibit Number 25 was marked for

25   identification.)

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 172

1    BY MR. TYSON:

2         Q    This is another tweet from the

3    @MarilynMarks account August 22, 2020.  And it says:

4    We at CGG -- I guess I should ask is

5    @CoalitionGoodGv the CGG Twitter account?

6         A    It is.

7         Q    And can you post to that account?

8         A    I can.

9         Q    Does anyone else have the rights to tweet

10   from that account?

11        A    Yes.  In fact, I rarely do it, but one of

12   our interns is supposed to be doing it, and we're

13   not keeping it up right now, but a few of our

14   interns have the ability to do that, and I believe

15   maybe Mary Eberle does as well.

16        Q    So this tweet --

17        A    Did I answer that I did?  I can't remember

18   if I told you whether I have the ability, but I do.

19        Q    Yes, and you did.  Thank you for that

20   clarification.

21             So this statement says:  We at Coalition

22   Good Gov are fighting for a fair election in

23   November.  We don't spend our time on seeking

24   recognition or writing research papers.  We spend

25   our resources on the battlefield in the court to

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 173

1   protect your rights.  Please help support our

2   efforts, and then you direct people to the

3   coalitionforgoodgovernance.org/donate site, correct?

4          A     Uh-huh.

5          Q     And so at least in part of how you're

6   soliciting funds for CGG you're telling them that

7   you're not engaged in research paper activity but

8   instead are spending resources in court, correct?

9          A     We are, and it's not meant to say we're

10   spending every single dime, but we are spending,

11   yes, our resources in court.  And I guess I was

12   taking a slam at some of the many voting rights

13   organizations that tend to just sit in ivory towers.

14          Q     Understood.

15               Does CGG maintain records of donations

16   that come from particular e-mails or campaigns or

17   does it all just kind of funnel into one pot?

18          A     It really all funnels into one pot.

19   Obviously that's not correct as it relates to, say,

20   a foundation that we would specifically solicit, and

21   their donations are not kind of getting -- they're

22   not generally coming in through the website or

23   anything like that.  We tend to have more one-on-one

24   personal communications with foundation-type donors.

25          Q     Has CGG had success raising money citing

Page 174

1    the Curling case as a reason to donate to the

2    organization?

3                    MR. MCGUIRE:   Object to form.

4        A    There are so many parts of that sentence.

5    Had success.   Sometimes I think that, actually, we

6    haven't had success in raising money compared to

7    what we need.

8             So have we raised money because people

9    support the litigation, yes.   Have we raised money

10   because they support more generally what we do, yes.

11   Have we raised money because they support our

12   education efforts, the non-litigation efforts, the

13   research efforts, yes, that too.   But people don't

14   send us a check saying, you know, 30 percent of this

15   is for litigation, and 40 percent of it is for

16   education.

17   BY MR. TYSON:

18       Q    Let me go back to Exhibit 8.   This is page

19   17 of the schedule A on the 2019 990.

20       A    Yes.

21       Q    You'd agree with me that from 2016 through

22   2019 support for CGG went up every year, right?

23       A    During that period, but -- yes.

24       Q    Curling was filed in 2017, correct?

25       A    Correct.   I was just -- I was just

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 175

1   thinking about the prior period where I believe we

2   put in, like, $700,000 or something like that that's

3   not showing on here, but during that period of time

4   that you referenced, 2017, '18, and '19, yes,

5   donations did go up.

6       Q    All right.  Let's move on to topic 7,

7   which will be a very brief one.  Topic 7 is the

8   activities or expenditures the organization plans to

9   undertake in the future related to the laws,

10  policies, and protocols challenged in this action if

11  it is unsuccessful in achieving relief through this

12  action.

13          Do you see that?

14      A    I do.  And I think we had an objection on

15  that or -- yeah.

16      Q    There's a statement.

17      A    Yeah, a statement, right.

18      Q    Yeah.

19      A    And, you know, in terms of -- undertake in

20  future related to this action.  We have not made

21  specific plans, you know, in the event that we are

22  unsuccessful.  We'll certainly keep what we're doing

23  on the education front and the lobbying front, but

24  have we tried to make specific plans on that, no.  I

25  would expect that that relates to Georgia --

Page 176

1        Q     Sorry, if I can just pause you for a

2    second.  I have to ask my -- you're the designee for

3    topic 7, correct?

4        A     Correct.

5        Q     And I'm assuming, based on what you just

6    said, there were no documents or anybody you spoke

7    with to prepare for this topic, correct?

8        A     That's correct.

9        Q     And so my only question is if the lawsuit

10   is unsuccessful, I'm assuming CGG will continue

11   filing lawsuits about election systems, right?

12       A     I don't know about that, but, you know, I

13   wouldn't say -- I wouldn't say yes to that.  If the

14   lawsuit were to be unsuccessful, we will continue

15   activities related to BMDs, the Dominion system,

16   audits, and those activities would be of the type

17   we've talked about:  Education, lobbying, working

18   with our voting members to try to find ways we would

19   be promoting absentee ballots, that sort of thing.

20   That would happen, but not necessarily filing

21   another lawsuit.

22       Q     That's all we need to do for number 7.

23             Go off the record for just a second.

24             THE VIDEOGRAPHER:  The time is 3:41 p.m.

25   We're off the record.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 177

1              (Recess 3:41-4:00 p.m.)

2              THE VIDEOGRAPHER:   The time is 4 p.m.

3    We're on the record.

4    BY MR. TYSON:

5        Q    Thank you, Ms. Marks.  We'll move on to

6    topic number 8 here, which is the total expenditures

7    of the organization on activities related to this

8    action since the organization began participating in

9    this litigation.

10             And you are the designee for topic 8,

11   correct?

12       A    That's correct.

13       Q    And did you review any documents to get

14   ready for this particular topic?

15       A    Yes.

16       Q    And what documents did you review?

17       A    I primarily looked at the 990s which we've

18   been looking at today.

19       Q    Anything else?

20       A    I did not look at the exhibit that you

21   talked about -- or, excuse me, the document you

22   talked about before, which was the -- our

23   applications for attorneys' fees.  I did not end up

24   going through all that but knew that that is in the

25   record.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 178

1      Q     Any other documents you looked at?

2      A     No, I don't think so.

3      Q     And did you speak to anybody connected

4   with CGG to prepare for this topic in particular?

5      A     No.

6      Q     So are the attorneys' fees that CGG has

7   paid so far reflected on its 990s?  And when I say

8   "paid," I mean -- let me step back for a second.

9   I'm going to ask you about the attorneys' fees that

10  have actually been paid by CGG at this point.  Are

11  those all reflected on the 990s?

12     A     Except for those that have been incurred

13  since our last filing of the 990s.

14     Q     And do you know what --

15     A     It ended in 2020.

16     Q     Do you know what the number is since the

17  filing of the last 990?

18     A     I do not.  I know that the accountants are

19  trying to close out the 2021 right now, and I do not

20  know what those numbers are.  It would be roughly at

21  the same type of levels that we've been looking at

22  for the last couple years.  Nothing dramatically

23  changed since that time.

24     Q     And as you know, obviously, attorney fees

25  are an issue with the Coalition seeking to recover

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 179

1  fees in this case.  Do you know the amount -- total

2  amount so far the Coalition is seeking to recover in

3  fees?

4        A    You know, seeking to recover where we have

5  requested the Court to award fees where the request

6  has already been made I assume is what you're

7  talking about, and what I remember right now is that

8  the total of fees and expenses, not just attorney

9  fees, is a little over 1.6 million, I believe.  But

10 do I remember right now how that breaks down into

11 attorneys' fees or litigation support, I actually do

12 not, but assume that is well and accurately

13 documented in the record.

14       Q    Thank you for that.

15            My specific question really is:  Do you

16 know what the amount is -- post the filing for fee

17 recovery the amount the Coalition will seek to

18 recover up to the present day of fees?

19       A    I do not know that number.

20       Q    Do you know who would know that number?

21       A    There will be no one person that would

22 know what we would plan to file for in the future

23 because that is going to be a combination of legal

24 bills from three different attorneys at least.

25       Q    Let's go to topic number 9, which is the

30(b)(6) Marilyn Marks              March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                        Page 180

1    nature of membership in the organization, including

2    how individuals become members, any obligations of

3    members, and any benefits offered by the

4    organization to its members.  And you are the

5    designee for topic 9, correct?

6          A    I am.

7          Q    And did you review any documents to get

8    ready for this particular topic?

9          A    No, I did not.

10         Q    Did you speak to anyone affiliated with

11   CGG to prepare for this particular topic?

12         A    Jeanne Dufort and I might have talked

13   about this topic.  I believe we did.

14         Q    Can you think of anybody else besides

15   Ms. Dufort?

16         A    No, not that I would have talked to about

17   this topic.

18         Q    What I want to do is start back to the

19   third amended complaint, which is Exhibit Number 3.

20         A    Mr. Tyson, that would be in addition to

21   counsel.  Okay?

22         Q    Certainly.  And I apologize, I don't

23   definitely want to discuss theories with counsel.

24              I want to ask you in paragraph 19 of the

25   third amended complaint, the Coalition says:

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 181

1    Individuals become members of Coalition by providing

2    their contact information and indicating a desire to

3    associate with the organization.

4              Is that still an accurate explanation of

5    how an individual becomes a member of the Coalition?

6        A    It is generally, but it shouldn't be

7    thought of as some kind of precise universal form of

8    how people associate with the organization.  Many

9    times it's a phone call to me saying, hey, I want to

10   be part of what you're doing and count me in.  It's

11   not like there's some form that they fill out for

12   contact information.  And so, you know, our members

13   come to us in any variety of rather informal means.

14       Q    So if someone called you and said, I want

15   to be part of what you're doing, would you consider

16   that -- is that person then a member of CGG from

17   that point?

18       A    Depending on how they express it, yes.

19   Then what I would do is say, hey, Mary Eberle, you

20   know, put them on our mailing list, and here's who

21   they are.

22       Q    I'm not -- I want to be clear I'm not

23   asking you for this, but does CGG maintain a list of

24   its members?

25       A    I will have to say that our list

Page 182

1    maintenance has kind of gone by way of many of our

2    other administrative activities.  It is -- no, we --

3    we do not have a current list.  The list that we

4    have are -- it's outdated.  I know it has deceased

5    people on it.  It hasn't been updated in quite a

6    while.

7          Q    Okay.  And so how would CGG go about then

8    right now determining if someone is a member or not?

9          A    If it were important, as I heard one

10   person express, hey, being part of CGG is kind of

11   like -- it's a lot like being a member of the

12   Libertarian Party or Republican Party or Democratic

13   Party, there are no real requirements to, you know,

14   you've got to pay fees.  No, there are no fees.

15   And, you know, people -- people come and go as they

16   may favor what we're doing or get irritated with

17   what we're doing, and so there is not some kind of

18   strict you're in or you're out.

19          For purposes of this litigation when it is

20   necessary to demonstrate that somebody really is an

21   active member of the organization, we make sure that

22   that is clear, and we put it in declarations, et

23   cetera, but other than that, we do not have rigid

24   requirements.

25          And one reason we don't need to do that is

Page 183

1  because there are no dues that go along with it.

2  Say, like, NAACP has dues requirements.  We don't

3  have that.

4       Q    Is there any affirmative obligation on the

5  part of anyone to stay a member of CGG?

6       A    Certainly not.

7       Q    In paragraph 19 you say that members

8  receive informational communications from Coalition.

9  Does the Coalition or CGG consider everyone who

10  receives informational communications from them to

11  be a member?

12       A    No.  No.

13       Q    Does CGG have a separate list for

14  informational communications for members and

15  non-members?

16       A    That's not really the way that we would --

17  we have multiple different, for example, e-mail

18  lists, and so we don't divide it up into members,

19  non-members.

20       Q    And so the various e-mail lists, there's

21  no members e-mail lists out there, correct?

22       A    There is an e-mail list that we -- that

23  would include all of the members, but it also

24  includes other people who we -- who would kind of

25  fall in that category of friends and people who

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 184

1   might be potential members, but it's -- I don't

2   remember exactly what we call that e-mail list.

3        Q    But you couldn't distinguish on that

4   e-mail list between someone who's a member and

5   someone who's a friend essentially?

6        A    Or somebody who -- or even somebody who

7   has said, I don't want to have anything to do with

8   you guys anymore.  No, there's not -- on that e-mail

9   list there would not be a way to determine that.

10       Q    When you say "determine that," you're

11  referring to there's no way to --

12       A    Determine who would just say, oh, this guy

13  told us to get lost, and he's not a member anymore.

14       Q    Got it.  No way to distinguish members and

15  non-members on that --

16       A    Not on that e-mail, that's correct.

17            MR. MCGUIRE:  Marilyn, I'm just going to

18  ask you let him finish his questions and don't talk

19  over him.

20       A    Sorry.  Apologize.

21            MR. MCGUIRE:  Thanks.

22            MR. TYSON:  Thank you, Rob.

23  BY MR. TYSON:

24       Q    So I want to ask you next, you say:

25  Members can benefit from Coalition's facilitation of

30(b)(6) Marilyn Marks            March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 185

1   members' individual participation in civic

2   activities that are germane to the organization's

3   purpose, such as poll watching, auditing election

4   results, and publishing opinion pieces.

5          Do you see that?

6      A   I do.

7      Q   And can non-members also benefit from

8   Coalition's facilitation of participation in civic

9   activities that you listed here?

10     A   Of course we believe everyone could

11  benefit from that work.

12     Q   And can -- referring to this last

13  sentence, can non-members utilize Coalition as a

14  resource to answer a wide range of questions about

15  voting rights, voting processes, open meetings law,

16  public records law, petition process- -- recalls,

17  petition processes, election legislation, and how to

18  challenge election issues they encountered?

19     A   Certainly, you know, not everybody has to

20  be a member who we talk to, and so, yeah, we would

21  hope to be of service to people who we would hope to

22  recruit as members or whether it's press,

23  legislators may utilize Coalition in that way as

24  examples.

25     Q   So the categories alleged in the last

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 186

1    sentence of paragraph 19 are not limited to members,

2    they're anyone who wants to reach out and you're

3    willing to help?

4          A    Let's add that part that says people who

5    reach out and we are willing to help.  Do we help

6    everybody who calls?  Absolutely not.  And we've

7    gotten a lot of calls this past -- since November of

8    2020 from -- from people we chose not to help.

9          Q    Let me direct you to what we marked as

10   Exhibit 26, and this is an e-mail that was produced

11   to us, communications it looks like between Brian

12   Blosser and Marilyn Marks in January of 2018.

13               (Exhibit Number 26 was marked for

14   identification.)

15   BY MR. TYSON:

16         Q    Do you see that?

17         A    I do.

18         Q    And do you recall -- have you seen these

19   e-mails before?

20         A    I have.  It's been a while since I looked

21   at them, though.

22         Q    And what I want to ask specifically about

23   is in your message apparently to Mr. Blosser, you

24   say -- you ask him:  Would you consider letting us

25   use that in our case in federal court?  All that you

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 187

1    would -- we would need is for you to be willing to

2    testify as to what happened and to be a member of

3    our organization.  There are no membership fees or

4    anything like that.

5              Do you see that?

6        A    Yes.

7        Q    And is that an accurate statement of, as

8    we've been discussing, how someone becomes a member?

9              MR. MCGUIRE:  Object to form.

10       A    No, we don't ask people to come testify in

11   federal court to become a member.

12   BY MR. TYSON:

13       Q    But it is correct that there are no

14   membership fees or anything like that to be a member

15   of CGG, correct?

16       A    There are no membership fees, and what I

17   was just generally and informally saying here is you

18   don't have to write a check to be part of CGG.

19       Q    And is Mr. Blosser currently a member of

20   CGG?

21       A    We have not communicated with him in a

22   while.  I believe that he may have moved out of

23   state and haven't heard from him in a while.

24       Q    So today you don't know whether

25   Mr. Blosser is a member or not?

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 188

1      A    You know, there's no reason to think he's

2    not a member.  I'm just trying to say that I haven't

3    had any recent communication with him.  He may be

4    back in Georgia for -- because I know that was his

5    intention to return, but we just haven't heard from

6    him much.

7      Q    He wasn't a member when this lawsuit was

8    filed, correct?

9      A    No, not -- I think that is -- that's

10   correct, he was not.

11     Q    Let me ask you next what I've marked as

12   Exhibit 27.  These are the Coalition Plaintiffs'

13   responses to interrogatory -- supplemental response

14   to interrogatory number 12.

15          (Exhibit Number 27 was marked for

16   identification.)

17   BY MR. TYSON:

18     Q    Do you see that?

19     A    Yes.

20     Q    And do you recall did you verify these

21   interrogatories, or do you know?

22     A    I don't think that I have verified the

23   interrogatories.

24     Q    Okay.  The interrogatory asked to identify

25   all members of the Coalition for Good Governance

30(b)(6) Marilyn Marks                     March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 189

1    that are residents of the state of Georgia, the date

2    their membership began, and, if applicable, the date

3    their membership ended.

4              Do you see that?

5         A    Yes.

6         Q    And the response is a list of members upon

7    whom CGG will rely to establish associational

8    standing and their dates of membership.  With me so

9    far?

10        A    I am, and I'm realizing that Brian

11   Blosser -- I think the question was -- if you scroll

12   up, I think it says Georgia.

13        Q    Yes.

14        A    And I realize that he might not be a

15   resident of Georgia anymore.  I think I missed that.

16        Q    And the other date, the date that the

17   membership began and Mr. Blosser indicates 2017, but

18   the e-mail we just looked at you were talking about

19   him becoming a member in 2018.

20        A    Right.  Right.  I -- that's just an error.

21        Q    So Mr. Blosser, should he not be on this

22   list?

23        A    He should still be on the list, but I

24   think it should be 2018 as the member.

25        Q    Okay.  And do you have -- I think I know

30(b)(6) Marilyn Marks                March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 190

1    the answer based on what we just talked about, but

2    Mr. Blosser's inactive status, there's no particular

3    method by which you track active or inactive

4    members, correct?

5         A    No -- that is correct.  I didn't mean to

6    say "no."  We do not track anything like an inactive

7    status.  It was just more a note of I haven't talked

8    to him in quite a while.  Many of these other people

9    I would talk to frequently.

10        Q    Understood.

11             Let me go next to another set of

12   interrogatories.  So these I marked as Exhibit 28

13   are the Plaintiff Coalition for Good Governance

14   Responses to Defendant Anh Le's First

15   Interrogatories.

16             (Exhibit Number 28 was marked for

17   identification.)

18   BY MR. TYSON:

19        Q    Do you see that?

20        A    I do.

21        Q    And do you recall these interrogatories in

22   the Curling case?

23        A    Barely.

24        Q    I'm just going to ask you about one.

25        A    Okay.

Page 191

1        Q     Interrogatory number 13, the Coalition was

2   asked to identify the responsibilities or

3   obligations entailed in being a member of Coalition

4   for Good Governance and any benefits conferred by

5   such membership.

6              Do you see that?

7        A     I do.

8        Q     And you give an answer -- Coalition gives

9   some answers here.  Does every member of the

10  Coalition for Good Governance have to work together

11  to promote the goals of the organization?

12       A     No.

13       Q     Does --

14       A     It's not meant -- that was not meant to be

15  an obligation.

16       Q     Okay.

17       A     It just meant to be basically about the

18  spirit and the benefits of being a member, not an

19  obligation of a member.

20       Q     Okay.  Does CGG provide voter education

21  for individuals who contact it who are not members?

22       A     Not every person, but yes, many people we

23  do.

24       Q     Okay.  Does CGG provide non-members with

25  poll watcher training?

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 192

1          A     Yes, we have.

2          Q     Does CGG provide non-members with

3     education for citizen lobbying on election-related

4     matters?

5          A     Let me go back to my previous answer.

6     That is not to say that we have been able to honor

7     all of the requests for poll watching training that

8     we have received.  Particularly this past year,

9     particularly since SB202 went into effect, and I

10    believe there are some requirements on poll watching

11    training we have actually had to say no to people.

12              So I don't -- when we say we do provide

13    that, it's not -- and we would give non-members

14    training as well, it's not meant to say we're able

15    to honor all the requests.

16         Q     Certainly.  And my question was just

17    limited to is this something that you do for both

18    members and non-members.

19         A     Correct, yes, we would.

20         Q     And so CGG would provide non-members with

21    education for citizen lobbying on election-related

22    matters?

23         A     Well, yes, because we would -- we would

24    maybe do special things for members, yes, special

25    focus they would reach out with communications for

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 193

1   them, but certainly we are not going to say that

2   it's only limited to members because we would -- we

3   would be talking to the press about some of these

4   things, we'd be talking to legislators themselves.

5   So we're not trying to say that our efforts are

6   limited to just what we would communicate with

7   members.

8        Q    You say at the end here that the foregoing

9   benefits are examples but not all of the types of

10  benefits that CGG provides to its members.

11       A    Correct.

12       Q    What other types of benefits -- or,

13  actually, let me ask it this way:  Does CGG provide

14  benefits to its members that it does not provide to

15  non-members?

16       A    Let me give you one example.  That answer

17  would be yes, and it's not meant to be a, you know,

18  we don't want to help anybody else-type thing.

19            Obviously we exist to grow our membership,

20  to -- and to try to be helpful to the public, you

21  know, it is really based on public policy efforts is

22  why we exist.

23            But, for example, something we would

24  use -- we would work with members specifically on

25  would be we mentioned the efforts that we make at

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 194

1   asking the State Election Board to promulgate

2   specific rules that we draft, that we work on

3   internally, and then we use our members to present

4   on behalf of other members, and we present them that

5   way to the State Election Board in the formal

6   process that's required by statute where we have to

7   have the form notarized, we are speaking on behalf

8   of members per se, and we only use members to do

9   those formal communications.

10          So that would be an example of a benefit

11  the public policy advocacy that we do on behalf of

12  members and with members exclusively.

13      Q    So besides the public policy advocacy you

14  do on behalf of members, is there any benefit

15  provided to members of CGG that would not also be

16  provided to non-members upon request?

17      A    Upon request.  Yes.  Yes, I mentioned to

18  you that we have had lots of calls this past year

19  from people who wanted to make demands on our time

20  concerning their challenges to -- and I don't mean

21  legal challenges, but their -- their challenges to

22  the 2020 election, and we have declined to spend the

23  kind of time with them that we would with our

24  members on the kinds of efforts that they wanted us

25  to try to contribute to educate them on.  We just

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 195

1    don't have enough time in the day to do that.

2         Q    I'm sorry.

3         A    Sorry, I'm done.

4         Q    And are those individuals you're referring

5    to people who were challenging the outcome of the

6    2020 presidential election?

7         A    When we say challenging, let's say not in

8    a formal way, but let's -- criticizing -- sending

9    disinformation.  We've had lots of requests for

10   information that we have that might benefit some of

11   those claims, some of those inappropriate claims

12   that we've said no to.

13        Q    So I understand that you -- there would be

14   times when you would deny a non-member a request.

15   Are there particular benefits to members aside from

16   the public policy advocacy you discussed that would

17   not be provided to a non-member solely because they

18   are not a member?

19             MR. MCGUIRE:  Object to form.

20        A    For example, yes, something like if

21   someone wanted a mailing list of members that we

22   had -- if they wanted contact information for some

23   of our members, you know, I'd be very selective as

24   to who I gave that to.  If they wanted a group of

25   people that I thought might be interested in a

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 196

1   particular topic in a certain county where we have

2   relationships and members, I wouldn't necessarily

3   turn that over to a non-member but generally would

4   to a member.  Something of that -- none of this is

5   written up as a policy, but I'm trying to tell you

6   the kind -- the ways that we would treat a member

7   and a non-member differently as an example.  I'm

8   sure that's not the only example.

9   BY MR. TYSON:

10      Q    Could every member obtain the contact

11  information of every other member?

12      A    Certainly not, no.  I would generally get

13  permission from members that if somebody says, hey,

14  we're trying to get a petition started in Cobb

15  County to do X related to election administration,

16  would you give me some of the members that are

17  active there, I would check with them first and then

18  do that.  But would I do that for a non-member, it

19  would depend on the circumstances, but generally

20  not.

21      Q    Let's move to topic number 10, Exhibit A,

22  whether and how the organization determined if any

23  of its individual members are impacted by the laws,

24  policies, and protocols challenged in this action.

25           And you are the designee for topic 10,

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 197

1    correct?

2         A    I am, yes.

3         Q    And did you review any documents

4    specifically for this topic of your testimony?

5         A    I did not.

6         Q    Did you speak with anyone associated with

7    CGG specifically to prepare for this testimony?

8         A    No, I did not.  Now, when I'm saying I

9    didn't speak with anybody about it, I sent the

10   topics out but only talked about things that people

11   said they had something to talk about.  It wasn't

12   that they didn't see the list; it's just we didn't

13   talk about number 10.

14        Q    To whom did you send the topic list?

15        A    I sent it to Mary Eberle, to Rutledge

16   Forney, Jeanne Dufort, Aileen Nakamura, I may have

17   sent it to Lisa Cyriacks, but I -- I don't remember

18   for sure.

19        Q    And then --

20        A    I did not get a chance to talk with Lisa.

21        Q    And then your practice was if somebody had

22   something to contribute they reached out to you or

23   did you reach out to them, how did that --

24        A    I reached out to them, or if I didn't get

25   them I told them to call me back.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 198

1      Q    And then in having a conversation with the

2  individuals to whom you sent the topic list, did you

3  ask them about each topic, or did you just wait to

4  see if they had specific --

5            (Simultaneous speaking.)

6      A    I asked them to read the whole thing and,

7  you know, let's discuss any that they felt like that

8  they might have information that I might have

9  forgotten about or was not aware of.  And we did not

10  go through topic by topic, and, you know, the

11  conversations differed by individual as to how --

12  how deeply we got into it.

13      Q    So let me ask then, has CGG determined if

14  any of its individual members were impacted by the

15  use of Dominion BMDs or other practices challenged

16  in this action?

17            MR. MCGUIRE:  Object to form.

18      A    Yes.

19  BY MR. TYSON:

20      Q    And what is that determination?

21      A    Well, I think it is pretty well documented

22  in the documents that we have filed in the case.

23      Q    Is it correct that -- I'm sorry.

24      A    I'm sorry, I talked over you.  You go

25  ahead.  Go right ahead.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 199

1        Q    In referring to the documents you filed in

2   the case, is CGG relying on the impact on all

3   Georgia voters for determining there was an impact

4   on its members?

5        A    No.

6        Q    Okay.  What specifically -- how

7   specifically have CGG members been impacted by the

8   practices challenged in this action?

9        A    Well, I think you -- we need to talk about

10  each individual that you're referring to here

11  because there's not a one-size-fits-all type of

12  injury.

13       Q    Okay.  Well, let's go to Exhibit 27 then.

14  How has Mr. Blosser been impacted by the practices

15  challenged in this action?

16       A    So if I recall Mr. Blosser's situation, it

17  was that he attempted to vote in the 2017

18  Congressional District 6 election, and when he

19  arrived at his polling place, even though it was the

20  same polling place, and he was voting from the same

21  address as he had been for years, the pollbook

22  showed that he was not an eligible elector, and he

23  was not permitted to vote even by provisional

24  ballot.  He was turned away even though he was an

25  eligible registered elector who had not previously

Page 200

1    voted, and it appeared to be the so-called software

2    glitch in the Express pollbooks that caused

3    Mr. Blosser not to be able to vote, is my

4    understanding.

5         Q    What is the impact on Ms. Clark in

6    Gwinnett County?

7         A    The -- I can name at least one instance,

8    but I would expect that there are more, and that the

9    one I'm remembering is that she went to vote, and

10   there were problems again with the ExpressPoll units

11   where she was told that, no, you are not registered

12   here, you're supposed to be at a different polling

13   location.  And she argued with them for quite a long

14   time.  They kept saying no, no, no, you have to go

15   to a different polling location.  She knew that she

16   did not belong at a different polling location.

17              She spent an extraordinary amount of time

18   and energy talking to person after person, calling

19   the Gwinnett office, and eventually for some reason

20   they claimed, well, wow, your name just popped up

21   now in the book, and now you can vote.

22              But, of course, we never knew what caused

23   the name to just now -- and I'm saying in quotes

24   just now pop up in the book, and that she was denied

25   time after time after time the ability to vote at

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 201

1   her home polling location.  We do not know the

2   nature of that particular glitch.  But her injury,

3   of course, was all of the difficulty that she went

4   through because of that -- because of the error.

5        Q    Before we continue on the list, how did

6   CGG go about determining that these members listed

7   in Exhibit 27 were affected by the practices it

8   challenges in this case?

9        A    I'm not sure that I exactly remember how

10  we did that.  I'm sure I to some extent worked from

11  memory.  I might have gone back through some of the

12  declarations that had been filed.  But it would

13  have -- and then it could have been -- I believe I

14  worked with our attorney Bruce Brown on this, and I

15  believe he might have been referencing some of his

16  notes and documents as well.

17       Q    And did CGG engage in this process of

18  determining which members were impacted in 2022 or

19  at some point before that?

20       A    Well, I think you're aware that many of

21  their declarations were dated back to 2017 or '18

22  and in subsequent years, and so I don't think we

23  have -- I don't remember that we filed anything in

24  2022 with any declarations from any of them -- these

25  members.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 202

1      Q     And my question was specifically the

2   process you just described with Mr. Brown and

3   working through the process of determining which

4   individuals would be listed.  Did that process take

5   place in 2022 or at some point earlier?

6      A     I think it would have probably taken place

7   at various times in the planning of the various

8   supplemental -- I don't mean -- probably the

9   supplemental complaint, the motions for preliminary

10  injunction, you know, various documents along the

11  way, things that we have filed we have selected some

12  of the members who have brought us complaints that

13  we used to have developed declarations.

14         And I think -- I believe what we did here

15  is selected from declarations.  Certainly wasn't

16  meant to be every potential allegation that we've

17  ever heard.

18     Q     And my specific question is:  When was

19  this list selected from --

20         (Simultaneous speaking.)

21     A     And I'm telling you that that list would

22  have been put together by Bruce Brown on the second

23  day of February, but I don't think it happened on

24  that day.  It would have been growing over time.

25         Maybe I'm not answering your question very

Page 203

1  well, but it was -- it was finalized on the second

2  day of February.

3          MR. MCGUIRE:  Can I object here, Bryan?  I

4  think there may be some miscommunication.  Are you

5  asking about the preparation of this document that

6  you're looking at, or are you talking about this

7  list in some other form?

8          MR. TYSON:  What I'm trying to

9  determine -- I'm trying to dig into the

10  determination of which of the members were impacted,

11  and we have a list of the people who were impacted

12  that was given to us on February 2nd.  I'm trying to

13  determine when were these people identified as

14  members who were impacted.  That's what I'm trying

15  to get at.  Is that -- is that coming through in the

16  questions?

17          MR. MCGUIRE:  Marilyn, if it's clear to

18  you, go ahead and answer.

19      A    I'll try.  I think I'm understanding you,

20  but, for example, Shea Roberts, I don't remember the

21  date of her declaration.  I'm assuming that there

22  were a number of things that she was concerned

23  about.  I do believe secret ballot was one of them.

24          I'm assuming that the date of the

25  particular injury that would have been used as an

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 204

1   example here of members' injuries would have been in

2   the declaration, and at the time of preparing the

3   declaration we would have been referencing back to

4   that injury.  But we would have heard about that

5   injury before the date of the declaration.

6          So there is no -- I don't think there is

7   any one answer for when were these injuries

8   determined.  They were determined at various times

9   as they happened over the course of the last

10  four-plus years.

11  BY MR. TYSON:

12     Q    So turning back to Exhibit 27, is it -- is

13  it your testimony that there are declarations or

14  affidavits from each of these 16 individuals that

15  have been filed in this case or just that you are in

16  possession of declarations or affidavits for each of

17  these 16 individuals?

18     A    No, I actually -- I don't think that each

19  of them has -- I don't believe that we -- that we

20  asked Mr. Blosser to file a declaration.  Ricardo

21  Davis, I don't remember whether it was a

22  declaration.  You have his testimony in a

23  deposition.  I don't believe that we completed the

24  declaration of Ashley Walker, but others I believe

25  have filed declarations.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 205

1      Q    Do you know whether all 16 of these

2   individuals voted on BMDs in 2020?

3      A    Oh, goodness, I would not know that.  I

4   don't think I ever knew that.  And if I did know, it

5   would be -- I would have forgotten it.  But I'm sure

6   that not all of them did.

7           And you're talking about for the entire

8   year of 2020?

9      Q    Any 2020 election, yes.

10     A    You're asking me -- do you mind repeating

11  the question?

12     Q    Do you know whether the 16 individuals

13  listed in Exhibit 27 voted on BMDs in any election

14  in Georgia in 2020?

15     A    I know that not all of them voted on BMDs

16  in 2020, and I know that some of them did have to

17  vote on BMDs during 2020.

18     Q    Do you know whether these 16 individuals

19  plan to vote on BMDs in Georgia in any election in

20  2022?

21     A    From what they have told me, I think most

22  of them, and, again, like Mr. Blosser I haven't

23  talked to in a long time, and he may not live in

24  state, but most of the people generally feel that

25  they want to avoid voting on BMDs if at all

30(b)(6) Marilyn Marks                 March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 206

1   feasible, possible, if they get their mail ballots

2   on time.  For most of them they believe that mail

3   ballots are a more secure form of voting.

4        Q    And CGG advises its members to vote using

5   absentee by mail ballots, correct?

6        A    Generally, yes.  It may not fit everyone's

7   particular circumstance, but yes, it is preferable.

8   We do not like mail ballot voting generally, and, of

9   course, I'm over-generalizing here.  Generally we

10  don't like mail ballot voting, but we believe it is,

11  with all its difficulties, preferable to voting on

12  BMDs.

13       Q    What is the injury that Ms. Forney

14  suffered?

15       A    I'm not necessarily referring to a

16  specific declaration.  I'm -- because I didn't

17  review that declaration, but I can tell you

18  generally that she is highly upset about the lack of

19  privacy in voting.

20            She is a prominent physician in town and

21  has often run into her patients in polling places,

22  and she -- she wants her privacy as to who she's

23  voting for.  And generally she tries to vote by

24  absentee mail ballot but hasn't always been able to

25  get the ballot back in time, get the request in in

30(b)(6) Marilyn Marks                          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 207

1  time.

2          So I know that one of her -- one of her

3  concerns is privacy, and I also think that the --

4  just the hassle of -- and particularly in Fulton

5  County of trying to get a mail ballot and get it on

6  time has been an injury that she has experienced.

7          There may be others that I'm not

8  remembering from her declaration right now.  I did

9  not review all these declarations before -- before

10  this -- before this deposition today.

11      Q    And I believe you indicated Ms. Walker did

12  not submit a declaration; is that right?

13      A    That is correct.

14      Q    And what is Ms. Walker's injury?

15      A    It would also be ballot privacy or ballot

16  secrecy.  And she has voted on BMD and complained to

17  me about the lack of privacy in the BMD.

18          Also, you know, she knows about the

19  security concerns and is concerned about whether or

20  not her vote is counting properly.

21      Q    Ms. Walker is also indicated as a member

22  from August of 2014.

23      A    Yes.

24      Q    Did she join the organization at the time

25  it was still the Rocky Mountain -- sorry, I've lost

Page 208

1    the name.

2          A     Foundation.  Rocky Mountain Foundation.

3          Q     Rocky Mountain Foundation?

4          A     Yes.

5          Q     In the interest of time let's keep moving

6    here.  For the moment, Ms. Marks, I'm going to skip

7    over 11.  We may come back to it if we have time.

8                Let me go to topic number 12, which is the

9    organization's communications with any county

10   government regarding the laws, policies, and

11   protocols it challenges in this action, from January

12   1st, 2017, to the present, including any other

13   litigation filed against a county entity during that

14   time regarding the laws, policies, and protocols

15   challenged in this action.

16               And you are the designee for topic 12,

17   correct?

18         A     Correct.

19         Q     And did you review any documents

20   specifically for topic 12?

21         A     Not any documents, no, I did not.

22         Q     Did you speak with anyone associated with

23   CGG besides your counsel to prepare for topic 12?

24         A     No, not specifically, but we didn't really

25   discuss this topic.  I think there was some mention

30(b)(6) Marilyn Marks                     March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 209

1    by Ms. Dufort on the ballot secrecy -- wait a

2    minute.  Let me see if -- regarding laws, policies

3    challenged in this action.

4            She had mentioned the Sumter County

5    lawsuit, but I don't guess that is really what

6    you're asking about here.  It just happens to have

7    secret ballot with respect to both of those -- both

8    of those cases.

9            No, I didn't have extensive discussions on

10   communications with county governments.

11        Q    CGG has communicated to county election

12   officials to urge them not to use Dominion BMDs,

13   correct?

14        A    Not to use them other than for

15   accessibility purposes.  And the answer was yes, we

16   have.

17        Q    And then you've kind of anticipated my

18   question.  Has CGG filed any litigation against any

19   county government officials related to the election

20   practices challenged in this case from January 1st,

21   2017, to the present?

22        A    The answer --

23            MR. MCGUIRE:  Just to clarify you mean

24   apart from this case, Fulton being a defendant here?

25            MR. TYSON:  That's a good call, Rob.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 210

1    BY MR. TYSON:

2        Q    Apart from Curling has CGG filed any

3    litigation against county government officials

4    related to the election practices challenged in this

5    case from January 1, 2017, to the present?

6        A    Okay.  So when we say "related to," while

7    certainly the burdens of absentee balloting are

8    related to both the injuries in the Curling case and

9    also to the core claims in the Gwinnett case, Martin

10   case on absentee balloting, I'm assuming that's not

11   really what you're talking about here.  I'm assuming

12   that it was something that would have the overlap,

13   say, of the ballot secrecy claims.  In Sumter County

14   we filed a ballot secrecy challenge there, and that

15   ballot secrecy is also covered in the Curling case.

16            And I'm trying to think if I've

17   forgotten -- on what we call our COVID case, I don't

18   remember that -- I don't think there were any

19   counties that were defendants on that.

20       Q    So --

21       A    Yeah.

22       Q    Sorry.  So besides the Sumter case, that's

23   the ballot secrecy case, are there any other ballot

24   secrecy cases the Coalition has filed against

25   counties that are not in Curling?

Page 211

1      A    Not -- not litigation per se, that's

2   correct.

3      Q    Has Coalition filed any other types of

4   actions against county officials related to ballot

5   secrecy?

6      A    No types of administrative actions other

7   than some time ago we did file a HAVA complaint that

8   referenced county ballot secrecy violations, but

9   the -- according to Georgia's law, HAVA complaints

10   have to go to the Secretary of State, and it was

11   really -- we did not choose any one county, I don't

12   believe, that we were alleging.  We just gave -- we

13   gave examples from numerous counties, but really the

14   respondent was meant to be the Secretary of State.

15      Q    And what was the outcome of the Sumter

16   case?

17      A    Really because of lack of resources we

18   made a voluntary withdrawal and closed the case.

19      Q    And no relief was granted in that case,

20   correct?

21      A    That is correct.  The good news was,

22   though, that the lawsuit itself caused the Sumter

23   County election officials to actually go take care

24   of the problem in the vast majority of the polling

25   places.  They were able to either get new polling

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 212

1    places or rearrange the polling places.  And so

2    during the pendency of the challenge, many of the

3    problems got solved because we challenged.

4         Q    Let's move to topic 13, which is

5    communications between the organization and any of

6    the co-plaintiffs, its individual member plaintiffs,

7    its other members, and other advocates or advocacy

8    organizations concerning this litigation or concerns

9    regarding vulnerabilities in electronic voting

10   systems.

11            And you are the designee for topic 13,

12   correct?

13        A    I am.

14        Q    And did you review any documents

15   specifically to prepare for this aspect of the

16   deposition?

17        A    No.

18        Q    And did you speak with anyone associated

19   with CGG specifically to prepare for this topic?

20        A    No.

21        Q    So I am not asking -- I want to be clear,

22   I know Mr. Cross has reserved rights here, I'm not

23   asking communications where counsel was present or

24   where you had a common interest agreement that

25   prohibited disclosure, but has CGG communicated with

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 213

1    other advocates and advocacy organizations about its

2    concerns with electronic voting equipment?

3        A    Yes.

4        Q    And were those communications in writing,

5    in person; how were they made?

6        A    Well, there are going to be such a variety

7    of communications with other people, organizations,

8    advocates that about every kind of communication,

9    you know, phone calls, Zoom meetings, text messages,

10   e-mails, letters.  We're talking about such a broad

11   topic here that, you know, there would be thousands

12   of such communications over the -- over the last

13   many years.

14       Q    Understood.

15            What I want to do is ask you about a

16   couple in particular.

17            (Exhibit Number 29 was marked for

18   identification.)

19   BY MR. TYSON:

20       Q    Marked as Exhibit 29, a Joint Litigation

21   and Common Interest Agreement between the Coalition

22   and Fair Fight Action and Care in Action.

23            Have you seen this document before?

24       A    I'm sure I have, but probably not since

25   the date it was signed.

Page 214

1      Q    Okay.  And this is an agreement between

2   Fair Fight Action and CGG among others, right?

3      A    Yes.

4      Q    And it looks like it was signed in January

5   of 2019?

6      A    Yes.

7      Q    Has this agreement been terminated?

8      A    You know, I don't know.  That would be a

9   question for counsel that I don't know the answer

10  to.

11     Q    Okay.  Do you know if CGG still has a

12  common interest privilege with Fair Fight?

13          MR. MCGUIRE:  I'm going -- we're going to

14  assert that we do still have a common interest.

15  These agreements have not terminated to my

16  knowledge, so we're going to continue to operate

17  under the assumption that they're operative.

18          And just wanted to -- if you're going to

19  get into specific communications, I did just want to

20  reiterate that document 1203, the order of the

21  Court, provides that State Defendants can ask

22  relevant questions about the substance of

23  conversations that plaintiffs have had with other

24  parties through the course of their advocacy work

25  generally, but that specifics the Court held would

Page 215

1    impinge on First Amendment rights, and so I just

2    want to reiterate that we are applying that holding

3    to ourselves as well, although it was obtained by

4    the Curling Plaintiffs, and so if you -- if you go

5    there, we have an objection on that.

6    BY MR. TYSON:

7         Q    Do you understand that Fair Fight is no

8    longer pursuing its voting machine claims in its

9    case?

10        A    That's my general understanding.  I

11   haven't tried to confirm that by reading their

12   documents.

13        Q    Okay.  Have you had any communications

14   with Fair Fight Action or their representatives

15   since November of 2020?

16        A    Trying to think about that for a moment.

17   It seems like I have had one conversation with one

18   of the Fair Fight employees, but I'm struggling to

19   remember what it was about.  It seems like it might

20   have -- seems like it might have been upcoming

21   legislation, but I'm -- I'm just not sure.

22        Q    Have you spoken with anybody at Fair Fight

23   regarding the outcome of the 2020 election?

24             MR. MCGUIRE:  Excuse me.  I'm just going

25   to interject and instruct my client to the extent

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 216

1    she answers this question under document 1203

2    defendants are not permitted to ask the identity of

3    anyone with whom we've spoken.  So you can answer

4    the question generally, but I would instruct you to

5    adhere to the order of the Court in document 1203

6    and keep it general.

7         A    Okay.  And, Mr. Tyson, do you mind

8    repeating the question?

9    BY MR. TYSON:

10        Q    Certainly.  Have you spoken -- had any

11   communications with anyone at Fair Fight Action

12   regarding the outcome of the 2020 election?

13        A    Not that I recall right now.  It's

14   possible, but I'm not recalling it.

15        Q    Have you had any communications with

16   anyone at Fair Fight where they explained why they

17   were dropping their voting machine claims?

18        A    No, I have not.

19        Q    I'm going to direct you to what we marked

20   as Exhibit 30.

21             (Exhibit Number 30 was marked for

22   identification.)

23   BY MR. TYSON:

24        Q    This is a Facebook advertisement from

25   friends of Coalition for Good Governance.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 217

1          Do you see that?

2     A    I do.

3     Q    And are you familiar with this

4    advertisement?

5     A    I'm looking at it again to -- I don't know

6    whether -- well, I don't remember it, but maybe --

7    maybe I have seen it, maybe I haven't, but, yeah,

8    I'm generally familiar with the contents.

9     Q    So who is the Friends of Coalition for

10   Good Governance there at the top?

11    A    I actually don't know who controls that

12   site.  There were several people who were working on

13   that at one time, and I cannot tell you all of their

14   names or who controls -- who controls that.  I think

15   Aileen Nakamura is one of them, but I actually don't

16   know the others.  I know she was working with some

17   friends, and I always meant to find out, and I never

18   got around to it.

19    Q    Do you recall a Fair Fight Action matching

20   fundraiser that benefited CGG?

21    A    I do recall that.

22    Q    Okay.  What was that about?

23         MR. MCGUIRE:  I'm going to object to form.

24    A    What was that about?

25         MR. MCGUIRE:  I'm going to object to form

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 218

1    on that question.  It's vague, ambiguous.

2    BY MR. TYSON:

3        Q    Can you answer, Marilyn?  Ms. Marks, I'm

4    sorry?

5        A    I'm not really sure what you're asking

6    what was it about.

7        Q    Okay.

8        A    I mean, I think, you know, to the extent

9    that this is accurate it -- it was about the fact

10   that they had offered to match funding that was

11   generated during that period for our -- for the

12   Curling lawsuit.  I don't remember many details of

13   it at the moment, I'm afraid.

14       Q    So the -- was there any formal agreement

15   between Fair Fight Action and CGG regarding this

16   matching fundraising effort?

17       A    I think it was probably -- it certainly --

18   I don't remember any kind of -- I'm sure there was

19   no kind of contract, and it was probably just an

20   e-mail, if that.  It might have just been a phone

21   call.

22       Q    And Fair Fight Action raised funds that it

23   then donated to Coalition for Good Governance; is

24   that correct?

25       A    That is correct.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 219

1        Q    And it was specifically to support the

2    Curling case, you said?

3        A    As I recall that's what this ad says, but,

4    you know, as I sit here today, I don't know whether

5    they said, look, this is because you were doing the

6    hand-marked paper ballot or if it was more general

7    as to why they -- as to why they were helping us on

8    this.

9        Q    And do you recall the reason why Fair

10   Fight offered to help on this, as you just said?

11       A    Well, you know, I do think --

12            MR. MCGUIRE:  Hold on.  I'm going to

13   object to that because I think you're starting to

14   intrude into the common interest litigation

15   agreement.  I'm going to instruct her not to answer

16   that unless I understand why it's not intruding into

17   that agreement.

18            MR. TYSON:  Let me understand.  You're

19   asserting the common interest privilege and

20   instructing her not to answer on that particular

21   question?

22            MR. MCGUIRE:  As I understood your

23   question to be getting into her understanding of

24   their motivation, and I believe that's encompassed

25   within the scope of the common interest agreement.

Page 220

1    Litigation -- if we have common interest litigation

2    agreement with them, that would be within the scope

3    of that.

4            MR. TYSON:  Okay.  And just so we have a

5    complete record on that, you're taking the position

6    that fundraising efforts between the two

7    organizations is covered by the common interest

8    litigation agreement?

9            MR. MCGUIRE:  Well, the motivation is what

10   you asked about, not -- I didn't object to the

11   questions about the fundraising arrangement, but I

12   did object to your question about the motivations.

13           MR. TYSON:  Okay.  Understood.  And you're

14   instructing her not to answer?

15           MR. MCGUIRE:  Yes, pursuant to that common

16   interest agreement and the privilege.

17           MR. TYSON:  Okay.

18   BY MR. TYSON:

19      Q    So just to clarify, Ms. Marks, the

20   donations were made to Fair Fight Action, and Fair

21   Fight Action transferred the funds to CGG, correct?

22      A    I cannot comment on how the money came

23   into Fair Fight Action.  I don't know that, but I

24   assume that it was Fair Fight Action that wrote the

25   check to us, but I'm not sure -- as I sit here

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                              Page 221

1    today, I can't tell you which -- I'm taking this at

2    face value that it was Fair Fight Action as opposed

3    to some other Fair Fight organization that sent the

4    check.

5           I assume it was Fair Fight Action, but if

6    you're asking me do I remember what the check looked

7    like, no, but I believe it was Fair Fight Action.

8       Q    So just so I'm clear, Fair Fight Action

9    has donated to CGG?

10      A    I believe it was Fair Fight Action.  It

11   was -- it was Fair Fight in one of its forms.  I'm

12   just not remembering all of their various corporate

13   forms right now.

14      Q    Okay.  So either Fair Fight, Incorporated

15   or Fair Fight Action?

16      A    Again, I don't know all of their corporate

17   names, but what I would just generally refer to as

18   "Fair Fight."  I'm sure they did it in whatever ways

19   were appropriate for their various tax-exempt

20   statuses or not tax exempt.  I didn't look behind

21   that.  I just tended to think of it in terms of Fair

22   Fight without knowing which fund from Fair Fight.

23      Q    Do you know approximately how much Fair

24   Fight or one of its affiliated groups donated to CGG

25   in 2019?

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 222

1      A     I don't remember.  I was just trying to

2   think if I did remember.  I don't remember.

3      Q     Don't even remember a potential range?

4      A     2019?  I am going to give a rough guess,

5   but it's only a rough guess at the moment, maybe

6   between 60- and 75,000.

7      Q     And I'm assuming CGG would have records

8   that would reflect those donations?

9      A     We do, but it's just not in my memory

10  right now.

11     Q     Let me ask you along this line what I've

12  marked as Exhibit 31.

13          (Exhibit Number 31 was marked for

14  identification.)

15  BY MR. TYSON:

16     Q     This is an e-mail that was produced to us,

17  communications -- and it doesn't have all the same

18  metadata, but you see the timeline is February 26,

19  2022, so recent communications, and there's a group

20  called State Audit Working Group.  What is State

21  Audit Working Group?

22     A     Okay.  It is a volunteer group of experts

23  and semi experts from around the nation that really

24  focus on election auditing, and they have had a big

25  effort over the years in also providing advice to

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 223

1    NIST, N-I-S-T, on election security as it relates

2    to -- as it relates to auditing.

3             And so it is a group that meets weekly

4    that I used to try to meet with weekly, but I now

5    maybe make one meeting every six months because back

6    to the requirements of this litigation and other

7    Dominion Voting System issues.

8        Q    This is an e-mail that indicates it's from

9    you.

10       A    Yes.

11       Q    And I wanted to ask you about this

12   sentence:  For some strange reason Fair Fight and

13   their colleagues claim that our goal is to sabotage

14   elections.

15            Do you see that?

16       A    I do.

17       Q    Where did you learn that Fair Fight and

18   their colleagues claimed that CGG's goal was to

19   sabotage elections?

20       A    I didn't really mean that it's Coalition

21   per se, the goal.  I'm talking about our goals in

22   promot- -- "our" more collective in promoting the

23   ballot -- excuse me, public -- public records --

24   sorry, that voted ballots become public records in

25   House Bill 993 and House Bill 1464, and that's what

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 224

1   I was -- when I said "our goal," I was speaking more

2   generally than just Coalition for Good Governance

3   because I had been in contact with some of the

4   people here in the State Audit Working Group.  It is

5   also their goal to see ballots as public records.

6       Q    Let me ask the other page -- this is

7   another e-mail from you on Saturday, February 26,

8   and you say:  Sadly, Fair Fight has gone ballistic

9   on this bill and calling those of us who promoted it

10  as attempting election sabotage.

11           You see that?

12      A    I do.

13      Q    So, again, is this a direct accusation

14  Fair Fight made against --

15      A    No, no, it is the people who -- they were

16  making this -- I saw a press release that they had

17  made where they were talking about ballots as public

18  record or HB933 I think it was at the time as being

19  an election sabotage bill, and because we had

20  initiated that idea and promoted it last year and

21  this year, and that's what I was trying to say here,

22  those of us who promoted it as attempting election

23  sabotage as I recall, and I'm sure this is not a --

24  not a direct quote at all, the press release was

25  something about those people who are promoting H

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 225

1    Bill -- HB933 or the ideas behind it are trying to

2    sabotage our elections.  I think they actually

3    called it election sabotage bill.

4        Q    Have you spoken with anybody affiliated at

5    Fair Fight about --

6        A    No.

7        Q    -- that allegation?

8        A    No.

9             (Exhibit Number 32 was marked for

10   identification.)

11   BY MR. TYSON:

12       Q    I've marked another exhibit here as

13   Exhibit 32.  This is an e-mail begins with you and

14   Kate Brumback but is an e-mail you sent to

15   Mr. Stark -- Dr. Stark, Dr. Halderman, Mr. Hursti,

16   Dr. Buell, Dr. Demillo, Dr. Appel, Mr. Skoglund, and

17   Ms. Greenhalgh; is that correct?

18       A    Yes, it looks correct.

19       Q    Do you recognize this e-mail?

20       A    I don't remember it right now.  I'm sure

21   it's legitimate.  I'm just not remembering it off

22   the top of my head.

23       Q    And this is referring to a petition, and

24   it appears that it's titled Voterga Philip Singleton

25   Dominion Ban Petition Roswell, Georgia, and the

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 226

1   subject line is, Garland's New Lawsuit Against BMDs.

2         A     Uh-huh.

3         Q     What is -- do you know what that's

4   referring to?

5         A     Yes, Voterga and Representative Singleton

6   filed that lawsuit in -- I believe it was Fulton

7   Superior Court trying to ban QR codes on ballots.

8   Yes, it was Fulton Superior Court, and, yes, that's

9   what they were trying to do.

10        Q     And it looks like you sent this e-mail

11  directly to various -- mostly experts in this case,

12  not all.  Is that -- is that the group you were

13  sending this e-mail to; is that accurate?

14        A     It looks that way.  I don't particularly

15  recall it, but that's what the header would appear.

16        Q     Okay.  Is it your practice to regularly

17  communicate with the experts in this case without

18  counsel on the e-mail?

19        A     Well, I was not communicating with them in

20  their role as experts.  Many of them were people

21  that I have communicated with on election matters

22  for probably the last 10 years.  So I was not

23  communicating with them, you know, in some kind of

24  expert advisory role.

25        Q     Okay.  And so if you weren't communicating

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 227

1    with them in their expert advisory role, what are

2    you -- why are you communicating with them at all on

3    this topic?

4         A    Well, I mean, those of us who live in

5    Election Integrity Land all the time, you know, tend

6    to share information about all sorts of topics, and

7    so communicating with these people and the broader

8    group is not unusual on election-related topics.

9         Q    Has CGG communicated with Mr. Favorito and

10   his Voterga group about his claims in this case?

11        A    In which case?

12        Q    In this case.

13        A    I'm sorry, about our claims, okay.  Oh,

14   gosh, not in a long time, we have not.  Don't

15   remember the last time I talked to him.

16        Q    Has any representative of CGG talked to

17   Mr. Favorito or Voterga?

18             MR. MCGUIRE:  I'm going to object again.

19   Bryan, I think this is the stuff that's covered in

20   document 1203, the order from the Court about

21   specific communications being not something that

22   plaintiff should be required to answer.

23             MR. TYSON:  And to be clear, my question

24   is just did communications take place, not with whom

25   or how.  With that scope would you allow her to

Page 228

1  answer?

2          MR. MCGUIRE:  I would not because footnote

3  1 on page 5 of document 1203 says State Defendants

4  are not permitted to ask the identity of anyone with

5  whom the Curling Plaintiffs spoke about these

6  topics, and I believe when you're asking if a

7  communication occurred, I think it falls within the

8  scope of that.

9          MR. TYSON:  Okay.  So will you have

10  similar objections to asking about Sidney Powell,

11  Lin Wood, and Mike Lindell and their

12  representatives?

13          MR. MCGUIRE:  As far as identifying

14  individuals who we've communicated with, I think it

15  falls within the scope of that order, and I don't

16  want to take inconsistent positions vis-a-vis people

17  we have contacted and people we haven't contacted,

18  so I'm just going to take a uniform position and say

19  I'd like us just to adhere to the order and not ask

20  about specific individuals but keep the questions

21  general like the Court ordered.

22          MR. TYSON:  So just so the record is clear

23  then, let me just go ahead and ask about each one,

24  and you can object, and instruct her not to answer.

25  BY MR. TYSON:

Page 229

```
 1       Q     Has anyone affiliated with CGG

 2    communicated with Mr. Favorito in Voterga about

 3    vulnerabilities in electronic voting machines in the

 4    last 12 months?

 5             MR. MCGUIRE:  Why don't we just do a

 6    standing objection to this.  If you're asking a

 7    question that's got a person's name in it and

 8    whether we've talked to them, I think it violates

 9    the Court order in 1203, I would object to it on a

10    standing basis.

11             MR. TYSON:  On a standing basis, okay.

12    And just so the record is complete, we were also

13    going to ask similar questions about Sidney Powell

14    and her representatives, Lin Wood and his

15    representatives, Mike Lindell, My Pillow, and their

16    representatives, and I understand you have a

17    standing objection, so just have the record clear on

18    that.

19             MR. MCGUIRE:  Yeah.  And just to clarify

20    my position, given that this is a court order and

21    given that it pertains to First Amendment rights,

22    that's the basis for our objection, and I don't want

23    my objection -- my objection is not offered as any

24    sort of confirmation that any of those

25    communications have occurred.  I'm simply objecting
```

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 230

1    to the question based on the Court's order.

2              MR. TYSON:   Understood.

3    BY MR. TYSON:

4        Q    Let's move to topic number 14.  That is

5    the organization's knowledge of any person in the

6    state of Georgia that was not able to vote as a

7    result of the laws, policies, and protocols

8    complained of in this action.  And you're the

9    designee for topic 14, Ms. Marks?

10       A    I am.

11       Q    Did you review any documents specifically

12   to prepare for this part of the deposition?

13       A    I some time ago thumbed through some of

14   the declarations and reviewed them, but it was not

15   in the last 24 hours.  It was probably in the last

16   week or so, two weeks.

17       Q    And so the only documents you reviewed are

18   declarations that were filed in this case; is that

19   correct?

20       A    For -- yes.

21       Q    And did you speak to anyone associated

22   with CGG specifically to prepare for this topic?

23       A    Not other than what we've already talked

24   about, the general conversations that I had with the

25   people we talked about and named previously today.

Page 231

1    Q    Does CGG know of any person in the state

2   of Georgia who was not able to vote as a result of

3   the State's use of the Dominion BMDs?

4    A    Dominion BMDs.  Because of the State's use

5   of Dominion BMDs.  If we are limiting the question

6   to because of the State's use of BMDs, no, I do not

7   know anyone who was unable to vote for that reason.

8    Q    Does CGG know of any person in the state

9   of Georgia who was not able to vote because of the

10  lack of audits CGG claims are necessary?

11   A    We don't claim that audits are necessary

12  in order to be eligible to vote, but we don't know

13  anybody who was turned away from being able to vote

14  because of inadequate audits.

15   Q    Does CGG have knowledge of any voter whose

16  votes -- sorry, I just asked that question.

17        Let's move to -- actually, one more on

18  this one.  Does CGG have knowledge of any voter in

19  the state of Georgia who was not able to vote as a

20  result of the use of Dominion scanners?

21        MR. MCGUIRE:  I'm going to object to form

22  because it's, I think, vague, ambiguous.

23   A    That question doesn't really sound too

24  logical to me.  I don't know how it could be that a

25  scanner would keep someone from voting, but no, I

Page 232

1  don't know of a scanner that has -- I don't know of

2  a person that a scanner's existence caused not to be

3  able to vote.

4  BY MR. TYSON:

5      Q    Let me ask it this way:  Does CGG have

6  knowledge of any voter whose vote was not counted as

7  a result of the use of Dominion voting equipment?

8      A    Yes.

9      Q    And who is that voter or voters?

10     A    Okay.  So I think we -- we start with

11  Donna Price.  As I understand it her ballot was not

12  accepted for voting in the Dominion system that -- I

13  don't know exactly the reason why, but I believe

14  it's probably a problem with the electronic -- the

15  electronic records, the ENET system, but that's one

16  voter I know of who wasn't able to vote.

17          You know, we do know of many voters who

18  had to cast provisional ballots.  When people cast

19  provisional ballots, then many of the votes which

20  they are eligible to vote, they are not -- they are

21  not able to vote because it's not on the provisional

22  ballot that they are given.  And so while they may

23  have engaged in the act of voting, it does not mean

24  that they were able to vote all of the eligible

25  contests that they attempted to vote.

Page 233

1          Then we certainly don't know of the

2    person's name because of the secret ballot, but we

3    certainly know of ballots that were cast and not

4    counted for all of the votes because of ballot

5    scanner inadequacy and it not picking up all of the

6    marks on the ballot.

7          We certainly know of what appear to be

8    thousands of ballots we do not know who actually

9    completed those ballots because of secret ballot

10   requirements, but we know that many of them exist in

11   the home precincts of several of our members and

12   plaintiffs where the votes were not counted by the

13   BM- -- excuse me, the Dominion Voting System.  And

14   so -- in, again, the home precincts of our members

15   and plaintiffs.  So, yes, there are wide variety of

16   votes that were not counted.

17      Q    And what I'm asking specifically is CGG's

18   knowledge of the identity of voters, and I believe,

19   based on what you said, the only voter you can for

20   sure identify is Ms. Price; is that correct?

21      A    We would need to go back and look at

22   people who were required to vote provisional ballots

23   and to see what -- and required to vote provisional

24   ballots because of errors in the pollbook system,

25   for example, to see --

Page 234

1      Q     Is it your custom -- I'm sorry.

2      A     -- to see what contest they were eligible

3   to vote and were not able to vote because of casting

4   a provisional ballot because of a problem with the

5   system.

6      Q     Is it your testimony that the Poll Pads

7   are Dominion voting equipment?

8      A     Yes.

9      Q     Are they manufactured by Dominion?

10     A     I don't think Dominion manufactures any of

11  their own equipment, but they are certainly

12  encompassed in our definition of the Dominion Voting

13  System, the Poll Pads are.

14     Q     Then let me just make sure we're all on

15  the same page here.  So does CGG have any knowledge

16  of the identity of any voter whose vote was not

17  counted as a result of the use of Dominion BMDs,

18  Dominion precinct scanners and Dominion central

19  count scanners, and the Dominion electronic

20  management system?

21     A     I'm thinking about that for just a moment.

22  In terms of specific identity for particular ballots

23  that we know were not counted, while we can go back

24  to the home precincts, I don't think we know of any

25  particular voter whose ballot we can identify -- we

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 235

1   wouldn't -- we wouldn't go so far as to identify if

2   we could -- that was -- that was not counted.

3           In fact, I have heard some people talk

4   about that they believe that their write-in votes

5   for qualified candidates were not counted, and we

6   have actually hesitated to go try to do the research

7   to find out, which we probably -- we might be able

8   to do, but we've hesitated to do it because we felt

9   like that was too much intrusion on ballot secrecy.

10      Q    We've been going on for a little while,

11  Ms. Marks.  Do you want to take another quick break?

12      A    If you wish.  How much time have we been

13  on the record?

14          MR. TYSON:  We can go off the record.

15          THE VIDEOGRAPHER:  The time is 5:30 p.m.

16  We're off the record.

17          (Recess 5:30-5:36 p.m.)

18          THE VIDEOGRAPHER:  The time is 5:36 p.m.

19  We're on the record.

20  BY MR. TYSON:

21      Q    Thank you, Ms. Marks.  I have consulted

22  over the break here to try to streamline this a

23  little bit and make this a little bit easier to skip

24  over a few things that we've pretty much covered, so

25  I'm going to skip ahead to topic number 19.

Page 236

1      A     Okay.

2      Q     Topic 19 is all factual and legal

3  contentions of the organization in relation to this

4  case, including but not limited to the contentions

5  of the organization concerning the 2020 elections

6  and the January 2021 runoff in Georgia.

7           And you're the designee for topic 19,

8  correct?

9      A     Correct.

10      Q     Did you review any documents to get ready

11  for this part of the deposition?

12      A     I review documents related to the 2020

13  election, you know, 17 hours a day, seven days a

14  week, so it's hard to say -- it wasn't done

15  specifically for this deposition, but I'm certainly,

16  you know, working with those documents all the time

17  that would prepare me for this deposition.  Not so

18  much on the January 2021.  I've not done a whole lot

19  of work on that -- the details of that election, but

20  certainly the legal contentions, yes.

21      Q     Okay.  Thank you.

22           So did you speak to anybody in preparation

23  for this particular topic?

24      A     Well, it kind of goes back to my first

25  answer.  I speak to dozens of people every day about

30(b)(6) Marilyn Marks                  March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 237

1   this -- this topic.  So I talked to nobody other

2   than counsel about -- about this topic as described

3   here.

4       Q    Okay.  Thank you.  That's helpful.

5            All right.  So is it CGG's contention that

6   it is impossible to know whether Joe Biden got more

7   votes than Donald Trump in the state of Georgia in

8   the 2020 presidential election?

9            MR. MCGUIRE:  Can I just object for a

10  moment.  I just want to reiterate the objection we

11  have made to the topic to the extent that it calls

12  for legal conclusions by a lay witness, and,

13  secondly, obviously this is a

14  1300-plus-docket-entry-length case, and it's an

15  unreasonable burden to prepare a witness on every

16  single factual contention in that volume of paper.

17           So I just want to make sure that objection

18  is on the record, and her preparation has been

19  constrained by that objection.

20           So with that, go ahead if you can answer.

21  BY MR. TYSON:

22      Q    You can answer.

23      A    Do you mind asking me that question again

24  because the question was kind of confusing, and I

25  may need more clarification from you?

Page 238

1      Q     Sure.  Maybe I can approach it this way,
2   it is CGG's contention that Dominion BMDs are
3   inherently unauditable, correct?
4      A     That's correct.
5      Q     Is it CGG's contention that because of the
6   unauditable nature of the Dominion BMDs, it is
7   impossible to know accurate vote totals for
8   elections conducted in Georgia?
9      A     Unfortunately, I'm going to need you to be
10  a little bit more precise because I don't want to
11  give you a misimpression.
12          When you say "accurate vote totals," we
13  can certainly do the arithmetic on the paper that
14  comes out of the BMDs, and somebody could eventually
15  figure out the correct arithmetic, but I'm not sure
16  that was the question you were asking me.
17          If you were asking me does -- do the
18  election totals reliably reflect what the voters may
19  have entered as their vote, that's a different
20  question.
21          So if you could be more precise with me,
22  that would be helpful.
23     Q     Certainly.  There's probably an easier way
24  to do this.  Let me mark Exhibit Number 33.
25          (Exhibit Number 33 was marked for

Page 239

1   identification.)

2   BY MR. TYSON:

3       Q    Do you see -- this is another Twitter

4   thread from your MarilynRMarks1 account?

5       A    Yes.  Does this have a date on it?

6       Q    This is January 1, 2021.

7       A    Okay.  All right.

8       Q    And what I'm trying to get to is someone

9   responded and said South Carolina and Kentucky are

10  the states that should be audited, and you said:

11  South Carolina is like Georgia.  It uses unauditable

12  BMD touchscreen machines.  We can never ever know

13  who won in South Carolina or Georgia because of the

14  use of those machines in the polling places.

15      A    Correct.

16      Q    You see that?

17      A    I do.

18      Q    Do you agree with that statement?

19      A    I do.

20      Q    Is CGG's contention that we can never

21  know -- is it -- sorry, let me start over again.

22           Is it CGG's contention that we cannot know

23  who won in Georgia because of the use of Dominion

24  BMDs in the polling places?

25      A    Yes.  And when we say "who won," what I

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 240

1    mean by that, and, of course, you know working with

2    a short Twitter message is hard to get all the

3    nuances in, but when I say "who won," what we mean

4    by that is we do not know who the voters voted for,

5    and that's what we mean by who won.  We do not know

6    who the majority or the plurality of the voters

7    voted for in Georgia.

8         Q    So it is CGG's contention then that it is

9    impossible to know whether more voters intended to

10   vote for Joe Biden than Donald Trump -- I'm sorry,

11   reverse of that.  It is CGG's contention that it's

12   impossible to know whether more voters attempted to

13   vote for Donald Trump in the November 2020 election

14   in the state of Georgia than voted for Joe Biden,

15   correct?

16        A    Well, that's true for any of the

17   candidates, including Biden, Trump, Jorgensen, that

18   that is correct that -- and that's what we've been

19   saying since before these BMDs were purchased long

20   before the 2020 election.

21        Q    And so it's also the case then --

22   actually, let me ask this:  Is it CGG's contention

23   that individuals who question the outcome of the

24   November 2020 election have a reasonable basis for

25   doing so?

30(b)(6) Marilyn Marks            March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 241

 1       A      Well, I guess you're going to have to be

 2    way more specific --

 3       Q      Okay.

 4       A      -- on, you know, quote, questioning the

 5    outcome.  We certainly do not condone the actions of

 6    some of the people you mentioned earlier today that

 7    you wanted to ask me about whether or not we've been

 8    in contact, people like Garland Favorito and Mike

 9    Lindell and Sidney Powell and whoever else was on

10    that list, we certainly do not condone those actions

11    at all, and I should say ever so strongly that we --

12    we do not support that kind of questioning of the

13    election.

14            And, you know, while we are very

15    uncomfortable with the way that the election was

16    conducted, and we've spent massive amounts of time

17    going through details of the election records, we

18    have found nothing that is recorded in the records

19    that would suggest that the outcome was wrongly

20    decided based on Georgia's processes.

21            But what we know, of course, is that we

22    will never know what the voters actually intended to

23    enter into those voting machines.

24            We do know how they voted on the

25    hand-marked paper ballots.  I say we do know.  Now,

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                                    Page 242

1    many of the records are missing, but at least we do

2    have a record, and that could be determined.

3         Q    So just -- just so I'm clear, that was a

4    long answer, I want to make sure I understand CGG's

5    contention about this.

6         A    Okay.  All right.

7         Q    If an individual relying on CGG's reasons

8    for questioning elections conducted on BMDs

9    questioned the outcome of an election, you would

10   agree that person had a reasonable basis to do so,

11   right?

12        A    I'm not going to tell you that as a

13   blanket proposition, no.  Let's say that we had an

14   election that used, I don't know, 15 percent BMDs

15   and most people voted by mail and somebody

16   challenged the election, I would not make a blanket

17   statement that there was a reasonable basis to

18   challenge.  It certainly depends on the

19   circumstances.  You have to be really -- you have to

20   look at all the facts before we can say there was a

21   reasonable basis for challenging.

22             I mean, you mentioned Garland Favorito.

23   Some of the wild claims that he is making,

24   absolutely there's no reasonable basis in it, and,

25   in fact, there are a bunch of lies coming out.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 243

1   That's -- no, that's not reasonable.

2       Q    Does CGG question the outcome of the
3   November 2020 presidential election?

4       A    No, I don't think you would have ever seen
5   us question that.  I think we have been consistent
6   before, during, and after this election, and before
7   the election we said, just as with all BMD
8   elections, we will never be able to know the
9   outcome.

10          We've said that -- we've said that since
11  before the BMDs were ever even purchased that
12  because of the design we would never be able to
13  assure ourselves of the outcome of any election
14  primarily conducted with BMDs.  We would say the
15  same, of course, of the November 2020 election and
16  all before and after elections, and -- oops, wait a
17  minute.  I messed up my screen just now.  Hold on.
18  Okay.  I'm back.

19          But as it -- and as I say, we've been
20  quite consistent.  We have huge objections to the
21  massive errors in the audit and the massive
22  tabulation errors, but still, given the work we've
23  done today, and it's not definitive, we have not
24  seen anything that, based on Georgia's method of
25  tabulating votes, that would change the outcome.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                        Page 244

1    Not a basis for challenging the outcome of the

2    presidential election.

3              Quite frankly, we have not -- if you were

4    talking about the presidential election.  I'm

5    assuming you were talking about the presidential

6    election.

7         Q    I was.  I'm sorry.

8         A    But if you were talking about some of the

9    down-ballot elections, we haven't done enough work

10   to know.  We do know that there was significant

11   double and triple counting of votes in many of the

12   down-ballot elections, but we have not gotten far

13   enough in our work to know whether it would have

14   changed the outcome of any of those down-ballot

15   elections.

16        Q    And I'm trying to understand the position

17   of CGG because what I hear you say is there's no --

18   we're not questioning the outcome of the November

19   2020 election because there's no evidence to the

20   contrary, but isn't CGG also saying that there

21   cannot be evidence of the contrary because the

22   machines don't preserve evidence of voter intent?

23        A    No, I think you're mixing a bunch of

24   subjects here because you're trying to talk about

25   the election in total and whether or not there is a

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 245

1   basis for contesting the outcome of the election and

2   then the operation of the BMDs as one sliver of it.

3            So if you don't mind, ask me the question

4   again, and I'll try better to understand your exact

5   question.

6       Q    Sure.  And to be clear, I'm not asking for

7   election contests.  I'm asking --

8       A    Okay.

9       Q    I'm asking specifically about if an

10   individual relying on CGG's position about the

11   unauditable nature of the Dominion BMDs --

12       A    Yes.

13       Q    -- has doubts about whether Joe Biden won

14   the state of Georgia in November 2020, are those

15   concerns valid?

16            MR. MCGUIRE:  Object to form.

17       A    Yes, I think that they are valid not only

18   for Joe Biden, but all the way up and down the

19   ballot for every ballot that was cast from the time

20   we, the State of Georgia, adopted BMDs until -- I

21   think there was an election Tuesday, wasn't there,

22   somewhere in a special election Tuesday or close to

23   it?

24            Anyway, all of those BMD-based elections,

25   yes, there is a reason to question whether the BMD

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 246

1    results reflect the will of the voters, absolutely.

2    BY MR. TYSON:

3        Q    And so is it CGG's contention that voters

4    in Georgia have a reasonable basis to question each

5    election conducted in Georgia as long as we use

6    Dominion BMDs?

7        A    So long as Dominion BMDs are the primary

8    source of votes cast, yes.

9        Q    Let me ask you about some additional -- I

10   want to turn to the Coalition's request -- responses

11   to our request for admission about some of the

12   specific contentions.  Let me find that real quick.

13   I'm sorry.

14       A    Bryan, may I go back and just add

15   something to my last answer about trying to address

16   your question about the presidential contest,

17   presidential --

18       Q    Uh-huh.

19       A    Okay.  What I'm trying to say is that

20   while you're asking about the presidential contest,

21   and we have seen a whole lot of errors in the entire

22   November election from the top of the ballot to tax

23   commissioner at the bottom, the system has so many

24   flaws in its operation right now that it is

25   reasonable to question any election contest on the

Page 247

1   November ballot and any election that was done from

2   the adoption of the BMDs through now, and we would

3   not make a particular distinction between the

4   presidential election and the tax commissioner

5   election.

6           I hope that's clearer than what I tried to

7   say before, which is very different from what you're

8   hearing Garland Favorito and Sidney Powell and those

9   characters say.  Okay?

10      Q    And essentially it's CGG's position that

11  you can't make the case that Garland Favorito and

12  Sidney Powell are making because the evidence

13  doesn't exist; is that correct?

14      A    Do you mind -- do you mind saying that one

15  more time?

16      Q    Uh-huh.  Is it CGG's position that you

17  can't make the case that Mr. Favorito and Ms. Powell

18  are making that the election was stolen because the

19  evidence doesn't exist when Georgia elections are

20  conducted primarily on BMDs?

21      A    Well, the claims that I hear them making

22  don't seem to have a lot to do with BMDs.  They're,

23  like, crazy -- crazy stuff about everything from

24  Chinese televisions to mail ballot counter- --

25  counterfeited mail ballots, and, no, I don't believe

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 248

1   any of that evidence -- I won't even call it

2   evidence.  I don't think any of those things exist

3   as evidence, but I don't think that if we come back

4   to the theme of what we at CGG are working on, and

5   that is that the BMD system does not provide an

6   evidence-based election result.

7        Q    Thank you.  All right.  Let me go to some

8   of the specific contentions about 2020.

9             (Exhibit Number 34 was marked for

10  identification.)

11  BY MR. TYSON:

12       Q    So I've marked as Exhibit 34 the

13  Coalition's objections and responses to Secretary

14  Raffensperger's first request for admission.

15            You see that?

16       A    Yes.

17       Q    What I want to do is ask about a couple

18  specific ones related to November.

19            So request for admission number 12 says

20  admit that you have no evidence that any component

21  of the election system was actually hacked prior to

22  or during the elections held on November 3rd, and

23  that was denied.

24            Do you see that?

25       A    I do see that.  And do you mind showing me

30(b)(6) Marilyn Marks                  March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 249

1    the date of this document?

2         Q    Certainly.  January 27th, 2021.

3         A    Okay.  And that is what we said at the

4    time?

5         Q    Uh-huh.  Is that a different answer today?

6         A    I think it is a different answer today.

7         Q    Okay.  Why is it a different answer today?

8         A    Because here we are, what, 14 months

9    later, and we now have pieces of evidence and

10   documents from the State Defendants as well as other

11   public records that we have obtained since that time

12   that would indicate that, in fact, there are

13   irregularities that could reasonably be attributed

14   to hacking.

15        Q    And those irregularities affected the

16   November 2020 election?

17        A    Yes.

18        Q    So what irregularities are you referring

19   to that changes this answer for the Coalition?

20        A    Okay.  There are three general categories

21   for this, and so I don't want to forget them.  Let

22   me just make myself a note.

23             Okay.  The first, and it is really the one

24   that has come to my awareness most recently, and

25   that is that it appears that in, perhaps, mid

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 250

1    November that unauthorized access was given to

2    people in Coffee County, Georgia mid November --

3    excuse me, mid November 2020, I didn't mean more

4    recent.  In mid November 2020 unauthorized access

5    appears to have been given to people after the

6    original count of the election was performed and the

7    hand audit in Coffee County which appeared to prove

8    out the arithmetic without a problem of one vote

9    difference, and then the third week of November

10   appears that there was unauthorized access, and

11   then, at least according to the public records, it

12   appears that there were problems with the

13   tabulations caused by what's alleged to be a

14   systemic problem in the machine re-count.  And so

15   there is a question as to whether that unauthorized

16   access created the tabulation errors.

17        Q    Is that -- is that number 1 of 3 or is

18   that all?

19        A    That's 1 of 3.  I'm so sorry, yes, that's

20   1 of 3.

21             The second would be the nature of the

22   double- and triple-counted votes that happened in

23   many counts, but I know more about them in Fulton

24   because I spent way more time looking at them in

25   Fulton than I have in other -- in others.

Page 251

1          Now, the Fulton Election Board has said

2     that they did not double scan or triple scan any

3     significant number of ballots.  They say it was

4     only, like, a hundred.  And I believe that that's

5     consistent generally with what the Secretary of

6     State's witnesses have said, that it was a very

7     limited number of ballots that they are aware of

8     being double scanned.  That leaves us with thousands

9     of ballots that we know we have images that were

10    double and triple counted.

11         So if they're not being scanned, there is

12    some other type of electronic systemic error or

13    manipulation that is going on that's causing the

14    double and triple counting of votes.

15         Then the third would be something similar

16    to the second, and that is there are thousands of

17    ballot images that are shown to be counted in the

18    first count -- the first machine count that were not

19    counted in the second machine count and vice versa.

20         And I'm sure I didn't explain that well,

21    but, you know, that you can take the sets of ballot

22    images and compare them and find in the population

23    of ballot images for the first count mismatches in

24    the second count.

25         So we for short call them strays where

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 252

1    they don't have a partner in the other account.

2    Sometimes they're in one and not two; sometimes

3    they're in two and not one.

4            Fulton County has essentially said, no, we

5    scanned only one ballot and only once, and if they

6    are correct in that, there is something causing that

7    is causing it to look like there was electronic

8    manipulation to create all of the irregularities in

9    the vote count.  Those are my three.

10       Q    Okay.  So for each of those three would it

11   be correct to say they are irregularities that could

12   be caused by hacking, but CGG doesn't know for sure?

13       A    Of course we do not know for sure because

14   there would be, you know, forensic analysis that's

15   not been permitted and not been undertaken that

16   would be required to know exactly how those

17   irregularities came to be.

18            Is it a mechanical problem, is it a -- a

19   software issue that was built into the system, is it

20   a change that -- that a malicious user or an insider

21   did, and then which of those -- which of those fall

22   in the definition of hacking.

23       Q    And so is it CGG's contention that those

24   three categories in Mr. Lamb's evidence of the KSU

25   server are evidence of hacking that CGG has related

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 253

1   to Georgia election systems?

2       A    Those are the primary things that come to

3   mind right now, and, quite frankly, we have so --

4   there have been -- we have so many troublesome

5   documents, in the millions of images and stuff that

6   we have, we could have evidence in our hands that we

7   have not yet figured out created a problem.

8           So I'm saying those are the four things

9   that are primary that I know of today.  And, you

10  know, some of them I didn't know of until very

11  recently.

12      Q    And so going to request for admission

13  number 12, would those same four categories of

14  evidence be the evidence CGG has about malware being

15  actually inserted into any component of the election

16  system prior to or during elections held on November

17  3rd, 2020?

18      A    Let me think about that for just a minute,

19  see if I can -- see if I'm leaving anything out.

20          Those four topics are the only things I

21  can think of right now that would be -- would be

22  signs of irregularities that could be caused by

23  malware.

24          I am not declaring that all of those

25  things were malware, I can't do that, but it is a

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 254

1    reasonable -- it is a reasonable possibility,

2    particularly given Fulton's position that it was

3    not, for example, double scanning, and they did

4    count all the ballots that they had.

5        Q    Let me go to request for admission 14.

6    There Coalition was asked to admit that you have no

7    evidence that any votes in the presidential election

8    held on November 3rd, 2020, in Georgia were actually

9    switched from President Trump to Joseph R. Biden,

10   Jr. as a result of an anomaly in the software used

11   in the election system.

12           What evidence does CGG have that a

13   software anomaly switched votes from President Trump

14   to President Biden?

15       A    I'm rereading the question and trying to

16   remember here.  Just a second.

17           I'm having a hard time remembering what we

18   might have been -- what examples we might have been

19   thinking about when we said denied.  I'm sure the

20   minute this deposition's over I'm going to remember

21   that.

22           I'm wondering if we might have been

23   looking at the flawed audit tallies and some of the

24   flawed hand -- hand audit counts that were in the --

25   that were done, as you recall, in the second week of

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 255

1   November hand tallies where, in fact, what was

2   showing up in those audits did appear to be

3   different and in some cases flipped from what was

4   recorded in the machines.

5        Q     And is that the only item you're aware of

6   that relates to a software anomaly?

7        A     It's what I'm remembering right now.  I'm

8   afraid I'm forgetting something on this, but it's

9   what I'm remembering right now we must have been

10  talking about.

11       Q     Go to request number 29.  Coalition was

12  asked to admit that you have no evidence there was

13  any mismatch between the QR codes on the paper

14  ballots cast in the presidential election held on/in

15  Georgia on November 3rd, 2020, and the human

16  readable portion of the paper ballots, and there was

17  a denial of that.

18            What evidence does Coalition have of a

19  mismatch between QR codes and the human readable

20  portion of the ballot?

21       A     Trying to remember what may have been in

22  our minds when we answered this question.  Mismatch

23  between the QR code.  I'm sorry, I just don't

24  remember right now.  I don't have any evidence off

25  top of my head that relates to mismatch between the

Page 256

1    QR code and the human readable text, but I'll be

2    happy to supplement my answer when I remember it.

3         Q    You need to take a break now so you

4    can investigate?

5         A    I'm probably not going to remember in the

6    next five minutes, but --

7         Q    Well, this is a 30(b)(6) deposition, so if

8    you want to take a pause to investigate, we can do

9    that.

10        A    It may just -- it may take a while.  Is

11   there an alternative for me to get back to you later

12   if I can remember what this is?

13        Q    Who would you call to verify this

14   information?

15        A    I would probably call Bruce Brown and get

16   him to remind me of his notes.

17        Q    Okay.  We can always suspend at the end

18   and come back if we need to, so that could be an

19   alternative.

20        A    Okay.

21        Q    Let me go next to topic number 20, which

22   is the organization's knowledge of any ballot

23   altered, not counted or otherwise impaired by use of

24   the Dominion BMD system in Georgia, and you are the

25   designee for this topic as well, correct?

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 257

1      A      I am, yes.

2      Q      Did you review any documents to prepare

3  for topic 20?

4      A      Certainly, I deal with November -- mainly

5  November 2020 ballot issues every single day, but

6  not necessarily specifically for the purpose of

7  preparing for this.  I feel prepared for this based

8  on the work that I do every day.

9      Q      And so did you speak with anybody

10  specifically for this topic as well?

11      A      I speak to people on this topic all the

12  time, but not for the specific purpose of preparing

13  for this deposition.

14      Q      Does CGG have any evidence, any ballots

15  generated by a BMD in the November 2020 election

16  that were not counted by the Dominion system?

17      A      Yes.

18      Q      And what evidence is that?

19      A      That is the number three thing that we

20  were talking about a few minutes ago where I called

21  them strays at the time where we have ballots that

22  are counted in machine -- we call it machine count

23  1, and the re-count we call machine count 2, but --

24  so we have ballots in both of those election counts

25  that were not counted in the other official count.

30(b)(6) Marilyn Marks                March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 258

1    So, yes, we do have -- we do have evidence of that.

2         Q    Does CGG have any evidence of any ballot

3    generated by BMD that was altered by the Dominion

4    system?

5         A    I can't quite envision how I would ever

6    know whether the thing was altered by the Dominion

7    system because all we have are -- are the ballot

8    images that were produced by the Dominion system.

9    We would have no way of knowing what the guts of the

10   BMD did to the choices on that ballot.

11            And other than not counting them

12   correctly, no, I don't have -- all I can envision is

13   something you're talking about that would suggest

14   that the ballot image has been altered by the system

15   itself.  Not that I'm aware of, but, again, we do

16   not know the cause of why some of these images

17   appear two and three times and are counted multiple

18   times.  And does that come from ballot alteration, I

19   don't know.

20        Q    And you don't have any evidence one way or

21   the other right now, right?

22        A    We know they weren't counted, or in other

23   cases counted two and three times, but whether or

24   not it is because a BMD ballot was altered -- using

25   the altered, I don't know that.  It would seem to be

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 259

1   some kind of systemic problem.

2        Q    Now, CGG responded to a December 30th,

3   2020, Senate Judiciary Subcommittee hearing posting

4   a transcript with some comments online.  Do you

5   recall that?

6        A    I don't, but I'm sure if you say so it

7   happened, but I don't recall it right now.

8             (Exhibit Number 35 was marked for

9   identification.)

10  BY MR. TYSON:

11       Q    So I marked --

12       A    I do recall it.

13       Q    Exhibit 35, this document is a rough

14  transcript with comments by Marilyn Marks, Coalition

15  for Good Governance in blue; you see that?

16       A    Yes.

17       Q    And you prepared this document?

18       A    I prepared at least my comments; otherwise

19  it was probably an automated transcript that we

20  would have produced -- excuse me, that we would have

21  created.  It was probably edited by an intern, and I

22  probably put in whatever is in blue font which we

23  haven't seen yet.

24       Q    Got it.  I just want to ask a few

25  questions about this.  Mr. Hutton-Pulitzer makes the

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 260

1    allegation that he would be able to tell if the

2    ballots were folded, if they were counterfeit,

3    whether they were filled out by human hands, whether

4    they were printed by a machine, whether they were

5    batch fed continually over and over, we can detect

6    every bit of that.  Do you see that language?

7        A    I do.

8        Q    Then CGG in blue responds:  There is no

9    credible allegation of ballots being repeatedly

10   scanned to add more votes.

11            Do you see that?

12       A    I do.

13       Q    And do you no longer agree with that

14   statement today?

15       A    Well, of course, this was written before

16   we were able to obtain all of the ballot images that

17   show double -- because we did not get those until

18   July, and -- excuse me, it might have been late --

19   sorry, I think it was late June of 2021, and we were

20   not aware of the double and triple counting until we

21   did analysis work on that.  But, now, what he is

22   saying, he -- what I was saying here is repeatedly

23   scanned to add more votes.

24            I don't know that we have seen anything

25   that says that the double and triple counting is

Page 261

1    coming from repeated scanning, but I'm guessing --

2    whether they were batch fed continually over and

3    over.

4              You know how they have these ridiculous

5    allegations of State Farm Arena-located employees

6    double and triple and quadruple scanning ballots to

7    add more votes.  We know that is not correct.  We

8    know the very limited number of ballots that were

9    double scanned during that time, and it is a small

10   number of ballots, but we did not know about that at

11   the time that I wrote this.  We did not know of any,

12   but we do know now it was a limited number.

13        Q    So let me go --

14        A    So that comment is out of date.  It's not

15   current.

16        Q    Okay.  So this statement was made before

17   CGG had made an investigation into whether there was

18   ballots being counted more than once?

19        A    Yes.  And, again, I would make a big

20   distinction between what he's talking about and the

21   scanning that took place at State Farm Arena which

22   we think that the errors were quite limited to

23   double and triple counting of much greater numbers.

24        Q    Go to one other statement on here that I

25   want to ask you about on page 14.  So there is a

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 262

1    kind of extended discussion about scanners.  I just

2    want to ask you about comments in blue.

3            CGG says:  We have tested the scanners on

4    many barcoded ballot-on-demand ballots and have not

5    seen any systemic counting errors related to the

6    barcode or alignment.  We've heard of none reported

7    by others.  Is Pulitzer saying he had some evidence

8    of a vote count problem; do you see that?

9        A    I do.

10       Q    And does CGG still agree with that

11   statement today?

12       A    So I believe that the focus -- I mean, I

13   am barely remembering this, but I believe the focus

14   of that was he didn't understand why there were

15   barcodes on some of the paper hand-counted

16   ballots -- it's not hand counted, I'm sorry,

17   hand-marked ballots, and, of course, they were from

18   the ballot-on-demand printer, which were not coming

19   from the commercial printer, and he was making some

20   big deal about the barcoded ballots being different.

21   I think he even said some crazy thing like the

22   Republican ballots only had barcodes.  I have

23   forgotten what it was, but his focus was the

24   barcode.

25           My point here was saying we have not seen

Page 263

1    any problem with the ballot-on-demand ballots being

2    any different than any other ballot.

3            That was -- that was the focus of that.

4    And to this day I don't believe we have found any

5    issue related to the printing of the barcode at the

6    top right corner of the ballot.

7        Q    Thank you.

8            With that, let me go to topic number 22,

9    which is the organization's review of expert reports

10   produced in this case, including, but not limited

11   to, the expert reports of Dr. J. Alex Halderman.

12           Do you see this topic?

13       A    I do.

14       Q    And you are the designee for this topic,

15   correct?

16       A    Yes.

17       Q    Have you personally read the sealed report

18   of Dr. Halderman?

19       A    No, I have not, of course.

20       Q    Has any representative of CGG read the

21   sealed report of Dr. Halderman?

22       A    When you say representative, the only

23   people that I'm aware of that have had access to

24   that report associated with CGG are our attorneys

25   and our experts in the case.  Certainly not me,

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 264

1    certainly not our directors, certainly none of our

2    members that I'm aware of.

3                MR. TYSON:  Let's go off the record for

4    just a minute.

5                THE VIDEOGRAPHER:  The time is 6:22 p.m.

6    We're off the record.

7                (Recess 6:22-6:32 p.m.)

8                THE VIDEOGRAPHER:  The time is 6:32 p.m.

9    We're on the record.

10               MR. TYSON:  Good afternoon again,

11   everybody.  I wanted to briefly clarify one point

12   before we get started again.

13   BY MR. TYSON:

14        Q    Ms. Marks, we were looking at Exhibit 34,

15   the request for admission, and I believe you

16   indicated that the answer to number 11 would have

17   changed, but the testimony as we talked through it,

18   in fact, you were discussing that the Coalition --

19   you discussed the Coalition's evidence of an actual

20   hacking which would make the answer of denied the

21   correct answer.

22               So is it correct that the answer to number

23   11 request for admission has not changed based on

24   your testimony?

25        A    That's correct, we were saying there is

Page 265

1    evidence.

2         Q     Thank you.

3              MR. TYSON:   Mr. McGuire?

4              MR. MCGUIRE:   Yes.   I also wanted to put

5    on the record that Mr. Tyson and I spoke off the

6    record during the break about the questions he had

7    attempted to ask earlier regarding Ms. Marks's

8    conversations, whether she had conversations or

9    anyone from Coalition had conversations with Sidney

10   Powell, Lin Wood, Mike Lindell, Garland Favorito.

11   We invoked document 1203 which has been entered by

12   the Judge in this case as prohibiting those

13   questions, but in the off-the-record time I offered

14   that Ms. Marks was willing to answer those questions

15   provided it didn't waive the protection of that

16   order 1203.

17              And Mr. Tyson and I -- Mr. Tyson said that

18   his team agreed that those questions were not

19   appropriate under the order, and, therefore, he

20   wouldn't ask them anyway.   And so we wanted to put

21   this on the record so that it's clear that we were

22   willing to answer those questions in the negative.

23   Thank you.

24              MR. TYSON:   Yes, and that's correct.

25   Thank you, Mr. McGuire.

Page 266

1    BY MR. TYSON:

2         Q    Ms. Marks, we're on the home stretch here.

3    Let me refer you back to our exhibit.  We're going

4    to be on our last topic, number 24, which is the

5    process by which the organization searched for and

6    identified documents responsive to discovery

7    requests in this case, and you're the designee for

8    topic 24, correct?

9         A    That is correct.

10        Q    And did you review documents to prepare

11   for this topic of the deposition?

12        A    I didn't review a document about the

13   process.  I don't think -- I don't think we created

14   a document for how I searched for records.

15        Q    Did you speak with anybody associated with

16   CGG to prepare for this topic?

17        A    Certainly with counsel, and in general in

18   the past talking to the board members about whether

19   they might have responsive documents that I did not

20   have, and generally the answer of that is no.

21        Q    So I just want to -- I've marked as

22   Exhibit 36 the Coalition's objections and responses

23   to our second request for production of documents.

24             (Exhibit Number 36 was marked for

25   identification.)

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 267

1   BY MR. TYSON:

2        Q     Do you see that?

3        A     I do.

4        Q     And so I wanted to go to -- hold on.  I

5   think I'm in the wrong document here.  Hang on just

6   a second.

7              I'm so sorry.  Let me go to Exhibit 37,

8   which is the first request for production of

9   documents.

10             Do you see that?

11       A     I do.

12             (Exhibit Number 37 was marked for

13   identification.)

14   BY MR. TYSON:

15       Q     So let me just go to a couple of these in

16   particular.  Request number 2 requested all

17   documents and communications that reflect any

18   diversion of personnel or time spent by or on behalf

19   of the Coalition as a result of your challenges to

20   the election system and/or the litigation from

21   January 1, 2017, to the present.

22             You see that?

23       A     Yes.

24       Q     And you indicate that Coalition will

25   produce documents sufficient to show a diversion of

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 268

1   resources for purposes of establishing standing in

2   this litigation?

3       A    Yes.

4       Q    How did you go about searching for those

5   documents in response to number 2?

6       A    Well, of course, in the fee claim that we

7   talked about earlier, I think we show a significant

8   amount of documentation of hours spent -- paid,

9   hours spent by our interns, and time that I spent,

10  and certainly that type of -- that type of activity

11  has continued since at similar levels.

12      Q    As of today, I know you said documents are

13  going to be produced -- more documents may exist

14  later on, but as of today has CGG produced all

15  responsive documents to this request?

16      A    I think we objected to some of this, but

17  have I sent you-all time sheets from the interns,

18  no.

19      Q    But it's CGG's position that it has

20  produced as of today documents sufficient to show a

21  diversion of resources for purposes of establishing

22  standing in this litigation?

23      A    Certainly, yes.

24      Q    Let me go next to -- down here to request

25  number 31, and so there's a serious of documents

30(b)(6) Marilyn Marks                March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 269

1    here, 31 through 42, where each response is

2    responsive documents will be produced.  I don't know

3    if you want to pull it up and review it on yours or

4    if you want to go through each one.  Do you have a

5    preference?

6         A    I'm sorry, are you asking do I want to

7    pull up what, this same -- the same exhibit?

8         Q    Yes.  Let me just explain.  What I want to

9    do is for each of those requests where responsive

10   documents will be produced is the response, I just

11   want to confirm that CGG has produced all responsive

12   documents as of today.

13            So we can either do them one at a time, or

14   if you want to read them as a group and then

15   respond, that's -- I'm just trying to think of the

16   most efficient way to --

17        A    Why don't we do them as a group and

18   respond.  How's that?

19        Q    Okay.  That'll work great.

20        A    Okay.  Can you scroll down.  Okay.  Okay.

21   Okay.  All right.  Okay.  Okay.

22        Q    Have you now reviewed request numbers 31

23   through 42?

24        A    Yes.

25        Q    And has CGG produced all documents

Page 270

1    responsive to these requests as of today's date?

2    I'm not asking for documents that may come into

3    existence in the future.

4         A    Right.  You know, all documents that we

5    reasonably found in our searches, you know.  Can I

6    tell you that we haven't missed some documents by

7    mistake, no, but, you know, all things -- all of the

8    ones that came up in reasonable searches, yes, we

9    have produced.

10        Q    Did the -- did CGG utilize keyword

11   searches to identify responsive documents?

12        A    Yes, we did, but not in a sophisticated

13   manner like a big agency would have.  I did it

14   through just normal using -- using Microsoft and

15   Adobe types of searches on e-mails, on PDFs, that

16   sort of thing.  I don't have any fancy litigation

17   platform searches of -- of the organization's

18   documents.

19        Q    Does CGG maintain a central e-mail server?

20        A    No, we do not.

21        Q    Did you conduct a search of all the e-mail

22   addresses for CGG that it maintains?

23        A    We don't actually maintain any e-mail

24   address for anybody except for me.

25        Q    Did you search the personal in-boxes of

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 271

1    any of your interns?

2         A    Sorry, I guess that's wrong.  We do have

3    their -- we have Gmail addresses that are assigned

4    to them, and they are only used for CGG business,

5    and so any documents that would have been in those

6    records we would have gotten in the searches.

7         Q    So you searched the e-mail boxes?

8         A    Yes, I think I did have them do that.  I

9    didn't personally do that.

10        Q    And does CGG maintain any sort of central

11   file server?

12        A    No.

13        Q    And so how did you conduct a search for

14   documents that were not e-mails?

15        A    So I keep lots of files by category in a

16   big Dropbox of -- account, and so I did searches on

17   all of my folders that have anything to do with

18   Georgia or election systems and did Dropbox searches

19   using -- using that tool.

20        Q    Okay.  And did you give your interns

21   specific written instructions of how to search their

22   own Gmail boxes?

23        A    No, that probably goes back some time ago,

24   and I probably just talked to them by phone about

25   it, but for the most part the vast majority -- vast

Page 272

1   majority of their e-mails are with me or -- they're

2   with me, and then otherwise they tend to be public

3   records requests and responses which they did look

4   for and forward me.  Generally I get a copy of them

5   anyway.  But that would account for virtually all of

6   the traffic going to the interns' accounts.

7        Q    So let's go next to same process for

8   request number 44 through 56.  I'll scroll through

9   those if you can read them.

10       A    Okay.  Okay.  Oops.  Okay.  All right.

11  Okay.  Okay.  Okay.  Okay.  Okay.  Okay.

12       Q    So you've now had a chance to review

13  request numbers 44 through 56?

14       A    Uh-huh.

15       Q    Is that a yes?

16       A    Yes.  I'm so sorry.  Yes.

17       Q    And has CGG produced all documents

18  responsive to these requests as of today?

19       A    Yes, to the best of my knowledge.

20       Q    And then I have three more.  Number 58.

21       A    Okay.

22       Q    And number 61.

23       A    Okay.

24       Q    And number 62.

25       A    Okay.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 273

1      Q    So for -- you've now read requests 58, 61,

2   and 62; is that correct?

3      A    Yes.

4      Q    The same question on those, have all

5   responsive documents been produced as of today?

6      A    To the best of my knowledge, yes.

7      Q    And I realize, Ms. Marks, I apologize, I

8   know we talked about interns and your e-mail box.

9   Did you collect any documents from the board members

10   of CGG?

11     A    If I recall this has been some time ago,

12   and I asked them, but I cannot remember whether any

13   of them had anything that I didn't have, so I don't

14   remember whether there was separate production from

15   them.  They were asked, but I don't -- but it

16   might -- if it was a duplicate document, if it was

17   something like to me we probably didn't produce both

18   copies.

19     Q    Did you provide any instructions to the

20   board members about how to conduct a search?

21     A    I don't recall right now.  It's been a

22   little while.

23     Q    Last thing our second requests for

24   production, Exhibit 36, I just want to go to number

25   8, all documents or communications concerning

Page 274

1   membership with the Coalition for Good Governance,

2   including but not limited to registration processes,

3   dues, responsibilities, obligations, or benefits of

4   membership.

5            See that request?

6        A    Yes.

7        Q    Has CGG provided all responsive documents

8   related to request number 8?

9        A    Yes, we have.  That would be directly for

10  those purposes, yes, and we've discussed a lot of

11  that today.

12       Q    Yes.  Okay.  Ms. Marks, I know it's been a

13  long day.  I appreciate your endurance through this.

14  With that, I know you had one issue you wanted to do

15  some further digging on related to QR codes, so at

16  this point I think we can just suspend whatever time

17  we have left and go from there.

18            THE VIDEOGRAPHER:  This suspends the

19  deposition.  The time is 6:50 p.m., and we are now

20  off the video record.

21            (Off video.)

22            MR. MCGUIRE:  I'm not sure if I said this

23  on the record or not, but we would like to read and

24  sign, so thank you.

25            (Off-the-record discussion.)

30(b)(6) Marilyn Marks                March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                                        Page 275

1              MR. TYSON:  So, Ms. Marks, one additional

2     housekeeping issue, I know we need to get a copy of

3     the notes that you referenced there, so if we could,

4     you just take a picture and e-mail it to

5     Ms. Bosworth, the court reporter, and we'll mark

6     that as Exhibit Number 38 to your deposition.

7          A     All right.

8              (Exhibit Number 38 was marked for

9     identification.)

10             MR. MCGUIRE:  While we're on the record, I

11    would just add that we wanted to read.

12             (Deposition adjourned at 6:52 p.m.)

13             (Signature reserved.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 276

1        The following reporter and firm disclosures
    were presented by me at this proceeding for review
2    by counsel:
3                REPORTER DISCLOSURES
4            The following representations and
    disclosures are made in compliance with Georgia Law,
5    more specifically:
6            Article 10 (B) of the Rules and
    Regulations of the Board of Court Reporting
    (disclosure forms)
7            OCGA Section 9-11-28 (c) (disqualification
    of reporter for financial interest)
8            OCGA Sections 15-14-37 (a) and (b)
    (prohibitions against contracts except on a
9    case-by-case basis).
10   - I am a certified court reporter in the State of
    Georgia.
11   - I am a subcontractor for Veritext.
    - I have been assigned to make a complete and
12   accurate record of these proceedings.
    - I have no relationship of interest in the matter
13   on which I am about to report which would disqualify
    me from making a verbatim record or maintaining my
14   obligation of impartiality in compliance with the
    Code of Professional Ethics.
15   - I have no direct contract with any party in this
    action, and my compensation is determined solely by
16   the terms of my subcontractor agreement.
17
18                FIRM DISCLOSURES
19   - Veritext was contacted to provide reporting
    services by the noticing or taking attorney in this
20   matter.
    - There is no agreement in place that is prohibited
21   by OCGA 15-14-37 (a) and (b).  Any case-specific
    discounts are automatically applied to all parties,
22   at such time as any party receives a discount.
    - Transcripts:  The transcript of this proceeding as
23   produced will be a true, correct, and complete
    record of the colloquies, questions, and answers as
24   submitted by the certified court reporter.
    - Exhibits:  No changes will be made to the exhibits
25   as submitted by the reporter, attorneys, or
    witnesses.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                                    Page 277

1    - Password-Protected Access:  Transcripts and

     exhibits relating to this proceeding will be

2    uploaded to a password-protected repository, to

     which all ordering parties will have access.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 278

1                              CERTIFICATE
2     STATE OF GEORGIA:
      COUNTY OF FULTON:
3
4              I hereby certify that the foregoing
      transcript was taken down, as stated in the caption,
5     and the colloquies, questions and answers were
      reduced to typewriting under my direction; that the
6     transcript is a true and correct record of the
      evidence given upon said proceeding.
7              I further certify that I am not a relative
      or employee or attorney of any party, nor am I
8     financially interested in the outcome of this
      action.
9              I have no relationship of interest in this
      matter which would disqualify me from maintaining my
10    obligation of impartiality in compliance with the
      Code of Professional Ethics.
11             I have no direct contract with any party
      in this action and my compensation is based solely
12    on the terms of my subcontractor agreement.
               Nothing in the arrangements made for this
13    proceeding impacts my absolute commitment to serve
      all parties as an impartial officer of the court.
14
15             This the 4th day of April, 2022.
16
17             _Robyn Bosworth_
18    _____
19     ROBYN BOSWORTH, RPR, CRR, CRC, CCR-B-2138
20
21
22
23
24
25

Veritext Legal Solutions
800.808.4958                                770.343.9696

30(b)(6) Marilyn Marks                        March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 279

1    To: Robert McGuire, Esq.
2    Re: Signature of Deponent Marilyn Marks
3    Date Errata due back at our offices: 30 Days
4
5    Greetings:
6    This deposition has been requested for read and sign
     by the deponent.  It is the deponent's
7    responsibility to review the transcript, noting any
     changes or corrections on the attached PDF Errata.
8    The deponent may fill out the Errata electronically
     or print and fill out manually.
9
     Once the Errata is signed by the deponent and
10   notarized, please mail it to the offices of Veritext
     (below).
11
     When the signed Errata is returned to us, we will
12   seal and forward to the taking attorney to file with
     the original transcript.  We will also send copies
13   of the Errata to all ordering parties.
14   If the signed Errata is not returned within the time
     above, the original transcript may be filed with the
15   court without the signature of the deponent.
16
17   Please send completed Errata to:
18   Veritext Production Facility
19   20 Mansell Court, Suite 300
20   Roswell, GA 30076
21   (770) 343-9696
22
23
24
25

30(b)(6) Marilyn Marks                     March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 280

1   ERRATA for ASSIGNMENT #5136390
2   I, the undersigned, do hereby certify that I have
    read the transcript of my testimony, and that
3
4   ___ There are no changes noted.
5   ___ The following changes are noted:
6
    Pursuant to Rule 30(7)(e) of the Federal Rules of
7   Civil Procedure and/or OCGA 9-11-30(e), any changes
    in form or substance which you desire to make to
8   your testimony shall be entered upon the deposition
    with a statement of the reasons given for making
9   them.  To assist you in making any such corrections,
    please use the form below.  If additional pages are
10  necessary, please furnish same and attach.
11  Page No._____Line No._____Change to_____
12  _____
13  Reason for change_____
14  Page No._____Line No._____Change to_____
15  _____
16  Reason for change_____
17  Page No._____Line No._____Change to_____
18  _____
19  Reason for change_____
20  Page No._____Line No._____Change to_____
21  _____
22  Reason for change_____
23  Page No._____Line No._____Change to_____
24  _____
25  Reason for change_____

Page 281

```
 1    Page No._____Line No._____Change to_____
 2    _____
 3    Reason for change_____
 4    Page No._____Line No._____Change to_____
 5    _____
 6    Reason for change_____
 7    Page No._____Line No._____Change to_____
 8    _____
 9    Reason for change_____
10    Page No._____Line No._____Change to_____
11    _____
12    Reason for change_____
13    Page No._____Line No._____Change to_____
14    _____
15    Reason for change_____
16    Page No._____Line No._____Change to_____
17    _____
18    Reason for change_____
19

              _____
20                  DEPONENT'S SIGNATURE
21    Sworn to and subscribed before me this____day of
      _____, 20__.
22

23    _____
      NOTARY PUBLIC
24

25    My Commission Expires:_____
```

**[& - 2017]**                                        Page 1

| & | | | |
|---|---|---|---|

**&**

**&**   6:16

**0**

**01**   85:18

**1**

**1**   2:3 4:15 25:25
26:2,11 41:7
42:14,16 43:1,6,13
44:3,6 46:5 95:10
96:20 97:4,24
99:22 101:18
129:7 130:22
133:14 134:15
139:5 145:2
152:13 210:5
228:3 239:6
250:17,19,20
257:23 267:21
**1.6**   179:9
**1/18/18**   3:23
**10**   2:20 5:13 22:8
22:10,24 23:20
82:2 83:4,21
94:22 104:19
111:19 129:19
155:6 196:21,25
197:13 226:22
276:5
**100**   2:16
**106**   2:17
**1071-2**   59:11
**109**   2:18
**11**   2:23 120:9,11
120:19 125:4
208:7 264:16,23
**111**   2:20
**113**   6:6
**11:01**   1:13 9:2
**11:49**   40:17

**11:49-11:54**   40:19
**11:54**   40:20
**11:55**   40:16
**11b**   104:22
**12**   2:25 4:1 102:6
122:13,17 188:14
208:8,16,20,23
229:4 248:19
253:13
**12.30.2020**   4:24
**120**   2:23
**1203**   39:7 214:20
216:1,5 227:20
228:3 229:9
265:11,16
**122**   2:25
**123**   3:1
**126**   3:3
**12:23**   60:14
**12:23-12:24**   60:16
**12:24**   60:17
**13**   3:1 123:21,24
191:1 212:4,11
**1300**   237:14
**136**   3:5
**13609**   278:17
**138**   3:7
**13th**   162:10
**14**   3:3 97:24
126:19 230:4,9
249:8 254:5
261:25
**140**   3:9
**141**   8:5
**142**   50:17
**143**   55:19
**1464**   93:25 223:25
**14th**   7:17
**15**   3:5 136:7,11
242:14

**15-14-37**   276:8,21
**150**   3:11
**15th**   151:4
**16**   3:7 12:10
138:10,11 204:14
204:17 205:1,12
205:18
**1600**   7:8
**161**   3:12
**162**   3:13
**163**   3:15
**166**   3:17
**167**   3:19
**168**   3:21
**17**   1:12 3:9 71:9
140:3,5 174:19
236:13
**171**   3:22
**17th**   9:2
**18**   3:11 102:22
150:15,17 151:22
175:4 201:21
**186**   3:23
**188**   3:25
**189,792**   104:22
105:25
**19**   3:12 161:9,12
175:4 180:24
183:7 186:1
235:25 236:2,7
**190**   4:2
**1970s**   21:7
**1975**   19:2
**1:17**   1:6
**1:20**   95:2
**1:20-1:30**   95:4
**1:30**   95:5
**1st**   130:25 208:12
209:20

**2**

**2**   2:4 28:11,14
39:5 56:21 97:8
98:15 101:4 106:5
107:5 129:13
130:21,22 131:3
133:10 134:15
257:23 267:16
268:5
**20**   3:13 12:23,25
13:5 93:6 141:21
162:5,6 171:2
256:21 257:3
279:19 281:21
**200**   7:8
**2000**   6:17 19:20
21:8
**20006**   6:18
**2001**   21:12,22
**2009**   13:12 15:6
141:12
**2010**   14:1
**2011**   14:1
**2013**   106:18
**2014**   62:10,13,23
63:13,16,20,23
64:4 106:17 135:1
207:22
**2015**   12:11 64:8,12
73:6,6
**2016**   66:15 68:3
71:1 73:6,7 106:8
133:5,6 174:21
**2017**   2:15 42:16
67:5 69:21 70:25
71:6,11,14,19
72:14,23 95:14
99:23,23 100:13
101:16 106:13,18
106:21 130:25
133:3,8 144:22

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

**[2017 - 4038]**

Page 2

145:2 174:24
175:4 189:17
199:17 201:21
208:12 209:21
210:5 267:21
**2018** 2:16 14:9
75:4,14,15 100:21
100:25 101:16
102:21 105:15
106:20 158:16
170:11 186:12
189:19,24
**2019** 2:17,25
106:23 107:2,13
107:24 108:8
111:23 122:14
123:16 124:13
134:15 146:17
158:16 170:11
174:19,22 214:5
221:25 222:4
**202** 164:7
**2020** 3:14 59:25
61:4 75:9,11
80:21 85:18 96:4
107:14 109:6
120:24 146:17
150:24 161:14
162:10 172:3
178:15 186:8
194:22 195:6
205:2,8,9,14,16,17
215:15,23 216:12
236:5,12 237:8
240:13,20,24
243:3,15 244:19
245:14 248:8
249:16 250:3,4
253:17 254:8
255:15 257:5,15
259:3

**2021** 2:24 3:21
4:15 59:11,21
61:2 96:2 120:15
126:18 128:10
150:24 169:12,15
169:16 178:19
236:6,18 239:6
249:2 260:19
**2022** 1:12 9:2
150:24,24 201:18
201:24 202:5
205:20 222:19
278:15
**20th** 161:14
**21** 3:15 50:19
142:11,23 151:4
163:18,21
**21-2-300** 56:21
**21-2-383** 56:22
**213** 4:5
**2138** 1:15 278:19
**216** 4:7
**218** 56:19
**21st** 151:2
**22** 3:17 151:5
166:2,4 172:3
263:8
**222** 4:10
**225** 4:12
**226** 49:23 50:4
**22nd** 151:2
**23** 3:19 167:9,12
**238** 4:15
**24** 3:21,21 114:16
114:21 116:15
168:20,23 230:15
266:4,8
**248** 4:16
**24th** 168:24
169:11

**25** 3:22 171:23,24
**259** 4:22
**26** 2:3 3:23 124:13
186:10,13 222:18
224:7
**266** 4:25
**267** 5:5
**27** 3:25 188:12,15
199:13 201:7
204:12 205:13
**275** 5:9
**27th** 249:2
**28** 2:4 4:2 97:12
97:17,22 190:12
190:16
**28210** 12:6
**283** 112:3
**28th** 169:12
**29** 4:5 97:12,17
213:17,20 255:11
**2989** 1:6
**2:25** 130:14
**2:25-2:33** 130:16
**2:33** 130:17
**2nd** 203:12

**3**

**3** 2:6 49:21,25
50:7 54:3 61:25
95:21 97:9 100:5
101:18 107:6
128:21 133:13,14
133:20 134:2
139:11 141:20
180:19 250:17,19
250:20
**3,289** 106:1
**3/15/21** 150:23
**3/4/21** 3:3
**30** 1:10 4:7 9:3
25:6 26:1,14,23
28:13 29:11,12,18

60:7 92:15 97:12
97:17 99:5 108:22
174:14 216:20,21
256:7 279:3 280:6
**300** 279:19
**30076** 279:20
**30303** 8:6
**30318** 7:18
**30339** 7:9
**30th** 259:2
**31** 4:10 97:13,19
222:12,13 268:25
269:1,22
**32** 4:12 97:13
225:9,13
**33** 4:15 238:24,25
**34** 4:16 248:9,12
264:14
**34,457** 108:9
**342** 111:12,17
**343-9696** 279:21
**35** 4:22 259:8,13
**36** 4:25 266:22,24
273:24
**365,904** 107:24
**369,346** 108:4
**37** 5:5 117:13,15
118:4 267:7,12
**38** 5:9 275:6,8
**3:41** 176:24
**3:41-4:00** 177:1
**3rd** 248:22 253:17
254:8 255:15

**4**

**4** 2:8 56:8,11 64:7
100:4 101:25
102:7 144:23,24
145:5 177:2
**40** 174:15
**4038** 8:5

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

**[42 - accounting]**

Page 3

**42**  109:14 269:1,23
**44**  272:8,13
**47**  100:6
**49**  2:6 118:20
119:14
**4a**  102:1,7,7,13,25
103:3 107:10,15
**4b**  102:1,7,8,20,25
107:11,15
**4c**  102:1 103:13
107:11,16
**4th**  122:14 126:18
278:15

**5**

**5**  2:13 59:10,13
65:19 66:12 94:22
97:22,23 129:19
152:13,13 153:2,6
228:3
**50**  92:14
**500**  7:17
**501**  95:21 100:5,7
128:21 139:11
**5136390**  280:1
**54**  50:15
**55**  54:19
**56**  2:8 272:8,13
**58**  272:20 273:1
**59**  2:13
**5:30**  235:15
**5:30-5:36**  235:17
**5:36**  235:18

**6**

**6**  1:10 2:15 9:3
25:6 26:1,14,23
28:13 29:11,12,18
67:4 69:18 71:8
71:15,16 95:14,16
98:16 108:22
109:16 156:16,16

157:10,14 169:15
199:18 256:7
**60**  222:6
**61**  272:22 273:1
**62**  272:24 273:2
**628**  56:16
**630**  111:22
**6:22**  264:5
**6:22-6:32**  264:7
**6:32**  264:8
**6:50**  274:19
**6:52**  275:12
**6th**  72:4

**7**

**7**  2:16 69:8 70:12
71:15 100:22,25
175:6,7 176:3,22
280:6
**700,000**  175:2
**7035**  12:5
**70s**  12:19 20:5
**75,000**  222:6
**770**  279:21

**8**

**8**  2:17 70:1,12
75:1 97:2 104:7
106:24 107:2
110:20 134:10
174:18 177:6,10
273:25 274:8
**8/22/20**  3:22
**8/24/21**  4:12
**80s**  12:19 20:5,19
**8:55**  40:15

**9**

**9**  2:18 75:17 104:4
104:19 109:8,9
110:22 112:14
179:25 180:5

**9-11-28**  276:7
**9-11-30**  280:7
**9/26/19**  3:1
**90**  54:22,24 55:8
116:6 154:22,25
154:25
**90s**  12:19
**95**  2:15
**98104**  6:7
**990**  2:15,16,17
43:8 95:14,24
96:3,18 100:20
101:1,7,7 104:1
107:2 134:6,15
155:13 174:19
178:17
**990s**  33:21,22 34:1
94:14,22 95:10
96:7,10,20,21,24
177:17 178:7,11
178:13
**993**  223:25

**a**

**a.m.**  1:13 9:2
40:17,19,20
**ability**  57:5 87:8
114:2 148:19
172:14,18 200:25
**able**  49:12 56:3
58:3 73:16,24
83:7 91:17 117:9
121:22 122:5
123:6,12 125:15
128:15 139:17
158:3 192:6,14
200:3 206:24
211:25 230:6
231:2,9,13,19
232:3,16,21,24
234:3 235:7 243:8
243:12 260:1,16

**abort**  125:24
126:5
**absentee**  74:12
75:4 103:14
176:19 206:5,24
210:7,10
**absolute**  278:13
**absolutely**  57:24
81:7 155:22 186:6
242:24 246:1
**absorbs**  53:10
**academics**  144:8
**accepted**  159:18
232:12
**access**  99:7 250:1
250:4,10,16
263:23 277:1,2
**accessibility**
209:15
**accidentally**  78:16
78:17
**accommodate**
130:8
**accomplishment**
97:24 98:11,15,25
99:6
**accomplishments**
97:10,17 101:4
102:1 104:1
**account**  87:25
88:1,5 168:15,18
168:25 170:1
172:3,5,7,10 239:4
252:1 271:16
272:5
**accountability**
136:25 137:8
**accountants**  99:20
155:12 178:18
**accounting**  18:25
19:1 168:11

30(b)(6) Marilyn Marks                                        March 17, 2022
Curling, Donna v. Raffensperger, Brad

**[accounting - ago]**                                               Page 4

| | | | |
|---|---|---|---|
| 171:21,21 | **actively** 144:3 | 111:4 140:17 | **advanced** 19:13 |
| **accounts** 272:6 | **activities** 34:19 | 246:9 275:1 280:9 | 19:17 |
| **accumulated** | 38:17 61:7,11,17 | **address** 12:4 | **advancing** 142:7 |
| 152:2 | 64:14 65:2,3 | 48:23 156:20,23 | **advertisement** 4:7 |
| **accurate** 106:12 | 69:24 70:1,2,14 | 157:3 158:4,7 | 216:24 217:4 |
| 134:18 165:17 | 76:8,11 77:8,10,14 | 160:19,23 199:21 | **advice** 38:7 222:25 |
| 166:22 181:4 | 77:17,20,21,22 | 246:15 270:24 | **advises** 206:4 |
| 187:7 218:9 | 80:1 82:11 83:20 | **addressed** 126:17 | **advisor** 38:1 |
| 226:13 238:7,12 | 85:4 88:13,18 | 129:25 131:8 | **advisory** 226:24 |
| 276:12 | 89:25 90:17 92:4 | **addresses** 270:22 | 227:1 |
| **accurately** 179:12 | 92:8,19 93:7,21 | 271:3 | **advocacy** 81:15,18 |
| **accusation** 224:13 | 100:7 101:16,19 | **adequate** 112:19 | 93:8 121:2,8 |
| **achieve** 128:8 | 101:22 107:14 | **adhere** 39:10 | 125:17 128:16 |
| **achieving** 175:11 | 110:18 111:5 | 216:5 228:19 | 137:11 194:11,13 |
| **act** 232:23 | 117:16,18 118:1 | **adjourned** 275:12 | 195:16 212:7 |
| **action** 1:5 99:17 | 118:22 133:2,15 | **administration** | 213:1 214:24 |
| 99:22 131:2 | 137:16 141:18 | 18:5 22:16 23:3 | **advocate** 100:12 |
| 152:16 156:19 | 144:9,19 147:12 | 48:14,22 49:7,15 | **advocated** 100:15 |
| 157:1,6 175:10,12 | 152:17,18,21,23 | 70:21 72:6 81:5 | **advocates** 121:4 |
| 175:20 177:8 | 153:10,19 154:15 | 81:11,14,17 90:18 | 156:24 157:4 |
| 196:24 198:16 | 158:24 160:1 | 92:19,23 115:7 | 212:7 213:1,8 |
| 199:8,15 208:11 | 168:17 175:8 | 141:9 142:9 | **advocating** 81:3,9 |
| 208:15 209:3 | 176:15,16 177:7 | 196:15 | 98:1 |
| 213:22,22 214:2 | 182:2 185:2,9 | **administrative** | **affidavits** 204:14 |
| 215:14 216:11 | **activity** 47:24 65:5 | 65:20,23,25 66:2 | 204:16 |
| 217:19 218:15,22 | 72:16 173:7 | 66:10 70:19 74:20 | **affiliated** 180:10 |
| 220:20,21,23,24 | 268:10 | 91:19 125:25 | 221:24 225:4 |
| 221:2,5,7,8,10,15 | **acts** 46:13,20 | 126:3 155:11 | 229:1 |
| 230:8 276:15 | 47:20 50:22 57:8 | 165:5 182:2 211:6 | **affirmative** 183:4 |
| 278:8,11 | **actual** 67:23 | **admission** 4:21 | **afford** 148:25 |
| **actions** 46:23 47:4 | 264:19 | 246:11 248:14,19 | **affordable** 114:24 |
| 47:13 48:5,11 | **ad** 219:3 | 253:12 254:5 | **afraid** 64:1 218:13 |
| 51:11,11 52:1 | **add** 39:7 132:15 | 264:15,23 | 255:8 |
| 87:18 152:14,24 | 186:4 246:14 | **admit** 248:20 | **afternoon** 264:10 |
| 211:4,6 241:5,10 | 260:10,23 261:7 | 254:6 255:12 | **agency** 270:13 |
| **active** 31:17 37:23 | 275:11 | **adobe** 270:15 | **agents** 27:3 |
| 38:1,9 45:15 | **added** 82:22 83:12 | **adopt** 160:10 | **ago** 12:10 14:1 |
| 58:18 64:18 73:20 | **addition** 180:20 | **adopted** 245:20 | 20:4 24:6 29:15 |
| 82:3 84:17 85:12 | **additional** 30:1 | **adoption** 247:2 | 34:11 53:6 61:23 |
| 153:21 182:21 | 32:13,15,19 102:2 | **advance** 142:1 | 109:23 111:11 |
| 190:3 196:17 | 102:5 107:10 | | 139:23 140:14 |

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

[ago - applies]

Page 5

157:18 165:4
211:7 230:13
257:20 271:23
273:11
**agree** 115:19
117:23 119:5
142:18 156:7
174:21 239:18
242:10 260:13
262:10
**agreed** 44:25
265:18
**agreement** 4:6
212:24 213:21
214:1,7 218:14
219:15,17,25
220:2,8,16 276:16
276:20 278:12
**agreements**
214:15
**ahead** 11:9,19
25:5 26:6 40:8,24
49:21 72:10 130:3
137:21 198:25,25
203:18 228:23
235:25 237:20
**aileen** 36:15 38:11
197:16 217:15
**al** 1:4,7
**alex** 263:11
**alexander** 6:4
**alignment** 262:6
**alive** 83:22
**allegation** 51:22
54:22 202:16
225:7 260:1,9
**allegations** 50:15
52:19 56:18
132:20 261:5
**allege** 51:9

**alleged** 51:11 52:2
185:25 250:13
**alleges** 42:18
46:12,20 47:13
56:19 141:25
156:17
**alleging** 52:13
211:12
**allocate** 149:4
**allocation** 42:15
43:19 145:1
149:19
**allow** 227:25
**alloy** 7:16
**aloud** 102:10
**alteration** 258:18
**altered** 256:23
258:3,6,14,24,25
**alternative** 256:11
256:19
**alternatives** 57:22
**ambiguous** 218:1
231:22
**amended** 2:6
25:25 26:14 30:22
34:7,12 42:19
49:22 50:7 54:3
141:20 180:19,25
**amendment** 215:1
229:21
**amendments** 94:7
132:24 139:22
**amico** 14:5
**amount** 83:13
84:20 88:17
100:18 104:12
106:19 115:8,11
119:20 137:20
152:20 179:1,2,16
179:17 200:17
268:8

**amounts** 104:17
107:25 108:14
241:16
**analysis** 79:15
252:14 260:21
**analysts** 168:5
**analytical** 53:21
**ancillary** 110:11
**anh** 4:3 190:14
**annual** 131:22
**anomaly** 254:10
254:13 255:6
**answer** 16:21 23:4
42:5 43:17 52:20
55:13 64:1 70:9
70:11 76:5 93:19
107:7 114:10
133:4 139:24
169:25 172:17
185:14 190:1
191:8 192:5
193:16 203:18
204:7 209:15,22
214:9 216:3 218:3
219:15,20 220:14
227:22 228:1,24
236:25 237:20,22
242:4 246:15
249:5,6,7,19 256:2
264:16,20,21,22
265:14,22 266:20
**answered** 63:3
80:10 255:22
**answering** 52:22
79:4 81:6 93:11
202:25
**answers** 191:9
216:1 276:23
278:5
**anticipated** 62:11
209:17

**anybody** 17:24
36:10 46:4 94:16
130:8 134:12
148:14 154:3
176:6 178:3
180:14 193:18
197:9 215:22
225:4 231:13
236:22 257:9
266:15 270:24
**anymore** 184:8,13
189:15
**anyway** 128:21
245:24 265:20
272:5
**apart** 209:24
210:2
**apologize** 47:11
105:14 132:14
134:8 180:22
184:20 273:7
**apparently** 186:23
**appeals** 16:10
**appear** 70:15
226:15 233:7
255:2 258:17
**appearance** 9:18
**appearances** 6:1,1
7:1 8:1 9:22
**appeared** 200:1
250:7
**appears** 225:24
249:25 250:5,10
250:12
**appel** 225:16
**applicable** 189:2
**applications**
177:23
**applied** 276:21
**applies** 39:11

30(b)(6) Marilyn Marks

March 17, 2022

Curling, Donna v. Raffensperger, Brad

[apply - august]

Page 6

**apply** 41:2
**applying** 215:2
**appreciate** 274:13
**approach** 116:16
  118:20 238:1
**appropriate** 27:4
  221:19 265:19
**approval** 68:5,6
  148:7
**approve** 147:13,24
**approximately**
  20:17 30:6 155:6
  221:23
**april** 72:14 278:15
**area** 18:19 58:12
**areas** 147:18
**arena** 261:5,21
**argued** 200:13
**arithmetic** 238:13
  238:15 250:8
**arrangement**
  220:11
**arrangements**
  278:12
**array** 47:4
**arrested** 18:13
**arrived** 199:19
**article** 276:5
**articles** 3:7 138:14
  138:22 139:4,23
  152:3
**ashley** 204:24
**aside** 40:4 195:15
**asked** 15:12 24:19
  30:1 39:22 45:19
  56:23 59:24 61:2
  63:6 83:13 84:5
  84:17 89:2 94:6
  113:22 123:9
  143:25 150:7
  151:17 188:24

191:2 198:6
204:20 220:10
231:16 254:6
255:12 273:12,15
**asking** 11:8 51:18
52:3 63:5 73:11
77:9,11,21 88:20
92:2 100:5 102:17
121:21 132:9,14
139:20 150:5
159:5 161:8 163:5
181:23 194:1
203:5 205:10
209:6 212:21,23
218:5 221:6 228:6
228:10 229:6
233:17 237:23
238:16,17 245:6,7
245:9 246:20
269:6 270:2
**asks** 101:25
**aspect** 212:15
**aspen** 13:13 15:3,5
16:9,11 84:10,13
140:24
**assemble** 151:13
**assembled** 151:11
**assembly** 100:13
100:17 128:17
158:15 160:18
**assert** 214:14
**asserted** 156:18
**asserting** 219:19
**assigned** 271:3
276:11
**assignment** 280:1
**assist** 112:15
280:9
**assistance** 113:1
**assisted** 115:3
166:13

**associate** 181:3,8
**associated** 43:12
  46:4,8 121:13
  131:10 134:12
  145:14 197:6
  208:22 212:18
  230:21 263:24
  266:15
**associational**
  189:7
**assume** 90:10
  106:12 161:23
  164:3 169:19
  179:6,12 220:24
  221:5
**assuming** 10:18
  26:17 65:23
  126:24 134:11
  150:1 176:5,10
  203:21,24 210:10
  210:11 222:7
  244:5
**assumption**
  214:17
**assure** 243:13
**atlanta** 1:2 7:9,18
  8:6 21:15
**attach** 280:10
**attached** 279:7
**attachment** 97:22
  97:23 98:16 139:4
**attempted** 199:17
  232:25 240:12
  265:7
**attempting** 224:10
  224:22
**attend** 22:22 40:14
**attended** 23:2,20
**attending** 22:18
  144:18

**attends** 38:13
**attorney** 117:10
  117:17 178:24
  179:8 201:14
  276:19 278:7
  279:12
**attorney's** 8:4
**attorneys** 30:23
  31:14 36:11,19
  51:15 53:9,14
  81:24 111:9,25
  113:9 115:1,9,10
  115:13 117:9,19
  118:21 149:2
  163:2,6 177:23
  178:6,9 179:11,24
  263:24 276:25
**attorneys'** 2:22
**attributable** 48:16
**attributed** 249:13
**audit** 61:10 66:14
  80:10,11,16,17
  85:9,11,13 92:17
  129:6 152:7
  155:13 222:20,21
  224:4 243:21
  250:7 254:23,24
**auditable** 103:10
  170:13
**audited** 239:10
**auditing** 22:20
  24:10 185:3
  222:24 223:2
**audits** 24:11 47:7
  76:15,15 80:14
  158:23 159:2,19
  160:14 176:16
  231:10,11,14
  255:2
**august** 161:13
  172:3 207:22

[authority - begins]

**authority** 144:25
149:1
**automated** 259:19
**automatically**
276:21
**available** 25:10
27:14,22 35:11
41:8 58:10 113:8
114:8
**avenue** 6:17 138:1
**avoid** 79:23 85:7
205:25
**avoiding** 158:22
**awaiting** 45:16
**award** 179:5
**aware** 23:11 31:19
32:5,11 121:12
147:23 153:18
198:9 201:20
251:7 255:5
258:15 260:20
263:23 264:2
**awareness** 249:24
**awful** 152:6

**b**

**b** 1:10,15 6:12 9:3
25:6 26:1,14,23
28:13 29:11,12,18
62:21 104:21
108:22 147:23
256:7 276:5,8,21
278:19
**bachelor** 19:1,21
**bachelor's** 19:4
**back** 12:10,19
13:12 16:17,18
17:23 21:21 29:15
30:14 34:12 38:23
39:14,23 53:15
63:2,5 71:16
74:23,25 87:22

91:8,18 101:18
104:4 107:10,23
130:21 133:13
134:5 141:19
145:16,18 147:19
152:13 153:12
158:15 159:3
163:17 174:18
178:8 180:18
188:4 192:5
197:25 201:11,21
204:3,12 206:25
208:7 223:5
233:21 234:23
236:24 243:18
246:14 248:3
256:11,18 266:3
271:23 279:3
**backed** 45:16
**background** 11:23
18:20 24:16 25:7
32:20 45:20
**bad** 122:5
**baker** 85:18
**ballistic** 224:8
**ballot** 4:10 15:12
17:1,4 24:10 57:3
57:13,24 58:1,3
65:21 66:8 74:10
78:3,4,9,22 86:15
103:12 105:9
122:25 125:4
155:18 158:15
160:10,19 199:24
203:23 206:8,10
206:24,25 207:5
207:15,15 209:1,7
210:13,14,15,23
210:23 211:4,8
219:6 223:23
232:11,22 233:2,4

233:6,9 234:4,25
235:9 244:9,12,14
245:19,19 246:22
247:1,24 251:17
251:21,23 252:5
255:20 256:22
257:5 258:2,7,10
258:14,18,24
260:16 262:4,18
263:1,2,6
**balloting** 210:7,10
**ballots** 15:12,18
15:18,20,24 16:11
16:12,16,22 17:6,7
17:15,15,17 74:12
75:4 79:6 89:1
93:25 98:7 103:6
103:14,24 155:17
156:8 159:19
170:15 176:19
206:1,3,5 223:24
224:5,17 226:7
232:18,19 233:3,8
233:9,22,24
234:22 241:25
247:25 251:3,7,9
254:4 255:14,16
257:14,21,24
260:2,9 261:6,8,10
261:18 262:4,16
262:17,20,22
263:1
**ballpark** 24:12
**ban** 225:25 226:7
**bandwidth** 126:9
**banned** 127:21
**banning** 86:6,15
**bar** 16:25 17:17
**barcode** 123:4
262:6,24 263:5

**barcoded** 262:4,20
**barcodes** 262:15
262:22
**barely** 190:23
262:13
**based** 48:11 52:22
106:14,15,16
109:20 123:4
165:14 168:2
176:5 190:1
193:21 230:1
233:19 241:20
243:24 245:24
248:6 257:7
264:23 278:11
**basic** 48:2,2
**basically** 53:10
57:15 107:13
191:17
**basis** 108:13
152:15 166:25
229:10,11,22
240:24 242:10,17
242:21,24 244:1
245:1 246:4 276:9
**batch** 260:5 261:2
**batten** 75:10 110:6
110:24 111:3
**battle** 163:9,13
**battlefield** 172:25
**becoming** 189:19
**began** 15:25 64:9
64:21,24 65:13
67:8,14 72:7 73:5
73:6,7 133:2
177:8 189:2,17
**beginning** 50:15
70:25 76:19
**begins** 142:12
225:13

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

**[behalf - brad]**

Page 8

**behalf** 6:2,10 7:2
8:2 27:4 31:1
33:22 38:21
122:22 169:20
194:4,7,11,14
267:18
**believe** 13:14,22
14:4,14 16:4,10
17:1,11 24:9
32:21 39:10 59:23
66:6,7 69:6 85:14
91:8,10,20 96:24
97:1 99:15,21,23
100:14 102:6
121:10,15 125:10
129:2 133:1
138:23 139:23
146:7,16 162:10
172:14 175:1
179:9 180:13
185:10 187:22
192:10 201:13,15
202:14 203:23
204:19,23,24
206:2,10 207:11
211:12 219:24
221:7,10 226:6
228:6 232:13
233:18 235:4
247:25 251:4
262:12,13 263:4
264:15
**believes** 81:10
**belinfante** 7:16
**bell** 14:10
**belong** 200:16
**benefit** 184:25
185:7,11 194:10
194:14 195:10
**benefited** 217:20

**benefits** 180:3
191:4,18 193:9,10
193:12,14 195:15
274:3
**best** 11:16 13:10
41:4 58:1 81:10
99:18 272:19
273:6
**better** 29:8 37:12
57:21 80:16
128:23 245:4
**beyond** 12:25
134:24 135:3
162:17
**biden** 237:6
240:10,14,17
245:13,18 254:9
254:14
**big** 53:19 62:6
74:18 148:9
222:24 261:19
262:20 270:13
271:16
**bigger** 116:25
**bill** 93:25 94:4,5
113:23 164:7
223:25,25 224:9
224:19 225:1,3
**bills** 129:1 155:20
156:1 179:24
**bio** 140:23
**bios** 140:4
**bit** 17:3 24:21 59:9
72:17 78:11 93:5
104:5 120:17
153:7 155:14
168:13 170:6
235:23,23 238:10
260:6
**bit.ly** 170:17

**bjacoutot** 7:11
**blank** 25:12
**blanket** 242:13,16
**blosser** 186:12,23
187:19,25 189:11
189:17,21 199:14
200:3 204:20
205:22
**blosser's** 190:2
199:16
**blue** 259:15,22
260:8 262:2
**bm** 233:13
**bmd** 56:25 57:4
76:10 77:24 85:4
92:23 93:20 94:9
94:11 127:20
129:6 154:23
207:16,17 239:12
243:7 245:24,25
248:5 256:24
257:15 258:3,10
258:24
**bmds** 4:14 49:2
86:6,10,19 87:2
93:14 120:5,15
123:4 137:6
158:22 159:1,1,17
176:15 198:15
205:2,13,15,17,19
205:25 206:12
209:12 226:1
231:3,4,5,6 234:17
238:2,6,14 239:24
240:19 242:8,14
243:11,14 245:2
245:11,20 246:6,7
247:2,20,22
**board** 3:11 10:25
17:25 21:17,19
22:4,11 29:23

31:7,16 35:8,13,20
36:1,4,6 37:25
38:13,16 45:24,25
50:20 62:20,21
66:5,7,22,24 68:5
68:6 74:3,16,17
75:23 77:1 82:24
92:22 93:4 120:5
120:15 121:16,20
122:14,24 123:3
123:16,19 124:4
140:19 146:1,2,5,6
146:8,9,9,10,12,14
146:22,24 147:5,9
147:13,16 148:6,9
148:10,15,18,20
149:3,10 150:16
151:13,21,22
152:1,5 159:10
194:1,5 251:1
266:18 273:9,20
276:6
**boards** 20:11 22:5
22:9 79:21,22
**body** 124:15
**bono** 114:12
**book** 200:21,24
**boss** 148:16
**bosworth** 1:15
275:5 278:19
**bottom** 136:11
246:23
**boulder** 84:4
**boulder's** 84:18
**box** 100:8 101:7
101:13 273:8
**boxes** 270:25
271:7,22
**brad** 1:7 4:19 5:6
7:2

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

**[breadth - cases]**

Page 9

**breadth** 29:24 117:2
**break** 11:12,13 25:22 40:10,13 80:24 94:15,20 129:12,15 130:3,7 235:11,22 256:3 265:6
**breaks** 179:10
**brian** 186:11 189:10
**brief** 31:13 175:7
**briefly** 18:22 134:16 264:11
**briefs** 47:3,17 165:6,6
**bring** 66:25
**bringing** 50:25 166:11
**broad** 213:10
**broaden** 64:25
**broadening** 64:15 65:2
**broader** 87:9 227:7
**broke** 154:6
**brought** 63:19 202:12
**brown** 201:14 202:2,22 256:15
**bruce** 201:14 202:22 256:15
**brumback** 225:14
**bryan** 7:4,5 9:9,11 10:22 38:25 41:12 60:3 169:9,17 203:3 227:19 246:14
**btyson** 7:10
**bucks** 171:2

**budget** 130:25 131:22,25 132:15 132:19,23,24 147:20,21
**budgetary** 42:16 118:12 132:9
**budgets** 130:23
**buell** 225:16
**bugs** 15:7
**building** 60:8,20
**built** 252:19
**bulk** 149:20
**bullet** 54:9,19,21 55:18
**bunch** 25:11 152:2 242:25 244:23
**burden** 237:15
**burdens** 210:7
**burner** 74:23
**business** 19:14,22 87:3 271:4
**busy** 64:16
**button** 166:10
**buy** 51:17 53:6,7

**c**

**c** 56:22 62:20,20 95:21 100:5 128:21 139:11 276:7
**call** 19:22 48:25 49:8,9,9 60:9 84:6 84:21 99:16,21 108:7 147:8 181:9 184:2 197:25 209:25 210:17 218:21 248:1 251:25 256:13,15 257:22,23
**called** 13:8 17:24 17:25 66:8,20 80:9 181:14 200:1

222:20 225:3 257:20
**calling** 200:18 224:9
**calls** 72:17 121:18 186:6,7 194:18 213:9 237:11
**camp** 64:21
**campaign** 74:19
**campaigns** 143:3 173:16
**campus** 19:6
**candidates** 72:18 78:8,12 81:9 93:13 141:8 143:3 149:16 235:5 240:17
**canvassing** 93:2
**capacity** 108:22 113:10 169:25
**capitol** 169:15
**caption** 278:4
**care** 133:9 211:23 213:22
**carey** 7:14
**carolina** 12:6,8 64:8,20,22,23 65:8 65:10,14,14 66:6,9 66:23 68:11 73:5 73:10,10,11,13,15 73:15,22 74:8,14 74:19,24 82:17 90:22,25 91:10,11 105:9 109:20 110:9,21,22 122:9 122:14,25 125:2 126:2,9 156:2 165:6,8 239:9,11 239:13
**cary** 31:14

**case** 9:10 11:3 12:17,18 13:7,13 13:14,15,21 14:4,8 15:3 16:3,9,11 17:4,16 18:18 29:20 34:4 46:14 47:16 48:6,12,21 49:24 51:12 58:22 75:5 83:20 85:1,3 86:24 89:10 91:24 91:25 92:3,12,15 98:12,14 99:1,2,14 102:9 103:15,17 105:2,3,12 109:2,5 109:14 110:3,6,7 110:12,24,24 111:3,3,8,10 114:13,17 116:7,9 116:15,17 120:23 121:1,6,7,11 122:3 122:10 127:25 128:10,14 148:4 161:6 162:1 164:8 174:1 179:1 186:25 190:22 198:22 199:2 201:8 204:15 209:20,24 210:5,8 210:9,10,15,17,22 210:23 211:16,18 211:19 215:9 219:2 226:11,17 227:10,11,12 230:18 236:4 237:14 240:21 247:11,17 263:10 263:25 265:12 266:7 276:9,9,21
**cases** 13:8 14:4,13 14:19,21,23 15:1 17:22 112:22

30(b)(6) Marilyn Marks                                   March 17, 2022
Curling, Donna v. Raffensperger, Brad

**[cases - cgg]**                                                    Page 10

| | | | |
|---|---|---|---|
| 115:9 116:20,22 | **ceo** 20:24 21:13 | **certificate** 278:1 | 141:5 142:18,23 |
| 148:23 209:8 | **ceos** 19:17 | **certificates** 32:1 | 143:1,6,11,19 |
| 210:24 255:3 | **certain** 52:14 | **certification** 19:25 | 144:5,12,16 |
| 258:23 | 196:1 | 20:15 126:1 | 145:14 146:10 |
| **cash** 170:25 | **certainly** 10:14 | **certifications** 20:7 | 150:16 153:21,21 |
| **cast** 57:3,13,24 | 11:21 13:11 21:25 | 23:4,5,9,15 | 158:7 161:5 163:5 |
| 232:18,18 233:3 | 29:22 34:17 40:1 | **certified** 276:10 | 163:14 166:23 |
| 245:19 246:8 | 47:1,4 51:4,13 | 276:24 | 167:17 168:18 |
| 255:14 | 53:6 59:1 60:6,12 | **certify** 122:25 | 171:8 172:4,5 |
| **casting** 234:3 | 60:23 61:24 67:17 | 123:3 278:4,7 | 173:6,15,25 |
| **catch** 112:4 | 70:13,17 71:17,21 | 280:2 | 174:22 176:10 |
| **categories** 33:17 | 77:13 79:13 81:13 | **cetera** 76:14 84:22 | 178:4,6,10 180:11 |
| 34:21 77:7,17 | 81:23 86:13 89:13 | 162:21 182:23 | 181:16,23 182:7 |
| 80:23 87:12 | 89:14 90:2 101:23 | **cgg** 3:3,11 28:2,6,7 | 182:10 183:5,9,13 |
| 104:10 108:12 | 103:9 105:22 | 30:12 32:9 43:1 | 187:15,18,20 |
| 132:1 155:7 | 107:22 119:16,17 | 43:13 45:21 46:5 | 189:7 191:20,24 |
| 185:25 249:20 | 121:9 122:11 | 46:8,11,18 47:13 | 192:2,20 193:10 |
| 252:24 253:13 | 123:8 124:20 | 48:5,10,20,22 61:7 | 193:13 194:15 |
| **category** 51:21 | 128:4,6,7,19 | 61:17 62:12,18 | 197:7 198:13 |
| 103:8,11 105:21 | 130:13 134:23 | 64:14 70:2 71:13 | 199:2,7 201:6,17 |
| 108:8 147:22,23 | 135:2 137:19 | 75:2,10,20 76:2,24 | 206:4 208:23 |
| 162:23 165:10 | 141:11 148:6 | 77:15,17 82:4,9 | 209:11,18 210:2 |
| 183:25 271:15 | 151:12 153:17 | 83:19 86:22,24 | 212:19,25 214:2 |
| **cause** 50:20 | 156:14 157:22 | 87:15,18 88:8 | 214:11 217:20 |
| 258:16 | 158:3,13 160:25 | 92:4,10 98:2 | 218:15 220:21 |
| **caused** 46:24 47:5 | 161:8 162:2 164:4 | 100:11,12,15 | 221:9,24 222:7 |
| 47:14 50:20 76:3 | 164:18 165:21 | 101:15 106:14,20 | 227:9,16 229:1 |
| 76:6 80:4 110:12 | 166:16 169:7 | 110:24 112:25 | 230:22 231:1,8,10 |
| 119:6,23 152:16 | 171:16 175:22 | 113:20 114:24,25 | 231:15,18 232:5 |
| 200:2,22 211:22 | 180:22 183:6 | 117:11,14,15,20 | 234:15 243:2 |
| 232:2 250:13 | 185:19 192:16 | 117:24 118:6 | 244:17,20 248:4 |
| 252:12 253:22 | 193:1 196:12 | 120:4 121:5 122:9 | 252:12,25 253:14 |
| **causing** 251:13 | 202:15 210:7 | 123:6 124:23 | 254:12 257:14 |
| 252:6,7 | 216:10 218:17 | 125:15 127:14 | 258:2 259:2 260:8 |
| **ccr** 1:15 278:19 | 233:1,3,7 234:11 | 128:15 131:3,11 | 261:17 262:3,10 |
| **cd6** 98:19 | 236:15,20 238:13 | 131:21 132:7,19 | 263:20,24 266:16 |
| **cease** 101:11 | 238:23 241:5,10 | 133:2,19,24 | 268:14 269:11,25 |
| **center** 98:20 | 242:18 249:2 | 134:12 135:8,20 | 270:10,19,22 |
| **central** 234:18 | 257:4 263:25 | 135:23,25 136:24 | 271:4,10 272:17 |
| 270:19 271:10 | 264:1,1 266:17 | 137:8,16 138:5,8 | 273:10 274:7 |
| | 268:10,23 | 138:22 139:17,19 | |

cgg's 46:24 64:8
65:24 69:9,24
70:1 118:2 121:2
121:23 123:10
128:1 134:18
135:14 137:12
142:9 145:24
223:18 233:17
237:5 238:2,5
239:20,22 240:8
240:11,22 242:4,7
245:10 246:3
247:10,16 252:23
268:19
cgg2021001277...
3:2
cgg2021001278...
3:24
cggdonate 170:17
chaffee 13:17,17
16:4,13,16
chain 94:3
chairman 45:24
146:6
challenge 14:5
66:13,19 90:24
91:11 103:13,20
113:10 185:18
210:14 212:2
242:18
challenged 131:2
175:10 196:24
198:15 199:8,15
208:15 209:3,20
210:4 212:3
242:16
challenges 65:20
65:24 66:3,10
74:20 91:9 125:25
166:12 194:20,21
194:21 201:8

208:11 267:19
challenging 74:15
75:3 87:19 99:25
125:6 164:6 195:5
195:7 242:21
244:1
chance 92:21
112:4 197:20
272:12
change 28:10 59:2
64:12,13,13
243:25 252:20
280:11,13,14,16
280:17,19,20,22
280:23,25 281:1,3
281:4,6,7,9,10,12
281:13,15,16,18
changed 178:23
244:14 264:17,23
changes 68:19
101:12 107:6
130:22,24 155:19
249:19 276:24
279:7 280:4,5,7
characterize 65:3
characters 247:9
charged 18:10
35:17 45:3 78:16
charitable 139:7
charity 138:8
charlotte 12:6
66:4,13 74:16
chattanooga 19:5
chatted 31:15
cheapest 118:16
check 174:14
187:18 196:17
220:25 221:4,6
checked 29:25
100:8 101:8,13

checking 99:20
chemicals 21:20
cherry 6:6
child 30:9
chinese 247:24
choice 10:16 90:3
117:3,7 118:9,9,14
128:13 138:2
choices 258:10
choose 116:24
128:8 211:11
chose 84:13
118:15 186:8
chosen 116:9,11
116:22
circle 7:8
circuit 170:5
circumstance
206:7
circumstances
196:19 242:19
citations 52:22,23
citing 2:24 173:25
citizen 72:22
192:3,21
citizens 73:20
79:20 99:7 142:2
city 13:13 15:3
84:6,13
civic 144:18 185:1
185:8
civil 1:5 280:7
claim 46:11,18
223:13 231:11
268:6
claimed 78:18
200:20 223:18
claims 48:20
195:11,11 210:9
210:13 215:8
216:17 227:10,13

231:10 242:23
247:21
clarification 39:4
39:13 135:6
172:20 237:25
clarify 134:11
209:23 220:19
229:19 264:11
clark 200:5
clean 11:17
clear 11:5 52:7
133:23 181:22
182:22 203:17
212:21 221:8
227:23 228:22
229:17 242:3
245:6 265:21
clearer 247:6
client 215:25
clip 133:10
close 19:12 37:25
165:12 178:19
245:22
closed 211:18
cmiller 7:19
coalition 1:10 2:9
2:20 3:5,9,15,17
3:19 4:2,8,16,17
4:25 5:5 6:2 9:3
9:13,14 17:12
21:25 22:6 26:15
27:7,21 28:2,3,6
29:11,13,14 33:20
33:23 36:1 37:22
38:4,21 44:22
50:8,16,17,21 51:8
51:25 52:10,13,17
54:6 55:23 56:3
56:12,18,19 57:1
57:11 58:13 61:21
62:1,5 63:12

67:15 81:4,10
83:5,7 86:5,7,14
86:16 91:5,24
93:8 95:15,21
96:3,10 97:16
109:1,20 110:6,23
111:2,9,23 112:11
112:15 116:8,21
121:13 122:22
127:13 136:14
141:24 142:12
160:17,22 161:18
162:13 164:14
167:12 170:10,21
172:21 178:25
179:2,17 180:25
181:1,5 183:8,9
185:13,23 188:12
188:25 190:13
191:1,3,8,10
210:24 211:3
213:21 216:25
217:9 218:23
223:20 224:2
249:19 254:6
255:11,18 259:14
264:18 265:9
267:19,24 274:1
**coalition's** 28:20
29:7 33:3,14 55:2
55:21,22,24 57:5
71:10 89:21 109:5
114:17 116:14
118:21 120:23
141:25 160:16
165:18 184:25
185:8 246:10
248:13 264:19
266:22
**coalitionforgood...**
136:12 140:3

163:19 166:3
173:3
**coalitiongoodgv**
172:5
**cobb** 80:15,16
85:6,12,17 196:14
**code** 16:25 123:11
123:13 139:11,12
255:23 256:1
276:14 278:10
**codes** 17:17 226:7
255:13,19 274:15
**coffee** 129:20
250:2,7
**collaborated**
144:6
**colleagues** 9:10
223:13,18
**collect** 53:7 273:9
**collective** 223:22
**college** 18:23 20:1
**colloquies** 276:23
278:5
**colorado** 13:13,17
13:18,21 14:20,23
14:25 15:5,19,23
16:9,10 17:9,20
18:6 62:15,25
63:12 64:17,18,21
65:12 67:20 68:14
68:22,24 73:3,10
73:14,19 74:7
83:1 84:4,8 90:22
90:22 91:8,18
134:24 135:3
138:5,7,15
**colorado's** 69:5
**column** 104:20,21
**combination**
179:23

**come** 13:15 16:15
24:8 89:14 91:12
127:17 150:25
173:16 181:13
182:15 187:10
208:7 248:3
249:24 253:2
256:18 258:18
270:2
**comes** 104:11
238:14
**coming** 24:15
34:25 80:2 173:22
203:15 242:25
261:1 262:18
**comment** 220:22
261:14
**commentary**
143:20
**comments** 112:11
259:4,14,18 262:2
**commercial** 12:21
14:24 262:19
**commission**
159:13,14 160:8,9
281:25
**commissioner**
246:23 247:4
**commit** 90:11
**commitment**
278:13
**committed** 74:24
**committee** 4:23
**common** 4:5
212:24 213:21
214:12,14 219:14
219:19,25 220:1,7
220:15
**communicate**
193:6 226:17

**communicated**
187:21 209:11
212:25 226:21
227:9 228:14
229:2
**communicating**
90:6 226:19,23,25
227:2,7
**communication**
126:16 188:3
213:8 228:7
**communications**
37:12 39:9 57:18
76:13 78:2 79:13
80:25 81:3,8,13
137:23 158:13
173:24 183:8,10
183:14 186:11
192:25 194:9
208:9 209:10
212:5,23 213:4,7
213:12 214:19
215:13 216:11,15
222:17,19 227:21
227:24 229:25
267:17 273:25
**community** 38:7
**company** 20:11,25
21:14,16,18
**compare** 251:22
**compared** 174:6
**compensation**
168:5 276:15
278:11
**complained**
207:16 230:8
**complaint** 2:7,8
34:8,8,11,12 42:19
42:20 47:2 49:23
50:7 51:3 52:19
52:21 54:3 56:7

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

[complaint - conversations]                                        Page 13

56:12 66:21
109:18 141:21,24
157:16 180:19,25
202:9 211:7
**complaints** 41:9
47:15,17 52:2
66:3 71:23 79:20
141:19 152:15
202:12 211:9
**complete** 33:3
37:11 43:22 59:5
73:16 76:23 77:5
83:4 220:5 229:12
276:11,23
**completed** 96:2
204:23 233:9
279:17
**completely** 33:9
160:12
**complexity** 75:18
**compliance** 276:4
276:14 278:10
**component** 76:10
77:24 248:20
253:15
**comprehensively**
151:15
**compromised**
98:22
**computer** 35:1
99:8
**conaway** 6:12
**concerned** 203:22
207:19
**concerning** 194:20
212:8 236:5
273:25
**concerns** 78:4
207:3,19 212:8
213:2 245:15

**conclusions**
237:12
**concur** 29:23
**condition** 12:13
**condone** 241:5,10
**conduct** 54:7 55:4
66:14 115:4
117:25 168:17
270:21 271:13
273:20
**conducted** 117:16
238:8 241:16
242:8 243:14
246:5 247:20
**conducting** 101:11
**conducts** 101:12
**conference** 72:17
**conferral** 31:13
**conferred** 191:4
**confess** 150:22
**confirm** 25:8
215:11 269:11
**confirmation**
229:24
**confirming** 88:25
**confused** 150:22
**confusing** 86:11
97:21 237:24
**congressional**
69:17 72:4 199:18
**connected** 178:3
**consider** 31:21
37:25 93:17
113:25 115:5
126:2,3 130:6
135:4 161:25
181:15 183:9
186:24
**consideration**
118:13 122:3

**considered** 86:3
**considering**
126:25 127:7,10
**consistent** 243:5
243:20 251:5
**consistently** 75:20
144:3
**constant** 148:8
**constantly** 45:11
**constitute** 162:14
**constitution** 74:14
**constitutional**
62:7 63:17 142:1
**constrained**
237:19
**constraints** 118:12
118:15
**consulted** 235:21
**consuming** 128:11
137:19
**contact** 58:17
148:8 181:2,12
191:21 195:22
196:10 224:3
241:8
**contacted** 228:17
228:17 276:19
**contacting** 149:23
**contemporaneous**
130:24
**contention** 237:5
237:16 238:2,5
239:20,22 240:8
240:11,22 242:5
246:3 252:23
**contentions** 236:3
236:4,20 246:12
248:8
**contents** 217:8
**contest** 14:9 15:10
67:3 75:13,14

102:21 234:2
246:16,20,25
**contesting** 245:1
**contests** 232:25
245:7
**context** 44:11 51:1
61:12 86:4
**continually** 260:5
261:2
**continue** 48:22
67:20 74:5,22
86:7,16,20,24
170:12 176:10,14
201:5 214:16
**continued** 7:1 8:1
48:21 109:17
268:11
**continuing** 65:12
82:14 95:9
**contract** 218:19
276:15 278:11
**contracts** 276:8
**contrary** 244:20
244:21
**contribute** 194:25
197:22
**contribution**
163:1
**contributions**
104:16 106:6,9,14
107:25
**control** 149:11
**controls** 80:4
217:11,14,14
**controversies**
112:16 113:12
**conversation**
36:25 168:3 198:1
215:17
**conversations**
43:24 44:2 158:18

[conversations - course]                                              Page 14

198:11 214:23
230:24 265:8,8,9
**convicted**  18:15
**copies**  273:18
279:12
**copy**  272:4 275:2
**copying**  54:12
**core**  49:11 90:20
210:9
**corner**  263:6
**corporate**  12:20
221:12,16
**corporation**  3:8
21:19,20 138:5,15
138:18 139:5,6
**correct**  10:20 23:7
23:10 36:8,9,21
39:5 40:6 43:2,3
44:4 47:12 52:4
52:15 54:19,20
59:22 62:3,16
65:4 66:1,2 69:15
69:18,19 75:12
81:11 82:18,24
85:2,8,22 86:1
89:12 90:16 95:23
96:1,4 97:19,20
101:13,14,15
103:1,25 104:2,14
104:24 105:14
106:22 107:8,9,18
108:1,2,5,6,9,10
110:25 111:1,5,6
116:9,22 117:11
120:24 121:8
122:23 123:1
124:2 128:9,18
131:3,4 132:1,2,4
132:7,18,21 133:2
133:20,25 134:13
134:14,22 135:21

136:17,20 137:1,4
138:6,17 142:7,24
145:5 146:13,21
146:23 147:3,4
150:4 151:10
153:3,4 157:11,12
160:10,20 161:6
165:16 168:15,16
170:21,22 171:8
171:10 173:3,8,19
174:24,25 176:3,4
176:7,8 177:11,12
180:5 183:21
184:16 187:13,15
188:8,10 190:4,5
192:19 193:11
197:1 198:23
206:5 207:13
208:17,18 209:13
211:2,20,21
212:12 218:24,25
220:21 225:17,18
230:19 233:20
236:8,9 238:3,4,15
239:15 240:15,18
247:13 252:6,11
256:25 261:7
263:15 264:21,22
264:25 265:24
266:8,9 273:2
276:23 278:6
**corrections**  279:7
280:9
**correctly**  63:3
64:2 258:12
**correspondence**
2:23 124:3
**corresponding**
139:12
**cost**  51:13,18
117:17 118:7

**costs**  155:24 171:7
**council**  84:6
**counsel**  6:1 9:5,13
9:24 32:11 43:16
112:19,21 113:2
113:18 131:12
180:21,23 208:23
212:23 214:9
226:18 237:2
266:17 276:2
**count**  15:8,14
93:15 163:9
181:10 234:19
250:6,14 251:18
251:18,19,23,24
252:9 254:4
257:22,23,23,25
262:8
**counted**  79:21
89:1 146:11 232:6
233:4,12,16
234:17,23 235:2,5
250:22 251:10,17
251:19 256:23
257:16,22,25
258:17,22,23
261:18 262:15,16
**counter**  247:24
**counteract**  50:22
55:3 57:7
**counterfeit**  260:2
**counterfeited**
247:25
**counties**  47:25
48:5,21 73:21
78:4 80:14 159:23
210:19,25 211:13
**counting**  79:16
80:9,20 85:7,17
89:23 152:8 156:5
156:8,9,13 207:20

244:11 251:14
258:11 260:20,25
261:23 262:5
**country**  112:17
121:20
**counts**  250:23
254:24 257:24
**county**  8:2,4 10:1
13:16,18,21 16:4
16:15,16 38:12
48:15,23 49:7
66:22 70:20 75:6
76:13,21 78:2
79:1,20 80:15,16
81:1 85:7,12,17,20
91:1 123:16,19
124:4 125:18
149:15,16 159:20
196:1,15 200:6
207:5 208:9,13
209:4,10,11,19
210:3,13 211:4,8
211:11,23 250:2,7
252:4 278:2
**county's**  38:16
48:17 66:13
**couple**  10:8 29:25
31:15 35:23 41:9
109:15 140:22
178:22 213:16
248:17 267:15
**course**  10:13
16:22 30:11 33:4
70:4 74:13 101:20
150:7 158:1
185:10 200:22
201:3 204:9 206:9
214:24 240:1
241:21 243:15
252:13 260:15
262:17 263:19

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

[course - declaration]

Page 15

268:6
**court** 1:1 9:16
11:18 13:4 16:10
17:14 45:9 63:6
81:21 98:3 99:24
125:6 130:6
172:25 173:8,11
179:5 186:25
187:11 214:21,25
216:5 226:7,8
227:20 228:21
229:9,20 275:5
276:6,10,24
278:13 279:15,19
**court's** 39:8 230:1
**courtroom** 13:24
**cover** 11:4 40:2
41:10 47:23 168:4
**covered** 36:24
37:1 48:3 105:6
129:25 133:1
154:14 159:21
210:15 220:7
227:19 235:24
**covid** 53:15 75:8
210:17
**cpa** 19:25 20:6,18
21:3
**cpas** 96:17
**crafting** 159:8
**crazy** 16:21
247:23,23 262:21
**crc** 1:15 278:19
**create** 85:15
151:12 252:8
**created** 151:9,22
250:16 253:7
259:21 266:13
**creates** 98:7 103:6
**credible** 260:9

**crime** 18:10
**critical** 171:5
**criticizing** 195:8
**cross** 94:9 212:22
**crowded** 58:7
**crr** 1:15 278:19
**cup** 129:20
**curling** 1:4 2:24
6:10 39:9 48:12
48:21 49:24 69:20
69:25 83:19 85:1
85:3 86:23 91:25
92:12 98:12,14
99:1,2,14,22 102:9
102:13,17 105:2
107:14,15 110:3,6
111:3 120:23
121:1,6,7,11,23
123:7 125:16
127:25 128:10,18
132:21 142:23
143:1,6,11,20
144:5,12,15
146:21 147:14
161:6 162:1 164:7
170:12 174:1,24
190:22 210:2,8,15
210:25 215:4
218:12 219:2
228:5
**current** 3:19 12:4
62:12,18 63:24
74:16 127:21
139:18 140:12
167:13,16 182:3
261:15
**currently** 22:5
43:12 91:23
145:13 187:19
**cursor** 101:19

**curtail** 82:10
**curtailed** 157:25
**curve** 112:20
**custody** 94:3
**custom** 234:1
**cv** 1:6
**cybersecurity**
23:16
**cyriacks** 62:19
63:22 64:17 146:6
146:25 197:17

**d**

**d** 21:18 36:15
**d&o** 155:11
168:11
**damn** 90:4
**dana** 21:18
**data** 102:2,5
107:10
**date** 9:1 30:16
38:15,16 82:21
83:9 124:11 136:4
136:6,17 140:7,16
166:17 167:22
168:6,8,13 189:1,2
189:16,16 203:21
203:24 204:5
213:25 239:5
249:1 261:14
270:1 279:3
**dated** 161:13
201:21
**dates** 32:8 189:8
**david** 8:3 9:25
**david.lowman** 8:7
**davis** 2:12 204:21
**day** 33:6 49:18,18
59:1 101:21,22
129:14,23 179:18
195:1 202:23,24
203:2 236:13,25

257:5,8 263:4
274:13 278:15
281:21
**days** 21:21 35:23
35:24 53:15 73:25
92:2 236:13 279:3
**dc** 6:18 113:24,24
114:14
**deadlines** 15:11
**deal** 79:9 257:4
262:20
**dealing** 28:21
129:5
**dear** 126:17
162:13
**decades** 20:4
**deceased** 182:4
**december** 259:2
**decide** 148:10,24
**decided** 15:9
241:20
**decision** 20:20,23
29:18 30:3 84:19
118:6 122:6
147:10,22 148:9
148:13,15,16
149:18 159:15
**decisions** 42:16
145:1 147:16
148:19 149:3
150:2
**declaration** 2:13
2:19 58:22 59:18
61:6,12,16,19
71:18 109:1,5,8,12
110:2 111:7,8
112:6,10 203:21
204:2,3,5,20,22,24
206:16,17 207:8
207:12

**[declarations - diane]**                                Page 16

declarations 34:4
182:22 201:12,21
201:24 202:13,15
204:13,16,25
207:9 230:14,18
declaring 253:24
decline 31:23 33:8
34:20 82:10
112:17 114:2
122:1 123:10
143:17
declined 83:15
143:14,16 144:20
194:22
dedicate 167:3
dedicated 154:17
deep 84:15
deeply 198:12
defeat 100:12,16
defend 164:17
defendant 4:3,19
7:2 8:2 190:14
209:24
defendants 1:8 5:2
9:9 10:1,24 46:14
46:21,24 47:5,13
48:18 50:18,22
51:12 54:7 55:4
57:8 115:12
152:15 210:19
214:21 216:2
228:3 249:10
defensible 163:10
163:14
defer 31:22 34:20
definitely 140:7
180:23
definition 234:12
252:22
definitive 243:23

degree 18:25
19:13,17,22
136:21 149:12
degrees 18:23 19:7
19:23,24
delegate 148:18
delve 99:17
demand 58:12
262:4,18 263:1
demanded 110:7
demands 68:19
82:5 85:1 128:14
194:19
demillo 225:16
democracy 171:3
democratic 182:12
democrats 72:12
demonstrate
132:19 182:20
denial 255:17
denied 200:24
248:23 254:19
264:20
denver 74:2,4
deny 195:14
depend 196:19
depending 181:18
depends 135:3
242:18
deployment 74:7
deponent 6:3 9:15
279:2,6,8,9,15
deponent's 279:6
281:20
deposed 11:1
12:17,17,22
deposition 1:10
2:3,5 9:3 11:6
25:17 26:1,14
27:9 28:13 29:4,6
29:7 30:7,12,12,20

32:6,9,12 35:5
37:3 38:20 41:4,7
43:11 44:12
105:19 111:15
134:3 145:8,15
154:5 167:20
204:23 207:10
212:16 230:12
236:11,15,17
256:7 257:13
266:11 274:19
275:6,12 279:6
280:8
deposition's
254:20
depositions 29:14
32:24
depth 29:24
derived 17:2
describe 127:13
134:16
described 202:2
237:2
description 2:2
design 109:21
243:12
designate 27:2
designated 27:8
27:17
designee 27:20
29:19 30:4 43:1
131:3 133:19
145:4 153:2
157:10 176:2
177:10 180:5
196:25 208:16
212:11 230:9
236:7 256:25
263:14 266:7
desire 181:2 280:7

desired 75:22
76:25 77:16
despite 121:23
123:7 125:16
128:16,17 156:2
detail 58:20
157:20
detailed 2:20
105:20 111:24
details 96:18
218:12 236:19
241:17
detect 260:5
determination
198:20 203:3
determine 47:19
113:1 184:9,10,12
203:9,13
determined 157:2
157:7 196:22
198:13 204:8,8
242:2 276:15
determining 182:8
199:3 201:6,18
202:3
developed 144:12
202:13
developments
143:7
devices 86:15
122:25 125:5
158:15 160:10,20
devote 55:8 89:24
devoted 91:24
92:3,11 100:19
118:2 119:21
140:24 141:12
devoting 88:13,17
89:22
diane 7:6 9:11

**[differed - documents]** Page 17

differed 198:11

difference 113:20
113:21 171:2
250:9

different 11:25
18:19 62:5,8
63:18 79:3 82:15
92:6 97:1 101:21
112:11 132:20
142:14,22 179:24
183:17 200:12,15
200:16 238:19
247:7 249:5,6,7
255:3 262:20
263:2

differently 58:14
196:7

difficulties 206:11

difficulty 113:2,18
201:3

dig 21:6 23:1
87:13 112:13
203:9

digges 2:10,11

digging 274:15

dime 171:20
173:10

direct 25:24 92:17
164:1 171:7 173:2
186:9 216:19
224:13,24 276:15
278:11

directed 76:11,12
78:25 171:19

direction 45:6
48:18 82:1 278:5

directly 20:24
110:18 131:8
136:1 226:11
274:9

director 45:22,25
120:20

directors 17:25
27:3 67:18 140:17
146:1,10 264:1

disclose 17:7

disclosure 212:25
276:6

disclosures 276:1
276:3,4,18

discount 276:22

discounts 276:21

discovery 120:10
123:25 126:15
266:6

discrepancies
61:10

discriminatory
103:14

discuss 148:25
180:23 198:7
208:25

discussed 18:18
28:19 29:14 34:22
35:9 43:4,15
54:10 103:15
107:6 148:11,12
149:6 195:16
264:19 274:10

discussing 44:13
187:8 264:18

discussion 3:11
59:9 130:12
147:20 150:16
151:21 262:1
274:25

discussions 209:9

disinformation
195:9

display 57:15

displaying 120:18

disqualification
276:7

disqualify 276:13
278:9

distinction 247:3
261:20

distinguish 184:3
184:14

distracted 60:20

distributions
139:9

district 1:1,1
69:17 72:4 98:3
199:18

dive 152:1

diverse 64:9
127:16

diversion 42:17
43:19 46:24 47:5
47:14 49:9,10
50:23 61:7,20,22
79:7 97:6 109:6
109:17 119:6,13
132:6 152:23
267:18,25 268:21

divert 33:7 46:11
46:18 50:21 51:22
55:20 57:1,7
87:18 148:10
152:16 167:2,3

diverted 52:14
61:18 87:14
118:25 119:10
152:20

diverting 48:5,10
48:23 49:1 52:1
52:11,18

divide 94:8 183:18

diving 68:2

division 1:2

dlaross 7:12

docket 47:21,23
48:3 237:14

document 26:13
26:17,20 28:17,18
33:3,10 39:15
42:5 49:23 50:3,4
55:11 56:16 58:19
59:10,11,17 88:16
108:25 109:14
111:12,22 120:9
123:24 126:15
131:16,25 132:3,5
132:9 150:8,16
151:9,11,12
177:21 203:5
213:23 214:20
216:1,5 227:20
228:3 249:1
259:13,17 265:11
266:12,14 267:5
273:16

documentation
150:2 268:8

documented 150:7
179:13 198:21

documents 5:4,8
25:9 32:13,16,19
33:1,12,13,17 34:1
34:19,22 35:1
39:7 41:5 42:8,11
43:4,6,9 45:8 48:1
53:7 88:12 96:21
126:6 131:5,8
132:10,15,19
134:1 145:7,9
153:5,8 154:21
157:13,21 176:6
177:13,16 178:1
180:7 197:3

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

**[documents - ed]**

Page 18

198:22 199:1
201:16 202:10
208:19,21 212:14
215:12 230:11,17
236:10,12,16
249:10 253:5
257:2 266:6,10,19
266:23 267:9,17
267:25 268:5,12
268:13,15,20,25
269:2,10,12,25
270:2,4,6,11,18
271:5,14 272:17
273:5,9,25 274:7
**doing**   53:21,21
55:17 59:21 67:15
67:16 72:3 78:5
80:14 89:3 90:10
90:12 107:22
115:7,10 116:3
120:4 149:8 155:2
156:2 161:1,2
171:1,16 172:12
175:22 181:10,15
182:16,17 219:5
240:25
**dollar**   171:5
**dominion**   47:6
49:3 55:14 56:25
76:9,14 77:23,23
79:14 80:3 85:4
86:6 89:25 91:4
92:16 93:20 103:7
110:14 114:4
119:23 127:20
129:6 154:24
176:15 198:15
209:12 223:7
225:25 231:3,4,5
231:20 232:7,12
233:13 234:7,9,10

234:12,17,18,18
234:19 238:2,6
239:23 245:11
246:6,7 256:24
257:16 258:3,6,8
**donald**   237:7
240:10,13
**donate**   3:15
163:19,25 164:5
164:14 166:9
173:3 174:1
**donated**   162:17
170:25 218:23
221:9,24
**donation**   161:18
161:25 166:13
170:20
**donations**   165:25
166:23 168:4
171:6 173:15,21
175:5 220:20
222:8
**donna**   1:4 232:11
**donors**   75:23 77:2
149:23 161:8,21
161:23 164:22,22
167:6 173:24
**dorsey**   21:13
**double**   79:16,21
80:19 85:7,16
89:1,23 152:8
156:5,8 244:11
250:22 251:2,8,10
251:14 254:3
260:17,20,25
261:6,9,23
**doubt**   88:4
**doubts**   245:13
**dozens**   236:25
**dr**   225:15,15,16,16
225:16 263:11,18

263:21
**draft**   194:2
**drain**   51:14
110:12
**dramatically**
178:22
**dre**   69:13 71:23
**dres**   69:16 74:11
**drive**   12:5 109:22
**dropbox**   271:16
271:18
**dropping**   216:17
**duck**   12:5
**due**   84:24 113:2,3
113:16,18 116:21
119:13,14 137:9
152:22 279:3
**dues**   104:13 183:1
183:2 274:3
**dufort**   36:14,20
37:5,6,21 38:6,9
44:1,6,19 45:15
153:15 154:4,7,9
180:12,15 197:16
209:1
**duly**   10:3
**duma**   7:7
**duplicate**   273:16

**e**

**e**   3:1,23 4:10,12
34:13,17,18 36:3
36:15,15 46:6
62:21,21,21
123:15,18 126:16
127:6,13 153:13
155:24 158:17
159:22 161:13,22
161:24 162:9
164:1 173:16
183:17,20,21,22
184:2,4,8,16

186:10,19 189:18
213:10 218:20
222:16 223:8
224:7 225:13,14
225:19 226:10,13
226:18 270:15,19
270:21,23 271:7
271:14 272:1
273:8 275:4 280:6
280:7
**e504**   12:5
**earlier**   43:25
96:19 103:16
107:6 116:5
148:11,12 156:4
202:5 241:6 265:7
268:7
**early**   58:6 65:21
67:5 71:9 72:12
72:23 74:10,11
146:17
**easier**   12:25 41:16
104:5 235:23
238:23
**easily**   39:21,25
**eastern**   11:12
**eastman**   21:19
**easy**   11:18 18:15
21:11 26:6,9 28:7
74:4 113:9
**eberle**   35:23,25
36:8,20 62:21
63:21 64:17
140:13 146:5
147:1,2 149:20,23
172:15 181:19
197:15
**economizing**
118:21
**ed**   143:25

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

[edited - encompasses]                                    Page 19

edited   259:21
eds   143:24
educate   57:11
  58:13 86:7,8,16,20
  86:25 98:17
  194:25
educated   98:5
  158:21
educating   57:2
  87:5 103:4 120:4
  149:15 158:25
education   21:2
  70:18 74:18 76:12
  76:22 78:25 79:11
  93:18 102:14,23
  103:19 110:17
  137:23 141:8
  142:24 147:18
  149:5 159:7
  174:12,16 175:23
  176:17 191:20
  192:3,21
educational   24:7
  31:25 55:2 58:15
  58:16 89:25
  143:12
effect   100:8 192:9
effective   57:4
  128:24 158:23
  166:11
effectively   129:4
efficient   117:17
  118:22 149:8
  269:16
effort   58:10 74:22
  119:22 121:22
  123:6 125:15,17
  128:16 160:16
  218:16 222:25
efforts   55:3,9,23
  69:9 71:11,14,19

71:20 79:25 82:4
82:23 91:19
118:25 119:12,13
121:19 123:13
125:24 128:21
141:1,10,14
154:18,19 158:7
160:7,24 161:2
162:1 173:2
174:12,12,13
193:5,21,25
194:24 220:6
either   23:10 45:5,9
  83:12 91:1 98:7
  103:5 105:2
  147:10 153:11
  211:25 221:14
  269:13
election   4:23
  10:25 14:21,23
  15:10,25 16:1
  17:19 18:5,8
  22:20 23:3,10,22
  23:24 24:3,9
  48:14,22 49:7,15
  50:20 62:14,25
  63:11 64:18 65:5
  65:6 66:4,9,14,15
  66:20 67:3,9,21,24
  68:3 70:14,21
  72:5,14 74:16,17
  75:13,15 76:21
  78:2,21,25 79:17
  79:20 80:13,18,21
  80:25 81:1,5,14,16
  81:24 85:10,15,20
  85:22 86:21 87:6
  92:19,22,23 93:7
  93:21 98:2,6,17,19
  98:20 99:7 100:7
  102:20 103:5

112:16 113:10,11
114:22 115:6
127:1,8,10,18,19
128:2,2 140:25
141:9,9 142:8
143:7,21 144:6,13
148:23 154:17,18
154:18,19,23,24
156:1,8,10 158:20
159:10,16,20,22
160:15 164:17
172:22 176:11
185:3,17,18 192:3
192:21 194:1,5,22
195:6 196:15
199:18 205:9,13
205:19 209:11,19
210:4 211:23
215:23 216:12
222:24 223:1
224:10,19,22
225:3 226:21
227:5,8 236:13,19
237:8 238:18
240:13,20,24
241:13,15,17
242:9,14,16 243:3
243:6,7,13,15
244:2,4,6,19,25
245:1,7,21,22
246:5,22,25 247:1
247:4,5,18 248:6
248:21 249:16
250:6 251:1 253:1
253:15 254:7,11
255:14 257:15,24
267:20 271:18
elections   15:3 16:5
  16:7 22:15,15
  38:16 57:5 59:25
  61:4 62:15 63:1

63:12,18 66:7,22
66:25 75:11 81:11
82:24 90:18 93:9
99:10 120:5
121:17 122:15
123:16 137:3,7
141:2 142:4
163:10,14 165:14
170:13 223:14,19
225:2 236:5 238:8
242:8 243:8,16
244:9,12,15
245:24 247:19
248:22 253:16
elector   199:22,25
electoral   144:17
electronic   125:4
  137:11 166:12
  212:9 213:2 229:3
  232:14,15 234:19
  251:12 252:7
electronically
  279:8
element   165:19
eligible   199:22,25
  231:12 232:20,24
  234:2
else's   130:8
elson   6:15
emphasis   73:9
  142:2
employee   278:7
employees   215:18
  261:5
employers   21:9
employment   21:6
  21:23,24
encompassed   99:3
  219:24 234:12
encompasses   32:2

30(b)(6) Marilyn Marks                                        March 17, 2022
Curling, Donna v. Raffensperger, Brad

[encountered - exhibit]                                                Page 20

encountered
  185:18
encourage  57:18
ended  65:11
  167:15 178:15
  189:3
ends  45:12
endurance  274:13
energy  65:16
  200:18
enet  232:15
enforcement
  50:19
engage  57:6 76:21
  83:5,7,20 84:23
  100:6 113:15,17
  118:22 121:22,25
  123:6 125:15
  128:15 129:4
  135:8 137:15,25
  149:1 152:22
  153:11 201:17
engaged  15:23
  17:10,13 43:22
  58:21 71:13 76:8
  76:10 83:23,25
  92:9 101:15
  135:10 136:24
  144:21 152:19
  173:7 232:23
engaging  148:21
english  7:7
enormous  51:14
entailed  191:3
enter  33:13 241:23
entered  238:19
  265:11 280:8
enthusiastic  57:20
entire  53:16 205:7
  246:21

entirety  47:20,23
entitled  114:17
  139:3 140:9
entity  28:3 208:13
entry  237:14
environments
  12:20
envision  258:5,12
equal  116:25
  137:9
equally  57:4
equipment  69:6
  213:2 232:7 234:7
  234:11
errata  279:3,7,8,9
  279:11,13,14,17
  280:1
error  189:20
  201:4 251:12
errors  233:24
  243:21,22 246:21
  250:16 261:22
  262:5
es&s  123:2
escalation  66:23
  66:24
esq  279:1
esquire  6:4,11,12
  6:13,14,15 7:4,5,6
  7:14,15 8:3
essential  163:9
essentially  126:6
  184:5 247:10
  252:4
establish  189:7
established  55:22
establishing  268:1
  268:21
estimate  91:22
  92:10 120:2

estimates  89:15
et  1:4,7 76:13
  84:22 162:21
  182:22
ethics  276:14
  278:10
evening  150:15
event  175:21
events  143:12
eventual  115:11
eventually  126:1
  200:19 238:14
everybody  185:19
  186:6 264:11
everyone's  206:6
evidence  59:24
  61:3 165:14
  244:19,21,22
  247:12,19 248:1,2
  248:3,6,20 249:9
  252:24,25 253:6
  253:14,14 254:7
  254:12 255:12,18
  255:24 257:14,18
  258:1,2,20 262:7
  264:19 265:1
  278:6
exact  19:15 39:23
  245:4
exactly  15:15
  19:16 77:11 88:24
  90:2,12 94:9
  99:17 121:4
  146:18 168:10
  184:2 201:9
  232:13 252:16
examination  5:12
  10:5
examined  10:3
example  53:5,8
  66:4 78:23 81:22

84:2 87:24 88:5
  92:20 98:18
  109:18 113:22
  119:20 149:4
  150:5 183:17
  193:16,23 194:10
  195:20 196:7,8
  203:20 204:1
  233:25 254:3
examples  185:24
  193:9 211:13
  254:18
excellent  170:25
excess  75:3
exchange  21:18
excluding  43:16
exclusively  139:7
  166:14,23 194:12
excuse  16:13
  17:15 60:3 70:4
  72:9 73:6 83:14
  121:5 155:3,13
  159:10 167:3
  177:21 215:24
  223:23 233:13
  250:3 259:20
  260:18
executive  45:22,25
  120:20
exempt  39:22
  133:14,16,23,23
  136:21 139:10
  141:17 221:19,20
exercised  142:4
exhausted  91:20
  126:3
exhibit  2:2,3,4,6,8
  2:13,15,16,17,18
  2:20,23,25 3:1,3,5
  3:7,9,11,12,13,15
  3:17,19,21,22,23

Veritext Legal Solutions

**[exhibit - fair]**                                              Page 21

3:25 4:2,5,7,10,12
4:15,16,22,25 5:5
5:9 25:16,24,25
26:2,11 27:15,18
28:11,14 39:5
41:3,7,13,22 42:2
49:21,25 50:7
54:3 56:8,11
59:10,13 61:7
95:13,14,16
100:22,25 106:24
107:2 108:24
109:8,9 111:19
120:9,11,19
122:13,17 123:21
123:24 124:16
126:19 130:22,22
133:14 134:10
136:7,11 138:10
138:11 140:2,5
141:20 150:15,17
151:22 152:13
161:9,12 162:4,6
163:18,21 166:2,4
167:9,12 168:20
168:23 171:24
174:18 177:20
180:19 186:10,13
188:12,15 190:12
190:16 196:21
199:13 201:7
204:12 205:13
213:17,20 216:20
216:21 222:12,13
225:9,12,13
238:24,25 248:9
248:12 259:8,13
264:14 266:3,22
266:24 267:7,12
269:7 273:24
275:6,8

**exhibits** 2:1 40:2
42:9 276:24,24
277:1
**exist** 23:11 33:12
193:19,22 233:10
247:13,19 248:2
268:13
**existence** 86:20
232:2 270:3
**existing** 52:11
**exists** 135:20
**expand** 71:9 117:6
146:14
**expanded** 134:24
135:3,5 162:17
166:21
**expect** 49:5,13,16
65:9 87:6 91:2
175:25 200:8
**expected** 125:8,10
**expecting** 132:12
**expedite** 102:4
**expenditure**
132:12
**expenditures** 53:3
53:24 54:1 96:25
105:19,20 175:8
177:6
**expense** 108:14
**expenses** 51:19
54:12,15 75:19
104:20,20,21,24
105:5,8,17,24,25
108:3,4,8 110:15
133:6 135:9 148:5
164:23 165:2,3,10
168:5 179:8
**expensive** 53:2,8
**experienced**
117:19 207:6

**expert** 118:11
226:24 227:1
263:9,11
**expertise** 112:20
113:7,8 115:6
118:23
**experts** 22:19
53:13,14 67:23,23
99:8 152:3 163:2
163:6 164:23
165:1 222:22,23
226:11,17,20
263:25
**expires** 281:25
**explain** 81:19
152:7 251:20
269:8
**explained** 216:16
**explaining** 117:14
**explains** 56:22
**explanation** 181:4
**exploration** 16:23
**exploring** 69:3
**exposing** 98:19
**express** 181:18
182:10 200:2
**expresspoll**
200:10
**expressvote** 123:2
123:4,14 124:5
125:5
**expressvote's**
124:25
**extended** 262:1
**extensive** 151:17
209:9
**extensively** 20:14
129:4 144:14
**extent** 30:23 33:8
122:1 123:8
125:22 128:19

143:10 144:22
168:19 201:10
215:25 218:8
237:11
**extraordinary**
200:17
**extremely** 115:25
**ez** 2:15 95:14
101:7

**f**

**f** 7:5 36:3,15
**face** 221:2
**facebook** 4:7
216:24
**facilitation** 184:25
185:8
**facility** 279:18
**fact** 23:25 77:10
77:10 117:4
172:11 218:9
235:3 242:25
249:12 255:1
264:18
**factors** 119:15
**facts** 115:5 242:20
**factual** 236:2
237:16
**fail** 25:3
**fails** 16:1
**failure** 61:10
66:13
**failures** 47:7
**fair** 47:21 65:3
76:1 141:4 172:22
213:22 214:2,12
215:7,14,18,22
216:11,16 217:19
218:15,22 219:9
220:20,20,23,24
221:2,3,5,7,8,10
221:11,14,15,18

30(b)(6) Marilyn Marks                                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

**[fair - flip]**                                                    Page 22

221:21,22,23
223:12,17 224:8
224:14 225:5
**fall** 103:7,11
183:25 252:21
**falls** 228:7,15
**familiar** 71:22
217:3,8
**fancy** 270:16
**far** 161:3 178:7
179:2 189:9
228:13 235:1
244:12
**farm** 261:5,21
**father** 68:17
**fault** 156:12
**favor** 182:16
**favorable** 138:2
**favorito** 227:9,17
229:2 241:8
242:22 247:8,11
247:17 265:10
**feasible** 114:25
206:1
**february** 59:10,21
61:1 202:23 203:2
203:12 222:18
224:7
**fed** 260:5 261:2
**federal** 17:14 98:3
125:6 156:18,25
157:5 170:12
186:25 187:11
280:6
**fee** 179:16 268:6
**feel** 24:17 30:9
54:23 167:22
205:24 257:7
**fees** 2:22 54:11
105:13 108:4
111:9,25 115:11

163:2,6 164:23
165:1 168:12
171:22 177:23
178:6,9,24 179:1,3
179:5,8,9,11,18
182:14,14 187:3
187:14,16
**felt** 32:20 122:5
158:20 198:7
235:8
**festin** 7:6
**fielding** 94:5
**fields** 22:19
**fight** 84:18 165:13
213:22 214:2,12
215:7,14,18,22
216:11,16 217:19
218:15,22 219:10
220:20,21,23,24
221:2,3,5,7,8,10
221:11,14,15,18
221:22,22,24
223:12,17 224:8
224:14 225:5
**fighting** 172:22
**figure** 41:25 84:7
106:13,17,19
238:15
**figured** 29:21
253:7
**file** 1:5 15:23
74:20,21 135:17
179:22 204:20
211:7 271:11
279:12
**filed** 17:22 33:24
48:1 50:10,12
59:10 75:5,10
95:15,24 96:3,14
99:22 109:18
111:23 135:19

138:25 139:16
146:21 148:23
174:24 188:8
198:22 199:1
201:12,23 202:11
204:15,25 208:13
209:18 210:2,14
210:24 211:3
226:6 230:18
279:14
**files** 271:15
**filing** 2:18 50:24
108:25 111:2
135:14 142:19,23
143:1,6,11,19
144:5,12,15
147:14 158:6
176:11,20 178:13
178:17 179:16
**filings** 47:2
**fill** 181:11 279:8,8
**filled** 260:3
**finalized** 203:1
**finances** 52:8
**financial** 20:24
33:19,25 46:11,19
51:9,10 52:4,5,6
52:10,15,18 53:10
54:22 55:21 68:15
87:14,17,23 88:3
118:10 119:18
147:17,24 148:11
276:7
**financially** 278:8
**find** 19:18 23:12
31:25 47:24 58:7
176:18 217:17
235:7 246:12
251:22
**findable** 39:21,25

**fine** 11:21 14:17
25:1,20 28:7,23
52:25 58:8,11
60:25 94:17,25
108:20 130:2
**finish** 144:11
184:18
**finished** 25:6 33:9
37:19 39:18 129:7
145:22,23
**firm** 6:5 276:1,18
**first** 2:8 4:4,20 5:7
10:3,9,11 15:7
28:8 29:3,5,10
34:8,10 42:19
46:10 54:9,19
56:6,11 59:23
61:2,11 65:13,18
66:21 69:9,12
71:10,19,20,21
72:1 74:9,25 75:3
97:8 100:11 101:3
104:22 106:13,19
111:22 112:14
140:11 157:16
190:14 196:17
215:1 229:21
236:24 248:14
249:23 251:18,18
251:23 267:8
**fit** 206:6
**fits** 148:24 199:11
**five** 40:13 94:25
95:1 146:11,15
256:6
**flawed** 254:23,24
**flaws** 246:24
**flesh** 61:17
**fleshing** 93:5
**flip** 60:4

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

**[flipped - garland's]**

Page 23

**flipped** 71:24
255:3
**focus** 62:7 63:11
63:18,18 67:9
72:7 87:8 127:21
128:10,12 131:15
149:16 192:25
222:24 262:12,13
262:23 263:3
**focused** 62:14,24
64:16 77:22 91:4
93:7
**focuses** 24:3
**focusing** 115:15
**foerster** 6:16
**folded** 260:2
**folders** 271:17
**folks** 117:6
**follow** 38:10 67:21
123:12
**followed** 121:11
**following** 54:8
61:3 276:1,4
280:5
**follows** 10:4 38:12
**font** 259:22
**foot** 64:20
**footnote** 228:2
**force** 56:21,25
**forced** 109:19
**forcing** 57:7
**forego** 24:1
**foregoing** 193:8
278:4
**forensic** 166:14,24
167:4 252:14
**forget** 16:13
249:21
**forgetting** 31:19
125:13 255:8

**forgot** 39:21,24
54:15 60:9 134:4
134:7
**forgotten** 35:2,17
59:20 198:9 205:5
210:17 262:23
**form** 2:15,16,17
10:11 33:22 43:8
46:16 66:3 70:6,8
76:4 77:3 95:24
101:7 105:23
106:10,15,18
107:5 116:10
125:7 137:18
152:15 154:20
164:10,15 174:3
181:7,11 187:9
194:7 195:19
198:17 203:7
206:3 217:23,25
231:21 245:16
280:7,9
**formal** 21:23,24
37:24,25 44:15
86:4 89:6,19
93:18 132:23,25
146:10 147:8,21
147:22 150:2
194:5,9 195:8
218:14
**formalized** 44:14
**formally** 46:6
135:5 158:17
**formerly** 46:4,7,8
62:1 145:14
**forms** 221:11,13
276:6
**forney** 35:22 36:2
36:7,20 146:8
197:16 206:13

**forward** 21:8
272:4 279:12
**found** 16:24 64:21
241:18 263:4
270:5
**foundation** 24:7
62:2,4,24 63:10
135:2 138:19
139:3 173:20,24
208:2,2,3
**four** 204:10 253:8
253:13,20
**frame** 146:18
**frankly** 24:23 33:6
78:8 139:21
143:14 164:2
244:3 253:3
**free** 88:3 114:8
**freed** 55:16
**frequent** 73:25
112:15
**frequently** 22:22
23:24 24:19 79:4
147:5 190:9
**friend** 184:5
**friendly** 162:23
**friends** 4:8 68:7
162:13,22 183:25
216:25 217:9,17
**front** 13:1 25:9,11
70:16 145:19
175:23,23
**fuchs** 6:11 9:19
**fulfill** 113:4
**fulfilled** 37:9
**full** 21:25 90:4
114:25 140:25
141:13 148:6
**fully** 12:14 84:23
**fulton** 8:2,4 10:1
38:12,16 99:23

207:4 209:24
226:6,8 250:23,25
251:1 252:4 278:2
**fulton's** 254:2
**fultoncountyga....**
8:7
**function** 137:16
**functional** 104:20
**fund** 160:24 162:1
164:22 221:22
**funding** 75:21
77:15 133:2 145:1
218:10
**fundraiser** 167:1
217:20
**fundraising** 3:12
3:13 155:10
160:24 161:1
166:19 168:17
169:24 218:16
220:6,11
**funds** 42:17
132:19 164:1
168:18 173:6
218:22 220:21
**funnel** 173:17
**funnels** 173:18
**furnish** 280:10
**further** 66:5
117:14 274:15
278:7
**future** 33:14 79:24
139:12 175:9,20
179:22 270:3

**g**

**ga** 4:22 279:20
**garland** 241:8
242:22 247:8,11
265:10
**garland's** 4:13
226:1

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

**[geared - going]**

Page 24

geared 80:18
general 31:7 51:5
  61:5 77:7 80:3
  100:13,17 105:24
  106:1 108:8
  128:17 155:11
  158:14 160:18
  162:23 215:10
  216:6 219:6
  228:21 230:24
  249:20 266:17
generalizing 206:9
generally 35:15
  37:1 39:23 43:5
  43:10 54:1 58:16
  63:16 65:5 88:14
  88:15 91:20 94:11
  101:17,19 115:9
  115:13 118:22
  143:24 147:10,23
  148:25 149:6
  173:22 174:10
  181:6 187:17
  196:3,12,19
  205:24 206:6,8,9
  206:18,23 214:25
  216:4 217:8
  221:17 224:2
  251:5 266:20
  272:4
generated 218:11
  257:15 258:3
generating 159:8
generous 161:18
geographic 65:2
geographically
  64:9
geography 64:15
georgia 1:1 3:4 7:9
  7:18 8:6 14:13
  17:21 18:6 55:4

65:15,15 67:5,24
68:2,7,8,9 69:9,24
70:2,3,25 71:10,14
71:19,22 72:7,12
72:16 73:2,17
77:23 80:5 90:23
90:25 93:9 98:4,5
98:18,20 99:10
100:13,16 103:4
125:6 126:17
133:3 138:8
153:19,19,25
155:17 156:1
160:20 166:13
170:14 175:25
188:4 189:1,12,15
199:3 205:14,19
225:25 230:6
231:2,9,19 236:6
237:7 238:8
239:11,13,23
240:7,14 245:14
245:20 246:4,5
247:19 250:2
253:1 254:8
255:15 256:24
271:18 276:4,10
278:2
georgia's 67:9
  98:4 103:7 211:9
  241:20 243:24
germane 185:2
getting 25:7 35:8
  45:12 74:25 93:24
  94:5 105:8 121:18
  134:10 152:6
  155:11,12 173:21
  219:23
gifts 104:16
  107:25

gig 22:2
gigs 21:21
give 17:6 19:11,12
  25:2 61:12 70:5
  76:23 77:4,7 87:8
  113:22 149:1
  161:8 191:8
  192:13 193:16
  196:16 222:4
  238:11 271:20
given 9:4 118:15
  203:12 229:20,21
  232:22 243:22
  250:1,5 254:2
  278:6 280:8
gives 191:8
giving 65:11
  129:22
glanced 157:19
glitch 200:2 201:2
gmail 271:3,22
go 11:9,19 12:24
  18:19 25:5 26:6
  26:22 33:5 34:12
  40:8,24 41:6,10,16
  49:15,21 53:17,24
  55:16,18 58:5
  63:2 71:16 72:10
  73:24 81:21 82:9
  82:15 87:3,7
  92:21 94:20 97:8
  99:5,17 101:3
  102:5 114:14,14
  114:16 117:13
  129:22 130:1,3,11
  134:5,9 137:20
  141:20,21 149:16
  150:3 151:15
  152:5 153:12
  157:21 158:4
  163:17 165:24,25

168:4 171:6,12
174:18 175:5
176:23 179:25
182:7,15 183:1
190:11 192:5
198:10,24,25
199:13 200:14
201:6 203:18
208:8 211:10,23
215:4 228:23
233:21 234:23
235:1,6,14 237:20
246:14 248:7
254:5 255:11
256:21 261:13,24
263:8 264:3 267:4
267:7,15 268:4,24
269:4 272:7
273:24 274:17
goal 40:25 160:8
  160:11 223:13,18
  223:21 224:1,5
goals 127:18 128:1
  128:5,6,7,8 191:11
  223:21
goes 29:15 51:14
  59:1 87:22 112:12
  147:19 155:7
  236:24 271:23
going 12:19,24
  13:9,10,12,15 19:8
  19:11,11 20:2
  21:11 25:14,14,18
  26:7 28:9 29:6,10
  29:18,19 39:10,19
  40:23 41:1,2,5
  42:1,23 52:20
  59:2 61:10 63:5
  65:9 68:19 79:2
  82:15 87:3,20
  92:13,14 94:14,20

**[going - happening]**                                        Page 25

94:21 97:22 106:5
111:16 112:3,13
129:11 130:4,20
140:11 141:19
145:16 148:4
151:2 158:15
159:3 171:23
177:24 178:9
179:23 184:17
190:24 193:1
208:6 213:6
214:13,13,16,18
215:24 216:19
217:23,25 219:12
219:15 222:4
227:18 228:18
229:13 231:21
235:10,25 238:9
241:1,17 242:12
251:13 253:12
254:20 256:5
266:3 268:13
272:6

**good** 1:10 2:10 3:6
3:10,15,17,20 4:8
4:16,25 5:5 6:2
9:4,8,14 10:7,10
10:21,23 13:2
17:12 21:25 22:6
24:21 26:15 27:8
28:3 33:20,23
40:9,11,15 50:8
56:13 62:1 72:16
78:11 81:4 94:18
94:19 96:10 109:1
111:18 121:14
127:14 129:9
162:14 167:13
170:10 172:22
188:25 190:13
191:4,10 209:25

211:21 216:25
217:10 218:23
224:2 259:15
264:10 274:1
**goodness** 70:4
205:3
**gosh** 227:14
**gotten** 80:8 186:7
244:12 271:6
**gov** 170:11 172:22
**governance** 1:11
2:10 3:6,10,16,18
3:20 4:9 5:6 6:2
9:4,14 17:12 22:1
22:7 26:15 27:8
28:3 33:20,23
50:8 56:13 62:1
96:11 109:1
121:14 127:14
162:14 167:13
188:25 190:13
191:4,10 216:25
217:10 218:23
224:2 259:15
274:1
**governance's** 4:17
5:1
**government**
136:25 137:7
208:10 209:19
210:3
**governments**
209:10
**governor** 14:9
102:21 105:12
160:19
**governor's** 75:15
**grab** 129:20
**graduated** 19:1
20:1

**granted** 211:19
**grants** 104:16
107:25
**great** 26:8 29:1
42:4,13 75:22
77:1 136:21
149:12 161:18
269:19
**greater** 261:23
**greatest** 29:24
**greatly** 117:6
**greenhalgh** 225:17
**greetings** 279:5
**grew** 12:9
**grief** 129:9
**ground** 11:4
154:14
**group** 24:2 64:4
71:9 195:24
222:19,20,21,22
223:3 224:4
226:12 227:8,10
269:14,17
**groups** 109:21
221:24
**grow** 55:24 56:4
193:19
**growing** 59:6
202:24
**grubbs** 14:8
**guess** 32:24 62:23
65:1 71:19 92:13
96:8 113:14 117:8
117:23 135:3
146:20 148:17
162:16 172:4
173:11 209:5
222:4,5 241:1
271:2
**guessing** 162:18
162:19 261:1

**guidance** 115:14
**guide** 59:8
**guilt** 44:24 45:3
**guilty** 167:22
**guts** 258:9
**guy** 184:12
**guys** 40:11 94:17
184:8
**gwinnett** 75:5
200:6,19 210:9
**gwinnett's** 103:24

**h**

**h** 100:7 224:25
**hackable** 170:14
**hacked** 248:21
**hacking** 98:22
249:14 252:12,22
252:25 264:20
**halderman** 225:15
263:11,18,21
**half** 129:25
**hand** 25:13 159:19
170:15 219:6
241:25 250:7
254:24,24 255:1
262:15,16,17
**handel** 69:17
**hands** 253:6 260:3
**handwritten** 5:9
**handy** 41:7
**hang** 267:5
**hannah** 6:15
**happen** 148:22
176:20
**happened** 49:5
59:3 64:25 79:17
187:2 202:23
204:9 250:22
259:7
**happening** 38:12
55:20 71:5 156:12

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

[happens - impacted]

Page 26

**happens** 11:8
209:6
**happy** 130:8
169:24 256:2
**hard** 22:23 119:19
236:14 240:2
254:17
**harvard** 19:14,22
**hassle** 207:4
**hava** 211:7,9
**hb933** 224:18
225:1
**head** 80:2 124:9
160:2 170:3
225:22 255:25
**header** 226:15
**headquartered**
21:15
**hear** 42:24 70:7
244:17 247:21
**heard** 76:20 182:9
187:23 188:5
202:17 204:4
235:3 262:6
**hearing** 93:12
247:8 259:3
**hearings** 158:17
**heavens** 20:22
151:24
**heavily** 88:23
**heavy** 68:15
**held** 20:8 214:25
248:22 253:16
254:8 255:14
**help** 41:16 45:7,10
59:8 60:1 73:12
85:7 105:8 109:21
115:10 116:17
123:10 154:10
161:6,25 163:1,5
164:17,22 170:16

173:1 186:3,5,5,8
193:18 219:10
**helped** 80:15
85:15 94:1 121:1
121:3 123:12
165:5,8
**helpful** 17:18
20:16 25:4 32:4
45:18 94:13
105:22 115:14
165:11 193:20
237:4 238:22
**helping** 70:18
79:18,19 84:18
113:10,25 120:17
219:7
**helps** 41:25 114:15
**helson** 6:23
**hesitated** 235:6,8
**hey** 37:2 44:11,15
49:2 88:21 114:12
181:9,19 182:10
196:13
**high** 96:15
**highly** 206:18
**history** 21:6 91:6
**hold** 19:7 20:3
23:5,15 41:12
81:24 96:23 144:9
219:12 243:17
267:4
**holding** 215:2
**home** 3:17 166:3
201:1 233:11,14
234:24 266:2
**honestly** 11:2
**honor** 192:6,15
**honored** 152:7
**hope** 74:21 185:21
185:21 247:6

**hoped** 128:23
**hopefully** 133:11
158:22
**hours** 88:6,8,21
89:3,5,11,15,18
90:12 230:15
236:13 268:8,9
**house** 93:25
223:25,25
**housekeeping** 10:8
275:2
**houses** 160:18
**how's** 269:18
**huge** 137:19
243:20
**huh** 26:10,12
82:13 88:2 97:11
104:25 120:21,25
161:7 173:4 226:2
246:18 247:16
249:5 272:14
**human** 255:15,19
256:1 260:3
**hundred** 251:4
**hundreds** 88:6,8
89:5,15,16,18
**hursti** 61:9 225:15
**hutton** 259:25

**i**

**ichter** 31:14
**idea** 24:1 68:2
154:22 224:20
**ideas** 45:8 81:4
85:24 225:1
**identifiable** 17:17
74:12
**identification** 26:3
28:15 50:1 56:9
59:14 95:17
100:23 106:25
109:10 111:20

120:12 122:18
123:22 126:20
136:8 138:12
140:6 150:18
152:19 161:10
162:7 163:22
166:5 167:10
168:21 171:25
186:14 188:16
190:17 213:18
216:22 222:14
225:10 239:1
248:10 259:9
266:25 267:13
275:9
**identified** 98:21
203:13 266:6
**identifies** 132:5
**identify** 46:23
99:9 131:24
188:24 191:2
233:20 234:25
235:1 270:11
**identifying** 228:13
**identity** 216:2
228:4 233:18
234:16,22
**iii** 2:11
**illegal** 50:22 57:8
**image** 4:10 258:14
**images** 15:12
24:10 155:18
251:9,17,22,23
253:5 258:8,16
260:16
**imminent** 50:18
**impact** 199:2,3
200:5
**impacted** 196:23
198:14 199:7,14
201:18 203:10,11

30(b)(6) Marilyn Marks                           March 17, 2022
Curling, Donna v. Raffensperger, Brad

203:14
**impacts** 278:13
**impair** 57:5
**impaired** 256:23
**impartial** 278:13
**impartiality**
 276:14 278:10
**impinge** 215:1
**implementation**
 73:19 74:6
**implications** 78:9
**imply** 156:11
**importance** 98:6
 98:17 103:4
**important** 32:20
 45:1 82:4 147:11
 182:9
**impossible** 112:19
 237:6 238:7 240:9
 240:12
**impractical**
 112:22
**improvement** 90:5
**improvements**
 75:9
**inability** 84:23
**inactive** 122:10
 190:2,3,6
**inadequacy** 76:15
 129:6 233:5
**inadequate** 114:9
 231:14
**inappropriate**
 195:11
**include** 159:16
 183:23
**included** 66:8
 158:25
**includes** 93:25
 98:7 103:5 183:24

**including** 76:9
 139:8 140:17
 142:13 144:25
 180:1 208:12
 236:4 240:17
 263:10 274:2
**incomplete** 31:21
**inconsistent**
 228:16
**incorporated**
 138:7 139:18
 221:14
**incorporation** 3:7
 138:14,22 139:4
 139:23
**incorrectly** 156:9
**incredible** 166:1
**incurred** 178:12
**index** 2:1 5:12
**indicate** 103:4
 109:16 112:14
 132:10 249:12
 267:24
**indicated** 90:13
 104:12 120:3
 140:23 207:11,21
 264:16
**indicates** 27:1
 101:10 189:17
 223:8
**indicating** 113:17
 181:2
**indication** 135:8
**indications** 90:4
**individual** 18:7
 27:17 142:1,8
 170:23 181:5
 185:1 196:23
 198:11,14 199:10
 212:6 242:7
 245:10

**individually** 27:24
**individuals** 36:13
 36:18 85:21
 127:17 144:25
 146:11 180:2
 181:1 191:21
 195:4 198:2 202:4
 204:14,17 205:2
 205:12,18 228:14
 228:20 240:23
**inform** 137:21
**informal** 66:3
 135:1 147:9
 150:11,12,13
 181:13
**informally** 57:17
 187:17
**information** 27:13
 27:22 35:10 44:21
 85:21 142:24
 181:2,12 195:10
 195:22 196:11
 198:8 227:6
 256:14
**informational**
 143:2 183:8,10,14
**infrastructure**
 75:9
**inherently** 238:3
**initiate** 80:16 94:1
 94:2 123:12
**initiated** 109:23
 224:20
**initiatives** 144:7
**injunction** 47:3
 86:6,10,14,19
 157:20 202:10
**injuries** 204:1,7
 210:8
**injury** 199:12
 201:2 203:25

**individually** 204:4,5 206:13
 207:6,14
**input** 73:20
**inserted** 253:15
**insider** 252:20
**instance** 200:7
**instant** 15:6 84:6,9
 84:12,14,16,19
**institution** 19:3
**institutions** 143:13
**instruct** 215:25
 216:4 219:15
 228:24
**instructing** 219:20
 220:14
**instruction** 150:3
**instructions**
 271:21 273:19
**insurance** 155:12
 168:11
**integrity** 62:14,25
 63:11 127:1,8
 140:25 141:10
 144:7 154:18,19
 227:5
**intended** 50:18
 54:7 64:6 103:12
 240:9 241:22
**intent** 244:22
**intention** 74:18
 134:5 188:5
**intentional** 64:24
**interest** 4:6 75:22
 77:1 91:14 208:5
 212:24 213:21
 214:12,14 219:14
 219:19,25 220:1,7
 220:16 276:7,12
 278:9
**interested** 23:13
 63:17 195:25

278:8
**interests** 135:20
136:24 137:8,12
**interject** 39:1
215:25
**intern** 45:16 150:5
259:21
**internal** 131:25
139:11
**internally** 194:3
**internet** 113:23
114:13
**interns** 45:10,10
53:18,18 87:22
88:10 89:6 115:3
116:17 149:19
150:9 166:1 168:6
171:16 172:12,14
268:9,17 271:1,20
272:6 273:8
**interrogatories**
4:4 188:21,23
190:12,15,21
**interrogatory** 4:1
188:13,14,24
191:1
**interrupt** 47:10
126:12
**interrupted** 47:11
**interview** 115:5
**introduce** 9:5,23
59:9
**introduced** 15:21
**introductions** 45:6
**intrude** 219:14
**intruding** 219:16
**intrusion** 235:9
**invested** 88:23
**investigate** 115:5
256:4,8

**investigation**
261:17
**investigative** 55:3
**invitations** 143:16
143:18
**invoked** 265:11
**involve** 70:17
**involved** 12:20
14:20,24 15:1,3
17:19 18:8 23:24
53:4 63:25,25
68:21 76:2 79:15
83:17,19 91:5,14
96:9,13 113:23
114:2 148:5
149:21,24 153:20
153:22 155:16
**involvement** 82:4
83:11 112:17
120:23 121:23
122:10 123:7
125:16 128:16,17
157:1,6 161:5
**involving** 111:9
**irregularities**
249:13,15,18
252:8,11,17
253:22
**irritated** 182:16
**irs** 33:24
**issue** 16:9 17:14
74:25 89:5,23
102:24 103:21
178:25 252:19
263:5 274:14
275:2
**issues** 17:2 49:7
61:3 67:9 70:19
78:3,13 83:9
86:21 87:2,6
90:20 91:4,6,18

92:17 94:3 105:10
129:6 135:11
143:21 151:16
152:7,8 153:19
155:4 156:5
158:21 160:15
185:18 223:7
257:5
**it'll** 19:12 104:5
**item** 101:18
102:13 104:15
255:5
**items** 102:8 110:1
116:7
**ivory** 173:13

**j**

**j** 263:11
**jacoutot** 7:5 9:11
**january** 2:24 3:21
4:15 42:16 120:14
130:25 145:2
168:24 169:11,12
169:15,16 186:12
208:11 209:20
210:5 214:4 236:6
236:18 239:6
249:2 267:21
**jconaway** 6:20
**jeanne** 36:14
180:12 197:16
**jenna** 6:12
**jo** 6:13
**job** 128:24
**joe** 237:6 240:10
240:14 245:13,18
**join** 207:24
**joined** 9:10
**joint** 4:5 213:20
**jorgensen** 240:17
**joseph** 254:9

**joy** 36:25 44:8
**jr** 254:10
**judge** 14:8 59:23
61:2 75:10 110:6
110:24 111:3
120:24 121:15
265:12
**judiciary** 4:22
259:3
**july** 69:21 260:18
**june** 72:14 260:19
**jurisdiction's**
137:6

**k**

**k** 36:16 62:20
**kate** 225:14
**keep** 12:13 21:1
41:3,6 88:21 89:3
120:1 129:11
147:21 169:13
171:2 175:22
208:5 216:6
228:20 231:25
271:15
**keeping** 128:14
172:13
**keeps** 38:14,15
**kemp** 71:11
**kentucky** 239:9
**kept** 64:20 200:14
**key** 35:19 142:9
**keyword** 270:10
**kind** 14:24 19:10
21:1,9,23,24 25:5
26:23 30:13 40:25
41:2,3 46:3 47:20
49:11,17 51:18,21
57:17 58:10,24
59:19,20 61:15
64:25 67:1,22
69:23 72:1 73:8

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

**[kind - lawsuits]**

Page 29

73:22,25 79:10,23
80:24 84:7,12,15
85:24 86:4 87:11
87:13 88:19 89:2
89:6,19 91:20
93:5,6,19 96:6,8
106:1 116:16
117:14,23 119:16
120:16 129:22,24
130:1 134:25
142:21 144:11
147:19 150:1
151:15 155:10
160:7 166:19
169:6 173:17,21
181:7 182:1,10,17
183:24 194:23
196:6 209:17
213:8 218:18,19
226:23 236:24
237:24 241:12
259:1 262:1
**kinds** 79:24 81:16
194:24
**knew** 15:13 19:8
29:12 44:13 147:2
177:24 200:15,22
205:4
**know** 10:22,22
11:10,11,13 12:16
14:5 15:15 20:5
21:5 26:5 29:15
30:13,24 31:6
32:8,15,18 33:4,9
33:22 34:25 35:7
39:17 42:6,10
44:9,10,14 48:13
48:15,25 49:6
53:1 56:23 76:7
78:3,17 81:23
83:3,8 86:3 87:13

87:25 88:5,19,22
89:4,8 91:11
92:20 93:17 94:3
95:10 100:15
106:11 108:11,13
108:17,20 110:16
113:5,5,7,24 114:9
116:24 119:18,25
120:16 121:3
127:2 129:21
130:5 131:16
132:11 135:17
136:1 138:21
139:18,22 141:7
141:12 144:21
145:22 147:9
148:4,21,23,24
149:15 156:4
158:24 161:21
162:15 167:21
168:9 171:1,5,15
174:14 175:19,21
176:12,12 178:14
178:16,18,20,24
179:1,4,16,19,20
179:20,22 181:12
181:20 182:4,13
182:15 185:19
187:24 188:1,4,21
189:25 193:17,21
195:23 198:7,10
201:1 202:10
205:1,3,4,12,15,16
205:18 207:2,18
212:22 213:9,11
214:8,8,9,11 217:5
217:11,16,16
218:8 219:4,4,11
220:23 221:16,23
226:3,23 227:5
231:1,7,8,12,24

232:1,1,13,16,17
232:17 233:1,3,7,8
233:10 234:23,24
236:13,16 237:6
238:7 239:12,21
239:22 240:1,4,5,9
240:12 241:4,14
241:21,22,24,25
242:14 243:8
244:10,10,13
250:23 251:9,21
252:12,13,14,16
253:9,10,10 258:6
258:16,19,22,25
260:24 261:4,7,8
261:10,11,12
268:12 269:2
270:4,5,7 273:8
274:12,14 275:2
**knowing** 148:5
221:22 258:9
**knowledge** 29:24
30:1 31:2,2 84:16
108:13 214:16
230:5 231:15,18
232:6 233:18
234:15 256:22
272:19 273:6
**known** 27:13,22
30:11 35:10 62:1
84:7 153:22
**knows** 207:18
**krishan** 8:10
**ksu** 98:20 252:24

**l**

**l** 36:15 46:6,6
62:21
**lack** 65:20 80:4
113:3,16 206:18
207:17 211:17
231:10

**lamb's** 252:24
**land** 227:5
**language** 27:15
64:10 65:24 67:5
104:8 157:8,9
260:6
**lapses** 99:9
**large** 12:20 57:14
119:18
**laross** 7:6 9:11
**late** 64:8 146:17
260:18,19
**laughing** 16:20
**laura** 2:10
**law** 4:23 6:5 48:18
143:7 156:18,25
157:5 185:15,16
211:9 276:4
**lawmakers** 158:13
158:16,19 159:16
160:17
**lawram.com** 6:8
**laws** 90:25 131:1
139:24 147:8
156:16,21,23
157:3 158:8,14
175:9 196:23
208:10,14 209:2
230:7
**lawsuit** 4:13 15:24
54:17 55:7 65:25
66:18 69:16,20,25
75:10 87:19 99:25
132:21 147:14
158:7 164:6
170:12 176:9,14
176:21 188:7
209:5 211:22
218:12 226:1,6
**lawsuits** 18:5
69:25 70:13 75:2

30(b)(6) Marilyn Marks                                   March 17, 2022
Curling, Donna v. Raffensperger, Brad

**[lawsuits - litigation]**                                        Page 30

110:8 114:22
125:8,10,11
135:15,17,19
176:11
**lawyers** 54:11
114:8
**lay** 70:15 237:12
**le's** 190:14
**leaders** 3:4 126:17
127:16
**leadership** 143:20
**learn** 28:8 29:3,5
29:10 223:17
**learned** 17:16
114:23
**learning** 112:20
**leaves** 251:8
**leaving** 253:19
**led** 17:8
**left** 12:9 45:9
126:7 274:17
**legal** 104:22 105:1
105:5,7,13,13,17
108:4 117:6
118:10 135:9
148:5 164:23
165:1,3,10 166:14
166:23 167:4
179:23 194:21
236:2,20 237:12
**legislation** 4:11
15:19 100:13,16
127:1,8,11 128:17
155:17 185:17
215:21
**legislative** 137:22
**legislators** 74:20
162:21 185:23
193:4
**legislature** 126:25
127:6

**legitimate** 225:21
**length** 237:14
**letter** 2:25 3:3
114:1 120:14,22
121:25 122:14,21
122:24
**letters** 84:5,22
165:7 213:10
**letting** 186:24
**level** 49:18 74:5
78:3 79:1 83:11
87:9 91:1,1 96:15
120:2 148:20
152:4
**levels** 178:21
268:11
**le's** 4:4
**libertarian** 182:12
**liberties** 142:1
**license** 20:18 21:3
**licenses** 20:3
**lies** 242:25
**lieutenant** 14:9
75:14 102:21
105:11
**life** 11:17 31:9
65:10
**limited** 120:4
128:21 160:12
162:2 164:19
186:1 192:17
193:2,6 236:4
251:7 261:8,12,22
263:10 274:2
**limiting** 85:9
86:10 231:5
**lin** 228:11 229:14
265:10
**lindell** 228:11
229:15 241:9
265:10

**line** 97:2,19,22
99:5,13,13 100:6
101:4,10,25
102:20 104:15
107:14 134:15,16
135:7 222:11
226:1 280:11,14
280:17,20,23
281:1,4,7,10,13,16
**lined** 155:12
**lines** 97:12,17
101:25 107:5
**link** 170:16
**links** 150:6
**lisa** 62:19 146:6,24
197:17,20
**list** 51:18 59:2,6
76:19,23 77:5
82:14 83:4,6,8,17
97:18 142:22
162:20 181:20,23
181:25 182:3,3
183:13,22 184:2,4
184:9 189:6,22,23
195:21 197:12,14
198:2 201:5
202:19,21 203:7
203:11 241:10
**listed** 27:15 54:18
83:21 97:16 101:7
102:6 104:1 110:1
137:3 141:18
146:2 185:9 201:6
202:4 205:13
**lists** 142:12,13
162:20 183:18,20
183:21
**literally** 116:1
168:10 171:13
**litigate** 113:25
116:9,12,17,22

118:6,14
**litigated** 98:3
**litigation** 4:5
12:21 14:24 15:25
17:8,20 18:8
45:12 50:24 51:13
51:18 53:1,3,12,17
53:20,25 54:11
55:2,9,14 56:2
67:3 68:21,25
69:3 70:3,16,23,24
71:14 74:21 75:19
76:2,11,16 77:14
79:18 82:6 85:5
91:16,17,19,21
92:18 102:14,15
102:18,24 103:22
104:2 108:15
109:19 110:10,15
110:18 112:21
114:3,24 117:15
117:25 118:23
119:5,22,22 125:5
126:4,7 127:20
135:8,10 137:15
137:15,19,25
138:1 140:25
141:10 142:19
147:17 148:22
149:4 151:17
152:2 161:4
164:19 165:2,9
168:4 171:7,12,17
171:20 174:9,12
174:15 177:9
179:11 182:19
208:13 209:18
210:3 211:1 212:8
213:20 219:14
220:1,1,8 223:6
267:20 268:2,22

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

270:16
**little**   16:23 17:2,3
  18:20 59:9 90:21
  93:5 94:22 97:21
  104:5 120:17
  124:15 130:1
  150:22 153:7,9
  155:14,16 165:23
  170:3,5 179:9
  235:10,23,23
  238:10 273:22
**littlefield**   7:16
**live**   64:17 74:3
  205:23 227:4
**lived**   12:7 68:8
**living**   15:22
**llp**   6:16 7:7
**lobby**   128:25
  158:22 160:16
**lobbying**   74:19
  100:6 128:21
  141:1,10 155:16
  155:23,25 159:6
  175:23 176:17
  192:3,21
**local**   49:18 87:9
  91:1
**locate**   139:16
**located**   261:5
**location**   200:13,15
  200:16 201:1
**logical**   231:24
**logikcull**   53:8
  87:24,25
**long**   12:7,10 14:1
  21:5 24:6 29:15
  51:2 68:2 83:17
  86:19 91:13,13
  94:24 112:20
  129:21 139:23
  151:14 167:21

200:13 205:23
227:14 240:19
242:4 246:5,7
274:13
**longer**   46:8 54:18
  55:8 83:22 90:1
  130:3 215:8
  260:13
**look**   34:18 37:2
  39:21,23 41:8
  42:2 43:8 47:20
  50:11 61:4 100:21
  101:18,24 105:20
  106:23 107:23
  108:12 111:22
  114:12 120:8
  136:18 140:1
  145:10 157:16
  161:20 164:12
  169:18 177:20
  219:5 221:20
  233:21 242:20
  252:7 272:3
**looked**   33:17,21
  34:5,10 51:3
  95:11 105:18
  157:15,18,19
  164:2 167:18,21
  177:17 178:1
  186:20 189:18
  221:6
**looking**   19:9 51:20
  51:21 64:22 69:4
  78:19 87:4,7
  88:25 101:3
  104:19 105:9
  136:22 177:18
  178:21 203:6
  217:5 250:24
  254:23 264:14

**looks**   102:20 106:8
  126:16 136:20
  186:11 214:4
  225:18 226:10,14
**losing**   115:12
**loss**   68:23 118:5
  140:23
**lost**   39:1 73:18,23
  184:13 207:25
**lot**   12:21 13:24
  24:14 34:25 38:6
  57:16 58:20 65:12
  65:15 72:21 76:8
  76:10 80:5,8
  81:13 90:23 91:3
  93:13,21,22,24
  94:5,6 102:23
  107:21 113:8
  121:18 141:7
  144:20 151:15,16
  151:18,25 152:6,9
  153:12 154:14
  161:3 171:1
  182:11 186:7
  236:18 246:21
  247:22 274:10
**lots**   68:18 132:10
  194:18 195:9
  271:15
**lowest**   117:16
  118:7
**lowman**   8:3 9:25
  9:25
**lunch**   129:15
  130:2

**m**

**m**   36:16 46:6
**machine**   58:7,9
  78:22 215:8
  216:17 250:14
  251:18,19 257:22

**looks** 257:22,23 260:4
**machines**   71:23
  79:7 124:5,25
  229:3 239:12,14
  241:23 244:22
  255:4
**mail**   4:10 57:19,21
  58:1,5 74:12 79:6
  103:24 123:15
  126:16 127:6,13
  155:24 161:13,22
  161:24 162:9
  164:1 183:17,20
  183:21,22 184:2,4
  184:8,16 186:10
  189:18 206:1,2,5,8
  206:10,24 207:5
  218:20 222:16
  223:8 224:7
  225:13,14,19
  226:10,13,18
  242:15 247:24,25
  270:19,21,23
  271:7 273:8 275:4
  279:10
**mailing**   162:20,20
  181:20 195:21
**mails**   3:1,23 4:12
  34:13,17,18
  123:18 153:13
  158:17 159:22
  173:16 186:19
  213:10 270:15
  271:14 272:1
**main**   43:23,23
**maintain**   131:21
  173:15 181:23
  270:19,23 271:10
**maintaining**   21:3
  276:13 278:9

Case 1:17-cv-02989-AT   Document 1565   Filed 01/07/23   Page 313 of 721

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

[maintains - mcguire]

Page 32

**maintains** 270:22
**maintenance**
182:1
**major** 29:22 72:2
137:16 157:24
**majority** 53:20
70:23 112:18
129:10 160:18
171:11,19 211:24
240:6 271:25
272:1
**makers** 159:15
**making** 24:10 91:9
139:9 158:4
161:25 224:16
242:23 247:12,18
247:21 262:19
276:13 280:8,9
**malicious** 252:20
**malware** 253:14
253:23,25
**management**
19:13,17 55:1
62:9,12,13,18
63:15,19,22 75:21
77:15 105:24
106:1 108:8
114:17 116:15
138:25 234:20
**manager** 58:9
**managing** 27:3
**manifested** 15:15
**manipulated**
170:15
**manipulation**
251:13 252:8
**manner** 270:13
**mansell** 279:19
**manually** 279:8
**manufactured**
234:9

**manufacturer**
21:14
**manufactures**
234:10
**manufacturing**
21:14
**march** 1:12 9:1
126:18
**marching** 12:5
41:3
**marietta** 85:14
**marilyn** 1:11 2:14
9:4 10:2 12:3
59:18 70:5 112:6
124:1 140:14
169:14 184:17
186:12 203:17
218:3 259:14
279:2
**marilynmarks**
172:3
**marilynrmarks1**
168:15,25 239:4
**mark** 25:16 30:14
100:20 108:24
135:23 138:10
140:2 162:5
163:18 166:2
171:23 238:24
275:5
**marked** 25:25
26:2,11 28:11,14
29:2 49:21,25
50:6 56:8,11
59:13 95:16
100:22,25 106:24
107:2 109:9
111:19 120:8,11
122:13,17 123:21
123:24 126:19
136:7 138:11

140:5 150:14,17
159:19 161:9,12
162:6 163:21
166:4 167:9,12
168:20,23 170:15
171:23,24 186:9
186:13 188:11,15
190:12,16 213:17
213:20 216:19,21
219:6 222:12,13
225:9,12 238:25
241:25 248:9,12
259:8,11 262:17
266:21,24 267:12
275:8
**market** 55:23
**marketing** 56:3
**marking** 86:15
122:25 125:4
158:15 160:10,20
**marks** 1:11 2:14
9:4 10:2,7,16,23
12:3 25:8,22
40:23 45:19 59:18
94:16 95:8 112:7
130:20 131:21
158:6 177:5
186:12 208:6
218:3 220:19
230:9 233:6
235:11,21 259:14
264:14 265:14
266:2 273:7
274:12 275:1
279:2
**marks's** 265:7
**martin** 75:5
103:15,17 105:2
107:15 146:8
210:9

**mary** 35:23 62:20
140:13 146:5,25
149:20,23 150:5,9
172:15 181:19
197:15
**mass** 57:18
**massive** 241:16
243:21,21
**match** 218:10
**matching** 217:19
218:16
**materials** 150:23
151:19
**matter** 31:7 67:22
112:20 117:4
129:18 276:12,20
278:9
**matters** 192:4,22
226:21
**mayor** 15:5 84:10
140:24
**mcguire** 6:4,5 9:12
9:12 10:9,12
15:21 17:10,13
25:16,20 28:19
31:12 38:25 39:6
40:5,12 46:16
55:10 60:3 70:5,8
76:4 77:3 94:19
94:23,25 114:11
116:10 137:18
154:20 157:23
164:10,15 165:5
169:9,17 174:3
184:17,21 187:9
195:19 198:17
203:3,17 209:23
214:13 215:24
217:23,25 219:12
219:22 220:9,15
227:18 228:2,13

[mcguire - minimizing]                                                  Page 33

229:5,19 231:21
237:9 245:16
265:3,4,25 274:22
275:10 279:1
**mcguire's** 105:8
**mean** 29:5 33:22
47:9 51:19 59:3
66:10 83:17 85:9
87:25 89:17,17
103:12 116:11
125:20 126:12
129:15 143:23
147:7 150:4
156:11 178:8
190:5 194:20
202:8 209:23
218:8 223:20
227:4 232:23
240:1,3,5 242:22
250:3 262:12
**meaning** 66:23
**meaningfully**
83:23 84:1
**means** 65:24
134:11 181:13
**meant** 39:23 85:10
164:19 165:22
166:19 167:5
168:9 173:9
191:14,14,17
192:14 193:17
202:16 211:14
217:17
**measure** 119:17
**mechanical**
252:18
**mecklenburg** 66:4
66:13 74:16
123:16,19 125:18
**medical** 12:13

**medication** 12:12
**meet** 109:18 147:5
147:7 223:4
**meeting** 23:25
24:7 90:25 147:7
147:9 150:23,25
151:14,18,23
223:5
**meetings** 38:13
65:6 70:20 73:24
74:1 90:21 91:6
91:13,18 144:18
155:4 159:13,14
185:15 213:9
**meets** 223:3
**megan** 2:12
**member** 37:25
76:12,22 86:4
181:5,16 182:8,11
182:21 183:5,11
184:4,13 185:20
187:2,8,11,14,19
187:25 188:2,7
189:19,24 191:3,9
191:18,19 195:14
195:17,18 196:3,4
196:6,7,10,11,18
207:21 212:6
**members** 29:23
31:7,16,17 35:8,13
35:20 36:1,4,6
37:12,23 38:9
44:2,5 45:15
55:23 56:4 57:2
57:11 58:13,18
74:3 75:23,23
77:1,1 78:7 79:19
80:11,15 84:4,6,18
85:12,25,25 86:3,7
86:16,20,25 87:5,6
93:12 109:21

110:21 127:16
142:3,24 144:15
144:16 146:3,15
146:22,24 149:23
158:25 176:18
180:2,3,4 181:1,12
181:24 183:7,14
183:15,18,19,21
183:23 184:1,14
184:15,25 185:1,7
185:13,22 186:1
188:25 189:6
190:4 191:21,24
192:2,13,18,18,20
192:24 193:2,7,10
193:14,15,24
194:3,4,8,8,12,12
194:14,15,16,24
195:15,21,23
196:2,13,16,23
198:14 199:4,7
201:6,18,25
202:12 203:10,14
204:1 206:4 212:7
233:11,14 264:2
266:18 273:9,20
**membership**
55:24 56:4 104:13
180:1 187:3,14,16
189:2,3,8,17 191:5
193:19 274:1,4
**memory** 25:2
39:19 58:24
201:11 222:9
**mention** 164:16
208:25
**mentioned** 12:16
16:14 22:4 23:18
31:6,15 35:7
43:25 63:21 78:6
80:23 85:6 155:2

156:4 157:15
165:4 193:25
194:17 209:4
241:6 242:22
**mentioning**
105:12
**message** 3:12,13
58:15,16 186:23
240:2
**messages** 213:9
**messed** 243:17
**metadata** 222:18
**method** 103:24
112:25 190:3
243:24
**microsoft** 270:14
**mid** 20:19 249:25
250:2,3,4
**middle** 164:21
**mike** 228:11
229:15 241:8
265:10
**miller** 7:14
**million** 179:9
**millions** 253:5
**mind** 24:15 30:14
31:18 34:25 40:12
44:13 50:25 51:2
59:19 60:7,19
63:5 77:11 86:11
129:19,22 205:10
216:7 237:23
245:3 247:14,14
248:25 253:3
**minds** 255:22
**minimal** 83:13
84:20 100:18
**minimize** 42:2
115:10
**minimizing**
115:11

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

[minimum - need]

Page 34

**minimum** 29:21
**minor** 133:7
  168:12
**minute** 13:16,23
  40:13 60:10
  118:13 124:6
  140:20 142:15
  161:20 164:12
  209:2 243:17
  253:18 254:20
  264:4
**minutes** 94:22
  95:1 129:19 256:6
  257:20
**misapplication**
  48:17
**miscellaneous**
  105:17
**miscommunicati...**
  203:4
**misimpression**
  238:11
**mismatch** 255:13
  255:19,22,25
**mismatches**
  251:23
**missed** 54:25
  151:7 189:15
  270:6
**missett** 2:12
**missing** 242:1
**mission** 3:5 39:24
  64:13 134:17,19
  134:21 135:14,17
  136:16,17 141:18
  142:9
**missions** 87:1
**misstates** 55:10
**mistake** 270:7
**misunderstanding**
  48:17

**mix** 108:19
**mixing** 244:23
**modest** 168:5
**modestly** 53:19
**mofo.com** 6:19,20
  6:21,22,23
**moment** 22:1
  23:24 29:13 31:10
  32:17 38:22 53:5
  71:16 80:3 96:22
  102:12 166:20
  169:5 208:6
  215:16 218:13
  222:5 234:21
  237:10
**momentum** 73:18
**monetary** 135:9
**money** 53:19
  104:11 106:20
  107:21 114:9
  119:1 132:11
  155:22,25 161:6
  163:5 167:7
  173:25 174:6,8,9
  174:11 220:22
**monitored** 143:7
**months** 32:10,19
  143:25 144:21
  223:5 229:4 249:8
**morgan** 149:15
**morning** 9:8 10:7
  10:21 49:5 84:11
**morrison** 6:16
**mother** 68:17
**motion** 2:22 47:2
  111:25 157:19
**motions** 47:17
  202:9
**motivation** 219:24
  220:9

**motivations**
  220:12
**mountain** 62:2,4
  62:24 63:10 135:2
  138:19 139:3
  207:25 208:2,3
**move** 11:24 25:5
  40:8,25 69:8 82:2
  87:11 94:14 97:23
  129:13 130:21
  133:10 144:23
  147:22 152:12
  156:15 175:6
  177:5 196:21
  212:4 230:4
  231:17
**moved** 12:9 20:23
  62:8 64:8,20
  187:22
**moving** 152:12
  208:5
**multiple** 41:2
  142:13 183:17
  258:17
**municipal** 80:17
  85:14,15 91:1

**n**

**n** 21:18 36:3,15,16
  44:20 223:1
**n.w.** 7:17
**naacp** 183:2
**nail** 151:1
**nakamura** 36:15
  36:20 37:14,16
  38:11 44:1,7,18
  153:16 154:4,8,10
  197:16 217:15
**nakamura's** 38:3
**name** 9:8 12:1
  13:16 16:15 19:9
  19:15,16 21:18

24:8 35:22,23
  36:3 170:24 200:7
  200:20,23 208:1
  229:7 233:2
**named** 230:25
**names** 146:3
  217:14 221:17
**nation** 67:25
  222:23
**national** 24:2,6
  153:23,24
**nationally** 67:22
**nationwide** 143:7
**nature** 125:7
  128:11 180:1
  201:2 238:6
  245:11 250:21
**ncsboe** 2:25
**nearly** 125:21
  129:4 143:9 144:3
**necessarily** 37:2
  49:1,8 58:7 64:24
  68:15 70:22 81:15
  85:5 90:19 102:24
  110:14 128:13
  149:14 154:23
  155:19 176:20
  196:2 206:15
  257:6
**necessary** 118:10
  135:18 182:20
  231:10,11 280:10
**necessitated**
  152:23
**necessity** 117:7
  159:1 160:14
**need** 9:18,23,23
  11:12 37:11,15
  41:6 47:20 115:16
  115:24 116:4
  124:10,17 127:2

**[need - objection]**                                    Page 35

130:6,7 158:20
161:7 169:6 170:8
174:7 176:22
182:25 187:1
199:9 233:21
237:25 238:9
256:3,18 275:2
**needed** 32:13,16
37:6 61:13 145:20
**needing** 88:4
**needs** 135:5
147:11 164:4
**negative** 265:22
**negatively** 83:10
**network** 23:25
**never** 18:13,15
84:14 200:22
217:17 239:12,20
241:22 243:8,12
**nevertheless** 13:20
**new** 2:23 4:13
21:17 33:6 55:23
56:3 59:4,4 69:5
82:23 113:23
120:4,15 121:2,8
121:16,20,23
129:20 148:4,8
211:25 226:1
**newest** 164:6
**news** 152:2 211:21
**nicely** 84:8
**night** 157:17
**nist** 223:1
**non** 46:19 51:10
52:6 53:12 54:22
70:24 71:14 85:25
87:6,17 174:12
183:15,19 184:15
185:7,13 191:24
192:2,13,18,20
193:15 194:16

195:14,17 196:3,7
196:18
**nonparties** 48:6,7
48:11
**nonpartisan**
127:15,18 143:2
144:7
**nonprofit** 3:8
127:15 138:15
139:5
**normal** 270:14
**normally** 152:4
**north** 12:6,7 64:8
64:20,22,23 65:8
65:10,14 66:6,9,23
68:11 73:5,10,14
73:22 74:8,13,19
74:24 82:17 90:22
90:25 91:11 105:9
109:20 110:9,21
122:9,14,25 125:2
126:1,9 156:2
165:6,8
**northern** 1:1 98:3
**notarized** 194:7
279:10
**notary** 281:23
**note** 134:7 158:4
190:7 249:22
**noted** 40:5 280:4,5
**notes** 5:9 25:12,13
31:20 201:16
256:16 275:3
**nothing's** 34:24
**notice** 2:3,4,18
11:25 26:1,14
28:12 30:22,23
35:9 38:19 41:4,7
108:25
**noticing** 276:19

**noting** 279:7
**november** 80:21
85:18 122:13
172:23 186:7
215:15 240:13,24
243:3,15 244:18
245:14 246:22
247:1 248:18,22
249:16 250:1,2,3,4
250:9 253:16
254:8 255:1,15
257:4,5,15
**nsa** 98:21
**nuances** 240:3
**number** 12:22
26:2 28:14 42:14
44:3 49:23,25
56:8 59:11,13
74:13 89:10 90:12
95:16 96:20 97:2
97:13 100:22,25
101:4 106:24
109:9 111:19
120:11 122:17
123:19,21 125:4
126:19 130:21
133:20 136:7
138:11 140:5
141:21 142:14
144:23 145:4
146:12 150:17
152:13 156:15,16
157:14 161:9
162:5,6 163:21
166:4 167:9
168:20 171:24
176:22 177:6
178:16 179:19,20
179:25 180:19
186:13 188:14,15
190:16 191:1

196:21 197:13
203:22 208:8
213:17 216:21
222:13 225:9
230:4 235:25
238:24,25 248:9
248:19 250:17
251:3,7 253:13
255:11 256:21
257:19 259:8
261:8,10,12 263:8
264:16,22 266:4
266:24 267:12,16
268:5,25 272:8,20
272:22,24 273:24
274:8 275:6,8
**numbers** 16:25
51:20 119:19
178:20 261:23
269:22 272:13
**numerous** 14:22
82:10 114:22
211:13
**nw** 6:17

**o**

**o** 36:3,15 44:20
**object** 46:16 70:6
70:8 164:10,15
174:3 187:9
195:19 198:17
203:3 217:23,25
219:13 220:10,12
227:18 228:24
229:9 231:21
237:9 245:16
**objected** 39:2
268:16
**objecting** 229:25
**objection** 9:6
55:10 76:4 77:3
116:10 131:17

30(b)(6) Marilyn Marks                                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

[objection - order]                                              Page 36

137:18 154:20
175:14 215:5
229:6,17,22,23,23
237:10,17,19
**objectionable**
47:24 131:18
**objections**  2:4
4:18 5:1 10:10
28:12,20,21 30:24
39:4 40:4 48:2
157:24 228:10
243:20 248:13
266:22
**objective**  113:6
**obligation**  183:4
191:15,19 276:14
278:10
**obligations**  30:19
33:5 147:24 180:2
191:3 274:3
**obtain**  15:24
196:10 260:16
**obtained**  215:3
249:11
**obtaining**  49:14
**obviously**  10:23
11:15 21:5 35:9
78:6 97:4 113:15
125:21 128:20
134:24 137:23
167:5 168:10
173:19 178:24
193:19 237:13
**occurred**  228:7
229:25
**ocga**  276:7,8,21
280:7
**october**  32:6
111:23 120:24
**offered**  61:19
122:2 180:3

218:10 219:10
229:23 265:13
**offering**  111:8
**office**  8:4 108:14
200:19
**officer**  278:13
**officers**  27:3
**offices**  171:15
279:3,10
**official**  45:20
156:8,11 257:25
**official's**  156:12
**officials**  76:13,21
78:2,21,25 80:13
81:1,1 85:20,22
126:25 158:20
159:17,20,23
209:12,19 210:3
211:4,23
**oh**  15:18 20:22
70:4 93:23 96:22
118:16 149:14
151:24 159:12
184:12 205:3
227:13
**okay**  10:21 11:4
13:2 14:18 18:3
18:21 20:7,13,16
25:15,15 26:7,25
27:11 29:1,17
31:5,12 36:5
38:23 39:19 40:3
41:18 42:11,12,13
43:10,16 48:9
50:13 51:7 52:9
52:20,24 53:1
54:16 57:14 60:24
63:9 65:1 77:19
77:24 82:23 84:2
84:3 88:15 96:23
97:3,5 99:5

102:12,19 103:3
105:22 106:13
110:20 111:12
112:10 116:2,5
117:13 124:14,18
124:18,21 127:4,5
131:24 132:4
133:9,12 135:6,19
136:19 140:7,21
142:11,17,17
143:19 145:21
147:5 150:10
159:6 160:4,6
161:24 164:5
165:11 166:22
167:8 168:14
169:1 170:2
180:21 182:7
188:24 189:25
190:25 191:16,20
191:24 199:6,13
210:6 214:1,11
215:13 216:7
217:22 218:7
220:4,13,17
221:14 222:22
226:16,25 227:13
228:9 229:11
232:10 236:1,21
237:4 239:7 241:3
242:6 243:18
245:8 246:19
247:9 249:3,7,20
249:23 252:10
256:17,20 261:16
269:19,20,20,20
269:21,21,21
271:20 272:10,11
272:10,11,11,11
272:11,11,11,21
272:23,25 274:12

**once**  25:17 58:25
252:5 261:18
279:9
**ones**  23:19 41:6
43:22 160:5
248:18 270:8
**ongoing**  55:22
123:10 127:19
166:25
**online**  259:4
**oops**  243:16
272:10
**op**  143:24,25
**open**  15:23 16:18
17:5 65:6,6 70:20
70:20 90:21,25
91:5,13,17 155:3,3
155:3,4,17 185:15
**opening**  162:23
**opens**  161:17
**operate**  115:14
168:14 214:16
**operation**  245:2
246:24
**operative**  214:17
**opinion**  185:4
**opponent**  84:8
**opportunity**  74:25
90:13
**opposed**  52:21
71:1 92:3 149:5
221:2
**options**  109:22
**oral**  91:11
**order**  35:13 39:8
41:1 46:5 47:19
109:18 121:15,21
160:8 214:20
216:5 227:20
228:15,19 229:9
229:20 230:1

**[order - participating]**                                    Page 37

231:12 265:16,19
**ordered** 228:21
**ordering** 277:2
279:13
**organization**
13:19 22:12 27:2
27:5,14,23 28:1
30:3 31:2 35:11
37:10 38:15 42:18
57:19 62:10 63:7
63:14,15 82:11
91:7 95:22 100:6
101:5,11 104:12
106:9 114:23
117:3 119:1,7,11
127:15 136:2,3
137:24 139:17
145:2 152:16,18
152:22 156:17,20
156:23 157:3
169:21,23 174:2
175:8 177:7,8
180:1,4 181:3,8
182:21 187:3
191:11 196:22
207:24 212:5
221:3 236:3,5
266:5
**organization's**
42:15 57:6 130:23
133:14 134:17
144:24 154:17
185:2 208:9 230:5
256:22 263:9
270:17
**organizational**
55:21 82:11
144:24 145:25
152:17
**organizations** 22:9
45:7 100:5 126:6

135:10 139:9,10
153:23 173:13
212:8 213:1,7
220:7
**organized** 72:16
75:2 114:22 139:7
**organizes** 117:15
**oriented** 68:25
**original** 134:25
138:21 250:6
279:12,14
**originally** 32:5
**ossoff** 69:17
**ourself** 159:8
**outcome** 195:5
211:15 215:23
216:12 240:23
241:5,19 242:9
243:2,9,13,25
244:1,14,18 245:1
278:8
**outcropping** 72:2
**outdated** 182:4
**outline** 129:23
**outlined** 47:15
116:16
**outlining** 58:22
69:9
**outreach** 38:7
**overall** 152:20
**overhead** 171:6,14
171:14,15
**overlap** 210:12
**overnight** 148:23
**oversight** 72:22

**p**

**p.m.** 60:14,16,17
95:2,4,5 130:14,16
130:17 176:24
177:1,2 235:15,17
235:18 264:5,7,8

274:19 275:12
**package** 3:11
150:16 152:4
**packages** 151:21
**pads** 234:6,13
**page** 2:2 3:17 5:12
25:13 26:22 50:15
54:9,19 97:8,24
102:5,6 104:4,19
111:12 112:3
124:19 134:15
139:3 163:25
164:5,14 165:12
166:3 174:18
224:6 228:3
234:15 261:25
280:11,14,17,20
280:23 281:1,4,7
281:10,13,16
**pages** 111:17
280:9
**paid** 87:21 88:10
99:8 115:3 171:15
178:7,8,10 268:8
**panels** 24:4
**paper** 25:12 34:21
98:7,8 103:6,6,10
103:12 159:19
173:7 219:6
237:16 238:13
241:25 255:13,16
262:15
**paperless** 98:5
**papers** 172:24
**paragraph** 50:17
55:19 56:19 61:25
64:7 65:19 66:11
66:12 67:4,7 69:8
70:1 71:8 75:1,17
82:2 83:4,21
109:16 110:20,22

112:14 114:16,21
115:17,20,20
116:15 117:13,15
118:4,20 119:14
137:14 141:21
142:11,22 180:24
183:7 186:1
**paragraphs** 61:16
71:15
**parallel** 76:16
102:23
**parents** 68:23
**parkwood** 7:8
**parse** 48:14,16
113:6,13
**part** 42:7 44:2
54:5 55:19 59:20
61:11 63:15 81:12
92:9 97:9 100:4
101:18 102:13,14
102:18,24 104:2,3
104:7,19,23 106:5
116:7,21 121:1,7
121:11 125:9,9
128:5,6 134:21
135:14 142:9
145:15,16 154:5,6
157:25 163:14,16
165:21 173:5
181:10,15 182:10
183:5 186:4
187:18 230:12
236:11 271:25
**participant** 29:22
**participate** 83:16
122:5
**participated**
144:16 159:8,13
**participating**
12:14 23:13 38:7
177:8

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad
March 17, 2022

**[participation - plaintiffs]**

Page 38

**participation** 55:1
74:5 185:1,8
**particular** 30:8
56:20 58:19 84:24
88:13,18 89:11
91:24 98:13
103:23 110:5,9
122:3 124:4
134:13,14 145:8
148:1 167:1 168:2
173:16 177:14
178:4 180:8,11
190:2 195:15
196:1 201:2
203:25 206:7
213:16 219:20
234:22,25 236:23
247:3 267:16
**particularly** 22:19
34:18 38:11 72:3
80:18 96:16 122:4
123:2 147:6
149:21 192:8,9
207:4 226:14
254:2
**parties** 50:8 72:18
78:8,12 81:8
143:4 214:24
276:21 277:2
278:13 279:13
**partly** 85:16
**partner** 252:1
**parts** 174:4
**party** 182:12,12
182:13 276:15,22
278:7,11
**pass** 35:1,1
**passage** 100:12,16
124:24
**passed** 15:11,20
68:18

**passionate** 149:13
**password** 277:1,2
**patel** 8:10
**patients** 206:21
**pause** 176:1 256:8
**pay** 53:9,13,18
54:18 87:22 163:5
182:14
**paying** 21:20
54:11
**payments** 105:1
**pdf** 279:7
**pdfs** 270:15
**pendency** 212:2
**pennsylvania** 6:17
125:11
**people** 16:20,22,24
17:7 20:25 43:15
43:18 57:18,25
58:2,11,18 63:25
63:25 67:21 71:24
73:11 81:19,25
86:2 90:7 113:8
121:10,12,20
162:17,19 171:14
173:2 174:8,13
181:8 182:5,15,15
183:24,25 185:21
186:4,8 187:10
190:8 191:22
192:11 194:19
195:5,25 197:10
203:11,13 205:24
213:7 217:12
224:4,15,25
226:20 227:7
228:16,17 230:25
232:18 233:22
235:3 236:25
241:6,8 242:15
250:2,5 257:11

263:23
**people's** 57:15
87:20
**percent** 54:22,24
55:8 92:14,15
93:6 116:6 154:22
154:25 155:6
174:14,15 242:14
**percentage** 92:11
94:10 154:16
**perfect** 39:20
117:8,24 118:3
**perfectly** 58:8,11
**perform** 115:8
**performed** 250:6
**performing**
115:15,23
**period** 71:15 73:9
73:13 105:6
174:23 175:1,3
218:11
**permission** 196:13
**permitted** 118:21
199:23 216:2
228:4 252:15
**person** 27:7,12
53:16 73:24
179:21 181:16
182:10 191:22
200:18,18 213:5
230:5 231:1,8
232:2 242:10
**person's** 229:7
233:2
**personal** 31:1
108:13 158:18
159:22 169:25
173:24 270:25
**personally** 18:4
67:16 115:4 136:1
169:20 263:17

271:9
**personnel** 50:21
55:21 57:1 267:18
**persons** 27:4,12
**persuade** 159:15
160:9,17
**pertains** 39:8
229:21
**petition** 69:13
90:7 185:16,17
196:14 225:23,25
**petitioning** 71:11
**phase** 25:6
**philip** 225:24
**phone** 60:9 84:21
181:9 213:9
218:20 271:24
**physician** 206:20
**pick** 126:7
**picking** 233:5
**picture** 62:6 275:4
**piece** 45:20 131:16
**pieces** 11:25 25:7
36:18 140:20
142:22 185:4
249:9
**pillow** 229:15
**place** 41:13 47:25
47:25 56:24 57:16
72:5 74:2 85:17
90:13 199:19,20
202:5,6 227:24
261:21 276:20
**places** 58:6 107:21
206:21 211:25
212:1,1 239:14,24
**plaintiff** 4:25 18:4
190:13 227:22
**plaintiffs** 1:5 2:6,9
2:18 6:10 9:13,14
39:9 56:12 111:24

30(b)(6) Marilyn Marks                                March 17, 2022
Curling, Donna v. Raffensperger, Brad

**[plaintiffs - present]**                                              Page 39

188:12 212:6,6
214:23 215:4
228:5 233:12,15
**plaintiffs'** 2:20 4:2
4:18
**plan** 109:22
179:22 205:19
**planning** 72:4
122:7 129:22
202:7
**plans** 92:25 175:8
175:21,24
**platform** 270:17
**play** 37:21
**please** 9:5,17
94:23 149:14
170:16 173:1
279:10,17 280:9
280:10
**plurality** 240:6
**plus** 204:10
237:14
**point** 11:12 21:16
54:10,21 55:18
68:21 81:25 88:22
91:6 94:15 129:16
168:7 171:18
178:10 181:17
201:19 202:5
262:25 264:11
274:16
**policies** 62:8
103:14 131:1
156:17,21,24
157:4 158:8
160:23 175:10
196:24 208:10,14
209:2 230:7
**policy** 22:21
113:11 137:22
193:21 194:11,13

195:16 196:5
**political** 78:8,12
127:17 143:4
**poll** 58:8 72:13,13
72:15,19 78:10,12
78:13,20 93:16,22
94:4,11 144:17
185:3 191:25
192:7,10 234:6,13
**pollbook** 199:21
233:24
**pollbooks** 200:2
**polling** 56:24
57:16 58:6 199:19
199:20 200:12,15
200:16 201:1
206:21 211:24,25
212:1 239:14,24
**pop** 200:24
**popped** 200:20
**population** 251:22
**porter** 6:13
**portion** 94:11
119:18 135:23
155:23 255:16,20
**portions** 56:17
**position** 220:5
228:18 229:20
244:16 245:10
247:10,16 254:2
268:19
**positions** 228:16
**positively** 83:10
**possession** 204:16
**possibility** 254:1
**possible** 11:18
30:25 117:16
118:7 143:10
206:1 216:14
**possibly** 21:1
118:17

**post** 66:14 85:10
135:1 172:7
179:16
**posted** 135:24
**posting** 259:3
**postponed** 32:12
**pot** 173:17,18
**potential** 78:20
184:1 202:16
222:3
**powell** 228:10
229:13 241:9
247:8,12,17
265:10
**practically** 30:25
**practice** 197:21
226:16
**practices** 81:10
198:15 199:8,14
201:7 209:20
210:4
**precinct** 85:18
234:18
**precincts** 233:11
233:14 234:24
**precise** 181:7
238:10,21
**precision** 48:19
**precursors** 24:11
**predecessor** 17:12
91:7
**predecessors**
155:21
**prefer** 53:4 87:10
90:10,14
**preferable** 137:24
206:7,11
**preferably** 121:6
**preference** 28:5
269:5

**preferred** 83:15
**preliminary** 47:3
157:19 202:9
**preparation** 30:13
30:15 32:2 34:6
43:7 44:3,15
95:11 96:10,12
105:19 111:15
157:25 167:20
203:5 236:22
237:18
**preparatory** 46:3
**prepare** 24:24
30:21,24 31:13
35:13 36:11,19
43:5,13 46:5 94:7
96:18 131:11
132:22 134:2
145:8,14 153:6
154:4,11 157:14
176:7 178:4
180:11 197:7
208:23 212:15,19
230:12,22 236:17
237:15 257:2
266:10,16
**prepared** 31:9
37:16 38:20 39:2
40:5 257:7 259:17
259:18
**preparing** 30:7,10
37:2 44:11 125:23
160:3 204:2 257:7
257:12
**present** 8:9 42:17
59:24 131:1 145:3
179:18 194:3,4
208:12 209:21
210:5 212:23
267:21

Veritext Legal Solutions

30(b)(6) Marilyn Marks                   March 17, 2022
Curling, Donna v. Raffensperger, Brad

**[presentations - projects]**                   Page 40

presentations
  24:19
presented   24:4,6,9
  139:21 276:1
presenting   24:1
  42:8
preserve   141:25
  244:22
preserving   142:2
president   45:23
  46:1 146:7 254:9
  254:13,14
presidential   66:15
  195:6 237:8 243:3
  244:2,4,5 246:16
  246:17,20 247:4
  254:7 255:14
press   79:2 143:3
  185:22 193:3
  224:16,24
pretty   73:20
  198:21 235:24
prevailed   48:20
previous   147:20
  155:15 192:5
previously   152:19
  199:25 230:25
price   118:24
  232:11 233:20
primarily   87:20
  88:5 93:8,11
  156:1 177:17
  243:14 247:20
primary   62:13
  127:21 128:10,12
  160:5,11 246:7
  253:2,9
print   279:8
printed   169:12
  260:4

printer   262:18,19
printing   167:16
  263:5
printout   136:10
prior   17:16 34:3
  35:4 50:18 62:23
  63:3,7,15 101:7,22
  103:19 168:2
  175:1 248:21
  253:16
priorities   45:11,14
priority   45:13
  140:15
privacy   127:19
  128:2 206:19,22
  207:3,15,17
private   39:8 58:7
  58:10,12 142:3
privilege   10:12
  214:12 219:19
  220:16
pro   114:12
probably   19:20
  20:19 29:16 30:9
  86:2 92:14,15,20
  94:3 99:15 113:9
  114:14 123:18
  129:8 135:4
  146:18 154:22,25
  157:17 160:14
  162:21 165:7
  168:8,10 202:6,8
  213:24 218:17,19
  226:22 230:15
  232:14 235:7
  238:23 256:5,15
  259:19,21,22
  271:23,24 273:17
problem   74:24
  78:14 151:6
  170:11 211:24

232:14 234:4
  250:8,14 252:18
  253:7 259:1 262:8
  263:1
problems   15:14,15
  48:15,22,24 49:7
  49:15 61:8 64:23
  71:23 78:22 79:16
  79:23 80:5,9,12
  119:23 120:5
  144:13 158:25
  200:10 212:3
  250:12
procedure   280:7
procedures   66:24
proceeding   276:1
  276:22 277:1
  278:6,13
proceedings
  276:12
process   66:1 69:5
  72:6 102:4 137:9
  144:17 150:12,13
  157:1,6 185:16
  194:6 201:17
  202:2,3,4 266:5,13
  272:7
processes   185:15
  185:17 241:20
  274:2
produce   34:18
  267:25 273:17
produced   32:13
  32:16 120:9
  123:25 126:15
  153:8 161:13
  162:9 186:10
  222:16 258:8
  259:20 263:10
  268:13,14,20
  269:2,10,11,25

270:9 272:17
  273:5 276:23
production   5:3,8
  33:3,10 266:23
  267:8 273:14,24
  279:18
professional   19:24
  20:3 276:14
  278:10
profits   144:7
program   93:18
  97:9,16,18,24
  98:11,15,25 99:6
  101:4,6,12,25
  104:1,21,23
  105:23,25 107:12
  108:3,3
programs   23:12
  53:12 107:7
progress   96:17
  161:19 166:11
prohibited   212:25
  276:20
prohibiting
  265:12
prohibitions   276:8
project   33:7 65:19
  89:12 127:21
  128:1,10 132:6,7
  164:16
projects   3:19
  25:14 31:18,20
  35:16 37:9,18
  38:8 43:20 44:25
  45:2 52:11 57:6
  58:20,23 59:4
  64:10,18,19 67:20
  68:13,22,24 70:25
  73:2,5,14 74:6
  75:22 76:25 77:16
  82:15,17 83:4,6

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

[projects - questioning]

Page 41

89:9,19 96:17
113:15,18 117:11
118:2,6 119:2,8
122:9 152:21
153:10 155:7,8
167:13,17
**prominent** 206:20
**promises** 37:10
**promot** 223:22
**promote** 93:1
191:11
**promoted** 158:14
224:9,20,22
**promoting** 158:23
176:19 223:22
224:25
**promulgate** 93:2
194:1
**pronouncing**
147:2
**proper** 142:8
**properly** 207:20
**proposed** 92:22
159:9
**proposition**
242:13
**prospective**
144:16
**protect** 57:3,12
63:16 78:18
135:21 173:1
**protected** 277:1,2
**protecting** 57:23
62:7 142:3
**protection** 49:19
137:10 265:15
**protest** 66:9,20,21
66:25
**protocols** 131:1
156:17,21,24
157:4 158:8

175:10 196:24
208:11,14 230:7
**protracted** 75:18
**prove** 250:7
**provide** 85:20
115:6 135:9
191:20,24 192:2
192:12,20 193:13
193:14 248:5
273:19 276:19
**provided** 85:23
109:4 142:23
143:12,20 194:15
194:16 195:17
265:15 274:7
**provides** 114:25
193:10 214:21
**providing** 45:5,6
181:1 222:25
**provision** 139:5
140:1
**provisional** 199:23
232:18,19,21
233:22,23 234:4
**pryor** 8:5
**public** 15:13,17,19
15:20,24 16:12
20:11 21:15 22:21
57:2,12 58:14
71:20 72:2 79:1
86:8,17,21,25 94:1
115:12 142:4
143:3 144:18
185:16 193:20,21
194:11,13 195:16
223:23,23,24
224:5,17 249:11
250:11 272:2
281:23
**publishing** 185:4

**pulitzer** 259:25
262:7
**pull** 60:4 269:3,7
**pulled** 93:3 151:19
**pulling** 51:6
**purchased** 240:19
243:11
**purpose** 39:22
62:5 131:13
133:15,16,23,24
136:21 139:6,6,16
139:19 140:2
141:25 142:12,19
151:19 185:3
257:6,12
**purposely** 15:10
**purposes** 34:5
57:23 79:17,18
133:22 139:8,8
182:19 209:15
268:1,21 274:10
**pursuant** 220:15
280:6
**pursue** 112:22
**pursuing** 215:8
**pursuit** 135:20
**put** 32:21,23 51:1
80:12 118:10
119:19 139:15
145:18 149:9
150:6 151:4 152:9
165:9 166:17
167:6 171:5 175:2
181:20 182:22
202:22 259:22
265:4,20
**putting** 44:24 84:8

**q**

**qr** 226:7 255:13,19
255:23 256:1
274:15

**quadruple** 261:6
**qualified** 235:5
**qualifier** 132:16
**qualify** 139:10
**quantifiable**
119:19
**quantify** 119:12
**question** 9:21 11:7
11:9,14 18:2 20:2
29:8 37:14 46:3
46:10 51:6,25
52:7 54:16 62:11
63:3 71:13 77:11
86:11,13 92:1,5
96:25 100:4
102:16 106:4
116:19 118:19
127:5 131:9
139:25 140:11
148:17 159:3
169:24 170:9
176:9 179:15
189:11 192:16
202:1,18,25
205:11 209:18
214:9 216:1,4,8
218:1 219:21,23
220:12 227:23
229:7 230:1 231:5
231:16,23 237:23
237:24 238:16,20
240:23 243:2,5
245:3,5,25 246:4
246:16,25 250:15
254:15 255:22
273:4
**questioned** 242:9
**questioning** 241:4
241:12 242:8
244:18

**[questions - recognition]**                                        Page 42

**questions**  11:23
26:23 41:1 42:6
42:24 79:4,11
80:8,11 81:6,14,16
92:1 93:11,13,19
93:22,24 94:6
95:12 96:7 97:7
100:3 109:16
140:22 184:18
185:14 203:16
214:22 220:11
228:20 229:13
259:25 265:6,13
265:14,18,22
276:23 278:5
**quick**  10:8 131:15
235:11 246:12
**quicker**  133:10
**quickly**  11:4 14:19
107:5,23
**quite**  14:14 20:12
24:11,23 31:21
33:6 65:12 78:8
123:18 127:16
139:21 143:14
164:2 182:5 190:8
200:13 243:20
244:3 253:3 258:5
261:22
**quote**  224:24
241:4
**quotes**  200:23

**r**

**r**  7:15 36:3,15,16
62:20,21 254:9
**race**  72:5 75:15
84:10
**raffensperger**  1:7
7:3 109:2 164:8
170:13

**raffensperger's**
248:14
**raffensperger's**
4:20 5:7
**rails**  84:13
**raise**  134:8 161:6
**raised**  106:20
174:8,9,11 218:22
**raising**  173:25
174:6
**ram**  6:8
**ran**  15:5 64:22
**range**  87:9 185:14
222:3
**rarely**  172:11
**rates**  115:4
**rationale**  39:11
130:24
**reach**  60:8 67:4
186:2,5 192:25
197:23
**reached**  197:22,24
**read**  10:19 26:20
34:12 38:23 63:6
102:7,10,11
107:12 115:25
124:15 137:21
142:15 145:17
198:6 263:17,20
269:14 272:9
273:1 274:23
275:11 279:6
280:2
**readable**  255:16
255:19 256:1
**readily**  113:7
114:8
**reading**  10:17
215:11
**ready**  27:12 31:4,8
31:11 33:18 34:9

34:13 35:5,8 36:7
37:7 43:11 96:20
131:6 177:14
180:8 236:10
**real**  10:8 93:18
182:13 246:12
**realize**  45:18
189:14 273:7
**realizing**  189:10
**reallocate**  147:17
**really**  14:15 20:25
24:2 44:12 49:16
64:16 65:1,11
72:7 74:22 77:21
79:6,9 87:10,12
90:20 93:14,15
94:8 96:17 114:12
118:8,9 129:17,18
129:19 130:5
145:9 146:20
148:3 149:17
153:12 154:22
155:2 166:20
173:18 179:15
182:20 183:16
193:21 208:24
209:5 210:11
211:11,13,17
218:5 222:23
223:20 231:23
242:19 249:23
**rearrange**  212:1
**reask**  63:8
**reason**  58:4 116:8
116:19 118:5
174:1 182:25
188:1 200:19
219:9 223:12
231:7 232:13
245:25 280:13,16
280:19,22,25

281:3,6,9,12,15,18
**reasonable**  240:24
242:10,17,21,24
243:1 246:4,25
254:1,1 270:8
**reasonably**  27:13
27:22 35:10
249:13 270:5
**reasons**  140:17
242:7 280:8
**recall**  11:6 13:4
20:17 23:20 30:6
32:18 37:5 58:21
66:5 68:14,20
109:4 111:8 120:6
120:14,16 122:8
123:15 124:4
156:5 169:4
186:18 188:20
190:21 199:16
216:13 217:19,21
219:3,9 224:23
226:15 254:25
259:5,7,12 273:11
273:21
**recalling**  124:7
216:14
**recalls**  185:16
**receive**  19:3 86:14
86:18 183:8
**received**  18:24
22:15 86:5,22
150:15 192:8
**receives**  112:15
183:10 276:22
**recess**  40:19 60:16
95:4 130:16 177:1
235:17 264:7
**recipients**  164:1
**recognition**
172:24

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

**recognize** 225:19
**recollection** 25:18
  44:23 61:1 91:9
  99:19 169:8
**recollections**
  24:24 88:20
**recommend** 79:5
**record** 9:23 12:2
  26:24 32:22,23
  40:18,21 42:7
  60:10,15,18 95:3,6
  130:11,15,18
  176:23,25 177:3
  177:25 179:13
  220:5 224:18
  228:22 229:12,17
  235:13,14,16,19
  237:18 242:2
  264:3,6,9 265:5,6
  265:13,21 274:20
  274:23,25 275:10
  276:12,13,23
  278:6
**record's** 52:7
**recorded** 241:18
  255:4
**records** 15:13,17
  15:19,20,23,24
  16:12,18 17:5
  19:10,19 33:19
  70:20 89:20 94:1
  99:8 120:1 138:24
  155:3,4,18 173:15
  185:16 222:7
  223:23,24 224:5
  232:15 241:17,18
  242:1 249:11
  250:11 266:14
  271:6 272:3
**recount** 15:9
  81:20,20,22

**recover** 178:25
  179:2,4,18
**recovery** 179:17
**recruit** 113:9
  185:22
**recruiting** 112:19
  113:2
**redirect** 67:8,14
  68:8 73:1 75:20
  77:15,18
**redirected** 68:10
  73:16
**redirecting** 76:24
  77:20
**redirection** 76:3,7
**reduce** 82:3
**reduced** 278:5
**reexamination**
  69:13 71:12 90:8
**refer** 41:5 42:5
  47:1 56:23 75:4
  102:8 119:11
  127:7 133:13
  221:17 266:3
**reference** 50:5
  65:18 69:12,20,25
  71:9 75:2,13 82:3
  110:20 119:14
  120:22 163:8
  164:6,7,13
**referenced** 15:4
  48:4 61:9,23
  62:12 64:13 65:18
  75:8 82:18 83:3
  89:24 95:11 175:4
  211:8 275:3
**references** 66:12
  97:22 103:13
  121:21 129:3
**referencing** 70:12
  102:17 103:15,17

103:18 121:9
  201:15 204:3
**referred** 50:24
**referring** 42:10
  62:17,22 71:15
  98:12,13 99:1,14
  99:15,21 130:21
  184:11 185:12
  195:4 199:1,10
  206:15 225:23
  226:4 249:18
**refers** 28:2 133:23
**reflect** 42:17 88:12
  88:16 222:8
  238:18 246:1
  267:17
**reflected** 140:18
  178:7,11
**refresh** 24:24
  25:18 169:8
**refreshing** 44:23
**refusing** 17:5
**regarding** 4:10
  27:14 30:20 61:20
  153:16 208:10,14
  209:2 212:9
  215:23 216:12
  218:15 265:7
**regardless** 86:18
  161:2
**region** 135:4
**registered** 138:8
  199:25 200:11
**registration** 98:21
  274:2
**regular** 147:6
**regularly** 226:16
**regulations** 94:4
  276:6
**reiley** 6:13

**reiterate** 157:23
  214:20 215:2
  237:10
**reject** 59:5 109:20
**rejecting** 103:24
**rejection** 75:3
  110:8
**rejects** 113:1,3
**relate** 76:9 90:18
  102:25 110:16
  137:6 165:2
  169:13,14
**related** 14:5,21,23
  16:5,7 17:16,19
  20:10,24 22:12
  34:19 37:17 44:2
  50:15 62:6 70:14
  70:23 75:8 76:14
  79:14 85:4 92:15
  92:16,24 93:7,21
  102:15,21 103:23
  105:2,8,13 108:15
  114:22 116:7
  128:1,4 133:3
  136:24 140:2
  149:22 154:23,23
  154:24,24 156:1
  169:22,24 175:9
  175:20 176:15
  177:7 192:3,21
  196:15 209:19
  210:4,6,8 211:4
  227:8 236:12
  248:18 252:25
  262:5 263:5 274:8
  274:15
**relates** 47:6 52:21
  54:10 96:16
  137:12 170:9
  173:19 175:25
  223:1,2 255:6,25

| | | | |
|---|---|---|---|
| **relating** 131:1 277:1 | 204:21 210:18 215:19 217:6 | **reporting** 276:6 276:19 | 151:25 152:6 164:1 192:7,15 |
| **relation** 236:3 | 218:12,18 221:6 | **reports** 152:3 | 195:9 266:7 269:9 |
| **relationship** 276:12 278:9 | 222:1,2,2,3 225:20 227:15 254:16,20 | 263:9,11 | 270:1 272:3,18 273:1,23 |
| **relationships** 153:24,25 196:2 | 255:21,24 256:2,5 256:12 273:12,14 | **repository** 277:2 | **require** 56:22 77:17 |
| **relative** 278:7 | **remembering** 20:12 22:23 | **represent** 9:9 10:23 127:16 | **required** 20:21 54:7 66:14 75:20 |
| **relatively** 130:4 131:15 133:7 | 105:18 159:4 160:1 170:2 200:9 | **representations** 276:4 | 76:17 77:14 89:14 110:8 112:21 |
| **release** 224:16,24 | 207:8 221:12 | **representative** 226:5 227:16 | 119:17 159:17 194:6 227:22 |
| **relevant** 44:22 214:22 | 225:21 254:17 255:7,9 262:13 | 263:20,22 | 233:22,23 252:16 |
| **reliably** 238:18 | **remind** 50:10 51:1 | **representatives** 215:14 228:12 | **requirements** 21:2 75:19 109:19 |
| **relief** 49:4,14 86:23 87:2,4,7 | 127:3 256:16 | 229:14,15,16 | 110:11 128:13 147:7 182:13,24 |
| 175:11 211:19 | **reminding** 59:19 | **representing** 9:15 | 183:2 192:10 223:6 233:10 |
| **religious** 139:7 | **remote** 1:14 | **republican** 3:4 126:17 182:12 | **requires** 35:10 |
| **rely** 38:6 164:21 164:22 189:7 | **remotely** 9:7 **remove** 69:16 | 262:22 | **requiring** 56:24 118:23 |
| **relying** 199:2 242:7 245:10 | **reorganization** 135:1,1 | **republicans** 72:12 **request** 4:20 5:3,7 | **reread** 134:5 |
| **remainder** 92:18 | **reorganized** 41:19 | 11:13 15:17 44:14 109:20 110:9,21 | **rereading** 115:21 254:15 |
| **remained** 101:19 | **repeat** 154:13 | 113:4 114:6 156:3 161:25 170:20 | **research** 53:22 103:21 115:4 |
| **remedied** 49:3 | **repeated** 261:1 | 179:5 194:16,17 195:14 206:25 | 117:6 118:11 144:13 172:24 |
| **remedies** 126:3 | **repeatedly** 260:9 260:22 | 246:10,11 248:14 248:19 253:12 | 173:7 174:13 235:6 |
| **remember** 11:2 12:23 13:10,19,24 | **repeating** 60:19 205:10 216:8 | 254:5 255:11 264:15,23 266:23 | **reserved** 212:22 275:13 |
| 14:12,14 16:20 17:3 19:16,18 | **rephrase** 11:10 | 267:8,16 268:15 268:24 269:22 | **reserving** 10:10 |
| 20:10 24:18 32:3 32:8 36:24 45:24 | **rephrasing** 86:11 **replies** 170:24 | 272:8,13 274:5,8 | **resident** 189:15 **residents** 189:1 |
| 52:23 72:11,14,17 72:21 88:24 | **reply** 171:4 **report** 161:19 | **requested** 15:18 16:12,16 32:11 | **resisted** 68:1,1 |
| 106:11 120:17 121:18 122:4 | 263:17,21,24 276:13 | 49:4 179:5 267:16 279:6 | **resolve** 91:17 |
| 139:22,25 160:2 162:18 170:8 | **reported** 262:6 **reporter** 9:17,18 | **requests** 68:3 112:15,18 113:1 | **resolved** 83:10 |
| 172:17 179:7,10 184:2 197:17 | 9:22 11:18 63:6 130:6,11 275:5 | 122:2 123:10 | |
| 201:9,23 203:20 | 276:1,3,7,10,24,25 | | |

30(b)(6) Marilyn Marks
March 17, 2022
Curling, Donna v. Raffensperger, Brad

**[resort - right]**                                      Page 45

**resort**  128:8
**resource**  110:12
  143:2 145:1
  185:14
**resources**  33:8
  42:15,18 43:19,19
  46:12,19,25 47:6
  47:15 48:5,11,23
  49:1,10 50:21,23
  51:10,14,22 52:1,4
  52:6,10,14,15,18
  53:11 55:22 57:1
  57:7 61:8,18,20,22
  67:8,15 68:4,9,10
  68:16 73:1,17,23
  75:20 76:3,7,16,24
  77:15,18,20 79:8
  87:12,14,15,17,23
  88:4 97:6 100:19
  109:6,17 110:7
  112:12 113:3,17
  114:9 117:2,5
  118:10,25 119:7
  119:11,18 128:22
  132:6 137:20
  147:17 148:11,12
  152:17,20,23
  161:3 171:9,11,19
  172:25 173:8,11
  211:17 268:1,21
**respect**  70:13,20
  209:7
**respond**  114:6
  269:15,18
**responded**  239:9
  259:2
**respondent**  211:14
**responds**  260:8
**response**  3:25 5:5
  16:17,18 188:13
  189:6 268:5 269:1

269:10
**responses**  4:3,19
  5:2 188:13 190:14
  246:10 248:13
  266:22 272:3
**responsibilities**
  191:2 274:3
**responsibility**
  279:7
**responsible**
  135:24 136:3
**responsive**  266:6
  266:19 268:15
  269:2,9,11 270:1
  270:11 272:18
  273:5 274:7
**responsiveness**
  10:11
**rest**  40:16 82:9
  129:14 137:21
**result**  46:12,19
  51:10 52:1,18
  87:18 132:20
  230:7 231:2,20
  232:7 234:17
  248:6 254:10
  267:19
**resulted**  23:3
**results**  185:4
  246:1
**retired**  21:12,22
**return**  60:9
  141:19 188:5
**returned**  279:11
  279:14
**revenue**  104:7,15
  107:24 139:11
**reverse**  160:8
  240:11
**review**  33:19,25
  34:3,13 35:4

96:13,15 102:11
  107:17 108:21
  111:14 123:11,14
  124:6 127:2 131:5
  134:1 145:7 153:5
  153:12 157:13
  169:6 177:13,16
  180:7 197:3
  206:17 207:9
  208:19 212:14
  230:11 236:10,12
  257:2 263:9
  266:10,12 269:3
  272:12 276:1
  279:7
**reviewed**  34:7,23
  43:4,6 96:19,21,24
  167:19 230:14,17
  269:22
**reviewing**  10:17
  45:8,8 169:14
**rhonda**  146:7
**ricardo**  2:11
  204:20
**rid**  87:24 88:3
**ridiculous**  261:4
**right**  15:8 17:7
  18:3 20:12 23:16
  24:8,11,15,18,20
  24:22 25:23 27:24
  28:3 29:9 32:3
  33:14,15 34:25
  35:2,3 40:3 41:21
  44:3 48:24 51:24
  52:3,23 54:4 55:9
  57:3,24 59:19
  62:2,15 63:1,9
  67:12 69:14 73:3
  74:4 77:12 81:5
  81:25 86:25 88:13
  92:7 93:13,24

95:22,25 102:5,12
  104:13,17 105:18
  106:2,9,14,21
  110:3,9,13 112:5
  113:25 116:18
  117:21 118:2
  119:8 121:2,24
  122:22 123:7
  124:1,14,22
  125:13,16 127:1
  134:9 135:15
  136:11,13 137:12
  137:17,20 138:19
  138:20 139:25
  141:2 142:19
  143:4,8,13,21
  144:8,9,13,19
  145:20,24 146:5
  146:12,18 147:3
  151:8,8 152:12,12
  154:24 156:2,9,15
  162:1,19 163:6,15
  164:8,14 165:2,7
  166:10,16,16
  168:12 171:10
  172:13 174:22
  175:6,17 176:11
  178:19 179:7,10
  182:8 189:20,20
  198:25 207:8,12
  214:2 216:13
  221:13 222:10
  225:20 237:5
  239:7 242:6,11
  246:24 248:7
  253:3,21 255:7,9
  255:24 258:21,21
  259:7 263:6
  269:21 270:4
  272:10 273:21
  275:7

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

**[rights - second]**

Page 46

**rights** 57:13 62:7
63:17 64:19 98:2
99:7 109:21 142:2
142:3,8 144:6
172:9 173:1,12
185:15 212:22
215:1 229:21
**rigid** 182:23
**ring** 14:9
**riot** 169:15
**risk** 85:9,10
115:10
**rla** 80:9 85:6
**rob** 40:15 94:18
114:11 131:16
184:22 209:25
**robbins** 7:16
**robbinsfirm.com**
7:19,20
**robert** 6:4,5 9:12
279:1
**roberts** 203:20
**robyn** 1:15 130:5
278:19
**robyn's** 11:17
**rocky** 62:2,4,24
63:10 135:2
138:18 139:3
207:25 208:2,3
**role** 37:21 38:3
84:17 85:19
226:20,24 227:1
**rolling** 11:20
25:17
**roots** 16:8
**ross** 7:16
**roswell** 225:25
279:20
**rough** 154:22
222:4,5 259:13

**roughly** 178:20
**rporter1** 6:21
**rpr** 1:15 278:19
**rule** 50:20 280:6
**ruled** 16:11
**rules** 11:5 51:1
81:20 92:22 93:1
159:9 194:2 276:5
280:6
**ruling** 120:24
**run** 74:2 206:21
**runoff** 15:6 69:18
80:17 84:6,9,12,14
84:16,19 85:14
236:6
**russo** 7:15
**rutledge** 35:22,25
36:2,7,19 146:8
197:15

**s**

**s** 44:20,20 62:20
223:1
**sabotage** 223:13
223:19 224:10,19
224:23 225:2,3
**sadly** 104:18 224:8
**safe** 159:13,14
160:8,9
**saguache** 13:21,23
**sake** 82:16
**salary** 171:15
**salida** 13:17 16:3
16:13,13
**salutation** 162:24
**saturday** 224:7
**save** 115:16,25
**saving** 171:3
**saw** 80:20,20
224:16
**saying** 37:2 46:6
61:17 71:5 102:18

114:11 117:9
118:4,8 154:9
165:12,20 167:2
170:7 174:14
181:9 187:17
197:8 200:14,23
240:19 244:20
247:14 253:8
260:22,22 262:7
262:25 264:25
**says** 50:18 54:5
55:19 97:24 101:5
106:10 115:23
125:10 134:16
139:6 150:9 158:8
160:23 162:13
170:24 172:3,21
180:25 186:4
189:12 196:13
219:3 228:3
248:19 260:25
262:3
**sb202** 78:15
110:13 129:2
155:20 166:18
192:9
**scan** 251:2,2
**scanned** 251:8,11
252:5 260:10,23
261:9
**scanner** 231:25
232:1 233:5
**scanner's** 232:2
**scanners** 231:20
234:18,19 262:1,3
**scanning** 254:3
261:1,6,21
**scenario** 117:24
**schedule** 106:5
130:9 147:7
174:19

**scheduled** 151:1
**school** 19:14,22
**science** 19:1,4,21
24:7
**scientific** 139:8
**scope** 64:25 65:2
131:18 219:25
220:2 227:25
228:8,15
**screen** 26:7 41:16
41:18,23 42:3
49:22 60:5 61:5
78:17,19 96:22
243:17
**screens** 42:1
**screwed** 41:18
151:4
**scribbled** 25:13
**scroll** 124:15,18
145:20 189:11
269:20 272:8
**scrolled** 124:12
**scrolling** 39:14
**se** 147:21 194:8
211:1 223:21
**seal** 279:12
**sealed** 263:17,21
**search** 270:21,25
271:13,21 273:20
**searched** 266:5,14
271:7
**searches** 270:5,8
270:11,15,17
271:6,16,18
**searching** 268:4
**seat** 13:16
**seattle** 6:7
**second** 5:3 25:25
26:13,22 30:22
34:24 36:23 41:12
41:19 54:5,21

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

**[second - set]**

Page 47

56:7 66:11,11
137:14 176:2,23
178:8 202:22
203:1 250:21
251:16,19,24
254:16,25 266:23
267:6 273:23
**secondly** 237:13
**seconds** 60:7
**secrecy** 78:3,4,9
78:22 105:9
207:16 209:1
210:13,14,15,23
210:24 211:5,8
235:9
**secret** 17:4,15,15
57:3,13,24 65:20
66:8 74:10 203:23
209:7 233:2,9
**secretary** 7:2
10:24 17:14 71:11
138:15 146:6
159:9 211:10,14
248:13 251:5
**section** 27:1 100:4
100:7 114:17
116:14 139:10,12
276:7
**sections** 276:8
**secure** 163:10,13
206:3
**security** 22:20
23:10,22 24:3
60:8,21 65:5 67:9
67:21,25 94:3
98:18 99:9 105:10
127:18 128:2
160:15 164:18
207:19 223:1
**see** 10:23 14:3
15:12,13,14 24:13

26:9,15 27:1,5,11
27:15 28:17,18
31:18 41:19 42:21
48:14 50:3,6,9
51:4 53:13 54:5
54:13 55:5,25
56:14,15 57:9
59:12 60:5 61:6
64:10 66:16 67:5
67:10,11 69:10,21
75:24 78:17 79:12
82:7,12 93:9
95:19 97:10,13,23
97:25 98:9,23
99:11 100:9 101:1
101:8 102:2,2
104:6,8 107:3,17
108:25 109:2,24
112:1,8,23 113:21
114:19 115:17
117:21 119:3
122:16 126:22
127:23 131:18
133:17 135:12
136:5,10 138:16
139:13 140:9
141:22 142:5
150:20 152:25
157:8,9 159:3
161:15 162:11
163:3,11,20 164:5
164:13,17,24
165:15 166:7,15
167:13 169:2
170:18 175:13
185:5 186:16
187:5 188:18
189:4 190:19
191:6 197:12
198:4 209:2 217:1
222:18 223:15

224:5,11 233:23
233:25 234:2
239:3,16 248:15
248:24,25 253:19
253:19 259:15
260:6,11 262:8
263:12 267:2,10
267:22 274:5
**seeing** 41:21 50:4
**seek** 170:13
179:17
**seeking** 69:16
86:23 111:10
127:20 172:23
178:25 179:2,4
**seen** 26:17 186:18
213:23 217:7
243:4,24 246:21
259:23 260:24
262:5,25
**selected** 202:11,15
202:19
**selecting** 69:5
73:21
**selective** 195:23
**semi** 222:23
**seminar** 79:2
**seminars** 22:18,21
23:2,19
**senate** 4:22 164:6
259:3
**send** 174:14
197:14 279:12,17
**sending** 84:21
123:15 169:4
195:8 226:13
**senior** 117:19
**sense** 129:14
141:16 154:1,16
**sent** 32:25 79:13
120:14 123:18

126:24 127:6,9
159:9 161:21,22
161:23 162:21
197:9,15,17 198:2
221:3 225:14
226:10 268:17
**sentence** 27:11
66:12 135:12
137:21,22 154:6
174:4 185:13
186:1 223:12
**separate** 183:13
273:14
**september** 124:13
162:10
**sequence** 73:1
170:10
**serial** 16:25
**series** 26:23 42:24
125:25 168:23
**serious** 268:25
**serve** 21:25 113:9
278:13
**served** 22:8,11
143:2
**server** 252:25
270:19 271:11
**serves** 142:12,18
**service** 20:11 22:4
97:9,17,24 98:11
98:15,25 99:6
101:4,25 104:1,21
104:23 105:24
108:4 185:21
**services** 53:7
97:18 101:6,12
105:13,25 106:1
107:13 276:19
**serving** 22:5
**set** 42:12 108:12
190:11

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

**[sets - speaking]**                                    Page 48

sets  251:21
setup  78:22
seven  92:2 236:13
shape  19:10
shaping  38:1
share  25:24 26:7
  41:13,15,25 42:2,3
  49:22 95:14
  124:16 227:6
shared  58:5
  144:12
sharefile  150:6
sharing  41:22,24
shea  203:20
sheet  89:6
sheets  268:17
shift  59:2
shifted  45:12,14
  115:12
short  130:5 170:5
  240:2 251:25
shortly  20:1
show  16:19,22,24
  50:6 134:9 161:12
  260:17 267:25
  268:7,20
showed  199:22
showing  109:12
  161:7 175:3
  248:25 255:2
shown  251:17
shows  106:5
sic  46:7 144:8
sidney  228:10
  229:13 241:9
  247:8,12 265:9
sign  10:19 274:24
  279:6
signature  120:19
  275:13 278:17
  279:2,15 281:20

signed  90:7 122:21
  213:25 214:4
  279:9,11,14
significance  122:6
  148:2
significant  65:19
  101:5,11 118:25
  119:6,10 133:7
  147:25 155:24
  244:10 251:3
  268:7
signing  10:17
signs  253:22
similar  38:8
  104:16 107:25
  115:9 153:14,17
  228:10 229:13
  251:15 268:11
simple  163:10,13
simply  229:25
simultaneous  47:8
  71:3 126:10 198:5
  202:20
single  21:7 101:20
  173:10 237:16
  257:5
singleton  225:24
  226:5
sit  32:17 108:17
  173:13 219:4
  220:25
site  167:17 173:3
  217:12
situation  199:16
six  106:13,17,19
  143:25 144:20
  223:5
size  199:11
skip  208:6 235:23
  235:25

skoglund  225:16
slam  173:12
slash  140:4
slightly  101:21
sliver  245:2
slow  153:11
slur  89:17
small  114:23
  127:14 155:23
  167:16 261:9
smaller  68:5
software  15:7 61:8
  200:1 252:19
  254:10,13 255:6
solely  195:17
  276:15 278:11
solicit  115:13
  168:18 173:20
soliciting  173:6
solved  74:23 212:3
somebody  89:2
  148:13 150:3
  182:20 184:6,6
  196:13 197:21
  238:14 242:15
sonja  6:14
soon  79:8 80:6
  125:8,10 151:18
sophisticated
  270:12
sorry  9:20 14:6,15
  16:4,19 23:9 28:9
  36:2 44:17 47:9
  52:11 66:12 67:13
  68:23 70:7 71:4
  72:9 82:13 87:15
  102:8 108:17
  110:24 124:12
  126:12 132:17
  145:12,18 146:25
  176:1 184:20

195:2,3 198:23,24
  207:25 210:22
  218:4 223:24
  227:13 231:16
  234:1 239:21
  240:10 244:7
  246:13 250:19
  255:23 260:19
  262:16 267:7
  269:6 271:2
  272:16
sort  21:2 24:5 30:2
  38:13 65:7 71:25
  74:1 165:7 176:19
  229:24 270:16
  271:10
sorts  140:16 227:6
sought  32:6
sound  231:23
sounded  154:7
sounds  13:2
source  123:11,13
  246:8
south  65:14 73:10
  73:11,13,15 91:9
  110:22 239:9,11
  239:13
spalding  149:16
speak  36:10 37:6
  37:15 43:12 44:5
  46:4 90:2 130:9
  131:10 134:12
  145:11,13 154:3
  154:10 178:3
  180:10 197:6,9
  208:22 212:18
  230:21 236:22,25
  257:9,11 266:15
speakers  143:12
speaking  24:13
  44:18 47:8 71:3

Case 1:17-cv-02989-AT   Document 1565   Filed 01/07/23   Page 330 of 721
30(b)(6) Marilyn Marks                                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

[speaking - stolen]                                                Page 49

126:10 136:2
169:20 194:7
198:5 202:20
224:1
**special** 98:18
192:24,24 245:22
**specialized** 22:14
22:17 23:8
**specific** 18:2 24:22
33:17 35:12 43:9
46:23 47:19 50:15
71:8 86:9 108:12
132:1 134:6
152:14,21 154:15
156:16,19,22
157:2 175:21,24
179:15 194:2
198:4 202:18
206:16 214:19
227:21 228:20
234:22 241:2
246:12 248:8,18
257:12 271:21
276:21
**specifically** 22:16
31:8,10 33:18
35:6 36:5 43:6,14
44:6 50:17 51:8
51:20 52:8,17
54:6,16 56:18
59:25 61:19 69:24
86:13 108:21
131:6,11,13
132:14 134:2
137:3 148:18
153:5 154:4
157:14 173:20
186:22 193:24
197:4,7 199:6,7
202:1 208:20,24
212:15,19 219:1

230:11,22 233:17
236:15 245:9
257:6,10 276:5
**specification** 2:21
111:24
**specifics** 54:2
91:12 214:25
**spend** 11:23 51:9
53:20 68:4,4
79:10 80:5,6
88:22 90:12 94:10
111:4 116:6
129:11 132:11
149:12 152:10
155:22,24,25
171:20 172:23,24
194:22
**spending** 53:11
72:21 91:2 112:12
116:20 131:25
132:19 133:5,7
173:8,10,10
**spent** 72:16 73:12
74:15 78:11 88:6
88:9 89:4,11,16,18
107:21 132:13
141:7 153:9
155:14 200:17
241:16 250:24
267:18 268:8,9,9
**spirit** 191:18
**spoke** 31:6 35:7,12
35:21 36:6,18
43:11 176:6 228:5
265:5
**spoken** 23:21 44:1
153:15 215:22
216:3,10 225:4
**spreading** 73:23
**sswanbeck** 6:22

**staff** 89:8 117:20
117:25 118:1,5
**stages** 67:1
**stand** 13:25 14:7
14:14 17:10 152:1
**standing** 50:16
56:17 59:24 61:3
114:11 189:8
229:6,10,11,17
268:1,22
**stark** 225:15,15
**start** 21:8 26:6
52:5,12 69:8
87:16 145:12
160:7 180:18
232:10 239:21
**started** 19:9 25:7
30:7,10 71:9
73:15 84:11 95:13
125:23 133:8
149:2 151:3
196:14 264:12
**starting** 11:11
61:25 62:9 219:13
**state** 5:2 7:2 9:9
10:24,24,25 12:1
14:3 17:14 32:5
46:13,21,24 47:4
47:13 48:18 50:19
51:11 66:7,24
67:4,8 70:21
74:17 75:5 82:24
92:22 98:21
116:23 120:5,15
121:16 122:14
138:16 159:10
187:23 189:1
194:1,5 205:24
211:10,14 214:21
222:20,20 224:4
228:3 230:6 231:1

231:8,19 237:7
240:14 245:14,20
249:10 261:5,21
276:10 278:2
**state's** 231:3,4,6
251:6
**stated** 71:18 278:4
**statement** 3:5
39:24 82:7 97:9
98:1,16 99:4
104:7,19 107:18
107:24 115:19
128:9 136:16,17
139:16,19 143:24
165:20 166:10
168:3,6,8,13 171:8
172:21 175:16,17
187:7 239:18
242:17 260:14
261:16,24 262:11
280:8
**statements** 115:20
**states** 1:1 17:20
18:5 239:10
**statewide** 65:21
**status** 37:19 190:2
190:7
**statuses** 221:20
**statute** 50:19
194:6
**statutes** 50:25
56:21
**stay** 183:5
**stayed** 64:16
**staying** 65:10
**step** 160:22 178:8
**steps** 156:19,22
157:2,2,7 169:23
**stock** 21:17
**stolen** 247:18

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

**[stood - system]**

Page 50

| | | | |
|---|---|---|---|
| **stood**  37:17 | **submitting**  58:22 | 61:6 157:16 | 221:18 224:23 |
| **stop**  41:24 126:4 | **subpart**  156:22 | 188:13 202:8,9 | 225:20 233:20 |
| 153:11 | **subscribed**  281:21 | **support**  2:21 | 234:14 237:17 |
| **strange**  223:12 | **subscription**  53:8 | 51:15,18 53:3,17 | 238:1,15 242:4 |
| **strategic**  45:6 | 148:8 | 53:21,25 76:12,16 | 245:6 251:20 |
| **strategy**  114:18 | **subsequent**  201:22 | 85:23 92:18 | 252:12,13 254:19 |
| 115:6 116:15 | **substance**  214:22 | 110:15,19 111:24 | 259:6 274:22 |
| **strategyphd** | 280:7 | 114:25 118:11 | **surprise**  17:6 |
| 170:24 | **substantial**  83:6 | 135:9 163:9 | **surprised**  72:20 |
| **strays**  251:25 | 115:8 | 165:25 166:14,23 | **surprises**  65:11 |
| 257:21 | **success**  173:25 | 168:4 171:12,17 | **surrender**  20:21 |
| **streamline**  235:22 | 174:5,6 | 171:20 173:1 | **surrounding** |
| **street**  6:6 7:17 8:5 | **successful**  49:13 | 174:9,10,11,22 | 151:16 |
| **stretch**  171:5 | 155:20 | 179:11 219:1 | **suspect**  54:23 |
| 266:2 | **sucked**  65:15 | 241:12 | **suspend**  256:17 |
| **strict**  182:18 | **sue**  17:13 | **supported**  99:7 | 274:16 |
| **strictly**  127:15 | **sued**  13:13,19,19 | **supporting**  79:24 | **suspends**  274:18 |
| **strong**  67:23 | **suffered**  206:14 | 123:13 165:13,21 | **swanbeck**  6:14 |
| **strongly**  241:11 | **sufficient**  267:25 | 165:22 | **swear**  9:17 |
| **structure**  144:24 | 268:20 | **supportive**  67:19 | **switched**  254:9,13 |
| 145:25 | **suggest**  241:19 | **supports**  82:5 | **sworn**  9:6 10:3 |
| **struggling**  16:14 | 258:13 | **supposed**  41:23 | 281:21 |
| 17:3 215:18 | **suite**  7:8 8:5 | 172:12 200:12 | **symposiums**  23:18 |
| **student**  115:3,4 | 279:19 | **sure**  13:9 14:12 | 23:21 |
| **stuff**  54:15 70:23 | **summarize**  18:22 | 23:23 26:10 36:17 | **system**  47:7 49:3 |
| 152:9 155:11 | 21:9 30:18 96:8 | 38:24 41:13,15 | 55:15 56:25 69:13 |
| 168:12 227:19 | **summary**  134:18 | 42:7 47:22,22 | 73:19,21 74:6 |
| 247:23 253:5 | **summation**  141:4 | 48:13,15 50:6 | 76:9,14 77:23 |
| **sub**  4:23 | 165:17 | 53:23 63:2,4 77:4 | 79:14 80:3 85:4 |
| **subcommittee** | **sumter**  209:4 | 78:15 80:1,19 | 89:25 91:4 92:17 |
| 259:3 | 210:13,22 211:15 | 85:16 94:2 113:12 | 93:20,20 98:5,6 |
| **subcontractor** | 211:22 | 115:22 116:23 | 99:10 103:5,7 |
| 276:11,16 278:12 | **superior**  99:24 | 117:12 124:8,16 | 105:10 110:14 |
| **subject**  4:12 67:22 | 226:7,8 | 129:24 131:7 | 114:5 119:24 |
| 112:20 226:1 | **supervise**  149:24 | 142:10 151:6 | 127:21 129:6 |
| **subjects**  79:14 | **supplement**  33:5 | 159:4 160:12,12 | 156:13 176:15 |
| 244:24 | 256:2 | 166:17,25 182:21 | 223:7 232:12,15 |
| **submit**  61:3 93:3 | **supplemental**  2:8 | 196:8 197:18 | 233:13,24 234:5 |
| 207:12 | 2:13 3:25 33:11 | 201:9,10 205:5 | 234:13,20 246:23 |
| **submitted**  276:24 | 34:8,11 42:20 | 213:24 215:21 | 248:5,21 252:19 |
| 276:25 | 56:7,12 59:17 | 218:5,18 220:25 | 253:16 254:11 |

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad
March 17, 2022

**[system - thank]**

Page 51

256:24 257:16
258:4,7,8,14
267:20
**systemic** 250:14
251:12 259:1
262:5
**systems** 98:20,22
99:8 100:1 102:16
103:1 112:21
166:12 176:11
212:10 253:1
271:18

**t**

**t** 36:15 223:1
**table** 11:14
**tabulating** 243:25
**tabulation** 61:8,9
85:13 243:22
250:16
**tabulations** 250:13
**take** 11:13 17:9
25:12 32:6 33:16
38:22 39:17 40:9
60:7,10 72:5
79:19,20 84:2,17
85:17 89:22 90:13
94:15,19,22 104:4
106:23 112:3
116:16,17 124:6
124:10 129:12,15
130:3 136:18
142:15 161:20
164:12 167:25
202:4 211:23
227:24 228:16,18
235:11 251:21
256:3,8,10 275:4
**taken** 1:14 12:12
29:7 30:13 47:25
47:25 57:16 58:11
136:21 156:23

160:22 161:3
168:10 202:6
278:4
**takes** 133:9
**talk** 11:16 17:9
31:3,12 33:16
35:19 42:12 79:22
80:25 148:24
184:18 185:20
190:9 197:11,13
197:20 199:9
235:3 244:24
**talked** 29:22 31:16
32:9 36:14 37:13
43:10,16,20 44:8
58:2 76:21 87:13
110:17 116:5
141:7 146:2
158:16,20 159:20
165:24 176:17
177:21,22 180:12
180:16 190:1,7
197:10 198:24
205:23 227:15,16
229:8 230:23,25
237:1 264:17
268:7 271:24
273:8
**talking** 35:15 37:8
37:11 43:18 44:10
49:2 63:22 67:17
72:22 76:13 77:19
78:7,7,11,20 80:13
84:11 85:11 94:10
96:16 110:13
121:16 125:11
129:3 140:13
141:8,8 149:7
179:7 189:18
193:3,4 200:18
203:6 205:7

210:11 213:10
223:21 224:17
244:4,5,8 255:10
257:20 258:13
261:20 266:18
**talks** 72:11 159:22
**tallies** 254:23
255:1
**task** 112:19
**tasks** 115:8,15,24
117:10
**taught** 22:19
**tax** 100:8 133:23
136:21 139:12
221:19,20 246:22
247:4
**taylor** 7:7
**taylorenglish.com**
7:10,11,12
**team** 88:7,9
118:11,11,11,11
265:18
**teams** 117:1,6
**technical** 118:23
**technically** 171:10
**technology** 22:20
22:21,21 112:16
113:11,11 115:7
143:8
**telephone** 158:18
**televisions** 247:24
**tell** 24:18 37:3
39:22 51:16 58:11
93:12 113:19,21
115:16 116:3,11
167:18,23 196:5
206:17 217:13
221:1 242:12
260:1 270:6
**telling** 19:15 57:25
99:18 173:6

202:21
**tend** 147:8 149:23
153:18,18,23,25
173:13,23 227:5
272:2
**tended** 221:21
**tennessee** 19:5
**term** 28:1
**terminated** 214:7
214:15
**terms** 73:19,20
88:11 92:8 154:14
175:19 221:21
234:22 276:16
278:12
**terribly** 57:20
**test** 25:2
**tested** 262:3
**testified** 10:4
13:14,15,20,22,22
13:23 77:13
113:16
**testify** 13:8 27:4
27:13 31:1 38:20
40:5 74:2 84:5
99:9 187:2,10
**testifying** 13:4
27:21 28:9 29:4
84:21 122:8
**testimony** 13:3
25:19 35:4,11
43:5,13 122:2
131:11 197:4,7
204:13,22 234:6
264:17,24 280:2,8
**text** 213:9 256:1
**thank** 16:2 17:18
18:9 20:16 21:4
25:4 30:5 32:4
37:4 38:18 39:3,3
39:12 40:23 45:18

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad
March 17, 2022

**[thank - time]**

46:2 47:9 49:20
50:13 61:14 64:3
72:24 80:22 94:13
95:8 108:23
114:15 124:21
130:20 133:9
135:6 136:23
152:11 158:4
159:24 160:6
165:11,12,20,20
165:22 171:4
172:19 177:5
179:14 184:22
235:21 236:21
237:4 248:7 263:7
265:2,23,25
274:24

**thankfully** 111:16

**thanks** 60:13
161:17 184:21

**theme** 248:4

**theories** 180:23

**thin** 73:23

**thing** 21:3,7 24:5
28:10 30:2 38:14
39:6,20 42:4 65:7
69:12 71:21,25
74:1 80:7 89:6
93:23 110:23
121:5 151:3 155:1
159:12 165:8,23
167:6 168:1
176:19 193:18
198:6 257:19
258:6 262:21
270:16 273:23

**things** 10:8 31:22
35:19 37:20 39:2
39:20 41:10,16
48:6 51:17 52:14
52:15 53:15,16

54:18 55:16 59:3
65:18 68:14 69:6
70:19 71:5 73:12
74:9 76:6,20,24
78:1,9,24 79:16
81:4,19 83:16,24
90:9,14,23 93:8
99:3 103:23
104:11 107:22
110:16 116:3,25
117:1 119:9 120:3
126:4 129:25
137:1,2 141:11
142:14 147:22
149:13 150:10
159:4 167:19
168:11 192:24
193:4 197:10
202:11 203:22
235:24 248:2
253:2,8,20,25
270:7

**thingy** 25:11

**think** 12:11 13:20
14:6,6,15 17:23
20:9 22:18 23:4,5
23:23 24:15 32:1
34:23,24 36:22
38:22 41:6 45:19
45:22,23 48:19
54:14,25 57:21,24
58:1 59:8 69:2,3,4
78:6 79:3 84:20
89:2 94:20 96:1
101:17 105:7
106:3 125:12
127:7 129:1
131:14,17 143:16
146:2,4 151:3
154:13 157:17
158:3 160:11

166:18 168:2,9
171:14 174:5
175:14 178:2
180:14 188:1,9,22
189:11,12,15,24
189:25 198:21
199:9 201:20,22
202:6,14,23 203:4
203:19 204:6,18
205:4,21 207:3
208:25 210:16,18
215:16 217:14
218:8,17 219:11
219:13 221:21
222:2 224:18
225:2 227:19
228:7,14 229:8
231:22 232:10
234:10,24 243:4,5
244:23 245:17,21
248:2,3 249:6
253:18,21 260:19
261:22 262:21
266:13,13 267:5
268:7,16 269:15
271:8 274:16

**thinking** 14:11
16:21 32:23 36:23
80:7 108:16 133:4
146:16 153:9
175:1 234:21
254:19

**thinks** 81:4

**third** 2:6 34:7,12
42:19 49:22 50:7
54:3 99:6 135:7
141:20 180:19,25
250:9 251:15

**thought** 30:1
102:16 106:17
132:8 153:7 181:7

195:25

**thoughts** 129:23

**thousands** 89:15
89:16,18 213:11
233:8 251:8,16

**thread** 239:4

**threatened** 91:16

**threatening** 91:18

**threats** 78:14

**three** 97:12 102:1
107:12,21 146:14
146:22,24 156:13
179:24 249:20
252:9,10,24
257:19 258:17,23
272:20

**threshold** 148:1

**thumbed** 230:13

**tight** 171:13

**time** 9:2 11:24
12:10 14:1 15:7
15:11,22,22 19:25
20:5 21:10,16,17
21:23,25 22:23
24:3,4,20 29:6
30:15 39:17 40:17
40:20 45:11,11,14
48:1 51:2 53:20
54:23,24 55:8,15
57:1,16 58:4,6
59:23 60:14,17
61:2 67:8,15,18
68:2,7,16,18,19,24
69:7 70:5 72:7,17
72:21 73:5,12,13
74:15 75:18,21
77:16 78:11 79:10
80:5 82:5,16
87:20,21,21 88:11
88:12,17 89:6,22
89:24 90:4 91:3

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

**[time - trailers]**

Page 53

| | | | |
|---|---|---|---|
| 91:23 92:11 93:3 | **timeline** 60:1 | **tomorrow** 49:2,5 | **topics** 23:22 27:14 |
| 94:10 95:2,5 | 222:18 | **tool** 271:19 | 27:18 29:25 30:8 |
| 106:6 111:4,11 | **times** 11:7 12:22 | **top** 80:2 102:6 | 30:22,25 35:12 |
| 114:1,9,25 115:16 | 32:10 41:9 57:17 | 124:9 160:2 | 37:6,8,15,15 40:6 |
| 115:25 116:6,20 | 58:2 70:19,21 | 166:10 170:3 | 40:9,24 41:2 |
| 117:10,18 118:1,5 | 135:18 156:13 | 217:10 225:22 | 54:10 61:5,23 |
| 119:1,20,21 120:1 | 181:9 195:14 | 246:22 255:25 | 87:9 123:20 |
| 122:12 124:10 | 202:7 204:8 | 263:6 | 153:15 159:11,23 |
| 125:13 127:10 | 258:17,18,23 | **topic** 28:22 38:19 | 169:19 197:10 |
| 128:22 129:11,23 | **title** 37:24 45:20 | 40:1 42:14,21 | 227:6,8 228:6 |
| 130:14,17 138:25 | 50:19 146:7 | 43:1,6,13,23 44:3 | 253:20 |
| 139:23 140:25 | 150:23 | 44:6,10,22 46:5 | **tos** 85:24 |
| 141:7,13 146:18 | **titled** 26:13 59:17 | 79:3 84:24 87:12 | **total** 89:13 96:25 |
| 146:21 149:4,12 | 112:6 116:14 | 95:10 96:20,21 | 97:13 104:20 |
| 149:19,25 151:14 | 150:16 151:3 | 97:1,4 123:11 | 105:18,23 108:7 |
| 152:10 153:9 | 225:24 | 129:7,13 130:4,21 | 177:6 179:1,8 |
| 155:14,25 158:14 | **today** 9:10 10:18 | 130:22 131:3,6,12 | 244:25 |
| 160:3 167:1,21 | 11:25 12:14 19:9 | 131:17 133:10,13 | **totally** 14:17 25:1 |
| 172:23 175:3 | 19:13 24:1,2 31:4 | 133:14,19 134:2 | 60:25 68:1 108:20 |
| 176:24 177:2 | 31:8,10 33:2,13,18 | 134:13,14 144:23 | 141:6 |
| 178:23 194:19,23 | 34:9,14 35:5,6,9 | 144:23 145:4,8,12 | **totals** 238:7,12,18 |
| 195:1 200:14,17 | 35:14 36:11,19 | 152:13,13 153:2,6 | **totenberg** 59:24 |
| 200:25,25,25 | 37:7,16 38:21 | 154:5,11 156:15 | 61:2 |
| 202:24 204:2 | 43:12 123:9 | 156:16 157:10,14 | **totenberg's** 120:24 |
| 205:23 206:2,25 | 129:25 141:6,12 | 157:24 175:6,7 | 121:15 |
| 207:1,6,24 208:5,7 | 161:25 177:18 | 176:3,7 177:6,10 | **touchscreen** 98:5 |
| 208:14 211:7 | 187:24 207:10 | 177:14 178:4 | 100:1 102:15 |
| 217:13 224:18 | 219:4 221:1 | 179:25 180:5,8,11 | 103:1 133:3 |
| 227:5,14,15 | 230:25 241:6 | 180:13,17 196:1 | 239:12 |
| 230:13 235:12,15 | 243:23 249:5,6,7 | 196:21,25 197:4 | **touchscreens** |
| 235:18 236:16 | 253:9 260:14 | 197:14 198:2,3,10 | 57:14 71:25 |
| 241:16 245:19 | 262:11 268:12,14 | 198:10 208:8,16 | 170:14 |
| 247:15 249:4,11 | 268:20 269:12 | 208:20,23,25 | **towers** 173:13 |
| 250:24 254:17 | 272:18 273:5 | 212:4,11,19 | **town** 206:20 |
| 257:12,21 261:9 | 274:11 | 213:11 227:3 | **track** 88:8,21 89:3 |
| 261:11 264:5,8 | **today's** 9:1 270:1 | 230:4,9,22 235:25 | 190:3,6 |
| 265:13 267:18 | **told** 15:18 84:10 | 236:2,7,23 237:1,2 | **traffic** 272:6 |
| 268:9,17 269:13 | 90:9 115:24 | 237:11 256:21,25 | **trail** 98:8 103:6,10 |
| 271:23 273:11 | 119:25 172:18 | 257:3,10,11 263:8 | **trailer** 21:14 |
| 274:16,19 276:22 | 184:13 197:25 | 263:12,14 266:4,8 | **trailers** 21:13 |
| 279:14 | 200:11 205:21 | 266:11,16 | |

30(b)(6) Marilyn Marks                        March 17, 2022
Curling, Donna v. Raffensperger, Brad

**training** 22:14,17
  31:9 191:25 192:7
  192:11,14
**transcript** 10:18
  11:17 259:4,14,19
  276:22 278:4,6
  279:7,12,14 280:2
**transcripts** 51:17
  53:6 276:22 277:1
**transferred**
  220:21
**transition** 64:9
  65:14
**transitioning** 73:9
**transparency** 16:1
  49:18 62:14,25
  63:11 65:6 72:22
  127:19 128:3
  136:25 137:8
  164:18
**transparent** 141:1
  165:13
**travel** 53:14,14
  54:11 108:14
**treat** 196:6
**trial** 10:11 13:4,18
**tried** 31:24 139:16
  158:12 175:24
  215:11 247:6
**tries** 206:23
**trip** 44:24 45:4
**triple** 79:16,21
  80:19 89:1,23
  152:8 244:11
  250:22 251:2,10
  251:14 260:20,25
  261:6,23
**troublesome** 253:4
**truck** 21:13
**trucking** 129:12

**true** 86:22 104:3
  158:19 240:16
  276:23 278:6
**trump** 237:7
  240:10,13,17
  254:9,13
**trust** 79:6
**truth** 167:18
**truthfully** 12:14
**try** 11:16 23:1
  31:13 41:3 78:18
  81:25 93:19 99:16
  104:5 105:20
  128:5 154:15
  159:15 167:15
  176:18 193:20
  194:25 203:19
  223:4 235:6,22
  245:4
**trying** 17:23 20:9
  25:1 36:22,24
  37:19 60:8 63:23
  70:15,17 71:7
  78:13,15 79:22
  103:19 113:14,19
  128:24 146:20
  149:22 151:1
  155:18 169:13
  178:19 188:2
  193:5 196:5,14
  203:8,9,12,14
  207:5 210:16
  215:16 222:1
  224:21 225:1
  226:7,9 239:8
  244:16,24 246:15
  246:19 254:15
  255:21 269:15
**tuesday** 150:15
  245:21,22

**turn** 56:6,16 67:2
  70:22 111:7 126:5
  196:3 246:10
**turned** 15:7 52:12
  199:24 231:13
**turning** 204:12
**tweet** 3:22 4:15
  172:2,9,16
**tweets** 3:21 168:24
  169:4 170:10
**twice** 156:13
**twitter** 168:15,18
  170:1 172:5 239:3
  240:2
**two** 14:25 34:11
  42:1 52:22 57:21
  67:1 92:1 140:17
  141:11 155:15
  220:6 230:16
  252:2,3 258:17,23
**type** 16:8 47:24
  49:19 68:21
  103:18 110:11
  113:6 132:2,11
  173:24 176:16
  178:21 193:18
  199:11 251:12
  268:10,10
**types** 53:2,24 54:1
  54:12 70:18,24
  77:20 92:19 93:6
  110:22 160:1
  193:9,12 211:3,6
  270:15
**typewriting** 278:5
**typical** 117:10
**typically** 67:1
**tyson** 5:13 7:4 9:8
  9:9 10:6,9,14,15
  10:22 13:9 24:17
  25:21 26:4 28:16

39:3,12,16 40:15
  40:22 46:17 50:2
  52:20 55:12 56:10
  59:16 60:6,11,19
  60:22 63:2 70:10
  76:18 77:6 94:18
  94:21,24 95:1,7,18
  99:16 100:24
  107:1 109:13
  111:21 116:13
  120:13 122:20
  123:23 126:21
  130:13,19 131:14
  131:20 136:9
  138:3,13 140:8
  150:19 155:5
  158:2 161:11
  162:8 163:24
  164:11,20 166:6
  167:11 168:22
  169:11,22 170:4
  172:1 174:17
  177:4 180:20
  184:22,23 186:15
  187:12 188:17
  190:18 196:9
  198:19 203:8
  204:11 209:25
  210:1 213:19
  215:6 216:7,9,23
  218:2 219:18
  220:4,13,17,18
  222:15 225:11
  227:23 228:9,22
  228:25 229:11
  230:2,3 232:4
  235:14,20 237:21
  239:2 246:2
  248:11 259:10
  264:3,10,13 265:3
  265:5,17,17,24

30(b)(6) Marilyn Marks
March 17, 2022
Curling, Donna v. Raffensperger, Brad

**[tyson - vice]**

Page 55

266:1 267:1,14
275:1

**u**

**u**  36:15,16
**uh**  26:10,12 82:13
88:2 97:11 104:25
120:21,25 161:7
173:4 226:2
246:18 247:16
249:5 272:14
**ultimately**  110:7
123:3
**umbrella**  101:20
**unable**  37:10
43:21,21 58:4,21
83:5 110:2 143:22
144:1 152:22
231:7
**unauditable**
166:12 238:3,6
239:11 245:11
**unauthorized**
250:1,4,10,15
**uncomfortable**
241:15
**unconstitutional**
46:13,20 125:7
156:18,25 157:5
158:9 160:24
**undersigned**  280:2
**understand**  11:9
27:20,25 28:2,4
29:19 30:19 47:12
48:4 69:23 71:7
72:25 108:11
113:14,19 150:12
154:16 169:18
195:13 215:7
219:16,18 229:16
232:11 242:4
244:16 245:4

262:14
**understanding**
28:24 67:24
107:20 156:20
200:4 203:19
215:10 219:23
**understands**  11:7
**understood**  22:3
22:25 59:7 64:3
138:4 139:1
140:19 173:14
190:10 213:14
219:22 220:13
230:2
**undertake**  43:21
65:19 101:5 175:9
175:19
**undertaken**  37:18
42:18 43:21 45:5
47:14 55:3 158:7
252:15
**undertakes**  70:3
133:15 163:15
**undertaking**  45:3
147:24 148:4
**undertook**  62:13
**underway**  70:25
**unfinished**  44:25
**unfortunately**
22:1 123:5 238:9
**uniform**  228:18
**unit**  12:5
**united**  1:1
**units**  200:10
**universal**  181:7
**universe**  13:14
**university**  19:5
**unlawful**  46:13,20
**unpaid**  22:2,2
**unpredicted**  75:18

**unreasonable**
237:15
**unrelated**  70:3
**unsuccessful**
175:11,22 176:10
176:14
**unusual**  227:8
**unverifiable**  98:4
**upcoming**  57:4
215:20
**update**  147:11
150:6 161:21
**updated**  140:15
164:4 166:20
182:5
**updates**  32:25
**uploaded**  277:2
**upset**  206:18
**urge**  209:12
**urged**  68:8 85:13
**urges**  122:24
**urging**  124:4,23
124:24
**uscgg.org**  124:1
**use**  10:11 24:10
25:18 28:1 56:20
56:24 69:17 84:14
84:19 86:6 90:1,3
98:4 99:25 102:25
110:13 112:25
117:17 124:5,24
137:6,11 160:19
170:14 171:6
186:25 193:24
194:3,8 198:15
209:12,14 231:3,4
231:6,20 232:7
234:17 239:14,23
246:5 256:23
280:9

**user**  252:20
**uses**  171:9 239:11
**usually**  28:5
**utilize**  117:24
185:13,23 270:10
**utilized**  91:23

**v**

**v**  170:12
**vague**  58:24 88:19
91:8 218:1 231:22
**vaguely**  120:16
**valid**  245:15,17
**value**  44:17 221:2
**variety**  53:16
82:14 159:20
181:13 213:6
233:15
**various**  23:18 32:9
37:18 40:24 43:20
104:10 183:20
202:7,7,10 204:8
221:12,19 226:11
**vast**  70:22 112:17
171:11,18 211:24
271:25,25
**vendor**  69:6
**verbatim**  276:13
**verifiable**  98:2
103:12 141:1
**verification**  23:25
**verified**  188:22
**verify**  23:6 188:20
256:13
**veritext**  276:11,19
279:10,18
**versa**  251:19
**versus**  48:17 84:21
94:11 105:24
109:2 114:8 164:7
**vice**  45:23,24 46:1
251:19

30(b)(6) Marilyn Marks                                March 17, 2022
Curling, Donna v. Raffensperger, Brad

**[video - want]**                                              Page 56

**video** 1:10 274:20 274:21
**videoconference** 1:14
**videographer** 8:10 9:1,16,20 40:17,20 60:14,17 95:2,5 130:14,17 176:24 177:2 235:15,18 264:5,8 274:18
**videotaped** 9:3
**view** 169:22
**views** 127:17
**vincent** 7:15
**violate** 156:18,25 157:5
**violates** 74:13 229:8
**violation** 66:21 74:10
**violations** 90:24 211:8
**virginia** 35:22 36:2 146:8
**virtually** 167:3 272:5
**vis** 228:16,16
**visits** 158:18
**volume** 237:16
**voluntary** 20:20 20:22 80:14,17 211:18
**volunteer** 52:6 75:21 77:16 87:21 88:11 89:8 90:3 118:1,5 119:20 120:1 128:22 149:4 222:22
**volunteers** 88:12 88:17,20 89:21 91:23 92:9,10

117:20,25 149:8 149:11,13
**vote** 15:14 57:4,18 58:1,4,8 79:6,7 147:13 149:10 199:17,23 200:3,9 200:21,25 205:17 205:19 206:4,23 207:20 230:6 231:2,7,9,12,13,19 232:3,6,16,20,21 232:24,25 233:22 233:23 234:3,3,16 238:7,12,19 240:10,13 250:8 252:9 262:8
**voted** 16:20,22,24 17:7 200:1 205:2 205:13,15 207:16 223:24 240:4,7,14 241:24 242:15
**voter** 49:18 79:10 98:21 102:23 127:18 128:2 149:5 191:20 231:15,18 232:6,9 232:16 233:19 234:16,25 244:22
**voterga** 225:24 226:5 227:10,17 229:2
**voters** 56:24 70:18 78:21 79:5 80:16 85:12 98:2,6,17 103:4 141:8 199:3 232:9,17 233:18 238:18 240:4,6,9 240:12 241:22 246:1,3
**votes** 57:15 71:24 79:21 80:10

231:16 232:19 233:4,12,16 235:4 237:7 243:25 244:11 246:8 250:22 251:14 254:7,13 260:10 260:23 261:7
**voting** 15:6 22:12 47:6 49:3 55:15 57:2,12,20 58:1,6 58:12,14 64:19 65:21 69:5,13 73:18,21 74:6,10 74:11 75:8 76:9 76:14 77:23 79:14 80:3 84:6,9,12,14 84:17,19 86:8,17 86:21,25 92:16 99:8 100:1 102:16 103:1 105:10 109:21,22 110:14 112:21 113:23 114:4,13 115:7 119:23 125:7 127:20 129:6 133:3 137:12 144:6 154:24 166:12 173:12 176:18 185:15,15 199:20 205:25 206:3,8,10,11,19 206:23 212:9 213:2 215:8 216:17 223:7 229:3 231:25 232:7,12,23 233:13 234:7,12 241:23
**vrusso** 7:20
**vs** 1:6

**vulnerabilities** 212:9 229:3
**vulnerability** 98:19
**vulnerable** 98:22

**w**

**w** 44:20
**wait** 13:22 58:9 198:3 209:1 243:16
**waited** 15:10
**waive** 265:15
**waiving** 10:17
**walk** 61:16 96:6 142:21
**walker** 204:24 207:11,21
**walker's** 207:14
**want** 21:6 22:25 23:19 25:8 28:12 38:25 39:1 40:9 49:11,17 50:14,16 55:16 59:9 60:4 65:17 69:23 79:9 79:9 87:11 89:4 90:20 94:15,24 96:6 100:20 101:3 101:24 102:10 108:21 112:13 120:8 123:9 124:18 125:3 126:14 127:12 129:12,15 130:2,9 134:9 142:21 144:3 150:14 154:13,15 155:1,2 162:25 167:24 168:1 170:23 180:18,23,24 181:9,14,22 184:7 184:24 186:22

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

193:18 205:25
212:21 213:15
214:19 215:2
228:16 229:22
235:11 237:10,17
238:10 242:4
246:10 248:17
249:21 256:8
259:24 261:25
262:2 266:21
269:3,4,6,8,11,14
273:24
**wanted**  15:14 23:6
67:19 72:19 85:21
95:9 97:6 104:21
109:15 125:22,23
126:5 139:2
140:22 151:6
157:23 166:9
194:19,24 195:21
195:22,24 214:18
223:11 241:7
264:11 265:4,20
267:4 274:14
275:11
**wanting**  51:16
81:19
**wants**  186:2
206:22
**warned**  170:11
**washington**  6:7,18
113:24
**wasson**  36:25 44:9
44:19,20 45:16
**watch**  166:11
**watched**  72:5
**watcher**  78:14
94:4 191:25
**watchers**  72:13
78:13,21 93:16,22
94:12

**watching**  72:4,13
72:15,19 78:10
144:17 185:3
192:7,10
**way**  28:12 44:18
48:8 53:2 65:3,10
89:18 92:6 107:12
113:6 116:8,24,24
118:16,17 119:16
128:7 129:1
131:24 132:20
139:15 171:14
182:1 183:16
184:9,11,14
185:23 193:13
194:5 195:8
202:11 226:14
232:5 238:1,23
241:2,15 245:18
250:24 258:9,20
269:16
**ways**  49:3 104:11
115:13 130:1
142:13 152:14
176:18 196:6
221:18
**we've**  32:19 43:10
78:24 79:1 87:13
89:4,16 90:21
91:21 94:5 110:17
129:24 141:7
143:15,16 151:14
154:14 158:16,19
159:12,19 165:24
168:11 176:17
177:17 178:21
186:6 187:8 195:9
195:12 202:16
216:3 228:14
229:8 230:23
235:8,10,24

240:18 241:7,16
243:10,10,19,22
262:6 274:10
**weakest**  67:24
**webinar**  78:24
**website**  90:5
135:24,25 136:4
136:14 140:2,4
149:22 150:7
163:17 167:17,19
167:21 173:22
**week**  59:1,4 83:18
88:6,9 92:3 151:1
157:18 230:16
236:14 250:9
254:25
**weekly**  223:3,4
**weeks**  34:11
109:23 140:14
147:10 230:16
**weigh**  121:20
**weighed**  121:13,14
**welcome**  79:1
**went**  49:2 84:12
96:22 159:14
174:22 192:9
200:9 201:3
**wide**  185:14
233:15
**wild**  92:13 242:23
**william**  2:11
**willing**  186:3,5
187:1 265:14,22
**win**  86:24
**wish**  83:11 90:5
93:1 151:24
235:12
**withdrawal**
211:18
**witness**  9:6,17
13:25 14:6,13

17:10,24 18:1
29:11,13 70:7
237:12,15
**witnesses**  115:5
251:6 276:25
**won**  239:13,23,25
240:3,5 245:13
**wondering**  254:22
**wood**  228:11
229:14 265:10
**word**  167:25
**wording**  134:6
**words**  30:19 39:23
89:17 96:9
**work**  15:25 21:1
28:11,21 31:17
32:2 38:2 41:9
45:16 49:11,17,19
53:21 62:13 64:8
64:16,21 65:12,13
65:24 67:21 69:1
72:2 84:20 85:6
85:19,21 87:10
90:5,20 92:9
93:15 95:10
103:18 110:21
114:4,12,13 115:8
135:5 141:4
149:13,15 153:22
154:17 156:4
163:2,6,14,16
164:13 165:2,5,18
165:19,21,25
166:14,24 167:4,5
170:25 171:3,16
185:11 191:10
193:24 194:2
214:24 236:19
243:22 244:9,13
257:8 260:21
269:19

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

**[worked - zoom]**

Page 58

**worked** 74:9 98:16
  201:10,14
**working** 31:23
  35:18 49:6 69:7
  73:4 87:5 90:15
  90:17 93:23 97:4
  117:1 176:17
  202:3 217:12,16
  222:20,21 224:4
  236:16 240:1
  248:4
**works** 11:19
  125:13
**workshops** 22:18
**world** 117:8,24
  118:3
**worry** 14:17
**wow** 200:20
**wrapped** 69:2
**wrapping** 68:13
  68:25 73:2
**write** 84:5 114:1
  143:25 165:8
  187:18 235:4
**writing** 172:24
  213:4
**written** 131:21
  143:15 167:1
  196:5 260:15
  271:21
**wrong** 59:22 84:16
  99:19 156:14
  267:5 271:2
**wrongly** 241:19
**wrote** 165:6
  220:24 261:11

**x**

**x** 90:12 196:15

**y**

**y** 36:3 46:6 62:20
**yeah** 25:20 60:6
  71:7 94:21,23,24
  106:18 114:14
  124:6,14 141:15
  167:2 175:15,17
  175:18 185:20
  210:21 217:7
  229:19
**year** 19:18,19,20
  21:8 29:16 32:7
  83:9 88:21 95:24
  100:8 101:6
  106:14,17,19
  143:16,17 144:22
  161:1,1 169:9,10
  174:22 192:8
  194:18 205:8
  224:20,21
**years** 12:23,25
  13:5 22:8,10,24
  23:21 24:4 31:25
  130:25 155:15,16
  178:22 199:21
  201:22 204:10
  213:13 222:25
  226:22
**yesterday** 92:25
  150:5
**york** 2:23 21:17
  82:23 120:4,15
  121:2,8,16,20,23

**z**

**zachary** 6:11
**zero** 54:25
**zfuchs** 6:19
**zoom** 6:1 11:15
  73:25 84:5 104:5
  167:15 213:9

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

DONNA CURLING, *et al.*,

     *Plaintiffs,*

v.

BRAD RAFFENSPERGER, *et al.*,

     *Defendant.*

CIVIL ACTION

FILE NO. 1:17-cv-2989-AT

## <u>SECOND AMENDED NOTICE OF 30(b)(6) DEPOSITION OF COALITION FOR GOOD GOVERNANCE</u>

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, counsel for the State Defendants will take the oral examination under oath of the designated representatives of the Coalition for Good Governance, Inc. ("Coalition" or "Organization") on Thursday, March 17, 2022, beginning at 11:00 a.m. and continuing thereafter until completed via Zoom videoconferencing through Veritext Legal Solutions. Details regarding the videoconferencing with be emailed to those participating once all arrangements are finalized.

The deposition shall be taken before a Notary Public or some other officer authorized by law to administer oaths for use at trial. The deposition will be taken by oral examination and recorded by stenographic means, the

1


**Exhibit**
CGG 0001

deposition may also be recorded for the purpose of preserving a sound and visual record thereof. The deposition will be taken for the purposes of cross-examination, discovery, and for all other purposes permitted under the Federal Rules of Civil Procedure or any other applicable law.

Please note, under Rule 30(b)(6) of the Federal Rules of Civil Procedure, the organization must designate one or more officers, directors, managing agents, or other appropriate persons who consent to testify on behalf of the organization. The Person(s) must be ready to testify about the information known or reasonably available to the Organization regarding the topics listed in Exhibit A, attached hereto.

Respectfully submitted this 14th day of March, 2022.

**Robbins Ross Alloy Belinfante Littlefield LLC**

Vincent R. Russo
Georgia Bar No.: 242628
vrusso@robbinsfirm.com
Joshua B. Belinfante
Georgia Bar No.: 047399
jbelinfante@robbinsfirm.com
Alexander F. Denton
Georgia Bar No.: 660632
adenton@robbinsfirm.com
Carey Miller
Georgia Bar No.:  976240
cmiller@robbinsfirm.com
500 14th Street, N.W.

Atlanta, GA 30318
Telephone:  (678) 701-9381
Facsimile:   (404) 856-3250

**TAYLOR ENGLISH DUMA LLP**

*/s/Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Jonathan D. Crumly
Georgia Bar No. 199466
jcrumly@taylorenglish.com
Diane Festin LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
James A. Balli
Georgia Bar No. 035828
jballi@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
lparadise@taylorenglish.com
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: 770.434.6868

*Attorneys for State Defendants*

# Exhibit A

1. The Organization's allocation of resources and budgetary decisions from January 1, 2017 through the present that reflect the diversion of funds and resources the Organization alleges it has undertaken in its Third Amended Complaint and First Supplemental Complaint.

2. The changes made to the Organization's budgets – as well as any contemporaneous rationale for such changes – during its budget years from January 1, 2017 through the present related to the laws, policies, or protocols challenged in this action.

3. The Organization's exempt purpose and activities it undertakes in accordance with its exempt purpose.

4. The Organization's organizational structure, including individuals who have the authority to make funding and resource-allocation decisions for the Organization from January 1, 2017 through the present.

5. The specific ways in which the actions of the Defendants that form the basis of the complaints in this action caused the Organization to divert resources away from its organizational activities to activities in which the Organization had not previously engaged, and the identification of the overall amount of the diverted resources.

    a. The specific activities and projects the Organization was unable to engage in due to the diversion of resources to activities necessitated by such actions.

6. The specific laws, policies, and protocols the Organization alleges are unconstitutional or violate federal law as asserted in this action and the specific steps the Organization took to address its understanding of those laws, policies, and protocols.

    a. The specific steps the Organization has taken to address those laws, policies, and protocols it advocates are unconstitutional or violate federal law in its involvement in this action and the process by which those steps were determined.

b.   The specific steps the Organization took to address those laws, policies, and protocols it advocates are unconstitutional or violate federal law other than its involvement in this action and the process by which those steps were determined.

7.   The activities or expenditures the Organization plans to undertake in the future related to the laws, policies, and protocols challenged in this action if it is unsuccessful in achieving relief through this action.

8.   The total expenditures of the Organization on activities related to this action since the Organization began participating in this litigation.

9.   The nature of membership of the Organization, including how individuals become members, any obligations of members, and any benefits offered by the Organization to its members.

10.  Whether and how the Organization determined if any of its individual members are impacted by the laws, policies, and protocols challenged in this action.

11.  The Organization's communications with the Office of Secretary of State and/or the State Election Board regarding the laws, policies, and protocols it challenges in this action, from January 1, 2017 to the present, including any other litigation filed against the Secretary or his office during that time that included a challenge to any of the laws, policies, and protocols challenged in this action.

12.  The Organization's communications with any county government regarding the laws, policies, and protocols it challenges in this action, from January 1, 2017 to the present, including any other litigation filed against a county entity during that time regarding the laws, policies, and protocols challenged in this action.

13.  Communications between the Organization and any of the co-Plaintiffs, its individual member plaintiffs, its other members, and other advocates and advocacy organizations, concerning this

A-2

litigation or concerns regarding vulnerabilities in electronic voting systems.

14. The Organization's knowledge of any person in the State of Georgia that was not able to vote as a result of the laws, policies, and protocols complained of in this action.

15. The specific relief the Organization seeks that will cause it to cease diverting resources to address the laws, policies, or protocols challenged in this action.

16. The documents produced in this litigation by the Coalition Plaintiffs and the Curling Plaintiffs and the information contained in the documents.

17. The Organization's activities in other States concerning the utilization of electronic voting systems and/or Risk-Limiting Audits.

18. The Organization's allegations in its various motions for injunctive relief sought in this case.

19. All factual and legal contentions of the Organization in relation to this case, including but not limited to contentions of the Organization concerning the 2020 elections and January 2021 Runoff in Georgia.

20. The Organization's knowledge of any ballot altered, not counted, or otherwise impaired by use of the Dominion BMD System in Georgia.

21. The Organization's knowledge of any security breach or hack of Georgia's election system, including any such breach or hack that resulted in the miscounting or tabulation of any votes.

22. The Organization's review of expert reports produced in this case, including but not limited to the expert reports of Dr. J. Alex Halderman.

23.   To the extent not otherwise provided herein, all factual matters which have bearing on the Organization's standing in this suit under Article III, Sec. 2, cl. 1.

24.   The process by which the Organization searched for and identified documents responsive to discovery requests served in this case.

## CERTIFICATE OF SERVICE

I hereby certify that, on March 14, 2022, 1 caused to be served the

foregoing **SECOND AMENDED NOTICE OF 30(b)(6) DEPOSITION OF**

**COALITION FOR GOOD GOVERNANCE** via email to the following:

Cary Ichter
Ichter Davis LLC
Suite 1530
3340 Peachtree Road N.E. Atlanta,
Georgia 30326
cichter@ichterdavis.com

Bruce P. Brown
BRUCE P. BROWN LAW LLC 1123
Zonolite Road, Suite 6 Atlanta,
Georgia 30306
bbrown@brucepbrownlaw.com

David D. Cross
Lyle F. Hedgecock
Mary G. Kaiser
Veronica Ascarrunz
Jenna B. Conway
Robert W. Manoso
Morrison & Foerster, LLP 2000
Pennsylvania Avenue, NW
Washington, DC 20006
dcross@mofo.com
lhedgecock@mofo.com
mkaiser@mofo.com
vascarrunz@mofo.com
jconaway@mofo.com
rmanoso@mofo.com

Halsey G. Knapp, Jr.
Adam Martin Sparks
Krevolin & Horst, LLC
One Atlantic Center, Suite 3250
1201 West Peachtree Street, NW
Atlanta, GA 30309
hknapp@khlawfirm.com
sparks@khlawfirm.com

Kaye Burwell
David Lowman
Cheryl Ringer
Fulton County Attorney's Office
141 Pryor Street, Suite 4038
Atlanta, Georgia 30303
kaye.burwell@fultoncountyga.gov
david.lowman@fultoncountyga.gov

Robert Alexander McGuire
Robert McGuire Law Firm
113 Cherry Street #86685
Seattle, WA 98104-2206
ram@lawram.com

cheryl.ringer@fultoncountyga.gov


This 14th day of March, 2022


*/s/ Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiff**<br><br>**s, v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-**<br>**AT** |

### COALTION FOR GOOD GOVERNANCE'S OBJECTIONS TO DEFENDANTS' RULE 30(b)(6) NOTICE OF DEPOSITION

Coalition for Good Governance hereby objects to Defendants' intended areas of inquiry as set forth in Exhibit "A" to the Notice of Deposition in the upcoming Rule 30(b)(6) deposition as follows:

1. The Organization's allocation of resources and budgetary decisions from January 1, 2017 through the present that reflect the diversion of funds and resources the Organization alleges it has undertaken in its Third Amended Complaint and First Supplemental Complaint.

   **No objection, although the designee will not be prepared to testify as to specific spending amounts.**

2. The changes made to the Organization's budgets – as well as any contemporaneous rationale for such changes – during its budget years from January 1, 2017 through the present related to the laws, policies, or protocols challenged in this action.

   **CGG objects to this topic in that it mischaracterizes CGG's position. CGG does not contend that it has made changes to its budgets "laws, policies, or protocols challenged in this action." Instead, CGG contends that it has been forced to make changes and**


**Exhibit**
CGG 0002

**adjustments to its budgets to accommodate the litigation costs associated with the challenges to said "laws, policies, or protocols challenged in this action."**

3.  The Organization's exempt purpose and activities it undertakes in accordance with its exempt purpose.

    **No objection.**

4.  The Organization's organizational structure, including individuals who have the authority to make funding and resource-allocation decisions for the Organization from January 1, 2017 through the present.

    **No objection.**

5.  The specific ways in which the actions of the Defendants that form the basis of the complaints in this action caused the Organization to divert resources away from its organizational activities to activities in which the Organization had not previously engaged, and the identification of the overall amount of the diverted resources.

    **No objection.**

    a.  The specific activities and projects the Organization was unable to engage in due to the diversion of resources to activities necessitated by such actions.

    **No objection.**

6.  The specific laws, policies, and protocols the Organization alleges are unconstitutional or violate federal law as asserted in this action and the specific steps the Organization took to address its understanding of those laws, policies, and protocols.

    **CGG objects to this topic in that it requires its designee to address matters of law rather than matter of fact. CCC further objects that the portion of the topic dealing with "specific steps" is vague, ambiguous, and requires CGG to guess as to its meaning, making it**

**impossible for CGG to prepare to proper respond to questions on this subject.**

    a.    The specific steps the Organization has taken to address those laws, policies, and protocols it advocates are unconstitutional or violate federal law in its involvement in this action and the process by which those steps were determined.

**CGG objects that this topic is vague, ambiguous, and generally indecipherable, making it impossible for CGG to prepare to proper respond to questions on this subject.**

    b.    The specific steps the Organization took to address those laws, policies, and protocols it advocates are unconstitutional or violate federal law other than its involvement in this action and the process by which those steps were determined.

**No objection.**

7.    The activities or expenditures the Organization plans to undertake in the future related to the laws, policies, and protocols challenged in this action if it is unsuccessful in achieving relief through this action.

**CGG has no plans related to the issues in this case other than to prevail in this matter. Hence, planning for failure would be useless and redundant.**

8.    The total expenditures of the Organization on activities related to this action since the Organization began participating in this litigation.

**No objection to the extent that this topic seeks information regarding only those expenditures CGG seeks to recover in this litigation. To the extent this topic seeks information regarding expenditures CGG does not seek to recover in this litigation, CGG objects to the same as irrelevant to the subject matter of this litigation and not calculated to lead to the discovery of admissible evidence.**

9.      The nature of membership of the Organization, including how individuals become members, any obligations of members, and any benefits offered by the Organization to its members.

**No objection.**

10.     Whether and how the Organization determined if any of its individual members are impacted by the laws, policies, and protocols challenged in this action.

**No objection.**

11.     The Organization's communications with the Office of Secretary of State and/or the State Election Board regarding the laws, policies, and protocols it challenges in this action, from January 1, 2017 to the present, including any other litigation filed against the Secretary or his office during that time that included a challenge to any of the laws, policies, and protocols challenged in this action.

**No objection.**

12.     The Organization's communications with any county government regarding the laws, policies, and protocols it challenges in this action, from January 1, 2017 to the present, including any other litigation filed against a county entity during that time regarding the laws, policies, and protocols challenged in this action.

**CGG does not maintain a record of all such communications but will employ its best efforts to provide as much information as possible on the subject.**

13.     Communications between the Organization and any of the co-Plaintiffs, its individual member plaintiffs, its other members, and other advocates and advocacy organizations, concerning this litigation or concerns regarding vulnerabilities in electronic voting systems.

**CGG objects to this topic to the extent that it would implicate any communications between CGG and/or its members and its counsel as violating attorney-client privilege or common-interest privilege.**

14.   The Organization's knowledge of any person in the State of Georgia that was not able to vote as a result of the laws, policies, and protocols complained of in this action.

**No objection.**

15.   The specific relief the Organization seeks that will cause it to cease diverting resources to address the laws, policies, or protocols challenged in this action.

**No objection.**

16.   The documents produced in this litigation by the Coalition Plaintiffs and the Curling Plaintiffs and the information contained in the documents.

**CGG objects to this topic in that it does not have encyclopedic knowledge of the documents produced to Defendants by the Curling Plaintiffs. Additionally, on its face, this topic seeks to require the CGG designee to have encyclopedic knowledge of the content of the thousands of documents it has produced in this case, which is an unfair and unreasonable burden. If Defendants will identify the specific documents about which it wishes to inquire, CGG will appropriately prepare the witness.**

17.   The Organization's activities in other States concerning the utilization of electronic voting systems and/or Risk-Limiting Audits.

**No objection.**

18.   The Organization's allegations in its various motions for injunctive relief sought in this case.

**On its face, this topic seeks to require the CGG designee to have encyclopedic knowledge of the content of the various motions for injunctive relief filed in this case, including motions filed by the Curling Plaintiffs. Such a requirement would be unfair and unreasonable burden, and CGG object to the same.**

19. All factual and legal contentions of the Organization in relation to this case, including but not limited to contentions of the Organization concerning the 2020 elections and January 2021 Runoff in Georgia.

**On its face, this topic seeks to require the CGG designee to have encyclopedic knowledge of all of CGG's factual and legal contentions in this case. Requiring a lay witness to articulate legal theories and requiring any fact witness to recite all contentions that have been made over a four-year period is an unfair and unreasonable burden, and CGG object to the same.**

20. The Organization's knowledge of any ballot altered, not counted, or otherwise impaired by use of the Dominion BMD System in Georgia.

**No objection.**

21. The Organization's knowledge of any security breach or hack of Georgia's election system, including any such breach or hack that resulted in the miscounting or tabulation of any votes.

**No objection.**

22. The Organization's review of expert reports produced in this case, including but not limited to the expert reports of Dr. J. Alex Halderman.

**No objection.**

23. To the extent not otherwise provided herein, all factual matters which have bearing on the Organization's standing in this suit under Article III, Sec. 2, cl. 1.

**CGG object to this topic in that it would require opine as to the legal significance of various facts as they relate to the issue of standing. CGG's designee will be prepared to respond to factual questions about standing but not legal theories of the legal significance of various facts as they relate to standing.**

24. The process by which the Organization searched for and identified documents responsive to discovery requests served in this case.

**No objection.**

This 15th day of March 2022.

/s/ Cary Ichter
CARY ICHTER
Georgia Bar No. 382515
**ICHTER DAVIS LLC**
3340 Peachtree Road NE,
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600


/s/ Bruce P. Brown
Bruce P.  Brown
Georgia Bar No. 64460
**BRUCE P. BROWN LAW LLC**
1123 Zonolite Rd.
Suite 6
Atlanta, Georgia 30306
(404) 881-0700


/s/ Robert A. McGuire, III
Robert A. McGuire, III
Admitted Pro Hac Vice (ECF No. 125)
**ROBERT MCGUIRE LAW FIRM**
2703 Jahn Ave NW, Suite C-7
Gig Harbor, WA  98335
(844) 318-6730

*Attorneys for Coalition for Good
Governance*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

**DONNA CURLING, ET AL.,**

**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
Defendants.

Civil Action No. 1:17-CV-2989-AT

## CERTIFICATES OF SERVICE AND COMPLIANCE

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Century Schoolbook and a point size of 13.

I further certify that on March 15, 2022, a copy of the foregoing was electronically served by sending a pdf. of same to all attorneys of record in this matter.

*/s/ Cary Ichter*
Cary Ichter

8

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| DONNA CURLING, ET AL. | ) |
| Plaintiffs, | ) |
|  | ) Civil Action |
| v. | ) No. 1:17-cv-02989-AT |
| BRIAN KEMP, ET AL. | ) |
| Defendants. | ) |

## THIRD AMENDED COMPLAINT OF PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES, WILLIAM DIGGES III, <u>RICARDO DAVIS, AND MEGAN MISSETT</u>



**Exhibit**
CGG 0003

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................... ii

I.    INTRODUCTION ........................................................................ 1

II.   PARTIES ................................................................................... 10

   A.   PLAINTIFFS ...................................................................... 10

     1.   Plaintiff Coalition for Good Governance ................................. 10

     2.   Plaintiff Individuals Who Are Members of Coalition (the "Member Plaintiffs") ................................................................... 12

     3.   Former Plaintiff Individuals. ................................................ 13

     4.   Plaintiff Individuals Who Are Not Now Members of Coalition (the "Non-Member Plaintiffs") .......................................................... 13

   B.   DEFENDANTS .................................................................. 14

     1.   Defendant Secretary. ......................................................... 14

     2.   Defendant State Board Members. ......................................... 15

     3.   Defendants Fulton Board Members. ...................................... 17

     4.   All Other Previously Named Defendants Are Now Dismissed Without Prejudice ....................................................................... 18

III.  JURISDICTION AND VENUE ..................................................... 18

IV.  LEGAL FRAMEWORK .............................................................. 19

A.  The United States Constitution .................................................19

B.  The Georgia Constitution ........................................................20

C.  The Georgia Election Code ......................................................20

D.  Georgia's Regulation of Elections ............................................24

V.  GENERAL ALLEGATIONS .........................................................25

A.  How Georgia's Voting System Works........................................25

B.  AccuVote DREs Are Insecure and Vulnerable to Malicious Hacking. ......29

C.  AccuVote DREs Fail to Provide Absolute Secrecy of the Ballot. .............33

D.  Security Breaches at KSU and CES Have Further Compromised Georgia's Voting System.................................................................34

VI.  SPECIFIC ALLEGATIONS .........................................................38

A.  Conduct of All Defendants—Past and Threatened .....................38

B.  Conduct of Defendant Secretary—Past and Threatened............41

C.  Conduct of Defendant State Board Members—Threatened ......................44

D.  Conduct of Defendant Fulton Board Members—Past and Threatened. .....44

E.  Standing of Plaintiff Coalition ................................................50

1.  Coalition Has Organizational Standing Derived from Past and Threatened Direct Injuries to Coalition. .........................................50

2.   Coalition Has Associational Standing Derived from Past and Threatened Injuries to Coalition's Members. ......................................................................53

VII.   CLAIMS ..........................................................................................................62

COUNT I: FUNDAMENTAL RIGHT TO VOTE ...........................................62

COUNT II:  EQUAL PROTECTION ..............................................................65

PRAYER FOR RELIEF ..............................................................................67

Plaintiffs Coalition for Good Governance ("**Coalition**"), Laura Digges,

William Digges, Ricardo Davis, and Megan Missett (the "**Coalition Plaintiffs**"),

for their Third Amended Complaint, allege as follows:

## I. INTRODUCTION

1.     This Third Amended Complaint is being filed at a time when virtually

every American voter has come to understand that the nation's election

infrastructure is susceptible to malicious manipulation from local and foreign

threats. Yet, Georgia's election officials continue to defend the State's electronic

voting system that is demonstrably unreliable and insecure, and have repeatedly

refused to take administrative, regulatory or legislative action to address the

election security failures.

2.     This is a civil rights action for declaratory and injunctive relief

brought against Georgia elections officials who have adopted—and who require

Georgia voters to use, as a condition of being able to cast a ballot in their polling

places—the State's direct recording electronic voting machines ("**DREs**") as the

means of casting their ballot.  Because Georgia's DRE touchscreen voting

machines are insecure, lack a voter-verified paper audit capacity, fail to meet

minimum statutory requirements, and expose voters to being deprived of the ability

to cast a "secret ballot," Ga. Const. Art. II, § 1, ¶ 1, requiring voters to use those

machines violates the voters' constitutional rights to have their votes recorded in a fair, precise, verifiable, and anonymous manner, and to have their votes counted and reported in an accurate, auditable, legal, and transparent process.

3.      "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).  The secret ballot—"the hard-won right to vote one's conscience without fear of retaliation"—is a cornerstone of this right to freely vote for one's electoral choices. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 343 (1995).

4.      The Coalition Plaintiffs challenge Georgia's use of DREs in the May 2018 and November 2018 General Elections; in any Runoff or Special Elections and in any of the numerous other elections, including special elections and runoffs for vacancies, that will be conducted in Georgia during 2018 (collectively, the "**Relevant Upcoming Elections**").[1]  Without this Court's intervention, the flawed and legally deficient DRE voting units will be used to conduct these elections, causing the true results of these elections to be uncertain. The continued use of unreliable un-auditable voting machines has a deleterious impact on the

---

[1] *See* Georgia Secretary of State, *2018 Elections and Voter Registration Calendar*, http://sos.ga.gov/index.php/elections/2018_elections_and_voter_registration_calendar (last visited Apr. 2, 2018).

governance of the State and its jurisdictions, when voters have increasing reasons to lose confidence in the stated election results. Since the action was initially filed in Fulton County Superior Court on July 3, 2017, the State and its counties and municipalities have continued to conduct scores of regularly scheduled and special elections. For example, on November 7, 2017, WAGA reported on the results of over 400 races in North Georgia alone.[2] There have been at least 12 special state legislative races and 5 runoffs since this case was filed. In addition to the May primary election, a July special election and primary run-off election are scheduled prior to the November general election.

5.      The Coalition Plaintiffs seek to have the Relevant Upcoming Elections conducted using verifiable paper ballots. The paper ballots may be counted using Georgia's currently owned and certified optical scanning system or, alternatively, counted by hand. Both voting methods are feasible and authorized by Georgia's election statutes.

6.      The relief requested is especially critical since Plaintiff Coalition and its members have found the doors to Georgia's ballot counting rooms locked, leaving them unable to watch how Georgia's elections are conducted, despite the

---

[2] See Fox 5 News, *Results from more than 400 races across north Georgia*, http://www.fox5atlanta.com/news/georgia-heads-to-the-polls-tuesday-for-municipal-elections (last visited Apr. 4, 2018).

obligation of Georgia's election officials under O.C.G.A. § 21–2–406 to "perform their duties in public."

7.      By this Third Amended Complaint, the Coalition Plaintiffs seek to remedy Georgia's unreliable, insecure and unverifiable election methods. This Third Amended Complaint is filed in an environment of alarming national news concerning the vulnerability of our country's election infrastructure. Georgia is frequently reported in the media as being the most populous of only five (5) states in the country that continue to utilize unverifiable electronic voting statewide. Admonitions from authorities regarding the serious risks of paperless electronic voting machines are escalating as the 2018 mid-term elections approach. Meanwhile, those in Georgia with the political power to remedy the situation have done nothing.

8.      Locally, Atlanta residents recently have been reminded of the very real disruption that cyber-attacks on government computer systems can create as they are experiencing loss of some City of Atlanta services following a ransomware attack on March 22, 2018.  Atlanta city government is still reeling from the attack at the time of this filing. There is no rational reason to believe that the current voting system, run on outdated computers using outdated operating systems, could defend against such an attack in the 2018 elections.

9.      On March 20, 2018, the United States Senate Select Committee on
Intelligence issued initial recommendations on election security, including a
"minimum" standard of a voter-verified paper trail.[3] The recommendation to use
paper ballots with post-election audits echoed the nearly universal warnings of
voting system experts over the last fifteen years. National and local media reports
have repeatedly described officials' concerns of immediate cybersecurity risk of
undetected system compromises. It is universally acknowledged that voting
machines, tabulation computers, voter registration records, and ballot provisioning
systems are exposed to cybersecurity threats in most jurisdictions at unacceptable
levels.  Making the situation worse still, the use of an electronic voting system
without independent paper records of voter intent makes it all but impossible for
election officials to detect attacks when they have occurred. These factors render
our elections, particularly elections involving Georgia's un-auditable voting
system, increasingly attractive targets for foreign adversaries. Meanwhile, Georgia

---

[3] The Select Committee determined that, "States should rapidly replace outdated and vulnerable
voting systems.  At a minimum, any machine purchased going forward should have a voter-
verified paper trail and no WiFi capability."  U.S. Senate Select Committee on Intelligence,
*Russian Targeting Of Election Infrastructure During The 2016 Election*,
https://www.burr.senate.gov/imo/media/doc/One-
Pager%20Recs%20FINAL%20VERSION%203-20.pdf (last visited Apr. 1, 2018).

has demonstrated a conscious disregard for these threats and a lack of interest in solving the problem, impacting every voter in the State of Georgia.

10.     Despite the constant drum-beat of warnings coming from the federal government, technology experts, security experts, the media, and voters, Georgia's General Assembly closed its 2017–18 session on March 29, 2018, having specifically debated the issue in the proposed Senate Bill 403 ("**SB403**") but without ultimately enacting that bill or any other palliative measure.  Georgia's legislature thus has done ***nothing*** to improve an election infrastructure that is widely recognized as one of the least secure in the country.

11.     In August 2016, the State of Georgia experienced massive security breaches exposing critical vulnerabilities in its centralized election computer operations--weaknesses so pervasive as to expose every voting machine and tabulating program in the State to the risk of undetectable malware. Yet Georgia's General Assembly declined to act on voting system and election security issues during both the 2017 and the 2018 legislative sessions.

12.     While SB403 acknowledged some of the problems afflicting Georgia's voting system, the proposed legislation failed to address what is required to remedy the problem. Crucially, though its proponents called the bill a "paper ballot" bill, SB403 did ***not*** require hand-marked auditable paper ballots. Instead,

SB403 sought to authorize a new type of unverifiable electronic voting system technology that, while favored by Defendant Secretary of State Brian Kemp and the bill's sponsors, was roundly criticized by experts as an insecure, dangerously hackable, high-risk technology.

13. Strangely, while SB403's provisions authorized limited post-election audits, state legislative races would have been exempted from required audits altogether. The General Assembly demonstrated its clear preference for continuing use of unverifiable voting systems in its deliberations and ultimately failed to address the imminent threats to the electoral process looming with the 2018 mid-term elections.

14. On March 23, 2018, during the legislative session, the U.S. Election Assistance Commission announced that, "Georgia would receive $10.3 million in federal grants from the recently signed fiscal 2018 government spending bill, combined with $515,000 in matching funds from the State" for the purpose of "upgrad[ing] its voting machines and mak[ing] other security improvements ahead of the upcoming elections."[4] Even with immediate funding available,

---

[4] Tamar Hallerman & Mark Niesse, *Feds to give Georgia $10 million to upgrade outdated voting machines*, Atlanta Journal Constitution, 2018, https://www.myajc.com/news/state--regional-govt--politics/feds-give-georgia-million-upgrade-outdated-voting-machines/B8IbGwxNJxtPFloEXn4aIL/ (last visited Apr. 1, 2018).

lawmakers chose to do nothing to improve the State's election security. A simple joint resolution requesting that the State Election Board use its authority to dedicate a very small portion of such funding to further deploy the currently authorized and state-owned paper ballot systems would have signaled lawmakers' desire to implement a verifiable voting system, but the legislature decline to take even that modest step.

15.    Defendant State Election Board has known of the massive August 2016 security breaches and vulnerabilities of the election system for over a year, and since this action was filed in July 2017, has known of the specific allegations in this litigation concerning the failures of the election system.  Despite having the authority to require Georgia's elections to be conducted using paper ballots counted by optical scanners—widely considered the best practice by voting system experts—and despite having the equipment and software licenses necessary to do so, the State Board has taken no action to mandate the use of paper ballots to protect Georgia's elections. Instead, the State Board has maintained its Election Rule 183–1–12–.01 mandating touchscreen voting machines for in-person voting.

16.    As explained in this Complaint, and as will be demonstrated by the Coalition Plaintiffs, the State possesses not only the authority, but the equipment, software licenses and know-how to immediately transition to paper ballots. The

required optical scan equipment is already used for current mail-in paper-ballot processing. The security and reliability that would result from deploying the currently available paper-ballot system far outweighs the administrative inconvenience of converting to hand-marked paper ballots to be counted by existing equipment.

17.     The State of Georgia and its officials have the legal, moral, and ethical obligation to secure the State's electoral system.  Sadly—and inexplicably—they appear to lack the will to do so. When the political branches have failed to secure fundamental rights in our country, it has traditionally been the Courts that stepped in to do so.  In a free society, no right is more precious or important than the right to vote.  When the exercise of that right is corrupted, the integrity of the democratic process is corrupted, and the legitimacy of our government suffers as the inevitable consequence.  If the right to vote in this society is essential to the integrity of democratic self-governance, then our election processes warrant the most urgent judicial protection.  Plaintiffs seek the intervention of this Court because neither the State Board of Elections, the Secretary of State, nor the Georgia General Assembly appear willing to act to protect voters' rights to a secure and accurately counted election process.

## II. PARTIES

### A. PLAINTIFFS

#### 1. Plaintiff Coalition for Good Governance

18. Plaintiff COALITION FOR GOOD GOVERNANCE is a non-profit corporation organized and existing under the laws of the State of Colorado.

19. Coalition is a membership organization, with a membership that consists of individuals residing in Georgia and across the United States. Individuals become members of Coalition by providing their contact information and indicating a desire to associate with the organization. Members donate money, contribute time, and share information and intelligence with the organization to the extent they are able and wish to do so. Members receive informational communications from Coalition and can benefit from Coalition's facilitation of members' individual participation in civic activities that are germane to the organization's purpose, such as poll watching, auditing election results, and publishing opinion pieces. Members utilize Coalition as a resource to answer a wide range of questions about voting rights, voting processes, open meetings law, public records law, recalls, petition processes, election legislation, and how to challenge election issues they encounter.

20.     Coalition's purpose is to preserve and advance the constitutional liberties and individual rights of citizens, with an emphasis on preserving and protecting those private rights of its members that are exercised through public elections.

21.     Coalition serves its purpose in multiple ways, including by providing information and education to its members; by serving as a non-partisan educational and informational resource for the public, press, campaigns, candidates, and political parties; by monitoring nationwide developments in election law and technology; by providing speakers for events at educational institutions; by providing commentary from its leadership on election issues; by collaborating in voting rights and election integrity initiatives with other nonpartisan nonprofits and academics; by developing and sharing research and investigation of reported election problems with the press, public and other members of the election-integrity community; and by facilitating the engagement of members and prospective members as non-partisan participants in the electoral process through poll watching, attendance at public meetings, and other civic activities.

22.     Coalition, acting on its own behalf, has organizational standing to bring each of the claims for prospective relief stated herein.

23.     Coalition, acting on behalf of its members who are threatened with
imminent injury-in-fact, including the Member Plaintiffs identified below, also has
associational standing to bring the claims for prospective relief stated herein.

### 2.     Plaintiff Individuals Who Are Members of Coalition (the "Member Plaintiffs")

24.     Plaintiff LAURA DIGGES ("**Ms. Digges**") was a Plaintiff when this
action was initially filed in Fulton County Superior Court on July 3, 2017.  (ECF
No. 1-2.)  Ms. Digges has been a member of Coalition since June 2017. Ms.
Digges is an elector of the State of Georgia and a resident of Cobb County. Ms.
Digges intends to vote in each of the Relevant Upcoming Elections in Cobb
County.

25.     Plaintiff WILLIAM DIGGES III ("**Mr. Digges**") was a Plaintiff when
this action was initially filed in Fulton County Superior Court on July 3, 2017.
(ECF No. 1-2.)  Mr. Digges has been a member of Coalition since June 2017.  Mr.
Digges is an elector of the State of Georgia and a resident of Cobb County. Mr.
Digges intends to vote in each of the Relevant Upcoming Elections in Cobb
County.

26.     Plaintiff RICARDO DAVIS ("**Davis**") was a Plaintiff when this
action was initially filed in Fulton County Superior Court on July 3, 2017.  (ECF

No. 1-2.)  Davis has been a member of Coalition since May 2017. Davis is an

elector of the State of Georgia and a resident of Cherokee County.  Davis intends

to vote in each of the Relevant Upcoming Elections in Cherokee County.

27.      Plaintiff MEGAN MISSET ("**Missett**") has been a member of

Coalition since March 2018. Missett is an elector of the State of Georgia and a

resident of Fulton County. Missett intends to vote in each of the Relevant

Upcoming Elections in Fulton County.

### 3.      Former Plaintiff Individuals.

28.      Former Plaintiff EDWARD CURTIS TERRY ("**Terry**") was a

Plaintiff when the Second Amended Complaint in this action was filed on

September 15, 2017, (ECF No. 70, at 11–12, ¶ 31), Terry's individual claims were

dismissed on March, 20, 2018, pursuant to Local Rule 41.3A(2) because Terry did

not comply with an Order directing him to apprise this Court of his mailing

address.  (ECF No. 147.)

### 4.      Plaintiff Individuals Who Are Not Now Members of Coalition (the "Non-Member Plaintiffs")

29.      Plaintiff DONNA CURLING ("**Curling**") was a Plaintiff and member

of Coalition when this action was initially filed in Fulton County Superior Court on

July 3, 2017.  (ECF No. 1-2, at 6–7, ¶¶ 12, 13, 15.)  Curling was a member of

Coalition between May 2017 and December 2017. Curling's claims are not amended by this Third Amended Complaint.

30.     Plaintiff DONNA PRICE ("**Price**") was a Plaintiff and member of Coalition when this action was initially filed in Fulton County Superior Court on July 3, 2017. (ECF No. 1-2, at 7–8, ¶ 12, 15–16.) Price was a member of Coalition between May 2017 and December 2017. Price's claims are not amended by this Third Amended Complaint.

31.     Plaintiff JEFFREY SCHOENBERG ("**Schoenberg**") was a Plaintiff when this action was initially filed in Fulton County Superior Court on July 3, 2017. (ECF No. 1-2, at 7–9, ¶ 12, 15, 17.) Schoenberg's claims are not amended by this Third Amended Complaint.

**B.     DEFENDANTS**

    **1.     Defendant Secretary.**

32.     Defendant BRIAN P. KEMP is sued for prospective declaratory and injunctive relief in his official capacities as the Secretary of State of Georgia and as Chairperson of the State Election Board when this action was initially filed in Fulton County Superior Court on July 3, 2017. Together with any successors in office automatically substituted for him as a Defendant by operation of Fed. R.

Civ. P. 25(d), Defendant KEMP is hereinafter referred to as "**Kemp**" or the

"**Secretary**."

33.     In his official and individual capacity, the Secretary is responsible for

the orderly and accurate administration of Georgia's electoral processes. The

Secretary's legal duties, among others, include the following: (i) to approve or

discontinue the use of Georgia's voting systems and to conduct any reexamination

of Georgia's voting systems, upon request or at his own discretion, O.C.G.A.

§§ 21–2–379.2(a), –379.2(b), –368(a), –368(b); (ii) to develop, program, build, and

review ballots for use by counties and municipalities on direct recording electronic

(DRE) voting systems in use in the State, O.C.G.A. § 21-2-50(a)(15); and (iii) to

serve as Chair of the State Election Board. O.C.G.A. § 21-2-30(d).

34.     The Secretary is also required by law to determine the voting

equipment that is to be used to cast and count the votes in all county, state, and

federal elections in Georgia and to provide the same type of equipment to all

counties in the State on behalf of the State of Georgia.  O.C.G.A. § 21-2-300.

>    **2.     Defendant State Board Members.**

35.     Together with the Secretary, Defendants DAVID J. WORLEY,

REBECCA N. SULLIVAN, RALPH F. "RUSTY" SIMPSON, and SETH HARP,

are sued for prospective declaratory and injunctive relief in their official capacities

as members of Georgia's State Election Board (the "**State Board**") when this action was initially filed in Fulton County Superior Court on July 3, 2017. Together with any successors in office automatically substituted for any of them as Defendants by operation of Fed. R. Civ. P. 25(d), these Defendants are hereinafter collectively referred to as the "**State Board Members**."

36.     Acting through the State Board, the State Board Members collectively are to discharge the following duties of the State Board, among others: (1) to promulgate rules and regulations to obtain uniformity in election practices, as well as the legality and purity of all primaries and elections, O.C.G.A. § 21-2-31(1); (2) to formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections, O.C.G.A. § 21-2-31(2); (3) to investigate the administration of primary and election laws and frauds and irregularities in elections and to report election law violations to the Attorney General or appropriate district attorney, O.C.G.A. § 21-2-31(5); and (4) to promulgate rules and regulations to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system used in Georgia, O.C.G.A. § 21-2-31(7).

37.     Acting through the State Board, the State Board Members collectively exercise the power vested in the State Board to enforce compliance with the Georgia Election Code and with the State Board's regulations.  *See* O.C.G.A. §§ 21-2-33.1, -32.

### 3.     Defendants Fulton Board Members.

38.     Defendants MARY CAROLE COONEY, VERNETTA NURIDDIN, DAVID J. BURGE, STAN MATARAZZO, and AARON JOHNSON, are sued for prospective declaratory and injunctive relief in their official capacities as members of the Fulton County Board of Registration and Elections (the "**Fulton Board**") when this action was initially filed in Fulton County Superior Court on July 3, 2017.  Together with any successors in office automatically substituted for any of them as Defendants by operation of Fed. R. Civ. P. 25(d), these Defendants are hereinafter collectively referred to as the "**Fulton Board Members**."

39.     The Fulton Board was created by a local Act of the General Assembly. Georgia Law, 1989, Act 250.  The Fulton Board has the authority to exercise the powers and duties of a county election superintendent with respect to conducting elections in Fulton County, *see* O.C.G.A. § 21–2–70 to –77. Duties of a county election superintendent include, among others, the following: (i) "To select and equip polling places for use in primaries and elections in accordance with [the

Georgia Election Code]," O.C.G.A. § 21–2–70(4); (ii) "To make and issue such rules, regulations, and instructions, consistent with law, including the rules and regulations promulgated by the State Election Board, as he or she may deem necessary for the guidance of poll officers, custodians, and electors in primaries and elections," O.C.G.A. § 21–2–70(7); (iii) "To conduct all elections in such manner as to guarantee the secrecy of the ballot and to perform such other duties as may be prescribed by law," O.C.G.A. § 21–2–70(13); and (iv) to determine whether to use paper ballots when the use of voting machines is not practicable, O.C.G.A. § 21–2–334.

### 4.      All Other Previously Named Defendants Are Now Dismissed Without Prejudice.

40.      With effect as of the date of this Court's Order granting Coalition's motion for leave to file this Third Amended Complaint as its operative complaint, Plaintiff Coalition voluntarily dismissed without prejudice its claims against any other Defendants previously named in this action.

## III.   JURISDICTION AND VENUE

41.      This action was initially filed in Fulton County Superior Court on July 3, 2017. (ECF No. 1-2, at 7–9, ¶ 12, 15, 17.)

42.      The Secretary was served with the state-court Complaint on August 3, 2017.  (ECF No. 1, at 4, ¶ 5.)

18

43.     On August 8, 2017, the Secretary and other Defendants removed this action to this Court pursuant to 28 U.S.C. § 1441 and § 1446. (ECF No. 1.)

44.     This Court has subject-matter jurisdiction over each of the claims raised in this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), § 1343 (jurisdiction over civil rights actions), § 1367 (supplemental jurisdiction), § 2201 (jurisdiction to grant declaratory relief) and § 2202 (jurisdiction to grant relief ancillary to declaratory judgment).

45.     Venue lies in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b) because multiple defendants reside in this judicial district and all defendants are residents of Georgia and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this judicial district.

## IV.   LEGAL FRAMEWORK

### A.     The United States Constitution

46.     The United States Constitution provides: "The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof…." U.S. Const. Art. I, § 4, cl. 1.

### B. The Georgia Constitution

47.    The Georgia Constitution provides: "Elections by the people shall be by secret ballot and shall be conducted in accordance with procedures provided by law." Ga. Const. Art. II, § 1, ¶ 1.

### C. The Georgia Election Code

48.    The Georgia Election Code (the "**Code**") provides, in pertinent part: "All primaries and elections in this state shall be conducted by ballot, except when voting machines are used as provided by law. A ballot may be electronic or printed on paper." O.C.G.A. § 21–2–280.

49.    The Code requires that uniform voting equipment "shall be provided to each county by the state, as determined by the Secretary of State." *See* O.C.G.A. § 21–2–300.

50.    Specifically, the Code requires the Secretary to furnish "a uniform system of direct recording electronic (DRE) equipment" to each county. O.C.G.A. § 21–2–379.3, and authorizes the use of DRE equipment under required conditions in numerous provisions of Title 21, Chapter 2, Article 9, Part 5.

51.     The Code establishes the following requirements for DREs in addition

to other minimum operating standards:

> No direct recording electronic voting system shall be
> adopted or used unless it shall, at the time, satisfy the
> following requirements:
>
> ….
>
> (6) It shall permit voting in absolute secrecy so that no
> person can see or know for whom any other elector has
> voted or is voting, save an elector whom he or she has
> assisted or is assisting in voting, as prescribed by law;
>
> ….
>
> (8) It shall, when properly operated, record correctly and
> accurately every vote cast;

O.C.G.A. § 21–2–379.1.

52.     The Code requires that, "All direct recording electronic (DRE) units

and related equipment, when not in use, shall be properly stored and secured under

conditions as shall be specified by the Secretary of State."  O.C.G.A. § 21–2–

379.9(a).

53.     The Code requires county election superintendents who conduct

elections using DREs to do the following:

•       "examine each unit before it is sent to a polling place, verify

that each registering mechanism is set at zero, and properly secure each unit so that

21

the counting machinery cannot be operated until later authorized," O.C.G.A. § 21-2-379.6(a);

- three days before every election, "have each DRE unit tested to ascertain that it will correctly count the votes cast for all offices and on all questions," O.C.G.A. § 21-2-379.6(c);

- "require that each DRE unit be thoroughly tested … prior to the delivery of each DRE unit to the polling place," O.C.G.A. § 21-2-379.7(b);

- "[p]rior to opening the polls each day[,] … certify that each unit is operating properly and is set to zero…." O.C.G.A. § 21-2-379.7(b);

- "[e]nsure that each DRE unit's tabulating mechanism is secure throughout the day during the primary or election," O.C.G.A. § 21-2-379.7(d)(3);

- use only DREs that "permit voting in absolute secrecy so that no person can see or know how any other elector has voted or is voting," O.C.G.A. § 21–2–379.1(6), and "conduct all elections in such manner as to guarantee the secrecy of the ballot," O.C.G.A. § 21–2–70(13); and

- "make and issue such rules, regulations, and instructions, consistent with law, including the rules and regulations promulgated by the State Election Board, as he or she may deem necessary for the guidance of poll officers, custodians, and electors in primaries and elections[,]" O.C.G.A. § 21–2–70(7);

- "perform their duties in public," O.C.G.A. § 21–2–406; and

- comply with the legal requirement that "all proceedings at the tabulating center and precincts shall be open to the view of the public," O.C.G.A. § 21–2–379.11.

54.    The Code authorizes the use of paper ballots for use in "any primary or election in which the use of voting equipment is impossible or impracticable, for the reasons set out in [§] 21–2–334….", O.C.G.A. § 21–2–281—i.e., when the use of voting machines is required but "is not possible or practicable" or "if, for any other reason, at any primary or election the use of voting machines wholly or in part is not practicable," O.C.G.A. § 21–2–334.

55.    The Code defines electors who do not vote in person at the polls on Election Day to vote as "absentee electors." O.C.G.A. § 21–2–380(a).

56.    The Code permits absentee electors who do not vote in person to use a paper absentee ballot that is mailed in or hand delivered, *see* O.C.G.A. § 21–2–385, and generally counted by optical scan equipment, but the Code requires absentee electors who vote in the advance voting period who vote in person to vote by DRE *if* DRE machines are used in the polling places on election day, *see* O.C.G.A. § 21–2–383(b).

57. The Code authorizes the use of paper ballots counted by optical scanning equipment and sets forth requirements for their approval and operation. *See* O.C.G.A Title 21, Chapter 2, Article 9, Part 4.

**D.    Georgia's Regulation of Elections**

58. The State Board's rules implementing the Code require that all voters who cast ballots in person at the polls on Election Day must vote by DRE:

> **Rule 183-1-12-.01 Conduct of Elections:** Beginning with the November 2002 General Election, all federal, state, and county general primaries and elections, special primaries and elections, and referendums in the State of Georgia ***shall be conducted at the polls through the use of direct recording electronic (DRE) voting units*** supplied by the Secretary of State or purchased by the counties with the authorization of the Secretary of State. In addition, absentee balloting shall be conducted through the use of optical scan ballots which shall be tabulated on optical scan vote tabulation systems furnished by the Secretary of State or purchased by the counties with the authorization of the Secretary of State; provided, however, that the use of direct recording electronic (DRE) voting units is authorized by the Secretary of State for persons desiring to vote by absentee ballot in person.

Ga. Comp. R. & Regs. r. 183–1–12–.01 (emphasis added).

## V.    GENERAL ALLEGATIONS

### A.    How Georgia's Voting System Works.

59.    The voting system configuration most recently provided to Georgia's

counties by the Secretary consists of the following configuration of hardware

components and related firmware and software:

- Diebold Election Systems ("**Diebold**")[5] AccuVote DRE touchscreen
  voting units ("**AccuVote DREs**"):
  - o    R6 TS model, with BallotStation version 4.5.2! firmware.
  - o    TSx model, with BallotStation version 4.5.2! firmware.

- Diebold optical scanners for tabulating paper ballots.

- Electronic Poll Books with barcode scanner to scan identification.

- Diebold General Election Management Software ("**GEMS**") for
  tabulation and reporting of data generated by AccuVote DRE and
  Diebold optical scanners.

(such configuration, "**Georgia's Voting System**").

60.    On information and belief, Georgia uses approximately 27,000

Diebold AccuVote DRE touchscreen voting machines.  These AccuVote DREs are

located at polling locations during elections, where they are used by electors who

vote absentee ballots in person during early voting as authorized by O.C.G.A.

§ 21–2–385(d) and by electors who vote in person on Election Day at the polls in

---

[5] Diebold Election Systems changed its name to Premier Election Solutions in 2007.  Diebold's
election system business was subsequently acquired by Dominion Voting Systems.

their home precincts. In Fulton County, TSx units are used as an intermediate device for electronic transmission of ballot data collected on TS units to the county GEMS server.

61.    The use of AccuVote DREs makes Georgia's elections unverifiable, unauditable, and vulnerable to undetectable manipulation. AccuVote DREs create no verifiable record of voter intent, unlike optical scanner components that rely on a voter-marked paper ballot as a verifiable official record.

62.    Each AccuVote DRE internally contains much of the same hardware that might typically be found in a very low-end general-purpose personal desktop computer in use in the early 2000s.

63.    Georgia's AccuVote DREs run a Diebold-modified version of Microsoft's Windows CE version 4.1 operating system—which Microsoft stopped supporting in early January 2013.  As a consequence, Microsoft is no longer issuing updates or security patches for that software.[6]

64.    A proprietary Diebold software application called BallotStation runs on top of the Windows operating system on AccuVote DREs and provides the user interface that voters and poll workers see. BallotStation interacts with the voter,

---

[6] See Wikipedia, *Windows Embedded Compact*,
https://en.wikipedia.org/wiki/Windows_Embedded_Compact (last visited Feb. 12, 2018).

accepts and records votes, counts the votes recorded on the DRE, and performs all

other election-related processing by the DRE.

65.    AccuVote DREs are configured for each election by inserting a

memory card into a slot behind a locked door on the side of the machine.

66.    Before the election, the file system on the memory card stores the

election definition, sound files, translations for other languages, interpreted code

that is used to print reports, and other configuration information.

67.    AccuVote DREs use software installed on the unit to display graphical

information to the voter that indicates which part of the touchscreen display

corresponds to particular electoral choices.

68.    Voters record their preferences by physically touching the part of the

screen that corresponds to voter's preferred choice.

69.    When operating properly, AccuVote DREs use software installed on

the unit to translate the voter's physical act of touching a particular place on the

touchscreen into a vote for the corresponding candidate or issue.

70.    When operating properly, AccuVote DREs use software installed on

the unit to change what is graphically displayed on the touchscreen to indicate to

the voter that a particular electoral choice has been electronically registered by the

unit.

71.     When operating properly, AccuVote DREs use software installed on the unit to record the voter's choice on both the DRE's removable memory card and into the machine's internal flash memory.  Both such records of the voter's choices are unreadable to humans.

72.     Georgia's AccuVote DREs do not record a paper or other independent verifiable record of the voter's selections.

73.     Upon the closing of the polls, poll workers cause AccuVote DREs to interpret collected electronic information and convert it to human readable form to print a paper tape of vote totals recorded on each machine.

74.     After the tape of the DREs machine's vote totals is printed, the removable DRE memory cards are taken from each of the AccuVote DREs and secured for transport either to a satellite vote transmission center, in the case of Fulton County, or to the county election office in other counties.

75.     On election night, AccuVote DRE memory cards from polling places are collected and uploaded into the Diebold GEMS server (running on a desktop computer) where the GEMS software combines DRE vote data with data from mail-in absentee ballots, and consolidated preliminary results reports are created and printed.

76.     Mail-in absentee paper ballots and provisional paper ballots are
scanned and tabulated by Diebold AccuVote Optical Scan units, located in the
office of the superintendents of elections.

77.     The Diebold AccuVote Optical Scan units are programmed with
software to scan, count, tabulate and report the paper ballot vote counts.

78.     On election night, Diebold AccuVote Optical Scan unit memory cards
are uploaded to the Diebold GEMS server and combined with the data from the
AccuVote DREs to create unofficial consolidated results and generate reports in
human readable form.

**B.     AccuVote DREs Are Insecure and Vulnerable to Malicious Hacking.**

79.     Scores of news reports in the last year have amplified the fifteen-plus
years of warnings from voting system computer scientists that paperless balloting
is unreliable, unquestionably insecure, and unverifiable because paperless balloting
cannot be audited.

80.     In January 2018, the Congressional Task Force on Election Security
formed by House Democratic Leader Nancy Pelosi and others issued a Final

Report addressing the insecurity of the voting infrastructure in the United States.

The Final Report warned:

> Given the breadth of security risks facing voting machines, it is especially problematic that approximately 20% of voters are casting their ballots on machines that do not have any paper backup. These voters are using paperless Direct Recording Electronic (DRE) machines that have been shown over and again to be highly vulnerable to attack. Because these machines record votes on the internal memory of the machine, and do not leave any paper backup, it is near impossible to detect whether results have been tampered with.[7]

81.     Such alarming findings about the security of DREs are not new. In 2007, California's then Secretary of State Debra Bowen ("**Secretary Bowen**") and Ohio's Secretary of State Jennifer Brunner ("**Secretary Brunner**") separately commissioned and published independent research studies that included the entire Diebold AccuVote voting system.

82.     Secretary Bowen's "Top-to-Bottom Review" ("**TTBR**")[8] of California's voting system produced a detailed scientific review of a Diebold AccuVote voting system that used newer, upgraded—and thus presumably more

---

[7] Congressional Task Force of Election Security, *Final Report*, https://democrats-homeland.house.gov/sites/democrats.homeland.house.gov/files/documents/TFESReport.pdf (Feb. 14, 2018), at 24 (last visited Apr. 2, 2018).
[8] See Joseph A. Calandrino, et al., *Source Code Review of the Diebold Voting System*, http://votingsystems.cdn.sos.ca.gov/oversight/ttbr/diebold-source-public-jul29.pdf (Jul. 20, 2007) (last visited Apr. 2, 2018).

secure—Diebold voting system components than the AccuVote DREs that are currently used in Georgia.

83.     Secretary Brunner's Evaluation and Validation of Election-Related Equipment, Standards and Testing ("**EVEREST**")[9] initiative likewise examined a newer version of the AccuVote DREs than Georgia uses.

84.     The TTBR found that California's AccuVote DREs were "inadequate to ensure accuracy and integrity of the election results…"; that the system contained "serious design flaws that have led directly to specific vulnerabilities, which attackers could exploit to affect election outcomes…"; and that "attacks could be carried out in a manner that is not subject to detection by audit, including review of software logs."[10]

85.     The EVEREST report concluded that Ohio's voting "system lacks the technical protections necessary to guarantee a trustworthy election under operational conditions. Flaws in the system's design, development, and processes lead to a broad spectrum of issues that undermine the voting system's security and

---

[9] Pennsylvania State Univ., et al., *EVEREST: Evaluation and Validation of Election-Related Equipment, Standards and Testing*, https://www.eac.gov/assets/1/28/EVEREST.pdf (Dec. 7, 2007) (last visited Feb. 5, 2018).
[10] See California Secretary of State, *Withdrawal Of Approval*, http://votingsystems.cdn.sos.ca.gov/vendors/premier/premier-11824-revision-1209.pdf (Dec. 31, 2009 rev.), at 2, 2, 3 (last visited Apr. 2, 2018).

reliability. The resulting vulnerabilities are exploitable by an attacker, often easily so, under election conditions." [11]

86.   Citing the failures and vulnerabilities of the Diebold's AccuVote voting system identified in the TTBR, Bowen decertified California's voting system. [12]

87.   The TTBR and the EVEREST reports are consistent with other published scientific reviews of AccuVote DREs that concluded the security and design failures of AccuVote DREs render the units unfit for use in public elections. [13]

88.   The only record of a voter's selection kept by Georgia's AccuVote DREs is the digital record created in the DRE's computer memory by the executable software that is installed on the individual DRE voting unit.  This digital record is only as trustworthy as the software that writes the information to memory.

89.   As indicated by the TTBR and EVEREST reports, the design of AccuVote DREs permits unauthorized, surreptitious manipulation of software

---

[11] See *EVEREST*, supra note 9, at 103.
[12] See *Withdrawal Of Approval*, supra note 10, at 5.
[13] *See, e.g.*,Candice Hoke, *Judicial Protection of Popular Sovereignty: Redressing Voting Technology*, 62 Cas. W. Res. L. Rev. 997 (2012), *available at,*
http://scholarlycommons.law.case.edu/caselrev/vol62/iss4/6 (last visited Apr. 4, 2018).

installed on individual machines that causes the AccuVote DREs to record and

report false votes and that is, for all practical purposes, undetectable by election

officials.

90.    As indicated by the TTBR and EVEREST reports, the results

produced by an AccuVote DRE are not reliable because the machine's software,

which is responsible for correctly recording voter choices, is subject to

undetectable manipulation.

91.    As indicated by the TTBR and EVEREST reports, the results

produced by an AccuVote DRE are not trustworthy because the unreliable software

is likewise responsible for reading the DRE unit's memory and reporting the

recorded results.

### C.    AccuVote DREs Fail to Provide Absolute Secrecy of the Ballot.

92.    Georgia's AccuVote DREs record votes in the order in which they are

cast and otherwise associate each electronic ballot with a unique serial number and

timestamp that can be used to determine the ballot's position in the chronology of

votes cast on the machine.  These design flaws render the electronic ballots cast on

AccuVote DREs capable of being matched to voter records maintained by

pollworkers and pollwatchers, or to polling place security video, or to ExpressPoll

book timestamps, each of which makes it possible to connect many voters with

33

their DRE ballots in violation of Georgia's state constitutional requirements of absolute secrecy of the ballot.

**D.    Security Breaches at KSU and CES Have Further Compromised Georgia's Voting System.**

93.    From at least 2002 until at least December 31, 2017, Secretary Kemp contracted with the Board of Regents of the University System of Georgia and through Kennesaw State University ("**KSU**"), a unit of the University System of Georgia, for the creation of the Center for Election Services ("**CES**") at KSU to assist the Secretary in the fulfillment of his statutory duties to manage Georgia's election system.

94.    Acting under contract as Kemp's agents, KSU, CES and CES's Executive Director Merle King ("**King**") maintained a computer server with the URL "elections.kennesaw.edu," on which they hosted an enormous assemblage of electronic files consisting of software applications, password files, encryption keys, voter information registration information, technical training videos, and other sensitive information critical to the safe and secure operation of Georgia's Voting System.

95.    The information hosted on the "elections.kennesaw.edu" server was not authorized to be publicly accessible. But between at least August 2016 and

34

March 2017, and likely for a much longer period of time, this server was fully accessible to any computer user with Internet access.

96.     The "elections.kennesaw.edu" server was in fact accessed from the public Internet by an unknown number of unauthorized individuals, including cybersecurity researcher Logan Lamb ("**Lamb**"), his colleague Chris Grayson ("**Grayson**"), and KSU's own computer science instructor Andy Green ("**Green**").

97.     In late August 2016, Lamb freely accessed files hosted on the "elections.kennesaw.edu" server, including the voter histories and personal information of all Georgia voters, tabulation and memory card programming databases for past and future elections, instructions and passwords for voting equipment administration, and executable programs controlling essential election resources.  When he accessed these sensitive files, Lamb noted that the files had been publicly exposed for so long that Google had cached (i.e., saved digital backup copies of) and published the pages containing many of them.

98.     Lamb immediately recognized that these files were a high-value target for malicious users who might want to manipulate Georgia's elections, not only in the November 2016 general election, but future elections as well, because he knew that the files created and maintained on this server were used to program virtually all other voting and tabulation equipment used in Georgia's elections.

99.    As a computer scientist and security researcher, Lamb knew that introducing malware into key files hosted on the "elections.kennesaw.edu" server could permit a malicious user to infect Georgia's Voting System with a computer virus that could be designed to travel across jurisdictions and equipment and potentially alter or control the results in multiple future elections with very little risk of detection.

100.    On or about August 28, 2016, Lamb promptly contacted King by telephone and email to warn him that CES should assume that the sensitive documents hosted on the "elections.kennesaw.edu" server had already been downloaded by unauthorized persons. King responded by assuring Lamb that the security issue would be addressed, but King simultaneously warned Lamb to keep his discovery of the server's vulnerabilities to himself or else, King warned, Lamb would be "crushed" by the politicians "downtown."

101.    King immediately informed CES staff of the breach, and KSU IT management was asked for advice and assistance on or about August 29, 2016. Public records demonstrate that in early September 2016, in a series of internal email communications, KSU's information technology staff member William Moore informed CES staffers Michael Barnes and Steven Dean and Information Technology professionals of KSU Tyler Hayden, Jason Figueroa, Matthew Sims,

and Chris Gaddis that the State's primary voting systems server had "exploitable,"
"severe," and "critical" vulnerabilities, and Stephen Gay, KSU's Chief Information
Security Officer, ordered security scans of the CES server.

102.    In October 2016, in a series of internal email communications sent
between William Moore, King, Michael Barnes, Steve Dean, Stephen Gay, Chris
Gaddis, Jason Figueroa, KSU's information technology staff described the
"elections.kennesaw.edu" server as having "40+ critical vulnerabilities."

103.    Despite these internal communications within KSU, and despite
King's commitment to Lamb to ensure that the software, data, and the
"elections.kennesaw.edu" server would be secured, neither Secretary Kemp nor his
agents KSU, CES, and King secured the server, which remained easily accessible
from the public Internet.

104.    Lamb and colleague Grayson accessed the server again several times
in late February 2017 and on March 1, 2017, and they were repeatedly able to
access and download the same types of files that Lamb had accessed months
earlier.

105.    On March 1, 2017, Grayson contacted KSU Computer Science
Instructor Green and informed him of the exact times and IP addresses of his own
recent repeated access of the unsecured voting system server.

106.   Green replicated Lamb and Grayson's access to the server and its sensitive files and then contacted Stephen Gay, who finally caused the elections server to be isolated from the public Internet on or about March 1, 2017.

107.   It is widely and generally known from public media reporting both prior to and since the 2016 presidential election that foreign governments and other unknown suspect parties have actively probed state election systems in attempts to gain unauthorized access and manipulate the voter information and computer systems used to conduct American elections.

108.   Public reports have documented that these efforts targeting American voting systems have included unauthorized intrusions into the very same kind of computer systems and files that Lamb, Grayson, and Green found to be completely unprotected from external access in Georgia for at least seven consecutive months from August 2016 through February 2017.

## VI.   SPECIFIC ALLEGATIONS

### A.   Conduct of All Defendants—Past and Threatened

109.   All Defendants, at all times material to this Complaint, knew that AccuVote DREs did not and cannot meet Georgia's statutory and regulatory requirements for certification, safety, security, and accuracy equipment as provided in Title 2 Chapter 21Article 9 Part 5.

110.   All Defendants, at all times material to this complaint, knew that software applications, password files, encryption keys, voter information registration information, and other sensitive information critical to the safe and secure operation of Georgia's Voting System had been unsecured, breached, and compromised; could not be presumed to be uncorrupted and should instead have been presumed to be compromised; and that Georgia's Voting System is materially noncompliant with applicable Election Code statutes and governing regulations as a result.

111.   From at least August 2016 until the present, the Secretary and his agents—and from at least March 2017 all Defendants—knew or should have known that the software, data, and voter information hosted on the "elections.kennesaw.edu" server at KSU had been repeatedly compromised by unauthorized access.

112.   All Defendants have known at all times material to this Complaint that no efforts have been made to remediate the compromised software programs and machines or to identify and remove any malware that was likely introduced during the lengthy security breaches referred to herein on the "elections.kennesaw.edu" server that hosted the election-specific software applications and data that are re-installed on every piece of voting and tabulation

39

equipment used to conduct Georgia's elections in advance of each election conducted using Georgia's Voting System.

113.   All Defendants, at all times material to this Complaint, knew or should have known of numerous expert opinions and academic research identifying security vulnerabilities in AccuVote DREs and advising against the use of AccuVote DREs in public elections because of their demonstrable lack of safety, reliability, and trustworthiness.

114.   All Defendants, at all times material to this complaint, knew or should have known that they were incapable of confirming the integrity of the software on AccuVote DREs and incapable of certifying that election results produced by AccuVote DREs were correct, given that malicious manipulations are generally undetectable, in part because of the inferior engineering of the system.

115.   By choosing to move forward in using the AccuVote DREs to conduct the November 2016 general election, the April and June 2017 Congressional District 6 ("CD6") Special Election Runoff and Special Election, and other elections from November 2016 to the present (the "**Relevant Past Elections**"), all Defendants caused Georgia voters to cast votes on an illegal and unreliable system that must be presumed to be compromised and that is incapable of producing verifiable results.

116.   By choosing to continue using the non-compliant system in the Relevant Upcoming Elections without taking any meaningful steps to remedy known security breaches affecting AccuVote DREs, all Defendants know that they will cause, and intend to cause, Georgia voters to cast votes in the Relevant Upcoming Elections on an illegal and unreliable voting system that must be presumed to be compromised and that is incapable of producing verifiable results.

**B.    Conduct of Defendant Secretary—Past and Threatened**

117.   KSU, CES, and King were actual and apparent agents of the Secretary, contracted and supervised by him for a purpose of providing, among other things, "technical support and training of State election officials in the use of the Statewide uniform electronic voting system[;]" "acceptance testing for the fiscal year 2018 of the GEMS software and server, [Georgia's AccuVote DREs], and the electronic poll book/encoders[;]" and "ballot building election related activities for counties and municipalities in the State of Georgia."[14]

118.   At all times material to this Complaint, KSU, CES, and King were acting further to their contractual arrangement with the Secretary, within the scope of their actual and apparent agency, and for the purpose of serving the Secretary.

---

[14] See Agreement Between the Secretary of State and The Board of Regents of the University System of Georgia, at 2 (July 13, 2017).

41

119.   In their capacity as agents for the Secretary, KSU, CES, and King

maintained software applications, password files, encryption keys, voter

information registration information, ballot building files, tabulation databases, and

other sensitive and essential information critical to the safe and secure operation of

Georgia's Voting System on the "elections.kennesaw.edu" server.

120.   After it became known that the "elections.kennesaw.edu" server was

compromised, none of the Secretary and his agents KSU, CES, and King

subsequently made adequate efforts to determine whether malicious hacking of

software, data, and voter information hosted on the "elections.kennesaw.edu"

server and used in Georgia's Voting System occurred during the at least seven-

months-long exposure of the "elections.kennesaw.edu" server content on the public

Internet.

121.   Neither the Secretary nor any of his agents, KSU, CES, and King, has

ever properly verified the integrity of, or repaired or replaced, any of the

potentially compromised software, passwords, and encryption keys that were

hosted on the "elections.kennesaw.edu" server.  As a consequence, the software,

passwords, and encryption keys that were presumably compromised all continue to

be used on the equipment that will be employed to conduct Georgia's public

elections.

42

122.   On July 7, 2017, after this action was initially filed in Fulton County Superior Court on July 3, 2017, KSU, CES, and King, acting as agents of the Secretary, destroyed all data on the hard drives of the KSU "elections.kennesaw.edu" server.

123.   On August 9, 2017, less than 24 hours after this action was removed from Fulton County Superior Court to this Court , KSU, CES, and King, acting as agents of the Secretary, destroyed all data on the hard drives of a secondary server hosted at "unicoi.kennesaw.edu", which contained similar, but not identical data, to that on the "elections.kennesaw.edu" server.

124.   On information and belief, the logfiles that contained historical records of external access from the public Internet to the "elections.kennesaw.edu" and "unicoi.kennesaw.edu" servers were deleted when all data on the respective servers' hard drives was destroyed.

125.   The Secretary intends to enforce and will enforce O.C.G.A. § 21–2–383(b) in the Relevant Upcoming Elections in all Georgia counties, and thus will require absentee electors who vote during the advance voting period in person to vote by DRE.

126.   The Secretary intends to enforce and will enforce State Election Board Rule 183–1–12–.01 in the Relevant Upcoming Elections in all Georgia counties,

and thus to require that all voters who cast ballots in person at the polls on Election Day must vote by DRE.

### C.     Conduct of Defendant State Board Members—Threatened

127.   The State Board Members, acting in their official capacity through the State Board, intend to enforce and will enforce O.C.G.A. § 21–2–383(b) in the Relevant Upcoming Elections in all Georgia counties, and thus to require absentee electors who vote during the advance voting period in person to vote by DRE.

128.   The State Board Members, acting in their official capacity through the State Board, intend to enforce and will enforce State Election Board Rule 183–1–12–.01 in the Relevant Upcoming Elections in all Georgia counties, and thus to require that all voters who cast ballots in person at the polls on Election Day must vote by DRE.

### D.     Conduct of Defendant Fulton Board Members—Past and Threatened.

129.   At all times material to this Complaint, Richard Barron ("**Barron**") was employed as the staff Director of Registration & Elections for Fulton County, in which capacity he was an actual and apparent agent of the Fulton Board and its official members, the Fulton Board Members, and was contracted and supervised by them.

130. At all times material to this Complaint, Barron acted within the scope of his agency for a purpose of serving the Fulton Board Members and the Fulton Board.

131. On April 18, 2017, Barron and the Fulton Board Members deprived numerous Fulton County voters, including Coalition member Brian Blosser, of the right to cast a ballot in the CD6 Special Election.

132. On April 22, 2017, at a Fulton Board meeting, Barron blamed the disfranchisement of CD6 voters such as Blosser on a software "glitch" of unknown origin that erroneously caused eligible voters to appear to be voters in other congressional districts or unregistered.

133. On November 7, 2017, and December 5, 2017, Barron and the Fulton Board Members aggressively blocked and prevented visual observation by Coalition's members and representatives of the Fulton Board's performance of the following election duties:

    a.   **North Fulton Annex polling place**. At the close of the polls on November 7 and December 5, at the North Fulton Annex polling place, Barron instructed polling place managers to refuse to permit Coalition Executive Director Marilyn Marks ("**Marks**") and other members of the public to observe polling

place close-down procedures, vote tabulation and printing of DRE machines' election results.  Fulton Board Members' agents and employees refused to permit Coalition's election observers within approximately 50 feet of the DRE machines and process on November 7 and refused to permit them and other members of the public into the polling place at all on December 5. The Fulton Board Members' agents and employees threatened Marks and others with arrest on both occasions, and some members of the public were forcefully escorted from the premises by law enforcement on Barron's instructions. Marks and others filed formal complaints with the Fulton Board which remain unanswered.

b.  **North Fulton Annex satellite location.**  On November 7 and December 5, at the North Fulton Annex satellite location, Barron instructed officials not to permit Marks, Missett, and others to observe the implementation of chain of custody procedures or the handling of the memory cards and provisional ballots received from Fulton County precincts before tabulation. Marks, Missett, and other members were prevented

46

from observing the uploading and electronic transmission of
AccuVote DRE memory cards and from entering or seeing into
the room in which this important process was occurring behind
closed doors.

c.   **English Street Warehouse**. On November 7 and December 5,
at the Board's English Street Warehouse, Barron instructed
officials not to permit Marks, Missett, and others to observe the
public meeting of the Fulton Board Members at which central
tabulation of election results was conducted.  On November 7,
security guards, operating at Barron's instruction, aggressively
demanded that Marks and another Coalition representative
leave the premises of the building where the Board meeting was
taking place and the vote tabulation was being conducted.  On
Barron's instruction, the security guards threatened Marks and
another Coalition representative with physical removal from
premises, despite their presence being entirely non-disruptive
and despite the press and other members of the public being
allowed to attend. On December 5, Barron permitted Marks and
Missett to remain in the building during tabulation but did not

allow them to come within 50 feet of documents or discussions, which effectively deprived Marks and Missett of the ability to observe.

134. By preventing public observation of the performance of their duties, the Fulton Board Members violated their statutory duty to "perform their duties in public," O.C.G.A. § 21–2–406, and also violated the statutory requirement that "all proceedings at the tabulating center and precincts shall be open to the view of the public," O.C.G.A. § 21–2–379.11. The Fulton Board Members thereby injured Coalition and its representatives by depriving them of their corresponding implied state-created informational rights to observe election officials performing their duties and to obtain public information.  The conduct of local official such as Barron and the State Board aggravate the injuries to the constitutional rights of Coalition's members attributable to Defendants Kemp and the State Board by preventing any public assessment of the integrity of Georgia's elections.

135. With the authorization of Defendants Kemp and the State Board, the Fulton Board Members intend to continue to prevent the public from observing the performance these duties in the Relevant Upcoming Elections in Fulton County.

136. With the authorization of Defendants Kemp and the State Board, the Fulton Board Members intend to enforce Election Rule 183-1-12-.01 concerning

election day use of DREs and will thus enforce O.C.G.A. § 21–2–383(b) in the Relevant Upcoming Elections in Fulton County, requiring absentee electors who vote in person during the early voting period to vote by AccuVote DRE.

137.   With the authorization of Defendants Kemp and the State Board, the Fulton Board Members, acting in their official capacities on behalf of the Fulton Board, intend to enforce and will enforce State Election Board Rule 183–1–12–.01 in the Relevant Upcoming Elections in all Fulton County, and thus to require all voters who cast ballots in person at the polls on Election Day to vote by AccuVote DRE.

138.   With the authorization of Defendants Kemp and the State Board, the Fulton Board Members have adopted voting procedures under which individual electronic ballots bearing a unique identifier are transmitted from Fulton County's AccuVote DREs located in satellite voting centers to Fulton County's central GEMS tabulation server in clear text (i.e., unencrypted) over an ordinary, unsecured telephone line on Election Night. This practice violates fundamental security principles because it subjects the transmitted votes to manipulation (such as man-in-the-middle interception and substitution of votes) and exposes the votes with their unique identifier to third-party interception, violating voters' rights of secrecy in voting.

E.    **Standing of Plaintiff Coalition**

139.   Coalition has organizational standing on its own behalf and associational standing on behalf of Coalition's individual members to bring each of the claims for prospective relief stated in this Third Amended Complaint.

1.    **Coalition Has Organizational Standing Derived from Past and Threatened Direct Injuries to Coalition.**

140.   Coalition has organizational standing, on its own behalf, to bring each of the claims for prospective relief stated in this Third Amended Complaint because Coalition has been and will be directly harmed by having to divert its own personnel and resources to counteract Defendants' unconstitutional enforcement of laws and regulations requiring Georgia voters to use DREs.

141.   Coalition possess a legally cognizable interest in pursuing its organizational goals without having to divert resources and personnel to counteract Defendants' illegal acts.

142.   Defendants' prior and intended imminent enforcement of O.C.G.A. § 21–2–383(b) and State Election Board Rule 183–1–12–.01 have caused and will cause Coalition to divert resources and personnel to counteract Defendants' illegal acts.  Specifically, Coalition has been and will be required by Defendants' past and intended conduct to do the following:

- Divert Coalition's scarce organizational funds since April 2017 to pay the fees of lawyers for advice and representation, litigation expenses, consulting expert expenses, travel expenses for Coalition's personnel, and research and copying costs required by Coalition's efforts to document and resist Defendants' enforcement of laws and regulations requiring Coalition's members to vote on DREs;

- Divert approximately 90% of the time of Coalition's Executive Director Marilyn R. Marks since April 2017 to participation in and management of Coalition's litigation, educational, and investigative efforts undertaken to counteract Defendants' conduct in Georgia—time that the Executive Director would otherwise have devoted to Coalition's ongoing efforts including but not limited to researching and promoting and  new post-election Risk Limiting Audit techniques in Colorado; advocacy of secret ballot and voter privacy principles in North Carolina seeking a change in state policy; researching security failures in North Carolina voter registration databases, and advocating for enhanced security; assisting members in researching South Carolina voting system security failures and impacts; educating Colorado voters on the negative impacts of new ballot-selfie laws; assisting Colorado members with organizing plans for a petition for a special election; publishing educational commentary related to election security

51

and transparency issues; educating public and officials on the dangers of internet voting through publishing and public speaking; assisting in research and planning for film documentary on election security; training members in Colorado for canvass board member duties; assisting Georgia members in evaluating ballot access laws; participating in press interviews regarding election security issues; speaking to civic groups on election security; assisting Colorado members in challenging public records violations for ballots in recent county assembly elections; and assisting members experiencing with problems in accessing public election records in numerous jurisdictions.

- Divert Coalition's organizational personnel and financial resources away from Coalition's established ongoing efforts to conduct research on new voting systems being used in Tennessee and considered in Georgia and other States and summarizing and providing that information to Coalition's members; and

- Divert Coalition's organizational personnel and financial resources away from Coalition's established ongoing efforts to market Coalition to new members and thereby grow Coalition's membership.

143. Defendants' past and imminent future invasions of Coalition's legally protected interests in pursuing its own organizational goals and projects have thus

caused and will continue to cause concrete and particularized harms to Coalition in the form of diverted organizational personnel and financial resources.

144.   Coalition has been directly harmed by the conduct of the Fulton Board Members and their agent Barron, done with the authorization of Defendants Kemp and the State Board, which deprived Coalition of its informational rights to observe election officials performing their duties and to obtain public information in furtherance of Coalition's mission of educating and informing its membership.

### 2.   Coalition Has Associational Standing Derived from Past and Threatened Injuries to Coalition's Members.

145.   Coalition also has associational standing, on behalf of Coalition's individual Georgia members threatened with imminent injury-in-fact, to bring each of the claims for prospective relief stated in this Third Amended Complaint because: (1) at least one of Coalition's members would have standing to sue each Defendant on each claim in his or her own right; (2) the interests Coalition seeks to protect are germane to Coalition's organizational purpose described above; and (3) the prospective injunctive and declaratory relief requested does not require the participation of Coalition's individual members in this lawsuit.

146.   At all times since this case was initially filed in Fulton County Superior Court on July 3, 2017, Coalition's membership has included at least one

eligible elector of the State of Georgia who is a resident in each of Fulton County,
Cherokee County, Cobb County, and DeKalb County.

147.   In each of the Relevant Past Elections, the Secretary and State Board
Members (acting through the State Board) have authorized and required local
official such as Barron, and the Fulton Board Members to enforce and threaten to
enforce O.C.G.A. § 21–2–383(b) and State Election Board Rule 183–1–12–.01.

*Standing of Coalition's Individual Members*

148.   The following Coalition members, whose standing to sue is a
predicate to Coalition's associational standing, have standing because each of them
suffered concrete and particularized harms and are now threatened with imminent
additional injury-in-fact as a result of Defendants' prior and intended future
unconstitutional enforcement of O.C.G.A. § 21–2–383(b) and State Election Board
Rule 183–1–12–.01 and prior and intended deprivations of the right to observe
election officials in the conduct of their duties.

*Past Injury*

a)      **Virginia R. Forney (Fulton County)**

149.   Virginia R. Forney, ("**Forney**") has been a member of Coalition since
2015.

54

150.   Forney, an elector of Fulton County, voted in person either during early voting or on Election Day at the polls in all Relevant Prior Elections, requiring her to vote on an AccuVote DRE.  Forney is a physician by profession, and multiple patients and others associated with her practice were candidates on the November 2017 City of Atlanta and Fulton County ballot.  Forney's work schedule required that she vote early before Election Day in the November 7 election. Aware that a ballot cast by AccuVote DRE was capable of being traced to her and that the risk was particularly enhanced in an early voting polling location with low traffic, and also fearing that her practice would suffer if her vote preferences became known, Forney skipped casting a vote in at least one race to avoid the risk of personal pecuniary harm.

### b)    Brian Blosser (Fulton County)

151.   Brian Blosser, ("**Blosser**") has been a member of Coalition since January 2018.

152.   Blosser was prohibited from voting on April 18, 2017, in the CD6 Special Election when his name did not appear on the eligible voter rolls for CD6, and was instead erroneously listed as a resident of CD11.  Blosser was not permitted to vote a provisional ballot, even after he made repeated attempts to have Fulton County election officials correct this system error. At a public meeting on

April 22, 2017, Barron and the Fulton Board Members blamed this error on a "software glitch."

### c) Megan Missett (Fulton County)

153. Member Plaintiff Megan Missett, an elector of Fulton County, voted by DRE in each of the last several elections for which she was eligible, including most recently, the Fulton County November 2017 election and December 2017 runoff. Missett was deprived of her right to vote in a verifiable, reliable election conducted in a manner that ensured that her vote would be counted accurately. Missett was deprived of her right to participate in the public observation of the December 5, 2017, runoff election in the City of Atlanta and was thereby deprived of access to public information concerning the election.

### d) Mr. and Ms. Digges (Cobb County)

154. Member Plaintiffs Mr. and Ms. Digges, electors of Cobb County, voted a mail-in paper absentee ballot in the June 2017 CD6 Special Election Runoff despite their preferences to vote in their neighborhood precinct on Election Day. Mr. and Ms. Digges chose to vote by mail-in paper absentee ballot because they were aware that an electronic ballot cast using an AccuVote DRE was insecure, not verifiable or re-countable, and incapable of being guaranteed to be a secret ballot. In order to cast their absentee ballots by mail, Mr. and Ms. Digges

were required to undergo the inconvenience of requesting paper ballot and the cost of postage required to mail their ballots.  In addition, by choosing to vote by using a mail-in absentee ballot, Mr. and Ms. Digges became subject to the corresponding need to place their ballots in the mail well before Election Day to ensure timely delivery and the ability to confirm timely receipt.  Accordingly, Mr. and Ms. Digges were deprived of the ability to await the latest campaign information before making their voting decisions and voting as part of their community in their home precinct along with their neighbors.

### e)  Mr. Davis (Cherokee County)

155.   Member Plaintiff Ricardo Davis, an elector of Cherokee County, voted a mail-in paper absentee ballot in all prior elections for over 10 years (including the November 8, 2016, election), with the exception of Cherokee County Special Election on November 7, 2017.  As an Information Technology professional, Davis has been keenly aware of the security and reliability deficiencies of AccuVote DREs and that a vote cast on such voting units cannot be audited or recounted, and that the secrecy of such a vote cannot be guaranteed. To avoid these burdens on his right to vote, Davis avoided voting on a DRE, and instead took steps to cast his votes by mail-in absentee paper ballot.  In order to do so, Mr. Davis was required to undergo the inconveniences of requesting paper

ballot and the costs of postage necessary to mail his ballot. In addition, because he chose to vote by means of mail-in absentee paper ballots, Mr. Davis was forced to place his voted ballots in the mail well before Election Day to ensure their timely delivery and to give himself the ability to ensure receipt. Accordingly, Mr. Davis was deprived of the ability to await the latest campaign information before making his voting decisions and to vote on Election Day along with his community members in his nearby neighborhood precinct.

156. In the November 7, 2017, Cherokee County Special Election, Davis was unable to submit his mail-in ballot application in time, so he was required to choose between not voting at all and voting by AccuVote DRE.

157. All of the foregoing Coalition members were injured by being required to vote in an election conducted using AccuVote DREs, which deprived them of their right to participate in a trustworthy and verifiable election process that safely, accurately, and reliably records and counts all votes cast and that produces a reliable election result capable of being verified as true in a recount or election contest.

158. All of the foregoing Coalition members were additionally injured by being required by Defendants to cast votes on AccuVote DREs—and thereby to

suffer violations of their constitutional rights—as a condition of being permitted by Defendants to enjoy the benefits and conveniences of casting a ballot in person.

*Imminent Future Injury*

159.   Each of Coalition's foregoing members intends to vote in each of the Relevant Upcoming Elections in his or her respective county.

160.   Each of Coalition's Georgia members will be required to cast their votes in the Relevant Upcoming Elections using Georgia's AccuVote DREs or to suffer the burdens required to obtain and cast a mail-in absentee ballot as an alternative.

161.   Each of Coalition's Georgia members will again be exposed to all the same injuries they have suffered in the past if Defendants again enforce O.C.G.A. § 21–2–383(b) and State Election Board Rule 183–1–12–.01 in the Relevant Upcoming Elections.

162.   Each of Coalition's Georgia members voting in the Relevant Upcoming Elections, if required to vote using an unreliable, untrustworthy AccuVote DRE, will be irreparably harmed in the following ways:

- By suffering burdens and infringements on the fundamental right to vote caused by having to use a voting machine that

59

cannot be relied upon for a trustworthy and verifiable election result;

- By suffering burdens and infringements on the fundamental right to vote caused by having to use a voting machine that cannot guarantee a secret ballot;

- By suffering burdens and infringements on the First Amendment right to anonymous free speech and association caused by having to use a voting machine that cannot guarantee a secret ballot;

- By suffering unequal protection of the state right to a secret ballot caused by having to use a voting machine that cannot guarantee a secret ballot, while similarly situated absentee electors who vote a mail-in ballot in the same election are allowed to vote a secret ballot;

- By suffering the arbitrary and capricious deprivation without due process of the state right to a secret ballot caused by having to use a voting machine that cannot guarantee a secret ballot;

- By having to endure the foregoing constitutional deprivations as the condition of being allowed to cast a ballot in person at the polls, either during advance voting or on Election Day.

163. Each of Coalition's Georgia members voting in the Relevant Upcoming Elections will be irreparably harmed in the exercise of the fundamental right to vote if his or her votes are tabulated together with the votes of **other** voters who cast their ballots using unreliable, untrustworthy AccuVote DREs.

164. Each of Coalition's Georgia members who to cast his or her individual ballots using AccuVote DREs will be irreparably harmed in the exercise of their constitutional, fundamental right to vote in the Relevant Upcoming Elections if they are required to cast their individual ballots using—or in an election in which anyone used—AccuVote DREs.

165. Each of the foregoing harms to each of Coalition's Georgia members is imminent for standing purposes because each of the Relevant Upcoming Elections is set to occur on a fixed date not later than eighteen months after the date when this action was filed in Fulton County Superior Court on July 3, 2017.

166. None of Coalition's Georgia members can be adequately compensated for these harms in an action at law for money damages brought after the fact because the violation of constitutional rights is an irreparable injury.

61

## VII.  CLAIMS

### COUNT I: FUNDAMENTAL RIGHT TO VOTE

### 42 U.S.C. § 1983

**Threatened Infringement of the Fundamental Right to Vote in Violation of the Fourteenth Amendment's Guarantee of (Substantive) Due Process**

**(Right to a trustworthy and verifiable election; Unconstitutional condition)**

*(Seeking declaratory and injunctive relief against all Defendants)*

167.   Plaintiff Coalition incorporates and realleges each of the foregoing Paragraphs 1 through 166.

168.   The right of all eligible citizens to vote in public elections is a fundamental right of individuals that is protected by the United States Constitution and incorporated against the States by the Due Process Clause of the Fourteenth Amendment.

169.   Inherent in individuals' fundamental right to vote is the right to participate in a trustworthy and verifiable election process that safely, accurately, and reliably records and counts all votes cast and that produces a reliable election result capable of being verified as true in a recount or election contest.

170.   By requiring the Member Plaintiffs and other members of Coalition to vote using AccuVote DREs in the Relevant Upcoming Elections, Defendants Kemp, the State Board Members, and the Fulton Board Members will knowingly

62

burden severely and infringe upon the fundamental right to vote of the Member

Plaintiffs and other members of Coalition and will injure Coalition by causing it to

divert resources and personnel from other ongoing projects.

171.   These severe burdens and infringements that will be caused by

Defendants' conduct will violate the fundamental right to vote of the Member

Plaintiffs and other members of Coalition.

172.   These severe burdens and infringements that will be caused by

Defendants' conduct are not outweighed or justified by, and are not necessary to

promote, any substantial or compelling state interest that cannot be accomplished

by other, less restrictive means, like conducting the Relevant Upcoming Elections

using paper ballots.

173.   Requiring voters to suffer these severe burdens and infringements

upon their constitutional right to vote as a condition of being able to enjoy the

benefits and conveniences of being permitted to cast their ballots in person at the

polls violates the unconstitutional-conditions doctrine.

174.   The foregoing violations will occur as a consequence of Defendants

Kemp, the State Board Members, and the Fulton Board Members acting under

color of state law. Accordingly, Coalition and the Member Plaintiffs bring this

cause of action for prospective equitable relief against Defendants Kemp, the State

Board Members, and the Fulton Board Members pursuant to 42 U.S.C. § 1983.

175. Unless Defendants Kemp, the State Board Members, and the Fulton

Board Members are enjoined by this Court, then the Coalition Plaintiffs will have

no adequate legal, administrative, or other remedy by which to prevent or

minimize the irreparable, imminent injury that is threatened by Defendants'

intended conduct. Accordingly, injunctive relief against these Defendants is

warranted.

**WHEREFORE**, Plaintiff respectfully requests that this Court preliminarily

and permanently enjoin Defendants Kemp, the State Board Members, and the

Fulton Board Members from enforcing O.C.G.A. § 21–2–383(b) and State Election

Board Rule 183–1–12–.01; and from requiring voters to vote using DREs; and

grant such other relief as may be warranted.

## COUNT II:  EQUAL PROTECTION

## 42 U.S.C. § 1983

**Threatened Infringement of the Fourteenth Amendment's Guarantee of Equal Protection**

**(fundamental right to vote, the right to freedom of speech and association, and the Georgia state constitutional right to a secret ballot; unconstitutional condition)**

*(Seeking declaratory and injunctive relief against all Defendants)*

176.   Plaintiff Coalition incorporates and realleges each of the foregoing Paragraphs 1 through 166.

177.   By requiring the Member Plaintiffs and other members of Coalition to vote using AccuVote DREs in the Relevant Upcoming Elections, Defendants Kemp, the State Board Members, and the Fulton Board Members will knowingly treat the Member Plaintiffs and other members of Coalition who vote by DRE differently than other, similarly situated electors in the same election who vote using mail-in paper ballots.

178.   Because of this differential treatment, Member Plaintiffs and other members of Coalition who vote by DRE will suffer greater and more severe burdens and infringements on their underlying substantive rights—namely, the fundamental right to vote, the right to freedom of speech and association, and the

Georgia state constitutional right to a secret ballot—than will other, similarly situated electors.

179.   These severe burdens and infringements that Defendants will impose unequally on Member Plaintiffs and other members of Coalition who vote by DRE will violate the Equal Protection Clause of the Fourteenth Amendment.

180.   These severe burdens and infringements that will be caused by Defendants' conduct are not outweighed or justified by, and are not necessary to promote, any substantial or compelling state interest that cannot be accomplished by other, less restrictive means, like conducting the Relevant Upcoming Elections using paper ballots.

181.   Requiring voters to be deprived of their constitutional right to equal protection of the laws as a condition of being able to enjoy the benefits and conveniences of voting in person at the polls violates the unconstitutional-conditions doctrine.

182.   The foregoing violations will occur as a consequence of Defendants Kemp, the State Board Members, and the Fulton Board Members acting under color of state law. Accordingly, Coalition and the Member Plaintiffs bring this cause of action for prospective equitable relief against Defendants Kemp, the State Board Members, and the Fulton Board Members pursuant to 42 U.S.C. § 1983.

183.    Unless Defendants Kemp, the State Board Members, and the Fulton Board Members are enjoined by this Court, then the Coalition Plaintiffs will have no adequate legal, administrative, or other remedy by which to prevent or minimize the irreparable, imminent injury that is threatened by Defendants' intended conduct.  Accordingly, injunctive relief against these Defendants is warranted.

**WHEREFORE**, Plaintiff respectfully requests that this Court preliminarily and permanently enjoin Defendants Kemp, the State Board Members, and the Fulton Board Members from enforcing O.C.G.A. § 21–2–383(b) and State Election Board Rule 183–1–12–.01; and from requiring voters to vote using DREs; and grant such other relief as may be warranted.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A.    Enter a judgment finding and declaring it unconstitutional for any public election to be conducted using any model of DRE voting unit;

B.    Enter a preliminary and permanent injunction prohibiting Defendants Kemp, the State Board Members, and the Fulton Board Members from enforcing O.C.G.A. § 21–2–383(b) and State Election Board Rule 183–1–12–.01 and from requiring voters to vote using DREs;

67

C.      Enter a preliminary and permanent injunction prohibiting Defendants Kemp, the State Board Members, and the Fulton Board Members from conducting or authorizing the conduct of any public election using optical scanned paper ballots without requiring the conduct in each case of post-election audits of paper ballots to verify the results reported by the tabulation machines;

D.      Enter a preliminary and permanent injunction prohibiting Defendants Kemp, the State Board Members, and the Fulton Board Members from conducting or authorizing the conduct of any public election without requiring subordinate election officials to permit, meaningful public observation of all stages of election processing;

E.      Retain jurisdiction to ensure all Defendants' ongoing compliance with the foregoing Orders.

F.      Grant Plaintiff an award of its reasonable attorney's fees, costs, and expenses incurred in this action pursuant to 42 U.S.C. § 1988; and

G.      Grant Plaintiff such other relief as the Court deems just and proper.

Dated: April 4, 2018.

                              Respectfully submitted,

                              */s/ Robert A. McGuire, III*
                              Robert A. McGuire, III
                              Admitted Pro Hac Vice (ECF No. 125)

ROBERT MCGUIRE LAW FIRM
2703 Jahn Ave NW, Suite C-7
Gig Harbor, WA 98335
T: (844) 318-6730

*Attorney for Plaintiff Coalition for Good Governance*


/s/ Cary Ichter
Cary Ichter
Georgia Bar No. 382515
cichter@IchterDavis.com

Ichter Davis, LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, GA 30326
Tel.: 404.869.5243
Fax: 404.869.7610

*Attorney for Plaintiffs Coalition for Good Governance, William Digges III, Laura Digges, Ricardo Davis, and Megan Missett*


/s/ Bruce P. Brown
Bruce P. Brown
Georgia Bar No. 064460
bbrown@brucepbrownlaw.com

Bruce P. Brown Law LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

*Attorney for Plaintiff Coalition for Good Governance*

/s/ William Brent Ney
William Brent Ney
GA Bar Number 542519

NEY HOFFECKER PEACOCK & HAYLE, LLC
One Midtown Plaza, Suite 1010
1360 Peachtree Street NE
Atlanta, GA 30309
T: (404) 842-7232

*Attorney for Plaintiffs Coalition for Good Governance, William Digges III, Laura Digges, Ricardo Davis, and Megan Missett*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## FIRST SUPPLEMENTAL COMPLAINT OF PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES, WILLIAM DIGGES III, RICARDO DAVIS, AND MEGAN MISSETT



**Exhibit**
CGG 0004

# TABLE OF CONTENTS

I.   INTRODUCTION ................................................................1

II.  PARTIES ......................................................................5

     A.   Plaintiffs ............................................................5

          1.   Plaintiff Coalition for Good Governance..................5

          2.   Coalition's Member Plaintiffs.............................5

     B.   Defendants ..........................................................5

          1.   Defendants Secretary of State............................5

          2.   Defendant State Board Members ......................5

          3.   Defendant Fulton Board Members ............................6

III. JURISDICTION AND VENUE ..............................................6

IV.  APPLICABLE LAW GOVERNING THE DOMINION BMD SYSTEM ....6

     A.   2019 HB 316's Key Changes to Georgia's Election Code .................6

     B.   Georgia's Voting System Certification Process....................8

          1.   Qualification Testing .....................................9

          2.   Certification Tests ......................................11

     C.   Functional Requirements for BMD Voting Systems .........................12

V.   GENERAL ALLEGATIONS................................................18

     A.   How Voting Works on the Dominion BMD System .........................18

     B.   Certification and Award ..........................................24

C.      The Dominion BMD System Is Constitutionally Defective and Not a Lawful Replacement for DRE System .................................................25

D.      The Upcoming BMD Elections ..........................................................27

VI.     REQUIRING VOTERS TO USE THE DOMINION BMD SYSTEM SEVERELY BURDENS THE RIGHTS OF GEORGIA VOTERS .............28

A.      The Dominion BMD System Forces In-Person Voters to Cast Ballots Without Being Able to Read or Verify The QR-Encoded Votes They Are Casting ..........................................................................................28

B.      Many In-Person Voters Will Be Unable to Verify Even the Human Readable Text Portions of Their Dominion BMD Ballots .................31

C.      Ballots Cast on the Dominion BMD System Are Not Secret Ballots.34

D.      The Dominion BMD System Does Not Create An Independent, Accountable Record of Voters' Choices ............................................36

E.      The Design of the Dominion BMD System Deprives Officials of Any Way to Confirm Equipment Malfunctions .........................................38

F.      Audits Examine Different Expressions of Voter Intent Than Official Counts—But Only for In-Person Voters ............................................39

G.      The Dominion BMD System Is Illegal To Use Because the Secretary's Improper Certification of the System Is Void .................41

        1.      Qualification Testing Has Not Been Performed As Required By the Certification Rule ................................................................41

        2.      Certification Testing Has Not Been Performed As Required By the Certification Rule ................................................................43

        3.      The Secretary's Certification of the Dominion BMD System Is Void and the System Is Not Legal to Use in Georgia ..............44

H. The State's Electronic Security Practices Render the BMD System Even More Vulnerable to Hacking and Malicious Manipulation Than The DRE System Was .......................................................................... 45

    1. QR Codes Create Inherently High-Risk Applications .............. 45

    2. The Dominion BMD System Will Inevitably Be Exposed to Compromised Components of the DRE System That Have Still Never Been Examined for, Much Less Cleansed of, Malware 48

    3. The State Has Still Not Improved Its Computer Security Practices, So New Exposures to Hacking and Malicious Manipulation Are All But Certain to Occur ............................ 51

I. Implementation of the BMD System in Time to Conduct the Upcoming BMD Elections Is Impractical, Exposing Georgia Voters to Electoral Disaster ........................................................................ 52

    1. The Scale of Georgia's Implementation Task Is Unprecedented ................................................................................................ 52

    2. Implementation Will Inevitably Be Delayed By the State's Required Re-Examination of the Dominion BMD System ...... 55

VII. STANDING .................................................................................... 56

A. Standing of the Member Plaintiffs ...................................... 57

    1. Imminent Threat of Injury-in-Fact .......................................... 57

    2. Causation .................................................................................. 59

    3. Redressability .......................................................................... 59

B. Standing of Coalition ........................................................... 59

    1. Associational standing ............................................................ 59

        a) Members have standing to sue in their own right .......... 60

|  |  | b) | Interests at stake are germane to organization's purpose ...................................................................60 |
|---|---|---|---|
|  |  | c) | Neither claim nor relief requires participation of individual members .....................................................61 |
|  | 2. | Organizational standing ..................................................61 |  |
|  |  | a) | Injury-in-Fact ................................................................61 |
|  |  | b) | Causation ......................................................................62 |
|  |  | c) | Redressability ...............................................................62 |
| VIII. | CLAIMS | ...........................................................................................62 |  |
|  | COUNT I: FUNDAMENTAL RIGHT TO VOTE .......................62 |  |  |
|  | COUNT II: EQUAL PROTECTION ............................................65 |  |  |
|  | COUNT III: DUE PROCESS ......................................................67 |  |  |
| IX. | PRAYER FOR RELIEF ................................................................69 |  |  |

Pursuant to Rule 15(d) of the Federal Rules of Civil Procedure, the Coalition Plaintiffs,[1] in this supplemental complaint, hereby set out the following transactions, occurrences, and events that happened after the relation-back date of the Coalition Plaintiffs' Third Amended Complaint (the "**TAC**," Doc. 226). The allegations and claims stated by this supplemental complaint are additional to, and do not supersede or replace, the allegations and claims stated in the TAC.

## I. INTRODUCTION

1. This Court held on September 17, 2018, that the U.S. Constitution requires "transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote." *Curling v. Kemp*, 334 F. Supp. 3d 1303, *aff'd in part, appeal dismissed in part*, No. 18-13951, 2019 WL 480034 (11th Cir. Feb. 7, 2019).

2. Counsel for the State Defendants subsequently told this Court on the record that the State of Georgia "took that [order] to heart"—specifically, by adopting legislation switching the state to a voting system that uses "ballot marking devices" ("**BMDs**"). According to counsel for the State, the new legislation:

---

[1] The "**Coalition Plaintiffs**" are individual Plaintiffs LAURA DIGGES, WILLIAM DIGGES III, RICARDO DAVIS, and MEGAN MISSETT (the "**Member Plaintiffs**"), together with organizational Plaintiff COALITION FOR GOOD GOVERNANCE ("**Coalition**").

> changes a number of areas of the Georgia Election Code
> but with respect to this case specifically the DRE issue
> and allows the state to implement new voting machines
> and a new voting system—a back end system also that
> will address—it addresses the concerns of the Court with
> the outdated machines.

(Tr. Status Conf. (Apr. 9, 2019), at 4:22–5:12.)  The State's counsel was referring

to 2019 HB 316, or Act 24 ("**HB 316**").

    3.    On April 2, 2019, Governor Kemp signed HB 316 into law.  This new

law mandates the implementation of a new uniform statewide voting system that

uses

> scanning ballots marked by electronic ballot markers and
> tabulated by using ballot scanners  for voting at the polls
> and for absentee ballots cast in person  unless otherwise
> authorized by law; provided, however, that such
> electronic ballot markers shall produce paper ballots
> which are marked with the elector's choices in a format
> readable by the elector.

O.C.G.A. § 21–2–300(a)(2).

    4.    HB 316 requires that the BMD system, following its certification as

"safe and practicable for use" by the Secretary of State, must be used in all federal,

state, and county elections in Georgia "for voting at the polls and for absentee

ballots cast in person." O.C.G.A. § 21–2–300(a)(2); *see also* O.C.G.A. § 21–2–

383(c).

5.     On July 29, 2019, the Secretary issued notice of his intent to select the Dominion Voting System (EAC Certification Number DVS-DemSuite 5.5-A) (the "**Dominion BMD System**"), sold by Dominion Voting Systems, Inc., to be the new BMD system that will replace Georgia's current, unconstitutional DRE voting system. (Docs. 552, 575.)

6.     As shown below in this supplemental complaint, the Dominion BMD System <u>cannot</u> be safely or lawfully used.  This is true because the system:

- does not meet Georgia's legal requirements for a lawful voting system,

- shares the same kinds of security flaws as Georgia's existing unconstitutional DRE voting system,

- has not been properly tested by the Secretary,

- was improperly certified and thus is illegal to use in Georgia,

- even if operated as designed, fails to produce verifiable, accountable, and auditable vote totals and election results,

- if used to conduct Georgia elections, will severely and unequally burden the constitutional rights of Georgia voters,

- if used to conduct Georgia elections, will deprive Georgia voters of their state constitutional right to a secret ballot, and

- cannot, in any event, practically be implemented within the time frame required to replace the constitutionally deficient DRE voting system, which this Court has ordered the State to discontinue using after the end of 2019.  (Doc. 579.)

7.     Despite these deficiencies, the Secretary intends for Georgia to use the Dominion BMD System to conduct all elections that will be held in the State of Georgia beginning with (1) the pilot BMD elections for a limited number of November 5, 2019 elections; and continuing with (2) all elections from the March 24, 2020 presidential primary election onward (all of the foregoing-described elections, the "**Upcoming BMD Elections**.")

8.     At each of the Upcoming BMD Elections, the State Defendants and the Fulton County Defendants intend to enforce newly enacted O.C.G.A. § 21–2–300(a)(2) and  § 21–2–383(c), both of which require all in-person voters—including absentee in-person voters and Election Day voters—to vote using the Dominion BMD System.

9.     Because the Dominion BMD System suffers from numerous legal, functional, and security defects, it fails to satisfy any of the requirements that this Court has held to be essential to constitutional accountable voting processes.

10.    This supplemental complaint seeks prospective preliminary and

permanent injunctive relief prohibiting the Defendants in each of the Upcoming

BMD Elections from employing the Dominion BMD System.

## II.    PARTIES

### A.    Plaintiffs

#### 1.    Plaintiff Coalition for Good Governance

11.    The allegations stated by Paragraphs 18 through 23 of the TAC are

adopted here pursuant to Rules 10(b) and 10(c).

#### 2.    Coalition's Member Plaintiffs

12.    The allegations stated by Paragraphs 24 through 27 of the TAC are

adopted here pursuant to Rules 10(b) and 10(c).

### B.    Defendants

#### 1.    Defendants Secretary of State

13.    The allegations stated by Paragraphs 32 through 34 of the TAC are

adopted here pursuant to Rules 10(b) and 10(c).

14.    Defendant BRAD RAFFENSPERGER ("**Raffensperger**" or the

"**Secretary**") is now substituted for former Secretary of State Brian Kemp.

#### 2.    Defendant State Board Members

15.    The allegations stated by Paragraphs 35 through 37 of the TAC are

adopted here pursuant to Rules 10(b) and 10(c).

### 3.    Defendant Fulton Board Members

16.    The allegations stated by Paragraphs 38 through 39 of the TAC are adopted here pursuant to Rules 10(b) and 10(c).

## III.   JURISDICTION AND VENUE

17.    The allegations stated by Paragraphs 41 through 45 of the TAC are adopted here pursuant to Rules 10(b) and 10(c).

## IV.   APPLICABLE LAW GOVERNING THE DOMINION BMD SYSTEM

### A.    2019 HB 316's Key Changes to Georgia's Election Code

18.    Following enactment of HB 316, Georgia's Election Code now requires that the "equipment used for casting and counting votes in county, state, and federal elections shall be the same in each county of this state and shall be provided to each county by the state, as determined by the Secretary of State." O.C.G.A. § 21–2–300(a)(1).

19.    The voting system furnished by the State must be "a uniform system of electronic ballot markers and ballot scanners." O.C.G.A. § 21–2–300(a)(3).

20.    HB 316 defines "electronic ballot marker"—the official term for a BMD—to mean:

> an electronic device that that does not compute or retain votes; may integrate components such as a ballot scanner, printer, touch screen monitor, audio output, and a navigational keypad; and  uses electronic technology to independently and privately mark a paper ballot at the

direction of an elector, interpret ballot selections,
communicate such interpretation for elector verification,
and print an elector verifiable paper ballot.

O.C.G.A. § 21–2–2(7.1).

21.    HB 316 provides that the voting system using BMDs must: "Produce

a paper ballot which is marked with the elector's choices in a format readable by

the elector."  O.C.G.A. § 21–2–379.22(6) (emphasis added)

22.    According to HB 316, "[a]s soon as possible" after the Secretary

certifies a new BMD system to be "safe and practicable for use," "all federal, state,

and county general primaries and general elections as well as special primaries and

special elections in the State of Georgia shall be conducted with the use of

scanning ballots marked by electronic ballot markers and tabulated by using ballot

scanners." O.C.G.A. § 21–2–300(a)(2).

23.    HB 316 provides that, following the new BMD system's certification

as "safe and practicable for use" by the Secretary of State, BMDs must be used as

the voting method "for voting at the polls and for absentee ballots cast in person"

in all federal, state, and county elections in Georgia. O.C.G.A. § 21–2–300(a)(2);

*see also* O.C.G.A. § 21–2–383(c).

24.     In such elections, the BMD system must be used "for voting at the

polls and for absentee ballots cast in person, unless otherwise authorized by law."

O.C.G.A. § 21–2–300(a)(2).

25.     The Election Code reinforces that in-person absentee voters must use

BMDs by providing a second time that,

> [I]n jurisdictions in which electronic ballot markers are
> used in the polling places on election day, such electronic
> ballot markers shall be used for casting absentee ballots
> in person at a registrar's or absentee ballot clerk's office
> or in accordance with Code Section 21-2-382, providing
> for additional sites.

O.C.G.A. § 21–2–383(c).

26.     The requirement that voters use BMDs does not apply to absentee

voters who do not vote in person.  O.C.G.A. § 21–2–385(a).  Absentee voters who

do not vote in person are still able to vote on paper absentee ballots that must be

returned by mail or personal delivery.  *Id*.

**B.     Georgia's Voting System Certification Process**

27.     BMD voting systems may not lawfully be sold by vendors or used in

an election in Georgia until and unless the Secretary has certified that the BMD

system "can be safely and accurately used by electors at primaries and elections."

O.C.G.A. § 21–2–379.24(b)–(d).

28. HB 316 provides that the State's new uniform BMD voting system must be used for all state, federal and county elections in the State "[a]s soon as possible, once such equipment is certified by the Secretary of State as safe and practicable for use." O.C.G.A. § 21–2–300(a)(2).

29. The Secretary has adopted a rule on Certification of Voting Systems that governs his certification of the Dominion BMD System. *See* Ga. Comp. R. & Reg. r. 590–8–1–.01 (Doc. 555, at 15–22, the "**Certification Rule**").

### 1. Qualification Testing

30. The Certification Rule requires "qualification testing" as a prerequisite to certification of a new voting system for use in Georgia.

31. The Certification Rule provides:

> Qualification tests shall be performed to evaluate the degree to which a system complies with the requirements of the *Voting Systems Standards* issued by the Election Assistance Commission (EAC).

Ga. Comp. R. & Reg. r. 590–8–1–.01(d).

32. The "Voting Systems Standards" referenced in the Certification Rule are the "Voting System Standards" (the "**2002 VSS**"), which were issued in 2002 by the Federal Election Commission ("**FEC**") before the Help America Vote Act of 2002 transferred the FEC's responsibility for developing voting system standards to the U.S. Election Assistance Commission ("**EAC**").

9

33.     The Certification Rule provides:

> Whenever possible, Qualification tests shall be conducted
> by Independent Test Agencies (ITA) certified by the
> EAC.  In the event that tests by an ITA are not feasible,
> these tests shall be conducted by a Georgia Certification
> Agent designated by the Secretary of State.

Ga. Comp. R. & Reg. r. 590–8–1–.01(d).

34.     The Certification Rule provides that the requirement for qualification

testing can be satisfied by EAC-issued Qualification Certificates that indicate the

testing was performed by an EAC approved Independent Testing Agency.  Ga.

Comp. R. & Reg. r. 590–8–1–.01(d), (d)1.

35.     If this level of testing is not available, then the Secretary may

designate an agency to conduct qualification testing.  Ga. Comp. R. & Reg. r. 590–

8–1–.01(d)1.

36.     "In either event, the Qualification tests shall comply with the

specifications of the *Voting Systems Standards* published by the EAC."  Ga. Comp.

R. & Reg. r. 590–8–1–.01(d)1.

37.     The Dominion BMD System does not satisfy the Certification Rule's

requirements for qualification testing, and thus the system is not validly certified

and is not legal to use in Georgia.

10

### 2.    Certification Tests

38.    The Certification Rule additionally and separately requires

"certification testing":

> Certification tests shall be performed to certify that the
> voting system complies with the Georgia Election Code,
> the Rules of the Georgia State Election Board, and the
> Rules of the Secretary of State.

Ga. Comp. R. & Reg. r. 590–8–1–.01(d).

39.    The evaluation procedure to obtain certification must be commenced

after the qualification testing.  *See* Ga. Comp. R. & Reg. r. 590–8–1–.01(d)2.

40.    The Certification Rule requires that, "A Georgia Certification Agent

designated by the Secretary of State shall conduct certification tests."  Ga. Comp.

R. & Reg. r. 590–8–1–.01(d).

41.    The Georgia Certification Agent is required to prepare an "Evaluation

Proposal" to identify the testing to be done by the Georgia Certification Agent and

any additional qualification testing that needs to be done by an EAC-approved

Independent Testing Agency.   Ga. Comp. R. & Reg. r. 590–8–1–.01(d)4.

42.    The vendor then reviews the Evaluation Proposal and notifies the

Secretary to proceed with the testing described in the Evaluation Proposal.  Ga.

Comp. R. & Reg. r. 590–8–1–.01(d)5.

43.    Only after the vendor arranges for and successfully completes any required additional testing, then "the Georgia Certification Agent shall conduct the tests described in the Evaluation Proposal and submit a report of the findings to the Secretary of State." Ga. Comp. R. & Reg. r. 590–8–1–.01(d)6.

44.    The Secretary finally determines whether to certify the voting system for use in Georgia based on the "information in the report from the Georgia Certification Agent, and any other information in [the Secretary's possession]." Ga. Comp. R. & Reg. r. 590–8–1–.01(d)4 & (d)7.

45.    The Dominion BMD System does not satisfy the Certification Rule's requirements for certification testing, and thus the system is not validly certified and is not legal to use in Georgia.

### C.    Functional Requirements for BMD Voting Systems

46.    HB 316 establishes specific functional requirements for lawful BMD systems, including that BMDs and ballot scanners must at all times "[p]ermit voting in absolute secrecy so that no person can see or know any other elector's votes, except when he or she has assisted the elector in voting, as prescribed by law." O.C.G.A. § 21–2–379.22(5) (emphasis added); *see also* O.C.G.A. § 21–2–365(6) (same requirement to permit voting in absolute secrecy for ballot scanners

used in optical scanning voting systems); O.C.G.A. § 21–2–2(19.1) (defining

optical scanning voting systems to include BMD systems that use ballot scanners).

47.     These statutes reflect the Georgia Constitution's requirement that,

"Elections by the people shall be by secret ballot and shall be conducted in

accordance with procedures provided by law."  Ga. Const. Art. II, § 1, ¶ 1.

48.     Because of the constitutional imperative that voters must be able to

verify the selections that BMDs make on their behalf, HB 316 provides that BMDs

must "[p]roduce a paper ballot which is marked with the elector's choices in a

format readable by the elector."  O.C.G.A. § 21–2–379.22(6) (emphasis added).

49.     HB 316 provides that, "The form and arrangement of ballots marked

and printed by an electronic ballot marker shall be prescribed by the Secretary of

State."  O.C.G.A. § 21–2–379.23(b).

50.     The Secretary's discretion to design the form and arrangement of

ballots is constrained by the statute's specific requirements that BMD printouts

must contain information that includes the following:

- "(4) Words identifying the proposed constitutional amendments or
  other questions for which the elector is eligible to vote."  O.C.G.A.
  § 21–2–379.23(c)(4).

- "(5) The name of the candidate and, for partisan offices, indication of the candidate's political party or political body affiliation, or the answer to the proposed constitutional amendment or other question for which the elector intends to vote." O.C.G.A. § 21–2–379.23(c)(5).

51.   HB 316 provides: "The paper ballot marked and printed by the electronic ballot marker shall constitute the official ballot and shall be used for, and govern the result in, any recount conducted pursuant to Code Section 21-2-495 and any audit conducted pursuant to Code Section 21-2-498." O.C.G.A. § 21–2–379.23(d).

52.   Nowhere does HB 316 contemplate that an "official ballot" might have both a human-readable part (the human readable text summary printed on the ballot card generated by the Dominion BMD System) and a non-human readable part (the QR code printed on the ballot card)—both of which purport to contain the same information, but only one of which (the human readable text portion) can be read and reviewed by the voter.

53.   HR 316 is silent about what portion of the "official ballot"—the QR code or the human readable text summary—must be counted in the official count, in recounts, and in audits.  *See* O.C.G.A. § 21–2–379.23(d).

54.    The Dominion BMD System's scanner only reads and interprets the portion of the ballot card that contains the QR code.

55.    For the official count of votes—which is generated by tabulating the Cast Vote Records recorded on the precinct scanners after the close of an election—the Dominion BMD System only tabulates the information contained in the non-human-readable ballot card QR codes, not the voter-reviewable information contained in the human readable text summary.

56.    For recounts conducted under O.C.G.A. § 21–2–495, the ballot printout cards are simply run through the scanners again.  This means that the Dominion BMD System's scanners—again—will only read and interpret the non-human-readable QR code, not the voter-reviewable human readable text summary.

57.    By contrast, for precertification tabulation audits and risk-limiting audits conducted under O.C.G.A. § 21–2–498, the statute requires "manual inspection of random samples of the paper official ballots."

58.    Applicable audit standards are left to be determined by the State Election Board.  *See* O.C.G.A. § 21–2–498(d).  As of the date of this filing, the State Election Board has not promulgated any rules or procedures to implement precertification tabulation audits

59.    A "manual inspection" of BMD printed ballots necessarily means that human auditors will have to examine the part of the printed ballot cards that contains the human readable text summary, not the part with the QR codes.

60.    The statute's requirement for the inspection sample to include "all types of ballots," O.C.G.A. § 21–2–498(c)(2), means that, for in-person voters, precertification tabulation audits and risk-limiting audits will examine a _different_ marking on a _different_ part of the ballot than was counted for official tabulations, whereas for absentee paper ballot voters, these audits will examine the _same_ marking on the _same_ part of the ballot that was counted for official tabulations.

61.    HB 316 does not provide for investigation of anomalies identified in precertification tabulation audits and risk-limiting audits to escalate the audit or correct the election results.  The discovery of errors in the audited sample does not prevent certification of inaccurate official results or even permit a discretionary (much less automatic) manual inspection and recounting of _all_ the ballots.

62.    Nor does HB 316 contain any provision that addresses what markings on a BMD ballot—the QR code or the human readable text summary—should be counted in the event of an election contest.  This omission is especially significant since an election contest is the most readily foreseeable result of an audit that produces evidence of an incorrect result.

16

63.    In summary, the selections shown on the voter-reviewable, human-readable text summary portions of BMD ballot cards are <u>never</u> "counted."  Only the selections encoded by the QR code are tabulated and recounted.  At most, only a sample of the human-readable text summaries on the ballot cards is ever used, and even that sample is only inspected to check the math produced by the prior tabulation of information contained in the indecipherable and unverifiable QR codes.

64.    The human-readable portions of BMD ballot cards generated by the Dominion BMD System are essentially irrelevant to the actual tabulation of votes.  The human readable text serves to give voters false comfort they may have verified their votes when in reality they cannot have done so.  Elections in Georgia conducted using the Dominion BMD System will be decided from beginning to end by undecipherable QR codes that voters must trust and cannot verify.

65.    By design, the Dominion BMD System forces Georgia voters to "trust the machine"—or, more specifically, to trust that the indecipherable QR code printed by the machine completely and correctly reflects the voter's actual touchscreen choices.  Even if the human readable text summary appears complete and correct to a voter with the time and ability to review it, the voter still must trust that the inscrutable QR code says the same thing as the summary.

66.     This system is severely burdens the rights of voters, as described in
Paragraphs 99–199 below, because (among other reasons) voters using the
Dominion BMD System have no way of knowing what votes they are actually
casting.

## V.     GENERAL ALLEGATIONS

### A.     How Voting Works on the Dominion BMD System

67.     The Dominion BMD System consists of:

- the Democracy Suite 5.5-A Election Management System Version
  5.5.12.1,

- EMS Adjudication Version 5.5.8.1,

- ImageCast X Prime (ICX BMD) Ballot Marking Device Version
  5.5.10.30,

- ImageCast Precinct (ICP) Scanning Device Version 5.5.3-0002, and

- ImageCast Central (ICC) Scanning Device Version 5.5.3-0002.

68.     The Secretary has erroneously claimed that the Dominion BMD
System is a paper ballot voting system.  The Dominion BMD System is actually an
electronic voting system that is very similar to a DRE system, but is even less
secure than DRE systems.

69.     Paragraphs 70–88 describe the material steps performed by voters and officials when the Dominion BMD System is used.

70.     The voter checks in and presents identification to pollworkers, who look up the voter using the ePollbook system.

71.     Assuming the ePollbook confirms that the voter is in the right polling and eligible to vote, the pollworkers use the ePollbook software to encode and issue a voter access "smart" card to the voter.

72.     The voter goes to an ImageCast X Prime (ICX BMD) Ballot Marking Device and inserts the voter access card into the BMD to activate it.

73.     The BMD pulls up the ballot style assigned to the voter according to the voter access card and displays voting options on the touchscreen, one page after the other.

74.     On each screen generated by the BMD, the voter expresses his or her electoral preferences by touching the target areas of the electronic screen that display voter's choices.

75.     The BMD interprets the voter's physical pressure on various target areas of the touchscreen as votes.  It converts the voter's on-screen selections into temporary entries in the BMD's memory to record the voter's choices based on the context of what is being displayed to the voter when the screen is touched.  When

the voter touches a target area, the BMD screen gives visual feedback to the voter to indicate that the voter's selection has been perceived by the BMD.

76.    Once the voter has advanced through all the screens of the ballot style and is finished making selections, the BMD prints a paper record that is the voter's "ballot" and clears its memory of the selections that the voter has just made.

77.    The "ballot" produced by the Dominion BMD System contains a "QR code"—a two-dimensional barcode that consists of black marks arranged in a square pattern on a white background.  The "ballot" also contains a human readable text that summarizes the voter's touchscreen selections with a short, paraphrased label for each contest, followed by an indication of selection that was recorded as being made (or skipped) by the voter.

78.    The following is a sample BMD ballot that Dominion provided in its RFP Response to the Secretary, showing both the QR code and a human readable text summary of the voter's choices:



(Doc. 555, at 13.)

79.     The QR code is a machine-readable optical label that uses standardized encoding to store data efficiently. It is a type of matrix barcode first designed in 1994 for the automotive industry in Japan to track vehicles during the manufacturing process.  The Dominion BMD System's QR codes contain information about the voter's choices, encoded in computer-readable form using a proprietary Dominion encoding format and may contain other information about

the voter as well.  Because the encoding format is proprietary, even if the voter had a QR code reader, he or she could not decipher the information that the QR code contains and would not be able to understand it or verify whether it reflected his or her votes.

80.     The human readable text portion of the ballot card generated by the BMD purports to summarize the voter's touchscreen selections by paraphrasing the affirmative selections (i.e., the voter's votes "for" electoral choices) that the BMD interpreted the voter to have either made, or skipped, on the touchscreen.

81.     If a BMD is functioning properly, the vote selections that are encoded by the printed QR code should be the same as the vote selections that are described by the printed text summary, and both the QR code and the text summary should record the same selections that the voter previously made on the touchscreen prior to the ballot card being printed by the BMD.

82.     Once the voter has received the ballot card printed by the BMD, he or she can (at least theoretically) review the human readable summary to check if it completely and correctly reflects the choices that the voter remembers making on the touchscreen.  The voter will be unable to conduct any verification of the information encoded in the non-human readable QR code.

83.     When the voter completes whatever review of the printed ballot card the voter wishes, is able, and has time to perform, the voter then takes the ballot card to the polling place ImageCast Precinct (ICP) Scanning Device and casts his or her ballot by inserting the printed ballot card into the scanner.

84.     The scanner decodes the information contained in the QR code and constructs a complete record of all the voter's selections (the "**Cast Vote Record**").  The scanner saves the Cast Vote Record to two redundant removable compact flash cards along with a linked timestamp that identifies when the ballot card was cast and scanned.

85.     At the end of voting, all the Cast Vote Records recorded by each polling place's scanner are transferred via removable media to the county's central tabulation center.

86.     At the county tabulation center, the votes contained on all the Cast Vote Records are combined with tabulations from hand-marked paper absentee and provisional ballots to produce county vote totals in each contest, which are then transmitted to the State for the generation of combined election results by contest.

87.     The ballot cards are transferred to the county's central tabulation center and retained there.  In the event of a recount, the ballot card is available to

be scanned again—in which case the recount result, like the original tabulation, is based exclusively on the information contained in the QR code.

88. In the case of a pre-certification tabulation audit or a pilot risk-limiting audit, both of which require the manual inspection by humans of random samples of the ballot cards (as well as absentee paper ballots), the human readable text portions of each ballot card, rather than the QR code, is what will be examined. In other words, although the information contained in the non-human readable QR code is what gets counted in the initial tabulation and any recounts, it is the information in the human readable text summary portion of the ballot that gets manually inspected in audits of the election's results.

**B.      Certification and Award**

89. A company called Pro V&V was engaged by the Secretary and conducted nominal "certification testing" of the selected Dominion BMD System in 2019.

90. Pro V&V was accredited as a voting system test laboratory by the EAC in 2015, but the 2015 certificate of accreditation expired on February 24, 2017.

91. On August 7, 2019, Pro V&V signed a Test Report stating that the Dominion BMD System had successfully been evaluated and certified against "the

requirements set forth for voting systems by the EAC 2005 VVSG and the State of Georgia."  (Pro V&V Test Report at 18.)

92.    On August 9, 2019, the same day the Secretary awarded the BMD purchase to Dominion Voting Systems, Inc., the Secretary certified that the Dominion BMD System "has been thoroughly examined and tested and found to be in compliance with the applicable provisions of the Georgia Election Code and Rules of the Secretary of State, and as a result of this inspection … can be safely used." (Docs. 575, 575-2.)

### C.    The Dominion BMD System Is Constitutionally Defective and Not a Lawful Replacement for DRE System

93.    As shown below in this supplemental complaint—and in flat contradiction to the Secretary's certification—the Dominion BMD System <u>cannot</u> be safely (or lawfully) used.  This is true because the system:

- does not meet Georgia's legal requirements for a lawful voting system,

- shares the same kinds of security flaws as Georgia's existing unconstitutional DRE voting system,

- has not been properly tested by the Secretary,

- was improperly certified and thus is illegal to use in Georgia,

- even if operated as designed, fails to produce verifiable, accountable, and auditable vote totals and election results,

- if used to conduct Georgia elections, will severely and unequally burden the constitutional rights of Georgia voters,

- if used to conduct Georgia elections, will deprive Georgia voters of their state constitutional right to a secret ballot, and

- cannot, in any event, practically be implemented within the time frame required to replace the constitutionally deficient DRE voting system, which this Court has ordered the State to discontinue using after the end of 2019.  (Doc. 579.)

94.    On August 19, 2019, a petition was filed with the Secretary by all individual Coalition Plaintiffs and more than 2,500 Georgia voters from 127 different counties [2] pursuant to O.C.G.A. § 21–2–379.24(a), demanding that the Secretary re-examine the Dominion BMD System because of deficiencies in the initial certification examination.  (Doc. 586, at 10 (Ex. A).)

---

[2] This figure includes signatures and residences of voters added in one or more supplements to the petition after its initial filing.

95.     As of the date of filing of this supplemental complaint, the Secretary

has not responded to the voters' request and has set no timetable for conducting the

required re-examination.

96.     All public statements by the Secretary's office indicate that the

Secretary has pre-judged that the required re-examination of the Dominion BMD

System will <u>not</u> cause him to revoke his certification of the system or even slow

implementation, despite the system's substantial non-compliance with voting

system rules.

**D.     The Upcoming BMD Elections**

97.     In particular, the Secretary intends for Georgia to use the Dominion

BMD System to conduct all federal, state, and county general primaries and

general elections, as well as special primaries and special elections, that will be

held in the State of Georgia beginning with (1) the pilot BMD elections for a

limited number of November 5, 2019 elections and the continuing with (2) all

elections from the March 24, 2020 presidential primary election onward (all of the

foregoing-described elections, the "**Upcoming BMD Elections**.")

98.     At each of the Upcoming BMD Elections, the State Defendants and

the Fulton County Defendants intend to enforce newly enacted <u>O.C.G.A.</u>

<u>§ 21–2–300(a)(2)</u> and § 21–2–383(c).  Those provisions require all in-person

voters—including absentee in-person voters and Election Day voters—to vote using the Dominion BMD System.

## VI. REQUIRING VOTERS TO USE THE DOMINION BMD SYSTEM SEVERELY BURDENS THE RIGHTS OF GEORGIA VOTERS

### A. The Dominion BMD System Forces In-Person Voters to Cast Ballots Without Being Able to Read or Verify The QR-Encoded Votes They Are Casting

99. The two types of ballot scanners certified by the Secretary as components the Dominion BMD System—

- ImageCast Precinct (ICP) Scanning Device Version 5.5.3-0002 (used in precincts), and

- ImageCast Central (ICC) Scanning Device Version 5.5.3-0002 (used for central counting of mail and provisional hand marked paper ballots).

—are programmed to read QR codes on ballot cards in the polling places and hand-marked paper ballots in the county election office.

100. The scanners interpret voter intent and create the Cast Vote Records that are used to tabulate election results.

101. Traditional hand-marked paper ballots contain colored-in oval target areas beside a human readable contest name. This target area is read by the optical scanners in the central count operation. For absentee mail-ballot voters and

provisional voters, the votes they can read and complete themselves are the votes that the scanners will count.

102. For in-person voters, only the votes encoded by the Dominion BMD System in the QR codes will be counted in the official tabulation and any recounts.

103. The information encoded by this QR codes is impossible for voters to read because the QR code is encrypted and encoded in a proprietary format that humans cannot decipher.

104. Voters are expected to review the text summary to satisfy themselves that the printed list of selections is the complete and accurate list of selections made on the touchscreen, and to report any machine malfunctions or discrepancies to poll managers. Even if a voter is are able to satisfy himself or herself that the text summary actually reflects the preferences that the voter expressed when voting on the BMD touchscreens, this design still requires voters simply to trust that the non-human readable QR code matches the text summary. The voter has no way to confirm that this is true.

105. The voter's rights to cast a vote and to have that vote correctly recorded and counted entitle voters to a voting system that permit the voter to read the actual "official" votes being cast and to confirm that the "official" votes being

cast actually reflect the preferences that the voter expressed while interacting with the BMD touchscreen.

106.    Voters may not legally be burdened with the requirement to conduct verification or machine accuracy testing in order to vote and have their votes counted. A voter should be permitted to simply vote without being expected or pressured to test the machine accuracy, particularly when the verification addresses a human readable text summary that is not even tabulated or recounted.

107.    The design of the Dominion BMD System is inherently burdensome to voters and severely burdens voters' rights to vote and to have their votes counted.

108.    The design of the Dominion BMD System also makes in-person voters less likely to cast an effective vote than absentee mail voters, who are allowed to vote on a paper ballot that the voter can mark without a computer intermediary, and with the confidence that they can see and read the vote they cast.

109.    Mail ballot voters, who are allowed to cast hand-marked paper ballots, make their own ballot markings and thus do not need to perform any additional verification or accuracy testing to confirm that the marks on their paper ballot are in fact their own choices.

**B.  Many In-Person Voters Will Be Unable to Verify Even the Human Readable Text Portions of Their Dominion BMD Ballots**

110.  Because of the length and complexity of modern ballots, requiring voters to verify even a human-readable text summary of their touchscreen choices is a severe burden on the right to vote that will cause in-person voters to be less likely cast an effective vote than are mail absentee voters.

111.  Many, if not most, in-person voters will lack the memory and cognitive skills to be able to verify that the printout produced by the Dominion BMD System has completely and correctly recorded their touchscreen selections.

112.  This is true because of the way voting on BMDs works: When a voter makes an electoral selection by tapping a space on a BMD touchscreen, both the voter's physical act of expressing intent and the relevant context shown to the voter (i.e., the information being displayed by the BMD at that moment) are completely ephemeral.  The confirmatory feedback that is displayed to the voter on screen once the voter has made a selection is also ephemeral.

113.  Voters are prohibited from electronically recording for verification purposes any of the context and feedback surrounding their touchscreen choices by the Election Code itself, which forbids recording any photos or videos of BMDs in operation.  *See* O.C.G.A. § 21-2-413.

114.   After all the voter's selections in all races on all voting screens have been completed (which in many elections takes a significant amount of time), when the BMD generates a printed paper "ballot" that contains both the QR code embedded with the voter's selections and a text summary of the voter's choices, the voter must rely exclusively upon his or her memory to review the text summary and confirm that it is complete and correct.

115.   Auditing and voting system experts are in virtually unanimous agreement that in most elections, many, if not most, voters will be unable, from memory, without the benefit of any visual cues or context, to reliably, accurately, and completely verify the completeness and correctness of a paraphrased textual summary of the selections they previously made on the touchscreen over the course of potentially 5 or 10 minutes.  For example, most voters are unlikely to detect if a low-profile down-ballot races or ballot question is left off the paper printout, or to notice if their votes were switched between "Yes" and "No" on a particular question.

116.   Without <u>every</u> voter accurately verifying his or her complete ballot, BMD elections become unauditable because the ballot cards are not uniformly reliable as records of voter intent.

117.   Many voters will skip trying to verify their ballots.  Few voters, having already spent the time needed to mark an entire ballot while standing at a voting machine, after also standing in line waiting to vote, will choose to perform the relatively tedious and repetitive task of thoroughly reviewing the printed ballot card—particularly if they are aware that the State's audit procedures are ineffective and that their verification efforts are pointless. The typical voter may simply assume that the QR code contains accurate and complete information, even if the printout appears to be incomplete. Many voters will just skip the verification altogether, particularly if there are lines behind the voter of other voters waiting to use the machine.

118.   Requiring voters to perform a challenging, memory-based verification of a paraphrasing of their touchscreen vote selections in order to assure that the printed text summary accurately reflects the voters' choices severely burdens the right to vote.

119.   To the extent the voter's act of verification is unnecessary to allow voters to cast an effective vote, it is a burden that lacks any justification. To the extent that verification is necessary, it is a burden that makes in-person voters less likely to cast effective votes than mail absentee voters, who are able to cast hand-

marked paper ballots without any additional step of having to confirm and verify the accuracy of a machine's translation of their electoral intent.

120. Fully accurate verification of the printed ballot content may be possible for a small minority of voters—those with high education levels, excellent memories, excellent English skills, no cognitive issues, and surplus time to spend at a voting machine studying a ballot card after already completing the ballot once. But less fortunate voters are more severely affected—especially disabled, elderly, less well-educated, non-native English-speaking, and cognitively challenged voters.

### C. Ballots Cast on the Dominion BMD System Are Not Secret Ballots

121. The two types of ballot scanners certified by the Secretary as components the Dominion BMD System, *see supra* Paragraph 99, record a timestamp on the electronic record when a ballot is scanned. Of concern here is the ICP Precinct Scanner, which is the single scanner in a polling place that voters use to cast their ballots.

122. This timestamp is linked to the Cast Vote Record by the scanner.

123. Anyone who gains access to these timestamps can compare them to other information that is typically recorded about voters in a polling place—such as check in times, pollwatcher notes, and polling place video recordings—to

determine which timestamped ballot in the scanner was cast by which particular

voter. The order and time of voters casting their ballots in a polling place is easily

documented. It becomes relatively easy to selectively target any individual voter

for exposure of their ballot simply by noting what time they cast their ballot into

the scanner.

124.   This determination of which Cast Vote Record belongs to which voter

can be made with a nearly 100% certainty under many circumstances.

125.   While Dominion claims to "anonymize" reported ballot data by

suppressing the timestamps for external reports when the data is exported to public

records, the original electronic records containing the timestamp and chronological

order of ballots cast can continue to be accessed by insiders and successful

hackers.

126.   The timestamp design feature of the scanner components of the

Dominion BMD System arbitrarily deprives in-person voters of their substantive

Georgia constitutional and statutory rights to vote in absolute secrecy, which in

turn violates federal constitutional guarantees of procedural due process.

127.   The inability of in-person voters to enjoy their state rights to cast an

absolutely secret ballot exposes these voters to the potential for identification,

Case 1:17-cv-02989-AT Document 628 Filed 10/03/19 Page 473 of 721

retaliation, and accountability based upon their electoral choices, which also burdens the fundamental right to vote.

128.   As voters learn of this threat to their privacy in voting, it will predictably deter voting by voters who may have reason to fear coercion or retaliation if their vote preferences are not absolutely secret. The existence of this vulnerability also creates a tempting target for hackers who trade in highly sensitive personal data.

129.   Because mail ballot voters  are allowed to return hand-marked paper ballots by personal delivery or by mail, rather than casting them into Dominion scanners, they are free from these deprivations and burdens—disparate treatment that, in turn, offends the right of in-person voters to equal protection.

### D.   The Dominion BMD System Does Not Create An Independent, Accountable Record of Voters' Choices

130.   The Dominion BMD System does not create an independent, accountable record of voter choices that satisfies "democracy's critical need for transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote." (Doc. 309, at 46, *Curling, 334 F. Supp. 3d 1303, 1328* (Sep. 17, 2018).)

131.   The inventor of risk limiting audits and the nation's foremost expert on post-election auditing, Professor Philip Stark, concludes that audits of BMD-generated results are "meaningless."

132.   Twenty-four leading voting systems experts, cybersecurity experts, and election quality leaders echoed this concern in a letter to the SAFE Commission, noting that a valid BMD audit is "impossible."

133.   Shortly after the passage of HB 316, Dr. Philip Stark, Dr. Richard DeMillo of Georgia Tech, and Dr. Andrew Appel of Princeton University published a paper called, "Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters," which explains that the security model of BMDs is broken.[3]

134.   Professor of Computer Science Dr. Wenke Lee, the Director of the Georgia Tech Information Security Center and the only cybersecurity expert on the SAFE Commission, voted against the SAFE Commission's recommendation to deploy BMDs for this reason.

135.   Even the National Academy of Sciences has warned: "Unless a voter takes notes while voting, BMDs that print only selections with abbreviated

---

[3] Andrew Appel, Richard DeMillo & Philip Stark, "Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters" (April 21, 2019), *available at,* SSRN: https://ssrn.com/abstract=3375755 (last visited Sep. 6, 2019)..

names/descriptions of the contests are virtually unusable for verifying voter

intent."[4]

136.  BMDs, like DREs, allow a computer to author the artifact that

constitutes the voter's "official" vote selections.  Because the Dominion BMD

System deprives voters of any ability to read and verify the undecipherable QR

code that contains the voter's choices, the Dominion BMD System is a

quintessential "black box"—the opposite of an accountable voting system.

**E.    The Design of the Dominion BMD System Deprives Officials of Any Way to Confirm Equipment Malfunctions**

137.  Because ballot cards are only printed after voters finish voting on their

touchscreens, the Dominion BMD System exposes in-person voters to a higher

likelihood than other voters that their votes will not be effective when and if a

BMD in their polling place malfunctions.

138.  BMDs interpose a delay between a voter's ephemeral indication of

intent and the voter's review (on paper) of what was purportedly recorded.  If the

voter detects an error and reports a malfunctioning machine to a pollworker, there

is no way for the worker to tell if the machine actually malfunctioned or if the

---

[4] National Academy of Sciences, Securing the Vote: Protecting American Democracy (2018), at 79 (available at https://www.nap.edu/catalog/25120/securing-the-vote-protecting-american-democracy) (last visited Sep. 5, 2019).

voter is simply mistaken, since the paper printout will be the only potential

evidence of the voter's touchscreen selections. Apart from the printout, no other

evidence of the voter's ephemeral expression of intent exists that can be used to

test the accuracy of the printout.

139. Many voters will be reluctant even to show pollworkers their ballot

card to try to demonstrate the inaccuracies, because doing so will reveal their

private ballot choices.

140. Since real-time polling place testing of BMDs for possible

misconfiguration or hacking is impractical, pollworkers will be forced ether to

keep the potentially defective machine in service or to take voters at their word and

take machines out of service, actions which will cause longer lines and delays.

141. If BMDs that voters report are malfunctioning are routinely taken out

of service, there is a real risk of fabricated claims that BMDs are malfunctioning,

claims that could bring a precinct to a stand-still and disenfranchise voters.

**F. Audits Examine Different Expressions of Voter Intent Than Official Counts—But Only for In-Person Voters**

142. HB 316 provides for precertification tabulation audits that are to be

conducted by manual inspection of a random sample of official ballots.

143. Because the official ballots for in-person voters are BMD-printed

ballot cards, the humans conducting the required "manual inspection" can

necessarily only examine the human readable text summary of any in-person ballot in the sample.  In other words, the humans conducting the manual inspection cannot review the undecipherable QR code (which was counted in the official tabulation and any recount), but can only review the human-readable portion of the ballot.

144.   By contrast, human auditors who conduct manual inspections of the hand-marked paper ballots cast by absentee voters will be able to examine the same portion of the absentee ballot that counted for the official tabulations and recounts.

145.   In other words, the "official" BMD votes of in-person voters will be excluded from any chance of being included in any precertification audits, unlike the official votes of absentee paper-ballot voters.  Since QR codes cannot be audited manually, they will not be audited at all in a manual inspection. The Dominion BMD System deprives in-person voters of the right to have their official votes audited that other voters enjoy under Georgia's recount statute for BMD voting systems.

146.   Apart from the unequal treatment of voters, the audits provided for by HB 316 are, in any event, ineffective and of limited value for confirming that election results actually reflect the intent of the electorate.  Since the human-

readable text portion of the BMD ballots is unlikely to have been completely and

correctly verified by all individual voters, manual inspection of ballot cards fails to

assure overall integrity of the election. At most, "audits" of a BMD election can

only confirm the arithmetical accuracy of tabulations—they cannot verify the

fidelity of machine-printed ballot cards to voters' actual touchscreen selections.

147. Audits of records that themselves are unverifiable by most individual

voters may do more harm than good by leading the public to believe that election

results have been "audited" in some meaningful way when, in fact, the opposite is

true.

### G. The Dominion BMD System Is Illegal To Use Because the Secretary's Improper Certification of the System Is Void

148. The Secretary's purported certification that the Dominion BMD

System "has been thoroughly examined and tested and found to be in compliance

with the applicable provisions of the Georgia Election Code and Rules of the

Secretary of State, and as a result of this inspection … can be safely used," (Docs.

575, 575-2), is objectively false and legally void.

### 1. Qualification Testing Has Not Been Performed As Required By the Certification Rule

149. Georgia law requires state qualification testing for the Dominion

BMD System unless the EAC has issued Qualification Certificates that certify the

system to comply with the *Voting System Standards*—i.e., the 2002 VSS. *See* Ga.
Comp. R. & Reg. r. 590–8–1–.01(d).

150.   The 2002 VSS provides a different set of standards than the guidelines
stated by the 2005 VVSG (or by the 2015 VVSG).

151.   Because the EAC has only certified the Dominion BMD System to
comply with the guidelines set out in the 2005 VVSG, not the standards set out in
the 2002 VSS, state qualification testing of the Dominion BMD System by the
Secretary is required under the Certification Rule.

152.   Pro V&V was accredited as a voting system test laboratory by the
EAC in 2015, but the 2015 certificate of accreditation expired on February 24,
2017.  The expiration of its EAC accreditation means that the "certification
testing" performed by Pro V&V on the Dominion BMD System for the Secretary
could not have been qualification testing.

153.   In addition, Pro V&V in its own report described the testing that it
performed as "certification testing," not "qualification" testing.

154.   Because Pro V&V did not perform qualification testing and because
the Secretary has not designated a Georgia Certification Agent or engaged any
other testing agency to conduct the required qualification testing, the Certification

Rule's requirement for qualification testing of the Dominion BMD System is not satisfied.

### 2. Certification Testing Has Not Been Performed As Required By the Certification Rule

155. The Dominion BMD System also does not satisfy the Certification Rule's requirements for certification testing.

156. The Certification Rule requires that, "A Georgia Certification Agent designated by the Secretary of State shall conduct certification tests." Comp. R. & Reg. r. 590–8–1–.01(d).

157. Pro V&V was never designated by the Secretary to be a Georgia Certification Agent.

158. Even if Pro V&V is construed to be acting as a Georgia Certification Agent without being designated as such in compliance with the Certification Rule, the certification testing that Pro V&V performed still does not meet the requirements for certification testing because Pro V&V's testing did not examine whether the Dominion BMD System "complies with the Georgia Election Code, the Rules of the Georgia State Election Board, and the Rules of the Secretary of State," Ga. Comp. R. & Reg. r. 590–8–1–.01(d).

159.   For example, the testing did not include tests of whether the operation of the system would permit valid auditing of the results—a fundamental test that the system clearly would have failed.

160.   The report prepared by Pro V&V shows that Pro V&V only examined the an incomplete set of functional operations of the Dominion BMD System and did not perform any of the kinds of "certification tests" that are required to "certify that the voting system complies with the Georgia Election Code, the Rules of the Georgia State Election Board, and the Rules of the Secretary of State." Ga. Comp. R. & Reg. r. 590–8–1–.01(d).

### 3.   The Secretary's Certification of the Dominion BMD System Is Void and the System Is Not Legal to Use in Georgia

161.   Because the Dominion BMD System was not properly tested according to the Certification Rule, the Secretary's nominal certification that the Dominion BMD System "has been thoroughly examined and tested and found to be in compliance with the applicable provisions of the Georgia Election Code and Rules of the Secretary of State, and as a result of this inspection, … can be safely used," (Doc. nos. 575, 575-2), is objectively false—and thus is legally void.

162.   In the absence of a valid certification that the Dominion BMD System "can be safely and accurately used by electors at primaries and elections," the

Dominion BMD System may not lawfully be used to conduct a Georgia election. O.C.G.A. § 21–2–379.24(b)–(d).

163.   Requiring Georgia's in-person voters to exercise their fundamental right to vote on a voting system that is illegal under state law violates the federal constitutional right to due process.

**H.   The State's Electronic Security Practices Render the BMD System Even More Vulnerable to Hacking and Malicious Manipulation Than The DRE System Was**

164.   HB 316 provides for (ineffective) precertification audits of BMD election results, but the Dominion BMD System—like Georgia's unconstitutional DRE voting system—suffers from security risks that cannot be mitigated by precertification audits.

165.   The mere fact that the Dominion BMD System produces a paper printout with a human readable text summary that can be manually inspected in a precertification audit does not make it anything close to equivalent in security to a voting system that uses hand-marked paper ballots in conjunction with proper chain of custody practices and robust audits.

**1.   QR Codes Create Inherently High-Risk Applications**

166.   QR codes are a form of computer "barcode."

45

167.  Cybersecurity experts warn that use of a "barcode" application for

voting systems is inherently dangerous.

168.  One of the nation's foremost voting system cybersecurity experts,

Harri Hursti, testified to the U.S. Presidential Commission on Election Integrity on

September 12, 2017:

> When you read barcode, the problem is that barcode
> readers are usually a keyboard. So anything you can do
> with a keyboard you can do with a barcode. Barcode
> readers also have a bad habit of reading more standards
> than the standard you are using, and some of these
> barcodes can have a thousand, two thousand characters,
> and they can emulate the keyboard very effectively, so
> they can  make those keyboard signs which are not-
> printable.
>
> Again, when you're reading a barcode, you can get an
> injection code into the system with that, and this is one
> thing which we found in the voting machine hacking
> village is how you can inject in some of these machines a
> SQL inject from the barcode.
>
> So these capabilities are very dangerous and we have to
> be very careful with the technology…" [5]

169.  Secretary Raffensperger ignored such expert warning when he

selected the Dominion BMD System and rushed to certify, without the benefit of

---

[5]  Testimony of Harri Hursti U.S. Presidential Commission on Election Integrity (Sep. 12, 2017),
at 110 of 124, *available at*
https://www.whitehouse.gov/sites/whitehouse.gov/files/images/Unedited%20Transcript%20for%
20September%2012%2C%202017%20Meeting%20in%20New%20Hampshire.pdf (last visited
Sep. 5, 2019).

having done the required qualification and certification testing, that the system

"has been thoroughly examined and tested and found to be in compliance with the

applicable provisions of the Georgia Election Code and Rules of the Secretary of

State, and as a result of this inspection, … can be safely used." (Doc. nos. 575,

575-2.)

170.   The Dominion BMD System has not, in fact, been properly tested as

required by the State Election Board's own Certification Rule.

171.   The Certification Rule mandates security qualification and

certification testing, both of which should address the vulnerability of the

Dominion BMD System's vulnerabilities to injection of malicious code via

barcodes.

172.   But there is no evidence of any such vulnerability testing ever having

been conducted, either by the EAC, by a Georgia Certification Agent, by the

Secretary's own staff, or by any other party prior to the Secretary's rubber-stamp

certification.

173.   In August 2019, at DEFCON 27, a trade convention of white-hat

hackers, several components of the Dominion BMD System were examined by

participants and attendees.  During the course of one weekend, the DEFCON

"Voting Village" participants identified twenty vulnerabilities, including flaws that

specifically affect the scanners used by the Dominion BMD System—one of which even permits the redirection of votes from one candidate to another.

174.   None of the "certification testing" of the Dominion BMD System conducted by Pro V&V addresses the vulnerabilities identified at the DEFCON 27 conference.

175.   The Secretary's intended use of the Dominion BMD System—an effectively untested voting system that is known to have inherent, publicly documented vulnerabilities—will place a severe burden on the fundamental right to vote of all in-person voters at the Upcoming BMD Elections and will cause those in-person voters to be treated differently than absentee voters who do not vote in person and thus are not required to use BMDs.

> **2.     The Dominion BMD System Will Inevitably Be Exposed to Compromised Components of the DRE System That Have <u>Still</u> Never Been Examined for, Much Less Cleansed of, Malware**

176.   There is a risk that malware-infected components of the compromised and unconstitutional DRE system can be transmitted to the new Dominion BMD System if the two systems interface in way—meaning if direct or indirect physical and networked interaction occurs between any piece(s) of the old system and any piece(s) of the new system at any point in time, including by shared interfacing with intermediary equipment.

177.    The State Defendants have denied that any data from the existing
GEMS server and database will be imported for use with the new Dominion BMD
System.  (Doc. 556.)  This is factually incorrect: The Dominion BMD System will
be exposed at least indirectly to compromised components of the old system as the
result of each system's separate interfacing with the Secretary's IT infrastructure
over time.  Accordingly, the new Dominion BMD System is susceptible to
infection by malware from any part of the Secretary's current infrastructure.

178.    The Secretary's current IT infrastructure is compromised because of
the history of security breaches already documented and proven in this litigation.
The following relevant allegations relating to such security compromises are
adopted and restated here pursuant to Rules 10(b) and 10(c):

- Paragraphs 93–108 of the TAC (Doc. 226, at 38–42.)

- Paragraphs 109–124 of the TAC (Doc. 226, at 42–47.)

- Paragraphs 27–30 of the Curling Plaintiffs' proposed Third Amended
  Complaint (the "**proposed Curling TAC**") (Doc. 581-2, at 21–22.)

- Paragraphs 31–33 of the proposed Curling TAC (Doc. 581-2, at 22.)

- Paragraphs 45–61 of the proposed Curling TAC (Doc 581-2, at 26–
  30.)

- Paragraphs 62–69 of the proposed Curling TAC (Doc 581-2, at 30–32.)

Despite these security lapses, the DRE system's components have never been examined for, much less cleansed of, any malware.  The State has taken no steps to correct or remedy the past exposure of its systems to hackers and adversaries.

179.   In addition, in November 2018, erroneous results were officially reported in a small number of counties as a result of apparently defective electronic files.

180.   Also, in 2019, the GEMS database contractors, who were working from unsecured facilities at their homes to build ballots for the State's current, unconstitutional DRE voting system, transmitted sensitive database configuration files to CES (within the Secretary of State's office) over the Internet, in contrast with Michael Barnes's courtroom testimony, putting the CES election data servers at risk.

181.   The DRE voting system and its components, including existing files, data sets, and auxiliary programs, can pass malware to the "new" servers and working files of the Dominion BMD System. As legacy GEMS files are converted or transferred to work with the new Dominion BMD System, they will carry with

them undetected malware or erroneous coding that will compromise the new system.

**3. The State Has <u>Still</u> Not Improved Its Computer Security Practices, So New Exposures to Hacking and Malicious Manipulation Are All But Certain to Occur**

182.   The State has made no effort to address numerous system failures and irregularities that have marred the DRE system and rendered it insecure and unsafe to use in Georgia elections.

183.   Even if the compromised components of the old system were not highly likely to compromise the new Dominion BMD System, the State's ongoing, systemically deficient security practices render the Dominion BMD System just as vulnerable and exposed to hacking and malicious manipulation as the DRE system.

184.   Even if the midst of this litigation over the unconstitutionality of the DRE voting system, the Secretary still has not improved the computer security practices that he requires his staff, vendors, and contractors to observe.

185.   Georgia law requires that, "All electronic ballot markers and related equipment, when not in use, shall be properly stored and secured under conditions as shall be specified by the Secretary of State." O.C.G.A. § 21–2–379.26(a).  This requirement of state law continues to be violated by the unchanged security practices of the Secretary and his staff, vendors, and contractors.

186.   Even after the adoption of the Dominion BMD System, the Secretary's ongoing deficient security practices will continue to impose a severe burden on the fundamental right to vote and effectively deprive in-person voters of equal protection and due process.

## I.   Implementation of the BMD System in Time to Conduct the Upcoming BMD Elections Is Impractical, Exposing Georgia Voters to Electoral Disaster

187.   Successful implementation of the Dominion BMD System before the Upcoming BMD Elections is a practical impossibility.

### 1.   The Scale of Georgia's Implementation Task Is Unprecedented

188.   Georgia' installation of the Dominion BMD System will be the largest and most complex voting system conversion ever attempted in U.S. history.

189.   The implementation will require the programming and installation of a new master software election management system and over 75,000 new computer-driven devices, including ballot printers and new electronic pollbooks and the successful integration of these many devices with Georgia's current, defective voter registration system.  No state has ever attempted a simultaneous statewide conversion on such a scale.  In addition, this conversion is being attempted during a presidential election cycle, which places additional demands and pressures upon the administration of the election.

190.   Accomplishing this monumental task in time to use the Dominion BMD System in a constitutional manner in the Upcoming BMD Elections requires training, manpower, technical skills, and financial resources that are simply not available to the state and county officials who are collectively charged with the responsibility.

191.   To attempt to accomplish this conversion in time for the presidential election cycle, the State will likely engage Dominion to program the election, install and test components, and provide significant hands-on operations in the field. The foreseeable involvement of the vendor in administering elections in this manner entails massive issues of conflicts of interests and will inevitably dilute the State's control over its own elections.

192.   The foreseeable effects of a fully or partially failed voting system implementation will be catastrophic.  A failed implementation will destroy voters' trust in the election system, will depress voter turnout by dissuading marginally motivated voters from suffering the burdens and inconveniences of untested and ad hoc remedial procedures, and will do severe and irreparable damage to Georgia's democracy by casting into question the integrity of the outcomes in all affected Upcoming BMD Elections.

193.   The preliminary injunction order issued by this Court on August 15, 2019, requires the Defendants to prepare for their own potential failure to timely implement the use of the BMD equipment by developing a contingency plan to use hand-marked paper ballots in coordination with the Dominion BMD System's scanner components.  (Doc. 579, at 148, ¶ (2).)

194.   The Dominion BMD System's scanners, however, record timestamps permitting the voters' electronic ballot record to be connected to the polling place voter based on the time of voting.[6]  This threat can be mitigated and the integrity of the optical scanner tabulation can be ensured if the State's contingency plan either 1) requires Dominion to disable the timestamping capability, or 2) uses the State's existing AccuVote optical scanners and GEMS.  Both of these alternatives would require conducting robust precertification audits of the hand-marked paper ballots.

195.   Although the Court was clear that the purpose of the pilot ordered using hand-marked paper ballots in November 2019, was to help create a backstop in the event of an implementation delay or failure for the Dominion BMD System, the implementation plan for that pilot will be grossly insufficient to serve the intended purpose.  The pilot is being implemented in just four small towns, in just

---

[6] Coalition Plaintiffs warned State Defendants of this flaw in their March 24, 2019 Demand letter. (Doc 351, at 28, ¶ 4.)

one county, for one election day.  The pilot should establish and document

contingency processes and procedures, expand the new voting system

infrastructure for ballot scanning, and permit multiple election directors to gain

know-how with hand-marked paper ballots, which could well be required in 2020.

The pilot was intended to provide practical experience to create a realistic,

practical contingency plan. Given the implementation risk, and this immediate

challenge to the implementation of the Dominion BMD system, the State should be

required to initiate multiple pilot sites for hand-marked paper ballot elections

utilizing the certified Diebold AccuVote scanners and Dominion ImageCast

Scanners if the Dominion BMD System can be legally and satisfactorily certified

(which would include the disabling of timestamps that violate Georgia's secret

ballot protections.)

### 2.    Implementation Will Inevitably Be Delayed By the State's Required Re-Examination of the Dominion BMD System

196.   The citizen petition signed by the Member Plaintiffs for ex-

examination of the Dominion BMD System has made the Secretary aware of the

clear deficiencies of his certification in detail, but the Secretary has thus far failed

to respond to the petition either by curing those deficiencies or by rebutting them.

197.   Because the Secretary did not perform qualification or appropriate

certification testing, it is highly likely that his planned implementation of the

Dominion BMD System will not be possible on the timetable that is required to permit the BMD system to replace Georgia's current unconstitutional DRE system.

198.   When the Secretary fails to implement the Dominion BMD System in time, Georgia voters will suffer severe burdens to their fundamental right to vote as a result of the electoral catastrophe that may ensue due to foreseeable voter and pollworker confusion with new and emergency procedures, long lines to vote, and inconsistent local implementations of election processes.

199.   Because these harms are likely to occur if the Secretary persists in his commitment to an unworkable timetable for implementing the Dominion BMD System, the use of the system should simply be enjoined so that the coming months may be better spent transitioning to a practically workable—and constitutional—voting system.

## VII.   STANDING

200.   Defendants' intended enforcement of O.C.G.A. § 21–2–300(a)(2) and O.C.G.A. § 21–2–383(c) in the Upcoming BMD Elections threatens the Member Plaintiffs, other individual members of Coalition, and Coalition itself, with imminent injuries that confer standing on each of the Coalition Plaintiffs to bring each of the claims for prospective injunctive relief stated by this supplemental complaint.

## A.     Standing of the Member Plaintiffs

201.   Each of the Member Plaintiffs has individual standing to bring each of the claims stated by this supplemental complaint because each intends to vote in each of the Upcoming BMD Elections in his or her respective county.

### 1.     Imminent Threat of Injury-in-Fact

202.   Individual Coalition Member Plaintiffs LAURA DIGGES, WILLIAM DIGGES III, RICARDO DAVIS, and MEGAN MISSETT will suffer an invasion of a number of legally protected interests, resulting in "concrete and particularized" injuries, if Defendants enforce O.C.G.A. § 21–2–300(a)(2) and O.C.G.A. § 21–2–383(c), requiring all polling-place voters to use the Dominion BMD System.

203.   Specifically, for example, voters who vote using BMDs will be required:

- to cast a ballot that is individually traceable and not a secret ballot,

- to cast a ballot that cannot be read or verified by the voter and may not reflect the voter's preferences, and

- to suffer a greater risk of casting a less effective vote than other similar situated voters who vote by mail.

204.    Voters who avoid BMDs by choosing to vote by mail, on the other hand,

- will incur postage and transportation costs and will suffer inconveniences as a result of casting mail ballots,

- will be deprived of their ability to vote in their neighborhood polling places on election day,

- will be deprived of the ability to cast a fully informed vote by virtue of having to cast their votes earlier than other, similarly situated voters who may cast their votes on election day using BMDs;

- will incur the risk of their ballot being erroneously rejected without timely notice for cure.

205.    These anticipated injuries satisfy the requirement of "immediacy" because they will occur within a fixed period of time in the future.

206.    Suffering at least some of the anticipated injuries will be a certainty if the Coalition Plaintiffs vote in the Upcoming BMD Elections, whether by BMD or by mail ballot.   No independent event—other than the act of voting itself—is needed to bring about some or all of the anticipated injuries to Coalition Plaintiffs.

### 2. Causation

207. The anticipated injuries to the Member Plaintiffs will be caused by the Defendants' enforcement of O.C.G.A. § 21–2–300(a)(2) and O.C.G.A. § 21–2–383(c), requiring all polling-place voters to use the Dominion BMD System.

### 3. Redressability

208. An injunction against the Defendants' enforcement of O.C.G.A. § 21–2–300(a)(2) and O.C.G.A. § 21–2–383(c) will redress the anticipated injuries by doing away with the requirement for all in-person voters to cast their ballots using the Dominion BMD System.

## B. Standing of Coalition

209. Coalition has associational standing and organizational standing to bring each of the claims stated by this supplemental complaint.

### 1. Associational standing

210. The individual Members Plaintiffs LAURA DIGGES, WILLIAM DIGGES III, RICARDO DAVIS, and MEGAN MISSETT, and other individuals, are members of Coalition. By virtue of these members, Coalition has associational standing.

### a) Members have standing to sue in their own right

211.   The Member Plaintiffs and other individual members of Coalition are registered Georgia electors who intend to vote in their counties of residence in each of the Upcoming BMD Elections.

212.   These individuals all face a probability of harm in the near and definite future as a result of the Defendants' anticipated enforcement of O.C.G.A. § 21–2–300(a)(2) and O.C.G.A. § 21–2–383(c).

213.   Each of the Member Plaintiffs and other members of Coalition who are registered Georgia electors thus have individual standing in their own right to bring each of the claims for prospective injunctive relief that are stated by this supplemental complaint.

### b) Interests at stake are germane to organization's purpose

214.   The interests at stake in the claims raised by this supplemental complaint are germane to Coalition's purpose of preserving and advancing the constitutional liberties and individual rights of citizens, with an emphasis on preserving and protecting the rights of its members that are exercised through public elections.

### c) Neither claim nor relief requires participation of individual members

215. The claims stated by this supplemental complaint seek prospective injunctive relief so individual participation of Coalition's is not necessary.

## 2. Organizational standing

216. Coalition also has standing on its own because it will suffer injury to its organizational interests as a result of Defendants' anticipated enforcement of O.C.G.A. § 21–2–300(a)(2) and O.C.G.A. § 21–2–383(c).

217. The allegations stated by Paragraphs 140 through 144 of the TAC are adopted here pursuant to Rules 10(b) and 10(c).

### a) Injury-in-Fact

218. Defendants' enforcement of O.C.G.A. § 21–2–300(a)(2) and O.C.G.A. § 21–2–383(c), requiring all polling-place voters to use the Dominion BMD System, will force Coalition to divert personnel, time, and resources to educating its members and the voting public about how to protect their rights to cast a secret ballot and an equally effective vote in the Upcoming BMD Elections; and will impair Coalition's ability to engage in the organization's other projects by forcing it to divert resources to counteract the Defendants' illegal acts.

### b) Causation

219.   These anticipated injuries to Coalition will be caused by the Defendants' enforcement of O.C.G.A. § 21–2–300(a)(2) and O.C.G.A. § 21–2–383(c), requiring all polling-place voters to use the Dominion BMD System.

### c) Redressability

220.   An injunction against the Defendants' enforcement of O.C.G.A. § 21–2–300(a)(2) and O.C.G.A. § 21–2–383(c) will redress the anticipated injuries by doing away with the requirement for all in-person voters to cast their ballots using the Dominion BMD System.

## VIII.  CLAIMS

### COUNT I: FUNDAMENTAL RIGHT TO VOTE

### 42 U.S.C. § 1983

**Claim for Relief from Threatened Unjustified and Untailored Infringements of the Fundamental Right to Vote
In Violation of the First and Fourteenth Amendments**

*(Seeking Prospective Injunctive Relief
Against All Defendants in Official Capacities)*

221.   The Coalition Plaintiffs incorporate and reallege each of the foregoing Paragraphs 1–220.

222.   Defendants Raffensperger, the State Board Members, and the Fulton Board Members intend to employ the Dominion BMD System in the Upcoming

BMD Elections and to require in-person voters to cast their ballots using the Dominion BMD System.

223.   Defendants' threatened conduct will severely burden Coalition Plaintiffs' fundamental right to vote as described in Paragraphs 99–199 above, including in the following ways:

- In-person voters will be unable to verify that their votes have been properly recorded in the QR code produced by the BMDs and used to tabulate the vote;

- In-person voters will be deprived of the benefit of  having their official votes examined in precertification tabulation and risk-limiting audits because the QR codes on their official ballots are incapable of manual inspection;

- Traceability of ballot cards due to scanner timestamps will expose in-person voters to coercion and retaliation, which burdens them in freely voting their conscience; and

-  All voters, including in-person and absentee mail voters, will be deprived of the right to participate in a trustworthy and verifiable election process that safely, accurately, and reliably records and

counts all votes cast and that produces a reliable election result capable of being verified as true in a recount or election contest.

224.   Defendants' threatened imposition of these burdens and deprivations is neither justified by any legitimate governmental interest nor properly tailored to serve such an interest.

225.   Defendants' threatened conduct will violate the fundamental right to vote protected by the First and Fourteenth Amendments to the United States Constitution.

226.   In addition, Defendants' threatened conduct will violate the unconstitutional-conditions doctrine by requiring voters to suffer these severe burdens and infringements upon their constitutional right to vote as a condition of being able to enjoy the benefits and conveniences of casting their ballots in person at the polls.

227.   Defendants will commit all the foregoing violations while acting under color of state law.

228.   If an injunction does not issue against Defendants' intended conduct, Coalition Plaintiffs' fundamental right to vote will be violated, and the Coalition Plaintiffs will suffer irreparable injuries for which there is no adequate legal remedy.

## COUNT II: EQUAL PROTECTION

### 42 U.S.C. § 1983

**Claim for Relief from Threatened Violations of the Fourteenth Amendment's Guarantee of Equal Protection**

*(Seeking Prospective Injunctive Relief*
*Against All Defendants in Official Capacities)*

229.   The Coalition Plaintiffs incorporate and reallege each of the foregoing Paragraphs 1–220.

230.   Defendants Raffensperger, the State Board Members, and the Fulton Board Members intend to employ the Dominion BMD System in the Upcoming BMD Elections and to require in-person voters to cast their ballots using the Dominion BMD System.

231.   Defendants' threatened conduct is fundamentally unfair because it will arbitrarily treat some voters, including the Member Plaintiffs and other members of Coalition, differently than other, similarly situated voters in the same elections, including at least in the following ways:

- Voters who cast their votes on the Dominion BMD System will be subjected to burdens on their federal constitutional rights as described in Paragraphs 99–199 above.

- Voters who cast their votes on the Dominion BMD System will be deprived of state rights to have their votes audited in state-law manual precertification tabulation and risk-limiting "audits".

- Voters who cast their votes on the Dominion BMD System will be differentially deprived of underlying substantive state statutory and constitutional rights to vote by secret ballot.

- Voters who are similarly situated in all respects but who instead cast their votes on mailed paper ballots in the same election will be treated differently and will suffer none of the foregoing burdens, risks, and harms, including the inability to read and verify the votes they cast.

232.    Defendants' threatened conduct, which will impose the foregoing kinds of unequal treatment, will severely burden and infringe the Coalition Plaintiffs' exercise of the fundamental right to vote, federal constitutional rights to freedom of speech and association, and Georgia constitutional right to vote by secret ballot.

233.    Defendants' threatened conduct is neither justified by a legitimate governmental interest nor properly tailored to serve such an interest.

234.    Defendants' threatened conduct will violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

235.   In addition, Defendants' threatened conduct will violate the unconstitutional-conditions doctrine by requiring voters to suffer deprivation of the constitutional right to equal protection as a condition of being able to enjoy the benefits and conveniences of casting their ballots in person at the polls.

236.   Defendants will commit all the foregoing violations while acting under color of state law.

237.   If an injunction does not issue against Defendants' intended conduct, Coalition Plaintiffs' constitutional right to equal protection will be violated, and the Coalition Plaintiffs will suffer irreparable injuries for which there is no adequate legal remedy.

## COUNT III: DUE PROCESS

### 42 U.S.C. § 1983

**Claim for Relief from Threatened Violations of the Fourteenth Amendment's Guarantee of (Procedural) Due Process**

*(Seeking Prospective Injunctive Relief
Against All Defendants in Official Capacities)*

238.   The Coalition Plaintiffs incorporate and reallege each of the foregoing Paragraphs 1–220.

239.   Defendants Raffensperger, the State Board Members, and the Fulton Board Members intend to employ the Dominion BMD System in the Upcoming

BMD Elections and to require in-person voters to cast their ballots using the
Dominion BMD System.

240.  Defendants' threatened conduct is fundamentally unfair because it
will severely restrict and/or arbitrarily and capriciously deprive the Coalition
Plaintiffs' without proper notice of at least the following state-created liberty and
property interests:

- The right of voters under Georgia statutes to have their official votes
  counted in an initial count.

- The right of voters under Georgia statutes to have their initial votes
  recounted in a recount or examined in an audit.

- The right of voters under Georgia statutes to cast their votes using a
  voting system that has been properly certified as safe for use.

- The right of voters under Georgia statutes to cast their votes on a
  voting system that is functionally compliant with Georgia law.

- The state statutory and state constitutional rights of voters to vote by
  secret ballot.

241.  Defendants' threatened conduct is neither justified by a legitimate
governmental interest nor properly tailored to serve such an interest.

242.   Defendants' threatened conduct will violate the procedural requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

243.   In addition, Defendants' threatened conduct will violate the unconstitutional-conditions doctrine by requiring voters to suffer deprivation of the constitutional right to procedural due process as a condition of being able to enjoy the benefits and conveniences of casting their ballots in person at the polls.

244.   Defendants will commit all the foregoing violations while acting under color of state law.

245.   If an injunction does not issue against Defendants' intended conduct, Coalition Plaintiffs' constitutional right to equal protection will be violated, and the Coalition Plaintiffs will suffer irreparable injuries for which there is no adequate legal remedy.

## IX.   PRAYER FOR RELIEF

WHEREFORE, the Coalitions Plaintiffs respectfully request that this Court:

A.     Enter a judgment finding and declaring it unconstitutional for any public election in Georgia to be conducted using the Dominion BMD System.

B.     Enter a preliminary and permanent injunction prohibiting Defendants Raffensperger, the State Board Members, and the Fulton Board Members from

employing the Dominion BMD System to conduct any public election in Georgia, and enjoining the Defendants to employ a properly certified voting system using hand marked paper ballots as the standard method of voting, followed by statistically valid post-election, precertification audits.

      C.     Enter a preliminary and permanent injunction prohibiting Defendants from enforcing either O.C.G.A. § 21–2–300(a)(2) (2019), O.C.G.A. § 21–2–383(c) (2019), or any other law or regulation that requires Georgia voters to vote using the Dominion BMD System

      D.     Order that Defendants shall take all necessary action to ensure that there is no information recorded by any touchscreen machine or scanner (including a DRE electronic ballot, the encrypted ballot card of the BMD, and any other similar device), that, alone or in combination with other records or information, may be used to identify the individual who cast that ballot.

      E.     For all federal, state, and county elections conducted in Georgia using the Dominion BMD System, beginning with the November 2019 BMD pilot elections, order pre-certification testing of (1) the QR-code generated tabulations against the human-readable ballot selections on the ballot cards and (2) the fidelity of the unencrypted bar codes with the human readable ballots.

F.     For the Court-ordered pilot election in November 2019 using hand-marked paper ballot, order the expansion of the pilot election to include at least ten counties in at least five different geographic areas of the State, using either the existing certified AccuVote optical scanners, or Dominion scanners if they can be properly certified.   In addition, hand-marked paper-ballot pilot elections should also be held in any December runoffs of the November 2019 pilot elections.

G.     For all federal, state, and county elections conducted in Georgia using the DRE voting system until the DRE voting machines are fully retired, order pre-certification audits of the computer-generated tabulations of optically scanned absentee mail ballots and tests of accuracy in recording the DRE output.

H.     Beginning immediately, for all federal, state, and county elections conducted in Georgia using hand-marked paper ballots tabulated using optical scanners, including pilot elections, order pre-certification audits of election results, focusing on contested candidate races and ballot questions, with the plan for auditing to be based on applying well-accepted audit principles that assure a high probability that incorrect outcomes will be detected and remedied.

I.     Retain jurisdiction to ensure all Defendants' ongoing compliance with the foregoing Orders.

J.      Grant Coalition Plaintiffs an award of its reasonable attorney's fees,

costs, and expenses incurred in this action pursuant to 42 U.S.C. § 1988; and

J.      Grant Coalition Plaintiffs such other relief as the Court deems just and

proper.

DATED: September 6, 2019.

Respectfully submitted,

*/s/ Bruce P. Brown*                    */s/ Robert A. McGuire, III*
Bruce P. Brown                          Robert A. McGuire, III
Georgia Bar No. 064460                  Pro Hac Vice (ECF No. 125)
bbrown@brucepbrownlaw.com

Bruce P. Brown Law LLC                  ROBERT MCGUIRE LAW FIRM
1123 Zonolite Rd. NE                    113 Cherry Street PMB 86685
Suite 6                                 Seattle, WA  98104-2205
Atlanta, Georgia 30306                  Tel.: (253) 267-8530
(404) 881-0700

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*                       */s/ John Powers*
Cary Ichter                             John Powers
Georgia Bar No. 382515                  Pro Hac Vice (5/17/19 text-only order)
cichter@IchterDavis.com
                                        Ezra D. Rosenberg
Ichter Davis, LLC                       Pro Hac Vice (ECF No. 497)
3340 Peachtree Road NE
Suite 1530                              Lawyers' Committee for Civil Rights
Atlanta, GA 30326                       Under Law
(404) 869-7600                          1500 K St. NW, Suite 900
                                        Washington, DC 20005
                                        (202) 662-8300

*Counsel for William Digges III,*              *Counsel for Coalition Plaintiffs*
*Laura Digges, Ricardo Davis*
*& Megan Missett*

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## CERTIFICATE OF SERVICE

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ Bruce P. Brown*
Bruce P. Brown

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,** | |
| **Plaintiffs,** | |
| | |
| **v.** | **Civil Action No. 1:17-CV-2989-AT** |
| | |
| **BRAD RAFFENSPERGER , ET AL.,** | |
| **Defendants.** | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 6, 2019, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

*/s/ Bruce P. Brown*
Bruce P. Brown

E
X
H
I
B
I
T

**Exhibit**
CGG 0005

# IN THE UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| DONNA CURLING, et al. | ) |
| Plaintiffs, | ) |
| vs. | ) **CIVIL ACTION FILE** |
|  | ) **NO.: 1:17-cv-2989-AT** |
| BRAD RAFFENSPERGER, et al. | ) |
| Defendants. | ) |

## SUPPLEMENTAL DECLARATION OF MARILYN MARKS

**I, MARILYN MARKS,** hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1. I have personal knowledge of all facts stated in this declaration and, if called to testify, I could and would testify competently thereto.

2. I am the Executive Director of Coalition for Good Governance ("CGG"). I am over the age of 18.

**CGG Activities and Diversion of Resources**

3. Coalition for Good Governance, (formally known as Rocky Mountain Foundation) was founded in 2008 as a non-profit non-partisan corporation under the laws of Colorado. The current management of CGG undertook the management of the organization in 2014 with

1

primary work focused on election integrity and transparency in Colorado elections. Public records confirm that, at that time, current management brought approximately $700,000 in funding to CGG to address the organization's goals.

4. After I moved to North Carolina in late 2015, CGG's work began to transition to more geographically diverse projects, including election security projects in North Carolina, South Carolina, and Tennessee and national projects with other non-profits.

5. CGG's work in 2015 in North Carolina involved a significant project to undertake administrative challenges to the lack of a secret ballot in early voting statewide. CGG challenged Charlotte-Mecklenburg County's failure to conduct a required post-election audit on the 2016 presidential election.

6. In early 2017, national election integrity groups urged me to expand CGG's reach to Georgia, which was known in national election integrity circles as having the least secure elections in the nation. After I watched the April 18, 2017 Fulton County election returns in the "jungle primary," where Fulton's server failed and anomalous results were reported, I began to redirect resources and time to focus on Georgia's election security issues.

7. CGG's first efforts in 2017 in Georgia were in petitioning then Secretary Kemp for a reexamination of the DRE voting system.  CGG filed a lawsuit in Fulton County Superior Court in May 2017 seeking to remove DRE from use in the Ossoff/Handle Congressional District 6 runoff. In July 2017 this Curling lawsuit was filed, initially to challenge the outcome of that runoff, and then seeking to halt the use of the DRE system.

8. CCG organized other lawsuits in Georgia related to election matters including challenging the excess rejections of absentee ballots (2018), COVID-related voting infrastructure improvements (2020), and an election contest (2018), all of which commanded significant resources of CGG's volunteers' and management's time and CGG's modest budget.

9. The unpredicted complexity and protracted time requirements and expenses of this litigation has required CGG to consistently redirect resources of funding and management and volunteer time away from other desired projects that are of great interest to our board members, members, and donors.

10. I have had to reduce my active involvement in several important efforts that CGG supports because of the time demands of this litigation, and CGG has had to curtail and decline numerous organization activities.

Some examples include: inability to participate in the EAC's current process of accepting comments on the controversial pending Voluntary Voting System Standards; sharply reducing active involvement in Election Verification Network (a national organization of election experts); declining most speaking invitations on the topic of election security; ceased active involvement in State Audit Working Group (experts focused on developing election auditing standards); ceased activity in weekly meetings of Election Cybersecurity Working Group (a group proposing VVSG standards to NIST); ceased work in on-going drive-up voting project CGG initiated in North Carolina; became inactive in working with other North Carolina election transparency groups on voter education and transparency efforts in Wake County; reduced collaboration with North Carolina NAACP on voter education on election security; stopped participation in meetings of the North Carolina State Board of Elections; stopped participation in Charlotte-Mecklenburg Board of Elections meetings; lacked resources to provide requested consulting support for another non-profit organization's North Carolina state court case on ballot marking devices; abandoned CGG's plans to file a lawsuit in North Carolina against the use of ballot marking devices; deferred plans to file a lawsuit in North Carolina on the violations of

secret ballot laws; limiting CGG's involvement in the current effort to educate the New York State Board of Elections on the problems in using Ballot Marking Devices; declining request of Colorado members to help educate the Boulder Colorado City Council on problems with Instant Runoff Voting; declining the request of Georgia members to conduct voter education or author an opinion piece on the difficulties with Ranked Choice Voting; cancel plans for candidate forum on election security prior to the November election; cancel plans to conduct a meeting regarding Georgia needed election law changes with a group of Georgia lawmakers; delayed preparation of education materials for Georgia election officials regarding HB270; and failing to keep our website, fundraising efforts and donor communications current.

11. The examples of more current resource diversions listed above are similar to the activities and resource diversions detailed in June 2018 in Coalitions' Plaintiffs' TAC (Doc. 226 ¶¶142-143) which were true and correct at that time.

**Batch Management-Tabulation Software Problem**

12. During the November 3, 2021 election, Harri Hursti and I visited Gwinnett County Elections for several hours on multiple days as they were having significant problems with the Dominion server processing

5

certain batches of scanned ballot images uploaded on precinct scanner memory cards. County officials disclosed in public announcements that several thousand ballots (tens of thousands of votes) in the batches could not be processed.  Mr. Hursti and I watched  Dominion technicians make repeated unsuccessful efforts to process the ballots.

13. A Dominion technical expert, David Moreno, was flown in from Denver to attempt to remedy the vote tabulation problem,County spokesman Joe Sorenson repeated explained that ballots were simply failing to be processed by the system, and that thousands of ballots were caught up in the failure.

14. Based on contemporaneous discussions with Mr. Hursti, who was watching Mr. Moreno's actions and computer screens, it appeared that that Mr. Moreno made software code changes in real time to circumvent the problem to force the system to process most, but not all, of the uncounted ballots. After most of the ballots were processed and counted, Gwinnett quickly closed and certified the election.  I estimated that at the time the election was certified at least 1,600 ballots remained uncounted. I asked county officials repeatedly, in emails and on site, for an accounting of these ballots, but received no response.

15. A few days later a statewide hand count audit of the presidential race was conducted. I was an authorized monitor of the audit process in several counties including Gwinnett. According to the audit summary published by the Secretary of State, attached hereto as Exhibit 1, during the audit Gwinnett discovered 1,642 more ballots than were originally counted. This confirmed my belief that over 1,600 ballots had not been counted even after Dominion made real time software changes and the Gwinnett Board of Elections certified the result.

16. CGG has Gwinnett-based members, but I do not have adequate information to know whether the uncounted ballots and discrepancies either before or after the Mr. Moreno's system adjustments affected the precinct counts in which our Gwinnett members vote. The change certainly affected the county vote tallies. Gwinnett has withheld production of documents in objection to CGG's document subpoena, which was issued in order to learn more about this software and vote counting problem. A joint discovery dispute is in front of the Court (Doc.1057) related to some of the documents sought to research the tabulation errors.

17. The ballot batch management problem apparently has been experienced in several counties, across several elections since at least August 11,

2020 when Harri Hursti first observed indications of this problem on

Election Night in Fulton County. (Doc. 809-3 ¶ 41-43).

18. Rockdale County detailed their ballot batch management problem in a

series of emails to the Secretary of State's Office and Dominion.  These

emails are attached as Exhibit 1.  Ms. Willingham's description (Exhibit

1 at 2, 6-7) of the problem is consistent with information we have

obtained concerning this software and tabulation problem.

19. We have no reason to believe that the vote count discrepancies created by

the batch management software problem were significant enough to

change the result of the presidential election. In fact, the hand count audit

found that both the manual tabulation of ballots and the machine count of

the ballots showed President Biden with highest number of votes.

**Tabulation Discrepancies and Audit Failure**

20. After the counties' certification of their election results, the Secretary of

State ordered a full manual count of the ballots in the Presidential contest

and called it a "Risk Limiting Audit" with a "Risk Limit of Zero."

(timestamp 1:22. https://www.rev.com/blog/transcripts/georgia-press-

conference-on-election-recount-updates-transcript-november-18 )

Voting Works was engaged to manage the audit process and conduct the

tabulation and consolidation of the manual counts using their software "Arlo."

21. CGG had approximately 6 authorized audit monitors observing the hand count at various times across approximately 12 counties. Harri Hursti and I worked as a team and observed audit operations in Gwinnett, Clayton, DeKalb, Fulton and Cobb counties.

22. Based my knowledge of auditing principles and election audit processes, and my observations of the processes employed in Georgia, the audit procedures employed were not standard, not transparent, and violated fundamental election audit procedures. Count data was concealed from the public during the audit and entered into Voting Works applications in a process that monitors were not permitted to watch in many counties.

23. I fielded numerous calls from our monitors and election integrity and election auditing experts from  other states complaining about the unusual audit practices and lack of transparency. Harri Hursti and I conferred with Professor Philip Stark multiple times each day during the audit regarding Voting Works's and the Secretary's non-standard procedures that were generating widespread dissatisfaction with the audit process.

24. Based on my discussions with Professor Stark and Harri Hursti during several times that they were studying Voting Works' publicly published source code, my understanding is that the source code was apparently being frequently updated in real time while the audit was being conducted and the data input and preliminary results were being concealed from the public.

25. The Secretary did not permit the counties to disclose the manual counts as they were being conducted and required that results be confidential until after his office reviewed and disclosed them. This practice is in violation of standard election auditing practices of end-to-end transparency.  O.C.G.A. § 21-2-498(c)(4) requires that election audits be conducted in view of the public. The audit was not in public view as counts were hidden from observers.

26. As one example of such audit transparency failure, as I was reading a batch sheet of tallies on a box of counted ballots at the DeKalb audit facility in my role as a monitor, the Chairman of the DeKalb County Board of Elections told me that I was not permitted to see the vote tallies on the batch sheets. When I asked why, he screamed at me, "Because I said so." I encountered similar obstruction at some other counties as well.

On the other hand, Gwinnett County's auditing process was quite transparent, and monitors, the press and the public were permitted to see the necessary documents and tallying processes. The lack of standard minimum requirements for transparency of the audit process demonstrated to me that Georgia's audit processes cannot be relied on to produce reliable audit information.

27. Exhibit 2 is a true and correct copy of one the audit summaries released by the Secretary of State in his press release concerning the audit findings. ([https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_result_of_presidential_race](https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_result_of_presidential_race) ) CGG will investigate some of the anomalous-appearing discrepancies when discovery documents become available from counties. For example, Exhibit 2 shows that Bartow County found 52 fewer ballots in the audit than machine count, but President Biden gained 66 votes. Clayton County's manual audit found 360 fewer ballots than the machine count, yet former President Trump gained 145 votes. These are two of many such anomalous appearing county audit results, suggesting that error rates are higher than implied by the Secretary's office. The summary and our initial work on details that are available indicate that there were

numerous offsetting errors in the machine vote counts compared to the audited tabulations, raising questions about the quality of the tabulation software. (Despite the large number of errors, they were generally offsetting.)

28. After the hand count audit, an official statewide recount was conducted by rescanning all ballots. There were a number of discrepancies between machine counts that tallied the same ballots, although no outcome-changing discrepancies were detected. Exhibit 3 is a worksheet prepared by CGG analyst under my supervision that shows discrepancies in gray highlight between the precinct results for the machine recount compared to the original machine count precinct results for some of our members' home precincts in Fulton County. The data was obtained from published reports of the results and recount reports obtained through public records requests. The hand count audit results are not available in the public records except in the case of Rhonda Martin's precinct 08H. The member's precincts listed on the worksheet are Megan Missett, Virginia Forney, Rhonda Martin, Aileen Nakamura, and Shea Roberts. The precincts in which the CGG members live is confirmed in public record.

29. For example, in Rhonda Martin's O8H precinct, the BMD early voting vote count for President Biden was 574 in the original machine count and

569 in the machine recount.  In Aileen Nakamura's SS06 precinct, the mail vote count for President Biden changed from 288 to 284 in the machine recount. In Plaintiff Megan Missett's 06J precinct, the original machine early vote count for President Biden was 1,036 and the machine recount was 1,033.

30. I monitored the Secretary's press conferences and public announcements concerning the hand count audit and the official machine recount. The Secretary and Gabe Sterling, a spokesperson for the Secretary, repeatedly minimized the discrepancies and offsetting errors that were detected in the audit, implying that there were only rare discrepancies. On December 23, 2020 testifying before the Georgia House of Representatives Governmental Affairs Committee, Secretary Raffensperger stated that the audit proved that the machines "did not flip votes," going on to say, "But what we've shown is that the machines are accurately tabulating." (timestamp 2:53:00

https://www.youtube.com/watch?v=gCjbPJLBI7c&feature=youtu.be )

31. Public records document the fact that the machines were not "accurately tabulating," despite the fact that discrepancies did not have an impact on the outcome of the election -- President Biden's vote count was higher. CGG is in the initial stages of conducting discovery on the audit reports,

recount reports and discrepancies and does not yet have enough

information to determine the cause of the apparent discrepancies.

**Ballot Secrecy**

32.  I have observed dozens of Georgia's polling places since the pilot BMD

election in November 2019 through the November 2020 election. In the

several hundred BMD's I have seen installed in the polling places,

including in polling places where some CGG members have voted, I have

seen less than 20 BMDs that protected the privacy of the voters' choices,

which was only possible in a very large polling place facility deploying a

small number of machines.

33. As reflected in the Summary of Evidence, Exhibit A to this filing, CGG

has collected numerous reports covering the entire 17-month period of

BMD use.  Over the last year, our reports from members and observers

show no meaningful improvement in ballot secrecy statewide. Although

the Secretary issued guidance to the counties one year ago (Doc. 716-3 at

8, 10-13), CGG members' and observers' and my previous declarations

show that Secretary's recommended arrangement was ineffective in

protecting ballot secrecy.

34. Based on my personal observations, the suggested arrangement of

equipment requires more floor space than is available in many polling

14

places and does not effectively obscure sightlines to the touchscreens by people in the polling place. This reality is in conflict with the Secretary of State's order of March 31, 2020. (Doc. 809-1 at 20). The Secretary's order was a result of a Help America Vote Act complaint filed by CGG in to address the violation of ballot secrecy that appears to be impractical to resolve given the design of the Dominion BMD units.

Executed on this date, February 12, 2021

Marilyn Marks

E
X
H
I
B
I
T

1

| County | Risk-Limiting Audit Full Hand Count | | | | | Original Reporting | | Margin Diff | | Total Count Diff | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Trump | Biden | Jorgensen | Total | Margin | Total Votes | Margin | Raw # | % | Raw # | % |
| APPLING | 6570 | 1785 | 36 | 8,391 | +4,785 Trump | 8,341 | +4,747 Trump | +38 Trump | +0.456% Trump | 50 | 0.599% |
| ATKINSON | 2300 | 825 | 30 | 3,155 | +1,475 Trump | 3,155 | +1,475 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| BACON | 4018 | 625 | 25 | 4,668 | +3,393 Trump | 4,668 | +3,393 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| BAKER | 897 | 652 | 6 | 1,555 | +245 Trump | 1,555 | +245 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| BALDWIN | 8906 | 9139 | 207 | 18,252 | +233 Biden | 18,251 | +237 Biden | +4 Trump | +0.022% Trump | 1 | 0.005% |
| BANKS | 7796 | 931 | 74 | 8,801 | +6,865 Trump | 8,801 | +6,863 Trump | +2 Trump | +0.023% Trump | 0 | 0.000% |
| BARROW | 26804 | 10453 | 664 | 37,921 | +16,351 Trump | 37,921 | +16,351 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| BARTOW | 37615 | 12099 | 701 | 50,415 | +25,516 Trump | 50,467 | +25,582 Trump | +66 Biden | +0.131% Biden | -52 | -0.103% |
| BEN HILL | 4111 | 2393 | 60 | 6,564 | +1,718 Trump | 6,560 | +1,718 Trump | +0 Biden | +0.000% Biden | 4 | 0.061% |
| BERRIEN | 6419 | 1269 | 55 | 7,743 | +5,150 Trump | 7,743 | +5,150 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| BIBB | 26617 | 43412 | 749 | 70,778 | +16,795 Biden | 70,802 | +16,883 Biden | +88 Trump | +0.124% Trump | -24 | -0.034% |
| BLECKLEY | 4328 | 1311 | 67 | 5,706 | +3,017 Trump | 5,706 | +3,017 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| BRANTLEY | 7001 | 690 | 57 | 7,748 | +6,311 Trump | 7,746 | +6,292 Trump | +19 Trump | +0.245% Trump | 2 | 0.026% |
| BROOKS | 4261 | 2790 | 50 | 7,101 | +1,471 Trump | 7,100 | +1,470 Trump | +1 Trump | +0.014% Trump | 1 | 0.014% |
| BRYAN | 14240 | 6739 | 355 | 21,334 | +7,501 Trump | 21,340 | +7,505 Trump | +4 Biden | +0.019% Biden | -6 | -0.028% |
| BULLOCH | 18387 | 11248 | 455 | 30,090 | +7,139 Trump | 30,084 | +7,143 Trump | +4 Biden | +0.013% Biden | 6 | 0.020% |
| BURKE | 5400 | 5208 | 75 | 10,683 | +192 Trump | 10,684 | +191 Trump | +1 Trump | +0.009% Trump | -1 | -0.009% |
| BUTTS | 8405 | 3272 | 91 | 11,768 | +5,133 Trump | 11,771 | +5,132 Trump | +1 Trump | +0.008% Trump | -3 | -0.025% |
| CALHOUN | 911 | 1264 | 12 | 2,187 | +353 Biden | 2,194 | +337 Biden | +16 Biden | +0.729% Biden | -7 | -0.319% |
| CAMDEN | 15262 | 7969 | 470 | 23,701 | +7,293 Trump | 23,688 | +7,284 Trump | +9 Trump | +0.038% Trump | 13 | 0.055% |
| CANDLER | 3132 | 1270 | 30 | 4,432 | +1,862 Trump | 4,431 | +1,864 Trump | +2 Biden | +0.045% Biden | 1 | 0.023% |
| CARROLL | 37476 | 16238 | 760 | 54,474 | +21,238 Trump | 54,474 | +21,238 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| CATOOSA | 25168 | 6931 | 494 | 32,593 | +18,237 Trump | 32,593 | +18,235 Trump | +2 Trump | +0.006% Trump | 0 | 0.000% |
| CHARLTON | 3419 | 1105 | 44 | 4,568 | +2,314 Trump | 4,566 | +2,316 Trump | +2 Biden | +0.044% Biden | 2 | 0.044% |
| CHATHAM | 53248 | 78316 | 1912 | 133,476 | +25,068 Biden | 133,420 | +25,017 Biden | +51 Biden | +0.038% Biden | 56 | 0.042% |
| CHATTAHOOCHEE | 880 | 667 | 35 | 1,582 | +213 Trump | 1,582 | +213 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| CHATTOOGA | 8064 | 1854 | 132 | 10,050 | +6,210 Trump | 10,050 | +6,210 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| CHEROKEE | 99590 | 42787 | 2450 | 144,827 | +56,803 Trump | 144,830 | +56,793 Trump | +10 Trump | +0.007% Trump | -3 | -0.002% |
| CLARKE | 14482 | 36006 | 842 | 51,330 | +21,524 Biden | 51,333 | +21,602 Biden | +78 Trump | +0.152% Trump | -3 | -0.006% |
| CLAY | 637 | 790 | 7 | 1,434 | +153 Biden | 1,434 | +153 Biden | +0 Biden | +0.000% Biden | 0 | 0.000% |
| CLAYTON | 15714 | 95232 | 1038 | 111,984 | +79,518 Biden | 112,344 | +79,663 Biden | +145 Trump | +0.129% Trump | -360 | -0.320% |
| CLINCH | 2105 | 747 | 12 | 2,864 | +1,358 Trump | 2,864 | +1,358 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| COBB | 165114 | 221816 | 6515 | 393,445 | +56,702 Biden | 393,746 | +56,387 Biden | +315 Biden | +0.080% Biden | -301 | -0.076% |
| COFFEE | 10578 | 4511 | 125 | 15,214 | +6,067 Trump | 15,214 | +6,067 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| COLQUITT | 11778 | 4189 | 119 | 16,086 | +7,589 Trump | 16,083 | +7,590 Trump | +1 Biden | +0.006% Biden | 3 | 0.019% |
| COLUMBIA | 50043 | 29197 | 1346 | 80,586 | +20,846 Trump | 80,579 | +20,777 Trump | +69 Trump | +0.086% Trump | 7 | 0.009% |
| COOK | 4900 | 2059 | 76 | 7,035 | +2,841 Trump | 7,035 | +2,841 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| COWETA | 51494 | 24219 | 1089 | 76,802 | +27,275 Trump | 76,799 | +27,291 Trump | +16 Biden | +0.021% Biden | 3 | 0.004% |
| CRAWFORD | 4428 | 1615 | 59 | 6,102 | +2,813 Trump | 6,102 | +2,813 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| CRISP | 4991 | 2989 | 66 | 8,046 | +2,002 Trump | 8,039 | +2,001 Trump | +1 Trump | +0.012% Trump | 7 | 0.087% |

| County | Trump | Biden | Jorgensen | Total | Margin | Total Votes | Margin | Raw # | % | Raw # | % |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Risk-Limiting Audit Full Hand Count** | | | | | **Original Reporting** | | **Margin Diff** | | **Total Count Diff** | |
| **DADE** | 6066 | 1261 | 107 | 7,434 | +4,805 Trump | 7,434 | +4,805 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| **DAWSON** | 13398 | 2486 | 197 | 16,081 | +10,912 Trump | 16,081 | +10,912 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| **DECATUR** | 6758 | 4779 | 90 | 11,627 | +1,979 Trump | 11,627 | +1,978 Trump | +1 Trump | +0.009% Trump | 0 | 0.000% |
| **DEKALB** | 58438 | 308769 | 4236 | 371,443 | +250,331 Biden | 370,711 | +249,771 Biden | +560 Biden | +0.151% Biden | 732 | 0.197% |
| **DODGE** | 5843 | 2172 | 56 | 8,071 | +3,671 Trump | 8,070 | +3,672 Trump | +1 Biden | +0.012% Biden | 1 | 0.012% |
| **DOOLY** | 2160 | 1910 | 35 | 4,105 | +250 Trump | 4,105 | +248 Trump | +2 Trump | +0.049% Trump | 0 | 0.000% |
| **DOUGHERTY** | 10412 | 24656 | 280 | 35,348 | +14,244 Biden | 35,305 | +14,127 Biden | +117 Biden | +0.331% Biden | 43 | 0.122% |
| **DOUGLAS** | 25446 | 42814 | 838 | 69,098 | +17,368 Biden | 69,097 | +17,358 Biden | +10 Biden | +0.014% Biden | 1 | 0.001% |
| **EARLY** | 2709 | 2451 | 28 | 5,188 | +258 Trump | 5,187 | +285 Trump | +27 Trump | +0.521% Trump | 1 | 0.019% |
| **ECHOLS** | 1256 | 167 | 18 | 1,441 | +1,089 Trump | 1,441 | +1,089 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| **EFFINGHAM** | 23359 | 7713 | 492 | 31,564 | +15,646 Trump | 31,570 | +15,638 Trump | +8 Trump | +0.025% Trump | -6 | -0.019% |
| **ELBERT** | 6229 | 2878 | 66 | 9,173 | +3,351 Trump | 9,171 | +3,347 Trump | +4 Trump | +0.044% Trump | 2 | 0.022% |
| **EMANUEL** | 6556 | 2888 | 66 | 9,510 | +3,668 Trump | 9,501 | +3,667 Trump | +1 Trump | +0.011% Trump | 9 | 0.095% |
| **EVANS** | 2888 | 1324 | 35 | 4,247 | +1,564 Trump | 4,247 | +1,564 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| **FANNIN** | 12170 | 2568 | 110 | 14,848 | +9,602 Trump | 14,850 | +9,598 Trump | +4 Trump | +0.027% Trump | -2 | -0.013% |
| **FAYETTE** | 38024 | 33111 | 975 | 72,110 | +4,913 Trump | 71,993 | +4,887 Trump | +26 Trump | +0.036% Trump | 117 | 0.163% |
| **FLOYD** | 28687 | 11853 | 512 | 41,052 | +16,834 Trump | 38,588 | +16,926 Trump | +92 Trump | +0.238% Trump | 2,464 | 6.385% |
| **FORSYTH** | 85142 | 42158 | 1995 | 129,295 | +42,984 Trump | 129,305 | +42,919 Trump | +65 Trump | +0.050% Trump | -10 | -0.008% |
| **FRANKLIN** | 9072 | 1589 | 102 | 10,763 | +7,483 Trump | 10,765 | +7,476 Trump | +7 Trump | +0.065% Trump | -2 | -0.019% |
| **FULTON** | 137620 | 381179 | 6494 | 525,293 | +243,559 Biden | 524,659 | +243,904 Biden | +345 Trump | +0.066% Trump | 634 | 0.121% |
| **GILMER** | 13429 | 2932 | 164 | 16,525 | +10,497 Trump | 16,525 | +10,497 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| **GLASCOCK** | 1402 | 155 | 8 | 1,565 | +1,247 Trump | 1,566 | +1,248 Trump | +1 Biden | +0.064% Biden | -1 | -0.064% |
| **GLYNN** | 25630 | 15868 | 490 | 41,988 | +9,762 Trump | 41,984 | +9,737 Trump | +25 Trump | +0.060% Trump | 4 | 0.010% |
| **GORDON** | 19406 | 4383 | 244 | 24,033 | +15,023 Trump | 24,033 | +15,021 Trump | +2 Trump | +0.008% Trump | 0 | 0.000% |
| **GRADY** | 7049 | 3601 | 54 | 10,704 | +3,448 Trump | 10,707 | +3,415 Trump | +33 Trump | +0.308% Trump | -3 | -0.028% |
| **GREENE** | 7068 | 4088 | 91 | 11,247 | +2,980 Trump | 11,247 | +2,980 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| **GWINNETT** | 167361 | 242490 | 5656 | 415,507 | +75,129 Biden | 413,865 | +75,414 Biden | +285 Trump | +0.069% Trump | 1,642 | 0.397% |
| **HABERSHAM** | 16636 | 3554 | 235 | 20,425 | +13,082 Trump | 20,432 | +13,074 Trump | +8 Trump | +0.039% Trump | -7 | -0.034% |
| **HALL** | 64246 | 25061 | 1336 | 90,643 | +39,185 Trump | 90,523 | +39,139 Trump | +46 Trump | +0.051% Trump | 120 | 0.133% |
| **HANCOCK** | 1154 | 2975 | 23 | 4,152 | +1,821 Biden | 4,165 | +1,826 Biden | +5 Biden | +0.120% Biden | -13 | -0.312% |
| **HARALSON** | 12331 | 1792 | 125 | 14,248 | +10,539 Trump | 14,248 | +10,539 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| **HARRIS** | 14319 | 5456 | 215 | 19,990 | +8,863 Trump | 19,991 | +8,862 Trump | +1 Trump | +0.005% Trump | -1 | -0.005% |
| **HART** | 9466 | 3155 | 106 | 12,727 | +6,311 Trump | 12,727 | +6,307 Trump | +4 Trump | +0.031% Trump | 0 | 0.000% |
| **HEARD** | 4519 | 824 | 51 | 5,394 | +3,695 Trump | 5,391 | +3,692 Trump | +3 Trump | +0.056% Trump | 3 | 0.056% |
| **HENRY** | 48153 | 73359 | 1303 | 122,815 | +25,206 Biden | 122,742 | +25,089 Biden | +117 Biden | +0.095% Biden | 73 | 0.059% |
| **HOUSTON** | 41520 | 32262 | 1059 | 74,841 | +9,258 Trump | 74,823 | +9,302 Trump | +44 Biden | +0.059% Biden | 18 | 0.024% |
| **IRWIN** | 3131 | 1012 | 24 | 4,167 | +2,119 Trump | 4,168 | +2,126 Trump | +7 Biden | +0.168% Biden | -1 | -0.024% |
| **JACKSON** | 29507 | 7639 | 532 | 37,678 | +21,868 Trump | 37,670 | +21,855 Trump | +13 Trump | +0.035% Trump | 8 | 0.021% |
| **JASPER** | 5822 | 1760 | 61 | 7,643 | +4,062 Trump | 7,644 | +4,061 Trump | +1 Trump | +0.013% Trump | -1 | -0.013% |
| **JEFF DAVIS** | 4695 | 1028 | 48 | 5,771 | +3,667 Trump | 5,771 | +3,667 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |

| County | Risk-Limiting Audit Full Hand Count | | | | | Original Reporting | | Margin Diff | | Total Count Diff | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Trump | Biden | Jorgensen | Total | Margin | Total Votes | Margin | Raw # | % | Raw # | % |
| JEFFERSON | 3538 | 4059 | 43 | 7,640 | +521 Biden | 7,642 | +524 Biden | +3 Trump | +0.039% Trump | -2 | -0.026% |
| JENKINS | 2161 | 1266 | 28 | 3,455 | +895 Trump | 3,455 | +895 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| JOHNSON | 2849 | 1222 | 28 | 4,099 | +1,627 Trump | 4,100 | +1,628 Trump | +1 Biden | +0.024% Biden | -1 | -0.024% |
| JONES | 9940 | 4896 | 112 | 14,948 | +5,044 Trump | 14,966 | +5,077 Trump | +33 Biden | +0.220% Biden | -18 | -0.120% |
| LAMAR | 6331 | 2610 | 94 | 9,035 | +3,721 Trump | 9,039 | +3,715 Trump | +6 Trump | +0.066% Trump | -4 | -0.044% |
| LANIER | 2512 | 1016 | 48 | 3,576 | +1,496 Trump | 3,576 | +1,490 Trump | +6 Trump | +0.168% Trump | 0 | 0.000% |
| LAURENS | 14496 | 8071 | 161 | 22,728 | +6,425 Trump | 22,729 | +6,420 Trump | +5 Trump | +0.022% Trump | -1 | -0.004% |
| LEE | 12007 | 4558 | 149 | 16,714 | +7,449 Trump | 16,714 | +7,449 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| LIBERTY | 7960 | 13131 | 331 | 21,422 | +5,171 Biden | 21,389 | +5,140 Biden | +31 Biden | +0.145% Biden | 33 | 0.154% |
| LINCOLN | 3173 | 1431 | 38 | 4,642 | +1,742 Trump | 4,650 | +1,744 Trump | +2 Biden | +0.043% Biden | -8 | -0.172% |
| LONG | 3526 | 2037 | 96 | 5,659 | +1,489 Trump | 5,656 | +1,495 Trump | +6 Biden | +0.106% Biden | 3 | 0.053% |
| LOWNDES | 25727 | 20083 | 547 | 46,357 | +5,644 Trump | 46,355 | +5,574 Trump | +70 Trump | +0.151% Trump | 2 | 0.004% |
| LUMPKIN | 12163 | 3126 | 242 | 15,531 | +9,037 Trump | 15,531 | +9,037 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| MACON | 1799 | 2849 | 22 | 4,670 | +1,050 Biden | 4,662 | +1,074 Biden | +24 Trump | +0.515% Trump | 8 | 0.172% |
| MADISON | 11326 | 3411 | 200 | 14,937 | +7,915 Trump | 14,937 | +7,915 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| MARION | 2275 | 1311 | 38 | 3,624 | +964 Trump | 3,624 | +964 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| MCDUFFIE | 6146 | 4174 | 132 | 10,452 | +1,972 Trump | 10,455 | +2,001 Trump | +29 Biden | +0.277% Biden | -3 | -0.029% |
| MCINTOSH | 4018 | 2610 | 68 | 6,696 | +1,408 Trump | 6,696 | +1,404 Trump | +4 Trump | +0.060% Trump | 0 | 0.000% |
| MERIWETHER | 6524 | 4287 | 66 | 10,877 | +2,237 Trump | 10,877 | +2,237 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| MILLER | 2066 | 747 | 20 | 2,833 | +1,319 Trump | 2,835 | +1,317 Trump | +2 Trump | +0.071% Trump | -2 | -0.071% |
| MITCHELL | 4935 | 3995 | 33 | 8,963 | +940 Trump | 8,963 | +940 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| MONROE | 11058 | 4388 | 152 | 15,598 | +6,670 Trump | 15,592 | +6,676 Trump | +6 Biden | +0.038% Biden | 6 | 0.038% |
| MONTGOMERY | 2960 | 980 | 27 | 3,967 | +1,980 Trump | 3,966 | +1,981 Trump | +1 Biden | +0.025% Biden | 1 | 0.025% |
| MORGAN | 8227 | 3357 | 122 | 11,706 | +4,870 Trump | 11,707 | +4,875 Trump | +5 Biden | +0.043% Biden | -1 | -0.009% |
| MURRAY | 12943 | 2305 | 144 | 15,392 | +10,638 Trump | 15,389 | +10,641 Trump | +3 Biden | +0.019% Biden | 3 | 0.019% |
| MUSCOGEE | 30025 | 49493 | 986 | 80,504 | +19,468 Biden | 80,543 | +19,480 Biden | +12 Trump | +0.015% Trump | -39 | -0.048% |
| NEWTON | 23888 | 29787 | 577 | 54,252 | +5,899 Biden | 54,239 | +5,925 Biden | +26 Trump | +0.048% Trump | 13 | 0.024% |
| OCONEE | 16596 | 8160 | 411 | 25,167 | +8,436 Trump | 25,168 | +8,433 Trump | +3 Trump | +0.012% Trump | -1 | -0.004% |
| OGLETHORPE | 5592 | 2437 | 102 | 8,131 | +3,155 Trump | 8,131 | +3,157 Trump | +2 Biden | +0.025% Biden | 0 | 0.000% |
| PAULDING | 54512 | 29681 | 1154 | 85,347 | +24,831 Trump | 85,385 | +24,821 Trump | +10 Trump | +0.012% Trump | -38 | -0.045% |
| PEACH | 6513 | 5926 | 125 | 12,564 | +587 Trump | 12,545 | +582 Trump | +5 Trump | +0.040% Trump | 19 | 0.151% |
| PICKENS | 14087 | 2816 | 233 | 17,136 | +11,271 Trump | 17,116 | +11,267 Trump | +4 Trump | +0.023% Trump | 20 | 0.117% |
| PIERCE | 7900 | 1099 | 49 | 9,048 | +6,801 Trump | 9,048 | +6,799 Trump | +2 Trump | +0.022% Trump | 0 | 0.000% |
| PIKE | 9127 | 1504 | 88 | 10,719 | +7,623 Trump | 10,720 | +7,622 Trump | +1 Trump | +0.009% Trump | -1 | -0.009% |
| POLK | 13581 | 3647 | 149 | 17,377 | +9,934 Trump | 17,399 | +9,931 Trump | +3 Trump | +0.017% Trump | -22 | -0.126% |
| PULASKI | 2816 | 1231 | 37 | 4,084 | +1,585 Trump | 4,059 | +1,588 Trump | +3 Biden | +0.074% Biden | 25 | 0.616% |
| PUTNAM | 8291 | 3448 | 116 | 11,855 | +4,843 Trump | 11,855 | +4,843 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| QUITMAN | 604 | 497 | 5 | 1,106 | +107 Trump | 1,106 | +107 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| RABUN | 7473 | 1985 | 110 | 9,568 | +5,488 Trump | 9,568 | +5,490 Trump | +2 Biden | +0.021% Biden | 0 | 0.000% |
| RANDOLPH | 1391 | 1671 | 12 | 3,074 | +280 Biden | 3,074 | +280 Biden | +0 Biden | +0.000% Biden | 0 | 0.000% |

| County | Risk-Limiting Audit Full Hand Count | | | | | Original Reporting | | Margin Diff | | Total Count Diff | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Trump | Biden | Jorgensen | Total | Margin | Total Votes | Margin | Raw # | % | Raw # | % |
| RICHMOND | 26767 | 59142 | 1111 | 87,020 | +32,375 Biden | 87,016 | +32,343 Biden | +32 Biden | +0.037% Biden | 4 | 0.005% |
| ROCKDALE | 13129 | 31120 | 431 | 44,680 | +17,991 Biden | 44,686 | +18,232 Biden | +241 Biden | +0.539% Biden | -6 | -0.013% |
| SCHLEY | 1800 | 462 | 13 | 2,275 | +1,338 Trump | 2,275 | +1,338 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| SCREVEN | 3936 | 2644 | 51 | 6,631 | +1,292 Trump | 6,628 | +1,255 Trump | +37 Trump | +0.558% Trump | 3 | 0.045% |
| SEMINOLE | 2613 | 1256 | 19 | 3,888 | +1,357 Trump | 3,884 | +1,357 Trump | +0 Biden | +0.000% Biden | 4 | 0.103% |
| SPALDING | 18057 | 11784 | 275 | 30,116 | +6,273 Trump | 30,116 | +6,273 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| STEPHENS | 9369 | 2385 | 132 | 11,886 | +6,984 Trump | 11,885 | +6,983 Trump | +1 Trump | +0.008% Trump | 1 | 0.008% |
| STEWART | 802 | 1181 | 7 | 1,990 | +379 Biden | 1,990 | +381 Biden | +2 Trump | +0.101% Trump | 0 | 0.000% |
| SUMTER | 5715 | 6324 | 99 | 12,138 | +609 Biden | 12,150 | +586 Biden | +23 Biden | +0.189% Biden | -12 | -0.099% |
| TALBOT | 1392 | 2114 | 16 | 3,522 | +722 Biden | 3,522 | +722 Biden | +0 Biden | +0.000% Biden | 0 | 0.000% |
| TALIAFERRO | 360 | 561 | 7 | 928 | +201 Biden | 928 | +201 Biden | +0 Biden | +0.000% Biden | 0 | 0.000% |
| TATTNALL | 6055 | 2053 | 76 | 8,184 | +4,002 Trump | 8,183 | +3,992 Trump | +10 Trump | +0.122% Trump | 1 | 0.012% |
| TAYLOR | 2420 | 1388 | 34 | 3,842 | +1,032 Trump | 3,839 | +1,031 Trump | +1 Trump | +0.026% Trump | 3 | 0.078% |
| TELFAIR | 2822 | 1491 | 21 | 4,334 | +1,331 Trump | 4,333 | +1,338 Trump | +7 Biden | +0.162% Biden | 1 | 0.023% |
| TERRELL | 2009 | 2371 | 36 | 4,416 | +362 Biden | 4,416 | +372 Biden | +10 Biden | +0.226% Biden | 0 | 0.000% |
| THOMAS | 13027 | 8697 | 190 | 21,914 | +4,330 Trump | 21,853 | +4,246 Trump | +84 Trump | +0.384% Trump | 61 | 0.279% |
| TIFT | 10782 | 5323 | 177 | 16,282 | +5,459 Trump | 16,283 | +5,462 Trump | +3 Biden | +0.018% Biden | -1 | -0.006% |
| TOOMBS | 7873 | 2941 | 104 | 10,918 | +4,932 Trump | 10,914 | +4,933 Trump | +1 Biden | +0.009% Biden | 4 | 0.037% |
| TOWNS | 6385 | 1549 | 45 | 7,979 | +4,836 Trump | 7,979 | +4,834 Trump | +2 Trump | +0.025% Trump | 0 | 0.000% |
| TREUTLEN | 2101 | 952 | 24 | 3,077 | +1,149 Trump | 3,077 | +1,149 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| TROUP | 18146 | 11582 | 328 | 30,056 | +6,564 Trump | 30,049 | +6,565 Trump | +1 Biden | +0.003% Biden | 7 | 0.023% |
| TURNER | 2349 | 1410 | 33 | 3,792 | +939 Trump | 3,792 | +939 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| TWIGGS | 2366 | 2048 | 31 | 4,445 | +318 Trump | 4,444 | +326 Trump | +8 Biden | +0.180% Biden | 1 | 0.023% |
| UNION | 12652 | 2801 | 109 | 15,562 | +9,851 Trump | 15,560 | +9,850 Trump | +1 Trump | +0.006% Trump | 2 | 0.013% |
| UPSON | 8613 | 4199 | 96 | 12,908 | +4,414 Trump | 12,905 | +4,407 Trump | +7 Trump | +0.054% Trump | 3 | 0.023% |
| WALKER | 23155 | 5770 | 412 | 29,337 | +17,385 Trump | 29,354 | +17,405 Trump | +20 Biden | +0.068% Biden | -17 | -0.058% |
| WALTON | 37858 | 12612 | 570 | 51,040 | +25,246 Trump | 51,095 | +25,160 Trump | +86 Trump | +0.168% Trump | -55 | -0.108% |
| WARE | 9902 | 4174 | 117 | 14,193 | +5,728 Trump | 14,192 | +5,654 Trump | +74 Trump | +0.521% Trump | 1 | 0.007% |
| WARREN | 1168 | 1466 | 16 | 2,650 | +298 Biden | 2,651 | +303 Biden | +5 Trump | +0.189% Trump | -1 | -0.038% |
| WASHINGTON | 4670 | 4743 | 65 | 9,478 | +73 Biden | 9,459 | +67 Biden | +6 Biden | +0.063% Biden | 19 | 0.201% |
| WAYNE | 10001 | 2661 | 104 | 12,766 | +7,340 Trump | 12,778 | +7,300 Trump | +40 Trump | +0.313% Trump | -12 | -0.094% |
| WEBSTER | 749 | 639 | 3 | 1,391 | +110 Trump | 1,390 | +109 Trump | +1 Trump | +0.072% Trump | 1 | 0.072% |
| WHEELER | 1583 | 689 | 13 | 2,285 | +894 Trump | 2,285 | +894 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| WHITE | 12222 | 2411 | 183 | 14,816 | +9,811 Trump | 14,816 | +9,811 Trump | +0 Biden | +0.000% Biden | 0 | 0.000% |
| WHITFIELD | 25666 | 10677 | 443 | 36,786 | +14,989 Trump | 36,746 | +14,966 Trump | +23 Trump | +0.063% Trump | 40 | 0.109% |
| WILCOX | 2403 | 861 | 16 | 3,280 | +1,542 Trump | 3,281 | +1,541 Trump | +1 Trump | +0.030% Trump | -1 | -0.030% |
| WILKES | 2822 | 2161 | 47 | 5,030 | +661 Trump | 5,029 | +663 Trump | +2 Biden | +0.040% Biden | 1 | 0.020% |
| WILKINSON | 2667 | 2067 | 31 | 4,765 | +600 Trump | 4,770 | +589 Trump | +11 Trump | +0.231% Trump | -5 | -0.105% |
| WORTH | 6829 | 2398 | 60 | 9,287 | +4,431 Trump | 9,285 | +4,435 Trump | +4 Biden | +0.043% Biden | 2 | 0.022% |

| County | Risk-Limiting Audit Full Hand Count | | | | | | Original Reporting | | | Margin Diff | | | Total Count Diff | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Trump | Biden | Jorgensen | Total | Margin | | Total Votes | Margin | | Raw # | % | | Raw # | % |
| **TOTALS** | 2,462,857 | 2,475,141 | 62,587 | 5,000,585 | +12,284 Biden | | 4,995,323 | +12,780 Biden | | +496 Trump | +0.0099% Trump | | 5,262 | 0.1053% |

EXHIBIT

2

**Cynthia Willingham**

| | |
|---|---|
| **From:** | Cynthia Willingham |
| **Sent:** | Tuesday, June 02, 2020 12:24 PM |
| **To:** | Scott Tucker |
| **Cc:** | Chris Harvey; Rayburn, Kevin |
| **Subject:** | Problems Scanning Election Ballots |
| **Attachments:** | icc error message.jpg |

## URGENT ASSISTANCE NEEDED

**Good Day All, your immediate help is needed with addressing the error we're getting in Scanning the Ballots on the ICC.  The Invalid Ballot Error Message is attached.**

**We have made several attempts in calling Dominion with no resolution.  It is imperative that someone timely be available to assist Counties with addressing issues with the New Voting System.  This problem was not experienced during L&A.  We have tried, re-loading the tabulator files , re-creating the files, to no avail.**

**We have no choice but to await a response from Dominion on resolving this problem; however, it is disappointing regarding the response time we have received.  It should not take several hours to get a response.**

**Thanks and you may contact me on my cellphone at (404) 409.7955.**

**Cynthia Willingham, Supervisor of Elections**
**Rockdale County Board of Elections**
**Ph. (770) 278-7333**
**Fax (770) 785-5932**
**"Your Voice…Your Choice…Your Vote"**

1

Rockdale000919

**Cynthia Willingham**

| | |
|---|---|
| **From:** | Cynthia Willingham |
| **Sent:** | Tuesday, June 09, 2020 10:11 PM |
| **To:** | Scott Tucker; Chris Harvey; Rayburn, Kevin |
| **Cc:** | Hill, Brian |
| **Subject:** | Production of Election Results |

Hello all, I wish I could say good day….Since just after 7pm, we have been attempting to pull over the By Mail Ballots to RTR to no avail…The Regional Manager has been here on site for at least 2 hours and still no results. I have observed the Regional Manager speaking with Mitch…still no results…NOW I am reaching out to you…Everyone is asking where are the results for mail ballots…I have no answers…I'm sending this email out to you, praying you will be able to assist. You may call me on my cellphone 404.409.7955.

**Cynthia Willingham, Supervisor of Elections**
**Rockdale County Board of Elections**
**Ph. (770) 278-7333**
**Fax (770) 785-5932**
**"Your Voice…Your Choice…Your Vote"**

1

2

Rockdale000920

## Cynthia Willingham

| | |
|---|---|
| **From:** | Cynthia Willingham |
| **Sent:** | Wednesday, June 10, 2020 12:53 AM |
| **To:** | Cynthia Willingham |
| **Cc:** | Aldren Sadler, Sr.; gerald barger; Karen James (karenjames2507@yahoo.com) |
| **Subject:** | Rockdale Election Results |
| **Attachments:** | ROCKDALE UNOFFICIAL_INCOMPLETE ELECTION RESULTS  6_9_20 Election.pdf |

**Hello Everyone, the Board of Elections and I would like to again thank you for your patience as we work through issues, at no fault of ours, in producing election results of the June 9th election.  We are committed to getting you results as soon as they are available to us.**

**Attached is the latest of what we have been able to pull from the tabulation system.  These results includes, Dem+Rep+NP Votes (see the last page of the results) as follows:  7,895 Election Day Votes; 5,516 Advance In-Person Votes; and 2,906 Absentee By Mail Votes (this is just a portion of the Absentee by Mail Votes).  Total Votes so far – 16,317 Votes.**

**We are still unable to produce all of the By Mail Votes.  We will try again tomorrow.**

**Thanks again.**


**Cynthia Willingham, Supervisor of Elections**
**Rockdale County Board of Elections**
**Ph. (770) 278-7333**
**Fax (770) 785-5932**
**"Your Voice…Your Choice…Your Vote"**

3

Rockdale000921

**Cynthia Willingham**

| | |
|---|---|
| **From:** | Cynthia Willingham |
| **Sent:** | Wednesday, June 10, 2020 1:32 AM |
| **To:** | Cynthia Willingham |
| **Cc:** | Aldren Sadler, Sr.; gerald barger; Karen James (karenjames2507@yahoo.com) |
| **Subject:** | Rockdale Election Results |
| **Attachments:** | ROCKDALE COUNTY UNOFFICIAL AND INCOMPLETE ELECTION RESULTS 6_9_20.pdf |

**Hello Again Everyone, FINALLY...WE HAVE SOME NUMBERS. PLEASE NOTE, THESE NUMBERS ARE UNOFFICIAL UNTIL THEY ARE RECONCILED AND CERTIFIED BY THE BOARD OF ELECTIONS. ALSO, WE STILL HAVE MORE ABSENTEE BY MAIL BALLOTS THAT HAVE TO BE VALIDATED BEFORE THEY CAN BE ACCEPTED AND COUNTED (APPROXIMATELY 600). PROVISIONAL BALLOTS WILL BE VALIDATED BEGINNING TOMORROW (WEDNESDAY) AND COUNTED ON FRIDAY, JUST 12TH.**

**AS IT STANDS RIGHT NOW, WE HAVE LOCAL RUNOFF ELECTIONS FOR: CLERK OF COURTS AND BOARD OF EDUCATION POST 5.**

**THANK EACH OF YOU...AND CONGRATS TO ALL!**

**Cynthia Willingham, Supervisor of Elections**
**Rockdale County Board of Elections**
**Ph. (770) 278-7333**
**Fax (770) 785-5932**
**"Your Voice...Your Choice...Your Vote"**

4

Rockdale000922

**Cynthia Willingham**

| | |
|---|---|
| **From:** | Cynthia Willingham |
| **Sent:** | Wednesday, June 10, 2020 1:40 AM |
| **To:** | Cynthia Willingham |
| **Cc:** | Elsie Roy; Renee Phifer; Samantha Roseberry; 'Linda James Rockdale County Elections'; 'kamekegrahamrockdalecounty@gmail.com' |
| **Subject:** | Rockdale June 9 2020 Election Results |
| **Attachments:** | ROCKDALE COUNTY UNOFFICIAL AND INCOMPLETE ELECTION RESULTS 6_9_20.pdf |

Good Morning Everyone, as you all know, there were delays in producing the Election Results from the June 9th General Primary/Nonpartisan/Special and PPP Elections. Well, after several hours, we finally have numbers, per the attached. Please note, these results are unofficial and incomplete. We still have approximately 600 absentee by mail ballots to validate, military ballots and an unknown number of provisional ballots to validate. We will do a final count of votes on Friday, June 12th. We will let you know the time as soon as it is determined.

As of this email, there are two local potential runoff elections: Clerk of Courts and Board of Education Post 5.

Thanks to each of you for your patience and understanding, while we work through learning the new voting system. Please let us know if you have any questions.

# To confirm your voter registration and where to vote visit:
• **Secretary of State My Voter Page:** www.mvp.sos.ga.gov
• **Download the Georgia Votes App: GA Votes**
• **Contact the Rockdale Board of Elections Office:**
**1261 Commercial Drive, SW, Suite B, Phone: (770) 278-7333**
**Website:** www.rockdalecountyga.gov

Thank you in advance for your part in making voting in our County a SUCCESS! Should you have any questions, please do not hesitate to contact us.

**NOTE: IF YOU WISH TO BE REMOVED FROM THIS LIST, PLEASE LET US KNOW.**

**Cynthia Willingham, Supervisor of Elections**
**Rockdale County Board of Elections**
**Ph. (770) 278-7333**
**Fax (770) 785-5932**
**"Your Voice...Your Choice...Your Vote"**

5

Rockdale000923

**Cynthia Willingham**

| | |
|---|---|
| **From:** | Cynthia Willingham |
| **Sent:** | Thursday, June 11, 2020 1:31 PM |
| **To:** | Scott Tucker; Chris Harvey; Rayburn, Kevin |
| **Cc:** | Aldren Sadler, Sr.; gerald barger; Karen James (karenjames2507@yahoo.com) |
| **Subject:** | Additional Training Needed - Tech and Regional Manager |

**Good Day All, I will be brief, I am not sure if you are aware of the problem experienced in Rockdale County in producing by mail election results on Election Night.  Immediately at 7pm on Election Night our tech, Allan, attempted to pull the by mail ballots scanned from ICC over into RTR...it did not work.  For some unknown reason, all batches were not coming over into RTR.  Allan contacted Stephanie, the Regional Manager, she attempted to assist via text and phone, to no avail.  Stephanie arrived at our office to further assist (I am not sure of the time but it was before 8pm).  At one point, early on, I saw Allan facetiming with Mitch.  The problem was not resolved until 1:00am, by this time, out of frustration, all candidates had left except one.  It should not have taken 6 hours to produce these results...but it did...why?  I spoke with Scott on Saturday, June 6th, I again expressed concerns and were given assurances by Scott that the Tech would have all that is needed to support us on Election Night...that did not happen.**

**I sent an email to each of you on June 2nd expressing my concerns with scanning of ballots; I sent an email to each of you Election Night requesting assistance, no response to my email.**

**I am making the following request, with hopes that I will get a timely response.  REQUEST:  The Rockdale Board of Elections and I are requesting that the Tech and Regional Manager be immediately provided with additional training on the ICC and RTR.  This training needs to be provided prior to us beginning the L&A preparations for the Runoff Election, so that we can practice the procedures in preparation for the runoff election (ensuring we are prepared and ready on Election Night).  As Scott knows, during the scanning of the by mail ballots last week, our Tech, purged the scanned ballots, not once, but twice on two different days.  We had to start over and rescan**

1                                                    6

Rockdale000924

the ballots, because our Tech, did not know to back up the scanned batches. This is primarily due to a lack of training. I requested from Scott, a checklist that the Techs should follow, so that I can ensure that we are doing what's needed to be able to produce results timely on Election Night. This is our reason for stating more training is needed to prevent these issues from reoccurring for the runoff election.

Chris, per your Buzz request this morning, at a later date, I will be providing a detailed report of things that went well and those we can improve upon.

We just want to ensure that we are all doing all we can to ensure elections are successful in Rockdale County and our great State.

Thank each of you and I look forward to your response to this request.


Cynthia Willingham, Supervisor of Elections
Rockdale County Board of Elections
Ph. (770) 278-7333
Fax (770) 785-5932
"Your Voice...Your Choice...Your Vote"

7

Rockdale000925

E
X
H
I
B
I
T

3

Fulton Nov. 3

### Election Day

| Precinct | Trump Original Machine Count | Trump Recount Machine Count | Trump Hand Count Audit | Biden Original Machine Count | Biden Recount Machine Count | Biden Hand Count Audit | Jorgensen Original Machine Count | Jorgensen Recount Machine Count | Jorgensen Hand Count Audit |
|---|---|---|---|---|---|---|---|---|---|
| 06J/ Missett | 46 | 46 | Not available | 73 | 72 | not available | 7 | 7 | not available |
| 06L1/ Forney | 24 | 24 | Not available | 27 | 27 | not available | 2 | 2 | not available |
| 08H/ Martin | 90 | 90 | 90 | 42 | 42 | 42 | 5 | 5 | 5 |
| SS06/ Nakamura | 51 | 51 | Not available | 38 | 38 | not available | 2 | 2 | not available |
| SS11D/ Roberts | 21 | 21 | not available | 6 | 6 | not available | 0 | 0 | not available |

### Early Voting

| Precinct | Trump Original Machine Count | Trump Recount Machine Count | Biden Original Machine Count | Biden Recount Machine Count | Jorgensen Original Machine Count | Jorgensen Recount Machine Count |
|---|---|---|---|---|---|---|
| 06J/ Missett | 198 | 198 | 1036 | 1033 | 15 | 15 |
| 06L1/ Forney | 96 | 96 | 366 | 365 | 6 | 6 |
| 08H/ Martin | 654 | 653 | 574 | 569 | 6 | 6 |
| SS06/ Nakamura | 401 | 399 | 413 | 412 | 7 | 7 |
| SS11D/ Roberts | 94 | 94 | 93 | 93 | 4 | 4 |

### Mail Ballots

| Precinct | Trump Original Machine Count | Trump Recount Machine Count | Biden Original Machine Count | Biden Recount Machine Count | Jorgensen Original Machine Count | Jorgensen Recount Machine Count |
|---|---|---|---|---|---|---|
| 06J/ Missett | 85 | 85 | 785 | 789 | 8 | 8 |
| 06L1/ Forney | 42 | 43 | 232 | 234 | 2 | 2 |
| 08H/ Martin | 224 | 224 | 483 | 478 | 1 | 1 |
| SS06/ Nakamura | 147 | 147 | 288 | 284 | 7 | 7 |
| SS11D/ Roberts | 30 | 29 | 73 | 74 | 4 | 4 |

294923210791 5   8

C&E 964 E

Form **990-EZ**

Department of the Treasury
Internal Revenue Service

**Short Form**
## Return of Organization Exempt From Income Tax
Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

▶ Do not enter social security numbers on this form as it may be made public
▶ Go to *www irs gov/Form990EZ* for instructions and the latest information.

OMB No 1545-1150

**2017**

**Open to Public Inspection**

**A** For the 2017 calendar year, or tax year beginning _____, 2017, and ending _____, 20 ____

| **B** Check if applicable | | **C** Name of organization | **D** Employer identification number |
|---|---|---|---|
| X | Address change | COALITION FOR GOOD GOVERNANCE | 26-3670783 |
| X | Name change | Number and street (or P O box, if mail is not delivered to street address)  Room/suite | **E** Telephone number |
| | Initial return | 1520 CRESS CT | (719 ) 256-4140 |
| | Final return/terminated | City or town, state or province, country, and ZIP or foreign postal code | **F** Group Exemption |
| | Amended return | BOULDER, CO 80304      03 | Number ▶ |
| | Application pending | | |

**G** Accounting Method   ☐ Cash   ☒ Accrual   Other (specify) ▶ _____

**I** Website: ▶ HTTPS://COALITIONFORGOODGOVERNANCE.ORG/

**J** Tax-exempt status (check only one) - ☒ 501(c)(3)   ☐ 501(c)( ) ◀ (insert no)   ☐ 4947(a)(1) or   ☐ 527

**H** Check ▶ ☐ if the organization is not required to attach Schedule B (Form 990, 990-EZ, or 990-PF)

**K** Form of organization ☒ Corporation   ☐ Trust   ☐ Association   ☐ Other

**L** Add lines 5b, 6c, and 7b to line 9 to determine gross receipts  If gross receipts are $200,000 or more, or if total assets (Part II, column (B) below) are $500,000 or more, file Form 990 instead of Form 990-EZ . . . . . . . . . . ▶ $   117,700.

### Part I   Revenue, Expenses, and Changes in Net Assets or Fund Balances (see the instructions for Part I)

Check if the organization used Schedule O to respond to any question in this Part I . . . . . . . . . . . ☒

| | | | |
|---|---|---|---|
| Revenue | 1 | Contributions, gifts, grants, and similar amounts received . . . . . . . . . . . . | **1** | 117,663. |
| | 2 | Program service revenue including government fees and contracts . . . . . . . | **2** | |
| | 3 | Membership dues and assessments . . . . . . . . . . . . . . . . . . . . | **3** | |
| | 4 | Investment income . . . . . . . . . . . . . . . ATCH 1 . . . . . . | **4** | 37. |
| | 5a | Gross amount from sale of assets other than inventory . . . . | 5a | | |
| | b | Less cost or other basis and sales expenses . . . . . . . . | 5b | 0. | |
| | c | Gain or (loss) from sale of assets other than inventory (Subtract line 5b from line 5a) . . . . . . . . . . | **5c** | |
| | 6 | Gaming and fundraising events | | |
| | a | Gross income from gaming (attach Schedule G if greater than $15,000) . . . . . . . . . . . . . . . . . . | 6a | | |
| | b | Gross income from fundraising events (not including $ _____ of contributions from fundraising events reported on line 1) (attach Schedule G if the sum of such gross income and contributions exceeds $15,000) . . | 6b | | |
| | c | Less direct expenses from gaming and fundraising events . . . . | 6c | | |
| | d | Net income or (loss) from gaming and fundraising events (add lines 6a and 6b and subtract line 6c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **6d** | |
| | 7a | Gross sales of inventory, less returns and allowances . . . . | 7a | | |
| | b | Less cost of goods sold . . . . . . . . . . . . . . . | 7b | 0. | |
| | c | Gross profit or (loss) from sales of inventory (Subtract line 7b from line 7a) . . . . . . . . | **7c** | |
| | 8 | Other revenue (describe in Schedule O) . . . . . . . . . . . . . . . . . . . | **8** | |
| | 9 | **Total revenue.** Add lines 1, 2, 3, 4, 5c, 6d, 7c, and 8 . . . . . . . . . . . . ▶ | **9** | 117,700. |
| Expenses | 10 | Grants and similar amounts paid (list in Schedule O) . . . . . . . . . . . . . | **10** | |
| | 11 | Benefits paid to or for members . . . . . . . . . . . . . . . . . . . . . | **11** | |
| | 12 | Salaries, other compensation, and employee benefits . . . . . . . . . . . . | **12** | |
| | 13 | Professional fees and other payments to independent contractors . . . . . . . | **13** | 119,000. |
| | 14 | Occupancy, rent, utilities, and maintenance . . . . . . . . . . . . . . . . | **14** | |
| | 15 | Printing, publications, postage, and shipping . . . . . . . . . . . . . . . . | **15** | |
| | 16 | Other expenses (describe in Schedule O) . . . . . . . . . . . . . . . . . . | **16** | 2,744. |
| | 17 | **Total expenses.** Add lines 10 through 16 . . . . . . . . . . . . . . . . ▶ | **17** | 121,744. |
| Net Assets | 18 | Excess or (deficit) for the year (Subtract line 17 from line 9) . . . . . . . . . | **18** | -4,044. |
| | 19 | Net assets or fund balances at beginning of year (from line 27, column (A)) (must agree with end-of-year figure reported on prior year's return) . . . . . . . . . . | **19** | 31,750. |
| | 20 | Other changes in net assets or fund balances (explain in Schedule O) . . . . . | **20** | |
| | 21 | Net assets or fund balances at end of year  Combine lines 18 through 20 . . . ▶ | **21** | 27,706. |

For Paperwork Reduction Act Notice, see the separate instructions

Form **990-EZ** (2017)

RECEIVED
NOV 0 9 2018
OGDEN, UT
E2989   IRS OSC

**Exhibit CGG 0006**

SCANNED DEC 17 2018

COALITION FOR GOOD GOVERNANCE                           26-3670783

Form 990-EZ (2017)                                                      Page **2**

| **Part II** | **Balance Sheets** (see the instructions for Part II) | | | |
|---|---|---|---|---|

Check if the organization used Schedule O to respond to any question in this Part II . . . . . . . . . . . . . . . . . . ☒

| | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|
| 22 | Cash, savings, and investments . . . . ATTACHMENT 3 . . . . . . . . | 31,750. | 22 | 27,706. |
| 23 | Land and buildings . . . . . . . . . . . . . . . . . . . . | 0. | 23 | 0. |
| 24 | Other assets (describe in Schedule O) . . . . . . . . . . . . . . . . . . . | 0. | 24 | 0. |
| 25 | Total assets . . . . . . . . . . . . . . . . . . . . . . | 31,750. | 25 | 27,706. |
| 26 | Total liabilities (describe in Schedule O) . . . . . . . . . . . . | 0. | 26 | 0. |
| 27 | Net assets or fund balances (line 27 of column (B) **must** agree with line 21) . . | 31,750. | 27 | 27,706. |

| **Part III** | **Statement of Program Service Accomplishments** (see the instructions for Part III) | **Expenses** |
|---|---|---|

Check if the organization used Schedule O to respond to any question in this Part III . . . ☒

(Required for section 501(c)(3) and 501(c)(4) organizations, optional for others )

What is the organization's primary exempt purpose?   ATTACHMENT 4

Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses  In a clear and concise manner, describe the services provided, the number of persons benefited, and other relevant information for each program title

**28**  ATTACHMENT 5

| (Grants $              ) If this amount includes foreign grants, check here . . . . . . ▶ | 28a | 68,064. |
|---|---|---|

**29**  ATTACHMENT 6

| (Grants $              ) If this amount includes foreign grants, check here . . . . . . ▶ | 29a | 26,063. |
|---|---|---|

**30**  SUPPORTED RIGHTS OF ALL CITIZENS TO ACCESS ELECTION RECORDS. PAID FOR VOTING SYSTEMS COMPUTER EXPERTS TO IDENTIFY AND TESTIFY ON SECURITY LAPSES IN THE GA ELECTIONS SYSTEM.

| (Grants $              ) If this amount includes foreign grants, check here . . . . . . ▶ | 30a | 2,759. |
|---|---|---|

**31** Other program services (describe in Schedule O) . . . . . . . . . . . . . . . . . . . . . .

| (Grants $              ) If this amount includes foreign grants, check here . . . . . . ▶ | 31a | |
|---|---|---|

| **32** Total program service expenses (add lines 28a through 31a) . . . . . . . . . . . . . . . . . ▶ | 32 | 96,886. |
|---|---|---|

| **Part IV** | **List of Officers, Directors, Trustees, and Key Employees** (list each one even if not compensated - see the instructions for Part IV) |
|---|---|

Check if the organization used Schedule O to respond to any question in this Part IV . . . . . . . . . . . . . . . . . . . . .

| (a) Name and title | (b) Average hours per week devoted to position | (c) Reportable compensation (Forms W-2/1099-MISC) (if not paid, enter -0-) | (d) Health benefits, contributions to employee benefit plans, and deferred compensation | (e) Estimated amount of other compensation |
|---|---|---|---|---|
| LISA A. CYRIACKS<br>PRESIDENT | 6.00 | 0. | 0. | 0. |
| MARY EBERLE<br>SECRETARY | 12.00 | 0. | 0. | 0. |
| MARILYN R. MARKS<br>VICE-PRESIDENT | 50.00 | 0. | 0. | 0. |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Form **990-EZ** (2017)

ABO

COALITION FOR GOOD GOVERNANCE                                    26-3670783

Form 990-EZ (2017)                                                                                     Page **3**

**Part V**    **Other Information** (Note the Schedule A and personal benefit contract statement requirements in the
instructions for Part V ) Check if the organization used Schedule O to respond to any question in this Part V . . ☐

| | | Yes | No |
|---|---|---|---|
| 33 | Did the organization engage in any significant activity not previously reported to the IRS? If "Yes," provide a detailed description of each activity in Schedule O . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **33** | | X |
| 34 | Were any significant changes made to the organizing or governing documents? If "Yes," attach a conformed copy of the amended documents if they reflect a change to the organization's name  Otherwise, explain the change on Schedule O (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **34** | | X |
| 35a | Did the organization have unrelated business gross income of $1,000 or more during the year from business activities (such as those reported on lines 2, 6a, and 7a, among others)? . . . . . . . . . . . . . . . . | **35a** | | X |
| b | If "Yes," to line 35a, has the organization filed a Form 990-T for the year? *If "No," provide an explanation in Schedule O* . . . | **35b** | | |
| c | Was the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization subject to section 6033(e) notice, reporting, and proxy tax requirements during the year? If "Yes," complete Schedule C, Part III . . . . . . . | **35c** | | X |
| 36 | Did the organization undergo a liquidation, dissolution, termination, or significant disposition of net assets during the year? If "Yes," complete applicable parts of Schedule N . . . . . . . . . . . . . . . . . . . . | **36** | | X |
| 37a | Enter amount of political expenditures, direct or indirect, as described in the instructions ▶ | **37a** | | |
| b | Did the organization file **Form 1120-POL** for this year? . . . . . . . . . . . . . . . . . . . . . . . . . | **37b** | | X |
| 38a | Did the organization borrow from, or make any loans to, any officer, director, trustee, or key employee **or were** any such loans made in a prior year and still outstanding at the end of the tax year covered by this return? . . . | **38a** | | X |
| b | If "Yes," complete Schedule L, Part II and enter the total amount involved . . . . . . . | **38b** | | |
| 39 | Section 501(c)(7) organizations  Enter | | | |
| a | Initiation fees and capital contributions included on line 9 . . . . . . . . . . . . . . . | **39a** | | |
| b | Gross receipts, included on line 9, for public use of club facilities . . . . . . . . . . . | **39b** | | |
| 40a | Section 501(c)(3) organizations  Enter amount of tax imposed on the organization during the year under section 4911 ▶ _____0 _, section 4912 ▶ _____0 _, section 4955 ▶ _____0 . | | | |
| b | Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations  Did the organization engage in any section 4958 excess benefit transaction during the year, or did it engage in an excess benefit transaction in a prior year that has not been reported on any of its prior Forms 990 or 990-EZ? If "Yes," complete Schedule L, Part I  . . . | **40b** | | X |
| c | Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations  Enter amount of tax imposed on organization managers or disqualified persons during the year under sections 4912, 4955, and 4958 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ _____0 . | | | |
| d | Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations  Enter amount of tax on line 40c reimbursed by the organization . . . . . . . . . . . . . . . . . . . . . . . . ▶ _____0 . | | | |
| e | All organizations  At any time during the tax year, was the organization a party to a prohibited tax shelter transaction? If "Yes," complete Form 8886-T . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **40e** | | X |
| 41 | List the states with which a copy of this return is filed  ▶ | | | |

| 42a | The organization's books are in care of ▶LISA CYRIACKS | Telephone no ▶ | 719-256-4140 |
|---|---|---|---|
| | Located at ▶1520 CRESS CT BOULDER, CO | ZIP + 4 ▶ | 80304 |

| | | Yes | No |
|---|---|---|---|
| b | At any time during the calendar year, did the organization have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? | **42b** | | X |
| | If "Yes," enter the name of the foreign country ▶ | | | |
| | See the instructions for exceptions and filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR) | | | |
| c | At any time during the calendar year, did the organization maintain an office outside the United States? . . . . | **42c** | | X |
| | If "Yes," enter the name of the foreign country ▶ | | | |
| 43 | Section 4947(a)(1) nonexempt charitable trusts filing Form 990-EZ in lieu of **Form 1041 -** Check here. . . . . . . . . . . . ▶ ☐ and enter the amount of tax-exempt interest received or accrued during the tax year. . . . . . . . ▶ | **43** | | |

| | | Yes | No |
|---|---|---|---|
| 44a | Did the organization maintain any donor advised funds during the year? If "Yes," Form 990 must be completed instead of Form 990-EZ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **44a** | | X |
| b | Did the organization operate one or more hospital facilities during the year? If "Yes," Form 990 must be completed instead of Form 990-EZ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **44b** | | X |
| c | Did the organization receive any payments for indoor tanning services during the year? . . . . . . . . . . . | **44c** | | X |
| d | If "Yes" to line 44c, has the organization filed a Form 720 to report these payments? *If "No," provide an explanation in Schedule O* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **44d** | | |
| 45a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? . . . . . . . . . . . . | **45a** | | X |
| b | Did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? If "Yes," Form 990 and Schedule R may need to be completed instead of Form 990-EZ (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **45b** | | |

JSA
7E1029 1 000

Form **990-EZ** (2017)

COALITION FOR GOOD GOVERNANCE                              26-3670783

Form 990-EZ (2017)                                                                   Page 4

| | | | Yes | No |
|---|---|---|---|---|
| 46 | Did the organization engage, directly or indirectly, in political campaign activities on behalf of or in opposition to candidates for public office? If "Yes," complete Schedule C, Part I . . . . . . . . . . . . . . . . . . . . . | 46 | | X |

**Part VI**  **Section 501(c)(3) organizations only**

All section 501(c)(3) organizations must answer questions 47-49b and 52, and complete the tables for lines 50 and 51.

Check if the organization used Schedule O to respond to any question in this Part VI . . . . . . . . . . . . . ☐

| | | | Yes | No |
|---|---|---|---|---|
| 47 | Did the organization engage in lobbying activities or have a section 501(h) election in effect during the tax year? If "Yes," complete Schedule C, Part II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 47 | | X |
| 48 | Is the organization a school as described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E . . . . . . . | 48 | | X |
| 49a | Did the organization make any transfers to an exempt non-charitable related organization? . . . . . . . . . . | 49a | | X |
| b | If "Yes," was the related organization a section 527 organization? . . . . . . . . . . . . . . . . . . . . . | 49b | | |

50  Complete this table for the organization's five highest compensated employees (other than officers, directors, trustees, and key employees) who each received more than $100,000 of compensation from the organization. If there is none, enter "None."

| (a) Name and title of each employee | (b) Average hours per week devoted to position | (c) Reportable compensation (Forms W-2/1099-MISC) | (d) Health benefits, contributions to employee benefit plans, and deferred compensation | (e) Estimated amount of other compensation |
|---|---|---|---|---|
| NONE | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

f   Total number of other employees paid over $100,000 . . . . . . ▶      0.

51  Complete this table for the organization's five highest compensated independent contractors who each received more than $100,000 of compensation from the organization. If there is none, enter "None."

| (a) Name and business address of each independent contractor | (b) Type of service | (c) Compensation |
|---|---|---|
| NONE | | |
| | | |
| | | |
| | | |
| | | |
| | | |

d   Total number of other independent contractors each receiving over $100,000 . . . ▶      0.

52  Did the organization complete Schedule A? Note: All section 501(c)(3) organizations must attach a completed Schedule A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ [X] Yes ☐ No

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

**Sign Here**

Signature of officer   *Lisa A. Cyriacks*                             Date  *10-30-18*

Type or print name and title   *President*

**Paid Preparer Use Only**

| Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN |
|---|---|---|---|---|
| ADAM R SMITH  CPA | *Adam Smith* | 10-23-18 | | P00958966 |

Firm's name ▶ BKD, LLP                                    Firm's EIN ▶ 44-0160260

Firm's address ▶ 111 SOUTH TEJON, SUITE 800              Phone no  719 471-4290

COLORADO SPRINGS, CO 80903-9848

May the IRS discuss this return with the preparer shown above? See instructions . . . . . . . . . . . . . . . . . . . ▶ [X] Yes ☐ No

Form **990-EZ** (2017)

| SCHEDULE A | **Public Charity Status and Public Support** | OMB No 1545-0047 |
|---|---|---|
| (Form 990 or 990-EZ) | Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust | **2017** |
| Department of the Treasury Internal Revenue Service | ▶ Attach to Form 990 or Form 990-EZ ▶ Go to *www irs gov/Form990* for instructions and the latest information. | Open to Public Inspection |

| Name of the organization | Employer identification number |
|---|---|
| COALITION FOR GOOD GOVERNANCE | 26-3670783 |

**Part I** **Reason for Public Charity Status** (All organizations must complete this part ) See instructions

The organization is not a private foundation because it is (For lines 1 through 12, check only one box )

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2 ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990 or 990-EZ) )

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170(b)(1)(A)(iv).** (Complete Part II )

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7 ☒ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II )

8 ☐ A community trust described in **section 170(b)(1)(A)(vi).** (Complete Part II )

9 ☐ An agricultural research organization described in **section 170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land-grant college of agriculture (see instructions) Enter the name, city, and state of the college or university

10 ☐ An organization that normally receives (1) more than 33 1/3 % of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions - subject to certain exceptions, and (2) no more than 33 1/3 %of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975 See **section 509(a)(2).** (Complete Part III )

11 ☐ An organization organized and operated exclusively to test for public safety See **section 509(a)(4).**

12 ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2)** See **section 509(a)(3).** Check the box in lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g

a ☐ **Type I** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization **You must complete Part IV, Sections A and B.**

b ☐ **Type II** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s) **You must complete Part IV, Sections A and C.**

c ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions) **You must complete Part IV, Sections A, D, and E.**

d ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions) **You must complete Part IV, Sections A and D, and Part V.**

e ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization

f Enter the number of supported organizations . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐

g Provide the following information about the supported organization(s)

| (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1-10 above (see instructions)) | (iv) Is the organization listed in your governing document? Yes | No | (v) Amount of monetary support (see instructions) | (vi) Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| **(A)** | | | | | | |
| **(B)** | | | | | | |
| **(C)** | | | | | | |
| **(D)** | | | | | | |
| **(E)** | | | | | | |
| **Total** | | | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ          Schedule A (Form 990 or 990-EZ) 2017

JSA
7E1210 1 000

8181NK 5974  10/18/2018  7:11:23 PM          1156879          PAGE 5

COALITION FOR GOOD GOVERNANCE                    26-3670783

Schedule A (Form 990 or 990-EZ) 2017                                                                Page **2**

**Part II**   **Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)**
(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under
Part III If the organization fails to qualify under the tests listed below, please complete Part III.)

## Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2013 | (b) 2014 | (c) 2015 | (d) 2016 | (e) 2017 | (f) Total |
|---|---|---|---|---|---|---|
| 1 Gifts, grants, contributions, and membership fees received (Do not include any "unusual grants ") . . . . . . | 44,932 | 15,150 | 6,010 | 0 | 117,663 | 183,755 |
| 2 Tax revenues levied for the organization's benefit and either paid to or expended on its behalf . . . . . . . | | | | | | 0 |
| 3 The value of services or facilities furnished by a governmental unit to the organization without charge . . . . . . . | | | | | | 0 |
| 4 Total Add lines 1 through 3 . . . . . . . | 44,932 | 15,150 | 6,010 | | 117,663 | 183,755 |
| 5 The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f). . . . . . . | | | | | | 93,949 |
| 6 Public support. Subtract line 5 from line 4 | | | | | | 89,806 |

## Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2013 | (b) 2014 | (c) 2015 | (d) 2016 | (e) 2017 | (f) Total |
|---|---|---|---|---|---|---|
| 7 Amounts from line 4. . . . . . . . . . | 44,932 | 15,150 | 6,010 | | 117,663 | 183,755 |
| 8 Gross income from interest, dividends, payments received on securities loans, rents, royalties, and income from similar sources . . . . . . . . . . . . | | 174 | 186 | 34 | 37 | 431 |
| 9 Net income from unrelated business activities, whether or not the business is regularly carried on . . . . . . . . . | | | | | | 0 |
| 10 Other income Do not include gain or loss from the sale of capital assets (Explain in Part VI) . . . . . . . . . . | | | | | | 0 |
| 11 Total support. Add lines 7 through 10 . . | | | | | | 184,186 |
| 12 Gross receipts from related activities, etc (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . | | | | **12** | | |

13 **First five years** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

## Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| 14 Public support percentage for 2017 (line 6, column (f) divided by line 11, column (f)). . . . . . . . | **14** | 48.76 % |
| 15 Public support percentage from 2016 Schedule A, Part II, line 14 . . . . . . . . . . . . . . . | **15** | 99.41 % |

16a **33 1/3 % support test - 2017.** If the organization did not check the box on line 13, and line 14 is 33 1/3 % or more, check this box and **stop here**. The organization qualifies as a publicly supported organization. . . . . . . . . . . . . . . . . . . . . ▶ ☒

b **33 1/3 % support test - 2016.** If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3 % or more, check this box and **stop here** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . . . . ▶ ☐

17a **10%-facts-and-circumstances test - 2017** If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here**. Explain in Part VI how the organization meets the "facts-and-circumstances" test The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

b **10%-facts-and-circumstances test - 2016.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

18 **Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

Schedule A (Form 990 or 990-EZ) 2017

COALITION FOR GOOD GOVERNANCE                    26-3670783

Schedule A (Form 990 or 990-EZ) 2017                                                                Page 3

**Part III** | **Support Schedule for Organizations Described in Section 509(a)(2)**
(Complete only if you checked the box on line 10 of Part I or if the organization failed to qualify under Part II
If the organization fails to qualify under the tests listed below, please complete Part II )

### Section A. Public Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2013 | (b) 2014 | (c) 2015 | (d) 2016 | (e) 2017 | (f) Total |
|---|---|---|---|---|---|---|
| 1  Gifts, grants, contributions, and membership fees received (Do not include any "unusual grants ") | | | | | | |
| 2  Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose . . . . . . | | | | | | |
| 3  Gross receipts from activities that are not an unrelated trade or business under section 513 . | | | | | | |
| 4  Tax revenues levied for the organization's benefit and either paid to or expended on its behalf . . . . . . . . | | | | | | |
| 5  The value of services or facilities furnished by a governmental unit to the organization without charge . . . . . . . | | | | | | |
| 6  **Total.** Add lines 1 through 5 . . . . . . . | | | | | | |
| 7a  Amounts included on lines 1, 2, and 3 received from disqualified persons . . . . | | | | | | |
| b  Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year | | | | | | |
| c  Add lines 7a and 7b. . . . . . . . . . | | | | | | |
| 8  **Public support** (Subtract line 7c from line 6 ) . . . . . . . . . . . . . . . | | | | | | |

### Section B. Total Support

| Calendar year (or fiscal year beginning in) ▶ | (a) 2013 | (b) 2014 | (c) 2015 | (d) 2016 | (e) 2017 | (f) Total |
|---|---|---|---|---|---|---|
| 9  Amounts from line 6 . . . . . . . . . . | | | | | | |
| 10a  Gross income from interest, dividends, payments received on securities loans, rents, royalties, and income from similar sources . . . . . . . . . . . . . . . | | | | | | |
| b  Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975 . . . . . . | | | | | | |
| c  Add lines 10a and 10b . . . . . . . . | | | | | | |
| 11  Net income from unrelated business activities not included in line 10b, whether or not the business is regularly carried on . . . . . . . . . . . . . . | | | | | | |
| 12  Other income Do not include gain or loss from the sale of capital assets (Explain in Part VI ) . . . . . . . . . . | | | | | | |
| 13  **Total support** (Add lines 9, 10c, 11, and 12 ) . . . . . . . . . . . . . . | | | | | | |

14  **First five years**  If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3)
organization, check this box and **stop here**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

### Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| 15  Public support percentage for 2017 (line 8, column (f) divided by line 13, column (f)), . . . . . . . . . . . . . | **15** | % |
| 16  Public support percentage from **2016** Schedule A, Part III, line 15 . . . . . . . . . . . . . . . . . . . | **16** | % |

### Section D. Computation of Investment Income Percentage

| | | |
|---|---|---|
| 17  Investment income percentage for **2017** (line 10c, column (f) divided by line 13, column (f)) . . . . . . . . . . | **17** | % |
| 18  Investment income percentage from **2016** Schedule A, Part III, line 17 . . . . . . . . . . . . . . . . . . | **18** | % |

19a  **33 1/3 % support tests - 2017**  If the organization did not check the box on line 14, and line 15 is more than 33 1/3 %, and line
17  is not more than 33 1/3 %, check this box and **stop here.** The organization qualifies as a publicly supported organization . ▶ ☐

b  **33 1/3 % support tests - 2016.**  If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3 %, and
line 18 is not more than 33 1/3 %, check this box and **stop here**  The organization qualifies as a publicly supported organization  ▶ ☐

20  **Private foundation**  If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions ▶ ☐

JSA
7E1221 1 000                                                                   Schedule A (Form 990 or 990-EZ) 2017

COALITION FOR GOOD GOVERNANCE                        26-3670783

Schedule A (Form 990 or 990-EZ) 2017                                                    Page **4**

| **Part IV** | **Supporting Organizations** |
|---|---|

(Complete only if you checked a box in line 12 on Part I If you checked 12a of Part I, complete Sections A and B. If you checked 12b of Part I, complete Sections A and C If you checked 12c of Part I, complete Sections A, D, and E If you checked 12d of Part I, complete Sections A and D, and complete Part V.)

**Section A. All Supporting Organizations**

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Are all of the organization's supported organizations listed by name in the organization's governing documents? *If "No," describe in Part VI how the supported organizations are designated If designated by class or purpose, describe the designation If historic and continuing relationship, explain* | **1** | | |
| 2 | Did the organization have any supported organization that does not have an IRS determination of status under section 509(a)(1) or (2)? *If "Yes," explain in Part VI how the organization determined that the supported organization was described in section 509(a)(1) or (2)* | **2** | | |
| 3a | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? *If "Yes," answer (b) and (c) below* | **3a** | | |
| b | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? *If "Yes," describe in Part VI when and how the organization made the determination* | **3b** | | |
| c | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? *If "Yes," explain in Part VI what controls the organization put in place to ensure such use* | **3c** | | |
| 4a | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes," and if you checked 12a or 12b in Part I, answer (b) and (c) below* | **4a** | | |
| b | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in Part VI how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations* | **4b** | | |
| c | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in Part VI what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes* | **4c** | | |
| 5a | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer (b) and (c) below (if applicable) Also, provide detail in Part VI, including (i) the names and EIN numbers of the supported organizations added, substituted, or removed, (ii) the reasons for each such action, (iii) the authority under the organization's organizing document authorizing such action, and (iv) how the action was accomplished (such as by amendment to the organizing document)* | **5a** | | |
| b | **Type I or Type II only** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? | **5b** | | |
| c | **Substitutions only** Was the substitution the result of an event beyond the organization's control? | **5c** | | |
| 6 | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in Part VI.* | **6** | | |
| 7 | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ)* | **7** | | |
| 8 | Did the organization make a loan to a disqualified person (as defined in section 4958) not described in line 7? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ)* | **8** | | |
| 9a | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in Part VI.* | **9a** | | |
| b | Did one or more disqualified persons (as defined in line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in Part VI* | **9b** | | |
| c | Did a disqualified person (as defined in line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in Part VI.* | **9c** | | |
| 10a | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer 10b below* | **10a** | | |
| b | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings )* | **10b** | | |

JSA                                                                  Schedule A (Form 990 or 990-EZ) 2017
7E1229 1 000

COALITION FOR GOOD GOVERNANCE                                   26-3670783

Schedule A (Form 990 or 990-EZ) 2017                                                                          Page **5**

| **Part IV** | **Supporting Organizations** *(continued)* | | | |
|---|---|---|---|---|

| | | | Yes | No |
|---|---|---|---|---|
| 11 | Has the organization accepted a gift or contribution from any of the following persons? | | | |
| a | A person who directly or indirectly controls, either alone or together with persons described in (b) and (c) below, the governing body of a supported organization? | 11a | | |
| b | A family member of a person described in (a) above? | 11b | | |
| c | A 35% controlled entity of a person described in (a) or (b) above? *If "Yes" to a, b, or c, provide detail in Part VI.* | 11c | | |

### Section B. Type I Supporting Organizations

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Did the directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in Part VI how the supported organization(s) effectively operated, supervised, or controlled the organization's activities  If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year* | 1 | | |
| 2 | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in Part VI how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised, or controlled the supporting organization* | 2 | | |

### Section C. Type II Supporting Organizations

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of each of the organization's supported organization(s)? *If "No," describe in Part VI how control or management of the supporting organization was vested in the same persons that controlled or managed the supported organization(s)* | 1 | | |

### Section D. All Type III Supporting Organizations

| | | | Yes | No |
|---|---|---|---|---|
| 1 | Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization's tax year, (i) a written notice describing the type and amount of support provided during the prior tax year, (ii) a copy of the Form 990 that was most recently filed as of the date of notification, and (iii) copies of the organization's governing documents in effect on the date of notification, to the extent not previously provided? | 1 | | |
| 2 | Were any of the organization's officers, directors, or trustees either (i) appointed or elected by the supported organization(s) or (ii) serving on the governing body of a supported organization? *If "No," explain in Part VI how the organization maintained a close and continuous working relationship with the supported organization(s)* | 2 | | |
| 3 | By reason of the relationship described in (2), did the organization's supported organizations have a significant voice in the organization's investment policies and in directing the use of the organization's income or assets at all times during the tax year? *If "Yes," describe in Part VI the role the organization's supported organizations played in this regard* | 3 | | |

### Section E. Type III Functionally Integrated Supporting Organizations

| 1 | Check the box next to the method that the organization used to satisfy the Integral Part Test during the year *(see instructions)* | | | |
|---|---|---|---|---|
| a | ☐ The organization satisfied the Activities Test  *Complete line 2 below* | | | |
| b | ☐ The organization is the parent of each of its supported organizations  *Complete line 3 below* | | | |
| c | ☐ The organization supported a governmental entity  *Describe in Part VI how you supported a government entity (see instructions)* | | | |

| | | | Yes | No |
|---|---|---|---|---|
| 2 | Activities Test  *Answer (a) and (b) below* | | | |
| a | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supported organization(s) to which the organization was responsive? *If "Yes," then in Part VI identify those supported organizations and explain how these activities directly furthered their exempt purposes, how the organization was responsive to those supported organizations, and how the organization determined that these activities constituted substantially all of its activities* | 2a | | |
| b | Did the activities described in (a) constitute activities that, but for the organization's involvement, one or more of the organization's supported organization(s) would have been engaged in? *If "Yes," explain in Part VI the reasons for the organization's position that its supported organization(s) would have engaged in these activities but for the organization's involvement* | 2b | | |
| 3 | Parent of Supported Organizations  *Answer (a) and (b) below.* | | | |
| a | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each of the supported organizations? *Provide details in Part VI.* | 3a | | |
| b | Did the organization exercise a substantial degree of direction over the policies, programs, and activities of each of its supported organizations? *If "Yes," describe in Part VI the role played by the organization in this regard* | 3b | | |

COALITION FOR GOOD GOVERNANCE                                26-3670783

Schedule A (Form 990 or 990-EZ) 2017                                                                    Page **6**

| Part V | Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations |
|---|---|

**1** ☐ Check here if the organization satisfied the Integral Part Test as a qualifying trust on Nov 20, 1970 (explain in Part VI) **See instructions. All other Type III non-functionally integrated supporting organizations must complete Sections A through E**

| Section A - Adjusted Net Income | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 Net short-term capital gain | 1 | | |
| 2 Recoveries of prior-year distributions | 2 | | |
| 3 Other gross income (see instructions) | 3 | | |
| 4 Add lines 1 through 3 | 4 | | |
| 5 Depreciation and depletion | 5 | | |
| 6 Portion of operating expenses paid or incurred for production or collection of gross income or for management, conservation, or maintenance of property held for production of income (see instructions) | 6 | | |
| 7 Other expenses (see instructions) | 7 | | |
| 8 **Adjusted Net Income** (subtract lines 5, 6, and 7 from line 4) | 8 | | |

| Section B - Minimum Asset Amount | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 Aggregate fair market value of all non-exempt-use assets (see instructions for short tax year or assets held for part of year) | | | |
| a Average monthly value of securities | 1a | | |
| b Average monthly cash balances | 1b | | |
| c Fair market value of other non-exempt-use assets | 1c | | |
| d Total (add lines 1a, 1b, and 1c) | 1d | | |
| e **Discount** claimed for blockage or other factors (explain in detail in **Part VI**) | | | |
| 2 Acquisition indebtedness applicable to non-exempt-use assets | 2 | | |
| 3 Subtract line 2 from line 1d | 3 | | |
| 4 Cash deemed held for exempt use  Enter 1-1/2% of line 3 (for greater amount, see instructions) | 4 | | |
| 5 Net value of non-exempt-use assets (subtract line 4 from line 3) | 5 | | |
| 6 Multiply line 5 by 035 | 6 | | |
| 7 Recoveries of prior-year distributions | 7 | | |
| 8 **Minimum Asset Amount** (add line 7 to line 6) | 8 | | |

| Section C - Distributable Amount | | Current Year |
|---|---|---|
| 1 Adjusted net income for prior year (from Section A, line 8, Column A) | 1 | |
| 2 Enter 85% of line 1 | 2 | |
| 3 Minimum asset amount for prior year (from Section B, line 8, Column A) | 3 | |
| 4 Enter greater of line 2 or line 3 | 4 | |
| 5 Income tax imposed in prior year | 5 | |
| 6 **Distributable Amount.** Subtract line 5 from line 4, unless subject to emergency temporary reduction (see instructions) | 6 | |

**7** ☐ Check here if the current year is the organization's first as a non-functionally integrated Type III supporting organization (see instructions)

**Schedule A (Form 990 or 990-EZ) 2017**

COALITION FOR GOOD GOVERNANCE                                      26-3670783

Schedule A (Form 990 or 990-EZ) 2017                                                        Page 7

| Part V | Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations *(continued)* | |
|---|---|---|
| **Section D - Distributions** | | **Current Year** |
| 1 | Amounts paid to supported organizations to accomplish exempt purposes | |
| 2 | Amounts paid to perform activity that directly furthers exempt purposes of supported organizations, in excess of income from activity | |
| 3 | Administrative expenses paid to accomplish exempt purposes of supported organizations | |
| 4 | Amounts paid to acquire exempt-use assets | |
| 5 | Qualified set-aside amounts (prior IRS approval required) | |
| 6 | Other distributions (describe in **Part VI**) See instructions | |
| 7 | **Total annual distributions.** Add lines 1 through 6 | |
| 8 | Distributions to attentive supported organizations to which the organization is responsive (provide details in **Part VI**) See instructions | |
| 9 | Distributable amount for 2017 from Section C, line 6 | |
| 10 | Line 8 amount divided by Line 9 amount | |

| Section E - Distribution Allocations (see instructions) | (i) Excess Distributions | (ii) Underdistributions Pre-2017 | (iii) Distributable Amount for 2017 |
|---|---|---|---|
| 1 | Distributable amount for 2017 from Section C, line 6 | | | |
| 2 | Underdistributions, if any, for years prior to 2017 (reasonable cause required-explain in **Part VI**) See instructions | | | |
| 3 | Excess distributions carryover, if any, to 2017 | | | |
| a | | | | |
| b | From 2013 . . . . . . . | | | |
| c | From 2014 . . . . . . . | | | |
| d | From 2015 . . . . . . . | | | |
| e | From 2016 . . . . . . . | | | |
| f | **Total** of lines 3a through e | | | |
| g | Applied to underdistributions of prior years | | | |
| h | Applied to 2017 distributable amount | | | |
| i | Carryover from 2012 not applied (see instructions) | | | |
| j | Remainder Subtract lines 3g, 3h, and 3i from 3f | | | |
| 4 | Distributions for 2017 from Section D, line 7    $ | | | |
| a | Applied to underdistributions of prior years | | | |
| b | Applied to 2017 distributable amount | | | |
| c | Remainder Subtract lines 4a and 4b from 4 | | | |
| 5 | Remaining underdistributions for years prior to 2017, if any Subtract lines 3g and 4a from line 2 For result greater than zero, explain in **Part VI** See instructions | | | |
| 6 | Remaining underdistributions for 2017 Subtract lines 3h and 4b from line 1 For result greater than zero, explain in **Part VI** See instructions | | | |
| 7 | **Excess distributions carryover to 2018** Add lines 3j and 4c | | | |
| 8 | Breakdown of line 7 | | | |
| a | Excess from 2013 . . . . | | | |
| b | Excess from 2014 . . . . | | | |
| c | Excess from 2015 . . . . | | | |
| d | Excess from 2016 . . . . | | | |
| e | Excess from 2017 . . . . | | | |

Schedule A (Form 990 or 990-EZ) 2017

COALITION FOR GOOD GOVERNANCE                  26-3670783

Schedule A (Form 990 or 990-EZ) 2017                                              Page **8**

**Part VI**  **Supplemental Information.** Provide the explanations required by Part II, line 10; Part II, line 17a or 17b, Part III, line 12, Part IV, Section A, lines 1, 2, 3b, 3c, 4b, 4c, 5a, 6, 9a, 9b, 9c, 11a, 11b, and 11c; Part IV, Section B, lines 1 and 2, Part IV, Section C, line 1; Part IV, Section D, lines 2 and 3; Part IV, Section E, lines 1c, 2a, 2b, 3a and 3b; Part V, line 1; Part V, Section B, line 1e; Part V, Section D, lines 5, 6, and 8, and Part V, Section E, lines 2, 5, and 6  Also complete this part for any additional information  (See instructions )

**SCHEDULE O**
**(Form 990 or 990-EZ)**

Department of the Treasury
Internal Revenue Service

**Supplemental Information to Form 990 or 990-EZ**

Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.
▶ Attach to Form 990 or 990-EZ
▶ Information about Schedule O (Form 990 or 990-EZ) and its instructions is at *www.irs.gov/form990*

OMB No 1545-0047

**2017**

**Open to Public
Inspection**

| Name of the organization | Employer identification number |
|---|---|
| COALITION FOR GOOD GOVERNANCE | 26-3670783 |

---

ATTACHMENT 1

FORM 990EZ, PART I - INVESTMENT INCOME

| DESCRIPTION | AMOUNT |
|---|---|
| INTEREST INCOME | 37. |
| TOTAL | 37. |

---

ATTACHMENT 2

FORM 990EZ, PART I - OTHER EXPENSES

| | |
|---|---|
| TRAVEL | 1,832. |
| INSURANCE | 650. |
| MISCELLANEOUS | 262. |
| TOTAL | 2,744. |

---

ATTACHMENT 3

FORM 990EZ, PART II - CASH, SAVINGS AND INVESTMENTS

| DESCRIPTION | BEGINNING OF YEAR | END OF YEAR |
|---|---|---|
| CASH | 31,750. | 27,706. |
| TOTALS | 31,750. | 27,706. |

---

ATTACHMENT 4

FORM 990EZ, PART III - ORGANIZATION'S PRIMARY EXEMPT PURPOSE

THE INTERESTS OF COALITION FOR GOOD GOVERNANCE ARE CONSTITUTIONAL
LIBERTIES AND THE INDIVIDUAL RIGHTS OF CITIZENS, WITH EMPHASIS ON
FIRST AMENDMENT RIGHT, ELECTIONS, GOVERNMENT TRANSPARENCY AND
ACCOUNTABILITY, OPEN RECORDS AND OPEN MEETINGS, DUE PROCESS, AND
EQUAL PROTECTION OF THE LAWS. IT WILL ENGAGE IN LITIGATION AS WELL
AS PROVIDE MONETARY SUPPORT FOR LEGAL EXPENSES TO OTHER ORGANIZATIONS
ENGAGED IN LITIGATION ON THESE ISSUES. IT WILL ALSO INFORM
LEGISLATIVE POLICY AND PERFORM INDEPENDENT RESEARCH AND ANALYSIS IN
THE FOREGOING SUBJECT AREAS. LASTLY, THE ORGANIZATION WILL USE
GENERALLY AVAILABLE MEANS OF EDUCATION AND COMMUNICATION TO
ILLUMINATE AND SHARE PUBLIC DEBATES ESPECIALLY AS ITS SUBJECTS OF
INTEREST APPEAR TO BEAR UPON THE CITIZENS OF COLORADO AND THE REGION.

---

For Privacy Act and Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.    Schedule O (Form 990 or 990-EZ) (2017)

JSA
7E1227 1.000

8161NK 5974  10/18/2018  7:11:23 PM           1156879                    PAGE 17

Schedule O (Form 990 or 990-EZ) 2017

| | Page **2** |
|---|---|
| Name of the organization<br>COALITION FOR GOOD GOVERNANCE | Employer identification number<br>26-3670783 |

ATTACHMENT 5

FORM 990EZ, PART III - STATEMENT OF PROGRAM SERVICE ACCOMPLISHMENTS

PROGRAM SERVICE ACCOMPLISHMENT 1

ADVOCATING FOR VOTERS' RIGHT TO A VERIFIABLE ELECTION. CGG
LITIGATED IN FEDERAL COURT  (NORTHERN DISTRICT OF GEORGIA) AGAINST
GEORGIA'S USE OF AN UNVERIFIABLE PAPERLESS TOUCHSCREEN SYSTEM AND
EDUCATED GEORGIA VOTERS ON THE IMPORTANCE OF USING AN ELECTION
SYSTEM THAT EITHER INCLUDES PAPER BALLOTS OR CREATES A PAPER
TRAIL.

ATTACHMENT 6

PROGRAM SERVICE ACCOMPLISHMENT 2

WORKED TO EDUCATE VOTERS ON THE IMPORTANCE OF ELECTION SECURITY
USING THE EXAMPLE OF THE GEORGIA SPECIAL ELECTION (CD6) AND
EXPOSING THE VULNERABILITY OF THE KSU CENTER FOR ELECTION SYSTEMS.
GEORGIA WAS ONE STATE INDENTIFIED BY THE NSA WHERE VOTER
REGISTRATION SYSTEMS WERE COMPROMISED AND VULNERABLE TO HACKING.

Case 1:17-cv-02989-AT Document 1565 Filed 01/07/23 Page 559 of 721

Form **990**

**Return of Organization Exempt From Income Tax**

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)

► Do not enter social security numbers on this form as it may be made public

► Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No 1545-0047

**2018**

Open to Public Inspection

Department of the Treasury
Internal Revenue Service

**A** For the 2019 calendar year, or tax year beginning 01-01-2018 , and ending 12-31-2018

| B Check if applicable | C Name of organization | D Employer identification number |
|---|---|---|
| ☐ Address change | Coalition for Good Governance | 26-3670783 |
| ☐ Name change | % LISA CYRIACKS | |
| ☐ Initial return | Doing business as | |
| ☐ Final return/terminated | | |
| ☐ Amended return | Number and street (or P O box if mail is not delivered to street address) Room/suite   1520 Cress Ct | E Telephone number  (719) 256-4140 |
| ☐ Application pending | City or town, state or province, country, and ZIP or foreign postal code   Boulder, CO  80304 | G Gross receipts $ 218,990 |

| F Name and address of principal officer  LISA CYRIACKS  PO Box 754  Crestone, CO  81131 | H(a) Is this a group return for subordinates? ☐Yes ☒No |
|---|---|
| | H(b) Are all subordinates included? ☐ Yes ☐No |
| **I** Tax-exempt status ☒ 501(c)(3)   ☐ 501(c) ( ) ◄ (insert no )   ☐ 4947(a)(1) or   ☐ 527 | If "No," attach a list  (see instructions) |
| **J** Website: ► https //coalitionforgoodgovernance org/ | H(c) Group exemption number ► |

| **K** Form of organization ☒ Corporation  ☐ Trust  ☐ Association  ☐ Other ► | **L** Year of formation 2008 | **M** State of legal domicile  CO |
|---|---|---|

## Part I Summary

| | | |
|---|---|---|
| Activities & Governance | **1** Briefly describe the organization's mission or most significant activities  ADVOCATING FOR VOTERS' RIGHT TO A VERIFIABLE ELECTION  EDUCATE VOTERS TO THE IMPORTANCE OF ELECTION SECURITY AND PROTECT VOTERS' RIGHTS TO HAVE BALLOTS COUNTED | |
| | **2** Check this box ► ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets | |
| | **3** Number of voting members of the governing body (Part VI, line 1a) . . . . . | **3** | 3 |
| | **4** Number of independent voting members of the governing body (Part VI, line 1b) . . . | **4** | 0 |
| | **5** Total number of individuals employed in calendar year 2018 (Part V, line 2a) . . . . . | **5** | 0 |
| | **6** Total number of volunteers (estimate if necessary) . . . . . . . . . | **6** | 6 |
| | **7a** Total unrelated business revenue from Part VIII, column (C), line 12 . . . . . | **7a** | 0 |
| | **b** Net unrelated business taxable income from Form 990-T, line 34 . . . . | **7b** | |

| Revenue | | Prior Year | Current Year |
|---|---|---|---|
| | **8** Contributions and grants (Part VIII, line 1h) . . . . . | 117,663 | 218,953 |
| | **9** Program service revenue (Part VIII, line 2g) . . . . . | 0 | 0 |
| | **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d ) . . . | 37 | 37 |
| | **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 0 | 0 |
| | **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 117,700 | 218,990 |

| Expenses | | | |
|---|---|---|---|
| | **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) . . . | 0 | 0 |
| | **14** Benefits paid to or for members (Part IX, column (A), line 4) . . . . | 0 | 0 |
| | **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 0 | 0 |
| | **16a** Professional fundraising fees (Part IX, column (A), line 11e) . . . . . | 0 | 0 |
| | **b** Total fundraising expenses (Part IX, column (D), line 25) ►0 | | |
| | **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) . . . . | 121,744 | 193,081 |
| | **18** Total expenses  Add lines 13–17 (must equal Part IX, column (A), line 25) | 121,744 | 193,081 |
| | **19** Revenue less expenses  Subtract line 18 from line 12 . . . . . . . | -4,044 | 25,909 |

| Net Assets or Fund Balances | | Beginning of Current Year | End of Year |
|---|---|---|---|
| | **20** Total assets (Part X, line 16) . . . . . . . . . . | 27,706 | 53,615 |
| | **21** Total liabilities (Part X, line 26) . . . . . . . . . | 0 | 0 |
| | **22** Net assets or fund balances  Subtract line 21 from line 20 . . . . . | 27,706 | 53,615 |

## Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete  Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | ······  Signature of officer | 2019-08-27  Date | **Exhibit CGG 0007** |
|---|---|---|---|
| | LISA CYRIACKS  President  Type or print name and title | | |

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN  P00958966 |
|---|---|---|---|---|---|
| | Firm's name ► BKD LLP | | | Firm's EIN ► | |
| | Firm's address ► 111 South Tejon Suite 800 | | | Phone no  (719) 471-4290 | |
| | Colorado Springs, CO  809039848 | | | | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . . . ☒ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions.   Cat No  11282Y   Form **990** (2018)

| Part III | Statement of Program Service Accomplishments 93491133002565 Filed 01/07/23 Page 560 of 721 |

Check if Schedule O contains a response or note to any line in this Part III . . . . . . . . . . . . . . . ☐

**1** Briefly describe the organization's mission

THE INTERESTS OF COALITION FOR GOOD GOVERNANCE ARE CONSTITUTIONAL LIBERTIES AND THE INDIVIDUAL RIGHTS OF CITIZENS, WITH EMPHASIS ON FIRST AMENDMENT RIGHT, ELECTIONS, GOVERNMENT TRANSPARENCY AND ACCOUNTABILITY, OPEN RECORDS AND OPEN MEETINGS, DUE PROCESS, AND EQUAL PROTECTION OF THE LAWS IT WILL ENGAGE IN LITIGATION AS WELL AS PROVIDE MONETARY SUPPORT FOR LEGAL EXPENSES TO OTHER ORGANIZATIONS ENGAGED IN LITIGATION ON THESE ISSUES IT WILL ALSO INFORM LEGISLATIVE POLICY AND PERFORM INDEPENDENT RESEARCH AND ANALYSIS IN THE FOREGOING SUBJECT AREAS LASTLY, THE ORGANIZATION WILL USE GENERALLY AVAILABLE MEANS OF EDUCATION AND COMMUNICATION TO ILLUMINATE AND SHARE PUBLIC DEBATES ESPECIALLY AS ITS SUBJECTS OF INTEREST APPEAR TO BEAR UPON THE CITIZENS OF COLORADO AND THE REGION

**2** Did the organization undertake any significant program services during the year which were not listed on

the prior Form 990 or 990-EZ? . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

If "Yes," describe these new services on Schedule O

**3** Did the organization cease conducting, or make significant changes in how it conducts, any program

services? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

If "Yes," describe these changes on Schedule O

**4** Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and revenue, if any, for each program service reported

| **4a** | (Code | ) (Expenses $ | 102,366 | including grants of $ | ) (Revenue $ | ) |
| | See Additional Data | | | | | |

| **4b** | (Code | ) (Expenses $ | 26,303 | including grants of $ | ) (Revenue $ | ) |
| | See Additional Data | | | | | |

| **4c** | (Code | ) (Expenses $ | 61,123 | including grants of $ | ) (Revenue $ | ) |
| | See Additional Data | | | | | |

**4d** Other program services (Describe in Schedule O )

(Expenses $       including grants of $       ) (Revenue $       )

**4e** Total program service expenses ▶      189,792

**Part IV** Checklist of Required Schedules    Document 1565   Filed 01/07/23   Page 561 of 721

|  |  | | Yes | No |
|---|---|---|---|---|
| 1 | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If "Yes," complete Schedule A* | **1** | Yes | |
| 2 | Is the organization required to complete *Schedule B, Schedule of Contributors* (see instructions)? | **2** | Yes | |
| 3 | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? *If "Yes," complete Schedule C, Part I* | **3** | | No |
| 4 | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? *If "Yes," complete Schedule C, Part II* | **4** | | No |
| 5 | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Revenue Procedure 98-19? *If "Yes," complete Schedule C, Part III* | **5** | | |
| 6 | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If "Yes," complete Schedule D, Part I* | **6** | | No |
| 7 | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? *If "Yes," complete Schedule D, Part II* | **7** | | No |
| 8 | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If "Yes," complete Schedule D, Part III* | **8** | | No |
| 9 | Did the organization report an amount in Part X, line 21 for escrow or custodial account liability, serve as a custodian for amounts not listed in Part X, or provide credit counseling, debt management, credit repair, or debt negotiation services?*If "Yes," complete Schedule D, Part IV* | **9** | | No |
| 10 | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi-endowments? *If "Yes," complete Schedule D, Part V* | **10** | | No |
| 11 | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable | | | |
| a | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? *If "Yes," complete Schedule D, Part VI* | **11a** | | No |
| b | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VII* | **11b** | | No |
| c | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VIII* | **11c** | | No |
| d | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part IX* | **11d** | | No |
| e | Did the organization report an amount for other liabilities in Part X, line 25? *If "Yes," complete Schedule D, Part X* | **11e** | | No |
| f | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If "Yes," complete Schedule D, Part X* | **11f** | | No |
| 12a | Did the organization obtain separate, independent audited financial statements for the tax year? *If "Yes," complete Schedule D, Parts XI and XII* | **12a** | | No |
| b | Was the organization included in consolidated, independent audited financial statements for the tax year? *If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional* | **12b** | | |
| 13 | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* | **13** | | No |
| 14a | Did the organization maintain an office, employees, or agents outside of the United States? | **14a** | | No |
| b | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If "Yes," complete Schedule F, Parts I and IV* | **14b** | | No |
| 15 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? *If "Yes," complete Schedule F, Parts II and IV* | **15** | | No |
| 16 | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? *If "Yes," complete Schedule F, Parts III and IV* | **16** | | No |
| 17 | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If "Yes," complete Schedule G, Part I*(see instructions) | **17** | | No |
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* | **18** | | No |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* | **19** | | No |
| 20a | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* | **20a** | | No |
| b | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | **20b** | | |
| 21 | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* | **21** | | No |
| 22 | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* | **22** | | No |

Case 1:17-cv-02989 Document 1565　Filed 01/07/23　Page 562 of 721

| Part IV | Checklist of Required Schedules *(continued)* | | | |
|---|---|---|---|---|

| | | | Yes | No |
|---|---|---|---|---|
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* . . . . . . . . . . . . . . . . . . . . . | **23** | | No |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K If "No," go to line 25a* . . . . . . . . . . . . . . | **24a** | | No |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? . . . | **24b** | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? . . . . . . . . . . . . . . . . . . . . | **24c** | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? . . . | **24d** | | |
| 25a | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I* . . . . . . . . . . . . . . . . . . . | **25a** | | No |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* . . . . . . . . . . . . . . . . . . . | **25b** | | No |
| 26 | Did the organization report any amount on Part X, line 5, 6, or 22 for receivables from or payables to any current or former officers, directors, trustees, key employees, highest compensated employees, or disqualified persons? *If "Yes," complete Schedule L, Part II* . . . . . . . . . . . . . . . . . . | **26** | | No |
| 27 | Did the organization provide a grant or other assistance to an officer, director, trustee, key employee, substantial contributor or employee thereof, a grant selection committee member, or to a 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part III* . . . . . . . . . . | **27** | | No |
| 28 | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions) | | | |
| a | A current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . . . . . . . . . | **28a** | | No |
| b | A family member of a current or former officer, director, trustee, or key employee? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . . . . . . | **28b** | | No |
| c | An entity of which a current or former officer, director, trustee, or key employee (or a family member thereof) was an officer, director, trustee, or direct or indirect owner? *If "Yes," complete Schedule L, Part IV* . . . | **28c** | | No |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* . . | **29** | | No |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* . . . . . . . . . . . . . . . . | **30** | | No |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* . | **31** | | No |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* . . . . . . . . . . . . . . . . . . . . . | **32** | | No |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301 7701-2 and 301 7701-3? *If "Yes," complete Schedule R, Part I* . . . . . . . . . . | **33** | | No |
| 34 | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* . . . . . . . . . . . . . . . . . . . . . . . . . | **34** | | No |
| 35a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | **35a** | | No |
| b | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* . . . . | **35b** | | |
| 36 | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* . . . . . . . . . . . . . . | **36** | | No |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* . . | **37** | | No |
| 38 | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O . . . . . . . . . . . . . . . | **38** | Yes | |

| Part V | Statements Regarding Other IRS Filings and Tax Compliance | | | |
|---|---|---|---|---|

Check if Schedule O contains a response or note to any line in this Part V . . . . . . . . . . . . . . ☐

| | | | | Yes | No |
|---|---|---|---|---|---|
| 1a | Enter the number reported in Box 3 of Form 1096 Enter -0- if not applicable . . | **1a** | 1 | | |
| b | Enter the number of Forms W-2G included in line 1a *Enter -0-* if not applicable | **1b** | 0 | | |
| c | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? . . . . . . . . . . . . . . . . . . . | | | **1c** | | |

Case 1:17-cv-02989-AT Document 1565 Filed 01/07/23 Page 563 of 721

| | | | | |
|---|---|---|---|---|
| **2a** | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return . . . . . . . . . . . . . . . . . . . | **2a** | 0 | | |
| **b** | If at least one is reported on line 2a, did the organization file all required federal employment tax returns?  **Note.** If the sum of lines 1a and 2a is greater than 250, you may be required to e-file (see instructions) | | | **2b** | |
| **3a** | Did the organization have unrelated business gross income of $1,000 or more during the year? . . . | | | **3a** | No |
| **b** | If "Yes," has it filed a Form 990-T for this year? *If "No" to line 3b, provide an explanation in Schedule O* . . . | | | **3b** | |
| **4a** | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? . . | | | **4a** | No |
| **b** | If "Yes," enter the name of the foreign country ▶  See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR) | | | | |
| **5a** | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . | | | **5a** | No |
| **b** | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | | | **5b** | No |
| **c** | If "Yes," to line 5a or 5b, did the organization file Form 8886-T? . . . . . . . . . . | | | **5c** | |
| **6a** | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . | | | **6a** | No |
| **b** | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? . . . . . . . . . . . . . . . . . . . . | | | **6b** | |
| **7** | **Organizations that may receive deductible contributions under section 170(c).** | | | | |
| **a** | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . . . . . . . . . . | | | **7a** | |
| **b** | If "Yes," did the organization notify the donor of the value of the goods or services provided? . . . . . | | | **7b** | |
| **c** | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? . . . . . . . . . . . . . . . . . . . . . . | | | **7c** | |
| **d** | If "Yes," indicate the number of Forms 8282 filed during the year . . . . | **7d** | | | |
| **e** | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | | | **7e** | |
| **f** | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . . | | | **7f** | |
| **g** | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? . . . . . . . . . . . . . . . . . . . . . . . | | | **7g** | |
| **h** | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? . . . . . . . . . . . . . . . . . . . . . . | | | **7h** | |
| **8** | **Sponsoring organizations maintaining donor advised funds.**  Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? . . . . . . . . . . . . . . . . . . . . . . . | | | **8** | |
| **9a** | Did the sponsoring organization make any taxable distributions under section 4966? . . . | | | **9a** | |
| **b** | Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? . . . | | | **9b** | |
| **10** | **Section 501(c)(7) organizations.** Enter | | | | |
| **a** | Initiation fees and capital contributions included on Part VIII, line 12 . . . | **10a** | | | |
| **b** | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | **10b** | | | |
| **11** | **Section 501(c)(12) organizations.** Enter | | | | |
| **a** | Gross income from members or shareholders . . . . . . . . . | **11a** | | | |
| **b** | Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them ) . . . . . . . . . | **11b** | | | |
| **12a** | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | | | **12a** | |
| **b** | If "Yes," enter the amount of tax-exempt interest received or accrued during the year | **12b** | | | |
| **13** | **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | | |
| **a** | Is the organization licensed to issue qualified health plans in more than one state?  **Note.** See the instructions for additional information the organization must report on Schedule O | | | **13a** | |
| **b** | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans . . . . | **13b** | | | |
| **c** | Enter the amount of reserves on hand . . . . . . . . . . . | **13c** | | | |
| **14a** | Did the organization receive any payments for indoor tanning services during the tax year? . . . . . | | | **14a** | No |
| **b** | If "Yes," has it filed a Form 720 to report these payments? *If "No," provide an explanation in Schedule O* . . | | | **14b** | |
| **15** | Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? If "Yes," see instructions and file Form 4720, Schedule N . . . . . | | | **15** | No |
| **16** | Is the organization an educational institution subject to the section 4968 excise tax on net investment income?  If "Yes," complete Form 4720, Schedule O . . . . . . . . . . . . . . . . . | | | **16** | No |

| Part VI | Governance, Management, and Disclosure For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O See instructions | | |
|---|---|---|---|

Check if Schedule O contains a response or note to any line in this Part VI . . . . . . . . . . . ☑

## Section A. Governing Body and Management

| | | | Yes | No |
|---|---|---|---|---|
| **1a** | Enter the number of voting members of the governing body at the end of the tax year | 1a | 3 | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O | | | |
| **b** | Enter the number of voting members included in line 1a, above, who are independent | 1b | 0 | |
| **2** | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? . . . . . . . . . . . . . . . . | **2** | | No |
| **3** | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? . | **3** | | No |
| **4** | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? . | **4** | | No |
| **5** | Did the organization become aware during the year of a significant diversion of the organization's assets? . | **5** | | No |
| **6** | Did the organization have members or stockholders? . . . . . . . . . . . . | **6** | | No |
| **7a** | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? . . . . . . . . . . . . . . . . . | **7a** | | No |
| **b** | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . . . . . . . . . . | **7b** | | No |
| **8** | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following | | | |
| **a** | The governing body? . . . . . . . . . . . . . . . . . . . . . | **8a** | Yes | |
| **b** | Each committee with authority to act on behalf of the governing body? . . . . . . . . . | **8b** | Yes | |
| **9** | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? If "Yes," provide the names and addresses in Schedule O . . . . . . . | **9** | | No |

## Section B. Policies (This Section B requests information about policies not required by the Internal Revenue Code.)

| | | | Yes | No |
|---|---|---|---|---|
| **10a** | Did the organization have local chapters, branches, or affiliates? . . . . . . . . . . | **10a** | | No |
| **b** | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | **10b** | | |
| **11a** | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? . . . . . . . . . . . . . . . . . . . . . . . | **11a** | Yes | |
| **b** | Describe in Schedule O the process, if any, used by the organization to review this Form 990 | | | |
| **12a** | Did the organization have a written conflict of interest policy? If "No," go to line 13 . . . . . . . | **12a** | Yes | |
| **b** | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? . . . . . . . . . . . . . . . . . . . . . . . | **12b** | Yes | |
| **c** | Did the organization regularly and consistently monitor and enforce compliance with the policy? If "Yes," describe in Schedule O how this was done . . . . . . . . . . . . . . . . . . | **12c** | Yes | |
| **13** | Did the organization have a whistleblower policy? . . . . . . . . . . . . . . | **13** | | No |
| **14** | Did the organization have a written document retention and destruction policy? . . . . . . . | **14** | Yes | |
| **15** | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| **a** | The organization's CEO, Executive Director, or top management official . . . . . . . . . | **15a** | | No |
| **b** | Other officers or key employees of the organization . . . . . . . . . . . . . | **15b** | | No |
| | If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions) | | | |
| **16a** | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . . . . . | **16a** | | No |
| **b** | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . . . . . . | **16b** | | |

## Section C. Disclosure

**17** List the States with which a copy of this Form 990 is required to be filed▶ _____

**18** Section 6104 requires an organization to make its Form 1023 (or 1024-A if applicable), 990, and 990-T (501(c)(3)s only) available for public inspection Indicate how you made these available Check all that apply

☐ Own website  ☐ Another's website  ☑ Upon request  ☐ Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year

**20** State the name, address, and telephone number of the person who possesses the organization's books and records
▶LISA CYRIACKS   504 ARROWHEAD WAY   Crestone, CO 81131 (719) 256-4140

| Part VII | Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors |

Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . . . . . . ☐

### Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees

**1a** Complete this table for all persons required to be listed Report compensation for the calendar year ending with or within the organization's tax year

● List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation Enter -0- in columns (D), (E), and (F) if no compensation was paid

● List all of the organization's **current** key employees, if any See instructions for definition of "key employee "

● List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations

● List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations

● List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations

List persons in the following order individual trustees or directors, institutional trustees, officers, key employees, highest compensated employees, and former such persons

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee

| (A)<br>Name and Title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C)<br>Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W- 2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W- 2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) Lisa A Cyriacks<br>................<br>President | 10 0<br><br>0 0 | | | X | | | | 0 | 0 | 0 |
| (2) Mary Eberle<br>................<br>Secretary | 20 0<br><br>0 0 | | | X | | | | 0 | 0 | 0 |
| (3) Marilyn R Marks<br>................<br>Vice-President | 50 0<br><br>0 0 | | | X | | | | 0 | 0 | 0 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

Form 990 (2018)									Page **8**

Section A Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees (continued)

| Part VII | Section A Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)* |

| (A) Name and Title | (B) Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b Sub-Total** . . . . . . . . . . . . . ▶ | | | | | | | | | | |
| **c Total from continuation sheets to Part VII, Section A** . . . . ▶ | | | | | | | | | | |
| **d Total (add lines 1b and 1c)** . . . . . . . . . ▶ | | | | | | | | 0 | 0 | 0 |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 0

| | | | Yes | No |
|---|---|---|---|---|
| **3** | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . . | **3** | | No |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **4** | | No |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* . . . . . . . . . . | **5** | | No |

### Section B. Independent Contractors

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization Report compensation for the calendar year ending with or within the organization's tax year

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶ 0

Form **990** (2018)

| Part VIII | Statement of Revenue 93989-AT   Document 1565   Filed 01/07/23   Page 567 of 721 |

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . . . □

| | | | (A)<br>Total revenue | (B)<br>Related or exempt function revenue | (C)<br>Unrelated business revenue | (D)<br>Revenue excluded from tax under sections 512 - 514 |
|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | **1a** Federated campaigns . . | **1a** | | | | |
| | **b** Membership dues . . | **1b** | | | | |
| | **c** Fundraising events . . | **1c** | | | | |
| | **d** Related organizations | **1d** | | | | |
| | **e** Government grants (contributions) | **1e** | | | | |
| | **f** All other contributions, gifts, grants, and similar amounts not included above | **1f** | 218,953 | | | |
| | **g** Noncash contributions included in lines 1a - 1f $ _____ | | | | | |
| | **h Total.** Add lines 1a-1f . . . . . . . ▶ | | 218,953 | | | |
| **Program Service Revenue** | **2a** _____ | | Business Code | | | |
| | **b** _____ | | | | | |
| | **c** _____ | | | | | |
| | **d** _____ | | | | | |
| | **e** _____ | | | | | |
| | **f** All other program service revenue | | | | | |
| | **g Total.** Add lines 2a–2f . . . . ▶ | | 0 | | | |
| **Other Revenue** | **3** Investment income (including dividends, interest, and other similar amounts) . . . . . . ▶ | | 37 | | | 37 |
| | **4** Income from investment of tax-exempt bond proceeds ▶ | | 0 | | | |
| | **5** Royalties . . . . . . . . ▶ | | 0 | | | |

**6a** Gross rents

| | (i) Real | (ii) Personal |
|---|---|---|
| **6a** Gross rents | | |
| **b** Less  rental expenses | | |
| **c** Rental income or (loss) | 0 | 0 |

**d** Net rental income or (loss) . . . . . . ▶　0

| | (i) Securities | (ii) Other |
|---|---|---|
| **7a** Gross amount from sales of assets other than inventory | | |
| **b** Less  cost or other basis and sales expenses | | |
| **c** Gain or (loss) | | |

**d** Net gain or (loss) . . . . . ▶　0

**8a** Gross income from fundraising events (not including $ _____ of contributions reported on line 1c) See Part IV, line 18 . . . . . **a** 0

**b** Less  direct expenses . . . **b** 0

**c** Net income or (loss) from fundraising events . . ▶　0

**9a** Gross income from gaming activities See Part IV, line 19 . . . **a** 0

**b** Less  direct expenses . . . **b** 0

**c** Net income or (loss) from gaming activities . . ▶　0

**10a** Gross sales of inventory, less returns and allowances . . **a** 0

**b** Less  cost of goods sold . . **b** 0

**c** Net income or (loss) from sales of inventory . . ▶　0

| Miscellaneous Revenue | | Business Code |
|---|---|---|
| **11a** _____ | | |
| **b** _____ | | |
| **c** _____ | | |
| **d** All other revenue . . . . . | | |
| **e Total.** Add lines 11a–11d . . . . . ▶ | | 0 |

| **12 Total revenue.** See Instructions . . . . . ▶ | 218,990 | | | 37 |

| Part IX | Statement of Functional Expenses |

Section 501(c)(3) and 501(c)(4) organizations must complete all columns  All other organizations must complete column (A)

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . . . . ☐

| Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII. | **(A)** Total expenses | **(B)** Program service expenses | **(C)** Management and general expenses | **(D)** Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic governments  See Part IV, line 21 | 0 | | | |
| **2** Grants and other assistance to domestic individuals  See Part IV, line 22 | 0 | | | |
| **3** Grants and other assistance to foreign organizations, foreign governments, and foreign individuals  See Part IV, line 15 and 16 | 0 | | | |
| **4** Benefits paid to or for members | 0 | | | |
| **5** Compensation of current officers, directors, trustees, and key employees . . . . . | 0 | | | |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) . . . . | 0 | | | |
| **7** Other salaries and wages | 0 | | | |
| **8** Pension plan accruals and contributions (include section 401 (k) and 403(b) employer contributions) . . . . | 0 | | | |
| **9** Other employee benefits . . . . . . | 0 | | | |
| **10** Payroll taxes . . . . . . . | 0 | | | |
| **11** Fees for services (non-employees) | | | | |
| **a** Management . . . . . . | 0 | | | |
| **b** Legal . . . . . . . | 189,792 | 189,792 | | |
| **c** Accounting . . . . . . . | 1,500 | | 1,500 | 0 |
| **d** Lobbying . . . . . . . | 0 | | | |
| **e** Professional fundraising services  See Part IV, line 17 | 0 | | | |
| **f** Investment management fees . . . | 0 | | | |
| **g** Other (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O) | 269 | | 269 | |
| **12** Advertising and promotion . . . . | 0 | | | |
| **13** Office expenses . . . . . . | 100 | | 100 | |
| **14** Information technology . . . . | 0 | | | |
| **15** Royalties . . | 0 | | | |
| **16** Occupancy . . . . . . | 0 | | | |
| **17** Travel . . . . . . . . | 770 | | 770 | |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials . | 0 | | | |
| **19** Conferences, conventions, and meetings . . . . | 0 | | | |
| **20** Interest . . . . . . . | 0 | | | |
| **21** Payments to affiliates . . . . . | 0 | | | |
| **22** Depreciation, depletion, and amortization . . | 0 | | | |
| **23** Insurance . . . | 650 | | 650 | |
| **24** Other expenses  Itemize expenses not covered above (List miscellaneous expenses in line 24e  If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O ) | | | | |
| **a** | | | | |
| **b** | | | | |
| **c** | | | | |
| **d** | | | | |
| **e** All other expenses | | | | |
| **25 Total functional expenses.** Add lines 1 through 24e | 193,081 | 189,792 | 3,289 | 0 |
| **26 Joint costs.** Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation  Check here ▶ ☐ if following SOP 98-2 (ASC 958-720) | | | | |

Case 1:17-cv-02989-AT    Document 1565    Filed 01/07/23    Page 569 of 721

| Part X | Balance Sheet |
|---|---|

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . ☐

| | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|
| **1** | Cash–non-interest-bearing . . . . . . . . | 27,706 | **1** | 53,615 |
| **2** | Savings and temporary cash investments . . . . . . . . . . | 0 | **2** | 0 |
| **3** | Pledges and grants receivable, net . . . . . . | 0 | **3** | 0 |
| **4** | Accounts receivable, net . . . . . . | 0 | **4** | 0 |
| **5** | Loans and other receivables from current and former officers, directors, trustees, key employees, and highest compensated employees Complete Part II of Schedule L . . . . . . . . . . | 0 | **5** | 0 |
| **6** | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), persons described in section 4958(c)(3)(B), and contributing employers and sponsoring organizations of section 501(c)(9) voluntary employees' beneficiary organizations (see instructions) Complete Part II of Schedule L . . . . | 0 | **6** | 0 |
| **7** | Notes and loans receivable, net . . . . . | 0 | **7** | 0 |
| **8** | Inventories for sale or use . . . . . . . | 0 | **8** | 0 |
| **9** | Prepaid expenses and deferred charges . . . . . . | 0 | **9** | 0 |
| **10a** | Land, buildings, and equipment cost or other basis Complete Part VI of Schedule D **10a** | | | |
| **b** | Less accumulated depreciation **10b** | 0 | **10c** | 0 |
| **11** | Investments—publicly traded securities . | 0 | **11** | 0 |
| **12** | Investments—other securities See Part IV, line 11 . . . . . | 0 | **12** | 0 |
| **13** | Investments—program-related See Part IV, line 11 . . | 0 | **13** | 0 |
| **14** | Intangible assets . . . . . . . . | 0 | **14** | 0 |
| **15** | Other assets See Part IV, line 11 . . . . . . . . | 0 | **15** | 0 |
| **16** | **Total assets.** Add lines 1 through 15 (must equal line 34) . . . | 27,706 | **16** | 53,615 |
| **17** | Accounts payable and accrued expenses . . . . . . | 0 | **17** | 0 |
| **18** | Grants payable . . . | 0 | **18** | 0 |
| **19** | Deferred revenue . . . . . . . | 0 | **19** | 0 |
| **20** | Tax-exempt bond liabilities . . . . . . . . | 0 | **20** | 0 |
| **21** | Escrow or custodial account liability Complete Part IV of Schedule D | 0 | **21** | 0 |
| **22** | Loans and other payables to current and former officers, directors, trustees, key employees, highest compensated employees, and disqualified persons Complete Part II of Schedule L . . . . | 0 | **22** | 0 |
| **23** | Secured mortgages and notes payable to unrelated third parties . . | 0 | **23** | 0 |
| **24** | Unsecured notes and loans payable to unrelated third parties . . | 0 | **24** | 0 |
| **25** | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17 - 24) Complete Part X of Schedule D | 0 | **25** | 0 |
| **26** | **Total liabilities.** Add lines 17 through 25 . . . | 0 | **26** | 0 |
| | **Organizations that follow SFAS 117 (ASC 958), check here ▶ ☐ and complete lines 27 through 29, and lines 33 and 34.** | | | |
| **27** | Unrestricted net assets | | **27** | |
| **28** | Temporarily restricted net assets . . . . . . . . . | | **28** | |
| **29** | Permanently restricted net assets . . . . . . . | | **29** | |
| | **Organizations that do not follow SFAS 117 (ASC 958), check here ▶ ☑ and complete lines 30 through 34.** | | | |
| **30** | Capital stock or trust principal, or current funds . . . . . | 0 | **30** | 0 |
| **31** | Paid-in or capital surplus, or land, building or equipment fund . . . | 0 | **31** | 0 |
| **32** | Retained earnings, endowment, accumulated income, or other funds | 27,706 | **32** | 53,615 |
| **33** | Total net assets or fund balances . . . . . . . | 27,706 | **33** | 53,615 |
| **34** | Total liabilities and net assets/fund balances . . . . | 27,706 | **34** | 53,615 |

(left margin labels: Assets / Liabilities / Net Assets or Fund Balances)

| Part XI | Reconciliation of Net Assets |

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . . . . . . . . . . .   ☐

| | | | |
|---|---|---|---|
| **1** | Total revenue (must equal Part VIII, column (A), line 12) . . . . . . . . . . . . . | **1** | 218,990 |
| **2** | Total expenses (must equal Part IX, column (A), line 25) . . . . . . . . . . . . | **2** | 193,081 |
| **3** | Revenue less expenses Subtract line 2 from line 1 . . . . . . . . . . . . . . . | **3** | 25,909 |
| **4** | Net assets or fund balances at beginning of year (must equal Part X, line 33, column (A)) . . | **4** | 27,706 |
| **5** | Net unrealized gains (losses) on investments . . . . . . . . . . . . . . . . | **5** | |
| **6** | Donated services and use of facilities . . . . . . . . . . . . . . . . . | **6** | |
| **7** | Investment expenses . . . . . . . . . . . . . . . . . . . . . . | **7** | |
| **8** | Prior period adjustments . . . . . . . . . . . . . . . . . . . . . | **8** | |
| **9** | Other changes in net assets or fund balances (explain in Schedule O) . . . . . . . . . | **9** | |
| **10** | Net assets or fund balances at end of year Combine lines 3 through 9 (must equal Part X, line 33, column (B)) | **10** | 53,615 |

| Part XII | **Financial Statements and Reporting** |

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . . . . . . . . .   ☐

| | | **Yes** | **No** |
|---|---|---|---|
| **1** Accounting method used to prepare the Form 990     ☐ Cash  ☑ Accrual  ☐ Other _____ <br> If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O | | | |
| **2a** Were the organization's financial statements compiled or reviewed by an independent accountant? | **2a** | | No |
| If 'Yes,' check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both | | | |
| ☐ Separate basis    ☐ Consolidated basis    ☐ Both consolidated and separate basis | | | |
| **b** Were the organization's financial statements audited by an independent accountant? | **2b** | | No |
| If 'Yes,' check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both | | | |
| ☐ Separate basis    ☐ Consolidated basis    ☐ Both consolidated and separate basis | | | |
| **c** If "Yes," to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | **2c** | | |
| If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O | | | |
| **3a** As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? | **3a** | | No |
| **b** If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits | **3b** | | |

# Additional Data

**Software ID:**

**Software Version:**

**EIN:**   26-3670783

**Name:**   Coalition for Good Governance

Form 990 (2018)

## Form 990, Part III, Line 4a:

ADVOCATING FOR VOTERS' RIGHT TO A VERIFIABLE ELECTION, CGG LITIGATED IN FEDERAL COURT AGAINST GEORGIA'S USE OF AN UNVERIFIABLE PAPERLESS TOUCHSCREEN SYSTEM AND EDUCATED GA VOTERS ON THE IMPORTANCE OF USING AN ELECTION SYSTEM THAT INCLUDES EITHER PAPER BALLOTS OR CREATES A PAPER TRAIL

**Form 990, Part III, Line 4b:**

LITIGATION ON THE PART OF GEORGIA VOTERS TO FORCE AN INVESTIGATION AND CORRECTION OF DEFECTS CAUSING DISCREPANCIES IN VOTING SYSTEM LITIGATION RESULTED IN IDENTIFYING AND INCLUSION OF VOTES THAT OTHERWISE WOULD NOT HAVE BEEN COUNTED

Case 1:17-cv-02989-AT Document 1565 Filed 01/07/23 Page 572 of 721

**Form 990, Part III, Line 4c:**

CHALLENGED STATE OF GEORGIA'S DISCRIMINATORY POLICIES ON ABSENTEE BALLOTS. THIS PROTECTED VOTERS' RIGHT TO FILE AN ABSENTEE BALLOT AND RESULTED IN THOUSANDS OF BALLOTS BEING COUNTED THAT OTHERWISE WOULD HAVE BEEN REJECTED

Case 1:17-cv-02989-AT Document 1565 Filed 01/07/23 Page 573 of 721

**SCHEDULE A**
**(Form 990 or 990EZ)**

Department of the Treasury
Internal Revenue Service

# Public Charity Status and Public Support

Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust.
▶ Attach to Form 990 or Form 990-EZ.
▶ Go to _www.irs.gov/Form990_ for the latest information.

OMB No 1545-0047

# 2018

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| Coalition for Good Governance | 26-3670783 |

## Part I — Reason for Public Charity Status (All organizations must complete this part.) See instructions.

The organization is not a private foundation because it is (For lines 1 through 12, check only one box )

1  ☐  A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2  ☐  A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990 or 990-EZ) )

3  ☐  A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4  ☐  A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state

5  ☐  An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170 (b)(1)(A)(iv).** (Complete Part II )

6  ☐  A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7  ☑  An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II )

8  ☐  A community trust described in **section 170(b)(1)(A)(vi)** (Complete Part II )

9  ☐  An agricultural research organization described in **170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land grant college of agriculture  See instructions  Enter the name, city, and state of the college or university

10  ☐  An organization that normally receives  (1) more than 331/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions—subject to certain exceptions, and (2) no more than 331/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975  See **section 509(a)(2).** (Complete Part III )

11  ☐  An organization organized and operated exclusively to test for public safety  See **section 509(a)(4).**

12  ☐  An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box in lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g

a  ☐  **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization  **You must complete Part IV, Sections A and B.**

b  ☐  **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s)  **You must complete Part IV, Sections A and C.**

c  ☐  **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions)  **You must complete Part IV, Sections A, D, and E.**

d  ☐  **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated  The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions)  **You must complete Part IV, Sections A and D, and Part V.**

e  ☐  Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization

f  Enter the number of supported organizations

g  Provide the following information about the supported organization(s)

| (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1- 10 above (see instructions)) | (iv) Is the organization listed in your governing document? | | (v) Amount of monetary support (see instructions) | (vi) Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| | | | **Yes** | **No** | | |
| | | | | | | |
| | | | | | | |
| **Total** | | | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.    Cat No 11285F    **Schedule A (Form 990 or 990-EZ) 2018**

| **Part II** | Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv), and 170 |
|---|---|

**(b)(1)(A)(ix)**

(Complete only if you checked the box on line 5, 7, 8, or 9 of Part I or if the organization failed to qualify under Part III. If the organization fails to qualify under the tests listed below, please complete Part III.)

### Section A. Public Support

| | Calendar year<br>(or fiscal year beginning in) ▶ | **(a)** 2014 | **(b)** 2015 | **(c)** 2016 | **(d)** 2017 | **(e)** 2018 | **(f)** Total |
|---|---|---|---|---|---|---|---|
| **1** | Gifts, grants, contributions, and membership fees received (Do not include any "unusual grant ") | 15,150 | 6,010 | 0 | 117,663 | 218,953 | 357,776 |
| **2** | Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | 0 |
| **3** | The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | 0 |
| **4** | **Total.** Add lines 1 through 3 | 15,150 | 6,010 | 0 | 117,663 | 218,953 | 357,776 |
| **5** | The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) | | | | | | 204,846 |
| **6** | **Public support.** Subtract line 5 from line 4 | | | | | | 152,930 |

### Section B. Total Support

| | Calendar year<br>(or fiscal year beginning in) ▶ | **(a)**2014 | **(b)**2015 | **(c)**2016 | **(d)**2017 | **(e)**2018 | **(f)**Total |
|---|---|---|---|---|---|---|---|
| **7** | Amounts from line 4 | 15,150 | 6,010 | 0 | 117,663 | 218,953 | 357,776 |
| **8** | Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | 174 | 186 | 34 | 37 | 37 | 468 |
| **9** | Net income from unrelated business activities, whether or not the business is regularly carried on | | | | | | 0 |
| **10** | Other income Do not include gain or loss from the sale of capital assets (Explain in Part VI ) | | | | | | 0 |
| **11** | **Total support.** Add lines 7 through 10 | | | | | | 358,244 |
| **12** | Gross receipts from related activities, etc (see instructions) | | | | | **12** | |

**13　First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization,

check this box and **stop here** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

### Section C. Computation of Public Support Percentage

| **14** | Public support percentage for 2018 (line 6, column (f) divided by line 11, column (f)) | **14** | 42 689 % |
|---|---|---|---|
| **15** | Public support percentage for 2017 Schedule A, Part II, line 15 | **15** | 48 758 % |

**16a　33 1/3% support test—2018.** If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box

and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . . . . ▶ ☑

**b　33 1/3% support test—2017.** If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this

box and **stop here.** The organization qualifies as a publicly supported organization . . . . . . . . . . . . . . . . . . ▶ ☐

**17a　10%-facts-and-circumstances test—2018.** If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test The organization qualifies as a publicly supported

organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**b　10%-facts-and-circumstances test—2017.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test The organization qualifies as a publicly

supported organization . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**18　Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see

instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

**Part III** Support Schedule for Organizations Described in Section 509(a)(2)
(Complete only if you checked the box on line 10 of Part I or if the organization failed to qualify under Part II. If the organization fails to qualify under the tests listed below, please complete Part II.)

### Section A. Public Support

| Calendar year<br>(or fiscal year beginning in) ▶ | (a) 2014 | (b) 2015 | (c) 2016 | (d) 2017 | (e) 2018 | (f) Total |
|---|---|---|---|---|---|---|
| **1** Gifts, grants, contributions, and membership fees received (Do not include any "unusual grants ") | | | | | | |
| **2** Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | | | | | | |
| **3** Gross receipts from activities that are not an unrelated trade or business under section 513 | | | | | | |
| **4** Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| **5** The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| **6** **Total.** Add lines 1 through 5 | | | | | | |
| **7a** Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | |
| **b** Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year | | | | | | |
| **c** Add lines 7a and 7b | | | | | | |
| **8** **Public support.** (Subtract line 7c from line 6 ) | | | | | | |

### Section B. Total Support

| Calendar year<br>(or fiscal year beginning in) ▶ | (a) 2014 | (b) 2015 | (c) 2016 | (d) 2017 | (e) 2018 | (f) Total |
|---|---|---|---|---|---|---|
| **9** Amounts from line 6 | | | | | | |
| **10a** Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | | | | | | |
| **b** Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975 | | | | | | |
| **c** Add lines 10a and 10b | | | | | | |
| **11** Net income from unrelated business activities not included in line 10b, whether or not the business is regularly carried on | | | | | | |
| **12** Other income Do not include gain or loss from the sale of capital assets (Explain in Part VI ) | | | | | | |
| **13** **Total support.** (Add lines 9, 10c, 11, and 12 ) | | | | | | |

**14** **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** ▶ ☐

### Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| **15** Public support percentage for 2018 (line 8, column (f) divided by line 13, column (f)) | **15** | |
| **16** Public support percentage from 2017 Schedule A, Part III, line 15 | **16** | |

### Section D. Computation of Investment Income Percentage

| | | |
|---|---|---|
| **17** Investment income percentage for **2018** (line 10c, column (f) divided by line 13, column (f)) | **17** | |
| **18** Investment income percentage from **2017** Schedule A, Part III, line 17 | **18** | |

**19a** **331/3% support tests—2018.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization ▶ ☐

**b** **33 1/3% support tests—2017.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3% and line 18 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization ▶ ☐

**20** **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions ▶ ☐

Schedule A (Form 990 or 990-EZ) 2018

**Part IV**   **Supporting Organizations** (continued)

(Complete only if you checked a box on line 12 of Part I If you checked 12a of Part I, complete Sections A and B If you checked 12b of Part I, complete Sections A and C If you checked 12c of Part I, complete Sections A, D, and E If you checked 12d of Part I, complete Sections A and D, and complete Part V )

### Section A. All Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| 1 | Are all of the organization's supported organizations listed by name in the organization's governing documents? *If "No," describe in **Part VI** how the supported organizations are designated If designated by class or purpose, describe the designation If historic and continuing relationship, explain*    **1** | | |
| 2 | Did the organization have any supported organization that does not have an IRS determination of status under section 509 (a)(1) or (2)? *If "Yes," explain in **Part VI** how the organization determined that the supported organization was described in section 509(a)(1) or (2)*    **2** | | |
| 3a | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? *If "Yes," answer (b) and (c) below*    **3a** | | |
| b | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? *If "Yes," describe in **Part VI** when and how the organization made the determination*    **3b** | | |
| c | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? *If "Yes," explain in **Part VI** what controls the organization put in place to ensure such use*    **3c** | | |
| 4a | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes" and if you checked 12a or 12b in Part I, answer (b) and (c) below*    **4a** | | |
| b | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in **Part VI** how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations*    **4b** | | |
| c | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in **Part VI** what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes*    **4c** | | |
| 5a | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer (b) and (c) below (if applicable) Also, provide detail in **Part VI**, including (i) the names and EIN numbers of the supported organizations added, substituted, or removed, (ii) the reasons for each such action, (iii) the authority under the organization's organizing document authorizing such action, and (iv) how the action was accomplished (such as by amendment to the organizing document)*    **5a** | | |
| b | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document?    **5b** | | |
| c | **Substitutions only.** Was the substitution the result of an event beyond the organization's control?    **5c** | | |
| 6 | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in **Part VI**.*    **6** | | |
| 7 | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ)*    **7** | | |
| 8 | Did the organization make a loan to a disqualified person (as defined in section 4958) not described in line 7? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ)*    **8** | | |
| 9a | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in **Part VI**.*    **9a** | | |
| b | Did one or more disqualified persons (as defined in line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in **Part VI**.*    **9b** | | |
| c | Did a disqualified person (as defined in line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in **Part VI**.*    **9c** | | |
| 10a | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer line 10b below*    **10a** | | |
| b | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings)*    **10b** | | |

**Part IV**    Supporting Organizations *(continued)*

| | | Yes | No |
|---|---|---|---|
| 11 | Has the organization accepted a gift or contribution from any of the following persons? | | |
| a | A person who directly or indirectly controls, either alone or together with persons described in (b) and (c) below, the governing body of a supported organization? **11a** | | |
| b | A family member of a person described in (a) above? **11b** | | |
| c | A 35% controlled entity of a person described in (a) or (b) above? *If "Yes" to a, b, or c, provide detail in Part VI* **11c** | | |

### Section B. Type I Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| 1 | Did the directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in Part VI how the supported organization(s) effectively operated, supervised, or controlled the organization's activities If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year* | **1** | |
| 2 | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in Part VI how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised or controlled the supporting organization* | **2** | |

### Section C. Type II Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| 1 | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of each of the organization's supported organization(s)? *If "No," describe in Part VI how control or management of the supporting organization was vested in the same persons that controlled or managed the supported organization(s)* | **1** | |

### Section D. All Type III Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| 1 | Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization's tax year, (i) a written notice describing the type and amount of support provided during the prior tax year, (ii) a copy of the Form 990 that was most recently filed as of the date of notification, and (iii) copies of the organization's governing documents in effect on the date of notification, to the extent not previously provided? | **1** | |
| 2 | Were any of the organization's officers, directors, or trustees either (i) appointed or elected by the supported organization (s) or (ii) serving on the governing body of a supported organization? *If "No," explain in Part VI how the organization maintained a close and continuous working relationship with the supported organization(s)* | **2** | |
| 3 | By reason of the relationship described in (2), did the organization's supported organizations have a significant voice in the organization's investment policies and in directing the use of the organization's income or assets at all times during the tax year? *If "Yes," describe in Part VI the role the organization's supported organizations played in this regard* | **3** | |

### Section E. Type III Functionally-Integrated Supporting Organizations

1   Check the box next to the method that the organization used to satisfy the Integral Part Test during the year **(see instructions)**

a   ☐   The organization satisfied the Activities Test Complete **line 2** below

b   ☐   The organization is the parent of each of its supported organizations Complete **line 3** below

c   ☐   The organization supported a governmental entity Describe in **Part VI** how you supported a government entity (see instructions)

| | | Yes | No |
|---|---|---|---|
| 2 | Activities Test **Answer (a) and (b) below.** | | |
| a | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supported organization(s) to which the organization was responsive? *If "Yes," then in Part VI identify those supported organizations and explain how these activities directly furthered their exempt purposes, how the organization was responsive to those supported organizations, and how the organization determined that these activities constituted substantially all of its activities* | **2a** | |
| b | Did the activities described in (a) constitute activities that, but for the organization's involvement, one or more of the organization's supported organization(s) would have been engaged in? *If "Yes," explain in Part VI the reasons for the organization's position that its supported organization(s) would have engaged in these activities but for the organization's involvement* | **2b** | |
| 3 | Parent of Supported Organizations **Answer (a) and (b) below.** | | |
| a | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each of the supported organizations? *Provide details in Part VI.* | **3a** | |
| b | Did the organization exercise a substantial degree of direction over the policies, programs and activities of each of its supported organizations? *If "Yes," describe in Part VI. the role played by the organization in this regard* | **3b** | |

**Schedule A (Form 990 or 990-EZ) 2018**

**Part V** Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations

1 ☐ Check here if the organization satisfied the Integral Part Test as a qualifying trust on Nov 20, 1970 (explain in Part VI) **See instructions.** All other Type III non-functionally integrated supporting organizations must complete Sections A through E

| Section A - Adjusted Net Income | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 Net short-term capital gain | 1 | | |
| 2 Recoveries of prior-year distributions | 2 | | |
| 3 Other gross income (see instructions) | 3 | | |
| 4 Add lines 1 through 3 | 4 | | |
| 5 Depreciation and depletion | 5 | | |
| 6 Portion of operating expenses paid or incurred for production or collection of gross income or for management, conservation, or maintenance of property held for production of income (see instructions) | 6 | | |
| 7 Other expenses (see instructions) | 7 | | |
| 8 **Adjusted Net Income** (subtract lines 5, 6 and 7 from line 4) | 8 | | |

| Section B - Minimum Asset Amount | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 Aggregate fair market value of all non-exempt-use assets (see instructions for short tax year or assets held for part of year) | 1 | | |
| a Average monthly value of securities | 1a | | |
| b Average monthly cash balances | 1b | | |
| c Fair market value of other non-exempt-use assets | 1c | | |
| d **Total** (add lines 1a, 1b, and 1c) | 1d | | |
| e **Discount** claimed for blockage or other factors (explain in detail in Part VI) | | | |
| 2 Acquisition indebtedness applicable to non-exempt use assets | 2 | | |
| 3 Subtract line 2 from line 1d | 3 | | |
| 4 Cash deemed held for exempt use Enter 1-1/2% of line 3 (for greater amount, see instructions) | 4 | | |
| 5 Net value of non-exempt-use assets (subtract line 4 from line 3) | 5 | | |
| 6 Multiply line 5 by 035 | 6 | | |
| 7 Recoveries of prior-year distributions | 7 | | |
| 8 **Minimum Asset Amount** (add line 7 to line 6) | 8 | | |

| Section C - Distributable Amount | | | Current Year |
|---|---|---|---|
| 1 Adjusted net income for prior year (from Section A, line 8, Column A) | 1 | | |
| 2 Enter 85% of line 1 | 2 | | |
| 3 Minimum asset amount for prior year (from Section B, line 8, Column A) | 3 | | |
| 4 Enter greater of line 2 or line 3 | 4 | | |
| 5 Income tax imposed in prior year | 5 | | |
| 6 **Distributable Amount.** Subtract line 5 from line 4, unless subject to emergency temporary reduction (see instructions) | 6 | | |

7 ☐ Check here if the current year is the organization's first as a non-functionally-integrated Type III supporting organization (see instructions)

**Part V** Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations *(continued)*

| **Section D - Distributions** | | | **Current Year** |
|---|---|---|---|
| **1** Amounts paid to supported organizations to accomplish exempt purposes | | | |
| **2** Amounts paid to perform activity that directly furthers exempt purposes of supported organizations, in excess of income from activity | | | |
| **3** Administrative expenses paid to accomplish exempt purposes of supported organizations | | | |
| **4** Amounts paid to acquire exempt-use assets | | | |
| **5** Qualified set-aside amounts (prior IRS approval required) | | | |
| **6** Other distributions (describe in **Part VI**) See instructions | | | |
| **7 Total annual distributions.** Add lines 1 through 6 | | | |
| **8** Distributions to attentive supported organizations to which the organization is responsive (provide details in **Part VI**) See instructions | | | |
| **9** Distributable amount for 2018 from Section C, line 6 | | | |
| **10** Line 8 amount divided by Line 9 amount | | | |

| **Section E - Distribution Allocations (see instructions)** | **(i)**<br>**Excess Distributions** | **(ii)**<br>**Underdistributions**<br>**Pre-2018** | **(iii)**<br>**Distributable**<br>**Amount for 2018** |
|---|---|---|---|
| **1** Distributable amount for 2018 from Section C, line 6 | | | |
| **2** Underdistributions, if any, for years prior to 2018 (reasonable cause required-- explain in Part VI) See instructions | | | |
| **3** Excess distributions carryover, if any, to 2018 | | | |
| **a** From 2013. . . . . . . . | | | |
| **b** From 2014. . . . . . . . | | | |
| **c** From 2015. . . . . . . . | | | |
| **d** From 2016. . . . . . . . | | | |
| **e** From 2017. . . . . . . . | | | |
| **f Total** of lines 3a through e | | | |
| **g** Applied to underdistributions of prior years | | | |
| **h** Applied to 2018 distributable amount | | | |
| **i** Carryover from 2013 not applied (see instructions) | | | |
| **j** Remainder Subtract lines 3g, 3h, and 3i from 3f | | | |
| **4** Distributions for 2018 from Section D, line 7 $ | | | |
| **a** Applied to underdistributions of prior years | | | |
| **b** Applied to 2018 distributable amount | | | |
| **c** Remainder Subtract lines 4a and 4b from 4 | | | |
| **5** Remaining underdistributions for years prior to 2018, if any Subtract lines 3g and 4a from line 2 If the amount is greater than zero, explain in Part VI See instructions | | | |
| **6** Remaining underdistributions for 2018 Subtract lines 3h and 4b from line 1 If the amount is greater than zero, explain in Part VI See instructions | | | |
| **7 Excess distributions carryover to 2019.** Add lines 3j and 4c | | | |
| **8** Breakdown of line 7 | | | |
| **a** Excess from 2014. . . . . . . | | | |
| **b** Excess from 2015. . . . . | | | |
| **c** Excess from 2016. . . . . | | | |
| **d** Excess from 2017. . . . . | | | |
| **e** Excess from 2018. . . . . | | | |

**Software ID:**

**Software Version:**

**EIN:**   26-3670783

**Name:**   Coalition for Good Governance

---

Schedule A (Form 990 or 990-EZ) 2018                                                                                                          Page **8**

| **Part VI** | **Supplemental Information.** Provide the explanations required by Part II, line 10, Part II, line 17a or 17b, Part III, line 12, Part IV, Section A, lines 1, 2, 3b, 3c, 4b, 4c, 5a, 6, 9a, 9b, 9c, 11a, 11b, and 11c, Part IV, Section B, lines 1 and 2, Part IV, Section C, line 1, Part IV, Section D, lines 2 and 3, Part IV, Section E, lines 1c, 2a, 2b, 3a and 3b, Part V, line 1, Part V, Section B, line 1e, Part V Section D, lines 5, 6, and 8, and Part V, Section E, lines 2, 5, and 6  Also complete this part for any additional information  (See instructions) |
|---|---|

| **Facts And Circumstances Test** |
|---|
| |
| |

Case 1:17-cv-02989-AT   Document 1565   Filed 01/07/23   Page 582 of 721

**SCHEDULE O**
**(Form 990 or 990-EZ)**

Department of the Treasury

# Supplemental Information to Form 990 or 990-EZ

Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.
▶ Attach to Form 990 or 990-EZ.
▶ Go to *www.irs.gov/Form990* for the latest information.

OMB No 1545-0047

## 2018

**Open to Public Inspection**

| Name of the organization | Employer identification number |
|---|---|
| Coalition for Good Governance | 26-3670783 |

## 990 Schedule O, Supplemental Information

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION B, LINE 11B | THE FORM 990 IS REVIEWED BY THE PRESIDENT AND THEN DISTRIBUTED TO THE BOARD FOR REVIEW  ALL QUESTIONS ARE ADDRESSED BY THE PRESIDENT AND THEN THE FORM 990 IS FILED WITH THE IRS |

**990 Schedule O, Supplemental Information**

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION B, LINE 12C | THE PRESIDENT REGULARLY MONITORS ALL TRANSACTIONS FOR POTENTIAL CONFLICTS AND IF A POTENTIAL CONFLICT WERE TO BE IDENTIFIED, SHE WOULD BRING THE TRANSACTION TO THE BOARD FOR APPROVAL  IF THE PRESIDENT IS THE PERSON WITH A CONFLICT, SHE WOULD ABSTAIN FROM VOTING AND THE INDEPENDENT BOARD MEMBERS WOULD DETERMINE IF THE TRANSACTION WAS IN THE BEST INTEREST OF THE COALITION |

**990 Schedule O, Supplemental Information**

| Return Reference | Explanation |
|---|---|
| Form 990, Part VI, Section B, Line 19 | THE ORGANIZATION MAKES ITS GOVERNING DOCUMENTS, CONFLICT OF INTEREST POLICY AND FINANCIAL STATEMENTS AVAILABLE TO THE PUBLIC UPON REQUEST |

Case 1:17-cv-02989-AT Document 1565 Filed 01/07/23 Page 585 of 721

OMB No 1545-0047

**Form 990**

# Return of Organization Exempt From Income Tax

**Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)**

▶ Do not enter social security numbers on this form as it may be made public

▶ Go to *www.irs.gov/Form990* for instructions and the latest information.

**2019**

Open to Public Inspection

Department of the Treasury
Internal Revenue Service

**A** For the 2019 calendar year, or tax year beginning 01-01-2019 , and ending 12-31-2019

| **B** Check if applicable | **C** Name of organization | **D** Employer identification number |
|---|---|---|
| ☐ Address change | COALITION FOR GOOD GOVERNANCE | 26-3670783 |
| ☐ Name change | % LISA CYRIACKS | |
| ☐ Initial return | Doing business as | |
| ☐ Final return/terminated | | |
| ☐ Amended return | Number and street (or P O box if mail is not delivered to street address) Room/suite | **E** Telephone number |
| ☐ Application pending | 1520 CRESS COURT | (719) 256-4140 |
| | City or town, state or province, country, and ZIP or foreign postal code | |
| | BOULDER, CO 80304 | **G** Gross receipts $ 387,003 |

| **F** Name and address of principal officer | **H(a)** Is this a group return for subordinates? | ☐ Yes ☒ No |
|---|---|---|
| LISA CYRIACKS | **H(b)** Are all subordinates included? | ☐ Yes ☐ No |
| PO BOX 754 | If "No," attach a list (see instructions) | |
| CRESTONE, CO 81131 | | |

**I** Tax-exempt status ☒ 501(c)(3) ☐ 501(c) ( ) ◀ (insert no ) ☐ 4947(a)(1) or ☐ 527

**J** Website: ▶ COALITIONFORGOODGOVERNANCE ORG/

**H(c)** Group exemption number ▶

**K** Form of organization ☒ Corporation ☐ Trust ☐ Association ☐ Other ▶ | **L** Year of formation 2008 | **M** State of legal domicile CO

## Part I Summary

| | | |
|---|---|---|
| **Activities & Governance** | **1** Briefly describe the organization's mission or most significant activities ADVOCATING FOR VOTERS' RIGHT TO A VERIFIABLE ELECTION EDUCATE VOTERS TO THE IMPORTANCE OF Election Security AND PROTECT VOTERS' RIGHTS TO HAVE BALLOTS COUNTED | |
| | **2** Check this box ▶ ☐ if the organization discontinued its operations or disposed of more than 25% of its net assets | |
| | **3** Number of voting members of the governing body (Part VI, line 1a) . . . . . . | **3** 3 |
| | **4** Number of independent voting members of the governing body (Part VI, line 1b) . . . | **4** 3 |
| | **5** Total number of individuals employed in calendar year 2019 (Part V, line 2a) . . . | **5** 0 |
| | **6** Total number of volunteers (estimate if necessary) . . . . . . . . . . . | **6** 6 |
| | **7a** Total unrelated business revenue from Part VIII, column (C), line 12 . . . . . . | **7a** 0 |
| | **b** Net unrelated business taxable income from Form 990-T, line 39 . . . . . . . | **7b** |

| | | Prior Year | Current Year |
|---|---|---|---|
| **Revenue** | **8** Contributions and grants (Part VIII, line 1h) . . . . . . | 218,953 | 365,904 |
| | **9** Program service revenue (Part VIII, line 2g) . . . . . . | 0 | 0 |
| | **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d ) . . | 37 | 86 |
| | **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | 0 | 21,013 |
| | **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | 218,990 | 387,003 |

| | | | |
|---|---|---|---|
| **Expenses** | **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) . . . | 0 | 0 |
| | **14** Benefits paid to or for members (Part IX, column (A), line 4) . . . . | 0 | 0 |
| | **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | 0 | 0 |
| | **16a** Professional fundraising fees (Part IX, column (A), line 11e) . . . . | 0 | 0 |
| | **b** Total fundraising expenses (Part IX, column (D), line 25) ▶0 | | |
| | **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) . . . | 193,081 | 403,803 |
| | **18** Total expenses Add lines 13–17 (must equal Part IX, column (A), line 25) | 193,081 | 403,803 |
| | **19** Revenue less expenses Subtract line 18 from line 12 . . . . . . | 25,909 | -16,800 |

| | | Beginning of Current Year | End of Year |
|---|---|---|---|
| **Net Assets or Fund Balances** | **20** Total assets (Part X, line 16) . . . . . . . . . . . . | 53,615 | 36,815 |
| | **21** Total liabilities (Part X, line 26) . . . . . . . . . . . | 0 | 0 |
| | **22** Net assets or fund balances Subtract line 21 from line 20 . . . . | 53,615 | 36,815 |

## Part II Signature Block

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge

| Sign Here | ****** Signature of officer | 2020-05-15 Date |
|---|---|---|
| | LISA A CYRIACKS PRESIDENT Type or print name and title | |

Exhibit CGG 0008

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date 2020-06-15 | Check ☐ if self-employed | PTIN P00958966 |
|---|---|---|---|---|---|
| | Firm's name ▶ BKD LLP | | | Firm's EIN ▶ | |
| | Firm's address ▶ 111 South Tejon Suite 800 | | | Phone no (719) 471-4290 | |
| | Colorado Springs, CO 809039848 | | | | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . . ☒ Yes ☐ No

For Paperwork Reduction Act Notice, see the separate instructions. | Cat No 11282Y | Form **990** (2019)

| Part III | Statement of Program Service Accomplishments 1565   Filed 01/07/23   Page 586 of 721 |
|---|---|

Check if Schedule O contains a response or note to any line in this Part III . . . . . . . . . . . . . . . . . ☑

**1**   Briefly describe the organization's mission

THE INTERESTS OF COALITION FOR GOOD GOVERNANCE ARE CONSTITUTIONAL LIBERTIES AND THE INDIVIDUAL RIGHTS OF CITIZENS, WITH EMPHASIS ON FIRST AMENDMENT RIGHT, ELECTIONS, GOVERNMENT TRANSPARENCY AND ACCOUNTABILITY, OPEN RECORDS AND OPEN MEETINGS, DUE PROCESS, AND EQUAL PROTECTION OF THE LAWS  IT WILL ENGAGE IN LITIGATION AS WELL AS PROVIDE MONETARY SUPPORT FOR LEGAL EXPENSES TO OTHER ORGANIZATIONS ENGAGED IN LITIGATION ON THESE ISSUES  IT WILL ALSO INFORM LEGISLATIVE POLICY AND PERFORM INDEPENDENT RESEARCH AND ANALYSIS IN THE FOREGOING SUBJECT AREAS  LASTLY, THE ORGANIZATION WILL USE GENERALLY AVAILABLE MEANS OF EDUCATION AND COMMUNICATION TO ILLUMINATE AND SHARE PUBLIC DEBATES ESPECIALLY AS ITS SUBJECTS OF INTEREST APPEAR TO BEAR UPON THE CITIZENS OF COLORADO AND THE REGION

**2**   Did the organization undertake any significant program services during the year which were not listed on

the prior Form 990 or 990-EZ? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

If "Yes," describe these new services on Schedule O

**3**   Did the organization cease conducting, or make significant changes in how it conducts, any program

services? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☐ **Yes** ☑ **No**

If "Yes," describe these changes on Schedule O

**4**   Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses
Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and revenue, if any, for each program service reported

| **4a** | (Code          ) (Expenses $ | 193,248 | including grants of $ | ) (Revenue $ | 21,013 ) |
|---|---|---|---|---|---|
|  | See Additional Data |  |  |  |  |

| **4b** | (Code          ) (Expenses $ | 123,061 | including grants of $ | ) (Revenue $ | ) |
|---|---|---|---|---|---|
|  | See Additional Data |  |  |  |  |

| **4c** | (Code          ) (Expenses $ | 53,037 | including grants of $ | ) (Revenue $ | ) |
|---|---|---|---|---|---|
|  | See Additional Data |  |  |  |  |

| **4d** | Other program services (Describe in Schedule O ) |  |  |  |  |
|---|---|---|---|---|---|
|  | (Expenses $ | including grants of $ | ) (Revenue $ | ) |  |

| **4e** | Total program service expenses ▶ | 369,346 |
|---|---|---|

| Part IV | Checklist of Required Schedules | | | |
|---|---|---|---|---|

| | | | **Yes** | **No** |
|---|---|---|---|---|
| **1** | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? *If "Yes," complete Schedule A* 🗐 | **1** | Yes | |
| **2** | Is the organization required to complete *Schedule B, Schedule of Contributors* (see instructions)? 🗐 . . . | **2** | Yes | |
| **3** | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office? *If "Yes," complete Schedule C, Part I* . . . . . . . . . . . . . . | **3** | | No |
| **4** | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? *If "Yes," complete Schedule C, Part II* . . . . . . . . | **4** | | No |
| **5** | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Revenue Procedure 98-19? *If "Yes," complete Schedule C, Part III* . . | **5** | | |
| **6** | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts? *If "Yes," complete Schedule D,Part I* . . . . . . . . . . . . . . . . . . . . . . . . | **6** | | No |
| **7** | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures? *If "Yes," complete Schedule D, Part II* . . . . | **7** | | No |
| **8** | Did the organization maintain collections of works of art, historical treasures, or other similar assets? *If "Yes," complete Schedule D, Part III* . . . . . . . . . . . . . . . . . . . . | **8** | | No |
| **9** | Did the organization report an amount in Part X, line 21 for escrow or custodial account liability, serve as a custodian for amounts not listed in Part X, or provide credit counseling, debt management, credit repair, or debt negotiation services? *If "Yes," complete Schedule D, Part IV* . . . . . . . . . . . . . . | **9** | | No |
| **10** | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi endowments? *If "Yes," complete Schedule D, Part V* . . . . . . | **10** | | No |
| **11** | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable | | | |
| **a** | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? *If "Yes," complete Schedule D, Part VI* . . . . . . . . . . . . . . . . . . . . . . . | **11a** | | No |
| **b** | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VII* . . . . . . . | **11b** | | No |
| **c** | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part VIII* . . . . . . . | **11c** | | No |
| **d** | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? *If "Yes," complete Schedule D, Part IX* . . . . . . . . . . . | **11d** | | No |
| **e** | Did the organization report an amount for other liabilities in Part X, line 25? *If "Yes," complete Schedule D, Part X* | **11e** | | No |
| **f** | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? *If "Yes," complete Schedule D, Part X* | **11f** | | No |
| **12a** | Did the organization obtain separate, independent audited financial statements for the tax year? *If "Yes," complete Schedule D, Parts XI and XII* . . . . . . . . . . . . . . . . . . . . | **12a** | | No |
| **b** | Was the organization included in consolidated, independent audited financial statements for the tax year? *If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional* | **12b** | | |
| **13** | Is the organization a school described in section 170(b)(1)(A)(ii)? *If "Yes," complete Schedule E* | **13** | | No |
| **14a** | Did the organization maintain an office, employees, or agents outside of the United States? . . . . . | **14a** | | No |
| **b** | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? *If "Yes," complete Schedule F, Parts I and IV* . . . . . . . . . | **14b** | | No |
| **15** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? *If "Yes," complete Schedule F, Parts II and IV* . . . . . . | **15** | | No |
| **16** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? *If "Yes," complete Schedule F, Parts III and IV* . . . . | **16** | | No |
| **17** | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? *If "Yes," complete Schedule G, Part I*(see instructions) . . . . | **17** | | No |
| **18** | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* . . . . . . . . . . . . | **18** | | No |
| **19** | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* . . . . . . . . . . . . . . . . . . . . | **19** | | No |
| **20a** | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* . . . . . | **20a** | | No |
| **b** | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | **20b** | | |
| **21** | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* . . . . . | **21** | | No |

Case 1:17-cv-02989-AT Document 1565 Filed 01/07/23 Page 588 of 721

| Part IV | Checklist of Required Schedules *(continued)* | | Yes | No |
|---|---|---|---|---|

| | | | Yes | No |
|---|---|---|---|---|
| 22 | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* . . . . . . . . . . . . | **22** | | No |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* . . . . . . . . . . . . . . . . . . . . . . . | **23** | | No |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K If "No," go to line 25a* . . . . . . . . . . . . | **24a** | | No |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? . . . | **24b** | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? . . . . . . . . . . . . . . . | **24c** | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? . . . | **24d** | | |
| 25a | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L,* Part I . . . . . . . | **25a** | | No |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* . . . . . . . . . . . . . . . . . . . . . . . | **25b** | | No |
| 26 | Did the organization report any amount on Part X, line 5 or 22 for receivables from or payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons? *If "Yes," complete Schedule L, Part II* . . . . . . . . . . | **26** | | No |
| 27 | Did the organization provide a grant or other assistance to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or employee thereof, a grant selection committee member, or to a 35% controlled entity (including an employee thereof) or family member of any of these persons? *If "Yes," complete Schedule L,* Part III . . . . . . . . . . . . . . . . . . . . . . . | **27** | | No |
| 28 | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions) | | | |
| a | A current or former officer, director, trustee, key employee, creator or founder, or substantial contributor? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . . . | **28a** | | No |
| b | A family member of any individual described in line 28a? *If "Yes," complete Schedule L, Part IV* . . . . . | **28b** | | No |
| c | A 35% controlled entity of one or more individuals and/or organizations described in lines 28a or 28b? *If "Yes," complete Schedule L, Part IV* . . . . . . . . . . . . . . . . . . . . . | **28c** | | No |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* . . | **29** | | No |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* . . . . . . . . . . . . . . . . . | **30** | | No |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* | **31** | | No |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* . . . . . . . . . . . . . . . . . . . . . . . | **32** | | No |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulations sections 301 7701-2 and 301 7701-3? *If "Yes," complete Schedule R, Part I* . . . . . . . . . . . . | **33** | | No |
| 34 | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* . . . . . . . . . . . . . . . . . . . . . . . | **34** | | No |
| 35a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | **35a** | | No |
| b | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* . . . | **35b** | | |
| 36 | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* . . . . . . . . . . . . | **36** | | No |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes? *If "Yes," complete Schedule R, Part VI* . . . | **37** | | No |
| 38 | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O . . . . . . . . . . . . . | **38** | Yes | |

| Part V | Statements Regarding Other IRS Filings and Tax Compliance |
|---|---|
| | Check if Schedule O contains a response or note to any line in this Part V . . . . . . . . . . . ☐ |

| | | | | Yes | No |
|---|---|---|---|---|---|
| 1a | Enter the number reported in Box 3 of Form 1096 Enter -0- if not applicable . . | **1a** | 7 | | |
| b | Enter the number of Forms W-2G included in line 1a Enter -0- if not applicable | **1b** | 0 | | |
| c | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? . . . . . . . . . . . . . . . . . | | | **1c** | | |

| Part V | Statements Regarding Other IRS Filings and Tax Compliance (continued) | | | | |
|---|---|---|---|---|---|
| **2a** | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return . . . . . . . . . . . . . . . . **2a** | 0 | | | |
| **b** | If at least one is reported on line 2a, did the organization file all required federal employment tax returns?  **Note.** If the sum of lines 1a and 2a is greater than 250, you may be required to e-file (see instructions) | | **2b** | | |
| **3a** | Did the organization have unrelated business gross income of $1,000 or more during the year? . . . | | **3a** | | No |
| **b** | If "Yes," has it filed a Form 990-T for this year?*If "No" to line 3b, provide an explanation in Schedule O* . . . | | **3b** | | |
| **4a** | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? . . | | **4a** | | No |
| **b** | If "Yes," enter the name of the foreign country ▶ See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR) | | | | |
| **5a** | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . | | **5a** | | No |
| **b** | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | | **5b** | | No |
| **c** | If "Yes," to line 5a or 5b, did the organization file Form 8886-T? . . . . . . . . . . | | **5c** | | |
| **6a** | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . | | **6a** | | No |
| **b** | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? . . . . . . . . . . . . . . . . . . . . | | **6b** | | |
| **7** | **Organizations that may receive deductible contributions under section 170(c).** | | | | |
| **a** | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . . . . . . . . . . | | **7a** | | No |
| **b** | If "Yes," did the organization notify the donor of the value of the goods or services provided? . . . . . | | **7b** | | |
| **c** | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it was required to file Form 8282? . . . . . . . . . . . . . . . . . . . . . | | **7c** | | |
| **d** | If "Yes," indicate the number of Forms 8282 filed during the year . . . . | **7d** | | | |
| **e** | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | | **7e** | | No |
| **f** | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . . | | **7f** | | No |
| **g** | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? . . . . . . . . . . . . . . . . . . . . . . | | **7g** | | |
| **h** | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? . . . . . . . . . . . . . . . . . . . . . . | | **7h** | | |
| **8** | **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? . . . . . . . | | **8** | | |
| **9** | **Sponsoring organizations maintaining donor advised funds.** | | | | |
| **a** | Did the sponsoring organization make any taxable distributions under section 4966? . . . . . . . | | **9a** | | |
| **b** | Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? . . . | | **9b** | | |
| **10** | **Section 501(c)(7) organizations.** Enter | | | | |
| **a** | Initiation fees and capital contributions included on Part VIII, line 12 . . . | **10a** | | | |
| **b** | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | **10b** | | | |
| **11** | **Section 501(c)(12) organizations.** Enter | | | | |
| **a** | Gross income from members or shareholders . . . . . . . . | **11a** | | | |
| **b** | Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them ) . . . . . . . . . . | **11b** | | | |
| **12a** | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | | **12a** | | |
| **b** | If "Yes," enter the amount of tax-exempt interest received or accrued during the year | **12b** | | | |
| **13** | **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | | |
| **a** | Is the organization licensed to issue qualified health plans in more than one state? . . . . . . . . **Note.** See the instructions for additional information the organization must report on Schedule O | | **13a** | | |
| **b** | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans . . . . | **13b** | | | |
| **c** | Enter the amount of reserves on hand . . . . . . . . . | **13c** | | | |
| **14a** | Did the organization receive any payments for indoor tanning services during the tax year? . . . . . | | **14a** | | No |
| **b** | If "Yes," has it filed a Form 720 to report these payments?*If "No," provide an explanation in Schedule O* . . | | **14b** | | |
| **15** | Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? . . . . . . . . . . . . . . . . . If "Yes," see instructions and file Form 4720, Schedule N | | **15** | | No |
| **16** | Is the organization an educational institution subject to the section 4968 excise tax on net investment income? . . If "Yes," complete Form 4720, Schedule O | | **16** | | No |

Case 1:17-cv-02989-AT Document 1565 Filed 01/07/23 Page 590 of 721

| Part VI | **Governance, Management, and Disclosure** *For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O See instructions* | | | |

Check if Schedule O contains a response or note to any line in this Part VI . . . . . . . . . . . . ☑

## Section A. Governing Body and Management

| | | | | Yes | No |
|---|---|---|---|---|---|
| **1a** | Enter the number of voting members of the governing body at the end of the tax year | **1a** | 3 | | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O | | | | |
| **b** | Enter the number of voting members included in line 1a, above, who are independent | **1b** | 3 | | |
| **2** | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? . . . . . . . . . . . . . . | **2** | | | No |
| **3** | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? . | **3** | | | No |
| **4** | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? . | **4** | | | No |
| **5** | Did the organization become aware during the year of a significant diversion of the organization's assets? . | **5** | | | No |
| **6** | Did the organization have members or stockholders? . . . . . . . . . . . . | **6** | | | No |
| **7a** | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? . . . . . . . . . . . . . . | **7a** | | | No |
| **b** | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . . . . . . . . | **7b** | | | No |
| **8** | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following | | | | |
| **a** | The governing body? . . . . . . . . . . . . . . . . . . | **8a** | | Yes | |
| **b** | Each committee with authority to act on behalf of the governing body? . . . . . . . . | **8b** | | Yes | |
| **9** | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? *If "Yes," provide the names and addresses in Schedule O* . . . . . . . | **9** | | | No |

## Section B. Policies *(This Section B requests information about policies not required by the Internal Revenue Code.)*

| | | | Yes | No |
|---|---|---|---|---|
| **10a** | Did the organization have local chapters, branches, or affiliates? . . . . . . . . . | **10a** | | No |
| **b** | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | **10b** | | |
| **11a** | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? . . . . . . . . . . . . . . . . . . . . . . | **11a** | Yes | |
| **b** | Describe in Schedule O the process, if any, used by the organization to review this Form 990 | | | |
| **12a** | Did the organization have a written conflict of interest policy? *If "No," go to line 13* . . . . . | **12a** | Yes | |
| **b** | Were officers, directors, or trustees, and key employees required to disclose annually interests that could give rise to conflicts? . . . . . . . . . . . . . . . . . . . . | **12b** | Yes | |
| **c** | Did the organization regularly and consistently monitor and enforce compliance with the policy? *If "Yes," describe in Schedule O how this was done* . . . . . . . . . . . . . . . | **12c** | Yes | |
| **13** | Did the organization have a written whistleblower policy? . . . . . . . . . . . | **13** | | No |
| **14** | Did the organization have a written document retention and destruction policy? . . . . . . . | **14** | Yes | |
| **15** | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| **a** | The organization's CEO, Executive Director, or top management official . . . . . . . . | **15a** | | No |
| **b** | Other officers or key employees of the organization . . . . . . . . . . . . | **15b** | | No |
| | If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions) | | | |
| **16a** | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . . . | **16a** | | No |
| **b** | If "Yes," did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . . . . . . | **16b** | | |

## Section C. Disclosure

**17** List the states with which a copy of this Form 990 is required to be filed▶

**18** Section 6104 requires an organization to make its Form 1023 (or 1024-A if applicable), 990, and 990-T (501(c)(3)s only) available for public inspection Indicate how you made these available Check all that apply

☐ Own website ☐ Another's website ☑ Upon request ☐ Other (explain in Schedule O)

**19** Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year

**20** State the name, address, and telephone number of the person who possesses the organization's books and records
▶LISA CYRIACKS  504 ARROWHEAD WAY  CRESTONE, CO 81131 (719) 256-4140

| Part VII | Compensation of Officers, Directors, Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors |

Check if Schedule O contains a response or note to any line in this Part VII . . . . . . . . . . . . . . . ☐

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed  Report compensation for the calendar year ending with or within the organization's tax year

● List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation  Enter -0- in columns (D), (E), and (F) if no compensation was paid

● List all of the organization's **current** key employees, if any  See instructions for definition of "key employee "

● List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations

● List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations

● List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations

See instructions for the order in which to list the persons above

☑ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee

| (A)<br>Name and title | (B)<br>Average<br>hours per<br>week (list<br>any hours<br>for related<br>organizations<br>below dotted<br>line) | (C)<br>Position (do not check more<br>than one box, unless person<br>is both an officer and a<br>director/trustee) | | | | | | (D)<br>Reportable<br>compensation<br>from the<br>organization<br>(W-2/1099-<br>MISC) | (E)<br>Reportable<br>compensation<br>from related<br>organizations<br>(W-2/1099-<br>MISC) | (F)<br>Estimated<br>amount of other<br>compensation<br>from the<br>organization and<br>related<br>organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) LISA A CYRIACKS<br>................................<br>PRESIDENT | 10 0<br>..............<br>0 0 | | | X | | | | 0 | 0 | 0 |
| (2) MARILYN R MARKS<br>................................<br>VICE-PRESIDENT | 50 0<br>..............<br>0 0 | | | X | | | | 0 | 0 | 0 |
| (3) MARY EBERLE<br>................................<br>Secretary | 20 0<br>..............<br>0 0 | | | X | | | | 0 | 0 | 0 |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

| Part VII | Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees *(continued)* |

| (A)<br>Name and title | (B)<br>Average<br>hours per<br>week (list<br>any hours<br>for related<br>organizations<br>below dotted<br>line) | (C)<br>Position (do not check more<br>than one box, unless person<br>is both an officer and a<br>director/trustee) | | | | | | (D)<br>Reportable<br>compensation<br>from the<br>organization<br>(W-2/1099-<br>MISC) | (E)<br>Reportable<br>compensation<br>from related<br>organizations<br>(W-2/1099-<br>MISC) | (F)<br>Estimated<br>amount of other<br>compensation<br>from the<br>organization and<br>related<br>organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |
| **1b Sub-Total** . . . . . . . . . . . . . ▶ | | | | | | | | | | |
| **c Total from continuation sheets to Part VII, Section A** . . . . ▶ | | | | | | | | | | |
| **d Total (add lines 1b and 1c)** . . . . . . . . . . ▶ | | | | | | | | 0 | 0 | 0 |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 0

| | | | Yes | No |
|---|---|---|---|---|
| **3** | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . | **3** | | No |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . . . . . . . . . . . . . . . . . | **4** | | No |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* . . . . . . . . . | **5** | | No |

### Section B. Independent Contractors

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization Report compensation for the calendar year ending with or within the organization's tax year

| (A)<br>Name and business address | (B)<br>Description of services | (C)<br>Compensation |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶ 0

| Part VIII | Statement of Revenue 02989-AT   Document 1565   Filed 01/07/23   Page 593 of 721 |

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . ☐

|  |  |  |  | **(A)** Total revenue | **(B)** Related or exempt function revenue | **(C)** Unrelated business revenue | **(D)** Revenue excluded from tax under sections 512 - 514 |
|---|---|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | **1a** Federated campaigns . . | **1a** |  |  |  |  |  |
|  | **b** Membership dues . . | **1b** |  |  |  |  |  |
|  | **c** Fundraising events . . | **1c** |  |  |  |  |  |
|  | **d** Related organizations | **1d** |  |  |  |  |  |
|  | **e** Government grants (contributions) | **1e** |  |  |  |  |  |
|  | **f** All other contributions, gifts, grants, and similar amounts not included above | **1f** | 365,904 |  |  |  |  |
|  | **g** Noncash contributions included in lines 1a - 1f $ | **1g** |  |  |  |  |  |
|  | **h Total.** Add lines 1a-1f . . . . . . . ▶ |  |  | 365,904 |  |  |  |

| | | | Business Code | | | | |
|---|---|---|---|---|---|---|---|
| **Program Service Revenue** | **2a** | | | | | | |
| | **b** | | | | | | |
| | **c** | | | | | | |
| | **d** | | | | | | |
| | **e** | | | | | | |
| | **f** All other program service revenue ▶ | | | | | | |
| | **9  Total.** Add lines 2a–2f. . . . . ▶ | | 0 | | | | |

| **Other Revenue** | **3** Investment income (including dividends, interest, and other similar amounts) . . . . . . . ▶ | | | 86 | | | 86 |
|---|---|---|---|---|---|---|---|
| | **4** Income from investment of tax-exempt bond proceeds ▶ | | | 0 | | | |
| | **5** Royalties . . . . . . . . . . ▶ | | | 0 | | | |
| | | | **(i)** Real | **(ii)** Personal | | | |
| | **6a** Gross rents | **6a** | | | | | | |
| | **b** Less rental expenses | **6b** | | | | | | |
| | **c** Rental income or (loss) | **6c** | 0 | 0 | | | | |
| | **d** Net rental income or (loss) . . . . . . . ▶ | | | 0 | | | |
| | | | **(i)** Securities | **(ii)** Other | | | |
| | **7a** Gross amount from sales of assets other than inventory | **7a** | | | | | | |
| | **b** Less cost or other basis and sales expenses | **7b** | | | | | | |
| | **c** Gain or (loss) | **7c** | | | | | | |
| | **d** Net gain or (loss) . . . . . . . . ▶ | | | 0 | | | |
| | **8a** Gross income from fundraising events (not including $ _____ of contributions reported on line 1c) See Part IV, line 18 . . . . | **8a** | 0 | | | | |
| | **b** Less direct expenses . . . | **8b** | 0 | | | | | |
| | **c** Net income or (loss) from fundraising events . . ▶ | | | 0 | | | |
| | **9a** Gross income from gaming activities See Part IV, line 19 . . . . | **9a** | 0 | | | | |
| | **b** Less direct expenses . . . | **9b** | 0 | | | | | |
| | **c** Net income or (loss) from gaming activities . . ▶ | | | 0 | | | |
| | **10a** Gross sales of inventory, less returns and allowances . . | **10a** | 0 | | | | |
| | **b** Less cost of goods sold . . | **10b** | 0 | | | | | |
| | **c** Net income or (loss) from sales of inventory . . ▶ | | | 0 | | | |
| | Miscellaneous Revenue | Business Code | | | | | |
| | **11a** REFUND OF LEGAL FEES | 900099 | | 21,013 | 21,013 | | |
| | **b** | | | | | | |
| | **c** | | | | | | |
| | **d** All other revenue . . . . . | | | | | | |
| | **e Total.** Add lines 11a–11d . . . . . . ▶ | | | 21,013 | | | |
| | **12 Total revenue.** See instructions . . . . . . ▶ | | | 387,003 | 21,013 | | 86 |

| Part IX | Statement of Functional Expenses | | | |
|---|---|---|---|---|

Section 501(c)(3) and 501(c)(4) organizations must complete all columns  All other organizations must complete column (A)

Check if Schedule O contains a response or note to any line in this Part IX  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  ☐

| *Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII.* | **(A)**<br>Total expenses | **(B)**<br>Program service expenses | **(C)**<br>Management and general expenses | **(D)**<br>Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic governments  See Part IV, line 21  .  .  .  .  . | 0 | | | |
| **2** Grants and other assistance to domestic individuals  See Part IV, line 22  .  .  .  .  .  .  .  .  .  .  . | 0 | | | |
| **3** Grants and other assistance to foreign organizations, foreign governments, and foreign individuals  See Part IV, lines 15 and 16  .  .  .  .  .  .  .  .  .  .  . | 0 | | | |
| **4** Benefits paid to or for members  .  .  .  .  .  .  . | 0 | | | |
| **5** Compensation of current officers, directors, trustees, and key employees  .  .  .  .  .  .  .  .  .  . | 0 | | | |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B)  .  .  .  .  .  .  .  . | 0 | | | |
| **7** Other salaries and wages  .  .  .  .  .  .  .  . | 0 | | | |
| **8** Pension plan accruals and contributions (include section 401 (k) and 403(b) employer contributions)  .  .  .  .  . | 0 | | | |
| **9** Other employee benefits  .  .  .  .  .  .  . | 0 | | | |
| **10** Payroll taxes  .  .  .  .  .  .  .  .  .  . | 0 | | | |
| **11** Fees for services (non-employees) | | | | |
| **a** Management  .  .  .  .  .  .  .  . | 0 | | | |
| **b** Legal  .  .  .  .  .  .  .  .  .  .  . | 387,404 | 369,346 | 18,058 | |
| **c** Accounting  .  .  .  .  .  .  .  .  .  . | 3,000 | | 3,000 | |
| **d** Lobbying  .  .  .  .  .  .  .  .  .  . | 0 | | | |
| **e** Professional fundraising services  See Part IV, line 17 | 0 | | | |
| **f** Investment management fees  .  .  .  .  .  . | 0 | | | |
| **g** Other (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O) | 0 | | | |
| **12** Advertising and promotion  .  .  .  .  . | 0 | | | |
| **13** Office expenses  .  .  .  .  .  .  .  . | 4,199 | | 4,199 | |
| **14** Information technology  .  .  .  .  .  . | 0 | | | |
| **15** Royalties  .  . | 0 | | | |
| **16** Occupancy  .  .  .  .  .  .  .  .  . | 985 | | 985 | |
| **17** Travel  .  .  .  .  .  .  .  .  .  . | 7,555 | | 7,555 | |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials  . | 0 | | | |
| **19** Conferences, conventions, and meetings  .  .  .  . | 0 | | | |
| **20** Interest  .  .  .  .  .  .  .  .  .  . | 0 | | | |
| **21** Payments to affiliates  .  .  .  .  .  . | 0 | | | |
| **22** Depreciation, depletion, and amortization  .  . | 0 | | | |
| **23** Insurance  .  .  . | 660 | | 660 | |
| **24** Other expenses  Itemize expenses not covered above (List miscellaneous expenses in line 24e  If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O ) | | | | |
| **a** | | | | |
| **b** | | | | |
| **c** | | | | |
| **d** | | | | |
| **e** All other expenses | | | | |
| **25** **Total functional expenses.** Add lines 1 through 24e | 403,803 | 369,346 | 34,457 | 0 |
| **26** **Joint costs.** Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation | | | | |
| Check here ► ☐ if following SOP 98-2 (ASC 958-720) | | | | |

Case 1:17-cv-02989-AT   Document 1565   Filed 01/07/23   Page 595 of 721

Part X    Balance Sheet

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . ☐

| | | | (A) Beginning of year | | (B) End of year |
|---|---|---|---|---|---|
| **Assets** | 1 | Cash—non-interest-bearing . . . . . . . . . . | 53,615 | **1** | 36,815 |
| | 2 | Savings and temporary cash investments . . . . . . . | 0 | **2** | 0 |
| | 3 | Pledges and grants receivable, net . . . . . . . | 0 | **3** | 0 |
| | 4 | Accounts receivable, net . . . . . . . . . . | 0 | **4** | 0 |
| | 5 | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons . . . . . . | 0 | **5** | 0 |
| | 6 | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), and persons described in section 4958(c)(3)(B) . . . | 0 | **6** | 0 |
| | 7 | Notes and loans receivable, net . . . . . . . . | 0 | **7** | 0 |
| | 8 | Inventories for sale or use . . . . . . . . . | 0 | **8** | 0 |
| | 9 | Prepaid expenses and deferred charges . . . . . . | 0 | **9** | 0 |
| | 10a | Land, buildings, and equipment cost or other basis Complete Part VI of Schedule D    **10a** | | | |
| | b | Less accumulated depreciation    **10b** | 0 | **10c** | 0 |
| | 11 | Investments—publicly traded securities . | 0 | **11** | 0 |
| | 12 | Investments—other securities See Part IV, line 11 . . . . . | 0 | **12** | 0 |
| | 13 | Investments—program-related See Part IV, line 11 . . | 0 | **13** | 0 |
| | 14 | Intangible assets . . . . . . . . . . . . | 0 | **14** | 0 |
| | 15 | Other assets See Part IV, line 11 . . . . . . . . | 0 | **15** | 0 |
| | 16 | **Total assets.** Add lines 1 through 15 (must equal line 34) . . . | 53,615 | **16** | 36,815 |
| **Liabilities** | 17 | Accounts payable and accrued expenses . . . . . . | 0 | **17** | 0 |
| | 18 | Grants payable . . . | 0 | **18** | 0 |
| | 19 | Deferred revenue . . . . . . . . . . . | 0 | **19** | 0 |
| | 20 | Tax-exempt bond liabilities . . . . . . . . . | 0 | **20** | 0 |
| | 21 | Escrow or custodial account liability Complete Part IV of Schedule D | 0 | **21** | 0 |
| | 22 | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons . . . . . . . . | 0 | **22** | 0 |
| | 23 | Secured mortgages and notes payable to unrelated third parties . . | 0 | **23** | 0 |
| | 24 | Unsecured notes and loans payable to unrelated third parties . . | 0 | **24** | 0 |
| | 25 | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17 - 24) Complete Part X of Schedule D | 0 | **25** | 0 |
| | 26 | **Total liabilities.** Add lines 17 through 25 . . | 0 | **26** | 0 |
| **Net Assets or Fund Balances** | | **Organizations that follow FASB ASC 958, check here ▶ ☐ and complete lines 27, 28, 32, and 33.** | | | |
| | 27 | Net assets without donor restrictions . . . . . . . . | | **27** | |
| | 28 | Net assets with donor restrictions . . . . . . . . . | | **28** | |
| | | **Organizations that do not follow FASB ASC 958, check here ▶ ☑ and complete lines 29 through 33.** | | | |
| | 29 | Capital stock or trust principal, or current funds . . . . . . | 0 | **29** | 0 |
| | 30 | Paid-in or capital surplus, or land, building or equipment fund . . . | 0 | **30** | 0 |
| | 31 | Retained earnings, endowment, accumulated income, or other funds | 53,615 | **31** | 36,815 |
| | 32 | Total net assets or fund balances . . . . . . . . . | 53,615 | **32** | 36,815 |
| | 33 | Total liabilities and net assets/fund balances . . . . . . . | 53,615 | **33** | 36,815 |

| Part XI | Reconciliation of Net Assets | | |
|---|---|---|---|

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . . . . . . . ☐

| | | | |
|---|---|---|---:|
| **1** | Total revenue (must equal Part VIII, column (A), line 12) . . . . . . . . . . . | **1** | 387,003 |
| **2** | Total expenses (must equal Part IX, column (A), line 25) . . . . . . . . . | **2** | 403,803 |
| **3** | Revenue less expenses Subtract line 2 from line 1 . . . . . . . . . . . . | **3** | -16,800 |
| **4** | Net assets or fund balances at beginning of year (must equal Part X, line 33, column (A)) . . | **4** | 53,615 |
| **5** | Net unrealized gains (losses) on investments . . . . . . . . . . . . . | **5** | |
| **6** | Donated services and use of facilities . . . . . . . . . . . . . . | **6** | |
| **7** | Investment expenses . . . . . . . . . . . . . . . . . . | **7** | |
| **8** | Prior period adjustments . . . . . . . . . . . . . . . . . | **8** | |
| **9** | Other changes in net assets or fund balances (explain in Schedule O) . . . . . . . . | **9** | |
| **10** | Net assets or fund balances at end of year Combine lines 3 through 9 (must equal Part X, line 33, column (B)) | **10** | 36,815 |

| Part XII | **Financial Statements and Reporting** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . . . . . ☐

| | | | **Yes** | **No** |
|---|---|---|---|---|
| **1** | Accounting method used to prepare the Form 990 ☐ Cash ☑ Accrual ☐ Other _____ <br> If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O | | | |
| **2a** | Were the organization's financial statements compiled or reviewed by an independent accountant? | **2a** | | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both | | | |
| | ☐ Separate basis     ☐ Consolidated basis     ☐ Both consolidated and separate basis | | | |
| **b** | Were the organization's financial statements audited by an independent accountant? | **2b** | | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both | | | |
| | ☐ Separate basis     ☐ Consolidated basis     ☐ Both consolidated and separate basis | | | |
| **c** | If "Yes," to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | **2c** | | |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O | | | |
| **3a** | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? | **3a** | | No |
| **b** | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits | **3b** | | |

**Software ID:**

**Software Version:**

**EIN:**   26-3670783

**Name:**   COALITION FOR GOOD GOVERNANCE

Form 990 (2019)

**Form 990, Part III, Line 4a:**

ADVOCATING FOR VOTERS' RIGHT TO A VERIFIABLE ELECTION, CGG LITIGATED IN FEDERAL COURT AGAINST GEORGIA'S USE OF AN UNVERIFIABLE PAPERLESS TOUCHSCREEN SYSTEM AND EDUCATED GA VOTERS ON THE IMPORTANCE OF USING AN ELECTION SYSTEM THAT INCLUDES EITHER PAPER BALLOTS OR CREATES A PAPER TRAIL

**Form 990, Part III, Line 4b:**

LITIGATION ON THE PART OF GEORGIA VOTERS TO FORCE A INVESTIGATION AND CORRECTION OF DEFECTS CAUSING DISCREPANCIES IN VOTING SYSTEM LITIGATION RESULTED IN IDENTIFYING AND INCLUSION OF VOTES THAT OTHERWISE WOULD NOT HAVE BEEN COUNTED

**Form 990, Part III, Line 4c:**

CHALLENGED STATE OF GEORGIA'S DISCRIMINATORY POLICIES ON ABSENTEE BALLOTS. THIS PROTECTED VOTERS' RIGHT TO FILE AN ABSENTEE BALLOT AND RESULTED IN THOUSANDS OF BALLOTS BEING COUNTED THAT OTHERWISE WOULD HAVE BEEN REJECTED

Case 1:17-cv-02989-AT Document 1565 Filed 01/07/23 Page 599 of 721

# SCHEDULE A
(Form 990 or 990EZ)

Department of the Treasury
Internal Revenue Service

## Public Charity Status and Public Support

Complete if the organization is a section 501(c)(3) organization or a section 4947(a)(1) nonexempt charitable trust.
▶ Attach to Form 990 or Form 990-EZ.
▶ Go to www.irs.gov/Form990 for instructions and the latest information.

OMB No 1545-0047

# 2019

**Open to Public Inspection**

**Name of the organization**
COALITION FOR GOOD GOVERNANCE

**Employer identification number**
26-3670783

## Part I — Reason for Public Charity Status (All organizations must complete this part.) See instructions.

The organization is not a private foundation because it is (For lines 1 through 12, check only one box )

1 ☐ A church, convention of churches, or association of churches described in **section 170(b)(1)(A)(i).**

2 ☐ A school described in **section 170(b)(1)(A)(ii).** (Attach Schedule E (Form 990 or 990-EZ) )

3 ☐ A hospital or a cooperative hospital service organization described in **section 170(b)(1)(A)(iii).**

4 ☐ A medical research organization operated in conjunction with a hospital described in **section 170(b)(1)(A)(iii).** Enter the hospital's name, city, and state

5 ☐ An organization operated for the benefit of a college or university owned or operated by a governmental unit described in **section 170 (b)(1)(A)(iv).** (Complete Part II )

6 ☐ A federal, state, or local government or governmental unit described in **section 170(b)(1)(A)(v).**

7 ☑ An organization that normally receives a substantial part of its support from a governmental unit or from the general public described in **section 170(b)(1)(A)(vi).** (Complete Part II )

8 ☐ A community trust described in **section 170(b)(1)(A)(vi)** (Complete Part II )

9 ☐ An agricultural research organization described in **170(b)(1)(A)(ix)** operated in conjunction with a land-grant college or university or a non-land grant college of agriculture See instructions Enter the name, city, and state of the college or university

10 ☐ An organization that normally receives (1) more than 331/3% of its support from contributions, membership fees, and gross receipts from activities related to its exempt functions—subject to certain exceptions, and (2) no more than 331/3% of its support from gross investment income and unrelated business taxable income (less section 511 tax) from businesses acquired by the organization after June 30, 1975 See **section 509(a)(2).** (Complete Part III )

11 ☐ An organization organized and operated exclusively to test for public safety See **section 509(a)(4).**

12 ☐ An organization organized and operated exclusively for the benefit of, to perform the functions of, or to carry out the purposes of one or more publicly supported organizations described in **section 509(a)(1)** or **section 509(a)(2).** See **section 509(a)(3).** Check the box in lines 12a through 12d that describes the type of supporting organization and complete lines 12e, 12f, and 12g

a ☐ **Type I.** A supporting organization operated, supervised, or controlled by its supported organization(s), typically by giving the supported organization(s) the power to regularly appoint or elect a majority of the directors or trustees of the supporting organization **You must complete Part IV, Sections A and B.**

b ☐ **Type II.** A supporting organization supervised or controlled in connection with its supported organization(s), by having control or management of the supporting organization vested in the same persons that control or manage the supported organization(s) **You must complete Part IV, Sections A and C.**

c ☐ **Type III functionally integrated.** A supporting organization operated in connection with, and functionally integrated with, its supported organization(s) (see instructions) **You must complete Part IV, Sections A, D, and E.**

d ☐ **Type III non-functionally integrated.** A supporting organization operated in connection with its supported organization(s) that is not functionally integrated The organization generally must satisfy a distribution requirement and an attentiveness requirement (see instructions) **You must complete Part IV, Sections A and D, and Part V.**

e ☐ Check this box if the organization received a written determination from the IRS that it is a Type I, Type II, Type III functionally integrated, or Type III non-functionally integrated supporting organization

f Enter the number of supported organizations

g Provide the following information about the supported organization(s)

| (i) Name of supported organization | (ii) EIN | (iii) Type of organization (described on lines 1- 10 above (see instructions)) | (iv) Is the organization listed in your governing document? | | (v) Amount of monetary support (see instructions) | (vi) Amount of other support (see instructions) |
|---|---|---|---|---|---|---|
| | | | Yes | No | | |
| | | | | | | |
| | | | | | | |
| **Total** | | | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.          Cat No 11285F          **Schedule A (Form 990 or 990-EZ) 2019**

**Part II** Support Schedule for Organizations Described in Sections 170(b)(1)(A)(iv) and 170(b)(1)(A)(vi)
(Complete only if you checked the box on line 5, 7, or 8 of Part I or if the organization failed to qualify under Part III.
If the organization failed to qualify under the tests listed below, please complete Part III.)

### Section A. Public Support

| | Calendar year<br>(or fiscal year beginning in) ▶ | (a) 2015 | (b) 2016 | (c) 2017 | (d) 2018 | (e) 2019 | (f) Total |
|---|---|---|---|---|---|---|---|
| **1** | Gifts, grants, contributions, and membership fees received (Do not include any "unusual grant ") | 6,010 | 0 | 117,663 | 218,953 | 365,904 | 708,530 |
| **2** | Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | 0 |
| **3** | The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | 0 |
| **4** | **Total.** Add lines 1 through 3 | 6,010 | 0 | 117,663 | 218,953 | 365,904 | 708,530 |
| **5** | The portion of total contributions by each person (other than a governmental unit or publicly supported organization) included on line 1 that exceeds 2% of the amount shown on line 11, column (f) | | | | | | 324,931 |
| **6** | **Public support.** Subtract line 5 from line 4 | | | | | | 383,599 |

### Section B. Total Support

| | Calendar year<br>(or fiscal year beginning in) ▶ | (a) 2015 | (b) 2016 | (c) 2017 | (d) 2018 | (e) 2019 | (f) Total |
|---|---|---|---|---|---|---|---|
| **7** | Amounts from line 4 | 6,010 | 0 | 117,663 | 218,953 | 365,904 | 708,530 |
| **8** | Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | 186 | 34 | 37 | 37 | 86 | 380 |
| **9** | Net income from unrelated business activities, whether or not the business is regularly carried on | | | | | | 0 |
| **10** | Other income Do not include gain or loss from the sale of capital assets (Explain in Part VI ) | | | | | | 0 |
| **11** | **Total support.** Add lines 7 through 10 | | | | | | 708,910 |
| **12** | Gross receipts from related activities, etc (see instructions) | | | | | **12** | 21,013 |

**13** **First five years.** If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here** . . . . . . . . . . . . . . . . . . . . . . . . . . ▶ ☐

### Section C. Computation of Public Support Percentage

| | | | |
|---|---|---|---|
| **14** | Public support percentage for 2019 (line 6, column (f) divided by line 11, column (f)) | **14** | 54 111 % |
| **15** | Public support percentage for 2018 Schedule A, Part II, line 14 | **15** | 42 689 % |

**16a 33 1/3% support test—2019.** If the organization did not check the box on line 13, and line 14 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization ▶ ☑

**b 33 1/3% support test—2018.** If the organization did not check a box on line 13 or 16a, and line 15 is 33 1/3% or more, check this box and **stop here.** The organization qualifies as a publicly supported organization ▶ ☐

**17a 10%-facts-and-circumstances test—2019.** If the organization did not check a box on line 13, 16a, or 16b, and line 14 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test The organization qualifies as a publicly supported organization ▶ ☐

**b 10%-facts-and-circumstances test—2018.** If the organization did not check a box on line 13, 16a, 16b, or 17a, and line 15 is 10% or more, and if the organization meets the "facts-and-circumstances" test, check this box and **stop here.** Explain in Part VI how the organization meets the "facts-and-circumstances" test The organization qualifies as a publicly supported organization ▶ ☐

**18** **Private foundation.** If the organization did not check a box on line 13, 16a, 16b, 17a, or 17b, check this box and see instructions ▶ ☐

**Part III**    **Support Schedule for Organizations Described in Section 509(a)(2)**
(Complete only if you checked the box on line 10 of Part I or if the organization failed to qualify under Part II. If the organization fails to qualify under the tests listed below, please complete Part II.)

## Section A. Public Support

| Calendar year<br>(or fiscal year beginning in) ▶ | **(a)** 2015 | **(b)** 2016 | **(c)** 2017 | **(d)** 2018 | **(e)** 2019 | **(f)** Total |
|---|---|---|---|---|---|---|
| **1** Gifts, grants, contributions, and membership fees received (Do not include any "unusual grants ") | | | | | | |
| **2** Gross receipts from admissions, merchandise sold or services performed, or facilities furnished in any activity that is related to the organization's tax-exempt purpose | | | | | | |
| **3** Gross receipts from activities that are not an unrelated trade or business under section 513 | | | | | | |
| **4** Tax revenues levied for the organization's benefit and either paid to or expended on its behalf | | | | | | |
| **5** The value of services or facilities furnished by a governmental unit to the organization without charge | | | | | | |
| **6** **Total.** Add lines 1 through 5 | | | | | | |
| **7a** Amounts included on lines 1, 2, and 3 received from disqualified persons | | | | | | |
| **b** Amounts included on lines 2 and 3 received from other than disqualified persons that exceed the greater of $5,000 or 1% of the amount on line 13 for the year | | | | | | |
| **c** Add lines 7a and 7b | | | | | | |
| **8** **Public support.** (Subtract line 7c from line 6 ) | | | | | | |

## Section B. Total Support

| Calendar year<br>(or fiscal year beginning in) ▶ | **(a)** 2015 | **(b)** 2016 | **(c)** 2017 | **(d)** 2018 | **(e)** 2019 | **(f)** Total |
|---|---|---|---|---|---|---|
| **9** Amounts from line 6 | | | | | | |
| **10a** Gross income from interest, dividends, payments received on securities loans, rents, royalties and income from similar sources | | | | | | |
| **b** Unrelated business taxable income (less section 511 taxes) from businesses acquired after June 30, 1975 | | | | | | |
| **c** Add lines 10a and 10b | | | | | | |
| **11** Net income from unrelated business activities not included in line 10b, whether or not the business is regularly carried on | | | | | | |
| **12** Other income Do not include gain or loss from the sale of capital assets (Explain in Part VI ) | | | | | | |
| **13** **Total support.** (Add lines 9, 10c, 11, and 12 ) | | | | | | |

**14** First five years. If the Form 990 is for the organization's first, second, third, fourth, or fifth tax year as a section 501(c)(3) organization, check this box and **stop here**                                                       ▶ ☐

## Section C. Computation of Public Support Percentage

| | | |
|---|---|---|
| **15** Public support percentage for 2019 (line 8, column (f) divided by line 13, column (f)) | **15** | |
| **16** Public support percentage from 2018 Schedule A, Part III, line 15 | **16** | |

## Section D. Computation of Investment Income Percentage

| | | |
|---|---|---|
| **17** Investment income percentage for **2019** (line 10c, column (f) divided by line 13, column (f)) | **17** | |
| **18** Investment income percentage from **2018** Schedule A, Part III, line 17 | **18** | |

**19a 331/3% support tests—2019.** If the organization did not check the box on line 14, and line 15 is more than 33 1/3%, and line 17 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization       ▶ ☐

   **b 33 1/3% support tests—2018.** If the organization did not check a box on line 14 or line 19a, and line 16 is more than 33 1/3% and line 18 is not more than 33 1/3%, check this box and **stop here.** The organization qualifies as a publicly supported organization       ▶ ☐

**20** **Private foundation.** If the organization did not check a box on line 14, 19a, or 19b, check this box and see instructions       ▶ ☐

**Part IV**   Supporting Organizations

(Complete only if you checked a box on line 12 of Part I If you checked 12a of Part I, complete Sections A and B If you checked 12b of Part I, complete Sections A and C If you checked 12c of Part I, complete Sections A, D, and E If you checked 12d of Part I, complete Sections A and D, and complete Part V )

### Section A. All Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| 1 | Are all of the organization's supported organizations listed by name in the organization's governing documents? *If "No," describe in **Part VI** how the supported organizations are designated If designated by class or purpose, describe the designation If historic and continuing relationship, explain* **1** | | |
| 2 | Did the organization have any supported organization that does not have an IRS determination of status under section 509 (a)(1) or (2)? *If "Yes," explain in **Part VI** how the organization determined that the supported organization was described in section 509(a)(1) or (2)* **2** | | |
| 3a | Did the organization have a supported organization described in section 501(c)(4), (5), or (6)? *If "Yes," answer (b) and (c) below* **3a** | | |
| b | Did the organization confirm that each supported organization qualified under section 501(c)(4), (5), or (6) and satisfied the public support tests under section 509(a)(2)? *If "Yes," describe in **Part VI** when and how the organization made the determination* **3b** | | |
| c | Did the organization ensure that all support to such organizations was used exclusively for section 170(c)(2)(B) purposes? *If "Yes," explain in **Part VI** what controls the organization put in place to ensure such use* **3c** | | |
| 4a | Was any supported organization not organized in the United States ("foreign supported organization")? *If "Yes" and if you checked 12a or 12b in Part I, answer (b) and (c) below* **4a** | | |
| b | Did the organization have ultimate control and discretion in deciding whether to make grants to the foreign supported organization? *If "Yes," describe in **Part VI** how the organization had such control and discretion despite being controlled or supervised by or in connection with its supported organizations* **4b** | | |
| c | Did the organization support any foreign supported organization that does not have an IRS determination under sections 501(c)(3) and 509(a)(1) or (2)? *If "Yes," explain in **Part VI** what controls the organization used to ensure that all support to the foreign supported organization was used exclusively for section 170(c)(2)(B) purposes* **4c** | | |
| 5a | Did the organization add, substitute, or remove any supported organizations during the tax year? *If "Yes," answer (b) and (c) below (if applicable) Also, provide detail in **Part VI**, including (i) the names and EIN numbers of the supported organizations added, substituted, or removed, (ii) the reasons for each such action, (iii) the authority under the organization's organizing document authorizing such action, and (iv) how the action was accomplished (such as by amendment to the organizing document)* **5a** | | |
| b | **Type I or Type II only.** Was any added or substituted supported organization part of a class already designated in the organization's organizing document? **5b** | | |
| c | **Substitutions only.** Was the substitution the result of an event beyond the organization's control? **5c** | | |
| 6 | Did the organization provide support (whether in the form of grants or the provision of services or facilities) to anyone other than (i) its supported organizations, (ii) individuals that are part of the charitable class benefited by one or more of its supported organizations, or (iii) other supporting organizations that also support or benefit one or more of the filing organization's supported organizations? *If "Yes," provide detail in **Part VI**.* **6** | | |
| 7 | Did the organization provide a grant, loan, compensation, or other similar payment to a substantial contributor (defined in section 4958(c)(3)(C)), a family member of a substantial contributor, or a 35% controlled entity with regard to a substantial contributor? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ)* **7** | | |
| 8 | Did the organization make a loan to a disqualified person (as defined in section 4958) not described in line 7? *If "Yes," complete Part I of Schedule L (Form 990 or 990-EZ)* **8** | | |
| 9a | Was the organization controlled directly or indirectly at any time during the tax year by one or more disqualified persons as defined in section 4946 (other than foundation managers and organizations described in section 509(a)(1) or (2))? *If "Yes," provide detail in **Part VI**.* **9a** | | |
| b | Did one or more disqualified persons (as defined in line 9a) hold a controlling interest in any entity in which the supporting organization had an interest? *If "Yes," provide detail in **Part VI**.* **9b** | | |
| c | Did a disqualified person (as defined in line 9a) have an ownership interest in, or derive any personal benefit from, assets in which the supporting organization also had an interest? *If "Yes," provide detail in **Part VI**.* **9c** | | |
| 10a | Was the organization subject to the excess business holdings rules of section 4943 because of section 4943(f) (regarding certain Type II supporting organizations, and all Type III non-functionally integrated supporting organizations)? *If "Yes," answer line 10b below* **10a** | | |
| b | Did the organization have any excess business holdings in the tax year? *(Use Schedule C, Form 4720, to determine whether the organization had excess business holdings)* **10b** | | |

**Part IV**    Supporting Organizations *(continued)*     Document 1565    Filed 01/07/23    Page 604 of 721

| | | Yes | No |
|---|---|---|---|
| **11** | Has the organization accepted a gift or contribution from any of the following persons? | | |
| **a** | A person who directly or indirectly controls, either alone or together with persons described in (b) and (c) below, the governing body of a supported organization? | **11a** | |
| **b** | A family member of a person described in (a) above? | **11b** | |
| **c** | A 35% controlled entity of a person described in (a) or (b) above? *If "Yes" to a, b, or c, provide detail in **Part VI*** | **11c** | |

### Section B. Type I Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| **1** | Did the directors, trustees, or membership of one or more supported organizations have the power to regularly appoint or elect at least a majority of the organization's directors or trustees at all times during the tax year? *If "No," describe in **Part VI** how the supported organization(s) effectively operated, supervised, or controlled the organization's activities  If the organization had more than one supported organization, describe how the powers to appoint and/or remove directors or trustees were allocated among the supported organizations and what conditions or restrictions, if any, applied to such powers during the tax year* | **1** | |
| **2** | Did the organization operate for the benefit of any supported organization other than the supported organization(s) that operated, supervised, or controlled the supporting organization? *If "Yes," explain in **Part VI** how providing such benefit carried out the purposes of the supported organization(s) that operated, supervised or controlled the supporting organization* | **2** | |

### Section C. Type II Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| **1** | Were a majority of the organization's directors or trustees during the tax year also a majority of the directors or trustees of each of the organization's supported organization(s)? *If "No," describe in **Part VI** how control or management of the supporting organization was vested in the same persons that controlled or managed the supported organization(s)* | **1** | |

### Section D. All Type III Supporting Organizations

| | | Yes | No |
|---|---|---|---|
| **1** | Did the organization provide to each of its supported organizations, by the last day of the fifth month of the organization's tax year, (ı) a written notice describing the type and amount of support provided during the prior tax year, (ıı) a copy of the Form 990 that was most recently filed as of the date of notification, and (ııı) copies of the organization's governing documents in effect on the date of notification, to the extent not previously provided? | **1** | |
| **2** | Were any of the organization's officers, directors, or trustees either (ı) appointed or elected by the supported organization (s) or (ıı) serving on the governing body of a supported organization? *If "No," explain in **Part VI** how the organization maintained a close and continuous working relationship with the supported organization(s)* | **2** | |
| **3** | By reason of the relationship described in (2), did the organization's supported organizations have a significant voice in the organization's investment policies and in directing the use of the organization's income or assets at all times during the tax year? *If "Yes," describe in **Part VI** the role the organization's supported organizations played in this regard* | **3** | |

### Section E. Type III Functionally-Integrated Supporting Organizations

**1**   Check the box next to the method that the organization used to satisfy the Integral Part Test during the year **(see instructions)**

- **a** ☐   The organization satisfied the Activities Test  Complete **line 2** below
- **b** ☐   The organization is the parent of each of its supported organizations  Complete **line 3** below
- **c** ☐   The organization supported a governmental entity  Describe in **Part VI** how you supported a government entity (see instructions)

**2**   Activities Test  **Answer (a) and (b) below.**

| | | Yes | No |
|---|---|---|---|
| **a** | Did substantially all of the organization's activities during the tax year directly further the exempt purposes of the supported organization(s) to which the organization was responsive? *If "Yes," then in **Part VI** identify those supported organizations and explain** how these activities directly furthered their exempt purposes, how the organization was responsive to those supported organizations, and how the organization determined that these activities constituted substantially all of its activities* | **2a** | |
| **b** | Did the activities described in (a) constitute activities that, but for the organization's involvement, one or more of the organization's supported organization(s) would have been engaged in? *If "Yes," explain in **Part VI** the reasons for the organization's position that its supported organization(s) would have engaged in these activities but for the organization's involvement* | **2b** | |

**3**   Parent of Supported Organizations  **Answer (a) and (b) below.**

| | | Yes | No |
|---|---|---|---|
| **a** | Did the organization have the power to regularly appoint or elect a majority of the officers, directors, or trustees of each of the supported organizations? *Provide details in **Part VI.*** | **3a** | |
| **b** | Did the organization exercise a substantial degree of direction over the policies, programs and activities of each of its supported organizations? *If "Yes," describe in **Part VI.** the role played by the organization in this regard* | **3b** | |

**Part V** Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations

| 1 | ☐ | Check here if the organization satisfied the Integral Part Test as a qualifying trust on Nov  20, 1970 (explain in Part VI)  **See instructions.** All other Type III non-functionally integrated supporting organizations must complete Sections A through E |  |  |  |
|---|---|---|---|---|---|

| **Section A - Adjusted Net Income** | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 | Net short-term capital gain | 1 | | |
| 2 | Recoveries of prior-year distributions | 2 | | |
| 3 | Other gross income (see instructions) | 3 | | |
| 4 | Add lines 1 through 3 | 4 | | |
| 5 | Depreciation and depletion | 5 | | |
| 6 | Portion of operating expenses paid or incurred for production or collection of gross income or for management, conservation, or maintenance of property held for production of income (see instructions) | 6 | | |
| 7 | Other expenses (see instructions) | 7 | | |
| 8 | **Adjusted Net Income** (subtract lines 5, 6 and 7 from line 4) | 8 | | |

| **Section B - Minimum Asset Amount** | | (A) Prior Year | (B) Current Year (optional) |
|---|---|---|---|
| 1 | Aggregate fair market value of all non-exempt-use assets (see instructions for short tax year or assets held for part of year) | 1 | | |
| a | Average monthly value of securities | 1a | | |
| b | Average monthly cash balances | 1b | | |
| c | Fair market value of other non-exempt-use assets | 1c | | |
| d | **Total** (add lines 1a, 1b, and 1c) | 1d | | |
| e | **Discount** claimed for blockage or other factors (explain in detail in Part VI) | | | |
| 2 | Acquisition indebtedness applicable to non-exempt use assets | 2 | | |
| 3 | Subtract line 2 from line 1d | 3 | | |
| 4 | Cash deemed held for exempt use  Enter 1-1/2% of line 3 (for greater amount, see instructions) | 4 | | |
| 5 | Net value of non-exempt-use assets (subtract line 4 from line 3) | 5 | | |
| 6 | Multiply line 5 by  035 | 6 | | |
| 7 | Recoveries of prior-year distributions | 7 | | |
| 8 | **Minimum Asset Amount** (add line 7 to line 6) | 8 | | |

| **Section C - Distributable Amount** | | | Current Year |
|---|---|---|---|
| 1 | Adjusted net income for prior year (from Section A, line 8, Column A) | 1 | | |
| 2 | Enter 85% of line 1 | 2 | | |
| 3 | Minimum asset amount for prior year (from Section B, line 8, Column A) | 3 | | |
| 4 | Enter greater of line 2 or line 3 | 4 | | |
| 5 | Income tax imposed in prior year | 5 | | |
| 6 | **Distributable Amount.** Subtract line 5 from line 4, unless subject to emergency temporary reduction (see instructions) | 6 | | |

| 7 | ☐ | Check here if the current year is the organization's first as a non-functionally-integrated Type III supporting organization (see instructions) |
|---|---|---|

**Part V** Type III Non-Functionally Integrated 509(a)(3) Supporting Organizations *(continued)*

| Section D - Distributions | | | Current Year |
|---|---|---|---|
| **1** Amounts paid to supported organizations to accomplish exempt purposes | | | |
| **2** Amounts paid to perform activity that directly furthers exempt purposes of supported organizations, in excess of income from activity | | | |
| **3** Administrative expenses paid to accomplish exempt purposes of supported organizations | | | |
| **4** Amounts paid to acquire exempt-use assets | | | |
| **5** Qualified set-aside amounts (prior IRS approval required) | | | |
| **6** Other distributions (describe in **Part VI**) See instructions | | | |
| **7 Total annual distributions.** Add lines 1 through 6 | | | |
| **8** Distributions to attentive supported organizations to which the organization is responsive (provide details in **Part VI**) See instructions | | | |
| **9** Distributable amount for 2019 from Section C, line 6 | | | |
| **10** Line 8 amount divided by Line 9 amount | | | |

| Section E - Distribution Allocations (see instructions) | (i) Excess Distributions | (ii) Underdistributions Pre-2019 | (iii) Distributable Amount for 2019 |
|---|---|---|---|
| **1** Distributable amount for 2019 from Section C, line 6 | | | |
| **2** Underdistributions, if any, for years prior to 2019 (reasonable cause required-- explain in **Part VI**) See instructions | | | |
| **3** Excess distributions carryover, if any, to 2019 | | | |
| **a** From 2014. . . . . . . . | | | |
| **b** From 2015. . . . . . . . | | | |
| **c** From 2016. . . . . . . . | | | |
| **d** From 2017. . . . . . . . | | | |
| **e** From 2018. . . . . . . . | | | |
| **f Total** of lines 3a through e | | | |
| **g** Applied to underdistributions of prior years | | | |
| **h** Applied to 2019 distributable amount | | | |
| **i** Carryover from 2014 not applied (see instructions) | | | |
| **j** Remainder Subtract lines 3g, 3h, and 3i from 3f | | | |
| **4** Distributions for 2019 from Section D, line 7 $ | | | |
| **a** Applied to underdistributions of prior years | | | |
| **b** Applied to 2019 distributable amount | | | |
| **c** Remainder Subtract lines 4a and 4b from 4 | | | |
| **5** Remaining underdistributions for years prior to 2019, if any Subtract lines 3g and 4a from line 2 If the amount is greater than zero, explain in **Part VI** See instructions | | | |
| **6** Remaining underdistributions for 2019 Subtract lines 3h and 4b from line 1 If the amount is greater than zero, explain in **Part VI** See instructions | | | |
| **7 Excess distributions carryover to 2020.** Add lines 3j and 4c | | | |
| **8** Breakdown of line 7 | | | |
| **a** Excess from 2015. . . . . . | | | |
| **b** Excess from 2016. . . . . . | | | |
| **c** Excess from 2017. . . . . . | | | |
| **d** Excess from 2018. . . . . . | | | |
| **e** Excess from 2019. . . . . . | | | |

**Software ID:**

**Software Version:**

**EIN:** 26-3670783

**Name:** COALITION FOR GOOD GOVERNANCE

---

Schedule A (Form 990 or 990-EZ) 2019                                                                                          Page **8**

| **Part VI** | **Supplemental Information.** Provide the explanations required by Part II, line 10, Part II, line 17a or 17b, Part III, line 12, Part IV, Section A, lines 1, 2, 3b, 3c, 4b, 4c, 5a, 6, 9a, 9b, 9c, 11a, 11b, and 11c, Part IV, Section B, lines 1 and 2, Part IV, Section C, line 1, Part IV, Section D, lines 2 and 3, Part IV, Section E, lines 1c, 2a, 2b, 3a and 3b, Part V, line 1, Part V, Section B, line 1e, Part V Section D, lines 5, 6, and 8, and Part V, Section E, lines 2, 5, and 6  Also complete this part for any additional information  (See instructions) |
|---|---|

| **Facts And Circumstances Test** |
|---|
| |
| |

Case 1:17-cv-02989-AT   Document 1565   Filed 01/07/23   Page 608 of 721

# SCHEDULE O
## (Form 990 or 990-EZ)

Department of the Treasury

**Supplemental Information to Form 990 or 990-EZ**

Complete to provide information for responses to specific questions on
Form 990 or 990-EZ or to provide any additional information.
▶ Attach to Form 990 or 990-EZ.
▶ Go to *www.irs.gov/Form990* for the latest information.

OMB No 1545-0047

# 2019

**Open to Public Inspection**

Name of the organization
COALITION FOR GOOD GOVERNANCE

**Employer identification number**

26-3670783

## 990 Schedule O, Supplemental Information

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION B, LINE 11B | THE FORM 990 IS REVIEWED BY THE PRESIDENT AND THEN DISTRIBUTED TO THE BOARD FOR REVIEW  ALL QUESTIONS ARE ADDRESSED BY THE PRESIDENT AND THEN THE FORM 990 IS FILED WITH THE IRS |

**990 Schedule O, Supplemental Information**

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION B, LINE 12C | THE PRESIDENT REGULARLY MONITORS ALL TRANSACTIONS FOR POTENTIAL CONFLICTS AND IF A POTENTIAL CONFLICT WERE TO BE IDENTIFIED, SHE WOULD BRING THE TRANSACTION TO THE BOARD FOR APPROVAL  IF THE PRESIDENT IS THE PERSON WITH A CONFLICT, SHE WOULD ABSTAIN FROM VOTING AND THE INDEPENDENT BOARD MEMBERS WOULD DETERMINE IF THE TRANSACTION WAS IN THE BEST INTEREST OF THE COALITION |

# 990 Schedule O, Supplemental Information

| Return Reference | Explanation |
|---|---|
| FORM 990, PART VI, SECTION C, LINE 19 | THE ORGANIZATION MAKES ITS GOVERNING DOCUMENTS, CONFLICT OF INTEREST POLICY AND FINACIAL STATEMENTS AVAILABLE TO THE PUBLIC UPON REQUEST |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **COALITION FOR GOOD GOVERNANCE,** et al., | |
| **Plaintiffs,** | |
| **v.** | **Civil Action No.** **1:20-cv- 01677 -TCB** |
| **BRAD RAFFENSPERGER, el al., ,** | |
| **Defendants.** | |

**PLAINTIFFS' NOTICE OF FILING DECLARATION**

Plaintiffs give notice of the filing of the Supplemental Declaration of Marilyn Marks, attached.

Respectfully submitted this 14th day of May, 2020.

| | |
|---|---|
| */s/ Bruce P. Brown* | */s/ Robert A. McGuire, III* |
| Bruce P. Brown | Robert A. McGuire, III |
| Georgia Bar No. 064460 | Pro Hac Vice Pending |
| BRUCE P. BROWN LAW LLC | ROBERT MCGUIRE LAW FIRM |
| 1123 Zonolite Rd. NE, Ste 6 | 113 Cherry St. #86685 |
| Atlanta, Georgia 30306 | Seattle, Washington 98104-2205 |
| (404) 881-0700 | (253) 267-8530 |

*Attorneys for Plaintiffs*

Page 1



Exhibit
CGG 0009

## CERTIFICATE OF COMPLIANCE AND SERVICE

I hereby certify that the foregoing has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14. I further certify that on May 14, 2020, a copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

/s/ Bruce P. Brown
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
Attorney for Plaintiffs
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

**Supplemental Declaration of Marilyn Marks**

**Marilyn Marks** declares, under penalty of perjury, pursuant to 28 U.S.C.

§1746, that the following is true and correct:

1. My name is Marilyn Marks.

2. I am the Executive Director of Coalition for Good Governance
   ("Coalition"), a non-profit 501 (c)(3).

3. I have personal knowledge of all facts stated in this declaration.

4. If called to testify, I could and would testify competently thereto.

Organizational Standing

5. The statements regarding Coalition's members and activities in the
   Complaint Doc. 1 paragraphs 132-138 and true and correct.

6. The diversion of Coalition's resources has continued since the complaint
   was filed. For example, in order to meet the requirements of this litigation, I
   was forced to reject the request by North Carolina-based Coalition members
   and voting rights groups to help design and plan drive-through voting
   options which I had initated several weeks ago. Other examples follow.

7. I had to decline the request to help with preparing more background
   educational materials for panel discussions and audiences of the HBO
   documentary Kill Chain, in which I appear.

8. I had to decline the request by North Carolina Coalition members propose and evaluate alternatives for voter identification methods for mail ballot voting.

9. In the last several weeks, in order to pursue this lawsuit, we have had to postpone our work on investigating the impacts of the violation of secret ballot laws in North Carolina and South Carolina.

10. I had to decline the opportunity to confer with a national study group of experts on signature verification and other eligibility verification in mail balloting.

11. I had to defer the request that Coalition conduct a webinar on the roles and responsibilities of canvass boards and election boards.

12. I had to seek an extension of time for submitting a grant proposal to a donor in order to devote resources to this litigation.

13. I have been receiving at least 3 or 4 invitations per week to participate in panels, educational events or group discussions on election security in the time of pandemic. I am having to decline all of them in order to pursue the claims in this lawsuit.

14. I have had to decline the request for help from our Colorado members to review and provide critique of Colorado's new proposed emergency election rules.

15. Our interns who generally write thank you notes and stay in touch with our donors and members have had to temporarily drop those duties to help organize evidence for this lawsuit.

16. We have had to curtail the volume and timeliness of our responses to voters who are inquiring with questions about their mail ballots and the upcoming election. They have expressed considerable confusion caused by conflicting information communicated by election officials. Many voters and members are seeking information from Coalition but our resources have been diverted to organize information for this lawsuit. We are unable to answer all the inquiries on a timely basis.

17. We had to decline a request to consult with the non-profit start up team working on apps for facilitating electronic mail ballot application submission in New York.

<u>Colorado Mail Ballot Conversion</u>

18. I was an election security activist in Colorado during the time of their managed conversion to an all-mail ballot voting system over the course of approximately 7 years (approximately 2007-2014). I observed the massive changes that are required in voter education, database quality, equipment and system conversions, poll worker training and complex election cybersecurity considerations.

Anticipated Ballot Scanning Errors

19. The video referenced in Ms. Dufort's declaration ( Doc. 38 at 4) at link
    https://drive.google.com/drive/folders/1bUqMPQUGEq4LNF5tSvafzsKzWn
    fFDDXi is a video that I recorded On November 2018 at the Gwinnett
    County Election Recount. It was edited and annotated by Taran Greenwald
    and displays the problem that is caused when folds or creases in a ballot are
    through or too close to the target area causing the scanner to read the shadow
    or crease marks as a spurious vote. This frequently causes the machine to
    read and reject this as an overvote.

20. I am familiar with this well-known elementary problem with shadows and
    smudges from ballot fold lines from observing it several times in Colorado
    during poll watcher duties. The problem and prevention are well understood
    by experienced election administrators, ballot builders and ballot printers.
    Experienced election officials and ballot builders take care to avoid this
    design flaw.

21. Based on my observations of pictures of 2020 primary ballots that concerned
    Georgia voters have sent me, with crease lines touching target areas, and my
    experience observing this issue in Colorado, that the counties should expect
    to encounter the collection of spurious votes and false positives of
    undervotes. Based on my observations in previous elections, this could cause

lengthy operating times for teams of workers to resolve each rejected ballot, and delays in results reporting.

## County Pollworker Shortage

22. Coalition has been monitoring the poll worker shortage by talking with county election officials and through open records requests with counties, and monitoring county election board meetings.

23. Forsyth County on May 5 reported that approximately 30% of their pollworkers were not planning to work on Election Day. (Exhibit 1)

24. Lowndes County reported on May 12 that only 38 of their needed 185 pollworker positions were filled. (Exhibit 2)

25. Cobb County reported on May 11 that they were at "bare bones" levels, and that workers over 65 were concerned, particularly given the Shelter in Place Order (Exhibit 3)

26. Oconee County on May 5 discussed having to consolidate polling places into just two  polling places because of a poll worker shortage and potential loss of polling place access. (Exhibit 4)

## County Election Board Meetings

27. Coalition interns and volunteer members monitored all remote (video or telephonic) county election board meetings available in the last three weeks, and recorded the meetings to create transcripts. Transcripts were also created

for various interviews or public meetings where Secretary Kemp and Governor Kemp commented on the pandemic or election matters. All transcripts were prepared under my supervision and represent a correct record of relevant portions of the meeting. (Coalition transcribers did not attempt to fully refine the transcripts for non-relevant portions of the meetings.) A copy of each transcript is maintained in Coalition's files.

28. Transcripts were created under my supervision for the May meetings of the Boards of Elections for Henry County, Clayton County, Newton County, Lowndes County, Cobb County Camden County, Athens-Clarke County, Effingham County, Oconee County, Richmond County, and Forsyth County.

29. The content of the public meetings was the source for many of Coalition's conclusions on the counties planned reduction in polling places, reduction in voting stations, shortage of pollworkers, lack of guidance from the Secretary of State regarding PPE for poll workers, delays of ballot mailing and processing.

30. Paulding County's planned BMD deployment is an example of significant reduction of the number of voting machines that can be used because of the lack of space and personnel. Using data obtained in an Open Records Request Plaintiff Jeanne Dufort and I calculated the estimated legal minimum of voting stations and the planned reductions. (Exhibit 5) and

found a significant shortfall in machines. For example, precinct 8 plans for 12 BMD compared to 44 required, or 912 voters per machine. Precinct 7 plans 15 machines rather than the 41 required, or 671 voters per machine. Precinct 13 plans 12 machines rather than the 38 required, or 795 voters per machine.

31. Douglas County's planned BMD deployment is another example reviewed by Ms. Dufort and me for the shortfall in polling place equipment deployment, based on Open Records Requests. (Exhibit 6). Some precincts will be in compliance with the 1 to 250 voter minimum while at least 7 precincts such as 1258 will have fewer than 50% of what is required. Precinct 1258 will have 641 voters per machine. Exhibit 11 also reflects the discussions of the Effingham and Forsyth counties inability to meet the 1 voting station to 250 voters statutory requirement.

32. Based on Coalition's review of numerous public records, listening to the board meetings and discussions with county election officials, many of the counties state that they are planning to permit only 10 people at a time in the polling place. This includes pollworkers which appear to average about 6 workers planned per polling location, leaving only 4 positions opened for voters. (Exhibit 11) Transcript excerpts from Effingham and Forsyth Counties' May meetings) The transcripts are accurate and were made under

my supervision from audio recordings of the public meetings, most of which plaintiffs or Coalition analysts observed live as well.)

33. Henry County's Election Board discussed the delay in mail ballot delivery from the mail vendor noting that it appeared that there were 2 to 3 week delays from county processing to voter ballot receipt. (Exhibit 9)

34. Secretary Raffensperger told listeners in a May 7 meeting of the Faith and Freedom Coalition that voters may deliver their completed mail ballots to polling places. I listened to this meeting as it was broadcast and heard his report concerning dropping off ballots, which is accurately transcribed on Exhibit 10.

35. I was pleased to hear him report this as it is part of the relief Plaintiffs seek and have been formally suggesting to Secretary Raffensperger and the State Election Board since December.

36. I frequently review dozens of absentee ballot daily reports from the counties posted daily to the Secretary of State's website to watch the progress of the issuance of absentee ballots. I have observed that the application date and the ballot issuance date are generally significantly inaccurate as the counties are following the directives of the Secretary of State's office as detailed in Chris Harvey's memo of April 13, 2020. (Doc. 20 at 65-68) This results in

the backdating of ballot issuance and also conceals the late processing of the ballot applications. The result is a far more favorable and inaccurate picture of the ballot application and ballot issuance dates. The ballot application received date is the date processed which may be weeks later than the application was received. The ballot issuance date is the date that the processed application information was sent to the vendor, not the date of the ballot issuance to the voter.

37. The delays in mail ballot issuance are not typical in recent prior elections based on my close observations beginning in 2017. In the past the counties have issued the mail ballots directly to the applying elector.

38. A Coalition analyst under my supervision used the database of the mail ballot application and issuance for the November 2018 election and calculated that the average processing time between application and mail ballot issuance by the county was under 2 days.

39. This compares to reported cases of 2 to 3 weeks between county application approval and ballot issuance.

40. This reported delay in vendor processing and mailing is consistent with my examination of numerous pictures of time stamped ballot packet outer envelopes sent to me by members and other Georgia voters.

41. Intentionally left blank

42. Athens-Clarke County Superintendent has recently published an emergency procedure plan which I obtained in a public document request. It is attached as Exhibit 12.

43. State Election Board Rule Rule 183-1-12-.11 (2)(d) was adopted earlier this year requiring that hand marked paper ballots are to be used when polling place emergencies occur including lines of 30 minutes or more. All plaintiffs attended multiple State Election Board meetings and county election board meetings where the intent of the intent of this 30 minute wait default to hand marked paper ballots was discussed. It is documented in various county records as well such as Athens-Clarke Board of Elections Resolution (¶ 6 at Exhibit 7 attached)

44. The information collected at the Wisconsin Exhibit to the Brief (Doc. 36 pages 17-86) was obtained by Coalition from the pubic websites of Wisconsin election officials by analysts working under my supervision. The purpose of the exhibit was to collect the types of Wisconsin Election Commission Guidance and procedures used with respect to public health protection.

45. Intentionally left blank

46. Information regarding the lack of PPE protocols issued by the State was confirmed by Coalition analysts working under my supervision through discussions confirmed by public records requests. One such example consistent with other counties we communicated with is Cherokee County. (Doc. 38 at 158) Another such example is the May Henry County Board meeting discussion where the supervisor reported that the Secretary's office had made it clear that PPE was the responsibility of the counties. (Exhibit 8 attached)

47. Coalition analysts requested information from numerous counties regarding their March 24 ballot cancellation policy or any changes communicated from the Secretary regarding such policy. The response provided by Cherokee County was consistent with other counties which reported no change from the Secretary's instructions to cancel ballots arriving March 24 or thereafter if an application for a June ballot was received from that voter. (Doc. 38 at 158)

Executed May 14, 2020

Case 1:17-cv-02989-ATCB  Document 1565  Filed 03/07/22  Page 624 of 721
Case 1:20-cv-01837-ATCB  Document 452  Filed 03/14/20  Page 624 of 721

Exhibit 1

**Marks Exhibit 1**

Poll Worker Shortage

## Forsyth 5/05 9:00 am

**Mandi Smith (election supervisor)**  51:38
That was my understanding and that's what we, you know, advertised. And then we're going to discuss today, the Saturday and the final week. Okay. So, start. So as far as poll workers, we have a link to, for them to follow and they you know, click and let us know if available/ not available. And this went out – I guess it was over a week ago now – it was prior to the governor issuing **the additional shelter in place for those individuals over 65, and with compromised immunity**. You said, we did have some folks change their availability after that order came out. So **300-plus emails went out** to everyone that was originally trained for the Presidential Preference. And as of yesterday morning, approximately **45  said that they were unavailable to work during advanced voting**. The schedule's out there, so on any given day of advanced voting, there's approximately 80 or so that are signed up to be available and approximately 130 signed up to say available to work on Election Day. And about 30% that they were not available to work on Election Day. So, the sign up – and I'm saying approximately because obviously things change – and some folks have double signed up for things. So we have to go out and go in, people get that kind of thing.

...

**Barbara Luth**  55:47
Mandi, my question is, with the limited number of people that we can have within the polling site, right? They need  – you have to cut back on some workers in order to get those numbers in there, which means, but yet **we're still going to have workers outside managing lines** and doing that sort of thing.

**Mandi Smith**  56:18
They, that will have to be part of the flow of the poll. That was part of what we trained on anyway. There'll be some tweaks to that in the sense of keeping six feet apart. Again, keeping even more people out than what we'd already trained out of the room, you know, you're not allowed to walk into the room at the same time. The concern that we have, though, and with the amount of people who are poll workers, I mean, our poll managers and assistant managers. So the key folks who, you know, in our case, for the most part has worked with for many years, and lots of training, lots of experience. And again, not to go into individual things  – but several of those that are not available to work.

**Joel Natt**  57:15
What about assistant managers? Experience is there – can they fill in if needed?

**Mandi Smith**  57:26

I know again, that's what I'm saying, well, managers and assistant managers can be who. So we have plenty **of assistant managers who will know never want to be, they never want to move up.** Right. And I understand that and I appreciate that. So staffing with experienced people, not saying that we won't have enough staff, I'm saying with experienced workers is going to possibly be a challenge. Let's see – I'm looking over my notes, too.

Exhibit 2

**Marks Exhibit 2**

**Lowndes 5/12 (4:30)**

**Deb Cox (election supervisor)** 11:11
Next Issue. Poll workers for the June 9 election. We need 185, we're down to 38. If it becomes necessary to combine precincts for this election, for the June 9 election which has combined the March and the May into. I propose to eliminate or combine some of the precincts and have them voted here as well. We would have open One and close Two, which is Trinity. We would open Northside. We would open Naylor because of the distance out there. Open Rainwater because of the size in the expandability. Open Six: Mildred open Seven: Papermill because the extreme south. Close Dasher because it's very small and we could reroute those between the office, and South Lowndes. Open South Lowndes of course because that's extreme sound as well. VSU is not going to be open, there's no question about that. And close Jaycee Shack and reroute those in here.  For the June 9 That's where we stand at the moment, if we get enough poll workers we can have more open, but the elections office is already programmed into the database as a backup on election day, in case this occurs, all counties have got that from the state. We'll standby to see what occurs. We have enough for advanced voting. Jessica's been on the phone literally all day she probably has cauliflower ear. But the problem is poll workers and we have a combined problem the COVID and the extra $600 on top of unemployment is not conducive to offering somebody you know basically $7.25 an hour to work. So that's where we're at, at the moment.

**Chris** 18:39
Hey Deb, it's Chris. Hello, could you go over the numbers of poll workers you currently have in- ones that you need for the actual election.

**Deb Cox** 18:52
We have 38, and we need 185 all totaled.

**Chris** 18:58
Yikes! Little bit short there.

**Deb Cox** 19:02
I would say so.

Exhibit 3

**Marks Exhibit 3**

**Cobb** 5/11 4:00 pm

**Janine Eveler (election supervisor)** 48:03
Okay, I'm in support, the poll workers, we don't have concrete numbers as of this date. **The area supervisors are in the process of going back and contacting all poll workers to see if they are still going to work, the election.** Prior to the pandemic we were able to have on the average of 10 to 11 workers per poll basically, but that number. At last, has **dropped substantially** that was still going to be available. And of course, our largest challenge would be those **poll managers or assistant managers that would not that would no longer be able to work**. After the initial evaluation and many of the workers have said that they need to **wait closer to the election, before they can make a commit**. So, now we are we are out basically as far as we can and we need to know if they're going to commit or not. Some of the workers, of course, those that **are 65 and older are kind of concerned because the, the order is to be lifted I think like after June 12, if they are 65 years and older**, and that includes a large number of our population. Some have been, of course reassured that you know because of our process, planning to do with providing masks and gloves and hand sanitizer. You know, some are gonna stick with us. If they can. So, but we're feeling like we're close to bare bones at a lot of places, especially with managers and assistant. That's all I have.

Exhibit 4

**Oconee County**
**5/5 5:30 pm**

**Fran Leathers (election supervisor)** 30:09

Right. So it'll be that- I'm assuming that's what they'll tell us that we have to do. All right. And early voting plan, we were sort of discussing this a little bit, but early voting begins May 18, which is right around the corner, and we're going to be ready for everybody who ever wants to come vote early with us. We have had plexiglass guards installed, they're temporary, above in our office where you would normally come in and you go into get you know, to show your ID and sign your form. Right there. We've had plexiglass installed there and there's about this about four or five inches below there where people can, you know, slide their ID or slide their papers and sign everything there. So that is good as far as the workers go, and as far as the voters. Right now as it stands, because our office is not as large but we can accommodate, probably four people in the lobby at a time, and try to keep the six foot social distancing. And at that point, once someone has stepped to the counter and they get their card together, they will go on into the voting room. And we will have to determine the six foot distancing in that room as well. A little closer to the time we're gonna early vote- we'll have to go in, plus to see how- what the county stance is, how everything is progressing as far as the distancing of what we're required to do. But we're prepared to do whatever we need to do to keep everybody safe. So it might just take a little longer, but we'll get it, get it all handled. We will have the same, probably most likely, I've talk to everybody that helped us in early voting last time at the PPP everybody's help- willing to help us. We may not need as many workers because we may not have as many people coming in and have as many voting equipment stations or booths setupbut will just have to play that by ear a little closer to the time. And Kirk and I talked about this a little earlier this week, was the Election Day contingency plan. And we've discussed this because Kirk asked me if what happens if something with our approach with the poll workers and our poll workers – say we lose half of them or something happened that they don't want to work because it maybe the situation worse or something like that. So how, what will we do? So Jennifer and I actually spoke about this, talked in great detail about how we would handle something of that nature. Or, say, if our polling sites did not want to open up, or let us – you know – use their polling sites. So what we discussed was having our two largest polling sites, which would be the Civics Center, and I'm saying largest as in the area, which would be Civic Center and Marcelin Hall would be the largest ones, and we would be able to hopefully go in and set up actual smaller precincts within those areas. So we would take You know, six here and six there and maybe put those in different areas in the room where people could come in and vote in those two different locations. And we of course, we would have to get the word out for everybody, you know, signs and that kind of thing as well. And hopefully, if that did happen, we would be able to notify people a little bit more in advance, you know if we needed to do that. But that's the plan that we have in place right now, because those are the only really two large places that we had that would accommodate everybody.

Exhibit 5

June 9th, 2020
Equipment Plans (subject to change)

| Precinct | BMD's | Scanners | Poll Pads | voters | req BMDs | |
|---|---|---|---|---|---|---|
| #1 BHP | 10 | 1 | 2 | 5854 | 24 | |
| #2 CRL | 10 | 1 | 2 | 3450 | 14 | |
| #3 SHEL | 12 | 1 | 2 | 4683 | 19 | |
| #4 RES | 12 | 1 | 2 | 7689 | 31 | |
| #5 PSC | 12 | 1 | 2 | 5449 | 22 | |
| #6 LBC | 12 | 1 | 2 | 4174 | 17 | |
| #7 WGC | 15 | 2 | 4 | 10062 | 41 | |
| #8 WRDG | 12 | 2 | 4 | 10994 | 44 | |
| #9 TEP | 10 | 1 | 2 | 4493 | 18 | |
| #10 PSBC | 12 | 1 | 2 | 4568 | 19 | |
| #11 DWIC | 12 | 1 | 2 | 5890 | 28 | |
| #12 TFP | 10 | 1 | 2 | 2643 | 11 | |
| #13 NES | 12 | 1 | 4 | 9551 | 38 | |
| #14 WOP | 12 | 1 | 2 | 5494 | 22 | |
| #15 MRP | 10 | 1 | 2 | 5441 | 22 | |
| #16 BBC | 10 | 1 | 2 | 2419 | 10 | |
| #17 PCA | 12 | 1 | 2 | 3855 | 16 | |
| #18 PMBC | 12 | 1 | 2 | 2610 | 11 | |
| #19 DMS | 12 | 2 | 4 | 7715 | 31 | |
| | | | | | | |
| AIP | | | | | | |
| WGC | 20 | 2 | 4 | | | |

## NUMBER OF MACHINES PER PRECINCT

Exhibit 6

### June 9, 2020 General/Presidential Preference Primary

| PRECINCT | Precinct # | Scanners # | VOTERS | BMD'S | BMD REQ | UPS'S | POLL PADS | ATI'S |
|---|---|---|---|---|---|---|---|---|
| Arbor Station Elementary School | 733 | 1 | 2845 | 10 | 12 | 5 | 2 | 1 |
| Atlanta West Pentecostal Church | 1270 | 1 | 3854 | 10 | 16 | 5 | 2 | 1 |
| Beulah Baptist Church | 731 | 1 | 3325 | 10 | 14 | 5 | 2 | 1 |
| Boundary Waters Aquatic Center | 785 | 1 | 4000 | 10 * | 16 | 5 | 2 | 1 |
| Bright Star Methodist Church | 734 | 1 | 2569 | 10 | 11 | 5 | 2 | 1 |
| Chapel Hill Middle School | 736N | 1 | 3844 | 10 | 16 | 5 | 2 | 1 |
| Chestnut Log Middle School | 737 | 1 | 3825 | 10 | 16 | 5 | 2 | 1 |
| Church at Chapel Hill | 736S | 1 | 6092 | 10 | 25 | 5 | 2 | 1 |
| Dog River Library | 1260 | 1 | 5684 | 10 | 23 | 5 | 2 | 1 |
| Deer Lick Park | 1276 | 1 | 2878 | 10 * | 12 | 5 | 2 | 1 |
| Dorsett Shoals Middle School | 735 | 1 | 3729 | 10 | 15 | 5 | 2 | 1 |
| Ephesus Baptist Church | 1271 | 1 | 3792 | 10 | 16 | 5 | 2 | 1 |
| Factory Shoals Middle School | 784 | 1 | 4078 | 10 | 17 | 5 | 2 | 1 |
| First Baptist Church - Douglasville | 740 | 1 | 2392 | 10 | 10 | 5 | 2 | 1 |
| First Baptist Church – Lithia Springs | 1274 | 1 | 1830 | 7 | 8 | 4 | 2 | 1 |
| Golden Methodist | 729 | 1 | 5292 | 10 * | 22 | 5 | 2 | 1 |
| Lithia Springs H.S. | 1275 | 1 | 5650 | 10 * | 23 | 5 | 2 | 1 |
| Lutheran Church | 739 | 1 | 3939 | 10 | 16 | 5 | 2 | 1 |
| Mirror Lake Elementary School | 1258 | 1 | 6409 | 10 | 26 | 5 | 2 | 1 |
| Old Courthouse | 730 | 1 | 5408 | 10 * | 22 | 5 | 2 | 1 |
| Pray's Mill Baptist Church | 1272 | 1 | 5233 | 10 | 21 | 5 | 2 | 1 |
| St. Julian Episcopal Church | 738 | 1 | 2158 | 9 | 9 | 5 | 2 | 1 |
| Stewart Middle School | 732 | 1 | 3079 | 10 | 13 | 5 | 2 | 1 |
| Turner Middle School | 3655 1273 | 1 | 2944 | 10 | 18 | 5 | 2 | 1 |
| Winston Elementary School | 1259 | 1 | 1821 | 6 | 8 | 3 | 2 | 1 |
| Advance Voting | | | | | | | | |
| New Courthouse | | 2 | | 10 | | 5 | 2 | 1 |
| Old Courthouse | | 1 | | 10 | | 5 | 2 | 1 |
| Woodie Fite Senior Center | | 1 | | 4 * | | 2 | 2 | 1 |
| Boundary Waters | | 1 | | 10 | | 5 | 2 | 1 |
| Deer Lick Park | | 1 | | 10 | | 5 | 2 | 1 |
| Dog River Library | | 1 | | 10 | | 5 | 2 | 1 |

Exhibit 7

Athens-Clarke County
Board of Elections and Registrations

**RESOLUTION TO ESTABLISH THE POLICY OF ATHENS-CLARKE COUNTY REGARDING PROTECTING BALLOT SECRECY AND VOTER PRIVACY IN THE USE OF GEORGIA'S NEW BALLOT MARKING DEVICES IN THE PRECINCTS OF ATHENS-CLARKE COUNTY**

**WHEREAS**, ballot secrecy and voter privacy are important principles for Georgia voters founded in the Constitution of the State of Georgia and other state and federal laws; and

**WHEREAS**, Georgia is transitioning to new ballot marking devices; and

**WHEREAS**, some voters and elections officials have expressed concerns about ensuring that ballot secrecy and voter privacy are maintained during the use of the new ballot marking devices in the precinct locations in Athens-Clarke County; and

**WHEREAS**, the Elections Division of the Georgia Secretary of State's Office has provided general guidance to all the county elections personnel in the state of Georgia; and

**WHEREAS**, the Athens-Clarke County Board of Elections and Registrations ("Board") is charged with, among other important tasks, seeking to ensure that ballot secrecy and voter privacy is maintained during the elections to be held in Athens-Clarke County; and

**WHEREAS**, the Board has received direction from legal counsel as to actions that can ensure ballot secrecy and voter privacy are maintained in the use of the ballot marking devices; and

**WHEREAS**, that direction is consistent with the law, guidance from the Secretary of State's Office and direction provided by the County Attorney; and

**WHEREAS**, in a Final Decision issued on March 31, 2020, in the matter of Administrative HAVA [Help America Vote Act] Complaint filed by the Coalition for Good Governance, the Secretary of State's Office stated:

[P]olling places layouts developed by local election officials must be done in a manner that ensures voter privacy, including obscuring the sightlines of observers, poll watchers, and the public such that they cannot view a BMD [ballot marking device] screen. The Secretary of State has provided a privacy shield to go with every ballot marking device, but the counties are not prohibited from finding privacy solutions that best fit their unique polling place needs. County election officials must provide a private voting experience, and privacy must be considered in all aspects of election administrative planning including polling place layouts, site selection, poll worker staffing levels, and the appropriate number and size of precincts.

**NOW THEREFORE BE IT RESOLVLED**, that the Athens-Clarke County Director of Elections and Voter Registration, the full-time staff and other employees and volunteers should to the maximum extent practicable implement the following policy regarding precinct layout:

1.      Under O.C.G.A. § 21-2-367, the number of "voting booths or enclosures" required in each precinct on election day is to be computed as follows:

- Divide the number of active voters in that precinct as of the close of the registration period (usually 30 days before election day) by 250
- Round the result up to the nearest whole number

So, for example, a precinct with 251 active voters would require 2 voting booths.

2.      The required number of "voting booths or enclosures" in a precinct can be satisfied by a combination of ballot-marking devices (BMDs) and voting booths or enclosures suitable for voting by paper ballot.

So, for example, a precinct that requires 10 "voting booths or enclosures" could have 4 BMDs and 6 places suitable for marking paper ballots.

3.      A precinct should have no more BMDs than can be arranged in a manner that is consistent with the Secretary of State's guidance on ensuring voter privacy (a copy of which is attached).  If that number is less than the number of "voting booths or enclosures" required by law in that precinct, the remaining number should consist of paper-ballot voting booths.

4.      In order to remain consistent with the Secretary of State's guidance on ensuring voter privacy, BMDs should be arranged in accordance with the following principles.

a.      Voters who are checking in, waiting in line, or using a magnifying station should not be able to see the screen of any BMD.

b.      Poll workers should not be able to see the screen of any BMD except when necessary to assist a voter.

c.      BMD screens should face the wall and should preferably be positioned back to back rather than side by side.

d.      If BMDs are positioned side by side, there should be an extended privacy screen between them, as illustrated by the attached photo.

e.      BMDs should be arranged so that no voter has to walk behind any other voter in order to get to a machine. Aisles of BMDs (see attached photo) are therefore strongly discouraged.

f.      There should be no more than two BMDs on any banquet table.

5.      A paper-ballot voting booth could be a table or a part of a table if appropriate screening is used to ensure voter privacy.  See the attached photo.  A provisional voting station counts as a "voting booth or enclosure" as long as it meets this guideline.

6.      Paper ballots—and paper-ballot voting booths—should only be used in cases of emergency.  Under the Georgia Administrative Code, examples of emergencies justifying the use of paper ballots include "power outages, malfunctions causing a sufficient number of electronic ballot markers to be unavailable for use, *or waiting times longer than 30 minutes*." Ga. R. & R. 183-1-12-.11(2)(d).

All poll managers should be trained on the use of paper ballots in the case of an emergency and should be instructed to monitor the length of the lines.  If, in the poll manager's judgment, waiting times are longer than 30 minutes, paper ballots should be used (in addition to BMDs) until the emergency is resolved.

7.      No number of voting booths is required during the early voting period.  Accordingly, guidelines 1 and 2, above, do not apply.  However, early voting locations should be arranged in a manner that is consistent with guidelines 3 and 4.

**AND BE IT FURTHER RESOLVED,** that the foregoing shall become and is the policy of the Athens-Clarke County Board of Elections and Registrations.


SO RESOLVED this 1st day of April, 2020.


_____              _____
Jesse Evans, Chairperson                      Charles Knapper, Vice Chairperson



_____             _____
Willa J. Fambrough, Secretary                 Patricia A. Till, Member



_____
Rocky Raffle, Member

Case 1:17-cv-02989-ATCB Document 1565 Filed 03/07/22 Page 634 of 721
Case 1:20-cv-02189-ATCB Document 42 Filed 05/14/20 Page 634 of 721

Exhibit 8

**Henry County Board of Elections**
**May, 2020 meeting**

**Dan Richardson** 39:34
Okay, thank you, thank you, Board Member Brown. Okay. Seeing no other comments on that topic, we move down to the next one, which is an update on the personal protection equipment. Madam Director.

**Ameika Pitts** 39:50
Yes, sir. Um. In the beginning we had a set number of what we were wanting and needing and it was getting detrimental not getting those things. And so after networking with a county manager as well as fleet maintenance, we gave them a list, and we have been communicating much more. And we found out that although we were not receiving what we were needing, I guess, and we felt like should have been timely, is that there was a lot of orders going out, and they were, there was a long time a period of things going back and stop. And I can report today that as things are coming in, we are getting our numbers. Not all of them close, but we were getting our numbers, and I was, and that was something that I was hoping that we wouldn't have a problem with is making sure that we have the PPE equipment for the safety of the poll workers and end voters, you know, the community, as well. But I'm very happy to report that then, with almost every other day we're getting things in now before it was just a little box or two. But, yeah, those things have changed and I'm happy to report that and has increased.

**Dan Richardson** 41:0[CGG]And so, board members I want to just point out two things. One is on the state call today. They did make an announcement that counties that were in need, is that they can make a request and **the state would distribute some protection equipment, they did not know the exact numbers**, because they need to receive the request to determine how much they were able to fulfill. They did make a point and wanted to be very clear that **this responsibility resides at the county level**. The state is just trying to facilitate the process to make sure that everyone have what they need. In addition to that, I have been conversing with Madam Director and I sent an email this morning to a local supplier. That's actually **Global Watchdog, Incorporated**. They will be able to provide hand-held

thermometers, gloves, lint-free alcohol wipes, hand sanitizers, and face shields and masks to include the N95 masks, if we feel that there's a need.

Exhibit 9

**Henry County Board of Elections Meeting**
**May 2020 meeting**

**Ameika Pitts** 22:24
That is potentially part of the issue – it's two things that we really need to push.
Drop off was the spike up this week but as well as I had applications come into my
inbox. And it took a minute with a few trial and errors with it for us to work out
how to get them from my inbox, so that the staff can have access to them. And as
of this morning when I talk with them. We have taken care of those. Those have
been broken down and being processed as we speak, and also the state did inform
us that the vendor that is sending out the ballots –I was, if I remember correctly –
they're anywhere from two to three weeks being behind. So that is also some of the
reasoning why some of them have not been reached. Okay. So, in terms of us,
when we say that we brought in additional people do we need to bring in more? Or
are we adequate? I feel that we're  adequate at a time because I feel like we are …
we're at the brim of what we need to have and as far as space. Um, and so that's
why I said I'm hoping that adding more people to our process of what we're doing
to get them done. I'm hoping to this will bump up the percentage, and then if not
then I do have other plans that I want to introduce to the staff to get things rolling a
little bit faster.

**Dan Richardson** 24:01
So, okay, okay. I think, I think we definitely need to do whatever we need to do to
get that number up. Initially, because I, I wrote it down. And I thought that I heard
6.63, and, I was hoping that I heard 66%, and to just be very honest with you, I
would have thought that the 66% would have been a lot. So I'm really concerned
about where we are. And I think that we need to make sure that we're pulling out
all the stops to get where we need to be. But my question along those lines are,
what should be our official communication to the citizens who are contacting
myself and other board members and trying to contact the office, regarding the
status of their ballots?

**Ameika Pitts** 24:58
Well one of the things and one of the questions that have been asked a lot is one of
the ones that you say that they have said at some time back and they haven't heard

anything, um, that reasoning is like I said from getting information from our emails as well as the massive amount that comes in the breakdown of getting everything prepared to process. It is just – it is a process. And then second question that has been really big is, if a spouse receives their ballot, and the other spouse has not, and they sent it at the same time. And that, not to look at, you know, lie blame with anyone because first thing we would do is to check and make sure that they've been entered. And if they've been entered, we just explain to them at that point that it goes with state vendor pulling those and sending those out and we do let them know that you know staying informed us that they're behind, and then also the mail system. There's nothing that we do with Postal Service making sure that they get things. And as they say, they send out the same time they feel like they should get it back at the same time and we just advise them to give it a couple days because if we cancel them, and reissue – which is some of the things that some people have mentioned – it just puts them back at the end. And so we try to ask them to the best of their patience ability to give it a couple of days, but sometimes soon as they do that, it shows up within a day or two. And now, they can't use that because that one has been cancelled and re-issued. So those are the two biggest issues that we're having as far as that and questions and …

**Dan Richardson**  26:41
Okay, so the thing is, I was I was on the state call today. And I know previously they had talked about the non-receipt, or not non-receipt – sorry, the ballot tracking that's going to be available, and they had hopes that reporting for that would be up as early as this afternoon. Will that help us? In the case where the ballots have been requested? And it perhaps is in the mail process, and it's my understanding with this ballot tracker, they will be able to determine if that ballot is out on a mail delivery for today, or whether it's sitting in a post office. Is that, is that correct?

**Ameika Pitts**  27:24
[CGG]That is my understanding and I am waiting to get official communication from them, explaining this. That was something that was not aware they were doing, of course, and that would be helpful. We have been advising people to check in MVP, and keep an eye on that because not only does it tell you where your ballot is, if your ballot has been mailed out, or has your application to received? It also lets you know once you complete your ballot in the middle of the

end that the office has proceeded so that that's one of the things that I have been pushing, but when they explained that this morning. I am excited about finding out exactly how all that's gonna take place. But that is my understanding. It's supposed to be a little bit more detailed. It will be giving us a true tracking.

Exhibit 10

 Marks Declaration
Exhibit 10

**May 7, 2020 Faith and Freedom Coalition of Georgia**

Rep. Cantrell:

But if you apply for you got your absentee ballot, but then you decide you want to vote in person. Did y'all talk about?

Sec. Raffensperger:
No, we didn't, but that's a good question. I've been telling people to bring the ballot with them. They have to otherwise it's going to be counted. Otherwise, it gets counted as it's been cast. So please, if you decided to want to change your mind, you have to bring it with you. And then you can decide to drop it in there or it's up to you how you want to handle that But without bringing it there. That's the situation that we have right now. So that's good advice. Thank you, Representative Cantrell.

Exhibit 11

**Forsyth Board May Meeting:**

**Mandi Smith**  58:26

Well, it is what it is, to some extent, I mean, but in terms of limiting the number of people, I mean, that's going to play in. So if we say we're only going to have four or five poll workers, then we can go back and look at the list and see if we can get maybe assistant managers who are willing to step up and be a manager, but at a different polling place. You know, we might have some folks to, to leave their normal polling place where they're assigned because if it's limited we can have enough we can still sprinkle in our more experienced poll workers with our less experienced poll workers. We have had folks reach out. I know the state has had a big push and a big campaign for folks who are interested in being a poll worker, particularly those folks who do work within those categories that they're still saying are in high risk. We're interested. We've not pursued that too much, because we're waiting to see some direction from you guys. And at the end of the day to get, if that's brand new people, at least – Yeah, we have a process. We sort of vet people when we have our meet and greets. We have training. You know, these will be brand new people with very limited training. So we're going to have to still pair them with some sort of experienced poll worker. We know gobs, you can't just be thrown out to the curb. There's a lot more to it, to being a poll worker. It's a very big responsibility. And I know they all take it very seriously. And they're there to do a great job. So circling back around, and it all kind of plays in together. So depending upon how many workers in general we want to get these polling place, then that also lends itself to **how much equipment do you put out**? We know and we've had many discussions about the challenges we were facing with meeting the rule when it comes to you know, **a piece of equipment for every 250 voters**. **There is no way you can do that and maintaining social distance** and, and and make sure that you know, there's there's room enough to keep people apart from each other. So the issue becomes, "how many to put in any given room?" It's like, okay, so say you have five machines. Well, then you have the potential of having five voters. And then and you can't have more than 10 people in the room, as long as it's kept apart from each other. We are familiar with our polling places. And we know how we have very few polling places where you're going to be able to have much more than 10 people in the room and be comfortably kept apart from each other. Right. So I'm sorry, what are your thoughts on?

**Barbara Luth**  61:42

Well, I think for that last week, we're going to have to open more sites if we can, but they're going to be limited. **We're not going to be able to put the amount of equipment out there that we normally put** – which, in essence is sort of good because you don't have to test it. You know, get what I'm saying, if we can only put I mean, if we can't put 20 machines someplace because we can't social distance, then we're gonna have to figure out how many we can put in. And still, especially for advanced voting. **I know we're gonna have to do for Election Day, too.** But for advanced voting, we're going to have to do that too. So we're gonna stay the first two weeks in our office, which is going to be a challenge anyway, because of using the office for other things.

**Matthew Blender** 62:39
Mandi?

**Mandi Smith** 62:41
Yes.

**Matthew Blender** 62:45
In general terms, because of the social distancing that's required, in any polling place, **we're going to have to cut back on the amount of equipment by about 50%**. Would that be a fair statement?

**Mandi Smith** 63:00
I think 50% honestly. Yes.

**Matthew Blender** 63:06
So among the advanced voting locations other than the office It seems to me that that Sharon and Midway are real – gonna be real choke points in that regard. Are we going, are we going to get the bigger room at the Hampton Library? That's …

**Mandi Smith** 63:31
Right. We were on track for the big room and for Hampton Library all year. So that's not an issue. Yeah. And I will I will put out there for your consideration. And I mean, we've given thought, and of course, nothing is set in stone, but in terms of how to use our office and for the first place that will open … Obviously, we've got our room, I'm gonna empty, shifting people. either, because right now, that's where we have people working on missing applications. **But some things to think about are the fact that in terms of maintaining the line, we know they can go out our door, down the side of the building on the sidewalk, we can have a poll worker keeping it so that they don't go across the road. They can then go up the sidewalk, back toward the tax commissioner's office. And frankly, they could go back down on the sidewalk all the way to town if they needed to. Comfortably park down the sidewalk.** It's not funny. Like the lines when you go to the grocery store.

**Joel Natt** 64:45
more tape across the sidewalk and six feet markers so that people know how to step up to here. Exactly.

## Effingham County Board Meeting

**Olivia Morgan** 06:19
Yes, yeah. So it makes it more complex. And then we're also limited to, you know, based on the 10 people per room guideline, that makes it more difficult. We've posted

notices about each of the rooms where voting will be taking place at, and they will be monitored by staff. We set up a PPE table in the waiting area leading into the voter check-in room, the signage, encouraging voters to use them. Hopefully they'll use them before they even start, you know, we'll have gloves and sanitizer. We're limiting it to get bought food and handling gloves, one per voter. We are limited to four voters in the check-in room at one time since we we have to have five to six staff members in there to process everybody. Also in the voting room. with maintaining the six foot I could only fit 7 BMDs back there, For the last election the march election we had 12 so that cuts back on how many people can be voting at one time. Also including an area where 4 additional voters can wait in line at the scanner and still maintain the six feet. We will still have the ballot review station setup since it will be a very long ballot and it prints on both sides of the paper. Voters should take advantage of that and definitely use the review station. Hopefully they will. Based on the limitations I expect that early voting process will be quite a bit slower than usual and lines will be longer than usual. And Laura correct me if I'm incorrect. Review of absentee ballots. Over 7000 absentee ballot applications have been processed and we are still receiving daily by mail and email and people dropping them off. Over 1000 completed ballots have been received. We're still using our mailbox as an after hour Dropbox. We have a ballot box in front of Sharon's desks for voters to walk in and drop their ballots in. Also, since the states contracted with a third party to mail ballots, we have become aware that instead of including an inner white envelope inside of the ballot assembly they did sent a secrecy sleeve, which is essentially a piece of paper. And then instructions still say an envelope for that. Confused a lot of our voters. I did post information about it on our website. It's on the initial homepage on our page and then it also is included on our phone menu message now to instruct voters how to use this. And for any of you that didn't get a ballot, or so you'll know, it's just you fold your ballot, put it inside. Fold the sleeve and then you don't have to seal it or anything and we prefer that they don't because that's going to take the absentee crew a lot longer to get them back open on election night. And then just put it inside of the oath envelope like they normally would. Also due to the applications being sent out by the state, there were over 2000 voters on the rollover list. So that means that we will have to mail over 2000 ballots out as soon as possible for the runoff election. We do not believe at this time the state is going to use the vendor for the runoff so that means we have to mail it all. Also we received a lot of calls from voters that said they received their ballot but they have decided they want to vote in person instead. We are asking that voters bring their ballot to the office to have it canceled, or they will need to bring it with them to the polling place on election day to have a canceled. If they never received their ballot, then they will have to complete a cancellation affidavit in order to vote. That kind of helps us out where every single person, you know, if they're bringing back a ballot, and you can determine, "Yes, this is you and this is your ballot that you're trying to cancel," then they can skip the step of calling us with every single voter for us to check. So that'll free up us on election day. But we have specific procedures for them to follow for that. We know. And this could also you know, we all probably have a lot of people doing that for early voting too. But that's gonna slow down things because there's paperwork involved. We've got to check things to cancel those ballots. For Election Day, I purchased face masks, latex gloves and hand wipes for thePoll Pad table. We will also have disinfectants to sterilize the machine. For anybody

who doesn't, you know want to use the sanitizer or the gloves we will still be sanitizing the machine. They're also faced with some difficulty with determining how to follow the law and also the social distancing guidelines in regards to the equipment. By law we are required to send out one BMD per 250 registered voters per precinct. To see Bible Lutheran which is our largest polling location in regards to voter registration number. They would require 16 BMDs. It is just not possible to set up 16 BMDs. The scanner and security barrier, and maintain social distancing guidelines and also have not more than 10 people in enclosed area in the public area. Trying to get guidance from the state. The counties haven't received any. They're pretty much saying, "Contact your county attorney. Contact your health department," so, haven't gotten anything. So in an effort to comply with the law and guidelines, we will be instructing each polling location to post a "space enclosed" notice on every other BMD that cannot be separated by six foot either by room constraints, electrical constraints or exceeding the 10 people within the enclosed space. But the ADA acessable unit will always be open. If a location can accommodate the guidelines and have all the, all the BMDs available then they will. Sharron and Brandon the new tech and I will be going to every polling location on delivery day to double check after the delivery crew and mark official distance for the polls and try to set up the room to accommodate social distancing guidelines. Election Day We will have additional phone support here at the office. We will have five additional poll workers assisting with the phones and the voters walking into needing to know where they go vote at office staff will be handling the more difficult calls and Brandon will be assisting with any equipment calls from the polling location for election night, Laura will definitely need a larger crew and we will begin the absentee process early. We haven't determined a specific time yet we'll wait till we get a little closer and see exactly how many ballots we have. Of course, no results will be tabulated until after seven but the process of opening only envelopes and counting them into batches to be scanned will be very time consuming. The voting room will be transformed into the tabulation and public viewing room. We will have the projector setup to display results as they're uploaded and a seating area for candidates to public.



Exhibit 12

# APPENDIX – CONTINGENY ELECTION PLANNING COVID-19

Due to the current COVID-19 pandemic, the Athens-Clarke County Board of Elections proposes the following contingency plan for the June

9, 2020 Primary Election.   This document should serve as an outline for that plan to include the following:

1. Athens-Clarke County List of Polling Locations
2. Current Condition – How did we get here?
3. Condition requirements under Federal Guidelines.
4. Alternative Polling locations in the event of the pandemic.
5. Election workers shortage/requirement for the plan.
6. Sample of plans and alternatives.
7. Supplies and assistance needed to carry out the plan.
8. Maps, drawings and set-ups to carry out the plan.
9. Absentee Voting process and contingency plan.
10.    Sanitation Practices for use under COVID-19 conditions at the polling locations.

 The purpose of the Contingency Plan is to set the processes to carry out during Elections during the COVID-19 pandemic or other incidents, which may inhibit the department from serving the public and/or conducting an election.

As we are hopeful that we will be able to proceed with use of all 24 polling locations, we must prepare for the foreseeable.

*Draft Revised May 13, 2020*

THE UNIFIED GOVERNMENT OF ATHENS-CLARKE COUNTY, GEORGIA
OFFICE OF THE BOARD OF ELECTIONS & VOTER REGISTRATION
P. O. Box 1828 • Athens, Georgia  30603          (706) 613-3150 • Fax (706) 613-3840
www.accgov.com

1 | P a g e

# ATHENS-CLARKE COUNTY POLLING LOCATIONS & ADDRESSES – 2020 GENERAL PRIMARY ELECTION

| Precinct Name | POLLING LOCATION | ADDRESS |
|---|---|---|
| 1A | WINTERVILLE TRAIN DEPOT | 125 N Church Street; Winterville 30683 |
| 1B | ACC TENNIS CENTER * | 4460 Lexington Road; Athens 30605 |
| 1C | BARNETT SHOALS ELEMENTARY SCHOOL * | 3220 S Barnett Shoals Road; Athens 30605 |
| 1D | WHIT DAVIS ELEMENTARY SCHOOL | 1450 Whit Davis Road; Athens 30605 |
| 2A | JUDIA J HARRIS ELEMENTARY SCHOOL | 2300 Danielsville Road; Athens 30601 |
| 2B | HOWARD B STROUD ELEMENTARY SCHOOL | 715 Fourth Street; Athens 30601 |
| 3A | CLARKE CENTRAL HIGH SCHOOL | 350 S Milledge Avenue; Athens 30605 |
| 3B | ACC THOMAS LAY PARK | 297 Hoyt Street; Athens 30601 |
| 4A | ATHENS TRANSIT MULTI-MODAL CENTER | 775 E Broad Street; Athens 30601 |
| 4B | ACC MEMORIAL PARK | 293 Gran Ellen Drive; Athens 30606 |
| 5A | OGLETHORPE AVENUE ELEMENTARY SCHOOL * | 1150 Oglethorpe Avenue; Athens 30606 |
| 5B | WHITEHEAD ROAD ELEMENTARY SCHOOL | 555 Quailwood Drive; Athens 30606 |
| 5C | CHASE STREET ELEMENTARY SCHOOL | 757 N Chase Street; Athens 30601 |
| 5D | ACC FLEET MANAGEMENT FACILITY | 255 Newton Bridge Road; Athens 30607 |
| 6A | CLEVELAND ROAD ELEMENTARY SCHOOL | 1700 Cleveland Road; Bogart 30622 |
| 6B | GA SQUARE MALL UPPER LEVEL, **NEAR SEARS** (as of 6/9/2020) | 3700 Atlanta Highway; Athens 30606 |
| 6C | TIMOTHY ROAD ELEMENTARY SCHOOL | 1900 Timothy Road; Athens 30606 |
| 6D | FIRE STATION #4 OGLETHORPE AVENUE | 900 Oglethorpe Avenue; Athens 30606 |
| 7A | UNITARIAN UNIVERSALIST FELLOWSHIP * | 780 Timothy Road; Athens 30606 |
| 7B | ATHENS REGIONAL LIBRARY (as of 11/18) | 2025 Baxter Street; Athens 30606 |
| 7C | FIRE STATION #3 FIVE POINTS | 1198 S Milledge Avenue; Athens 30605 |
| 8A | GAINES SCHOOL ELEMENTARY SCHOOL | 900 Gaines School Road; Athens 30605 |
| 8B | CEDAR SHOALS HIGH SCHOOL | 1300 Cedar Shoals Drive; Athens 30605 |
| 8C | FIRE STATION #7 BARNETT SHOALS ROAD | 2350 Barnett Shoals Road; Athens 30605 |

(*) New location as of June 9, 2020

# CURRENT CONDITION

## How Did We Get Here?

On March 14, 2020, the Secretary of State's Office announced postponement of the March 24, 2020 Presidential Preference Primary Election, announcing that it will be held in conjunction with the General Primary & Non-partisan Elections scheduled for May 19, 2020.

Then, on April 9, there was an announcement that the General Primary Election is extended to June 9, 2020.

Since March 19, 2020, the Unified Government of Athens-Clarke County is operating under a shelter in place ordinance and mandated to practice social distancing by limitations of less than ten gathering.

Due to the mandates placed on our jurisdiction and the status of COVID-19, this office has implemented the challenges, strategies, needs and requirements listed in this document.

On pages 5-8, we are providing the criteria that we will follow if the crisis has not improved by May 10, 2020 as it relates to our Advance Voting locations.  Advance Voting will begin on Monday, May 18, 2020 at the Board of Elections Office.


**REMEMBER, PERSONAL HYGIENE AND SAFETY IS IMPORTANT!**

# CONDITIONS REQUIRED UNDER GEORGIA STATE GOVERNOR KEMP'S EXECUTIVE ORDER,

## MARCH 14, 2020

## State of Georgia Executive Order:

Code Section 38-3-51(c)(4) vests the Governor with the powers and duties to promote and secure the safety and protection of the civilian population.

1. No county shall allow more than ten (10) persons to be gathered at a single location if such gathering requires persons to stand or to be seated within six (6) feet of another person. (so ordered)
2. BOE "Critical Infrastructure" shall implement measures which mitigate the exposure and spread of COVID-19 among its work force. (so ordered)
3. Screen workers who exhibit signs of illness such as fever, cough, or shortness of breath. (1, critical infrastructure)
4. Require workers who exhibit signs of illness to not report to work or to seek medical attention. (2, critical infrastructure)
5. Enhance sanitation as appropriate in the workplace. (3, critical infrastructure)
6. Require handwashing or sanitation by workers at appropriate places within the location. (4, critical infrastructure)
7. Provide personal protective equipment as available and appropriate to the function and location of the worker within the location. (5, critical infrastructure)
8. Prohibit the gathering of workers. (6, critical infrastructure)
9. Provide disinfectant and sanitation products to clean the workspace and equipment. (13, critical infrastructure) Prohibiting handshaking and other unnecessary person to person contact. (14, critical infrastructure)
10. Placing notices to encourage hygiene at the entrance of the building. (15, critical infrastructure)

The BOE's priority is protecting the staff and public from disease spread while providing appropriate opportunities to carry out a citizens' civic right to cast an in-person ballot during the Advance Voting period and at the polling locations on Election Day.

# ADVANCE VOTING (Three weeks prior Election Day)
## Dates:  Monday, May 18 – Friday, June 5, 2020
## Location:  Board of Elections Office
## 155 E Washington Street; Athens, GA 30601

| Challenge(s) | Strategy | Supplies Needed | Assistance Required |
|---|---|---|---|
| <ul><li>Minimal staff</li><li>Maintain less than 10 people in the space at a time.</li><li>Voters will remain in vehicles until instructed to enter the building.</li></ul> | <ul><li>Implement a system of car lines/parking (refer to voting route attached)</li><li>Maintain a minimum of four staff positions outside the voting area (in our cubicle workstation and offices behind locked access doors).</li><li>One elections clerk fielding phone calls/questions and performing daily work will operate the office. The remaining three are Director Charlotte Sosebee, Elections Assistant Pamela Long, and Administrative Assistant Aletha Perkins; three BOE staff will serve as Poll workers operating the Advanced Voting Location – a manager and two assistant managers needed, by law, to staff a polling location. Two will perform the function of check in. One will operate the tabulator and assist voters when necessary.</li><li>This leaves space for three voters in the office at a time.</li><li>One poll worker will operate the door and direct the controlled entrance and exit of voters.</li><li>ACC Gov. Employees from other departments will provide needed personnel (number undetermined) to manage the car line along Washington Street and through the downtown parade route for as far as cars extend.</li><li>We will allow occupants of the lead car into the office to vote. The occupants of additional cars will also enter the office at the same time if the total number of voters inside the office is less than the maximum of three (allowing for those who require/bring assistance).</li><li>Voters who arrive on foot – we will mark 6 feet spacing on the ground with tape to maintain social distancing.  The voters will be interspersed/alternated with the car riders lined up to vote.</li><li>Voters will receive items for proper protection/sanitation upon entering the office to dispose of such items upon exit.</li><li>Between each round of three voters, (only three units provided for voting) staff will sanitize all equipment by wiping with alcohol wipes or some version thereof.  Poll Workers will wear proper PPE at all times.</li></ul> | <ul><li>Gloves</li><li>Masks</li><li>Tissue to wrap & transfer DLs to poll worker</li><li>Hand sanitizer</li><li>Alcohol wipes</li><li>Other recommended supplies</li><li>ACC Gov. or BOE must procure & provide Bio-waste disposal containers/bags and dispose of bags in the proper manner.</li></ul><br>**Equipment Needed**<br><ul><li>3 BMDs – one ATI</li><li>2 UPSs</li><li>1 ICP tabulator</li><li>2 Poll Pads</li><li>2-25ft extension cords</li><li>Provisional Ballot Area & Magnifying Station</li><li>Voter's Certificates</li><li>Advanced voting paperwork</li></ul> | <ul><li>Directing traffic and car line</li><li>Placing directional signs, cones, etc. directing traffic along parade or alternate route</li><li>Delivery of elections equipment on 5/15, Friday before Advanced Voting begins</li><li>Pick up of elections equipment after 5:30pm on 6/5.</li></ul> |

## Location:  Miriam Moore Community Center
## McKinley Drive; Athens, GA 30605

| Challenge(s) | Strategy | Supplies Needed | Assistance Required |
|---|---|---|---|
| • Minimal staff<br>• Maintain less than 10 people in the space at a time.<br>• In order to maintain social distancing we will allow three voters in the room at one time.<br>• The parking lot is shared with East Athens Health Department. They will need access to parking spaces for their patients. Confirm with the two offices (East Athens Development Corporation and the Health Department) how many parking spaces are available for the use of voters. | • Six poll workers will staff this location; one will direct entrance and exit of voters at the outside door; Manager will perform his/her poll management duties; two will operate check in stations; one will roam the room to address questions and provide assistance.<br>• This leaves space for four voters.<br>• Voters enter the voting space through the interior door and exit the exterior door into the parking lot.<br>• ACC Gov. Employees will use numbering system such as laminated numbered 8x11 cards placed on the windshield that voters return as they enter the building (or a worker retrieves from the car to avoid passing contact with voters). This will designate the voting order.<br>• Place signs to direct cars to enter the parking lot from the left side of McKinley Drive and exit out to the right.<br>• If a line forms there will be a plan to keep the cars from blocking the spaces in front of the Athens' Neighborhood Health Center located nearby on McKinley.<br>• We will direct voters in need of an ADA access to park in spaces nearest the building entrance and allowed to go inside at the earliest available time.<br>• Hold at least one space open on the side of the building for an ADA voter's arrival, at all times.<br>• Voters who arrive on foot – we will mark 6 feet spacing on the ground with tape to maintain social distancing.  The voters will be interspersed/alternated with the car riders lined up to vote.<br>• Voters will receive items for proper protection/sanitation upon entering the office to dispose of such items upon exit.<br>• Between each round of three voters, (only three units provided for voting) staff will sanitize all equipment by wiping with alcohol wipes or some version thereof.   Poll workers will wear proper PPE at all times. | • Gloves<br>• Masks<br>• Tissue to wrap & transfer DLs to poll worker<br>• Hand sanitizer<br>• Alcohol wipes<br>• Other recommended supplies<br>• ACC Gov. or BOE must procure & provide Bio-waste disposal containers/bags and dispose of bags in the proper manner.<br><br>**Equipment Needed**<br>• 3 BMDs – one ATI<br>• 2 UPSs<br>• 1 ICP tabulator<br>• 2 Poll Pads<br>• 2-50ft extension cords<br>• 1 ADA Height table<br>• Provisional Ballot Area & Magnifying Station<br>• Voter's Certificates<br>• Advanced voting paperwork | • Directing cars to park in the appropriate parking spaces and using the laminated cards to "line up" voters.<br>• If needed, directing traffic line from McKinley Drive into the parking lot and directing exiting traffic to turn right onto McKinley Drive for safe exit.<br>• Placing signs leading to the beginning point on McKinley Drive and down both roads leading to McKinley. Place signs for NO ENTRANCE and NO EXIT at the proper points on McKinley Drive, properly leading traffic to and away from the parking lot.<br>• Delivery of elections equipment on 6/1, Friday before Advanced Voting begins at this location.<br>• Pick up of elections equipment after 5:30pm on 6/5. |

## Location:  ACC Regional Library
## Baxter Street; Athens, GA 30606

| Challenge(s) | Strategy | Supplies Needed | Assistance Required |
|---|---|---|---|
| • Minimal staff<br>• Maintain less than 10 people in the space at a time.<br>• In order to maintain social distancing we will only three voters in the room at one time. | • Consisted of eight workers, one worker who will direct entrance and exit of voters at the outside door will staff this location; one will remain in lobby area to manage social distancing and direct voters into meeting room where voting will is held. This person will be responsible for alerting door attendant of the number of voters to let inside the building at any given time.<br>• Staff consists of a Manager, who will perform his/her poll management duties; three who will operate check in stations; one will operate the tabulator; one will roam the room for questions and assistance.<br>• Voters enter the voting space through the interior door and exit the exterior door into the parking lot.<br>• ACC Gov employees from other departments will provide needed personnel (number undetermined) to manage the car line around the parking lot to the library front entrance.<br>• Utilize the large number of parking spaces instead of forming a line. Direct cars into predetermined order of spaces.<br>• Use numbering system as alternative to line, such as laminated numbered 8x11 cards placed on the windshield that voters return as they enter the building (or a worker retrieves to avoid passing contact with the voter).<br>• Voters requiring ADA entrance ramps or assistance will be directed to drive up to the building entrance and allowed to go inside at the earliest available time.<br>• Occupants of the lead car will be allowed into the building to vote. The occupants of additional cars may be allowed inside at the same time if the total number of voters inside the meeting room is less than the maximum of four.<br>• Voters who arrive on foot, will be directed by the outside poll worker to line up in designated area. Mark six foot spacing on the ground to maintain social distancing. The voter's will be given interspersed/alternated with and overflow car riders sent up the steps to vote.<br>• Voters will receive items for proper protection/sanitation upon entering the office to dispose of such items upon exit.<br>• Between each round of three voters (only three units provided for voting), staff will sanitize all equipment by wiping with alcohol wipes or some version thereof.   Poll workers will wear proper PPE at all times. | • Gloves<br>• Masks<br>• Tissue to wrap & transfer DLs to poll worker<br>• Hand sanitizer<br>• Alcohol wipes<br>• Other recommended supplies<br>• ACC Gov. or BOE must procure & provide Bio-waste disposal containers/bags and dispose of bags in the proper manner.<br><br>**Equipment Needed**<br>• 4 BMDs – one ATI<br>• 2 UPSs<br>• 1 ICP tabulator<br>• 3 Poll Pads<br>• 2-50ft extension cords<br>• 1 ADA Height table<br>• Provisional Ballot Area & Magnifying Station<br>• Voter's Certificates<br>• Advanced voting paperwork | • Directing traffic and car line<br>• Placing signs directing traffic on appropriate path around the Library parking lot<br>• Delivery of elections equipment on 6/1, Friday before Advanced Voting begins at this location<br>• Pick up of elections equipment after 5:30pm on 6/5. |

# Location:  Cooperative Extension Office
# Athens, GA 30606

| Challenge(s) | Strategy | Supplies Needed | Assistance Required |
|---|---|---|---|
| • Minimal staff<br>• Maintain less than 10 people in the space at a time.<br>• In order to maintain social distancing we will only allow three voters in the room at one time. | • Six poll workers will staff this location; one will direct entrance and exit of voters at the outside door; Manager will perform his/her poll management duties; two will operate check in stations; one will roam the room to address questions and provide assistance.<br>• This leaves space for four voters.<br>• Voters enter the voting space through the interior door and exit the exterior door into the parking lot.<br>• ACC Gov. Employees will use numbering system such as laminated numbered 8x11 cards placed on the windshield that voters return as they enter the building (or a worker retrieves from the car to avoid passing contact with voters). This will designate the voting order.<br>• Place signs to direct cars to enter the parking lot.<br>• If a line forms there will be a plan to keep the cars from blocking the spaces in front of the Cooperative Extension Office.<br>• We will direct voters in need of an ADA access to park in spaces nearest the building entrance and allowed to go inside at the earliest available time.<br>• Hold at least one space open on the side of the building for an ADA voter's arrival, at all times.<br>• Voters who arrive on foot – we will mark 6 feet spacing on the ground with tape to maintain social distancing.  The voters will be interspersed/alternated with the car riders lined up to vote.<br>• Voters will receive items for proper protection/sanitation upon entering the office to dispose of such items upon exit.<br>• Between each round of three voters, (only three units provided for voting) staff will sanitize all equipment by wiping with alcohol wipes or some version thereof.   Poll workers will wear proper PPE at all times. | • Gloves<br>• Masks<br>• Tissue to wrap & transfer DLs to poll worker<br>• Hand sanitizer<br>• Alcohol wipes<br>• Other recommended supplies<br>• ACC Gov. or BOE must procure & provide Bio-waste disposal containers/bags and dispose of bags in the proper manner.<br><br>**Equipment Needed**<br>• 4 BMDs – one ATI<br>• 2 UPSs<br>• 1 ICP tabulator<br>• 2 Poll Pads<br>• 2-25ft extension cords<br>• 2 tables; one being an ADA Height table<br>• Provisional Ballot Area & Magnifying Station<br>• Voter's Certificates<br>• Advanced voting paperwork | • Directing cars to park in the appropriate parking spaces and using the laminated cards to "line up" voters.<br>• If needed, directing traffic line from Cleveland Road and directing exiting traffic for safe exit.<br>• Placing signs leading to the beginning point on Cleveland Road leading to Cooperative Extension's entrance. Place signs for NO ENTRANCE and NO EXIT at the proper points on McKinley Drive, properly leading traffic to and away from the parking lot.<br>• Delivery of elections equipment on 6/1, Friday before Advanced Voting begins at this location.<br>• Pick up of elections equipment after 5:30pm on 6/5. |

# ELECTION DAY VOTING

The Combined Presidential Preference Primary (PPP), General Primary and Non-partisan Elections will take place on June 9, 2020. It remains indefinite as to whether the State will continue under shelter in place orders or if the crisis will have abated. Because of these unknown factors, many of our precinct locations are not available for use unless the crisis has passed and the State and/or County reopens the buildings.

Five locations have indicated they will allow us into the building to hold this election. The remaining 19 are closed or hesitant under the current situation.

In addition, every operating location will follow the listed options provided in this document, listed as option #1, 2 or 3.

**Note:**  All operating locations will serve as an **Absentee Drop-Off Location** from 7am to 5pm on Election Day. At 5:30pm, a member of the Board of Elections will collect the Absentee Ballots and deliver to the tabulation location, 2555 Lexington Road, to the Absentee Ballot Team.

We will implement the following plans if the crisis has not improved by June 1, 2020, incorporating the continued process of proper hygiene and social distancing mandate as noted on pages 23-26 of this document.  We will operate with using all of our current 24 polling locations listed on page 2.

We will make clear indication of the 6-feet barrier per person by placing marks on the floor/ground at each location where lines are formed.

Listed are three options for voting on Election Day as it relates to loss of locations. State Law provides guideline related to emergency polling locations, shown on page 10 to support options listed in this document.

Directions and information leading up to Election Day will be posted on the home page of our website, our Face Book page; include a Legal Notice in the paper and share with all media circuits.

# OFFICIAL CODE OF GEORGIA ANNOTATED

## O.C.G.A. §21-2-265

(a)  The superintendent of a county or the governing authority of a municipality shall select and fix the polling place within each precinct and may, either on his, her, or its own motion or on petition of ten electors of a precinct, change the polling place within any precinct. Except in case of an emergency or unavoidable event occurring within ten days of a primary or election, which emergency or event renders any polling place unavailable for use at such primary or election, the superintendent of a county or the governing authority of a municipality shall not change any polling place until notice of the proposed change shall have been published for once a week for two consecutive weeks in the legal organ for the county or municipality in which the polling place is located. Additionally, on the first election day following such change, a notice of such change shall be posted on the previous polling place and at three other places in the immediate vicinity thereof. The occupant or owner of the previous polling place, or his or her agent, shall be notified in writing of such change at the time notice is published in the legal organ.

(b)  Except in case of an emergency or unavoidable event occurring within ten days of a primary or election, which emergency or event renders any polling place unavailable for use, if a petition is presented to the superintendent of a county or the governing authority of a municipality on or before the day set for hearing of the petition for change of a polling place, signed by 20 percent of the electors of the precinct objecting to the proposed change, such change shall not be ordered.

# OPTION #1

## Combined Election Day Locations

### Challenge/objective:

A. Three of the locations that are open are large enough to accommodate two or more precincts.
B. Four of the locations in maybe/hold status are large enough to accommodate two or more precincts.
C. After combining as many as possible, four of our largest precincts would remain at their current locations. These will be set up to vote outside the buildings, under cover near the school entrances. There would need to be a contingency plan for inclement weather.

| LOCATION | STRATEGY | VOTERS |
|----------|----------|--------|
| 7B – ACC Library | Service three precincts. As of 4/5/2020, the Library has confirmed availability. Use meeting rooms #1 through 3 with partitions. Utilize the same social distancing and parking/car loop plan developed for Advanced Voting. | 7B – ACC Library<br>3A – Clarke Central HS<br>5A – Oglethorpe Ave School |
| 4B – Memorial Park | Service two precincts. As of 4/5/2020, Memorial Park has confirmed availability. Use main room and meeting room to separate precincts. Utilize similar plan as developed for Advanced voting at the Library with car loop or designated parking spaces with ACCGov employees directing traffic flow. | 4B – Memorial Park<br>(voters use Community Rm)<br>7C – Fire Station #3 at Five Points<br>(voters use the Meeting Rm) |
| 3B – Thomas Lay Park | Service three precincts. As of 4/5/2020, Thomas N. Lay Park has confirmed availability. Use first floor meeting/lunch room and gym. Divide Gym space into two precincts. Use designated parking spaces in lot across the street with ACCGov employees directing traffic flow. | 3B – Thomas N. Lay Park<br>(1/2 gym)<br>4A – Multi Modal Transit Center<br>(1/2 gym)<br>5C – Chase Street School<br>(Room) |

# OPTION #1 (cont'd)

## Combined Election Day Locations

| LOCATION | STRATEGY | VOTERS |
|---|---|---|
| 6B – Georgia Square Mall | Service three precincts. As of 4/5/2020, Georgia Square Mall is completely closed; but, with hesitation, will open the community room where 6B precinct is located. There are empty stores and common spaces that could house at least two more precincts if the management allows and sufficient electrical are available. Use Community Room for 6B and additional stores/open spaces as guided by mall management to house two additional precincts. Due to the size of the building, managing the flow of people and directing to correct area of the mall will be a challenge. It will require and undetermined amount of help from ACC Gov. Employees, stationed in different sections of the mall to direct voters. Place signs to direct traffic of each precinct to correct entrance and closest parking. Control social distancing once voters are inside with 6 foot spaces marked with tape, on the floor at the entrance to each precinct area. | 6B – Georgia Square Mall 6A – Cleveland Road School 5B – Whitehead Road School |
| 7A – Unitarian Universalist Fellowship | Service two precincts. As of 4/5/2020, Unitarian Universalist is currently closed to public gatherings. Though staff is concerned and hesitant, the church will open if the pandemic does not worsen. Use the lobby area for 7A. There is a medium size meeting room near the lobby that can be used for another small precinct. Utilize the designated parking plan similar to Advanced voting at the Library with ACC Gov. Employees directing traffic flow. | 7A – Unitarian Universalist Fellowship (Lobby) 6D – Oglethorpe Fire Station # 4 (Meeting Room off of Lobby) |

# OPTION #1 (cont'd)

# Combined Election Day Locations

| LOCATION | STRATEGY | VOTERS |
|---|---|---|
| 1C – Barnett Shoals Elementary | Service two precincts. As of 4/5/2020, none of the CCSD buildings are available for use. Operations states that the schools are closed to the public. If direction from the State/County changes, they will reevaluate. This plan is implemented ONLY if CCSD allows us to utilize a few of the buildings to consolidate precincts. Use the cafeteria divided into two sections. There is the possibility of requesting the gym or a resource room for the second precinct. Allow cars to park as they please, use social distancing plan, marking 6 ft spaces on the floor with tape. Utilize ACC Gov employees to direct and control the flow of voters into the line and exiting the building to maintain safe distance from one another. | 1C – Barnett Shoals School 8C – Barnett Shoals Fire Station # 7 |
| 1D – Whit Davis Elementary | Service two precincts. As of 4/5/2020, none of the CCSD buildings are available for use. Operations states that the schools are closed to the public. If direction from the State/County changes, they will reevaluate. This plan is implemented ONLY if CCSD allows us to utilize a few of the buildings to consolidate precincts. Divide the gym into two spaces or request another room to use for the second precinct. Allow cars to park as they please, use social distancing plan, marking 6 ft spaces on the floor with tape. Utilize ACC Gov employees to direct and control the flow of voters into the line and exiting the building to maintain safe distance from one another. | 1D – Whit Davis School 8B – Cedar Shoals HS |

# OPTION #1 (cont'd)

## Combined Election Day Locations

Here is one precinct who will serve only its voters:

| LOCATION | STRATEGY | VOTERS |
|---|---|---|
| 6D – ACC Fleet Management (One precinct) | As of 4/5/2020 is available if necessary. Mr. Saunders, rightly so, would like to tour the location with our staff to go over procedures to protect the public and workers.  If the operations are closed that day, utilize all of the parking for voters with designated parking spaces. ACC Gov. employees will direct parking and send voters inside the building, controlling specified number they send inside at one time. | 6D – ACC Fleet Management |

Here are two precincts that are open, but not large enough or in optimal locations to house another precinct:

| LOCATION | STRATEGY | VOTERS |
|---|---|---|
| 1A – Winterville Train Depot | As of 4/5/2020, Winterville Train Depot is available for use.  Utilize designated parking plan developed by Advance Voting.  ACC Gov. employees will help with traffic flow. | 1A – Winterville Train Depot |
| 1B – ACC Tennis Center | As of 4/5/2020, ACC Tennis Center is available for use.  Utilize designated parking plan developed for Advance Voting.  ACC Gov. employees will help with traffic flow. | 1B – ACC Tennis Center |

**Note:**  Four of the largest precincts are in schools.  If the buildings remain closed to voting, provisional voting will be set up outside the buildings, under cover near the school entrances.  There will be a need for an additional contingency depending on the weather.  Utilize this plan for designated parking or car loops, depending on the school layout.  ACC Gov. Employees will provide direction for parking or drive through.  Social distancing will be maintained by taping six feet spaces on the ground extending away from the ballot casting/collection area.  Those schools are:

2A – JJ Harris Elementary, 2B – Howard B Stroud Elementary, 6C – Timothy Road Elementary and 8A – Gaines Elementary

# OPTION #2

| LOCATION | STRATEGY | VOTERS |
|---|---|---|
| All Schools (12 of our 24 locations are held in schools) | As of 4/5/2020, none of the CCSD buildings are available for use. Operations states that the schools are closed to the public. If direction from the State/County changes, they will reevaluate. If the situation is the same on Election Day, 5/19, we will implement the following plan - except in the case of inclement weather when additional arrangements will be made.  All school locations will vote using provisional ballots. A voting area will be set up under the covered entrance areas. Car lines or designated parking will be utilized depending on the best plan for each individual school. | 1C – Barnett Shoals School 1D – Whit Davis School 2A – JJ Harris School 2B – Howard B. Stroud School 3A – Clarke Central HS 5A – Oglethorpe Ave School 5B – Whitehead Rd School 5C – Chase Street School 6C – Timothy Road School 8A – Gaines School 8B – Cedar Shoals HS |
| ACC Gov. Properties (Three of our 24 locations are held in an ACC Gov't Building) | **For 5D** – Precinct operates normally inside the building.  Utilize similar plan as developed for Advanced Voting at the Library with car loop of designated parking spaces with ACC Gov. employees directing traffic flow. **For 4A** – Location will close and combine with 3B; this location is closed and has had an employee test positive for COVID-19.  Do not Open.  Send 4A voters to 3B, Thomas Lay Park.  Use the first floor room/lunch space and designated parking spaces in lot across the street with ACC Gov. employees directing traffic flow. **For 7B** – Precinct operates normally inside the building.  Utilize the same plans developed for Advance Voting at this location with car loop or designated parking spaces with ACC Gov. employees directing traffic flow. | 5D – ACC Fleet 4A – ACC Transit 7B – Athens Regional Library |

# OPTION #2 (cont'd)

| LOCATION | STRATEGY | VOTERS |
|---|---|---|
| ACC Parks (Three of our 24 locations are Park Community Buildings) | **For 4B** – Precinct operates normally inside the building. Utilize similar plan as developed for Advanced voting locations with car loop or designated parking spaces with ACC Gov. employees directing traffic flow. <br> **For 3B** – this location with adding the 4A voters, will host 3 locations. 3B Precinct operates normally inside the gym. Due to closure of ACC Multi Modal Transit Center.  4A voters will vote at Thomas N. Lay Park in the first floor room/lunch space. Use designated parking spaces in lot across the street with ACC Gov. employees directing traffic flow and entrance to the building. <br> **For 1B** – Precinct operates normally inside the building. Utilize similar plan as developed for Advanced voting locations with car loop or designated parking spaces with ACC Gov. employees directing traffic flow. | 4B – Memorial Park <br> 3B – Thomas Lay Park <br> 1B – ACC Tennis Center |
| Fire Stations (Three of our 24 locations are Fire Stations) | The fire stations are closed for voting to reduce the risk of additional public exposure to our first responders. All voting at fire stations #3 – Five Points, #4 – Oglethorpe, and #7 – Barnett Shoals will be conducted under the covered entrances to the buildings unless another plan is needed due to inclement weather. ACC BOE or ACC Gov. will provide tents to extend the covered spaces, allowing more room to set up voting areas. Utilize similar plan developed for designated parking spaces with ACC Gov. employees directing traffic flow.  Sidewalks/parking lot is marked with tape, designating six-foot social distancing spaces for the line toward the voting areas. | 6D – Fire Station #4 <br> 7C – Fire Station # 3 <br> 8C – Fire Station #7 |

# OPTION #2 (cont'd)

| LOCATION | STRATEGY | VOTERS |
|---|---|---|
| Churches (only one of our 24 locations is a church) | This is one of our newest polling locations beginning with the May Primary (unmerging of 6C/7A). Precinct will operate inside the building. Utilize similar plan as developed for Advanced voting locations with car loop or designated parking spaces with ACC Gov. employees directing traffic flow. | 7A – Unitarian Universalist Fellowship |
| Other Locations (Two of our 24 locations are those that are considered other) | **For 6B** – Precinct operates normally in the Community Room on the second floor next to Sears's entrance. Voters follow signs directing them to the space. Floor is marked with tape, designating six-foot social distancing spaces for the line outside the door to the Community Room. ACC Gov. employees help to maintain voter line and direct any voters to the Community Room if needed.<br>**For 1A** – Precinct operates normally inside the building. Utilize similar plan as developed for Advanced voting locations with car loop or designated parking spaces with ACC Gov. employees directing traffic flow. | 6B – Georgia Square Mall<br>1A – Winterville Train Depot |

# OPTION #3

| LOCATION | STRATEGY | VOTERS |
|---|---|---|
| BOE Office<br><br>Athens Regional Library*<br><br>Miriam Moore Community Center*<br><br>Cooperative Extension*<br>*if open allow us entry | To avoid confusion on Election Day, less number of locations is an option, particularly if the locations choose to not open and allow us the space.  We will need additional splitter at Cooperative Extension Office for more use of laptops. All locations currently serve as Advance Voting sites.  We will operate them according to the Advance Voting plans.<br><br>Due to the many resignations of poll workers, many States are relying on their county employees to serve as poll workers.  We will need to train them all virtually.  If we go with this option, our need for workers and health risk to so many workers would greatly reduce. | All ACCUG voters will have the leniency of voting at any of the four locations.  We will need to consider more traffic plans and outside voting possibilities of processing voters and allowing votes on Emergency Ballots. |

Route #1

## Voting Route for COVID - 19 BOE Office & ADA Voters



April 7, 2020

1:2,257

Sources: Esri, HERE, Garmin, FAO, NOAA, USGS, © OpenStreetMap

# DIRECTOR'S RECOMMENDATION

I have shared three options to support the remedy of this pandemic as it relates to the upcoming Election.  It is my recommendation to consider Option #2 where the polling locations are combined, but held in separate rooms at another location.

1. All voters assigned to 6D-Fire Station #4 (Oglethorpe) would vote at the Regional Library; in separate from 7B (Library Precinct);
2. All voters assigned to 7C-Fire Station #3 (Five Points) would vote at Memorial Park; a room separate from 4B (Memorial Park Precinct);
3. All voters assigned to 8C-Fire Station #7 (Barnett Shoals) would vote at Hilsman Middle School.
4. All voters assigned to 4A-ACC Multi-Modal Transit would vote at Lay Park; separate from 3B (Lay Park Precinct)

Timeline:
- After meeting with the Fire Chief on Thursday, April 30, and meeting with the City Attorney on Friday, May 1, we will have information needed to present the following for vote at their May 5, 2020 monthly Board Meeting.
- Advertise in local organ, Legal Ad section – May 8, 19, 26, June 2 and 9.
- Post the information on our website beginning on May 8.
- Place signs as early May 26 locations inside the precinct boundaries.
- Place signs at the Fire Stations and Multi-Modal to instruct voters of their temporary locations on June 5.
- Take advantage of all opportunities to process this information to our voters, beginning on May 8.

# ABSENTEE BALLOT PROCESS

On Monday, March 31, the Secretary of State's Office began mailing Absentee Ballot Applications to all active registered voters.   As early as noon on Friday, April 3 we started receiving applications via email.  On Monday, April 6, we began receiving applications by US Mail.

We enter the application into the ElectoNet system (ENet) and send SOS sends a ballot according to the preferred type; Democratic, Republican or Non-partisan.

We are listing FAQs on our website to assist our voters with processing the applications and the ballots.

Leading up to Election Day, in lieu of placing a stamp on the applications and/or voted ballots, our voters will have the option of using a drop-box, located at the front of our office, beginning on April 15, 2020.

Regarding drop boxes, currently, there is no law that allows drop boxes; however, the State is considering this as a contingency plan with a requirement of surveillance at the location of the drop box.  This means it is very likely that we will only have one drop-box in Athens-Clarke that would meet that requirement.

As mentioned previously, prior to Election Day we will inform our voters of the drop off locations for Absentee Ballots.   As an added service regarding collection of Absentee Ballots on Election Day and pending approval by the Board of Elections,

- We will deputize all Poll Managers at the locations to receive the Absentee Ballots.
- At 5:30 PM, a Board Member will transport those ballots to the Tabulation Center for tabulation before the polls close at 7pm.
- Voters will also have the option of leaving it inside the drop-box at the BOE Office through 7pm Election Day.

# Q&A – June 9, 2020 Combine Presidential Preference and General Primary & Non-partisan Election

## Questions & Answers about the combined June 9, 2020 Presidential Preference/General Primary/Non-Partisan Election

Q: If I voted early or by mail before the March 24, 2020 PPP was postponed, will my vote still count?

A: Yes.  All ballots are held securely and will be counted on Election Night, May 19, 2020, along with all ballots for the May 19 Election.

Q: If I voted in March, do I still vote in May?

A: Yes. If you voted in March, you voted only for the Presidential Preference Primary candidates. The May Election ballot also includes the General Primary for Federal, State, and Local candidates, along with Non-partisan races; therefore, your ballot will *only* contain the General Primary and Non-partisan races.

Q: What happens if I *did not* vote in March?

A: Your ballot for the May 19 Election will contain both the PPP race, the General Primary and Nonpartisan races

Q: Will I receive an absentee ballot application to vote by mail?

A: The State sent out absentee ballot applications to the residential address of all active voters in the State of Georgia. However, if you do not receive one, you can visit the SOS website, https://sos.ga.gov/index.php/Elections/absentee_voting_in_georgia, to print out and complete an application.

Q: How do we get the completed application back to the elections office?

A: You can mail it to Athens-Clarke County Elections & Registration office, P O Box 1828, Athens GA  30603; you can scan and email it to paula.williams@accgov.com or you can drop it in our drop box located near the front door of our office located at 155 E. Washington Street. (Drop box available on April 15, 2020)

Q: Can I still register to vote for the May 19 Election?

A: Yes.  The voter registration deadline for the May 19 Election is April 20. Visit My Voter Page, www.mvp.sos.ga.gov to register online or to verify registration status.

Q: What is the deadline to submit an Absentee Ballot Application?

A: May 15th is the last day to submit a request.  We recommend that you submit an application as early as possible to process mailing of the ballot, allowing ample time for our office to receive your voted ballot by 7:00 PM Election Day, May 19th.

When completing the Absentee Ballot Application, please make sure you choose a ballot type (Democratic, Republican, or Non-partisan) and sign the application.

Q:  What if I cannot locate the application that was sent to me in the mail by the SOS Office?

A:   You can visit the SOS website, https://sos.ga.gov/index.php/Elections/absentee_voting_in_georgia, to print out and complete an application.  You should mail it to Athens-Clarke County Elections & Registration, P O Box 1828, Athens, GA 30603; you can scan and email it to paula.williams@accgov.com or you can drop it in our drop box located near the front door of our office at 155 E. Washington Street. (Drop box will be available on April 15, 2020)

**PLEASE NOTE:** If you choose a Non-partisan ballot, you will *ONLY* receive Judicial, County Commission and School Board races on your ballot.  There will be NO Democratic or Republican races on your ballot (US Senate, State Senate, State Representative, Sheriff, Tax Commission, etc.).

If you have any other questions, please feel free to call our office at 706-613-3150.

# Sanitation Practices for Use under COVID -19 Conditions at the Poll Locations

**Background supplied by the Centers for Disease Control under Recommendations for Election Polling Locations**:

There is much to learn about the novel coronavirus (SARS-CoV-2) that causes corona virus disease (COVID-19). Based on what is currently known about SARS-CoV-2 and about similar coronaviruses, spread from person-to-person happens most frequently among close contacts (within about 6 feet). This type of transmission occurs via respiratory droplets. Transmission of SARS-CoV-2 to persons from surfaces contaminated with the virus has not been documented. Transmission of coronavirus in general occurs much more commonly through respiratory droplets than through contact with contaminated surfaces. Current evidence suggests that SARS-CoV-2 may remain viable for hours to days on surfaces made from a variety of materials. Cleaning of visibly dirty surfaces followed by disinfection is a best practice measure for prevention of COVID-19 and other viral respiratory illnesses in election polling locations.

**Preventative actions poll workers can take**:

Stay home if they have a fever, respiratory symptoms, or believe they are sick.

Practice frequent hand washing with soap and water for at least 20 seconds. If not readily available, use hand sanitizer containing at least 60% alcohol.

Practice routine cleaning and disinfecting of frequently touched surfaces: tables, doorknobs, and voting associated equipment.

**Preventative action polling location workers can take for themselves and the general public:**

Based on available data, the most important measures to prevent transmission of viruses in crowded public areas include careful and consistent cleaning of one's hands. Therefore:

Ensure bathroom at the polling station are supplied with soap, water, and drying material so visitors and staff can wash their hands.

Provide alcohol-based hand sanitizer with at least 60% alcohol for use before and after using a voting machine. Place the sanitizer in visible locations such as the check in stations and near the exits.

Incorporate social distancing strategies, increasing the space between individuals and reducing the risk of spreading the disease. 6 feet apart is ideal based on what is known about COVID-19.

> Increase distance between voting booths

> Limit nonessential visitors. Voters should be encouraged not to bring children and family members who are not voting.

> Provide signs and taped floor markings to encourage 6 feet of distance between voters.

> Discourage voters and workers from greeting each other with physical contact such as handshakes.

**Poll workers will be provided with PPE:**

Mask and a supply of gloves sufficient to change throughout the day as needed to prevent cross contamination.

**Direct Instructions for poll workers**:

The normal tasks of operating a polling location are divided among the staff. These are generally:

Manager – paperwork and supervision
Poll Pad Operators – Check in
ICP Monitor – Precinct Scanner
Floater – Assists voters with general questions and monitors voting booths
Line Monitor – Outside the door to the location, maintains line.

**All Poll Workers** –

Wear mask while working. It may be removed if they are on break and away from the voting area and others.

Wear gloves. Periodically change them for a new pair. Follow the safe procedure for glove removal and dispose in the BIOHAZARD CONTAINER ONLY.

**Manager** –

Supervise the overall sanitation of the polling location. Guaranteeing that BMDs, Printers, Voter Access Cards, and Poll Pad Stylus are wiped with alcohol pads or alcohol dampened microfiber cloths between each use. Supervise the maintenance of social distancing of at least 6 feet between voters.

Be available to intervene and direct voters if distancing is not being maintained after guidance from one of the other poll workers.

**Poll Pad Operators** –

Maintain 6 feet distance from voters during the check-in process.

Wipe the stylus with an alcohol pad or alcohol dampened microfiber cloth between each voter processed.

As voter access cards are rotated to their check in station, wipe them with a cloth slightly dampened with alcohol. AVOID THE SMART CHIP. On every half-hour, wipe down the Poll Pad surface with a cloth slightly dampened with alcohol.

**ICP Monitor** –

Maintain as much distance as practical from the voter as they place their ballot into the ICP.

On every half-hour wipe down the ICP and Ballot Box with a cloth slightly dampened with alcohol.

**Floater** –

Maintain as much distance as practical will assisting voters.

Wipe down the surface of a BMD with a cloth SLIGHTLY dampened with alcohol after **each** use by a voter. Do not let liquid pool on the screen or drip into any opening of the BMD. Be aware that Dominion Voting recommends ONLY wiping the screen when the device is OFF. In this case, they must be cleaned. Proceed with the awareness that your touch may cause an option to be chosen. Ask for assistance from your manager if this occurs.

Wipe down a printer with a cloth SLIGHTLY dampened with alcohol after **each** use by a voter. Do not let liquid pool on or drip into the printer. Monitor and enforce to the best of their ability 6 foot of social distancing between everyone in the polling location.

**Line Monitor** –

Maintain 6 foot social distancing of voters in the line outside the voting location.

Tape the ground with lines, marking 6 feet line spacing.

Source:

Coronavirus Disease 2010 (COVID-19); Recommendations for Election Polling Locations; Updated 3/27/2020;
https://www.cdc.gov/coronavirus/2019-ncov/community/election-polling-locations.html

# CLOSING

During a State of Emergency, only the Secretary of State can suspend the duty of conducting Elections, per O.C.G.A. § 21-2-50.1.

These plans shall be used in conjunction with the Athens-Clarke County Emergency Plan and Shelter in Place Plan (located on the County's website and the Secretary of State's Emergency Plan).

The department measures its responses to emergencies by the degree of alert created by an emergency such as the COVID-19 pandemic.  As always, if an employee begins to show signs of infection, he/she shall notify the Poll Manager and/or Elections Director immediately.

In spite of our current circumstances, we will continue providing excellent voting services the voters of Athens-Clarke County.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

**DONNA CURLING, ET AL.,**

**Plaintiffs,**

**v.**                                           **Civil Action No. 1:17-CV-2989-AT**

**BRAD RAFFENSPERGER, ET AL.,**

**Defendants.**

## COALITION PLAINTIFFS' DETAILED
## SPECIFICATION IN SUPPORT OF MOTION FOR ATTORNEYS' FEES

1



**Exhibit**
CGG 0010

# TABLE OF CONTENTS

I.     *INTRODUCTION* ............................................................................................. 3

II.     *COALITION PLAINTIFFS ARE PREVAILING PARTIES* ........................................... 5

   A.   Preliminary Injunction Entitles Plaintiffs to An Award of Fees .................................... 5

   B.   Plaintiffs Obtained an Excellent Result .................................................................... 6

   C.   Excellence of Result Further Confirmed by Specific Relief Granted ............................ 8
      1.  Ban on DREs After 2019 ...................................................................................... 9
      2.  Providing a Constitutional Alternative to BMDs for 2020 Elections ..................... 10
      3.  Audits ............................................................................................................. 11
      4.  Electronic pollbooks and Related Injunctive Relief ........................................... 11

   D.   No "Special Circumstances" Warranting Reduction in Fees ..................................... 14
      1.  Passage of HB 316 Does Not Impact Award ...................................................... 14
      2.  Two Sets of Plaintiffs Does not Warrant Reduction .......................................... 22

III.    *LEGAL STANDARD* ....................................................................................... 24

IV.    *REASONABLENESS OF TIME* ......................................................................... 24

V.     *REASONABLENESS OF THE AMOUNT OF TIME SPENT* ....................................... 27

   A.   Overall Size and Complexity of the Case ............................................................... 27

   B.   Narrative Description of the Work ........................................................................ 27
      1.  Phase I: 2017 to February 28, 2018: Case Initiation through Steptoe & Johnson Withdrawal .............. 28
      2.  Phase II: March 1, 2018 to June 30, 2018: Third Amended Complaint and Motions to Dismiss............ 30
      3.  Phase III: July 1, 2018 to September 19, 2018 - 2018 Motion for Preliminary Injunction...................... 31
      4.  Phase IV: September 20, 2018 to October 2, 2018 – Motion to Stay, Motion for Additional Injunctive Relief, Appeal ............ 33
      5.  Phase V: October 3, 2018 to February 8, 2019: Stay, 2018 Election, Appeal ........................... 33
      6.  Phase VI: February 9, 2019 to August 15, 2019: 2019 Motion for Preliminary Injunction..................... 34
      7.  Phase VII: August 16, 2019 to Present: Post-Injunction Enforcement and Fees ...................................... 47

VI.    *REASONABLENESS OF RATES* ....................................................................... 48

VII.   *REASONABLENESS OF EXPENSES AND CGG TIME* ........................................... 53

VIII.  *SUMMARY* ............................................................................................... 56

Having timely filed a Special Motion for Award of Attorneys' Fees and
Costs (Doc. 595)("the Special Motion"), the Coalition Plaintiffs now submit this
Detailed Specification of those fees pursuant to Local Rule 54.2A(2).

## I.    INTRODUCTION

This case has vindicated and protected the rights of seven million Georgians
to vote and to have their vote counted.  In the face of daily warnings from the
nation's top intelligence and cyber-security officials, the State of Georgia refused
to recognize or address the profound vulnerability of its DRE voting system.  The
evidence – from the State's willful failure to address the impact of the exposure at
CES/KSU to the State's courtroom admission that the GEMS databases are built
by contractors in their homes – confirmed that the State would be a prime target for
disruption or undetectable malicious manipulation.

But for this litigation and the granting of injunctive relief, Georgia would
still be using the DRE system, and its faulty electronic pollbooks, in elections in
2020 and would have no constitutional alternative to fall back upon in the event the
State's new BMD system cannot be deployed for 2020 elections.  Without the
injunctive relief that has been obtained by the Plaintiffs, the risk of catastrophe for
the voters of Georgia was real and substantial. The Court has provided for fail-safe

3

alternatives to protect 2020 elections from the extreme risks of using paperless

DREs by requiring the use of hand-marked paper ballot in pilot elections and in the

event the BMD system cannot be implemented on time or is itself found to be

constitutionally defective.  The Court also directed the State to address the defects

in the electronic pollbooks that are part of the DRE voting system.

Though much work needs to be done by the State of Georgia before it

deploys a safe, constitutional voting system, the granting of injunctive relief at this

stage already constitutes success on the merits entitling the Coalition Plaintiffs to

an award of reasonable attorneys' fees and expenses.

Coalition Plaintiffs should be awarded their attorneys' fees and expenses

incurred to date of $1,406,393 and $340,965, respectively, as prevailing parties

under 42 U.S.C. § 1988 based on this Court's August 15, 2019 Order ("the

Preliminary Injunction," Doc. 579) granting in part Coalition Plaintiffs' Motion for

Preliminary Injunction (Doc. 419).  Pursuant to Local Rule 54.2, this Brief and the

attachments hereto contain a "detailed specification and itemization of the

requested award, with appropriate affidavits and other supporting documentation."

In Part II, this Brief restates and supplements the basis of which entitlement to the

award is claimed as originally set forth in the Special Motion (Doc. 595).  Part III

of this Brief summarizes the familiar legal standards.  Part IV addresses the

reasonableness of the amount of time spent on the case, providing a detailed

narrative description of the work. Part V addresses the reasonableness of the rates, Part VI addresses the reasonableness of the expenses, and Part VII provides a summary of the amounts sought.

## II.     COALITION PLAINTIFFS ARE PREVAILING PARTIES[1]

### A.     Preliminary Injunction Entitles Plaintiffs to An Award of Fees

It is well established that "a preliminary injunction is a 'material alteration of the legal relationship of the parties'" entitling the plaintiff to an award of fees and expenses as the prevailing party under Section 1988. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1356 (11th Cir. 2009). *See also Williams a/k/a Occasional Superstar v. City of Atlanta,* No. 1:17-CV-1943-AT, 2018 WL 2284374, at *3 (N.D. Ga. Mar. 30, 2018) ("*Occasional Superstar*") ("*More recently, the Supreme Court reiterated its repeated holding that, 'an injunction or declaratory judgment, like a damages award, will usually satisfy [the prevailing party test].' *Lefemine v. Wideman*, 568 U.S. 1, 4 (2012) (finding the plaintiff to be

---

[1] Parts II(A), (B) and (C) of this Brief are substantially the same as the discussion in the Coalition Plaintiffs' Special Motion (Doc. 595), and have been restated herein for the Court's convenience.

a prevailing party when he obtained an injunction to terminate a continuing threat of potential criminal sanctions for engaging in public protest activity.")).[2]

In the Preliminary Injunction, this Court materially altered the legal relationship of the parties by ordering immediate, wide-spread injunctive relief relating to multiple aspects of the State's election system, as explained in greater detail below.

### B.      Plaintiffs Obtained an Excellent Result

The Preliminary Injunction granted the Coalition Plaintiffs substantial relief – an "excellent result" - on the merits.  In this litigation, the Plaintiffs claimed a First and Fourteenth Amendment right to cast a vote that is properly counted.  *See generally Curling v. Kemp,* 334 F. Supp. 3d 1303 (N.D. Ga. 2018); (Preliminary Injunction, Doc. 579 at 3).  In the Complaint and in the Amended Complaints, the Plaintiffs alleged that the State Defendants were infringing on their right to cast a vote that is properly counted by continuing to use the profoundly vulnerable DRE system, and, in similar counts under the Equal Protection and Due Process Clauses

---

[2] Fee awards to prevailing plaintiffs in a § 1983 civil rights action are not limited to those actions where damages are either sought or obtained.  *Riverside v. Rivera*, 477 U.S. 561, 575 (1986) ("Because damages awards do not reflect fully the public benefit advanced by civil rights litigation, Congress did not intend for fees in civil rights cases, unlike most private law cases, to depend on obtaining substantial monetary relief.").

of the U.S. Constitution, sought to enjoin the State Defendants from using the
DREs in future Georgia elections and to address the defects in the electronic
pollbooks, and for other relief.

Over the course of this litigation, the Plaintiffs amassed mountains of
evidence and expert testimony proving the defective operation of the DRE voting
system and the security risks it posed, cataloguing the "pervasive voting problems
arising in the 2017-2018 election period," (Doc. 579 at 5), and supporting the
equities of granting injunctive relief. The evidentiary record Plaintiffs established
is detailed in the Court's exhaustive 46-page September 17, 2018 Order, which
found Plaintiffs' "are substantially likely to succeed on the merits of one or more
of their constitutional claims," (Doc. 309), in the Court's 61-page May 21, 2019
Order, which denied Defendants' motion to dismiss as to each of the Coalition
Plaintiffs' claims,[3] (Doc. 375), and most recently in the Court's 153-page August
15, 2019 Order. (Doc. 579).

Coalition Plaintiffs also defeated *each* of the numerous defenses raised by
the Defendants, including the alleged absence of concrete injury in fact (addressed
at Doc. 309 pages 17-22), lack of causation (*id.* at 22), lack of redressability (*id.* at

---

[3] In the May 21, 2019 Order, the Court denied in its entirety the Defendants'
motions to dismiss the Coalition Plaintiffs' Complaint. (Doc. 375 at 61).

25-26), alleged "manufactured standing" (*id.* at 27), lack of organizational standing (*id.* at 27), lack of standing due to residency of named plaintiffs (*id.* at 28-29), "meritless" Eleventh Amendment immunity defenses (*id.* at 29 – 30), application of res judicata and collateral estoppel (Doc. 375 at 14-34), failure to state a viable claim for due process and equal protection violations (*id.* at 34 – 53), supposed improper joinder of the Members of the State Board of Elections (*id.* at 53 – 54), and the alleged need to join as parties defendant the municipalities conducting November 2019 election (Doc. 579 at 12-21).

In the Preliminary Injunction, the Court agreed that the "record in this case is substantial," (Doc. 579 at 5), that the Plaintiffs had carried their burden of establishing a likelihood of success on the merits, and that the equities compelled the granting of wide-ranging injunctive relief.   (Doc. 579 at 129 -153).  By any measure, Coalition Plaintiffs have obtained an "excellent result" and should be fully compensated for "all time reasonably expended on the litigation." *Popham,* 820 F.2d at 1578.

### C.   Excellence of Result Further Confirmed by Specific Relief Granted

Because the Coalition Plaintiffs achieved "excellent results" on the objectives of the litigation, it is not necessary for the purposes of determining entitlement to fees (or the amount of the fee award) to examine each particular

claim or theory to determine whether or to what extent the claim or theory was considered by the Court or was the basis for relief. "In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley,* 461 U.S. at 435. In addition, the fact that Coalition Plaintiffs advanced alternative legal grounds for relief obtained has no impact on the fee. "Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee. The result is what matters." *Id.*

Nevertheless, the broad-ranging and comprehensive nature of the injunctive relief ordered by this Court underscores Coalition Plaintiffs' entitlement to 100% of its reasonable fees and expenses, as outlined below:

*1. Ban on DREs After 2019*

As discussed above, in their 2018 Motion for Preliminary Injunction (Doc. 258) and in their 2019 Motion for Preliminary Injunction (Doc. 419), Coalition Plaintiffs sought to enjoin Defendants from using DRE machines in upcoming Georgia elections. (Doc. 258 at 1; Doc. 419 at 2). The Court granted this relief in substantial part: In the Preliminary Injunction, this Court directed the State Defendants to "refrain from the use of the GEMS/DRE system in conducting elections after 2019." (Doc. 579 at 148).

## 2. *Providing a Constitutional Alternative to BMDs for 2020 Elections*

In support of their 2019 Motion for Preliminary Injunction, Coalition Plaintiffs built upon the record previously adduced and argued that "granting injunctive relief now" by replacing DREs with hand-marked paper ballots "will provide a safe, sensible, constitutional alternative to, and contingency for, the State's planned deployment of the BMD system in 2020." (Doc. 419-1 at 9). Coalition Plaintiffs argued that, unless the State Defendants were required to replace DREs with an auditable system using hand-marked paper ballots and optical ballot scanners, if deployment of the new BMD system were delayed, inadequate or derailed, Georgia voters would have no constitutional voting alternative in numerous elections in the 2020 Presidential election cycle. (Doc. 419-1 at 4). Both in their briefs and in their submissions from experts, the Coalition Plaintiffs urged the Court to require the State Defendants to start using hand-marked paper ballots beginning October 1, 2019, so that the State would have a default plan in the event BMD deployment failed. (*E.g.,* Doc. 419-1 at 4, 9, 49; Doc. 413 at 220, 254, 282).

The Court granted this relief, requiring the State Defendants to begin using hand-marked paper ballots in pilot elections in 2019 and in the 2020 elections prior to the deployment of the new BMD system. Thus, in the Preliminary Injunction, this Court directed the State Defendants "to develop a default plan" using "hand-

marked paper ballots" in the event "the new BMD system enacted by the State Legislature may not be completely rolled out and ready in time for operation in time for the March 2020 Presidential Primary elections." (Doc. 579 at 148). The Court directed the State Defendants, as a part of this default plan, to "identify a select number of counties or jurisdictions that agree to implement a pilot election in November 2019 using hand-marked paper ballots along with optical ballot scanners and voter-verifiable, auditable ballot records." (Doc. 579 at 148).

### 3. Audits

The Coalition Plaintiffs moved this Court to require the State Election Board to develop and file pre-certification audits plans. The Court directed the State Defendants to "promptly file with the Court all proposed and final audit requirements that the State Election Board and Secretary of State's Office considers or approves in connection with elections to be held in 2020 or thereafter." (Doc. 579 at 152; *see also id.* at 148-49).

### 4. Electronic pollbooks and Related Injunctive Relief

Coalition Plaintiffs moved the Court for multi-faceted relief relating to the reliability of the voter registration database and the ExpressPoll electronic pollbooks. In particular, Coalition Plaintiffs moved the Court to direct the Secretary to file a plan with the Court addressing:

11

the procedures to be undertaken by election officials to address errors and discrepancies in the electronic pollbooks or voter registration database that my cause eligible voters to (i) not appear as eligible voters in electronic pollbooks, (ii) receive the wrong ballot, (iii) be assigned to the wrong precinct in the electronic pollbook, or (iv) be prevented from casting a regular ballot in their properly assigned precinct.

(Doc. 419 at 4). The Court directed the State Defendants:

to develop a plan for implementation by **NO LATER THAN JANUARY 3, 2020,** that addresses the procedures to be undertaken by election officials to address errors and discrepancies in the voter registration database that may cause eligible voters to (i) not appear as eligible voters in the electronic pollbooks; (ii) receive the wrong ballot; (iii) be assigned to the wrong precinct in the electronic pollbooks; or (iv) be prevented from casting a regular ballot in their properly assigned precinct. A copy of the plan shall be provided to Plaintiffs' counsel.

(Doc. 579 at 150) (emphasis by the Court).

The Coalition Plaintiffs further moved the Court to direct the Secretary to file a plan with the Court for county election officials and poll workers "to provide for use of an updated paper back-up of the pollbook in the polling places for adjudicating voter eligibility and precinct assignment problems." (Doc. 419 at 4). The Court, recognizing that accurate pollbooks in the polling place are imperative, ordered the State Defendants to "require all County Election Offices to furnish each precinct location with at least one print-out of the voter registration list for that precinct." (Doc. 579 at 150).

12

The Coalition Plaintiffs moved the Court to direct the State Defendants "to immediately instruct every Superintendent in all elections to ensure that every person attempting to vote but who is denied a ballot is immediately informed by poll officials that they are entitled to case a provisional ballot."  (Doc. 419 at 4). The Court granted this relief, directing the State Defendants to:

> provide clear pre-election guidance to all Count Election Officials regarding all polling officials' mandatory duty under the law to provide voters the option of completing provisional ballots, including those who do not appear on the electronic voter registration database at a specific precinct or at all.

(Doc. 579 at 150).  The Court further directed the State Defendants to:

> continue in future elections to prominently post information concerning the casting of provisional ballots and voters' submission of additional information, including their registration status, and voters' capacity to check the status of their provisional ballot on the SOS website throughout the course of any state or federal election.

(*Id.*)

Coalition Plaintiffs moved the Court to direct the State Defendants to "undertake a review of the pollbook software to determine the source of the defect or malware and promptly undertake remedial action" (Doc. 419 at 3) and to submit a plan with the Court that addresses "a security evaluation" of voting system components, "including electronic pollbooks" to "detect malware or other significant security vulnerabilities." (Doc. 419 at 4).  The Court ordered the Secretary of State's Office to

13

work with its consulting cybersecurity firm to conduct an in-depth review and formal assessment of the issues relating to exposure and accuracy of the voter registration database discussed here as well as those related issues that will migrate over to the State's database or its new vendor's handling of the EPoll voter database and function.

(Doc. 579 at 150).

The successful character of the Coalition Plaintiffs' litigation efforts is plainly evident from each of the foregoing rulings. This Court has granted significant and substantial relief that altered the pre-litigation status quo between the parties.  This Court did so in answer to the claims of constitutional violations raised by the Coalition Plaintiffs.  This outcome is, measured by any standard, an excellent result.

### D.     No "Special Circumstances" Warranting Reduction in Fees

There is no reason for the Court not to award 100% of the reasonable time and expenses incurred.  Two arguments that Defendants may raise are addressed below.

#### 1.     Passage of HB 316 Does Not Impact Award

The Defendants may contend that the Plaintiffs are not entitled to fees because the Defendants would have taken the same actions even without a Court order, pursuant to HB 316.  This argument should be rejected for a number of reasons.

14

First, the test for determining whether a plaintiff is entitled to attorneys' fees under Section 1988 is not whether the defendant would have acted differently without the granting of injunctive relief. Instead, the test is whether the injunction constitutes a "material alteration of the legal relationship of the parties." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1356 (11th Cir. 2009). Here, the Court's Order materially altered the legal relationship of the parties by ordering the State Defendants to take all the actions described therein.

Second, the relief ordered by the Court goes far beyond anything the State would otherwise have done pursuant to HB 316. HB 316 mandates no particular time frame for the converstion to a new system. HB 316 does not ban DREs effective January 1, 2020, does not require the State to develop a backup plan using hand-marked paper ballots, and does not require the State to remediate the electronic pollbooks or ensure that paper copies of registration information are placed in the precincts.

Third, even if the only thing the Court's Order accomplished was to ban DREs effective January 1, 2020—and to be clear, the Order does much more than that—any suggestion that the State would have acted on its own initiative to replace the unconstitutional DREs without this litigation is both irrelevant and completely contrary to the evidentiary record. The State Defendants *and* Fulton County have consistently resisted the outcome produced by this Court's Order

15

since the start of this litigation. On April 16, 2018, the Coalition Plaintiffs

followed up on numerous prior communications by making a formal demand upon

counsel for the State Defendants that the DREs be replaced with hand-marked

paper ballots. (Doc. 258-1 at 93 and *id.* at 98 n.3 (listing numerour prior

demands)). Counsel for the State Defendants did not respond. In a July 26, 2018,

letter from Coalition Plaintiffs' counsel to counsel for the State Defendants,

counsel described the urgent warnings from House Intelligence Committee

Chairman Devin Nunes and DHS Secretary Nielsen to ban electronic voting and

again demanded that the DREs be replaced by hand-marked paper ballots. (Doc.

258-1 at 91). Again, counsel for the State Defendants did not respond. In an

August 1, 2018, Official Election Bulletin to county elections officials, State

Elections Director Chris Harvey stated: "To this day, there is no credible evidence

that our election process is anything except secure and accurate." (Doc. 258-1 at

104). Based on the State Defendants' failure to take any action in response to

Plaintiffs' demands or in response to the warning from federal officials, the

Coalition Plaintiffs filed their 2018 Motion for Preliminary Injunction.[4]

_____

[4] On April 13, 2018, then Secretary of State Kemp announced the formation of the Secure, Accessible & Fair Elections (SAFE) Commission. (Doc. 260-1 n. 18). But the SAFE Commission met only once and took no action before Coalition Plaintiffs' filed the Motion for Preliminary Injunction on August 3, 2018 (Doc. 258; *see also* Doc. 260-1, n 21).

In response to the 2018 Motion, the State Defendants gave no indication that they intended to replace the DREs or even that they took the matter seriously. Instead, they cast aspersions on Plaintiffs' concerns, saying, "Luddite prejudices against software technology are insufficient justification to override a statutory regime promulgated by duly-elected legislators, sustained against prior constitutional challenges, and overseen by state officials acting pursuant to their respective duties within that legislative framework." (Doc. 265 at 28).

The State Defendants called the concept of "undetectable manipulation" as "oxymoronic," a position decimated by the Coalition Plaintiffs' authoritative expert testimony. (DeMillo Decl., Doc. 277 at 55 ("Undectable manipulation is the most common, widely recognized, and serious threat facing computer systems, including election systems.") *See also Curling,* 324 F. Supp. 2d at 1328 ("Advanced persistent threats in this data-driven world and ordinary hacking are unfortunately here to stay. Defendants will fail to address that reality if they deman as paranoia the research-based findings of national cybersecurity engineers and experts in the field of elections.")

Even without any experts of their own, the State Defendants belittled the expertise arrayed against them, saying: "Plaintiffs' so-called experts are Ph.D. candidates, a hacker, and lower-level functionaries from other states." (Doc. 265 at 11-12). This dismissiveness was utterly unwarranted. Mr. Bernhard is a Ph.D.

17

"candidate," but he distinguished himself as an expert in direct and on cross-examination in hearings in 2018 and 2019 – testimony which the State Defendants have never even attempted to impeach or contradict. Logan Lamb is not a "hacker," but a civic-minded individual who in absolute good faith reported the outrageous vulnerability of the State's compromised elections server to KSU officials as soon as he discovered it. The "lower-level functionaries" were in fact outstanding expert witnesses whom the Court had the opportunity to observe in person in the 2019 hearings, Amber McReynolds and Virginia Martin. The State Defendants apparently could find no critical epithets for the Coalition Plaintiffs' other experts—Dr. Richard DeMillo, the Charlotte B. and Roger C. Warren Chair of Computer Science at Georgia Tech, or Dr. Philip Stark who, among other accomplishments, invented the risk limiting audit—so the State prudently says nothing at all. (Doc. 296 at 8.)

At the hearing, the State's counsel asked Professor Halderman if he knew anything about Georgia and how many times he had been to Georgia before concluding, in grand-finale fashion, "Do you know where the Big Chicken is?" (Doc. 307 at 102–03). Fulton County, for its part, likewise engaged no experts of its own and instead argued only that Dr. Halderman's demonstration was irrelevant because he was using Ballot Station Version 4.3, 4.4 and 4.6, but not Version 4.5, which is the one used in Georgia. (Doc. 307 at 118). There is no indication Fulton

County actually believed that this distinction made any difference; yet they made the argument anyway. And, in response to questioning by the Court, Dr. Halderman explained that the version of Ballot Station that he was able to compromise in his demonstration was actually a *more secure* version that the version used by Georgia. (Doc. 307 at 120).

The State Defendants also took the position that the results of elections on DREs could be audited. "What I'm trying to point out is the representation of my friends on the other side that these things cannot be audited is untrue. . . . You can audit these things." (Doc. 307 at 58). Fulton County and the State Defendants took the position that if individual voters were concerned about their votes being counted on the DREs, they could always vote by absentee ballot. (Doc. 307 at 63; Doc. 265 at 28).

The State's position in 2018 was that the State's voting system was secure enogh and would be no more secure if the State switched to hand-marked paper ballots. In opposing the 2018 Motion for Preliminary Injunction, the State Defendants relied heavily on the testimony offered in the declaration of Secretary of State Chief Information Officer Merritt Beaver, who stated: "Moving to paper ballots for the voting mechanism would not add one iota of protection to the state's voter registration database, air-gapped ballot building network, or other online tools such as election night reporting." (Doc. 265-1 at 5). In cross-examination a

19

year later, however, Michael Barnes revealed for the first time that the "air-gapped ballot building network" that Mr. Beaver touted in 2018 was in fact three independent contractors programming each of the State's 159 election databases from their homes and then transmitting the databases to the Secretary of State's *public facing* internet server via thumb drive.

In this litigation, the Defendants forced the Plaintiffs to spend the time and the money to defeat each of these factual and legal positions. Such conduct directly contradicts the State's present claim that it would be preparing to abandon DREs even in the absence of the Coalition Plaintiffs' litigation efforts and this Court's resulting judicial mandate. Moreover, if the State Defendants intended to replace the DREs as a matter of course, they would not have wasted taxpayer money by pursuing an interlocutory appeal of this Court's 2018 Order on frivolous grounds of jurisdiction and standing. The State's position resembles the position of Fulton County in *Webster Greenthumb Co. v. Fulton County,* 112 F. Supp. 2d 1339, 1347–48 (N.D. Ga. 2000). In *Webster Greenthumb,* Judge Thrash granted the plaintiffs' motion for fees under Section 1988, rejecting the County's argument that it would have dismantled a challenged program without the litigation:

> Indeed, if Fulton County really had planned to dismantle the MFBE program on its own accord within the three months immediately following issuance of the injunction, there would have been little reason for the County to request, as it did, a stay of the injunction until

20

after the Eleventh Circuit decided the case on appeal. Certainly, if the
County did not intend to renew the MFBE program, it would not
have wasted the taxpayers' money appealing the Order abolishing it.

So too here.  It was only after this Court held that the Plaintiffs had a

likelihood of success on the merits that the State passed HB 316—which it did

simultaneously appealing this Court's jurisdiction. In the first status conference

after the Eleventh Circuit affirmed this Court's denial of the State Defendants'

immunity defenses, the State Defendants' counsel acknowledged that the State's

legislative action was in direct response to this litigation:

> Your Honor, as you are aware, you issued an order at the end of last
> year telling the state to get moving, so-to-speak . . . and that, you
> know, as time continue forward, if the state wasn't moving – wasn't
> movin along that their arguments regarding lack of resources and
> difficulties changing to an all paper ballot system would weaken.  The
> state took that to heart.  And as you are aware, House Bill 316, which
> is now Act 24, has been signed into law.

(Doc. 363 at 4-5).

The passage of HB 316 did not make the retirement of the DREs, and does

not make the implementation of new Dominion BMD system, inevitable.

Throughout this case, the State Defendants have repeatedly emphasized the

difficulty of replacing the DRE system.  (Doc. 307 at 53 (State Defendants'

counsel explaining that Maryland's conversion took 8 years)).  Had this Court not

enjoined the State Defendants, then when and if the State encountered delays or

21

budgetary shortfalls, the State Defendants would have been free simply to reverse course and continue using the unconstitutional DREs for the 2020 Presidential elections.

In sum, Defendants have never conceded anything, and instead have forced the Coalition Plaintiffs to expend an enormous amount of time and money to prosecute this lawsuit to its successful completion. Defendants cannot now claim that this lawsuit was unnecessary and that this Court's injunction orders have not produced a change in the legal relationship between the parties..

### 2. *Two Sets of Plaintiffs Does not Warrant Reduction*

Defendants may contend that the fact that there are two sets of Plaintiffs should reduce Plaintiffs' recovery under Section 1988. This is incorrect.

First, the Coalition Plaintiffs and the Curling Plaintiffs cannot have the same lawyers because they have firmly held, conflicting positions on important issues in the case. For example, in 2018, the Curling Plaintiffs sought an order banning DREs and requiring the Secretary to mail absentee ballots to each registered voter, a proposal that the Coaltion Plaintiffs (more keenly aware of the Secretary's abysmal record on absentee balloting) opposed. The Curling Plaintiffs dropped the proposal before the 2018 hearing, but the two sets of plaintiffs obviously needed, and were entitled to, separate representation.

22

Second, the time spent by the Coalition Plaintiffs and the Curling Plaintiffs has been complementary, not overlapping. Throughout the litigation, the Curling Plaintiffs have focused upon, and invested heavly in, the cyber-security threats to Georgia's system, with the engagement of Dr. Halderman and the establishment of laboratories for the review of the GEMS databases and servers in Washington, D.C. and Ann Arbor, Michigan. The Coalition Plaintiffs, on the other hand, have focused on the vulnerability of the system at the local level, the feasibility of transitioning to hand-marked paper ballots, the evidence of vulnerability in the Lieutenant Governor's race, the gathering of substantial evidence from voters with actual experience in the 2018 elections, and the evidentiary impact of the State's destruction of the KSU/CES server. In addition, where feasible and efficient, the two sets of Plaintiffs have joined efforts.

Third, as a matter of law, even if the efforts of the Curling Plaintiffs were duplicative of the efforts of the Coalition Plaintiffs, that would still properly have no impact on Plaintiffs' fee recovery. *Dowdell v. Apopka,* 698 F.2d 1181, 1188 (11th Cir. 1983) (rejecting argument that similar or overlapping work should not be compensated, holding: "All attorneys who contribute their services to a case may be awarded reasonable attorneys' fees."); *Tasby v. Estes,* 651 F.2d 287 (5th Cir. 1981) (authorizing the award of two fees even when work is partially duplicative); *Webster Greenthumb* at 1350 ( "Work performed by multiple attorneys, however,

23

is not subject to reduction where the attorneys were not unreasonably doing the same work.").

## III.   LEGAL STANDARD

When assessing an award of attorneys' fees, a district court must first calculate the lodestar amount – the number of hours reasonably expended multiplied by a reasonable hourly rate.  *Hensley,* 461 U.S. at 433.  The lodestar "yields a fee that is presumptively sufficient."  *Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 552 (2010). After calculating the lodestar, the Court may adjust the amount based on a number of factors, such as the quality of the results obtained and the legal representation provided.  *Duckworth v. Whisenant,* 97 F.3d 1393, 1396 (11th Cir. 1996).

Pursuant to this well-established precedent, Coalitions Plaintiffs in Part IV show the reasonableness of the hours expended and, in Part V, demonstrate the reasonableness of the rates.  Part VI address reasonableness of the expenses.

## IV.   REASONABLENESS OF TIME

Table I divides the litigation into seven periods of time, or phases, and shows the total number of hours spent by each firm or lawyer during each phase. Though particular activities predominated in each phase of the case, many activities (e.g., investigative fact-gathering, formal discovery, effots aimed at

24

preservation of evidence, expert witness preparation, conferral discussions)

occurred in every phase.

| Phase | Dates | Major Activities in the Phase | McGuire | Ichter | Brown | The LC | Ney | Total |
|---|---|---|---|---|---|---|---|---|
| | | Table II - Coalition Plaintiffs' Hours by Phase | | | | | | |
| I | 2017 to Febuary 28, 2018 | Case Initiation, State Court Complaint; Second Amended Complaint | 153 | 10 | | | 70 | 233 |
| II | March 1, 2018 – June 30, 2018 | Third Amended Complaint; Motion to Dismiss | 148 | 74 | 69.7 | | 49 | 340.7 |
| III | July 1, 2018 – September 19, 2018 | 2018 Motion for Preliminary Injunction | 186 | 25 | 166 | | 11 | 388 |
| IV | September 20, 2018 to October 2, 2018 | Motion to Stay, Motion for Additional Injunctive Relief | 10 | 15 | 44 | | | 69 |
| V | October 3, 2018 to February 8, 2019 | Stay, 2018 Election, Appeal[5] | 5 | 16 | 29 | | | 50 |
| VI | February 9, 2019 to August 15, 2019 | 2019 Motion for Preliminary Injunction | 9 | 148 | 503 | 754 | | 1414 |
| VII | August 16, 2019 to Present | Enforcement and Fee Application | 44.3 | 7 | 145.7 | 7 | | 204 |
| **Totals** | | | **554.21** | **294.6** | **954.5** | **761** | **129** | **2693** |

---

[5] Note that, although the appeal occurred during this time period, the appeal is only referenced here to provide context. The Coalition Plaintiffs are not seeking an award in this fee request for any attorney time that was spent on the Eleventh Circuit appeal, with the sole exception of time spent on settlement discussions that occurred in the appellate mediation context.

## V.  REASONABLENESS OF THE AMOUNT OF TIME SPENT

### A.  Overall Size and Complexity of the Case

Twenty-six hundred hours is an objectively reasonable amount of attorney time to spend successfully prosecuting a case of this magnitude.  As the Court is well aware, the docket is now has over six hundred entries.  The case is important and complex enough for the State's Law Department to require three outside law firms: the Barnes Law Group until early 2019, and the Robbins Firm and Tayor English in 2019.  The Robbins Firm used at least six lawyers throughout the case, and Taylor English at least two more.  The State adopted such lawyer-intensive staffing even though it is the Plaintiffs, not the State Defendants, who must marshal evidence and satisfy a burden of proof.  Fulton County has at least three lawyers on the case.

As the Court stated in its 2018 Order, the "subject matter in this suit is complex." *Curling,* 334 F. Supp. 2d at 1321.  The comprehensive orders entered by this Court reflect the complexity and difficulty of the case.

### B.  Narrative Description of the Work

Coalition Plaintiffs have filed detailed time records from each attorney describing the work peformed in minute detail.  To give the Court a better overall

27

description of the work and why it was reasonable and necessary, the Coalition

Plaintiffs provide below a narrative description of the major case events that

occurred during each phase of the case.  As noted above, the phases are time

periods only and, though particular activities predominated in each phase of the

case, many activities (e.g., discovery, fact-gathering, expert witness preparation)

occurred in every phase.

### 1. Phase I: 2017 to February 28, 2018: Case Initiation through Steptoe & Johnson Withdrawal

This litigation commenced on July 3, 2017, with the filing of a civil

complaint in Fulton County Superior Court.   Defendants timely removed the case

to this Court on August 8, 2017.  An amended complaint was docketed on August

18, 2017.  (Doc. 14, 15.)  Defendants filed motions to dismiss the amended

complaint based in part on immunity defenses.  (Doc. 49, 50.)  On September 5,

2017, this Court stayed all discovery pending resolution of those immunity

issues.  (Doc. 56.)  Plaintiffs filed a Second Amended Complaint (the "SAC") on

September 15, 2017, (Doc. 70), prompting renewed motions to dismiss, (Doc. 79,

82, 83, 84).

All plaintiffs up to this point had been jointly represented by common

counsel—Steptoe & Johnson as lead counsel, and Holcomb & Ward as local

counsel.  The preparation of the SAC, however, laid bare conflicting interests among the plaintiffs, and so on November 3, 2017, Steptoe sought leave to withdraw as counsel for the Coalition for Good Governance ("Coalition").  (Doc. 104.)  The plaintiffs groups subsequently split into the groups that are before the Court today—the Curling Plaintiffs and the Coalition Plaintiffs—and a period of transition followed when Steptoe and Holcomb & Ward departed the case entirely.[6]

New counsel for both plaintiffs groups subsequently appeared.  For the Coalition Plaintiffs, William Ney appeared as transition counsel in November 2017, Robert McGuire appeared for Coalition in December 2017, followed by Bruce Brown as counsel for Coalition and Cary Ichter as counsel for the Coalition and for the individual Coalition Plaintiffs.  For the Curling Plaintiffs, Morrison & Foerster appeared as lead counsel and Krevolin & Horst LLC appeared as local counsel in March 2018.

---

[6] In this fee petition, the Coalition does not seek to recover fees for the work performed by Steptoe & Johnson because (1) Steptoe participated in this case on a pro bono basis and (2) Steptoe ultimately chose, in the face of a conflict of interest among plaintiffs, not to represent the Coalition.  Coalition is thus not the proper party to claim for Steptoe's time.  Coalition does, however, seek reimbursement for the full amount of legal fees that the Coalition was charged for services performed by Holcomb & Ward, which Coalition paid.  For purposes of its own fee petition, the Coalition limits its claim in respect of Holcomb & Ward's time to the amount of fees that Holcomb & Ward was actually paid by Coalition.

2.    *Phase II: March 1, 2018 to June 30, 2018: Third Amended Complaint and Motions to Dismiss*

By early April 2018, all plaintiffs had new counsel.  On April 4, 2018, the Coalition Plaintiffs filed their motion for leave (Doc. 160) to file their own Third Amended Complaint (the "TAC").  The TAC was addressed by the parties and the Court in a May 1, 2018 Status Conference (Doc. 186, 189), which prompted further briefing (Doc. 209).  The Court granted Coalition Plaintiffs leave to file the TAC on June 13, 2018 (Doc. 225), and it was docketed as Document 226.  The entirety of the TAC survived an interlocutory appeal on issues of jurisdiction and standing (Doc. 338), as well as two motions to dismiss (Doc. 375).  The Coalition Plaintiffs' TAC is the operative complaint under which this Court granted the Coalition Plaintiffs injunctive relief against the State's continued use of DREs and defective epollbooks.  (Doc. 579.)

Also during this "Phase II," Coalition Plaintiffs renewed efforts to settle the case, sending substantial and detailed correspondence in April 16, 2018 to then-counsel for the Defendants, Roy Barnes and John Salter.  (Doc. 258-1 at 92).  This period also saw continued efforts to determine how Defendants were to preserve evidence in light of upcoming elections, including in-person conferences with the Court on May 1 and May 10, and a telephone conference with the Court on May 18, 2018. (Doc. 186, 189, 204, 205, 217).  Though formal discovery remained

30

stayed because of Defendants' pending motions to dismiss, Coalition Plaintiffs continued informal gathering of case facts through Open Records Act requests, monitoring of primary and other elections, and by other means.

### 3. Phase III: July 1, 2018 to September 19, 2018 - 2018 Motion for Preliminary Injunction

After the Defendants did not respond to repeated demands from the Coalition Plaintiffs to switch to hand-marked paper ballots[7] or to the escalating warnings from national intelligence and security officials,[8] Coalition Plaintiffs filed a Motion for Preliminary Injunction on August 3, 2018. (Doc. 258).[9]

The Coalition Plaintiffs amassed a substantial evidentiary record in support of the 2018 Motion, evidence that would later form the foundation for the successful 2019 Motion. In support of the 2018 Motion, the Coalition Plaintiffs submitted evidence establishing the general vulnerability of DREs and electronic pollbooks, the hightened vulnerability of DREs in Georgia, the experience of Georgia voters in the 2018 mid-term elections, and the feasibility of injunctive relief. Coalition Plaintiffs submitted declarations from Logan Lamb (Doc. 258-1 at

---

[7] Doc. 258-1 at 93 and *id.* at 98 n.3 (listing numerour prior demands).

[8] Doc. 258-1 at 91.

[9]

125), voters Jeanne DuFort (Doc. 296 at 177), Dana Bowers (*id.* at 61and Doc. 277 at 45), Jasmine Clark (Doc. 258-1 at 105 and Doc. 296 at 173), Rob Kadel (Doc. 258-1 at 61), Carri Luse (*id.* at 257), and Laurie Mitchell (*id.* at 286).

In support of the 2018 Motion for Preliminary Injunction, Coalition Plaintiffs submitted nine declarations from six experts:  Richard A. DeMillo (Doc. 277 at 52 and Doc. 285-1 at 1 (enclosing National Academies of Sciences Report "Securing the Vote")), Philip Stark (Doc. 296 at 6); Matthew Bernhard (258-1 at 33; and Doc. 277 at 37), Rebecca Wilson (Doc. 258-1 at 296), Virginia Martin (Doc. 277 at 77 and Doc. 296 at 188), and Amber McReynolds (Doc. 277 at 93).

Coalition Plaintiffs lead counsel Robert McGuire and counsel Bruce Brown presented argument and examined witnesses at the September 12, 2018 hearing. (Doc. 307 (Transcript)).  After the submission of post-hearing closing statements (*e.g.,* Doc. 302), the Court entered an Order on September 17, 2019, denying Defendants' Motions to Dismiss and Denying Plaintiffs' Motions for Preliminary Injunction.  (Doc. 309).  Importantly, however, the 2018 hearing led this Court to find a probability that the Plaintiffs would prevail on the merits and created the evidentiary foundation that the 2019 injunction motion would ultimately incorporate and build upon.

4.      *Phase IV: September 20, 2018 to October 2, 2018 – Motion to Stay, Motion for Additional Injunctive Relief, Appeal*

The State Defendants immediately filed a Notice of Appeal of this Court's denial of their motions to dismiss (Doc. 310) and moved to stay the case pending appeal. (Doc. 320).  While the motion to stay was pending, Coalition Plaintiffs filed a Motion for Additional Injunctive Relief to address the vulnerability and corruption of electronic pollbooks, to enjoin Defendants from conducting elections on DREs after the November 2018 mid-term elections and to require audits of the tabulation of the anticipated large number of absentee ballots in the November election.  (Doc. 372).  Before the Coalition Plaintiffs' Motion for Additional Injunctive Relief was heard, the Court on October 26, 2018, granted the Defendants' Motion to Stay and administratively closed the case.  (Doc. 337).

5.      *Phase V: October 3, 2018 to February 8, 2019: Stay, 2018 Election, Appeal*

With the litigation administratively closed, efforts turned to developing a factual record based on the actual performance of the DREs and Electronic Pollbooks in the 2018 Elections.  On November 3, 2018, just several days before the election, Coalition Counsel received information from a third party that the State's "my voter page" system was vulnerable to an attack and promptly notified John Salter and Roy Barnes, counsel for the State Defendants.  (Curling Counsel

David Cross did the same). In response, the Secretary of State's spokesperson

blamed the Georgia Democrat Party for hacking into the system and accused party

officials of criminal conduct. Worse, with the election just days away, the

Secretary posted a statement on the Secretary of State's official web page – for

every voter to see - stating that he was investigating Georgia Democrats after an

alleged hacking attack, when there no hacking attack and there was never an

investigation by the Secretary of State.

Meanwhile, the State Defendants lost their meritless appeal to the Eleventh

Circuit on 11th Amendment immunity on February 7, 2019. *Curling v. Kemp,* 334

F. App'x 927 (11th Cir. 2019) (finding Defendants' arguments counter to "settled

precedents"). Coalition Plaintiffs are not seeking fees for work on the appeal in

this motion, since appellate attorney fees may only be awarded by the Court of

Appeals. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1356–57 (11th Cir.

2009); 11th Cir. R. 39-2.

> 6.   *Phase VI: February 9, 2019 to August 15, 2019: 2019 Motion for Preliminary Injunction*

After the Eleventh Circuit affirmed this Court's exercise of jurisdiction in

spite of the State's frivolous interlocutory immunity and standing objections (Doc.

338), this Court by docket entry on March 18, 2019 directed the parties to meet and

confer about the scope of the case in light of the passage of HB 316 and to address

34

the scope of discovery. The Court also scheduled a status conference for April 9, 2019. At the status conference, the State Defendants' counsel stated that that the State, in direct response to this Court's 2018 Order, was addressing the critical vulnerabilities in the election system by purchasing a new system for implementation before the Presidential Primaries in 2020. Defendants initially took the position that Plaintiffs' claims with respect to the DREs were moot in light of the passage of HB 316 and that Plaintiffs' claims with respect to the BMDs were not yet ripe. After the Court gave the Defendants a specific briefing schedule on the mootness issue (Doc. 356), the Defendants on April 11, 2019, announced that they would not file a motion to dismiss on mootness. (Doc. 362 at 2).

In April and May, 2019, Defendants refused to participate in discovery themselves and sought to quash Plaintiffs' non-party subpoenas on grounds that the Court had not yet formally reopened the discovery period and had not rendered a decision addressing the remaining issues raised in Defendants' 2018 motions to dismiss. (Doc. 369). On May 16, 2019, Plaintiffs filed a Motion to Open Discovery (Doc. 374). On May 21, 2019, this Court entered an order denying the remaining issues raised in the 2018 motions to dismiss and ordering that discovery was to begin immediately. (Doc. 375).

Although the Court had already found in the Court's 2018 Order that Plaintiffs had established a likelihood of success on their constitutional claims, 334

F. Supp. 2d at 1324, and that Plaintiffs were likely to suffer irreparable injury
without court interevention.  The Court also stated, however, that the case "would
benefit from some discovery and a full evidentiary hearing."  334 F. Supp. at
1322.

Anticipating a heavier workload in a compressed period of time than their
existing team of small-firm and solo lawyers might be able to handle in the face of
conflicting commitments in other cases, the Coalition Plaintiffs expanded their
legal representation to include Ezra Rozenberg, John Powers, and the team of
several additional lawyers from the Lawyers' Committee for Civil Rights Under
Law in May, 2019.

The briefing and fact gathering that were required to support the Coalition
Plaintiffs' renewed Motion for Preliminary Injunction were substantial, requiring
scores of hours by Coalition Plaintiffs' lawyers and support staff.  Coalition
Plaintiffs, primarily through the work of the Lawyers' Committee, devoted
substantial efforts to discovery and hearing preparations relating to the feasibility
of transitioning the State of Georgia to hand-marked paper ballots.  The Coalition
Plaintiffs engaged three experts to provide opinions on feasibility: Virginia Martin,
Candice Hoke, and Amber McReynolds.  Ms. Martin and Ms. McReynolds
testified at the 2019 hearing, and the Court cited this testimony repeatedly in its
Order granting relief.

In addition, Coalition Plaintiffs directed discovery at several Georgia counties to amass evidence showing the feasibility of transitioning to hand-marked paper ballots.  Coalition Plaintiffs took depositions of officials from Gwinnett, Morgan, and Bartow Counties and served document subpoenas on those counties and Hancock County.  Coalition Plaintiffs also took depositions of Defendants' expert Dr. Shamos and Michael Barnes.

The scale and scope of the foregoing efforts alone are sufficient to justify the amount of time that the Coalition Plaintiffs' lawyers spent on this Phase of the case.  In addition, there were a number of other issues that required substantial attention during this time frame.  Seven of those issues are addressed below:

### a. GEMS Database and Server Discovery[10]

As soon as this Court denied the two motions to dismiss the Coalition Plaintiffs' TAC (and denied the motions in part with respect to the Curling second amended complaint), the Court ordered discovery to "begin immediately." (Doc 375, at 61.) Despite this Order, Plaintiffs were immediately met with Defendants' absolute refusal to allow any discovery of the GEMS databases or the GEMS

---

[10] The fees and expenses claimed by the Coalition Plaintiffs in Plaintiffs' recently filed Motion for Sanctions (Doc. 623) for the work on  GEMS database and server discovery are included in the fees and expenses claimed in the Coalition Plaintiffs' motion under Section 1988.  Coalition Plaintiffs submit that each motion must stand on there own and any reconciliation of awards thereunder may be undertaken at the appropriate time.

servers. Litigation over the scope and mechanics of the GEMS discovery

consumed a substantial amount of time in June, July, and early August, 2019. The

work was tedious and difficult due in large part to logistical protections adopted by

the Court to accommodate the State Defendants' misrepresentation that the

structure of Georgia's GEMS databases was unique and therefore confidential.

On June 5, 2019, the State Defendants objected to GEMS database discovery

in its entirety because of the alleged uniqueness of Georgia's GEMS database.

(*See* Doc. 416 at 1). This led to a June 10, 2019 "meet and confer" at State

Defendants' counsel's offices, a June 19, 2019, telephone conference among

counsel, and the June 21, 2019 filing of the "Consolidated/Joint Discovery

Statement Regarding Coalition Plaintiffs' First Request for Production" (Doc.

416). (The Curling Plaintiffs joined the dispute in Doc. 420). The GEMS dispute

was also closely related to a separate dispute concerning the protective order,

which addressed how confidential and "attorneys-eyes-only" materials would be

handled. The dispute over the terms of the protective order was presented to the

Court in the June 25, 2019, "Consolidated/Joint Discovery Statement on the Need

for a Protective Order" (Doc. 429).

The Court addressed both of the GEMS discovery dispute and the related

protective order issues in a June 28, 2019, telephone conference (Doc. 438), which

led to additional briefing (Doc. 440, 441) and the Court's Order of July 2, 2019

(Doc. 446).  That order directed the parties to meet and confer concerning the

State's proposed protocols for the production of the GEMS databases, which, in

turn, led to additional briefing and submission of expert testimony concerning

protocols, including Plaintiffs' July 3, 2019, "Proposal Regarding Security

Protocols for Review of GEMS Database," (Doc. 451), with declarations from

Matt Bernhard (Doc. 451-3) and Alex Halderman (Doc. 451-2).

     These filings led to the Court's Order (by docket entry only) on July 8,

2019, directing the State Defendants to provide information about how the State

could host the discovery of the GEMS databases.  This prompted further briefing

the same day by Plaintiffs (Doc. 455) and the State Defendants (Doc. 456) and

another Minute Order by the Court.  More briefing ensued the next day by

Plaintiffs (Doc. 460), and an Order on GEMS Database Discovery by the Court.

(Doc. 463).  Further briefing ensued on the State Defendants' position that Phase I

GEMS discovery was moot (Doc. 470), which led to another telephone hearing on

July 11, 2019.  (Doc. 482).

     Again, all of this litigation activity was based on the State Defendants'

misrepresentation that the structure of Georgia's GEMS database was unique.  On

July 12, 2019, the databases were finally delivered to Plaintiffs' experts in Ann

Arbor, just two weeks prior to the hearing on the motion for preliminary

injunction.  Plaintiffs' expert quickly discovered that there was nothing

confidential or unique about Georgia's GEMS databases – they were exactly the

same as public GEMS databases from other jurisdictions. (GEMS Screenshots,

Doc. 489).

On July 15, 2019, counsel for Coalition Plaintiffs and Curling Plaintiffs

conferred with counsel for the State Defendants about the State Defendants'

misrepresentations. Counsel for the State Defendants would not respond to

questions about the misrepresentation and did not respond to follow up emails.

Counsel for Plaintiffs informed counsel for the State Defendants that Plaintiffs

would seek relief from the Court at the appropriate time. Plaintiffs filed a Joint

Motion for Sanctions on October 11, 2019, which is currently pending. (Doc.

623).

### b. 2018 Election Discovery

Lawyers and staff for the Coalition Plaintiffs devoted a substantial amount

of time obtaining evidence from voters on their actual experiences attempting to

vote in the 2018 elections. Of the hundreds of declarations obtained and reviewed,

the Coalition Plaintiffs selected the most relevant and filed those in two large

volumes of evidence on June 19, 2019 (Doc. 412 and 413). This evidence showed

that in the 2018 elections Georgia voters experienced a multitude of problems in

their attempts to to vote using DREs: candidates did not appear on the electronic

ballot until the summary screen, voters received ballots from the wrong congressional district, DREs would "self-cast" ballot before the voter finished making selections, DREs flipped votes from Stacey Abrams to Brian Kemp, DREs randomly generated error messages, malfunctioning DREs were not replaced by pollworkers, and so on.

Scores of declarations filed by the Coalition Plaintiffs also described a host of problems with electronic pollbooks encountered by voters and pollwatchers. (Doc. 412 at 108 to 323). This evidence ssupplemented a number of declarations that Coalition Plaintiffs submitted in 2018 describing similar problems that were encountered with the electronic pollbooks in the 2018 primaries. (*See* Doc. 258-1). Problems with the electronic pollbooks lead directly to massive voter disenfranchisement.

The Court discussed this evidence in detail in its Order. (Doc. 579 at 90 to 111).

Coalition researchers also reviewed hundreds of polling place records including poll tapes locating numerous discrepancies and indications of machine defects and unreconciled differences in ballots cast and ballots counted.

c. Role of Municipalities

During the May 24, 2019 telephone conference, the Court raised the issue of how a preliminary injunction prohibiting DREs to be used as voting devices would affect the administration of local and municipal elections, given that the Secretary, the State Board and the Fulton Board were the only parties to the action. In a May 29, 2019 Brief, Coalition Plaintiffs explained that an injunction prohibiting the Secretary from using DREs would, in effect, prohibit their use statewide because the Secretary is the solely responsible for programming the DREs. (Doc. 379). In addition, as to the burden on non-party municipalities, Coalition Plaintiffs explained that Georgia law obligated the Secretary and the State Board to support local jurisdictions in their the use of any voting system, which included hand-market paper ballots. (Doc. 379 at 6 - 7).

The Court discussed this issue in detail in its Order. (Doc. 579 at 12 to 21).

d. Lietuenant Governor Election Evidence

The Coalition was an original plaintiff in *Martin v. Raffensperger,* a state-court election contest now pending before the Supreme Court of Georgia. The evidence obtained in that case, which the Court directed the State Defendants to file in this case (Doc. 418), showed that the unusually high undervote in the Lieutenant Governor's race occurred only in votes cast on the DRE voting

42

machines. (Doc. 419-1 at 24-28). This evidence was relevant to this case because, as Dr. Philip Stark opined, the "disparity in undervote rates by voting technology strongly suggests that malfunction, misconfiguration, bugs, hacking, or other error or malfeasance caused some DREs not to record votes in the Lt. Governor's contest." (*Id.*). Precinct-level analysis of the reported votes also revealed that the drop-off in voter participation was much greater in precincts with a high percentage of African American voters. (*Id.*).

The Coalition Plaintiffs do not seek reimbursement for the actual cost of developing this evidence in the *Martin* litigation. It was reasonable and efficient for the Coalition Plaintiffs to address this evidence in detail in its briefing. (Doc. 419-1 at 24-28; Doc. 507 at 13-17).

### e. State Defendants Subpoena Churches

On June 28, 2019, the State Defendants issued subpoenas to Ebenezer Baptist Church and 11 other local churches and organizations. The only reason this discovery was served was to harass these Churches and support the Secretary of State's media message. In response, the Coalition Plaintiffs filed a Motion to Quash explaining the many reasons this discovery should not go forward. The Motion was stricken because it did not follow the Court's discovery dispute resolution protocols, and Coalition Plaintiffs are not seeking reimbursement for the

work on the Motion to Quash.   (*See* Ex. E, E. Rosenberg Decl. at ¶ 46).  The State

Defendants eventually withdrew the discovery.

### f.  Ballot Secrecy Claim

Discovery has yet been permitted that would reveal conclusively whether

DREs *do* retain information which links an individual voter to his or her cast ballot

(something the State Defendants argues when resisting discovery (Doc. 369 at 22-

23)), or whether DREs *cannot* retain such information (the contrary argument that

the State Defendants made when resisting Plaintiffs' Motion for Preliminary

Injunction, (Doc. 472 at 55)).   The State Defendants have never addressed, much

less reconciled, their conflicting positions.

The Court did not address ballot secrecy in its injunction order.  (Doc. 579.)

In light of the Defendants' argument made in discovery that inspection of the

DREs could indeed violate ballot secrecy, however, the Coalition Plaintiffs' efforts

to pursue the issue were certainly reasonable, and the fact that the relief granted

was not ultimately based on ballot secrecy violations is immaterial to the fee

petition.  *Hensley,* 461 U.S. at 435 ("Litigants in good faith may raise alternative

legal grounds for a desired outcome, and the court's rejection of or failure to reach

certain grounds is not a sufficient reason for reducing a fee. The result is what

matters.")

g.  KSU Server Destruction of Evidence

Finally, Defendants' destruction of evidence warranted the commitment of additional resources in the preparation and filing of the Coalition Plaintiffs' Hearing Brief on Evidentiary Presumption Arising from Spoliation of Evidence. (Doc. 548).  That Brief detailed how the State Defendants, almost immediately upon receiving notice of the pendency of this suit and allegations of the insecurity of electronic voting in the State, destroyed the evidence that was "ground zero" for establishing hacking, unauthorized access, and potential manipulation of election results. The Brief further described how less than a day of the removal of this case to this Court, the State and its agents destroyed a second server and all of its resident data.  And the Brief complained of the ongoing spoliation of evidence by the State Defendants, who, despite repeated preservation demands, continued over and over again to delete and overwrite data previously preserved in the DRE's memories and on memory cards used in relevant elections.

As the Brief noted, the servers destroyed by the State Defendants and the memory cards overwritten or deleted by the State Defendants were the repository of records that go to the most critical issues in this case: logging records that would reflect unauthorized access of the election servers; deleted files or manipulated data; implanted malware that, as this Court has seen, can actually change an elector's vote and thereby actually change an election result.

45

In response, the State Defendants insisted that the servers were not destroyed but instead were "repurposed," (Doc. 558 at 2), and accused Coalition Plaintiffs' counsel of sharing their brief with reporters before it was filed. (*Id.* at 3-4.) The State Defendants also took the position that some of the evidence had not been lost entirely because the FBI has an image of the "repurposed" CES server. Yet the State Defendants now are refusing to allow Plaintiffs to conduct forensic discovery on the FBI's image of the now-destroyed CES server, taking the position that the Court's Order (which they are coy about whether they will appeal) moots the issue. The State Defendants refusal to permit this discovery – which would only cost them if they have something to hide –has thus prompted yet another discovery dispute that is currently before the Court. (Doc. 589).

These disputes illustrate why the Coalition Plaintiffs were required to spend the time that they did during Phase VI. At every stage of this litigation, the State Defendants have put the Plaintiffs in the position of having to overcome a scorched-earth defense and frivolous arguments on everything from *Ex parte Young* to discovery of the GEMS databases. Now that they are faced with the financial consequences of their own litigation tactics, the State Defendants should not be permitted to second guess the time that the Plaintiffs have had to spend to overcome so much meritless opposition.

7.    *Phase VII: August 16, 2019 to Present: Post-Injunction Enforcement and Fees*

The last chronological phase brings us to the present time.  Phase VII encompasses both the Plaintiffs' ongoing supervision of this Court's injunction Order and the present claim for attorney fees and expenses.  Under Section 1988, successful plaintiffs may recover attorneys' fees for efforts undertaken to enforce the judgment.  *United States v. Conces,* 507 F.3d 1028, 1039 (6th Cir. 2007).  Coalition Plaintiffs accordingly seek reimbursement for efforts undertaken to ensure that Defendants are complying with the injunction and that the injunction is explicit enough to insure meaningful efforts by the State Defendants to develop a backup plan for the 2020 elections and to address the persistent problems with electronic pollbooks.  These efforts included meeting and conferring with the State Defendants on issues relating to compliance as well as the filing of Coalition's Rule 59(e) Motion to Alter or Amend the Judgment (Doc. 605, 621).

Successful Plaintiffs also may recover for time spent in connection with preparing a fee petition.  *Johnson v. University College,* 706 F.2d 1205, 1207 (1983).  Coalition Plaintiffs' counsel seek to recover for less than 150[11] hours spent in connection with preparing the petition, which is reasonable in light of the size of

---

[11] This is an estimate.  The number of hours spent in Phase VII is 204 to date, but that period included substantial work on Coalition Plaintiffs' Rule 69(e) Motion and ongoing discovery disputes.

the case and the requested award.  *Compare Occasional Superstar* (after

adjustment, finding 25 hours of time on fee award of $46,213 was reasonable and

appropriate).

## VI.    REASONABLENESS OF RATES

"A reasonable hourly rate is the prevailing market rate in the relevant

community for similar services by lawyers of reasonably comparable skills,

experience, and reputation," *Norman v. Hous. Auth. of Montgomery,* 836 F.2d

1292, 1299 (11th Cir. 1988), "regardless of whether plaintiff is represented by

private or non-profit counsel." *Blum v. Stenson,* 465 U.S. 886, 895 (1984).  "Civil

rights litigants may not be charged with selecting the nearest and cheapest

attorney." *Dowdell,* 698 F.2d at 1192.

Coalition Plaintffs are requesting the following hourly rates.  The

qualifications of each of the lawyers is discussed in greater detail in the attached

declarations.

Robert McGuire: $615.  Mr. McGuire graduated from Princeton in 1994 and

Yale Law School in 1999, where he served as a Senior Editor of the Yale Law

Journal.   After law school, Mr. McGuire clerked for Judge James B. Loken of the

U.S. Court of Appeals for the Eighth Circuit.  Prior to starting his own firm in

2009, Mr. McGuire worked in the capital markets group of Allen & Overy LLP in

48

London, U.K., where his hourly rate ranged between $725 and $1,000.  Since

2009, Mr. McGuire's law practice through his own firm has focused on federal and

state elections laws and litigation.  Mr. McGuire's practice is split between Seattle,

Washington, and Denver, Colorado, and he has represented clients in election and

other cases all over the country.

     Bruce Brown: $625.  Mr. Brown graduated from Davidson College in 1979

and University of Georgia School of Law in 1984.  After law school, Mr. Brown

clerked for Judge Edward A. Tamm of the U.S. Court of Appeals for the District of

Columbia Circuit and Chief Justice of the United States Warren E. Burger.  Mr.

Brown practiced with Long, Aldridge & Norman (and its successor, McKenna,

Long & Aldridge) from 1986 to 2012, when he started his own practice.  When he

left McKenna, Mr. Brown's hourly rate was $605.  Mr. Brown has specialized in

complex commercial, regulatory and constitutional cases throughout his career.

     Cary Ichter: $625.  Mr. Ichter is the managing partner of Ichter Davis, LLC,

and has practiced in Atlanta since graduating *magna cum laude* from the

Univeristy of Georgia School of Law in 1984.  Mr. Ichter began his legal career

working for Powell, Goldstein, Frazer & Murphy, where he worked until 1992.  In

1992, Mr. Ichter co-founded the firm Meadows, Ichter & Trigg.  Mr. Ichter is

known by reputation as a "highly skilled litigator."  (Remar Decl., ¶ 10).

Additional information about Mr. Ichter's practice and experience may be found in his declaration (Ex. D), and his firm web site, ichterdavis.com.

William Ney: $450.00. Mr. Ney is a 1999 graduate of Emory Law School and has practiced in Atlanta since 2001. Mr. Ney was a founding member of Ney Hoffecker Peacock & Hayle, LLC, where he practiced until 2018, when he started his own solo practice. Mr. Ney has handled a wide range of civil cases throughout his career, with a speciality in professional liability cases. Mr. Ney frequently serves as an expert witness on lawyers' standard of care and reasonableness of fees. (Ex. F, Ney Decl.).

Lawyers' Committee Lawyers. The two primary lawyers from the Lawyers' Committee engaged in this case are Ezra Rozenberg and John Powers. Mr. Rosenberg ($650) is the Co-Director of the Voting Rights Project at the Lawyers Committee. (*See generally,* Ex. E, E. Rosenberg Decl., ¶ ¶ 8-11). A 1974 graduate of New York University School of Law, Mr. Rosenberg practiced with Dechert for many years before leaving to join the Lawyers' Committee in 2014. Mr. Rosenberg has substantial experience at Dechert and the Lawyers' Committee on voting rights cases, representing plaintiffs in high profile cases throughout the country. Mr. Rosenberg many honors and other information on his background may be found in his declaration.