*Carolyn S. Pace v. Durance Lowendick and Cuzdey*, *Ehrmann, Wagner, Stine, Sansalone & Bobe LLC,* State Court of Fulton County, State of Georgia, Civil Action File No. 10EV010683-D (Legal malpractice case involving negligent medical malpractice representation)

*Janet Guzzardo v. James E. Patterson, et al.*, Superior Court of Butts County, State of Georgia, Civil Action File No. 2012V364(W) (Legal malpractice action involving negligent representation in disability case)

*David Berkman, et al. v. Christopher T. Graham, et al.,* State Court of Fulton County, State of Georgia, Civil Action File No. 13EV017175A (Legal malpractice action involving negligent asset protection planning)

*Billy K. Larkin v. Karen M. Earley, et al.*, Superior Court of Muscogee County, State of Georgia, Civil Action No. SU13CV3751-06 (Legal malpractice action involving improper deed preparation by closing attorney)

*Tyrone Bennett v. Andrew M. Magruder, et al.*, Superior Court of Richmond County, State of Georgia, Civil Action File No. 2014RCCV96 (Legal malpractice action Involving negligent representation in personal injury action)

*Glenn Daniel Morgan v. Richard R. Rafter, et al.*, Superior Court of Effingham County, State of Georgia, Civil Action File No. 2015000196T (Legal malpractice action involving improper drafting of promissory note and security instrument)

*James W. Penland v. Evelyn Bostwick, et al.*, State Court of DeKalb County, State of Georgia, Civil Action File No. 15-A-57449-E5 (Attorney Fee Dispute representation)

*Peter Greene v. Henry De Give, et al.*, Superior Court of Fulton County, State of Georgia, Civil Action File No. 2015CV264025 (Legal malpractice action involving negligent personal injury representation)

*Mary Anne Hampton, et al. v. P. Justin Thrailkill,* Superior Court of Fayette County, State of Georgia, Civil Action File No. 2015V-0113 (Legal malpractice action involving trial error in commercial dispute)

*Leiba Middleton v. Nkosi John Bey, et al.*, State Court of Fulton County, State of Georgia, Civil Action File No. 15EV004153 (Legal malpractice action involving negligent personal injury representation)

*Offutt v. Schwartz, et al.*, Superior Court of DeKalb County, State of Georgia, Civil Action File No. 17CV5249 (Legal malpractice action involving negligent slip and fall claim representation)

*Joseph Zywics v. Roberts W. Lamb, et al,* Superior Court of Bartow County, State of Georgia, Civil Action File No. SUCV2017000621 (Legal malpractice action involving improper representation in property damage claim)

*Edward F. Culican, Jr. v. Marta Maria Noriega-Allen, et al.,* Superior Court of Fulton County State of Georgia, Civil Action File No. 2017CV290193 (Legal malpractice action involving mishandling of divorce issues)

*Krystal Moore v. Morris O. Little et al.*, Superior Court of Fulton County, State of Georgia, Civil Action File No. 2017CV292107 (Legal malpractice action involving negligent representation in defamation action)

*Jerry Maki v. John Foy et al.*, Superior Court of Fulton County, State of Georgia, Civil Action File No. 2017CV285055 (Legal malpractice case involving mishandling of personal injury claim)
*Janel Cheek v. L. Clayton Smith, Jr. et al.*, Superior Court of Dougherty County, State of Georgia, Civil Action File No. SUCV2018000359 (Legal malpractice action involving improper administration of estate)

*George Potter, et al v. Gary J. Markwell et al.*, Superior Court of Fulton County, State of Georgia, Civil Action File No. 2017CV288866 (Legal malpractice action involving misdrafting of will and failure to properly administer estate)

*Dashawn Mayweather v. Sherri L. Washington et al.*, Superior Court of Rockdale County, State of Georgia, Civil Action File No. 2018-CV-1052 (Legal malpractice action involving failure to appear at divorce hearing)

*Jerry Gibby v. Andrea Tousignant*, Court of Appeals, State of Georgia, Appeal No. Appeal No. A18A1202 (Appeal of attorneys' fee award)

*Brett D. McNeill et al. v. SD&D Greenbuilt, LLC*, Court of Appeals, State of Georgia, Appeal No. A18A1840 (Interlocutory appeal in legal malpractice action involving improper advice regarding redevelopment of commercial property)

*Birikiti Geberemedhen v. Richard Stephen et al.*, Superior Court of Gwinnett County, State of Georgia, Civil Action File No. 18A 00626-6 (Legal malpractice action involving theft of client funds)

*Wendy Christian v. T. Joseph Boyd et al.*, Superior Court of Bibb County, State of Georgia, Civil Action File No. 2016-CV-065671 (Legal malpractice action involving missed statute of limitations and *ante litem* notice issue in a personal injury action)

*Lynn Roberta Roberts v. James D. McGuire et al.*, United States District Court for the Northern District of Georgia, Civil Action File No. 1:17-cv-01588-TWT (Legal malpractice action involving improper handling of divorce issues)

*Gabriela Da Silva v. Neil R. Flit et al.*, Superior Court of Cobb County, State of Georgia, Civil Action File No. 17109053 (Legal malpractice action involving mishandling of client funds)

*Samir Braich v. Neil Flit et al.*, Superior Court of Cobb County, State of Georgia, Civil Action File No. 18103330 (Legal malpractice action involving missed statute of limitation on personal injury action)

*Kris Reed v. Neil Flit et al.*, Superior Court of Fulton County, State of Georgia, Civil Action File No. 2017CV292114 (Legal malpractice action involving missed statute of limitation on personal injury action)

*Susan Hill v. Amy Burnett*, Court of Appeals, State of Georgia, Appeal No. Appeal No. A18A1655 (Appeal of attorneys' fee award)

*Michael Pitts v. Neil R. Flit and Law Office Neil Flit and Associates LLC*, Superior Court of Cobb County, State of Georgia, Civil Action File No. 18105778 (Legal malpractice case involving missed statute of limitations)

*Sharon Redden v. Neil R. Flit and Law Office Neil Flit and Associates LLC*, Superior Court of Cobb County, State of Georgia, Civil Action File No. 18109085 (Legal malpractice case involving escrow accounting dispute)

## EXPERT CONSULTING AND TESTIMONY

*Baskin & Baskin, P.C. v. Linnette E. Dreisbach*, State Court of Cobb County, State of Georgia, Civil Action File No. 14-A-1629 (O.C.G.A. § 9-11-9.1 Affidavit and deposition testimony)

*R.D. Thomas Jr., and Mary Lynn Troia Willingham, et al. v. First Southern Bank f/k/a/ The Patterson Bank, et al.*, Superior Court of Pierce County, State of Georgia, Civil Action File No. SUCA2015000234 (O.C.G.A. § 9-11-9.1 Affidavit and deposition testimony)

*Tony E. Mathis v. Robert Kenner Jr and The Law Offices of Robert Kenner Jr.,* State Court of Henry County, State of Georgia. Civil Action File No. 16SV486JTH (O.C.G.A. § 9-11-9.1 Affidavit, deposition testimony and trial testimony)

*The Maneley Law Firm, P.C. v. Quincy Sneed*, Superior Court of Fulton County, State of Georgia, Civil Action File No. 2016CV280985 (O.C.G.A. § 9-11-9.1 Affidavit and deposition testimony)

*Meunier Carlin & Curfman, LLC v. Scidera, Inc.*, United States District Court for the Northern District of Georgia, Civil Action File No. 1:15-cv-01665-RWS (Expert consulting regarding reasonableness of attorneys' fees and other issues in dispute between law firm and former client)

*Alice H. Anderson v. Robert Michael Drose, et al.*, Court of Common Please for the Ninth Judicial Circuit, County of Charleston, State of South Carolina, Case No. 2018-CP-10-02963 (Standard of care affidavit in legal malpractice dispute)

*Ryan Froelich et al. v. Andrew Charles Matteson et al.*, Henning Arbitration (O.C.G.A. § 9-11-9.1 Affidavit regarding abandonment of breach of contract/business tort case by clients' former attorneys)

*Ramirez v. Merriwether & Tharpe, LLC*, *et al*., Superior Court of Fulton County, State of Georgia, Civil Action File No.2018-CV-311598 (O.C.G.A. § 9-11-9.1 Affidavit and testimony regarding standard of care issues in the context of family law case)

Case 1:17-cv-02989-AT   Document 5305-5   Filed 10/15/19   Page 205 of 342

EXHIBIT 2

# WILLIAM BRENT NEY, LLC
ATTORNEY AT LAW

WILLIAM BRENT NEY
Direct Dial 404-842-7232
Fax 770-637-5057
william@neyrhein.com

265 SOUTH CULVER STREET
LAWRENCEVILLE, GEORGIA 30046

October 14, 2019

## STATEMENT OF ACCOUNT

Client:   Coalition for Good Governance
Marilyn R. Marks
7035 Marching Duck Drive E504
Charlotte, North Carolina 28210

Matter:  CGG/Kemp

---

TIME CHARGES

|  | Hours | Rate | Amount |
|---|---|---|---|
| William Brent Ney | 99.4 | $450/hr. | $44,730.00 |
| Law Clerk | 13.6 | $145/hr. | $1,972.00 |
| Paralegal | 12.5 | $145/hr. | $1,812.50 |
|  |  | **Total:** | **$48,514.50** |

## DAILY DETAIL OF TIME CHARGES

William Brent Ney

| Date | Services Rendered | Hours |
|---|---|---|
| 11/17/2017 | Telephone conference with Marks; Two emails to Marks; Four emails from Marks; Review documentation provided by Marks | 0.8 |
| 11/18/2017 | Email from Marks | 0.1 |
| 11/19/2017 | Four emails from Marks; Two emails to Marks | 0.2 |
| 11/20/2017 | Four emails to Marks; Five emails from Marks | 0.2 |
| 11/21/2017 | Teleconference with Law Clerk; Seven emails from Marks; Two emails to Marks | 0.3 |
| 11/22/2017 | Three telephone conferences with Marks; Meet with Contract Attorney; Meet with Law Clerk; Eighteen emails from Marks; Three emails from Renigar; Three emails to Renigar; Email to Schwartz; Seven emails to Marks; Edit Entry of Limited Scope Appearance; Edit Response to Motion to Withdraw and Cross-Motion to Disqualify; Legal research regarding Disqualification issues; Review documents provided by Marks; | 4.5 |
| 11/23/2017 | Legal research regarding conflict issues, duties to former clients, and informed consent; Reviewed Motion to Withdraw; Review prior communications from between CGG and Steptoe; Review docket; Prepare | 3.9 |

| | | |
|---|---|---|
| | and edit Response to Motion to Withdraw and Cross-Motion to Disqualify; Three emails from Marks | |
| 11/24/2017 | Edit and revise Entry of Limited Scope Appearance, Motion to Disqualify and related documentation; Edit and revise Motion to Stay and Brief in Support; Review Docket; Review documents and information provided by Marks; Telephone conference with Marks; Seventeen emails to Marks; Twenty-seven emails from Marks | 3.5 |
| 11/25/2017 | Edit and revise Entry of Limited Scope Appearance. Motion to Disqualify and Brief in Support; Edit and revise Motion to Stay and Brief in Support; Twenty emails from Marks; Fifteen emails to Marks | 3.2 |
| 11/26/2017 | Six emails to Marks; Nine emails from Marks; Three emails from Hoke; Review multiple revisions of Motion to Disqualify, Brief in Support and related documents | 1.1 |
| 11/27/2017 | Meet with Law Clerk; Review legal research regarding disqualification issues; Telephone conference with Marks; Conference call with Marks and Hoke; Edit Motion to Expand Time to File *Ex Parte* Response; Edit Notice of Appearance; Twenty-seven emails to Marks; Three emails to Hoke; Thirty-Five emails from Marks; Six emails from Hoke; Email from Renigar; Email from Court | 5.5 |
| 11/28/2017 | Edit Motion to Strike and related documents; Edit, print and assemble Response to Motion to Withdraw and related documents; Meet with Law Clerk; Twenty-eight emails from Marks; Two emails from Court; Review Order Extending Response Time; Email to McConochie; Email from McConochie; Email from Ward; Review letter from Ward; Email from Daniel; Review letter from Steptoe; Twenty-Four emails to Marks; Email to McConochie | 4.8 |
| 11/29/2017 | Meet with Law Clerk; Prepare and edit letter to Steptoe; Three telephone conferences with Marks; Telephone conference with Ward; Two emails from Curling; Email from Price; Edit Consent to Withdrawal; Sixteen emails from Marks; Email from Ward; Two emails from Court; Review Order Granting Withdrawal and Staying Case; Review Order Administratively Closing Case; Two emails from Hoke; Fifteen emails to Marks; Two emails to Ward; Text from Marks | 4.0 |
| 11/30/2017 | Telephone conference with Marks; Six emails from Marks; Review litigation overview; Email from Court; Review Amended Order Sealing Response; Five emails to Marks; Two emails from Court; Email from Ward | 1.0 |
| 11/17/2017 | Telephone conference with Marks; Two emails to Marks; Four emails from Marks; Review documentation provided by Marks | 0.8 |
| 12/01/2017 | Telephone conference with McConochie; Five emails from Marks; Email from Ward; Three mails to Marks; Email to Ward | 0.4 |
| 12/02/2017 | Telephone conference with Marks; Five emails to Marks; Five emails from Marks; Email from Hoke | 0.7 |
| 12/03/2017 | Two emails from Marks; Review two draft letters | 0.2 |
| 12/04/2017 | Two emails from Ward; Email from Marks | 0.1 |

| | | |
|---|---|---|
| 12/05/2017 | Two telephone conferences with Marks; Six emails from Marks; Email from Holcomb; Five emails from Ward; Five emails from Marks; Six emails to Marks; Email to Holcomb; Three emails to Ward | 1.0 |
| 12/06/2017 | Email from Ward; Email from Marks; Telephone conference with Marks; Email to Ward; Two emails to Marks | 0.4 |
| 12/07/2017 | Two emails from Marks | 0.1 |
| 12/08/2017 | Meet with Marks;Mmeet with Marks and Protect Democracy Attorneys; Three emails to Marks; Email from Schnell; Email from Marks; Review letter to Totenberg; Four emails from Marks; Email from Ward; Email from Curling; Review/Process several dozen emails from Holcomb | 1.2 |
| 12/09/2017 | Telephone conference with Marks; Three emails from Marks | 0.4 |
| 12/11/2017 | Email from Marks; Email from Highsmith; Email from Ward; Email from McConochie; Email to Ringer; Email to Highsmith | 0.3 |
| 12/12/2017 | Telephone conference with Marks; Edit letter to Renigar; Email from Court; Review Order; Meet with Law Clerk; Twenty-one emails from Marks; Fifteen emails from Ward; Email from Law Clerk; Six emails from McGuire; Five emails from Caldwell; Email from Salter; Email froM Highsmith; Email from Lewis; Email from Waldron; Email fromk Hoke; Email from White; Email from Ringer; Email from Bennett; Email from Schnell; Eighjt emails to Marks; Email to Law Clerk; Two emails to McGuire; Two emails to Ward; Email to Renigar; Email to Salter; Email to Hoke | 3.0 |
| 12/13/2017 | Meet with Law Clerk; Telephone conference with McGuire; Two emails from Schnell; Six emails ffrom McGuire; Email from Marks; Email from Court; Two emails from Salter; Edit Joint Report Regarding Document Preservation Issues; Email from Caldwell; Email to McGuire; Email to Law Clerk; Three emails to McGuire | 1.8 |
| 12/14/2017 | Telephone conference with Marks; Three emails from Schnell; Five emails from Marks; Five emails from McGuire; Email from Highsmith; Three emails from Salter; Email from Court; Email from Renigar; Three emails to McGuire; Email to Ward; Email to Salter; Email to Marks | 1.3 |
| 12/15/2017 | Five emails to Marks; Eleven emails from Marks; Six emails from Ward; Two emails from Court; Review Orders Regarding Preservation of Evidence | 0.7 |
| 12/16/2017 | Email from Holcomb; Email from Schoenburg; Email from Price; Email from Digges; Email from Marks | 0.1 |
| 12/17/2017 | Three emails to Marks; Two emails from Marks; Email from Ward; Email from Curling | 0.3 |
| 12/18/2017 | Two emails from Marks; Email from Holcomb; Email from Imdigges; Email from Bacon; Email to Marks | 0.2 |
| 12/19/2017 | Email from Terry; Email from Holcomb; Emails from Marks; Email from Davis | 0.1 |

| Date | Description | Hours |
|---|---|---|
| 12/21/2017 | Six emails from Marks; Two emails from Ward; Email from Salter; Meet with Law Clerk; Edit letter to Fulton County Board of Elections; Two emails from Court; Email from Hoke; Email from Holcomb; Email from Renigar; Three emails to Marks; Email to Schwartz, *et al*.; Email to Law Clerk; Email to Ringer; Two emails to McGuire | 1.2 |
| 12/22/2017 | Two emails from Court; Review Order Granting Admission *Pro Hac Vice*; Review Certificate of Mailing; Two emails from Marks; Email from McGuire; Email to McGuire; Email to McGuire | 0.3 |
| 12/27/2017 | Email to McGuire; Email to Marks; Two emails from Marks | 0.1 |
| 12/30/2017 | Email to Marks | 0.1 |
| 12/31/2017 | Two emails from Marks | 0.1 |
| 01/01/2018 | Two emails to Marks; Two emails from Marks | 0.1 |
| 01/03/2018 | Two emails from Marks; Three emails to Marks | 0.2 |
| 01/04/2018 | Two emails from Marks; Email from Holcomb; Email from Hoke | 0.1 |
| 01/05/2018 | Email from Court; Review Order; Meet with Law Clerk; Edit Notice of Appearance; Telephone conference with Marks; Eleven emails from Marks; Eight emails from McGuire; Four emails to Marks; Six emails to McGuire; Two emails to Renigar | 1.5 |
| 01/06/2018 | Two emails from Marks; Email from Hoke | 0.1 |
| 01/07/2018 | Email from Marks | 0.1 |
| 01/08/2018 | Prepare and edit Notice of Intent Regarding Representation; Meet with Law Clerk; Thirteen emails from Marks; Three emails from McGuire; Two emails from Court; Email from Law Clerk; Email from Renigar; Review Status Report filed by Steptoe & Johnson, LLP; Seven emails to Marks; Two emails to McGuire | 1.6 |
| 01/09/2018 | Telephone conference with Marks; Email to Marks; Eight emails from Marks; Two emails from McGuire; Email from Court; Review Entry of Appearance; Email from McGuire | 0.5 |
| 01/10/2018 | Four emails from Marks; Email to McGuire | 0.1 |
| 01/11/2018 | Email from Court; Review Order; Email to Marks; Nine emails from Marks | 0.2 |
| 01/12/2018 | Email from McGuire; Email from Ward; Email from Court; Review Motion to Withdraw and related documents; Email to Marks; Email from Marks | 0.2 |
| 01/13/2018 | Two emails from Marks | 0.1 |
| 01/16/2018 | Three emails from Court; Review Objection to Request to Withdraw; Review Notice of Leave of Absence; Review Certificate of Compliance with Standing Order; Seven emails from Marks; Email from Ichter; Two emails from McGuire; Email from McConochie; Two email to McGuire; Email to Marks | 1.2 |

| 01/17/2018 | Three emails from Marks | 0.1 |
|---|---|---|
| 01/18/2018 | Email from Court; Review Order Granting Motion to Withdraw; Three emails to Marks; Three emails from Marks; Email to McGuire | 0.2 |
| 01/19/2018 | Review documents relating to Substitution of Counsel; Three emails from Ichter; Two emails from McGuire; Email to Marks; Email from Marks | 0.3 |
| 01/21/2018 | Email from Marks | 0.1 |
| 01/23/2018 | Meet with Law Clerk | 0.1 |
| 01/25/2018 | Nine emails from Marks; Email from Ward; Email from Ichter; Review Consent to Withdraw; Email from McGuire; Email from Court; Three emails to Marks; Email to Ward | 0.3 |
| 01/26/2018 | Email from Salter; Email from Marks | 0.1 |
| 01/27/2018 | Email from Marks; Email to Marks | 0.1 |
| 01/28/2018 | Two emails from Marks; Email to Marks | 0.1 |
| 01/29/2018 | Five emails from Marks; Three emails from McGuire | 0.1 |
| 01/30/2018 | Email from Salter; Two emails from McGuire; Seven emails from Marks; Three emails to Marks | 0.2 |
| 02/02/2018 | Two emails from Marks; Two emails from Ichter; Two emails from McGuire | 0.2 |
| 02/03/2018 | Two emails from Marks; Email from McGuire; Email to McGuire | 0.1 |
| 02/06/2018 | Email from Ichter; Two emails from Court; Review Response to Order by Curling, Price and Schoenberg; Two emails from Marks; Review Response to Order by Digges; Email from McGuire | 0.2 |
| 02/07/2018 | Six emails from Marks; Email from Ichter; Two emails to Marks | 0.2 |
| 02/08/2018 | Two emails from Ichter; Four emails from Marks | 0.1 |
| 02/09/2018 | Email from McGuire; Email from Marks | 0.1 |
| 02/12/2018 | Email to Marks; Two emails from Marks | 0.1 |
| 02/16/2018 | Review Leave of Absence | 0.1 |
| 02/17/2018 | Email to Marks; Email from Marks | 0.1 |
| 02/21/2018 | Email from Marks; Email from Brown | 0.1 |
| 02/23/2018 | Three emails from Court; Review Digges' Response to Order; Review Curling/Price Response to Order; Review Davis Response to Order | 0.1 |
| 02/26/2018 | Three emails to Marks; Email from Marks; Email from McGuire | 0.1 |

| Date | Description | Hours |
|---|---|---|
| 02/27/2018 | Two emails from Marks; Two emails from Court; Review Order; Review Certificate of Mailing; Two emails from McGuire; Two emails from Ichter; Email to McGuire; Two emails to Marks; Two emails to Ichter | 0.3 |
| 02/28/2018 | Email from Brown; Three emails from Court; Review Order; Review Certificates of Mailing; Email from Marks; Email from McGuire; Email to Ichter, *et al.;* Two emails to Marks | 0.2 |
| 03/02/2018 | Two emails from McGuire; Email from Ichter; Email to Ichter*, et al.*; Email to McGuire, *et al.* | 0.1 |
| 03/05/2018 | Meet with Law Clerk | 0.1 |
| 03/06/2018 | Review Third Amended Complaint; Email to McGuire; Email to Marks; Four emails from Marks | 0.8 |
| 03/07/2018 | Conference call with Marks, McGuire, *et al.* | 0.3 |
| 03/08/2018 | Email from Ichter; Review article regarding voting issues | 0.1 |
| 03/13/2018 | Email from Court | 0.1 |
| 03/14/2018 | Three emails from Court; Review Order and Certificate of Mailing; Two emails to Marks; Email from Marks; Email from McGuire | 0.1 |
| 03/21/2018 | Telephone conference with Marks; Telephone conference with Clerk of Court; Four emails from Court; Review Order dismissing Mr. Terry's claims; Review Clerk's Entry of Judgment; Four emails from Marks; Review Clerk's Certificate of Mailing; Email from McGuire; Ten emails to Marks | 1.0 |
| 03/22/2018 | Two emails from Court; Review Docket Correction; Email to Marks; Email from Marks | 0.1 |
| 03/23/2018 | Email from Court; Review Certificate of Mailing; Email to Marks | 0.1 |
| 03/27/2018 | Four emails from McGuire; Email from Ichter; Review Case Roles document; Email from Marks | 0.2 |
| 03/28/2018 | Three emails from Marks; Two emails from McGuire; Two emails to Marks | 0.2 |
| 03/29/2018 | Three emails to McGuire; Email to Marks; Email from Ichter; Two emails from McGuire; Five emails from Marks | 0.3 |
| 03/30/2018 | Telephone conference with Marks; Conference call with McGuire*, et al.;* Meet with Paralegal; Edit Entry of Appearance; Seventeen emails from Marks; Email from Brown; Three emails from Ichter; Two emails from McGuire; Email from Davis; Six emails from Court; Email from Digges; Fifteen emails to Marks; Meet with Paralegal; Prepare and edit Agreements for Legal Services for new clients; Two emails to Digges | 4.4 |
| 03/31/2018 | Email to Davis | 0.1 |
| 04/01/2018 | Five emails from Marks; Three emails from McGuire; Four emails from Ichter; Email from Brown; Email to Marks | 0.2 |

| | | |
|---|---|---|
| 04/02/2018 | Six emails from Marks; Two emails from McGuire; Five emails from Ichter; Three emails from Court; Email from Brown; Review Notices of Appearance; Email to McGuire; Two emails to Law Clerk; Email to Ichter | 0.2 |
| 04/03/2018 | Three emails from Cross; Five emails from Marks; Email from Ichter Two emails from Court; Review Notice of Appearance; Ten emails from McGuire; Email from Salter; Two emails to Marks | 0.2 |
| 04/04/2018 | Ten emails from McGuire; Twenty-One emails from Marks; Three emails from Salter; Email from Corrira; Eight emails from Brown; Two emails from Ichter; Three emails from Cross; Email from White; Three emails from Court; Email from Bennett; Email to McGuire; Two emails to Ichter; Email to Marks; Email to Brown | 0.3 |
| 04/05/2018 | Nine emails from Ichter; Eight emails from McGuire; Thirteen emails from Marks; Six emails from Brown; Email from Court; Review Motion for Status Conference; Email from Digges; Email to McGuire | 0.1 |
| 04/06/2018 | Seven emails from Marks; Eight emails from McGuire; Three emails from Court; Review Notice of Change of Address; Email from McConochie; Six emails from Ichter; Two emails from Brown | 0.2 |
| 04/07/2018 | Two emails from Marks | 0.1 |
| 04/08/2018 | Three emails from Marks | 0.1 |
| 04/09/2018 | Seven emails from Marks; Ten emails from McGuire; Three emails from Ichter; Email from Brown; Two emails from Court; Review Response to Motion to Amend Complaint; Email to Marks | 0.2 |
| 04/10/2018 | Twenty-two emails from Marks; Eleven emails from Ichter; Five emails from Brown; Six emails from McGuire; Three emails to Marks; Email to Ichter | 0.3 |
| 04/11/2018 | Email from Ichter; Four emails from McGuire; Three emails from Marks; Email from Ichter; Review Response in Support of Motion for Status Conference | 0.2 |
| 04/12/2018 | Six emails from Marks; Two emails from Brown; Two emails from Ichter | 0.2 |
| 04/13/2018 | Fifteen emails from McGuire; Sixteen emails from Marks; Four emails from Cross; Nine emails from Brown; Three emails from Ichter; Email from Court; Review Motion for Extension | 0.3 |
| 04/14/2018 | Two emails from Brown; Six email from Marks | 0.1 |
| 04/15/2018 | Three emails from Marks; Two emails to Marks | 0.1 |
| 04/16/2018 | Telephone conference with Marks; Meet with Law Clerk; Edit Response in Opposition to Motion for Extension; Edit letter to Lowman; Edit letter to Lowman; Three emails from Brown; Two emails from McGuire; Nine emails from Marks; Three emails from Court; Two emails from Salter; Email from Ichter; Eight emails to Marks | 1.3 |
| 04/17/2018 | Four emails from Marks; Email from Court; Email from Ichter; Review | 0.2 |

Reply Brief

| Date | Description | Hours |
|---|---|---|
| 04/18/2018 | Ten emails from Marks; Six emails from Brown; Email from Ichter; Five emails from Court; Review Responses to Motion to Amend; Review Order Granting Motion to Amend; Three emails to Marks | 0.2 |
| 04/19/2018 | Seven emails from Marks; Three emails from Cross; Four emails from Brown; Email from McGuire | 0.2 |
| 04/20/2018 | Email from Marks; Email from Cross | 0.1 |
| 04/21/2018 | Two emails from McGuire; Two emails from Brown; Email from Marks; Email from Ichter | 0.1 |
| 04/22/2018 | Email from Bentrott; Four emails from Marks; | 0.1 |
| 04/23/2018 | Email to Marks; Three emails from McGuire; Four emails from Marks; Two emails from Ichter | 0.2 |
| 04/24/2018 | Sixteen emails from McGuire; Fourteen emails from Marks; Three emails from McConochie; Five emails from Salter; Two emails from Bryan; Email from Highsmith; Two emails from Brown; Two emails from Cross; Ten emails from Ichter; Four emails from White; Email from Burwell; Email from Court; Email from Lamb; Email to Marks; Email to McGuire, *et al.* | 0.5 |
| 04/25/2018 | Meet with Paralegal; Eight emails from McGuire; Email from McConochie; Email from Court; Email from Bentrott; Two emails from Brown; Email from Ichter; Four emails from Marks; Email from Brown; Two emails to Marks | 0.3 |
| 04/26/2018 | Email to McGuire; Two emails to Marks; Five emails from Marks; Email from Ichter; Two emails from McGuire; Email from Court; Review Response in Opposition to Motion to Amend Complaint | 0.2 |
| 04/27/2018 | Six emails from Marks; Two emails from McGuire; Two emails from Ichter; Email to Marks | 0.2 |
| 04/28/2018 | Email from Ichter; Two emails from Marks; Email from McGuire; Email to Marks | 0.1 |
| 04/29/2018 | Nine emails from Marks; Email from Brown; Three emails from Ichter; Four emails from McGuire; Email from Eberle | 0.1 |
| 04/30/2018 | Meet with Marks, Brown, McGuire, *et al.;* Ten emails from Marks; Email from Brown; Review draft Motion Regarding Use of AV Equipment and proposed Order; Eight emails from Court; Review Reply to Motion to Amend Complaint; Meet with Law Clerk; Edit Notice for Inspection; Seven emails from Schnell; Five emails from Cross; Email from Davis; Email from Ichter; Six emails from McGuire; Two emails to Marks; Email to Law Clerk | 9.0 |
| 05/01/2018 | Meet with Marks, *et al.*; Sixteen emails from Marks; Thirteen emails from McGuire; Email from Ichter; Email from Manoso; Five emails from Cross; Three emails to Marks | 0.5 |
| 05/02/2018 | Fourteen emails from Marks; Five emails from Ringer; Three emails from | 0.2 |

| | | |
|---|---|---|
| | Cross; Three emails from Bennett; Email from Ichter; Four emails from McGuire; Email to Lowman; Two emails to Marks; Email to Cross | |
| 05/03/2018 | Email to Marks; Five emails from Ichter; Two emails from Brown; Four emails from Marks; Three emails from Court; Two emails from Manoso; Two emails from McConochie; Three emails from Cross; Two emails from McGuire | 0.2 |
| 05/04/2018 | Eighteen emails from Marks; Eleven emails from Ichter; Email from Brown; Email from Salter; Email from Cross; Four emails from McGuire; Email from Stacy; Email from Court; Email to Marks; Email to Brown | 0.3 |
| 05/05/2018 | Twelve emails from Marks; Twelve emails from Ichter; Email from Bennett; Two emails from Cross; Two emails from McGuire | 0.2 |
| 05/06/2018 | Email to McGuire; Nine emails from Marks; Email from Bennett; Six emails from Ichter; Email from McGuire; Two emails from Brown; Email from Court; Review Notice Regarding Third Amended Complaint | 0.2 |
| 05/07/2018 | Three emails from McGuire; Twelve emails from Marks; Eleven emails from Ichter; Two emails from Salter; Email from Palermo; Two emails from Brown | 0.2 |
| 05/08/2018 | Thirteen emails from Marks; Email from Brown; Nine emails from Ichter; Email from Salter; Six emails from McGuire; Two emails from Court; Email from White; Review Defendants' Notice Regarding Immunity Issues; Review Notice of Appearance; Review Application for Admission; Email from Lowman; Email from Chapple | 0.2 |
| 05/09/2018 | Two emails from Salter; Email from Brown; Two emails from Schnell; Two emails from Ichter; Three emails from Cross; Twelve emails from McGuire; Seven emails from Marks; Email from White; Two emails from Chapple; Email from Ringer; Email from Ichter; Two emails from Court | 0.2 |
| 05/10/2018 | Email from McGuire; Four emails from Marks; Two emails from Salter; Three emails from Cross; Four emails from Court; Email from Burgess; Email from Brown; Two emails from Court; Three emails from McConochie; Email from Johnson; Email from Brown; Two emails from Court; Email to Marks | 0.2 |
| 05/11/2018 | Email from Marks; Two emails from Court; Email from McConochie; Two emails from Court | 0.1 |
| 05/12/2018 | Email from McGuire | 0.1 |
| 05/13/2018 | Five emails from Marks; Email from Ichter; Email from MCGuire | 0.1 |
| 05/14/2018 | Four emails from Ichter; Six emails from Marks; Four emails from Court; Email from Brown; Email from McGuire | 0.1 |
| 05/16/2018 | Five emails from Marks; Email from Salter; Email from McGuire; Meet with Law Clerk; Two emails to Marks | 0.2 |
| 05/17/2018 | Two emails from Salter; Seven emails from Chapple; Four emails from Marks; Seven emails from White; Two emails from Bryan; Nine emails from McGuire; Email from Court; Five emails from Manoso; Email from | 0.2 |

|  |  |  |
|---|---|---|
|  | Lowman; Two emails from Ichter; Email from Brown; Email from Court |  |
| 05/18/2018 | Email to Ichter; Two emails from Court; Three emails from Marks; Email from Ichter; Email from White; Two emails from Court | 0.1 |
| 05/20/2018 | Six emails from Marks; Four emails from Ichter; Three emails from Cross; Email to Marks | 0.2 |
| 05/21/2018 | Conference call with Marks, *et al*.; Seventeen emails from Marks; Seven emails from Ichter; Email from Brown; Eleven emails from McGuire; Email from Court; Two emails from Chapple; Four emails from Cross; Email to Ichter; Email to McGuire | 1.7 |
| 05/22/2018 | Six emails from Marks; Four emails from McGuire; Two emails from Chapple; Email to McGuire; | 0.1 |
| 05/23/2018 | Email from Cross; Five emails from Marks; Three emails from Ichter; Two emails from White; Five emails from McGuire | 0.2 |
| 05/24/2018 | Eight emails from Marks; Four emails from McGuire; Two emails from Ichter; | 0.2 |
| 05/25/2018 | Email from Court; Review Order; Email from Brown; Email from Marks | 0.1 |
| 05/26/2018 | Four emails from Marks; Three emails from Ichter | 0.1 |
| 05/27/2018 | Four emails from Marks; Email from McGuire | 0.1 |
| 05/28/2018 | Two emails from McGuire; Two emails from Marks | 0.1 |
| 05/29/2018 | Eleven emails from Ichter; Fifteen emails from Marks; Nine emails from McGuire; Email from Brown; Two emails from Bentrott; Email to Marks; Email to Brown | 0.3 |
| 06/01/2018 | Telephone conference with Marks, Ichter, McGuire and Brown; Ten emails from Marks; Three emails from Salter; Seven emails from Ichter; Two emails from Brown; Two emails from White; Eleven emails from McGuire; Nine emails from Chapple; Two emails from Schnell; Seven emails from Cross; Email from Ringer; Email from Manoso; Email from Court; Email to Brown; Email to Ichter; Two emails to Marks; Email to McGuire | 1.8 |
| 06/05/2018 | Email from Court; Review Order; Two emails from Marks; Email from Brown; Two emails from McGuire | 0.2 |
| 06/06/2018 | Four emails from Marks; Seven emails from McGuire; Three emails from Cross | 0.2 |
| 06/07/2018 | Two emails from Marks; Email from Chapple; Email from Cross; Email from McGuire | 0.2 |
| 06/07/2018 | Email from Marks | 0.1 |
| 06/08/2018 | Email from Salter; Email from Schnell; Two emails to Cross; Four emails from Marks; Email from Court; Two emails from McGuire; Email from Ichter | 0.1 |

| | | |
|---|---|---|
| 06/11/2018 | Three emails from Marks; Two emails from Ichter; Two emails from McGuire | 0.1 |
| 06/12/2018 | Email from Marks; Email from McGuire | 0.1 |
| 06/13/2018 | Three emails from Court; Review Order; Email from Brown; Eight emails from McGuire; Email from Ichter; Three emails from Marks; Two emails from Cross | 0.2 |
| 06/14/2018 | Two emails from McGuire; Two emails from Marks; Email from Court; Review Amended Order; Six emails from Marks; Two emails from Ichter | 0.3 |
| 06/15/2018 | Two emails from Marks; Two emails from McGuire; Email from Cross | 0.1 |
| 06/18/2018 | Email from Salter; Two emails from McGuire; Four emails from Marks | 0.1 |
| 06/19/2018 | Six emails from Cross; Five emails from Ichter; Ten emails from Marks; Eight emails from McGuire; Email from Lowman; Email from Price; Email from Marks; Two emails from Salter; Email from Court; Email from Brown | 0.2 |
| 06/20/2018 | Three emails from Cross; Three emails from Ichter; Two emails from Brown; Nine emails from McGuire; Email from Court; Eight emails from Marks; Email from Court | 0.2 |
| 06/21/2018 | Two emails to Brown; Three emails from Marks; Three emails from McGuire | 0.1 |
| 06/22/2018 | Email to Marks; Thirteen emails from Marks; Three emails from Ichter; Email from Evans; Six emails from McGuire; Two emails from White | 0.2 |
| 06/23/2018 | Email from Marks | 0.1 |
| 06/24/2018 | Email from Marks | 0.1 |
| 06/25/2018 | Email from Marks | 0.1 |
| 06/27/2018 | Email from McConochie | 0.1 |
| 06/28/2018 | Seven emails from McGuire; Email from Marks; Two emails from Chapple; Email from Lowman | 0.2 |
| 06/29/2018 | Two emails from White: Email from Marks; Five emails from McGuire; Two emails from Cross; Two emails from Salter | 0.1 |
| 06/30/2018 | Two emails from Ichter; Three emails from Marks; Two emails from Chapple | 0.1 |
| 07/01/2018 | Email from Chapple | 0.1 |
| 07/02/2018 | Email from Salter; Email from Chapple; Two emails from McGuire; Email from Cross | 0.1 |
| 07/03/2018 | Email from Cross; Email from Knapp; Five emails from McGuire; Email from Ringer; Three emails from Court; Review Response in Opposition to Motion to Issue Subpoenas; Email from White; Email from Chapple; | 0.3 |

|  | Review Motion for Leave to File Excess Pages; Review Motion to Dismiss for Failure to State a Claim; Two emails from Brown; Email from Marks |  |
|---|---|---|
| 07/05/2018 | Email from Marks | 0.1 |
| 07/06/2018 | Email from White; Email from McGuire; Two emails from Marks | 0.1 |
| 07/07/2018 | Email from Marks | 0.1 |
| 07/09/2018 | Three emails from Marks; Three emails from McGuire; Email from Ichter | 0.1 |
| 07/10/2018 | Email from Marks | 0.1 |
| 07/11/2018 | Two emails from Marks; Two emails from McGuire | 0.1 |
| 07/12/2018 | Email from Lowman; Two emails from Marks; Two emails from Ichter | 0.1 |
| 07/13/2018 | Email from Ichter; Email from Marks | 0.1 |
| 07/16/2018 | Two emails from Lowman; Email from Chapman | 0.1 |
| 07/17/2018 | Three emails from McGuire; Five emails from Marks; Email from Chapple; Nine emails from Court; Email from Brown; Review Response in Opposition to Motion to Dismiss | 0.2 |
| 07/18/2018 | Four emails from Court; Twelve emails from Marks; Five emails from McGuire; Two emails from Brown; Four emails from Ichter | 0.3 |
| 07/19/2018 | Email from Marks; Five emails from Court; Two emails from Brown; Three emails from Marks; Email from McGuire; Email from Ichter | 0.2 |
| 07/20/2018 | Four emails from Marks; Six emails from McGuire; Email from Ichter; Two emails from Brown | 0.2 |
| 07/21/2018 | Email from Ichter; Three emails from Marks; Email from McGuire | 0.1 |
| 07/23/2018 | Two emails from Court | 0.1 |
| 07/24/2018 | Email from Court; Email from Marks; Email from Chapple | 0.1 |
| 07/25/2018 | Email from Court; Review Order Denying Issuance of Subpoena; Two emails from McGuire; Six emails from Marks; Email from Brown; Four emails from Ichter | 0.2 |
| 07/25/2018 | Email from Marks | 0.1 |
| 07/26/2018 | Two emails from Brown; Two emails from Ichter; Seven emails from Marks; Email from McGuire | 0.1 |
| 07/27/2018 | Two emails from Court; Email from Chapple; Two emails from McGuire; Email from Marks; Email from Brown | 0.1 |
| 07/28/2018 | Two emails from Marks; Two emails from Ichter; Email from Brown | 0.1 |
| 07/30/2018 | Email from Marks | 0.1 |

| | | |
|---|---|---|
| 08/01/2018 | Email from McGuire | 0.1 |
| 08/02/2018 | Three emails from McGuire; Six emails from Ichter; Five emails from Marks; Email from Manoso; Two emails from Salter; Three emails from Cross; Email from McConochie | 0.3 |
| 08/03/2018 | Nine emails from Marks; Five emails from Ichter; Nine emails from McGuire; Email from Cross; Three emails from Brown; Three emails from Murray; Email from Court; Review Motion for Preliminary Injunction and Brief in Support | 0.2 |
| 08/04/2018 | Five emails from Marks; Email from McGuire; Email from Icher; Email from Brown | 0.1 |
| 08/05/2018 | Email from McGuire | 0.1 |
| 08/06/2018 | Email from Ichter; Three emails from Marks; Two emails from Burgess; Two emails from Brown; Email from McGuire | 0.1 |
| 08/07/2018 | Five emails from Marks; Email from Court; Review Order; Four emails from Brown; Three emails from McGuire; Email from Ichter; Email to Marks; Email to Brown | 0.2 |
| 08/08/2018 | Two emails from Court; Review Motion for Preliminary Injunction and Brief in Support; Three emails from Cross; Email from Salter; Email from Ichter; Three emails from Marks; Email from McGuire; Email from Brown; Email from McConochie; Review Consent Motion for Scheduling Order | 0.3 |
| 08/09/2018 | Five emails from Marks; Two emails from Brown | 0.1 |
| 08/10/2018 | Three emails from Marks; Email from Court; Review evidence in Support of Motion for Preliminary Injunction | 0.2 |
| 08/11/2018 | Email from Marks | 0.1 |
| 08/13/2018 | Seven emails from Marks; Three emails from Brown; Email from Ichter | 0.1 |
| 08/14/2018 | Four emails from Court; Review Order; Two emails from Cross; Email from Court; Review Responses to Motion for Preliminary Injunction; Three emails from McConochie; Three emails from Brown; Email from Salter; Two emails from Marks; Email from Ichter | 0.3 |
| 08/15/2018 | Four emails from Marks; Two emails from Court; Two emails from McConochie; Email from Brown; Email from McGuire | 0.2 |
| 08/16/2018 | Three emails from Marks | 0.2 |
| 08/17/2018 | Email from Court | 0.1 |
| 08/20/2018 | Three emails from McConochie; Seven emails from Court; Email from Cross; Email from McGuire; Email from Marks; Email from Salter | 0.1 |
| 08/21/2018 | Email from Brown; Five emails from Marks; Three emails from McGuire; Email from Court | 0.1 |
| 08/22/2018 | Three emails from Marks; Three emails from Ichter; Three emails from | 0.1 |

McGuire; Two emails from Brown

| Date | Services Rendered | Hours |
|------|------|------|
| 08/24/2018 | Email from Marks | 0.1 |
| 08/27/2018 | Email from Marks; Email from Court | 0.1 |
| 08/29/2018 | Email from Court; Email from Barnes; Email from Cross; Email from McConochie | 0.1 |
| 08/30/2018 | Three emails from McConochie; Email from Ringer; Email from Salter; Email from Brown | 0.1 |

**TOTAL**                                                                                    **99.4**

Law Clerk

| Date | Services Rendered | Hours |
|------|------|------|
| 11/21/2017 | Telephone conference with Ney | 0.1 |
| 11/22/2017 | Meet with Ney; Prepare and edit Notice of Appearance; Prepare and edit Motion for Stay; Review docket; Legal research regarding stay issues | 1.8 |
| 11/24/2017 | Edit Response to Motion to Withdraw and Cross-Motion to Disqualify; Edit Motion to Stay; Edit Notice of Limited Scope Appearance | 1.5 |
| 11/27/2017 | Meet with Ney; Legal research regarding counsel's responsibility to turn over internal communications over to client; File and serve Motion to Expand Time to File *Ex Parte* Response; | 0.6 |
| 11/28/2017 | Meet with Ney; Edit Response to Motion to Withdraw and Cross-Motion to Disqualify; Edit Motion to Stay; Hand File Response to Motion to Withdraw and Cross-Motion to Disqualify; Edit and file Motion to Stay | 1.4 |
| 11/29/2017 | Meet with Ney; Prepare and edit letter to Steptoe | 0.3 |
| 12/11/2017 | Legal research regarding *Pro Hac Vice* Application in Northern District of Georgia | 0.4 |
| 12/12/2017 | Meet with Ney; Edit letter to Steptoe & Johnson | 0.4 |
| 12/13/2017 | Meet with Ney; File and serve *Pro Hac Vice* Application for McGuire; Prepare and edit Entry of Limited Scope Appearance of McGuire; Email from Ney | 1.0 |
| 12/14/2017 | Prepare and edit Joint Statement Concerning Preservation of Evidence; File and Serve Joint Statement Concerning Preservation of Evidence | 0.4 |
| 12/21/2017 | Meet with Ney; Email from Ney; Prepare and edit letter to Ringer | 1.2 |
| 01/05/2018 | Meet with Ney; Prepare and edit Notice of Appearance of McGuire | 0.4 |
| 01/08/2018 | Meet with Ney; Prepare and edit Notice Regarding Representation of William Brent Ney; File and serve Notice; Email to Ney | 0.9 |
| 01/23/2018 | Meet with Ney | 0.1 |

| 03/05/2018 | Meet with Ney | 0.1 |
| 03/30/2018 | Edit Notice of Entry of Appearance; File and serve Notice of Entry of Appearance | 0.3 |
| 04/16/2018 | Meet with Ney; Edit Response to Motion to Extend Time; Edit letter to Fulton County | 1.3 |
| 04/30/2018 | Meet with Ney; Email from Ney; Prepare and edit Notice of Inspection; Edit Motion to Allow Electronic Equipment; File and serve Motion to Allow Electronic Equipment; Edit Order Allowing Electronic Equipment | 1.4 |

**TOTAL** **13.6**

Paralegal

| Date | Services Rendered | Hours |
|------|-------------------|-------|
| 11/22/2017 | Initial file set-up | 1.0 |
| 11/29/2017 | Organize, file and index pleadings, documents, correspondence | 0.1 |
| 12/13/2017 | Organize, file and index pleadings, correspondence and documents. | 0.1 |
| 01/09/2018 | Organize, file and index pleadings, correspondence, documents | 0.4 |
| 01/31/2018 | Organize, file and index pleadings, correspondence, documents | 0.3 |
| 03/30/2018 | Prepare Entry of Appearance; Meet with Ney | 1.0 |
| 04/05/2018 | Organize, file and index pleadings, correspondence, documents | 0.2 |
| 04/25/2018 | Meet with Ney | 0.1 |
| 05/11/2018 | Download, organize, file and index all federal pleadings | 1.8 |
| 05/22/2018 | Download, organize, file and index all federal pleadings | 1.5 |
| 06/26/2018 | Organize, file and index pleadings, correspondence, documents | 2.0 |
| 07/03/2018 | Organize, file and index pleadings, correspondence, documents | 0.6 |
| 07/26/2018 | Organize, file and index pleadings, correspondence, documents | 1.5 |
| 08/31/2018 | Organize, file and index pleadings, correspondence, documents | 1.9 |

**TOTAL** **12.5**

EXHIBIT

G

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| **DONNA CURLING, et al.**<br><br>**Plaintiff,**<br><br>vs.<br><br>**BRIAN P. KEMP, et al.**<br><br>**Defendant.** | )<br>)<br>)<br>)<br>)<br>)   **CIVIL ACTION FILE NO.: 1:17-cv-**<br>)   **2989-AT**<br>)<br>)<br>)<br>)<br>) |

## <u>DECLARATION OF  MARILYN MARKS</u>

**MARILYN MARKS** hereby declares under penalty of perjury,

pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.  I have personal knowledge of all facts stated in this declaration, and if
    called to testify, I could and would testify competently thereto.

2. I am the Executive Director of Plaintiff Coalition for Good Governance
   ("CGG" or "Coalition").

3. I have worked full time in the area of election integrity, transparency and
   security for over ten years, with primary focus on Colorado, Georgia and
   North Carolina elections. Most, but not all, of my election work since
   2014 has been in my role of Executive Director of Coalition for Good
   Governance.

1

4. In the 10 years I have worked in the election integrity area, either as an individual or in my role as a director of a non-profit organizations, I have organized over 30 election-related lawsuits and brought many administrative actions and election protests in numerous jurisdictions.

5. The Curling case is one of four election-related lawsuits Coalition has organized in the State of Georgia against election officials since May 2017. I am therefore familiar with the varying complexity of the cases, the relative difficulty in recruiting counsel, and the differing economic risks assumed by counsel in these engagements.

6. In each case, I interviewed several Georgia and out-of-state firms as I attempted to expand the Coalition's legal team working on Georgia matters. I have current, personal and in-depth knowledge of the market for counsel able to try such cases on a practical basis.

**Engaging Counsel for This Case**

7. Much of the electrion-related litigation I have organized has, like this case, involved voting system technology and its impact on the constitutional rights of voters. This is a rarely litigated area of election controversies or civil rights. As a result there are very few attorneys in private practice with relevant experience or election technology subject

matter expertise. This results in great difficulty in recruiting appropriate legal counsel for cases such as this case.

8. Coalition for Good Governance's counsel Robert A. McGuire has served as counsel for Coalition for Good Governance, me, or related parties in numerous such actions since 2009. It is my opinion that Mr. McGuire has litigated more voting systems-related cases than any attorney in private practice in the nation.

9. Coalition for Good Governance receives frequent requests to assist in election technology controversies across the country. We decline involvement in the vast majority of the requests because of the almost impossible task of recruiting counsel with adequate subject matter expertise. The long learning curve required for counsel in voting systems litigation makes most such cases impractical to pursue.

10. Because of his subject matter expertise, Mr. McGuire's engagement on the case was an essential prerequisite in recruiting experienced litigators Bruce Brown and Cary Ichter as Atlanta-based co-counsel. Likewise, recruiting Atlanta-based litigators such as Bruce Brown and Cary Ichter with many years of complex litigation was also essential in order for Mr. McGuire to be able to accept the case.

11. When the case was initiated in July 2017, Mr. McGuire was unavailable because of prior case commitments until early December, 2017. Although I diligently searched for additional counsel for the early phase of this case, and interviewed dozens of attorneys, the difficulty of the case and the lack of attorneys with subject matter expertise made recruiting appropriate legal counsel extremely difficult.

12. During the first few months of the case (before current counsel's involvement), our then counsel, the large law firm of Steptoe & Johnson, contributed to the case. Significant value was invested in the case by Steptoe senior attorneys in securing expert declarations, obtaining and organizing facts used as evidence later in the case, and working hard in an attempt to assure that Defendants would preserve their electronic records. I understand that Steptoe made the decision to not seek fees from Coalition or to apply for fees itself under Section 1988. Even a full recovery of the fees sought in Coalition's current application, therefore, will not pay for the real cost of this litigation.

13. Prior to successfully concluding weeks of discussions and negotiations with the team of Mr. McGuire, Mr. Brown and Mr. Ichter, I contacted dozens of attorneys in Georgia, North Carolina, Washington DC, New

York, and California, without finding suitable competent counsel willing to accept the unattractive risks of the case and serve as lead counsel.

14. Coalition for Good Governance is a small 501(c)(3) organization and operates in a very limited budget, requiring attorneys who agree to represent the organization to obtain most, if not all, of their compensation through a Section 1988 award. The risk of non-recovery and the possibility of prolonged, complex litigation both make the case too unattractive for many attorneys with relevant and adequate litigation expertise to agree to undertake.

15. Voting system technology cases like this one are complex. Most small litigation firms, as a business matter, cannot afford to take on a case like this one.

16. In attempting to recruit local (as well as lead) counsel for this case, I interviewed at least 10 Georgia-based firms that initially indicated interest, only to learn that those firms represented the State or various county governments in other matters and that their clients objected to their involvement in this case, which involved challenging the voting system and questioning election outcomes.

17. In the many election cases I have organized, a consistent difficulty in recruiting counsel (whether local or lead) has always been the reluctance

of attorneys to sue their own local or state public officials and suffer this indirect cost of taking the case. In this case in particular, the Coalition Plaintiffs' attorneys have had to endure unprofessional name-calling and disparagement in the press (and in court papers) by Defendants.

18. When undertaking to litigate an election-related case against the state or counties, attorneys must be prepared for the economic risk generated by the inefficient and wasteful manner in which election officials, in my experience, typically defend such cases. Unlike much commercial litigation, where parties have limits on the resources they are able to devote to litigation, it has been my experience, including in this case, that government defendants operate as though they are unconstrained by budgets and thus generally prolong discovery disputes, appeal rulings on unreasonable grounds, file unnecessary pleadings, issue overly broad discovery requests, and generally have little incentive for efficiency. In addition, these kinds of cases, by their nature, are difficult to settle. These factors force counsel like the Coalition Plaintiffs' present attorneys to invest additional resources at a significant risk of never being compensated, all of which makes cases like this one even more unattractive to potential counsel.

19. Coaltion for Good Governance was fortunate to put together its legal team of McGuire, Brown, and Ichter after Mr. McGuire completed his other commitments in early December 2017. The legal team used their first four months to coordinate roles, gather evidence, and prepare for the litigation of the case while the case was administratively closed from November 27, 2017 until March 30, 2018, pending the appearance of new counsel on behalf of the Curling Plaintiffs.

20. After the November 2018 general election, which revealed the mounting evidence of widespread discrepancies and significant evidence of racially based vote suppression through the DRE system in the Lieutenant Governor's race, it became clear that Coalition Plaintiffs needed to expand its legal team further. We needed both experienced litigators accustomed to litigating against government entities and specialized civil rights litigation experience relating to racial discrimination. For that reason, I began repeated attempts to recruit Lawyer's Committee for Civil Rights Under the Law beginning in December 2018, with talks continuing until May 2019 when Coalition Plaintiffs were able to engage LC.

**Attorney's Hourly Rates**

21. I consider myself to be a sophisticated consumer of legal services, in view of the numerous public interest cases I have organized over the last ten years and also because of my background as a corporate executive prior to my retirement. I have attached as Exhibit 8 an affidavit filed in a Colorado case concerning my wide-ranging experience in engaging attorneys in complex legal matters.

22. Because of my many interviews with potential counsel for this case, I am aware of the Atlanta area market rates for attorneys, paralegals, and research assistants in complex litigation matters, as well as the rates used by Washington, D.C.-based public interest law firms.

23. Based on my experience in and knowledge of the Atlanta legal market, the rates charged andfee arrangements offered by the Coalition Plantiffs' counsel in this case are exceptionally fair, and likely are well below the relevant market rates even without considering the risk premium that is economically necessary to permit an attorney to commit to take a case where recovery of most of the fees is all or partly contingent.

### Coalition's Case Management Strategy

24. In the numerous election-related lawsuits I have organized, I have learned that, for a small organization like CGG, litigation like this is only affordable and feasible if CGG provides full-time support to its attorneys.

Assisted by interns paid at student rates, I personally conduct research, investigate facts, interview witnesses, consider strategy, and provide expertise on election administration and voting technology.  In doing these tasks, I perform a substantial amount of work generally done by attorneys in similar cases, and by so doing I help my attorneys minimize their own risk as well as minimizing the eventual amount of fees that may be shifted to losing public defendants.  I generally solicit my attorneys for ways I can be helpful, and I operate under their guidance by focusing on performing only those tasks that they tell me need to be done and will save them time.

25. The scope of my work ranges widely depending on the attorney's instructions and requirements. It ranges from outlining potential theories of the case and proposing legal arguments based on my knowledge of the facts and relevant expertise, at one extreme, to more mundane legal-assistant and paralegal tasks like proofing drafts, preparing exhibits, and checking citations in = pleadings, at the other extreme.  One of my most important roles is always finding, interviewing, and engaging expert witnesses and assisting lawyers in their development of the expert testimony.

26. I have over 10 years' experience in researching, interpreting, and applying various states' election laws, regulations, and practices, as well as extensive knowledge of federal laws such as the Help America Vote Act and other authorities like the EAC's Voluntary Voting System Guidelines. With this deep background, I am able to assist counsel, who rely on me to present the first level of analysis of the statutory and regulatory regimes governing particular cases.

27. I have been made responsible by our counsel for recruiting and negotiating with all experts and consultants used in the case. I have also assisted the attorneys in organizing their efforts by providing background case materials for review and serving as a primary point of contact for the attorneys in their dealings with fact witnesses and experts. I am frequently asked to assist counsel with arranging expert declarations and assisting with the proofing and citation checking of such declarations.

28. The attorneys rely on me to arrange for the acquisition of all transcripts and to conduct the first review of transcripts of court hearings to bring their attention to important issues that require follow up or fact checking.

29. At the direction of the attorneys, I make arrangements for depositions and help by arranging court reporters. I also assist by proposing deposition topics, outlining recommended questions of witnesses, and preparing

suggested exhibits for the depositions. All of this work would have to be done by my attorneys if I did not assist, and I have noted that the associate labor involved in these tasks in other cases of comparable complexity is extremely costly but invariably regarded as a legitimate use of attorney time.

30. The attorneys in this case have frequently asked me to conduct the first review of the deposition transcripts and to highlight, locate, and note important parts of the testimony for the attorneys' later use in hearings or, alternately, for futher discovery follow up.

31. I have frequently been asked by the attorneys to write first drafts of discovery requests and document subpoenas for their review—typical paralegal or junior associate work.

32. I have been asked to assist the attorneys by conducting initial review of documents produced to us in discovery—excluding of course any that are designated as "Attorney's Eyes Only"—and to summarize key facts shown by those documents.

33. I have frequentyly been asked to be heavily involved in the fact checking, editing, cite checking, and proofing of all pleadings in the case. I generally study and fact-check all pleadings filed by the Defendants, and I supply notes and feedback to Coalition Plaintiffs' attorneys.

34. I am frequently asked by the attorneys to provide case updates to the individual Coalition Plaintiffs.

35. I am also a resource for counsel on technical issues involved in these voting cases and frequently provide counsel with academic and scientific literature for their review relating to voting systems and cybersecurity.

36. I am responsible for alerting the attorneys to news releases, press articles and website postings by the Defendants or third parties for information related to the case, and organizing the materials if required in the evidence gathering process.

37. CGG organizes its litigation activities to be conducted at the lowest possible cost to make the most efficient use of attorney time. All activities that could be done by someone other than very experienced senior attorneys is done by CGG staff or volunteers. By leveraging our attorneys' time, I have dramatically reduced the number of attorneys that Coalition and the Coalition Plaintiffs have had to engage and minimized, to the extent possible, the number of hours that our attorneys have had to expend to vindicate the Coalition Plaintiffs' claims.

38. My time is valued at $200 per hour by CGG, and all of my compensation for the time I have spent is presently deferred until CGG has paid all

amounts due to third parties for this and all other litigation, and until

CGG's Board determines that cash reserves are adequate to pay me.

**Coalition's Use of Interns to Support Litigation Activities**

39. To make discovery of election administration details feasible, Coalition

conducts research that would typically be conducted by research

contractors, paralegals, analysts, or experts engaged by the attorneys.

Because of my extensive background and full time dedication to

Coalition's election integrity efforts, we have trained and organized a

team of college-age interns to conduct much of the analysis and research.

40. Coalition interns' work in this case includes:

-preparation of public records requests to election officials and follow up

to obtain and organize responses;

-analysis of information obtained from public records requests and

reporting to me and to the attorneys;

-locate archived legislative history of relevant election law and policies;

-analysis for detection of discrepancies between polling place data and

reported results;

-analysis of anomalies including undervote trends in specific precincts

and DRE machines;

-fact gathering by observation of voting at the polling places and documentation of findings;

-pick up and delivery of discovery documents from county election offices for attorneys;

-organization of electronic research files for discovery;

-organization of voter affidavits;

-preparing transcripts of relevant public meetings, speeches, or broadcasts related to discovery topics for review by attorneys or preparing as evidence;

-organization and copying of documents for hearings; and

-attendance at hearings to provide administrative assistance to the attorneys.

41. CGG pays contracted interns at a standard rate of $17 per hour and reimburses mileage for required deliveries at standard IRS published rates. This provides an exceptionally inexpensive way to accomplish work normally provided to attorneys by paralegals, analysts, researchers, and messenger services. Typical rates charged by law firms and their vendors would be many times these hourly rates.

**Coalition's Use of Volunteers to Support Attorneys' Litigation Activities**

42. CGG engages and I supervise a group of volunteers to support evidence collection, analysis, organization, and other case litigation functions typically performed by law firm's non-attorney staff or contractors. The volunteers CGG and I have recruited for this case are generally of a high education level, with specialized skills in areas such as computer science, database management, supply chain management, professional editing, and cost analysis. By recruiting highly skilled volunteers to support the attorneys' litigation efforts (which would otherwise require third party specialist contracts), CGG has made the litigation support vastly more affordable than it otherwise would have been.

43. Under my direction in my capacity as Executive Director of CGG, our volunteers have reviewed hundreds of affidavits from voter witnesses to determine which had experiences related to our claims. They then conducted the initial outreach to scores of potential voter witnesses and conducted interviews with them to confirm facts and determine their availability for live testimony. The price for a law firm to organize and perform this work would have been staggering.

44. Our volunteers worked with hearing witnesses on logistics, arranged interviews with attorneys, and provided our attorneys with notes of important facts related to the testimony.

45. A volunteer who was permitted to do so under the relevant protective order provided page-by-page labeled exhibits of the GEMS database for review by our experts and attorneys and for subsequent filing with the Court. This is typical of the litigation support provided by our volunteers—support that would typically have been provided by analysts, consultants, or paralegals.

46. Volunteers have provided documented cost analysis of voting system elements and administration for use by the attorneys in discovery and as support for our arguments regarding feasibility. This work would typically have been conducted by a contracted analyst or expert witnesses at much greater cost.

47. Volunteers also made travel arrangements for expert witnesses and provided for their local transportation.

48. In summary, the litigation support provided and managed by CGG was essential to our success thus far, yet cost a fraction of what would have been required if the same effort had been outsourced and managed in a traditional manner by a law firm.

49. This approach to economizing has permitted Coalition's attorneys to be efficient and generally only engage in activities requiring their technical and litigation expertise.  It has, however, not been without its price, for these efforts have diverted significant resources of the organization, in both time and money, away form other projects.

## Summary of Expenses Incurred by CGG

50. I have attached as exhibits the following documents as support for the expenses incurred by CGG in this case.  Additional documentation will be made available upon request:

| Exhibit 1 | Spreadsheet Summarizing CGG Expenses |
| Exhibit 2 | Expert Starks Invoice |
| Exhibit 3 | Expert Bernhard Invoice |
| Exhibit 4 | Expert Martin Invoice |
| Exhibit 5 | Expert Ottonboni Time Record |
| Exhibit 6 | Expert Hoke Billing Records |
| Exhibit 7 | Expert Wilson Time Records |
| Exhibit 8 | Marks Affidavit |
| Exhibit 9 | Marks Time Records |

This 15th day of October, 2019.

_____

Marilyn Marks

E
X
H
I
B
I
T

1

| Category of Expenditure | Description | Vendor | Amount | Exhibit |
|---|---|---|---|---|
| Expert consulting | Audit expert | Philip Stark | 39,450.00 | 2 |
| Expert consulting | Voting systems Expert | Matthew Bernhard | 20,856.47 | 3 |
| Expert consulting | Election Admin. Expert | Amber McReynolds | 13,703.15 | |
| Expert consulting | Election Admin. Expert | Virginia Martin | 6548.45 | 4 |
| Expert consulting | Statistical analysis of voting patterns | Kelly Ottoboni | 6,225 | 5 |
| Expert consulting | Cybersecurity and legal support to Ney | Candice Hoke | 17,628 | 6 |
| Expert consulting | GEMS database analysis | Ritchie Wilson | 42651 | 7 |
| Database analysis | Creating statewide vote database for analysis | Brandyn Lee | 690 | |
| Database analysis | Creating/analyzing anomalies in vote database | Wendell Wilson | 300 | |
| Litigation support--intern | Evidence gathering, analysis, organization, etc (Nov. 2018 - July 25, 2019) | Taran Greenwald | 29,826 | |
| Litigation support--intern | Evidence gathering, analysis, organization, etc (May 2019--July 2019) | Bea Brown | 3392 | |
| Litigation support--intern | Evidence gathering, analysis, organization, etc (January 2019- July 2019) | Samantha Whitley | 4225 | |
| Litigation support--intern | Evidence gathering, analysis, organization, etc (July 2019) | Harrison Thwaett | 790.53 | |
| Litigation support | See detailed time sheet | M. Marks | 125330 | |
| | Total Professional time | | 311,615.60 | |
| **Expenses** | Sharefile fees for electronic doc storage | Sharefile | $200 | |
| | Parking Courthouse-interns | | 25 | |
| | Process Server | Matt Hickman | 1,740 | |
| Transcripts --Court | Transcript 9.20.17 | | $123.25 | |
| | Transcript 11.7.17 | | 181.25 | |
| | Transcript 5.1.18 | | 102 | |
| | transcript 5.10.17 | | 152.25 | |
| | transcript 9,12,18 | | 338.1 | |
| | transcript 4 .19 | | 76.8 | |
| | transcript 5.24.19 | | 43.2 | |
| | transcript 5.31.19 | | 97.2 | |
| | 6.28.19 | | 63.6 | |
| | 7.17.19 | | 52.8 | |
| | 7.25-26 | | 621.9 | |
| | 8.27.19 | | 70.8 | |
| | 5.19.18 | | 281.3 | |
| Court Reporting | APG USA--depositions | | 3628.35 | |
| Copies, Supplies for Hearing | Fed ex copies, supplies for July hearing | | 19.82 | |
| | Fed ex copies, supplies for July hearing | | 77.3 | |
| | office depot | | 57.34 | |
| | ups  copying, supplies for hearing | | 239.98 | |
| Computer | Computer required for Ann Arbor GEMS work | | 953.98 | |
| | **Total out of pocket direct expenses** | | $9,146 | |

E

X

H

I

B

I

T

2

**Philip B. Stark | 1157 Cragmont Ave | Berkeley, CA 94708-1641**

**stark@risklaw.org · 510-282-1157 · EIN 94-323-4271**

**1 September 2019**

**Marilyn Marks**
**Coalition for Good Governance**

Litigation consulting *in re* Curling v. Kemp

| Invoice | Due Date | Total Due |
|---|---|---|
| **CGG-20190901** | **9/1/2019** | **$39,450** |

| Date | Description | Hours | Expenses |
|---|---|---|---|
| 9/7 | email | 0.2 | |
| 9/8 | call, writing | 4.8 | |
| 9/9 | writing, email | 0.9 | |
| 12/24 | call | 1.2 | |
| 12/25 | examine data | 0.3 | |
| 12/27 | programming, data analysis | 0.8 | |
| 1/2 | call, programming, data analysis | 2.1 | |
| 1/3 | programming, data analysis, calls | 1.2 | |
| 1/4 | data analysis, calls | 1.0 | |
| 1/5 | data analysis, calls | 4.5 | |
| 1/6 | data analysis, calls | 4.0 | |
| 1/16 | calls | 0.4 | |
| 1/31 | data analysis | 1.0 | |
| 2/4 | data analysis | 0.5 | |
| 2/5 | meeting, data analysis | 1.5 | |
| 2/6 | data analysis | 0.5 | |
| 2/15 | coding, writing | 0.8 | |
| 2/16 | coding, writing | 0.6 | |
| **Total** | **26.3h @ $1500/h** | **$39,450** | **$0** |

E

X

H

I

B

I

T

3

Invoice Number: 201907-01

# Invoice

## Matthew Bernhard

2260 Hayward Street
Ann Arbor, MI 48109

281-725-8544

August 4, 2019

## Invoice For

**Coalition for Good Governance**

7035 Marching Duck Dr. E504
Charlotte, NC 28210

## Subject

Expert consulting services for
Bruce Brown on
*Curling v. Raffensperger*

| Description | Date | Amount |
|---|---|---|
| Expert consulting services | 4-Aug | $19,200.00 |
| Deferred | | -$14,400.00 |

| **Expenses** | | |
|---|---|---|
| Hotel | 27-Jul | $682.07 |
| Local transportation | 27-Jul | $79.00 |
| Airport parking | 27-Jul | $56.00 |

Total  this invoice $ 20,017.07
12/18                      225.00
9/18 Travel             614.40
Total                    20,856.47

AMOUNT DUE **$5,617.07**

Payment due upon receipt

| Date | Reasoning | Hours | Total | | | |
|------|-----------|-------|-------|---|---|---|
| 7/1 | Database discovery declaration | 1 | $200.00 | | | |
| 7/2 | Database discovery declaration | 3 | $600.00 | | | |
| 7/3 | Database discovery response declaration | 3 | $600.00 | Total Hours | | 96 |
| 7/6 | GEMS database preparation work | 2 | $400.00 | **Total** | | $19,200.00 |
| 7/7 | GEMS database preparation work | 2 | $400.00 | **w/ deferred** | | $4,800.00 |
| 7/8 | GEMS database preparation work | 8 | $1,600.00 | | | |
| 7/9 | teleconference w/ defendants, document | 8 | $1,600.00 | | | |
| 7/10 | GEMS database preparation work | 8 | $1,600.00 | | | |
| 7/11 | GEMS database preparation work | 8 | $1,600.00 | | | |
| 7/12 | GEMS database review | 7 | $1,400.00 | | | |
| 7/13 | GEMS database review | 12 | $2,400.00 | | | |
| 7/14 | GEMS database review | 3 | $600.00 | | | |
| 7/15 | GEMS database review | 1 | $200.00 | | | |
| 7/16 | | 0 | $0.00 | | | |
| 7/17 | | 0 | $0.00 | | | |
| 7/18 | Review of Shamos testimony and prep fo | 4 | $800.00 | | | |
| 7/19 | | 1 | $200.00 | | | |
| 7/20 | | 0 | $0.00 | | | |
| 7/21 | | 0 | $0.00 | | | |
| 7/22 | | 0 | $0.00 | | | |
| 7/23 | Call for hearing prep | 1 | $200.00 | | | |
| 7/24 | Hearing prep | 4 | $800.00 | | | |
| 7/25 | Hearing | 9 | $1,800.00 | | | |
| 7/26 | Hearing | 11 | $2,200.00 | | | |
| 7/27 | | 0 | $0.00 | | | |
| 7/28 | | 0 | $0.00 | | | |
| 7/29 | | 0 | $0.00 | | | |
| 7/30 | | 0 | $0.00 | | | |
| 7/31 | | 0 | $0.00 | | | |



**ATLANTA MARRIOTT MARQUIS**

**GUEST FOLIO**

| 821 | BERNHARD/M | 132.00 | 07/27/19 | 11:00 | 55896 |
|-----|------------|--------|----------|-------|-------|
| ROOM | NAME | RATE | DEPART | TIME | ACCT# |
| GK | | | 07/24/19 | 15:22 | |
| TYPE | | | ARRIVE | TIME | |
| 201 | | | | | |

| ROOM CLERK | ADDRESS | PAYMENT | | MBV#: | XXXXX5484 |
|------------|---------|---------|--|-------|-----------|

| DATE | REFERENCES | CHARGES | CREDITS | BALANCES DUE |
|------|------------|---------|---------|--------------|
| 07/24 | RM SERV    2479 821 | 21.78 | | |
| 07/24 | ROOM TR    821, 1 | 210.00 | | |
| 07/24 | STATE TX   821, 1 | 18.69 | | |
| 07/24 | CITY TAX   821, 1 | 16.80 | | |
| 07/24 | GA RMFEE   821, 1 | 5.00 | | |
| 07/25 | ROOM TR    821, 1 | 210.00 | | |
| 07/25 | STATE TX   821, 1 | 18.69 | | |
| 07/25 | CITY TAX   821, 1 | 16.80 | | |
| 07/25 | GA RMFEE   821, 1 | 5.00 | | |
| 07/26 | ROOM TR    821, 1 | 132.00 | | |
| 07/26 | STATE TX   821, 1 | 11.75 | | |
| 07/26 | CITY TAX   821, 1 | 10.56 | | |
| 07/26 | GA RMFEE   821, 1 | 5.00 | | |
| 07/27 | VS CARD | | $682.07 | |

TO BE SETTLED TO:   VISA        CURRENT BALANCE  .00

THANK YOU FOR CHOOSING THE ATLANTA MARRIOTT MARQUIS!

**See our "Privacy & Cookie Statement" on Marriott.com**

**Your Marriott Bonvoy points/miles earned on your eligible earnings will be credited to your account. Check your Marriott Bonvoy Account Statement for updated activity. See members.marriott.com for new Marriott Bonvoy benefits.**



ATLANTA MARRIOTT MARQUIS
265 PEACHTREE CENTER
ATLANTA GA  30303

**Treat yourself to the comfort of Marriott Hotels in your home. Visit ShopMarriott.com.**

This statement is your only receipt. You have agreed to pay in cash or by approved personal check or to authorize us to charge your credit card for all amounts charged to you. The amounts shown in the credit column opposite any credit card entry in the reference column above will be charged to the credit card number set forth above. (The credit card company will bill in the usual manner.) If any reason the credit card company does not make payment on this account, you will owe us such amount. If you are direct billed, in the event payment is not made within 25 days after check-out, you will owe us interest from the check-out date on any unpaid amount at the rate of 1.5% per month (ANNUAL RATE 18%), or the maximum allowed by law, plus the reasonable cost of collection, including attorney fees.

Signature X

Case 1:17-cv-02989-ATT Document 1565-3 Filed 01/07/23 Page 47 of 238



82 934
SOUTHLAND PRINTING
SHREVEPORT, LA.

DETROIT METRO AIRPORT

3374-000115-03:00:30 07/27/19 1-5-000 00-$455.

RECEIPT

 Gmail

**Matt Bernhard <mdb92nc@gmail.com>**

---

**Your ride with Cecil on July 25**
1 message

---

**Lyft Ride Receipt** <no-reply@lyftmail.com>          Fri, Jul 26, 2019 at 8:48 AM
To: mdb92nc@gmail.com



**JULY 25, 2019 AT 9:43 PM**

# Thanks for riding with Cecil!



Lyft fare (2.96mi, 10m 0s)                    $9.16
Round Up & Donate - Girls Who Code            $0.84
Tip                                           $2.00


 Pay    Apple Pay (Visa)                    **$12.00**



🔴 **Pickup** **9:43 PM**
1304 W Peachtree St NW, Atlanta, GA

🔵 **Drop-off** **9:53 PM**
60 Harris St NE, Atlanta, GA

  

## This and every ride is carbon neutral

**LEARN MORE**

 Gmail

**Matt Bernhard <mdb92nc@gmail.com>**

---

## Your ride with Ronald on July 24
1 message

---

**Lyft Ride Receipt** <no-reply@lyftmail.com>
To: mdb92nc@gmail.com

Wed, Jul 24, 2019 at 3:22 PM





## Thanks for riding with Ronald!
July 24, 2019 at 2:47 PM

---

### Ride Details

| | |
|---|---|
| Lyft fare (10.71mi, 26m 52s) | $23.62 |
| Round Up & Donate - Girls Who Code | $0.84 |
| Tip | $3.54 |

 Pay
Apple Pay (Visa)      **$28.00**



● Pickup     2:47 PM
  N Terminal Pkwy, College Park, GA

● Drop-off    3:13 PM
  45 Harris St NE, Atlanta, GA



**This and every ride is carbon neutral**

**Learn more**



 Gmail

**Matt Bernhard <mdb92nc@gmail.com>**

---

**Your ride with Elliott on July 27**
1 message

---

**Lyft Ride Receipt** <no-reply@lyftmail.com>
To: mdb92nc@gmail.com

Sat, Jul 27, 2019 at 8:36 AM



**JULY 27, 2019 AT 7:55 AM**

# Thanks for riding with Elliott!



Since you updated your stop or destination, your fare reflects actual time and distance
Learn more

| | |
|---|---|
| Base fare | $1.05 |
| 40m 2s | $6.01 |
| 26.70 mi | $21.63 |
| Service fee | $3.40 |
| Round Up & Donate - Girls Who Code | $0.49 |
| Tip | $6.42 |

 Pay    Apple Pay (Visa)               **$39.00**



🔴 **Pickup**  **7:55 AM**
253 Peachtree Center Ave NE, Atlanta, GA

🔵 **Drop-off**  **8:35 AM**
1947 Piedmont Ave NE, Atlanta, GA

  

# This and every ride is carbon neutral

**LEARN MORE**

# Invoice

Invoice Number: 201809-02

## Matthew Bernhard

2260 Hayward Street
Ann Arbor, MI 48109

281-725-8544

September 19, 2018

## Invoice For

**Coalition for Good Governance**
7035 Marching Duck Dr. E504
Charlotte, NC 28210

## Subject

Expert consulting services

| Description | Date | Amount |
|---|---|---|
| Reimbursement for Flight | 11-Sept | $566.40 |
| Reimbursement for airport parking | 11-Sept | $48.00 |
| Reimbursement for travel to and from airport | 11-Sept | $40.00 |

|  | AMOUNT DUE | **$614.40** |
|---|---|---|

Payment due upon receipt

# Invoice

Invoice Number: 201812-01

## Matthew Bernhard

2260 Hayward Street
Ann Arbor, MI 48109

281-725-8544

December 26 2018

## Invoice For

**Coalition for Good Governance**
7035 Marching Duck Dr. E504
Charlotte, NC 28210

## Subject

Expert consulting services

| Description | Date | Hours | Amount |
|---|---|---|---|
| Collecting GA Election result data ($45/hr) | 25-Dec | 5.00 | $225.00 |

AMOUNT DUE **$225.00**

Payment due upon receipt

E

X

H

I

B

I

T

4

# Virginia Martin

---

724 Warren Street #2, Hudson, NY 12534

virginiamartin2010@gmail.com

518.755.1521

September 30, 2019

**Invoice**

Marilyn Marks, Esq.
Executive Director
Coalition for Good Governance
1520 Cress Court
Boulder, CO 80304

**Consulting services, Curling v. Kemp**
Research and consulting with other experts, including election officials and ballot printers, to confirm facts. Drafting of declarations. Responding to attorney questions and preparing with attorneys for hearing. Attendance at hearing.

| Date | Hours |
|------|-------|
| 8/12/18 | 1.00 |
| 8/18/18 | 3.00 |
| 8/20/18 | 2.00 |
| 9/4/18 | 1.50 |
| 9/6/18 | 0.50 |
| 9/9/18 | 2.00 |
| 9/10/18 | 0.50 |
| 2/7/19 | 1.00 |
| 5/16/19 | 0.50 |
| 5/18/19 | 1.50 |
| 5/20/19 | 1.00 |
| 5/22/19 | 0.50 |
| 6/17/19 | 2.00 |
| 6/17/19 | 2.00 |
| 6/18/19 | 2.00 |
| 7/23/19 | 2.00 |
| 7/25/19 | 9.00 |
| 7/26/19 | 11.00 |

43.00 @ $150.00                    $6,450.00

**Invoice, September 30, 2019, Coalition for Good Governance, re Curling v. Kemp**

    **Out of pocket (receipts attached)**

| 7/24/19 | 40.00 | taxi |
|---------|-------|------|
|         | 10.90 | dining |
| 7/25/19 | 16.64 | dining |
| 7/27/19 | 9.91  | dining |
|         | 21.00 | parking |

                                                            98.45

           Total                        6,548.45

Thank you.

| JUL 25, 2019 | $40.00 |
|---|---|
| SQ *SQ *ADOMUSE05@YAHO | TRAVEL |

**Post Date:** Jul 25, 2019
**Transaction Date:** Jul 24, 2019
**City/St:** CLARKSTON , GA
**Zip:** 30021
**Category:** Travel
**Transaction Code:** 05
**Reason Code:** 00

**Transaction Type:** Purchase
**Original Amount:** $40.00
**Original Currency:** USD
**MCC:** 4121
**MCC Description:** Taxicabs/Limousines
**Merchant ID:** 242661000053360
**Originating Account #:** -
Edit | Dispute This Charge

E

X

H

I

B

I

T

5

**Subject:** FW: bill for Kellie Ottoboni's time

**Date:** Tuesday, October 15, 2019 at 7:05:53 PM Eastern Daylight Time

**From:** Marilyn Marks

**From:** "Philip B. Stark <stark@risklaw.org>
**Reply-To:** "stark@risklaw.org" <stark@risklaw.org>
**Date:** Monday, January 7, 2019 at 8:21 PM
**To:** Marilyn Marks <marilyn@aspenoffice.com>
**Subject:** bill for Kellie Ottoboni's time

Hi Marilyn--

I trust everything was filed. Fingers crossed.

Here's Kellie's time:

1/2: 2 hours
1/3: 3.5 hours
1/4: 4 hours
1/5: 6 hours
1/6: 1.5 hours
Total hours: 15 hours @ $150/h = $2250.

I'll send you a bill for my time in the next few days; we can discuss how to handle it.

Best,
Philip

--

Philip B. Stark | Associate Dean, Mathematical and Physical Sciences | Professor,  Department of Statistics |
University of California
Berkeley, CA 94720-3860 | 510-394-5077 | statistics.berkeley.edu/~stark |
@philipbstark

--

Philip B. Stark | Associate Dean, Mathematical and Physical Sciences | Professor,  Department of Statistics |
University of California
Berkeley, CA 94720-3860 | 510-394-5077 | statistics.berkeley.edu/~stark |
@philipbstark

---------- Forwarded message ---------
From: **Kellie Ottoboni** <kellieotto@berkeley.edu>
Date: Mon, Feb 11, 2019 at 6:57 PM
Subject: Hours for GA precinct-level work
To: Philip B. STARK <pbstark@berkeley.edu>


1/29: 1 hour parsing turnout data
2/1: 3.25 hours parsing precinct-level votes
2/2: 2 hours parsing precinct-level votes; merging votes and turnout
2/3: 3 hours merging votes and turnout
2/4: 3 hours merging votes and turnout
2/5: 4 hours merging votes and turnout; Fulton analysis
2/6: 1.25 hour Fulton analysis
Total: 17.5 hours

Best,
Kellie
--
Kellie Ottoboni
Ph.D. Statistics '19, University of California, Berkeley
Fellow at Berkeley Institute for Data Science

Mobile: (650) 520-5056
Website: www.kellieottoboni.com

On Thu, Jun 13, 2019 at 2:39 PM Kellie Ottoboni <kellieotto@berkeley.edu> wrote:

Thanks Marilyn! I will keep following along...

My mailing address has changed to the following:

1313 Martin Luther King Jr. Way
Apt #6
Berkeley, CA 94709

5/13: 2 hr 15 min fixing data merge
5/14: 2 hr 45 min data analysis for queries 2-4
5/15: 1 hr writing up queries 2-4
5/17: 2 hr data analysis for Bartow County
6/13: 1 hour on phone call + prepping dropbox folder
Total: 9 hr

Best,
Kellie

Case 1:17-cv-02989-AT  Document 635-3  Filed 10/16/19  Page 24 of 42

E

X

H

I

B

I

T

6

| Hoke, Candice- Expert witness and legal services - Professional Time & Expenses |
|---|
| Matter: Curling v Kemp,  No. 17-cv-2989-AT |

| Date | Description of services | Time spent - in hrs | Comments<br>EW = Expert witness<br>LS = Legal services |
|---|---|---|---|
| 08/27/17 | Review emails requesting expert witness services; review case docs | 1.1 | EW |
| 08/28/17 | research on scientific deficiencies Diebold GEMS VS; VS forensics; constitutional bases for & send research with overview analysis; draft Declaration | 4.3 | EW |
| 08/29/17 | Draft & edit Declaration; send signed final | 3.2 | EW |
| 09/02/17 | Disc with client re other EW services requested & my expertise as used in other cases | 0.8 | EW |
| 09/03/17 | analyze case issues; research; sent | 0.5 | EW |
| 10/02/17 | Review emails & initial MTD case docs re for obtaining litigation new counsel | 0.2 | LS |
| 10/07/17 | Analyze MTD case docs re for obtaining litigation new counsel | 0.5 | LS |
| 10/30/17 | Conf call re spoliation of evidence & new counsel effort | 0.5 | LS |
| 11/16/17 | Legal research and answ email | 0.2 | LS |
| 11/17/17 | Review corr re atty withdrw; review case docs | 0.2 | LS |
| 11/18/17 | Rev docs re atty misfeasance | 1.3 | LS |
| 11/25/17 | Corrsp re evid of atty misfeas; analyze case docs | 3.1 | |
| 11/26/17 | Corrsp w/ new Client atty re motion to withdraw and need for new counsel; analyze S+J case filings and motion to withdraw; research, draft, and edit legal arguments for client's cross motion for S+J disqualification | 14.4 | LS |
| 11/27/17 | Review draft jud filing w/ attory of record notes. Revise in light of S+J change of position; craft and organize exhibits; draft motion for access; edit all docs for filing | 15.8 | LS |
| 11/29/17 | Review corr re S+J withdrawal | 1.1 | LS |
| 12/12/17 | Review and write corresp re MTW | 0.2 | LS |
| 12/14/17 | Corresp re proteciton of tech evid | 0.5 | LS |
| 12/17/17 | Rev corresp and respond | 0.5 | LS |
| 12/18/17 | Rev corresp and respond; con call w/ new attys re tech aspects | 1.1 | LS |
| 12/19/17 | Case reorg discussion with new attys | 0.2 | LS |

| 01/12/18 | Review jud order on MTW and discuss | 0.2 | LS |
|----------|-------------------------------------|-----|-----|
| 01/18/18 | Review USDCt order | 0.1 | LS |
| 09/18/18 | Consult on operational security steps needed as part of relief request for Jud Order; read case docs | 1.4 | EW |
| 09/20/19 | Consult on need for addl Declar; read case docs | 1.7 | EW |
| 05/18/19 | Review Judicial decision & Order | 1.1 | EW |
| 05/22/19 | review case docs for Decl addition | 0.9 | EW |
| 05/28/19 | Review case docs for addl Declaration | 0.2 | EW |
| 06/16/19 | Draft & edit Declaration | 0.7 | EW |
| 06/17/19 | Edit & submit Declaration for filing | 4.5 | EW |
| 07/18/19 | Assist in prep for Shamos deposition | 4.8 | EW |
| 07/19/19 | Listen via concall to Shamos deposition; standby assistance for technical security refutation if needed | 2.5 | EW |
| | **Total Hours** | **67.8** | |

Hourly Rate for Election Consulting ---$400  x 67.8 hours =  $27,120

Discount---public interest lawsuit, 501(c)(3)        (  9, 492)

Net billing @ $260 per hour                    =  $17,628

E

X

H

I

B

I

T

7

# **Ritchie Wilson**

# **INVOICE**

**813 East Ann Street, Apt 3**

**Ann Arbor, MI, 48104**

**Phone: 646-657-9545**

| DATE |
| --- |
| **8/27/2019** |

| BILL TO |
| --- |
| Coalition for Good Governance |

| NOTE: |
| --- |
| This work was billed at the agreed $200 per hour. However, in consideration of CGG's non-profit status and ongoing litigation, I agree to accept the reduced rate of $50 per hour now, and the defered $150 per hour to be payable when the CGG board determines it has secured sufficient funding for it other litigation expenses. |

| DESCRIPTION | HOURS/QTY | PRICE | AMOUNT | TMP REDUCED PRICE | TMP REDUCED AMOUNT |
| --- | --- | --- | --- | --- | --- |
| Investigating GEMS DBs - Week July 7 -13 | 16 | 200.00 | 3,200.00 | 50.00 | 800.00 |
| Investigating GEMS DBs - Week July 14-20 | 52.5 | 200.00 | 10,500.00 | 50.00 | 2,625.00 |
| Investigating GEMS DBs - Week July 21-27 | 32.5 | 200.00 | 6,500.00 | 50.00 | 1,625.00 |
| Investigating GEMS DBs - Week July 28 - Aug 3 | 31.5 | 200.00 | 6,300.00 | 50.00 | 1,575.00 |
| Investigating GEMS DBs - Week Aug 4-10 | 18.5 | 200.00 | 3,700.00 | 50.00 | 925.00 |
| Investigating GEMS DBs - Week Aug 11-17 | 25 | 200.00 | 5,000.00 | 50.00 | 1,250.00 |
| Investigating GEMS DBs - Week Aug 18-25 | 3 | 200.00 | 600.00 | 50.00 | 150.00 |
| | | | - | | |
| Flight July 12, Washington DC to Detroit | 1 | 277.29 | 277.29 | 277.29 | 277.29 |
| Microsoft Access License | 1 | 74.19 | 74.19 | 74.19 | 74.19 |
| TOTAL | | $ | 36,151.48 | $ | 9,301.48 |

# Ritchie Wilson

# INVOICE

**813 East Ann Street, Apt 3**

**Ann Arbor, MI, 48104**

**Phone: 646-657-9545**

| DATE |
| --- |
| 9/3/2019 |

| BILL TO |
| --- |
| Coalition for Good Governance |

**NOTE:**

This work was billed at the agreed $200 per hour. However, in consideration of CGG's non-profit status and ongoing litigation, I agree to accept the reduced rate of $50 per hour now, and the defered $150 per hour to be payable when the CGG board determines it has secured sufficient funding for its other litigation expenses.

| DESCRIPTION | HOURS/QTY | PRICE | AMOUNT | TMP REDUCED PRICE | TMP REDUCED AMOUNT |
| --- | --- | --- | --- | --- | --- |
| Writing Declaration - Week Aug 26 - Sept 1 | 32.5 | 200.00 | 6,500.00 | 50.00 | 1,625.00 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | **TOTAL** | | $ 6,500.00 | | $ 1,625.00 |

E

X

H

I

B

I

T

8

| DISTRICT COURT, JEFFERSON COUNTY, COLORADO | |
|---|---|
| Court Address: | |
| 100 Jefferson County Parkway | |
| Golden, Colorado 80401 | |
| IN RE: THE REQUEST OF MARILYN MARKS FOR CERTAIN RECORDS PURSUANT TO THE COLORADO OPEN RECORDS ACT, § 24-72-201, ET SEQ. | ▲ COURT USE ONLY ▲ |
| **Attorney for Respondent:** | |
| Robert A. McGuire | Case Numbers: 2011CV3576; |
| ROBERT A. McGUIRE, ATTORNEY AT LAW, LLC | 2011CV3828 |
| 1624 Market Street, Suite 202 | |
| Denver, Colorado 80202 | |
| Phone Number: 303-734-7175 | |
| FAX Number: 303-734-7166 | |
| E-mail: ram@lawram.com | |
| Atty. Reg. #: 37134 | Div.: 9 Ctrm.: |

## AFFIDAVIT OF MARILYN R. MARKS SUPPORTING RESPONDENT'S CLAIMED AMOUNT OF REASONABLE ATTORNEY FEES

City and County of Pitkin )
                       ) ss.
State of Colorado )

**MARILYN R. MARKS** ("Affiant"), being of lawful age and first duly sworn upon oath, deposes and states as follows:

1.       I am the Respondent in the above-captioned matter.

2.       I have prepared and do hereby submit this affidavit pursuant to this Court's Final Order Re: Respondent's Requests for Data and Reports Pursuant to the Colorado Open Records Act at 11 (the "Order"), and as supporting documentation to evidence the reasonableness of the fees claimed, as required under C.R.C.P. 121(c) § 1-22 ¶ 2(b).

3.       Through my corporate business experience, non-profit work and personal business requirements, I have more than 30 years of experience as a consumer of legal services, during which time I have either directly or through subordinates engaged, interviewed and (as representative of a party) been opposed by literally hundreds of lawyers from law firms across the United States and in some foreign countries.

4.       Either directly or through subordinates, I have engaged and instructed specialist counsel for specific assignments in patent law; transportation law; U.S., State, and international

tax law; M&A transactions; commercial litigation; commercial real estate; labor law; employment law; anti-trust; securities compliance; securities litigation; white-collar crime; Uniform Commercial Code and secured transactions; chemical technology; bio-technology licensing; restructuring; bankruptcy; intellectual property; internet technology and e-commerce; international trade; investment management; ERISA; RICO; Foreign Corrupt Practices Act defense; lease financing; global policy; directors' and officers' liability; private equity; municipal law; election law; trusts and estates; debt financing; personal real estate transactions; and Colorado law on initiatives.

     5.     My background as a sophisticated and prolific consumer of legal services has endowed me with a great depth of background and experience in assessing and evaluating the relative quality of legal services and the market price of attorney time among competing legal services providers practicing in various markets, including Colorado.

     6.     I believe that my extensive knowledge of market prices for attorney time in competitive legal markets is far greater than the knowledge of such rates on the part of most attorneys actually practicing in such markets and unquestionably exceeds the knowledge of those rates that would typically inform the attorney selection process and legal services purchasing decisions of most individual and corporate consumers of legal services. My experience has also given me substantial familiarity with the amount of legal work that is reasonably and necessarily required in order to achieve many of the objectives of litigation.

## EXPERIENCE AS A CONSUMER OF LEGAL SERVICES

     7.     In 1982, I became a Vice-President of a Fortune 500 Corporation, The Dorsey Corporation.

     8.     In my executive duties with The Dorsey Corporation, I worked closely with teams of attorneys in New York, Atlanta, and Chattanooga.

     9.     My primary responsibilities with The Dorsey Corporation involved mergers and acquisitions, corporate development and strategic planning, the last of which involved almost daily interactions with attorneys of various specialties including M&A, tax, international business, patent law, intellectual property and securities law.

     10.     As Vice-President of The Dorsey Corporation, I was involved in engaging law firms for various assignments. I made and assisted decisions about engaging legal counsel on the basis of counsel's areas and depth of legal expertise and the reasonableness of proposed counsel's fee arrangements.

     11.     Law firms of note that I worked directly with at The Dorsey Corporation included:

- Wachtell, Lipton, Rosen & Katz
- Dechert LLP

Case 1:17-cv-02989-AT Document 1555-3 Filed 01/01/2023 Page 72 of 238

Marks Aff. Supp. Respondent's Claimed Amount of Reasonable Att'y Fees
Page 3

- Alston & Bird LLP
- Miller & Martin PLLC (Chattanooga)
- Powell Goldstein LLP (Atlanta)

12.     Law firms of note that I worked directly opposite at The Dorsey Corporation included:

- Shearman & Sterling LLP
- Kirkland & Ellis LLP
- King & Spalding LLP

13.     Because it did business in dozens of States, The Dorsey Corporation also had numerous law firms serving as local counsel with whom I worked, including particularly local tax, litigation, labor and real estate counsel.

14.     In 1986, I was appointed to serve as Chief Executive Officer and Chairman of the Board of Directors of Dorsey Trailers, Inc. ("Dorsey Trailers"), a subsidiary of The Dorsey Corporation. I held the position of Chairman of the Board for 15 years, from 1986 to 2000, and I was Chief Executive Officer for 14 of those years.

15.     Dorsey Trailers was a mid-size manufacturing company with factories in five States and customers in almost all of the fifty States and some foreign countries.

16.     By virtue of its need for local counsel as a result of its widely distributed operations, Dorsey Trailers engaged dozens of law firms under my direction and supervision to serve as local counsel in a variety of jurisdictions. I retained what I would estimate to be more than 30 local law firms to serve as local counsel with various areas of expertise in the States of Wisconsin, Georgia, South Carolina, Pennsylvania and Alabama, as well as in other States, as local litigation required.

17.     In 1987, I led a leveraged buy-out of Dorsey Trailers, in connection with which I interviewed numerous firms for the role of corporate counsel to the newly acquired company.

18.     I chose Alston & Bird LLP as corporate counsel for Dorsey Trailers based on that firm's expertise and willingness to negotiate various flexible fees.

19.     I also selected and engaged McGlinchey Stafford PLLC as labor counsel and Fisher & Phillips LLP as subsequent labor counsel.

20.     In 1994, I took Dorsey Trailers public, in the course of which I worked with various New York and Baltimore law firms that served as underwriter's counsel. Among these firms was Hunton & Williams LLP.

Marks Aff. Supp. Respondent's Claimed Amount of Reasonable Att'y Fees
Page 4

21.     In 1994, I also began to serve as a director on the Boards of Directors of two Fortune 500 companies, Dana Corporation and Eastman Chemical.

22.     Each of these public companies engaged hundreds of law firms in various locales and specialties. As a director, my interface with attorneys in those firms varied depending on the events that occurred in active major cases.

23.     Each of these public companies also maintained in-house legal staffs totaling about 25 lawyers. I worked with in-house counsel closely as a member of each company's board. I also approved compensation for both companies' in-house legal department staff through my work on the compensation committees of the boards on which I served.

24.     As a member of the audit, finance and corporate governance committees of the Boards of Directors for each of these two companies, I worked with numerous law firms and helped to engage law firms for special assignments related to the work of those committees.

25.     Law firms of note that I worked with as a director of Dana Corporation and Eastman Chemical included:
- Skadden, Arps, Slate, Meagher & Flom LLP
- Jones Day
- Wachtell, Lipton, Rosen & Katz
- Alston & Bird LLP

26.     I also personally/individually engaged a specialist attorney at McKenna, Long & Aldridge LLP to advise me on my corporate board responsibilities at Dana Corporation and potential personal legal liabilities inherent in that role.

## **PARTICULAR KNOWLEDGE OF THE COLORADO LEGAL MARKET**

27.     Over the last 8 years I have paid (directly or through corporate involvement) rates from $135 per hour to in excess of $1200 per hour for legal services. The variation between these rates is explained by disparities in expertise and by the specific geographic markets and availability of the attorney to undertake new work.

28.     As a resident of Aspen, Colorado, I have engaged the following local counsel during this period for a variety of personal matters, primarily consisting of real estate transactions:
- Neal D. Karbank, P.C.
- Millard Zimet
- Krabacher & Sanders PC

29.     In 2007, I engaged Holland & Hart LLP to advise a nonprofit group seeking to overturn local ordinances in the City of Aspen.

Case 1:17-cv-02989-AT Document 1555-3 Filed 01/07/23 Page 74 of 238

Marks Aff. Supp. Respondent's Claimed Amount of Reasonable Att'y Fees
Page 5

30.     As part of this effort, I found only one attorney in the Roaring Fork Valley (Aspen, Basalt, Glenwood Springs) who was able to advise the group on municipal law, property rights and elections.

31.     I therefore interviewed every Denver-based firm with offices in the Roaring Fork Valley before ultimately selecting Holland & Hart LLP and engaging that firm on behalf of the nonprofit group.

32.     In 2009, I ran for mayor of the City of Aspen. Further to my campaign, I engaged Denver counsel at the law firm now known as Hale Westfall LLP, to advise me on election law and regulations. As I had found two years previously, there were no law firms in the Roaring Fork Valley and, indeed, no law firms that I was aware of anywhere else in western Colorado that practiced heavily in the area of election law. Thus my requirement for legal expertise in the area of election law compelled me to obtain qualified legal counsel by turning to practitioners principally located and practicing within the Denver metropolitan area.

33.     In late 2009, I initiated a Colorado Open Records Act ("CORA") case in Pitkin County, designated Marks v. Koch (Pitkin County District Court, 11CV694). In the course of searching for qualified counsel to represent me in that CORA matter, I interviewed a number of Denver-based firms, after finding again that there was no attorney with the appropriate expertise and availability in the Roaring Fork Valley.

35.     In the Fall of 2011, I helped local Roaring Fork Valley citizens interview and consider firms to potentially file an action under the Colorado Open Meetings Law ("COML"). I interviewed three firms with Aspen-area offices, and approximately four Denver-based firms. Billing rates ranged for the attorneys I interviewed ranged from $355 per hour to $525 per hour, depending on the relevant attorney's workload, experience and skill set.

36.     In February 2012, I interviewed a Denver firm with expertise in COML and CORA, with billing rates of $355 per hour, but discussions on that particular matter halted due to potential conflict of interest.

37.     In my experience, there are very few law firms and attorneys outside of the Denver metropolitan area with a practice in election law, in CORA litigation or in the area of regulation relating to voting systems, and no firm or attorney outside Denver to my knowledge has a practice that involves all three areas.

38.     To represent me in the present case, there were basically two attorneys that I identified as having appropriate expertise and experience to deal with my CORA case in Jefferson County, which required familiarity with election laws, voting systems and Colorado's open records laws. My present counsel, Mr. McGuire, is one of those two attorneys. The other attorney's regular market rate is $480 per hour.

Case 1:17-cv-02899-ATT Document 555-3 Filed 01/07/23 Page 75 of 238

Marks Aff. Supp. Respondent's Claimed Amount of Reasonable Att'y Fees
Page 6

39.     I have reviewed Mr. McGuire's affidavit of today's date, which is submitted contemporaneously herewith, and I am personally familiar both with it and with the legal services that Mr. McGuire has performed on my behalf throughout this case.

## CONCLUSIONS

40.     My case would have been delayed, more costly and potentially handled with less skill and efficiency of focus if I had selected an attorney other than Mr. McGuire.

41.     Based upon my personal knowledge derived from my background of experience as a sophisticated and prolific consumer of legal services, as described in the foregoing discussion, it is my opinion that the number of hours that are itemized in Mr. McGuire's affidavit is not only a reasonable number of hours for the work that Mr. McGuire has performed on my behalf in this case to date, but is in fact at the low end of the range of hours that I would expect a highly-qualified attorney with practice-area expertise to reasonably spend completing the same work.

42.     Based upon my same knowledge, it is also my opinion that a fee of $385 per hour for the legal services that Mr. McGuire has performed to date on my behalf in this case not only is a reasonable hourly rate, but in fact constitutes a substantial discount from the actual hourly value of Mr. McGuire's services in this legal market.

43.     Based upon my same knowledge, it is also my opinion that the lodestar amount that is set out in Mr. McGuire's affidavit is a minimum reasonable aggregate attorney fee for the legal work that Mr. McGuire has performed on my behalf through May 7, 2012, in connection with this case.

44.     The statements made in this Affidavit are not intended to waive and should not be construed as waiving any right or privilege.

45.     Further Affiant sayeth not.

Marilyn R. Marks

Subscribed and sworn to before me this 7ᵗʰ day of May, 2012, by Marilyn R. Marks.
Witness my hand and official seal.

My commission expires: 11/12/2013

Notary Public

[SEAL]

WESLEY C.
SULEK

Marks Aff. Supp. Respondent's Claimed Amount of Reasonable Att'y Fees
Page 7

## CERTIFICATE OF SERVICE

I hereby certify that on the 7th day of May, 2012, I served a true and correct copy of the **AFFIDAVIT OF MARILYN R. MARKS SUPPORTING RESPONDENT'S CLAIMED AMOUNT OF REASONABLE ATTORNEY FEES** and all attachments by the method indicated below to each of the following:

| Attorney | Firm And/Or Address: | Method |
|---|---|---|
| Ellen G. Wakeman, #12290 | Jefferson County Attorney's Office | LexisNexis |
| Writer Mott, #33148 | 100 Jefferson County Parkway, #5500 | File & Serve |
| David R. Wunderlich, #39365 | Golden, Colorado 80419-5500 | |

Robert A. McGuire

E
X
H
I
B
I
T

9

| Document | Doc Number | work done | Hours |
|---|---|---|---|
| Demand Letter 4.16.18 | 351 | outline, rough drafting, editing, citation checks, research organizing facts for attorneys | 5 |
| Demand Letter 4.16.18 | 351 | rough drafting, editing, citation checks, research organizing facts for attorneys | 1 |
| Demand Letter 2.18.19 | 351 | outline, rough drafting, editing, citation checks, research organizing facts for attorneys | 2 |
| Demand Letter 2.18.19 | 351 | rough drafting, editing, citation checks, research organizing facts for attorneys | 1 |
| Demand Letter April 1 2019 | 351 | outline, rough drafting, editing, citation checks, research organizing facts for attorneys | 4.5 |
| Demand Letter April 1 2019 | 351 | rough drafting, editing, citation checks, research organizing facts for attorneys | 1 |
| Demand letter March 2019 | 351 | research, drafting, fact checking, | 5 |

### Declarations and Affidavits

| | | | |
|---|---|---|---|
| Voter affidavits | 412, 413 | obtaining affidavits, communications with voter contacts | 7.5 |
| Voter affidavits | 412, 413 | reading, evaluating affidavits for inclusion in brief | 6.75 |
| voter affidavits | 412, 413 | evaluating affidavits for inclusion in brief | 3 |
| voter affidavits | 412, 413 | organizing affidavits for inclusoins in brief | 2 |
| voter affidavits | 412, 413 | Organizing affidavits for inclusoins in brief | 2.75 |
| voter affidavits | 412, 413 | superiving interns for affidavit organization | 2.5 |
| voter affidavits | 412, 413 | superiving interns for affidavit organization | 1.75 |
| | | | |
| Virginai Martin 1 | | assisting Martin in organizing declaration information | 1.5 |
| Virginai Martin 1 | | assisting Martin in organizing declaration information, providing research materials and contacts | 0.5 |
| Virginai Martin 1 | | proof reading, formatting, cross reference, | 0.75 |
| Virginia Martin 2 | | assisting Martin in organizing declaration information | 1.5 |
| Virginia Martin 2 | | assisting Martin in organizing declaration information, providing research materials and contacts | 0.35 |
| Virginia Martin 2 | | proof reading, formatting, cross reference, | 0.5 |
| Amber McReynolds 1 | | requesting declaration, covering subject matter, communications re: goals and case statuts | 1.5 |
| Amber McReynolds 1 | | assisting McReynolds in organizing information , sending revelant case files, explaining GA procedures, | 0.75 |
| Amber McReynolds 1 | | proof reading, formatting, cross reference, | 1.25 |
| Amber McReynolds 2 | | requesting declaration, covering subject matter, communications re: goals and case statuts | 1.5 |
| Amber McReynolds 2 | | assisting McReynolds in organizing information , sending revelant case files, explaining GA procedures, | 2 |
| Amber McReynolds 2 | | proof reading, formatting, cross reference, | 0.5 |
| Philip Stark Declaration | | requesting dclaration, communication re: theory of case, and subject matter of declaration. | 0.8 |
| Philip Stark Declaration | | providing case materials to Stark | 1.5 |
| Philip Stark Declaration | | answering questions from Stark re: GA policies and practicies | 0.5 |
| Philip Stark Declaration | | providing research materials to Stark | 0.5 |
| philip Stark Declaration | | proofreading | 0.5 |
| Richard DeMillo 1 | | requesting dclaration, communication re: theory of case, and subject matter of declaration. | 1.5 |
| Richard DeMillo 1 | | providing case materials, providing other experts' reports. | 0.75 |
| Richard DeMillo 1 | | proofreading, formatting | 0.75 |
| Richard DeMillo 2 | | inquiring, make request, supply subject matter details | 1 |
| Richard DeMillo 2 | | providing case materials, providing other experts' reports. | 2 |
| Richard DeMillo 2 | | proofreading, formatting | 1.5 |
| Megan Missett 1 | | making request, supply subject matter details, | 0.5 |
| Megan Missett 1 | | proof reading, corrections, formatting | 0.5 |
| Megan Missett 2 | | making request, supply subject matter details, | 0.25 |
| Megan Missett 2 | | proof reading, corrections, formatting | 0.5 |
| Jeanne Dufort 1 | | making request, supply subject matter details, | 0.5 |
| Jeanne Dufort 1 | | proof reading, corrections, formatting | 0.5 |
| Jeanne Dufort 2 | | making request, supply subject matter details, | 0.5 |
| Jeanne Dufort 2 | | formatting, proofreading, | 0.5 |
| Matt Bernhard 1 | | outlining need | 0.75 |
| Matt Bernhard 1 | | providing background docs. | 1.5 |
| Matt Bernhard 1 | | formatting, proof reading, check references, | 0.5 |
| Matt Bernhard 2 | | formatting, proof reading, check references, | 0.5 |
| Matt Bernhard 3 | | formatting, proof reading, check references, | 0.75 |
| Ronnie Martin | | expaining request, providing documents | 1 |
| Ronnie Martin | | proofreading, formatting, | 0.5 |
| Garland Favorito | | explaining request, providing documents | 1 |
| Garland Favorito | | communicate re: excess length | 0.25 |
| Garland Favorito | | summarizing content for attorneys | 0.75 |
| Garland Favorito | | locating proofing transcipts, | 0.75 |
| Garland Favorito | | proofreading, formatting | 1 |

| | | |
|---|---|---|
| Pride Forney | request declaration, | 0.25 |
| Pride Forney | proofreading, formatting | 0.5 |
| Taran Greenwald | assisting with outline, formatting, proofreading | 1.5 |
| Digges | outline, make request, proofread. | 1.5 |
| Digges | outline, make request, proofread. | 1 |
| Davis | outline, make request, proofread. | 1 |

**Assisting Attorneys Witness Prep**

| | | |
|---|---|---|
| V Martin | preparing outlines, suggesting questions, considering cross examination, | 2 |
| Sarah LeClerc | preparing outlines, suggesting questions, considering cross examination, | 1 |
| Matt Bernhard | preparing outlines, suggesting questions, considering cross examination, | 0.5 |

**Analysis for MPI relief**

| | | |
|---|---|---|
| Municipal elections | design research and worksheet | 1.5 |
| Municipal elections | explain to attorneys, explain to interns | 0.75 |
| Municipal elections | review data and supervise interns | 5 |

**First Quarter elections analysis**

| | | | |
|---|---|---|---|
| Q 1 elections history | 621 | prepare outline of reseach, worksheets, supervise intern. Analyze type of eleactoins | 5 |

**Complaints, Motions, etc**

| | | | |
|---|---|---|---|
| Complaint 1 | | assist H&W with fact gathering, research law, gathering affidavits, researching supporting documents, coordinating in witness affidavits, editing, proofing, outlining goals, interviewing witnesses | 45 |
| Amended complaint | | helped correct errors, fact check , editing, research for attorneys | 14 |
| Complaint 1--service of process | | identifying and resolving service issues | 10 |
| Third Amended Complaint | | outline facts for attorneys | 5.25 |
| Third Amended Complaint | | contrast with SAC for unwanted claims | 1 |
| Third Amended Complaint | | preparing facts for attorneys | 1.5 |
| Third Amended Complaint | | edits, suggestions, fact checking, citation checking, | 3.5 |
| Third Amended Complaint | | consulting with experts | 3 |
| Defendants  MTD to TAC | 234 | analyze, provide facts, comments to attorneys | 3 |
| D's MTD to TAC | 234 | Provide suggestions to attorneys for response. | 2 |
| 2018  P.I. Injunction Brief | 258 | outlining goals, drafting proposed sections, preparing facts, research | 10 |
| 2018  P.I. Injunction Brief | 248 | revisions | 5 |
| 2018  P.I. Injunction Brief | 258 | facts, working with experts | 3 |
| 2018 D's Response | 265 | reiew to provide comments to attorneys, fact checking | 5 |
| 2018 D's Reponse | 265 | annotations and write up of comments to attorneys | 4 |
| 2018 PI injunction Reply | 277 | assist in drafting, fact checking, reference checking | 5 |
| 2018 PI Inj Brief Oct | 327 | outline goals and initial drafting of ideas | 3 |
| 2018 PI Inj Brief Oct | 327 | review and edit drafts and review relief | 3 |
| 2018 PI Inj Brief Oct | 327 | work with experts on audit requirements | 5 |
| April  2019 Status Report | 351 | researching HB316, outlining, assiting in drafting, editing, citation checking, proofing, | 10 |
| 2019 P.I.Injunction Brief | 419 | outline goals, outline sections  draft proposed order | 5 |
| 2019 P.I.Injunction Brief | 419 | rough drafting sections of Mpi | 10 |
| 2019 P.I.Injunction Brief | 419 | preparation of evidence | 35 |
| 2019 P.I.Injunction Brief | 419 | review, editing | 10 |
| 2019 D response | 472 | review and fact check for attorneys | 3 |
| 2019 D response | 472 | provide comments to attorneys for reply brief consideration | 2.5 |
| 2019 P.I. Inj Reply Brief | 507 | provide facts, reseach, suggesting for reply | 2.5 |
| 2019 P.I. Inj Reply Brief | 507 | help with drafting, edits, fact check, citations | 10 |
| Spoliation Brief | 548 | outline brief and goals for Ichter | 1.5 |
| Spoliation Brief | 548 | provide factual background for Ichter | 2.5 |
| Spoliation Brief | 548 | draft portion of brief | 2.5 |
| Spoliation Brief | 548 | editing brief, providing references, | 2 |
| Spoliation Brief | 548 | proofreading, fact check, | 2.5 |
| spoliation Brief response | 558 | fact checking --summary to attorneys | 1.5 |
| spoliation Brief reply | 564 | fact checking editing, outlining goals | 3 |
| Fee Claim | | organize CGG expenses , professional fees, | 12 |
| Fee Claim | | prepare declaration | 3 |
| Fee Claim | | review, suggest edits brief | 2 |

**Discovery**

| | | |
|---|---|---|
| RFA -Fulton | | drafting, reviewing with attorneys | 1.5 |

| Item | Doc/Page | Description | Hours |
|---|---|---|---|
| RFA-State | | drafting, reviewing with attorneys | 2.5 |
| public records requests SOS | | preparing, follow up on public reccords requests for evidence | 7.5 |
| public records requests Fulton | | preparing, follow up on public records requests for evidence | 4 |
| KSU FOIA | | 187 page KSU server doc. Review for technical analysis and details. Includes request, followup, analysis, inquiring with experts, summary memos to attorneys, fact checking, incorporating into discovery requests, organizing pages for attorneys. | 17 |
| Interrogatories-fulton | | draft, edit, communicate with attorneys | 3 |
| Interrogatories-state | | draft, edit, communicate with attorneys | 4 |
| **Request for documents--** | | | |
| Request for documents--SOS | | draft, edit, discuss with attorneys | 4 |
| Request for document--SOS | | review. Comment, analyze Curling Doc request | 3 |
| Deposition -- Barnes | | outline goals, prepare list of topics, questions | 2.5 |
| Deposition -- Barnes | | provide Brown with documents for deposition | 2 |
| Deposition -- Barnes | | refine questions and prep with Brown | 3 |
| Deposition -- Barnes | | attend deposition, refine questions, supply documents, | 7 |
| Deposition -- Barnes | | review transcript for attorneys, annotate for hearing prep for attorneys, | 2 |
| Deposition--Kirk | | outline goals, prepare topic list, prepare questions | 2.5 |
| Deposition--Kirk | | refine questions, provide gather supporting documents | 1.5 |
| Deposition--Kirk | | refine questions, provide supporting documents | 1 |
| Deposition--Kirk | | attend deposition, provide questions, review documents produced, fact check, assist Powers | 5 |
| Deposition--Kirk | 503 | review transcript for P I hearing, prepare info for attorneys | 2 |
| Deposition--Ledford | | outline goals. Prepare questions, topics | 3 |
| Deposition--Ledford | | locate relevant documents | 3 |
| Deposition--Ledford | | prep session with Powers | 3 |
| Deposition--Ledford | | attend deposition and assist Powers | 6 |
| Deposition-Shamos | | Help prepare Powers for background technology | 5 |
| Deposition-Shamos | | Prep with Powers for questions. Organize documents | 4 |
| Deposition-Shamos | | gather technical materials for Powers | 2.5 |
| Deposition-Shamos | | Attend deposition, assist Powers with questions, followup, and organizing results for PI hearing | 5 |
| Deposition--Doran | | Prepare questions , supporting materials for Brown | 5 |
| deposition--Doran | | Refine questions, materials for Brown | 2 |
| Deposition--Doran | | Attend deposition, assist Brown, provide questions and following questions, review documents produced. | 4 |
| Subpeona Morgan County docs | | Draft subpeona, review with Brown | 2 |
| Subpeona- Bartow county doce | | draft subpeona, review with Brown | 2 |
| Subpeona- Rockdale county docs | | draft subpeona, review with Brown | 2 |
| Monitoring 8.15.19 order | | recruting volunteers for monitoring pilot elections | 3 |
| Monitoring 8.15.19 order | | organizing , training, documenting discovery needed for pilot | 3.5 |
| monitoring 8.15.19 order | | obtain, organize feedback from observers | 2.5 |
| monitoring 8.15.19 order | | draft memo re: observation to D counsel | 1.5 |
| **Review Transcripts** | | | |
| Transcript 5.1.2018 | 185 | Review and annotate for attorneys | 2 |
| Transcripts 5.8. 2018 | 204 | Review and annotate for attorneys | 1.5 |
| Transcripts 2018 PI hearing | 307 | Review and annotate for attorneys | 4.5 |
| Transcript 4.9.2019 conf | 363 | Review and annotate for attorneys, prepare notes for followup | 3 |
| Transcripts | 391 | Review and annotate for attorneys, prepare notes for followup | 2.25 |
| Transcript July PI hearing | 570 571 | Review and annotate for attorneys | 4 |
| **Hearing Prep** | | | |
| status conf 5/1/2018 | | gather materials for attorneys, prep for stauts conf. | 3 |
| status conf 5/8/2018 | | prepare materials for attorneys re preservation | 4 |
| Direct--Barnes July 2019 | | prepare questions and materials for attorneys | 3.5 |
| Direct--Beaver July 2019 | | prepare questions and materials for attorneys | 3 |
| barron- July 2019 | | prepare questions and materials for attorneys | 4 |
| Document discovery response | | prepare correspondence with election officials | 10 |
| document discovery response | | supervise interns re document preparation | 2.5 |

| | | | | |
|---|---|---|---|---|
| Documents for 7.25.19 Hearing | Gathering,, supervise interns for printing, organizing | 4.5 | | |
| Documents for 7.25.19 Hearing | reviewing, supplementing, reviewing with attorneys | 3 | | |
| **GEMS database controversy** | details in sanctions motion. Developing facts, investigating public databases, recruting experts, training experts, arranging logistics, attending conf calls with attorneys and court, assisting in declaratoins | 68.5 | | |
| **Preservation issues** | | | | |
| preservation FBI image | consulting with Ichter, preparing background materials | 2.5 | | |
| preservation FBI image | advising data recovery experts on contents, procedures logistics | 6 | | |
| preservation FBI image | discussions with foresnsics experts on recovery | 5 | | |
| | Total hours | 626.65 | $200 | 125,330 |



January 12, 2021

Douglas A. Kellner, Co-chair
Peter S. Kosinski, Co-chair
Andrew J. Spano, Commissioner
Anthony J. Casale, Commissioner
New York State Board of Elections
40 North Pearl Street, Suite 5
Albany, NY 12207-2729

Re: Please deny certification—ExpressVoteXL

Dear Commissioners,

On behalf of our New York voter members, Coalition for Good Governance, a non-profit, non-partisan membership organization, requests that you deny certification of the ExpressVoteXL for universal use. Our objections relate to the fundamental nature of electronic ballot markers which cannot generate an "accountable" vote as the Honorable Judge Amy Totenberg used the term in her August 2019 ruling finding Georgia's Diebold DREs in violation of the US Constitution. (https://coaltionforgoodgovernance.sharefile.com/d-sea7c416b54604862bf15940a73ed4ba4 ) Coalition for Good Governance is the organizational plaintiff in that ongoing lawsuit, (Curling v Raffensperger) which now challenges the use of touchscreen BMDs on the same federal constitutional grounds. In October 2020, Judge Totenberg, while denying a preliminary injunction so close to the date of the November general election, expressed serious concerns about the potential constitutional violations of barcode-producing BMDs. (https://bit.ly/CGGOrderOct ) Similar infringements on the right to vote and to "cast an accountable vote" are inherent in the use of the ExpressVoteXL. The pleadings in the ongoing case address multiple federal constitutional claims that would also apply to the ExpressVoteXL as proposed in New York.

Further, we would like to point out the ongoing struggle in Georgia regarding the inability for the critics to accept the results of the Presidential Election where approximately 75% of the ballots were generated by unauditable touchscreen BMD ballots. As you are likely aware from the much-reported story of the vote-counting controversies in Georgia, manual audits of hand-marked ballots were able to confirm voters' choices and test the tabulation of such mail ballots, but did little to quiet the concerns of President Trump's supporters concerning potential vote-flipping, hacking, erroneous programming, software vulnerabilities, or machine malfunction for 75% of the ballots--the BMD ballots. As made clear in experts' opinions such as the research paper, *Ballot-Marking Devices*

**Exhibit
CGG 0011**

CGG2021001277499

*(BMDs) Cannot Assure the Will of the Voters,*[1] the voters' choices that are entered on the touchscreens simply cannot be verified no matter what type of ballot summary is printed. The failure of the BMD system to prove and confirm voters' presidential choices in Georgia will remain an issue generating mistrust, controversy and divided partisan views for years to come in Georgia. We urge the New York State Board of Elections to study the public turmoil that continues today in Georgia regarding the lack of confidence in the BMD system results because they can never actually be concretely determined to reflect the choices the voters entered on the touchscreen.

As plaintiffs deeply involved in collecting evidence in the BMD case, we can provide you with numerous sworn declarations from polling place observers across the state over the course of BMD elections of the last 16 months, documenting that only a minor percentage of voters review their printed BMD ballots to attempt to verify the printed text *even when reminded to do so by poll workers*. BMD ballots are simply too complex and generally too long for voters to be charged with the responsibility to check the accuracy of the touchscreen machines. Voters simply cannot accurately verify such ballots, will often not attempt to do so, and should not be expected to undertake this difficult responsibility---a unrealistic impossible task that is required to be completed accurately by all voters before election outcomes can be verified. Audits of election outcomes are essential for the public to gain confidence in the election. As noted above, such confidence will likely never be possible for many Georgia voters, who must be content to rely on the fact that more Biden votes were recorded than Trump votes in Georgia, without the ability to determine whether those BMD tallies were reflections of the voters' recording of their vote.

For the reasons detailed above, we urge the Board of Elections to deny certification as universal BMD voting equipment, given the infringement on the right to cast an accountable vote and the inability for BMD election outcomes to be verified. Please let us know if we can provide more information.

Sincerely,

Marilyn R. Marks, Executive Director
c/o Board Secretary, Coalition for Good Governance
1520 Cress Court, Boulder, CO 80304
(704) 292 9802
Marilyn@USCGG.org

---

[1] Appel, DeMillo, Stark, *--Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters,* https://www.cs.princeton.edu/~appel/papers/bmd-insecure.pdf

CGG2021001277500

November 4, 2019

Damon Circosta, Chair
Stella Anderson
David C. Black
Jeff Carmon III
Kenneth Raymond
(Via email)

North Carolina State Board of Elections
430 N. Salisbury Street
Raleigh, North Carolina 27603

Re: Numbered Memo 2019-07 What Constitutes a Vote

Dear State Election Board Members:

I received the attached Numbered Memo 2019-7 dated November 1, 2019 on Friday. I urge you to review the memo in the context of the spirit and clear intent of the statute which provides:

> *Procedures and Standards. – The State Board of Elections **shall adopt** uniform and nondiscriminatory procedures and standards for voting systems. The standards shall define what constitutes a vote and what will be counted as a vote **for each category of voting system** used in the State. The State Board shall adopt those procedures and standards at **a meeting occurring not earlier than 15 days** after the State Board gives notice of the meeting. The procedures and standards adopted shall apply to all elections occurring in the State and shall be subject to **amendment or repeal by the State Board acting at any meeting** where notice that the action has been proposed has been given at least 15 days before the meeting.*

> *G.S. § 163-182.1 (emphasis added)*

There are numerous unanswered questions raised by the memo, which proports only to "offer guidance," (not the adoption of binding standards the law requires), but highlights the fact that the type of decisions made in the preparation of this guidance memo are required instead to be made in a public meeting of the Board. As stated in the October 14, 2019 letter attached, the General Assembly considered this to be such a crucial issue that it mandated a 15 day notice period for such a decision by the board. Numbered Memo 2019-07 attempts to substitute staff "guidance" to the counties for a formal and binding decision by the Board which the General Assembly commanded to "adopt...procedures and standards..." during a public meeting. The Board's attempt to sidestep its responsibilities which require a hearing in which political parties, candidates, election officials, scientists, voting rights advocates, legal experts, and voters can participate is quite disappointing. No doubt the General Assembly intended that in order to avoid legal controversies during an election, the Board make formal definitive

**Exhibit**
CGG 0012

CGG2021001277514

and binding decisions that would control the legal requirements for counting votes with adequate notice prior to the conduct of elections.

The barcoding ballot marking device such as the ExpressVote is clearly a new "category of voting system" never before addressed by this Board to meet its requirement to determine what "constitutes a vote." Indeed, on page 2 of the memo, "Ballot Marking Device Systems" are referenced as a type of ***voting system.*** A barcode "Ballot Marking Device System" simply cannot be considered a sub-category of other existing voting systems already subjected to the Board's adoption of standards and procedures. A determination of the "vote" to be counted on such a system must be made in a public meeting that complies with the General Assembly's mandate. I urge you to obey the mandate of the General Assembly and conduct the required noticed meeting and deliberatively consider the questions that must be answered about the new voting systems adopted on August 23, 2019.

A sample of questions that the Numbered Memo 2019-07 and the ES&S 5.2.2.0 system generates are:

1. NC statute G.S. § 163-165.7(a) and the NCSBE Voting System Certification Program require that the voter be able to "***verify the vote***" and "correct any error," before it is cast. For the ExpressVote BMD, the ***vote*** to be counted is either the barcode or the human readable text. Numbered memo 2019-07 indicates that the official "vote" is ***both***—although the two indicia of the vote may differ for multiple reasons.  Given that the voter can only verify the human readable text, the text must be the vote that is counted even during the first tabulation. The human readable vote is the only legally valid vote.

2. Numbered memo 2019-07 states on page 2 that "in the case of a barcode ballot, the voter is verifying that ***the names*** printed on the ballot accurately reflect the voter's selections."  This indicates a requirement to use the printed names as the only "vote" to be counted. The barcode is simply not a legally authorized vote under NC law, yet that is the only "vote" that the scanner can count. This guidance leaves the clear danger that the official vote tallies will be tabulated differently for races subject to hand-to-eye sampling than for other races on the ballot. Or that precincts subjected to hand-to-eye sampling will be tabulated on a different basis than other precincts for the same race.  Board deliberations and discussions are required on this important decision to reconcile the law and the form of the ballot--- a decision that should not be delegated to informal and non-binding "guidance" from a staff memo.

3. The staff memo (2019-07) states, "Ballot marking device (BMD) voting systems do not allow irregularly marked ballots."  (Note that the memo recognizes that BMDs are a class of voting systems, clearly not previously addressed.) The

CGG2021001277515

statement is categorically inaccurate. Numerous types of errors and defects can occur on thermally printed ExpressVote ballots. For example, printing problems can occur because of mechanical defects or defective thermal paper (See Exhibit 1)[1], or thermal paper ballots can almost immediately fade if exposed to heat and light (See Exhibit 2). Obviously, such ballots can be damaged in voting, transport, storage or processing as well. Such ballots generate the question not answered by this board of which record is to be referenced if the paper ballot is defective. Choices include:

    a.  The graphical image created by the scanner if it is not defective; or

    b.  A software independent interpretation of the barcode on the paper ballot; or

    c.  The cast vote record as recorded on the memory card and database.

This determination clearly needs a thoughtful set of board-approved standards responsive to a set of different types of potential problems with the thermal paper ballot.

The Board should consider the common defects in thermal paper papers which can experience legibility degradation rapidly with heat or light exposure and can experience mechanical errors in printing. Officials must not assume as stated that there are no "irregularly marked ballots."

4.  Question 3 above generates other important questions that require prompt resolution by the Board in determining what indicia of the vote should be used in cases of irregular or damaged paper ballots for the original tabulation, recounts or hand-to-eye sampling for all three voting systems approved August 23.

    a.  Given that the voting systems certified on August 23, 2019 include scanners which capture graphical images of paper ballots and also create electronic cast vote records for each ballot, are such scanned electronic records to be referenced to control the interpretation of the vote in cases where the paper ballot (hand marked or BMD marked) is damaged, illegible, or when discrepancies are detected? If so, which record source is the primary source—the image on the memory card, or image stored in the post-election database?

    b.  If electronic records created by the scanner can be used for such interpretations, which is the priority ordering of the various following

---

[1] Exhibit 1 is an annotated photograph of an actual ballot that is defective discovered by a Maryland audit. Maryland Board of Elections slideshow, slide 27, accessible at http://www.ncsl.org/Portals/1/Documents/Elections/Elections_June2017_Ballot_Image_Audits.pdf

CGG2021001277516

records that should control the interpretation of the vote in the case of ballot damage, loss, illegibility, or discrepancy?

  ∗ Barcode interpretation referencing the paper ballot
  ∗ Graphical image of the ballot (whether hand marked or machine marked)
  ∗ Cast vote record

5. If graphical images are permitted to be referenced for interpretation in the event of ballot loss, damage, illegibility, discrepancy, have counties been uniformly instructed to **capture** and **save** all images of paper ballots, with instructions for appropriate retention periods under state and federal law? (Failure to require uniformity of preservation of ballot image files can create legal complexities in post-election controversies.)

The above list is only a partial list of questions generated by the new voting systems as to "what constitutes a vote" that the Board must determine. The memo states that it provides guidance on "the **tabulation** of election results" as well as post-election hand-to-eye reviews. However no guidance is provided on the **tabulation** of election results, especially for barcoded paper ballots.

It is further gravely disappointing that the memo misquotes the currently operative NC statute in a material and misleading manner. Footnote 1 quotes G.S. § 163-165.7(a) that is effective beginning December 1, 2019 rather than the operative law now in effect and that was in effect when the subject voting systems were certified on August 23, 2019. The memo then attempts to misleadingly rely on provisions for "backup means" of counting found in the statute not yet effective. The law currently requires that--

> *"The State Board may certify voting systems only if they meet the requirements set forth in this section and only if they generate either a paper ballot or a paper record by which voters **may verify their votes before casting** them…"*

The Numbered Memo instead quotes from a more lenient statute effective **after** December 1, 2019 without disclosing its future effective date--

> *"The State Board may certify voting systems only if they meet the requirements set forth in this section and only if they generate a paper ballot which provides a backup means of counting the vote that the voter casts."*

This attempt to mislead readers is unacceptable.

Regardless of an upcoming change in the law, the requirements of the NCSBE Voting System Certification Program clearly authorize **only** voting systems that permit voter verifiable votes:

*3.4.2.6 Voter Privacy*

*The voting system must permit the voter to verify, in a private and independent manner,* **the vote** *selected by the voter on the ballot before the ballot is cast and counted.*

*3.4.2.7 Ballot Correction*
*The voting system must provide the voter with the opportunity, in a private and independent manner, to change the ballot* **or correct any error** *before the ballot is cast and counted*

Obviously, a voter cannot verify a barcode nor could they detect an erroneous, misconfigured barcode before casting it as her official vote to be tabulated.

The Board's improper decision to certify the ExpressVote barcode ballot system has created a cascading set of issues that invite post-election controversies, including the examples given above. We urge the Board to reconsider the decision to certify the ExpressVote devices, and further to meet in public session as the law requires in which the Board "**shall adopt**" standards and procedures for the new voting system attributes certified.

I am happy to respond to any questions or comments.

Respectfully,

Marilyn Marks
Executive Director
Coalition for Good Governance
Marilyn@USCGG.org
704 292 9802

cc: Katelyn Love, Karen Brinson Bell

CGG2021001277518

Exhibit 1



BALTIMORE CITY/STATE OF MARYLAND
2016 PRESIDENTIAL GENERAL ELECTION
11/08/2016
011-003. BALLOT STYLE 4

PRESIDENT - VICE PRES---------------------------------
                                            TRUMP-PENCE

U.S. SENATOR------------------------------------------
                                            KATHY SZELIGA

REP IN CONGRESS---------------------------------------
                                            CORROGAN R. VAUGHN

MAYOR-------------------------------------------------

**Not all information printed
on the card. You can see the
bottom of the card in the
image so this not not a
scanner issue, it is a ballot
marking device issue.**

CGG2021001277519

# Exhibit 2

SEVIER COUNTY/TENNESSEE
PRIMARY ELECTION
05/01/2018
SEVIERVILLE ELEMENTARY2 1ST SCHOOL BOA



REP CIRCUIT COURT JUDGE PART I•LU ANN (HATCHER) BALLEW

REP CIRCUIT COURT JUDGE PART II DIST 4--------JIM GASS

REP COUNTY MAYOR------------------------LARRY WATERS

REP CC DISTRICT 4 A COMM 04---------------RONNIE WHALEY

REP CC DISTRICT 4 B COMM 04-----W/I FORMER UNDERVOTE ⬅

REP CC DISTRICT 4 C COMM 04----------NO SELECTION MADE

REP COUNTY TRUSTEE----------------TONYA CASE STINNETT

REP SHERIFF---------------------RONALD L. "HOSS" SEALS

REP CIRCUIT COURT CLERK---------------W/I RITAS MOM ⬅

REP GEN SESS COURT CLERK--------------CONNIE E. HOLT

REP COUNTY CLERK-----------------------KAREN COTTER

REP REGISTER OF DEEDS-------W/I FORMER UNDERVOTE TWO ⬅

REP ROAD SUPERINTENDENT----------------JONAS SMELCER

REP CONST DIST 1 A CONS 01------------JIMMY C  MAPLES

REP CONST DIST 1 B CONS 01----------NO SELECTION MADE

SCHOOL BOARD 1 DIST 1-----------------W/I MIKES WIFE ⬅

CGG2021001277520

**Sent:** Thursday, September 26, 2019 5:47 PM EDT
**To:** David.Black.board@ncsbe.gov <David.Black.board@ncsbe.gov>
**BCC:** Stella Anderson <anderson.stella0@gmail.com>
**Subject:** Message to Mecklenburg BOE

Mr. Black,
The Mecklenburg County Board of Elections meets tomorrow (Friday) at 1pm. I sent them this information in advance of the meeting.
I hope that you will attend to hear the discussion.
I'm troubled that the State Board members seem to be ignoring the continuing and mounting problems of system certification. It appears that the staff simply did not do the homework before approving new systems that will cause the counties problems.
Thank you.
Marilyn Marks

███████

---

**From:** Marilyn Marks <Marilyn@USCGG.org>
**Date:** Thursday, September 26, 2019 at 12:02 PM
**To:** <beverly3@bellsouth.net>, <jgresham@tinfulton.com>, <Emmcd2012@gmail.com>, <mpsumma@gmail.com>, <crhwilliams@aol.com>
**Cc:** <LaShonda.Hart@mecklenburgcountync.gov>, <George.Dunlap@mecklenburgcountync.gov>, <elaine.powell@mecklenburgcountync.gov>, <Vilma.Leake@mecklenburgcountync.gov>, <Mark.Jerrell@mecklenburgcountync.gov>, <susan.harden@mecklenburgcountync.gov>, <susan.rodriguez-mcdowell@mecklenburgcountync.gov>, <pat.cotham@mecklenburgcountync.gov>, <trevor.fuller@mecklenburgcountync.gov>, <ella.scarborough@mecklenburgcountync.gov>, "Dickerson, Michael" <Michael.Dickerson@mecklenburgcountync.gov>, <Kristin.Mavromatis@mecklenburgcountync.gov>
**Subject:** New voting system risks

Dear Mecklenburg County Board of Elections:

As you meet to consider a new voting system, please consider the many clouds over the new systems under consideration that create the need for a  sound  and fiscally responsible decision to maintain the current Unity election management system you own today and rent or lease enough inexpensive M100 scanners to conduct 2020 elections with hand marked paper ballots, while discontinuing the use of DREs. Doing so will create a paper ballot election that can be audited, and avoid a high risk, very high cost purchase that will likely be subject to controversy and potential legal challenge.

**None of the systems** certified by the NCSBE can be reasonably purchased this year because of **NCSBE failures to fulfill required testing** against NC rules and laws.

See the WRAL report published yesterday. https://www.wral.com/did-nc-skip-a-step-new-voting-machines-questioned-again/18657405/?utm_medium=email&utm_campaign=newsletter&utm_source=wral

1. NCSBE failed to conduct the mandated tests on the three systems, making the systems all subject to legal challenge before or after an election.   [ https://coaltionforgoodgovernance.sharefile.com/d-s53215e4355442229 ]
   [ https://coaltionforgoodgovernance.sharefile.com/d-se0f9b4709a346b28 ]

2. Electronic touchscreen voting with ExpressVote (barcodes) defies the General Assembly's mandate to abandon touchscreen voting with unverified paper trails (DREs.)   ExpressVote merely substitutes a more expensive form of electronic voting the General Assembly attempted to abolish. It will almost certainly have a short life, if ever deployed at all.

3. Nation's top auditing and cybersecurity experts agree that ExpressVote election results **cannot be meaningfully audited**. https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3375755
   While post-election "audits" can be attempted, they are *meaningless* because the paper ballot records are not verified by the voters. Voters do not review the printed ballot record making such records unfit source records for audits, and not an acceptable audit trail. Despite vendor claims that the system can be "audited," it is the election results that must be *meaningfully audited* to achieve voter confidence, not merely perform superficial "feel good" audits.

4. The ES&S ExpressVote system (Hardware Version 1.0) certified in NC is *not being sold* to other states because some components are considered **"end of life."** https://coaltionforgoodgovernance.sharefile.com/d-s1ea1018de7849e5b

   -ES&S told the federal Election Assistance Commission in April 2019 that it Version 1.0 was "end of life."
   -ES&S told Tennessee in January 2019 that it ceased manufacturing Version 1.0.
   -ES&S told Michigan, Montana, Wisconsin, in recent months that Version 1.0 was "end of life."



**Exhibit CGG 0013**

-NC certified version 1 on August 23, 2019.
-September 23, 2019 ES&S says they will ship Version 1 to NC counties *although* it is "end of life."

Version 1 runs on long-outdated Windows CE6 and Windows 7, and **very labor intensive and expensive to upgrade**.
Counties must assess security risks and financial implications of buying such equipment.

5.  Barcode balloting systems like ExpressVote were recently banned in Colorado for security reasons. Colorado used barcode ballots in vote centers for the past few years, and gained experience to understand the risks. [ https://www.cnn.com/2019/09/16/politics/colorado-qr-codes-votes/index.html ]

6.  Costs of ExpressVote system is **multiple times** the cost of hand marked paper ballot equipment. https://www.cyber.pitt.edu/votingsystemsanalysis A detailed cost comparison should be demanded before considering electronic ballot marking devices. Taxpayers will object to this waste that benefits only the vendor. Although the above issues should bring the consideration of ExpressVotes to an immediate halt, if they are still under consideration, a thorough analysis of the extreme cost will prove that the ExpressVotes provide an inferior product for an unjustifiable extremely high price.

7.  Operation of ExpressVotes is considerably more labor intensive and complex than hand marked paper ballots.

8.  Voters should not be forced to cast official votes that they cannot read or verify. The written text may or may not represent what is in the barcode.

9.  ExpressVote units are expensive and take voters several minutes to use, resulting in polling place lines. Hand marked paper ballot capacity can be immediately increased. Lines drop dramatically when hand marked paper ballots are used and touchscreens are not used.

10. NC law requires that the voter be able to verify and correct their ballot before casting. Voters cannot read the official barcode vote in order to do so. Reading the text on the ballot card **cannot "verify"** what the official barcode vote is.

11. Electronic ballot marking devices such as ExpressVote are in litigation in federal court in Georgia, challenging the unconstitutional nature of this form of voting. More lawsuits are expected soon.

In summary, choosing ES&S ExpressVote is a high cost, high risk choice that will likely generate a required replacement within a short time as certification may be withdrawn or potential litigation may halt the use. The ExpressVote brings no benefits to voters –only to vendors. Given that the results cannot be meaningfully audited, (despite vendors' false claims), this system should not be considered.

So far, no NC counties have approved the use of ExpressVotes for standard voting technology, and if adopted at all, they have limited the use to assistive technology in the polling place. Most counties are choosing hand marked paper ballots because they are long-life technology, auditable, and a far more affordable voting system choice. Personally, as a Mecklenburg voter, I urge you to adopt hand marked paper ballots and reject the ballot marking technology that is well understood to be a broken security model.

Please feel free to contact me with any questions or for more information.

Marilyn Marks
Executive Director
Coalition for Good Governance
Charlotte, NC
Cell: ████████
Marilyn@USCGG.org
Follow me @MarilynRMarks1

SHARE:



Join Our Email List



March 4, 2021

Dear Georgia Republican Leaders:

Georgia's 2022 election results may well see Republican voters at least as flummoxed and frustrated as they were after the November 2020 results, given the likely impacts of the Republican-sponsored election bills in the legislature. But in 2022, it appears that there will be even *less* party oversight of elections permitted, *less* transparency, and *greater* dependence on Dominion's un-auditable touchscreen system. Republican voters and officials will have *less*, rather than more, ability to determine "what happened" thanks based on pending legislation. This letter is a follow up to our letter of February 28.

While ballot box access and voting rights issues are making all the headlines about the Republican-sponsored election bills, downgrading security and transparency and undermining traditional public election principles are occurring while no one is looking. Many of the problematic policies are being written "between the lines" of the bills not obvious to the press.

We are suggesting consideration of a *3 phase plan* to election security legislation to ensure that security and transparency measures are effective and do not trigger unintended consequences, given that lawmakers have been unable to obtain the essential information about the November elections that should inform new election laws.

Unintended consequences are built into various provisions of key current bills:
--*Greater* dependence on the Dominion un-auditable touchscreen system, reducing the number of auditable ballots—hand-marked paper ballots. (HB531, SB241)

--*Reduced* oversight rights of party monitors. (HB531)


**Exhibit
CGG 0014**

--Significant delays (at least overnight) in reporting *any* election night results in large counties. (SB188)

--Escalating county operations cost requiring "security ballot paper" that provides no security benefit, as mail ballot scanners do not even recognize security paper. (HB531)

--*Eliminating* best security practice of signature verification of mail ballots, *downgrading* to DL# "verification," an invitation for fraud and error. (HB531)

-*Eliminating* best security practice of delaying scanning/tabulation of mail ballot until shortly before election *downgrading* to permit early scanning/tabulation under the "honor system," of not disclosing trends early. (SB 241)

--Eliminates secret ballot protections for mail ballots. (SB232) (Unconstitutional), leaving no option for casting a secret ballot in Georgia, given the privacy-stealing BMD screens for in-person voting. Drives some center-right voters not to vote by removing secret ballot protections in both polling places and secret ballots. (SB241 and SB232)

--Threats of felony charge against poll workers, poll watchers and voters for seeing how someone votes on large touchscreen displays. (SB241)

--Eliminating ability for dedicated voters with sudden unforeseen circumstances (illness, quarantine, bereavement, emergency medical or work travel, etc.) to obtain an absentee ballot. (HB531)

We at Coalition for Good Governance have attempted to follow the primary attributes of the various election bills, with particular attention to HB531.  We understand the Dominion system well. Recently in our Curling v Raffensperger litigation, plaintiffs provided further evidence to the Court that the BMD system as installed in Georgia is even more vulnerable to compromise than the DRE system now banned, as well as evidence of very concerning software problems. Now is not the time to force more voters onto the unauditable touchscreen portion of the system, meaning that no one can ever determine with certainty who wins highly competitive elections. Instead, ask lawmakers to put appropriate transparency and oversight measures on mail ballots to avoid driving more voters to Dominion touchscreen "black boxes."

**Proposed Solutions:**
We suggest that lawmakers adopt a 3-phase comprehensive plan to be enacted over the 2021-2022 session. Ask lawmakers to pass low-risk/high-value measures this year to provide greater oversight and transparency and appoint a bi-partisan bicameral special committee with subpoena power to work during spring and summer to better understand the facts of systemic issues before the General Assembly enacts legislation that may have unintended consequences.

1. Specifically, immediately enact measures that:
--improve party poll watcher and mail ballot monitor rights.
--establish bi-partisan Signature Review Panels, modelled after the Vote Review Panels, charged with resolving signature verification issues.
--require that scanned images of all ballots be published (HB659)
--enact mail ballot anti-coercion, anti-harvesting provisions of HB531.
--require hand recounts (not QR code scans) (HB501)
-- permit voters to return their ballot to polling places and show ID to have ballot accepted, reducing mail ballot loss and damage.
--permit counties the local option to use hand marked paper ballots counted by optical scanner rather than using Dominion touchscreens. (BMD)
--formalize a bi-partisan committee with subpoena power to more precisely assess election security needs for 2022 legislation.

2. Review effectiveness of enacted measures in the 2021 municipal elections to inform early 2022 legislation.

3. Craft well-informed legislation for 2022 that can be effective prior to 2022 primaries on issues of:
--making drop boxes more secure than USPS for mail ballots.
--timing and deadlines for mail ballot applications and early voting.
--local options versus statewide uniformity on election administration.
--whether early scanning/tabulation can avoid being serious security risk. (Is leasing more scanners for election week a better alternative?)
--evaluate most secure ways to authenticate mail ballot voters.
--whether no-excuse mail ballot voting is adequately secured after phase 1 controls in place.

**Coalition for Good Governance**
CGG is a small but strictly non-partisan non-profit organization. Our members and leaders represent quite diverse political views as individuals but come together for the non-partisan goals of election security, voter privacy, and election

CGG2021001277898

transparency. Our ongoing litigation seeking to have the Dominion BMD voting system banned is a project of current primary focus for us.

We look forward to hearing from you if you would like more information.

Marilyn R. Marks, Executive Director
(704) 292 9802
Marilyn@USCGG.org

 Coalition for Good Governance is a nonpartisan, nonprofit organization focused on election security and transparency.

CGG2021001277899

## Mission Statement

The interests of The Coalition for Good Governance are constitutional liberties and the individual rights of citizens, with emphasis on First Amendment Rights, elections, government transparency and accountability, open records and open meetings, due process, and equal protection of the laws.

We will engage in litigation and inform legislative policy on these issues.

We will use generally available means of education and communication to illuminate and shape public debates.



**Exhibit**
CGG 0015

Document must be filed electronically.
Paper documents will not be accepted.
  Document processing fee
Fees & forms/cover sheets
  are subject to change.
To access other information or print
  copies of filed documents,
  visit www.sos.state.co.us and
  select Business Center.

**E-Filed**

Colorado Secretary of State
Date and Time: 11/04/2008 06:47 PM
ID Number: 20081585735

$50.00

Document number: 20081585735
Amount Paid: $50.00

ABOVE SPACE FOR OFFICE USE ONLY

## Articles of Incorporation for a Nonprofit Corporation
filed pursuant to § 7-122-101 and § 7-122-102 of the Colorado Revised Statutes (C.R.S.)

1. The domestic entity name for the nonprofit corporation is

Rocky Mountain Foundation, Inc.                                              .

   *(Caution: The use of certain terms or abbreviations are restricted by law.  Read instructions for more information.)*

2. The principal office address of the nonprofit corporation's initial principal office is

Street address          3840 S. Willow Way
                        *(Street number and name)*

Denver                              CO        80237
*(City)*                            *(State)*   *(ZIP/Postal Code)*
                        United States
*(Province – if applicable)*        *(Country)*

Mailing address
(**leave blank** if same as street address)    _____
                                               *(Street number and name or Post Office Box information)*

_____

*(City)*                    *(State)*       *(ZIP/Postal Code)*

*(Province – if applicable)*        *(Country)*       .

3. The registered agent name and registered agent address of the nonprofit corporation's initial registered agent
   are

   Name
     (if an individual)    _____
                           *(Last)*        *(First)*        *(Middle)*    *(Suffix)*

   **OR**

   (if an entity)          The Tipton Law Firm, P.C.
   *(Caution:  Do not provide both an individual and an entity name.)*

   Street address          3840 S. Willow Way
                           *(Street number and name)*

   Denver                           CO      80237
   *(City)*                         *(State)*   *(ZIP Code)*

ARTINC_NPC                        Page 1 of 3

**Exhibit
CGG 0016**

Mailing address
(**leave blank if same as street address**)

_____
*(Street number and name or Post Office Box information)*

_____ CO _____ .
*(City)*          *(State)*          *(ZIP Code)*

*(The following statement is adopted by marking the box.)*

☑ The person appointed as registered agent above has consented to being so appointed.

4. The true name and mailing address of the incorporator are

Name
(if an individual)

_____ _____ _____ _____
*(Last)*          *(First)*          *(Middle)*   *(Suffix)*

**OR**

(if an entity)          The Tipton Law Firm, P.C.
*(**Caution:** Do not provide both an individual and an entity name.)*

Mailing address          3840 S. Willow Way
*(Street number and name or Post Office Box information)*

Denver                    CO   80237
*(City)*          *(State)*          *(ZIP/Postal Code)*

United States
*(Province – if applicable)*          *(Country)*

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ The corporation has one or more additional incorporators and the name and mailing address of each
additional incorporator are stated in an attachment.

5. *(If the following statement applies, adopt the statement by marking the box.)*

☐ The nonprofit corporation will have voting members.

6. *(The following statement is adopted by marking the box.)*

☑ Provisions regarding the distribution of assets on dissolution are included in an attachment.

7. *(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☑ This document contains additional information as provided by law.

8. *(**Caution:** <u>Leave blank</u> if the document does not have a delayed effective date. Stating a delayed effective date has
significant legal consequences. Read instructions before entering a date.)*

*(If the following statement applies, adopt the statement by entering a date and, if applicable, time using the required format.)*
The delayed effective date and, if applicable, time of this document is/are _____ .
*(mm/dd/yyyy hour:minute am/pm)*

**Notice:**

Causing this document to be delivered to the Secretary of State for filing shall constitute the affirmation or
acknowledgment of each individual causing such delivery, under penalties of perjury, that the document is the
individual's act and deed, or that the individual in good faith believes the document is the act and deed of the
person on whose behalf the individual is causing the document to be delivered for filing, taken in conformity
with the requirements of part 3 of article 90 of title 7, C.R.S., the constituent documents, and the organic
statutes, and that the individual in good faith believes the facts stated in the document are true and the
document complies with the requirements of that Part, the constituent documents, and the organic statutes.

This perjury notice applies to each individual who causes this document to be delivered to the Secretary of State, whether or not such individual is named in the document as one who has caused it to be delivered.

9. The true name and mailing address of the individual causing the document to be delivered for filing are

Tipton                          Cory
_(Last)_                        _(First)_                       _(Middle)_                      _(Suffix)_

3840 S. Willow Way
_(Street number and name or Post Office Box information)_

Denver                                      CO    80237
_(City)_                                     _(State)_    _(ZIP/Postal Code)_

                        United States .
_(Province – if applicable)_     _(Country)_

*(If the following statement applies, adopt the statement by marking the box and include an attachment.)*

☐ This document contains the true name and mailing address of one or more additional individuals causing the document to be delivered for filing.

**Disclaimer:**

This form/cover sheet, and any related instructions, are not intended to provide legal, business or tax advice, and are furnished without representation or warranty. While this form/cover sheet is believed to satisfy minimum legal requirements as of its revision date, compliance with applicable law, as the same may be amended from time to time, remains the responsibility of the user of this form/cover sheet. Questions should be addressed to the user's legal, business or tax advisor(s).

**Rocky Mountain Foundation, Inc.**
**Attachment to**
**Articles of Incorporation for the Nonprofit Corporation**

Provision 1:    **Purpose**.   Said corporation is organized exclusively for charitable, religious, educational, and scientific purposes, including, for such purposes, the making of distributions to organizations that qualify as exempt organizations under section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code.

Provision 2:    **Net Earnings**.  No part of the net earnings of the corporation shall inure to the benefit of, or be distributable to its members, trustees, officers, or other private persons, except that the corporation shall be authorized and empowered to pay reasonable compensation for services rendered and to make payments and distributions in furtherance of the purposes set forth in Provision 1 hereof. No substantial part of the activities of the corporation shall be the carrying on of propaganda, or otherwise attempting to influence legislation, and the corporation shall not participate in, or intervene in (including the publishing or distribution of statements) any political campaign on behalf of or in opposition to any candidate for public office. Notwithstanding any other provision of these articles, this corporation shall not, except to an insubstantial degree, engage in any activities or exercise any powers that are not in furtherance of the purposes of this corporation.

Provision 3:    **Distribution on Dissolution**.   Upon the dissolution of the corporation, assets shall be distributed for one or more exempt purposes within the meaning of section 501(c)(3) of the Internal Revenue Code, or the corresponding section of any future federal tax code, or shall be distributed to the federal government, or to a state or local government, for a public purpose. Any such assets not so disposed of shall be disposed of by a Court of Competent Jurisdiction of the county in which the principal office of the corporation is then located, exclusively for such purposes or to such organization or organizations, as said Court shall determine, which are organized and operated exclusively for such purposes.

**Lisa Cyriacks, President**

As a freelance writer, independent researcher, and journalist, I am very invested in maintaining regulations that require openness and transparency in government. Over the years I have also taken on roles of public trust and served on many nonprofit and local organizational boards, including as a trustee for local governments. In this capacity I am well aware of the challenges and importance of keeping lines of public communication open and the role of accountability in securing the public's trust.

**Marilyn R. Marks, Vice President and Executive Director**

In 2009, after a narrow loss to become the Mayor of Aspen, I recognized the vulnerabilities in Colorado's election systems. I then devoted full time to election integrity litigation and lobbying efforts for more transparent and verifiable elections. I successfully litigated the effort to make Colorado ballots open public records for postelection reviews, followed by more than 25 election-related cases involving election transparency or voter privacy ("secret ballots"). After moving back east, I became the driving force behind the current legal challenge to Georgia's unverifiable electronic voting system. I now reside in Charlotte, North Carolina.

**Mary Eberle, Secretary**

I've spent most of my professional life editing for geologists and other scientists. Since 2010, I have devoted myself almost completely to working on election integrity, mainly in Colorado. In that work, I do a lot of editing for my colleagues. I also analyze election reports and data in much the same way as an editor would look at them for publication; I check for internal consistency and "does it make sense?" Unfortunately for election integrity, the answer is often "No."

**Exhibit
CGG 0017**

**CGG Board Discussion Package** (March 21/22, 2022 zoom)

**A .Curling Litigation Update--**
Update on Schedule
Update on Discovery, State's Depositions, CGG Deposition

Status of Halderman Report

Experts' report findings

B. **Curling Litigation Alternative**

Georgia Election Security-- Immediate Solution to Restore Voter Confidence and Secure 2022 Elections

Georgia's well-designed emergency balloting procedures could be immediately deployed to restore voter confidence and secure the 2022 May and November elections. Voter confidence is low and is destined to decline further as more information becomes available to the press and public from experts' reports regarding the elevated risk of touchscreen security flaws[1], current CISA (DHS) review of system vulnerabilities [2], and system tabulation errors [3] and audit discrepancies [4] in the Nov. 2020 election. Dominion software has been stolen from at least three jurisdictions in Colorado and Michigan, putting the Georgia voting system at risk as well.[5] There are credible allegations of Georgia's software was stolen from Coffee County in November 2020, putting Georgia elections at extreme risk. Additionally, Georgia voters will learn that in 2020, thousands of ballots were double-and triple counted by the voting system, but not detected as errors by the hand count audit.[6]

Immediately Implementable Solution: Voters understand the need to protect 2022 elections from **risks of stolen software** until such time as the system can be better secured. Georgia officials have provided for and tested a contingency plan for conditions when the equipment is at risk. Officials could invoke temporary use of Georgia's **tested and proven** emergency balloting procedures and expand audits of the scanner tabulations for the May and November 2022 elections.

---

[1] Exhibit A Documents related to Dr. Halderman's Report
[2] Exhibit B CISA investigation of reported vulnerabilities
[3] Exhibit C Dr. Duncan Buell's Expert Report
[4] Exhibit D Nov. 2020 hand count audit issues, including Dr. Philip Stark's Expert Report
[5] Exhibit E Stolen Dominion software from Michigan, Colorado, Georgia
[6] Exhibit F Examples of tabulation irregularities


**Exhibit**
**CGG 0018**

- Use "emergency" hand marked paper ballots (identical to absentee mail ballots) for in-person voting. Dominion precinct scanners are *already automatically programmed* to scan and tabulate hand marked ballots. (Reserve touchscreens for voters with accessibility needs.)

- Use current Dominion equipment/programs as Ballot-On-Demand printers in Early Voting centers to print low volume ballot styles. At each polling place, inventory top 20 high frequency ballot styles as pre-printed ballot stock for 75% of voters. (This will greatly reduce current level of ballot issuance errors for touchscreen voting.)

- Expand transparent post-election audits (statically-based sample counts) for May and November 2022 to increase voter confidence.

- Make ballot images immediately available prior to certification of results. (Implement the SB202 mandate that SOS create pilot program of posting digital ballot images. O.C.G.A. §21-2-493(j.1))
- Support HB933 (HB1464) permitting paper ballot inspection with ballots as open records. [7]

Advantages of adopting reconfiguration plan:

1. It is understandable by voters as prudent action to protect against **risks created by well-known software theft** and subsequent public disclosure of the software that occurred in Michigan and Colorado in approximately August 2021. (Exhibit E). Recent disclosures have alleged that similar software theft occurred in Coffee County, Georgia in December 2020. When Coffee County theft is soon publicly disclosed, voters will likely demand and support a secure alternative.

2. Voters understand that Sec. Raffensperger acknowledged that Georgia voting system manipulations and hacks are possible when extended access is available. (Exhibit A-1) That extended access has been made available with illegal Colorado and Michigan Dominion software releases into the public domain, lowering the barrier to entry to electronic tampering.

3. Emergency balloting can be invoked on temporary basis for 2022, for safe and simple reconfiguration of the Dominion system, without addressing Dominion system longer term.

4. Emergency hand marked ballot use has already been successfully piloted (2019), required statewide for all polling places (2020)[8] and used in many precincts when machine problems occurred. (75% of Americans vote in this manner.)

---

[7] AJC: *Georgia bill seeks public ballot reviews* https://www.ajc.com/politics/transparency-or-conspiracy-georgia-bill-seeks-public-ballot-reviews/DDIFYLUTEZHPVIT27WESTKJ5YE/

[8] Rule 183-1-12-.11 2(c) **(c)** If an emergency situation makes utilizing the electronic ballot markers **impossible or impracticable,** as determined by the election superintendent, the poll officer shall issue the voter an emergency paper ballot that is to be **filled out with a pen** after verifying the identity of the voter and that the person is a registered voter of the precinct. Emergency paper ballots shall not be treated as provisional ballot.  but instead **shall be placed into the**

5.  Election Code Rules and training are already in place.

6.  Inoculates against impact of potential negative findings in CISA investigation which could be ill-timed, shortly before or after May primary.

7.  Greatly reduces cost and complexity for county election administration during a time when election officials have recruitment and retention challenges.

8.  Challenge of early voting ballot inventory management is easily solved by using Dominion's Mobile Ballot Printing software and currently owned HP printers.[9]

9.  Significant current problem of incorrect early voting BMD ballot style issuance is solved by issuing verified accurate pre-printed ballots for hand marking.

10. Transparency measures of prompt ballot image release and original ballots as public records will permit critics (or legitimate challengers) to verify tabulations for themselves.

<u>Alternative Pathways for Adopting Temporary Plan:</u>

1) State Election Board (or Secretary of State) can make determination that during the ongoing CISA investigation, and while stolen software risks have not been mitigated, an emergency exists requiring deployment of emergency balloting rule. (Rule 183-1-12-.11 (2)(c) see footnote 8); *or*

2) General Assembly can pass sunsetting legislation to accomplish the same emergency procedures to sunset January 31, 2023 with report from SEB and SOS required by mid-January 2023 for status of mitigation of security issues; *or*

3) Temporary injunction through Curling v Raffensperger litigation.

---

*scanner in the same manner that printed ballots in the polling place are scanned*. The election superintendent shall cause each polling place to have a sufficient amount of emergency paper ballots so that voting may continue uninterrupted if emergency circumstances render the electronic ballot markers or printers unusable. For any primary or general election for which a state or federal candidate is on the ballot, a sufficient amount of emergency paper ballots shall be at least 10% of the number of registered voters to a polling place. The poll manager shall store all emergency ballots in a secure manner and ensure that all used and unused emergency ballots are accounted for. All unused emergency ballots shall be placed into a secure envelope and sealed such that the envelope cannot be opened without breaking such seal.

[9] Dominion Mobile Ballot Printing   https://www.dominionvoting.com/download/imagecast-remote/?wpdmdl=67458&masterkey=5f1f594f7ecc9

<u>Timing:</u>

Voter confidence can be rebuilt rapidly with prompt action for installed solutions prior to coming disclosures.

Prompt action is needed to permit counties to prepare for paper ballot primary. Early voting begins May 2. Logic and Accuracy Testing of machines to begin mid-April.

Counties can begin to plan for procurement of commercially printed ballots, reduced labor and technical support, and training of pollworkers to issue paper ballots and operate currently owned  HP Printers as Ballot on Demand printers.

**Exhibit A – Topic -- Dr. Alex Halderman's Sealed July 1, 2021 Report**

Exhibit A-1. Halderman 9/21/21Declaration and email from CISA

Exhibit A-2 Halderman 8/2/21 Declaration

Exhibit A-3 Halderman 7/12/21 Declaration

Exhibit A-4 AJC: "*U.S. cybersecurity agency reviews hacking risk to Georgia voting system*"
            2/11/22

Exhibit A-5 AP*: "Feds oppose immediate release of voting machine report"*
            2/11/22

Exhibit A-6 AJC: "*Secret report finds flaw in Georgia voting system, but state shows no interest*"
            1/26/22

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **DECLARATION OF**<br>**J. ALEX HALDERMAN**<br><br><br>**Civil Action No. 1:17-CV-2989-AT** |

Pursuant to 28 U.S.C. § 1746, J. ALEX HALDERMAN declares under penalty of perjury that the following is true and correct:

1.     I hereby incorporate my previous declarations as if fully stated herein. I have personal knowledge of the facts in this declaration and, if called to testify as a witness, I would testify under oath to these facts.

2.     My July 1, 2021, expert report describes numerous security vulnerabilities in Georgia's Dominion ICX BMDs. These include flaws that would allow attackers to install malicious software on the ICX, either with temporary physical access (such as that of voters in the polling place) or remotely from election management systems. They are not general weaknesses or theoretical problems, but

rather specific flaws in the ICX software, and I am prepared to demonstrate proof-of-concept malware that can exploit them to steal votes cast on ICX devices.

3.　　Some of these critical vulnerabilities could be at least partially mitigated through changes to the ICX software if Dominion implemented such changes and jurisdictions deployed them. However, it would likely take months for Dominion to assess the problems, develop responsive software updates, test them, obtain any necessary approvals from the EAC and state-level certification authorities, and distribute the new software to states, as well as additional time for localities to install the changes. But Dominion cannot begin this process, because (to my knowledge) they have yet to learn what is in my report.

4.　　My analysis also concludes that the ICX is very likely to contain other, equally critical flaws that are yet to be discovered. Jurisdictions can mitigate this serious risk through procedural changes, such as reserving BMDs for voters who need or request them. Election officials cannot make an informed decision about such urgent policy changes or any other mitigations until they have assessed the technical findings in my report. However, to my knowledge, the Georgia Secretary of State's Office has yet to even request access to it, despite Plaintiffs' repeated offers to make it available to appropriate individuals at the Secretary's Office.

5.      Nor do these problems affect Georgia alone. In 2022, the ICX will be used in parts of 16 states.[1] Nevada will use it as the primary method of in-person voting in certain areas of the state. Louisiana is slated to use it for early voting in a DRE configuration where there is not even a paper trail. It will be used for accessible voting in Alaska and large parts of Arizona, California, Colorado, and Michigan. It will also see some use in parts of Illinois, Kansas, Ohio, Missouri, New Jersey, Pennsylvania, Tennessee, and Washington State. Officials in these jurisdictions too must act to update the software and their procedures, but they cannot do so without information about the problems. Continuing to conceal those problems from those who can—and are authorized to—address them, to the extent possible, serves no one and only hurts voters (and heightens the risk of compromise in future elections).

6.      The most effective way to ensure that the necessary information gets to the parties responsible (without also falling into the wrong hands) would be to share my report with the Cybersecurity and Infrastructure Security Agency (CISA), which operates a Coordinated Vulnerability Disclosure (CVD) program for just this purpose. CISA is a federal agency that collaborates with state and local governments, election officials, federal partners, and vendors to manage risks to U.S. election

---

[1] See Verified Voting, "Verifier Search – November 2022," https://verifiedvoting. org/verifier/#mode/search/year/2022/model/ImageCast%20X.

infrastructure.[2] Under CISA's CVD process, agency staff would independently validate the vulnerabilities, work with Dominion to develop software updates as necessary, and facilitate sufficient time for affected states and localities to apply mitigation strategies.[3] CISA strives to disclose "accurate, neutral, objective information focused on technical remediation and mitigation" and to "correct misinformation where necessary,"[4] making it well qualified to coordinate the disclosure of such sensitive vulnerabilities.

7.     Geoff Hale, Director of CISA's Election Security Initiative, has confirmed to me that, if the Court permits it, the agency would be willing to receive my expert report and carry out coordinated vulnerability disclosure activities as appropriate (see Exhibit 1). Mr. Hale requests that I and my assistant Drew Springall be available for consultation with CISA during the CVD process, which we would be willing to do subject to the Court's permission.

8.     Informing responsible parties about the ICX's vulnerabilities is becoming more urgent by the day. Foreign or domestic adversaries who are intent on

---

[2] Cybersecurity and Infrastructure Security Agency, "Election Infrastructure Initiative," https://www.cisa.gov/election-security.

[3] Cybersecurity and Infrastructure Security Agency, "Coordinated Vulnerability Disclosure Process," https://www.cisa.gov/coordinated-vulnerability-disclosure-process.

[4] *Id.*

attacking elections certainly could have already discovered the same problems I did, yet Georgia's 2022 primaries are less than nine months away, and other states that use the ICX will conduct high-profile elections even sooner. It is important to recognize the possibility that nefarious actors already have discovered the same problems I detail in my report and are preparing to exploit them in future elections. Providing my report to CISA through its CVD program will ensure that Dominion and affected jurisdictions are able to begin appropriate mitigations as soon as possible. Continuing to withhold my report from CISA puts voters and election outcomes in numerous states at unnecessary, and avoidable, risk.

9.      I understand that State Defendants object to disclosure to CISA on the argument that my report should be used only for this lawsuit. But this ignores the implications of my report and my role in this matter. I am not a party to this lawsuit. I am an independent expert who was engaged to conduct an impartial assessment of the security and reliability of the Dominion BMD system, using (in part) election equipment that the Court ordered I be provided. I have done that, as reflected in my lengthy, detailed report and other submissions in this matter. As an independent expert and member of the election integrity community, I have a professional obligation to take appropriate steps to ensure that the severe vulnerabilities my report describes are properly remediated, to the extent possible, and that those tasked with

election security and administration across the country have the information they need to make responsible, informed decisions about election procedures, including the equipment used, the manner and purposes for which it is used (including whether it is used at all), the steps needed to secure that equipment and other aspects of the election systems in which it is used, and more. In short, my professional obligations do not end at the boundaries of this lawsuit, nor do the serious risks to voters and elections that my report discusses in depth. Additionally, I can imagine no prejudice to anyone in this lawsuit (or beyond) from disclosure of my report to CISA, nor am I aware of any claim of prejudice from any of the parties.

10. I of course have complied, and will continue to comply, with all directives from the Court regarding disclosure of my work in this matter. I submit this declaration to explain why I believe disclosure of my report to CISA is critically important (and not just for Georgia) and to respectfully ask that the Court allow that disclosure, rather than accept State Defendants' position that my findings must not be shared beyond the confines of this lawsuit, including with those who are authorized to address the vulnerabilities with the ICX and stand ready to do so. If my findings regarding the ICX actually present no meaningful risks to voters and election outcomes and therefore require no remediation, as I gather State Defendants would have the Court believe, CISA is well positioned to determine that. If, on the other

hand, my findings do warrant remediation, as I believe they do, then CISA is well positioned to work with Dominion and the appropriate authorities around the country to implement remedial measures. I can see no reason to prevent (or further delay) that important work for future elections. And I note that none of State Defendants' experts have disputed my findings regarding the ICX machines. Only Dr. Juan Gilbert has responded to my sealed report, and he has not examined the machines (or used them) to my knowledge.

I declare under penalty of the perjury laws of the State of Georgia and the United States that the foregoing is true and correct and that this declaration was executed this 21st day of September, 2021 in Ann Arbor, Michigan.

J. ALEX HALDERMAN

# EXHIBIT 1

 Gmail

Exhibit A-1

J. Alex Halderman <jhalderm@gmail.com>

---

## Vulnerability Disclosure

**Hale, Geoffrey** <Geoffrey.Hale@cisa.dhs.gov>                    Thu, Aug 19, 2021 at 12:15 PM
To: "J. Alex Halderman" <jhalderm@umich.edu>
Cc: Andrew Springall <andrew.springall@gmail.com>

Prof. Halderman,

Thank you for your email.  Yes, CISA would be willing to receive the report regarding possible vulnerabilities in election infrastructure for inclusion in CISA's Coordinated Vulnerability Disclosure (CVD) process and would carry out any further coordinated disclosures activities as appropriate.  As we share on our public website (https://www.cisa.gov/coordinated-vulnerability-disclosure-process), CISA's CVD program coordinates the remediation and public disclosure of newly identified cybersecurity vulnerabilities in products and services with the affected vendor(s).  Note that part of our process may also involve validating any alleged vulnerabilities, planned mitigations, remediations, or patches with the security researcher who discovered the alleged vulnerability, so we would appreciate if you could continue to be available for consultation during the CVD process as well.

As shared on our website, please submit any vulnerability reports for CVD coordination using the form here: https://www.kb.cert.org/vuls/report/

Best,

Geoff

---

**From:** J. Alex Halderman <jhalderm@umich.edu>
**Sent:** Wednesday, August 18, 2021 4:37 PM
**To:** Hale, Geoffrey <Geoffrey.Hale@cisa.dhs.gov>
**Cc:** Andrew Springall <andrew.springall@gmail.com>
**Subject:** Vulnerability Disclosure

> **CAUTION:** This email originated from outside of DHS. DO NOT click links or open attachments unless you recognize and/or trust the sender. Contact your component SOC with questions or concerns.

Dear Mr. Hale,

We are writing to you in your capacity as Director of the Election Security Initiative at the federal Cybersecurity and Infrastructure Security Agency (CISA).

We understand that the Election Security Initiative at CISA works to ensure the physical security and cybersecurity of the systems and assets that support the Nation's elections, including through detection and prevention, information sharing and awareness, and incident response.

As you may be aware from recent press reports, one of us (Halderman) is presently serving as an expert witness for the plaintiffs in Curling v. Raffensperger (Civil action no. 1:17-CV-2989-AT, N.D. Ga.), a case that concerns the security of Georgia's election system. A year ago, the court granted plaintiffs access to an ICP ballot scanner and ICX ballot marking device as used in Georgia in order to test their security. Following months of analysis, on July 1, Dr. Halderman submitted an expert report that describes several very serious vulnerabilities we found in the equipment, which, to our knowledge, have not been previously documented or disclosed.

Given the nature of the vulnerabilities and the time that would be necessary to mitigate them before the 2022 midterm elections, we believe it is critical for Dominion and affected jurisdictions (which include Georgia and parts of many other states) to begin taking responsive action soon. It is also vitally important to prevent information sufficient to exploit the vulnerabilities from falling into the wrong hands, and to avoid fueling election-related misinformation if possible.

Currently, disclosure of the expert report to anyone other than outside litigation counsel for the parties is strictly prohibited by the Court's protective order and by recent directives from the judge. However, if permitted by the Court, we would like to share the report with CISA and ask your agency to carry out appropriate further disclosure of the information it contains to Dominion and affected jurisdictions as you see fit, under CISA's coordinated vulnerability disclosure (CVD) program (https://www.cisa.gov/coordinated-vulnerability-disclosure-process).

We understand that under this process, CISA will work with the vendor (Dominion) for mitigation development and the issuance of patches or updates and to facilitate sufficient time for affected end users to obtain, test, and apply mitigation strategies. We further understand that CISA strives to disclose "accurate, neutral, objective information focused on technical remediation and mitigation" and to "correct misinformation where necessary".

Please confirm that CISA would be an appropriate agency to handle coordinated vulnerability disclosure for election infrastructure under these circumstances, and that you would be willing to receive the report (subject to the Court's permission) and carry out further disclosures as you deem appropriate.

Sincerely,

J. Alex Halderman

Drew Springall

Exhibit A-2
Page 1 of 24



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **DECLARATION OF**<br>**J. ALEX HALDERMAN**<br><br>**Civil Action No. 1:17-CV-2989-AT** |

Pursuant to 28 U.S.C. § 1746, J. ALEX HALDERMAN declares under penalty of perjury that the following is true and correct:

1.      I hereby incorporate my previous declarations as if fully stated herein. I have personal knowledge of the facts in this declaration and, if called to testify as a witness, I would testify under oath to these facts.

2.      I have reviewed the expert disclosures prepared by Dr. Juan Gilbert and Dr. Benjamin Adida for State Defendants. Neither Dr. Gilbert not Dr. Adida offers any rebuttal to the numerous, critical vulnerabilities in Georgia's BMDs that I described in my July 1, 2021 expert report. Dr. Adida did not respond to my report at all; State Defendants reissued prior declarations from him previously provided in this litigation. Neither of them disputes the presence of any of the serious

vulnerabilities I detail in my report or the steps I describe for exploiting those vulnerabilities to alter individual votes and election outcomes in Georgia. Nor does either of them claim to have examined any of the voting equipment used in Georgia to evaluate whether the vulnerabilities I identified—or others—have been exploited in any past election. Although each of them presumably could do this with the permission of State Defendants, who I understand engaged them as experts in this case, there is no indication either has undertaken any such inquiry or asked to do so. As a result, neither Dr. Gilbert nor Dr. Adida has anything to say about the reliability of the voting equipment used in Georgia elections. This is surprising, given that they have had at least the last year to examine Georgia's voting equipment.

3.    State Defendants urgently need to engage with the findings in my report and address the vulnerabilities it describes before attackers exploit them. Nothing in Dr. Gilbert's or Dr. Adida's responses indicates that State Defendants understand the seriousness of these problems or have taken any measures to address them and their implications for the Plaintiffs' individual votes in future elections. Established practice in the security field would require State Defendants to promptly subject Georgia's voting system to rigorous testing in response to my report, to assess the extent and significance of each of the vulnerabilities I described, and to identify and *promptly implement* specific measures (where possible) to eliminate or mitigate each

of those vulnerabilities. Neither Dr. Gilbert nor Dr. Adida indicates any such efforts on their own part or on the part of State Defendants or anyone else. Again, Dr. Adida did not respond to my report.

4.      In my report—a 25,000-word document that is the product of twelve weeks of intensive testing of the Dominion equipment provided by Fulton County— I find that Georgia's BMDs contains multiple severe security flaws. Attackers could exploit these flaws to install malicious software, either with temporary physical access (such as that of voters in the polling place) or remotely from election management systems. I explain in detail how such malware, once installed, could alter voters' votes while subverting all the procedural protections practiced by the State, including acceptance testing, hash validation, logic and accuracy testing, external firmware validation, and risk-limiting audits (RLAs). Finally, I describe working proof-of-concept malware that I am prepared to demonstrate in court.

5.      My report concludes, *inter alia*, that Georgia's BMDs are not sufficiently secured against technical compromise to withstand vote-altering attacks by bad actors who are likely to target future elections in the state; that the BMDs' vulnerabilities compromise the auditability of Georgia's paper ballots; that the BMDs can be compromised to the same extent as or more easily than the DREs they replaced; and that using these vulnerable BMDs for all in-person voters, as Georgia

does, greatly magnifies the level of security risk compared to using hand-marked paper ballots and providing BMDs to voters who need or request them.

**Reply to Declaration of Dr. Juan Gilbert**

6.      Rather than engage with the facts in my report, Dr. Gilbert responds largely with vague generalities. He gives no indication that he has ever used an ICX BMD, let alone tested its security. He begins by conceding that "any computer can be hacked," but he contends that "this general statement is largely irrelevant," because hand-marked paper ballot systems use computers too (to scan the ballots) (¶ 6). His position is inconsistent with accepted standards for election security and with the facts of the particular voting system used in Georgia.

7.      My testing has shown that the BMDs used in Georgia suffer from specific, highly exploitable vulnerabilities that allow attackers to change votes despite the State's purported defenses. There is no evidence that Georgia's ballot scanners suffer from the same extraordinary degree of exploitability, nor does Dr. Gilbert contend they do. He ignores the relative ease with which Georgia's BMDs can be hacked, including by a voter in a voting booth in mere minutes. That extreme difference in security as compared to other voting technologies, particularly hand-marked paper ballots, is far from "irrelevant" as Dr. Gilbert implies.

4

8.     Furthermore, even if the scanners were just as insecure as the BMDs, Georgia's practice of requiring essentially all in-person voters to use highly vulnerable BMDs would needlessly give attackers *double* the opportunity to change the personal votes of individual Georgia voters, since malware could strike either the BMDs or the scanners. Accepted standards in election security compel reducing points of attack for bad actors, not unnecessarily expanding them—a point Dr. Gilbert ignores.

9.     Lastly, Dr. Gilbert also ignores that accepted election security protocols include an effective measure to protect against hacks of ballot scanners when the ballots are hand-marked rather than generated by BMDs—namely, reliable risk-limiting audits (RLAs), which would have a high probability of detecting any outcome-changing attack on the scanners. Not only do Georgia's BMDs defeat the efficacy of RLAs, but Dr. Gilbert continues to ignore the fact that Georgia requires an RLA of just one statewide contest every two years (and, to my knowledge, has not adopted specific, adequate procedures to ensure a reliable RLA for that one audit every other year).

10.     Dr. Gilbert goes on to discuss issues related to voter verification of BMD ballots (which I respond to below). Yet he fails to address the potential for attackers to cheat by changing only the QR codes printed by Georgia's BMDs.

Voters cannot read the QR codes, but they are the only part of the ballots that the scanners count. My report details several routes by which malicious hardware or software can manipulate the QR codes and cause the recorded votes to differ from voters' selections. In principle, a rigorous risk-limiting audit would be likely to detect such an attack if the attacker changed enough votes to alter the outcome of the contest being audited, but again Georgia rules require such an audit in only a single statewide contest once every two years. As my report explains, this leaves the vast majority of elections and contests in Georgia vulnerable to QR code (and others) attacks, yet Dr. Gilbert says nothing about this threat.

11.    Instead, Dr. Gilbert focuses exclusively on a different threat: attacks that change *both* the QR codes and the ballot text. In addition to the barcode-only attacks I just discussed, my report demonstrates that Georgia's BMDs can be manipulated so that both the barcodes and the printed text indicate the same fraudulent selections. No audit or recount can catch such fraud, because all records of the voter's intent would be wrong. The only reliable way to detect it would be if enough voters carefully reviewed their ballots, noticed that one or more selections differed from their intent, and reported the problems to election officials, *and* if Georgia officials then discerned from the pattern of voter reports that the BMDs were systematically misbehaving. Thus, Dr. Gilbert is mistaken when he contends that the distinction

6

between "voter-verifiable" and "voter-verified" paper ballots "only matters in principle" (¶ 7). All BMD ballots are potentially voter-verifiable, but unless enough BMD ballots are actually voter-*verified*, BMD-based attacks could alter election outcomes even in the rare instances where the State conducts a risk-limiting audit. And unless *every* BMD ballot is actually voter-*verified*, BMD-based attacks could alter individual voters' selections without detection..

12.  A large body of recent scientific evidence has established that few voters are likely to catch errors caused by malicious BMDs. I have reviewed this evidence in previous declarations.[1] It comes from both field observations (which report how long real voters review their ballots during real elections) and laboratory tests (which report the fraction of errors that subjects detect when voting on hacked BMDs in simulated elections). These methodologies are complementary, and results to-date from all studies of both kinds point to a low rate of voter-verification.

13.  Dr. Gilbert criticizes field observations because "[t]ime spent reviewing a ballot has little to do with whether it was actually verified" (¶ 9). This claim is inconsistent with accepted election security principles. Of course, they are not exactly the same question, but obviously the time spent reviewing a ballot can

---

[1] *Halderman decl.* (Dec. 16, 2019), Dkt. 682 at 23-33; *Halderman decl.* (Sept. 1, 2020) Dkt. 855-1 at 6-8, 55.

provide important insight into whether it was likely verified. For example, we can conclude that a voter who spends only a second or two reviewing a lengthy, complicated ballot is unlikely to have reliably verified each of their selections on the ballot. And of course, the same is true for a voter who spends no time at all reviewing their ballot. Review time is both practical to measure and clearly correlated with the error detection success, making it a valuable and relevant metric, as multiple studies confirm.

14.     Dr. Gilbert seems to contend, without evidence, that a casual glance is sufficient to review Georgia-style ballots because selections are printed together with party affiliations (¶ 9). He cites no research (and I am unaware of any) that supports this conclusion, particularly when, as in Georgia, the party affiliations are printed in small type and in a different horizontal position for each contest. A real BMD ballot is reproduced on page 15 of my expert report. This is just one example of such a ballot; they can be longer and more confusing. Dr. Gilbert provides no basis for believing that voters would likely catch deliberate errors caused by compromised BMDs when voting such a ballot.

15.     Dr. Gilbert references my award-winning peer-reviewed study about voter verification behavior, which found very poor rates of error detection and

reporting in a mock election using BMDs that my team hacked (¶ 10).[2] He contends

that my study "ignores the reaction to such manipulation in an actual election,

particularly one as heated in the public domain as the 2020 Election." (¶ 11). He

does not explain how or why such circumstances would be expected to materially

increase voter verification of their respective BMD ballots, nor does he cite any

support for his claim to believe they would. And, just last week, the Atlanta Journal-

Constitution obtained a study (under the Georgia Open Records Act) commissioned

by the Secretary of State's Office in which researchers from the University of

Georgia observed Georgia voters during the November 2020 election and reported

how long they spent reviewing their BMD ballots.[3] Although it appears the Secretary

of State had this study at the time of Dr. Gilbert's response to my report, he does not

address or acknowledge it. The new study suggests that voters in the real world

review their ballots *even less carefully* than voters in recent laboratory studies—

despite the reminders election workers are supposed to give them to carefully review

---

[2] Matthew Bernhard, Allison McDonald, Henry Meng, Jensen Hwa, Nakul Bajaj, Kevin Chang, and J. Alex Halderman, "Can Voters Detect Malicious Manipulation of Ballot Marking Devices?" In *41st IEEE Symposium on Security and Privacy* (May 2020). Available at https://ieeexplore.ieee.org/document/9152705.
[3] Mark Niesse, "Under half of Georgia voters checked their paper ballots, study shows," *Atlanta Journal-Constitution* (July 27, 2021). Available at https://www.ajc.com/politics/under-half-of-georgia-voters-checked-their-paper-ballots-study-shows/6HSVHHFOBRBDPODRZXLIBTUS64/.

their ballots at the polling sites, which Dr. Gilbert emphasizes as a remedy for poor voter verification of BMD ballots.[4]

16.    The University of Georgia researchers report that 20% of voters they observed did not check their ballots at all.[5] Only about 49% examined their ballots for at least one second, and only 19% did so for more than five seconds. This is significantly worse performance than observed in my study, which found that when voters were verbally prompted to review their ballots before casting them, as should occur in Georgia, 63% of voters reviewed their ballots for only *two* seconds or more, compared to 19-49% in the new study.

17.    This suggests that laboratory studies like mine tend to *overestimate* the rate at which real Georgia voters would detect errors on their BMD ballots. Since real Georgia voters were observed to review their ballots even less carefully than the

---

[4] Secretary Raffensperger appears to disagree with Dr. Gilbert about the value of measuring voter review time for assessing voter verification performance. He told the Atlanta Journal-Constitution that the new study "shows voters do indeed review their ballots for accuracy before casting them" and offers "proof the votes that were counted were for the candidates the voters intended." (*Id.*). I agree that the new study provides valuable insights about voter behavior, but, contrary to the Secretary's pronouncements, the results indicate that real Georgia voters are even less likely to detect errors caused by compromised BMDs than previous studies have suggested.

[5] Audrey A. Haynes and M.V. Hood III, "Georgia Voter Verification Study" (January 22, 2021). Available at https://s3.documentcloud.org/documents/21017815/gvvs-report-11.pdf.

10

participants in my study, it is reasonable to infer that real voters would catch an even smaller fraction of errors. The participants in my study who were similarly prompted to review their ballots caught 14% of errors. Therefore, real voters in Georgia are likely to catch substantially less than 14% of errors.

18.    How often would voters have to detect errors on their BMD ballots to effectively safeguard against attacks? The answer depends on the margin of victory, since an outcome-changing attack would need to change fewer votes in a close contest. The model from my study shows that, given the margin of victory from the 2020 Presidential contest in Georgia, voters would need to have detected 46% of errors for there to be even one error report per 1000 voters, under a hypothetical scenario where the election outcome had been changed by hacked BMDs.[6] The University of Georgia observations show that barely 49% of voters looked at their ballots for even a second, let alone studied them carefully enough to reliably spot errors.

---

[6] To reiterate, the November presidential race was the only state-wide contest subjected to a risk-limiting audit. In other contests, attackers could change the outcome by tampering with only the ballot QR codes, and voters would have no practical way to detect this manipulation regardless of how diligently they reviewed their ballots.

19. Dr. Gilbert performs a similar calculation using the baseline error detection rate measured in my study. He finds that an outcome changing attack on Georgia's Presidential contest would have resulted in only 832 voters noticing that their BMD ballots showed the wrong selection. Dr. Gilbert suggests that there have not been such complaints from any voters, and says he finds it implausible that so many voters would have "simply not said anything or otherwise simply corrected their ballot and thought nothing of it then or since" (¶ 12).

20. This is an oddly constructed hypothetical, since Curling Plaintiffs do not claim here that the Presidential outcome was altered by hacking the BMDs. And Dr. Gilbert does not indicate any effort to determine the total number of spoiled ballots in Georgia's Presidential contest, which he presumably could have explored with State Defendants. Neither does he provide any basis to believe there were only 832 or fewer spoiled ballots. But suppose for the sake of argument that the Presidential election outcome in Georgia had been altered by hacking the BMDs, and there *were* complaints from the 832 voters that Dr. Gilbert has calculated. What then? It seems all but certain that these complaints would have been dismissed or drowned out in the cacophonous aftermath of the election or simply disregarded by election workers at the polling sites as voter errors. Yet the official count, the risk-limiting audit, and the recount would all have found the wrong winner, and there would be no

way to recover any altered vote or correct the election outcome short of rerunning the election. With a mere 832 complaints among 5 million participating voters (amidst a sea of other complaints, real and imagined), it is unlikely that poll workers or election officials, including State Defendants, would realize or even suspected there was a systemic problem with the BMDs, and it is completely implausible that they would take the drastic but necessary step of asking Georgians to vote again. Georgia's election system is susceptible to this extraordinary risk as long as it remains vulnerable to the attacks I described in my report (and potentially others).

21.    To get to the point of making a decision to rerun an election, State Defendants (among others, perhaps) would first need to know how many voters discovered a problem when verifying their ballots. As Dr. Gilbert points out, the number of spoiled BMD ballots provides an upper bound on the number of voters who discovered and corrected an error (¶ 12). He does not say how many spoiled ballots there actually were in November 2020. If State Defendants knew the number was less than 832, they likely would have shared this fact with Dr. Gilbert, and he would have stated it in his report. It is reasonable to infer that either there were more than 832 spoiled ballots (and the attack is plausible) or State Defendants *do not know* how many BMD ballots were spoiled during the election, eight months later, despite

what Dr. Gilbert acknowledges those ballots would suggest about the reliability of the election.

22.   That State Defendants may not know this information is consistent with gaps in other important election data that Georgia counties report to the Secretary of State. State Defendants recently produced electronic data (election projects) that I understand were required to be returned to them by counties after the November 2020 and January 2021 elections. In both elections, a large fraction of counties failed to return any data, returned the wrong data, or omitted data necessary for assessing the security and integrity of the result, such as election databases or ballot images. More than six months after these elections, the Secretary of State has not been able to assemble these electronic records and has not indicated any effort or willingness to do so. Yet the only way that State Defendants could use the number of spoiled ballots as a defense against BMD-based cheating would be if the poll workers accurately tracked it, counties accurately aggregated it, and the Secretary's Office received such data from across the state before the election result was determined. Even then, it is unlikely that the Secretary would be prepared to react by *rerunning the election* if the number of spoiled ballots exceeded the number predicted in an outcome-changing attack.

23.   Given the ineffectiveness of such defenses and the critical security problems in Georgia's BMDs, I (like Dr. Appel) recommend that BMDs be reserved for voters who need or request them, as is the case in most states. Dr. Gilbert responds by claiming, without evidence, that "[d]isabled voters are even less likely to identify an error on their printed ballot" (¶ 14). I am unaware of any study that supports this sweeping indictment of voters with disabilities, which encompasses a vast array of disabilities that would not impact the ability of the voter to identify an error on their printed ballot in any way. He also contends that blind voters cannot detect errors on their ballot at all, but this is not true. Many blind voters use assistive technology to read printed text and likely could do so to verify their ballots. Moreover, only some voters who need BMDs are blind. For instance, those with motor impairments that prevent them from marking a ballot by hand would not necessarily have any greater difficulty verifying the printed text than any other voter. In any case, if BMDs are used primarily by voters with disabilities (as in most jurisdictions that use BMDs), they will represent a *much* smaller target,[7] and an

---

[7] Although Dr. Gilbert cites a figure that would imply that 10% of Georgians who voted in 2020 were disabled, data from Maryland, where BMDs are available upon request, suggests that only about 1.8% of voters would request to use BMDs if they were offered a hand-marked ballot first. (*Halderman decl.*, Aug. 19, 2020, Dkt. 785-2 at 49.) Dr. Gilbert's citation to the number of all Georgia voters with disabilities is highly misleading since, again, very few of those voters would be

outcome-changing attack on any given election will be detectable with a much lower rate of voter error detection than when all in-person voters use BMDs as they do in Georgia today. This in turn creates a strong disincentive for bad actors to attempt hacking an election (the risk likely is not worth the reward when the outcome is highly unlikely to be changed), which means individual votes would be less likely to be altered by hacking.

24.    In his only direct response to my expert report, Dr. Gilbert states that he is not aware that I have "provided equipment marred by 'undetectable' hacks to any other independent researcher" (¶ 15).[8] This is a curious and ironic criticism coming from Dr. Gilbert, since he evidently chose not to evaluate my findings through an examination of the voting equipment himself, which he does not explain. Moreover, Dr. Gilbert misreads my report. It does not claim that malicious software infecting a BMD would be undiscoverable by any possible means. If an individual BMD is

---

unable to vote on a hand-marked paper ballot, consistent with the number reported in Maryland.

[8] Dr. Gilbert ignores that, as I understand it, State Defendants have objected to my report and the underlying work being shared with third parties (except Dominion), including other independent researchers, with whom I am eager to share my work for review. I am confident in my findings and believe they should be shared promptly with appropriate election security researchers and officials in an effort to mitigate the critical vulnerabilities in Georgia's voting equipment that I describe. I invite Dr. Gilbert to join me in seeking State Defendants' consent to do that.

*known* to contain malware, there will likely be some level of detailed forensic scrutiny that can detect where the malware is, perhaps requiring months of expert analysis per machine at extraordinary expense. It would be completely infeasible to perform this level of analysis on every machine before every election, much less between an election and the deadline for certification of its results. (And after manipulating ballots, malware could remove all traces of its presence from a machine, defeating any possible post-election examination of the device.) What my report shows is that vote-stealing malware of the type I have constructed would not be detected by any of the defenses that State Defendants purport to practice. I describe in detail how such malware would defeat QR code authentication, logic and accuracy testing, on-screen hash validation, and external APK validation (as was used by Pro V&V after the November election). Dr. Gilbert offers no rebuttal to these findings. He does not dispute them or even address them.

25. Moreover, there is already an example of an "undetectable" attack entered into testimony: exploitation of the Drupal vulnerability discovered by Logan Lamb in the Center for Election Systems server. As Lamb attested, the developers of the primary tool for detecting this vulnerability stated that "[n]either [the defensive tool] nor an expert can guarantee a website has *not* been compromised. They can only

confirm with certainty a website *has* been compromised."[9] Furthermore, the Drupal developers state that any server running the vulnerable software after the initial disclosure of the vulnerability should be assumed to have been compromised unless it was patched within *hours* of disclosure. According to the timeline presented in Lamb's declaration, he found the KSU server to be in a vulnerable state on August 28, 2016, nearly two years after the initial announcement of the critical vulnerability (October 15, 2014).[10] The KSU server image also contains evidence that a second vulnerability, the so-called Shellshock flaw, was exploited on December 2, 2014.[11] This vulnerability was publicly disclosed more than two months earlier and widely publicized in the media as a critical vulnerability, yet the KSU server remained unpatched.

26.    An attacker who compromised the KSU server could therefore have maintained undetected access to the compromised server. Since the server remained in a vulnerable state undetected for almost two years, it is highly likely that it was successfully attacked at some point in time. An attacker who did so would have been able to move laterally to other systems within the CES network and to other

---

[9] *Lamb decl.*, Dkt. 258-1 at 19.

[10] See "Drupal Core - Highly Critical - Public Service announcement" (Oct. 29, 2014), available at https://www.drupal.org/PSA-2014-003.

[11] *Halderman decl.* (Sept. 1, 2020) Dkt. 855-1 at 23.

components of Georgia's voting system. As I have previously pointed out, many election system components that could have been compromised in this way are still in use in Georgia today, where they provide a means by which attackers could spread vote-stealing malware to the BMDs.

27.    Rather than address the many threats to Georgia's voting system, Dr. Gilbert persists in drawing illogical comparisons between BMDs and hand-marked paper ballots. For instance, he questions why Plaintiffs have presented no research "regarding voters' proclivity to review [hand-marked paper ballots] to ensure their ballots are marked and will count as intended" (¶ 8). Much like Dr. Gilbert's earlier testimony that "[i]n essence, a BMD is nothing more than an ink pen,"[12] one does not need expertise in election security to find fault with this reasoning. Preventing voters from making accidental mistakes is a completely different problem from preventing their selections from being deliberately and systematically changed by an attacker who has compromised the BMDs. There is abundant evidence that voters do sometimes make errors whether filling out a ballot by hand or by machine. Bad ballot design exacerbates this problem with both voting modalities, but following ballot design best practices can greatly reduce it. Both

---

[12] *Gilbert decl.*, Dkt. No. 658-3 at 60.

BMDs and scanners that count hand-marked ballots can also be configured to reject overvotes and to warn voters about undervotes, the most common kinds of voter errors. Moreover, unlike older technologies for counting hand-marked ballots, the scanners used in Georgia (when properly configured) can detect improperly or incompletely marked bubbles and present them to human operators to adjudicate whether the marks should count as votes. Election officials can use all of these options to help protect voters from their own mistakes, but none of them offers protection against a BMD that deliberately changes the selections printed on a voter's ballot (or those encoded in the ballot barcode). The central problem with Georgia's highly vulnerable BMD system—that attackers can change all records of the voter's intent without being detected by election officials—has no parallel in a hand-marked paper ballot system.

28. Dr. Gilbert concludes as he started, with vague and sweeping generalities. "Simply put, BMD elections systems are no more insecure than [hand-marked] systems" (¶ 16). It is unclear whether he is claiming that *all* BMD systems are at least as secure as all hand-marked systems or merely that some specific BMD system (such as the one he recently developed himself to address some of the reliability problems that exist with Georgia's BMDs) is at least as secure as some hand-marked system, but this is of little consequence. The only BMD system that is

relevant here is the Dominion ICX as used in Georgia. As my expert report details, Georgia's BMD system suffers from numerous, severe vulnerabilities. These vulnerabilities would have little potential to change election outcomes if use of BMDs were limited to voters who need or request them, as Curling Plaintiffs desire, and they would be far less likely to affect the personal votes of individual Georgia voters.

## Reply to Declarations of Dr. Benjamin Adida

29. The declarations by Dr. Adida that State Defendants have submitted predate my expert report, so Dr. Adida's opinions are not informed by the critical vulnerabilities in Georgia's BMD equipment that my analysis has revealed or by anything else in my lengthy, detailed report. Nor are they informed by any events that occurred in the year since he first provided these declarations, such as any aspect of the November 2020 election in Georgia or the Secretary of State's study indicating that few voters verified their respective ballots in that election.

30. Nevertheless, Dr. Adida's first declaration is correct that "Running a risk-limiting audit is one of the most important advances states can take in improving election integrity—without an RLA, we are effectively trusting computerized scanners to count our paper ballots" (Dkt. 834-2 at ¶ 5). This is true, but, as my expert report shows, without a risk-limiting audit Georgia is also trusting its critically

vulnerable BMDs to generate ballots with QR codes that correctly reflect voters' selections. Obviously compromised BMDs and compromised scanners could change individual votes and election outcomes. But again, nothing suggests that Georgia's scanners suffer from such easily exploitable critical vulnerabilities as the BMDs do.

31. Dr. Adida and I also agree that RLAs are important for discovering whether compromised BMDs have manipulated enough ballot QR codes to change the outcome of an election (¶ 12). Although RLAs are, as Dr. Adida says, "of the utmost importance" (¶ 6), Georgia does not require an RLA in the vast majority of elections and the vast majority of contests, leaving both election outcomes and individual voters' votes susceptible to manipulation via BMD malware. Additionally, it is insufficient for states to merely (in Dr. Adida's words) "take meaningful steps to implement RLAs"; rather, states have to *actually conduct* reliable RLAs, which Georgia does not intend to do for the vast majority of its elections (or perhaps any of its elections, depending on the reliability of the audit procedures it implements).

32. In his second declaration, Dr. Adida refers to a "dispute amongst academics regarding whether voters verify their ballots using ballot-marking devices" (Dkt. 912-1 at ¶ 11). This statement reflects a misunderstanding of the state of research today. I am not aware of any scientific research that supports the proposition that Georgia voters would likely detect more than a small fraction of

errors caused by BMD malware. In contrast, the past two years have seen a wave of laboratory studies and multiple field observation studies addressing this question, all of which strongly indicate the opposite, that few voters carefully review their ballots and so the vast majority of errors caused by BMD malware would likely to go undiscovered and uncorrected. Although there once was uncertainty about whether most voters carefully verify their BMD ballots, there is no longer any serious scientific dispute that they do not. It is the hallmark of good science (and of good public policy) that it evolves based on new evidence, such as the University of Georgia study commissioned by the Secretary of State that I discussed above—which Dr. Adida has not addressed.

33. Georgia's election system needs to evolve as well. Due to the critical vulnerabilities in Georgia's BMDs that are described in my expert report, Georgia voters face an extreme risk that BMD-based attacks could manipulate their individual votes and alter election outcomes. Even in the rare contests for which the State requires a risk-limiting audit, the scientific evidence about voter verification shows that attackers who compromise the BMDs could likely change individual votes and even the winner of a close race without detection. Georgia can eliminate or greatly mitigate these risks by adopting the same approach to voting that is practiced in most of the country: using hand-marked paper ballots and reserving

BMDs for voters who need or request them. Absent security improvements such as this, it is my opinion that Georgia's voting system does not satisfy accepted security standards. Neither Dr. Gilbert nor Dr. Adida offers a contrary opinion in their respective declarations, instead ignoring the critical issue of whether the *voting system used in Georgia*—which neither claims to have examined—reliably protects the right to vote for individual Georgia voters.

I declare under penalty of the perjury laws of the State of Georgia and the United States that the foregoing is true and correct and that this declaration was executed this 2nd day of August, 2021 in Rushland, Pennsylvania.

J. ALEX HALDERMAN



# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| **DONNA CURLING, ET AL.,** **Plaintiffs,** | |
| **v.** | **DECLARATION OF** **J. ALEX HALDERMAN** |
| **BRAD RAFFENSPERGER, ET AL.,** **Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

Pursuant to 28 U.S.C. § 1746, J. ALEX HALDERMAN declares under penalty of perjury that the following is true and correct:

1. I hereby incorporate my previous declarations as if fully stated herein. I have personal knowledge of the facts in this declaration and, if called to testify as a witness, I would testify under oath to these facts.

2. When a security analysis demonstrates the existence of vulnerabilities in election equipment, there are a wealth of reasons to make those findings broadly available to the public, subject to appropriate limitations.

3. Public disclosure ensures that all jurisdictions that rely on the vulnerable equipment will be aware of the problems and able to begin mitigating them. It informs law enforcement and national security groups about forms of attack that they

should be on the lookout for. It helps jurisdictions that are procuring new equipment make better informed purchases. It ensures that vendors of other equipment that may suffer from similar problems are on notice. It provides a foundation for research and development of stronger election security mechanisms. It informs test laboratories and regulators such as the U.S. Election Assistance Commission about gaps in established testing methodologies. It also helps inform policymakers, such as state legislatures and the U.S. Congress, which is now considering several measures to overhaul election cybersecurity. Ultimately, transparency about actual election system vulnerabilities can improve public trust in elections by demonstrating that election security has been rigorously scrutinized and by helping to separate facts about real vulnerabilities (which technology and policy changes can address) from the baseless speculation and fantasy of conspiracy theorists.

4.    However, it is important to make findings about vulnerabilities public in the right way, considering both the timing of the public disclosure and its content. In general, public vulnerability disclosures must "strike a careful balance between the public's interest in transparency into whether their voting systems are secure and the public's interest in being protected against the risks due to the disclosure of those

flaws."[1] Previous election security analyses have attempted to strike this balance by withholding specific details that would greatly benefit potential attackers while shedding little light for the public about the scope or nature of the security problems.

5.     A prime example of how this balance has been struck is the California Secretary of State's Top-to-Bottom Review of Electronic Voting Systems (TTBR), the first comprehensive state-sponsored election security review, in which I took part as an expert. The TTBR resulted in hundreds of pages of public reports describing numerous vulnerabilities in voting systems from four major vendors.[2] Nevertheless, the authors withheld certain key details about some of the problems. In the words of the principal investigator, "Our objective was to avoid reducing the amount of access an attacker would require to attack elections. We attempted to accomplish this by omitting details that would have the effect of converting an attack that would require reverse engineering or access to the source code into one that would not. These details were relegated to a confidential appendix."[3] Project EVEREST, a similar comprehensive election security review commissioned by the Secretary of State of

---

[1] David A. Wagner, "Principal Investigator's Statement on Protection of Security-Sensitive Information," *California Top-to-Bottom Review of Voting Systems* (2007). Available at https://votingsystems.cdn.sos.ca.gov/oversight/ttbr/state-of-protect(dw).pdf.
[2] California Secretary of State, *Top-to-Bottom Review* (2007). https://www.sos.ca.gov/elections/ovsta/frequently-requested-information/top-bottom-review.
[3] Ibid. 1.

Ohio, applied a similar strategy, again making hundreds of pages of detailed findings public while withholding key details in select instances.[4]

6.      The computer science research community similarly recognizes that researchers who discover vulnerabilities have a professional and ethical duty to safeguard the public interest. Key to this protection is the notion of giving responsible parties an early warning about the problems before such knowledge becomes public (a so-called "disclosure window"), so that they can take remediative action. During the scientific peer review process, referees consider whether the duty to protect the public has been fulfilled and may deny or delay publication if it has not. For example, the IEEE Symposium on Security and Privacy, one of the premier scientific venues for security research, requires that:

> "Where research identifies a vulnerability (e.g., software vulnerabilities in a given program, design weaknesses in a hardware system, or any other kind of vulnerability in deployed systems), we expect that researchers act in a way that avoids gratuitous harm to affected users and, where possible, affirmatively protects those users. In nearly every

---

[4] Patrick McDaniel et al., "EVEREST: Evaluation and Validation of Election-Related Equipment, Standards and Testing" (2007). Available at https://www.eac.gov/sites/default/files/document_library/files/EVEREST.pdf.

case, disclosing the vulnerability to vendors of affected systems, and other stakeholders, will help protect users. It is the committee's sense that a disclosure window of 45 days to 90 days ahead of publication is consistent with authors' ethical obligations."[5]

7.    In preparing my expert report in this case, I did not anticipate that it might become public immediately, given the Court's existing protective order. As such, the report contains some specific details that might be dangerous in the wrong hands. I would be happy to prepare an abridged version that removes this information if the Court sees fit to make the findings public.

8.    I have been attempting since January, through Plaintiffs' counsel, to meet with Dominion to confidentially discuss the vulnerabilities in my report. However, Dominion has yet to agree to meet. It would be dangerous to provide Dominion with the complete report if it were then disclosed through discovery in the company's various ongoing defamation suits to anyone who might misuse it.

---

[5] IEEE Symposium on Security and Privacy, "Call for Papers" (2021). Available at https://www.ieee-security.org/TC/SP2022/cfpapers.html.

I declare under penalty of the perjury laws of the State of Georgia and the United States that the foregoing is true and correct and that this declaration was executed this 12th day of July, 2021 in Rushland, Pennsylvania.

_____

J. ALEX HALDERMAN

6

Exhibit A- 4

https://www.ajc.com/politics/us-cybersecurity-agency-reviews-hacking-risk-to-georgia-voting-system/UQ4LHNUL3VGNLM7UIX6VNKDUVE/

**U.S. cybersecurity agency reviews hacking risk to Georgia voting system**

Mark Niesse



Credit: JOHN SPINK / AJC

**Report cites potential for tampering in future elections**

A confidential report alleging Georgia's voting touchscreens could be hacked is now being reviewed by the federal government.

The U.S. Cybersecurity and Infrastructure Agency wrote in a court filing late Thursday that it will assess potential vulnerabilities and decide whether updates or patches are needed to mitigate risks.

CISA's action came in response to a report by a computer scientist who said someone could change voters' ballot choices if they had physical access to Georgia's voting touchscreens or election management computers.

Georgia election officials say the state's voting systems are secure and that vulnerabilities discovered in a lab would be difficult to exploit in a real election.

There's no indication that Georgia's election computers manufactured by Dominion Voting Systems were hacked in the 2020 election, but an ongoing election security lawsuit alleges the touchscreens could be exploited in future elections. Three ballot counts and multiple investigations checked the 2020 election results.

Both Secretary of State Brad Raffensperger and plaintiffs in the lawsuit have called for a redacted version of the hacking report to be made public, but CISA urged a judge not to disseminate further information for now.

"Such premature disclosure increases the risk that malicious actors may be able to exploit any vulnerabilities and threaten election security," CISA, an agency within the U.S. Department of Homeland Security, said in the filing.

CISA will analyze the extent of potential vulnerabilities, work with Dominion and develop mitigation measures, according to the agency's court filing.

If vulnerabilities are confirmed and fixes required, CISA's review could reverberate beyond Georgia. Dominion touchscreens that print out paper ballots, called ballot-marking devices, are used in jurisdictions in 12 states, including California, Michigan and Missouri.

The report was produced by University of Michigan computer science professor Alex Halderman, who as an expert for the plaintiffs was able to examine Georgia's voting equipment for 12 weeks and look for flaws.

Halderman found that malicious software could be installed on voting touchscreens so that votes are changed in QR codes printed on paper ballots, which are then scanned to record votes, according to court documents.

The secretary of state's office reviewed Halderman's report after a judge made clear last month that it could be shared with election officials, following reporting about the potential vulnerability by The Atlanta Journal-Constitution. But the report remains sealed from public view.

Raffensperger said Halderman is "way off base."

"I'm sure that anyone who has that kind of unlimited access could do something, but it's not the real world," Raffensperger said during an Atlanta Press Club interview Thursday.

David Cross, an attorney for the plaintiffs, said more information should be revealed about the risks to Georgia's voting system after CISA has an opportunity to review it. Cross asked a judge last week to release a redacted version of the report within 30 days.

"Sending it to CISA for this purpose so that they can basically make the independent decision of how to do that balancing act is appropriate," Cross said in court Feb. 2. "The public is entitled to have an understanding of the general matters covered in the report."

It's unclear how long CISA's review would take, but the agency said it would provide an update in 30 days.

After CISA finishes its evaluation and develops safeguards, it will disclose information about vulnerabilities and mitigations but not necessarily release Halderman's full report.

Exhibit A-5 —Halderman report

https://apnews.com/article/technology-georgia-atlanta-voting-elections-d4543623099fea5bf3633d0913532c11

**Feds oppose immediate release of voting machine report**

ATLANTA (AP) — A federal cybersecurity agency says a report by an expert who says he's identified security vulnerabilities in voting machines used by Georgia and other states shouldn't be made public until it has had time to assess and mitigate potential risks.

The report has been under seal since July in federal court in Atlanta, part of a long-running lawsuit challenging Georgia's voting machines. Its author, J. Alex Halderman, said in sworn declarations filed publicly with the court that he examined the Dominion Voting Systems machines for 12 weeks and identified "multiple severe security flaws" that would allow bad actors to install malicious software.

Plaintiffs in the case, who are election security advocates and individual voters, have for months called for the release of a redacted version of the report and urged that it be shared with state and federal election security officials. Lawyers for the state had repeatedly objected to those requests, but Secretary of State Brad Raffensperger last month put out a news release calling for its release.

U.S. District Judge Amy Totenberg agreed on Feb. 2 that the report could be shared with the U.S. Cybersecurity and Infrastructure Agency, or CISA. The agency said in a court filing Thursday that it would work with Halderman and Dominion to analyze potential vulnerabilities, develop any necessary mitigation measures and work with jurisdictions that use the machines to test and apply any protections.

CISA said it would complete its "coordinated vulnerability disclosure" process as quickly as possible, but urged the judge not to release the report before it's done, saying "premature disclosure of Dr. Halderman's report, even in redacted form, could, in the event any vulnerabilities ultimately are identified, assist malicious actors and thereby undermine election security."

The report was initially designated "attorneys' eyes only," meaning even the actual parties to the lawsuit couldn't see it — only their lawyers and expert witnesses could. Halderman, a voting technology specialist and director of the University of Michigan's Center for Computer Security and Society, urged the court to make his findings public in a limited and responsible way so that problems could be addressed.

Halderman told The Associated Press in August that he'd seen no evidence that the machines' vulnerabilities were used to tamper with the 2020 election, but he said "there remain serious risks that policymakers and the public need to be aware of."

Totenberg has resisted making the report public, saying she too is concerned it could be exploited by attackers.

Raffensperger's news release went out Jan. 27 while the lawyers in the case were on a conference call with Totenberg. Noting that all parties in the case had come to agree that the report should be made public, an attorney for the plaintiffs asked the judge to release a version redacted by Halderman to exclude details showing how hacks could be carried out.

In a Feb. 2 phone call, Totenberg agreed that the report could be released to CISA but did not immediately decide whether it could otherwise be made public. She instructed the parties to talk with the federal agency to get information about its review, saying she wanted to know whether CISA would provide any guidance as to what should and shouldn't be disclosed.

Lawyers for the plaintiffs suggested that Totenberg make a redacted version of the report public 30 days after CISA received the unredacted version. A lawyer for the state didn't object to CISA getting the report, but said the public release should not be delayed, arguing that keeping it sealed undermines confidence in the election system.

Others have also sought access to the report. Totenberg last month rejected a request for access from the secretary of state in Louisiana, which uses the Dominion system for early voting. She has not yet ruled on requests for access from Fox News and One America News, both of which are facing defamation suits filed by Dominion.

CISA said in its court filing that it "understands and shares the parties' urgency with completing this work, and will prioritize its completion as expeditiously as possible." It proposed that it would notify the court within 30 days about its progress, its timeline and its thoughts on the "scope and information to be included in a future public disclosure."

Exhibit A-6

https://www.ajc.com/politics/secret-report-on-georgia-voting-system-finds-flaws-but-state-shows-no-interest/YKFEET2WE5BBPJ7TYVOYMBTIKQ/

**Secret report finds flaw in Georgia voting system, but state shows no interest**

Mark Niesse



Credit: JOHN SPINK / AJC

**Hacking is possible, experts say, but there's no sign 2020 election was rigged**

A confidential report alleges that hackers could flip votes if they gained access to Georgia's touchscreens, drawing interest from the U.S. Department of Homeland Security, Louisiana election officials and Fox News.

One key agency hasn't asked the court to disclose the report: the Georgia secretary of state's office.

There's no sign that state election officials have done anything about the vulnerability, a potential flaw dangerous enough to be kept under seal, labeled in court as "attorneys' eyes only" six months ago.

The vulnerability hasn't been exploited in an election so far, according to examinations of the state's Dominion Voting Systems equipment, but election security experts say it's a risk for upcoming elections this year. Investigations have repeatedly debunked allegations of fraud in the 2020 election.

Georgia election officials won't say what actions they've taken, if any, to improve security or detect tampering. State election officials declined to answer questions about the flaw, which was discovered as part of a lawsuit aimed at forcing the state to abandon its $138 million voting system that prints out paper ballots and instead use paper ballots filled out by hand.

Several election integrity advocates said Georgia Secretary of State Brad Raffensperger shouldn't ignore the issue, even if he believes existing protections would prevent illicit access to voting equipment.

"It's really concerning that the Georgia secretary of state and Dominion are kind of putting their head in the sand," said Susan Greenhalgh, an election security consultant for plaintiffs suing over Georgia's voting system. "Common sense would say you would want to be able to evaluate the claims and then take appropriate action, and they're not doing any of that."

Dominion became a frequent target of misinformation after the 2020 election, when election skeptics falsely claimed the company's voting equipment produced fraudulent results. Georgia's election results were checked by a recount of all 5 million paper ballots and multiple investigations.



**Voting machine penetrated**

The vulnerability was first alleged in sealed court documents in July by Alex Halderman, a computer science professor at the University of Michigan. As an expert for plaintiffs in the election security lawsuit, Halderman gained access to Georgia voting equipment for 12 weeks and produced a 25,000-word secret report.

Halderman found that malicious software could be installed on voting touchscreens so that votes are changed in QR codes printed on paper ballots, which are then scanned to record votes, according to court documents. QR codes aren't readable by the human eye, and voters have no way to know whether they match the printed text of their choices.

The vulnerability could be exploited by someone with physical access to a voting touchscreen, such as a voter in a polling place, or by an attacker who used election management system computers, Halderman said. A hacker in a polling place could only target one touchscreen at a time, limiting the number of votes that could be changed, but an attack on election management systems could have a broader impact.

"It is important to recognize the possibility that nefarious actors already have discovered the same problems I detail in my report and are preparing to exploit them in future elections," Halderman wrote in a September declaration. Halderman has said there's no evidence that Dominion voting machines changed votes in the 2020 election.

Georgia election officials have previously said their security precautions keep elections safe, though they won't discuss Halderman's findings in the ongoing court case.

Poll workers could see whether someone was trying to tamper with a voting touchscreen in a polling place. Touchscreens aren't connected to the internet, and equipment goes through what's called logic and accuracy testing before elections to ensure it's functioning correctly.

"There are vulnerabilities in all systems. The main issue is you have to have processes and procedures in place to mitigate risks," Gabriel Sterling, chief operating officer for the secretary of state's office, wrote on Twitter in August.



Credit: Steve Schaefer

**Impact extends beyond Georgia**

The potential ability to hack voting touchscreens that print out paper ballots extends beyond Georgia. Dominion ballot-marking devices are used in jurisdictions in 12 states, including California, Michigan and Missouri.

While Georgia election officials aren't saying whether they've increased the security of the state's voting system, others have taken an interest.

The Cybersecurity and Infrastructure Security Agency, part of the Department of Homeland Security, wrote a letter to the judge Jan. 21 informing her that potential vulnerabilities could be disclosed and mitigated.

Last month, Louisiana Secretary of State Kyle Ardoin asked the court to see the report because his state also uses Dominion touchscreens during early voting, a motion that U.S. District Judge Amy Totenberg denied, citing the danger of spreading information that could be used to subvert elections.

Totenberg hasn't ruled on another request for the report this month by Fox News, which is defending itself in a defamation lawsuit by Dominion. Fox is being sued for $1.6 billion for allegedly spreading false conspiracy theories that the company's election technology had rigged vote counts.

The Georgia secretary of state's office should also take concerns about vulnerabilities seriously, several experts say. Election officials could hire consultants to review election equipment for weaknesses, strengthen audits and review the physical security of election equipment.

An expert for the state, University of Florida computer scientist Juan Gilbert, said Georgia's election audit process, which reviews the printed text of voters' choices, would expose inconsistencies between QR codes and the text. Gilbert declined to comment on Halderman's allegation but has previously addressed protections from hacking.

"If QR codes are inconsistent with the human-readable portion of the ballot, this will be detected during the (risk-limiting audit) and may signal a full manual recount," Gilbert wrote in a November 2019 court declaration. "The general statement that computers can be hacked is no justification to remove all computers from any type of interaction with voting and election systems."

But others say audits would be inadequate because they might not detect fraud on a small number of ballots that could swing a close election.

"If there's any way to get at these machines, that's a vulnerability. That's an open door, and you need to have intrusion detection systems in place to monitor it," said Gregory Miller, co-founder of the Open Source Election Technology Institute, an organization that researches ways to increase election security and transparency. "A lot of stars have to align themselves for an immaculate hack, but it is possible, so steps should be made to mitigate that."

**Dilemma: Keep secret or go public**

Noah Praetz, an election security consultant and former elections director in Cook County, Ill., said election officials should assume their equipment has vulnerabilities and develop safeguards, including audits, testing and reviews of equipment to ensure there's no malware.

"Even an attack on one voting machine that is caught and corrected would feed a damaging narrative that's already taken hold in some quarters of our country, so they're advised to buckle down and be extra secure with their cyber practices and physical control over their voting systems," Praetz said.

An evaluation of Georgia's voting machines two weeks after the 2020 election found no signs of hacking or tampering. Former U.S. Attorney General William Barr said in December 2020 that there was no evidence of fraud on the scale that could have changed the outcome of the election, contradicting his boss, President Donald Trump.

A testing lab called Pro V&V audited a random sample of Dominion voting machines from several counties, finding that all software and firmware was the same as components certified for use by the secretary of state's office.

Since then, it's unclear whether the secretary of state's office or its election security vendor, Fortalice Solutions, has done more to harden election systems against threats. Dominion also declined to comment.

"Election safeguards — from testing and certification of voting systems to canvassing and auditing — prevent malicious actors from tampering with results," Dominion said in a December 2020 statement.

Because details of the hack are sealed from public view, available only to attorneys and experts in the court case, it's difficult for anyone else to evaluate how dangerous it could be.

The lack of disclosure could fuel conspiracy theories by losing candidates, said David Jefferson, a computer scientist and former board member for Verified Voting, an organization that focuses on election technology. On the other hand, revealing more information about the hack would make it easier for hackers to replicate it.

"Keeping this information secret does more damage than making it public because the people who wish to cast doubt on the integrity of our elections have this weapon of saying, 'The government knows these machines have been compromised,' and no one is going to be able to refute that claim," Jefferson said.

More information about the vulnerability could be made public through testimony by Halderman and other witnesses when the case goes to trial later this year.

Totenberg has signaled deep concerns about the security of Georgia's voting equipment, writing in an October 2020 ruling that "these risks are neither hypothetical nor remote."

So far, Totenberg has refused to release the report because its information could be misused if it fell into the hands of hackers.

"The state has to live with how it conducts its business," Totenberg said during a court hearing in November.

**Exhibit B –**

**<u>Cybersecurity and Infrastructure Security Agency (CISA) Documents</u>**

Exhibit B-1 Court Order to CISA (2/11/22)

Exhibit B-2 CISA Notice to Court (2/10/22)

Exhibit B-3 CISA letter Statement of Interest  (1/20/22)
Vulnerability Disclosure Issues in *Curling v. Raffensperger*, No. 17-cv-2989 (N.D. Ga.)

Exhibit B-4 CISA update letter (3/14/22)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DONNA CURLING, *et al.*, | : | |
| Plaintiffs, | : | |
| v. | : | CIVIL ACTION NO. 1:17-cv-2989-AT |
| BRAD RAFFENSPERGER, *et al.*, | : | |
| Defendants. | : | |

## ORDER

In a Teleconference held on February 2, 2022, the Court authorized the parties to share an unredacted copy of a provisionally sealed expert report prepared by cybersecurity expert Dr. J. Alex Halderman with the United States Cybersecurity and Infrastructure Agency ("CISA"). The purpose of sharing Dr. Halderman's report with CISA was so that CISA could review the report and undergo its formal Coordinated Vulnerability Disclosure ("CVD") process. After conferring with the parties, CISA filed a notice with the Court on February 10, 2022 to provide the Court with additional information about potential timelines for completing its CVD process and its views regarding future public disclosure of Dr. Halderman's report. (Doc. 1314.)

In its notice, CISA stated that in its view, "premature disclosure of Dr. Halderman's report, even in redacted form, could, in the event any vulnerabilities ultimately are identified, assist malicious actors and thereby undermine election security." (*Id.* at 1.)  CISA explained that for that reason, "public disclosure, even in redacted form, should await completion of the normal CVD process."  (*Id.*) However, CISA added that it "understands and shares the parties' urgency with completing this work, and will prioritize its completion as expeditiously as possible." (*Id.* at 2.)  CISA therefore proposed that it file a notice within the next 30 days to provide the Court with "any status updates regarding the process or the anticipated timeline for completion, as well as any updates regarding CISA's views as to scope and information to be included in a future public disclosure." (*Id.* at 5.)

The Court is appreciative of CISA's expressed willingness to expedite its review of the complex and sensitive issues raised by Dr. Halderman's report, and the Court agrees that it would be appropriate for CISA to provide an update on the status of its review within the next 30 days.

Accordingly, as CISA requested in its notice, the Court **DIRECTS** CISA to provide an update on the status of its review of Dr. Halderman's report within 30 days of the date of this Order.  In the event that there are highly confidential matters referenced in CISA's status report, the Court **DIRECTS** CISA to (1) file a properly redacted version of its status report on the public record; and (2)

provide the Court with a sealed hard copy of the non-redacted version of the status report.

**IT IS SO ORDERED** this 11th day of February, 2022.

**Honorable Amy Totenberg**
**United States District Judge**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| DONNA CURLING, ET AL., <br><br> *Plaintiffs*, <br><br> v. <br><br> BRAD RAFFENSPERGER, ET AL., <br><br> *Defendants*. | No. 1:17-CV-2989-AT <br><br><br> NOTICE |

The undersigned counsel respectfully submit this notice on behalf of the United States Cybersecurity and Infrastructure Security Agency (CISA) in response to matters raised at the Court's February 2, 2022 hearing regarding CISA's Coordinated Vulnerability Disclosure (CVD) process. Specifically, CISA writes to provide additional information on the CVD process and its timeline, to reiterate its commitment to ensuring election security and completing the CVD process as quickly as feasible, and to notify the Court of CISA's view that premature disclosure of Dr. Halderman's report, even in redacted form, could, in the event any vulnerabilities ultimately are identified, assist malicious actors and thereby undermine election security. As explained herein, CISA thus respectfully submits that public disclosure, even in redacted form, should await completion of the normal CVD process and proposes that it notify the Court within 30 days of any status updates regarding the process and its anticipated timeline, as well as any updates regarding CISA's views as to scope and information to be included in a future public disclosure.

CISA understands that, during the February 2nd hearing, the Court authorized disclosure to CISA of an unredacted report prepared by Dr. Halderman for the purpose of CISA

undertaking its CVD process. CISA received an unredacted copy of the report from Dr. Halderman on February 2nd, and counsel for Plaintiffs shared the unredacted report with Dominion Voting Systems on February 4th. The report discusses potential vulnerabilities in Dominion ImageCast X ballot marking devices. *See generally* ECF 1177-1 ¶ 2.

Now that the report has been shared among Dr. Halderman, CISA, and Dominion, CISA has commenced its CVD process, which is described in detail in CISA's January 20, 2022 letter, *see* ECF No. 1269. CISA understands and shares the parties' urgency with completing this work, and will prioritize its completion as expeditiously as possible. As confirmed in CISA's letter, the CVD process requires the agency to coordinate between and work with the reporting source of the potential vulnerabilities (here, Dr. Halderman) and the vendor (here, Dominion), to analyze the potential vulnerabilities, including the risk they present; develop mitigation measures to mitigate the risk of the potential vulnerabilities, as needed; facilitate sufficient time for affected end users to obtain, test, and apply any recommended mitigation measures prior to full public disclosure of the potential vulnerability; and strive to ensure accurate and objective disclosures by the vendors. *See generally id.*[1] A range of factors—such as the potential impact on critical infrastructure (*e.g.*, election equipment), the availability of effective mitigations, the feasibility of developing an update or patch, the estimated time necessary for affected end users to obtain, test, and apply the patch, or other situations that require changes to established standards—may result

---

[1] CISA is also aware that, prior to and separate from the commencement of the CVD process, the Court imposed a protective order on dissemination of Dr. Halderman's report, as applied to parties in the litigation. As noted in CISA's letter, ECF No. 1269 at 2-4, the CVD process requires sharing and dissemination of vulnerability information. CISA understands the Court to have authorized disclosure of Dr. Halderman's report to CISA for the purpose of following its normal process, including, as appropriate, any information-sharing with Dr. Halderman, Dominion, affected end users, and, at the conclusion of the process, with the public. *See* Feb. 2, 2022 Hr'g Trans. at 5:12-20; 9:19-10:2.

in shifts to both the timeline and process. *See id.* Depending on what is discovered, CISA may need to coordinate with one or more affected end users, including states and municipalities using the same technology, early in the CVD process.

Both from the transcript of the February 2nd hearing and from a February 3rd conversation between undersigned counsel and the parties, CISA understands that the parties to this case requested a redacted version of Dr. Halderman's report to be released publicly as soon as possible. Specifically, the plaintiffs apparently request release of the redacted report within 30 days, while the State would prefer immediate (or as soon as practicable) release. CISA also understands that the Court would like to ascertain how quickly CISA can complete its process and whether CISA will be prepared to provide its views on what information may be released publicly without compromising security and what information should be withheld.

As to the timeline for the CVD process, CISA is not able to provide a definitive answer at this point. As with all of its CVD work, CISA's goal is to facilitate an assessment of the potential vulnerabilities in a coordinated way that minimizes risk. If warranted, CISA will coordinate with the vendor during development of any patches or other mitigation measures necessary to address any identified vulnerabilities. The rapidity with which that can be completed depends largely on the scope of any identified vulnerabilities, the actions and responses among participants in the process (*i.e.*, Dr. Halderman, Dominion, and states and municipalities using the same technology), the mitigation measures any identified vulnerabilities may warrant, and other factors, including the feasibility of, and timeline for, developing any needed update(s) or patch(es). Any mitigation measures also must be made available to affected end users—*i.e.*, both Georgia and other states/municipalities using the same technology—and must be obtained, applied, and tested by those stakeholders, as well as, in some cases, certified for use by those

stakeholders. Election security is a top priority; CISA is thus committed to taking these steps expeditiously and will seek to complete the process as promptly as possible. But the timeline also depends on the actions of a range of other actors outside CISA's control. A 30-day timeline may be impractical in this situation, despite best efforts and prioritization of this work.

CISA understands the urgency given the upcoming elections in which this voting equipment is presently planned to be used. Yet CISA can neither control how quickly any necessary mitigation measures are developed, made available, and implemented, nor at this time can CISA anticipate with any degree of reasonable certainty how long the process may take. This was communicated by undersigned counsel to counsel for the parties and counsel for Dominion during the February 3, 2022 conference call.

As to what can be released publicly, CISA supports public disclosure of any vulnerabilities and their associated mitigations, subsequent to any applicable mitigation measures being developed and applied, consistent with the CVD process. ECF No. 1269 at 3. As explained in CISA's January 20, 2022 letter, CISA carefully stewards sensitive data made available to the agency as part of the CVD process, maintaining confidentiality until disclosure to affected end users and the public at large is warranted. This enables key vulnerabilities to be addressed, while also preserving the confidentiality of sensitive proprietary information. Consistent with this approach, CISA typically would not release a report such as Dr. Halderman's at the conclusion of the CVD process; it would, however, disclose necessary information about any vulnerabilities and associated mitigations.

CISA is particularly concerned about dissemination of potential vulnerabilities—even in redacted form—before CISA and the vendor have been able to address them through appropriate mitigation action. Such premature disclosure increases the risk that malicious actors may be able

to exploit any vulnerabilities and threaten election security. CISA respectfully submits that, in order to best promote the security of the nation's critical infrastructure, any vulnerabilities should be disclosed—with the maximum appropriate transparency—in accordance with the CVD process. CISA's goal is to disclose any confirmed vulnerabilities and associated mitigations to the public in a coordinated way, so the entire cyber ecosystem can benefit while minimizing the risk of harm to election security.

For these reasons, CISA respectfully submits that public disclosure, even in redacted form, should await completion of the normal CVD process. CISA is committed to prioritizing this work and ensuring it is given the attention it deserves. CISA proposes that it notify the Court within 30 days of any status updates regarding the process or the anticipated timeline for completion, as well as any updates regarding CISA's views as to scope and information to be included in a future public disclosure.

Respectfully submitted,

BRIAN M. BOYNTON
*Acting Assistant Attorney General*

BRIGHAM J. BOWEN
*Assistant Branch Director*

 */s/ Kate Talmor*
KATE TALMOR
*Trial Attorney*
Civil Division
Federal Programs Branch
US Department of Justice
1100 L St., NW
Washington, DC 2005
202-305-5267
kate.talmor@usdoj.gov

**U.S. Department of Homeland Security**
Cybersecurity & Infrastructure Security Agency
Office of the Director
Washington, DC 20528

January 20, 2022

Mr. Brian M. Boynton
Acting Assistant Attorney General, Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

      Re:    Vulnerability Disclosure Issues in *Curling v. Raffensperger*, No. 17-cv-2989
            (N.D. Ga.)

Dear Mr. Boynton:

The Cybersecurity and Infrastructure Security Agency (CISA) respectfully submits this letter in
response to the Court's inquiry from the October 7, 2021, and November 19, 2021, hearings in
*Curling v. Raffensperger*, No. 17-cv-2989 (N.D. Ga.), at which time the Court offered to receive
a letter from CISA regarding our agency's vulnerability disclosure program. This letter provides
information about CISA, the importance of vulnerability disclosure programs and processes in
general, and CISA's Coordinated Vulnerability Disclosure (CVD) process. The CVD process
offers a mechanism for potential vulnerabilities to be shared with the vendor through
coordination with CISA. Were the Court to permit the parties to share information on the
alleged vulnerability with CISA, CVD is the process CISA would use to receive, assess, and, as
needed, coordinate the mitigation of any ongoing risk posed by an identified vulnerability. As
explained below, CISA would almost certainly need to disclose the information through the
CVD process to the vendor (*i.e.*, Dominion Voting Systems) to analyze and mitigate, if
necessary, the alleged vulnerability. Further, if a vulnerability required mitigation, relevant
information would need to be shared with affected end users (*e.g.*, users of the ballot marking
devices (BMD) system) and the public.

*The Cybersecurity and Infrastructure Security Agency*

CISA leads the national effort to understand, manage, and reduce risk to our cyber and physical
infrastructure. To that end, CISA works with federal, state, local, tribal, and territorial (SLTT),
international, and private sector partners to ensure the security and resilience of the nation's
critical infrastructure. CISA also serves as the Sector Risk Management Agency (*see* 6 U.S.C. §
665d) for a number of critical infrastructure sectors and subsectors, including the Election
Infrastructure subsector of the larger Government Facilities critical infrastructure sector.

CISA has specific statutory authority to receive, analyze, and disseminate information relating to
cybersecurity risks and function as a Federal civilian interface for the multi-directional and
cross-sector sharing of such information. 6 U.S.C. § 659(c)(9), (5)(A)–(B), (7), (1); *see also* §

659(a)(8) (defining "sharing" as "providing, receiving, and disseminating"). "Cybersecurity risk[s]" include vulnerabilities. 6 U.S.C. § 659(a)(2)(A). Using the cybersecurity risk and vulnerability information it receives and analyzes, CISA is authorized to engage with federal and non-federal entities to provide shared situational awareness and support the mitigation of vulnerabilities across the federal government and non-federal entities. *See* 6 U.S.C. § 659(c)(2). Specific to CISA's mission to coordinate the mitigation of cybersecurity vulnerabilities and risks, CISA has a responsibility to "develop and adhere to Department policies and procedures for coordinating vulnerability disclosures." 6 U.S.C. § 659(n). One such policy and procedure is CISA's CVD process, which CISA makes publicly available at: https://www.cisa.gov/coordinated-vulnerability-disclosure-process.

*CISA's Vulnerability Disclosure Process*

CISA's CVD process facilitates the remediation and public disclosure of newly identified cybersecurity vulnerabilities in products and services with affected vendors. A vulnerability may be identified when an outside entity or person reports having discovered a vulnerability in software or hardware owned, operated, or sold by a vendor or service provider. The goal of CISA's CVD process is for CISA to facilitate an assessment of the potential vulnerability by, at a minimum, the reporter and the affected vendor(s) and/or service provider(s) in a controlled and risk-minimal (*i.e.*, usually confidential) way. Where needed, that assessment may lead to a disclosure of the vulnerability, often paired with an associated software update or mitigation. Through this approach, users and administrators receive clear and actionable information in a timely manner, and risk of harm is minimized.

The CISA CVD process involves five basic steps:

**Collection**: CISA collects vulnerability reports in three ways: receiving reports of vulnerabilities from security researchers; discovering vulnerabilities through our own staff work; and monitoring public sources of vulnerability information. The first is the primary way that CISA becomes aware of vulnerabilities, with the second and third methods representing much more limited sources for the CISA CVD process. As applicable here, after receiving a report, CISA performs an initial analysis to assess a vulnerability's presence and compares it with existing reports to identify duplicates.

**Analysis**: CISA alerts the vendor(s) and begins the process of engaging the source of the vulnerability report and vendor together to understand the vulnerability by examining the technical issue(s) and the potential risk the vulnerability represents.

**Mitigation Coordination**: CISA continues to work with the affected vendor(s) on the development and issuance of patches or updates to mitigate the risk of the vulnerability.

**Application of Mitigation**: When possible and where necessary, CISA may work with the vendor(s) to facilitate sufficient time for affected end users to obtain, test, and apply mitigation strategies prior to full public disclosure of the vulnerability.

**Disclosure**: In coordination with the source of the vulnerability report and the affected vendor(s), CISA strives to ensure accurate and objective disclosures by the vendors, focused on technical remediation and mitigation for asset owners and operators.

Time frames for mitigation development and the type and schedule of disclosure may be affected by various factors. Extenuating circumstances, such as active exploitation of the vulnerability by a malicious cyber actor, threats of an especially serious nature, or situations that require changes to established standards may result in changes to the disclosure timeline. Other factors include, but are not limited to:

- whether the vulnerability has already been publicly disclosed, *i.e.*, published by the source of the vulnerability report;
- potential impact to critical infrastructure, national security, or public health and safety;
- the availability of effective mitigations;
- vendor responsiveness and feasibility of developing an update or patch; and,
- vendor estimate of time required for customers to obtain, test, and apply the patch.

When CISA informs an affected vendor or service provider of a vulnerability, CISA will provide the name and contact information of the vulnerability reporter unless otherwise requested by the vulnerability reporter. As the information-exchange develops, CISA will advise the vulnerability reporter of vendor-reported significant changes in the status of any vulnerability reported, without revealing information provided in confidence by the affected vendor(s) or service provider(s).

Affected vendors will be apprised of any plans to publish information about the vulnerability, and alternate publication schedules may be negotiated with affected vendors, as required.

Throughout this process, CISA carefully stewards the sensitive data involved in these matters, ensuring that CISA shares such information only between the source of the vulnerability report and the vendor until broader disclosure to any additional parties, including customers and ultimately the public, is warranted. As noted above, the ultimate goal is to disclose confirmed vulnerabilities and associated mitigation to the public in a controlled way, so that the entire cyber ecosystem can benefit while minimizing risk of additional harm.

*Importance of Vulnerability Disclosure*

Vulnerability disclosure is critical to the security of our Nation's information systems. When software vendors become aware of a vulnerability in their product, they can issue an update that removes or mitigates the vulnerability. Malicious cyber actors may independently discover vulnerabilities, so rapid disclosure of vulnerabilities by researchers to software vendors is critical to limiting the window of opportunity for malicious actors to exploit such vulnerabilities. Finally, public disclosure of the vulnerability (usually simultaneous with disclosure of the associated software update or mitigation) protects the wider technology ecosystem.

*Concluding Considerations*

CISA is prepared to receive potential vulnerability information connected to this litigation, subject to the caveat that CISA would carry out its work as described above, including, as warranted, coordination with the vendor and security researcher as well as broader dissemination of information related to confirmed vulnerabilities to affected end users and the public. It is CISA's understanding that the Court's current orders do not permit the dissemination CISA may

deem necessary and appropriate in order to carry out its mission. It is important to remember that the ultimate goal of vulnerability disclosure is to ensure that researchers and vendors confirm vulnerabilities and produce mitigations, and that the broader community is advised of confirmed vulnerabilities and associated mitigations. CISA could not receive this information from the security researcher if we are unable to carry out our process as described, as this would risk putting CISA in the untenable situation of knowing our stakeholders are subject to a vulnerability that we are unable to effectively work towards mitigating. In the event that the Court modifies its orders to permit disclosure to CISA, CISA requests that such modification explicitly recognize that CISA would be permitted to follow its ordinary operations with respect to effectuating and/or facilitating warranted disclosures. CISA also would not anticipate, by virtue of its CVD engagement, further involvement in the ongoing litigation itself.

Thank you for considering CISA's views on this matter.

Sincerely,

Brandon Wales
Executive Director
CISA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

DONNA CURLING, ET AL.,

*Plaintiffs*,

v.

BRAD RAFFENSPERGER, ET AL.,

*Defendants*.

No. 1:17-CV-2989-AT

STATUS REPORT

As this Court directed on February 11, 2022, *see* Doc. 1315, the U.S. Cybersecurity and Infrastructure Security Agency (CISA), respectfully submits this status report to update the Court and the parties on CISA's ongoing Coordinated Vulnerability Disclosure (CVD) process.

CISA commenced its CVD process once it was able to share Dr. Halderman's report among its own staff and also with Dominion. *See* Doc. 1314. CISA continues to work with Dr. Halderman's team and Dominion to analyze the potential software vulnerabilities identified in the report.[1] After the analysis phase, CISA will continue to coordinate with Dr. Halderman and Dominion to develop and share measures to mitigate the risk of any confirmed vulnerabilities, as needed. The goal of this process is to provide sufficient time for any affected end users to obtain, test, and apply any mitigation measures before public disclosure of software

---

[1] CISA's CVD process addresses software vulnerabilities and does not cover other types of weaknesses, such as the physical security of the systems themselves or general machine design that are not tied to the software vulnerabilities under review. To address other sources of risk, CISA has published Best Practices for Securing Election Systems and encourages election officials to engage in information-security best practices, such as updating and patching software, enabling multi-factor authentication, chain-of-custody measures, software independence, and robust audits.

vulnerabilities. Moreover, through this process, CISA will strive to ensure accurate and objective disclosures by the vendor.

As CISA previously indicated, *see* Doc. 1314, the timeline for completion of the CVD process, which is already operating in a greatly expedited fashion, depends on a range of factors outside CISA's control, including the cooperation of third parties. CISA is aware of the urgency of this matter and is devoting extensive resources to this effort, is working closely with Dr. Halderman and Dominion to guide them through the CVD process, and will endeavor to garner their continued cooperation through the entire process to the greatest extent it is able. CISA is not yet in a position to provide a definitive timeline for completion, however, given that significant aspects of the process are outside of CISA's control and CISA cannot predict how expeditiously other parties will complete necessary parts of the process.

CISA anticipates that, ideally in coordination with Dominion and Dr. Halderman's team, it soon may be in a position to conduct limited pre-disclosure releases of certain information to relevant states that use the specific version of the election software analyzed in Dr. Halderman's report. In addition, limited pre-disclosures to other stakeholders, such as states that use other versions of the election software or entities that certify election systems, may be contemplated in the future. Such pre-disclosures are a typical part of CISA's CVD process.

Accordingly, CISA respectfully requests that the Court order that another status report shall be due in 30 days.

Respectfully submitted,


BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

BRIGHAM BOWEN
*Assistant Branch Director*

 */s/ Kate Talmor*
KATE TALMOR
*Trial Attorney*
*Civil Division*
*Federal Programs Branch*
*US Department of Justice*
*1100 L St., NW*
*Washington, DC 2005*
*202-305-5267*
*kate.talmor@usdoj.gov*

**Exhibit C - Tabulation Errors Noted in Expert's Reports**

Exhibit C-1 Dr. Duncan Buell's  1/11/22 Expert Report in *Curling v. Raffensperger*


Note ¶¶ 16, 20 referencing missing electronic records

Note ¶¶ 27, 28, 30 on types of discrepancies and double and triple counting

Note ¶ 29, 47 on RLA failure

Note ¶¶ 35 to 42 discrepancies in Curling's Fulton Roswell RW01 precinct

Note ¶ 56 regarding unknown cause of double counting


Exhibit C-2 Dr. Duncan Buell's  2/1/22 Supplemental Report

Note ¶ 10 referencing double and triple counting of ballots in the official results in Plaintiff Donna Curling's Fulton RW01 precinct.


(See also Exhibit F-Tabulation Discrepancies And Exhibit D— Dr. Stark's report)

Exhibit C-1

Page 1 of 68

# IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| DONNA CURLING, et al. ) | |
| Plaintiff, ) | |
| vs. ) | **CIVIL ACTION FILE NO.:** |
| BRAD RAFFENSPERGER, et al. ) | **1:17-cv-2989-AT** |
| Defendant. ) | |

## DECLARATION OF DUNCAN A. BUELL

DUNCAN A. BUELL ("Declarant") hereby declares as follows:

1.    I am a retired professor of Computer Science and Engineering at the University of South Carolina. I submit this declaration in support of the above captioned litigation to prohibit further use of Georgia's current Dominion BMD voting system..

2.    Based on my research on the data provided by the state and by counties in Georgia from the November 2020 General Election and the January 2021 runoff election, it is my opinion that additional basic, and more complete, data must be provided in order to provide Coalition Plaintiffs' voting system experts with adequate information to reach conclusions on the root causes of the systemic discrepancies I have observed to date.  The number of anomalies and discrepancies between the various sets of data provided are too great to assume they are simply the occasional errors made in an enterprise as large as a quadrennial election in Georgia.  Further, for an appropriate and definitive examination,

Exhibit C-1
Page 2 of 68

access to target samples of paper ballots and their scanning records must be granted,

given the anomalies and discrepancies detected in the November 3, 2020 election, it is

impossible to determine which electronic version of the data should be considered to be

operative.  Based on what is known today from the incomplete election records provided

by Defendants and Georgia counties,  is very likely that examination of the paper records

will lead experts to the conclusion that  access to the key components of hardware and

software used in the November 2020 election will be necessary to determine whether the

significant discrepancies identified are caused by exploitation of the system's security

vulnerabilities or human error or insider malfeasance. My background and opinions are

set forth below.

**Qualifications and Relevant Employment History**

3.    In 1971, I earned a B.S. in Mathematics from the University of Arizona.  The

following year, I earned an M.A. in Mathematics from the University of Michigan.  In

1976, I earned a doctorate in Mathematics, with an emphasis in number theory, from the

University of Illinois at Chicago. A copy of my resume is available on my university

website at http://www.cse.sc.edu/~buell.

4.    Prior to moving into my position at the University of South Carolina, I was

employed for approximately 15 years (with various job titles and duties) at the

Supercomputing Research Center (later named the Center for Computing Sciences) of the

Institute for Defense Analyses, a Federally Funded Research and Development Center

(FFRDC) supporting the National Security Agency. Our mission at SRC/CCS was

primarily to conduct research on high performance computing systems and computational

Exhibit C-1
Page 5 of 68

mathematics to ensure that those computing systems would be suitable for use at NSA,

since the NSA workload has technical characteristics different from most high-end

computations like weather modeling. While at IDA, I played a leading role in a group

that received a Meritorious Unit Citation from Director of Central Intelligence George

Tenet for what was then "the largest single computation ever made" in the U.S.

intelligence community.

5.    From 2000 until my retirement on 1 January 2021, I was a Professor in the

Department of Computer Science and Engineering at the University of South Carolina.

From 2000 to 2009, I served as Chair of that department. During 2005-2006, I served as

Interim Dean of the College of Engineering and Information Technology at the

University of South Carolina.  In my management capacity as department chair, my

duties also included the management of the college's information technology staff and its

network and computer center, which included 9 instructional labs with approximately 250

desktop computers.  I was also responsible for the management and operation of cluster

computers, file and mail servers, and the college's network infrastructure.

6.    In 2013, I was elected a Fellow of the American Association for the

Advancement of Science. In 2016, I was appointed to an endowed professorship, the

NCR Chair in Computer Science and Engineering at the University of South Carolina.

7.    My current research interests include electronic voting systems, digital

humanities, high performance computing applications, parallel algorithms and

architecture, computer security, computational number theory, and information retrieval.

Exhibit C-1

Over the past 40 years, I have published articles in peer-reviewed journals and lectured

on each of these topics.

8.   Beginning about 2004 I worked with the League of Women Voters of South

Carolina (LWVSC) as an unpaid consultant on the issue of electronic voting machines.

South Carolina uses statewide the ES&S iVotronic Direct Recording Electronic (DRE)

terminals and the corresponding Unity software. Beginning in summer 2010, I worked

with citizen volunteer activists Frank Heindel, Chip Moore, Eleanor Hare, and Barbara

Zia on acquisition by FOIA of the election data from the November 2010 general

elections in South Carolina and on the analysis of that data. That work, based on data we

acquired by FOIA, culminated in an academic paper that was presented at the annual

USENIX EVT/WOTE (Electronic Voting Technology Workshop/Workshop on

Trustworthy Elections) conference in August 2011. My work with the LWVSC

continued. When the state of South Carolina acquired the 2010 election data from the

counties and posted it on the SCSEC website, I analyzed that data as well. I have

obtained and analyzed the data from the 2012, 2014, 2016, and 2018 elections in South

Carolina, and I have also analyzed ES&S DRE-voting system data in more limited

quantities from Colorado, Kansas, North Carolina, Pennsylvania, and Texas.

9.   I have also analyzed, in limited quantity, data from the June 2020 statewide

primary from the ES&S ExpressVote-based voting system purchased in 2019 by South

Carolina to replace the iVotronic-based system.  The ExpressVote is a Ballot Marking

Device, usually referred to as a BMD.  The ExpressVote can be viewed as the ES&S

competition to the voting system marketed by Dominion and purchased by Georgia.

Exhibit C-1

10.  In March 2019 I was nominated by the county legislative delegation and the appointed by Governor Henry McMaster to the Board of Voter Registration and Elections of Richland County, South Carolina.  I held this position until March 2021, when I resigned because I was moving in April 2021 from South Carolina to Ohio.   I have also been asked to serve, and agreed to serve, as the technical lead on a third-party source code review of the ES&S voting system software, including the ExpressVote Ballot Marking Device components, as used in North Carolina.  In that state, the law requires an escrow of code and a review of that code which do not seem to have taken place, and one of the recognized political parties has, as permitted by North Carolina law, sought such a third-party review.

**Basis for My Opinions**

11.  I base the opinions in this declaration on my knowledge, skill, training, education, research, and experience: I have been programming computers for more than 50 years and was employed as a computer scientist for more than 40 years, working with computers and computer applications and operations and management of large computer networks, including file and mail servers that utilize the Internet.

12.  I have conducted research on polling place operations in South Carolina, which has included assessing wait times and voting times at the DREs and BMDs, and I have been a poll observer and thus watched voter behavior as they voted on DREs and BMDs and the behavior of poll workers.

13.  I also base my opinions primarily on an extensive analysis of the JSON (Javascript Object Notation) cast vote record files produced in Georgia in November

Exhibit C-1

Page 6 of 68

2020 and January 2021 and provided to me by the plaintiffs in this case, which I understand they obtained from State Defendants.  Although it is somewhat tedious due to the quantity of data, I have focused primarily on Fulton County.  All my work in this assignment has been based on examination of electronic files, not of the physical paper.

### The Data As Provided Is Inadequate and Cannot Be Viewed As Authoritative

14.  Although I have done an extensive analysis of the data from November 2020, and I can (and will below) draw conclusions from my analysis, I cannot with confidence say that the data provided should be treated as authoritative and I cannot say that the entire story of those Fulton County elections is presented in that data.  Since there is a single voting system used statewide in Georgia, and since management and configuration of the election is the responsibility of the Secretary of State, it is very disconcerting that the data comes piecemeal, with different structures and file names, and that valuable data provided by some counties is missing from others.  This is, for example, in very sharp contrast with the ballot level electronic data, including cast vote records, I used from South Carolina, that was provided by the state as public record.  The South Carolina data was consistent, nearly complete and consistently presented, with only a few anomalies (in each biennial, if memory serves, there might be a different county whose data was corrupted and unusable and a handful of devices that had failed).  This allowed for a reliable analysis and a comparison across counties, voting methods, and such.  In contrast, the significantly incomplete Georgia data as presented to me can only be described as a "mess".

Exhibit C-1

15.  Not only is the Fulton County data significantly incomplete, but the electronic data files of the Election Project Packages obtained by order of this Court on December 3, 2021, were not provided in their original unmodified form in a zipped file as officials were required to produce at the close of the election.   I obtained the electronic files from Coalition Plaintiffs, who represented to me that they forwarded the files to me in the same condition as they were received from Fulton County and State Defendants. I have reviewed correspondence from Coalition Plaintiffs' attorneys to attorneys for the State Defendants and Fulton Defendants detailing the missing records and unzipped modified condition of the records, which informs my concern about the ability to reasonably rely on the electronic records provided to me.

16.  Coalition Plaintiff's attorneys' correspondence  indicates the estimated number of electronic records missing. In Fulton County ballot images and their attached "AuditMark" tabulation interpretations are missing for approximately 360,000 BMD ballots and 6.4 million BMD votes they contain for in-person voting for the official certified count of all down ballot races. Approximately 17,800 images and the same number of .sha files are missing from the presidential recount. Approximately 11,000 .dvd files are missing from the presidential recount for Fulton's November 2020 election. Such electronic files are essential when testing the election records for consistency and accuracy.  Significant numbers of missing files inhibits a complete authoritative analysis of causes or effects of potential impacts of malware, software bugs, equipment malfunction, human error or malfeasance by insiders.

Exhibit C-1
Page 8 of 68

17.  The inability of the state and counties to provide complete, authoritative, and consistent data from the Dominion BMD system, coupled with the highly vulnerable nature of the BMD touchscreen machines, does, in my opinion, call into serious question whether voters in Georgia can feel confident that their votes have been cast as intended and counted as cast.  I try to make it a practice not to attribute to malice that which is equally explained by incompetence or inattention, and I would not suggest (since I have no reason to suggest) that the data has been deliberately provided to the Coalition Plaintiffs only in part and in an inconsistent way.  But the next mostly likely reason for the data being such a mess would be that it is unreasonable to believe that the Dominion BMD voting system can be used reliably.  The kinds of mistakes in the data could come from mistakes by election workers, and the usual excuse for such mistakes is to attribute them to "human error".

18.  But we also know, from Dr. Alex Halderman's report on the use of Dominion equipment in Antrim County, Michigan [1] that election workers can make mistakes because the human error occurred in the design and implementation of the system by the vendor.  All the types of mistakes made in Antrim County with Dominion equipment have been made in South Carolina using its iVotronic system, and it is possible to make those mistakes only because the voting system software has not been sufficiently bulletproofed to ensure the mistakes are impossible to make.  Indeed, I used these

---

[1] Analysis of the Antrim County, Michigan November 2020 Election Incident

https://www.michigan.gov/documents/sos/Antrim_720623_7.pdf

Exhibit C-1
Page 9 of 68

mistakes in my third-semester undergraduate class as examples of things students would

lose points for were they to submit work that permitted those kinds of mistakes.  One

need not suggest malfeasance; if the system cannot be used as intended by the intended

users, then it is the system that is at fault, not the users.

### Data Analysis Raises Serious Questions

19.  Although the data provided to me seems unlikely to be entirely reliable, I have

nonetheless done some analysis on it.  I have been provided with three sets of JSON cast-

vote-records (CVRs) for the November 3, 2020 Fulton County election, and a set of

numerous counties' election project packages forward to Coalition Plaintiffs by State

Defendants for the November 2020 and January 2021 elections.  Two of the three CVR

files are of the original count, which is the final certified count for all races other than for

President of the United States; the third is the CVR from the Presidential recount.  I have

also visually reviewed targeted samples of ballot images, generally those representing

problematic ballots such as those which appear to have been counted multiple times in

the official counts.

20.  The significance of the missing and unverified files cannot be overstated in

the limitations they place on expert analysis. For example, while I worked extensively

with Fulton's cast vote records, roughly 34% of the ballot images and often the .dvd and

.sha related files were simply missing, preventing me from consulting those files for

confirmation of the fidelity of the data with the image and its related files.  It is my

understanding that while Coalition Plaintiffs desire that I analyze Cobb County's cast

Exhibit C-1

Page 10 of 68

vote records and other electronic records, a full 50% of the required records have not been preserved by Cobb County.

21.  There is no question about the relevance of ballot images and related .sha and .dvd files and complete Election Project Packages to any examination of the November 2020 electronic election records. The Dominion records in a digital-only record the interpretation of each ballot and appends that record to the image. The digital ballot image and the AuditMark interpretation are the records reviewed by the bi-partisan review boards in deteremining how to adjudicate voters' marks on ballots when human review is required. From a voting system security perspective, destruction of these records is unjustifiable, given Georgia's election record preservation legal requirements, the federal statute requiring 22 months retention,  and what I presume to be the preservation obligations related to this lawsuit. The US Department of Justice released a bulletin in July 2021 reinforcing the importance of electronic election records retention.[2]

22.  Access to the paper ballots and scanning records and extensive testing of them is needed to provide assurance of accurate tabulations, but such access and was not permitted at this stage of the litigation.

23.  I have written programs to read the data files and output a large file with one line for each ballot; the format is similar to a CSV from an Excel spreadsheet, but easier for subsequent programs of mine to read and compare.  For each ballot, I have recorded the precinct portion, the ballot style, the "counting group" of how the ballot was cast

---

[2] page 2  https://www.justice.gov/opa/press-release/file/1417796/download

Exhibit C-1

Page 11 of 68

(Election Day, absentee by mail, early, or provisional), the tabulator number, batch

number, sequence number within each batch, and then the list of candidate numbers.  I

have deliberately ignored the generic write-in numbers and the numbers for registered

write-in candidates.  I have, however, recorded the CvrExport_xxx.json filename in

which that ballot is found.

24.  The JSON filename, tabulator, batch, and sequence numbers will (unless there

is an extraordinary coincidence) be different for a ballot recorded in the original CVR

when compared to a ballot in the recount CVR.  However, one can view the rest of each

line for a ballot as a "signature": in that precinct portion, with that ballot style, cast in that

fashion, what the actual choices are recorded on the ballot image.  I use the term

"signature" of the ballot image to mean a index created in our analysis of the ballot

images where we combine key attributes of the ballot (like precinct and style) with letter

codes indicating the ballot choice in each contest. The combined codes create a pattern

that gives us considerable information in one alpha-numeric string about each ballot.  If

there were say  35 ballots in a given precinct with exactly the same candidate choices

made we can verify that there should be 35 votes for each of the candidates chosen,

coming from that particular pattern of choices made, and for the purpose of counting

votes for candidates, and of matching ballots in the original with ballots in the recount.

This would be 35 instances of the "signature" for each such ballot.  It is only necessary to

match the count for each pattern (signature); if there are 35 instances of that pattern in

that precinct, style, and counting group, in the original, but only 34 in the recount, then

one of those ballot records  is missing from the JSON files I am analyzing, and each

11

Exhibit C-1

candidate chosen in the original ballots has had their vote total diminished by one. The <span style="color:red">Page. 12 of 68</span>
individual ballot content indices, the "signatures," are a fundamental analytical tool in
detecting duplicate and  ballots that cannot be matched from the original to the recount
data.

25.  Given the nature of the BMDs, however, the actual choices of the voters
cannot be known when they vote on  the touchscreen BMDs, as has been thoroughly
explained in the declarations of Professor J. Alex Halderman, Professor Andrew Appel,
Professor Philip Stark, Professor Richard DeMillo, and Harri Hursti. Therefore my
electronic data analysis can only begin with the marks as recorded on the electronic
record, ignoring the important truth that such marks may not represent the actual choices
of the BMD voters.

26.  The two "original" CVRs provided to me appear to be identical, at least as far
as the CVR itself is concerned.

27.  When comparing the electronic cast vote records of the initial count to the cast
vote records of the Presidential recount (which also recorded, but did not officially count,
the down ballot races), a suprising and significant number of discrepant cast vote records
were detected. The two primary types of such discrepant records were 1) the double- and
triple counting of some ballots, and 2) the interpretations of some ballots that appeared
only once between the original count and the recount. The two counts should have
obviously produced a one to one relationship of exactly the same ballots interpreted
exactly the same way, but the analysis does not show such an expected relationship.

Exhibit C-1

28.  By creating "signatures" for each ballot image available, Coalition Plaintiffs

analysts identified examples of ballot images that appeared to be duplicate and triplicate

images of exactly the same ballot and presented them to me for review. While it is

infeasible to visually review all ballot images, I reviewed a significant number of images

which appear to me to be of duplicates or triplicates of the same ballot. I can confirm

from the cast vote records that these identical ballot images were actually counted in the

tabulation multiple times.

29.  This is not a normal expected typical election administration error. It is

completely unacceptable for a system to operate in a manner where widespread double-

and triple-counting of ballots can occur undetected. Certainly this represents a failure of

both the post election audit and the certification and canvassing process, although we do

not know the root cause of the multiple counts of the same ballots.

30.  Coalition Plaintiffs analysts currently estimate the vote count effect of the

double counted ballots to be approximately 400 additional ballots in the original count

and about 3,000 in the presidential recount. These estimates seem reasonable in my view

based on the analysis I have conducted, however it is infeasible to attempt to personally

confirm every ballot image suspected of being counted multiple times. Additionally,

some 700 estimated duplicates of BMD ballot images that are part of the the nearly

18,000 missing Fulton recount images cannot be visibly visually confirmed but

reasonable conclusions can be drawn by noting identical characteristics in sequences of

BMD cast vote records that indicate that such sequences of ballots were double and triple

counted.

Exhibit C-1

31.  I have, however, tried to match up the ballot signatures from the original data and from the recount data, and I come up with thousands of "mismatched" ballots county-wide.  In Fulton County, for example, there are 528,776 ballots in the original JSON data and 527,925 in the recount data, a difference of 851 fewer in the recount.  Of these, more than 500,000 signatures in the JSON data in the original match up with signatures in the recount, but there are thousands of ballots in the original that do not match a ballot in the recount, and vice versa.

32.  It cannot be determined from a review of the electronic records available whether the "mismatches" represent physically different ballots scanned in the two official counts, or whether the scanner/tabulators interpreted the votes marked on the *same* set of ballots differently for the first count than from the second count. As has been clearly demonstrated by years of scientific research on electronic voting system processes, malware, programming errors, or configuration errors can cause voter marks to be changed in electronic election records. The "mismatches" may well represent the *same* physical ballots interpreted differently by the system in the two counts and therefore have different signatures. That differing interpretation could be caused by a wide variety of conditions or malicious attack, but the reason for the difference cannot be determined from the electronic records made available to me.

33.  The possibility of such malware or programming or configuration errors cannot be ruled out until the paper ballots and related electronic records are reviewed.  In my opinion, it is imperative for Plaintiffs and State officials promptly to determine factual reasons for these mismatches and mitigate the unacceptable flaw in the voting

Exhibit C-1

system and processes. Whether the cause of the mismatches is physically different ballots being scanned in the two counts or conflicting electronic interpretation of voters, neither is an acceptable condition for a public election.

34. A small caveat must be made. I am matching electronic ballot records by signature. If there were to be three ballots with the same signature in the original data but only two in the recount data, without a review of the images or the paper record, I would not be able to determine which of the three original ballots was not included in the recount, but I can conclude that one of the three was not counted, and thus that the candidates chosen by that voter did not get an accurate count of votes cast.

**Review of Donna Curling's RW01 Precinct Tabulation**

35. The variety and location of errors and discrepancies in the Fulton County files is significant and difficult to analyze using incomplete records and without access to the paper documents, so focus on a sample precinct is useful for analysis. Therefore, I have particularly focused on detected discrepancies in Plaintiff Donna Curling's home precinct of RW01 (Fulton County). Instances of double-counting of BMD ballots and both double- and triple-counting of hand-marked paper ballots occurred in RW01. Seven of triple-counted and three of double-counted ballots have been detected in Ms. Curling's precinct. Analysts have found it possible to identify the images that were counted multiple times which represent hand marked paper ballots, because each ballot has slightly unique markings in each oval and images counted multiple times generally can be confirmed as representing the same ballot.

36.  An example of a triple counted hand marked paper ballot is attached at Exhibit A.

37.  An example of a double counted BMD ballot is attached at Exhibit B.

38.  It is likely that the number of BMD ballots counted multiple times is greater than the number so far detected because machine markings of ballots generally make them indistinguishable, except for write-ins or unintentional artifacts from the scanning process.

39.  The Secretary of State's certified results show a total of about 4250 ballots in Ms. Curlings' RW01 precinct in the original and the recounted data.  Specifically in RW01, I find that 118 ballot records in the original data do not match with a ballot record in the recount data, and 114 ballots in the recount data do not match with a ballot in the original data.  There appears to be no localized isolating explanation; the mismatches occur across precincts, tabulators, batches, and counting groups.  Vote counting errors of this magnitude (more than 2-1/2%) are unacceptable for any voting system or election tabulation process. I have not examined or heard of an election in the United States with errors of this type or this magnitude. It should be noted that it is impossible to determine the exact impact of these discrepancies on the November election results, but all of my analysis and the analysis that I have seen of Coalition Plaintiffs' analysts indicate that there is a pattern of offsetting errors in the presidential election, but no major net change has been noted to date.

40.  The root cause of the differing interpretations of what should be the same paper ballots cannot be determined without access to hardware and software that may

Exhibit C-1

Page 17 of 68

have interpreted the same ballots in different ways, and access to the original paper

ballots to determine the accurate interpretation of the voters' marks.

41.  Alternatively, an inspection of the paper ballots could conclude that groups of

different paper ballots were used in the original count versus the recount. With the

incomplete and unreliable electronic records available no reasonable conclusions can be

drawn as to what types of vulnerabilities may have been exploited intentionally or

unintentionally.

42.  The significant changes in certain subsets of the three counts are generally

consistent with types of tabulation anonmalies explained above. For example, the official

Election Day ballot vote count (as reported on the Secretary of State's webpage)  for

Donald Trump varied from 202 for the first machine count to the audited tally of 243 to

the final official count of 167. President Biden Election Day ballot vote tallies varied

from 92 initially to an audited tally of 88 and a final machine recounted total of 76.   The

fact that such differences between the hand counted audited ballot tallies and the official

machine count tallies differs by this much signals that tabulation and auditing processes

are flawed and strongly argue for intense objective expert examination and considerable

mitigation efforts. It should be the case that counts are consistent and exact.  (I remember

calling into question the count in Richland County that was off by one ballot, and being

told that that particular ballot was a Provisional ballot that was rejected.  Any differences

in counts should be entirely explainable and effort should be made to explain them)

43.  The fact that such audit discrepancies at a precinct level did not cause pre-

certification investigations of the count variances is unacceptable; it essentially defeats

Exhibit C-1

the purpose of an audit if signficant discrepancies are ignored and chalked up to "human Page 19 of 68
error" as they seem to have been at least in the case of the Fulton County audit.

44.  I have no doubt that a deeper analysis of mismatched ballots across precinct
lines would have similar results to the results of the RW01 precinct.  The vast majority of
Fulton County precincts appear to have mismatched ballots.

45.  The nature of the anomalies in Fulton County must be seen to be deeply
disturbing.  If anomalies were concentrated in a few precincts, or related to specific
tabulators, or such, then one might assume a specific malfunction.  I saw this in the South
Carolina data, where all the data from one particular malfunctioning device would be
missing.

46.  In Fulton precinct 826-03I, for example, there are 528 ballots that match in the
original and the recount data, but 142 ballots in the original that do not occur in the
recount.  A closer examination shows that 127 of the 142 are from tabulator 456 and
batch 0.  This would appear to be a localized error.  The fact that the overwhelming
majority of the Fulton precincts have mismatched ballots would appear much more likely
to be a systemic error in the voting system. Expert examination of the paper ballot
records and the tabulation server and related software is essential for an understanding of
the source of the tabulation discrepancies.

47.  Given the level of tabulation discrepancies in Fulton's November 2020
election, the hand count audit must be considered a failure, and a failure that should have
immediately triggered a serious analysis and mitigation of voting system deficiencies to
ensure that future elections permit voters to cast an accountable vote.

**Other System Deficiencies Detected**

48.  The anomalies are not confined to Fulton County.  In Bartow County, although the number of ballots in the CVR is only three smaller in the recount, there are 250 mismatches in the original data and 247 mismatches in the recount, out of a total of just over 50 thousand ballots.  Detailed examination of these mismatches shows that the differences often but not always lie in one contest for ballots scanned with tabulator 530. Curiously, in precinct 207-WOOD, tabulator 530, batch 88, sequence numbers 76 through 82 all are mismatches in the recount, with the only vote choices being for the Democrat for president in the first two and for the Republican for president in the next five.

49.  A modern voting system should only permit ballots printed for the correct specific election and jurisdiction to be scanned and tabulated. However, the Dominion system was configured in Fulton County in a manner that permitted out of county ballots or ballots cast in a different election to be scanned and tabulated. For example several DeKalb County November 2020 ballots were accepted and counted in Fulton. Although the votes were marked for *DeKalb* candidates after the statewide candidate section of the ballot, the votes were tabulated for *Fulton* candidates whose names were on the ballot in the same position of the DeKalb candidate chosen.

50.  The error can be seen on Exhibit C which is a group of original count and recount DeKalb County ballot images, cast and counted for Fulton candidates. The voters

Exhibit C-1

marks can be seen on pages one and two of the ballots voting for DeKalb candidates and

ballot questions. Reviewing page 3 shows the interpretation of the votes, where Fulton

County candidates were given the vote cast for another candidate.

51.  The fact that this error can occur is evidence of poor design and non-

compliant use. The errors that resulted in the wrong ballots being cast and counted are a

classic example of a combination of system design problems coupled with election

worker error and inadequate audit procedures.

52.  Another issue demonstrating a lack of proper electronic security controls is

the off-hours adjudication of ballots, which literally changes votes in the system based on

decisions during human inspection of the images. Exhibit D is an example of a ballot

scanned at 2:35AM on November 5, and adjudicated at 5:10AM that day. Note that the

third page of the DeKalb ballot in Exhibit C shows a ballot adjudication time of 2:15AM.

53.  It is my understanding that Fulton Defendants represented to Coalition

Plaintiffs that ballots were not adjudicated without the involvement of bi-partisan Vote

Review Panels, and that such review panels did not meet prior to 7am. The vote

adjudication times of 2:15 AM and 5:10AM and therefore suggests that unauthorized

electronic vote adjudication was taking place, and at a time of day when there would have

been little citizen or management oversight. These facts point out the security risk of

using electronic adjudication of ballots, allowing changes in the vote count by people

with access to the system. An alternative explanation is that the timer inside the

computers recording adjudication was incorrect.  This would be a different but also

serious indication of inadequate care taken in processing ballots from the election.

Exhibit C-1

Page 21 of 68

54.  If the timer is correct, and the times shown are correct (meaning that the

software correctly read the timer value and converted it to human-readable date and time)

the timer's records off-hours recording would be evidence of apparent unauthorized

access to the system by people possessing credentials to sign into the server and make

vote changes in off hours. This reinforces the need to conduct a thorough examination of

the system logs, server, paper ballot records and the related complete electronic records

to determine the cause of the discrepancies and to install mitigating system controls for

future elections.

### Summary and Conclusions

55.  The errors and discrepancies noted to date in the partial electronic records

provided cannot be viewed in isolation and without consideration of Dr. Halderman's

July 1 report on the extreme and wide-ranging security vulnerabilities of the BMD

system. The report explains the many (and mostly obvious) attack surfaces that invite

undetectable electronic manipulation of an election, including an attacker's ability to

deliver malware that infects components and software throughout the system, not limited

to BMD ballots.

56.  In my opinion, the concerning discrepancies of the type detected in the

November 3, 2020 election may have been caused by system malfunctions, malware, by

election workers at the state or county level, a systemic desire of election workers to "just

get the job done" instead of to "get the job done right", or perhaps even malfeasance.

However, it is my understanding that Fulton County Defendents have stated in their

Exhibit C-1
Page 22 of 68

discovery responses that ballots were not double scanned and then double-counted. The double *counting* certainly took place. Physical double-scanning is a serious enough problem.  But if Fulton Defendants are correct in their statement that double *scanning* did not take place, we must assume that the devices used (scanners and tabulators) produced the duplicated ballots either due to bad software from the vendor or intentional duplication by software inserted after the vendor's installation of the software. Urgent and expert analysis should be underway by Georgia officials to investigate the root cause of the tabulation problems and install immediate mitigations where possible.

57.  However, so long as the Dominion BMD touchscreen units are in use, Dr. Halderman's findings would indicate that vote discrepancies similar to those described above, if caused by malware, could not be reasonably prevented.  The solution to Georgia's election verification shortfall undeniably lies in 1) the implementation of hand marked paper ballots as the standard voting method to obtain a trustworthy source document, 2) chain of custody controls, 3) comprehensive ballot accounting and canvassing procedures, and 4) robust post-election audits of the type recommended by Dr. Stark. These basic elements are essential to ensure that Georgia voters an cast an accountable vote.

58.  It is my understanding that neither State Defendants nor Fulton Defendants have sought access to Dr. Halderman's report on the dangerous vulnerabilities of the Dominion BMD system, nor have they undertaken any efforts to address the security risks associated with the use of the equipment, despite the concerning tabulation errors in November 2020 election, and unresolved discrepancies in the post-election audit.

Exhibit C-1

59.  Meaningful assessments by voting system experts of the cause and
recommended mitigation of the discrepancies detected in the November 2020 election
will require access to paper ballots, scanning documents, tabulation equipment and
related software and in-depth analysis of all.

I declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the
foregoing is true and correct.

Executed on this date, January 11, 2022.

DUNCAN ALAN BUELL

Exhibit C-1

Page 24 of 68

# Exhibit A



Exhibit C5
Page 25 of 68

## FULTON COUNTY
779-RW01

## OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT

### OFFICIAL GENERAL AND SPECIAL ELECTION BALLOT
### OF THE STATE OF GEORGIA
### NOVEMBER 3, 2020

**INSTRUCTIONS:**

| To Vote | Warning |
|---|---|
| 1. Use black or blue ink to mark the ballot | Do **NOT** use red ink or felt tip pen to mark ballot |
| 2. Completely fill in the empty oval to the left of the candidate name or choice in all races you wish to vote | Do **NOT** circle, underline or mark through choices |
| 3. If voting for a Write-In candidate, completely fill in the empty oval to the left of the Write-In selection, then write the name of the write-in candidate in the space provided | Do **NOT** use check marks or X to mark ballot<br>Do **NOT** mark more choices per race than allowed<br>Do **NOT** sign, cut, tear or damage the ballot |

**If you make a mistake or change your mind on a selection:**

A. Do not attempt to mark through the selection or attempt to erase. Write "Spoiled" across the ballot and across the return envelope
B. Mail or return the spoiled ballot and envelope to your county board of registrars; a new official absentee ballot will be mailed to you

**If you decide to vote in-person:** Surrender the ballot to the poll manager of an early voting site within your county of the precinct to which you are assigned. You will then be permitted to vote a regular ballot

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

### For President of the United States
(Vote for One)

○ **Donald J. Trump** - President
**Michael R. Pence** - Vice President
**(Incumbent)** Republican

● **Joseph R. Biden** - President
**Kamala D. Harris** - Vice President
Democrat

○ **Jo Jorgensen** - President
**Jeremy "Spike" Cohen** - Vice President
Libertarian

○ _____
Write-In

### For United States Senate
(Vote for One)

○ **David A. Perdue**
**(Incumbent)** Republican

● **Jon Ossoff**
Democrat

○ **Shane Hazel**
Libertarian

○ _____
Write-In

### SPECIAL ELECTION

### For United States Senate
(To Fill the Unexpired Term of Johnny Isakson, Resigned)
(Vote for One)

○ **Al Bartell**
Independent

○ **Allen Buckley**
Independent

○ **Doug Collins**
Republican

○ **John Fortuin**
Green

○ **Derrick E. Grayson**
Republican

○ **Michael Todd Greene**
Independent

○ **Annette Davis Jackson**
Republican

○ **Deborah Jackson**
Democrat

○ **Jamesia James**
Democrat

○ **A. Wayne Johnson**
Republican

○ **Tamara Johnson-Shealey**
Democrat

○ **Matt Lieberman**
Democrat

○ **Kelly Loeffler**
**(Incumbent)** Republican

○ **Joy Felicia Slade**
Democrat

○ **Brian Slowinski**
Libertarian

○ **Valencia Stovall**
Independent

○ **Ed Tarver**
Democrat

○ **Kandiss Taylor**
Republican

● **Raphael Warnock**
Democrat

○ **Richard Dien Winfield**
Democrat

○ _____
Write-In

### For Public Service Commissioner
(To Succeed Jason Shaw)
(Vote for One)

○ **Jason Shaw**
**(Incumbent)** Republican

● **Robert G. Bryant**
Democrat

○ **Elizabeth Melton**
Libertarian

○ _____
Write-In

### For Public Service Commissioner
(To Succeed Lauren Bubba McDonald, Jr.)
(Vote for One)

○ **Lauren Bubba McDonald, Jr.**
**(Incumbent)** Republican

● **Daniel Blackman**
Democrat

○ **Nathan Wilson**
Libertarian

○ _____
Write-In

### For U.S. Representative in 117th Congress From the 6th Congressional District of Georgia
(Vote for One)

○ **Karen Handel**
Republican

● **Lucy McBath**
**(Incumbent)** Democrat

○ _____
Write-In

### For State Senator From 56th District
(Vote for One)

○ **John Albers**
**(Incumbent)** Republican

● **Sarah Beeson**
Democrat

○ _____
Write-In

**Turn Ballot Over To Continue Voting**

Exhibit C2
Page 26 of 68

**For State Representative
In the General Assembly From
48th District**
(Vote for One)

○ **Betty Price**
Republican

● **Mary Robichaux**
(Incumbent) Democrat

○

Write-In

---

**For District Attorney of the
Atlanta Judicial Circuit**
(Vote for One)

● **Fani Willis**
Democrat

○

Write-In

---

**For Clerk of Superior Court**
(Vote for One)

● **Cathelene "Tina" Robinson**
(Incumbent) Democrat

○

Write-In

---

**For Sheriff**
(Vote for One)

● **Patrick "Pat" Labat**
Democrat

○

Write-In

---

**For Tax Commissioner**
(Vote for One)

● **Arthur E. Ferdinand**
(Incumbent) Democrat

○

Write-In

---

**For Surveyor**
(Vote for One)

○

Write-In

---

**For Solicitor-General of
State Court of Fulton County**
(Vote for One)

● **Keith E. Gammage**
(Incumbent) Democrat

○

Write-In

---

**For Fulton County Commissioner
From District No. 2**
(Vote for One)

○ **Bob Ellis**
(Incumbent) Republican

● **Justin Holsomback**
Democrat

○

Write-In

---

**For Fulton County Soil and Water
Conservation District Supervisor**
(Vote for One)

● **Alan Toney**
(Incumbent)

○

Write-In

---

## PROPOSED CONSTITUTIONAL AMENDMENTS

**- 1 -**

**Authorizes dedication of fees and taxes to their intended purposes by general state law.**

House Resolution 164
Act No. 597

"Shall the Constitution of Georgia be amended so as to authorize the General Assembly to dedicate revenues derived from fees or taxes to the public purpose for which such fees or taxes were intended?"

● YES

○ NO

**- 2 -**

**Waives state and local sovereign immunity for violation of state laws, state and federal constitutions.**

House Resolution 1023
Act No. 596

"Shall the Constitution of Georgia be amended to waive sovereign immunity and allow the people of Georgia to petition the superior court for relief from governmental acts done outside the scope of lawful authority or which violate the laws of this state, the Constitution of Georgia, or the Constitution of the United States?"

● YES

○ NO

## STATEWIDE REFERENDUM

**- A -**

**Establishes a tax exemption for certain real property owned by charities.**

House Bill 344
Act No. 149

"Shall the Act be approved which provides an exemption from ad valorem taxes for all real property owned by a purely public charity, if such charity is exempt from taxation under Section 501(c)(3) of the federal Internal Revenue Code and such real property is held exclusively for the purpose of building or repairing single-family homes to be financed by such charity to individuals using loans that shall not bear interest?"

○ YES

● NO

**Turn Ballot Over To Continue Voting**

Scanned on: ICC  Tabulator: 794  Batch: 18
Poll ID:  317  Ballot ID: 676

Exhibit C-1

Page 27 of 68

President of the United States
  Joseph R. Biden (Dem)
US Senate (Perdue)
  Jon Ossoff (Dem)
US Senate (Loeffler) - Special
  Raphael Warnock (Dem)
Public Service Commission District 1
  Robert G. Bryant (Dem)
Public Service Commission District 4
  Daniel Blackman (Dem)
US House District 6
  Lucy McBath (I) (Dem)
State Senate District 56
  Sarah Beeson (Dem)
State House District 48
  Mary Robichaux (I) (Dem)
District Attorney - Atlanta
  Fani Willis (Dem)
Clerk of Superior Court
  Cathelene "Tina" Robinson (I) (Dem)
Sheriff
  Patrick "Pat" Labat (Dem)
Tax Commissioner
  Arthur E. Ferdinand (I) (Dem)
Surveyor
  BLANK CONTEST
Solicitor General
  Keith E. Gammage (I) (Dem)
County Commission District 2
  Justin Holsomback (Dem)
Soil and Water - Fulton County
  Alan Toney (I)
Constitutional Amendment #1
  YES
Constitutional Amendment #2
  YES
Statewide Referendum A
  NO

Exhibit C24
Page 28 of 68

## FULTON COUNTY
779-RW01

# OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT

### OFFICIAL GENERAL AND SPECIAL ELECTION BALLOT
### OF THE STATE OF GEORGIA
### NOVEMBER 3, 2020

**INSTRUCTIONS:**

| To Vote | Warning |
|---|---|
| 1. Use black or blue ink to mark the ballot<br>2. Completely fill in the empty oval to the left of the candidate name or choice in all races you wish to vote<br>3. If voting for a Write-In candidate, completely fill in the empty oval to the left of the Write-In selection, then write the name of the write-in candidate in the space provided | Do **NOT** use red ink or felt tip pen to mark ballot<br>Do **NOT** circle, underline or mark through choices<br>Do **NOT** use check marks or X to mark ballot<br>Do **NOT** mark more choices per race than allowed<br>Do **NOT** sign, cut, tear or damage the ballot |

**If you make a mistake or change your mind on a selection:**

A. Do not attempt to mark through the selection or attempt to erase. Write "Spoiled" across the ballot and across the return envelope
B. Mail or return the spoiled ballot and envelope to your county board of registrars; a new official absentee ballot will be mailed to you

**If you decide to vote in-person:** Surrender the ballot to the poll manager of an early voting site within your county or the precinct to which you are assigned. You will then be permitted to vote a regular ballot

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

---

### For President of the United States
(Vote for One)

○ **Donald J. Trump** - President
**Michael R. Pence** - Vice President
**(Incumbent)** Republican

● **Joseph R. Biden** - President
**Kamala D. Harris** - Vice President
Democrat

○ **Jo Jorgensen** - President
**Jeremy "Spike" Cohen** - Vice President
Libertarian

○ _____
Write-in

### For United States Senate
(Vote for One)

○ **David A. Perdue**
**(Incumbent)** Republican

● **Jon Ossoff**
Democrat

○ **Shane Hazel**
Libertarian

○ _____
Write-in

---

### SPECIAL ELECTION

### For United States Senate
(To Fill the Unexpired Term of Johnny Isakson, Resigned)
(Vote for One)

○ **Al Bartell**
Independent

○ **Allen Buckley**
Independent

○ **Doug Collins**
Republican

○ **John Fortuin**
Green

○ **Derrick E. Grayson**
Republican

○ **Michael Todd Greene**
Independent

○ **Annette Davis Jackson**
Republican

○ **Deborah Jackson**
Democrat

○ **Jamesia James**
Democrat

○ **A. Wayne Johnson**
Republican

○ **Tamara Johnson-Shealey**
Democrat

○ **Matt Lieberman**
Democrat

○ **Kelly Loeffler**
**(Incumbent)** Republican

○ **Joy Felicia Slade**
Democrat

○ **Brian Slowinski**
Libertarian

○ **Valencia Stovall**
Independent

○ **Ed Tarver**
Democrat

○ **Kandiss Taylor**
Republican

● **Raphael Warnock**
Democrat

○ **Richard Dien Winfield**
Democrat

○ _____
Write-in

---

### For Public Service Commissioner
(To Succeed Jason Shaw)
(Vote for One)

○ **Jason Shaw**
**(Incumbent)** Republican

● **Robert G. Bryant**
Democrat

○ **Elizabeth Melton**
Libertarian

○ _____
Write-in

### For Public Service Commissioner
(To Succeed Lauren Bubba McDonald, Jr.)
(Vote for One)

○ **Lauren Bubba McDonald, Jr.**
**(Incumbent)** Republican

● **Daniel Blackman**
Democrat

○ **Nathan Wilson**
Libertarian

○ _____
Write-in

### For U.S. Representative In 117th Congress From the 6th Congressional District of Georgia
(Vote for One)

○ **Karen Handel**
Republican

● **Lucy McBath**
**(Incumbent)** Democrat

○ _____
Write-in

### For State Senator From 56th District
(Vote for One)

○ **John Albers**
**(Incumbent)** Republican

● **Sarah Beeson**
Democrat

○ _____
Write-in

---

**Turn Ballot Over To Continue Voting**

**For State Representative In the General Assembly From 48th District**
(Vote for One)

○ Betty Price
Republican

● Mary Robichaux
(Incumbent) Democrat

○

Write-in

**For District Attorney of the Atlanta Judicial Circuit**
(Vote for One)

● Fani Willis
Democrat

○

Write-in

**For Clerk of Superior Court**
(Vote for One)

● Cathelene "Tina" Robinson
(Incumbent) Democrat

○

Write-in

**For Sheriff**
(Vote for One)

● Patrick "Pat" Labat
Democrat

○

Write-in

**For Tax Commissioner**
(Vote for One)

● Arthur E. Ferdinand
(Incumbent) Democrat

○

Write-in

**For Surveyor**
(Vote for One)

○

Write-in

**For Solicitor-General of State Court of Fulton County**
(Vote for One)

● Keith E. Gammage
(Incumbent) Democrat

○

Write-in

**For Fulton County Commissioner From District No. 2**
(Vote for One)

○ Bob Ellis
(Incumbent) Republican

● Justin Holsomback
Democrat

○

Write-in

**For Fulton County Soil and Water Conservation District Supervisor**
(Vote for One)

● Alan Toney
(Incumbent)

○

Write-in

## PROPOSED CONSTITUTIONAL AMENDMENTS

**- 1 -**

**Authorizes dedication of fees and taxes to their intended purposes by general state law.**

House Resolution 164
Act No. 597

"Shall the Constitution of Georgia be amended so as to authorize the General Assembly to dedicate revenues derived from fees or taxes to the public purpose for which such fees or taxes were intended?"

● YES

○ NO

**- 2 -**

**Waives state and local sovereign immunity for violation of state laws, state and federal constitutions.**

House Resolution 1023
Act No. 596

"Shall the Constitution of Georgia be amended to waive sovereign immunity and allow the people of Georgia to petition the superior court for relief from governmental acts done outside the scope of lawful authority or which violate the laws of this state, the Constitution of Georgia, or the Constitution of the United States?"

● YES

○ NO

## STATEWIDE REFERENDUM

**- A -**

**Establishes a tax exemption for certain real property owned by charities.**

House Bill 344
Act No. 149

"Shall the Act be approved which provides an exemption from ad valorem taxes for all real property owned by a purely public charity, if such charity is exempt from taxation under Section 501(c)(3) of the federal Internal Revenue Code and such real property is held exclusively for the purpose of building or repairing single-family homes to be financed by such charity to individuals using loans that shall not bear interest?"

○ YES

● NO

**Turn Ballot Over To Continue Voting**

Scanned on: ICC  Tabulator: 791  Batch: 19
Poll ID:   317  Ballot ID: 676

Exhibit C-1

Page 30 of 68

President of the United States
  Joseph R. Biden (Dem)
US Senate (Perdue)
  Jon Ossoff (Dem)
US Senate (Loeffler) - Special
  Raphael Warnock (Dem)
Public Service Commission District 1
  Robert G. Bryant (Dem)
Public Service Commission District 4
  Daniel Blackman (Dem)
US House District 6
  Lucy McBath (I) (Dem)
State Senate District 56
  Sarah Beeson (Dem)
State House District 48
  Mary Robichaux (I) (Dem)
District Attorney - Atlanta
  Fani Willis (Dem)
Clerk of Superior Court
  Cathelene "Tina" Robinson (I) (Dem)
Sheriff
  Patrick "Pat" Labat (Dem)
Tax Commissioner
  Arthur E. Ferdinand (I) (Dem)
Surveyor
  BLANK CONTEST
Solicitor General
  Keith E. Gammage (I) (Dem)
County Commission District 2
  Justin Holsomback (Dem)
Soil and Water - Fulton County
  Alan Toney (I)
Constitutional Amendment #1
  YES
Constitutional Amendment #2
  YES
Statewide Referendum A
  NO



# FULTON COUNTY
### 779-RW01

## OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT

### OFFICIAL GENERAL AND SPECIAL ELECTION BALLOT
### OF THE STATE OF GEORGIA
### NOVEMBER 3, 2020

**INSTRUCTIONS:**

| To Vote | Warning |
|---|---|
| 1. Use black or blue ink to mark the ballot | Do **NOT** use red ink or felt tip pen to mark ballot |
| 2. Completely fill in the empty oval to the left of the candidate name or choice in all races you wish to vote | Do **NOT** circle, underline or mark through choices |
| 3. If voting for a Write-In candidate, completely fill in the empty oval to the left of the Write-In selection, then write the name of the write-in candidate in the space provided | Do **NOT** use check marks or X to mark ballot |
| | Do **NOT** mark more choices per race than allowed |
| | Do **NOT** sign, cut, tear or damage the ballot |

**If you make a mistake or change your mind on a selection:**

A. Do not attempt to mark through the selection or attempt to erase. Write "Spoiled" across the ballot and across the return envelope
B. Mail or return the spoiled ballot and envelope to your county board of registrars; a new official absentee ballot will be mailed to you

**If you decide to vote in-person:** Surrender the ballot to the poll manager of an early voting site within your county or the precinct to which you are assigned. You will then be permitted to vote a regular ballot

*I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

### For President of the United States
(Vote for One)

○ **Donald J. Trump** - President
**Michael R. Pence** - Vice President
**(Incumbent)** Republican

● **Joseph R. Biden** - President
**Kamala D. Harris** - Vice President
Democrat

○ **Jo Jorgensen** - President
**Jeremy "Spike" Cohen** - Vice President
Libertarian

○ _____
Write-in

### For United States Senate
(Vote for One)

○ **David A. Perdue**
**(Incumbent)** Republican

● **Jon Ossoff**
Democrat

○ **Shane Hazel**
Libertarian

○ _____
Write-in

## SPECIAL ELECTION

### For United States Senate
(To Fill the Unexpired Term of Johnny Isakson, Resigned)
(Vote for One)

○ **Al Bartali**
Independent

○ **Allen Buckley**
Independent

○ **Doug Collins**
Republican

○ **John Fortuin**
Green

○ **Derrick E. Grayson**
Republican

○ **Michael Todd Greene**
Independent

○ **Annette Davis Jackson**
Republican

○ **Deborah Jackson**
Democrat

○ **Jamesia James**
Democrat

○ **A. Wayne Johnson**
Republican

○ **Tamara Johnson-Shealey**
Democrat

○ **Matt Lieberman**
Democrat

○ **Kelly Loeffler**
**(Incumbent)** Republican

○ **Joy Felicia Slade**
Democrat

○ **Brian Slowinski**
Libertarian

○ **Valencia Stovall**
Independent

○ **Ed Tarver**
Democrat

○ **Kandiss Taylor**
Republican

● **Raphael Warnock**
Democrat

○ **Richard Dien Winfield**
Democrat

○ _____
Write-in

### For Public Service Commissioner
(To Succeed Jason Shaw)
(Vote for One)

○ **Jason Shaw**
**(Incumbent)** Republican

● **Robert G. Bryant**
Democrat

○ **Elizabeth Melton**
Libertarian

○ _____
Write-in

### For Public Service Commissioner
(To Succeed Lauren Bubba McDonald, Jr.)
(Vote for One)

○ **Lauren Bubba McDonald, Jr.**
**(Incumbent)** Republican

● **Daniel Blackman**
Democrat

○ **Nathan Wilson**
Libertarian

○ _____
Write-in

### For U.S. Representative in 117th Congress From the 6th Congressional District of Georgia
(Vote for One)

○ **Karen Handel**
Republican

● **Lucy McBath**
**(Incumbent)** Democrat

○ _____
Write-in

### For State Senator From 56th District
(Vote for One)

○ **John Albers**
**(Incumbent)** Republican

● **Sarah Beeson**
Democrat

○ _____
Write-in

**Turn Ballot Over To Continue Voting**

**For State Representative In the General Assembly From 48th District**
(Vote for One)

○ Betty Price
  Republican

● Mary Robichaux
  (Incumbent) Democrat

○
  Write-In

**For District Attorney of the Atlanta Judicial Circuit**
(Vote for One)

● Fani Willis
  Democrat

○
  Write-In

**For Clerk of Superior Court**
(Vote for One)

● Cathelene "Tina" Robinson
  (Incumbent) Democrat

○
  Write-In

**For Sheriff**
(Vote for One)

● Patrick "Pat" Labat
  Democrat

○
  Write-In

**For Tax Commissioner**
(Vote for One)

● Arthur E. Ferdinand
  (Incumbent) Democrat

○
  Write-In

**For Surveyor**
(Vote for One)

○
  Write-In

**For Solicitor-General of State Court of Fulton County**
(Vote for One)

● Keith E. Gammage
  (Incumbent) Democrat

○
  Write-In

**For Fulton County Commissioner From District No. 2**
(Vote for One)

○ Bob Ellis
  (Incumbent) Republican

● Justin Holsomback
  Democrat

○
  Write-In

**For Fulton County Soil and Water Conservation District Supervisor**
(Vote for One)

● Alan Toney
  (Incumbent)

○
  Write-In

## PROPOSED CONSTITUTIONAL AMENDMENTS

### - 1 -

**Authorizes dedication of fees and taxes to their intended purposes by general state law.**

House Resolution 164
Act No. 597

"Shall the Constitution of Georgia be amended so as to authorize the General Assembly to dedicate revenues derived from fees or taxes to the public purpose for which such fees or taxes were intended?"

● YES

○ NO

### - 2 -

**Waives state and local sovereign immunity for violation of state laws, state and federal constitutions.**

House Resolution 1023
Act No. 596

"Shall the Constitution of Georgia be amended to waive sovereign immunity and allow the people of Georgia to petition the superior court for relief from governmental acts done outside the scope of lawful authority or which violate the laws of this state, the Constitution of Georgia, or the Constitution of the United States?"

● YES

○ NO

## STATEWIDE REFERENDUM

### - A -

**Establishes a tax exemption for certain real property owned by charities.**

House Bill 344
Act No. 149

"Shall the Act be approved which provides an exemption from ad valorem taxes for all real property owned by a purely public charity, if such charity is exempt from taxation under Section 501(c)(3) of the federal Internal Revenue Code and such real property is held exclusively for the purpose of building or repairing single-family homes to be financed by such charity to individuals using loans that shall not bear interest?"

○ YES

● NO

**Turn Ballot Over To Continue Voting**

Scanned on: ICC  Tabulator: 791  Batch: 26
Poll ID:  317  Ballot ID: 676

Exhibit C-1

Page 33 of 68

President of the United States
  Joseph R. Biden (Dem)
US Senate (Perdue)
  Jon Ossoff (Dem)
US Senate (Loeffler) - Special
  Raphael Warnock (Dem)
Public Service Commission District 1
  Robert G. Bryant (Dem)
Public Service Commission District 4
  Daniel Blackman (Dem)
US House District 6
  Lucy McBath (I) (Dem)
State Senate District 56
  Sarah Beeson (Dem)
State House District 48
  Mary Robichaux (I) (Dem)
District Attorney - Atlanta
  Fani Willis (Dem)
Clerk of Superior Court
  Cathelene "Tina" Robinson (I) (Dem)
Sheriff
  Patrick "Pat" Labat (Dem)
Tax Commissioner
  Arthur E. Ferdinand (I) (Dem)
Surveyor
  BLANK CONTEST
Solicitor General
  Keith E. Gammage (I) (Dem)
County Commission District 2
  Justin Holsomback (Dem)
Soil and Water - Fulton County
  Alan Toney (I)
Constitutional Amendment #1
  YES
Constitutional Amendment #2
  YES
Statewide Referendum A
  NO

Exhibit C-1

Page 34 of 68

# Exhibit B

## 00801_00043_000083.tif

**FULTON COUNTY**
**OFFICIAL BALLOT**
**GENERAL AND SPECIAL ELECTION**
**OF THE STATE OF GEORGIA**
**NOVEMBER 3, 2020**

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

 779-RW01



For President of the United States  (Vote for One) (NP)
    Vote for Donald J. Trump (I) (Rep)

For United States Senate (Perdue)  (Vote for One) (NP)
    Vote for David A. Perdue (I) (Rep)

For United States Senate (Loeffler) - Special  (Vote for One) (NP)
    Vote for Doug Collins (Rep)

For Public Service Commissioner (Vote for One) (NP)
    Vote for Jason Shaw (I) (Rep)

For Public Service Commissioner  (Vote for One) (NP)
    Vote for Lauren Bubba
      McDonald, Jr. (I) (Rep)

For U.S. Representative in 117th Congress From the 6th Congressional District of Georgia (Vote for One) (NP)
    Vote for Karen Handel (Rep)

For State Senator From 56th District (Vote for One) (NP)
    Vote for John Albers (I) (Rep)

For State Representative In the General Assembly From 48th District (Vote for One) (NP)
    Vote for Betty Price (Rep)

For District Attorney of the Atlanta Judicial Circuit  (Vote for One) (NP)
    Vote for Fani Willis (Dem)

For Clerk of Superior Court  (Vote for One) (NP)
    Vote for Cathelene "Tina"
      Robinson (I) (Dem)

For Sheriff  (Vote for One) (NP)
    Vote for Patrick "Pat" Labat (Dem)

For Tax Commissioner  (Vote for One) (NP)
    Vote for Arthur E. Ferdinand (I)
      (Dem)

For Surveyor  (Vote for One) (NP)
    BLANK CONTEST

For Solicitor-General of State Court of Fulton County  (Vote for One) (NP)
    Vote for Keith E. Gammage (I)
      (Dem)

For Fulton County Commissioner From District No. 2  (Vote for One) (NP)
    Vote for Bob Ellis (I) (Rep)

For Fulton County Soil and Water Conservation District Supervisor  (Vote fo One) (NP)
    Vote for Alan Toney (I)

Constitutional Amendment #1 (NP)
    Vote for YES

Constitutional Amendment #2 (NP)
    Vote for NO

Statewide Referendum A (NP)
    Vote for YES

1/1

---

Exhibit C-1
Page 35 of 68

## 00801_00044_000083.tif

**FULTON COUNTY**
**OFFICIAL BALLOT**
**GENERAL AND SPECIAL ELECTION**
**OF THE STATE OF GEORGIA**
**NOVEMBER 3, 2020**

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

  779-RW01



For President of the United States  (Vote for One) (NP)
    Vote for Donald J. Trump (I) (Rep)

For United States Senate (Perdue)  (Vote for One) (NP)
    Vote for David A. Perdue (I) (Rep)

For United States Senate (Loeffler) - Special  (Vote for One) (NP)
    Vote for Doug Collins (Rep)

For Public Service Commissioner (Vote for One) (NP)
    Vote for Jason Shaw (I) (Rep)

For Public Service Commissioner  (Vote for One) (NP)
    Vote for Lauren Bubba
      McDonald, Jr. (I) (Rep)

For U.S. Representative in 117th Congress From the 6th Congressional District of Georgia (Vote for One) (NP)
    Vote for Karen Handel (Rep)

For State Senator From 56th District (Vote for One) (NP)
    Vote for John Albers (I) (Rep)

For State Representative In the General Assembly From 48th District (Vote for One) (NP)
    Vote for Betty Price (Rep)

For District Attorney of the Atlanta Judicial Circuit  (Vote for One) (NP)
    Vote for Fani Willis (Dem)

For Clerk of Superior Court  (Vote for One) (NP)
    Vote for Cathelene "Tina"
      Robinson (I) (Dem)

For Sheriff  (Vote for One) (NP)
    Vote for Patrick "Pat" Labat (Dem)

For Tax Commissioner  (Vote for One) (NP)
    Vote for Arthur E. Ferdinand (I)
      (Dem)

For Surveyor  (Vote for One) (NP)
    BLANK CONTEST

For Solicitor-General of State Court of Fulton County  (Vote for One) (NP)
    Vote for Keith E. Gammage (I)
      (Dem)

For Fulton County Commissioner From District No. 2  (Vote for One) (NP)
    Vote for Bob Ellis (I) (Rep)

For Fulton County Soil and Water Conservation District Supervisor  (Vote fo One) (NP)
    Vote for Alan Toney (I)

Constitutional Amendment #1 (NP)
    Vote for YES

Constitutional Amendment #2 (NP)
    Vote for NO

Statewide Referendum A (NP)
    Vote for YES

1/1

00801_00043_000083.tif scanned at: 18:54:32 on 12/01/20.

Scanned on: ICC  Tabulator: 801   Batch: 43
Poll ID:  317  Ballot ID: 676

**00801_00043_000083.tif**

President of the United States
  Donald J. Trump (I) (Rep)
US Senate (Perdue)
  David A. Perdue (I) (Rep)
US Senate (Loeffler) - Special
  Doug Collins (Rep)
Public Service Commission District 1
  Jason Shaw (I) (Rep)
Public Service Commission District 4
  Lauren Bubba McDonald, Jr. (I) (Rep)
US House District 6
  Karen Handel (Rep)
State Senate District 56
  John Albers (I) (Rep)
State House District 48
  Betty Price (Rep)
District Attorney - Atlanta
  Fani Willis (Dem)
Clerk of Superior Court
  Cathelene "Tina" Robinson (I) (Dem)
Sheriff
  Patrick "Pat" Labat (Dem)
Tax Commissioner
  Arthur E. Ferdinand (I) (Dem)
Surveyor
  BLANK CONTEST
Solicitor General
  Keith E. Gammage (I) (Dem)
County Commission District 2
  Bob Ellis (I) (Rep)
Soil and Water - Fulton County
  Alan Toney (I)
Constitutional Amendment #1
  YES
Constitutional Amendment #2
  NO
Statewide Referendum A
  YES

00801_00044_000083.tif scanned at: 18:59:28 on 12/01/20.

Scanned on: ICC  Tabulator: 801   Batch: 44
Poll ID:  317  Ballot ID: 676

**00801_00044_000083.tif**

President of the United States
  Donald J. Trump (I) (Rep)
US Senate (Perdue)
  David A. Perdue (I) (Rep)
US Senate (Loeffler) - Special
  Doug Collins (Rep)
Public Service Commission District 1
  Jason Shaw (I) (Rep)
Public Service Commission District 4
  Lauren Bubba McDonald, Jr. (I) (Rep)
US House District 6
  Karen Handel (Rep)
State Senate District 56
  John Albers (I) (Rep)
State House District 48
  Betty Price (Rep)
District Attorney - Atlanta
  Fani Willis (Dem)
Clerk of Superior Court
  Cathelene "Tina" Robinson (I) (Dem)
Sheriff
  Patrick "Pat" Labat (Dem)
Tax Commissioner
  Arthur E. Ferdinand (I) (Dem)
Surveyor
  BLANK CONTEST
Solicitor General
  Keith E. Gammage (I) (Dem)
County Commission District 2
  Bob Ellis (I) (Rep)
Soil and Water - Fulton County
  Alan Toney (I)
Constitutional Amendment #1
  YES
Constitutional Amendment #2
  NO
Statewide Referendum A
  YES

Exhibit C-1

Page 37 of 68

# Exhibit C

Exhibit C2
Page 38 of 68

# DEKALB COUNTY
**738-BM**

# OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT

### OFFICIAL GENERAL AND SPECIAL ELECTION BALLOT
### OF THE STATE OF GEORGIA
### NOVEMBER 3, 2020

**INSTRUCTIONS:**

| To Vote | Warning |
|---|---|
| 1. Use black or blue ink to mark the ballot | Do **NOT** use red ink or felt tip pen to mark ballot |
| 2. Completely fill in the empty oval to the left of the candidate name or choice in all races you wish to vote | Do **NOT** circle, underline or mark through choices |
| 3. If voting for a Write-In candidate, completely fill in the empty oval to the left of the Write-In selection, then write the name of the write-in candidate in the space provided | Do **NOT** use check marks or X to mark ballot |
| | Do **NOT** mark more choices per race than allowed |
| | Do **NOT** sign, cut, tear or damage the ballot |

**If you make a mistake or change your mind on a selection:**

A. Do not attempt to mark through the selection or attempt to erase. Write "Spoiled" across the ballot and across the return envelope
B. Mail or return the spoiled ballot and envelope to your county board of registrars; a new official absentee ballot will be mailed to you

**If you decide to vote in-person:** Surrender the ballot to the poll manager of an early voting site within your county or the precinct to which you are assigned. You will then be permitted to vote a regular ballot

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

---

## For President of the United States
(Vote for One)

○ **Donald J. Trump** - President
**Michael R. Pence** - Vice President
**(Incumbent)** Republican

● **Joseph R. Biden** - President
**Kamala D. Harris** - Vice President
Democrat

○ **Jo Jorgensen** - President
**Jeremy "Spike" Cohen** - Vice President
Libertarian

○
_____
Write-in

## For United States Senate
(Vote for One)

○ **David A. Perdue**
**(Incumbent)** Republican

● **Jon Ossoff**
Democrat

○ **Shane Hazel**
Libertarian

○
_____
Write-in

---

## SPECIAL ELECTION

### For United States Senate
(To Fill the Unexpired Term of Johnny Isakson, Resigned)
(Vote for One)

○ **Al Bartell**
Independent

○ **Allen Buckley**
Independent

○ **Doug Collins**
Republican

○ **John Fortuin**
Green

○ **Derrick E. Grayson**
Republican

○ **Michael Todd Greene**
Independent

○ **Annette Davis Jackson**
Republican

○ **Deborah Jackson**
Democrat

○ **Jamesia James**
Democrat

○ **A. Wayne Johnson**
Republican

● **Tamara Johnson-Shealey**
Democrat

○ **Matt Lieberman**
Democrat

○ **Kelly Loeffler**
**(Incumbent)** Republican

○ **Joy Felicia Slade**
Democrat

○ **Brian Slowinski**
Libertarian

○ **Valencia Stovall**
Independent

○ **Ed Tarver**
Democrat

○ **Kandiss Taylor**
Republican

○ **Raphael Warnock**
Democrat

○ **Richard Dien Winfield**
Democrat

○
_____
Write-in

---

## For Public Service Commissioner
(To Succeed Jason Shaw)
(Vote for One)

○ **Jason Shaw**
**(Incumbent)** Republican

● **Robert G. Bryant**
Democrat

○ **Elizabeth Melton**
Libertarian

○
_____
Write-in

## For Public Service Commissioner
(To Succeed Lauren Bubba McDonald, Jr.)
(Vote for One)

○ **Lauren Bubba McDonald, Jr.**
**(Incumbent)** Republican

● **Daniel Blackman**
Democrat

○ **Nathan Wilson**
Libertarian

○
_____
Write-in

### For U.S. Representative in 117th Congress From the 4th Congressional District of Georgia
(Vote for One)

○ **Johsie Cruz Ezammudeen**
Republican

● **Henry C. "Hank" Johnson, Jr.**
**(Incumbent)** Democrat

○
_____
Write-in

### For State Senator From 10th District
(Vote for One)

● **Emanuel Jones**
**(Incumbent)** Democrat

○
_____
Write-in

### For State Representative in the General Assembly From 90th District
(Vote for One)

● **Pam Stephenson**
**(Incumbent)** Democrat

○
_____
Write-in

---

**Turn Ballot Over To Continue Voting**

**For District Attorney of the Stone Mountain Judicial Circuit**
(Vote for One)

● Sherry Boston
(Incumbent) Democrat

○
Write-in

**For Clerk of Superior Court of DeKalb County**
(Vote for One)

● Debra DeBerry
(Incumbent) Democrat

○
Write-in

**For Sheriff**
(Vote for One)

○ Harold Dennis
Republican

● Melody M. Maddox
(Incumbent) Democrat

○
Write-in

**For Tax Commissioner**
(Vote for One)

● Irvin J. Johnson
(Incumbent) Democrat

○
Write-in

**For Chief Magistrate**
(Vote for One)

● Berryl A. Anderson
(Incumbent) Democrat

○
Write-in

**For Solicitor General of DeKalb County**
(Vote for One)

● Donna Coleman-Stribling
(Incumbent) Democrat

○
Write-in

**For Chief Executive Officer**
(Vote for One)

● Michael "Mike" Thurmond
(Incumbent) Democrat

○
Write-in

**For County Commissioner District 5**
(Vote for One)

● Mereda Davis Johnson
(Incumbent) Democrat

○
Write-in

**For DeKalb County Soil and Water Conservation District Supervisor**
(Vote for One)

○ Dell F. McGregor

○
Write-in

## PROPOSED CONSTITUTIONAL AMENDMENTS

### - 1 -

**Authorizes dedication of fees and taxes to their intended purposes by general state law.**

House Resolution 164
Act No. 597

"Shall the Constitution of Georgia be amended so as to authorize the General Assembly to dedicate revenues derived from fees or taxes to the public purpose for which such fees or taxes were intended?"

○ YES
● NO

### - 2 -

**Waives state and local sovereign immunity for violation of state laws, state and federal constitutions.**

House Resolution 1023
Act No. 596

"Shall the Constitution of Georgia be amended to waive sovereign immunity and allow the people of Georgia to petition the superior court for relief from governmental acts done outside the scope of lawful authority or which violate the laws of this state, the Constitution of Georgia, or the Constitution of the United States?"

● YES
○ NO

## STATEWIDE REFERENDUM

### - A -

**Establishes a tax exemption for certain real property owned by charities.**

House Bill 344
Act No. 149

"Shall the Act be approved which provides an exemption from ad valorem taxes for all real property owned by a purely public charity, if such charity is exempt from taxation under Section 501(c)(3) of the federal Internal Revenue Code and such real property is held exclusively for the purpose of building or repairing single-family homes to be financed by such charity to individuals using loans that shall not bear interest?"

● YES
○ NO

## SPECIAL ELECTION DEKALB COUNTY

### Ethics Question
(Vote for One)

"Shall the Act be approved which revises the Board of Ethics for DeKalb County?"

○ YES
● NO

**Turn Ballot Over To Continue Voting**

00729_00116_000049.tif scanned at 20:28:58 on 11/06/20.

Scanned on: ICC   Tabulator: 729   Batch: 116
Poll ID:   261   Ballot ID:  284

Exhibit C-1

Page 40 of 68

President of the United States
    Joseph R. Biden (Dem)
US Senate (Perdue)
    Jon Ossoff (Dem)
US Senate (Loeffler) - Special
    Tamara Johnson-Shealey (Dem)
Public Service Commission District 1
    Robert G. Bryant (Dem)
Public Service Commission District 4
    Daniel Blackman (Dem)
US House District 5
    Nikema Williams (Dem)
State Senate District 36
    Nan Orrock (I) (Dem)
State House District 60
    Kim Schofield (I) (Dem)
District Attorney - Atlanta
    Fani Willis (Dem)
Clerk of Superior Court
    BLANK CONTEST
Sheriff
    BLANK CONTEST
Tax Commissioner
    BLANK CONTEST
Surveyor
    BLANK CONTEST
Solicitor General
    BLANK CONTEST
Soil and Water - Fulton County
    BLANK CONTEST
Constitutional Amendment #1
    BLANK CONTEST
Constitutional Amendment #2
    YES
Statewide Referendum A
    BLANK CONTEST
Atlanta Homestead Exemption - Special
    OVER-VOTE
    YES (NOT COUNTED)
    NO (NOT COUNTED)


Adjudicated at 2:15 AM on 11/7/2020 by emsadmin04

President of the United States
    Joseph R. Biden (Dem) (100%)
US Senate (Perdue)
    Jon Ossoff (Dem) (100%)
US Senate (Loeffler) - Special
    Tamara Johnson-Shealey (Dem) (100%)
Public Service Commission District 1
    Robert G. Bryant (Dem) (100%)
Public Service Commission District 4
    Daniel Blackman (Dem) (100%)
US House District 5
    Nikema Williams (Dem) (100%)
State Senate District 36
    Nan Orrock (I) (Dem) (94%)
State House District 60
    Kim Schofield (I) (Dem) (99%)
District Attorney - Atlanta
    Fani Willis (Dem) (100%)
Clerk of Superior Court
    BLANK CONTEST
Sheriff
    BLANK CONTEST
Tax Commissioner
    BLANK CONTEST
Surveyor
    BLANK CONTEST
Solicitor General
    BLANK CONTEST
Soil and Water - Fulton County
    BLANK CONTEST
Constitutional Amendment #1
    BLANK CONTEST
Constitutional Amendment #2
    YES (31%)
Statewide Referendum A
    BLANK CONTEST
Atlanta Homestead Exemption - Special
    *Adjudicated* Mark removed for YES
    NO (98%)

Exhibit C3
Page 41 of 68

# DEKALB COUNTY
611-EG

## OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT

### OFFICIAL GENERAL AND SPECIAL ELECTION BALLOT
### OF THE STATE OF GEORGIA
### NOVEMBER 3, 2020

**INSTRUCTIONS:**

| To Vote | Warning |
|---|---|
| 1. Use black or blue ink to mark the ballot | Do **NOT** use red ink or felt tip pen to mark ballot |
| 2. Completely fill in the empty oval to the left of the candidate name or choice in all races you wish to vote | Do **NOT** circle, underline or mark through choices |
| 3. If voting for a Write-In candidate, completely fill in the empty oval to the left of the Write-In selection, then write the name of the write-in candidate in the space provided | Do **NOT** use check marks or X to mark ballot |
| | Do **NOT** mark more choices per race than allowed |
| | Do **NOT** sign, cut, tear or damage the ballot |

**If you make a mistake or change your mind on a selection:**

A. Do not attempt to mark through the selection or attempt to erase.  Write "Spoiled" across ~~the ballot and across the return envelope~~

B. Mail or return the spoiled ballot and envelope to your county board of registrars; a new official absentee ballot will be mailed to you

**If you decide to vote in-person:**  Surrender the ballot to the poll manager of an early voting site within your county or the precinct to which you are assigned.  You will then be permitted to vote a regular ballot

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(e)]*

## For President of the United States
(Vote for One)

○ Donald J. Trump - President
**Michael R. Pence** - Vice President
**(Incumbent)** Republican

● **Joseph R. Biden** - President
**Kamala D. Harris** - Vice President
Democrat

○ **Jo Jorgensen** - President
**Jeremy "Spike" Cohen** - Vice President
Libertarian

○

Write-in

## For United States Senate
(Vote for One)

○ David A. Perdue
**(Incumbent)** Republican

● Jon Ossoff
Democrat

○ Shane Hazel
Libertarian

○

Write-in

## SPECIAL ELECTION

### For United States Senate
(To Fill the Unexpired Term of Johnny Isakson, Resigned)
(Vote for One)

○ Al Bartell
Independent

○ Allen Buckley
Independent

○ Doug Collins
Republican

○ John Fortuin
Green

○ Derrick E. Grayson
Republican

○ Michael Todd Greene
Independent

○ Annette Davis Jackson
Republican

○ Deborah Jackson
Democrat

○ Jamesia James
Democrat

○ A. Wayne Johnson
Republican

○ Tamara Johnson-Shealey
Democrat

○ Matt Lieberman
Democrat

○ Kelly Loeffler
**(Incumbent)** Republican

○ Joy Felicia Slade
Democrat

○ Brian Slowinski
Libertarian

○ Valencia Stovall
Independent

○ Ed Tarver
Democrat

○ Kandiss Taylor
Republican

● Raphael Warnock
Democrat

○ Richard Dien Winfield
Democrat

○

Write-in

## For Public Service Commissioner
(To Succeed Jason Shaw)
(Vote for One)

○ Jason Shaw
**(Incumbent)** Republican

● Robert G. Bryant
Democrat

○ Elizabeth Melton
Libertarian

○

Write-in

## For Public Service Commissioner
(To Succeed Lauren Bubba McDonald, Jr.)
(Vote for One)

○ Lauren Bubba McDonald, Jr.
**(Incumbent)** Republican

● Daniel Blackman
Democrat

○ Nathan Wilson
Libertarian

○

Write-in

## For U.S. Representative in 117th Congress From the 5th Congressional District of Georgia
(Vote for One)

○ Angela Stanton-King
Republican

● Nikema Williams
Democrat

○

Write-in

## For State Senator From 42nd District
(Vote for One)

● Elena Parent
**(Incumbent)** Democrat

○

Write-in

## For State Representative In the General Assembly From 83rd District
(Vote for One)

● Becky Evans
**(Incumbent)** Democrat

○

Write-in

**Turn Ballot Over To Continue Voting**

**For District Attorney of the
Stone Mountain Judicial Circuit**
(Vote for One)

● Sherry Boston
(Incumbent) Democrat

○

Write-in

**For Clerk of Superior Court
of DeKalb County**
(Vote for One)

● Debra DeBerry
(Incumbent) Democrat

○

Write-in

**For Sheriff**
(Vote for One)

○ Harold Dennis
Republican

● Melody M. Maddox
(Incumbent) Democrat

○

Write-in

**For Tax Commissioner**
(Vote for One)

● Irvin J. Johnson
(Incumbent) Democrat

○

Write-in

**For Chief Magistrate**
(Vote for One)

● Berryl A. Anderson
(Incumbent) Democrat

○

Write-in

**For Solicitor General
of DeKalb County**
(Vote for One)

● Donna Coleman-Stribling
(Incumbent) Democrat

○

Write-in

**For Chief Executive Officer**
(Vote for One)

● Michael "Mike" Thurmond
(Incumbent) Democrat

○

Write-in

**For County Commissioner
District 6**
(Vote for One)

● Edward "Ted" Terry
Democrat

○

Write-in

**For DeKalb County Soil and Water
Conservation District Supervisor**
(Vote for One)

● Dell F. McGregor

○

Write-in

## PROPOSED CONSTITUTIONAL AMENDMENTS

### - 1 -

**Authorizes dedication of fees and taxes to their intended purposes by general state law.**

House Resolution 164
Act No. 597

"Shall the Constitution of Georgia be amended so as to authorize the General Assembly to dedicate revenues derived from fees or taxes to the public purpose for which such fees or taxes were intended?"

● YES
○ NO

### - 2 -

**Waives state and local sovereign immunity for violation of state laws, state and federal constitutions.**

House Resolution 1023
Act No. 596

"Shall the Constitution of Georgia be amended to waive sovereign immunity and allow the people of Georgia to petition the superior court for relief from governmental acts done outside the scope of lawful authority or which violate the laws of this state, the Constitution of Georgia, or the Constitution of the United States?"

● YES
○ NO

## STATEWIDE REFERENDUM

### - A -

**Establishes a tax exemption for certain real property owned by charities.**

House Bill 344
Act No. 149

"Shall the Act be approved which provides an exemption from ad valorem taxes for all real property owned by a purely public charity, if such charity is exempt from taxation under Section 501(c)(3) of the federal Internal Revenue Code and such real property is held exclusively for the purpose of building or repairing single-family homes to be financed by such charity to individuals using loans that shall not bear interest?"

○ YES
● NO

## SPECIAL ELECTION DEKALB COUNTY

**Ethics Question**
(Vote for One)

"Shall the Act be approved which revises the Board of Ethics for DeKalb County?"

● YES
○ NO

Scanned on: ICC   Tabulator: 729   Batch: 118
Poll ID:   168   Ballot ID:  247

Exhibit C-1

Page 43 of 68

President of the United States
  Joseph R. Biden (Dem)
US Senate (Perdue)
  Jon Ossoff (Dem)
US Senate (Loeffler) - Special
  Raphael Warnock (Dem)
Public Service Commission District 1
  Robert G. Bryant (Dem)
Public Service Commission District 4
  Daniel Blackman (Dem)
US House District 5
  Nikema Williams (Dem)
State Senate District 36
  Nan Orrock (I) (Dem)
State House District 58
  Park Cannon (I) (Dem)
District Attorney - Atlanta
  Fani Willis (Dem)
Clerk of Superior Court
  BLANK CONTEST
Sheriff
  BLANK CONTEST
Tax Commissioner
  BLANK CONTEST
Surveyor
  BLANK CONTEST
Solicitor General
  BLANK CONTEST
County Commission District 4
  Write-in
Soil and Water - Fulton County
  Write-in
Constitutional Amendment #1
  YES
Constitutional Amendment #2
  YES
Statewide Referendum A
  NO
Atlanta Homestead Exemption - Special
  BLANK CONTEST



# DEKALB COUNTY
600-AA

## OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT

### OFFICIAL GENERAL AND SPECIAL ELECTION BALLOT
### OF THE STATE OF GEORGIA
### NOVEMBER 3, 2020

**INSTRUCTIONS:**

| To Vote | Warning |
|---|---|
| 1. Use black or blue ink to mark the ballot<br>2. Completely fill in the empty oval to the left of the candidate name or choice in all races you wish to vote<br>3. If voting for a Write-In candidate, completely fill in the empty oval to the left of the Write-In selection, then write the name of the write-in candidate in the space provided | Do NOT use red ink or felt tip pen to mark ballot<br>Do NOT circle, underline or mark through choices<br>Do NOT use check marks or X to mark ballot<br>Do NOT mark more choices per race than allowed<br>Do NOT sign, cut, tear or damage the ballot |

**If you make a mistake or change your mind on a selection:**

A. Do not attempt to mark through the selection or attempt to erase. Write "Spoiled" across the ballot and across the return envelope
B. Mail or return the spoiled ballot and envelope to your county board of registrars; a new official absentee ballot will be mailed to you

**If you decide to vote in-person:** Surrender the ballot to the poll manager of an early voting site within your county or the precinct to which you are assigned. You will then be permitted to vote a regular ballot

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

---

### For President of the United States
(Vote for One)

○ Donald J. Trump - President
Michael R. Pence - Vice President
**(Incumbent) Republican**

● Joseph R. Biden - President
Kamala D. Harris - Vice President
Democrat

○ Jo Jorgensen - President
Jeremy "Spike" Cohen - Vice President
Libertarian

○

Write-In

### For United States Senate
(Vote for One)

○ David A. Perdue
(Incumbent) Republican

● Jon Ossoff
Democrat

○ Shane Hazel
Libertarian

○

Write-In

---

### SPECIAL ELECTION

### For United States Senate
(To Fill the Unexpired Term of Johnny Isakson, Resigned)
(Vote for One)

○ Al Bartell
Independent

○ Allen Buckley
Independent

○ Doug Collins
Republican

○ John Fortuin
Green

○ Derrick E. Grayson
Republican

○ Michael Todd Greene
Independent

○ Annette Davis Jackson
Republican

● Deborah Jackson
Democrat

○ Jamesia James
Democrat

○ A. Wayne Johnson
Republican

○ Tamara Johnson-Shealey
Democrat

○ Matt Lieberman
Democrat

○ Kelly Loeffler
(Incumbent) Republican

○ Joy Felicia Slade
Democrat

○ Brian Slowinski
Libertarian

○ Valencia Stovall
Independent

○ Ed Tarver
Democrat

○ Kandiss Taylor
Republican

○ Raphael Warnock
Democrat

○ Richard Dien Winfield
Democrat

○

Write-In

---

### For Public Service Commissioner
(To Succeed Jason Shaw)
(Vote for One)

○ Jason Shaw
(Incumbent) Republican

● Robert G. Bryant
Democrat

○ Elizabeth Melton
Libertarian

○

Write-In

### For Public Service Commissioner
(To Succeed Lauren Bubba McDonald, Jr.)
(Vote for One)

○ Lauren Bubba McDonald, Jr.
(Incumbent) Republican

● Daniel Blackman
Democrat

○ Nathan Wilson
Libertarian

○

Write-In

### For U.S. Representative in 117th Congress From the 4th Congressional District of Georgia
(Vote for One)

○ Johsie Cruz Ezammudeen
Republican

● Henry C. "Hank" Johnson, Jr.
(Incumbent) Democrat

○

Write-In

### For State Senator From 41st District
(Vote for One)

○ William Park Freeman
Republican

● Kim Jackson
Democrat

○

Write-In

### For State Representative in the General Assembly From 86th District
(Vote for One)

● Zulma Lopez
Democrat

○

Write-In

---

**Turn Ballot Over To Continue Voting**

**For District Attorney of the
Stone Mountain Judicial Circuit**
(Vote for One)

● **Sherry Boston**
(Incumbent) Democrat

○
Write-in

**For Clerk of Superior Court
of DeKalb County**
(Vote for One)

● **Debra DeBerry**
(Incumbent) Democrat

○
Write-in

**For Sheriff**
(Vote for One)

○ **Harold Dennis**
Republican

● **Melody M. Maddox**
(Incumbent) Democrat

○
Write-in

**For Tax Commissioner**
(Vote for One)

● **Irvin J. Johnson**
(Incumbent) Democrat

○
Write-in

**For Chief Magistrate**
(Vote for One)

● **Berryl A. Anderson**
(Incumbent) Democrat

○
Write-in

**For Solicitor General
of DeKalb County**
(Vote for One)

● **Donna Coleman-Stribling**
(Incumbent) Democrat

○
Write-in

**For Chief Executive Officer**
(Vote for One)

● **Michael "Mike" Thurmond**
(Incumbent) Democrat

○
Write-in

**For County Commissioner
District 4**
(Vote for One)

● **Steve Bradshaw**
(Incumbent) Democrat

○
Write-in

**For DeKalb County Soil and Water
Conservation District Supervisor**
(Vote for One)

● **Dell F. McGregor**

○
Write-in

## PROPOSED CONSTITUTIONAL AMENDMENTS

### - 1 -

**Authorizes dedication of fees and taxes to their intended purposes by general state law.**

House Resolution 164
Act No. 597

"Shall the Constitution of Georgia be amended so as to authorize the General Assembly to dedicate revenues derived from fees or taxes to the public purpose for which such fees or taxes were intended?"

● YES
○ NO

### - 2 -

**Waives state and local sovereign immunity for violation of state laws, state and federal constitutions.**

House Resolution 1023
Act No. 596

"Shall the Constitution of Georgia be amended to waive sovereign immunity and allow the people of Georgia to petition the superior court for relief from governmental acts done outside the scope of lawful authority or which violate the laws of this state, the Constitution of Georgia, or the Constitution of the United States?"

○ YES
● NO

## STATEWIDE REFERENDUM

### - A -

**Establishes a tax exemption for certain real property owned by charities.**

House Bill 344
Act No. 149

"Shall the Act be approved which provides an exemption from ad valorem taxes for all real property owned by a purely public charity, if such charity is exempt from taxation under Section 501(c)(3) of the federal Internal Revenue Code and such real property is held exclusively for the purpose of building or repairing single-family homes to be financed by such charity to individuals using loans that shall not bear interest?"

● YES
○ NO

## SPECIAL ELECTION DEKALB COUNTY

### Ethics Question
(Vote for One)

"Shall the Act be approved which revises the Board of Ethics for DeKalb County?"

○ YES
● NO

**Turn Ballot Over To Continue Voting**

05150_00134_006053.tif scanned at: 14:18:02 on 10/30/20

Scanned on: ICC  Tabulator: 5150   Batch: 134
Poll ID:  314  Ballot ID:  1

Exhibit C-1

Page 46 of 68

President of the United States
  Joseph R. Biden (Dem)
US Senate (Perdue)
  Jon Ossoff (Dem)
US Senate (Loeffler) - Special
  Deborah Jackson (Dem)
Public Service Commission District 1
  Robert G. Bryant (Dem)
Public Service Commission District 4
  Daniel Blackman (Dem)
US House District 5
  Nikema Williams (Dem)
State Senate District 36
  Write-in
State House District 59
  Write-in
District Attorney - Atlanta
  Fani Willis (Dem)
Clerk of Superior Court
  BLANK CONTEST
Sheriff
  BLANK CONTEST
Tax Commissioner
  BLANK CONTEST
Surveyor
  BLANK CONTEST
Solicitor General
  BLANK CONTEST
Soil and Water - Fulton County
  BLANK CONTEST
Constitutional Amendment #1
  BLANK CONTEST
Constitutional Amendment #2
  OVER-VOTE
  YES (NOT COUNTED)
  NO (NOT COUNTED)
Statewide Referendum A
  BLANK CONTEST
Atlanta Homestead Exemption - Special
  OVER-VOTE
  YES (NOT COUNTED)
  NO (NOT COUNTED)

Adjudicated at 3:19 PM on 11/3/2020 by emsadmin06

President of the United States
    Joseph R. Biden (Dem) (100%)
US Senate (Perdue)
    Jon Ossoff (Dem) (100%)
US Senate (Loeffler) - Special
    Deborah Jackson (Dem) (100%)
Public Service Commission District 1
    Robert G. Bryant (Dem) (100%)
Public Service Commission District 4
    Daniel Blackman (Dem) (100%)
US House District 5
    Nikema Williams (Dem) (100%)
State Senate District 36
    Write-in (100%)
State House District 59
    Write-in (100%)
District Attorney - Atlanta
    Fani Willis (Dem) (100%)
Clerk of Superior Court
    BLANK CONTEST
Sheriff
    BLANK CONTEST
Tax Commissioner
    BLANK CONTEST
Surveyor
    BLANK CONTEST
Solicitor General
    BLANK CONTEST
Soil and Water - Fulton County
    BLANK CONTEST
Constitutional Amendment #1
    BLANK CONTEST
Constitutional Amendment #2
    *Adjudicated* Mark removed for YES
    NO (99%)
Statewide Referendum A
    BLANK CONTEST
Atlanta Homestead Exemption - Special
    *Adjudicated* Mark removed for YES
    NO (100%)

Exhibit O-1
Page 47 of 68

# DEKALB COUNTY
### 649-FC

## OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT

### OFFICIAL GENERAL AND SPECIAL ELECTION BALLOT
### OF THE STATE OF GEORGIA
### NOVEMBER 3, 2020

**INSTRUCTIONS:**

| **To Vote** | **Warning** |
|---|---|
| 1. Use black or blue ink to mark the ballot | Do **NOT** use red ink or felt tip pen to mark ballot |
| 2. Completely fill in the empty oval to the left of the candidate name or choice in all races you wish to vote | Do **NOT** circle, underline or mark through choices |
| 3. If voting for a Write-in candidate, completely fill in the empty oval to the left of the Write-in selection, then write the name of the write-in candidate in the space provided | Do **NOT** use check marks or X to mark ballot |
| | Do **NOT** mark more choices per race than allowed |
| | Do **NOT** sign, cut, tear or damage the ballot |

**If you make a mistake or change your mind on a selection:**

A. Do not attempt to mark through the selection or attempt to erase.  Write "Spoiled" across **the ballot and across the return envelope**
B. Mail or return the spoiled ballot and envelope to your county board of registrars; a new official absentee ballot will be mailed to you

**If you decide to vote in-person:**  Surrender the ballot to the poll manager of an early voting site within your county or the precinct to which you are assigned.  You will then be permitted to vote a regular ballot

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

---

## For President
## of the United States
(Vote for One)

○ **Donald J. Trump** - President
**Michael R. Pence** - Vice President
(Incumbent) Republican

● **Joseph R. Biden** - President
**Kamala D. Harris** - Vice President
Democrat

○ **Jo Jorgensen** - President
**Jeremy "Spike" Cohen** - Vice President
Libertarian

○
_Joseph R. Biden_
Write-in

## For United States Senate
(Vote for One)

○ **David A. Perdue**
(Incumbent) Republican

● **Jon Ossoff**
Democrat

○ **Shane Hazel**
Libertarian

○
_Jon Ossoff_
Write-in

---

## SPECIAL ELECTION

## For United States Senate
(To Fill the Unexpired Term of
Johnny Isakson, Resigned)
(Vote for One)

○ **Al Bartell**
Independent

○ **Allen Buckley**
Independent

○ **Doug Collins**
Republican

○ **John Fortuin**
Green

○ **Derrick E. Grayson**
Republican

○ **Michael Todd Greene**
Independent

○ **Annette Davis Jackson**
Republican

○ **Deborah Jackson**
Democrat

○ **Jamesia James**
Democrat

○ **A. Wayne Johnson**
Republican

○ **Tamara Johnson-Shealey**
Democrat

○ **Matt Lieberman**
Democrat

○ **Kelly Loeffler**
(Incumbent) Republican

○ **Joy Felicia Slade**
Democrat

○ **Brian Slowinski**
Libertarian

○ **Valencia Stovall**
Independent

○ **Ed Tarver**
Democrat

○ **Kandiss Taylor**
Republican

● **Raphael Warnock**
Democrat

○ **Richard Dien Winfield**
Democrat

○
_Raphael Warnock_
Write-in

---

## For Public Service
## Commissioner
(To Succeed Jason Shaw)
(Vote for One)

○ **Jason Shaw**
(Incumbent) Republican

● **Robert G. Bryant**
Democrat

○ **Elizabeth Melton**
Libertarian

○
_Robert G Bryant_
Write-in

## For Public Service
## Commissioner
(To Succeed Lauren Bubba McDonald, Jr.)
(Vote for One)

○ **Lauren Bubba McDonald, Jr.**
(Incumbent) Republican

● **Daniel Blackman**
Democrat

○ **Nathan Wilson**
Libertarian

○
_Daniel Blackman_
Write-in

## For U.S. Representative in 117th
## Congress From the 5th
## Congressional District of Georgia
(Vote for One)

○ **Angela Stanton-King**
Republican

● **Nikema Williams**
Democrat

○
_Nikema Williams_
Write-in

## For State Senator From
## 44th District
(Vote for One)

○ **Benjamin Brooks**
Republican

● **Gail Davenport**
(Incumbent) Democrat

○
_Gail Davenport_
Write-in

## For State Representative
## In the General Assembly From
## 83rd District
(Vote for One)

● **Becky Evans**
(Incumbent) Democrat

○
_Becky Evans_
Write-in

---

**Turn Ballot Over To Continue Voting**

**For District Attorney of the Stone Mountain Judicial Circuit**
(Vote for One)

● Sherry Boston
(Incumbent) Democrat

○ *Sherry Boston*
Write-in

**For Clerk of Superior Court of DeKalb County**
(Vote for One)

● Debra DeBerry
(Incumbent) Democrat

○ *Debra DeBerry*
Write-in

**For Sheriff**
(Vote for One)

○ Harold Dennis
Republican

● Melody M. Maddox
(Incumbent) Democrat

○ *Melody M. Maddox*
Write-in

**For Tax Commissioner**
(Vote for One)

● Irvin J. Johnson
(Incumbent) Democrat

○ *Irvin J. Johnson*
Write-in

**For Chief Magistrate**
(Vote for One)

● Berryl A. Anderson
(Incumbent) Democrat

○ *Berryl A. Anderson*
Write-in

**For Solicitor General of DeKalb County**
(Vote for One)

● Donna Coleman-Stribling
(Incumbent) Democrat

○ *Donna Coleman-Stribling*
Write-in

**For Chief Executive Officer**
(Vote for One)

● Michael "Mike" Thurmond
(Incumbent) Democrat

○ *Michael Thurmond*
Write-in

**For County Commissioner District 6**
(Vote for One)

● Edward "Ted" Terry
Democrat

○ *Edward Terry*
Write-in

**For DeKalb County Soil and Water Conservation District Supervisor**
(Vote for One)

● Dell F. McGregor

○ *Dell F. McGregor*
Write-in

## PROPOSED CONSTITUTIONAL AMENDMENTS

**- 1 -**

Authorizes dedication of fees and taxes to their intended purposes by general state law.

House Resolution 164
Act No. 597

"Shall the Constitution of Georgia be amended so as to authorize the General Assembly to dedicate revenues derived from fees or taxes to the public purpose for which such fees or taxes were intended?"

● YES
○ NO

**- 2 -**

Waives state and local sovereign immunity for violation of state laws, state and federal constitutions.

House Resolution 1023
Act No. 596

"Shall the Constitution of Georgia be amended to waive sovereign immunity and allow the people of Georgia to petition the superior court for relief from governmental acts done outside the scope of lawful authority or which violate the laws of this state, the Constitution of Georgia, or the Constitution of the United States?"

● YES
○ NO

## STATEWIDE REFERENDUM

**- A -**

Establishes a tax exemption for certain real property owned by charities.

House Bill 344
Act No. 149

"Shall the Act be approved which provides an exemption from ad valorem taxes for all real property owned by a purely public charity, if such charity is exempt from taxation under Section 501(c)(3) of the federal Internal Revenue Code and such property is held exclusively for the purpose of building or repairing single-family homes to be financed by such charity to individuals using loans that shall not bear interest?"

● YES
○ NO

## SPECIAL ELECTION DEKALB COUNTY

**Ethics Question**
(Vote for One)

"Shall the Act be approved which revises the Board of Ethics for DeKalb County?"

● YES
○ NO

Scanned on: ICC  Tabulator: 5160   Batch: 441
Poll ID:   90   Ballot ID: 335

Exhibit C-1

Page 49 of 68

President of the United States
   Joseph R. Biden (Dem)
US Senate (Perdue)
   Jon Ossoff (Dem)
US Senate (Loeffler) - Special
   Raphael Warnock (Dem)
Public Service Commission District 1
   Robert G. Bryant (Dem)
Public Service Commission District 4
   Daniel Blackman (Dem)
US House District 5
   Nikema Williams (Dem)
State House District 56
   Write-in
District Attorney - Atlanta
   Write-in
Clerk of Superior Court
   BLANK CONTEST
Sheriff
   Write-in
Tax Commissioner
   BLANK CONTEST
Surveyor
   BLANK CONTEST
Solicitor General
   BLANK CONTEST
County Commission District 4
   BLANK CONTEST
Soil and Water - Fulton County
   Write-in
Constitutional Amendment #1
   YES
Constitutional Amendment #2
   OVER-VOTE
   YES (NOT COUNTED)
   NO (NOT COUNTED)
Statewide Referendum A
   BLANK CONTEST
Atlanta Homestead Exemption - Special
   OVER-VOTE
   YES (NOT COUNTED)
   NO (NOT COUNTED)

Adjudicated at 8:55 PM on 11/4/2020 by emsadmin02

President of the United States
    Joseph R. Biden (Dem) (100%)
US Senate (Perdue)
    Jon Ossoff (Dem) (99%)
US Senate (Loeffler) - Special
    Raphael Warnock (Dem) (100%)
Public Service Commission District 1
    Robert G. Bryant (Dem) (100%)
Public Service Commission District 4
    Daniel Blackman (Dem) (99%)
US House District 5
    Nikema Williams (Dem) (95%)
State House District 56
    Write-in (98%)
District Attorney - Atlanta
    Write-in (100%)
Clerk of Superior Court
    BLANK CONTEST
Sheriff
    Write-in (99%)
Tax Commissioner
    BLANK CONTEST
Surveyor
    BLANK CONTEST
Solicitor General
    BLANK CONTEST
County Commission District 4
    BLANK CONTEST
Soil and Water - Fulton County
    Write-in (100%)
Constitutional Amendment #1
    YES (100%)
Constitutional Amendment #2
    OVER-VOTE
    YES (NOT COUNTED) (33%)
    NO (NOT COUNTED) (100%)
Statewide Referendum A
    BLANK CONTEST
Atlanta Homestead Exemption - Special
    OVER-VOTE
    YES (NOT COUNTED) (48%)
NO (NOT COUNTED) (100%)

Copyright © 2020 Dominion Voting Inc. All Rights Reserved

Exhibit C-1

Page 50 of 68

# DEKALB COUNTY
641-DC, 658-DC

## OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT

### OFFICIAL GENERAL AND SPECIAL ELECTION BALLOT
### OF THE STATE OF GEORGIA
### NOVEMBER 3, 2020

**INSTRUCTIONS:**

| To Vote | Warning |
|---|---|
| 1. Use black or blue ink to mark the ballot | Do **NOT** use red ink or felt tip pen to mark ballot |
| 2. Completely fill in the empty oval to the left of the candidate name or choice in all races you wish to vote | Do **NOT** circle, underline or mark through choices |
| 3. If voting for a Write-In candidate, completely fill in the empty oval to the left of the Write-In selection, then write the name of the write-in candidate in the space provided | Do **NOT** use check marks or X to mark ballot |
| | Do **NOT** mark more choices per race than allowed |
| | Do **NOT** sign, cut, tear or damage the ballot |

**If you make a mistake or change your mind on a selection:**

A. Do not attempt to mark through the selection or attempt to erase. Write "Spoiled" across the ballot and across the return envelope
B. Mail or return the spoiled ballot and envelope to your county board of registrars; a new official absentee ballot will be mailed to you

**If you decide to vote in-person:** Surrender the ballot to the poll manager of an early voting site within your county or the precinct to which you are assigned. You will then be permitted to vote a regular ballot

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

---

### For President of the United States
(Vote for One)

○ Donald J. Trump - President
Michael R. Pence - Vice President
(Incumbent) Republican

● Joseph R. Biden - President
Kamala D. Harris - Vice President
Democrat

○ Jo Jorgensen - President
Jeremy "Spike" Cohen - Vice President
Libertarian

○ _____
Write-In

### For United States Senate
(Vote for One)

○ David A. Perdue
(Incumbent) Republican

● Jon Ossoff
Democrat

○ Shane Hazel
Libertarian

○ _____
Write-In

---

## SPECIAL ELECTION

### For United States Senate
(To Fill the Unexpired Term of Johnny Isakson, Resigned)
(Vote for One)

○ Al Bartell
Independent

○ Allen Buckley
Independent

○ Doug Collins
Republican

○ John Fortuin
Green

○ Derrick E. Grayson
Republican

○ Michael Todd Greene
Independent

○ Annette Davis Jackson
Republican

○ Deborah Jackson
Democrat

○ Jamesia James
Democrat

○ A. Wayne Johnson
Republican

○ Tamara Johnson-Shealey
Democrat

○ Matt Lieberman
Democrat

○ Kelly Loeffler
(Incumbent) Republican

○ Joy Felicia Slade
Democrat

○ Brian Slowinski
Libertarian

○ Valencia Stovall
Independent

○ Ed Tarver
Democrat

○ Kandiss Taylor
Republican

● Raphael Warnock
Democrat

○ Richard Dien Winfield
Democrat

○ _____
Write-In

---

### For Public Service Commissioner
(To Succeed Jason Shaw)
(Vote for One)

○ Jason Shaw
(Incumbent) Republican

● Robert G. Bryant
Democrat

○ Elizabeth Melton
Libertarian

○ _____
Write-In

### For Public Service Commissioner
(To Succeed Lauren Bubba McDonald, Jr.)
(Vote for One)

○ Lauren Bubba McDonald, Jr.
(Incumbent) Republican

● Daniel Blackman
Democrat

○ Nathan Wilson
Libertarian

○ _____
Write-In

### For U.S. Representative in 117th Congress From the 6th Congressional District of Georgia
(Vote for One)

○ Karen Handel
Republican

● Lucy McBath
(Incumbent) Democrat

○ _____
Write-In

### For State Senator From 42nd District
(Vote for One)

● Elena Parent
(Incumbent) Democrat

○ _____
Write-In

### For State Representative in the General Assembly From 82nd District
(Vote for One)

● Mary Margaret Oliver
(Incumbent) Democrat

○ _____
Write-In

---

**Turn Ballot Over To Continue Voting**

Copyright © 2020 Dominion Voting Inc. All Rights Reserved

**For District Attorney of the Stone Mountain Judicial Circuit**
(Vote for One)

● Sherry Boston
(Incumbent) Democrat

○

Write-in

**For Clerk of Superior Court of DeKalb County**
(Vote for One)

● Debra DeBerry
(Incumbent) Democrat

○

Write-in

**For Sheriff**
(Vote for One)

○ Harold Dennis
Republican

● Melody M. Maddox
(Incumbent) Democrat

○

Write-in

**For Tax Commissioner**
(Vote for One)

● Irvin J. Johnson
(Incumbent) Democrat

○

Write-in

**For Chief Magistrate**
(Vote for One)

○ Berryl A. Anderson
(Incumbent) Democrat

○

Write-in

**For Solicitor General of DeKalb County**
(Vote for One)

○ Donna Coleman-Stribling
(Incumbent) Democrat

○

Write-in

**For Chief Executive Officer**
(Vote for One)

○ Michael "Mike" Thurmond
(Incumbent) Democrat

○

Write-in

**For County Commissioner District 6**
(Vote for One)

○ Edward "Ted" Terry
Democrat

○

Write-in

**For DeKalb County Soil and Water Conservation District Supervisor**
(Vote for One)

○ Dell F. McGregor

○

Write-in

---

**PROPOSED CONSTITUTIONAL AMENDMENTS**

**- 1 -**

**Authorizes dedication of fees and taxes to their intended purposes by general state law.**

House Resolution 164
Act No. 597

"Shall the Constitution of Georgia be amended so as to authorize the General Assembly to dedicate revenues derived from fees or taxes to the public purpose for which such fees or taxes were intended?"

● YES
○ NO

**- 2 -**

**Waives state and local sovereign immunity for violation of state laws, state and federal constitutions.**

House Resolution 1023
Act No. 596

"Shall the Constitution of Georgia be amended to waive sovereign immunity and allow the people of Georgia to petition the superior court for relief from governmental acts done outside the scope of lawful authority or which violate the laws of this state, the Constitution of Georgia, or the Constitution of the United States?"

○ YES
○ NO

**STATEWIDE REFERENDUM**

**- A -**

**Establishes a tax exemption for certain real property owned by charities.**

House Bill 344
Act No. 149

"Shall the Act be approved which provides an exemption from ad valorem taxes for all real property owned by a purely public charity, if such charity is exempt from taxation under Section 501(c)(3) of the federal Internal Revenue Code and such real property is held exclusively for the purpose of building or repairing single-family homes to be financed by such charity to individuals using loans that shall not bear interest?"

○ YES
○ NO

**SPECIAL ELECTION DEKALB COUNTY**

**Ethics Question**
(Vote for One)

"Shall the Act be approved which revises the Board of Ethics for DeKalb County?"

● YES
○ NO

Scanned on: ICC  Tabulator: 5160   Batch: 441
Poll ID:   559  Ballot ID:  358

Exhibit C-1

Page 52 of 68

President of the United States
  Joseph R. Biden (Dem)
US Senate (Perdue)
  Jon Ossoff (Dem)
US Senate (Loeffler) - Special
  Raphael Warnock (Dem)
Public Service Commission District 1
  Robert G. Bryant (Dem)
Public Service Commission District 4
  Daniel Blackman (Dem)
US House District 5
  Nikema Williams (Dem)
State Senate District 39 - Special Democratic Primary
  BLANK CONTEST
State House District 56
  Mesha Mainor (Dem)
District Attorney - Atlanta
  Fani Willis (Dem)
Clerk of Superior Court
  Write-in
Sheriff
  Write-in
Tax Commissioner
  BLANK CONTEST
Surveyor
  BLANK CONTEST
Solicitor General
  BLANK CONTEST
Soil and Water - Fulton County
  BLANK CONTEST
Constitutional Amendment #1
  YES
Constitutional Amendment #2
  BLANK CONTEST
Statewide Referendum A
  BLANK CONTEST
Atlanta Homestead Exemption - Special
  BLANK CONTEST



# DEKALB COUNTY
### 611-EG

## OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT

### OFFICIAL GENERAL AND SPECIAL ELECTION BALLOT
### OF THE STATE OF GEORGIA
### NOVEMBER 3, 2020

**INSTRUCTIONS:**

| To Vote | Warning |
|---|---|
| 1. Use black or blue ink to mark the ballot | Do **NOT** use red ink or felt tip pen to mark ballot |
| 2. Completely fill in the empty oval to the left of the candidate name or choice in all races you wish to vote | Do **NOT** circle, underline or mark through choices |
| 3. If voting for a Write-in candidate, completely fill in the empty oval to the left of the Write-In selection, then write the name of the write-in candidate in the space provided | Do **NOT** use check marks or X to mark ballot<br>Do **NOT** mark more choices per race than allowed<br>Do **NOT** sign, cut, tear or damage the ballot |

**If you make a mistake or change your mind on a selection:**

**A.** Do not attempt to mark through the selection or attempt to erase. Write "Spoiled" across **the ballot and across the return envelope**
**B.** Mail or return the spoiled ballot and envelope to your county board of registrars; a new official absentee ballot will be mailed to you

**If you decide to vote in-person:** Surrender the ballot to the poll manager of an early voting site within your county or the precinct to which you are assigned. You will then be permitted to vote a regular ballot

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

---

### For President of the United States
(Vote for One)

○ **Donald J. Trump** - President
**Michael R. Pence** - Vice President
**(Incumbent)** Republican

● **Joseph R. Biden** - President
**Kamala D. Harris** - Vice President
Democrat

○ **Jo Jorgensen** - President
**Jeremy "Spike" Cohen** - Vice President
Libertarian

○

Write-in

### For United States Senate
(Vote for One)

○ **David A. Perdue**
**(Incumbent)** Republican

● **Jon Ossoff**
Democrat

○ **Shane Hazel**
Libertarian

○

Write-in

---

### SPECIAL ELECTION

### For United States Senate
(To Fill the Unexpired Term of Johnny Isakson, Resigned)
(Vote for One)

○ **Al Bartell**
Independent

○ **Allen Buckley**
Independent

○ **Doug Collins**
Republican

○ **John Fortuin**
Green

○ **Derrick E. Grayson**
Republican

○ **Michael Todd Greene**
Independent

○ **Annette Davis Jackson**
Republican

○ **Deborah Jackson**
Democrat

○ **Jamesia James**
Democrat

○ **A. Wayne Johnson**
Republican

○ **Tamara Johnson-Shealey**
Democrat

○ **Matt Lieberman**
Democrat

○ **Kelly Loeffler**
**(Incumbent)** Republican

○ **Joy Felicia Slade**
Democrat

○ **Brian Slowinski**
Libertarian

○ **Valencia Stovall**
Independent

○ **Ed Tarver**
Democrat

○ **Kandiss Taylor**
Republican

● **Raphael Warnock**
Democrat

○ **Richard Dien Winfield**
Democrat

○

Write-in

---

### For Public Service Commissioner
(To Succeed Jason Shaw)
(Vote for One)

○ **Jason Shaw**
**(Incumbent)** Republican

● **Robert G. Bryant**
Democrat

○ **Elizabeth Melton**
Libertarian

○

Write-in

### For Public Service Commissioner
(To Succeed Lauren Bubba McDonald, Jr.)
(Vote for One)

○ **Lauren Bubba McDonald, Jr.**
**(Incumbent)** Republican

● **Daniel Blackman**
Democrat

○ **Nathan Wilson**
Libertarian

○

Write-in

### For U.S. Representative in 117th Congress From the 5th Congressional District of Georgia
(Vote for One)

○ **Angela Stanton-King**
Republican

● **Nikema Williams**
Democrat

○

Write-in

### For State Senator From 42nd District
(Vote for One)

● **Elena Parent**
**(Incumbent)** Democrat

○

Write-in

### For State Representative In the General Assembly From 83rd District
(Vote for One)

● **Becky Evans**
**(Incumbent)** Democrat

○

Write-in

---

## For District Attorney of the Stone Mountain Judicial Circuit
(Vote for One)

- ● **Sherry Boston**
  (Incumbent) Democrat
- ○
- Write-in

## For Clerk of Superior Court of DeKalb County
(Vote for One)

- ● **Debra DeBerry**
  (Incumbent) Democrat
- ○
- Write-in

## For Sheriff
(Vote for One)

- ○ **Harold Dennis**
  Republican
- ● **Melody M. Maddox**
  (Incumbent) Democrat
- ○
- Write-in

## For Tax Commissioner
(Vote for One)

- ● **Irvin J. Johnson**
  (Incumbent) Democrat
- ○
- Write-in

## For Chief Magistrate
(Vote for One)

- ● **Berryl A. Anderson**
  (Incumbent) Democrat
- ○
- Write-in

## For Solicitor General of DeKalb County
(Vote for One)

- ● **Donna Coleman-Stribling**
  (Incumbent) Democrat
- ○
- Write-in

## For Chief Executive Officer
(Vote for One)

- ● **Michael "Mike" Thurmond**
  (Incumbent) Democrat
- ○
- Write-in

## For County Commissioner District 6
(Vote for One)

- ● **Edward "Ted" Terry**
  Democrat
- ○
- Write-in

## For DeKalb County Soil and Water Conservation District Supervisor
(Vote for One)

- ● **Dell F. McGregor**
- ○
- Write-in

## PROPOSED CONSTITUTIONAL AMENDMENTS

### - 1 -

**Authorizes dedication of fees and taxes to their intended purposes by general state law.**

House Resolution 164
Act No. 597

"Shall the Constitution of Georgia be amended so as to authorize the General Assembly to dedicate revenues derived from fees or taxes to the public purpose for which such fees or taxes were intended?"

- ● YES
- ○ NO

### - 2 -

**Waives state and local sovereign immunity for violation of state laws, state and federal constitutions.**

House Resolution 1023
Act No. 596

"Shall the Constitution of Georgia be amended to waive sovereign immunity and allow the people of Georgia to petition the superior court for relief from governmental acts done outside the scope of lawful authority or which violate the laws of this state, the Constitution of Georgia, or the Constitution of the United States?"

- ● YES
- ○ NO

## STATEWIDE REFERENDUM

### - A -

**Establishes a tax exemption for certain real property owned by charities.**

House Bill 344
Act No. 149

"Shall the Act be approved which provides an exemption from ad valorem taxes for all real property owned by a purely public charity, if such charity is exempt from taxation under Section 501(c)(3) of the federal Internal Revenue Code and such real property is held exclusively for the purpose of building or repairing single-family homes to be financed by such charity to individuals using loans that shall not bear interest?"

- ○ YES
- ● NO

## SPECIAL ELECTION DEKALB COUNTY

### Ethics Question
(Vote for One)

"Shall the Act be approved which revises the Board of Ethics for DeKalb County?"

- ● YES
- ○ NO

**Turn Ballot Over To Continue Voting**

Scanned on: ICC  Tabulator: 742  Batch: 54
Poll ID:  168  Ballot ID: 247

Exhibit C-1

Page 55 of 68

President of the United States
  Joseph R. Biden (Dem)
US Senate (Perdue)
  Jon Ossoff (Dem)
US Senate (Loeffler) - Special
  Raphael Warnock (Dem)
Public Service Commission District 1
  Robert G. Bryant (Dem)
Public Service Commission District 4
  Daniel Blackman (Dem)
US House District 5
  Nikema Williams (Dem)
State Senate District 36
  Nan Orrock (I) (Dem)
State House District 58
  Park Cannon (I) (Dem)
District Attorney - Atlanta
  Fani Willis (Dem)
Clerk of Superior Court
  BLANK CONTEST
Sheriff
  BLANK CONTEST
Tax Commissioner
  BLANK CONTEST
Surveyor
  BLANK CONTEST
Solicitor General
  BLANK CONTEST
County Commission District 4
  Write-in
Soil and Water - Fulton County
  Write-in
Constitutional Amendment #1
  YES
Constitutional Amendment #2
  YES
Statewide Referendum A
  NO
Atlanta Homestead Exemption - Special
  BLANK CONTEST

Exhibit C41

Page 56 of 68

# DEKALB COUNTY
## 738-BM

# OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT

### OFFICIAL GENERAL AND SPECIAL ELECTION BALLOT
### OF THE STATE OF GEORGIA
### NOVEMBER 3, 2020

**INSTRUCTIONS:**

| To Vote | Warning |
|---|---|
| 1. Use black or blue ink to mark the ballot | Do **NOT** use red ink or felt tip pen to mark ballot |
| 2. Completely fill in the empty oval to the left of the candidate name or choice in all races you wish to vote | Do **NOT** circle, underline or mark through choices |
| 3. If voting for a Write-In candidate, completely fill in the empty oval to the left of the Write-In selection, then write the name of the write-in candidate in the space provided | Do **NOT** use check marks or X to mark ballot |
| | Do **NOT** mark more choices per race than allowed |
| | Do **NOT** sign, cut, tear or damage the ballot |

**If you make a mistake or change your mind on a selection:**

A. Do not attempt to mark through the selection or attempt to erase. Write "Spoiled" across **the ballot and across the return envelope**
B. Mail or return the spoiled ballot and envelope to your county board of registrars; a new official absentee ballot will be mailed to you

**If you decide to vote in-person:** Surrender the ballot to the poll manager of an early voting site within your county or the precinct to which you are assigned. You will then be permitted to vote a regular ballot

*"I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

## For President of the United States
(Vote for One)

○ **Donald J. Trump** - President
**Michael R. Pence** - Vice President
**(Incumbent)** Republican

● **Joseph R. Biden** - President
**Kamala D. Harris** - Vice President
Democrat

○ **Jo Jorgensen** - President
**Jeremy "Spike" Cohen** - Vice President
Libertarian

○ _____

Write-in

## For United States Senate
(Vote for One)

○ **David A. Perdue**
**(Incumbent)** Republican

● **Jon Ossoff**
Democrat

○ **Shane Hazel**
Libertarian

○ _____

Write-in

## SPECIAL ELECTION

### For United States Senate
(To Fill the Unexpired Term of Johnny Isakson, Resigned)
(Vote for One)

○ **Al Bartell**
Independent

○ **Allen Buckley**
Independent

○ **Doug Collins**
Republican

○ **John Fortuin**
Green

○ **Derrick E. Grayson**
Republican

○ **Michael Todd Greene**
Independent

○ **Annette Davis Jackson**
Republican

○ **Deborah Jackson**
Democrat

○ **Jamesia James**
Democrat

○ **A. Wayne Johnson**
Republican

● **Tamara Johnson-Shealey**
Democrat

○ **Matt Lieberman**
Democrat

○ **Kelly Loeffler**
**(Incumbent)** Republican

○ **Joy Felicia Slade**
Democrat

○ **Brian Slowinski**
Libertarian

○ **Valencia Stovall**
Independent

○ **Ed Tarver**
Democrat

○ **Kandiss Taylor**
Republican

○ **Raphael Warnock**
Democrat

○ **Richard Dien Winfield**
Democrat

○ _____

Write-in

## For Public Service Commissioner
(To Succeed Jason Shaw)
(Vote for One)

○ **Jason Shaw**
**(Incumbent)** Republican

○ **Robert G. Bryant**
Democrat

○ **Elizabeth Melton**
Libertarian

○ _____

Write-in

## For Public Service Commissioner
(To Succeed Lauren Bubba McDonald, Jr.)
(Vote for One)

○ **Lauren Bubba McDonald, Jr.**
**(Incumbent)** Republican

● **Daniel Blackman**
Democrat

○ **Nathan Wilson**
Libertarian

○ _____

Write-in

## For U.S. Representative in 117th Congress From the 4th Congressional District of Georgia
(Vote for One)

○ **Johsie Cruz Ezammudeen**
Republican

● **Henry C. "Hank" Johnson, Jr.**
**(Incumbent)** Democrat

○ _____

Write-in

## For State Senator From 10th District
(Vote for One)

● **Emanuel Jones**
**(Incumbent)** Democrat

○ _____

Write-in

## For State Representative In the General Assembly From 90th District
(Vote for One)

● **Pam Stephenson**
**(Incumbent)** Democrat

○ _____

Write-in

**Turn Ballot Over To Continue Voting**

## For District Attorney of the Stone Mountain Judicial Circuit
(Vote for One)

● **Sherry Boston**
(Incumbent) Democrat

○

Write-in

## For Clerk of Superior Court of DeKalb County
(Vote for One)

● **Debra DeBerry**
(Incumbent) Democrat

○

Write-in

## For Sheriff
(Vote for One)

○ **Harold Dennis**
Republican

● **Melody M. Maddox**
(Incumbent) Democrat

○

Write-in

## For Tax Commissioner
(Vote for One)

● **Irvin J. Johnson**
(Incumbent) Democrat

○

Write-in

## For Chief Magistrate
(Vote for One)

● **Berry A. Anderson**
(Incumbent) Democrat

○

Write-in

## For Solicitor General of DeKalb County
(Vote for One)

● **Donna Coleman-Stribling**
(Incumbent) Democrat

○

Write-in

## For Chief Executive Officer
(Vote for One)

● **Michael "Mike" Thurmond**
(Incumbent) Democrat

○

Write-in

## For County Commissioner District 5
(Vote for One)

● **Mereda Davis Johnson**
(Incumbent) Democrat

○

Write-in

## For DeKalb County Soil and Water Conservation District Supervisor
(Vote for One)

○ **Dell F. McGregor**

○

Write-in

## PROPOSED CONSTITUTIONAL AMENDMENTS

### - 1 -

**Authorizes dedication of fees and taxes to their intended purposes by general state law.**

House Resolution 164
Act No. 597

"Shall the Constitution of Georgia be amended so as to authorize the General Assembly to dedicate revenues derived from fees or taxes to the public purpose for which such fees or taxes were intended?"

○ YES
● NO

### - 2 -

**Waives state and local sovereign immunity for violation of state laws, state and federal constitutions.**

House Resolution 1023
Act No. 596

"Shall the Constitution of Georgia be amended to waive sovereign immunity and allow the people of Georgia to petition the superior court for relief from governmental acts done outside the scope of lawful authority or which violate the laws of this state, the Constitution of Georgia, or the Constitution of the United States?"

● YES
○ NO

## STATEWIDE REFERENDUM

### - A -

**Establishes a tax exemption for certain real property owned by charities.**

House Bill 344
Act No. 149

"Shall the Act be approved which provides an exemption from ad valorem taxes for all real property owned by a purely public charity, if such charity is exempt from taxation under Section 501(c)(3) of the federal Internal Revenue Code and such real property is held exclusively for the purpose of building or repairing single-family homes to be financed by such charity to individuals using loans that shall not bear interest?"

● YES
○ NO

## SPECIAL ELECTION DEKALB COUNTY

### Ethics Question
(Vote for One)

"Shall the Act be approved which revises the Board of Ethics for DeKalb County?"

○ YES
● NO

**Turn Ballot Over To Continue Voting**

Scanned on: ICC  Tabulator: 742  Batch: 60
Poll ID:  261  Ballot ID: 284

Exhibit C-1

Page 58 of 68

President of the United States
  Joseph R. Biden (Dem)
US Senate (Perdue)
  Jon Ossoff (Dem)
US Senate (Loeffler) - Special
  Tamara Johnson-Shealey (Dem)
Public Service Commission District 1
  Robert G. Bryant (Dem)
Public Service Commission District 4
  Daniel Blackman (Dem)
US House District 5
  Nikema Williams (Dem)
State Senate District 36
  Nan Orrock (I) (Dem)
State House District 60
  Kim Schofield (I) (Dem)
District Attorney - Atlanta
  Fani Willis (Dem)
Clerk of Superior Court
  BLANK CONTEST
Sheriff
  BLANK CONTEST
Tax Commissioner
  BLANK CONTEST
Surveyor
  BLANK CONTEST
Solicitor General
  BLANK CONTEST
Soil and Water - Fulton County
  BLANK CONTEST
Constitutional Amendment #1
  BLANK CONTEST
Constitutional Amendment #2
  YES
Statewide Referendum A
  BLANK CONTEST
Atlanta Homestead Exemption - Special
  OVER-VOTE
  YES (NOT COUNTED)
  NO (NOT COUNTED)



# DEKALB COUNTY
### 649-FC

## OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT

### OFFICIAL GENERAL AND SPECIAL ELECTION BALLOT
### OF THE STATE OF GEORGIA
### NOVEMBER 3, 2020

**INSTRUCTIONS:**

| To Vote | Warning |
|---|---|
| 1. Use black or blue ink to mark the ballot | Do **NOT** use red ink or felt tip pen to mark ballot |
| 2. Completely fill in the empty oval to the left of the candidate name or choice in all races you wish to vote | Do **NOT** circle, underline or mark through choices |
| 3. If voting for a Write-In candidate, completely fill in the empty oval to the left of the Write-In selection, then write the name of the write-in candidate in the space provided | Do **NOT** use check marks or X to mark ballot |
| | Do **NOT** mark more choices per race than allowed |
| | Do **NOT** sign, cut, tear or damage the ballot |

**If you make a mistake or change your mind on a selection:**

A. Do not attempt to mark through the selection or attempt to erase. Write "Spoiled" across the ballot and across the return envelope
B. Mail or return the spoiled ballot and envelope to your county board of registrars; a new official absentee ballot will be mailed to you

**If you decide to vote in-person:** Surrender the ballot to the poll manager of an early voting site within your county or the precinct to which you are assigned. You will then be permitted to vote a regular ballot!

*I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

---

### For President of the United States
(Vote for One)

○ **Donald J. Trump** - President
**Michael R. Pence** - Vice President
(Incumbent) Republican

● **Joseph R. Biden** - President
**Kamala D. Harris** - Vice President
Democrat

○ **Jo Jorgensen** - President
**Jeremy "Spike" Cohen** - Vice President
Libertarian

○ _Joseph R. Biden_
Write-In

### For United States Senate
(Vote for One)

○ **David A. Perdue**
(Incumbent) Republican

● **Jon Ossoff**
Democrat

○ **Shane Hazel**
Libertarian

○ _Jon Ossoff_
Write-In

---

### SPECIAL ELECTION

#### For United States Senate
(To Fill the Unexpired Term of Johnny Isakson, Resigned)
(Vote for One)

○ **Al Bartell**
Independent

○ **Allen Buckley**
Independent

○ **Doug Collins**
Republican

○ **John Fortuin**
Green

○ **Derrick E. Grayson**
Republican

○ **Michael Todd Greene**
Independent

○ **Annette Davis Jackson**
Republican

○ **Deborah Jackson**
Democrat

○ **Jamesia James**
Democrat

○ **A. Wayne Johnson**
Republican

○ **Tamara Johnson-Shealey**
Democrat

○ **Matt Lieberman**
Democrat

○ **Kelly Loeffler**
(Incumbent) Republican

○ **Joy Felicia Slade**
Democrat

○ **Brian Slowinski**
Libertarian

○ **Valencia Stovall**
Independent

○ **Ed Tarver**
Democrat

○ **Kandiss Taylor**
Republican

● **Raphael Warnock**
Democrat

○ **Richard Dien Winfield**
Democrat

○ _Raphael Warnock_
Write-In

---

### For Public Service Commissioner
(To Succeed Jason Shaw)
(Vote for One)

○ **Jason Shaw**
(Incumbent) Republican

● **Robert G. Bryant**
Democrat

○ **Elizabeth Melton**
Libertarian

○ _Robert G Bryant_
Write-In

### For Public Service Commissioner
(To Succeed Lauren Bubba McDonald, Jr.)
(Vote for One)

○ **Lauren Bubba McDonald, Jr.**
(Incumbent) Republican

● **Daniel Blackman**
Democrat

○ **Nathan Wilson**
Libertarian

○ _Daniel Blackman_
Write-In

### For U.S. Representative in 117th Congress From the 5th Congressional District of Georgia
(Vote for One)

○ **Angela Stanton-King**
Republican

● **Nikema Williams**
Democrat

○ _Nikema Williams_
Write-In

### For State Senator From 44th District
(Vote for One)

○ **Benjamin Brooks**
Republican

● **Gail Davenport**
(Incumbent) Democrat

○ _Gail Davenport_
Write-In

### For State Representative in the General Assembly From 83rd District
(Vote for One)

● **Becky Evans**
(Incumbent) Democrat

○ _Becky Evans_
Write-In

---

**Turn Ballot Over To Continue Voting**

## For District Attorney of the Stone Mountain Judicial Circuit
(Vote for One)

⬤ **Sherry Boston**
(Incumbent) Democrat

○ *Sherry Boston*
Write-In

## For Clerk of Superior Court of DeKalb County
(Vote for One)

⬤ **Debra DeBerry**
(Incumbent) Democrat

○ *Debra DeBerry*
Write-In

## For Sheriff
(Vote for One)

○ **Harold Dennis**
Republican

⬤ **Melody M. Maddox**
(Incumbent) Democrat

○ *Melody M. Maddox*
Write-In

## For Tax Commissioner
(Vote for One)

⬤ **Irvin J. Johnson**
(Incumbent) Democrat

○ *Irvin J. Johnson*
Write-In

## For Chief Magistrate
(Vote for One)

⬤ **Berryl A. Anderson**
(Incumbent) Democrat

○ *Berryl A. Anderson*
Write-In

## For Solicitor General of DeKalb County
(Vote for One)

⬤ **Donna Coleman-Stribling**
(Incumbent) Democrat

○ *Donna Coleman-Stribling*
Write-In

## For Chief Executive Officer
(Vote for One)

⬤ **Michael "Mike" Thurmond**
(Incumbent) Democrat

○ *Michael Thurmond*
Write-In

## For County Commissioner District 6
(Vote for One)

⬤ **Edward "Ted" Terry**
Democrat

○ *Edward Terry*
Write-In

## For DeKalb County Soil and Water Conservation District Supervisor
(Vote for One)

⬤ **Dell F. McGregor**

○ *Dell F. McGregor*
Write-In

---

## PROPOSED CONSTITUTIONAL AMENDMENTS

### - 1 -

**Authorizes dedication of fees and taxes to their intended purposes by general state law.**

House Resolution 164
Act No. 597

"Shall the Constitution of Georgia be amended so as to authorize the General Assembly to dedicate revenues derived from fees or taxes to the public purpose for which such fees or taxes were intended?"

○ YES
○ NO

### - 2 -

**Waives state and local sovereign immunity for violation of state laws, state and federal constitutions.**

House Resolution 1023
Act No. 596

"Shall the Constitution of Georgia be amended to waive sovereign immunity and allow the people of Georgia to petition the superior court for relief from governmental acts done outside the scope of lawful authority or which violate the laws of this state, the Constitution of Georgia, or the Constitution of the United States?"

⬤ YES
○ NO

## STATEWIDE REFERENDUM

### - A -

**Establishes a tax exemption for certain real property owned by charities.**

House Bill 344
Act No. 149

"Shall the Act be approved which provides an exemption from ad valorem taxes for all real property owned by a purely public charity, if such charity is exempt from taxation under Section 501(c)(3) of the federal Internal Revenue Code and such real property is held exclusively for the purpose of building or repairing single-family homes to be financed by such charity to individuals using loans that shall not bear interest?"

⬤ YES
○ NO

## SPECIAL ELECTION DEKALB COUNTY

### Ethics Question
(Vote for One)

"Shall the Act be approved which revises the Board of Ethics for DeKalb County?"

⬤ YES
○ NO

---

**Turn Ballot Over To Continue Voting**

Scanned on: ICC  Tabulator: 5150  Batch: 80
Poll ID:  90  Ballot ID: 335

Exhibit C-1

Page 61 of 68

President of the United States
  Joseph R. Biden (Dem)
US Senate (Perdue)
  Jon Ossoff (Dem)
US Senate (Loeffler) - Special
  Raphael Warnock (Dem)
Public Service Commission District 1
  Robert G. Bryant (Dem)
Public Service Commission District 4
  Daniel Blackman (Dem)
US House District 5
  Nikema Williams (Dem)
State House District 56
  Write-in
District Attorney - Atlanta
  Write-in
Clerk of Superior Court
  BLANK CONTEST
Sheriff
  Write-in
Tax Commissioner
  BLANK CONTEST
Surveyor
  BLANK CONTEST
Solicitor General
  BLANK CONTEST
County Commission District 4
  BLANK CONTEST
Soil and Water - Fulton County
  Write-in
Constitutional Amendment #1
  YES
Constitutional Amendment #2
  OVER-VOTE
  YES (NOT COUNTED)
  NO (NOT COUNTED)
Statewide Referendum A
  BLANK CONTEST
Atlanta Homestead Exemption - Special
  OVER-VOTE
  YES (NOT COUNTED)
  NO (NOT COUNTED)

Copyright © 2020 Dominion Voting Inc. All Rights Reserved



Exhibit C-1

Page 62 of 68

# DEKALB COUNTY
641-DC, 658-DC

## OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT

### OFFICIAL GENERAL AND SPECIAL ELECTION BALLOT
### OF THE STATE OF GEORGIA
### NOVEMBER 3, 2020

**INSTRUCTIONS:**

| To Vote | Warning |
|---|---|
| 1. Use black or blue ink to mark the ballot | Do NOT use red ink or felt tip pen to mark ballot |
| 2. Completely fill in the empty oval to the left of the candidate name or choice in all races you wish to vote | Do NOT circle, underline or mark through choices |
| 3. If voting for a Write-In candidate, completely fill in the empty oval to the left of the Write-In selection, then write the name of the write-in candidate in the space provided | Do NOT use check marks or X to mark ballot |
| | Do NOT mark more choices per race than allowed |
| | Do NOT sign, cut, tear or damage the ballot |

**If you make a mistake or change your mind on a selection:**

A. Do not attempt to mark through the selection or attempt to erase.  Write "Spoiled" across **the ballot and across the return envelope**
B. Mail or return the spoiled ballot and envelope to your county board of registrars; a new official absentee ballot will be mailed to you

**If you decide to vote in-person:**  Surrender the ballot to the poll manager of an early voting site within your county or the precinct to which you are assigned.  You will then be permitted to vote a regular ballot

*I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law." [O.C.G.A. 21-2-284(e), 21-2-285(h) and 21-2-383(a)]*

### For President of the United States
(Vote for One)

○ **Donald J. Trump** - President
   **Michael R. Pence** - Vice President
   **(Incumbent)** Republican

● **Joseph R. Biden** - President
   **Kamala D. Harris** - Vice President
   Democrat

○ **Jo Jorgensen** - President
   **Jeremy "Spike" Cohen** - Vice President
   Libertarian

○ _____
   Write-in

### For United States Senate
(Vote for One)

○ **David A. Perdue**
   **(Incumbent)** Republican

● **Jon Ossoff**
   Democrat

○ **Shane Hazel**
   Libertarian

○ _____
   Write-in

### SPECIAL ELECTION

### For United States Senate
(To Fill the Unexpired Term of Johnny Isakson, Resigned)
(Vote for One)

○ **Al Bartell**
   Independent

○ **Allen Buckley**
   Independent

○ **Doug Collins**
   Republican

○ **John Fortuin**
   Green

○ **Derrick E. Grayson**
   Republican

○ **Michael Todd Greene**
   Independent

○ **Annette Davis Jackson**
   Republican

○ **Deborah Jackson**
   Democrat

○ **Jamesia James**
   Democrat

○ **A. Wayne Johnson**
   Republican

○ **Tamara Johnson-Shealey**
   Democrat

○ **Matt Lieberman**
   Democrat

○ **Kelly Loeffler**
   **(Incumbent)** Republican

○ **Joy Felicia Slade**
   Democrat

○ **Brian Slowinski**
   Libertarian

○ **Valencia Stovall**
   Independent

○ **Ed Tarver**
   Democrat

○ **Kandiss Taylor**
   Republican

● **Raphael Warnock**
   Democrat

○ **Richard Dien Winfield**
   Democrat

○ _____
   Write-in

### For Public Service Commissioner
(To Succeed Jason Shaw)
(Vote for One)

○ **Jason Shaw**
   **(Incumbent)** Republican

● **Robert G. Bryant**
   Democrat

○ **Elizabeth Melton**
   Libertarian

○ _____
   Write-In

### For Public Service Commissioner
(To Succeed Lauren Bubba McDonald, Jr.)
(Vote for One)

○ **Lauren Bubba McDonald, Jr.**
   **(Incumbent)** Republican

● **Daniel Blackman**
   Democrat

○ **Nathan Wilson**
   Libertarian

○ _____
   Write-In

### For U.S. Representative in 117th Congress From the 6th Congressional District of Georgia
(Vote for One)

○ **Karen Handel**
   Republican

● **Lucy McBath**
   **(Incumbent)** Democrat

○ _____
   Write-In

### For State Senator From 42nd District
(Vote for One)

● **Elena Parent**
   **(Incumbent)** Democrat

○ _____
   Write-In

### For State Representative In the General Assembly From 82nd District
(Vote for One)

● **Mary Margaret Oliver**
   **(Incumbent)** Democrat

○ _____
   Write-In

**Turn Ballot Over To Continue Voting**

Copyright © 2020 Dominion Voting Inc. All Rights Reserved

Exhibit C-1

Page 63 of 66

**For District Attorney of the Stone Mountain Judicial Circuit**
(Vote for One)

● Sherry Boston
(Incumbent) Democrat

○
Write-in

**For Clerk of Superior Court of DeKalb County**
(Vote for One)

● Debra DeBerry
(Incumbent) Democrat

○
Write-in

**For Sheriff**
(Vote for One)

○ Harold Dennis
Republican

● Melody M. Maddox
(Incumbent) Democrat

○
Write-in

**For Tax Commissioner**
(Vote for One)

● Irvin J. Johnson
(Incumbent) Democrat

○
Write-in

**For Chief Magistrate**
(Vote for One)

○ Berryl A. Anderson
(Incumbent) Democrat

○
Write-in

**For Solicitor General of DeKalb County**
(Vote for One)

○ Donna Coleman-Stribling
(Incumbent) Democrat

○
Write-in

**For Chief Executive Officer**
(Vote for One)

○ Michael "Mike" Thurmond
(Incumbent) Democrat

○
Write-in

**For County Commissioner District 6**
(Vote for One)

○ Edward "Ted" Terry
Democrat

○
Write-in

**For DeKalb County Soil and Water Conservation District Supervisor**
(Vote for One)

○ Dell F. McGregor

○
Write-in

## PROPOSED CONSTITUTIONAL AMENDMENTS

### - 1 -

**Authorizes dedication of fees and taxes to their intended purposes by general state law.**

House Resolution 164
Act No. 597

"Shall the Constitution of Georgia be amended so as to authorize the General Assembly to dedicate revenues derived from fees or taxes to the public purpose for which such fees or taxes were intended?"

● YES
○ NO

### - 2 -

**Waives state and local sovereign immunity for violation of state laws, state and federal constitutions.**

House Resolution 1023
Act No. 596

"Shall the Constitution of Georgia be amended to waive sovereign immunity and allow the people of Georgia to petition the superior court for relief from governmental acts done outside the scope of lawful authority or which violate the laws of this state, the Constitution of Georgia, or the Constitution of the United States?"

○ YES
○ NO

## STATEWIDE REFERENDUM

### - A -

**Establishes a tax exemption for certain real property owned by charities.**

House Bill 344
Act No. 149

"Shall the Act be approved which provides an exemption from ad valorem taxes for all real property owned by a purely public charity, if such charity is exempt from taxation under Section 501(c)(3) of the federal Internal Revenue Code and such real property is held exclusively for the purpose of building or repairing single-family homes to be financed by such charity to individuals using loans that shall not bear interest?"

○ YES
○ NO

## SPECIAL ELECTION DEKALB COUNTY

### Ethics Question
(Vote for One)

"Shall the Act be approved which revises the Board of Ethics for DeKalb County?"

● YES
○ NO

**Turn Ballot Over To Continue Voting**

Scanned on: ICC  Tabulator: 5150  Batch: 80
Poll ID:  559  Ballot ID: 358

Exhibit C-1

Page 64 of 68

President of the United States
  Joseph R. Biden (Dem)
US Senate (Perdue)
  Jon Ossoff (Dem)
US Senate (Loeffler) - Special
  Raphael Warnock (Dem)
Public Service Commission District 1
  Robert G. Bryant (Dem)
Public Service Commission District 4
  Daniel Blackman (Dem)
US House District 5
  Nikema Williams (Dem)
State Senate District 39 - Special Democratic Primary
  BLANK CONTEST
State House District 56
  Mesha Mainor (Dem)
District Attorney - Atlanta
  Fani Willis (Dem)
Clerk of Superior Court
  Write-in
Sheriff
  Write-in
Tax Commissioner
  BLANK CONTEST
Surveyor
  BLANK CONTEST
Solicitor General
  BLANK CONTEST
Soil and Water - Fulton County
  BLANK CONTEST
Constitutional Amendment #1
  YES
Constitutional Amendment #2
  BLANK CONTEST
Statewide Referendum A
  BLANK CONTEST
Atlanta Homestead Exemption - Special
  BLANK CONTEST

# Exhibit D