IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*

      *Plaintiffs,*

v.

BRAD RAFFENSPERGER, *et al.*,

      *Defendants.*

CIVIL ACTION

NO. 1:17-CV-2989-AT

**STATE DEFENDANTS' BRIEF IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT
ON CURLING PLAINTIFFS' CLAIMS**

# CONTENTS

Introduction ..................................................................................... 1

Background ...................................................................................... 4

   I.    Georgia's voting system. ...................................................... 4

       A.   How the Dominion BMD System works. ......................... 5

       B.   The State has decertified the DRE system. .................... 6

       C.   Numerous audits and recounts have confirmed the accuracy
of the BMD system. ........................................................ 7

   II.   Curling Plaintiffs' allegations regarding vulnerabilities with
Georgia's voting system. ................................................... 11

       A.   Curling Plaintiffs' fears are undefined, unfounded, and
speculative. ................................................................... 11

       B.   Curling Plaintiffs' experts speculate about "vulnerabilities"
but cannot support their speculation with evidence. .................. 15

       C.   The unauthorized access of the Coffee County election
equipment. ..................................................................... 16

  III.  Curling Plaintiffs' claims. ................................................. 17

Standard of Review ...................................................................... 18

Argument ...................................................................................... 18

   I.    Curling Plaintiffs' DRE claims (Counts I–II) are moot. ..................... 18

   II.   Curling Plaintiffs lack Article III standing to bring any of their
claims ............................................................................. 22

       A.   Curling Plaintiffs cannot demonstrate an injury-in-fact. ............. 24

          1.   "Verifying" a vote is not a legally cognizable interest. ......... 25

          2.   Curling Plaintiffs' fears of "potential" vulnerabilities are
generalized grievances that are not particular to any
individual. ...................................................................... 27

          3.   Curling Plaintiffs' alleged harm is purely conjectural
and speculative, not concrete nor certainly impending. ....... 33

B.    Curling Plaintiffs' alleged injuries are neither traceable nor redressable by State Defendants...................................................... 37

III.  Curling Plaintiffs' claims fail on the merits. .......................................38

A.    The *Anderson-Burdick* framework. ................................. 39

B.    Georgia's in-person voting system does not impose any burden—let alone a severe one—on the right to vote. .................. 41

1.  Voters are free to vote absentee. .......................................... 42

2.  The Curling Plaintiffs have no evidence of actual, unlawful BMD manipulation. ................................................ 43

C.    The State's important regulatory interests are sufficient to justify Georgia's voting system policy. ........................................... 46

Conclusion ........................................................................................... 49

*Federal judges can have a lot of power—especially when issuing injunctions. And sometimes we may even have a good idea or two. But the Constitution sets out our sphere of decisionmaking, and that sphere does not extend to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules.*

*New Georgia Project v. Raffensperger,*
976 F.3d 1278, 1284 (11th Cir. 2020)

## INTRODUCTION

This case involves a challenge to Georgia's electronic voting systems, both past and present. Curling Plaintiffs[1] challenge the Georgia General Assembly's decision to use machine-based voting, and the Secretary of State's decision to procure Dominion voting equipment. Specifically, the Curling Plaintiffs contend that these elected officials' policy choices violate the United States Constitution because, according to the Curling Plaintiffs, machines are an unreliable means of conducting an election. Curling Plaintiffs are wrong, and summary judgment should be granted.

Since the case was first filed in 2017 as a far-narrower challenge to a special election, the State has held numerous elections. The State has

---

[1] The case was administratively closed by the Court in 2017 due to a dispute among the Plaintiffs. Doc. 116–17, 135, 144. In May 2018, the Court officially reopened the case. Doc. 198. The Plaintiffs split into two Plaintiff groups: Coalition Plaintiffs and Curling Plaintiffs. This motion and brief deal solely with Curling Plaintiffs' claims in their Third Amended Complaint ("TAC"), Doc. 627.

replaced its prior paperless election system with a paper-based one. And there have been multiple risk-limiting audits and a widely lauded full hand recount of the 2020 presidential election that confirmed the accuracy and reliability of Georgia's new election system.

Meanwhile, this case has amassed over 1,500 docket entries (excluding exhibits), six amended and supplemental complaints filed by two separate plaintiff groups, and at least 11 different motions for preliminary injunction and temporary restraining orders. Nevertheless, despite this extensive record, Curling Plaintiffs' claims still suffer from numerous fatal defects, both legal and factual.

*First*, this Court lacks jurisdiction over Curling Plaintiffs' claims. Their challenges to the State's now-decertified direct-recording electronic-voting machine ("DRE") system are moot. The State's policymakers decided to utilize to ballot-marking devices, or "BMDs," that are separate from the old system. Curling Plaintiffs also lack Article III standing to bring *any* of their claims, including those that challenge the current election equipment. The record confirms that the Curling Plaintiffs have suffered no injury-in-fact, because their concerns are neither legally cognizable, particularized, nor certainly impending. And even if they were all of those things, Curling Plaintiffs cannot trace those injuries directly to State Defendants' actions.

*Second*, even assuming the Court had jurisdiction over the claims, Curling Plaintiffs' claims still fail on the merits. Under the familiar *Anderson-Burdick* framework, the State's electronic-voting system does not violate Curling Plaintiffs' constitutional rights for at least two reasons. Curling Plaintiffs are not required to vote on the BMDs—they are perfectly free to vote their preferred method of hand-marked paper ballots by voting absentee. And Curling Plaintiffs have failed to produce a single shred of evidence to substantiate the supposed "risks" they fear. There is no evidence that their ballots or any ballots cast using a BMD were not accurately counted or that any vote has been changed or will be altered as a result of the use of the BMD system. And there is no evidence of the BMD system being hacked—indeed, Curling Plaintiffs' expert confirmed that he has not identified any malware on any component of Georgia's current election system. Nor are Curling Plaintiffs' fears about the elections being "unverifiable" justified. Each audit and recount since Georgia implemented the BMDs—including the much-lauded hand recount of the 2020 presidential election—confirmed the reliability of the BMDs in accurately counting votes.

This case has essentially become a means for the Curling Plaintiffs' experts to vent their disagreement with Georgia (and other states') policymakers based on their idiosyncratic views of the risk of using BMD-like

systems. But weighing risk is a political and not judicial decision.

Accordingly, Court should enter summary judgment in Defendants' favor and

conclude this longstanding case.

## BACKGROUND

### I.  Georgia's voting system.

Georgia policymakers began exploring a replacement for the DRE

machines in 2017. Statement of Undisputed Material Facts ("SMF") ¶ 1.[2] The

State had first purchased the DREs in 2002 in response to the plagued voting

system—that included hand-marked paper ballots—used in the controversial

Bush-Gore presidential election of 2000.[3] *Id.* The Georgia House of

Representatives created a joint study committee to examine Georgia's voting

system and related policy areas, and to consider options for replacement of

the DRE voting system. *Id.* ¶ 2. The next legislative session, the Georgia

General Assembly passed House Bill 316 ("H.B. 316"), adopting a new voting

---

[2] State Defendants have filed one SMF separately on the docket that is jointly referred to in the two motions for summary judgment against both Curling and Coalition Plaintiffs.

[3] While "Florida got the attention in 2000," the Atlanta Journal-Constitution reported that "Georgia's percentage of uncounted votes" under the old paper-ballot system "was actually higher—and twice the national average." Ex. 2 at H1–2.

system using BMDs, and the Governor signed the legislation on April 2, 2019.
2019 Ga. Laws Act No. 24 (H.B. 316).

Following the passage of H.B. 316 and a competitive bid process, the
Secretary awarded a contract worth $107 million to Dominion Voting
Systems on August 9, 2019. SMF ¶ 8. Pursuant to that contract, the State
purchased over 30,000 BMDs at tremendous expense to the State's taxpayers
in the first year and immediately began helping Georgia's counties to
implement the new system. *Id.* ¶ 9.

### A. How the Dominion BMD System works.

Under the Dominion BMD System, voters who vote in-person make
their selections using the touchscreen on a BMD. *Id.* ¶ 13. When voters are
finished making their selections, they are provided with an on-screen visual
summary of their selections and instructed to review them for accuracy
before printing their ballot. *Id.* ¶ 14. After confirming their choices with an
affirmative press of a button, a printer connected to the BMD prints out a
paper ballot containing an electronic QR code (a computer-readable selection
of the voter's choices) as well as a written, human-readable list of the voter's
choices. *Id.* ¶¶ 15–16. Georgia law considers this written, human-readable
list to be the voter's official ballot. Ga. Comp. R. & Regs. 183-1-15-.02(h), (j)

(defining a "vote" as the choices indicated by the printed paper ballot" and stating that "the printed text shall control" between the QR code and the printed list). The voter is instructed to read this printed summary to ensure that it accurately reflects the choices the voter made on the BMDs. SMF ¶ 18. After they have done so, the voter inserts the printed ballot into a precinct scanner which scans the QR code and deposits the ballot into a locked box to be kept for later auditing and recount purposes. *Id.* ¶¶ 19, 24.

For absentee ballots,[4] voters mark ballots by hand by darkening an oval next to their selections. *Id.* ¶ 25. These hand-marked paper ballots are then scanned and tabulated by scanning them on a scanner. *Id.* Like the in-person ballots, absentee ballots are stored securely in a locked box. *Id.* ¶ 26.

**B. The State has decertified the DRE system.**

In concert with the adoption of the BMD system, and because Georgia law requires the State and its counties to use the BMDs as the State's unified election system for all elections, O.C.G.A. § 21-2-300(a)(2), the Secretary decertified the entire GEMS/DRE system on December 30, 2019. SMF ¶ 29.

---

[4] The Georgia election code categorizes voting as either Election Day voting or "advance voting," with advance voting split between advance in-person voting and advance voting by mail. O.C.G.A. § 21-2-380. For simplicity's sake, the State uses "absentee voting" to refer to advance voting by mail.

The decertification order of the Secretary specified that the GEMS/DRE system could no longer be used in Georgia elections or primaries:

> [T]he Accu Vote Voting System, consisting of the Global Election Management System (GEMS), Accu-Vote TS R6 DRE Voting Station, AccuVote TSX DRE Voting Station, AccuVote OS Optical Scanner, ExpressPoll 4000 Electronic Poll Book, and ExpressPoll 5000 Electronic Poll Book, can no longer be lawfully used in Georgia beginning on January 1, 2020. Therefore, the previous certifications for the aforementioned system are hereby revoked, and the system is no longer certified for use in any primaries or elections in this state.

*Id.* ¶ 30. The Court subsequently entered a Consent Order on Storage of DREs on June 25, 2020, but that Consent Order had no bearing on the conclusive effect of the Secretary's GEMS/DRE decertification order. No elections in Georgia have been conducted using the DREs since the Secretary decertification order. *Id.* ¶ 31. State Defendants have no plans—nor legal authority—to ever return to the old DRE system for any future election. *Id.* ¶¶ 32–33.

### C. Numerous audits and recounts have confirmed the accuracy of the BMD system.

Georgia law requires the Secretary of State to conduct risk-limiting audits ("RLAs") on at least one general-election race in even years to further confirm election results for the BMD voting systems. *Id.* ¶ 292. RLAs make

use of statistical methods like random sampling to validate the accuracy of an election result and are considered the "gold standard for post-election tabulation auditing" by the Carter Center. SMF ¶ 293; Ex. 37 at 11; Ex. 38 at 2; O.C.G.A. § 21-2-498(a)(3). In conducting an RLA (and in a recount), the printed, *human-readable* text on the BMD ballot controls and is what officials count. Ga Comp. R. & Regs. 183-1-15-.02(j).

Since the introduction of RLAs, the Secretary of State has conducted two audits of statewide elections. The first was the full hand recount conducted on November 19, 2020 for the 2020 presidential election mentioned above.[5] The second was conducted on November 18, 2022, for the Georgia Secretary of State election. *Id.* ¶ 295.

The Carter Center observed both RLAs at the State's invitation. *Id.* ¶ 296. After observing these audits—which used the *printed, human-readable* ballots containing voter's selections—the Carter Center "commende[d] Georgia election officials for instituting a process that should serve as the basis for increased confidence in the [State's] electoral system," and said that

---

[5] Because of the incredibly narrow margin between the two candidates in that race, the Secretary of State chose to do a full hand count of *all* ballots in that race, rather than just the typical sampling. SMF ¶ 297.

both audits "confirmed the original results" of these elections as reported through the BMD's initial QR-code tabulation. Ex. 37 at 5; Ex. 38 at 1.

**The 2020 presidential recount.** In the wake of the 2020 election—and in an atmosphere of speculative concerns raised about the Dominion BMD system by former President Trump and his supporters similar to Curling Plaintiffs' allegations here—the State satisfied its obligations to complete a risk-limiting audit by conducting a full hand recount of the 2020 presidential election on November 19, 2020. SMF ¶ 297.

### 2020 PRESIDENTIAL RECOUNT[6]

| CANDIDATE | INITIAL TOTAL | RECOUNT TOTAL | DIFFERENCE |
|---|---|---|---|
| Trump | 2,461,837 | 2,462,857 | + 1,020 |
| Biden | 2,474,507 | 2,475,141 | + 634 |
| Jorgensen | 62,138 | 62,587 | + 449 |

The November 19, 2020 hand recount was conducted by auditing all 159 counties, examining 41,881 batches, hand-sorting and then hand-tallying each ballot. *Id.* It was the largest hand count of ballots in U.S. history. *Id.* ¶ 298. Most counties found no change in their final tally, and the majority of the remaining counties changed fewer than 10 ballots. *Id.* ¶ 299. 103 of the

---

[6] SMF ¶ 297; Ex. 39.

159 counties showed a margin variation of less than 0.05%, and Georgia's highest error rate in any county recount during the audit was 0.73%. *Id.* ¶ 300. This percentage was well within the expected margin of human error that occur during hand-counting ballots. *Id.* ¶ 301. After conducting the recount, Georgia showed a mere 0.1053% variation in statewide total vote count, and a 0.0099% variation in the overall margin. *Id.* ¶ 303. As the Carter Center said in its post-audit report, the 2020 recount—which recounted the *human-readable* portion of the ballots—"confirmed the original results of the presidential election in Georgia[.]" Ex. 37 at 5.

**The November 2022 RLA.** For the statewide audit of the 2022 Secretary of State race, county election officials in all 159 counties hand counted a random selection of ballots in order to confirm the accuracy of the results for the Secretary of State election. SMF ¶ 304. A total of 328 batches of ballots were audited, of which 279 (85%) had no deviation from the original vote totals. *Id.* ¶ 306. Of the 49 other batches, all except for one were within the expected margin of error for a hand count. *Id.* ¶ 307. Like the 2020 RLA, the 2022 RLA identified only a small difference in votes that was well within the expected margin of error, thereby re-confirming the accuracy of the BMD system. *Id.* ¶ 308.

## II. Curling Plaintiffs' allegations regarding vulnerabilities with Georgia's voting system.

### A. Curling Plaintiffs' fears are undefined, unfounded, and speculative.

Despite the lack of connection between the two systems, Curling Plaintiffs contend that the new BMD system suffers from similar security vulnerabilities as the DRE Voting System. TAC ¶ 11. Specifically, Curling Plaintiffs contend that the BMD system is potentially susceptible to malware and that the system's use of a QR code for its initial tabulation prevents voter's from verifying that their votes were counted correctly. *Id.* ¶ 72.

The individual Curling Plaintiffs have all submitted declarations in this case stating that, while they prefer to vote in person, they have felt compelled to vote by absentee ballot due to "concern[s]" about whether their ballots would be accurately counted by the BMD voting systems. *See* Doc. 785-3 ¶ 7; Doc. 785-4 ¶ 11; Doc. 785-5 ¶ 10.

**Donna Curling.** Plaintiff Curling believes that Georgia's BMD election system prevents her from "know[ing] if [her] vote is counted as cast because [her] vote is translated into a QR code, which is not human readable." Curling Dep. 41:7–12; SMF ¶ 91. But when pressed, Curling admitted that she had no evidence to substantiate her fears. For example, Curling's fears stem from her belief that the BMD election system must be

"presumed to be compromised," but she could not explain why. *Id.* ¶ 92.

Curling also pled that there is a "vulnerability" in the Dominion BMDs that

that "remote attackers [could] implement a DNS attack." Doc. 627 ¶ 81.

However, Curling does not know what a DNS attack is, and she has no

knowledge if one has actually occurred on the Georgia Election System. SMF

¶ 94. Likewise, Curling has no knowledge of a BMD being manipulated to

redirect votes from a voter's choice. *Id.* ¶ 96.

While Curling (like other Plaintiffs) criticize the BMDs for not

satisfying "minimal and legally required steps to ensure that [they] cannot be

operated without authorization … [or] unauthorized tampering," she could

not identify any of those steps. *Id.* ¶ 97–98. For that matter, Plaintiff Curling

pled but cannot explain what she meant by the allegation that the Dominion

BMD system "fails to ensure that all such equipment, firmware, and software

is reliable, accurate, and capable of secure operation as required by law." *Id.*

Curling perceives less risk when a voter casts a hand-marked paper

ballot, as a voter can review and verify that her votes are marked as

intended—something which voters are also able to do with ballots cast on a

BMD. Doc. 785-4 ¶ 12. Similarly, while Curling questions the use of machines

to vote, she does not object to a machine counting her hand-marked paper

ballot so long as there are risk-limiting audits (a term she cannot define).

SMF ¶¶ 437–39. Curling acknowledges, however, that there are risks associated with hand-marked paper ballots, including: the hacking of scanners, a voter's inadvertent marking outside of the appropriate line, and having a person falsely complete ballots and stuff them into a ballot box. *Id.* ¶ 440. Indeed, Curling acknowledges that using her requested remedy would not really address her complaint; she still would have no idea if her vote were counted. *Id.* ¶ 441.

**Donna Price.** Plaintiff Price asserts that Georgia's BMD system lacks transparency and, therefore, constitutes a barrier to her ability to vote. *Id.* ¶ 135. She believes that QR Codes render BMD-produced ballots unverifiable. Doc. 785-4 ¶ 8. In other words, Price believes that, since she cannot read a QR code, she cannot verify that her ballot reflects her choice (despite the plainly written identification of choices below the QR Code itself). This fear— the purported inability to know how a vote was actually counted—is what she states serves as the basis for her claim that the BMDs are unconstitutional. Doc. 785-4 ¶ 9; SMF ¶¶ 134–35, 139.

Accordingly, Price has not voted on a BMD in Georgia's current voting system and does not plan to vote on a BMD in the future. *Id.* ¶¶ 127–29. Since 2018, Plaintiff Price has always voted absentee by mail. *Id.* ¶ 127. Despite Price's fears, however, she does not know of anyone whose printed

ballot did not reflect the choices they made on a BMD. *Id.* ¶ 136.

**Jeffrey Schoenberg.** Finally, Plaintiff Schoenberg shares the other two individual Plaintiffs' fears with regards to the BMD voting system. Schoenberg contends that the BMD system is an unverifiable, un-auditable computer system that doesn't produce a verifiable auditable paper trail, and he has no way of verifying that the QR code accurately reflects the intention of the voter. *Id.* ¶ 173. He believes that the BMD system fails to protect against intrusion and manipulation, which is based on what the experts in the case tell him. *Id.* ¶ 177.

But when pressed, Schoenberg, like Price and Curling, admitted that he has no proof that his vote or anyone else's vote was not counted as cast. *Id.* ¶ 320. And despite his fears, Plaintiff Schoenberg voted on a BMD in the 2020 Presidential Preference Primary and did not feel pressured to vote absentee by mail. *Id.* ¶ 176. He has no evidence that anyone has manipulated election results, he does not believe that the winners of the elections were not the correct winners, and he also does not believe any previous elections have been hacked. *Id.* ¶¶ 320–23, 340–42.

**B. Curling Plaintiffs' experts speculate about "vulnerabilities" but cannot support their speculation with evidence.**

Following the path of the individual Plaintiffs' unsubstantiated fears, Plaintiffs' experts 'findings' are nothing more than hypothesized security risks that nothing suggests ever came to fruition.

**Dr. Alex Halderman.** Citing the QR codes, Dr. Halderman's general opinion regarding BMDs is that they "face security risks that are worse than the risks they faced when voting on DREs." Doc. 1068 at 1–2. But he completely dismisses the BMD's inclusion of human-readable text on the grounds that votes are initially tabulated using the QR code. *Id.* at 2. And while Dr. Halderman's declarations discuss at length scenarios that *could hypothetically* occur, he fails to provide evidence of any actual hack or existence of malware on the voting machines. SMF ¶ 428–29. This is not for lack of trying. Dr. Halderman has had significant access to images of Georgia's DREs, BMDs, and GEMS databases but has never found any evidence of malware on that system. SMF ¶¶ 427–29. Further, Dr. Halderman stated that even if he again failed to find malware after conducting a full forensic review of Dominion BMDs, he still could not rule out the presence of malware. *Id.* Thus, even a full forensic review would fail to assuage Dr. Halderman's concerns, which he recognizes are contrary to the

scientific community's recommendation of BMDs. Doc. 571-1 at 151:1–23.

**Dr. Andrew Appel.** Dr. Appel, like Dr. Halderman, asserts that "[t]he use of BMDs, by voters who are otherwise able to mark a paper ballot with a pen, is not adequately secure for use in public elections." SMF ¶ 430. Dr. Appel has never forensically examined the Dominion BMDs used in Georgia. *Id.* ¶ 431. He has never examined the voter registration database. *Id.* ¶ 432. He has never examined the PollPads. *Id.* ¶ 433. Nonetheless, Dr. Appel speculates that because some voters do not closely verify the printed text on their ballots, a theoretical hacker could alter a small number of votes without raising alarm, an amount sufficient to "alter the outcome of several recent elections in Georgia, including the 2020 Presidential election and one of the January 2021 Senate runoff elections." *Id.* ¶ 434. Dr. Appel conceded, however, that he was unaware of malware capable of doing so and which was both self-propagating (such that it could spread to infect multiple BMDs on its own) and adaptable (such that it could effectively alter votes on multiple different ballot styles). *Id.* ¶ 435.

### C. The unauthorized access of the Coffee County election equipment.

In January 2021, various supporters of then-President Donald Trump, including certain since-terminated county election officials, granted

unauthorized accessed to Coffee County's election equipment. Doc. 1473. Despite conducting extensive discovery into this issue—and having experts forensically examine the equipment—Plaintiffs have not discovered any evidence of any malware being installed on the Coffee County equipment, nor of anything being done to the machines that could affect any votes in the future. SMF ¶¶ 395, 404, 410–13, 417–18, 424.

## III.  Curling Plaintiffs' claims.

Curling Plaintiffs have asserted four separate claims in their TAC related to the DREs and BMDs: that the DREs violate (1) the Due Process Clause (Count I) and (2) Equal Protection Clause (Count II); and that the BMDs violate (3) Due Process Clause (Count III) and (4) the Equal Protection Clause (Count IV).[7] TAC ¶¶ 91-140. The individual Curling Plaintiffs prefer elections to be conducted using *only* hand-marked paper ballots, despite acknowledging that risks are associated with that method of voting. Summary Judgment in favor of Defendants on all four of these remaining claims is appropriate and necessary.

––––––––––––––––––––

[7] A fifth claim for declaratory relief was dismissed by the Court in a previous order. (Doc. 751 at 30 n.18).

## STANDARD OF REVIEW

Summary judgment is warranted when there are no "genuine dispute[s] as to any material fact" and the defendant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Defendants (as movants) bear the burden of making this showing, which they may satisfy by demonstrating there "is an absence of evidence" to support an element of Plaintiffs' claims. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Evidence and "factual inferences [are viewed] in the light most favorable" to Plaintiffs (as non-movants). *Johnson v. Clifton,* 74 F.3d 1087, 1090 (11th Cir.1996). Once Defendants satisfy this initial requirement, the burden shifts to the Plaintiffs to show the existence of a dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

## ARGUMENT

### I.   Curling Plaintiffs' DRE claims (Counts I–II) are moot.

As an initial matter, Curling Plaintiffs' claims related to the decertified DRE system are moot—as Plaintiffs themselves agree—and must be dismissed. SMF ¶ 34; Ex. 11, Nov. 19, 2021 Hearing Tr. at 73:10–13 (Curling Plaintiffs' counsel David Cross saying that "all parties agree that [Counts I–II of the TAC, the DRE claims] are moot[.]").

The Court is "not empowered to decide moot questions." *North Carolina*

*v. Rice*, 404 U.S. 244, 246 (1971). "An issue is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1189 (11th Cir. 2011). "If events that occur subsequent to the filing of a lawsuit or an appeal deprive the court of the ability to give the plaintiff or appellant meaningful relief then the case is moot and must be dismissed." *United States v. Georgia*, 778 F.3d 1202, 1204 (11th Cir. 2015) (quoting *Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1282 (11th Cir. 2004)). "And an issue can become moot at any stage of litigation, even if there was a live case or controversy when the lawsuit began." *Wood v. Raffensperger (Wood I)*, 981 F.3d 1307, 1316 (11th Cir. 2020).

Here, Curling Plaintiffs seek declaratory and prospective injunctive relief regarding the State's now-decertified DRE voting system. TAC Counts I–II, ¶¶ 98, 112. But the State no longer uses the DRE voting system—it completely replaced it with the BMD system before the 2020 primary election. *See* O.C.G.A. § 21-2-300 (mandating the use of the BMD system). The DRE system is no longer authorized for use in Georgia elections and there is no discussion about ever returning to the DRE system. SMF ¶¶ 29–33. Indeed, this Court has already recognized that Georgia law "precludes the possibility of the DRE machines being used again in Georgia elections" and

that it "does not intend to grant any further relief relating to the use of the old DRE voting machines." July 30, 2020 Order on Defendants Motions to Dismiss ("MTD Order"), Doc. 751 at 20.

The Court in its MTD Order held that the DRE claims were not "entirely moot" because they "challenged elements of the voting system beyond the DRE voting machines themselves," namely "the security of the Secretary of State's election technology infrastructure and the actual breach of the Center for Election Systems ("CES") servers, computer networks, and data and the State's electronic voter registration system and database." *Id.* at 20. In particular, the Court appeared concerned that the voter-registration database—and any potential errors in that database—was being transferred from the DRE system into the new BMD system. *Id.* at 21.

At this point, however, it is now apparent that the Curling Plaintiffs did not allege the types of claims identified by the Court and, regardless, the record fails to support them anyway. Despite years of discovery, Curling Plaintiffs have not produced any evidence of any "virus [or] malware infection" that affected the State's voter-registration database under the old system, let alone that such inaccuracies were carried over into the new system. MTD Order at 21; SMF ¶ 437. Nor have they produced a single voter who has testified that their voter-registration information is incorrect, let

– 20 –

alone that such an inaccuracy was *caused* by any actual breach of the old CES server. Indeed, a two-month federal trial in this District—filed *after* this litigation began and that included the statements of over 3,000 declarants—likewise failed to produce any evidence of widespread, systemic issues with the State's voter-registration process. *See generally Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2022 WL 4725887 (N.D. Ga. Sept. 30, 2022). And even if there were errors—which Curling Plaintiffs have produced no evidence of—those errors would, at this point, relate to Curling Plaintiffs' *BMD* claims, not their DRE claims. *See* MTD Order at 24–25 ("Plaintiffs' *claims* relating to the hand[l]ing of security of the *current* voting system"—*i.e.*, the BMD claims, not the DRE claims—would not "be moot to the extent that evidence is introduced linking this to prior security issues and breaches.") (emphasis added).[8]

---

[8] On this point, the MTD Order appears to address mootness of a *case* instead of mootness of a *claim*. The State does not argue that the *case* is moot, simply that the *claims* related to the defunct DRE system are moot. *See, e.g.*, *TransUnion LLC v. Ramirez*, 210 L. Ed. 2d 568, 141 S. Ct. 2190, 2208 (2021) ("standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for *each claim* that they press") (emphasis added); *United States v. Vega*, 960 F.3d 669, 673 (5th Cir. 2020) (federal courts "must evaluate mootness on a claim-by-claim basis to determine whether each claim satisfies the constitutional requirements for Article III jurisdiction."); *ThermoLife Int'l, LLC v. Hi-Tech Pharms., Inc.*, No. 1:15-CV-00892-ELR, 2021 WL

Thus, because injunctive relief is "inherently prospective in nature," and there is no threat of future harm or relief remaining for this Court to issue related to the defunct DRE system—something on which Curling Plaintiffs agree—Curling Plaintiffs' claims related to the DREs are moot and must be dismissed. *Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 734 (11th Cir. 2018).

## II.  Curling Plaintiffs lack Article III standing to bring any of their claims.

Summary judgment in Defendants' favor on all of Curling Plaintiffs remaining claims is warranted because Curling Plaintiffs cannot satisfy Article III's standing requirements. "Federal courts are not constituted as free-wheeling enforcers of the Constitution and laws." *Wood v. Raffensperger (Wood I)*, 981 F.3d 1307, 1313 (11th Cir. 2020) (quotations omitted). Rather, federal courts may decide only active "cases" and "controversies." U.S. Const. art. III, § 2. "For there to be a case or controversy under Article III, the plaintiff must have a personal stake in the case—in other words, standing." *Ramirez*, 141 S. Ct. at 2203 (quotations omitted). As a fundamental

---

4185905, at *3 (N.D. Ga. Apr. 13, 2021), *rept. and rec. adopted*, 2021 WL 4185901 (N.D. Ga. May 5, 2021).

jurisdiction question, standing must be established before consideration of the merits. *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990).

To establish standing to sue, a plaintiff must prove: "(i) that he suffered an injury-in-fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Ramirez*, 141 S. Ct. at 2203. "Because the elements of standing 'are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported ... with the manner and degree of evidence required at the successive stages of the litigation.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (quoting *Lujan*, 5043 U.S. at 561). This means that, in order to survive summary judgment, a plaintiff "can no longer rest on [ ] 'mere allegations,' but must set forth by affidavit or other evidence specific facts" establishing these elements. *Lujan*, 504 U.S. at 561. The burden for establishing standing rests squarely with Curling Plaintiffs and is one which they fail to carry on multiple fronts. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

### A. Curling Plaintiffs cannot demonstrate an injury-in-fact.

Injury-in-fact is the "first and foremost" of the standing elements. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To establish an injury-in-fact, a plaintiff must establish three sub-elements, namely that he or she has suffered "[1] an invasion of a legally protected interest that is [2] both concrete and particularized and [3] actual or imminent, *not conjectural or hypothetical.*" *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (emphasis added). As the Third Circuit put it in the aftermath of the 2020 election, an injury "that does no specific harm to you, or [that] depends on a harm that may never happen," lacks these fundamental characteristics of a cognizable injury. *Bognet v. Sec'y of Pa.,* 980 F.3d 336, 348 (3d Cir. 2020), *cert. granted, judg. vacated as moot*, 141 S. Ct. 2508 (2021).[9]

Here, Curling Plaintiffs fall far short of demonstrating an injury-in-fact. *First*, Curling Plaintiffs have not alleged an injury to a legally cognizable interest. *Second*, Curling Plaintiffs' claims are merely generalized grievances and are not particularized to the Plaintiffs. *Third*, even if their

---

[9] *Bognet* has repeatedly been favorably cited by courts in the Eleventh Circuit. *Wood*, 981 F.3d at 1314-15; *Wood I*, 2020 WL 6817513 at *4; *Wood II*, 2020 WL 7706833 at *3; *Trump v. Kemp*, No. 1:20-CV-5310-MHC, 2021 WL 49935 at *3 (N.D. Ga. Jan. 5, 2021).

claimed harm were otherwise adequate, they present only a speculative

possibility of harm that is neither certainly impending nor concrete.

### 1. *"Verifying" a vote is not a legally cognizable interest.*

Curling Plaintiffs first fail to demonstrate an injury-in-fact because

voters do not have an independent, constitutional right to "verify" that their

votes were correctly counted. As the Court articulated in its MTD Order,

Curling Plaintiffs allege that their constitutional rights were infringed

because "they will be required to cast a ballot that cannot be read or verified

as reflecting their actual choices because the votes are tabulated solely from

an encrypted bar code that is not human readable." MTD Order at 38. In

other words, Curling Plaintiffs allege that their injury-in-fact is the inability

to "verify" that their ballots were correctly cast.

As discussed further below in Section III.B.1, this is factually untrue.

Voters are not "required" to use the BMD system—they are completely free to

vote absentee-by-mail, the method which they themselves agree is

constitutionally sufficient. TAC ¶ 103, 124. Moreover, while the initial vote

tabulation is done using scanners which read the QR codes, Georgia law

requires that audits to use the *human-readable* text on the ballot. SMF

¶¶ 17, 294; Ga. Comp. R. & Regs. 183-1-15-.02(h) (defining a "vote" as the

choices indicated by the printed paper ballot"). And if there is any discrepancy between the QR code and the printed *human-readable* text, Georgia law states that the *human-readable* "printed text shall control." *Id.* (j). Thus, the entire foundation of this theory of injury is based on a false description of Georgia's election system.

But even if Georgia voters were "required" to use the BMD system and the only "valid" votes were contained in the BMDs, Curling Plaintiffs would still lack standing because there is no constitutional right to "verify" one's vote. To demonstrate an injury-in-fact, a plaintiff "must show that he 'suffered an invasion of a *legally protected interest*[.]'" *Burdick v. Kennedy*, 700 F. App'x 984, 986 (11th Cir. 2017) (emphasis added) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)). A "legally cognizable injury requires infringement of an interest protected by statute or otherwise." *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty.*, 450 F.3d 1295, 1304 (11th Cir. 2006).

Here, the relevant right is the "ability to vote" and have that vote "given the same weight as any other," *not* to be able to "verify" their votes. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1246 (11th Cir. 2020); *see also Nemes v. Bensinger*, 467 F. Supp. 3d 509, 528 (W.D. Ky. 2020) ("there is no constitutional right to vote in a particular … manner."); *Schulz v. Kellner*,

No. 1:07-CV-0943 LEK/DRH, 2011 WL 2669456, at *5 (N.D.N.Y. July 7, 2011) (rejecting claim that electronic-voting machines unconstitutionally prevented plaintiffs from "know[ing] that their votes were accurately counted" because there is no "legally protected interest in having their votes counted in a very particular way"). *Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 820 (S.D. Ind. 2006) (same), *aff'd*, 472 F.3d 949 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008). Curling Plaintiffs have never cited—and State Defendants are not aware of—any authority to suggest that the constitutional right to vote entails a collateral right to "verify" that the vote was correctly counted.

Thus, the mere fact that a voter cannot "verify" that their ballot was correctly cast—something which is not true of the BMD system—is insufficient to demonstrate an injury-in-fact because there is no legally protected interest in "verifying" a ballot.

### 2. *Curling Plaintiffs' fears of "potential" vulnerabilities are generalized grievances that are not particular to any individual.*

Rather, in order to demonstrate an injury-in-fact stemming from the State's use of the BMDs, Curling Plaintiffs must demonstrate that the BMDs threaten to cause a burden on their right to *actually* vote and do so effectively. Curling Plaintiffs attempt to shore up their allegations by arguing

that the BMDs create a "risk" of future harm due to their "vulnerabilities" that are "susceptible to manipulation." TAC ¶ 8. But this "risk of future harm" argument dressed up in techno-speak is nothing more than a "generalized grievance" that falls short of establishing an Article III injury. *Wood I*, 981 F.3d at 1314.

Generalized grievances, like those alleged by Curling Plaintiffs, are "undifferentiated and common to all members of the public." *Lujan*, 504 U.S. at 575. Particularized injuries, by contrast, "affect the plaintiff in a personal and individual way." *Spokeo*, 136 S. Ct. at 1548. Thus, to satisfy the particularity requirement, a plaintiff must demonstrate "a personal stake in the outcome of the controversy," *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018), one which is "different from that of any other person." *Wood I*, 981 F.3d at 1314. Curling Plaintiffs do not.

Instead, Curling Plaintiffs articulate two theories of injury. *First*, their due process claim is based on an idea that they have been unjustly compelled to vote by absentee ballot due to their fears that Georgia's in-person voting system is *potentially* vulnerable, unreliable, and unverifiable for those Georgia voters that *do* vote in person. *See* Docs. 785-3 ¶ 7; 785-4 ¶ 11; 785-5 ¶ 10.

*Second*, Curling Plaintiffs assert they have standing to bring their

equal protection claims because absentee ballots are given "greater weight" due to the fact that they "can be accurately recounted, errors identified and corrected" compared to votes cast using the old DRE and current BMD systems which "do not share those essential advantages." TAC ¶¶ 108, 129. Neither theory satisfies Article III's particularity requirement.

**Due-process theory.** Their due-process theory fails for a number of reasons. *First*, as discussed above, there is no constitutional right to a particular *form* of voting. *See supra* at 26.

*Second,* it is "an individual's *choice* whether to vote by mail or in person," *Wood I*, 981 F.3d at 1315 (emphasis in original). Indeed, "Georgia law permits all eligible voters to choose whether to cast an absentee ballot, without reason or explanation." *Wood v. Raffensperger (Wood II)*, No. 1:20-CV-5155-TCB, 2020 WL 7706833, at *4 (N.D. Ga. Dec. 28, 2020), *aff'd*, No. 20-14813, 2021 WL 3440690 (11th Cir. Aug. 6, 2021). Here, Curling Plaintiffs largely *chose* to vote absentee-by-mail, *i.e.*, the very method they allege is *better*. SMF ¶¶ 62–63, 66–68, 113–19, 150, 152–59.[10] Thus, the only persons

---

[10] This choice remains available to Curling Plaintiffs now. They seek here only to eliminate that choice for other Georgia voters who may prefer to vote on BMDs.

voting by BMD who may not know if their vote is counted are not parties to the lawsuit, or certainly are not the Curling Plaintiffs.

*Third*, to the extent they chose to vote in-person (or claim that voting by absentee entails costs that voting in-person does not), Curling Plaintiffs "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).[11]

*Fourth*, even assuming they were all "forced" to vote in-person and were therefore subject to a supposedly "unreliable" in-person election system, this would still be a generalized grievance insufficient to grant Article III standing. "[A]n asserted interest in being free of an allegedly illegal electoral system" is not a particularized injury. *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1333 (11th Cir. 2007) (per curiam). Indeed, the Eleventh Circuit squarely rejected this idea after the 2020 election cycle. *Wood II*, 2021 WL 3440690. In that case—part of a series of lawsuits Lin Wood brought in the wake of the 2020 election—Wood alleged that his due process rights were

---

[11] As discussed further below, Curling Plaintiffs have not provided any evidence demonstrating that there is any real danger of hacking the election system to substantiate their fears of an unreliable system.

violated as an in-person voter because the election procedures were "defective and unlawful" and "affected the integrity of the election." *Id.* at *3. But the Eleventh Circuit clearly said that "this grievance is common to all members of the public, so it is not particularized and thus not enough for Article III standing." *Id.*

Similar to the claims of Lin Wood, Curling Plaintiffs allege that their due process rights were violated by voting using an allegedly unreliable and unverifiable system. But this grievance would be "shared identically by the four million or so Georgians who voted in person this November." *Wood I*, 981 F.3d at 1315. "[W]hen the asserted harm is ... shared in substantially equal measure by ... a large class of citizens," it is not a particularized injury." *Id.*; *see also Crist v. Comm'n on Presidential Debates*, 262 F.3d 193, 195 (2d Cir. 2001) ("a voter fails to present an injury-in-fact when the alleged harm is abstract and widely shared."); *Landes*, 2004 WL 2415074, at *3 (finding plaintiff's allegation of injury where machines prevented her from knowing whether her vote was actually cast "amounts to a generalized grievance shared in substantially equal measure by all or a large class of citizens and is not sufficient to confer standing.").

**Equal-protection theory.** Curling Plaintiffs' equal-protection theory suffers from a similar fate. The Eleventh Circuit has squarely rejected the

theory of injury based on a "preferred" type of voter based on different methods of voting and voting procedures. In *Wood I*, the Eleventh Circuit rejected Lin Wood's argument that Georgia treats absentee voters as a "preferred class," because "[e]ven if we assume that absentee voters are favored over in-person voters, that harm does not affect Wood as an individual—it is instead shared identically by the four million or so Georgians who voted in person this November." *Id.* at 1315.

The Eleventh Circuit reaffirmed this principle in *Wood II*. 2021 WL 3440690 at *2. There, Wood alleged that his vote was devalued in relation to other votes because of claimed irregularities with the BMD voting machines and absentee-ballot procedures, which he claimed subjected him to unequal treatment as an in-person voter. *Id.* at *3–4. Like Curling Plaintiffs, Wood alleged that absentee voters were treated better than in-person voters. *Compare id. with* TAC ¶ 108, 129 (stating that absentee ballots are given "greater weight" because they "can be accurately recounted, errors identified and corrected" compared to votes cast using the BMD systems which "do not share those essential advantages."). Once again, "Wood's asserted injuries were shared identically by [all] Georgians who voted in person" and failed to establish standing. *Wood II*, 2021 WL 3440690 at *2.

The same analysis bars Curling Plaintiffs' claims. Each failed to

"explain how [their] particular in-person vote[s]"—to the extent such votes were cast—"as opposed to all in-person votes more generally, [were] diluted or disvalued," how the BMD system "'specifically disadvantaged' [their] vote[s] rather than impacting the proportional effect of every vote," or how the supposed differences in absentee and in-person voting affected them as "individual[s]." *Wood II*, 2021 WL 3440690, at *2. At most, Curling Plaintiffs' asserted injuries "were shared identically by all Georgians who voted in person." *Id.* (quotations omitted). Curling Plaintiffs have therefore "shown nothing more than [ ] textbook generalized grievance[s] that [are] insufficient for Article III standing." *Id.*

### 3. Curling Plaintiffs' alleged harm is purely conjectural and speculative, not concrete nor certainly impending.

Even if their alleged injuries were particularized, they would still be far too speculative to constitute a concrete injury under Article III. "A 'concrete' injury is one that actually exists—it is 'real,' as opposed to 'abstract.'" *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cty. Bd. of Registration & Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022) (citations omitted). Because Curling Plaintiffs seek prospective relief, they must prove that the risk of their threatened injuries is "certainly impending." *Clapper*, 568 U.S. at 401.

Curling Plaintiffs have not done so here. Curling Plaintiffs'

– 33 –

fundamental allegation is that the State's BMD system "fails to provide reasonable and adequate protection against the real and substantial threat of electronic and other intrusion and manipulation by individuals and entities without authorization to do so." TAC ¶ 116. But despite extensive discovery in this case, Curling Plaintiffs cannot demonstrate a single instance of hacking or manipulation that actually affected the integrity of the election system.[12] Curling Plaintiffs' "fears" are, therefore, nothing more than rank speculation.

The Eleventh Circuit recently—*i.e.*, *after* the Court issued its MTD Order and *after* the Court issued its October 10, 2020 Order on Plaintiffs' Tenth Motion for Preliminary Injunction [Doc. 964]—rejected similarly speculative allegations of "risks" in *Tsao v. Captiva MVP Rest. Partners, LLC*, a case in which a plaintiff whose information had been compromised in a data-breach case alleged he had standing "because he face[d] a substantial risk of identity theft, fraud, and other harm in the future as a result of the

---

[12] Plaintiffs have no evidence that the unauthorized access to election equipment in Coffee County in January 2021 (currently the subject of an investigation referred to the Georgia Bureau of Investigation) included, caused, or otherwise led to the hacking or manipulation of election results or the introduction of malware into any aspect of the Georgia election system, let alone their specific votes. SMF ¶¶ 396, 405, 411–14, 418–19, 425, 437.

data breach." 986 F.3d 1332, 1340 (11th Cir. 2021). Just as Curling Plaintiffs'

claims here are premised on fear of a speculative multi-step process that *may*

lead to vote alterations in the future—others' votes, that is, given Curling

Plaintiffs' general refusal to use the BMDs—Tsao's claims were premised on

a fear that "he *could* suffer future injury from misuse of the personal

information disclosed during the cyber-attack (though he has not yet), and, he

argued, "this risk of misuse alone [was] enough to satisfy the standing

requirement." *Id.* at 1337 (emphasis in original).

The Eleventh Circuit squarely rejected this argument. As it held in

*Muransky* just one year prior, a mere "'elevated risk of identity theft"—or, as

'Tsao puts it, a 'continuing increased risk' of identity theft—'[is] simply not

enough' to confer standing." *Id.* at 1343 (quoting *Muransky v. Godiva

Chocolatier, Inc.*, 979 F.3d 917, 933 (11th Cir. 2020)); *see also Alabama

Legislative Black Caucus v. Alabama*, 988 F. Supp. 2d 1285, 1300 (M.D. Ala.

2013) ("When a threatened future injury is dependent upon 'conjecture about

how individuals will intentionally act in the future,' that injury will be 'cast ...

into the realm of conjecture and speculation.'") (quoting *Fla. State Conference

of NAACP v. Browning*, 522 F.3d 1153, 1162–63 (11th Cir. 2008)).

Here, Curling Plaintiffs cannot match the "certainly impending"

standard articulated in *Clapper*, *Tsao*, and *Muransky*. As an initial matter,

– 35 –

no Curling Plaintiff resides or votes in Coffee County. SMF ¶ 53, 108, 140. Nevertheless, even taking the facts most favorable to Curling Plaintiffs and viewing Coffee County as an unauthorized breach of the elections system, there is no evidence of manipulation of votes or evidence of introducing malware to the election system to cause a future manipulation of votes. SMF ¶¶ 396, 405, 411–14, 418–19, 425, 437. As *Tsao* made clear, a breach alone is insufficient to establish standing. 986 F.3d at 1344 ("[e]vidence of a mere data breach does not, standing alone, satisfy the requirements of Article III standing.").

In short, as demonstrated by the lack of any evidence showing the manipulation of Georgia's election system, Curling Plaintiffs "fears" about unauthorized access to Georgia's election systems are based upon nothing more than "speculation about actions or conduct of independent bad actors[.]" Doc. 1066-2 (*Twelfth Cong. District Republican Cmte v. Raffensperger*, Case No. 1:20-CV-180 (S.D. Ga. Dec. 17, 2020), Motions Hrg. Tr. at 6:14–24). Curling Plaintiffs simply "see ghosts behind a door." *Id.* Under binding Supreme Court and Eleventh Circuit precedent, such rank speculation is not enough to confer Article III standing.

**B. Curling Plaintiffs' alleged injuries are neither traceable nor redressable by State Defendants.**

Curling Plaintiffs also lack standing because their alleged injuries are neither traceable nor redressable by State Defendants. To satisfy the traceability requirement, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1253 (11th Cir. 2020). Additionally, "it must be *the effect of the court's judgment on the defendant*—not an absent third party— that redresses the plaintiff's injury, whether directly or indirectly." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (emphasis in original).

Here, Plaintiffs' injuries are not traceable to State Defendants because the ultimate injury they fear—the inability to have their vote accurately counted—could only be traced either to illegal hacking by third parties; improper conduct by election officials; or voters' failures to verify their paper ballots—not the State's implementation of BMDs. Likewise, Curling Plaintiffs' claims are not redressable by State Defendants because the same concerns allegedly associated with BMDs (lack of audits, hacking, and interference from election officials) are present in Plaintiffs' requested relief. Plaintiffs' speculation that their preferred balloting system would eliminate

– 37 –

potential third-party interference ignores the reality "that the possibility of electoral fraud can never be completely eliminated, no matter which type of ballot is used." *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) (emphasis in original).

**III. Curling Plaintiffs' claims fail on the merits.**

Even if the Court did have jurisdiction over Curling Plaintiffs' claims—it does not—summary judgment is still warranted because Curling Plaintiffs' claims that Georgia's election system is unconstitutional still fail on the merits.

Specifically, the Curling Plaintiffs allege the BMD system violates their due process rights by unconstitutionally burdening their right to vote in three separate (potential) ways: it (1) is *vulnerable* to manipulation by third parties; (2) produces no verifiable paper trail; and (3) does not allow for a "meaningful audit." MTD Order at 8–13. Curling Plaintiffs also allege that the BMD system violates the Equal Protection Clause because absentee ballots are given "greater weight" because they are more easily reviewable after an election than votes on the old DRE and current BMD systems which "do not share those essential advantages." TAC ¶¶ 108, 129.

But whether viewed independently or collectively, none of these alleged

injuries are supported by any evidence. And even if they had a factual basis,

the supposed burdens the BMD system would impose on voting would not

rise to the level of a constitutional violation under binding Supreme Court

precedent.

### A. The *Anderson-Burdick* framework.

Courts "evaluate the constitutionality of a challenged election law by

applying the *Anderson-Burdick* test." *Democratic Exec. Comm. of Fla. v. Lee*,

915 F.3d 1312, 1318 (11th Cir. 2019) (citing *Anderson v. Celebrezze*, 460 U.S.

780, 789 (1983) and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)).[13] Under

this familiar test, the Court must first decide if there is *any* burden on the

right to vote. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1261 (11th Cir.

2020) ("we have to identify a burden before we can weigh it."). If it identifies

a burden, the Court must then "weigh the burden imposed by the law [on the

right to vote] against the state interests justifying the law." *Id.* "[T]he

---

[13] The *Anderson-Burdick* framework applies equally to due-process and
equal-protection claims where, as here, a plaintiff has not alleged a
discriminatory intent in establishing the challenged policy. *Democratic Exec.
Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019); *see also New
Georgia Project v. Raffensperger*, 976 F.3d 1278, 1282 (11th Cir. 2020) ("We
must evaluate laws that burden voting rights using the approach of *Anderson*
and *Burdick*.").

rigorousness of [the] inquiry into the propriety of a state election law depends on the extent to which a challenged regulation burdens" a plaintiff's constitutional rights. *Burdick v. Takushi*, 504 U.S. 428, 432 (1992). Those that burden voters' rights are scrutinized more closely than those that burden them only slightly, if at all. "A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest. But reasonable, nondiscriminatory restrictions that impose a minimal burden may be warranted by the State's important regulatory interests." *Black Voters Matter Fund v. Raffensperger*, 478 F. Supp. 3d 1278, 1316 (N.D. Ga. 2020) (Totenberg, J.) (quotations omitted), *aff'd*, 11 F.4th 1227 (11th Cir. 2021).

Here, Curling Plaintiffs challenge the State's choice to use the Dominion BMD system for in-person voting. But as demonstrated below, Plaintiffs have not shown that the BMD system burdens their right to vote at all, let alone in a way that can be characterized as severe. Moreover, the State has a clear and justifiable interest in choosing to utilize an electronic voting system.

### B. Georgia's in-person voting system does not impose any burden—let alone a severe one—on the right to vote.

Curling Plaintiffs cannot satisfy the *Anderson-Burdick* test because they cannot demonstrate that the use of the Dominion BMD system both burdens them individually (*e.g.*, is beyond mere inconvenience) and burdens their right to vote (*e.g.*, substantively impairs their voting rights). *Fair Fight Action,* 2022 WL 4725887, at *49. In analyzing their claims, the Court must consider the other methods of voting available to Curling Plaintiffs, including their ability to use hand-marked paper ballots during early voting. *See New Georgia Project*, 976 F.3d at 1281 (considering various methods of voting absentee when applying *Anderson-Burdick* analysis), 1286 (same) (Lagoa, J., concurring).

Here, Curling Plaintiffs contend that the Dominion BMD system burdens their right to vote because it "forc[es] voters to choose between totally relinquishing their right to vote and acquiescing to cast their vote despite very real risks: [1] the *risk* that their vote will not be properly counted; [2] the *risk* that the declared results will be contrary to the will of voters; and furthermore, [3] the *risk* that there will be no way to verify the validity of the election." TAC ¶ 8 (emphasis added). But this entire theory is based on a series of fundamentally flawed premises.

### 1. *Voters are free to vote absentee.*

*First*, it rests on a false dichotomy—voters do not have to choose between voting on the BMD system and not voting at all. Voters have other options, most notably by voting absentee using hand-marked paper ballots, which the Curling Plaintiffs contend is a "verifiable, recountable [method], which can be counted, reviewed, and discrepancies corrected under the supervision of a court." TAC ¶¶ 103, 124. Nothing prevents the Curling Plaintiffs, or any other Georgians, from using this method. *Wood II*, 2020 WL 7706833, at *4; SMF ¶¶ 62–63, 66–68, 113–19, 150, 152–59 (all Curling Plaintiffs have voted by absentee numerous times). Thus, the Curling Plaintiffs may choose to eliminate their anxiety by doing what they typically do: vote absentee with a paper ballot. *Id.*

This is dispositive. As the Eleventh Circuit held in *New Georgia Project*, a regulation simply "does not implicate the right to vote at all" where the State—as it does here—"provide[s] numerous avenues to mitigate chances that voters will be unable to cast their ballots." 976 F.3d at 1281. The wholesale lack of a burden ends the inquiry. *See Jacobson*, 974 F.3d at 1262

("because the statute does not burden the right to vote, we cannot engage in [the *Anderson-Burdick*] review.").[14]

### 2.   *The Curling Plaintiffs have no evidence of actual, unlawful BMD manipulation.*

*Second*, there is no evidence to substantiate the supposed "risks" of hacking, manipulation, or changed votes that cause the Curling Plaintiffs such apprehension. SMF ¶ 437. Nor are their fears about the elections being "unverifiable" justified. Numerous audits since Georgia implemented the BMDs—including the much-lauded hand recount of the 2020 presidential election—have confirmed the reliability of the BMDs in accurately counting votes.

**No evidence of hacking.** None of the Curling Plaintiffs have any firsthand knowledge of a vote cast on a BMD being altered, not counted, or otherwise diminished. SMF ¶¶ 96, 136, 320–23, 340–42. Nor are Curling Plaintiffs' experts aware of any actual hacks or situations in which votes were actually compromised. Not a single one of them can testify under oath

---

[14] Because the State's use of BMDs does not burden the right to vote at all, Curling Plaintiffs' challenge also presents a nonjusticiable political question. *See Jacobson*, 974 F.3d at 1262 (*Anderson-Burdick* standard does not apply where a "statute does not burden the right to vote[.]").

that malware was placed on any BMD, let alone that malware placed on one BMD spread throughout the State. SMF ¶¶ 428–30, 436–37. Without evidence of an actual hack or injection of malware, the burden on Curling Plaintiffs (and Plaintiffs generally) can only be described as simple fear of future events. As discussed above, this is not an actual injury, but even if it were, it is slight at best. *Supra* at 24–36. *See Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) ("Under *Burdick*, the use of touchscreen voting systems is not subject to strict scrutiny simply because this particular balloting system may make the possibility of some kinds of fraud more difficult to detect.").

The Eleventh Circuit has already rejected similar "fears" and concerns of voters as a basis for constitutionally challenging state election laws. During the 2020 COVID pandemic, for example, the New Georgia Project attempted to extend the deadline for county election offices to receive mailed-in absentee ballots based on "fear" that the mail would be delayed. *New Georgia Project*, 976 F.3d at 1286 (Lagoa, J., concurring). Based on a "*potentially* substantial backlog, increasing the *possibility* that voters will receive their ballots on a later date," the trial court found that Georgia's election-day deadline for receiving absentee ballots imposed a "severe

burden" on the right to vote. *Id.* at 1282 (citing *New Ga. Project*, 484 F. Supp. 3d at 1303) (emphasis added)).

The Eleventh Circuit expressly rejected this line of reasoning, holding that the trial court's conclusions "missed the mark." *Id.* Even assuming some individual votes were rejected because of the deadline—something which Curling Plaintiffs cannot even do here—the Eleventh Circuit held that "it is simply not enough to conclude" that just because some voters experience *a* burden means "many" voters will feel a *severe* burden. *Id.* at 1281. In other words, someone's mere fears that a severe burden *might* exist are "simply not enough" to prove that a severe burden *actually* exists. *Id.*; *see also Democratic Senatorial Campaign Comm. v. Detzner*, 347 F. Supp. 3d 1033, 1038 (N.D. Fla. 2018) (holding that the "potential" that a voter's vote not be counted was minimal and outweighed by actual state interests).

Here, the Curling Plaintiffs' alleged injury is just as speculative and hypothetical as the plaintiffs in *New Georgia Project* and is the type of speculative injury that cannot establish standing, much less show a severe or material burden on the right to vote.

**Audits and recounts confirm the BMD's reliability.** Further, the audits after the 2020 Presidential Election and in the elections since demonstrate that, contrary to the Curling Plaintiffs' claims, the paper ballots

created by the BMDs can be audited by humans without regard for the QR code. *See supra* at 7–10.

Put simply, Plaintiffs' fears are just that: concerns that have never materialized. Under these circumstances, they cannot show that the requirement that counties offer BMDs imposes a burden on anyone's right to vote. If Georgia requires voters to use a BMD, the case may be different. But it is not, and this fact alone warrants granting summary judgment.

### C. The State's important regulatory interests are sufficient to justify Georgia's voting system policy.

Even if the BMD system imposed a minor burden on the right to vote— it doesn't—the State's important regulatory interests in adopting such a system would easily outweigh it. When considering the State's interest, the State Defendants are not required to provide "elaborate, empirical verification of the weightiness of the [s]tate's asserted justifications." *Libertarian Party of Alabama*, 2021 WL 5407456 at *6. Nor are State Defendants required to show that a harm would exist absent the challenged policy. *See Cowen v. Sec'y of State of Georgia*, 22 F.4th 1227, 1234 (11th Cir. 2022). Put differently, the State Defendants are simply required to show that the status quo better satisfies the State's interest than the Curling Plaintiffs' proposed remedy. As the Eleventh Circuit recently said, if the burden on the

plaintiffs' rights is not severe, "the test is not whether the regulations are necessary; it's whether they rationally serve important state interests." *Libertarian Party of Alabama v. Merrill*, 20-13356, 2021 WL 5407456, at *6 (11th Cir. Nov. 19, 2021).

The State has numerous reasons to choose the BMD machines as the standard for in-person voting across the State. Any of these interests individually outweigh Plaintiffs' apprehension about using technology in elections, and collectively, they foreclose any potential for the Curling Plaintiffs' Count III to overcome summary judgment.

*First*, the State's concern about the potential manipulation and errors associated with hand marked paper ballots is a compelling state interest as a matter of law. "A State indisputably has a compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (internal quotation marks omitted). And as other courts across the country have noted, the widespread use of hand-marked paper ballots brings with it numerous problems for election integrity that more than justify the State's adoption of the BMD system. *See Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) (noting that "traditional paper ballots" are subject to a host of "mechanical and human errors that may thwart voter intent.").

*Second*, the United States Constitution grants states significant leeway

when administering elections, as state governments are empowered to decide the "Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. art. I, § 4, cl. 1. This provision grants "broad power" to state governments. *Cook v. Gralike*, 531 U.S. 510, 523 (2001). The power extends to the "manner" of elections, which includes methods of casting and counting votes like those Plaintiffs challenge in this lawsuit. Indeed, the Supreme Court said that the term "manner" includes matters like "notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns." *Cook*, 531 U.S. at 523–24. The type of election equipment selected by State policymakers certainly includes the type of equipment used to reduce fraud and count votes.

*Third*, the State also has a compelling interest in complying with state laws as they are written. *See Fair Fight Action, Inc. v. Raffensperger*, 1:18-CV-5391-SCJ, 2019 WL 13221296, at *9 (N.D. Ga. Dec. 27, 2019) (denying preliminary injunction). The current statutory framework requires counties to use the same type of voting equipment. O.C.G.A. § 21-2-300(a)(1). The equipment must be "electronic ballot markers" and not hand marked paper ballots. O.C.G.A. § 21-2-300(a)(3). And, it must have been procured by the

– 48 –

Secretary as the current BMDs were. O.C.G.A. § 21-2-300(a)(2). The Curling

Plaintiffs' proposed remedy of utilizing hand marked paper ballots and

optical scanners is incompatible with the laws passed by the General

Assembly and would require a full rewriting of significant portions of the

Election Code. This too is an important state interest.

Any and each of these interests outweigh Plaintiffs' actual fears and

hypothetical harms. Summary judgment is, therefore, warranted as to each of

the remaining counts in Curling Plaintiffs' TAC.

## CONCLUSION

For the reasons stated above, Defendants respectfully request that the

Court grant their motion for summary judgment in their favor on the Curling

Plaintiffs' claims.

Respectfully submitted, this 9th day of January, 2022.

*Vincent R. Russo*

| | |
|---|---|
| Vincent R. Russo | 242628 |
| Josh Belinfante | 047399 |
| Carey Miller | 976240 |
| Alexander Denton | 660632 |
| Edward A. Bedard | 926148 |
| Javier Pico Prats | 664717 |
| Anna Edmondson | 289667 |

ROBBINS ALLOY BELINFANTE
  LITTLEFIELD, LLC
500 14th St. NW
Atlanta, GA 30318
T: (678) 701-9381

F: (404) 856-3255
E: vrusso@robbinsfirm.com
   jbelinfante@robbinsfirm.com
   cmiller@robbinsfirm.com
   adenton@robbinsfirm.
   ebedard@robbinsfirm.com
   jpicoprats@robbinsfirm.com
   aedmondson@robbinsfirm.com

Bryan P. Tyson     515411
Diane F. LaRoss   430830
Bryan F. Jacoutot  668272
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
T: 678-336-7249
E: btyson@taylorenglish.com
   dlaross@taylorenglish.com
   bjacoutot@taylorenglish.com

*Counsel for State Defendants*

# LOCAL RULE 7.1(D) CERTIFICATION

I certify that this State Defendants' Brief in Support of Their Motion for Summary Judgment on Curling Plaintiffs' Claims has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1. Specifically, this document has been prepared using 13-pt Century Schoolbook font and type.

*/s/ Vincent R. Russo*
Vincent R. Russo