# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

DONNA CURLING, *et al.*

*Plaintiffs,*

     v.

BRAD RAFFENSPERGER, *et al.*,

*Defendants.*

CIVIL ACTION

FILE NO. 1:17-cv-2989-AT

## STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON COALITION PLAINTIFFS' CLAIMS

# INTRODUCTION

Coalition Plaintiffs'[1] view of elections is clear: Georgia voters have a reasonable basis to question every election result for elections conducted on Dominion BMDs and Georgia voters "will never be able to know the outcome" of the November 2020 presidential election in Georgia. SMF,[2] ¶¶ 179, 222. Similarly, just as the Eleventh Circuit concluded, CGG does not trust the results of the very first election it challenged in this case—from 2017. *See Curling v. Raffensperger*, 50 F.4th 1114, 1118 (11th Cir. 2022). Their experts agree—Dr. Halderman has explained that people who claim that Georgia's election system is not safe and reliable have a reasonable basis for making that statement and that there is "abundant reason to believe" that Georgia elections in the past have been compromised. SMF, ¶ 455. Yet, despite these sweeping claims undermining public trust in electronic voting equipment—claims that have been dismissed in numerous other cases across the country—Coalition Plaintiffs cannot prevail on their actual claims in this case.

---

[1] Coalition Plaintiffs are the Coalition for Good Governance (CGG), Laura M. Digges, William Digges III, Ricardo Davis, and Megan Missett.

[2] Per this Court's earlier order, State Defendants are filing a single Statement of Undisputed Material Facts with exhibits for both this Motion and the Motion regarding Curling Plaintiffs' claims. All references in this brief to "SMF" are to that Statement of Undisputed Material Facts (which is filed on the record after this brief).

First, they cannot establish by admissible evidence that this Court has jurisdiction. The individual Coalition Plaintiffs have no standing because they only assert generalized grievances and do not have particularized injuries. CGG does not have associational standing because it does not have members with distinct injuries different from any other voter, and it does not have organizational standing because it is not diverting resources in response to the use of electronic voting equipment—it is fulfilling its purpose by attacking that very equipment everywhere it can, almost exclusively by funding litigation. Further, Coalition Plaintiffs' claims about the DREs are moot.

But even if CGG and the individual Coalition Plaintiffs had standing, their claims fail on the merits. There are only four remaining counts across the operative Complaints, which are the Third Amended Complaint [Doc. 226] ("TAC") and the First Supplemental Complaint [Doc. 628] ("FSC"). Count I of each Complaint asserts a fundamental right to vote claim and Count II of each Complaint asserts an Equal Protection claim.[3] None of these claims pass scrutiny under *Anderson-Burdick*, which is the legal standard by which these claims are evaluated. Not only is there no severe burden on the right to vote from Georgia's use of its chosen electronic voting equipment, the State's

---

[3] This Court already dismissed the due-process claim in Count III of the FSC so it is no longer pending. [Doc. 751, p. 50].

interest in an orderly election system more than justifies the choice of that equipment.

Further, Georgia's choice of equipment rests squarely within the constitutional authority of the state legislature. "[F]ederal courts are not 'the arbiter[s] of disputes' which arise in elections; it [is] not the federal court's role to 'oversee the administrative details of a local election.'" *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2022 U.S. Dist. LEXIS 179889, at \*277 (N.D. Ga. Sep. 30, 2022) (quoting *Curry v. Baker*, 802 F.2d 1302, 1306 (11th Cir. 1986)); *accord Georgia Shift v. Gwinnett Cty.*, No. 1:19-cv-01135-AT, 2020 U.S. Dist. LEXIS 31407, at \*16 (N.D. Ga. Feb. 12, 2020). There is "no license for 'second-guessing and interfering with' state decisions; ***the Constitution charges States, not federal courts, with designing election rules***." *Curling*, 50 F.4th at 1122 (citing *New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020)) (emphasis added). Yet this is precisely what Coalition Plaintiffs request this Court to do.

Because Coalition Plaintiffs ask this Court to second-guess the State's reasonable and nondiscriminatory determinations about voting equipment and weigh the costs and benefits of various election systems, their claims are barred by binding precedent. Additionally, after nearly six years of litigation, Coalition Plaintiffs offer only vulnerabilities in the Dominion equipment

without any concrete evidence that any Georgia election result has been tampered with, manipulated, or altered. At this stage, potential future harm without more is insufficient for Coalition Plaintiffs to prevail. This Court should enter judgment for State Defendants.

## FACTUAL BACKGROUND

This Court is more than aware of the long and tortured history of this case. For purposes of this Motion, State Defendants focus on the relevant and material facts from the operative complaints and the discovery process instead of recounting the twists and turns of nearly six years.[4]

## I.   Coalition Plaintiffs' claims in their current complaints.

The TAC alleges one burden on the right to vote: the requirement to vote on AccuVote DREs. [Doc. 226, ¶ 170]. The TAC also alleges unequal treatment of in-person voters versus absentee voters. [Doc. 226, ¶ 178]. The only relief sought in the TAC is (1) a declaratory judgment that elections held on any type of DRE are unconstitutional; (2) an injunction preventing the use of DREs in Georgia elections; (3) an injunction requiring post-election audits; (4) an injunction requiring meaningful public observation; and (5) attorney fees. [Doc.

---

[4] For historical reference, the election that originally spurred this case took place on June 20, 2017, and this case was first filed in July 2017. [Doc. 1].

226, pp. 71-72]. While other components of the election system are discussed in the TAC, it seeks no relief regarding pollbooks or other election equipment.

Similarly, the FSC claims the State of Georgia is placing a severe burden on the right to vote by[5] (1) using QR codes on ballots; (2) not having sufficient precertification tabulation and risk-limiting audits; (3) using a particular method of timestamps on scanner images; and (4) not being able to trust and verify the election processes [Doc. 628, ¶ 223]. Similarly, its Equal Protection count focuses on burdens on voters who cast their votes on Dominion BMDs, both in allegedly different treatment and in a lack of audits. [Doc. 628, ¶ 231]. The requested relief in the FSC seeks (1) a declaratory judgment that it is unconstitutional to conduct elections on the Dominion BMD system; (2) an injunction prohibiting the use of the Dominion BMD system and requiring a hand-marked paper ballot system with "statistically valid post-election, precertification audits"; (3) an injunction prohibiting enforcement of statutes that require voters to use the Dominion BMD system; (4) an order that no information be recorded that could identify a voter who cast a particular ballot; (5) an order requiring pre-certification testing related to QR codes; (6) an expanded pilot election using hand-marked paper ballots with Dominion

---

[5] Count I of the FSC also incorporates 100 paragraphs of the FSC as allegations of ways voters will have their right to vote burdened. *Id.*

scanners; (7) an order requiring pre-certification audits for all DRE elections; (8) an order requiring pre-certification audits "based on applying well-accepted audit principles that assure a high probability that incorrect outcomes will be detected and remedied"; and (9) attorney fees. [Doc. 628, pp. 74-77]. The Dominion BMD System is defined in the FSC as the system covered by EAC Certification Number DVS-DemSuite 5.5-A. [Doc. 628, ¶ 5]. That certification does not cover the PollPads or other components of the election system.

## II.    Alleged injuries of Coalition Plaintiffs.

### A.    Individual Coalition Plaintiffs.

The TAC identifies four individual plaintiffs, each of which claims only that they are registered to vote and intend to participate in upcoming elections. [Doc. 226, ¶¶ 24–27]. The FSC supplemented those claims with allegations that the individual plaintiffs will be required to vote on the Dominion BMD System, and all of their alleged injuries relate to the use of Dominion BMDs, not to any other component of the election system. [Doc. 628, ¶¶ 201–208]. Each individual Coalition Plaintiff personally opposes BMD-marked paper ballots. SMF, ¶ 223.

During their depositions, each of the four individual plaintiffs named in the TAC and FSC was unable to identify any alleged injury particularized to them that was different from the injury to all Georgia voters.

Plaintiff Laura Digges has no evidence that any BMD used in any election was hacked or that any malware was ever inserted into any BMD used in a Georgia election. SMF, ¶ 233. She voted absentee by mail in every election in 2016 and has no plans to ever vote on a BMD in the future. SMF, ¶¶ 229-230.

Plaintiff William Digges, III explained that his goal as a plaintiff is to change voting in Georgia to hand-marked paper ballots. SMF, ¶ 248. He has no evidence that DREs were hacked or that malware was inserted into any Georgia voting machine. SMF, ¶ 245. Likewise, he has no evidence that any BMD was hacked or that any malware has been inserted into any BMD in Georgia. SMF, ¶ 246. He has never had trouble voting by absentee ballot and believes the challenges he described were true of many voters. SMF, ¶¶ 252-253. Mr. Digges has never voted on a BMD and has no plans to vote on a BMD in the future.[6] SMF, ¶¶ 254-255.

Plaintiff Ricardo Davis has no evidence that a DRE has ever hacked during an election in Georgia and no evidence that a BMD in use in Georgia was ever hacked. SMF, ¶ 265. Mr. Davis also has no evidence that malware

---

[6] Despite earlier references to his involvement in discovery, Mr. Digges never reviewed databases beyond transcribing the Pima County GEMS Database from Access into Excel. SMF, ¶¶249-251.

was ever inserted into a Georgia voting machine since 2019. SMF, ¶ 266. Like his co-plaintiffs, Mr. Davis has never voted on a BMD in Georgia and has no plans to vote on one in the future. SMF, ¶ 267.

Plaintiff Megan Missett has no evidence that any component of Georgia's election system has been hacked or that malware was inserted. SMF, ¶ 287. Specifically, she has no evidence that votes were changed in Georgia or that any DRE was actually hacked. SMF, ¶ 288. Likewise, she has no evidence that any malware has been inserted into any BMD in Georgia. SMF, ¶ 289. She does not plan to vote on a BMD in any future election and will only vote by absentee ballot. SMF, ¶¶ 290-291.

### B.   Plaintiff Coalition for Good Governance.

In addition to the individual Plaintiffs, CGG is a Colorado corporation that also claims it has associational standing based on injuries to its members and organizational standing based on its own diversion of resources. *See, e.g.*, [Doc. 226, ¶¶ 18–23; Doc. 628, ¶¶ 209, 216]; SMF, ¶ 178. Advancing individual rights through the proper administration of elections is a key part of the mission of CGG. SMF, ¶ 181. CGG's interests include jurisdictions using BMDs and advocacy around the use of electronic voting. SMF, ¶ 207.

CGG contends that voters can never know who voters voted for because of the use of Dominion BMDs in polling places and further believes that it is

impossible to know the outcome of the November 2020 election in Georgia. SMF, ¶¶ 179, 220. CGG contends that voters in Georgia will have a reasonable basis to question each election conducted in Georgia as long as the Dominion BMDs are the primary source of votes cast. SMF, ¶ 222.

1.    *Facts regarding CGG's diversion of resources.*

CGG does not maintain a written annual budget and thus cannot identify spending on any specific categories from any document. SMF, ¶¶ 189-190. And CGG's spending on costs related to this case is one of the causes of diversion of significant resources of CGG away from its other projects. SMF, ¶ 187. In fact, its financial diversion of resources (as opposed to non-financial diversion) refers to its litigation costs related to this case. SMF, ¶ 191. More than 90% of CGG's work is dedicated to election-related activities. SMF, ¶ 201. CGG sometimes serves its organizational purpose by filing litigation. SMF, ¶¶ 204-205. When CGG reported its program service accomplishments to the IRS in 2017, 2018, and 2019, it listed this litigation and other litigation challenging touchscreen voting systems. SMF, ¶ 203. This litigation was a project of primary focus for CGG in 2021. SMF, ¶ 206. CGG's inability to engage on topics it wishes to engage in is due to this litigation and corollary activities related to Dominion BMDs. SMF, ¶¶ 188, 202. While CGG claims to have diverted resources from activities and projects in other states to spend resources in

Georgia, SMF, ¶ 185, it is unable to determine how much of its claimed diversion is due to this litigation and how much is due to other factors. SMF, ¶ 188. Further, CGG's decision about how to litigate this case contributed to its inability to have time for other projects of CGG. SMF, ¶ 186. Due to its lack of relevant records, CGG also cannot identify which requests for assistance from other organizations it receives that are rejected due to a general lack of resources as opposed to its claims in this case. SMF, ¶ 194.

Far from being financially harmed by the use of Dominion BMDs in Georgia, CGG has benefited financially from its role as a plaintiff in this litigation. CGG has used its participation as a plaintiff in this case for fundraising purposes. SMF, ¶ 195. Further, CGG fundraising increased every year from the filing of this lawsuit through 2019. SMF, ¶ 196. CGG represents to potential donors that "all donations go for the direct costs of litigation," which means that the "vast majority of resources are being directed to litigation support." SMF, ¶ 197.

The non-financial resources CGG claims it has diverted includes volunteer time but CGG does not track volunteer time so it cannot quantify that diversion. SMF, ¶ 199. And because CGG has no established process for admitting members nor one for determining an individual's ongoing interest in remaining a member once ostensibly admitted, there is no reliable way to

determine whether so-called volunteer time is actually undertaken by active members or simply by those who support what CGG does. SMF, ¶¶ 213-218. While more than 80% of CGG volunteer time is related to this litigation and CGG's efforts related to the Dominion Voting System, the remaining 20% of time includes answering questions about the Dominion Voting System and election administration. SMF, ¶ 200. The answers to these questions and associated research conducted in order to do so, if any, bear directly on this litigation—demonstrating that CGG raises money to litigate.

Ultimately, CGG is unable to identify when it diverts resources based on the actions of nonparty counties versus the actions of State Defendants. SMF, ¶ 184. And if CGG prevailed in this lawsuit, it would still continue its work on county election administration problems and issues. SMF, ¶ 219.

### 2.    *Members and membership in CGG.*

There is no universal method or process for how people become members of CGG. SMF, ¶ 213. Unlike other organizations, there are no membership fees or dues necessary to become a member of CGG. SMF, ¶ 214. Further, members of CGG are under no obligation to work together to promote the goals of the organization. SMF, ¶ 215. Members and non-members of CGG both benefit from access to civic activities such as poll watching, auditing election results, and publishing opinion pieces. SMF, ¶ 216.

CGG does not have a current list of its members or even a current email list of members it could use to contact them. SMF, ¶¶ 217-218. CGG is unable to determine whether Brian Blosser, identified in the TAC as a member, [Doc. 226, ¶¶ 151–152], is currently a member of CGG. SMF, ¶ 209. Even if he was a member, Mr. Blosser's alleged injuries were limited to check-in units used in the 2017 Congressional District 6 special election and not DREs or BMDs. [Doc. 226, ¶ 152]; SMF, ¶ 208. Likewise, allegations about injuries of member Virginia Forney in the TAC were related to ballot secrecy on DREs, not on BMDs. [Doc. 226, ¶ 150]; SMF, ¶ 210.

CGG does not know of any person in the state of Georgia—including any members—who were unable to vote as a result of the State's use of the Dominion BMDs. SMF, ¶ 325. CGG likewise cannot identify any voter whose vote was not counted as a result of the use of Dominion BMDs, Dominion precinct scanners, Dominion central count scanners, and the Dominion election management system. SMF, ¶ 324. CGG does not know of any person in the state of Georgia who was unable to vote because of the claimed lack of necessary audits. SMF, ¶ 326.

Since filing of this lawsuit, CGG has provided information and education to its members, served as an information resource, monitored nationwide developments in election law and technology, provided speakers for

educational institutions, collaborated with other voting rights and election integrity initiatives, and shared research about election problems. SMF, ¶ 180. Since the filing of this lawsuit, CGG members and prospective members have participated in poll watching, attending public meetings, and other civic activities. SMF, ¶ 182. CGG will continue educating its members about election issues regardless of whether it receives an injunction banning ballot-marking devices. SMF, ¶ 183.

Ultimately, CGG educates its members and the general public with the same message. SMF, ¶ 198. It also advises its members to vote using absentee-by-mail ballots and not in person, but believes that some of its members have voted in person. SMF, ¶ 211.

## III.   Claims on the merits.

### A.   The use of BMDs in elections.

Experts recognize BMDs as a safe and secure voting system. The National Academy of Sciences, while critical of DREs, recommends paper ballots (1) marked by either BMDs or by hand and (2) counted using optical

scanners or by hand.[7] SMF, ¶ 6. Even Dr. Halderman recognizes that the scientific community currently recommends BMDs.[8] SMF, ¶ 427.

BMD election systems and hand-marked paper ballot voting systems are similar in many ways. Both use paper ballots; both are considered paper- ballot systems by the EAC; and both provide auditable paper trails of cast ballots.[9] SMF, ¶¶ 6, 35. Georgia statutes require that the new voting machines provide an "elector verifiable" audit trail. O.C.G.A. § 21-2-300(a)(3).

The Dominion system includes an electronic BMD, a printer, and an optical scanner (ICP) connected to a locked ballot box. SMF, ¶ 12. The Dominion BMD allows the voter to make selections on a screen and then prints those selections onto a paper ballot. SMF, ¶¶ 13-15.

The voter has an opportunity to review the paper ballot before placing it into the scanner. SMF, ¶¶ 16-18. BMDs thus create an auditable, verifiable ballot, as required by statute. *Id*.; O.C.G.A. § 21-2-300(a)(2) ("electronic ballot

---

[7] [Doc. 285-1 at 34 ("4.11 Elections should be conducted with human-readable paper ballots. These may be marked by hand or by machine (using a ballot-marking device); they may be counted by hand or by machine (using an optical scanner).")]

[8] Dr. Halderman's personal disagreement with that recommendation runs counter to the expert consensus. SMF, ¶ 427.

[9] *See* U.S. EAC, 2005 VVSG, Vol. 1, V. 1.0 § 4.3.5 (referring to ballot marking devices as a paper-based system).

markers shall produce paper ballots which are marked with the elector's choices *in a format readable by the elector*" (emphasis added)).

An optical scanner is programmed to look for information at particular coordinates and then tabulates votes based on the information at that location—the scanner does not read the text portion of either a BMD-marked ballot or a hand-marked ballot. SMF, ¶ 20. What matters is not the candidate information, but rather the programming for where the computer looks for information at particular coordinates. SMF, ¶ 21. The method by which a BMD-marked ballot and hand-marked ballot are read by the optical scanner is identical. SMF, ¶ 22.

In 2020, BMDs that print barcodes were used in six of the ten largest counties in the country, including Los Angeles, California; Cook County/City of Chicago; Maricopa, Arizona; San Diego, California; Dallas, Texas; and Riverside, California. SMF, ¶ 23. Of those six counties, five used the Dominion BMDs. *Id*.

Georgia law also provides for a post-election audit of elections and requires audits of federal or state general elections prior to certification of the election results. O.C.G.A. § 21-2-498; *see also* O.C.G.A. § 21-2-499. These post-election audits have been conducted after the 2020 presidential election and after the 2022 general election. SMF, ¶ 295. Both of these Risk Limiting Audits

15

("RLAs") were observed by the Carter Center and confirmed the election results for the races audited. SMF, ¶¶ 296, 303-308.

Unlike some states, Georgia requires EAC certification for its voting machines.[10] O.C.G.A. § 21-2-300(a)(3). The Help America Vote Act ("HAVA") created the EAC, which set up a rigorous process for voting-equipment certification, working with committees of experts and coordinating with the National Institute of Standards and Technology. 52 U.S.C. § 20962; *see also* 52 U.S.C. §§ 20962, 20971 (test lab standards). The Dominion system certified by Georgia is certified to the standards developed by these rigorous processes.

## B.    State's interests for selecting a BMD-based system.

While this Court does not determine policy, the policy decisions of the General Assembly are relevant to Coalition Plaintiffs' claims and this Court's analysis under *Anderson-Burdick*, as explained below. There are a number of reasonable state interests that support the decision by Georgia elected representatives to choose BMDs over hand-marked paper ballots.

### 1.    *BMDs are accessible for disabled voters.*

Hand-marked paper ballots are not an option for many voters with disabilities. SMF, ¶ 37. Without the use of technology, voters with disabilities

___

[10] Dr. Halderman agrees that applying some of the patches he suggests would make the system more secure would require EAC approval. SMF, ¶ 456.

are unable to mark paper ballots privately and independently. SMF, ¶ 38. Many voters with disabilities cannot visually verify that the completed paper ballot is correct. *Id*. Technology does not exist that would allow voters with disabilities complete independence while voting on a hand-marked paper ballot system, and Coalition Plaintiffs' preferred voting system—hand-marked ballots counted by optical scan units—are not equipped for all voters to independently mark and verify their ballots, resulting in the disenfranchisement of voters with disabilities. *Id*.

Utilizing a single, accessible voting system—*i.e.*, BMDs—bypasses many legal and practical issues that may arise when a State employs a default system of hand-marked ballots with a separate system for voters with disabilities, such as Coalition Plaintiffs seek to have this Court order. A separate system for voters with disabilities results in two systems that are inherently "separate and unequal." SMF, ¶ 39. Having only voters with disabilities vote on BMDs can result in the loss of the right to vote by secret ballot. SMF, ¶ 40. Using BMDs only for voters with disabilities can create a greater risk to election security than using BMDs more broadly. *Id*.

> ### 2. *BMDs provide clear voter intent, unlike hand-marked ballots.*

BMD-marked paper ballots provide clear voter intent, unlike hand-marked ballots, where voters often circle or "x" through selections instead of filling in bubbles. SMF, ¶ 41. Further, a voter's mark may be evidence of the intention of a voter to cross-out or circle a candidate in disregard of the ballot's instructions. SMF, ¶ 42.

> ### 3. *BMDs protect ballot secrecy.*

When a ballot is scanned into a Dominion optical scanner, whether that ballot is hand-marked or marked by a BMD, the scanner creates a digital image of the front and back of the ballot. SMF, ¶ 43. The tabulating software also adds a feature called an "AuditMark" to each image. SMF, ¶ 44. The AuditMark is a text representation of how the tabulating software interpreted the ballot when it was scanned. SMF, ¶ 45. That scanned image can later be used as part of an audit of the election. SMF, ¶ 46.

Each AuditMark includes only (1) what tabulating unit scanned the ballot and (2) a randomized sequence number. SMF, ¶ 47. There is no way to correlate the sequence number to an individual voter or any point in time that the ballot was cast. SMF, ¶ 48. The optical scanner does not store any date or time-stamp information with the ballot image. SMF, ¶ 49. In short, it is

impossible to re-recreate the sequence of the order in which the ballots were cast—meaning it is impossible to determine how someone voted. SMF, ¶ 50. Further, the paper ballots jumble in the ballot box, making the precise order in which they were cast unknowable. SMF, ¶ 51.

### C.   Potential compromise of Dominion equipment.

While Plaintiffs disagree with the use of BMDs in elections, they have never identified any votes that were changed as the result of malware or compromise of BMDs. SMF, ¶¶ 343-366. Coalition Plaintiffs and their experts have no evidence of any malware being inserted into Dominion BMDs or those units being electronically hacked. *Id.*; SMF, ¶¶ 405, 408, 419, 428-430.

Further, despite having access for years, Plaintiffs cannot identify any malware that has been inserted into the DREs or the BMDs. Dr. Halderman had access to images of Georgia's DREs and GEMS databases, but never found any evidence of malware on that system. SMF, ¶ 428.[11] Despite having access to images and components of the Dominion equipment accessed in Coffee County, neither Dr. Halderman nor Plaintiffs have identified any malware that was placed on that equipment. SMF, ¶¶ 430, 395, 404, 410–13, 417–18, 424.

---

[11] While theorizing that it is possible, Dr. Halderman has never designed malware that would work on both DREs and BMDs. SMF, ¶ 429.

## ARGUMENT AND CITATION OF AUTHORITY

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden, but need not disprove the opposing party's claims. Instead, the moving party may point out the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 91 L. Ed. 2d 265 (1986); *Marion v. DeKalb County, Ga.*, 821 F. Supp. 685, 687 (N.D. Ga. 1993). In defending its claims, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). The non-moving party "must come forward with ***significant, probative evidence*** demonstrating the existence of a triable issue of fact." *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995) (emphasis added) (quoting *Chanel, Inc. v. Italian Activewear, Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)).

## I.   The undisputed facts demonstrate this Court lacks jurisdiction to adjudicate this case.

Federal courts may decide only active "cases" and "controversies." U.S. Const. art. III, § 2. To establish standing to present a case or controversy, a litigant must prove: "(1) an injury in fact that (2) is fairly traceable to the

challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla Sec'y*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)); *U.S. v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019). "[E]ach element must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation.'" *Jacobson*, 974 F.3d at 1245 (quoting *Lujan*, 504 U.S. at 561). While standing is provisionally determined at the time a lawsuit is filed, it is continuously reevaluated and "must persist throughout a lawsuit." *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cty. Bd. of Registration & Elections*, 36 F.4th 1100, 1113 (11th Cir. 2022) ("*GALEO*"). Further, "[i]f a case 'no longer presents a live controversy with respect to which the court can give meaningful relief,' the case is moot and must be dismissed." *Id*. (quoting *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1216 (11th Cir. 2009)).

Now that the discovery is over, Coalition Plaintiffs cannot establish they have standing with admissible evidence. And Coalition Plaintiffs' DRE claims are moot. This Court should grant judgment to State Defendants based on the jurisdictional claims alone.

## A.   The individual Coalition Plaintiffs lack an injury in fact.

None of the four individual Coalition Plaintiffs has an injury that is "'distinct and palpable,' as distinguished from merely 'abstract,' and the

alleged harm must be actual or imminent, not 'conjectural' or 'hypothetical.'"
*Georgia Shift*, 2020 U.S. Dist. LEXIS 31407, at *9 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). Because the individual Coalition Plaintiffs do not assert any injury other than that shared by all seven million registered voters in Georgia, they can support only a "paradigmatic generalized grievance" and lack an injury. *Wood v. Raffensperger*, 501 F. Supp. 3d 1310, 1322 (N.D. Ga. 2020) (quoting *Bognet v. Sec'y of State of Pennsylvania*, 980 F.3d 336, 356 (2020)), *aff'd* 981 F.3d 1307, 1314 (11th Cir. 2020).

When facing a case involving similar allegations of machines not functioning correctly, the Eleventh Circuit determined that an individual asserting an Equal Protection Clause claim alleging that in-person votes would be treated differently than absentee votes—as the individual Coalition Plaintiffs do here—was asserting "a textbook generalized grievance that is insufficient for Article III standing." *Wood v. Raffensperger*, No. 20-14813, 2021 U.S. App. LEXIS 23376, at *7 (11th Cir. Aug. 6, 2021). The same logic barred the individual's due process claim that alleged "defective and unlawful" procedures would affect "the integrity of the election." *Id*. at *8.

Further, even if the individual Coalition Plaintiffs could assert some kind of cognizable injury, they admitted they have no evidence of any malware being actually placed on Dominion voting equipment, SMF, ¶¶ 233, 246, 266,

289—which means the individual Coalition Plaintiffs cannot support their theories of injury by claiming that some hypothetical harm based on vulnerabilities is "certainly impending." *Tsao v. Captiva MVP Rest. Partners, Ltd. Liab. Co.*, 986 F.3d 1332, 1339 (11th Cir. 2021). At most, the individual Coalition Plaintiffs cannot show more than an "increased risk" of problems with election equipment, which is insufficient.[12] *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 933 (11th Cir. 2020). And the individual Coalition Plaintiffs' respective refusals to vote on Dominion BMDs, SMF, ¶¶ 229, 255, 267, 290, demonstrates not only that no alleged injury is "certainly impending," but that they *cannot* suffer the elevated risk of injury because they only vote using hand-marked paper ballots, as permitted by law.

---

[12] Other district courts dealing with claims involving hacking of election equipment since the 2020 election have dismissed those claims as generalized grievances or insufficient injuries. *See, e.g., O'Rourke v. Dominion Voting Sys.*, Civil Action No. 20-cv-03747-NRN, 2021 U.S. Dist. LEXIS 81135, at *38 (D. Colo. Apr. 28, 2021) (dismissing claims including allegations of hacked Dominion equipment); *Lake v. Hobbs*, No. CV-22-00677-PHX-JJT, 2022 U.S. Dist. LEXIS 154117, at *24 (D. Ariz. Aug. 26, 2022) (allegations that voting machines are hackable to insufficient to confer standing). *Pirtle v. Nago*, No. 22-00381 JMS-WRP, 2022 U.S. Dist. LEXIS 209354, at *9 (D. Haw. Nov. 18, 2022) (dismissing involving alleged "backdoor" into voting equipment); *Soudelier v. Dep't of State La.*, No. 22-2436, 2022 U.S. Dist. LEXIS 214216, at *10 (E.D. La. Nov. 29, 2022) (dismissing claims of uncertified Dominion voting machines as generalized grievances).

23

Because the individual Coalition Plaintiffs here assert nothing more than what Mr. Wood did in the 2020 election cycle and have asserted no particularized injury distinct from any other Georgian, they cannot support their allegations of injury with admissible evidence and thus do not have an injury in fact sufficient to invoke this Court's jurisdiction.

## B.  The organizational plaintiff CGG cannot assert associational standing.

"An organization can establish standing in two ways: (1) through its members (i.e., associational standing) and (2) through its own injury in fact that satisfies the traceability and redressability elements." *GALEO*, 36 F.4th at 1114. CGG cannot establish standing through either method.

"An association has standing to bring suit on behalf of its members ***when its members would otherwise have standing to sue in their own right***, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.,* 528 U.S. 167, 181 (2000) (emphasis added). "[U]nder this theory, an organization must 'make specific allegations establishing that at least one identified member ha[s] suffered or [will] suffer harm.'" *Ga. Republican Party v. SEC,* 888 F. 3d 1198, 1203 (11th Cir. 2018).

24

Especially at this stage of the litigation, courts "cannot accept the organization's self-descriptions of [its] membership…" *Id.*

>    1.   *CGG members have the same generalized grievances as the individual Coalition Plaintiffs.*

Apart from the named individual member plaintiffs in this action, which do not have standing for reasons already discussed, CGG identifies just a handful of other purported members they claim confer standing on the organization. But none of these individuals afford CGG the associational standing it seeks because they cannot establish an injury in fact.

In order for CGG to assert the rights of its purported members, those members must have standing to sue ***in their own right***. *Friends of the Earth, Inc.,* 528 U.S. at 181. An injury in fact must be "concrete and particularized and … actual or imminent, not conjectural or hypothetical." *Id.* at 180. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending." *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409 (2013). The imminence requirement is critical because, as the Supreme Court has repeatedly instructed,"'[a]llegations of possible future injury' are not sufficient." *Id.* (quoting *Whitmore v. Arkansas,* 495 U.S. 149, 158 (1990)).

Indeed, the Supreme Court has long been "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Id.* at 414. Accordingly, "[a] prospective injury that is contingent on the choices of a third party is less likely to establish standing." *Ga. Republican Party,* 888 F. 3d at 1202.

CGG cannot identify any member in Georgia that suffers an injury any different from those of the individual CGG plaintiffs. Indeed, CGG advises its members to vote using hand-marked paper ballots and cannot identify any members who voted on Dominion BMDs or plan to do so, despite baselessly theorizing that some may have. SMF, ¶¶ 198, 211. In fact, its members' alleged injuries relate to ballot secrecy and not to the use of BMDs. SMF, ¶ 212. Furthermore, CGG cannot identify any individuals who have any injury different than the very same generalized grievance problem that characterizes the individual member plaintiffs' claims. For these reasons, CGG cannot establish associational standing through any of its purported members.

> 2. *CGG cannot identify a member who has suffered harm because of its lack of records.*

But even assuming there was some individual related to CGG with a distinct injury that is not a generalized grievance, CGG cannot identify a member, as required by the Eleventh Circuit, because there are no relevant

records of membership. There is no identifiable process for becoming a member of CGG in the first place—much less an established process or procedure that a member might follow to continue their membership in the organization once they've been ostensibly admitted.

CGG alleged in the TAC that "[i]ndividuals become members of [CGG] by providing their contact information and indicating a desire to associate with the organization." [Doc. 226, ¶ 19]. But there is no consistent process for becoming a member. SMF, ¶ 213. There are no membership fees and no meaningful benefits for members that are any different than for the public or other supporters of CGG's mission. SMF, ¶¶ 214-216.

Moreover, CGG has no reliable means of tracking membership. After a person initially identifies themselves as having an interest in joining, the monitoring of the purported membership and any contact with them effectively ceases. SMF, ¶¶ 217-218.

The lack of identifiable processes for initially determining membership, coupled with CGG's inability or unwillingness to monitor whether individuals wish to remain connected to the organization creates problems for associational-standing purposes. The broad information vacuum created by CGG's lack of due diligence effectively means this Court must take the organization at its word as to who its members are. But the Eleventh Circuit

is clear that courts "cannot accept the organization's self-descriptions of [its] membership…". *Ga. Republican Party,* 888 F. 3d at 1203. This concept, earlier set forth by the Supreme Court in *Summers v. Earth Island Inst.*, is important because without it there is no realistic limiting principle as to who an organization may claim comprises its membership. And failing to insist on concrete evidence of membership beyond the organization's say-so would essentially convert associational standing from a practical means for organizations to vindicate the rights of their members in court into a combative legal strategy whereby organizations target their communications to potentially aggrieved individuals in order to carry out litigation by proxy.

More fundamentally, though, CGG's lack of identifiable processes surrounding the issue of membership forecloses any possibility that the declarants might fill in the gaps left by the organization and establish membership through their own testimony. Even where a declarant clearly states that they are members of CGG, there is no basis upon which this Court may test the veracity of that claim. SMF, ¶¶ 217-218. In other words, the records (or lack thereof) provide no way of reliably identifying membership in the organization, and the statements of individuals claiming membership have no way to prove it.

This is not to say that an organization must establish a rigorous and formalistic process for granting and monitoring membership to avail itself of associational standing. Article III does not require that. But surely Article III requires *some* way of testing the veracity of the claims made by an organization and its purported members. And the only way to do that is for the organization to identify some *consistent* process—formal or informal—that courts may apply to identify the overall scope of its membership. CGG has no such process and, accordingly, cannot establish associational standing through its members.

Even if it could, though, the handful of declarants identified by CGG all lack an injury-in-fact. Thus, associational standing for CGG is barred because they have failed to identify any members who have suffered or will suffer a legally cognizable harm.

## C.   The organizational plaintiff CGG has no injury in fact.

Unlike associational standing, an "organization has standing 'if the defendant's illegal acts impair its ability to engage in its projects by forcing the organization to divert resources to counteract those illegal acts.'" *GALEO*, 36 F. 4th at 1114 (quoting *Jacobson*, 974 F.3d at 1250). In order to have its own injury for standing, "an organizational plaintiff must explain where it would have to 'divert resources away from in order to spend additional resources on combating' the effects of the defendant's alleged conduct." *Id*. at 1114-15

(collecting cases). Organizational plaintiffs making such claims must prove that counteracting the defendant's allegedly illegal acts required diversion of either financial resources or its personnel's time and energy. *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1341 (11th Cir. 2014); *Common Cause of Ga. V. Billups*, 554 F.3d 1340, 1350 (11th Cir. 2009).

At this stage of the case, Plaintiffs must sustain their burden of proof with trial-worthy evidence, *Lujan*, 504 U.S. at 561, which must show an injury—in this case, diversion of resources—as of the time that the plaintiffs filed their complaint. *A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co.*, 925 F.3d 1205, 1212 (11th Cir. 2019); *Arcia*, 772 F.3d at 1340; *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003).

Further, each plaintiff must be more than just a "concerned bystander" who is interested in a problem—the plaintiff must show that the injury is distinct to that plaintiff. *Gardner v. Mutz*, 962 F.3d 1329, 1342 (11th Cir. 2020) (no injury when only generalized interest in preserving history). Other circuit courts and another district court within this circuit have recognized the particularity requirement as mandating that an organization demonstrate that "the asserted illegal acts are in conflict with the organization's mission." *People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 189 F. Supp. 3d 1327, 1337-38 (S.D. Fla. 2016) (citing *Arcia*, 772 F.3d at 1342) (finding

30

standing where PETA protests against captivity of a whale and efforts to secure its release "impaired its mission of protecting animals from abuse through legislative and educational efforts"); *see also Nat'l Treasury Emps. Union v. U.S.*, 101 F.3d 1423, 1430 (D.C. Cir. 1996) (if the conduct "does not directly conflict with the organization's mission," the claimed injury is likely shared by many citizens and thus insufficient).

Finally, while a conflict with the mission of the organization is necessary to confer standing, it is not sufficient. *Id*. at 1429 ("Individual persons cannot obtain judicial review of otherwise non-justiciable claims simply by incorporating, drafting a mission statement, and then suing on behalf of the newly formed and extremely interested organization."). Coalition Plaintiffs cannot claim injury simply by diverting resources to new initiatives. They must identify what activities they must "divert resources away *from* in order to spend additional resources" combatting the practices at issue. *Jacobson*, 974 F.3d at 1250 (emphasis in original).

CGG also must demonstrate a concrete injury such as perceptible impairment of organizational activities or daily operations, *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919-21 (D.C. Cir. 2015), or diverted resources "beyond those normally expended," *Cigar Ass'n of Am. V. U.S.*, 323 F.R.D. 54, 63 (D.C. Dist. 2017). *Accord, Ga. Republican Party*, 888 F.3d at 1203

(no evidence that plaintiff was forced to divert resources, "let alone that such diversion impairs the Party."); *Ga. Latino Alliance for Human Rights v. Deal*, 691 F.3d 1250, 1260 (11th Cir. 2012) (challenged legislation "has strained [plaintiff's] limited resources and will continue to do so").

Despite its allegations over the journey of this case so far, CGG cannot show by admissible evidence that it is diverting resources based on allegedly illegal acts—it is simply fulfilling its purpose and paying its lawyers in this litigation. As its corporate representative explained, it cannot account for any diversion and cannot identify any cause of the diversion except for its payments and efforts related to this case, SMF, ¶ 186-188, 191-192, 197, 199-200—and paying for its lawyers and experts here is not a diversion.

Because CGG is serving its organizational purpose by filing and pursuing this litigation, it cannot be injured by a diversion of resources because it is doing the very thing it exists to do.[13] *Nat'l Treasury Emps. Union*, 101 F.3d at 1430. Further, CGG cannot convert an otherwise non-justiciable generalized grievance common to all Georgians into a particularized one by the simple act of incorporating—otherwise all of the plaintiffs in the cases brought in the

---

[13] The fact that CGG has benefited financially from its participation in this litigation—by increased fundraising and using its role in this case to attract donors, SMF, ¶¶ 195-197—further demonstrates it is not injured.

aftermath of the 2020 election could have solved their standing problem by filing as corporations. *See id*. at 1429 (mission statements do not establish standing).

After nearly six years of litigation, there is simply no evidence to support that CGG is doing anything other than pursuing its purpose or otherwise spending resources except on this case. This Court should grant summary judgment to State Defendants and dismiss this case because Coalition Plaintiffs cannot support their claimed injury with admissible evidence.

### D.   Coalition Plaintiffs' claims about DREs are moot.

As discussed above, Counts I and II of the TAC relate solely to the alleged injury from having to vote on AccuVote DREs—equipment which has not been used in Georgia elections since 2019. If a case 'no longer presents a live controversy with respect to which the court can give meaningful relief,' the case is moot and must be dismissed." *GALEO*, 36 F.4th at 1117 (quoting *Friends of Everglades*, 570 F.3d at 1216). While this Court earlier held that the DRE claims were not "entirely moot" because they "challenged elements of the voting system beyond the DRE voting machines themselves," [Doc. 751, p. 20], it is now apparent that the Coalition Plaintiffs did not allege the types of claims identified by the Court and, regardless, the record fails to support those claims.

33

Mootness is part of the "powerful limitation[]" that Article III imposes on the federal judiciary: "if a suit is moot, it cannot present an Article III case or controversy and the federal courts lack subject matter jurisdiction to entertain it." *Coral Springs Street Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328 (11th Cir. 2004). When a government does not intend to return to a prior legislative scheme, plaintiffs must present affirmative evidence that their claims remain viable. *U.S. v. Georgia*, 778 F.3d 1202, 1205 (11th Cir. 2015); *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1329, 1334 (11th Cir. 2005). The undisputed facts demonstrate that State Defendants have no intent to return to DREs after decertifying the system in 2019. SMF, ¶¶ 29-30. In fact, State Defendants have attempted to dispose of the remaining DREs several times in this case and are still storing more than 30,000 of them at a warehouse solely for the purpose of complying with the direction of this Court. *See* [Doc. 745]. Further, the State of Georgia spent more than $100 million purchasing the Dominion equipment, SMF, ¶¶ 8-9, which is persuasive evidence the State does not intend to return to its use of the DRE system.

As a result of this change of systems and because Coalition Plaintiffs are only entitled to prospective injunctive relief, Coalition Plaintiffs' request for an order finding it "unconstitutional for any public election to be conducted using any model of DRE voting unit" and for an injunction prohibiting State

Defendants "from requiring voters to vote using DREs" is moot. [Doc. 226, pp. 71–72]. Further, Paragraph D, F, and G of the TAC [Doc. 628, pp. 75–76] are also moot, because no ballot-secrecy claim survives after this Court's ruling on the motion to dismiss, no pilot remains active, and State Defendants are not using any DREs.

## II.   Even if this Court had jurisdiction, Coalition Plaintiffs cannot prevail on the merits of their claims.

As the Eleventh Circuit noted in an appeal of this Court's prior order, claims brought under fundamental right to vote and the Equal Protection Clause related to elections are evaluated "under what is known as the *Anderson-Burdick* test, weighing 'the character and magnitude of the asserted injury' to voting rights 'against the precise interests put forward by the State as justifications for the burden imposed by its rule.' *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S. Ct. 2059, 119 L. Ed. 2d 245 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789, 103 S. Ct. 1564, 75 L. Ed. 2d 547 (1983) (internal quotation marks omitted))." *Curling*, 50 F.4th at 1121.

That inquiry is a sliding scale:

> If we conclude that the State's policy imposes a severe burden on the right to vote, we subject the policy to strict scrutiny—meaning that the rule survives only if it is narrowly tailored to serve a compelling state interest. *New Georgia Project*, 976 F.3d at 1280. When the burden is more modest, though, so is the inquiry. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 452, 128 S. Ct. 1184,

> 170 L. Ed. 2d 151 (2008). So long as a policy is "reasonable and nondiscriminatory," the State's "important regulatory interests in conducting orderly elections" will generally be enough to justify it. *Grizzle v. Kemp*, 634 F.3d 1314, 1322 (11th Cir. 2011) (quotations omitted); *Indep. Party of Florida v. Sec'y, State of Florida*, 967 F.3d 1277, 1281 (11th Cir. 2020) (quotation omitted).

*Id.* at 1121. This balancing test is important because there is "no license for 'second-guessing and interfering with' state decisions; ***the Constitution charges States, not federal courts, with designing election rules***." *Id.* (citing *New Georgia Project*, 976 F.3d at 1284) (emphasis added).

It is not enough to show a burden on the right to vote. Coalition Plaintiffs "must show, at the very least, that the burdens imposed 'represent a significant increase over the usual burdens of voting.'" *Id.* (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 198 (2008) (plurality opinion)). This is especially true of challenges to a state's electronic-voting method and requests the use of paper ballots because the lower-scrutiny *Burdick* test is applied. *See Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006) (applying *Burdick* to challenge to touchscreen voting procedure); *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003).

### A.   There is no severe burden on the right to vote by the use of electronic voting machines as opposed to hand-marked paper ballots.

Coalition Plaintiffs' claim that the Dominion BMD system is unconstitutional, [Doc. 628, p. 74], falls apart when one considers the actual text of the U.S. Constitution, and considers both the inherent authority to conduct elections retained by the states and the statutory structure around the implementation and use of voting machines in Georgia. The U.S. Constitution authorizes states to prescribe the "time, place, and manner" of elections—both federal and state. U.S. CONST. Art. I § 4, Cl.1. Congress has the authority to impose regulations and laws regarding elections—which it did when it passed HAVA in 2002—but it has yet to mandate the states employ particular voting equipment or methods for elections and anticipates that states will use a variety of technology in their individual voting systems. *See* 52 U.S.C. § 21081(a) (providing requirements for lever voting systems, optical scanning voting systems, direct recording electronic systems, and paper ballot voting systems[14]). Instead, HAVA provides general requirements for a voting system. 52 U.S.C. § 21081(a)(1)(A), (B). The voting system must have the ability to

---

[14] Coalition Plaintiffs' position must also be that Congress was mistaken when it passed HAVA, because it allowed states to select from a variety of voting methods Coalition Plaintiffs assert are unconstitutional.

conduct an audit and be accessible for individuals with disabilities. *Id*. at (a)(2)-(3).

Unlike some states, Georgia requires its election equipment to be certified by the EAC. O.C.G.A. § 21-2-300(a)(3). The EAC was created by HAVA and set up a rigorous process for the certification of voting equipment through a 110-member Standards Board, a 37-member Board of Advisors, and a 15-member Technical Guidelines Development Committee. 52 U.S.C. §§ 20943, 20944, 20961. Both BMDs and hand-marked ballots are certified by the EAC as voting systems for elections in the United States. *See Voluntary Voting System Guidelines Version 1.0.*[15] at Vol. I, V. 1.l, Section 2.3.1.2 (referring to ballot marking devices as a part of a paper-based voting system).

HAVA recognizes the substantial discretion states enjoy in creating and implementing election procedures within these parameters. *See Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1080 (N.D. Fla. 2004) (holding that provisions voting section of HAVA must be interpreted in accordance with state law on that issue); *see also Paralyzed Veterans of Am. v. McPherson*, Case No. C-06-4670-SBA, 2006 WL 3462780, at *9 (N.D. Cal. 2006) ("HAVA section

---

[15] *Available at* https://www.eac.gov/sites/default/files/document_library/files/VVSG.1.0_Volume_1.PDF (last accessed January 7, 2023).

301 is framed in terms of requirements for voting systems, *which are chosen by state and county officials*") (emphasis added).

States must "weigh the pros and cons of various balloting systems" to make state policy and "[s]o long as their choice is reasonable and neutral, it is free from judicial second-guessing." *Weber*, 347 F.3d at 1107; *see also McDonald v. Bd. of Election Comm'rs of Chicago*, 394 U.S. 802, 808-09 (1969) (noting that "a legislature need not run the risk of losing an entire remedial [electoral] scheme simply because it failed, through inadvertence or otherwise, to cover every evil that might conceivably have been attacked."); *Green Party of N.Y. v. Weiner*, 216 F.Supp.2d 176, 190–91 (S.D.N.Y. 2002) (dismissing the Green Party's challenge to the state's use of paper ballots during its primary on the ground that "[i]t may or may not be desirable for New York to purchase more or newer voting machines, or to adopt some more modern technology for conducting election[s] . . . [b]ut that debate is for the elected representatives of the people to decide, after balancing the pros and cons of different systems against their expense."). "[T]he mere possibility of error" is not enough to bar the use of a particular voting system, especially given the state interest in the orderly conduct of elections. *Banfield v. Cortés*, 631 Pa. 229, 260 (2015); *see also Stein v. Cortés*, 223 F. Supp. 3d 423, 441-42 (E.D. Pa. 2016).

Hand-marked paper ballot systems are not without their own security risks, as the basis for the adoption of HAVA—the 2000 election—makes abundantly clear. *Weber*, 347 F.3d at 1106 (citing *Bush v. Gore*, 531 U.S. 98 (2000)) ("Traditional paper ballots, as became evident during the 2000 presidential election, are prone to overvotes, undervotes, 'hanging chads,' and other mechanical and human errors that may thwart voter intent"); *see also* Gary Pomerantz, Atlanta Journal-Constitution, *When Georgia had three governors: The story that won George Goodwin a journalism prize* (June 20, 2019) *available at* https://www.ajc.com/news/special-reports/when-georgia-had-three-governors-the-story-that-won-george-goodwin-journalism-prize/PNNohvV4spaPsd5lFSzbkK/ (noting problems with paper ballots that led to the Three Governors Controversy).

Coalition Plaintiffs are activists—and there is nothing wrong with that. But their challenge to the use of technology in voting is ultimately just a policy disagreement and Georgia's selection is entitled to significant deference. *Weber*, 347 F.3d at 1107. And the legislature remains the most well-suited avenue for their political advocacy.

**B.     Even if there was a burden, the state's interests more than justify the decision to choose electronic voting machines.**

In sharp contrast to the lack of any burden on Coalition Plaintiffs, State Defendants have extremely significant interests in using BMDs. Even if this Court finds a burden on the right to vote, it must still balance the state's interests in using the election system. *Timmons*, 520 U.S. at 358.

As discussed above, BMD-marked paper ballots provide clear voter intent, unlike hand-marked ballots, where voters often circle or "x" through selections instead of filling in bubbles. SMF, ¶ 41. A voter's mark may be evidence of the intention of a voter to cross-out or circle a candidate in disregard of the ballot's instructions. SMF, ¶ 42. The state's interest in having clear voter intent clearly favors the use of BMDs over hand-marked paper ballots. The paper ballots printed by BMDs can be audited and have details that allow for analysis of proper functioning. SMF, ¶¶ 43-46. The Dominion BMD system protects ballot secrecy. SMF, ¶¶ 47-51. Further, the Dominion BMD system in Georgia has been subject to audits, including a complete hand recount. SMF, ¶¶ 292-308.

The Dominion BMD system also protects disabled voters. Both Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act prohibit discrimination against people with disabilities. Title II of the ADA

41

states that "no qualified individual with a disability shall by reason of such disability be excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In enacting the ADA, Congress concluded that there was a "compelling need" for a "clear and comprehensive national mandate" to both eliminate discrimination and to integrate disabled individuals into the social mainstream of American life. 42 U.S.C. § 12101(a)(5). For example, requiring blind and visually impaired individuals to vote with the assistance of a third party, at best provides these individuals with a voting experience not equal to that afforded other voters. *Cal. Council of the Blind v. Cty. Of Alameda*, 985 F. Supp. 2d 1229, 1239 (N.D. Cal. 2013). Similarly, Maryland's absentee voting program, which did not allow disabled individuals to mark their ballots without third-party assistance, also ran afoul of the ADA. *Nat'l Federation of the Blind v. Lamone*, 813 F.3d 494, 506 (4th Cir. 2016).

HAVA also requires the state to provide persons with disabilities access to voting technology that provides them with the means to vote in private and independently "through the use of at least one direct recording electronic voting system or other voting system equipped for individuals with disabilities at each polling place." 52 U.S.C. § 21081(a)(3). These federal laws require that

disabled individuals be provided an opportunity to participate that is equal to that afforded to others. *See Lamone*, 813 F.3d at 506; *see also* 28 C.F.R. § 35.130(b)(1)(ii). Coalition Plaintiffs' proposed relief—an exclusive HMPB system with one BMD at each precinct for use by disabled individuals—would necessarily require the State of Georgia to implement a voting program that could be challenged under the ADA.[16]

Further, Coalition Plaintiffs' theory would seek to require the State of Georgia to provide individuals with disabilities, who have been relegated to a position of "political powerlessness in our society," a sharply disparate means of voting (BMDs) that Coalition Plaintiffs themselves claim would allegedly place their actual vote and private information in potential harm. *See Tennessee v. Lane*, 541 U.S. 509, 516 (2004) (quoting 42 U.S.C. § 12101(a)(7)). Under Coalition Plaintiffs' logic and applicable ADA law, such a course of action would place the State of Georgia in a position of providing "an aid benefit, or service [to disabled individuals] that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others," in direct

---

[16] The State of Georgia is currently facing allegations that changes made by its Election Integrity Act violate the Americans with Disabilities Act. *See In re Georgia Senate Bill 202*, Case No. 1:21-mi-55555-JPB.

contrast to the requirements of HAVA and the ADA. *See* 28 C.F.R. § 35.130(b)(1(iii); 52 U.S.C. § 21081(a)(3). This Court cannot order a remedy that requires the State to violate federal law.

Ultimately, State Defendants and the State of Georgia had a litany of interconnected and overlapping compelling reasons for choosing the election system at issue. States have original authority over the time, place, and manner of their elections. And absent a burden that cannot be justified through government interests, they are charged with making reasonable policy decisions to effectuate orderly elections. *Powell v. Power*, 436 F.2d 84, 86 (2d Cir. 1970). When any burden is slight, there is no burden of proof on State Defendants because the regulatory interest of the state are sufficient to justify the practice. *Common Cause/Ga.*, 554 F.3d at 1355.

The interests of the State of Georgia far outweigh any burden on the right to vote based on the evidence presented to this Court. Further, any errors or problems with the election system can be resolved through the normal processes of the state's Election Code, including election contests. O.C.G.A. § 21-2-520 *et seq*.

## CONCLUSION

While there are thousands of pages of facts presented in this case, very few of them are material. The material facts demonstrate that Coalition

Plaintiffs do not have standing. If they do, their DRE claims are moot. But ultimately, there is no burden on the right to vote using the state's chosen voting system by the mere existence of vulnerabilities—because every voting system has vulnerabilities. This Court's role is limited, because it cannot and "does not sit as a guarantor of a flawless election." *Georgia Shift*, 2020 U.S. Dist. LEXIS 31407, at *18. And even if an election system is not "perfect," that does not mean that the system "violate[s] . . . the constitution." *Fair Fight Action*, 2022 U.S. Dist. LEXIS 179889, at *277.

Moreover, it is Coalition Plaintiffs' burden of proof to establish that the Georgia election system is unconstitutional. Coalition Plaintiffs cannot satisfy their burden of proof by showing vulnerabilities alone. And the numerous audits and hand counts of Georgia elections verify the accuracy of Georgia's voting equipment. Mere conjecture of vulnerabilities falls far short of the "significant, probative evidence"[17] required for Coalition Plaintiffs to defeat summary judgment, much less satisfy their burden of proof that Georgia's election system is defective or somehow illegal.

---

[17] *Irby,* 44 F.3d at 953.

For these reasons, State Defendants are entitled to judgment as a matter of law and Coalition Plaintiffs' claims should be dismissed with prejudice in their entirety.

Respectfully submitted this 9th day of January, 2023.

Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Edward A. Bedard
Georgia Bar No. 926148
ebedard@robbinsfirm.com
Javier Pico Prats
Georgia Bar No. 664717
jpicoprats@robbinsfirm.com
Anna Edmondson
Georgia Bar No. 289667
aedmondson@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3250

*/s/ Bryan P. Tyson*
Bryan P. Tyson

Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Diane F. LaRoss
Georgia Bar No. 430830
dlaross@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
Telephone: 678-336-7249

*Counsel for State Defendants*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing **STATE DEFENDANTS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON COALITION PLAINTIFFS' CLAIMS** has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Bryan P. Tyson*
Bryan P. Tyson
