IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*

     *Plaintiffs,*

v.

BRAD RAFFENSPERGER, *et al.*,

     *Defendants.*

CIVIL ACTION

NO. 1:17-CV-2989-AT

# STATE DEFENDANTS'
## STATEMENT OF UNDISPUTED MATERIAL FACTS
## IN SUPPORT OF THEIR MOTIONS FOR SUMMARY JUDGMENT
## ON CURLING AND COALITION PLAINTIFFS' CLAIMS

# TABLE OF CONTENTS

I. Georgia's Election System......................................................1

   A. Georgia's Adoption of the BMD System. ...................................1

   B. How the BMD System works..................................................3

   C. The State decertified the defunct DRE system..........................6

   D. Policy reasons regarding adoption of BMD System..................7

II. The Plaintiffs in this lawsuit ..............................................10

   A. Donna Curling ...............................................................10

   B. Donna Price...................................................................19

   C. Jeffrey H. E. Schoenberg .................................................23

   D. Coalition for Good Governance.........................................29

   E. Laura Marie Digges........................................................35

   F. William Digges III .........................................................36

   G. Ricardo Davis................................................................39

   H. Megan Missett ..............................................................41

III. The BMD System has provided a secure and accurate method of conducting Georgia's elections since its implementation.........44

   A. Numerous risk-limiting audits and hand recounts have confirmed the accuracy and reliability of the BMD system. ...44

   B. There is no evidence that the BMD System caused any voter's vote to not be counted. ...................................................47

   C. There is no evidence that the BMD Systems have been compromised or suffer from malware. ...................................52

IV. Plaintiffs' experts and their findings.................................56

   A. Dr. Philip Stark ...........................................................56

   B. Kevin Skoglund.............................................................63

   C. Dr. Alex Halderman .......................................................68

D. Dr. Andrew Appel ....................................................................... 69

E. Plaintiffs' Experts Lack of Malware Findings .......................... 70

V.   Plaintiffs' Requested Remedies ...................................................... 70

## I.   Georgia's Election System

### A. Georgia's Adoption of the BMD System.

1.    In 2017, Georgia began exploring a replacement for the DRE machines it had first purchased back in 2002 in response to the plagued paper-ballot system used in the controversial Bush-Gore presidential election of 2000.[1] Duane D. Stanford, *High-tech voting due November*, Atlanta Journal-Constitution, May 4, 2002 at H1–2, Ex. No. (1) at H1-2.

2.    The Georgia House of Representatives created a joint study committee to examine Georgia's voting system and related policy areas, and to consider options for replacement of the DRE voting system. HR 1699, 154th Gen. Assemb., Reg. Sess. (Ga. 2018) <u>available at</u> https://www.legis.ga.gov/legislation/53941.

3.    The following legislative session, the General Assembly enacted House Bill 316 ("H.B. 316") on April 2, 2019. HB 316, 155th Gen. Assemb., Reg. Sess. (Ga. 2019), <u>available at</u> https://www.legis.ga.gov/legislation/54991 (Signed by the Governor as Act 24).

4.    HB 316 became effective on April 2, 2019, upon being signed by

---

[1] While "Florida got the attention in 2000," the Atlanta Journal-Constitution reported that "Georgia's percentage of uncounted votes" under the old paper-ballot system "was actually higher—and twice the national average."

– 1 –

the Governor of Georgia. HB 316, 155th Gen. Assemb., Reg. Sess. (Ga. 2019), available at https://www.legis.ga.gov/legislation/54991 (Signed by the Governor as Act 24).

5.     This new law required the State to move towards a new voting system utilizing "ballot-marking devices," or "BMDs." *See generally* HB 316, 155th Gen. Assemb., Reg. Sess. (Ga. 2019), available at https://www.legis.ga.gov/legislation/54991 (Signed by the Governor as Act 24).

6.     Experts recognize BMDs as a safe and secure voting system. The National Academy of Sciences, while critical of DREs, recommends paper ballots (1) marked by either BMDs or by hand and (2) counted using optical scanners or by hand. Ex. No. (2) at 34.

7.     Following the passage of H.B. 316, the Secretary of State engaged in a competitive bid process for the new BMD system. *See* Request for Proposal for a Statewide Voting System, available at https://ssl.doas.state.ga.us/PRSapp/PublicBidNotice?bid_op=194780047800-SOS0000037.

8.     On August 9, 2019, the Secretary awarded a contract in the amount of $106,842,590.80 to Dominion Voting Systems to provide the new BMD system. *See* Notice of Award, underline available at

– 2 –

http://ssl.doas.state.ga.us/PRSapp/bid-documents/194780047800-SOS0000037242349.pdf.

9.     Pursuant to that contract, the State purchased the Statewide Voting System from Dominion Voting Systems—including 30,500 BMD machines in the first year of the contract—and immediately began helping Georgia's counties to begin implementing the new system. Declaration of R. Germany, Ex. No. (3) at ¶ 5.

10.     The BMD voting systems have been fully distributed and are currently in use in all counties in Georgia. Ex. No. (3) at ¶ 6.

11.     The BMDs completely replaced the DREs that were previously used in Georgia, including the November 2018 general elections. Ex. No. (3) at ¶ 7.

**B. How the BMD System works.**

12.     The Dominion system includes an electronic BMD, a printer, and an optical scanner (ICP) connected to a locked ballot box. Declaration of Dr. E. Coomer, Ex. No. (4) at ¶ 3.

13.     Under the Dominion BMD System, voters that vote in-person make their selections on an electronic BMD. Declaration of Dr. E. Coomer, Ex. No. (4) at ¶ 4.

14.     When they are finished making their selections, they are instructed to review their selections for accuracy before printing their ballot. Declaration of Dr. E. Coomer, Ex. No. (4) at ¶ 4.

15.     After confirming their choices, a printer connected to the BMD prints out a ballot containing an electronic QR code that is a computer-readable selection of the voter's choices. Declaration of Dr. E. Coomer, Ex. No. (4) at ¶ 4.

16.     The printed ballot also contains a written, human-readable list of the voter's choices. Declaration of Dr. J. Gilbert, Ex. No. (5) at ¶¶ 33-35.

17.     Georgia law considers this written, human-readable list to be the voter's official ballot. Ga. Comp. R. & Regs. 183-1-15-.02(h), (j) (defining a "vote" as the choices indicated by the printed paper ballot" and stating that "the printed text shall control" between the QR code and the printed list).

18.     The voter is instructed to review the ballot selections on the printed ballot to ensure that it accurately reflects the choices they made on the BMD. Ga Comp. R. & Regs. 183-1-12-.11(8).

19.     After they have done so, the voter inserts the printed ballot into a precinct scanner which scans the QR code and deposits the ballot into a locked box. Ga Comp. R. & Regs. 183-1-12-.11(2)(b); Ex. No. (3) at ¶ 8.

20.     An optical scanner is programmed to look for information at

particular coordinates and then tabulates votes based on the information at that location—the scanner does not read the text portion of either a BMD-marked ballot or a hand-marked ballot. Declaration of Dr. E. Coomer, Ex. No. (4) at ¶ 9.

21.    What matters is not the candidate information, but rather the programming for where the computer looks for information at particular coordinates. Declaration of Dr. E. Coomer, Ex. No. (4) at ¶ 9.

22.    The method by which a BMD-marked ballot and hand-marked ballot are read by the optical scanner is identical. Declaration of Dr. E. Coomer, Ex. No. (4) at ¶ 9.

23.    In 2020, BMDs that print barcodes were used in six of the ten largest counties in the country, including Los Angeles, California; Cook County/City of Chicago; Maricopa, Arizona; San Diego, California; Dallas, Texas; and Riverside, California. Of those six counties, five are using the Dominion BMD. Declaration of Dr. E. Coomer, Ex. No. (4) at ¶ 5.

24.    The locked boxes of ballots are kept for 24 months to be used in the event of any recounts. O.C.G.A. § 21-2-500.

25.    For mail absentee ballots,[2] voters mark ballots by hand. These hand-marked paper ballots are then scanned and tabulated using a "Central Count Scanner." Ex. No. (3) at ¶ 9.

26.    Similar to the secure storage of in-person ballots, absentee ballots are stored securely in a locked box. Ga Comp. R. & Regs. 183-1-14-.14(3)(g).

27.    The Dominion BMD System also includes a new election management system ("EMS") for the consolidation and tabulation of results, which replaced the prior GEMS system used for DREs. Ex. No. 5 at ¶ 43.

28.    There is no software continuity between the two systems that could transmit viruses or malware. Ex. No. (5) at ¶ 43.

**C. The State decertified the defunct DRE system.**

29.    The Secretary of State issued the order to decertify the DREs on December 30, 2019. Ex. No. (6) at 2.

30.    The decertification order specifies that nothing in the old DRE system can be used for any Georgia election, effective January 1, 2020:

> [T]he Accu Vote Voting System, consisting of the

---

[2] The Georgia election code categorizes voting as either Election Day voting or "absentee" voting, with absentee voting including both absentee-by-mail and what is called "advance voting." O.C.G.A. 21-2-380(a), 21-2-385(a) and (d). For simplicity's sake, the State uses "absentee voting" to refer to advance voting by mail.

> Global Election Management System (GEMS), Accu-Vote TS R6 DRE Voting Station, AccuVote TSX DRE Voting Station, AccuVote OS Optical Scanner, ExpressPoll 4000 Electronic Poll Book, and ExpressPoll 5000 Electronic Poll Book, can no longer be lawfully used in Georgia beginning on January 1, 2020. Therefore, the previous certifications for the aforementioned system are hereby revoked, and the system is no longer certified for use in any primaries or elections in this state.

Ex. No. (6) at 2.

31.     Since the Secretary of State decertified the DREs, no elections in Georgia have been conducted using the DREs. Ex. No. (3) at ¶ 10.

32.     State Defendants have no intention of using the DREs for any election in the future. Ex. No. (3) at 11.

33.     State Defendants have no legal authority to use the DREs for any election in the future. *See* O.C.G.A. § 21-2-300; *see also* Ex. No. (6) at 2.

34.     The Curling Plaintiffs and the Coalition Plaintiffs agree that the DRE Claims are moot. *See generally* Ex. No. (7); Ex. No. (8) at 6; Ex. No. (9) at 1; Ex. No. (10) at 13; Nov. 11, 2019 Hrg, Ex. No. (11) at 73:09–13.

**D. Policy reasons regarding adoption of BMD System.**

35.     Both BMDs and hand-marked ballots are certified by the EAC as voting systems for elections in the United States. *See Voluntary Voting System Guidelines Version 1.0*, at Vol. I, V. 1.l, Section 2.3.1.2, publicly

available at

https://www.eac.gov/sites/default/files/document_library/files/VVSG.1.0_Volume_1.PDF.

36.     The State of Georgia has used electronic voting for more than two decades, so Georgia voters are already familiar with an electronic in-person voting experience. HR 1699, 154th Gen. Assemb., Reg. Sess. (Ga. 2018) available at https://www.legis.ga.gov/legislation/53941.

37.     Hand-marked paper ballots are not an option for many voters with disabilities. Ex. No. (5) at ¶ 40(A).

38.     Without the use of technology, voters with disabilities are unable to mark paper ballots privately and independently. Ex. No. (5) at 658-3, ¶ 40(A).

39.     A separate system for voters with disabilities results in two systems that are inherently "separate and unequal." Ex. No. (12) at ¶¶ 8, 13.

40.     Having only voters with disabilities vote on BMDs can result in the loss of the right to vote by secret ballot. Using BMDs only for voters with disabilities can create a greater risk to election security than using BMDs more broadly. Ex. No. (12) at ¶¶ 9, 11.

41.     BMD-marked paper ballots provide clear voter intent, unlike hand- marked ballots, where voters often circle or "x" through selections

instead of filling in bubbles. Deposition of L. Ledford, Ex. No. (13) at 37:8-38:4, 49:8-22; Ex. No. (14) at 262:11-20; Ex. No. (5) at ¶ 39(C).

42.    A voter's mark may be evidence of the intention of a voter to cross-out or circle a candidate in disregard of the ballot's instructions. Ex. No. (5) at ¶ 53.

43.    When a ballot is scanned into a Dominion optical scanner, whether that ballot is hand-marked or marked by a BMD, the scanner creates a digital image of the front and back of the ballot. Ex. No. (4) at ¶ 10.

44.    The tabulating software also adds a feature called an "AuditMark" to each image. Ex. No. (4) at ¶ 10.

45.    The AuditMark is a text representation of how the tabulating software interpreted the ballot when it was scanned. Ex. No. (4) at ¶ 10.

46.    That scanned image can later be used as part of an audit of the election. Ex. No. (4) at ¶ 10.

47.    Each AuditMark includes only (1) what tabulating unit scanned the ballot and (2) a randomized sequence number. Ex. No. (4) at ¶ 10.

48.    There is no way to correlate the sequence number to an individual voter or any point in time that the ballot was cast. Ex. No. (4) at ¶ 10.

49.    The optical scanner does not store any date or time-stamp information with the ballot image. Ex. No. (4) at ¶ 10.

50.     In short, it is impossible to re-recreate the sequence of the order in which the ballots were cast—meaning it is impossible to determine how someone voted. Ex. No. (4) at ¶ 10.

51.     Further, the paper ballots jumble in the ballot box, making the precise order in which they were cast unknowable. Ex. No. (15) at ¶ 7.

52.     The State of Georgia's ENET database maintains records demonstrating a voter's voting history, including which elections they voted in and the method they chose to vote in those elections. Ex. No. (3) at ¶¶ 12, 14-21.

## II.   The Plaintiffs in this lawsuit

### A. Donna Curling

53.     Donna Curling is a resident of Fulton County, Georgia. D. Curling Dep., Ex. No. (16) at 125:10-16.

54.     Curling has no formal training in election law, election administration, computer security, or cybersecurity. Ex. No. (16) at 29:10-18, 30:1-4.

55.     Curling has not had any formal training on either Georgia's former Diebold DRE election system or the current Dominion BMD election system. Ex. No. (16) at 31:25-32:7.

56.     Curling has never worked at a polling place, for a campaign, or

received any formal training relating to absentee ballots. Ex. No. (16) at 29:10-25.

57.     Curling voted in at least the November 8, 2016 General Election (the "2016 General Election"), the April 18, 2017 6th Congressional District Special Election ("Special Election"), the June 20, 2017 6th Congressional District Runoff Election ("Runoff"), the May 2018 and November 2018 General Elections, and the 2020 General Election (the "2020 General Election"). Ex. No. (17) at 5-7; *see also* D. Curling ENET Report, Ex. No. (18) at 2.

58.     Since the filing of this suit, and up until her deposition on January 19, 2022, Curling voted in 10 elections, and her votes were counted in each of those elections. Ex. No. (18) at 2.

59.     For the November 6, 2017 General Election, Curling voted in person on a DRE voting machine. Ex. No. (18) at 2.

60.     For the May 22, 2018 General Primary Election, Curling voted in person on a DRE voting machine. Ex. No. (18) at 2.

61.     For the July 24, 2018 General Primary Runoff Election, Curling voted in person on a DRE voting machine. Ex. No. (18) at 2.

62.     For the November 6, 2018 General Election, Curling voted by absentee ballot. Ex. No. (18) at 2.

63.    For the December 4, 2018 General Election Runoff, Curling voted by absentee ballot. Ex. No. (18) at 2.

64.    For the November 5, 2019 General Election, Curling voted in person on a DRE voting machine. Ex. No. (18) at 2.

65.    For the December 3, 2019 General Election Runoff, Curling voted in person on a DRE voting machine. Ex. No. (18) at 2.

66.    For the June 9, 2020 General Primary Election, Curling voted by absentee ballot. Ex. No. (18) at 2.

67.    For the November 3, 2020 General Election, Curling voted by absentee ballot. Ex. No. (18) at 2.

68.    For the January 5, 2021 General Election Runoff, Curling voting by absentee ballot. Ex. No. (18) at 2.

69.    Curling intends to vote in all future elections. Ex. No. (16) at 33:12-15.

70.    In the early 2000s, Curling volunteered with a group known as Vote Trust USA. The organization worked with at least one member of the United States House of Representatives to pass legislation to impose a federal ban on DREs. At that time, Plaintiff Curling met Dr. Alex Halderman. Ex. No. (16) at 11:19-23, 12:4-10, 11:22-23.

71.    Vote Trust USA and Curling's opposition to DREs was that the

devices presented "no paper trail, and that it was software dependent, and you were literally putting your vote into a black box and assuming, hoping that it would be counted as you cast it, but there were no guarantees and there was no fall-back to verify." Ex. No. (16) at 13:2-8.

72.    Curling currently serves, on a volunteer basis, as the legislative liaison for Georgians for Verified Voting. The only members of Georgians for Verified Voting are Plaintiff Curling and Plaintiff Donna Price. Ex. No. (16) at 34:15, 35:11-12, 35:8-10.

73.    According to Curling, Georgians for Verified Voting's mission to inform voters on the "flaws in [the DRE] system and to encourage them to vote on hand-marked paper ballots so that there would be a record of their vote." Ex. No. (16) at 35:15-19.

74.    By January 2022, Curling could not remember what "was the injury that led [her] to file the third amended complaint." Ex. No. (16) at 95:7-14.

**75.**    Curling claims that losing "faith in the system" causes people not to choose not to vote and, therefore, violates voting rights. Ex. No. (16) at 73:15-23.

**76.**    Curling also identified her injury as having a "lack of confidence in [her] vote," because Georgia's Election System is not, for Curling at least,

– 13 –

sufficiently "transparent." Ex. No. (16) at 92:8-22, 96:6-10.

77.     This lack of transparency Curling describes apparently focuses on "software programming in the machines" that Curling cannot see, and therefore feels that she will be "screwed" by the technology. Ex. No. (16) at 113:3-16; Ex. No. (19) at 1.

78.     Plaintiff Curling later said her injury was not knowing if her vote were counted as cast. Ex. No. (16) at 99:16-23, 102:6-12 (identifying the lack of knowledge as a due process violation).

79.     Curling's lack of knowledge is the basis of her claim that Georgia's Election System violates the Due Process Clause as alleged in Count III. Ex. No. (16) at 101:22-102:12.

80.     Curling acknowledged that she would also not have any idea if her vote were counted if she used a hand marked paper ballot with an optical scanner. Ex. No. (16) at 99:25-100:3.

81.     Voting causes Curling "anxiety," because she does not trust the machines and finds the absentee-ballot request process cumbersome. Ex. No. (16) at 111:20-112:8; *see also* Ex. No. (19).

82.     When asked about her Equal Protection Claim (Count IV), Curling could not identify anyone who was treated differently as a result of the way that Georgia conducts elections. Ex. No. (16) at 102:22-25.

**83.** Later, she claimed that the Georgia elections are not equal because persons, like her, who vote by absentee ballots can verify their votes. Ex. No. (16) at 107:15-17.

**84.** Curling cannot identify any Georgia voter whose constitutional rights were violated by the conduct of the presidential election in November 2020. Ex. No. (16) at 79:9-15.

**85.** Curling has no knowledge of a "systematic attack" on a Georgia election. Ex. No. (16) at 87:3-8.

**86.** But she believes that no one could ever prove that a systemic attack did *not* occur. Ex. No. (16) at 87:3-9.

**87.** Similarly, no evidence could satisfy Curling that Georgia's election system has *not* been hacked. Ex. No. (16) at 89:21-24.

**88.** Plaintiff Curling does not know whether the "scanners used in the Dominion system, or the current voting system are reliable, accurate, and capable of secure operation as required by law." Ex. No. (16) at 91:25-92:6.

**89.** Curling had no issue with the existing scanners used in Georgia's Election System. Ex. No. (16) at 94:12-14.

90. During Curling's deposition, she stated that, other than information provided to her by her legal counsel, she reviewed no information to familiarize herself with the Dominion voting equipment now utilized in

Georgia. Ex. No. (16) at 40:23-41:2.

91.    Despite this lack of information, Curling believes that the

Georgia's Election System prevents her from "know[ing] if [her] vote is

counted as cast because [her] vote is translated into a QR code, which is not

human readable." Ex. No. (16) at 41:7-12.

92.    Curling also pled that the Dominion system must be "presumed

to be compromised," but she could not explain why. Ex. No. (17) at ¶ 117; Ex.

No. (16) at 98:10-14.

93.    While the Curling Plaintiffs' Third Amended Complaint cites

Texas' voting-systems examiners' conclusions about the Dominion BMDs,

Curling has no firsthand knowledge of any of these examiners' concerns

coming to fruition in Georgia. Ex. No. (16) at 85:5-11.

94.    Curling also pled that a "vulnerability" of the Dominion BMD's

are that "remote attackers [could] implement a DNS attack." (Doc. 627 at 26,

¶ 81.) But she neither knows what a DNS attack is nor if one has actually

occurred on the Georgia Election System. Ex. No. (16) at 85:18-23.

95.    Curling also pled that the Dominion BMDs could be manipulated

to redirect votes to a different candidate, but here again, Curling has no

knowledge of this occurring. Ex. No. (17) at ¶ 81; Ex. No. (16) at 85:24-86:3.

96.    Curling has no knowledge of an actual electronic and/or other

intrusion and manipulation of the new BMD Election System by an individual or entity without authorization to do so. Ex. No. (16) at 90:11-16.

97.     Curling pled that the Dominion Election System lacked "minimal and legally required steps to ensure that [it] cannot be operated without authorization … [or] unauthorized tampering," but she does not know what that means. Ex. No. (16) at 90:17-91:13; Ex. No. (17) at ¶ 116.

98.     For that matter, Curling pled but cannot explain what she meant by the allegation that the Dominion voting equipment "fails to ensure that all such equipment, firmware, and software is reliable, accurate, and capable of secure operation as required by law." Ex. No. (16) at 91:15-23; Ex. No. (17) at ¶ 116.

99.     Curling admits that Georgia's BMD paper ballots can be recounted, but she presumes that the "general practice" is to re-scan them. Ex. No. (16) at 103:3-8.

100.    Curling concedes that the Dominion BMD equipment utilizes a paper ballot. She also admits that while not her "ideal system," the paper ballot utilized by the BMD equipment can lead to a verified election with the proper procedures. Ex. No. (16) at 52:14-16, 80:8-11.

101.    Curling also acknowledges that a voter can verify his or her choices identified in text on the paper ballot produced by the BMD. This is

like a hand-marked paper ballot where voters bubble in their choice and verifiable by human review. Ex. No. (16) at 65:3-7, 103:10-25.

102.   In January 2022, Curling was unaware that the BMD-produced ballot showed when a voter did not vote in a particular race. Ex. No. (16) at 63:8-17.

103.   In the 2019 municipal elections, Curling voted on a Dominion BMD machine. Ex. No. (16) at 42:13-43:1.

104.   When Curling voted on the Dominion BMD system in the 2019 municipal election, she could "see what the print[] out said was [her] vote was as [she] intended." She checked the print out for accuracy, and it accurately identified the name of her chosen candidate. Ex. No. (16) at 43:16-24, 43:10-12.

105.   Curling maintains, however, that she does not know if her vote counted in the 2019 municipal election. Ex. No. (16) at 43:2-14.

106.   Curling's ultimate issues with the BMD equipment are the fact that it uses a QR code and the fact that it uses software. Ex. No. (16) at 45:22-45:17.

107.   Plaintiff Curling is not concerned about the printers used by the Georgia Election System. Ex. No. (16) at 59:4-5.

**B. Donna Price.**

108.   Donna Price is a resident of DeKalb County. D. Price Dep., Ex. No. (20) at 44:22-24.

109.   Price has not received training on the hardware or programing of the DRE voting equipment. Ex. No. (20) at 20:17-21:3.

110.   Price relies on information from experts about vulnerabilities to a voting system. Ex No. (20) at 70:1-4.

111.   Specifically, Price stated, "I think I have to rely on security experts, voting security experts, to know whether a specific system, meaning the Georgia BMD voting system, is vulnerable to attacks." Ex. No. (20) at 71:23-72:6.

112.   Since the inception of this lawsuit, Price has voted in seven elections in Georgia. Ex. No. (21) at 1-2.

113.   For the May 22, 2018 General Primary Election, Price voted by absentee ballot. Ex. No. (21) at 2.

114.   For the November 6, 2018 General Election, Price voted by absentee ballot. Ex. No. (21) at 2.

115.   For the December 4, 2018 General Election Runoff, Price voted by absentee ballot. Ex. No. (21) at 2.

116.   For the November 5, 2019 General Election, Price voted by

absentee ballot. Ex. No. (21) at 2.

117.   For the March 24, 2020 Presidential Preference Primary

Election, Price voted by absentee ballot. Ex. No. (21) at 2.

118.   For the November 3, 2020 General Election, Price voted by

absentee ballot. Ex. No. (21) at 2.

119.   For the January 5, 2021 General Election Runoff, Price voted by

absentee ballot. Ex. No. (21) at 2.

120.   Price's votes were counted in each of these elections. Ex. No. (21)

at 1-2.

121.   Price founded the organization Georgians for Verified Voting

because she was "concerned about the voting system, the security reliability

and verifiability of the voting system in Georgia, the DRE voting system." Ex.

No. (20) at 22:6-14.

122.   By election security concerns relating to the DRE voting system,

Price meant that there was no paper record to verify the software tabulation

of the votes. Ex. No. (20) at 22:15-23:13.

123.   Price does not believe that a BMD produces a voter-verified paper

ballot. Ex. No. (20) at 27:9-15.

**124.**   Price learned about all of the supposed vulnerabilities to the

election systems that form the basis of her claims from experts in this case,

namely Dr. Halderman. Ex. No. (20) at 86:4-90:24.

**125.**   According to Price, her right to vote is burdened by voting absentee because she is "forced to forgo the privilege, honor, and right to vote alongside my fellow voters." Ex. No. (20) at 117:13-20.

**126.**   Price also claims she is burdened by merely requesting the absentee ballot. Ex. No. (20) at 118:7-9.

127.   Since 2018, Price has always voted absentee by mail. Ex. No. (20) at 39:22-24.

128.   Price has not voted on a BMD voting machine in Georgia's current voting system. Ex. No. (20) at 43:3-4.

129.   Price does not have any plans to vote on a BMD in the future. Ex. No. (20) at 43:5-7.

130.   Price has no evidence that any of her absentee ballots were not accurately counted. Ex. No. (20) at 42:2-6.

131.   According to Price, if she votes on the current BMD system, she is not able to cast a voter-verified paper ballot. If she votes an absentee ballot, she is not able see that that ballot is actually fed into the lockbox, the optical scanner and lockbox at the precinct, like voters do if they're using the BMD. Ex. No. (20) at 45:23-46:7.

132.   Price believes Georgia does not currently have post-election risk-

limiting audits, which she believes is another component to being able to secure her right to vote. Ex. No. (20) at 46:8-11.

133.   Price believes that if she votes on a ballot marking device, the votes are encompassed in a QR code, and she cannot validate that those are selections that she made because the QR code is what's read by the scanner. Ex. No. (20) at 47:6-14.

134.   Price also believes the burden on her right to vote is that the primary record of her vote is a voter-verified paper ballot, and without what she believe is a voter-verified paper ballot, there's no record that she has verified to of the selections she made on the ballot. Ex. No. (20) at 47:21-25.

135.   Without a voter-verified paper ballot, Price does not believe she is voting. Instead, she contends that she would "be giving that -- my vote to whoever is -- and whatever is determining what's in that QR code." Ex. No. (20) at 48:8-15.

136.   Price has no evidence of anyone who voted on a BMD and the printed candidates were not what the person selected. Ex. No. (20) at 48:23-49:7.

137.   Price believes that all elections using BMDs are indeterminable. Ex. No. (20) at 61:17-21.

138.   Price cannot have confidence in any election results because she

cannot read bar codes. Ex. No. (20) at 103:17-104-5.

139.   Price further stated, "without being able to verify that the ballot which I mark as a voter or I mark my selections and I can't verify those selections, then that's a threat to the results of the election being accurate." Ex. No. (20) at 105:3-7.

### C. Jeffrey H. E. Schoenberg

140.   Jeffrey H. E. Schoenberg is a resident of DeKalb County. J. Schoenberg Dep., Ex. No. (22) at 10:8-9.

141.   Schoenberg does not have any formal training or experience in election administration or with election technology. Ex. No. (22) at 32:20-24.

142.   Schoenberg does not have any formal training or experience with computers or IT security. Ex. No. (22) at 32:20-33:2.

143.   Schoenberg has no formal training or experience with risk limiting audits, and has never performed one. Ex. No. (22) at 32:20-33:7.

144.   Plaintiff Schoenberg was asked to join as a plaintiff in this litigation by Representative Scott Holcomb because "they were looking to have somebody to represent voters of DeKalb County on the plaintiffs' group." Ex. No. (22) at 35:16-18.

145.   Representative Holcomb knew Mr. Schoenberg was interested in

the topic of voting machines, and when Representative Holcomb ran for Secretary of State in 2006, he campaigned on the issue of election machinery and a paper trail for voting. Ex. No. (22) at 35:14-36:17.

146.   Representative Holcomb was legal counsel for the plaintiffs at the start of the case. Ex. No. (22) at 36:18-22.

147.   Schoenberg understands that his co-plaintiffs are involved in Georgians for Verified Voting—Ms. Price as co-chairman of the organization and Ms. Curling is involved with the organization. Ex. No. (22) at 38:12-39:8.

148.   Since the inception of this lawsuit, Schoenberg has voted in 11 elections. Ex. No. (23) at 2.

149.   For the November 7, 2017 General Election, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

150.   For the May 22, 2018 General Primary Election, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

151.   For the July 24, 2018 General Primary Runoff Election, Schoenberg voted in person on a DRE voting machine. Ex. No. (23) at 2.

152.   For the November 6, 2018 General Election, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

153.   For the December 4, 2018 General Election Runoff, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

154.   For the November 5, 2019 General Election, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

155.   For the March 24, 2020 Presidential Preference Primary Election, Schoenberg voted in person on a BMD voting machine. Ex. No. (23) at 2; Ex. No. (24) at 1.

156.   For the June 9, 2020 General Primary Election, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

157.   For the August 11, 2020 General Primary Runoff Election, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

158.   For the November 3, 2020 General Election, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

159.   For the January 5, 2021 General Election Runoff, Schoenberg voted in person on a BMD voting machine. Ex. No. (23) at 2; Ex. No. (24) at 1.

160.   Schoenberg's votes were counted in each of these elections. Ex. No. (23) at 2.

161.   Plaintiff Schoenberg has voted on the BMD system at least twice, and when he did, he personally reviewed the text on the printed ballot. Ex. No. (22) at 81:20-82:1; 96:11-16.

162.   Plaintiff Schoenberg believes every election is "flawed" because he believes the DRE and BMD election systems are unverifiable, unreliable,

and cannot be audited. Ex. No. (22) at 83:25-84:4.

163.   Schoenberg contends that voting absentee by mail is burdensome because "it does not feel to [him] like full civic participation in the communal process of voting." Ex. No. (22) at 92:23-93:4.

164.   Additionally, Schoenberg thinks voting absentee by mail is burdensome because he has to plan ahead, use the mail multiple times, trust that the ballot will get processed in a timely manner, and it requires him to vote early. Ex. No. (22) at 93:8-19.

165.   Schoenberg claims his absentee by mail ballot did not arrive in the 2021 runoff election, but he did not try to contact the DeKalb County election office about his absentee request and instead voted in person. Ex. No. (22) at 93:20-96:10.

166.   Schoenberg also believes that voting by absentee ballot in Georgia is flawed, burdensome, and "somewhat unreliable." Ex. No. (22) at 99:5-24.

167.   Schoenberg does not know what the minimal and legally required steps to ensure equipment cannot be operated without authorization would be, and instead he has relied on Dr. Halderman to tell him. Ex. No. (22) at 104:16-105:17.

168.   According to Schoenberg, "if [Dr. Halderman] said it, I think it's

important or we wouldn't have asked him to say it to the judge. So whether in writing or in spoken language, I'm relying on him for what I have said here today." Ex. No. (22) at 108:7-13.

**169.** Schoenberg believes he was injured by voting in an unverifiable way. Specifically, Plaintiff Schoenberg testified, "This is not only about risk. This is, the reality is I have been damaged because my vote has not been reliably counted as cast." Specifically, Schoenberg believes there is "no verifiable, human verifiable record of my intent." Ex. No. (22) at 79:1-10, 79:18-80:5.

**170.** Schoenberg also testified that "[m]y rights have been violated because my vote has not reliably been counted as I intended. I cannot know that I am being heard as an individual citizen, and I think that that's wrong and needs to be corrected." Ex. No. (22) at 85:11-16.

**171.** Schoenberg testified that he wants to know that when he expresses his opinion through voting, "somebody hears it, that it gets counted, and it gets counted along with the votes from everybody else who voted for whatever reasons and however much they care, they expressed their opinion," but with the BMD system, he does not know "for certain that this system is doing what it's intended to do." Ex. No. (22) at 126:10-127:25.

172.   Plaintiff Schoenberg contends that, under the DRE voting

system, only voters who cast absentee by mail and provisional paper ballots were able to vote using a verifiable ballot. Ex. No. (22) at 55:12-24.

173.   As to the BMD system, Plaintiff Schoenberg also contends that it is an unverifiable, un-auditable computer system that doesn't produce a verifiable auditable paper trail, and he has no way of verifying that the QR code accurately reflects the intention of the voter. Ex. No. (22) at 76:22-77:14.

174.   According to Plaintiff Schoenberg, "when reportedly the vote gets tallied, there's no way of saying afterwards that it reflected what I intended to have happen with my vote. I know after every vote I cast on the system that I have essentially put my vote into -- my intended vote into a black box, and what comes out the other side may or may not be what I intended, which is a harm to me. Ex. No. (22) at 79:18-80:5.

175.   When Schoenberg voted on a BMD, the only problems he could recall were his personal belief that the instructions were difficult and someone could see his screen if they were motivated to see it, but the machine was not hard to touch and it took his selections. Ex. No. (22) at 96:17-97:16.

176.   Schoenberg voted on a BMD in the 2020 Presidential Preference Primary and did not feel pressured to vote absentee by mail. Ex. No. (22) at 132:9-16.

177.   Schoenberg's belief that the BMD system fails to protect against

intrusion and manipulation is based on what the experts in the case tell him. Specifically, he testified that "Based on the evidence of the experts in this case, I'm -- I feel very strongly that – that the system is not secure from those kind of external threats." Ex. No. (22) at 101:1-17.

### D. Coalition for Good Governance.

178.   Plaintiff Coalition for Good Governance ("CGG") is a non-profit corporation organized under the laws of Colorado. Coalition for Good Governance 30(b)(6) Dep., Ex. No. (25) at 138:5-25.

179.   CGG believes that Georgia voters have a reasonable basis to question every election result for elections conducted on Dominion BMDs and Georgia voters "will never be able to know the outcome" of the November 2020 presidential election in Georgia. Ex. No. (25) at 246:03-246:08, 243:02-243:09.

180.   Since filing this lawsuit, CGG has provided information and education to its members, served as an information resource, monitored nationwide developments in election law and technology, provided speakers for educational institutions, collaborated with other voting rights and election integrity initiatives, and shared research about election problems. Ex. No. (25) at 142:21-144:14.

181.   Advancing individual rights through the proper administration of elections is a key part of the mission of the CGG. Ex. No. (25) at 142:07-142:10.

182.   Since the filing of this lawsuit, CGG members and prospective members have participated in poll watching, attending public meetings, and other civic activities. Ex. No. (25) at 144:15-22.

183.   CGG will continue educating its members about election issues regardless of whether it receives an injunction banning ballot-marking devices. Ex. No. (25) at 86:13-86:21.

184.   CGG is unable to identify when it diverts resources based on the actions of nonparty counties versus State Defendants. Ex. No. (25) at 48:4-48:19.

185.   CGG diverted resources from planned projects in Colorado, North Carolina, and South Carolina because it spent resources in Georgia. Ex. No. (25) at 74:14-74:25.

186.   CGG's decision about how to litigate this case contributed to its inability to have time for other projects of CGG. Ex. No. (25) at 116:19-117:12, 117:23-118:3.

187.   This case is one of the causes of diversion of significant resources of CGG away from its other projects. Ex. No. (25) at 119:5-119:9.

188.   CGG is unable to determine how much of its diversion is due to this litigation and how much is due to other factors. Ex. No. (25) at 119:10-120:2.

189.   CGG maintains no written annual budget. Marks Dep. 131:21-23.

190.   CGG cannot identify spending on any specific categories from any document. Ex. No. (25) at 131:24-132:25.

191.   CGG's financial diversion of resources is litigation costs related to this case. Ex. No. (25) at 51:8-51:15.

192.   The financial resources CGG is diverting relate to supporting the litigation in this case. Ex. No. (25) at 52:17-54:1.

193.   CGG does not collect dues from its members. Ex. No. (25) at 104:10-104:14.

194.   CGG cannot identify which requests for assistance it receives that are rejected due to lack of resources. Ex. No. (25) at 112:25-113:13.

195.   CGG has used its participation as a plaintiff in this case for fundraising purposes. Ex. No. (25) at 161:5-161:8, 162:25-163:16, 170:9-22.

196.   CGG fundraising increased every year from the filing of this lawsuit through 2019. Ex. No. (25) at 174:21-174:23.

197.   When CGG represented to potential donors that "all donations go for the direct costs of litigation," it meant the "vast majority of resources are

being directed to litigation support." Ex. No. (25) at 171:4-171:22.

198.    CGG educates its members and the general public with the same message. Ex. No. (25) at 58:13-58:18.

199.    The non-financial resources CGG claims it has diverted includes volunteer time but CGG does not track volunteer time. Ex. No. (25) at 87:17-88:14.

200.    While more than 80% of CGG volunteer time is related to this litigation and CGG's efforts related to the Dominion Voting System, the remaining 20% of time includes answering questions about the Dominion Voting System and election administration. Ex. No. (25) at 92:8-94:12.

201.    More than 90% of CGG's work is dedicated to election related activities. Ex. No. (25) at 154:13-155:4.

202.    CGG's inability to engage on topics it wishes to engage in is due to this litigation and activities related to Dominion BMDs. Ex. No. (25) at 84:23-85:5.

203.    When CGG reported its program service accomplishments to the IRS in 2017, 2018, and 2019, it listed this litigation and other litigation challenging touchscreen voting systems. Ex. No. (25) at 97:8-100:2, 101:3-101:22, 103:25-104:3, 107:10-107:22.

204.    CGG files lawsuits in pursuit of the interests that it exists to

protect. Ex. No. (25) at 135:19-135:22.

205.   CGG sometimes serves its organizational purpose by filing litigation. Ex. No. (25) at 142:11-142:20.

206.   This litigation was a project of primary focus for CGG in 2021. Ex. No. (25) at 128:8-128:14.

207.   CGG's interests include jurisdictions using BMDs and advocacy around the use of electronic voting. Ex. No. (25) at 136:24-137:13.

208.   The injury alleged by CGG member Mr. Brian Blosser related to the electronic pollbook when he attempted to vote in a 2017 special election. Ex. No. (26) at ¶ 152; Ex. No. (25) at 199:13-200:4.

209.   CGG cannot state whether Mr. Blosser is currently a member of CGG. Ex. No. (25) at 187:19-188:10.

210.   Allegations about injuries of member Virginia Forney in the TAC were related to ballot secrecy on DREs, not on BMDs. Ex. No. (26) at ¶ 150; Ex. No. (25) at 206:13-207:20.

211.   CGG advises its members to vote using absentee-by-mail ballots and not in person. Ex. No. (25) at 206:4-206:12.

212.   The injuries alleged by CGG members Forney and Walker both relate to ballot secrecy issues. Ex. No. (25) at 206:13-207:20.

213.   There is no universal form of how people become members of

CGG. Ex. No. (25) at 180:24-181:13.

214.   There are no membership fees or dues necessary to become a member of CGG. Ex. No. (25) at 182:7-183:03, 187:13-18.

215.   There are no obligations for CGG members to work together to promote the goals of the organization. Ex. No. (25) at 191:8-191:19.

216.   Members and non-members of CGG both benefit from access to civic activities such as poll watching, auditing election results, and publishing opinion pieces. Ex. No. (25) at 184:24-185:11.

217.   CGG does not have a current list of its members. Ex. No. (25) at 181:22-182:6.

218.   CGG does not have a current email list for its members. Ex. No. (25) at 183:20-184:16.

219.   If CGG prevailed in this lawsuit, it would still continue its work on county election administration problems and issues. Ex. No. (25) at 48:20-49:19.

220.   CGG contends that voters can never know who voters voted for because of the use of Dominion BMDs in polling places. Ex. No. (25) at 239:8-242:2.

221.   CGG does not question the results of the November 2020 election in Georgia but believes voters can never know the outcome of the election. Ex.

No. (25) at 243:2-243:9.

222.   CGG contends that voters in Georgia will have a reasonable basis to question each election conducted in Georgia as long as the Dominion BMDs are the primary source of votes cast. Ex. No. (25) at 246:3-246:8.

223.   Each individual Coalition plaintiff personally opposes BMD-marked paper ballots. Ex. No. (27) at 151-152, 157-158, 163, 168.

### E. Laura Marie Digges

224.   Laura Marie Digges is a resident of Cobb County, Georgia. Ex. No. (28) at 11:18-23.

225.   Mrs. Digges does not have any specific education or training with respect to election law, or election administration. Ex. No. (28) at 14:15-24.

226.   Mrs. Digges worked as a poll watcher during the 2018 gubernatorial election and again in 2019, but she did not receive any training relating to the hardware, programming, or cybersecurity of the voting equipment. Ex. No. (28) at 14:25-16:21.

227.   Mrs. Digges has not received any training or education concerning the DRE voting machines, the BMD voting machines, or the operation or function of the BMD scanners. Ex. No. (28) at 17:24-18:14.

228.   Mrs. Digges has voted on a DRE voting machine, but never on a

BMD voting machine. Ex. No. (28) at 18:15-19.

229.   Mrs. Digges has no plans to ever vote on a BMD in the future. Ex. No. (28) at 42:17-19.

230.   Mrs. Digges has voted absentee by mail ballot in every election since 2016. Ex. No. (28) at 42:17–19; L. Digges ENET Report, Ex. No. (29) at 1-2.

231.   Mrs. Digges read reports on Facebook from unnamed individuals that votes during the November 3, 2020 election were being switched, but she has no evidence that any vote in any race during the November 3, 2020 election was switched. Ex. No. (28) at 46:17-49:13, 49:22-50:3.

232.   Mrs. Digges claims to have seen a voting machine briefly left unattended at a Cobb County election location. She reported the incident to local election official, Janine Eveler, and to CBS 46, but did not make any report to any state election official. Ex. No. (28) at 24:15-26:23.

233.   Mrs. Digges has no evidence that any BMD used in any election was hacked or than any malware was ever inserted into any BMD used in a Georgia election. Ex. No. (28) at 32:24–33:1, 33:2–11.

**F. William Digges III**

234.   William Digges III is a resident of Cobb County, Georgia. Ex. No.

(30) at 15:8-16.

235.   Mr. Digges has a BA in accounting and received a master's degree in information systems in 1995. Ex. No. (30) at 17:8-22.

236.   Mr. Digges voted on DRE voting machines but not on the BMD voting machines. Ex. No. (30) at 22:13-21.

237.   Mr. Digges worked for IBM from 1977 until 2010 when he retired. Ex. No. (30) at 23:6-10.

238.   Mr. Digges worked for Kennesaw State University for a few months in 2010 and then retired from that position. Ex. No. (30) at 24:19-22.

239.   Mr. Digges does not have any training in Georgia election law or election administration or procedures for any state. Ex. No. (30) at 20:5-14.

240.   Mr. Digges has never worked at a polling place or as a poll worker, in any role. Ex. No. (30) at 20:15-17.

241.   Mr. Digges has never received training or education in cybersecurity. Ex. No. (30) at 21:11-13.

242.   Mr. Digges has never received training or education with respect to voting equipment. Ex. No. (30) at 21:14-16.

243.   Mr. Digges has never received training or education related to computer hacking, or the insertion of malware into a computer system. Ex. No. (30) at 21:17-23.

244.   Mr. Digges has never received training or education concerning the operation or function of DRE voting machines, BMD voting machines, or the BMD scanners. Ex. No. (30) at 21:20-10.

245.   Mr. Digges has no evidence that DREs were hacked or that malware was inserted into any Georgia voting machine. Ex. No. (30) at 31:21–31:25, 34:2–34:5.

246.   Mr. Digges has no evidence that any BMD was hacked or that any malware has been inserted into any BMD in Georgia. Ex. No. (30) at 34:6–34:13.

247.   Mr. Digges has been a member of CGG since 2017 and transcribed data for them and attended a few state meetings. Ex. No. (30) at 25:15-26:2.

248.   Mr. Digges's goal as a plaintiff in this lawsuit is to change voting to hand marked paper ballots. Ex. No. (30) at 30:1-5.

249.   Although his July 5, 2019 statement marked as Exhibit WD 0003 stated that he was "expected to lead the Coalition Plaintiffs' review of the [GEMS] database", he only transcribed the Pima County GEMS database from Access into Excel. Ex. No. (30) at 40:7-9, 42:3-9.

250.   He did not review the databases for Hall County and Cobb County. Ex. No. (30) at 42:25-43:6.

251.   It was anticipated that Mr. Digges was going to "lead the team of less experienced analysts in their labor-intensive clerical review of voluminous data" but that never happened. Ex. No. (30) at 46:1-11, Coalition Plaintiffs' Statement on W. Digges, Ex. No. (31) at 2.

252.   Mr. Digges was never prevented from voting by absentee ballot and did not have any trouble doing so. Ex. No. (30) at 52:18-25.

253.   The challenges he described by voting absentee are the same for a lot of voters. Ex. No. (30) at 53:1-6.

254.   As per Mr. Digges' ENET report, Mr. Digges has only voted by absentee ballot since 2016. Ex. No. (30) at 37:21-38:10, 34:23-24; *see generally* W. Digges ENET Report, Ex. No. (32).

255.   Mr. Digges has no plans to vote on a BMD in the future. Ex. No. (30) at 38:25-39:2.

### G. Ricardo Davis

256.   Ricardo Davis graduated from the University of Arkansas in 1986 with an undergraduate degree in Chemistry. He received a minor in computer science as well. He also received ad Masters Degree in Chemistry from Texas A&M in 1990. R. Davis Dep., Ex. No. (33) at 17:4-18, 17:13-18:20.

257.   Davis has worked in Information Technology since 1995 at

various companies. Ex. No. (33) at 21:11-13, 22:11-26:5.

258.   In his job as an IT professional, Davis never worked with an organization that is related to voting or elections. Ex. No. (33) at 35:6-24.

259.   Davis has no specialized training related to election equipment, including the DRE and BMD devices used in Georgia's election system over the last two decades. Ex. No. (33) at 28:6 -22.

260.   Davis has never examined a BMD device apart from viewing it being used in connection with his duties as a poll watcher. Ex. No. (33) at 28:23-30:9.

261.   In his job as an IT professional, Davis never worked with an organization that is related to voting or elections. Ex. No. (33) at 35:6-24.

262.   Davis has no specialized training related to election equipment, including the DRE and BMD devices used in Georgia's election system over the last two decades. Ex. No. (33) at 28:6 -22.

263.   Davis has never examined a BMD device apart from viewing it being used in connection with his duties as a poll watcher. Ex. No. (33) at 28:23-30:9.

264.   Davis has no specialized knowledge of BMD equipment operation apart from reading what is available publicly on the internet and watching expert testimony in this case. Ex. No. (33) at 30:17-32:18.

265.   Davis has no evidence that a DRE has ever hacked during an election in Georgia and no evidence that a BMD in use in Georgia was ever hacked. Ex. No. (33) at 41:16–42:9, 42:16–20.

266.   Davis has no evidence that malware was ever inserted into a Georgia voting machine since 2019. Ex. No. (33) at 42:21–43:5.

267.   Davis has never voted on a BMD in Georgia and does not plan to vote on one in the future. Ex. No. (33) at 43:6-11; *see generally* R. Davis ENET Report, Ex. No. (34).

**H. Megan Missett**

268.   Megan Missett is registered to vote as Margaret Missett. M. Missett Dep. Ex. No. (35) at 5:18-21.

269.   Missett is a member of CGG. Ex. No. (35) at 48:16-18.

270.   Missett is a resident of Fulton County, Georgia. Ex. No. (35) at 15:19-20.

271.   Missett moved to Georgia in 1996. Ex. No. (35) at 15:24-25.

272.   Missett testified in GA legislature regarding voting legislation a number of times. Ex. No. (35) at 16:22-25, 17:6-11.

273.   Missett testified before the Georgia legislature about issues with fair voting and voter suppression and wanting hand marked paper ballots.

Ex. No. (35) at 18:14-18.

274.   Missett also contacted legislators in person or by email concerning voting, trustworthiness of voting machines, and systemic bias and access to the ballot. Ex. No. (35) at 20:6-13, 19-22.

275.   Missett graduated in 1986 from Sarah Lawrence College and got her Ph.D. in Clinical Psychology at St. Johns University in 1992. Ex. No. (35) at 27:7-12.

276.   Missett practiced clinical psychology in Mississippi and has not practice since moving to Georgia. Ex. No. (35) at 32:23-24.

277.   Missett worked as a poll watcher in DeKalb a couple of times. Ex. No. (35) at 32:20-33:6.

278.   The first time Missett worked as a poll watcher for the Ossoff campaign. Ex. No. (35) at 33:13-16.

279.   The next time Missett worked at a poll was for CGG's citizen engagement efforts. Ex. No. (35) at 35:12-17.

280.   Missett also worked outside polling locations to organize people to photograph the poll tapes from DREs on behalf of CGG on three occasions. Ex. No. (35) at 38:15-21, 34-38:2, 38:18-22.

281.   Missett's involvement in photographing poll tapes was in Fulton County, Dekalb, Dougherty, Randolph and Terrell. Ex. No. (35) at 40:12-17.

282.   Missett has not had any formal training in computer hardware in voting machines, cybersecurity, hacking or inserting malware in voting equipment or the operation of voting equipment. Ex. No. (35) at 41:15- 42:19.

283.   As of Missett's deposition on September 28, 2021, Missett has voted on voting machines twice. Ex. No. (35) at 42:24-43:4; *see generally* M. Missett ENET Report, Ex. No. (36).

284.   Missett is affiliated with many voter advocacy groups including Black Lives Matter, Common Cause and ACLU of GA. Ex. No. (35) at 48:19-21, 49:8-9.

285.   Missett was asked by Marilyn Marks to be a plaintiff in the lawsuit. Missett Depo., 54:2-3. She became a Plaintiff in this case at the time of the Third Amended Complaint in February, 2018. Ex. No. (35) at 54:13-17.

286.   Missett's concerns are of the possibility that malware could be inserted in Georgia voting machines. Ex. No. (35) at 57:16-18.

287.   Missett has no evidence that any component of Georgia's election system has been hacked or that malware was inserted. Ex. No. (35) at 66:21–67:6.

288.   Missett has no evidence that votes were changed in Georgia or that any DRE was actually hacked. Ex. No. (35) at 56:1–8.

289.   Missett has no evidence that any malware has been inserted into

– 43 –

any BMD in Georgia. Ex. No. (35) at 57:13–57:16, 58:14–58:15.

290.   Missett does not have any plans to vote on a BMD in the future and plans to vote by absentee ballot. Ex. No. (35) at 59:10-12, 19-22.

291.   As long as BMDs are used in Georgia, Missett plans to vote by absentee ballot. Ex. No. (35) at 60:2-5; 73:21-23.

### III. The BMD System has provided a secure and accurate method of conducting Georgia's elections since its implementation.

#### A. Numerous risk-limiting audits and hand recounts have confirmed the accuracy and reliability of the BMD system.

292.   Georgia law requires the Secretary of State to conduct risk-limiting audits ("RLAs") on at least one general-election race in even years to further confirm election results for the BMD voting systems. O.C.G.A. 21-2-498(e).

293.   RLAs make use of statistical methods like random sampling to validate the accuracy of an election result and are considered the "gold standard for post-election tabulation auditing" by the Carter Center. Ex. No. (37) at 11; Ex. No. (38) at 2; O.C.G.A. § 21-2-498(a)(3).

294.   In conducting an RLA (and in a recount), the printed, human-readable text on the BMD ballot controls and is what officials count. Ga Comp. R. & Regs. 183-1-15-.02(j).

295.   Since the passage of House Bill 316, Georgia has conducted two

statewide RLAs: the first on November 19, 2020 for the 2020 Presidential election, and the second on November 18, 2022 for the 2022 Georgia Secretary of State election. *See generally* November 2020 Risk-Limiting Audit Report, Ex. No. (39); (publicly <u>available at</u> https://sos.ga.gov/news/georgias-2022-statewide-risk-limiting-audit-confirms-results).

296.   The Carter Center observed both RLAs at the State's invitation. *See generally* Ex. (37); *see also* Ex. (38).

297.   The November 19, 2020 RLA was conducted by auditing all 159 counties, examining 41,881 batches, hand-sorting and then hand-tallying each ballot. Ex. No. (39)

298.   This was the largest hand count of ballots in U.S. history. Ex. No. (39).

299.   Most counties found no change in their final tally, and the majority of the remaining counties changed fewer than 10 ballots. (Publicly <u>available at</u> https://sos.ga.gov/page/2020-general-election-risk-limiting-audit).

300.   103 of the 159 counties showed a margin variation of less than 0.05%, and Georgia's highest error rate in any county recount during the audit was 0.73%. Ex. No. (39).

301.   This percentage was well within the expected margin of human error that occur during hand-counting ballots. Ex. No. (39).

302.   Hand-counting can produce error rates that are up to 2% on average, according to a 2012 study by Rice University and Clemson University. (Publicly <u>available at</u> https://sos.ga.gov/news/historic-first-statewide-audit-paper-ballots-upholds-result-presidential-race); (study publicly <u>available at</u> https://news2.rice.edu/2012/02/02/hand-counts-of-votes-may-cause-errors-says-new-rice-u-study/).

303.   After conducting the recount, Georgia showed a mere 0.1053% variation in statewide total vote count, and a 0.0099% variation in the overall margin, confirming that the original machine count accurately portrayed the winner of the election. Ex. No. (39).

304.   For the statewide audit of the 2022 General Election, county election officials in all 159 counties hand counted a random selection of ballots in order to confirm the accuracy of the results for the Secretary of State election. (Report publicly <u>available at</u> https://sos.ga.gov/news/georgias-2022-statewide-risk-limiting-audit-confirms-results#:~:text=November%2018th%2C%202022&text=The%20purpose%20of%20the%20audit,for%20jurisdictions%20who%20conduct%20RLAs.).

305.   The risk limit set was 5% for the RLA in the 2022 general election statewide audit. (Report publicly <u>available at</u> https://sos.ga.gov/news/georgias-2022-statewide-risk-limiting-audit-confirms-

results#:~:text=November%2018th%2C%202022&text=The%20purpose%20of
%20the%20audit,for%20jurisdictions%20who%20conduct%20RLAs.).

306.   328 total batches were audited, of which 279 (85%) had no
deviation from the original vote totals. (Report publicly <u>available at</u>
https://sos.ga.gov/news/georgias-2022-statewide-risk-limiting-audit-confirms-
results#:~:text=November%2018th%2C%202022&text=The%20purpose%20of
%20the%20audit,for%20jurisdictions%20who%20conduct%20RLAs.).

307.   Of the 49 other batches, all except for one were within the
expected 5% margin of error for a hand count. (Report publicly <u>available at</u>
https://sos.ga.gov/news/georgias-2022-statewide-risk-limiting-audit-confirms-
results#:~:text=November%2018th%2C%202022&text=The%20purpose%20of
%20the%20audit,for%20jurisdictions%20who%20conduct%20RLAs.).

308.   This difference was well within the expected margin of error for
an audit of this size. (Report publicly <u>available at</u>
https://sos.ga.gov/news/georgias-2022-statewide-risk-limiting-audit-confirms-
results#:~:text=November%2018th%2C%202022&text=The%20purpose%20of
%20the%20audit,for%20jurisdictions%20who%20conduct%20RLAs.).

## B. There is no evidence that the BMD System caused any voter's vote to not be counted.

309.   Curling does not contend that the BMD's switched votes from one

candidate to another during the 2020 General Election, nor does she have any evidence to support such a claim. Ex. No. (16) at 24:16-25:5.

310.   Curling is not aware of any facts that support the contention or idea that components of the Election System were hacked prior to or during the elections on November 3rd, 2020. Ex. No. (16) at 16:24-17:5, 21:7-12.

311.   Curling is also unaware of any facts to show that the results of any election held during the 2020 General Election were changed, manipulated, or otherwise the result of hacking or insertion of malware into the Georgia Election System. This response flatly contradicts her sworn response to Secretary Raffensperger's First Request for Admissions, in which Curling denied she had "no evidence that any component of the Election System was actually hacked prior to or during the elections held on November 3, 2020. Ex. No. (16) at 21:15-20, 22:1, 23:5-9, 23:21-24:2; Curling Plaintiffs' Response to Raffensperger's First Request for Admission, Ex. No. (40) at Response to RFA No. 3.

312.   Curling is not aware of any incident where the Georgia Election System failed to count any legal vote in the 2020 General Election. Ex. No. (16) at 26:4-9.

313.   Curling also has no knowledge of an incident where the Georgia Election System counted an illegal vote in the 2020 General Election. Ex. No.

(16) at 26:10-14.

314.   Curling maintains that it is "unknown" if any party interfered with Georgia's elections in 2020. Ex. No. (16) at 51:21-23.

315.   Similarly, Curling claims that there is "no way to know" whether any votes were not properly counted on the BMDs, whether the Georgia Election System was hacked by third parties. Ex. No. (16) at 68:15-69:6.

316.   Ultimately, Curling acknowledges that nothing would satisfy her fear that Georgia's Election System was hacked, or that malware was inserted into any component of Georgia's Election System. Ex. No. (16) at 18:21-19:11, 22:9-18, 22:23-24.

317.   Curling has "confidence" in the results of the 2020 General Election. Ex. No. (16) at 19:8-11.

318.   Curling admits that the presidential election, in Georgia, in 2020, was verified. Ex. No. (16) at 79:1-4.

319.   Curling voted by mail in 2020, using a hand-marked paper ballot. Ex. No. (16) at 74:3-9.

320.   Schoenberg has no proof that his vote or anyone else's vote was not counted as cast during the 2017 Congressional District 6 Special Election or Special Runoff Election. Ex. No. (22) at 54:15-55:3.

321.   Schoenberg has no information to support any belief that the

– 49 –

winner was incorrect in any previous election. Ex. No. (22) at 73:4-9.

322.   Schoenberg does not believe his vote was altered in any previous election or contend that anyone else's vote was altered in any way. Ex. No. (22) at 73:10-14.

323.   Schoenberg has no evidence to believe the 2018 election results were manipulated or that the winners were not the correct winners in the elections. Ex. No. (22) at 84:6-18.

324.   CGG cannot identify any voter whose vote was not counted as a result of the use of Dominion BMDs, Dominion precinct scanners, Dominion central count scanners, and the Dominion election management system. Ex. No. (25) at 234:14-235:09.

325.   CGG does not know of any person in the state of Georgia who was not able to vote as a result of the State's use of the Dominion BMDs. Ex. No. (25) at 231:1-231:7.

326.   CGG does not know of any person in the state of Georgia who was unable to vote because of the lack of necessary audits. Ex. No. (25) at 231:8-231:14.

327.   Digges admitted she has no evidence establishing that a vote in Georgia was cast but not counted. Ex. No. (28) at 31:6-15.

328.   Davis has no evidence that any votes he cast in any Georgia

election were not counted. Ex. No. (33) at 40:20-41:8.

329.   While working as a poll watcher, Missett did not observe anyone having a problem with the BMD. Ex. No. (35) at 35:18-22.

330.   Missett did not have any trouble operating the BMDs. Ex. No. (35) at 43:9-13.

331.   Missett has no evidence that her vote did not count. Ex. No. (35) at 47:16-17.

332.   Missett does not have any evidence that any votes were changed in GA. Ex. No. (35) at 56:1-4.

333.   Mr. Digges has no evidence that any votes cast on the machines in GA were not counted or were changed. Ex. No. (30) at 31:15-21.

334.   Mr. Digges believes the results of the November 2020 election and the elections in 2020 are valid. Ex. No. (30) at 47:19-48:3.

335.   Mr. Digges believes the results of the January 2021 runoff are valid. Ex. No. (30) at 48:14-18.

336.   Mr. Digges has no evidence that the Georgia election system failed to count any legal votes or counted any illegal votes in 2020. Ex. No. (30) at 50:24-51:6.

337.   Mr. Digges has no evidence that there was a mismatch of the QR codes or with the human readable portion of the hand marked paper ballots

in the November 2020 election. Ex. No. (30) at 51:3-17.

### C. There is no evidence that the BMD Systems have been compromised or suffer from malware.

338.   Curling has no knowledge of any bad actor who actually manipulated Georgia's election process by targeting and infiltrating the Georgia Center for Election System at Kennesaw State University. Ex. No. (16) at 56:10-15.

339.   Curling did not know of anyone intending to interfere in Georgia's 2022 elections. Ex. No. (16) at 51:24-52:5.

340.   Schoenberg has no evidence that anyone has manipulated election results. Ex. No. (22) at 60:11-21, 61:7–8.

341.   Schoenberg also does not believe any previous elections have been hacked. Ex. No. (22) at 72:22-73:2.

342.   Schoenberg is not aware of any Russian manipulation of elections. Ex. No. (22) at 141:24-145:18.

343.   Mrs. Digges purpose in filing and proceeding with this litigation is that she believes the voting machines to be untrustworthy, and believes they are subject to being hacked and are insecure. However, she is also concerned about absentee voting, and stated that "I would love to vote on the machines if I trusted them." Ex. No. (28) at 30:2-21.

344.   Mrs. Digges has not had any specific training on how to operate a BMD. Ex. No. (28) at 18:4-14.

345.   Mrs. Digges admitted she has no evidence that any BMD used in any Georgia election was hacked. Ex. No. (28) at 32:24-33:1.

346.   Mrs. Digges admitted she has no evidence that any malware was ever actually inserted into any BMD used in a Georgia election since 2019. Ex. No. (28) at 33:2-11.

347.   Mrs. Digges admitted she has no evidence of any malfunctions in the election system that impacted the outcome of the November 3, 2020 presidential election. Ex. No. (28) at 50:8-24.

348.   Mrs. Digges admitted she has no evidence that any illegal votes were counted in the November 3, 2020 election. Ex. No. (28) at 53:2-6.

349.   Mrs. Digges admitted she has no evidence of any mismatch between the QR codes and the human readable portion of the paper ballots in the November 3, 2020 election. Ex. No. (28) at 53:17-24.

350.   Davis has no evidence a BMD in use in Georgia was ever hacked. Ex. No. (33) at 42:16-20.

351.   Davis has no evidence malware was inserted in a voting machine in Georgia since 2019. Ex. No. (33) at 42:21-43:5.

352.   Missett does not have any evidence that there was any malware

– 53 –

inserted in any BMD in GA. Ex. No. (35) at 57:13-16, 58:14-15.

353.   Missett has no evidence that any component of the Georgia election system was hacked. Ex. No. (35) at 66:21-67:1.

354.   Missett has no evidence of insertion of malware in any component of the Georgia election system prior to or during the Nov. 3, 2020 election. Ex. No. (35) at 67:2-6.

355.   Missett has no evidence that the results of any November, 3, 2020 election were changed. Ex. No. (35) at 67:7-10.

356.   Missett has no evidence of actual hacking of the Georgia election system. Ex. No. (35) at 67:22-68:2.

357.   Missett does not have evidence that any vote was changed from Biden to Trump due to a problem with the software or an algorithm or any design feature of the election system in the November 3, 2020 election. Ex. No. (35) at 69:8-20.

358.   Missett does not have evidence of any votes changed in any 2020 election. Ex. No. (35) at 69:15-20.

359.   Missett does not have evidence that Georgia election system failed to count any vote in the November 3, 2020 election. Ex. No. (35) at 70:14-18.

360.   Missett has no evidence that the results of runoff elections in

January 2021 were changed in any way due to hacking or insertion of malware. Ex. No. (35) at 77:3-9.

361.   Mr. Digges has no evidence that malware was inserted in any Georgia voting machine. Ex. No. (30) at 34:2-5.

362.   Mr. Digges has no evidence that BMDs were hacked or that any malware was inserted into any BMD. Ex. No. (30) at 34:6-13.

363.   Mr. Digges has no evidence that any component of the Georgia election was hacked or that there was malware inserted in the November 2020 election. Ex. No. (30) at 48:4-12.

364.   Mr. Digges has no evidence that any component of the Georgia election system was hacked or that there was any malware inserted into any component of the election system in the January runoff. Ex. No. (30) at 48:21-49:5.

365.   Mr. Digges has no evidence that there were any votes changed in the 2020 presidential election or any other election in 2020. Ex. No. (30) at 49:11-50:1.

366.   Mr. Digges has no evidence of any malfunction of the election system that impacted the outcome of the November 2020 election. Ex. No. (30) at 50:6-10.

367.   On July 2022, MITRE's National Election Security Lab, retained

by Dominion Voting Systems Corp., provided their findings of an independent expert technical review of the claims concerning the security of specific devices used in the conduct of elections in the State of Georgia. *See generally* Ex. No. (41).

## IV. Plaintiffs' experts and their findings.

### A. Dr. Philip Stark

**368.** Dr. Philip Stark is a Professor of Statistics at the University of California–Berkeley. *See generally* Stark March 9, 2022 Decl., Ex. No. (42) at 34-200.

369. Dr. Stark was previously a member on Georgians for Verified Voting's Board of Advisors. *See generally* Dr. Stark's Resignation Letter from Verified Voting, Ex. No. (43) (publicly available at https://www.stat.berkeley.edu/~stark/Preprints/vv-resign-19.pdf).

370. Dr. Stark's research expertise and interests, according to the Berkeley's public webpage, include "uncertainty quantification and inference, inverse problems, nonparametrics, risk assessment, earthquake prediction, election auditing, geomagnetism, cosmology, litigation, food/nutrition." (Publicly available at https://statistics.berkeley.edu/people/philip-b-stark).

371. Dr. Stark offers two opinions generally relevant to this case: (1) that a risk-limiting audit, in his view, cannot be conducted on an election

utilizing BMDs as the primary method of voting; and (2) that "absent some changes to procedures; in particular, around the … physical security of the voted ballots and physical accounting for ballots, checks of chain of custody, and things of that kind," Georgia's risk-limiting audits—whether concerning a BMD-based election system or hand-marked-paper-ballot-based election system—are insufficient. December 5, 2022 Declaration of P. Stark, Ex. No. (44) at ¶ 5, P. Stark Dep., Ex. No. (45) at 19:9–20:06, 20:23–21:14.

372.   Dr. Stark's former colleagues on the Board of Advisors of Verified Voting disagree with Dr. Stark's position, with Dr. David Dill (a Professor Emeritus of Computer Science at Stanford University) noting that his "recent definition of RLAs is revisionist." Ex. No. (46) at CURLING-0010018; *see also* Ex. No. (47) at CURLING-0010127; Ex. No. (48) at CURLING-0010142, Ex. No. (49) at CURLING-0010153; Ex. No. (50) at CURLING-0010166; Ex. No. (51) at CURLING-0010181.

373.   Indeed, Dr. Stark had previously asserted that "RLAs are procedures that guarantee a minimum chance of conducting a full manual tally of the voter-verifiable records when the result of that tally would belie the reported outcome." In doing so, Dr. Stark and his co-authors discussed how various types of RLA procedures could be successfully utilized in Indian parliamentary elections to ensure the accuracy of elections. Ex. No. (46) at

CURLING-0010018; *see also* Ex. No. (47) at CURLING-0010127; Ex. No. (48) at CURLING-0010142, Ex. No. (49) at CURLING-0010153; Ex. No. (50) at CURLING-0010166; Ex. No. (51) at CURLING-0010181.

374.   India, however, utilizes "Electronic Voting Machines (EVMs) … fitted with printers that produce Voter-Verifiable Paper Audit Trails," similar to Georgia's BMD system. Vishal Mohanty, et al., *Auditing Indian Elections*, Ex. No. (52) at 1.

375.   Unlike Georgia's BMD system, however, the Indian system does not scan its paper printouts for the initial tally of the vote. Rather, India's paper audit trails consist of a *separate* printout which is collected in a *separate* container. Ex. No. (52) at 2; Ex. No. (53) at 70:18–21.

376.   Dr. Stark asserted that such an RLA in India "may justify confidence of voters, candidates, and parties that election results are correct," Indian Elections at 2, though he maintains in this case that RLAs conducted in Georgia are not "genuine risk-limiting audit[s]" because of the use of BMDs and RLAs cannot determine whether BMDs altered enough votes to change the apparent winner. Ex. No. (44) at ¶ 5; Ex. No. (45) at 19:13–20:06.

377.   Dr. Stark ultimately resigned from his position with Verified Voting due to this disagreement, re-iterating that RLAs conducted on BMD ballots "can't confirm election outcomes" and arguing that Verified Voting's

public statement concerning pilot RLAs in Georgia "has done damage to a case trying to hold Georgia SoS accountable for historic neglect of election integrity and its ill-advised decision to buy universal-use BMDs." Ex. No. (43).

378.   Dr. Stark asked Verified Voting to clarify that statement to explain that, in his view, "basing an audit on BMD output cannot confirm election outcomes," with enough time to allow for that revised statement "to be used in court filings to counter claims that Georgia election officials have made in court documents." However, Dr. Stark noted that "[n]o such statement has been made." Ex. No. (43) at 2.

379.   Much like the leadership at Verified Voting, the National Academies of Sciences, Engineering and Medicine's 2018 report *Securing the Vote: Protecting American Democracy* recommending the use of RLAs states that RLAs can be done using paper ballots that have been "marked by hand or by machine (using a ballot marking device)." *Securing the Vote: Protecting American Democracy,* National Academies of Sciences, Engineering and Medicine, 2018, Ex. No. (54) at 80 (report publicly available at https://nap.nationalacademies.org/catalog/25120/securing-the-vote-protecting-american-democracy).

380.   Dr. Stark's categorical opposition to conducting an RLA on a

BMD-based election is rooted in his opinion that the BMD paper trail cannot be trusted because too few voters verify their ballots. However, Dr. Stark has not reviewed and is "not aware of any studies on the rate at which voters do verify [HMPBs]." *See, e.g.*, Ex. No. (55) at 225, ¶ 13; Ex. No. (53) at 60:1–2.

381.   Dr. Stark opines that the 2022 RLA conducted on the Secretary of State race was not a genuine RLA, but admitted that he did not "digest the details [of the 2022 RLA] nor [ ] search exhaustively" for such details. Ex. No. (44) at ¶ 8.

382.   Specifically, Dr. Stark asserts that, "[t]o the best of his knowledge, there was no mandatory ballot accounting, pollbook reconciliation, eligibility auditing, chain-of-custody checks, or other measures to ensure that the paper trail was complete and intact." Ex. No. (44) at ¶ 10.

383.   However, Dr. Stark could not recall any regulations he had reviewed in coming to that opinion, only that he had reviewed "a 2019 statute." His declaration cites no Georgia regulation or statute concerning RLAs, and includes only a summary for audit software registration, powerpoint slides, and a single email. Ex. No. (44) at 17–74; Ex. No. (45) at 23:18–21.

384.   Dr. Stark was not aware that "pollbook reconciliation" is a required step in Georgia at the time of tabulation. Likewise, Dr. Stark did

apparently did not notice the reconciliation procedures required at the time of an RLA, though it was noted in the powerpoint slides attached to his declaration. Dr. Stark did however agree that such redundant checks are a valuable tool. Ga. Comp. R. & Regs., r. 183-1-12-.12; Ex. No. (45) at 27:17–25, 32:01–34:15, 33:03–18.

385.   Dr. Stark explained that the mandatory ballot accounting he opined was lacking entailed "keeping track of how many pieces of paper go to each polling place, [and] how many came back voted, spoiled, or unvoted." Ex. No. (45) at 24:19–20.

386.   State Election Board Rule 183-1-12-.12, which Dr. Stark did not review, requires county poll managers to record the number of ballots printed from each BMD, spoiled ballots, and ballots placed in the emergency bin of the scanner to be recorded on a polling place recap form. Ga. Comp. R. & Regs., r. 183-1-12-.12; Ex. No. (45) at 27:20–23.

387.   Dr. Stark was unfamiliar with such polling-place recap forms. Ex. No. (45) at 27:04–14.

388.   Dr. Stark described "eligibility auditing" as, for example, "double checking signature verification in some way … for quality control purposes," and ensuring that only eligible voters vote and that they vote the correct ballot. Ex. No. (45) at 38:13–39:10.

389.   Dr. Stark clarified in his deposition, however, that he was not offering any opinion on the existing provisional ballot procedures in Georgia. Ex. No. (45) at 39:11–19.

390.   Likewise, Dr. Stark noted that he was not offering an opinion as to whether voter eligibility is in fact checked, just that he would like to see a redundant check of eligibility. Ex. No. (45) at 39:20–24.

391.   Dr. Stark also opined that "chain of custody checks" were not present. Dec. 7, 2022 Dec. at ¶ 10. Upon reviewing State Election Board Rule 183-1-12-.12 and the documents attached to his declaration, Dr. Stark conceded that chain of custody checks occur both at the tabulation stage and during the RLA. Ex. No. (45) at 36:12–19; Ga. Comp. R. & Regs. r. 183-1-12-.12.

392.   Dr. Stark further testified that he "was not aware of any evidence of misbehavior of BMDs," nor tabulators, but that he was aware of "procedural lapses." Ex. No. (45) at 54:23–55:01.

393.   Dr. Stark did not specify what these "procedural lapses" were. Ex. No. (45) at 54:23–55:01.

394.   Dr. Stark could not say whether these procedural lapses were attributable to the lack of State law or regulation as opposed to local officials failing to adhere to existing law or regulation. Ex. No. (45) at 26:20–03.

395.   Dr. Stark did not review the forensic images of the Coffee County election equipment, which he testified was beyond his expertise in this case. Ex. No. (45) at 14:16–22.

396.   Dr. Stark was not aware of any evidence that any individual had corrupted software installed on the Coffee County equipment or otherwise implanted malware on that equipment, nor that those machines misbehaved in practice in any way. Ex. No. (45) at 15:12–15, 17:08–15, 54:09–11.

397.   Dr. Stark testified that he is not offering an opinion as to whether the incorrect winner was certified in any Georgia election and that he would have no basis for any such opinion. Ex. No. (45) at 55:02–07.

### B. Kevin Skoglund

398.   Kevin Skoglund ("Skoglund") is an election-system advocate, a polling-place manager in Pennsylvania for five years, and a consultant for Plaintiff Coalition for Good Governance.  Ex. No. (56) at 114:11-12, 115:12-14, 121:9-16.

399.   Skoglund presents himself as a cybersecurity expert. Ex. No. (56) at 41:23-25.

400.   Skoglund is not an expert in computer forensics. Ex. No. (56) at 41:23-42:2.

401.   Skoglund is not any attorney or legal expert and offers no legal opinions or opinions on legality. Ex. No. (56) at 22:4-7, 28:24-29:1.

402.   Skoglund is not an election-audits expert. Ex. No. (56) at 108:1-3.

403.   Skoglund offers no opinion on the accuracy of the reported and certified results of the November 2020 general and January 2021 runoff elections in Georgia. Ex. No. (56) at 44:10-13, 44:24-45:2.

404.   Skoglund never has been to the Coffee County, Georgia election office.  Ex. No. (56) at 18:3-5.

405.   Skoglund reviewed forensic election server images obtained by Plaintiffs from Coffee County, Georgia election equipment and found no malware on any of those images. Ex. No. (56) at 18:19-24.

406.   Skoglund did not create the forensic election server images he reviewed from Coffee County, Georgia election equipment. Ex. No. (56) at 43:2-8.

407.   Skoglund did not compare the forensic election server images he reviewed from Coffee County, Georgia election equipment to the data on the equipment itself as that existed prior to the creation of those forensic server images. Ex. No. (56) at 42:3-24.

408.   Skoglund is aware of no one who found any malware in any Georgia election equipment. Ex. No. (56) at 38:4-7.

409.  Skoglund is not aware of any evidence that Doug Logan or Jeffrey Lenberg installed malicious code or other malware into any Georgia election equipment or system. Ex. No. (56) at 45:19-25.

410.  The only data change Skoglund identified in the Coffee County, Georgia election management server was the logging of a connection of a USB device to that server. Ex. No. (56) at 38:8-39:13.

411.  Skoglund is aware of no evidence of anyone actually using information produced from the Coffee County outsider access to subvert the operation of any aspect of Georgia's election system. Ex. No. (56) at 37:8-14.

412.  Skoglund is aware of no evidence of anyone actually using information produced from the Coffee County outsider access to reprogram any Georgia election equipment. Ex. No. (56) at 37:16-18.

413.  Skoglund is aware of no evidence of anyone actually using information produced from the Coffee County outsider access to disable any defense to any aspect of Georgia's election system. Ex. No. (56) at 37:19-23.

414.  Skoglund is aware of no evidence of anyone actually using information produced from the Coffee County outsider access to insert malware into any component of the Georgia election system. Ex. No. (56) at 37:24-38:3.

415.  Skoglund is concerned about people outside Georgia having

access to information generated from the Coffee County outsider access because "people . . . outside the State of Georgia may not share any of Georgia's interests.  They may not be impacted by any problems that are caused." Ex. No. (56) at 55:25-56:2.

416.  Skoglund's conclusions presented in his Supplemental Report are warnings about areas of heightened concern following the Coffee County outsider access, but he did not see any evidence that any of those heightened concerns actually materialized or happened. Ex. No. (56) at 64:23-66:8.

417.  Skoglund has not reviewed evidence of how election equipment in Coffee County, Georgia operated in elections conducted there since January 2021. Ex. No. (56) at 73:8-13.

418.  Skoglund is not aware of evidence of data generated from the Coffee County outsider access being put into use in the election system in Georgia. Ex. No. (56) at 76:16-77:14.

419.  Skoglund has not seen evidence of malware being introduced into the Coffee County, Georgia election equipment, and no one has reported such a finding to him in this case. Ex. No. (56) at 84:5-17.

420.  Aside from the work of Dr. Alex Halderman memorialized in a sealed report in this case, Skoglund is unaware of anyone who has developed a proof-of-concept attack that could be effective on the Georgia election

system. Ex. No. (56) at 104:4-11.

421.   The idea of a perfectly secure voting system that relies on computers is not one that, from a cybersecurity perspective, exists.  Ex. No. (56) at 88:19-21.

422.   Access of the sort afforded in the Coffee County outsider access event could impair the trustworthiness of marked paper ballots regardless of how those ballots were marked (i.e., by hand or by ballot-marking device). Ex. No. (56) at 110:1-20.

423.   If all Georgia voters were required to vote on hand-marked paper ballots, the risks Skoglund identified in his Supplemental Report would not be fully mitigated. Ex. No. (56) at 111:10-23.

424.   The occurrence of the Coffee County outsider access did not change his preexisting opinion that Georgia should not use a ballot-marking device election system. Ex. No. (56) at 119:2-14.

425.   Skoglund has not seen any evidence of voters who were harmed by the Coffee County outsider access. Ex. No. (56) at 112:14-113:2.

426.   Skoglund offers no opinion on whether the Coffee County outsider access burdened anyone's right to vote. Ex. No. (56) at 113:13-18.

### C. Dr. Alex Halderman

427.   Dr. Halderman recognizes that the scientific community currently recommends BMDs.[3] Ex. No. (14) at 151:1-23.

428.   Dr. Halderman had access to images of Georgia's DREs and GEMS databases, but never found any evidence of malware on that system. A. Halderman Dep., November 17, 2021, Ex. No. (57) at 33:11–34:4, 35:6–35:20.

429.   Dr. Halderman theorized that it is possible that malware could work on DREs and BMDs, however Dr. Halderman has never designed malware that would work on either voting system. Ex. No. (57) at 30:17–33:10.

430.   Despite having access to images and components of the Dominion equipment accessed in Coffee County, Dr. Halderman still has not identified any malware that was placed on that equipment nor any indication that votes were shifted. A. Halderman Dep., January 3, 2023, Ex. No. (58) at 23:23-24:9, 38:13-21.

---

[3] Dr. Halderman's personal disagreement with that recommendation runs counter to the expert consensus. [Doc. 571-1 at 151:1-23].

### D. Dr. Andrew Appel

431.   Dr. Appel, like Dr. Halderman, asserts that "[t]he use of BMDs, by voters who are otherwise able to mark a paper ballot with a pen, is not adequately secure for use in public elections." A. Appel, June 28, 2021 Expert Report, Ex. No. (59) at ¶ 86.

432.   Dr. Appel has never forensically examined the Dominion BMDs used in Georgia. A. Appel Dep., Ex. No. (60) at 38:22–39:03.

433.   Dr. Appel has never examined the voter registration database. Ex. No. (60) at 40:23–41:04.

434.   He has never examined the PollPads. Ex. No. (60) at 41:05–08.

435.   Nonetheless, Dr. Appel speculates that because some voters do not closely verify the printed text on their ballots, a theoretical hacker could alter a small number of votes without raising alarm, an amount sufficient to "alter the outcome of several recent elections in Georgia, including the 2020 Presidential election and one of the January 2021 Senate runoff elections." Ex. No. (59) at ¶ 69.

436.   Dr. Appel conceded, however, that he was unaware of malware capable of doing so and which was both self-propagating (such that it could spread to infect multiple BMDs on its own) and adaptable (such that it could effectively alter votes on multiple different ballot styles). Ex. No. (58) at

23:23-24:9, 38:13-21; Ex. No. (60) at 67:20–25; 85:17–21; 100:03–11; 101:07–11.

### E. Plaintiffs' Experts Lack of Malware Findings

437.   None of the Plaintiffs' Experts have been able to find malware on any aspect of Georgia's election system, nor are they aware of any evidence of malware. Ex. No. (45) at 15:12–15, 17:08–15, 54:09–11; Ex. No. (56) at 84:5-17; Ex. No. (58) at 23:23-24:9, 38:13-21; Ex. No. (60) 67:20–25, 85:17–21, 100:03–11, 101:07–11.

## V.   Plaintiffs' Requested Remedies

438.   Curling believes a policy that (a) utilizes hand-marked paper ballots, including ballots where a voter's choice is marked by filling in a bubble like a test; (b) has a machine or scanner read and tabulate the ballot; and (c) utilizes risk-limiting audits would be sufficient. Ex. No. (16) at 47:6-48:17.

439.   In the alternative, Curling explained, under oath, that she could be satisfied with an order that kept the BMDs as they are but had risk-limiting audits like those advocated for by Dr. Stark. Ex. No. (16) at 71:8-18, 72:2-3, 7-9, 77:2-6, 93:34-94:7.

440.   Curling would be satisfied if hand-marked paper ballots were

read by a machine and the results were audited. Ex. No. (16) at 48:12-22, 59:7-11.

441.   Curling acknowledges, however, that there are risks associated with hand-marked paper ballots, including: the hacking of scanners, a voter's inadvertent marking outside of the appropriate line, and having a person falsely complete ballots and stuff them into a ballot box. Ex. No. (16) at 69:10-70:3.

442.   Indeed, Curling acknowledges that she would also not have any idea if her vote were counted if she used her requested remedy of a hand-marked paper ballot that was tallied by an optical scanner. Ex. No. (16) at 99:25-100:3; 108:2-5.

443.   Curling cannot herself identify whether audits would cure her concerns about the counting of ballots, she simply "think[s] that experts could --- could make the system safer to use." Ex. No. (16) at 71:5-7.

444.   Having described her injury as a lack of confidence in her vote, Plaintiff Curling cannot articulate what would provide her with the confidence that her vote is counted "so [she] could overcome [her] fear." Instead, she is completely dependent upon "the experts [to] guide [her] as to things that could help me to have confidence." Ex. No. (16) at 93:9-22, 24-94:7.

445.   Curling also admitted that there is no evidence that would give her confidence that her votes in any 2020 election were actually counted. Ex. No. (16) at 97:1-7.

446.   The relief Price seeks for herself in this case is a "constitutional right to vote on the election system in Georgia and have a reasonable assurance that [her] vote will be counted as cast." Ex. No. (20) at 67:7-10.

447.   According to Price, the scope of her complaint is the lack of voter verification, non-transparency, concerns about the security of the election system, that the election system does not include postelection risk limiting audits, and the possibility of malfeasance or security problems, problems with the technology, errors that can be made. Ms. Price contends that these are "essential for -- to protect my constitutional right to cast a vote and have a reasonable – reasonable expectation that that vote was counted as cast." Ex. No. (20) at 49:25-50:12.

448.   Through this litigation, Schoenberg wants to make the state of Georgia "operate a transparent, verifiable, auditable election system where [he] could know for certain that when [he] cast a vote, it was counted as cast," but he does not know what such a system would look like. He believes hand-marked paper ballots would be such as system, but he may be satisfied with a system other than hand-marked paper ballots "if a system could be made

– 72 –

where [he is] – [he], the public and the state, can know for certain that the system is working as intended [and] that [his] vote counts the way [he] intended." Ex. No. (22) at 37:1-23.

449.    Schoenberg describes an election system that can guarantee that the votes were properly counted as cast as follows: "We can have an election using colored chips in this room and we could go back and know that you counted properly. There are a myriad number of ways where you can cast -- you can express your opinion and know that your opinion is counted. You know, the -- I don't have one answer for what is an adequate election. I -- there has been conversation about hand-marked paper ballots in this case. It strikes me that hand-marked paper ballots are generally reliable for what we're talking about, that they are not subject to the hacking, for example, that was the subject of your previous question. So that would be an acceptable form of solving the problem, potentially. If you can produce electronic machinery and a system to support that machinery, but you can also demonstrate can't be hacked, or that you can demonstrate if a hack happens, that there is evidence left over that you can go back and correct the results, it can get more and more complicated, but if you've had evidence of that, then maybe you can have a system that's reliable and verifiable and auditable. I haven't seen that in this case." Ex. No. (22) at 103:4-104:1.

450.   CGG believes that the BMDs should not be required, and that there should be hand-marked paper ballots and audits. Ex. No. (25) at 158:3-159:23.

451.   Mr. Digges stated that voting by hand marked paper ballots is his personal preference. Ex. No. (30) at 53:7-10.

452.   Mr. Digges stated his purpose in participating in the lawsuit is to "get voting moved to paper ballots - - hand-marked paper ballots." Ex. No. (30) at 30:1-8.

453.   Missett stated that the plaintiffs in this lawsuit are "looking for to see the best practices, best true practices put into place in Georgia, like hand-marked paper ballots, like chain of custody, you know, in general, based on cybersecurity experts or independents." Ed. No. (35) at 53.

454.   Davis stated that his goal is "restoring constitutional legal transparent elections in the state of Georgia" of which instituting hand-marked paper ballots is a part of that. Ex. No. (33) at 39:6-21.

455.   Dr. Halderman has explained that people who claim that Georgia's election system is not safe and reliable have a reasonable basis for making that statement and that there is "abundant reason to believe" that Georgia elections in the past have been compromised. Ex. No. (58) at 40:3-7, 42:5-20.

456.   Dr. Halderman agrees that applying some of the patches he suggests would make the system more secure would require EAC approval. Ex. No. (58) at 64:9-19.

Respectfully submitted, this 9th day of January, 2022.

*/s/ Vincent R. Russo*

Vincent R. Russo        242628
Josh Belinfante         047399
Edward A. Bedard        926148
Carey Miller            976240
Alexander Denton        660632
Javier Pico Prats       664717
Anna Edmondson          289667
ROBBINS ALLOY BELINFANTE
  LITTLEFIELD, LLC
500 14th St. NW
Atlanta, GA 30318
T: (678) 701-9381
F: (404) 856-3255
E: vrusso@robbinsfirm.com
   jbelinfante@robbinsfirm.com
   cmiller@robbinsfirm.com
   adenton@robbinsfirm.
   ebedard@robbinsfirm.com
   jpicoprats@robbinsfirm.com
   aedmondson@robbinsfirm.com

Bryan P. Tyson          515411
Diane F. LaRoss         430830
Bryan F. Jacoutot       668272
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
T: 678-336-7249
E: btyson@taylorenglish.com
   dlaross@taylorenglish.com

– 75 –

bjacoutot@taylorenglish.com

*Counsel for State Defendants*