IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF
GEORGIA ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, ET AL., Plaintiffs, v. BRAD RAFFENSPERGER, ET AL., Defendants. | Civil Action No. 1:17-CV-2989-AT |

**CURLING PLAINTIFFS' REPLY IN SUPPORT OF
PLAINTIFFS' MOTION TO SEVER**

Severance of Curling Plaintiffs' DRE claims is warranted and necessary because those claims have been long-resolved in Plaintiffs' favor and no further action on them is sought. *See Estate of Amergi ex rel. Amergi v. Palestinian Auth.*, 611 F.3d 1350, 1367 (11th Cir. 2010) ("The district court plainly had sound administrative reasons to try to simplify a case that was becoming increasingly unmanageable."). State Defendants offer no valid reason for opposing severance. They feign confusion about the claims to be severed and contradict their own prior argument that Curling Plaintiffs' current claims regarding Georgia's new Dominion BMD system are so distinct from the DRE claims as to require amended complaints—with which the Court agreed. (Dkt. 969 at 9 n.7.) The same reasoning mandates severance of the DRE claims now.

The Court and the parties have maintained the distinct DRE and BMD claims together in the same case for convenience—but no convenience exists any longer. Plaintiffs are entitled to sever their DRE claims so they can finalize the longstanding resolution of those claims, focus this case on the relief they seek regarding the current election system, and recover the substantial fees and costs they are owed as prevailing parties on the DRE claims. The Eleventh Circuit's recent *Common Cause* decision confirms Curling Plaintiffs' standing and their entitlement to fees and costs regarding the DRE claims. (Ex. 1 at 8.)

1

State Defendants improperly seek to convert their Opposition into a constructive motion to dismiss for lack of standing. Their arguments fail. First, Curling Plaintiffs have standing, as this Court has held. Second, Curling Plaintiffs' DRE claims are clear and distinct. Third, the requested relief is clear and necessary at this stage of the litigation. The Court should grant the Motion.

## I. Curling Plaintiffs Have Standing

Defendants' latest standing argument ignores that this Court already has ruled that Curling Plaintiffs have standing (Dkts. 309, 751, 964), declined to certify that finding for interlocutory appeal to allow for necessary discovery (Dkt. 1088), and not received a motion for summary judgment from Defendants. Curling Plaintiffs have submitted significant briefing rebutting Defendants' arguments and will again—upon a complete record—if and when Defendants move for summary judgment. Defendants' invitation to dismiss the case now for lack of standing—tucked into an opposition on a motion to sever claims challenging *one* of those systems—is not only procedurally improper but ignores new evidence.

### A. Recent Evidence Further Supports Curling Plaintiffs' Standing

Voting data State Defendants recently produced revealed that Ms. Price was disenfranchised in the June 2020 election when she voted absentee to avoid the

unconstitutionally-vulnerable BMD system—her vote never counted.[1] (Ex. 2; Dkt. 1067-2 ¶ 12.) Thus, absentee voting is no escape from the infirmities of the BMDs as State Defendants claim—it not only imposes undue burdens individually on each of the Curling Plaintiffs, but has resulted in a deprivation of the right to vote. "A choice between two evils is no choice at all." (Dkt. 964 at 83.)

Mr. Schoenberg has voted on Georgia's Dominion BMD system (contrary to State Defendants' repeated claim that no Plaintiff has), and he recently explained his individual harm, which concerns his personal right to vote, *not* the *results* of any Georgia election as State Defendants wrongly speculate:

- "[W]ithout evidence of the actual recording and counting of votes in a reliable transparent way, there is always the question of whether the elections are being operated fairly and more importantly to me personally, whether my vote counted. I don't know that that vote has counted. I would like to know that. And every time I vote it is on a system that is not reasonably secure, I can't know that I have participated in the democratic process in a meaningful way. That's the source of the harm here." (Ex. 3 at 125-126; *see also id.* at 83-84.)

- "I would not characterize this case as being only about risk by any stretch. Once you acquiesce, the risk has been realized. You are suffering harm by voting in an unverifiable way…. There's no [] human verifiable record of *my intent*. So that when reportedly the vote gets tallied, there's no way of saying afterwards that it reflected *what I intended* to have happen with *my vote*. I know after every vote I cast on the system that I

---

[1] Ms. Curling learned through discovery from State Defendants in this case that her attempt to vote absentee to avoid the prior DRE system similarly "resulted in [her] vote not being counted at all, a fact [she] did not learn until filings in this case were made by the Defendants." (*See* Dkt. 1067-1 ¶ 5.)

3

have essentially put … *my intended vote* into a black box, and what comes out the other side may or may not be *what I intended*, which is a *harm to me*. My vote is a precious thing to me. It's … *my voice*. It's *my participation in democracy* and it's valued. And I don't know for certain that it's getting heard." (*Id.* at 79-80 (emphasis added).)

Georgia State Election Board members also confirmed standing here—e.g.:

- Members Mashburn and Le would not support the use of an election system that could be hacked in a few minutes by a voter in the voting booth (*as Dr. Halderman demonstrated*). (Ex. 4 at 20-21; Ex. 5 at 18-19.) Nor would they support the use of a system that could be hacked in a way that altered the QR code but not the human readable text of the ballot (*as Dr. Halderman demonstrated*). (Ex. 4 at 31; Ex. 5. at 23-25 (expressing disbelief that a voting system could be hacked in this way).)[2]

- Members Sullivan, Le, and Mashburn agreed that their votes not being counted, *as with Ms. Curling and Ms. Price*, would be personally concerning to each of them (thus corroborating the individualized harm each has suffered as a voter). (Ex. 6 at 37; Ex. 4 at 76; Ex. 5 at 36.)

- Each of the SEB members confirmed that Georgia audits do not compare any voter's ballot with its electronically-tabulated counterpart—thus confirming that no audit in Georgia can verify that any *individual* vote

---

[2] Remarkably, none of the SEB members—who are parties to this case and state officials entrusted with authority over Georgia elections—was aware that Dr. Halderman identified numerous serious vulnerabilities with the BMD system; but all testified they would like to learn more about his findings. (Ex. 6 at 47-49; Ex. 7 at 46-51; Ex. 4 at 49-55; Ex. 5 at 47-48.) They were woefully uninformed about this case and Georgia's current election system. (Ex. 4 at 60, 67.) One member, who is one of two people on the rules working group, testified that he does not even know who provides Georgia's BMDs. (Ex. 5 at 19-20.) No one with technical expertise has explained to the State Election Board how Georgia's election system works. (Ex. 4 at 98.) Several SEB members do not understand Georgia's audit process, including whether it could detect discrepancies between QR codes and human-readable text. (Ex. 6 at 30-32; Ex. 4 at 59-60, 67.)

4

has been counted as cast (or at all). (Ex. 7 at 30; Ex. 5 at 65.)

State Defendants' expert, Dr. Juan Gilbert,[3] also confirmed standing—e.g.:

- He "ha[s] not examined any [election] equipment" used in Georgia, including the software used on that equipment (Ex. 8 at 13); and was not aware (i) that Fortalice found serious cybersecurity vulnerabilities with the Secretary's IT systems (*id.* at 269); (ii) that the prior DRE system was not actually "air gapped" as State Defendants claimed (*id*. at 266-69); and (iii) that removable media used with the DRE system may have been reused with the new BMD system (*id.* at 209-215, 265-266).

- He admits Dr. Halderman identified numerous attacks that could be readily implemented against Georgia's BMD system—and he does not disagree with Dr. Halderman's findings regarding the manner and ease with which those attacks could be effected in Georgia. (*Id.* at 177-179; 184-235.)

- He agrees it is possible to "manipulate the QR code and/or the human-readable text" and only a small number of voters would identify a human-readable change on their respective ballots. (*Id.* at 74-75, 192.)

- He agrees that barring QR codes "would get rid of a lot of the issues that

---

[3] State Defendants have churned through election experts: (i) Dr. Michael Shamos, who confirmed the unconstitutionality of Georgia's DRE system and testified that BMDs should not use QR codes (Dkt. 554 at 56:13-57:21); (ii) Dr. Wenke Lee, whom then-Secretary of State and current-Governor Brian Kemp, selected as the sole election security expert on the State's SAFE Commission and who objected to the use of BMDs in Georgia (Dkt. 615-2 at 4 ("A secure voting system should use hand-marked paper ballots instead of ballot marking devices…. This consensus approach among the cybersecurity research community ensures that votes by the voters are counted accurately."); *see also* Dkt. 615-3 at 2-3); (iii) Theresa Payton, another of State Defendants' prior cybersecurity experts who found serious security failings with the Secretary's networks; (iv) Dr. Eric Coomer (who retained Dr. Halderman as his own election security expert regarding Dominion's BMDs); and (v) Dr. Ben Adida, State Defendants' audit expert who has offered no testimony since the 2020 hearing. Only Dr. Gilbert remains.

5

- we're discussing" and he "would recommend not using them to eliminate all these discussions and concerns around them." (*Id.* at 88-89.)

- He would hope Georgia would "[d]etermine the protocol for comparing the QR code against the human-readable text" but is "not aware if [Georgia] did or did not." (*Id.* at 35.) (*Georgia has no such protocol.*)

- His patent for a new type of BMD states that BMDs "are often non-transparent, hackable, and overly complex." (*Id.* at 57-58; Ex. 10 at 1:19-31.) He is designing a new BMD for the purpose of trying to remedy some of the serious deficiencies with the Dominion BMDs that are at issue in this case. (Ex. 8 at 23-24, 126-127.)

- He was unaware of a study the Secretary commissioned confirming very poor voter verification of ballots in Georgia 2020 elections (it preceded his latest declaration and was discussed in the expert declarations responding to his declaration). (*Id.* at 40-43; *see also* Ex. 9.)

- He agrees that "RLAs do not have any ability to determine whether an individual vote has been counted correctly." (Ex. 8 at 70, 173.)

- He does not dispute that malware could alter votes on a large scale on a BMD in a couple minutes in the voting booth whereas altering hand-marked paper ballots requires many hours to manually change ballots—and any alteration to a hand-marked paper ballot could occur *only after the ballot is tabulated by the scanner*. (*Id.* at 105-09, 134-35.)

- He agrees that individual voters are harmed if their respective votes are not counted, even if the election outcome is unaltered. (*Id.* at 194-96.)

Dr. Gilbert also testified that he is not a cybersecurity expert and thus lacks the expertise to evaluate the cybersecurity of Georgia's election system—and if he wanted to do that, he would contact Drs. Halderman and Appel (both of whom have offered expert testimony supporting Curling Plaintiffs' standing and the relief they seek in this case). (*Id.* at 143-44.) Thus, Defendants *do not have a single*

6

*cybersecurity expert* who supports Georgia's BMD system as reasonably securing Curling Plaintiffs' individual right to vote or as otherwise reliable. The two experts the Secretary previously tapped to address that issue—Drs. Shamos and Lee—both object to Georgia's current BMD election system. And the two individuals their own remaining expert recognizes as *the leading* election security experts also both object to that system. This disposes of any asserted defense.[4]

### B. State Defendants' Rehashed Arguments Still Fail

Rather than address new developments, State Defendants repeat their

---

[4] Dr. Gilbert's deposition confirmed that he is an extreme outlier in his views, which he admits stem from the fact that he does not evaluate election systems from a *cybersecurity* perspective. (Ex. 8 at 44-47.) Although he does not refute or doubt the validity of the many serious security failings Dr. Halderman found with Georgia's BMD system, he nonetheless theoretically supports that system because he believes (i) voters *can* verify their ballots; and (ii) election *outcomes can* be reliably audited. But he admits this belief is only *theoretical* since (i) he does not know how Georgia's BMD system actually operates in practice; (ii) he does not dispute that very few voters verify their ballots in practice and that Georgia's particular ballots include designs that are very difficult to verify; and (iii) he emphasizes that he is not an audit expert and does not understand how election audits work in Georgia or more broadly, and instead defers to experts such as Dr. Philip Stark on that key issue. In short, Dr. Gilbert is not troubled by *any* serious cybersecurity flaw with an election system because a hack *theoretically might* get detected by voter verification of individual ballots or by an audit of the specific election contest hacked (*if* audited). Based on those purported protections, Dr. Gilbert even went so far as to opine that Georgia could again use in actual elections the Fulton County election equipment that Dr. Halderman has successfully hacked. (Ex. 8 at 184.) Even Defendants acknowledge this would be unsound, thus confirming the extreme and unreliable nature of their own expert's opinions.

7

improper attempts to disparage Curling Plaintiffs by likening them to *Wood* and *Pearson*. Curling Plaintiffs incorporate their prior briefing (Dkts. 1051, 1067, 1075) and respond in summary as follows:

1. The Court already has found Curling Plaintiffs have standing as to both the DRE and BMD claims. (Dkt. 309; Dkt. 751 at 38-39.) The Eleventh Circuit rejected State Defendants' prior appeal in this case as frivolous, notwithstanding that they asserted essentially the same standing arguments; and that panel included the same Circuit Judge who authored the *Wood* decision State Defendants rely on. (*See* Dkt. 969 at 4 n.3; Dkt. 338 at 15-16.)

2. The Court already repeatedly has found injury-in-fact to the Curling Plaintiffs, as summarized at Dkts. 1075, 1067, and 1051. (Dkt. 309 at 33 ("Here, Plaintiffs have shown that their Fourteenth Amendment rights to Due Process and Equal Protection have been burdened."); Dkt. 964 at 79 ("Plaintiffs have shown demonstrable evidence that the manner in which Defendants' alleged mode of implementation . . . deprives them or puts them at imminent risk of deprivation of their fundamental right to cast an effective vote"); Dkt. 751 at 41 ("[T]he Court finds that Plaintiffs' allegations of the threat of imminent harm are sufficient at this stage of the proceedings to establish injury to their constitutional rights and demonstrate standing to proceed on their asserted claims.").) State Defendants

8

offer no basis for this Court to reverse its prior findings—nor is there any.

3. No new election law eliminates Plaintiffs' standing here. Curling Plaintiffs have repeatedly distinguished Defendants' cited cases. (Dkts. 1075, 1067, 1051.) None alleges a similar injury to the personal and individual right of a specific voter to cast a verifiable vote and have that vote counted, especially with the scientific support present here. *Cf. Pearson*, Dkt. 1066-1 (seeking *decertification of election* arguing plaintiffs' lawful votes were diluted by fraud enabled by foreign oligarchs); *Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020) (seeking to *enjoin certification* of election results with no specific burden or harm alleged to plaintiff's vote); *Wood v. Raffenspserger*, 2021 WL 3440690, at *1 (11th Cir. Aug. 6, 2021) (seeking to *prevent January 5, 2021 runoff*; "Wood does not explain how his particular in-person vote" was diluted or disvalued, allegation that procedures were unlawful and affected the integrity of the election were not particularized, and Wood did not actually vote in the election). Curling Plaintiffs have shown—unrebutted by Defendants—that they have *individually* suffered *personal* harm from the DRE system, the BMD system, and the absentee system. *Cf. Jacobson v. Fla. Sec'y of State,* 974 F.3d 1236, 1246 (11th Cir. 2020) (stating that voters who do not suffer "difficulty in voting for [their] preferred candidate or otherwise participating in the political process" do not have standing).

9

4. The recent Eleventh Circuit decision in *Common Cause* confirms that standing exists here. (Ex. 1 at 8.) With significant parallels to this case, the Eleventh Circuit affirmed a fee award against the Secretary based on temporary relief awarded to Common Cause for their concerns with the voter registration system, implicitly affirming standing. The district court found standing based on harm suffered by the infringement of the fundamental right to vote and excessive burdens (*like in this case*). *Common Cause Ga. v. Kemp*, 347 F. Supp. 3d 1270, 1288 (N.D. Ga. 2018). The decision cites *Common Cause/Ga. v. Billups* with approval, which reversed the district court's finding of no standing as to individual voters, finding those individual voters suffered injury due to their right to cast an in-person ballot. 554 F.3d 1340, 1351-52 (11th Cir. 2009) ("Requiring a registered voter either to produce photo identification to vote in person or to cast an absentee or provisional ballot is an injury sufficient for standing."). That case also awarded the voters fees as prevailing parties for their challenge of the earlier statute that charged a fee for a voter identification card, even though the State argued that the repeal of that law and later decision not to issue a permanent injunction vitiated the earlier victory. *Id.* at 1356. Just as the Eleventh Circuit rejected that argument in *Billups*, so too should the Court reject the *same* argument here.

5. State Defendants' criticism that Plaintiffs have not identified any

10

challenge "that is not 'common to all members of the public'" is both incorrect and beside the point. (Dkt. 1201 at 7-8.) Curling Plaintiffs' submission at Dkt. 1067 refutes this claim. "To deny standing to persons who are in fact injured simply because many others are also injured, would mean that the most injurious and widespread Government actions could be questioned by nobody." *United States v. S.C.R.A.P.*, 412 U.S. 669, 686-88 (1973).

6. Curling Plaintiffs' injuries are not at all merely generalized grievances, as explained at length in Curling Plaintiffs' previous submissions and arguments (Dkts. 1075, 1067, 1051), and as acknowledged by the Court.

## II. The DRE Claims Are Clear and Distinct

State Defendants feign confusion as to which claims are to be severed. (Dkt. 1201 at 11.) Curling Plaintiffs' DRE claims are clear and distinct from their BMD claims, as State Defendants recently acknowledged to the Court:

> But as far as the relevance at this juncture . . . the Curling plaintiffs' complaint has with it *two counts regarding the DRE systems*, which your Honor will recall we do believe is moot. *But, frankly, Your Honor, we lost that issue*.
>
> *The second set of claims are regarding the BMD issue*. And so we also addressed those claims regarding the deposition testimony.

(Dkt. 1194 at 32-33 (emphasis added).) Indeed, on their face, Counts I and II of the Curling Plaintiff's Third Amended Complaint seek relief for the DRE system

11

whereas Counts III and IV seek relief for the Proposed Election System (the BMD system). (Dkt. 627.) Curling Plaintiffs seek to sever the DRE claims in Counts I and II from the BMD claims in Counts III and IV. Tellingly, State Defendants have repeatedly argued the claims against the two systems are distinct and never had difficulty discerning them before. (*See e.g.*, Dkt. 645-1 at 12-15 (arguing DRE claims were moot and separate from BMD claims).) The Court also has treated the claims as clearly delineated and distinct. (*See* Dkt. 751 at 15 (noting "State Defendants ignored this Court's directives" to address new BMD claims rather than DRE claims that were the basis of the Court's 2019 injunction Order,); *id.* at 20 ("the Court has indicated that it does not intend to grant any further relief relating to the use of the old DRE voting machines").) In fact, the Court summed up precisely the rationale that supports severance of the DRE claims now: "the Court does *not* view the Curling Plaintiffs' retention of these [prior DRE] allegations that form the basis of relief already granted as *seeking any new or additional relief regarding the defunct DRE voting machines*." (*Id.* at 26 (emphasis added).) Severance is thus warranted and necessary.

**III.    Permitting Severance Will Focus the Case on the Current Election System and Warrant an Award of Attorney's Fees and Sanctions Now**

State Defendants claim Plaintiffs seek to "avoid this Court's prior rulings," but State Defendants seek to avoid the full impact of the 2019 injunction Order

12

Plaintiffs won. Secretary Raffensperger himself admitted: "We stood up a new voting system, new voting machines in less than six months. *And that was really because we had an activist federal judge that said you can't use the old DRE machines. And so we had to do that for the first primary that we had coming up.*" (Dkt. 1030 at 1 n.1.) The DRE claims thus are moot, as State Defendants admit. (Dkt. 1194 at 32-33.) State Defendants have, on that very basis, resisted discovery relating to the DRE system since Curling Plaintiffs filed their BMD claims. They now oppose severance for one self-serving reason: to avoid the award of fees and costs, and sanctions, that Curling Plaintiffs are entitled to under the law. The 2019 injunction Order awarded significant and ongoing relief: it not only abolished the DRE system, it also required a backup paper ballot plan; a security assessment of Georgia's registration system; and a pilot election using hand-marked paper ballots in 2019 (which saved Cobb County from the chaos of the BMD pilots, Dkt. 1030 at 9). (Dkt. 579 at 147-49.) This relief has been critically important. In fact, it is the reason Georgia was able to manually recount the 2020 Presidential election.

    Never shy to speculate and personally attack Curling Plaintiffs, State Defendants claim that this "motion is about one thing and one thing only: Plaintiffs' fear that their legally infirm claims will be dismissed before they can extract millions of dollars from taxpayers for their speculative journey through

13

Georgia's voting system over the past four years." (Dkt. 1201 at 5.) First, State Defendants ignore that Curling Plaintiffs are taxpayers too—and they are Georgia voters who are entitled to a modicum of civility and respect from State Defendants who are charged with administering a constitutional election system that does not violate their individual right to vote. Second, Curling Plaintiffs are entitled by law to recover the millions of dollars Defendants forced them to incur to win the injunction they sought, that Defendants did not appeal and still stands today, that the Secretary himself admits eliminated the DRE system when it otherwise would have remained in use at least a while longer, and that provides other important relief.[5] Third, State Defendants willfully multiplied Curling Plaintiffs' fees and costs greatly through their deliberate obstruction and prevarications, which this Court has noted multiple times. Fourth, Curling Plaintiffs have already waited over two years for what they are owed, and such delay has a devastating chilling effect on would-be plaintiffs and counsel for important cases against state actors protecting constitutional rights. Fifth, severance is consistent with Rule 1 of the Federal Rules of Civil Procedure, by focusing the case on the remaining BMD

---

[5] *See* Ex. 1 at 8-11 (affirming award for fees under 42 U.S.C. § 1988(b) for temporary relief awarded); *Kemp*, 347 F. Supp. 3d at 1288 (finding Section 1988 fees appropriate for preliminary relief where State argued repeal of law and later decision not to issue permanent relief vitiated preliminary victory).

14

claims and allowing for dismissal of those claims all parties agree are moot since Plaintiffs prevailed in obtaining the 2019 injunction Order. There is no good reason not to do exactly that at this stage of protracted, costly litigation.

## IV. Conclusion

State Defendants' opposition to severance of the DRE claims is so utterly meritless that they cannot mount even a consistent argument. They incoherently argue that the DRE claims "have been moot for nearly two years" and that discovery regarding those claims is barred while insisting that those claims are somehow not ripe for resolution and that severance is improper because Defendants want to "test those claims under a conventional standard, i.e., *not* a preliminary injunction," which of course would necessitate discovery regarding those claims and a trial on the merits. (Dkt. 1201 at 10.) Although the issue of whether breach of the DRE system may have affected Georgia's BMD system remains an important issue for the *BMD claims*, the *DRE claims* are moot because no further relief is sought regarding that now-defunct system. Accordingly, Curling Plaintiffs' Counts I and II (the DRE claims) should be severed and final judgment entered on those claims, and the Court should promptly award Curling Plaintiffs reasonable fees and costs as prevailing parties as well as the sanctions they seek for State Defendants' willful misconduct.

Respectfully submitted, this 15th day of November, 2021.

| | |
|---|---|
| /s/ David D. Cross | /s/ Halsey G. Knapp, Jr. |
| David D. Cross (*pro hac vice*) | Halsey G. Knapp, Jr. |
| Veronica S. Ascarrunz (*pro hac vice*) | GA Bar No. 425320 |
| Mary G. Kaiser (*pro hac vice*) | Adam M. Sparks |
| Lyle F. Hedgecock (*pro hac vice*) | GA Bar No. 341578 |
| MORRISON & FOERSTER LLP | KREVOLIN & HORST, LLC |
| 2100 L Street, NW | 1201 West Peachtree Street, NW |
| Suite 900 | Suite 3250 |
| Washington, DC 20037 | Atlanta, GA 30309 |
| (202) 887-1500 | (404) 888-9700 |

*Counsel for Plaintiffs Donna Curling, Donna Price & Jeffrey Schoenberg*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>Plaintiffs,<br><br>v.<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>Defendants. | **Civil Action No. 1:17-CV-2989-AT** |

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

                                                 */s/ David D. Cross*
                                                David D. Cross

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| DONNA CURLING, ET AL., Plaintiffs, v. BRAD RAFFENSPERGER, ET AL., Defendants. | Civil Action No. 1:17-CV-2989-AT |

## CERTIFICATE OF SERVICE

I hereby certify that on November 15, 2021, a copy of the foregoing **CURLING PLAINTIFFS' REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO SEVER** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

                                                           */s/ David D. Cross*
                                                           David D. Cross