# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

DONNA CURLING, *et al.*,

        Plaintiffs,

v.

BRAD RAFFENSPERGER, *et al.*,

        Defendants.

\*

\*

Civil Action No. 1:17-CV-2989-AT

\*

\*

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## DECLARATION OF MARK RICCOBONO

I, Mark Riccobono, declare as follows:

1. I am over 18 years of age and competent to make this declaration.

2. My business address is 200 E. Wells Street at Jernigan Place, Baltimore, Maryland 21230.

3. I am the President of the National Federation of the Blind ("NFB"), a position I have held since 2014.

4. The NFB is the oldest and largest national organization of blind persons. It has affiliates in all 50 states, Washington, D.C., and Puerto Rico, and its headquarters in Baltimore, Maryland. The NFB and its affiliates are widely recognized by the public, Congress, executive agencies of state and federal governments, and the courts as a collective and representative voice on behalf of blind Americans and their families. The organization promotes the general welfare of the blind by assisting the blind in their efforts to integrate themselves into society on terms of equality and by removing barriers that result in the denial of opportunity to blind persons in

virtually every sphere of life, including education, employment, family and community life, transportation, and recreation.

5.     The ultimate purpose of the NFB is the complete integration of the blind into society on a basis of equality. This objective includes the removal of legal, economic, and social discrimination. As part of its mission and to achieve these goals, the NFB has worked actively to ensure that the blind have an equal opportunity to vote on the same terms as all other voters.

6.     The NFB has more than 200 members in its Georgia affiliate.  These blind Georgia residents wish to vote on an equal basis as voters without disabilities.

7.     I understand that the plaintiffs in the above-captioned lawsuit have moved for a preliminary injunction to require Georgia to switch from its current plan of using ballot marking devices ("BMDs") as the primary method of voting in 2020 and beyond to a system whereby all voters will be required to hand mark their paper ballots, with the exception of voters with disabilities who must use a BMD to vote independently.  The NFB is deeply concerned about the consequences of such a change for blind Georgia voters.

8.     The experiences of NFB members throughout the country have shown that where states adopt two different methods of voting—one for voters with disabilities and one for everyone else—the two systems are inherently separate and unequal.  This creates several problems for blind voters that impede on their right under Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134, to vote on equal terms.

9.     First, when voters with disabilities are the only voters using BMDs, and all other voters use hand-marked paper ballots to vote, their ballots become readily identifiable and they lose the right to vote by secret ballot, just like everyone else.  In many polling places, there may be a single voter with a disability using the BMD.  Because the ballots produced by BMDs

typically look different from hand-marked paper ballots (in shape, size, and content), ballots marked by BMDs are often readily identifiable in case of a recount or audit.  It is then easy for poll workers or local election officials to figure out how the one blind voter in a precinct voted.

10.    Second, when only voters with disabilities use BMDs, they tend to be used infrequently if at all at many polling places.  This leads poll workers to be less or totally unfamiliar with their set-up and operation.  In Maryland, for example, where the state maintains a system where hand-marked ballots are the primary method of voting, with BMDs available for those with disabilities and others who ask to use them, NFB members have encountered polls where the BMDs are still unplugged by mid-afternoon on election day and the poll workers do not know how to set them up.  In other cases, the sole BMD at a polling place has been broken during all or part of an election, forcing blind voters to rely on third-party assistance to review and mark their ballot.  This has forced such voters to not only sacrifice the secrecy of their ballots, but to rely on someone else to mark their ballots correctly, with no way to confirm the accuracy of the selections.  If there were more than one BMD at each polling location and they were the primary method of voting, there would be alternate machines available and malfunctioning machines would likely be fixed on a more timely basis.

11.    Third, to the extent BMDs are vulnerable to any sort of security threat (which of course paper ballots are as well, since voting selections can easily be added to a paper ballot), leaving that risk to be borne only by voters with disabilities is discriminatory and increases the risk that a security issue could go undetected.  If, for example, a BMD were hacked to change the voting selections that were printed on the ballot, it is less likely the issue would be detected if only a small group of voters were using the machines—particularly a group with many blind voters who do not visually confirm the accuracy of their printed ballots.  The problem would

3

likely be detected, and corrected, much more quickly if all voters used the BMD. Limiting use of BMDs to only voters with disabilities, therefore, actually creates greater election security risks and may invite hackers who want to influence an election to target the votes of this readily identifiable group of voters. Any security risks posed by the BMDs should be assessed and mitigated to the extent possible with respect to the entire voting population—not simply left for voters with disabilities to face on their own.

12.     The problems with using hand-marked paper ballots as the primary method of voting have led the NFB to file suit in Maryland to demand that the state adopt BMDs as the default method of voting for all Marylanders (with paper ballots available upon request or in cases where there are long lines at the polls). *See Nat'l Fed'n of the Blind v. Lamone*, No. 19-2228-SAG (D. Md.). A true and accurate copy of the complaint filed in that case is attached hereto as Exhibit A. Plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss are currently pending before the court.

13.     BMDs are used throughout the country and, when used as the primary method of voting in a jurisdiction, offer the benefit of having all voters use one accessible, paper-verifiable method of voting. This ensures that all voters can vote on an equal basis, privately and independently, and with a paper trail. Blind Georgia voters should not be relegated to a separate and unequal method of voting that, because of its limited and segregated use, threatens to deprive them of a secret ballot and could expose them to greater security threats.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: November 11, 2019

_____
Mark Riccobono

4

# Exhibit A

## to Declaration of Mark Riccobono

Case 1:17-cv-02989-AT   Document 1569-12   Filed 01/09/23   Page 6 of 25
Case 1:17-cv-02989-AT   Document 1698-41   Filed 04/09/23   Page 6 of 25
Case 1:19-cv-02228-SAG   Document 1   Filed 08/01/19   Page 1 of 20

**IN IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | | |
|---|---|---|
| THE NATIONAL FEDERATION | * | |
| OF THE BLIND, INC., | | |
|    At Jernigan Place | * | |
| Baltimore, MD 21230, | | |
| | * | |
| THE NATIONAL FEDERATION OF | | |
| THE BLIND OF MARYLAND, | * | |
| 15 Charles Plaza, # 3002 | | |
| Baltimore, MD 21201, | * | |
| | | Civil Action No.:_____ |
| JOEL ZIMBA, | * | |
| 3601 Greenway, Unit 206 | | |
| Baltimore, MD 21218, | * | |
| | | |
| RUTH SAGER, | * | |
| 7634 Carla Road | | |
| Pikesville, MD 21208, | * | |
| | | |
|    and | * | |
| | | |
| MARIE COBB, | * | |
| 810 Hidden Bluff Circle | | |
| Catonsville, MD 21228, | * | |
| | | |
|    Plaintiffs, | * | |
| | | |
|   v. | * | |
| | | |
| LINDA H. LAMONE, | * | |
| STATE ADMINISTRATOR, STATE | | |
| BOARD OF ELECTIONS, | * | |
| in her official capacity, | | |
| 151 West Street, Suite 200 | * | |
| Annapolis, MD 21401, | | |
| | * | |
| MICHAEL R. COGAN | | |
| CHAIRMAN, STATE BOARD OF | * | |
| ELECTIONS, in his official capacity, | | |
| 151 West Street, Suite 200 | * | |
| Annapolis, MD 21401, | | |

PATRICK J. HOGAN,                            *
VICE CHAIRMAN, STATE BOARD OF
ELECTIONS, in his official capacity,          *
151 West Street, Suite 200
Annapolis, MD 21401,                          *

WILLIAM G. VOELP,                            *
MEMBER, STATE BOARD OF
ELECTIONS, in his official capacity,          *
151 West Street, Suite 200
Annapolis, MD 21401,                          *

KELLEY A. HOWELLS,                           *
MEMBER, STATE BOARD OF
ELECTIONS, in her official capacity,          *
151 West Street, Suite 200
Annapolis, MD 21401,                          *

    and                                         *

MALCOLM L. FUNN,                             *
MEMBER, STATE BOARD OF
ELECTIONS, in his official capacity,          *
151 West Street, Suite 200
Annapolis, MD 21401,                          *

    Defendants.                                 *

\*   \*   \*   \*   \*   ooOoo   \*   \*   \*   \*   \*

## COMPLAINT

### INTRODUCTION

1.    Plaintiffs the National Federation of the Blind ("NFB"), the National Federation of

the Blind of Maryland ("NFB-MD"), Joel Zimba, Ruth Sager, and Marie Cobb bring this action

against Defendants Linda H. Lamone, in her official capacity as State Administrator of the

Maryland State Board of Elections ("the Board"), Michael R. Cogan, in his official capacity as

Chairman of the Board, Patrick J. Hogan, in his official capacity as Vice Chairman of the Board,

and William G. Voelp, Kelley A. Howells, and Malcolm L. Funn, in their official capacities as

members of the Board, for denying blind individuals an equal opportunity to vote in person by

secret ballot in violation of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101-12213, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794. On the basis of these violations, Plaintiffs seek a declaratory judgment, injunctive relief, attorneys' fees and costs, and any other available relief.

2.      Plaintiffs, two blind advocacy organizations and several blind individuals who are registered to vote in Maryland, wish to exercise their right and the right of their members to vote in a manner that is equal to that afforded to individuals without disabilities.

3.      Since 2016, Maryland has maintained two separate and unequal voting systems: one for voters with disabilities and one for everyone else.  The Board has made hand marking paper ballots the default voting option in Maryland.  For voters with disabilities who cannot hand mark print ballots, such as blind voters, the Board offers a voting machine that electronically marks and then prints paper ballots ("Ballot Marking Device" or "BMD") as an accessible alternative. Although Board policy has been to require at least two voters per precinct to use the Ballot Marking Device, in each election since 2016, numerous polling places have had only one voter use the device.  Because the ballots produced by the BMD differ in shape, size, and content from the hand-marked ballots, they are readily distinguishable from hand-marked ballots. Thus, when only one voter uses the BMD in her precinct, her ballot becomes easily identifiable, destroying the secrecy of her vote.

4.      In addition, because the BMDs are a secondary, poorly used voting option, poll workers are not as familiar with how to operate them, sometimes even failing to plug them in before a voter requests to use one.  Maryland's use of dual voting systems, therefore, renders the lesser used system an inferior voting option for those who must use the BMD to vote independently.

5.  The ADA and Section 504 require the Board to provide individuals with disabilities an equal opportunity to exercise their fundamental right to vote. To ensure that individuals with disabilities can communicate their votes in an equally effective manner and enjoy an equal opportunity to vote, the Board must move to a fully integrated voting system, in which the BMD is the default option for all voters, thus providing an equal voting experience for all Maryland voters and safeguarding the secrecy of all ballots.

## JURISDICTION

6.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343 because Plaintiffs' claims arise under the ADA and Section 504.

## PARTIES

7.  The National Federation of the Blind, the oldest and largest national organization of blind persons, is a 501(c)(3) non-profit corporation duly organized under the laws of the District of Columbia and headquartered in Baltimore, Maryland. It has affiliates in all 50 states, Washington, D.C., and Puerto Rico. The NFB and its affiliates are widely recognized by the public, Congress, executive agencies of state and federal governments, and the courts as a collective and representative voice on behalf of blind Americans and their families. The organization promotes the general welfare of the blind by assisting the blind in their efforts to integrate themselves into society on terms of equality and by removing barriers that result in the denial of opportunity to blind persons in virtually every sphere of life, including education, employment, family and community life, transportation, and recreation. The NFB has many blind members, including Mr. Zimba, Ms. Sager, and Ms. Cobb, who are registered to vote in Maryland and wish to vote in person at their local precinct on the same terms as all other voters.

8.     The ultimate purpose of the National Federation of the Blind is the complete integration of the blind into society on a basis of equality.  This objective includes the removal of legal, economic, and social discrimination.  As part of its mission and to achieve these goals, the NFB has worked actively to ensure that the blind have an equal opportunity to vote on the same terms as all other voters by collaborating with developers of voting technology to ensure accessibility for the blind.  In particular, the NFB has devoted extensive resources—resources that have been diverted from other important projects—to helping develop accessible voting options and advocating to election officials, including the Maryland State Board of Elections, to provide equal voting opportunities for blind individuals.

9.     The National Federation of the Blind of Maryland is the Maryland state affiliate of the NFB.  The NFB-MD is a 501(c)(3) non-profit corporation made up of approximately 2,000 blind Marylanders and their families and friends.   The NFB-MD has many blind members, including Mr. Zimba, Ms. Sager, and Ms. Cobb, who wish to vote in person at their local polling places on an equal basis.

10.     The NFB-MD shares the NFB's mission and purpose, with a focus on issues and organizing at the Maryland state level.  The NFB-MD works in furtherance of its members' right to participate fully and equally in all aspects of their lives in Maryland, including in voting.  The organization has devoted substantial resources—resources diverted from other important work— to advocacy in the Maryland legislature and before the Maryland State Board of Elections to protect the right of blind Marylanders to vote on equal terms during Maryland's recent transition from electronic to paper-based voting. The NFB-MD has sent representatives to multiple Board meetings and has expended significant resources advocating for a legislative fix to the Board's ongoing violations of the rights of blind Maryland voters.

11.     Plaintiff Joel Zimba is a blind member of the NFB and NFB-MD. He resides in Baltimore, Maryland and is a registered Maryland voter.  He is thus a qualified individual with a disability within the scope of the ADA and Section 504.

12.     Plaintiff Ruth Sager is a blind member of the NFB and NFB-MD.  She resides in Pikesville, Maryland and is a registered Maryland voter.  She is thus a qualified individual with a disability within the scope of the ADA and Section 504.

13.     Plaintiff Marie Cobb is a blind member of the NFB and NFB-MD.  She resides in Catonsville, Maryland and is a registered Maryland voter.  She is thus a qualified individual with a disability within the scope of the ADA and Section 504.

14.     The Maryland State Board of Elections is an agency created, authorized, and existing under the laws of the State of Maryland.  The Board and its members are responsible for managing and supervising elections in Maryland and ensuring compliance with the requirements of applicable state and federal law, including the ADA and Section 504.  The Board's five members are appointed by the Governor of Maryland, with the advice and consent of the Maryland Senate.

15.     The Board receives federal financial assistance in many forms, including, but not limited to, grants to enhance election technology and security, and is therefore required to comply with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794.

16.     Defendant Linda H. Lamone is the State Administrator of the Board, and as such is employed as an officer, employee, and agent of the Board.  Ms. Lamone serves as the chief election official for Maryland.  Her office is located in Annapolis, Maryland.  Ms. Lamone is sued in her official capacity.

17.     Defendant Michael R. Cogan serves as the Chairman of the Board and is sued in his official capacity.

18.     Defendant Patrick J. Hogan serves as Vice Chairman of the Board and is sued in his official capacity.

19.     Defendants William G. Voelp, Kelley A. Howells, and Malcolm L. Funn, serve as members of the Board and are sued in their official capacities.

## FACTUAL ALLEGATIONS

20.     Maryland offers voters the option of voting in person before election day at early voting centers or on election day at their local polling places.  From in or about 2004 until 2016, all voters at both early voting centers and local polling places used the same electronic voting machines, which were equipped with accessibility features that allowed blind voters to vote on equal terms with all other voters.

21.     In 2007, Maryland enacted legislation requiring the Board to certify, for use in elections after January 1, 2010, voting machines that would provide a paper trail.  *See* Md. Code Ann., Elec. Law § 9-102.  This legislation also required the Board to ensure that voters with disabilities have access to a BMD at their local precinct, so that they could vote privately and independently, while also producing a paper trail. This legislation further required the Board to ensure that voters with disabilities not be forced to vote by segregated ballot.

22.     The Maryland Attorney General issued an opinion in 2013, warning that the Board would violate the provision of this new law prohibiting segregated ballots if it did not either use one accessible ballot marking system for all voters, ensure that hand-marked and BMD-marked ballots were indistinguishable, or require a significant number of voters without disabilities to use the BMDs. 98 Op. Att'y 152 (Dec. 18, 2013).

23.     Despite the Attorney General's opinion, the Board failed to follow any of the alternatives for compliance with Maryland law when it transitioned the state to paper-based voting

in 2016. The Board chose to lease Election Systems and Software's ExpressVote BMD for use as an accessible alternative to hand marking paper ballots. The BMD uses a touchscreen, as well as a non-visual interface, to allow voters with or without disabilities to mark their ballots electronically. The BMD helps prevent common voter mistakes by alerting voters if they have selected too many options for a particular contest (over-voting) or too few (under-voting). Once voters confirm their selections, the BMD prints a paper ballot they can then feed into the scanner that tabulates votes.  This scanner is also used to tabulate the votes on hand-marked paper ballots. The BMD does not cast or directly record any votes.

24.     The paper ballots produced by the ExpressVote BMD differ in size and content from the hand-marked paper ballots other voters use. While the paper ballots used for hand marking are 8.5 by 11 inches and contain all contest selections, with corresponding bubbles for voters to fill in with their selections, the ExpressVote paper ballots measure 4.5 by 14 inches and only list the options the voter selected.  The ExpressVote ballots are thus readily distinguishable from the hand-marked paper ballots used in Maryland.

25.     Instead of having all Maryland voters use the ExpressVote BMDs, since 2016, the Board's policy has been to offer all voters the paper ballot for hand marking as the default option. Voters with disabilities may use the BMD in lieu of hand marking their ballots, but all other voters are generally steered towards hand marking their ballots.

26.     Instead of ensuring that a significant number of voters use the BMD in each precinct to protect the secrecy of these readily-distinguishable ballots, the Board's policy, from 2016 until late June 2019, has been to require only two voters in each precinct to use the BMD in each election.

27.     Following the Board's initial proposal in 2016 to require two voters to use the BMD

for the 2016 primary election and subsequent elections, NFB-MD and the Maryland Disability

Law Center co-authored a letter to the Board warning that the proposal was not sufficient to protect

the privacy of voters with disabilities who use the BMD.  The Board disregarded their warning

and implemented this policy.

28.     The worst fears of the NFB-MD were realized when, in the 2016 general election,

there were 34 precincts in which only one ballot was cast using the BMD.  Upon learning of this

and other violations of the rights of blind voters, the NFB-MD wrote to the Board again in 2017,

once again urging the Board to increase the minimum number of voters required to use the BMD

in each precinct to ensure the privacy of voters with disabilities.

29.     The NFB-MD also wrote to members of the Maryland state legislature in January

2018, alerting them that the Board was violating the right of blind voters to a secret ballot and

requesting that they write to the Board to demand policy changes that would ensure an equal voting

experience for blind voters. The Board made no policy changes as a result of these efforts.

30.     Yet again, the Board ignored NFB-MD's warnings and suggested policy changes.

Consequently, blind voters continued to have their right to vote by secret ballot violated in the

2018 elections.  In the 2018 primary election, in 40 precincts throughout the state, only one BMD-

marked ballot was cast.  The 2018 primary election generated several manual recounts, where

votes cast using the BMDs would have been readily distinguishable from hand-marked ballots.

31.     The NFB-MD again wrote to the Maryland legislature in August 2018, asking the

body to require the Board to issue a substantive report containing data for the 2016 general and

2018 primary elections on the number of ballots marked using BMDs, and the secrecy of those

ballots. The letter also requested that the Board implement policy changes to ensure that voters

with disabilities who use the BMDs can vote by secret ballot. The NFB-MD is unaware of the Board producing such a substantive report or implementing the requested policy changes.

32.     Despite knowing that its two-voter BMD usage policy had not been followed in the two previous elections, the Board made no changes in time for the November 2018 general election. Unsurprisingly, violations of ballot privacy persisted. In the November 2018 election, only one ballot was cast using a BMD at 22 precincts in Maryland. Moreover, in this same election—the only election for which this data is available—the Board reported that 66 precincts failed to require any voter to use the BMD. Thus, despite setting itself such a low bar, the Board has failed, for at least three consecutive elections, to ensure that at least two voters use a BMD in all Maryland precincts.

33.     Given the Board's ongoing failure to ensure ballot secrecy for blind voters, the NFB-MD lobbied the Maryland legislature in 2019 to solve the problem by requiring that all voters use the BMD as the default voting option. Nevertheless, the Board opposed the NFB-MD's proposed legislation, without offering any alternative way to resolve the problem.

34.     Despite the Board's intransigence, the NFB and NFB-MD again wrote to the Board in May 2019, requesting that Maryland adopt the BMDs as the default voting option for all Marylanders. The Board's response was to increase the minimum number of voters required to use the BMDs from two to five voters per precinct.

35.     Because the Board has consistently failed to require even two voters per precinct to use the BMD since 2016, the NFB and NFB-MD have little confidence that the Board will succeed in requiring five voters to use the BMD in all precincts in the 2020 elections.

36.     Furthermore, this new policy maintains the existence of separate and unequal voting systems in Maryland. The Board's decision to relegate the BMDs to a seldom-used

alternative voting system deprives blind Maryland voters of an equal voting experience. Beyond the ballot secrecy issues, the low usage rate of the BMD and that fact that it is a disfavored alternative means that poll workers are less familiar with how to set up and operate the machines, making it more likely that blind voters will have difficulty using the BMD in a timely manner.

37. Plaintiffs' concerns about Maryland's separate and unequal voting system are not abstract. For example, Plaintiff Joel Zimba was the only voter in his precinct to use the BMD in the 2018 primary election. The poll workers at Mr. Zimba's polling place, Margaret Brent Elementary School in Baltimore City, recognize Mr. Zimba when he comes to vote and even know him by name. As the only voter to use the BMD in his precinct, Mr. Zimba, whose ballot was readily identifiable to the poll workers, was denied the right to vote by secret ballot in the 2018 primary election.

38. Mr. Zimba plans to vote in future elections in Maryland and is concerned that if Maryland continues to use a separate and unequal voting system for individuals with disabilities, he will again be deprived of a secret ballot in the future.

39. Plaintiff Ruth Sager has had varying levels of difficulty voting in every election since the Board transitioned to paper ballots and BMDs in 2016. During the November 2018 general election, however, she was not able to use the BMD at all. When Ms. Sager arrived at her polling place, Pikesville Middle School in Baltimore County, to vote, the poll workers informed her that the only BMD at the location was broken. A poll worker told Ms. Sager she should have her husband, who is sighted, read and mark a paper ballot for her. Ms. Sager was not comfortable with relying on her husband to vote for her. She instead requested that the poll worker read and mark her ballot, leading the poll worker to react with annoyance. The poll worker attempted to read Ms. Sager's ballot to her but was unable to pronounce certain names, properly read numbers

11

(*e.g.*, the amount of money requested in certain budgetary items on the ballot), or properly mark the ballot.  Because of the poll worker's errors, Ms. Sager's ballot could not be processed by the tabulating scanner, requiring another poll worker to fill out a new paper ballot for her.  Ms. Sager therefore had to announce her selections to two poll workers and was denied the right to vote privately and independently altogether. Ms. Sager spent approximately 50 minutes voting, even though there was no line. If the Board had used the BMD as the default voting option, there would have been more than one BMD at Ms. Sager's polling location and any operational issues would likely have been timely fixed or the faulty BMD replaced.

40.     Ms. Sager generally votes in person at her local polling place in all elections and plans to continue to vote in future elections in Maryland.  She is concerned that if Maryland continues to use a separate and unequal voting system for individuals with disabilities, she will continue to be subjected to an unequal voting experience.

41.     Plaintiff Marie Cobb has had difficulty voting in every election since 2016.  In the November 2016 general election, the poll worker at Ms. Cobb's polling place, Catonsville High School in Baltimore County, stated that she was unfamiliar with how to use the BMD, and Ms. Cobb requested to try to use the machine anyway.  After attempting to use it without success, Ms. Cobb was forced to enlist the assistance of her 13-year-old granddaughter, who had accompanied her to her precinct.  With her granddaughter's help, she discovered that the BMD was not even plugged in.  The plug was still wrapped up and affixed to the back of the machine, indicating that the BMD had not been used at all that day, even though Ms. Cobb arrived to vote in the afternoon. Ms. Cobb's granddaughter had to plug in the BMD.  Ms. Cobb ultimately called an NFB employee who helped guide her through the proper operation of the BMD.  Ms. Cobb spent about an hour voting, even though there was no line at her polling place.  In the November 2018 general election,

12

Ms. Cobb again encountered a poll worker who admitted that she had no idea how to use the BMD. Ms. Cobb had to set up and figure out how to use the machine on her own.  In each election since Maryland's transition to a paper-based voting system, Ms. Cobb has been required to spend between half an hour to an hour trying to vote, even though there has been no line at her polling place.  Poll workers have told Ms. Cobb that they have never received training on how to set up or use the BMD.

42.     Ms. Cobb generally votes in person at her local polling place in every election.  Ms. Cobb plans to vote in future elections in Maryland and is concerned that if Maryland continues to use a separate and unequal voting system for individuals with disabilities, she will continue to be subjected to an inferior voting experience.

43.     The Board justifies its decision to maintain two separate and unequal voting systems as a response to its unsubstantiated fears that voters may be confused about how to move between screens on the BMD and that candidates further down the ballot could be prejudiced by not appearing on the initial contest screen.  Yet the BMD does not allow voters to cast their ballots without navigating through all screens of options in a given contest.  Furthermore, upon information and belief, of the 19 other states, as well as the District of Columbia, that use the ExpressVote BMD, none has experienced significant problems with voters being confused about navigation or skipping screens.

44.     In contrast to the Board's policy, other jurisdictions that use the ExpressVote BMD have taken measures to ensure that voters with disabilities are not relegated to a separate and unequal voting system.  West Virginia and counties in Tennessee encourage all voters to use the BMD and only provide paper ballots upon request.  Counties in Nevada, Tennessee, and Texas require all voters to use the BMD, unless the voter is casting an absentee or provisional ballot.

45.     Because of the Board's consistent failure to adopt these or similar policies designed to create an integrated voting experience for voters with and without disabilities, the voting experiences of blind Maryland voters have deteriorated with the move to paper-based voting. Fifty percent of blind Maryland voters who responded to an NFB survey in 2016 reported that poll workers failed to inform them that they had the option of voting using a BMD, requiring the voters to know in advance of the option and affirmatively ask for it.  Moreover, 28% of blind respondents to this 2016 survey indicated that poll workers failed to provide instructions on how to use the BMD and nearly 40% reported that poll workers had problems setting up or activating the BMD.

### COUNT I
### Violation of Title II of the Americans with Disabilities Act
### 42 U.S.C. § 12131 et seq.

46.     Plaintiffs incorporate the allegations in the preceding paragraphs, as if alleged herein.

47.     The Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213, guarantees equal access for qualified individuals to the benefits of the services, programs, or activities of a public entity.  42 U.S.C. § 12132.

48.     Title II of the ADA mandates, *inter alia*, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.

49.     In providing aids, benefits, or services, public entities may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," nor may public entities provide qualified individuals with disabilities "an aid, benefit, or service that is not as effective in affording equal

opportunity" to gain the same result or benefit as provided to others.  28 C.F.R. § 35.130(b)(1)(ii)-(iii).

50.     Furthermore, such public entities "shall furnish appropriate auxiliary aids and services where necessary to afford individuals with disabilities . . .  an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity of a public entity."  28 C.F.R. § 35.160(b)(1).   Public entities must also "take appropriate steps to ensure that communications with . . .  members of the public . . . with disabilities are as effective as communications with others." *Id.* § 35.160(a)(1).  To be effective, the "auxiliary aids and services must be provided in . . . such a way as to protect the privacy and independence of the individual with a disability."  28 C.F.R. § 35.160(b)(2).

51.     The Board, as an agency or instrumentality of the State of Maryland, is a public entity under Title II of the ADA.

52.     Voting is a service, program, or activity provided by the Board.

53.     Mr.  Zimba, Ms. Sager, and Ms. Cobb are individuals with disabilities under the ADA, as are the NFB's and NFB-MD's blind members.

54.     Mr. Zimba, Ms. Sager, Ms. Cobb, and many NFB and NFB-MD members, are registered to vote in Maryland and are thus qualified individuals entitled to the protections of the ADA.

55.     The Board has failed and is failing to meet its obligations to provide voters who are blind with an opportunity to vote that is equal to the opportunity provided to other voters.  It is also failing to ensure that blind voters can communicate their votes as effectively as all other voters.  In segregating voters with disabilities to a lesser used voting system, the Board has denied Mr. Zimba, Ms. Sager, Ms. Cobb, and other NFB and NFB-MD members an auxiliary aid or

service that would allow them to vote equally. Accordingly, the Board has denied Mr. Zimba, Ms. Sager, Ms. Cobb, and other NFB and NFB-MD members an equal opportunity to access to its service, program, or activity of voting and to communicate their voters in an equally effective manner.

56. As a result of the Board's actions, Mr. Zimba, Ms. Sager, Ms. Cobb, and other NFB and NFB-MD members have suffered and will continue to suffer irreparable harm: they have suffered and continue to suffer from discrimination and unequal access to the Board's program, service, or activity of voting. If there is no change in the status quo, Mr. Zimba, Ms. Sager, Ms. Cobb, and other members of the NFB and NFB-MD will be denied their right to vote on an equal basis with all other voters in future elections.

57. The Board's failure to meet its obligations to provide blind voters with an equal opportunity to vote constitutes an ongoing and continuous violation of the ADA and its supporting regulations. Unless restrained from doing so, the Board will continue to violate the ADA. Unless enjoined, the Board's conduct will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

58. Unless the requested relief is granted, Mr. Zimba, Ms. Sager, Ms. Cobb, and other NFB and NFB-MD members will suffer irreparable harm in that they will be discriminated against and denied equal access to the fundamental right to vote.

59. The ADA authorizes injunctive relief as appropriate to remedy acts of discrimination against persons with disabilities. 42 U.S.C. § 12188(a)(1).

60. Mr. Zimba, Ms. Sager, Ms. Cobb, and other members of the NFB and the NFB-MD are entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

## COUNT II
### Violation of Section 504 of the Rehabilitation Act of 1973
### 29 U.S.C. § 794

61.     Plaintiffs incorporate by reference all allegations contained in the preceding paragraphs, as if alleged herein.

62.     Section 504 of the Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).

63.     Section 504 defines "program or activity," in pertinent part, as "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government; or the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government . . . ." § 794(b)(1).

64.     Such federally funded programs and activities may not, in providing aids, benefits, or services, "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," nor may such programs and activities provide qualified handicapped persons with "an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others."  28 C.F.R. § 41.51(b)(1)(ii)-(iii).

65.     The Board, an agency or instrumentality of the State of Maryland, receives federal grants and other financial assistance, thereby subjecting itself to the requirements of Section 504.

66.     Voting, including in-person voting, is a service, program, or activity provided by the Board.

67. Mr. Zimba, Ms. Sager, and Ms. Cobb are individuals with disabilities under Section 504, as are the NFB's and NFB-MD's blind members.

68. Mr. Zimba, Ms. Sager, Ms. Cobb, and many NFB and NFB-MD members, are registered to vote in Maryland and are thus qualified individuals with disabilities entitled to the protections of Section 504.

69. The Board has failed and is failing to meet its obligations to provide voters who are blind with an opportunity to vote that is equal to the opportunity provided to other voters. In segregating voters with disabilities to a lesser used voting system, the Board has refused to provide an auxiliary aid or service that would allow Mr. Zimba, Ms. Sager, Ms. Cobb, and other NFB and NFB-MD members to vote equally. Accordingly, the Board has denied and continues to deny Mr. Zimba, Ms. Sager, Ms. Cobb, and other NFB and NFB-MD members an equal opportunity to access its program or activity of voting.

70. As a result of the Board's actions, Mr. Zimba, Ms. Sager, Ms. Cobb, and other NFB and NFB-MD members have suffered and will continue to suffer irreparable harm: they have suffered and continue to suffer from discrimination and unequal access to the Board's program, service, or activity of voting. If there is no change in the status quo, Mr. Zimba, Ms. Sager, Ms. Cobb, and other NFB and NFB-MD members will be denied their right to vote on an equal basis with all other voters in future elections.

71. The Board's failure to meet its obligations to provide blind voters with an equal opportunity to vote constitutes an ongoing and continuous violation of Section 504 and its supporting regulations. Unless restrained from doing so, the Board will continue to violate Section 504. Unless enjoined, the Board's conduct will continue to inflict injuries for which Plaintiffs have no adequate remedy at law.

72.     Unless the requested relief is granted, Mr. Zimba, Ms. Sager, Ms. Cobb, and other NFB and NFB-MD members will suffer irreparable harm in that they will be discriminated against and denied equal access to the fundamental right to vote.

73.     Mr. Zimba, Ms. Sager, Ms. Cobb, and other members of the NFB and the NFB-MD are entitled to injunctive relief, as well as reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Mr. Zimba, Ms. Sager, Ms. Cobb, the NFB, and the NFB-MD request that this Court enter judgment in their favor and award them the following relief:

a. A permanent injunction prohibiting Defendants from violating the ADA and Section 504 and requiring the Board in all future elections to offer BMDs to every in-person voter as the default method of voting, with paper ballots offered only to those voters who affirmatively opt out of using the BMD or in cases where there are long lines of people waiting to vote;

b. A declaration that Defendants have and continue to violate the ADA and Section 504;

c. An award of Plaintiffs' reasonable attorneys' fees and costs; and

d. Such other and further relief as the Court may deem just.

Dated: August 1, 2019                    Respectfully submitted,


                                         _____/s/_____
                                         Jessica P. Weber (Federal Bar No. 17893)
                                         James T. Fetter (Federal Bar No. 20727)
                                         Brown, Goldstein & Levy, LLP
                                         120 E. Baltimore Street, Suite 1700
                                         Baltimore, Maryland 21202
                                         (410) 962-1030 (phone)
                                         (410) 385-0869 (fax)
                                         jweber@browngold.com
                                         jfetter@browngold.com

                                         *Attorneys for Plaintiffs*