Page 1

1           IN THE UNITED STATES DISTRICT COURT

            FOR THE NORTHERN DISTRICT OF GEORGIA

2                   ATLANTA DIVISION

3

4    DONNA CURLING, et al.,

5         Plaintiffs,

                                    CIVIL ACTION FILE

6         vs.

                                    NO. 1:17-cv-2989-AT

7    BRAD RAFFENSPERGER, et al.,

8         Defendants.

9

10   30(b)(6) VIDEO DEPOSITION of the COALITION FOR GOOD

11        GOVERNANCE, INC. through MARILYN MARKS

12                  March 17, 2022

13                   11:01 a.m.

14         TAKEN BY REMOTE VIDEOCONFERENCE

15     Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138

16

17

18

19

20

21

22

23

24

25

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 2

1                    INDEX TO EXHIBITS

2    EXHIBIT              DESCRIPTION              PAGE

3    Exhibit 1    Notice of Deposition              26

4    Exhibit 2    Objections to Notice of           28

5                 Deposition

6    Exhibit 3    Plaintiffs' Third Amended         49

7                 Complaint

8    Exhibit 4    First Supplemental Complaint      56

9                 of Plaintiffs Coalition for

10                Good Governance, Laura Digges,

11                William Digges III, Ricardo

12                Davis, and Megan Missett

13   Exhibit 5    Supplemental Declaration of       59

14                Marilyn Marks

15   Exhibit 6    2017 Form 990-EZ                  95

16   Exhibit 7    2018 Form 990                    100

17   Exhibit 8    2019 Form 990                    106

18   Exhibit 9    Plaintiffs' Notice of Filing     109

19                Declaration

20   Exhibit 10   Coalition Plaintiffs' Detailed   111

21                Specification In Support of

22                Motion for Attorneys' Fees

23   Exhibit 11   New York correspondence from     120

24                January 2021 citing Curling

25   Exhibit 12   NCSBOE letter from 2019          122

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

```
 1   Exhibit 13      E-mails, 9/26/19,              123
 2                   CGG2021001277506
 3   Exhibit 14      3/4/21 letter from CGG to      126
 4                   Georgia Republican Leaders
 5   Exhibit 15      Mission Statement - Coalition  136
 6                   for Good Governance
 7   Exhibit 16      Articles of Incorporation for  138
 8                   a Nonprofit Corporation
 9   Exhibit 17      Who We Are - Coalition for     140
10                   Good Governance
11   Exhibit 18      CGG Board Discussion Package   150
12   Exhibit 19      Fundraising message            161
13   Exhibit 20      Fundraising message during     162
14                   2020
15   Exhibit 21      Donate - Coalition for Good    163
16                   Governance
17   Exhibit 22      Home page - Coalition for Good 166
18                   Governance
19   Exhibit 23      Current Projects - Coalition   167
20                   for Good Governance
21   Exhibit 24      Tweets from January 24, 2021   168
22   Exhibit 25      8/22/20 tweet                  171
23   Exhibit 26      E-mails, 1/18/18,              186
24                   CGG2021001278172
25   Exhibit 27      Supplemental Response to       188
```

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 4

1                         Interrogatory No. 12

2    Exhibit 28    Coalition Plaintiffs'                 190

3                  Responses to Defendant Anh

4                  Le's First Interrogatories

5    Exhibit 29    Joint Litigation and Common           213

6                  Interest Agreement

7    Exhibit 30    Facebook advertisement from           216

8                  Friends of Coalition for Good

9                  Governance

10   Exhibit 31    E-mail regarding ballot image         222

11                 legislation

12   Exhibit 32    E-mails, 8/24/21,  Subject:           225

13                 Garland's new lawsuit against

14                 BMDs

15   Exhibit 33    January 1, 2021 tweet                 238

16   Exhibit 34    Coalition for Good                    248

17                 Governance's and Coalition

18                 Plaintiffs' Objections and

19                 Responses to Defendant Brad

20                 Raffensperger's First Request

21                 for Admission

22   Exhibit 35    GA Senate Judiciary                   259

23                 Sub-Committee on Election Law

24                 12.30.2020

25   Exhibit 36    Plaintiff Coalition for Good          266

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 5

1                    Governance's Objections and

2                    Responses to State Defendants'

3                    Second Request for Production

4                    of Documents

5     Exhibit 37      Response of Coalition for Good     267

6                    Governance to Brad

7                    Raffensperger's First Request

8                    for Production of Documents

9     Exhibit 38      Handwritten notes                  275

10

11

12                  INDEX TO EXAMINATION               PAGE

13    By Mr. Tyson                                       10

14

15

16

17

18

19

20

21

22

23

24

25

```
                                                        Page 6

1    APPEARANCES OF COUNSEL:  (All appearances via Zoom)

2    On behalf of the Coalition for Good Governance and

3    the Deponent:

4              ROBERT ALEXANDER MCGUIRE, ESQUIRE

5              Robert McGuire Law Firm

6              113 Cherry Street

7              Seattle, Washington  98104

8              ram@lawram.com

9

10   On behalf of the Curling Plaintiffs:

11             ZACHARY FUCHS, ESQUIRE

12             JENNA B. CONAWAY, ESQUIRE

13             REILEY JO PORTER, ESQUIRE

14             SONJA SWANBECK, ESQUIRE

15             HANNAH ELSON, ESQUIRE

16             Morrison & Foerster, LLP

17             2000 Pennsylvania Avenue, NW

18             Washington, DC  20006

19             zfuchs@mofo.com

20             jconaway@mofo.com

21             rporter1@mofo.com

22             sswanbeck@mofo.com

23             helson@mofo.com

24

25
```

30(b)(6) Marilyn Marks                                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 7

1    APPEARANCES (Continued):

2    On behalf of Defendant Secretary of State Brad

3    Raffensperger:

4              BRYAN TYSON, ESQUIRE

5              BRYAN F. JACOUTOT, ESQUIRE

6              DIANE FESTIN LAROSS, ESQUIRE

7              Taylor English Duma LLP

8              1600 Parkwood Circle, Suite 200

9              Atlanta, Georgia  30339

10             btyson@taylorenglish.com

11             bjacoutot@taylorenglish.com

12             dlaross@taylorenglish.com

13   -and-

14             CAREY MILLER, ESQUIRE

15             VINCENT R. RUSSO, ESQUIRE

16             Robbins Ross Alloy Belinfante Littlefield

17             500 14th Street, N.W.

18             Atlanta, Georgia  30318

19             cmiller@robbinsfirm.com

20             vrusso@robbinsfirm.com

21

22

23

24

25

Page 8

1    APPEARANCES (Continued):

2    On behalf of Defendant Fulton County:

3              DAVID LOWMAN, ESQUIRE

4              Fulton County Attorney's Office

5              141 Pryor Street, Suite 4038

6              Atlanta, Georgia  30303

7              david.lowman@fultoncountyga.gov

8

9    Also Present:

10             Krishan Patel, videographer

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 48

```
 1   since the last time that documents were filed, but
 2   yes, the basic -- the basic objections that we have
 3   are covered in the docket.
 4        Q    And just so I understand, you referenced
 5   actions of counties.  Is CGG diverting resources for
 6   things that -- for nonparties in this case as well?
 7        A    When you say "for nonparties" --
 8        Q    Let me ask it this way --
 9        A    Okay.
10        Q    -- if that's -- is CGG also diverting
11   resources based on the actions of nonparties to the
12   Curling case?
13        A    I'm not sure that we would know how to
14   parse out -- when we see election administration
15   problems in a county, I'm not sure we would know how
16   to parse out how much of that is attributable to a
17   County's misunderstanding, misapplication versus the
18   law and the direction of the State Defendants.  I
19   don't think we have any such precision.
20        Q    So if CGG prevailed on all of its claims
21   in the Curling case, but counties continued to have
22   election administration problems, CGG would continue
23   diverting resources to address those county
24   problems, right?
25        A    I don't know that I would call that
```

Page 49

1    necessarily diverting resources because if we're

2    talking about, hey, if BMDs went away tomorrow and

3    the Dominion Voting System were remedied in the ways

4    that we have requested for our relief, if all of

5    that happened tomorrow morning, I expect that we

6    would still -- I know we would still be working on

7    county election administration problems and issues.

8             I wouldn't necessarily call -- I wouldn't

9    call that a diversion -- at all call that a

10   diversion of resources.  That's much more of the

11   core of the kind of work we want to do and have not

12   been able to do.

13            Do I expect that should we be successful

14   in obtaining relief on everything we ask for all

15   election administration problems go away, no, I

16   don't expect that.  And that's really much more, as

17   I say, of the kind of work we want to do is the more

18   day-to-day local-level transparency and voter

19   protection type of work.

20        Q    Thank you.

21            I've marked as Exhibit 3, I'll go ahead

22   and share this on the screen, the third amended

23   complaint, which is document number 226 in the

24   Curling case.

25            (Exhibit Number 3 was marked for

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 51

1   rules to remind me what -- put this in context for

2   me, if you don't mind?  It's been a long time since

3   I looked at this complaint.

4       Q    Certainly.  Let me see if I can get those

5   up here for you.  And maybe I can ask a more general

6   question while I'm pulling these up for you.

7       A    Okay.

8       Q    What specifically does the Coalition

9   allege that it is having to spend financial and

10  non-financial resources on as a result of the

11  alleged actions or the actions of the State

12  Defendants in this case?

13      A    Well, certainly litigation cost is an

14  enormous drain on our resources and all that goes to

15  support the attorneys.

16           Are you wanting me to, like, tell you

17  things like we have to buy transcripts; are you

18  asking me to list kind of litigation support cost --

19  I mean expenses?

20      Q    I'm not looking specifically for numbers.

21  What I'm looking for is kind of by category.  So the

22  allegation is that you had to divert resources from

23  something to something else.

24      A    Right.

25      Q    And my question is:  What is the Coalition

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 52

1    diverting resources to as a result of the actions

2    that are alleged in your complaints?

3         A    And you're asking right now about

4    financial resources, correct?

5         Q    Let's start with financial, and then we'll

6    do volunteer or other non-financial resources next.

7    So the record's clear let me ask the question again

8    specifically about finances.

9         A    Okay.

10        Q    What financial resources is the Coalition

11   diverting from existing projects -- I'm sorry.  I

12   turned myself around.  Let me start again.

13             So the Coalition is alleging that it

14   diverted resources from certain things to other

15   things, financial resources, correct?

16        A    Yes.

17        Q    And what specifically is the Coalition

18   diverting its financial resources to as a result of

19   the allegations in the complaint?

20        A    Okay.  And, Mr. Tyson, I'm going to answer

21   as it relates to the complaint as opposed to

22   answering based on those two citations because I

23   don't remember what those citations are right now.

24   Okay?

25        Q    That's fine.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 53

1        A     Okay.  So as you know litigation is

2    expensive, and there are way too many types of

3    expenditures we have to make to support litigation

4    that we would prefer not to be involved in.

5              One, the example I gave you for a moment

6    ago, we certainly have to buy transcripts, we have

7    to buy services that collect documents, and, for

8    example, our Logikcull subscription is expensive.

9    We have to pay the attorneys what we can, and it

10   basically absorbs almost all of the financial

11   resources that we would otherwise be spending on

12   non-litigation programs.

13             And let's see.  We have had to pay experts

14   and travel for experts, travel for our attorneys

15   back in the days before COVID when we did things in

16   person, and so it is the entire variety of things

17   that go to support litigation.

18             Our interns, we do pay our interns

19   modestly, but it's still big money to us, and they

20   spend the majority of their time on litigation

21   support, whether it's doing analytical work or doing

22   some research for us.

23             So I'm sure that is not all that we -- of

24   the types of expenditures that we have that go for

25   litigation support, but that's -- that will be

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 54

1    generally the types of expenditures we have.

2         Q    Let me ask you about some of the specifics

3    in the third amended complaint, Exhibit 3.

4         A    All right.

5         Q    You see the second part, it says:

6    Specifically, Coalition has been and will be

7    required by Defendants' past and intended conduct to

8    do the following.

9              And on the next page the first bullet

10   point relates to the topics you just discussed:

11   Paying the fees of lawyers, litigation, travel,

12   copying, all those types of expenses.

13             Do you see that?

14        A    I do, and it makes me think of some other

15   stuff that I forgot about expenses.

16        Q    Okay.  My question specifically, though,

17   is if this lawsuit was over, then you would no

18   longer have to pay for the things that are listed in

19   the first bullet on page 55, correct?

20        A    That's correct.

21        Q    And the second bullet point is a

22   non-financial allegation here, and it's 90 percent

23   your time, and I suspect it may be more -- feel like

24   more than 90 percent of your time.

25        A    It does.  I think we missed a zero there.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 58

1   think that voting a vote-by-mail ballot is best.

2          At other times we have talked to people

3   about -- who have not been able to get their ballot

4   on time or for some reason just been unable to vote

5   by mail, we have shared with them how to go into the

6   polling places at a time in early voting that is not

7   necessarily crowded and then find a private machine

8   to vote on, how it's perfectly fine to ask the poll

9   manager if they can wait until a machine that's more

10  private is available.  It's that kind of effort that

11  we have taken to tell people it's perfectly fine to

12  demand a private voting area.

13      Q    Do you educate Coalition members

14  differently than the voting public, or is the

15  educational message the same?

16      A    The educational message would generally be

17  the same, it's just that we would have more contact

18  with people who are more active members.

19      Q    And in this particular document there's

20  not a whole lot of detail about other projects that

21  you are unable to be engaged in.  Do you recall

22  submitting a declaration in this case outlining some

23  of those other projects?

24      A    I have kind of the vague memory of that,

25  and we may have done it more than once, and

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 74

1   meetings and that sort of thing, and I was not in a

2   place that I could run to Denver and testify, and

3   then both of our other board members don't live

4   right there in Denver and easy to get to, so we did

5   not continue the level of participation we had had

6   in the projects for voting system implementation and

7   deployment in Colorado.

8          And then when I came to North Carolina one

9   of the first things that I worked on was the

10  violation of secret ballot for early voting where

11  all of the early voting, whether it was on the DREs

12  or on absentee by mail ballots has an identifiable

13  number on it, which, of course, violates the North

14  Carolina Constitution.

15         So I spent time challenging both my

16  current election board in Charlotte-Mecklenburg as

17  well as the State Election Board on that.

18         Our intention was to do a big education

19  campaign, to do lobbying with North Carolina

20  legislators, and to file administrative challenges

21  and hope that we did not have to file litigation,

22  but that effort really did not continue.  I've still

23  got it on the back burner.  We haven't solved the

24  problem in North Carolina, and I am committed to

25  getting back to that issue at the first opportunity.

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 84

1    meaningfully" --

2         A    Okay, let me take an example.

3         Q    Okay.

4         A    We had Colorado members in Boulder who

5    asked us to testify by Zoom, to write letters, to

6    call city council members on instant runoff voting.

7    And I was kind of a well-known figure, that's

8    putting it nicely, in Colorado as an opponent of

9    instant runoff voting.

10             The mayor of Aspen race that I told you

11   about when we started talking this morning was done

12   by instant runoff voting, and it kind of went off

13   the rails, and after that, the City of Aspen chose

14   never to use instant runoff voting again.

15             But so -- because of my kind of deep

16   knowledge of what was wrong with instant runoff

17   voting, I was asked to take a very active role in

18   helping our members out there fight Boulder's

19   decision to use instant runoff voting.  I could only

20   do a minimal amount of work, and I think I might

21   have made one phone call versus testifying, sending

22   letters, et cetera.

23        Q    That inability to fully engage on that

24   particular topic was due --

25        A    Yes.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 85

1      Q    -- to the demands of the Curling case on
2   you, correct?
3      A    Both the Curling case and the other
4   related activities on Dominion BMD system that were
5   not necessarily litigation.
6      Q    And you mentioned your RLA work with Cobb
7   County was to help avoid double counting; is that
8   correct?
9      A    I didn't mean to say risk-limiting audit
10   if I did say risk -- I meant to say post-election
11   audit if I -- and I was talking with some of our
12   members and other active voters in Cobb County, and
13   I urged them to ask for a tabulation audit after the
14   runoff in a municipal -- I believe it was Marietta
15   municipal election, and I helped them create their
16   ask, and it was partly to make sure that double
17   counting did not take place as it had in Cobb County
18   in the Baker 01 precinct in November 2020.
19      Q    And so your role in that was not to work
20   with the county election officials, but to provide
21   information to individuals who wanted to work with
22   those election officials; is that correct?
23      A    Yes, yes, I provided them with support,
24   ideas, kind of the how-tos.
25      Q    And those were members and non-members,

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 86

1   correct?

2        A    Yes.  It was some people who probably

3   considered themselves members, but, you know, wasn't

4   in some kind of formal member context.

5        Q    Let me ask you, if the Coalition received

6   an injunction banning the use of Dominion BMDs, will

7   the Coalition continue to educate its members and

8   educate the voting public?

9        A    Can you be more specific?  Are you

10  limiting -- like, an injunction just about the BMDs?

11  Do you mind rephrasing the question?  It's confusing

12  to me.

13       Q    Certainly.  So my question is specifically

14  if the Coalition was to receive an injunction

15  banning just the ballot marking devices, would the

16  Coalition continue to educate its members and the

17  voting public?

18       A    Regardless of whether or not we receive an

19  injunction about just the BMDs, we will, as long as

20  we're in existence, continue to educate members and

21  voting public about election issues.

22       Q    And that's true if CGG received all the

23  relief that it's seeking in this -- in the Curling

24  case, so you win on everything, CGG would continue

25  to educate members and the voting public, right?

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 87

1       A    On -- it is one of our missions.  It may

2   not be about the issues of BMDs or the other relief,

3   but we're not going to go out of business if we got

4   all the relief we're looking for.  We would -- we

5   would always be working on educating members,

6   non-members on -- I don't expect all election issues

7   to go away if we got all the relief we're looking

8   for.  It would give us much more ability to focus on

9   a broader range of topics at a more local level,

10  which is really where we would prefer to work.

11      Q    So next I want to kind of move to

12  categories of resources under this topic to really

13  kind of dig in on.  I know we've talked about

14  financial resources that were diverted.  What are

15  the other resources that CGG does not have -- sorry,

16  let me start over that again.

17           What are the non-financial resources that

18  CGG has had to divert as a result of the actions

19  it's challenging in this lawsuit?

20      A    It's going to be primarily people's time

21  and -- volunteer time and as well as paid time like

22  our interns' pay and -- well, so much goes back to

23  financial resources.

24           For example, we'd get rid of our Logikcull

25  account.  Do you know what I mean by our Logikcull

Case 1:17-cv-02989-AT   Document 1569-25   Filed 01/09/23   Page 21 of 76
30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 92

1       A     I have two questions about your question.
2    Are you asking me how much of their seven days a
3    week is devoted to the case itself as opposed to
4    other CGG activities or --
5       Q     I'm not.  Let me ask the question a
6    different way.
7       A     All right.
8       Q     So in terms of the activities that the
9    volunteers are engaged in as part of their work as
10   volunteers for CGG, do you have an estimate of the
11   percentage of that time that is devoted to the
12   Curling case?
13      A     This is just going to be a wild guess.
14   I'm going to say that probably 50 percent of it
15   would be related to the case.  Probably 30 percent
16   of it would be related to other Dominion Voting
17   System and audit issues that are not in direct
18   support of the litigation, and the remainder on
19   other types of election administration activities.
20            For example, as you probably know we often
21   go to -- haven't had a chance to do this recently --
22   State Election Board with proposed rules about
23   election administration.  Some of them would be BMD
24   related; many of them would not.
25            We didn't make it yesterday.  We had plans

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 97

1    which I believe is a different topic on down the

2    line, number 8.

3         Q    Okay.  Well, let me ask, so we're still,

4    obviously, on topic 1 working through --

5         A    Okay.

6         Q    -- the diversion of resources, so I wanted

7    to ask a few questions about this.

8              So, first of all, if you go to page 2,

9    part 3, the statement of program service

10   accomplishments, do you see that?

11        A    Uh-huh.

12        Q    And there's then three lines, 28, 29, 30,

13   and 31, and then a total in number 32.  Do you see

14   that?

15        A    I do.

16        Q    And so the Coalition listed program

17   service accomplishments in lines 28, 29, and 30 but

18   didn't list anything for other program services on

19   line 31, correct?

20        A    That's correct.

21        Q    So this gets a little confusing because

22   line 28 references attachment 5, so I'm going to

23   move down to the attachment 5, and then you see it

24   says on page 14 program service accomplishment 1?

25        A    Yes, I do see that.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 98

1     Q     And the statement there is:  Advocating

2  for voters' rights to a verifiable election, CGG

3  litigated in federal court Northern District of

4  Georgia against Georgia's use of an unverifiable

5  paperless touchscreen system and educated Georgia

6  voters on the importance of using an election system

7  that either includes paper ballots or creates a

8  paper trail.

9          Do you see that?

10    A     I do.

11    Q     Is that program service accomplishment

12  referring to the Curling case?

13    A     That particular one is referring to the

14  Curling case.

15    Q     And program service accomplishment 2

16  there, attachment 6, statement that is:  Worked to

17  educate voters on the importance of election

18  security using the example of the Georgia special

19  election CD6 and the exposing vulnerability of the

20  KSU Center for Election Systems, Georgia was one

21  state identified by the NSA where voter registration

22  systems were compromised and vulnerable to hacking.

23          Do you see that?

24    A     I do.

25    Q     Is that program service accomplishment

30(b)(6) Marilyn Marks                        March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 99

1   also referring to the Curling case?

2        A    Well, the Curling case is one of the

3   things that would have been encompassed by that

4   statement.

5        Q    Okay.  Let me go -- ask about line 30

6   then.  The third program service accomplishment is:

7   Supported rights of all citizens to access election

8   records; paid for voting systems computer experts to

9   identify and testify on security lapses in the

10  Georgia elections system.

11            Do you see that?

12       A    I do.

13       Q    And that line -- is that line also

14  referring to the Curling case?

15       A    I believe that that was probably referring

16  to what we call -- and, Mr. Tyson, I did not try to

17  go delve into exactly which action this would have

18  been, so I'm telling you to the best of my

19  recollection, which could be wrong here, but --

20  without checking with accountants, but what I

21  believe that may be referring to is what we call

22  Curling 1 that was an action we filed in May of

23  2017, I believe it was May of 2017, in Fulton

24  Superior Court.

25       Q    Was that lawsuit also challenging the use

Page 100

1    of touchscreen voting systems?

2         A    It was.

3         Q    So let me ask you on the questions here in

4    part 4, there's a question here about section

5    501(c)(3) organizations only and asking if the --

6    line 47, did the organization engage in lobbying

7    activities or have a section 501(h) election in

8    effect during the tax year, and the box is checked

9    for no.  Do you see that?

10        A    I do.

11        Q    Has CGG -- well, let me ask first:  Did

12   CGG advocate for the passage or defeat of any

13   legislation of the Georgia General Assembly in 2017?

14        A    I don't believe so.

15        Q    Do you know if CGG has ever advocated for

16   the defeat or passage of legislation in the Georgia

17   General Assembly?

18        A    We have, yes.  A minimal amount of our

19   resources are devoted to that, but we have.

20        Q    Let me mark the next 990 here.  I want to

21   look next at 2018.

22             (Exhibit Number 7 was marked for

23   identification.)

24   BY MR. TYSON:

25        Q    I've marked as Exhibit Number 7 the 2018

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 101

1   990.  You see that?

2          A     I do.

3          Q     So I first want to go to again looking at

4   the program service accomplishments, line number 2

5   says, did the organization undertake any significant

6   program services during the year which were not

7   listed on the prior Form 990 or 990-EZ, and the box

8   is checked as no.  Do you see that?

9          A     I do.

10         Q     And the next line indicates, did the

11  organization cease conducting or make significant

12  changes in how it conducts any program services, and

13  the box is checked no, correct?

14         A     Correct.

15         Q     Is it correct to say that CGG was engaged

16  in the same activities in 2018 as it was in 2017?

17         A     Generally, yes, and I -- I think we would

18  look back to part 3, item 1 up there above your

19  cursor that generally our activities have remained

20  under that umbrella, but, of course, every single

21  day there's something slightly different about our

22  activities from the prior day.

23         Q     Certainly.

24               So I want to then look -- you have in

25  lines -- line 4 asks again for program service

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 103

1   touchscreen voting systems, correct?

2        A    Yes.

3        Q    Okay.  And in 4A, at the end of that you

4   indicate, educating Georgia voters on the importance

5   of using an election system that includes either

6   paper ballots or creates a paper trail.

7             Doesn't Georgia's Dominion system fall

8   within that category?

9        A    We certainly should have said something

10  like an auditable paper trail, but it would not --

11  it does not fall in the category of what was

12  intended to mean a verifiable paper ballot.

13       Q    And then 4C references a challenge to

14  discriminatory policies on absentee ballots.  Is

15  this referencing the Martin case that we discussed

16  earlier?

17       A    It is referencing the Martin case, and it

18  is also referencing the type of work that we did

19  prior to that for both education and trying to get

20  others to make the challenge instead of us and

21  research around the issue.

22            So yes, it is a litigation and other

23  things that were related to, in particular,

24  Gwinnett's method of rejecting mail ballots.

25       Q    And so it's correct then that each of the

Page 104

1   program service accomplishments listed on this 990

2   are, at least in part, litigation, correct?

3       A    Yes, in part, that is true.

4       Q    Let me take us back up to page 9.  I'll

5   try to zoom this in a little bit.  It'll be easier

6   to see.

7           So on part 8, Statement of Revenue, do you

8   see this language?

9       A    I do.

10      Q    And so there's various categories of

11  things -- of ways that money comes to the

12  organization, and there's no amount indicated for

13  membership dues, right?

14      A    Correct.

15      Q    And the only line item for revenue is all

16  other contributions, gifts, grants, and similar

17  amounts, right?

18      A    Sadly so.

19      Q    Then looking at page 10, part 9, Statement

20  of Functional Expenses, column A is Total Expenses,

21  column B is Program Service Expenses, and I wanted

22  to ask first why in 11B for legal you have $189,792

23  and all of that is part of the Program Service

24  Expenses, correct?

25      A    Uh-huh.  Yes.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 112

1          Do you see that?

2      A    Yes.

3      Q    So I'm going to take us to page 283.  Let

4   it have a chance to catch up.

5      A    All right.

6      Q    So this is titled Declaration of Marilyn

7   Marks.

8          Do you see that?

9      A    I do.

10     Q    Okay.  And so in this declaration you made

11  several different comments about how the Coalition

12  goes about spending its resources, and that's what I

13  want to dig into of what's going on here.

14          First, in paragraph 9 you indicate that:

15  The Coalition receives frequent requests to assist

16  in election technology controversies across the

17  country.  We decline involvement in the vast

18  majority of the requests because of the almost

19  impossible task of recruiting counsel with adequate

20  subject matter expertise.  A long learning curve

21  required for counsel in voting systems litigation

22  makes most such cases impractical to pursue.

23          Do you see that?

24     A    I do.

25     Q    So what method, if any, does CGG use to

Page 113

 1   determine which requests for assistance it rejects

 2   due to the difficulty of recruiting counsel and

 3   which it rejects due to the lack of resources to

 4   fulfill that request?

 5        A    You know, I don't know that you could ever

 6   parse that out in any type of objective way, you

 7   know?  It's -- if the expertise was readily

 8   available and a lot of people had that expertise it

 9   would probably be easy to recruit attorneys to serve

10   in the capacity of helping challenge election

11   technology, election technology policy

12   controversies.  So I'm not sure how I would ever

13   parse that out.

14        Q    And I guess what I'm trying to understand

15   is there were obviously projects you didn't engage

16   in that you've testified were due to a lack of

17   resources.  Here you're indicating you don't engage

18   in some projects due to the difficulty of counsel.

19   I'm just trying to understand how you tell the

20   difference for CGG.

21        A    How do we tell the difference?  Let me see

22   if I can give you a recent example.  We were asked

23   to get involved with the new Internet voting bill in

24   DC, and -- Washington, DC, and, you know, would we

25   consider helping litigate against that, and right

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 116

1   literally.

2        Q    Okay.

3        A    I end up doing more things than they tell

4   me that need to be done.

5        Q    Okay.  And so earlier we talked about that

6   you were having to spend 90 percent of your time on

7   items related to this case or more.  Part of the

8   reason for that is the way that the Coalition has

9   chosen to litigate this case, correct?

10            MR. MCGUIRE:  Objection to form.

11       A    Can you tell me what you mean by "chosen

12   to litigate"?

13   BY MR. TYSON:

14       Q    So you've titled this section Coalition's

15   Case Management Strategy, and in paragraph 24 you've

16   outlined kind of the approach that you take and your

17   interns take to help litigate the case.

18       A    Right.

19       Q    And my question is:  The reason why you

20   were spending as much time as you are on these cases

21   is, at least in part, due to how the Coalition has

22   chosen to litigate its cases, correct?

23       A    I'm not sure that I would -- I would state

24   it that way.  You know, the way we would choose, all

25   other things being equal, would be for much bigger

30(b)(6) Marilyn Marks            March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 117

1    teams to be working on the things that I do, but we

2    do not have the resources and the breadth of

3    organization.  It is not by choice but by just that

4    is where we are as a matter of fact.  There's no one

5    else to do it, and we don't have the resources to

6    expand greatly for legal teams, research folks.

7    It's not by choice, it's just by necessity.

8         Q    So, I guess in a perfect world you're

9    saying if you were able to have the attorneys do all

10   the typical attorney tasks you would have more time

11   for other projects of CGG, correct?

12        A    Yes, sure.

13        Q    Okay.  Go down to paragraph 37 next.  So,

14   again, further explaining kind of what CGG does, you

15   say in paragraph 37:  CGG organizes its litigation

16   activities to be conducted at the lowest possible

17   cost to make the most efficient use of attorney

18   time.  All activities that could be done by someone

19   other than very experienced senior attorneys is done

20   by CGG staff or volunteers.

21             See that, right?

22        A    Yes.

23        Q    And so you'd agree kind of I guess to our

24   perfect-world scenario, if CGG did not utilize its

25   staff or volunteers to conduct these litigation

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 118

1    activities, then that staff and volunteer time could

2    be devoted to CGG's other projects, right?

3         A    In a perfect world, yes.

4         Q    And are you saying in paragraph 37 that

5    the reason for the loss of staff and volunteer time

6    for other CGG projects is this decision to litigate

7    at the lowest possible cost?

8         A    No, not really saying that.  That would

9    really not be our choice.  My choice would be to

10   have the financial resources necessary to put legal

11   team, expert team, support team, research team on

12   without having budgetary constraints have to be an

13   every-minute consideration.

14             So, yes, we made this choice to litigate

15   given the constraints.  It's not that we chose to

16   have, oh, let's just do this the cheapest way we

17   possibly can; it's let's do this the only way we

18   can.

19        Q    Let me ask one more question about this.

20   In paragraph 49 you say:  This approach to

21   economizing has permitted Coalition's attorneys to

22   be efficient and generally only engage in activities

23   requiring their technical and litigation expertise.

24   It has, however, not been without its price, for

25   these efforts have diverted significant resources of

30(b)(6) Marilyn Marks                              March 17, 2022
Curling, Donna v. Raffensperger, Brad

                                              Page 119

 1    the organization, in both time and money, away from

 2    other projects.

 3              Do you see that?

 4       A    Yes.

 5       Q    And so you'd agree that this litigation is

 6    what has caused the diversion of significant

 7    resources of the organization away from other

 8    projects, right?

 9       A    It's one of the things that has, yes.

10       Q    You say that it diverted significant

11    resources of the organization, you refer to these

12    efforts have done that.  Can you quantify how much

13    of the diversion was due to the efforts you

14    reference in paragraph 49 and how much is due to

15    other factors?

16       A    No, I certainly don't have any kind of way

17    to measure that because it certainly required all --

18    you know, a large portion of the financial resources

19    we have, but it's hard to put quantifiable numbers

20    on the amount of volunteer time, for example, and

21    then my time that has to get devoted to

22    litigation -- this litigation effort as well as

23    other problems being caused by the Dominion Voting

24    System.

25              You know, we don't -- as I told you

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 120

1    before, we don't keep records of the volunteer time

2    at that level, so I don't have an estimate for you.

3         Q    Now, one of the things you indicated that

4    CGG was limited in doing was educating the New York

5    State Board of Elections on problems with BMDs.

6              Do you recall that?

7         A    I do.

8         Q    I want to have you look at what I marked

9    as Exhibit 11, document that was produced to us in

10   discovery.

11             (Exhibit Number 11 was marked for

12   identification.)

13   BY MR. TYSON:

14        Q    Do you recall a letter sent in January

15   2021 to the New York State Board about BMDs?

16        A    I recall it kind of vaguely, you know.

17   Helping me remember it a little bit as you're

18   displaying it.

19        Q    And Exhibit 11 has your signature as

20   executive director?

21        A    It does, uh-huh.

22        Q    And in this letter you reference the

23   Coalition's involvement in the Curling case and

24   Judge Totenberg's ruling from October 2020, correct?

25        A    Uh-huh.  Yes.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 128

1   project that is related to CGG's goals here of

2   election security, voter privacy, and election

3   transparency?

4       A    Well, certainly it is related to our

5   goals.  We try not to do anything that's not part of

6   our goals.  But, yes, it's certainly part of our

7   goals, but it's certainly not the way we would

8   choose to achieve our goals.  It's a last resort.

9       Q    And is the statement correct that the

10  Curling case was a project of primary focus in 2021?

11      A    Yes, just because of the consuming nature

12  of it, it had to be a primary focus for us, not

13  necessarily by choice, but by just the requirements

14  of keeping up with the demands of the case.

15      Q    And CGG was able to engage in this

16  advocacy effort despite its involvement -- for the

17  General Assembly legislation despite its involvement

18  in Curling, correct?

19      A    Yes, certainly not to the extent that we

20  should have or would like to.  Obviously as a

21  501(c)(3) our lobbying efforts are limited anyway,

22  but had we had more resources, more volunteer time I

23  would have hoped that we would have done a better

24  job of being effective at what we were trying to

25  lobby against.

Page 131

1    present relating to the laws, policies or protocols

2    challenged in this action.  And you were the

3    designee for CGG on topic 2, correct?

4         A    That's correct.

5         Q    And did you review any documents

6    specifically to get ready for this topic?

7         A    No, I'm not sure that there were any

8    documents that would have directly addressed this

9    question.

10        Q    And did you speak to anyone associated

11   with CGG specifically to prepare for your testimony

12   on this topic besides counsel?

13        A    Not specifically for this purpose, no.

14             MR. TYSON:  I think this one will be

15   relatively quick since my focus is on just the

16   document piece, and, Rob, I know you had some

17   objection to this topic.  I don't think we'll get to

18   the objectionable scope here, but we'll see how we

19   do.

20   BY MR. TYSON:

21        Q    Ms. Marks, does CGG maintain a written

22   annual budget?

23        A    No, we do not.

24        Q    Okay.  And so there's no way to identify

25   from an internal budget document spending on

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 132

1    specific categories; is that correct?

2         A    That is correct, not from any type of

3    document.

4         Q    Okay.  And so then it would be correct to

5    say that there's not a document that identifies a

6    diversion of resources from one project to another

7    project within CGG, correct?

8         A    I would not say that.  I thought you were

9    asking me about a budgetary document, but we have

10   lots of documents that would indicate that, you

11   know, we had to spend money on some type of

12   expenditure that perhaps we were not expecting that

13   we -- which we could have spent on something else.

14        Q    I apologize, I was asking specifically

15   about budget documents.  I didn't add that

16   qualifier.  So --

17        A    Sorry.

18        Q    -- it's correct to say there are not

19   budget documents that demonstrate CGG spending funds

20   in a different way as a result of the allegations in

21   the Curling lawsuit, correct?

22        A    And that is because we do not prepare a

23   formal budget.  So, yes, there would not be

24   amendments to the budget because we don't have a

25   formal one.

Page 135

1    post-2014 reorganization -- informal reorganization
2    of Rocky Mountain Foundation, and we -- we certainly
3    expanded beyond Colorado, and I guess it depends on
4    what you consider the region, but that probably
5    needs to be formally expanded in our -- in our work.
6         Q    Okay.  Thank you for that clarification.
7              On the third line there, there's an
8    indication that:  CGG will engage in litigation as
9    well as provide monetary support for legal expenses
10   to other organizations engaged in litigation on
11   these issues.
12             Do you see that sentence?
13        A    Yes.
14        Q    And so part of CGG's mission is filing
15   lawsuits, right?
16        A    Well, I wouldn't -- I wouldn't say that it
17   is our mission to file lawsuits.  We know that it
18   will be necessary at times.
19        Q    Okay.  And the lawsuits that are filed are
20   in pursuit of the interests that CGG exists to
21   protect, correct?
22        A    Well, yes.
23        Q    So let me next mark a portion of the CGG
24   website.  Are you responsible for what's posted on
25   the CGG website?

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 136

1      A     Not me personally directly.  I don't know

2    how to do it.  But speaking for the organization,

3    yes, we as an organization are responsible for

4    what's on the website, which is often out of date.

5      Q     Well then let me ask about this to see if

6    this is in date or not.

7            (Exhibit Number 15 was marked for

8    identification.)

9    BY MR. TYSON:

10     Q     So this is a printout you can see at the

11   bottom here Exhibit 15, right,

12   coalitionforgoodgovernance.org.

13     A     Right.

14     Q     Is that the website of the Coalition?

15     A     Yes, it is.

16     Q     And this is a mission statement.  Is this

17   mission statement up to date and correct?

18     A     Let me take a look.

19     Q     Okay.

20     A     It is correct, and it looks like it was

21   taken to a great degree from that tax-exempt purpose

22   that you and I were just looking at.

23     Q     Thank you.

24           So CGG is engaged in interests related to

25   government transparency and accountability.  That's

30(b)(6) Marilyn Marks                      March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 137

1    one of the things, correct?

2         A    One of the things, yes.

3         Q    And elections are listed specifically,

4    correct?

5         A    Yes.

6         Q    Does a jurisdiction's use of BMDs relate

7    both to the elections and the government

8    accountability and transparency interests of CGG?

9         A    As well as due process and equal

10   protection, yes.

11        Q    So advocacy around the use of electronic

12   voting relates to several of CGG's interests, right?

13        A    Yes.

14        Q    When you say in that second paragraph, "we

15   will engage in litigation," that litigation is a

16   major function of CGG, at least as to its activities

17   right now?

18             MR. MCGUIRE:   Objection to form.

19        A    Litigation is certainly consuming a huge

20   amount of our resources right now, but if we go

21   ahead and read the rest of that sentence, inform

22   legislative policy, and then the next sentence we

23   will be using education, communications, obviously

24   those are much preferable for any organization than

25   to engage in litigation.

Page 138

1          So yes, litigation is one avenue, but it

2    is our -- our least favorable choice.

3    BY MR. TYSON:

4        Q    Understood.

5              Now, CGG is a Colorado corporation,

6    correct?

7        A    Incorporated in Colorado, yes.

8        Q    Is CGG registered as a charity in Georgia?

9        A    We are.

10       Q    So let me next mark Exhibit 16.

11             (Exhibit Number 16 was marked for

12   identification.)

13   BY MR. TYSON:

14       Q    These are articles of incorporation for a

15   nonprofit corporation from the Colorado Secretary of

16   State.  Do you see that?

17       A    Correct.

18       Q    And this is for the corporation Rocky

19   Mountain Foundation, Inc., right?

20       A    Right.  Yes.

21       Q    Do you know, are these the original

22   articles of incorporation for what is now CGG?

23       A    I believe that they are.  At least

24   according to our records they are.  We did not -- we

25   were not management at the time they were filed.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 142

1   advance the constitutional liberties and individual

2   rights of citizens with an emphasis on preserving

3   and protecting those private rights of its members

4   that are exercised through public elections.

5           Do you see that?

6       A    I do.

7       Q    And so is it correct that advancing

8   individual rights through proper election

9   administration is a key part of CGG's mission?

10      A    Yes, sure.

11      Q    Okay.  Then there's a -- paragraph 21

12  lists -- begins, "Coalition serves its purpose in

13  multiple ways, including by," and then lists out a

14  number of different things that are there, which if

15  you can just take a minute to read through those for

16  me.

17      A    Okay.  Okay.

18      Q    You'd agree with me CGG sometimes serves

19  its purpose by filing litigation, right?

20      A    Sometimes, yes.

21      Q    So what I want to do is kind of walk

22  through these different pieces you list in paragraph

23  21.  Since the filing of Curling, CGG has provided

24  information and education to its members, correct?

25      A    Yes.

30(b)(6) Marilyn Marks        March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 143

1       Q       And since the filing of Curling, CGG has

2    served as a nonpartisan and informational resource

3    for the public, press, campaigns, candidates, and

4    political parties, right?

5       A       We have.

6       Q       And since the filing of Curling, CGG has

7    monitored nationwide developments in election law

8    and technology, right?

9       A       Not nearly as much as we used to, but we

10   have done that to the extent possible.

11      Q       And since the filing of Curling, CGG has

12   provided speakers for events at educational

13   institutions, right?

14      A       Quite frankly, that has declined even

15   since this was written because we've had to -- I

16   think this year we've declined all invitations, and

17   most of last year we had to decline most

18   invitations, but we still -- when we can, we do it.

19      Q       Okay.  And CGG, since the filing of

20   Curling, has provided commentary from its leadership

21   on election issues, right?

22      A       We have done that, but we have been unable

23   to do it recently.  And what I mean by this in that

24   statement was generally op-eds, and I have been

25   asked to write many a op-ed in this last six months

Page 144

1   and have been unable to.

2            So, yes, done it, but we have not done it

3   nearly as consistently and as actively as we want

4   to.

5       Q    Since the filing of Curling, CGG has

6   collaborated with voting rights and election

7   integrity initiatives with other nonpartisan profits

8   (sic) and academics, right?

9       A    Many of those activities are on hold right

10  now, but we have done some of this, yes.

11      Q    And to kind of finish out here, since the

12  filing of Curling, CGG has developed and shared

13  research about election problems, right?

14      A    That we have done extensively, yes.

15      Q    And since the filing of Curling, members

16  and prospective members of CGG have participated in

17  the electoral process through poll watching,

18  attending public meetings, and other civic

19  activities, right?

20      A    That has declined a lot in the last six

21  months, but yes, we have engaged in that, you know,

22  to some extent in every year since 2017.

23      Q    Let me move next to topic number 4.  Topic

24  4 is the organization's organizational structure,

25  including individuals who have the authority to make

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 154

1    that makes any sense.

2         Q     It does.

3               Did you speak to anybody else besides

4    Ms. Dufort and Ms. Nakamura to prepare specifically

5    for this part of the deposition, this topic?

6         A     You broke up during part of that sentence.

7    It sounded like you said Ms. Dufort and

8    Ms. Nakamura; is that what you said?

9         Q     Yes, I was saying besides Ms. Dufort and

10   Ms. Nakamura, did you speak to anyone to help

11   prepare for this topic?

12        A     No, I did not.

13        Q     And I don't want us to repeat, I think

14   we've covered a lot of this ground already in terms

15   of specific activities, but I did want to just try

16   to understand do you have a sense of what percentage

17   of the organization's work is dedicated to election

18   integrity or election efforts -- not election

19   integrity, just election efforts?

20              MR. MCGUIRE:   Objection to form.

21        A     I have no documents on such, and it would

22   just be a really rough idea of probably 90 percent

23   election related.  Not necessarily BMD related or

24   Dominion voting related, but election related right

25   now probably 90 -- 90 percent, but not -- not

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 155

1    because that's the only thing we want to do.

2              As I mentioned, I really want to be doing

3    some open -- open records -- excuse me -- yes, open

4    records and open meetings issues.

5    BY MR. TYSON:

6        Q    And so the approximately 10 percent that

7    goes to other projects, what categories of -- are

8    those projects?

9        A    I would say that some of that would be

10   fundraising, some of that will be just kind of

11   general administrative stuff like getting D&O

12   insurance or getting the accountants lined up to do

13   our audit -- or excuse me, our 990, but also where I

14   have spent some time, a little bit more these past

15   two years that I did not do so much in previous

16   years has been a little more involved in lobbying

17   for some legislation in Georgia, ballots as open

18   records, ballot images, and then trying to make

19   whatever changes we could, not necessarily

20   successful at it, in bills like SB202 and its

21   predecessors.

22             So while we spend absolutely no money on

23   lobbying other than some small portion of whatever

24   an e-mail costs, we don't spend any significant

25   money on lobbying, but I do spend some time on

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 158

1   course.

2   BY MR. TYSON:

3       Q     Certainly.  I think we'll be able to

4   address that as we go, so thank you for making note

5   of that.

6           So, Ms. Marks, other than filing this

7   lawsuit, has CGG undertaken any efforts to address

8   the laws, policies, and protocols it says are

9   unconstitutional?

10      A     Yes.

11      Q     And what are those?

12      A     Well, for one, we have tried to do

13  communications with lawmakers certainly both at the

14  time that laws were being promoted in the general

15  assembly about ballot marking devices going back to

16  2018 and then 2019, we've talked to lawmakers both

17  formally in hearings, through e-mails, through

18  personal telephone conversations, through visits

19  with lawmakers.  The same would be true of we've

20  talked to election officials who we felt they need

21  to be both educated on the -- on the issues and who

22  would hopefully lobby for avoiding BMDs and

23  promoting effective audits.

24          You know, other -- other activities would

25  have included educating members on the problems with

30(b)(6) Marilyn Marks                      March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 159

1    the BMDs, and not only BMDs but necessity for

2    audits.

3              Let's see.  I'm going back to the question

4    to make sure that I'm remembering all the things

5    you're asking about.

6              Okay.  So we would have done lobbying, we

7    would have done education, we would have also

8    participated in generating -- crafting ourself

9    proposed rules that we have sent to the secretary --

10   excuse me, to the State Election Board around some

11   of these topics.

12             Oh, another thing that we've done, we

13   participated in the SAFE Commission meetings.  We

14   went to almost all of the SAFE Commission meetings

15   to try to persuade the decision makers there, which

16   did not just include lawmakers but election

17   officials that the BMDs should not be required --

18   should not be accepted, and there should be

19   hand-marked paper ballots and audits, and we've also

20   talked to a variety of county election officials.  I

21   may have already covered that.  But there would have

22   been e-mails as well as personal talks to election

23   officials in the counties about these topics.

24        Q    Thank you.

25        A    Now, there could be some other -- some

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 161

1   would be doing fundraising year in and year out

2   regardless of efforts of what we were doing, but,

3   yes, it's taken a lot of resources to get this far

4   with this litigation.

5        Q    And CGG has used its involvement in the

6   Curling case to help raise money, correct?

7        A    Yes, uh-huh, in showing the need for what

8   we were asking donors to give, certainly.

9             (Exhibit Number 19 was marked for

10  identification.)

11  BY MR. TYSON:

12       Q    Show you what we marked as Exhibit 19.

13  This is another e-mail produced to us dated August

14  20th, 2020.

15            Do you see that?

16       A    I do.

17       Q    And it opens with:  Thanks for your

18  generous donation to the Coalition.  We have great

19  progress to report.

20            Could you take a minute and look, is this

21  an update sent to donors, or do you know to whom

22  this e-mail was sent?

23       A    I assume it was sent to donors.

24       Q    Okay.  And in this e-mail there's a

25  request to consider making a donation today to help

Page 162

1    fund the efforts in the Curling case, right?

2        A    Yes.  Certainly not limited to that, but

3    yes.

4        Q    Let me -- there's another exhibit we'll

5    mark as Number 20.

6            (Exhibit Number 20 was marked for

7    identification.)

8    BY MR. TYSON:

9        Q    This is another e-mail produced to us.  I

10   believe it's September 13th, 2020.

11           Do you see that?

12       A    I do.

13       Q    And it says, Dear friends of Coalition for

14   Good Governance.  Who does that constitute, do you

15   know?

16       A    I don't.  My guess is what we did is we

17   expanded beyond people who had donated in the past,

18   and I'm guessing it would be -- I don't remember

19   right now, but I'm guessing it would be people on

20   our mailing list, other mailing lists we may have,

21   we probably even sent to legislators, et cetera.

22           And when we say "friends," that was just a

23   general category of having a friendly opening to --

24   in the salutation.

25       Q    What I want to ask here, there's an ask

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 163

1    here:  Can you make a contribution now to help with

2    attorneys' fees and experts' work.

3              You see that?

4       A    I do.

5       Q    And so CGG is asking for money to help pay

6    for attorneys' fees and experts' work, right?

7       A    As we always do, yes.

8       Q    And then you make the reference:  Can we

9    count on you to support the essential battle for

10   simple, secure, and defensible elections?

11             Do you see that?

12      A    Yes.

13      Q    And that battle for simple, secure, and

14   defensible elections is part of the work that CGG

15   undertakes, right?

16      A    It is part of the work, yes.

17      Q    So let me -- let's go back to the website

18   here.  We'll mark as Exhibit 21, this is the

19   coalitionforgoodgovernance.org/donate.

20             Do you see that?

21             (Exhibit Number 21 was marked for

22   identification.)

23      A    I do.

24   BY MR. TYSON:

25      Q    And is this the donate page that you would

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 170

1    Twitter account.

2         A    Okay.  I'm not remembering all this off

3    the top of my head without a little more.

4    BY MR. TYSON:

5         Q    And maybe I can short-circuit a little

6    bit.

7         A    I'm not saying I didn't do it.  I just

8    need to remember what this is about.

9         Q    So my only question relates to these last

10   few tweets in this sequence:  We at Coalition Good

11   Gov warned of this problem in 2018, 2019, and

12   continue our federal lawsuit (Curling v.

13   Raffensperger) to seek auditable elections-no

14   hackable touchscreens.  Georgia should use

15   hand-marked ballots that cannot be manipulated.

16   Please help us, and there's a link to something

17   that's bit.ly/CGGDonate.

18              You see that?

19        A    I do.

20        Q    And so this is a request for a donation to

21   the Coalition, correct?

22        A    That's correct, yes.

23        Q    What I want to ask about is an individual

24   with the name @strategyPhD replies and says:  I just

25   donated some cash for this excellent work that

Page 171

1    you-all are doing.  I know it's not a lot, but every

2    20 bucks here or there will make a difference.  Keep

3    up the democracy-saving work.

4          Then you reply:  Thank you so much.  We

5    know how to stretch a dollar and put it to critical

6    use.  We have no overhead, and all donations go for

7    direct costs of litigation.

8          Is that a correct statement of how CGG

9    uses its resources?

10    A     It is not technically correct.  Right now

11    the vast majority of the resources that we get in

12    are having to go to support the litigation, but

13    literally we have a tight -- when I say we have no

14    overhead, overhead in the way most people think of

15    overhead, offices, paid -- salary, you know, most of

16    the work our interns are doing certainly is for

17    litigation support.

18          And so my point was here that the vast

19    majority of resources are being directed to

20    litigation support, not that we don't spend a dime

21    on something like an accounting -- like accounting

22    fees.

23    Q     I'm going to mark what I marked as 25.

24          (Exhibit Number 25 was marked for

25    identification.)

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 174

1    the Curling case as a reason to donate to the

2    organization?

3              MR. MCGUIRE:  Object to form.

4         A    There are so many parts of that sentence.

5    Had success.  Sometimes I think that, actually, we

6    haven't had success in raising money compared to

7    what we need.

8              So have we raised money because people

9    support the litigation, yes.  Have we raised money

10   because they support more generally what we do, yes.

11   Have we raised money because they support our

12   education efforts, the non-litigation efforts, the

13   research efforts, yes, that too.  But people don't

14   send us a check saying, you know, 30 percent of this

15   is for litigation, and 40 percent of it is for

16   education.

17   BY MR. TYSON:

18        Q    Let me go back to Exhibit 8.  This is page

19   17 of the schedule A on the 2019 990.

20        A    Yes.

21        Q    You'd agree with me that from 2016 through

22   2019 support for CGG went up every year, right?

23        A    During that period, but -- yes.

24        Q    Curling was filed in 2017, correct?

25        A    Correct.  I was just -- I was just

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 180

1    nature of membership in the organization, including

2    how individuals become members, any obligations of

3    members, and any benefits offered by the

4    organization to its members.  And you are the

5    designee for topic 9, correct?

6         A    I am.

7         Q    And did you review any documents to get

8    ready for this particular topic?

9         A    No, I did not.

10        Q    Did you speak to anyone affiliated with

11   CGG to prepare for this particular topic?

12        A    Jeanne Dufort and I might have talked

13   about this topic.  I believe we did.

14        Q    Can you think of anybody else besides

15   Ms. Dufort?

16        A    No, not that I would have talked to about

17   this topic.

18        Q    What I want to do is start back to the

19   third amended complaint, which is Exhibit Number 3.

20        A    Mr. Tyson, that would be in addition to

21   counsel.  Okay?

22        Q    Certainly.  And I apologize, I don't

23   definitely want to discuss theories with counsel.

24             I want to ask you in paragraph 19 of the

25   third amended complaint, the Coalition says:

30(b)(6) Marilyn Marks                     March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 181

1    Individuals become members of Coalition by providing

2    their contact information and indicating a desire to

3    associate with the organization.

4            Is that still an accurate explanation of

5    how an individual becomes a member of the Coalition?

6        A    It is generally, but it shouldn't be

7    thought of as some kind of precise universal form of

8    how people associate with the organization.  Many

9    times it's a phone call to me saying, hey, I want to

10   be part of what you're doing and count me in.  It's

11   not like there's some form that they fill out for

12   contact information.  And so, you know, our members

13   come to us in any variety of rather informal means.

14       Q    So if someone called you and said, I want

15   to be part of what you're doing, would you consider

16   that -- is that person then a member of CGG from

17   that point?

18       A    Depending on how they express it, yes.

19   Then what I would do is say, hey, Mary Eberle, you

20   know, put them on our mailing list, and here's who

21   they are.

22       Q    I'm not -- I want to be clear I'm not

23   asking you for this, but does CGG maintain a list of

24   its members?

25       A    I will have to say that our list

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 182

1    maintenance has kind of gone by way of many of our

2    other administrative activities.  It is -- no, we --

3    we do not have a current list.  The list that we

4    have are -- it's outdated.  I know it has deceased

5    people on it.  It hasn't been updated in quite a

6    while.

7           Q    Okay.  And so how would CGG go about then

8    right now determining if someone is a member or not?

9           A    If it were important, as I heard one

10   person express, hey, being part of CGG is kind of

11   like -- it's a lot like being a member of the

12   Libertarian Party or Republican Party or Democratic

13   Party, there are no real requirements to, you know,

14   you've got to pay fees.  No, there are no fees.

15   And, you know, people -- people come and go as they

16   may favor what we're doing or get irritated with

17   what we're doing, and so there is not some kind of

18   strict you're in or you're out.

19           For purposes of this litigation when it is

20   necessary to demonstrate that somebody really is an

21   active member of the organization, we make sure that

22   that is clear, and we put it in declarations, et

23   cetera, but other than that, we do not have rigid

24   requirements.

25           And one reason we don't need to do that is

Page 183

1  because there are no dues that go along with it.

2  Say, like, NAACP has dues requirements.  We don't

3  have that.

4       Q    Is there any affirmative obligation on the

5  part of anyone to stay a member of CGG?

6       A    Certainly not.

7       Q    In paragraph 19 you say that members

8  receive informational communications from Coalition.

9  Does the Coalition or CGG consider everyone who

10  receives informational communications from them to

11  be a member?

12       A    No.  No.

13       Q    Does CGG have a separate list for

14  informational communications for members and

15  non-members?

16       A    That's not really the way that we would --

17  we have multiple different, for example, e-mail

18  lists, and so we don't divide it up into members,

19  non-members.

20       Q    And so the various e-mail lists, there's

21  no members e-mail lists out there, correct?

22       A    There is an e-mail list that we -- that

23  would include all of the members, but it also

24  includes other people who we -- who would kind of

25  fall in that category of friends and people who

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 184

1   might be potential members, but it's -- I don't

2   remember exactly what we call that e-mail list.

3        Q    But you couldn't distinguish on that

4   e-mail list between someone who's a member and

5   someone who's a friend essentially?

6        A    Or somebody who -- or even somebody who

7   has said, I don't want to have anything to do with

8   you guys anymore.  No, there's not -- on that e-mail

9   list there would not be a way to determine that.

10       Q    When you say "determine that," you're

11   referring to there's no way to --

12       A    Determine who would just say, oh, this guy

13   told us to get lost, and he's not a member anymore.

14       Q    Got it.  No way to distinguish members and

15   non-members on that --

16       A    Not on that e-mail, that's correct.

17            MR. MCGUIRE:  Marilyn, I'm just going to

18   ask you let him finish his questions and don't talk

19   over him.

20       A    Sorry.  Apologize.

21            MR. MCGUIRE:  Thanks.

22            MR. TYSON:  Thank you, Rob.

23   BY MR. TYSON:

24       Q    So I want to ask you next, you say:

25   Members can benefit from Coalition's facilitation of

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 185

1   members' individual participation in civic

2   activities that are germane to the organization's

3   purpose, such as poll watching, auditing election

4   results, and publishing opinion pieces.

5          Do you see that?

6      A   I do.

7      Q   And can non-members also benefit from

8   Coalition's facilitation of participation in civic

9   activities that you listed here?

10     A   Of course we believe everyone could

11  benefit from that work.

12     Q   And can -- referring to this last

13  sentence, can non-members utilize Coalition as a

14  resource to answer a wide range of questions about

15  voting rights, voting processes, open meetings law,

16  public records law, petition process- -- recalls,

17  petition processes, election legislation, and how to

18  challenge election issues they encountered?

19     A   Certainly, you know, not everybody has to

20  be a member who we talk to, and so, yeah, we would

21  hope to be of service to people who we would hope to

22  recruit as members or whether it's press,

23  legislators may utilize Coalition in that way as

24  examples.

25     Q   So the categories alleged in the last

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 187

1    would -- we would need is for you to be willing to

2    testify as to what happened and to be a member of

3    our organization.  There are no membership fees or

4    anything like that.

5            Do you see that?

6        A    Yes.

7        Q    And is that an accurate statement of, as

8    we've been discussing, how someone becomes a member?

9            MR. MCGUIRE:  Object to form.

10       A    No, we don't ask people to come testify in

11   federal court to become a member.

12   BY MR. TYSON:

13       Q    But it is correct that there are no

14   membership fees or anything like that to be a member

15   of CGG, correct?

16       A    There are no membership fees, and what I

17   was just generally and informally saying here is you

18   don't have to write a check to be part of CGG.

19       Q    And is Mr. Blosser currently a member of

20   CGG?

21       A    We have not communicated with him in a

22   while.  I believe that he may have moved out of

23   state and haven't heard from him in a while.

24       Q    So today you don't know whether

25   Mr. Blosser is a member or not?

30(b)(6) Marilyn Marks        March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 188

1      A    You know, there's no reason to think he's

2  not a member.  I'm just trying to say that I haven't

3  had any recent communication with him.  He may be

4  back in Georgia for -- because I know that was his

5  intention to return, but we just haven't heard from

6  him much.

7      Q    He wasn't a member when this lawsuit was

8  filed, correct?

9      A    No, not -- I think that is -- that's

10  correct, he was not.

11      Q    Let me ask you next what I've marked as

12  Exhibit 27.  These are the Coalition Plaintiffs'

13  responses to interrogatory -- supplemental response

14  to interrogatory number 12.

15          (Exhibit Number 27 was marked for

16  identification.)

17  BY MR. TYSON:

18      Q    Do you see that?

19      A    Yes.

20      Q    And do you recall did you verify these

21  interrogatories, or do you know?

22      A    I don't think that I have verified the

23  interrogatories.

24      Q    Okay.  The interrogatory asked to identify

25  all members of the Coalition for Good Governance

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 191

1        Q     Interrogatory number 13, the Coalition was

2   asked to identify the responsibilities or

3   obligations entailed in being a member of Coalition

4   for Good Governance and any benefits conferred by

5   such membership.

6              Do you see that?

7        A     I do.

8        Q     And you give an answer -- Coalition gives

9   some answers here.  Does every member of the

10  Coalition for Good Governance have to work together

11  to promote the goals of the organization?

12       A     No.

13       Q     Does --

14       A     It's not meant -- that was not meant to be

15  an obligation.

16       Q     Okay.

17       A     It just meant to be basically about the

18  spirit and the benefits of being a member, not an

19  obligation of a member.

20       Q     Okay.  Does CGG provide voter education

21  for individuals who contact it who are not members?

22       A     Not every person, but yes, many people we

23  do.

24       Q     Okay.  Does CGG provide non-members with

25  poll watcher training?

Page 199

1      Q    In referring to the documents you filed in

2   the case, is CGG relying on the impact on all

3   Georgia voters for determining there was an impact

4   on its members?

5      A    No.

6      Q    Okay.  What specifically -- how

7   specifically have CGG members been impacted by the

8   practices challenged in this action?

9      A    Well, I think you -- we need to talk about

10  each individual that you're referring to here

11  because there's not a one-size-fits-all type of

12  injury.

13     Q    Okay.  Well, let's go to Exhibit 27 then.

14  How has Mr. Blosser been impacted by the practices

15  challenged in this action?

16     A    So if I recall Mr. Blosser's situation, it

17  was that he attempted to vote in the 2017

18  Congressional District 6 election, and when he

19  arrived at his polling place, even though it was the

20  same polling place, and he was voting from the same

21  address as he had been for years, the pollbook

22  showed that he was not an eligible elector, and he

23  was not permitted to vote even by provisional

24  ballot.  He was turned away even though he was an

25  eligible registered elector who had not previously

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 200

1   voted, and it appeared to be the so-called software

2   glitch in the Express pollbooks that caused

3   Mr. Blosser not to be able to vote, is my

4   understanding.

5          Q      What is the impact on Ms. Clark in

6   Gwinnett County?

7          A      The -- I can name at least one instance,

8   but I would expect that there are more, and that the

9   one I'm remembering is that she went to vote, and

10  there were problems again with the ExpressPoll units

11  where she was told that, no, you are not registered

12  here, you're supposed to be at a different polling

13  location.  And she argued with them for quite a long

14  time.  They kept saying no, no, no, you have to go

15  to a different polling location.  She knew that she

16  did not belong at a different polling location.

17         She spent an extraordinary amount of time

18  and energy talking to person after person, calling

19  the Gwinnett office, and eventually for some reason

20  they claimed, well, wow, your name just popped up

21  now in the book, and now you can vote.

22         But, of course, we never knew what caused

23  the name to just now -- and I'm saying in quotes

24  just now pop up in the book, and that she was denied

25  time after time after time the ability to vote at

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 206

1   feasible, possible, if they get their mail ballots

2   on time.  For most of them they believe that mail

3   ballots are a more secure form of voting.

4        Q    And CGG advises its members to vote using

5   absentee by mail ballots, correct?

6        A    Generally, yes.  It may not fit everyone's

7   particular circumstance, but yes, it is preferable.

8   We do not like mail ballot voting generally, and, of

9   course, I'm over-generalizing here.  Generally we

10  don't like mail ballot voting, but we believe it is,

11  with all its difficulties, preferable to voting on

12  BMDs.

13       Q    What is the injury that Ms. Forney

14  suffered?

15       A    I'm not necessarily referring to a

16  specific declaration.  I'm -- because I didn't

17  review that declaration, but I can tell you

18  generally that she is highly upset about the lack of

19  privacy in voting.

20            She is a prominent physician in town and

21  has often run into her patients in polling places,

22  and she -- she wants her privacy as to who she's

23  voting for.  And generally she tries to vote by

24  absentee mail ballot but hasn't always been able to

25  get the ballot back in time, get the request in in

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 207

1    time.

2              So I know that one of her -- one of her

3    concerns is privacy, and I also think that the --

4    just the hassle of -- and particularly in Fulton

5    County of trying to get a mail ballot and get it on

6    time has been an injury that she has experienced.

7              There may be others that I'm not

8    remembering from her declaration right now.  I did

9    not review all these declarations before -- before

10   this -- before this deposition today.

11       Q    And I believe you indicated Ms. Walker did

12   not submit a declaration; is that right?

13       A    That is correct.

14       Q    And what is Ms. Walker's injury?

15       A    It would also be ballot privacy or ballot

16   secrecy.  And she has voted on BMD and complained to

17   me about the lack of privacy in the BMD.

18             Also, you know, she knows about the

19   security concerns and is concerned about whether or

20   not her vote is counting properly.

21       Q    Ms. Walker is also indicated as a member

22   from August of 2014.

23       A    Yes.

24       Q    Did she join the organization at the time

25   it was still the Rocky Mountain -- sorry, I've lost

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 231

1      Q    Does CGG know of any person in the state
2   of Georgia who was not able to vote as a result of
3   the State's use of the Dominion BMDs?
4      A     Dominion BMDs.  Because of the State's use
5   of Dominion BMDs.  If we are limiting the question
6   to because of the State's use of BMDs, no, I do not
7   know anyone who was unable to vote for that reason.
8      Q    Does CGG know of any person in the state
9   of Georgia who was not able to vote because of the
10  lack of audits CGG claims are necessary?
11     A    We don't claim that audits are necessary
12  in order to be eligible to vote, but we don't know
13  anybody who was turned away from being able to vote
14  because of inadequate audits.
15     Q    Does CGG have knowledge of any voter whose
16  votes -- sorry, I just asked that question.
17          Let's move to -- actually, one more on
18  this one.  Does CGG have knowledge of any voter in
19  the state of Georgia who was not able to vote as a
20  result of the use of Dominion scanners?
21          MR. MCGUIRE:  I'm going to object to form
22  because it's, I think, vague, ambiguous.
23     A    That question doesn't really sound too
24  logical to me.  I don't know how it could be that a
25  scanner would keep someone from voting, but no, I

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 234

1          Q     Is it your custom -- I'm sorry.

2          A     -- to see what contest they were eligible

3     to vote and were not able to vote because of casting

4     a provisional ballot because of a problem with the

5     system.

6          Q     Is it your testimony that the Poll Pads

7     are Dominion voting equipment?

8          A     Yes.

9          Q     Are they manufactured by Dominion?

10         A     I don't think Dominion manufactures any of

11    their own equipment, but they are certainly

12    encompassed in our definition of the Dominion Voting

13    System, the Poll Pads are.

14         Q     Then let me just make sure we're all on

15    the same page here.  So does CGG have any knowledge

16    of the identity of any voter whose vote was not

17    counted as a result of the use of Dominion BMDs,

18    Dominion precinct scanners and Dominion central

19    count scanners, and the Dominion electronic

20    management system?

21         A     I'm thinking about that for just a moment.

22    In terms of specific identity for particular ballots

23    that we know were not counted, while we can go back

24    to the home precincts, I don't think we know of any

25    particular voter whose ballot we can identify -- we

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 235

1    wouldn't -- we wouldn't go so far as to identify if
2    we could -- that was -- that was not counted.
3              In fact, I have heard some people talk
4    about that they believe that their write-in votes
5    for qualified candidates were not counted, and we
6    have actually hesitated to go try to do the research
7    to find out, which we probably -- we might be able
8    to do, but we've hesitated to do it because we felt
9    like that was too much intrusion on ballot secrecy.
10       Q    We've been going on for a little while,
11   Ms. Marks.  Do you want to take another quick break?
12       A    If you wish.  How much time have we been
13   on the record?
14              MR. TYSON:  We can go off the record.
15              THE VIDEOGRAPHER:  The time is 5:30 p.m.
16   We're off the record.
17              (Recess 5:30-5:36 p.m.)
18              THE VIDEOGRAPHER:  The time is 5:36 p.m.
19   We're on the record.
20   BY MR. TYSON:
21       Q    Thank you, Ms. Marks.  I have consulted
22   over the break here to try to streamline this a
23   little bit and make this a little bit easier to skip
24   over a few things that we've pretty much covered, so
25   I'm going to skip ahead to topic number 19.

Page 239

1    identification.)

2    BY MR. TYSON:

3        Q    Do you see -- this is another Twitter

4    thread from your MarilynRMarks1 account?

5        A    Yes.  Does this have a date on it?

6        Q    This is January 1, 2021.

7        A    Okay.  All right.

8        Q    And what I'm trying to get to is someone

9    responded and said South Carolina and Kentucky are

10   the states that should be audited, and you said:

11   South Carolina is like Georgia.  It uses unauditable

12   BMD touchscreen machines.  We can never ever know

13   who won in South Carolina or Georgia because of the

14   use of those machines in the polling places.

15       A    Correct.

16       Q    You see that?

17       A    I do.

18       Q    Do you agree with that statement?

19       A    I do.

20       Q    Is CGG's contention that we can never

21   know -- is it -- sorry, let me start over again.

22            Is it CGG's contention that we cannot know

23   who won in Georgia because of the use of Dominion

24   BMDs in the polling places?

25       A    Yes.  And when we say "who won," what I

Page 242

1    many of the records are missing, but at least we do

2    have a record, and that could be determined.

3          Q    So just -- just so I'm clear, that was a

4    long answer, I want to make sure I understand CGG's

5    contention about this.

6          A    Okay.  All right.

7          Q    If an individual relying on CGG's reasons

8    for questioning elections conducted on BMDs

9    questioned the outcome of an election, you would

10   agree that person had a reasonable basis to do so,

11   right?

12         A    I'm not going to tell you that as a

13   blanket proposition, no.  Let's say that we had an

14   election that used, I don't know, 15 percent BMDs

15   and most people voted by mail and somebody

16   challenged the election, I would not make a blanket

17   statement that there was a reasonable basis to

18   challenge.  It certainly depends on the

19   circumstances.  You have to be really -- you have to

20   look at all the facts before we can say there was a

21   reasonable basis for challenging.

22              I mean, you mentioned Garland Favorito.

23   Some of the wild claims that he is making,

24   absolutely there's no reasonable basis in it, and,

25   in fact, there are a bunch of lies coming out.

30(b)(6) Marilyn Marks          March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 243

1   That's -- no, that's not reasonable.

2        Q    Does CGG question the outcome of the

3   November 2020 presidential election?

4        A    No, I don't think you would have ever seen

5   us question that.  I think we have been consistent

6   before, during, and after this election, and before

7   the election we said, just as with all BMD

8   elections, we will never be able to know the

9   outcome.

10           We've said that -- we've said that since

11   before the BMDs were ever even purchased that

12   because of the design we would never be able to

13   assure ourselves of the outcome of any election

14   primarily conducted with BMDs.  We would say the

15   same, of course, of the November 2020 election and

16   all before and after elections, and -- oops, wait a

17   minute.  I messed up my screen just now.  Hold on.

18   Okay.  I'm back.

19           But as it -- and as I say, we've been

20   quite consistent.  We have huge objections to the

21   massive errors in the audit and the massive

22   tabulation errors, but still, given the work we've

23   done today, and it's not definitive, we have not

24   seen anything that, based on Georgia's method of

25   tabulating votes, that would change the outcome.

Page 246

1   results reflect the will of the voters, absolutely.

2   BY MR. TYSON:

3       Q    And so is it CGG's contention that voters

4   in Georgia have a reasonable basis to question each

5   election conducted in Georgia as long as we use

6   Dominion BMDs?

7       A    So long as Dominion BMDs are the primary

8   source of votes cast, yes.

9       Q    Let me ask you about some additional -- I

10  want to turn to the Coalition's request -- responses

11  to our request for admission about some of the

12  specific contentions.  Let me find that real quick.

13  I'm sorry.

14      A    Bryan, may I go back and just add

15  something to my last answer about trying to address

16  your question about the presidential contest,

17  presidential --

18      Q    Uh-huh.

19      A    Okay.  What I'm trying to say is that

20  while you're asking about the presidential contest,

21  and we have seen a whole lot of errors in the entire

22  November election from the top of the ballot to tax

23  commissioner at the bottom, the system has so many

24  flaws in its operation right now that it is

25  reasonable to question any election contest on the

30(b)(6) Marilyn Marks                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 278

1                          CERTIFICATE
2       STATE OF GEORGIA:
        COUNTY OF FULTON:
3
4                I hereby certify that the foregoing
        transcript was taken down, as stated in the caption,
5       and the colloquies, questions and answers were
        reduced to typewriting under my direction; that the
6       transcript is a true and correct record of the
        evidence given upon said proceeding.
7                I further certify that I am not a relative
        or employee or attorney of any party, nor am I
8       financially interested in the outcome of this
        action.
9                I have no relationship of interest in this
        matter which would disqualify me from maintaining my
10      obligation of impartiality in compliance with the
        Code of Professional Ethics.
11               I have no direct contract with any party
        in this action and my compensation is based solely
12      on the terms of my subcontractor agreement.
                 Nothing in the arrangements made for this
13      proceeding impacts my absolute commitment to serve
        all parties as an impartial officer of the court.
14
15               This the 4th day of April, 2022.
16
17                        Robyn Bosworth
18      _____
19        ROBYN BOSWORTH, RPR, CRR, CRC, CCR-B-2138
20
21
22
23
24
25