**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

|  |  |
|---|---|
| **DONNA CURLING, ET AL.** ) | |
| ) | |
| **Plaintiffs,** ) | **Civil Action** |
| ) | **No. 1:17-cv-02989-AT** |
| **v.** ) | |
| ) | |
| **BRIAN KEMP, ET AL.** ) | |
| ) | |
| **Defendants.** ) | |

**THIRD AMENDED COMPLAINT OF PLAINTIFFS COALITION FOR
GOOD GOVERNANCE, LAURA DIGGES, WILLIAM DIGGES III,
<u>RICARDO DAVIS, AND MEGAN MISSETT</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................ ii

I.   INTRODUCTION .............................................................. 1

II.  PARTIES ..................................................................... 10

    A.   PLAINTIFFS ........................................................... 10

        1.   Plaintiff Coalition for Good Governance .................... 10

        2.   Plaintiff Individuals Who Are Members of Coalition  (the "Member Plaintiffs") ........................................................ 12

        3.   Former Plaintiff Individuals. ................................. 13

        4.   Plaintiff Individuals Who Are Not Now Members of Coalition (the "Non-Member Plaintiffs") ................................... 13

    B.   DEFENDANTS ......................................................... 14

        1.   Defendant Secretary. .......................................... 14

        2.   Defendant State Board Members. ............................. 15

        3.   Defendants Fulton Board Members. .......................... 17

        4.   All Other Previously Named Defendants Are Now Dismissed Without Prejudice. ................................................ 18

III. JURISDICTION AND VENUE ................................................ 18

IV.  LEGAL FRAMEWORK ...................................................... 19

A. The United States Constitution ...................................................19

B. The Georgia Constitution .........................................................20

C. The Georgia Election Code .......................................................20

D. Georgia's Regulation of Elections .............................................24

V. GENERAL ALLEGATIONS ............................................................25

A. How Georgia's Voting System Works.........................................25

B. AccuVote DREs Are Insecure and Vulnerable to Malicious Hacking.......29

C. AccuVote DREs Fail to Provide Absolute Secrecy of the Ballot..............33

D. Security Breaches at KSU and CES Have Further Compromised Georgia's Voting System.................................................................34

VI. SPECIFIC ALLEGATIONS ..............................................................38

A. Conduct of All Defendants—Past and Threatened ....................................38

B. Conduct of Defendant Secretary—Past and Threatened..............................41

C. Conduct of Defendant State Board Members—Threatened ......................44

D. Conduct of Defendant Fulton Board Members—Past and Threatened. .....44

E. Standing of Plaintiff Coalition ...................................................50

1. Coalition Has Organizational Standing Derived from Past and Threatened Direct Injuries to Coalition. ...........................................50

2.  Coalition Has Associational Standing Derived from Past and Threatened Injuries to Coalition's Members. ......................................................................53

VII.  CLAIMS ...........................................................................................................62

COUNT I: FUNDAMENTAL RIGHT TO VOTE .............................................62

COUNT II:  EQUAL PROTECTION .................................................................65

PRAYER FOR RELIEF ..............................................................................................67

Case 1:17-cv-02989-AT   Document 226   Filed 06/13/18   Page 5 of 74

Plaintiffs Coalition for Good Governance ("**Coalition**"), Laura Digges,

William Digges, Ricardo Davis, and Megan Missett (the "**Coalition Plaintiffs**"),

for their Third Amended Complaint, allege as follows:

## I.    INTRODUCTION

1.      This Third Amended Complaint is being filed at a time when virtually

every American voter has come to understand that the nation's election

infrastructure is susceptible to malicious manipulation from local and foreign

threats. Yet, Georgia's election officials continue to defend the State's electronic

voting system that is demonstrably unreliable and insecure, and have repeatedly

refused to take administrative, regulatory or legislative action to address the

election security failures.

2.      This is a civil rights action for declaratory and injunctive relief

brought against Georgia elections officials who have adopted—and who require

Georgia voters to use, as a condition of being able to cast a ballot in their polling

places—the State's direct recording electronic voting machines ("**DREs**") as the

means of casting their ballot.  Because Georgia's DRE touchscreen voting

machines are insecure, lack a voter-verified paper audit capacity, fail to meet

minimum statutory requirements, and expose voters to being deprived of the ability

to cast a "secret ballot," Ga. Const. Art. II, § 1, ¶ 1, requiring voters to use those

machines violates the voters' constitutional rights to have their votes recorded in a fair, precise, verifiable, and anonymous manner, and to have their votes counted and reported in an accurate, auditable, legal, and transparent process.

3.     "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).  The secret ballot—"the hard-won right to vote one's conscience without fear of retaliation"—is a cornerstone of this right to freely vote for one's electoral choices. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 343 (1995).

4.     The Coalition Plaintiffs challenge Georgia's use of DREs in the May 2018 and November 2018 General Elections; in any Runoff or Special Elections and in any of the numerous other elections, including special elections and runoffs for vacancies, that will be conducted in Georgia during 2018 (collectively, the "**Relevant Upcoming Elections**").[1]  Without this Court's intervention, the flawed and legally deficient DRE voting units will be used to conduct these elections, causing the true results of these elections to be uncertain. The continued use of unreliable un-auditable voting machines has a deleterious impact on the

---

[1] *See* Georgia Secretary of State, *2018 Elections and Voter Registration Calendar*, http://sos.ga.gov/index.php/elections/2018_elections_and_voter_registration_calendar (last visited Apr. 2, 2018).

governance of the State and its jurisdictions, when voters have increasing reasons to lose confidence in the stated election results. Since the action was initially filed in Fulton County Superior Court on July 3, 2017, the State and its counties and municipalities have continued to conduct scores of regularly scheduled and special elections. For example, on November 7, 2017, WAGA reported on the results of over 400 races in North Georgia alone.[2] There have been at least 12 special state legislative races and 5 runoffs since this case was filed. In addition to the May primary election, a July special election and primary run-off election are scheduled prior to the November general election.

5.     The Coalition Plaintiffs seek to have the Relevant Upcoming Elections conducted using verifiable paper ballots. The paper ballots may be counted using Georgia's currently owned and certified optical scanning system or, alternatively, counted by hand. Both voting methods are feasible and authorized by Georgia's election statutes.

6.     The relief requested is especially critical since Plaintiff Coalition and its members have found the doors to Georgia's ballot counting rooms locked, leaving them unable to watch how Georgia's elections are conducted, despite the

---

[2] See Fox 5 News, *Results from more than 400 races across north Georgia*, http://www.fox5atlanta.com/news/georgia-heads-to-the-polls-tuesday-for-municipal-elections (last visited Apr. 4, 2018).

obligation of Georgia's election officials under O.C.G.A. § 21–2–406 to "perform their duties in public."

7.      By this Third Amended Complaint, the Coalition Plaintiffs seek to remedy Georgia's unreliable, insecure and unverifiable election methods. This Third Amended Complaint is filed in an environment of alarming national news concerning the vulnerability of our country's election infrastructure. Georgia is frequently reported in the media as being the most populous of only five (5) states in the country that continue to utilize unverifiable electronic voting statewide. Admonitions from authorities regarding the serious risks of paperless electronic voting machines are escalating as the 2018 mid-term elections approach. Meanwhile, those in Georgia with the political power to remedy the situation have done nothing.

8.      Locally, Atlanta residents recently have been reminded of the very real disruption that cyber-attacks on government computer systems can create as they are experiencing loss of some City of Atlanta services following a ransomware attack on March 22, 2018.  Atlanta city government is still reeling from the attack at the time of this filing. There is no rational reason to believe that the current voting system, run on outdated computers using outdated operating systems, could defend against such an attack in the 2018 elections.

9.     On March 20, 2018, the United States Senate Select Committee on

Intelligence issued initial recommendations on election security, including a

"minimum" standard of a voter-verified paper trail.[3] The recommendation to use

paper ballots with post-election audits echoed the nearly universal warnings of

voting system experts over the last fifteen years. National and local media reports

have repeatedly described officials' concerns of immediate cybersecurity risk of

undetected system compromises. It is universally acknowledged that voting

machines, tabulation computers, voter registration records, and ballot provisioning

systems are exposed to cybersecurity threats in most jurisdictions at unacceptable

levels.  Making the situation worse still, the use of an electronic voting system

without independent paper records of voter intent makes it all but impossible for

election officials to detect attacks when they have occurred. These factors render

our elections, particularly elections involving Georgia's un-auditable voting

system, increasingly attractive targets for foreign adversaries. Meanwhile, Georgia

---

[3] The Select Committee determined that, "States should rapidly replace outdated and vulnerable
voting systems.  At a minimum, any machine purchased going forward should have a voter-
verified paper trail and no WiFi capability."  U.S. Senate Select Committee on Intelligence,
*Russian Targeting Of Election Infrastructure During The 2016 Election*,
https://www.burr.senate.gov/imo/media/doc/One-
Pager%20Recs%20FINAL%20VERSION%203-20.pdf (last visited Apr. 1, 2018).

has demonstrated a conscious disregard for these threats and a lack of interest in solving the problem, impacting every voter in the State of Georgia.

10.    Despite the constant drum-beat of warnings coming from the federal government, technology experts, security experts, the media, and voters, Georgia's General Assembly closed its 2017–18 session on March 29, 2018, having specifically debated the issue in the proposed Senate Bill 403 ("**SB403**") but without ultimately enacting that bill or any other palliative measure.  Georgia's legislature thus has done ***nothing*** to improve an election infrastructure that is widely recognized as one of the least secure in the country.

11.    In August 2016, the State of Georgia experienced massive security breaches exposing critical vulnerabilities in its centralized election computer operations--weaknesses so pervasive as to expose every voting machine and tabulating program in the State to the risk of undetectable malware. Yet Georgia's General Assembly declined to act on voting system and election security issues during both the 2017 and the 2018 legislative sessions.

12.    While SB403 acknowledged some of the problems afflicting Georgia's voting system, the proposed legislation failed to address what is required to remedy the problem. Crucially, though its proponents called the bill a "paper ballot" bill, SB403 did ***not*** require hand-marked auditable paper ballots. Instead,

SB403 sought to authorize a new type of unverifiable electronic voting system technology that, while favored by Defendant Secretary of State Brian Kemp and the bill's sponsors, was roundly criticized by experts as an insecure, dangerously hackable, high-risk technology.

13.     Strangely, while SB403's provisions authorized limited post-election audits, state legislative races would have been exempted from required audits altogether.  The General Assembly demonstrated its clear preference for continuing use of unverifiable voting systems in its deliberations and ultimately failed to address the imminent threats to the electoral process looming with the 2018 mid-term elections.

14.     On March 23, 2018, during the legislative session, the U.S. Election Assistance Commission announced that, "Georgia would receive $10.3 million in federal grants from the recently signed fiscal 2018 government spending bill, combined with $515,000 in matching funds from the State" for the purpose of "upgrad[ing] its voting machines and mak[ing] other security improvements ahead of the upcoming elections."[4] Even with immediate funding available,

---

[4] Tamar Hallerman & Mark Niesse,  *Feds to give Georgia $10 million to upgrade outdated voting machines*, Atlanta Journal Constitution, 2018, https://www.myajc.com/news/state--regional-govt--politics/feds-give-georgia-million-upgrade-outdated-voting-machines/B8IbGwxNJxtPFloEXn4aIL/ (last visited Apr. 1, 2018).

lawmakers chose to do nothing to improve the State's election security. A simple joint resolution requesting that the State Election Board use its authority to dedicate a very small portion of such funding to further deploy the currently authorized and state-owned paper ballot systems would have signaled lawmakers' desire to implement a verifiable voting system, but the legislature decline to take even that modest step.

15.    Defendant State Election Board has known of the massive August 2016 security breaches and vulnerabilities of the election system for over a year, and since this action was filed in July 2017, has known of the specific allegations in this litigation concerning the failures of the election system.  Despite having the authority to require Georgia's elections to be conducted using paper ballots counted by optical scanners—widely considered the best practice by voting system experts—and despite having the equipment and software licenses necessary to do so, the State Board has taken no action to mandate the use of paper ballots to protect Georgia's elections. Instead, the State Board has maintained its Election Rule 183–1–12–.01 mandating touchscreen voting machines for in-person voting.

16.    As explained in this Complaint, and as will be demonstrated by the Coalition Plaintiffs, the State possesses not only the authority, but the equipment, software licenses and know-how to immediately transition to paper ballots. The

required optical scan equipment is already used for current mail-in paper-ballot processing. The security and reliability that would result from deploying the currently available paper-ballot system far outweighs the administrative inconvenience of converting to hand-marked paper ballots to be counted by existing equipment.

17.     The State of Georgia and its officials have the legal, moral, and ethical obligation to secure the State's electoral system.  Sadly—and inexplicably—they appear to lack the will to do so. When the political branches have failed to secure fundamental rights in our country, it has traditionally been the Courts that stepped in to do so.  In a free society, no right is more precious or important than the right to vote.  When the exercise of that right is corrupted, the integrity of the democratic process is corrupted, and the legitimacy of our government suffers as the inevitable consequence.  If the right to vote in this society is essential to the integrity of democratic self-governance, then our election processes warrant the most urgent judicial protection.  Plaintiffs seek the intervention of this Court because neither the State Board of Elections, the Secretary of State, nor the Georgia General Assembly appear willing to act to protect voters' rights to a secure and accurately counted election process.

## II.  PARTIES

### A.  PLAINTIFFS

#### 1.  Plaintiff Coalition for Good Governance

18.  Plaintiff COALITION FOR GOOD GOVERNANCE is a non-profit corporation organized and existing under the laws of the State of Colorado.

19.  Coalition is a membership organization, with a membership that consists of individuals residing in Georgia and across the United States. Individuals become members of Coalition by providing their contact information and indicating a desire to associate with the organization. Members donate money, contribute time, and share information and intelligence with the organization to the extent they are able and wish to do so. Members receive informational communications from Coalition and can benefit from Coalition's facilitation of members' individual participation in civic activities that are germane to the organization's purpose, such as poll watching, auditing election results, and publishing opinion pieces.   Members utilize Coalition as a resource to answer a wide range of questions about voting rights, voting processes, open meetings law, public records law, recalls, petition processes, election legislation, and how to challenge election issues they encounter.

20.     Coalition's purpose is to preserve and advance the constitutional liberties and individual rights of citizens, with an emphasis on preserving and protecting those private rights of its members that are exercised through public elections.

21.     Coalition serves its purpose in multiple ways, including by providing information and education to its members; by serving as a non-partisan educational and informational resource for the public, press, campaigns, candidates, and political parties; by monitoring nationwide developments in election law and technology; by providing speakers for events at educational institutions; by providing commentary from its leadership on election issues; by collaborating in voting rights and election integrity initiatives with other nonpartisan nonprofits and academics; by developing and sharing research and investigation of reported election problems with the press, public and other members of the election-integrity community; and by facilitating the engagement of members and prospective members as non-partisan participants in the electoral process through poll watching, attendance at public meetings, and other civic activities.

22.     Coalition, acting on its own behalf, has organizational standing to bring each of the claims for prospective relief stated herein.

23.     Coalition, acting on behalf of its members who are threatened with imminent injury-in-fact, including the Member Plaintiffs identified below, also has associational standing to bring the claims for prospective relief stated herein.

### 2. Plaintiff Individuals Who Are Members of Coalition (the "Member Plaintiffs")

24.     Plaintiff LAURA DIGGES ("**Ms. Digges**") was a Plaintiff when this action was initially filed in Fulton County Superior Court on July 3, 2017.  (ECF No. 1-2.)  Ms. Digges has been a member of Coalition since June 2017. Ms. Digges is an elector of the State of Georgia and a resident of Cobb County. Ms. Digges intends to vote in each of the Relevant Upcoming Elections in Cobb County.

25.     Plaintiff WILLIAM DIGGES III ("**Mr. Digges**") was a Plaintiff when this action was initially filed in Fulton County Superior Court on July 3, 2017. (ECF No. 1-2.)  Mr. Digges has been a member of Coalition since June 2017.  Mr. Digges is an elector of the State of Georgia and a resident of Cobb County. Mr. Digges intends to vote in each of the Relevant Upcoming Elections in Cobb County.

26.     Plaintiff RICARDO DAVIS ("**Davis**") was a Plaintiff when this action was initially filed in Fulton County Superior Court on July 3, 2017.  (ECF

12

No. 1-2.)  Davis has been a member of Coalition since May 2017. Davis is an

elector of the State of Georgia and a resident of Cherokee County.  Davis intends

to vote in each of the Relevant Upcoming Elections in Cherokee County.

27.     Plaintiff MEGAN MISSET ("**Missett**") has been a member of

Coalition since March 2018. Missett is an elector of the State of Georgia and a

resident of Fulton County. Missett intends to vote in each of the Relevant

Upcoming Elections in Fulton County.

### 3.     Former Plaintiff Individuals.

28.     Former Plaintiff EDWARD CURTIS TERRY ("**Terry**") was a

Plaintiff when the Second Amended Complaint in this action was filed on

September 15, 2017, (ECF No. 70, at 11–12, ¶ 31), Terry's individual claims were

dismissed on March, 20, 2018, pursuant to Local Rule 41.3A(2) because Terry did

not comply with an Order directing him to apprise this Court of his mailing

address.  (ECF No. 147.)

### 4.     Plaintiff Individuals Who Are Not Now Members of Coalition (the "Non-Member Plaintiffs")

29.     Plaintiff DONNA CURLING ("**Curling**") was a Plaintiff and member

of Coalition when this action was initially filed in Fulton County Superior Court on

July 3, 2017.  (ECF No. 1-2, at 6–7, ¶¶ 12, 13, 15.)  Curling was a member of

Coalition between May 2017 and December 2017. Curling's claims are not amended by this Third Amended Complaint.

30. Plaintiff DONNA PRICE ("**Price**") was a Plaintiff and member of Coalition when this action was initially filed in Fulton County Superior Court on July 3, 2017. (ECF No. 1-2, at 7–8, ¶ 12, 15–16.) Price was a member of Coalition between May 2017 and December 2017. Price's claims are not amended by this Third Amended Complaint.

31. Plaintiff JEFFREY SCHOENBERG ("**Schoenberg**") was a Plaintiff when this action was initially filed in Fulton County Superior Court on July 3, 2017. (ECF No. 1-2, at 7–9, ¶ 12, 15, 17.) Schoenberg's claims are not amended by this Third Amended Complaint.

## B. DEFENDANTS

### 1. Defendant Secretary.

32. Defendant BRIAN P. KEMP is sued for prospective declaratory and injunctive relief in his official capacities as the Secretary of State of Georgia and as Chairperson of the State Election Board when this action was initially filed in Fulton County Superior Court on July 3, 2017. Together with any successors in office automatically substituted for him as a Defendant by operation of Fed. R.

14

Civ. P. 25(d), Defendant KEMP is hereinafter referred to as "**Kemp**" or the
"**Secretary**."

33.     In his official and individual capacity, the Secretary is responsible for
the orderly and accurate administration of Georgia's electoral processes. The
Secretary's legal duties, among others, include the following: (i) to approve or
discontinue the use of Georgia's voting systems and to conduct any reexamination
of Georgia's voting systems, upon request or at his own discretion, O.C.G.A.
§§ 21–2–379.2(a), –379.2(b), –368(a), –368(b); (ii) to develop, program, build, and
review ballots for use by counties and municipalities on direct recording electronic
(DRE) voting systems in use in the State, O.C.G.A. § 21-2-50(a)(15); and (iii) to
serve as Chair of the State Election Board. O.C.G.A. § 21-2-30(d).

34.     The Secretary is also required by law to determine the voting
equipment that is to be used to cast and count the votes in all county, state, and
federal elections in Georgia and to provide the same type of equipment to all
counties in the State on behalf of the State of Georgia.  O.C.G.A. § 21-2-300.

### 2.     Defendant State Board Members.

35.     Together with the Secretary, Defendants DAVID J. WORLEY,
REBECCA N. SULLIVAN, RALPH F. "RUSTY" SIMPSON, and SETH HARP,
are sued for prospective declaratory and injunctive relief in their official capacities

as members of Georgia's State Election Board (the "**State Board**") when this action was initially filed in Fulton County Superior Court on July 3, 2017. Together with any successors in office automatically substituted for any of them as Defendants by operation of Fed. R. Civ. P. 25(d), these Defendants are hereinafter collectively referred to as the "**State Board Members**."

36.     Acting through the State Board, the State Board Members collectively are to discharge the following duties of the State Board, among others: (1) to promulgate rules and regulations to obtain uniformity in election practices, as well as the legality and purity of all primaries and elections, O.C.G.A. § 21-2-31(1); (2) to formulate, adopt, and promulgate such rules and regulations, consistent with law, as will be conducive to the fair, legal, and orderly conduct of primaries and elections, O.C.G.A. § 21-2-31(2); (3) to investigate the administration of primary and election laws and frauds and irregularities in elections and to report election law violations to the Attorney General or appropriate district attorney, O.C.G.A. § 21-2-31(5); and (4) to promulgate rules and regulations to define uniform and nondiscriminatory standards concerning what constitutes a vote and what will be counted as a vote for each category of voting system used in Georgia, O.C.G.A. § 21-2-31(7).

37. Acting through the State Board, the State Board Members collectively exercise the power vested in the State Board to enforce compliance with the Georgia Election Code and with the State Board's regulations. *See* O.C.G.A. §§ 21-2-33.1, -32.

### 3. Defendants Fulton Board Members.

38. Defendants MARY CAROLE COONEY, VERNETTA NURIDDIN, DAVID J. BURGE, STAN MATARAZZO, and AARON JOHNSON, are sued for prospective declaratory and injunctive relief in their official capacities as members of the Fulton County Board of Registration and Elections (the "**Fulton Board**") when this action was initially filed in Fulton County Superior Court on July 3, 2017. Together with any successors in office automatically substituted for any of them as Defendants by operation of Fed. R. Civ. P. 25(d), these Defendants are hereinafter collectively referred to as the "**Fulton Board Members**."

39. The Fulton Board was created by a local Act of the General Assembly. Georgia Law, 1989, Act 250. The Fulton Board has the authority to exercise the powers and duties of a county election superintendent with respect to conducting elections in Fulton County, *see* O.C.G.A. § 21–2–70 to –77. Duties of a county election superintendent include, among others, the following: (i) "To select and equip polling places for use in primaries and elections in accordance with [the

Georgia Election Code]," O.C.G.A. § 21–2–70(4); (ii) "To make and issue such rules, regulations, and instructions, consistent with law, including the rules and regulations promulgated by the State Election Board, as he or she may deem necessary for the guidance of poll officers, custodians, and electors in primaries and elections," O.C.G.A. § 21–2–70(7); (iii) "To conduct all elections in such manner as to guarantee the secrecy of the ballot and to perform such other duties as may be prescribed by law," O.C.G.A. § 21–2–70(13); and (iv) to determine whether to use paper ballots when the use of voting machines is not practicable, O.C.G.A. § 21–2–334.

### 4. All Other Previously Named Defendants Are Now Dismissed Without Prejudice.

40. With effect as of the date of this Court's Order granting Coalition's motion for leave to file this Third Amended Complaint as its operative complaint, Plaintiff Coalition voluntarily dismissed without prejudice its claims against any other Defendants previously named in this action.

## III. JURISDICTION AND VENUE

41. This action was initially filed in Fulton County Superior Court on July 3, 2017. (ECF No. 1-2, at 7–9, ¶ 12, 15, 17.)

42. The Secretary was served with the state-court Complaint on August 3, 2017. (ECF No. 1, at 4, ¶ 5.)

43.     On August 8, 2017, the Secretary and other Defendants removed this action to this Court pursuant to 28 U.S.C. § 1441 and § 1446. (ECF No. 1.)

44.     This Court has subject-matter jurisdiction over each of the claims raised in this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), § 1343 (jurisdiction over civil rights actions), § 1367 (supplemental jurisdiction), § 2201 (jurisdiction to grant declaratory relief) and § 2202 (jurisdiction to grant relief ancillary to declaratory judgment).

45.     Venue lies in the Northern District of Georgia pursuant to 28 U.S.C. § 1391(b) because multiple defendants reside in this judicial district and all defendants are residents of Georgia and a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this judicial district.

## IV.    LEGAL FRAMEWORK

### A.    The United States Constitution

46.     The United States Constitution provides: "The times, places and manner of holding elections for Senators and Representatives, shall be prescribed in each state by the legislature thereof…." U.S. Const. Art. I, § 4, cl. 1.

19

### B.     The Georgia Constitution

47.     The Georgia Constitution provides: "Elections by the people shall be by secret ballot and shall be conducted in accordance with procedures provided by law."  Ga. Const. Art. II, § 1, ¶ 1.

### C.     The Georgia Election Code

48.     The Georgia Election Code (the "**Code**") provides, in pertinent part: "All primaries and elections in this state shall be conducted by ballot, except when voting machines are used as provided by law. A ballot may be electronic or printed on paper."  O.C.G.A. § 21–2–280.

49.     The Code requires that uniform voting equipment "shall be provided to each county by the state, as determined by the Secretary of State."  *See* O.C.G.A. § 21–2–300.

50.     Specifically, the Code requires the Secretary to furnish "a uniform system of direct recording electronic (DRE) equipment" to each county.  O.C.G.A. § 21–2–379.3, and authorizes the use of DRE equipment under required conditions in numerous provisions of Title 21, Chapter 2, Article 9, Part 5.

51.     The Code establishes the following requirements for DREs in addition

to other minimum operating standards:

> No direct recording electronic voting system shall be
> adopted or used unless it shall, at the time, satisfy the
> following requirements:
>
> ….
>
> (6) It shall permit voting in absolute secrecy so that no
> person can see or know for whom any other elector has
> voted or is voting, save an elector whom he or she has
> assisted or is assisting in voting, as prescribed by law;
>
> ….
>
> (8) It shall, when properly operated, record correctly and
> accurately every vote cast;

O.C.G.A. § 21–2–379.1.

52.     The Code requires that, "All direct recording electronic (DRE) units

and related equipment, when not in use, shall be properly stored and secured under

conditions as shall be specified by the Secretary of State." O.C.G.A. § 21–2–

379.9(a).

53.     The Code requires county election superintendents who conduct

elections using DREs to do the following:

> •      "examine each unit before it is sent to a polling place, verify

that each registering mechanism is set at zero, and properly secure each unit so that

the counting machinery cannot be operated until later authorized," O.C.G.A. § 21-2-379.6(a);

- three days before every election, "have each DRE unit tested to ascertain that it will correctly count the votes cast for all offices and on all questions," O.C.G.A. § 21-2-379.6(c);

- "require that each DRE unit be thoroughly tested … prior to the delivery of each DRE unit to the polling place," O.C.G.A. § 21-2-379.7(b);

- "[p]rior to opening the polls each day[,] … certify that each unit is operating properly and is set to zero…." O.C.G.A. § 21-2-379.7(b);

- "[e]nsure that each DRE unit's tabulating mechanism is secure throughout the day during the primary or election," O.C.G.A. § 21-2-379.7(d)(3);

- use only DREs that "permit voting in absolute secrecy so that no person can see or know how any other elector has voted or is voting," O.C.G.A. § 21–2–379.1(6), and "conduct all elections in such manner as to guarantee the secrecy of the ballot," O.C.G.A. § 21–2–70(13); and

- "make and issue such rules, regulations, and instructions, consistent with law, including the rules and regulations promulgated by the State Election Board, as he or she may deem necessary for the guidance of poll officers, custodians, and electors in primaries and elections[,]" O.C.G.A. § 21–2–70(7);

- "perform their duties in public," O.C.G.A. § 21–2–406; and

- comply with the legal requirement that "all proceedings at the tabulating center and precincts shall be open to the view of the public," O.C.G.A. § 21–2–379.11.

54. The Code authorizes the use of paper ballots for use in "any primary or election in which the use of voting equipment is impossible or impracticable, for the reasons set out in [§] 21–2–334….", O.C.G.A. § 21–2–281—i.e., when the use of voting machines is required but "is not possible or practicable" or "if, for any other reason, at any primary or election the use of voting machines wholly or in part is not practicable," O.C.G.A. § 21–2–334.

55. The Code defines electors who do not vote in person at the polls on Election Day to vote as "absentee electors." O.C.G.A. § 21–2–380(a).

56. The Code permits absentee electors who do not vote in person to use a paper absentee ballot that is mailed in or hand delivered, *see* O.C.G.A. § 21–2–385, and generally counted by optical scan equipment, but the Code requires absentee electors who vote in the advance voting period who vote in person to vote by DRE *if* DRE machines are used in the polling places on election day, *see* O.C.G.A. § 21–2–383(b).

23

57. The Code authorizes the use of paper ballots counted by optical scanning equipment and sets forth requirements for their approval and operation. *See* O.C.G.A Title 21, Chapter 2, Article 9, Part 4.

### D. Georgia's Regulation of Elections

58. The State Board's rules implementing the Code require that all voters who cast ballots in person at the polls on Election Day must vote by DRE:

> **Rule 183-1-12-.01 Conduct of Elections:** Beginning with the November 2002 General Election, all federal, state, and county general primaries and elections, special primaries and elections, and referendums in the State of Georgia ***shall be conducted at the polls through the use of direct recording electronic (DRE) voting units*** supplied by the Secretary of State or purchased by the counties with the authorization of the Secretary of State. In addition, absentee balloting shall be conducted through the use of optical scan ballots which shall be tabulated on optical scan vote tabulation systems furnished by the Secretary of State or purchased by the counties with the authorization of the Secretary of State; provided, however, that the use of direct recording electronic (DRE) voting units is authorized by the Secretary of State for persons desiring to vote by absentee ballot in person.

Ga. Comp. R. & Regs. r. 183–1–12–.01 (emphasis added).

## V.    GENERAL ALLEGATIONS

### A.    How Georgia's Voting System Works.

59.    The voting system configuration most recently provided to Georgia's

counties by the Secretary consists of the following configuration of hardware

components and related firmware and software:

- Diebold Election Systems ("**Diebold**")[5] AccuVote DRE touchscreen
  voting units ("**AccuVote DREs**"):
  - o    R6 TS model, with BallotStation version 4.5.2! firmware.
  - o    TSx model, with BallotStation version 4.5.2! firmware.

- Diebold optical scanners for tabulating paper ballots.

- Electronic Poll Books with barcode scanner to scan identification.

- Diebold General Election Management Software ("**GEMS**") for
  tabulation and reporting of data generated by AccuVote DRE and
  Diebold optical scanners.

(such configuration, "**Georgia's Voting System**").

60.    On information and belief, Georgia uses approximately 27,000

Diebold AccuVote DRE touchscreen voting machines.  These AccuVote DREs are

located at polling locations during elections, where they are used by electors who

vote absentee ballots in person during early voting as authorized by O.C.G.A.

§ 21–2–385(d) and by electors who vote in person on Election Day at the polls in

---

[5] Diebold Election Systems changed its name to Premier Election Solutions in 2007.  Diebold's
election system business was subsequently acquired by Dominion Voting Systems.

their home precincts. In Fulton County, TSx units are used as an intermediate device for electronic transmission of ballot data collected on TS units to the county GEMS server.

61.     The use of AccuVote DREs makes Georgia's elections unverifiable, unauditable, and vulnerable to undetectable manipulation. AccuVote DREs create no verifiable record of voter intent, unlike optical scanner components that rely on a voter-marked paper ballot as a verifiable official record.

62.     Each AccuVote DRE internally contains much of the same hardware that might typically be found in a very low-end general-purpose personal desktop computer in use in the early 2000s.

63.     Georgia's AccuVote DREs run a Diebold-modified version of Microsoft's Windows CE version 4.1 operating system—which Microsoft stopped supporting in early January 2013.  As a consequence, Microsoft is no longer issuing updates or security patches for that software.[6]

64.     A proprietary Diebold software application called BallotStation runs on top of the Windows operating system on AccuVote DREs and provides the user interface that voters and poll workers see. BallotStation interacts with the voter,

---

[6] See Wikipedia, *Windows Embedded Compact*,
https://en.wikipedia.org/wiki/Windows_Embedded_Compact (last visited Feb. 12, 2018).

accepts and records votes, counts the votes recorded on the DRE, and performs all other election-related processing by the DRE.

65.     AccuVote DREs are configured for each election by inserting a memory card into a slot behind a locked door on the side of the machine.

66.     Before the election, the file system on the memory card stores the election definition, sound files, translations for other languages, interpreted code that is used to print reports, and other configuration information.

67.     AccuVote DREs use software installed on the unit to display graphical information to the voter that indicates which part of the touchscreen display corresponds to particular electoral choices.

68.     Voters record their preferences by physically touching the part of the screen that corresponds to voter's preferred choice.

69.     When operating properly, AccuVote DREs use software installed on the unit to translate the voter's physical act of touching a particular place on the touchscreen into a vote for the corresponding candidate or issue.

70.     When operating properly, AccuVote DREs use software installed on the unit to change what is graphically displayed on the touchscreen to indicate to the voter that a particular electoral choice has been electronically registered by the unit.

71. When operating properly, AccuVote DREs use software installed on the unit to record the voter's choice on both the DRE's removable memory card and into the machine's internal flash memory. Both such records of the voter's choices are unreadable to humans.

72. Georgia's AccuVote DREs do not record a paper or other independent verifiable record of the voter's selections.

73. Upon the closing of the polls, poll workers cause AccuVote DREs to interpret collected electronic information and convert it to human readable form to print a paper tape of vote totals recorded on each machine.

74. After the tape of the DREs machine's vote totals is printed, the removable DRE memory cards are taken from each of the AccuVote DREs and secured for transport either to a satellite vote transmission center, in the case of Fulton County, or to the county election office in other counties.

75. On election night, AccuVote DRE memory cards from polling places are collected and uploaded into the Diebold GEMS server (running on a desktop computer) where the GEMS software combines DRE vote data with data from mail-in absentee ballots, and consolidated preliminary results reports are created and printed.

76.     Mail-in absentee paper ballots and provisional paper ballots are scanned and tabulated by Diebold AccuVote Optical Scan units, located in the office of the superintendents of elections.

77.     The Diebold AccuVote Optical Scan units are programmed with software to scan, count, tabulate and report the paper ballot vote counts.

78.     On election night, Diebold AccuVote Optical Scan unit memory cards are uploaded to the Diebold GEMS server and combined with the data from the AccuVote DREs to create unofficial consolidated results and generate reports in human readable form.

### B.     AccuVote DREs Are Insecure and Vulnerable to Malicious Hacking.

79.     Scores of news reports in the last year have amplified the fifteen-plus years of warnings from voting system computer scientists that paperless balloting is unreliable, unquestionably insecure, and unverifiable because paperless balloting cannot be audited.

80.     In January 2018, the Congressional Task Force on Election Security formed by House Democratic Leader Nancy Pelosi and others issued a Final

Report addressing the insecurity of the voting infrastructure in the United States.

The Final Report warned:

> Given the breadth of security risks facing voting machines,
> it is especially problematic that approximately 20% of
> voters are casting their ballots on machines that do not
> have any paper backup. These voters are using paperless
> Direct Recording Electronic (DRE) machines that have
> been shown over and again to be highly vulnerable to
> attack. Because these machines record votes on the
> internal memory of the machine, and do not leave any
> paper backup, it is near impossible to detect whether
> results have been tampered with.[7]

81.     Such alarming findings about the security of DREs are not new.  In

2007, California's then Secretary of State Debra Bowen ("**Secretary Bowen**") and

Ohio's Secretary of State Jennifer Brunner ("**Secretary Brunner**") separately

commissioned and published independent research studies that included the entire

Diebold AccuVote voting system.

82.     Secretary Bowen's "Top-to-Bottom Review" ("**TTBR**")[8]  of

California's voting system produced a detailed scientific review of a Diebold

AccuVote voting system that used newer, upgraded—and thus presumably more

---

[7] Congressional Task Force of Election Security, *Final Report*, https://democrats-homeland.house.gov/sites/democrats.homeland.house.gov/files/documents/TFESReport.pdf
(Feb. 14, 2018), at 24 (last visited Apr. 2, 2018).
[8] See Joseph A. Calandrino, et al., *Source Code Review of the Diebold Voting System*,
http://votingsystems.cdn.sos.ca.gov/oversight/ttbr/diebold-source-public-jul29.pdf (Jul. 20, 2007)
(last visited Apr. 2, 2018).

secure—Diebold voting system components than the AccuVote DREs that are currently used in Georgia.

83.     Secretary Brunner's Evaluation and Validation of Election-Related Equipment, Standards and Testing ("**EVEREST**")[9] initiative likewise examined a newer version of the AccuVote DREs than Georgia uses.

84.     The TTBR found that California's AccuVote DREs were "inadequate to ensure accuracy and integrity of the election results…"; that the system contained "serious design flaws that have led directly to specific vulnerabilities, which attackers could exploit to affect election outcomes…"; and that "attacks could be carried out in a manner that is not subject to detection by audit, including review of software logs."[10]

85.     The EVEREST report concluded that Ohio's voting "system lacks the technical protections necessary to guarantee a trustworthy election under operational conditions. Flaws in the system's design, development, and processes lead to a broad spectrum of issues that undermine the voting system's security and

---

[9] Pennsylvania State Univ., et al., *EVEREST: Evaluation and Validation of Election-Related Equipment, Standards and Testing*, https://www.eac.gov/assets/1/28/EVEREST.pdf (Dec. 7, 2007) (last visited Feb. 5, 2018).
[10] See California Secretary of State, *Withdrawal Of Approval*, http://votingsystems.cdn.sos.ca.gov/vendors/premier/premier-11824-revision-1209.pdf (Dec. 31, 2009 rev.), at 2, 2, 3 (last visited Apr. 2, 2018).

reliability. The resulting vulnerabilities are exploitable by an attacker, often easily so, under election conditions." [11]

86.     Citing the failures and vulnerabilities of the Diebold's AccuVote voting system identified in the TTBR, Bowen decertified California's voting system. [12]

87.     The TTBR and the EVEREST reports are consistent with other published scientific reviews of AccuVote DREs that concluded the security and design failures of AccuVote DREs render the units unfit for use in public elections. [13]

88.     The only record of a voter's selection kept by Georgia's AccuVote DREs is the digital record created in the DRE's computer memory by the executable software that is installed on the individual DRE voting unit.  This digital record is only as trustworthy as the software that writes the information to memory.

89.     As indicated by the TTBR and EVEREST reports, the design of AccuVote DREs permits unauthorized, surreptitious manipulation of software

---

[11] See *EVEREST*, supra note 9, at 103.
[12] See *Withdrawal Of Approval*, supra note 10, at 5.
[13] *See, e.g.*,Candice Hoke, *Judicial Protection of Popular Sovereignty: Redressing Voting Technology*, 62 Cas. W. Res. L. Rev. 997 (2012), *available at,*
http://scholarlycommons.law.case.edu/caselrev/vol62/iss4/6 (last visited Apr. 4, 2018).

installed on individual machines that causes the AccuVote DREs to record and report false votes and that is, for all practical purposes, undetectable by election officials.

90.    As indicated by the TTBR and EVEREST reports, the results produced by an AccuVote DRE are not reliable because the machine's software, which is responsible for correctly recording voter choices, is subject to undetectable manipulation.

91.    As indicated by the TTBR and EVEREST reports, the results produced by an AccuVote DRE are not trustworthy because the unreliable software is likewise responsible for reading the DRE unit's memory and reporting the recorded results.

**C.    AccuVote DREs Fail to Provide Absolute Secrecy of the Ballot.**

92.    Georgia's AccuVote DREs record votes in the order in which they are cast and otherwise associate each electronic ballot with a unique serial number and timestamp that can be used to determine the ballot's position in the chronology of votes cast on the machine.  These design flaws render the electronic ballots cast on AccuVote DREs capable of being matched to voter records maintained by pollworkers and pollwatchers, or to polling place security video, or to ExpressPoll book timestamps, each of which makes it possible to connect many voters with

their DRE ballots in violation of Georgia's state constitutional requirements of absolute secrecy of the ballot.

### D. Security Breaches at KSU and CES Have Further Compromised Georgia's Voting System.

93.     From at least 2002 until at least December 31, 2017, Secretary Kemp contracted with the Board of Regents of the University System of Georgia and through Kennesaw State University ("**KSU**"), a unit of the University System of Georgia, for the creation of  the Center for Election Services ("**CES**") at KSU to assist the Secretary in the fulfillment of his statutory duties to manage Georgia's election system.

94.     Acting under contract as Kemp's agents, KSU, CES and CES's Executive Director Merle King ("**King**") maintained a computer server with the URL "elections.kennesaw.edu," on which they hosted an enormous assemblage of electronic files consisting of software applications, password files, encryption keys, voter information registration information, technical training videos, and other sensitive information critical to the safe and secure operation of Georgia's Voting System.

95.     The information hosted on the "elections.kennesaw.edu" server was not authorized to be publicly accessible.  But between at least August 2016 and

March 2017, and likely for a much longer period of time, this server was fully accessible to any computer user with Internet access.

96.     The "elections.kennesaw.edu" server was in fact accessed from the public Internet by an unknown number of unauthorized individuals, including cybersecurity researcher Logan Lamb ("**Lamb**"), his colleague Chris Grayson ("**Grayson**"), and KSU's own computer science instructor Andy Green ("**Green**").

97.     In late August 2016, Lamb freely accessed files hosted on the "elections.kennesaw.edu" server, including the voter histories and personal information of all Georgia voters, tabulation and memory card programming databases for past and future elections, instructions and passwords for voting equipment administration, and executable programs controlling essential election resources.  When he accessed these sensitive files, Lamb noted that the files had been publicly exposed for so long that Google had cached (i.e., saved digital backup copies of) and published the pages containing many of them.

98.     Lamb immediately recognized that these files were a high-value target for malicious users who might want to manipulate Georgia's elections, not only in the November 2016 general election, but future elections as well, because he knew that the files created and maintained on this server were used to program virtually all other voting and tabulation equipment used in Georgia's elections.

Case 1:17-cv-02989-AT Document 226 Filed 06/13/18 Page 40 of 74

99.     As a computer scientist and security researcher, Lamb knew that introducing malware into key files hosted on the "elections.kennesaw.edu" server could permit a malicious user to infect Georgia's Voting System with a computer virus that could be designed to travel across jurisdictions and equipment and potentially alter or control the results in multiple future elections with very little risk of detection.

100.   On or about August 28, 2016, Lamb promptly contacted King by telephone and email to warn him that CES should assume that the sensitive documents hosted on the "elections.kennesaw.edu" server had already been downloaded by unauthorized persons. King responded by assuring Lamb that the security issue would be addressed, but King simultaneously warned Lamb to keep his discovery of the server's vulnerabilities to himself or else, King warned, Lamb would be "crushed" by the politicians "downtown."

101.   King immediately informed CES staff of the breach, and KSU IT management was asked for advice and assistance on or about August 29, 2016. Public records demonstrate that in early September 2016, in a series of internal email communications, KSU's information technology staff member William Moore informed CES staffers Michael Barnes and Steven Dean and Information Technology professionals of KSU Tyler Hayden, Jason Figueroa, Matthew Sims,

36

and Chris Gaddis that the State's primary voting systems server had "exploitable," "severe," and "critical" vulnerabilities, and Stephen Gay, KSU's Chief Information Security Officer, ordered security scans of the CES server.

102. In October 2016, in a series of internal email communications sent between William Moore, King, Michael Barnes, Steve Dean, Stephen Gay, Chris Gaddis, Jason Figueroa, KSU's information technology staff described the "elections.kennesaw.edu" server as having "40+ critical vulnerabilities."

103. Despite these internal communications within KSU, and despite King's commitment to Lamb to ensure that the software, data, and the "elections.kennesaw.edu" server would be secured, neither Secretary Kemp nor his agents KSU, CES, and King secured the server, which remained easily accessible from the public Internet.

104. Lamb and colleague Grayson accessed the server again several times in late February 2017 and on March 1, 2017, and they were repeatedly able to access and download the same types of files that Lamb had accessed months earlier.

105. On March 1, 2017, Grayson contacted KSU Computer Science Instructor Green and informed him of the exact times and IP addresses of his own recent repeated access of the unsecured voting system server.

37

106.   Green replicated Lamb and Grayson's access to the server and its sensitive files and then contacted Stephen Gay, who finally caused the elections server to be isolated from the public Internet on or about March 1, 2017.

107.   It is widely and generally known from public media reporting both prior to and since the 2016 presidential election that foreign governments and other unknown suspect parties have actively probed state election systems in attempts to gain unauthorized access and manipulate the voter information and computer systems used to conduct American elections.

108.   Public reports have documented that these efforts targeting American voting systems have included unauthorized intrusions into the very same kind of computer systems and files that Lamb, Grayson, and Green found to be completely unprotected from external access in Georgia for at least seven consecutive months from August 2016 through February 2017.

## VI.   SPECIFIC ALLEGATIONS

### A.   Conduct of All Defendants—Past and Threatened

109.   All Defendants, at all times material to this Complaint, knew that AccuVote DREs did not and cannot meet Georgia's statutory and regulatory requirements for certification, safety, security, and accuracy equipment as provided in Title 2 Chapter 21Article 9 Part 5.

110.   All Defendants, at all times material to this complaint, knew that software applications, password files, encryption keys, voter information registration information, and other sensitive information critical to the safe and secure operation of Georgia's Voting System had been unsecured, breached, and compromised; could not be presumed to be uncorrupted and should instead have been presumed to be compromised; and that Georgia's Voting System is materially noncompliant with applicable Election Code statutes and governing regulations as a result.

111.   From at least August 2016 until the present, the Secretary and his agents—and from at least March 2017 all Defendants—knew or should have known that the software, data, and voter information hosted on the "elections.kennesaw.edu" server at KSU had been repeatedly compromised by unauthorized access.

112.   All Defendants have known at all times material to this Complaint that no efforts have been made to remediate the compromised software programs and machines or to identify and remove any malware that was likely introduced during the lengthy security breaches referred to herein on the "elections.kennesaw.edu" server that hosted the election-specific software applications and data that are re-installed on every piece of voting and tabulation

equipment used to conduct Georgia's elections in advance of each election conducted using Georgia's Voting System.

113. All Defendants, at all times material to this Complaint, knew or should have known of numerous expert opinions and academic research identifying security vulnerabilities in AccuVote DREs and advising against the use of AccuVote DREs in public elections because of their demonstrable lack of safety, reliability, and trustworthiness.

114. All Defendants, at all times material to this complaint, knew or should have known that they were incapable of confirming the integrity of the software on AccuVote DREs and incapable of certifying that election results produced by AccuVote DREs were correct, given that malicious manipulations are generally undetectable, in part because of the inferior engineering of the system.

115. By choosing to move forward in using the AccuVote DREs to conduct the November 2016 general election, the April and June 2017 Congressional District 6 ("CD6") Special Election Runoff and Special Election, and other elections from November 2016 to the present (the **Relevant Past Elections**"), all Defendants caused Georgia voters to cast votes on an illegal and unreliable system that must be presumed to be compromised and that is incapable of producing verifiable results.

116.  By choosing to continue using the non-compliant system in the Relevant Upcoming Elections without taking any meaningful steps to remedy known security breaches affecting AccuVote DREs, all Defendants know that they will cause, and intend to cause, Georgia voters to cast votes in the Relevant Upcoming Elections on an illegal and unreliable voting system that must be presumed to be compromised and that is incapable of producing verifiable results.

**B.    Conduct of Defendant Secretary—Past and Threatened**

117.  KSU, CES, and King were actual and apparent agents of the Secretary, contracted and supervised by him for a purpose of providing, among other things, "technical support and training of State election officials in the use of the Statewide uniform electronic voting system[;]" "acceptance testing for the fiscal year 2018 of the GEMS software and server, [Georgia's AccuVote DREs], and the electronic poll book/encoders[;]" and "ballot building election related activities for counties and municipalities in the State of Georgia."[14]

118.  At all times material to this Complaint, KSU, CES, and King were acting further to their contractual arrangement with the Secretary, within the scope of their actual and apparent agency, and for the purpose of serving the Secretary.

---

[14] See Agreement Between the Secretary of State and The Board of Regents of the University System of Georgia, at 2 (July 13, 2017).

119.   In their capacity as agents for the Secretary, KSU, CES, and King maintained software applications, password files, encryption keys, voter information registration information, ballot building files, tabulation databases, and other sensitive and essential information critical to the safe and secure operation of Georgia's Voting System on the "elections.kennesaw.edu" server.

120.   After it became known that the "elections.kennesaw.edu" server was compromised, none of the Secretary and his agents KSU, CES, and King subsequently made adequate efforts to determine whether malicious hacking of software, data, and voter information hosted on the "elections.kennesaw.edu" server and used in Georgia's Voting System occurred during the at least seven-months-long exposure of the "elections.kennesaw.edu" server content on the public Internet.

121.   Neither the Secretary nor any of his agents, KSU, CES, and King, has ever properly verified the integrity of, or repaired or replaced, any of the potentially compromised software, passwords, and encryption keys that were hosted on the "elections.kennesaw.edu" server.  As a consequence, the software, passwords, and encryption keys that were presumably compromised all continue to be used on the equipment that will be employed to conduct Georgia's public elections.

42

122.   On July 7, 2017, after this action was initially filed in Fulton County Superior Court on July 3, 2017, KSU, CES, and King, acting as agents of the Secretary, destroyed all data on the hard drives of the KSU "elections.kennesaw.edu" server.

123.   On August 9, 2017, less than 24 hours after this action was removed from Fulton County Superior Court to this Court , KSU, CES, and King, acting as agents of the Secretary, destroyed all data on the hard drives of a secondary server hosted at "unicoi.kennesaw.edu", which contained similar, but not identical data, to that on the "elections.kennesaw.edu" server.

124.   On information and belief, the logfiles that contained historical records of external access from the public Internet to the "elections.kennesaw.edu" and "unicoi.kennesaw.edu" servers were deleted when all data on the respective servers' hard drives was destroyed.

125.   The Secretary intends to enforce and will enforce O.C.G.A. § 21–2–383(b) in the Relevant Upcoming Elections in all Georgia counties, and thus will require absentee electors who vote during the advance voting period in person to vote by DRE.

126.   The Secretary intends to enforce and will enforce State Election Board Rule 183–1–12–.01 in the Relevant Upcoming Elections in all Georgia counties,

and thus to require that all voters who cast ballots in person at the polls on Election Day must vote by DRE.

### C. Conduct of Defendant State Board Members—Threatened

127. The State Board Members, acting in their official capacity through the State Board, intend to enforce and will enforce O.C.G.A. § 21–2–383(b) in the Relevant Upcoming Elections in all Georgia counties, and thus to require absentee electors who vote during the advance voting period in person to vote by DRE.

128. The State Board Members, acting in their official capacity through the State Board, intend to enforce and will enforce State Election Board Rule 183–1–12–.01 in the Relevant Upcoming Elections in all Georgia counties, and thus to require that all voters who cast ballots in person at the polls on Election Day must vote by DRE.

### D. Conduct of Defendant Fulton Board Members—Past and Threatened.

129. At all times material to this Complaint, Richard Barron ("**Barron**") was employed as the staff Director of Registration & Elections for Fulton County, in which capacity he was an actual and apparent agent of the Fulton Board and its official members, the Fulton Board Members, and was contracted and supervised by them.

130.    At all times material to this Complaint, Barron acted within the scope of his agency for a purpose of serving the Fulton Board Members and the Fulton Board.

131.    On April 18, 2017, Barron and the Fulton Board Members deprived numerous Fulton County voters, including Coalition member Brian Blosser, of the right to cast a ballot in the CD6 Special Election.

132.    On April 22, 2017, at a Fulton Board meeting, Barron blamed the disfranchisement of CD6 voters such as Blosser on a software "glitch" of unknown origin that erroneously caused eligible voters to appear to be voters in other congressional districts or unregistered.

133.    On November 7, 2017, and December 5, 2017, Barron and the Fulton Board Members aggressively blocked and prevented visual observation by Coalition's members and representatives of the Fulton Board's performance of the following election duties:

> a.     **North Fulton Annex polling place**.  At the close of the polls on November 7 and December 5, at the North Fulton Annex polling place, Barron instructed polling place managers to refuse to permit Coalition Executive Director Marilyn Marks ("**Marks**") and other members of the public to observe polling

place close-down procedures, vote tabulation and printing of DRE machines' election results. Fulton Board Members' agents and employees refused to permit Coalition's election observers within approximately 50 feet of the DRE machines and process on November 7 and refused to permit them and other members of the public into the polling place at all on December 5. The Fulton Board Members' agents and employees threatened Marks and others with arrest on both occasions, and some members of the public were forcefully escorted from the premises by law enforcement on Barron's instructions. Marks and others filed formal complaints with the Fulton Board which remain unanswered.

b.   **North Fulton Annex satellite location.**   On November 7 and December 5, at the North Fulton Annex satellite location, Barron instructed officials not to permit Marks, Missett, and others to observe the implementation of chain of custody procedures or the handling of the memory cards and provisional ballots received from Fulton County precincts before tabulation. Marks, Missett, and other members were prevented

from observing the uploading and electronic transmission of
AccuVote DRE memory cards and from entering or seeing into
the room in which this important process was occurring behind
closed doors.

c.  **English Street Warehouse**. On November 7 and December 5,
at the Board's English Street Warehouse, Barron instructed
officials not to permit Marks, Missett, and others to observe the
public meeting of the Fulton Board Members at which central
tabulation of election results was conducted.  On November 7,
security guards, operating at Barron's instruction, aggressively
demanded that Marks and another Coalition representative
leave the premises of the building where the Board meeting was
taking place and the vote tabulation was being conducted.  On
Barron's instruction, the security guards threatened Marks and
another Coalition representative with physical removal from
premises, despite their presence being entirely non-disruptive
and despite the press and other members of the public being
allowed to attend. On December 5, Barron permitted Marks and
Missett to remain in the building during tabulation but did not

allow them to come within 50 feet of documents or discussions, which effectively deprived Marks and Missett of the ability to observe.

134.   By preventing public observation of the performance of their duties, the Fulton Board Members violated their statutory duty to "perform their duties in public," O.C.G.A. § 21–2–406, and also violated the statutory requirement that "all proceedings at the tabulating center and precincts shall be open to the view of the public," O.C.G.A. § 21–2–379.11. The Fulton Board Members thereby injured Coalition and its representatives by depriving them of their corresponding implied state-created informational rights to observe election officials performing their duties and to obtain public information.  The conduct of local official such as Barron and the State Board aggravate the injuries to the constitutional rights of Coalition's members attributable to Defendants Kemp and the State Board by preventing any public assessment of the integrity of Georgia's elections.

135.   With the authorization of Defendants Kemp and the State Board, the Fulton Board Members intend to continue to prevent the public from observing the performance these duties in the Relevant Upcoming Elections in Fulton County.

136.   With the authorization of Defendants Kemp and the State Board, the Fulton Board Members intend to enforce Election Rule 183-1-12-.01 concerning

election day use of DREs and will thus enforce O.C.G.A. § 21–2–383(b) in the Relevant Upcoming Elections in Fulton County, requiring absentee electors who vote in person during the early voting period to vote by AccuVote DRE.

137.  With the authorization of Defendants Kemp and the State Board, the Fulton Board Members, acting in their official capacities on behalf of the Fulton Board, intend to enforce and will enforce State Election Board Rule 183–1–12–.01 in the Relevant Upcoming Elections in all Fulton County, and thus to require all voters who cast ballots in person at the polls on Election Day to vote by AccuVote DRE.

138.  With the authorization of Defendants Kemp and the State Board, the Fulton Board Members have adopted voting procedures under which individual electronic ballots bearing a unique identifier are transmitted from Fulton County's AccuVote DREs located in satellite voting centers to Fulton County's central GEMS tabulation server in clear text (i.e., unencrypted) over an ordinary, unsecured telephone line on Election Night. This practice violates fundamental security principles because it subjects the transmitted votes to manipulation (such as man-in-the-middle interception and substitution of votes) and exposes the votes with their unique identifier to third-party interception, violating voters' rights of secrecy in voting.

### E.  Standing of Plaintiff Coalition

139.  Coalition has organizational standing on its own behalf and associational standing on behalf of Coalition's individual members to bring each of the claims for prospective relief stated in this Third Amended Complaint.

> **1.  Coalition Has Organizational Standing Derived from Past and Threatened Direct Injuries to Coalition.**

140.  Coalition has organizational standing, on its own behalf, to bring each of the claims for prospective relief stated in this Third Amended Complaint because Coalition has been and will be directly harmed by having to divert its own personnel and resources to counteract Defendants' unconstitutional enforcement of laws and regulations requiring Georgia voters to use DREs.

141.  Coalition possess a legally cognizable interest in pursuing its organizational goals without having to divert resources and personnel to counteract Defendants' illegal acts.

142.  Defendants' prior and intended imminent enforcement of O.C.G.A. § 21–2–383(b) and State Election Board Rule 183–1–12–.01 have caused and will cause Coalition to divert resources and personnel to counteract Defendants' illegal acts.  Specifically, Coalition has been and will be required by Defendants' past and intended conduct to do the following:

- Divert Coalition's scarce organizational funds since April 2017 to pay the fees of lawyers for advice and representation, litigation expenses, consulting expert expenses, travel expenses for Coalition's personnel, and research and copying costs required by Coalition's efforts to document and resist Defendants' enforcement of laws and regulations requiring Coalition's members to vote on DREs;

- Divert approximately 90% of the time of Coalition's Executive Director Marilyn R. Marks since April 2017 to participation in and management of Coalition's litigation, educational, and investigative efforts undertaken to counteract Defendants' conduct in Georgia—time that the Executive Director would otherwise have devoted to Coalition's ongoing efforts including but not limited to researching and promoting and  new post-election Risk Limiting Audit techniques in Colorado; advocacy of secret ballot and voter privacy principles in North Carolina seeking a change in state policy; researching security failures in North Carolina voter registration databases, and advocating for enhanced security; assisting members in researching South Carolina voting system security failures and impacts; educating Colorado voters on the negative impacts of new ballot-selfie laws; assisting Colorado members with organizing plans for a petition for a special election; publishing educational commentary related to election security

51

and transparency issues; educating public and officials on the dangers of internet voting through publishing and public speaking; assisting in research and planning for film documentary on election security; training members in Colorado for canvass board member duties; assisting Georgia members in evaluating ballot access laws; participating in press interviews regarding election security issues; speaking to civic groups on election security; assisting Colorado members in challenging public records violations for ballots in recent county assembly elections; and assisting members experiencing with problems in accessing public election records in numerous jurisdictions.

- Divert Coalition's organizational personnel and financial resources away from Coalition's established ongoing efforts to conduct research on new voting systems being used in Tennessee and considered in Georgia and other States and summarizing and providing that information to Coalition's members; and

- Divert Coalition's organizational personnel and financial resources away from Coalition's established ongoing efforts to market Coalition to new members and thereby grow Coalition's membership.

143.   Defendants' past and imminent future invasions of Coalition's legally protected interests in pursuing its own organizational goals and projects have thus

caused and will continue to cause concrete and particularized harms to Coalition in the form of diverted organizational personnel and financial resources.

144. Coalition has been directly harmed by the conduct of the Fulton Board Members and their agent Barron, done with the authorization of Defendants Kemp and the State Board, which deprived Coalition of its informational rights to observe election officials performing their duties and to obtain public information in furtherance of Coalition's mission of educating and informing its membership.

### 2. Coalition Has Associational Standing Derived from Past and Threatened Injuries to Coalition's Members.

145. Coalition also has associational standing, on behalf of Coalition's individual Georgia members threatened with imminent injury-in-fact, to bring each of the claims for prospective relief stated in this Third Amended Complaint because: (1) at least one of Coalition's members would have standing to sue each Defendant on each claim in his or her own right; (2) the interests Coalition seeks to protect are germane to Coalition's organizational purpose described above; and (3) the prospective injunctive and declaratory relief requested does not require the participation of Coalition's individual members in this lawsuit.

146. At all times since this case was initially filed in Fulton County Superior Court on July 3, 2017, Coalition's membership has included at least one

eligible elector of the State of Georgia who is a resident in each of Fulton County, Cherokee County, Cobb County, and DeKalb County.

147.   In each of the Relevant Past Elections, the Secretary and State Board Members (acting through the State Board) have authorized and required local official such as Barron, and the Fulton Board Members to enforce and threaten to enforce O.C.G.A. § 21–2–383(b) and State Election Board Rule 183–1–12–.01.

<u><em>Standing of Coalition's Individual Members</em></u>

148.   The following Coalition members, whose standing to sue is a predicate to Coalition's associational standing, have standing because each of them suffered concrete and particularized harms and are now threatened with imminent additional injury-in-fact as a result of Defendants' prior and intended future unconstitutional enforcement of O.C.G.A. § 21–2–383(b) and State Election Board Rule 183–1–12–.01 and prior and intended deprivations of the right to observe election officials in the conduct of their duties.

<u><em>Past Injury</em></u>

**a)    Virginia R. Forney (Fulton County)**

149.   Virginia R. Forney, ("**Forney**") has been a member of Coalition since 2015.

54

150.   Forney, an elector of Fulton County, voted in person either during
early voting or on Election Day at the polls in all Relevant Prior Elections,
requiring her to vote on an AccuVote DRE.  Forney is a physician by profession,
and multiple patients and others associated with her practice were candidates on
the November 2017 City of Atlanta and Fulton County ballot.  Forney's work
schedule required that she vote early before Election Day in the November 7
election. Aware that a ballot cast by AccuVote DRE was capable of being traced to
her and that the risk was particularly enhanced in an early voting polling location
with low traffic, and also fearing that her practice would suffer if her vote
preferences became known, Forney skipped casting a vote in at least one race to
avoid the risk of personal pecuniary harm.

### b)   Brian Blosser (Fulton County)

151.   Brian Blosser, ("**Blosser**") has been a member of Coalition since
January 2018.

152.   Blosser was prohibited from voting on April 18, 2017, in the CD6
Special Election when his name did not appear on the eligible voter rolls for CD6,
and was instead erroneously listed as a resident of CD11.  Blosser was not
permitted to vote a provisional ballot, even after he made repeated attempts to have
Fulton County election officials correct this system error. At a public meeting on

April 22, 2017, Barron and the Fulton Board Members blamed this error on a "software glitch."

### c)     Megan Missett (Fulton County)

153.   Member Plaintiff Megan Missett, an elector of Fulton County, voted by DRE in each of the last several elections for which she was eligible, including most recently, the Fulton County November 2017 election and December 2017 runoff. Missett was deprived of her right to vote in a verifiable, reliable election conducted in a manner that ensured that her vote would be counted accurately. Missett was deprived of her right to participate in the public observation of the December 5, 2017, runoff election in the City of Atlanta and was thereby deprived of access to public information concerning the election.

### d)     Mr. and Ms. Digges (Cobb County)

154.   Member Plaintiffs Mr. and Ms. Digges, electors of Cobb County, voted a mail-in paper absentee ballot in the June 2017 CD6 Special Election Runoff despite their preferences to vote in their neighborhood precinct on Election Day.  Mr. and Ms. Digges chose to vote by mail-in paper absentee ballot because they were aware that an electronic ballot cast using an AccuVote DRE was insecure, not verifiable or re-countable, and incapable of being guaranteed to be a secret ballot.  In order to cast their absentee ballots by mail, Mr. and Ms. Digges

were required to undergo the inconvenience of requesting paper ballot and the cost of postage required to mail their ballots. In addition, by choosing to vote by using a mail-in absentee ballot, Mr. and Ms. Digges became subject to the corresponding need to place their ballots in the mail well before Election Day to ensure timely delivery and the ability to confirm timely receipt. Accordingly, Mr. and Ms. Digges were deprived of the ability to await the latest campaign information before making their voting decisions and voting as part of their community in their home precinct along with their neighbors.

### e)      Mr. Davis (Cherokee County)

155.    Member Plaintiff Ricardo Davis, an elector of Cherokee County, voted a mail-in paper absentee ballot in all prior elections for over 10 years (including the November 8, 2016, election), with the exception of Cherokee County Special Election on November 7, 2017. As an Information Technology professional, Davis has been keenly aware of the security and reliability deficiencies of AccuVote DREs and that a vote cast on such voting units cannot be audited or recounted, and that the secrecy of such a vote cannot be guaranteed. To avoid these burdens on his right to vote, Davis avoided voting on a DRE, and instead took steps to cast his votes by mail-in absentee paper ballot. In order to do so, Mr. Davis was required to undergo the inconveniences of requesting paper

ballot and the costs of postage necessary to mail his ballot. In addition, because he chose to vote by means of mail-in absentee paper ballots, Mr. Davis was forced to place his voted ballots in the mail well before Election Day to ensure their timely delivery and to give himself the ability to ensure receipt. Accordingly, Mr. Davis was deprived of the ability to await the latest campaign information before making his voting decisions and to vote on Election Day along with his community members in his nearby neighborhood precinct.

156. In the November 7, 2017, Cherokee County Special Election, Davis was unable to submit his mail-in ballot application in time, so he was required to choose between not voting at all and voting by AccuVote DRE.

157. All of the foregoing Coalition members were injured by being required to vote in an election conducted using AccuVote DREs, which deprived them of their right to participate in a trustworthy and verifiable election process that safely, accurately, and reliably records and counts all votes cast and that produces a reliable election result capable of being verified as true in a recount or election contest.

158. All of the foregoing Coalition members were additionally injured by being required by Defendants to cast votes on AccuVote DREs—and thereby to

suffer violations of their constitutional rights—as a condition of being permitted by Defendants to enjoy the benefits and conveniences of casting a ballot in person.

*Imminent Future Injury*

159.   Each of Coalition's foregoing members intends to vote in each of the Relevant Upcoming Elections in his or her respective county.

160.   Each of Coalition's Georgia members will be required to cast their votes in the Relevant Upcoming Elections using Georgia's AccuVote DREs or to suffer the burdens required to obtain and cast a mail-in absentee ballot as an alternative.

161.   Each of Coalition's Georgia members will again be exposed to all the same injuries they have suffered in the past if Defendants again enforce O.C.G.A. § 21–2–383(b) and State Election Board Rule 183–1–12–.01 in the Relevant Upcoming Elections.

162.   Each of Coalition's Georgia members voting in the Relevant Upcoming Elections, if required to vote using an unreliable, untrustworthy AccuVote DRE, will be irreparably harmed in the following ways:

- By suffering burdens and infringements on the fundamental right to vote caused by having to use a voting machine that

cannot be relied upon for a trustworthy and verifiable election result;

- By suffering burdens and infringements on the fundamental right to vote caused by having to use a voting machine that cannot guarantee a secret ballot;

- By suffering burdens and infringements on the First Amendment right to anonymous free speech and association caused by having to use a voting machine that cannot guarantee a secret ballot;

- By suffering unequal protection of the state right to a secret ballot caused by having to use a voting machine that cannot guarantee a secret ballot, while similarly situated absentee electors who vote a mail-in ballot in the same election are allowed to vote a secret ballot;

- By suffering the arbitrary and capricious deprivation without due process of the state right to a secret ballot caused by having to use a voting machine that cannot guarantee a secret ballot;

- By having to endure the foregoing constitutional deprivations as the condition of being allowed to cast a ballot in person at the polls, either during advance voting or on Election Day.

163.   Each of Coalition's Georgia members voting in the Relevant Upcoming Elections will be irreparably harmed in the exercise of the fundamental right to vote if his or her votes are tabulated together with the votes of **other** voters who cast their ballots using unreliable, untrustworthy AccuVote DREs.

164.   Each of Coalition's Georgia members who to cast his or her individual ballots using AccuVote DREs will be irreparably harmed in the exercise of their constitutional, fundamental right to vote in the Relevant Upcoming Elections if they are required to cast their individual ballots using—or in an election in which anyone used—AccuVote DREs.

165.   Each of the foregoing harms to each of Coalition's Georgia members is imminent for standing purposes because each of the Relevant Upcoming Elections is set to occur on a fixed date not later than eighteen months after the date when this action was filed in Fulton County Superior Court on July 3, 2017.

166.   None of Coalition's Georgia members can be adequately compensated for these harms in an action at law for money damages brought after the fact because the violation of constitutional rights is an irreparable injury.

61

## VII. CLAIMS

**COUNT I: FUNDAMENTAL RIGHT TO VOTE**

**42 U.S.C. § 1983**

**Threatened Infringement of the Fundamental Right to Vote in Violation of the Fourteenth Amendment's Guarantee of (Substantive) Due Process**

**(Right to a trustworthy and verifiable election; Unconstitutional condition)**

*(Seeking declaratory and injunctive relief against all Defendants)*

167.   Plaintiff Coalition incorporates and realleges each of the foregoing Paragraphs 1 through 166.

168.   The right of all eligible citizens to vote in public elections is a fundamental right of individuals that is protected by the United States Constitution and incorporated against the States by the Due Process Clause of the Fourteenth Amendment.

169.   Inherent in individuals' fundamental right to vote is the right to participate in a trustworthy and verifiable election process that safely, accurately, and reliably records and counts all votes cast and that produces a reliable election result capable of being verified as true in a recount or election contest.

170.   By requiring the Member Plaintiffs and other members of Coalition to vote using AccuVote DREs in the Relevant Upcoming Elections, Defendants Kemp, the State Board Members, and the Fulton Board Members will knowingly

62

burden severely and infringe upon the fundamental right to vote of the Member

Plaintiffs and other members of Coalition and will injure Coalition by causing it to

divert resources and personnel from other ongoing projects.

171.   These severe burdens and infringements that will be caused by

Defendants' conduct will violate the fundamental right to vote of the Member

Plaintiffs and other members of Coalition.

172.   These severe burdens and infringements that will be caused by

Defendants' conduct are not outweighed or justified by, and are not necessary to

promote, any substantial or compelling state interest that cannot be accomplished

by other, less restrictive means, like conducting the Relevant Upcoming Elections

using paper ballots.

173.   Requiring voters to suffer these severe burdens and infringements

upon their constitutional right to vote as a condition of being able to enjoy the

benefits and conveniences of being permitted to cast their ballots in person at the

polls violates the unconstitutional-conditions doctrine.

174.   The foregoing violations will occur as a consequence of Defendants

Kemp, the State Board Members, and the Fulton Board Members acting under

color of state law. Accordingly, Coalition and the Member Plaintiffs bring this

cause of action for prospective equitable relief against Defendants Kemp, the State Board Members, and the Fulton Board Members pursuant to 42 U.S.C. § 1983.

175.   Unless Defendants Kemp, the State Board Members, and the Fulton Board Members are enjoined by this Court, then the Coalition Plaintiffs will have no adequate legal, administrative, or other remedy by which to prevent or minimize the irreparable, imminent injury that is threatened by Defendants' intended conduct.  Accordingly, injunctive relief against these Defendants is warranted.

**WHEREFORE**, Plaintiff respectfully requests that this Court preliminarily and permanently enjoin Defendants Kemp, the State Board Members, and the Fulton Board Members from enforcing O.C.G.A. § 21–2–383(b) and State Election Board Rule 183–1–12–.01; and from requiring voters to vote using DREs; and grant such other relief as may be warranted.

## COUNT II:  EQUAL PROTECTION

## 42 U.S.C. § 1983

### Threatened Infringement of the Fourteenth Amendment's Guarantee of Equal Protection

### (fundamental right to vote, the right to freedom of speech and association, and the Georgia state constitutional right to a secret ballot; unconstitutional condition)

*(Seeking declaratory and injunctive relief against all Defendants)*

176.   Plaintiff Coalition incorporates and realleges each of the foregoing Paragraphs 1 through 166.

177.   By requiring the Member Plaintiffs and other members of Coalition to vote using AccuVote DREs in the Relevant Upcoming Elections, Defendants Kemp, the State Board Members, and the Fulton Board Members will knowingly treat the Member Plaintiffs and other members of Coalition who vote by DRE differently than other, similarly situated electors in the same election who vote using mail-in paper ballots.

178.   Because of this differential treatment, Member Plaintiffs and other members of Coalition who vote by DRE will suffer greater and more severe burdens and infringements on their underlying substantive rights—namely, the fundamental right to vote, the right to freedom of speech and association, and the

Georgia state constitutional right to a secret ballot—than will other, similarly situated electors.

179.   These severe burdens and infringements that Defendants will impose unequally on Member Plaintiffs and other members of Coalition who vote by DRE will violate the Equal Protection Clause of the Fourteenth Amendment.

180.   These severe burdens and infringements that will be caused by Defendants' conduct are not outweighed or justified by, and are not necessary to promote, any substantial or compelling state interest that cannot be accomplished by other, less restrictive means, like conducting the Relevant Upcoming Elections using paper ballots.

181.   Requiring voters to be deprived of their constitutional right to equal protection of the laws as a condition of being able to enjoy the benefits and conveniences of voting in person at the polls violates the unconstitutional-conditions doctrine.

182.   The foregoing violations will occur as a consequence of Defendants Kemp, the State Board Members, and the Fulton Board Members acting under color of state law. Accordingly, Coalition and the Member Plaintiffs bring this cause of action for prospective equitable relief against Defendants Kemp, the State Board Members, and the Fulton Board Members pursuant to 42 U.S.C. § 1983.

183.   Unless Defendants Kemp, the State Board Members, and the Fulton Board Members are enjoined by this Court, then the Coalition Plaintiffs will have no adequate legal, administrative, or other remedy by which to prevent or minimize the irreparable, imminent injury that is threatened by Defendants' intended conduct.  Accordingly, injunctive relief against these Defendants is warranted.

**WHEREFORE**, Plaintiff respectfully requests that this Court preliminarily and permanently enjoin Defendants Kemp, the State Board Members, and the Fulton Board Members from enforcing O.C.G.A. § 21–2–383(b) and State Election Board Rule 183–1–12–.01; and from requiring voters to vote using DREs; and grant such other relief as may be warranted.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court:

A.   Enter a judgment finding and declaring it unconstitutional for any public election to be conducted using any model of DRE voting unit;

B.   Enter a preliminary and permanent injunction prohibiting Defendants Kemp, the State Board Members, and the Fulton Board Members from enforcing O.C.G.A. § 21–2–383(b) and State Election Board Rule 183–1–12–.01 and from requiring voters to vote using DREs;

67

C.      Enter a preliminary and permanent injunction prohibiting Defendants Kemp, the State Board Members, and the Fulton Board Members from conducting or authorizing the conduct of any public election using optical scanned paper ballots without requiring the conduct in each case of post-election audits of paper ballots to verify the results reported by the tabulation machines;

D.      Enter a preliminary and permanent injunction prohibiting Defendants Kemp, the State Board Members, and the Fulton Board Members from conducting or authorizing the conduct of any public election without requiring subordinate election officials to permit, meaningful public observation of all stages of election processing;

E.      Retain jurisdiction to ensure all Defendants' ongoing compliance with the foregoing Orders.

F.      Grant Plaintiff an award of its reasonable attorney's fees, costs, and expenses incurred in this action pursuant to 42 U.S.C. § 1988; and

G.      Grant Plaintiff such other relief as the Court deems just and proper.

Dated: April 4, 2018.

Respectfully submitted,

*/s/ Robert A. McGuire, III*
Robert A. McGuire, III
Admitted Pro Hac Vice (ECF No. 125)

ROBERT MCGUIRE LAW FIRM
2703 Jahn Ave NW, Suite C-7
Gig Harbor, WA  98335
T: (844) 318-6730

*Attorney for Plaintiff Coalition for Good Governance*


*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
cichter@IchterDavis.com

Ichter Davis, LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, GA 30326
Tel.: 404.869.5243
Fax: 404.869.7610

*Attorney for Plaintiffs Coalition for Good Governance, William Digges III, Laura Digges, Ricardo Davis, and Megan Missett*


*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
bbrown@brucepbrownlaw.com

Bruce P. Brown Law LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

*Attorney for Plaintiff Coalition for Good Governance*


/s/ William Brent Ney
William Brent Ney
GA Bar Number 542519

NEY HOFFECKER PEACOCK & HAYLE, LLC
One Midtown Plaza, Suite 1010
1360 Peachtree Street NE
Atlanta, GA 30309
T: (404) 842-7232

*Attorney for Plaintiffs Coalition for Good Governance, William Digges III, Laura Digges, Ricardo Davis, and Megan Missett*