Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE NORTHERN DISTRICT OF GEORGIA

3                   ATLANTA DIVISION

4     DONNA CURLING, et al.,

5          Plaintiffs,        CIVIL ACTION FILE

6     vs.                     NO. 1:17-cv-2989-AT

7     BRAD RAFFENSPERGER, et

8     al.,

9          Defendants.

10

11

12                DEPOSITION OF

13                RICARDO DAVIS

14             September 29, 2021

15                9:09 a.m.

16

17     TAKEN BY REMOTE VIDEO CONFERENCE

18        LaRita J. Cormier, RPR, CCR-2578

19

20

21

22

23

24

25

Ricardo Davis                                          September 29, 2021
Curling, Donna v. Raffensperger, Brad

                                                              Page 2

1                         INDEX OF EXHIBITS

2    Exhibit No.          Description                       Page

3       Exhibit 1    Notice of Deposition                    10

4       Exhibit 2    Declaration filed 10/23/19              20

5       Exhibit 3    Mr. Davis' voting record                57

6

7

8

9

10

11

12

13            I N D E X   O F   E X A M I N A T I O N

14                                                         Page

15   Examination by Mr. Jacoutot.......................05

16

17

18

19

20

21

22

23

24

25

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

```
                                                    Page 3

 1    APPEARANCES OF COUNSEL:

 2    On behalf of the Plaintiffs:

 3            CARY ICHTER, ESQUIRE

 4            Ichter Davis LLC

 5            3340 Peachtree Road NE

 6            Suite 1530

 7            Atlanta, Georgia  30326

 8            cichter@ichterdavis.com

 9

10    On behalf of the Curling Plaintiffs:

11            HANNAH ELSON, ESQUIRE

12            Morrison & Foerster, LLP

13            2000 Pennsylvania Avenue, NW

14            Washington, DC  20006

15            Helson@mofo.com

16

17    On behalf of Defendant Secretary of State Brad

18    Raffensperger:

19            DIANE FESTIN LaROSS, ESQUIRE

20            R. DAL BURTON, ESQUIRE

21            Taylor English Duma LLP

22            1600 Parkwood Circle, Suite 200

23            Atlanta, Georgia  30339

24            Dlaross@taylorenglish.com

25            Dburton@taylorenglish.com
```

Page 4

1   APPEARANCES OF COUNSEL (Cont'd):

2   On behalf of Defendant Fulton County:

3            CHERYL RINGER, ESQUIRE

4            Fulton County Attorney's Office

5            141 Pryor Street, Suite 4038

6            Atlanta, Georgia  30303

7            Cheryl.ringer@fultoncountyga.gov

8

9

10

11

12  Also present:

13           MARILYN MARKS, Coalition for Good

14             Governance

15

16

17

18

19

20

21

22

23

24

25

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 17

1    afterwards?

2         A.   Yes.

3         Q.   Where was that?

4         A.   Undergraduate at the University of

5    Arkansas, graduate at Texas A&M University.

6         Q.   Excellent.   What did you earn your

7    undergraduate degree in?

8         A.   Chemistry, with a minor in computer

9    science.

10        Q.   Okay.   Tough major definitely.   What years

11   were you at University of Arkansas?

12        A.   From 1981 to 1986.

13        Q.   And you went to grad school, so I'm

14   assuming you graduated.   What did you go to graduate

15   school for?

16        A.   Chemistry.

17        Q.   Anything in particular, any specific side

18   of chemistry, or concentration?

19        A.   Yes.   My concentration was in analytical

20   chemistry.

21        Q.   And what does that entail?

22        A.   Well, the branch of analytical chemistry

23   entailed, as the name would suggest, the specific

24   analysis made to determine what the investigator is

25   trying to discern with regard to a particular

Ricardo Davis                          September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 18

1    problem in chemistry.

2        Q.   Okay.  And when you say "investigator," are

3    you using that term as sort of a profession, like,

4    did it focus on how criminal investigations involve

5    chemistry or how a chemist is investigating a

6    particular, you know, chemistry problem?

7        A.   The latter.

8        Q.   Okay.  And you might have already said

9    this, but when did you or did you graduate in the

10   chemistry graduate program?

11       A.   Yes.  I graduated in 1990.

12       Q.   1990.  Did you go straight from undergrad

13   in '86 to grad school, or did you take some time off

14   in between?

15       A.   Oh, I -- I went directly to.

16       Q.   Okay.  As a master's degree or Ph.D.?

17       A.   I received a master's degree.

18       Q.   Okay.  Anything beyond that master's degree

19   in terms of educational training?

20       A.   No.

21       Q.   Okay.  Any licenses or certifications that

22   you might have?

23       A.   No.

24       Q.   Okay.  And any other education that you --

25   that you have beyond what you told me?

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 21

1      A.  Yes.

2      Q.  So what type of IT professional are you?

3  What is your -- what's your current role?  Let's

4  start with that.  What's your current role, if any,

5  in the IT industry?

6      A.  Okay.  My current title is senior

7  integration analyst.

8      Q.  How long have you -- I'm sorry, say that

9  again?

10     A.  The work is in the healthcare setting.

11     Q.  And how long have you been in information

12 technology?

13     A.  Since 1995.

14     Q.  Okay.  So that would have been about five

15 years after you graduated from Texas A&M in

16 chemistry.  What did you do in that intervening five

17 years between graduating from Texas A&M and

18 beginning your information technology role?

19     A.  I worked as a research scientist for

20 Westinghouse.

21     Q.  Okay.  And what years was your -- what

22 years were you at Westinghouse?

23     A.  From 1990 through roughly 1994.

24     Q.  Okay.  And what did that job entail as a

25 research scientist?

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 22

1       A.  I was a chemical process modeler.  I won't

2   go into the weeds with you, but essentially what me

3   and my colleague did was we created models of

4   chemical processes on plants which involved not only

5   computational chemistry but also visualization.

6       Q.  Okay.  Might be getting over my head

7   already, but I appreciate that.  And so then after

8   your time at Westinghouse, you got into information

9   technology; is that correct?

10      A.  That is correct.

11      Q.  Okay.  And let's just kind of go through

12  your career in IT.  When did you begin -- what job

13  did you begin at in 1995?

14      A.  I was a help desk agent with Hewlett

15  Packard as a contractor.

16      Q.  Okay.  And what years did you do that for?

17      A.  I believe about a year and a half.

18      Q.  After that, did you stay in IT?

19      A.  Oh, yes.

20      Q.  And what was your next position?

21      A.  From there, I was a developer with --

22  again, on a contract basis -- with AT&T.

23      Q.  As a developer, what sort of job duties did

24  you have?

25      A.  These were primarily web design and web

Page 23

1     application development projects.

2          Q.   Okay.   How long did you do that for?

3          A.   Again, that was about year and a half.

4          Q.   Year and a half?   So would you say you

5     finished this role around 1999?

6          A.   Probably sooner.

7          Q.   So 1998 then?

8          A.   Yeah.   You know what, though, now that

9     you -- I believe -- I will refer counsel to my

10    LinkedIn page, which I believe have many of the

11    details that you're inquiring about.

12         Q.   Okay.

13         A.   And I will defer to that resource for the

14    specifics in terms of dates and times.

15         Q.   Dates and times, okay.   Do you have any

16    reason to think that anything on your LinkedIn page

17    would be inaccurate?

18         A.   No, I don't.

19         Q.   Okay.

20         A.   I will say one comment, in that in terms of

21    my recent employment with Common Spirit Health, it

22    is not up to date.

23         Q.   Okay.   And how long have you been with

24    Common Spirit Health?

25         A.   As an employee, since December 30th, 2020.

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 24

1        Q.   Were you a contractor before that?

2        A.   Yes.

3        Q.   When did you start as a contractor with

4   them?

5        A.   2015.

6        Q.   2015?  And when you say you're a

7   contractor, are you hired individually or do you

8   work with maybe a temporary staffing company or a

9   contract based staffing company that sort of you're

10  on their payroll and then you work with other

11  employers through that staffing company?

12       A.   Close.  I was a subcontractor.

13       Q.   Okay.

14       A.   To the firm Matrix Resources.

15       Q.   Okay.  So you were a subcontractor for

16  Matrix Resources, which is a staffing firm; is that

17  correct?

18       A.   Correct.

19       Q.   Okay.  And through your subcontracting at

20  Matrix Resources, you were placed at -- I'm sorry,

21  could you say that name again?  Was it --

22       A.   Common Spirit Health.

23       Q.   Common Spirit Health.

24       A.   At the time of the hire, the organization

25  was known as Dignity Health.

Page 25

1          Q.   And what have you done -- what's your job

2     duties, your job role when you were a subcontractor

3     for Matrix Resources at Common Spirit?

4          A.   Common Spirit, Common Spirit Health.  Thank

5     you.

6          Q.   What were your job duties while you were

7     there?

8          A.   Well, since I'm still there and still doing

9     the same thing.

10         Q.   Well, so -- sorry to interrupt you, but

11    just to make sure my question is clear, what were

12    your job duties at Common Spirit Health while you

13    were a subcontractor through Matrix Resources?

14         A.   And to answer the question, they are the

15    same as my current duties, which are enterprise

16    application data integration between systems.

17         Q.   Okay.  What is -- what does that entail, at

18    a high level?

19         A.   At a pedestrian level?

20         Q.   Sure.

21         A.   When you walk into, let's say you go in to

22    get an x-ray, you walk into the clinic.  They

23    register you on their electronic health records

24    system.  You walk back to the room where the x-ray

25    machine is, and the technician pulls your

Ricardo Davis                          September 29, 2021
Curling, Donna v. Raffensperger, Brad

                                                        Page 26

1    information up on the particular x-ray system.   My

2    job is to make sure that that data from the

3    registration system gets to the x-ray system.   That,

4    at a very high level, is part of the work of the

5    integration analyst.

6          Q.   Okay.   That helps.   Thank you.

7          A.   You're welcome.

8          Q.   So then I think it's fair to say you've

9    been in IT since, I believe I have '95 on here, but

10   you've been trained -- I think it's fair to say

11   you've been trained to a certain degree and have

12   education related to computers; is that right?

13         A.   I've been around the block for a while,

14   yes.

15         Q.   Okay.   Do you do any -- do you have any

16   experience with the hardware side of computers,

17   constructing hardware, deconstructing it, anything

18   like that?

19         A.   Some.

20         Q.   Is any of that experience through your job

21   as an IT professional or is it more of a hobby?

22         A.   Some.   Especially in my early days.

23         Q.   Okay.

24         A.   It was part of, you know, if you're doing

25   help desk work, you have to know something of the

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 28

1        Q.  Uh-huh.  Okay.

2        A.  That level of troubleshooting continues to

3   this day.  Like I said, it's minimal, but it's

4   something that I have to deal with on occasion

5   regularly.

6        Q.  Okay.  So do you have any training or

7   education related to computer hacking or the

8   insertion of malware into the computer system or

9   voting machine?

10       A.  I do not.

11       Q.  Okay.  Any training or education concerning

12  the operation or functioning of direct recording

13  electronic voting machines that are commonly

14  referred to as DREs?

15       A.  No formal training.

16       Q.  Okay.  Any training or education concerning

17  the operation or functioning of ballot marking

18  devices, more commonly referred to as BMDs?

19       A.  Again, no formal training.

20       Q.  What type of informal training do you have?

21       A.  Primarily reading specs and monographs

22  regarding said system.

23       Q.  Okay.  Have you ever physically examined a

24  ballot marking device?

25       A.  Clarifying question, is this examination as

Ricardo Davis                          September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 29

1   of visual inspection?  Is it examining operating

2   characteristics of the --

3        Q.  Sure.  Let's start with visual inspection.

4   Have you ever visually inspected a ballot marking

5   device?

6        A.  Oh, yes.

7        Q.  And you did that in person or through

8   pictures?

9        A.  In person.

10       Q.  When was that?

11       A.  The last I can recall is November 3rd,

12  2020.

13       Q.  Is that when you were voting?

14       A.  That was when I was poll watching.

15       Q.  Poll watching, okay.  Have you ever voted

16  on a ballot marking device?

17       A.  No.

18       Q.  Okay.  So beyond the visual inspection

19  while you were poll watching on November 3rd, is

20  that -- I'm sorry, did I get that wrong?  You said

21  you were poll watching on November 3rd; right?

22       A.  That's correct.

23       Q.  And so you sort of -- when you say you

24  visually inspected a BMD, did you look to determine

25  how it operated or did you just see them in the

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 30

1    room?

2         A.   I saw them in the room.  I saw them being

3    used.

4         Q.   Okay.  And did you ever open up any of the

5    components on the BMD and tinker with them?

6         A.   That would be prohibited during that

7    particular role.

8         Q.   Okay.  So that would be a no, then?

9         A.   Yes.

10        Q.   Okay.  Good.  Now would you count

11   visualizing and seeing them in the election room or

12   your poll watching, would you count that among your

13   informal training of BMDs?

14        A.   Yes.

15        Q.   Okay.  Any other informal training that you

16   have with BMDs, that you can think of?

17        A.   Again, other than self-paced learning and

18   reading, no.

19        Q.   Okay.  What sort of stuff did you read

20   about BMDs?

21        A.   Well, just stuff on the Internet.

22        Q.   Have you read any of the reports, the

23   expert reports filed in this case about BMDs?

24        A.   I don't recall offhand.

25        Q.   Okay.  Would you say your reading, then,

Ricardo Davis                                          September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 31

1   was more limited to general Internet websites?

2          A.   My phone dropped.  Hang on.

3          Q.   Okay.

4          A.   We're back.

5          MR. JACOUTOT:  If the court reporter would

6   read the last question back.

7          (The reporter read the requested material.)

8   BY MR. JACOUTOT:

9          Q.   I can rephrase that, Mr. Davis, if it

10  helps.

11         A.   I can respond.  My reading was limited to

12  reports and documents that were retrieved over the

13  Internet.

14         Q.   Okay.  And would you say that it then did

15  not include the -- the docket for this case, some of

16  the reports are online as well.  So that's why I'm

17  asking, trying to determine whether you read it from

18  your -- from an expert report from this case,

19  specifically from the online docket, or if it was

20  more from, you know, a website unrelated to this

21  court system, the federal court system.

22         A.   Hmm.  I can't say for sure whether or not I

23  did or not.

24         Q.   Okay.  That's fine.  So apart from the, you

25  know, time you spent in the polling place, you know,

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 32

1   observing BMDs and the reading that you've done from

2   online sources, do you have any other informal

3   education about them?

4        A.  The only thing I can probably ask of that

5   is watching other experts' testimony regarding their

6   systems.

7        Q.  Okay.  And what expert testimony did you

8   watch regarding the BMDs?

9        A.  I believe Dr. Halderman in particular comes

10  to mind, but that's the only one I can think of

11  right offhand.

12       Q.  Okay.  And when did you observe

13  Dr. Halderman testifying about BMDs?

14       A.  I don't recall.

15       Q.  Okay.  Do you recall if it was -- your

16  observing of Dr. Halderman, do you recall if it was

17  related to this particular case?

18       A.  I don't recall.

19       Q.  Okay.  Do y'all mind if we take a break

20  'til 10:05?

21       A.  A break would be very much appreciated.

22       Q.  Excellent.  Let's go ahead and do that.

23            (Recess 9:58 to 10:09 a.m.)

24       A.  Well, when we were asking questions about

25  my various legal past and legal involvement, I did

Ricardo Davis                                September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 35

1   referred me to your LinkedIn, sort of a better job

2   history, and you verified that you don't believe

3   there's anything inaccurate in that LinkedIn to your

4   knowledge; is that right?

5        A.  That is correct.

6        Q.  The one question I would ask specifically

7   then is, do you have any employment -- any

8   employment history ever previously worked at an

9   organization that is related to voting or elections

10  specifically?

11       A.  No.

12       Q.  Okay.  Perfect, thank you.

13       A.  Question, clarifying question.

14       Q.  Sure.

15       A.  Voting or elections.  Do you mean, like,

16  working for a company like Dominion as a contractor?

17  Is that what you're referring to?

18       Q.  Yeah.  And we'll -- I certainly would be

19  referring to that, and sort of broadly speaking, if

20  any company dealt specifically with elections or

21  voting as a part of their overall organizational

22  mission.

23       A.  No, never worked for a company doing that

24  kind of work.

25       Q.  Okay.  And so you have voted on the DRE

Ricardo Davis                        September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 39

1   fair to say that the primary goal of your work with

2   the Coalition for Good Governance is to make voting

3   by paper ballot a reality in Georgia?

4        A.   Restate the beginning of that question,

5   please.

6        Q.   Sure.  Would it be fair to say -- strike

7   that.  I'll just restate the whole question,

8   including the beginning, so there's no confusion.

9             Would it be fair to say that your primary

10  goal of your work with the Coalition for Good

11  Governance is to make voting by paper ballot a

12  reality in Georgia?

13       A.   No.

14       Q.   How would you characterize your primary

15  goal in working with the Coalition for Good

16  Governance?

17       A.   I would characterize the primary goal of

18  the relationship in being restoring constitutional

19  legal transparent elections in the state of Georgia,

20  of which the specific item that you mentioned is

21  part of that.

22       Q.   Okay.  So to make sure I understand your

23  response correctly, the primary goal of your work

24  with CGG is to make sure that there are

25  constitutional legal transparent elections in

Ricardo Davis                                September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 40

1    Georgia, and using paper ballots in elections would

2    achieve that goal; is that correct?

3         A.   That would be part of achieving that goal.

4         Q.   Are elections by paper ballots the only way

5    to achieve that goal?  And I'll rephrase that

6    question, so we can strike that.  You don't have to

7    answer it.

8             Are elections by paper ballot the only way

9    to achieve constitutional elections in Georgia, to

10   your knowledge?

11        A.   No, no.

12        Q.   Okay.  As a plaintiff in this case, is it

13   fair to say that you're familiar with the claims in

14   this case?

15        A.   Generally, yes.

16        Q.   Okay.  And apart from the claims in this

17   case, are there any other claims that you plan on

18   making that have not yet been made?

19        A.   No.

20        Q.   Okay.  Now you voted in numerous elections;

21   correct?

22        A.   Yes.

23        Q.   Do you have any evidence that any of the

24   votes that you cast in any Georgia election were not

25   counted?

Ricardo Davis                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 41

1        A.  Is counsel asking if I have any knowledge

2    that my ballot cast was not counted?

3        Q.  That is the question.

4        A.  I am not aware.

5        Q.  Okay.  Do you have any evidence that any

6    votes that you have cast in Georgia have ever been

7    changed from the selection that you made?

8        A.  No.

9        Q.  Do you have evidence that any DREs in any

10   election in Georgia has ever actually been hacked?

11       A.  Define hacked.

12       Q.  Manipulated in such a way as to change the

13   outcome of the voter selection.

14       A.  Are you referring to the physical hardware,

15   or are you talking about the data?

16       Q.  I'm referring to the voter selection, so

17   I'll rephrase the question.  Do you have any

18   evidence that any DRE used in any election in

19   Georgia has ever been actually manipulated by a

20   third party and, as a result of that manipulation,

21   changed a selection to a different selection than

22   that was selected by the voter?

23       A.  Yes.

24       Q.  What evidence do you have in that regard?

25       A.  I personally have no evidence.  However, I

Ricardo Davis                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 42

1  am aware of cases that have come before the state

2  election committee when it says activity was in

3  question.

4      Q.  So you're not referring, as you said, to

5  any personal evidence that you possess, you're only

6  referring to cases that have gone before the state

7  election committee and alleged that they have been

8  hacked and that their votes were changed?

9      A.  Correct.

10     Q.  Do you have any evidence that a BMD used in

11 any election in Georgia has been hacked?  And I'll

12 represent to you that we can use the same definition

13 for hacked for all of these that I just provided to

14 you.

15     A.  I am not aware, period.

16     Q.  Understood.  So when you say you're not

17 aware, I'm not really asking that.  I'm asking if

18 you have any evidence that BMD used in any election

19 in Georgia was hacked.

20     A.  I do not.

21     Q.  Okay.  Do you have any evidence that

22 malware was inserted in any voting machine in

23 Georgia since 2019?

24     A.  I do not have said evidence.

25     Q.  Okay.  And now this question sounds very

Ricardo Davis                                    September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 43

1    similar, but there's a slight difference.  And I can

2    point it out to you if you would like, but do you

3    have any evidence that malware was inserted into any

4    BMD used in an election in Georgia since 2019?

5          A.   I do not.

6          Q.   Okay.  Now you mentioned that you've never

7    voted on a BMD; is that correct?

8          A.   That's correct.

9          Q.   Do you have any plans to vote on a BMD in

10   the future?

11         A.   No.

12         Q.   Okay.

13         A.   Clarifying point.

14         Q.   Sure.

15         A.   I do not under the current election

16   framework in the state of Georgia.

17         Q.   Okay.  Now is it -- is it fair to say that

18   the reason why you don't have any plans to vote on a

19   BMD in the future is your concern that it will not

20   be accurately tabulated?

21         A.   My concern is that there's a lack of

22   integrity by audit to independently verify that such

23   is the case.

24         Q.   So your concern deals exclusively with the

25   fact that you believe that there's not a sufficient

Ricardo Davis                          September 29, 2021
Curling, Donna v. Raffensperger, Brad

Page 60

```
1                        CERTIFICATE
2    STATE OF GEORGIA:
     COUNTY OF FULTON:
3
            I hereby certify that the foregoing
4    transcript was taken down, as stated in the caption,
     and the colloquies, questions and answers were
5    reduced to typewriting under my direction; that the
     transcript is a true and correct record of the
6    evidence given upon said proceeding.
            I further certify that I am not a relative
7    or employee or attorney of any party, nor am I
     financially interested in the outcome of this
8    action.
            I have no relationship of interest in this
9    matter which would disqualify me from maintaining my
     obligation of impartiality in compliance with the
10   Code of Professional Ethics.
            I have no direct contract with any party in
11   this action and my compensation is based solely on
     the terms of my subcontractor agreement.
12          Nothing in the arrangements made for this
     proceeding impacts my absolute commitment to serve
13   all parties as an impartial officer of the court.
14          This th
15
16
17          LaRita J. Cormier, RPR, CCR No. 2578
18
19
20
21
22
23
24
25
```

Veritext Legal Solutions
800.808.4958                                    770.343.9696