Page 1

1            THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION
3    DONNA CURLING, et al.,
4          Plaintiffs,
                              CIVIL ACTION FILE
5       vs.
                              NO. 1:17-CV2989-AT
6    BRAD RAFFENSPERGER, et
     al.,
7
           Defendants.
8    _____
9
10          VIDEOTAPED DEPOSITION OF DONNA CURLING
11            TAKEN BY REMOTE VIDEOCONFERENCE
12
13                  January 19, 2022
14                    9:33 a.m.
15
16
17
18
19
20   REPORTED REMOTELY BY:
21   LAURA R. SINGLE, CCR-B-1343
22
23
24
25

Donna Curling                                   January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 2

```
 1                 A P P E A R A N C E S
 2                 (All appearing remotely)
 3
 4    For the Curling Plaintiffs:
 5              ADAM M. SPARKS, Esq.
                Krevolin & Horst, LLC
 6              1201 West Peachtree Street, N.W.
                Suite 3250
 7              Atlanta, Georgia  30309
                  (404) 888-9700
 8                sparks@khlawfirm.com
 9
10
11              DAVID CROSS, Esq.
                VERONICA ASCARRUNZ, Esq.
12              REEMA SHOCAIR ALI, Esq.
                ZACHARY FUCHS, Esq.
13              Morrison & Foerster, LLP
                2000 Pennsylvania Avenue, N.W.
14              Suite 6000
                Washington, D.C.  20006
15                (202) 887-1500
                  dcross@mofo.com
16
17
18
19    For the Fulton County Defendants:
20              DAVID LOWMAN, Esq.
                Fulton County Attorney's Office
21              141 Pryor Street
                Suite 4038
22              Atlanta, Georgia  30303
                  (404) 612-0246
23                david.lowman@fultoncountyga.gov
24
25
```

Page 3

1                  A P P E A R A N C E S
2                (All appearing remotely)
3
4    For the State Defendants:
5             JOSH BELINFANTE, Esq.
              DANIELLE HERNANDEZ, Esq.
6             ANNA EDMONDSON, Esq.
              CAREY MILLER, Esq.
7             Robbins Alloy Belinfante Littlefield, LLC
              500 14th Street, N.W.
8             Atlanta, Georgia  30318
                 (678) 701-9381
9                jbelinfante@robbinsfirm.com
10
11
12
13
14
     Also Present:
15
              David Ramirez, Videographer
16               (Veritext Legal Solutions)
17
18
19
20
21
22
23
24
25

Page 4

1                          I N D E X

2

3    EXAMINATION OF DONNA CURLING                        PAGE

4    BY MR. BELINFANTE............................  8

5    BY MR. SPARKS................................ 127

6    BY MR. BELINFANTE............................ 135

7

8                      *        *        *

9

10   NUMBER                 DESCRIPTION            PAGE

11   For the Defendants:

12   Exhibit 1        Amended Notice of Deposition     9
                      of Donna Curling

13

14   Exhibit 3        Declaration of Donna A.         37
                      Curling in Support of

15                    Curling Plaintiffs'
                      Motion For Preliminary

16                    Injunction

17   Exhibit 7        Verified Complaint For          50
                      Declaratory Relief,

18                    Injunctive Relief, and Writ
                      of Mandamus

19

20   Exhibit 8        Third Amended Complaint         67

21   Exhibit 9        E-mail chain                   109
                      (CURLING-0006817 - 0006818)

22

23   Exhibit 10       E-mail chain                   110
                      (CURLING-0010237 - 0010239)

24

25

Donna Curling                                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

                                                        Page 5

1                        I N D E X
2
3    NUMBER                    DESCRIPTION                PAGE
4    For the Defendants:
5    Exhibit 11       E-mail chain                        113
                      (CURLING-0010015 - 0010023)
6
7    Exhibit 12       E-mail chain                        118
                      (CURLING-0010166 - 0010180)
8
9    Exhibit 14       Curling Plaintiffs'                 13
                      Responses and Objections to
10                    Ahn Le's First
                      Interrogatories to Donna
11                    Curling, Donna Price, and
                      Jeffrey Schoenberg
12
13   Exhibit 15       Curling Plaintiffs'                 17
                      Responses to Defendant Brad
14                    Raffensperger's First
                      Requests For Admission
15
16   Exhibit 16       Declaration of Donna P.             32
                      Curling in Support of Motion
17                    for Preliminary Injunction
18
19
20
21
22
23
24
25

Page 11

1      exhibits, Todd?

2           MR. SPARKS:  We see Exhibit 1 and Exhibit 14

3      on the screen, yes.

4           MR. BELINFANTE:  Oh, here it is.  I got it.

5      Okay.  Sorry.

6  BY MR. BELINFANTE:

7      Q.   All right.  Ms. Curling, do you personally

8  know Dr. Alex Halderman?

9      A.   Yes, I do.

10     Q.   Okay.  When did you meet Dr. Halderman?

11     A.   Probably around 2008 or '9, I believe but

12 I -- I -- honestly, I don't know.

13     Q.   Okay.

14     A.   It's been many years.

15     Q.   Okay.  So it's fair to say you've known him

16 before you filed the initial lawsuit in 2017?

17     A.   Yes; but not well.

18     Q.   Okay.  How did you come to know him?

19     A.   In the early 2000s, I worked as a

20 legislative liaison back and forth to D.C. with

21 another coworker from at the time Vote Trust USA; and

22 we -- we worked with a lot of experts and Alex was

23 one.

24     Q.   Tell me about Vote Trust USA.  Is that still

25 an organization that's around today?

Page 12

```
 1        A.    It is not.

 2        Q.    Okay.  What was your role with Vote Trust

 3   USA?

 4        A.    I was just a member of the group, and we

 5   were all working with Representative Rush Holt's

 6   office at the time to try to get legislation

 7   nationally to get rid of DREs.

 8        Q.    And was that a paid position or volunteer

 9   position?

10        A.    Volunteer.

11        Q.    Okay.  And what was Vote Trust USA's main

12   concern with DREs?  And before you answer that, let

13   me ask you if you could just define for the record

14   what you mean by DRE?

15        A.    Direct reporting electronic device that

16   records your vote.

17        Q.    And the Diebold voting machines that Georgia

18   used to use would be an example of a DRE machine,

19   correct?

20        A.    That's correct.

21        Q.    Okay.  And so what was the main criticism

22   that Vote Trust USA had of the DRE system?

23             MR. SPARKS:  Objection.  It calls for

24        speculation.

25   BY MR. BELINFANTE:
```

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 13

1      Q.   You can answer the question, if you know.
2      A.   Oh, okay.  Well, we -- we -- and I -- I
3  include myself in this -- objected to the fact that
4  there was no paper trail and that it was software
5  dependent and you were literally putting your vote
6  into a black box and assuming, hoping that it would
7  be counted as you cast it, but there were no
8  guarantees and there was no fall-back to verify.
9      Q.   And that's because the DRE system -- when
10  you say there was no paper trial, there was no
11  document that a voter could have, touch, et cetera,
12  to look and see how their vote was cast; is that
13  correct?
14      A.   That's correct.
15      Q.   All right.  And Dr. Halderman also shared
16  those concerns about DREs; is that right?
17      A.   Oh, yes.
18           (Exhibit 14 was marked for
19           identification, attached at the end of
20           the original transcript.)
21  BY MR. BELINFANTE:
22      Q.   All right.  I'm going to show you -- and I'm
23  sorry this out of order -- what we have marked as
24  Exhibit 14.  Let me know -- can you see that,
25  Ms. Curling?

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 16

1    marking devices or DREs at this point?

2         Q.   This definition refers to BMDs, as I

3    understand it.   Is that your understanding?

4         A.   Okay.   That's what it appears.   I just

5    wanted to make sure.

6         Q.   Okay.   Yeah, that's my understanding.

7              All right.   What facts are you aware of that

8    support the contention that the components of the

9    election system was actually hacked prior to or

10   during the elections held on November 3rd, 2020?

11             MR. SPARKS:   Objection.   It calls for a

12        legal conclusion and speculation.

13   BY MR. BELINFANTE:

14        Q.   Ms. Curling, you can answer, if you know;

15   but I didn't know if you were thinking or if you were

16   just --

17        A.   Oh, I'm sorry.   After -- I'm -- I'm a little

18   unclear when he objects that I'm -- that I'm still

19   allowed to answer or supposed to answer.

20             Could you --

21        Q.   That's fair.

22        A.   -- repeat the question?

23        Q.   I'd be happy to.

24             Are you aware of any facts that support the

25   contention that or the idea that components of the

Donna Curling
Curling, Donna v. Raffensperger, Brad

January 19, 2022

Page 17

```
 1   election system were actually hacked prior to or
 2   during the elections held on November 3rd, 2020?
 3            MR. SPARKS:  Same objection.
 4            You may answer.
 5            THE WITNESS:  And I am aware of none, no.
 6   BY MR. BELINFANTE:
 7        Q.   All right.  Sorry.  I've got to work through
 8   the document system now.
 9            (Exhibit 15 was marked for
10         identification, attached at the end of
11         the original transcript.)
12   BY MR. BELINFANTE:
13        Q.   All right.  I'm going to show you what we've
14   marked as Exhibit 15.
15            MR. BELINFANTE:  Mr. Sparks, do you want to
16         pull that up on yours or do you want to use what
17         we've got here?
18            MR. SPARKS:  Ms. Curling, are you able to
19         read the text or would you like me to --
20            THE WITNESS:  Yeah.  I can -- I can read it.
21            MR. SPARKS:  For the moment, we're fine with
22         your screen share at the moment now, Counsel.
23         I'll let you know if we need to switch.
24            MR. BELINFANTE:  Got it.  Thank you.
25   BY MR. BELINFANTE:
```

Donna Curling
Curling, Donna v. Raffensperger, Brad

January 19, 2022

Page 18

1      Q.    Ms. Curling, have you seen this document
2  before?
3      A.    Yes, I have.
4      Q.    Okay.  And did you assist in providing
5  answers to the request for admissions submitted by
6  Secretary Raffensperger?
7           MR. SPARKS:  Ms. Curling, I'm going to
8      instruct you at this time not to answer with any
9      information that would reveal attorney-client
10      privileged information or any of the work product
11      that your attorneys have provided you in this
12      case.
13  BY MR. BELINFANTE:
14      Q.    And to that point, Ms. Curling, I'm not
15  asking what you said.  I'm just asking if you
16  assisted in providing answers.
17      A.    It was a joint effort between myself,
18  co-Plaintiffs, and the attorneys to answer these
19  questions.
20      Q.    All right.  Thank you.
21           Let me show you request for admission
22  number three.  Here it says:  Admit that you have no
23  evidence that any component of the election system
24  was actually hacked prior to or during the elections
25  on November 3rd, 2020.

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

                                              Page 19

 1            The response was denied.  Why was that
 2    denied?
 3            MR. SPARKS:  Objection to the extent it
 4        misstates the record and calls for a legal
 5        conclusion.
 6    BY MR. BELINFANTE:
 7        Q.    You can answer.
 8        A.    I think because there's no way to know one
 9    way or another, but there -- there were a -- there
10    was a lot of diligence done after the election that
11    gave me confidence in the election results of 2020.
12        Q.    Okay.  And I will show you these were
13    provided to us on January 14, 2021.  Do you see that?
14        A.    Yes, I do.
15        Q.    Okay.  And sitting here today, are you aware
16    of any evidence that any component system of the
17    election system was actually hacked prior to or
18    during the elections held on November 3rd, 2020?
19            MR. SPARKS:  Objection to the extent it
20        calls for a legal conclusion.
21            And to the extent it asks you to reveal
22        privileged or protected conversations with
23        counsel, please do not answer.
24            MR. BELINFANTE:  Mr. Sparks, do you want to
25        tell me what the attorney-client privilege is if

Donna Curling                                                      January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 21

1    BY MR. BELINFANTE:

2        Q.    Ms. Curling, I'll note that your counsel is

3    not instructing you not to answer the question

4    completely, so do you need me to ask it again?

5        A.    Are you asking me if I'm aware of any hacks

6    on the system for 2020?   Is that your question?

7        Q.    Yes.   My question is effectively the request

8    for admission number three.   Sitting here today, are

9    you aware of any evidence that any component of the

10   election system was actually hacked prior to or

11   during the elections held on November 3rd, 2020?

12       A.    I am not.

13            MR. SPARKS:   Same objection and instruction.

14   BY MR. BELINFANTE:

15       Q.    Sitting here today, are you aware of any

16   facts that would show that the results of any

17   election held in Georgia on November 3rd, 2020, were

18   actually changed in any way as a result of hacking or

19   the insertion of malware into any component of the

20   election system?

21            MR. SPARKS:   Objection to the extent it

22        calls for a legal conclusion.

23            Same instruction.   Please don't reveal any

24        privileged information.   You may answer if you

25        know.

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 22

1            THE WITNESS:  I do not know of any.

2    BY MR. BELINFANTE:

3       Q.   All right.  So why -- were you aware of any

4    on -- were you aware of any evidence on January 14,

5    2021?

6       A.   I guess I'm confused.  You're going to have

7    to clarify what you're asking.

8       Q.   Sure.

9            On January 21 of last year, we asked you to

10   admit that you had no evidence that any malware was

11   actually inserted into any component of the election

12   system prior to or during the elections held on

13   November 3rd, 2020.  You denied that.

14           I'm asking, why was it denied?  Did you have

15   evidence at that time that there was actually malware

16   inserted into any component of the election system

17   prior to or during the elections held on November 3rd

18   of 2020?

19      A.   Can I answer?

20           MR. SPARKS:  You may answer to the extent it

21       doesn't reveal privileged or protected

22       conversations with counsel.

23           THE WITNESS:  I -- I would maintain that

24       there's no evidence either way really.

25   BY MR. BELINFANTE:

Donna Curling                                          January 19, 2022
Curling, Donna v. Raffensperger, Brad

                                                                 Page 23

1        Q.   I'm sorry.  You maintain that there was

2    what?  I just lost you in there.

3        A.   That -- that the -- I'm not aware of any

4    evidence.

5        Q.   Okay.  And is it true that you've never been

6    aware of any evidence that malware was inserted into

7    any component of the election system prior to or

8    during the elections held on November 3rd of 2020?

9        A.   Yes.

10       Q.   So do you know why the request was denied?

11       A.   I'm assuming at the advice of counsel, but

12   I -- I'm unclear with this line of questioning

13   exactly what you're going for.

14       Q.   Okay.  On January 21 of 2021 -- in January

15   of 2021, were you aware of any evidence that the

16   results of any election held in Georgia on

17   November 3rd, 2020, were actually changed in any way

18   as a result of the hacking or the insertion of

19   malware into any component of the election system?

20       A.   I was not aware, no.

21       Q.   Sitting here today, are you aware of any

22   evidence that the results of any election held in

23   Georgia on November 3rd, 2020, were actually changed

24   in any way as a result of the hacking of or the

25   insertion of malware into any component of the

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 24

1    election system?

2          A.   No.

3               MR. SPARKS:  Counsel, to the extent my

4          instruction concerning the wording of the

5          question you use -- and I'm not trying to

6          interrupt for the sake of [indiscernible], so

7          I've not been objecting each time.  I'll -- with

8          your permission, I'll just leave that instruction

9          and objection of the wording of the question on

10         the table and any others that resemble it.  Would

11         you mind if --

12              MR. BELINFANTE:  Yeah, that's agreeable.  I

13         think that's the only one I'll have on that

14         request.

15   BY MR. BELINFANTE:

16         Q.   Ms. Curling, are you contending that the BMD

17   machines switched votes from one candidate to

18   another?  And by that I mean if someone were to press

19   Donald J. Trump for president and the vote was

20   actually recorded as Joseph Biden for president.

21         A.   Is your question am I aware of such a thing?

22         Q.   Yes.

23         A.   No, I am not.

24         Q.   Are you contending that BMDs actually switch

25   votes?  Understanding you're not aware of any

Donna Curling

Curling, Donna v. Raffensperger, Brad

January 19, 2022

Page 25

1  incident of that occurring but are you contending

2  that the BMDs have, in fact, switched votes from one

3  candidate to another in contraindication to the

4  voter's choice?

5      A.   That is not my contention, no.

6      Q.   Okay.  Are you contending that the BMDs

7  malfunctioned during the 2020 election in Georgia,

8  November 2020?

9          MR. SPARKS:  Objection.  It calls for

10      speculation.

11          THE WITNESS:  Yeah.  I don't -- I don't know

12      the answer to that question.  I have not

13      researched it.

14  BY MR. BELINFANTE:

15      Q.   All right.  Is it an argument that you're

16  advancing in the lawsuit -- are you trying to

17  convince the Court that any BMD in the state of

18  Georgia malfunctioned during the 2020 November

19  election?

20          MR. SPARKS:  Objection; asked and answered.

21      You can answer.

22          THE WITNESS:  I may answer?

23          MR. SPARKS:  I objected because it's been

24      asked and answered.

25          THE WITNESS:  Oh, okay.

Page 26

1              MR. SPARKS:  You may answer the question.

2              THE WITNESS:  I don't know.

3       BY MR. BELINFANTE:

4          Q.   Okay.  Sitting here today, are you aware of

5       any incident where the election system failed to

6       count any legal vote or votes in the presidential

7       election held until November of 2020 in the state of

8       Georgia?

9          A.   I do not know.

10         Q.   Sitting here today, are you aware of any

11      incident where the election system counted an illegal

12      vote or a vote that should not have been counted in

13      the state of Georgia on November election 2020?

14         A.   I'm not aware.

15         Q.   Ms. Curling, what did you do to prepare for

16      today's deposition?  And as you answer, I'm

17      specifically not asking you to tell me of any

18      conversations with counsel.

19         A.   I went over my declarations and kind of

20      tried to refresh my memory because this lawsuit has

21      been going on for quite some time, and that's

22      basically all.

23         Q.   How long did it take you to prepare for

24      today's deposition?

25         A.   A couple of hours.

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 29

```
 1        A.    No.
 2        Q.    Okay.  It's just one of the questions we
 3   have to ask.  I'm not trying to --
 4        A.    Okay.  Okay.
 5        Q.    Can you tell me your education history?
 6        A.    I have a high school education and two and a
 7   half years of college, but I never finished.
 8        Q.    Where was the college?
 9        A.    UNC Charlotte.
10        Q.    Have you had any formal training in election
11   law?
12        A.    No, I have not.
13        Q.    Okay.  Any formal training in computer
14   security?
15        A.    No, I have not.
16        Q.    Any formal training in election
17   administration?
18        A.    No, I have not.
19        Q.    Have you ever worked at a polling place?
20        A.    I haven't.
21        Q.    Have you ever worked on a campaign?
22        A.    No.
23        Q.    Have you ever had any training on absentee
24   ballots?
25        A.    No.
```

Donna Curling
Curling, Donna v. Raffensperger, Brad                    January 19, 2022

Page 30

1       Q.    Have you had any formal training related to

2   cyber security --

3       A.    No.

4       Q.    -- or computer security?

5             Okay.  Have you ever attended seminars on

6   cyber security?

7       A.    In 2017 I went to Las Vegas for -- I've

8   forgotten the name of the event.  Black -- does

9   anybody remember?  I don't remember what the event

10  was; but, yes, we had different forums where we could

11  choose what we wanted to go learn about, hear various

12  speakers.  And there was a hacking village there, so

13  they were showing the flaws in some of the systems.

14      Q.    And when you say systems, do you mean

15  election systems?

16      A.    Yes.

17      Q.    Okay.  Was the event called DEFCON?

18      A.    Yes, it was.

19      Q.    Okay.  All right.  Tell me about the hacking

20  village.  I've actually never seen one, so can you

21  just tell me kind of what it looks like if I were to

22  walk up to one and see it?

23      A.    Well, they -- the room was full of machines;

24  and various experts were there trying to break them,

25  trying to break into all the different systems that

Page 31

1    they had there in the room.

2         Q.   Okay.  And so it was an open -- open room

3    and people were doing this in the open; is that --

4         A.   Yes.  Yes.  Some people were wandering

5    through and observing what -- all the various things,

6    yes.

7         Q.   I see.

8              Okay.  So when you went in 2017 to Las Vegas

9    to the DEFCON group, did you see the former system

10   that Georgia used to have, the Diebold DRE?  Was that

11   something you saw in the hacking village?

12        A.   I don't -- I'm not -- I honestly don't

13   remember, but I think so.  I think it was there.

14        Q.   Okay.  Do you recall seeing Georgia's

15   current Dominion election system in the hacking

16   village in 2017?

17        A.   I do not recall and wasn't even aware of the

18   Dominion system at that point in time.

19        Q.   All right.  Do you know how long people in

20   the hacking village had with the machines?  I mean,

21   was this something that was open all week?  Was it --

22   or was it timed that people went in and had

23   30 minutes and then left; do you know?

24        A.   I honestly don't know, no.

25        Q.   Okay.  Have you had any formal training on

Case 1:17-cv-02989-AT   Document 1570-1   Filed 01/09/23   Page 22 of 75
Donna Curling
Curling, Donna v. Raffensperger, Brad
January 19, 2022

Page 32

```
1    the Dominion voting systems that Georgia currently
2    utilizes?
3          A.    No.
4          Q.    Okay.  Have you had any formal training on
5    the old system that Georgia used to use, the DRE
6    system from Diebold?
7          A.    No.
8          Q.    Have you ever attended any seminars where
9    the current BMD system that Georgia uses was
10   discussed?
11         A.    No.
12              (Exhibit 16 was marked for
13         identification, attached at the end of
14         the original transcript.)
15   BY MR. BELINFANTE:
16         Q.    I'm going to share my screen again.  I'll
17   show you what we have marked -- oh, I marked it.
18   Yeah, there it is -- as Exhibit 16.  I think that
19   actually should -- I think I had an Exhibit 16.  I'm
20   not sure why it's 16.  Well, that's something we'll
21   correct later.
22              This is the declaration that was filed it
23   looks like in August 7 of 2018 in this case.  Have
24   you seen this document before, Ms. Curling?
25         A.    Yes.
```

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 33

1        Q.    Okay.  And just for the record, it looks
2    like it was signed on August 7 of 2018.  Is that
3    accurate?
4        A.    That's accurate.
5        Q.    And that's your signature?
6        A.    Yes, it is.
7        Q.    Okay.  Did you type up this affidavit or was
8    it prepared for you -- or declaration?  Excuse me.
9        A.    I did not type it up, I don't think; but I
10   told the -- told -- I gave the details of what
11   occurred.
12       Q.    All right.  Looking at paragraph 2, you say
13   that you intend to vote in all future elections.  Is
14   that still true?
15       A.    Yes.
16            MR. SPARKS:  Counsel, I have a paper copy of
17        all the declarations Ms. Curling has filed in the
18        case that's clean.  Would you object to me
19        handing her a paper copy so she can read it more
20        cleanly?
21            MR. BELINFANTE:  As long as they're not
22        marked, that's fine with me.
23            MR. SPARKS:  They are not marked.  They are
24        printed as filed and no markings have been made
25        on them.

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 34

1          MR. BELINFANTE:  Great.  Yeah.  Not a

2      problem.

3  BY MR. BELINFANTE:

4      Q.   Ms. Curling, paragraph 3 says that you are

5  the legislative liaison for Georgians for Verified

6  Voting.  Can you tell me what Georgians for Verified

7  Voting is?

8      A.   Georgians for Verified Voting is a group

9  that really consists of Donna Price and myself.  The

10  title of legislative liaison is -- we've never

11  changed it, and when we first started Georgians for

12  Verified Voting was when I was going back and forth

13  to D.C.  And that was where my focus was, but I don't

14  have anything to do with legislation and haven't in

15  many years.

16      Q.   Okay.  Does Georgians for Verified Voting

17  have a mission statement?

18      A.   Yes.

19      Q.   Do you know the mission statement?

20      A.   I do not.  I do not.

21      Q.   Okay.  Can you tell me what your

22  understanding of the mission for Georgians for

23  Verified Voting -- well, let me back up before I ask

24  that.

25          Is Georgians for Verified Voting still an

Donna Curling
Curling, Donna v. Raffensperger, Brad

January 19, 2022

Page 35

1  active organization?

2      A.   It's -- I guess it is.  It's a website where

3  we try -- well -- and when -- by we, I mean my

4  partner Donna Price handles all of the posting things

5  out there just to -- it's kind of a place to get

6  information about voting.

7      Q.   I see.

8           Okay.  Does -- does Georgians for Verified

9  Voting have members other than you and Ms. Price?

10     A.   No, not anymore.

11     Q.   Okay.  Is it a paid position or a volunteer?

12     A.   Volunteer.

13     Q.   Can you tell me your understanding of what

14  the mission is of Georgians for Verified Voting?

15     A.   Just to keep voters informed and in

16  particular when we were voting on DREs to try to help

17  voters understand the flaws in that system and to

18  encourage them to vote on hand-marked paper ballots

19  so that there would be a record of their vote.

20     Q.   You say in paragraph 4 that your role in

21  GAVV has provided you with familiarity with Georgia's

22  election system of voting.  Based on my knowledge of

23  Georgia's system, including the vulnerability of DRE

24  machines to hacking and the lack of any paper trail,

25  I am afraid that my vote will not be counted equally

Donna Curling                                      January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 40

1       question?

2   BY MR. BELINFANTE:

3       Q.   Sure.

4            At the time you completed this declaration

5   on October 4 of 2019, have you read -- had you read

6   any documents from Dominion?

7            MR. SPARKS:  Same instruction.

8            THE WITNESS:  I honestly don't recall if I

9       had -- I know that there were handouts from the

10      Secretary of State's office.  I did go to a

11      couple of meetings where it was discussed, and

12      they had handouts.  So more than likely, there

13      was something from Dominion.  There were -- all

14      the systems that were being proposed had their

15      fliers and information on how their systems

16      worked.

17  BY MR. BELINFANTE:

18      Q.   When you say you went to meetings, were

19  those meetings hosted by the Georgia Secretary of

20  State?

21      A.   Yes.  They were in the Georgia court --

22  yeah.  Yes.

23      Q.   All right.  Other than information provided

24  to you by counsel, were there any -- anything else

25  that you used to make yourself familiar with the

Donna Curling                          January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 41

1    proposed election system?

2         A.    No.

3         Q.    Let's look at paragraph 6.  If you'll just

4    read that to yourself and then let me know when

5    you've done so.

6         A.    Yes.

7         Q.    Okay.  When you say you'll be forced to vote

8    on a system that I do not believe will count my vote

9    equally and fully, what did you mean by that?

10        A.    There's no way to know if my vote is counted

11   as cast because my vote is translated into a QR code,

12   which is not human readable.

13        Q.    Are you -- at the time that you completed

14   this application in October of 2019, were you aware

15   that the proposed election system as defined in this

16   declaration provided not only the QR code but also a

17   list of the voter's choice below?

18        A.    I'm not -- wait a minute.  I'm not

19   following.  Sorry.

20        Q.    That's all right.  Let me do this.

21             All right.  Ms. Curling, I'm going to show

22   you what is Exhibit A to one of the declarations in

23   this case, which is a Barrow County official ballot

24   from November 3 of 2020.  Would you agree with me

25   that when a voter votes on a -- well, first off, can

Page 42

1   you see this?

2        A.   Yes, I can see it.

3        Q.   Okay.  Would you agree with me that when a

4   voter votes on Georgia's current election system, the

5   Dominion BMD system as I'll refer to it, this comes

6   out of the printer and the voter takes this printout

7   to a scanner --

8             MR. SPARKS:  Objection --

9   BY MR. BELINFANTE:

10       Q.   -- or something like this?

11            MR. SPARKS:  Objection; compound.

12            You may answer.

13            THE WITNESS:  Honestly, I've only voted on

14       BMD recently, and it's for municipal elections,

15       so I've never seen anything that looks like this

16       coming out of the printer.  I saw a single vote

17       was all.

18   BY MR. BELINFANTE:

19       Q.   You -- oh, go ahead.  I'm sorry.

20       A.   No.  That's okay.

21            If you say that's what it looks like, I

22   guess that's what it looks like.  I honestly don't

23   know from experience.

24       Q.   All right.  You -- you recently voted in a

25   municipal election on the BMD system?

Donna Curling
Curling, Donna v. Raffensperger, Brad
January 19, 2022

Page 43

1        A.    Yes, I did.

2        Q.    Do you have any reason to believe that your

3   vote was not counted?

4        A.    I have no way of knowing.

5        Q.    Do you have any reason to believe, though --

6   understanding that you may not know but do you have

7   any reason to believe that your vote was not counted?

8              MR. SPARKS:   Objection; asked and answered.

9              You can answer.

10             THE WITNESS:   I mean, I maintain I could see

11         what the printed out said my vote was as I

12         intended; but I have no idea, when I put into the

13         scanner, the scanner read the QR code.  I don't

14         know.

15   BY MR. BELINFANTE:

16       Q.    Okay.  And when you voted, you did see the

17   list or the name of the candidate who you selected on

18   the actual ballot that was printed out from --

19       A.    Yes.

20       Q.    Okay.

21       A.    Yes.

22       Q.    And did you read it before turning it into

23   the scanner?

24       A.    Yes.

25       Q.    All right.  And so while this ballot is --

Donna Curling
Curling, Donna v. Raffensperger, Brad                    January 19, 2022

Page 45

1    of your choices, would that be objectionable to you?

2              MR. SPARKS:  Objection.  It calls for

3         speculation and vague.

4              You may answer, if you know.

5              THE WITNESS:  I mean, I would have less of a

6         problem with it if there were no QR code.

7    BY MR. BELINFANTE:

8         Q.   Okay.  If you have less of a problem, then

9    that suggests to me there's still a problem.  Could

10   you tell me what the problem would be if that -- if

11   the ballot just listed out your choices and did not

12   have the QR code?

13        A.   Well, the -- the problem for me is -- is

14   that everything is software dependent, and I feel

15   like even with hand-marked paper ballots that are

16   scanned risk-limiting audits are required to really

17   get voter confidence.

18        Q.   So is the issue then -- and, again, I'm

19   asking a hypothetical; and the hypothetical is that

20   you would vote and you would have a ballot like this

21   without the QR code.  Is the issue that you're voting

22   by machine and it's a machine that uses software?

23             MR. SPARKS:  Objection; compound, calls for

24        speculation.

25             You may answer, if you know.

Page 47

1          You may answer.

2          THE WITNESS:  That the voter is marking the

3     ballot themselves and it is inherently voter

4     verified.

5   BY MR. BELINFANTE:

6     Q.   And when you say marking the ballot

7   themselves, do you mean with a pen or pencil or other

8   writing device?

9     A.   Yes.

10    Q.   Okay.  Are you -- would -- if the Court were

11  to order hand-marked paper ballots using Scantron

12  technology or fill-in-the-bubble technology -- do you

13  know what I mean by that?

14    A.   Yes, I do.

15    Q.   If the Court would to order

16  fill-in-the-bubble or Scantron technology type

17  ballots, would that satisfy what you're seeking in

18  the lawsuit?

19          MR. SPARKS:  Objection.  It calls for

20     speculation.

21          You may answer.

22          THE WITNESS:  With the addition of

23     risk-limiting audits.

24  BY MR. BELINFANTE:

25    Q.   So -- and is that a yes?  I'm sorry.

Page 48

1      A.    Yes.  With risk-limiting, yes.

2      Q.    Okay.  With risk-limiting audits, correct?

3      A.    Correct.  Yes.

4      Q.    Okay.  All right.  And are you opposed to

5  hand-marked paper ballots using bubble technology

6  being counted on a machine?

7      A.    Are you talking about marked and counted on

8  a machine?

9      Q.    No.  I'm talking about what you just defined

10  as hand-marked paper ballots and --

11      A.    Okay.

12      Q.    -- what's used the fill-in-the-bubble one

13  right now.  If the Court ordered fill-in-the-bubble

14  type ballots, would you be opposed to those ballots

15  being counted on a machine or tabulated on a machine?

16      A.    As long as there were risk-limiting audits,

17  I would be okay with that.

18      Q.    Okay.  If the machine that tabulated the

19  ballot had software, would you be opposed to the

20  machine tabulating the ballots?

21      A.    Again, I believe audits are required if any

22  machine is involved in tabulating the votes.

23      Q.    Okay.  So you're not asking for voters to

24  write out the name of the candidate and have humans

25  review that as the hand-marked paper ballot, correct?

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 51

```
 1        Q.   Okay.  Let's go to paragraph 9 on page 7.
 2   You said in this complaint, which, again, was
 3   verified in June of 2017, that it is presently
 4   unknown if any party interfered with Georgia's
 5   elections in 2016 or 2017.
 6            Sitting here today, is it still presently
 7   unknown if any party interfered with Georgia's
 8   elections in 2016 or 2017?
 9            MR. SPARKS:  Objection; vague.
10            You may answer.
11            THE WITNESS:  I would say it's unknown.
12            (Court reporter clarification.)
13            THE WITNESS:  Unknown.
14   BY MR. BELINFANTE:
15        Q.   Is it also unknown if any party interfered
16   with Georgia's elections in 2018?
17            MR. SPARKS:  Same objection.
18            You can answer.
19            THE WITNESS:  I would say it's unknown.
20   BY MR. BELINFANTE:
21        Q.   Is it unknown if any party interfered with
22   Georgia's elections in 2020?
23        A.   I would say it's unknown.
24        Q.   Okay.  Sitting here today, do you have any
25   knowledge of any party's intent to interfere in
```

Donna Curling
Curling, Donna v. Raffensperger, Brad
January 19, 2022

Page 52

1    Georgia's elections in 2022?

2         A.    In 2022?

3         Q.    Yes; in this year's election.

4         A.    Oh, the upcoming election, no, I -- I do not

5    know of any.

6         Q.    Okay.  I'm going to go to paragraph 26.

7    Here it says:  Despite this authority and ability to

8    avoid unsafe systems, Defendants allowed the special

9    election to be run on a compromised system.  The

10   Defendants refused to use the only safe method for

11   conducting elections - paper ballots.

12            Do you see that?

13        A.    Yes, I do.

14        Q.    Okay.  Would you agree with me that the BMD

15   system utilizes a paper ballot?

16        A.    Yes, it does.

17        Q.    Would you agree with me that the BMD paper

18   ballot is verifiable by the voter?

19            MR. SPARKS:  Objection --

20            THE WITNESS:  I would --

21            MR. SPARKS:  -- vague.  It calls for

22        speculation.

23            You may answer.

24            THE WITNESS:  I would disagree with you on

25        that.

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 54

1        speculation; and to the extent it calls for a

2        legal conclusion, I object as well.

3              You may answer.

4              THE WITNESS:  I would say that the person

5        who came up with risk-limiting audits -- and I

6        believe his name is Stark, Philip Stark -- that

7        as the person who created that, that I would

8        prefer his method to some of the other methods.

9   BY MR. BELINFANTE:

10       Q.   Okay.  Did you follow the post-election in

11  Georgia that's -- let me -- let me -- that's a

12  terrible question.  Let me start over.

13             Did you follow the November 2020 general

14  election in Georgia?

15       A.   Yes, I did.

16       Q.   Okay.  And are you aware that the Secretary

17  ordered a recounting of ballots in the November 2022

18  [sic] presidential election?

19       A.   Yes, I am.

20       Q.   Okay.  Can you tell me your understanding of

21  how that recount proceeded?

22       A.   I think it was a hand recount; was it not?

23  Honestly, I don't remember.  I don't recall.

24       Q.   Okay.  Let me ask this, and I'll do it as a

25  hypothetical.  We went through and looked at a BMD

Donna Curling                              January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 55

1   ballot that identified candidates' names.  If
2   counties were to recount a full recount of the BMD
3   ballot looking only at the names and not the QR code,
4   would that constitute a risk-limiting audit that
5   would satisfy your concerns?
6           MR. SPARKS:  Objection.  It calls for
7       speculation and a legal conclusion.
8           You may answer.
9           THE WITNESS:  It would have to be determined
10      by someone much smarter than me.  I have no idea.
11  BY MR. BELINFANTE:
12      Q.   Okay.  Is it your understanding that a
13  risk-limiting audit looks at a sample of ballots or
14  looks at all ballots?
15      A.   A sample ballots what?
16      Q.   Or all ballots?
17      A.   A sample.
18      Q.   Okay.  I'm going to show you paragraph 42 of
19  the Fulton County complaint.  This refers to CES.  Do
20  you recall what CES was --
21      A.   Yes.
22      Q.   -- and what you were --
23      A.   It was -- I'm sorry.
24      Q.   No, no.  I spoke over you.  Go ahead.  I'm
25  sorry.  Can you just -- go ahead.  I'll be quiet.

Donna Curling                        January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 56

1        A.    I'm sorry.  It's the -- the KSU Center for

2   Elections where they handled everything for the

3   Secretary of State at the time.

4        Q.    Okay.  The last sentence of paragraph 42

5   says:  In Georgia a bad actor could manipulate the

6   State's electrical process by targeting and

7   infiltrating CES.

8              Do you see that?

9        A.    Yes, I do.

10       Q.    Sitting here today, do you have any

11   knowledge of any bad actor who actually manipulated

12   the State's electoral process by targeting and

13   infiltrating the CES?

14       A.    I have no information of that, but I also

15   have no information that it did not occur.

16       Q.    Okay.  I'm going to show you paragraph 131.

17   Here you allege that the failure to comply with the

18   Georgia Constitution and the Georgia Code concerning

19   elections is a violation of federal due process when

20   the patent and fundamental fairness of the election

21   is called into question.

22             Do you see that?

23       A.    Okay.  I'm going to ask you to start over

24   because the page was behind and I wanted see it as

25   you spoke.

Donna Curling                                January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 59

1      speculation.

2              You can answer.

3              THE WITNESS:  Yeah, I can't answer that.

4      Yeah.  I mean, I see no reason to have a problem

5      with the printer.

6   BY MR. BELINFANTE:

7      Q.   Okay.  Are you concerned with the scanners

8   that the voter inserts the paper ballot into?

9      A.   Well, again, the fact that we're scanning, I

10  have no problem with that as long as there are

11  risk-limiting audits.

12     Q.   So boiled down in essence, this lawsuit is

13  about the use of a QR code as opposed to

14  fill-in-bubble balloting; is that correct?

15             MR. SPARKS:  Objection.  It mischaracterizes

16     testimony.  It calls for a legal conclusion.

17             You may answer.

18             THE WITNESS:  I feel like my objection is

19     the lack of transparency that occurs through it

20     being translated to a -- to a bar -- to a QR

21     code, yes.

22  BY MR. BELINFANTE:

23     Q.   Okay.  So you do not have a concern with

24  bubble ballots, fill-in-the-bubble ballots, being

25  tabulated by a scanner; is that correct?

Donna Curling
Curling, Donna v. Raffensperger, Brad

January 19, 2022

Page 63

1    you see here where it says, blank contest for

2    sheriff?

3          A.   Yes.

4          Q.   So we have --

5          A.   So it's prints -- okay.

6          Q.   Go ahead.

7          A.   No.  You go ahead.

8          Q.   I was going to say what do you understand

9    that -- that area or that -- that to mean, blank

10   contest?

11         A.   Well, if this is what the printer prints,

12   that was not my understanding.  I thought that

13   anything -- if you skipped a particular race that it

14   just would not show up; but you're -- what you're

15   showing me, it lists each one and it shows that that

16   was blank, that I intentionally left that blank.  Is

17   that correct?

18         Q.   That's -- I mean, that's certainly what the

19   document seems to suggest, but the -- so -- and here,

20   too, you can see where there's a vote recorded for

21   the Constitutional Amendments 1 and 2.  Do you see

22   that?

23         A.   No, I don't.  Wait.  Wait.

24         Q.   Sure.

25         A.   Yes.  Okay.

1    part that I'm looking at to verify that my votes are

2    accurately recorded.

3         Q.    But can the -- would you agree with me that

4    the voter can verify that the choices identified here

5    below the QR code are consistent with that voter's

6    intent?

7         A.    Yes.

8         Q.    I'm going back to your original complaint in

9    Fulton County.  Are you able to see this,

10   Ms. Curling?

11        A.    Yes.

12        Q.    Okay.  I'm on page 81 of the document using

13   the ECF number.  Part of the relief sought in this

14   middle bullet point is to grant injunctive relief

15   requiring that certification of results of the recent

16   Congressional District 6 elections and the elections

17   itself be declared void ab initio and enjoining the

18   future of Georgia's DRE-based voting system.

19             Do you see that?

20        A.    Yes.

21        Q.    What did you understand that complaint to be

22   seeking in terms of relief as it relates to just that

23   bullet point?

24        A.    That the election results were invalid

25   because there's no way of knowing.  This was on DREs,

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 68

1          Have you seen this document before?

2     A.   Yes, I have.

3     Q.   All right.

4          MR. SPARKS:  Counsel, I do have a file

5     stamped clean copy of the operative complaint in

6     this case.  I'm going to hand it to the witness

7     so she can see what she needs to see with

8     clarity.  Is that permissible?

9          MR. BELINFANTE:  Absolutely.  Thank you.

10    BY MR. BELINFANTE:

11    Q.   Let's go to paragraph 8, which is on page 5

12    of the complaint.  If you'll just read that and let

13    me know when you've completed it.

14    A.   Okay.  I'm finished.

15    Q.   Okay.  It says here that there is a risk

16    that a vote will not be properly counted.  Sitting

17    here today, do you have any reason to believe that

18    any vote cast in Georgia elections since the 2020 --

19    excuse me.

20         Sitting here today, do you have any reason

21    to believe that any vote cast in a Georgia election

22    using the BMD machine was not properly counted?

23    A.   I would maintain there's no way to know.

24    Q.   Sitting here today, do you have any personal

25    knowledge that the declared results will be contrary

Page 69

1  to the will of the voters?

2         A.    Again, there's no way to know.

3         Q.    And sitting here today, do you have any

4  evidence that the system has been hacked by any third

5  parties?

6         A.    There's no way to know either way.

7         Q.    Would you agree with me that there are risks

8  associated with hand-marked paper ballots?

9         A.    Yes.

10        Q.    Okay.  And those risks could include the

11  hacking of scanner machines, couldn't it?

12        A.    Yes.

13        Q.    Okay.  And those risks could include that a

14  voter colors outside the line and their vote is not

15  counted, right?

16        A.    Correct.

17        Q.    And those risks could include someone

18  improperly completing ballots and in effect stuffing

19  them into a ballot box; is that correct?

20        A.    Are you -- I want to you make sure I

21  understand you.  You're saying in the case of

22  hand-marked paper ballots that someone could just

23  mark a bunch of random ballots and stuff them into

24  the box?

25        Q.    Yes.

Donna Curling

Curling, Donna v. Raffensperger, Brad

January 19, 2022

Page 70

1      A.   Yeah.  Yeah.  I mean, I guess it's

2   theoretically possible; but I -- given the security,

3   I would be surprised if that were possible.

4      Q.   Okay.  Do you believe that the possibility

5   of hacking a scanner is a very real risk?

6           MR. SPARKS:  Objection; vague.

7           You may answer.

8           THE WITNESS:  Yes, I would believe it is a

9       real risk.

10  BY MR. BELINFANTE:

11     Q.   Okay.  It says in the first sentence that

12  the case is not merely about a technical or

13  theoretical risk.  What did you mean by theoretical

14  risk?

15          MR. SPARKS:  Objection to the extent it

16      calls for a legal conclusion.

17          You may answer.

18          THE WITNESS:  That something potentially

19      could have happened.  I think that's what it

20      means by theoretical, but -- I'm done.  Sorry.

21  BY MR. BELINFANTE:

22     Q.   Okay.  And what takes this lawsuit or your

23  concerns -- what makes it where it's not a

24  theoretical risk?

25     A.   I'm guessing we're talking about audits for

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 71

 1    me.

 2         Q.   Okay.  So the theoretical risk of things

 3    identified in this paragraph could be cured by

 4    audits?  Is that your position?

 5         A.   Honestly, I feel like it's all outside of my

 6    limited knowledge to know; but I think that experts

 7    could -- could make the system safer to use.

 8         Q.   If the Court were to order -- and I

 9    understand it's a hypothetical; but if the Court were

10    to say we're going to keep the BMDs as they are but

11    order risk-limiting audits as even Dr. Stark

12    suggests, would your concerns about elections be

13    resolved?

14              MR. SPARKS:  Objection.  It calls for

15         speculation and a legal conclusion.

16              You may answer.

17              THE WITNESS:  I would have to think about it

18         more deeply, but just my first impression is yes.

19    BY MR. BELINFANTE:

20         Q.   And in paragraph 8 of the Third Amended

21    Complaint when it talks about these risks, were you

22    addressing both BMDs and the former DRE system?

23         A.   Are you talking about all the risks

24    mentioned in paragraph 8?

25         Q.   Yes.

Donna Curling
Curling, Donna v. Raffensperger, Brad                    January 19, 2022

Page 72

1          A.    Yes, it refers to both.

2          Q.    Okay.  So it's your position that there is

3    no way to verify the validity of an election on BMDs?

4          MR. SPARKS:   Objection.  It mischaracterizes

5          testimony.

6          You may answer.

7          THE WITNESS:  No, I would not say that.  I

8          think it's -- with the audits, I think I would

9          find the results acceptable.

10   BY MR. BELINFANTE:

11         Q.    Okay.  So this statement here at the end of

12   the paragraph, the risk that there will be no way to

13   verify the validity of an election, that's not true

14   with the current BMD system, is it?

15         A.    Yes, it is true because we don't have a

16   risk-limiting audit in place.

17         Q.    Do you believe that the general election in

18   2020 -- that the validity of that election was not

19   verified?

20         A.    Was not verified?

21         Q.    Yes.

22         A.    Actually, 2020 is kind of a special

23   circumstance because of how important the election

24   was and the fact that the Secretary of State did

25   recounts and audits.  So I have a reasonable amount

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 73

1    of faith in that -- I have -- I have faith that --
2    that the results are correct.
3         Q.   Okay.  Do you understand that the recounts
4    were limited to the presidential election?
5         A.   Yes, I do.  Yes, I do.  So, yes, just on
6    the -- yes, you're right.  There's no way of knowing
7    for the rest of it.  That's correct.
8         Q.   So -- so sitting here today, do you believe
9    that the results of the election of Senator Ossoff
10   were valid?
11        A.   I guess there's no way to know.
12        Q.   And the same would be true of Senator
13   Warnock?
14        A.   The same would be true.
15        Q.   The second sentence says that the case is
16   about forcing voters to choose between totally
17   relinquishing their right to vote.  What do you mean
18   by that?
19        A.   Well -- okay.  If -- if you have no faith in
20   the system that you're using, then it's the same
21   thing as if, okay, I -- I don't believe the -- I
22   don't believe the system can accurately reflect my
23   vote, so, therefore, I just won't vote.
24             And I guess that's -- I'm not sure which
25   part of the question you're asking about; but if

Donna Curling

Curling, Donna v. Raffensperger, Brad

January 19, 2022

Page 74

1  you're asking about totally relinquishing the right

2  to vote, that's, I think, what that's referring to.

3       Q.   You voted in the general election in 2020,

4  didn't you?

5       A.   Yes, I did.

6       Q.   Did you vote using an absentee ballot?

7       A.   Yes, I did.

8       Q.   How did you return that absentee ballot?

9       A.   Through the mail.

10       Q.   Do you have any concerns that that ballot

11  was not counted?

12            MR. SPARKS:  Objection; vague.

13            You may answer.

14            THE WITNESS:  I haven't had -- I haven't had

15       the best of luck in using the absentee ballot

16       system that is supposed to be your remedy if you

17       don't want to use the machines.  I would not know

18       if not for this lawsuit; but on more than one

19       occasion, my votes were not counted.

20  BY MR. BELINFANTE:

21       Q.   But in the November 2020 election, do you

22  have any reason to believe that your mail-delivered

23  absentee ballot was not counted?

24            MR. SPARKS:  Objection; vague.

25            You may answer.

Donna Curling
Curling, Donna v. Raffensperger, Brad

January 19, 2022

Page 77

1    light, I believe.

2         Q.   And you don't have a problem if hand-marked

3    paper ballots are tabulated by an optical scanner as

4    you've just defined it, do you?

5         A.   Again, as long as there are audits, I do not

6    have a problem.

7         Q.   Let's look at paragraph 72.

8         A.   72?

9         Q.   Yes, ma'am.  If you'll just read that and

10   then tell me when you've done so.

11        A.   Okay.

12        Q.   All right.  I think we've covered this; but

13   when you say that the proposed system, which refers

14   to the BMD system, does not provide a meaningful way

15   for a voter to audit their vote, what did you mean by

16   audit their vote?

17        A.   Verify their vote.

18        Q.   Okay.  And the issue there again is the QR

19   code?

20        A.   Correct.

21        Q.   You say that the proposed election system,

22   which again refers to the BMDs, will not be

23   substantially safer than the current system.

24             Do you believe that the proposed election

25   system or the BMD system is in any way safer than the

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 79

1      Q.    So do you sitting here today believe that

2    the presidential election from November of 2020 in

3    Georgia was verified?

4      A.    Yes.

5      Q.    And can you tell me what steps or actions

6    taken lead you to that conclusion?

7      A.    The Secretary of State went through numerous

8    forms of diligence to ensure confidence in the race.

9      Q.    Do you believe that the presidential

10   election from November of 2020 violated anyone's

11   constitutional rights?

12         MR. SPARKS:  Objection.  It calls for

13         speculation, vague.

14         You may answer.

15         THE WITNESS:  Not that I know of.

16   BY MR. BELINFANTE:

17     Q.    And is that because of the actions taken

18   after the election?

19         MR. SPARKS:  Same objection.

20         THE WITNESS:  Yes.

21   BY MR. BELINFANTE:

22     Q.    Even though you testified a moment ago that

23   the paper itself is worthless?

24         MR. SPARKS:  Objection.

25         THE WITNESS:  No, no.

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 80

1          MR. SPARKS:  Objection.

2          THE WITNESS:  Okay.  I was reasoning through

3      that the paper is not worthless, but the fact

4      that the scanner does not read the human portion

5      of the paper makes it somewhat meaningless as far

6      as your question was concerned.

7   BY MR. BELINFANTE:

8      Q.   So is it fair to say that the paper is not

9   your ideal system, but it can at least lead to a

10  verified election?

11     A.   With the proper procedures in place, yes.

12     Q.   All right.  So in paragraph 72 where it

13  says, the proposed system does not provide a

14  meaningful way for a voter to audit their vote,

15  that's not accurate, is it?

16     A.   Wait a minute.  It is accurate.

17     Q.   Well, I guess my question then is what's the

18  difference between a meaningful way to audit a

19  vote -- well, how could someone not -- let me start

20  over.

21          How could someone not have a meaningful way

22  to audit their vote, yet have an election that is

23  verifiable based on the proposed election system?

24     A.   I am quite confused about what you're

25  asking.

Donna Curling                                      January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 85

1        paragraph are we?

2              THE WITNESS:  80.

3              MR. SPARKS:  80.  Thank you.

4    BY MR. BELINFANTE:

5        Q.   All right.  For the problems that are -- or

6    alleged problems that are identified in paragraph 80,

7    subparagraphs (a) through (e), do you have any

8    personal knowledge of any of those things actually

9    happening in a Georgia election utilizing the

10   Dominion BMD system?

11       A.   I don't know if they did or did not.

12       Q.   I'll show you paragraph 81.

13       A.   Yes.  I read that.

14       Q.   Okay.  All right.  This sentence, one

15   vulnerability was the ability of remote attackers to

16   implement a DNS attack, do you see that?

17       A.   Yes, I do.

18       Q.   What did you mean by DNS attack?

19       A.   I don't know.

20       Q.   Sitting here today, do you have any personal

21   knowledge of a DNS attack on the Georgia election

22   system?

23       A.   I don't know if one has or has not occurred.

24       Q.   Okay.  Sitting here today, do you have any

25   personal knowledge of an XML file being manipulated

Donna Curling
Curling, Donna v. Raffensperger, Brad

January 19, 2022

Page 86

1    to redirect scanned votes to a different candidate

2    other than that of the voter's choice?

3         A.   I have no -- no way of knowing either way.

4              MR. SPARKS:  Since we're coming up on the

5         lunch hour, I just wanted to put in mind that

6         when you get to a good point for a break we

7         should probably plan to take one.

8              MR. BELINFANTE:  Sure.  Why don't we this.

9         I've got just a couple of questions in this area,

10        and then -- then we'll take a break.

11             MR. SPARKS:  Okay.  That should be fine.

12        Thanks.

13             MR. BELINFANTE:  Thank you.

14   BY MR. BELINFANTE:

15        Q.   All right.  If you could you look at

16   paragraph 87, which is on page 27 of the complaint.

17        A.   Okay.

18        Q.   My question is in the scheme of things, what

19   do you think is a more likely outcome, a voter making

20   a mistake on their ballot or a systemic attack on an

21   election?

22             MR. SPARKS:  Objection.  It calls for

23        speculation.

24             You may answer.

25             THE WITNESS:  I don't know.  I mean, it

Case 1:17-cv-02989-AT   Document 1570-1   Filed 01/09/23   Page 53 of 75
Donna Curling
Curling, Donna v. Raffensperger, Brad
January 19, 2022

Page 87

```
 1        depends on the voter.
 2    BY MR. BELINFANTE:
 3        Q.   Sitting here today, do you believe that
 4    there has been a systemic attack on any Georgia
 5    election?
 6        A.   I have no way of knowing either way.
 7        Q.   How could one prove to you that there has
 8    not been a systemic attack on a Georgia election?
 9        A.   They probably could not.
10             MR. BELINFANTE:  Mr. Sparks, I'm about to
11        get into the counts.  So if you want to take a
12        break now, it might be an appropriate time to do
13        so.
14             MR. SPARKS:  Yeah.  I think that should be
15        fine.
16             MR. BELINFANTE:  Okay.  Would you guys like
17        to come back at -- at 12:50, 1:00?  You tell me.
18        I've probably got --
19             We can go off the record, if that's all
20        right with everyone.
21             THE VIDEOGRAPHER:  Stand by, please.
22             The time is 11:51 a.m.  We are off video
23        record.
24             (A lunch recess was taken.)
25             THE VIDEOGRAPHER:  The time is 12:32 p.m.
```

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 89

1    other intrusion and manipulation by individuals and

2    entities without authorization to do so?

3            A.    Yes; the KSU system in 2017.  Is that what

4    you're talking about?

5            Q.    I'm just talking about paragraph --

6            A.    Yes.

7            Q.    -- 116 (a).

8            A.    Yes.  So, yes, there -- there -- there was

9    an intrusion and that system was hacked.

10           Q.    Do you know who it was hacked by?

11           A.    Logan Lamb.

12           Q.    And did Logan Lamb, to your knowledge,

13   attempt to change the outcome of any election?

14           A.    To my knowledge, no; but he -- his access

15   means that a -- that many others could have had

16   access who could have.

17           Q.    Could have but you sitting here today have

18   no knowledge of anyone who actually did hack the

19   system?

20           A.    I have no knowledge anyone did or did not.

21           Q.    And there's no way that anyone could prove

22   to you that someone did not hack the system; isn't

23   that right?

24           A.    That's correct.

25           Q.    So when you say, though, that the -- Logan

Page 90

1  Lamb and the Kennesaw State incident involved the old
2  Diebold voting system; is that right?
3      A.   Yes.
4      Q.   Is it your understanding that the system
5  that was at KSU and that Logan Lamb hacked is still
6  used in Georgia today?
7           MR. SPARKS:  Objection; vague.
8           You may answer.
9           THE WITNESS:  It is not.
10 BY MR. BELINFANTE:
11     Q.   All right.  So looking at today and as
12 paragraph 116 describes the proposed election system,
13 do you have any knowledge of an actual electronic
14 and/or other intrusion and manipulation by an
15 individual or entity without authorization to do so?
16     A.   No.  I have no evidence of either.
17     Q.   Paragraph 116 (b) also says that the
18 proposed election system, quote, fails to include
19 minimal and legally required steps to ensure that
20 such equipment cannot be operated without
21 authorization.
22          What did you mean by minimal and legally
23 required steps?
24          MR. SPARKS:  Objection.  It calls for a
25     legal conclusion.

Donna Curling
Curling, Donna v. Raffensperger, Brad                January 19, 2022

Page 91

1            You may answer.
2            THE WITNESS:  I'm assuming -- this is for
3       like -- I don't know.  I don't know.  Election
4       workers, not -- I don't -- I don't know.
5  BY MR. BELINFANTE:
6       Q.   All right.  It also says that the proposed
7  election system in paragraph 116 (b) does not provide
8  the minimal and legally required protection for such
9  equipment to secure against unauthorized tampering.
10           What did you mean by that?
11           MR. SPARKS:  Same objection.
12           You may answer.
13           THE WITNESS:  And same answer.
14  BY MR. BELINFANTE:
15       Q.   All right.  In the last part of 116 (b), it
16  says that the proposed election system does not or
17  fails to ensure that all such equipment, firmware,
18  and software is reliable, accurate, and capable of
19  secure operation as required by law.
20           What did you mean by that?
21           MR. SPARKS:  Same objection.
22           You may answer.
23           THE WITNESS:  And same answer.
24  BY MR. BELINFANTE:
25       Q.   Is it your position that the scanners used

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 92

1   in the Dominion system, or the current voting system,

2   are reliable, accurate, and capable of secure

3   operation as required by law?

4           MR. SPARKS:  Same objection.

5           You may answer.

6           THE WITNESS:  I don't know.

7   BY MR. BELINFANTE:

8       Q.   Okay.  If the scanners that we currently use

9   with the BMD system were used to scan hand-marked

10  paper ballots and there was a risk-limiting audit,

11  would that constitute a constitutional method of

12  conducting elections in Georgia?

13          MR. SPARKS:  Objection.  It calls for

14      speculation and a legal conclusion.

15          You can answer.

16          THE WITNESS:  I would feel better about it,

17      but I still feel like there's -- it's not

18      transparent.  The whole thing is just not

19      transparent.  So like even an audit isn't going

20      to guarantee me that my vote counts, and this is

21      about my vote and my lack of confidence in my

22      vote.

23  BY MR. BELINFANTE:

24      Q.   And what is -- okay.  So in that case, what

25  would give you confidence in your vote and have you

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 93

1   overcome your fear that your vote is not being

2   counted?

3           MR. SPARKS:  Objection; compound.

4           You can answer.

5           THE WITNESS:  I didn't hear the last part of

6      your question.

7   BY MR. BELINFANTE:

8      Q.   Sure.

9           What would give you confidence that your

10  vote is counted so you could overcome your fear that

11  it is not counted?

12     A.   I don't know.  I would want to discuss it

13  with the experts that I know and let them, you know,

14  guide me as to the things that could help me to have

15  confidence.

16     Q.   So your confidence is dependent upon

17  conversations with experts?

18          MR. SPARKS:  Objection.  It mischaracterizes

19     testimony.

20          You can answer.

21          THE WITNESS:  Yeah, conversations with

22     people who -- who know.

23  BY MR. BELINFANTE:

24     Q.   Ms. Curling, do you have any independent

25  opinion on what would -- what would satisfy your

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 94

1    fears about elections in Georgia?

2            MR. SPARKS:  Objection.  It calls for

3        speculation.

4            You can answer.

5            THE WITNESS:  No; but I mean, I would settle

6        for hand-marked paper ballots and -- and to be

7        scanned in and risk-limiting audits.

8    BY MR. BELINFANTE:

9        Q.   And to be clear when you say and scanned,

10   would you be satisfied if they were scanned on the

11   existing Dominion systems?

12       A.   I don't think it makes any difference which

13   scanner is used, but keep in mind that a lot of the

14   things that have been discovered are not known to me.

15   They're sealed.  I don't know what the experts found,

16   but I know specifically that -- that something was

17   found with the Dominion system.  And so that makes me

18   reluctant to say whether I would or would not be

19   happy with the Dominion scanner.

20       Q.   You said something was found.  What was that

21   something?

22       A.   I don't know.  I'm not privy to that

23   information.

24       Q.   So your fear of the scanners is based on

25   something you know that the experts at least

Case 1:17-cv-02989-AT   Document 1570-1   Filed 01/09/23   Page 60 of 75
Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 95

```
1   purportedly discovered, but you don't have any
2   personal knowledge of what that is; is that correct?
3        A.   And I don't know if it was the scanner or
4   the B -- or the machine or the print -- I have no
5   idea what was found.  I don't know means I don't
6   know.
7        Q.   Okay.  At the time you filed this lawsuit,
8   what was the harm -- what was the injury that led you
9   to file the third amended complaint?
10            MR. SPARKS:  Objection to the extent it
11       calls for a legal conclusion.
12            THE WITNESS:  So when was this filed?
13       Honestly, it was so -- so long ago I just don't
14       remember.  I don't remember.
15   BY MR. BELINFANTE:
16       Q.   Okay.  You would agree with me, though, that
17   at the time you filed at this lawsuit -- and by
18   lawsuit -- let me -- let me start over.
19            You would agree with me that the time you
20   filed the third amended complaint in October of 2019
21   you did not have any knowledge of an actual hack of
22   Georgia's election system, correct?
23       A.   I didn't have any evidence either way that
24   it had or had not.
25       Q.   Okay.  So at the time you filed the lawsuit
```

Donna Curling                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 96

1    in October of 2019, is it fair to say that your

2    injury was your fear that the system could be hacked?

3                MR. SPARKS:  Objection.  It calls for a

4          legal conclusion, asked and answered.

5                You may answer.

6                THE WITNESS:  It is about the lack of

7          transparency.  This is about my vote, and I have

8          no way of knowing.  It's not about fear.  It's

9          about that there's no way to know, and I have a

10         problem with that.

11   BY MR. BELINFANTE:

12         Q.    And so the reason that you filed the

13   complaint is your concern of something that you don't

14   know?  Is that what I understand you to be testifying

15   to?

16         A.    No.  It's --

17               MR. SPARKS:  Objection; mischaracterizes,

18         asked and answered.

19               Go ahead, Ms. Curling.  I'm sorry to

20         interrupt you.

21               THE WITNESS:  It's based on information,

22         things that I've read throughout my time of

23         working on this issue that concern me.  So, no,

24         not that I don't know but just it's pretty broad.

25   BY MR. BELINFANTE:

Donna Curling                                January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 97

1        Q.    And do you have any reason to believe that a

2    vote you cast in the 2020 election, be it the primary

3    or the general election, was not counted?

4        A.    I don't know if it was or was not.

5        Q.    Okay.  Is there anything that anyone could

6    submit to you that would give you that confidence?

7        A.    No.

8        Q.    Let's look at paragraph 117 of the third

9    amended complaint, which starts on page 36 and goes

10   to page 37.

11            MR. SPARKS:  Let the record reflect that

12        Ms. Curling still has a clean, unmarked as filed

13        copy of the third amended complaint for Curling

14        plaintiffs in front of her.

15            THE WITNESS:  Starting at 116?

16   BY MR. BELINFANTE:

17        Q.    Paragraph 117, Ms. Curling.  Starting on

18   page --

19        A.    117, okay.

20            Okay.  Just 117 or all of it?

21        Q.    Yes, ma'am, just 117.

22        A.    Okay.

23        Q.    Where it says that a system must be -- that

24   must be presumed to be compromised and incapable of

25   producing verifiable results -- let's start with the

Donna Curling                           January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 98

1   presumed to be compromised.  Why must the system be

2   presumed to be compromised?

3        A.   I'm assuming it's still about the -- the

4   fact that the system was breached.

5        Q.   Let's go back and look up at the top of

6   paragraph 30 -- or 116, excuse me, which discusses

7   the proposed election system.  Do you understand the

8   proposed election system to be the BMD system?

9        A.   Okay.  So -- all right.

10       Q.   So then going back to paragraph 117, which

11  again refers to the proposed election system, why

12  must the proposed election -- the Dominion BMD system

13  be presumed to be compromised?

14       A.   I don't know.

15       Q.   All right.  And as we kind of went through

16  before, it is possible to verify the results of an

17  election using the current Dominion BMD system, isn't

18  it?

19            MR. SPARKS:  Objection.  It mischaracterizes

20       prior testimony.

21            You may answer.

22            THE WITNESS:  Would you repeat the question?

23  BY MR. BELINFANTE:

24       Q.   Sure.

25            Sitting here today, do you -- do you believe

Page 99

1   that it is possible to verify the results of an

2   election using the BMD system?

3              MR. SPARKS:  Same objection.

4              You may answer.

5              THE WITNESS:  Not conclusively, no.

6   BY MR. BELINFANTE:

7       Q.   Can you ever conclusively verify an election

8   result?

9       A.   Probably not.  I don't know.

10      Q.   All right.  Paragraph 119, if you'll go

11  ahead and read that and tell me once you have.

12      A.   Okay.

13      Q.   All right.  Paragraph 119 (c) asks for an

14  award of attorneys' fees and costs for Defendants'

15  causation of concrete injury to Plaintiffs.

16             What is the concrete injury that you have

17  experienced as a result of the use of the Dominion

18  BMD system?

19             MR. SPARKS:  Objection to the extent it

20        calls for a legal conclusion.

21             You may answer.

22             THE WITNESS:  I have no idea if my vote

23        counted or was not counted.  That's my injury.

24  BY MR. BELINFANTE:

25      Q.   And that would be true if you used a

Donna Curling
Curling, Donna v. Raffensperger, Brad                    January 19, 2022

Page 100

1    hand-marked paper ballot with an optical scanner as

2    well, wouldn't it?

3         A.   That's true.

4         Q.   You are seeking attorneys' fees in this

5    lawsuit; is that correct?

6         A.   Yes.

7         Q.   All right.  Do you have a retainer agreement

8    with the Morrison & Foerster law firm?

9         A.   I don't know the answer to that.  I mean, I

10   don't -- no, I don't think so.  I don't know.

11        Q.   Have you entered into an agreement with the

12   Morrison -- a written agreement with the Morrison &

13   Foerster law firm to represent you in this case?

14        A.   I remember signing something for each law

15   firm as this is our third law firm, but I don't

16   recall specifically if it was a retainer or what.  I

17   don't -- I don't know anything about legal stuff, so

18   sorry.

19        Q.   Have you actually expended any personal

20   funds in the prosecution of this lawsuit?

21        A.   Not aside from some travel but -- early on,

22   not since.

23        Q.   Okay.  And early on was that with the

24   Holcomb & Ward law firm?

25        A.   It's when we were in D.C. with our second

Donna Curling
Curling, Donna v. Raffensperger, Brad
January 19, 2022

Page 101

1    law firm Steptoe & Johnson.

2         Q.   Okay.  Would you be willing to provide us

3    any agreements that you have with the Morrison &

4    Foerster law firm?

5              MR. SPARKS:  I'm going to object here,

6         Counsel.  I think at minimum Ms. Curling would

7         have to consult with counsel before agreeing to

8         such a provision.  I'm trying to give some

9         leeway, but that's a little much.

10             MR. BELINFANTE:  Are you instructing her not

11        to answer?

12             MR. SPARKS:  Yes.  Sorry.  I should be more

13        clear.  Yes.

14             Ms. Curling, please don't answer that

15        question at least not at the moment.

16             THE WITNESS:  Okay.

17   BY MR. BELINFANTE:

18        Q.   And I anticipate where this is going; but,

19   Ms. Curling, do have an agreement with the Krevolin &

20   Horst law firm, a written agreement?

21        A.   Same thing.  I'm unsure.

22        Q.   Count III alleges, as you can see on 119, a

23   violation of the due process clause.  Can you explain

24   to me your understanding of what the violation of the

25   due process clause is?

Donna Curling                                    January 19, 2022
Curling, Donna v. Raffensperger, Brad

                                                        Page 102

1              MR. SPARKS:  Objection to the extent it
2         calls for a legal conclusion.
3              You can answer.
4              THE WITNESS:  Right to vote.
5    BY MR. BELINFANTE:
6         Q.   And your right to vote -- how is your right
7    to vote injured as a result of Georgia's use of the
8    proposed election system as alleged in the complaint?
9              MR. SPARKS:  Same objection.
10             You can answer.
11             THE WITNESS:  Because I don't know if my
12        vote is counted as I cast my vote.
13   BY MR. BELINFANTE:
14        Q.   Count IV alleges a violation of the Equal
15   Protection Clause of the 14th Amendment.  Can you
16   tell me your understanding of what the harm is or
17   what the equal protection violation is in Georgia
18   elections using the -- as alleged in the complaint?
19        A.   I am not a hundred percent sure, but I think
20   it's saying that -- that everyone is to be treated
21   the same.
22        Q.   Who is treated differently as a result of
23   the way that Georgia conducts elections?
24        A.   I don't know.  I don't know the answer to
25   these questions.

Donna Curling                                   January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 103

1      Q.    Okay.  Let's look at paragraph 124 on page

2    38 of the third amended complaint.

3            All right.  Can the paper ballots that come

4    from Georgia's BMD system be recounted?

5            MR. SPARKS:  Objection; vague.

6            THE WITNESS:  I assume that they can be, but

7       I think general -- the general practice is to --

8       to re-scan.

9    BY MR. BELINFANTE:

10     Q.    And when you say here that absentee paper

11   ballots are verifiable recountable ballots, did you

12   mean recountable through scanning or did you mean

13   recountable by human review without a machine?

14     A.    They're verifiable by human review.

15     Q.    And that's because you can see the voter's

16   choice as bubbled in next to the candidate's name,

17   correct?

18     A.    Correct.

19     Q.    And with a BMD paper ballot, you can see the

20   voter's choice identified below the QR code; isn't

21   that correct?

22            MR. SPARKS:  Objection.  It mischaracterizes

23       testimony.

24            You may answer.

25            THE WITNESS:  That's correct.

Donna Curling
Curling, Donna v. Raffensperger, Brad
January 19, 2022

Page 107

1   protection for such equipment to secure against

2   authorization -- excuse me, unauthorized tampering.

3           Sitting here today, do you know what those

4   minimal and legally required steps would be?

5       A.   No, I don't.

6       Q.   Okay.  If you could look at paragraph 129

7   and then just let me know once you've had a chance to

8   read that.

9       A.   Okay.

10      Q.   In your own words, can you explain to me

11  what you meant in that paragraph?

12      A.   They're talking about that it's not equal

13  the people who vote on the machines versus the people

14  who vote by absentee ballots.

15      Q.   Okay.  And why is it not equal?

16      A.   It's because the people who vote by absentee

17  ballots can verify their vote.

18      Q.   And a person voting on a BMD can read the

19  selection below the QR code and see the names of

20  candidates that they have chosen, correct?

21      A.   Correct.

22      Q.   And does that not constitute some form of

23  verifying their vote?

24      A.   It doesn't constitute how the scanner is

25  going to read their vote.

Page 108

1        Q.    Sure.

2              And by the same token, would a voter voting

3    by absentee not be able to determine how a scanner is

4    going to read how they fill in the bubbles?

5        A.    That's correct.

6        Q.    All right.  Ms. Curling, have you ever been

7    employed by ChoicePoint, Incorporated?

8        A.    No.

9        Q.    Okay.  Is that -- was ChoicePoint a company

10   that your family members were employed by?

11       A.    My husband, yes.

12       Q.    Okay.  And ChoicePoint settled a matter with

13   the Federal Trade Commission in and around 2009,

14   didn't it?

15             MR. SPARKS:  Counsel, I have to object at

16        this point to relevance.  Do you mind explaining

17        where we're going with this?

18             MR. BELINFANTE:  Sure.  It involved a data

19        breach, and I'm just trying to determine the

20        significance of that to Ms. Curling.

21             THE WITNESS:  Do you want me to answer it?

22             MR. SPARKS:  It's his deposition.  Sure.  Go

23        ahead.

24             THE WITNESS:  I mean, yes, I remember the

25        breach.  I remember how it was resolved; but it

Donna Curling                                January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 111

1      so.

2            MR. BELINFANTE:  Sure.  Just let me know

3      when you've got it.

4            MR. SPARKS:  Okay.  We have the document up

5      now.  Thank you.

6            MR. BELINFANTE:  Okay.

7  BY MR. BELINFANTE:

8      Q.   And I acknowledge it's is a little blurry on

9  the screen.

10           Ms. Curling, toward the back of this

11  e-mail -- well, never mind.

12           You say on the first page -- well, again,

13  let me give you a chance -- I think my only questions

14  are going to be coming from your e-mail, this last

15  bit here starting with I'm laughing out loud down to

16  thanks for being careful.  So if you want to reread

17  that, I'll -- let me know when you've finished.

18      A.   Okay.  I remember this e-mail, so...

19           Okay.

20      Q.   All right.  The last sentence of the first

21  paragraph says:  It's insane but voting has truly

22  become one of the most anxiety provoking American

23  activities and it should not be that way.

24           What is it about voting that makes it an

25  anxiety provoking activity for you?

Donna Curling                          January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 112

1    A.   Okay.  Well, for one because I don't trust

2  the machines.  I have to go through the exercise of

3  getting an absentee ballot.  In the election in

4  question, the Secretary of State's office was

5  incredibly late.  You then have to like wait and hope

6  and pray you get your ballot in time to mark it and

7  return it so that your vote will be counted.  That's

8  what I mean.

9    Q.   Okay.  Do you recall if in the -- this was

10  sent in October, so I presume you're talking about

11  the general election in November; is that correct?

12    A.   I guess so, yeah.

13    Q.   Okay.

14    A.   Let me see.  Okay.

15    Q.   And do you recall if in the November 2020

16  election how you returned your ballot, by mail or

17  drop box?

18    A.   Wow.  I -- okay.  I believe for 2020 my -- a

19  bunch of my friends and I requested our ballots at

20  the same time.  Theirs came in literally months

21  before mine.  My husband's and mine -- Doug got his

22  the Saturday before election day, and I got mine on

23  the Monday before election day.  So I filled it out

24  and then took it to the drop box and put it in.

25    Q.   Okay.  And your friends that got theirs

Page 113

1   months before, do they also live in Fulton County?

2       A.   Yes, they do.

3       Q.   Okay.  The second to last sentence on the

4   last paragraph says:  I still worry we will get

5   screwed here because of the machines, but I don't

6   think that they will be rejecting ballots for simple

7   things.

8            Do you see that?

9       A.   Yeah.

10      Q.   When you said, I still worry we'll get

11  screwed here because of the machines, what were you

12  referring to?  What did you mean?

13      A.   I mean, if there were software programming

14  in the machines that could, you know -- would -- all

15  the things you worry about with a nontransparent

16  system.

17      Q.   And sitting here today, do you have any

18  reason to believe that your fears were materialized?

19      A.   I'll never know one way or another.

20      Q.   Sorry.  I'm just pulling up another

21  document.

22      A.   No problem.

23           (Exhibit 11 was marked for

24       identification, attached at the end of

25       the original transcript.)

Page 125

1    yes.  I asked her to look at the signature

2    verification on the back and to make sure that

3    everything there was in order.  She said yes.  And I

4    said so if I leave my ballot here, this is where it

5    will get counted.  She said yes.  I left.

6              I didn't find out until we were sitting in

7    the courtroom and -- that my vote didn't count that

8    particular election.  I don't know why, but it

9    didn't.

10       Q.   All right.  And -- and all of your voting

11   and the incidents you described, that occurred in

12   Fulton County?

13       A.   Yes.

14       Q.   Okay.  How long have you been a resident of

15   Fulton County?

16       A.   Since 1987.

17       Q.   All right.  Sorry.  I'm looking for a

18   document, and I'm having trouble locating it.

19            MR. BELINFANTE:  All right.  Counsel, I know

20       we just did this, but that was -- I had to --

21       there was a different document that I was pulling

22       up.

23            If everyone will give me ten minutes, I

24       could be done.  So if we go off the record and

25       reconvene at 2:15, I think we could conceivably

Donna Curling                          January 19, 2022
Curling, Donna v. Raffensperger, Brad

Page 140

<pre>
1                         CERTIFICATE
2    STATE OF GEORGIA:
3    COUNTY OF GWINNETT:
4              I hereby certify that the foregoing
     transcript was taken down, as stated in the caption,
5    and the colloquies, questions and answers were
     reduced to typewriting under my direction; that the
6    transcript is a true and correct record of the
     evidence given upon said proceeding.
7              I further certify that I am not a
     relative or employee or attorney of any party, nor am
8    I financially interested in the outcome of this
     action.
9              I have no relationship of interest in
     this matter which would disqualify me from
10   maintaining my obligation of impartiality in
     compliance with the Code of Professional Ethics.
11             I have no direct contract with any
     party in this action and my compensation is based
12   solely on the terms of my subcontractor agreement.
               Nothing in the arrangements made for
13   this proceeding impacts my absolute commitment to
     serve all parties as an impartial officer of the
14   court.
               This the 3rd day of February, 2022.
15
16
17
18
                      _____
19
                      LAURA R. SINGLE, CCR-B-1343
20
21
22
23
24
25
</pre>

Veritext Legal Solutions

800.808.4958                                    770.343.9696