Page 1

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE NORTHERN DISTRICT OF GEORGIA

2                    ATLANTA DIVISION

3

4      DONNA CURLING, et al.,

5          Plaintiffs,

6                                    CIVIL ACTION

       vs.                    FILE NO.:  1:17-CV-2989-AT

7

       BRAD RAFFENSPERGER, et al.,

8

9          Defendants.

10     ------------------------------

11

12

13                 REMOTE DEPOSITION OF

14                  DR. PHILLIP STARK

15                 December 16, 2022

16                     1:00 p.m.

17

18          (All attendees appeared remotely via

19        videoconferencing and/or teleconferencing)

20

21

22

23                   Inger Douglas

24                   CVR No. 7481

25            CCR No. 5166-3765-6508-0064

Dr. Phillip Stark                                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 2

1                    A P P E A R A N C E S   O F   C O U N S E L

2

3       On behalf of the Coalition Plaintiffs:

4       MR. BRUCE P. BROWN, Esquire

        Bruce P. Brown Law

5       1123 Zonolite Road NE

        Floataway Business Complex, Suite 6

6       Atlanta, Georgia 30306

        Email:  bbrown@brucepbrownlaw.com

7

8       On behalf of the Curling Plaintiff:

9       MR. DAVID CROSS, Esquire

        Morrison & Foerster LLP

10      2100 L Street NW, Suite 900

        Washington, DC 20037

11      Email:  dcross@mofo.com

12

13      On behalf of Secretary Brad Raffensperger and Members of the

        State Election Board:

14

15      MR. CAREY A. MILLER, Esquire

        MR. ALEXANDER DENTON, Esquire

16      Robbins Ross Alloy Belinfante Littlefield LLC

        500 14th Street, N.W.

17      Atlanta, Georgia 30318

        Phone:  678-701-9381

18      Email:  cmiller@robbinsfirm.com

                adenton@robbinsfirm.com

19

20      Also Present:

21      Ms. Deidra Thomas, Videographer

22      Ms. Anna Edmondson, Esq.          Ms. Caroline Middleton, Esq.

23      Ms. Donna Price, Esq.             Ms. Sonja Swanbech, Esq.

24      Ms. Jenna Conway, Esq.            Mr. Richard DeMillo

25      Ms. Danielle Hernandez, Esq.      Ms. Marilyn Marks, Esq.

Dr. Phillip Stark                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 3

1                         I N D E X

2      DEPONENT:

3      DR. PHILLIP STARK

4                                                        PAGE

5      Examination By Mr. Miller  . . . . . . . . . . . . . . .   5

6      Examination By Mr. Brown . . . . . . . . . . . . . . . .  55

7      Re-Examination By Mr. Miller . . . . . . . . . . . . . .  56

8

9

10                         *       *       *

11                   A T T A C H M E N T S

12     Certificate

13     Reporter's Disclosure Statement

14                         *       *       *

15

16               T R A N S C R I P T   C O D E S

17     --                  interruption/change in thought

18     . . .               incomplete thought

19     [sic]               denotes word/phrase that may seem strange

20                         or incorrect has been written verbatim

21     (ph)                phonetically spelled

22     (indiscernible)     not capable of being understood

23     (crosstalk)         two or more talking simultaneously

24

25

Dr. Phillip Stark                          December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 4

1                    I N D E X   T O   E X H I B I T S

2       Defendant's

        Exhibits                 Description                 Page

3

4    Exhibit 1          Notice of Deposition              6

5    Exhibit 2          Supplemental Report 66            6

6    Exhibit 3          Tabulating Results                27

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Dr. Phillip Stark                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

                                                      Page 14

1        Q    Okay.  So it's your understanding that the access

2    to...

3        A    The 2020 -- yeah, the 2020 election, so January 2021.

4    I'm sorry.  Forgive me.  It is 2021.

5        Q    Yeah.  Okay.

6        A    I can't count.  That's an occupational hazard as a

7    statistician, so...

8        Q    Yeah.  It's difficult for a mathematician and a

9    statistician, yeah.

10       A    Right.

11       Q    At least I can say that as a lawyer that's not a big

12   deal, you know?  So you go on to state that those parties had

13   enough access to corrupt the installed software or implant

14   malware on the devices.  Do you see that?

15       A    Yes, sir.

16       Q    Okay.  And did you review any of the forensic images

17   taken of the Coffee County election equipment?

18       A    I did not.

19       Q    Okay.  And why not?

20       A    It's outside my expertise as regards to this case.  I

21   -- there were specific experts looking at that,

22   Mr. Skoglund ph) and Professor Haldeman (ph).

23       Q    Okay.  So by extension then, you didn't look at the

24   forensic image to see if anybody actually corrupted the

25   installed software, right?

Dr. Phillip Stark                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

                                                    Page 15

1          A    I did not.

2          Q    Okay.  And you didn't, you know, look to verify

3    whether anybody actually implanted malware on those devices,

4    right?

5          A    I did not.

6          Q    Okay.  Are you aware of anybody that did look for

7    that?

8          A    I understand that, as I mentioned before, Professor

9    Haldeman and Mr. Skoglund examined the images.  I don't know

10   whether they specifically looked for malware, but I know that

11   others have examined the images.

12         Q    Okay.  Are you aware of any individual examining the

13   images or that equipment that has identified either corrupted

14   software or malware in that examination?

15         A    I am not aware of that.

16         Q    Okay.  And just to make sure I'm, you know, covering

17   all bases here, the same question, but -- are you aware of any

18   individual that examined those images or equipment that

19   identified any anomalous operation or malicious code or

20   anything out of the ordinary as far as the operating software

21   on the devices?

22         A    I'm hung up a little on anomalous operation because I

23   understand that Mr. Limburg in particular was looking at

24   whether he could generate anomalous operation by changing

25   settings in some of the software.  But I -- other than that,

Dr. Phillip Stark                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

                                                      Page 17

1      that there wasn't time for him to restore the settings back to

2      what they were before that test.  I might be misremembering

3      that, but that's -- that's what I recall.

4           Q    Okay.  And that's -- when you said he discovered

5      settings, that's him tinkering with it in his own experiment to

6      change the settings, right?

7           A    That's my understanding, yes.

8           Q    Okay.  And so just so that I understand your

9      testimony here, you're not offering an opinion that any party

10     corrupted the installed software or implanted malware on the

11     devices, right?

12          A    No, sir.  The point of those paragraphs is really

13     that there was an opportunity to, not that it, in fact,

14     happened, and that this may indicate that there could be other

15     opportunities, too, in other jurisdictions within Georgia.

16          Q    Okay.  And so the next sentence there, you state that

17     you "understand Sullivan-Strickland" -- excuse me --

18     "Sullivan-Strickler copied all the digital information from

19     (imaged the drives of many pieces of equipment) and posted

20     images to a ShareFile site online."  So this image made by

21     Sullivan-Strickler falls in the category of things you -- you

22     did not personally review, right?

23          A    Correct.  Yes, sir, I did not.

24          Q    And then, you go on to talk about what I think you've

25     alluded to earlier here today.  "I understand that an unknown

Dr. Phillip Stark                        December 16, 2022
Curling, Donna v. Raffensperger, Brad

                                                        Page 19

 1    concern your view on audits and a purported vulnerability

 2    called DVSorder.  Is that generally accurate?

 3        A    Yes, sir.  A little bit of specific information about

 4    the audit of the Secretary of State's contest.

 5        Q    Okay.  All right.  So if you'll scroll maybe to

 6    paragraph five, this is -- let's see.  I think it's the third

 7    page of the declaration.

 8        A    Yes, sir.

 9        Q    You state there, "No audit can reliably determine

10    whether BMDs altered enough votes to change who appeared to

11    win."  Do you see that?

12        A    Yes, sir.

13        Q    Okay.  So do I understand this correctly to mean that

14    in your opinion, even if the State did everything, you know,

15    precisely as you recommend as far as procedure in here that the

16    audit would essentially be worthless because it's -- the

17    election was conducted on BMDs; is that accurate?

18        A    I've -- it's a bit of an overstatement.  I wouldn't

19    say it's entirely worthless.  But it couldn't limit the risk

20    that an incorrect electoral outcome would be certified because

21    there are ways in which the outcome could be altered that no

22    audit could detect.  In particular, malware or malfunctioning

23    or misconfiguration of BMDs could cause the BMDs to print

24    different votes from what the voters actually selected, and

25    there would be no way for an audit to detect that that

Dr. Phillip Stark                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

                                                            Page 20

1      happened.

2            Q    Okay.  So the point is that you can have an audit,

3      but it wouldn't be risk-limiting; is that accurate?

4            A    Yes, sir.  There are aspects of the election that you

5      could check by auditing.  But ultimately, you could not check

6      the correctness of the outcome of the election.

7            Q    Okay.  So there is still some value in doing those

8      audit procedures even if you're utilizing a BMD, right?

9            A    If they're done correctly, yes.

10           Q    Okay.  And is there some value in utilizing audit

11     procedures more generally -- strike that.  Is there some value

12     in utilizing audit procedures generally even if it might not

13     align to a statewide, jurisdiction-wide, risk-limiting audit?

14           A    There is some value and there's also -- there is also

15     some danger in that it's an invitation to draw erroneous

16     conclusions.  In particular, the Secretary of State's Office

17     has advertised that these audits have demonstrated that the

18     equipment functioned correctly, that the results are accurate,

19     and that the reported winners really did win.  And the audits

20     don't, in fact, show those things.  So I think that there's a

21     danger of misinterpreting the result of applying some of these

22     procedures to an untrustworthy paper trail.

23           Q    Okay.  And so then, in paragraph six you also -- what

24     I gather in this paragraph, you also state the opinion that

25     essentially even a hand-marked paper ballot, risk-limiting

Dr. Phillip Stark                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 21

1    audit in Georgia would be insufficient, right?

2        A    Absent some changes to procedures; in particular,

3    around the security -- physical security of the voted ballots

4    and physical accounting for ballots, checks of chain of

5    custody, and things of that kind.

6        Q    Okay.  But you specifically say in the last sentence

7    that, "Thus, any audit that Georgia might perform cannot

8    protect against the possibility that the Coffee County breach

9    resulted in changed election outcomes in Coffee County or other

10   counties," right?

11       A    Yes, sir.  But there's a first sentence about the

12   lack of physical accounting controls, et cetera.  If those

13   controls were there, then my conclusion in the second sentence

14   would be different.

15       Q    Okay.  And we'll get to those controls here.  I do

16   want to note -- go briefly to paragraph eight.

17       A    Yes, sir.

18       Q    You say basically you haven't had adequate time to

19   digest the details nor to search exhaustively, right?

20       A    Yes, sir.

21       Q    And then, you go on to provide plenty of additional,

22   you know, opinion testimony on this.  But what exactly have you

23   reviewed in relation to risk-limiting audits that you were

24   relying on for this declaration?

25       A    I have the PowerPoint slides from a presentation

Dr. Phillip Stark                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 24

1    writing this report.

2         Q    Okay.  So what you were just referencing there in

3    terms of the statute, you didn't go back and, you know, look at

4    that for writing this report, you know, in a close period of

5    time to submitting it?

6         A    No, sir.

7         Q    Okay.  And you didn't personally observe any audit

8    being conducted by county officials in Georgia, right?

9         A    Correct.  I did not.

10        Q    And you are aware that the county officials are the

11   ones that carry out the audits in Georgia, right?

12        A    That they are responsible for it.  They presumably

13   have other people on the ground doing the work, but yes.

14        Q    Sure.  Okay.  All right.  So I want to just break

15   these items down quickly here that you list in paragraph ten.

16   I thought it was sort of a synopsis to some of the things you

17   wanted to go to later in the declaration.  But mandatory ballot

18   accounting, what do you mean by that?

19        A    Keeping track of how many pieces of paper go to each

20   polling place, how many come back voted, spoiled, or unvoted.

21   In the case of BMDs, it would be keeping track of the blank

22   stock that the printouts are on, crosschecking that against the

23   number of people who checked in to vote, and for the

24   registration numbers, participation records, and so on.

25   Largely physical accounting.

Dr. Phillip Stark                         December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 26

1          A    I'm not, but that's true in most places.

2          Q    Okay.  And with respect to the poll book

3     reconciliation, you're aware that that's required as part of

4     the tabulation process in Georgia, right?

5          A    No, I'm not aware of that.  My understanding -- and

6     I'm not an expert on law.  But my reading of that regulation or

7     statute was that it doesn't happen at the time of tabulation;

8     that it is required to happen within something like 30 days

9     after the election.

10          Q    Okay.  So you're not doubting me that that is, in

11     fact, a requirement, right?

12          A    I have no reason to doubt whether it's a requirement.

13     I would have reason to doubt whether it's enforced, given the

14     number of ballots or ballot scans that were discovered after

15     the 2020 election never to have been uploaded into the system

16     in the first machine tabulation, and given another omission.  I

17     can't recall which county it was in here where some -- some

18     number of the Cobb County memory card hadn't been uploaded into

19     the voting system.  That's in paragraph 12.

20          Q    Okay.  So -- and this is the distinction that I'm

21     trying to make sure I understand.  Are you offering an opinion

22     as to whether state law or regulation itself is adequate or

23     that based on observation of county procedures under such law

24     or regulation that they're not adhering to a regulation?

25          A    So I'm not an attorney.  I won't pretend to be able

Dr. Phillip Stark                          December 16, 2022
Curling, Donna v. Raffensperger, Brad

                                                        Page 27

1      to interpret the law.  But regardless of what the law says, it

2      seems that this isn't happening in practice, at least not that

3      well.

4            Q    Okay.  Have you ever seen a polling place recap form?

5            A    A polling place what form?

6            Q    Recap form?

7            A    No, sir.

8            Q    Okay.  Would you have any reason to doubt me that

9      these are standard forms compiled as part of the tabulation

10     process?

11           A    I'm not familiar with that -- with the term "recap

12     form".  It's possible that I have seen such a form but don't

13     know it by that name.  But I have no reason to doubt what

14     you're telling me.

15               (Defendant's Exhibit No. 3 was identified.)

16     BY MR. MILLER:

17           Q    Okay.  And I'm going to mark another exhibit for you

18     here.  And just let me know when you see it on your end.

19           A    I have it.

20           Q    Okay.  Have you seen this regulation before?

21           A    No, sir.

22           Q    Okay.  And you see at the top it says 183-1-12-.12?

23           A    Yes, sir.

24           Q    And it's entitled Tabulating Results, right?

25           A    Yes.

Dr. Phillip Stark                              December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 32

1       Q    Okay.  So if you'll -- with this in mind concerning

2    the tabulation timeframe, if you'll turn back with me to your

3    declaration?  And if you'll scroll with me down to the

4    appendix?  So when you reviewed these documents, did you notice

5    polling place reconciliation procedures -- or I'm sorry.

6    Strike that.  When you reviewed this -- these documents in your

7    appendix, did you notice items concerning polling pad or voter

8    check-in reconciliation procedures?

9       A    I noticed a reference to comparing the check-ins to

10   the number of ballots in the batch according to the batch

11   inventory, and language that said if there was a large

12   difference it should be reported to the Secretary of State.

13      Q    Okay.  So if you'll scroll with me to Page 26 of the

14   PDF, Exhibit 2?  I'm sorry.  I don't think they've got page

15   numbers at the bottom, so you have to kind of rely on the...

16      A    Are you talking about Appendix B, Page 4 of 4?

17      Q    I'm sorry.  Page 3 of 4?

18      A    Okay.

19      Q    And you see here the last sentence of that first

20   paragraph?  And this is talking about the ballot inventory

21   worksheet.  It reads, "Each section of the worksheet should be

22   reviewed carefully and compared to voter check-in data."  Do

23   you see that?

24      A    Yes, sir.

25      Q    Okay.  And it goes on under the Section 1 heading to

Dr. Phillip Stark                           December 16, 2022
Curling, Donna v. Raffensperger, Brad

                                                        Page 33

1    say, "Verify these totals match your known voter totals."

2         A    Yes, sir.

3         Q    Okay.  So this is the second phase of polling pad

4    reconciliation as I see it.  Is that consistent with what you

5    were referring to as polling pad reconciliation?

6         A    Poll book reconciliation.  It -- this is part of poll

7    book reconciliation.  It is happening rather late in the

8    process after the ballot manifest has already been constructed

9    rather than basing the ballot manifest on the physical count

10   and this reconciliation.  Moreover, if the steps that you

11   pointed out in the -- regarding the recap form had, in fact,

12   taken place, then this would appear to be redundant, not that

13   redundant checks are -- aren't valuable.

14        Q    You anticipated my next question.

15        A    Yeah.

16        Q    Redundancy, as I've heard in this case, is a valuable

17   tool to use, right?

18        A    Yes, I agree.

19        Q    Okay.  And in fact, there's a -- if you'll scroll

20   with me to Page 37 -- I'm sorry -- Page 36 of the PDF?

21        A    Thirty-six is the ballot inventory tool of what you

22   will generate?

23        Q    Yes.

24        A    Yes.

25        Q    And you see there in italics, it's emphasized at the

Page 34

1    end, you know, "Remember it's up to you to ensure all of your

2    votes have been uploaded to the RTR system.  The system will

3    not check that for you."  Do you see that?

4        A    Yes, sir.

5        Q    Okay.  And then, if you continue scrolling down to

6    Page 44 of the -- Exhibit 2?

7        A    Forty-four, the batch inventory tool?

8        Q    Yeah.  It's a screenshot of an Excel sheet.  Do you

9    see that?

10       A    Yes, sir.

11       Q    Yeah.  And it says there in the instructions on the

12   Excel sheet, "Compare the cast vote record ballot count for

13   each ballot group to your voter check-in data."  Do you see

14   that?

15       A    Yes, sir.

16       Q    Okay.  So the next thing in your -- there are a

17   category of items in the declaration.  I saw a concern about

18   chain of custody checks.

19       A    Yes, sir.

20       Q    Okay.  And what do you mean by that?  And I'll

21   qualify that question to say:  Are you referring to chain of

22   custody checks at the polling place or during the audit process

23   or both?

24       A    Chain of custody checks throughout the election and

25   the audit to ensure that the paper trail is trustworthy

Dr. Phillip Stark                                      December 16, 2022
Curling, Donna v. Raffensperger, Brad

                                                                Page 36

1              MR. MILLER:  Yeah.  I apologize for that.

2       BY MR. MILLER:

3          Q    You see there the first bullet?  "The check-in and

4       check-out clerk should refer to the appropriate documentation

5       to verify the chain of custody of each secure container prior

6       to removing it from the check-in and out station."

7          A    Yes, sir, I see that.

8          Q    Okay.  And it talks there specifically about

9       verifying the seals on the container with the check-in and out

10      clerk before signing the chain of custody form.

11         A    Yes, sir.

12         Q    Okay.  So you're aware that during the audit process,

13      state regulation and the Secretary's directives require the

14      ballots to be sealed when they arrive at the location where the

15      audit is occurring and to be unsealed and resealed as each

16      container is checked out, right?

17         A    You told me that they're required to be sealed in the

18      polling place, and this says that the seal should be checked

19      when they're opened again for the audit.  Yes.

20         Q    Okay.  And then, after the audit of a particular

21      container or a tally of a particular container -- if you'll

22      scroll with me to Page 62?  You see there that, "Upon check-in,

23      the check-in and out clerk will have the total number of

24      ballots in the batch manifest and is comparing that to the

25      audit team's total number of ballots counted"?

Page 38

1        batch.  And therefore, there's no way for the tool to

2        discover whether a discrepancy matters or the measured

3        risk.

4    BY MR. MILLER:

5        Q    Okay.  So your concern is with the entry fields of

6    Arlo or with the verification by the check-in and out clerk of

7    the total number of ballots counted?

8        A    My concern is with the fact that discrepancies

9    between the number of ballots according to the voting system

10   and the number of ballots found by the audit team are not taken

11   into account in determining whether the risk limit has been

12   met.

13       Q    So lastly, I want to ask you about eligibility

14   auditing.  And this is another term that was referenced in your

15   paragraph ten.

16       A    Yes, sir.

17       Q    By this, do you mean whether a voter was eligible to

18   cast a ballot; like, for instance, was a challenged voter or

19   not on the registration list?

20       A    In general, I mean, double-checks of the

21   determinations of the eligibility of voters.  This is a concern

22   both for polling place and for vote by mail.  Just confirmed --

23   you know, double-checking signature verification in some way to

24   -- for quality control purposes.

25       Q    Okay.  But you're not offering an opinion in this

Dr. Phillip Stark                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

                                                        Page 39

1    declaration on Georgia procedures concerning the verification

2    and counting of provisional ballots, right?

3         A    No, sir.  I -- not specifically, but in general, the

4    processes that are in place to ensure that every eligible voter

5    has the opportunity to vote and no one who is not eligible, in

6    fact, votes and those who are eligible to vote are given a

7    ballot of the appropriate style that contains exactly those

8    contests that they're eligible to vote in are all processes

9    that are subject to some error and need to be vetted as part of

10   an audit or as precursor to a risk-limiting audit.

11        Q    Okay.  Yeah.  I'm not sure that that was the question

12   that I asked, though helpful, but in your declaration here,

13   you're not offering an opinion on, say, provisional ballot

14   procedures, right?

15        A    It would be subsumed into the general issue of

16   eligibility auditing.  The resolution of provisional ballots

17   and the determination of whether they should or should not be

18   counted is a process that should be checked as part of a

19   compliance audit.

20        Q    Okay.  So you're not saying that it's not done; you

21   just would like to see an additional -- a redundant

22   double-check as a compliance audit?

23             MR. BROWN:  Object to form.

24             THE WITNESS:  Yes, sir.

25   BY MR. MILLER:

Dr. Phillip Stark                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 54

1       A     I'm sorry.  I did testify that I did not, yes.

2       Q     That -- thank you for clarifying that.  And -- but I

3   understood you testified that Mr. Skoglund and Dr. Haldeman

4   did?

5       A     That's my understanding, yes.

6       Q     Okay.  And in their review, are you aware of any

7   evidence that votes cast on that equipment were not cast as

8   intended?

9       A     I am not aware of any evidence that the machine

10  misbehaved in practice in any way.

11      Q     Okay.  And are you aware of any evidence of machines

12  in Coffee County or elsewhere in Georgia did not cast votes as

13  intended subsequent to the unauthorized access in Coffee

14  County?

15      A     Could would be a little bit more specific?  Are we

16  talking about ballot marking devices?  I mean, the issue with

17  ballot marking devices is I'm not aware of any evidence that

18  they printed selections other than what the voters intended.

19  But the problem with ballot marking devices is that they don't

20  generate any evidence of printing selections other than what

21  the voters intended.  So there's just a security gap there,

22  which is one of my biggest concerns with the widespread

23  reliance on BMDs.  But I am not aware of any evidence of

24  misbehavior of BMDs.  I'm not aware of any evidence of

25  misbehavior of the tabulators.  I am aware of evidence of

Dr. Phillip Stark                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 55

1    procedural lapses of various kinds.

2         Q    Okay.  I think that satisfies my question there.  And

3    you're not offering an opinion that the incorrect winner was

4    certified in any Georgia election, right?

5         A    I'm offering no such opinion.

6         Q    Okay.

7         A    I would have no basis for any such opinion.

8              MR. MILLER:  Okay.  That's all the questions I have.

9         Mr. Brown or Mr. Cross may have some for you.

10                   E X A M I N A T I O N

11   BY MR. BROWN:

12        Q    Dr. Stark, Bruce Brown representing the Coalition

13   Plaintiffs.  Thank you for your testimony today.  I just have a

14   couple of questions.  You testified as to when you started to

15   put pen to paper on your declaration and -- but you also

16   collected some documents in advance of that, correct?

17        A    Yes, sir.  I'm trying to think of specifically which

18   ones, but I've been -- I've been following the developments in

19   the case including attending the depositions that are referred

20   to.  And I was certainly collecting thoughts and making notes

21   anticipating that I might be asked to write a supplementary

22   declaration.  But I didn't start to really draft it until

23   approximately December 1.  I believe that was, I think, the

24   Thursday or Friday of that week.

25        Q    Okay.  And then, you -- and you participated or at

Dr. Phillip Stark                     December 16, 2022
Curling, Donna v. Raffensperger, Brad

                                                        Page 59

1                          CERTIFICATE

2       STATE OF GEORGIA

3       COUNTY OF FORSYTH

4

5            I, Inger Douglas, Certified Court Reporter, hereby certify

6       that the foregoing pages numbered 2 through 59 constitute a

7       true, correct, and accurate transcript of the testimony heard

8       before me, an officer duly authorized to administer oaths, and

9       was transcribed under my supervision.

10           I further certify that I am a disinterested party to this

11      action and that I am neither of kin nor counsel to any of the

12      parties hereto.

13           In witness whereof, I hereby affix my hand on this the

14      20th day of December 2022.

15

16      _____

17      Inger Douglas, CVR 7481

18      CCR 5166-3765-6508-0064

19      Certified Court Reporter

20

21

22

23

24

25