## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| DONNA CURLING, et al; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | FILE NO: 1:17cv02989-AT |
| BRAD RAFFENSBERGER, et al.; | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

## FULTON COUNTY DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Plaintiffs believe hand-marked paper ballots are the only valid manner by which an election should be conducted. (Docs. 601, 627). Accordingly, Plaintiffs desire the implementation of an election system which utilizes hand-marked paper ballots. Because the General Assembly has adopted a different voting system for the State of Georgia, initially a Direct Recording Electronic ("DRE") system, and more recently a Ballot Marking Devices ("BMD") system, the Plaintiffs are asking this Court to declare the current State of Georgia's voting system to be

unconstitutional and impose a hand-marked paper ballot system instead. Ultimately, Plaintiffs challenge the integrity, credibility, security, and reliability of these voting systems and take issue with their usage in any future public election. To that end, Plaintiffs have asked this Court to declare the use of the BMD system in public elections unconstitutional, prevent their future usage, and replace them with hand marked paper ballots.

The allegations asserted by Plaintiffs in arguing that the current voting system in Georgia is unconstitutional (and therefore should be replaced) are truly against the State of Georgia, and not against the Fulton County Defendants. There are no facts adduced against the Fulton County Defendants. Even if Plaintiffs can somehow carry their burden of persuasion, their claims against the Fulton County Defendants are misguided, as both voting systems were implemented by the State Defendants and not the County. (*See* Declaration of Nadine Williams, Ex. 4, at ¶¶ 4, 5).

Additionally, because the Fulton County Defendants are operating at the direction of the Secretary of State and the State Election Board ("SEB"), the Fulton County Defendants cannot provide the relief sought by the Plaintiffs. The voting systems in question are the product of a statewide mandate for all 159 counties in the State of Georgia. (O.C.G.A. § 21-2-300).  This is because all counties are

vested with the same election duties and are therefore beholden to the same election regulations. *Id.* These regulations are set by the SEB and counties cannot unilaterally or independently deviate from these regulations without legal consequence. *Id.* Any change to these regulations will necessarily bind all counties.

Within their Third Amended Complaint, the Curling Plaintiffs' claim: (1) that the DRE voting system violates their fundamental right to vote; (2) the DRE voting system violates the Equal Protection Clause of the Fourteenth Amendment; (3) the BMD voting system violates their fundamental right to vote; and (4) the BMD voting system violates the Equal Protection Clause of the Fourteenth Amendment. *See* Curling Plaintiff's Third Amended Complaint. (Doc. 627, pp. 28-41). These are the only allegations for which they seek relief in this case. Notably, all the aforementioned claims seek relief that only the State Defendants can provide.

Within their First Supplemental Complaint, the Coalition Plaintiffs claim: (1) the BMD voting system will severely burden their fundamental right to vote; (2) the BMD voting system will impose unequal treatment in violation of the Fourteenth Amendment's Guarantee of Equal Protection; and (3) the BMD voting system will severely restrict and/or arbitrarily and capriciously deprive them

without proper notice in violation of the Fourteenth Amendment's Guarantee of Due Process. *See* Coalition Plaintiffs' First Supplemental Complaint. (Doc. 601, pp. 62-69).

Plaintiffs brought this case to challenge the mandated, ***statewide*** voting system and originally brought suit against several county defendants; and arguably should have included all 159 counties in Georgia as defendants. Nonetheless, as one of the counties named, and the only one remaining, the Fulton County Defendants have continuously argued that the relief sought by Plaintiffs impacts all 159 county boards of registration and elections and election superintendents throughout the State of Georgia, and that they therefore cannot solely provide or implement the relief sought by Plaintiffs. (*See* Fulton County Defendants' previous arguments to this point Docs. 814, pp. 7-8 and 1024, p. 7).  It is unreasonable for Plaintiffs to continue their claims against the one exemplar County that Plaintiffs kept in the case after dismissing the DeKalb County Defendants and the Cobb County Defendants, despite the fact that all counties are vested with the same duties, and similarly lack the capacity to provide Plaintiffs with the relief requested.  (Doc. 225, p. 2).

This Court has twice concluded that the relief Plaintiffs sought from the State Defendants would necessarily bind all counties in Georgia, whether or not

any county officials were parties in this case. *Curling v. Kemp*, 334 F.Supp.3d 1303, 1318 (N.D. Ga. 2018); (Doc. 579, pp. 12-14).  This decision strongly implied that the Fulton County Defendants were not proper parties to this suit, as was the case with the DeKalb and Cobb County Defendants. (Doc. 225). This Court also noted an earlier decision by Judge Steve Jones in *Fair Fight Action, Inc. v. Raffensperger*, Civil Action No. 1:18-cv-5391-SCJ, in which he concluded that county election officials were not necessary parties because the Court could gain complete relief against state election officials. (Doc. 579, pp. 13-14). Plaintiffs could obtain all the relief they seek without having the Fulton County Defendants in this case. "…the State Defendants are in a position to redress the Plaintiffs' injury because the requested injunctive relief as to the suspended use of the DRE voting system would enjoin both the State Defendants as well as counties required to use DREs, including Fulton County Defendants." *See Curling v. Kemp*, 334 F. Supp. 3d 1303, 1318 (N.D. Ga. 2018). "The State Defendants now appear to recognize that counties have no leeway in how to conduct their elections under Georgia's election code…" (Doc. 579 p. 15). "…if the Secretary of State is enjoined from preparing electronic ballots and ordered to provide only paper ballots for use by counties and municipalities, Plaintiffs would be afforded complete relief." (Doc. 579 p. 20).

Because the Fulton County Defendants did not create or implement the previous DRE-based voting system, nor did they participate in or have any responsibility for the creation or implementation of the current BMD-based voting system, there is no way they can be found liable to Plaintiffs for the alleged constitutional violations that form the basis of the operative Complaint(s) in this case. Within this Court's August 15, 2019 Order, it also concluded ".... that joining all of Georgia's counties and municipalities into this action is not feasible **and is not required** to provide relief to Plaintiffs where the State's Chief Election Officer charged with implementation and enforcement of the State's election system is a party." (Doc. 579 p. 19). (emphasis added). In the context of summary judgment, "Unless the complaint states a compensable claim for relief ..., it should not survive a motion to dismiss." *See Harlow v. Fitzgerald*, 457 U.S. 800, 808, 102 S. Ct. 2727, 2733, 73 L. Ed. 2d 396 (1982) (*citing Butz v. Economou*, 438 U.S. 478, 507, 98 S. Ct. 2911-12. Consequently, summary judgment in favor of the Fulton County Defendants is warranted.

## STANDARD OF REVIEW

Summary judgment is warranted when there is no "genuine dispute[s] as to any material fact" and the defendant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Defendants (as movants) bear the burden of making this showing,

satisfied by demonstrating there "is an absence of evidence" to support an element of Plaintiffs' claims. *Celotex Corp v. Catrett*, 477 U.S. 317, 325 (1986). The movant may discharge his burden by merely "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Id.* Evidence and "factual inferences" [are viewed] in the light most favorable to Plaintiffs (as non-movants). *Johnson v. Clifton,* 74 F.3d 1087, 1090 (11th Cir. 1996).  Once Defendants satisfy this initial requirement, the burden shifts to the Plaintiffs to show the existence of a dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 US. 574, 587 (1986). "The mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). *See Witter v. Bank of Am.*, No. 1:07-CV-1344-GET-AJB, 2008 WL 11470984, at *5 (N.D. Ga. May 15, 2008), report and recommendation adopted, No. 1:07-CV-1344-GET, 2008 WL 11470997 (N.D. Ga. June 12, 2008).

## STATEMENT OF THE CASE

This action was initially filed on July 3, 2017, in Fulton County Superior Court (*Curling II*) on behalf of six (6) individuals and an out-of-state organization against twenty-nine state and county defendants, asserting eight (8) causes of

action. (Doc. 1-2). Plaintiffs were challenging the use of the Direct Recording Electronic ("DRE") machines that were used for voting during the June 20, 2017 run-off for the Sixth Congressional District.[1]

On August 8, 2017, Defendant Kemp, the State Election Board ("SEB"), and the named members of the SEB ("State Defendants") removed the action to this Court. (Doc. 1). On August 18, 2017, Plaintiffs filed an Amended Complaint (Doc. 15) and on September 15, 2017, Plaintiffs filed a Second Amended Complaint (Doc. 70). There was then a series of amendments. Motions to Dismiss were filed by various Defendants. *See, e.g.,* Docs. 47-50.

By leave of Court, a Second Amended Complaint was filed on September 15, 2017. (Doc. 70). After fully briefing the Motion to Dismiss Plaintiffs' Second Amended Complaint, an apparent disagreement arose between the Plaintiffs. On November 3, 2017, then-counsel for all the original Plaintiffs moved to withdraw representation from a single Plaintiff, the Coalition for Good Governance (or "CGG"). (Doc. 104). Eventually, their (CGG's) lawyers moved to withdraw

---

[1] Plaintiffs Donna Curling, Donna Price, and Coalition for Good Governance filed a similar action on May 25, 2017, just prior to the June 20, 2017 Run-off Election, and sought declaratory relief and an injunction preventing Defendants from using DRE machines for the election. The motion for injunction was denied and all claims dismissed by the Court. *Curling, et al., v. Kemp, et al.*, CA No. 2017cv290630 (Fulton County Superior Court, June 9, 2017). (*Curling I*). (*See* June 9, 2017 Order, attached hereto as Exhibit 3).

entirely from the case. (Doc. 131). By April of 2018, the Plaintiffs were divided into two factions with separate legal teams. On one side were Donna Curling, Donna Price, and Jeffrey Schoenberg (i.e., the "Curling Plaintiffs"). The other group—comprised of CGG, Ricardo Davis, Laura Digges, Megan Missett, and William Digges, III—were represented by other counsel (hereinafter "the Coalition Plaintiffs").

Through the subsequent motions and amendments, the Plaintiffs are now proceeding under two different operative complaints. The Curling Plaintiff's Third Amended Complaint asserts five (5) counts against all defendants alleging violations of the U.S. Constitution and claims pursuant to 42 U.S.C. § 1983. Specifically, Curling Plaintiffs assert the following claims:

-    Count I is a federal § 1983 claim against the Defendants in their official capacities for alleged violations of the Plaintiffs' right to vote, under the Due Process Clause of the 14th Amendment. (Doc. 627 ¶¶ 91-98).

-    Count II is a federal § 1983 claim against the Defendants in their official capacities for alleged violations of the Plaintiffs' right to vote, under the Equal Protection Clause of the 14th Amendment. (Doc. 627 ¶¶ 99-112).

-    Count III is a federal § 1983 claim against the Defendants in their official capacities for alleged violations of the Plaintiffs' right to vote, under the

Due Process Clause of the 14th Amendment. (Doc. 627 ¶¶ 113-119).

-       Count IV is a federal § 1983 claim against the Defendants in their official capacities for alleged violations of the Plaintiffs' right to vote, under the Equal Protection Clause of the 14th Amendment. (Doc. 627 ¶¶ 120 - 132).

-       Count V is a call for a Declaratory Judgment that the election System violates Act No. 24, H.B. 316. (Doc. 627 ¶¶ 133-140).[2]

Similarly, the Coalition Plaintiffs' First Supplemental Complaint asserts three (3) counts against all defendants, alleging violations of the U.S. Constitution and claims pursuant to 42 U.S.C. § 1983. Specifically, the Coalition Plaintiffs assert the following claims:

-       Count I is a federal § 1983 claim against the Defendants in their official capacities for alleged violations of the Plaintiffs' right to vote, under First and Fourteenth Amendments. (Doc. 601 ¶¶ 221-228).

-       Count II is a federal § 1983 claim against the Defendants in their official capacities for alleged violations of the Plaintiffs' right to vote, under the Fourteenth Amendment's Equal Protection Clause. (Doc. 601 ¶¶ 229-237).

-       Count III is a federal § 1983 claim against the Defendants in their

---

[2] Count V of the Third Amended Complaint was dismissed by the Court's Order of July 30, 2020. (Doc. 751).

official capacities for alleged violations of the Plaintiffs' right to vote, under the Fourteenth Amendment's Due Process Clause. (Doc. 601 ¶¶ 238-245).[3]

Plaintiffs' requests for relief include prohibiting the State of Georgia from utilizing the current BMD-based voting system and the implementation of a hand-marked paper ballot voting system in Georgia.   (Doc. 1565, Deposition of Coalition for Good Governance, pp. 158-160, 170); (Doc. 1557, Deposition of Donna Price, pp.  28-30, 105-107) (excepts attached hereto as Exhibits 1 and 2).

The claims asserted by both the Curling Plaintiffs and the Coalition Plaintiffs are improper as against the Fulton County Defendants, which is a fact that arguably is not in dispute, as the Fulton County Defendants cannot provide the relief sought by either faction of Plaintiffs. (*See* Doc. 579 p. 19). Further, the Fulton County Defendants neither established nor implemented either voting system in which Plaintiffs claim unfairly infringe upon their constitutional rights. Plaintiffs cannot present an issue of material fact as to the Fulton County Defendants' actions that have led to the claimed constitutional violations. Accordingly, the Fulton County Defendants are entitled to Summary Judgment as a matter of law.

## ARGUMENT AND CITATION OF AUTHORITY

---

[3] Count III of the Coalition Plaintiffs' First Supplemental Complaint was dismissed by the Court's Order of July 30, 2020. (Doc. 751).

The Fulton County Defendants have a legal duty to abide by the laws of the State of Georgia and are required by the Georgia Constitution and state statutes to conduct elections in accordance with existing Georgia state law.  (O.C.G.A. § 21-2-300).  Defendants thus have no discretion regarding the use of state-mandated voting machines.  (Declaration of Nadine Williams ¶ 5; O.C.G.A. § 21-2-300).  At all times relevant to this litigation, the Fulton County Defendants acted in good faith and with reasonable belief that their actions in conducting elections in conformance with existing Georgia state law were valid, necessary, and constitutionally proper.

## A. Incorporation and Adoption of Arguments presented by State Defendants.

The Fulton County Defendants incorporate by reference, as if set forth verbatim herein, the arguments and citations of authority set forth in the State Defendants' Briefs in Support of their Motions for Summary Judgment. Additionally, the Fulton County Defendants offer the following.

## B. Qualified Immunity Bars All Federal Claims as to the Fulton County Defendants.

In the claims of both factions, each count alleged against all Defendants, including the Fulton County Defendants, are federal § 1983 claims for violations of the right to vote under the First Amendment, Due Process, and Equal Protection

under the Fourteenth Amendment. These claims are all alleged against the Fulton County Defendants in their official capacities. However, qualified immunity protects officials from § 1983 claims if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. ("government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate "clearly established" statutory or constitutional rights of which a reasonable person would have known.") *See Harlow v. Fitzgerald*, 457 U.S. 800, 801, 102 S. Ct. 2727, 2729, 73 L. Ed. 2d 396 (1982). "…public officers require this protection to shield them from undue interference with their duties and from potentially disabling threats of liability." *See id.* "Moreover, the Court recognized in Scheuer that **damages suits concerning constitutional violations need not proceed to trial but can be terminated on a properly supported motion for summary judgment based on the defense of immunity**…" *Id.* (emphasis added).

"… we have held that qualified immunity would be defeated if an official "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury...." Ibid. (emphasis added). *Id.* Clearly the Fulton County

Defendants took their orders of conducting the respective elections using the voting systems put in place by the Secretary of State. *See* O.C.G.A. § 21-2-300. Plaintiffs cannot show that the Fulton County Defendants engaged in their official duties with the knowledge that their functions could potentially violate the Plaintiffs' constitutional rights. Neither is there any scintilla of evidence that the Fulton County Defendants engaged in their duties during the respective elections while utilizing the voting system implemented by the Secretary of State, both the DRE and BMD voting systems, with malicious intent as to cause the deprivation of the Plaintiffs' constitutional rights. "In order to withstand motion for summary judgment on basis of qualified immunity, § 1983 plaintiff must produce sufficient competent evidence to at least raise issue of whether reasonable person in position of defendant would have known that his actions violated plaintiffs clearly established constitutional or statutory rights;" 42 U.S.C.A. § 1983. *See Datz v. Hutson*, 806 F. Supp. 982 (N.D. Ga. 1992), aff'd, 14 F.3d 58 (11th Cir. 1994). "thus, government officials are entitled to immunity as long as their actions could reasonably have been thought consistent with rights that they are alleged to have violated." *Id.* Accordingly, all of Plaintiffs' § 1983 claims are barred by qualified immunity.

The decision to use the statewide BMD based voting system is not within the

Fulton County Defendants' authority. The Fulton County Defendants had no evidence and no notice that using the machines required by all 159 counties (and other states)[4] violated Plaintiffs' rights. Further, there is no evidence of past problems with the BMD voting system and arguably no evidence now that in use this system has even been compromised. Further, all Plaintiffs have the right and opportunity to vote hand-marked paper ballots by voting absentee.

### C. Eleventh Amendment Immunity Bars Plaintiffs' Claims against the Fulton County Defendants.

The Eleventh Amendment bars claims against a state in federal court, except where the state has consented to be sued. *Lassiter v. Alabama A&M University*, 3 F.3d 1482, 1485 (11th Cir. 1993). County officials are considered state officials under the Eleventh Amendment when acting as an "arm of the state." *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003). To determine whether an official is acting as an arm of the state, the court must consider the following criteria, in light of the relevant function: (1) how state law defines the entity; (2) what degree of control the state maintains over the entity; (3) the source of the entity's funds; (4)

---

[4] *See Weber v. Shelley and Townsend*, 347 F.3d 1101 (9th Cir. 2003) (In upholding summary judgment in defendants' favor, the Ninth Circuit Court of Appeals found that the State of California and Riverside County violated no constitutional provision in implementing and utilizing a touchscreen voting system instead of hand-marked paper ballots).

who bears financial responsibility for judgments entered against the entity. *Abusaid v. Hillsborough County Board of County Commissioners*, 405 F.3d 1298, 1304 (11th Cir. 2005).

Here, the relevant function is conducting elections. Because elections are governed entirely by state laws and regulations, the Fulton County Defendants act as arms of the state when conducting elections. *See Casey v. Clayton County*, 2007 WL 788943 at *8 (N.D. Ga. Mar. 14, 2007). Therefore, the Fulton County Defendants in their official capacities are immune from Plaintiffs' claims under the Eleventh Amendment. *See also McConnell v. Adams*, 829 F.2d 1319 (1987), where the Fourth Circuit held that local election boards are arms of the state under the 11th Amendment because they "bear a closer nexus to the state than with the localities where they work." *Id.* at 1327. *See also Tiraco v. New York State Board of Elections*, 963 F.Supp.2d 184 (Aug. 7, 2013) (dismissing complaint against board of elections under 11th Amendment immunity); *Libertarian Party of Virginia v. Virginia State Board of Elections*, 2010 WL 3732012 (Sept. 16, 2010) (board of elections is "arm of the state" under 11th Amendment).

As the Fulton County Board was created by the state[5] and is controlled by

---

[5] The General Assembly authorized to create board of elections and board of election and registration in any county - § 21-2-40 (a) of the Ga. Elec. Co. Ann. state, "(a) the General Assembly may by local Act create a board of elections in

the state, and the business of conducting elections is governing entirely by state law, the Fulton County Defendants in their official capacities are "arms of the state" and immune from Plaintiffs' § 1983 claims under the 11th Amendment.

### D. Plaintiff's First and Fourteenth Amendment Claims against the Fulton County Defendants are Untenable.

Plaintiffs cannot show that the Fulton County Defendants' rules, customs, or policies required the use of the voting systems and equipment that purportedly infringed on their First and Fourteenth Amendment rights.[6]  To determine if such a violation occurred, "a court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule"" *Burdick v. Takushi*, 504 U.S. 428, 434, (1992). However,

---

any county of this state and empower the board with the powers and duties of the election superintendent relating to the conduct of primaries and elections. Such board shall consist of not fewer than three members."

[6] The "unequal application [of the law] to those who are entitled to be treated alike is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination" based upon such factors as race, religion, national origin, or poverty. *Snowden v. Hughes,* 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944); *see also E & T Realty v. Strickland,* 830 F.2d 1107, 1112–14 (11th Cir.1987), *cert. denied,* 485 U.S. 961, 108 S.Ct. 1225, 99 L.Ed.2d 425 (1988). No such factor is present in this case and Plaintiffs' claims should be dismissed.

regardless of whether such an infringement took place, there is no link to the actions of the Fulton County Defendants, as these defendants neither established, nor mandated these requirements. "In order to state a claim against the County under 42 USC § 1983, . . . (Plaintiff) must allege that a County policymaker's acts or omissions, done under color of state law, resulted in the deprivation of a right, privilege, or immunity protected by the United States Constitution or the laws of the United States." *Brown v. Dorsey*, 276 Ga. App. 851, 853 (2005). "[L]ocal government entities are included among those persons to whom § 1983 applies." Dorsey, 276 at 853 (*citing Monell v. Dept. of Social Services.*, 436 U.S. 658, 690–691 (1978). "[H]owever, it is only when the execution of . . . (the local government entity's) **policy or custom** inflicts the subject injury that liability can attach to the entity under § 1983." *Dorsey*, 276 at 853 (*citing Board of County Commissioners v. Brown*, 520 U.S. 397, 403(II); *Monell v. Dept. of Social Services.*, 436 U.S. 658, 690–691 (1978)) [emphasis added]. "To make this showing, . . . [P]laintiff must prove that, through a deliberate and official policy, the local governmental entity was the moving force behind the constitutional tort." *Dorsey*, 276 at 853 (*citing Brown*, 520 U.S. at 403-404).

   State law provides that "the equipment used for casting and counting votes

in county, state, and federal elections shall . . . be provided to each county by the state, as determined by the Secretary of State. O.C.G.A. § 21-2-300 (a)(1). In addition, the State Election Board also echoed this sentiment, promulgating that "[t]he electronic ballot markers and ballot scanners shall be supplied by the Secretary of State or purchased by the counties with the authorization of the Secretary of State." Ga. Comp. R. & Regs. r. 183–1–12–.01. In light of this power conferred to the State Defendants, they issued the rule requiring the statewide use of the BMD systems. Thus, the State Defendants again have chosen to enforce state law to generally require the statewide use of a specific voting system. *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1317 (N.D. Ga. 2018) (The State Election Board issued a rule requiring the statewide use of DRE voting systems, pursuant to statutory authority. The requirement was alleged to be a constitutional violation. This Court reasoned that the State Defendants chose to enforce state law to generally require the use of the DREs). Therefore, the Fulton County Defendants were merely operating at the direction of the State Defendants rules and Plaintiffs have not and presented evidence to the contrary. Furthermore, as laid out in *Monell*, the Fulton County Defendants cannot be held liable for the execution of the rules of the State Defendants.

**E. The power to establish and implement voting systems rests squarely with the Secretary of State and the State Legislature and not the Fulton County Defendants.**

In accordance with § 21-2-50 of the Ga. Elec. Co. Ann., the Secretary of State has the power to (1) to determine the forms of nomination petition, ballots, and other forms…;" "(9) to determine and approve the form of ballots for use in special elections;" "(15) **to develop, program, build, and review ballots <u>for use by counties and municipalities</u> on voting system in use in the state.**" § 21-2-50 (a)(1), (9) and (15). (emphasis added). § 21-2-210 of the Ga. Elec. Co. Ann. provides, "The Secretary of State is designated as the chief state election official to coordinate the responsibilities of this state under the National Voter Registration Act of 1993." *See id.* "The **equipment used** for casting and counting votes in county, state, and federal elections shall be the same in each county in this state and **shall be provided to each county by the state, as determined by the Secretary of State**." *See* O.C.G.A. § 21-2-300 (a). (emphasis added). Moreover, § 21-2-324 (a) and (b) of the Ga. Elec. Co. Ann. provides, in pertinent part, "(a) any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any voting machine may request the Secretary of State to examine the machine."

"(b) The Secretary of State shall thereupon require such machine to be examined or reexamined by three examiners when he or she shall appoint for the purpose, of whom one shall be an expert in patent law and the other two shall be experts in mechanics, and shall be an expert in patent law and the other two shall be experts in mechanics, and shall require off them a written report on such machine, attested by their signatures; and the Secretary of State shall examine the machine and shall make and file, together with the reports of the appointed examiners, his or her own report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion and in consideration of the reports of the examiners aforesaid, the kind of machine so examined can be safely and accurately used by electors are primaries and elections as provided in this chapter. **If his or her report states that the machine can be so used, the machine shall be deemed approved; and machines of its kind may be adopted for use at primaries and elections as provided in this chapter**." *Id.* (emphasis added).

As it relates to the former DRE system, in accordance with the Georgia Constitution, the General Assembly established said system which the Secretary of State then implemented. "after a Pilot Project was conducted in 2001 pursuant to Ga. L. 2001, pp. 269, 285, § 19, **the General Assembly established a uniform direct recording electronic (DRE) voting system**. Ga. L. 2002, p. 598. *See also* Ga. L. 2003, p. 517. The Secretary of State examined, purchased, and distributed touch-screen voting machines, testing them at various points during the process." *See Favorito v. Handel*, 285 Ga. 795, 795, 684 S.E.2d 257, 259 (2009). (emphasis added).

Similarly, as it relates to the current BMD system, the General

Assembly/Georgia Legislature established said system, and the Secretary of State implemented the same. "Effective April 2, 2019, the Georgia legislature passed H.B. 316 and S.B. 34, mandating a new uniform statewide voting system… Georgia's new election code defines "electronic ballot marker" – also referred to as a ballot marking device or BMD…" (Doc. 751 ¶ A).  As is the normal course, pursuant to O.C.G.A. § 21-2-300 (a)(1) "equipment used for casting and counting votes in county, state, and federal elections shall be the same in each county of this state and shall be permitted to each county by the state, as determined by the Secretary of State. *Id.*

Moreover, it is of note that the Fulton County Defendants, who are members of the Fulton County Board of Registration and Elections, are members of an entity created by the General Assembly and therefore cannot establish or implement voting systems of its own volition. (General Assembly authorized to create board of elections and board of election and registration in any county - § 21-2-40 (a) of the Ga. Elec. Co. Ann. state, "(a) the General Assembly may by local Act create a board of elections in any county of this state and empower the board with the powers and duties of the election superintendent relating to the conduct of primaries and elections. Such board shall consist of not fewer than three members."). The instant Defendants are simply a creation of the General Assembly

in furtherance of fair elections.

Missing from Plaintiffs' recitations are any descriptions of unique relief obtained against the Fulton County BRE members and the need for such relief. Indeed, this Court has twice concluded that the relief Plaintiffs sought from the State Defendants would necessarily bind all counties in Georgia, whether or not any county officials were parties in this case. *Curling v. Kemp*, 334 F.Supp.3d 1303, 1318 (N.D. Ga. 2018); (Doc. 579, pp. 12-14). This Court noted an earlier decision by Judge Steve Jones in *Fair Fight Action, Inc. v. Raffensperger*, Civil Action No. 1:18-cv-5391-SCJ, in which he concluded that county election officials were not necessary parties because the Court could gain complete relief against state election officials. (Doc. 579, pp. 13-14). Plaintiffs could have obtained all of the relief they seek without having the Members of the Fulton County BRE in this case.[7]

This Court previously recognized that Georgia law confers on the Georgia Secretary of State the primary responsibility to manage Georgia's electoral system. (Doc. 579, p.17, citing O.C.G.A. §21-2-50(b)). The Secretary of State has the statutory responsibility to "develop, program, build, and review ballots for use by

---

[7] The Coalition Plaintiffs own prior filing states "that an injunction prohibiting the Secretary's use of DREs would, in effect, prohibit their statewide use because the Secretary is solely responsible for programing the DREs." (Doc. 632, p. 43).

counties and municipalities on voting systems in use in the state." O.C.G.A. §21-2-50(a)(15). In their Third Amended Complaint, the Coalition Plaintiffs point to actions taken by the Members of the Fulton County BRE "[w]ith the authorization of Defendants Kemp and the State Board." (Doc. 226 ¶¶135-138). This case was about State law and choices made by the State Defendants. Only from the State Defendants could Plaintiffs get the relief they now use as a basis for an award of attorneys' fees. The Fulton County BRE members were not necessary parties. Initially, Plaintiffs in this action arbitrarily selected and named as defendants, members of the election and registration boards for 3 of the 159 counties in Georgia, including Fulton County Defendants.   Plaintiffs then summarily dismissed two the other county defendants besides the Fulton County Defendants. The Fulton County Defendants do not have any authority regarding the enactment of voting systems or voting legislation in the State of Georgia, nor do they have any discretion over whether to follow the laws passed by the Legislature.

Rather than limiting their lawsuit to the Secretary of State, and the State Defendants as the parties responsible for the passage, enactment, and enforcement of the provisions of the Georgia Election Code, Plaintiffs have kept the Fulton County Defendants in this case.  Failure to dismiss the Fulton Defendants is an

improper application of the ruling in *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245-46 (11th Cir. 2020).

*Jacobson*, dealing with the standing of voters to challenge Florida's ballot order provision, reiterated the test from *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61, 112 S. Ct. 2130 (1992), that "[t]he litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision" and held that the plaintiff in that case could not show standing because the sole defendant, the Florida Secretary of State, had no authority to implement the relief that the plaintiffs requested (changing the ballot order).

Given the complete dearth of factual allegations involving the Fulton County Defendants, Plaintiffs appear to have kept them in the case them solely for purposes of redressability.   However, nowhere in the Third Amended Complaint filed by Curling Plaintiffs or the First Supplemental Complaint filed by the Coalition Plaintiffs have they demonstrated an injury-in-fact, much less one that is fairly traceable to the actions of the Fulton County Defendants.

"Actions the County is liable for [under § 1983] should also be those it has the authority to remediate." *Vandiver v. Meriwether Cnty*, 325 F.Supp.3d 1321 at 1332 (N.D. Ga. 2018). Fulton County Defendants have no authority to remediate

any of Plaintiffs' concerns regarding the selection and implementation of the statewide voting system. The Fulton County Defendants' inability to address the alleged problems with the voting system utilized by the State of Georgia, demonstrates that it has no control or authority over the election system and thus cannot be liable for the alleged constitutional violations.

Further, even if the Court were inclined to give the Plaintiffs latitude regarding the injury-in-fact and traceability factors, Plaintiffs cannot rationally explain how seeking relief against 1 of the 159 counties in the State of Georgia would redress their purported injuries.

Based on the foregoing it is evident that the power to both establish and implement voting systems, such as the DRE and BMD systems, which Plaintiffs' claim violated their right to vote, rests solely with the State of Georgia (via the Secretary of State). Counties, which include, members of the County Board of Registration and Elections do not have the authority/the autonomy to establish or implement voting systems and therefore cannot be held liable for violating Plaintiffs' rights under a system they did not create. Accordingly, the remedy sought by Plaintiffs rests exclusively within the Secretary of State's control.

### F. The Fulton County Defendants are an Improper Party to this action, as Plaintiffs Do Not Have Standing with Respect to the Fulton County Defendants.

The Eleventh Circuit has summarized the doctrine of standing as follows: Article III of the Constitution limits the subject-matter jurisdiction of federal courts to "Cases" and "Controversies." U.S. Const. art. III, § 2. "To have a case or controversy, a litigant must establish that he has standing," which requires proof of three elements. *United States v. Amodeo*, 916 F.3d 967, 971 (11th Cir. 2019). The litigant must prove (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Because the elements of standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported ... with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561, 112 S.Ct. 2130. If an action proceeds to trial, the facts necessary to establish standing "must be supported adequately by the evidence adduced at trial." *Id.* And when plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401, 133 S.Ct. 1138, 185 L.Ed.2d 264 (2013).

Even if the Plaintiffs had proved an injury in fact, they would still lack

standing because any injury would be neither traceable to the Fulton County Defendants nor redressable by relief against them. Instead, any injury would be traceable only to the State Defendants and redressable only by relief against them.

To satisfy the causation requirement of standing, a plaintiff's injury must be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560, 112 S.Ct. 2130. The Plaintiffs contend that they are injured because a BMD-based voting system is used in Georgia. For them to have standing as to the Fulton County Defendants, the mandate requiring this system must be traceable to the to the Fulton County Defendants. Plaintiffs have provided no contrary evidence to establish that the Fulton County Defend ants play any role in determining the statewide voting system of Georgia. "Because the [Fulton County Defendants] didn't do (or fail to do) anything that contributed to [their] harm," with respect to the Fulton county Defendants, Plaintiffs "cannot meet Article III's traceability requirement." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (*en banc*).

In the alternative, if the Fulton County Defendants were proper parties in this case, then Plaintiffs' decision to include only the officials of one of Georgia's 159 counties as litigants in this action is frankly nonsensical. The challenged

provisions apply in every county in the State. Plaintiffs have not, and cannot, put forth either evidence or argument that the designated counties are somehow unique in their administration of these laws. The Court therefore cannot accord complete relief among the parties without the participation of all other allegedly relevant local officials. Fed. R. Civ. Pro. 19(a). Given the fact that this case concerns voting rights, this situation sets up the very real possibility of an equal protection problem because of the application of differential standards State-wide. Moreover, there is a very real chance that the rights of these other officials will be impaired or impeded by their absence from this lawsuit, and that a multiplicity of competing rulings may result. *Id.*

At this stage in the litigation, and considering its pace, joinder of the additional parties is simply not feasible. Fed. R. Civ. Pro. 19(b).  If a necessary party cannot be joined, the court must then proceed to Rule 19(b) and consider whether in "equity and good conscience," the suit should proceed without the necessary party. The court balances four factors in this analysis: (1) how prejudicial a judgment would be to the nonjoined and joined parties, (2) whether the prejudice could be lessened depending on the relief fashioned, (3) whether the judgment without joinder would be adequate, and (4) whether the plaintiff would have any alternative remedies were the case dismissed for nonjoinder.  *Laker*

*Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999). Again, in this case, proceeding to judgment on the challenged provisions without the other counties of the State, will be prejudicial both to the Plaintiffs and to the unnamed parties. Therefore, even if these Defendants were the proper parties as to all claims, they are still entitled to summary judgment.

### G. Fulton County Defendants Have Not Deprived Plaintiffs of Any Rights.

Even if all of Plaintiffs allegations are all taken as fact, the Fulton County Defendants cannot be held liable to the Plaintiffs, as they have not subjected the Plaintiffs to any deprivation of rights. No actions taken by any of the Fulton County Defendants, infringed upon the Plaintiffs right to vote.

The Equal Protection Clause of the Fourteenth Amendment commands that no State shall "deny to any person within its jurisdiction the equal protection of the laws," which is essentially a direction that all persons *similarly situated* should be treated alike. *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985) (emphasis added). An Equal Protection claim requires a showing that a plaintiff has been the victim of intentional discrimination. *Batson v. Kentucky*, 476 U.S. 79, 94, n.18 (1986). The requisite discriminatory purpose must be "more than intent as volition or intent as awareness of consequences. It implies that the

decision maker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (internal citations omitted).

A plaintiff may prove intent with direct or circumstantial evidence. *Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999).  The first step in any Equal Protection claim is to establish that a recognizable, distinct class is singled out for different treatment under the laws as written or as applied. *Castaneda v. Partida*, 430 U.S. 482, 494 (1977). Here, Plaintiffs fail this first step.  Plaintiffs' claim is not that similarly situated voters are treated differently, it's that voters that choose to vote on Election Day must vote using the BMD based voting system instead of hand-marked paper ballots.  In other words, Plaintiff fails to identify two classes of voters which are similarly situated. As soon as a voter picks their ballot method, they become dissimilar. All voters get a choice to vote by absentee ballot, during advance voting or on Election Day or by BMD.  In making this choice, a voter has discretion in determining whether he or she will need for a ballot to be mailed to him or her, whether he or she will avail themselves of one of the various places offered for advance voting for several weeks, including a weekend, or whether he or she will choose to wait until Election Day to vote. "To maintain this

focus on discrimination, and to avoid constitutionalizing every state regulatory dispute, [courts] are obliged to apply the 'similarly situated' requirement with rigor." *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007). "Different treatment of dissimilarly situated persons does not violate the equal protection clause." *Id.* (quoting *E & T Realty v. Strickland*, 830 F.2d 1107, 1109 (11th Cir. 1987)). Where, as here, there are no allegations that the only impacted electors were members of a suspect or quasi-suspect class, "[t]he general rule is that [the state action] is presumed to be valid and will be sustained if the classification drawn by the [state action] is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440.

Fulton County Defendants have not deprived any Plaintiffs of the right to vote, or any rights provided under the Fourteenth Amendment. There are no actions alleged in this case on behalf of the Fulton County Defendants that violate the constitutional rights of the Plaintiffs. The Southern District of New York has held that the use of voting machines is "for the elected representatives of the people to decide[.] There is no constitutional right to any particular method of registering and counting votes." *Green Party of N.Y. v. Weiner*, 216 F. Supp. 2d 176, 190-91 (S.D.N.Y. 2002).

Further, if Plaintiffs' desire to vote via hand-marked paper ballots, they can

do so by voting by mail-in ballot.  The Fulton County Defendants' use of the mandated statewide voting system does not infringe on their right to vote a paper ballot because they can choose to do so.  There are no Fourteenth Amendment violations.

As discussed at length herein, Plaintiffs' claims are against the State Defendants in promulgating the statewide voting system.  However, Plaintiffs' few remaining specific allegations against the Fulton County Defendants are contained in Coalition Plaintiffs' Third Amended Complaint.  (Doc. 226).  All of these allegations relate to the DRE voting system and concern access to and observance of post-election activities in 2017.  Specifically, Plaintiffs' allegations pertain to April 22, 2017, November 7, 2017, and December 5, 2017. (Doc.  226, ¶¶ 129 -138).  Plaintiffs' claim they were not allowed to observe close down procedures, vote tabulation, or the post-election meeting of the Fulton County Board of Registration and Elections from a distance that was as close as they desired. (Doc. 226, ¶ 133).   All of these claims involve DRE machines, which are no longer in use by anyone in the State of Georgia.  The remaining allegations involve the speculative use of the DRE system in the future.  (*See* Doc.  226, ¶¶ 136 -138, alleging what the Fulton County Defendants, intend to do, "[w]ith the authorization of Defendants Kemp and the State Board" as related to the DRE voting system).

Even if these unsubstantiated allegations are taken as fact, there is no constitutional violation on part of the Fulton County Defendants.  The [federal] Constitution is not an election fraud statute: protection is extended to the right of all qualified citizens to vote in state and federal elections…. *Bodine v. Elkhart County Election Bd*., 788 F.2d 1270 (1986) *citing Reynolds v. Sims,* 377 U.S. 533, 554, 84 S.Ct. 1362, 1377-78, 12 L.Ed.2d 506 (1964). "It is not every election irregularity, however, which will give rise to a constitutional claim and an action under section 1983." *Hennings v. Grafton,* 523 F.2d 861, 864 (7th Cir.1975).  The court in *Hennings* held that section 1983 is implicated only when there is "*willful* conduct which undermines the organic processes by which candidates are elected." 523 F.2d at 864 (emphasis added); *see also Shannon v. Jacobowitz*, 394 F.3d 90, 97 (2d Cir.2005) ("Because no conduct is alleged that would indicate an intentional deprivation of the right to vote, we find no cognizable federal due process claim."); *Burton v. Georgia*, 953 F.2d 1266, 1268 (11th Cir.1992) ("Principles of federalism limit the power of federal courts to intervene in state elections.")  Because Plaintiffs have failed to show any willful conduct on the part of the Fulton County Defendants, they have failed to state a constitutional violation of the Fourteenth Amendment. Every speculative election irregularity or potential problem does not rise to a constitutional violation. *See Pettengill v. Putnam County R-1 Sch. Dist.*,

472 F.2d 121, 121-22 (8th Cir. 1973). Indeed, the Constitution does not mandate flawless or perfect elections. *Bodine* 788 F.2d at 1272 (7th Cir. 1986). Absent invidious discrimination or "fraudulent interference with a free election by stuffing the ballot box," irregularities do not amount to constitutional violations. *Pettengill*, 472 F.2d 121, 122 (8th Cir. 1973).

Plaintiffs were not prevented from voting or observing the election process. They were simply not allowed to be as close as they wanted or to disrupt the process. In any event, the elections in State of Georgia were certified Secretary of State and the candidates who were originally a part of this litigation were dismissed and are longer a part of this case. (Doc. 81). This court should no longer entertain such claims, as these elections have already occurred. *See De La Fuente v. Kemp*, 679 F. App'x 932, 933 (11th Cir. 2017). The 11th Circuit reasoned, "[w]hile De La Fuente's appeal has been pending before this Court, the November 2016 elections have come and gone. Kemp contends that this renders De La Fuente's claims for a preliminary injunction moot because we can no longer direct him to accept De La Fuente's slate of electors for the November 2016 presidential election and De La Fuente can no longer appear on the ballot. We agree only in part." *Id.*

"Under Article III of the United States Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Brooks v. Ga. State Bd. of Elections*, 59 F.3d 1114, 1118 (11th Cir. 1995).[8] "For that reason, if an event occurs while a case is pending on appeal that makes it impossible for the court to grant any effectual relief whatever to a prevailing party, the appeal must be dismissed . . . This Court cannot prevent what has already occurred." *Id.*

Further, the specific claims against the Fulton County Defendants are no longer relevant or viable as they involve the DRE and the processes surrounding the DRE-based voting system. Even if substantiated, as discussed above, Plaintiffs claims for "more transparency" in the post-election process do not amount to a constitutional violation.[9]

## CONCLUSION

Based on the foregoing it is clear, as it was at the outset of this matter, that the Fulton County Defendants are an improper party to this action as they did not establish or implement any of the voting systems alleged to have violated Plaintiffs' constitutional rights to vote in this action. As a creation of the General Assembly and therefore an arm of the State/Secretary of State, the Fulton County

---

[8] See also  U.S. Const. art. III; *Lewis v. Continental Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 1253 (1990).

[9] *See* the Deposition of Megan Missett (Doc. 1558, pp. 79-81).

Defendants simply engaged in their function, which was not an obvious and knowing violation of Plaintiffs' constitutional rights. Accordingly, the Fulton County Defendants are entitled to summary judgment as a matter of law.

Respectfully submitted this 9th day of January 2023.

OFFICE OF THE COUNTY ATTORNEY

Kaye Burwell
Georgia Bar Number: 775060
kaye.burwell@fultoncountyga.gov

*/s/ David R. Lowman*
David R. Lowman
Georgia Bar Number: 460298
david.lowman@fultoncountyga.gov

ATTORNEYS FOR DEFENDANTS
MARY CAROLE COONEY,
VERNETTA NURIDDIN, DAVID J.
BURGE, AARON JOHNSON, AND
THE FULTON COUNTY BOARD
OF REGISTRATION &
ELECTIONS

OFFICE OF THE COUNTY ATTORNEY
141 Pryor Street, S.W.
Suite 4038
Atlanta, Georgia 30303
(404) 612-0246

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| DONNA CURLING, et al; | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| | ) |
| v. | ) CIVIL ACTION |
| | ) FILE NO: 1:17cv02989-AT |
| BRAD RAFFENSBERGER, et al.; | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |
| | ) |
| | ) |
| _____ | ) |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I have electronically filed the foregoing **FULTON COUNTY DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using the CM/ECF system, which will send email notification of such filing to all attorneys of record.

This 9th day of January 2023.

_/s/ **David R. Lowman**_
David R. Lowman
Georgia Bar Number: 460298
david.lowman@fultoncountyga.gov

# EXHIBITS 1 - 4

Page 1

1          IN THE UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF GEORGIA

2                   ATLANTA DIVISION

3

4    DONNA CURLING, et al.,

5        Plaintiffs,

                                    CIVIL ACTION FILE

6        vs.

                                    NO. 1:17-cv-2989-AT

7    BRAD RAFFENSPERGER, et al.,

8        Defendants.

9

10   30(b)(6) VIDEO DEPOSITION of the COALITION FOR GOOD

11       GOVERNANCE, INC. through MARILYN MARKS

12                  March 17, 2022

13                   11:01 a.m.

14       TAKEN BY REMOTE VIDEOCONFERENCE

15    Robyn Bosworth, RPR, CRR, CRC, CCR-B-2138

16

17

18

19

20

21

22

23

24

25

**EXHIBIT**

tabbies

_1_

30(b)(6) Marilyn Marks
Curling, Donna v. Raffensperger, Brad

March 17, 2022

Page 158

1    course.

2    BY MR. TYSON:

3        Q    Certainly.  I think we'll be able to

4    address that as we go, so thank you for making note

5    of that.

6            So, Ms. Marks, other than filing this

7    lawsuit, has CGG undertaken any efforts to address

8    the laws, policies, and protocols it says are

9    unconstitutional?

10       A    Yes.

11       Q    And what are those?

12       A    Well, for one, we have tried to do

13   communications with lawmakers certainly both at the

14   time that laws were being promoted in the general

15   assembly about ballot marking devices going back to

16   2018 and then 2019, we've talked to lawmakers both

17   formally in hearings, through e-mails, through

18   personal telephone conversations, through visits

19   with lawmakers.  The same would be true of we've

20   talked to election officials who we felt they need

21   to be both educated on the -- on the issues and who

22   would hopefully lobby for avoiding BMDs and

23   promoting effective audits.

24           You know, other -- other activities would

25   have included educating members on the problems with

30(b)(6) Marilyn Marks                                    March 17, 2022
Curling, Donna v. Raffensperger, Brad

Page 159

1    the BMDs, and not only BMDs but necessity for

2    audits.

3              Let's see.  I'm going back to the question

4    to make sure that I'm remembering all the things

5    you're asking about.

6              Okay.  So we would have done lobbying, we

7    would have done education, we would have also

8    participated in generating -- crafting ourself

9    proposed rules that we have sent to the secretary --

10   excuse me, to the State Election Board around some

11   of these topics.

12             Oh, another thing that we've done, we

13   participated in the SAFE Commission meetings.  We

14   went to almost all of the SAFE Commission meetings

15   to try to persuade the decision makers there, which

16   did not just include lawmakers but election

17   officials that the BMDs should not be required --

18   should not be accepted, and there should be

19   hand-marked paper ballots and audits, and we've also

20   talked to a variety of county election officials.  I

21   may have already covered that.  But there would have

22   been e-mails as well as personal talks to election

23   officials in the counties about these topics.

24        Q    Thank you.

25        A    Now, there could be some other -- some

1    other types of activities I'm not remembering off

2    the top of my head and that I didn't remember at the

3    time I was preparing.

4         Q    Okay.

5         A    Those are some primary ones.

6         Q    Okay.  Thank you.

7              And the efforts to -- kind of start in

8    reverse order with the SAFE Commission, the goal

9    there was to persuade the SAFE Commission not to

10   adopt ballot marking devices, correct?

11        A    I think that was a primary goal.  I'm not

12   sure it was completely limited to that, but I'm sure

13   we would have had something to say about the

14   necessity of audits as well and probably other

15   election security issues.

16        Q    And the Coalition's effort to lobby

17   lawmakers, if the Coalition could persuade a

18   majority of the General Assembly in both houses and

19   the Governor it could address the use of ballot

20   marking devices in Georgia, correct?

21        A    Yes.

22        Q    Is another step the Coalition has taken to

23   address the policies that it says are

24   unconstitutional is fundraising to fund its efforts?

25        A    Well, yes, certainly.  We would -- we

Page 170

1    Twitter account.

2          A      Okay.  I'm not remembering all this off

3    the top of my head without a little more.

4    BY MR. TYSON:

5          Q      And maybe I can short-circuit a little

6    bit.

7          A      I'm not saying I didn't do it.  I just

8    need to remember what this is about.

9          Q      So my only question relates to these last

10   few tweets in this sequence:  We at Coalition Good

11   Gov warned of this problem in 2018, 2019, and

12   continue our federal lawsuit (Curling v.

13   Raffensperger) to seek auditable elections-no

14   hackable touchscreens.  Georgia should use

15   hand-marked ballots that cannot be manipulated.

16   Please help us, and there's a link to something

17   that's bit.ly/CGGDonate.

18               You see that?

19         A      I do.

20         Q      And so this is a request for a donation to

21   the Coalition, correct?

22         A      That's correct, yes.

23         Q      What I want to ask about is an individual

24   with the name @strategyPhD replies and says:  I just

25   donated some cash for this excellent work that

Page 1

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTH DISTRICT OF GEORGIA
2                       ATLANTA DIVISION

3

4
                                        )
5     DONNA CURLING, ET AL.,            ) CIVIL ACTION NO.
                                        ) 1:17-CV-2989-AT
6          PLAINTIFFS,                  )
                                        )
7     v.                                )
                                        )
8     BRAD RAFFENSPERGER, ET AL.,       )
                                        )
9          DEFENDANTS.                  )
      ----------------------------------

10

11

12

13               DEPOSITION OF DONNA PRICE
14                 (TAKEN by DEFENDANTS)
15        ATTENDING VIA ZOOM IN FULTON COUNTY, GEORGIA
16                    MARCH 8, 2022
17

18

19

20    REPORTED BY:        Meredith R. Schramek
                          Registered Professional Reporter
21                        Notary Public
                          (Via Zoom in Mecklenburg County,
22                        North Carolina)
23

24

25

**EXHIBIT**

2

Donna Price                                      March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 28

1           You can answer, Ms. Price.

2           THE WITNESS:  For the Georgia -- the current

3      Georgia voting system, the ballot marking device has a

4      QR code so that when the voter marks the ballot, they

5      cannot know what's -- if their votes -- and speaking

6      for myself, if I was voting on it, I wouldn't know if

7      my votes were being counted as -- as I marked them, the

8      selections on my ballot, because I can't read the QR

9      code.  So therefore, I can't verify the ballot.

10     BY MR. RUSSO:

11          Q    So -- and the -- can you explain to me the

12     difference, I guess, between the voting of the BMD and

13     a ballot and the hand-marked paper ballot?

14          MR. CROSS:  Objection to form.  Vague.

15          You can answer if you understand.

16          THE WITNESS:  Could you please rephrase that?

17     BY MR. RUSSO:

18          Q    Sure.  So -- and I'm just trying to

19     understand what -- like what you're saying in terms of

20     a voter-verified paper ballot ultimately.  It's --

21     it's -- because you -- you mentioned a QR code because

22     you can't read the QR code; is that correct?  Am I

23     understanding you correctly?

24          A    Yes.

25          Q    And does that change if there's -- does

Donna Price
Curling, Donna v. Raffensperger, Brad

March 8, 2022

Page 29

1      your -- does your opinion change if there's -- the

2      candidates' names are printed on the ballot?

3                  MR. CROSS:  Objection to form.  Hypothetical.

4                  You can answer, Ms. Price.  When I object,

5      just as a reminder, you still answer unless I instruct

6      you not to.

7                  THE WITNESS:  Okay.  All right.  Thank you.

8                  Could you repeat the question?

9      BY MR. RUSSO:

10          Q    Sure.  And you mentioned that the QR code --

11     and I asked if your belief as to what is a

12     voter-verified paper ballot changes if the names of the

13     candidates selected are printed on the ballot.

14                 MR. CROSS:  Calls for speculation.

15                 THE WITNESS:  Well, if the names are printed

16     on the ballot but the marks that I make when I vote are

17     interpreted as a QR code, then that's not a

18     voter-verified ballot.

19     BY MR. RUSSO:

20          Q    And what would be, then, a voter-verified

21     paper ballot?

22          A    It would be a -- in the Georgia current

23     system, that is an absentee paper ballot that I hand

24     mark.

25          Q    And is it your position that the markings on

Page 30

1      the ballot aren't interpreted by any computer?

2              A    No.  That's not my understanding.

3              Q    What is your understanding?

4                   MR. CROSS:  Objection.  Form.  Vague.

5                   Vincent, do you mind clarifying her

6      understanding as to what?

7      BY MR. RUSSO:

8              Q    As to the -- the hand-marked paper ballot and

9      whether the marks are interpreted by any computer.

10             A    If the question's about a voter-verified

11     ballot, when I look at the marks that I make on that

12     paper ballot, as I'm voting it, then I'm verifying that

13     those candidates or election contests or whatever

14     that's on the ballot are the ones that I selected.

15                  So that is -- we're talking just about

16     voter-verified ballot.  That's a voter-verified ballot.

17     It has nothing to do with the later processes of

18     voting.

19             Q    So your voter-verified paper ballot is not --

20     the scanner tabulation of it is not an aspect of

21     whether a ballot is a voter-verified paper ballot or

22     not?

23             A    Correct.

24             Q    Okay.  You're the director of Georgians for

25     Verified Voting; is that right?

Donna Price                                              March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 41

1    the ballots were accepted.

2         Q    So you would agree that your ballots were

3    accepted based on this report?

4         A    According to that report.

5         Q    But you have no -- you have no evidence that

6    the ballots were not counted, that the votes were not

7    accurately counted, I should say?

8         A    I have no evidence that they were -- that my

9    votes were or were not since the DRE -- the paperless

10   DRE voting system was installed.

11        Q    Okay.  And looking at your report further

12   down where it begins with the absentee, each time you

13   voted absentee, it was by mail; correct?

14        A    In the 2020 election, I dropped off my ballot

15   at the -- at a drop box.

16        Q    Okay.  And -- and that -- that ballot was an

17   absentee ballot, a hand-marked paper ballot that you

18   received in the mail?

19        A    Yes.  And also for the -- the general

20   election runoff.  I dropped that ballot off at a

21   ballot, you know, drop box.

22        Q    Okay.  And that was also the hand-marked

23   paper ballot --

24        A    That's correct.

25        Q    -- that you had received in the mail?

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 105

1    vulnerabilities to advanced persistent threats

2    mentioned in this paragraph?

3         A    I think that I've already answered that.  But

4    without being able to verify that the ballot which I

5    mark as a voter or I mark my selections and I can't

6    verify those selections, then that's a threat to the

7    results of the election being accurate.

8         Q    And what did you mean by "advanced persistent

9    threats" then?

10        A    Well, I would think that an advanced

11   persistent threat would definitely describe what little

12   I know about the reports from our expert -- report from

13   Dr. Halderman that I have not read.  But I think that

14   that would be --

15        Q    And then in paragraph 11, you state "Were the

16   Court to order that Georgia cannot implement and use

17   the proposed election system but must instead use

18   hand-marked paper ballots for all voters who can hand

19   mark which a voter can review to verify that her votes

20   are cast as intended and would be counted as cast, I

21   would perceive less risk in casting my ballot in

22   person."  Do you see that?

23        A    Yes.

24        Q    And I'm going to kind of focus on the part of

25   this that's referring to what you're asking and it's

1    these hand-marked paper ballots for voters who can hand

2    mark, which a voter can review and verify that her

3    votes are cast as intended and will be counted as cast,

4    how do you know a vote -- a hand-marked paper ballot as

5    you've requested the Court to do will be counted as

6    cast?

7         A    I think that --

8         Q    What does that mean?

9         A    I've described that earlier as a voting --

10   it's an entire voting system.  So you have the

11   hand-marked paper ballot which is voter verified just

12   by the action of hand marking it.  And then you have

13   the risk of the voting system.  So less risk means that

14   that part of the voting system would be voter verified.

15   The rest of the voting system involves transparency,

16   security for the software and hardware.  And that

17   includes the standards and postelection risk-limiting

18   audits.

19        Q    And -- go ahead.  I'm sorry.  Were you still

20   talking?  All right.  I thought I heard something.

21             And what are you proposing -- and I

22   understand you want the hand-marked paper ballots, and

23   then you said count as cast and that's the rest of the

24   system.  What are you proposing for that here?  In this

25   paragraph, you say you perceive less risk in casting my

Donna Price                                      March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 107

1    ballot in person.  If you have hand-marked paper

2    ballots which a voter can review to verify her votes

3    are cast, we talked about that piece.  And then "will

4    be counted as cast."  And you just stated that that was

5    the rest of the system, and then you mentioned audits.

6    So I'm just trying to get an understanding about that

7    part of what you meant here.

8                MR. CROSS:  Objection.  Vague.

9                THE WITNESS:  I think I --

10   BY MR. RUSSO:

11        Q    Are you -- go ahead.

12        A    I've already answered this.  It's that you're

13   starting off with the primary record in the election

14   which is the voters' verified selections, that they

15   have verified their own selections.  And so that means

16   that the primary record is going to be used in the

17   counting in the tabulation of the election and in the

18   postelection audits.  So that primary record is what I

19   meant in this paragraph.  Because if the primary record

20   is not voter verified, then there's more risk that it

21   will not -- there's risk that it wouldn't be counted as

22   accurate.

23        Q    Are you -- do -- your claims in this case,

24   are you also challenging the scanners that are used?

25   Maybe this will help kind of cut through it.

Fulton County Superior Court
***EFILED***NE
Date: 6/9/2017 6:39:47 PM
Cathelene Robinson, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

DONNA CURLING, et al.   )
          )
  **Plaintiffs,**    )
          )  **CIVIL ACTION FILE**
v.         )  **NO. 2017CV290630**
          )
BRIAN P. KEMP, in his official )
capacity as Secretary of State of )
Georgia, et al.     )
          )
  **Defendants.**   )

## ORDER DENYING PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND INTERLOCUTORY INJUNCTION AND FOR WRIT OF MANDAMUS

Plaintiffs' Emergency Motion for Temporary Restraining Order and Interlocutory Injunction ("Emergency Motion") filed on May 26, 2017 — on the eve of advance voting in the State of Georgia's Sixth Congressional District Run-Off Election — came before the Court for hearing and oral argument on June 7, 2017 following statutory notice to the State of Georgia.  Attorneys Robert McGuire (*pro hac vice*) and Edward Krugman appeared on behalf of Plaintiffs;  Attorneys Christina Correia and Josiah Heidt appeared on behalf of Defendant Brian Kemp, Georgia Secretary of State; Attorney Kaye Burrell appeared on behalf of Defendant Richard Barron, Director of the Fulton County Board of Elections; Attorney Bennett Bryan appeared on behalf of Defendant Maxine Daniels, Director of Voter Registrations and Elections for Dekalb County; and Attorney Daniel

EXHIBIT

3

White appeared on behalf of Defendant Janine Eveler, Director of the Cobb County Board of Elections and Registration. All of the defendants were sued in their respective official capacities.

In their Emergency Motion, Plaintiffs, a Colorado-based non-profit organization with members in Georgia's Sixth Congressional District, seek an Order from this Court to restrain and enjoin Defendants from using the Direct Recording Electronic ("DRE") voting equipment and its related DRE-based voting system to conduct the June 20, 2017 run-off election for the 2017 Sixth Congressional District Special Election in Cobb, Dekalb and Fulton counties. More particularly, Plaintiffs assert that Georgia's DRE voting system is uncertifiable, unsafe and inaccurate such that Defendants should be required to comply with O.C.G.A. §§ 21-2-334 and 21-2-281 and use paper ballots for hand counting in the manner proscribed under the laws of the State of Georgia. Having considered the issues presented in the parties' motions and supporting briefs, evidence, argument of counsel and applicable authority, Plaintiffs' Emergency Motion for Temporary Restraining Order and Interlocutory Injunction is hereby **DENIED** for the reasons explained below.

Plaintiffs assert their claim for injunctive relief applies only to the Defendant Counties. However, inasmuch as the Secretary of State is statutorily conferred with the authority to determine the voting equipment that will be used throughout

the State of Georgia, the claim for injunctive relief is necessarily asserted against

Defendant Secretary of State as the relief Plaintiffs seek rests exclusively within

his control.  Even still, because the individually-named Defendants have been sued

in their official capacities, the doctrine of sovereign immunity applies.  Cameron v.

Lang, 274 Ga. 122 ( 2001).   Sovereign immunity also extends to the County

Defendants. Butler v. Dawson Co., 238 Ga. App. 808, 809 (1999).  As such, any

state law claims against the Defendants are covered under the sovereign immunity

doctrine unless there is some waiver of immunity.  Plaintiffs have failed to identify

any such waiver.

Plaintiffs asserted for the first time during the Emergency Hearing that their

claims were based, in part, on the United States Constitution at 42 USC § 1983

authorizing their claims to be brought against state officers and employees in their

official capacities where plaintiffs allege a violation of federal rights based on

action taken under the color of law as follows:

> Every person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State or Territory or
> the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other person
> within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured
> in an action at law, suit in equity, or other proper
> proceeding for redress, except that in any action brought
> against a judicial officer for an act or omission taken in

> such officer's judicial capacity, injunctive relief shall not
> be granted unless a declaratory decree was violated or
> declaratory relief was unavailable. For the purposes of
> this section, any Act of Congress applicable exclusively
> to the District of Columbia shall be considered to be a
> statute of the District of Columbia.

42 USC § 1983.  Although such claims could be properly brought before this Court, in this instance Plaintiffs have failed to make such a pleading.  As such there are no federal claims before this Court, and any state law causes of action would be subject to qualified immunity and must be **DISMISSED**. Moroever, because sovereign immunity applies, Plaintiffs are barred from injunctive relief at common law on any state law claims. Ga. Dept. of Nat'l. Resources, et. al v. Center for Sustainable Coast, 294 Ga. 593 (2014).

Even if Plaintiffs' claims were not barred by sovereign immunity, Plaintiffs request for an interlocutory injunction must fail because Plaintiffs cannot satisfy the elements for such a remedy.  It is well settled that the issuance of an injunction is an extraordinary remedy that should be reserved for **"clear and urgent cases."** OC.G.A. § 9-5-8 (emphasis added).  Courts have been cautioned to exercise this power "prudently and cautiously."  Id.  In considering whether to exercise the power to grant this extraordinary remedy, the Court must consider the following factors:

> (1) there is a substantial threat that the moving party will
> suffer irreparable injury if the injunction is not
> granted; (2) the threatened injury to the moving party
> outweighs the threatened harm that the injunction
> may do to the party being enjoined; (3) there is a
> substantial likelihood that the moving party will
> prevail on the merits of [their] claims at trial; and (4)
> granting the interlocutory injunction will not disserve
> the public interest.

Holton v. Physician Oncology Servs. LP, 292 Ga. 864, 866, (2013).

As to the first factor, while the Court is keenly aware and appreciates the heightened concern surrounding voting security in the State of Georgia and nationally taken together with troubling allegations of election interference, this Court is constrained by the law and the evidence presented in this case. Additionally, Plaintiffs' concern that the DRE voting system lacks a verification feature is legitimate. However, in the absence of evidence (*e.g.,* voter testimony, malfunction, unexplained deviations, skewed results, historical data, national research, etc.), this Court cannot adopt Plaintiffs' conclusion that Georgia's DRE voting equipment and its related voting system are unsafe, inaccurate and impracticable within the meaning of the statute. Plaintiffs have failed to demonstrate any concrete harm. Accordingly, the first factor militates against Plaintiffs.

Moving to the second and fourth factors, the Court finds that these factors also militate against Plaintiffs. Advance voting in the Special Election Sixth

Congressional Run-Off commenced on May 26, 2017.  Evidence presented during the hearing showed that requiring Defendants to halt the Special Election in order to substitute DRE machines with paper ballot in the middle this election would be costly and could potentially create voter confusion and possible voter disenfranchisement in an ongoing election.  These outcomes would necessarily undermine voter trust and confidence in the electoral process and the integrity of Georgia's elections and disserve the public interest.  Further evidence showed that visually-impaired and other disabled voters would not have equal access to the ballot.  The testimony further showed that election officials, including many volunteer poll officers and workers, are only trained to conduct elections using the method certified by the Secretary of State and, as such, would need to be re-trained on both the administration and tabulation of paper ballots which could have the unintended consequence of creating both security and accuracy concerns.  As such, the Court finds that both the second and fourth factors favor Defendants.

As to the third factor, *assuming arguendo* that the claims survive sovereign immunity, the Georgia Supreme Court found in <u>Favorito v. Handel</u>, that so long as the voting method used – DRE machines in that case – was reasonable and neutral, that method would be free from second-guessing.  285 Ga. 795, 798 (2009).  Based on precedent and the dearth of non-speculative evidence presented by Plaintiffs at

the hearing on the Emergency Motion, the Court finds that there is little likelihood of success on the merits.

Finally, Defendants jointly assert a valid laches argument. Laches applies to a request for equitable relief when: (1) there was a delay in asserting the claim; (2) the delay was not excusable; and (3) the delay caused the non-moving party undue prejudice. <u>United States v. Barfield</u>, 396 F.3d 1144, 1150 (11th Cir. 2005). Here, evidence shows the Plaintiffs was aware of the factors giving rise to the Verified Complaint and Emergency Motion on April 18, 2017, if not sooner. Plaintiffs knew that Advance Voting for the June 20, 2017 Special Run-off Election commenced on May 30, 2017. Plaintiffs were aware of alleged system errors that occurred during the April 18, 2017 Special Election tabulation in Fulton County. Plaintiffs were aware of a March 15, 2017 inquiry being forwarded to the Georgia Secretary of State regarding concerns with DRE machines. Despite all of this knowledge, however, Plaintiffs filed suit one (1) business day before advance voting commenced. This delay taken together with an intervening holiday and the statutory notice to which the State of Georgia is entitled prevented this matter from being considered by the Court prior to the start of Advance Voting. Plaintiffs' delay in asserting the claim has prejudiced Defendants.

It cannot be argued in a democracy that the right to vote is fundamental. Concomitant with that right is the assurance that the ballot cast reflects the choices of the elector.  As the Favorito Court pointed out:

> The unfortunate reality is that the possibility of electoral fraud can never be completely eliminated; no matter which type of ballot is used. [Citation omitted.] [Even assuming that] none of the advantages of touch-screen systems over traditional methods would be sacrificed if voter-verified paper ballots were added to touchscreen systems . . . , it is the job of democratically-elected representatives to weigh the pros and cons of various balloting systems. [Citation omitted.]  So long as their choice is reasonable and neutral, it is free from judicial second-guessing.

Favorito, 684 S.E.2d 257, 261.

Accordingly, for the reasons discussed above, the Court finds that Defendants are entitled to sovereign immunity from any claim for injunctive and declaratory relief.  The Court further finds that the harm to the public would greatly outweigh the issuance of an injunction upon a consideration of the applicable factors and in conjunction with Defendants' laches arguments.  For similar reasons, the Court still further finds that Plaintiffs' Request for a Writ of Mandamus must necessarily fail.  Accordingly, Plaintiffs' Emergency Motion is hereby **DENIED** and the Complaint is hereby **DISMISSED**.

This 9th day of June 2017.

HONORABLE KIMBERLY M. ESMOND ADAMS
SUPERIOR COURT OF FULTON COUNTY
ATLANTA JUDICIAL CIRCUIT

**Distribution List**

EDWARD B. KRUGMAN
ROBERT L. ASHE, III
1201 WEST PEACHTREE STREET NW
SUITE 3900
ATLANTA, GA 30309
KRUGMAN@BMELAW.COM

CHRISTOPHER CARR
CHRISTINA CORREIA
GEORGIA ATTORNEY GENERAL
40 CAPITOL SQUARE, SW
ATLANTA, GA 30334
CCARR@LAW.GA.GOV

OVERTIS HICKS BRANTLEY
BENNETT, BRYAN
DEKALB COUNTY LAW DEPARTMENT
1300 COMMERCE DRIVE
FIFTH FLOOR
DECATUR, GA 30030
OVBRANTLEY@DEKALBCOUNTYGA.GOV

PATRISE M. PERKINS-HOOKER KAYE BURWELL
FULTON COUNTY ATTORNEY'S OFFICE
141 PRIOR STREET, SW
SUITE 4038
ATLANTA, GA 30303
PATRISE.HOOKER@FULTONCOUNTYGA.GOV

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, et al;                     )
                                          )
                                          )
                                          )
          Plaintiffs,                     )
                                          )
                                          )   CIVIL ACTION
     v.                                   )   FILE NO: 1:17cv02989-AT
                                          )
BRAD RAFFENSPERGER, et al.;               )
                                          )
                                          )
          Defendants.                     )

## DECLARATION OF NADINE WILLIAMS

Pursuant to 28 U.S.C. 1746, Nadine Williams declares as follows:

1.

I make this Declaration in support of the Fulton County Defendants' Motion

for Summary Judgment filed in the above-styled matter of Donna Curling, et al., v.

Brad Raffensperger, et al., (Civil Action No. 1:17-cv-2989-AT).

2.

I am the Interim Director of the Fulton County Department of Registration

and Elections, and have been employed in that role since April 4, 2022. Prior

to this position, I was employed as the Elections Chief for the Fulton County

Department of Registration and Elections and held that position since September 2,



EXHIBIT
4

2020.

3.

The Fulton County Defendants (Mary Carole Cooney, Vernetta Nurridin, Kathleen D. Ruth, Mark Wingate, and Aaron Johnson) are or were at all times relevant to this action Members of the Fulton County Board of Registration and Elections, which is the superintendent of elections for Fulton County, Georgia.

4.

Beginning in June of 2020, with the 2020 Presidential Preference Primary/Special Election/General Primary Election, the State of Georgia has utilized a Ballot Marking Device based voting system.

5.

Under Georgia Election Code, the Fulton County Board of Registration and Elections cannot refuse to use the current statewide Ballot Marking Device based voting system and implement a hand-marked paper ballot system.

6.

I declare under penalty of perjury that the foregoing is true and correct to the best of my ability.

This ____ day of January, 2023.

Nadine Williams, Interim Director
Fulton County Department of Registration
and Elections