**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, et al.,**<br><br>**Defendants.** | **CIVIL ACTION FILE NO.:**<br>**1:17-cv-2989-AT** |

## DECLARATION OF RHONDA J. MARTIN

**RHONDA J. MARTIN** declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I have personal knowledge of all facts stated in this declaration and, if called to testify, I could and would testify competently thereto.

2.      This declaration supplements my Declarations of May 20, 2019 (Doc. 413, Ex. C); December 16, 2019 (Doc. 680, Ex. L); March 4, 2020 (Doc. 716, Ex. 3); March 10, 2020 (Doc. 723, Ex. J); August 23, 2020 (Doc. 809, Ex. 3), and February 12, 2021.

3.      I am Executive Secretary for the Qatar Computing Research Institute Scientific Advisory Committee, and a board member of the Coalition for Good Governance ("CGG"). I have developed avionics software for the Space Shuttle

and worked with the Department of Defense to develop guidance and policy for the testing of computer software for mission-critical applications. I have also taught AP Statistics and other Upper School level mathematics courses. I have an M.S. in Operations Research and a B.S. in Applied Mathematics from Georgia Institute of Technology, and Teaching Certification in Math Education Major/Science Education Minor from Purdue University.

4.      Since my supplemental declaration of February 12, 2021, I observed the Election Day Voting in Fulton County at the North Fulton Annex on November 8, 2022 as an authorized poll watcher.

5.      During the 40 minutes I was on the premises, I estimated that approximately half of the people that arrived to vote were in the wrong polling location based on overhearing their conversations. Poll workers speculated to me that this was because the North Fulton Annex is located on busy Roswell Road and that for weeks people would have seen the Vote Here signs when driving by. They also suggested that redistricting could have played a role. Each of the voters that was turned away would have been allowed to vote at the North Fulton Annex had it been during the Early Voting time frame, but on Election Day voters must go to their assigned precincts. This phenomenon was also noted in the Carter Center Report, 2022 Election Observation: Fulton County, Georgia, (Doc. 1590-6 at 15)

6.      This highlights the importance of having accurate paper backup voter lists available to permit voter check-in, or the redirection of voters to their proper precincts, in cases where there is an interruption in the online check-in system or problems with the PollPads.

7.      The Carter Center Report also notes the violation of voter privacy because of the Ballot Marking Device touchscreen vote displays. (*Id*. at 13): Their observation is consistent with my own observations expressed in my  previous declarations. On November 8, 2022, I again witnessed the inability to protect the secrecy of ballot choices when voters are required to vote using Ballot Marking Devices. As a poll watcher, I know to try to take deliberate steps to not look at how people are voting, although it is sometimes difficult to find a direction to look where I will not see voters' selections in a busy polling place. Typical voters, however, walking from check-in to a Ballot Marking Device or to the scanner to cast their ballots would not know to be careful about where they directed their gaze. Further, they would not know to use caution when selecting which Ballot Marking Device to use if they want to be sure to improve the secrecy protection of their ballots, something that should be guaranteed without special effort on their part.

8.      I have observed and personally experienced the operation of the Ballot Marking Device touchscreens as they present messages on the screen to notify the voter of an attempted over-vote or under-vote on a race. That notification can be read by others in the area, and is not private.

9.      Likewise, I have observed and personally experienced that after a voter has made all their touchscreen selections and before the voter instructs the Ballot Marking Device to print the ballot, the machine displays all the selections the voter has made and permits the voter to change his selection or correct errors in the selection. These review screens are also displayed in a manner that neighboring voters and people in the polls can observe.

10.      As I discussed in my declaration of February 12, 2021, the use of Ballot Marking Devices has resulted in the legal requirement for the voter to take on the difficult task of verifying that their ballot summary printout accurately records their votes. My June 9, 2020 ballot had approximately 48 ballot selections to make. There is no way I would have been able to remember all of the races on the ballot to verify that the Ballot Marking Device ballot summary printout was accurate and complete, so I would have had to bring a completed sample ballot with me for reference as I attempted to complete the process of voting and then verifying that the machine correctly printed the text of my choices.

4

11.     I have to admit, my lack of enthusiasm for this task is also affected by
my knowledge that the vote that is actually counted is that embedded in the QR
code, something I can't read or verify. When voting by mail, I do not have to check
that tools I employ are operating correctly. What I record on my mail ballot is
clearly visible to me and exists on a durable record that can be audited or manually
recounted as a trustworthy document. Due to continuing concerns about the
complete lack of privacy when using the Ballot Marking Devices, as well as
concerns about my inability to know what votes are actually being counted, I now
accept the inconvenience of voting by mail ballot deposited in a Fulton County
drop box.

12.     Although the process has worked a number of times to permit me to
cast my ballot, I find myself frequently going online to check My Voter Page to
see if my application has been received, if my ballot had been issued, and if it has
been accepted. That is because I am aware from my work with  CGG, which gets
reports of problems in ballot issuance and acceptance from many absentee mail
ballot voters, that delays and problems with mail ballot processing are common.

13.     Another reason I routinely tolerate the inconveniences to vote a mail
ballot is to avoid the risk of PollPad check in problems that can make it very
difficult to cast a ballot, based on information that our CGG observers have

documented in the polling places. For example, the PollPad inaccuracies for precinct 0F1 (FanPlex) during the August 11, 2020 runoff election exemplify voting problems I want to avoid. (Whitley Decl. Doc. 800-6 ¶¶ 5-20 ; Stippich Doc. 800-5 ¶¶ 5-13; Hursti Decl. Doc. 800-2 ¶¶ 18-19).

14.     As noted in the Whitley, Stippich and Hursti declarations, no meaningful backup paper poll book was available during the August 11, 2020 runoff election to permit check-in of voters whose records were erroneous to issue regular ballots to them. As noted in the Whitley Declaration, the paper poll book backups had been prepared prior to the June 9, 2020 primary.  (Doc. 800-6 ¶¶ 18)

15.     The lack of accurate PollPad records and current paper backup became obvious to me personally on that same Election Day when I voted in person in the August 11, 2020 runoff, when my mail ballot did not arrive, as I noted in my declaration of February 12, 2021. (Doc. 1071-4 ¶21) My polling place, Sutton School, was uncrowded and poll workers were not distracted with problems.

16.     When I checked in, I expected to have to answer questions about whether I had voted the mail ballot that purportedly had been sent to me which should have been reflected in the PollPad record. I expected that I would need to sign an oath that I had not voted that ballot and would not do so, as I was applying

6

for a replacement ballot. I had watched other voters cancel their ballots in this manner in the past observations. However, the PollPad voter history check in information apparently did not reflect that mail ballot issuance because I was immediately issued a voter access card for voting a regular Ballot Marking Device ballot.

17.    If the PollPad had shown inaccurately that I had voted the mail ballot and should not be permitted to vote at the polls, as had happened with FanPlex voters in 0F1, there was no applicable paper poll book backup for workers to review to determine the official status of my eligibility to vote a regular ballot.  As noted in the referenced Declarations and in the Court's finding (Doc. 918 at 19) paper backups are not updated for runoff elections.

18.    Another reason I question the accuracy of the State's voter database is my own Voter Participation Record as reflected on the Secretary of State's website MVP as of January 31, 2023. (Exhibit 1) The record shows that I did not participate in the August 11, 2020 election, although I voted in person at my home precinct on Election Day.

19.    As a board member of CGG, I am concerned by the requirement to divert the majority of our resources to litigation in the Curling case. I would like to

see CGG continue education related work for Local Election Officials and poll watchers.

20.    CGG also has a long list of topics (e.g.,  transparency, poll watching, public observation, electronic records retention, access for voters with disabilities, and absentee ballot delivery in polling places) that it would like to address by proposing rules to the State Election Board. This has not been possible due to the demands of litigation.

21.    Along similar lines, this is the first year in quite a while where CGG has not drafted election legislation for consideration by the State.

22.    As a member of CGG, in the past, I have regularly made public comments at Fulton County Board of Registration and Elections meetings and at Georgia State Election Board meetings, participated in the development of rules to propose to the State Election Board, and attended legislative meetings and hearings, testifying when appropriate. This is not currently possible due to the claims the lawsuit has placed on my limited time.

23.    One particular project of specific interest where CGG is having to minimize the resources deployed is the current topic of Ranked Choice Voting ("RCV") that, according to press reports, is generating a lot of discussion among

Georgia's political and legislative decision makers. Our most active members are getting questions daily about the potential use of RCV.

24.    CGG is uniquely positioned to add considerable knowledge and experience to this discussion, but cannot afford the resources required to do so because of the litigation. In addition to the skills and experience Marilyn Marks has in this area, I feel that I could make significant contributions to the most difficult part of the RCV analysis—the math of RCV that is confusing to the public. My background as a teacher of AP Statistics and other Upper School level mathematics courses using my B.S. in Applied Mathematics from Georgia Institute of Technology, combined with my experience in observing Georgia's post-election audits, would permit me to explain to decision makers the fundamental principles as well as the risks and complexity of the RCV math as applied in real elections.

25.    I would like to be able to use my skills for this project, given the void that CGG believes exists in Georgia in the understanding of RCV principles as they are currently being debated. However, even a brief webinar or training session would take dozens of person hours that CGG just cannot spare with the need to address the litigation requirements.

Executed on this date, February 7, 2023

Rhonda J. Martin