Page 1

1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF GEORGIA

3                        ATLANTA DIVISION

4

5      DONNA CURLING, et al.              )
                                          )
6                    Plaintiffs           )
                                          )
7                       vs.               )Case No.
                                          )1:17-CV-2989-AT
8      BRAD RAFFENSPERGER, et al.         )
                                          )
9                    Defendants           )
       _____)

10

11

12

13

14

15

16          VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

17                   JUAN GILBERT, Ph.D.

18                Friday, October 29, 2021

19                       Volume I

20

21

22     Reported by:
       CARLA SOARES
23     CSR No. 5908
24     Job No. 4871592
25     Pages 1 - 289

```
 1              IN THE UNITED STATES DISTRICT COURT
 2             FOR THE NORTHERN DISTRICT OF GEORGIA
 3                       ATLANTA DIVISION
 4
 5      DONNA CURLING, et al.            )
                                        )
 6               Plaintiffs             )
                                        )
 7                  vs.                 )Case No.
                                        )1:17-CV-2989-AT
 8      BRAD RAFFENSPERGER, et al.       )
                                        )
 9               Defendants             )
        _____)
10
11
12
13
14
15
16              VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
17      JUAN GILBERT, Ph.D., Volume I, taken on behalf of
18      Plaintiffs, beginning at 10:06 a.m., and ending at
19      5:31 p.m., on Friday, October 29, 2021, before CARLA
20      SOARES, Certified Shorthand Reporter No. 5908.
21
22
23
24
25
```

Page 3

1    APPEARANCES VIA VIDEOCONFERENCE:

2

3    For the Curling Plaintiffs:

4              MORRISON & FOERSTER LLP

5              BY:  DAVID D. CROSS, Attorney at Law

6              BY:  VERONICA ASCARRUNZ, Attorney at Law

7              2100 L Street, NW, Suite 900

8              Washington, DC 20037

9              202.887.1500

10             dcross@mofo.com

11             vascarrunz@mofo.com

12

13

14   For Defendant Secretary of State Brad Raffensperger:

15             ROBBINS

16             BY:  CAREY MILLER, Attorney at Law

17             500 14th Street, NW

18             Atlanta, Georgia 30318

19             678.701.9381

20             cmiller@robbinsfirm.com

21

22

23

24

25

1    APPEARANCES VIA VIDEOCONFERENCE (Continued):

2

3    For Defendant Fulton County:

4              FULTON COUNTY ATTORNEY'S OFFICE

5              BY:  DAVID LOWMAN, Attorney at Law

6              151 Pryor Street, Suite 4038

7              Atlanta, Georgia 30303

8              404.612.4000

9              david.lowman@fultoncountyga.gov

10

11

12   ALSO PRESENT:  Kevin Skoglund

13                 Duncan Buell

14                 Marilyn Marks

15                 Susan Greenhalgh

16                 Philip Stark

17                 J. Alex Halderman

18                 David Campbell, Video Operator

19                 Neil Martin, Veritext Concierge

20

21                 --o0o--

22

23

24

25

1                          INDEX

2        WITNESS

3        JUAN GILBERT, Ph.D.                    EXAMINATION

         Volume I

4

5                    BY MR. CROSS                        9

6

7                         EXHIBITS

8        NUMBER                DESCRIPTION              PAGE

9        Exhibit 1                                      10

10             Declaration of Dr. Juan Gilbert

11

12       Exhibit 2                                      41

13             Document entitled "Georgia Voter

14             Verification Study"

15

16       Exhibit 3                                      56

17             United States Patent,

18             No. US 11.036,442 B2

19

20       Exhibit 4                                     141

21             Article entitled "Why computer

22             scientists prefer paper ballots"

23

24

25

                              EXHIBITS

NUMBER                    DESCRIPTION                    PAGE

Exhibit 5                                                179

         Document labeled "Exhibit A"


Exhibit 6                                                209

         E-mail string, top e-mail to Scott

         Tucker from Michael Barnes, dated

         1-15-20


Exhibit 7                                                260

         Twitter page


Exhibit 8                                                270

         Letter to Juan E. Gilbert, Ph.D. from

         Bryan P. Tyson, dated 11-8-19


Exhibit 9                                                274

         Trial transcript, dated 3-24-09


            (Exhibits attached to transcript.)

1                    REFERENCED EXHIBITS

2                 EXHIBIT         PAGE

3                      (None)

4

5

6          INSTRUCTIONS NOT TO ANSWER

7                  PAGE        LINE

8                   90           5

9                     --o0o--

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 8

1          Witness Location:  Gainesville, Florida

2                  Friday, October 29, 2021

3                      10:06 a.m.

4

5              P R O C E E D I N G S

6              THE VIDEO OPERATOR:  Good morning.  We are

7     going on the record at 10:06 a.m. Eastern Time on

8     October 29th, 2021.

9              This is Media Unit No. 1 of the

10    video-recorded deposition of Dr. Juan Gilbert, taken

11    by counsel for the plaintiff, in the matter of Donna

12    Curling, et al., versus Brad Raffensperger, et al.,

13    filed in the United States District Court for the

14    Northern District of Georgia, Atlanta Division.

15    This is a remote Zoom deposition.

16             My name is David Campbell from the firm

17    Veritext, and I'm the videographer.  The court

18    reporter today is Carla Soares, also from Veritext.

19             I am not authorized to administer an oath,

20    I'm not related to any party in this action, nor am

21    I financially interested in the outcome.

22             All attorneys' presences will be noted on

23    the stenographic record.  And with that, will the

24    court reporter please swear in the witness, and we

25    can proceed.

                                                    Page 9

1                    JUAN GILBERT, Ph.D.,

2     having been administered an oath, was examined and

3     testified as follows:

4                    MR. CROSS:  Before we begin the

5     questioning, is everybody on -- does everybody here

6     have access to the Exhibit Share or is it only the

7     lawyers and the witness?

8                    VERITEXT CONCIERGE:  Everybody should have

9     access.

10                   MR. CROSS:  Okay.  We need -- can we go

11    off the record?  I didn't realize that.

12                   THE VIDEO OPERATOR:  Okay.  Going off the

13    record at 10:07.

14                   (Recess, 10:07 a.m. - 10:09 a.m.)

15                   THE VIDEO OPERATOR:  Back on the record at

16    10:09.

17                            EXAMINATION

18    BY MR. CROSS:

19         Q    Good morning, Dr. Gilbert.

20         A    Good morning.

21         Q    Can you hear me okay?

22         A    Yes, I can.

23         Q    Is there any reason why you feel you

24    cannot testify truthfully and completely today?

25         A    No.

Page 10

1          Q    Okay.  Have you been deposed before?

2          A    Yes.

3               (Exhibit 1 was marked for identification

4          and is attached hereto.)

5     BY MR. CROSS:

6          Q    Okay.  Can you pull up Exhibit 1, which

7     should be a copy of your most recent declaration?  I

8     think it's July 16, 2021.  Just let me know when you

9     have it.

10         A    Okay.  I'm refreshing the exhibit, waiting

11    on it to refresh.

12              You said Exhibit 1?

13         Q    Yes.  It should be the only exhibit in

14    there right now, other than -- I think there was a

15    test or something.

16         A    Okay.  Let's see.  I see it.  Let me see

17    if I can open that.  I've got it.

18         Q    If you just look at it, you can see at the

19    end there's your signature on it.

20              Do you recognize this as a copy of your

21    July 16, 2021, declaration in this case?

22         A    Yes, it appears to be a copy of it.

23         Q    Okay.  And one of the things you did in

24    this declaration was to respond to a report that

25    Dr. Alex Halderman had submitted in this case on

1    July 1 of 2021; is that right?

2         A    Yes.

3         Q    Okay.  You understood when you prepared

4    this declaration that one of the things that

5    Dr. Halderman had done for his report was to examine

6    election equipment that had been provided by Fulton

7    County, right?

8         A    I don't recall if that was done at this

9    time or not.  I have to go back and look.  But I

10   believe I was made aware that he had gotten the

11   equipment, but I can't remember exactly when he had

12   gotten it and if this particular declaration

13   responded to him having that equipment.

14        Q    Do you recall writing a declaration that

15   responded to his analysis of the Fulton County

16   election equipment?

17        A    I recall this declaration that I'm looking

18   at.  Let's see.  Let me walk through this.

19             In looking at this document, I do not see

20   a reference to Fulton County, so I don't know if

21   this is the response to Fulton County directly.

22        Q    Take a look at paragraph 9 on page 3.

23        A    Paragraph 9.  I'm there.

24        Q    Do you see at the end the reference to

25   Dr. Halderman, it says, "For example, Dr. Halderman

Page 12

1    provides a picture of an actual ballot in his

2    report," and you cite Halderman report on page 15?

3              Do you see that?

4         A    Yes.

5         Q    Does that help refresh your recollection

6    that you were responding in part to his report where

7    he examined election equipment provided for this

8    case?

9         A    I'm responding to the referenced report.

10   If that is the same report, then yes.

11        Q    Okay.  And we'll look at Dr. Halderman's

12   report.  I'll represent to you that he provided that

13   report on July 1, 15 days before your declaration

14   here.

15             Does that help your recollection at all?

16        A    Not really, but somewhat.  I mean, it's

17   cited there.  That's what I was referencing.

18        Q    Did you -- Dr. Halderman's July 1, 2021,

19   report, did you read that carefully?

20        A    Yes.  I read what was given to me.  Yes.

21        Q    Were you given the entire report?

22        A    I assume I was given the entire report.

23   How would I know if the report was incomplete?  Is

24   there an incomplete report that says it's

25   incomplete?  I don't recall reading something that

Page 13

1    said, "incomplete report."

2        Q    You said you read what was given to you.

3    I just wanted to confirm that, to your

4    understanding, what was given to you was

5    Dr. Halderman's complete July 1 report; is that

6    right?

7        A    Yes.

8        Q    Did I understand correctly, you reviewed

9    that report carefully before responding to it,

10   right?

11       A    Yes.

12       Q    But nowhere in your July 16 declaration do

13   you indicate that you've conducted any examination

14   of any election equipment used in Georgia; is that

15   right?

16       A    Correct.  I have not examined any

17   equipment.

18       Q    You did not think that was relevant to

19   respond to Dr. Halderman's analysis, examining that

20   equipment?

21       A    In my response, no.

22       Q    Why not?

23       A    I only responded to things that I could

24   respond to without having examined the equipment

25   using the expertise that I have in the area.

1      Q   Why didn't you examine the equipment
2    yourself so that you could respond to his precise
3    findings where he examined the equipment?
4      A   I was not provided the equipment.
5      Q   Did you ask for it?
6      A   No.
7      Q   Why not?
8      A   I believe I mentioned this in the
9    declaration or previous declarations.  I was not
10   aware that that was an option for me to have
11   equipment given the nature of past cases where this
12   equipment was never given to experts.  So it's
13   just -- it's something that never crossed my mind.
14     Q   That's an exchange that you and I had in
15   the September hearing where I asked you in September
16   of last year why you did not look at the equipment.
17   But you knew as of July this year when you prepared
18   your declaration that Dr. Halderman had access to
19   election equipment from Fulton County; right, sir?
20     A   I believe so, looking at that declaration,
21   yes.
22     Q   Even though you knew Dr. Halderman had
23   access, even though you were reviewing and
24   responding to his report regarding that access, you
25   did not think it was relevant to ask for access to

Page 15

```
 1    the equipment yourself?
 2         A    No.
 3              MR. MILLER:   Objection to form.   Asked and
 4    answered.
 5    BY MR. CROSS:
 6         Q    You think it's appropriate for an expert
 7    who's opining on the security and reliability of an
 8    election system not to actually examine that system
 9    for himself?
10         A    Yes.
11         Q    You don't actually -- in your declaration
12    from July of this year, you don't actually offer any
13    disagreement with any of Dr. Halderman's findings
14    based on his analysis of that equipment; correct,
15    sir?
16         A    Can you elaborate on what finding in
17    particular, or specific findings?
18         Q    Any of them.
19         A    I need to know exactly which findings.
20         Q    Okay.   Well, direct me to your -- a
21    portion of your July 16 declaration where you
22    disagree with any of his findings in his July 1
23    report.
24         A    I don't understand -- you said disagree
25    with any of his findings.
```

1          It would be helpful to know what

2     finding -- what finding you're referencing.

3          Q    Any of them.

4               MR. MILLER:  Objection.  Form.

5               THE WITNESS:  Paragraph 14.  Well, that's

6     Dr. Appel.

7               Halderman.  Paragraph 15.  "Dr. Halderman

8     asserts he has tested various methods of hacking and

9     that those methods are generally undetectable."

10              Again, Dr. Appel likewise asserts the same

11    thing.  "I am not aware that Dr. Halderman has

12    provided equipment marred by 'un-detectable' hacks

13    to any other independent researcher," so there's

14    one.

15    BY MR. CROSS:

16         Q    And what finding by Dr. Halderman are you

17    disagreeing with there?

18         A    Dr. Halderman asserts he has tested

19    various methods of hacking and that those methods

20    are generally undetectable.  That's the one.

21         Q    So you're offering an opinion that the

22    methods of hacking that Dr. Halderman has said are

23    generally undetectable based on his examination of

24    the equipment --

25              MR. MILLER:  Objection.  Misstates

Page 17

```
1    testimony.
2            MR. CROSS:  I wasn't done.  Let me try the
3    question again.
4        Q   You say here, "Dr. Halderman asserts he
5    has tested various methods of hacking and that those
6    methods are generally undetectable."
7            Do I understand that you're saying in
8    paragraph 15 you disagree with that finding?
9        A   Yes.  And my disagreement is that to say
10   that they're undetectable, I'm looking for evidence
11   that they were -- for example, he had a machine, he
12   hacked it, and then he handed it off to a third
13   party, and the third party could not identify the
14   hack.
15       Q   But he did that; right, sir?
16       A   Who was the third party?
17       Q   You, Dr. Gilbert.  He provided you his
18   report.  You had access to the same equipment
19   through the state.  You just chose not to do it;
20   isn't that right, sir?
21           MR. MILLER:  Objection to form.
22           THE WITNESS:  No, I was not given the
23   equipment.
24   BY MR. CROSS:
25       Q   Let's just be really clear here.
```

Page 18

1           You never asked for access to the
2     equipment that Dr. Halderman had access to, correct?
3           A    Correct.
4                MR. MILLER:  Objection.  Asked and
5     answered.
6     BY MR. CROSS:
7           Q    So you decided to respond to his findings
8     based on hours and hours of analysis of election
9     equipment without ever yourself examining that
10    equipment; is that right, sir?
11          A    I responded without examining that
12    equipment.
13          Q    And then in paragraph 15, you criticize
14    him for saying he did not make his equipment
15    available to another independent researcher to
16    verify his findings when, in fact, that's exactly
17    what he was expecting from you; right, sir?
18          A    I can't -- I can't confirm that.  I was
19    never contacted by you or Dr. Halderman offering
20    such a hack solution to determine if I could
21    identify the hack.  That was never presented to me.
22    So I don't think that's an accurate claim to say he
23    offered that to me.
24                Can you tell me when that was offered to
25    me, when he offered that to me?

1          Q    Dr. Gilbert, when you received

2     Dr. Halderman's July 1 report, you were tasked with

3     responding to that report on behalf of the state,

4     right?

5          A    Yes.

6          Q    And one of the criticisms you make in

7     paragraph 15 is that he should have made the

8     equipment available to another independent

9     researcher to assess his findings, including whether

10    the methods of hacking are undetectable, right?

11              MR. MILLER:  Objection.  Asked and

12    answered.

13              THE WITNESS:  The -- to make a statement

14    that they're generally undetectable, I would expect

15    some evidence to support that.

16    BY MR. CROSS:

17         Q    And by "evidence," you mean having an

18    independent researcher test his theory; that's what

19    you write here, right?

20         A    That's -- yes, that would be my preferred

21    method.  Yes.

22         Q    And you are an independent researcher in

23    computer security who could have tested his theory

24    by examining the equipment; isn't that right, sir?

25         A    I am an independent researcher

1    specializing in election security, not computer

2    security.

3          Q    What's the difference that you're drawing

4    there?

5          A    Computer security can cover networks and

6    all kinds of computing devices.  I have expertise in

7    election security, not computer security.

8          Q    Do you not have, in your view, the

9    expertise you would need to test Dr. Halderman's

10   theory about the hackability of this equipment and

11   whether that's detectable?

12         A    No, I didn't say I don't have that

13   expertise.  My expertise is in election systems and

14   technology security.  You used the term "computer

15   security," and I said that does not apply to me.

16         Q    Okay.  So let's try this again.

17              You state in paragraph 15 that

18   Dr. Halderman should have had another independent

19   researcher test his theory that the hacks are, in

20   fact, undetectable and not correctable; right, sir?

21         A    Yes.

22              MR. MILLER:  Asked and answered.

23   BY MR. CROSS:

24         Q    Do you have the necessary expertise to

25   test this theory in the way that you say it should

Page 21

1    be done?

2         A    I believe I have the expertise, and there

3    are others who have the expertise as well.

4         Q    So why did you not do that?

5         A    It was never provided to me.

6              As you said, which I think is an

7    inaccurate claim, that he offered it to me, that was

8    never offered to me.  It was never provided to me.

9    Therefore, it did not happen.  It was never offered

10   to me.

11        Q    Dr. Gilbert, I'm having a hard time

12   following your testimony because you say on the one

13   hand it was not offered to you, but you also admit

14   you never asked for it.  So help me understand.

15             You didn't review or examine the election

16   equipment here.  Is it because no one offered it to

17   you or is it because you never asked for it?

18             MR. MILLER:  Asked and answered.

19             THE WITNESS:  Both.

20   BY MR. CROSS:

21        Q    Why didn't you ask the state which engaged

22   you to give you access to the same equipment or

23   similar election equipment that Dr. Halderman had

24   access to?

25             Can somebody mute, whoever is making

Page 22

```
 1    noise?
 2            Go ahead, Dr. Gilbert.
 3        A   As I mentioned, it didn't cross my mind to
 4    do so.  And the examination, I'm not sure what I was
 5    examining.
 6            The only thing that would make sense to me
 7    is if I was given the equipment that he had
 8    allegedly hacked, and then -- in an attempt to
 9    identify it or correct it.
10            I wouldn't be given the equipment and then
11    attempting to hack the equipment.  I wouldn't be
12    trying to break the equipment.
13        Q   Right.  But you could test his theory in
14    the way that you say it should have been done in
15    paragraph 15; right, sir?
16        A   No.
17        Q   Why not?
18        A   Because, again, the protocol -- I'm sorry,
19    maybe I wasn't clear on this -- is Dr. Halderman
20    should do the hack, and then an independent
21    researcher should be given that and identify.  It
22    shouldn't be someone who tries to replicate his
23    hack.
24            In that scenario, I think that is
25    unrealistic because the obvious thing would be to
```

1  say, "Oh, they didn't do it right.  They didn't hack

2  it right."  Or "Of course they found it.  They

3  hacked it, and then they knew where it was."

4          Does that make -- I hope that makes sense.

5      Q   Why did it not occur to you to ask for

6  access to the election equipment when you knew, at

7  least by September of last year, that Dr. Halderman

8  had access to this equipment for the purpose of

9  examination for this case?

10     A   I don't -- I'm not going to hack the

11  equipment, so I had no motivating factor to hack it.

12          As I mentioned, it didn't occur to me to

13  ask for it.  Number two, I'm not -- I don't hack

14  equipment.  I don't break things.

15          In my area of election security, I secure

16  technology and fix things.  I'm not the person who

17  breaks them.  Dr. Halderman specializes in that, so

18  I -- I wouldn't be the one to get it and then try --

19  you know, find vulnerabilities and exploit

20  vulnerabilities and break things.  That's not what I

21  do.

22     Q   And what do you mean, you wouldn't be the

23  one to explore vulnerabilities with the election

24  equipment?

25          MR. MILLER:  Objection.  Misstates

1    testimony.

2            THE WITNESS:  As I said, I fix things.

3    That's what I do.  I secure them.

4            I'll give you an example.  Dr. Halderman

5    did a study whereby he found 6.6 percent of

6    participants did not notice or speak up that a

7    vote -- only 6.6 percent noticed that their vote had

8    been flipped.  That's a vulnerability that he

9    alleges in his study, and he found that.  So he --

10   he found something that was wrong.

11           And I created and designed a solution to

12   that that secured that now.  In fact, it turned out

13   coincidentally that only 6.6 percent of my

14   participants did not notice and could not identify

15   the hack.

16           So we're on opposite ends of election

17   security.  He breaks things, and I'm the one who

18   fixes them or repairs them or secures election

19   security systems.  That's the difference.

20   BY MR. CROSS:

21       Q   The Michigan study that you just

22   referenced from Dr. Halderman, you're not offering

23   an opinion that that study is inaccurate, right?

24       A   No.

25       Q   What I'm still having a hard time with,

Page 25

1    Dr. Gilbert, you keep saying it did not occur to you

2    to examine the election equipment even though you

3    knew Dr. Halderman was examining it.

4              Can you explain that to me?  Why would it

5    not occur to you to look at election equipment where

6    you are tasked with responding to the expert who has

7    himself examined that equipment?

8              MR. MILLER:  Objection.  Asked and

9    answered.

10             THE WITNESS:  Because I didn't see it as a

11   necessity.  I wasn't going to get the equipment and

12   break the equipment or replicate his hacks.

13   BY MR. CROSS:

14       Q   But couldn't -- there's no other analysis

15   you could have done with the equipment to respond to

16   his report?

17       A   The analysis that I have done I feel is

18   sufficient to respond to his report.

19       Q   But you've done no analysis of any

20   election equipment used in the State of Georgia; is

21   that correct, sir?

22             MR. MILLER:  Objection.

23             THE WITNESS:  I have not had access to any

24   equipment in the State of Georgia.

25   ///

Page 26

1    BY MR. CROSS:

2         Q    But you could have had access if you had

3    asked for it.

4              Do you understand that?

5         A    I take it that you are correct, that I

6    could now.

7         Q    You mentioned that the issue that the

8    Michigan study found about voters largely not

9    verifying their ballots, you have a new BMD system

10   that you say addresses or corrects that problem; is

11   that right?

12        A    Yes.

13        Q    Why did you create that new system?

14        A    I created it to advance the state of

15   ballot-marking devices.  I have been working in this

16   space since 2000, and I have done innovations in

17   this space of election technology, so I'm advancing

18   the state of the art.  That's one.

19             Number two, I did it to hopefully remedy

20   these concerns about voter verification.  That was

21   my other motivating factor.

22        Q    And why is it important to remedy those

23   concerns?

24        A    So that, no offense, you and I don't have

25   to have this conversation again.

1          Q    Meaning so voters like my clients will

2     have confidence in their vote and won't bring cases

3     like this?

4          A    Meaning we will eliminate these concerns

5     from any perspective.  But that doesn't legitimize

6     that the concerns are at the level expressed, as

7     always expressed.

8          Q    If an election security expert came in and

9     offered opinions that your new system was unreliable

10    without ever having actually examined that system,

11    would that strike you as reasonable?

12              MR. MILLER:  Objection to form.

13              THE WITNESS:  Definitely.  I would say

14    definitely, because that happens constantly.

15              You referenced Dr. Appel.  Dr. Appel has

16    done that I'd say at least 50 times during the year

17    that I was building this.  That's exactly what he

18    was doing.  He was deeply engaged with me in

19    conversations around this particular technology.

20    That is actually a standard practice in the field, I

21    would argue strongly.

22    BY MR. CROSS:

23         Q    Let me ask a more precise question because

24    I'm not just talking about responding to a concept,

25    okay?

1           If an election security expert came in and

2     said that your new BMD system has a fundamental flaw

3     in the software itself, in the code, would you

4     expect them to actually take the time to examine

5     that code?

6           A   No.   Again, that's -- this is standard.

7     This happens constantly in our field.   And there are

8     several people in this field who do that.   That's

9     where they start.   That's exactly what they do

10    constantly.

11          And if you look at elections technology,

12    prior to this case, as I stated earlier, there were

13    several cases where access was not granted to these

14    particular machines, and these statements were made

15    that, you know, there could be vulnerabilities in

16    these machines, and never had access to them.   This

17    is standard protocol, I would argue, definitely for

18    years.

19          Q   I think we're missing each other,

20    Dr. Gilbert, because you keep talking about "could,"

21    okay?   Let's get more concrete.

22          You understand in this case Dr. Halderman

23    is not offering an opinion that there could be or

24    might be vulnerabilities with the election equipment

25    in Georgia.   He's actually examined it and concluded

Page 29

1      that they exist.

2                    Do you understand that?

3                    MR. MILLER:  Object to form.

4                    THE WITNESS:  I don't -- I'm kind of

5      confused because when Dr. Halderman says that there

6      is a -- for example, let's go back to the Michigan

7      study.

8                    Voters can verify their ballots, but he

9      claimed that they didn't verify their ballots.  So

10     that is a "definitely could" scenario.

11                   I'm not aware that Dr. Halderman provided

12     evidence or claimed that the machines had been

13     altered.  So what Dr. Halderman was providing was

14     that they could be altered if these particular

15     protocols that he was suggesting were followed and

16     there were no remedies.  And he claimed that

17     generally no one would be able to find them.  But

18     again, that has not been tested, to my knowledge.

19     BY MR. CROSS:

20          Q    We're still missing each other here,

21     Dr. Gilbert.

22                   Do you understand that Dr. Halderman has

23     spent hours examining the election equipment

24     provided to him that's used in Georgia and has found

25     that specific vulnerabilities exist in that

```
 1    equipment today?  He's not saying they might

 2    exist --

 3              MR. MILLER:  Objection.  Asked and

 4    answered.

 5    BY MR. CROSS:

 6         Q    -- he's saying they do exist.

 7              Do you understand that?

 8         A    I understand that's what he said.

 9         Q    And you did not undertake any analysis to

10    determine whether he's right about that; isn't that

11    right, sir?

12         A    I did not get the equipment and analyze

13    the equipment.

14         Q    Nowhere in your July 16 declaration do you

15    offer an opinion that it would be appropriate for

16    the State of Georgia to continue to use the election

17    equipment if Dr. Halderman is right in his findings,

18    correct?

19         A    I don't recall saying that directly in my

20    declaration, but I -- I could go back and look at it

21    if you want me to right now.

22         Q    Sure.  Why don't you take a look and tell

23    me if that's there.

24         A    If you go to paragraph 16, paragraph 16, I

25    would say that answers your question in that I'm
```

1     saying that they -- they are -- they can still be

2     used, and they have advantages over hand-marked

3     paper ballots.

4               So I didn't directly word it the way that

5     you said it, but I think that Georgia can proceed

6     with the BMDs.

7          Q    So you're offering an opinion in this case

8     that even if Dr. Halderman is right about every

9     finding in his report, his July 1 report, you think

10    it's appropriate as an election security expert for

11    the State of Georgia to continue to use that system

12    without taking any remedial measures at all; is that

13    your opinion, sir?

14              MR. MILLER:  Object to form.

15              THE WITNESS:  No.

16    BY MR. CROSS:

17         Q    What did I get wrong?

18         A    I think they can proceed with the BMDs,

19    but they can take precautions; the recommendations

20    as far as voters verifying their ballots, and those

21    actions can be instituted in different ways.  They

22    could hopefully accomplish more verification.  But

23    yes, so that's where you got it wrong.

24         Q    Is it your opinion that Georgia can

25    proceed -- it would be appropriate for Georgia to

1    continue to use the current election equipment if

2    the state takes some sort of precautionary measures

3    to address Dr. Halderman's findings?

4              MR. MILLER:  Objection.  Misstates.

5              THE WITNESS:  Yes.

6    BY MR. CROSS:

7         Q    And what measures should it take?

8         A    The most important is on the voter

9    verification and looking at strategies to increase

10   voter verification.

11             And then there's probably strategies -- I

12   have to go back and look at some of his claims, but

13   looking at verifying the equipment and as far as

14   making sure no additional apparatus is added to the

15   equipment.

16             But there are things that I'd have to go

17   back and review to do a point-by-point

18   recommendation.

19        Q    When you say "voter verification

20   strategies," what specific strategies are you saying

21   Georgia should implement in order to continue to use

22   its election equipment in light of Dr. Halderman's

23   findings?

24        A    One, reminding them to verify before they

25   scan their ballot.  That's the top one.  And prior

Page 33

1       to, reminding them to verify.

2               Q    What else?

3               A    Those would be my initial recommendations.

4               There's actually a report that came out of

5       Rice University that had some, and if I'm not

6       mistaken, there were additional recommendations in

7       the Michigan paper as well.

8               Q    What about auditing?  Is your opinion that

9       the state should do anything with auditing to

10      proceed with the election equipment in light of

11      Dr. Halderman's findings?

12              A    I think we -- we recommended a

13      risk-limiting audit, RLA.  That's been recommended.

14      And I believe Georgia is instituting that.

15              Q    When you say "we," who do you mean?

16              A    I serve as a member of a National

17      Academies report.  We strongly recommended RLAs.

18              Q    In fact, the recommendation there was an

19      RLA on every contest, right?

20              A    I don't know if it was on every contest.

21      I'd have to go back and look.

22              Auditing is not my area of expertise.  I

23      am supporting our recommendation.  But I'd have to

24      go back and review the report to confirm whether we

25      said on every contest or not.

Page 34

1          Q    Certainly you would not expect that

2     auditing only a single statewide contest every two

3     years would be sufficient to address Dr. Halderman's

4     findings with this equipment, right?

5               MR. MILLER:  Object to form.

6               THE WITNESS:  As I stated, auditing is not

7     my area of expertise, and I would allow other

8     members of the committee and other experts to make

9     that decision.

10    BY MR. CROSS:

11         Q    Dr. Philip Stark is a widely recognized

12    expert on election audits, right?

13         A    Yes.

14         Q    What remedial measure should the state

15    take to verify QR codes in order to continue using

16    this election equipment in light of Dr. Halderman's

17    findings?

18              MR. MILLER:  Object to form.

19              THE WITNESS:  The verification of a QR

20    code is to -- you can -- the QR code can be verified

21    against the human-readable portion of the text.  So

22    you could scan it and determine that it is a match

23    to that text.

24              To my understanding, I have not seen a QR

25    code that's self-modifiable whereby it changes

1    itself after it's been scanned.  Therefore, you'd

2    have evidence that there's a difference between the

3    QR code and the actual human-readable text.

4    BY MR. CROSS:

5         Q    And what specific steps are you

6    recommending should be taken to test that?

7               MR. MILLER:  Objection.  Misstates.

8               THE WITNESS:  I have not given a specific

9    recommendation as of this time.  I could develop

10   that.  That hasn't been something I've worked on,

11   but that's something I could develop if necessary.

12              I would hope the election administration

13   would do that.

14   BY MR. CROSS:

15        Q    When you say "do that," do what?

16        A    Determine the protocol for comparing the

17   QR code against the human-readable text.

18        Q    You understand Georgia currently has no

19   protocol for that, right?

20        A    I was not aware if they did or did not.

21        Q    So that's not something you considered for

22   your opinions in this case; is that fair?

23        A    I don't understand that question.

24        Q    It's okay.  I'll withdraw it.

25              Are there any other remedial measures

1    Georgia should take before proceeding with the

2    current election equipment in light of

3    Dr. Halderman's findings?

4         A    I can't think of anything at this time.

5    I'd have to go back and review, again, his report

6    and do a point-by-point measure.

7              And I would also say that the RLA is --

8    again, getting at the QR code, the RLA would also be

9    a measure to identify differences between QR codes

10   and the human-readable portion of the text.

11        Q    One of the measures you said the state

12   should take is reminding voters to verify their

13   ballots before they're scanned or tabulated, right?

14        A    Yes.

15        Q    Do you understand Georgia already requires

16   that?

17        A    I may have read that.  It wasn't at the

18   top of my mind.

19        Q    Given that Georgia already requires that,

20   why would you expect that to have a meaningful

21   impact on the security and reliability of this

22   election system?

23        A    Reminding voters did show some improvement

24   on voters verifying their ballots.

25        Q    In fact, the Rice study and the Michigan

Page 37

1    study you cited both show that it has a very, very

2    small improvement, if any, right?

3            A    I would say it has an improvement.

4            Q    Okay.  Let me ask my question again.

5                 The Rice study and the Michigan study that

6    you cite both show that it has a very small impact

7    on improving voter verification, right?

8                 MR. MILLER:  Objection.  Asked and

9    answered.

10                THE WITNESS:  I would say it has an impact

11   on improving voter verification.

12   BY MR. CROSS:

13           Q    How much?

14           A    Sufficient.

15           Q    Sufficient by what measure?

16           A    So I mentioned to you that Dr. Halderman

17   had done the Michigan study and then the Rice study.

18   And I mentioned to you that I am an election

19   security expert that works opposite of

20   Dr. Halderman.  Halderman breaks things, and I

21   secure things.

22                And I mentioned to you that I created a

23   transparent voting technology that addresses or

24   eliminates this concern of voters verifying their

25   ballot.

Page 38

1          I conducted a study here in Gainesville,

2     Florida, similar to the protocol that Dr. Halderman

3     used.  And one of the observations that came out of

4     this was -- another thing that I believe I've put in

5     my declarations is that there's an assumption made

6     that if 6.6 percent -- only 6.6 percent of the

7     people notice that their vote was flipped, that

8     that's sufficient to change the outcome of an

9     election such that it goes undetected, that no one

10    would know what happened.

11          And in my studies, I noticed that you

12    cannot underestimate the human condition.  And what

13    I mean by that is, people are vocal.  When a

14    person's vote is inaccurately recorded, there's an

15    assumption that people walk away and won't speak up.

16          So the ability to actually identify a

17    problem in an election is not proportional to a

18    percentage necessarily of those who can actually

19    verify.

20          So it takes, from my observation and my

21    study I just ran, a much smaller percentage to

22    actually be vocal to identify that something is

23    wrong.

24     Q    Okay.  So Dr. Gilbert, let me bring you

25    back to my question.

```
 1              When you say that providing reminders to
 2      voters to verify their ballot provides some
 3      sufficient improvement, what metric are you using
 4      for "sufficient" that's accepted in the field of
 5      election security?
 6          A   I'm using the metric that I observe that
 7      voters are vocal, which would not be accepted in the
 8      field because this is something that's just been
 9      identified this year.
10              And in the election security community,
11      for example, Dr. Halderman and others, again, their
12      goal is to break things and show vulnerabilities.
13      And from my understanding, they don't have a
14      background like I do on the human center computing
15      side to understand the human condition and the
16      impact of that on an election.
17          Q   The study that you're talking you
18      conducted, is that the study that you performed on
19      your new BMD prototype?
20          A   Yes.
21          Q   So this was not a study that was performed
22      using the BMD equipment that Georgia currently uses;
23      correct, sir?
24          A   Correct.
25          Q   Even in the study that you did with your
```

Page 40

1    new BMD prototype, you found that many voters, even

2    when they noticed an error, often would not speak

3    up, correct?

4         A    That's not absolutely correct.

5              They confirmed that they didn't speak up

6    because it was a study.  That is a documented effect

7    called the Hawthorne effect, which is when people

8    are being studied, they behave differently than when

9    they do in reality.

10             And I documented that, and we have a paper

11   that will be published next month with all these

12   findings.  But I did present this in a lecture for

13   Princeton University.

14        Q    So you've not conducted a study on whether

15   or the extent to which voters will even speak up to

16   poll workers that they found an error on their

17   ballot in an actual election; right, sir?

18        A    I have not, and to my knowledge, no one

19   has done that study.

20        Q    But we do know that the Georgia Secretary

21   of State had a study commissioned looking at voter

22   verification in actual elections in 2020, correct?

23        A    Which study is this?  I'm -- can you --

24        Q    Let me pull it up for you.

25        A    Okay.

1              MR. CROSS:  It should be in the "Marked

2       Exhibits" folder.  I'm not sure exactly how to

3       change the exhibit name.  Here we go.

4              (Exhibit 2 was marked for identification

5          and is attached hereto.)

6       BY MR. CROSS:

7          Q   Do you see Exhibit 2?

8          A   Let me refresh.  I don't see it.

9              MR. MILLER:  David, just for your

10      awareness, they're not labeled as Exhibit 1 -- the

11      first one is, but there's no Exhibit 2.

12             MR. CROSS:  Say again?

13             MR. MILLER:  I'm just saying, for your

14      awareness, the files are not labeled Exhibit 2, like

15      the file name.

16             MR. CROSS:  I just renamed it.  It should

17      show up now as Exhibit 2.

18             MR. MILLER:  Okay.

19             THE WITNESS:  Okay.  I found it.

20      BY MR. CROSS:

21         Q   Okay.  So if you can open that, let me

22      know when you have it, Dr. Gilbert.

23         A   Got it.

24         Q   Do you see that this is -- it says

25      "Georgia Voter Verification Study, January 22nd,

1    2021"?

2         A    I see that.

3         Q    Do you understand that this is a study

4    that was actually commissioned by the Georgia

5    Secretary of State looking at actual elections in

6    certain counties in 2020?

7         A    I do not understand that as I have not

8    read this, so I don't.  All I have is the title that

9    I can see, and all I can gather is what I can gather

10   from the title.

11        Q    In fact, you don't reference this study in

12   your July 16 report, correct?

13        A    I don't believe so.  I'm looking at this

14   trying to see if I've seen this.

15             Okay.  Yeah, I don't believe I reference

16   this study.  Georgia, University of Georgia.  No.

17             The study that I recall was, I believe, a

18   study in Tennessee where people were observing

19   whether or not individuals were verifying their

20   ballots off of a BMD, and they were recording the

21   amount of time spent.

22             But I don't recall this particular study.

23        Q    Were you aware that the state had

24   commissioned this study and that at least a draft of

25   the report was available six months before you

1    issued your declaration on behalf of the state in

2    this case?

3          A    I do not.  I don't -- I'm looking at this.

4    I don't recall this study.  I don't recall getting

5    this study.

6          Q    Do you recall that Dr. Stark,

7    Dr. Halderman and Dr. Appel all discussed this study

8    in their declarations in response to your July 16

9    declaration?

10         A    I don't recall that.

11         Q    So even though all three of them

12   emphasized this study in their response to your

13   declaration, you never read it before this moment?

14         A    I don't believe I've read this study.  It

15   does not look familiar to me.  I'm trying to go

16   through it and see.  I don't -- I don't recall this

17   study.

18         Q    Have you read the reply declarations from

19   those three experts in response to your July

20   declaration?

21         A    I may have.  I don't know.  If we could

22   look at one, I could tell you if I've seen it

23   before.

24         Q    So you didn't review those, for example,

25   in preparation for your deposition today?

Page 44

1       A    I don't know if I did.  I reviewed several

2    documents, and I don't know if those were particular

3    documents that I reviewed.

4       Q    You said a moment ago that you have an

5    expertise on human factors that Dr. Halderman

6    doesn't have.  I just want to make sure I understand

7    that.

8            Is your testimony that you're an expert on

9    human factors, not cybersecurity in the way that

10   Dr. Halderman is?

11           MR. MILLER:  Object to form.

12           THE WITNESS:  I am an expert in human

13   center computing and elections technology,

14   specializing in the accessibility, usability, and

15   security of those systems, in particular, securing

16   them and fixing problems, not hacking them.

17           I would say, and you have to ask

18   Dr. Halderman, if he considers himself an

19   expertise -- has expertise in human center computing

20   or human computer interaction would be the question

21   you could ask him.

22           From my observation and knowledge of his

23   research and what he does, I would say he does not

24   have that.  His expertise, again, is in -- in

25   particular as it relates to elections, is in

1    breaking those systems and finding problems and, you

2    know, he -- the way I would classify it is he's on

3    the opposite end of the spectrum.  He destroys

4    things, and I create things and repair them and fix

5    them.

6    BY MR. CROSS:

7         Q    Would you say the same for Dr. Andrew

8    Appel?

9         A    He -- generally, I would say he doesn't do

10   the human center computing as well.  I don't think

11   he does.  But again, you could ask him to see if he

12   thinks that's what he does.  I don't think he does.

13        Q    You don't think he does what?

14        A    Human center -- he doesn't have expertise

15   on human computer interaction or the human

16   condition, those kind of things that I also have

17   expertise in.

18        Q    Are you saying that he is of the opposite

19   end of the spectrum from you, like you characterized

20   Dr. Halderman, in the sense that he breaks things

21   and you fix things?

22        A    I would say he's closer to that end, yes.

23        Q    So you disagree with both Dr. Halderman

24   and Dr. Appel that you should have examined the

25   election equipment in responding to Dr. Halderman's

Page 46

1    report?  They're both wrong about that?

2              MR. MILLER:  Object to form.

3              THE WITNESS:  Do I disagree?  I don't

4    understand the question.  Can you rephrase that,

5    please?

6    BY MR. CROSS:

7         Q    Sure.

8              As I understand it, you're taking the

9    position that you did not need to examine the

10   election equipment that Dr. Halderman did to respond

11   to his findings about that specific equipment,

12   right?

13        A    Yes.  I did not need to examine the

14   equipment to respond to him.

15        Q    And so to the extent that Dr. Halderman

16   and Dr. Appel opined that you should have looked at

17   the equipment, you just think they're wrong about

18   that, right?

19        A    No, I -- it depends on what thing they

20   wanted me to look at.  It depends on what is it they

21   were hoping I would look at.  That would be my

22   question.  I would need more details as to what

23   specific thing did I need to actually look at.

24        Q    You understand that Dr. Halderman's report

25   describes each of the attacks in technical detail so

1    that another researcher can replicate and test them,

2    right?

3         A    I believe it describes in detail, and

4    those steps could be followed.  I don't know if it

5    would give an exact replication.

6         Q    Because you didn't try that, right?

7              MR. MILLER:  Objection.  Asked and

8    answered.

9              THE WITNESS:  No, that's not accurate.

10   I'm basing that on my expertise, having a Ph.D. in

11   computer science, knowing that if a person is going

12   to say, "This is how you would hack a system,"

13   following those steps doesn't always work out the

14   same way.

15              So what you're assuming is that

16   Dr. Halderman's documentation is sufficient to

17   create an exact replication of his demonstrated

18   hack, and I would say I don't agree with that.

19              Again, my recommendation -- sorry for

20   being redundant -- is that -- and I haven't seen

21   this -- Dr. Halderman institutes a hack, hands off

22   the hacked equipment, because that would be the

23   reality of the matter, to see if someone can

24   identify and repair that hack, whereas someone

25   getting equipment and trying to replicate a hack is

Page 48

1    a different scenario.

2            And again, that's not my expertise.  I do

3    not hack things.  I secure them as I gave an example

4    of securing a solution that defused or eliminated

5    Dr. Halderman's allegation of a voter verification.

6            So that's an example of one solution that

7    I've done to remedy a hack that he has observed or

8    said he found.

9    BY MR. CROSS:

10       Q   You said -- you said Dr. Halderman, what

11   he should have done was institute a hack, hand off

12   the hacked equipment to see if someone could

13   identify and repair that hack.

14           You could have done that with access to

15   the equipment, right?

16           MR. MILLER:  Objection.  Asked and

17   answered.

18           THE WITNESS:  I think there are several

19   researchers and election technology administration

20   folks who -- you know, I would phrase this as a

21   study.

22   BY MR. CROSS:

23       Q   Dr. Gilbert, this is not my question.

24       A   I don't understand, then.

25       Q   Okay.  Let me try it again.

```
 1            You could have done yourself exactly what
 2     you just described should have happened where
 3     Dr. Halderman hacks the equipment and hands it off
 4     to an independent researcher to replicate and test
 5     the hack.  Could you have done that?
 6         A    That's not what I said.  I purposely said
 7     I don't want to replicate any hack that
 8     Dr. Halderman has done.  That's not what I'm trying
 9     to do.
10            What I'm trying to do -- what I said was
11     if he hacked the voting machine, give it to a third
12     party and see if the third party can identify and
13     fix the hack, that's what I said.
14            I didn't say give a voting machine to a
15     person and then have them try and replicate his
16     hack, and then have them try and say, "I found the
17     hack."  That just doesn't make any sense.
18         Q    Okay.  Let's be precise.  This is what you
19     said:  "My recommendation is that Dr. Halderman
20     institutes a hack, hands off the hacked equipment to
21     see if someone can identify and repair the hack."
22            Could you have done that yourself with
23     access to the equipment, yes or no, sir?
24         A    No.
25         Q    Why not?
```

1      A    Because Dr. Halderman would have to have

2    hacked the equipment first and handed it off to me

3    with that understanding, whereas if I had requested

4    the equipment like he did, I would have gotten a

5    piece of equipment that was not hacked.

6      Q    But you could have had access to the same

7    equipment that he was working on, that he examined,

8    if you had simply asked the state or us or the

9    judge, right?

10            MR. MILLER:  Objection.  Asked and

11    answered.

12            THE WITNESS:  I don't -- I guess I could

13    have had access to that equipment, but I would not

14    have access to the hack that Dr. Halderman had

15    instituted.

16    BY MR. CROSS:

17      Q    Why?  You would have access to the same

18    equipment and you'd have his report identifying the

19    specific steps by which he did what he did.

20      A    Because to -- for me to implement a hack,

21    again, there would be steps that I had to follow.

22            And obviously I would suspect

23    Dr. Halderman would say, "No, he did not do it

24    right.  This is not how I would have done it or I'd

25    recommend doing it."

Page 51

1              Or he would have said, "Oh, that's
2    obvious.  If you institute the hack, then of course
3    you know where the hack is from a study perspective
4    and identifying the hack."
5              That would be his next -- and you --
6    again, you could always ask him.
7              If I instituted his hack and then I said,
8    "I found your hack," would he find that acceptable?
9              I would appreciate Dr. Halderman saying
10   that is an appropriate exercise.
11        Q    Where in your report do you recommend the
12   specific steps that Georgia needs to take to fix
13   each of the problems Dr. Halderman finds in his
14   report with the election equipment?
15             MR. MILLER:  Object to form.
16             THE WITNESS:  I don't think I did that.
17   BY MR. CROSS:
18        Q    You said he breaks things, you fix things.
19   And you've not offered any opinion in your
20   declaration about what the state needs to do to fix
21   the problems that he's identified; right, sir?
22             MR. MILLER:  Object to form.
23             THE WITNESS:  I gave some recommendations,
24   but I didn't go point by point.  I did not do a
25   point-by-point counter to say, "This is how you fix

Page 52

```
 1    this.  This is how you fix that."
 2              I did not do that.
 3    BY MR. CROSS:
 4        Q    Why not?  You said that's your expertise,
 5    right?  You fix the things that he breaks.  Why
 6    didn't you do that in this case?
 7        A    I was trying to address the claims that he
 8    had made, and I was not making a recommendation to
 9    the state at that time.
10        Q    And you're not making any recommendation
11    to the court as to what needs to be done to remedy
12    the problems he finds with the system; right, sir?
13        A    It depends on each problem.  I'd have to
14    go over those problems.
15              Some of those problems may not come to a
16    level of a particular remedy or a recommendation.
17    So there's -- it just depends on the specific
18    problem.
19        Q    We'll walk through those in a little bit.
20              You said that reminding voters to verify
21    their ballots before they're tabulated, that that is
22    sufficient to address concerns about the reliability
23    of BMDs.
24              Did I understand you right?
25        A    No, that's not what I said.  I said that
```

1    is one strategy that can be implemented to help

2    voters verify their ballots.

3              And I mentioned that one voter or a small

4    percentage of voters speaking out can bring

5    awareness to a problem.

6        Q    When you testified earlier that that sort

7    of reminder is sufficient, is a sufficient

8    improvement, sufficient for what then?

9        A    As far as identifying a problem or

10   bringing awareness that there's a problem.

11       Q    So it's not sufficient for remedying the

12   problem; it's just sufficient for identifying that

13   the problem exists; is that right?

14       A    Well, I -- again, the scale of the problem

15   varies.  Again, his study says that only 6.6 percent

16   noticed.

17              But in a real election contest, we -- we

18   don't have that particular data.  But at the same

19   time, I think that the numbers will be higher, and

20   then people are more vocal about it.

21       Q    Well, Dr. Gilbert, you may be under the

22   impression we don't have the data in a real election

23   contest because you never bothered to read this

24   January 2021 report that the Secretary of State in

25   Georgia commissioned on actual voter verification in

Page 54

1    elections; right, sir?

2            MR. MILLER:  Objection.  Misstates

3    testimony.

4            THE WITNESS:  I don't recall reading that,

5    but I would ask that -- was that a replication of

6    the Michigan study or the Rice study or a Florida

7    study in a real election?

8            I don't believe so in skimming over it,

9    meaning I don't believe they actually flipped votes

10   and calculated how many people caught the flip.

11   BY MR. CROSS:

12       Q   You say that you're an expert on human

13   factors in elections.  Given that, why would you not

14   want to read a study that was commissioned by your

15   client looking at human factors with respect to

16   voter verification in actual elections in the state?

17           MR. MILLER:  Objection.  Relevance.

18           THE WITNESS:  I did not say I did not want

19   to read the article.

20   BY MR. CROSS:

21       Q   Okay.  So you want to read it, but you've

22   chosen not to; is that what you're saying?

23       A   No, I didn't say that, either.  I said I

24   have not read it.  I don't recall reading it.  And I

25   plan to definitely read it.  It's of interest to me.

1   But I did not read it, and so that's -- that's where

2   I stand on it.

3        Q   Well, if it's not because you don't want

4   to read it, why have you not read it, especially

5   given that three different experts pointed it out in

6   their response to you?

7        A   I have to go back and see where they

8   pointed it out, and I could answer why I didn't read

9   it after reading what they -- what their claims

10  were.

11       Q   If reminding voters to verify their

12  ballots before they're tabulated is sufficient, as

13  you use that term, to address the concerns about the

14  reliability of BMDs, then why have you bothered to

15  create this new BMD, which you said is intended to

16  resolve that concern?

17       A   Because it's an improvement.  By that

18  analogy, you know, we improve technology in a lot of

19  areas that either work or are sufficient or whatever

20  the case would be, but it's an improvement.

21       Q   Why do you need to make an improvement if

22  the measure you've identified is already sufficient?

23       A   Because that's what I do.  I make things

24  work.  I make things better.  I improve upon them.

25  That's the kind of work we do.

1          Q    You improve things that are already
2     sufficient in the way they currently operate?
3          A    Yes.  We can do that, too.  Yes.
4          Q    Dr. Gilbert, you recognize that BMDs are
5     often nontransparent, right?
6          A    I don't understand what that means.
7          Q    You don't understand what that means?
8          A    No, I do not.  What do you mean by
9     "nontransparent"?
10         Q    Do you agree that BMDs are often hackable?
11         A    No, I do not.
12         Q    Do you agree that BMDs are often overly
13    complex?
14         A    No, I do not.
15              (Exhibit 3 was marked for identification
16              and is attached hereto.)
17    BY MR. CROSS:
18         Q    All right, Dr. Gilbert.  Grab Exhibit 3 if
19    you would.  It should pop up here in just a minute
20    for you.
21              Let me know when you have it.
22         A    You said 3?  Okay.  I found it.
23         Q    Do you have it, Dr. Gilbert?
24         A    Yes, I do.
25         Q    Exhibit 3 is a patent dated June 15 of

1    this year for which you are the inventor; right,

2    sir?

3         A    Yes, this appears to be the patent.

4         Q    Have you seen this patent before?

5         A    This appears to be what we submitted, yes.

6         Q    If you turn to the page -- it looks like

7    it's -- if you go past the figures, so after

8    Figure 6, you'll get to where it starts to describe

9    the patent, and it has "Transparent Interactive

10   Printing Interface."

11          Do you see that?

12        A    Yes.

13        Q    And this concerns the new BMD prototype

14   that we've been discussing today that you developed,

15   right?

16        A    Yes.

17        Q    Do you see under "Background"?

18        A    Yes.

19        Q    Do you see what's written here in this

20   patent that you helped prepare, and for which you're

21   identified as the inventor, it reads,

22   "Ballot-marking devices (BMDs) such as electronic

23   ballot markers (EBMs) electronically-assisted ballot

24   markers, in voting machines are often

25   nontransparent, hackable, and overly complex."

1          That's written here; correct, sir?

2      A    Yes, it is.

3      Q    It also goes on, "Such conventional

4  devices often result in a trade-off between

5  consistency and transparency," right?

6      A    Yes.

7      Q    And at the end it reads, "It is typically

8  difficult or impossible to fully examine and trace

9  the process and result of entering selections for a

10 ballot using conventional BMDs and EMDs."

11          Do you see that?

12     A    Yes, I do.

13     Q    In preparing the patent for which you're

14 identified as an inventor, were you careful to be

15 accurate and truthful in the information that you

16 included there?

17     A    I was careful to be truthful in the

18 information and as accurate as possible using

19 language that I've seen in other places about BMDs.

20          These are allegations against BMDs.  And I

21 would say I don't necessarily agree with all the

22 allegations, but these are common allegations

23 against BMDs.  So I'm stating what is the common

24 allegation against BMDs.  And that's why it's in

25 background, to say these are the common allegations

Page 59

1    against BMDs.

2         Q   Dr. Gilbert, nowhere here does it say that

3    these are allegations that you do not believe to be

4    true; right, sir?

5         A   Right.  In a patent submission, I don't

6    think I would say that I don't agree with these or I

7    don't believe these things.  I wouldn't say that in

8    a patent application.

9              What I'm doing is stating what is commonly

10   said or communicated in the -- in a community around

11   BMD allegations.

12             These allegations that I am setting forth

13   are -- even right as we're here now -- are the bases

14   for these allegations.  So these are, I would argue,

15   common -- common allegations that are said.

16        Q   Dr. Gilbert, do you understand you're

17   under oath today?

18        A   Yes, I am under oath, and I would say --

19        Q   Do you understand --

20        A   -- they're common allegations.

21        Q   Do you understand that not being truthful

22   under oath today is a felony?

23        A   Yes, sir.

24        Q   Okay.

25             MR. MILLER:  Object.  This is --

Page 60

1      BY MR. CROSS:
2           Q    Are you representing today under oath that
3      what's written here in a patent that you helped
4      prepare for, which you're an inventor, under
5      "Background," that you do not believe those
6      statements to be accurate statements in
7      characterizing BMDs?  Is that your testimony here,
8      sir?
9                MR. MILLER:  Objection.  Misstates.
10               THE WITNESS:  I believe those statements
11     to be common allegations.
12     BY MR. CROSS:
13          Q    Can you answer my question?
14          A    I'm answering your question as I
15     understand it.
16               I believe those to be common allegations
17     that are set forth by the election community against
18     BMDs.
19          Q    The reason those statements are included
20     in the background section of the patent is they are
21     a justification for the invention that you have
22     offered, which is intended to address those
23     concerns; isn't that right, sir?
24               MR. MILLER:  Objection.  Calls for a legal
25     conclusion.

1          THE WITNESS:  No.  I see it as a

2     background of the field.  I didn't -- I don't see it

3     as a common -- I don't understand that.  No.  It's a

4     background of the field, of what's happening in the

5     field at the current state of submission.

6     BY MR. CROSS:

7          Q    So then if somebody walks into the Patent

8     and Trademark Office and alerts them that

9     Dr. Gilbert does not actually believe BMDs are

10    generally nontransparent, hackable, and overly

11    complex, you don't have any issue with that?  That's

12    fine?

13         A    I don't have an issue with that.

14         Q    Okay.

15         A    I do not.  My belief is that they are not

16    those things, but that is the common

17    communicated-in-the-field allegation against these

18    particular devices.

19         Q    Again, there's nothing written in this

20    patent that says, "I, Dr. Gilbert, or the people

21    submitting this patent, don't actually believe these

22    statements to be true.  We're just including them

23    because somebody believes them to be true."

24              We don't see that in here, do we, sir?

25         A    No, you do not.  And I think that

1    statement is accurate because I don't put my belief

2    in there.  I'm stating what's commonly spoken, the

3    common allegation that's in the field.  That's what

4    I'm document -- I'm documenting that.

5         Q   Sir, given that you're now saying you

6    believe BMDs are not generally hackable, is it your

7    view that the BMDs that are used in Georgia are

8    unusual in the fact that Dr. Halderman has been able

9    to hack them in a variety of ways?

10        A   So I'm -- let me address that.

11        Q   Can you just answer my question yes or no?

12        A   That is not a yes or no.

13            MR. MILLER:  David, allow him to respond.

14    BY MR. CROSS:

15        Q   Well, the problem we have, Dr. Gilbert, is

16    you're doing exactly what Judge Totenberg told you

17    at the hearing you cannot do.

18            When you didn't want to answer her

19    question, she said, "You don't get to change the

20    subject of the question."

21            So I'd like to you answer my question.

22        A   Generally hackable.  If a BMD is given to

23    a person with knowledge and sufficient time, it is

24    hackable.

25            To say it's generally hackable, I don't

Page 63

1    think that's -- that is a fair statement.  You have

2    to define what "generally" would mean in the

3    context.

4              Dr. Halderman, as you told me, had an

5    extended period of time to interrogate and hack the

6    particular machine.  So that -- that's the

7    perspective I'm giving.

8         Q    Do you believe that the BMDs that are used

9    in Georgia, that they are unusual in the degree to

10   which Dr. Halderman has been able to hack them as

11   compared to other BMDs that have been used in

12   elections in the country, yes or no, sir?

13        A    I don't know because I haven't seen

14   Dr. Halderman hack other BMDs.

15        Q    You also don't know because you yourself

16   have never examined any BMD at all with respect to

17   its security; right, sir?

18        A    That's not accurate.

19        Q    Okay.  What BMD have you examined for

20   security other than your own BMDs that you have

21   developed and market?

22        A    That's exactly right.  The ones that I

23   developed as open source and that was used and

24   certified, that's what I have examined, and that

25   would be an example.

Page 64

1          Q    You say an example.  But apart from the

2     BMDs that you yourself have developed and market for

3     use in elections, you have not examined the security

4     of any other BMD that's been used in any election in

5     the U.S., right?

6          A    I have not examined the -- have had access

7     to a BMD to examine the security.  I've had access

8     to examine other features, but not the security.

9               Again, I don't hack them, so I haven't

10    been given one to say, "Fine.  Can you find this

11    hack?"

12              That has never happened.

13         Q    What BMDs have you physically examined

14    other than your own?

15         A    ES&S ExpressVote.

16         Q    And when was that?

17         A    I was at Clemson University at the time.

18    I don't remember an exact year, but it had to be

19    between 2010 and 2014, somewhere in there.

20         Q    And those are different from the BMDs that

21    the Dominion provided to the State of Georgia,

22    right?

23         A    Those are different BMDs.

24         Q    The BMDs that you've developed and market

25    for use in elections, do those have the same

Page 65

1    vulnerabilities that Dr. Halderman has identified
2    with the Dominion equipment in Georgia?
3         A    The -- I have not created -- I created
4    open source software that runs on commercial
5    off-the-shelf components, or COTS.
6              So I haven't created my own BMD and
7    marketed a BMD, to be accurate.
8         Q    You developed Prime III.  That's a BMD;
9    right, sir?
10        A    Prime III is software that runs on
11   off-the-shelf components.
12        Q    As a BMD?
13        A    Well, that's one aspect of it.  It runs --
14   it could run as a BMD.  It can run as a
15   remote-accessible ballot-printing option as well.
16        Q    Does Prime III suffer the same
17   vulnerabilities that Dr. Halderman identifies in his
18   report regarding the Dominion election equipment
19   used in Georgia?
20        A    Can you identify a vulnerability?
21        Q    Any.  Does Prime III contain any of the
22   same vulnerabilities Dr. Halderman has identified?
23        A    It depends on the setup, but I can't think
24   of anything.  But it would depend on the setup.
25              Prime III is running on the exact same

1   equipment from a hardware perspective, but it

2   just -- there's a lot of dependencies there.  Again,

3   it's software that runs on off-the-shelf components,

4   so it would have to be in a particular context.

5        Q    Have you provided Prime III for use with

6   Dominion ICX BMD machines or scanners?

7        A    Not to my knowledge.

8        Q    As you sit here right now, do you have any

9   reason to believe that your Prime III software has

10  any of the same vulnerabilities that exist on that

11  equipment and the software on that equipment?

12       A    If you put Prime III on that equipment,

13  I'm not sure of what -- if it changes the

14  vulnerabilities.  I don't know if it does.  That

15  he -- his claimed vulnerabilities, I don't know that

16  for sure.

17            So there -- again, it could run on

18  different platforms in different contexts.  So to

19  try and generalize and say that Prime III would be

20  vulnerable is -- it's inaccurate to do that.  We'd

21  have to have a specific case.

22       Q    What equipment does Prime III run on in

23  the elections in which it's being used?

24       A    It was being used in New Hampshire.  It

25  was running on tablets.  I think Dell tablets.  And

Page 67

1      they had printers and a headset and a microphone.

2              It's being used in Butler County, Ohio, as

3      a remote-accessible ballot option where it's running

4      on a web server.

5          Q   And as you sit here, do you believe that

6      the Prime III software that you developed that's in

7      use in both New Hampshire and Ohio suffers any of

8      the same vulnerabilities that Dr. Halderman has

9      identified in his report with respect to the Georgia

10     election equipment?

11             MR. MILLER:  Objection.  Asked and

12     answered.

13             THE WITNESS:  I'd have to have a specific

14     context to test that.

15     BY MR. CROSS:

16         Q   I've given you the specific context.

17     New Hampshire and Ohio, actual places where it's

18     used on actual equipment.

19             As you sit here, do you believe that any

20     of the vulnerabilities Dr. Halderman has identified

21     are present with your software used on that

22     equipment in those elections, yes or no?

23         A   I can't think of any vulnerability that he

24     has identified with Dominion that would apply in one

25     of those -- in a context with Prime III.

Page 68

1      Q    The testing that you did with the ES&S BMD

2    years ago, was that cybersecurity testing?

3      A    No, it was accessibility testing.

4      Q    You've never done cybersecurity testing on

5    BMD equipment or software; is that right?

6      A    I don't -- what do you mean by "cyber"?

7           So I just -- as I explained, I created a

8    transparent voting machine which we did election

9    security testing to get at a vulnerability

10   Dr. Halderman had identified as voters not

11   verifying.  So that's an example where I have done a

12   test of election security, not cybersecurity.

13   Election security.

14     Q    Thank you.  That's a fair distinction.

15   Let me ask a better question.

16          As I understand it, you have not conducted

17   any test to determine the extent to which any BMD

18   software or hardware can be hacked; is that fair?

19     A    Can be hacked?  I have not hacked any,

20   so -- that's not what I do.  I don't know if that

21   answers your question or not.  But I don't hack

22   these systems.  I said that time and time again.

23          MR. MILLER:  David, I don't know where you

24   are on your timeline.  Do you want to take a short

25   break and come back, if that's all right with you?

Page 69

1           MR. CROSS:  Yeah, that's great.  Why don't
2      we do that, and we can make sure we are set up on
3      Dr. Halderman's sealed report.
4           MR. MILLER:  Okay.  Five minutes or so?
5           MR. CROSS:  Sure.
6           What do you need, Dr. Gilbert?
7           THE WITNESS:  Five minutes is fine.
8           MR. CROSS:  Okay.  All right.  Thank you.
9           THE VIDEO OPERATOR:  Okay.  Going off the
10     record at 11:27.
11           (Recess, 11:27 a.m. - 11:43 a.m.)
12           THE VIDEO OPERATOR:  We are back on the
13     record at 11:43.
14     BY MR. CROSS:
15           Q    Dr. Gilbert, just to pick up a little bit
16     more on what we were talking about before, on voter
17     verification as a means to help address concerns
18     about the reliability of BMDs, just to be clear,
19     that's not a cybersecurity remedy, right?
20           A    That's an election security remedy.
21           Q    Which is not a cybersecurity remedy?
22           A    Yes.  I'm not speaking to anything
23     cybersecurity-wise.  That's not what I do.  I'm not
24     a cybersecurity person.  I do election security from
25     the perspective of solidifying systems, fixing them,

Page 70

1    innovating, but I'm not a cybersecurity person.

2        Q   But you also emphasize that risk-limiting

3    audits are also needed to address reliability issues

4    with BMDs, right?

5        A   I think, again, doing a NASEM report,

6    National Academies report, we've recommended

7    risk-limiting audits, and I'm supportive of that

8    recommendation.

9        Q   But RLAs do not have any ability to

10   determine whether an individual vote has been

11   counted correctly, right?

12       A   Yes.  My understanding -- again, I'm not

13   an audit expert -- but my understanding is if you

14   had hand-marked paper ballots and you send them

15   through a scanner, and the scanner gave you a wrong

16   tabulation, that the RLA would catch that improper

17   tabulation.  So then it would essentially get the

18   right outcome.

19       Q   Are you talking about a situation where

20   the QR code does not match the human-readable text?

21       A   Any ballot -- what I said was if you have

22   a hard-marked paper ballot and you send them through

23   a scanner, but the scanner has been compromised and

24   gives you the wrong out -- number, gives you the

25   wrong determination, the RLA should catch that and

1    give you the right tally.

2         Q    Right.   The right tally, but it's not

3    going to tell you whether any individual ballot was

4    altered, right?

5         A    Would it tell you if an individual ballot

6    was altered?   If I sent a ballot through the

7    scanner -- I guess it would depend.   Again, I'm not

8    an audit expert.   It just depends on how far you

9    investigate to determine if the ballot was correct.

10              So in other words, if a hand-marked paper

11   ballot -- if a person made an oval but the scanner

12   recorded that oval improperly, but if you looked at

13   the record of the scanner and the ballot, then you

14   would be able to get the correct record vote.   So

15   that way -- that's one way you would get a

16   correction.

17        Q    Dr. Gilbert, do you understand that in

18   Georgia, the QR code is the official ballot of

19   record for tabulation?

20              MR. MILLER:   Object to form.

21              THE WITNESS:   I believe in prior

22   declarations, I've referenced documents that showed

23   that the human-readable text is what was used in the

24   audit and would be the determining part of the

25   tally.   That is my understanding.

1   BY MR. CROSS:

2        Q   Do you understand when votes are tabulated

3   in the ordinary course of an election in Georgia,

4   they're tabulated using the QR code for a BMD

5   ballot?  Do you understand that?

6        A   My understanding is that they are put

7   through the tally machine and then they are tallied

8   on the QR code and followed by the -- again, the

9   RLA.  But yes, it does read the QR code.

10       Q   When you say, "followed by the RLA," why

11  do you think there's an RLA of every contest in

12  Georgia?

13       A   I didn't say, "every contest."  Again, I

14  just said there's an RLA.  And I -- never mind.

15       Q   So when you said that the way votes are

16  tallied in Georgia is they go through -- the QR is

17  tabulated and then it's followed by an audit, that's

18  not accurate except for a single election statewide

19  every two years, right?

20            MR. MILLER:  Objection.  Calls for a legal

21  conclusion.

22            THE WITNESS:  I'd have to go back and

23  confirm how it's actually done in Georgia by any

24  statute.

25  ///

Page 73

1    BY MR. CROSS:

2        Q    As you sit here today, do you have any

3    reason to believe that Georgia is auditing anything

4    other than a single election statewide every two

5    years?

6        A    I don't -- I don't know.

7        Q    So for any election where Georgia is not

8    conducting an RLA, do you understand that the QR

9    code is the only thing that gets tabulated?

10       A    In any election that they don't do an RLA,

11   then the QR code would be the tabulation that comes

12   from a computer that is a scanner.  I'm going to

13   refer to it as a scanner.

14       Q    And you understand for any election where

15   there's no RLA but there's a recount, the recount

16   relies on the QR code.  They just run the ballots

17   back through the scanners.

18            Do you understand that, sir?

19       A    No, I do not.

20            My understanding, I believe -- again, I

21   have to go back to those previous declarations where

22   I -- my understanding is that they would actually

23   recount the human-readable text.

24       Q    Even in a recount as opposed to a

25   risk-limiting audit?

Page 74

1        A    I thought the recount did that.

2        Q    Is that the understanding you have for

3    your opinions?

4        A    Which opinion?

5        Q    The opinions you've offered in this case.

6        A    It depends on the opinion.

7        Q    Is that the understanding you have for any

8    of these opinions you've offered in this case?

9        A    I guess I would have to know what opinion

10   you're asking me about.

11           In other words, I'm not connecting this to

12   my opinions in any kind of way.  So the things

13   you're asking me, I'm not following how -- how is

14   this related to my opinions is what I'm asking.

15       Q    You understand that one of the ways that a

16   ballot can be hacked with a BMD is to change both

17   the QR code and the human-readable text; that's a

18   concern that's been raised, right?

19       A    I understand that's a possibility.  If you

20   can get in and manipulate things, you could

21   manipulate the QR code and/or the human-readable

22   text.

23       Q    And the Rice study and the Michigan study

24   show that very few, if any, voters would be expected

25   to find that change, right?

Page 75

1          A    Find what change?

2          Q    That their ballot, even as to the

3     human-readable text, does not accurately reflect all

4     of their selections.

5          A    Those studies suggest that a few number

6     would identify a human-readable change on that

7     ballot.

8          Q    In the scenario where that happened, where

9     both the QR code and the human-readable text has

10    been changed with respect to one or more selections

11    voters made, an RLA would not detect that; right,

12    sir?

13         A    If a human didn't detect the change, then

14    the RLA would not detect it if the QR code and the

15    human-readable text match.

16         Q    In the State of Georgia, even if an RLA

17    were to find -- strike that.

18              In the State of Georgia, even if an RLA

19    were to generate a different outcome for an election

20    than what was originally reported and certified

21    based on the tabulation of running the ballots

22    through the scanners at the polls, there's no legal

23    authority in Georgia that allows the Secretary of

24    State or anyone to rerun the election, right?

25              MR. MILLER:  Objection.  Calls for a legal

Page 76

1   conclusion.

2           THE WITNESS:  I don't know.  I'm not an

3   election administrator, so I wouldn't be able to

4   tell you that.

5   BY MR. CROSS:

6       Q   Based on your work in this case as an

7   expert on behalf of the state, having submitted

8   multiple declarations, what remedy is available to

9   voters in the State of Georgia if an RLA were to

10   produce a different election outcome than the one

11   that was originally reported for an election?

12           MR. MILLER:  Objection.  Calls for a legal

13   conclusion.

14           THE WITNESS:  I don't know.  I'm not an

15   expert on audits, and I'm not an expert on the

16   policy that follows those.

17           I am here to talk about ballot-marking

18   devices.  That's my expertise.  Not audits and the

19   policy that follows an audit.

20           The things that you're asking as far as

21   the RLA, my understanding -- again, I'm not an

22   expert, you can ask the experts -- but those same

23   things would apply to hand-marked paper ballots,

24   meaning -- in other words, just use the word

25   "ballots."

1        If ballots -- if the risk-limiting

2    auditing found a problem with the ballots, then what

3    do you do?  The same scenario happens with any

4    ballot.

5    BY MR. CROSS:

6        Q    Of the many vulnerabilities or flaws that

7    Dr. Halderman reports in his July 1, 2021, report,

8    how many of those apply to hand-marked paper

9    ballots?

10        A    I don't recall, but I do recall in my

11    declaration that I discuss hand-marked paper ballots

12    as they relate to ballot-marking devices.

13        Q    So show me in your declaration from July

14    of this year which findings you identify from

15    Dr. Halderman's July 1 report could also occur with

16    hand-marked paper ballots.

17        A    Start at paragraph 6.  It goes to the

18    tampering of the -- it's the scanner.

19            So if you have hand-marked paper ballots

20    you could tamper with the scanner and again give the

21    wrong outcome.  So it could give you a wrong number.

22    Whereas if you tamper with the QR code and went

23    through a scanner, it would give you a wrong outcome

24    as well.  Both scenarios give you a wrong outcome.

25    If the scanner is compromised, you would get a wrong

Page 78

1    outcome.

2        Q    So the only findings in Dr. Halderman's

3    report regarding the security of the Georgia

4    election equipment that you opine in your

5    declaration could apply to hand-marked paper ballots

6    are those that apply to the scanner; is that right?

7        A    I don't know that that's correct.  That's

8    not what I said.  I gave you an example of one is

9    what I did.  I did not say that is the only one.

10   I'd have to -- I'd have to go through this again.

11   But I gave you -- you asked for one, and I gave you

12   one.

13       Q    All right.  So you've given me that maybe

14   some of his findings regarding scanners could apply

15   to hand-marked paper ballots.

16            What else in your declaration identifies

17   any findings from Dr. Halderman that would apply to

18   hand-marked paper ballots?

19       A    Let me see.  I have to go through -- hold

20   on.

21            One of the issues that is pointed out is

22   if -- hand-marked paper ballots, do voters verify

23   them?

24            So for example, here in 20- -- I think

25   2020 or 2018, the governor's race, voters did not

Page 79

```
 1    verify their hand-marked paper ballots, and we had a

 2    huge undervote for the Senate race.  And that was a

 3    ballot design issue, we suspect.

 4          So verification as an issue relating to

 5    printed ballot-marking device summaries also was an

 6    issue for hand-marked paper ballots.  That's another

 7    correlation there.

 8      Q    Is it your testimony that one of the

 9    failings that Dr. Halderman details in his report

10    with Georgia's election equipment is the lack of

11    voter verification, that that's a cybersecurity

12    problem he identifies with the equipment?

13      A    That is an election security problem that

14    he identifies.

15      Q    Okay.

16      A    He's -- we talked repeatedly about the

17    Michigan study.

18      Q    Let me -- let me try the question again.

19          Of the specific ways in which

20    Dr. Halderman finds that the Georgia election

21    equipment can be hacked in his July 1 report, how

22    many of those do you indicate in your declaration

23    could also apply to hand-marked paper ballots beyond

24    the ones that you say may apply to scanners?

25      A    I'm not sure -- again, I didn't do a
```

1    point-by-point on all of his to compare it to

2    hand-marked paper ballots.  I reference in here

3    hand-marked paper ballots in my declaration to show

4    an area where that is a correlation.

5             So I didn't elaborate on every single hack

6    that he had to say that it is also a hack of a

7    hand-marked paper ballot and in what way.  I did not

8    do that.

9        Q    Are you offering an opinion that

10   hand-marked paper ballots -- you keep referring to

11   hacking of hand-marked paper ballots.  What do you

12   mean by "hacking hand-marked paper ballots"?

13       A    If a voter decides, "I don't like any of

14   the candidates in this contest," that means they

15   don't fill in an oval.  So now you have what's

16   called an undervote.  And an insider could just fill

17   in an oval for whoever they want.  I refer to that

18   as an undervote hack, the ability to add a vote.

19            Now, the overvote hack, as I elaborated on

20   in my declaration, also says that if someone filled

21   in the oval for someone, a candidate, a person could

22   fill in an oval for another, causing an overvote,

23   which doesn't give a vote to a candidate but it

24   takes away a vote from a candidate.

25            I also talk about, again, ballot design.

Page 81

1      There's ballot design issues.  You can do things

2      with ballot design to cause outcomes in an election.

3                So those are things that I reference.

4           Q    But what you just referenced, those are

5      not computer hacks, right?

6           A    No.  The term "hacking" is not exclusive

7      to computers.

8           Q    You testified earlier that Dr. Halderman

9      is an expert on hacking and you're not, which is why

10     you didn't examine his hacking the election

11     equipment.  So now you're saying you are an expert

12     on hacking?

13          A    No, I'm not saying I'm an expert on

14     hacking.

15                To be able to identify something and say

16     it exists doesn't require expertise.  So the fact

17     that I can tell you that you can hack paper, meaning

18     the undervote hack or overvote hack, doesn't

19     necessarily say I'm an expert on hacking.  I'm not

20     professing I'm an expert on hacking.

21          Q    You're not suggesting --

22          A    I'm identifying it.

23          Q    I see.  Okay.  Okay.

24                The concern you've raised about ballot

25     designs with hand-marked paper ballots, that applies

Page 82

1    equally to BMDs, right?

2         A    You can have a poorly designed BMD.   I

3    don't know that I would say it applies equally, but

4    I would say you can have a poorly designed BMD.

5         Q    In fact, are you aware that in 2020,

6    Georgia, the Secretary of state, reported that they

7    had to change the software -- update the software on

8    the BMDs because of a ballot design issue?   Were you

9    aware of that?

10        A    No, I don't recall that.

11        Q    You weren't aware that there was an issue

12   reported by the Secretary of State that there were

13   so many candidates in a particular contest that they

14   had to change the software for the BMD in terms of

15   how that ballot gets presented?

16        A    That sounds familiar.   I'd have to go find

17   the article.   But that does sound familiar.

18        Q    That's not -- that's not something you

19   thought about or considered for your opinions in

20   this case; is that right?

21        A    No.

22        Q    Can malware or hacking cause voters to

23   write the wrong votes on a hand-marked paper ballot?

24             MR. MILLER:   Object to form.

25             THE WITNESS:   I don't know that there's

Page 83

1    such a thing as malware on paper.

2    BY MR. CROSS:

3        Q    Is there any form of hacking you're aware

4    of in the way you're using that term that can cause

5    voters to write the wrong selections on a paper

6    ballot?

7        A    Yes.  We can design it so that they can

8    write -- in the year 2000, in the State of Florida,

9    we had a presidential election, and we were using

10   hand-marked paper ballots, and several voters left

11   having voted for the wrong person because of a

12   ballot design issue.

13            So yes, you can design a paper ballot and

14   have voters mark the wrong person.

15       Q    And you're -- sorry.

16       A    Yes, that is accurate and has been

17   documented.

18       Q    And you're calling that hacking?

19       A    I call it -- we call it hacking or ballot

20   design.  The term -- I don't have a particular term

21   for it.

22            What I'm saying is paper has issues, and

23   I'm showing you the issues.

24       Q    I'm asking a very precise question,

25   Dr. Gilbert.

1           Is there any form of hacking -- hacking --
2     that can cause a voter to fill in a vote in a
3     contest that they do not intend?
4           A    Yes.
5           Q    Okay.  What's that?
6           A    I gave you an example.  Florida 2000 did
7     exactly that.  Yes.
8           Q    Okay.  So you -- it's your opinion that in
9     Florida in 2000, whoever designed the ballot
10    designed it in a way deliberately to cause voters to
11    do that; they were hacking the votes that voters
12    cast so that the voters would fill in votes they did
13    not intend; is that your opinion?
14              MR. MILLER:  Objection.
15              THE WITNESS:  No, no.  I didn't say --
16    BY MR. CROSS:
17          Q    How is that hacking?  How is that hacking?
18          A    As I mentioned, I used the term "hacking"
19    or "bad design."  It's intentional or unintentional.
20              The term is -- to me, it's not important.
21    What I'm showing you is that there are issues with
22    paper, meaning paper can cause -- to answer your
23    question, paper can cause a voter to select the
24    wrong person or have the wrong entry.  Yes.  That
25    was your question.  Yes, paper can do it, and we

Page 85

1     have seen that.

2          Q    That was not my question.  I'm going to

3     try it one more time.  I'll remind you of what Judge

4     Totenberg told you.  You don't get to change the

5     subject of the question, Doctor.

6               MR. MILLER:  Objection.  David --

7     BY MR. CROSS:

8          Q    My question to you is, can you offer any

9     way in which a hand-marked -- in which hacking --

10    okay, I'm not talking about just your general view

11    on the unreliability or the issues that come up with

12    paper ballots marked by hand.

13              Can you identify any way in which hacking

14    can cause a voter to make a selection on a ballot

15    they did not intend, yes or no?

16              MR. MILLER:  Objection.  Asked and

17    answered.

18              THE WITNESS:  Yes.

19    BY MR. CROSS:

20         Q    Okay.  And what is the form of hacking

21    that you're talking about?

22         A    I can design a ballot in such a way that

23    it would cause them to incorrectly record their

24    mark, options.

25         Q    And that's true for both a BMD and a

Page 86

1      hand-marked paper ballot; is that right?

2          A    It's possible, yes, for both.

3          Q    Are you talking about designing it in that

4      way with the intent of making voters select

5      something other than they intended, or are you

6      saying that would just be an inadvertent consequence

7      of the design, or both?

8          A    I'm saying it could happen either way.

9              I don't know the intention of the

10     individual who's done it.  I have not interviewed a

11     person who's done it to determine if it was

12     intentional or not.  I can only tell you it has

13     actually happened; therefore, we have evidence that

14     this has occurred.

15         Q    But you're not aware of any instance where

16     it's been established that a ballot was designed

17     with the intent of causing voters that voted by hand

18     to vote for a candidate they did not intend to,

19     right?

20         A    I am not aware of any documented case

21     where someone purposely did that.  I am not aware of

22     a documented case.

23         Q    You're aware that -- sorry.  I just got an

24     echo for a second.

25             Doctor, are you aware that in Florida in

Page 87

1    2006, there was a poor ballot design on an

2    electronic interface for elections that caused many

3    thousands of undervotes?

4         A    Yes, I'm aware of that.  Sarasota.

5         Q    In fact, the magnitude of the undervotes

6    potentially could have changed the outcome of that

7    congressional race given the magnitude.

8              Are you aware of that possibility?

9         A    Yes, I am aware.  And that was a DRE, if

10   I'm not mistaken.

11        Q    Are you familiar with Michael Shamos?

12        A    Yes, I know him.

13        Q    Do you communicate with him regularly?

14        A    No, I do not.

15        Q    Have you communicated with him about this

16   case or the issues in this case?

17        A    No.

18        Q    Were you aware that the state engaged him

19   as an expert in this case before you?

20        A    I don't -- I don't recall that.  I know

21   Michael has been on other cases that I've been on,

22   so I don't know.

23        Q    So you haven't reviewed any of his

24   testimony, written or oral, for your opinions in

25   this case; is that right?

1          A    No.

2          Q    I gather you're not aware that he

3    testified in this case on behalf of the state that

4    he advises not using QR codes for BMDs; you were not

5    aware of that?

6          A    No, I was not aware of that.

7          Q    And you disagree with Dr. Shamos on that?

8          A    I think that you can do it without the QR

9    code.  I think that's a solution that would get rid

10   of a lot of these issues that we're discussing.  So

11   I think it's feasible to do that.

12              Since you're asking about QR code, I guess

13   I'll be full disclosure here.

14              I have a forthcoming -- a paper under

15   review where we've created something called informed

16   optical character recognition, IOCR, that has given

17   100 percent accuracy in OCR for ballots.  So that's

18   a forthcoming solution in probably 2022.  So I have

19   worked in this area as well.

20         Q    Are you aware that the Dominion equipment

21   that's used in Georgia currently already has the

22   ability to scan and count the human-readable portion

23   of the BMD ballot rather than the QR code?

24         A    I can't remember -- I get them mixed up.

25   I can't remember if they had that, but I don't

1    know -- I haven't seen any data to see how accurate

2    it is, how it works.  I haven't seen any of that.

3         Q    That's not something you considered for

4    your opinions; is that right?

5         A    I haven't seen it, so I don't know that I

6    can opine on that as far as Dominion's -- how they

7    do it, the accuracy.  I don't have any knowledge of

8    that.

9         Q    Do you share Dr. Shamos's recommendation

10   against using QR codes with BMDs for elections in

11   the United States?

12        A    I think BMDs can -- QR codes can be used,

13   so I'm not totally against them.  But I think -- if

14   I had my choice, I would recommend not using them to

15   eliminate all these discussions and concerns around

16   them.

17        Q    Looking at paragraph 15 of your July

18   declaration again -- and if you need to pull that up

19   again, Dr. Gilbert, feel free.  It's --

20        A    I got it.

21        Q    Okay.

22        A    Okay.  I got it.  Yeah.

23        Q    Where you indicate here that you're not

24   aware that Dr. Halderman has provided equipment

25   marred by undetectable hacks to any other

1    independent researcher to test his theory that it

2    is, in fact, undetectable and not correctable, did

3    you recommend to your client, the Secretary of

4    State's office in this case, that they do that?

5               MR. MILLER:  Dr. Gilbert, I'm going to

6    instruct you not to answer that question on the

7    basis of privilege.

8    BY MR. CROSS:

9         Q    Are you declining to answer?

10        A    I decline.

11        Q    Have you made any recommendations to

12   anyone that this independent research that you

13   identified in paragraph 15, that that should occur

14   in the State of Georgia for its election system?

15        A    I don't recall.

16        Q    And why would you not make that

17   recommendation as an election security expert who's

18   concerned about the reliability of elections in

19   Georgia and elsewhere?

20        A    My understanding is getting access to the

21   equipment for general studies like that is a

22   complicated matter, as I mentioned before.

23        Q    But you now know that it's available here

24   just as it was to Dr. Halderman.  I think we've been

25   over this, right?

Page 91

1        A    The fact that the machine is available, as
2    I mentioned, is only available if Dr. Halderman has
3    it first.  Dr. Halderman -- it does no good -- if
4    Dr. Halderman and I get the same equipment and I
5    institute the hack, and then I say, "I found the
6    hack," again, I would ask Dr. Halderman, would he
7    accept that ruling?
8            If he's willing to accept that, I would be
9    very happy to get machines and institute his hack
10   and then be able to report whether or not I found
11   that.
12           To me, that's not a scientific way to do
13   this.  And I don't think Dr. Halderman would agree
14   to that.
15       Q    Let me make sure I understand.
16           You're saying you don't think
17   Dr. Halderman would agree that you should get access
18   to the same equipment he had, institute the same
19   steps that he took, to determine whether you find
20   the same hack that he found?
21       A    Institute the same things, and then say,
22   "Oh, I found it and corrected it"?  Yeah, I don't
23   think he -- I don't see him agreeing to that.
24       Q    And what basis do you have for believing
25   that Dr. Halderman would not agree to that?

1        A    Because Dr. Halderman does research in

2    these areas, and I don't think this is a proper

3    research protocol.  It doesn't make sense.

4             In other words, if I'm going to implant a

5    hack, of course I know where the hack is.  How can I

6    then declare that I found the hack?  That doesn't --

7    I don't know how that would work.

8             But I would love the opportunity for

9    Dr. Halderman to answer that question.  If

10   Dr. Halderman was -- and if I'm wrong, I'd be happy

11   to take Dr. Halderman's advice, and I would follow

12   his protocol, implement his hack, and then tell him

13   if I could find his hack.

14       Q    Do you understand that Dr. Halderman has

15   repeatedly offered to Dominion to do exactly what

16   you're suggesting, that they look at his report,

17   they go step by step through it, and determine

18   whether his findings are accurate?

19             MR. MILLER:  Objection.  Lack of

20   foundation, misstatement.

21             THE WITNESS:  I'm not -- I'm not -- I

22   don't know that.  I can't -- I don't know that he's

23   done that.

24   BY MR. CROSS:

25       Q    So take as a given that Dr. Halderman has

1    repeatedly offered to Dominion to provide them his

2    report, to meet with them, and to even work with

3    them to test or validate his findings and even take

4    remedial measures.

5            Would that affect your view on whether he

6    would agree to allow you or another independent

7    researcher to do that?

8        A   I don't -- that has no pending on my view

9    of whether he would do that.  Those are independent.

10   I don't know that that matters on my view.

11       Q   You offer the view that you thought he

12   would not allow anyone to do that, and yet he's

13   offered it to Dominion.  Does it affect your view?

14       A   No, you misinterpreted what I said.  That

15   is not what I said.

16           What I said is Dr. Halderman -- I do not

17   believe he would agree to the following:  I would

18   get a machine.  I would follow his steps to

19   implement a hack.  Then I would report if I found

20   that hack on that machine, and if I corrected that

21   hack on that machine.

22           I don't think he would be in line to allow

23   such an experiment.  I don't know how else to make

24   it more clear.

25       Q   That's exactly what he's offered to

1    Dominion.  I will represent to you and ask you to

2    take it as an assumption.

3            Does that change your view if you assume

4    what I've told you to be true?

5            MR. MILLER:  Objection.  Asked and

6    answered.

7            THE WITNESS:  Change my view?  What view

8    are you -- I don't understand what you ask to

9    change.

10           My view is that Dr. Halderman would not

11   support an individual following his steps and then

12   saying they found the attack.  That is my view.

13   BY MR. CROSS:

14      Q   And I'm telling you that he has offered

15   exactly that to Dominion on numerous occasions.

16           And so in light of that, if you just take

17   that as a given, does it change your view that he's

18   unwilling to have anyone do that?

19      A   Well, if he's done that, then obviously

20   he's not unwilling.  I never said he was unwilling

21   to do that.  I said to my knowledge, it has not been

22   done.  That exercise, to my knowledge, has not been

23   done.

24           But I think that's an exercise that should

25   be done in the future in general -- in general

1    terms, and I think that's an area where

2    Dr. Halderman and I probably could work together in

3    the future.

4         Q    Do you have any understanding as to why

5    Georgia Secretary of State's office has refused to

6    do that themselves with an independent researcher?

7         A    I do not.

8         Q    Do you have any understanding as to why

9    Dominion has refused to do that?

10        A    I do not.

11        Q    Do you have any understanding as to why

12   Fulton County has refused to do that?

13        A    I do not.

14        Q    Are you aware of any protocols or steps

15   that Georgia takes in the ordinary course that would

16   detect any of the hacks that Dr. Halderman reports

17   in his July 1 declaration or his July 1 report?

18        A    I can't recall all the steps that they

19   take off the top of my head as far as their testing

20   and verification steps.  That's not something I have

21   in memory, so it's hard for me to answer that

22   question to say were they aligned with things he's

23   done.

24        Q    You don't address that in your July 2021

25   declaration, correct?

Page 96

1          A    I do not.

2          Q    The analysis or testing that you suggest

3      in paragraph 15 of your report, what steps would you

4      describe should be taken for an independent

5      researcher who would do that work?  What should they

6      do?

7          A    All right.  So what I would recommend

8      is -- and this is a very important question -- I

9      think that Dr. Halderman would have particular

10     voting equipment.  He would institute his hack.

11     That particular voting equipment would be sent to a

12     third party, and then the third party would be --

13     would use that equipment, and then try to identify

14     if there's any alterations or any issues with the

15     equipment.

16              If they identify anything, they would

17     document it, and they would document any resolutions

18     that they took to eliminate it.

19              That's at a very high level, but that

20     would be the protocol, I would think.

21              And then they would report that back to

22     Dr. Halderman, and Dr. Halderman would acknowledge

23     if they found everything, if anything, et cetera.

24     So that's the way that I would anticipate something

25     like that occurring.

Page 97

1            Q    Are you aware that no one at the Secretary
2     of State's office has actually reviewed
3     Dr. Halderman's report?
4            A    No, I'm not aware of that.
5            Q    Does that surprise you?
6            A    I don't have an opinion either way.  I
7     don't know.
8            Q    Given the many findings Dr. Halderman has
9     about the security of the election equipment used in
10    Georgia, wouldn't you expect those who are
11    responsible for administering elections to at least
12    read the report to determine whether they need to
13    address any of those findings?
14                MR. MILLER:  Objection.  Asked and
15    answered.
16                THE WITNESS:  I don't -- I don't have an
17    opinion.  I think someone should read it.  I don't
18    know who.  I don't know the protocols of chain of
19    custody and how those things work in the State of
20    Georgia, so I can't answer that directly because I
21    don't -- these are things that I don't know and are
22    outside of my expertise.
23    BY MR. CROSS:
24           Q    We talked about the Michigan and Rice
25    voter verification studies, and one thing you

1  pointed out about those was that they did not occur

2  in a real election, right?

3       A   Right.

4       Q   And then we talked about the Georgia voter

5  verification study that the Secretary of State

6  commissioned.  One of the things you pointed out

7  about that is they didn't flip votes like they did

8  in the Michigan and Rice studies, right?

9       A   I haven't read it, but I suspect they

10  didn't flip the votes.

11       Q   Is it your opinion that the only way to

12  conduct a valid study of voter verification is to do

13  it in an actual election where you're flipping

14  votes?

15            MR. MILLER:  Objection to form.

16            THE WITNESS:  No.

17  BY MR. CROSS:

18       Q   So you're not suggesting that that's

19  required, right?

20       A   No, I am not.

21       Q   And the study that you've talked about

22  today that you performed with your new BMD prototype

23  has the same condition as the Michigan and Rice

24  studies in that that was not conducted in a real

25  election, right?

Page 99

1          A    Correct.

2          Q    Are you aware that you're the only expert

3    in this case retained by defendants that, to our

4    knowledge, has even read Dr. Halderman's July 1

5    report?

6          A    I was not aware.

7          Q    Does that concern you?

8          A    You just informed me.  I haven't had a

9    chance to form an opinion on it.  I don't know.  I'd

10   have to think about it.

11         Q    As you sit here today as an election

12   security expert, does that raise any concern for

13   you?

14         A    I don't know.  I'd like to hear more

15   context around why that is.  It generates questions

16   for me, and I don't know.  I don't have an opinion

17   at this point.  It's something I have to digest and

18   then think about.

19         Q    What questions does it generate?

20         A    First of all, why is that the case?  Is

21   there -- there may be a justification for that.  I

22   don't know.

23         Q    What justification comes to mind?

24         A    I don't have one.

25              MR. MILLER:  Objection.  Relevance.

```
                                          Page 100

 1    BY MR. CROSS:

 2         Q    I'm sorry.  You said, "I don't have one"?

 3         A    Yeah.  I don't have one.  I'm not

 4    speculating.  I don't know.  I would want to know.

 5    I don't want to speculate.

 6         Q    Understood.

 7              Do you still have your July declaration in

 8    front of you?

 9         A    I can get it.  Yes.

10         Q    Just let me know when you have it.

11         A    I have it.

12         Q    Okay.  So take a look at paragraph 6.

13              Do you see that?

14         A    Paragraph 6?  Let me get there.  I am

15    there.

16         Q    If you look at the end of paragraph 6, the

17    last two sentences, do you see that you wrote, "As I

18    have also stated before, even under a hand-marked

19    ballot system, computers must still be utilized,

20    e.g., scanners and voter registration systems.

21    Accordingly, this general statement is largely

22    irrelevant"?

23              Do you see that?

24         A    Yes.

25         Q    And the general statement you're referring
```

1   to is in the preceding sentence which reads, "I

2   agree that any computer can be hacked with enough

3   access and knowledge of a determined malicious

4   actor."

5          Right?

6      A   Right.

7      Q   Are you offering an opinion that there are

8   no increased risks with BMDs over hand-marked paper

9   ballots even though BMDs include at least two

10  additional computer components, the BMD and the

11  printer?

12          MR. MILLER:  Object to form.

13          THE WITNESS:  I am offering that risk

14  exists with computing devices.  Therefore, there's a

15  risk in both.

16  BY MR. CROSS:

17     Q   And one of the important things to do --

18  sorry.  Strike that.

19          One of the things to do that's important

20  as an election security expert is to evaluate the

21  level of risk, not just whether risk exists at all;

22  you'd agree with that?

23     A   Yes.

24     Q   And you don't dispute that BMD systems

25  pose greater risk than hand-marked paper ballots in

1    terms of manipulation through the computer equipment

2    because there's extra equipment, right?

3         A    I -- I take issue with that from the

4    perspective of just counting and saying that there's

5    more computer equipment, therefore, there's more

6    risk.  I don't agree with that.  I don't agree with

7    that analogy.

8         Q    One of the things that you point out is

9    that with hand-marked paper ballots, an insider can

10   alter votes where there are undervotes or overvotes,

11   for example, right?

12        A    Yes.

13        Q    And an insider can also alter votes in a

14   BMD system; we're agreed on that, right?

15        A    Can you give me the scenario by which

16   you're referencing that?

17        Q    Sure.  Any of the ways that Dr. Halderman

18   identifies in his July 1 report.

19        A    In the ways that he designated, an insider

20   with a certain level of technical expertise could

21   certainly do that versus with a hand-marked paper

22   ballot, 100 percent of the people inside can do

23   that.

24        Q    Taking the undervote, for example, where

25   a -- a situation where, on a hand-marked paper

1       ballot, a voter does not fill in any selection for a

2       particular contest, that's what we're talking about,

3       right?

4               A    Yes.

5               Q    And so you're saying in that situation, an

6       insider could come in with a pen and fill in a vote

7       for that -- that voter that that voter did not

8       intend, right?

9               A    Correct.

10              Q    And you've posited in the past that that

11      takes, say, at least two to five seconds to do that,

12      right?

13              A    Correct.

14              Q    And the insider has to do that one ballot

15      at a time, right?

16              A    Correct.

17              Q    And the insider has to have access to each

18      ballot, the paper ballot, that they are

19      manipulating, right?

20              A    Right.  That's the point.  Yes.

21              Q    And they have to have access to each of

22      those ballots in an environment where they're not

23      going to be detected, right?

24              A    Correct.

25              Q    And so for an insider to -- strike that.

1          For an election where the contest is

2     decided by, let's say, a 20,000-vote differential,

3     over 10,000 votes would have to be altered, flipped,

4     to reverse the outcome of that election, right?

5          A    The margin of victory is 20,000 votes.  So

6     if you alter 10,000 of one, yes, that would break

7     even.

8          Q    Well, 10,000 would break even.  10,001

9     would flip the result, right?

10         A    Correct.

11         Q    And in the world where we've got

12    hand-marked paper ballots and an insider that's

13    changing maybe undervotes or overvotes in that

14    election, they're going to need at least two to five

15    seconds with over 10,000 ballots in an environment

16    where they have access to each ballot and they can

17    do it undetected, right?

18         A    That sounds right.

19         Q    With the hacks that Dr. Halderman

20    identifies in his report, an insider could

21    mass-change 10,000 -- hundreds of thousands of votes

22    in a matter of minutes with access to the election

23    equipment, right?

24         A    It depends on which hack you're

25    identifying.

Page 105

1          Q    There are hacks that he identifies in his
2     report that allow that, right?
3          A    It depends on which hack.  Can you tell me
4     which hack you're referencing?
5          Q    We're going to get to that.  But right now
6     I'm trying not to get into the sealed stuff.  I
7     just -- I just -- do you agree that there are hacks
8     identified in Dr. Halderman's report, at least one
9     or more hacks, that would allow an insider to change
10    votes on a mass scale, thousands, tens of thousands
11    or hundreds of thousands of votes, in a matter of
12    minutes with malware?
13             MR. MILLER:  Objection.  Asked and
14    answered.
15             THE WITNESS:  Again, I need to know the
16    specific hack.  I -- I don't want to claim that that
17    is the case without knowing the hack.
18    BY MR. CROSS:
19         Q    As you sit here, you don't remember
20    whether there are any such hacks in his report?
21         A    I need the context.  I don't -- I need the
22    context.
23         Q    What about a hack where the malware
24    changes the QR code and flips it from the intended
25    selection by the voter?  Are you with me?

1        A    Okay.

2        Q    You understand that that is a hack that is

3    included in his report, right?

4        A    Okay.

5        Q    And you understand that an insider that is

6    able to put that malware into the system could do

7    that in a matter of minutes and change votes on a

8    mass scale, right?

9              MR. MILLER:  Object to form.

10             THE WITNESS:  I don't know on a mass

11    scale.  An insider could do that and -- again, it

12    depends on the hack.

13             So my colleagues, Dr. Halderman,

14    Dr. Appel, several of them have said to me

15    repeatedly, when we do have the opportunity to talk,

16    that if they were going to hack an election, they

17    wouldn't change every vote.  They'd selectively

18    change.

19             So when you say change a certain quantity,

20    that's why I need more context.  Because even they

21    won't admit that they're changing every vote from a

22    candidate to another candidate.

23             So to say that it's a large scale, to say

24    that it would change a certain number, I need more

25    specifics, and then I can answer your question

Page 107

```
 1      accurately.
 2               Because the context that I've been given
 3      by them repeatedly is that, "No, no, no, no, no.
 4      The reason no one is going to detect is because we
 5      don't change all of them all the time.  We don't
 6      change that frequently."
 7               So I hear that from them repeatedly.  And
 8      then your line of questioning suggests something
 9      otherwise, so I need you to be specific so we have
10      this accurately recorded.
11      BY MR. CROSS:
12           Q   All right.  Let's do it this way:  You've
13      got an insider who's changing votes on a hand-marked
14      paper ballot that takes them two to five seconds at
15      least, right?
16           A   Okay.
17           Q   Okay.  So let's say an average of 3.5
18      seconds.  We'll split it right down the middle.  Are
19      you with me?
20           A   Okay.
21           Q   So we've got 10,000 votes that are getting
22      changed every 3.5 seconds, right?  That gets us to
23      about 2,800 seconds.  We divide that by 60, we get
24      to 47 -- make sure I get this right.  Hold on.
25      Sorry.  I did that wrong.  I'll do this again.
```

Page 108

1           Right.  So 10,000 ballots at three and a

2    half seconds would be 35,000 seconds on average to

3    change 10,000 ballots, right?

4           A    Okay.

5           Q    Okay.

6           MR. MILLER:  Object to form.

7    BY MR. CROSS:

8           Q    And we divide that by 60, we get to over

9    583 minutes.  Divide by 60 again, we get to almost

10   ten hours that it would take an insider to change

11   ballots in the way that you've suggested for

12   hand-marked paper ballots, which they would have to

13   do in an environment where they have access to the

14   ballots for ten hours and can do it undetected,

15   right?

16          A    Right.  According to your analysis, that

17   scenario plays out.

18          Q    Do you understand that Dr. Halderman has

19   identified hacks -- for example, one that's commonly

20   discussed with these types of BMDs is changing --

21   flipping the QR code in a way that that could happen

22   in minutes, right, where an insider can embed the

23   malware in the BMD within minutes and flip 10,000

24   votes?  You understand that, right?

25          A    No.  So let me make sure I understand what

1    you're asking.

2              Someone inserts malware that's going to

3    change the QR code, so it's going to change 10,000

4    votes and only 10,000 votes.

5              So what happens if that particular

6    precinct only has 5,000 votes?  So it changed all

7    5,000 votes.  And is it changing the QR code and the

8    human-readable text or just the QR code?

9              There's so many -- I need more context.  I

10   don't know how else to put it.

11        Q    Okay.  All right.  We'll come back to it

12   when we walk through Dr. Halderman's report.

13             Do you have your declaration in front of

14   you again?

15        A    Yes.

16        Q    Okay.  In paragraph 8, you write, "Neither

17   of the Curling experts offer any scientific research

18   regarding voters' proclivity to review hand-marked

19   paper ballots to ensure their ballots are marked and

20   will count as intended."

21             Do you see that?

22        A    Yes.

23        Q    And you don't identify any such research

24   yourself, right?

25        A    Right.

Page 110

1          Q    And we agree that any error on a

2     hand-marked paper ballot at the time the voter

3     completes the ballot is caused by the voter, right?

4          A    No.

5          Q    Okay.  How is that not accurate?

6          A    In Florida in the year 2000, there was a

7     ballot design that caused errors that were not the

8     fault of the voter.  That's an example.

9          Q    The ballot design caused the voter to fill

10    in a selection they did not intend; is that what

11    you're saying?

12         A    Exactly.

13         Q    But the selection that appeared on the

14    ballot was manually entered by the voter with a pen

15    or pencil, right?

16         A    Correct.

17         Q    Paragraph 9, do you have that in front of

18    you?

19         A    Yes, I do.

20         Q    Do you see five lines down, you write,

21    "Time spent reviewing a ballot, however, has little

22    to do with whether it was actually verified"?

23              Do you see that?

24         A    Yes.

25         Q    Is that something you really believe?  You

Page 111

1    stand by that claim?

2          A    I -- I do stand by the claim that time

3    spent reviewing doesn't guarantee accuracy of that

4    review.

5          Q    That's not -- sorry.

6          A    So again, I mention in studies that I've

7    seen, there's been this assumption because there was

8    thought that people didn't spend a lot of time,

9    whatever that is, that they could not have

10   accurately reviewed their ballot.  And I don't agree

11   with that.

12         Q    But what you just said is not what you

13   wrote here, right?  You didn't write anything about

14   guaranteeing.  What you wrote is "Time spent

15   reviewing a ballot, however, has little to do with

16   whether it was actually verified."

17              Do you stand by that statement?

18         A    Yeah, I do, because you can review a

19   ballot and not review the entire ballot.  You can

20   spend a lot of time looking at a particular contest.

21   You can -- there's so many different ways that time

22   spent can not be an accurate measure of reviewing

23   the ballot.

24         Q    So it's your opinion that whether a voter

25   spends one second versus, say, 30 seconds reviewing

1    a ballot tells us nothing at all about the

2    likelihood of whether that voter has accurately

3    verified the selections; is that your opinion, sir?

4         A    No, I don't say "nothing at all."  I won't

5    say "nothing at all."

6         Q    In fact, it can tell us a lot, right?  We

7    can reasonably conclude that someone who spent only

8    a second or less reviewing a two-page ballot that

9    has lots of contests has very likely not verified

10    the accuracy of all those contests, right?

11        A    I won't agree with that.  I would want

12    data to support that.

13              I think there's scenarios where -- that a

14    small amount of time could result in an accurate

15    verification.  In particular, if the voter voted

16    party -- straight party.  That's -- and again, it

17    depends on the design of the ballot summary.

18    There's things that can make less time spent and

19    easier verification.

20        Q    So you think that a two-page ballot that

21    has numerous contests on both pages, on the front

22    and back, even for a voter who voted the same party

23    on every selection, that they could reliably review

24    that for every contest in under a minute -- I'm

25    sorry -- in under one second?  That's what you're

Page 113

1    saying?

2         A    Under a second?  I have to see it.  That's

3    a challenge, but again, I would honestly -- I think

4    that is a challenge.  I think that is a challenge.

5    For less than a second, I think that could be a

6    challenge.

7         Q    Did you -- sorry.  I may have asked you

8    this before.

9              Did you review Dr. Philip Stark's response

10   to your declaration in this case?

11        A    I don't recall.  I may have.  I don't

12   know.  It just depends.  Can you tell me what the

13   particular question or context is?  And then I could

14   tell you if I recall that.

15        Q    Do you recall that he cited studies of

16   reading that report rates of about 138 words per

17   minute to 600 words per minute for college students

18   depending on the goal?  Do you recall that?

19        A    Yes, I do.

20        Q    And the studies also indicated for general

21   tasks, a typical rate is 300 words per minute.

22             Do you see that?

23        A    Yes.

24        Q    He then walked through exactly what you've

25   just described about looking at data on the degree

1      and speed at which individuals can read, and

2      indicated that for a typical ballot in Georgia in

3      the recent elections, it's going to take a lot more

4      than one second to verify each contest.

5                  Do you recall that?

6                  MR. MILLER:  Objection.  Lack of

7      foundation.

8                  THE WITNESS:  I don't understand the

9      question.  Do I recall -- I recall the minutes, but

10     I don't understand your question.

11     BY MR. CROSS:

12         Q   Do you recall that he pointed out that

13     exemplar ballots contained between 16 contests in

14     Clark County as one example he cites and 27 contests

15     in Oconee County?  Do you remember that?

16         A   I don't remember that, but that doesn't

17     sound unusual.

18         Q   He points out that five seconds to review

19     27 contests would be only 0.185 seconds per contest.

20                 Do you see that?

21         A   I don't see it, but I understand the math

22     behind it.

23         Q   Okay.  As you sit here today, you don't

24     dispute any of the analysis that he provides in his

25     declaration responding to you on the amount of time

1    that it would take, based on the studies that were

2    conducted on reading rates, to verify ballots in

3    Georgia election, right?

4         A    No, I absolutely dispute it, and on the

5    basis that Dr. Stark is a brilliant statistician,

6    and I'm not surprised by these numbers.  But again,

7    they forget the human condition.

8              So notice that in all the things you just

9    read, you said, "reading."  "Read."  "Reading."

10   "Read."  "Reading."  You used that word several

11   times, and so did he.  You assume that you have to

12   read the ballot to confirm and verify the

13   selections.

14             So there's a notion we call sight words,

15   meaning kids learn to read using sight words,

16   identifying words upon sight.  You don't actually

17   have to read the line to identify that anomaly on

18   the line.  You can identify anomalies by looking at

19   them, not necessarily reading them.

20             Now, I don't recall him having data on

21   identification of anomalies upon sight, which is the

22   more accurate way to look at this, versus how --

23   what it takes to read text and things like that.

24             So that's why I would object to his -- I

25   think the numbers are correct in the context of

1    reading, but I don't think this exercise is a

2    reading exercise.

3         Q    In the Georgia Secretary of State

4    commissioned study on actual elections for voter

5    verification, are you aware that it found that more

6    than half of voters observed either spent no time at

7    all reviewing their ballot or did so for less than

8    one second?  Were you aware of that?

9         A    I don't recall that.

10        Q    So in a contest like Oconee, in an

11   election like in Oconee County where there are 27

12   contests, are you offering an opinion that voters

13   could verifiably -- sorry.  Strike that.

14             In an election like in Oconee County where

15   there were 27 contests, are you offering an opinion

16   that voters can typically, reliably verify their

17   selection on each of those 27 contests by reviewing

18   their ballot in under one second?

19             Is that an opinion you're offering in this

20   case, sir?

21             MR. MILLER:  Objection.  Form.

22             THE WITNESS:  No, that is not my opinion.

23   BY MR. CROSS:

24        Q    Take a look at paragraph 12 of your

25   declaration, please.

Page 117

1        A    Okay.  Got it.

2        Q    Here, you posit a hypothetical based on, I

3   think it's the Michigan study, where you take the

4   6.6 percent from in paragraph 12 at the end.

5             Do you see that?

6        A    Yes.

7        Q    And you say, "But that means the other

8   6.6 percent that did notice," which, in your

9   hypothetical, would be 832 votes based on the

10  Trump/Biden election in 2020, you say that for those

11  voters, they "simply did not say anything or

12  otherwise simply corrected their ballot and thought

13  nothing of it then or since."

14            Do you see that?

15       A    Yes.

16       Q    You say, "I find this unlikely in light of

17  my experience, qualifications, and recent work in

18  the field in relation to my transparent BMD

19  prototype."

20            Do you see that?

21       A    Yes.

22       Q    At the end of that paragraph, you write,

23  "Even still, it would mean there are 832 spoiled BMD

24  ballots from that 2020 Biden/Trump election," right?

25       A    Yes.

1      Q    But you don't indicate anywhere in your
2      declaration how many spoiled ballots there were in
3      that election, right?
4      A    Right.  I don't have that data.
5      Q    Did you ask the state for it?
6      A    I don't recall.  I don't think so.  I
7      don't recall.
8      Q    You didn't think it was relevant for your
9      analysis in saying that 832 spoiled ballots might
10     indicate something, and you didn't want to know
11     whether that number of spoiled ballots actually
12     exist in the election?
13     A    I've searched for it.  I couldn't find the
14     data.  I didn't ask the state, but I searched for
15     it, and I couldn't find that data.
16     Q    Why didn't you ask the state or Fulton
17     County?
18     A    I don't know.  It didn't occur to me to
19     ask them.
20     Q    Would it surprise you to learn that in the
21     Biden/Trump presidential election, there were a lot
22     more than 832 spoiled ballots?
23     A    No, it wouldn't surprise me if there were
24     more than that number of spoiled ballots, but
25     specifically whether those spoiled ballots

1    specifically had a vote for Biden.  How many spoiled

2    ballots had Biden on them?  That's the bigger

3    question.

4          Q    And that's not a question you posed to

5    your clients, right?

6          A    I have not.

7          Q    And have you recommended to anyone that

8    they should look into that to determine whether

9    there are 832 spoiled ballots or more with Biden on

10   them?

11         A    No, I have not.

12         Q    You don't think that's something somebody

13   should take a look at?

14              MR. MILLER:  Objection.

15              THE WITNESS:  I think someone could take a

16   look at it, but you -- I understand your position on

17   this, but you completely ignored the previous

18   comment, which is, if that many people had their

19   votes switched, and again, from my experience, in

20   particular, a vote where they were voting for Trump

21   and it switched to Biden, there would have been

22   chaos.

23              And so I don't recall chaos on election

24   day around votes being switched from Trump to Biden.

25   I don't see that scenario playing out, where people,

```
 1    from my experience, would have just taken that and
 2    not gone crazy with it.
 3             So that's why I didn't raise it as an
 4    issue, but I don't think there's any scenario where
 5    this could have played out.
 6    BY MR. CROSS:
 7        Q   Do you know how many Georgia voters voted
 8    for -- voted in the presidential contest in 2020?
 9        A   I don't know off the top of my head.  I
10    had that data at one time.
11        Q   Do you know what percentage 832 voters
12    would be of that total?
13        A   I know it's very small.  I don't remember.
14        Q   A lot less than 1 percent, right?
15        A   Okay.
16        Q   I mean, you don't dispute that, right?
17        A   I don't -- I don't have the numbers.  If
18    you'd like, I can Google and ask how many people
19    voted in Georgia, and that would give me the number,
20    and then I could get a percentage directly off of
21    that number.
22        Q   Are you aware that Georgia has deployed
23    over 30,000 BMDs across the state for that election?
24        A   I was not aware of the exact number.  I
25    know it was in the thousands, but I didn't know the
```

Page 121

1    exact number.

2         Q    And do you recall that Dr. Appel explains

3    in his response to your declaration that with over

4    30,000 BMDs and 832 spoiled ballots, that would

5    amount to only a single spoiled ballot for at least

6    every 36 BMDs across the entire state on average?

7    Do you recall that?

8         A    Vaguely.  I don't recall off the top of my

9    head.

10        Q    And he went on to explain that in that

11   scenario, most BMDs would have no spoiled ballots

12   from any voter claiming an error on the ballot, and

13   a handful of BMDs would have only one such spoiled

14   ballot.

15             Do you remember that?

16        A    Vaguely, but -- okay.

17        Q    So it's your testimony in this case that

18   if voters reported a single spoiled ballot with

19   respect to only every 36 BMDs across the entire

20   state, that that would lead to chaos in the

21   election; that's what you're saying?

22             MR. MILLER:  Objection.

23             THE WITNESS:  That's not what I'm saying.

24             What I'm saying is if -- actually, that

25   scenario is actually more true than you probably

Page 122

1      imagine.  A single voter whose vote is flipped can
2      lead to chaos.
3              And so, again, ignoring the human
4      condition, I understand that statistically it seems
5      that it morphs in reality from a statistical
6      perspective.  But again, you're ignoring the human
7      condition.
8              To flip those number of votes, and
9      people just ignore it, I don't think that's a
10     reality.  That is not reality.  Based on -- when I
11     did my study with the transparent voting machine, I
12     did a combination of a Florida 2018 and a Florida
13     2020 ballot that had the presidential election on
14     it, and flipping votes disproportionately higher at
15     the top of the ballot with the presidential
16     election.  And flipping those votes caused reactions
17     that would not have gone unnoticed, and that's even
18     in the study.
19             So for my observation as an expert in this
20     field dealing with human subjects and human studies
21     in the real world, this would have been catastrophic
22     if that was observed.
23             So the number -- what percentages
24     statistically, although we can minimize them, you
25     cannot minimize the human condition and the reaction

Page 123

1    to these things, which I think a lot of my

2    colleagues, in particular those on the cybersecurity

3    side, would do that.  And on the, you know, security

4    side, that's how they see the world.  I understand

5    that.  But that's not reality.

6    BY MR. CROSS:

7         Q    Again, in the study you keep talking about

8    on your pilot BMD, many of the people who

9    participated in that study did not report an error

10   even when they saw the error on the flipped ballot,

11   right?

12        A    Yes.  Those people reported that they

13   didn't speak up because it was a study, and then

14   they were able to successfully tell me immediately

15   which one was flipped.  So they accurately saw it.

16        Q    Well, let's be clear.

17             Even among those who reported an error,

18   many of them did not identify the error correctly,

19   right, in your study?

20        A    No.  No, no.  I had 151 participants.

21   Only one participant said there was an error and

22   could not identify it.  A 67-year-old white female

23   who was just playing with the system was the only

24   one who said, "Yeah, there was an error," and could

25   not identify it.  Only one.

Page 124

1              Q    Maybe we'll look at that later.

2                   Just so I understand, you're saying that

3         in your -- in the study, there was only one

4         participant who identified an error on their ballot,

5         or had it pointed out to them that there was an

6         error, and they identified the error incorrectly?

7              A    They could not identify the error.

8              Q    Okay.

9              A    They could not identify it.

10             Q    Okay.  So let's make sure we're talking

11        about the same thing.

12                  I thought in your study, one of the things

13        you found was that even for participants that

14        reported an error on the ballot, at least some of

15        them, more than one, did not identify the error

16        correctly.  Am I wrong about that?

17             A    Yeah, you're wrong.

18             Q    Okay.

19             A    There was only one participant who said,

20        "Yeah, there was an error."

21                  And I said, "Well, can you tell me where

22        the contest flipped?"

23                  She could not do it.  There was only one.

24             Q    Okay.  And you talked about the human

25        condition a lot.

1          In the real world of an election and using

2     your hypothetical of 832 spoiled ballots, what basis

3     do you have to believe that a single voter, over the

4     course of an entire election day, voting on a BMD,

5     who reports one ballot where they thought that the

6     result was flipped for a single contest, that a poll

7     worker would raise that concern to election

8     officials and to the point that someone would think,

9     "Hey, we need to investigate whether the system has

10    been hacked"?

11         What's your basis for believing that that

12    is a plausible scenario?

13         MR. MILLER:  Object to form.

14         THE WITNESS:  So I ran this study.  I have

15    data.  I observed the reaction to votes being

16    flipped for the presidential contest in particular.

17    Those reactions were not subtle, number one.

18         Number two, leading up to the election,

19    there were allegations that the election would be

20    stolen.  So voters all were prepped for mischief,

21    and in many voters' minds, that this thing was fixed

22    and in my study, voters said that.

23         I had a participant in particular tell me,

24    after I did the study, "So that's how they stole the

25    election," quote/unquote.

Page 126

1          So what -- the scenario that I am giving

2     you, that I am 100 percent confident that would have

3     played out, would have been a voter would have gone

4     to the media, would have gone to others.  This would

5     have blown up that the machines were flipping votes.

6     There's no way that this would have gone unnoticed.

7          In particular, in Georgia, in the year

8     2020, no.  There's no scenario where that would have

9     gone through -- the human condition would not have

10    allowed that with all that was happening before the

11    election, during, and afterwards.

12    BY MR. CROSS:

13         Q   Again, the study that we're talking about

14    here that you keep referring to is on your new BMD

15    prototype, right?

16         A   Exactly.

17         Q   Is it your understanding that no one

18    reported at any point in the 2020 presidential

19    election that their vote was flipped on a BMD?

20         A   No.  My understanding -- I have not heard

21    reports of a vote being flipped or votes being

22    flipped in Georgia on the Dominion BMD.

23         Q   But you have heard reports of -- I'm

24    sorry.  Strike that.

25              You have heard reports of voters claiming

1    that their vote was flipped on voting election

2    equipment in other states, right?

3         A    Yes, of votes being flipped on screen, I

4    have heard that, and I've done a video on YouTube to

5    address that.

6              So since you brought that up, that's

7    another example of the work I do in election

8    security to fix and secure things.

9              There was an allegation that votes were

10   being flipped, and the community and election

11   security and cybersecurity went to the code and

12   looked deep into the system.

13             And when I saw what was happening, it's

14   what I call a finger roll, where they were

15   inadvertently touching the bottom of a button for

16   another candidate.  And we designed a solution to

17   that, and our solution has never had a vote flipped.

18             So again, solved.

19        Q    Are you aware of any situation where a

20   state or county has conducted an investigation to

21   determine whether their election system was hacked

22   based on a complaint from a voter or poll worker

23   that the system did not accurately record the vote

24   that was cast by the voter?

25        A    That I'm not aware of.  And I'm not

1    surprised by that for many -- before BMDs, we had

2    DREs.  And with DREs, there would be no way for a

3    voter to determine if their vote was recorded at all

4    or accurately or inaccurately.  So that doesn't

5    surprise me from that perspective.

6         Q    But BMDs have been in use in a variety of

7    locations for at least a few years, and you're not

8    aware of any such investigation, right?

9         A    I am not aware of any such investigation.

10        Q    Again, returning to your hypothetical in

11   your declaration -- sorry -- with the 832 spoiled

12   ballots, what would you expect would happen if 832

13   voters in that election falsely claimed -- they were

14   lying -- that their ballots had been flipped by the

15   BMD?

16        A    Well, I don't know the protocols in the

17   state, so I can't say what would actually occur.

18             I have recommendations that I could give

19   to help with that, but again, I would say I know

20   protocols had to -- if they don't exist, they will

21   exist for these scenarios given what happened in

22   Arizona, which was using hand-marked paper ballots,

23   and allegations of ballot stuffing and all kinds of

24   other things proliferated in an election with

25   hand-marked paper ballots.

Page 129

1          Q    Are you talking about the recent election?

2          A    Yes.

3          Q    And they conducted an audit --

4          A    Yes.

5          Q    -- with the hand-marked paper ballots, not

6     only verifying the results, but actually found that

7     there were additional ballots for Biden that had not

8     been counted, right?

9          A    Yes.  That's what happened.  But my point

10    is that a false accusation of tampering I suspect is

11    just the new normal or a temporary normal, that

12    that's going to happen.

13         Q    One more reason why we need election

14    equipment that is as secure as it reasonably can be,

15    right?

16         A    I -- I agree with that statement, and --

17         Q    In fact, that's why you've offered

18    developing your BMD prototype, right, is to --

19    that's the improvement you're offering with that

20    prototype, is to address these types of concerns; is

21    that fair?

22         A    I think that's fair.  I'm trying to

23    improve the environment so that we can do some of

24    those things.

25              And I'm working on the next evolution of

Page 130

```
 1    your question.  Dr. Appel and others have asked me
 2    that -- brought that scenario to me, meaning if
 3    indeed someone makes a claim that this machine is
 4    hacked, what do the election administrators do?  So
 5    I'm working on that now.
 6             So I will say this for the record:  In
 7    2022, I will have a resolution to that as well, and
 8    I'm hopeful that Dr. Halderman and the others here
 9    will participate in that evaluation.  I'm hopeful
10    they will do that.
11        Q   And you've sort of anticipated where I was
12    going to go with the -- as you put it, the evolution
13    of my question.
14             In this -- and maybe this is where you're
15    going to go in 2022.
16             But the question I will ask, I guess, is,
17    in today's environment with the election system that
18    currently exists in Georgia, do you have some view
19    on how the Secretary of State or the county is
20    supposed to determine when it's appropriate to
21    conduct an investigation of whether the system has
22    been hacked or not?
23             Because you've testified that a single
24    vocal voter saying their vote is flipped plausibly
25    should lead to that investigation, but the state and
```

Page 131

1   counties could find themselves conducting all sorts

2   of investigations every time somebody makes a claim,

3   right?

4              MR. MILLER:  Objection.  Calls for

5   speculation.

6              THE WITNESS:  I have some work that I'm

7   doing in that area which is confidential at the time

8   that I'm not privy to talk about, unfortunately.

9              But to kind of help with that question,

10   that is something that needs to be addressed.  I

11   don't -- I don't know what the protocols are in

12   Georgia or any place where, you know, these things

13   happen with paper ballots.  They just spoil it, and

14   you do it over.  And that's -- that's essentially

15   what happens if there's a mistake found.

16              But, like, in Florida in 2018 when all

17   those undervotes happened, and South Florida,

18   Broward County, some people spoiled their ballots or

19   had an issue, and they were able to get it right.

20   But no one thought that, "Wait a minute, we have a

21   problem here."

22              So it can happen on both sides.

23   BY MR. CROSS:

24       Q   I think you testified a moment ago that

25   with DREs, there would be no way to determine

1    whether a vote was flipped because there's no paper

2    trail.  But that's true of BMDs as well, right?

3         If a voter comes and says, "Hey, this

4    ballot flipped my vote," the poll worker has no

5    ability to determine whether that's accurate looking

6    at the ballot or looking at the BMD, right?

7         A    In the current state, meaning the current

8    state of BMDs, if that was to happen, the poll

9    worker could not determine if it was a mistake on

10   the voter's part or the -- an error or anything like

11   that.  I don't know how they would determine it by

12   just looking at the paper itself.

13            MR. MILLER:  David, I'm not sure where you

14   are on your outline, but at an appropriate time, I

15   think a short lunch break might be good.

16            MR. CROSS:  Sure.  We're almost at a

17   breaking point.

18        Q    Do you mind just a few more minutes,

19   Dr. Gilbert?

20        A    I'm fine.

21        Q    Okay.  So take as an assumption based on

22   what I was able to look up that approximately

23   5 million voters voted in the presidential election

24   in Georgia in 2020.  Okay?

25        A    Okay.

1          Q   Do I understand correctly that it's your

2     opinion that if a small number, say as few as one, I

3     think you said, voters were to report to a poll

4     worker that they thought the BMD flipped their vote

5     in that election, you expect that that would spur

6     the state into an investigation to determine whether

7     the election system itself was hacked and flipping

8     votes.

9               Do I understand that right?

10              MR. MILLER:   Objection.   Misstates

11    testimony.

12              THE WITNESS:   Right.   That's -- okay.

13    What I'm saying is that a vocal person who had one

14    vote flipped could make a difference in getting an

15    investigation started.

16              Now, it's unlikely that only one would

17    speak up.   Based on the evidence of my study, I

18    don't think -- especially in 2020 in that

19    election -- and by the way, the 5 million that

20    you're quoting, if I'm not mistaken, that includes

21    both in-person and absentee ballots.

22              So I don't know what the total in-person

23    who actually voted with the BMD would have been.   I

24    don't know that tally.   But I don't think the

25    5 million is all BMD, if I'm not incorrect on that.

Page 134

1          But yeah, I think that what I'm getting
2     at, the point that I'm making is a small number of
3     individuals whose votes get flipped would speak up,
4     and this would -- I don't know what the protocols
5     are or the steps are.  Again, that's something we're
6     working on, what to do when this occurs.  But I
7     don't know what the scenarios are currently in place
8     for something like this.
9               MR. CROSS:  Let's go off the record.
10              THE VIDEO OPERATOR:  Okay.  Going off the
11    record at 1:08.
12              (Recess, 1:08 p.m. - 1:45 p.m.)
13              THE VIDEO OPERATOR:  Back on the record at
14    1:45.
15    BY MR. CROSS:
16         Q   Dr. Gilbert, we've talked about a couple
17    of ways that you've identified where hand-marked
18    paper ballots can be altered such as with changing
19    undervotes and overvotes, right?  We talked about
20    that today?
21         A   Right.
22         Q   That can only happen after the ballots
23    have been tabulated in a system where the ballots
24    are tabulated on the scanner in the polls, right?
25         A   It happens whenever the opportunity

1    presents itself.  So it depends on the precinct and

2    how they handle their ballots.  If they -- do the

3    voters automatically do it?  Is it a centralized

4    tally?  It just depends on the scenario.

5         Q   So let's talk about a specific scenario, a

6    scenario in which Georgia has voters vote on

7    hand-marked paper ballots at the polls.  That voter

8    takes that ballot, walks over to the scanner in

9    exactly the way they do today, and puts it into the

10   scanner themselves.

11        The only way that that vote could be

12   altered or that ballot could be altered in the way

13   that you've described would be after it runs through

14   the scanner and is tabulated, right?

15        A   In that particular scenario, that seems to

16   be the case.

17        Q   And so whatever alteration might happen to

18   that ballot after it's tabulated would not affect

19   the outcome of that election based on the results

20   that come out of the tabulation of the ballots,

21   right?

22        A   Not necessarily.

23        My understanding is that certain margins

24   require an audit or recount; therefore, it would

25   have an impact.

Page 136

1     Q    Only if it was within the margin that
2     required an audit or a recount, right?
3     A    On that scenario, I think that's right.  I
4     haven't thought this in detail to see if there's a
5     way to circumvent direct insertion into the scanner,
6     but my initial thoughts are yes.  If it's outside
7     the margin, it would -- no one would know that it
8     was modified and it would never get tallied as
9     modified.
10    Q    And because Georgia law doesn't provide
11    any provision whereby a different result in an audit
12    allows the election results to be set aside, even
13    if -- even if the audit comes up with a different
14    result because of manipulation after the ballot is
15    initially tabulated, there's no way to change the
16    election outcome, right?
17              MR. MILLER:  Objection.  Calls for a legal
18    conclusion.
19              THE WITNESS:  I don't know.
20    BY MR. CROSS:
21    Q    That's not something you've considered for
22    your opinions in this case; is that fair?
23              MR. MILLER:  Same objection.
24              THE WITNESS:  I don't -- again, I'm here
25    to talk about ballot-marking devices and not the

Page 137

1     policies and protocols that the state has adopted.
2              I'm not familiar with how that would work
3     as far as what the rules are on that particular
4     case, so I don't know.
5     BY MR. CROSS:
6         Q   How can you offer an opinion on whether
7     the state should continue to use its BMDs without
8     understanding the particular policies and protocols
9     that are in place in the state to secure that system
10    and to verify that votes are counted as intended?
11             MR. MILLER:  Objection.  Misstates
12    testimony.
13             THE WITNESS:  I can offer an opinion on
14    the technology with respect to its security,
15    accessibility, usability, in the context of voters
16    and common protocols.  And, you know, as far as
17    policies around, you know, audits, what triggers an
18    audit and things like that, that's not my area, and
19    how that would work, I don't know.
20             So that's how I can give expertise in this
21    matter.
22    BY MR. CROSS:
23        Q   When you say you can offer an opinion on
24    the technology with respect to its security, you
25    don't mean cybersecurity, right?

1       A    Again, I am an expert in election

2   security.  I am not using the term "cybersecurity."

3            Could you define "cybersecurity" as it

4   relates to elections?

5       Q    That's exactly what I was going to ask

6   you, Dr. Gilbert.

7            When you say that you're an expert in

8   election security but not cybersecurity, what's the

9   distinction you're drawing?

10      A    Cybersecurity would be, like, hacking

11  banks.  Typically, as an example, people who hack a

12  bank and steal money, that's an area that I would

13  classify as cybersecurity.

14           Election security involves paper ballots

15  and overvote hacks, as I described, or undervote

16  hacks.  Cybersecurity doesn't involve paper at all.

17  Election security does.

18           So those are just some examples of

19  differences from my perspective.

20      Q    So you're an expert on election security

21  with respect to, like you said, things like hacking

22  the paper, but not on the cybersecurity that gets to

23  the computer equipment that's used in elections?

24      A    No, I did not say that.  No.

25  Cybersecurity -- so this is a question.

Page 139

1            What you're saying, security as it relates
2       to computers is cybersecurity.  Is that what you're
3       saying?
4            Q    Yes.
5            A    I disagree.  No, I do not agree with that.
6            Q    You think cybersecurity is something other
7       than security that relates to computers?
8            A    No.  Cybersecurity relates to computers,
9       but not all computing situations are a form of
10      cybersecurity.  I don't view it that way.
11           Election security, election systems, I
12      would not classify as cybersecurity.
13           Q    Really?
14           A    Not all --
15           Q    You're going to stand by that?
16           A    I don't classify -- so valid marking
17      device security.  I could see, like, online voting.
18           Online voting, I could see people -- my
19      colleagues have always said that's cybersecurity
20      because it's a network and things like that.  I
21      don't -- I do not classify election security as
22      cybersecurity.  I would not call it that.  It's much
23      broader than just the computers.  I wouldn't do
24      that.
25           Q    Okay.  Don't election security experts,

1    like those in this case and others, routinely talk
2    about needing to address cybersecurity
3    vulnerabilities with election systems that use
4    computer equipment?
5         A    Yes, they do.  Absolutely they do because
6    they are cybersecurity experts.  Exactly.  Thank
7    you.  That's exactly right.  They I would classify
8    as cybersecurity experts.  They hack things that are
9    not election systems.  They work with computers that
10   are not election systems.  Yes.  I would classify
11   them as such.  Cybersecurity, that's who they are.
12        Q    But those same experts routinely work with
13   election security -- election systems and, in fact,
14   focus on election systems, many of them, right?
15        A    I wouldn't say "many."  I would say
16   Dr. Halderman may focus, but --
17        Q    What about Rich DeMillo?  Are you familiar
18   with him?
19        A    Vaguely.  I don't know what all Rich works
20   on, so I can't speak to Rich's background.
21             But there's so many of them who just tap
22   into elections when it's hot, but they're doing all
23   kinds of things in the cybersecurity space outside
24   of that.
25        Q    Are you familiar with Wenke Lee?

1        A    With who?

2        Q    Wenke Lee, W-E-N-K-E.

3        A    I don't think so.

4        Q    Are you familiar with the SAFE Commission

5    in the State of Georgia?

6        A    I've seen it, but I don't know much about

7    it.

8        Q    Are you aware that when Governor Kemp was

9    Secretary of State, he created a commission called

10   the SAFE Commission which was supposed to look at

11   whether to -- one of the things it was supposed to

12   look at was whether to replace the DRE system with a

13   new election system that would be secure and

14   reliable and how they might do that?

15            MR. MILLER:   Objection to form.

16   BY MR. CROSS:

17       Q    Have you ever heard of that?  Do you know

18   what I'm talking about?

19       A    I don't think so.

20       Q    Do you consider yourself a computer

21   scientist?

22       A    Yes.  I have a Ph.D. in computer science

23   and a master's degree in computer science.

24            (Exhibit 4 was marked for identification

25            and is attached hereto.)

Page 142

1    BY MR. CROSS:

2         Q    Grab the next -- it's going to be

3    Exhibit 4.  It should pop up.  Just let me know when

4    you have it.

5         A    Okay.  I found it.  Exhibit 4, got it.

6         Q    Do you see that this is an article

7    entitled "Why computer scientists prefer paper

8    ballots," published on January 10 of 2019?

9         A    Okay.  I see it.

10        Q    Do you see the author is indicated as

11   Wenke Lee, a professor at Georgia Tech?

12        A    Okay.

13        Q    Do you see that he indicates here, "Today,

14   Georgia's 'Secure, Accessible and Fair Elections

15   (SAFE) Commission' delivered to the state

16   legislature a final recommendation for new, more

17   reliable election equipment"?

18             Do you see it?

19        A    Yes, I see that.

20        Q    And he goes on to say, "I was honored to

21   serve as a cybersecurity expert for the SAFE

22   Commission to help improve a process at the very

23   core of democracy - secure elections and the right

24   to a private vote."

25             Do you see that?

Page 143

1          A    Yes.

2          Q    And do you understand that when Governor

3    Kemp was the Secretary of State, he personally

4    selected Wenke Lee to serve as a cybersecurity

5    expert on the SAFE Commission specifically to help

6    determine a more -- new and more reliable election

7    equipment?

8          A    Okay.

9          Q    Do I understand correctly that you think

10   cybersecurity experts don't have the necessary

11   expertise to opine on election security?

12              MR. MILLER:  Objection.

13              THE WITNESS:  No, I never said that.  No,

14   that's incorrect.

15   BY MR. CROSS:

16         Q    In fact, we agree that cybersecurity

17   experts like Wenke Lee, Dr. Halderman, Dr. Appel,

18   have the necessary expertise to evaluate the

19   security of election equipment like BMDs in Georgia,

20   right?

21              MR. MILLER:  Object to form.

22              THE WITNESS:  No, I didn't say that,

23   either.

24              Dr. Appel, Dr. Halderman, I would agree

25   with.  I know them.  I don't know Dr. Lee and his

Page 144

1    background, so I cannot speak to his credentials.

2         The fact that he was appointed to some

3    commission and given a title does not guarantee he

4    knows what he's doing or his credentials.  So I

5    can't speak to that.  I'm sorry.

6    BY MR. CROSS:

7         Q    No, no.  That's fair.  That's fair.

8              You're not disputing that experts like

9    Dr. Halderman and Dr. Appel have the necessary

10   computer science expertise to evaluate the security

11   of election systems like that used in Georgia,

12   right?

13        A    No, I do not dispute that.  In fact, if I

14   was asked the question, "I have an election system.

15   We need someone to evaluate the security of it to

16   find vulnerabilities," at the top of my list would

17   be Appel, Halderman.  That's where I would start.

18        Q    Now, if you look here, if you continue on

19   in Exhibit 4, Dr. Lee goes on to say, "I ultimately

20   chose to vote against the Commission's final report

21   even though we agreed on many points."

22              Do you see that?

23        A    Yes.

24        Q    If you go to the next paragraph, he

25   writes, "The SAFE Commission was charged with

Page 145

1    studying options for Georgia's next voting system."

2            Do you see that?

3        A    Yes.

4        Q    Do you understand that the SAFE Commission

5    recommended the BMD system that ultimately was

6    adopted by the state, a BMD system with QR codes?

7        A    Okay.  I guess so.

8        Q    You just don't know one way or the other?

9        A    Yeah, I don't know one way or the other.

10       Q    Do you know whether Dr. Lee objected as

11   the cybersecurity expert on the SAFE Commission to

12   the state adopting the BMD system that it has today?

13       A    Until today, I don't think I've ever heard

14   that name, so I cannot say that I know.

15       Q    So before today, were you aware that the

16   state previously engaged two election security

17   experts, Michael Shamos and Wenke Lee, and both of

18   them advised against the election system, the BMD

19   system that the state uses today?

20           MR. MILLER:  Object to form.

21           THE WITNESS:  I was not aware of that.

22   BY MR. CROSS:

23       Q    Before today, you were not aware that you

24   were the only election security expert the state has

25   engaged -- of the election security experts the

Page 146

1    state has engaged who still endorses the system

2    that's used today?  You didn't know that?

3         A   No, I didn't.  I was not aware of that.

4         Q   Does that affect your opinions at all on

5    whether the -- the state should continue to use the

6    current election system in some form?

7         A   No, it doesn't.

8             And just point of verification.  If I'm

9    not mistaken, Dr. Halderman's declaration did not

10   say that -- they said keep the system, but only have

11   people with disabilities use it.

12            So they didn't reject using it in the

13   state.  Is that correct?

14        Q   Well, that's a question for Dr. Halderman,

15   and I'll let him answer that.  I'm happy to give you

16   my understanding, but I suspect Mr. Miller does not

17   want me to testify here today.

18        A   So let me make it a broader question.

19        Q   Okay.

20        A   Can you find me the election security

21   expert who says that BMDs should not be used by

22   anyone ever?  Find me that individual.

23            Because my understanding, Appel,

24   Halderman, the entire community was supportive of

25   them, but only for people with disabilities.

1           But I would appreciate if you could

2    document for the record who Wenke Lee or whoever --

3    find me the individual that says they should not be

4    used by anyone.

5           Q    Is it your understanding that election

6    security experts like Dr. Halderman and Dr. Appel,

7    that they support the use of reasonably secure BMDs

8    for those who need them, but they otherwise think

9    that hand-marked paper ballots are the most reliable

10   election system?

11          Is that a fair statement of how you

12   understand their views?

13          MR. MILLER:  Object to form.

14          THE WITNESS:  I would -- I think they

15   would say hand-marked paper ballots should be used

16   by everyone except people with disabilities.  I

17   think that's where they stand on this.  BMDs should

18   only be used by people who have a disability.

19   BY MR. CROSS:

20          Q    But you understand --

21          A    That's my understanding.

22          Q    And you understand their view, though, is

23   not just any BMDs, but the BMDs themselves still

24   should be reasonably secure and reliable, right?

25          A    I hope, Mr. Cross, that you are right.  I

Page 148

1     would like to make sure this is known on the record,

2     what you just said, which is that Dr. Halderman,

3     Appel, et cetera, have a notion of a secure or

4     reasonably secure BMD.

5             I have never heard them use that language,

6     and I would love to see documentation of what they

7     see as a secure, reasonably secure BMD.

8        Q    It's your position that Dr. Halderman and

9     Dr. Appel have never offered an opinion that BMDs

10    can be appropriate for those who need them, people

11    with particular disabilities?

12       A    It's my opinion that Dr. Halderman -- none

13    of them -- no one on the election security side, who

14    comes from a cybersecurity background in particular,

15    has ever declared any computing system secure as far

16    as I know, especially in elections.

17            So I would love to see Dr. Halderman or

18    any of them document what is a reasonably secure

19    BMD.

20       Q    You understand evaluating the

21    reasonableness of the security of a BMD when it's

22    used for only a very, very small portion of voters

23    is a different analysis than when it's used for all

24    voters, right?

25       A    I understand that's the ideal situation

1    that they propose.

2              But as in my declaration, I made it clear,

3    for example, BMDs have empowered people with

4    disabilities.  And in many places, the number of

5    people who vote on a BMD with a disability exceeds

6    the margin of victory.

7              So as I explained, that actually weakens

8    election security because that's an easier target.

9              So again, I would love to see, if it

10   exists, any of them to tell me what is a reasonably

11   secure BMD for people with disabilities.  What would

12   they accept?

13        Q    Well, how about a BMD that addresses all

14   the vulnerabilities that Dr. Halderman has

15   identified with the Dominion BMD?

16        A    Again, I would love to have Dr. Halderman

17   on the record saying that.  I don't believe -- so I

18   could be wrong, but I don't believe he can say that.

19   I don't think he will say that.

20              Dr. Halderman's expertise is breaking

21   things.  If something is fixed, I don't think he's

22   happy with that.  So I would love to see any of

23   them -- find me one of your experts that's willing

24   to document what a reasonably secure -- even if we

25   address them, I suspect they would say it's possible

Page 150

1      to address them maybe.  They may say that as a way
2      to avoid that.  But there's no way they would claim
3      a reasonably secure BMD.
4              If such a scenario existed, meaning they
5      actually believed there was something reasonable,
6      that would have been documented by now.  We've been
7      doing -- dealing -- going around in this case alone
8      for how many months, and they've never proposed that
9      or never said that.
10             Q   So how about paragraph 17 of Dr. Appel's
11     reply declaration where he points out that
12     "Dr. Gilbert discusses the use of BMDs by voters
13     with disabilities.  Indeed, voters with severe or
14     total vision impairment will have difficulty
15     verifying a BMD printed ballot.  Therefore, voters
16     with disabilities who use a BMD are at least as
17     vulnerable to BMD hacking as any other voters.  In
18     my opinion, it would be a reasonable policy to
19     preserve several options for voters with
20     disabilities.  Voting by mail on a hand-marked paper
21     ballot, perhaps with the assistance of a person they
22     trust to mark the ballot, voting by BMD, and so on.
23     But that is not a reason to needlessly subject
24     voters who can mark a paper ballot by hand to the
25     risk of their vote being stolen by computer

1    hacking."

2            Do you recall reading that in his

3    declaration?

4        A   Vaguely.  I don't know if I read it, but

5    we talk a lot, so I've heard him say those things

6    before.  And I always reply the same way.

7            If it's okay for me to have someone mark

8    my ballot on my behalf, how would you like it if we

9    required everyone to have that?  Why is it okay for

10   one population but not another when it's perfectly

11   capable of marking their ballot independently?

12           So again, it doesn't address the issue

13   that I point out, which is that because the number

14   of people with disabilities is increased, your

15   original question here dealt with a small number of

16   people, but that has exploded.

17           The two paces out of the two in the sense

18   that these people have been empowered, and now they

19   vote in larger numbers, which exceeds a lot of

20   margins of victory.

21       Q   Let's pause on that because you keep

22   saying that, and it's just not accurate, as

23   Dr. Appel points out in his declaration, right?

24           You're using an overall aggregate number

25   of people with disabilities voting in elections

Page 152

1    rather than looking at the number who actually need
2    to vote on BMDs, right?
3        A    No.   I don't -- there's data that comes
4    out of Rutgers that records how many people vote
5    with a disability.   We've gotten that data in the
6    past.  I don't have that off the top of my head.
7        Q    A disability of any kind, right?
8        A    I have to go look, but it may be
9    disability of any kind.
10       Q    In fact, if you look at your declaration,
11   and look at paragraph 14, you indicate that Georgia
12   has an estimated 700 -- sorry.  Try that again.
13           You state that "Georgia has an estimated
14   797,000 eligible voters that are disabled, and their
15   recent report estimates that disabled voters'
16   turnout rate was 62.8 percent of those Georgians who
17   voted in 2020."
18           Do you see that?
19       A    Yes.
20       Q    You go on to say that "In 2020
21   approximately 500,516 disabled Georgians voted in
22   2020.  This number is, of course, well beyond the
23   margin of victory in the presidential election,"
24   right?
25       A    Yes.

1      Q    As Dr. Appel points out in his response,

2   that is remarkably misleading because only a tiny

3   fraction of those people with disabilities could not

4   vote on hand-marked paper ballots.

5           That is a fact; right, sir?

6      A    No, I don't agree with that.  Because at

7   the same time, he's actually making another error,

8   which is, there are people who don't have a

9   proclaimed disability who also need it, but they

10  don't say they have a disability.

11          So to say that there are people with a

12  disability who don't need it, you don't -- you've

13  got to account for the people who claim they don't

14  have one who do need it.

15     Q    Where in your declaration do you identify

16  specifically the number of voters who voted in the

17  2020 election in Georgia who have a disability that

18  would make it impossible for them to vote on a

19  hand-marked paper ballot?  Where can I find that

20  number?

21     A    That number is not in my declaration.  And

22  where in Dr. Appel's rebuttal does he give the

23  specific number of people who use the machine who

24  had a proclaimed disability who did not need it?  Is

25  that number documented by Dr. Appel?

Page 154

1          Q    You don't think it's misleading to suggest
2     that all voters who identify as disabled have to
3     vote on a BMD?
4               MR. MILLER:   Objection.  Asked and
5     answered.
6               THE WITNESS:   I do not think it's
7     misleading to say that.  I'd say it is correct to
8     say that all voters with a disability have the right
9     to a private vote, and the BMD gives them that
10     ability.
11               For example -- here's another scenario I
12     will give you that Dr. Appel would miss, and I
13     suspect many of your experts.  There are people with
14     cognitive disabilities.  Those individuals voting on
15     paper is much more of a challenge or impossible for
16     some of them.
17               We use Prime III, our open source voting
18     system, with a group, an organization, that
19     represents people with cognitive disabilities.
20               So I'm fully aware that this is the
21     scenario, meaning there are individuals who appear
22     to not need this type of engagement, but they do.
23     BY MR. CROSS:
24          Q    Again, you understand Dr. Appel, in
25     responding to you, specifically said that voters

Page 155

```
 1    with disabilities should be allowed to vote by BMD
 2    if that's what they need or choose.
 3              There's no disagreement between you and
 4    him on that, right?
 5        A    Voters -- there's no disagreement that
 6    voters with disabilities have that access.  There's
 7    no disagreement on that.
 8        Q    In terms of the accuracy of what you're
 9    saying about disabilities, Dr. Gilbert, I will tell
10    you, I was born without a left hand.  I am disabled.
11              Would you include me among your voters who
12    has to have a BMD, who cannot vote on a hand-marked
13    paper ballot?
14        A    I don't include anyone.  That's a judgment
15    to the voter who would be doing that.
16        Q    In fact, you include everyone.  You
17    include everyone who identifies as disabled in
18    paragraph 14 of your report, which is misleading,
19    isn't it, sir?
20              MR. MILLER:  Objection.
21              THE WITNESS:  No, it's not misleading,
22    because all of them may -- we don't -- you can't --
23    you asked me the question, where in my report did I
24    document the number that needed it.  So I posed a
25    question, where in those numbers can you identify
```

1    those that do not?  How do you know that all of them

2    did not need it?

3    BY MR. CROSS:

4         Q   But you understand in an election system

5    that allows hand-marked paper ballots as one option,

6    BMDs as another option, that anyone who has a

7    disability that needs a BMD would have that

8    available to them as a choice, right?

9         A   That's the presumed assumption.  And in my

10   declaration, I clearly said when those scenarios

11   happen, what's called a separate but equal

12   connotation, that doesn't play out well, and I

13   explain that in my declaration.  I can elaborate on

14   that if necessary.

15        Q   You understand that many jurisdictions, in

16   fact most jurisdictions in the country that use

17   BMDs, use them in the way I just described for

18   people with disabilities and most voters vote on

19   hand-marked paper ballots; you're aware of that,

20   right?

21        A   Yes, I'm aware of that.

22        Q   Can you point to any situation where votes

23   have been stolen, altered, or election outcomes have

24   been altered in those jurisdictions?

25        A   I am not aware of any situation that is

Page 157

1    evident of votes being stolen, altered, by a BMD in
2    the United States of America.
3          Q    Given your view that BMDs, even as they
4    are right now, are sufficiently reliable, then how
5    does it hurt people with disabilities who vote on
6    BMDs to continue to do that in a world where other
7    voters vote on hand-marked paper ballots since you
8    say the BMDs are just as reliable, if not more so?
9               MR. MILLER:  Objection to form.
10              THE WITNESS:  Because when you go to the
11   polling, this is documented.  When people -- when
12   the disability go to a polling place, the accessible
13   voting machine is set aside, and it's not set up in
14   a lot of cases because it would get infrequent use
15   in some places.  That's scenario one.
16              Scenario two, if you believe in
17   Dr. Halderman and others that the machines could be
18   compromised, if I'm an adversary, I definitely want
19   to try and target them now because, again, the
20   margins of victory could be small enough such that
21   it's easy to target a person who can't read a ballot
22   at all and have them produce a paper ballot.
23              So by having a diversity of people using
24   that same approach, you at least have the chance, as
25   I mentioned earlier, to have someone identify and

1     say, "No, no, this is misbehaving," whereas if it's

2     only people with a disability using it, your chances

3     of success of an attack are increased.

4     BY MR. CROSS:

5          Q    I'm getting confused here, Dr. Gilbert.

6               You're saying that there were hundreds of

7     thousands of disabled Georgians who voted in 2020

8     where you suggest some significant number or maybe

9     all of them need a BMD, but you say in a world where

10    they have the choice of hand-marked paper ballots or

11    BMDs, BMDs are infrequently used.

12              Why are BMDs infrequently used when

13    there's a choice if there are hundreds of thousands

14    of voters who need them?

15         A    It depends on the precinct.

16         Q    The reality is that we have -- in

17    jurisdictions that allow both BMDs and hand-marked

18    paper ballots, as you rightly point out, there is

19    infrequent use of the BMDs because there actually is

20    a very small number of voters who need them and

21    choose to use them when they have the choice; right,

22    sir?

23              MR. MILLER:  Objection to form.

24              THE WITNESS:  I don't agree with that.  It

25    depends on the precinct.  It varies.

1    BY MR. CROSS:

2         Q    And that is true for most precincts.

3    That's literally the concern you just testified to,

4    is the infrequent use of them when there's a choice,

5    right?

6         A    No, no.  That's -- no, you're putting

7    words in my mouth.

8              What I said, there are -- it depends on

9    the precinct.  There are precincts that get low

10   utilization, but there are others that would get

11   higher utilization.

12        Q    Where can I find that data in your

13   declaration?

14        A    It's not in my declaration, but the

15   reference is there to Rutgers.  That's the source.

16             So if you needed that, I would go to

17   Rutgers and get that.  I would gather to say, in

18   particular -- Rutgers is in the city -- I bet you

19   they -- the cities in particular would have higher

20   turnouts and uses of this equipment.

21             So it varies.  There's a variance

22   depending on where you are.

23        Q    So it's your opinion that every

24   jurisdiction in the country that has hand-marked

25   paper ballots as the primary option and BMDs as an

Page 160

1      option for those who need them as a disability or

2      otherwise choose to use them, those jurisdictions

3      should not be handling elections in that way; that's

4      your opinion; is that fair?

5               MR. MILLER:  Objection.  Misstates

6      testimony.

7               THE WITNESS:  My opinion, I would prefer a

8      uniform BMD approach.  That would be my

9      recommendation.

10     BY MR. CROSS:

11        Q   We talked earlier about -- I think I may

12     have gotten the math wrong so I want to come back to

13     this.

14               I gave you an election situation where the

15     differential was 20,000 votes.  Candidate A wins

16     20,000 votes over Candidate B.  And I said to flip

17     that you'd have to alter over 10,000 votes.

18               Do you remember this discussion?

19        A   Yes.

20        Q   But actually using the hack that you've

21     described with hand-marked paper ballots where

22     you're affecting an undervote or overvote, you

23     actually would have to flip more than 20,000 --

24     you'd have to alter more than 20,000 ballots, right?

25     Because it's not a situation where you're changing a

Page 161

1    vote, right?

2         A    It depends on which attack.  If it's the

3    undervote attack, then you've got to fill in the

4    oval for 20,000.

5         Q    We talked a lot about ballot design

6    issues, and you've given examples where, like in

7    Florida, they were able to look at the ballot design

8    and conclude that the design itself led to some

9    confusion with voters; is that right?

10        A    Not only confusion, but it led to them

11   making an inappropriate selection.

12        Q    And a ballot design problem like that is

13   assessed by looking at the ballot, looking at the

14   design.

15             Do I understand that right?

16        A    That's one aspect of it.  And then you

17   could test it with particular voters or users.  Yes.

18        Q    And you referred to that in your

19   terminology of hacking as a type of hack, right?

20        A    Yes, I call that a hack.

21        Q    Now, a hack that includes malware embedded

22   in computer election equipment, like a BMD, that's

23   not something that a poll worker or an election

24   worker, election official, could evaluate just by

25   looking at a ballot or a machine, right?

Page 162

```
1         A   I don't understand your question.
2         Q   If there's malware embedded in an election
3    in a BMD that's flipping votes, okay, changing the
4    QR codes, for example --
5         A   Okay.
6         Q   -- you couldn't identify that hack by just
7    looking at the face of the ballot in the way that
8    you can with a ballot design problem, right?
9         A   Can you identify by -- so what you're
10   saying is there's malware on a BMD, and it printed a
11   ballot with a QR code.  Could you look at that
12   ballot that it printed and determine that malware is
13   on the BMD?
14        Q   Yes.
15        A   That's your question?
16        Q   Yes.
17        A   Yes, you can.
18        Q   And how would you do that?
19        A   If the QR code does not match the
20   human-readable text, there you go.
21        Q   But you couldn't do that by looking at the
22   face of the ballot.  You'd actually have to run the
23   ballot through a tabulator, then look at what was
24   tabulated on the scanner, and then go back and read
25   the human-readable portion and compare the two,
```

Page 163

1    right?

2         A    Yes.   You have to compare -- you have to

3    scan it and compare.

4         Q    Okay.   I guess this is something we talked

5    about earlier.   I want to make sure we're on the

6    same page.

7              Do you understand that the auditing that

8    Georgia has done to date is what's called a ballot

9    polling audit?

10        A    Okay.

11        Q    Are you familiar with ballot polling

12   audits?

13        A    No, not -- I've heard the term, so you

14   could refresh my memory.

15             Again, I'm not an expert in audits so this

16   wouldn't be something that I would have in my

17   memory.

18        Q    Let me ask it this way:   Do you understand

19   that the way Georgia has done audits, including for

20   the presidential election in 2020, it does not

21   compare the printed paper ballot to the cast ballot

22   record that's reflected in the tabulation data?

23        A    I don't know.   I mentioned I'm not an

24   expert in audit.   That's not my area.   I can't speak

25   to -- to audit.   That's just not what I do.

1      Q   You don't know whether that's done in

2  Georgia or not?

3      A   I don't know.

4      Q   I asked you earlier about whether an audit

5  could determine whether a specific ballot was cast

6  as the voter intended.  Can an audit do that, or you

7  just don't know one way or the other?

8          MR. MILLER:  Objection.

9          THE WITNESS:  Can an audit determine if a

10  specific ballot was cast as the voter intended?

11          I'm not following what that means.  That

12  doesn't make sense to me.

13  BY MR. CROSS:

14      Q   Okay.

15      A   A proper audit should -- should result in

16  looking at a ballot where the voter intent is clear.

17          Now, with hand-marked paper ballots, we

18  know you can have stray marks and other things, and

19  the determination of what the intent is is

20  determined by the auditor.

21          That doesn't happen in a ballot-marking

22  device where you have a ballot summary.  If you're

23  looking at the human-readable portion, I have yet to

24  see anyone declare that there's ambiguity about that

25  mark.  And the only ambiguity that happens is the

Page 165

1    claim that, "Well, we don't know if they verified
2    it."
3              So I would challenge anyone to say, "Okay.
4    Now I've created a technology that I can give you
5    the verification.  Now tell me how that's
6    ambiguous."  Whereas hand-marked paper ballots, I
7    could show you examples of ambiguity where it's
8    determined by the auditor.
9         Q    But you understand that the human-readable
10   portion of a BMD ballot also can be changed by
11   malware, for example, that then it does not reflect
12   the intended selections of the voter, right?
13        A    How?
14        Q    Well, in any of the ways that
15   Dr. Halderman identifies in his report.
16        A    Oh, okay.  If -- again, if it's malware
17   that changes it, and the voter verifies it, and then
18   they spoil it and do it over and get it right, there
19   is no ambiguity.  We have 100 percent confidence
20   that there's no -- it's an unambiguous result when
21   it's verified.  That's the statement I'm making.
22   Maybe that will help.
23             Ballot summaries from ballot-marking
24   devices yield an unambiguous result, whereas
25   hand-marked paper ballots can result in ambiguous

Page 166

 1    results that have to be interpreted by an auditor or
 2    third party.
 3         Q    Again, we know from studies like the Rice
 4    study and the Michigan study and the study
 5    commissioned by the Georgia Secretary of State that
 6    the vast majority of voters do not actually verify
 7    their ballots before they cast them from a BMD,
 8    right?
 9              MR. MILLER:  Objection.  Asked and
10    answered.
11              THE WITNESS:  The studies speak for
12    themselves.
13    BY MR. CROSS:
14         Q    You don't dispute what I just said; right,
15    sir?
16              MR. MILLER:  Same objection.
17              THE WITNESS:  I don't dispute what you
18    said, but I dispute what the outcomes are and the
19    resolutions to those.
20              So in other words, we talked about trying
21    to implement interventions, and then we also
22    discussed that people who would notice would not
23    ignore.
24              I mentioned earlier the Hawthorne effect
25    that exists in studies.

Page 167

1    BY MR. CROSS:

2         Q    The audit that was done on the

3    presidential election in Georgia in 2020, do you

4    understand that they read the human-readable

5    portions of the ballots?

6         A    I guess so.  My understanding was that in

7    Georgia, they had multiple recounts which required

8    them to manually read all of them.  But okay.

9         Q    Are you aware of any steps the state or

10   any county took to test whether the QR code on any

11   specific ballot matched the human-readable language

12   on that ballot?

13        A    No, I am not aware of that.

14        Q    You understand that malware that flips the

15   QR code on a significant number of ballots, say

16   1,000 ballots, so that those ballots aren't counted

17   the way those voters intended, and the voters did

18   not have any ability to catch it because it's in the

19   QR code, an audit would still get to the same

20   election outcome, but those voters would be

21   disenfranchised on their individual ballots, right?

22        A    No.  If you change the QR code but the

23   human-readable portion of the text is correct and

24   you do an RLA, you would detect that.

25        Q    How would you detect that on those ballots

1       if you're not comparing the QR code to the

2       human-readable portion on any given ballot?

3              A    Okay.  So I will -- let me explain it this

4       way:  If the QR code has an improper selection in it

5       but the human-readable portion is correct, that

6       means the tally or scanner is going to give you the

7       wrong result, okay?  Do we agree on that?

8              Q    Hold on.  I lost you for a second.  Let me

9       just look at what you said so you don't have to

10      repeat it.

11             Yes.  Okay.

12             A    Okay.  So if you do an RLA on a

13      human-readable portion, that will catch that the

14      scanner had the wrong outcome.

15             Now, if I'm incorrect -- I know you have

16      Dr. Stark on your team -- I would pose this question

17      to him:  Please tell me the distinction between

18      hand-marked paper ballots that go through the

19      scanner with the correct choices on them but the

20      scanner gives you the wrong number, whereas a

21      scanner that has a QR code that's giving you the

22      wrong number, there is no distinction between them.

23      And I would love to have a debate with him or anyone

24      else to show me where there's a distinction.

25             And if he says that you cannot get to the

1    right result of the election with a scanner that is

2    correct and a QR code that is wrong and the

3    human-readable portion is the RLA, then he has a

4    flaw in the risk-limiting audit.  And I'd be happy

5    to have that conversation.  I think he's way -- I

6    think he's very smart, and I think he's right about

7    the RLA, so I defer to Dr. Stark that the RLA would

8    catch this.  If I'm wrong, he's wrong.

9         Q   You understand that the way the RLA

10   typically works is, it takes a statistical sample of

11   the ballots that are cast.  It doesn't look at every

12   single ballot in the ordinary course of an RLA,

13   right?

14        A   That is correct, but I would add to that.

15            I don't need to understand how the RLA

16   operationally works.  What I know is Dr. Philip

17   Stark has said on many occasions if you have

18   hand-marked paper ballots and they go through a

19   scanner and the scanner gives you the wrong result,

20   the RLA will give you the correct outcome.

21            If Dr. Stark is wrong, then you're right.

22   The QR code could not be corrected, and Dr. Stark is

23   wrong.

24        Q   You think he's wrong because the -- you

25   consider the hand-marked paper ballot less reliable

1    than the BMD because voters make mistakes on them?

2         A    No.   I'm saying Dr. Stark is right in the

3    sense that an RLA will catch a scanner that gives

4    you the wrong result.

5         Q    Okay.

6         A    And what I'm saying, the scenario that

7    you're giving me that the QR code is wrong but the

8    human-readable portion is right is no different than

9    the scanner giving you the wrong result.  It's the

10   scanner giving you the wrong result.  It's the exact

11   same thing.

12        Q    So let's -- let's back up for a second.  I

13   want to make sure we're on the same page.

14             In the ordinary course, an RLA uses a

15   statistical sample of votes -- of the ballots cast.

16   It doesn't look at every ballot, right?

17        A    Yes.  And let me just say, before you go

18   on to that, the protocol for the RLA I'm going to

19   say is not the point here.  I'm not disputing the

20   protocol.

21             What I'm saying is -- and I don't know how

22   to get you to understand this -- is that the scanner

23   gave me a wrong result with hand-marked paper

24   ballots.  Dr. Stark says the RLA will correct that.

25             I don't dispute that.  He is right.  He

Page 171

1    knows his stuff.  Our committees agree with that.  I
2    agree with that.
3                Now, what I'm saying is, your scenario of
4    a QR code that has a wrong result, but
5    human-readable portion that's used in the RLA is
6    scanned, I mean read, there's no difference between
7    that and a hand-marked paper ballot with a bad
8    scanner.  There is no -- those are identical
9    scenarios.
10               So if you're going to tell me that, "No,
11   no, no, no.  The RLA will not find -- get you a
12   correct result if the QR codes are wrong and the
13   human-readable portion is right," and that's what
14   you're using for the RLA, then Dr. Stark made a huge
15   error with the RLAs.
16               So I ask you, is Dr. Stark wrong?  Did we
17   get it wrong in the National Academies?  I'm not an
18   expert in this area.  I believe what my colleagues
19   were saying and what Dr. Stark said.
20        Q    Okay.  It's remarkable to me that we're
21   having this conversation, but let me see if we can
22   do this.
23               Do you understand that in a world where
24   there are hand-marked paper ballots, and there's --
25   and there is a problem with -- well, strike that.

Page 172

1     Let me figure out how to explain this.

2              In a world where the QR codes are used,

3     and malware flips the QR codes on thousands of votes

4     across the state, okay, and actually flips the

5     election outcome, that can be done by malware,

6     right?

7         A    Um-hum.  Um-hum.

8         Q    Okay.  Yes?

9         A    Yes.  Exactly.  Exactly.

10        Q    And what you're talking about on the

11    hand-marked paper ballots, are you suggesting that

12    those are also miscounted by malware in the scanner?

13        A    Exactly.  Exactly.

14        Q    Right.  But a hand-marked paper ballot

15    system eliminates -- it reduces the vector points by

16    which the election can be hacked because you can't

17    get malware into a BMD or a printer; we're agreed on

18    that, right?

19        A    Wait.  Wait.  So hand-marked paper

20    ballots, the malware -- if you're injecting malware,

21    it will be in the scanner.

22        Q    Right.  So the hand-marked -- with the

23    hand-marked paper ballot system, there are fewer

24    vector points or entry points for malware because

25    you don't have two pieces of computer equipment that

Page 173

1    are used with BMDs, both the BMD and the printer,

2    right?

3         A    Technically, there are fewer points of

4    computing devices as it relates to a hand-marked

5    paper ballot versus a BMD.

6         Q    Right.  Now let's come back to where we

7    were.  I'm trying to get to a simple point.

8              An RLA is designed to confirm election

9    outcomes.  It is not designed or capable of

10   confirming that an individual ballot counted the way

11   it was intended, right?

12        A    I'm fine with that.  Again, I -- go ahead.

13   I'm trying to understand your point.

14             I don't think you're understanding my

15   point about the RLA as it relates to hand-marked

16   paper -- the scanner giving you the wrong number

17   because it was hand-marked or if it gave you the

18   wrong number because of the QR code.  No matter

19   what, it gave you the wrong number.

20             And again, Dr. Stark, who is very well

21   respected when it comes to these areas, and our

22   committee acknowledged that, and I find it hard to

23   believe that he would be wrong about this.  I don't

24   think he's wrong.

25        Q    I understand what you're saying.  We're

Page 174

1      getting at different points, but I understand what
2      you're saying.
3            I asked you earlier, in a scenario where
4      an RLA finds a different election outcome than the
5      one that was reported, and I said, "Doesn't that
6      mean that those voters who had their votes altered
7      were disenfranchised?"
8            You said, "No, because the RLA has caught
9      the problem."
10           But again, in the State of Georgia, there
11     is no legal authority that allows that election to
12     be rerun.  The mere fact that the RLA got to a
13     different result doesn't mean that those voters are
14     not disenfranchised, right?
15           MR. MILLER:  Objection.  Calls for a legal
16     conclusion.
17           THE WITNESS:  I have no comment on that.
18     I don't -- again, I -- I'm not an expert in Georgia
19     election law and protocol.  That's not what I do.
20     I'm sorry.
21     BY MR. CROSS:
22        Q   Right.  So you're not offering an opinion
23     in this case that RLAs can ensure that any voter
24     avoids being disenfranchised by a compromise of the
25     election system in Georgia, right?

Page 175

```
 1        A    I don't understand that question.
 2             If we had 100 percent hand-marked paper
 3     ballots and you did an RLA and you got a different
 4     result than the scanner, according to what you're
 5     saying, the State of Georgia would not allow the new
 6     result.  Is that correct?
 7        Q    I really need you to focus on what I'm
 8     asking you here, Dr. Gilbert.  At some point we may
 9     just have to call the judge.  I'm trying to avoid
10     that.  I need you to focus.  I get you want to talk
11     about your points and hand-marked paper ballots.
12     I'm asking you specific questions.
13             My question is this:  Are you offering an
14     opinion that RLAs in the State of Georgia offer
15     voters assurance that they will not be
16     disenfranchised if the current election system is
17     hacked and their votes are changed?
18             Is that an opinion you are offering in
19     this case?
20             MR. MILLER:  Objection.  Calls for a legal
21     conclusion.
22             THE WITNESS:  I still don't understand.  I
23     don't understand.  I don't understand.  Again, I
24     don't understand how to answer that question because
25     it just doesn't make any sense to me.  I don't know
```

1    what you're asking me.  It just doesn't make any

2    sense.

3              I don't understand Georgia law, and I

4    can't say what Georgia law should be.  I don't know.

5    I don't know how to answer that question.

6    BY MR. CROSS:

7         Q    Okay.  In response to the findings that

8    Dr. Halderman has in his July 1 report, haven't you

9    said that some of the precautions that the state

10   could and should adopt -- I think you identified two

11   things earlier.  One was prompting voters to verify

12   their ballots before they're tabulated, and two are

13   audits, right?

14        A    Yes.

15        Q    Okay.  So what I'm asking you is, isn't it

16   a fact that an audit does not actually remedy or

17   protect the vote of any voter against any of the

18   hacks that Dr. Halderman identifies?  Because the

19   audit is not going to -- even if the audit gets to a

20   different election outcome, there's no mechanism in

21   Georgia law to reverse the outcome of that election.

22              MR. MILLER:  Same objection.

23              THE WITNESS:  Is that a question?

24   BY MR. CROSS:

25        Q    Yes.

1        A    Again, I don't know how to answer that.

2             I think what you're saying is, if an

3   election happens in Georgia and you get a result

4   from the machines, and then you do an audit and you

5   get a different result, you cannot change the

6   outcome of the election.

7             Is that what you're saying?

8        Q    I'm asking, are you aware of a mechanism

9   in Georgia law that would allow the outcome of the

10  election to be changed in that scenario?

11            MR. MILLER:  Same objection.

12            THE WITNESS:  I am not aware of anything

13  in Georgia law that relates to that.  No.  As I have

14  said several times before, my expertise is not in

15  Georgia law.  It's not in election law.  That's not

16  what I do.

17  BY MR. CROSS:

18       Q    So then what is the basis for your opinion

19  that running audits in Georgia would prevent voters

20  from being disenfranchised if the audit finds a

21  different election result than the one that was

22  reported?

23       A    That's not what I said.

24            MR. MILLER:  Objection.

25            THE WITNESS:  I said I recommend audits as

1    part of the National Academies report as something

2    we recommend as a best practice, the best way to

3    secure elections.  That's what we said from our

4    report.

5    BY MR. CROSS:

6        Q    Okay.  So you are not offering an opinion

7    that audits can keep voters from being

8    disenfranchised when their votes have been altered

9    by a hacking of the system?

10            MR. MILLER:  Objection.  Calls for a legal

11    conclusion.

12    BY MR. CROSS:

13        Q    That's not an opinion you're offering,

14    right?

15        A    I'm not talking to -- still, I don't know

16    what you're -- I think what you're saying is, if it

17    turns out that the scanners give you the wrong

18    number and you do an audit, you cannot change the

19    election.

20            I don't have -- I don't know that about

21    Georgia law.  I don't have a recommendation.  That's

22    not what I do.

23        Q    Okay.

24        A    I can recommended some political

25    scientists here at the University of Florida who are

Page 179

1    experts in that area if you need.  That's not my
2    expertise to recommend that.
3           I'm giving you a recommendation that came
4    from a National Academies committee; that we took
5    the time to do this evaluation, and we recommended
6    the audit.
7           And I'm sticking to that recommendation
8    that was grounded in work on a risk-limiting audit
9    created by Dr. Philip Stark who I, again, trust that
10   he had it right.  And if that's incorrect, I'm
11   sorry, but that's the recommendation that came out
12   of our report, and that's what I'm giving you.
13          (Exhibit 5 was marked for identification
14        and is attached hereto.)
15   BY MR. CROSS:
16       Q   All right.  Dr. Gilbert, grab Exhibit 5,
17   which is Dr. Halderman's sealed report.
18          And I don't want you to read anything out
19   loud from this.  I just want you to go to a specific
20   page that has something public.
21          So once you've got it, let me know, and
22   I'll tell you where to go.
23       A   All right.  Found it.
24          MR. MILLER:  David, I presume, by the way
25   you phrased that, you're aware of this, but I just

Page 180

1      want to make sure, there are people on the line

2      other than --

3                  MR. CROSS:  Yeah.

4                  MR. MILLER:  Okay.

5                  THE WITNESS:  I have it.

6      BY MR. CROSS:

7           Q   Okay.  Go page to page 15, and you'll see

8      a copy of the Fayette County official ballot.

9           A   15?

10          Q   Page 15, and you'll see an image of --

11          A   Okay.  I got it.

12          Q   You have that in front of you?

13          A   Yes.

14          Q   Okay.  How many of the election selections

15     on that ballot are not Republican selections for the

16     candidates?

17          A   Wait.  Say that again.  I didn't --

18          Q   How many of the selections made on that

19     ballot are not Republican candidates that were

20     selected?

21          A   Are not Republican?  So count everyone

22     who's not a Republican?

23          Q   Correct.

24          A   I counted six.

25          Q   And point out the ones that you're

Page 181

1    identifying.

2         A    Okay.  Number one, Nathan Wilson.

3         Q    Okay.

4         A    Chris Pigors.

5         Q    Okay.

6         A    Yes, no, no, no.

7         Q    The other four are not candidate

8    selections, they're issue voting on a yes or no

9    basis; is that right?

10        A    Yeah.  They are not Republicans.  That's

11   correct.  They are not Republicans.

12        Q    Well, they're not any party.  They're a

13   selection of an issue, yes are no?

14        A    Well, you asked me to count the number of

15   not Republicans, and that's what I did.  Not

16   Republicans.

17        Q    Right.  I just want to make sure we're

18   talking about the same four things.  You're talking

19   about the four things that are at the end of the

20   third column, right?

21        A    Yes.

22        Q    So it's two constitutional amendments.

23   One is a statewide referendum, and one is Fayette

24   County School District homestead exemption.

25             Those are the four things you're talking

Page 182

1    about?

2         A    That is correct.

3              MR. CROSS:  Okay.  All right.  While we

4    have this up, anyone who does not have access to AEO

5    information needs to drop off, and I think that's

6    just Marilyn.

7              MR. MILLER:  David, how long do you think

8    you're going to go on this section of questioning?

9              MR. CROSS:  Do you want to take a break?

10             MR. MILLER:  Yeah.  If you're going to be

11   on it for a while, if you don't mind, just a

12   five-minute break.

13             MR. CROSS:  Sure, that's fine.

14             THE VIDEO OPERATOR:  Okay.  Going off the

15   record at 2:43.

16             (Recess, 2:43 p.m. - 2:52 p.m.)

17             THE VIDEO OPERATOR:  Back on the record at

18   2:52.

19   BY MR. CROSS:

20        Q    Dr. Gilbert, do you still have

21   Dr. Halderman's July 1 report in front of you?

22        A    Yes.

23        Q    Do you still have that Fayette County

24   ballot on page 15 up?

25        A    Yes, I do.

1         Q   In your opinion, is that a well-designed

2    ballot?

3         A   Did somebody say something?

4              MR. MILLER:  I think we just had a

5    momentary interruption.

6              THE WITNESS:  I would not have designed it

7    this way.  It can be done better.

8    BY MR. CROSS:

9         Q   How would you design it better?

10        A   It has a ballot summary, but I wouldn't

11   have put it in three columns, as an example.

12        Q   Why not?

13        A   It does make it harder to identify

14   discrepancies if you have the three-column format

15   like this.

16        Q   How so?

17        A   Because it doesn't allow you to scan all

18   at once.  You have to do multiple scans, either left

19   to right multiple times, or top to bottom multiple

20   times.

21        Q   And just so we're clear, when you say

22   "scan," you mean the human scanning, not the

23   electronic tabulator?

24        A   Exactly.  Yeah.  The human read.

25        Q   And then fair to say that you -- as you

Page 184

1  sit here, you don't have any way of knowing whether

2  the QR code in that ballot matches the individual

3  selections below, right?

4      A   No, I do not.

5      Q   The election equipment from Fulton County

6  that Dr. Halderman has examined, would you recommend

7  putting that equipment back into use in Georgia

8  elections after an independent expert has tested it?

9      A   I would -- I would recommend using it

10  again, but I would recommend consideration to

11  addressing issues where they can be addressed.

12          Again, one of the recommendations is

13  focusing on voter verification, as an example.

14      Q   So let me be more specific because I may

15  not have been clear.

16          I don't mean equipment of that type.  What

17  I'm saying is the specific equipment, the machines

18  that Dr. Halderman did his testing on, would you

19  recommend putting those machines back into service

20  in Georgia elections after an independent expert

21  evaluates them?

22      A   I think you can put those back.  Again,

23  even -- even if -- even if they have been

24  compromised, but if we had 100 percent voter

25  verification, we would be in a good place.

Page 185

1       Q    Are there any steps that you would
2    recommend be taken with those machines before they
3    go back into service?
4       A    I haven't given that thought.  That's not
5    something I've thought about.  Sorry.
6       Q    That's okay.
7            All right.  Take a look at -- go to the
8    beginning --
9            Let me just make sure we're all good here.
10   Yeah.  All right.  As far as I can tell, everyone on
11   has access to AEO information.  I don't see
12   Ms. Marks, but Carey, let me know if you've got a
13   different --
14           MR. MILLER:  I think it was -- I think
15   that's right.
16   BY MR. CROSS:
17      Q    Dr. Gilbert, go to the first page of
18   Dr. Halderman's report, if you would, and the
19   heading is "███████████
20      A    Hold on here.  Let me get there.  You said
21   the heading is -- the contents page?
22      Q    No, no.  Sorry.  It's the first
23   substantive page.  It's the heading "██████████
24      A    Okay.
25      Q    It's page 5 of the blue pagination at the

Page 186

1    top.

2         A   I got it.  I got it.  I'm on that page

3    now.

4         Q   Okay.  If you come down below, do you see

5    the third paragraph where Dr. Halderman wrote, "█

6    ████████████████████████████████████████████████

7    ████████████████████████████████████████████

8    ████████████████████████████████████████████████

9    ██████████████████████████████████████████

10   ████████████"?

11        Do you see that?

12        A   I do see that.

13        Q   Were you asked, for the purpose of your

14   engagement, to conduct the same type of analysis or

15   were you asked to do something different?

16        A   I was not asked to do that.  No, I was

17   not.

18        Q   If you come down below, you'll see the

19   next heading is "███████████████████."

20        Do you see that?

21        A   Yes, I do.

22        Q   And then at the bottom, you'll see, just

23   before the number 1 paragraph, it reads, "██████

24   ██████████████████████████████████████████

25   ████████████

Page 187

```
 1              Do you see that?
 2         A    I do.
 3         Q    And in your declaration, you don't dispute
 4    that any of the number of vulnerabilities that he
 5    has in paragraphs 1 through 7 are present in the
 6    election equipment used in Georgia, right?
 7              MR. MILLER:  Object to form.
 8              THE WITNESS:  Number one, ███████████
 9    ███████ that -- I trust that he was able to do that,
10    so I don't dispute that.
11              I would say, you know, given access and
12    time that he was given, I think these -- I don't
13    question him being able to accomplish any of these.
14    BY MR. CROSS:
15         Q    Come to the -- it's page 7 of 97.  Near
16    the top it says, "████████████  in bold.
17         A    Got it.
18         Q    Do you see here -- do you see the
19    sentence, it's the second sentence that begins,
20    "However"?
21         A    Yes.
22         Q    And Dr. Halderman wrote, "█████████████████
23    ████████████████████████████████████████████████████
24    ██████████████████████████."
25              Do you see that?
```

Page 188

```
 1        A   I do.
 2        Q   In your declaration, you don't disagree
 3   with that opinion, right?
 4        A   I don't agree -- I don't know that I agree
 5   or disagree with it as far as what he -- what he's
 6   constituting as patching.  I don't know what that
 7   means.  Merely patching, I'm not sure what the
 8   context is, what that means.
 9        Q   You didn't undertake any analysis into
10   what kind of patching could be adopted to mitigate
11   the vulnerabilities he identifies in his report,
12   right?
13        A   No, I did not.  And I would say that -- I
14   would like -- it would be interesting for
15   Dr. Halderman to say what patching he's referring
16   to.
17            In addition to that, I go back to our
18   previous discussion about this.  When he says the
19   patching, is that referencing reliably secure?  Is
20   that the same thing or not?
21        Q   All right.  If you come down, do you see
22   below that, it says, "               "?  It's
23   Section 1.2?
24        A   Yes, I do.
25        Q   And then he's got a number of paragraphs
```

Page 189

```
 1    set off by bullets.
 2              Do you see that?
 3         A    Yes.
 4         Q    And in your declaration, you don't dispute
 5    any of the technical findings that he has listed
 6    there, right?
 7         A    The ██████████ , I do not agree with
 8    that.
 9         Q    What paragraph are you at?
10         A    The second bullet.
11         Q    Where in your declaration do you dispute
12    that?
13         A    I don't -- I don't know if I spoke
14    directly to this in my declaration or not, but I --
15    you know, this particular notion that ██████████
16    ██████████ , I -- I don't agree with that.
17         Q    Do you see -- I'm sorry.  I didn't mean to
18    cut you off.
19         A    You asked me, do I disagree with any of
20    the points, and I'm telling you that I disagree, for
21    example, with that point immediately.  I can look at
22    the others, but I can tell you, just looking at it,
23    I saw DRE and I saw that comment, I can immediately
24    tell you I do not agree with that.
25         Q    My question was actually more precise
```

1    about whether you disagree in your declaration,

2    because my focus is on the opinion you've put in

3    this case.  But I understand your testimony.

4            Looking at this particular piece or this

5    particular point about the DREs, do you see where

6    his writes in the second sentence of that paragraph,

7    "████████████████████████████████████

8    ███████████████████████████████████████

9    █████████████████████████████████████

10    ██████████████████████████████████████████

11    █████████████"?

12            Do you see that?

13       A   Yeah, I see that.

14       Q   And he goes on, "██████████████████

15    ██████████████████████████████████████

16    ███████████████████████████████████

17    ██████████████████████████████████████

18    █████████████████████."

19            Do you see that?

20       A   I see that.

21       Q   And in your declaration responding to this

22    report, you don't dispute his opinions in either of

23    those sentences, right?

24       A   I don't recall.  Let me pull up my

25    declaration.  I can look.

Page 191

```
 1            But if I didn't dispute them, I'm telling
 2     you now I do dispute it.  It may have not appeared
 3     in my declaration, but I do not agree that the BMD
 4     is at the same level in any comparison as the DRE.
 5            Because just as he did a study on voters
 6     verifying their ballots, in a real election
 7     scenario, in the scenario where some people are
 8     actually worried about votes flipping, and they're
 9     all verifying their ballots, you're going to tell me
10     that somehow you're going to change the outcome of
11     an election with this -- with everyone verifying?  I
12     don't believe that.  Whereas the DRE, you could
13     easily do that because it's impossible to verify.
14     Here, you can verify.  DRE, you cannot.  So I think
15     that's disingenuous to compare the two at that
16     level.
17         Q    Where does Dr. Halderman say here that
18     what he's looking at has anything to do with
19     changing election outcomes?
20         A    That's the whole intent of the hack.
21         Q    Okay.  That's your understanding of what
22     he's saying here?
23         A    My understanding of Dr. Halderman's
24     overall objective is to change the outcome of the
25     election undetected and where it can't be corrected.
```

1          Q   You don't have an understanding that

2     Dr. Halderman is looking at whether individual

3     voters can be disenfranchised by having their

4     individual votes altered even if the election

5     outcome is not altered?  You don't understand that

6     part of his analysis?

7          A   I've never heard him say that, and I don't

8     see that as his analysis.  That's not how I'm

9     interpreting anything he's written.  No.

10         Q   So you -- in responding to his report

11    here, his July 1 report, your understanding was that

12    what he was talking about was only about whether

13    these hacks can result in changes to the election

14    outcomes as opposed to simply changing individual

15    votes that may not rise to the level of changing

16    outcomes?

17         A   I think the -- the context that I read his

18    work and his declaration is the ability to change

19    the outcome of the election, changing both so that

20    it's undetectable and can't be corrected.

21         Q   And in this paragraph we're looking at

22    where he is comparing the ICX BMDs to the AccuVote

23    TS and TS-X DREs, you understand that what he's

24    comparing there are specific cybersecurity

25    vulnerabilities within the computer equipment,

1    right?

2         A   Well, in the next sentence where he talks

3    about ███████████████████████████████████

4    ██████████, those are things he's referencing.  From

5    that perspective, that's what he's referencing.  I

6    see that.

7         Q   There are these bulleted technical

8    findings that we're looking at under his main

9    conclusions.  Are there any others that you dispute

10   in your declaration?

11        A   I don't recall directly disputing -- I

12   don't know -- it goes to my declaration.  I have

13   to -- I need to pull out my declaration and go point

14   by point down my declaration and see -- look at each

15   one of these points and then go back and see if I

16   reference that or talk about it in my declaration.

17            Do you want me to do that exercise?

18        Q   Unfortunately I have to have you do that

19   exercise because I need to know whether you're

20   talking a position that your declaration refutes any

21   of these points.

22        A   Okay.  So point 1, "████████████████████

23   ███████████████████████████" -- okay.  Point 1 is

24   not specific.

25            I already addressed point 2.

Page 194

```
 1          Point 3, "███████████████████████████
 2    ██████" -- all right.  So Point 3, he's saying that
 3    ███████████████████████████████████████████████
 4    ████████████████████████████████, which you were
 5    asking, do I understand the context.  That's exactly
 6    what he just said here.
 7          Let's see.
 8       Q   Let's just pause there so we're on the
 9    same page.
10          He says the ████████████████████████
11    ██████████████████████████████ ███████████████
12    ██████████████████████████████████████████████.
13          That's what he wrote there, right?
14       A   Those are different things?
15       Q   You don't understand that individual votes
16    are distinct from election outcomes?  You consider
17    them the same?
18       A   Election outcomes are based on individual
19    votes, are they not?
20       Q   But you understand that a voter can be
21    disenfranchised when their vote does not count even
22    if the election outcome is not altered by the
23    failure to count their vote, right?
24          MR. MILLER:  Objection.  Calls for a legal
25    conclusion.
```

1           THE WITNESS:  Can you point to me in this

2    declaration that we're looking at for Dr. Halderman

3    where he says that?  I may have missed it.  I'm

4    sorry.

5    BY MR. CROSS:

6           Q    You mean where he writes, "██████████

7    ████████████████████████████████████████████████

8    ██████████████████████████████████████████████████

9    ███████████████████████"?

10          Are you asking for something other than

11   what he wrote there?

12          A    You're saying that the disenfran- -- how

13   did you say -- disenfranchisement of an individual

14   vote and not changing the outcome of an election?

15          Q    Do you understand that a voter --

16          A    Wait.  Wait.  Before you ask me that, I'm

17   asking you, can you point to me in the document

18   where he said that?

19          Q    I'm not -- Dr. Gilbert, I'm not the

20   witness, and I'm not representing you about language

21   of disenfranchisement, okay?

22          You asked me to show you where he talks

23   about evaluating the impact on individual votes and

24   on election outcomes.  We're reading a sentence

25   here.

1           If you'd like to go through it and find

2     others, we can do that.  I'm trying to make sure I

3     understand your view here.

4           Do you understand that a voter can cast a

5     vote in an election, have that vote not count

6     because it is altered in some way, it's lost, any

7     variety of things could happen, and yet that does

8     not alter the election outcome?  Are we agreed that

9     that is a scenario that can happen?

10     A    Yes, I agree that's a scenario that can

11    happen.

12     Q    And in that scenario, that individual

13    voter has been harmed by not having their vote

14    counted.

15           MR. MILLER:  Objection.  Legal conclusion.

16    BY MR. CROSS:

17     Q    I mean, do you dispute that, that every

18    voter wants their vote to count?

19     A    No, I don't dispute that.

20     Q    Okay.

21     A    I guess the point that I'm making is, if

22    individual votes change -- outcomes are determined

23    by individual votes.  So I was trying to understand

24    where you were going, but I see your point.

25           You're talking about disenfranchisement of

```
 1      individual voters, which I would also say I would
 2      agree with that.  Just as I stated earlier, people
 3      with disabilities are individual voters, and they
 4      want the right to a private ballot and a fair ballot
 5      as well.  Shouldn't their votes be counted and not
 6      be disenfranchised either?
 7              So yes, I completely agree with that.
 8      Yes.  You're right.  Individual voters, every one,
 9      including those with disabilities.
10          Q   I will say, Dr. Gilbert, that we have
11      found something that we're in violent agreement on,
12      particularly for voters with disabilities.
13          A   Okay.  So he's talking -- the third one is
14      about QR codes.  Let's see.  In my -- let's see.
15      Let me look for QR codes.  Do I talk about QR codes
16      in here?
17              In my declaration, paragraph 12, I talk
18      about QR codes.
19          Q   Just so we're clear, you don't dispute
20      that -- strike that.
21              You don't dispute Dr. Halderman's finding
22      that the ███████████████████████████████████████
23      ████████████████████████████████████████ that's
24      used in Georgia; you don't dispute that, right?
25          A   I do not dispute that, given time and
```

1       access, that you can ████████████████████

2       ███████████████████████████████████.

3       I do not dispute that.

4            Q    And you haven't undertaken any analysis to

5       determine how much time it would take for a hacker

6       to do that if they wanted to do it, right?

7            A    No, I have not done that.  As I mentioned

8       earlier, I don't hack systems.  That's not my

9       expertise, so I wouldn't have done that.

10                That's a great question to ask

11      Dr. Halderman, how long does it take to do such an

12      exercise.

13                MR. CROSS:  You might want to write that

14      down, Carey.

15                THE WITNESS:  And with that, as far as the

16      time it takes, again, that's not my area, but I

17      think it would be interesting to find the answer to

18      that.

19                And I'd be interested -- again, in the

20      same spirit that I mentioned earlier about

21      Dr. Halderman hacking a system and giving it to a

22      third party, the same thing could be true where

23      Dr. Halderman is given a system and then put on the

24      clock to determine how long it takes him to hack it,

25      not one that he's seen for 12 months.

Page 199

1    BY MR. CROSS:

2        Q    Are you aware that there are individuals

3    that are claiming to have released proprietary

4    election management software from Dominion like that

5    used in Georgia?

6        A    I am not aware of that, but I am not

7    surprised that -- whether it's true or not, the

8    allegation would be out there is not a surprise to

9    me.

10       Q    Why not?

11       A    It's the climate we live in.  Just

12   misinformation, disinformation.  Just, I'm not

13   surprised.

14       Q    Would you be concerned if that allegation

15   is true that proprietary election software from

16   Dominion was leaked, for example, by a clerk who had

17   access to it in one of the election challenge

18   proceedings in a state like Arizona?

19           MR. MILLER:  Object to form.

20           THE WITNESS:  I wouldn't be severely

21   concerned.

22           Again, I think the verification piece is

23   more important to me.  So I would -- you know, and

24   I'm willing -- I'd be willing to consider this.

25   That was another piece.

Page 200

```
 1          If people are verifying their ballots and
 2     it's wrong, they correct them, and that would tell
 3     you things, so you would get it right.
 4          So even if you did hack it, if people were
 5     verifying it, you'd get it right.
 6     BY MR. CROSS:
 7     Q    Isn't one of the challenges with voter
 8     verification is that even if you're right that
 9     voters can reliably identify when their votes are
10     being altered from what they cast, that only occurs
11     once the election is underway, right?
12     A    Right.
13     Q    So shouldn't you, as an election security
14     expert -- don't you agree that rather than the
15     mechanism for securing an election being one that
16     has to play out when the election is already
17     underway, there should be measures that are taken
18     before the election even begins to make the election
19     as secure as it can reasonably be?
20     A    I think that's a good approach, and I hope
21     that Dr. Halderman and others will -- I hope you
22     will communicate to them to relay publicly what is
23     reasonable security so that we can implement those,
24     and those standards can be used if they are willing
25     to accept what they are.
```

1          So yes.  What you just said is a reference

2     to reasonable security implementation for these

3     systems which none of them, to my knowledge, have

4     ever said.  But if they can do that recommendation,

5     I appreciate it.  And again, I said I'm working on

6     things in this area, which I look forward to

7     engaging them on in '22.

8          Q    You've testified in your declaration and

9     here today that voter verification is one of the

10    primary ways to protect against the particular hacks

11    that Dr. Halderman identifies in his July 1 report,

12    right?

13         A    Right.

14         Q    As an election security expert, don't you

15    think that the better approach would be to actually

16    remedy the hack, to take measures that prevent the

17    hacking in the first place, rather than leaving it

18    to voters to discover it on their ballots in the

19    middle of an election?

20         A    That's -- to me, that's an ideal scenario.

21    But I would say that my colleagues, Dr. Halderman

22    and Dr. Appel, et cetera, would say there is no way

23    to secure a machine, given time and access,

24    100 percent.  The verification is the one thing we

25    can secure independent of the hacks that they

Page 202

1    implement.

2            So again, I'm going back to the reference

3    of reasonably secure.  I suspect that doesn't exist

4    because I don't think they can live with themselves

5    saying that there's a way -- a computer system that

6    would be acceptable in voting because their job is

7    to break things.

8            But if they were to announce that and say

9    that, that would be a remarkable thing we could all

10   agree upon and move forward in a positive direction

11   upon if there is such a reasonable secure standard.

12   Q    You keep talking about Dr. Halderman and

13   Dr. Appel, but -- and I understand that you perceive

14   a disagreement among you.

15           I'm really focusing right now on your

16   position.  Your position, as I understand it, is

17   that BMDs can be reliably used.

18           And my question to you is, rather than

19   relying on voter verification to catch a hack or a

20   glitch in the system once an election is already

21   underway, don't you agree as an election security

22   expert that those who are responsible for these

23   machines and for elections should take reasonable

24   measures to prevent the hacking in the first place,

25   for example, taking measures to mitigate what

1    Dr. Halderman has found with these machines?

2              MR. MILLER:  Objection.  Vague, asked and

3    answered.

4              THE WITNESS:  Well, I would say I agree

5    with reasonable measures.  You and I agree on that,

6    and I hope Dr. Halderman and them -- I'm so excited

7    to hear this, and I am eager to see what comes out

8    of this.

9              But yeah, reasonable measures.  See, to

10   me, the question is, what is reasonable?  And I want

11   to hear what reasonable is.

12             You're using the term, and I'm -- I'm

13   using the term, and hopefully we are on the same

14   page what that actually was going to look like.

15             But yeah, I think that's true.  Reasonable

16   security, that makes sense to me.

17   BY MR. CROSS:

18        Q    As an election security expert, why would

19   it be sensible to use an election system that

20   possesses all of the vulnerabilities that

21   Dr. Halderman has identified in Georgia and leave it

22   to voters to identify a hack by carefully reviewing

23   their ballots, including ballots like the one you

24   just looked at, from an actual election in Georgia,

25   rather than taking necessary measures on the front

1    end to mitigate those vulnerabilities?

2         A    I think you could take necessary measures

3    to make it reasonable, as you said.  But again, even

4    in a hand-marked paper ballot scenario, I gave you

5    an example where voters don't verify those and you

6    have issues.

7              So the burden is on the voter either way

8    to actually verify the ballot.  Even hand-marked

9    paper ballots have to be verified.

10        Q    Right.  But what we've established is, I

11   thought, that the burden on the voter is much higher

12   with BMDs because the BMD allows a hack that can

13   change votes on a large scale the voters may not

14   even be able to detect on their ballot such as a

15   change in the QR code, right?

16        A    A change in the QR code cannot be detected

17   by the voter.  I think we all agree on that.

18        Q    And the type -- sorry.

19        A    What I'm saying is, in the case of the

20   hand-marked paper ballots, I gave you examples where

21   large-scale votes were changed.  Large-scale votes.

22   Large.  So you can't minimize the impact either way

23   of voter verification.  There's -- the burden is

24   there in both scenarios.

25        Q    Just be precise.  You've not given a

```
1    situation where large-scale votes were changed in a

2    hand-marked paper ballot.  You're testifying about

3    the situation in Florida where the vote they cast

4    was not the vote they intended.  But their vote

5    wasn't changed from the way it was cast on the

6    ballot, right?

7         A    It wasn't changed the way they cast, but

8    they cast it -- the design caused them to cast it

9    the wrong way.  I don't see a distinction either

10   way.

11        Q    I didn't want to cut you off when you were

12   looking at the main conclusions.

13             Are there any other -- any findings here

14   that you dispute?

15        A    Okay.  I talk about QR codes.  I talk

16   about using BMDs for only with people with

17   disabilities.

18        Q    Which bullet are you on?

19        A    The second-to-the-last bullet, using

20   vulnerable -- and it talks about all in-person

21   voters.

22             Okay.  So I know I talk about those things

23   in my declaration.

24        Q    All right.  Go to page 19 of 97, if you

25   would.  And the heading is "4.2 ██████████."
```

```
 1        A   Got it.
 2        Q   Do you see in the third paragraph down
 3   that begins "███████████████"?
 4        A   Yes.
 5        Q   And here Dr. Halderman writes, "████████
 6   ████████████████████████████████████████████
 7   ████████████████████████████████  ██████████,
 8   ████████████████████████████████████████████████
 9   ████████████████████████████████████████."
10        Do you see that?
11        A   Yes.
12        Q   And you don't dispute in your declaration
13   that the printer that's used with the BMD system in
14   Georgia is, in fact, an off-the-shelf printer like
15   the one that Dr. Halderman used, right?
16        A   No, I do not dispute that.  I don't have
17   access to the actual printer being used, but I
18   didn't dispute that at all.
19        Q   And then if you come down, do you see the
20   paragraph that begins, "█████████████████" on the same
21   page, a couple below where we were?
22        A   Let's see.
23        Q   Two paragraphs --
24        A   I got it.  I see it.
25        Q   Here Dr. Halderman wrote, "███████████████████
```

Page 207

```
1    ████████████████████████████████████

2    ████████████████████████████████████████

3    █████████████████████████████████████████

4    ██████████████████████████████████

5    ████████████

6            Do you see that?

7        A   Yes.

8        Q   He goes on to talk about the election

9    packages that he received.

10           Do you see that?

11       A   Yes.

12       Q   You don't address that data in your

13   declaration, right?

14       A   No, I do not.

15       Q   Do I understand, is that not something

16   you've analyzed?

17       A   No, I have not analyzed that.

18       Q   If you come to the next paragraph, do you

19   see where it reads, "███████████████████████████"?

20       A   Yes.

21       Q   He writes, "████████████████████

22   ███████████████████████████████████████

23   ██████████████████████████████████████

24   ████████████████████████."

25           He goes on to say, "████████████████████
```



1 ███████████████████████████████████████

2 ███████████████████████████████████████

3 ████████████████████████████████████

4 ███████████████████████████████."

5          Do you see that?

6      A   Yes.

7      Q   And you don't dispute his opinion there on

8  what that indicates in your declaration, right?

9      A   I do not discuss that in my declaration.

10     Q   You previously testified in this case that

11 your understanding is that the BMD election system

12 is air-gapped, right?

13     A   Yes.

14     Q   I think you testified before that you're

15 assuming that to be true based on some materials you

16 looked at describing how the system is supposed to

17 operate and be set up; is that right?

18     A   Correct.

19     Q   You've not yourself confirmed that any

20 aspect of Georgia's election system is, in fact,

21 air-gapped, right?

22     A   I have not had a Georgia system in my

23 possession to do any evaluation.

24     Q   And you did not undertake any analysis or

25 investigation with your client in this case to

1    determine whether the election system is in any way

2    air-gapped, right?

3         A    No.   I use -- I cited in my previous

4    declarations what I used.   Those documents were

5    referenced in my declaration.

6         Q    You did not undertake any analysis or

7    investigation to determine whether any equipment or

8    devices that were used with the old DRE system have

9    also been used with the new BMD system, right?

10        A    All I had was what I put in my

11   declaration, the documents that I referenced.   I

12   didn't have access to an old DRE, I did not have

13   access to the new BMD or any election system.   I

14   have not had access to any election system from the

15   State of Georgia ever.

16             MR. CROSS:   Oh, why did it do that?   Hold

17   on.   Sorry.   I was just pulling up a new exhibit.

18   It's going to be Exhibit 6.   Give me one second.

19             (Exhibit 6 was marked for identification

20        and is attached hereto.)

21   BY MR. CROSS:

22        Q    All right.   Pull up Exhibit 6, if you

23   would, please, Dr. Gilbert.   Just let me know when

24   you have it.

25             Hold on.   Sorry.   It's Exhibit -- it's

Page 210

1    Exhibit 5.

2         A    Exhibit 5, you said?

3         Q    Yes.

4         A    I think there's -- we already had 5,

5    right?

6         Q    I'm not sure what just happened here.

7    Sorry.  I just introduced a new exhibit, but --

8              MR. MILLER:  Yeah, I noticed the same

9    thing.  I think it -- somehow they got switched.

10   I'm not exactly sure how.

11             MR. CROSS:  All right.  Hold on.  Hold on.

12             MR. MILLER:  Do you want to go off the

13   record?

14             MR. CROSS:  Yeah, yeah.  Let's go off the

15   record.

16             THE VIDEO OPERATOR:  Okay.  Going off the

17   record at 3:30.

18             (Recess, 3:30 p.m. - 3:32 p.m.)

19             THE VIDEO OPERATOR:  Back on the record at

20   3:32.

21   BY MR. CROSS:

22        Q    Dr. Gilbert, do you have Exhibit 6 open in

23   front of you?

24        A    I do.  The Tab 6 Dominion thing?

25        Q    Yes.

Page 211

```
 1          A   Okay.
 2          Q   Is this a document that you've seen
 3     before?
 4          A   I don't recognize this off the top of my
 5     head.
 6          Q   Do you see at the top there's an e-mail
 7     from Michael Barnes to Scott Tucker?
 8          A   Yes, I do.
 9          Q   Do you know who Michael Barnes is?
10          A   No, I do not.
11          Q   Do you understand he's one of the election
12     officials that works for the Secretary of State's
13     office?
14          A   If you say so.  Like I say, I don't know
15     who that is.
16          Q   You see the e-mail thread begins with an
17     e-mail between two individuals at Dominion Voting,
18     Dedrick Smith and Scott Tucker?
19          A   Okay.
20          Q   And those are -- that e-mail is sent on
21     January 15, 2020, right?
22          A   Yes.
23          Q   And Mr. Smith writes to Mr. Tucker, "I was
24     wondering if you could ask the state if there is a
25     special USB they are supposed to be sending out to
```

Page 212

1    the counties to submit their L&A exports and the
2    exports for election day."
3              Do you see that?
4         A    I see something, but it doesn't say
5    "special USB."  It says, "Is the state providing new
6    USB drives?"
7              That's what I have here in front of me.
8         Q    No, no.  Come down to the first e-mail in
9    the thread from Mr. Smith to Mr. Tucker, bottom of
10   the page.
11        A    Okay.  Bottom of the page.  I'm there.  I
12   see it now.  "Special USB," I see it.
13        Q    You understand L&A here refers to logic
14   and accuracy testing, right?
15        A    Correct.  Yes.
16        Q    And then Mr. Smith goes on, "They have a
17   USB that they normally send the export files on, but
18   they are old.  So we need to know if they can use
19   those or if the state will be sending new USBs out."
20             Do you see that?
21        A    Yes.
22        Q    Mr. Tucker forwards this e-mail on to
23   Michael Barnes.  You can see his e-mail indicates
24   that he is with the Secretary of State's office in
25   Georgia.

1             Do you see that?

2        A    Yes, I see that.

3        Q    Mr. Tucker writes, "Michael, is the state

4    providing new USB drives for the counties to send

5    their L&A exports and E-Day exports to you on or

6    should they use the USB drive they have from the

7    previous system?"

8             Do you see that?

9        A    Yes.

10       Q    Do you understand that January of 2020 is

11   in the time frame of when Georgia was rolling out

12   the new BMD system, switching from the DREs to the

13   Dominion system?

14       A    Okay.

15       Q    Do you recall one way or the other whether

16   that's right?

17       A    I don't recall when they -- when they did

18   that, but --

19       Q    Okay.

20       A    -- okay.

21       Q    And then Mr. Barnes responds same day

22   saying, "The counties can use the USB that the state

23   has previously provided."

24             Do you see that?

25       A    Yes, I do.

1        Q    Are you aware that this is an exhibit that

2    we introduced during the hearing in September of

3    last year in which you also testified?

4        A    Like I said, I don't remember this, but

5    okay.

6        Q    There's no indication in your declaration

7    that you've had any -- conducted any investigation

8    into what's being discussed here and whether USB

9    drives that were used with the DRE system have also

10   been used with the new BMD system.  That's not

11   something you've looked into, correct?

12            MR. MILLER:  Objection.  Relevance.

13            THE WITNESS:  No, I have not.

14   BY MR. CROSS:

15       Q    And you previously testified in this case

16   that the new BMD system is completely separate and

17   unconnected to the old DRE system, right?

18       A    Yes, I did.

19       Q    But if the counties were using USB drives

20   with the new Dominion system that they previously

21   had used with the DRE system, that certainly would

22   raise the possibility for an exchange of data

23   between those two systems, right?

24            MR. MILLER:  Objection.  Relevance.

25            THE WITNESS:  I think you said it

Page 215

1    correctly.  Possibility.

2           So it's possible that these drives could

3    have been completely wiped and reformatted.  It's

4    possible that they could have been tainted.  So it's

5    possible a lot of different things based on what you

6    are saying.

7    BY MR. CROSS:

8           Q    You didn't think that it was relevant for

9    your opinions in this case to determine whether the

10   counties or the state are using USB drives with the

11   new system that were previously used with the DRE

12   system without wiping them, without securing them,

13   without ensuring that they're not compromised?

14          A    I did not ask that question.

15          Q    Do you think that that's a relevant

16   question for evaluating the security of the new

17   election system?

18          A    I think that is a relevant question, and

19   it should be asked.

20          I think the protocol of what's obviously

21   exchanged -- anything connected to the voting system

22   should be evaluated, obviously.

23          Q    Evaluated how?

24          A    All kinds of ways.  It depends on what

25   you're connecting to it.

1          Q    I'm sorry.  Can you explain what you mean?

2          A    For example, if you're connecting a USB to

3     the system, it should be wiped.  That's a clean -- a

4     way to clean the -- keep the system clean, avoid

5     issues.  Standard protocol in many places in shops

6     that have technology.

7               So evaluating what is connected, what's

8     the data on there, those questions are things that

9     have to be looked at.

10         Q    Why didn't you look at that on behalf of

11    the state with respect to things like the USB drives

12    that we see being discussed here for your work?

13         A    I was -- I was focused on what was

14    given -- I was not given USB drives.  I was not

15    given any technology.

16              My focus, again, was on Dr. Halderman and

17    Appel's analysis.  That's where my focus was on.  I

18    don't have any equipment, never have received any

19    equipment, technology, from the State of Georgia.

20         Q    If you come back to Dr. Halderman's

21    report, the July 1 report, the page we were on

22    before, page 19 of 97 --

23         A    Okay.

24         Q    -- at the bottom, do you see where it

25    says, Section 4.3, "████████████████"?

Page 217

1          A    Yes, I do.

2          Q    You don't offer an opinion in this case

3     that Dr. Halderman's methodology for his analysis in

4     his report was in any way improper or unsound,

5     right?

6          A    I do not.

7          Q    Come to page 22 of 97.  You'll see there's

8     a heading in the middle of the page, Section 5.2,

9     "███████████████████████████."

10         A    Yes.

11         Q    And here he writes, "██████   ████████████

12    ████████████████████████████████████████████████

13    ██████████████████████████████████████████████

14    █████████

15              Do you see that?

16         A    Yes.

17         Q    You don't dispute in your declaration that

18    ICX QR codes are not protected against replay

19    attacks, right?

20         A    I do not.

21         Q    If you come down to page 24 of 97, do you

22    see where it says, "███████████████████"?

23         A    Yes.

24         Q    And here he wrote, "████████████████████

25    ████████████████████████████████████████████████

1   ██████████████████████████████████  ████████████

2   ████████████████████████████████████████

3   ████████████," and he refers to Section 11.1.  He

4   says, "████████████████████████████████████████

5   ████████████████."

6            Do you see that?

7        A   I do see that.

8        Q   And you don't dispute in your declaration

9   his finding on the ability to copy the ballots,

10  right?

11       A   I do not.

12       Q   Next, he refers again to the ████████

13  ████████

14           Do you see that?

15       A   Yes.

16       Q   Come to page 29 of 97.

17       A   Okay.

18       Q   Do you see there's a picture at the top

19  of -- it looks like access cards?

20       A   Yep.

21       Q   Do you see where it says, "████████████

22  ████████████"?

23       A   Yes.

24       Q   And then he writes, "████████████████████

25  ████████████████████████████████

1    ████████████████████████████████████████."

2         Do you see that?

3    A    Yes, I do.

4    Q    He goes on to say at the end, "██████

5    ████████████████████████████████████

6    ████████████████████████."

7         Do you see that?

8    A    I do.

9    Q    You don't dispute that finding in your

10   declaration, right?

11   A    I do not.

12   Q    If you come down to the heading 6.1 on the

13   same page --

14   A    Yep.

15   Q    -- it reads, "██████████████████████████

16   █████████████████."

17        Do you see that?

18   A    I do.

19   Q    Here he writes, "████████████████████████

20   ████████████████████████████████████

21   ████████████████████████████████████████

22   ██████████████████████████████."

23        Do you see that?

24   A    I do.

25   Q    And you don't dispute that finding in your

Page 220

1    declaration, right?

2            A    I do not.

3            Q    All right.  Come to the next page, heading

4    6.2.

5            A    Yes.

6            Q    It says, "████████████████████

7    ████████████████████."

8            Do you see that?

9            A    I do.

10           Q    And here he writes, "████████████

11   ████████████████████████████████

12   ████████████    ████████████████████████

13   ████████████████████████████████

14   ████████████."

15           Do you see that?

16           A    I do.

17           Q    And you don't dispute that finding in your

18   declaration, right?

19           A    No, I do not.

20           Q    Come down to the next page, please,

21   heading 6.3.

22           A    Got it.

23           Q    Here it reads, "████████████████████

24   ████████

25           Do you see that?

```
 1          A   Yes.

 2          Q   He writes, "████████████████████

 3   ████████████████████████████████████████████

 4   ██████████████████████████████████████████

 5   █████████████████

 6              Do you see that?

 7          A   I do.

 8          Q   You don't dispute that finding in your

 9   declaration, correct?

10          A   I do not.

11          Q   Come to the next page, 33 of 97,

12   heading 7.

13          A   Page 33, you said?

14          Q   Yes, sir.  Heading 7.

15          A   I'm there.

16          Q   Okay.  Come down to heading 7.1.

17              Do you see that?

18          A   Yeah, I'm there.

19          Q   He writes, "███████████████████

20   █████████████████████████████████████████████

21   ███████████████████████████████████."

22              Do you see that?

23          A   Yes.

24          Q   You don't dispute that finding in your

25   declaration, correct?
```

Page 222

1        A    I do not.

2        Q    Come to the next page, please,

3    heading 7.2.

4        A    Yes.

5        Q    Here he writes -- the heading is

6    "███████████████████." And he writes, ███████

7    ██████████████████████████████████████████,

8    ████████████████████████."

9             Do you see that?

10       A    Yes.

11       Q    You don't dispute that finding in your

12   declaration, correct?

13       A    I do not.

14       Q    Go on page 36 of 97, please.

15       A    Okay.

16       Q    He has heading 7.5, "████████████████

17   ██████████

18            Do you see that?

19       A    I do.

20       Q    He writes, "███████████████████████

21   ████████████████████████████████████████████

22   ████████████████████████████████████

23   ████████████████."

24            Do you see that?

25       A    I do.

1       Q   You don't dispute that finding in your

2   declaration, correct?

3       A   I don't think I dispute this.  No, I do

4   not.

5       Q   And then he goes on to refer to defeating

6   logic and accuracy testing.

7           Do you see that?

8       A   I do.

9       Q   And he -- at the end of that paragraph, he

10  concludes, "███████████████████████████████████

11  ██████████

12          Do you see that?

13      A   At the end of that paragraph?  I don't see

14  it.

15      Q   Do you see the short paragraph that has

16  the bolded language, "██████████████████████████████

17  ██████████

18      A   Yeah, I do.

19      Q   If you come to the end of that short

20  paragraph, the last sentence reads, "████████████

21  ████████████████████████████████████."

22      A   I don't see that anywhere.  I see

23  "████████████████████████" --

24      Q   You're too far down.  I'm sorry.  Come up

25  above -- just below the heading 7.5, the bolded

Page 224

1    language, "███████████████████████████."

2           A    Okay.  I'm there.

3           Q    So stay in that same short paragraph.

4           A    I see it.  I see it.  "████████████

5    ████████████████████."  I see it now.  The last

6    sentence in that paragraph.  Okay.

7           Q    Yes.  And you don't dispute that finding

8    in your declaration, right?

9           A    I did not dispute that in my declaration.

10          Q    Okay.  If you come down to where you were

11   looking at a moment ago, the bolded language at the

12   bottom of that page that reads, "████████████████

13   ███████," do you see that?

14          A    Yes.

15          Q    At the end of that paragraph, still on the

16   same page, he concludes, ██████████████████████████

17   ████████."

18               Do you see that?

19          A    Yes.

20          Q    You did not dispute that finding in your

21   declaration, correct?

22          A    No, I did not.

23          Q    Okay.  Come to the next page, please.

24          A    Okay.

25          Q    Do you see at the bottom of the next page

1    there's a bold heading, "███████████████

2    ██████

3         A    Yes.

4         Q    If you come down just three or four lines,

5    the sentence that begins "However"?

6         A    Yes.

7         Q    He writes, "███████████████████

8    ████████████████████████████████████████

9    ██████████████████████████████████████████

10   ██████████████████████"

11        Do you see that?

12        A    Yes.

13        Q    You don't dispute that finding in your

14   declaration, right?

15        A    I did not.

16        Q    If you come to the next page --

17        A    Yes.

18        Q    -- at the top he writes, "█████████

19   ██████████████████."

20        Do you see that?

21        A    Yes.

22        Q    Come to the beginning of the very next

23   paragraph.  Do you see where it begins, "█████████

24   ██████"?

25        A    Yes.

1    Q   And he writes, "████████████████

2  ████████████████████████████████████

3  ████████████████████████████████████."

4        Do you see that?

5    A   I do.

6    Q   You don't dispute that finding in your

7  declaration, right?

8    A   I do not.

9    Q   Come to the next bold heading on the same

10  page that reads, "██████████████████████

11  ███████████

12        Do you see that?

13    A   Yes.

14    Q   He writes, "██████████████████████

15  ██████████████████████," right?

16    A   Right.

17    Q   And we're agreed on that, right?

18    A   Yes.  To my knowledge, I don't know how

19  they would verify it.  The only way I've seen

20  that -- and I don't -- I haven't seen this.  But I

21  know other systems -- and when we designed -- we

22  designed this many years ago -- take the ballot and

23  stick it in another machine to get a summary

24  display, or have the tally, the scanner, give you

25  a -- I guess a ballot summary, and you can compare

Page 227

1    it to the ballot summary that's on there.

2              But I -- other than that, people cannot

3    read the QR code itself.

4         Q    One of the things you suggested in an

5    earlier declaration in this case is that the state

6    should do parallel testing of a single BMD during an

7    election.

8              Do you recall suggesting that?

9         A    Yes.

10        Q    Do you think that testing a single BMD out

11   of over 30,000 that are used across the state

12   provides a meaningful test of the security and

13   reliability of those BMDs as a whole?

14        A    That's not what I recommended.  But to

15   answer your question, no, that would not.  You have

16   all those, and you're just testing one?  No, that

17   wouldn't make a difference.  But if you test one in

18   every precinct, that's different.

19        Q    Okay.  So it's your recommendation to test

20   one in every precinct during the election in

21   parallel testing?

22        A    That is something I have recommended.  It

23   has pros and cons.  But that's way better than just

24   picking one particular BMD in the State of Georgia

25   and parallel testing it.  Yeah, that wouldn't make

1    much sense.

2         Q    Okay.  Come to page 40 of 97 in

3    Dr. Halderman's report, section heading 8.1.

4         A    Got it.

5         Q    You see it reads, ███████████████

6    ███████ "?

7         A    Yes.

8         Q    And he writes, ████████████████

9    ████████████████████████████████████████████

10   ████████████████████████████████████████████

11   ██████████████████████████████████ ."

12        Do you see that?

13        A    I do.

14        Q    You don't dispute that finding in your

15   declaration, correct?

16        A    I do not.

17        Q    Come down to the next page under the

18   pictures.

19        A    Okay.

20        Q    Do you see where it says, "Figure 9"?

21        A    Yes.

22        Q    And here it reads, "████████████████

23   ██████████████████████████ ."

24        Do you see that?

25        A    I do.

Page 229

1    Q    Dr. Halderman writes, "███████████

2    ████████████████████████████████████████.

3    ████████████████████████████████████████████

4    ████████████████████████████████████████

5    ██████████████████████████████████

6    █████████████████████████████████████████████

7    ████████████████████████████."

8         Do you see that?

9    A    I do.

10   Q    And you don't dispute that finding in your

11   declaration, correct?

12   A    I do not.

13   Q    Come to the top of the next page, please.

14   A    Okay.

15   Q    You see there's a picture, and below that

16   it says, "Figure 10"?

17   A    Yes.

18   Q    And then it reads, "█████████████████████

19   ████████████████████████."

20        Do you see that?

21   A    I do.

22   Q    And here Dr. Halderman writes, "██████████

23   ████████████████████████████████████████

24   ████████████████████████████████████████

25   ████    ██████████████████████████████

1 ████████████████████████████████████

2 ██████████████████████████████████████

3 ██████████████████████████████████████

4 ████████████████████████████ "

5        Do you see that?

6    A   I do.

7    Q   And you do not dispute that finding in

8 your declaration, correct?

9    A   I do not.

10    Q   Go to section heading 8.2.

11    A   Okay.

12    Q   It reads ██████████████████████

13        Are you with me?

14    A   Yes, I am.

15    Q   And then Dr. Halderman writes, "████

16 ██████████████████████████████████████

17 ████████████████████████████████████████

18 ████████████████████████████████████████

19 ██████████████████████████████████████ ."

20        Do you see that?

21    A   I do.

22    Q   And you don't dispute that finding in your

23 declaration, right?

24    A   I do not.

25    Q   If you stay in that same section, do you

1     see the very next paragraph begins, "█

2     ████████████"?

3         A   Yes, I see it.

4         Q   Dr. Halderman writes, "████████████

5     ████████████████████████████

6     █████████████████████████████

7     ███████████████████████████████

8     ████████████."

9         Do you see that?

10    A   Yes.

11    Q   In the next paragraph he writes, "█

12    █████████████████████████

13    ███████████████████████

14    ██████  █████████████████████

15    ████████████████████████

16    ██████████████████████."

17        Do you see that?

18    A   I see that.

19    Q   You don't dispute that finding in your

20    declaration, correct?

21    A   I do not.

22    Q   If you stay on that same page, the

23    paragraph we just read, do you still have that in

24    front of you?

25    A   I do.

1          Q    If you come above, do you see where

2     Dr. Halderman indicates that he previously drew an

3     analogy to the Boeing 737 MAX aircraft, where a

4     small, last-minute change to correct a single

5     problem inadvertently created a much more dangerous

6     failure mode that reportedly led to two fatal

7     crashes?

8               Do you see that?

9          A    I do.

10         Q    Are you familiar with that situation with

11    Boeing?

12         A    I am not.

13         Q    Come to page 44 of 97, if you would.

14         A    Real quick, the Boeing example that you

15    gave, just to make a note, I'm not familiar with

16    that, but that's an example of what cybersecurity

17    people would be very well aware of.

18         Q    Got it.  Understood.

19         A    Where do you want me to go?

20         Q    Sorry.  Page 44 of 97.

21         A    Okay.  I'm there.

22         Q    Do you see the heading 8.3?

23         A    Yes.  Got it.

24         Q    And it reads, "███████████████████████

25    ██████████████████████████."

Page 233

```
 1            Do you see that?
 2       A   I do.
 3       Q   And then Dr. Halderman writes, "███████
 4  █████████████████████████████████████████
 5  ███████████████████████████████████████████
 6  ████████████████████████████████████████."
 7            Do you see that?
 8       A   Yes.
 9       Q   You don't dispute that finding in your
10  declaration, correct?
11       A   I do not.
12       Q   All right.  Come to the next page, please,
13  under heading 8.5.
14       A   Okay.
15       Q   And here it reads, "█████████████████
16  ███████████  right?
17       A   Yes.
18       Q   And Dr. Halderman writes, "██████████
19  ██████████████████████████" -- I'm sorry.  Let
20  me try that again.
21            Here Dr. Halderman writes, "██████████
22  ████████████████████████████████████████████████
23  ███████████████████████████████
24  ████████████████████████████████████████████
25  █████████████████████      ████████████████████
```

Page 234

1    ████████████████████████████████████████

2    ████████████████████████████████."

3            Do you see that?

4       A    Yes.

5       Q    And you don't dispute that finding in your

6    declaration, correct?

7       A    I do not.

8       Q    Come to page 47 of 97, please.

9       A    Okay.

10      Q    Actually, go up one page -- sorry -- to

11   page 45 of 97 just so you see the heading 8.6 at the

12   bottom.

13      A    Got it.

14      Q    It reads, "████████████████████████

15   ███████████████████████."

16           Do you see that?

17      A    I do.

18      Q    If you come to the top of the next page,

19   do you see at the very top of that page

20   Dr. Halderman writes, "████████████████████

21   ████████████████████████████████

22   ██████████████████████████████████████

23   ████████████████████████████████

24   ██████████████████████████████

25   ███████████████

Page 235

```
 1              Do you see that?
 2         A    I do.
 3         Q    You don't dispute that finding in your
 4    declaration, correct?
 5         A    I do not.
 6         Q    All right.  Come down to the next section,
 7    please, 8.7.
 8         A    Okay.
 9         Q    Here it reads, "████████████████████████
10    ████████████████████."
11              Are you with me?
12         A    Yes.
13         Q    Here Dr. Halderman writes, "█████████████
14    ███████████████████████████████████████████████
15    ████████████████████████████████."
16              Do you see that?
17         A    Yes.
18         Q    You don't dispute that finding in your
19    declaration, correct?
20         A    I do not.
21         Q    Come to page 50 of 97, please.
22         A    Okay.
23         Q    Do you see at the top there's what looks
24    to be some computer code and then it says, "███████
25    underneath?
```

1        A    Yep.

2        Q    And here Dr. Halderman writes, "█████

3    ████████████████████████████████████████████,

4    ██████████████████████████████████████████████

5    ███████████████████████████████████████

6    ███████████████████████████."

7             Do you see that?

8        A    I do.

9        Q    You do not dispute that finding in your

10   declaration, correct?

11       A    I do not.

12       Q    Then if you come down one paragraph, do

13   you see the heading that reads "██████████████████

14   ████████████████"?

15       A    I do.

16       Q    If you come down to the second paragraph

17   under that heading, do you see where it reads --

18   it's just two sentences -- two lines -- it reads,

19   "███████████████████████"?

20       A    I do.

21       Q    In there Dr. Halderman writes, "████████

22   ██████████████████████████████████████████████

23   ██████████████████████████████████

24   ██████████   and he identifies two examples, one at the

25   county level, one at Dominion.

1          Do you see that?

2     A   I do.

3     Q   You don't dispute that finding in your

4  declaration, correct?

5     A   I do not.

6     Q   Come to the next -- top of the next page,

7  please.

8     A   Okay.

9     Q   Do you see section 9.2, "███████████

10 ████████████████████████████"?

11    A   I do.

12    Q   Here Dr. Halderman writes, "███████

13 ████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████████████████████████████████████

16 ███████

17         Do you see that?

18    A   I do.

19    Q   You don't dispute that finding in your

20 declaration, correct?

21    A   I do not.

22    Q   Come down to the next section, please,

23 9.3.

24    A   Okay.

25    Q   It reads, "█████████████████████████████

Page 238

1   ████████

2        Do you see that?

3   A   I do.

4   Q   Here Dr. Halderman writes, "█████████

5   ████████████████████████████████████

6   ████████████████   ████████████████████

7   ████████████████████████████████████████

8   ████████████████████████████████████

9   ████████████████████████."

10        Do you see that?

11   A   I do.

12   Q   You do not dispute that finding in your

13   declaration, correct?

14   A   I do not.

15   Q   Come to page 54 of 97, please.

16   A   I'm there.

17   Q   Do you see the heading 9.6, "█████████

18   A   I do.

19   Q   Do you see the second paragraph that

20   begins, "███████████████"?

21   A   Yes.

22   Q   Here Dr. Halderman writes, ██████████

23   ████████████████████████████████████████

24   ████████████████████████████████████████,

25   ████████████████████████████████████

1   ███████████████████████████████████████████."

2          Do you see that?

3      A   I see it.

4      Q   You don't disagree with that statement in

5   your declaration, correct?

6      A   I do not.

7      Q   You see he goes on to explain --

8   Dr. Halderman does -- "██████████████████████

9   ████████████████████████████████████████

10  ██████████████████████████████████████████████

11  ██████████."

12         Do you see that?

13     A   Yes.

14     Q   Do you recall that vulnerability that was

15  discovered?

16     A   I do not.

17     Q   Dr. Halderman explains, "██████████████,

18  ██████████████████████████████████████████████

19  ████████████████████████████████████████

20  ██████████████████████████

21         Dr. Halderman concludes, "████

22  ██████████████████████████████████████████."

23         Do you see that?

24     A   I see it.

25     Q   And you don't dispute that finding in your

1    declaration that ████████████████████████

2    ████████████████████, right?

3         A   I do not dispute it in my declaration, but

4    I do not agree with it.

5         Q   And what's the basis for disagreeing with

6    that when you've not examined the security -- the

7    cybersecurity of the equipment at issue here?

8         A   I don't need to examine it to make this

9    statement.

10              The DRE does not have a paper trail.  If

11   there's a vulnerability on the BMD and voters verify

12   it, you can catch it.  In other words, you can

13   prevent it.  He can hack it and change it all he

14   wants.  But if they are verifying it, he can't

15   change the outcome of the election.  He can't

16   disenfranchise people.  The DRE, you can change it

17   and it's impossible to know.

18              So Dr. Shamos is right in the context of

19   the DRE, but that doesn't apply to a BMD the same

20   way.  It is not the same.

21        Q   Voter verification does not prevent any of

22   the hacks that Dr. Halderman has identified from

23   occurring, right?

24        A   Voter verification would not prevent the

25   hack from occurring.  It would prevent the hack from

Page 241

1    being successful.

2         Q    When you say, "Voter verification will

3    prevent the hack from being successful," you mean if

4    a voter has the time and the ability to reliably

5    verify every selection on their ballot before it's

6    tabulated, correct?

7         A    Yes.

8         Q    Come to page 55 of 97, please.

9         A    Okay.

10        Q    Actually, we should be more precise.

11             When you say -- when you say, "Voter

12   verification will prevent the hack from changing a

13   vote or an election outcome," that's only if the

14   voter has the time and the ability to verify each of

15   the selections on their bullet, and they actually do

16   that for each selection, right?

17        A    If they actually do it for each selection,

18   yes.  It has to be a verification for those

19   selections.  Yes.

20        Q    All right.  I'm sorry.  Take a look at

21   page 55 of 97.

22        A    Page 55, I'm there.

23        Q    Sorry.  I'm just thinking about the

24   question I just asked you.

25             There's also an additional step that's

Page 242

```
 1    needed to protect the voter, which is there also has
 2    to be an audit, right?  A reliable audit?
 3          A   It depends on the -- on the technology and
 4    how it all fits together.
 5              But we recommended for the NASEM report
 6    that if you're going to have a scanner, then you
 7    need to have an audit because the scanner could be
 8    compromised.
 9          Q   All right.  I'm sorry.  Take a look at
10    page 55 of 97 now, heading 10.1.
11          A   Got it.
12          Q   Here you have the heading "███████████
13    ████████████████."
14              Do you see that?
15          A   I do.
16          Q   And Dr. Halderman writes, "███████████████
17    ██████████████████████████████████████████████████
18    ████████████████████████████████████████████
19    ██████████████████████████████."
20              Do you see that?
21          A   Yes.
22          Q   You don't dispute that finding in your
23    declaration, correct?
24          A   I do not.
25          Q   He then goes on in the same section, "████
```

Page 243

```
 1    ████████████████████████████████████████████
 2    ████████████████████████████."
 3              Do you see that?
 4         A   I do.
 5         Q   You don't dispute that finding in your
 6    declaration, correct?
 7         A   I do not.
 8         Q   Come to the page 57 of 97, please.
 9         A   I'm there.
10         Q   Do you see the heading 11.1, "██████
11    ███████████████████████"?
12         A   Yes.
13         Q   Here Dr. Halderman writes, "██████████
14    ████████████████████████████████████████████
15    ███████████████████████████████████
16    █████████████████████████."
17              Do you see that?
18         A   I do.
19         Q   You did not dispute that finding in your
20    declaration, correct?
21         A   I did not.
22         Q   Do you see the next heading, 11.2, on the
23    same page?
24         A   I do.
25         Q   Here it reads, "████████████████████████
```

```
 1    ████████████████████████████████████████
 2    █████████████████████."
 3              Do you see that?
 4         A   I see it.
 5         Q   Dr. Halderman writes, "████████████████
 6    ███████████████████████████████████████
 7    ████████
 8              Do you see that?
 9         A   I do.
10         Q   You do not dispute that finding in your
11    declaration, correct?
12         A   I do not.
13         Q   Dr. Halderman goes on here to write, "████
14    ███████████████████████████████████████
15    ███████████."
16              Do you see that?
17         A   I do.
18         Q   You do not dispute that finding in your
19    declaration, correct?
20         A   I do not.
21         Q   Come to the next page, please, Section
22    11.3.
23         A   Okay.
24         Q   The report itself is not 97 pages long, so
25    we're getting towards the end.  I imagine this is
```

1    getting monotonous.

2            Take a look at Section 11.3.  Do you see

3    where it reads, "███████████████████████████

4    ███████████████████"?

5        A   Yes.

6        Q   Here Dr. Halderman writes, "██████████

7    ████████████████████████████,

8    ████████████████████."

9            Do you see that?

10       A   I do.

11       Q   You do not dispute that finding in your

12   declaration, correct?

13       A   I do not.

14       Q   He then goes on in the same section to

15   write, "████████████████████████████████████

16   ███████████████████████████████

17   ██████████

18           Do you see that?

19       A   I do.

20       Q   You did not dispute that finding in your

21   declaration, correct?

22       A   Did not.

23       Q   Come to page 62 of 97, please.  There's a

24   heading, "█████████████████

25       A   Got it.

1      Q    Did you study any of the references that

2   Dr. Halderman cites in preparing your response to

3   this report?

4      A    Did I study any of the references?  I read

5   some of these, not all of them.

6      Q    Do you recall which ones you read for your

7   report?

8      A    Okay.  Do you want me to go through each

9   one and tell you which ones?

10      Q    That would be great.

11      A    Okay.  Let's walk through.  So they are

12   numbered, so I will refer to numbers.  Is that okay?

13      Q    That's perfect.

14      A    Let's see.  Number 7, I've read that.

15   That was a while ago.  Number 9.  I believe

16   Number 10, I've read that.  Number -- I remember

17   Number 11, but I can't recall if I read it.

18   Number 12.  Let's see.  I think Number 14.  I think

19   Number 26, but I'm vague on that one, too.  I

20   believe Number 31, but that was a while ago.

21   Obviously declarations.  43, I think I've read that

22   one.  That looks familiar, that Washington Post

23   story.  48, 54, 57, obviously 58, 59, maybe 64.  I

24   believe I read 80.  That looks familiar.  86, the

25   VVSG, 87.

Page 247

1             Okay.  I think that's it.

2             MR. CROSS:  Let's go off the record in

3       case Ms. Marks wants to come back in, because I'm

4       done with this exhibit.

5             THE VIDEO OPERATOR:  Okay.  Going off the

6       record at 4:14.

7             (Recess, 4:14 p.m. - 4:25 p.m.)

8             THE VIDEO OPERATOR:  Back on the record at

9       4:25.

10      BY MR. CROSS:

11          Q   Dr. Gilbert, you talk about the risk of

12      insiders manipulating hand-marked paper ballots,

13      right?

14          A   Yes.

15          Q   And by "insider," you mean someone who has

16      legitimate access to the ballots like a poll worker

17      or election worker of some kind; is that what you

18      mean?

19          A   That's one area.  It's someone on the

20      inside where the ballots are, more generally

21      speaking.

22          Q   You have not undertaken any investigation

23      of whether there are any such insiders in Georgia

24      already who are capable of exploiting any of the

25      hacks that Dr. Halderman identifies in his report

Page 248

1    with the current system, right?

2              MR. MILLER:  Object to form.

3              THE WITNESS:  I don't understand.  Have I

4    done an investigation to determine if there's

5    someone in Georgia who can do his hack?  Is that the

6    question?

7    BY MR. CROSS:

8         Q    Right, who is an insider in the way that

9    you use that term.

10        A    I have not had the opportunity to subpoena

11   or question every poll worker or election official

12   in the State of Georgia to determine if they had the

13   technology, capability to do what Dr. Halderman has

14   done.

15        Q    You're not aware of any investigation in

16   the State of Georgia into that by the Secretary of

17   State or anyone else, right?

18             MR. MILLER:  Objection.  Relevance.

19             THE WITNESS:  I thought -- I'm sorry.

20   Maybe it's a terminology thing.

21             My understanding, in order for there to be

22   an investigation, there has to be an allegation or

23   crime.  I was not aware that there was an allegation

24   or a crime that BMDs were hacked by an insider, so

25   to my knowledge, no, and I was not aware that that

Page 249

1    was a case that existed.  I was not aware of that.

2    BY MR. CROSS:

3         Q    Aren't you saying that BMDs -- you prefer

4    them over hand-marked paper ballots because an

5    insider can hack paper ballots?

6         A    No.  That's part of it, but it's more than

7    that.

8         Q    But that's part of it, right?

9         A    Yes.

10        Q    So don't you think that those who are

11   responsible for administering elections should take

12   reasonable precautions to make sure that there are

13   not insiders within their ranks who can exploit

14   hacks of the election system like those that

15   Dr. Halderman has identified?

16        A    My expertise is in election security.  I'm

17   not in law enforcement to determine how to make that

18   investigation or how that would happen.  I'm not

19   familiar with the protocol to do that.  I think

20   that's outside of my bounds of expertise to say how

21   the state would go about that.

22        Q    I know we've been over this before, but

23   just to lay the groundwork for a question that I

24   want to ask, we're agreed that voters cannot verify

25   what's actually tabulated in Georgia elections with

Page 250

1    the QR code, right?

2        A    Georgians cannot -- to my knowledge, no

3    human being can look at a QR code and determine

4    what's in it, to my knowledge.  I have not seen

5    that.

6        Q    So a voter with a ballot in Georgia has no

7    greater ability to verify what's going to get

8    tabulated and stored in the election data as the

9    cast ballot in Georgia, they have no greater ability

10   to do that than they did with the old DREs, right?

11       A    That I don't know because what's stored in

12   the -- in the tally machine, I'm not aware of any

13   scenario where a voter can verify that, even with

14   hand-marked paper ballots.  They cannot go to that

15   machine and verify that it stored their vote as they

16   marked on the ballot.  That does not exist in any

17   election system, to my knowledge.

18       Q    But a voter with a hand-marked paper

19   ballot that's going to be scanned at the poll, that

20   they're feeding into the scan, they have the ability

21   to verify that the selections on that ballot are as

22   exactly what they marked before it's scanned, right?

23            MR. MILLER:  Objection.

24            THE WITNESS:  They have the ability to

25   verify that the marks on that ballot are the marks

1    that they made.

2              That doesn't mean that the marks on the

3    ballot are accurate.  That doesn't mean that the

4    marks on the ballot will be translated the way they

5    marked it.  Their intent is not guaranteed to be

6    captured by the scanner.

7    BY MR. CROSS:

8         Q    But if the scanner is operating as it

9    should and they have carefully verified each of the

10   selections on their hand-marked paper ballot, then

11   they can have reasonable confidence that it's going

12   to be tabulated, at the moment it goes into the

13   scanner, correctly, right?

14             MR. MILLER:  Object to form.

15             THE WITNESS:  It goes back to

16   "reasonable."  I don't know to what extent.  But

17   hopefully they have complete confidence.  Because if

18   they don't, we have an issue with our elections.

19   But there is a level of reasonableness there that's

20   variable.

21   BY MR. CROSS:

22        Q    But with a QR code, the voter has no

23   ability -- no matter how carefully they review the

24   ballot, they have no ability to verify that what's

25   going to get tabulated as their vote when it goes

1    into the scanner is accurate even if the scanner is

2    working exactly as it should, right?

3              MR. MILLER:  Objection.  Asked and

4    answered.

5              THE WITNESS:  There's no way for a human

6    being to look at a QR code, to my knowledge, and

7    determine what's in it.  So by that definition, you

8    cannot -- you don't know what's in it.  You can't

9    read the QR code with your eyes.

10   BY MR. CROSS:

11        Q   And that's the same way with the old DREs

12   in Georgia, right?  The moment the voter casts their

13   ballot, casts their ballot on the DRE, they have no

14   way to know whether it's going to be counted as they

15   intended because they don't know whether the DRE is

16   working properly, right?

17             MR. MILLER:  Objection.  Asked and

18   answered.

19             THE WITNESS:  The DRE -- there's no way to

20   know if it's even stored, if it's stored as

21   intended, if it's modified.  You have no idea of

22   anything.

23             With the QR code, you knew it was

24   successfully scanned.  You do have that

25   determination.  Just like you do with a hand-marked

Page 253

1    paper ballot, you know that it was scanned, but you

2    don't know that it read it correctly or even stored

3    it.  You don't know that it didn't change your vote.

4    You have no idea what it did in the tally.

5    BY MR. CROSS:

6        Q    As an election security expert, do you

7    believe that an election system can be so unsecured

8    that it should not be used?

9            MR. MILLER:  Objection.

10           THE WITNESS:  Yes.

11   BY MR. CROSS:

12       Q    You've prepared something you called a

13   ballot-marking verification protocol, right?

14       A    Yes.

15       Q    And the conclusion you included in that,

16   you wrote, "Don't trust the BMD.  Audit it with the

17   BMVP."

18           Do you recall writing that?

19       A    Yes.

20       Q    And why did you write that?

21       A    Because whenever you use a computing

22   device to do the tally, you cannot trust it.  You

23   have to do the audit, which was the conclusion of

24   the National Academies report.  That's why we do the

25   audit.

1           If you have hand-marked paper ballots, you

2     have to do the audit because the scanner could lie

3     to you.  You can hack the scanner.

4           Q    You testified in a case captioned National

5     Federation of the Blind versus Linda Lamone; is that

6     right?

7           A    Yes.

8           Q    And that was in 2014; is that right?

9           A    I don't know the year.

10          Q    Do I understand correctly that you

11    testified on behalf of the plaintiffs that were

12    challenging the election system in that case?

13          A    No, I don't recall which side I was on.  I

14    have to go back and look at my notes.  It's been a

15    long time, and I've served on several cases since

16    then.

17          Q    You don't recall that you testified on

18    behalf of the National Federation of the Blind?

19          A    I do recall that.  So were they the

20    plaintiffs?

21          Q    Yes.

22          A    Whoever they were, that's who I -- what

23    side I was on.  Does that help?

24          Q    Yes.  Yes.  Okay.  What was the thrust of

25    your opinions in that case on behalf of the National

Page 255

1    Federation of the Blind?

2         A    That was a remote-accessible

3    ballot-marking case, giving people the ability to

4    pull up a ballot online, use their home equipment to

5    mark it and print it and send it back.

6         Q    Why did you testify on behalf of the

7    National Federation of the Blind in that case?

8         A    Because they asked me to, and I have

9    expertise in the area.

10        Q    Did you support the relief that they were

11   seeking in that case?

12        A    Yes.

13        Q    What was that relief?

14        A    To allow an option for remote-accessible

15   believe ballot marking.

16        Q    Why?

17        A    To give accessibility for absentee voting

18   for people with disabilities.  In this case,

19   specifically visual impairment.

20        Q    And that relief would have -- would have

21   helped whom, exactly?

22        A    People with disabilities who wanted to

23   participate in absentee voting.

24        Q    Do you know about how many voters there

25   are in the State of Maryland that fall into that

Page 256

1    category?

2         A    I do not.

3         Q    Do you have a rough estimate?

4         A    I do not.

5         Q    Would you say it's many or few?

6         A    I do not know.  I have no idea.  I live in

7    the State of Florida, and I don't even know those

8    numbers for Florida.  That is something I do not

9    memorize.

10             If I needed that data, I'd go to my

11   colleagues at Rutgers University who's in my

12   declaration, and I would say, "Can you tell me these

13   numbers?"

14             And they have that data in a database, and

15   they usually can get it to me.  So it's not

16   something I have in my memory.

17             MR. MILLER:  David, did we lose you?

18             THE VIDEO OPERATOR:  We lost him.  I'm

19   going to go off the record just in case.

20             MR. MILLER:  There he is.

21             THE VIDEO OPERATOR:  We're still on the

22   record.

23             MR. CROSS:  Sorry about that.  I don't

24   know what just happened.

25        Q    Sorry, Dr. Gilbert.  Can you --

Page 257

1        A    I hear you.

2        Q    Okay.

3             Do I understand correctly that in that

4   case, the court ordered the relief that the National

5   Federation of the Blind was seeking in the form of

6   an injunction?

7        A    I believe so, yes.  I think that's the

8   outcome.

9        Q    And in your view, that relief remedied the

10  harm that all the disabled voters who were affected

11  by the particular election system at issue, it

12  remedied that harm for them?

13            MR. MILLER:  Objection.  Calls for a legal

14  conclusion.

15            THE WITNESS:  I don't know what that

16  means.  I don't understand that terminology.

17  BY MR. CROSS:

18       Q    That's a fair point.

19            You were testifying on behalf of the

20  National Federation of the Blind to help certain

21  disabled voters protect their right to vote; is that

22  fair?

23       A    Yes.

24       Q    And the relief that was awarded in that

25  case that you were seeking on behalf of them and

Page 258

1    supporting, do I understand correctly that in your

2    view, that helped protect their right to vote?

3         A    Yes.  It gave them access that others had

4    who do not have a disability.

5         Q    You have a Twitter account, right?

6         A    Yes, I do.

7         Q    Do you recall re-tweeting a tweet from

8    Matthew Masterson on September 28 of this year

9    concerning CISA's access to Dr. Halderman's sealed

10   report?

11        A    I probably did.  Matt Masterson and I are

12   colleagues, and I promote things that he puts out so

13   other people just know what's going on.  So he's a

14   colleague of mine.

15        Q    And Mr. Masterson was in a former senior

16   position at CISA, right?

17        A    I think it was CISA.  I don't know.  He

18   was at the EAC, then he left, and he was -- I forget

19   where he went directly.  Department of Defense or

20   something.  So he's had a couple positions, so I

21   kind of got lost in the mix of that.

22        Q    Why did you think it was important for

23   people to read Mr. Masterson's tweet when you

24   re-tweeted it about CISA getting access to

25   Dr. Halderman's sealed report?

Page 259

1              MR. MILLER:  Objection.  Relevance.

2              THE WITNESS:  I didn't take the time to

3    contemplate that it would be important.  Matt put it

4    out and it popped up at the top of my Twitter feed.

5    So coming from him, I said, "Oh, let me get this

6    out."

7              So I'm respectful of what he puts out, and

8    I'm respectful of what Alex does, Dr. Halderman.

9    BY MR. CROSS:

10        Q    Do you oppose CISA getting access to

11   Dr. Halderman's report?

12             MR. MILLER:  Objection.  Relevance.

13             THE WITNESS:  To be honest, I hadn't

14   thought about it.  It's not something I contemplated

15   at all.

16   BY MR. CROSS:

17        Q    As you sit here today, do you have any

18   reason to object to that?

19             MR. MILLER:  Same objection.

20             THE WITNESS:  So just to be clear, the

21   report that I have as part of this case, do I object

22   to CISA having access to that?

23   BY MR. CROSS:

24        Q    Yes.

25        A    I don't know.  It's hard to say whether I

Page 260

1    have an opinion on it or not.

2              Again, I don't know the ground rules for

3    sharing that kind of information, whether or not --

4    I don't know.  I have to think about it and

5    understand more about CISA's role as it relates to

6    this particular case.  So the answer is I don't

7    know.

8              (Exhibit 7 was marked for identification

9         and is attached hereto.)

10   BY MR. CROSS:

11        Q    Grab Exhibit 7, if you would, please.

12   We're almost done, Dr. Gilbert.

13        A    Exhibit 7?

14        Q    Yeah.

15        A    I found it.  Got it.

16        Q    You see this is the tweet that we were

17   talking about where you re-tweeted a tweet from

18   Matthew Masterson regarding CISA's access to

19   Dr. Halderman's report?

20        A    Okay.

21        Q    And Mr. Masterson wrote and what you

22   re-tweeted, "Just to be clear here, CISA is offering

23   to facilitate coordinated disclosure from a

24   researcher to impacted entities.  This is something

25   they have a division whose job it is to do this and

Page 261

1    we did with elections fairly regularly."

2              Do you see that?

3         A    I see it.

4         Q    When you re-tweeted this, you didn't

5    object or express any concern about CISA getting

6    this access, right?

7              MR. MILLER:  Objection.  Relevance.

8              THE WITNESS:  I didn't say anything.  I

9    just re-tweeted it.

10             I think -- just to be clear, if I re-tweet

11   something, that is not an endorsement of it.  It's

12   sharing information.  That's how I was doing this.

13   I was sharing information.

14             I'm in the election community.  So is

15   Matt.  And Matt and I have a relationship for many

16   years.  And so I feel that just sharing information

17   and putting it out there so others can make their

18   own determination, that's how I see this.  It's not

19   an endorsement on my behalf or otherwise.

20   BY MR. CROSS:

21        Q    Dr. Gilbert, you don't indicate in your

22   declaration whether there has been any hack or

23   compromise of Georgia's election system, right?

24        A    Correct.

25        Q    And that's not something you undertook to

Page 262

1    investigate, right?

2         A    Something I -- I don't understand.  I

3    don't -- I wouldn't think I had the authority to

4    start an investigation to say Georgia's election

5    system had been hacked for the 2020 election.

6              If there was such a hack, I think it would

7    have made national media, or an accusation of such a

8    hack would have made national media.  But I don't

9    see myself as the authority to go in and declare a

10   hack was done.  No.

11        Q    Do you understand that the state has

12   represented in this case that they are not aware of

13   any hacking of any elections in Georgia?

14        A    I'm not surprised by that.  Again, if

15   there was any accusation, that would have made

16   national media.

17        Q    But in your role as an election security

18   expert retained by the state addressing the security

19   of and reliability of the election system, you

20   didn't conduct any investigation of your own into

21   whether there has been any hacking that's occurred

22   in the state with any election.  You just didn't

23   look into it, right?

24             MR. MILLER:  Asked and answered.

25             THE WITNESS:  I'm struggling with this.

Page 263

1    It seems by that question it gives me the impression

2    that I have the authority to look into -- and I

3    don't know of any allegation of election hacking in

4    the State of Florida -- I mean, Georgia.  And what

5    you're saying is I had that capability to do that.

6            I'm not aware that I had that, so that

7    would be news to me that I can do that.

8    BY MR. CROSS:

9        Q   It never occurred to you to just ask your

10   client, "Hey, are you aware of any instance where

11   there's been unauthorized access to any component of

12   the election system in Georgia?"

13       A   Absolutely not, because of the last

14   election being highly contentious, if there was even

15   an allegation, it would have made national media.

16       Q   Dr. Gilbert, you've been retained in this

17   case since November of 2019, right?

18       A   I guess.  I don't remember the exact start

19   date.

20       Q   Well, you testified in a hearing last

21   September that predates the controversy in Georgia

22   regarding the November election, right?

23       A   Yes.

24       Q   So at no point prior to the controversy

25   you just mentioned about elections in Georgia, it

Page 264

1    never occurred to you to ask your client, "Hey, are

2    you aware of whether there's ever been unauthorized

3    access to election equipment or software or data in

4    Georgia?"

5              MR. MILLER:  Objection.  Asked and

6    answered.

7              THE WITNESS:  No.  I'm sorry.  But you

8    just asked a totally different question.

9    BY MR. CROSS:

10        Q    I didn't mean to.

11        A    Which question are we dealing with?

12   You've asked two different questions, and I want to

13   know -- so ask me the exact question you want an

14   answer to, because you just asked two different

15   questions that are not the same.  So please be clear

16   in what you're asking.

17        Q    So from the time that you were engaged in

18   this case in November of 2019 until at least the

19   September hearing of last year, it never occurred to

20   you to ask your client whether they were aware of

21   any unauthorized access to any components of the

22   Georgia election system with the current system; you

23   never asked that, right?

24             MR. MILLER:  Objection.  Asked and

25   answered.

1          THE WITNESS:  I did not ask that question.

2     BY MR. CROSS:

3          Q    And you did not ask that question

4     regarding the prior DRE system, correct?

5          A    I did not ask that question.  The answer

6     to that was no.

7          Q    In what way?

8          A    There was an article, Kennesaw State and

9     the files.  Are you familiar with what I'm talking

10    about?

11         Q    Tell me what you mean.

12         A    The previous DRE system was managed by

13    Kennesaw State, statewide, and there was a report --

14    I don't remember the exact details, but there was a

15    report of a breach or something with files and the

16    DRE.  So I remember that report.

17              Therefore, it was not a question for me to

18    ask, knowing that it was in the public already.

19         Q    You didn't undertake any investigation to

20    determine whether that breach of the old DRE system

21    has, in any way, infected the new BMD system in

22    Georgia, correct?

23         A    I did not.  As I mentioned in my previous

24    declaration that the BMD is air-gapped, and this is

25    an independent entity, independent system.  It's not

Page 266

1    even the same manufacturer.

2         Q    Right.  But you're assuming that it's

3    air-gapped because you've never confirmed that it

4    is, right?  I thought we established that.

5              MR. MILLER:  Asked and answered.

6    BY MR. CROSS:

7         Q    You're assuming it's air-gapped, right?

8         A    No, I was using the documents that were

9    provided to me that the machine was air-gapped.

10        Q    I thought we established earlier you don't

11   actually know whether any aspect of the system is

12   actually air-gapped because you haven't looked,

13   right?

14             MR. MILLER:  Same objection.

15             THE WITNESS:  If the standard is that

16   you -- any written documentation could be false, and

17   the only way to determine if the technology is what

18   it's documented as, then I have not evaluated it to

19   make that determination.

20             So I think what you're saying, it's

21   possible that the documents that were provided to me

22   were incorrect.

23   BY MR. CROSS:

24        Q    Are you aware that there was a hearing in

25   this case in 2018 involving the prior election

Page 267

1    system?

2         A    I -- I don't know.  You have to give me

3    details, and then I could tell you if I heard about

4    it.  I've been involved in many cases and I read a

5    lot of this information.  So to just ask me that

6    question, it's a tough one for me to say yes.

7              Again, I live in Florida, not Georgia.  If

8    I was in Georgia, I'd probably be able to answer

9    that question easily.

10        Q    Are you aware that in 2018, the state

11   represented, including under oath, that the DRE

12   system was air-gapped, and it came to light during

13   the course of a hearing, where their witnesses were

14   cross-examined, that, in fact, it was not

15   air-gapped, that there were connections to the

16   Internet or to devices that are connected to the

17   Internet?

18             Is that something you reviewed and

19   considered for your opinions in this case?

20             MR. MILLER:  Objection.

21             THE WITNESS:  I was not aware of that.

22   BY MR. CROSS:

23        Q    Don't you think that that is relevant

24   information in determining whether you can rely on

25   documentation or representations from the state on

1    whether the new system is, in fact, air-gapped?

2              MR. MILLER:  Objection.  Relevance.

3              THE WITNESS:  That's information.  I don't

4    know -- so the information -- so there's a scenario

5    where that information -- I don't know the source of

6    the information that provided the false information

7    about the DRE.  It may not be the same source that

8    provided the information about the BMD.

9              In other words, in essence, based on the

10   questioning here, if someone ever was dishonest,

11   then that assumes all people are dishonest, and I

12   don't believe that.

13   BY MR. CROSS:

14        Q    To be clear, Dr. Gilbert, I'm not

15   suggesting -- I'm not opining on anybody's intent.

16   People can believe that something is air-gapped and

17   be wrong about that for any manner of reasons.

18             All I'm asking you is, for the opinions

19   you've offered in this case, you didn't think it was

20   relevant to go back and examine the reliability of

21   documentation and representations that had been made

22   about the air-gapping of the system in light of

23   those representations coming to light as unreliable

24   in the past?

25        A    As I said, I was not aware of the

Page 269

1    representations that you just presented as

2    unreliable in the past.  I'll say it again.  I was

3    not aware of them.

4         This is news, the first time I'm hearing

5    it, number one.  The documents that were provided to

6    me, again, are cited in my declaration, and they,

7    from my interpretation, are official documents.

8         But if they are unofficial or if they're

9    false, that would be good information for me to be

10   aware of.

11        Q    Are you aware that the Secretary of

12   State's office engaged a company called

13   Forless (phonetic) to do some cybersecurity

14   assessments on behalf of the state?

15        A    That does not ring a bell.  I don't -- I'm

16   not familiar with that company.

17        Q    So in formulating your opinions in this

18   case, you haven't reviewed or considered any reports

19   by Forless that were prepared on behalf of the

20   Secretary of State's office; is that right?

21        A    I don't think so.  That doesn't ring a

22   bell.  The name -- that name doesn't resonate with

23   me right now.

24             MR. CROSS:  All right.  Let's go off the

25   record.

```
                                        Page 270

 1              THE VIDEO OPERATOR:  Going off the record
 2      at 4:56.
 3              (Recess, 4:56 p.m. - 5:10 p.m.)
 4              THE VIDEO OPERATOR:  We are back on the
 5      record at 5:10.
 6              (Exhibit 8 was marked for identification
 7          and is attached hereto.)
 8      BY MR. CROSS:
 9          Q   Dr. Gilbert, can you grab Exhibit 8,
10      please?
11          A   All right.  I got it.
12          Q   Do you recognize Exhibit 8 as a copy of
13      your engagement letter on behalf of the state in
14      this case?
15          A   I guess so.  This looks familiar.  Okay.
16      Yeah.
17          Q   If you come to page 3, do you see your
18      signature and the date November 12, 2019?
19          A   Yes.
20          Q   Do you recall that the first declaration
21      you issued in this case on behalf of the state was
22      dated November 13, 2019, the very next day?
23          A   I don't recall the date.
24          Q   Do you recall how much time you put into
25      preparing your declaration?
```

1       A    I'd have to go look at records or

2    something, but I don't recall.

3       Q    Approximately how many hours have you

4    worked on behalf of the state in this case?

5       A    I don't know if I have a record of that.

6    Let me see.

7       Q    Just your best estimate.  I don't need you

8    to look it up, Dr. Gilbert.

9       A    That's hard for me.  I'm only tracking

10   since the last one.  So I would say -- I don't

11   know -- 40 hours or -- I don't even know.  I'd have

12   to -- I'd really have to go and analyze and look at

13   invoices and all of that.

14      Q    How much have you been paid for your work

15   in this case?

16      A    That I don't know, either.  Probably on

17   the order of, my best guess, probably like 5- -- 4-

18   or 5,000, if that maybe.

19      Q    Do you anticipate offering any opinions

20   at any future date in this case that are not

21   reflected in your declaration or in your testimony

22   today?

23      A    I don't know.

24      Q    So as you sit here in this moment, are

25   there any opinions that you have in mind that you

Page 272

1      would anticipate offering that you've not

2      already shared with us through written or oral

3      testimony?

4           A    I don't anticipate anything at this time.

5           Q    How many times have you been engaged as a

6      consultant or expert to address election security

7      issues?

8           A    Several.  Off the top of my head, probably

9      six.

10          Q    Can you describe each of those?

11          A    This case, the Maryland case, then there

12     was another Maryland case.  I've been on New York,

13     New Hampshire, Pennsylvania.  And I think I've

14     discussed -- I didn't get -- go all in with

15     something in California maybe, but those are the six

16     off the top of my head.

17          Q    You said the Maryland case.  Were you

18     talking about the one for the National Federation of

19     the Blind that we looked at earlier as one of the

20     Maryland cases?

21          A    Yes, that's one of them.

22          Q    And what did the other one involve?

23          A    The other Maryland case, I think that's

24     another ballot-marking case, BMD case.

25          Q    When were you involved in that case?

Page 273

1         A    Maybe last year.

2         Q    Did you submit any testimony, written or
3    oral?

4         A    I believe so.  I'd have to go back and
5    look at all those records.

6         Q    What was the thrust of your opinions in
7    that case?

8         A    If it's the right case, that the
9    ballot-marking device was acceptable for use
10   throughout the state.  I believe that was the
11   Maryland -- the second Maryland case.  But again,
12   I'd have to go look all these cases up.  They're
13   blurry to me because there were so many.

14            Some were remote ballot-marking cases, so
15   there's a variation in what the cases were about,
16   and I just -- I'd have to go look and see case to
17   case what it was, and what -- oh, and Virginia.
18   There was one in Virginia as well.

19            So I'd have to go look and verify these
20   things.

21        Q    Dr. Gilbert, to make it easy on you,
22   rather than to walk through each of these and test
23   your memory, we would ask that you would send us a
24   disclosure statement that identifies each
25   engagement in which you have been retained

Page 274

1      on related to election security issues so that we

2      can see what those engagements were and what the

3      thrust of your role or opinions were and the

4      timing.

5              I just want to ask, are you willing to do

6      that?  If you're not, we're going to have to go case

7      by case right now.  I'm trying to save you some

8      time.  I need to know whether you're willing to do

9      that or whether Mr. Miller is going to object.

10             MR. MILLER:  David, we'll provide it to

11     you.  Yeah.

12             MR. CROSS:  Okay.

13             MR. MILLER:  If that's the request.

14             MR. CROSS:  Yeah.  Thank you.  It will

15     make it a lot faster for you, Dr. Gilbert.  We

16     appreciate that.

17             (Exhibit 9 was marked for identification

18          and is attached hereto.)

19     BY MR. CROSS:

20         Q   All right.  Take a look at -- and I

21     promise, we're almost done.

22             Take a look at Exhibit 9, please, just

23     briefly on this.  Let me know when you have it.

24         A   Okay.  Got it.

25         Q   Do you see here, this is a portion of a

Page 275

1    transcript in a case, Assemblyman Reed Gusciora, and

2    it's in -- as one of the plaintiffs, and it's in

3    Superior Court of New Jersey.

4            Do you see that?

5        A   Okay.  At the top?  Yes.

6        Q   And you see, if you look in the middle

7    where it says, "Place:  Mercer County Courthouse,"

8    the date, March 24, 2009.

9            Do you see that?

10       A   Yes.

11       Q   And if you look at the bottom right

12   corner, do you see where it says,

13   "STATE-DEFENDANTS," and then there's a number?

14       A   Bottom right corner?  Yes, I do.  I do.

15       Q   And I will tell you, what that indicates

16   is this is a document that was produced to us by the

17   state defendants in this case.  That's how we got

18   this.

19           I wanted to ask you, if you look at -- go

20   to the bottom of the first page of the testimony,

21   page 81, line 23.

22           Do you see that?

23       A   Page 81, line 23.  Yes.

24       Q   And actually -- I'm sorry.  To give you a

25   little more context, look at the top of page 81,

Page 276

1    line 6.
2             Do you see that?
3        A    Yes.
4        Q    And you see it says, "But, Dr. Shamos,
5    haven't you stated."
6             Do you see that line?
7        A    Yes.
8        Q    Do you understand that this is an
9    examination of Dr. Shamos in this case?
10       A    Okay.
11       Q    Now, if you come down to line 23 on that
12   same page, the question to Dr. Shamos, "So do you
13   believe that DREs are better without a paper trail
14   than with one?"
15            Do you see that?
16       A    I see that.
17       Q    His answer was, according to this
18   transcript, "I believe that DREs are better without
19   the currently available paper trail mechanisms.  I
20   don't rule out the possibility that somebody could
21   design a better paper trail mechanism, that would be
22   perfectly fine."
23            Do you see that?
24       A    I see that.
25       Q    I just have one question for you because

Page 277

1     it directly relates to you.

2              If you come to page 83, line 17 -- and let

3     me know when you have that.

4          A    Page 83, line 17.  I'm there.

5          Q    And the question was, "So you're saying

6     that other people agree with your position?

7              "Answer:  Yes.

8              "Question:  Who else?

9              "Answer:  Ted Selker, for example, of MIT.

10    Juan Gilbert of Auburn University."

11             Do you see that?

12         A    I see it.

13         Q    And then if you come to the top of 84 --

14    are you there?

15         A    I'm there.

16         Q    -- at line 4, the questioner continues,

17    "If we were to call Professor Selker, and you said,

18    Juan Gilbert as rebuttal witnesses, it's your

19    position that they would get on the stand and state

20    that they believe that paperless DREs are better as

21    they exist than DREs with paper -- with paper as

22    they exist now?  Is that your testimony?

23             "Answer:  Well, that's my belief.  I don't

24    know what they would actually say under oath.

25    Nobody knows what they would say under oath."

Page 278

1          Do you see that?

2      A    I see it.

3      Q    Does Dr. Shamos characterize your position

4    accurately on this issue here?

5          MR. MILLER:  Objection.  Relevance.

6          THE WITNESS:  No.  What year was this?

7    BY MR. CROSS:

8      Q    It looks like 2009, according to the

9    transcript.

10     A    No.  That's not -- that is not my

11   position.  And you can find probably videos of me --

12   in fact, the presentation I did at Princeton, I

13   was clear in saying what my position was, that you

14   had to have a paper ballot.  There's no way to

15   secure a digital ballot.  There's no known way to do

16   that.

17         I'm on the record saying that several

18   times in the EAC, all over the place.

19     Q    You were at one point a proponent of DREs,

20   right?

21         MR. MILLER:  Objection.  Relevance.

22         THE WITNESS:  I was a proponent of

23   accessible DREs with a paper trail.  We have to go

24   back and look at the record.

25         We may have been the first to actually do

Page 279

```
 1    this when we did -- back in 2000, I know we were the

 2    first to create the universally designed voting

 3    machine because we did that in 2002, 2003, when no

 4    one believed you could have one machine that

 5    everyone could vote on.  So we'd been doing that.

 6              But I said that accessibility at the time

 7    was -- DREs gave accessibility, but, yeah, the

 8    security aspect, you just don't know because you

 9    can't verify.

10    BY MR. CROSS:

11         Q   But you no longer support DREs as a

12    reliable election mechanism in the U.S., right?

13         A   Correct.

14              MR. MILLER:  Objection.  Relevance and

15    misstatement.

16    BY MR. CROSS:

17         Q   And, I'm sorry, did you say "correct"?

18         A   Yes.  DREs, again, there's no way to

19    secure a digital ballot.

20         Q   Given you were once a proponent of DREs

21    and you now agree that DREs are not reliably secure,

22    do you allow for the possibility that you are wrong

23    about the reliability of BMDs in your stance in

24    supporting them today?

25              MR. MILLER:  Object to form and relevance.
```

```
                                             Page 280

 1               THE WITNESS:  I do not.  I think it's
 2      interesting that -- that is a good question to ask
 3      in light of the new development, in particular,
 4      transparent voting machine that broke
 5      Dr. Halderman's, I guess, hack or whatever you
 6      want to call it, that voter verification.  Now we
 7      solved that problem.  Solved.  Solution.  There it
 8      is.
 9               I do know that voting through the BMD, as
10      I stated in my declaration, has advantages over
11      hand-marked paper ballots, and I still believe
12      they -- there's a much better option than
13      hand-marked paper ballots.  I believe that is a
14      better option for providing equity, security,
15      usability, accessibility.  The BMD or a form of a
16      BMD is the way to go.
17      BY MR. CROSS:
18          Q   I'm sorry.  Did you say the new
19      transparent voting machine BMD prototype you have
20      broke Dr. Halderman's hack?
21          A   Yes.
22          Q   And you say that's because this new
23      prototype that you have allows a greater ability of
24      voter verification; is that right?
25          A   Yes.  Not only allows.  I guarantee voter
```

Page 281

1    verification.  You'd have to try not to verify,

2    especially -- again, that was the first version that

3    I posted.  The next version is even better.

4           So at a time when Dr. Halderman and others

5    said, "Well, there's no -- people can't verify,

6    people won't verify," I created a solution that

7    gives that, and now you can have accessibility at

8    the same time.

9           So there you go.  Again, I don't break

10   these things.  I fix them and make them work.  But

11   I'm glad he exists because he keeps me busy.

12        Q    And to be clear, when you say you broke

13   his hack, your new prototype doesn't prevent any of

14   the hacks that Dr. Halderman has identified with the

15   election system in Georgia, correct?

16        A    We'll find out in 2022.  As I mentioned

17   earlier, I hope Dr. Halderman would be open to

18   exploring that option to see.  We'll see.

19        Q    Let me make sure we're understanding each

20   other.

21        A    Yeah.

22        Q    Your position is that your new prototype

23   BMD protects against the types of hacks that

24   Dr. Halderman has identified in his report in this

25   case; is that fair?

Page 282

1          A    I'm saying that I'm working on a new

2     extension of that prototype that I will have go

3     public within 2022 that either prevents

4     Dr. Halderman from hacking it or eliminates his

5     hacks and makes them irrelevant.

6               And again, if -- I hope that he is open to

7     exploring that, and we'll find out.  I hope that's

8     the case.

9          Q    That prototype is not used in the State of

10    Georgia today, correct?

11         A    The prototype is a prototype that's not

12    being used anywhere in the world.

13         Q    And -- so that prototype does not offer

14    any protection to Georgia voters using the current

15    system today with respect to the hacks that

16    Dr. Halderman has identified, correct?

17         A    No.  It is not offered -- it's a

18    prototype.  It has not gone to a certification.  It

19    has not been produced as a product.  It is not a

20    product.

21         Q    Even with respect to that prototype, do I

22    understand correctly there's nothing in that

23    prototype that prevents the hacks that Dr. Halderman

24    has identified from occurring; what you're saying is

25    that the greater level of voter verification

Page 283

1    increases the odds that voters will catch the hack

2    and then prevent the hack from having an impact on

3    their votes or election outcomes?  Do I have that

4    fair?

5         A    No.  Only half.

6              It does give you verification; therefore,

7    you cannot have a scenario where votes are swapped

8    undetected, number one.

9              Number two, I believe it will prevent the

10   hacks that he specializes in or make them

11   irrelevant.

12        Q    How does your prototype prevent the hacks

13   from even occurring?

14             Again, I'm not talking about whether they

15   have an impact because of voter verification.  But

16   what is it about your prototype that would prevent

17   Dr. Halderman from even implementing the hack in

18   the first instance if he had access to the

19   equipment?

20        A    I haven't released that information yet,

21   and I don't know that it's pertinent to this case.

22             Carey, is that something I have to

23   reveal?

24        Q    It's fine.

25             MR. MILLER:  David, I'll instruct him on

Page 284

1     privilege if you need to me to, but otherwise --
2              MR. CROSS:  That's not a privilege issue.
3     I don't think an instruction would be proper because
4     there's no privilege issue.
5         Q    But I'm not going to ask you to disclose
6     it, Dr. Gilbert.
7              Just so I understand, are you saying that
8     you have in development right now with your
9     prototype some measures that you believe would
10    prevent someone like Dr. Halderman from even
11    implementing on that prototype the sort of hacks
12    that he's identified in his sealed report?  Is that
13    fair?
14        A    That's fair.
15        Q    Okay.  But those measures are still under
16    development; do I understand that right?
17        A    Yes.  I need to implement them into a
18    hardware.  And once I have that done, then I'm ready
19    to go public.
20             And Dr. Halderman, Dr. Appel, I have a
21    list of people who I'm going to reach out to first
22    and make sure they're aware.
23             And I'm planning to offer, in particular,
24    Dr. Halderman to send him a machine and let him hack
25    it and have him send it back, and we will do an

1    experiment to see if he can hack it, and if we can

2    determine if he hacked it and if we can correct it.

3    We will document the whole process.

4         Q   Do you believe that other makers of

5    election equipment like Dominion should subject

6    their voting equipment to a similar robust testing

7    as you've just described for yours?

8              MR. MILLER:  Objection.  Relevance.

9              THE WITNESS:  I don't know that they can.

10   I'm not a vendor.  Therefore, I'm working in a

11   totally different space where I can do things --

12   and I don't know what this means for people like

13   that.

14             For example, if I send Dr. Halderman my

15   technology and he's successful, I don't lose

16   anything.  It's not -- you know, I go back to the

17   drawing board and start over.  I don't know if the

18   implications are the same for a vendor.

19             So it's a different thing.  I have a

20   different level of freedom to be able to do these

21   things.

22   BY MR. CROSS:

23        Q   Because you don't have a commercial

24   interest in the product, you mean?

25        A   Yes.  I'm not a -- yeah.  Again, I'm not a

Page 286

1    vendor.

2              And remember, when I first did this, it

3    was open source so anyone could have it.  It was

4    free.

5              MR. CROSS:  I do not have any further

6    questions for you, Dr. Gilbert, and I appreciate

7    your time.

8              THE WITNESS:  Thank you.

9              MR. MILLER:  Before we go off the record,

10   I'm just going to reserve signature for Dr. Gilbert.

11   I'm not going to ask questions here today.

12             THE REPORTER:  Before we go off, this is

13   the reporter --

14             MR. CROSS:  I think we're done.  Thank you

15   again, Dr. Gilbert.

16             MR. MILLER:  I think our court reporter is

17   speaking to us.

18             THE REPORTER:  I'm sorry.  Mr. Miller, a

19   copy of the transcript?

20             MR. MILLER:  Yes, please.  Rough when it's

21   available.  And then a week or so on the final, if

22   that's all right.

23             THE REPORTER:  Okay.  And Mr. Lowman, a

24   copy for you?

25             MR. LOWMAN:  Yes.  We do not need a rough,

Page 287

1      though.

2              THE REPORTER:  Okay.  Thank you.  Did you

3      want your copy rushed, or is the regular --

4              MR. LOWMAN:  No.

5              MR. CROSS:  Carla, do you want to go off

6      the video?

7              THE REPORTER:  Sure.  That's fine.

8              THE VIDEO OPERATOR:  Okay.  Going off the

9      record on October 29th, 2021, at 5:31 p.m. Eastern

10     Time.

11              (TIME NOTED:  5:31 p.m.)

12                      --o0o--

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 288

1          I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4          That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12         Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [x] was [ ] was not requested.

16         I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19         IN WITNESS WHEREOF, I have this date

20    subscribed my name.  Dated this 5th day of November, 2021.

21

22

23

24                    *Carla Soares*

25                    CARLA SOARES

                      CSR No. 5908

Page 289

1    Carey Miller, Esquire

2    carey.miller@robbinsfirm.com

3                          November 5, 2021

4    RE:    Curling, Donna  v. Raffensperger, Brad

5         10/29/2021, Juan Gilbert, Ph.D. (#4871592)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   erratas-cs@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of transcript.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

```
                                          Page 290

 1    Curling, Donna  v. Raffensperger, Brad

 2    Juan Gilbert, Ph.D. (#4871592)

 3                 E R R A T A   S H E E T

 4    PAGE_____ LINE_____ CHANGE_____

 5    _____

 6    REASON_____

 7    PAGE_____ LINE_____ CHANGE_____

 8    _____

 9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____     _____

24    Juan Gilbert, Ph.D.                      Date

25
```

Page 291

1    Curling, Donna  v. Raffensperger, Brad

2    Juan Gilbert, Ph.D. (#4871592)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Juan Gilbert, Ph.D., do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Juan Gilbert, Ph.D.                     Date

13   *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20____.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25