Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION

3

    DONNA CURLING, ET AL.,

4
                Plaintiffs,
5                               CIVIL ACTION FILE
        vs.                     NO. 1:17-CV-2989-AT
6

    BRAD RAFFENSPERGER, ET AL.,

7
                Defendants.
8

9

10

11        REMOTE VIDEOTAPED ZOOM DEPOSITION OF
                    DAVID HAMILTON
12
                January 18, 2022
13                  10:06 A.M.

14

15      Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC

16

17

18

19

20

21

22

23

24

25

```
 1                    APPEARANCES OF COUNSEL
 2                 (All appearances via Zoom)
 3
 4     On behalf of the Plaintiffs:
 5          MARY G. KAISER, ESQ.
            DAVID D. CROSS, ESQ.
 6          MORRISON & FOERSTER LLP
            2100 L Street, NW
 7          Suite 900
            Washington, DC 20037
 8          202.887.1500
            mkaiser@mofo.com
 9          dcross@mofo.com
10     - and -
11          HALSEY G. KNAPP, JR., ESQ.
            ADAM M. SPARKS, ESQ.
12          KREVOLIN HORST
            One Atlantic Center
13          1201 W. Peachtree Street, NW
            Suite 3250
14          Atlanta, Georgia  30309
            404.888.9700
15          hknapp@khlawfirm.com
            sparks@khlawfirm.com
16
17     On behalf of Secretary of State and the State
       Election Board:
18
            CAREY MILLER, ESQ.
19          ROBBINS ALLOY BELINFANTE LITTLEFIELD
            500 14th Street NW
20          Atlanta, Georgia 30318
            678.701.9381
21          carey.miller@robbinsfirm.com
22
23
24
25
```

1                    APPEARANCES OF COUNSEL

2

3       On behalf of Defendants Fulton County Voter
        Registration and Elections:

4
                CHERYL RINGER, ESQ.
5               OFFICE OF THE FULTON COUNTY ATTORNEY
                141 Pryor Street, SW
6               Suite 4038
                Atlanta, Georgia 30303

7

8

9       Also Present:
10              Marilyn Marks, Coalition for Good Governance

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    INDEX OF EXAMINATION

2     WITNESS:  DAVID HAMILTON

3     EXAMINATION                                    PAGE

      By Ms. Kaiser                                   9

4     By Mr. Miller                                  199

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                     INDEX TO EXHIBITS
2        Plaintiffs'
           Exhibit          Description           Page
3
4        Exhibit 1    Email Chain, Bates Numbers      18
                      FORTALICE001200 through
5                     -001201
6        Exhibit 2    LinkedIn Profile of David       22
                      Hamilton, No Bates Numbers
7
         Exhibit 3    Email Chain dated August        40
8                     2016, Bates Numbers
                      FORTALICE000002952 through
9                     -2953
10       Exhibit 4    Fortalice Red Team              46
                      Penetration Test and Cyber
11                    Risk Assessment Report for
                      State of Georgia, Office of
12                    the Secretary of State,
                      November 2018, Bates Numbers
13                    Payton 000070 through
                      -000119
14
         Exhibit 5    Declaration of David            53
15                    Hamilton, No Bates Numbers
16       Exhibit 6    Task order from Fortalice to    84
                      the Secretary of State's
17                    office dated March 11, 2021,
                      Bates Numbers
18                    FORTALICE000001 through -2
19       Exhibit 7    Weekly Updates from             65
                      Fortalice to the Secretary
20                    of State's Office, Bates
                      Numbers FORTALICE002781
21                    through -2788
22       Exhibit 8    Email Chain, Bates Numbers      90
                      STATE-DEFENDANTS-00126678
23                    through -126682
24       Exhibit 9    Email Chain, Bates Numbers      94
                      STATE-DEFENDANTS-00126696
25                    through -126698

```
 1                     INDEX TO EXHIBITS
 2      Plaintiffs'
          Exhibit            Description          Page
 3
        Exhibit 10   News Article, "UPDATE:        102
 4                   Ransomware Attackers Hit
                     Hall County Election
 5                   Infrastructure, dated
                     October 23, 2020, No Bates
 6                   Numbers
 7      Exhibit 11   Email Chain, Bates Number      104
                     STATE-DEFENDANTS-00104972
 8
        Exhibit 12   Email Chain, Bates Numbers     109
 9                   STATE-DEFENDANTS-00158821
                     through -158822
10
        Exhibit 13   Election Office Notes, 10 AM   116
11                   6/15/20 Meeting, Bates
                     Numbers
12                   STATE-DEFENDANTS-00158823
                     through -158825
13
        Exhibit 14   Email Chain, Bates Numbers     125
14                   STATE-DEFENDANTS-00171971
                     through -171973
15
        Exhibit 15   Email Chain, Bates Numbers     134
16                   FORTALICE001209 through
                     -1212
17
        Exhibit 16   Supplemental Declaration of    144
18                   David Hamilton, No Bates
                     Numbers
19
        Exhibit 17   Email Chain, Bates Numbers     149
20                   STATE-DEFENDANTS-00126614
                     through -126616
21
        Exhibit 18   Email Chain, Bates Numbers     152
22                   FORTALICE001163 through
                     FORTALICE001166
23
        Exhibit 19   Report from Fortalice          158
24                   Solutions dated July 14,
                     2020, Bates Numbers
25                   FORTALICE000625 through -629
```

Page 7

1                          INDEX TO EXHIBITS
2        Plaintiffs'
           Exhibit            Description              Page
3
         Exhibit 20   Email from David Hamilton     165
4                     dated 4/29/2021, Bates
                      Number
5                     STATE-DEFENDANTS-00170625
6        Exhibit 21   Email from Dave Hamilton      172
                      dated 8/21/2020, Bates
7                     Number
                      STATE-DEFENDANTS-00161203
8
         Exhibit 22   Document, Bates Numbers        172
9                     STATE-DEFENDANTS-00161204.xl
                      sx through -161204.xlsx
10
         Exhibit 23   Document Titled "2020          176
11                    Security of the Voter
                      Registration System
12                    Artifacts and Attestation
                      Pursuant to Rule
13                    590-8-3-.01" dated December
                      18, 2020, Bates Numbers
14                    STATE-DEFENDANTS-00182171
                      through -00182214
15
         Exhibit 24   Email Chain, Bates Numbers     179
16                    STATE-DEFENDANTS-00182118
                      through -182120
17
18              (Original exhibits are attached to the
19          original transcript.)
20
21
22
23
24
25

1                    Deposition of DAVID HAMILTON

                         January 18, 2022

2

3                    (Reporter disclosure made pursuant to

4            Article 8.B of the Rules and Regulations of the

5            Board of Court Reporting of the Judicial

6            Council of Georgia.)

7                    VIDEOGRAPHER:  We are on the record

8            January 18, 2022, at approximately 10:06 a.m.

9            Eastern time.  This will be the videotaped

10           deposition of David Hamilton.

11                   Would counsel please identify themselves

12           and who they represent for the record.

13                   MS. KAISER:  This is Mary Kaiser with

14           Morrison & Foerster on behalf of the Curling

15           plaintiffs.  With me today are my colleagues

16           Zach Fuchs, David Cross, and Halsey Knapp.

17                   MR. MILLER:  This is Carey Miller with the

18           Robbins firm, here on behalf of the State

19           defendants Secretary of State Brad

20           Raffensperger and the State Election Board

21           members.

22                   MS. MARKS:  This is Marilyn Marks,

23           representative, Coalition for Good Governance.

24                   MS. RINGER:  Cheryl Ringer, attorney for

25           Fulton County.

Page 9

1            VIDEOGRAPHER:  Would the court reporter
2        please swear in the witness.
3            DAVID HAMILTON, having been first duly sworn,
4    was examined and testified as follows:
5            EXAMINATION
6    BY MS. KAISER:
7        Q.   Good morning, Mr. Hamilton.
8        A.   Good morning.
9        Q.   Can you please state your name and address
10   for the record?
11       A.   David Hamilton, ████████████████████████
12   ████████████████████████
13       Q.   Thank you.
14            Are you represented by counsel today, sir?
15       A.   For the purposes of this proceeding, yes,
16   by Carey Miller.
17       Q.   Okay.  All right.  Have you ever been
18   deposed before?
19       A.   Not via video, no.
20       Q.   All right.  Let me just walk you through a
21   couple of rules of the road, just to -- just to
22   level-set here.
23            So I'm going to be asking you a series of
24   questions.  I'll try to make my questions clear, but
25   if you do not hear a question or you don't

Page 10

1    understand it, please ask me to clarify my question.

2            Is that okay?

3        A.   Sure.

4        Q.   Okay.  If you answer, I'm going -- going

5    to assume that you understood the question.

6        A.   Understood.

7        Q.   We should try not to talk over each other,

8    because the court reporter is going to be taking

9    down everything that we say.  So I will try not to

10   interrupt you, and I also ask that you let me finish

11   my question before you begin your answer.

12           Is that okay?

13       A.   Certainly.  Certainly.

14       Q.   Okay.  Your counsel may object to some of

15   my questions, but do you understand that unless your

16   attorney instructs you not to answer, that you need

17   to answer all of my questions?

18       A.   I do.

19       Q.   And you understand that you're under oath

20   today, sir; correct?

21       A.   Yes.

22       Q.   Is there any reason that you cannot

23   testify truthfully today?

24       A.   No.

25       Q.   Is there anyone else in the room with you?

Page 11

1          A.    No.  I'm in my office at home.

2          Q.    Okay.  And just because we're in a -- in a

3     remote environment, I just want to make sure.

4               Do you have any -- any chat functions or

5     email or anything else open on your computer?

6          A.    Just this share for exhibits.

7          Q.    The Exhibit Share?

8          A.    Yeah.

9          Q.    Okay.  Okay.  Great.  Thank you.

10              If you need to take a break at any point,

11    just let me know.  I will -- I will just ask that

12    you -- if there's a question pending, if I've asked

13    a question, that you provide an answer to that

14    question before we take a break.

15         A.    Sure.  That's fine.

16         Q.    Thank you.

17              What did you do to prepare for your

18    deposition today, Mr. Hamilton?

19         A.    Not an awful lot.  I haven't been at the

20    State now for six months.  So...

21         Q.    Right.

22              When did you leave the State?

23         A.    Middle of June of this past year, 2020 --

24    2021.

25         Q.    2021?

Page 12

```
 1        A.   Sorry.
 2        Q.   I think time is a little confused for all
 3   of us because of COVID.
 4        A.   The years, yeah.
 5        Q.   Right.  All right.  So thank you.
 6             So when did you first learn that we wanted
 7   to take your deposition in this case?
 8        A.   I guess middle of last week.
 9        Q.   Okay.  And how did you learn that?
10        A.   I -- we got the -- I got an email from --
11   I'm blanking on it -- Ryan Germany and -- and said
12   that I may get a subpoena.  And lo and behold, I
13   did.  So...
14        Q.   So Mr. Germany reached out to you first
15   about this deposition; is that right?
16        A.   Just to let -- let me know that it may be
17   coming.
18        Q.   Did you meet with -- with counsel for the
19   State before today in preparation for the
20   deposition?
21        A.   Yes, ma'am.
22             MR. MILLER:  Objection on relevance.
23   BY MS. KAISER:
24        Q.   And when did you do that?
25        A.   I guess last week.  I can't remember the
```

Page 13

1      day now, but...

2              Q.   Was that just one meeting?

3              A.   Yeah.

4              Q.   And about how long was it?

5              A.   Maybe an hour.

6              Q.   Did you review any documents during that

7      meeting?

8              A.   Yes.

9              Q.   Can you just generally describe what kind

10     of documents you reviewed?

11             A.   They were --

12             MR. MILLER:  Objection -- David --

13     David --

14             THE WITNESS:  Sorry.

15             MR. MILLER:  -- I'm going to instruct you

16         not to answer as to documents that were

17         provided by counsel to you.

18             To the extent that, to your knowledge,

19         they are public documents, you can answer the

20         question.  But with respect to documents

21         provided by counsel, I'm going to instruct you

22         not to answer.

23             THE WITNESS:  Okay.

24     BY MS. KAISER:

25             Q.   And, again, I'm just asking generally if

1    you could describe the categories of documents that

2    you reviewed.

3         A.   They were -- they seemed to be court

4    documents.

5         Q.   Did you review any emails?

6         A.   I -- I think one of them was a exhibit

7    that had an email in it.

8         Q.   Understood.

9              And did you have any other meetings or

10   phone calls or correspondence with -- with the

11   State's counsel regarding the deposition?

12        A.   No.

13             MR. MILLER:  I'll continue my objection on

14        relevance here.

15   BY MS. KAISER:

16        Q.   All right.  So it was just the one

17   meeting?

18             COURT REPORTER:  If there was an answer, I

19        didn't get it.

20             THE WITNESS:  No.  Sorry.

21   BY MS. KAISER:

22        Q.   And that's a good reminder.  Mr. Hamilton,

23   because the court reporter is taking a transcript

24   today, we need a verbal answer, please, to all

25   questions.

Page 15

```
 1          A.   Okay.  I'm sorry.  I probably talked over
 2     the end of your question.  I'm sorry.
 3          Q.   No problem.  Thank you.
 4               Have you spoken with anyone besides
 5     counsel for the State about this deposition?
 6          A.   No.  I take that back.  Yes, my wife.
 7          Q.   What did you tell your wife with respect
 8     to the deposition?
 9          A.   Just that I was being deposed for the case
10     that I gave testimony in a couple years ago.  So...
11          Q.   Okay.  Thank you.
12               And I believe you said that the way that
13     you learned about the deposition was receiving an
14     email from Mr. Germany; is that correct?
15          A.   Yes, ma'am.
16          Q.   And then -- so that was -- was that on a
17     personal email address?
18          A.   Same one that you have here, yeah.
19          Q.   I'm -- okay.  Yeah.
20               Did anybody from the State's -- from the
21     Secretary of State's office or their counsel contact
22     you last year regarding having your deposition taken
23     in this case?
24          A.   No.
25               MR. MILLER:  Objection.  Relevance.
```

1    BY MS. KAISER:

2         Q.   Do you have any idea why the Secretary of

3    State's counsel told us that they were unable to

4    locate you in late 2021?

5         A.   I --

6              MR. MILLER:  Objection.  Relevance.  Lack

7         of foundation.

8    BY MS. KAISER:

9         Q.   You may answer the question, Mr. Hamilton.

10        A.   No, I don't.

11        Q.   Do you live at the same home address as

12   when you worked at the Secretary of State's office?

13        A.   Yes, ma'am.

14        Q.   And did the Secretary of State's office

15   have that address on record, to your knowledge?

16        A.   Probably not, because I wasn't an

17   employee.

18        Q.   Understood.

19             But they did have your email address; is

20   that correct?

21        A.   Yes, ma'am.

22        Q.   And so they were able to contact you when

23   they tried?

24        A.   I believe so, yes.

25        Q.   Thank you.

1              Did you receive any notices to retain

2      documents relating to the subject matter of this

3      case at any time?

4          A.    No, ma'am.

5          Q.    When you were doing work for the Secretary

6      of State's office, you had an email address with the

7      Secretary of State; is that right?

8          A.    Yes, ma'am.

9          Q.    That was dhamilton@sos.ga.gov; is that

10     correct?

11         A.    Correct.

12         Q.    Did you use any email addresses other than

13     dhamilton@sos.ga.gov for work that you did for the

14     Georgia Secretary of State's office?

15         A.    No.  As a practice, we like to keep all of

16     the email on the client's email system.  Just keeps

17     things simpler.

18              There might have been some contractual

19     language and things like that that went back to my

20     TrustPoint address.  That was

21     david.hamilton@trustpointsolutions.com.

22         Q.    Okay.

23         A.    That was the firm that I worked for when I

24     was with the Secretary of State.

25         Q.    Understood.

1         Did you have an email address at -- during

2    the time you worked at the Secretary of State's

3    office, dhamilton@imperialhealth.com?

4         A.   That was another client that I had at the

5    same time.

6         Q.   And did you conduct any business for the

7    Secretary of State's office using that email

8    address?

9         A.   Not on purpose, no.

10             MS. KAISER:  Pull up Tab 5, please, Zach.

11             (Plaintiffs' Exhibit 1 was marked for

12        identification.)

13   BY MS. KAISER:

14        Q.   Mr. Hamilton, we've loaded an exhibit to

15   the Exhibit Share folder.  If you can --

16        A.   Okay.

17        Q.   -- open that up.

18             MS. KAISER:  This will be Exhibit 1.

19             THE WITNESS:  It still shows empty right

20        now.  I did a refresh.

21             Oh, there it is.  Okay.  Yeah, I --

22   BY MS. KAISER:

23        Q.   This is a -- this is a document that's

24   Bates-marked -- that has a Bates Number

25   FORTALICE001200.  And the top email in this chain is

1    an email from dhamilton@imperialhealth.com dated

2    July 10, 2020.

3            Do you see that?

4        A.   I do.

5        Q.   And is that your -- is that your email

6    address?

7        A.   It was at Imperial Health down in

8    Louisiana, right.  This was a fractional --

9        Q.   And --

10       A.   -- engagement between the two and I was

11   half-timing it, sometimes in Louisiana, sometimes at

12   the State.

13       Q.   Understood.

14           So during the time you were working with

15   the Secretary of State's office, you were also

16   working with Imperial Health; is that right?

17       A.   Correct.  And other clients as well.

18       Q.   Okay.  If you look -- if you look through

19   this email chain -- and it starts at the -- it

20   begins at the end, if you will, so the first email

21   is at the bottom.

22       A.   Okay.

23       Q.   And this looks to be -- the subject of

24   this email chain is "FortaliceSOSGA - Rules of

25   Engagement."

1          Do you see that?

2     A.    Uh-huh.

3     Q.    All right.  And there's an email from Paul

4     Brandau at Fortalice Solutions.

5          Do you see that?

6     A.    Right.

7     Q.    All right.  What is Fortalice Solutions?

8     A.    Fortalice is a -- is a vendor, a partner,

9     of the State that provides security services, pen

10    testing, pay-as-you-go kind of investigative

11    services on things that are security based.

12    Q.    Okay.  And Mr. Brandau sent this email to

13    Merritt Beaver, as well as you and some others in

14    the Secretary of State's -- or, sorry, and some

15    others at Fortalice; is that right?

16    A.    Correct.

17    Q.    And who is Mr. Beaver?

18    A.    I'm sorry?

19    Q.    Who is Merritt Beaver?

20    A.    He's the CIO for the State of Georgia --

21    for the Secretary of State of Georgia.

22    Q.    Okay.  And then on the first -- first page

23    of the document, you see a response from Mr. Beaver

24    to you and Mr. Brandau.

25          Do you see that?

1          A.    Yeah, I do.

2          Q.    Okay.  And so does it appear to you that

3     this document relates to your work for the Secretary

4     of State's office?

5          A.    It does.

6          Q.    Okay.  And your response at the top of the

7     page, where we started, that was sent from your

8     Imperial Health email address; is that correct?

9          A.    Right.  Just on error --

10         Q.    Did you --

11         A.    -- because -- because -- because I was

12    probably down there and I didn't change the thing at

13    the top of Outlook.

14         Q.    Did you ever collect any emails from your

15    Imperial Health email account for the purposes of

16    this case?

17         A.    No, ma'am.

18         Q.    Okay.  You can put that document aside for

19    now.

20         A.    Okay.

21         Q.    I'm just going to ask you a few questions

22    about your background, Mr. Hamilton.

23              Where did you get your undergraduate

24    degree?

25         A.    I did not go to college.

Page 22

1          Q.   Oh, okay.  Do you have any certifications

2     or -- or professional -- I believe you have some

3     professional certifications; is that correct?

4          A.   I do, yes, ma'am.

5          Q.   Can you tell me about those?

6          A.   I have a CISSP, which is the certification

7     for information security professionals.  I have a

8     CISM through ISACA.  I have a CDPSE, which is a

9     privacy standard certification.  I have a

10    healthcare-specific privacy and compliance

11    certificate and also a certified C|CISO certificate.

12         Q.   That's C-S-E-L?

13         A.   C, and then a bar, C-I-S-O.  Right.

14         Q.   Would you say that you have any training

15    in cybersecurity?

16         A.   Yes, ma'am.

17         Q.   How long have you worked in the

18    cybersecurity field?

19         A.   Probably about 15 years now.

20              MS. KAISER:  Pull up Tab 1, please.

21    BY MS. KAISER:

22         Q.   I'm going to add Exhibit 2 to the Exhibit

23    Share.

24         A.   Okay.

25              (Plaintiffs' Exhibit 2 was marked for

```
 1          identification.)
 2               THE WITNESS:  Oops, it logged me out.
 3          Hang on a second.
 4     BY MS. KAISER:
 5          Q.   Sure.
 6          A.   Crap.  I'm looking at the wheel.  Hang on.
 7     It's thinking.
 8               Okay.  Number 2.
 9          Q.   Do you recognize this document,
10     Mr. Hamilton?
11          A.   Uh-huh.  Yes.
12          Q.   Is this a copy of your profile from
13     LinkedIn?
14          A.   Looks like it.
15          Q.   And is this something that you update
16     regularly?
17          A.   I haven't in a while.  Since -- since I
18     landed at -- at Shepherd, there's not much point in
19     it.
20          Q.   Okay.  And that was -- when did you begin
21     with Shepherd?
22          A.   June, right as I left TrustPoint.
23          Q.   In 2021?
24          A.   Yes, ma'am.
25          Q.   On -- at the bottom of page 1 of this
```

Page 24

1      document, it indicates that you worked for

2      TrustPoint Solutions from October 2013 to June 2021;

3      is that correct?

4             A.    It is.

5             Q.    And what is TrustPoint Solutions?

6             A.    They're a provider of security and

7      infrastructure services predominantly in healthcare.

8      They have some business outside in the public

9      sector.

10            Q.    Sorry.  I think you mentioned this, but

11     during the time that you had the title of chief

12     information security officer for the Georgia

13     Secretary of State's office, were you employed by

14     TrustPoint Solutions?

15            A.    Yes, ma'am.

16            Q.    So did you do work for the Secretary of

17     State's office on a contract basis?

18            A.    No, not directly.  Always through

19     TrustPoint.

20            Q.    So you mean you, yourself, were not under

21     contract; the company --

22            A.    Correct.

23            Q.    -- TrustPoint was?

24            A.    Correct.

25            Q.    How much time did you spend per month on

Page 25

1   work at the Secretary of State's office, roughly?

2        A.   I guess it averaged out to be probably

3   half-time.  There was some spikes there where it was

4   more full time as things ramped up for events such

5   as elections and things, incorporations.  End of

6   year was a pretty busy time for the corporation

7   side.  But as you look across, I would imagine it

8   would compute to be about half-time.

9            There were some times where I didn't --

10  wasn't there at all during a week because I was at a

11  different client.

12       Q.   When you say "there at all," were you

13  physically at the Secretary of State's office?

14       A.   Yes, ma'am.

15       Q.   And when did you begin working for the

16  Georgia Secretary of State's office?

17       A.   Summer of 2018.  That's when the

18  engagement first began.

19       Q.   And so from roughly summer of 2018 until

20  June of 2021, you spent approximately half your time

21  working on security issues for the Georgia Secretary

22  of State's office; is that correct?

23       A.   Yes, ma'am.

24       Q.   And what were your responsibilities for

25  the Georgia Secretary of State's office?

Page 26

1          A.   Just overseeing the -- the corporate

2     information security program, which included the --

3     the election side as far -- insofar as it -- the

4     registration side of the house.  Not the Dominion

5     side, but the -- the corporation side of the house,

6     which is where you get a business license in

7     Georgia, and then also the Bureau of Licensing,

8     which is all the professional boards, the nursing

9     board and the barbershop folks and all those folks.

10    It's where you kind of go for -- that was the only

11    place that had PHI, so -- protected health

12    information.

13         Q.   Understood.  Okay.

14              And when you said -- you said that that

15    encompassed the election side insofar as the

16    registration side of the house.

17              Can you explain what you mean by that?

18         A.   Well, there's -- there was a couple of

19    different buckets, right?  The -- the -- the main

20    things that I was concerned with is the -- is the

21    voter registration, the MVP site; security of the --

22    more or less the public-facing sites that managed

23    the registration of a voter.

24              Didn't have anything to do with the

25    tabulation of votes or the voting machines

1    themselves.  All that was handled by the vendor.

2         Q.   Interesting.  Okay.

3              Who did you report to at the Secretary of

4    State's office?

5         A.   Mr. Beaver.  Merritt Beaver, the CIO.

6         Q.   And did anybody report to you?

7         A.   Yes.  There was -- we had a couple of --

8    three.  At one point there was one, then it got back

9    up to three when we restaffed.  There were several

10   names in there.  Do you want me to try to recall

11   them?

12        Q.   Yes, if you can.

13        A.   Okay.  When I got there, it was -- I just

14   can't recall his name.  Heavyset fella.  I can't --

15   probably have to go to LinkedIn to figure that one

16   out.  I can't recall his name.

17             When I left --

18        Q.   Do you recall -- I'm sorry.  Please

19   finish.

20        A.   I was just going to say when I left, I can

21   tell you who those folks were.

22             Ronnell Spearman, who is -- who I think is

23   still there; Kevin Fitts; and then there was one

24   person that hired just as I was leaving.  I actually

25   never got to meet him in person and I can't recall

Page 28

```
 1       his name.
 2            Q.    Do you recall the titles of the -- the
 3       people that reported to you?
 4            A.    Yeah.  Just security analyst.
 5            Q.    As part of your work with the Secretary of
 6       State's office, did you work with any outside
 7       vendors?
 8            A.    Yes, ma'am.
 9            Q.    What vendors were those?
10            A.    Probably the largest being Fortalice.
11       They were kind of my right hand, made up for us not
12       having a big staff of folks.
13                  Beyond that, we had Dell Secureworks.  We
14       had Palo Alto.  A lot of the providers of the
15       solutions that we used.  Critical Start would be an
16       example.  Just -- Clawless [phonetic].
17            Q.    And I think you -- you may have mentioned
18       this before, but what services did Fortalice provide
19       for the Secretary of State's office?
20            A.    Security services.  They did pen testing.
21       You know, we have an annual pen test where we have
22       somebody come in from the outside.
23                  And also incident response.  So if there
24       was something that came up where we needed some
25       investigative specialty, kind of a subject matter
```

```
 1     expert on intrusion or one of those guys, they have
 2     a bench of people.
 3               They're -- they hired on about the same
 4     time that TrustPoint did.  We kind of came in about
 5     the same time.  And we decided to use Fortalice for
 6     that half and -- and TrustPoint for the guy that sat
 7     in the seat, which was me.
 8               It actually started off being Gaylon
 9     Stockman, but once things got ramped up, Gaylon left
10     TrustPoint for another job, so it ended up being
11     just me.  The idea was to kind of alternate us back
12     and forth to give enough time, but it just didn't
13     work out that way in the end.
14          Q.   So originally the job was supposed to be
15     split between two people from TrustPoint --
16          A.   Correct.
17          Q.   -- TrustPoint?
18          A.   Yeah, that was how -- that was how the SOW
19     was written, statement of work.
20          Q.   And would that have provided more hours
21     overall of support from TrustPoint, more like a
22     full-time person?
23          A.   No, I think the statement of work was
24     still half-time at that point, but the issue was
25     that both Gaylon and I had other commitments that I
```

1      think they were trying to jockey things around and

2      kind of fill the blank spots with the schedules.

3           Q.    You mentioned Secureworks as another

4      vendor.

5           A.    Uh-huh.

6           Q.    What services did Secureworks provide to

7      the Secretary of State's office?

8           A.    There's a pretty large contract with

9      Dell -- with Dell Secureworks to provide logging and

10     aggregation of logs and kind of oversight as a -- as

11     a -- you can call it a SIEM, S-I-E-M.  It's a

12     security incident event monitoring.

13               And that's -- they kind of watch from

14     afar.  They look for patterns.  They look for things

15     that happen in -- in the world and then hone in on

16     that.

17               And they're supposed to alert us when

18     things happen, and then we -- we can take action or

19     we can say, "No, that was us" or "That was a test"

20     or things like that.

21          Q.    And did they provide services to the

22     Secretary of State's office throughout your tenure

23     there?

24          A.    No.  We decided to let them go I guess

25     about halfway through my tenure.  I think it was

```
 1    mostly because I think over time -- they were
 2    engaged, I think, long before I got there, but over
 3    time, I think the -- the cost kind of crept up over
 4    time and it -- it was a very significant investment.
 5    So we decided to part company so we could take that
 6    money and use it in different ways for different
 7    tools.
 8         Q.   Were you involved in --
 9              (Cross-talk.)
10         A.   Yes, ma'am.
11              COURT REPORTER:  One at a time, please.
12         Were you involved in?
13              THE WITNESS:  Sorry.  Yes, ma'am.
14              COURT REPORTER:  I didn't get the whole
15         question, though.
16              THE WITNESS:  Oh, I'm sorry.
17              COURT REPORTER:  That's okay.
18    BY MS. KAISER:
19         Q.   I said were you -- were you --
20              MS. KAISER:  I'm sorry, Ms. Barnes.
21              COURT REPORTER:  Go ahead.
22    BY MS. KAISER:
23         Q.   The question was were you involved in that
24    decision?
25         A.   Yes.
```

1          Q.   As chief information security officer,
2     would you say that you had a relatively senior
3     position in the Secretary of State's office?
4          A.   Yeah, as far as a contractor can go.  You
5     know, I didn't have any signing authority.  I didn't
6     have a budget.  I didn't -- you know, it's not like
7     a regular engagement where, you know, there's some
8     distance there.
9               If -- if I was a full-time employee, it
10    would have been a different situation, I think.  But
11    I relied on -- on Merritt for a lot of the back
12    office-type operations, and most -- most of my
13    engagement was -- there was basically making
14    recommendations and just -- you know, "I think we
15    should do this," and, you know, Merritt could say
16    yea or nay and we went from there.
17         Q.   Do you have a view on whether having a
18    half-time chief information security officer was
19    adequate for an entity the size of the Georgia
20    Secretary of State's office?
21              MR. MILLER:  Objection.  Lack of
22         foundation.  Calls for speculation.
23              THE WITNESS:  I can say that I do -- or I
24         did, rather, in the past fractional CISO work
25         for a lot of firms and it worked very well.

Page 33

```
 1      BY MS. KAISER:
 2          Q.   And I believe you said you left the
 3      Georgia Secretary of State's office in June 2021; is
 4      that correct?
 5          A.   Yes, ma'am.
 6          Q.   And what were the circumstances for your
 7      departure?
 8          A.   TrustPoint, the company, got acquired by
 9      another firm out of Jacksonville, Florida.
10      Optimum HIT is how they pronounce their corporate
11      name.
12               And when they did, they -- they had such a
13      dramatic change in the benefits -- not -- not really
14      compensation, but the benefits side of the house --
15      and it became financially untenable for me to
16      continue, because my wife is disabled and she
17      requires certain medicines and they did not cover
18      them at all.
19               So, basically, my -- my decision to leave
20      was strictly on medical benefits.  I mean, I left on
21      good terms.  They're still good guys.  Work for them
22      again if they could come up with a better health
23      plan.  So...
24          Q.   Understood.  And I'm sorry to hear that
25      about your wife, Mr. Hamilton.
```

Page 34

```
 1              So it sounds like this had everything to
 2      do with TrustPoint and nothing to do with the
 3      Secretary of State's office; is that --
 4          A.   Oh, sure, no.
 5          Q.   -- accurate?
 6          A.   Yeah.  Yeah.  It was all about -- yeah, I
 7      just couldn't -- I couldn't swing it -- I couldn't
 8      swing it by myself.
 9              And -- and it's interesting that I kind of
10      ended up at a firm that -- that deals with brain
11      injury, which is exactly what my wife had, so they
12      understand my plight, so to speak.  So I'm in a good
13      place now.
14          Q.   I'm glad to hear that.
15          A.   Thank you.
16          Q.   I just wanted to circle back to one thing
17      in your background.
18              So I believe you said that when you met
19      with counsel in preparation for your deposition
20      today, you did look at some documents; is that
21      correct?
22          A.   Yes, ma'am.
23          Q.   And did those documents refresh your
24      recollection about any facts or -- or events that
25      took place pertinent to this case?
```

Page 35

1      A.   I -- I didn't spend an awful lot of time

2   reading them.  We just kind of glazed over them.

3           But, no, I -- I felt pretty good about my

4   memory about things, what happened.  So...

5      Q.   Did you ever recommend to the Secretary of

6   State at any point that they should have a full-time

7   chief information security officer?

8      A.   Yes.

9      Q.   Do you recall approximately when you made

10   that recommendation?

11      A.   I think, basically, when -- when James

12   Oliver -- he was my predecessor.  He was a full-time

13   employee.

14           I think initially when we came in, you

15   know, our edict was to kind of coach him up and get

16   him, you know, kind of more out there.

17           And James, very nice man, but he was kind

18   of reserved and quiet, and it's kind of hard to do

19   this job when you seal yourself in your office.  You

20   kind of have to be out there and evangelize security

21   and get people excited about it, and he just didn't

22   have that gene.

23           So I -- you know, when the Secretary of

24   State made the decision to part ways with James, I

25   really thought the next step was for me to help the

Page 36

```
 1      Secretary of State find another full-time employee.
 2               In the end, it wasn't.  What they decided
 3      to do is do a fractional kind of a situation where
 4      they'd continue that relationship and kind of let me
 5      sit in the chair.
 6               That's not unheard of, but it's -- I mean,
 7      I would have rather have them have a full-time
 8      employee just for consistency, right?  Because you
 9      never know if I'm going to get pulled away on
10      another -- on another deal or -- you know.  It would
11      have been better, I think, to have a full-time, and
12      I could advise that person kind of as a -- think of
13      it as like a mentor relationship.
14          Q.   And I believe you said that you didn't --
15      you personally didn't have a budget.
16               Did you ever make a recommendation that
17      the chief information security officer should have a
18      budget?
19          A.   No.  I mean, they -- they had a budget for
20      security; it's just I wasn't -- I didn't have any
21      signing authority.  I couldn't go spend money.  You
22      know, I didn't have an expense account or anything
23      like that.
24               Anything I wanted to spend money on, I had
25      to go to -- go to Merritt for, and he worked it out
```

Page 37

1     through back channels.

2         Q.    Did you make any other recommendations to

3     the Secretary of State's office regarding security

4     that the Secretary of State did not accept or

5     implement?

6         A.    No.   I think -- I think most of what we

7     talked about -- you know, we had kind of a list of

8     best practices.

9              We were trying to get them to conform to

10    the NIST standards, the 800-53, which is kind of a

11    very good place to start.   And a lot of those things

12    could have been better.   You know, if you rated them

13    1 to 5, you had some 1s and 2s.   They should have

14    probably been 3s.

15             So over time, I think we picked the

16    low-hanging fruit and fixed the most critical ones,

17    a lot of it just based on judgment, right?   You just

18    made a judgment based on what you had and what we

19    could do.

20             I knew there wasn't an unlimited budget

21    for Secretary of State.   Like other state agencies,

22    you know, they were -- but I was impressed in the

23    fact that they were able to secure some really good

24    hardware and some really good technologies to be

25    able to kind of build upon, in some cases better

```
 1    than some of my healthcare customers.
 2              So, you know, started off -- I guess now
 3    Governor Kemp, but Secretary of State Kemp, I think
 4    he played a big part in that and funding that and
 5    kind of paying attention to the security.  It was
 6    important to him, and as -- as it was important to
 7    Secretary Raffensperger as well.
 8         Q.   Do you know who has the chief information
 9    security officer responsibilities at the Secretary
10    of State's office now, if anyone?
11         A.   I don't.  I don't.  I kind of lost touch
12    with the guys.  So...
13         Q.   So prior to your departure, you weren't
14    told who was going to step into that role?
15         A.   No, they --
16              MR. MILLER:  Objection.
17              THE WITNESS:  -- they -- I'm sorry.
18              MR. MILLER:  You can answer, Mr. Hamilton.
19              THE WITNESS:  Okay.
20              They talked about -- I had given Merritt
21         three different kind of recommendations based
22         on my experiences while I was there, and one of
23         them was moving the then service desk manager
24         over to security, because he had passed his
25         CISSP and he was very interested in security,
```

```
 1            which is awesome -- that's one of the things
 2            you need, working in security -- Kevin Fitts.
 3                   And I think they -- I'm pretty sure they
 4            moved him into that group, but it was as a
 5            manager, it wasn't as the CISO or the ISO.
 6                   And there's also a dual role there at
 7            Secretary of State, which is the local agency
 8            security officer.  That's the person that signs
 9            off on the ability for people to get background
10            checks, things like that.  I believe we turned
11            that over to Ronnell Spearman.  He acts in that
12            role.  I think we did that right before I left.
13            Because you don't want that seat to go
14            unfilled.  Somebody needs to be able to sign
15            those papers.  They come through pretty
16            readily.  So...
17       BY MS. KAISER:
18            Q.   Does that person, the local agency
19       security officer, have any oversight or
20       responsibilities for the election system?
21            A.   No.  This was -- this was more of an
22       administrative role, where a lot of the -- a lot of
23       the requests we got were from the corporation side
24       of the house and also from the -- the bureau of the
25       licensing.
```

```
 1              It's folks that had the ability to go in
 2      and look at people's backgrounds.  They wanted to
 3      make sure that they were vetted before we allow
 4      somebody to look at somebody's personal information.
 5              MS. KAISER:  Can you add Tab 2, please,
 6         Zach?
 7      BY MS. KAISER:
 8         Q.   We're adding a document to the Exhibit
 9      Share --
10         A.   Okay.
11         Q.   -- Mr. Hamilton.
12              (Plaintiffs' Exhibit 3 was marked for
13         identification.)
14              THE WITNESS:  Okay.
15      BY MS. KAISER:
16         Q.   Do you have Exhibit 3 up?
17         A.   I do.
18         Q.   All right.  This is a document with the
19      Bates Number FORTALICE002952.  It's an email chain
20      from August of 2016.
21              Do you see that?
22         A.   I do.
23              MR. MILLER:  Hey, Mary, can we go off the
24         record just briefly?
25              MS. KAISER:  Sure.
```

Page 41

```
 1              VIDEOGRAPHER:  The time is 10:43.  We're
 2         off the record.
 3              (Off the record.)
 4              VIDEOGRAPHER:  The time is 10:46.  We're
 5         back on the record.
 6              MS. KAISER:  So -- so, Carey, I believe
 7         you stated a confidentiality objection here.
 8         We -- we object to that confidentiality
 9         designation of this document.  The email at the
10         bottom of the page from Logan Lamb is certainly
11         not confidential, and the email at the top of
12         the page from Merle King has no substance
13         whatsoever.  So we don't believe there's any
14         confidential information contained in this
15         document.
16              MR. MILLER:  Okay.  I -- you know,
17         respectfully, I'm not asking you to waive any
18         rights to challenge the designation, but this
19         was designated by Fortalice.  Frankly, I
20         just -- I don't have enough information sitting
21         here today to say otherwise.  My concern is
22         purely on the individuals on the Exhibit Share.
23              MS. KAISER:  So can you identify any
24         information in the document that you believe is
25         confidential?
```

1          MR. MILLER:  No.  That -- that's what I

2      just said.  It was designated by Fortalice, who

3      I, frankly, would defer to for any sensitive

4      information.

5          MS. KAISER:  Okay.  You know, I believe

6      this email has been disclosed to the public.

7          But if we're going to insist on it, then,

8      Ms. Marks, we'll ask you to drop off while we

9      discuss this document and we'll let you know

10     when we're finished discussing this -- this

11     document.

12         MR. MILLER:  I mean, Mary, I'm willing to,

13     you know, just say -- if it's been disclosed

14     publicly, I trust your -- your judgment there.

15     But I don't want to -- don't imply that I don't

16     trust anybody that's on the call right now; I'm

17     just trying to -- particularly if other

18     documents are coming up, that may be a bigger

19     issue.

20         MS. MARKS:  Mary, this is Marilyn.  Just

21     let me know what you want me to do.

22         MS. KAISER:  Marilyn, you've seen this

23     document before, have you not?

24         MS. MARKS:  Yes.  In fact, I was the one

25     who first received it in a public records

1      request.

2           MS. KAISER:  Okay.  So I think -- I think

3      Ms. Marks can stay on for the discussion of

4      this document.  It should be brief.  And

5      then --

6           MR. MILLER:  That's fine by me.  I think

7      it's probably more a cue to potentially other

8      documents coming.  So I just want to flag it

9      now.

10          MS. KAISER:  Okay.  Thank you.

11     BY MS. KAISER:

12          Q.  All right.  Sorry, Mr. Hamilton.

13          A.  Oh, no problem.

14          Q.  Have you had a chance to review this

15     document?

16          A.  I read it, yep.

17          Q.  If you look at the email from the -- from

18     Mr. Lamb starting at the bottom of the page on

19     page 1, the second paragraph down, he states, "While

20     attempting to get more background information on the

21     center prior to contacting you, I discovered serious

22     vulnerabilities affecting elections.kennesaw.edu."

23          Do you see that?

24          A.  I do.

25          Q.  Are you familiar with the situation that's

1    being described in this document where Logan Lamb,

2    an independent cybersecurity researcher, identified

3    certain vulnerabilities with this -- with the

4    Kennesaw server, the election server?

5         A.   Yeah, I don't really have any recollection

6    of this.  This happened before I got to the State.

7              So I know one person on there, Michael

8    Barnes.  He was still there when I was at the State.

9         Q.   So during your time at the Secretary of

10   State's office, did you learn anything about this

11   incident with Mr. Lamb?

12        A.   No.  I don't think anybody was named.

13             I know there was a reason that they moved

14   stuff from Kennesaw into the Election Center over in

15   Marietta, but it was just hearsay.  I don't have any

16   direct knowledge of it.

17        Q.   What was your understanding of why they

18   moved the server from Kennesaw?

19             MR. MILLER:  Objection.  Lack of

20        foundation.

21             THE WITNESS:  I -- I don't know if I could

22        say.  I think they just wanted to have it a

23        little more captive and out of the higher ed

24        side of the house.  I think it was maybe --

25

Page 45

1     BY MS. KAISER:

2          Q.   Did you have any --

3          A.   -- the wrong place to put it.

4          Q.   Did you have any involvement with making

5     that transition of the Kennesaw server?

6          A.   No, ma'am.  No, ma'am.  That was way

7     prior.  2016, I guess.  So...

8          Q.   We've mentioned Fortalice several times

9     now.

10               Are you aware that Fortalice conducted a

11    series of cyber risk assessments for the Secretary

12    of State's office in 2017 and 2018?

13         A.   Yes, I -- I have knowledge of those.

14         Q.   What role, if any, did you have in working

15    with Fortalice on those cyber risk assessments?

16         A.   The second one in 2018, I believe that was

17    during my tenure, at least I got the report.  The

18    2017, I think they just passed it to me as history.

19    So...

20         Q.   And can you tell me, in general terms,

21    what Fortalice found in its 2017 and 2018 cyber risk

22    assessments for the Secretary of State's office?

23         A.   There was a number of items.  They

24    classified them as high, medium, low, based on their

25    experience, and then gave us an opportunity to

Page 46

1    either accept or -- or deny, you know, what was

2    going on.

3            It gives us a good basis for kind of

4    reprioritizing our work within the State to figure

5    out where we should spend our money and time trying

6    to go after the things that are the most vulnerable.

7    It's a judgment call.

8            MS. KAISER:  Can you pull up Tab 3,

9        please.

10           (Plaintiffs' Exhibit 4 was marked for

11       identification.)

12           THE WITNESS:  Is there another document?

13       I'm sorry.

14   BY MS. KAISER:

15       Q.   It's being loaded right now.

16       A.   Okay.  I'm sorry.

17       Q.   It takes a minute with larger documents,

18   so apologies --

19       A.   Gotcha.

20       Q.   -- for the delay.

21       A.   Okay.  Exhibit B.  Okay.

22       Q.   So if you scroll down to the next page,

23   you'll see this is the cover page of the report.

24           Do you recognize this as the 20- --

25   November 2018 report that Fortalice provided to the

Page 47

1      Secretary of State's office?

2            A.   I think so.  Let me go down to the meat of

3      it here.  Hang on.

4                 MR. MILLER:  Mary, this is another sealed

5            document.  I can't recall from the 2019 hearing

6            if we -- how we designated this.

7                 THE WITNESS:  Yeah, this kind of thing

8            should never be made public, but I get it.

9                 MR. MILLER:  So, Mary, I'll -- I'll ask at

10           this point if we treat it as attorneys' eyes

11           only.

12                And, Ms. Marks, if you could please drop

13           off for the period of time.

14                MS. MARKS:  Sure, I will.  And if you will

15           let me know when I can safely come back on.

16           Thank you.

17                (Ms. Marks left the Zoom deposition.)

18      BY MS. KAISER:

19            Q.   Mr. Hamilton, have you had a chance to

20      take a look at the document now?

21            A.   I have, yep.

22            Q.   And do you recognize this as Fortalice's

23      2018 Red Team Penetration Test and Cyber Risk

24      Assessment?

25            A.   I do, yep.

Page 48

```
 1          Q.    If you could turn to page 8 of the report.
 2          A.    Okay.
 3          Q.    The top section there says "███████████
 4   ████████████████████████████"
 5                Do you see that?
 6          A.    Correct.
 7          Q.    That next paragraph reads, "████████████
 8   █████████████████████████████████████████
 9   ██████████████████████████████████████████████
10   ████████████████████████████████"
11          A.    Right.
12          Q.    If you skip one sentence, it says, "███████
13   ████████████████████████████████████████████
14   ███████████████████████████████████
15   ███████████████████████████████████
16   ████████████████████████████"
17                Do you see that?
18          A.    I do.
19          Q.    So do you understand this section of the
20   report to address progress made on the top ten risks
21   identified by Fortalice in 2017?
22          A.    Uh-huh.  Yes.
23          Q.    Do you know why three of those top ten
24   risks were not tested in 2018?
25          A.    I do not.  Usually, it's a -- when a --
```

1    when a security firm does a -- a pen test or a

2    security assessment, they use last year and the

3    current year to show progress or show kind of a

4    trend, are you getting better or are you getting

5    worse.  So usually you test the same things.

6         The only reason I would think that we

7    missed is if they were specifically taken out of

8    scope.

9         Q.   Okay.  And this report says that of the

10   top ten risks identified in 2017, only three had

11   been remediated in 2018; is that correct?

12        A.   That's what this states, correct.

13        Q.   If you can flip to page 5 of the report.

14        A.   Okay.  Hang on.  It's back.  Hang on.

15             Okie-doke.  I'm here.

16        Q.   The second paragraph on page 5, it reads,

17   "████████████████████████████████████████████████

     ████████████████████████████████████████████

     ████████████████████████████████████████

     ██████████████████████████████████████

     ████████████████████████████████████."

22             Do you see that?

23        A.   Right.

24        Q.   And that first bullet point reads, "██████

     ███████████████████████████...."

1              Do you see that?

2         A.   I do.

3         Q.   And are those recommendations detailed on

4    pages 6 and 7 of the report --

5         A.   I believe so.

6         Q.   -- in this table?

7         A.   Yeah.

8         Q.   What steps did the Georgia Secretary of

9    State's office take to implement these 20

10   recommendations from Fortalice?

11        A.   I can't speak to the first half of that

12   year because I wasn't there, but it might have had

13   something to do with -- and this is a little bit of

14   speculation on my part -- is that that might have

15   been the reason for our involvement, is that Merritt

16   didn't feel like things were moving along fast

17   enough.

18              So he wanted -- that was one of the things

19   that we were to come in and coach up for James

20   Oliver is to kind of get him excited about this

21   stuff and get moving on some of these things that

22   were identified.

23              And I think this was the list that I gave

24   the status on I guess about halfway through the

25   tenure.  That was one of the exhibits or the

1    statements that I made to the Court.

2         So I don't know what the status is now, of

3    course, because I've been gone six months, but they

4    were well on their way to taking care of those

5    and -- and others that were found along the way.

6    So...

7         Security is -- itself truly is a -- it's a

8    journey; it's not a destination.  You're never done.

9    I mean, there's always -- the threat landscape

10   changes every day.  Things change every day.

11        So, you know, it's a snapshot in time.  At

12   the time that Fortalice did this, this is what they

13   found.  They could have waited three weeks and did

14   another one and found something else and not found

15   three others.  So it's just a snapshot in time.

16        Q.   Sure.

17             At the bottom of page 5 of the report, the

18   last paragraph there, it says, "████████████████████

     ███████████████████████████████████████████████████

     ███████████████████████████████████████████████████

     ████████████████████████████████████████

     ███████████████████████████████████████."

23             Do you see that?

24        A.   I do.

25        Q.   To your knowledge, did the Secretary of

Page 52

```
 1    State's office dedicate any additional resources to
 2    addressing the security risks Fortalice identified?
 3              MR. MILLER:  Objection.  Lack of
 4         foundation.
 5              THE WITNESS:  I believe I was one of those
 6         resources.
 7    BY MS. KAISER:
 8         Q.   Do you have any awareness of whether
 9    internally at the Secretary of State's office, any
10    additional resources were applied to addressing
11    these security risks?
12         A.   Yeah, when -- I was able to recall that
13    gentleman's name, Adam Abell.  He -- he was the one
14    that was working with James on a day-to-day basis.
15    So it was only the two of them.
16              Shortly after my arrival, they moved
17    Ronnell Spearman over from the services side of the
18    house and opened up a req for adding another party
19    to the security.  I think all of that was based on
20    the findings.
21              So most of the time that I was there, we
22    were at a staff of three and -- not including me,
23    except when we ended up letting one guy go and that
24    gap of time when we were looking for the next
25    person.
```

```
 1            MS. KAISER:  Will you add Tab 4, please,
 2        Zach.
 3    BY MS. KAISER:
 4        Q.   We're going to bring up the next exhibit,
 5    Mr. Hamilton.
 6        A.   Okay.
 7            (Plaintiffs' Exhibit 5 was marked for
 8        identification.)
 9    BY MS. KAISER:
10        Q.   If you scroll down to the second page, I
11    believe you -- you stated that you -- you know, you
12    made a statement in this case.
13            Do you recognize this to be the
14    declaration that you provided in this case?
15        A.   Yes, ma'am.  One of two, correct.
16        Q.   Correct.
17            Let's see.  This one is dated August --
18    August 25, 2020.
19            Do you see that?
20        A.   That sounds about right, yep.
21        Q.   Okay.  Did you draft this document, sir?
22        A.   I did.
23        Q.   And the purpose of your declaration, as
24    you mentioned, was to go through the recommendations
25    from Fortalice and give a status update on how they
```

1    were being resolved or remediated; is that right?

2         A.    Correct.

3         Q.    I just want to walk through a couple of

4    these.

5              So Number 2, the "Two-Factor

6    Authentication," do you see that?

7         A.    Uh-huh.

8         Q.    It says the "Status" was "Accepted and

9    Partially Remediated."

10         A.    Uh-huh.

11         Q.    Do you see that?

12              All right.  And Number 5 was "Non-Unique

13    Local Admin Passwords."

14              Do you see that?

15         A.    I do.

16         Q.    The "Status" was "Accepted and

17    Compensating Control Applied."

18              Do you see that?

19         A.    Correct.

20         Q.    What did you mean by "compensating control

21    applied"?

22         A.    The long-term solution would be to go to a

23    PAM, which is a privileged account management

24    solution, but that's a pretty heavy lift

25    financially.

Page 55

1            So in the short term, what we did is apply

2    the out-of-the-box LAP Solution that allows the --

3    the encryption of the endpoints.

4            And also we put in some policy and

5    procedures that when the guys were out working on

6    people's machines, that they -- they have to go to a

7    centralized password vault to be able to access

8    them.

9            They -- in the past, they had the same

10   administrative password on all the systems to make

11   it easy to maintain, you know, your IT help desk

12   guys.  But it was a problem for me because I -- I

13   knew that, you know, there was some churn in that,

14   and it's just not a best practice.  You should have

15   a unique admin password on every endpoint.

16       Q.   Number 10 is "Lack of Security Controls

17   for PCC."

18            You see that?

19       A.   Right.

20       Q.   And the "Status" for that is "Accepted and

21   Remediation On-Going."

22       A.   Yeah.  I -- I -- during my tenure there at

23   the State, I think that was the most difficult

24   vendor to deal with, the PCC folks, because they

25   would say one thing and do another.

1           And I even got to the point where I sent

2      them an attestation of a -- basically, a list of

3      minimum security.  I just wanted somebody to sign

4      their name to the fact that, you know, some -- the

5      minimum is being done.  And they signed it, but in

6      my heart of hearts, I kind of knew that they

7      probably weren't doing it.

8           So -- but at that point, they had already

9      made the decision to remove PCC and move to another

10     vendor, so it would have been kind of wasted breath

11     at that point.  Which was, I -- I think, a good -- a

12     good decision to move away from PCC.  They just --

13     they just weren't the right guys.  That's all.

14          Q.   And we'll come back to PCC later on

15     today --

16          A.   Okay.  Okay.

17          Q.   -- but just quickly, what did they have

18     responsibility for with respect to the election

19     system?

20          A.   The coding, the actual coding of the

21     program itself.  The Secretary of State didn't

22     employ anybody that -- that actually wrote computer

23     code, that developed applications.  They -- they

24     always relied on third-party vendors for that.

25          And they did the ENET system and they did,

Page 57

1     you know, the corporation side and -- and also some

2     of the licensing sites as well.  They were kind of

3     the go-to company for all things Secretary of State.

4                I think prior to my arrival, the word

5     was -- is they were a lot better back then.  But

6     they had some changes.  A lot of people left, good

7     people left, that kind of thing, and over time it

8     just became a problem.  So...

9          Q.   A problem from a security perspective, was

10    that your view?

11         A.   Yeah.  Even -- yeah, even the stability of

12    the code line, I think, was wearing very, very thin

13    on the customer, being the Secretary of State.  They

14    were getting tired of, you know, things that -- you

15    had mentioned before the confidential --

16    confidentiality, integrity, and availability.  That

17    availability part of that triad is pretty important

18    when it comes to the Secretary of State.  They

19    always want to be available because they don't want

20    to be viewed as, you know, not on the -- not on the

21    ball.

22               So -- and there were some availability

23    problems with PCC.  Some of their practices were not

24    best -- best practice.  And they would fix things on

25    the fly and although it fixed it at the moment, they

1      wouldn't move that fix back into the code line, so

2      the very next time they did a revision, they would

3      re-break the thing.

4              And that is kind of a, you know, 101

5      change control operation.  Somebody wasn't watching

6      the store.  So...

7              And we tried to help grow them.  You know,

8      we gave them a lot of feedback, probably a lot more

9      than they ever wanted.

10             And then they were purchased by another

11     firm, and that gentleman -- they had a CISO there.

12     He's the gentleman that actually attested to the

13     fact that their minimum security met the minimum

14     based on what I had sent them.  I think he was

15     hopeful that it would get that way, but I had my --

16     like I said, I had my doubts, so to speak.

17        Q.   All right.  Well, going back to your

18     declaration, Mr. Hamilton, we can -- we can keep

19     walking through them one by one, but by my count,

20     there were 11 out of 20 recommendations that,

21     according to your declaration, had not been fully

22     remediated.

23        A.   Right.

24        Q.   Does that sound about right?

25        A.   (Nodded head.)

1          Q.   Okay.  And that was the status as of

2     August 2020; correct?

3          A.   Correct, so basically three months into my

4     tenure.  That's about right, yeah.

5          Q.   Three months into your tenure.  Okay.

6               And -- but that was nearly two years after

7     Fortalice issued their cyber risk assessment in

8     November 2018; is that correct?

9          A.   Correct.

10              MR. MILLER:  Objection.  Lack of

11         foundation.

12    BY MS. KAISER:

13         Q.   And so nearly two years after Fortalice

14    issued that report, at least half of their

15    recommendations had not been fully implemented; is

16    that correct?

17              MR. MILLER:  Objection.  Asked and

18         answered.

19              THE WITNESS:  It sounds like it, yeah.

20    BY MS. KAISER:

21         Q.   Based on your experience and training,

22    does it seem reasonable to have a cybersecurity

23    vendor identify security risks in your system and

24    then not take recommended steps to address those

25    risks for nearly two years?

Page 60

1           MR. MILLER:  Objection to form.  Lack of

2      foundation.  Calls for speculation.

3           THE WITNESS:  In -- in my professional

4      opinion, it's not uncommon.  Some of -- some of

5      the things that we're faced with have budgetary

6      constraints.

7           The bottom line is we present -- as

8      security people, we present to the business and

9      say, "Here's the nine things we've got to do.

10     You know, what's our bucket of money look like?

11     What does it take, you know, horsepower,

12     people, whatever?"  And then the business makes

13     the decision finally on -- on what -- what to

14     focus on.  We make recommendations and then we

15     move on those.

16          But we made pretty good headway, I

17     think --

18 BY MS. KAISER:

19     Q.   Were you pushing the Secretary of

20 State's --

21     A.   -- before I left.  So...

22     Q.   Were you pushing the Secretary of State's

23 office to move faster or make more headway on these

24 recommendations from Fortalice?

25     A.   Yes, ma'am.  I was kind of the evangelist,

1    and, yeah, I was -- I was not shy about it.  So...

2         Q.   Why were you pushing that?

3         A.   Just to get -- get moving, right?  We had

4    the time and some of the things, like was outlined,

5    are low cost or no cost.  It doesn't mean that it --

6    I mean, no cost is nobody has to write a check to a

7    vendor.

8              But the big thing is -- is the headcount.

9    It's the talent that you have in-house that are able

10   to do these tasks.  And a lot of my time there

11   was -- was training, mentoring, kind of teaching

12   people how to kind of ramp things up.  So -- yep.

13        Q.   Have you -- you felt that these

14   recommendations from Fortalice were good ones,

15   correct, that would improve the security of the

16   system?

17        A.   Yeah.  That's why on -- on the -- on the

18   statement where I said "Accepted" -- in any -- in

19   any situation where a -- a security firm comes in

20   and does an assessment or a pen test and they

21   present you with the findings, you're able to accept

22   those or not accept them.

23             An example of not accepting is either it

24   was out of scope or something that had long been

25   fixed and they missed it.  You know, things like

Page 62

1     that.

2               So in most of these cases, I believe I

3     accepted most of these because I verified that they

4     were still valid.

5          Q.   Has Fortalice done any additional work for

6     the Secretary of State's office since the

7     penetration testing in 2018?

8          A.   I -- I -- they had an annual -- they had

9     an annual test and assessment, a pen test.

10         Q.   And when you say "pen test" --

11         A.   I know we --

12         Q.   -- is that --

13         A.   Penetration test.  That's somebody from

14    the outside tries to get in.  There's three forms of

15    that.  There's, you know, the white hat, the black

16    hat, and the gray hat.

17              So this was very much -- we did not give

18    them the keys to the castle.  We wanted them to

19    replicate the outside world, so that becomes a black

20    hat operation.

21              Gray hat is when you give them a little

22    bit of a path, you know a little bit about the

23    environment.

24              And then white hat, of course, is you give

25    them carte blanche to the environment and then they

Page 63

1     just go -- usually that's an internal pen test.

2             But all of these were external.

3        Q.   And to your understanding, Fortalice did

4     one of these pen test assessments each year since --

5        A.   Yes, ma'am.

6        Q.   -- 2018?

7             And did they test the -- the entire part

8     of the Secretary of State's network or -- or

9     portions of it in those years, do you know?

10       A.   Most of it was just the business network,

11    right?  It was the business network and the

12    public-facing websites, nothing specific to --

13            You know, every business has a certain

14    number of IP addresses that face the public, and I

15    think in previous years, because of cost, they had

16    kind of truncated that list a little bit.  Because

17    they do charge per IP address.

18            And I know one of the years that I was

19    there, I went ahead and had them test everything,

20    every public IP address that we had.  It was

21    expensive to do, but you -- you kind of want a basis

22    to kind of run from.  So...

23       Q.   Did these pen -- penetration tests include

24    the portions of the election system that the

25    Secretary of State is responsible for?

Page 64

1          A.    Yes, ma'am.  The registration side, yes.

2          Q.    Did you personally work with Fortalice on

3    these penetration tests?

4          A.    No.  I -- I'm just the client.  They're

5    done in a vacuum and then they report back in a

6    draft mode and we talk about them, and then they

7    make a final report.

8          Q.    Did they provide those reports to --

9          A.    To Merritt, yeah.  Again --

10         Q.    Did you review --

11         A.    -- that was done because they were the

12   customer.

13         Q.    Correct.

14               But did you review those reports?

15         A.    I did.

16         Q.    And you said that there were discussions

17   of the reports.

18               Were you involved in the discussions?

19         A.    I would say most of them, but maybe not

20   all of them.

21         Q.    So to your knowledge, Fortalice conducted

22   and provided a report regarding a penetration test

23   in 2019; is that correct?

24         A.    I would think so, yes.

25         Q.    And in 2020?

Page 65

1          A.    I'm not sure because of the COVID stuff.

2     I don't know if that happened.

3          Q.    And how about 2021?

4          A.    Again, I don't know.

5          MS. KAISER:  Can you mark Tab 6, please?

6     I'm sorry, Tab 7.

7     BY MS. KAISER:

8          Q.    We're adding two documents to your folder,

9     Mr. Hamilton.  I'd actually like to start with the

10    second one.

11         A.    Okay.

12         MS. KAISER:  7; is that right?

13         (Plaintiffs' Exhibit 7 was marked for

14         identification.)

15    BY MS. KAISER:

16         Q.    Exhibit 7.

17         A.    Okay.

18         Q.    Do you recognize this document?

19         A.    Something I guess from Fortalice.  I --

20    we -- we didn't have Microsoft Teams then.  I guess

21    that would be a Fortalice thing.

22         Q.    Yeah, that was one of my questions.  It

23    says -- at the top of this page, it says, "This page

24    is automatically updated from the Wiki in Microsoft

25    Teams."

1          Did --

2      A.   Yeah.

3      Q.   Do you know what a "Wiki" is?

4      A.   Yeah.  It's a -- just a database of

5  information.

6      Q.   Do you know whether the Secretary of

7  State's office maintained a Wiki with Fortalice

8  through Microsoft Teams?

9      A.   No, ma'am.  Not -- not to my knowledge.

10      Q.   So this isn't something that you've seen

11  before?

12      A.   No, ma'am.

13      Q.   It looks to be weekly updates from

14  Fortalice to the Secretary of State's office

15  starting in September 2020 and going through

16  July 2021.

17      A.   Right.

18          MR. MILLER:  Objection.  Lack of

19      foundation.

20  BY MS. KAISER:

21      Q.   Do you have any reason to believe that's

22  not what this document represents?

23      A.   No.  I think that -- that's probably what

24  it is.  We might have -- we might have gotten these

25  updates via email.

Page 67

1          Q.   If you look at the entry for December --
2     excuse me -- yeah, December 4, 2020, I think it's on
3     page --
4          A.   Oh, hang on.  I went the wrong way.  Hang
5     on.
6               Oh, I got --
7          Q.   On the --
8          A.   Sorry.  I go from 6/11 to 6/18.  Which --
9     which date?  Sorry.
10         Q.   This is December 4, 2020.  It's on the --
11         A.   December.  Okay.
12         Q.   -- page ending in -2786 at the bottom.
13         A.   December 18.  Okay.
14         Q.   I'm sorry.  December 4th, which is a
15    little bit -- just a little bit further down on that
16    same page.
17         A.   December 4.  Gotcha.  Okay.
18         Q.   Do you see under "Project Status," the
19    second bullet there says, "Pen test aiming for
20    Feb/March 2021"?
21         A.   Right.
22         Q.   Does that indicate to you that Fortalice
23    was planning to do penetration testing for the
24    Secretary of State's office in 2021?
25         A.   Sounds like it.

1           MR. MILLER:  Objection.  Lack of

2       foundation.

3    BY MS. KAISER:

4       Q.   Let's see.  If you move forward on this

5    document to the February 26, 2021, entry.

6       A.   Okay.

7       Q.   It's on the page ending in -2785.

8       A.   -2785.  Okay.  I got it.

9       Q.   The last bullet there says, "Weekly

10   update."  It says, "vCISO services have been

11   mentioned."

12      A.   Right.

13      Q.   "Kyle and Paul are setting up meeting to

14   discuss with Dave Hamilton to get them caught up on

15   a backlog of security tasks."

16           Do you --

17      A.   Right.

18      Q.   -- see that?

19      A.   Right.

20      Q.   Do you know what that is referring to?

21      A.   Yeah.  I had mentioned to Fortalice that I

22   was planning on leaving the State as soon as I found

23   another position and that they needed to -- you

24   know, as the other partner, if they had the ability

25   to step in.

1          You know, I wanted to take care of the

2    State.  TrustPoint did not have any resources they

3    had left, so there wasn't anybody from our firm.

4    And I checked it out with my boss and he said it

5    would be fine to kick it to them and say, "Listen,

6    you know, we want to take care of our customer and

7    if you're getting ready to leave, then, you know,

8    you need to give it to them."

9          They subsequently decided that they

10   couldn't fill that seat because of a conflict of

11   interest.

12       Q.   What was the backlog of security tasks

13   that are --

14       A.   I think --

15       Q.   -- mentioned here?

16       A.   I think I pitched to them that there was

17   definitely work to be done, it was a work in

18   progress, and it wasn't going to be -- I think my

19   emphasis there was for -- for them to please be

20   interested, you know.

21          Because they would want to bill,

22   obviously.  They didn't want to just come in and be

23   a -- more of a maintainer than a fixer, right?  So

24   my emphasis there was just to kind of get them

25   interested in coming in and stepping in for me.

Page 70

1        Q.   In your view, why was there a backlog of
2    security tasks?
3        A.   Well, I think it was just, you know, we
4    needed some help.  You know, we had some staff
5    turnover and some people leave and I was getting
6    spread pretty thin between there and Imperial and I
7    wasn't there every week, and I just felt like I
8    needed to kind of get people interested in coming to
9    help.
10       Q.   If you move forward in the document to the
11   entry for April 16, 2023 [sic], it's on the page
12   ending in -2784.
13       A.   -2784.  Okay.  April 16 you said?
14       Q.   16, yes.
15       A.   Yes, ma'am.  Got it.
16       Q.   It says "Project Status," and the second
17   bullet point there says, "Pen test wrapping up."
18            Do you see that?
19       A.   Okay.  Adam Brown.  Okay.
20            Yeah, I worked with --
21       Q.   Does that suggest --
22       A.   -- Adam.
23       Q.   Does that suggest to you that Fortalice
24   did conduct penetration testing in 12 --
25       A.   Sounds like it, yeah.

```
 1              COURT REPORTER:  Whoa, whoa, whoa, whoa.
 2         Excuse me.  Can you repeat your question,
 3         please?
 4              MS. KAISER:  Sorry.
 5    BY MS. KAISER:
 6         Q.   The question was, does that suggest to you
 7    that Fortalice did conduct penetration testing in
 8    April of 2021?
 9         A.   And I said, yeah, it does sound like it.
10         Q.   And if you move forward to April 30, 2021.
11    It's the first entry -- or, sorry, the last entry on
12    the next page, -2783.
13              You see that?
14         A.   Okay.  "Pen test draft...out."  Right.
15         Q.   Yep.  "Pen test draft...out," yep.
16              So does that suggest to you that Fortalice
17    provided a draft report regarding the penetration
18    testing in 2021?
19         A.   Sounds like it --
20              MR. MILLER:  Objection --
21              THE WITNESS:  -- yeah.
22              MR. MILLER:  -- lack of foundation.
23              COURT REPORTER:  Repeat the objection,
24         please.
25              MR. MILLER:  Lack of foundation.
```

Page 72

```
1              COURT REPORTER:  Thank you.
2    BY MS. KAISER:
3         Q.  If you go up to the first entry in the
4    document for July 15, 2021.
5              Do you see that?
6              The last bullet point there under "Weekly
7    Update," it says, "Red team establishing assumed
8    breach."
9              Do you see that?
10        A.  What -- I'm sorry.  Which page are we on
11   again?  I got lost.
12        Q.  Sorry.  We're on the first page of the
13   document.
14        A.  Oh, sorry.  Okay.
15             Yep, I got it.
16        Q.  What does, "Red team establishing assumed
17   breach" mean?
18        A.  There's a couple of different ways to
19   approach a client when you're doing red team
20   exercises.  And I wanted -- I wanted them to -- or
21   somebody -- probably was me -- wanted them to act
22   like, you know, we had a breach and we needed to
23   also exercise the incident response plan as part of
24   the red team exercise.
25        Q.  What is the incident response plan?
```

Page 73

1          A.   It's a set of documentation, policies,

2     procedures that tells people what their roles are.

3     There's certain people that are identified in the

4     organization that kind of -- think of it like

5     everybody heads to the war room and chats about it.

6               When -- when the security team has an

7     event, that event then -- with further kind of

8     research, if it seems like it is a security issue,

9     then we refer to it as an incident.

10              It is not the security team's privy to

11    deem something as a breach.  We can only show it as

12    a potential breach, and then it's up to management

13    to make that decision whether something is actually

14    a breach.  We just -- we just give the facts to

15    leadership and they make the determination whether

16    something's a breach or not.

17              Only the senior leadership team can

18    implement the incident response plan and kind of

19    move forward with that.

20         Q.   Who is on the -- that management team?

21         A.   Legal -- by name or title?  I'm sorry.

22         Q.   Either.

23         A.   Okay.  So it would be somebody from legal,

24    somebody from public relations, somebody -- usually

25    two or three people from the senior leadership team,

Page 74

```
 1    somebody from operations, service desk.  Anybody
 2    involved directly in the incident gets drafted into
 3    that meeting.
 4            It's just basically to get all the facts
 5    out on the table.  You whiteboard everything and
 6    then you -- there's a playbook that we kind of go by
 7    to certify something as real.  We score it based
 8    on -- it's a judgment, right?  We score it based on
 9    criticality, and that's how that kind of runs
10    through that program.
11        Q.   And were you part of that management team?
12        A.   I was as the -- as the CISO, yes.
13        Q.   Do you recall what they -- what the
14    results or findings were from Fortalice's 2021
15    penetration testing?
16        A.   Not -- not by heart.  Sorry.
17        Q.   Do you recall anything generally?
18        A.   I think it was just a continuation of
19    the -- you know, the path that they were on.  I
20    think they found some new things, I think there were
21    some things from the old report, and then there was
22    things that we fixed.  So just part of that journey
23    that I mentioned.
24        Q.   Do you recall whether Fortalice sent a
25    final version of their report from this penetration
```

1    testing?

2         A.   Yeah, all those would have been uploaded

3    to a -- a document site, and that, I believe, Ryan

4    and Merritt had access to.  Because usually when I

5    got the report, it was from one of those two guys.

6         Q.   So to your knowledge, there was a

7    document -- like a document share site for

8    Fortalice --

9         A.   Uh-huh.

10        Q.   -- in the Secretary of State's office?

11        A.   Yes.  Yeah, I had an account there to be

12   able to upload things as artifacts, things that I

13   found, stuff like that.

14        Q.   Did that have a name?

15        A.    It was a commercial site.  I -- it's -- I

16   don't want to say -- it wasn't like a Box or a -- it

17   might -- might have been like a share file type.

18        Q.   Okay.

19        A.   Based on what I remember about Fortalice,

20   it was probably locally held.  It probably wasn't a

21   cloud service, because they were a little paranoid

22   about that.  So I would say that it was something

23   that they owned in their own private space.

24        Q.   All right.  Mr. Hamilton, I have a few

25   more questions about Fortalice, but I know we've

Page 76

```
 1      been going about an hour and a half.  Would you like
 2      to take a short break?
 3           A.   I'm okay.  I've got my Diet Coke.  Keep on
 4      going.
 5           Q.   Okay.  Glad to hear it.
 6                All right.  So let's go back to --
 7                (Off-the-record discussion.)
 8      BY MS. KAISER:
 9           Q.   Can you look back at Exhibit 1, please?
10           A.   Okay.
11                MR. MILLER:  And, Mary, I haven't been
12           looking at the participant list, but if
13           somebody wants to email Ms. Marks if we're done
14           with that section.
15                MS. KAISER:  We are, although this
16           document is also marked "AEO" by Fortalice.
17           So --
18                MR. MILLER:  I think that's the one we
19           came to the conclusion on earlier, right --
20                MS. KAISER:  Oh, no.
21                MR. MILLER:  -- Exhibit 1?
22                MS. KAISER:  No.  I'm sorry.  It was a
23           different one.
24                MR. MILLER:  Oh, I thought you said
25           Exhibit 1.  I apologize.
```

Page 77

```
 1              MS. KAISER:  We're looking at Exhibit 1.
 2         I think it was Exhibit -- it was the Logan Lamb
 3         email that was decided --
 4              MR. MILLER:  Yeah, you're right.  You're
 5         right.  I'm sorry.  Okay.
 6    BY MS. KAISER:
 7         Q.   All right.  Mr. Hamilton, so do you
 8    recognize this document as an email chain from
 9    July 2020?
10         A.   Yes, yes.
11         Q.   And, see, the first email came from Paul
12    Brandau at Fortalice; is that right?
13         A.    Correct.
14         Q.    Who is Mr. Brandau?
15         A.    He was an employee of Fortalice at the
16    time.  I think he left shortly after this
17    engagement, but I'm -- I'm not for sure on that.
18         Q.    And what was this engagement?  What do you
19    recall this engagement was?
20         A.    This would have been some -- this was
21    probably pen test from the outside.
22         Q.    So in -- in the first email in the chain,
23    Mr. Brandau sent this to Merritt Beaver and to you
24    and two others at Fortalice.  He said, "Sending
25    along here to cover down on all aspects - Rules of
```

Page 78

1    Engagement included."

2            Do you see that?

3        A.    Right.

4        Q.    What are the "Rules of Engagement"?

5        A.    It's a formal document that usually any

6    kind of pen tester will give a client that -- you

7    can liken it to a "get out of jail free" card.

8            Because, basically, attacking any website,

9    public or -- it's against the law in -- in a lot of

10   states.  There's been a lot of media coverage on

11   guys that end up in the pokey because they had a

12   real job and they were trying to do the right thing.

13           So the Rules of Engagement is basically a

14   document that outlines, "Here's what we're going to

15   do; here's what we're going to try to attack; here's

16   the time frame that we're going to do it within."

17           And they do that for two reasons.  They

18   give us the time frame so we can not implement the

19   incident response plan thinking it's a real -- a

20   real person, we kind of know they're doing it.

21           So -- and the pretext there is just to

22   kind of give them a paper trail of saying that,

23   "Hey, we discussed this fully with the client and

24   they knew what was happening," and they can't come

25   back later and say, "Oh, you bad people.  You

Page 79

1    shouldn't have done what you did."  So that's
2    basically it.
3         Q.   The next email, Mr. Beaver responded and
4    said, "Dave, please take ownership of this and get
5    them started."
6              Do you see that?
7         A.   Right.  Right.  Yeah.
8         Q.   So you were tasked with overseeing this
9    penetration testing?
10        A.   Right.  And I think the reason he did that
11   is because I didn't have any signatory -- you know,
12   I couldn't sign the statement of work.  I
13   couldn't -- you know, I wasn't given that.  So
14   that's probably why Merritt got passed that.
15        Q.   Okay.  And the next sentence says, "We
16   need to get a good understanding of any
17   vulnerabilities of OLVR and MVP."
18        A.   Right.
19        Q.   Do you see that?
20        A.   Right.
21        Q.   What does "OLVR" stand for?
22        A.   Online voter registration, and MVP is My
23   Voter Page.
24        Q.   So these are -- these are components of
25   the voting system; is that right?

Page 80

```
 1        A.   Registration, right.  Public-facing web
 2   base.
 3        Q.   Why did the Secretary of State's office
 4   think that there may be vulnerabilities with OLVR
 5   and MVP at this time?
 6             MR. MILLER:  Objection.  Misstates
 7        testimony not in evidence.
 8             THE WITNESS:  Yeah, I'm -- I'm not really
 9        sure that they did.  It's just a common thing
10        that we test every year, regardless of what's
11        happening.  We want to be --
12   BY MS. KAISER:
13        Q.   You wouldn't have any --
14        A.   -- in front of the bad guys, right?  So we
15   test.
16        Q.   Were OLVR and MVP part of the penetration
17   testing that Fortalice conducted each year, to your
18   knowledge?
19        A.   I believe so, because they were perimeter
20   websites.  So -- especially the one where I opened
21   it up and had them hit all the publics.  So yeah.
22        Q.   So do you have any understanding of why
23   Mr. Beaver specifically called out OLVR and MVP in
24   this email if they were part of the penetration
25   testing each year?
```

Page 81

1          A.   No.  I -- he was just probably telling me

2     to get busy.

3          Q.   Was it important to understand any

4     vulnerabilities with OLVR and MVP?

5          A.   Always, right.

6          Q.   And why is that?

7          A.   Well, it's just a very visible system, a

8     lot of -- a lot of stuff going on.

9               You know, we had a lot of public interest

10    in it, a lot of media attention.  I'm sure that

11    drove part of his understanding of why we were

12    interested in it.  That way we'd have the answers

13    before somebody asked.

14         Q.   What work did Fortalice do to assess any

15    such vulnerabilities with OLVR and MVP in 2020?

16         A.   I -- I don't specifically know what tools

17    they used.  I mean, they're widely -- there's a

18    bunch of different kind of tools, but -- some of

19    them are automated, some of them are manual.

20              They run, basically, robots against all

21    the outside sites, look for certain vulnerabilities,

22    open ports, things that might -- you know, might

23    have not been caught in a previous test.

24              And then, you know, it gives them a list

25    of what -- what to go after manually and see if they

1     can break in using rainbow tables, you know,

2     "Password" is password, that kind of thing.

3             I don't really know specifically what

4     tools -- and -- and they don't really want us to

5     know that, right?  Because that's part of their

6     secret sauce.  How they get the information, we

7     don't really know.  But once they get it, we get the

8     results.

9         Q.   And do you recall what the results were

10    with respect to this testing?

11        A.   Not specifically.  I'm sure there was a

12    list much like the one we looked at before, where

13    they color code them and they kind of rank them as

14    far as criticality.

15        Q.   And do you recall whether Fortalice

16    identified any vulnerabilities specifically with

17    respect to OLVR or MVP?

18             (Court reporter lost power.)

19             (Off the record.)

20             VIDEOGRAPHER:  The time is 11:53.  We're

21        back on the record.

22    BY MS. KAISER:

23        Q.   So, Mr. Hamilton, we were discussing

24    Exhibit 6 [sic] before we went off the record.

25             Do you recall that?

Page 83

1          A.    Yes, ma'am.

2          Q.    And including this email from Mr. Barrett

3     [sic] that talked about Fortalice getting "a good

4     understanding of any vulnerabilities of OLVR and

5     MVP."

6               Do you see that?

7          A.    Right.

8          Q.    And I believe we were discussing did

9     you -- do you know whether Fortalice identified any

10    vulnerabilities specifically with respect to OLVR

11    and MVP in 2020?

12         A.    I -- I don't recall without being able to

13    look at the report.  But I -- I think I stated

14    before, they're pretty good at what they do, so if

15    there was any to be found, they would have found

16    them.  So...

17         Q.    And if they found any, they would have

18    included that in their written report that was

19    delivered to the Secretary of State's office; is

20    that correct?

21         A.    Correct.

22         Q.    We can look at the next exhibit.  I

23    believe it's Exhibit 6.

24         A.    Okay.

25         Q.    Yes, Exhibit 6.

Page 84

1              (Plaintiffs' Exhibit 6 was marked for
2         identification.)
3      BY MS. KAISER:
4         Q.    Have you seen this document before?
5         A.    Yep.
6         Q.    And it looks like it's a task order from
7      Fortalice to the Secretary of State's office; is
8      that right?
9         A.    Correct.
10        Q.    It's dated --
11        A.    It's a -- what they -- what they refer to
12     as a bucket of hours, yes.
13        Q.    And this is dated -- dated March 11, 2021;
14     is that right?
15        A.    Correct.
16        Q.    If you look on the second page, the
17     signature line, is that your signature?
18        A.    It is.
19        Q.    So you approved this task order; is that
20     right?
21        A.    Correct.  Statement of work, right.
22        Q.    The project description is, "The following
23     task order has been established to provide the
24     Georgia Secretary of State with Chief Information
25     Security Officer Support."

Page 85

```
 1              Do you see that?
 2       A.    Uh-huh.
 3       Q.    And then under -- at the bottom of that
 4   table on page 1, the last line there says,
 5   "Deliverables."  It says, "Monthly report including
 6   tasks accomplished by labor category."
 7              Do you see that?
 8       A.    No --
 9       Q.    This is on page 1.
10       A.    -- I don't, actually.
11              You're talking about -- oh, okay.  Maybe
12   I'm looking -- under the table.  I got it.  Yep.
13       Q.    Right.
14              To your knowledge, did Fortalice provide
15   monthly reports pursuant to this task order?
16       A.    I would think they would have had to,
17   right, to be able to get paid.  And those would have
18   went to Merritt.  So...
19       Q.    So you think those were provided to
20   Merritt Beaver?
21              MR. MILLER:  Objection --
22              THE WITNESS:  I'm sure.
23              MR. MILLER:  -- foundation.
24              THE WITNESS:  We should ask him, I guess.
25       Yeah.
```

Page 86

1    BY MS. KAISER:

2        Q.   Do you recall any situation during your

3    tenure at the Secretary of State's office in which

4    Fortalice was brought in to handle any potential or

5    actual breach of a security -- excuse me --

6    Secretary of State's system?

7        A.   There were some incidents that they were

8    brought into, but nothing that -- nothing that rose

9    to the level of an actual breach.

10       Q.   What do you recall about those incidents?

11       A.   Just as a matter of course, you know,

12   we -- we'd find something or, you know, somebody

13   alerts us.

14            It's not uncommon for, you know, us to

15   bump into things on a daily basis that might be a

16   problem, so we usually vet them.  And that's what --

17   this backs us up.  It allows us to use them as a

18   subject matter expert to be able to hunt down stuff,

19   and they give us an opinion, a judgment, whether

20   it's real or not real or -- so...

21       Q.   And does that trigger the incident

22   response plan that you described previously, if

23   they --

24       A.   Yeah, only --

25            (Cross-talk.)

Page 87

1          A.   Only if it's deemed -- only if it's deemed
2      as a potential breach, right.
3          Q.   And during your time, you don't recall any
4      incidents that were deemed a potential breach?
5          A.   No, there was at least one, yep.
6          Q.   What do you recall about that -- that one?
7          A.   That was the one where John Q Public
8      emailed somebody in the agency that they found
9      something, which is not uncommon.  I have that
10     happen in healthcare, too, where somebody from the
11     outside, you know, is -- is trying to tell you that,
12     "Hey, I found this problem.  You want to fix it."
13          Most of the time, it's -- it has been my
14     experience that it's a -- it's a regular good guy
15     that's doing the right thing, just trying to be part
16     of the Internet community.
17          But I think here at State they were a
18     little paranoid of that, with all the media pressure
19     and things like that.  My opinion again.
20          So we elevated it to them to do a little
21     background on it to make sure that we were flying in
22     the right direction.  So...
23          And there were -- there were some things
24     that were found that didn't directly line up with
25     what they said that we got our vendor to address in

Page 88

1    a big hurry.

2            But, you know, I -- I never turn away

3    anyone from the public telling me something,

4    because, you know, we're all in this together.  So

5    if somebody sends an email to somebody in the

6    agency, I vet it, because it could be right.  You

7    never know.  So...

8        Q.   Do you recall approximately when this

9    incident took place where you received an email from

10   somebody in the public?

11       A.   Probably 20- -- probably in 2021, early

12   2021 or late '20.

13       Q.   And did the potential vulnerabilities that

14   this person, the member of the public, emailed you

15   about pertain to the election system?

16       A.   The registration site, right.

17       Q.   And so in response, you asked Fortalice to

18   take a look; is that right?

19       A.   Correct.

20       Q.   And they did identify some -- some real

21   issues?

22       A.   They did.

23       Q.   What steps were taken to remediate those

24   issues?

25       A.   A code line change by the vendor to -- to

Page 89

```
 1      flush a certain variable to make it null set instead

 2      of just a sequential number.

 3           Q.   Who was the vendor at that time?

 4           A.   PCC or whatever they called themselves

 5      after the fact.

 6           Q.   Were there any steps taken to ensure that

 7      the vulnerability had been -- had not been utilized

 8      by a bad actor, for example?

 9           A.   Yeah, there was some -- there was some

10      logging available on the site, but it was

11      ascertained by Fortalice that it wasn't a bulk

12      situation.  It was a situation where you would go to

13      the website and you'd look at the -- at the data in

14      the URL line and you'd notice that it was, you know,

15      serialized, 1234.  And if you put 1233, it would

16      then display the last guy that was in.

17                So it didn't go any further back than that

18      and it didn't go forward, so for somebody to -- to

19      use that tool, it would have taken forever to get,

20      you know, any substance.

21                But it was definitely an issue, so we took

22      care of it.  I say "we."  We asked that it be taken

23      care of.

24                MS. KAISER:  Tab 16.

25
```

Page 90

```
 1      BY MS. KAISER:
 2          Q.   You should see an exhibit, Exhibit 8.
 3               (Plaintiffs' Exhibit 8 was marked for
 4          identification.)
 5               THE WITNESS:   Okay.
 6      BY MS. KAISER:
 7          Q.   If you -- if you start from the last email
 8      in the chain, it looks like it's from August 12,
 9      2020, from Kijyuu Tradebit.
10               Do you see that?
11          A.   Yeah, I do.  I got it.
12          Q.   Does this document describe the incident
13      you were just talking about?
14          A.   Yeah, it would be a good example of -- of
15      one that we got from the outside, right.
16          Q.   Okay.
17          A.   Yep, that's the one.  The --
18          Q.   This is the one --
19          A.   -- randomization of the last four digits,
20      right.
21          Q.   Right.
22               So this came from somebody in the public
23      who wanted to stay anonymous; is that right?
24          A.   Right.
25          Q.   They contacted the Secretary of State's
```

```
 1     office because they identified this vulnerability
 2     with the voter registration system.
 3              Do you see that?
 4        A.   Right.
 5        Q.   And this was with the Cobb County voter
 6     registration system.
 7        A.   Uh-huh.
 8        Q.   Do you recall that?
 9        A.   Yep.
10        Q.   So this email went to Michael Barnes, who
11     then forwarded it to you; is that right?
12        A.   Correct.
13        Q.   And did you interact with this individual
14     who reported the vulnerability?
15        A.   I'm not sure if I actually emailed.  I
16     might have emailed this person.  I'm not sure.
17              But just on the face of it, I think I
18     kicked off, you know, a process internal to kind of
19     review it and go look and see what they were looking
20     at.
21              It -- it's certainly not uncommon to have
22     folks from the public say, "Hey, we got this wrong."
23     You know, as I said, it's -- even in healthcare
24     today, we still have those.  And some of the ones we
25     follow -- you know, we follow up on, there's a real
```

1    problem; others, not so much.

2              So I don't want to waste anybody's time,

3    but usually they don't go into such a big deal of,

4    you know, obfuscation of who they are.  That was a

5    little weird.

6              So we definitely looked into this one, and

7    it ended up that this one had a problem, but it was

8    actually on the Cobb County side of things.  And so

9    I -- I reached out for -- for the IT folks on their

10   side and -- and, you know, alerted them to it,

11   and -- and the IT director over there took the site

12   down, took it off the air, until they could get the

13   code line remediated.

14             And it -- it was basically pointing only

15   to their Cobb County information, so, you know, it

16   was up to them.  We're just trying to be good

17   citizens that "we heard something and here we go."

18   It wasn't uncommon for us to have discussions with

19   the counties, because they all operate independently

20   from the Secretary of State.  So...

21        Q.   Right.  And you can see that in your

22   email -- this is on page 2 of the document; the

23   Bates number is -126679 --

24        A.   Yeah.  Okay.

25        Q.   -- you emailed -- in the middle of the

1       page there, you emailed Kimberly Lemley.

2               Do you see that?

3               A.    Yeah.   I don't know her personally, but,

4       yeah, that was the IT person.   Director, I think it

5       was, yeah.

6               Q.    All right.   And you -- you reported that

7       this appeared to be a valid vulnerability.

8               You see that?

9               A.    Correct.

10              Q.    Okay.   And so -- and to your knowledge,

11      Cobb County addressed this particular vulnerability;

12      is that right?

13              A.    Yeah.   They pulled the site down pretty

14      quickly after I sent this email and -- yeah.

15              Q.    If you go back to page 3 of the document,

16      there's an email from you in the middle of that page

17      from Wednesday, August 12 --

18              A.    Right.

19              Q.    -- to Merritt Beaver and others.   It says,

20      "Here it is.   He is right, I checked.   It sounds

21      like the same thing -- the exact same thing we

22      addressed with PCC on our website."

23              Do you see that?

24              A.    Right.

25              Q.    What did you mean by that?

Page 94

1          A.   Yeah, it's a -- just a common web

2     vulnerability, is that they do insertion at the

3     actual URL line.  Same issue that comes up on a lot

4     of things, so not uncommon.

5          Q.   And when you say "our website" --

6          A.   It would have probably -- I was most

7     likely referring to either MVP or the OLVR.

8               I think the difference was -- is that

9     we -- I think we caught that one internally.  So...

10         Q.   Did you take steps to remediate that one?

11         A.   Yeah, again, just reach out to the

12    developer and have them change the way they

13    randomize that number.

14         Q.   I'm going to add Exhibit 9.

15         A.   Okay.

16              (Plaintiffs' Exhibit 9 was marked for

17         identification.)

18              THE WITNESS:  Okay.

19    BY MS. KAISER:

20         Q.   So this looks to be an email chain from

21    the same time period, August 12, 2020.

22         A.   Right.

23         Q.   It starts with the same email from Kijyuu

24    Tradebit.  But I just want to focus on your email at

25    the top of page 1.

Page 95

```
 1          A.    Right.
 2          Q.    This is an email from you to Nick Salsman,
 3     Ronnell Spearman, and Derek Hawkins.
 4               Do you see that?
 5          A.    Correct.  Those are the three security
 6     people on my team.
 7          Q.    And you say, "Guys, I would like to see if
 8     the other big counties have similar sites that have
 9     this vulnerability."
10               Do you see that?
11          A.    Yes.
12          Q.    You ask them, "Would you nose around
13     Fulton, Gwinnett, DeKalb, Forsyth, et cetera and see
14     if this developer possibly sold the same app to
15     them?"
16               Do you see that?
17          A.    Correct.
18          Q.    Do you know if your -- these team members
19     did that review?
20          A.    They did.
21          Q.    What did they find?
22          A.    None of the counties they tested had the
23     same vulnerability.
24          Q.    Did you only test these about five
25     counties?
```

Page 96

1      A.   Right.  Because we have 159 counties in

2   Georgia.  Right.  It would be a manual test.

3      Q.   So you didn't --

4      A.   You'd have to go find out every single

5   test and -- but usually it's only the big counties

6   that have the money to do their own site instead of

7   just forwarding it to the MVP or the OLVR.

8           So I just told them to hit the big ones

9   just to make sure.  And that was just a -- truly a

10  community thing.  We just wanted to make sure that

11  everybody was safe, not just us.

12     Q.   Were there -- was anything else done to

13  ensure that other counties didn't have this same

14  vulnerability?

15     A.   No, I think that was it.  We just -- I had

16  the guys do some vetting of those sites, and if --

17  if one of them had come up, we would have done the

18  same thing that we did with Cobb.  We would have

19  reached out and said, "You need to down your site

20  until you get this fixed."

21     Q.   Previously, Mr. Hamilton, you gave some

22  answers about the fact that, you know, security is a

23  journey --

24     A.   Yeah.

25     Q.   -- not a destination and it involves, you

Page 97

1    know, prioritizing certain remedies and that kind of

2    thing.  I just wanted to go back to that for one

3    minute.

4         A.   Sure.

5         Q.   You would agree that the --

6         A.   Sure.

7         Q.   -- Secretary of State is responsible for

8    what's considered critical infrastructure, including

9    the election system, would you not?

10        A.   Yes.

11             MR. MILLER:  Objection.  Lack of

12        foundation.  Calls for speculation.

13   BY MS. KAISER:

14        Q.   And do you agree that all reasonable

15   measures should be made to secure such critical

16   systems?

17             MR. MILLER:  Same objection.

18             THE WITNESS:  Reasonable, right, yep,

19        reasonable and appropriate.  It's all based on

20        judgment.

21   BY MS. KAISER:

22        Q.   So you were not suggesting that it's

23   appropriate to leave significant vulnerabilities

24   unmitigated when you're dealing with --

25             (Cross-talk.)

1          A.    Not at all.

2          Q.    -- critical infrastructure?

3                MR. MILLER:  Objection.

4                THE WITNESS:  Not at all.

5    BY MS. KAISER:

6          Q.    And you were not suggesting it's

7    appropriate to take no measures to mitigate

8    significant vulnerabilities with critical

9    infrastructure systems?

10               MR. MILLER:  Same objection.

11               THE WITNESS:  Correct, I was not.  If we

12          can't fix it one way, there's usually other

13          compensating controls that we can do.  So...

14   BY MS. KAISER:

15         Q.    I have a couple of questions about

16   Georgia's prior election system, by which I mean the

17   DRE voting system.

18         A.    Oh, yeah.  I probably won't be much --

19         Q.    Are you aware of any --

20         A.    -- help there, but --

21         Q.    Are you aware of any efforts made by

22   anyone in the Secretary of State's office to

23   determine whether malware was located on any

24   component of the -- of the prior DRE system?

25               MR. MILLER:  I'm going to note an

Page 99

1        objection on relevance here.

2              And, Mary, if you'll just allow me the --

3        humor me to have a running objection on this

4        line of questions for the old system.

5              THE WITNESS:  Yeah, I wasn't around then,

6        so I just don't have any personal knowledge.

7   BY MS. KAISER:

8        Q.   What components of the DRE system were

9   carried over or used at any point in time with the

10  new voting system, the BMD system?

11             MR. MILLER:  The same objection.  Lack of

12        foundation.

13             THE WITNESS:  I -- I don't really know

14        what was there before; I can only tell you what

15        was there when I got there.  So...

16  BY MS. KAISER:

17       Q.   So you don't have any knowledge about

18  whether equipment or servers were reused?

19       A.   I think initially they probably reused the

20  servers while they were waiting to put in the new

21  ones.  But that's just a piece of hardware.  So...

22             At -- at one point, PCC, the company, had

23  the responsibility for the operations side, and when

24  that transferred to the Secretary of State, there

25  was a big refresh of hardware that came with it.

1      Q.   Do you recall about when that took place?

2      A.   Pretty soon to the beginning of my

3  engagement.  It was probably sometime 2018, early

4  2019.  That's a guess, but yeah.

5      Q.   You said they probably initially reused

6  servers while waiting to put in new ones.

7           Do you know when the new servers were put

8  in -- put into place?

9      A.   I -- I don't have a date.  That would be a

10  question for Merritt.  He probably would remember

11  the date.

12      Q.   Are you aware of any situation where there

13  was a suspected hack of any aspect of the IT system

14  that the Secretary of State has responsibility for?

15      A.   No, not -- I -- I mean, it's a terminology

16  thing.

17           I know -- I think what you're talking

18  about is a bad actor hacking.  There are good

19  actors, like Fortalice, that does good hacking.

20  But, no, not from a bad side, no.

21      Q.   Other than Fortalice, are you aware of

22  any -- any hacks, good or bad?

23      A.   No.  We -- we monthly used our own tool,

24  Qualys, to interrogate a lot of the websites

25  internally.  But that was for our own use, just to

Page 101

1    make sure things were prodding along.

2              For instance, like the statement that I

3    made before about something being remediated, that

4    was a snapshot in time.  So if something changed the

5    next day, a new release, something happened in the

6    real world, then you -- that's -- that's why you --

7    you kind of keep a -- a good -- a good bead on

8    everything that's happened in the past and you keep

9    retesting it all the time just in case.  So...

10        Q.   Are you aware of any incident where there

11   was unauthorized access to any aspect of the IT

12   infrastructure that the Secretary of State's office

13   manages?

14        A.   No, not -- not directly.

15        Q.   Are you aware of any attacks on election

16   infrastructure in any counties in Georgia?

17             MR. MILLER:  Objection.  Lack of

18        foundation.

19             THE WITNESS:  Yeah, I -- I wouldn't know

20        about the counties because they didn't kind of

21        report up through me.  It's two separate

22        entities.

23             But as far as the -- the home-based

24        system, what we were responsible for, no.

25   BY MS. KAISER:

Page 102

1          Q.   Exhibit 10.

2          A.   Yeah, I got it.

3               (Plaintiffs' Exhibit 10 was marked for

4          identification.)

5     BY MS. KAISER:

6          Q.   I'll represent to you that this is a news

7     article.

8               Do you -- do you recall this -- I'm sorry.

9               The news article describes a ransomware

10    attack on Hall County election infrastructure in

11    October 2020.

12              Do you see that?

13         A.   Yep.

14         Q.   Do you have any recollection of that

15    incident?

16         A.   Vaguely.  I remember folks talking about

17    it, but we didn't get involved in it.

18         Q.   And by "we," you mean the Secretary of

19    State's office?

20         A.   Correct.  Right.

21         Q.   So if the Secretary of State's office was

22    not involved in any investigation or -- or

23    remediation in --

24         A.   No.  My recollection of this event is it

25    just hardened our -- our intent to kind of get out

Page 103

1      in front of people within our organization to
2      reeducate them on a monthly basis about the dangers
3      of ransomware and don't click the link if you don't
4      absolutely have to and things like that.
5                I spent a lot of my time kind of
6      evangelizing security and even made some videos for
7      the organization that could be played at any time,
8      not just on shift.
9                So we had pretty good tools at the
10     Secretary of State that allowed us to, you know,
11     keep away from that kind of stuff.  The -- the
12     smaller counties may not have the budget to do that.
13     That would be my opinion.  So...
14         Q.   Are you aware of any incident where
15     somebody contacted the Secretary of State's office
16     and threatened to hack Georgia's elections?
17         A.   No.  I mean, I -- I don't -- nothing
18     directly that I -- that I saw or -- no.
19         Q.   If something like that happened, would
20     it -- would it fall under your responsibility to
21     respond to that?
22         A.   I would imagine that somebody in
23     leadership would have tipped me off to it as to, you
24     know, "Here, go look at this.  Somebody thinks we're
25     a ripe target" kind of thing.  But I don't remember

1    any specific instances where Merritt or somebody

2    came to me and said, "Hey, somebody's going to hack

3    us."

4              So I -- honestly, as a security

5    professional, I think the world's going to hack me

6    every day.  That's how I go to work.  So...  They

7    only have to be right once.  I've got to be right

8    every day.

9         Q.   Understood.

10             MS. KAISER:  Can you publish Tab 8,

11        please.

12             (Plaintiffs' Exhibit 11 was marked for

13        identification.)

14   BY MS. KAISER:

15        Q.   We're adding I think what will be

16   Exhibit 11.

17             All right.  Do you have Exhibit 11 open,

18   Mr. Hamilton?

19        A.   I do.

20        Q.   The first email in this chain is from

21   Bret Hadley.

22             Do you see that?

23        A.   Gotcha.  Yep.

24        Q.   April 4, 2019?

25             So this is --

Page 105

1          A.    Got it.

2          Q.    -- during the time that you worked with

3     the Secretary of State's office; is that right?

4          A.    If it was sent in April -- oh, yeah, okay.

5     I would have -- I don't know if I was on site that

6     week.

7                Because that was -- if they copied Clark

8     Rainer, he was the IT director at that point, and it

9     was when he left that I started spending a little

10    more time at Secretary of State.  So this might have

11    been maybe one of my off weeks where I was at

12    another client.

13         Q.    Okay.

14         A.    I don't remember this email, seeing it, I

15    don't think.  I don't...

16         Q.    Okay.  Yeah.

17                So Mr. Hadley's email at the bottom of the

18    page, the subject is "I bet I can hack your election

19    [sic] voting machines."

20                Do you see that?

21         A.    Yeah.

22         Q.    He said, "If you don't want me to try and

23    hack your elections, please follow Oregon's lead and

24    vote by mail, on paper.  You really DON'T" -- all

25    capitalized -- "need electronic voting machines, but

1    if you insist, then let the games begin.  Fair

2    warning."

3              Do you see that?

4         A.   Yep.

5         Q.   And it looks like -- it looks like this

6    was sent to soscontact@sos.ga.gov?

7         A.   Right.  That's just the -- the basic

8    website.  It's like sending a note to the webmaster,

9    right.

10        Q.   Okay.  And then this was forwarded on to a

11   group of people, including -- let's see -- including

12   Chris Harvey and Kevin Rayburn.

13             Do you see that?

14        A.   Yep.  James Oliver.  Right.

15        Q.   Right.

16             But you don't recall -- you don't have any

17   recollection of this email or this incident?

18        A.   No, ma'am.

19        Q.   And you don't recall any similar threats

20   during your time at the Secretary of State's office?

21        A.   No, nothing like that.  It's been my

22   experience that people who threaten usually don't do

23   it.  It's the people that don't say anything that do

24   things like this.

25        Q.   Do you know whether there has ever been a

1     cybersecurity assessment done of Georgia's voting

2     equipment?

3          A.   I do not.  As I understood it, that was

4     the privy of the Dominion folks and that they were

5     independently certified.  I don't know much about

6     that process.

7          Q.   So you're not aware of any cyber

8     assess- -- cybersecurity assessment of the voting

9     machines?

10         A.   No, ma'am.

11         Q.   Are you aware of any reports or

12    conclusions regarding any security vulnerabilities

13    with the BMD system?

14         A.   Not -- not specifically, because it kind

15    of fell outside my scope.  So...

16         Q.   Are you generally aware of any?

17         A.   No, I -- I can't recall any that -- I

18    mean, there was always the underpinnings of somebody

19    trying to do something, but we live with that every

20    day.  So...

21         Q.   So you're not personally aware of any

22    security breaches or vulnerabilities involving the

23    BMD system.

24              MR. MILLER:  Objection.  Asked and

25         answered.  Lack of foundation.

Page 108

1            THE WITNESS:  Yeah, I -- not that I can
2        recall.
3    BY MS. KAISER:
4        Q.   Are you aware of any complaints regarding
5    the security of the BMD system?
6        A.   No.  I -- I think I read some news stories
7    and things like that, but nothing specific.
8        Q.   What is the Election Center?
9        A.   I think that's the hardened facility that
10   they moved to.  I've never been in it.  Not meaning
11   like moved the servers to.  I think that was like
12   the -- the war room, so to speak.  It's where the
13   people went during an election.
14       Q.   The people but not the servers, you said?
15       A.   No.  Servers are maintained in -- in
16   secure data centers.
17       Q.   Okay.  What server is the election
18   management system for the new BMD election system,
19   where is that currently hosted?
20           MR. MILLER:  Objection.  Foundation.
21           THE WITNESS:  Yeah, I can only -- I can
22       only speak to the stuff for the election side
23       of the house for the registration side, and
24       those are housed in -- here in Atlanta, and
25       then there's -- there's a backup site that gets

```
                                            Page 109

  1          mirrored in Ashburn, Virginia.  Both of them
  2          are QTS sites, Quality Technical Services.
  3     BY MS. KAISER:
  4          Q.   Is there a point in time that there --
  5     that the election management system for the new --
  6     for the BMD voting system was moved to a new server?
  7               MR. MILLER:  Objection.  Lack of
  8          foundation.
  9               THE WITNESS:  Again, for the BMD site, I'm
 10          not -- I'm not sure.  I can only --
 11     BY MS. KAISER:
 12          Q.   You weren't involved in that?
 13          A.   -- speak to ENET -- ENET and, you know,
 14     MVP sites, things like that.
 15               (Off-the-record discussion.)
 16               THE WITNESS:  12 is the new one?
 17     BY MS. KAISER:
 18          Q.   Do you have that up?
 19               (Plaintiffs' Exhibit 12 was marked for
 20          identification.)
 21               THE WITNESS:  Oh, EMS?  Yeah.
 22     BY MS. KAISER:
 23          Q.   Yeah.  So this is an email chain from
 24     July 15, 2020.
 25               Do you see that?
```

1          A.    Right.

2          Q.    The first email is --

3          A.    Right.  This is --

4          Q.    -- from you?

5          A.    Right.  This is the system that does the

6     ballot design.

7          Q.    Ballot design.  Okay.  Yeah.

8                So the subject is "EC Visit Notes."

9                What does "EC" stand for?

10         A.    Election Center in Marietta.

11         Q.    Okay.  And you say this is what does the

12    ballot design.

13               What program does the ballot design?

14         A.    I'm not sure who authored it.  It was

15    something that was -- that was originally installed

16    on a -- on a private network, not facing the

17    Internet, and great -- great care was taken to make

18    it not touch the Internet.  So we basically

19    constructed a -- a new virtual environment for it,

20    and it, as far as I know, remains that way today.

21               But I don't remember that as BMD.  I

22    remember it as the -- that EMS system.

23         Q.    Right.  And "EMS" being the Election

24    Management System; is that right?

25         A.    Yeah, I think that's what they call their

1    ballot design thing.  I think that's -- that's

2    all -- what we likingly call Michael Barnes'

3    servers, right.  That was it.

4         Q.   All right.  So the EMS system is used for

5    the ballot design, and that's true with respect to

6    the new BMD voting machines, too; right?

7         A.   Yes.  It's just, I think, a different

8    version.  Because it didn't run on the -- on the

9    version of Virtual Center that we had, so we had to

10    upgrade that environment.  And that was what this

11    project was about, just trying to get out of their

12    way so they could get the new thing set up.

13         Q.   In the second line of this email, you say,

14    "I do think the shortest path is to spin up an

15    additional VM host on 6.5, build everything

16    new - partition the existing storage, add some

17    drives."

18              Do you see that?

19         A.   Right.

20         Q.   Can you -- can you explain what you meant

21    there?

22         A.   VM host is -- is -- a host is a -- is a --

23    is a set of software that runs on a physical server

24    that allows you to spin up independent guests, which

25    are instances of servers that run in a virtual

1    world.

2         So being that they were way back at

3    Version 5.2, we needed to get them on the most

4    current version to be supported even though it was

5    off the Internet, just because it was the -- you

6    know, the right thing to do, get on the latest code

7    line for -- with the virtualization side of things

8    so they could run their servers.

9         Q.   Who do you mean by "they"?

10        A.   Michael Barnes' group.  He's got a group

11   of people out there, half a dozen folks.

12        Q.   And your next line says, "This" -- sorry.

13   The next line down says, "This would give us a clean

14   slate."

15        A.   Right.

16        Q.   So you thought this was the right way to

17   go because it would basically allow you to start

18   over --

19        A.   Right, the --

20        Q.   -- with the EMS system; is that right?

21        A.   -- the idea being that the servers had

22   some age on them and the -- you know, the operating

23   systems that they ran had some age, so we wanted to

24   get them on something current.

25             Because I think there was some assumptions

Page 113

1    made that if it had new software, we're going to

2    have to have the underpinnings be that way as well.

3    So, yeah, this was one of many recommendations I

4    made for that environment.

5         Q.   Was that recommendation followed?

6         A.   Yes.  It was actually my team that ended

7    up building it, because the infrastructure team was

8    otherwise engaged in spinning up other things.  So

9    my team took it on -- upon themselves to get that

10   set up.

11        Q.   The last line of your email says, "Lots of

12   open stuff to make us security folks nervous - but

13   out of all we do - this likely needs to be the most

14   secure."

15             Do you see that?

16        A.   Correct.  Correct.

17        Q.   Why did you feel that this needed to be

18   the most secure?

19        A.   Because historically, it had been an

20   off-net, private net solution, so you knew they were

21   nervous about it being on the edge.

22             All the other things that we were

23   responsible for were public-facing, a lot of public

24   information.  This was not public information.  This

25   was to help the 159 counties do ballot design and

Page 114

1      things like that.

2              So, yeah, out of all the things we did,

3      this was probably the most critical.

4          Q.   If you look at Kevin Robertson's response

5      to you, the top of page 1.

6          A.   Okay.

7          Q.   And who is Kevin Robertson?

8          A.   He was the head of the I- -- what we would

9      term as a PMO, project management office.  So...

10         Q.   Did you work with him on this project?

11         A.   Yes, yes.  He -- we worked together on a

12     lot of different things.  He kind of was the

13     right-hand guy of Merritt.

14         Q.   Okay.  Number 3 in Mr. Robertson's email

15     here says, "Once we copy everything over then

16     determine if we want to use the existing servers and

17     build those out with new patches and recommendations

18     made in the attached survey."

19              Do you see that?

20         A.   Right.

21         Q.   Was Mr. Robertson suggesting using

22     existing servers rather than new ones?

23         A.   He was, but he didn't understand that the

24     newest code wouldn't run on the older servers.  So

25     oil and water.

Page 115

 1          Q.   And so, ultimately, you did use new
 2     servers?
 3          A.   Correct.
 4          Q.   And let's see.  These emails were from
 5     June 2020.
 6               Do you know when that change was made,
 7     when the new servers went into use?
 8          A.   I think probably by the end of the year,
 9     there was -- he had a due date.  I don't know if he
10     mentioned it on here.  Michael is -- no, not on this
11     one.
12               Michael usually waited till the last
13     moment to let us know.  So I -- I'm not sure how
14     fast we were able to turn that thing around for him,
15     but I do think we hit his date.  Otherwise, the
16     world would have stopped turning, according to
17     Michael.  So...
18          Q.   Understood.
19               If you look at item 2 in Mr. Robertson's
20     email --
21          A.   Uh-huh.
22          Q.   -- it says, "Reached out to Dominion and
23     set the expectation that they are going to load what
24     is needed once we build out the environment."
25               Do you see that?

Page 116

1           A.    Correct.

2           Q.    Do you know what he meant by that?

3           A.    The actual specific software that goes on

4     there we did not have any experience with, so I

5     think I had asked somebody along the line, I said,

6     "If -- if the vendor should do the install, then let

7     them do the install."

8                 But I would do that with other examples,

9     too.  That's probably where that came from.

10          Q.    And when you mean [sic] "the software,"

11    you mean the actual EMS software that did --

12          A.    Correct.

13          Q.    -- the ballot design?

14          A.    Yeah.  Yeah.  So in other words, right,

15    you've got a Windows -- a Windows box that runs

16    Windows and on top of that are individual

17    applications.  This would be an individual

18    application on top of that.

19                (Plaintiffs' Exhibit 13 was marked for

20          identification.)

21    BY MS. KAISER:

22          Q.    Can you look at the next exhibit, 13?

23          A.    Okay.  Hang on.  Oh, I don't have that one

24    yet.  Hang on.

25                All right.

1          Q.   And I'll represent to you this was an
2      attachment to the prior email that we were just
3      looking at.
4          A.   Right.
5          Q.   This -- so it says "Site Visit."
6      "Election Office Notes" --
7          A.   Right.
8          Q.   -- "10am 6/15/20 Meeting."
9               You see that?
10         A.   Right.
11         Q.   And did you recall this meeting -- I
12     mean -- sorry -- do you recall attending that
13     meeting?
14         A.   Vaguely, yeah.  I -- I definitely -- this
15     would be like one of my normal hit lists that I list
16     when I go somewhere.  Yep.
17         Q.   So do you think that these are notes that
18     you took at that meeting?
19         A.   Yes.
20         Q.   What was the purpose of the meeting?
21         A.   To get a feeling for where he is today and
22     where he wanted to be and how much of a heavy lift
23     it was going to do to -- to get it running.
24         Q.   And when you say "he," you mean --
25         A.   Michael Barnes.  I'm sorry.  Yeah.

Page 118

1          Q.   So this was kind of the level set about
2     the project of getting the new servers going for the
3     EMS --
4          A.   Right.
5          Q.   -- software?
6          A.   This was the feedback to the PMO so they
7     could break it into tasks and figure out what other
8     groups needed to help.
9               And some of the errata I put in here was
10    just typical security guy, head on a swivel, you
11    know, walking around the facility, things I noticed
12    that we could do better.  So just a heads up.
13              And, you know, the idea of giving it back
14    to the PMO would be so he could kind of filter it
15    through the different groups of responsibility.
16    So...
17         Q.   Under "Basic Overview," about -- I think
18    it's about eight bullets down, it says, "No patching
19    of VMware in recent memory, no firmware updating of
20    the hosts, controllers, network gear, etc."
21              Do you see that?
22         A.   Correct.  Yeah.
23         Q.   What did you mean by that?
24         A.   Because it was off-net, they had no way to
25    patch it.  They didn't know how, let's put it that

Page 119

1    way.

2            Q.   And was that a concern to you?

3            A.   Yeah.  I mean, I -- I just -- I looked at

4    it as any other asset.  I mean, that's what we do is

5    we make judgments based on the asset and also the

6    criticality of the data that's on it.

7                 Not so much from a security standpoint,

8    but if you're not on the most current versions of

9    software, firmware, things like that, if you end up

10   having a problem and you end up calling anybody for

11   support, they're going to -- the first question out

12   of their mouth is going to be, "Are you on the

13   current version?"  And if you're not, then they're

14   going to say, "Call us back when you are."  So that

15   was my -- one of my concerns.

16                It -- back to that confidentiality,

17   integrity, and availability.  That's that

18   availability and integrity side of the house that I

19   was trying to lay into.

20           Q.   Can you flip to the next page?

21           A.   Okay.

22           Q.   At the top under "Application Related,"

23   the first bullet point --

24           A.   Right.

25           Q.   -- it says, "Legacy 1998 Application -

Page 120

1      GEMS - now defunct.  Now supported by Dominion."

2              Do you see that?

3          A.    Right.

4          Q.    What did you mean by that?

5          A.    I guess "GEMS" refers to a company name.

6      I don't know if it was a company name or a product.

7      And this was basically notes from a meeting, so this

8      is probably what Michael Barnes told me.

9          Q.    Do you know what "GEMS" is?

10         A.    I'm sure the acronym spans a lot of

11     things, but I don't recall pursuant to this.

12         Q.    Do you recall if it -- do you have any

13     recollection that it is the -- the prior Election

14     Management System that was used with the DRE system?

15             MR. MILLER:  Objection.

16             THE WITNESS:  I didn't --

17             MR. MILLER:  Asked --

18             THE WITNESS:  -- no.

19             MR. MILLER:  -- and answered.  Lack of

20         foundation.

21             COURT REPORTER:  Could you repeat your

22         answer, please?

23             THE WITNESS:  I don't.  I'm sorry.

24             COURT REPORTER:  Just remember to speak

25         one at a time so --

Page 121

```
 1    BY MS. KAISER:
 2         Q.   So you don't --
 3              MS. KAISER:  Sorry, Ms. Barnes.  Thank
 4         you.
 5    BY MS. KAISER:
 6         Q.   So you don't know what it meant that
 7    the -- that GEMS was now supported by Dominion?
 8              MR. MILLER:  Objection.  Lack of
 9         foundation.
10              THE WITNESS:  I didn't take that away, I
11         guess, from that meeting.  I was just -- I was
12         focused on getting the new stuff loaded.
13    BY MS. KAISER:
14         Q.   A few bullets down says, "No history of
15    patching anything," and that looks like a frowny
16    face next to it.
17         A.   Yeah.  I can do one --
18         Q.   What did you mean --
19         A.   -- right here.
20         Q.   What did you mean by that?
21         A.   It's just a -- it's -- it's basically
22    repeating what he told me.  He says there's no --
23    there's no history of patching anything.
24              Because there was an assumption that it
25    was off-net, it didn't need to be patched.  The
```

Page 122

1    reason people patch is because they're afraid of the

2    Internet.  It's not on the Internet; we don't need a

3    patch.

4              That's not necessarily the way I think,

5    so -- you still gotta be current for the support

6    reasons.

7         Q.   So why did you include a frowny face after

8    that comment?

9         A.   Just -- it's kind of -- for me, when I see

10   a frowny face, it's to kind of remind me that that

11   was a bad thing.  Just a note-taking style.

12        Q.   So that was something that you thought

13   needed to be changed?

14        A.   Yes.

15        Q.   Two bullets down from that, it says, "Need

16   to be able to scan every USB attached storage device

17   connected to prior [sic] use.  Cannot ensure USB is

18   free from malware, keylogging, etc."

19              Do you see that?

20        A.   Yes.

21        Q.   What did you mean by that comment?

22        A.   So it was common practice for the -- for

23   the data to be shared with the counties once they

24   drafted or came up with a -- a strawman of what

25   their ballot looks like.  They would share that data

Page 123

1    via USB.  They would, you know, FedEx it to them and

2    then they'd -- they'd mark up changes and then

3    they'd FedEx the USB key back.

4              Even though Michael had an internal

5    process that when he started the event, he would

6    take a USB drive out of the package and start, he --

7    he thought that was good enough and -- because he

8    encrypted it and did a lot of other things.

9              But, you know, I had a different

10   experience in life, so I decided that I thought that

11   he needed to go to a more secure managed solution

12   for USB drives, and I proposed moving to a -- an

13   actual managed USB key program.

14             And I'm not sure if that ever got funded

15   or not.  It was not an insignificant amount of

16   money, but I think they decided that the -- you

17   know, the juice wasn't worth the squeeze, so to

18   speak.

19        Q.   So to -- to your knowledge, at the time

20   you left the Secretary of State's office, that

21   recommendation had not been implemented --

22        A.   No.  They had -- they had quotes -- we had

23   quotes and we actually had sample units that Michael

24   Barnes had where he was using it for his work flow

25   to see how it moved.

Page 124

1              But I think I left before that decision
2       was made.  So...
3              Q.    And why did you make that recommendation?
4              A.    Because he was using commodity-based USB
5       drives.
6              Q.    And why was that not a best practice, in
7       your view?
8              A.    Because they're not made in the U.S.
9       They're -- they could have all kinds of things on
10      them.  We don't know.
11             The only way to really make sure is to,
12      you know, wipe the thing free of -- it has to go
13      through a process of sanitization before you use it.
14             And, you know, I just -- I really like the
15      idea of a managed USB.  The name of it is called
16      DataLocker, and -- and it actually has code on it
17      that you're able to track, much like a LoJack, and
18      it keeps a log of every file ever written and a
19      log -- a file of every -- every time it's read,
20      every time it's loaded, every time anything happens
21      to it, and it uploads it to a cloud-based service so
22      you can see where these drives are; and if someone
23      got ahold of one of these drives and put it in a USB
24      slot that wasn't authorized, that it would wipe the
25      contents securely and -- kind of like bricking a Mac

Page 125

1      if you don't -- if you're not the owner kind of

2      deal.

3             But it was a pretty significant outlay of

4      cash to get that done.  And I think he liked the

5      idea.  I think -- he wasn't as paranoid as I was.

6      Michael Barnes.  Sorry.  Didn't mean to say "he."

7             MS. KAISER:  Can you add Exhibit 12,

8         please -- Tab 12?

9             THE WITNESS:  14.

10            (Plaintiffs' Exhibit 14 was marked for

11         identification.)

12     BY MS. KAISER:

13        Q.   If you look at the first email in this

14     chain, it's from Michael Smith at DataLocker.

15            Do you see that?

16        A.   Yeah, all the way at the bottom?  Got it.

17     Okay.

18        Q.   Is this the vendor that you were just

19     discussing?

20        A.   Yes, ma'am.

21        Q.   So it looks like in July of 2020, you

22     reached out to DataLocker and they sent you a

23     response.

24        A.   Correct.

25        Q.   And then your email at the top of

1    page 1 --

2         A.   Yep.

3         Q.   -- you responded to Michael Smith?

4         A.   Right.  Talked about two use cases.

5    Right.

6         Q.   And so this was your explanation of why

7    you were interested in using DataLocker?

8         A.   Correct.

9         Q.   And under -- under item 1 there, you say,

10   "We have a group in the Election Center that uses

11   consumer grade USB flash drives and software

12   encryption to move data regarding ballots and poll

13   information (not votes) to and from the 159 counties

14   in Georgia."

15             Do you see that?

16        A.   Correct.  I do.

17        Q.   Further -- in the next -- top of the next

18   paragraph, you say, "Today these drives are erased

19   and loaded at the EC...."

20             Do you see that?

21        A.   Right.

22        Q.   Is that the Election Center?

23        A.   It is.  Marietta, right.

24        Q.   It says, No. 2, "The environment where

25   these drives are initially populated is currently

Page 127

```
 1      air gapped, and my group is reengineering the way
 2      that it interacts with the world - maintaining its
 3      logical and physical separation."
 4                Do you see that?
 5           A.   Correct.  Right.
 6           Q.   And so the environment that you're talking
 7      about there, that's the EMS system that was on
 8      the --
 9           A.   (Nodded head.)
10           Q.   Yeah.  Okay.
11           A.   Correct.  Yeah.
12           Q.   -- that was in the Election Center.
13                So were people in the 159 counties using
14      USB drives to move data in and out of the air-gapped
15      EMS system?
16                MR. MILLER:  Objection.  Lack of
17           foundation.
18                THE WITNESS:  Well, yes, but they were
19           provided by Michael's -- Michael Barnes' group.
20           I mean, it's not like the counties are going
21           out and buying their own and using them.  It
22           was stuff that was originally provided by
23           Michael.  So...
24      BY MS. KAISER:
25           Q.   But they were using USB drives,
```

Page 128

1      removable --

2            A.   Correct.

3            Q.   -- media.

4            A.   Uh-huh.

5            Q.   Is that consistent --

6            A.   Yeah.

7            Q.   -- with best practices, in your view?

8                 MR. MILLER:  Objection.  Lack of

9            foundation.  Calls for opinion testimony.

10                THE WITNESS:  Yeah, it's -- it -- it's one

11           step above a sneakernet.  So, yeah, I mean, I

12           understand why they did it.  They didn't want

13           to use email -- I get it -- and they figured

14           that the courier system was more secure and the

15           encryption of the drives and -- you know, he

16           had an erasure kind of process that he went

17           through that we helped kind of tune up a little

18           bit so it does more of a wipe -- a DoD wipe of

19           a drive prior to use.

20                So it's just -- it's how he had done it

21           for years, and trying to change that was a bit

22           of a challenge.

23      BY MS. KAISER:

24           Q.   Based on your experience and training, you

25      recommended that the Secretary of State use a vendor

```
                                              Page 129

  1      like DataLocker and implement a more secure process;

  2      is that right?

  3           A.   Correct, yeah.  Yeah, if you're going to

  4      use a USB drive, it might as well be a managed,

  5      FIPS-compliant device, right.

  6           Q.   If we can go back for a moment to

  7      Exhibit 13.

  8           A.   Okay.

  9           Q.   I'm just finishing off looking through

 10      your notes here.

 11               This is on page 2 --

 12           A.   Okay.

 13           Q.   -- under "Operational" --

 14           A.   Okay.

 15           Q.   -- the second bullet.  "Data flow into

 16      system accomplished by various USB flash drives -

 17      not encrypted, not serialized - so no ability to

 18      track full lifecycle and pinpoint data loss."

 19               Do you see that?

 20           A.   Yeah.  They actually are encrypted, but

 21      they were not serialized.

 22           Q.   And so data was brought into the EMS

 23      system through these USB drives; is that correct?

 24               MR. MILLER:  Objection.  Lack of

 25           foundation.
```

                                                        Page 130

1                  THE WITNESS:  I think we probably ought to

2          ask Michael Barnes about that.

3                  I believe that the markups came back on

4          the USB drives.  I'm not sure the markups ever

5          made it back to EMS.

6                  I think the idea is is you look at

7          somebody's markups and then they go back into

8          the EMS system and make those changes.  I don't

9          think the file itself actually got pushed back

10         into the EMS.

11                 Think of it as a poor man's markup

12         language.  And sometimes in some of the

13         counties, it was a -- it was a, you know,

14         photograph of the ballot with pen marks of what

15         they wanted moved, things like that.

16                 So, yeah, I don't -- that doesn't have any

17         systematic value to the system, so it would be

18         a -- one of Michael Barnes' folks that would do

19         that.  But, again, I'd verify it with Michael

20         Barnes.

21     BY MS. KAISER:

22         Q.   And further down -- or, sorry, the next

23     page under "Other," the second bullet point there,

24     "Liked the idea of leaving the legacy system [sic]

25     alone, spinning up a second VM host for new

1      applications - allowing the other to be idled in

2      place for retention without impact."

3              Do you see that?

4         A.   Right.   Yeah.

5         Q.   And, again, that --

6         A.   That's --

7         Q.   -- was your recommendation?

8         A.   That was -- that's known as

9      shrink-wrapping, right?   In other words, we don't

10     want to mess with the source system.   We derack it

11     with all the data on it, we wrap it up in shrink

12     wrap, and we secure it in a location.   That way it

13     can always be referenced in its original form.

14        Q.   And the next bullet says, "No need to have

15     connectivity between old and new - as the data is

16     moved 'sneakernet' or equivalent."

17        A.   Right.

18        Q.   What does "sneakernet" mean?

19        A.   Just a manual process, no electronic link,

20     no Ethernet.   You know, it's just moving it by

21     person.

22        Q.   And you said that this recommendation to

23     spin up a new server was -- was accepted and that's

24     what ultimately --

25        A.   Yes --

Page 132

1        Q.    -- happened; is that right?

2        A.    -- yes, yes.  They didn't have a choice.

3    They had to -- to run the newest code, they had to

4    have a newer version of processors, right.

5        Q.    And I think we mentioned the term "air

6    gapped."

7              What do you understand the term "air

8    gapped" to mean?

9        A.    Not connected to the open public Internet

10   in any way.

11       Q.    And so is the new server that houses the

12   EMS system supposed to be air gapped?

13       A.    It is.

14       Q.    And why is it important for that server to

15   be air gapped?

16       A.    There was a policy at some point that they

17   decided -- and this, again, is memory -- so it was

18   always air gapped, so we wanted to retain that -- I

19   don't like using the term "air gapped," but,

20   basically, it was disconnected from the Internet,

21   never to be connected to the Internet.

22             Some air-gapped systems are air gapped

23   partially and then when it comes time for updates,

24   they plug it in.  That's not the case here.  There

25   was no way into that system from the Internet.

Page 133

1           Q.   That was my next question.

2                So to your knowledge, this system was air

3      gapped?

4           A.   Correct.

5           Q.   And to ensure that this -- that the EMS is

6      air gapped, it would have to be completely detached

7      or disconnected from other parts of the IT

8      infrastructure in the Secretary of State's office

9      that does connect to the Internet; is that right?

10          A.   Correct.

11               MR. MILLER:  Object to the form of the

12          question.  Compound.

13     BY MS. KAISER:

14          Q.   And to your knowledge, that's the case

15     that --

16          A.   It is --

17          Q.   -- this --

18          A.   -- the case, yeah, yeah.

19          Q.   Are there any components of the BMD system

20     that are connected to the Internet?

21          A.   "BMD" meaning the -- the Michael Barnes

22     environment that does the ballots?

23          Q.   Yes.

24          A.   No.  They have a separate desktop on each

25     one of the users, and that's the desktop that they

Page 134

1    use to connect to it.

2            Then they have another desktop that's for

3    their normal use.  There's no email, there's no

4    anything on the other one except the application.

5    It runs on a separate physical network all the way

6    to the wires -- all the way to the wires, all the

7    way back.  So...

8            MS. KAISER:  Let's load Tab 11, please.

9            THE WITNESS:  Did you say 11?  I'm sorry.

10           (Plaintiffs' Exhibit 15 was marked for

11       identification.)

12   BY MS. KAISER:

13       Q.   I'm sorry.  That -- that was Tab 11 for us

14   internally.

15       A.   Oh, okay.

16       Q.   Exhibit 15.

17       A.   Okay.

18       Q.   It should be up now.

19           So you'll see this starts with an email

20   from Frances Watson on October 29, 2020.

21       A.   Uh-huh.

22       Q.   Do you see that?

23       A.   I remember, right.

24       Q.   Who is Frances -- who is Frances Watson?

25       A.   She's the chief investigator for the

Page 135

1    Secretary of State, the organization.  She's a --

2         Q.   So did you work with her?

3         A.   Yeah.  She's a sworn law enforcement

4    agent.  So...

5         Q.   And you said you remember.  What do you

6    remember about this incident?

7         A.   Just that the county that had this

8    problem -- basically, my memory is is that someone,

9    a poll worker, said, "Hey, my mouse is moving and

10   I'm -- I'm not doing it.  It's like somebody has

11   remote control of my system."

12        So one of the poll supervisors, of course,

13   shut the notebook down, completely disconnected it,

14   and it became kind of a thing.  And we heard about

15   it through the County and they wanted us to help

16   with it to make sure that there wasn't anything

17   nefarious going around.

18        So we had Frances Watson's organization

19   take possession of that and send it directly to

20   Fortalice to have it analyzed to see if there's

21   any -- anything on it that might be, you know,

22   malware, keyloggers, that kind of stuff.  We sent it

23   directly to -- to their folks.  I think

24   Chris Furtick was in that group.

25        So, anyway, we never touched the notebook

1    because we wanted to maintain the chain of custody.

2    But they didn't find anything out of the -- out of

3    the norm, so eventually it was returned to Fulton

4    County by Frances and her organization.

5         Q.   If you look at the -- let's see -- page 3,

6    there's an email from Adrick Hall on October 29th.

7              Do you see that?

8         A.   Page 3.  Let's see.  Got it.

9         Q.   It's the page ending --

10        A.   Got it.

11        Q.   -- in -1211.

12        A.   Okay.  I got it.  The one that starts

13   "Braun is here [sic]"?

14        Q.   Yes.

15        A.   Okay.

16        Q.   About three lines in, it says, "The

17   general statement is that the laptop was a Fulton

18   County laptop.  The" -- I think maybe it's "they" --

19   "used it to access ElectioNet and Easy Vote and

20   process the AB applications for voters."

21             Do you see that?

22        A.   Right.  Absentee --

23        Q.   So this election --

24        A.   -- ballot.

25        Q.   -- this laptop -- I'm sorry.  What was

Page 137

1    that?

2            A.    The "AB" is absentee ballot.  Right.

3            Q.    All right.  So the laptop was being used

4    to access ElectioNet and Easy Vote and to process

5    absentee ballots; is that correct?

6            A.    Sounds like it, yep.

7            Q.    Okay.  And it says, "The laptop was on

8    Wi-Fi mode and the curser began to move from icon to

9    icon on its own."

10           Do you see that?

11           A.    Yes.

12           Q.    Was it consistent with policy for that

13   laptop to be in Wi-Fi mode?

14               MR. MILLER:  Objection.  Lack of

15           foundation.

16               THE WITNESS:  I can't -- can't speak for

17           the counties, the individual counties.

18   BY MS. KAISER:

19           Q.    Okay.  Would it be -- based on your

20   experience and training, would that -- would that be

21   best -- a security best practice, to have a laptop

22   that was being used for these purposes connected to

23   the -- to Wi-Fi?

24               MR. MILLER:  Same objection.  Lack of

25           foundation.

Page 138

```
 1              THE WITNESS:  Yeah, just from an -- an
 2         opinion base, it all depends on the
 3         circumstances and what their wireless network
 4         looks like.
 5              I mean, I've got a huge wireless network
 6         at the hospital that I feel very confident
 7         about its security, so I don't have any problem
 8         with PHI running left and right.
 9              But I just don't know enough about their
10         network to make that call.
11    BY MS. KAISER:
12         Q.   And when -- a laptop like this that was
13    used by Fulton County -- a poll worker in Fulton
14    County, would that have any connectivity to the EMS
15    system that we would -- were talking about
16    previously?
17         A.   No.
18              MR. MILLER:  Foundation.
19    BY MS. KAISER:
20         Q.   So moving up in the document, you see the
21    bottom of page 2 an email from Ryan Germany, "Should
22    we have Fortalice or someone do some forensics on
23    this laptop?"
24              You said that is what happened?
25         A.   That is what happened, right.
```

1        Q.   And Fortalice determined there was no

2   malware or --

3        A.   No.

4        Q.   -- something similar on the laptop?

5             Do you know what permissions are required

6   to access the EMS server?

7        A.   Are we talking about the ballot

8   development server?

9        Q.   Yes.

10       A.   Yeah, you have to have an independent

11   account on that environment, a named account.  There

12   are no -- there are no generic users.  Password

13   complexity --

14       Q.   There's no -- please.  Sorry.  Go ahead.

15       A.   Yeah, it has password complexity and --

16   and some other things that just harden that side of

17   the house.

18       Q.   Are there any full-admin permissions for

19   that server?

20            MR. MILLER:  Objection --

21            THE WITNESS:  Yes.

22            MR. MILLER:  -- lack of foundation.

23            COURT REPORTER:  Repeat the objection,

24       please.

25            MR. MILLER:  Lack of foundation.

Page 140

1           COURT REPORTER:  Thank you.

2           One at a time, please.

3      BY MS. KAISER:

4           Q.   And how do you know that, that there are

5      full-admin permissions for that server?

6           A.   Because you'd have to have it to install

7      software, so the IT group had administrative access

8      to it to be able to maintain it.

9           Q.   Did anybody else have access?

10          A.   Just the IT group, right.

11          MR. MILLER:  Hey, Mary, when you get to a

12          good point, if we could take a break for a

13          quick second.

14          MS. KAISER:  Yeah.  This is a good time.

15          MR. MILLER:  Not right this second, but up

16          to you.

17          MS. KAISER:  No, this is a good time.

18          We're moving to a different topic.

19          So -- and I don't know, Mr. Hamilton, do

20          you -- do you want to take a quick lunch break?

21          I know it's the middle of the day.  So...

22          THE WITNESS:  No, we're good.  We can --

23          if you guys are okay, I can go through.  That's

24          fine.

25          MR. MILLER:  We --

Page 141

1              MS. KAISER:  Okay.  Do you want to just

2         take a -- sorry, Carey.

3              MR. MILLER:  Yeah.  How much are you

4         anticipating going forward?  We can talk about

5         this --

6              MS. KAISER:  I'd say --

7              MR. MILLER:  -- off the record.

8              MS. KAISER:  Yeah, I'm sorry.  Let's go

9         off the record.

10              VIDEOGRAPHER:  The time is 1:03.  We're

11         off the record.

12              (Off the record.)

13              VIDEOGRAPHER:  The time is 1:17.  We're

14         back on the record.

15    BY MS. KAISER:

16         Q.   Mr. Hamilton, I think we've discussed

17    ElectioNet several times.  I just wanted to ask a

18    few more questions about that.

19              So can you just describe generally what

20    ElectioNet is?

21         A.   It's just a voter registration system.  It

22    allows the public to register for -- to vote, to

23    check what precinct they vote in, that kind of

24    stuff.  Kind of a --

25         Q.   Does it store voter information?

Page 142

1      A.   Address, some -- some PII, but not -- not
2    the extent that would rise to the level of driver's
3    license, license numbers, things like that.  It's
4    just normally public-facing information.
5      Q.   Do you know how that information is used
6    in Georgia elections?
7      A.   Well, they -- I know they make it
8    available to anybody that, you know, runs or has
9    interest in it.  For a fee, they sell the file.  You
10   know, that -- that happens pretty normally as a
11   normal course of business.
12     Q.   And do you have any understanding about
13   how the voter identification data in ElectioNet
14   is -- is used with, for example, poll books?
15     A.   No.  Just that the -- the poll books were
16   supposed to be a -- a backup to them.  Maybe not as
17   timely as -- as -- as the electronic form, but the
18   poll books are printed a few days before the
19   election.  And that's to be used in emergency if for
20   some reason ElectioNet goes down or something like
21   that.  But it's -- I believe it's the same
22   information.
23     Q.   Are you aware that in August of 2019, the
24   judge in this case ordered the Secretary of State's
25   office to conduct a cyber- -- cybersecurity

Page 143

1    assessment of the ElectioNet database?

2            A.    I -- I remember, yes.

3            Q.    And did that review ever happen?

4            A.    Yeah.  That was done by -- by Fortalice.

5            Q.    And do you know what Fortalice found as

6    part of that assessment?

7            A.    I don't have the report right with me, but

8    there was a special carve-out for just those two

9    systems.

10           Q.    Do you recall generally what the Fortalice

11   report found with respect to the systems?

12           A.    I don't believe there's any criticals.

13   There might be a high or two.  Most of them were

14   medium.

15                 Mediums are pretty prevalent in any

16   system.  We try to hit off the highs and especially

17   criticals.  Criticals we'll stop the presses for and

18   try to at least -- remediate them or at least, you

19   know, put some parameters around it or a

20   compensating control to reduce the threat.  So...

21           Q.    And do you know what steps have been taken

22   to remediate any of the vulnerabilities identified

23   by Fortalice in that report?

24           A.    No, not without seeing the report.  Then I

25   can speak to each one.  But...

Page 144

1          Q.   What office or entity has responsibility

2     for ElectioNet currently, do you know?

3          A.   Secretary of State.  That's one of the

4     three --

5          Q.   And is it your --

6          A.   -- pillars.  Sorry.

7          Q.   Is it your understanding that PCC

8     previously owned and operated ElectioNet?

9          A.   Yes.

10         Q.   But the Secretary of State's office has

11    taken over ElectioNet?

12         A.   Correct.

13              MS. KAISER:  If we could look at Tab 24,

14         please.

15              (Plaintiffs' Exhibit 16 was marked for

16         identification.)

17    BY MS. KAISER:

18         Q.   It should be Exhibit 16.

19         A.   Okay.  Got it.

20         Q.   Do you recognize this document?

21         A.   Yes.  This was the second one I did.

22         Q.   The second declaration?

23         A.   (Nodded head.)

24         Q.   Okay.  See in paragraph 12 of this

25    declaration, the last sentence there on page 9?

Page 145

1          A.    Oop, I went past it.

2          Q.    It says, "To be clear, the P-" -- oh,

3     sorry.

4          A.    Got it.  I got you.

5          Q.    "To be clear, the PCC environment was

6     transitioned to full SOS control and responsibility

7     as of July 2019."

8                Do you see that?

9          A.    Okay.  Apparently I was not on the --

10         Q.    What is the --

11         A.    -- right page.

12         Q.    -- "PCC environment"?  Oh, sorry.

13         A.    Sorry.  I guess it was -- you really meant

14    page 9.  I was looking at Bullet 9.  So...

15         Q.    Oh, yeah, page 9 --

16         A.    Okay.  Got it.

17         Q.    -- paragraph 12 --

18         A.    Yeah.

19         Q.    -- last sentence there.

20         A.    Uh-huh.  Yep.

21         Q.    Okay.  What is the "PCC environment"?

22         A.    That was the ENET, the corporation side,

23    everything that they did for us.  They -- and as I

24    understand it, they used to -- they -- the original

25    contract was kind of an all-in, you know, they are

Page 146

1   responsible for the -- running the servers and
2   patching and doing all the operational things that a
3   normal IT organization would do as a service.
4           And I think because of the shortfall of
5   that service and some -- the decision was made to
6   bring that back -- even though the hardware was
7   actually owned by the State, the decision was made
8   to bring that back under the control of -- of the
9   infrastructure through -- at Secretary of State,
10  which was Bill Warwick and Jason Matthews, those two
11  guys.
12          Q.   And forgive me, I don't recall.  Did
13  you -- did you testify that you were part of that
14  decision?
15          A.   No, I'm not a part of that decision.  I --
16  I -- my -- I think it was a good idea, but the -- I
17  don't believe I -- I had a hand in that.
18          I think part of my engagement there was to
19  evaluate a replacement data center, and the move to
20  QTS was on my recommendation -- that was away from
21  the -- the White Street Zayo facility that they were
22  in -- for no other reason than just get some
23  distance from -- from the other hosted systems that
24  they had there.
25          Q.   And when you said in your declaration that

Page 147

1    it was tran- -- the PCC environment was transitioned

2    to full SOS control and responsibility, what did you

3    mean by that?

4         A.   For patching, the normal care and treating

5    of a server, making sure that, you know, we could

6    get to it, administrative control.

7              We were able to -- to lock a -- all the

8    PCC folks out of it unless they absolutely needed

9    access, and then it was only on a temporary basis.

10   So by "control," it's just that administrative

11   control, knowing, you know, what levels of patches

12   are there and things like that.

13             And I -- I believe they --

14        Q.   Do you --

15        A.   -- struck a new contract with the

16   provider.

17             Because PCC had the original contract and

18   had other states' information and other customers

19   kind of in that rack commingled.  So the idea of us

20   breaking away from them, we had to physically move

21   them to a separate rack to be on our own.  I think

22   that took us to strike our own contract with -- with

23   Zayo.

24             And that was a temporary move --

25        Q.   When you say "rack" --

Page 148

1          A.    A rack -- it's an empty -- it's an empty

2     metal cabinet that you actually slide the servers

3     into.  Allows air -- free air flow.  There's a

4     power -- A and B power so you can have a power

5     outage and not stop the world.  It's a service that

6     data center providers provide.  You can buy a rack

7     from somebody.

8          Q.    As of July 2019, is it accurate that PCC

9     no longer had any responsibility for hosting or

10    managing ElectioNet?

11         A.    Other than the application that rides on

12    it, no.  From the -- from the patching and

13    day-to-day care and feeding of it, it was -- it was

14    our guys.

15         Q.    What steps did the Secretary of State's

16    office take to remediate the -- the known security

17    vulnerabilities that were present in ElectioNet

18    after taking control of it?

19              MR. MILLER:  Objection.  Misstates

20         testimony not in evidence.

21              THE WITNESS:  Just that they worked --

22         continued to work the same list.

23              Some of it made -- it made it a lot easier

24         on us because we were able to see into the

25         environment, where we hadn't been able to see

Page 149

1              before as a user, right?  So we were able to

2              fix a lot of things even not captured in other

3              reports that we felt needed to be done.

4                    MS. KAISER:  Tab 13, please.

5                    (Plaintiffs' Exhibit 17 was marked for

6              identification.)

7                    THE WITNESS:  17?

8        BY MS. KAISER:

9              Q.   Yes.

10                   Have you had a minute to review the

11       document, Mr. Hamilton?

12             A.   I got it.  Yep.

13             Q.   So this is an email chain from April of

14       2019 with the subject "Fannin County IP."

15                   Do you see that?

16             A.   Uh-huh.  Got it.

17             Q.   Do you remember the incident that's being

18       described in this document?

19             A.   Not particularly, no.

20             Q.   So we'll walk through this.

21                   So the first email in the chain looks like

22       it has -- just contains a series of numbers that

23       looks like --

24             A.   An IP address.

25             Q.   -- an IP address.

Page 150

1          A.    Correct.

2          Q.    And then if you go up in the email, it

3     says, "This is one of several blocks from this

4     morning."

5                Do you see that?

6          A.    Yes.

7          Q.    And so it looks like, you know, what was

8     happening here is that this IP address from --

9     allegedly from Fannin County was blocked.

10         A.    Correct.

11         Q.    Is that your understanding?

12         A.    Uh-huh.

13         Q.    So if you look on page 1 of the document,

14    Clark Rainer's email at the bottom of page 1 --

15         A.    Right.

16         Q.    -- it says, "We have a web application

17    firewall running on the Voter Registration --

18    Georgia Voter Registration System, and this is the

19    system the elections offices use [sic] to update

20    voter records."

21               Do you see that?

22         A.    I do.

23         Q.    So was that the ElectioNet system that

24    he's describing?

25         A.    Part of it, right.

Page 151

1          Q.   Okay.  And then he goes on to say that

2     they've identified the IP address and it's been

3     blocked.

4               Do you see that series of four bullet

5     points?

6          A.   Correct.

7          Q.   "Just got an email from MS-ISAC with some

8     more information I'll forward on in just a minute

9     also showing you may have a malware infection."

10              Do you see that?

11         A.   I do.

12         Q.   Do you recall whether there was any

13    investigation into whether this was a malware

14    infection?

15         A.   I do not.  Not specific to Fannin County,

16    no.  This -- this would have been a normal

17    occurrence, though, from the firewall.  That's what

18    its job is to do, is to actively block anything that

19    it thinks is -- in this case, it appeared like a

20    false positive because it was coming from a county.

21              But because of the way it was flagged, we

22    were just being a good community member and letting

23    them know, "Hey, you might have a malware thing, so

24    heads up."

25         Q.   And, yeah, I mean, I was -- I was going to

Page 152

1    ask if there was any investigation done to determine

2    whether this was actually coming from the County,

3    this IP address.

4         A.   Yeah, I think that would be on the County.

5    I think Clark sending up a flare and saying, "Hey,

6    we have this" -- I'm sure this originally came from

7    the people in Fannin County saying, "Hey, we can't

8    get into the election system this morning."  And

9    that would have been on purpose because the firewall

10   would have clamped them.

11        So -- but I do not remember this

12   specifically.  It didn't trigger an incident

13   response that I can recall.  So...

14        Q.   We're adding Exhibit 18 now, Mr. Hamilton.

15        (Plaintiffs' Exhibit 18 was marked for

16        identification.)

17        THE WITNESS:  18.  Okay.  I got it.

18   BY MS. KAISER:

19        Q.   All right.  This is an email chain, see,

20   from October -- sorry -- let's see -- starts in

21   July 2020.

22        Do you see that?

23        A.   I do.

24        Q.   And the first email in the chain is from

25   you to Ashwin Ramaswami.

Page 153

```
 1                Do you see that?
 2        A.     Uh-huh.  Right.
 3        Q.     Who is -- who is Ashwin Ramaswami?
 4        A.     He worked for -- I'm sorry, he was a
 5   student at Stanford.  This is one of those
 6   John Q Public heads up from the -- from the world,
 7   because he didn't obfuscate his -- you know, his --
 8   didn't make a big deal of "I want to stay private,"
 9   everything else.
10                So this is basically a conversation that I
11   forwarded on that I had with this -- I believe this
12   went originally to one of the leadership.  I'm
13   not -- it didn't come to me.  Somebody -- somebody
14   said, "Hey, check out this email address" or -- I
15   don't know how we originally found this.
16                But, yeah, Ashwin is the -- is the student
17   who, at that point, claimed to be a Georgia
18   resident.  His dad lives in Johns Creek, which is
19   around the corner.  Had a lot of information about
20   that.
21                And, actually, in other conversations,
22   found that we had a common thread through somebody I
23   used to work for -- or worked with 10, 15 years ago.
24   So it didn't look like it was bogus, so that's why I
25   kind of ran it down.
```

Page 154

1          Q.   Okay.  Yeah.  So in this first email, you

2     say, "Ashwin, Thanks again for your email regarding

3     MVP, the vendor is currently working to validate,

4     recode and test those issues you identified."

5               Do you see that?

6          A.   Correct.  Correct.

7          Q.   Do you recall what issues Mr. Ramaswami

8     identified with MVP?

9          A.   No, not right offhand.  I think some of it

10    was SQL -- SQL injection maybe or cross-site

11    scripting.  It wasn't something super deep, because

12    they were able to remediate it pretty fast.

13         Q.   But it was a valid vulnerability?

14         A.   Yeah.

15              The second -- the second thing he sent me

16    was about what appeared to be the source code for

17    our ElectioNet system on a publicly available

18    website.  That's the GitHub.

19         Q.   Right.

20         A.   Yeah.

21         Q.   Right.  I think if you go up two emails --

22    let's see -- at the top of the next page, there's an

23    email from Mr. Ramaswami on October 16.

24         A.   Right.

25         Q.   And he said, "Wanted to let you know about

Page 155

1      another issue:  It seems like the Georgia --

2      Georgia's ElectioNet system's source code is

3      available publicly in GitHub."

4              Do you see that?

5         A.   Correct.  Yep.

6         Q.   And that's what you were just referring

7      to?

8         A.   Correct.

9         Q.   Okay.  So what is GitHub?

10        A.   GitHub is a -- is a sharing platform,

11     basically, for programmers.  If you can -- I -- we

12     talked about a Wiki before.  It's sort of kind of

13     like that.

14              Folks -- programmers will go out there

15     and -- and kind of copy snippets of code so they

16     don't have to write it from scratch.  So you piece

17     things together using libraries and things like

18     that.  It's just a community of software developers,

19     but it's a worldwide thing.

20              So there's, you know, source code on there

21     for Windows and all kinds of strange stuff.  So...

22        Q.   So Mr. Ramaswami was alerting you to the

23     fact that source code for Georgia's voter

24     registration system was posted on a public website;

25     is that right?

Page 156

1          A.    Correct.

2          Q.    And he says in the next line, "The [sic]

3     repository also appears to contain passwords and

4     private keys."

5          A.    Correct.

6          Q.    Do you see that?

7          A.    Right.

8          Q.    What was the significance of that?

9          A.    The passwords ended up being test accounts

10    that -- that software -- this source code came from.

11            The private keys also were to test

12    instances, not the production side, so there wasn't

13    direct involvement of the production code line.

14            But in further investigations, what this

15    was was a programmer that worked for PCC posting it

16    there because it was easier than copying it

17    somewhere else.  I don't know what the excuse was.

18            But we came down kind of hard on PCC about

19    that and they rectified it, I think, within 24

20    hours.  I mean, I think they pulled it down.

21            And GitHub does a pretty good job of

22    logging access instances and also instances where

23    folks that had actually taken a snippet or

24    downloaded the code.

25            And PCC was able to verify and

Page 157

1    authenticate that all of the accesses to that code
2    line with the exception of me and one other guy from
3    the SOS that were just checking it out were, in
4    fact, PCC employees.  So...
5        Q.    So you forwarded Mr. Ramaswami's email to
6    a couple of folks at Fortalice; is that right?
7        A.    Right.
8        Q.    And asked -- and asked them to look into
9    it?
10       A.    Correct.  Right.  Because they've got --
11       Q.    So that's the --
12       A.    -- application -- I'm sorry.
13             Fortalice has application-specific talent
14   that understands code lines, programming, all that
15   good stuff, and they probably frequent those
16   libraries and frequent that site.  So that was the
17   best place to go, because the SOS organization had
18   no programmers.
19             So that was my idea, is to involve them
20   early to see what -- this thing and how it panned
21   out.
22       Q.    And so working with Fortalice, that's how
23   you determined that -- that this was put on GitHub
24   by a programmer for PCC; is that right?
25       A.    Well, they -- they were able to come up

Page 158

1    with the IP addresses of -- of people that had

2    accessed the library.  And further investigation and

3    once I supplied those to PCC, they were able to

4    validate each one of those IP addresses were their

5    employees.  So...

6         Q.   And so the -- the -- what was done to

7    remedy this was just to have PCC pull the --

8         A.   Yeah, to destroy it.

9         Q.   -- pull the --

10        A.   Yeah, to pull it down, right.

11        Q.   Was anything else done to remediate this

12   incident?

13        A.   No.  I think -- I -- I know that there

14   were some phone calls that I was not involved in

15   between leadership and SOS and PCC.  I'm sure they

16   were not comfortable phone calls, because they were

17   getting -- you know, it was just -- but I wasn't

18   part of the phone call, so that's a Merritt

19   question.

20        Q.   We're going to look at the next exhibit.

21   I believe it's Exhibit 19.

22             (Plaintiffs' Exhibit 19 was marked for

23        identification.)

24             THE WITNESS:  Okay.  I got it.  That's a

25        wicked pattern.

Page 159

1      BY MS. KAISER:

2            Q.    This is --

3            A.    Okay.

4            Q.    This is a report from Fortalice Solutions.

5                  Do you see that?

6            A.    Yes.

7            Q.    Dated July 14, 2020?

8            A.    Right.

9            Q.    If you look at page 2 of the report --

10     it's the third page of the document, but it says

11     page 2 at the bottom --

12           A.    Okay.

13           Q.    -- under Section 1.1, "Overview," it says,

14     "In June of 2020, Secretary of State Georgia

15     received report of two vulnerabilities in a web

16     application hosted at

17     https://www[.]mvp[.]sos[.]ga[.]gov."

18                 Do you see that?

19           A.    Correct.  Yep.

20           Q.    All right.  So this is -- the "MVP" is the

21     My Voter Page; is that right?

22           A.    Yes.

23           Q.    And the next sentence says, "Upon

24     attempted remediation, SoSGA requested that

25     Fortalice validate the remediation attempts."

Page 160

```
 1              Do you see that?
 2         A.   I do.
 3         Q.   Do you recall anything about this
 4    incident, about --
 5         A.   Yeah.  Basically --
 6              (Cross-talk.)
 7         A.   Basically, we were asking Fortalice to
 8    verify what we were being told by PCC as "it's
 9    fixed."  Because we didn't have the -- the
10    wherewithal to, you know, go through this stem by
11    stem, we got Fortalice to do it as a third -- third
12    party.  So...
13         Q.   And what did Fortalice find?
14         A.   They found that actually they had not
15    remediated it sufficiently, and they made a
16    suggestion on how to fix it the right way.  And we
17    fed that information back to PCC.
18         Q.   This is in 2020; correct?
19         A.   Probably.  Yeah.
20         Q.   Did PCC still have responsibility for the
21    MVP page in 2020?
22         A.   No.
23         Q.   So why did you need to feed the fix back
24    to PCC?
25         A.   Because they still write the code.  They
```

Page 161

1        still manage the application, they just don't manage

2        the hardware.  So they're still responsible for the

3        code line.

4              Q.   So when you identified a vulnerability on

5        the My Voter Page, you still had to rely on PCC to

6        fix it?

7              A.   Correct.

8              Q.   If you look at page 4 of the Fortalice

9        report --

10             A.   Okay.

11             Q.   -- under "Conclusion," it says, "The

12       remediation attempts that are currently in place

13       partially fix the issues in the original report, but

14       more work needs to be done to secure the website

15       from potential attacks."

16                  Do you see that?

17             A.   Right.

18             Q.   "In addition to the checks performed,

19       Fortalice noticed other areas of potential impact

20       that, while unconfirmed, Fortalice believes could be

21       used to further exploit the site or the servers

22       hosting it.  Fortalice recommends having the

23       application thoroughly reviewed for similar issues."

24                  Do you see that?

25             A.   Correct.  Right.

Page 162

1      Q.   Do you know whether that recommendation
2    was accepted, to have the application reviewed for
3    similar issues?
4      A.   I -- I didn't.  I didn't have an
5    application-specific review done for them because
6    I -- I think at that point, the decision had been
7    made to jettison PCC.
8          So I think leadership looked at it as,
9    "We're going away from them, so, you know, we're
10   going to spend the time on the new stuff."
11         We did feed all this information back to
12   them, that there might be some other areas and, you
13   know, as a partner, we expect them to, you know,
14   find some of their own issues.  We don't want to
15   be -- be their QA group.  So...
16     Q.   I just want to make sure I understand the
17   timing, because, you know, I -- I've understood you
18   to say that PCC was jettisoned in 2019; is that
19   right?
20     A.   From the operational standpoint, right,
21   the care and feeding of the servers, the patching,
22   that kind of stuff, and the contract of housing the
23   servers and we're paying them to do that service.
24         But the actual code line, the development
25   and the -- and the -- you know, the changes that

Page 163

1    were made to MVP and all those -- OLVR, all those

2    systems, were still under their control because they

3    were the developers.

4         Q.   Right.

5              And so by 2020, the Secretary of State's

6    office had taken over with respect to the security

7    of these applications; is that right?

8         A.   Well, insofar as we can handle it from

9    the -- from the edge.  But as far as internal to the

10   actual application, we still have to rely on PCC to

11   do what they profess they're experts at.

12             So that's why we run these monthly checks,

13   and what we do with Fortalice with pen tests is to,

14   you know, trust but verify, right?  We verify what

15   they told us to be true.

16             Because the Secretary of State doesn't

17   employ any developers, that's -- that's a bit of

18   a -- a hill to climb.  We didn't have anybody in

19   there that wrote code, so we couldn't really

20   challenge them on a code line level.  We just

21   identified, "Hey, this doesn't work right; go fix

22   it."

23        Q.   So when --

24        A.   This --

25        Q.   -- Fortalice recommended -- recommended a

Page 164

1      thorough application review, is that --

2          A.    Uh-huh.

3          Q.    -- something that the Secretary of State's

4      office could carry out, or would you have to rely on

5      PCC?

6          A.    No, no, no.  We would have to actually

7      hire another company to do that as a third party.

8              So they would take the source code, they

9      would go review the source code and how the program

10     is written, and make recommendations, look at common

11     security vulnerabilities.

12             There's a term "OWASP."  It's for the --

13     you know, the top 25 things that people do wrong in

14     programs.  And they were missing some of the basic

15     stuff, so we started beating up on them about being

16     at least OWASP compliant.

17             But it would have been a third party.  I'm

18     not sure if -- if Fortalice provided that.  They --

19     they may or may not have had that as -- it sounds

20     like it is.  It sounds like, "Oh, by the way, you

21     know, we could do this for you," cha-ching, you

22     know, that kind of thing.

23         Q.   But to your knowledge, that kind of

24     thorough review of the application for similar

25     issues to the ones you identified at the time was

Page 165

1      never done?

2           A.   Not while I was there.  It might have been

3      done after I left, but, again, that's --

4           Q.   You're not aware of that?

5           A.   I'm not aware of it, right.

6                MS. KAISER:  Tab 18, please.  I'm adding

7           Exhibit 20.

8                THE WITNESS:  Okay.

9                (Plaintiffs' Exhibit 20 was marked for

10          identification.)

11               THE WITNESS:  Okay.

12     BY MS. KAISER:

13          Q.   This is an email from you dated April 29,

14     2021.

15          A.   Right.

16          Q.   Do you see that?

17               And it says to Ronnell Spearman, Derek

18     Hawkins, and DeVon King.

19          A.   Right.

20          Q.   And are those -- are those the three

21     security analysts that reported to you --

22          A.   At that --

23          Q.   -- at this time?

24          A.   -- time, right.

25               COURT REPORTER:  One at a time, please.

```
 1           THE WITNESS:  DeVon King replaced one of
 2      the guys, right.
 3  BY MS. KAISER:
 4      Q.   You say, "My latest response to
 5  KRob - ok - understood."
 6           And is "KRob" Kevin Robertson?
 7      A.   Kevin Robertson, yeah.  That was his
 8  nickname because we had too many Kevins.
 9      Q.   You say, "I would like to know are these
10  two apps on different physical db servers or
11  different instances on the same?"
12           Do you see that?
13      A.   Yep.
14      Q.   Do you know what apps you were talking
15  about in this email?
16      A.   Not without seeing the -- the response
17  that I sent to KRob.  If you have that email, I
18  could probably tell you.
19           They were pretty good about segmenting the
20  databases away from each other on different
21  instances, because they wanted to keep them
22  physically and logically separate.  But it all
23  depends on what we were talking about.
24           "Secure tunnel," that's a way of
25  transmitting over the open Internet.  Yeah.
```

Page 167

1      Enabling TLS.

2              Q.    Yeah.

3              A.    Right.

4              Q.    We were -- we were trying to figure out

5      what this email was -- was referring to in terms of

6      the two apps.

7              A.    Yeah, it's -- if you had the --

8              Q.    Let me just --

9              A.    If you had the other email, it would

10     probably help me kind of weed this one down.

11             But these are -- this is generic things

12     that I asked my team to go hunt down on different --

13     it's basically you're -- we're looking for the --

14     how -- how hardened the simple -- a simple site is,

15     right, what -- what did they -- how far did they go

16     to make things encrypted and safe.

17             And I mention there that I know that with

18     self-signed certs, sometimes that breaks the app,

19     but it's better than nothing.

20             Well, and the intent there is that there

21     is -- and this is industry-wide, not just the

22     State -- but there is a -- kind of a rub between

23     development and operations.  You know, they -- they

24     point at each other for the fault of things.

25             A lot of times developers will say, "No,

Page 168

1    you can't take that patch.  You can't update that
2    server because you're going to break the app."
3              And this is my response to it.
4    Apparently, I was saying, "Yeah, I understand that
5    it might break the app, but we gotta do something,"
6    right?  So this is -- sounds like a conversation
7    around a compensating control.
8         Q.   And a compensating control means something
9    you would do to remediate a vulnerability you've
10   identified?
11        A.   Correct.  And that -- the idea is that
12   there's more than one way to -- to address a
13   problem.
14             And mitigation is a -- is only a snapshot
15   in time, so we do -- we do mitigations.  We do
16   compensating controls when we can't fully mitigate.
17   Like I said, when a developer tells you, "You can't
18   do that, you'll break the app," we do other things
19   to protect the house.  So...
20        Q.   And the last line of this email, you say,
21   "ALL connections" -- "ALL" in caps --
22        A.   Right.
23        Q.   -- "ALL connections internal should be
24   encrypted and we ought not use the standard 1433
25   port."

1        A.    Correct.

2        Q.    Do you see that?

3        A.    Right.  So internally to the SOS, what I

4    was talking about there is that the actual

5    connections that are made between the application

6    servers, which service the front end -- like when

7    you're typing in My Voter Page, you're running a

8    program on those servers -- there is a secure link

9    that goes from that server through the covers to the

10   actual database server itself.  And that is on Port

11   1433.  Normal- -- normally, you can make the port

12   anything you want.

13            The idea of changing from the -- from the

14   regular port number is just a way to obfuscate what

15   that traffic might be.  Because it's encrypted, it

16   would be very hard for an outsider or, you know,

17   even somebody from the inside to be able to sniff

18   the traffic and figure out what it is.

19            So that's just a good practice, that

20   even -- people think of it like a -- a castle with a

21   moat, right?  We only worry about the Internet.

22            But internal to the system, as a -- as an

23   organization moves through that maturity of

24   security, you -- you move more towards a zero trust.

25   I don't know if you've heard that term before.  And

1    the idea is you treat internal assets as if they

2    were public, and that helps harden things.

3             And that -- this is basically me kind of

4    coaching my guys about, "Go look at this stuff and,

5    oh, by the way, you know, think long term.  All of

6    our internal connections need to be fully encrypted

7    and we ought to not use standard ports, because it

8    just makes it easy for the bad actors."  So that was

9    what that was about.

10            But specific to each individual point, I

11   would imagine if we had the original email that I

12   sent to KRob, I could probably speak to it.

13       Q.   You say, "...ALL connections should be

14   encrypted...."

15            To your knowledge, were all internal

16   connections encrypted?

17       A.   Not at that point.  There were -- to the

18   database servers they were, but there was other

19   applications not affiliated with the ElectioNet, but

20   there was other applications internal to the -- to

21   the SOS that just had public information and they

22   didn't deem it.

23            But it's -- easier from a security

24   perspective is to make everything standard.  That

25   way if anything falls out of the bucket, it's easy

Page 171

1       to identify.  I don't want to have to pick and
2       choose.
3              That's why I was telling him about the
4       long term, get everything under the same hat.
5       Regardless whether it's public information or not, I
6       don't care.  I still want to encrypt it internally.
7       So -- it doesn't cost any more; it's just coding it
8       that way.  So...
9           Q.   Are you aware of what operating system
10      Dominion's BMD machines runs on?
11          A.   No.
12              MS. KAISER:  Tab 20, please.
13              THE WITNESS:  Yeah, the -- the ballot --
14          the ballot situation over at EC is running on
15          Windows Servers, but they're in virtual
16          machines.  So -- but I know --
17      BY MS. KAISER:
18          Q.   I meant the BMD.
19          A.   Okay.  All right.  Yeah, that -- I'm
20      sorry.  I had it in my mind that you were talking
21      about the poll pads and all that stuff.
22              Yeah, those are -- those Windows --
23      Windows Server.
24          Q.   Right.  No, I was talking about the BMDs
25      themselves, not --

1          A.   Oh.

2          Q.   -- not the EMS server.

3          A.   Okay.  I guess -- I guess I need a

4     clarification.

5               BMD's not a term -- is this the ballot

6     system again, or are we talking about --

7          Q.   Yes.  I'm sorry.  No, the -- the

8     ballot-marking devices, the devices themselves, the

9     machines.

10         A.   Yeah, and I don't -- I -- I've never

11    looked under the covers over there.

12         Q.   Okay.  Understood.

13              (Plaintiffs' Exhibit 21 was marked for

14         identification.)

15              (Plaintiffs' Exhibit 23 was marked for

16         identification.)

17              MS. KAISER:  Okay.  Let's see.  We've

18         added Exhibit 21, I think.  Is that -- okay.

19         Pull that up.

20              THE WITNESS:  Okay.

21    BY MS. KAISER:

22         Q.   And, I'm sorry, we're adding the

23    attachment to this email as well.  It will be --

24         A.   Okay.

25         Q.   -- Exhibit 22.

Page 173

```
 1          A.    Okay.  I got 21.
 2          Q.    And you see 21 is an email from you to
 3    Merritt Beaver?
 4          A.    Right.  I was sensitive to the fact of
 5    the -- keeping it very closely held, what the
 6    contents of the register are.  Right.
 7          Q.    Right.  And -- yeah.
 8          So the attachment -- and we'll pull it up
 9    in just a second -- is the -- something called the
10    "Remediation Task List."
11          Do you see that?
12          A.    Right.  It's part of the risk register.
13    It's a tab of an Excel spreadsheet.
14          Q.    What is the risk register?
15          A.    It's a commonly used practice through
16    security groups, not -- not just Secretary of State,
17    but everywhere, to kind of keep track of all
18    vulnerabilities, whether they are confirmed or not.
19          It's -- it's an ever-growing list of
20    things.  You don't delete anything from it because
21    the threat landscape can change and you need to be
22    able to go back and look at things that might have
23    been remediated before on a periodic basis to make
24    sure they're still remediated.
25          So it's just -- you know, it's a list of
```

Page 174

1    all the things that we need to do.
2         Q.   And you said that the remediation task
3    list was just one tab in -- in the Excel spreadsheet
4    that had the whole risk register; is that right?
5         A.   Right.
6         Q.   And were you responsible for updating that
7    task list?
8         A.   Anybody on the security team can add --
9    add, modify, delete -- or not delete, but add or
10   modify.  Make up dates, too, as things change.
11        Q.   Were -- were you supposed to update that
12   on any regular cadence?
13        A.   We usually did it monthly.  Or when we got
14   a -- you know, an assessment that came in, like a
15   Fortalice, we'd add to it or we'd go find the same
16   one that was on the list and kind of reprioritize
17   it.
18             I think my role there was just to
19   prioritize the work that was being done and kind of
20   farming it out.  As time passed, you know, we'd try
21   to get things done.
22        Q.   And it looks like you were being asked to
23   share the risk register with somebody.
24             Do you recall this?
25        A.   Let me see -- let me go back to that email

Page 175

1      for a second.  I want to see if I can recall.

2                  Somebody public, and based on what I said

3      here, the level of detail to "anyone outside the

4      agency."  So it was somebody outside the agency that

5      wanted access to it.

6                  I didn't even give -- I don't think I

7      shared my risk register with Fortalice.  I mean,

8      it's usually a very closely held -- and I haven't at

9      any other customer either.  I mean, it's not a

10     Georgia Secretary of State thing.  It's a very

11     defined work list of things and also, to a bad

12     actor, it would be like a roadmap of how to get in.

13                 So not something I'd want -- when I --

14     when I had my testimony before in front of the

15     judge, I know there was a portion of it where they

16     made it, you know, private.  I don't know what the

17     terminology is, but -- under seal, right?  And that

18     was because we were discussing things off that list

19     and I didn't want to have 400 people on the Internet

20     hearing what I was talking about.  It's just bad

21     practice.  Otherwise, you're going to be chasing

22     stuff for a while.

23            Q.   But you don't recall who asked to take a

24     look --

25            A.   I don't.

Page 176

1              Q.    -- at this risk register?

2              A.    I don't.  I don't know who it would have

3        been.

4              Q.    Okay.

5              A.    8/21/20.  Was that around the time that we

6        were doing the litigation?  I mean, I don't know if

7        that might have been it.  Maybe a lawyer asked for

8        it.  I'm not sure.

9                    I was just concerned of it being public,

10       that's all.  Just trying to advise.

11                   MS. KAISER:  All right.  Tab 22, please.

12                   (Plaintiffs' Exhibit 23 was marked for

13             identification.)

14                   THE WITNESS:  So that was 21 and 22.  This

15             will be 23?

16       BY MS. KAISER:

17             Q.    Oh, apologies.  Yep, this will be 23.

18             A.    Okay.  There it is.

19             Q.    Are you familiar with Rule 590-8-3?

20             A.    Uh-huh.

21             Q.    And just generally, what do you -- what do

22       you recall about that rule, what it requires?

23             A.    I think -- I think -- do I put it on here?

24             Q.    Yeah.  If you -- on page 3, starting --

25             A.    Yeah.

Page 177

1          Q.    -- on page 3.

2          A.    The definitions.  I just copied the rule

3     into the document.  So...

4          Q.    Right.  Right.

5                So Section (b), if you look at the middle

6     of the page, says --

7          A.    Right.

8          Q.    -- "Security of the Voter Registration

9     System is vital to the administration of elections

10     in Georgia.  As such, the system shall be maintained

11     in a manner that is consistent with the following

12     security standards."

13                Do you see that?

14          A.    Yes, ma'am.

15          Q.    And then it lists 27 security standards;

16     right?

17          A.    Right.

18          Q.    And then Section (c), "Assessments," says,

19     "The Secretary of State shall conduct or have

20     conducted regular cybersecurity assessments of the

21     Voter Registration System."

22                Do you see that?

23          A.    I do.

24          Q.    And then Subsection (d) essentially

25     requires an annual certification of compliance with

Page 178

1       the rule; is that right?

2            A.   Correct.

3            Q.   Was it your responsibility to prepare a

4       certification of compliance with Rule 590-8-3?

5            A.   Yes.  This is my document, so yes.

6            Q.   And this is the document for 2020;

7       correct?

8            A.   Correct.

9            Q.   Did you prepare a certification like this

10      in any other years?

11           A.   I think 2020 was the -- the only one I

12      did.  I think before that, it was somebody else or

13      it got missed.  Again, I don't know.  I --

14           Q.   On page 6 --

15           A.   Okay.

16           Q.   -- the second paragraph on page 6, it

17      says, "Currently, our agency does NOT meet the

18      requirements of the rule.  Out of the 38

19      requirements we only meet 66%."

20                Do you see that?

21           A.   Yes.

22           Q.   And so you did an analysis and determined

23      that you only met the -- met the requirements for

24      about two-thirds of the requirements of the rule; is

25      that correct?

Page 179

1          A.   Correct.  Yeah, it says there if we took

2     the Civix-related ones out, we'd be at 81.

3          Q.   And what is Civix?

4          A.   The new name for PCC.

5               MS. KAISER:  Tab 19, please.

6               (Plaintiffs' Exhibit 24 was marked for

7          identification.)

8               THE WITNESS:  Are we done with that one?

9     BY MS. KAISER:

10         Q.   Yes.  We're adding the next exhibit now,

11    24.

12              Do you have that document in front of you?

13         A.   Waiting for it to update.

14              24.  Okay.  There it is.  Okay.

15         Q.   All right.  This is an email chain from

16    December of 2020.

17              Do you see that?

18         A.   Uh-huh.

19         Q.   And I'm focused on your email on the --

20    starting on page 1.

21         A.   Okay.

22         Q.   It looks like you were just sharing some

23    thoughts with folks internal to the Secretary of

24    State's office.

25              Does that look right?

Page 180

1          A.    It does.

2          Q.    If you look about four paragraphs down, it

3     says, "From a security team perspective, we need

4     more time to focus on the day-to-day operations -

5     all the guys are buried in projects so there is no

6     time to 'watch' or tune things."

7                Do you see that?

8          A.    Yeah.

9          Q.    What did you mean by this comment?

10         A.    As an example, us having to build the

11    servers over at the Election Center and do a bunch

12    of stuff that are usually infrastructure related.

13    That was supposed to be a pretty quick turnaround

14    and just helping out a brother kind of a thing

15    because they were slammed.  It ended up being a very

16    long-term project and Michael Barnes didn't want to

17    let go of us.  So it -- it became kind of a

18    resource, you know, drain on all of us.

19                I think that's probably one of my -- what

20    I was saying here is we -- we really want to hand

21    this back to the infrastructure team.  That's why I

22    copied Bill Warwick and Jason and Kevin.  So I think

23    this was my, you know, mea culpa of, "Hey, you know,

24    we've got to address a lot of things and there's

25    just not enough hands."  So yeah.

1         Q.   What effect did it have on the security

2    team's ability to do its work effectively?

3         A.   Well, I mean, we had to depend on systems,

4    right, instead of people.  And luckily we had very

5    good systems, in that we had, you know, Palo Alto,

6    XDR.  We had Cortex on the edge.  We had multiple

7    layers of security in some cases, where if one thing

8    broke, then we'd still be okay.

9              But we needed time to continue to tune

10   those as time went on.  And the idea there is to

11   reduce the amount of false positives that you get

12   or, even worse, false negatives.

13             So the idea is it's a -- it's a constant

14   thing, you know, to -- to look at this kind of

15   status of everything on a daily basis and make

16   adjustments.

17             And I -- I think my note here was just

18   underlying the fact of, "Hey, infrastructure guys,

19   we really need you to do your -- your part in this

20   so we can get back to our real jobs."  So...

21        Q.   Are you familiar with a professor at the

22   University of Michigan named Alex Halderman?

23        A.   Yes.

24        Q.   What do you know about Mr. Halderman?

25        A.   He was part of the litigation the last

Page 182

1    time around.  He had some specific questions that

2    kind of trickled back towards me.  It was -- that

3    was the reason I wrote the second document, to

4    clarify some of the things that he assumed.

5         Q.   Did you review any declarations that

6    are -- that were put in by Dr. Halderman?

7         A.   At that time I did, yes.

8         Q.   Have you reviewed any testimony from

9    Dr. Halderman regarding how easily the BMD system

10   can be hacked?

11        A.   No.

12             MR. MILLER:  Objection.  Lack of

13        foundation.

14   BY MS. KAISER:

15        Q.   Were you aware of that testimony?

16        A.   In passing, I think.  I -- I -- I don't

17   know if my opinion matters when it comes to that.

18   So...

19             It's very easy for an academic to control

20   an environment, given enough time and resources and

21   money, to do anything.  So that's where the judgment

22   comes in.

23             So that's what I was trying to get across

24   to the doctor when I responded in that second note,

25   just giving him some clarity about in the

Page 183

1    operational world of running a business, we have to

2    do these things and reprioritize.

3            So that's basically what that was.

4       Q.   Do you understand that Dr. Halderman has

5    analyzed the voting equipment that is used in

6    Georgia today to assess the reliability and security

7    of that equipment?

8       A.   I didn't know that he personally had done

9    it, no.  I know --

10      Q.   So you weren't aware that he's issued a

11   detailed report finding that the current system

12   suffers from many significant vulnerabilities?

13      A.   I didn't --

14           MR. MILLER:  Objection.  Lack of

15       foundation.

16           THE WITNESS:  Yeah, I -- I didn't.  Sorry.

17   BY MS. KAISER:

18      Q.   You didn't know -- you just didn't know

19   about that report one way or the other?

20      A.   No.  I'm not --

21           MR. MILLER:  Objection.

22           THE WITNESS:  -- in the academic world.  I

23       don't spend a lot of time reading papers and

24       things like that.  So...

25

Page 184

```
 1     BY MS. KAISER:
 2          Q.   I'm sorry.  It was not a paper, but a
 3     report in this case.
 4          A.   Yeah, that's fine.
 5               MR. MILLER:  Objection.  Lack of
 6          foundation.
 7     BY MS. KAISER:
 8          Q.   So you were not -- not aware of it?
 9               MR. MILLER:  Same objection.
10               COURT REPORTER:  The answer again, please?
11               THE WITNESS:  No, I -- I was not aware of
12          it.
13               COURT REPORTER:  Thank you.
14     BY MS. KAISER:
15          Q.   Do you understand that the current BMD
16     voting system uses QR codes to tally votes?
17          A.   I do --
18               MR. MILLER:  Objection --
19               THE WITNESS:  -- and only because I vote
20          in Georgia.  I saw them.  So...
21               COURT REPORTER:  The objection again,
22          please?
23               MR. MILLER:  Lack of foundation.
24               COURT REPORTER:  Thank you.
25               Please -- please let him get in an
```

Page 185

1          objection and her finish the question.  Thank
2          you.
3                THE WITNESS:  All right.
4     BY MS. KAISER:
5          Q.   Are you aware that the current election
6     equipment can be hacked in a way that QR codes can
7     be changed so that they don't reflect what the voter
8     actually intended when they voted on the machine?
9                MR. MILLER:  Objection.  Lack of
10          foundation.
11                THE WITNESS:  I did not.
12     BY MS. KAISER:
13          Q.   Based on your experience and training, if
14     that were the case, would you take measures to
15     eliminate that vulnerability?
16                MR. MILLER:  Objection.  Lack of
17          foundation.
18                THE WITNESS:  I don't know if I have
19          enough information, but, yeah, it would
20          definitely go on the list.
21     BY MS. KAISER:
22          Q.   Would it be a high priority on the list?
23                MR. MILLER:  Same objection.
24                THE WITNESS:  I -- again, it -- it all
25          depends on what else was going on at the time.

```
 1           So...
 2      BY MS. KAISER:
 3           Q.   A vulnerability that would allow a QR code
 4      to be changed to change votes, would that be
 5      considered high priority?
 6                MR. MILLER:  Objection.  Lack of
 7                foundation.  Asked and answered.
 8                THE WITNESS:  But the -- the issue is is
 9                that -- that system is out of scope for me in
10                my role for Secretary of State.  It -- it all
11                belongs to Dominion.
12                So for them, I would imagine it would
13                cause some heartburn, but not -- I -- out of
14                scope for me.
15      BY MS. KAISER:
16           Q.   Would it surprise you to learn that the
17      Secretary of State's office has taken no measures to
18      mitigate or eliminate any of the vulnerabilities
19      that Dr. Halderman has found with the existing
20      equipment in Georgia?
21                MR. MILLER:  Objection.  Lack of
22                foundation.  Form of the compound question.
23                Misstates testimony.
24                THE WITNESS:  Yeah, I -- I -- I don't know
25                what he -- he brought out.  I don't know what
```

Page 187

```
 1          his list was.
 2     BY MS. KAISER:
 3          Q.   Based on your experience and training in
 4     cybersecurity, if a cybersecurity expert identifies
 5     vulnerabilities with a voting system, would you
 6     think it would be a high priority to address those
 7     vulnerabilities?
 8               MR. MILLER:  Objection.  Lack of
 9          foundation.  Calls for speculation.
10               THE WITNESS:  Yeah, I don't -- I would
11          be -- I'd be suspect of it.  Just -- I'd want
12          to look at it myself.
13     BY MS. KAISER:
14          Q.   Would you look at it yourself, though?
15               MR. MILLER:  Same objection.
16               THE WITNESS:  If given the opportunity, I
17          guess, yeah.
18     BY MS. KAISER:
19          Q.   And if you, yourself, identified security
20     vulnerabilities, would it be a high priority --
21     priority to fix those vulnerabilities?
22               MR. MILLER:  Objection.  Lack of
23          foundation.  Calls for speculation.
24               THE WITNESS:  All depends on the -- the
25          judgment at the time, I guess, of what's going
```

Page 188

1       on.

2    BY MS. KAISER:

3       Q.   If you had responsibility for voting

4    equipment and you identified a security

5    vulnerability in that equipment, would you consider

6    that an important thing to -- to fix?

7       A.   Yes.

8            MR. MILLER:  Objection.  Lack of

9       foundation.  Calls for speculation.

10           THE WITNESS:  Sorry.

11   BY MS. KAISER:

12      Q.   Your answer was?

13      A.   Yes.

14      Q.   Thank you.

15           MS. KAISER:  All right.  Mr. Hamilton, if

16      you'll give us just a minute to confer, I think

17      we're -- we're reaching the end of our

18      questions.

19           THE WITNESS:  Okay.

20           MS. KAISER:  So we'll go off the record

21      for just a minute, please.

22           VIDEOGRAPHER:  The time is 2:15.  We're

23      off the record.

24           (Off the record.)

25           VIDEOGRAPHER:  The time is 2:27.  We're

Page 189

```
 1           back on the record.
 2      BY MS. KAISER:
 3           Q.   Just a few more questions for you,
 4      Mr. Hamilton.
 5                Are you aware that Dr. -- Dr. Halderman
 6      got access to Fulton County's voting equipment in
 7      August of 2020?
 8           A.   No, I didn't.
 9           Q.   Okay.  You were chief information security
10      officer at the time, August 2020; correct?
11           A.   Yes.
12           Q.   All right.  And were you aware that
13      Dr. Halderman testified in an evidentiary hearing in
14      September of 2020 about that election -- about
15      vulnerabilities in that equipment?
16           A.   Was that the same one that I did my
17      testifying in or is that a different one?
18           Q.   I'm sorry.  Did you ever testify at a
19      hearing?
20           A.   Yes, ma'am.  I was -- I had, like, two
21      questions asked of me, but yeah.  It was a
22      federal -- I thought it was the Curling case, the
23      initial part of it, with Judge Totenberg.  She asked
24      me to clarify a couple of terms.  But --
25           Q.   Okay.
```

Page 190

1        A.   -- that was when -- that was when we -- we
2    got Zoom bombed that day.  Do you recall that?
3        Q.   You know, I wasn't present at the hearing,
4    so I can't recall.
5        A.   Okay.
6             MS. KAISER:  And, Carey, I'm not sure if
7             you recall either if that was the
8             September 2020 hearing.
9             MR. MILLER:  My understanding of the
10            question, I think so, yeah.
11            MS. KAISER:  Okay.
12   BY MS. KAISER:
13       Q.   Well, so did -- were you present for
14   Dr. Halderman's testimony --
15       A.   No.
16       Q.   -- in a -- in a hearing?
17       A.   No, no, no.  I only -- the only people I
18   saw were the ones that were on that day, and he was,
19   I think, on a previous day.  That's why I had to
20   respond in writing for his stuff.
21       Q.   And are you aware -- are you aware that he
22   testified that he was able to hack the election
23   equipment from Fulton County?
24            MR. MILLER:  Objection.  Lack of
25            foundation.  Calls for speculation.

```
                                              Page 191

 1            THE WITNESS:  Yeah, I -- I didn't realize.

 2        No, I didn't hear that.

 3    BY MS. KAISER:

 4        Q.   And he was able to do so in just three

 5    days?

 6            MR. MILLER:  Objection.  Lack of

 7        foundation.  Calls for speculation.

 8    BY MS. KAISER:

 9        Q.   You're --

10        A.   And this is the --

11        Q.   -- not aware of that testimony?

12        A.   No.  Just as it pertains to that list that

13    I gave.

14        Q.   This is not -- this is not about the list

15    of -- from Fortalice; this is --

16        A.   Okay.

17        Q.   -- this is separate.

18        A.   Yeah.  I wasn't present for any of that.

19        Q.   Okay.  And you were not made aware of

20    Dr. Halderman's testimony regarding hacking the

21    actual election equipment from Fulton County?

22        A.   No, I was not.

23            MR. MILLER:  Objection.  Asked and

24        answered.

25            THE WITNESS:  Sorry.
```

Page 192

1       BY MS. KAISER:

2            Q.    Would you expect to be made aware of

3       that -- of testimony that the election equipment

4       that Georgia had and was using was able to be hacked

5       in three days?

6                    MR. MILLER:  Objection.  Calls for

7            speculation.

8                    THE WITNESS:  Yeah, I would think so.

9       BY MS. KAISER:

10           Q.    And as -- in your role as chief

11      information security officer for the Secretary of

12      State's office, that's something that you would have

13      liked to know about; is that right?

14                   MR. MILLER:  Objection.  Calls for

15           speculation.

16                   COURT REPORTER:  The answer again, please?

17      BY MS. KAISER:

18           Q.    But nobody told you about that testimony

19      from Dr. Halderman?

20                   MR. MILLER:  Objection.  Lack of

21           foundation.  Asked and answered.

22                   COURT REPORTER:  I didn't hear the

23           previous answer to the question -- the previous

24           question.

25                   THE WITNESS:  No.  "No" was on both.

Page 193

1          Yeah.

2                COURT REPORTER:   Thank you.

3                MS. KAISER:   I just want to make sure,

4          Ms. Barnes -- I'm sorry, I don't have access to

5          the realtime -- which question did you not have

6          an answer to?

7                COURT REPORTER:   One moment, please.

8                (Whereupon, the record was read by the

9          reporter as follows:

10                     Question, "In your role as chief

11          information security officer for the Secretary

12          of State's office, that's something that you

13          would have liked to know about; is that

14          right?")

15                THE WITNESS:   And I said, yes, that would

16          be nice to know.

17     BY MS. KAISER:

18          Q.   Do you have any idea why nobody told you

19     about this testimony from Dr. Halderman?

20                MR. MILLER:   Objection.   Calls for

21          speculation.

22                THE WITNESS:   I don't.

23     BY MS. KAISER:

24          Q.   Are you aware of any measures to mitigate

25     the hack that Dr. Halderman executed on the Fulton

Page 194

1      County election equipment?

2              A.    No, I --

3                      MR. MILLER:  Objection.  Lack of

4              foundation.  Calls for speculation.

5                      THE WITNESS:  No, I -- I would expect that

6              to be a Dominion thing.  So...

7      BY MS. KAISER:

8              Q.    You think -- do you think the Georgia

9      Secretary of State's office would be involved,

10     though?

11                     MR. MILLER:  Objection.  Calls for

12             speculation.

13                     THE WITNESS:  I -- I would think as a

14             customer, yeah.

15     BY MS. KAISER:

16             Q.    And who within the -- the Georgia

17     Secretary of State's office would have

18     responsibility over that?

19             A.    Over the machines themselves?

20             Q.    Yes, or -- yeah, over identifying or

21     mitigating vulnerabilities with the machines

22     themselves.

23                     MR. MILLER:  Objection.  Lack of

24             foundation.

25                     THE WITNESS:  Yeah, it was my

```
 1          understanding that all of them are actually

 2          owned by the individual counties.  So --

 3               But, yeah, I still think the Secretary of

 4          State would want to know that information and

 5          then do -- you know, get somebody excited about

 6          fixing it if that was the case.

 7     BY MS. KAISER:

 8          Q.   And the person within the Secretary of

 9     State's office under whose purview that would fall,

10     don't you think that would be the chief information

11     security officer?

12               MR. MILLER:  Objection.  Calls for

13          speculation.  Lack of foundation.

14               THE WITNESS:  I guess if it was in scope,

15          probably, yep.

16     BY MS. KAISER:

17          Q.   So this shouldn't just be a Dominion

18     thing, as you said earlier; right?  That's something

19     that --

20          A.   Well, I mean, it's their -- it's their

21     equipment and it's their code line, so, you know, we

22     can't fix it for them.  They would have to do it for

23     us, much like PCC would have to fix their software

24     for us.

25          Q.   But the Secretary of State's office would
```

Page 196

1    have a great interest in making sure that those

2    vulnerabilities were fixed; correct?

3         A.   I would think --

4              MR. MILLER:  Objection --

5              THE WITNESS:  -- so.

6              MR. MILLER:  -- asked and answered.  Calls

7         for speculation.

8              MS. KAISER:  Did you get that answer,

9         Ms. Barnes?

10             COURT REPORTER:  I heard, "I would think

11        so."

12   BY MS. KAISER:

13        Q.   Are you aware, Mr. Hamilton, that

14   Fortalice conducted an assessment of the BMD

15   equipment in 2019?

16        A.   No, actually, not -- you mean the actual

17   polling equipment in the --

18        Q.   (Nodded head.)

19        A.   No, I didn't realize they did that.  That

20   must have been on a -- on a separate statement of

21   work.

22        Q.   So you had no involvement with -- with

23   that assessment by Fortalice of the equipment

24   itself?

25        A.   No.  And it might be just because it was

Page 197

1    excluded from my statement of work from TrustPoint.

2    You know, it was specifically excluded that the

3    actual voting tabulating, Dominion or whatever, was

4    excluded from my responsibilities.

5              MS. KAISER:  All right.  Just one -- one

6         more minute, Mr. Hamilton.  Thank you.

7              THE WITNESS:  Okie doke.

8              VIDEOGRAPHER:  Would you like to go off

9         the record, Counsel, or stay on?

10             MS. KAISER:  [Inaudible], please.

11             VIDEOGRAPHER:  I'm sorry.  You broke up.

12             MS. KAISER:  I said go off the record,

13        please.

14             VIDEOGRAPHER:  The time is 2:35.  We are

15        off the record.

16             (Off the record.)

17             VIDEOGRAPHER:  The time is 2:38.  We're

18        back on the record.

19   BY MS. KAISER:

20        Q.   Mr. Hamilton, just -- I just want to make

21   sure the record is clear.

22             You're not aware of any request by anyone

23   from the Secretary of State's office to Dominion to

24   fix any of the vulnerabilities that Dr. Halderman

25   identified with the Fulton County voting equipment;

Page 198

```
 1      is that correct?
 2              A.    That is --
 3                    MR. MILLER:  Objection --
 4                    THE WITNESS:  -- correct.
 5                    MR. MILLER:  -- lack of foundation.
 6                    THE WITNESS:  I -- I don't recall any
 7              conversation specific to Fulton County except
 8              for that notebook we talked about.
 9      BY MS. KAISER:
10              Q.    That was a laptop.
11              A.    Laptop, yeah, notebook.  Sorry.
12              Q.    Right.
13                    So with respect to the Fulton County
14      voting equipment that Dr. Halderman tested and was
15      able to hack, you don't recall any instruction to
16      Dominion to fix anything related to that?
17              A.    No.
18                    MR. MILLER:  Objection.  Lack of
19              foundation.  Asked and answered.
20                    THE WITNESS:  No.
21                    MS. KAISER:  All right.  No further
22              questions from me, Mr. Hamilton.  Thank you
23              very much for your time today.
24                    THE WITNESS:  Thank you.
25                    MR. MILLER:  Dave, I'm going to have a
```

Page 199

1          couple of questions for you.  I need to look at

2          my notes real quick.

3                    THE WITNESS:  Okay.

4                    MR. MILLER:  I'm sorry to keep going on

5          and off the record, but --

6                    THE WITNESS:  No, no, that's --

7                    MR. MILLER:  -- about five minutes.

8                    THE WITNESS:  -- that's fine.

9                    VIDEOGRAPHER:  The time is 9- -- I'm

10         sorry, 2:39.  We're off the record.

11                   (Off the record.)

12                   VIDEOGRAPHER:  The time is 2:42.  We're

13         back on the record.

14         EXAMINATION

15         BY-MR. MILLER:

16         Q.   Okay.  Mr. Hamilton, I just have a few

17    questions for you before we break here.  I'll try

18    and be quick.

19                   Ms. Kaiser, at a couple different points,

20    asked you questions including the term "BMD."

21                   Do you recall that?

22         A.   Yes.

23         Q.   Do you understand what "BMD" stands for,

24    the acronym?

25         A.   I hadn't heard it until today, but I think

Page 200

1      I've got it correlated now.

2           Q.   Okay.  And have you ever done any work on

3      BMDs?

4           A.   No.  I've seen them, you know, as a voter,

5      but...

6           Q.   Right.

7                And so as the voter, you have some

8      familiarity with what the BMD is; right?

9           A.   Correct.

10          Q.   And that would be the touchscreen

11     computer; right?

12          A.   Right, iPad or Android, depending on where

13     you go, I guess.

14          Q.   And when you vote on those devices, you

15     understand there's a printer connected to that

16     device; right?

17          A.   Right, HP printer.  I've seen them.

18          Q.   And then you understand that that printer

19     prints a ballot to the voter; right?

20          A.   Correct.

21          Q.   And then as a voter, you then took that

22     ballot to a scanner; right?

23          A.   Correct.

24          Q.   And so just that I'm -- so that I'm clear,

25     you've -- in your scope of work with the Secretary,

Page 201

1    you never worked on the ballot-marking devices

2    themselves?

3         A.   No, sir, not in any --

4         Q.   Never worked on the printer?

5         A.   Nope.

6         Q.   Never worked on the scanner into which the

7    ballots were fed?

8         A.   No, sir.

9         Q.   Okay.  And was that type of work beyond

10   your work scope?

11        A.   It was.

12        Q.   So Ms. Kaiser asked you a couple of

13   questions concerning Dr. Halderman.

14             Do you recall that?

15        A.   Yes.

16        Q.   Are you aware that the report he worked on

17   concerned hacking of that same voting equipment?

18        A.   I -- I didn't correlate the two, no.

19        Q.   Okay.  Knowing that, that would then be

20   outside of your work scope; right?

21        A.   Yes.

22        Q.   You talked earlier with Ms. Kaiser about

23   the EMS system.

24             Do you recall that?

25        A.   Uh-huh.

Page 202

```
 1          Q.   And I'm going to ask you for an audible
 2     answer there.
 3          A.   Yes.  I'm sorry.
 4          Q.   And do you recall discussing with her
 5     ballot building or ballot configuration?  Do you
 6     recall that?
 7          A.   Yes, sir.
 8          Q.   And am I correct that you've never done
 9     any of that ballot building yourself?
10          A.   No, not at any time.
11          Q.   Okay.  And so when you talked today about
12     your understanding of that process, was that based
13     on an understanding gleaned from others?
14          A.   Yes.
15          Q.   Ms. Kaiser asked you earlier about a
16     situation in Cobb County.
17               Do you recall what I'm talking about?
18          A.   Yes.  About the vulnerability, yes.
19          Q.   Yeah.  Okay.
20               And do you understand what that
21     vulnerability made visible?
22          A.   Yes.
23          Q.   And what was that?
24          A.   Another person's voter registration
25     information.
```

Page 203

1          Q.    Is it your understanding that exploiting

2     that vulnerability would allow you to change a

3     person's voter registration information?

4          A.    No.  It wasn't an edit screen; it was only

5     a display screen.

6          Q.    And I think you had talked with Ms. Kaiser

7     about a similar issue related to MVP.

8               Do you recall that?

9          A.    Yes, sir.

10          Q.    And in that context, was there any ability

11     to change voter registration information or, like

12     you just mentioned, no -- no editing ability?

13          A.    No, it was just the view side.  It's

14     displaying your precinct information and things like

15     that.

16          Q.    I just want to clarify quickly here.

17               You talked about PCC's services and

18     responsibility related to MVP.

19               Do you recall that?

20          A.    I do.

21          Q.    And just to make sure I have your

22     testimony correct, it's your testimony today that

23     PCC does not maintain responsibility for the

24     maintenance and operation of MVP; is that accurate?

25          A.    Of the hardware and the underlying

1    operating system, that is correct.  But the

2    application they still have ownership of.

3            Q.   And so by that, you mean PCC still writes

4    code to then be used on the hardware; is that

5    accurate?

6            A.   Yes, sir.

7            Q.   But sitting here today, PCC wouldn't have

8    the ability to -- to access it right now as we speak

9    and -- and adjust something.

10           A.   As -- as of the date that I left, we had

11   locked them out of the system and then that --

12   inserted our people into the change control process.

13               So when PCC wanted to change something,

14   then we were party of it, instead of it being kind

15   of a -- a grab bag when they were in charge of it.

16   So it was to formalize the change control.

17               So they -- they still have access to the

18   system when we want them to have it to upload

19   changes, because they change that system a lot, as

20   far as I -- as of the date that I left.  I don't --

21   I don't even know if PCC has been released now from

22   State.  I don't know if they found another vendor or

23   what the deal is.

24           Q.   Okay.

25           A.   We didn't talk about that the other day.

Page 205

1      So...

2           Q.   So at the time that your -- you left

3      Secretary of State, do I understand your testimony

4      correctly that -- that PCC on their own could not

5      make a change to MVP?

6           A.   Correct.

7           Q.   Does that same understanding apply to the

8      ENET system?

9           A.   Yes.

10          Q.   And just so that I understand the work

11     flow, if a change was needed to be made, am I

12     correct that the Secretary of State would direct PCC

13     to make some change?  Is that accurate?

14          A.   Correct.  Or if -- if they had other

15     changes to go in, they would ask for access.  And it

16     was an over-the-shoulder kind of thing, where we

17     would link together in a session and they would do

18     it with us watching the screen.

19               So that was the idea, is to always have

20     kind of a finger on what they were doing so we could

21     have some visibility into what they were doing.

22     So...

23          Q.   Okay.

24          A.   Without us, they can't get in.  So...

25          Q.   Okay.

Page 206

1            MR. MILLER:  That's all I have.

2            THE WITNESS:  Okay.

3            MS. KAISER:  I don't have any further

4      questions.  Thank you very much, Mr. Hamilton.

5            THE WITNESS:  Oh, you bet.  You guys have

6      a great day.

7            VIDEOGRAPHER:  This concludes the

8      videotaped deposition.  The time is

9      approximately 2:50 p.m. Eastern time.  We're

10     off the record.

11            (Deposition concluded at 2:50 p.m.)

12            (Pursuant to Rule 30(e) of the Federal

13     Rules of Civil Procedure and/or O.C.G.A.

14     9-11-30(e), signature of the witness has been

15     reserved.)

16

17

18

19

20

21

22

23

24

25

Page 207

1                    C E R T I F I C A T E
2
3

     STATE OF GEORGIA:
4
     COUNTY OF FULTON:
5
6

     I hereby certify that the foregoing transcript was
7    taken down, as stated in the caption, and the
     questions and answers thereto were reduced to
8    typewriting under my direction; that the foregoing
     pages represent a true, complete, and correct
9    transcript of the evidence given upon said hearing,
     and I further certify that I am not of kin or
10   counsel to the parties in the case; am not in the
     regular employ of counsel for any of said parties;
11   nor am I in anywise interested in the result of said
     case.
12
13
14
15
16

     LEE ANN BARNES, CCR B-1852, RPR, CRR, CRC
17
18
19
20
21
22
23
24
25

1                    COURT REPORTER DISCLOSURE

2

3      Pursuant to Article 10.B. of the Rules and
       Regulations of the Board of Court Reporting of the
4      Judicial Council of Georgia which states: "Each
       court reporter shall tender a disclosure form at the
5      time of the taking of the deposition stating the
       arrangements made for the reporting services of the
6      certified court reporter, by the certified court
       reporter, the court reporter's employer, or the
7      referral source for the deposition, with any party
       to the litigation, counsel to the parties or other
8      entity. Such form shall be attached to the
       deposition transcript," I make the following
9      disclosure:

10

11     I am a Georgia Certified Court Reporter. I am here
       as a representative of Veritext Legal Solutions.
12     Veritext Legal Solutions was contacted to provide
       court reporting services for the deposition.
13     Veritext Legal Solutions will not be taking this
       deposition under any contract that is prohibited by
14     O.C.G.A. 9-11-28 (c).

15

16     Veritext Legal Solutions has no contract/agreement
       to provide reporting services with any party to the
17     case, any counsel in the case, or any reporter or
       reporting agency from whom a referral might have
18     been made to cover this deposition. Veritext Legal
       Solutions will charge its usual and customary rates
19     to all parties in the case, and a financial discount
       will not be given to any party to this litigation.

20

21

22     _Lee Ann Barnes_

23     LEE ANN BARNES, CCR B-1852B, RPR, CRR, CRC

24

25

Page 209

1      To: CAREY MILLER, ESQ.
2      Re: Signature of Deponent David Hamilton
3      Date Errata due back at our offices:
4
5      Greetings:
6      This deposition has been requested for read and sign
       by the deponent.  It is the deponent's
7      responsibility to review the transcript, noting any
       changes or corrections on the attached PDF Errata.
8      The deponent may fill out the Errata electronically
       or print and fill out manually.
9
10     Once the Errata is signed by the deponent and
       notarized, please mail it to the offices of Veritext
11     (below).
12     When the signed Errata is returned to us, we will
       seal and forward to the taking attorney to file with
13     the original transcript.  We will also send copies
       of the Errata to all ordering parties.
14
15     If the signed Errata is not returned within the time
       above, the original transcript may be filed with the
16     court without the signature of the deponent.
17
18     Please send completed Errata to:
19     Veritext Production Facility
20     20 Mansell Court, Suite 300
21     Roswell, GA 30076
22     (770) 343-9696
23
24    5036176
25

1      ERRATA for ASSIGNMENT #5036176
2      I, the undersigned, do hereby certify that I have
       read the transcript of my testimony, and that

3
4       ____ There are no changes noted.
5       ____ The following changes are noted:
6
       Pursuant to Rule 30(7)(e) of the Federal Rules of
7      Civil Procedure and/or OCGA 9-11-30(e), any changes
       in form or substance which you desire to make to
8      your testimony shall be entered upon the deposition
       with a statement of the reasons given for making
9      them.  To assist you in making any such corrections,
       please use the form below.  If additional pages are
10     necessary, please furnish same and attach.
11     Page _____Line _____Change to:_____

       _____
12     Reason for change:_____
13     Page _____Line _____Change to:_____

       _____
14     Reason for change:_____
15     Page _____Line _____Change to:_____

       _____
16     Reason for change:_____
17     Page _____Line _____Change to:_____

       _____
18     Reason for change:_____
19     Page _____Line _____Change to:_____

       _____
20     Reason for change:_____
21     Page _____Line _____Change to:_____

       _____
22     Reason for change:_____
23     Page _____Line _____Change to:_____

       _____
24     Reason for change:_____
25   5036176

Page 211

1      Page _____Line _____Change to:_____
       _____
2      Reason for change:_____
3      Page _____Line _____Change to:_____
       _____
4      Reason for change:_____
5      Page _____Line _____Change to:_____
       _____
6      Reason for change:_____
7      Page _____Line _____Change to:_____
       _____
8      Reason for change:_____
9      Page _____Line _____Change to:_____
       _____
10     Reason for change:_____
       Page _____Line _____Change to:_____
11     _____
       Reason for change:_____
12
       Page _____Line _____Change to:_____
13     _____
       Reason for change:_____
14
       Page _____Line _____Change to:_____
15     _____
       Reason for change:_____
16     Page _____Line _____Change to:_____
       _____
17     Reason for change:_____
18
19            _____
20            DEPONENT'S SIGNATURE
       Sworn to and subscribed before me this _____ day
21
       of _____, 20__.
22
23     _____
       Notary Public
24
       My commission expires_____
25     5036176