1                 UNITED STATES DISTRICT COURT

              FOR THE NORTHERN DISTRICT OF GEORGIA

2                      ATLANTA DIVISION

3

4             Civil Action No. 1:17-cv-02989-AT

5    _____

6    DONNA CURLING, et al.,

7              Plaintiffs,

8         vs.

9    BRAD RAFFENSPERGER, et al.,

10             Defendants.

     _____

11

12

13

14

15           REMOTE VIDEOTAPED DEPOSITION OF

                  JAMES A. BARNES, JR.

16

17                  Lakeland, Georgia

18              Wednesday, July 20, 2022

19

20

21

22

23

24

25    Court Reporter:  Michelle M. Boudreaux-Phillips, RPR

Page 2

1

2

3

4

5

6                          July 20, 2022

7                          9:14 a.m.

8

9

10              Remote videotaped deposition of

11      JAMES A. BARNES, JR., conducted at the

12      location of the witness in Lakeland, Georgia,

13      pursuant to Agreement, before Michelle M.

14      Boudreaux-Phillips, a Registered Professional

15      Reporter in the State of Georgia.

16

17

18

19

20

21

22

23

24

25

```
 1                       APPEARANCES
 2                       (Via Zoom)
 3
 4      On behalf of the Witness:
 5           STEPHEN DELK, Esq.
             Hall Booth Smith, P.C.
 6           1564 King Road
             Tifton, Georgia 31793
 7           229.382.0515
             sdelk@hallboothsmith.com
 8
 9      On behalf of the Plaintiffs:
10           DAVID D. CROSS, Esq.
             Morrison & Foerster LLP
11           2100 L Street, NW
             Suite 900
12           Washington, D.C. 20037
             202.887.1500
13           dcross@mofo.com
14
        On behalf of the Coalition for Good Governance:
15
             RUSSELL T. ABNEY, Esq.
16           Watts Guerra, LLP
             4 Dominion Drive
17           Building 3, Suite 100
             San Antonio, Texas 78257
18           866.457.3403
             rabney@wattsguerra.com
19
20      On behalf of the Defendants:
21           ALEXANDER DENTON, Esq.
             CAREY MILLER, Esq.
22           Robbins Firm
             500 14th Street, NW
23           Atlanta, Georgia 30318
             678.701.9381
24           adenton@robbinsfirm.com
             cmiller@robbinsfirm.com
25
```

1                     APPEARANCES (Cont'd)

2                        (Via Zoom)

3

4    Also Present:   Diane LaRoss

                     Caroline Middleton

5                    Duncan Buell

                     Ernestine Thomas-Clark

6                    Jenna Conaway

                     Kevin Skoglund

7                    Logan Wren

                     Marilyn Marks

8                    Mary Kaiser

                     Sofia Debbiche

9                    Susan Greenhalgh

                     Wail Jihadi

10                   Oluwasegun Joseph

11

     Videographer:   Jonathan Miller

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          INDEX
2
                        EXAMINATIONS
3
        By Mr. Cross ................................ 6
4
        By Mr. Abney ............................... 199
5
        By Mr. Denton .............................. 214
6
        By Mr. Cross ............................... 231
7
        By Mr. Abney ............................... 235
8
        By Mr. Denton .............................. 237
9
10                        EXHIBITS
11   Exhibit                                      Page
12   Exhibit 1 ..................................... 57
         October 27, 2021 email chain
13
     Exhibit 2 ..................................... 100
14       ICS Advisory, "Vulnerabilities Affecting
         Dominion Voting Systems ImageCast X
15       (June 3, 2022)
16   Exhibit 3 ..................................... 132
         April/May 2021 email chain with attachment
17
     Exhibit 4 ..................................... 139
18       April/May 2021 email chain
19   Exhibit 5 ..................................... 151
         Photo of Post-it note
20
     Exhibit 6 ..................................... 159
21       May 2021 email chain with attachment
22   Exhibit 7 ..................................... 187
         Coffee County Board of Elections and
23       Registration Monthly Board Meeting,
         April 13, 2021, 9:30 AM
24
     Exhibit 8 ..................................... 188
25       Invoice dated 4/13/2021

                                                    Page 6

1              THE VIDEOGRAPHER:  We are on the record

2         July 20th, 2022 at approximately 9:14 a.m.

3         Eastern Time.  This will be the videotaped

4         deposition of James Barnes, Jr.  Appearances

5         today will be noted on the transcript.

6              Would the court reporter please swear in

7         the witness.

8                        JAMES A. BARNES, JR.,

9    being first duly sworn, was examined and testified as

10   follows:

11                        EXAMINATION

12   BY MR. CROSS:

13        Q    Good morning, Mr. Barnes.

14        A    Good morning.

15             (Discussion off the written record.)

16        Q    (By Mr. Cross)  All right.  Sorry,

17   Mr. Barnes.  We appreciate you taking the time to do

18   this today.  I'm sure you can think of a lot of better

19   ways to spend your day than sitting in a deposition.

20   You're here pursuant to a subpoena; is that right?

21        A    Yes, that's correct.

22        Q    Okay.  Where are you physically located right

23   now?

24        A    I'm in Lakeland, Georgia.

25        Q    All right.  And are you at your home, an

Page 7

1    office, or where?

2         A    It's an office.

3         Q    What's the address?

4         A    It's 162 West Thigpen Avenue.

5         Q    Is that where you currently work?

6         A    Yes.

7         Q    What is your current job?

8         A    I work for Lanier County Board of

9    Commissioners, and I work in the EMA office.

10        Q    What do you do there?

11        A    I help out the EMA director and I also go

12   through and update the codes or the links.

13        Q    What is EMA?

14        A    Emergency Management Agency.

15        Q    Okay.  All right, we'll come back to that in

16   a little bit.

17             Is there anyone else with you?

18        A    No.

19        Q    Do you have any -- like an iPhone or personal

20   devices or any other computer, anything with you

21   besides what you're looking at on the Zoom?

22        A    I do, but I've muted them all.

23        Q    Okay.  So no one is allowed to communicate

24   with you during the deposition, except your own screen

25   where everybody can see and hear it, so just make sure

Page 8

1      you're not getting, like, text messages or emails or

2      jumping on the web or something, okay?

3           A      Understood.

4           Q      If there is something that you feel like you

5      need to look at, like if there's a document you think

6      might help you to pull up, just say that and we'll

7      figure that out in the moment, okay?

8           A      Fair.

9           Q      Have you been deposed before?

10          A      No.

11          Q      So just briefly, then, the way this works is

12     I'll be asking you some questions today.  I know

13     there's at least one other questioner, maybe more, who

14     will have some questions for you today.

15               There's a court reporter that's taking

16     everything down.  It's important to speak slowly enough

17     for her to be able to take down what you're saying.  I

18     have to be conscious of that myself because sometimes I

19     talk too fast.

20               We also need to not speak over each other, so

21     let me finish a question and I'll try to be sure I let

22     you finish an answer, so the court reporter can take

23     that down.  Things like head nods and "uh-huhs" and

24     "uh-uhs" are hard for her to take down.  So "yes" or

25     "no," audible answers.

Page 9

```
 1              If there's a question that anyone asks at any
 2      point during the day and you're confused about it or
 3      you need some sort of clarity, just feel free to say
 4      so.  I'm happy to help out with that.
 5              You have to ask -- you have to answer every
 6      question that's asked of you truthfully and completely
 7      unless your counsel instructs you not to.  And the only
 8      basis on which they should instruct you not to would be
 9      if there's a privilege issue.
10              Are there any questions or concerns you have
11      about the deposition?
12         A    No.
13         Q    Did you say no?
14         A    Yes, that's correct.  No.
15         Q    Okay.  Is there any medication you're on
16      today, any other reason you feel like you cannot
17      testify truthfully and completely today?
18         A    No.
19         Q    And if you need to take a break at any point,
20      just say the word, happy to do it.  If we're in the
21      middle of a question and answer, just want to complete
22      that, but otherwise we'll get to a break as quickly as
23      we can, okay?
24         A    Okay.
25         Q    All right.  Did you go to college?
```

Page 10

1          A     Yes.

2          Q     Okay.  Where did you go to college?

3          A     Valdosta State University.

4          Q     Can you spell that?

5          A     V-A-L-D-O-S-T-A.

6          Q     Where is that?

7          A     That's located in Valdosta, Georgia.

8          Q     When did you graduate?

9          A     I got my master's in 2018.

10         Q     Master's in what?

11         A     Public administration.

12         Q     Okay.  And when did you graduate from your

13    undergraduate program?

14         A     That was 2014.

15         Q     And then you got your master's in 2018, you

16    said?

17         A     Yes, correct.

18         Q     And did you do anything between the

19    undergraduate program and the master's program, or did

20    you just go straight through?

21         A     Pretty much dived right back into it.

22         Q     Do you have any other formal education or

23    degrees apart from your undergraduate degree and your

24    master's degree?

25         A     I have an associate of criminal justice.

Page 11

1          Q     When did you get that?

2          A     That was 2006.

3          Q     Where was that?

4          A     Georgia Military College.

5          Q     And where is your master's from?

6          A     Valdosta State University.

7          Q     What was your first job after you got your

8     master's?

9          A     After I got my master's, I went to work for

10    the Lanier County Board of Commissioners office.

11         Q     What did you do there?

12         A     I was a deputy clerk.

13         Q     Just generally, what were your

14    responsibilities?

15         A     Issuing business licenses, all of the account

16    payables, the vendors, payroll for the employees.

17         Q     Approximately when did you leave that job?

18         A     Well, from working with them, let's see, that

19    would have been -- that would have been March 2021.

20    Well, actually, technically I still work for them, but

21    I was also under the role of assistant supervisor of

22    elections from roughly November 2019 up through

23    February 2021.

24         Q     Where were you the assistant supervisor of

25    elections?

1        A     Lanier County.

2        Q     Got it.  So you -- just to make sure I have

3    this right, so after you finished your master's program

4    in 2018, you worked at Lanier County as a deputy clerk

5    until March 2021.  But during the same time, from

6    November 2019 to around February 2021, you were also

7    the assistant supervisor of elections; is that right?

8        A     That is correct.  They sent me over to be

9    able to help out with that, so I got certified as an

10   election official.

11       Q     When did you get certified as an election

12   official in Georgia?

13       A     That was in March 2020.

14       Q     What's involved -- or strike that.

15             What's required to get that certification?

16       A     You have to take a series of online courses

17   and be able to pass tests after each one.

18       Q     And just generally, what do those courses

19   cover, like what are you expected to learn for that

20   certification?

21       A     A lot about cybersecurity, a lot about

22   maintaining election security, and essentially how

23   voter information is similar to HIPAA information and

24   has to be secure.

25       Q     Sorry, you said similar -- voter information

Page 13

```
 1     is similar to what?

 2          A     Similar to HIPAA information in that it's

 3     protected.

 4                THE COURT REPORTER:  Excuse me one

 5          second.

 6                (Discussion off the written record.)

 7                THE VIDEOGRAPHER:  The time is 9:24.

 8          We're off the record.

 9                (Off the record.)

10                THE VIDEOGRAPHER:  The time is  9:25.

11          We're back on the record.

12          Q     (By Mr. Cross)  Mr. Barnes, just briefly on

13     the certification you were talking about that you got

14     in March of 2020, what do you recall learning about the

15     importance of cybersecurity or election security for

16     that certification?

17          A     Well, I mean, it goes into, you know, spear

18     phishing and essentially people trying to send in fake

19     emails to gain access to stuff and that type of thing,

20     basically stuff that should be common sense but often

21     isn't.

22          Q     Okay.  And when you say "often isn't," why,

23     just based on your experience?

24          A     Well, a lot of communities around here are

25     silver-haired communities, and sometimes people get
```

1    taken advantage of clicking on emails and things.

2         Q    Did the certification get into physical

3    security measures like protecting access to voting

4    equipment or servers?

5         A    Conferences that we went to and multiple

6    different training that we went to covered all of that.

7         Q    And is that -- so those are conferences or

8    trainings that you had while you were an associate

9    supervisor of elections in Lanier?

10        A    That's correct.

11        Q    Did you attend those sorts of trainings or

12   conferences when you were the elections supervisor in

13   Coffee County?

14        A    I went to a conference there, yes.

15        Q    Is there a particular organization that puts

16   on those conferences?

17        A    Carl Vinson Institute.

18        Q    Were those conferences attended by election

19   officials outside of Georgia as well?

20        A    I don't have any knowledge of that.

21        Q    So the conferences you went to, were they --

22   were the attendees, as you understood, they were only

23   people from Georgia?

24        A    It was for Georgia election officials, yes.

25        Q    Okay.  All right, so we'll come back and talk

1       more about some of those issues, but coming back to

2       your employment, so you left -- in the February/March

3       2021 time frame, you left Lanier County.  Where did you

4       go next with your work?

5            A    I didn't leave Lanier County.  I just

6       continued in my role as the deputy clerk.

7            Q    I see, okay.  Well, maybe I don't.  Hold on.

8       Sorry.  I want to make sure I have this.

9                 So in February of 2021, you stopped being an

10      associate supervisor of elections at Lanier, right?

11           A    That is correct.

12           Q    Okay.  When -- are you -- at what point did

13      you stop working as a deputy clerk in Lanier County?

14           A    That would have been in February.

15           Q    Of 2021?

16           A    Yes, that's correct.

17           Q    Okay.  So what was your next job after that?

18           A    I just went back to work for the Board of

19      Commissioners office.

20           Q    In Lanier County?

21           A    Yes, that's correct.

22           Q    Okay.  And how long did you do that?

23           A    That was up until the end of May.  End of

24      March, rather.  And in April, I started in Coffee

25      County.

Page 16

```
 1        Q    And so April of 2021 is when you took over as
 2   the elections supervisor for Coffee County; is that
 3   right?
 4        A    That's correct.
 5        Q    When did you leave that job?
 6        A    Let's see.  That would be December of 2021.
 7        Q    How did you get the position of elections
 8   supervisor in Coffee County?  Did you apply for it?
 9   Did you go through some process?  What was the process?
10        A    Yeah, I applied, along with several other
11   applicants.
12        Q    How did you learn about the opening?
13        A    Through other elections officials that I had
14   known.  It was well known amongst everybody that there
15   was an open position there.
16        Q    And how did that become known that there was
17   an opening?
18        A    Word just travels on BuzzFeed and all that.
19   They post often for positions.  It's a very common
20   practice.
21        Q    Okay.  Did anyone recommend you for that
22   position?
23        A    I got a recommendation from my former
24   supervisor.
25        Q    In Lanier County?
```

Page 17

1          A     Yes.

2          Q     Who was that?

3          A     Josh Black.

4          Q     Can you spell Josh's last name?

5          A     B-L-A-C-K.

6          Q     How, if at all, did the -- your role as

7    Coffee County elections supervisor differ from the role

8    you had as an associate elections supervisor in Lanier?

9          A     A lot more open-records requests.

10         Q     Any other differences?

11         A     Well, you know, Coffee County is a bit bigger

12   than Lanier County with more sites, also more

13   personnel.

14         Q     When you say "more sites," you mean more

15   voting sites, like polling places?

16         A     Yeah, exactly, polling locations.

17         Q     Okay.  About how many polling locations were

18   there in Coffee County when you were there?

19         A     If you include early voting, six.

20         Q     What if you don't?

21         A     Five.

22         Q     How many employees worked for Coffee County,

23   specifically for elections, when you were there?

24         A     When I was there, we didn't have the full

25   force because we were only having municipal elections,

1    so I would say we had about 10 or 15 people.

2        Q    Ten to fifteen people who were responsible

3    for -- some responsibility for administering and

4    organizing elections in the county?

5        A    Essentially just poll workers that actually

6    went out with the polling equipment and conducted the

7    election.

8        Q    Okay.  So 10 to 15 poll workers?

9        A    Yes.

10       Q    In -- I gather the number of poll workers

11   employed in the county at any point changes based on

12   the needs of the elections that are ongoing.  Is that

13   right?

14       A    That's correct.

15       Q    So a big year like a presidential election

16   typically would have more poll workers than in an off

17   year where you just have municipal elections?

18       A    That's correct.

19       Q    Are you -- were you involved at all in the

20   process of hiring poll workers?

21       A    Actually, I was lucky and quite a few of the

22   very loyal old-school poll workers came back to work.

23       Q    Did you have to hire anyone new?

24       A    Well, the Board hired a new assistant for me.

25       Q    What was that person's name?

```
 1          A    Sandy Grantham.

 2          Q    Can you spell Sandy's last name?

 3          A    It's G-R-A-N-T-H-A-M.

 4          Q    What was her role?

 5          A    Assistant supervisor.

 6          Q    So same role that you had at Lanier?

 7          A    That's correct.

 8          Q    What were her responsibilities?

 9          A    Essentially overseeing poll workers,

10    answering phone calls, helping to input data into

11    ElectioNet, filing, things of that nature.

12          Q    Did she report to you?

13          A    Yes, that's correct.

14          Q    Did anyone other than Ms. Grantham report to

15    you while you were at Coffee County?

16          A    The poll workers.

17          Q    Anyone else?

18          A    No.

19          Q    When the Board hired Ms. Grantham to work for

20    you, were you involved in that decision?

21          A    I was present, yes.

22          Q    And did you have any views on her employment?

23    Was it something you supported?

24          A    I think she was a good enough applicant.

25          Q    Okay.  When the County hires employees like
```

1       Ms. Grantham or poll workers, what background checks

2       are performed?

3            A     They perform standard background checks.

4            Q     And how are those performed?  Is that

5       something the County does itself or it hires a third

6       party?

7            A     That, I couldn't tell you.

8            Q     Where was your office physically located in

9       Coffee County?

10           A     Right across from the courthouse.

11           Q     What's the address?

12           A     Geez.  Honestly, I would have to look it up,

13      to tell you the truth.

14           Q     That's fine.

15                 And was Ms. Grantham in the same physical

16      office with you?

17           A     Yes, that's correct.

18           Q     Did poll workers have access to that office?

19           A     Yes.  We would let them in when it was time

20      for an election.

21           Q     Okay.  Was there ever any election equipment

22      or -- like the election server or other things, were

23      those physically located in that office?

24           A     Yes.

25           Q     What all was located in that office with

Page 21

```
 1    respect to election equipment?
 2         A    All of the equipment.
 3         Q    Who all had keys to that office or -- well,
 4    let me take a step back.
 5              MR. DELK:  Can I just clarify for the
 6         record -- you keep saying "office."  I don't
 7         want there to be any confusion about his
 8         office versus the building.  If we could just
 9         clarify that for the record, please.
10              MR. CROSS:  Sure, yeah.
11         Q    (By Mr. Cross)  So let's take a step back.
12    The office where you and Ms. Grantham worked, I assume
13    that was in some sort of building?
14         A    Yes, that's correct.
15         Q    Was there anything in that building other
16    than the office, the physical office, that you and
17    Ms. Grantham were in?
18         A    Yes, naturally.
19         Q    Okay.  The election equipment that we've
20    talked about, like the EMS server, the BMDs, the other
21    things, were those stored in the same physical office
22    that you and Ms. Grantham worked in or some other part
23    of the building?
24         A    No, they were not stored actually in the
25    office.
```

Page 22

```
 1        Q    Okay.

 2        A    They were behind locked doors.

 3        Q    Okay.  Where in the building were those

 4   stored?

 5        A    The EMS server was actually in a separate

 6   room attached to my office that was kept locked, and

 7   the scanners and the BMDs and also the poll pads were

 8   kept in a climate-controlled room in the rear that was

 9   locked.

10        Q    The rear of what?

11        A    Well, when you walk in the building, that

12   would be a whole section, whole wing to the office

13   complex to the left.

14        Q    So that was -- that was outside of the

15   physical part of the building where your office and

16   Ms. Grantham's office was?

17        A    No.  It's all one large complex; it's one big

18   building.

19        Q    Okay.  What else was in that building besides

20   the election office?

21        A    There were no other offices there besides the

22   elections office.  It was strictly for elections and

23   registration.

24        Q    Okay.  So the whole building was solely for

25   the physical offices -- physical offices of those
```

Page 23

1    administering elections in Coffee County; is that

2    right?

3        A    That's correct.

4        Q    And the people with access to that building

5    were you, Ms. Grantham, and poll workers?

6        A    Yes, but the only people with keys to the

7    actual building were Ms. Grantham and myself.

8        Q    And so I was going to ask, the access to the

9    building, was it a physical key?

10       A    Yes.

11       Q    It wasn't like a punch code or something like

12   that?

13       A    No, physical key.

14       Q    And that was only you and Ms. Grantham?

15       A    That's correct.

16       Q    None of the election board members, for

17   example, had keys?

18       A    No.  The only other person that had a key was

19   actually the main Board of Commissioners office, just

20   to have a key in spare.

21       Q    And who had that key?

22       A    That would have been with the County

23   Administrator's office.

24       Q    So who was responsible for securing that key?

25   Someone in that office?

Page 24

1        A    I'm assuming it would be Wesley Vickers.

2        Q    Okay.  Do you know if anyone at the Secretary

3    of State's office had a key?

4        A    No.  And I've never heard of them having keys

5    to offices.

6        Q    You said the -- the key we're talking about,

7    is that the key to the building?

8        A    That's the key to the building, correct.

9        Q    Was there a different key to the server room?

10       A    Absolutely.

11       Q    Who had that key?

12       A    I did.

13       Q    What about Ms. Grantham?

14       A    She had a spare key to that, yes, that's

15   correct.

16       Q    What about the Board of Commissioners?

17       A    No.

18       Q    Anyone else have that key?

19       A    No.

20       Q    And then you said there was a

21   climate-controlled room for the BMDs and poll pads and

22   other devices.  Was that also locked with a key?

23       A    That's correct.

24       Q    And so that's a third key that we're talking

25   about now?

1      A     Yes, separate.

2      Q     Did you and Ms. Grantham both have that key?

3      A     Yes, we both had that key.

4      Q     Anyone else?

5      A     No.

6      Q     How did you maintain that key?  Was it on

7  like a key chain that you carried with you with, like,

8  house keys and stuff for convenience?

9      A     Yes, it was on my own personal key ring.

10     Q     Okay.  And do you know if Ms. Grantham

11  carried it in the same way?

12     A     Yes.

13     Q     When you took over as Coffee County elections

14  supervisor in April 2021, where did you get your keys,

15  the three keys we just talked about?

16     A     I got those from Ms. Ernestine Thomas-Clark,

17  and the County had just rekeyed the outside locks to

18  the building.

19     Q     Did they rekey those two inside locks?

20     A     I don't know if they did or not, honestly.

21     Q     That wasn't something you asked?

22     A     No.

23     Q     Okay.  Do you know why they rekeyed the

24  exterior lock?

25     A     I would -- honestly, I don't know.  I would

1    assume because some employees still had keys to it.

2         Q    Do you know whether it's required or

3    customary practice, when an elections supervisor or an

4    assistant supervisor turns over in a county, that the

5    county rekeys locks to their election facilities?

6         A    I'm honestly not sure.  That's their security

7    prerogative.

8         Q    When you say "their security prerogative,"

9    who is "they"?

10        A    The county commissioners, I would assume.

11        Q    When you were an assistant elections

12   supervisor in Lanier County, did they ever change any

13   of the locks while you were there?

14        A    Well, actually, while I was there, the

15   elections office went into a whole new building.  So,

16   yes, all of the locks got changed.

17        Q    Apart from moving into a new building, in

18   either the prior building or the new building, was

19   there ever a point where they changed the locks?

20        A    Well, it moved into a new building when they

21   got a new supervisor.

22        Q    Okay.  All right, I understand -- I just to

23   make sure I understand.  Let's just break it down.

24             When you worked in the original building, was

25   there ever a point where Lanier County changed the

Page 27

1    locks, any of the locks?

2         A    Not when it was in the courthouse, no.

3         Q    Okay.  And then when they moved into a new

4    building -- I understand they changed the locks with

5    that move, but once you were in that building, was

6    there ever a point where Lanier County changed any of

7    those locks?

8         A    No.  And it really wasn't necessary because

9    they had keypad security.

10        Q    Okay.  Was there ever a point where they

11   changed the keypad -- or, sorry, changed the code?

12        A    No.

13        Q    Was the keypad just on the new building or

14   also on the original courthouse building?

15        A    It was on the new building.

16        Q    Okay.  So the original building had a

17   physical key?

18        A    Yes.

19        Q    And in the time that you were there, was

20   there ever any turnover in any of the employees, like

21   assistant supervisors, anyone else?

22        A    There wasn't when I left.

23        Q    Okay.  Do you know whether they changed the

24   code or any of the keys when you left?

25        A    Not to my knowledge.

Page 28

1          Q    Was there anyone else who either left
2     employment or started employment in the time that you
3     were at Lanier County?
4          A    While I was there in my role as elections
5     supervisor, there wasn't any other turnover other than
6     myself, except for maybe your standard poll workers
7     coming and going.
8          Q    Do poll workers in Lanier County have access?
9     Do they have either the key code or a physical key?
10         A    No.
11         Q    Do you know what background checks are done
12    by the County, just based on your experience in Lanier
13    and Coffee, on poll workers?
14         A    Yes, they run background checks on them, but
15    I'm not sure what it is.
16         Q    Okay.  All right, we'll come back to that as
17    well.
18              Did you work in Lowndes County at some
19    point?
20         A    Lowndes County was the regional coordinator's
21    office, basically.  So we would go over there for
22    training and different sorts of things.
23         Q    And when you say "regional coordinator," what
24    do you mean?
25         A    I mean that's the regional office for us.

1    It's different than a liaison, but it's somebody

2    that everybody within this particular region, like

3    Region 11, would go for training and memos from the

4    Secretary of State, different things.

5        Q    And training with respect to elections?

6        A    Yes, that's correct.

7        Q    So does Coffee County sit in a broader region

8    that's managed or overseen by folks in Lowndes County

9    for election purposes?

10       A    It's not managed by Lowndes County, no.  It's

11   just that is a training hub where you go for

12   information.

13       Q    And what training did you go to

14   Lowndes County for with respect to elections?

15       A    I went and -- well, when I was in Lanier, we

16   went and trained the poll workers over there at

17   Lowndes County.  It was one of the original of the

18   eight pilot organizations that conducted elections with

19   the Dominion voting system originally.

20       Q    Were you involved at all with any of the

21   pilots of the Dominion system in 2019?

22       A    No, I was not.

23       Q    Have you done any work for any political

24   parties?

25       A    No.

1     Q    All right, Mr. Barnes, you're represented by

2     counsel today, right?

3     A    That's correct.

4     Q    Who is that?

5     A    Stephen Delk.

6     Q    Did you seek out counsel or they came to you?

7          MR. DELK:  I'm going to object to the

8     form and instruct him not to answer.  This is

9     getting into privileged communications.

10          MR. CROSS:  You're saying it's

11     privileged whether he contacted you or

12     contacted -- or you contacted him?

13          MR. DELK:  Frankly, I think the line of

14     questioning is off base relative to the

15     material.  But, I mean, I suppose he can

16     answer that brief question, but it's not

17     going to go much further.

18     Q    (By Mr. Cross)  So, Mr. Barnes, did you first

19     contact -- were you out looking for counsel and

20     contacted someone in Mr. Delk's office, or did someone

21     there first contact you?

22     A    Yes, I initially had made a call seeking

23     counsel.

24     Q    Okay.  When did you decide to seek counsel?

25     A    That was several weeks ago.

1          MR. DELK:  Object to form.

2      Q    (By Mr. Cross)  Go ahead, Mr. Barnes.

3      A    I just said it was several weeks ago.

4      Q    Okay.  And you spoke with me and a couple of

5  our colleagues on the phone a couple times about the

6  deposition, right?

7      A    That's correct.

8      Q    And at no point did you have counsel when you

9  and I were communicating; is that right?

10     A    That's correct.

11     Q    So you retained counsel at some point after

12  we had spoken about the deposition and coordinating the

13  logistics; is that fair?

14     A    Yes.

15     Q    Okay.  Are you paying for your counsel or is

16  someone else paying?

17          MR. DELK:  Object to form.

18          Don't answer that.  That's privileged.

19          MR. CROSS:  That is absolutely not

20      privileged.

21          MR. DELK:  Well, we can take it up later

22      on.

23          MR. CROSS:  What's the basis for saying

24      that it's privileged, who's paying?  What's

25      the communication of that?  What's the legal

Page 32

```
 1        advice?
 2             MR. DELK:  Well, his rates and stuff
 3        are -- the payment of that is entirely
 4        irrelevant and between us.
 5             MR. CROSS:  Relevance is not an
 6        appropriate objection or instruction.
 7             What's the basis for saying that there's
 8        legal advice embedded in whether he's paying
 9        or you're paying?
10             MR. DELK:  I object.
11             MR. CROSS:  Okay, I'm going to ask my
12        question again.
13        Q    (By Mr. Cross)  Mr. Barnes, who's paying for
14   your counsel for this deposition?
15        A    Is that actually relevant to this?
16        Q    Yes.
17        A    Okay.  Coffee County is.
18        Q    Okay.  Thank you.
19             Do you know whether the counsel that
20   represents you here, whether they also represent
21   Coffee County Election Board?
22        A    No.  I wouldn't have any reason to know that.
23        Q    Do you know whether they also represent
24   Eric Chaney?
25        A    I have no idea.
```

Page 33

1        Q    Okay.  All right, Mr. Barnes, did you review
2    any documents in advance of your deposition today?
3        A    Yes.  I looked at the subpoena.
4        Q    Did you look at anything else?
5        A    Just basic, how depositions go kind of stuff.
6             MR. DELK:  Any communication from us,
7        Mr. Barnes, is not subject to the response.
8             THE WITNESS:  Yeah.
9             MR. DELK:  He's talking about any
10        extraneous documents.
11             THE WITNESS:  I got you.  No.
12             MR. CROSS:  Okay.
13        Q    (By Mr. Cross)  Did you speak to anyone other
14    than your own counsel about the deposition?
15        A    No.  Other than just letting my wife know
16    that I had something coming up.
17        Q    So you didn't speak to anyone in
18    Coffee County or Lanier County or anywhere else about
19    the deposition?
20        A    No.  I don't have any reason to.
21        Q    Okay.  Without getting into any substance
22    with your counsel, did you spend any time with your
23    lawyer preparing for today, just yes or no?
24        A    Yes.
25        Q    About how much time?

1      A      Honestly, I'm not sure.  I don't have a

2   watch.  I just check, you know.

3      Q      Would you say more or less than an hour?

4      A      Probably more.

5      Q      More or less than two hours?

6      A      Probably less than two.

7      Q      Okay.  Just yes or no, were there any

8   documents you reviewed while you met with your counsel

9   for the deposition?

10     A      No.

11            MR. DELK:  Object to form.

12     Q      (By Mr. Cross)  You said no?

13     A      No.

14     Q      Okay.  So you also got a subpoena to produce

15   documents, and we understand from you and your counsel

16   that you didn't find any documents responsive to the

17   subpoena.  Is that -- is that right?

18     A      That is correct.

19     Q      Just walk me through, if you would, what you

20   did to look for documents responsive to the subpoena.

21     A      I mean, I checked everything I have at the

22   house, you know, computer, thumb derives, all that kind

23   of stuff, but it's not best practices to take that kind

24   of information home anyway.  As I said before, a lot of

25   that's protected voter information, and you don't want

Page 35

1   to go down that rabbit hole.

2       Q    So did you, for example, like search personal

3   email accounts, text messages, anything like that?

4       A    Yes, that's correct, but I had a work phone

5   and a work email that I used for that.

6       Q    Okay.  So when you were the elections

7   supervisor in Coffee County, you never sent any text

8   messages or emails from any personal device, personal

9   email accounts, that related to Coffee County?

10      A    I didn't really have a reason to unless it

11  was -- I had a problem taking a picture or something

12  and I had to shoot it over that way, but...

13      Q    Okay.  And did you go back and search all

14  your personal accounts and places to see if you've got

15  photos or text messages or anything like that?

16      A    Yeah.  Like I said, I don't transfer

17  documents willy-nilly because you have to be on a

18  secured network to really even do that, and I don't

19  have one of those at home.

20      Q    But it sounds like there were at least

21  moments when you took a photo that you sent on to

22  someone from a personal device.  Did you go back and

23  look for those?

24      A    Well, actually, that was on my work phone.  I

25  was trying to take a photograph for a voter ID card.

1       Q     So did you -- sorry, go ahead.

2       A     I just forwarded it along, basically.

3       Q     Okay.  So as you sit here, you don't recall

4    ever using any personal devices, personal email

5    accounts, or anything of that nature in any way with

6    respect to your work for Coffee County?

7       A     Yes, sir, that's correct, because it's --

8    like I said, that's not best practice.

9       Q     You said you had a personal phone when you --

10   you had a personal phone and a work phone while you

11   were at Coffee County; is that right?

12      A     That's correct.

13      Q     And the work phone, was that issued to you by

14   the County?

15      A     That's correct.

16      Q     So you had that from the moment you started

17   until the moment you left?

18      A     Yes.

19      Q     Did you ever replace that device while you

20   were there?

21      A     No.  It was the same one.

22      Q     What kind of device was it?

23      A     It was an iPhone 13.

24      Q     And did that device have access to your work

25   email account?

Page 37

```
 1        A    I believe that's correct, that I had it set
 2   up on it.
 3        Q    Okay.  When you left, what happened to that
 4   device?
 5        A    It went to the new supervisor.
 6        Q    Who was that?
 7        A    Rachel Roberts.
 8        Q    Do you know whether the device was wiped when
 9   it went to her, or did it keep your old emails and
10   other information for her to reference?
11        A    I have no idea what happened to it after she
12   got it.
13        Q    When you left, who did you give the phone to?
14        A    When I left, I turned it over to the Board of
15   Elections.
16        Q    Who specifically?
17        A    Ernestine Thomas-Clark, I believe.
18        Q    And you physically handed it to her?
19        A    Yes.
20        Q    And your understanding is that was then given
21   to Rachel Roberts to use in her work --
22        A    Yes, that's correct.
23        Q    Would you have any reason to expect it to be
24   wiped, or would you expect them to keep the historical
25   information for her?
```

Page 38

1          A     I would expect that it remained the same as

2     when I turned it over.

3          Q     And that would be better for the incoming

4     elections supervisor because then they'd have

5     historical information [indiscernible]?

6          A     Absolutely, and also pertinent phone numbers.

7          Q     Okay.  The elections supervisor immediately

8     before you in Coffee County was Misty Hampton; is that

9     right?

10         A     Yes.

11         Q     Do you know whether she used the same

12    iPhone 13 that was given to you?

13         A     No.  It was a new phone.

14         Q     Do you know what happened to hers?

15         A     The County still has it.

16         Q     Why did they get you a new one instead of

17    giving you hers like Ms. Roberts getting yours?

18         A     Just felt that, you know, Apple has better

19    security, and that one was actually quite an old phone.

20    I believe it was a Samsung Galaxy S4.

21         Q     Did you ever get access to Ms. Hampton's work

22    phone?

23         A     Yes.  They kept it just in case there was

24    anything useful.

25         Q     Where was it kept?

Page 39

1          A     It was kept in the elections office.

2          Q     Where specifically?

3          A     In a drawer in the front area next to where

4    Sandy Grantham's office was.  Or desk, rather.

5          Q     So that was something you and Ms. Grantham

6    had access to if you needed to look at historical data,

7    historical information, and contacts?

8          A     Yeah, that's correct.

9          Q     Was that phone still there when you left?

10         A     Yes.

11         Q     How often did you or Ms. Grantham look at

12   Ms. Hampton's phone?

13         A     Not very often.

14         Q     When you first took over and realized you

15   were getting a new phone that wouldn't have that

16   historical information, did you look at Ms. Hampton's

17   phone at that point to try to bring yourself up to

18   speed on contacts and other historical information?

19         A     Yeah, I looked to see if there were any

20   necessary contacts, but since I had worked in elections

21   before, I already knew most of the people at the State

22   that I would need to be in contact with.

23         Q     So when you first came in, you sat down with

24   her phone and flipped through it; is that fair?

25         A     Yes.

```
                                                    Page 40
 1          Q     And Ms. Hampton's emails and contacts and
 2    other information from the time she was the elections
 3    supervisor, that was still on the phone for your -- for
 4    you to reference; do I understand that right?
 5          A     No.  I've never had access to her email.
 6          Q     Okay.  So her emails were not on that phone?
 7          A     No.
 8          Q     Do you know why not?
 9          A     I don't know.  There wasn't an email account
10    attached to it.
11          Q     There was no email app or account on that
12    phone anymore?
13          A     No, she didn't have the Coffee County email
14    on there.
15          Q     But she originally had it on there before she
16    left, right?
17          A     I have no idea.
18                MR. DELK:  Object to the form.
19                THE WITNESS:  I wasn't there.
20          Q     (By Mr. Cross)  Let me get it straight.
21    We're talking about the work phone that was issued to
22    Ms. Hampton by the County, just like you got, right?
23          A     Yes.
24          Q     Okay.  And so you'd expect her to have her
25    work email on there since that's her work phone, right?
```

Page 41

1          A     I don't know because I don't know her.

2          Q     Okay.  When you first got access to

3     Ms. Hampton's phone, did you ask anyone why there was

4     no email on it?

5          A     No.  I didn't really think to ask.

6          Q     Well, when you left Coffee County, you wanted

7     to make sure your emails were accessible for

8     Ms. Roberts, right?

9          A     Yes, that's correct.

10         Q     And you thought that would be important for

11    her because there's a lot of historical information in

12    the emails, right?

13         A     Yes, that's correct.

14         Q     And you never had access to Ms. Hampton's

15    emails at all is what you're saying?

16         A     That's correct.

17         Q     Did you ask anyone at Coffee County what

18    happened to her emails when you came in?

19         A     Well, I did ask about getting access to them.

20         Q     Okay.  Who did you ask?

21         A     The county manager.

22         Q     Who was that?

23         A     Wesley Vickers.

24         Q     So you came in, wanted access to

25    Ms. Hampton's emails, you asked the county manager.

Page 42

1      What was the response?

2          A    He got back in touch with the guy that runs

3      IT for Coffee County.

4          Q    Who is that?

5          A    I know his name was Charles.  I can't

6      remember his last name.

7          Q    What happened there?

8          A    He did try to go back and access them, but

9      when he had deactivated her account, he didn't archive

10     everything and apparently it was lost.

11         Q    When was her account deactivated?

12         A    I'm not sure.  Basically, since they have a

13     Coffee County network, anybody can log in with those

14     credentials on any Coffee County computer, so they

15     deactivated it.

16         Q    So when you came in, you asked for access to

17     Ms. Hampton's emails and you were told they no longer

18     existed; is that right?

19         A    Essentially, yes.

20         Q    And that they had been lost when her account

21     had been deactivated; do I understand that right?

22         A    That's correct.

23         Q    When you were in Lanier County as an

24     assistant supervisor, I think you said they replaced

25     the elections supervisor at some point.  Is that right?

Page 43

1          A     That's correct.

2          Q     What was the practice in Lanier with respect

3     to email accounts when election officials, like the

4     elections supervisor, would get replaced?  Did those --

5     was there access to the incoming elections supervisor

6     like you did for Ms. Roberts?

7          A     No, there wasn't access for the previous

8     supervisor's email.

9          Q     So how was it handled in Lanier?

10         A     Well, until recently, they had office email

11    set up.  Now they all go through a main office email

12    account where the county clerk actually sets up email

13    accounts for everyone.

14         Q     When you were in Lanier, were you aware of

15    any election officials' email accounts being wiped in

16    the way that Ms. Hampton's was?

17         A     I just simply don't think anybody had access

18    to it because the supervisor had set that account up.

19         Q     Can you explain what you mean?

20         A     Exactly like I said.  The supervisor actually

21    created the email account for that office; and once she

22    left, nobody had access to it.

23         Q     I see.  I see.  And then from -- after that,

24    Lanier went to a system that sat on a server where

25    other people --

Page 44

```
 1        A     Yes.

 2        Q     Got it.

 3        A     Managed their --

 4        Q     Got it.  Okay.

 5              Who was the elections supervisor when you

 6    started in Lanier?

 7        A     When I started working there, that was

 8    Sherry Griffin.

 9        Q     And was that the one -- was she the one who

10    set up that personal email that was used there?

11        A     That's correct.

12        Q     And who replaced her?

13        A     Josh Black.

14        Q     What email system was used in Coffee County?

15    It was a managed system?

16        A     Yes, that's correct.  It was done through the

17    IT guy who managed all those accounts.

18        Q     Was it an Exchange Server, was it

19    Microsoft Outlook, or what was it?

20        A     I'm not exactly sure what software that they

21    were using to manage it.  I just know that it was set

22    up for everybody.

23        Q     Do you remember what application you would

24    use to get into your work email on your computer?  Was

25    it -- would you click on Outlook, would you click on
```

Page 45

1      something else?

2          A      I used Outlook.

3          Q      Were you assigned a computer as the elections

4      supervisor in Coffee County?

5          A      Yes, that's correct.

6          Q      Was that a laptop or a desktop?

7          A      It was a desktop.

8          Q      And would you regularly access your work

9      email on that?

10         A      Yes, that's correct.

11         Q      The desktop that you got, was that the same

12     computer Ms. Hampton had?

13         A      Yes, it was.

14         Q      Did you ever ask anyone whether any of her

15     prior emails had been stored on that desktop?

16         A      Well, they essentially got the IT guy to try

17     to go in, but like I said, once those credentials --

18     since that's attached to the computer and the server,

19     once you don't have that email credential anymore, you

20     can't access any of that.

21         Q      So who told you that?

22         A      That would be the IT guy.

23         Q      Charles somebody?

24         A      Yeah.  But there were some of her files that

25     were backed up onto the server.

```
 1         Q    Yeah, we'll come to that.  Thank you.
 2              So just sticking with the computer for a
 3    moment, you don't have -- you're not aware that when
 4    Outlook is used on a -- on a desktop, the emails can
 5    get stored locally on that computer?
 6         A    Well, I'm not an IT guy, so, no, I didn't
 7    know that.
 8         Q    So what was told to you when you were trying
 9    to get the historical information in Ms. Hampton's
10    emails was that they were gone from the server, from
11    the network, from her phone, and from her desktop?
12         A    I was never aware that she had the emails on
13    her phone.
14         Q    Got it.  Sorry.  That's fair.  But they were
15    gone from every device on which she had it that you
16    might get access to; is that fair?
17         A    Yes.
18         Q    Okay.  All right, and then you said she had
19    some files on the server.  What are you talking about
20    there?
21         A    Stored locally, there's a shared server for
22    the computers in there, and there were some files in
23    there.
24         Q    And that's a computer that's connected to the
25    EMS server?
```

Page 47

1       A    No.   The EMS server is a completely closed

2    thing.   There's no network to it.

3       Q    Okay.   So when you say "server," what server

4    are you talking about?

5       A    I'm talking about an actual, like, server

6    backup.   Just in case a computer got fried or

7    something, you would have all your information stored

8    there.

9       Q    So this is a server for the computer system,

10   not for the Election Management System?

11      A    That's correct.

12      Q    Okay.   And then there was a shared computer

13   that was connected to that server, right?

14      A    Yes.

15      Q    Okay.   And the files that were on there, did

16   any of them include any emails?

17      A    Not that I'm aware of.

18      Q    Do you know whether anyone looked when you

19   were there?

20      A    Well, honestly, most of those files in there

21   were older, from, you know, several years ago.

22      Q    When you say "several years ago," you mean

23   several years before you took over as --

24      A    Yes, that's correct.

25      Q    What specific files do you recall on that

Page 48

1   computer from Ms. Hampton?

2        A    It was mostly things about billing, previous

3   elections, various election forms, and things of that

4   nature.

5        Q    Any videos or photos?

6        A    I believe there were some personal photos on

7   there.

8        Q    When you say "personal photos," what do you

9   mean?

10       A    Photographs of her family.

11       Q    Anything else?

12       A    Not that I recall, no.  Well, actually, I

13  think there were some board minutes on there that had

14  been typed up.

15       Q    Okay.  Did you have any understanding of why

16  her account, her email account, had been deactivated

17  when she left?

18       A    Not really.  But, I mean, the county official

19  acted pretty surprised that that happened.  I think it

20  was just something that the kind of contracted-out IT

21  department did.

22       Q    And by "county official," were you referring

23  to Mr. Vickers?

24       A    Yes, sir.

25       Q    Okay.  And you said he was surprised that it

Page 49

1    was deactivated?

2        A    That's correct.  He was under the

3    understanding that it was still accessible.  So I don't

4    believe it was intentional that the IT department just,

5    you know, deactivated it completely.  That's why we

6    made a real strong point of making sure that my emails

7    were archived, so that the new supervisor wouldn't be

8    flying blind without all that information.

9        Q    And the IT department that you refer to, you

10    said that was contracted out, that was a third party?

11        A    Yeah, it's contracted out through some

12    company, I believe, in Homerville, Georgia.

13        Q    Do you recall the name of the company?

14        A    I can't remember the name of the company,

15    honestly.

16        Q    If you wanted to recall the last name of

17    Charles, the IT guy, or recall his full name, who would

18    you ask?

19        A    Wesley Vickers usually contacts him whenever

20    somebody needs it, so I'm sure he knows.

21        Q    Charles Dial, does that ring a bell?

22        A    I believe that might be it.

23        Q    Okay.  You mentioned a desktop.  Was there a

24    laptop issued to you in Coffee County?

25        A    There was a laptop there, but I didn't use

Page 50

1   it.  It was older.

2       Q    Do you know whether Ms. Hampton used it?

3       A    I'm not sure, honestly.  I didn't have a

4   password to get into that.

5       Q    So you never even accessed the laptop?

6       A    No.  I did try, but like I said, I didn't

7   know the password and I didn't see it written down

8   anywhere.

9       Q    Did you ask for a password?

10      A    She would have been the only one to know

11  that.

12      Q    Ms. Hampton?

13      A    Yes.

14      Q    Why wouldn't you expect the IT people to have

15  access to a laptop issued by the County?

16      A    I'm not sure of the laptop policies.  I just

17  know I never used one while I was there.

18      Q    But you never asked anyone at the County or

19  at the IT department whether they had access to the

20  laptop; is that right?

21      A    Well, I was told that, you know, that that

22  was her laptop that she had set up, so I don't think

23  anybody knew that.

24      Q    Okay.  And so I just want to -- I just want

25  to make sure I understand.

Page 51

1          Did you ever ask anyone specifically at the

2    County or in the IT department if they could access --

3    give you access to her laptop?

4          A    Actually, I asked my former supervisor about

5    it, and it looks like it's one of those old ES&S

6    laptops possibly, so it really wasn't any good for

7    anything.

8          Q    Okay.  But did you ever ask anyone if they

9    could get you access?

10         A    No.  Honestly, I didn't have any reason to

11   either because she primarily used that desktop, so that

12   was what I was most concerned with.

13         Q    How did you know Ms. Hampton primarily used

14   the desktop?

15         A    Well, I just assumed that she primarily used

16   the desktop because that's what most people do,

17   considering it's hooked up to the high-speed internet.

18         Q    Is there WiFi in the county election office?

19         A    There was WiFi in there, yes.

20         Q    Was the WiFi secured by log-in?

21         A    Yes, that's correct.

22         Q    Who had the log-in credentials while you were

23   there?

24         A    Well, the log-in actually was through the --

25   like I said, the IT guy, but I had access to that.

Page 52

1        Q     Who else had the log-in credentials?

2        A     Just the people in our office.

3        Q     So that's you, Ms. Grantham.  Did poll

4    workers?  Were they allowed on the WiFi?

5        A     No.  There wasn't any reason for them to be

6    on it.

7        Q     So did anyone other than you and Ms. Grantham

8    and the IT department have access to the Coffee County

9    election office WiFi?

10       A     No.

11       Q     And just to be clear, you don't actually know

12   whether Ms. Hampton primarily used the desktop or the

13   laptop, you were assuming that; is that right?

14       A     That's correct, because it was an older

15   laptop.

16       Q     Did you ever speak with Ms. Hampton?

17       A     No.  I've never met her before.

18       Q     So you came into the office in April of 2021

19   immediately after her.  You didn't reach out to her to

20   get some thoughts or insight or guidance on her

21   experience?

22       A     No.

23       Q     Did anyone tell you not to do that?

24       A     No, nobody told me not to.

25       Q     Were you discouraged from that?

Page 53

1          A     No.

2          Q     So you came into a -- the Coffee County

3     elections supervisor role, you had no access to her

4     email, her prior files, apart from a handful of things

5     on the shared computer.  You didn't -- you didn't think

6     it would be useful to at least have a conversation with

7     her about this new role?

8          A     Well, to be fair, all of us in elections had

9     already seen the YouTube video by that point, so I

10    didn't figure it was really worth my time.

11         Q     Okay.  And just so we're clear we're talking

12    about the same thing, describe the YouTube you're

13    talking about.

14         A     That was the YouTube video of her showing --

15    loading ballots into the scanner and it having

16    problems.

17         Q     And that video was from December 2020; does

18    that sound right?

19         A     I'm not sure when the video was from.  I just

20    know that pretty much most of the elections offices had

21    watched it by then, so it wasn't a secret or anything.

22         Q     But this is a video that you saw between the

23    November 2020 election and then taking over as the

24    elections supervisor; is that the time frame?

25         A     Yes.

Page 54

1     Q    So because of that video, you didn't think it
2     would be useful or valuable or constructive to speak
3     with her.  Let me ask a better question.
4     A    Well --
5     Q    Yeah, let me -- sorry -- let me just ask a
6     better question.
7          What was it about that video --
8     A    Well, it wasn't just the video.  The office
9     was in a state of disorganization and disarray.  And,
10    honestly, it was a little bit difficult finding
11    somebody to come in and take over for her because they
12    understood they were going to be going into a mess, and
13    that was never really hidden.
14    Q    Why did you want to step into that?
15    A    Well, because like I was told, it's an
16    excellent opportunity because you know you've got
17    nowhere to go but up, so...
18    Q    I guess no one told you you might end up in a
19    deposition some day?
20    A    No, sir.
21         MR. CROSS:  All right, why don't we --
22         we've been going an hour.  You want to take a
23         short break?
24         THE WITNESS:  It's up to you.  We can
25         keep going if you'd like.

Page 55

1              MR. CROSS:  Okay.  Why don't we take a

2        short break.  Why don't we say like five

3        minutes.

4              THE WITNESS:  Okay.

5              THE VIDEOGRAPHER:  The time is 10:17.

6        We're off the record.

7              (Recess taken.)

8              THE VIDEOGRAPHER:  The time is 10:30

9        a.m.  We're back on the record.

10       Q    (By Mr. Cross)  Mr. Barnes, do you have the

11    Exhibit Share application in front of you?

12       A    Yes, sir.

13       Q    Okay.  All right, so just hang on to that.

14    We're going to look at something in just a moment.

15             A couple things I just want to make sure I

16    understand.  Are you saying that you never used a

17    laptop while you were the elections supervisor in

18    Coffee County?

19       A    It wasn't necessary to use one simply because

20    we had a nice, actual tower computer.

21       Q    So did you ever visit, like, polling sites,

22    for example?

23       A    Yes, we did go on site.

24       Q    Did you ever have meetings with the Board,

25    for example, that were not in your office?

Page 56

1      A    No.  We always met in the conference room.

2      Q    In the conference room, not sitting in your

3   office where your desktop was, right?

4      A    No.

5      Q    Okay.  So when you would go to, like, polling

6   sites, for example, or you'd have meetings with the

7   Board in a conference room, you didn't have a laptop

8   with you?

9      A    No.

10     Q    The laptop that you found for Ms. Hampton,

11  can you just describe that in as much detail as you

12  can, like what color was it, how big was it, what make

13  or model was it?

14     A    It was just a gray laptop, maybe 17-inch

15  screen.

16     Q    Do you remember the maker?

17     A    No.

18     Q    Did you power it on?

19     A    I did power it on just to see, but like I

20  said, it didn't have any access to it.  It didn't

21  really seem relevant either because it was an older

22  model, like I said.  I don't think anybody had used it

23  in a long time.

24     Q    When you powered it on, was there a log-in

25  screen that came up?

Page 57

1          A     Yes.

2          Q     Was it running Windows?  Was it like --

3          A     Yes.

4          Q     -- a typical Window --

5          A     Yeah.

6          Q     Okay.  The Outlook email that you used at

7    Coffee County, was that -- did you click on an icon

8    that opened an app, or did you log in to like a

9    webpage?

10         A     No, I clicked on an icon.

11         Q     So this wasn't like a web-based email, this

12   was something that -- it was an app that was locally on

13   your computer?

14         A     Yes, that's correct.

15         Q     All right, pull up Exhibit Share if you

16   would.  I'm going to give you a document here.  Let me

17   just move it over.

18              All right, so if you click on -- are you in

19   the folder for your deposition?

20         A     Yes.

21              (Exhibit 1 marked for identification.)

22         Q     (By Mr. Cross)  Okay, if you refresh your

23   screen, you should see a document pop up.  It's going

24   to be labeled Exhibit 1.

25         A     Is it supposed to be under "Marked Exhibits"?

Page 58

1              (Discussion off the written record.)

2         Q    (By Mr. Cross)  Okay, so Exhibit 1, you'll

3    see that at the top there's an email from Charles Dial

4    to Tracie Vickers, Jennifer Herzog, and Mr. Barnes.

5    That's you, right?

6         A    Yes.

7         Q    Tracie Vickers, is that the person that you

8    were talking about earlier?

9         A    Tracie Vickers is the county clerk for

10   Coffee County.

11        Q    So it's a different Vickers?

12        A    Yes, that's correct.

13        Q    Okay.  So if you go down to the bottom,

14   you'll see that Tracie Vickers, here indicated

15   "County Clerk, Coffee County Commissioners," sends an

16   email to Charles Dial on October 27, 2021.  Do you see

17   that?

18        A    Yes.

19        Q    Tracie is a woman; is that right?

20        A    Yes, that's correct.

21        Q    And Ms. Vickers writes, "Could you please

22   confirm that the County can or cannot retrieve

23   Misty Hampton's emails prior to her leaving the

24   County?  Or do we have them stored in any format for

25   access to them in the event of any open-records request

```
 1        for inquiry?"  Do you see that?

 2        A    Yes.

 3        Q    And then Mr. Dial responds the same day that

 4    he was not told to preserve the emails and basically

 5    indicating they're gone, right?

 6        A    Yes.

 7        Q    Do you know what prompted Ms. Vickers' email

 8    on October 27 of 2021 to see if Ms. Hampton's emails

 9    were available?

10        A    I'm assuming it was because of an

11    open-records request.  But we had contacted him --

12    well, she hadn't contacted him, but I had been in

13    contact with him previously about the same thing, and

14    he more or less told me that as well, that they were

15    gone.

16        Q    Okay.  So just to make sure I have the timing

17    right, you came in in April 2021 and you immediately

18    realized that her emails were not available?

19        A    Yes.  We were going through the process of

20    trying to find out who we needed to contact to get

21    access to her emails and also be able to log in with

22    her credentials on the computer and access that.

23        Q    And so when you came in, you couldn't get

24    access to her emails or files on anything other than

25    the few things that you found on the shared computer
```

Page 60

1   connected to the backup server, right?

2        A    That is correct.

3        Q    Okay.  And then in October of 2021, what's

4   your understanding as to why Ms. Vickers was looking

5   for Ms. Hampton's emails since it was known, from what

6   you're telling us, that her emails were long gone?

7        A    Well, I'm not entirely sure that Tracie knew

8   that they were long gone; but, I mean, I did and, you

9   know, the Board did.

10       Q    When Mr. Dial indicates that he was not told

11  to preserve the emails and he removed the Office 365

12  license, did you ever discuss with Mr. Dial why he

13  removed the Office 365 license for her?

14       A    No.  It was -- what I was basically told

15  essentially -- Wesley was told this also -- is that,

16  you know, when an employee leaves there, they

17  deactivate their account because that's how they log in

18  to the all the computers systems and all that.

19       Q    Right, but I think we established earlier

20  when you left, you made your that your emails were

21  archived for Ms. Roberts, right?

22       A    Yes, I did because I didn't want her to have

23  to go through the same trouble that I did, not have any

24  kind of context for anything that was going on.

25       Q    Did you have access to any emails or files

Page 61

1   from -- for any elections supervisor at Coffee County

2   who preceded Ms. Hampton?

3        A    No.

4        Q    So there was no historical files or data when

5   you came into the office; is that right?

6        A    Just what was on that backup server, some of

7   which was fairly old.

8        Q    And there were no emails on that server,

9   right?

10       A    No.  I never found any emails.

11       Q    In your communications with Mr. Dial, was it

12  your understanding that he was -- he was directed by

13  someone in Coffee County not to preserve Ms. Hampton's

14  account?  Is that right?

15            MR. DELK:  Object to form.

16            THE WITNESS:  I was never under any kind

17       of understanding that he was told to delete

18       anything.  Like I said previously, everybody

19       seemed kind of surprised that they couldn't

20       access it.

21       Q    (By Mr. Cross)  If the ordinary course is to

22  deactivate an account and that wipes out the emails,

23  why was everyone surprised that that happened?

24       A    I'm not sure if everybody even gets an

25  account like that.  I mean, I don't know what their

Page 62

1    standard HR practices are.

2        Q    So you're saying it's standard practice to

3    deactivate an account, wipe everything out, but at the

4    same time, everybody in Coffee County was surprised

5    that Ms. Hampton's emails were gone?

6            MR. DELK:  Object to form.

7            THE WITNESS:  No.  I'm saying I don't

8        work in HR, so I don't have any idea what

9        their standard procedure is.

10       Q    (By Mr. Cross)  Okay, so I just want to make

11   sure, you're not -- you're not suggesting that what

12   Ms. [sic] Dial did here with Ms. Hampton's emails and

13   deactivating her account, you're not testifying that

14   that is standard practice; is that right?

15           MR. DELK:  Object to form.

16           THE WITNESS:  I don't know what the

17       standard practice is.

18       Q    (By Mr. Cross)  You're just not offering a

19   view one way or the other on whether that was standard

20   practice?

21       A    Correct.

22       Q    Okay.

23       A    That would be speculation.

24       Q    Got it.  Thank you, Mr. Barnes.

25           When you left and made sure your emails were

Page 63

1    archived for Ms. Roberts, walk me through the steps you

2    took to make sure that happened.

3         A    I contacted Mr. Dial and talked about what

4    could be done to preserve the emails so that she would

5    have access to all my contacts and all.  And he said

6    that he could archive them and attach them to her email

7    address under like a subfolder, and that's what he did.

8         Q    Okay.  Was there anything else you archived

9    or made sure that was preserved for Ms. Roberts?

10        A    Essentially, she just -- she got all my

11   emails.  And what I did is prior to when I left, I made

12   sure that I copied all the files over onto a thumb

13   drive and transferred that over to her so that she

14   wouldn't lose any of that.  And, also, she had access

15   in, through the network, through the server, to my old

16   computer as well.  We made sure of that.

17        Q    Did she -- so she had access to the desktop

18   that you used?

19        A    Yes, that's correct.

20        Q    And did you delete anything on that desktop

21   before you left?

22        A    No.

23        Q    Did you delete anything from any of the

24   servers in the election county office before you left?

25        A    No.

1      Q    At any point when you were the elections

2   supervisor for Coffee County, did you change any of the

3   passwords on any of the election equipment, like the

4   EMS server, ICC, anything?

5      A    No.

6      Q    Did you have administrative rights to do

7   that?  Was that something you were capable of?

8      A    Honestly, I don't know.  I don't think you

9   can, but I never was told that you could.

10     Q    And why do you think you would not be able

11  to?

12     A    Because it's a very secure system.  That's

13  the way we were all told.

14     Q    So based on your understanding, who had

15  administrative privileges in the system to change the

16  password on, say, the EMS server?

17     A    Well, as I was told through CES, nobody

18  should be able to do that.  I would assume it would

19  only be the State that could to do that.

20     Q    And who told you that through CES?

21     A    I believe it was Mr. Prateek Patel.

22     Q    I'm sorry, could you spell that one?

23     A    Let's see.  I believe it's

24  P-R-I-T-E-C-K [sic].  I believe that's correct.

25     Q    What's his role in CES, your understanding of

Page 65

1   it?

2        A    Well, everybody at CES is essentially, like,

3   IT for the Secretary of State's office, so they're all

4   the computer-savvy guys.  He was the one that built the

5   election databases for me, ballot databases.

6        Q    So do I understand correctly that the -- the

7   password for an EMS server for the County, did that get

8   set by the State when that server comes in?

9        A    Yes, the State initially sets that up.

10       Q    And your understanding is the County wouldn't

11  then be able to change that password, that's something

12  they'd have to work with the Secretary's office on?

13       A    That was my understanding.

14       Q    And is that the same for the ICC?

15       A    Yes, that's my understanding of that as well.

16       Q    Okay.  So you said you would -- well, sorry,

17  before we get to that, you mentioned earlier the

18  video of Misty Hampton running ballots through a

19  Coffee County scanner.

20            What was it about that video that led you to

21  decide not to reach out to her once you became the

22  elections supervisor?

23       A    Well, all the equipment was completely

24  functional and, you know, if you -- you're supposed to

25  take those scanners and actually clean them every now

Page 66

1    and then, because if you don't you'll get ink smudges

2    and things like that that will jam them up.  And when I

3    cleaned it, I never had any problem with it.

4         Q    Sorry, I'm not sure how that relates to what

5    I just asked.

6         A    I'm essentially saying that she didn't even

7    know basic maintenance for the equipment.

8         Q    Your understanding is she did not clean the

9    scanners or didn't have them cleaned?

10        A    Yes.

11        Q    And what's your basis for that understanding?

12        A    Well, that's a basic maintenance thing you're

13   supposed to do, but yet I didn't see any wipes there.

14   And, also, I had to buy the cleaning cards for the big

15   scanners because there were never any there.  So it was

16   my understanding that none of the scanners had ever

17   been cleaned through the various elections.

18        Q    Just to be clear we're talking about the same

19   video, when you refer to a YouTube video, are you

20   talking about a video where she shows that a scanner at

21   Coffee County will scan the same ballots twice,

22   including after she overvotes them?

23        A    Yes, that's correct.

24             MR. DELK:  Object to form.

25             MR. CROSS:  Okay.

Page 67

1          Q     (By Mr. Cross)  So, again, what was it about
2     that video that led you to decide that there was no
3     value at all in talking to your predecessor?
4          A     Well, for one thing, she's using the
5     adjudication process to try to show that somebody could
6     change votes when there's clearly a digital log for
7     every time somebody does that in there.
8          Q     Where does that digital log get stored?
9          A     It gets stored there on the server.
10         Q     Which server?
11         A     That should be on the EMS server.
12         Q     So you saw this video and just decided this
13    wasn't somebody you wanted to talk to about --
14         A     No.  She kind of made a laughingstock of all
15    the elections officials, honestly.
16         Q     Was there anything you saw on that video that
17    concerned you about the security of the voting system
18    in Coffee County or elsewhere in Georgia?
19         A     Not at all because she wasn't using the
20    normal practices.
21         Q     She was using the equipment, right?
22         A     She was using the equipment, correct.
23         Q     Did it concern you that the Dominion scanner
24    will scan and tabulate the same ballots multiple times?
25         A     Well, see, it's not supposed to do that, and

1     there was functionally no problem with that equipment.

2     Like I said, when I came in there, I tested all that

3     equipment and there were no issues with it.  I mean,

4     that's one of the things you're supposed to do, you're

5     supposed to go in there and, every single election, you

6     have to do logic and accuracy testing.  And every

7     single instance where I did logic and accuracy testing,

8     the equipment was fully functional, so I can only

9     believe that it was user error.

10         Q    Is your understanding that logic and accuracy

11    testing is a cybersecurity test of voting equipment?

12         A    The logic and accuracy testing goes through

13    and basically makes sure that it will accept

14    undervotes, overvotes.  It tests everything,

15    essentially.  Just like you would if you were actually

16    tabulating the election.  It goes through the entire

17    process, basically, of running an election start to

18    finish and matches the numbers and makes sure that

19    everything matches up.

20         Q    I'm asking you a more precise question,

21    Mr. Barnes.

22              Is it understanding that logic and accuracy

23    testing constitutes cybersecurity testing of the

24    equipment, or do you just not know one way or the

25    other?

Page 69

1        A     Logic and accuracy is not really about

2    cybersecurity.  They're supposed to be closed systems

3    that are not networked out and supposed to be in a

4    locked door with only minimal access to -- of a few

5    people to them.  So unless there's user error, there

6    shouldn't be cybersecurity issues.

7        Q     And the testing that you did when you came

8    in, you're talking about logic and accuracy testing,

9    correct?

10       A     Yes, that's correct.

11       Q     In the time that you were at Coffee County,

12   are you aware of any cybersecurity testing that was

13   done on any of the election equipment there?

14       A     No, sir.  When it comes to us, it's certified

15   by the State.

16       Q     So you rely on the State for that; is that

17   fair?

18       A     Yes.

19       Q     You mentioned earlier that you would

20   participate in meetings with the Coffee County Election

21   Board from time to time, right?

22       A     That's correct.

23       Q     How frequently was that?

24       A     The Board had a monthly meeting every month.

25       Q     And you participated in those meetings,

Page 70

1    typically?

2         A    Yes, sir.

3         Q    What were those meetings -- what was the

4    general purpose of those meetings?

5         A    The general purpose of those meetings is

6    updates on the status of the office and elections

7    from -- from my part, and also them going over budget

8    items or getting things that I've requested.

9         Q    Were there regular reports that you provided

10   to the board?

11        A    Yes, that's correct.

12        Q    Were those written reports or oral or both?

13        A    They were typed reports and then I would

14   also -- I would have the agenda, you know, and then I

15   would also go over it verbally and also provide like

16   the budget report.

17        Q    And were those -- the written reports, were

18   those maintained on your desktop?

19        A    They should be on the desktop, but there's

20   also a folder that has them all in it as well.

21        Q    Like hard copy --

22        A    And each one of the board members have a hard

23   copy also.

24        Q    Okay.  When you say "a folder," you mean a

25   hard-copy folder?

Page 71

```
 1        A    Yes, that's correct.
 2        Q    Did you email them out as well?
 3        A    No.
 4        Q    And what was the general topics covered in
 5   your monthly report?
 6        A    Like I said, generally just the status of the
 7   office, you know, people coming in and getting voter ID
 8   cards, people applying for registration in Georgia's
 9   voter system, also expenditures and requests for
10   various things.  The office was a little old and out of
11   date, so we were trying to update various things and
12   I'd give them status updates on that.
13        Q    Any security updates?
14        A    No, but I did mention that it would probably
15   be a good idea to get a, you know, keypad security
16   system like ADT or something like that.
17        Q    When did you suggest that?
18        A    Fairly early on, because we had one of those
19   in Lanier and it was beneficial.
20        Q    Why is that beneficial?
21        A    Because that way if somebody tries to gain
22   access to the office, it will immediately call whoever
23   is on the list to call and also starts police on the
24   way there unless you stop it.
25        Q    Did the Coffee County election office, while
```

Page 72

1    you were there, have any sort of security system?

2          A     No.  That was why I was bringing that up.

3          Q     Was that implemented while you were there?

4          A     No.  It was my understanding that they were

5    trying to wait until the new fiscal year to do that.

6          Q     Do you know whether it was ever implemented?

7          A     I'm not sure.

8          Q     In the time that you were the Coffee County

9    elections supervisor, did you meet with -- beyond just

10   the meetings with the Coffee County board, did you meet

11   with any other election officials at the county or

12   state level as part of your responsibilities?

13         A     Well, naturally, I met with other elections

14   officials when I would go to the regional meetings.

15   Usually had one of those once a month or once every

16   couple of months.

17         Q     And what are the regional meetings?

18         A     That was the ones I was talking about, the

19   regional-level meetings in Valdosta.  Usually everybody

20   in that area that was an elections supervisor would

21   come to those.  And sometimes we'd get briefings from

22   the Secretary of State's office there as well.

23         Q     Did you ever hear any concerns at any of

24   these regional meetings from other election officials

25   about the BMD system?

Page 73

1        A     No.

2        Q     Did you ever have any briefings at those

3    meetings from the Secretary of State or otherwise on

4    security of the system?

5        A     No.  Mostly it was -- there's one tab on

6    there that's a secure tab.  We were always told that if

7    you mess up and take that off, it immediately has to

8    get sent back to CES.

9        Q     Secure tab is on what?

10       A     The ballot-marking device.

11       Q     Is that a physical tab?

12       A     Yes, that's correct.

13       Q     Are you talking about the seals that go on

14   there?

15       A     It's a -- it's a braided metal and then

16   clamped in plastic seal.

17       Q     Right.  And so if that seal is broken or

18   missing, the machine is supposed to go back to CES?

19       A     That's correct.

20       Q     Why is that?

21       A     Because then it would pose a security hazard.

22       Q     How so?

23       A     I'm not entirely sure.  That's just what I

24   was told.

25       Q     So if any of the seals -- these security

1    seals, if any of the security seals that are on a BMD

2    are broken or missing, you're not supposed to use it in

3    an actual election; is that fair?

4        A    Yes, if that seal from the State is broken,

5    you're not supposed to use it.

6        Q    Are there any seals on the BMDs apart from

7    the ones from the State?

8        A    There's the ones that we put on there.

9        Q    Why does the County put its own seals?

10       A    Because there's certain things you have to

11   do.  Like, to be able to upload the election data for

12   the individual election on there, you have to put it in

13   through a USB thumb drive, and then we put a plastic

14   seal on there again just to be able to check -- every

15   single day when we open and close polls, we check those

16   to make sure that no civilian person has come in there

17   and tampered with it.

18       Q    And presumably, if you come in the next day

19   and one of those county seals is broken or missing, you

20   wouldn't use that in an actual election either, right?

21       A    That's correct.

22       Q    The state seal that goes on the BMDs, those

23   have numbers that are registered with the Secretary of

24   State's office, right?

25       A    That's correct.

Page 75

1        Q    Is that true for the county seals too?

2        A    No, but the county seals, we write those down

3   on state documentation, and we have to turn that in

4   with all the other election materials at the end.

5        Q    So the Secretary of State's office, or at

6   least CES, would have a list of the numbers for both

7   the state seals and the county seals on each machine,

8   right?

9        A    That's correct.

10       Q    Did you have any meetings with anyone from

11   the Secretary of State's office while you were in

12   Coffee County as the elections supervisor?

13       A    Yes.  I met with them at the regional

14   meetings, of course, and then occasionally state

15   investigators would be in contact about old cases and

16   things.

17       Q    And what kind of cases did you hear from the

18   state investigators on?

19       A    Mostly just older ones from 2018 and '19.

20   They apparently had quite the backlog.

21       Q    What did those cases involve, just generally?

22       A    Generally, just inquiring about voters being

23   registered properly or living out of state or the --

24   the general run-of-the-mill.

25       Q    Any election security issues that were

Page 76

1    investigated?

2         A    I was never -- I never talked to anybody

3    about any election security issues, no.

4         Q    Did you hear from state investigators

5    involving any -- about any investigation related to the

6    time that Misty Hampton was there?

7         A    Yes, I was.

8         Q    Who contacted you?

9         A    Let's see.  Well, I kind of get them mixed up

10   because I was contacted by quite a bit of investigators

11   throughout the course.  But, let's see, Josh Blanchard,

12   Mr. Paris -- I can't remember his first name -- Robert

13   Hernandez.

14        Q    Any other names come to mind?

15        A    No, not other than that.

16        Q    And those were state investigators who

17   contacted you about some investigation that involved

18   Coffee County during the period Misty Hampton was the

19   elections supervisor?

20        A    Well, they contacted me, yes.  She would have

21   been the supervisor back in 2018, so that's correct.

22        Q    And so did any state investigator contact you

23   about an investigation involving events that happened

24   in, say, late 2020 to 2021?

25        A    I don't remember anybody contacting me about

Page 77

1    that.  But like I said, since they had a backlog, they

2    may not have gotten to it yet while I was there.

3         Q    So all the investigations you recall being

4    contacted about were 2018 or 2019 or maybe earlier?

5         A    Yes, sir.

6         Q    Did you ever have any communications with

7    anyone from the Secretary's office outside of the

8    regional meetings and outside of these

9    investigations -- these three investigators you

10   mentioned?

11        A    No, sir, other than contacting CES and, you

12   know, I emailed Chris Harvey.  Actually, I emailed most

13   of the people in the Secretary of State's office at

14   various points for different things, especially for

15   election materials to get replenished.

16        Q    We'll come back to that in a little bit.

17             Did you ever have any communications with

18   anyone with Dominion while you were there?

19        A    The -- Dominion did send us out some emails.

20        Q    Who did you email with at Dominion?

21        A    I wasn't emailing anybody.  Dominion just

22   sent out some, like, broad emails to elections

23   officials.

24        Q    So you never sent any emails yourself to

25   anyone at Dominion?

Page 78

1          A     No.   There wasn't any reason to.   CES handles
2     our issues.
3          Q     You never had a phone call with anyone at
4     Dominion?
5          A     No, not that I recall.   Mostly, like I said,
6     I contact the State on that.
7          Q     Did you ever have any communications with any
8     Dominion techs, folks who come out and help with the
9     equipment and machines?
10          A     No, we didn't have a Dominion tech assigned
11     to us.
12          Q     So any time you have an issue, performance
13     and operation issue with any of the election equipment,
14     you go to CES for that?
15          A     Yes, that's correct.
16          Q     Was that the same in Lanier?
17          A     Yes, that's correct.
18          Q     Why did you leave the elections supervisor
19     position in December 2021?
20          A     Essentially, I got offered a job that's right
21     down the road from where I live with a little bit
22     better pay and I'm able to be closer to the kids.   If
23     one of them gets sick in daycare or something, I can
24     just swing down there and grab them.   So convenience,
25     really.

Page 79

1          Q     And when you left -- I know we talked about
2     your emails, you archived your emails.  Ms. Roberts had
3     access to that.  You didn't -- you said you didn't
4     delete any of your work-related materials.
5               Was there anything, other than the emails,
6     you specifically made sure was archived?  Or did you
7     just make sure you didn't delete anything?
8          A     Well, like I said, I made sure that she had
9     access to everything that was on the computer just in
10    case whenever it was switched over, it was going to
11    lose any of -- it would drop some of it into the server
12    files, and I also made a hard copy on a high-capacity
13    thumb drive and turned that over to her.
14         Q     Did anyone ever offer any explanation to you
15    for why Ms. Misty Hampton left the elections supervisor
16    position?
17         A     I was under the understanding there were some
18    issues with timesheets and that they had opted to
19    resign for that reason.
20         Q     That Misty Hampton had resigned over that?
21         A     Yes.
22         Q     And what -- who gave you that understanding?
23         A     That's what I was told by the Board, and I
24    actually did see both her and Jil Riddlehoover's
25    original resignation letters, and that's what they said

```
 1    as well.
 2          Q    You saw resignation letters specifically from
 3    Ms. Hampton and -- I'm sorry, what's the other one,
 4    Riddle -- I'll get the name wrong.
 5          A    Jil Riddlehoover.
 6          Q    Riddlehoover.
 7               So you actually saw resignation letters
 8    signed by Ms. Riddlehoover and Ms. Hampton where they
 9    indicated they were resigning because of concerns about
10    timesheets?
11          A    That's correct.
12          Q    And who provided you those?
13          A    Actually, that was just in the folders that
14    were maintained by the Board of Elections members.  I
15    went back through some of the old minutes and all just
16    to kind of get up to speed on things, and that was
17    there.
18          Q    Who on the Board specifically did you speak
19    with about Ms. Hampton leaving her position?
20          A    It came up in a standard board meeting, so I
21    would assume it would basically be everybody.
22          Q    Was it the first meeting you had, that's
23    where it came up?
24          A    Yes, sir.
25          Q    What all was discussed about Ms. Hampton in
```

Page 81

1      that meeting?

2          A     Essentially, just like I had told you, that,

3      you know, there had been some falsification of

4      timesheet data and that they had been caught with it

5      and opted to resign and be able to go and apply

6      somewhere else rather than getting disciplinary action.

7          Q     How soon after you started did that meeting

8      take place, just approximately?

9          A     Oh, geez, let's see.  Maybe a week or two

10     after I started.

11         Q     Were there any other concerns expressed about

12     Ms. Hampton in that meeting?

13         A     No.

14         Q     Did the YouTube video that you mentioned

15     before, did that come up in that meeting?

16         A     Not in that meeting, but they did mention it

17     to me that, you know, Coffee County was a little bit

18     famous during the hiring process.

19         Q     Okay.  And what was mentioned to you during

20     the hiring process?

21         A     Just essentially that it was a fixer-upper

22     office and it was going to take a lot.

23         Q     That YouTube video was part of why it was a

24     fixer-upper?

25         A     Well, that's partly why, yeah.

Page 82

1        Q    Was there anything else said to you during

2    the hiring process about Ms. Hampton?

3        A    No.

4        Q    Once you took over as elections supervisor,

5    was there ever any discussion between you and anyone

6    else in the County about Ms. Hampton and the YouTube

7    video that you mentioned?

8        A    No, not really.

9        Q    So no one on the Board, no one in the County

10   ever came to you and said, "We have concerns about what

11   Ms. Hampton did in that video and let's talk about it"?

12       A    Essentially, the main thing was everybody was

13   focused on trying to move forward and just get the

14   office up to speed.  Quite frankly, there was a lot to

15   do.

16       Q    Did you learn that in that video Ms. Hampton

17   had a password that was readable posted on her desk or

18   on her screen?

19       A    Yeah, I actually did see the Post-it note.

20       Q    Was there ever any discussion, once you came

21   in as the elections supervisor, about that's not a good

22   practice, you shouldn't be doing that, any concerns

23   about that?

24       A    Oh, well, absolutely that's not best practice

25   to be putting your password around like that.  That's

Page 83

1    not something I do.

2         Q    Right, but more specifically, was there any

3    discussion that you were in about the fact that

4    Ms. Hampton had done that and whether that posed any

5    security risk for Coffee County's election system?

6         A    No, I didn't have a conversation about that

7    with anybody.  I just didn't do that.

8         Q    Sorry, you may have said this earlier.  You

9    never had any communications, written or oral, in

10   person, with Ms. Hampton ever; is that right?

11        A    That's correct.

12        Q    You've never met her?

13        A    No.

14        Q    Did she have an assistant elections

15   supervisor?

16        A    That's correct.

17        Q    Was that --

18        A    Jil Riddlehoover.

19        Q    Right, that was Ms. Riddlehoover?

20        A    Yes.

21        Q    So when you came in, it was new staff in the

22   Coffee County office, right?

23        A    Yes, that's correct.

24        Q    But you said some of the poll -- or actually

25   a lot of the poll workers had been folks who had worked

Page 84

1    in the county before, right?

2         A    That's correct.

3         Q    Did you ever have any communications with any

4    of the poll workers about their experience working with

5    Ms. Hampton?

6         A    Essentially, they had just said that she

7    wasn't very hands-on, so they were kind of left on

8    their own.

9         Q    Any other communications with poll workers

10   about their experience with Ms. Hampton?

11        A    Not really, no.

12        Q    None of the poll workers came in and said,

13   "Hey, I saw this video.  It's pretty crazy.  What do

14   you think"?

15        A    Well, they didn't like the fact that, you

16   know, Coffee County got drug into national news

17   coverage.  I don't think anybody would.  I mean, we're

18   a small town in south Georgia here.

19        Q    Right.

20             Did any of the poll workers express any

21   concern about the reliability of the voting system or

22   the office there in light of that video?

23        A    No, everybody seemed to like the system okay,

24   and one of the main things is just making sure that

25   they had adequate training and they were comfortable

Page 85

1    with the system.

2         Q    And the poll worker training, is that

3    provided by the State or by you guys, by the County?

4         A    Poll worker training is provided by the

5    County, but generally speaking, I try to look at how

6    some of the bigger, more successful offices do theirs

7    and mirror that.

8         Q    Have you ever met Ms. Riddlehoover?

9         A    No.

10        Q    Ever spoken with her?

11        A    No.

12        Q    No emails, text messages, phone calls, no

13   contact with her at all?

14        A    No contact whatsoever.

15        Q    And did you decide not to contact her for the

16   same sort of reasons you decided not to contact

17   Ms. Hampton?

18        A    That's correct.

19        Q    When you came in, had Ms. Hampton left you

20   like a note, instructions, anything directed to you?

21        A    No.

22        Q    And Ms. Riddlehoover did not either?

23        A    That's correct.  It was my understanding that

24   they had left in February, and I came in in April,

25   so...

1       Q    And who was managing the election program in

2    Coffee County in that window; do you know?

3       A    I don't -- I don't know who would have been

4    doing it.

5       Q    That wasn't something you asked

6    [indiscernible]?

7       A    Well, it was my understanding that, you know,

8    the phone calls for the elections office were being

9    rerouted through the county commissioner's office.

10       Q    So the county commissioner's office had took

11    on some level of responsibility while the State was

12    looking to replace -- or, sorry, while the County was

13    looking to replace Ms. Hampton?

14       A    That's correct.

15       Q    When you were in Lanier, when you started at

16    Lanier, the State was using the old DRE voting system,

17    right?

18       A    That's correct.

19       Q    And then they switched over to the BMD

20    system, right?

21       A    That's correct.

22       Q    And are you aware that the judge in this case

23    that you're here for, in August of 2019, ordered the

24    State to stop using the DRE system?

25       A    Yes, and to go to a paper ballot.

1          Q     When did you first learn that?

2          A     That would be 2019.

3          Q     How did you learn that?

4          A     I learned that because when I started with

5     elections, it was right before the new system rolled

6     out.

7          Q     So you learned that as part of your work in

8     Lanier?

9          A     Yes, that's correct.

10          Q     Who told you that -- strike that.

11               I just kind of want to understand sort of the

12     circumstances of how you learned this.  Approximately

13     when did you learn that the court had issued that

14     order?

15          A     Well, it was common knowledge.  I mean, when

16     we were getting trained on the new DREs, I mean, it was

17     said that this is what they're replacing and why, so

18     everybody knew that.

19          Q     Everybody knew that the "why" was because the

20     judge had issued this order?

21          A     Yes, that's correct.

22          Q     I see.

23               I think you said earlier you didn't have any

24     involvement in the pilots of the DRE [sic] systems that

25     were in the November election season of 2019.  Right?

1    A    That's correct, I didn't have any.

2    Q    So your first experience as an election

3    official with the BMD system -- sorry, I think I

4    misspoke.  I think I said the of pilots of the DREs.  I

5    meant the pilots of the BMDs.  Let me ask a new

6    question.

7         Your first experience as an election official

8    with the BMD system would have been in 2020 in

9    Lanier?

10   A    That's correct.  It would have been the

11   presidential preference primary.

12   Q    And I assume you heard about a lot of the

13   challenges that a lot of the counties had across the

14   state with that new system, particularly the June

15   presidential primary.  Do you remember that?

16   A    Yes, I remember that.

17   Q    And when you were the assistant elections

18   supervisor in Lanier County, did you guys experience

19   some of the similar challenges with the new system?

20        MR. DENTON:  Object to the form.

21        THE WITNESS:  I don't recall ever having

22        any issues with the system.

23   Q    (By Mr. Cross)  How many voters are there

24   typically in Lanier?

25   A    Let's see.  About 6500.

Page 89

```
 1          Q    Much smaller than, say, Fulton or Cobb or
 2     DeKalb County?
 3          A    Oh, absolutely.
 4          Q    Fair to say that in Lanier and Coffee County,
 5     just because you're dealing with so many fewer voters,
 6     you don't tend to run into issues along the lines like
 7     in the denser counties?
 8          A    Yeah, it's a much different ballgame for us.
 9          Q    Who specifically first informed you that the
10     State was going to the BMD system because of this court
11     order?  Do you remember who told you that?
12               MR. DENTON:  Object to form.
13               THE WITNESS:  I believe it was the
14          supervisor, but like I said, we all knew
15          about it.
16               MR. CROSS:  Right.
17               THE WITNESS:  I don't think there's a
18          single supervisor of elections that didn't
19          know about that, because quite a few of them
20          are older and set in their ways and didn't
21          really want to change over.
22          Q    (By Mr. Cross)  When you say "the
23     supervisor," you mean your elections supervisor that
24     you worked for in Coffee -- sorry, in Lanier County?
25          A    That's correct.
```

Page 90

```
 1         Q    It sounds like some of the election officials
 2    were disappointed that the court was requiring them to
 3    make a change and do something new?
 4              MR. DENTON:  Object to form.
 5              THE WITNESS:  Well, it's common for
 6         people to be set in their ways and
 7         comfortable.
 8              MR. CROSS:  Right.
 9         Q    (By Mr. Cross)  Were you surprised to learn
10    that the new system the court -- sorry, that the State
11    was going to was ballot-marking devices as opposed to
12    hand-marked paper ballots?
13              MR. DENTON:  Object to form.
14              THE WITNESS:  Not really.  I mean,
15         everybody had used those for years and years.
16         And it's pretty common in other states, too,
17         to use some kind of digital-marking device.
18         Q    (By Mr. Cross)  Are you aware of any other
19    state in the country that requires all in-person voters
20    to use BMDs?
21         A    I don't know what states, but I know that
22    they're in other locations.
23         Q    Would it surprise you to learn that there's
24    no other state that uses BMDs as the primary in-person
25    voting means other than Georgia?
```

1      A    Well, I mean, take a look at somewhere like

2    Florida where everybody is out for their own, picking

3    their voting machines.  So nothing much surprises me

4    when it comes to that.  Everywhere is different.

5      Q    Are you aware that most states rely on

6    hand-marked paper ballots?

7           MR. DENTON:  Object to form.

8           THE WITNESS:  No, I'm not aware of that.

9      I thought the dangling [sic] chad issues kind

10         of got rid of that.

11     Q    (By Mr. Cross)  And what's your understanding

12   of how dangling [sic] chads relate to hand-marked paper

13   ballots?

14     A    Well, it said there can be issues when

15   they're doing hand-marked paper ballots.  I mean, I'm

16   sure everybody remembers that back in, what was it,

17   2000.

18     Q    And just so I -- it's your understanding that

19   hand-marked paper ballots would involve something like

20   poking through a chad or -- that issue would still

21   arise if you're doing that?

22     A    Well, I don't get paid the big bucks --

23         MR. DENTON:  Object to form.

24     A    -- to decide things.

25     Q    Are you aware that you can vote by

Page 92

1    hand-marked paper ballot at the polls the same way you

2    would with an absentee ballot where you bubble in a

3    circle and it gets scanned?

4        A    I believe that you're referring to -- what's

5    the terminology here -- when somebody doesn't have what

6    they need to be able to vote on the machines, that they

7    can fill out a provisional ballot.

8        Q    Provisional or an emergency ballot, right?

9        A    Yes, that's correct.

10       Q    And voting by hand on a -- on a hand-marked

11   paper ballot where you're bubbling in a circle, that

12   wouldn't involve a hanging chad, right?

13       A    No.

14       Q    Have you ever voted by a hand-marked paper

15   ballot in Georgia, absentee?

16       A    I've voted absentee before.

17       Q    Do you tend to vote more by absentee or more

18   in person?

19       A    I tend to vote more by absentee just to avoid

20   all the people.

21       Q    Fair to say you don't -- you don't have any

22   concerns about whether your absentee vote, which you

23   mark by hand, whether it's going to get counted

24   correctly in Georgia, right?

25       A    I don't have any concerns.

Page 93

1    Q    Just to pick up where we were talking a

2    moment ago, you are aware, through your experience both

3    in Lanier County and in Coffee County as an election

4    official, that Georgia state law does allow counties to

5    use hand-marked paper ballots for emergency purposes,

6    right?

7    A    Yes, that's correct.

8    Q    And that's a decision that the county

9    elections supervisor makes, whether that becomes

10   necessary or appropriate; is that fair?

11   A    Well, I mean, if you're getting to a point

12   where your machines all go down and you're going to

13   have to go to emergency ballots, you're supposed to

14   contact the State anyway to let them know about it.

15   Q    Right, you want to inform the State, but it's

16   the elections supervisor's decision, right?

17   A    Well, yeah, because you have to keep the

18   election going; otherwise, you end up with a court

19   order to extend it.

20   Q    And the emergency circumstances wouldn't

21   necessarily be the machines going down, right, there

22   could be other circumstances?  Like, if you had really

23   long lines, that could support the elections supervisor

24   deciding to go to hand-marked paper ballots if the

25   elections supervisor thought it would speed up the

Page 94

1    process; is that fair?

2         A    Well, when it comes to long lines, we're

3    supposed to give reports regularly to the State about

4    how long the line times are; and if the State thinks

5    that the lines are too long, then they'll give us

6    directive on that.  That's really -- that's really up

7    to them to give us the go-ahead on something like that.

8         Q    So to your understanding, the elections

9    supervisor doesn't have the authority to make that

10   decision, they need to turn to the State for that?

11             MR. DENTON:  Object to form.

12             THE WITNESS:  It's my understanding that

13        we tell the State about our line times, and

14        if the line times get too long, then they'll

15        direct us what to do.

16        Q    (By Mr. Cross)  As an elections supervisor

17   or as the assistant supervisor in both Lanier and

18   Coffee County, did you have or did the County have

19   discretion to determine whether to use BMDs or not in

20   any given election, or did they rely on the State to

21   determine that?

22        A    We're supposed to use BMDs if at all

23   possible, yes.  It's usually -- that's reserved more

24   for, really, emergency situations, like a tornado came

25   through and knocked everything out and you don't have

Page 95

1     any other option, at which point you would still let
2     the State know that a tornado came through and knocked
3     everything out.
4          Q     So fair to say in Georgia, the State
5     determines the means of voting across the state?
6          A     That is correct.
7          Q     And that's the Secretary of State's office,
8     right?
9          A     Yes.
10         Q     Have you ever been in a situation as an
11    election official where hand-marked paper ballots were
12    used to vote in person, not absentee?
13         A     Provisional ballots mostly.  Never had an
14    emergency ballot situation.
15         Q     When you were the elections supervisor in
16    Coffee County, about how many voters, just
17    percentage-wise, voted absentee versus in person?  How
18    did the numbers break down?
19         A     Actually, it was quite a relatively small
20    number that voted absentee compared to in person.
21         Q     What about Lanier?
22         A     Same thing in Lanier, most people wanted to
23    come in person.
24         Q     Again, you guys have the benefit of not
25    running into long lines there, right, in Lanier and

Page 96

1    Coffee?

2         A    Yeah, and plus it's kind of an event where,

3    you know, "Hey, there's Joe's mother's brother's

4    cousin," you know, so...

5         Q    In smaller counties, people tend to know each

6    other, smaller communities?

7         A    Yeah.  Yeah, and it gives everybody a chance

8    to be nosy about who's out and about.

9         Q    Is it -- in your experience, is it fair to

10   say that that's -- that tends to be important to

11   voters, to be able to show up at the polls and vote in

12   person?

13        A    Oh, yeah, absolutely.

14        Q    Why is that?

15        A    Well, a lot of people just say that they just

16   want to make sure that, you know, they're casting their

17   ballot in person and they know what happened.  I think

18   it just makes a lot of people more comfortable,

19   especially the older folks.

20        Q    And fair to say that for lot of people, it's

21   important to be part of that democratic process, right,

22   being there in person?

23        A    Oh, yeah.  I think the participation and

24   getting the sticker is a big part of that.

25        Q    Have you ever discussed any election security

1    concerns with the Coffee County board, election board?

2         A    Other than just making sure that, you know,

3    all the equipment is secured properly and stored

4    properly with climate control.  And then also, of

5    course, I brought up the server issue because, you

6    know, I couldn't get into that and we had an upcoming

7    election.

8         Q    Right, and we'll come to that.

9         Any other -- any other election security

10    issues you discussed with the State?

11         A    No.  Well, now, are you talking about the

12    State or Coffee County?  Because initially you said

13    Coffee County.

14         Q    Oh, yeah.  I'm sorry.  I mean with

15    Coffee County.  I'm just focusing on that.  Nothing

16    else with Coffee County beyond what you identified?

17         A    Correct.

18         Q    Okay.  And did you ever discuss any election

19    security issues, while you were with Coffee County,

20    with the State?

21         A    Yes.  The server issues.

22         Q    Okay.  And that was when you could not get

23    access to the EMS server?

24         A    That's correct.

25         Q    And that included the ICC too, right?

Page 98

1          A    Yes, that's correct.

2          Q    Any other equipment, as part of the election

3     system in Coffee County, you did not have access to

4     that you --

5          A    No.

6          Q    -- raised with the State?

7          A    No, I didn't have any other issues.

8          Q    All right, we'll come back to that.

9               Did you ever get any communications from

10    anyone on behalf of the State about election security

11    concerns?

12         A    Well, we commonly get little memos and all.

13    And, you know, of course, most of the time we're

14    involved with CISA, and they give out cybersecurity

15    bulletins.  And then like I said, of course, the

16    Dominion Voting kind of blast-out to everybody's email

17    just warning about third-party people trying to gain

18    access.

19         Q    And CISA, you're talking about the

20    cybersecurity/infrastructure agency that's part of DHS,

21    the federal level?

22         A    Yes, that's correct.  And they also have like

23    a [indiscernible] for elections that gives out

24    elections bulletins to everybody.

25         Q    And so do I understand right, in your

Page 99

1    experience in Coffee County and Lanier, the Counties

2    look both to the State and to the federal agency to

3    provide guidance on election security?

4         A    That's correct.

5         Q    Were you aware that in July of 2021, there

6    was an election security expert named Alex Halderman

7    who did a security analysis of Dominion voting

8    equipment from Fulton County?

9         A    No, I was not aware of that.

10        Q    Is that something you've ever heard before

11   now?

12        A    No.

13        Q    So that wasn't something that was conveyed to

14   you when you were the elections supervisor in

15   Coffee County?

16        A    No.  I don't recall that.

17        Q    Never read any press around that?

18        A    No.

19        Q    So no one from the State ever reached out,

20   for example, and said, "Hey, there's -- we have this

21   100-page report from an election security expert that's

22   identified a lot of security vulnerabilities with the

23   Dominion voting equipment used in Georgia"?

24        A    I don't recall any emails of that nature.

25        Q    If those types of vulnerabilities existed, if

Page 100

1     a report had gone to the Secretary's office identifying

2     those vulnerabilities, would you expect to hear that

3     from the State so that you could take remedial

4     measures?

5               MR. DENTON:  Object to form.

6               THE WITNESS:  Honestly, like I said, I

7          couldn't say.  I don't -- I don't get paid

8          the big bucks like they do to decide things.

9               MR. CROSS:  All right, pull up the next

10         exhibit if you would, please.

11              THE WITNESS:  All right.

12              MR. CROSS:  Just let me know when you've

13         got it.  It's Exhibit 2.

14              THE WITNESS:  Okay, I've got it.

15              (Exhibit 2 marked for identification.)

16         Q    (By Mr. Cross)  All right, do you see that

17    this is an advisory that was issued by CISA on June 3rd

18    of 2022?

19         A    Yes.

20         Q    And this is the same federal agency we were

21    just talking about that would send you election

22    security guidance from time to time as an election

23    security official, right?

24         A    Yes, that's correct.

25         Q    Have you seen this before?

Page 101

```
 1        A    I have seen something like this before.
 2        Q    Have you seen this particular one, Exhibit 2,
 3    before?
 4        A    I believe I've seen this, but I'm not
 5    entirely sure.
 6        Q    You're not still working as an election
 7    official in Georgia, right?
 8        A    No, that's correct.  I'm out of elections.
 9        Q    And you said you think you may have seen this
10    before from June of 22 -- sorry, from June of 2022.
11    Why do you think you may have seen this before?
12        A    Well, because we usually get a lot of those
13    emails out about these different things.
14        Q    Okay.  This is from June of this year.  In
15    what context would you have received that this year?
16        A    Well, then I probably haven't seen it.  Like
17    I said, I've seen things similar to that.  That's why I
18    said I'm not sure.
19        Q    Okay.  Understood.  And that's why I just
20    wanted to make sure you were focusing on the year,
21    because this would have -- this would have come out
22    after you left Coffee County, obviously.
23        A    Yes, that's correct.
24        Q    Okay.  I didn't expect that you would have
25    seen this.
```

1          So this advisory that came out in June of

2     2022 is the product of CISA looking at the July 2021

3     expert report I told you about earlier.  They looked at

4     that report, they met with that expert, they met with

5     Dominion, and then issued this advisory in June of this

6     year.  So you're not familiar with any of that?

7          A    No, I've never heard about any updates to any

8     of it, so that's new to me.

9          Q    Okay.  If you look under the summary, you see

10    where it says, "This advisory identifies

11    vulnerabilities affecting versions of the Dominion

12    Voting Systems Democracy Suite ImageCast X"?  Do you

13    see that?

14         A    Yes.

15         Q    And so here CISA has confirmed specific

16    vulnerabilities that Dr. Halderman had identified in

17    July of 2021.

18              Would you have expected the Secretary of

19    State's office to alert you to those vulnerabilities as

20    a county elections supervisor using that equipment?

21              MR. DENTON:  Object to form.

22              THE WITNESS:  Well, I would -- I would

23         assume that this notice should have went out

24         to all the county officials anyway if they're

25         keeping track with ES-ISAC and CISA.

Page 103

1        Q    (By Mr. Cross)  Right, but this came out in

2    June of 2022 because it took some time to get

3    Dr. Halderman's report to CISA and then have CISA send

4    the -- do its work and send its own advisory out.  My

5    question is a little bit different.

6            Given that these same vulnerabilities were

7    disclosed to the Secretary's office in Georgia in July

8    of 2021, would you have expected them to alert

9    elections supervisors at the county level that these

10   vulnerabilities were present so that you'd be aware of

11   them?

12           MR. DENTON:  Object to form.

13           THE WITNESS:  Well, once again, I will

14       simply say that if a county official is doing

15       their job, they should be up to date on the

16       federal releases as well, so it shouldn't be

17       an issue of whether or not somebody got it.

18       Q    (By Mr. Cross)  But you understand in 2021,

19   there was no federal release on these vulnerabilities

20   because CISA had not gotten Dr. Halderman's report yet?

21   Do you understand that?

22       A    Yes, I understand that.

23       Q    Okay.  So the only way the counties could

24   have learned about these vulnerabilities is if the

25   Secretary's office had informed counties about

Page 104

1     Dr. Halderman's report from July 2021.  Are you with

2     me?

3               MR. DENTON:  Object to form.

4               THE WITNESS:  I understand what you're

5          saying, but like I said, I've never read

6          that, so I wouldn't begin to speculate on

7          that.

8          Q    (By Mr. Cross)  Well, as a county elections

9     supervisor, wouldn't you want to be aware of any

10    vulnerabilities that affect the security and

11    reliability of the equipment that you're responsible

12    for?

13         A    I would want to be aware of any trouble, but

14    I also defer to the State's judgments, generally

15    speaking, on things.

16         Q    One of the findings of Dr. Halderman, and

17    this is public, is that a voter could walk into a

18    voting booth with a Dominion BMD system and plug in a

19    flash drive into a USB port and upload malware and that

20    that could happen in a matter of minutes.  Have you

21    ever heard that before?

22              MR. DENTON:  Object to form.

23              THE WITNESS:  No, I've never heard that,

24         but we do keep seals on there for that very

25         purpose right there, and you're supposed to

Page 105

1          check those just to make sure that nobody has

2          that tampered with it.  That's the purpose of

3          them.

4          Q    (By Mr. Cross)  Are you aware that there are

5     USB ports available on the voting equipment that's used

6     in the voting booth that does not have a seal on it?

7          A    No, I've never heard that.

8          Q    The printer, for example, has a USB port.

9     Were you aware of that?

10         A    Yes.  Most printers do now.

11         Q    Right.  And there's no seal on the printer

12    that's used, the seals are on the BMDs, correct?

13         A    That's correct.

14         Q    So as someone who was responsible for

15    administering elections in two separate counties,

16    wouldn't you have wanted to know that you needed to

17    take some measures to protect those USB ports?

18              MR. DENTON:  Object to form.

19              THE WITNESS:  Well, it's always nice to

20         have all the tools you can in your toolbox,

21         of course, but like I said, I'm not the one

22         in charge of all that kind of data release.

23         Q    (By Mr. Cross)  But does it surprise you that

24    the Secretary of State's office had the support for the

25    last year and didn't convey any of that information to

Page 106

1    the counties, instead had to wait for CISA to do it

2    almost a year later?

3              MR. DENTON:  Object to form.

4              THE WITNESS:  Well, it doesn't surprise

5         me because I assume that they had their

6         reasons for it.  I don't know what that is,

7         but since I don't have all the knowledge, I

8         would only be speculating at this point.

9         Q    (By Mr. Cross)  So as a county elections

10   supervisor, you trust the State to determine election

11   security across the state, fair?

12        A    That's correct.

13        Q    All right.  So when you came in to

14   Coffee County, at some point you tried to access the

15   EMS server and you couldn't access it, right?

16        A    That's correct.

17        Q    When did that happen?

18        A    That would have been towards the end of

19   April, I believe, and I contacted CES about that and

20   described the problem to them, and they said that they

21   would be down next week to check it out.  Initially,

22   there was the assumption that maybe I had fat-fingered

23   in the 16-digit-long password.

24        Q    And the 16-digit password was one that was

25   provided by the State; is that right?

1     A     That's correct.

2     Q     And why was it that you didn't try to access

3     the EMS server or the ICC until a few weeks after you

4     arrived?

5     A     Because there wasn't an election for a while

6     out, so there wasn't really any need to.  And there was

7     quite a bit of other work to do, also, catching up on

8     voter registrations and things like that.

9     Q     So you didn't try to access the EMS server or

10    the ICC with the password you had until a need arose

11    with an upcoming election?

12    A     That's correct.

13    Q     Where did you get the 16-digit password that

14    you were trying to use?

15    A     Initially, that was the same one that had

16    gotten left there by Ms. Hampton.  And I called CES up

17    to make sure that that was, in fact, the correct

18    password, they verified that that should be the correct

19    password, and when I tried it several times and it

20    didn't work, they said that they would come down and

21    take a look.

22    Q     You said it was left by Ms. Hampton.  Where

23    did you find it?

24    A     It was still up there attached to the

25    computer screen.

Page 108

1        Q     On the Post-it note?

2        A     Yeah.

3        Q     Okay.  And how did you confirm with CES that

4    that was the password that they had provided initially?

5        A     By calling up there to the CES office.

6        Q     So you called someone at CES, you read the

7    16-digit password, they said, "Yeah, that's the one

8    that we have for this equipment," and you pointed out

9    it didn't work?

10       A     That's correct.

11       Q     Was the 16-digit password in Coffee County

12   the same one that you used for the EMS or ICC in

13   Lanier?

14       A     No.

15       Q     So Lanier had a different password?

16       A     That's correct.

17       Q     Also 16-digit?

18       A     Yeah, they're all the 16-digit,

19   Google-generated type passwords.

20       Q     Okay.  And they're all provided by the State?

21       A     That's correct.

22       Q     What did CES say when you contacted them and

23   said the password doesn't work?

24       A     Like I said, they tried to go back through it

25   several times with me and just make sure that I

Page 109

1   wasn't -- it wasn't a user error on my part.  And then

2   when it continued not to work, they said that they

3   would come down and take a look at it the following

4   week.

5        Q    Do you recall who specifically you spoke with

6   at CES?

7        A    I believe it was Prateek Patel that I spoke

8   to because, like I said, I know him better than most

9   since he builds my ballot databases.

10       Q    Sorry, give me the name one more time.

11       A    Prateek Patel.

12       Q    Patel is P-A-T-E-L?

13       A    Yes, that's correct.

14       Q    And this was sometime in late April of 2021?

15       A    Yes, I believe that's correct.

16       Q    Did you ask or was there any discussion with

17   him or anyone else at the Secretary's office about why

18   the password wasn't working?

19       A    Well, when he came down, he brought another

20   gentleman with him named Chris.  I'm not sure about his

21   last name.  I just know he works at CES.  And initially

22   they -- you know, first thing he did was try that

23   password just to see if it worked, because in the past

24   people have just messed it up and not done it right.

25   And they didn't know why the password had been changed,

Page 110

1    said that it shouldn't have been able to be changed,

2    and that's basically where that stood.  So I have no

3    idea why or how.

4         Q    But they -- Mr. Patel came in and someone

5    else named Chris, both from CES, right?

6         A    Yes, that's correct.

7         Q    And they looked at the ICC and the EMS server

8    and their assumption was that somebody had changed the

9    password?

10        A    I'm not sure, actually.  They just seemed

11   surprised to me because, like he said, they're not

12   supposed to be able to change it.  So I'm not sure that

13   they knew exactly what had happened --

14        Q    Got it.

15        A    -- at that juncture.

16        Q    All they could tell was the password didn't

17   work?

18        A    Yes, that's correct.

19        Q    And they explained that people at the county

20   level aren't supposed to have administrative rights to

21   change a password?

22        A    Yes, that's correct.

23        Q    So what happened next?

24        A    After that, I was told that they were going

25   to have to replace the server and take it back to CES,

Page 111

1   try to gain access to it.  They tried to move over as

2   much as they could kind of back-door style, but it was

3   impossible to retrieve all the data at that time.

4        Q    When you say -- sorry, the last thing you

5   said, retrieve data, what were you talking about?

6        A    All the election files that are stored there

7   on the server, they were unable to retrieve all of that

8   simply based on the nature of it being in lock-down.

9        Q    They were -- was CES able to retrieve any

10  files or data from the EMS server?

11       A    I don't know if they ever were or not, but at

12  that point in time, they were unable to retrieve it.

13       Q    What about the ICC, did they ever get access

14  to that?

15       A    I'm not sure, to tell you the truth.

16       Q    How soon after Mr. Patel came in and

17  confirmed the password didn't work did the State take

18  the ICC and the server?

19       A    That was the same day.  They just had an

20  extra one with them, just depending on whatever the

21  problem might be, just in case.

22       Q    So you contacted Mr. Patel in late April of

23  2021, right?

24       A    Yes.

25       Q    And that was a phone call?

Page 112

1          A    Yes, that's correct.

2          Q    Did you email anyone about this?

3          A    No.

4          Q    Did you contact Chris Harvey or anyone else

5     beyond Mr. Patel about not having access?

6          A    No, I didn't contact anybody else about not

7     having access.

8          Q    So Mr. Patel was the only person you ever

9     spoke with or emailed or communicated with about not

10    having access to the ICC and the EMS server?

11         A    That's right.

12              MR. DENTON:  Object to form.

13         Q    (By Mr. Cross)  I'm sorry, did you say that's

14    right?

15         A    Yes.

16         Q    Okay.  How quickly after you called Mr. Patel

17    did he arrive?

18         A    It was about like what they said; it was

19    about a week before the two people from CES came.

20         Q    It was a week after you called them?

21         A    Yeah, roughly.  It was probably the next

22    week.

23         Q    Okay.  And when they came, they had with them

24    a replacement server and a replacement ICC?

25         A    Yes, that's correct.

Page 113

1          Q      And they replaced them on the spot?

2          A      That's correct.

3          Q      Did they replace anything else besides the

4    EMS server and the ICC?

5          A      No.

6          Q      In the room where the EMS server is, is there

7    a computer that's connected directly to that server?

8          A      The ICC and the EMS are both networked

9    together, but there's no other equipment.

10         Q      But if you want to -- when you go to log in

11   to the EMS server, there's a keyboard and a screen that

12   you're trying to log in on, right?

13         A      Yes, that's correct.

14         Q      Does that sit in the room with the EMS

15   server?

16         A      Yes, the screen and keyboard are in there for

17   each one of those.

18         Q      Okay.  And the screen and keyboard, when

19   you're trying to log in to the EMS server, are those

20   hardwired into the server or they're connected to a

21   separate computer terminal of some sort?

22                MR. DENTON:  Object to form.

23                THE WITNESS:  Each one of them is

24         connected to the computer terminal that

25         you're using.

Page 114

1          Q     (By Mr. Cross)  Okay, so when Mr. Patel came

2     and replaced the EMS server, did he replace the

3     keyboard, the screen, any computer terminal, any wires,

4     any other equipment, or was it just the server that got

5     replaced?

6          A     I don't recall anything else being replaced.

7          Q     Beyond the server?

8          A     That's correct.

9          Q     And same with the ICC, the only thing they

10     replaced was the ICC itself, no other peripherals or

11     anything attached to it?

12          A     As far as I know, that's correct.

13          Q     Were you there with them when they were

14     replacing the equipment?

15          A     Yes, I was there with them for the majority

16     of that time.  I was doing other work.

17          Q     Okay.  So they left, took the ICC and the

18     server with them, and you don't know one way or the

19     other whether anyone ever got access to the data or the

20     files on the --

21          A     That's correct.

22          Q     What's your understanding of where the new

23     server and ICC came from that they brought that day?

24          A     I would assume it came from their main office

25     in Marietta, but I'm not sure.

Page 115

1      Q    You didn't ask?

2      A    No.

3      Q    Did you have any understanding as to whether

4   these were a new EMS server and ICC or whether they

5   were taken from another county or had been used before

6   or just no understanding one way or the other?

7      A    I just got the new server in there and it was

8   working, and that's what mattered to me because I had

9   an election coming up.

10     Q    So you didn't ask -- you didn't ask them,

11  "Where did this come from"?  All you needed was it to

12  work?

13     A    Yeah, I didn't ask where it came from.

14     Q    And after Mr. Patel and Chris left with the

15  ICC and the server, what follow-up did you have with

16  Mr. Patel or anyone else about this issue?

17     A    I didn't have any follow-up with them.

18     Q    Did you ever talk to Mr. Patel again?

19     A    Yeah, in the normal course of business.

20     Q    So he was one of -- he was, I think you said

21  earlier, your primary contact at CES, right?

22     A    Yeah, I had asked -- I had asked him at one

23  point in time were they ever able to get, you know,

24  anything off of there because I had an open-records

25  request, and they said that -- "No, if you don't -- if

Page 116

1     you don't have it, then you don't have it," so...

2          Q    What does that mean, "if you don't have it,

3     you don't have it"?

4          A    Well, he said if I don't have it there on the

5     server, then I don't have anything responsive to that.

6     So I took that to mean that he didn't have it either.

7          Q    So you got an open-records request related to

8     the EMS server that had been replaced, you contacted

9     Mr. Patel, and he said if you don't have something

10    locally in Coffee County, you don't have anything to

11    produce?

12         A    Yes, that's correct because -- I don't know

13    what that meant as far as his side.  I just assumed it

14    meant they hadn't gained access either.

15         Q    But you didn't ask him specifically if they

16    had been able to access the server themselves?

17         A    Well, it was my understanding that when I

18    asked him if they had been able to access it because I

19    needed to get this equipment, he said that if I don't

20    have it locally, then, you know, I just don't -- I

21    don't have anything, that they hadn't been able to

22    access it.  That's generally what you would assume if

23    an IT guy tells you that.

24         Q    Right, but he -- I just want to be really

25    precise.  And I apologize, because we're lawyers, words

1    matter.

2            Did he -- at any point, did Mr. Patel ever

3    say to you explicitly that no one at the Secretary of

4    State's office, including CES, had been able to access

5    the EMS server that was taken?

6        A    He did not specifically say that, but I had

7    asked them if they had accessed it to be able to get

8    that -- if there was any way I could get that.  And he

9    responded in the negative to that, so I took that to

10   mean that, no, they had not.

11       Q    When you say "he responded in the negative,"

12   he said if you don't have it locally, you don't have

13   anything to produce for the open records, right?

14       A    Yes, he said if I don't have a copy of it

15   physically there in my office, then there's nothing

16   available to give them.

17       Q    Okay.  So as you sit here today, you don't

18   know for certain whether anyone at the Secretary's

19   office ever got access to the ICC or the EMS server?

20       A    No, I don't.

21       Q    And the conversation you had with Mr. Patel

22   about the open-records request, do you remember

23   approximately when that was?

24       A    Honestly, I'm not sure.

25       Q    Would you say the latter half of 2021, like

                                        Page 118

1     closer to the time that you left, or closer to the time

2     you arrived?

3          A     It was the latter half of 2021.  It's just

4     typically the elections office gets so many

5     open-records request, it's hard to keep track of them.

6          Q     Sure.  And was this a phone conversation or

7     an email exchange?

8          A     A phone conversation.

9          Q     So you never sent an email or a text message

10    or created any written document about replacing the EMS

11    server or the ICC?

12         A     No.

13         Q     Why is that?  It's not a small thing to get a

14    new ICC and a new EMS.  Why not create a report on

15    this?

16         A     Well, say in your office, if you contact an

17    IT guy with a problem, do you usually email him or do

18    you usually call him up because it's simpler?

19         Q     Well, for us it's easier to email.

20         A     I got you.  Well, for me it's easier to walk

21    through a problem talking, so that's just typically why

22    I do.

23         Q     Okay.  No, and I understand that, I

24    understand the phone call to Mr. Patel.  I'm sorry.

25    I'm asking a different question, which is:  The point

1    at which you -- the State replaced the ICC and the EMS

2    and you realized the password didn't work, I'm curious

3    why you -- why you didn't write a report to provide for

4    the Board, for example, or to have posterity for the

5    incoming -- you know, the next elections supervisor, on

6    what had happened here and what had been done.

7         A    Well, like I said, you have to understand

8    that the office was in quite a bit of disarray and

9    there was a lot to do in there.  So kind of trying to

10   tackle one emergency at a time, you know.

11        Q    But it never occurred to you to put anything

12   in writing on something as substantial as replacing an

13   ICC and an EMS server?

14        A    Well, what my job was, was there was a

15   problem and to get the problem fixed, so that's what I

16   did.

17        Q    What did you share with the Board, if

18   anything, the election board, about this situation?

19        A    We had a conversation about it because I was

20   letting them know that, you know, "Hey, we had some

21   guys from the State that had to come because there's a

22   problem with the server and I can't access it, and

23   we've got an upcoming election."

24        Q    And when was that approximately?

25        A    I'm not entirely sure.  It would have been

Page 120

1     around the beginning of May.

2         Q     So shortly after the situation arose, you

3     alerted the Board in some fashion that this had

4     happened?

5         A     Yeah.

6         Q     And who specifically did you alert?

7         A     I believe it was just brought up in the

8     meeting, as I may recall, but it's been a while.

9         Q     So your memory is Mr. Patel comes in,

10    replaces the server and the ICC, and then at the next

11    monthly board meeting, you provided some sort of oral

12    report to the Board on that?

13        A     Yes.

14        Q     And your memory is that -- were all the board

15    members present for that, to your recollection?  Were

16    any missing?

17        A     I'm not sure if everyone was there or not

18    because you know how it is trying to schedule meetings.

19        Q     And this would have been one of the meetings

20    in the conference room in your office that you

21    mentioned?

22        A     Yes, that's correct.

23        Q     And since you provided the Board a monthly

24    report, why not include this in that monthly report as

25    well when you were preparing that report?

Page 121

1        A    Honestly, I'm not sure if it was in the

2    minutes or not.

3        Q    The minutes of the board meetings, are those

4    public?

5        A    Yes, that's correct.

6        Q    Okay.  And would it surprise you that there's

7    no indication of discussion of this?

8        A    Not really.  Like I said, I was more

9    concerned with the election than going through the

10   issues of documenting down everything.  I don't

11   typically make it a point to document a lot of things

12   other than my emails, which are open, and my phone

13   records, which are open, and if I have some reason to

14   write a report to the State.

15       Q    It didn't -- it didn't trouble you that you

16   came in to an office where the prior two election

17   officials had been at least encouraged to leave for

18   what you said was not being honest or accurate about

19   their time records, it didn't trouble you that the EMS

20   server and the ICC were no longer even accessible?  You

21   didn't view that as a security concern?

22            MR. DENTON:  Object to the form.

23            THE WITNESS:  Definitely, because I

24        contacted the State about it.  But like I

25        said, it's not my job to speculate on what

Page 122

1          anything may or may not be.  It's my job to

2          report a problem if I have one, which I did.

3          Q     (By Mr. Cross)  And did you contact -- so you

4     didn't contact -- you didn't think this warranted

5     communicating to law enforcement, for example, like the

6     GBI?

7          A     No.  It's simply I couldn't get into it, they

8     came and replaced it and fixed it for me.  That was

9     that.

10         Q     Were you concerned that the fact that the

11    password never -- no longer worked, that maybe that was

12    an indication that someone had done something they

13    weren't supposed to do on that server and on the ICC?

14         A     Like I said, I don't get paid to speculate

15    and investigate.  That's why the State has

16    investigators.

17         Q     So from your perspective, you walked in, the

18    password didn't work, you did what you were supposed to

19    do, contacted the State, and you left it for them to

20    investigate and figure out if there was a bigger issue?

21         A     That's correct.

22         Q     And did you ever hear from anyone at the

23    State again about this particular issue, that the

24    password didn't work and they had to replace these two

25    pieces of equipment?

Page 123

```
 1              MR. DENTON:  Object to form.

 2              THE WITNESS:  No, I did not, but it's

 3         not unusual for the State not to follow back

 4         up with us.  I mean, there's 159 counties.

 5         They'd have to have more employees to follow

 6         up with everybody on everything, I'm sure.

 7         Q    (By Mr. Cross)  But we're talking about a

 8    county where the elections supervisor reportedly had

 9    been asked to leave for not being honest with time

10    records, where she put up a video that had the original

11    password for this machine publicly accessible, and then

12    the password didn't work when you showed up and all her

13    emails were gone.  That doesn't strike you as sort of

14    circumstances where somebody might want to dig a little

15    deeper beyond just replacing the equipment?

16         A    Well, like I said, I'm not paid to be an

17    investigator.  I'm paid to be an elections supervisor.

18    And normally my follow-up is if I get an invitation to

19    a State Election Board case.

20         Q    But you said it doesn't surprise you

21    initially they didn't follow up because they're busy

22    and they have lots of things, but we're not talking

23    about an ordinary situation here, right?  We agree on

24    that, this is not an ordinary situation?

25         A    Well --
```

Page 124

1           MR. DENTON:  Object to form.

2      A    -- here's the thing, they investigate all of

3    these things.  And usually I hear back about it because

4    there will or there will not an SEB case on it.  So

5    it's not unusual for me not to hear back from them

6    unless it's because it's going to the State Board.

7    That's not unusual for anybody, as far as I know.

8      Q    But as you sit here today, you don't -- you

9    never got any indication from anyone at the State,

10   Secretary's office, or the SEB, that any investigation

11   was conducted into why the password wasn't working,

12   right?

13          MR. DENTON:  Object to form.

14          THE WITNESS:  I have no idea whether

15          there was an investigation or not, and I

16          don't -- I don't get SEB case updates

17          anymore, so I have no idea if there's one

18          ongoing right now or not.

19     Q    (By Mr. Cross)  Is there anyone else you

20   communicated with about this password issue?

21     A    No.

22     Q    For example, did you reach out to former

23   colleagues in Lanier that you were close with or

24   Mr. Vickers?

25     A    Oh, well, I did -- I did reach out to Josh

Page 125

1    about it because I was a little confused on why it

2    would happen and all.  But he said, you know, just

3    contact about CES about it because that's the best

4    thing to do, you know.

5         Q    So you contacted Josh Black before you

6    contacted CES?

7         A    No.  I contacted CES already because I knew

8    that was what I was supposed to.  I just mentioned it

9    to him in passing because it was odd.

10        Q    I see.  Okay.  And what all did you discuss

11   with Mr. Black?

12        A    Essentially just that I had an issue getting

13   into the server and, you know, had to have our servers

14   replaced.

15        Q    And all he said was deal with CES?  Did he

16   offer any other views or opinions or concerns?

17        A    No, he didn't have anything else to offer.

18        Q    But he agreed it was odd, right?

19        A    I don't know if that happens on a regular

20   basis or not, but all I know is I didn't know how to

21   access the -- change a password, and I don't know

22   anybody else that knew how to.

23        Q    Anyone else you communicated about this?  You

24   didn't initially remember Mr. Black.  Is there anyone

25   else you can think of?

Page 126

1    A    Not to my knowledge, and that was more

2    because it was an odd election event and, you know, we

3    tend to talk amongst ourselves.

4    Q    Did you communicate with Mr. Vickers about

5    it?

6    A    I don't recall if I talked to Wesley Vickers

7    about it or not.  Usually I let him know if it's

8    something bigger.

9    Q    When they provided the new ICC and new EMS

10   server, did the State give you a new password?

11   A    Yes, that's correct.

12   Q    And it was another 16-digit password?

13   A    Yeah.  It was a different 16-digit password.

14   Q    And what's the guidance from the Secretary's

15   office on how you're supposed to maintain that

16   password?

17   A    Well, they said that we're not supposed to

18   put it on Post-it notes and things like that.  I mean,

19   you're supposed to keep it secure.

20   Q    Right.  Is there specific guidance on how to

21   secure it, like where you should maintain it, where you

22   should keep it, where you should store it?

23   A    No.  You're not -- you're just not supposed

24   to keep it out in a public place, anything like that,

25   where anybody else can access it.

Page 127

1        Q    Where did you keep it so that you could
2    remember it?  That's a long number to keep up with.
3        A    Yeah, that's a fairly long number.  Yeah, I
4    kept it on my person.
5        Q    When you say on your person, what do you
6    mean?
7        A    I mean whenever it's election time, I kept it
8    on my person.  Otherwise, I kept it locked up when it's
9    not election.
10        Q    And so -- and how did you keep it locked up?
11    It was, like, written down on a piece of paper?
12        A    Filing cabinet.
13        Q    Filing cabinet in your office?
14        A    (No audible response.)
15        Q    I'm sorry, did you say yes?
16        A    Yes, that's correct.
17        Q    And was it written -- like, what was it
18    written on?
19        A    I just had it written on a small piece of
20    paper.
21        Q    And that was locked in a filing cabinet in
22    your office?
23        A    Yes, that's correct.  And my office was
24    always locked as well.
25        Q    Who had access to the filing cabinet, just

Page 128

1      you and Ms. --

2           A      Nobody but me.

3           Q      Ms. Grantham did not?

4           A      No.

5           Q      And that was a key that you kept with you?

6           A      Yes, that's correct.

7           Q      And then when elections were going on, you

8      would keep that piece of paper with you just for easy

9      access?

10          A      Just whenever I had to type something in, I

11     kept it on me.  When I was having to set up the servers

12     for the election or whenever I was having to get back

13     into it at the end to tabulate, but not just

14     constantly, no.

15          Q      And a need never came to change the password

16     on any of that equipment while you were there, right?

17          A      No.

18          Q      When you provided the report on this to

19     the -- to the Board, what was the reaction of the Board

20     that you had to replace this equipment and the password

21     didn't work?

22          A      Well, I mean, naturally they were surprised

23     by it.

24          Q      Did anyone express concerns in that meeting?

25          A      Well, the main concern was, was I able, you

Page 129

1    know, to get the new system up and running and were we

2    going to be okay in the upcoming election.  And, of

3    course, all that was fine.

4         Q    Well, for example, did anyone say, "Hey, this

5    is kind of weird, we had this weird situation with

6    Ms. Hampton.  Maybe we should look into whether there's

7    a broader issue here"?

8         A    Well, generally speaking, I believe that was

9    just more or less deferred over to the State because,

10   you know, having dealt with state investigators

11   previously, they, I'm sure, knew that there was going

12   to be a state investigation.

13        Q    The Board knew there would be a state

14   investigation of this password situation, you're

15   saying?

16        A    I'm saying that, you know, they've had enough

17   experiences with them to assume that there's going to

18   be an investigation into that.  They'd already dealt

19   with quite a few.

20        Q    And why would you assume there would be an

21   investigation into that?

22        A    Because if we take a step, there's an

23   investigation.  I mean, it doesn't take much to get

24   one.  All it takes is one person saying one thing.

25        Q    Okay.  And understanding the Board would --

1    I understand your testimony, the Board would defer the

2    investigation to the State.  I was asking a more

3    specific question.

4         Did any of the board members in that meeting

5    express concern about what the situation might mean for

6    the security or the reliability of the equipment that

7    you had or whether Ms. Hampton or anyone else had done

8    something they weren't supposed to do?

9         A    Not any concerns over the equipment we had,

10   but like I said, we really changed the security

11   procedures since I'm there.  So it's more of a "Oh, no,

12   this happened in the past but things are better now"

13   kind of situation.

14        Q    You said you changed the security practices

15   in Coffee County.  How so?

16        A    Well, we just kept all the doors locked

17   unless there was a need not to.  You know, like all the

18   storage for the equipment was locked at all times, the

19   main door past the lobby that goes into where our

20   office space was was kept locked.  Whenever I wasn't

21   there, I locked the office door that I had, and the

22   server door was locked.  Essentially, we just changed

23   the ways we did things.

24        Q    And making sure everything was locked, that

25   was a change, that wasn't a historic practice at

Page 131

1    Coffee County; is that your understanding?

2         A    Yes, that's correct.  And I also kept regular

3    voters and people from going back there into the inner

4    office.  We just dealt with them at the countertop up

5    front.

6         Q    And that was a change from prior practice in

7    Coffee County?

8         A    Yes.

9              MR. CROSS:  Okay, why don't we take

10             another break.  Let's go off the record.

11             THE VIDEOGRAPHER:  The time is 12:05.

12        We're off the record.

13             (Recess taken.)

14             THE VIDEOGRAPHER:  The time is 12:27.

15        We're back on the record.

16        Q    (By Mr. Cross)  All right, sorry, just trying

17   to pull something up real quick.

18             All right, Mr. Barnes, I want to make sure I

19   got -- I understood something right.

20             So when the State took the ICC and the EMS

21   server, was that documented, like was there chain of

22   custody paperwork that you signed on that?

23        A    I don't recall signing chain of custody

24   paperwork.  Maybe I did.  I'm not sure.  It's been a

25   while, but...

Page 132

```
 1        Q    But you expect to, right?  That's a pretty
 2   major change, to bring in a new ICC and EMS and get rid
 3   of the old one.  There would be chain of custody
 4   documentation, right?
 5              MR. DELK:  Object to form.
 6              THE WITNESS:  If there was, the State
 7        would have that option.
 8        Q    (By Mr. Cross)  The County wouldn't keep a
 9   copy of their own chain of custody documents so that
10   there's a record of replacing the ICC and the EMS?
11        A    I'm not aware of any documentation about it
12   being taken, but then again, it was the state employees
13   coming to get it, so...
14        Q    And you don't recall them handing you
15   paperwork to sign?
16        A    I don't recall, no.
17        Q    But you agree that chain of custody is
18   important, right?
19              MR. DELK:  Object to form.
20              MR. DENTON:  Object to the form.
21              THE WITNESS:  Yeah, chain of custody is
22        important.
23              (Exhibit 3 marked for identification.)
24              MR. CROSS:  Grab Exhibit 3, if you
25        would, please, sir.  Just let me know when
```

Page 133

1          you've got it.

2                THE WITNESS:  I've got it.

3                MR. CROSS:  All right.

4          Q    (By Mr. Cross)  Do you see at the top there's

5     an email that you sent to Robert Hernandez on May 6,

6     2021?

7          A    Yes, that's correct.

8          Q    And Robert Hernandez is one of the state

9     investigators you mentioned before that you dealt with

10    while you were at Coffee County?

11         A    Yes.

12         Q    And you see in your email, you write in your

13    second sentence, "You will find a response letter from

14    our office attached."  Do you see that?

15         A    Yes.

16         Q    If you come down to the second page, you see

17    the letter that you sent to Mr. Hernandez there?

18         A    Yes.

19         Q    And at the end of that -- well, you point

20    out -- you start the letter by saying, "I assumed the

21    position of Supervisor of Elections on April 1st,

22    2021."  Do you see that?

23         A    Yes.

24         Q    In the last paragraph, you wrote, "The

25    Coffee County Board of Elections fully understands the

1    requirement of maintaining absentee ballot transfer

2    sheets and chain of custody documents, and will ensure

3    this occurs for any future elections."

4         Do you see that?

5    A    Yes.

6    Q    And yet as you sit here, you don't recall

7    whether there were any chain of custody documents

8    maintained by the County or even signed for something

9    as significant as replacing your ICC and EMS server; is

10   that right, sir?

11   A    Well, I understand your implications here;

12   however, there's not even paperwork around to be able

13   to fill out for this.  It's not like this is something

14   anybody ever planned to happen.  We don't even have a

15   chain of custody document for replacing servers.

16   Q    159 counties in Georgia, no one has ever had

17   to replace an ICC or a scanner -- or a server before?

18            MR. DENTON:  Object to form.

19            MR. DELK:  Object to the form.

20   Q    (By Mr. Cross)  Is that what you're saying?

21   A    I'm not sure about all the other 159

22   counties.

23   Q    You think in all the time that the State has

24   had electronic voting equipment across 159 counties,

25   they've never had to replace a server or an ICC

Page 135

1    scanner?

2             MR. DELK:  Object to the form.

3             MR. DENTON:  Object to form.

4             THE WITNESS:  The only thing I can

5         account to is I've never seen a form for

6         transferring those items.

7         Q    (By Mr. Cross)  And you don't think the State

8    has chain of custody documents, forms, or -- for

9    something as significant as replacing that election

10   equipment?  You just think --

11            MR. DENTON:  Object to form.

12            THE WITNESS:  I've never seen it.

13        Q    (By Mr. Cross)  When Mr. Patel took the

14   equipment, did you ask him, did you say, "Hey, think I

15   should sign something here, maybe we should have some

16   kind of documentation that we've done this"?

17        A    No, because both of the gentlemen that were

18   there were higher up [indiscernible] state employees,

19   and I trusted them.

20        Q    Has anyone ever indicated to you that the

21   Secretary of State's office actually cannot take that

22   equipment and the data on it without a court order?

23   Has anybody ever discussed that with you?

24        A    No.

25        Q    As the elections supervisor, did you have an

1    understanding of whether your office was supposed to be

2    legally the custodian of records of everything on that

3    equipment?

4        A    My understanding, there were legal custodians

5    of things, but how are you supposed to access it if you

6    don't have a password that works for it?

7        Q    Well, I'm not asking about access right now.

8    I'm just asking you.  You were the legal -- you

9    understand the County is the legal custodian of the

10   election data on those pieces of equipment, but you

11   handed them over to the State and didn't even document

12   it.  I mean, that's the testimony today, right, sir?

13             MR. DENTON:  Object to form.

14             THE WITNESS:  I turned it over to the

15        State.

16        Q    (By Mr. Cross)  You mentioned something

17   earlier, and I just want to make sure I didn't

18   misunderstand.  You said when they -- when Mr. Patel

19   first came in and was trying to access the data on the

20   EMS server, you said something to the effect that

21   they -- that they were able to move some data back-door

22   style?

23        A    Well, they were able to --

24             MR. DENTON:  Object to form.

25             THE WITNESS:  It ended up being mostly

                                                          Page 137

 1            just file folders.  There wasn't really any

 2            significant data that was transferred over.

 3            I'm not sure of the ins and outs as to why or

 4            why not because I'm not an IT guy.

 5                  MR. CROSS:  I see.

 6            Q    (By Mr. Cross)  That transfer, did they do

 7       that on site at Coffee County or they did that after

 8       they took the server?

 9            A    Yes, they attempted to do it on site, but I

10       think they had some issues.

11            Q    What did they connect to the server to do

12       that back-door-style transfer?

13            A    I'm not sure what they connected.

14            Q    Did they -- did you see them -- did they have

15       like a laptop that they connected to the server to

16       transfer data?

17            A    No, I didn't see a laptop.

18            Q    But your understanding is there were some

19       files they were able to pull off that EMS server in

20       some fashion?

21            A    Yes, that's my understanding.

22            Q    And that was something Mr. Patel explained to

23       you?

24            A    Yes.

25            Q    And do you know what was in those files?

Page 138

1          A     Like I said, mostly it was just empty files

2     and just, like, our basic election setup, but there was

3     not a large cache of information.

4          Q     And where would -- where did that -- when

5     that information was transferred, what was it

6     transferred to?

7          A     The new server.

8          Q     So there were some -- there were some files

9     that were taken off the old EMS server and transferred

10    to the new server?

11         A     Yes.

12         Q     Okay.  Are those files stored in a particular

13    location on the new server so that you can identify

14    them as coming from the old server?

15         A     Yes.

16         Q     Okay.  Do you remember what that -- what that

17    folder was called where all those stores were filed on

18    the server, the new server?

19         A     No.  It just -- it just had the election name

20    from the older election on it.

21         Q     And were those files from the prior server,

22    were those still on the new server when you left your

23    position in Coffee County?

24         A     That's correct.

25         Q     When you -- any of the calls that you had

Page 139

1  with Mr. Patel about replacing the ICC or the EMS

2  server, what phone did you use?

3       A    I believe that was just the office phone.

4  I've called him sometimes on my personal -- not the

5  personal cell, but work cell.  There should be records

6  of me having called him on that because once I had his

7  cell phone number, it was easier to contact him on the

8  work phone.

9       Q    Okay.

10      A    Or, rather, the work cell phone.

11      Q    And your work cell phone was, I think you

12  said, an iPhone 13?

13      A    Yes, that's correct.

14      Q    And you said the one that Ms. Hampton had was

15  older, was a Samsung Galaxy?

16      A    Yes.

17      Q    Did you ever have a Samsung Galaxy that you

18  used for work?

19      A    No.

20           (Exhibit 4 marked for identification.)

21      Q    (By Mr. Cross)  All right, Mr. Barnes, if you

22  would grab Exhibit 4, please, and just let me know when

23  you've got that in front of you.

24      A    All right.

25      Q    So you see at the top, Exhibit 4 is an email

Page 140

1     that you sent to Breanna Thomas on May 17, 2021?

2          A    Yes.

3          Q    And you'll see in this email thread -- well,

4     let's just be clear.  Ms. Breanna Thomas was the

5     training administrator at the State Elections Division,

6     right?

7          A    Yes, that's correct.

8          Q    And this email thread begins with an email

9     that you sent on April 5th of 2021 where you were

10    asking for access to Firefly and ENet.  Do you see

11    that?

12         A    Yes.

13         Q    And if you come down to the bottom,

14    immediately below your original email, do you see where

15    it says "Sent from my Verizon, Samsung Galaxy

16    smartphone"?

17         A    Let's see.  Yes, I do.

18         Q    And in your email, you wrote in the last

19    sentence, "This is my official County email."  Do you

20    see that?

21         A    Yes.

22         Q    Does this refresh your recollection that you

23    actually did use a Samsung Galaxy smartphone?

24              MR. DELK:  Object to the form.

25              THE WITNESS:  I did use a Samsung Galaxy

Page 141

1        smartphone at one point in time just to have

2        my work email connected to it, but I got

3        disconnected from that work email when I

4        left, which means I have no access to that

5        whatsoever, just like I don't have access to

6        it in any other capacity.  They deactivated

7        my account.  I thought I made that clear.

8        Q    (By Mr. Cross)  All right, so let's --

9   sorry -- let's just slow down.  I want to make sure I

10   have this right.

11        So you did use a Samsung Galaxy phone while

12   you were at Coffee County, right?

13        A    At one point in time, I had the email on the

14   phone.

15        Q    Okay.  And was that a phone that was issued

16   by the County, or was that a personal device?

17        A    No, this was my personal phone.  I just kept

18   county email on there so that way I could see if

19   anything popped up whenever I was off.

20        Q    Okay.  And how did you get your county email

21   onto your Samsung Galaxy smartphone?  Did the IT folks

22   at Coffee County or did the State help with that?

23        A    No.  I think I had it on my Outlook.

24        Q    So you were able to -- you were able to set

25   up your Coffee County Outlook email account on your

Page 142

1    personal Samsung device on your own?

2         A    Yes, because I had the username and password.

3         Q    Right.  And so while you were the elections

4    supervisor, you had your work email on both your work

5    phone and your personal phone just for convenience's

6    sake?

7         A    Yes, that's correct.

8         Q    And then when you left in December 2021, you

9    turned your work phone -- I think you said earlier you

10   handed that to Ms. Ernestine?

11        A    That's correct.

12        Q    Okay.  Are you sure you handed it to

13   Ms. Ernestine, or was it somebody else?

14        A    I believe it was Ms. Ernestine.  I might have

15   given it directly to Rachel.

16        Q    Okay.  Rachel Roberts?

17        A    Yes.

18        Q    Okay.  And then when you left, did you delete

19   your work email account from your personal phone?

20        A    Yeah, because they deactivated it.

21   Charles Dial killed the account, so I had already

22   deleted that off of there.  Plus there wasn't any

23   reason to keep it anymore.

24        Q    So when you left, it's your understanding

25   that Charles Dial deactivated your Office 365 Outlook

Page 143

1      account just like he did with Misty Hampton?

2                  MR. DENTON:  Object to the form.

3                  THE WITNESS:  I know he did.

4           Q     (By Mr. Cross)  You know he did, right, but

5      we do know that your emails -- the deactivation of your

6      email account did not delete your emails because you

7      made sure those were archived for Ms. Roberts, right?

8           A     What happened is he archived them over into

9      her email account under a subfolder, so they're all

10     still there.

11          Q     Right, so -- right, so he deactivated your

12     account, but your emails were still preserved in

13     Ms. Roberts' account?

14          A     Yes, because he made a subfolder and put,

15     like, "James Barnes" or something to that nature on

16     there and then pulled them over into that, so they

17     should all be there.

18          Q     Yeah.

19          A     That's how they're able to get them in a

20     Freedom of Information request, because it's still on

21     her commuter.

22          Q     Got it.

23                The calls that you made to Mr. Patel, were

24     some of those using your Samsung phone?

25          A     No.  I didn't have anybody's work number

Page 144

1       saved in that phone.

2            Q     So you never made any work calls on your

3       Samsung phone?

4            A     No, because I had all the people that I

5       needed to talk to with work on the actual work cell

6       phone.

7            Q     Did you search your Samsung phone for

8       responsive documents to the subpoena?

9            A     Yes, I did, but I don't have any.  Like I

10      said, the only reason why I had email attached on that

11      is because I'm not super iPhone savvy about how they

12      get it on there.

13           Q     Who deleted your work emails from your

14      Samsung phone?

15           A     I just took the account off of there whenever

16      I got done working there.

17           Q     So what specific steps did you take to see if

18      your work emails are still on that phone?

19           A     Well, I mean, I went back into the app that I

20      used for my email; but, I mean, like I said, I deleted

21      that whole section off of there when it became

22      inactive.

23           Q     Okay.

24           A     No reason to keep something that doesn't

25      work.

Page 145

1      Q    Do you know if -- the password for the ICC
2   and the EMS server, will the system lock you out if you
3   enter the wrong password after so many times?
4      A    I believe that's correct, that it does lock
5   you if you do it too many times.
6      Q    Is that a permanent lock until an IT
7   administrator comes in to fix it, or will it reset
8   after some period of time?
9      A    I'm not sure one way or the other, honestly.
10      Q    When Mr. Patel came in and tried the password
11   on the ICC and the EMS, was there any discussion of
12   whether it was just an inadvertent lockout because
13   someone had entered --
14      A    No.
15      Q    No, that wasn't discussed?
16      A    No.
17      Q    He just came in, tried the password, didn't
18   work, and he gave you new equipment?
19      A    Well, they tried the password multiple times,
20   but there wasn't like a lock screen or anything.  It
21   was the standard log-in screen.
22      Q    I see.  Okay.
23           When Mr. Patel came in, did you see him try
24   to circumvent the locked screen to try to get into the
25   operating system when the -- when the server was coming

Page 146

1    on and booting up?

2         A    No, I did not see that.

3         Q    Have you ever had IT folks -- for example, if

4    you had a computer problem, have they ever shown you

5    how they can get access to the operating system without

6    going through the log-in?

7         A    Well, I know that you can gain access to

8    operating systems sometimes depending on what the

9    software is, but doesn't that usually cause you to lose

10   the users?

11        Q    I will get out of my depth quickly, and I

12   don't want to speculate on something.  I'm just trying

13   to understand what your knowledge is.

14            You're aware that certain operating systems,

15   when a computer is booting up, you know, an IT person

16   can hit certain keys, for example, and that combination

17   of keys will bring up like a DOS operating system, for

18   example, a DOS prompt?  Have you seen that?

19        A    Yes.

20        Q    Okay.  Do you know whether that was tried by

21   Mr. Patel or Chris with the EMS server or the ICC?

22        A    I'm not sure if they tried to do anything

23   like that or not, because I think their main goal was

24   trying to preserve the data on there and not disrupt

25   anything.

Page 147

1          Q    Okay.  Do I understand correctly that for the

2     EMS server and the ICC, each county has just one

3     password to access those systems?

4          A    The password on that is -- each one is

5     different.  There's a 16-digit one that we use to get

6     into that, and then there's a separate password for the

7     ICC.

8          Q    I see.  Okay.

9               So that -- it was two passwords that weren't

10    working when you came in, for the ICC and for the EMS

11    server?

12         A    To my recollection, the ICC password was

13    actually functional, but the other one was not.

14         Q    Oh.  So why did the State take the ICC too?

15         A    I would assume just based -- that it's just

16    because there's a problem with this one, let's just

17    double-check and make sure there's not an issue with

18    that as well, which is understandable.

19         Q    Yeah, okay.  I see.

20              So it wasn't that you had a password issue or

21    that the ICC wasn't functioning; Mr. Patel made a

22    decision or someone at the State made a decision, since

23    they were taking the server, to go ahead and take the

24    ICC too?

25         A    Yes, that's my understanding.

Page 148

1      Q    Did you specifically have a discussion, did

2    you ask Mr. Patel, "Oh, why are you taking the ICC

3    since it works"?

4      A    No, because I assumed obviously there was

5    problems with the one and there could be issues with

6    that one as well.  I mean, if it's been compromised in

7    any way, I can't use it in an election.

8      Q    What do you mean by that?

9      A    I mean simply what I said, if it has been

10   compromised in any way, I can't use it in an election.

11     Q    Sorry, when you say "compromised," I'm just

12   trying to understand what you mean.

13     A    I mean if somebody had gone in and changed

14   the password on there, then that would mean that I

15   can't use that system because of what else could have

16   been done.  It's no longer trustworthy.

17     Q    So that -- I see what you're saying.  So the

18   concern was the password no longer working, that might

19   suggest a compromise and so you should replace both to

20   be safe?

21     A    Yes.

22     Q    In the time that you were the elections

23   supervisor for Coffee County, was anyone ever allowed

24   in the EMS server room apart from you and your

25   assistant?

Page 149

1         A    No.

2         Q    So in the whole time you were there, you're

3    not aware of anyone ever being in that room apart from

4    the two of you?

5         A    No, because I kept the key to it on me.

6         Q    So no one from the Coffee County election

7    board, for example, was ever in that room, to your

8    knowledge?

9         A    No.

10        Q    And was that one of the changes that you made

11   for security after Ms. Hampton left?

12        A    Well, now, hold on a second.  They were

13   allowed in there during the adjudication process

14   because, of course, as you know, you've got to have two

15   people from the -- each party and you've got to have an

16   election board member there.  So, yes, people were in

17   there during that period of time, but I was right there

18   at the actual server myself.  So nobody was ever in

19   there unsupervised.

20        Q    So for adjudication process, that happens in

21   the same room where the EMS server is?

22        A    Yes, because the ICC and the EMS are both

23   right there together.  They have to be networked

24   together by a cable.

25        Q    And so the ICC sits in the same room as the

Page 150

1      EMS server?

2           A    Yes.  They're both on the same desk,

3      actually.

4           Q    I see.  Okay.  And so the ICC is the central

5      scanner that's used for paper ballots, right?

6           A    Yes, that's correct.

7           Q    So, for example, when voters vote absentee in

8      Coffee County, the County runs those through the ICC,

9      right?

10          A    Yes.

11          Q    And who is responsible for running ballots

12     through the ICC?

13          A    I run the ballots through the ICC.

14          Q    Did your -- did you assistant ever do that?

15          A    No.

16          Q    That's not something poll workers did?

17          A    No.

18          Q    So you were the sole person to run ballots

19     through the ICC?

20          A    Correct.

21          Q    And then when there was an adjudication

22     process, who all was typically in the room for that

23     with the EMS server and the ICC?

24          A    Like I said, it would be the two

25     representatives from each party and two of the board

Page 151

1    members and myself would be in there.  And they would

2    be there basically just to say, yes, if there's an

3    issue, we all agree that this was voter intent.

4         Q    And is that the same setup in Lanier County

5    when you were there?

6         A    Yes, it's the same thing.

7         Q    Is it your understanding that's how all the

8    counties are set up, that the adjudication process

9    happens in the room with the EMS server?

10        A    Yes.

11        Q    All right, let me show you something else.

12             (Discussion off the written record.)

13             (Exhibit 5 marked for identification.)

14        Q    (By Mr. Cross)  All right, grab Exhibit 5, if

15   you would, please.

16        A    Okay, let's see here.

17             All right, I've got it.

18        Q    So I just want to make sure we are talking

19   about the same thing.

20             You said earlier that when you came in as the

21   elections supervisor in Coffee County, the password for

22   the EMS that Ms. Hampton had had was still posted to

23   the screen on her computer, just like you had seen in

24   that YouTube video.  Do you remember that?

25        A    Yes, sir.

Page 152

1          Q    And this is a screenshot we took from the
2     YouTube video.  Is this -- is this how you found it,
3     what's reflected here in Exhibit 5?
4          A    Yes, that's correct.
5          Q    Okay.  And the password that's on Exhibit 5,
6     that's the password you tried and it didn't work?
7          A    Yes.
8          Q    Okay.  Were you aware that after the November
9     2020 election, Coffee County had trouble certifying the
10    election results?
11         A    Yes, I do remember that.
12         Q    And what are you aware about that?
13         A    Apparently they were having trouble getting
14    their numbers to match up, so they refused to certify.
15         Q    And do you understand the report from
16    Coffee County was that when they ran the paper ballots
17    through the scanner again for recount, it would
18    generate a different total number of ballots, of votes,
19    than what was recorded on the election night?
20         A    Yes, I had heard that.
21         Q    Was that something you looked into when you
22    came on, to determine whether there was a glitch or a
23    problem or a compromise with the system in
24    Coffee County?
25         A    Whenever I had tested the system out, like I

Page 153

1    said, with logic and accuracy testing, I never saw any

2    discrepancies between what it was supposed to be and

3    anything else.

4         Q    Okay.  So you didn't yourself -- you didn't

5    participate in any kind of inquiry or investigation or

6    analysis to determine whether there was a problem with

7    the Coffee County system based on the certification

8    challenges they had reported?

9         A    Well, being as I got a completely new server,

10   if there was any issue in that, it would have been

11   resolved.

12        Q    And a new scanner?

13        A    I don't believe we got a new scanner.  But I

14   did clean that one because it had never been cleaned

15   before, and I didn't notice any issues with it.

16        Q    The ICC is the scanner, right?

17        A    No, the ICC is the computer that's attached

18   to the scanner.

19        Q    Right.  Sorry.  Sorry, I'm getting mixed up.

20             The computer attached to the scanner is what

21   was replaced?

22        A    Yes.

23        Q    Yeah, and so the EMS server and that computer

24   were replaced.  So, in your mind, if there had been a

25   challenge like that reported by Coffee County in late

Page 154

1    2020, replacing those pieces of equipment would have

2    resolved it?

3        A    Those were the only pieces of equipment that

4    ran, like, complicated software on there.  So if there

5    was an issue, that should have resolved it.  I know I

6    certainly didn't experience any kind of

7    [indiscernible].

8        Q    Okay.  So in the time that you were there,

9    did you ever run a recount after an election?

10       A    Let's see.  I don't believe that we had to

11   run a recount because we didn't -- we didn't have a

12   challenge on it.

13       Q    So you were never in the position that

14   Coffee County was in December 2020 when they counted

15   an -- they counted the ballots from an election twice,

16   both election night and then on a recount, to see

17   whether the tallies were the same?  That's not a

18   situation you found yourself in?

19       A    I was not in that situation in Coffee County,

20   only in Lanier.

21       Q    And, sorry, I forgot to ask something.

22            When -- the State has indicated that the --

23   or the documentation we've gotten from the State

24   suggests that the -- or indicates that the EMS server

25   and the ICC were replaced in Coffee County on June 8 of

Page 155

1    2021, but that sounds much later than you were thinking

2    because you reached out to Mr. Patel in April.

3              Does that date sound right to you?

4         A    I thought that it -- I thought that it got

5    replaced in May, but I could be wrong.

6         Q    Okay.  Do you recall -- did the State do

7    acceptance testing on the new EMS server?

8         A    Yes, they did.

9         Q    And did they do that locally on site in

10   Coffee County?

11        A    Yes.  It was -- it was all set up on site.

12        Q    So you were there for that?

13        A    Yes.

14        Q    In addition to the acceptance testing, did

15   they do logic and accuracy testing?

16        A    They ended up actually, you know, testing it

17   with the paper ballots just to make sure it scanned

18   everything okay.

19        Q    And that was all there on site with you in

20   Coffee County?

21        A    Yes, that's correct.

22        Q    Sorry, I don't remember off the top of my

23   head.  Were there any elections in Coffee County

24   between the time you started as the supervisor and

25   June 8?

Page 156

1          A     No, there weren't any elections in that

2     period of time.

3          Q     Did you keep a calendar when you were there?

4          A     Yes, we had a calendar.

5          Q     Do you recall, like, creating an appointment

6     or a meeting, something on a calendar that would have

7     indicated when they came in to replace the server?

8          A     No, not that I can think of.  I know that we

9     had to have -- well, let me see.  I think that we

10    had -- we weren't going to end up doing -- yeah, we did

11    a primary election for the city council, and I want to

12    say that was held sometime in June.  And that was the

13    reason why I had reached out to them, because we had to

14    make sure back in May, with a little bit of time, you

15    know, that everything was going to be good to go.

16         Q     Okay.  And did Mr. Patel or Chris or anyone

17    else, did they send you an email or text message or

18    anything saying, "Hey, this is when we're going to

19    come, this is the date and time"?

20         A     No.  What he said when I had talked to him

21    was that they would just be there next week.

22         Q     But they set a specific date and time so you

23    knew they were coming, right?

24         A     Yes.

25         Q     And all of the communications about this were

Page 157

1    oral, nothing was in writing?

2        A    Unless he sent me a text message on the work

3    phone.  That's possible.

4        Q    Do you recall whether he sent you a text

5    message on your work phone?

6        A    He may have in reference to that, as far as

7    when he was coming.

8        Q    So sometimes, like when you're dealing with

9    CES on IT issues, they might shoot you a text?

10       A    Yeah.

11       Q    On your work phone?

12       A    Yes.

13       Q    Do you know why they replaced just the ICC

14   computer and not the scanner itself?

15       A    I'm not sure because I don't know what their

16   policy is.

17       Q    So you didn't ask why they were taking the

18   ICC computer but not the scanner?

19       A    No.

20       Q    When you came in to Coffee County, one of the

21   things that you found that had been left behind was a

22   business card from an organization called Cyber Ninjas,

23   right?

24       A    Yes, that's correct.

25       Q    And when you found that, you alerted

Page 158

1    Chris Harvey to it at the State, right?

2         A    Later on I notified him because, honestly, I

3    didn't even know what it was at the time.  I just make

4    it a practice of keeping all business cards from a

5    former employee just in case I ever need it.

6         Q    I see.  So when you first came in on

7    April 1st, went through documents, files, things in the

8    office, you found the Cyber Ninjas card at that point,

9    but you didn't know what it was?

10        A    That's correct.

11        Q    And then about a month or so later, you

12   alerted Mr. Harvey to it; does that sound about right?

13        A    Yes, that's correct.

14        Q    What was it that happened in the intervening

15   weeks that made you think "I should probably let

16   Chris Harvey know about this"?

17        A    Well, there was a letter -- or email, rather,

18   from Dominion that circulated around to all the county

19   offices warning about, you know, third-party actors

20   possibly trying to gain access to the servers, and

21   Cyber Ninjas was one of the groups that was mentioned,

22   and also the situation where they had done the forensic

23   audit in Arizona was mentioned as an example of what

24   they might be trying to do.  And when I noticed that, I

25   figured, you know, hey, I've got a Cyber Ninjas card

Page 159

1      over here; maybe I should forward that along and let

2      the State take over on that.

3           Q    So you emailed Mr. Harvey and let him know

4      about the card, right?

5           A    Yes, that's correct.

6           Q    Why did you email him instead of calling him?

7           A    Just because I wasn't sure what to do with

8      it.  I had contacted a former supervisor about it and

9      said, "Hey, this doesn't look good."  And he said,

10     "Well, why don't you go ahead and email Chris and let

11     him know."  So that's what I did.

12          Q    So when you came in and you realized that you

13     couldn't get access to the ICC and the EMS server, you

14     didn't email anyone about it, you only used the phone,

15     but when you thought about the Cyber Ninjas card might

16     be an issue, you emailed.  Why treat them differently?

17               MR. DENTON:  Object to form.

18               THE WITNESS:  Well, just because it was

19          suggested that I email Chris Harvey, so

20          that's what I said.  I mean, there's no

21          special, magic sauce to it.  It's just how it

22          happened.

23               MR. CROSS:  Okay.

24               (Exhibit 6 marked for identification.)

25          Q    (By Mr. Cross)  So pull up Exhibit 6, if you

Page 160

1      would, please.

2              I'm sorry.  Was Josh Black the one who

3      suggested you email Mr. Harvey?

4          A    Yes, that's correct.

5          Q    Just let me know when you've got this.

6          A    I've got it.

7          Q    All right.  So if you look at the first page,

8      you'll see there's an email thread there.  Do you see

9      that?

10         A    Yes.

11         Q    And if you come down to the bottom, there's

12     an email from you to Chris Harvey on May 7, 2021.  Do

13     you see that?

14         A    Yes.

15         Q    But it's -- the full email is not there, but

16     you can see it reads, "The Dominion email today,

17     pertaining to Cyber Ninjas, was alarming to me.  When I

18     took over at the Coffee County office, the attached

19     business card was at the base of Misty Hayes' computer

20     monitor."

21              And then if you scroll down, you'll see the

22     whole email of what you said.  Do you see that?

23         A    Yes.

24         Q    And then you say, "I thought nothing of it

25     until I heard about the situation in Arizona with the

Page 161

1      DOJ.  If she did not use them, she was at the very

2      least in contact."  Do you see that?

3          A    Yes.

4          Q    And then if you go all the way to the bottom,

5      you'll see a copy of the Cyber Ninjas card that you

6      sent to Mr. Harvey.

7          A    Yes.

8          Q    What was the situation in Arizona with DOJ

9      that prompted your concern?

10         A    Well, that was mentioned in that Dominion

11     email, you know, where the Department of Justice had

12     come in and stopped that -- stopped them from, you

13     know, tampering with the equipment.  So I just felt

14     like it would be pertinent to look into that.

15              Part of the reason is -- you can see why that

16     was sent in email form, is because I scanned the card

17     just to show, hey, this Douglas Logan guy had a

18     business card here.

19         Q    Got it.  Yep.

20              And then -- so do I understand correctly your

21     concern was you got an -- you got the alert from

22     Dominion, you understood the situation with DOJ in

23     Arizona --

24         A    Yes.

25         Q    -- with Cyber Ninjas, and you thought there

1    at least potentially could be a similar compromise

2    issue in Coffee County, and so you thought you should

3    alert Chris Harvey to that?  Is that fair?

4         A    Yes.  And, of course, I was also, you know,

5    thinking about the situation -- if somebody had come in

6    and, you know, touched any of the equipment or done

7    anything.

8         Q    Right.  And did it occur to you that that

9    might explain why the password no longer worked on the

10   ICC and the EMS, that someone like Cyber Ninjas may

11   have come in and done something?

12        A    Yeah, the thought did cross my mind.

13        Q    And was that something you discussed with

14   Mr. Harvey or Mr. Patel or others when they were

15   looking into the server and replacing it?

16        A    Well, when I was talking with them about it,

17   part of my concern was that, you know, potentially

18   somebody had done something to that server.

19        Q    Did you speak specifically with Mr. Patel,

20   for example, about maybe it was Cyber Ninjas?

21        A    Honestly, I thought that I had sent that to

22   Chris before they ever got the servers, but it may have

23   been after that.

24        Q    So your thinking is that you sent this email

25   to Mr. Harvey with the Cyber Ninjas card before they

Page 163

1    replaced the server and the ICC?

2         A    That was what I thought.

3         Q    Okay.

4         A    Honestly, to be sure about that, I'd have to

5    see the call log on the phone.

6         Q    Right.  And that timing would suggest that

7    you didn't realize that the passwords weren't -- that

8    the password wasn't working on the server until

9    sometime after your May 7 email?

10        A    That's what I thought, yes.

11        Q    So now your recollection is --

12        A    Well, I'm not sure which one came first, but

13   I don't recall having a conversation with them, when

14   they came, about Cyber Ninjas.

15        Q    "Them" being Mr. Patel and Chris from --

16        A    Yes, that's correct.

17        Q    So you don't recall ever speaking to them

18   about Cyber Ninjas?

19        A    No, I don't recall.

20        Q    You only communicated with Chris Harvey?

21        A    Yes, that's correct.

22        Q    And so Mr. Harvey here writes you back four

23   days later.  You sent your email on a Friday afternoon.

24   He responds on Tuesday, May 11th.  "I think it might be

25   prudent to see if there has been any contact between

Page 164

1      the person on the card and anyone in your office and/or
2      if they have had any access to any of your equipment.
3      I have let our investigations division and CES know,
4      and they might follow up with you."  Do you see that?
5           A    Yes.
6           Q    So a few questions on this.  Did anyone ever
7      follow up with you from the State on this issue?
8           A    I never heard anything back from anybody at
9      the State.
10          Q    So no further communications from anyone at
11     the State about the concern that Mr. Harvey notes here
12     about whether there might have been access to any of
13     the equipment at Coffee County?
14          A    No, I never heard anything else back from
15     them.
16          Q    And you can see on Mr. Harvey's email back to
17     you, he copies Frances Watson.  Do you see that?
18          A    Yes.
19          Q    And do you recall she was formerly the head
20     of the investigations unit at the Secretary's office?
21          A    Yes, that's correct.
22          Q    So you never heard from Ms. Watson?
23          A    No.
24          Q    Never heard -- you mentioned a number of
25     investigators that you spoke with during your time at

Page 165

1      Coffee County.

2              None of those or any other investigator ever

3      raised any issue with you at all about Cyber Ninjas or

4      potential access to Coffee County?

5          A    No, I never heard from any of them.

6          Q    And Michael Barnes here, head of CES, also

7      copied on your email -- do you see that --

8          A    Yes.

9          Q    -- never heard from Mr. Barnes about this

10     issue?

11         A    No, sir.

12         Q    And, again, the State has provided a document

13     indicating that the EMS server was replaced on June 8,

14     so about a month after this, and already we can see

15     that Mr. Harvey has alerted CES to the Cyber Ninjas

16     issue.  But do I understand correctly that throughout

17     all of your communications with CES on replacing that

18     server, no one ever suggested to you that it had

19     anything to do with the Cyber Ninjas concern or an

20     improper access concern?

21         A    I don't recall any conversation of that.

22         Q    So no one from the State ever came to

23     Coffee County, for example, to look at any of the

24     equipment there forensically to determine whether there

25     had been any improper access while you were at that

Page 166

1     office; is that right?

2              MR. DELK:  Object to form.

3              THE WITNESS:  Not while I worked

4          there.

5          Q    (By Mr. Cross)  No one came in and looked at

6     any hard-copy files while you were there?

7          A    I don't recall anybody coming to look at

8     anything like that.

9          Q    No one spoke with your assistant, to your

10    knowledge?

11         A    No, not to my knowledge.

12         Q    No one spoke with any member of the board, to

13    your knowledge?

14         A    As far as the board goes, I couldn't say.  I

15    never heard anything from them about it.

16         Q    But if an investigator from the State had

17    contacted your assistant or a board member about

18    possible improper access to voting equipment, would you

19    expect them to let you know that that outreach had

20    occurred, given you were the elections supervisor?

21         A    I would tend to think I would have heard

22    about it.

23         Q    Okay.  Did you follow up with Mr. Harvey

24    after his May 11th email about the Cyber Ninjas card

25    and potential improper access to the equipment there?

Page 167

1        A     No, I never reached back out to him.  I

2    wasn't able to ever find anything.

3        Q     Why didn't you follow up with Mr. Harvey or

4    Mr. Barnes or anyone else?

5        A     Like I said, because when I looked into it,

6    apparently, you know, the video cameras in the office

7    are set on a certain time period, and then after that

8    it kind of deletes it to make room for more, so I

9    didn't have any footage to look at from back then or

10   anything like that, so I just kind of left it to them.

11       Q     So the election -- the head of elections from

12   the State of Georgia told you on May 11 that there was

13   at least some concern about access to any of your

14   equipment, your election equipment, and he was going to

15   have the State investigate it, and you never heard from

16   anyone and you didn't -- you didn't want to follow up

17   yourself to understand whether there was a concern you

18   might need to deal with?

19             MR. DELK:  Object to form.

20             THE WITNESS:  Like I said before,

21        sometimes they have a backlog of

22        investigations and they may end up having to

23        come back to it at a later date.  I may just

24        simply not have heard from them yet.  It's

25        entirely possible they'll contact me at some

Page 168

1           point and follow up.

2           Q    (By Mr. Cross)  So Coffee County continued to

3      use election equipment -- BMDs, poll pads, printers, a

4      scanner, a central scanner, polling place scanners --

5      in elections in 2021, while you were there, after the

6      head of elections for the State said that there was a

7      potential access concern that needed to be

8      investigated; is that right?

9           A    We used the same --

10               MR. DENTON:  Object to form.

11          A    -- poll pads and ballot-marking devices.

12          Q    I'm sorry, can you say that again?

13          A    We use the same poll pads and ballot-marking

14     devices and scanners.

15          Q    And the same printers, right?

16          A    Yes.

17          Q    And you said the same scanners?

18          A    Yes.

19          Q    After the email you got from Chris Harvey on

20     May 11th, right?

21          A    Yes, that's correct.

22          Q    If you see here, Ms. Watson sends the email

23     internally to Pamela Jones within about half an hour of

24     Mr. Harvey's email.  Do you see that?

25          A    Is it just further down in this one?

Page 169

```
 1        Q    It's the very top, the most recent email on
 2   the first page.
 3        A    Yes, I see it.
 4        Q    And here Ms. Watson, the head of the state
 5   investigative unit at that time, writes, "Can you
 6   contact the County and verify what, if any, contact
 7   Cyber Ninjas had with any election equipment?"  Do you
 8   see that?
 9        A    Yes.
10        Q    And you're saying you never heard from
11   Pamela Jones?
12        A    I never heard from anybody asking about
13   contact with the equipment or Cyber Ninjas.  It's
14   possible that they reached out and asked somebody else.
15        Q    Well, it's only you and your assistant
16   responsible for elections in the state beyond -- or in
17   Coffee County beyond the Board, right?
18        A    Yes, that's correct.  I'm just saying it's
19   possible that they reached out to somebody at the
20   actual county commissioner's office because, of course,
21   we have cameras in there but we don't have a terminal
22   for them on site.
23        Q    All right.  So you mentioned cameras a couple
24   of times.  I want to make sure I understand that.  What
25   cameras are you talking about?
```

Page 170

1          A     Just the cameras in the office.

2          Q     And that's in the office where you work or

3     worked?

4          A     Yes.

5          Q     And what cameras were in the election office

6     at Coffee County when you were there?

7          A     There was one in the front lobby.  There was

8     one over there, let's see, near Sandy Grantham's desk.

9     And then there was one down in the big room where

10    there's a portion for early voting.

11               THE WITNESS:  My headset is about to

12          die, so I'm going to have to switch over to

13          the computer.

14               MR. CROSS:  Okay.

15               (Discussion off the written record.)

16          Q     (By Mr. Cross)  So no -- there was no cameras

17    in your office?

18          A     No, not in that office.

19          Q     And no cameras in the room where the EMS

20    server and the ICC were?

21          A     No.  I don't -- I don't believe that there's

22    a camera in the big room where the scanners are.

23          Q     And the only access to the room with the EMS

24    server is through a door specifically to that room, but

25    they first have to get into your office?

Page 171

1        A    Yes, sir.

2        Q    And you said you yourself looked to see if

3     there was any footage after you found the Cyber Ninjas

4     card; is that right?

5        A    Yes.  I contacted Charles Dial just to see,

6     you know, what, if anything, there was, if anybody had

7     come.  I asked board members about it as well.

8        Q    And did Mr. Dial tell you there was no

9     available footage for those cameras?

10        A    Yes.

11        Q    Did he explain why that was?

12        A    He said it had already been overwritten.  It

13     only kept maybe like about a three-month period on it.

14        Q    And where is the footage from those cameras

15     maintained?  Who has that?

16        A    That would be up there at the county office.

17        Q    So did you alert -- or did you reach out to

18     Mr. Dial about this before or after you emailed

19     Mr. Harvey?

20        A    I'm not sure about that.

21        Q    Was it roughly around the same time?

22        A    Yeah, roughly around that time period,

23     because I followed up, basically, and did what Chris

24     had recommended me to do.

25        Q    Chris Harvey?

1          A     Yes.

2          Q     What did Chris Harvey recommend you to do?

3          A     In that email, he says it would be prudent to

4     see if anybody had gained access to the county office.

5     So that's what I was more or less trying to find out,

6     were there any unusual people that had been coming and

7     going, but that footage was not available.

8          Q     I see.

9                Was there anything else you did besides see

10    if that footage was available?

11         A     Well, that was mostly all I could do.  I did

12    talk with the board members and some people about had

13    there ever been anybody, but nobody had any knowledge

14    about it, and the poll workers didn't know of anybody

15    having come in either, so...

16         Q     All right.  So you contacted Mr. Dial.  Did

17    you email him, or how did you contact him about this?

18         A     I called him about it.

19         Q     Did you put anything in writing with Mr. Dial

20    about this issue?

21         A     No.

22         Q     With Mr. Harvey, anything in writing besides

23    the email thread we just saw?

24         A     No, because that was the only contact I had

25    with him about the issue.

Page 173

1          Q    So when Mr. Harvey emailed you back on

2     May 11th, you didn't respond at all, you didn't call

3     him, you didn't send him an email, nothing?

4          A    No, I didn't respond back because he had said

5     that somebody would probably be in contact with me.

6     And, like I said, I didn't find anything, so...

7          Q    Did you ever speak on the phone with

8     Mr. Harvey about this?

9          A    No.

10         Q    Did you ever speak on the phone with

11    anyone beyond Mr. Dial?  It sounds like Mr. Dial was

12    the only person you spoke with on the phone about the

13    Cyber Ninjas issue.  Is that it?

14         A    No.  I believe what it was is initially I

15    talked with Wesley about that; and, you know, he had

16    gotten in touch with Mr. Dial about that issue.  Any

17    time it's tech stuff, pretty much you have to go

18    through Charles because the County has a pretty

19    closed-up system.  We can't even add an app onto our

20    computers without having him first.

21         Q    And by "Wesley," you mean Wes Vickers?

22         A    Yes, that's correct.

23         Q    So you also spoke with Mr. Vickers about the

24    Cyber Ninjas concern?

25         A    No, I don't believe I spoke with him about

Page 174

1    the Cyber Ninjas.  I would just talk with him about the

2    video footage or seeing if there was anybody

3    suspicious.

4         Q    I see.  Okay.

5              Did you explain to Mr. Vickers about why you

6    were asking about whether there was anything

7    suspicious?  Did you tell him about the Cyber Ninjas

8    card?

9         A    No, I don't recall telling him anything about

10   the card.

11        Q    So you just contacted him and said, "I'm

12   looking to see if there's been any suspicious activity

13   around the office"?

14        A    Yes.  But, I mean, you know, we had -- we had

15   to replace the server, so it wasn't unusual to be

16   checking.

17        Q    And you said you had to replace the server.

18   Why does that -- why does that matter here?

19        A    It doesn't.  It's all interconnected in.

20   It's the same kind of stuff.  But, no, I didn't

21   specifically go into details about Cyber Ninjas with

22   him because, at that point in time, it was more or less

23   conjecture and speculation.  I didn't know that anybody

24   had specifically talked with them or if they were just

25   at a conference and saw a business card and picked it

Page 175

1   up.  I mean, there's no way for me to know that.  I

2   wasn't even really sure anything had happened.  It's

3   just, you know, "better safe than sorry" was my theory.

4        Q    You didn't -- you didn't reach out to

5   Ms. Hampton and ask her about the card?

6        A    No.

7        Q    Or talk -- same with Ms. Riddlehoover, you

8   didn't ask her about the card?

9        A    No.

10        Q    You said you did contact the board members

11   about this issue.  What did you communicate with the

12   board members about this issue, the Cyber Ninjas card?

13        A    Just more or less that we had -- that I had

14   found it, you know, and that I emailed the State about

15   it just to be on the safe side.

16        Q    Did you share Mr. Harvey's email with anyone

17   on the board?

18        A    No.

19        Q    I'm sorry, what?

20        A    Honestly, at -- no, I didn't.  Honestly, at

21   the time, I just sent it to him just to be on the safe

22   side.  I didn't even really think there was anything to

23   it.

24        Q    Well, you wrote an email that was quite

25   specific; you were in the context of having just

1     received an alert from Dominion about people trying to

2     get improper access to voting equipment; you

3     specifically referenced an issue in Arizona where DOJ

4     was involved and specifically Cyber Ninjas was involved

5     in these situations, the Dominion alert; and you sent

6     that on to the head of elections for the entire state

7     of Georgia.  So you certainly had some concern here,

8     right, that Cyber Ninjas may have been in Coffee County

9     or at least been in contact --

10          A     That they may have been, yes --

11                MR. DELK:  Object to form.

12          A     -- but I didn't know for sure.

13          Q     Right, you didn't know for sure, but you had

14    a concern about that, and you rightly raised it with

15    the State?

16          A     Yes, that's correct.

17          Q     You never heard back?

18          A     I never heard anything back other than that

19    email response.

20          Q     When you were -- and I'm going to wrap up

21    here soon, Mr. Barnes -- when you were in your position

22    as the elections supervisor, did you ever hear from

23    anyone that in January of 2021, sometime around January

24    2021, individuals had come in to the Coffee County

25    election office and had gotten access to the EMS server

Page 177

1    or other equipment in there?

2        A    I was never privy to any information about

3    that.

4        Q    Have you since read any press reports about

5    this situation?

6        A    Yes, sir, I did.

7        Q    We just lost you.  Are you still there,

8    Mr. Barnes?

9        A    [Audio drop] Washington Post article.

10       Q    Sorry, we lost you for a second.  Are you

11   still there?

12       A    Can you hear me now?  I had a power glitch

13   because it's storming pretty bad here --

14       Q    Okay.

15       A    -- but what was the question again?

16       Q    I just said you've read some press, and you

17   had mentioned a Washington Post article.  What

18   Washington Post article did you read?

19       A    It was the one that came out here a few

20   months ago.

21       Q    And in that article -- this is the one that

22   reported that there were indications that some

23   individuals associated with the "Stop the Steal"

24   movement may have gotten access to the Coffee County

25   EMS server in or around January of 2021, right?

Page 178

1          A     Yes, that's what I read.

2          Q     And you're saying that article is the first

3     time you had ever heard that that may have happened?

4          A     Yes, that's correct.

5          Q     So in all the time you were working as the

6     elections supervisor, you never heard from the State,

7     for example, about any investigation into that

8     situation that was reported in the Washington Post?

9          A     No, I never heard anything about that.

10              THE COURT REPORTER:  I'm sorry,

11         Mr. Barnes, can you repeat your answer?

12              THE WITNESS:  I never heard anything

13         about that.

14              THE COURT REPORTER:  Thank you.

15         Q     (By Mr. Cross)  Beyond the press reports that

16    you just mentioned, have you -- have you ever heard

17    of -- that anyone obtained copies of election software

18    from Coffee County?

19         A     No.  It's only been from the press reports

20    that I've heard it.

21         Q     Did you alert anyone at Dominion to the

22    concern about the Cyber Ninjas card?

23         A     No, I did not.

24         Q     So no communications with anyone at Dominion

25    about that?

Page 179

```
 1        A    No, but typically we didn't really
 2   communicate with Dominion because they've already, you
 3   know, turned the equipment over to the State, and then
 4   they brought it to us, so...
 5             MR. CROSS:  All right, Mr. Barnes, I
 6        think I am done, but can we go off the record
 7        and just give me like two minutes to check
 8        with my group before I hang it up?
 9             THE WITNESS:  No problem.
10             THE VIDEOGRAPHER:  The time is 1:29.
11        We're off the record.
12             (Recess taken.)
13             THE VIDEOGRAPHER:  The time is 1:43.
14        We're back on the record.
15        Q    (By Mr. Cross)  All right, a few more things,
16   Mr. Barnes, and then I'm almost done.
17             Did you ever speak with Chris [sic] Dial or
18   anyone else in the IT department about trying to get
19   access to the EMS server when you were having trouble
20   with the password?
21             MR. DELK:  Charles Dial, you mean?
22             MR. CROSS:  Charles Dial.
23             MR. DELK:  Okay.
24             MR. CROSS:  Yeah.
25             THE WITNESS:  No, I didn't talk to any
```

Page 180

1          of them about it.  They didn't have access.

2          Q    (By Mr. Cross)  Did you ask anyone there

3     whether they could help, or you just went straight to

4     CES?

5          A    No, I went straight to CES.

6          Q    In the time that you were an election

7     official at Lanier County or Coffee, were there any

8     requests that came in for forensic images of any of the

9     voting equipment or data or software?

10         A    I didn't get any request for anything

11    forensic at all, so no.

12         Q    So no open-records request, for example,

13    asking for forensic images of anything?

14         A    I had gotten some open-records requests at

15    Coffee asking for the ballot images, yes.

16         Q    And that was what I was going to ask you

17    next, about ballot images.

18              Tell me about the open-records request for

19    ballot images in Coffee County.

20         A    It was more or less just a request for those

21    because that was something that was allowable

22    [indiscernible] open records.

23         Q    That was something that was what?

24         A    That was allowable to be requested.

25         Q    Sorry, you're breaking up again.

Page 181

1       A      That was allowable to be requested through

2    open-records requests.

3       Q      So when you were the elections supervisor in

4    Coffee County, did the County provide any ballot images

5    in response to open-records requests?

6       A      I didn't have any ballot images on the server

7    other than the ones from the election I conducted.

8       Q      Did you ever provide any ballot images at all

9    from any election while you were there?

10      A      None were ever requested for the ones that I

11   did, so no.

12      Q      So the requests that came in, the

13   open-records requests, were only for elections that

14   preceded you?

15      A      Yes, that's correct.

16      Q      And you didn't have the ballot images because

17   the server was gone?

18      A      That's right.

19      Q      Did you say that's right?

20      A      That's correct.

21      Q      Were there any open records requests for cast

22   vote records?  Would you consider that similar to

23   ballot images, or is that different?

24      A      I believe that we had some for that as well.

25      Q      And did you -- go ahead.

Page 182

1      A    I don't have any of those either from the old
2    server.
3      Q    So all the cast vote records that came in to
4    Coffee County when you were there were for elections
5    that preceded you?
6      A    The only ones that were on the server once it
7    got replaced were from when I [indiscernible].
8      Q    Sorry, say that again.  You're getting
9    garbled again, sir.
10     A    I'm sorry.  The only ones available on that
11   machine, the new server, are the ones I conducted.
12     Q    Right.  And so all the open-records requests
13   that came in for cast vote records were for elections
14   that preceded you?
15     A    Correct.
16     Q    Were all of the open-records requests that
17   came in while you were at Coffee County for ballot
18   images or cast vote records, were they all specifically
19   related to the November 2020 elections?
20     A    I believe most of them were November 2020,
21   but I think one also covered the January runoff as
22   well.
23     Q    When you were working in Lanier County or
24   Coffee County, were there ever any requests that came
25   in for access by third parties to voting equipment?

Page 183

1         A     I've never heard of it.

2         Q     Are you familiar with Doug Logan?

3         A     I recognize the name from the Cyber Ninjas

4    card, and I looked it up just to see who it is.

5         Q     But you don't know him, you've never had any

6    contact with him?

7         A     No, I don't know him.

8         Q     Are you familiar with Scott Hall?

9         A     After the Washington Post article, yes.

10        Q     So that was the first time you had heard of

11   Scott Hall?

12        A     Yes, that's correct.

13        Q     Ever had any contact with him at all?

14        A     No.

15        Q     Ever heard of Scott Hall or Doug Logan being

16   in Coffee County?

17        A     Prior to the Washington Post article, no.

18        Q     Are you familiar with Ben Cotton [phonetic]?

19        A     No, I don't recognize that name.

20        Q     Ever heard of Scott Hall or Doug Logan being

21   in any Georgia county apart from the Washington Post

22   article you read?

23        A     No.  That's the only knowledge I have of it.

24        Q     One of the things you -- you talked earlier

25   about cleaning up the office, that it was in disarray.

Page 184

1      One of the things you did was to provide to the clerk

2      of the court, the superior court in Coffee County,

3      certain election records that Misty Hampton had not

4      provided, right?

5           A     Yes, that's correct.

6           Q     Did someone named Deb Cox help with that?

7           A     She was initially who they had contacted, as

8      the regional coordinator, to try to help take stock of

9      the situation.

10          Q     So did Ms. Cox help you sort of pull together

11     the materials that you provided to the clerk of the

12     court?

13          A     Yes.

14          Q     And what specifically do you recall providing

15     the court clerk?

16          A     Copies of some of the files that are supposed

17     to be turned over to her because there was a -- kind of

18     a mess of files all over the place.

19          Q     Did you provide the clerk of court, for

20     example, election project files?

21          A     No, because honestly, once I went through

22     there, I couldn't find the election project files.

23          Q     Did you look for them when you came in to the

24     office?  Was that one of the things you tried to track

25     down?

Page 185

1          A     Yes, that's correct.

2          Q     And would those -- those normally would be on

3     the EMS server; is that right?

4          A     Yes, and usually it's also best practice to

5     have them saved on a thumb drive as well.

6          Q     So when you came in on April 1st and

7     obviously had a lot to clean up, one of the things you

8     tried to do was to find the election project files on

9     the EMS server or on a flash drive; is that right?

10         A     Yes, that's correct.

11         Q     So you realized pretty quickly -- like right

12    when you came in to the office, you realized quickly

13    that the EMS server password you had didn't work

14    because it wouldn't work to get you access to the

15    project files?

16         A     I didn't initially try to get the project

17    files off of there right off the bat.  I originally

18    tried to find it through the thumb drive.

19         Q     Right.  When you didn't find a thumb drive,

20    you would have turned pretty quickly to the EMS server

21    as the next best source, right?

22         A     Yeah, the EMS server would be a good source

23    to get those from.

24         Q     Right.  So sometime within the first few days

25    or so, you tried the password to the EMS server, trying

1    to clean up, find the election project files, it didn't

2    work; is that right?

3         A     No.  I didn't try the EMS server until later

4    on, and that's why I contacted CES.  I didn't

5    immediately dive in and do that.  There were a lot of

6    things that needed work, specifically that and other

7    things.

8         Q     Sorry, I want to -- I just want to make sure

9    since -- you come in to the office on April 1st, one of

10   the first things you'd -- wouldn't one of the first

11   things you would do would be to check the password and

12   see if you can get into one of the most important

13   pieces of equipment you have the, EMS server?

14        A     Well, that's not the way it happened.  I was

15   actually trying to get a lot of other things situated,

16   especially the backlog of all the voter registrations

17   and everything that hadn't been done in months.

18        Q     Do you know whether any election project

19   files for elections that occurred during

20   Misty Hampton's period, whether any of those have ever

21   been provided to the court clerk?

22        A     You're talking about the project files?

23        Q     Yes.

24        A     Not to my knowledge, no.

25        Q     So you never found those anywhere?

Page 187

1         A     No.

2         Q     All right.  Let's look at one quick thing and

3    see if this helps.  I'm trying to get the timing down a

4    little better.

5              (Exhibit 7 marked for identification.)

6         Q     (By Mr. Cross)  All right, grab Exhibit 7, if

7    you would, please.

8         A     Okay.

9         Q     You see Exhibit 7 is a copy of meeting

10   minutes from an April 13, 2021 Coffee County board

11   meeting?

12        A     Yes.

13        Q     And if you come down to paragraph 6, do you

14   see it references an update that you provided the board

15   then?

16        A     Yes.

17        Q     And it reads, "James Barnes updated the board

18   on old equipment that was returned to the Secretary of

19   State's office and the Dominion equipment audit.  The

20   board was also made aware of new equipment deployment

21   and staffing requirements per SB 202."  Do you see

22   that?

23        A     Yes.

24        Q     The new equipment deployment and the return

25   of old equipment to the Secretary of State, is that the

Page 188

1     replacement of the ICC and the EMS server?

2          A     No.   That's actually much older than that.

3     That was returning of the GEMS server cards and things

4     like that that were supposed to have been turned in way

5     back the previous years.

6          Q     Got it.   Okay.

7                All right, let me look at one more thing.

8                (Exhibit 8 marked for identification.)

9          Q     (By Mr. Cross)   All right, grab Exhibit 8.

10         A     I have it.

11         Q     Do you see here this is an invoice from

12    Southeast Georgia Computer Consulting & Engineering?

13         A     Yes.

14         Q     And is that the third-party IT company that

15    you were talking about?

16         A     Yes, that's correct.

17         Q     So that's the company Chris [sic] Dial works

18    for?

19         A     Yes.

20               MR. DELK:   Charles Dial.

21               MR. DENTON:   Object to form.

22               MR. CROSS:   Sorry, I don't know why I

23         keep saying -- I'm sorry.   I keep thinking of

24         the Chris that came with Mr. Patel.   Sorry.

25         Thank you for the correction.   Let me try

Page 189

1          that again.
2                 MR. DELK:  There's a bunch of names
3          floating around.  It's okay.
4          Q    (By Mr. Cross)  So this is --
5    Southeast Georgia Computer Consulting is the company
6    that Charles Dial worked for?
7          A    Yes, that's correct.
8          Q    All right.  Thank you.
9                 Now, you see that the invoice is dated
10   April 13?
11         A    Yes.
12         Q    And if you look, you'll see Item 1,
13   "Task/Ticket: ASAP..."
14                Do you see that under "Description"?
15         A    Yes.
16         Q    It says, "Please change the log-in
17   credentials for the elections computer from Misty to
18   James Barnes."  Do you see that?
19         A    That's correct.
20         Q    So does that refresh your recollection that
21   at least as of April 13, you were already trying to get
22   access to the EMS server?
23         A    No, because I was actually trying to get
24   access to any computer in the office period because I
25   couldn't get in any of them.

Page 190

1        Q    I see.  So the work order here from April 13
2   was you had realized by this point that you didn't have
3   log-in credentials for any of the computers in the
4   office?
5        A    Yes.  And so I had been pestering them about
6   getting me a county email so I could log in to the
7   computers and try to take stock of what was on there.
8        Q    I see.  I see.  And does that include the EMS
9   server and the ICC?  Like, at this point you had
10   realized the credentials weren't working for that
11   either?
12        A    No, that doesn't include that because, like I
13   said, I still didn't know that that didn't work.  This
14   right here was specifically about the actual PCs in the
15   office because I couldn't access any of them.
16        Q    So it says "elections computer."  What
17   computer is that?
18        A    Office computer in Misty's office.
19        Q    I see.  Okay.
20             Okay, so as you sit here, what is your best
21   recollection of when you first realized that the
22   password that Misty Hampton had left behind did not
23   work for the EMS server or the ICC?
24        A    Well, I thought it was around in there,
25   around end of April or beginning of May; but, I mean, I

1    guess if they've got something different on paper, then

2    maybe that's right.

3         Q    Okay.

4         A    But I could have sworn I had a June election,

5    though, that I had to do, because we had a primary and

6    then, of course, we had the November election.

7         Q    Okay.  All right.

8              Are any -- is any of the equipment in the

9    room where the EMS server sits, is any of that

10   equipment connected to the internet?

11        A    No.

12        Q    Is it -- to your knowledge, has any of that

13   equipment ever been connected to the internet?

14        A    Not to my knowledge, no, and it shouldn't be.

15        Q    Have you ever connected a laptop or a

16   smartphone or a tablet to any of the equipment in that

17   room?

18        A    No, definitely not.

19        Q    Sorry, did you say no?

20        A    I said no, definitely not.

21        Q    Do you know whether anyone else has?

22        A    Not to my knowledge.

23        Q    You sometimes use flash drives with that

24   equipment, right?

25        A    Yes, that's correct.

Page 192

1              Q     What do you use flash drives for, for

2       election purposes, to plug into the EMS server or the

3       ICC?

4              A     Well, the State sends us the election project

5       on a thumb drive, and then we plug that in to download

6       that information onto there.  That's the primary

7       function for that.  You're not supposed to plug any

8       outside thumb drives into there.  There's no reason to

9       do so, and it can compromise the system.

10             Q     And so the flash drives that were plugged

11      into the Coffee County equipment and the EMS server,

12      those were provided by the State, to your knowledge?

13             A     Yes.

14             Q     Is that the same for your experience at

15      Lanier?

16             A     Yes, that's correct.

17             Q     How does -- in your experience, how does the

18      County get the election night results from the ICC and

19      EMS to the election night reporting system so that they

20      can upload that to State?

21             A     Well, what we -- what we do is -- like I

22      said, they're networked in together, so we pull the

23      information that we've gathered from the scanner and

24      send it over to EMS, then we tabulate that information

25      together, and then we get an election report for that

Page 193

1    day, and we provide that via email to the State

2    liaison.  And, of course, when we send our election

3    materials off, we always send one of those, as well, to

4    them.

5           Q    So the EMS server is networked, it's

6    hardwired to the ICC?

7           A    That's correct.

8           Q    And the ICC is the computer and that's --

9    that manages the central scanner?

10          A    Yes.

11          Q    And so that computer, the ICC, is hardwired

12   to the central scanner?

13          A    Yes, it is.

14          Q    But there are election results or election

15   files that are taken off the EMS onto a flash drive by

16   the County?

17          A    Yes, because we keep a -- usually you want to

18   keep a backup of your election projects -- your

19   election project on one just in case there's a glitch,

20   the power gets knocked out, something happens.

21          Q    Right.  And I thought you had said earlier,

22   for example, that you expected there to be election

23   project files from prior elections on a flash drive.

24          A    Yes.

25          Q    So in addition to the flash drives that the

1    State provides to upload election files for an

2    election, in your experience, the County also has flash

3    drives that it plugs into the EMS to pull down a copy

4    of election project files after an election, right?

5        A    Well, usually it's during the election.  But,

6    yes, once you complete it, you should update that

7    backup one last time just in case something ever

8    happened to the server and you needed to

9    [indiscernible].

10       Q    And in your experience, when that happens,

11   were you using the same flash drive that the State

12   provided before the election or using a different flash

13   drive to pull the election project files off?

14       A    No, it's a different one.

15       Q    And where did you get that flash drive?

16       A    This -- these were the black flash drives

17   that the State originally sent.  They sent like a

18   fairly large box full of them.

19       Q    When did those come in?

20       A    Before I got there.

21       Q    I see.  And where -- and so when you got

22   there, where did you find these flash drives?

23       A    The box of flash drives were just in there in

24   the server room.

25       Q    How many were in there approximately?

Page 195

1          A     Maybe 30 or 40, something around that nature.

2          Q     You said maybe 30 or 40?

3          A     Yes.

4          Q     And none of those flash drives had any

5     election project files from elections preceding you?

6          A     No.  Those were blank.

7          Q     They were all blank.

8                How do you know that all 30 or 40 flash

9     drives in that box actually came from the State?

10         A     Well, I'm not entirely sure that they did,

11    but it had the -- they were black and had the same

12    writing on it as the one the State sent, so I assumed

13    they were.

14         Q     I see.  Okay.

15               And you were in -- you were the assistant

16    elections supervisor in Lanier County for the

17    switchover from DREs to BMDs, right?

18         A     Yes, that's correct.

19         Q     And was it the same method there?  So with

20    the DRE system, you'd have a flash drive, you'd pull

21    off the election data onto a flash drive from the old

22    GEMS server, much like you do with the Dominion system

23    now; is that right?

24         A     Yes, that's correct.

25         Q     And when you were in Lanier County and there

1    was a switchover from the DRE system to the BMD system,

2    you guys already had flash drives on hand to use to

3    pull the election data off of the new Dominion EMS

4    server, right?

5          A    Well, all of the old equipment associated

6    with the GEMS server was actually supposed to be turned

7    in to the State to be kept at a -- you know, Kennesaw

8    State.  So when we got the new equipment in from the

9    State in Lanier, we also got new black hard drives.

10   They just sent us as many as they did Coffee.

11         Q    I see.  So when you were in Lanier County,

12   there were some new black -- there were some new flash

13   drives that came in when the BMD system was rolled out?

14         A    Yes, that's correct.

15         Q    Okay.  What happened to the old flash drives?

16         A    Presumably, all that got sent back over to

17   the Secretary of State's office because they asked us

18   to return all that [indiscernible].

19         Q    Do you know for sure that all went back, in

20   Lanier, or you don't -- somebody else handled it?

21         A    We -- well, somebody else handled it, but we

22   didn't have any old flash drives there when I was

23   there.

24         Q    But when you got to Coffee County, you found

25   that Coffee County still had a lot of their old GEMS

1    equipment.  I think that's one of the things you said

2    you had to turn back in?

3         A    Yeah, they had like some of the old voter

4    cards and things like that that you were supposed to

5    turn in back when we switched over.

6         Q    Did they have other -- were there any DREs,

7    was there a GEMS server?  What all do you recall from

8    that system?

9         A    No, there were no DREs or GEMS servers there.

10   It was mostly just the Compaq flash cards and

11   voter ID -- I mean voter cards, things of that nature.

12        Q    Have you ever asked the Secretary of State's

13   office for any election project files for

14   Coffee County?

15        A    The only ones that we requested was for the

16   municipal election.

17        Q    So that's an election that used the new

18   replacement server?

19        A    Yes, that's correct.

20        Q    Did you ever ask for any election project

21   files from the server they took?

22        A    I did go back and say that -- like I told you

23   before, that we were trying -- somebody had open-record

24   requested, you know, the ballot images and whatnot and

25   that I couldn't find any of that and, you know, was

1    there any way I could get it.  And I was told no, there

2    was no way to get it.

3         Q    What happens to the flash drives -- after you

4    pull the election data off to provide the State or to

5    keep a copy of that, what happens to those flash

6    drives?

7         A    Yeah, they're supposed to be maintained along

8    with all the other election file -- election materials,

9    as they call it.  And usually best practice is to take

10   a DYMO LabelWriter and print off a label that says, you

11   know, the -- what election it was, what year and date

12   it was, and you always want to label them somehow or

13   another and put them in your boxes [indiscernible].

14        Q    Okay.

15        A    In my course of being there, I haven't found

16   any of those.

17        Q    Right.  And do the flash drives get reused,

18   so, for example, from one election to the next, so that

19   you can keep project files in one easy place?

20        A    No.  It's supposed to just be for that

21   specific election, so that way you can keep track of

22   it.

23        Q    And are you -- in your experience at Lanier

24   and Coffee County, were flash drives ever reused?

25        A    No.  They shouldn't be.

```
                                            Page 199

 1        Q    I know they shouldn't be.  Do you recall an
 2    instance where they were?
 3        A    I never did.  I don't know about anybody
 4    prior to me.
 5        Q    Okay.
 6             MR. CROSS:  All right, thank you,
 7        Mr. Barnes, I don't have any further
 8        questions.  I appreciate your time.
 9             THE WITNESS:  Okay.
10             MR. CROSS:  Why don't we go off the
11        record.
12             THE VIDEOGRAPHER:  The time is 2:08.
13        We're off the record.
14             (Off the record.)
15             THE VIDEOGRAPHER:  The time is 2:09.
16        We're back on the record.
17             MR. ABNEY:  Sorry, just tried to connect
18        my ear pods.
19                       EXAMINATION
20    BY MR. ABNEY:
21        Q    Can you hear me okay, Mr. Barnes?
22        A    Yes, sir.
23        Q    Perfect.  Let me know if there's a problem
24    and I'll switch back to a different microphone, but
25    usually this works the best.
```

1          My name is Russ Abney.  I'm just going to

2     really ask you mostly follow-up questions to -- just

3     things that came to mind when you were being asked

4     earlier questions.  I did have one area that I guess

5     I'll cover with you first that I don't think was

6     covered.

7          As an elections supervisor, one of the things

8     you're responsible for is inventory of election

9     equipment; is that correct?

10         A    Yes, that's correct.

11         Q    And when you came in to Coffee County, do you

12    recall when you did the first inventory on the

13    equipment there?

14         A    I believe that was done on week one that I

15    was there, because there was some of it that had not

16    been accepted previously.

17         Q    What do you mean "had not been accepted

18    previously"?  What does that mean?

19         A    Well, when everybody got all the Dominion and

20    poll pad equipment in, they were supposed to accept the

21    equipment, essentially, and let the Secretary of

22    State's office know that they had this number of them.

23    So one of the first things I did was go through and

24    audit all the machines.

25         Q    Did you check to see when the most recent

Page 201

1   audit had been done prior to you getting there?

2       A    I'm not honestly sure if there was one,

3   because there was quite a bit of equipment that was

4   still packaged up and had never even been taken out.

5       Q    When you did the equipment audit, did you

6   have a list of equipment that you were supposed to have

7   on site?

8       A    Yes, that's correct.

9       Q    And your job, so to speak, was to audit the

10  physical equipment that you had to see how it matched

11  up to that list; is that right?

12      A    Yes, I went through each serial number and

13  made sure that that was present and accounted for.

14      Q    And what were the results of your audit?

15      A    It came out with all the ballot-marking

16  devices and poll pads that were supposed to be there

17  being present.

18      Q    Was there any other equipment that you

19  audited?

20      A    Also the printers.

21      Q    Anything else?

22      A    Well, of course, I had to go back and check

23  and make sure all the scanners were there.

24      Q    Okay.  Anything else?  Any other equipment?

25      A    No, no other equipment.  That was the main

1      things that had to be checked off on the list.

2          Q    So if I've got the list right, we've got

3      BMDs, poll pads, printers, and scanners; is that right?

4          A    Yes.  And the ICC and EMS server had already

5      previously been accepted.

6          Q    And to the best of your recollection, all the

7      equipment that was supposed to be there was there, you

8      weren't short anything, you didn't have anything extra;

9      is that right?

10         A    That's right.

11         Q    This horse has kind of been beat to death, so

12     I'm afraid to whoop it anymore, but I do want to follow

13     up with one other piece of information.

14              I have seen a memo with the subject line

15     "Transferred Election Materials" that you signed off on

16     on May 7th of 2021 that indicated 27 boxes of election

17     materials had been transferred for storage.  Does that

18     sound familiar?

19         A    It does.

20         Q    Where was -- where were those materials

21     stored?

22         A    That would have been with the clerk of court.

23         Q    Okay.  And that's another requirement of your

24     office, right, is to -- is to transmit certain election

25     materials/records to the clerk of the court?

Page 203

1        A     Yes, that's correct.

2        Q     Do you know if that was ever done with

3    respect to the 2020 election materials?

4        A     I believe 2020 election materials are over

5    there at the clerk's office.

6        Q     Is that something you did or something that

7    was done before you got there?

8        A     I put some over there, but I'm not sure if

9    she had put anything over there before or not.

10       Q     And I may have misunderstood, but I thought

11   you said earlier that part of what should have been

12   transmitted would have necessarily come off of the EMS

13   server, and that wasn't available to you; is that

14   right?

15       A     Yes, sir, that's correct.  I didn't have

16   access to that.

17       Q     Would you have checked to see if you had

18   access to that material so that you could do your job

19   and deliver it to the clerk of the court before you

20   signed off on this transfer memo on May 7th of 2021?

21       A     Yes, I did check for those and I did not find

22   them.

23       Q     Okay.  My question is a little bit different,

24   or maybe I asked a bad question.  Let me try it again.

25            Before May 7th of 2021, when you signed off

Page 204

1    on the transfer of the election materials to the clerk

2    of the court, would you have checked to see if you

3    could pull those materials off of the EMS server?

4         A    Well, actually, what I had done was I had

5    checked to see if we had any of the thumbnail files, as

6    well, that you're supposed to back up, and none of

7    those were present.

8         Q    Right.  I understood that from your prior

9    testimony.  I thought you said, also, at some point you

10   would have looked on the EMS server to see if you could

11   pull them off of the EMS server.  Is that not correct?

12        A    Yes, usually you would check there as well.

13        Q    And so my question is:  Would you have

14   checked there before May 7th of 2021 when you

15   transferred these materials to the clerk of the court?

16        A    Well, that's what I was saying earlier, I

17   thought I -- that I had actually said something about

18   the server password being messed up more along the

19   lines of end of April, beginning of May.

20        Q    And that's the point I'm trying to, like I

21   said, whoop the dead horse on.  But when was the first

22   election held that you would have been responsible for

23   in Coffee County?

24        A    That would have been June.

25        Q    And in your normal practice, how far in

Page 205

```
1    advance of the election would you have started getting

2    ready, including checking the server and loading or

3    programming whatever you need to do on that server?

4         A    Yeah, usually that would be a month out

5    because, of course, you're always going to have

6    absentee-by-mail ballots, you know, coming in well in

7    advance of that date.

8         Q    So that would line up more with the end of

9    April or beginning of May?

10        A    Yes, that's correct.

11        Q    Sorry, I was kind of thinking out loud there.

12             The May 7th, 2021 date, is it your best

13   recollection that you would have discovered the

14   password issue before or after that date?

15        A    I believe I would have discovered the

16   password issue prior to that date.

17        Q    I think you've already answered this too, but

18   did the County issue a personal computer to your

19   office -- I'm sorry, did the -- did the County issue a

20   laptop to your office for use with election activities?

21        A    They didn't specifically issue one to me.

22   There were a couple of old laptops that were there that

23   were probably from before Misty even took over.

24        Q    Okay.  You mentioned one that you found

25   earlier.  Do you recall there being more than one?
```

Page 206

1          A     There was another one that was even older

2      than that that was in a box, but...

3          Q     Did you ever try to access that computer?

4          A     No, because I didn't feel like there would be

5      a need to be because it was pretty obvious it was old

6      enough that nobody should have been using it recently.

7          Q     I think you've already testified to this

8      also, but can you remind me who Ms. Cox is?

9          A     She's the supervisor of elections in

10     Lowndes County and also the Region 11 coordinator.

11         Q     Do you recall if you ever communicated with

12     her at all about the password issue on the server?

13         A     I'm not sure if I contacted her about that or

14     not.  A lot of times I would contact her about things,

15     just because she's the Region 11 coordinator, to get

16     input.

17         Q     Do you recall if she had any input?

18         A     No, because I'm not sure that I contacted

19     her.

20         Q     There's an email from her to the county

21     commission shortly before you arrived, so you probably

22     would not have seen it, but the gist of it was that she

23     was delaying a visit by a Dominion rep to your county

24     until your position had been filled.

25              And so with that in mind, my question is:  Do

1     you remember or recall any visit by any Dominion reps

2     during the first part of your tenure or during your

3     tenure at all at Coffee County?

4             MR. DENTON:  Object to form.

5             THE WITNESS:  The only person that I

6         remember coming by was -- I believe his name

7         was Greg Whiten, and that was with

8         EasyVote.

9         Q    (By Mr. Abney)  I'm sorry, was with who?

10        A    The gentleman from EasyVote.  That's a system

11    that we use.  But I don't recall a Dominion

12    representative, no.

13        Q    You mentioned obtaining and/or sharing

14    information -- I don't want to put words in your mouth,

15    but that was my recollection -- something to do with

16    BuzzFeed.  Do you recall that?

17        A    Yes, BuzzFeed is something that most

18    elections officials use.

19        Q    What is BuzzFeed?

20        A    BuzzFeed is like a comment board that's

21    provided by the Secretary of State's office for people

22    that have a log-in for it.  It's used by elections

23    officials a lot of times to advertise for open

24    positions and also to put out equipment that they no

25    longer need to see if anybody else needs it.

1      Q    Do you recall any of the Coffee County issues

2  being discussed on the BuzzFeed other than possibly

3  your opening?

4      A    No, I don't recall any of the issues prior to

5  my arrival there really being discussed, no.  But then

6  again, sometimes we tune that out because it can get

7  pretty busy on there.

8      Q    I want to see if you can explain a little bit

9  more about the password situation for the EMS server

10  and the ICC.

11          It's my understanding from your prior

12  testimony that there's a separate, lengthy password for

13  each one of those systems.  Is that right?

14      A    Yes, you have to log in to each one of them

15  individually.

16      Q    And to the best of your knowledge, there's

17  only one password for each of those systems for each

18  county; is that right?

19      A    Yes.

20      Q    Is there any -- and I know individual

21  computers would have log-in information, but I'm

22  talking about the election equipment or software

23  itself.

24          Do any of those systems have individual

25  passwords per user?

Page 209

1          A     Well, you can set -- or at least I saw

2     multiple user accounts on there, but typically there's

3     only one user account that you would need to log in.

4     There really should only be one person doing the

5     servers.

6          Q     What do you mean when you say you saw

7     multiple user accounts?

8          A     On the ICC, there were several different

9     users set up.

10         Q     Do you recall who those users were?

11         A     No.  It was just generic names like ICC-1,

12    something similar to that.

13         Q     Okay.  I take it there's not one, but let me

14    ask.  Are you aware of any policy or procedure that's

15    been written down anywhere for how to handle the

16    situation like you faced where you have an EMS server

17    that you can't gain access to using the State-provided

18    password?

19         A     No, I'm not aware of any SOP for that

20    situation.

21         Q     And I know this topic also was covered, but I

22    want to make sure I got it right.

23              You contacted the State, told them you had a

24    problem with the password, they walked you through some

25    stuff on the phone and said, "Well, looks like we'll

Page 210

1    come down next week and take care of it."  Essentially,

2    that's what happened --

3         A    Yes.

4         Q    -- right?

5         A    That's correct.

6         Q    And the question that I was a little confused

7    about was during that phone call, did they tell you --

8    did they schedule a time and date the following week,

9    or was it just, "We'll be down sometime next week"?

10        A    It was just that they would -- they would

11   come down and take a look at it next week.

12        Q    And is it safe to assume that they didn't

13   just show up unannounced?

14        A    Yeah.  They gave me a call when they were,

15   you know, going to be coming down.

16        Q    Okay.  So you recall getting a telephone

17   call?

18        A    Yes.

19        Q    Who was that call from?

20        A    That was Prateek Patel, I believe.

21        Q    Okay.  And did they call and tell you a day

22   or two in advance?  Or was it, "Hey, we're in the car

23   headed your way"?

24        A    It was the day of.

25        Q    And your -- so it was a telephone call.  Did

Page 211

```
 1    he normally call you on your official cell phone?

 2         A    Yes, usually that's the case.  And it might

 3    have been the day before, but I believe it was the same

 4    day that they were coming.

 5         Q    I'm assuming you didn't know Ms. Grantham

 6    before the day she was hired.  Is that --

 7         A    That's correct.

 8         Q    -- true?

 9              Can you tell me a little bit about her

10    background, whatever you remember being told?

11         A    Previously she had worked at several

12    banks, and she had also worked as a dispatcher for

13    P&M Trucking up in Douglas.

14         Q    The banks she worked at, were they local

15    banks?

16         A    Yes, that's correct.

17         Q    I believe you said you conducted some type of

18    investigation to determine whether or not anybody had

19    had contact with the Ninja folks.  Is that right?

20         A    Well, you know, I asked around to see if

21    anybody unusual had been there and sought out any kind

22    of video footage that might corroborate with that, but

23    I was unable to find anything.

24         Q    Who all did you ask about that?

25         A    Mostly just board members, you know, poll
```

Page 212

1    workers, people like that.

2         Q    Did you ask all the board members?

3         A    I believe so, yes.

4         Q    Did you talk to the county attorney about

5    that, about the Cyber Ninjas?

6         A    I don't recall if I mentioned that issue to

7    him or not.

8         Q    If a third party was given access improperly

9    to the EMS server, who would most likely have been the

10   one giving them that access?

11             MR. DENTON:  Object to the form.

12             THE WITNESS:  I really couldn't say who

13        it would be that would do that, just somebody

14        that had access to the office, I suppose, but

15        I'm not sure.  I wasn't there then.

16        Q    (By Mr. Abney)  They would have had to have

17   access to the office and to the closet where it's kept

18   under lock and key, correct?

19        A    Yes.

20        Q    And before you, that person would have been

21   Misty Hampton?

22        A    Well, she was the ultimate one that was in

23   control of it, yes.

24        Q    But according to your testimony, you didn't

25   reach out to her to see if she had any information

Page 213

1    about anybody visiting that may have gained access to
2    the equipment; is that right?
3         A    Well, I knew that she was under several
4    active investigations.  So, no, I chose not to do that.
5         Q    Fair enough.
6              MR. ABNEY:  Sorry, I'm just looking over
7         my notes.  Going second, I'm trying not to
8         plow too much of the same ground.
9         Q    (By Mr. Abney)  You were asked about several
10   people, and I didn't make great notes, so I want to ask
11   you about one more or maybe the same one.
12             Russ Ramsland, do you know who that is?
13        A    No, I'm not familiar with that name.
14        Q    Okay.
15             MR. ABNEY:  All right, I think that's
16        all I have.  Give me just -- if we can go to
17        the breakout room, give me five minutes and
18        let me make sure I didn't leave out anything
19        major, and I think we'll be done.
20             THE WITNESS:  Okay.
21             THE VIDEOGRAPHER:  The time is 2:30 p.m.
22        We're off the record.
23             (Recess taken.)
24             THE VIDEOGRAPHER:  The time is 2:38.
25        We're back on the record.

Page 214

1          MR. ABNEY:  Mr. Barnes, thank you for

2      your time today and your patience.  I do

3      appreciate it.  That's all the questions I

4      have.  Thank you.

5          THE WITNESS:  Okay.  Thank you.

6                      EXAMINATION

7  BY MR. DENTON:

8      Q    Good afternoon, Mr. Barnes.  My name is

9  Alexander Denton.  I am an attorney for the State

10 defendants in this case.  I have a few questions to ask

11 you as well.

12     A    Okay.

13     Q    I'm going to try to limit my questions based

14 on those you've already been asked.  I appreciate your

15 patience and time today.

16          The first question I have for you -- again,

17 hopefully briefly revisiting the timeline question --

18 to your knowledge, the first time anyone in

19 Coffee County provided information to any State

20 officials about the password situation with the EMS

21 server and the ICC was the phone call that you made to

22 your CES contact, right?

23     A    Yes, sir.

24     Q    And after the events that you described that

25 occurred on that -- during that telephone call, the CES

Page 215

1    contact told you, "We'll be down in about a week to
2    take a look at it," right?
3          A     Yes, that's correct.
4          Q     And two folks from CES did, in fact, come
5    down about a week later, right?
6          A     Yes, that's correct.
7          Q     Mr. Barnes, you have no personal knowledge of
8    any unauthorized access to the Coffee County room
9    containing the EMS server and the ICC, right?
10         A     I have no knowledge of it, that's correct.
11         Q     And you have no personal knowledge of any
12   unauthorized access to any Coffee County election
13   equipment; is that right?
14         A     That's correct.
15         Q     Earlier this morning, Mr. Cross stated that
16   he had a conversation with you about this case prior to
17   the time when you were represented by counsel.  Do you
18   remember that?
19         A     Yes, sir.
20         Q     And can you describe to me the circumstances
21   of that conversation between you and Mr. Cross?
22         A     It was more or less similar to the questions
23   that he had asked now today.  I did make sure that he
24   knew I had not worked there prior to April 1, so
25   there's no way for me to really know anything that

Page 216

1    happened prior to that.

2        Q    So you had a conversation with Mr. Cross

3    where you discussed your knowledge of some of the

4    things that we've talked about today?

5        A    Yes, that's correct.

6        Q    Do you remember when that conversation

7    occurred?

8        A    I believe it was maybe, let's see, maybe two

9    weeks ago or so.

10       Q    Who initiated that conversation?

11       A    That would have been Mr. Cross and another

12   woman.  I can't remember her name.

13       Q    Do you have an understanding of who that

14   woman is?

15       A    No, not really.  She was more or less just

16   bringing him into the call.

17       Q    So this conversation occurred on a telephone

18   call?

19       A    Yes, that's correct.

20       Q    And this woman was the person who initiated

21   that telephone call to you; is that right?

22       A    Yes, that's correct.

23       Q    Prior to this woman's call to you a couple

24   weeks ago, had you received any communication, either

25   by phone or writing or otherwise, that this call was

Page 217

1    going to take place?

2         A    No, I had not.

3         Q    So she called you out of the blue,

4    essentially?

5         A    Yes, sir.

6         Q    And when she called you, did she speak to you

7    at all before bringing Mr. Cross into the conversation?

8         A    It was very brief.

9         Q    And what did she relay to you in that --

10   those brief moments?

11        A    Just essentially that she was calling in

12   reference to that case and that she wanted to bring

13   Mr. Cross, one of the attorneys, in -- on to talk to me

14   for a moment.

15        Q    And you said, "That's fine"?

16        A    Honestly, I wasn't really sure what they were

17   wanting.  I didn't know if they were just trying to

18   find out if it was worth their time or not, but I had

19   already gotten the subpoena by that point.

20        Q    And then Mr. Cross did, in fact, join the

21   call thereafter, right?

22        A    Yes, that's correct.

23        Q    Did anyone else ever join the call at any

24   point before it concluded?

25        A    No, sir.

Page 218

1          Q     Okay.  So Mr. -- just so I'm clear, Mr. Cross

2     didn't send you an email or anything, he had somebody

3     call you on his behalf to speak to you over the phone

4     about this important subject, right?

5          A     Yes, that's correct.

6          Q     And then what did the two of you discuss once

7     Mr. Cross joined the call?

8          A     Definitely not as much as we did today, but

9     he was more or less just asking about, you know, was

10    there a password issue with the server, you know, he

11    asked about the Cyber Ninjas card; and, you know,

12    essentially I said the same thing I did today, which is

13    just the limited truth that I know.

14         Q     The limited scope of information about --

15         A     Yes.

16         Q     -- those questions?

17         A     Yes, exactly.

18         Q     What -- was there anything that Mr. Cross

19    discussed with you on that telephone call that he did

20    not bring up today?

21         A     No, I don't recall anything additional

22    besides what I heard today.

23         Q     Did he tell you anything about the case

24    generally?

25         A     I mean, he had brought up some stuff about,

Page 219

1    you know, the Washington Post article and things of

2    that nature, but nothing other than that really.

3         Q    Sure.  Let me ask my question slightly

4    different.

5              Did -- during that telephone call, did

6    Mr. Cross tell you anything about this lawsuit

7    generally?

8         A    No, he didn't inform me of anything to do

9    with it.

10        Q    Did Mr. Cross introduce himself on the phone

11   call?  Did you understand who he was?

12        A    He introduced himself as an attorney in the

13   case.

14        Q    Did he tell you who he represented in the

15   case?

16        A    No, I don't recall him specifically

17   referencing who he represented.

18        Q    So you didn't know, based on the information

19   he gave you, whether he represented the Secretary of

20   State's office or some other group?

21             MR. CROSS:  Objection.

22             THE WITNESS:  No, I believe he mentioned

23        that it was a -- the Donna Curling thing,

24        which I had already gotten a subpoena for.

25        Q    (By Mr. Denton)  After that phone call ended,

Page 220

1    have you had any other communications with Mr. Cross

2    before today?

3         A    No.  I sought out to get an attorney.  He

4    scheduled a deposition meeting and sent me a subpoena

5    about that, and then I retained counsel and I didn't

6    speak to him anymore.

7         Q    Did he -- after the telephone call, did he or

8    anyone on his behalf send you any written

9    communications directly?

10        A    Just about when the deposition was supposed

11   to be coming up and, like, how to log into the Zoom

12   thing.

13        Q    So that was by email?

14        A    Yes.

15        Q    And the contents of the email were limited to

16   logistical information about how to access the Zoom for

17   today?

18        A    Yes, that's correct.

19        Q    Mr. Barnes, I want to ask you about any

20   awareness of or familiarity with or communications with

21   a list of people, and I'll represent to you that these

22   people either are or have been plaintiffs in this case,

23   all right?

24        A    Okay.

25        Q    Do you have any familiarity with a person

Page 221

1      named Donna Curling?

2           A     Not until this case happened, no.

3           Q     Okay.  Is your familiarity with her limited

4      to your knowledge that she's a party to the case?

5           A     That's correct.

6           Q     Ms. Curling never attempted to contact you or

7      meet with you in any way?

8           A     No.

9           Q     You never had any communications with her?

10          A     No, sir.

11          Q     How about Donna Price?

12          A     No, I don't recognize that name.

13          Q     Do you recognize the name Jeffrey Schoenberg?

14          A     No, sir, I don't recognize that name.

15          Q     How about Laura Digges, D-I-G-G-E-S?

16          A     No, I don't recall that name.

17          Q     Do you recall the name William Digges III,

18     again spelled the same way, D-I-G-G-E-S?

19          A     No, sir.

20          Q     Do you recall the name Ricardo Davis?

21          A     No.

22          Q     Do you recall the name Megan Missett,

23     M-I-S-S-E-T-T?

24          A     No.

25          Q     Are you familiar with an organization called

Page 222

```
 1      the Coalition for Governance [sic]?

 2           A    Yes.  I've received open-records request from

 3      them before.

 4           Q    Do you recall when you first received an

 5      open-records request from the Coalition for Good

 6      Governance?

 7           A    I believe it was back in 2020.

 8           Q    And did you receive that open-records request

 9      in 2020 from the Coalition for Good Governance in your

10      capacity as a Lanier County employee?

11           A    Yes, that's correct.

12           Q    Do you recall the substance of that request?

13           A     It was something about documents from a

14      previous election, but I don't remember what it was

15      specifically.

16           Q    Was that the only open-records request you

17      received from the Coalition for Good Governance while

18      you worked for Lanier County?

19           A    I believe that was the only one.

20           Q    Did you receive any other communications from

21      the Coalition while you worked for Lanier County?

22           A    I don't believe so, no.  I think that they

23      just simply would open-records request us occasionally.

24           Q    Sorry, they would open-records request you

25      what?
```

Page 223

1        A     I said occasionally we got open-records

2   request from organizations like that, but I don't know

3   them.

4        Q     And when you say "organizations like that,"

5   what do you mean?

6        A     The NGO, nonprofit organizations.

7        Q     Do you -- did you receive any open-records

8   requests from the Coalition for Good Governance while

9   you were working for Coffee County?

10       A     Yes, I do seem to recall getting one from

11  them.

12       Q     Do you recall the substance of that one?

13       A     I'm not entirely sure what that specific

14  open-records request was about.

15       Q     Outside of the two open-records requests that

16  you received as a county employee, have you had any

17  other communications or interactions with any

18  representative of the Coalition for Good Governance?

19       A     Marilyn Marks did contact me prior to the

20  date of the 14th just to see if I was still going to be

21  attending a deposition, because she claimed she wanted

22  to attend as well.  So I just simply stated in the

23  affirmative, because at that point in time it was

24  scheduled for the 14th.

25       Q     Okay.  I apologize, Mr. Barnes, you broke up

Page 224

1   just a little bit, and so I want to make sure I heard

2   your answer.

3           You testified that Marilyn Marks contacted

4   you prior to the 14th about whether you were going to

5   sit for this deposition; is that right?

6       A    Yes, that is correct.

7       Q    And so she contacted you prior to the 14th of

8   July of this year; that's what you're referring to?

9       A    Yes, she contacted me the day before the

10   deposition to make sure I was going to be there.

11       Q    And that was the date of the original -- the

12   originally scheduled date of the deposition, right?

13       A    Yes, that's correct.

14       Q    And how did she contact you on -- I guess

15   that would be July 13th of this year.

16       A    She called me on my phone.  I don't know how

17   she had my number, but she did.

18       Q    Okay.  Do you recall what time of day that

19   was that she called you?

20       A    I want to say it was maybe a little after

21   lunch, like early afternoon.

22       Q    And you had no advanced notice that a call

23   from Ms. Marks was coming to you pertaining to anything

24   in this case, right?

25       A    No.

Page 225

1      Q    And do you recall the specifics of her
2   conversation with you on July 13th in that phone
3   conversation?
4      A    It was essentially just, like I said,
5   verifying that I was going to be there because she said
6   that she wanted to be there for it, and she was also
7   asking initially was it, you know, going to be in
8   person or what because she had to make plans well in
9   advance because she lives six hours away or some such,
10   and I said no, it was going to be Zoom, and she said,
11   well, that was better for her.  So that was essentially
12   the content of the conversation.
13      Q    And in response to her question as to whether
14   you were going to attend, you said yes, right?
15      A    Yes.  Because at that particular point in
16   time, it was still scheduled to be on.
17      Q    Did she provide you any indication of why she
18   was calling you directly to ask about a status of a
19   deposition in this case?
20      A    No, she didn't specify exactly why.  She just
21   said that she had an interest in the case and just
22   wanted to sit in on the deposition.
23      Q    Did she disclose to you during that telephone
24   call that she is a representative of one of the parties
25   in this case?

Page 226

```
 1        A    No, I didn't realize that she was actually
 2    one of the plaintiffs in it.
 3        Q    Was the telephone conversation where
 4    Ms. Marks called you July 13th of this year the only
 5    time the two of you have spoken?
 6        A    Yes.  I don't recall having ever spoken to
 7    her before.
 8        Q    Has she spoken with you or communicated with
 9    you since July 13th?
10        A    No, I haven't heard anything from her.
11        Q    Mr. Barnes, one more question about the
12    Coalition specifically.  Well, let me ask you this:
13    Did Ms. Marks, in that telephone call, identify herself
14    as a representative of the Coalition for Good
15    Governance?
16        A    I don't recall her representing herself as
17    that.
18        Q    You do not recall?
19        A    I do not recall that.
20        Q    Mr. Barnes, Ms. Marks apparently is not the
21    only person interested in the proceedings that were
22    rescheduled for today.  There are a lot of people on
23    this Zoom deposition.  I want to ask you about them as
24    well.
25             So we've already talked about Ms. Marks, who
```

Page 227

```
 1      is here today, and I'm going to just run through the
 2      list of folks who are here.
 3           A     Okay.
 4           Q     Similar questions to the questions I was
 5      asking you about the folks who are the plaintiffs in
 6      this case, about whether you know any of these people
 7      or have had interactions or communications with them.
 8                 Are you familiar with the name -- and, again,
 9      these people that I'm about to list are all people who
10      are participating or attending today's deposition.
11                 So Marilyn Marks is the first one.  In
12      addition to Ms. Marks, Stephen Delk, that's your
13      attorney, right?
14           A     Yes, that's correct.
15           Q     And then we have Caroline Middleton.  Do you
16      know Ms. Middleton?
17           A     No, I don't recognize that name.
18           Q     Okay.  There's someone logged in with the
19      username "Ernestine's iPad."  Do you know whether that
20      refers to Ernestine Thomas-Clark?
21           A     I believe that's correct.
22           Q     And is Ms. Thomas-Clark a Coffee County
23      employee?
24           A     Yes.  She's one of the Board of Elections
25      members.
```

Page 228

1      Q    Another person who's present today is someone
2    named Duncan Buell, B-U-E-L-L.  Do you recognize that
3    name?
4      A    I don't recognize that name.
5      Q    Also attending today is Susan Greenhalgh,
6    G-R-E-E-N-H-A-L-G-H.  Do you recognize that name?
7      A    No, I do not.
8      Q    Also attending today we have Mr. Abney, who
9    just asked you questions.  In case it wasn't clear,
10   Mr. Abney represents the Coalition.
11          We've also had today present Sofia Debbiche,
12   D-E-B-B-I-C-H-E.  Do you recognize that name?
13     A    No, I don't recognize that name.
14     Q    Also attending today is someone named Wail
15   Jihadi, W-A-I-L, J-I-H-A-D-I.  Do you recognize that
16   name?
17     A    No, I do not.
18     Q    Also attending today is someone named
19   Kevin Skoglund, S-K-O-G-L-U-N-D.  Do you recognize that
20   name?
21     A    No, I do not.
22     Q    Also attending today is someone named
23   Jenna Conaway, C-O-N-A-W-A-Y.  Do you recognize that
24   name?
25     A    No, I do not.

Page 229

```
 1          Q    Also attending today is someone named

 2    Mary Kaiser, K-A-I-S-E-R.  Do you recognize that name?

 3          A    I don't recognize that.

 4          Q    Also attending today is someone named

 5    Logan Wren, W-R-E-N.  Do you recognize that name?

 6          A    No.

 7          Q    And the last one I have on my list attending

 8    today is Oluwasegun Joseph.  That's

 9    O-L-U-W-A-S-E-G-U-N, Joseph.  Do you recognize that

10    name?

11          A    No, I do not.

12          Q    I appreciate your patience on that

13    Mr. Barnes.  That's, I think, the end of my list of

14    names.

15               I have a few more topics I want to cover with

16    you very briefly.  And I hate to have to ask you about

17    your personal voting experience, but Mr. Cross asked

18    you a couple of questions about that, and I just want

19    to round that subject out.

20               MR. CROSS:  Objection.  I did not ask

21          him any questions about his voting, about how

22          he voted.

23               MR. DENTON:  We can revisit the

24          transcript, David, but you did ask him about

25          his personal experience, his voting on
```

1       absentee-by-mail ballots and so --

2           MR. CROSS:  Oh, okay.  That's fine.

3       Q    (By Mr. Denton)  And so I want to ask you,

4  Mr. Barnes, whether you also have voted using BMDs?

5       A    Yes, I have voted using BMDs as well.

6       Q    And do you have any concern about whether

7  votes that you cast on BMDs were, in fact, counted

8  accurately?

9       A    No, I don't have any concerns about that.

10      Q    Thank you, Mr. Barnes.  I apologize for

11 having to ask that.

12          If you'll give me -- allow me just a few

13 seconds, I want to make sure that I've covered

14 everything I need.  I think I may have.

15      A    Okay.

16      Q    Mr. Barnes, the last subject I'd like to

17 visit with you very briefly is the subject of elections

18 conducted while you were a Coffee County employee.

19          Was it just the one election that you

20 referenced in June?

21      A    Yes, that -- the June election and then the

22 November -- actual Election Day, because that was a

23 primary election in June.

24      Q    Thank you for clarifying that.  So really it

25 was two elections, the June primary --

Page 231

1        A     That's correct.

2        Q     -- and the November general, right?

3        A     Yes.

4        Q     And do you have any concerns about the way

5    that Coffee County conducted either of those elections?

6        A     No, sir.

7             MR. DENTON:  Thank you, Mr. Barnes.

8        That's all I have today.  Thanks again.  Nice

9        meeting you.

10             MR. CROSS:  Mr. Barnes, I just have a

11        few follow-up questions.  I'll be brief.

12                     FURTHER EXAMINATION

13    BY MR. CROSS:

14        Q     For some reason that's hard to comprehend,

15    Mr. Denton decided to spend almost the entirety of his

16    questions for you about communications with individuals

17    instead of talking about issues that matter in the

18    case.

19             But the call that you and I had, just so the

20    record is clear on this -- I think you said this, but

21    there was nothing you and I discussed in that call that

22    we didn't cover today, correct, sir?

23        A     Yes.

24        Q     And that call was brief, it lasted a few

25    minutes; is that fair?

Page 232

1      A     Yes, that's fair.

2      Q     And the way we left it was you -- we were

3   going to follow up with you on deposition logistics

4   because we offered to do it by Zoom; is that right?

5      A     Yes.

6      Q     You were asked whether you have concerns

7   about the reliability of the BMDs.  Do you remember

8   that?

9      A     Yes.

10     Q     Can you do me a favor, can you just pull up

11  Exhibit 2 again, please, and just let me know when you

12  got it.

13     A     Okay, I've got it up.

14     Q     Okay.  And you -- I believe you said you had

15  not seen this before I showed it to you today.  Is that

16  right?

17     A     That is correct.

18     Q     And Exhibit 2, just so we're looking at the

19  same thing, this is the advisory from CISA that came

20  out in June of this year addressing "Vulnerabilities

21  Affecting Dominion Voting Systems ImageCast X," right?

22     A     Yes.

23     Q     And fair to say you haven't studied this

24  today; is that right?

25     A     Yes, that's correct.

Page 233

```
 1        Q    If you come down to page 3, do you see a
 2   heading that says "2.4 Researcher"?
 3        A    Yes, I see that.
 4        Q    And there are two names there:  J. Alex
 5   Halderman at the University of Michigan and
 6   Drew Springall at Auburn University.  Do you see that?
 7        A    Yes, I do.
 8        Q    And you haven't -- you haven't seen at all
 9   the 100-page report we talked about before that
10   precipitated this CISA advisory; is that right?
11        A    No, I have not seen it.
12        Q    And if you come down to Heading 3,
13   "Mitigations" -- do you see that?
14        A    Yes, I do.
15        Q    And you see there are about a dozen bullet
16   points here of mitigations that CISA recommends to
17   reduce the risk of exploitation of these
18   vulnerabilities.  Do you see that?
19        A    Yes, I do.
20        Q    So when you answered Mr. Denton's question
21   about whether you have concerns about the BMDs, you
22   don't know what the mitigations are that have or have
23   not been taken in Georgia or even what the
24   vulnerabilities are that CISA confirmed in this report;
25   is that right, sir?
```

Page 234

```
1              MR. DENTON:  Object to form.
2              THE WITNESS:  Yes, I haven't worked in
3         elections in almost a year.
4         Q    (By Mr. Cross)  Right, so -- just so we're
5    clear, in answering Mr. Denton's question that you
6    didn't have concerns about the reliability of the BMDs,
7    you don't know what vulnerabilities existed in the BMDs
8    that CISA has confirmed, right?
9              MR. DENTON:  Object to form.
10             THE WITNESS:  No.
11        Q    (By Mr. Cross)  You do not know; is that
12   right, sir?
13        A    That's correct.
14        Q    Did you say that's correct?
15        A    Yes.
16        Q    Sorry, you -- the sound is cutting out a
17   little bit.
18             And also in answering that question, you
19   don't know whether any of the mitigations, the
20   mitigations that CISA has recommended here, whether
21   they have been taken in Georgia; is that right, sir?
22        A    I don't know because I'm not up to speed on
23   current elections, so...
24        Q    Right.
25             MR. CROSS:  All right, I don't have any
```

Page 235

```
 1        further questions.  Thank you, Mr. Barnes.  I
 2        think we can go off the record.  I'm sorry,
 3        Russ.  I'm sorry.  Yeah, go ahead.
 4             MR. ABNEY:  No, that's all right.  I
 5        just have one quick follow-up.
 6                    FURTHER EXAMINATION
 7   BY MR. ABNEY:
 8        Q    Mr. Barnes, did Ms. Marks text-message you
 9   before you actually spoke on the phone?
10        A    Yes, she did right before she called me, I
11   believe, because I had been busy work -- at work that
12   day and I hadn't gotten it.
13        Q    Have you read her text message?
14        A    Yes, I have read it since then.
15        Q    Does her text message introduce her as a
16   representative for CGG?
17        A    It's possible.  It's possible that it does.
18   I'm not sure.
19        Q    Okay.  Well, if she had text-messaged you
20   that she was going to call and indicated who she
21   represented, does it stand to reason that she might
22   have assumed you knew who she represented?
23        A    Well, she didn't actually text-message me
24   that she was going to call.  She just was wanting to
25   know if the deposition was still going to be on the
```

Page 236

1   date.  The only reason she called me is because I --

2   like I said, I was busy at the time [indiscernible].

3        Q    Okay, but you got her text message, right?

4        A    Yes, I did get her text message.

5        Q    And it identifies what organization she's

6   with, correct?

7        A    Yes, the text message does.  Like I said, I

8   didn't get that until later on.

9        Q    You didn't get it until after you had talked

10   to her?

11        A    Well, I didn't get it -- honestly, I didn't

12   see it until near or around the time that she was

13   calling me.  She had called me earlier in the day.

14        Q    Okay.  Did you read her text message before

15   or after you talked to her?

16        A    I believe I might have seen it before she

17   called.

18        Q    Okay.  So when she called, you would have

19   known who she was representing, right?

20             MR. DENTON:  Object to form.

21             THE WITNESS:  Well, technically, I mean,

22        I know who she is because I've dealt with her

23        in the past through open-records requests.

24        Q    (By Mr. Abney)  Okay, so it was no mystery

25   who she was representing when she called you, right?

1       A    Yes, that's correct.

2       Q    And you had received a subpoena that

3  identified the Coalition for Good Governance as a party

4  to the lawsuit, right?

5       A    The subpoena mainly put on it

6  Donna Curling.  But, of course, it's et al., so I

7  assume there's other groups involved.

8            MR. ABNEY:  Okay.  That's all I have.

9       Thank you.

10                 FURTHER EXAMINATION

11  BY MR. DENTON:

12       Q    Mr. Barnes, just a brief follow-up there.

13            Did you -- is your testimony that on

14  July 13th, 2022, Ms. Marks actually called you twice

15  that day?

16       A    No, she didn't call me twice.  What it is

17  is that she had sent me a text message earlier, prior

18  to that, but I was at work and I didn't get it at that

19  particular time.  I got it later.

20       Q    And so she sent it to you on your personal

21  cell phone?

22       A    Yes, that's correct.

23       Q    Okay.  And although you may have received it

24  prior to her call, did you read it prior to her call?

25       A    I don't remember if I read it prior to her

Page 238

1      call or not.

2            Q    And just --

3            A    At that time, I was busy at work and it was a

4      hectic day, so that wasn't really the focus of my

5      energy.

6            Q    Sure.  And did that text message indicate

7      that she was also going to call you?

8            A    No.  The text message just was making sure if

9      I was going to be at the deposition at the day and time

10     that was previously acknowledged.

11                MR. DENTON:  Thank you, Mr. Barnes.

12                MR. CROSS:  Thank you, Mr. Barnes.  We

13           can go after the record.

14                THE VIDEOGRAPHER:  This concludes the

15           videotaped deposition.  The time is

16           approximately 3:07 p.m. Eastern Time.  We're

17           off the record.

18                (Deposition concluded at 3:07 p.m.)

19

20

21

22

23

24

25

Page 239

1                    C E R T I F I C A T E

2

3       STATE OF GEORGIA

4       COUNTY OF COBB

5

6            I, MICHELLE M. BOUDREAUX-PHILLIPS, do hereby

7       certify that JAMES A. BARNES, JR., the witness whose

8       deposition is hereinbefore set forth, was duly sworn by

9       me and that such deposition is a true record of the

10      testimony given by such witness.

11

12           I further certify that I am not related to

13      any of the parties to this action by blood or marriage

14      and that I am in no way interested in the outcome of

15      this matter.

16

17           IN WITNESS WHEREOF, I have hereunto set my

18      hand this 27th day of July 2022.

19           *Michelle M. Boudreaux*

20      _____

             MICHELLE M. BOUDREAUX-PHILLIPS, RPR

21

22

23

24

25

Page 240

1    Stephen Delk, Esquire

2    sdelk@hallboothsmith.com

3                           July 27, 2022

4    RE:    Curling, Donna  v. Raffensperger, Brad

5          7/20/2022, James A. Barnes , Jr. (#5331982)

6          The above-referenced transcript is available for

7    review.

8          Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                     Yours,

23                     Veritext Legal Solutions

24

25

Page 241

1   Curling, Donna  v. Raffensperger, Brad

2   James A. Barnes , Jr. (#5331982)

3                E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____   _____

24  James A. Barnes , Jr.                       Date

25

Page 242

1    Curling, Donna   v. Raffensperger, Brad

2    James A. Barnes , Jr. (#5331982)

3                    ACKNOWLEDGEMENT OF DEPONENT

4       I, James A. Barnes , Jr., do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   James A. Barnes , Jr.                        Date

13   *If notary is required

14                         SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                         _____ DAY OF _____, 20____.

16

17

18                         _____

19                         NOTARY PUBLIC

20

21

22

23

24

25