Page 1

1          UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF GEORGIA

3                ATLANTA DIVISION

4

5         Civil Action No. 1:17-cv-02989-AT

6    _____

7    DONNA CURLING, et al.,

8         Plaintiffs,

9    vs.

10   BRAD RAFFENSPERGER, et al.,

11        Defendants.

12   _____

13

14      VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

15             BENJAMIN R. COTTON

16   DATE:          August 25, 2022

17   TIME:          9:11 a.m. to 4:02 p.m. CDT

18   LOCATION:    Witness location

19

     REPORTED BY:  Felicia A. Newland, CSR

20

21            Veritext Legal Solutions

           1250 Eye Street, N.W., Suite 350

22            Washington, D.C. 20005

Page 2

```
 1                    A P P E A R A N C E S

 2        On behalf of the Witness:

 3              ANDREW PARKER, ESQUIRE

 4              Parker Daniels & Kibort, LLC

 5              123 North 3rd Street

 6              Suite 888

 7              Minneapolis, Minnesota 55401

 8              parker@parkerdk.com

 9        On behalf of the Curling Plaintiffs:

10              MARY KAISER, ESQUIRE

11              DAVID D. CROSS, ESQUIRE

12              SONJA SWANBECK, ESQUIRE

13              JENNA CONAWAY

14              CAROLINE MIDDLETON

15              WAIL JIHADI

16              Morrison & Foerster LLP

17              2100 L Street, Northwest

18              Suite 900

19              Washington, D.C. 20037

20              mkaiser@mofo.com

21              dcross@mofo.com

22              sswanbeck@mofo.com
```

1            A P P E A R A N C E S (Cont'd)

2       On behalf of the Coalition for Good Governance

3       Plaintiffs:

4            BRUCE P. BROWN, ESQUIRE

5            MARILYN MARKS, ESQUIRE

6            Bruce P. Brown Law

7            1123 Zonolite Road, Northeast

8            Suite 6

9            Atlanta, Georgia 30306

10           bbrown@brucepbrownlaw.com

11      On behalf of the State Defendants:

12           CAREY MILLER, ESQUIRE

13           DANIELLE HERNANDEZ, ESQUIRE

14           JAVIER PICO PRATS, ESQUIRE

15           Robbins Firm

16           500 14th Street, Northwest

17           Atlanta, Georgia 30318

18           carey.miller@robbinsfirm.com

19           Jpicoprats@robbinsfirm.com

20           dhernandez@robbinsfirm.com

21

22

Page 4

1      Also Present:  (Via Zoom)

2              Donna Curling

3              Bryan Tyson

4              Ernestine Thomas-Clark

5              Kevin Skoglund

6              Marilyn Marks

7              Oluwasegun Joseph

8              Diane Laross

9              J. Alex Halderman

10             Donna Price

11             David Lowman

12             Cheryl Ringer

13             Susan Greenhalgh

14     Videographer:  Brian Ciccone

15

16

17

18

19

20

21

22

1                    C O N T E N T S

2    EXAMINATION BY:                                    PAGE

3         Counsel for Curling Plaintiffs            11

4         Counsel for Coalition Plaintiffs          166

5         Counsel for State Defendants              227

6         Counsel for Witness                       273

7         Counsel for State Defendants              278

8              COTTON DEPOSITION EXHIBITS

9    NO.  DESCRIPTION                                   PAGE

10   1    LinkedIn Profile of Ben Cotton             24

11   2    Letter from Andrew Parker to Mary          38

12        Kaiser, and others, dated August 24,

13        2022

14   3    Letter from Andrew Parker to Mary          53

15        Kaiser, dated August 19, 2022

16   4    Article entitled:  Pro-Trump Tech Team     77

17        Copied Georgia Election Data, Records

18        Show

19   5    January 8, 2021 Paul Maggio e-mail chain   85

20        and invoice

21   6    Key Photos from Maggio Production          93

22   7    8/12/2022 Maggio Hard Drive Contents       101

```
 1        8    8/12/2022 Email addresses with access to    107
 2             CC data
 3        9    4/22/2021 Email, Greg Freemyer - no          113
 4             involvement
 5        10   E-mail chain, Coffee County Forensics        116
 6             FedEx to Lambert
 7        11   Cotton Excerpt, July 21, 2022 Motion         119
 8             Hearing, Lake v. Hobbs
 9        12   Declaration of Benjamin R. Cotton in         137
10             Lake v. Hobbs
11        13   May 7, 2021 Barnes e-mail chain re:          151
12             Cyber Ninjas
13        14   Georgia, Secretary of State, News and        156
14             Announcements, January 27th, 2022
15        15   ICS Advisory (ICSA-22-154-01) 6/4/22,        158
16             3:21 p.m.
17        16   7/13/2021 Corrected Exhibit B - July 12      165
18             Declaration of J. Alex Halderman
19        D1   Exhibit D to Cotton First Declaration -      267
20             EAC Inv Report Williamson County, TN
21        D2   Exhibit F to Cotton's First Declaration      278
22             - Halderman Dec 2020.08.19
```

1        D3    Exhibit G to Cotton First Declaration -      281

2              Halderman Rebuttal Declaration

3

4        *(Exhibits attached to transcript.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1                    P R O C E E D I N G S

2                       *  *  *  *  *  *  *

3                    VIDEOGRAPHER:  Good morning.  We are

4        going on the record at 9:11 a.m. Central Daylight

5        Time on August 25th, 2022.  This is Media Unit

6        Number 1 of the video-recorded deposition of

7        Benjamin R. Cotton, taken by the counsel -- by

8        counsel for Plaintiff in the matter of Donna

9        Curling, et al. versus Brad Raffensperger, et al.,

10       filed in the United States District Court for the

11       Northern District of Georgia, Case Number

12       1-17-cv-02989-AT.

13                    This deposition is being held via

14       remote Zoom.  My name is Brian Ciccone,

15       representing Veritext Legal Solutions.  And I am

16       the videographer.  The court reporter is Felicia

17       Newland, also from Veritext Legal Solutions.

18                    Will the attorneys please note

19       their appearances for the record?

20                    MS. KAISER:  This is Mary Kaiser with

21       Morrison & Foerster on behalf of the Curling

22       Plaintiffs.  With me on the line, I see David

1    Cross, Caroline Middleton, Jenna Conaway, Wail

2    Jihadi, Sonja Swanbeck.  I believe that's everyone

3    also with Morrison & Foerster.  And our clients

4    Donna Curling and Donna Price.  And an expert

5    witness involved in our case, Mr. Alex Halderman,

6    Dr. Alex Halderman.

7              MR. BROWN:  This is Bruce Brown,

8    representing the Coalition Plaintiffs.  With us

9    today are Marilyn Marks, my client, Kevin Skoglund.

10   And if there's anyone else from the Coalition

11   Plaintiffs, they may introduce themselves.

12             MR. MILLER:  This is Carey Miller,

13   here on behalf of the State Defendants.  In the

14   room with us, we've got Bryan Tyson, Danielle

15   Hernandez, Diane LaRoss, and Javier Pico Prats.

16             Given the late notice that we had

17   regarding this deposition, unless there's

18   objection of counsel, we will switch off our

19   coverage for the morning and afternoon.

20   Mr. Tyson will handle this morning and I'll

21   handle this afternoon.  We didn't want to hold up

22   moving this forward.

1                    MR. PARKER:  And this is Andrew

2        Parker here representing Ben Cotton.  I am in the

3        room with Mr. Cotton.  I am not on camera, but I

4        will be speaking during the deposition.

5                    VIDEOGRAPHER:  Is that everybody --

6                    MR. PARKER:  If you need me to be on

7        camera, I am certainly happy to do that, but prior

8        to starting, there was a request made that only

9        Mr. Cotton be in the camera view.

10                   VIDEOGRAPHER:  Has everybody

11       announced their appearances?

12                   Okay.  Will the court reporter

13       please swear in the witness?

14              (Witness duly sworn in.)

15                   VIDEOGRAPHER:  You may proceed.

16                   * * * * * *

17        Whereupon,

18                   BENJAMIN R. COTTON

19       was called as a witness and, having been first duly

20       sworn, was examined and testified as follows:

21

22

1           EXAMINATION BY COUNSEL FOR CURLING PLAINTIFFS

2       BY MS. KAISER:

3               Q     Good morning, Mr. Cotton.

4                     MR. PARKER:  Mary, if I might, before

5       you begin, I wanted to put on the record our

6       agreement to the subpoena in testifying here today.

7       Mr. Cotton received two subpoenas, one from the

8       Curling Plaintiffs, another from the organizational

9       plaintiff in your case in Georgia.  We provided an

10      objection to those subpoenas.  We offered to

11      discuss with counsel to coordinate Mr. Cotton's

12      cooperation with the subpoenas.  We did that on

13      more than one occasion with you all.

14                    And we ultimately determined, and

15      agreed, that the subpoenas would be narrowed,

16      which they were, through an August 9th letter

17      from David Cross to counsel.  It is our

18      understanding that both outstanding subpoenas

19      have been narrowed by the August 9th letter, and

20      that that agreement was made and a date was

21      selected for today at this time for the

22      deposition to proceed.

1          The location of the deposition was

2     also agreed to.  Yesterday we learned that the

3     deposition was to be taken by Zoom, and we

4     voluntarily agreed to that as well.

5          So Mr. Cotton is here for the

6     limited purpose of answering questions within the

7     scope of the amended subpoena based on the

8     August 9th letter from Mr. Cross.  And he will do

9     so in advance of the subpoena.  He provided --

10    he -- he did a thorough review of all of his

11    records in response to the amended subpoena.  He

12    provided responsive documents, which were not

13    withheld based on privilege or rule.  He also

14    provided a log of other responsive documents,

15    which are protected by a privilege or rule, which

16    are identified in the log.

17          And with those limitations and

18    background, he's here to answer your questions.

19          MS. KAISER:  Thank you, Andrew.  I'll

20    note for the record that, you know, the parties

21    have had correspondence back and forth.  And, you

22    know, we will have some questions for Mr. Cotton

1          today with respect to some of the representations

2          that you just made, but I believe we can get

3          started.

4                          MR. PARKER:  Okay.

5          BY MS. KAISER:

6                  Q      Good morning, Mr. Cotton.

7                  A      Good morning.

8                  Q      I'm Mary Kaiser.  Nice to meet you.

9                          Can you please state your name and

10         address for the record?

11                 A      My name is Benjamin R. Cotton,

12         C-O-T-T-O-N.  And my address is ██████████████

13         ████████████████████████████████████.

14                 Q      I'm going to be asking you a series

15         of questions today.  Before we do that, do you

16         understand that you are under oath?

17                 A      I do.

18                 Q      Is there any reason why you would be

19         unable to give full and complete testimony today?

20                 A      No.

21                 Q      Have you been deposed before?

22                 A      I have.

Page 14

```
1              Q     So you understand how this works.
2         I'll be asking you questions.  Your attorney may
3         object, but unless he instructs you not to answer a
4         question, you may, and should, answer my question.
5                    Do you understand that?
6              A     Yes.
7              Q     Because we are in a remote
8         environment today, I do have a couple of questions
9         for you.  I understand that your attorney,
10        Mr. Parker, is in the room with you.  Is that
11        correct?
12             A     That is correct.
13             Q     Is there anybody else in the room?
14             A     There is not.
15             Q     Do you have a cellphone or a computer
16        with you today, sir?
17             A     I have a cellphone.  It's silenced.
18             Q     Okay.  Can you -- do you have any
19        chat functions open on your cellphone?
20             A     I do not.
21             Q     And I believe you said no -- no
22        computer with you today?
```

1          A      No.

2          Q      Do you understand that you are not

3     allowed to communicate during the deposition via

4     text, e-mail, chat or other electronic means?

5          A      Yes.

6          Q      If you need to take a break at any

7     point, please just let me know.  I'll just ask that

8     if I have a question pending, that you provide an

9     answer and then I will try to find a time very

10    shortly thereafter to go on a break.  Is that okay

11    with you?

12         A      That's fine.  Thank you.

13         Q      Sure.

14                Okay.  Mr. Cotton, where did you go

15    to college?

16         A      I went through the -- I was active

17    duty military.  And for my bachelor's, I got that

18    through the University of New York.  And then I got

19    my master's at the University of Maryland.

20         Q      What was your undergraduate degree

21    in?

22         A      It was general studies.

Page 16

```
 1              Q      Did you have a concentration?

 2              A      I did not.

 3              Q      And you said you had a graduate

 4       degree from the University of Maryland.  Is that

 5       correct?

 6              A      That's correct.

 7              Q      What is your master's degree in?

 8       What subject?

 9              A      Primary concentration on that is

10       Information Technology Management.

11              Q      When did you receive that degree?

12              A      That was in 2002.

13              Q      Do you have any other graduate

14       degrees?

15              A      No.

16              Q      Do you have any certifications or

17       additional credentials?

18              A      I do.

19              Q      Can you list those for me, please?

20              A      I have a CISSP from the ISC Square

21       Institute.  I have --

22              Q      Can you just describe that acronym
```

1      for me or give me a little bit more information

2      what that certificate is in?

3              A    Yeah.  It's a -- it's a degree for

4      the security -- well, it's not a degree.  It's a

5      certificate for cybersecurity and other forms of

6      security as it pertains to the industry.

7              Q    Thank you.

8                   So you have your CISSP.  When did you

9      receive that credential?

10             A    I received that in 2002, and it has

11     remained active ever since.

12             Q    Okay.  Do you have any other

13     certificates?

14             A    Yes.  Certified Microsoft

15     professional.  I am a Network Plus professional.  I

16     have a certification in forensics incident response

17     for the CyFIR program.

18             Q    What is the CyFIR program?

19             A    The CyFIR program is a

20     enterprise-level Computer Forensics and Incident

21     Response Technology.

22             Q    Okay.  Any other certificates that

1    you have?

2              A    No, not off the top of my mind.

3              Q    Where are you currently employed,

4    Mr. Cotton?

5              A    I'm currently employed as the vice

6    president for incident response with eSentire.

7              Q    Is that a company that you -- that

8    you own?

9              A    No.  ESentire purchased the -- the

10   company that I owned.

11             Q    What company was that?

12             A    CyFIR.

13             Q    When did that purchase or acquisition

14   take place?

15             A    That was June 2021.

16             Q    So you've worked at eSentire since

17   June 2021?

18             A    Yes.

19             Q    How many -- about how many employees

20   does that firm have?

21             A    About 600.

22             Q    Where is it located?

Page 19

```
 1              A     The headquarters is in Canada.

 2       There's a U.S. subsidiary based out of Ashton,

 3       Virginia.

 4              Q     And do you work out of that Virginia

 5       office?

 6              A     So I work remotely out of the

 7       Montana -- out of my Montana address.

 8              Q     And is that your home address that

 9       you --

10              A     Yes.

11              Q     -- stated earlier on the record?

12              Okay.  What are your responsibilities

13       as the vice president for incident response at

14       eSentire?

15              A     Well, I oversee a team of personnel

16       responding to cybersecurity incidents.  I perform

17       forensics analysis in addition to my management

18       responsibilities.

19              Q     You manage other employees?

20              A     I do.

21              Q     What -- what types of clients does

22       eSentire have?
```

```
                                                 Page 20

 1              A     We have a wide variety of clients

 2       ranging from financial institutions, private

 3       industry.  It's pretty much the gamut of -- of

 4       companies out there.

 5              Q     All right.  I think you -- you

 6       mentioned a firm that you owned or founded called

 7       CyFIR.  Is that correct?

 8              A     That's correct.

 9              Q     When did you found that company?

10              A     That company was founded in 2018, or

11       it was actually spun out of another company called

12       CyTech.

13              Q     And you were the founder of CyFIR,

14       correct?

15              A     Yes.

16              Q     Did you hold any other titles at the

17       company?

18              A     When you're a small company like

19       that, you hold a lot of titles.  So I was the --

20       the director of forensics for CyFIR, in addition to

21       being a board member.

22              Q     You mentioned it was a small company.
```

Page 21

1          How many employees did CyFIR have?

2               A     I think at its peak before the sale,

3     we had about 18 employees.

4               Q     Did you have a physical location?

5               A     Yes.

6               Q     Where was that?

7               A     Initially it was in Manassas,

8     Virginia and then that was changed to Ashburn,

9     Virginia.

10              Q     Did you work out of the Virginia

11    offices?

12              A     I did.

13              Q     Did you -- so did you relocate to

14    Montana when CyFIR was sold to eSentire?

15              A     I relocated before that.  It would

16    have been approximately the last part of 2017.

17              Q     And you worked remotely for CyFIR

18    from that point until --

19              A     Yes.

20              Q     -- you worked at eSentire?

21              A     Yes.

22              Q     Please tell me a little bit about

1          the -- the business that the CyFIR company did.

2                 A     Well, we created a enterprise-level

3          forensic software that had basically overcame some

4          challenges with the current industry software.  So

5          EnCase was the leading forensic software at that

6          time.  They had a significant problem with speed,

7          as addressed especially with scalability across

8          large networks.

9                       And so we created a technology that

10         would essentially do forensics analysis, live

11         memory analysis, the full keyword search

12         capabilities that scaled across very large networks

13         and get those results in the same time it took you

14         to examine or analyze one computer.

15                A     And that was -- what was that

16         technology called?

17                A     CyFIR.

18                Q     Okay.  Same as the company?

19                A     Yes.

20                Q     Okay.  And is that technology

21         still -- was that part of the acquisition with

22         eSentire --

1          A      Yes, it was.

2          Q      -- that technology?

3                 Okay.  What kind of clients did CyFIR

4     have?

5          A      We had both public and private

6     clients, that included banks, that included large

7     manufacturers, that includes sportswear companies,

8     and the federal government.

9          Q      And I think you said that CyFIR was

10    spun out of another company called CyTech.  Is that

11    correct?

12         A      That's correct.

13         Q      Is that Cybersecurity Technology

14    Services?  Is that the full name of CyTech?

15         A      Cyber Technology Services, yes --

16         Q      Okay.

17         A      -- doing business as CyTech Services.

18         Q      Okay.  Were you a founder or owner of

19    CyTech?

20         A      I was.

21         Q      When did you found that company?

22         A      I founded the company initially in

1    2002.

2            Q    That was right after you received

3    your master's degree?

4            A    Yes.  I was -- I was retiring from

5    the military and I -- I created the company.

6            Q    Where was that company located?

7            A    That was in Manassas, Virginia.

8            Q    And about how many employees did

9    CyTech have?

10           A    CyTech does primarily government

11   contracting, so that ebbs and flows with budgets

12   and sequestration.  At the peak, I would probably

13   have had about 30 employees, maybe a little less.

14   I think currently there are 17.

15           Q    And what was the -- what was your

16   title at CyTech?

17           A    President and CEO.

18           Q    Okay.

19                MS. KAISER:  I'm going to introduce

20   our first exhibit here.  Tab 1 will be Exhibit 1.

21                (Cotton Deposition Exhibit Number 1

22                 marked for identification.)

```
 1                   MR. PARKER:  Let's see if I can get

 2        that pulled up.  Let's see, refresh.

 3                   MS. KAISER:  Is it -- is the exhibit

 4        available for you, Andrew?

 5                   MR. PARKER:  Yes.  With Ben Cotton's

 6        name on the top?

 7                   MS. KAISER:  Yes.

 8                   MR. PARKER:  Exhibit 1?

 9                   MS. KAISER:  Yes, this is Exhibit 1.

10                   MR. PARKER:  Yes.

11        BY MS. KAISER:

12             Q    Mr. Cotton, do you recognize this

13        document?

14             A    I do.

15             Q    Does it say your LinkedIn profile?

16             A    It is.

17             Q    Do you -- do you update your LinkedIn

18        profile, you know, pretty regularly?

19             A    I don't.

20             Q    Okay.  Fair enough.

21                   All right.  Well, I know your

22        experience here.  Is this -- is this information
```

1           accurate?

2                   A      I am no longer president and CEO of

3           CyTech Services.

4                   Q      Okay.

5                   A      As part of the agreement with

6           eSentire, I have brought in personnel to fill those

7           positions.

8                   Q      Do you still have any role at CyTech?

9                   A      I am a board member --

10                  Q      Okay.

11                  A      -- and president of the board at

12          CyTech.

13                  Q      But you're no longer president and

14          CEO?

15                  A      I am not.

16                  Q      Okay.  Other than that, are these

17          first three entries under your experience accurate?

18                  A      Yes.  I would say that on the

19          Guidance Software, I was one of the contract

20          part-time instructors --

21                  Q      Okay.

22                  A      -- based out of the Sterling office.

Page 27

```
 1              Q    Okay.  With that adjustment,
 2      otherwise, this -- this information looks accurate
 3      to you?
 4              A    Yes.
 5              Q    Can you -- can you tell me a little
 6      bit about your role with BYU?
 7              A    Yes.  So I sit on the Cybersecurity
 8      Advisory Board there.  They have a cybersecurity
 9      program.  And we oversee the -- the curriculum and
10      the training for the students and ensure that that
11      is up to date and is relevant with what the
12      industries are requiring of its hirees out of
13      college.
14              Q    Okay.  So are you currently employed
15      by any other companies that we have not talked
16      about yet?
17              A    No.
18              Q    Are you a member of any other
19      organizations that we have not talked about?
20              A    Yes.  I am a member of HTCIA.
21              Q    What is HTCIA?
22              A    HTCIA is a nationwide-recognized
```

Page 28

```
 1        forensics organization.

 2               Q      You said you're just a member of that

 3        organization?

 4               A      I am.

 5               Q      Do you have a leadership role?

 6               A      I do not.

 7               Q      Do you know about how many members

 8        the organization has?

 9               A      I -- I really don't have any idea.

10        It's -- it's global, so there would be a lot.

11               Q      Okay.  Are you involved in any

12        election organizations or offices?

13               A      I am not.

14               Q      Prior to the November 2020 general

15        election, did you have any experience analyzing

16        election systems?

17               A      No.

18               Q      Prior to the November 2020 general

19        election, did you have any experience analyzing

20        elections data?

21               A      No.

22               Q      Have you done any work on behalf of a
```

1          political party?

2                    A      No.

3                    Q      Or a political organization?

4                    A      No.

5                    Q      Have you ever been retained as an

6          expert witness?

7                    A      Yes.

8                    Q      In what cases?

9                    MR. PARKER:  Don't answer that.  That

10         goes beyond the scope of the subpoena.  I will also

11         add in that it violates potentially the

12         work-product doctrine in most cases, as well as the

13         rules cited in our document log.

14                   MS. KAISER:  Mr. Parker, the fact

15         of -- the fact of Mr. Cotton's retention is not

16         privileged.  I will -- I will limit my question.

17         BY MS. KAISER:

18                   Q      Mr. Cotton, have you been retained as

19         an expert witness in any case involving Georgia's

20         election system?

21                   A      Yes.

22                   MR. PARKER:  You can answer that.

```
 1        BY MS. KAISER:

 2             Q      What cases -- in what cases have you

 3        been retained as an expert?

 4                    MR. PARKER:  You can answer that.

 5                    THE WITNESS:  I have been retained by

 6        two legal teams.  The first team involved the

 7        VoterGA.org cases concerning the election voting

 8        system.  And also I was tangentally involved with

 9        some actions on Gwinnett County.  The second team,

10        I was retained on matters pertaining to Coffee

11        County.

12        BY MS. KAISER:

13             Q      Let me get into that a little bit.

14                    Have you submitted an expert report

15        in any of those matters that you just listed?

16             A      I have not.

17             Q      Have you testified under oath in any

18        of those matters?

19             A      I have not.

20             Q      Mr. Cotton, you are represented by

21        counsel today, correct?

22             A      I am.
```

```
 1              Q     Mr. Andrew Parker?

 2              A     Yes.

 3              Q     Did you seek out Mr. Parker as an --

 4      as an attorney?

 5              A     I did.

 6              Q     Approximately when?

 7              A     Approximately the time that I

 8      received the first subpoena.

 9              Q     Can you tell me a little bit about

10      the circumstances of you retaining Mr. Parker?

11                   MR. PARKER:  Do not communicate any

12      discussions that we had in answering this question

13      or any legal advice you sought or received, as it

14      would be privileged.

15                   THE WITNESS:  When I received the

16      subpoena, I determined that it would be best if I

17      had legal counsel responding to the subpoena, and

18      so I contacted Mr. Parker and asked him if he --

19                   MR. PARKER:  Don't go into anything

20      that we talked about.

21                   THE WITNESS:  Okay.  So I contacted

22      Mr. Parker.
```

Page 32

1          BY MS. KAISER:

2                   Q      Did you know Mr. Parker prior to

3          receiving the subpoena?

4                   A      I did.

5                   Q      Has he represented you before?

6                   A      No.

7                   Q      Who's paying your attorney for your

8          representation today?

9                   A      I am.

10                  Q      Did you spend any time with your

11         attorney preparing for today's deposition?

12                  A      Yes.

13                  Q      Approximately how much time did you

14         spend preparing?

15                  A      Probably about -- if -- if we're --

16         does this include the time that was spent searching

17         for documents?

18                  Q      If you could give me -- you could

19         give me a separate estimate of how much time you

20         spent searching for documents and then how much

21         time you spent preparing for the deposition.

22                  A      So the time searching for documents

Page 33

1      entailed roughly 30 hours.

2              Q      Okay.

3              A      And I met with Mr. Parker an hour

4      before this deposition, and we had several brief

5      phone calls previous to this.

6              Q      How long would you estimate those

7      calls lasted in total?

8              A      In total, including all of the

9      conversations concerning the documents and the

10     production, maybe two and a half, three hours,

11     maybe.

12             Q      Okay.  Mr. Cotton, you represented

13     that you spent approximately 30 hours searching for

14     documents responsive to the subpoena.  Is that

15     correct?

16             A      That's correct.

17             Q      Can you describe what kind of

18     searches you did to locate responsive documents?

19             A      So I have access to forensic

20     software, EnCase, CyFIR, various e-mail production

21     technologies.  So the first thing that we looked at

22     was e-mail for all of my accounts.  And I --

1          Q     Work accounts and personal?

2          A     Correct.

3                I then ran the eDiscovery software,

4     performing keyword searches that corresponded to

5     the subpoena in the areas of the subpoena across

6     those accounts.

7          Q     Did you -- I'm sorry, did you mention

8     the name of that software?

9          A     I used Aid4Mail.  And I also used the

10    Office 365 security and management search

11    functions.

12         Q     Okay.  And you said you searched for

13    terms relevant to the subpoena?

14         A     That's correct.

15         Q     Were there -- were there names

16    included in those terms?  Specific names?

17         A     There were.

18         Q     Okay.

19         A     As well as e-mail addresses and other

20    search terms.

21         Q     Okay.

22               MS. KAISER:  Mr. Parker, we would

1    request a list of the search terms that Mr. Cotton

2    used to search for documents responsive to the

3    subpoena.

4                    MR. PARKER:  We will consider that.

5                    MS. KAISER:  Thank you.

6    BY MS. KAISER:

7         Q    Okay.  So you said you ran searches

8    across your e-mails based on these search terms.

9    Is that correct, Mr. Cotton?

10        A    That's correct.

11        Q    What e-mail addresses did you search?

12        A    I searched my

13   Ben.Cotton@███████.com,

14   Ben.Cotton@██████████.com, and

15   Bencotton@██████.com.

16        Q    And those are all of the e-mail

17   addresses that you currently use?

18        A    Yes.

19        Q    And is that all the e-mail addresses

20   that you have used since November 2020?

21        A    Yes.

22        Q    Did you do anything else to search

Page 36

1        for responsive documents?

2              A      Yes.  I -- I did a review and a

3        search across my forensics platforms for files that

4        were pertinent to the subpoena.

5              Q      Did you locate any?

6              A      Yes.

7              Q      Did you produce any of those to us?

8              A      I produced them to the attorneys.

9              Q      I'll represent that those were not

10       produced to the Plaintiffs in this matter.  Do you

11       know why?

12             A      I -- I leave that up to the

13       attorneys.

14             Q      Can you estimate the -- the volume of

15       the forensics files that you produced to your

16       attorney?

17                    MR. PARKER:  That's attorney-client

18       privilege.  We'll object.

19                    Don't answer.

20       BY MS. KAISER:

21             Q      Are you going to follow your

22       attorney's instruction not to answer that question,

Page 37

```
 1          Mr. Cotton?
 2                  A      I am.
 3                  Q      Is there anything you're willing to
 4          tell me about the forensic files that you turned
 5          over to your attorney?
 6                  A      I'm following the advice of my
 7          attorney on this.
 8                  Q      Did you do anything else to search
 9          for responsive files?
10                  A      Can you repeat the question, please?
11                  Q      Did you ask for any -- do anything
12          else to search for materials responsive to the
13          subpoena?
14                  A      That was the entirety of what -- of
15          my holdings.
16                  Q      Your e-mails and your forensics
17          platforms?
18                  A      Yes.
19                  Q      Do you use -- do you use any -- did
20          you search, for example, text messages?
21                  A      I did.
22                  Q      Did you find any responsive text
```

Page 38

1      messages?

2              A     I found a couple responsive messages.

3      Those were turned over to the attorneys.

4              Q     And I will, again, represent those

5      were not turned over to Plaintiffs.  Do you know

6      why?

7                  MR. PARKER:  I'll represent for

8      Mr. Cotton that everything that is responsive to

9      the subpoena was turned over to you.

10                 MS. KAISER:  Well, we have reasons to

11     question that, Mr. Parker.

12                 MR. PARKER:  What's the basis of your

13     questioning of my professional representation?

14                 MS. KAISER:  Well, for example --

15                 Will you introduce Tab 6 as the

16     next exhibit?

17                 We're going to introduce the next

18     exhibit.

19             (Cotton Deposition Exhibit Number 2

20              marked for identification.)

21                 MS. KAISER:  While we do that,

22     Mr. Parker, we request immediate production of the

1          forensics -- of all of the files that Mr. Cotton

2          pulled from the forensics files that he identified

3          as responsive to the subpoena.

4                        MR. PARKER:  You're referring to

5          those listed on the log?

6                        MS. KAISER:  I'm referring to what

7          Mr. Cotton produced to you that he found was

8          responsive to the subpoena.

9                        MR. PARKER:  That who found was

10         responsive to the subpoena?

11                        MS. KAISER:  Mr. Cotton determined

12         were responsive to the subpoena.

13                        MR. PARKER:  Well, that's not what

14         he's testified to.

15                        MS. KAISER:  I believe that's exactly

16         what he's testified to.

17                        MR. PARKER:  No, he has not.  In our

18         legal analysis of what the subpoena requests, and,

19         in fact, we were quite broad in our response to you

20         with documents, is that we have provided all

21         responsive documents or listed them on the log.

22         Anything not listed is not responsive to the

Page 40

1      subpoena as amended by the August 9th letter.  And

2      we'll stand by that.

3      BY MS. KAISER:

4              Q     Can you take a look at Exhibit 2,

5      please?  Do you recognize this document,

6      Mr. Cotton?

7              A     I personally don't, but it appears to

8      be the privilege log.

9              Q     Yes.  So just for clarity's sake,

10     there is a cover letter dated August 24th from your

11     attorney, Andrew Parker, to myself and my

12     colleague, David Cross.

13                  Do you see that?

14             A     I do.

15             Q     It says, "Enclosed is a log of

16     documents responsive to the subpoenas."  And do you

17     recognize the attachment to this as that privilege

18     log?

19             A     I see it.  I -- this is the first

20     time that I've seen the privilege log, but I do see

21     it and acknowledge what it says -- what it states.

22             Q     Fair enough.  Okay.

```
 1                     Do you see anywhere listed on this
 2          privilege log any text messages?
 3               A     Can you scroll down?
 4                     One of these is not identified as a
 5          text message, but it was a -- it was a screen
 6          capture of a message.  And that is the BC0009 --
 7               Q     Okay.
 8               A     -- Bates number.
 9               Q     Thank you.
10                     Approximately how many text messages
11          did you turn over to your attorney, Mr. Cotton?
12               A     I believe there was only one.  This
13          one that was relevant with the subpoena.
14               Q     And I'd like to ask again, about how
15          many forensics files did you turn over to your
16          attorney?
17                     MR. PARKER:  Objection.  That is
18          protected by the work-product doctrine and the
19          rules identified in the log.
20                     MS. KAISER:  Andrew, how is the
21          number of files privileged?  I'm asking for the
22          number.
```

Page 42

1                    MR. PARKER:  Yeah, I understand.
2          That goes into what he was provided to review.  The
3          number is a fact related to that.  He's not going
4          to go into that.
5                    MS. KAISER:  I fail to see how the
6          number of documents that he turned over to you
7          could be privileged.
8                    MR. PARKER:  It is.
9                    MS. KAISER:  I'm not asking for the
10         contents of the documents or -- or what was
11         contained in them, simply the number.
12                    MR. PARKER:  It is.  Look at the case
13         law regarding work-product doctrine.  It is.
14                    MS. KAISER:  I am very familiar with
15         the case law.  Thank you, Mr. Parker.
16                    MR. PARKER:  Okay.
17                    MS. KAISER:  All right.  We -- we
18         request immediate production of both the forensics
19         files that Mr. Cotton turned over, as well as the
20         text messages.
21         BY MS. KAISER:
22                    Q    Mr. Cotton, do you use any other

Page 43

1        messaging services besides text message?

2              A      Well, text message is a category, not

3        a service.

4              Q      Sure.  Okay.

5                     What -- what text -- what text

6        platforms do you use?

7              A      I use Signal.  And for family

8        communications, I use the messaging app on iOS

9        devices.

10             Q      So iMessage?

11             A      I believe it's just called Message.

12             Q      Okay.  Did you search Signal for

13       documents or communications responsive in the

14       subpoenas?

15             A      I did.

16             Q      Did you locate any?

17             A      That one message that I previously

18       located as part of the Bates number.

19             Q      That came from your -- from your

20       Signal account?

21             A      Well, it came from a Signal account

22       that I preserved.  The Signal account, up until the

Page 44

```
 1           time that I received the subpoena, I had dissolving

 2           messages turned on.  When I received the -- the

 3           subpoena, I disabled that and preserved everything

 4           that I had at that point.

 5                Q    When you say "dissolving messages,"

 6           can you describe what you mean?

 7                A    So Signal -- the messages -- the --

 8           the application only preserves those for a week.

 9                Q    So prior to your -- to when you

10           received the subpoena, your Signal account was set

11           to delete messages after one week.  Is that

12           correct?

13                A    Well, they call it dissolving, and

14           that's basically a default setting when I installed

15           it.

16                Q    Are you aware of other documents

17           responsive to the subpoena that existed in your

18           Signal account at sometime?

19                A    No.

20                Q    So, to your knowledge, nothing

21           responsive to the subpoena was deleted within your

22           Signal account.  Is that correct, or dissolved?
```

Page 45

1          A     That's correct.  If I had received

2     something through that medium, I had preserved that

3     as part of the forensics notes or files within the

4     individual cases.

5          Q     What did you do to preserve that

6     with -- within the other files?

7          A     So as part of my forensics

8     examinations, I maintain notes and I maintain --

9     well, I maintain the files that are pertinent to

10    the case.  And I do that on a forensics examination

11    platform that has RAID redundancy capability built

12    in.

13         Q     What's the name of that platform?

14         A     It's my computer.

15         Q     I'm sorry.  Your computer --

16         A     It's an -- it's an individual

17    forensics workstation located in my forensics

18    examination facility.

19         Q     Which is your home address?

20         A     Yes.

21         Q     So your representation is that

22    anything that was pertinent to the -- to the work

Page 46

1      that you were doing that you received through

2      Signal, you -- you know, you entered into or moved

3      over to your computer that was located in your lab.

4              Is that accurate?

5          A    That's accurate.

6          Q    Including -- including

7      communications?

8          A    Yes, as if they're required, right,

9      but yes.

10          Q    And did you save the communication

11     itself or just make a notation of it on your

12     computer?

13         A    Notations of it.

14         Q    What did those notations entail --

15     encompass?

16         A    Those would have been communications

17     with the attorneys, which I believe is covered by

18     the attorney-work privilege.

19         Q    Did you write down the name of the --

20     the person who was communicating with you?

21         MR. PARKER:  I am going to object.

22         Don't answer that.  Attorney-work

1      product gets into information.

2                     MS. KAISER:  Mr. Parker, I'm asking

3      what Mr. Cotton did when he received messages.

4                     MR. PARKER:  Yes, he received

5      messages, but getting into what he did with them

6      gets into the work-product privilege and the rules

7      related to a consulting expert.

8      BY MS. KAISER:

9            Q     Mr. Cotton, did you receive messages

10     on Signal from anyone other than an attorney?

11           A     Not as related to these cases.

12           Q     Did you receive messages on Signal

13     from any attorney with whom you did not have an

14     active engagement agreement?

15           A     Within the scope of the subpoena, no.

16           Q     What do you mean by that?

17           A     Meaning we're limited to Georgia

18     and -- and Georgia cases.

19           Q     So as it relates to anything

20     pertaining to Georgia, did you receive messages on

21     Signal from anyone other than an attorney with whom

22     you had an active engagement as an expert?

```
 1              A     So I received text messages, or

 2         Signal messages, from other experts on the team,

 3         but I did not receive e-mails or Signal messages

 4         from people not associated with the engagement and

 5         investigation.

 6              Q     Who were the other experts on the

 7         team that you received messages from?

 8                   MR. PARKER:  Objection.

 9                   Don't answer that.  Attorney-work

10         product.

11                   Frankly, I've let you go further

12         than what the work product would normally allow

13         in certain respects.  So, you know, we're not

14         going to get into things that he received and who

15         he talked to.

16                   MS. KAISER:  Mr. Parker, the

17         communications --

18                   MR. PARKER:  Let me --

19                   MS. KAISER:  -- between experts

20         themselves are not privileged.  And communications

21         from an expert to an expert is not privileged.  I

22         am asking him about communications with other
```

1      experts, not with an attorney.

2                    MR. PARKER:  Any information that he

3      receives as it relates to his non-testifying

4      consulting expert work, his work product, and he's

5      not going to answer any questions regarding it.

6                    MS. KAISER:  I think that's a vastly

7      overexpansive interpretation of the work-product

8      doctrine.

9                    MR. PARKER:  I have an accurate

10     interpretation of it.

11     BY MS. KAISER:

12            Q     We may return to that topic.

13                    Mr. Cotton, did you search any

14     other -- we were speaking about Signal.  Did you

15     search any other messaging platforms for documents

16     responsive to the subpoena?

17            A     I don't use any others, so no.

18            Q     You mentioned the -- the messaging

19     platform on your iOS system.  Did you search those

20     messages?

21            A     I did.  But those are used

22     exclusively for personal communications and they

1      did not return any messages that were relating to

2      Georgia.

3              Q     Do you use any cloud accounts?

4              A     Are you talking about messaging

5      accounts or e-mail accounts or what --

6              Q     I'm talking -- I believe we covered

7      your e-mail, and we covered your messaging

8      platforms.  Are there any other cloud-based

9      software programs that you use as part of your

10     work?

11             A     Not for Georgia.

12             Q     Okay.  Did you search for any

13     hard-copy documents?

14             A     I did not maintain any hard-copy

15     documents with respect to these engagements.

16                   MR. PARKER:  When you say "these,"

17     you're talking about Georgia?

18                   THE WITNESS:  Georgia, yeah.

19     BY MS. KAISER:

20             Q     So you do not have any hard-copy

21     documents that relate in any way to your

22     involvement in the Georgia matters?

Page 51

```
 1             A     No.   What I have are electronically

 2       stored documents.   And those were searched as part

 3       of the search across the file systems and the

 4       e-mail.

 5             Q     Did you use the same eDiscovery tool

 6       to search across other documents, not just -- other

 7       document types in addition to e-mail?

 8             A     I did.

 9             Q     And you ran the same list of search

10       terms?

11             A     Yes.

12             Q     Okay.   Did you do anything else to

13       search for responsive documents or communications

14       when you received the subpoena?

15             A     Not that I can recall.

16             Q     When you were doing -- well, when you

17       were preparing for your deposition today, did you

18       review any documents?

19             A     Yes.

20             Q     Did they refresh your recollection

21       about any facts or events?

22             A     Yes.
```

Page 52

1           Q     Can you please describe those

2      documents?

3           A     I reviewed the engagement letter with

4      an attorney on the Coffee County engagement.

5           Q     Is that it?

6           A     Well, obviously when I produce

7      something, I look at the documents that I produce

8      to the attorneys.

9           Q     So you -- you reviewed all of the

10     documents that you handed over to your attorney.

11     Is that what you're saying?

12          A     Yes.

13          Q     Did any of those documents refresh

14     your recollection about facts or events?

15          A     I'm sure they did.

16                MS. KAISER:  We would ask for

17     immediate production of any documents that

18     Mr. Cotton reviewed as part of his preparation for

19     today that refreshed his recollection.

20                     I'm going to introduce another

21     exhibit.  This will be Exhibit 3.

22

1                    (Cotton Deposition Exhibit Number 3

2                    marked for identification.)

3          BY MS. KAISER:

4                    Q      Actually, Mr. Cotton, just before you

5          look at that document, just -- just a first

6          question:  Are you -- are you currently engaged as

7          an expert witness regarding the Dominion Voting

8          System used in Georgia?

9                    A      Yes.

10                   Q      Who engaged you as a witness -- as an

11         expert?

12                   A      Stefanie Lambert.

13                   Q      When did she engage you as an expert?

14                   A      I was originally engaged as an expert

15         in March of 2021.  As a part of that engagement, I

16         received a task order to support Coffee County,

17         Georgia.  And that would have been the middle of

18         June of 2021.

19                   Q      You said you received a task order.

20         Is that correct?

21                   A      Yes.  So verbally I received a task

22         order to support potential litigation in Coffee

Page 54

1        County, Georgia.

2                Q     What litigation is that?

3                MR. PARKER:  Don't answer that.  It's

4        work-product privilege.

5                MS. KAISER:  Absolutely not

6        work-product privilege what litigation he is

7        engaged to be an expert with respect to.

8                MR. PARKER:  There was no litigation.

9        It's an anticipation of litigation.

10               Do not answer that question.

11               MS. KAISER:  Mr. Parker, we are going

12       to have a big problem if you won't let him answer

13       this question.  We are entitled to test the

14       representation that he has been engaged as an

15       expert with ongoing or anticipated litigation.  We

16       need to understand the details regarding that.

17               MR. PARKER:  The objection stands.

18       BY MS. KAISER:

19               Q     Mr. Cotton, are you going to follow

20       your attorney's instruction not to answer?

21               A     I am.

22               Q     You said you received a verbal task

Page 55

1          order in June of 2021.  Is that correct?

2                    A     That is correct.

3                    Q     Do you have a document -- a written

4          task order with respect to that representation?

5                    A     I do not.

6                    Q     Did you perform any work for

7          Ms. Lambert prior to June 2021 with respect to

8          Coffee County, Georgia?

9                    A     No.

10                   Q     With respect to Georgia at all?

11                   A     No.

12                   Q     So you were retained in March of

13         2021.  Is that correct?

14                   A     Correct.

15                   Q     But you did no work for Ms. Lambert

16         until you received the task order in June of 2021?

17                   A     That's incorrect.

18                   Q     How is that incorrect?

19                   A     I performed work under that

20         engagement for other cases prior to that time

21         frame.

22                   Q     Prior to June 2021, did you perform

Page 56

1      any work related to Georgia?

2              A      No -- well -- no, I did not.

3              MR. BROWN:  This is Bruce Brown.  I'm

4      going to ask for a clarification that may save some

5      time in the future, and that is that you say no

6      work for Georgia.  And I just want to make sure

7      that that includes work about Georgia that you

8      might have done for another engagement.

9              THE WITNESS:  I had no dealings with

10     any data related to Georgia prior to the middle of

11     June time frame of 2021.

12             MR. BROWN:  Thank you.  And sorry for

13     the interruption.

14     BY MS. KAISER:

15             Q      Mr. Cotton, can you take a look at

16     Exhibit 3?

17             Do you see there's a cover e-mail

18     from your attorney, Mr. Parker, to myself?

19     Attached to that are two documents.  Do you see

20     that?

21             A      I do.

22             Q      The first document is starting on the

Page 57

1      page marked BC0001.  Do you see that document?

2              A     Yes.

3              Q     Is this the March 2021 engagement

4      that you were referring to?

5              A     That is correct.

6              Q     And it says that it is entered into

7      on behalf of Matt DePerno of DePerno Law Office.

8                    Do you see that?

9              A     Can you scroll down?

10             Q     No, this is at the top.  This is the

11     second line -- the first and second line of the

12     agreement.

13             A     It says Matt DePerno and Stefanie

14     Lambert.

15             Q     Okay.  Fair enough.

16                   Who is Mr. DePerno?

17             A     He was an attorney that was working

18     with Ms. Lambert on various cases in -- in

19     different jurisdictions.

20             Q     And the other person on this --

21     entering into this agreement is Stefanie Lambert --

22     is it Junttila?

Page 58

1          A     Yes.

2          Q     -- on behalf of Stefanie L. Lambert,

3     PLLC.  Do you see that?

4          A     I do.

5          Q     Who is Stefanie Lambert Junttila?

6          A     Stefanie Lambert is the attorney that

7     I primarily work for on these matters.

8          Q     So is Stefanie Lambert Junttila and

9     Stefanie L. Lambert the same person?

10          A     I believe so, yes.

11          Q     Are you aware that Stefanie Lambert

12     represents Misty Hampton, the former Coffee County

13     election supervisor?

14          A     Yes.

15          Q     How did this agreement come into --

16     tell me about how this -- how you entered into this

17     agreement with Mr. DePerno and Ms. Lambert.

18               MR. PARKER:  Objection.  Work-product

19     privilege, consulting expert rule.  He won't answer

20     that.

21     BY MS. KAISER:

22          Q     Did you know Mr. DePerno or

Page 59

1           Ms. Lambert prior to entering into this agreement?

2                   A     I did not.

3                   Q     Have you done any work for them prior

4           to entering into this engagement?

5                   A     I had not.

6                   Q     Please describe the services that you

7           were engaged to perform.

8                           MR. PARKER:  That's attorney-work

9           product.  He won't answer that.

10          BY MS. KAISER:

11                  Q     Under, "Description of Services," it

12          says, "CyFIR will advise Client to provide

13          professional services for issues relating to

14          forensic imaging of hard drives."

15                          Do you see that, Mr. Cotton?

16                  A     I do.

17                  Q     Do you agree that you were retained

18          to perform issues of forensic imaging of hard

19          drives?

20                  A     I was retained in a broad forensics

21          capacity, and that is one of the aspects, if it was

22          necessary to perform, that this would have covered.

Page 60

```
 1              Q     Would you say the same thing with
 2       respect to forensic imaging of storage media?
 3              A     Yes.
 4              Q     And live computer analysis?
 5              A     Yes.
 6              Q     As well as computer forensics?
 7              A     Yes.
 8              Q     And electronic discovery and expert
 9       witness support?
10              A     If required, yes.
11              Q     If required.
12              I'm going to look at the next
13       sentence here.  It says, "CyFIR will provide Client
14       with assistance in identifying possible sources of
15       voting system compromise, attack vectors, relevant
16       electronic data, provide technical advice in the
17       remediation of identified exposures, offer guidance
18       concerning the implementation of such requests, and
19       participate in possible legal processes associated
20       with or stemming from the engagement."
21              Do you see that?
22              A     I do.
```

Page 61

1               Q     The time that you entered into this

2        engagement, were there any legal processes ongoing

3        associated with or stemming from the engagement?

4               A     Yes.

5               Q     What were those legal processes?

6               MR. PARKER:  Objection.  It's work

7        product.  And to the extent it's outside of

8        Georgia, it's outside of the scope of the subpoena.

9        It also --

10       BY MS. KAISER:

11              Q     Were there legal --

12              MR. PARKER:  -- violates the

13       consulting expert rules.

14              MS. KAISER:  Mr. Parker, again,

15       the -- the expert rule applies to experts engaged

16       for ongoing or anticipated litigation.  And we are

17       entitled to the facts underlying that

18       representation.  It is critical for us to

19       understand if there was an ongoing legal process

20       for which Mr. Cotton was retained as an expert.

21              MR. PARKER:  Well, it doesn't need to

22       be an ongoing legal process.

1                    MS. KAISER:  Or anticipated.

2                    MR. PARKER:  Okay.

3                    MS. KAISER:  We are entitled to

4        understand the specific litigation with respect he

5        was -- with respect to which he was engaged as an

6        expert.

7                    MR. PARKER:  The specific litigation?

8        No, you're not, because it may just be in

9        anticipation of litigation.  He's not a lawyer.  He

10       doesn't know.  And it's covered by the work-product

11       doctrine.

12                   And, you know, I'll add that once a

13       consulting expert, including in this

14       jurisdiction, but in other jurisdictions,

15       depositions are often not even allowed.  We're --

16       we're offering Mr. Cotton to answer the narrow

17       set of questions, which you've already gone well

18       beyond, in the August 9th amended letter -- or

19       amended subpoena communication.

20                   And, you know, if you would stay

21       focused on -- on that, we would not have to lodge

22       so many objections, which I -- you know, I really

Page 63

1          don't want to do but need to.

2          BY MS. KAISER:

3                    Q      Mr. Cotton, when you entered into

4          this engagement in March of 2021, were you asked to

5          do any work related to data from Georgia?

6                    A      No.

7                    Q      And the next page of this agreement,

8          paragraph 5, "Third Parties," do you see that

9          paragraph?

10                   A      Yes.

11                   Q      It says that, "In the event that the

12         Client has arranged for a third party to pay CyFIR,

13         CyFIR will accept payment from such third party in

14         place of direct payment."

15                   Do you see that?

16                   A      I do.

17                   Q      Has any third party ever paid for

18         your services under this agreement?

19                   A      No.

20                   Q      Turn to the page marked -- labeled

21         BC0005.  Do you see that?

22                   A      I do.

Page 64

```
 1          Q     And this appears to be an engagement

 2     letter with Stefanie Lambert, dated July 3rd, 2021.

 3                Do you see that?

 4          A     I see that.  This is -- this is a

 5     supplement to the previous engagement letter and it

 6     primarily contained a nondisclosure requirement.

 7          Q     Okay.  What was the -- what were --

 8     what were the circumstances for signing this second

 9     agreement with Ms. Lambert?

10          A     That was to follow up with the -- the

11     verbal task order that I received in the middle of

12     June.  And Ms. Lambert wanted to put additional

13     confidentiality restrictions in place.

14          Q     The services included in this

15     supplement, as you -- as you characterize it, are

16     "forensic analysis as evidence."

17                Do you see that?

18          A     Yes.

19          Q     "Expert reports and testimony,"

20     correct?

21          A     Correct.  The testimony was if

22     required.
```

Page 65

1          Q     Okay.   The next paragraph there it

2     says, "This engagement includes, but is not limited

3     to, a specific requirement to comply with the

4     non-disclosure agreement (attached) with the Firm

5     related to evidence obtained by SullivanStrickler

6     from Coffee County, Georgia and the forensic

7     analysis reports, information, data, and any other

8     attorney-client privileged information from the

9     Company performed on behalf of the Firm on that

10     same date."

11                    Do you see that?

12          A     I do.

13          Q     Did you have access to evidence -- or

14     information obtained by SullivanStrickler from

15     Coffee County, Georgia?

16                    MR. PARKER:   Objection.   Work

17     product, and the other objections listed on the

18     log.

19                    MS. KAISER:   You're claiming work

20     product over whether he had access to that data?

21                    MR. PARKER:   Yes, information that he

22     received and was asked to review.   And not just

Page 66

1          work product, but the other rules that apply and

2          are listed on the log.

3                         MS. KAISER:  Work-product privilege

4          does not apply to facts and data underlying an

5          analysis, Mr. Parker.  I'm asking about facts and

6          data underlying his analysis or work.

7                         MR. PARKER:  Work-product privilege

8          does apply to that information, very specifically.

9          BY MS. KAISER:

10                     Q    Mr. Cotton, what services have you

11         performed under this agreement?

12                     A    So I have performed non- --

13                         MR. PARKER:  Objection.  Work

14         product.

15                         Don't answer that.

16                         And the rules listed in the log as

17         well.

18         BY MS. KAISER:

19                     Q    You're not willing to tell me

20         anything about the services that you performed

21         under this agreement, Mr. Cotton?

22                         MR. PARKER:  Nothing beyond what has

Page 67

1       been stated in his testimony in Arizona that

2       relates to Georgia.

3                    MS. KAISER:  All right.  We'll get to

4       that.

5       BY MS. KAISER:

6             Q     I'd like to go back to Exhibit 2,

7       Mr. Cotton.  This is the letter from your attorney

8       attaching the privilege log.

9                    For the -- several of these entries,

10      you -- the document is described as, you know,

11      something that you analyzed on behalf of S.

12      Lambert.  Is that Stefanie Lambert?

13            A     Yes.

14            Q     Who is "T. Harding"?

15            A     T. Harding is the attorney for

16      VoterGA in this lawsuit, Todd Harding.

17            Q     Has Mr. Harding engaged you as an

18      expert witness?

19            A     Yes.

20            Q     When?

21            A     I don't have the exact dates.  It was

22      a verbal engagement.  And it would have been

Page 68

1      approximately September of 2021.

2              Q    What is the scope of your engagement

3      for Mr. Harding?

4              A    To perform forensics analysis on

5      artifacts that the legal team has come into

6      possession of through subpoenas or FOIA requests to

7      the Fulton County election officials.

8              Q    You said through FOIA requests or

9      subpoenas?

10             A    Correct.

11             Q    From the Fulton County Election

12     System.  Is that correct?

13             A    Correct.

14             Q    Fulton County, Georgia?

15             A    Correct.

16             Q    Do you -- do you have a written

17     engagement with Mr. Harding?

18             A    I do not.

19             Q    Why not?

20             A    It was just never implemented.

21             Q    Okay.

22                  MS. KAISER:  All right.  Mr. Cotton,

Page 69

1          we've been going for about an hour, and I'm about

2          to -- to change topics.  Do you want to take a

3          short break, just five minutes?

4                         THE WITNESS:  Sure.

5                         MS. KAISER:  Okay.  Thank you.

6                         We're off the record.

7                         VIDEOGRAPHER:  The time is

8          approximately 10:21 a.m.  We are going off the

9          video record.

10               (Recess from 10:21 a.m. to 10:37 a.m.)

11                         VIDEOGRAPHER:  The time is

12         approximately 10:37 a.m.  We are back on the video

13         record.  Go ahead.

14         BY MS. KAISER:

15               Q     Mr. Cotton, do you know who Garland

16         Favorito is?

17               A     I do.

18               Q     Who's Mr. Favorito?

19               A     He is the head of the VoterGA.org.

20               Q     Have you had any communications with

21         Mr. Favorito?

22               A     Yes.

Page 70

1          Q      Have you had any communications with

2     Mr. Favorito related to data or software from

3     Georgia?

4          A      As it related to and through his

5     attorney, yes.

6          Q      And for what purpose?

7          A      For the purpose of the engagement

8     which we previously spoke, which was to analyze the

9     artifacts that were produced in response to FOIA

10    requests and subpoenas to VoterGA.org in relation

11    to one of their -- well, two of their cases that

12    they had, that they were prosecuting.

13         Q      Mr. Cotton, you -- you mentioned

14    before, Mr. Cotton, that prior to June 2021, you

15    had not analyzed any data from Georgia.  Is that

16    correct?

17         A      That's correct.

18         Q      Have you analyzed any data or

19    software related to the Dominion Voting System

20    that's used in Georgia, the same Dominion equipment

21    that's used in Georgia?

22                MR. PARKER:  You can answer limited

Page 71

1          to what you've testified to in Arizona.

2                    THE WITNESS:  Yes, I have.

3          BY MS. KAISER:

4                    Q     What equipment was that?

5                    MR. PARKER:  You can, again, answer

6          limited to what you have testified to in Arizona.

7          Beyond that, it is work product and governed by the

8          rules cited in the log.

9                    THE WITNESS:  I had reviewed the

10         equipment and software related to the Dominion

11         Democracy Suite Software, Version 5.5B and 5.5, I

12         believe it was, A.

13         BY MS. KAISER:

14                   Q     5.5A?

15                   A     Uh-huh.

16                   Q     Approximately when did you review

17         that software?

18                   A     I began a review of that sometime in

19         March of 2021.

20                   Q     And your understanding is that's the

21         same version of the Dominion Democracy Suite that's

22         used in Georgia?

Page 72

1          A      That is my understanding.

2          Q      Okay.  Do you know who typically has

3    access to a Georgia county's election system?

4          A      I don't have any real direct personal

5    knowledge to that other than the -- obviously the

6    county clerk and the poll workers who would be

7    supporting an election.

8          Q      Do you have an understanding as to

9    who has access to an EMS server in Georgia?

10         A      Once again, the election official in

11   that jurisdiction and people that she designates to

12   perform work or support an election.

13         Q      Do you know whether you need a

14   password to access an EMS server?

15         A      Yes.

16              MR. PARKER:  In Georgia, you're

17   talking about, Mary?

18              MS. KAISER:  Yes, in Georgia.

19              THE WITNESS:  Yes.

20   BY MS. KAISER:

21         Q      Do you know who has access to that

22   password?

Page 73

```
 1              A     I would assume the people that the
 2       clerk --
 3                    MR. PARKER:  Don't assume.
 4                    THE WITNESS:  Okay.
 5                    MR. PARKER:  Just testify as to what
 6       you know.
 7                    THE WITNESS:  I don't know everyone
 8       that has access to that password.
 9       BY MS. KAISER:
10              Q     Do you know who can change the
11       password to an EMS server in Georgia?
12              A     I don't know who has the legal
13       authority, but the practical answer to that, from a
14       computer perspective, is anyone that has
15       administrative access to that system.
16              Q     Do you know who typically has
17       administrative access to that system with respect
18       to Georgia?
19              A     Within the accounts on a computer,
20       there are certain accounts that are designated as
21       administrative or administrator accounts and others
22       that are designated as user accounts.  Anyone that
```

1    has access to one of the administrative accounts

2    could change the passwords.

3         Q    And I guess my question is:  Do you

4    know, with respect to Georgia, who typically has an

5    administrator account?

6         A    I don't know who has access to that

7    account.

8         Q    Do you have a relationship with

9    anyone from an elections office in Georgia?

10        A    No.

11        Q    Have you communicated with anyone

12   from a Georgia elections office --

13        A    No.

14        Q    -- since November 2020?

15        A    No.

16        Q    Have you communicated with any

17   Georgia election official or employee since

18   November 1st, 2020?

19        A    No.

20        Q    Have you communicated with anyone

21   working on behalf of any Georgia elections official

22   or employee since November 1st, 2020?

Page 75

```
 1              A       Only with my attorneys.

 2              Q       When you say your attorneys, what do

 3      you mean by that?

 4              A       I mean the attorneys by which I was

 5      engaged --

 6              Q       And that --

 7              A       -- for the performance.

 8              Q       Which specific attorneys would that

 9      be?

10              A       That would be Stefanie Lambert and

11      Todd Harding.

12              Q       Please tell me what you know about

13      any instance in which Georgia election equipment or

14      data was accessed by anyone other than a Georgia

15      voter or election worker between November 2020 and

16      today.

17                      MR. PARKER:  Only testify about this

18      outside of what you learned related to your

19      engagement.  If it's part of your engagement, you

20      can't testify about it.  You cannot testify about

21      it if it's part of your engagement.

22                      THE WITNESS:  Does that include how
```

Page 76

1        those images were provided, too?

2                    MR. PARKER:  Yes, you cannot testify.

3        BY MS. KAISER:

4               Q     Mr. Cotton, could you speak up?  I

5        couldn't hear you.

6               A     Can you please repeat your question?

7               Q     Yes.

8                    Please tell me what you know about

9        any instance in which Georgia election equipment or

10       data was accessed by anyone other than a Georgia

11       voter or election worker between November 2020 and

12       today.

13                   MR. PARKER:  And we are allowing him

14       to answer that question to the extent that it does

15       not enter into the work for which he was engaged as

16       a consulting expert.

17       BY MS. KAISER:

18              Q     You may answer the question,

19       Mr. Cotton.

20              A     I don't have any personal direct

21       knowledge of any unauthorized person accessing the

22       voting systems.

1          Q     Anywhere in Georgia?

2          A     Anywhere in Georgia.

3          Q     Have you read anything in the press

4     or, you know, come -- come across any information

5     related to this in your personal capacity?

6          A     Well, there's a lot of things in the

7     press and a lot of those things aren't true.  So,

8     once again, I don't have any direct personal

9     knowledge of this.  I know what the press has

10    written about me and that's certainly false, so

11    I -- you know, I don't hold any credibility with

12    what I read in the press.

13               MS. KAISER:  I'm going to introduce

14    as the next exhibit, this is Tab 7, which is

15    Exhibit 4, I think.  I'm sorry, just give us one

16    second.

17               THE WITNESS:  Okay.

18          (Cotton Deposition Exhibit Number 4

19            marked for identification.)

20    BY MS. KAISER:

21          Q     This will be Exhibit Number 4.

22               Can you see that exhibit now,

1      Mr. Cotton?

2              A     I do.

3              Q     So this is a news article from the

4      Atlanta Journal-Constitution entitled, "Pro-Trump

5      tech team copied Georgia election data, records

6      show."

7                    Do you see that?

8              A     I do.

9              Q     Okay.  Have you seen this article

10     before?

11             A     I have.

12             Q     Okay.  It describes, "A breach that

13     included data from an election server, voter

14     check-in computers, and ballot memory cards."

15                   Do you see that?

16             A     I do.

17             Q     Do you have any knowledge whatsoever

18     about that breach that's described in this article?

19                   MR. PARKER:  Again, outside of the

20     work that you did as engaging -- being engaged as a

21     consulting expert in Georgia, as you've testified

22     to, and the nondisclosure agreement and what's

Page 79

1      listed in the log as the rules on this issue, you

2      can testify in response to that question.

3                    THE WITNESS:  I don't have any

4      knowledge about this breach or the details

5      surrounding it.

6      BY MS. KAISER:

7            Q     It says, "Trump attorney Sidney

8      Powell helped coordinate the effort."  Do you see

9      that?

10           A     I do.

11           Q     Do you know Sidney Powell?

12           A     I do not.

13           Q     Have you ever heard -- do you know

14     any -- you have never had any communication with

15     Sidney Powell?

16           A     I have not, and I never met the lady.

17     She's been in the news, that's how I know the name.

18           Q     Going on, it says, "She was billed

19     over $26,000 by computer experts from Atlanta tech

20     company SullivanStrickler."

21                 Do you see that?

22           A     I do.

Page 80

1          Q     Do you know the Sullivan -- have you
2     heard of the SullivanStrickler firm before?
3          A     I have.
4          Q     What do you know about the
5     SullivanStrickler firm?
6          A     They're a well-respected computer
7     forensics firm based out of Atlanta.
8          Q     Have you ever worked with
9     SullivanStrickler?
10          A     I have not worked directly with
11     SullivanStrickler, other than as detailed in the
12     agreement with Stefanie Lambert.
13          Q     Who from the SullivanStrickler firm
14     have you ever been in contact with?
15          A     I haven't been in contact with anyone
16     there.
17          Q     You've never been in contact with
18     anybody from the SullivanStrickler firm?
19          A     No.
20          Q     Do you know who Paul Maggio is?
21          A     Pardon?
22          Q     Do you know who Paul Maggio is,

```
                                                        Page 81

 1        M-A-G-G-I-O?

 2              A     That name is not familiar.

 3              Q     Okay.  The next sentence here says,

 4        "The GBI confirmed Tuesday that it has opened a

 5        criminal investigation of the incident on

 6        January 7th, 2021."

 7                    Do you see that?

 8              A     I do.

 9              Q     Have you been contacted by any

10        investigator in relation to what happened in Coffee

11        County, Georgia?

12              A     I have not.

13              Q     Are you the target of any

14        investigation with respect to anything related to

15        the Georgia voting system?

16              A     Not to my knowledge.

17              Q     Did you have any involvement

18        whatsoever in the January 7th, 2021 incident in

19        Coffee County?

20              A     No.

21              Q     Did you know about the plan to go to

22        Coffee County prior to or on January 7th, 2021?
```

Page 82

1           A      I did not.

2           Q      Have you ever accessed any voting

3     equipment or voting data from Coffee County,

4     Georgia?

5                 MR. PARKER:  Don't -- don't answer

6     that if it gets into anything regarding your

7     engagement as a consulting expert.

8                 THE WITNESS:  Yes, I have.

9     BY MS. KAISER:

10          Q      Did you access any voting equipment

11    or voting data from Coffee County on January 7th,

12    2021?

13          A      No.

14          Q      When is the first time that you ever

15    accessed voting -- voting equipment or data from

16    Coffee County, Georgia?

17          A      It would have been the middle to end

18    of June of 2021.

19          Q      Okay.  I'll come back to that.

20                Do you have any understanding of who

21    collected that data from Coffee County, Georgia?

22          A      I have no direct personal knowledge

Page 83

1          of that.

2                    Q      Do you know who Scott Hall is?

3                    A      I do not.

4                    Q      Do you know who Eric Chaney is?

5                    A      I'm not familiar with that name

6          either.

7                    Q      Do you know who Cathy Latham is?

8                    A      No.

9                    Q      Do you know who Misty Hampton is?

10                   A      Yes.

11                   Q      Who is Misty Hampton?

12                   A      Misty Hampton was the election

13         official in Coffee County, Georgia, and she's also

14         Stefanie Lambert's client.

15                   Q      Have you ever had any communications

16         with Ms. Hampton?

17                   A      Yes.

18                   Q      Regarding what?

19                   A      I met her prior to June of 2021, and

20         it was a social setting.

21                   Q      Where was that social event?

22                   A      That was in Michigan.

Page 84

1           Q     Can you tell me anything more about

2     that event, please?

3                 MR. PARKER:  That's outside the scope

4     of the subpoena.

5                 You don't need to answer that.

6     BY MS. KAISER:

7           Q     Did you speak with Misty Hampton

8     about anything related to Georgia voting systems or

9     voting data?

10          A     No.

11          Q     You said that was prior to June of

12    2021.  Do you recall approximately when it was?

13          A     Approximately April, maybe.  I was

14    introduced to her by Stefanie Lambert, and at that

15    time Stefanie was engaged by Misty Hampton as a

16    client.

17          Q     I'm sorry, I missed the first -- the

18    first part of that answer.  Can you please repeat

19    what you just said?

20          A     I was introduced to her by Stefanie

21    Lambert, and Stefanie was at that time beginning an

22    engagement with Misty Hampton.

Page 85

1          Q     Have you had any communications with

2     Ms. Hampton since this event in approximately

3     April 2021?

4          A     No.

5          Q     Do you know who Jil Ridlehoover is?

6          A     The name is not familiar.

7          Q     Do you know who organized the

8     January 7, 2021 trip to Coffee County?

9          A     I do not.

10               MS. KAISER:  Let's mark the next

11    exhibit.  It will be Exhibit 5.

12               (Cotton Deposition Exhibit Number 5

13               marked for identification.)

14    BY MS. KAISER:

15          Q     Mr. Cotton, this is an e-mail chain.

16    I'm going to direct you to the e-mail that starts

17    at the top of the second page here from Paul

18    Maggio, dated January 7th, 2021.

19               Do you see that?

20          A     I do.

21          Q     So this -- I believe you said you do

22    not know who Mr. Paul Maggio is.  Is that correct?

Page 86

1          A     No, I don't recall him.

2          Q     Okay.  Do you see next to his name it

3     says "SullivanStrickler, LLC"?

4          A     I see that, yeah.

5          Q     Do you have an understanding that

6     Mr. Maggio worked at SullivanStrickler?

7          A     Based on this e-mail and your

8     representations, yes.

9          Q     Okay.  And that the e-mail is to

10    Sidney Powell.  I believe you said you are -- you

11    are aware of who Ms. Powell is just from press

12    reports.  Is that correct?

13         A     That's correct.

14         Q     Okay.  And copied on the e-mail is

15    Tricia.  Do you know who Tricia is?

16         A     I don't.

17         Q     How about Jim Penrose?

18         A     I know who Jim Penrose is.

19         Q     Who is Mr. Penrose?

20         A     He is a forensics expert that was

21    also engaged by Stefanie Lambert on some of her

22    engagements, I believe, outside of Georgia.  I

Page 87

1       didn't know that he was working in Georgia.

2              Q     Have you ever had any communications

3       with Mr. Penrose?

4              A     Only in the capacity of collaborating

5       experts supporting Ms. Lambert.

6              Q     Have you collaborated with

7       Mr. Penrose at all with respect to Georgia voting

8       data or voting -- the Georgia voting software?

9              A     Tangentally.

10             Q     Can you elaborate on that?

11                   MR. PARKER:  If it relates to your

12      engagement as a consulting expert in Georgia, you

13      cannot testify to it.  If it does not, you can.

14                   THE WITNESS:  He was involved in the

15      initial spin-up of Coffee County, Georgia.

16      BY MS. KAISER:

17             Q     What do you mean when you say

18      "spin-up of Coffee County, Georgia"?

19             A     So when -- when Stefanie directed me

20      to support Coffee County, Georgia, I had a

21      conversation with him that -- concerning access to

22      the materials.

Page 88

```
 1              Q     Did he facilitate your access to the
 2       materials?
 3                    MR. PARKER:  Don't answer that.  It's
 4       related to work product.  Actually, you can -- you
 5       can answer it to the extent that you don't get into
 6       materials that you actually received and reviewed.
 7                    THE WITNESS:  Yes, he did.
 8       BY MS. KAISER:
 9              Q     How did he facilitate that access?
10                    And, again, I'm not asking about the
11       contents of the materials.  I'm just asking about
12       the access.
13              A     He provided some log-in credentials
14       for me to download the materials.
15              Q     To download them from where?
16              A     From the SullivanStrickler website, a
17       secured portal.
18              Q     A secured portal?
19              A     Yes.
20              Q     And approximately when was that,
21       Mr. Cotton?
22              A     That was approximately the 11 -- or
```

Page 89

1      the middle of June, 11th, 12th, somewhere in there.

2             Q      June 2021, correct?

3             A      Correct.

4             Q      So Mr. Penrose provided you with the

5      log-in credentials that you required to download

6      information from the SullivanStrickler secured

7      portal.  Is that correct?

8             A      That is correct.

9             Q      Is that the extent of your

10     communications with Mr. Penrose?

11            A      Yes.

12            Q      Also copied on this e-mail is Brendan

13     Sullivan.  Do you see that?

14            A      I do.

15            Q      Do you know Mr. Sullivan?

16            A      I do not.

17            Q      And the last person copied on this

18     e-mail is Doug Logan.  Do you see that name?

19            A      I do.

20            Q      Do you know Mr. Logan?

21            A      I know a Doug Logan.  I don't know if

22     this is the same Doug Logan, but I certainly know a

1      Doug Logan.

2             Q     Who is the Doug Logan that you know?

3             A     Doug Logan was the primary contractor

4      for the Arizona audit, of which I was a

5      subcontractor to him, or to Cyber Ninjas.

6             Q     I'm sorry, to Cyber Ninjas.  And

7      that's Mr. Logan's firm, correct?

8             A     It was.  I believe it went bankrupt

9      at this point.

10            Q     And you said that you were a

11     subcontractor for Mr. Logan's firm Cyber Ninjas in

12     Arizona.  Is that correct?

13            A     That's correct.

14            Q     Are you currently in contact with

15     Mr. Logan?

16            A     Mr. Logan is a testifying expert in

17     Arizona, so I have had contact with him, yes.

18            Q     Have you had any communications with

19     Mr. Logan related to Georgia?

20            A     Not that I recall.

21            Q     All right.  So taking a look at this

22     e-mail from Mr. Maggio to Sidney Powell, you can

1      see he writes, "Sidney, good morning.  Per Jim

2      Penrose's request, we are on our way to Coffee

3      County, Georgia to collect what we can from the

4      election/voting machines and systems."

5                    Do you see that?

6            A      If you can scroll down.

7                    MR. PARKER:  Mary, what page are you

8      reading from?

9                    MS. KAISER:  This is the e-mail from

10     Paul Maggio to Sidney Powell.  It starts at the top

11     of the second page --

12                   MR. PARKER:  Okay.

13                   MS. KAISER:  -- January 7th, 2021.

14                   THE WITNESS:  Yes, I see that.

15     BY MS. KAISER:

16           Q      Okay.  So this was sent at 10:31 a.m.

17     on January 7th, 2021, correct?

18           A      Yes.

19           Q      Do you know who was on the way to

20     Coffee County at that time?

21           A      I do not.

22           Q      Do you know if everyone on this

Page 92

```
1        e-mail chain traveled to Coffee County on

2        January 7th, 2021?

3              A     I don't.

4              Q     If you would flip back to the prior

5        page, page 1, there's an e-mail from Paul Maggio to

6        Sidney Powell, copying the same group of people,

7        that was sent at -- on Thursday, January 7, 2021,

8        at 4:10 p.m.

9                    Do you see that?

10             A     I do.

11             Q     It says, "Everything is going well

12       here in Coffee County, Georgia."  Do you see that?

13             A     I do.

14             Q     Do you have any knowledge about what

15       this team was doing when they were in Coffee

16       County, Georgia on January 7th?

17             A     I don't.

18                   MR. PARKER:  I want to state for the

19       record that he's never seen this e-mail before

20       until today, as he has testified.  And that we are

21       allowing quite a bit of leeway to go into issues

22       that are not identified anywhere near on the
```

Page 93

1      August 9 communication that amended the subpoena in

2      this case.  But you can go ahead.

3                     MS. KAISER:  I will push back on your

4      representation that this is not related to the

5      narrow topics, Mr. Parker, but I appreciate you're

6      willing to let us proceed.

7                     We will do the -- the next exhibit.

8      This is Tab 9.

9                     (Cotton Deposition Exhibit Number 6

10                     marked for identification.)

11     BY MS. KAISER:

12            Q     Do you see the next exhibit,

13     Mr. Cotton?

14            A     We are waiting for it to refresh.

15            Q     Okay.

16                    MR. PARKER:  Is this Exhibit 6?

17                    MS. KAISER:  Yes.

18                    THE WITNESS:  Is it a series of

19     pictures?

20     BY MS. KAISER:

21            Q     Yes, this is a series of pictures.

22     I'll give you a moment to look at them.

Page 94

1              Have you had a chance to look at the

2       pictures, Mr. Cotton?

3              A     We're still scrolling down.

4              Q     Please let me know when you have had

5       a chance to review them.

6              A     Okay.

7                    Okay.  I think we're down at the end.

8              Q     Have you seen any of these pictures

9       before today?

10             A     I have not.

11             Q     Do you have any understanding that

12      this shows members of the SullivanStrickler team

13      copying data in the Coffee County election office

14      on January 7th, 2021?

15             A     I do not.

16             Q     Okay.  I'm just going to walk through

17      these quickly to see if you recognize any of these

18      individuals.

19                    The first picture here on the first

20      page, do you recognize the man shown sitting in

21      front of the computer in this picture?

22             A     I do not.

1          Q     Do you recognize the woman to his

2     right?

3          A     I do not.

4          Q     Do you recognize what this computer

5     equipment is in this picture?

6          A     That looks like a Dell system.  I

7     don't know what it -- what the function of it is.

8          Q     Okay.  If you look at the next

9     picture, do you recognize this computer system

10     here?

11          A     That's a MacBook Pro but it --

12          Q     I'm sorry.  The next picture --

13          A     That's a -- that's a MacBook.  I

14     don't know what that -- what its function is.

15          Q     Okay.  Do you recognize any of the --

16     either of the individuals in this photo shown

17     behind the laptop?

18          A     The one on the right may be Jim

19     Penrose.  I'm not entirely certain on that.

20          Q     Okay.  You think that could be Jim

21     Penrose?

22          A     Say again.

Page 96

1          Q      You said you think that might be Jim

2     Penrose on the right?

3          A      Possibly.

4          Q      Do you recognize the person in the

5     baseball cap?

6          A      I don't.

7          Q      I'm sorry, just if you could go back

8     one -- one photo prior to that, the picture of the

9     Dell computer.  Do you know -- do you have any

10    understanding of what that equipment is?

11         A      I don't know what the function is.

12    It's -- it's clearly a Dell small desktop.

13         Q      Do you understand it to be a

14    component of the Coffee County election system?

15         A      It certainly could be, but I don't

16    know that to be a fact.

17         Q      Okay.  If you flip to the next

18    picture -- sorry, the one after the one where you

19    identified Mr. Penrose, so this would be the fourth

20    page.

21               MR. PARKER:  Did you say that he

22    identified him as Mr. Penrose?

Page 97

1       BY MS. KAISER:

2               Q       I'm sorry, that you indicated could

3       possibly be Mr. Penrose.

4               A       Yeah.

5               Q       The next picture, do you recognize

6       this -- the man standing up on the left side of

7       this picture?

8               A       I do not.

9               Q       Do you recognize the woman sitting in

10      the office, sort of in the background of this

11      photo?

12              A       I can't really see her face, but she

13      has the same body build type as Misty Hampton.

14              Q       So you think that could possibly be

15      Misty Hampton?

16              A       Possibly, but I can't see her face.

17              Q       Next picture, this appears to show a

18      bark -- like a barcode on the bottom piece of

19      equipment.  Do you see that?

20              A       I do.

21              Q       Do you have any understanding of what

22      this equipment is?

```
 1            A     Well, that's the -- a tag that's

 2      placed on a Dell system for extended warranties.

 3      And the service tag there would be the serial

 4      number of that device.  "Express Service Code" is

 5      what you would use to get express help if something

 6      goes wrong with that device.

 7            Q     Okay.  Do you see that there's a

 8      Post-it note in the bottom of this picture?

 9            A     I see a partial --

10            Q     Yeah.

11            A     -- note there.  It's cut off at the

12      bottom -- well, yeah, I see the note.

13            Q     All right.  Do you know what is

14      written on that note?

15            A     Well, it says "SOS_Georgia & Votes!"

16            Q     Do you know if that was a password?

17                  MR. PARKER:  If it's outside of the

18      consulting work that you did as an expert, you can

19      answer that as it relates to your knowledge, but if

20      you gained that knowledge from your consulting work

21      as an expert in Georgia, you should not answer it.

22                  THE WITNESS:  Based on that, I -- I
```

1      cannot answer that question.

2      BY MS. KAISER:

3              Q      The last picture on the -- on 7 of

4      this.  Do you see this also appears to show a

5      Post-it note with another piece of white paper on

6      top of it?

7                      Do you see that?

8              A      I do.

9              Q      Do you -- do you recognize the code

10     that's written on that white piece of paper?

11                     MR. PARKER:  You can answer if it's

12     outside the knowledge from your consulting work, if

13     you remember of course.

14                     THE WITNESS:  So it seems similar to

15     the decryption code that I received from

16     Mr. Penrose when I downloaded the materials.

17     BY MS. KAISER:

18             Q      And --

19             A      I don't know if it's exact because I

20     don't have that with me --

21             Q      Okay.

22             A      -- but it seems similar.

Page 100

1        Q     And that was the encryption code that

2    you needed in order to download the materials from

3    the SullivanStrickler website.  Is that right?

4        A     That was the code that I needed to

5    access the devices after I had downloaded them.

6        Q     So you -- Mr. Penrose sent you a set

7    of log-in credentials in order to download the

8    materials.  Is that correct?

9        A     That is correct.

10       Q     And then once the materials were

11   downloaded, you required an encryption code to

12   access them.  Is that accurate?

13       A     That is correct.

14       Q     You're -- you're saying this -- this

15   code here looks similar to that encryption code

16   that you needed?

17       A     Yeah, I can't tell if it is exactly

18   the same or not, but it -- it seems to be similar

19   to my recollection.

20       Q     Okay.  Okay.  Do you have any

21   understanding of what components of the Georgia

22   voting system were accessed in Coffee County on

Page 101

1          January 7th, 2021?

2                  A     I have no personal knowledge of that

3          other than what was provided to me to examine.

4                        MS. KAISER:  I'm going to introduce

5          the next exhibit.  This will be Exhibit 7, Tab 10.

6                    (Cotton Deposition Exhibit Number 7

7                     marked for identification.)

8          BY MS. KAISER:

9                  Q     Are you able to see Tab 7?

10                 A     Not yet.

11                       Okay.

12                 Q     Do you recognize this document?

13                 A     I don't recognize the document.

14                 Q     Do you understand this to be a list

15         of the contents on the SullivanStrickler hard drive

16         that you were provided access to?

17                       MR. PARKER:  Do not testify to that

18         if it involves information you received as a part

19         of your consulting expert work in Georgia.

20                       THE WITNESS:  I cannot answer that

21         question.

22

Page 102

1      BY MS. KAISER:

2              Q    I'm going to go back to what we

3      marked as Exhibit 5.  If you could go back to that

4      document, please.

5                    The e-mail at the top of the first

6      part of this document is from Paul Maggio, sent on

7      January 8th, 2021, to Sidney Powell.  Do you see

8      that document -- I mean that e-mail?

9              A    I do.

10             Q    And the subject line here is, "Re:

11     SSA1722."  Do you see that?

12             A    Yes.

13             Q    "Jim Penrose Coffee County, Georgia

14     Forensic Engagement Agreement."  Do you see that?

15             A    I do.

16             Q    And the attachment here is SSA1722

17     and 4205.  Do you see that?

18             A    I do.

19             Q    The e-mail states, "Sidney,

20     everything went smoothly yesterday with Coffee

21     County collection.  Everyone involved was extremely

22     helpful."

Page 103

1                    Do you see that?

2          A     I do.

3          Q     And it says, "We are consolidating

4    all of the data collected and will be uploading it

5    to our secured site for access by your team."

6                    Do you see that?

7          A     I do.

8          Q     So is it your understanding that

9    SullivanStrickler uploaded everything that they

10   collected from Coffee County onto their secured

11   site?

12                 MR. PARKER:  Objection.  He's already

13   testified he doesn't know anything about this.

14                 THE WITNESS:  Yeah, I don't know

15   anything about this.

16   BY MS. KAISER:

17         Q     Do you know who "your team" is

18   referred to in this e-mail or "your team" --

19         A     I do not.

20                 MR. PARKER:  He's already testified

21   he wasn't even contacted as of that time.

22

```
                                              Page 104

 1      BY MS. KAISER:

 2              Q     Do you know who the e-mail address

 3      "Magnolia64@█████████████" is associated with?

 4              A     I do not.

 5              Q     Going back to Exhibit 7, do you see

 6      that the hard drive here is named "SSA1722"?

 7                    MR. PARKER:  He already testified

 8      that he has never seen this document before.

 9                    MS. KAISER:  I am asking him if he

10      sees at the top of the page --

11                    MR. PARKER:  Well, the document

12      speaks for itself.

13                    THE WITNESS:  Yeah.

14                    MS. KAISER:  Thank you, Mr. Parker,

15      I'll ask the questions.

16      BY MS. KAISER:

17              Q     Do you see at the top of the

18      document?

19              A     I do.

20              Q     "SSA1722 Hard Drive Contents."  Do

21      you see that?

22              A     I do see that.
```

Page 105

1              Q    Do you recognize that as the same

2       number that was referenced in Maggio's --

3       Mr. Maggio's e-mail on Exhibit 5?

4              A    I do.

5              Q    Mr. Cotton, did you receive data

6       copied from Coffee County, Georgia on January 7,

7       2021?

8              A    I did not.

9              Q    At any time?

10                  MR. PARKER:  Objection.

11                  You can answer if it's outside of

12      the consulting expert role that you were retained

13      for in Georgia; and if it is not, you cannot

14      answer.

15                  THE WITNESS:  So as I previously

16      testified, I received access to a download site on

17      or about the middle of June 2021.

18      BY MS. KAISER:

19              Q    Did you ever receive a hard drive

20      or -- or any other materials containing data from

21      Coffee County, Georgia?

22                  MR. PARKER:  You cannot answer that

Page 106

1        if it was received as a part of your consulting

2        expert role in Georgia.

3                        THE WITNESS:  So as I previously

4        testified, I received access to the

5        SullivanStrickler download site in the middle of

6        June of 2021.

7        BY MS. KAISER:

8            Q     If you look at Exhibit 7 again.  Did

9        you receive access to the files listed in

10       Exhibit 7?

11                       MR. PARKER:  If you -- if you

12       received that -- if you received any access related

13       to your consulting expert role, you cannot answer

14       it, but if you received it outside of that role,

15       you can.

16                       THE WITNESS:  I did not receive any

17       access outside of my role as a consulting expert.

18       BY MS. KAISER:

19           Q     So you're not willing to testify as

20       to the contents of the data that you received

21       access to?

22                       MR. PARKER:  That's correct.  I'm

Page 107

1       instructing him not to answer based on the

2       work-product doctrine, consulting expert rules

3       cited, and also the rules cited in the log and the

4       nondisclosure agreement.

5       BY MS. KAISER:

6            Q     Did you do anything to validate that

7       the data that you received access to was, in fact,

8       from Coffee County, Georgia?

9                 MR. PARKER:  Same objection.  I'm

10      instructing him not to answer.

11      BY MS. KAISER:

12           Q     You're -- you're taking your

13      attorney's instruction not to answer, Mr. Cotton?

14           A     Yes.

15                 MS. KAISER:  I'll introduce the next

16      exhibit, this is Tab 11.  This will be Exhibit 8.

17            (Cotton Deposition Exhibit Number 8

18             marked for identification.)

19      BY MS. KAISER:

20           Q     Let me know when you've had a chance

21      to review Exhibit 8, Mr. Cotton.

22           A     I'm pulling it up now.

Page 108

1          Q     I realize the type is quite small on

2     this one.

3          A     Okay.

4          Q     Do you recognize this document?

5          A     I do not.

6          Q     Do you understand this to be a list

7     of all the e-mail addresses that have had access to

8     data on this -- copied from Coffee County on the

9     SullivanStrickler secured site?

10          A     I don't --

11               MR. PARKER:  Objection.  He lacks

12     foundation to answer.  He's already said that he

13     does not recognize it.

14               You can answer the question though

15     if you know.

16               THE WITNESS:  That's what it may

17     appear to be, but I don't know for certain what

18     this is.

19     BY MS. KAISER:

20          Q     Okay.  If you look at the ninth page

21     of this exhibit, a -- there's a Bates stamp in the

22     top right corner.  It ends in 134.  About a third

Page 109

1          of the way down the page there, it looks like

2          there's a line entry with your name, "Ben Cotton,"

3          and your firm, "CyFIR."

4                    A      Correct.

5                    Q      Do you see that?

6                    A      I see that.

7                    Q      Is this your e-mail address,

8          BenCotton█████████?

9                    A      That is my e-mail address.

10                   Q      Now, your name appears again, if

11         you -- about towards the bottom of the page -- I'm

12         sorry, going back -- going back to that first

13         entry.  It says in the furthest column to the left,

14         "10SSA1722 Court Documents."

15                          Do you see that?

16                   A      I do.

17                   Q      Were you given access to a folder

18         called, "Court Documents" on the SSA1722 hard

19         drive?

20                   A      I don't know the original name of the

21         portal.  It simply brought up a list of --

22                          MR. PARKER:  If this relates to your

Page 110

```
 1         work as a consulting expert, you should not testify

 2         about it.

 3                     THE WITNESS:  Okay.  It relates.

 4         BY MS. KAISER:

 5              Q    All right.  Further down the page,

 6         there's another entry for Ben Cotton, CyFIR, and

 7         your e-mail address.

 8                     Do you see that?  It's maybe ten

 9         lines up from the bottom.

10              A    I see that.

11              Q    There it says, furthest to the left,

12         "10SSA1722, Court Documents/Forensic Images."

13                     Do you see that?

14              A    I do.

15              Q    Were you given access to forensic

16         images from the SullivanStrickler website?

17                     MR. PARKER:  Objection.  Do not

18         answer that as it -- if it relates to your

19         consulting expert work based on the objections that

20         I have made today regarding work product and rules

21         related to consulting experts and the nondisclosure

22         agreement as listed in the log.
```

Page 111

1                    THE WITNESS:   I cannot answer that

2        question.

3        BY MS. KAISER:

4               Q     Okay.   The next page, this is a page

5        ending in 135.   About halfway through, you see your

6        name, "Ben Cotton," your firm, "CyFIR," your e-mail

7        address one more time.

8                    Do you see that?

9               A     Is this the one that has thumb drives

10       as the second column?

11              Q     Yes.

12                   Do you see that?

13                   MR. PARKER:   He is trying to

14       acclimate to which page you're looking at and

15       column.   He asked you about thumb drives.

16       BY MS. KAISER:

17              Q     Page 1 -- the Bates number ends in

18       135, the number at the top of the page.

19              A     Okay.

20              Q     And, yes, in the second column it

21       says "thumb drives."

22                   MR. PARKER:   We have Bates numbers in

Page 112

```
 1        the bottom right of the page.  You're saying at the
 2        top of the page.  I'm not trying to --
 3                    MS. KAISER:  Okay.  I apologize.
 4        I -- I was thinking vertically, but if you're
 5        looking at it horizontally, the Bates numbers
 6        should be in the bottom right.
 7                    MR. PARKER:  Okay.
 8                    THE WITNESS:  Yeah, I see this page.
 9        BY MS. KAISER:
10             Q    Okay.  And about halfway down, let's
11        see, about six or seven lines down, do you see your
12        name?
13             A    I do.
14             Q    And your firm CyFIR?
15             A    I do.
16             Q    And you can confirm this is your
17        e-mail address, correct?
18             A    Yes, that is my e-mail address.
19             Q    Were you given --
20             A    Or that was one that I was using at
21        the time.  It's no longer an e-mail address.
22             Q    Okay.  Thank you for that
```

Page 113

1          clarification.  All right.

2                  A     Can you provide some --

3                          MR. PARKER:  Just wait for a

4          question.

5                          THE WITNESS:  All right.

6                          MS. KAISER:  I'm going to introduce

7          the next exhibit.  This will be Exhibit 9.

8                      (Cotton Deposition Exhibit Number 9

9                       marked for identification.)

10                         MR. PARKER:  Are you done with page

11         135?

12                         MS. KAISER:  Yes.

13                         MR. PARKER:  Hello?

14                         MS. KAISER:  Yes.  Could you hear me?

15                         MR. PARKER:  Yeah.  Are you done with

16         page 135?

17                         MS. KAISER:  We are.

18                         MR. PARKER:  Okay.

19                         THE WITNESS:  Do you have any data on

20         this particular exhibit as to what the columns are?

21         BY MS. KAISER:

22                 Q     They're listed on the first page.

Page 114

```
 1              A      Okay.

 2              Q      Do you see that?

 3              A      I do.

 4              Q      Is there something additional that

 5       you'd like to tell me about this document,

 6       Mr. Cotton?

 7              A      Well, it's the first time that I've

 8       seen it, so I wanted to take a look at something.

 9              Q      What did you want to take a look at?

10              A      I just wanted to take a look at what

11       those columns represented.  Okay.  Thank you.

12              Q      Sure.

13                     Exhibit 9 should be loaded.  If

14       you'll look at the e-mail, the to/from information

15       is at the very bottom of page 1.  You see it's from

16       "JPcomms2020███████████."

17                     Do you see that?

18              A      Just wait one moment, please.

19              Q      Sure.

20              A      Which page?

21              Q      At the very bottom of the first page,

22       the Bates number is -- ends in 175.
```

Page 115

```
 1              A      Okay.

 2              Q      There's an e-mail from Thursday,

 3      April 22, 2021, at 1:42 p.m.

 4              A      Yes.

 5              Q      JPcomms2020█████████.  Do you

 6      know who that e-mail address corresponds to?

 7              A      JP Comms?  I do not.

 8              Q      Do you understand -- well, it was --

 9      let's see, if you flip to the next page, the

10      subject of the e-mail is, "Coffee County Forensics

11      FEDEX report."

12                     Do you see that?

13              A      I see that.

14              Q      And the e-mail is signed by Jim

15      Penrose.  Do you see that?

16              A      I do.

17              Q      Do you -- does that refresh your

18      recollection as to whether that JP Comms e-mail

19      address is Mr. Penrose's e-mail?

20              A      I don't recognize that e-mail so. . .

21              Q      All right.  Mr. Penrose e-mailed

22      Mr. Maggio and said, "Paul, can you please FedEx
```

Page 116

1        all the forensics material from the Coffee County

2        acquisition to the same address as before."

3                    Do you see that?

4            A    I do.

5            Q    All right.  And this was dated April

6        of 2021, correct?

7            A    Yes.

8            Q    Do you know whether Mr. Penrose was

9        requesting the forensic material from Coffee County

10       that was collected in January of 2021?

11           A    I don't know.

12           Q    Do you know if anybody had access to

13       the Coffee County system in April of 2021?

14           A    Not to my knowledge.

15                MS. KAISER:  We are going to mark the

16       next exhibit.  This will be Exhibit 10.

17               (Cotton Deposition Exhibit Number 10

18                marked for identification.)

19       BY MS. KAISER:

20           Q    Do you see Exhibit 10?

21           A    I do.

22           Q    All right.  So Exhibit 10, it's on

Page 117

```
 1          the bottom of the first page.  It looks like it

 2          starts with that first e-mail that we just reviewed

 3          from Mr. Penrose.

 4                       Do you see that?

 5               A     I do.

 6               Q     All right.  And Mr. Maggio responded

 7          at the top of the page, on the next -- that same

 8          day --

 9               A     Uh-huh.

10               Q     -- April 22nd, 2021.  Do you see

11          that?

12                       And he says, "Jim/Stefanie, this is

13          received and we will begin the process of copying

14          everything to a drive."

15                       Do you see that?

16               A     I do.

17               Q     All right.  And attached to this, on

18          the next page, do you see a FedEx receipt?

19               A     I do.

20               Q     All right.  And so this was a FedEx

21          that was sent from Karen Wilson at

22          SullivanStrickler, LLC.  Do you see that?
```

Page 118

1           A      I do.

2           Q      And Stefanie Lambert.  Do you see

3    that?

4           A      I do.

5           Q      Do you know whether this address,

6    ███████████████████████, Royal Oak, Michigan

7    48067, do you recognize that address?

8           A      I don't.

9           Q      Do you know if that's Ms. Lambert's

10   address?

11          A      I -- I don't.  I don't recognize the

12   address.

13          Q      Okay.  To your knowledge, does

14   Ms. Lambert live in Royal Oak, Michigan?

15          A      She lives in Michigan.  I'm not sure

16   exactly where.

17          Q      Okay.  This FedEx receipt shows that

18   SullivanStrickler sent this package out, and its

19   ship date April 27, 2021.

20                 Do you see that?

21          A      I do.

22          Q      Directed to Ms. Lambert at this Royal

Page 119

1          Oak address, correct?

2                  A     Yes.

3                  Q     All right.

4                  MS. KAISER:  I'm going to introduce

5          the next exhibit, which will be Exhibit 11.

6                      (Cotton Deposition Exhibit Number 11

7                       marked for identification.)

8          BY MS. KAISER:

9                  Q     While we are introducing that, do you

10         know who Michael Lynch is?

11                 A     I do.

12                 Q     Who is Mr. Lynch?

13                 A     He's a private investigator that is

14         engaged by Stefanie Lambert.

15                 Q     Have you had any communications with

16         Mr. Lynch?

17                 A     Not --

18                 MR. PARKER:  I'm going to object.

19         What -- which of the items that the subpoena was

20         amended to and -- in the August 9th letter does

21         this relate to?

22                 MS. KAISER:  How any software or

Page 120

1      related data were copied or otherwise obtained from

2      any such voting equipment or election records in

3      Georgia.  Who all received any such software or

4      related data.

5                  MR. PARKER:  Well, he's already said

6      that he has no knowledge of that.

7                  MS. KAISER:  We're -- I'm -- we're

8      asking him questions about that, Mr. Parker.  It's

9      well within the scope of the agreed-upon topics for

10     today's deposition.

11                 MR. PARKER:  Well, I don't agree,

12     but, you know, I'll let you continue for a bit, but

13     not -- you know, I just think you're going well

14     beyond the scope of what we agreed.  For what

15     purpose, I don't know, but it doesn't relate to

16     Mr. Cotton as he has disqualified himself from

17     testifying about most all of what you have asked

18     him.

19                 MS. KAISER:  I'm sorry, can you

20     repeat that?

21                 MR. PARKER:  Can I repeat what?

22                 MS. KAISER:  What you just said.  You

Page 121

1          cut out for a minute.

2                          MR. PARKER:  Oh.  Did the court

3          reporter get it?

4                          COURT REPORTER:  I did.

5                          MS. KAISER:  Can you read it back to

6          me, please, Felicia?

7                  (The reporter read as requested.)

8          BY MS. KAISER:

9                  Q     Mr. Cotton, prior to preparing for

10         this deposition, have you discussed the events that

11         took place in Coffee County in January 2021 with

12         anybody?

13                         MR. PARKER:  Other than your lawyers

14         and other than as it relates to the consulting

15         expert work that you did in Georgia.

16                         THE WITNESS:  No.

17         BY MS. KAISER:

18                 Q     Are you aware of any other instances

19         of access to the Coffee County elections office?

20                 A     No.

21                 Q     Have you ever physically or remotely

22         accessed the Coffee County elections office?

Page 122

1          A     No.

2          Q     Have you ever physically or remotely

3     accessed any elections office in Georgia?

4          A     No.

5          Q     You have provided sworn testimony

6     that you forensically analyzed the voting system

7     for Coffee County, Georgia.  Is that correct?

8          A     That is correct.

9          Q     Will you please walk me through how

10    you came to analyze that voting system?

11               MR. PARKER:  You can testify about

12    what you testified to in Arizona, but if it relates

13    to your work as a consulting expert in Georgia, you

14    cannot testify beyond that.

15               THE WITNESS:  I had the occasion to

16    be able to examine the artifacts necessary to make

17    conclusions about the cybersecurity posture of the

18    EMS server in Coffee County, Georgia.

19    BY MS. KAISER:

20          Q     Did you offer an expert opinion on

21    that matter?

22          A     I have a -- a declaration in another

Page 123

```
 1        matter in Arizona to that effect.

 2                Q     Do you -- have you ever offered that

 3        opinion in any litigation in Georgia?

 4                A     No.

 5                Q     How do you know that the data that

 6        you analyzed came from the Dominion -- Dominion

 7        voting equipment in Coffee County, Georgia?

 8                      MR. PARKER:  You can testify only if

 9        it is unrelated to the work you did as a consulting

10        expert in Georgia.

11                      THE WITNESS:  I came to that

12        conclusion based on my consulting work in Georgia.

13        BY MS. KAISER:

14                Q     Based on the analysis that you did as

15        part of your engagement?

16                      MR. PARKER:  I'm sorry, I didn't hear

17        that question.

18        BY MS. KAISER:

19                Q     I said, you came to that conclusion

20        as part of the analysis that you undertook as part

21        of your engagement for Ms. Lambert.  Is that

22        correct?
```

Page 124

1           A      Yes.

2           Q      So as you sit here today, Mr. Cotton,

3      you have no knowledge of how the data that you

4      received was obtained from voting equipment in

5      Coffee County.  Is that correct?

6           A      That is correct.

7           Q      I want to go back to what was

8      previously marked as Exhibit 3.  This is your

9      March 2021 engagement letter with Ms. Lambert.

10              We walked through this -- the

11     description of services section agreement prior --

12     previously.  Do you remember that?

13          A      I do.

14          Q      And your engagement letter states

15     that you would provide forensic imaging of hard

16     drives, correct?

17          A      If required, yes.

18          Q      Did you, yourself, undertake any

19     forensic imaging of hard drives in Coffee County,

20     Georgia?

21          A      I did not --

22              MR. PARKER:  Do not answer that --

Page 125

1                    THE WITNESS:  Oh.

2                    MR. PARKER:  -- because it is

3        protected by the consulting expert work product

4        privilege.

5        BY MS. KAISER:

6              Q      You're taking your attorney's

7        instruction not to answer?

8              A      Yes.

9              Q      Your engagement letter states that

10       you will provide live computer analysis.  Do you

11       see that?

12             A      I see that.

13             Q      What is under -- what is meant by

14       "live computer analysis"?

15             A      So this is actually boilerplate

16       engagement here.  And if required, or if we see

17       signs of a breach, we have the -- the ability to

18       analyze a forensics image in an isolated live

19       environment to determine if there are memory

20       resident pieces of malware that are -- that are

21       loaded at -- at boot or at startup.  And that's

22       what that refers to.

Page 126

1            Q     Have you provided any live computer

2       analysis of any aspect of the Coffee County

3       Election System?

4            A     No.

5            Q     You testified that Mr. Penrose

6       provided the credentials necessary to access data

7       from Coffee County for you to analyze.  Is that

8       correct?

9            A     Yes.

10           Q     Did you speak to anybody else about

11      getting access to that data?

12           A     My -- the attorney that I was engaged

13      for --

14                 MR. PARKER:  You can't speak about

15      the content of your discussions with your attorney

16      or your work product relating to your consulting

17      work.

18                 THE WITNESS:  Other than the -- the

19      attorney, no.

20      BY MS. KAISER:

21           Q     You didn't speak to anybody other

22      than your -- other than -- when you say "the

1      attorney," was that Stefanie Lambert?

2           A     Yes.

3           Q     What happened after you downloaded

4      the data from Coffee County, Georgia?  What did you

5      do with it?

6                MR. PARKER:  Objection.  Don't go any

7      further than what you testified to in Arizona, to

8      the extent that it relates to your consulting work

9      as an expert.

10                THE WITNESS:  I provided -- or I

11     performed an analysis of those provided artifacts.

12     And a portion of those conclusions are referenced

13     in the Arizona declaration.

14     BY MS. KAISER:

15          Q     Did you undertake that analysis right

16     away?

17          A     It's my recollection that it was

18     fairly shortly after the -- I downloaded the

19     artifacts.

20          Q     Did you save that data anywhere?

21          A     Which data are you speaking about?

22          Q     The Coffee County data that you

1          accessed from the SullivanStrickler secured site.

2                    A      Yes.

3                    Q      Where did you save it?

4                    A      I saved it on my forensics

5          workstation.

6                    Q      That's the computer in -- in your lab

7          in Montana.  Is that correct?

8                    A      That is correct.

9                    Q      But you saved a copy of it there?

10                   A      Yes.

11                   Q      Did you replicate the data in any

12         way?

13                   A      I did not.

14                   Q      Did you share the data with anybody?

15                   A      No.

16                   Q      Did you perform this analysis on your

17         own?

18                   MR. PARKER:  Objection.  It goes into

19         his work as a consulting expert.  I would instruct

20         him not answer.

21         BY MS. KAISER:

22                   Q      Have you worked with anybody else

1    as -- as part of your analysis of the Coffee County

2    election data, Mr. Cotton?

3                    Or anybody on your behalf?

4                    MR. PARKER:  Same objection.  I

5    instruct him not to answer.

6    BY MS. KAISER:

7            Q    What voting equipment or components

8    did you analyze?

9                    MR. PARKER:  Same objection.  I

10   instruct him not to answer.

11   BY MS. KAISER:

12           Q    Did you analyze all of the data that

13   you were provided access to?

14                   MR. PARKER:  Same objection.

15                   I instruct you not to answer.

16   BY MS. KAISER:

17           Q    Did you reconfigure or in any way

18   change the Dominion software, data or files related

19   to the Georgia election system?

20                   MR. PARKER:  Objection.

21                   I instruct you not to answer if it

22   relates to your work as a consulting expert.  If

1     it's work-product doctrine, it's governed by all

2     of the rules that have been cited in the log, as

3     well as the nondisclosure agreement.

4     BY MS. KAISER:

5          Q     Are you willing to answer that

6     question, Mr. Cotton?

7          A     I will follow the direction of the

8     attorney.

9          Q     Do you still have the Dominion data

10    files from Coffee County?

11         A     Yes.

12         Q     What steps, if any, have you taken to

13    secure those files?

14         A     They're on isolated systems, password

15    protected on encrypted hard drives.

16         Q     Does anybody have access to those

17    passwords besides you?

18         A     No.

19         Q     To your knowledge, who has received

20    or had access to the Dominion data from Coffee

21    County, Georgia?

22                    MR. PARKER:  To the extent that it

Page 131

```
 1        relates to any consulting work that you were doing

 2        in Georgia, I'd instruct you not to answer.

 3                     THE WITNESS:  I have not disseminated

 4        any of that data to any party, nor have I discussed

 5        that data with anyone who is not a part of Stefanie

 6        Lambert's legal team.

 7   BY MS. KAISER:

 8             Q     Are you aware of anybody outside of

 9        that legal team having access to the Dominion

10        software data collected in Coffee County, Georgia?

11             A     I have no personal knowledge of that.

12                   MS. KAISER:  I'm going to introduce

13        the next exhibit, Exhibit 11.

14   BY MS. KAISER:

15             Q     Do you see that Exhibit 11,

16        Mr. Cotton?

17             A     I do.

18             Q     All right.  This is a transcript of a

19        proceeding from the Blake versus Katie Hobbs case

20        in the District of Arizona.  Do you see that?

21             A     I do.

22             Q     This was from July 21st, 2022.  Do
```

Page 132

1          you see that?

2                  A     I do.

3                  Q     And you testified in that proceeding,

4          did you not?

5                  A     Say again, please.

6                  Q     You testified at that proceeding.  Is

7          that correct?

8                  A     Yes.

9                  Q     Okay.  You testified under oath that

10         your access to Coffee County voting data was

11         authorized.  Is that correct?

12                 A     Yes.

13                 Q     You said that this -- your access was

14         authorized by a Coffee County election official in

15         that case.  Do you see that?

16                 A     Yes.

17                       MR. PARKER:  Where are you referring

18         to?

19         BY MS. KAISER:

20                 Q     I'm sorry.  Do you recall that?

21                 A     I do recall that.

22                 Q     What Coffee County election official

Page 133

1       were you referring to?

2              A      So, once again, this was -- as it was

3       represented to me by Ms. Lambert, and I was

4       informed by an officer of the court that Misty

5       Hampton had approved the collection and the

6       preservation of those voting systems.

7              Q      Did you believe that Ms. Hampton had

8       the authority to grant that authorization?

9              A      I did.

10             Q      What's the basis for that belief?

11             A      Based on a representation by my

12      attorney that she was authorized to do that.

13             Q      You testified in this proceeding that

14      you were aware that Misty Hampton was under

15      investigation.  Is that right?

16             A      Yes.

17             Q      Can you please tell me what you know

18      about that investigation?

19             A      I really don't know anything about

20      that investigation other than the fact that based

21      on news reports and representations by Ms. Lambert,

22      that she was under investigation and that she had

Page 134

```
 1          retained Ms. Lambert as her attorney.
 2               Q     With respect to that investigation?
 3               A     I would assume so.
 4               Q     And I believe you testified -- you
 5          said today that you have never been contacted by an
 6          investigator in relation to Misty Hampton.  Is that
 7          right?
 8               A     I have not.
 9               Q     I'm going to switch topics.  Are you
10          okay to keep going for a few minutes or would you
11          like a break, Mr. Cotton?
12               A     If you don't mind, I've been drinking
13          a few diet Cokes, so --
14               Q     Sure.
15               A     -- I could hit the bathroom.
16               Q     No problem.  We'll take a short
17          break.  Five or ten minutes, is that sufficient?
18               A     Sure.
19               Q     Okay.  Thanks.
20                     VIDEOGRAPHER:  The time is
21          approximately 11:48 a.m.  We are going off the
22          video record.
```

Page 135

1                    (Recess from 11:48 a.m. to 12:01 p.m.)

2                        VIDEOGRAPHER:   The time is

3          approximately 12:01 p.m.  We are back on the video

4          record.  Go ahead.

5          BY MS. KAISER:

6                    Q     Mr. Cotton, we were just speaking

7          about Misty Hampton and your belief that she had

8          authority to authorize your access to the Coffee

9          County voting data.

10                        Are you aware that Ms. Hampton was

11         fired from her job in February of 2021?

12                   A     I am not.

13                   Q     You met Ms. Hampton in approximately

14         April of 2021.  Is that right?

15                   A     That's correct.

16                   Q     And that by that time she had

17         retained Ms. Lambert as her attorney.  Is that

18         right?

19                   A     That's my understanding, yes.

20                   Q     Did you have an understanding of why

21         she needed an attorney?

22                   A     I -- my understanding was, is that

1      she was being harassed by the -- by the County.

2      And there was possible action -- I was unclear as

3      to what action that it would have been that was

4      going to be taken against her.

5              Q     By the County?

6              A     By the County.

7              Q     And so your understanding is

8      Ms. Lambert was hired to represent her in the

9      defense of an action by Coffee County?

10             A     Yes.

11             Q     Did she tell you anything about that

12     when you met with her in April of 2021?

13             A     We did not discuss what was going on

14     in Coffee County when I met her in April.

15             Q     Did you discuss her -- why she had

16     retained Ms. Lambert?

17             A     I did not.  And, you know, it's not

18     my place.

19             MS. KAISER:  I'm going to mark the

20     next exhibit, which I think is going to be

21     Exhibit 12.

22

Page 137

```
 1              (Cotton Deposition Exhibit Number 12

 2              marked for identification.)

 3      BY MS. KAISER:

 4              Q      Do you see that exhibit, Mr. Cotton?

 5              A      Yes.

 6              Q      This is a declaration that you gave

 7      in the Lake v. Hobbs case in Arizona.  Is that

 8      correct?

 9              A      That is correct.

10              Q      And this was filed on June 8, 2022?

11              A      That is correct.

12              Q      Do you recognize this document?

13              A      I do.

14              Q      If you look at page 2, paragraph 9,

15      it says, "In the course of my duties, I have

16      forensically examined Dominion Democracy Suite

17      voting systems in Maricopa County, Arizona, Antrim

18      County, Michigan, Mesa County, Colorado, and Coffee

19      County, Georgia."  Is that right?

20              A      That's correct.

21              Q      Okay.  On the next -- on page 5, this

22      is paragraph 17(b) -- or excuse me, 18(b), at the
```

Page 138

1          bottom of page 5.  It says, "Based on my analysis

2          of the analyzed election systems in Maricopa

3          County, Arizona, Fulton County, Georgia, Antrim

4          County, Michigan, Mesa County, Colorado, and Coffee

5          County, Georgia."

6                    Do you see that?

7          A     I do.

8          Q     Have you also forensically analyzed

9          the Dominion Democracy Suite software from Fulton

10         County, Georgia?

11         A     I have not.  I have examined

12         artifacts.

13         Q     What do you mean -- what distinction

14         are you making there?

15         A     I have not analyzed the entire -- I

16         did not have access to the entire EMS system in

17         Fulton County, Georgia.

18         Q     Did you have access to the entire EMS

19         system in the other counties listed in this

20         declaration?

21         A     I have access to --

22                    MR. PARKER:  Don't answer that

Page 139

1    question.

2                    THE WITNESS:  Oh.

3                    MR. PARKER:  It goes outside the

4    scope of the subpoena.  And it also requires

5    regarding work product.

6    BY MS. KAISER:

7         Q    Did you have access to the entire EMS

8    system for Coffee County, Georgia?

9                    MR. PARKER:  Don't answer that

10   question.  It goes to the issue -- or it goes to

11   the work-product doctrine, and it's prohibited by

12   the work-product doctrine as it relates to your

13   consulting expert work.

14   BY MS. KAISER:

15        Q    Can you please continue to explain

16   what you meant by you have not accessed the entire

17   EMS system for Fulton County, Georgia, Mr. Cotton?

18        A    Yeah, so the subpoena -- subpoenas

19   and the FOIA requests results came in very, I

20   guess, fractionalized, is the best way to put that.

21   And so I had access to some vet logs and some

22   publicly produced printout tapes that were

Page 140

1       subsequently digitized from the -- from the polling

2       devices.

3                    Q     What devices were those?

4                    MR. PARKER:  Don't answer that.  That

5       goes beyond the -- the scope of what you testified

6       to in Arizona.

7       BY MS. KAISER:

8                    Q     I'm asking about the subject of your

9       sworn testimony in this declaration, Mr. Cotton.

10                   MR. PARKER:  Don't answer that

11      question.

12      BY MS. KAISER:

13                   Q     You indicated that the data that you

14      analyzed -- looked at for Fulton County, Georgia

15      was received in response to FOIA requests.  Is that

16      correct?

17                   A     My understanding from the legal team

18      is that they were as a result of FOIA and subpoena

19      requests.

20                   Q     Did you personally file any of those

21      FOIA requests or was that done by the legal team?

22                   A     That was done by the legal team.

Page 141

1              Q     How did you get access to the

2       information that you analyzed from Fulton County?

3                    MR. PARKER:  Beyond what you've

4       testified to in Arizona, do not answer the question

5       as it goes to work product, as well as your work as

6       a consulting expert.

7       BY MS. KAISER:

8              Q     Is there anything that you can tell

9       me about that, Mr. Cotton?

10             A     I'm following the advice of the

11      attorney.

12             Q     When did you perform this analysis of

13      information from Fulton County, Georgia?

14             A     I began working with them in

15      September of -- around or about September of 2021.

16             Q     How do you know that the data that

17      you analyzed came from Dominion voting equipment in

18      Fulton County, Georgia?

19                   MR. PARKER:  Only answer to the

20      extent that it is part of your testimony in

21      Arizona.  If it goes beyond that at all, and is

22      related to your consulting work, then it is work

Page 142

1          product or governed by the consulting expert rules.

2                    THE WITNESS:  My determination was

3          based on my -- my consulting expert opinion and

4          work product.

5          BY MS. KAISER:

6               Q    Let's go back to what was marked as

7          Exhibit 2.  It's the letter from your attorney

8          dated August 24th in the privileged log.

9                    Do you see that?  Do you have that in

10         front of you?

11              A    We just brought it up.  And which one

12         are we looking at here?

13              Q    The Bates number BC0010.  Do you see

14         that?

15              A    Yes.

16              Q    Described as "March 22nd, 2022,

17         Fulton County Certification of Records, produced

18         pursuant to a FOIA request."

19                   Do you see that?

20              A    I do.

21              Q    Did you seek certification of records

22         from Fulton County, Georgia?

Page 143

1            A     I --

2                  MR. PARKER:  Objection.

3                  Don't answer that as it relates to

4       your work as a consulting expert in the case.

5       BY MS. KAISER:

6            Q     Are you not answering that question,

7       Mr. Cotton?

8            A     I'm following the direction of my

9       attorney.

10           Q     Did you seek similar certification

11      records for Coffee County, Georgia?

12                 MR. PARKER:  Same objection.

13                 I'm instructing you not to answer.

14      BY MS. KAISER:

15           Q     And you're following your attorney's

16      instruction, Mr. Cotton?

17           A     Yes.

18           Q     We can go back to Exhibit 12, your

19      declaration from the Arizona case.  I'm going back

20      to paragraph 9 where you say, "I forensically

21      examined Dominion Democracy Suite voting systems

22      for the counties listed here."

Page 144

1              What components of the Dominion

2       Democracy voting systems did you analyze?

3              MR. PARKER:  Do not answer that

4       question to the extent it goes beyond what you've

5       stated in your declaration, because it relates to

6       your consulting work as an expert in Georgia.

7       BY MS. KAISER:

8          Q     Are you refusing to answer that

9       question, Mr. Cotton?

10         A     I am following the advice of my

11      attorney.

12         Q     The next paragraph says, "I reviewed

13      the administrative manuals and documentation from

14      the Dominion Democracy Suite software and hardware

15      components."

16              Do you see that?

17         A     I do.

18         Q     What administrative manuals and

19      documentation did you review as part of your

20      analysis?

21         A     I reviewed the publicly available

22      documents that are downloadable from the internet

1          pertaining to the operation and function of the

2          Democracy Suite.

3                    Q     Do you have any knowledge of how the

4          data that you analyzed from Fulton County was

5          captured?

6                         MR. PARKER:  Objection.

7                         It relates to the work you did as a

8          consulting expert.  You can testify whether you

9          have knowledge, yes or no, but not what that

10         knowledge is.

11         BY MS. KAISER:

12                   Q     Do you have any knowledge of how that

13         data was captured, Mr. Cotton?

14                   A     No.

15                   Q     Did you, yourself, ever have access

16         to the Fulton County, Georgia voting system?

17                   A     No.

18                   Q     Either in person or remotely?

19                   A     No.

20                   Q     Did you, yourself, undertake any

21         forensic imaging of the Fulton County voting

22         system?

Page 146

```
 1              A     No.

 2                    MR. PARKER:  This relates to your

 3        work as a consulting expert.  The last three

 4        questions did, and I allowed you to answer them,

 5        but they all relate to your consulting work.  So

 6        they're governed by the work-product doctrine.

 7        BY MS. KAISER:

 8              Q     By what means did you receive the

 9        data that was from Fulton County, Georgia?

10              A     I received them --

11                    MR. PARKER:  Same objection.

12                    Don't answer that question.

13                    THE WITNESS:  Okay.

14        BY MS. KAISER:

15              Q     Was it from an attorney?

16              A     Yes.

17                    MR. PARKER:  Same --

18        BY MS. KAISER:

19              Q     What happened when you received the

20        data from Fulton County, Georgia?

21                    MR. PARKER:  I'm sorry.  I didn't

22        hear that question.
```

1     BY MS. KAISER:

2             Q     What happened when you -- after you

3     received the data from Fulton County, Georgia?

4     What did you do with it?

5                   MR. PARKER:  Objection.  That

6     violates the work-product doctrine to answer.

7                   So you may not answer it, as a

8     consulting -- as it relates to your work as a

9     consulting expert.

10    BY MS. KAISER:

11            Q     Did you save the data anywhere?

12                  MR. PARKER:  Same objection.

13                  Do not answer.

14    BY MS. KAISER:

15            Q     Did you begin your analysis of the

16    data right away?

17            A     Yes.

18            Q     Are you aware of anybody else having

19    access to data from the Fulton County, Georgia

20    election system?

21                  MR. PARKER:  Same objection.

22                  I'm instructing you not to answer.

1     BY MS. KAISER:

2          Q    Was your analysis of the Fulton

3     County, Georgia data done in connection with your

4     engagement by Stefanie Lambert?

5          A    No.

6          Q    Was it done in connection with your

7     engagement by Todd Harding?

8          A    Yes.

9          Q    Did you do anything with the Dominion

10    software data from Fulton County, Georgia other

11    than analyze it?

12         A    No.

13         Q    Do you still have -- do you still

14    have the Dominion software data from Fulton County,

15    Georgia?

16         A    I have three items.

17         Q    Are those saved on your computer

18    that's in your lab in Montana?

19         A    Yes.

20         Q    What have you done to secure those --

21    those files?

22         A    It's on an isolated system.  It's a

Page 149

1          hardware-encrypted disk with a password required to

2          access the disk and a separate password to access

3          the system itself.

4                    Q      Who authorized access to voting

5          equipment -- or, excuse me, voting data from Fulton

6          County, Georgia?

7                         MR. PARKER:  Objection.

8                         Work -- work product.  And to the

9          extent it's part of your consulting work, you

10         cannot answer.  If not, you can.

11                        THE WITNESS:  So it was represented

12         that this data was a result of subpoenas and FOIA

13         requests to Fulton County.

14         BY MS. KAISER:

15                   Q      Did anyone other than Mr. Harding

16         facilitate your access to the voting data from

17         Fulton County, Georgia?

18                   A      Not that I recall.

19                   Q      If you will look at the privilege log

20         that's been marked as Exhibit 2 again, Mr. Cotton.

21         The Bates number BC0009, do you see that?

22                   A      Just one moment, please.

Page 150

1              Yes.

2         Q    The description here is,

3    "6/12/2021 Communication with log-in credentials

4    for the forensic images to be analyzed on behalf of

5    S. Lambert."

6              Do you see that?

7         A    Yes.

8         Q    Are these forensic images from Coffee

9    County, Georgia?

10             MR. PARKER:  Objection.

11             Don't testify to that.  That goes

12   to the work-product doctrine, as well as your

13   work as a consulting expert and the nondisclosure

14   agreement and the rules related to it.

15   BY MS. KAISER:

16        Q    Mr. Cotton, I think that you

17   testified previously that you got access to the

18   Coffee County voting data in around June 11th or

19   June 12th of 2021.  Is that correct?

20        A    That is correct.

21             MS. KAISER:  I'm going to introduce

22   the next exhibit.  I believe it will be 13.

Page 151

1                    (Cotton Deposition Exhibit Number 13

2                    marked for identification.)

3       BY MS. KAISER:

4            Q     Mr. Cotton, do you have an e-mail

5       program opened right now?

6            A     I do not.

7            Q     Does your attorney?

8            A     No.  My attorney is right here

9       with -- with me in the room.

10           Q     Okay.  Because we hear a ding coming

11      through.  It sounds like it's a message or an

12      e-mail system.  Is that coming from your end?

13           A     I have a cellphone, but it is turned

14      off -- or it's not turned off, but it's not open or

15      interacting.

16           Q     Can you please confirm that you don't

17      have your e-mail or any text applications open

18      right now?

19           A     That is correct.

20           Q     You're not communicating with anybody

21      other than the attorney sitting next to you?

22           A     I am not.

Page 152

1          Q     Thank you.

2                Did you see Exhibit 13?

3          A     I -- yes, I see it.

4          Q     If you look at the third page of the

5     document, it's an e-mail from James Barnes, dated

6     May 7, 2021.

7                Do you see that?

8          A     I do.

9          Q     And do you know who James Barnes is?

10         A     I do not.

11         Q     Are you aware that he replaced Misty

12    Hampton as the Coffee County elections director in

13    Georgia?

14         A     I am not aware of that.

15         Q     The e-mail is to Wharvey@SOS.ga.gov.

16    Do you know whose e-mail address that?

17         A     I don't.

18         Q     Mr. Barnes' e-mail says that he --

19    let's see, it's to Chris Harvey, who works at the

20    Secretary of State's office in Georgia.  He said --

21    in the second sentence here he says, "When I took

22    over at the Coffee County office, the attached

Page 153

```
 1        business card was at the base of Misty Hampton's
 2        computer monitor."
 3                    Do you see that?
 4            A     I see that.
 5            Q     And he goes on, "I thought nothing of
 6        it until I heard about the situation in Arizona
 7        with the DOJ.  If she did not use them, she was at
 8        the very least in contact."
 9                    Do you see that part of the e-mail?
10            A     I do.
11            Q     Okay.  And if you flip to the page --
12        flip the page, do you see on the next page a
13        business card from Douglas Logan?
14            A     I -- I see it.  It's very grainy.
15            Q     Right.  But can you see --
16            A     I can make out his name, but I can't
17        make out any other data.
18            Q     But you do see where it says "Cyber
19        Ninjas"?
20            A     I do.
21            Q     Okay.  Do you know why Misty Hampton
22        had Doug Logan's business card on her computer
```

Page 154

```
 1        monitor?

 2                      MR. PARKER:  Objection.  There's --

 3        there's no foundation.

 4                      You can answer if you even know

 5        that they were connected in any way.

 6                      THE WITNESS:  I have no idea.

 7        BY MS. KAISER:

 8             Q     Do you know if Doug Logan ever went

 9        to Coffee County, Georgia?

10                      MR. PARKER:  Disqualify himself.  You

11        can answer if you know.

12                      THE WITNESS:  I'm sorry.  Can you

13        repeat the question?

14        BY MS. KAISER:

15             Q     I said, do you know if Doug Logan

16        ever went to Coffee County, Georgia?

17             A     I don't know.

18             Q     Do you know whether Mr. Logan was in

19        any way connected with the -- accessing the voting

20        system in Coffee County, Georgia?

21             A     I don't have any personal knowledge

22        of any of those activities.
```

Page 155

1          Q      Do you know who Mike Lindell is?

2          A      I've seen him on TV.

3          Q      Do you know if Mr. Lindell is

4     connected in any way with accessing the voting

5     system in Coffee County, Georgia?

6          A      I have no knowledge about any of

7     that.

8          Q      Do you know who Russell Ramsland is?

9          A      I'm sorry.  The computer dinged when

10    you were saying your question.

11         Q      Do you know who Russell Ramsland is?

12         A      I've heard the name, but I don't know

13    him.  I don't believe I ever met him.

14         Q      Do you know if he was connected in

15    any way with accessing the voting system in Coffee

16    County, Georgia?

17         A      No.

18                And let me make this perfectly clear,

19    I have no knowledge whatsoever about the imaging of

20    any systems in Coffee County, Georgia.  I have no

21    personal knowledge of that at all.

22                MS. KAISER:  I'm going to mark the

Page 156

1         next exhibit as 14.

2                      (Cotton Deposition Exhibit Number 14

3                      marked for identification.)

4         BY MS. KAISER:

5                  Q     Do you know who Alex Halderman is?

6                  A     I know of him by reputation, and he

7         was an opposing expert in Michigan.

8                  Q     Are you aware that he submitted a

9         report in this case regarding the Dominion Voting

10        System in Georgia?

11                 A     I am.

12                 Q     What do you know about that report?

13                 A     Well, it seemed like a fairly

14        thorough report documenting the vulnerabilities of

15        the Dominion Voting System in, I believe, it's

16        Fulton County.

17                 Q     How did you hear about that report?

18                 A     Well, it was on the news.  It was

19        released under seal.  And as I am involved in some

20        of the election analysis, I reviewed that report.

21                 Q     You -- I'm sorry, you said you

22        reviewed the report?

Page 157

1              A      Yes.

2              Q      So you've seen the report itself?

3              A      I have.

4              Q      So you're aware that Dr. Halderman's

5      report details a number of -- of serious security

6      vulnerabilities in Georgia's Dominion voting

7      system?

8              A      I am.

9              Q      Have you undertaken any analysis

10     regarding the vulnerabilities identified in

11     Dr. Halderman's report?

12             MR. PARKER:  If it's not part of your

13     consulting -- well, no.

14             Actually, if it's not part of your

15     consulting, then how is it within the bounds of

16     the amended subpoena, Mary?  Which of the items

17     are you inquiring about?

18             MS. KAISER:  I'm just asking a

19     question, and it's up to you to object, Mr. Parker.

20             MR. PARKER:  Well, I'm giving you the

21     opportunity to explain to me where it fits so that

22     I don't object.  I'll object.  If you don't want to

Page 158

1     tell me, that's fine.  I view it as beyond the

2     scope.

3                 MS. KAISER:  I'm going to introduce

4     one last exhibit.  This will be 15.

5                 (Cotton Deposition Exhibit Number 15

6                 marked for identification.)

7                 MR. PARKER:  Are you referring to

8     Exhibit 14 now?

9     BY MS. KAISER:

10          Q     I'm sorry.  I want to -- I want to

11    ask one more question about the Halderman report,

12    Mr. Cotton.  How did you get access to that report?

13                MR. PARKER:  I'm going to object that

14    it's beyond the scope of the questioning here.

15                MS. KAISER:  Well, he testified that

16    he's looked at the report and I'm asking how he

17    accessed the report.

18                MR. PARKER:  I understand that.  I

19    think it goes beyond the scope of the subpoena.  I

20    did let you go into a few questions about it, but

21    unless you can explain how it was part of the

22    subpoena, I'm going to instruct him not to answer

Page 159

```
 1        because it's beyond the scope, but if you disagree,

 2        please let me know.

 3        BY MS. KAISER:

 4             Q     Was it related to your engagement as

 5        an expert, Mr. Cotton, or was this just in your

 6        personal capacity?

 7             A     It was related to my engagement as an

 8        expert.

 9             Q     Was the report provided to you by an

10        attorney?

11             A     It was.

12             Q     Was it provided to you by Stefanie

13        Lambert?

14             A     It was not.

15             Q     Was it provided to you by Todd

16        Harding?

17             A     It was not.

18             Q     What attorney -- was it provided to

19        you by an attorney with whom you have an

20        engagement?

21             A     Yes.

22             Q     What attorney was that?
```

Page 160

```
 1            A     With Parker Daniels in preparation

 2      for the Arizona hearing.

 3            Q     Approximately when did he give you

 4      access to that report?

 5            A     That would have been the middle to

 6      end of July.

 7                  MR. PARKER:  Hold on.  I want to

 8      inquire with Mr. Cotton.

 9                (Counsel and witness conferred.)

10                  THE WITNESS:  I -- I stand corrected.

11      I was provided a declaration by Mr. Halderman, not

12      a report.

13      BY MS. KAISER:

14            Q     A declaration submitted in this case

15      to your understanding?

16            A     That was my understanding.

17            Q     But not to his expert report.  Is

18      that correct?

19            A     No.

20            Q     So Exhibit 15, do you have that up

21      now, Mr. Cotton?

22                  MR. PARKER:  Did you say 15?
```

Page 161

1                    MS. KAISER:  15, yes.

2                    MR. PARKER:  So 14 you skipped over,

3        right?

4                    MS. KAISER:  No, I didn't have any

5        questions specifically related to the document.

6                    MR. PARKER:  All right.  Okay.  We

7        have up 15.

8        BY MS. KAISER:

9             Q     Okay.  Do you recognize this

10       document, Mr. Cotton?

11            A     I do.

12            Q     What is this?

13            A     It is a CISA Advisory Report

14       Detailing Vulnerabilities Affecting Dominion Voting

15       Systems in the ImageCast X, also known as an BMD.

16            Q     Have you seen this advisory before?

17            A     I have.

18            Q     To your understanding, is the

19       Dominion -- the Dominion Democracy Suite ImageCast

20       X the same model that's used in Georgia?

21            A     Yes.

22            Q     Have you reviewed this CISA advisory?

Page 162

1              A      Excuse me.

2                     VIDEOGRAPHER:  Andrew, you're

3      drifting quite a bit into the picture.

4                     MR. PARKER:  Oh, sorry.

5                     VIDEOGRAPHER:  Thank you.

6                     THE WITNESS:  Can you repeat the

7      question, please?

8      BY MS. KAISER:

9              Q      Have you reviewed this advisory?

10             A      I have.

11             Q      Have you validated any of the

12     vulnerabilities described in this advisory?

13             A      That would go into my -- my work

14     product, but I will tell you that I don't disagree

15     with anything in the advisory.

16             Q      Okay.

17                    MR. PARKER:  And be sure not to be

18     violating the work-product analysis, conclusions,

19     information that you received.

20                    THE WITNESS:  Okay.

21     BY MS. KAISER:

22             Q      I have one follow-up question

Page 163

```
 1       regarding the event at which you met -- met Misty

 2       Hampton in April of 2021.  Where did that take

 3       place, that meeting?

 4            A     It was in Michigan.  I met her over

 5       dinner, I believe.

 6            Q     Do you recall where you had dinner?

 7            A     I don't.

 8            Q     And who all was at that dinner?

 9            A     Myself, Misty Hampton, Stefanie

10       Lambert.

11            Q     Just the three of you?

12            A     Yeah.

13            MS. KAISER:  All right.  Mr. Cotton,

14       if you would just give us about -- about five

15       minutes.  My colleague -- or co-counsel, Bruce

16       Brown, I think, is going to have a couple of

17       questions for you, too, but if you could just let

18       me confer quickly with my colleagues, we'll be

19       right back on.

20            We can go off the record.

21            VIDEOGRAPHER:  The time is

22       approximately 12:33 p.m.  We are going off the
```

Page 164

1          video record.

2                    (Recess from 12:33 p.m. to 12:27 p.m.)

3                    VIDEOGRAPHER:  The time is

4          approximately 12:47 p.m.  We are back on the video

5          record.  Go ahead.

6          BY MS. KAISER:

7                Q     Mr. Cotton, you testified that Parker

8          Daniels provided you a document from Alex Halderman

9          in preparation for your testimony in Arizona.  Is

10         that right?

11               A     Yes.

12               Q     And approximately when was that?

13               A     The middle of July.

14               Q     This year?

15               A     Yes.

16               Q     Okay.  Approximately how long was

17         that document that you reviewed?

18               A     It was several pages.  I don't recall

19         the exact number.

20               Q     Okay.  So your recollection is that

21         it was just -- it was, you know, just maybe five to

22         ten pages?  Something like that?

Page 165

1                     MR. PARKER:  Objection.

2                     Only testify if you know.

3                     THE WITNESS:  I don't recall the

4        number of pages.

5        BY MS. KAISER:

6               Q     Okay.

7               A     It was more than one.

8               Q     Okay.

9                     MS. KAISER:  I'm going to mark the

10       next exhibit.  This will be Exhibit 16.

11                     (Cotton Deposition Exhibit Number 16

12                      marked for identification.)

13       BY MS. KAISER:

14               Q     Do you see it?

15               A     Not yet.

16               Q     Okay.

17               A     Yeah, I see it.

18               Q     Great.

19                     This is a declaration from

20       Dr. Halderman.  If you could scroll to the last

21       page, you can see he signed it.  It's dated

22       July 12, 2021.

Page 166

1              A      Yes.

2              Q      Does this look like the -- the

3      document that you reviewed?

4              A      It does.

5              Q      And your testimony is that -- that

6      you did not review the Halderman expert report,

7      just the declaration.  Is that right?

8              A      Just the -- just the declaration.

9              MS. KAISER:  All right.  Thank you,

10     Mr. Cotton.  I don't have any additional questions

11     for you.  My colleague, Bruce Brown, is going to

12     ask a few questions.

13       EXAMINATION BY COUNSEL FOR COALITION PLAINTIFFS

14     BY MR. BROWN:

15             Q      Mr. Cotton, my name is Bruce Brown,

16     and I represent the Coalition Plaintiffs in this

17     case.  I'm going to go over some of your testimony.

18     And it could very well be that it is repetitive,

19     but in that case, you will probably be able to

20     answer quickly.  So I think those questions,

21     although repetitive, will go quickly.

22                    Getting back to the start -- can you

Page 167

1    hear me okay?

2            A     I can.

3            Q     Okay.  Getting back to the start of

4    your testimony, you testified about how you

5    collected documents in response to the -- the

6    subpoena.

7                  Do you recall that testimony?

8            A     Yes.

9            Q     And you described -- you described

10   collecting a lot of files and -- and giving them to

11   your attorney.

12                 You with me?

13           A     Yes.

14           Q     And with respect to the files that

15   you gave to your attorney, your attorney lodged an

16   objection for you not to answer.  I want to ask you

17   a different question, and that is:  I don't want to

18   know what you gave to your attorney.  I want to

19   know how many files you collected of documents that

20   you thought were responsive to the subpoena.

21                 MR. PARKER:  Objection as to the form

22   of the question as it relates to responsive to the

Page 168

1      subpoena.

2                      Go ahead.

3                      THE WITNESS:  So let me -- let me

4      clarify this for you and the other attorneys.  When

5      I did the search, I included search terms and

6      e-mail addresses and things that had an

7      overly-broad collection.  So in other words, those

8      same search terms would return documents that were

9      not related to this matter, but I did not review

10     those documents myself as to whether or not they

11     pertained specifically to this subpoena.  I relied

12     on my attorneys to do that for me.

13     BY MR. BROWN:

14             Q     And so you gave your -- so you

15     collected more documents that might have been

16     responsive.  Is it fair to say?

17             A     Yes.  I -- I am certain that there

18     were documents in there that were not responsive,

19     but because of the search terms, they came up as --

20     as hits on the -- on the collection.

21             Q     And do you still -- is there still a

22     copy of what you collected somewhere?

Page 169

1           A     I would have to ask the -- the

2      attorneys about that.

3           Q     Okay.  Do you know who Shawn Still

4      is?

5           A     Can you say the last name again?

6           Q     Still, S-T-I-L-L.

7                 THE WITNESS:  Was he one of the --

8      no.

9                 I -- I don't recall that name.

10     BY MR. BROWN:

11          Q     How about Kurt Hilbert, do you recall

12     that name?

13          A     I don't.

14          Q     How about Robert Sinners,

15     S-I-N-N-E-R-S?

16          A     I do not.

17          Q     Okay.  You testified that you had

18     read press accounts, and you said that some of the

19     press accounts about you were not true.  Can you

20     elaborate on your response, please?

21          A     Well, based on my reading, they were

22     not factual.

1          Q     Which -- what statements?

2          A     You know, I don't recall the exact --

3                MR. PARKER:  Bruce, what -- what part

4     of the subpoena is this questioning related to?

5                MR. BROWN:  Every part of the

6     subpoena.

7                MR. PARKER:  Talking about what a

8     press release said about Ben Cotton?  Where in the

9     subpoena?

10                MR. BROWN:  No.  I'm talking about

11     his knowledge of what the press said was false.

12     The press was talking about Coffee County, so I

13     want to know what he thinks the press got wrong.

14     BY MR. BROWN:

15          Q     Was there anything they got wrong,

16     Mr. Cotton?

17                MR. PARKER:  You didn't refer to

18     Coffee County or Georgia anywhere in your question.

19     BY MR. BROWN:

20          Q     Mr. Cotton, your -- your lawyer makes

21     a good point.

22                With respect to Coffee County,

Page 171

1    Georgia, was there anything wrong with what the

2    press said about you?

3            A    Well, the insinuation clearly in some

4    of the press stories -- and I don't recall the

5    exact articles -- where I was under indictment in

6    Coffee County for illegal access to voting systems.

7    And that clearly is wrong.

8            Q    What else?

9            A    That -- that's what sticks -- that's

10   what jumped into my memory when -- when you asked

11   the question.  I don't --

12           Q    Not only -- not only have you not

13   been indicted, nobody from Georgia has even

14   contacted you, right?

15           A    Correct.

16           Q    And do you know -- can you tell me,

17   or can Andrew tell me, if they've contacted your

18   attorney?

19           A    Not to my knowledge.

20           Q    And I mean, Georgia Secretary of

21   State, Georgia State Election Board, Georgia

22   Bureau --

Page 172

```
 1              A     None --

 2              Q     -- of Investigation?

 3              A     None of the above.

 4              Q     How about the FBI?

 5              A     No.

 6              Q     And I believe your declaration in

 7       Arizona was in April of this year.  Is that right?

 8              A     No.  The declaration in Arizona was

 9       July -- the end of July --

10              Q     Okay.

11              A     -- of this year.

12              Q     And then did you give testimony prior

13       to that?

14              A     I have presented --

15              Q     Well, let me ask -- let me -- let me

16       back up and you'll see where I'm going on this.

17                    To the best of your recollection,

18       when did you publicly disclose that you had

19       examined a forensic copy of election files or data

20       from Coffee County?

21              A     That would have been in the

22       declaration on -- on or about the 21st of July.
```

1              Q      Okay.

2              A      And I said I forensically examined.

3              Q      And after that was made public, you

4       got no call from any official in Georgia, right?

5              A      I did not.

6                     MR. PARKER:  Bruce, I think the date

7       on that would be part of the public record, part of

8       the record maybe even in this deposition.

9       BY MR. BROWN:

10             Q      You testified at the start of your --

11      your testimony earlier today about team one and

12      team two, is the way that you described the work

13      that you did in Georgia.  Team, or group one,

14      something to that effect, was VoterGeorgia.org in

15      Gwinnett County.

16                    Do you recall that?

17             A      Well, VoterGA had legal matters

18      pending in both of those -- in both Fulton County

19      and Gwinnett, Georgia.

20             Q      I see.  So the VoterGA.org matter

21      involved both Fulton County and Gwinnett County.

22      Is that right?

1              A      Correct.

2              Q      And what was the scope of your expert

3       testimony or what were you engaged to do with

4       respect to the VoterGeorgia.org matter?

5              A      I was engaged to review artifacts

6       that were produced via subpoena and FOIA requests.

7              Q      And when you say "artifacts," I think

8       of Grecian urns and things like what, but what do

9       you mean when you say artifacts?

10                    MR. PARKER:  I would instruct you not

11      to answer as that goes into the facts that you were

12      given to review and analyze as part of your

13      consulting expert work.

14      BY MR. BROWN:

15             Q      Well, you didn't -- you didn't review

16      Grecian urns, right?

17                    What do you mean by "artifacts" when

18      you say that word?

19                    MR. PARKER:  Again, I'd instruct you

20      not to answer any further.

21      BY MR. BROWN:

22             Q      Let me back up a little bit because

Page 175

1        this raises a good issue.

2                    When you're engaged as an expert, the

3        value that you provide is your professional

4        expertise brought to bear on a particular problem

5        that you are engaged to analyze.  Fair to say?

6             A     Yes.

7             Q     You're not hired to describe the

8        artifacts, are you?

9             A     In the forensic sense, yes, you are,

10       because you have to be able to accurately depict

11       and report as to what you examined should you be

12       required to testify.

13            Q     I don't want to know about your

14       opinions for VoterGeorgia.org.  I don't want to

15       know anything that involved any expertise.  All I

16       want to know is what you looked at.

17                    Do you follow me?

18                    MR. PARKER:  Bruce, I think we have a

19       disagreement on the scope and breadth of the

20       work-product doctrine, mental impressions,

21       conclusions drawn that an expert makes are

22       certainly protected under the work-product

1          doctrine; but also protected is information that

2          they are given to review and analyze as a

3          consulting expert, not a testifying expert.  That

4          is all protected information.

5                    Some call it the work-product

6          doctrine, others call it consulting expert rules.

7          Some say one is broader than the others, others

8          say the opposite.  But in this context, the

9          questioning that you're going into at this point

10         because it's not our privilege to open, we have

11         to lodge this objection.

12                    So I am instructing him not to

13         answer as it relates to specifics about what it

14         was that he was given to review.  And he hasn't

15         done that.  He's given a general statement of the

16         word "artifacts" and that's all.

17                    MR. BROWN:  I understand.  I need to

18         ask some questions and -- and get some objections

19         to simply preserve the record, Andrew.

20                    MR. PARKER:  Okay.

21                    MR. BROWN:  Bear with me.

22

1      BY MR. BROWN:

2              Q      You testified that some of the

3      artifacts were obtained by FOIA and some were

4      obtained via a subpoena.

5                     You with me, with respect to the

6      Voter.org matter?

7              A      That was my understanding.

8              Q      And were any artifacts obtained not

9      by subpoena or FOIA requests, to the best of your

10     knowledge?

11             A      Not -- not to the best of my

12     knowledge.

13             Q      Were any artifacts from Coffee County

14     obtained pursuant to subpoena, to the best of your

15     knowledge?

16             A      I don't know how those were

17     collected.  I don't know the circumstances

18     surrounding the imaging of those artifacts.

19             Q      Were any of the artifacts from Coffee

20     County obtained by a FOIA request?

21             A      Once again, I don't know how the

22     artifacts came to be, who -- who preserved them or

Page 178

1    anything of that.  I was not involved in any of

2    those actions.

3            Q      Did you ever ask?

4            A      I inquired of my attorney on the

5    legality of the evidence.  And, furthermore, if you

6    refer to paragraph 10, I believe, in Exhibit 3,

7    which is the engagement letter, paragraph 10 is

8    something that the attorneys agreed to.  And they

9    signed it.  And that states that this evidence was

10   obtained legally and that they had the authority to

11   grant me permission to examine this evidence.

12           Q      Is that language that you insisted be

13   in the engagement letter?

14           A      That's language that is boilerplate

15   for all of my forensics engagements.

16           Q      So other than getting your client's

17   representation that it's authorized, do you do

18   anything else to determine the legality of the

19   capture of the data that you're asked to analyze,

20   typically?

21           A      In this particular case, I asked the

22   attorney some facts about the -- about these --

Page 179

1      these artifacts, and she informed me that her

2      client had the authority to preserve the election

3      data as part of her duties as an elected --

4      election official in the state of Georgia.

5              Q     And when did your attorney inform you

6      that Misty Hampton had that authority?

7              A     It would have been in the June time

8      frame of 2021.

9              Q     That was after --

10             MR. PARKER:  To be clear, Bruce, for

11     the record, when you say "your attorney," you're

12     talking about the attorney who retained you --

13             THE WITNESS:  Correct.

14             MR. PARKER:  -- to be an expert?

15             THE WITNESS:  Correct.

16             This would have been Stefanie

17     Lambert.

18     BY MR. BROWN:

19             Q     Thank you.  I appreciate that

20     clarification.

21             And -- and you didn't know -- did you

22     know by June 2021 that Misty Hampton was no longer

Page 180

1      an employee of Coffee County?

2              A     I don't believe I did in -- in June.

3      I now know, based on our conversations and things,

4      that she was terminated later, but I don't believe

5      I knew that in June of 2021.

6              Q     And I believe you already testified

7      that when you had a dinner with Ms. Lambert and

8      Misty Hampton in -- I believe it was in April of

9      2021.  Is that right?

10             A     That's correct.

11             Q     And at that time, you were not aware

12     that she had been terminated?

13             A     I was not.

14             Q     But you were aware that she had

15     engaged Stefanie Lambert as her attorney, correct?

16             A     That's correct.

17             Q     Did you find it odd that a county

18     election officer in a small town in Georgia who had

19     not been terminated had engaged Stefanie Lambert of

20     Detroit, Michigan to represent her?

21             A     I did not find that odd.  And in --

22     within context of the motivation of the engagement,

Page 181

1        it was my understanding at that point that she was

2        seeking whistleblower protection due to some

3        irregularities that she saw in -- in Coffee County,

4        and that there were efforts to basically

5        discriminate against her at that time.

6                Q      And -- and what was she blowing her

7        whistle at?

8                A      It's my understanding --

9                       MR. PARKER:  By the way, again, if

10       this gets into your consulting expert work, you

11       shouldn't testify to it --

12                      THE WITNESS:  Okay.

13                      MR. PARKER:  -- if you were retained

14       by Stefanie Lambert as a lawyer, but if it's not

15       related to that, you can testify to it.

16                      THE WITNESS:  It was my later

17       understanding, i.e. June 2021, that Misty observed

18       some irregularities in the voting system, and based

19       on that, she was -- she was questioning the -- the

20       conduct of that election.  And beyond that, I get

21       into the -- the expert work that I did for Stefanie

22       Lambert.

Page 182

1     BY MR. BROWN:

2           Q     Was part of your expert work related

3     to potential litigation that Misty Hampton would be

4     involved in?

5           A     Potentially, yes.

6           Q     And so is that the anticipated

7     litigation that your consulting or expert services

8     relates to?

9           A     That would be --

10          MR. PARKER:  Well --

11          THE WITNESS:  Oh, sorry.

12          MR. PARKER:  Objection as to form, in

13    terms of foundation.

14          If you know, you can testify.

15          THE WITNESS:  That was certainly part

16    of it.

17    BY MR. BROWN:

18          Q     And so your understanding was that

19    the lawyer that you were engaged by was Stefanie

20    Lambert and her client was Misty Hampton,

21    correct --

22          A     Correct.

Page 183

1          Q      -- with respect to the engagement?

2                 Okay.  And was the -- was your

3    understanding that the copying of the data in

4    Coffee County, that was uploaded to the system from

5    which you downloaded, was related to potential

6    whistleblower claims?

7          A      That is certainly how it was

8    represented to me, but I -- once again, I was not

9    there during the preservation of this data.  I have

10   no knowledge of how that was preserved.  I was, you

11   know, provided access to those artifacts.

12         Q      When you spoke with Misty Hampton and

13   Ms. Lambert at dinner in Detroit, the data had

14   already been captured, right?  And you knew that,

15   right?

16         A      I did not know that at the time.

17         Q      Did you ask?

18         A      I did not.

19         Q      Did it ever come up -- I mean, did

20   you -- you raised the question, you know, "Before I

21   can do any -- before I can provide you any expert

22   testimony, I've got to have something to analyze"?

1           Did that come up?

2                MR. PARKER:  To the extent that this

3      discussion at this meeting was regarding your

4      consulting expert work, I'd instruct you not to

5      answer, but if it's outside of that, you certainly

6      can.

7                THE WITNESS:  So the -- the meeting

8      was primarily a social meeting.  We didn't discuss

9      Coffee County specific items at that dinner.  There

10     was some -- some questions about, you know, my

11     expertise and my -- my background as part of this,

12     but we didn't discuss specifics to the engagement.

13     I didn't, at that point in time, know that I was

14     going to be asked to support that client.

15     BY MR. BROWN:

16           Q     Well, but your engagement was

17     executed before the dinner with Misty Hampton,

18     correct?

19           A     Correct.

20           Q     And that engagement -- did that

21     engagement cover your work for Coffee County?

22           A     It covered a number of engagements

Page 185

1        with Stefanie Lambert in different jurisdictions.

2               Q     And I believe the -- I'm not sure if

3        the -- I'm not trying to trick you on this.  It's

4        just I don't want go through the documents

5        themselves, but it's your understanding that the

6        original engagement letter listed Coffee County as

7        one of the areas that you would be looking in to?

8               A     No.

9               Q     Did I --

10              A     That was a supplement to it in -- I

11       believe they actually executed that in July of

12       2021.

13              Q     And July, when it mentions Coffee

14       County -- and I believe indicates that it had been

15       a prior discussion though, correct?

16              A     Correct.  We had a discussion in the

17       middle of June 2021.

18              Q     Okay.  So when did you first learn

19       that the data had been captured in Coffee County?

20              A     The middle of June, 2021.

21              Q     So about the same time that you

22       actually got it, correct?

Page 186

1           A      Correct.

2           Q      Okay.  And how did you learn that it

3    had been captured?

4           A      Through a -- an attorney -- through

5    discussions with Stefanie Lambert.

6           Q      Okay.  And I believe you testified

7    that you got the credentials from Mr. Penrose.  Is

8    that right?

9           A      That is correct.

10          Q      And how did -- how were those

11   credentials transmitted to you?

12          A      Those were transmitted to me in

13   Signal, and then I took a screenshot of those.

14          Q      And did you retain that screenshot?

15          A      I did.

16          Q      And you gave that to your attorney?

17          A      I believe that's part of the

18   production, yes.

19          Q      Okay.  And that screenshot would show

20   us basically who gave you the keys to Coffee

21   County, right?

22                 MR. PARKER:  Objection.  That

1    mischaracterizes.  That's one of the items on the

2    log, Bruce.  So it describes what he can testify to

3    about it.

4                    Beyond that, I'd instruct you not

5    to answer.

6    BY MR. BROWN:

7        Q    But if we had that screenshot, we --

8    we would have very good evidence of how you got

9    access to the Coffee County data, who gave it to

10    you, and when they gave it to you, correct?

11                MR. PARKER:  Same objection.

12   BY MR. BROWN:

13       Q    Go ahead and answer.

14                MR. PARKER:  No, I'm instructing him

15    not to answer.

16                MR. BROWN:  Andrew, are you sure you

17    want to instruct him not to answer that one?

18                MR. PARKER:  Yes.  You specifically

19    asked what is on a document that we -- we're not

20    going to produce because of the work product

21    doctrine, because of the consulting expert rules,

22    and the nondisclosure agreement.

Page 188

1      BY MR. BROWN:

2             Q      And Mr. Penrose was a part of the --

3      the team representing Misty Hampton.  Is that

4      correct?

5             A      He was part of the -- yes, so the

6      Stefanie Lambert team.

7             Q      Is he an expert or is he an attorney

8      or is he a helper?  What is he?

9             A      It's my understanding he was an

10     expert.

11            Q      Okay.  So is an expert someone -- a

12     designation that you give to someone to cloak him

13     with protection from discovery or was he really an

14     expert?

15            A      My understanding is, is that he was

16     an expert.

17            Q      And what's that understanding based

18     on?

19            A      Off of the representations by

20     Stefanie Lambert.

21            Q      Okay.  Who else did Stefanie Lambert

22     tell you was an expert for Misty Hampton?

Page 189

```
 1                  That's quite a team for Misty

 2      Hampton.  We've got Ben Cotton, we've got Jim

 3      Penrose, we've got the legal team, Stefanie

 4      Lambert.  Who else is on that team?

 5           A     That's all that I recall.

 6           Q     So if there are other communications

 7      about Coffee County in that cache of documents that

 8      is with your lawyer, but not with us, they would

 9      not be within that group, correct?

10                  MR. PARKER:  I'm sorry.  Can you

11      repeat that question, Bruce?

12                  MR. BROWN:  Sure.

13                  MR. PARKER:  I didn't understand it.

14      BY MR. BROWN:

15           Q     If there -- if there are

16      communications with people other than Stefanie

17      Lambert and Jim Penrose and Misty Hampton that are

18      in that large cache of documents that you collected

19      and gave to your attorney, but that we did not

20      receive, those documents would not be within the

21      scope of your expert testimony, correct?

22           A     Well, I know that she had a private
```

Page 190

1          investigator hired for all of her cases by the name

2          of Michael Lynch, and he would be part of that

3          team.

4                   Q     Who else?  Who else?

5                   A     With respect to Coffee County, I

6          don't recall any other people that were involved in

7          Coffee County.

8                   Q     The engagement of -- of Misty

9          Hampton -- I'm sorry, the engagement by Misty

10         Hampton of Ms. Lambert related to potential

11         whistleblower protection.  Is that matter still

12         ongoing?

13                  A     I believe it is.

14                  Q     Any litigation been filed?

15                  A     No.  There is anticipated litigation

16         though.

17                  Q     And it would be Misty Hampton, what,

18         filing suit against the County for terminating her

19         because she was a whistleblower?

20                  MR. PARKER:  Only answer if -- if you

21         know and if it's outside the scope of what you know

22         from your consulting expert work.

```
 1                    THE WITNESS:  I don't know what
 2        the -- the attorney is planning to do in the form
 3        of action.  I know there's anticipated action, but
 4        I don't have the details of that.
 5        BY MR. BROWN:
 6             Q     Typically when -- I don't do
 7        whistleblower work, but sometimes it's in -- that
 8        the allegation is that an employee was terminated
 9        in retaliation for some kind of whistleblowing.
10                   Was that -- did -- did -- I'll just
11        ask you again.  Wasn't it clear to you by the time
12        that you met, she had already been terminated?
13             A     It was not.
14             Q     Okay.  And -- and are you still on --
15        are you still engaged by Lambert for this matter,
16        the whistleblower matter?
17             A     I am.
18             Q     Anything that you've seen in the
19        evidence or the files give you any pause in terms
20        of relying upon the representations of Ms. Lambert
21        about the authority that Misty Hampton had to give
22        you -- indirectly give you access to the Coffee
```

Page 192

1        County data?

2                    MR. PARKER:  To the extent that that

3        relates to the work that you received or

4        information that you received related to your

5        consulting work, do not answer, but if it's outside

6        your consulting work, you may.

7                    THE WITNESS:  Nothing I have seen

8        outside of my consulting work has given me cause to

9        pause.

10       BY MR. BROWN:

11            Q    Is this deposition within your

12       consulting work?

13                   MR. PARKER:  Objection as to form.

14                   If you know, that calls for a legal

15       analysis.

16                   THE WITNESS:  Yeah.  I don't -- I

17       don't know.  I will leave that legal analysis to

18       Mr. Parker.

19       BY MR. BROWN:

20            Q    Let me come at this again, and you've

21       got -- you've got counsel who's outstanding and

22       will advise you appropriately, but I caution that

Page 193

1          the answer to my question may not be bad for you.

2          It might be good for you.  And not answering may be

3          bad for you in light of the publicity and other

4          instances.

5                    But to an untrained eye, or to a

6          trained eye also, the circumstances of you relying

7          upon Ms. Lambert's statement that Misty Hampton had

8          authority looks shallow, frankly.  Is there

9          anything that you have not testified to that would

10         lend credence to the reasonability of your

11         conclusion that you had authority to look at this

12         data?

13                   MR. PARKER:  I'm going to object.

14         He's -- he's not a lawyer.  We aren't answering

15         questions based on whether they're good or bad.

16         We're trying to follow the legal line of what the

17         work product doctrine requires or doesn't.  And if

18         he were released from the work product doctrine

19         from those that hold it, then he may be able to

20         answer many more questions.

21         BY MR. BROWN:

22                   Q    Let me ask it this way.  My question

1        at the beginning was very long.  Is there anything

2        you want to add that would support the

3        reasonability of your reliance upon what you were

4        told by Ms. Lambert with respect to the authority

5        that Misty Hampton had about access to the

6        software?

7             A    Well, I'll start this off with, I'm

8        not an attorney, but it was represented to me by an

9        officer of the court, which, in my opinion, lends

10       significant weight and credence to that opinion

11       that this was authorized for me to look at it and

12       to analyze it.

13                 And part of that answer from Stefanie

14       Lambert, it was represented that she had performed

15       an analysis of Georgia law, and that this was in

16       accordance with the duties and responsibilities and

17       authorizations of an elected election official

18       within the -- within that county and that

19       jurisdiction.

20                 That was further reinforced by the

21       engagement letter that was executed by, once again,

22       an officer of the court, that paragraph 10 in the

Page 195

1          engagement letter, essentially, stated that the

2          evidence that was to be analyzed was legally

3          obtained and that they had the legal right to

4          authorize me to analyze it.  So, you know, it's

5          a -- you know, that's -- that's the weight of

6          validation from my side.

7                  Q     When you -- you testified in Arizona

8          based upon your analysis of the Maricopa County

9          data, with respect to that testimony, what did you

10         do to validate that what you had really was from

11         Coffee County, if any?

12                      MR. PARKER:  Objection.  As it

13         relates to work product or your consulting as an

14         expert engagement, you cannot answer, but if it is

15         outside of that, you may.

16                      THE WITNESS:  Without going into my

17         analysis, I was satisfied that that information was

18         from Coffee County.

19         BY MR. BROWN:

20                  Q     Did you obtain -- you testified that

21         you reviewed publicly available documentation

22         relating to the Dominion System as a part of your

Page 196

1      work.

2                        Do you recall that testimony?

3           A     Yes.

4           Q     Did you obtain any proprietary or

5      generally nonpublic information, either from

6      Dominion or otherwise, relating to your work?

7           A     No.

8           Q     Have you been contacted by Dominion

9      with respect to the work that you have done on

10     Dominion software?

11          A     I have not.

12          Q     Have you been -- I have to ask these

13     questions.

14                   Have you been contacted by any

15     attorney for Dominion --

16          A     No.

17          Q     -- with respect to --

18                   Have -- are you aware of any

19     suggestion by Dominion that anything that you have

20     done violates any law or any proprietary interest

21     of Dominion?

22          A     No.

Page 197

```
 1            Q      Are you -- don't tell me the

 2      substance of it, but are you -- have you been

 3      engaged by anyone to testify about the

 4      defamatory -- the allegations, the statements,

 5      about Dominion were defamatory?

 6            A      No.

 7            Q      Do you know why Mike Lindell visited

 8      Coffee County in 2021?

 9            A      I do not.

10            Q      Do you know why Doug Logan did?

11            A      I do not.

12            Q      Doug Logan -- I will represent to you

13      that Doug Logan has stated publicly that he

14      crisscrossed Georgia trying to obtain evidence from

15      election equipment.  Do you know anything about

16      that?

17            A      I don't.

18            Q      Do you know how Ms. Lambert or

19      Mr. DePerno knew you?

20            A      I don't know how they -- they knew

21      me.  I received a call from Ms. Lambert.  She said

22      that she had heard good things about some of my
```

1   work in civil cases, and she asked if I would be

2   available to do some expert witness -- or expert --

3   consulting expert work for her on some voting

4   systems.  But how she came to hear about me, I -- I

5   never really got into, and I'm not sure how that

6   came to be.

7           Q     Is the work that you're doing in

8   Arizona also for Ms. Lambert?

9           A     It is not.

10          Q     And how do you -- how do you

11  allocate, if you do, the costs of your work between

12  Ms. Lambert and whoever is paying you in Arizona?

13          A     So it's separate engagements, and I

14  keep time records of that engagement that's not

15  related to Stefanie Lambert separate.

16          Q     But you have -- your work in Arizona

17  is based upon -- in one matter is based upon the

18  artifacts you received with respect to another

19  matter, correct?

20          A     In the declaration, I was permitted

21  to state that I had examined the Coffee County

22  data.

Page 199

```
 1            Q     And have you been paid for the expert
 2       work that you've done with respect to Coffee
 3       County?
 4            A     It's an ongoing matter, but some of
 5       it, yes.
 6            Q     How much?
 7            A     I don't have that figure in front of
 8       me.
 9            Q     More than a hundred thousand?
10            A     Less.
11            Q     Less than 50?
12            A     I really don't know.
13            Q     Between 50 and a hundred?
14            A     I really don't know.
15            Q     Do you know -- do you recall the --
16       the nature of the harassment by the County that
17       Misty Hampton had indicated that she had been
18       subjected to?
19            A     I don't recall that in detail, just
20       the generality that it was represented that she was
21       getting harassment by the County.
22            Q     I want to ask some questions, and you
```

Page 200

1    may have covered it before, but Penrose gave you

2    the credentials to download from a site, correct?

3         A     That's correct.

4         Q     And are you sure that was

5    SullivanStrickler's site or might it have been

6    another site?

7         A     I'm sure it was -- well, let's put it

8    this way, in the web address it stated

9    "SullivanStrickler."

10        Q     Okay.  And did Penrose say where

11   SullivanStrickler got the data from?

12        A     He did not.

13        Q     Did you ask?

14        A     I asked as to the forensics viability

15   of what I was looking at, and I was assured that it

16   was performed in a forensically sound manner.

17        Q     What gave you assurance that it was

18   done in a forensically sound manner in particular?

19             MR. PARKER:  You can testify if it's

20   outside of your consulting expert work -- or the

21   information that you received as a consulting

22   expert.

Page 201

1                THE WITNESS:  My validation of that

2        would have been within the consulting expert realm

3        of the analysis.

4        BY MR. BROWN:

5            Q     Okay.  Did you describe to either

6        Ms. Lambert or Mr. Penrose components of the system

7        that you needed to do your analysis?

8                MR. PARKER:  I'm going to object.

9        That's part of your consulting work and part of the

10       work product doctrine.  I would instruct you not to

11       answer that.

12       BY MR. BROWN:

13           Q     Let me ask it a different way.  I'm

14       trying to get a handle of the scope of your

15       engagement.  And so what I'm trying to find out are

16       the boundaries of your engagement, because unless I

17       know the scope of your engagement, I can't -- I

18       don't know whether I'm asking you something that's

19       privileged or not.

20                And so with respect to the scope of

21       your engagement, how did you describe the

22       components that you needed to -- to review?

Page 202

```
 1              MR. PARKER:  You don't want to get

 2      into what you were given or what you did review or

 3      the conclusions that you reached from what you

 4      reviewed, frankly, what the assignment is.  But if

 5      you can answer it without going into that.

 6              THE WITNESS:  So I did not demand or

 7      dictate what would be made available to me, I

 8      accepted what was available and examined those

 9      artifacts.

10      BY MR. BROWN:

11          Q    Did you have sufficient artifacts to

12      make a comprehensive and useful analysis of the

13      Coffee County system?

14          A    Yes.

15          Q    Were there any components that --

16      that you did not have that would have assisted in

17      that analysis?

18          A    Yes.

19          Q    And what were those?

20              MR. PARKER:  Don't answer that.  That

21      does get into your expert work and mental

22      impressions.
```

Page 203

```
 1     BY MR. BROWN:

 2           Q     Actually, the question was designed

 3     to focus upon things that were not a part of your

 4     expert work.  In other words, things that you were

 5     not able to review.  You with me?

 6           A     So the --

 7                 MR. PARKER:  But, again, by -- by

 8     saying what is not -- that you were not able to

 9     review, gets into your expert opinion about what

10     you would need to make and draw the conclusions.

11     So just make sure that you don't trample that

12     privilege.

13                 THE WITNESS:  Yeah, the -- with all

14     respect, if I tell you what would have been needed,

15     that will also violate the privilege with what I --

16     you can infer from that what I actually examined.

17     So I have been instructed by the attorney, I -- I

18     can't answer that.

19     BY MR. BROWN:

20           Q     Are you aware of any data or software

21     that SullivanStrickler collected that was not

22     provided to you to review?
```

Page 204

1                    MR. PARKER:  Objection as to form.

2         Lack of foundation.  He doesn't know who collected

3         what.  But also to the extent that he does, I'd

4         just instruct you not to include anything related

5         to your consulting expert work and work product

6         doctrine.

7                    THE WITNESS:  Yeah, I -- I was not

8         there or had anything to do with the preservation

9         of these systems, so therefore, I can't tell you

10        what, if anything, was missing from the artifacts

11        that were provided to me.

12                    Do you mind if we take a quick bio

13        break?

14                    MR. BROWN:  Absolutely.  I'm sorry, I

15        should have offered that earlier.  Thank you for

16        your time and attention.  Let's take a ten-minute

17        break.

18                    VIDEOGRAPHER:  The time is

19        approximately 1:35 p.m.  We are going on a -- we

20        are going off the video record.

21                    (Recess from 1:35 p.m. to 2:17 p.m.)

22                    VIDEOGRAPHER:  The time is

Page 205

1        approximately 2:17 p.m.  We are back on the video

2        record.  Go ahead.

3        BY MR. BROWN:

4               Q     Mr. Cotton, we're back on the record.

5                     I want to get back to the -- the --

6        what you know about Misty Hampton's situation.

7        The -- we know now that the data was captured on

8        January 7th by someone from SullivanStrickler.

9                     And at that time, Misty wasn't being

10       harassed, was she, as far as you know?

11              A     I don't know.  You know, I want to

12       leave that as a legal definition to Stefanie

13       Lambert.

14              Q     Was -- was she being harassed because

15       of the breach or was the breach in support of her

16       whistleblower claim?

17                    MR. PARKER:  Objection as to form.

18                    You can answer if you know.

19                    THE WITNESS:  I -- I don't know.

20       BY MR. BROWN:

21              Q     Was it your understanding that to

22       support a whistleblower claim, that Misty would

1      need a forensic copy of the election server and

2      data?

3                     MR. PARKER:  Objection as to form.

4                     You can answer if you can do so

5      without getting into your consulting expert work.

6                     THE WITNESS:  So in April, when I met

7      her, I did not know about any of the preservation

8      or anything of that nature.  I do recall speaking

9      with her and she asked me some questions about my

10     forensics background.

11     BY MR. BROWN:

12          Q    And what is your understanding of the

13     connection between your expertise and her claim?

14                     MR. PARKER:  You mean his

15     understanding today?

16                     MR. BROWN:  Sure.

17                     MR. PARKER:  Okay.  So you're not

18     talking about in April, just to be clear for the

19     record?

20     BY MR. BROWN:

21          Q    Yeah, what's your understanding

22     today?

Page 207

 1                   THE WITNESS:  Is any of that covered

 2          by attorney-client?

 3                   MR. PARKER:  It could be

 4          attorney-client.  I don't know what the basis of

 5          your information is.  But you -- you shouldn't

 6          divulge any communications with your attorney or

 7          with any attorney that has retained you for

 8          consulting expert work to the extent it relates to

 9          that work.

10                   THE WITNESS:  My understanding of

11          that is that she observed irregularities in the

12          runoff election and that she had doubts about

13          unauthorized access to that system by Dominion

14          employees remotely during that runoff election.

15          BY MR. BROWN:

16               Q     And what did she tell you about

17          unauthorized access by Dominion?

18               A     I got this from Stefanie Lambert, not

19          Misty.  It was represented that the election

20          systems were not functioning properly.  The

21          Dominion support personnel were called in, they

22          couldn't fix it.  And when Misty attempted to

Page 208

1          escalate this and to notify the press that there

2          were problems with the election, the Dominion

3          employees went to the parking lot and came back in

4          10 or 15 minutes later and said, "Try it now" and

5          it worked.  And at that point, it raised questions

6          in her mind as to how they could do this remotely

7          from the parking lot.

8                   Q      And you were engaged to figure that

9          out?

10                  A      That was part of my expert

11         consultation statement of work, if you will.

12                  Q      And what did you find?

13                  MR. PARKER:  Objection.  That's work

14         product.

15         BY MR. BROWN:

16                  Q      What did you find?

17                  MR. PARKER:  I'm instructing you not

18         to answer.

19                  Work product related to consulting

20         expert privilege and rules, and I'm instructing

21         him not to answer that.

22

1    BY MR. BROWN:

2          Q    Okay.  And so the sequence of this is

3    there's a situation in which Dominion techs did

4    something from the parking lot, then Misty/Lambert

5    have SullivanStrickler forensically copy the Coffee

6    County data and software, and then three months

7    later, you are engaged to review the data that they

8    had collected.  Fair to say?

9          A    I have no personal knowledge as to

10   who was involved in the preservation.  I don't know

11   if Stefanie Lambert was involved or not.  What I do

12   know is that at some point -- and I know this now,

13   not -- not back in the April or even before June --

14   the middle of June time frame, but at some point in

15   time, Misty Hampton had authorized the preservation

16   of those systems to retain the forensics artifacts.

17         Q    So you described the -- what you had

18   access to was a preservation of the system,

19   correct?

20         A    I had access to what the result --

21              MR. PARKER:  Without getting into

22   what your -- you were given to review, other than

Page 210

1          the use of the word "artifacts."

2                    THE WITNESS:  I had access to the

3          artifacts that were present when I logged in to the

4          SullivanStrickler secured web portal.

5          BY MR. BROWN:

6               Q    The record will reflect that a number

7          of other people downloaded that software from the

8          SullivanStrickler website.  Were any of those other

9          people also working on -- to your knowledge,

10         working with you on Misty Hampton's whistleblower

11         claim or might they have been downloading the data

12         for some other purpose?

13                   MR. PARKER:  If you know, you can

14         answer.

15                   THE WITNESS:  Well, I don't have any

16         knowledge as to everyone that downloaded that or

17         why they downloaded it, other than I had access to

18         it, and Jim Penrose is the one who gave me that

19         access.

20         BY MR. BROWN:

21              Q    Were the credentials that Penrose

22         gave you his credentials so that his name would

Page 211

1      appear if you downloaded it?

2                     MR. PARKER:  If you know, you can

3      answer that.

4                     THE WITNESS:  He gave me a set of his

5      credentials, yes.

6      BY MR. BROWN:

7           Q    And so if you were looking on the

8      record on the share file, we would be looking for

9      "Penrose," not for "Cotton."  Is that correct?

10          A    I would assume that was correct.  I

11     don't have direct knowledge of the logging of that

12     system, but from what I saw, I would assume that to

13     be the case.  And I was later provided credentials

14     that reflected my e-mail account.

15          Q    And who gave you those credentials?

16          A    I believe those came from Jim Penrose

17     as well.

18          Q    So Penrose gave you two sets of

19     credentials, one that would show as his name and

20     then later it would show as your name, correct?

21          A    I believe so.

22          Q    And the first one was June 11, 12,

Page 212

1        correct?

2                A     Correct.

3                Q     And the second one was when?

4                A     I don't recall.  It was subsequent to

5        that.

6                Q     A year later?  A month later?

7                A     I don't recall.

8                Q     When was the last -- how many

9        different downloads did you make?

10                     Like, is it one sitting that you did

11       all of it or did you sort of go back and forth, do

12       some, come back, do some, come back?

13                     MR. PARKER:  You can answer that if

14       it doesn't get into your consulting expert -- the

15       facts that you received, information that you

16       received, your conclusions that you made, or the

17       analysis that you did.

18                     THE WITNESS:  I accessed the site

19       several times, but, you know, downloading data from

20       the internet web servers can be kind of challenging

21       sometimes.  So I know that there were several

22       sessions when I downloaded data.

Page 213

1       BY MR. BROWN:

2              Q    And it was probably up to a half a

3       terabyte of data, correct?

4                    MR. PARKER:  Objection.  I'm not

5       going to let him answer that, getting into the

6       amount of data.

7                    MR. BROWN:  Okay.  I'm not talking

8       about the content of the data, what it means.  I'm

9       just asking the amount of data.

10                   MR. PARKER:  I don't understand.

11      It -- it's -- it's hard to lodge an objection on

12      that, but you would probably be the one to know if

13      by giving that information it reveals the -- the

14      work that you were provided, the information of

15      facts that you were provided, then you can't answer

16      it, but if it doesn't reveal that, then you can.

17                   THE WITNESS:  So the -- providing

18      that answer would certainly reveal the systems or

19      the artifacts that I had access to, so I will

20      respectfully decline to answer that on the advice

21      of the attorney.

22

Page 214

BY MR. BROWN:

1

2         Q     Did it strike you as odd that Misty

3    Hampton had the resources or someone had the

4    resources to pay SullivanStrickler to do this

5    preservation for her yet unfiled whistleblower

6    claim?

7         A     I didn't find that odd, no.

8         Q     SullivanStrickler would cost tens of

9    thousands of dollars, right?

10              I mean, you're familiar with their

11   work and you're familiar with forensics and how

12   expensive it is.  That didn't strike you as odd at

13   all?

14        A     No.  Preservation functions like that

15   occur all the time.  And it was my understanding

16   that Misty was the election official in a very

17   large Georgia county.  I would assume they would

18   have 15 or $20,000 to do this preservation.

19        Q     You said it happens frequently.  Any

20   other instance that you're aware of where an

21   election system was, quote, preserved like this?

22        A     I didn't say election system.  I said

Page 215

```
 1          that this preservation-type function occurs very

 2          frequently in litigation.  And occasionally, you

 3          know, we are called in by private sector companies

 4          to just preserve employee laptops and --

 5                  Q     I understand that.  I --

 6                  A     -- things of that nature, so it's a

 7          commonplace occurrence.

 8                  Q     I understand that, and we've all done

 9          that.  What I'm asking about is a separate

10          question, period, paragraph.

11                      Are you aware of any other instance

12          in which election systems have been, quote,

13          preserved, closed quote, like this?

14                  A     Not in Georgia.

15                  Q     Anywhere in the -- in the world?

16                      MR. PARKER:  You don't have to answer

17          that.  It's beyond the scope.

18          BY MR. BROWN:

19                  Q     Okay.  I just want to make sure I've

20          got clear answers on some of these.  Have you ever

21          visited Georgia from the -- from now back to the

22          November 2020 election?
```

Page 216

```
 1              A     No.
 2              Q     Did you do any work associated with
 3        Ware County, Georgia?
 4              A     No.
 5              Q     Have you ever heard of any forensic
 6        or, quote, preservation work being done in Ware
 7        County?
 8              A     Not to my knowledge.
 9              Q     Okay.  Do you know of anybody who
10        took private flights to Georgia in between
11        November 2020 and November 2021 for purpose of
12        obtaining or analyzing forensic images of Georgia
13        election data?
14              A     No.
15              Q     Do you know of a person named Peter
16        Chara?
17              A     No, I do not.
18              Q     Have you ever spoken with Harri
19        Hursti?
20              A     Can you say that name again, please?
21              Q     Harri Hursti, H-A-R-R-I, H-U-R-S-T-I?
22              A     I don't believe I have.
```

Page 217

1          Q     When was the first time that you did

2     any work for anybody relating to Georgia elections?

3          A     That would have been the middle of

4     June 2021.

5          Q     Does that include any

6     communication -- I'm talking about -- well, let me

7     back up.

8                When's the time that you talked to

9     anybody about doing work for Georgia relating to

10    elections?

11         A     It would have been June 20 --

12    June 2021, middle of the month.

13         Q     Okay.  Do you know of a gentleman

14    named Jeffrey Lindberg?

15         A     I do.

16         Q     And who is he?

17         A     He was a person that was engaged by

18    Stefanie Lambert to look at specific Dominion

19    devices.  To my knowledge, he -- he didn't have

20    anything to do with Georgia.

21         Q     And I believe that -- that you

22    testified that you do know Russ Ramsland or don't?

1    I couldn't recall.

2            A    I don't -- the name is familiar, but

3    I -- I wouldn't say that I know him.

4            Q    Are you familiar with any of the work

5    that he's done with respect to Coffee County?

6            A    No, not with Coffee County.

7            Q    With any other county in Georgia?

8            A    No.

9            Q    Do you know of anyone else other than

10   yourself who received a copy of the forensic data

11   from Coffee County?

12           A    I do not.

13           Q    Do you know Lin Wood?

14           A    Only from the name appearing in

15   newspapers and media.

16           Q    Have you had any business with him at

17   all?

18           A    No.

19           Q    Any communications with him?

20           A    No.

21           Q    What about with John Eastman?

22           A    I don't know that.

Page 219

1              Q      What about Mr. Phil Waldron, do you
2       know Mr. Waldron?  Or I think it's Colonel Waldron.
3              A      Yes, I know Mr. Waldron.
4              Q      And how do you know him?
5              A      I have had some discussions with him
6       on other matters not pertaining to Georgia.
7              Q      What about Mike Flynn?
8              A      I know him from his reputation and
9       from his time spent in the service.
10             Q      Have you ever talked with him or had
11      any communications with him relating to Georgia?
12             A      No.
13             Q      How about Roger Stone, have you had
14      any communications with him about Georgia?
15             A      No.
16             Q      Do you know Dave Hancock?
17             A      I do not.
18             Q      Have you had any communications with
19      Patrick Byrne or anyone working for him?
20             A      Not as it relates to Georgia.
21             Q      How have -- what have you talked with
22      Mr. Byrne about?

Page 220

1          A     Mr. Byrne came and visited during the

2     Arizona audit.

3          Q     Any other dealings with Mr. Byrne?

4          A     No.

5          Q     Are you familiar with the executive

6     orders that were presented to then-President Trump,

7     one of which mentioned Coffee County?

8                Are you familiar with those?

9          A     I am not.

10         Q     Do you know Mark Cook?

11         A     No.

12         Q     Are you familiar with someone named

13    Jim Marchant or Merchant?

14         A     No.

15         Q     How about Bob Cheeley?

16         A     No, he doesn't ring a bell.

17         Q     I believe you were asked if you knew

18    or had ever spoken with Scott Hall?

19         A     No.

20         Q     What about Rudy Giuliani or anybody

21    working with him?

22         A     Not as it pertains to election

Page 221

1      matters or anything in Georgia.

2              Q     Do you know of a person named Edward

3      Solomon?

4              A     No.

5              Q     In your --

6              MR. BROWN:  And I'm -- I'm going to

7      ask this, Andrew, for the record.  And you can

8      object.

9      BY MR. BROWN:

10             Q     In the course of your work, did you

11     detect any evidence that there had been prior

12     captures or preservations of the forensic images

13     that you reviewed for Coffee County?

14             MR. PARKER:  Object.  Work product

15     and consulting expert grounds and rules related to

16     both, as well as the nondisclosure agreement that

17     you executed.

18             I would instruct you not to answer.

19     BY MR. BROWN:

20             Q     And Garland Favorito is not a lawyer,

21     right?

22             A     Initially, I -- I believed that he

Page 222

```
 1      was, but I have come to the knowledge that he is

 2      not.

 3             Q     And what discussions have you had

 4      with him about the work that you have done in

 5      Georgia?

 6                   MR. PARKER:  You can answer to the

 7      extent that it does not relate to a discussion

 8      coming from a lawyer, regarding your consulting

 9      expert work for a lawyer.

10                   THE WITNESS:  Yeah, in all

11      conversations that I had with Garland Favorito,

12      Todd Harding was present in those discussions.  And

13      as part of those discussions, we would review those

14      areas that I was hired to review.

15      BY MR. BROWN:

16             Q     Do you know how to create and export

17      cast vote records in JSON format in the Dominion

18      EMS system?

19             A     If you are talking about the standard

20      reporting function of the Dominion software, that

21      was part of my discovery and analysis under my

22      engagement, but yes --
```

Page 223

1                    MR. PARKER:  Yeah, you can't answer

2           related to your engagement, but he's just asking

3           whether you know how to do something.

4                    THE WITNESS:  Yes, I do.

5      BY MR. BROWN:

6                Q    And do you know that that was done

7           for Coffee County in January 2021?

8                    MR. PARKER:  Objection.  To the

9           extent that it relates to your expert consulting

10          work or the work product related to that, I will

11          object based on those doctrines and the rules

12          identified in the log and the nondisclosure

13          agreement.

14                   If you can answer without going

15          into that, you can do so.

16                   THE WITNESS:  I can't answer that

17          question because the answer would be based on my

18          analysis of artifacts under my engagement.

19     BY MR. BROWN:

20               Q    Just for the record, did you detect

21          from your review that someone had generated cast

22          vote records in JSON format from the Dominion EMS

Page 224

1       system that was preserved for your review?

2                       MR. PARKER:  Same objection.  I'd

3       instruct you not to answer unless you can do so

4       without getting into the information related to

5       your consulting expert work, work product doctrine.

6                       THE WITNESS:  I cannot answer that

7       question without relying upon opinions and work

8       product under my engagement.

9       BY MR. BROWN:

10              Q     Do you know who provided the CBR to

11      somebody or something named Ardros?

12              A     I do not.

13              Q     Do you know who provided the CBR to

14      someone named Jeffrey O'Donnell?

15              A     I not.

16              Q     Do you know who Jeffrey O'Donnell is?

17              A     I have heard of him.

18              Q     And who is he?

19              A     He is -- he's a guy involved in some

20      elections.  I don't know much about him.

21              Q     How do you know him?

22                    What more can you tell us about him?

1            A      Nothing related to Georgia.

2            Q      What about -- what is -- what is

3    Ardros?  Do you know?

4            A      Pardon?

5            Q      A-R-D-R-O-S.  I may be reading my

6    notes badly, but have you heard of that name?

7            A      I have not.

8            Q      Okay.  Do you know Tony Rowell?

9            A      I do not.

10           Q      And can you tell me anything more

11   about your understanding about what Misty was being

12   harassed about?

13           A      Other than what I've already

14   testified to, I can't.  I -- I have very limited

15   knowledge about that.

16           Q      Was the gist of it that she was being

17   harassed because of her criticism of the system?

18   Was that the gist of it?

19                  MR. PARKER:  You can answer if you

20   have anything to add.

21                  THE WITNESS:  Just to reiterate, my

22   understanding was, is that she was being harassed

1       based on her work as an election official and her

2       calling out the fact that there may have been

3       something irregular with those elections,

4       specifically with the recount in Coffee County.

5                        MR. BROWN:  Let me take a two-minute

6       break to see if I have any more questions.  I will

7       be right back.

8                        THE WITNESS:  Okay.

9                        VIDEOGRAPHER:  Are we going off the

10      record, Bruce?

11                       MR. BROWN:  Yes, we're going off the

12      record for just a few minutes.

13                       VIDEOGRAPHER:  All right.  The time

14      is approximately 2:44 p.m.  We are going off the

15      video record.

16             (Recess from 2:44 p.m. to 2:47 p.m.)

17                       VIDEOGRAPHER:  The time is

18      approximately 2:47 p.m.  We are back on the video

19      record.  Go ahead.

20                       MR. BROWN:  I have no further

21      questions.  Thank you for your time, Mr. Cotton.

22                       Thank you, Andrew.

Page 227

1              MR. PARKER:  You're welcome, Bruce.

2              Are we completed then on the

3    subpoenas?

4       EXAMINATION BY COUNSEL FOR STATE DEFENDANTS

5    BY MR. MILLER:

6          Q    Mr. Cotton, this is Carey Miller.  I

7    represent the State Defendants.  I'm going to ask

8    you a few questions while we're here today.

9          A    Okay.

10         Q    If you need a break before we get

11   started, that's fine, Mr.Cotton, or we can just

12   roll right into it.

13         A    We can roll right into it.  Just for

14   everybody's awareness, I had a late checkout at my

15   hotel.  So if we're going to go past 3:30, then I

16   will need to ask for a break so I can run and get

17   my luggage out of there and be right back.  It'll

18   take a few minutes.

19         Q    Okay.  Well, Mr. Cotton, it is every

20   intention of mine to be done by -- by 3:30 here, so

21   I'll save you that.

22         A     All right.  I appreciate that.  Thank

Page 228

1       you.

2               Q     So, Mr. Cotton, as I just mentioned

3       earlier, I represent the State Defendants in the

4       Curling v. Raffensperger case.  And those State

5       Defendants, for your awareness, are Secretary of

6       State Brad Raffensperger and the State Election

7       Board members within the State of Georgia.

8                     I'm going to ask you a few questions,

9       some of which have already been covered today.

10      And, like I said, I'll make every attempt to be

11      brief.

12                    Mr. Cotton, I'd like to start off by

13      asking you:  What is your awareness of this

14      litigation for which you're testifying today, if

15      any at all?

16              A     Until I got the subpoena, I really

17      wasn't aware of this litigation at all.

18              Q     So just you didn't know it existed?

19              A     I didn't know it existed.

20              Q     But now with your testimony in the

21      Lake v. Hobbs case, you -- you reviewed

22      declarations from this litigation.  Isn't that

Page 229

1       right?

2               A       That is true, but I had received the

3       subpoena prior to this as well.

4               Q       Prior to?

5               A       Prior to the testimony.

6               Q       Okay.   And was that subpoena prior to

7       your drafting of that declaration?

8               A       Yes.

9               Q       So if I understand your testimony

10      correctly then, when you were preparing to testify

11      in the Lake v. Hobbs case, you would not have even

12      referenced those declarations had you not gotten

13      the subpoena and made you aware of this case?

14              A       Well, I was aware of some statements

15      by Halderman, and I was aware of the fact that

16      there was a sealed report from Halderman prior to

17      that case, but I was not aware really of the -- the

18      case in question here.

19              Q       Okay.   And I suspect the answer to

20      this is no, but do you have any familiarity with

21      the Plaintiffs themselves in this case?

22              A       I do not.

Page 230

1          Q     And I don't expect that you'd have

2     much familiarity with those individuals.  Do you

3     have any familiarity with an organization called

4     the Coalition for Good Governance?

5          A     Not until I started researching this

6     case and then I became aware of them.

7          Q     Okay.  And what did you become aware

8     of regarding that organization?

9          A     That they were a -- they were a

10    Plaintiff in this case.

11         Q     And that's the only aspect you became

12    aware of?

13         A     Yes.

14         Q     Are you familiar with a group called

15    Verified Voting?

16         A     I am not.

17         Q     Mr. Cotton, I want to ask you a

18    couple of questions about that that you've largely

19    discussed here.  I just want to clarify some of

20    your testimony.

21              Do you recall testifying that you

22    first accessed data regarding Coffee County in or

Page 231

1      about June of 2021?

2              A      That is correct.

3              Q      As I understood your testimony, the

4      reason you came to interact with that data was by

5      way of your engagement with Ms. Lambert.  Is that

6      accurate?

7              A      Yes, it is.

8              Q      And the litigation related to

9      Ms. Lambert, is there active litigation for which

10     you were working for her or was it active at that

11     time?

12             A      It is -- it is and still -- it was,

13     and still is, anticipated litigation.

14             Q      Anticipated litigation.  Okay.

15                    And just so I'm clear that it's --

16     it's the same thing, and it may not be, but this is

17     with respect to the anticipated whistleblower

18     litigation that you were discussing earlier or

19     something different?

20                    MR. PARKER:  I'm going to object as

21     to foundation.  He's not a lawyer.

22                    But you can answer if you know what

Page 232

1      it's with respect to in that regard.

2                    THE WITNESS:  I don't know all the

3      details.  I -- I know that based on what I was told

4      initially, that it was a whistleblower-type case.

5      BY MR. MILLER:

6            Q     Okay.  You were asked a couple of

7      questions by, I think, both Plaintiffs' counsel

8      groups regarding data you reviewed from Fulton

9      County, Georgia.

10                   Do you recall that?

11           A     Yes.

12           Q     Okay.  And I believe you said

13     something along the lines that what you reviewed

14     were artifacts obtained through FOIA requests and

15     subpoenas.

16                   Do you recall testifying to that?

17           A     Yes.

18           Q     Okay.  So with respect to those

19     subpoenas, let me -- let me ask you -- strike that.

20                   Let me ask it this way:  What gave

21     you the impression that subpoenas were issued to

22     obtain such information?

Page 233

1          MR. PARKER:  You can answer that to

2     the extent that it doesn't get into your consulting

3     expert work.

4          THE WITNESS:  I can't answer that

5     without going into details about the work that I

6     performed for them.

7     BY MR. MILLER:

8          Q    Okay.  Is it your understanding that

9     those subpoenas were issued relative to active

10    litigation?

11         A    Yes.

12         Q    Do you have any knowledge of the

13    court from which those subpoenas were issued?

14         A    I don't have knowledge of which court

15    actually issued those subpoenas.  I -- well, I just

16    don't have direct knowledge of which court did

17    that.

18         Q    Okay.  And that's fair.

19              Do you have direct knowledge

20    regarding litigation to which the subpoenas

21    pertained?

22         A    There were several ongoing litigation

Page 234

1      efforts by VoterGA at that time.  One of them was

2      specific to the voting systems in Fulton County,

3      Georgia and the other was pertaining to some

4      aspects of Gwinnett County.

5              Q     Okay.  And I believe you had

6      testified that the items produced were artifacts

7      and not items like an image of an EMS server

8      itself, right?

9                   MR. PARKER:  Objection.

10                  You can only testify to artifacts

11      which have already been identified and testified

12      to.  You can't go on with additional descriptions

13      of what you received to analyze because of the

14      consulting expert nondisclosure rules, as well as

15      the work product doctrine.

16                  MR. MILLER:  Well, I -- Mr. Parker,

17      just to be clear, if these were issued by a

18      subpoena, then that's -- there's no protection as

19      to the information that was obtained therefrom.

20      The opposing party had to produce them.  Same thing

21      with a FOIA request.

22                  MR. PARKER:  Well, that's not

1          actually true.  The work product doctrine covers

2          for -- and as it relates to non-testifying experts,

3          covers the information received and utilized to

4          draw conclusions or analyze that the expert

5          obtains, whether it be public information or not

6          public information.

7                          If you were to give someone a

8          series of research journals, a non-consulting

9          expert, in order to provide an analysis of those

10         research journals and consult with you about

11         that, even though they're public information,

12         they would not have to testify about what they

13         reviewed.

14         BY MR. MILLER:

15                 Q     Mr. Cotton, did you review ballot

16         images from Fulton County?

17                        MR. PARKER:  Same objection.

18                        Don't answer unless you can do so

19         without getting into the information that you

20         reviewed beyond just the general term

21         "artifacts."

22

Page 236

1      BY MR. MILLER:

2              Q     I'm sorry, I couldn't tell if you

3      were saying something there, Mr. Cotton, I saw you

4      move, but --

5              A     I am following the advice of the

6      attorney here.

7              Q     Okay.  Mr. Cotton, do you have any

8      reason to believe that what you reviewed from

9      Fulton County was not publicly available documents,

10     or artifacts as you phrased it?

11             A     Can you define "publicly available"?

12             Q     In other words, subject to a FOIA

13     request, or in Georgia, as it's referred to under

14     the law, an Open Records Act request, or otherwise

15     just publicly posted by either the Secretary of

16     State or a local election official.

17             A     I have no impression that these were

18     not produced by FOIA or subpoena.

19             Q     Okay.  And am I correct you testified

20     earlier that you personally have never had access

21     to the Fulton County Election System yourself?

22             A     That's correct.

Page 237

1              Q     And, likewise, with respect to Coffee
2        County, you didn't have personal interaction with
3        the hardware itself, correct?
4              A     That's correct.
5              Q     Okay.  Mr. Cotton, is it your
6        understanding -- strike that.
7                    Mr. Cotton, do you have any reason to
8        believe that the artifacts you reviewed were the
9        results of anyone other than authorized election
10        officials gathering those artifacts and producing
11        them pursuant to a subpoena or a FOIA request?
12                    MR. PARKER:  You're talking about
13        Fulton County now, Carey?
14                    MR. MILLER:  Yes.  I'm sorry, I'm
15        talking about Fulton County.
16                    THE WITNESS:  Can you repeat the
17        question?
18        BY MR. MILLER:
19              Q     Do you have any reason to believe
20        that the artifacts you reviewed relative to Fulton
21        County were the results of someone other than an
22        authorized election official gathering those

1       artifacts and producing them pursuant to a FOIA

2       request or a subpoena?

3               A     No.

4               Q     Mr. Cotton, I want to ask you a

5       little bit about the Lake v. Hobbs case.  Is it --

6       am I correct in my understanding that you're

7       engaged as an expert on behalf of Ms. Lake, the

8       plaintiff in that litigation?

9               A     I'm engaged by the law firm that

10      represents her, yes.

11              Q     Okay.  Fair enough.

12                    With respect to that litigation, what

13      is your understanding of the relief those

14      plaintiffs are seeking?

15              A     It is my belief they are seeking --

16                    MR. PARKER:  Let me just lodge an

17      objection regarding foundation.

18                    THE WITNESS:  Okay.

19                    MR. PARKER:  You can testify about

20      what you know as a nonlawyer.

21      BY MR. MILLER:

22              Q     That's fair.  And I'm only asking

Page 239

1       based off of your understanding.

2                A      Yeah.   My understanding is they're

3       simply seeking that if we are going to use digital

4       voting systems, that those voting systems be

5       secure.  And if they can't be secure, then we

6       should not use them until we can provide the proper

7       cybersecurity basis to ensure the protection of the

8       voting systems.

9                Q      And am I correct in my understanding

10      that the plaintiffs in that case are seeking to use

11      hand-marked paper ballots that are hand counted?

12                      MR. PARKER:  Same objection.

13                      Go ahead if you know.

14                      THE WITNESS:  My understanding is, is

15      that in Arizona they use hand-marked ballots.  And

16      what the plaintiffs are objecting to is the use of

17      digital systems if they're not secured.

18      BY MR. MILLER:

19                Q      And so those digital systems that

20      you're referring to, you're talking about the

21      scanners or tabulators and the EMS server, those

22      kind of aspects, right?

Page 240

1            A      That's correct.

2            Q      Okay.  Is it your position that the

3      election equipment in Arizona can be sufficiently

4      secured to use those electronic aspects?

5                   MR. PARKER:  Objection as to

6      foundation.  You can -- you're just asking his

7      opinion about that?

8                   MR. MILLER:  And I can help clarify.

9      BY MR. MILLER:

10           Q      Mr. Cotton, I'm trying to get to your

11     opinion that you've rendered relative to that case.

12     Have you -- have you taken a position that those

13     electronic aspects can be secured?

14           A      Well, I haven't taken a position in

15     that case to that -- to that effect.  As a general

16     belief, I believe --

17                  MR. PARKER:  You don't have to

18     testify about --

19                  THE WITNESS:  Okay.

20                  MR. PARKER:  -- your general belief.

21                  THE WITNESS:  Go ahead.

22                  MR. MILLER:  I'm sorry, I couldn't

Page 241

1    hear that instruction.

2              MR. PARKER:  The objection was that

3    he doesn't need to testify about his general belief

4    as it relates to that.  First, I don't think it was

5    asked, maybe you want to ask it.  Secondly, I just

6    need you to explain how it's within the parameters

7    of the subpoena at issue here.

8              MR. MILLER:  Well, to be truthful

9    with you, Mr. Parker, I'm not aware of what the

10   subpoena at issue is.  We participated in no

11   negotiation concerning this, and we're not under

12   any obligation to notice an act of deposition or

13   define scope relative to that.

14             MR. BROWN:  Well, you also don't have

15   the witness under --

16             MR. MILLER:  Bruce, I'm really not

17   trying to start an argument with Plaintiffs'

18   counsel right now.

19             MR. BROWN:  Okay.  But I mean --

20             MR. PARKER:  Well, I was just going

21   to say, Carey, you're saying you didn't get a copy

22   of the subpoena?

Page 242

1            MR. MILLER:  Based on my

2       understanding of this previous testimony, that

3       there was a revised subpoena issued sometime after

4       August the 9th, is what I understand.

5            MR. PARKER:  Yeah, there was a letter

6       in which we narrowed the subpoena so that, you

7       know, we could all agree on what we're coming in

8       here to talk about.  And it's about Georgia --

9            MR. MILLER:  Yeah.

10            MR. PARKER:  -- which probably is the

11       only thing relevant to your lawsuit.  But, you

12       know, I've -- I've let some questions go as it

13       relates to Arizona to the -- because it's

14       related -- it could be related to Georgia.  But I

15       don't see how the line of questioning that you're

16       now engaging in is related to Georgia.  There may

17       be other Arizona questions that are, but that's my

18       only objection here.

19            MR. MILLER:  Yeah.  And, Andrew, I

20       get it.  I guess what I'm saying is that we were

21       not a party to any sort of agreement to that

22       effect.

Page 243

1                    MR. PARKER:  Well --

2                    MR. MILLER:  Yeah, I --

3                    MR. PARKER:  -- I mean, I don't know

4        that -- I think you would agree that doesn't give

5        you carte blanche to open up to anything in the

6        world.

7                    MR. MILLER:  Clearly, you're

8        obligated to appear pursuant to the subpoena if

9        there were defects in that regard, but we're

10       already here.

11       BY MR. MILLER:

12           Q    Mr. Cotton, let me ask you this way:

13       Have you taken a position relative to the Arizona

14       litigation that those electronic systems can be

15       secured?

16           A    I am not taking a position with

17       respect to the litigation on potential cures or

18       possibilities of protecting those systems.  That

19       has not come up as part of the litigation at this

20       point.

21           Q    Okay.  Fair enough.

22                    Now, you testified earlier that you

Page 244

1          lacked some familiarity as to the Curling

2          litigation that we're here for today in Georgia.

3                    Would it surprise you to know that

4          the Plaintiffs in this case are pursuing the use of

5          hand-marked paper ballots on the theory that the

6          BMD machines cannot be sufficiently secured?

7               A    Based on my review of the litigation,

8          that does not surprise me at all, but I only

9          reviewed that litigation after I received the

10         subpoena.

11              Q    Okay.  And relative again to your --

12         or strike that.

13                   You discussed earlier an exhibit, and

14         I will point you to the number.  I apologize,

15         I'm -- it was a Plaintiffs' exhibit here.

16         Plaintiffs' Exhibit 7.  Do you have that in front

17         of you or can you access the Exhibit Share?

18              A    Yeah, just one minute.

19                   THE WITNESS:  7.  That's 4.

20                   MR. PARKER:  This is -- oh.

21                   THE WITNESS:  I have it in front of

22         me.

Page 245

1     BY MR. MILLER:

2          Q     Okay.  And do you recall looking at

3     this document?

4          A     I do.

5          Q     And can you -- rather than me trying

6     to reinterpret your testimony, can you -- can you

7     describe to me what this document is, to your

8     understanding?

9          A     I have never seen this --

10              MR. PARKER:  Objection.  Lack of

11    foundation.  He's testified that he's never seen it

12    before.

13    BY MR. MILLER:

14         Q     That's fine.  And that's -- and

15    that's what I was trying to avoid, was putting

16    words into your mouth, Mr. Cotton.

17         A     Yeah.

18         Q     You have not seen this document

19    before today.  Is that right?

20         A     That's correct.

21         Q     Okay.  With respect to the election

22    system in Georgia, do you have an understanding as

Page 246

1          to the component pieces that are pertinent to that

2          election system?

3                    A      I do.

4                    Q      And what -- what would those

5          component pieces be?

6                            MR. PARKER:  You can answer to the

7          extent that you can do so without testifying

8          related to your consulting expert work.

9                            THE WITNESS:  So the knowledge that I

10         have with the Dominion System arises from the

11         consulting work that I have performed on this.

12                           MR. PARKER:  So it's related to

13         information that you received?

14                           THE WITNESS:  Correct.

15                           MR. PARKER:  All right.

16         BY MR. MILLER:

17                    Q      Mr. Cotton, I think you also

18         testified in Arizona about your review of this

19         work.

20                    A      I did to the effect that I had

21         reviewed the systems to the point where I could

22         render an opinion on the cybersecurity matters.

Page 247

1           Q      And all my question is asking you is

2      to identify the component hardware pieces used in

3      the Georgia election system on election-day

4      operations.   Are you willing to answer that

5      question?

6                   MR. PARKER:   I think that goes beyond

7      his testimony in Arizona -- well, I know it does,

8      and because of that, I instruct him not to answer.

9      Aside from the fact that you can get that

10     information much easier than through this witness.

11     And I'm sure you probably already know the

12     information.

13     BY MR. MILLER:

14          Q      Mr. Cotton, I will represent to you

15     that in Georgia, a few key pieces of election

16     equipment are utilized on election-day operations.

17     And those would include ballot scanners,

18     ballot-marking devices, poll pads for voter

19     check-in, and an EMS server for compiling and

20     tabulating the results.

21                 Do you have any reason to disagree

22     with me as to those component pieces?

Page 248

```
 1              A     No.
 2              Q     So back to Exhibit 7.  While I
 3     understand you have not seen this document before,
 4     this is reflective of the items that you testified
 5     earlier you did review regarding Coffee County,
 6     correct?
 7              A     I don't believe that I testified that
 8     I actually reviewed these.  I believe that was an
 9     objection of work product.
10              Q     I think we went through earlier, and
11     I don't want to take your time thumbing through
12     exhibits, but your download of the information from
13     the SullivanStrickler website, right?
14                    Do you recall that?
15              A     I do.
16              Q     So what did you download from the
17     SullivanStrickler website?
18                    MR. PARKER:  I'll object to the
19     extent that it goes into anything beyond of what
20     was in the log.  This was produced here using the
21     word "artifacts."
22                    Any further description, I would
```

Page 249

1      instruct you not to answer.

2      BY MR. MILLER:

3              Q     Mr. Cotton, did you review artifacts

4      or forensic images of poll pads in Georgia?

5                      MR. PARKER:  Same objection.

6                      I'd instruct you not to answer.

7      BY MR. MILLER:

8              Q     Mr. Cotton, did you review artifacts

9      or forensic images of thumb drives from Coffee

10     County, Georgia?

11                     MR. PARKER:  Same objection.

12                     And I would instruct you not to

13     answer.

14     BY MR. MILLER:

15             Q     Did you review forensic images of

16     compact flash drives and artifacts obtained from

17     Coffee County, Georgia?

18                     MR. PARKER:  Same objection.

19                     I'll instruct you not to answer.

20     BY MR. MILLER:

21             Q     Mr. Cotton, did you review images or

22     artifacts from the EMS server in Coffee County,

Page 250

```
1        Georgia?

2                    MR. PARKER:  Same objection.

3                    I'll instruct you not to answer.

4        BY MR. MILLER:

5             Q    And, finally, did you review images

6        or artifacts from ballot-marking devices obtained

7        from Coffee County, Georgia?

8                    MR. PARKER:  Same objection.

9                    I will instruct you not to answer.

10       BY MR. MILLER:

11            Q    So, Mr. Cotton, if you'll look at

12       Exhibit 7 with me.

13            A    Yes.

14            Q    And I'm looking at the first category

15       of what appears to be sort of a master folder there

16       at the top of the first page.  Do you see that?

17            A    I do.

18            Q    Okay.  And do you see here it says

19       "Compact flash"?  Do you see that?

20            A    I do.

21            Q    And then the next one is

22       "Dominion-supplied laptop."  Do you see that?
```

Page 251

1          A      I do.

2          Q      Followed by "EMS server"?

3          A      I do.

4          Q      "Miscellaneous thumbs," I -- I take

5     that to mean from one of the later pages that these

6     are thumb drives.  Do you -- do you agree with that

7     assessment?

8          A      It --

9                 MR. PARKER:  Only testify if you

10    know.

11                THE WITNESS:  I don't know for sure

12    what that means.  It says, "Miscellaneous," or

13    "MISC/thumbs."

14    BY MR. MILLER:

15          Q      And do you see there it says "Polling

16    pads?"  Do you see that?

17          A      I do.

18          Q      Are you aware of what a polling pad

19    is?

20          A      Yes.

21          Q      And what is that?

22          A      A polling pad in the Dominion system

1       from their public Open Source documentation is a --

2       typically an Apple iOS device that allows the poll

3       workers to validate or verify voters in the polling

4       places.

5             Q     And it's your understanding that

6       those are Dominion devices?

7             A     I am unclear as to whether those are

8       Dominion devices or those devices are supplied by

9       the election jurisdiction.

10            Q     Got it.

11                  And with respect to the -- you talked

12      before about voters coming to vote.

13                  I take that the main -- your

14      understanding is these are for voter check-in

15      purposes, right?

16                  MR. PARKER:  Are you referring,

17      Carey, to Georgia specifically?

18                  MR. MILLER:  Yes, I am.

19                  MR. PARKER:  All right.  To the

20      extent that you have to answer by considering or

21      talking about your consulting expert work, I would

22      instruct you not to answer.  If you can do as it

Page 253

1       relates to Georgia, without referring to your

2       consulting expert work, then you may answer.

3                    THE WITNESS:  Can you please repeat

4       the question?

5       BY MR. PARKER:

6            Q     Sure.

7                    And to clarify, I'm talking about

8       what you just referred to as reviewing Open Source

9       public documentation related to poll pads.

10           A     Okay.

11           Q     Is it your understanding based on

12      that documentation those are used for voter

13      check-in processes?

14           A     Yes.

15           Q     Okay.  And so going back to my

16      earlier question about the components of the

17      election system in Georgia.  Based on your review

18      of the Dominion Open Source documentation you just

19      referenced, are you now willing to identify for me

20      those pieces of those components of the Georgia

21      election system?

22                   MR. PARKER:  I am instructing you not

Page 254

1      to answer to the extent that it relates to Georgia

2      and your consulting expert work in Georgia.

3                      THE WITNESS:  Yeah, I would -- I

4      would have to rely on what the Dominion manuals

5      state as to the actual systems involved in Georgia

6      and Coffee County.  That would be -- that would

7      require me to reflect back on my analysis as a

8      retained expert in this matter.  But if the -- from

9      the Open Source perspective --

10                     MR. PARKER:  If it relates at all to

11     your work in Georgia, whether it's public, private,

12     confidential, sensitive or not --

13                     THE WITNESS:  Okay.

14                     MR. PARKER:  -- it's protected.

15                     THE WITNESS:  I don't have specific

16     knowledge outside of my expert opinions and work

17     that I performed on this engagement as to the

18     composition of the devices inside of Georgia.

19     BY MR. MILLER:

20          Q     Okay.  Mr. Cotton, am I correct that

21     prior to the 2020 election, you had never

22     forensically reviewed an election system?

Page 255

1          A     That is correct.

2          Q     As I understand it, you've now done

3      it at least three times since then, right?

4          A     Yes.

5          Q     What was the impetus behind that

6      shift in focus of your work?

7          A     Well, the initial impetus was

8      somebody asked me.  Previous to this, I had done

9      extensive cybersecurity work and forensics work and

10     expert witness testimony in other matters.  It

11     simply had not been related to election systems.

12              From a -- when someone asked me to

13     take a look at this, I knew that I could be

14     objective.  I knew I could be fair.  I was not

15     influenced by political motivations, and I could

16     give an honest result out to the people who asked

17     me to analyze the systems.

18          Q     Okay.  In your analyzing of those

19     systems, did you discover any algorithms or

20     otherwise infectious malware that would switch

21     votes?

22              MR. PARKER:  You're talking about

Page 256

1       related to his work in Georgia?

2       BY MR. MILLER:

3            Q    I am talking about related to any of

4       the selection work that you just testified about,

5       Mr. Cotton.

6                 MR. PARKER:  Well, to the extent that

7       it's outside of Georgia, it goes outside the scope

8       of the subpoena.  In the event that it's within

9       Georgia, it would be covered by work product and

10      the consulting expert work to ask what he found.

11      So I'll instruct him not to answer that question.

12                MR. MILLER:  I disagree with you

13      relative to scope of any subpoena.  To the

14      extent --

15                MR. PARKER:  Why would you say that?

16                MR. MILLER:  -- that you have

17      work-product protection assertion, I will accept

18      that as an instruction.  Is that your instruction

19      relative to Georgia?

20                MR. PARKER:  Yes.

21                MR. MILLER:  Okay.

22

Page 257

1      BY MR. MILLER:

2            Q     So, Mr. Cotton, setting aside any of

3      your work product relative to Georgia, have you

4      identified any algorithms which weight or switch or

5      alter votes in any election system you have

6      reviewed?

7                  MR. PARKER:  And just tell me, Carey,

8      where in the subpoena is that.

9                  MR. MILLER:  I don't -- I don't have

10     the subpoena.  It was never given to me.  I have

11     the initial subpoena.  I have no subsequent

12     correspondence.  I have no subsequent

13     communication.  We have not waived our right to

14     depose this witness, to cross-examine this witness

15     relative to the scope that's provided under

16     Rules 30 and 45, which compels his attendance.

17                 MR. PARKER:  No, you're right.  It's

18     my understanding you haven't waived your right, but

19     you have not subpoenaed this witness, which you

20     could do.  You do have a right to.  And in doing

21     so, you would identify the topics in which you wish

22     to ask questions of this third-party witness.

Page 258

1            By being here today, having a

2       subpoena that caused Mr. Cotton to be here today,

3       which identifies those topics, you know, by you

4       being here doesn't mean that it's opened up now

5       to anything in the universe to ask him about.

6                 It's still -- we're here today to

7       answer questions based on the subpoena.  And if

8       you wanted to subpoena him with broader topics,

9       we would have dealt with that as well.

10                MR. MILLER:  I guess my point is,

11      Mr. Parker, we can serve a separate subpoena.

12      There is no obligation under the rules, and I'll

13      cite you to authority under the district of Montana

14      that there's no cross-notice or cross-subpoena

15      required for me to be able to pose questions, so

16      long as they are relevant under the standards of

17      Rule 26.

18                So I truly am -- I truly do just

19      only have a few questions here.  If you don't

20      want to answer them, we can pursue a separate

21      subpoena and get back on the Zoom call in a week.

22      Otherwise, I -- we will be done within 15

Page 259

1     minutes.

2                    MR. PARKER:  Let me confer.  Hold on

3     one moment.

4                    MR. MILLER:  Okay.

5               (Discussion had with Attorney Parker and

6          Witness.)

7                    MR. PARKER:  Mr. Cotton, wait for a

8     question.

9                    Go ahead, Carey.

10                   MR. MILLER:  Andrew, do you prefer me

11    to ask the court reporter to read back the question

12    or --

13                   MR. PARKER:  Go ahead with your

14    question.  We will proceed.

15                   MR. MILLER:  Felicia, I apologize, I

16    know there was a lot of back and forth between the

17    questions.

18                   COURT REPORTER:  No, problem.  Let me

19    get back up there and see if I can find the

20    question.

21               (The reporter read as requested.)

22

Page 260

1      BY MR. MILLER:

2              Q      Yeah, that was accepting work product

3      relative to Georgia.

4                    So setting that aside, accepting a

5      work-product objection, have you identified any

6      algorithms or malware that weight or switched votes

7      in any of the election systems that you have

8      reviewed?

9              A      The short answer is I am aware of

10     election definitions that have switched votes.  I

11     am aware of QR code-based inputs that have modified

12     how votes were cast.  And I am aware of

13     anonymous -- or atypical anonymous log-ins that did

14     not have sufficient supporting data to validate

15     whether or not those were authorized log-ins to the

16     systems.

17                    I have not fully investigated all of

18     those -- all of that knowledge.  I have not been

19     asked to do that, but I am aware of -- of those

20     categories of situations.

21             Q      Okay.  Thank you for that.

22                    I'm going to ask you just a couple

```
 1        follow-up questions relative to those three
 2        categories.
 3                    As to the election definition issues
 4        that you stated that you've identified, my
 5        understanding to your testimony just then is that
 6        those election definition issues switched votes.
 7        Is that accurate as to your testimony?
 8             A      That is correct.
 9             Q      And the election definitions --
10                    MR. PARKER:  Carey, I am sorry to
11        interrupt you, but I just want to be clear for the
12        record.  He didn't say he identified them.  He said
13        he's aware of them.
14                    MR. MILLER:  I see.  Okay.  Fair
15        enough.
16        BY MR. MILLER:
17             Q      And, Mr. Cotton, I don't at any point
18        mean to put words in your mouth.  Most of my job
19        here is clarifying what your testimony is.
20                    With respect to those election
21        definitions, that's like the issue in Antrim
22        County, right?
```

Page 262

1          A     That is correct.

2          Q     Okay.  Anywhere other than Antrim

3     County on a system that you have analyzed where

4     there was an election definition issue?

5          A     Not on the systems that I have

6     analyzed.

7          Q     Okay.  With respect to QR code inputs

8     that you referred to.  Do you recall that?

9          A     Yes.

10         Q     Okay.  Did you become aware of that

11    because you observed it in an actual election that

12    did, in fact, switch votes?

13         A     No.  I am aware of that based on some

14    reporting out of Williamson County.  I believe

15    Williamson County, Tennessee.

16         Q     Okay.  So that's not a system that

17    you've analyzed, right?

18         A     Correct.

19         Q     Okay.  So you don't have any personal

20    observations that there were votes switched by a QR

21    code input, right?

22         A     Correct.

1          Q     Okay.  And just so I understand what

2     you mean by QR code input, that's -- that's where

3     the QR code says something that doesn't reflect,

4     say, the ballot summary that's on the ballot,

5     right?

6               You voted for Joe Smith, but the QR

7     code, the computer reads it as you voting for Jason

8     Bourne.  Is that more or less accurate?

9          A     More or less.  It's a little bit

10    broader than that.  It also changes how those votes

11    are counted and what category of vote is counted

12    against.  So, for example, a -- a ballot that was

13    cast legitimately in a precinct would be counted as

14    a provisional vote.

15         Q     Okay.  And when you referred to

16    atypical anonymous log-ins in your earlier

17    testimony, I did not hear your testimony saying

18    that atypical anonymous log-ins, in fact, switched

19    any votes.  Is that accurate?

20         A     You didn't hear me say that because

21    in that particular jurisdiction, they did not

22    maintain enough data or logs sufficient to prove

Page 264

1       that votes were switched.

2               Q     And is that relative to your review

3       in Maricopa County, Arizona?

4               A     It is.

5               Q     And this is the whole log-rolling

6       issue, right?

7               A     That's part of it.

8               Q     Okay.  So, Mr. Cotton, I -- I ask

9       this question only because I want to make sure I

10      understand your relationship on the engagement.

11      Were you ever engaged directly by Sidney Powell?

12              A     No.

13              Q     Okay.  Did you have any awareness

14      that your work would be utilized by Sidney Powell

15      or individuals you knew to be working for her?

16              A     No.

17              Q     Okay.  And the three items that you

18      pointed out here, the first of which being the

19      Antrim County issue, the second of which being

20      reporting, but an item that you don't have any

21      personal knowledge of regarding QR code inputs, and

22      the third of which being atypical anonymous

Page 265

1        log-ins.

2                     Those three issues, is it your

3        understanding that those were perpetrated or

4        exploited by any individual with the intent to

5        alter the outcome of an election?

6            A     I don't have enough data to render an

7        opinion on that.

8            Q     Okay.  You just don't have an opinion

9        one way or the other?

10           A     No.

11           Q     Okay.  But we didn't discover Hugo

12       Chavez's algorithm in the Dominion machines, right?

13           A     That would go into work product.

14           Q     Okay.  And we didn't discover, you

15       know, Putin's input of algorithms into the Dominion

16       machines, right?

17           A     Once again --

18                 MR. PARKER:  You don't need to answer

19       that.

20                 Go ahead.

21       BY MR. MILLER:

22           Q     And to be clear, what I'm referring

Page 266

1        to with that question is simply those three

2        categories that you talked about before, not

3        something else.  But you're just not rendering an

4        opinion one way or the other on that, right?

5                A      Correct.

6                       MR. MILLER:  Okay.  Mr. Cotton, if

7        you'll give me just two minutes, I think we're --

8        we're done here.

9                       THE WITNESS:  Okay.

10                      MR. MILLER:  I believe I'm the last

11       person asking questions.  Give me just a second.

12                      VIDEOGRAPHER:  Do you want to go off

13       the record?

14                      MR. MILLER:  Yes, please.  I

15       apologize.

16                      VIDEOGRAPHER:  All right.  The time

17       is approximately 3:32 p.m.  We are going off the

18       video record.

19              (Recess from 3:32 p.m. to 3:37 p.m.)

20                      VIDEOGRAPHER:  The time is

21       approximately 3:37 p.m.  We are back on the video

22       record.  Go ahead.

Page 267

```
 1       BY MR. MILLER:

 2              Q     Mr. Cotton, I'm going to introduce

 3       one exhibit here real quick.  It should show on

 4       your end momentarily here, and just let me know

 5       when you see it.

 6              A     What exhibit number will that be?

 7              Q     I marked it as Exhibit D1.

 8              MR. PARKER:  E-1?

 9              MR. MILLER:  "D" as in dog or

10       defendant.

11       BY MR. MILLER:

12              Q     Well, I'm sorry, it's showing up as a

13       second Exhibit Number 1 on the list.  If you look

14       at the stamp, it says D1.  It says, "Exhibit D to

15       Cotton First Declaration - EAC Investigative

16       Report."

17              MR. PARKER:  Okay.  Yes.

18            (Cotton Deposition Exhibit Number D1

19              marked for identification.)

20              MR. MILLER:  Sorry, I didn't realize

21       that's how it was showing up on your end.

22
```

Page 268

1        BY MR. MILLER:

2              Q    Mr. Cotton, do you have that in front

3        of you?

4              A    I do.

5              Q    Okay.  And do you see at the bottom

6        there it says Exhibit D0001?

7              A    Yes.

8              Q    Okay.  And you've seen this document

9        before, right?

10             A    I have.

11             Q    Okay.  In fact, it was attached to

12       your declaration in the Lake v. Hobbs case, right?

13             A    Correct.

14             Q    Okay.  And this is concerning an

15       investigative report of the United States Election

16       Assistance Commission concerning Williamson County,

17       Tennessee and the Dominion Voting System there,

18       right?

19             A    Yes.

20             Q    Okay.  And am I correct in my

21       understanding that this investigative report

22       reflects the issue that you were referring to

Page 269

1          regarding QR code inputs?

2                  A       Yes.

3                  Q       Okay.   Is it your opinion that the

4          conclusion and analysis here by the EAC is -- is

5          accurate?

6                  A       Well, quietly frankly, I think it's

7          incomplete.

8                  Q       Incomplete?

9                  A       Yes.

10                 Q       In what respect?

11                 A       Well, with respect that the --

12         actually, they say they don't really know what --

13         what caused this, however, they fixed it.   So if

14         they don't exactly know what happened, but they're

15         claiming they fixed it, then I would suggest that

16         there's probably a need for further analysis to

17         this problem, and to the full extent to which a QR

18         code could effect the behaviors of an -- of an ICP.

19                 Q       Okay.   So with respect to the factual

20         description of the issue here, you agree that this

21         encompasses what you were referring to as QR code

22         inputs.   Is that accurate?

Page 270

1          A     It -- it is accurate to the extent

2     that they recorded what they observed.  I'm not --

3     I'm not convinced that that is the full extent to

4     which QR codes could have influenced the -- the

5     counting of the ballots.

6          Q     Okay.  I'm just trying -- so I'm just

7     trying to make sure there's not some additional

8     layer to the QR code input that is not reflected as

9     to the issue identified here.  I realize you don't

10    fully disagree with the analysis and conclusion.

11    I'm talking about the factual issue that was being

12    investigated.

13         A     What I would also say is that based

14    on the Open Source Dominion documentation, this

15    manifestation of a QR code variation and the vote

16    tabulation in the manner in which it was tabulated

17    is contrary to what was represented in the

18    documentation.  That would indicate to me that

19    there may be additional functions that will accept

20    QR code input from the tabulator scanning that is

21    not noted or discovered or disclosed in the

22    Dominion documentation.

Page 271

1          Q     Okay.  I will ask you to pull up one

2     more document real quick, and this is a Plaintiffs'

3     exhibit, Plaintiffs' Exhibit 3.  And just let me

4     know when you have that.

5          A     It's Plaintiffs -- yeah.  Are we

6     talking about the privilege -- privilege log or the

7     engagement letter?

8          Q     Yeah.  Plaintiffs' Exhibit 3 is a

9     letter from your counsel, followed by some

10    documents you produced, right?

11         A     Yes.

12         Q     Okay.  And just to confirm, this

13    BC0001 through BC0008 reflects the full and

14    complete production of documents pursuant to the

15    subpoena, correct?

16              And let me clarify that because I'm

17    not trying to ask you a trick question here.

18              My question is:  Is there anything

19    other than these documents that was produced and

20    provided to the Plaintiffs' counsel that is not in

21    here?

22              MR. PARKER:  These are -- these are

Page 272

1        the documents that were produced, and there was a

2        log produced of documents that were responsive but

3        withheld.

4                      MR. MILLER:  Okay.

5        BY MR. MILLER:

6              Q    So, Mr. Cotton, other than -- and I

7        understand you've -- your counsel has withheld

8        documents on privileged grounds.  As far as the

9        documents that were actually produced and not

10       withheld, these constitute the full production,

11       correct?

12             A    I'll rely on my attorney's production

13       within the scope of the subpoena on that.  I

14       provided them with the results of search queries,

15       and they reviewed them for relevance to the

16       subpoena.

17             Q    Okay.  And with respect to the search

18       queries, how did you come to those search queries?

19                      Was that negotiated with the

20       Plaintiffs' counsel or -- or did you come up with

21       these?

22             A    We came up with those based on the

Page 273

1      parameters of the subpoena.

2              Q      Okay.

3                     MR. MILLER:  All right.  Mr. Cotton,

4      I promised that I didn't have much after that

5      break.  That is, in fact, all that I have.  Thank

6      you for your time today.

7                     MR. PARKER:  Is there anyone else for

8      the Plaintiffs or Defendants?

9                     MR. BROWN:  The Coalition Plaintiffs

10     do not have any further questions.

11                    MS. KAISER:  The Curling Plaintiffs

12     do not have any further questions either.

13                    MR. PARKER:  I just have a few

14     questions quickly.

15              EXAMINATION BY COUNSEL FOR WITNESS

16     BY MR. PARKER:

17              Q      Mr. Cotton, you were asked about the

18     gathering of documents.  And you said that you did

19     search queries, gathered documents, provided them

20     to our firm.

21                     Were you relying on our firm to

22     determine what was responsive?

Page 274

1           A      Yes.

2           Q      Did you make a determination of what

3     was responsive without relying on us?

4           A      No.

5           Q      In terms of documents you reviewed to

6     prepare for this deposition, differentiating that

7     from documents that you collected to send to your

8     law firm and then to send those -- what was

9     responsive to the Plaintiffs, as it relates to what

10    you reviewed to prepare for this deposition, how

11    many documents did you review for that?

12          A      Just a -- just a couple.  Primarily,

13    the -- the engagement letter as to timing, when

14    things were signed, and the NDA, the subsequent NDA

15    for Coffee County.

16          Q      And those were produced?

17          A      Correct.

18          Q      Anything else?

19          A      No.

20          Q      And were there any documents other

21    than those that were produced that you looked at to

22    refresh your recollection prior to this deposition?

Page 275

1          A      No.

2          Q      There was a point during the

3    deposition that it appeared to me that you said you

4    started your work in March of 2021 as it relates to

5    the Lambert retainer, but was that work at that

6    time related at all to Georgia?

7          A      No.

8          Q      And I think you testified June was

9    the first time that you did anything related to

10   Georgia?

11         A      Correct.

12         Q      As it relates to the Halderman

13   declaration, which is an exhibit in this deposition

14   that you looked at, are you aware that

15   Mr. Halderman has executed numerous declarations?

16         A      I am aware of that now.

17         Q      In terms of the document that is

18   introduced here, you said that's the declaration

19   that you reviewed.  Do you know whether it is the

20   one that you attached to your declaration in

21   Arizona?

22         A      I -- I didn't compare the exhibit

Page 276

1      that was presented to me to the declaration that

2      was attached to my declaration in Arizona.  The one

3      that I reviewed is the one that is attached as an

4      attachment to that declaration.

5           Q    Okay.  As it relates to Williamson

6      County that you were asked about, and I think it's

7      Defendants' Exhibit 1 in this deposition, that

8      document, the USEAC had certified the equipment

9      that was later found to be faulty, correct?

10          A    Yes.

11          Q    Does that give you confidence in the

12     USEAC?

13          A    It does not give me any confidence in

14     the EAC.

15          MR. PARKER:  That's all that I have.

16     Plaintiffs or Defendants have any follow-up to

17     those?

18          MS. KAISER:  Could you give us just

19     two minutes to confer, please?

20          MR. PARKER:  Sure.

21          VIDEOGRAPHER:  Do you want to go off

22     the record?

Page 277

```
 1                     MS. KAISER:  Yes, please.

 2                     VIDEOGRAPHER:  The time is

 3       approximately 3:49 p.m.  We are going off the video

 4       record.

 5                  (Recess from 3:49 p.m. to 3:52 p.m.)

 6                     VIDEOGRAPHER:  The time is

 7       approximately 3:52 p.m.  We are back on the video

 8       record.  Go ahead.

 9                     MR. BROWN:  Coalition Plaintiffs have

10       no further questions.

11                     MS. KAISER:  Curling Plaintiffs have

12       no further questions.

13                     MR. BROWN:  Thank you, everybody.

14                     MS. KAISER:  Thank you for your time,

15       Mr. Cotton.

16                     MR. BROWN:  Thank you, Mr. Cotton.

17                     MR. MILLER:  Mr. Cotton, let me put

18       on the record.

19                     I've got just two additional

20       clarifying questions regarding the questions that

21       you just asked, Mr. Parker.

22                     MR. PARKER:  All right.
```

Page 278

1              EXAMINATION BY COUNSEL FOR STATE DEFENDANTS

2         BY MR. MILLER:

3              Q    Mr. Cotton, you were asked about the

4         declarations of Dr. Halderman that you reviewed

5         relative to your declaration in the Arizona case,

6         right?

7              A    Yes.

8              Q    Okay.  I'm going to, just for

9         clarity, introduce to you here -- it should be in

10        there now.  It's Defendants' Exhibit D2.  Just let

11        me know when you see it.

12                  (Cotton Deposition Exhibit Number D2

13                   marked for identification.)

14        BY MR. MILLER:

15             Q    It reads again, Exhibit --

16             A    We got it.

17             Q    You got it.  Okay.

18                  So, Mr. Cotton, if you'll scroll down

19        with me to the second page here -- well, the top

20        page says, "Exhibit F," and then at the top, do you

21        see "Case Number 2:22-cv-00677JJT"?

22                  Do you see that?

Page 279

1          A     I do.

2          Q     Okay.  And "June 8th, 2022."  Do you

3    see that?

4          A     I do.

5          Q     And I'll represent to you that that

6    is the case number for the Lake v. Hobbs case.  Do

7    you have any reason to doubt me on that?

8          A     No.

9          Q     Okay.  And if you'll scroll down here

10   with me to the substantive pages.  Do you see that

11   is the declaration of J. Alex Halderman in Support

12   of Motion for Preliminary Injunction?

13         A     Which page are you on?

14         Q     I'm just on the first substantive

15   page in the caption there, "Declaration of J. Alex

16   Halderman in Support of Motion for Preliminary

17   Injunction."

18         A     Yes.

19         Q     The second -- do you see that?

20         A     Yes.

21         Q     Okay.  And this is one of the

22   declarations of Dr. Halderman you reviewed,

Page 280

1       correct?

2               A       Correct.

3               Q       And it was attached to your

4       declaration in the Arizona case, correct?

5               A       I don't have that paperwork in front

6       of me, but yes, it was.

7               Q       Okay.  And I'll represent to you that

8       this was pulled from the CM/ECF system that was

9       Exhibit F to your declaration.

10              A       Okay.

11              Q       And if you'll scroll with me to the

12      sixth page of the PDF, page 5 of the declaration

13      itself.

14              A       Okay.

15              Q       And it's page 5 at the bottom of the

16      page.  And do you see Footnote 5 there where

17      Dr. Halderman talks about the Stuxnet computer

18      virus?

19              A       I do.

20              Q       Okay.  And you also theorized about

21      this Stuxnet computer virus in the Arizona

22      litigation, right?

Page 281

1           A     I -- I did as an example of how an

2      air gap system could be negated.

3           Q     Okay.  And I'm going to mark one

4      additional exhibit here to you.

5               (Cotton Deposition Exhibit Number D3

6                marked for identification.)

7      BY MR. MILLER:

8           Q     All right.  And that should show up

9      on your side here.  This will be Defendants'

10     Exhibit 3.  It reads in the description, "Exhibit G

11     to Cotton First Declaration."  If you'll just let

12     me know when you have that.

13          A     I have that.

14          Q     Okay.  And so you see here on the

15     first page, again at the top of the page, Case

16     2:22-cv-00677JJT.

17               Do you see that?

18          A     Yes.

19          Q     Okay.  And that's the same case

20     number we looked at before and reflects the Arizona

21     litigation, right?

22          A     I wasn't paying attention on that.

Page 282

```
 1              Q    Okay.  Fair enough.  It's a lot of

 2       numbers to memorize when you're not expecting to

 3       need to, right?

 4                    And I'll represent to you again that

 5       this was attached as Exhibit G to your Arizona

 6       declaration.  Do you have any reason to doubt me on

 7       that?

 8              A    No.

 9              Q    Okay.  And so this --

10              MR. PARKER:  And let me put on the

11       record, because this beeping has been going on

12       throughout the day.  Mary Kaiser reflected on that

13       and identified it.  And we figured out that the

14       computer that we are on, I have my e-mail in

15       Outlook open in the background in order that I

16       could get in, et cetera.  So that's what you're

17       hearing.  Even though it's not up on the screen at

18       all for us, it causes that to occur.

19                    MR. MILLER:  Okay.  And thanks for

20       that clarity.  That's fine.

21       BY MR. MILLER:

22              Q    And so, Mr. Cotton, this Exhibit G
```

1          was also attached to your Arizona declaration,

2          right?

3                    A      Yes.

4                    Q      Okay.  So this is another declaration

5          of Dr. Halderman you reviewed in forming your

6          opinion in that case, right?

7                    A      Yes.

8                    Q      Okay.  So with respect to the

9          clarifying questions your attorney just referred

10         to, are those the only two Halderman declarations

11         you've reviewed?

12                   A      I believe so, yes.

13                   Q      Okay.  And you've reviewed the --

14                   A      Well, one clarification on that.

15                   Q      Oh, sure.

16                   A      As part of the Antrim County

17         litigation, I did review his opinion on that matter

18         as well, but it is not included as part of Arizona.

19                   Q      Okay.  And you are going -- you're

20         reading my mind here.

21                          So the Antrim County report that

22         Dr. Halderman prepared, you have reviewed that on

Page 284

1      your own, right?

2              A     I have, yes.

3              Q     Okay.  And would you agree with me

4      that it looks very different than this declaration

5      here that's in the form of a report with a table of

6      contents and things of that nature?

7              A     Can you rephrase that question or

8      repeat that question, please?

9              Q     Sure.

10             So the Antrim County report by

11     Dr. Halderman that you reviewed is much different

12     in form than this declaration, right?

13             It's a longer document, with a full

14     table of contents and more of a narrative writing.

15             Would you agree with me on that?

16             A     I haven't reviewed that document

17     recently, but conceptually, yes.

18             Q     Okay.  And with respect to that

19     Antrim County report, have you reviewed any other

20     document prepared by Dr. Halderman that is similar

21     in form and nature to that Antrim County report?

22             A     To the best of my recollection, I

Page 285

1          have reviewed these three documents from

2          Dr. Halderman.

3                    Q      Okay.

4                         MR. MILLER:  That's all the questions

5          that I have.

6                         MR. PARKER:  Anyone else?

7                         MS. KAISER:  No further questions

8          from the Curling Plaintiffs.  Thank you.

9                         MR. BROWN:  Nothing from the

10         Coalition Plaintiffs.

11                        VIDEOGRAPHER:  Okay.  Are we done?

12         Are we going to go off the record?  Yes?

13                        MR. BROWN:  Yes.

14                        MR. PARKER:  We'll read -- we'll read

15         and sign.

16                        VIDEOGRAPHER:  Okay.  The time is

17         approximately 4:02 p.m.  We are going off the video

18         record.

19                    (Whereupon, at 4:02 p.m., the

20                    video-recorded videoconference deposition

21                    of BENJAMIN R. COTTON was concluded;

22                    signature reserved.)

Page 286

CERTIFICATE OF NOTARY PUBLIC

1                  CERTIFICATE OF NOTARY PUBLIC

2      I, FELICIA A. NEWLAND, CSR, the officer before whom

3      the foregoing deposition was taken, do hereby

4      certify that the witness whose testimony appears in

5      the foregoing deposition was duly sworn by me; that

6      the testimony of said witness was taken by me in

7      stenotype and thereafter reduced to typewriting

8      under my direction; that said deposition is a true

9      record of the testimony given by said witness; that

10     I am neither counsel for, related to, nor employed

11     by any of the parties to the action in which this

12     deposition was taken; and, further, that I am not a

13     relative or employee of any counsel or attorney

14     employed by the parties hereto, nor financially or

15     otherwise interested in the outcome of this action.

16

17

18     _____

19     FELICIA A. NEWLAND, CSR

        Notary Public

20

     My commission expires:

21     September 15, 2024

22

Page 287

1   Andrew Parker, Esquire

2   parker@parkerdk.com

3                          August 30, 2022

4   RE:    Curling, Donna  v. Raffensperger, Brad

5        8/25/2022, Benjamin  R Cotton (#5361567)

6        The above-referenced transcript is available for

7   review.

8        Within the applicable timeframe, the witness should

9   read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12       The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  cs-midatlantic@veritext.com

16

17   Return completed errata within 30 days from

18  receipt of testimony.

19    If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22                     Yours,

23                     Veritext Legal Solutions

24

25

```
                                          Page 288
 1   Curling, Donna  v. Raffensperger, Brad

 2   Benjamin  R Cotton (#5361567)

 3                E R R A T A   S H E E T

 4   PAGE_____ LINE_____ CHANGE_____

 5   _____

 6   REASON_____

 7   PAGE_____ LINE_____ CHANGE_____

 8   _____

 9   REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____     _____

24   Benjamin  R Cotton                           Date

25
```

Page 289

1    Curling, Donna  v. Raffensperger, Brad

2    Benjamin  R Cotton (#5361567)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Benjamin  R Cotton, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Benjamin  R Cotton                          Date

13   *If notary is required

14                       SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                       _____ DAY OF _____, 20___.

16

17

18                       _____

19                       NOTARY PUBLIC

20

21

22

23

24

25