1          UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF GEORGIA

3              ATLANTA DIVISION

4

5          Civil Action No. 1:17-cv-02989-AT

6    _____

7    DONNA CURLING, et al.,

8          Plaintiffs,

9    vs.

10   BRAD RAFFENSPERGER, et al.,

11         Defendants.

12   _____

13

14       VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

15                EDWARD H. LINDSEY, JR.

16   DATE:          August 31, 2022

17   TIME:          9:34 a.m. to 11:46 a.m.

18   LOCATION:      Witness location

19

     REPORTED BY:  Felicia A. Newland, CSR

20

21             Veritext Legal Solutions

            1250 Eye Street, N.W., Suite 350

22             Washington, D.C. 20005

1                    A P P E A R A N C E S

2        On behalf of the Curling Plaintiffs: (Via Zoom)

3              MARY KAISER, ESQUIRE

4              DAVID D. CROSS, ESQUIRE

5              SONJA SWANBECK, ESQUIRE

6              JENNA CONAWAY

7              WAIL JIHADI

8              REILEY J. PORTER, ESQUIRE

9              Morrison & Foerster LLP

10             2100 L Street, Northwest

11             Suite 900

12             Washington, D.C. 20037

13             mkaiser@mofo.com

14             dcross@mofo.com

15             sswanbeck@mofo.com

16             rporter@mofo.com

17        On behalf of the Coalition for Good Governance

18        Plaintiffs:

19             MARILYN MARKS, ESQUIRE (Via Zoom)

20             Attorney At Law

21             7035 Marching Duck Drive, E504

22             Marilyn@uscgg.org

Page 3

1               A P P E A R A N C E S (Cont'd)

2      On behalf of the State Defendants:

3           CAREY MILLER, ESQUIRE  (Via Zoom)

4           ALEXANDER F. DENTON, ESQUIRE

5           Robbins Firm

6           500 14th Street, Northwest

7           Atlanta, Georgia 30318

8           carey.miller@robbinsfirm.com

9           a.denton@robbinsfirm.com

10     Also Present:  (Via Zoom)

11          Donna Curling

12          Bryan Tyson

13          Oluwasegun Joseph

14          Diane LaRoss

15          Donna Price

16          Jess Cino

17          Vincent R. Russo

18     Videographer:  Jess Wiggins

19     Veritext Concierge:  Joe Raguso

20

21

22

1                         C O N T E N T S

2    EXAMINATION BY:                                    PAGE

3        Counsel for Curling Plaintiffs                   7

4                LINDSEY DEPOSITION EXHIBITS

5    NO.   DESCRIPTION                                   PAGE

6    1    June 15 Proposed Redactions, Halderman          9

7         Report

8    2    Excerpt from 10/29/2021 Transcript of          13

9         Juan Gilbert

10   3    State-Defendants-00202234 (Red-Embargoed       17

11        CISA)

12   4    State Defendants 00202239 (White CISA)         19

13   5    Article, "Pro-Trump tech team copied          27

14        Georgia election data, records show"

15   6    Video clip, Restoring Elections Panel          40

16   7    May 7, 2021 Barnes E-mail Chain re:            61

17        Cyber Ninjas

18   8    Excerpt from James A. Barnes, Jr.              68

19        transcript

20   9    State Defendants 00205051-53 (Edward &         71

21        Amber Text)

22   10   State Defendants 202613, E-mail,              100

Page 5

1            "Renewed Letter Petition to State

2            Election Board

3

4       *(Exhibits attached to transcript.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1                P R O C E E D I N G S

2                  * * * * * * *

3                VIDEOGRAPHER:  Today's date is a

4    August 31st, 2022.  And the time 9:34 a.m.  This

5    will be the videotaped deposition of Edward

6    Lindsey.

7                Will Counsel present please

8    identify themselves for the record.

9                MR. DENTON:  This is Alexander Denton

10   for the State Defendants.

11               MS. CINO:  Jessica Cino for the

12   Curling Plaintiffs.

13               MS. SWANBECK:  This is Sonja

14   Swanbeck, also for the Curling Plaintiffs.  And I

15   am joined by David Cross and Mary Kaiser, also for

16   the Curling Plaintiffs.

17               VIDEOGRAPHER:  Thank you.

18               Will the court reporter please

19   swear in the witness?

20

21

22

1                        * * * * * * *

2        Whereupon,

3                      EDWARD H. LINDSEY, JR.

4        was called as a witness and, having been first duly

5        sworn, was examined and testified as follows:

6            EXAMINATION BY COUNSEL FOR CURLING PLAINTIFFS

7        BY MS. SWANBECK:

8                Q     Good morning, Mr. Lindsey.  My name

9        is Sonja Swanbeck.

10               A     Good morning.

11               Q     And thank you for your time this

12       morning.

13                     Could you state your full name for

14       the record?

15               A     Edward Harman Lindsey, Jr.

16               Q     Thank you.

17                     And do you understand you're under

18       oath today?

19               A     Yes.

20               Q     Is there any reason why you would not

21       be able to give full and complete testimony today?

22               A     No.

Page 8

```
 1              Q    You are currently a member of the
 2       Georgia State Election Board, correct?
 3              A    Correct.
 4              Q    Were you aware that the Plaintiffs in
 5       this case asked to depose you in April of this
 6       year?
 7              A    I'm aware that there was a question
 8       as to whether or not the request was within the
 9       discovery period.  I'm aware that objections were
10       raised.  I'm aware that y'all went to court.  And
11       I'm aware that the judge ruled that my deposition
12       could be taken, but they were limited to 90
13       minutes.  I'm also aware that I was asked for some
14       times, that I gave those times that -- and at
15       y'all's convenience, I moved the deposition twice.
16              Q    Okay.  When did you learn that?
17              A    I'm sorry?
18              MR. DENTON:  Object to form.
19              THE WITNESS:  I was told first that
20       y'all needed 9:30, or 9:00, then y'all needed 8:00,
21       then y'all needed 9:30.  It's not an indictment,
22       Counsel, I'm just sort of saying I think I've been
```

1        cooperative.  That's all I'm saying.

2        BY MS. SWANBECK:

3             Q    Okay.  Fair enough.

4             When did you learn about the

5        litigation, this case?

6             A    Oh, it was probably shortly after I

7        got appointed.  This, along with numerous other

8        cases, I was basically told, "Congratulations on

9        your appointment, you're about to be sued multiple

10       times."

11            Q    And when were you appointed?

12            A    Whatever the Friday before the second

13       Tuesday in January was.  It was the second Monday

14       of January it was.

15            MS. SWANBECK:  I'm going to introduce

16       the first exhibit, Tab 1 as Exhibit 1.

17             (Lindsey Deposition Exhibit Number 1

18             marked for identification.)

19       BY MS. SWANBECK:

20            Q    And just looking at the cover page of

21       this report here, do you recognize this report?

22            A    I'm generally -- I've seen it before,

```
 1        yes.

 2                  Q     You have seen it before?

 3                  A     Yes.

 4                  Q     When did you first see it, do you

 5        remember?

 6                  A     I do not.  It's been a while, but I

 7        have seen it before.

 8                  Q     Were you aware that the Plaintiffs in

 9        this case provided this report to your counsel in

10        July of last year?

11                  A     I don't know the exact date.  I know

12        that -- that both sides have exchanged expert

13        reports over the course of this litigation.  I

14        don't -- I don't know the exact times.

15                  Q     Because it was provided in July of

16        last year, why didn't you review it earlier?

17                        MR. DENTON:  Object to form.

18                        THE WITNESS:  I think I just said

19        that I reviewed it earlier than -- than now, but I

20        was appointed in January this year.

21        BY MS. SWANBECK:

22                  Q     So you didn't review it earlier
```

Page 11

1     because you hadn't been appointed.  Is that fair to

2     say?

3                    MR. DENTON:  Object to form.

4                    THE WITNESS:  I think that would be

5     fair to say.

6     BY MS. SWANBECK:

7            Q     Did the report raise any concerns to

8     you about Georgia's voting system?

9            A     It raised questions for me, as well

10    as any type of report that I see that -- that

11    raises questions regarding our system, yes.

12           Q     What kinds of questions did it raise

13    for you?

14           A     Well, I want to -- you know, it

15    raised questions regarding that, both in terms of

16    his pointing out as to potential vulnerabilities

17    and as to his conclusions.  It also prompted me to

18    take a look at what some other people had said as

19    well.

20           Q     And do you recall what else you

21    looked at?

22           A     Generally speaking, I think I've seen

```
 1          some analysis by other experts in this case.  I've

 2          seen the report by CISA.  And I've seen the -- I've

 3          seen of -- I haven't actually seen the report, I'd

 4          like to see the report, from the experts that were

 5          retained by Dominion that apparently issued a

 6          report in May of this year.  So I've either seen

 7          reports or seen -- or heard of various reports with

 8          different conclusions.

 9                  Q    What did you think after seeing all

10          of those reports?

11                  A    Well, like any other system of

12          voting, there are vulnerabilities, and the State

13          needs to be aware of vulnerabilities and take

14          necessary steps to minimize it.  You know, with any

15          election, or with any voting system, there's always

16          going to be potential vulnerabilities, whether it

17          be hand ballots or some of the earlier versions of

18          eVoting or the -- or this one, we have to be

19          consciously aware of potential vulnerabilities and

20          be constantly asking questions as to how those

21          vulnerabilities can be minimized.

22                  Q    Do you know what steps the State of
```

1        Georgia has taken to mitigate the vulnerabilities

2        in this report?

3              A     I've talked to various experts and

4        various folks within the Secretary of State's

5        office, in general terms of -- in terms of limiting

6        total access to the system to anyone.  Breaking

7        that apart, limiting public access to the system as

8        a whole, that sort of thing.  I would have to sort

9        of go back to them and sort of ask you to sort of

10       chat with them on -- on those various things.

11                   I've also looked at -- at what CISA

12       recommended.  I've looked at -- at what some of the

13       other folks have said in terms of the -- of the

14       likelihood or unlikelihood of the vulnerabilities

15       cited by Dr. Halderman.  And I've looked at some of

16       the other courts that have questioned

17       Dr. Halderman's objectivity.

18                   MS. SWANBECK:  At this point I'd like

19       to introduce Exhibit 2, it's Tab 2 as Exhibit 2.

20                   (Lindsey Deposition Exhibit Number 2

21                   marked for identification.)

22

1      BY MS. SWANBECK:

2              Q      And do you see -- oh, sorry.

3              Do you see this -- from the first

4      page that this is a transcription of the deposition

5      of Dr. Juan Gilbert?

6              A      Yes.

7              Q      Are you aware that the Secretary of

8      State retained Dr. Gilbert as its election security

9      expert in this case?

10             A      Yes.

11             Q      So going to the next page, that is

12     numbered page 144 at the top --

13             A      Uh-huh.

14             Q      -- then going to Line 8.  The

15     question says:  "You're not disputing that experts

16     like Dr. Halderman and Dr. Appel have the necessary

17     computer science expertise to evaluate the security

18     of election systems like that used in Georgia,

19     right?"

20             And then the answer says:  "No, I do

21     not dispute that.  In fact, if I was asked the

22     questions, 'I have an election system.  We need

1      someone to evaluate the security of it to find

2      vulnerabilities,' at the top of my list would be

3      Appel, Halderman, that's where I would start."

4                    Do you see that?

5            A     Yes.

6                    Let me also add that as a litigator

7      when I see something like that, I'm reminded of

8      what my first boss said when he heard something

9      like this, "This is a bless-their-heart comment,

10     where you agree with certain expertise of an expert

11     and then you proceed to say that they're wrong in

12     their conclusions."

13           Q     Okay.  But are you aware that

14     Dr. Gilbert testified that Dr. Halderman was one of

15     two experts he would turn to for a cybersecurity

16     assessment?

17                    MR. DENTON:  Object to form.

18                    THE WITNESS:  I see the comment, yes.

19     BY MS. SWANBECK:

20           Q     But were you aware of it?

21           A     I --

22                    MR. DENTON:  Object to form.

```
 1                   THE WITNESS:  Was I aware of it
 2        before today, are you asking me?
 3        BY MS. SWANBECK:
 4              Q     Yes.
 5              A     Oh, yeah.
 6                   I did review the deposition of
 7        Dr. Johnston y'all took last week and I believe
 8        this was one of the exhibits.  Yes, I saw that.
 9              Q     And are you aware that Dr. Gilbert,
10        the State's expert, did not disagree with any of
11        Dr. Halderman's technical findings about the
12        vulnerabilities with the Dominion equipment?
13                   MR. DENTON:  Object to form.
14                   THE WITNESS:  I -- I guess I would
15        have to go back and read the entire deposition to
16        be able to give you an accurate answer to that.
17        BY MS. SWANBECK:
18              Q     Okay.  So is it fair to say that you
19        were not aware of that?
20              A     It would be --
21                   MR. DENTON:  Object to form.
22                   THE WITNESS:  -- fair to say that
```

Page 17

1          without reading the entire deposition, I can't give

2          you an answer to that one way or the other.

3          BY MS. SWANBECK:

4                    Q     It's a yes-or-no question.

5                    A     I understand, but -- but in terms of

6          a yes-or-no question, there's also a -- a

7          can-you-answer aspect of it.  I don't believe I can

8          answer it because I haven't read his entire

9          deposition.

10                   Q     Okay.

11                         MS. SWANBECK:  At this time I'll

12         introduce as Exhibit 3 Tab 3.

13                         (Lindsey Deposition Exhibit Number 3

14                          marked for identification.)

15         BY MS. SWANBECK:

16                   Q     Okay.  And looking at this first

17         page, do you see that's it's entitled,

18         "Vulnerabilities Affecting Dominion Voting Systems

19         ImageCast X"?

20                   A     I see that.  I see that it was

21         embargoed in the first draft.

22                   Q     Yes.

1               And then down at the left-hand

2       corner, you see it's issued by CISA, the

3       Cybersecurity and Infrastructure Security Agency?

4               A     Like I said, yes, I see it.  And I

5       see it's an early draft, yes.

6               Q     Have you seen this advisory before?

7               A     Yes.

8               Q     Please turn to the second to the last

9       page.  It says page 4 of 5 at the bottom left.

10              A     Yes.

11              Q     Do you see the Section 3 that says

12      "Mitigations"?

13              A     Yes.

14              Q     If you could go to the second to the

15      last bullet on that page that begins, "When

16      barcodes."

17              A     Yes, I see it.

18              Q     Could you read that and let me know

19      when you're finished?

20              A     I see it, yes.

21              Q     Were you aware that CISA drafted this

22      advisory recommending that where possible that BMD

 1          devices be configured to avoid the use for QR codes

 2          for tabulation?

 3                    MR. DENTON:  Object to form.

 4                    THE WITNESS:  I'm aware that this was

 5          an early draft in which it was included.  I'm also

 6          aware that in the final draft that's been

 7          published, and is online, this is not included

 8          within that, which raises a question as to why you

 9          are relying on this when this is not the final

10          draft from CISA.

11      BY MS. SWANBECK:

12               Q     But you're aware that this was in the

13          first draft?

14               A     I'm aware it was in the first draft.

15          I'm also aware that it was not included in the

16          final published draft, yes.

17                    MS. SWANBECK:  So I'll introduce as

18          Exhibit 4, Tab 4.

19                    (Lindsey Deposition Exhibit Number 4

20                     marked for identification.)

21                    THE WITNESS:  I might add I'm also

22          aware that you didn't inform Dr. Johnston that this

```
1         was not the final draft when you met with her.
2         BY MS. SWANBECK:
3                 Q     It says that it's an embargoed copy.
4         And it says it's not for public dissemination --
5                 A     I see.
6                 Q     -- it's an indication that it's not
7         public.
8                       But moving on to Exhibit 4, do you
9         see that this is the final version, the public --
10                A     Yes.
11                Q     -- version of this?
12                A     Yes.
13                Q     Could you turn to that same section,
14        Section 3 --
15                A     Sure.
16                Q     -- "Mitigations," where you see it
17        says "CISA recommends?"
18                A     Yeah.
19                Q     Could you read those bullet points
20        and let me know when you're done?
21                A     Yes, I'm ready.
22                Q     Were you aware of any of these
```

Page 21

1    recommendations?

2              A    Yes.

3              Q    Is that because you've read this

4    advisory previously?

5              A    Yes.

6              Q    Do you know if the State of Georgia

7    followed any of these recommendations to mitigate

8    the vulnerabilities identified in the advisory?

9              A    I am in the process now as a board

10   member seeking information about whether they have

11   responded to these or have come up with reasons why

12   it's not necessary.  That would be the best way I

13   could answer that.

14             Q    So you are actively seeking that

15   information of what -- what steps have been taken?

16             A    And -- or that matter -- yeah, what

17   need to be taken and whether or not -- and how

18   secure our system is given the questions that were

19   raised by CISA, yes.

20             Q    Could you say specifically so far

21   what the State of Georgia has done to mitigate each

22   of these vulnerabilities?

```
                                                        Page 22

  1              A      I -- I think it would be better to

  2       ask the State of Georgia that question.  I have

  3       been -- I've been talked -- I've had people talk in

  4       generalities to me regarding safeguards that they

  5       believe are sufficient.  I have asked for a hearing

  6       on this matter to -- for them to be able to address

  7       to reassure the people of Georgia that the system

  8       is secure.  That would be the best way I could

  9       answer that question.

 10              Q      And has that hearing been scheduled?

 11              A      Not yet.

 12              Q      Who have you asked for the hearing?

 13              A      The Chair.

 14              Q      Who did you talk to about the steps,

 15       or potential steps, for mitigation?

 16              A      I've talked with -- in addition to

 17       counsel, I have also talked with the state election

 18       head.  And I've talked to Gabe Sterling.  And I've

 19       also talked within the Secretary of State's office.

 20       I believe that's it.

 21              Q      Who's the state election head?

 22              A      You're going to find pretty quickly
```

Page 23

1      that I'm lousy on names.  And I apologize.  I know

2      them well and -- but as I'm sitting here today

3      being deposed, he's well known to both sides.  And

4      I do apologize, but I'm -- I'm lousy sometimes with

5      names.

6              Q     Is that Mr. Harvey?  Does that ring a

7      bell?

8              A     No, that's not Mr. Harvey.

9              Q     Or Blake Evans.

10             A     That's him.

11             Q     Blake Evans?

12             A     Yeah.  Thank you.  Sometimes I'm

13     going to need to phone a friend here when it comes

14     to names.

15             Q     Are you aware of any specific steps

16     the State has taken, other than generalities, can

17     you name any specific steps that the State has

18     taken on mitigation?

19             A     I would hesitate to try to say that

20     at this time.

21             Q     Why?

22             A     Because my memory may not be as good

Page 24

1      as it should be when it comes to technical matters.

2              Q      Are you satisfied that the State is

3      working to mitigate these vulnerabilities?

4              A      I'm satisfied as to their good-faith

5      efforts, yes.  Am I satisfied as to whether or not

6      we've done everything possible?  I reserve that

7      until I hear from everybody.

8              Q      Who else do you want to hear from?

9              A      Well, anybody that wants to provide

10     certain expertise.  Like I said, I would like to

11     see the report from the Dominion expert.  Once

12     again, I need to phone a friend here in terms of

13     the name of the company, which is also highly

14     recognized.  And I would like to look more fully at

15     some of the other experts in the case.  And -- and

16     I'll go back and look again at your expert's

17     deposition or your expert's report.

18             Q      You stated just now that you asked

19     for a hearing for the purpose of assuring the

20     public that the system is secure.  How --

21             A      Yes.

22             Q      -- can you believe that the system is

Page 25

1      secure?

2            A      That -- well, I guess, let me -- let

3      me be broader.  I want to have a hearing to -- to

4      for them -- for us to be able to assure, which will

5      include if any additional steps need to be taken.

6      That's probably the best way for me to answer that

7      question.

8            Q      Why do you need a hearing for that?

9            A      I think there's --

10           MR. DENTON:  Object to form.

11           THE WITNESS:  But, you know, as -- as

12     a board member, I'm aware that there's some --

13     there's some people within our state that are

14     concerned about voter integrity.  And I want to do

15     whatever it takes to -- to -- to have a safe system

16     and to have people have confidence in the system so

17     that as many people as possible vote in November.

18           Because that's part -- you know, if

19     you look at my responsibilities in the Code,

20     there are, I believe, ten that are listed.  One

21     of them is to provide public information to

22     voters regarding the system.  And that's part of

1        my duty.  And that's part of the things -- that's

2        one of the things that I take very seriously

3        because I don't want people to, because of

4        concerns, have the -- their vote turnout

5        suppressed.  That's not good for anybody.

6    BY MS. SWANBECK:

7            Q     So would -- so would you say that the

8        purpose of a public hearing is to -- to preserve

9        voter confidence in the system?

10           A     Do whatever it takes to preserve --

11       to -- to ensure voter confidence of as many people

12       as possible.

13           Q     Why is voter confidence important?

14           A     Well, we've seen what happens when

15       voters don't have confidence because false rumors

16       exists that it turns out sometimes gets lower.  And

17       that's not healthy in a democracy.

18                 MS. SWANBECK:  So I would like to

19       introduce Tab 5 as Exhibit 5.

20                 MS. CINO:  Are we going to 5?

21                 MS. SWANBECK:  Yes.

22

```
 1              (Lindsey Deposition Exhibit Number 5

 2               marked for identification.)

 3     BY MS. SWANBECK:

 4          Q     Okay.  Have you seen this article

 5     before?

 6          A     Yes.

 7          Q     And as you see in paragraph 3 on that

 8     first page it says that, "The GBI confirmed Tuesday

 9     that it has opened a criminal investigation

10     incident"?

11          A     I am.

12          Q     Do you know when that investigation

13     began?

14          A     I don't know specifically.  I do know

15     that in consultation with the Chair of our

16     committee, Judge Duffey, that he wanted to make the

17     referral to the GBI.  We talked about it in early

18     August before I went on an extended vacation.  And

19     he indicated that he was -- he wanted to do so.  I

20     indicated that I thought that was a good idea.

21               We talked about his consultation with

22     other board members that he attended to do.  So I
```

```
 1          would assume -- I know Judge Duffey made the

 2          recommendation to GBI.  I do not know if someone

 3          made that request before Judge Duffey did.

 4               Q     I'm sorry, could you repeat that?  I

 5          didn't catch that last sentence.

 6               A     I'm sorry.  What?

 7               Q     I'm sorry, I didn't hear your last

 8          sentence.

 9               A     I said I do not if someone before

10          Judge Duffey did.  I do know that Judge Duffey made

11          that referral sometime in early August.

12               Q     So are you saying that the State

13          Election Board through Duffey initiated the

14          investigation?

15               A     I'm saying --

16               MR. DENTON:  Object to form.

17               THE WITNESS:  -- made a request for

18          an investigation.  What I'm saying is I don't know

19          if somebody else before him did so.  But I do know

20          Judge Duffey did from our Board.

21     BY MS. SWANBECK:

22               Q     Do you know why it wasn't initiated
```

1     earlier?

2              A      I do not know.

3                     MR. DENTON:  Object to form.

4                     THE WITNESS:  Like I said, Counsel, I

5     do not know if -- if anyone made a recommendation

6     before Judge Duffey did.  I don't know one way or

7     the other.

8     BY MS. SWANBECK:

9              Q      Did the State Election Board task the

10    Secretary of State's office with investigating

11    potential and unauthorized access to Coffee County

12    voting equipment?

13             A      I know in the past they did.  And I

14    know that they are at the present our investigative

15    arm.  So I guess the answer to that would be yes,

16    because I -- I know that prior to my becoming a

17    board member, they were tasked with that.  And I

18    know that up until today, they are still our

19    investigative arm.

20                    We're looking, quite frankly, to --

21    to get some budget and guidance from the

22    legislature on that, but at the present moment

Page 30

```
1        they're our investigative arm.  So I would assume,

2        given the past recommendation from the Board, that

3        the Secretary of State's office would continue to

4        investigate, yes.

5               Q    If the Secretary of State's office is

6        the investigative arm, why didn't Chair Duffey

7        recommend or refer this to the GBI?

8               A    Because in his opinion -- and I might

9        also add in my opinion -- there clearly appeared to

10       be criminal activity -- or possible, possible,

11       criminal activity, which would -- which would put

12       them -- put the investigation clearly into the lap

13       of the GBI, and possibly other -- other criminal

14       investigative groups.

15              Q    You said that the SEB tasked the

16       Secretary of State's office with this investigation

17       before you were appointed.  Is that correct?

18              A    Yeah, that's my understanding, yeah.

19              Q    Do you know when they --

20              A    No, I don't.  I don't know.  That was

21       before my time.

22              Q    Do you know why they made that
```

Page 31

```
 1          referral?  What was the -- what initiated that

 2          referral?

 3                    A     I don't know the --

 4                          MR. DENTON:  Object to form.

 5                          THE WITNESS:  -- specifics on that

 6          either.  Like I said, it was before my time.

 7          BY MS. SWANBECK:

 8                    Q     You said that you were looking to

 9          hear from the legislature about the budget for the

10          investigation.  Why?

11                          MR. DENTON:  Object to form.

12                          THE WITNESS:  Not as to this.  I

13          probably garbled that a little bit.  And I

14          apologize, Counsel.  What we are looking to do is

15          enhance our budget.  The -- the legislature has

16          tasked the State Election Board to be a -- a more

17          independent body from the -- from the Secretary of

18          State's office, both in terms of its Chair, it is

19          now someone independent from the Secretary of

20          State's office, and other duties of the -- and

21          expected responsibilities under Senate Bill 202, I

22          believe.
```

1              Given that fact, we believe that we

2        need additional State resources to be able to be

3        a more independent body in line with the specific

4        intent of the legislature through its -- through

5        its passage of its legislation.

6        BY MS. SWANBECK:

7              Q     What's the basis of your belief that

8        the Secretary of State is an investigative arm of

9        the SEB?

10             A     It has additionally been so.  And

11       underneath the present resources available to the

12       State Election Board, it has been necessary for

13       them to continue to do so.

14             Q     Going back to what you were saying

15       about the SEB's independence.  In the SEB meeting

16       last Monday, Judge Duffey discussed the Board's

17       handling of the investigations and its relationship

18       with the Secretary of State.

19             A     Uh-huh.

20             Q     But the reports that the SEB receives

21       from the Secretary of State are recommendations to

22       the Board, not final decisions?

Page 33

```
 1            A      Correct.

 2            Q      From these statements, is it your

 3     understanding that going forward, the SEB will be

 4     more actively involved in investigations conducted

 5     by the Secretary of State?

 6                   MR. DENTON:   Object to form.

 7                   THE WITNESS:   It depends on the case,

 8     I guess I would say.

 9     BY MS. SWANBECK:

10            Q      Do you believe that the SEB should be

11     more actively involved in these investigations?

12            A      I believe that we should fulfill the

13     intent of the legislature under SB 202 to be a more

14     independent body.

15            Q      But do you believe that the SEB

16     should be more actively involved in investigations?

17            A      Well, if we're going to be more

18     independent, that implies greater activity, yes,

19     Counsel.

20            Q      Is part of the reason for this

21     greater involvement the fact that the Secretary of

22     State's office didn't uncover what happened in
```

Page 34

```
 1        Coffee County and publicly claimed that the
 2        incident didn't happen?
 3                A     Well, that's --
 4                      MR. DENTON:  Object to form.
 5                      THE WITNESS:  No, that's not --
 6        you -- you're conflating apples and oranges.  We
 7        are -- I am -- we're trying to fulfill our mission
 8        as set out by the legislature in SB 202, which was
 9        independent from the Coffee County issue.
10        BY MS. SWANBECK:
11                Q     Do you know why the legislature made
12        that change in SB 202?
13                A     Counsel, I don't know if you know my
14        background, but my background, I served ten years
15        in the legislature.  And I know it's always
16        somewhat doubtful to question what 180 members' and
17        56 senators' intent was to try to come up with one
18        answer.
19                      I think, in general, though, that --
20        leaving that comment aside, I apologize --
21        basically what they wanted was a more -- a more
22        independent agency overseeing it.  And, you know,
```

Page 35

1          for various reasons.  Different legislatures had

2          different reasons in my talking with them.

3                    Q     Have you asked the Secretary of State

4          for funding of independent investigations?

5                    A     We've asked for -- well, we've asked

6          for them to provide us with funding for various

7          investigations, but, more specifically, we've asked

8          them to conduct investigations.  And, quite

9          frankly, I haven't had any real serious issue with

10         any of the investigations that I've seen that

11         they've conducted to date.

12                   Q     Judge Duffey, in the meeting last

13         Monday, mentioned that there had been times where

14         he had reviewed the results of their investigations

15         and have asked for more information or for more

16         work to be done.

17                         Is that your understanding that

18         sometimes the investigation --

19                   A     Yeah.

20                   Q     -- are more --

21                   A     Yeah.  And --

22                         MR. DENTON:  Object to form.

```
 1                    THE WITNESS:  -- exactly what I would
 2        assume that we would do.  And there are times in
 3        which I have asked for additional information.  I
 4        think one of the cases -- I'm not sure if I asked
 5        for additional information or I asked for
 6        additional guidance.  But yes, we have from time to
 7        time asked for them to go back and do additional
 8        investigations.
 9                    We have at times asked that based
10        on the investigation that's -- that's been done
11        by the Secretary of State's office that the
12        Attorney General do an additional investigation.
13        And we have, as shown herein with the Coffee
14        County case, have at times asked that the GBI
15        pick up and do additional investigation.
16                    So we have asked for an additional
17        investigation to done either by the Secretary of
18        State's office, the Attorney General's office or
19        the -- are the GBI, from time to time.
20        BY MS. SWANBECK:
21             Q    What do you view as the role of the
22        Attorney General in these investigations as opposed
```

Page 37

1          to the role of the Secretary of State's office?

2                        MR. DENTON:  Object to form.

3                        THE WITNESS:  A, there are -- they

4          are our attorneys; and, B, they are generally

5          involved in the civil side of potential penalties

6          that we are concerned about.  GBI, when we think

7          there's a possible criminal activity, we send it to

8          the GBI, when we think there are possible civil

9          penalties related to an incident, we send it to the

10         Attorney General for additional investigation and

11         recommendations, and whenever necessary,

12         prosecution.

13         BY MS. SWANBECK:

14                  Q     Has the Attorney General had any

15         involvement in the Coffee County investigation?

16                        MR. DENTON:  Object to form.

17                        And I'd certainly instruct you not

18         to answer to the extent that your answer would

19         require you to disclosure attorney-client

20         privileged communications.  If you can answer

21         without disclosing privileged information, you

22         may answer.

Page 38

```
 1                    THE WITNESS:  I don't believe I can
 2        without disclosing privileged information.
 3        BY MS. SWANBECK:
 4               Q     Has the Secretary -- or, sorry.
 5                    Has the State Election Board asked
 6        either the Secretary of State's office or the
 7        Attorney General to do more investigation in the
 8        Coffee County case?
 9                    MR. DENTON:  Object to form.
10                    And the same instruction on
11        privilege.
12                    THE WITNESS:  In terms of publicly,
13        no.  No.  We have instead, like I said through
14        Judge Duffey, asked GBI to do so.
15        BY MS. SWANBECK:
16               Q     You said just now that you haven't
17        seen any serious issues with the investigations by
18        the Secretary of State's office to date.  Does that
19        include whatever investigation the Secretary of
20        State conducted into the breach of the voting
21        system into Coffee County?
22                    MR. DENTON:  Object to form.
```

Page 39

1                    THE WITNESS:  I haven't seen a report

2        from the Secretary of State's office on Coffee

3        County.  They haven't made a public report to us

4        since I've been on the Board.

5        BY MS. SWANBECK:

6              Q     What insight do you have into their

7        investigation?

8              A     None.  As a general rule, I --

9        once -- once they launch an investigation, I wait

10       for their conclusions, both -- both as to any -- as

11       to any matter.

12             Q     So you're waiting for their

13       conclusion in the case of Coffee County?

14             A     Yeah.  And, quite frankly, I'm

15       probably more urgently waiting on the GBI, because

16       I do agree with Judge Duffey, while there is a --

17       that there is a possible criminal aspect to that

18       activity.

19             Q     Are you aware that Gabe Sterling

20       publicly announced in April of 2022 that the

21       Secretary of State investigated the Coffee County

22       breach and concluded that the breach didn't happen?

Page 40

```
 1                      MR. DENTON:  Object to form.

 2                      THE WITNESS:  As to the specifics of

 3          what Mr. Sterling said, I cannot testify to.  I

 4          don't -- I'd have to go back and look.

 5                      MS. SWANBECK:  So we're going to

 6          introduce the next exhibit, 15, which is a video.

 7                  (Lindsey Deposition Exhibit Number 6

 8                    marked for identification.)

 9                      MR. DENTON:  Ms. Swanbeck, will this

10          be Exhibit 6?

11                      MS. SWANBECK:  Yes.  I'm sorry, it

12          will be Exhibit 6.

13                      MS. CINO:  Are you going to do a

14          screen share?

15                      MS. SWANBECK:  Yes.

16                  (Video being played.)

17                      MS. CINO:  We're not getting any

18          sound.

19                      VIDEOGRAPHER:  No sound, Counselor,

20          sorry.

21                      MR. DENTON:  I'll just note while

22          we're working on that, that it looks like the file
```

```
                                                    Page 41
 1          of this video is entitled, "15 Video Clip
 2          (Sterling)."  It looks like a 12-second clip.
 3                       MS. SWANBECK:  Yes, it's in the
 4          marked exhibit folder.  Can you play it on your
 5          end?
 6                       VERITEXT CONCIERGE:  Counsel, I have
 7          sound if you'd like me to screen share it as well.
 8                       MS. SWANBECK:  That works.
 9                       VERITEXT CONCIERGE:  This is the
10          concierge.  Please stand by.
11                   (Video being played.)
12                       THE WITNESS:  I can't hear sound.
13                       MR. DENTON:  Ms. Swanbeck, we're
14          still not getting sound here in the room.
15                       VERITEXT CONCIERGE:  No one was able
16          to hear that?
17                       MR. DENTON:  We could barely hear it
18          at the very beginning.
19                       MS. SWANBECK:  Jess, can you play it
20          in -- in the room?
21                       MS. CINO:  Oh, let me see what I can
22          do.
```

Page 42

1                    MS. SWANBECK:  Can we go off the

2        record for a minute, please?

3                    VIDEOGRAPHER:  The time is 10:15 a.m.

4        We are off video record.

5              (Recess from 10:15 a.m. to 10:16 a.m.)

6                    VIDEOGRAPHER:  The time is 10:16 a.m.

7        We are back on video record.

8                    MS. CINO:  I'm going to hit play.

9              (Video being played.)

10       BY MS. SWANBECK:

11             Q    Did you hear that Gabe Sterling, from

12       the Secretary of State's office, said that the

13       breach didn't happen, correct?

14                   MR. DENTON:  Object to form.

15                   THE WITNESS:  When -- when was -- if

16       you don't mind me asking, Counsel, when was this?

17       BY MS. SWANBECK:

18             Q    It looks like it was from this past

19       April.

20             A    Okay.  You know, we -- we hope -- we

21       certainly know that a breach did happen.  We know

22       that people went to Coffee County.  We know that

```
 1        folks in Coffee County allowed certain people into
 2        their office that they should not have.  I don't
 3        know the context of this, nor do I know what the
 4        full statement of Gabe was other than these 12
 5        seconds.
 6                    I will also say that I've known Gabe
 7        for over 20 years, and I've dealt with him in
 8        multiple capacities in -- in different roles he's
 9        had.  I believe him to be a good and honorable
10        person.  But I would -- I do -- I will ask him
11        about this.
12                    I will also say that I've talked to
13        him subsequent to April, and that he has talked to
14        me about the breach, what took place in Coffee
15        County, and -- and that he and the Secretary of
16        State's office are very upset about that.  So yes,
17        yeah.  What he said on this, based on what we now
18        know, is not accurate.  But does that mean that I
19        think that Gabe was hiding anything?  No.  Based on
20        my 20-year plus -- my probably 25-year experience
21        with Gabe, that would be totally out of character
22        for him.
```

Page 44

1      BY MS. SWANBECK:

2             Q     And what did you -- what did you talk

3      with Gabe Sterling about related to the breach?

4             A     We talked in general terms about what

5      was and was not done down there.  We talked about

6      what we know in terms of who -- who sent the people

7      and who went.  Probably spent more time talking

8      about who sent the people than who went.  That --

9      and that's generally it.

10            Q     What specifically do you -- did you

11     talk about, do you remember?

12            A     Like I said, we talked about based on

13     what we know now, who sent them.  It was apparently

14     an attorney for Former President Trump.  We know

15     the organization that went down.  And we know in

16     some generalities what they did or did not look at,

17     in terms of different parts of the election system.

18     That was generally it.

19            Q     And which attorney was that that sent

20     them?

21            A     My understanding it was -- what's her

22     name, Sidney Powersome -- Sidney -- what was her

Page 45

1      name?  I need a phone a friend here.  Sidney,

2      whatever her name is, that released the Kraken

3      attorney.

4                Q    Okay.  Sidney Powell?

5                A    Sidney Powell.  Thank you again.

6      Thank you for being my friend on that one.

7                Q    Sure.

8                     And do you recall what team that was

9      that was sent down?

10               A    Off the top of my head, no.  I know

11     it was somebody out of Atlanta, who then turned

12     around and billed them for, like, $29,000 and flew

13     on a private plane down to Coffee County.  I think

14     it's in the news report as a matter of fact.

15     SullivanStrickler, according to the news report.

16               Q    Do you know how the Secretary of

17     State's office concluded that the breach didn't

18     happen, as Mr. Sterling reported in April?

19                    MR. DENTON:  Object to form.

20                    THE WITNESS:  I do not know.  I do

21     not know if someone from Coffee County lied to them

22     or not.  It may very well have been the case.

Page 46

1      BY MS. SWANBECK:

2              Q     Does --

3              A     People who do wrongdoing often lie

4      about having done wrongdoing.  That's been my

5      experience as an attorney.  But that's simply

6      speculation on my part.

7              Q     Does it concern you that the

8      Secretary of State reached that conclusion?

9                    MR. DENTON:  Object to form.

10                   THE WITNESS:  No.  I'm more concerned

11     with the fact that it took place and that people

12     thought they had a right to do so.  That's my

13     primary concern here, Counsel.

14     BY MS. SWANBECK:

15             Q     And do you know if the Secretary of

16     State's office talked to anybody in reaching that

17     conclusion?

18                   MR. DENTON:  Object to form.

19                   THE WITNESS:  Like I said, no, I

20     don't know, Counsel.  Like I said, my primary focus

21     has been on what actually did occur and -- and --

22     and in supporting my Chair when he made a

Page 47

1       recommendation to the GBI.  That's been my primary

2       concern.

3       BY MS. SWANBECK:

4              Q     Have you asked Mr. Sterling why the

5       Secretary of State's office has never interviewed

6       anyone involved with the Coffee County breach?

7              A     I have not.

8              Q     Why not?

9              A     Because I've been more focused on

10      getting the GBI to do so.

11             Q     What is your understanding of what

12      was and what wasn't looked at in Coffee County?

13                    MR. DENTON:  Object to form.

14                    THE WITNESS:  Once again, that's

15      certain -- that's certain technical aspects that

16      are probably outside of my expertise, but I do

17      understand there were certain aspects of the 2020

18      election that was copied and certain data

19      regarding -- that was online regarding that.  And

20      I -- and I am aware that there was certain software

21      and certain equipment that was not touched, but I

22      would have to sort of defer that back to folks who

1        have greater knowledge than I as to the details.

2        BY MS. SWANBECK:

3                Q     What software do you believe was not

4        touched?

5                A     I'm not going to be able to get into

6        technical --

7                        MR. DENTON:  Object to form.

8                        THE WITNESS:  Thank you, Counsel.

9        I'll go a little slower next time.

10                       Like I said, I think that it

11       centered on the 2020 election, dealing with the

12       candidates on the ballot.  That's my

13       understanding.  But that's just a broad

14       statement, Counselor.  I'd have to sort of defer

15       back to other folks who have more on-the-ground

16       knowledge.

17                       MS. SWANBECK:  If it's all right with

18       everyone, at this point I'd like to take a break

19       and go off the record for a few minutes.

20                       VIDEOGRAPHER:  The time is 10:23 a.m.

21       We are off video record.

22                       (Recess from 10:23 a.m. to 10:34 a.m.)

1              VIDEOGRAPHER:  The time is 10:34 a.m.

2      We are back on video record.

3      BY MS. SWANBECK:

4              Q     You said earlier that you had spoken

5      to Gabe Sterling about the Coffee County

6      investigation.  Can you state specifically what you

7      talked to -- with him about?

8              A     Well, I think we've been over it, but

9      basically two -- two aspects:  Number one, we

10     discussed the fact that we -- we simply confirmed

11     what was in the newspaper report, that Sidney

12     Powell had authorized a local tech group to go down

13     to Coffee County and utilize the -- at least some

14     folks from the election board or someone -- some

15     folks from the election division down there to have

16     access to the equipment.  We talked about that.  We

17     talked about in general terms that there were some

18     things that were copied and some things that they

19     didn't have access to.

20             Q     And what is your understanding of

21     what they had access to?

22             A     From my -- as I'm sitting here today,

1          it was generally they had access to materials

2          dealing specifically with the 2020 election.

3                    Q     Just the 2020 election?

4                    A     Yes.

5                          I'm not sure if they also had access

6          to the 2021 senate runoffs or not.  I'm not -- I

7          don't -- but I don't recall that one way or the

8          other.

9                    Q     Are you aware that they also had

10         access to the EMS server data and the software from

11         the voting equipment?

12                         MR. DENTON:  Object to form.

13                         THE WITNESS:  I can't say that one

14         way or the other.  I'd have to go back and look.

15         BY MS. SWANBECK:

16                    Q     If that were true, would you be

17         worried that that would have an affect on the

18         upcoming elections?

19                         MR. DENTON:  Object to form.

20                         THE WITNESS:  If that were true, I

21         would want to hear from various experts as to

22         whether or not it would have a problem with the

1      elections.  And I would have to -- and I would also

2      want to hear what would or would not be needed

3      to -- to protect the integrity of the system.

4      BY MS. SWANBECK:

5          Q     Are you concerned that having that

6      software out on the internet could be used to

7      exploit future elections?

8                  MR. DENTON:  Object to form.

9                  THE WITNESS:  It depends on what was

10     put on the internet.  It depends on how it could be

11     utilized.  It depends on what kind of -- what kind

12     of access would be necessary for someone to -- to

13     put, for instance, malware on.  And it would be

14     necessary for me to know what safeguards would be

15     put in existence to keep that from happening.

16                  Keep in mind, Counselor, that every

17     elections -- form of elections have

18     vulnerabilities.  The question is whether or not

19     there are safeguards in place to protect against

20     those vulnerabilities, and also to detect whether

21     or not those vulnerabilities are being exploited.

22                  CISA issued an excellent report,

Page 52

1     for instance, at the end of May in which they

2     raised just this point going, "Every -- every

3     voting system has vulnerabilities, the question

4     is whether or not you take the necessary steps to

5     protect against them."

6     BY MS. SWANBECK:

7          Q     Every system has vulnerabilities, but

8     do you agree that having the proprietary software

9     for an election system out on the internet creates

10    unique vulnerabilities?

11              MR. DENTON:  Object to form.

12              THE WITNESS:  I think I've answered

13    the question, Counselor.

14    BY MS. SWANBECK:

15         Q     You explained that every system has

16    vulnerabilities, but my question was whether this

17    breach creates unique vulnerabilities?

18         A     To walk back through the same

19    question again, I believe it to be the same

20    question again, the question is what exactly was

21    the software?  What exactly -- what exactly it

22    could possibly lead to in terms of exploitation?

1    What exactly safeguards are in place in order to

2    keep that exploitation from taking place?  And what

3    exactly was in place to be able to detect what that

4    exploitation does?  Those are the questions that I

5    have.

6          Q    Given that the November elections are

7    coming up pretty quickly, how will you evaluate

8    those safeguards that you've been describing in

9    time to determine whether they are enough to secure

10   the election?

11         A    Well, I'm -- I'm working on it.  And,

12   quite frankly, the Secretary of State's office, I

13   know, is working on it.  And -- and, quite frankly,

14   I hope that you guys are working on it.  So between

15   all of us, I hope that we can show confidence to

16   the -- to the people that the 2022 election is --

17   the results will be accurate.

18         Q    Are you aware of any specific steps

19   that have been taken to address these safeguards?

20         A    I know that --

21              MR. DENTON:  Object to form.

22              THE WITNESS:  I'm sorry.  Thank you.

1          I know -- I know in general terms

2     what -- what has been done in the past in terms

3     of checking and rechecking and in limiting access

4     to the system, but I do want to see more

5     information, yes.  I want to see more information

6     publicized.

7     BY MS. SWANBECK:

8          Q     You mentioned among those safeguards

9     various aspects of physical security.  Doesn't the

10    Coffee County breach suggest that those safeguards

11    are not adequate?

12         A     It indicates that that particular

13    breach is inadequate.  It will protect -- perhaps

14    we need something, our discussions with local --

15    local counties, yes.

16         Q     What would you like to see changed in

17    terms of safeguards that are maintained by the

18    counties?

19         A     Well, with -- a lot of it is simply

20    following the existing laws, because what we have

21    here is a -- in my opinion, a clear breach of

22    existing law.  Making it very clear that any such

1          action taking place in the future will be met

2          with -- with -- with possible criminal sanctions.

3          But that's my most immediate thought.

4               Q     What is the SEB doing to ensure that

5          counties follow the law in the future?

6               A     Well, right now we've -- we've

7          launched a criminal investigation.  Deterrence is

8          an important aspect of -- of any kind of

9          enforcement.

10              Q     Going back to your conversations with

11         Gabe Sterling.  Did he mention any conversations

12         that the Secretary of State's office had with

13         anyone from Coffee County about the breach?

14              A     No, that wasn't the discussion.

15              Q     Are you aware that he hadn't -- or

16         that he hadn't talked to anyone in Coffee County

17         about the breach?

18                    MR. DENTON:  Object to form.

19                    THE WITNESS:  I'm not aware one way

20         or the other.  Whether he or anyone else, I'm not

21         aware one way or the other.

22

Page 56

BY MS. SWANBECK:

      Q    Are you concerned about the fact that he didn't talk to anyone about the breach in Coffee County?

      MR. DENTON:  Object to form.

      THE WITNESS:  Well, since I don't know whether or not that's accurate or not, then, no, at this point.  But I'm -- like I said, what I'm most concerned about is seeing too that the GBI conducts its investigation.

BY MS. SWANBECK:

      Q    But at that point when the Secretary of State's office had been put on notice that there was a breach in Coffee County, at least as of February of this year, you're not concerned that they didn't talk to anyone in Coffee County, the Secretary of State didn't talk to anyone?

      A    I'm not --

      MR. DENTON:  Object to form.

      THE WITNESS:  I'm not aware of that one way or the other, Counsel.

Page 57

1      BY MS. SWANBECK:

2            Q     If they hadn't talked to anyone in

3      Coffee County, would that bother you?

4                 MR. DENTON:  Object to form.

5                 THE WITNESS:  Same answer.  I would

6      like to know more about what -- what they did do.

7      But like I said, my primary concern at this point

8      in moving forward was seeing to it that the

9      criminal investigation moves forward and that we

10     take whatever steps are necessary to -- to secure

11     the election in 2022.

12     BY MS. SWANBECK:

13           Q     So I don't believe you answered my

14     question.

15                 So to repeat.  If they didn't talk to

16     anyone for months after being put on notice that

17     there was a breach in Coffee County, would that

18     concern you?

19                 MR. DENTON:  Same objection.

20                 THE WITNESS:  Thank you.

21                 First off, Counselor, I'd like to

22     know what information they had before, in terms

1          of possible breach.  I'd like to know what
2          information people held and -- and did not turn
3          over to the Secretary of State's office to assist
4          them further in doing the investigation.  I would
5          like to know -- I would like to know what they
6          did once they got that additional information.  I
7          would like to know -- yeah, I mean, those --
8          those are all questions that I would like to have
9          answered, yeah.
10                    But, like I said, right now my
11         primary focus is on, one, the criminal
12         investigation of Coffee County.  Once that's
13         concluded, we -- the Secretary -- the State
14         Election Board will probably have to take
15         additional -- some civil action, when it comes to
16         Coffee County, possibly.  And also making sure of
17         the 2022 election.  That's my primary concern at
18         this point, Counselor.
19         BY MS. SWANBECK:
20                    Q    What -- what additional information
21         are you referring to in Coffee County?
22                    MR. DENTON:  Object to form.

```
 1                    THE WITNESS:  I'm not sure if I
 2          understand your question.
 3          BY MS. SWANBECK:
 4               Q     You said that you'd be curious to
 5          know what additional information they received.
 6          What -- what additional information are you
 7          referring to?
 8                    Is that something that you spoke
 9          about with --
10               A     Yeah, you asked -- you asked what I
11          would like to know.  And yes, I am sort of curious
12          as to -- as to various aspects of what took place
13          before now, when it comes to investigations.  When
14          it comes to not just what the Secretary of State's
15          office knew, but what other people also knew.  What
16          information did people have that they were possibly
17          holding on to and not -- not giving it to the
18          Secretary of State's office.  Why did the Secretary
19          of State's office -- you know, these are -- these
20          are -- these are issues that I'm -- that I'm
21          curious about.
22                    But, like I said, within my
```

Page 60

```
 1          bandwidth, my primary concern is -- is -- is Coffee
 2          County, what did happen and what we need to be
 3          doing moving forward.  That's my primary concern at
 4          this point.
 5               Q     And earlier you said that you had no
 6          concerns in general about these Secretary of
 7          States' investigative actions thus far based on the
 8          reports that you had seen?
 9               A     Yeah.  They -- based on what I've
10          seen produced, and the hearings that I've -- that
11          I've been a part of it -- I've been a part of
12          three -- I have generally been impressed with the
13          thoroughness of the -- of the investigators.
14          Although, as with any decision-making body, there
15          are times in which we, A, want them to do more; B,
16          believe that the Attorney General needs to --
17          office needs to take place or see that the GBI
18          does.  But have I generally been -- been impressed
19          with the investigators in particular?  Yes.
20               Q     Okay.  And you said that you had not
21          seen a report yet related to Coffee County.  Is
22          that correct?
```

Page 61

```
 1              A      No, not until they've reached a

 2       conclusion.

 3              Q      So is it fair to say that your

 4       confidence in the Secretary of State's

 5       investigative abilities do not include their

 6       investigation into Coffee County?

 7                    MR. DENTON:  Object to form.

 8                    THE WITNESS:  Well, given the fact

 9       that I haven't seen what they've done yet, yes,

10       that's correct.  I'm basing it on the

11       investigations that I've heard to date.  I believe,

12       somewhere around -- somewhere around 85 to 100

13       cases that I've heard over the last three meetings.

14       I believe that they've done a thorough job in those

15       matters.  But no, I have no opinion regarding --

16       one way or the other, regarding their investigation

17       in Coffee County.

18                    MS. SWANBECK:  I'd like to introduce

19       the next exhibit, this will be Tab 16, which I

20       believe is Exhibit 7.

21                    (Lindsey Deposition Exhibit Number 7

22                     marked for identification.)
```

```
 1                      MS. CINO:  Uh-huh.

 2        BY MS. SWANBECK:

 3                 Q    Can you go to the second full page

 4        after the slip sheet?

 5                      MR. DENTON:  Sorry, Ms. Swanbeck,

 6        you -- you cut out right there at the end.

 7                      MS. SWANBECK:  I'm sorry.

 8        BY MS. SWANBECK:

 9                 Q    Mr. Lindsey, can you flip the page to

10        the e-mail that's after the slip sheet page?  And

11        can you read this e-mail and let me know when

12        you're done?

13                 A    Okay.  I see it.

14                 Q    Were you aware that James Barnes, the

15        former Coffee County elections supervisor, found

16        Doug Logan's Cyber Ninjas business card attached to

17        the computer of the previous supervisor of the

18        election board?

19                      MR. DENTON:  Object to form.

20                      THE WITNESS:  I think I heard about

21        this before, Counsel, but I'm not -- I'm not for

22        sure where, but yes.
```

Page 63

1        BY MS. SWANBECK:

2             Q     Are you familiar with Doug Logan or

3        his organization, Cyber Ninjas?

4             A     Just what I read regarding, you know,

5        Arizona.  And I believe there's been at least some

6        newspaper articles involving their involvement here

7        in Georgia.

8             Q     What have you read regarding their

9        activities in Arizona?

10            A     Just that they -- they were brought

11       in, if I recall, by the Arizona Senate Republicans

12       to do a full audit/recount of the -- of Maricopa

13       County, I think it was.

14            Q     And what have you read about their

15       activities in Georgia?

16            A     I'm not exactly sure, but I -- I

17       believe that the folks, if I -- if I -- if I'm

18       recalling this correctly, SullivanStrickler --

19       somehow -- somehow they looked at some of the

20       material that was brought out of Coffee County.

21       That's all I remember.

22            Q     Are you aware that Doug Logan

1      accompanied SullivanStrickler to copy the Coffee

2      County data?

3             A     No, but I certainly hope that the GBI

4      is.

5             Q     Going back to --

6             A     I would assume that they are.  Let me

7      answer that again.  I didn't mean to -- to infer

8      that they might not.

9             Q     Would it concern you if they weren't?

10            A     Would it concern me if they were

11     or --

12            Q     Weren't?  Would it concern you if

13     they were not?

14            A     -- or weren't?

15                  MR. DENTON:  Object to form.

16                  THE WITNESS:  It would -- it would

17     surprise me because I believe that they would.  I

18     mean, it's been pretty widely published.  And my

19     experience with the GBI is that they're a pretty

20     thorough bunch, so I -- I would assume that they

21     would.

22

1   BY MS. SWANBECK:

2           Q     Okay.  Going back to the first page

3   of the exhibit.  To that second e-mail on that

4   page, do you see it's from Chris Harvey, the

5   elections director of Georgia to --

6           A     Uh-huh.

7           Q     -- then-Coffee County Election

8   Supervisor, James Barnes.  And a little ways down

9   in that e-mail he says, "I have let our

10  investigations division and CES know and they might

11  follow up with you."

12                Do you see that?

13          A     Yes.

14          Q     And then the -- the top e-mail on the

15  page -- well, sorry strike that.

16                So still on the second e-mail, do you

17  see that Chris Harvey has cc'd Frances Watson, the

18  head of the Secretary of State's investigative unit

19  at the time?

20          A     Uh-huh.  Yes, I see that.

21          Q     Do you see the top e-mail where she

22  says, "Can you contact the County and verify what

1      if any contacts Cyber Ninjas had with any election

2      equipment?"

3               A     Yes.

4               Q     Do you know whether that contact with

5      the County ever occurred?

6               A     I do not.

7               Q     Why not?

8               A     Because it's an ongoing

9      investigation, and our -- our active role comes

10     once the investigation is completed, they come to

11     us.

12              Q     Do you see that that e-mail from

13     Frances Watson is dated May 11, 2021?

14              A     Yes, I see that.

15              Q     So that's over a -- well over a year

16     ago.  Does it concern you that no one from the

17     Secretary of State's office ever contacted anyone

18     in Coffee County at that time?

19                    MR. DENTON:  Object to form.

20                    THE WITNESS:  I don't know if you're

21     commenting -- if your -- if your statement is true

22     or not, Counsel.

Page 67

1      BY MS. SWANBECK:

2              Q     Would it concern you if they hadn't

3      contacted anyone from Coffee County about the

4      possible Cyber Ninjas' contact?

5                   MR. DENTON:  Object to form.

6                   THE WITNESS:  It would interest me.

7      I'd like to know why, yeah.  At some point in the

8      game, yeah.  Particularly when they -- you know,

9      when they come to us with a completed

10     investigation, that is certainly a question that I

11     will ask as to whether or not the claim that you

12     just made is accurate or not.  I do -- that is a

13     question that I will ask.

14     BY MS. SWANBECK:

15             Q     Why would you want to ask that?

16             A     Because I want to know the

17     thoroughness of their investigation.  And, you

18     know, we -- we -- these are the sort of questions

19     that we ask, Counsel, when -- when they do bring to

20     us with their conclusions.  We do walk through

21     their -- with them their investigations.  And that

22     is something that I will -- I will tuck away and I

Page 68

1      do intend to ask once -- once the time is

2      appropriate.

3                 Q      Thank you.

4                 A      But like I said, I don't know if --

5      if -- if -- if the statement you made is true or

6      not.

7                 Q      Do you know if the Secretary of State

8      investigator ever contacted anybody at Coffee

9      County?

10                     MR. DENTON:  Object to form.

11                     THE WITNESS:  I think -- I think

12      we've answered that a few times, Counselor.  No, I

13      don't know one way or the other.

14                     MS. SWANBECK:  Then I'll introduce as

15      the next exhibit Tab 47, as Exhibit 8.

16                     (Lindsey Deposition Exhibit Number 8

17                      marked for identification.) yes, sir

18                     MS. CINO:  Did you say 47?

19                     MS. SWANBECK:  Yes.

20                     MS. CINO:  Okay.  Hang on just a

21      second.  There you go.

22

1       BY MS. SWANBECK:

2            Q     And you see from this top page that

3       it's the deposition transcript for James Barnes?

4            A     Yes.

5            Q     And from that last exhibit, you'll

6       remember that he was the former election supervisor

7       for Coffee County.

8            A     Yes.

9            Q     If you turn to the next full page

10      that's numbered 164 at the top right.

11           A     Uh-huh.

12           Q     Go down to Line 8, you'll see that

13      he -- well, sorry, strike that.

14                 If you'll see on Page 163, Line 22,

15      beginning, "And so Mr. Harvey here writes back four

16      days later."  And he quotes from that last exhibit

17      that we just discussed.  Do you see that?

18           A     I see that.

19           Q     So going to Page 164, Line 8, James

20      Barnes says, "I never heard anything back from

21      anybody at the State."

22                 And then the question continues.  "So

1    no further communication from anyone from the State

2    about the concern that Mr. Harvey notes here about

3    whether there might have been access to any of the

4    equipment at Coffee County?"  And James Barnes

5    responds, "No, I never heard anything else back

6    from them."

7              Do you see that?

8         A    I see that.

9         Q    Does that concern you that no one

10   ever followed up with James Barnes?

11              MR. DENTON:  Object to form.

12              THE WITNESS:  It raises questions.

13   I'd like to -- and it raises questions as to

14   whether or not they utilized some other means of

15   determining what was going on or not.  But it

16   does -- it does raise questions, yeah.

17   BY MS. SWANBECK:

18         Q    Mr. Barnes is the one who reported

19   finding the business card attached to his computer

20   that had belonged to the previous election

21   supervisor.  Wouldn't you expect that they would

22   follow up with the person who had found that card?

1              MR. DENTON:  Object to form.

2              THE WITNESS:  Well, like I said, it

3     raises -- it raises a question, Counselor, you

4     know.  But whether or not they utilized something

5     else, whether or not they -- they considered

6     Mr. Barnes to be a person to be suspicious so they

7     wouldn't talk to someone else, I don't know.  But

8     it does raise a question.  I'm not prepared to make

9     a conclusion, but it does raise a question.

10             MS. SWANBECK:  So I will introduce at

11    this point Tab 50 as the next exhibit, Exhibit 9.

12             (Lindsey Deposition Exhibit Number 9

13              marked for identification.)

14    BY MS. SWANBECK:

15             Q    And you see that this is a text

16    thread that's --

17             A    Yeah, it's mine.  Yes, it's mine.

18             Q    Okay.  And so just to -- you sent

19    this text at the top here?

20             A    Yes.

21             Q    Who is the Amber that this text

22    conversation is with?

Page 72

```
 1              A      Amber McReynolds.

 2              Q      And is that Amber McReynolds the

 3      former Denver elections official?

 4              A      Yes.

 5              Q      And in your text at the top there you

 6      say, "I would appreciate any thoughts you may have

 7      on this and whether this compromises the State's

 8      election voting."  And then you linked to that the

 9      Atlanta Journal Constitution article that we

10      covered earlier.

11              A      Yes.

12              Q      Why did you want Ms. McReynolds'

13      thoughts on whether this compromises the State's

14      election security?

15              A      Because I'm reaching out to multiple

16      people to ask that same question.  And I know Amber

17      from my past dealings with her.  And so I -- like

18      I -- the same reason that I reached out to

19      Sterling, the same reason that I reached out --

20      I -- I've heard from others in the Secretary of

21      State's office, same reason that I will ask this

22      same sort of question to others.
```

1          Q     Why specifically did you choose to

2     consult with Ms. McReynolds?

3                MR. DENTON:  Object to form.

4                THE WITNESS:  Ms. McReynolds and I

5     have worked together in the past and I know her,

6     and I have -- I have respect for her.

7     BY MS. SWANBECK:

8          Q     What did you work on in the past?

9          A     I represented her in the past.  I

10    represented her organization in the past.

11         Q     Which organization is that?

12         A     Vote At Home.

13         Q     So did your representation of her

14    involve vote-by-mail issues?

15         A     No.  It dealt more with voter access,

16    dealing with the proposals in the 2020 and 2021

17    legislative cycle.

18         Q     What voter access issues?

19         A     Well, we had SB 202, I guess -- is it

20    202 or 201?  I'm suddenly -- the Bill that got

21    passed last -- in 2021.  She -- she has certain

22    expertise when it comes to what does and does not

1     work, when it comes to voter access versus voter

2     security.  And she wanted to testify in Georgia,

3     and I -- I introduced her to various legislatures

4     and I help set up her testimony.

5          Q    Do you consider her an expert in

6     election security?

7          A    I'm not so sure -- well, I'd have to

8     ask her if she considers herself an expert.  I

9     consider herself -- her knowledgeable, and -- and I

10    consider her being a good resource.  Whether or not

11    she is an expert or not, I wouldn't -- it depends

12    on -- it depends on the issue and the topic.

13         Q    Is it fair to say that you respect

14    her opinion on election security issues?

15         A    Yes.  It would be fair to say that I

16    think -- we mentioned a whole host of -- yes.  The

17    answer is yes.  And -- and I -- I have certain

18    respect for just about anyone that we've mentioned

19    so far.

20         Q    Can you go to the second page of this

21    exhibit where it shows her full response, or most

22    of her full response?

1          A     Yeah.

2          Q     And do you see the sentence at the

3     top there that says, "Well, first, I know the State

4     is investigating and it needs to be taken seriously

5     and they need to move swiftly"?

6               Do you agree with those statements?

7          A     Yes, that's why we referred it to the

8     GBI.

9          Q     And then going down to the second

10    sentence of that next paragraph.  It's about

11    halfway down the page that begins with "normally."

12    Do you see that where it says, "Normally when you

13    do a software update (as I believe Georgia has done

14    since this copy was made) the State would then do a

15    trusted build and then install the next version."

16               Do you see that?

17         A     I do.

18         Q     Do you know whether Georgia has

19    completed a software update since the copy of the

20    Coffee County system?

21         A     I do not, but it is -- like I said,

22    it's something that it -- it's an additional

Page 76

1       question in my -- in my list for people.

2                Q     Have you asked anyone else whether

3       that has been completed?

4                A     I have not had a chance to yet.  This

5       was last week, I think it was.  I'm just coming off

6       of my vacation, so I haven't had a chance to yet,

7       but it is -- it's on my list.

8                Q     So would it be fair to say that you

9       haven't asked anyone because you haven't had time

10      to get to it?

11               A     Yes.  It would be fair to say that

12      yes, that I have not focused specifically on

13      this -- on this question yet.

14               Q     Who would you like to ask about it?

15               A     I'll start with the Secretary of

16      State's office and then I'll go from there.

17               Q     Who at the Secretary of State's

18      office would you like to ask?

19               A     The election director, Gabe, and

20      anyone else that I might feel is necessary.  Then

21      if -- and if it has not, I want to know why not.  I

22      want to know what other precautions that they --

Page 77

1      have they taken that they feel is as good or

2      better.  I don't . . .

3              Q     Would it concern you if they hadn't

4      made a software update?

5              A     It depends on their answer as to --

6      as to what -- what they have done to protect us.

7              Q     What do you believe they could do in

8      lieu of a software update that would protect the

9      system?

10                   MR. DENTON:  Object to form.

11                   THE WITNESS:  I'm going to first

12     listen to them and then talk to others to see what

13     I think is sufficient.  I'm not -- at this point

14     yet to give a conclusion.

15     BY MS. SWANBECK:

16             Q     Is there anyone else that you'd like

17     to talk to besides persons at the Secretary of

18     State's office that you've already mentioned?

19             A     That's a good place to begin.  We'll

20     see where it goes from there.

21             Q     Would you like to talk to Ryan

22     Germany, the general counsel?

Page 78

1           A      I would expect to talk to Ryan, yeah.

2      I think he's at the Secretary of State's office, so

3      he would be included in that group that I

4      previously mentioned.

5           Q      You said earlier that you'd start

6      with the Secretary of State's office and then would

7      talk to others.  What others would you talk to?

8           A      It depends on what I hear from the

9      Secretary of State's office.

10          Q      Whom might you talk to?

11               MR. DENTON:  Object to form.

12               THE WITNESS:  That calls for some

13     speculation since I don't know what the answer is

14     from the Secretary of State's office, so it's kind

15     of difficult.  But I'd certainly talk to -- I would

16     like to -- if necessary I would love to hear from

17     somebody from -- depending -- I believe your

18     question calls for too much speculation because I

19     haven't talked to the Secretary of State's office,

20     to be candid.

21               Beyond that, there's certainly a

22     number of folks that have been involved in this

Page 79

1          case one way or the other that might be possible

2          folks that I would talk to.  That could include

3          the -- that could include Dominion, that could

4          include going back to Ms. McReynolds, that could

5          include going to other possible sources.  That

6          could include, if you guys want to send me

7          something, I'm more than happy to look at it,

8          too.

9          BY MS. SWANBECK:

10                 Q     We appreciate that.

11                       Given that the November 2022

12         elections are coming up, when do you expect to

13         gather information that you need to assess the

14         security of the system?

15                 A     It's ongoing.

16                 Q     Is there any sense of urgency given

17         that the 2022 elections are coming up?

18                       MR. DENTON:  Object to form.

19                       THE WITNESS:  There is a sense of

20         let's get it -- let's get to a point where we are

21         comfortable that the system is secure, yes, as soon

22         as possible.  That's why I asked the Chair for a

Page 80

```
 1        hearing sometime in September.

 2        BY MS. SWANBECK:

 3             Q     Do you expect to have the information

 4        that you need by the November 2022 elections?

 5             A     Yes.

 6                   MR. DENTON:  Object to form.

 7        BY MS. SWANBECK:

 8             Q     What would you -- what would you do

 9        if the investigation showed that the system was not

10        secure?

11             A     Well, that once again calls for

12        speculation.  I believe that the system -- based on

13        everything that I've seen, including the various

14        reports that I've seen, or the various reports that

15        I've heard of, including the reports from CISA, the

16        report that I've heard of from Dominion, the -- the

17        conclusions of our experts that this is an issue

18        that is soluble.  I do believe that to be true,

19        based on the -- based on the totality of what I've

20        heard so far.

21                   What exactly that is, I can't tell

22        you at this point, but based on everything that
```

Page 81

```
 1        I've seen and heard from -- from a wide range of

 2        individuals is I believe this is an issue that --

 3        that -- that we can deal with.

 4              Q    So the CISA report, and the other

 5        reports that you've mentioned, were published a

 6        while ago before the -- the news of the Coffee

 7        County breach came out as a public matter.

 8                   Do you believe -- does this -- sorry,

 9        strike that.

10                   Does the fact that the Coffee County

11        data was breached or -- was breached, does this not

12        change your opinion in -- in any way, given that

13        those reports don't reflect on such a -- such a

14        massive breach?

15                   MR. DENTON:  Object to form.

16                   THE WITNESS:  The question is how

17        massive the breach was, Counselor, and whether or

18        not it can be rectified.  My understanding is that

19        these are issues that can be.  Let's -- let's see

20        though.

21        BY MS. SWANBECK:

22              Q    How do you believe they can be
```

1     addressed?

2            A     We typically -- we typically deal

3     with a lot of ways in which we check and we

4     recheck.  We deal with various ways in which

5     that -- that limit people's ability to get to the

6     system to be able to exploit any type of -- of

7     issues.  We've historically been able to deal with

8     those sort of issues, and I expect us to be able to

9     deal with them again.  With that being said, I want

10    to hear more.

11           Q     What more do you want to hear?

12           A     I think we've already been over that

13    a few times.  I want to -- I want to find -- I want

14    to get more detail on what happened.  I want to get

15    more detail on what the Secretary of State's office

16    believe needs to be -- to happen.  And I want to --

17    I want to hear from a wide range of individuals as

18    to whether the steps that are being taken are

19    secured.  And if any additional steps need to be

20    taken.

21           Q     Going down to -- further down in this

22    exhibit, do you see the sentence where

1          Ms. McReynolds says, "Public logic and accuracy

2     tests and post election audits real risk limiting

3     audits are safeguards in ensuring a system is

4     secure"?

5                    Do you see that?

6          A    Yeah.

7          Q    Are you aware that the Halderman

8     report that we went over earlier demonstrated that

9     logic and accuracy testing can be defeated my

10     malware on BMDs?

11               MR. DENTON:  Object to form.

12               THE WITNESS:  I've heard different

13     reports on that, yes.  But that is -- that is that

14     person's or entity's conclusion.

15     BY MS. SWANBECK:

16          Q    Are you aware that the Halderman

17     report describes how risk-limiting audits can be

18     circumvented by malware on BMDs?

19               MR. DENTON:  Object to form.

20               THE WITNESS:  I'd have to go back and

21     read the details of it, but I've -- I've heard --

22     I'd heard that.  I would have to go back and -- and

Page 84

1        review it to be able to confirm what you say.

2        BY MS. SWANBECK:

3              Q      Given the -- given that these are the

4        main safeguards that Ms. McReynolds details, does

5        it concern you that they can be circumvented by

6        malware on BMDs?

7                    MR. DENTON:  Object to form.

8                    THE WITNESS:  Well, I've heard

9        different opinions as to that.  But I'm -- I'm

10       prepared to listen to everybody.

11       BY MS. SWANBECK:

12             Q      What different opinions have you

13       heard?

14             A      Well, there's other experts that have

15       said that various security systems are -- are

16       sufficient, this one says no.  I'd like to hear it

17       from -- I'd like to hear from everybody.

18             Q      What experts have you heard from?

19             A      I'm just talking in generalities,

20       Counselor, as to -- you know, for instance,

21       Ms. McReynolds' opinion, and other people's

22       opinion, that they believe that the -- that that is

1           one tool -- that is not the only tool, but that is

2           one tool in the toolbox to try to check against

3           potential misconduct.

4                  Q     Have you heard from any expert that

5           has found that the version of the Dominion software

6           that is being used in Georgia is secure?

7                  A     Ask the question again, if you don't

8           mind.

9                  Q     Have you heard from any expert that

10          has concluded that the version of the Dominion

11          software that is being used in Georgia is secure?

12                 A     I have heard from Secretary of

13          State's office that they believe that with the

14          necessary safeguards is secure.

15                 Q     So the answer to that is no.  Is that

16          correct?

17                        MR. DENTON:  Object to form.

18                        THE WITNESS:  I think I just -- just

19          answered that.  I -- I -- I -- no, the answer to

20          your question is not no.  I've just given you the

21          group of who I've talked to who believes that it is

22          secure.

Page 86

1      BY MS. SWANBECK:

2              Q     But they aren't -- they aren't

3      cybersecurity experts.  So have you talked to any

4      cybersecurity experts that --

5              A     Directly no.  I've --

6                    MR. DENTON:  Object to form.

7                    THE WITNESS:  I'm sorry.  Thank you.

8                    Directly no.  I've talked to the

9      Secretary of State's office, who -- who does talk

10     to experts.

11     BY MS. SWANBECK:

12             Q     And --

13             A     I assume --

14             Q     -- do you know who they've talked to?

15             A     I do not off the top of my head, no.

16             Q     Do you know whether they've talked to

17     any experts at all?

18             A     I don't know the answer to that.  I

19     just finished answering that I don't know who

20     they've talked to.

21             Q     So you don't know who if they've

22     talked to anybody?

Page 87

```
 1              A      That's the third time you've asked
 2         the same question.  I don't know one way or the
 3         other.
 4              Q      What steps have been taken to
 5         determine whether this sort of breach in Coffee
 6         County has happened elsewhere in Georgia?
 7                      MR. DENTON:  Object to form.
 8                      THE WITNESS:  I don't know one way or
 9         the other.
10         BY MS. SWANBECK:
11              Q      What steps have been taken to
12         determine whether the Coffee County breach affected
13         the way Georgia's voting system -- sorry, the way
14         that Georgia's voting system tabulates votes?
15                      MR. DENTON:  Object to form.
16                      THE WITNESS:  Ask me the question
17         again, please.
18         BY MS. SWANBECK:
19              Q      I'm sorry.
20                      What steps have been taken to
21         determine whether the Coffee County breach affected
22         the way Georgia's voting system tabulates votes?
```

Page 88

1                    MR. DENTON:  Object to form.

2                    THE WITNESS:  I believe that the

3       Secretary of State's office has -- has made its

4       investigation and -- and believes that it is

5       secure.

6       BY MS. SWANBECK:

7            Q    Do you know what --

8            A    In my conversation with them.

9            Q    Do you know what steps they've taken

10      to make that determination?

11           A    I'd like to hear more, but no -- of

12      the details, no.

13           Q    Have you asked them what steps

14      they've taken?

15           A    I've begun my discussions with them.

16      I need to do -- I -- I intend for the SEB people to

17      do more.

18           Q    Do you know what steps have been

19      taken to determine whether anyone associated with

20      the Coffee County breach left malware in Georgia's

21      voting system?

22                    MR. DENTON:  Object to form.

Page 89

```
 1                    THE WITNESS:  I don't know the answer

 2          to that one way or the other.

 3          BY MS. SWANBECK:

 4                    Q     Isn't that really important to

 5          determine for future elections?

 6                    MR. DENTON:  Object to form.

 7                    THE WITNESS:  I don't have any

 8          evidence that -- that it was or was not one way or

 9          the other.

10          BY MS. SWANBECK:

11                    Q     But --

12                    A     Let me ask you this, Counselor, I

13          mean, because my job primarily is making sure

14          elections are protected, which is far more

15          important than this deposition.  If y'all have any

16          evidence that malware may have been placed on

17          that -- that system, I'd like to hear it from

18          y'all.  Let me just go ahead and just state -- say

19          that for the record.

20                    Q     So you didn't actually answer my

21          question.

22                    A     I think I did.  I don't know one way
```

1          or the other.  I haven't heard any evidence that it

2          has.  I haven't heard anyone say that it has.  I

3          haven't heard anyone even speculate that it may

4          have other than you.  And I'm asking you, as -- as

5          someone involved in this issue, if you and your

6          client have any such evidence, I'd like for you to

7          please turn it over.

8                    Q    So you think --

9                    MR. DENTON:  Sorry, Ms. -- I'm sorry,

10         Ms. Swanbeck, I've got you as over your time.

11         BY MS. SWANBECK:

12                   Q    So -- so do you believe that it's

13         important for future elections to determine whether

14         any malware has been placed on Georgia's voting

15         system?

16                   MR. DENTON:  Ms. Swanbeck, I think

17         he's answered that question.  And I believe you

18         are -- I know you are over your time.

19         BY MS. SWANBECK:

20                   Q    Can you answer the question?

21                   MR. DENTON:  Ms. Swanbeck, he did

22         answer the question.  And you are over your time.

Page 91

```
 1                    MS. SWANBECK:  I don't believe he did
 2         answer the question.
 3                    MR. DENTON:  Well, we have a
 4         disagreement then.
 5                    MR. CROSS:  Are you instructing him
 6         not to answer?
 7                    MR. DENTON:  I'm telling you --
 8         David, are you the deposing attorney on this
 9         deposition?
10                    MR. CROSS:  Are you instructing him
11         not to answer the question?
12                    MR. DENTON:  You're over your time.
13                    MR. CROSS:  Okay.  We'll call the
14         judge.  Are you cutting us off, because if you are,
15         we'll call the judge?
16                    You know full well that when she
17         set the 90-minute limit, none of the Coffee
18         County breach had come to light, and your client,
19         the Secretary of State's office, publicly claimed
20         it didn't happen.  So we are perfectly happy to
21         jump on the phone with her and explain that we
22         need a little more than 90 minutes or we can
```

Page 92

1        bring your client back, you choose.

2                    I would suspect Mr. Lindsey wants

3        to get this over with.  We're not asking for a

4        lot more time.

5                    MR. DENTON:  How much time are you

6        asking for, David?

7                    THE WITNESS:  David, take a break --

8        if I may, take a break and ask -- and y'all figure

9        out how much more time you need, and then we can

10       determine whether or not we'll give it to you.  As

11       a witness, I'll -- I'll be a part of that.

12                   MR. CROSS:  Yeah, that's -- that's

13       fair.  We appreciate that, Mr. Lindsey.  We'll go

14       off the record.

15                   VIDEOGRAPHER:  Good to go off the

16       record?

17                   Stand by one moment.  The time is

18       11:20 a.m.  We are off the video record.

19              (Recess from 11:20 a.m. to 11:27 a.m. )

20                   VIDEOGRAPHER:  The time is 11:27 a.m.

21       We are back on video record.

22

Page 93

```
 1    BY MS. SWANBECK:
 2            Q     Mr. Lindsey, what steps have been
 3    taken to determine whether sophisticated nation
 4    states, like Russia, whether they downloaded the
 5    Dominion voting software and data that was put on
 6    the internet from Coffee County?
 7                  VIDEOGRAPHER:  Ma'am -- ma'am, you're
 8    really low now.
 9                  MS. SWANBECK:  Can you hear me now?
10                  THE WITNESS:  Now I can, yes.  If you
11    could ask the question again.
12    BY MS. SWANBECK:
13            Q     Sure.  I'll try speaking up.
14                  What steps have been taken to
15    determine whether sophisticated nation states, like
16    Russia, downloaded the Dominion voting software and
17    data that were put on the internet from Coffee
18    County?
19                  MR. DENTON:  Object to form.
20                  THE WITNESS:  I don't know.  Like I
21    said, we turned over the investigation to the GBI.
22    And -- and we certainly would expect them to
```

Page 94

1        conduct a thorough investigation as they -- as I --

2        my experience with them in other matters has been

3        that they usually do.

4        BY MS. SWANBECK:

5              Q     Is it appropriate in your view to

6        require voters to use the Dominion System in

7        Georgia without first determining with reasonable

8        certainty that the Coffee County breach has not

9        affected the way that the system tabulates votes?

10                   MR. DENTON:  Object to form.

11                   THE WITNESS:  I believe, once again,

12       that calls for some speculation.  I think that it

13       is appropriate for us to investigate to make sure

14       that the system that we use is secure and is

15       verifiable.  And that is my goal.

16       BY MS. SWANBECK:

17             Q     You said -- you've talked about

18       having a lot of questions today, a lot of questions

19       for GBI, a lot of questions for the Secretary of

20       State's office and others.

21                   Isn't it important to get the answers

22       to these questions before the midterm elections?

Page 95

1                    MR. DENTON:  Object to form.

2                    THE WITNESS:  I would certainly hope

3         to get the -- the answer to -- at least a

4         sufficient number of answers so that we can --

5         folks can have -- have -- have assurance that the

6         voter outcome is -- is accurate, yes.

7    BY MS. SWANBECK:

8              Q    Isn't that somewhat assuming that the

9         conclusion of the investigation, that everything is

10        secure?

11                   What would you do if the system is

12        not found to be secure?

13                   MR. DENTON:  Object to form.

14                   THE WITNESS:  Well, that's -- that --

15        that calls for some speculation, Counselor.  You

16        know, based on everything that I've heard from a

17        wide range of experts, with your client's expert

18        opinion being one great exception, that folks

19        generally believe that an eVoting system is -- can

20        be protected and secured.

21                   And -- and keep in mind, Counselor,

22        that I'm also under these certain kinds of

Page 96

```
 1      confines here and that, you know, the General
 2      Assembly, in its infinite wisdom, has prescribed
 3      eVoting as the system to be utilized by the
 4      state.  And so my job is -- is to do what's
 5      necessary to make sure that that's a secured
 6      system.  And I intend to try to do that.  And to
 7      date, I haven't seen anything that indicates that
 8      we can't.
 9      BY MS. SWANBECK:
10           Q      Okay.  But those -- those experts
11      that you mentioned seem to be talking about the
12      Dominion System's capacity for security.
13                 Doesn't it concern you that the
14      system in Georgia has been breached in Coffee
15      County, doesn't it concern you that the security of
16      the system is no longer -- that it no longer has
17      that level of security?
18                 MR. DENTON:  Object to form.
19                 THE WITNESS:  Well, once again,
20      Counselor, I think that you're making certain
21      assumptions in that question that I -- that that --
22      that the evidence so far doesn't bear out.  It does
```

Page 97

1      raise a sufficient amount of concern for me, and

2      for the other members of the Board, particularly

3      our Chair, that brought in the GBI, and -- and --

4      and others.  And I would assume that they would

5      also be bringing in experts to take a look at that

6      as well.

7      BY MS. SWANBECK:

8           Q    Isn't it important to determine the

9      answers to these questions before the midterm --

10     before the voters are required to use these BMDs to

11     tabulate their votes?

12               MR. DENTON:  Object to form.

13               THE WITNESS:  I think I've answered

14     that a few times, Counselor.  You know, it's -- you

15     know, we are working toward it.  We've got the GBI

16     working on it.  I -- I believe that the Secretary

17     of State's office needs to be stepping up and

18     explaining to the public why they believe it to be

19     secured so that folks can then see -- see the

20     validity of that assertion.

21     BY MS. SWANBECK:

22           Q    Okay.  But as we've gone over in

1          previous exhibits, there's been an indication of

2          the breach for over a year and a half.  Does it

3          raise concerns to you that there's been a year and

4          a half for an investigation to happen and we're

5          coming up just a couple of months before the

6          midterm elections and there -- these -- this

7          investigation hasn't been completed or that there

8          are no answers to your questions yet?

9                    MR. DENTON:  Object to form.

10                   THE WITNESS:  I think there are some

11         answers to the questions, and we've gone over them

12         already.  But are there more to be asked?  Yes.

13         And that's why we have the GBI working on it.  And

14         I -- and we will hear from the Secretary of State's

15         office as to whether or not they believe it to be

16         secure.  I do want to hear from them specifically

17         on this.  And I do want them to be public about why

18         they think it will be secured.

19                   I do want to see the GBI get to a

20         point where they can -- they can publicly divulge

21         what they have learned in terms of the -- the

22         seriousness of the breach.  And, quite frankly, I

Page 99

1      would ask that other folks that have information

2      to be more forthcoming.

3                    You asked, does it concern me.  A

4      lot of things about this raise questions for me.

5      Questions will be better statements than

6      concerns.

7                    You know, when you asked me about

8      this -- this e-mail -- well, this text with Amber

9      McReynolds, for instance, you -- you passed over

10     the question on why Marilyn Marks -- who I know

11     and have a lot of respect for, let me make sure

12     that you understand that -- if, indeed, she was

13     holding on to information that may have helped

14     the investigation for a year, I'm -- I'm a little

15     concerned about that, too.

16                    But at this point in the game, I'm

17     more concerned about from this point forward what

18     we need to do in order to make sure that the

19     election is secure.  But there are a lot of

20     questions that may over time have -- that I'd

21     like answers to, but right now I want to -- I

22     want to focus on the 2022 election.

Page 100

1               MS. SWANBECK:  So I'd like to

2       introduce the next exhibit, the last exhibit, Tab

3       29 is Exhibit 10, I believe.

4               MS. CINO:  I'm handing it to the

5       witness now.  Sorry, there you go.

6               (Lindsey Deposition Exhibit Number 10

7               marked for identification.)

8       BY MS. SWANBECK:

9               Q    And do you see that this is an

10      e-mail --

11              A    Yes.

12              Q    -- "Letter Petition to State Election

13      Board"?

14              A    Yes.  I think we got this in several

15      different forms.

16              Q    So you recognize this e-mail?

17              A    Yes.

18              Q    And could you go to -- flip the --

19      the page over, and do you see in the signatures

20      there it says -- it's signed by Jeanne Dufort, who

21      is the First Vice President for Morgan -- of the

22      Morgan County Democratic Committee, Ryan Graham,

Page 101

1          the Chair of the Libertarian Party of Georgia, and

2          Salleigh Grubbs, the Cobb County Republican Party

3          Chair?

4                      Do you see that?

5          A      Uh-huh.  Yes.

6          Q      Now going back to the first page, the

7          second paragraph of the e-mail, that starts, "As

8          leaders in our respective political parties, we

9          renew our joint interest for the State Election

10         Board to declare that emergency paper balloting

11         should be used in the upcoming elections based on

12         the finding of escalating emergent circumstances

13         showing that the BMD system is not reliable for use

14         in Georgia elections."

15                     Do you see that?

16         A      Yes.

17                     MR. DENTON:  Object to form.

18         BY MS. SWANBECK:

19         Q      Okay.

20         A      I see it.

21         Q      Do you find it concerning that the

22         political leaders of Georgia do not believe that

Page 102

1       the BMD system is reliable for use in Georgia's

2       elections?

3                       MR. DENTON:  Object to form.

4                       THE WITNESS:  I guess I have to put

5       this in -- in perspective, Counselor.  A, it raises

6       allegations that we've heard from other folks.  B,

7       in terms of the folks that were -- they were able

8       to get to sign the letter, while I'm sure they're

9       very fine people, I don't believe them to be

10      necessarily folks that have expertise.

11                      And I would also say that, to

12      borrow from Arthur Conan Doyle, "I find it

13      equally interesting the dog that doesn't bark."

14      And what I mean by that is the number of

15      political leaders in the state who haven't

16      called -- come out for this sort of thing.

17                      While these, I'm sure, are very

18      fine people, they're hardly what I would call the

19      people that -- that are actively involved in the

20      elections over the years, either as candidates or

21      as -- or as overall leaders of their party.  So I

22      do have some -- I have to put it in perspective.

1                    Like I said, I respect their

2         opinion, I read their opinion, but I need to put

3         it in perspective when it comes to that narrow

4         issue of who's calling -- who among in the

5         political circles is calling for it.  I have to

6         weigh it against all of the people that I have

7         heard from.

8         BY MS. SWANBECK:

9              Q    Are you aware that the Georgia

10        Republican Party, as part of its Convention and

11        Resolutions Committee report, are you aware that

12        the Party called for Georgia to replace all

13        Dominion Voting Systems with secured hand-marked

14        paper ballots?

15                    MR. DENTON:  Object to form.

16                    THE WITNESS:  I'm -- I'm aware that

17        some within the Republican Party do believe that to

18        be true, yes.  And that's primarily borne out of

19        their insistence -- the folks that have e-mailed

20        me, primarily borne out of their insistence that

21        the 2020 presidential election was wrongly decided

22        in Georgia.  And that's a conclusion that I don't

Page 104

1      agree with.

2      BY MS. SWANBECK:

3          Q    Does it concern you, however, that

4      problems with the security of the system could

5      degrade voter confidence such that people may

6      easily be led to believe that the outcome of the

7      vote was wrong?

8              MR. DENTON:  Object to form.

9              THE WITNESS:  What concerns me --

10     like I said, what I have to do, Counselor, is

11     divide out those allegations and suspicions and

12     those conspiracies from facts.  And I am trying to

13     very hard to focus on the facts.

14             I am aware that because of claims

15     by various entities and individuals, and many of

16     them that have borne false have raised suspicions

17     that concerns me.  I -- I -- but I -- but I would

18     also say that I also want to -- to be objective

19     in terms of any hard evidence of problems.

20             And it does concern me that certain

21     people, I think for the wrong reasons, believe

22     that the system is flawed because they simply

Page 105

1      didn't like the outcome of the 2020 election.

2      And so I -- I need to deal with that.  So I have

3      to deal with a multiple of factors here, both in

4      terms of conspiracy theories that are simply

5      unfounded and then there are real problems in

6      terms of knowing exactly -- what exactly the

7      problem.  So I would have to weigh a lot of

8      things and -- and wear a lot of hats.

9                  Getting back to those issues that

10     exist -- not issues, but those mandates from the

11     legislature, those ten things that we talked

12     about earlier, one is to try to get -- make sure

13     that folks have an accurate view of the election

14     system, and the other is to do what I can do to

15     instill public confidence.  I'm trying to balance

16     all those things in the time that I have.

17     BY MS. SWANBECK:

18          Q     Doesn't the fact that the Coffee

19     County security breach demonstrate that at least

20     some of those concerns that you heard are

21     legitimate?

22          A     I don't know, because I think that

1       the 20 -- that the Coffee County breach was the --

2       the attempt to do was borne on a false assumption

3       that the 2020 presidential election was stolen, and

4       so -- but it does concern me that people have been

5       led to believe certain things and so, therefore,

6       they've gone and done things that I think are

7       potentially criminal because they've been -- they

8       have been led to believe false conspiracies, so

9       yeah.  With that being said, yeah, I'm concerned

10      about Coffee County.  We've been through this a

11      great deal.

12                      MR. DENTON:  Are you all set,

13      Ms. Swanbeck?

14                      MS. SWANBECK:  Almost.

15      BY MS. SWANBECK:

16              Q     Are you aware that the SEB has the

17      power to mandate emergency use of hand-marked paper

18      ballots for future elections?

19              A     We do not, not -- not unilaterally.

20              Q     You don't believe that you can

21      implement that using current SEB rules?

22              A     No.  No.  No.  You have to look at

Page 107

1          the totality of the State statutes.  And I'm aware

2          that you guys have raised that allegation based on,

3          I think, item 10 on the statute, whatever it might

4          be.  But you have to -- you have to weigh that,

5          which is a general statement as to our powers,

6          versus the specific mandate that came from the

7          General Assembly in regards to use of the eVoter

8          system.  I have to weigh those two things.  And so,

9          you know, that does limit my authority somewhat.

10              Q    Who do you believe has the authority

11         to mandate the use of hand-marked paper ballots in

12         the case of an emergency?

13              A    If there is a specific concern in the

14         county, I know the counties have -- have a certain

15         amount of flexibility in that area.

16              Q    What about state law?

17              A    Under state law, we are somewhat

18         limited.

19              Q    So you believe it's up to the state

20         counties to implement the use of hand-marked paper

21         ballots on an emergency basis?

22              A    Let me put it this way --

Page 108

```
 1                    MR. DENTON:  Object to form.

 2                    THE WITNESS:  Let put it this way:  I

 3         think my power to unilaterally declare an emergency

 4         is limited.

 5    BY MS. SWANBECK:

 6             Q     What about the Board's power?

 7             A     Huh?

 8                    MR. DENTON:  Object to form.

 9    BY MS. SWANBECK:

10             Q     What about the --

11             A     Mine -- mine being the Board.  I'm

12         sorry.  I think that under existing Georgia law, my

13         power to declare that kind of an emergency is

14         limited.

15             Q     Can the Chair of the Board have any

16         impact on that?

17                    MR. DENTON:  Object to form.

18                    THE WITNESS:  The Board -- the

19         Chair -- the Chair is the first among equals

20         sometimes.  When I talk about the Board, I include

21         me, I include the other members and I include the

22         Chair.
```

Page 109

1       BY MS. SWANBECK:

2               Q       What has the Board done to

3       investigate the failures of the State to conduct

4       the -- the required risk-limiting audits?

5                       MR. DENTON:  Object to form.

6                       THE WITNESS:  You're going to have to

7       be more specific.  Is there something specific that

8       you think that they failed to do?

9       BY MS. SWANBECK:

10              Q       So the statute --

11              A       Can you cite to me something in

12      particular?

13              Q       Risk-limiting audits are required by

14      statute, however some of them have not been -- have

15      not been conducted.  Do you know if anything has

16      been done to investigate the fact that

17      risk-limiting audits have not been done in

18      accordance with statute?

19                      MR. DENTON:  Object to form.

20                      THE WITNESS:  I would need to know

21      what specific risk-limiting audits you believe have

22      not been done and then we need to take a look at

1          that.  And I would invite you, you know, beyond

2          this lawsuit, if y'all believe that something has

3          not been done that should have been done, please

4          feel free to file a complaint with the State

5          Election Board and we'll take a look.

6                         MR. DENTON:  And, Ms. Swanbeck, I

7          think this sounds like a good stopping point.

8                         MS. SWANBECK:  Okay.  No further

9          questions then.

10                         MR. DENTON:  Okay.

11                         THE WITNESS:  If I can simply -- once

12          again, simply say my invitation to you was sincere,

13          if y'all have information that you believe would

14          help in the investigation, please do so, please --

15          and please do send it to GBI or -- or relay it to

16          us and we'll relay it to GBI.  And if you believe

17          that something in particular has not happened that

18          needs to be done, please avail yourself of the

19          complaint power of the State Election Board for us

20          to -- to look at it further.  That's a sincere

21          offer.

22                         MS. SWANBECK:  Thank you, Mr.

Page 111

1          Lindsey.

2                    MR. CROSS:  This is David Cross.  And

3          I will say we do very much appreciate that.  And we

4          have offered to cooperate with the Board and the

5          GBI.  And we welcome any dialogue.

6                    THE WITNESS:  Thank you.

7                    MR. CROSS:  Thank you.

8                    VIDEOGRAPHER:  The time is 11:46 a.m.

9          This includes the videotape deposition.  We are off

10         video record.

11                   (Whereupon, at 11:46 a.m., the

12                   video-recorded deposition of EDWARD H.

13                   LINDSEY, JR. was concluded; signature

14                   reserved.)

15

16

17

18

19

20

21

22

Page 112

1              CERTIFICATE OF NOTARY PUBLIC

2         I, FELICIA A. NEWLAND, CSR, the officer before whom

3    the foregoing videotaped deposition was taken, do

4    hereby certify that the witness whose testimony

5    appears in the foregoing deposition was duly sworn

6    by me; that the testimony of said witness was taken

7    by me in stenotype and thereafter reduced to

8    typewriting under my direction; that said deposition

9    is a true record of the testimony given by said

10   witness; that I am neither counsel for, related to,

11   nor employed by any of the parties to the action in

12   which this deposition was taken; and, further, that

13   I am not a relative or employee of any counsel or

14   attorney employed by the parties hereto, nor

15   financially or otherwise interested in the outcome

16   of this action.

17

18

19         _____

20         FELICIA A. NEWLAND, CSR

           Notary Public

21

     My commission expires:

22   September 15, 2024

Page 113

1    Alexander Denton, Esquire

2    a.denton@robbinsfirm.com

3

4    RE:    Curling, Donna  v. Raffensperger, Brad

5         8/31/2022, Edward H. Lindsey , Jr. (#5384601)

6         The above-referenced transcript is available for

7    review.

8         Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                   Yours,

23                   Veritext Legal Solutions

24

25

Page 114

1    Curling, Donna  v. Raffensperger, Brad

2    Edward H. Lindsey , Jr. (#5384601)

3                   E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____   _____

24   Edward H. Lindsey , Jr.                    Date

25

Page 115

1    Curling, Donna  v. Raffensperger, Brad

2    Edward H. Lindsey , Jr. (#5384601)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Edward H. Lindsey , Jr., do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____   _____

12   Edward H. Lindsey , Jr.              Date

13   *If notary is required

14                         SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                         _____ DAY OF _____, 20____.

16

17

18                         _____

19                         NOTARY PUBLIC

20

21

22

23

24

25