1          UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF GEORGIA

3               ATLANTA DIVISION

4         Civil Action No. 1:17-cv-02989-AT

5    _____

6    DONNA CURLING, et al.,

7         Plaintiffs,

8    vs.

9    BRAD RAFFENSPERGER, et al.,

10        Defendants.

11   _____

12

13        VIDEOTAPED DEPOSITION OF ROBERT A. SINNERS

14   DATE:          September 28, 2022

15   TIME:          9:21 a.m. to 4:29 p.m. EDT

16   LOCATION:      Krevolin & Horst LLC

               1201 West Peachtree Street, NW

17             Suite 3250

               Atlanta, GA 30309

18

     REPORTED BY:  Felicia A. Newland, CSR

19

               Veritext Legal Solutions

20        1250 Eye Street, N.W., Suite 350

               Washington, D.C. 20005

21

22

Page 2

1                    A P P E A R A N C E S

2         On behalf of the State Defendants and the Witness:

3              BRYAN TYSON, ESQUIRE

4              BRYAN JACOUTOT, ESQUIRE

5              Taylor English Duma, LLC

6              1600 Parkwood Circle, Southeast

7              Suite 200

8              Atlanta, Georgia 30339

9              btyson@taylorenglish.com

10        On behalf of the Curling Plaintiffs:

11             DAVID D. CROSS, ESQUIRE

12             JENNA CONAWAY (via Zoom)

13             WAIL JIHADI (via Zoom)

14             Morrison & Foerster LLP

15             2100 L Street, Northwest

16             Suite 900

17             Washington, D.C. 20037

18             dcross@mofo.com

19             jconaway@mofo.com

20

21

22

Page 3

1                A P P E A R A N C E S (Cont'd)

2         On behalf of the Coalition for Good Governance

3         Plaintiffs:

4               BRUCE P. BROWN, ESQUIRE

5               Bruce P. Brown Law

6               1123 Zonolite Road, Northeast

7               Suite 6

8               Atlanta, Georgia 30306

9               bbrown@brucepbrownlaw.com

10              -- and --

11              MARILYN MARKS, ESQUIRE (via Zoom)

12              Attorney At Law

13              7035 Marching Duck Drive, E504

14              Marilyn@uscgg.org

15        On behalf of the State Defendants:

16              DANIELLE HERNANDEZ, ESQUIRE (Via Zoom)

17              Robbins Firm

18              500 14th Street, Northwest

19              Atlanta, Georgia 30318

20              dhernandez@robbinsfirm.com

21

22

Page 4

1              A P P E A R A N C E S (Cont'd)

2       Also Present:  (Via Zoom)

3             Donna Curling

4             Ernestine Thomas-Clark

5             Kevin Skoglund

6             Marilyn Marks

7             Oluwasegun Joseph

8             Diane LaRoss

9             Donna Price

10            Susan Greenhalgh

11            Richard A. DeMillo

12            Duncan Buell

13            Adam Sparks

14            Daniella Stucchi

15            Alex Denton

16            Robert Gilb

17            Jessica Cinco (in person)

18      Videographer:  Jess Wiggins

19

20

21

22

1                    C O N T E N T S

2       EXAMINATION BY:                                PAGE

3            Counsel for Curling Plaintiffs            10

4            Counsel for Coalition Plaintiffs          243

5                 SINNERS DEPOSITION EXHIBITS

6       NO.  DESCRIPTION                               PAGE

7       1    LinkedIn Profile, Robert A. Sinners       14

8       2    Bates Numbers 08122022-000034 through     45

9            08122022-000053

10      3    Bates Numbers 08122022-000110 through     53

11           08122022-000122

12      4    Bates Numbers 08122022-000162 through     53

13           08122022-000174

14      5    E-mail thread, Harry MacDougald, dated    56

15           November 10, 2020 3:52 p.m.

16      6    Email thread from Harry MacDougald,       66

17           dated November 10, 2020, 8:01:24 p.m.

18      7    Excerpt of Misty Hampton's messages       69

19      8    E-mail from Eric Chaney, November 11,     73

20           2020, 3:20:20 p.m.

21      9    E-mail thread, Tracie Vickers, December   75

22           3, 2020, 17:56

Page 6

1       10   E-mail thread, David Shafer, November        80
2            20, 2020, 12:34:14 p.m.

3       11   November 11, 2020 letter to Brad             81
4            Raffensperger

5       12   E-mail thread, Eric Chaney, December 8,      83
6            2020, 3:42:51 p.m.

7       13   December 2, 2020, Misty Hampton              87
8            e-mailing Sinner re: Trump Campaign

9       14   December 13, 2020 Sinners text messages     100
10           with Alex Kaufman

11      15   Washington Post article:  Fake Trump        115
12           electors in Georgia told to to shroud
13           plans in 'secrecy,' email shows

14      16   Germany Declaration                         126

15      17   Raffensperger: Coffee County Probe          136
16           Stalled Because Local Officials Lied

17      18   Doug Richards Short Version                 136

18      19   Questions Raised in Timeline of State       137
19           Response to Coffee County Breach

20      20   Questions Raised In Timeline of State       139
21           Response to Coffee County Breach

22      21   May 7, 2021 Barnes E-mail Chain re Cyber    148

Page 7

1        Ninjas

2    22  Excerpt from deposition of Michael Ian      170

3        Shamos

4    23  MITRE report                                 192

5    24  May 20, 2021 Sinners E-mail template to      203

6        Fuchs

7    25  March 3, 2021 Sinners asked to draft         205

8        more responses

9    26  4/13/22 Texts between Sinners and            210

10       Marshall re Sterling Deposit

11   27  Sinners E-mails in response to media         219

12       requests

13   28  2021 Convention Resolutions Committee        224

14       Report

15   29  Text messages between R. Sinners and C.      229

16       Gardner

17   30  Pictures, SOS Investigator visit             233

18   31  Alex Kaufman e-mail to Robert Sinners,       251

19       December 12, 2020, 8:30 p.m.

20   32  Affidavit of Alyssa Hope Taylor             253

21   33  Presidential Findings To Preserve           257

22       Collect and Analyze National Security

1          Information Regarding The 2020 General

2          Election

3     34   Still Lawsuit                                259

4     35   Shawn Still Motion                           266

5     36   O.C.G.A. 21-2-524(b) Certificate of          270

6          Service of Summons, Petition and

7          Discovery

8     37   Shawn Still e-mail, December 15, 2020,       271

9          8:42:46 a.m.

10    38   E-mail from Christina Read, December 10,     273

11         2020, 6:51:06 a.m.

12    39   E-mail thread, Christina Norton, January     280

13         1, 2021

14

15    *(Exhibits attached to transcript.)

16

17

18

19

20

21

22

1                     P R O C E E D I N G S

2                       *  *  *  *  *  *  *

3                    VIDEOGRAPHER:  Today's date is

4        September 28th, 2022, and we are on the record at

5        9:21 a.m.  This will be the videotaped deposition

6        of Robert Sinners.

7                         Would Counsel present please

8        identify themselves starting with the taking

9        attorney?

10                   MR. CROSS:  David Cross of Morrison &

11       Foerster.  And along with us is my -- along with

12       the Plaintiffs is also my colleague Jenna Conaway,

13       my clients Donna Price, Donna Curling, my colleague

14       Halsey Knapp.

15                        And I think that's it for us,

16       Bruce.

17                   MR. BROWN:  This is Bruce Brown, and

18       I represent the Coalition Plaintiffs.  With us on

19       Zoom is Marilyn Marks and others associated with

20       the Coalition Plaintiffs.

21                   MR. TYSON:  Good morning.  Bryan

22       Tyson for the State Defendants and defending

1        Mr. Sinners' deposition today.  I'm joined by my

2        colleague, Bryan Jacoutot, and then Danielle

3        Hernandez from the Robbins Firm.

4                    MS. CINO:  I'm Jessica Cino from

5        Krevolin & Horst, also for the Curling Plaintiffs.

6        And on Zoom is Daniella Stucchi and Robert Gilb.

7                    VIDEOGRAPHER:  Thank you.

8                    If there's no objection, the court

9        reporter will now swear in the witness remotely.

10                        * * * * * *

11       Whereupon,

12                    ROBERT A. SINNERS

13     was called as a witness and, having been first duly

14     sworn, was examined and testified as follows:

15        EXAMINATION BY COUNSEL FOR CURLING PLAINTIFFS

16       BY MR. CROSS:

17               Q    Good morning, Mr. Sinners.

18               A    How are you doing, sir?

19               Q    Good.

20                    And can you just state your full name

21     and address for the record, if you would?

22               A    Robert Alexander Sinners.

1          919 Greenwood Avenue, Atlanta, Georgia.

2                Q     Okay.  And have you ever been deposed

3      before?

4                A     No.

5                Q     Have you been at a deposition?

6                A     No.

7                Q     Okay.  So I'm sure Bryan or others

8      have walked you through it.  The short of it is I'm

9      going to ask you some questions today.  Bruce will

10     likely have some questions.  You have to answer the

11     question as we put it to you unless Bryan instructs

12     you not to on a privilege basis.  But if at any

13     point you don't understand a question, just let me

14     know.  I'm happy to --

15               A     Sure.

16               Q     -- clarify, rephrase, follow up.

17                     You're welcome to take a break at any

18     point as long as the question is not pending --

19               A     Okay.

20               Q     -- so answer it before you go.

21                     Is there any reason that you feel

22     that you cannot testify truthfully and completely

Page 12

```
1        today?

2                A     No.

3                Q     So no medication?  Nothing that

4        would --

5                A     No.

6                Q     -- affect your ability to --

7                      Okay.  Have you ever been arrested or

8        charged with a crime?

9                A     I have two misdemeanors, no charges.

10               Q     Okay.  And what are those?

11               A     Underage drinking, simple assault,

12       victim and defendant.

13               Q     Okay.  When was that?

14               A     When was which?

15               Q     Sorry.  The simple assault.

16               A     Recently.

17               Q     Oh, when was --

18               A     July.

19               Q     July of this year?

20               A     Uh-huh.

21               Q     And was that a charge or a

22       conviction?
```

```
 1                A     A conviction.

 2                Q     Is that still open?

 3                A     Pending.

 4                Q     I see.

 5                      And where is that pending?

 6                A     Tennessee.

 7                Q     Okay.  And just at a general level,

 8       what are the circumstances?

 9                A     Domestic.

10                Q     Okay.  Like involving a spouse or

11       what?

12                A     Significant other.

13                Q     Okay.  Okay.

14                      MR. TYSON:  David, do you want to

15       serve -- reserve objections as to form and

16       responsiveness, or do you want to go ahead and make

17       all objections on the record?  How do you want to

18       handle that?  I just don't want you too deep into

19       stuff.

20                      MR. CROSS:  Yeah, if you just want to

21       say objection to form.

22                      MR. TYSON:  Okay.
```

1                    MR. CROSS:   Objection to form or just

2          one objection, sure.

3                    MR. TYSON:   Perfect.   I just wanted

4          to make sure that was clear.

5                    MR. CROSS:   Yeah.

6          BY MR. CROSS:

7                Q    All right.   Let me hand you a copy of

8          your LinkedIn profile.   So this will be Exhibit 1.

9                    (Sinners Deposition Exhibit Number 1

10                   marked for identification.)

11                   MR. CROSS:   We're going to -- as

12         we've done in other depositions, the formal way for

13         the exhibits for the record will be in Exhibit

14         Share.

15         BY MR. CROSS:

16              Q    So this will be Exhibit 1.   And then

17         just flip through this, if you would, Mr. Sinners.

18              A    Sure.

19              Q    Does this look to be a fair and

20         accurate copy of your current LinkedIn profile?

21              A    I don't know if it's current, but

22         yeah.

Page 15

```
 1              Q     Okay.  As you look at it -- I'll tell
 2       you we pulled it very recently, but is there
 3       anything, just looking at this, that looks to be
 4       missing to you?
 5              A     Not particularly.
 6              Q     Okay.  And does your LinkedIn profile
 7       generally capture your -- your significant
 8       employment history and education?
 9              A     Yeah, I think so.
10              Q     Okay.  So when you graduated at the
11       University of South Carolina, when was that?
12              A     2010 undergrad.
13              Q     I'm sorry?  Say again.
14              A     2010.
15              Q     2010.  Okay.
16                    And you got a master's and an
17       undergraduate degree?
18              A     Yes.
19              Q     Okay.
20              A     In 2012.
21              Q     So undergraduate is 2010, master's is
22       2012?
```

```
                                                     Page 16

 1                 A      Right.

 2                 Q      Got it.

 3                        From 2012 to 2013, you did some work

 4         with the U.S. House of Representatives.  Is that

 5         right?

 6                 A      Yep.

 7                 Q      And then 2016 to 2017, you were a

 8         leasing brokerage associate at McBride Real Estate

 9         Services.  Is that right?

10                 A      Yeah.

11                 Q      And then you went from that role to

12         special assistant and senior advisor at GSA?

13                 A      Yep.

14                 Q      And you were there until March 2019,

15         about?

16                 A      Yeah.

17                 Q      Okay.  And then what is the

18         Republican National Lawyers Association?

19                 A      Association for Republican lawyers.

20         It's like a trade association.

21                 Q      And what's your involvement?

22                 A      I was regional political director.
```

Page 17

1           Q      You're not a lawyer?

2           A      No.

3           Q      Have you ever held yourself out as a

4     lawyer?

5           A      No.

6           Q      And then in May of 2020 to February

7     of 2021, you worked with Georgia Republican Party

8     DJT.  Is that right?

9           A      Uh-huh.

10          Q      Yes?

11          A      Yeah.

12          Q      And DJT is Donald J. Trump?

13          A      Yeah, the campaign.

14          Q      So State Director, Election Day

15    Operations.  Is that right?

16          A      Uh-huh.

17          Q      I'm sorry, you have to answer yes or

18    no.

19          A      Yes.

20          Q      Everybody does it, just for the court

21    reporter.

22          A      Gotcha.  Gotcha.

1            Q      And there you indicate you oversaw

2       most aspects of election administration, election

3       integrity, and it goes on from there, for the

4       statewide 2020 election runoff.

5            A      Uh-huh.

6            Q      What responsibilities did you have

7       working with the Trump Campaign for election

8       integrity for the statewide 2020 general election?

9            A      It was the majority of my employment,

10      I would say.  I ran the poll-watching effort and

11      the rapid response hotline on behalf of the Georgia

12      Republican Party.

13           Q      When you use the term "election

14      integrity" there, what do you mean?

15           A      Ensuring that elections are fair and

16      accurate.

17           Q      And was there anything that you did

18      beyond what you just described for that role,

19      specific to election integrity?

20           A      I -- I don't know.  You'd have to

21      clarify it.

22           Q      Well, I just want to understand.

1      When you say that you oversaw most aspects of

2      election integrity for the statewide 2020 general

3      election runoff, what all did that encompass?

4              A     I would define that as our

5      poll-watching effort.

6              Q     Okay.  Did you also have any

7      responsibility while you worked with the Trump

8      Campaign for investigating fraud or allegations of

9      fraud in the 2020 election?

10             A     In the rapid response hotline, you

11     know, we would take phone calls.  And if it seemed

12     like something, we would chase it down with teams,

13     volunteer attorneys.  So I would say yes.

14             Q     And are you aware of any findings as

15     part of that effort of any fraud affecting the

16     Georgia 2020 election?

17             A     I would not agree with "affecting,"

18     but, you know, isolated incidents.

19             Q     Give me an example of what you mean

20     by isolated incidents.

21             A     There was a case where we had a

22     pretty compelling, you know, belief that there were

Page 20

1          isolated incidents of ballot harvesting, some

2          issues at the polling place that, you know, might

3          not have been able to be explained by a simple

4          mistake, but nothing, you know, widespread that I

5          would believe influenced the outcome of the

6          election.

7               Q     Okay.  Were there any instances that

8          came to your attention that you believed affected

9          an individual vote even if it didn't affect the

10         outcome?

11              A     Yes.

12              Q     And what were those?

13              A     An example would be someone called us

14         in Ben Hill County and said that, you know, they

15         had gotten confused while voting, and as they

16         printed their ballot, they noticed that they had

17         selected Joe Biden inadvertently, and they said as

18         much.  You know, "I remember selecting that,

19         thought I fixed it, but I didn't."  And it printed

20         out their ballot, and then they went over to talk

21         to a polling official and they said that, you know,

22         they would correct it on the back end.

```
 1                And I didn't really understand the

 2      meaning of that.  My view is that I think the

 3      election worker didn't want to deal with the

 4      situation and just said, "Go ahead and scan your

 5      ballot."  And, you know, I know it to be that when

 6      you scan your ballot, it is recorded as you

 7      intended, so, therefore, they voted for Joe Biden.

 8      And they had a -- you know, a willing -- a want to

 9      vote for Donald Trump.  And I think that is an

10      example of, you know, someone not voting as they

11      intended.

12            Q    And that was someone who was voting

13      on the BMD system?

14            A    Yes.

15            Q    Okay.  So this isn't -- this isn't an

16      absentee ballot.  This is a ballot generated by the

17      BMD -- or by the --

18            A    Yes.

19            Q    -- BMD printer?

20            A    Yes.

21            Q    A printed ballot?

22            A    Yes.
```

```
                                                      Page 22
 1              Q      Okay.  Was that a rare occurrence
 2       that was reported to you guys?  Or how often did
 3       you get that report?
 4              A      That was the only one I got.
 5              Q      And was there any investigation done
 6       into that by anyone involved with your
 7       organization?
 8              A      Yeah, I'd say preliminarily.  But,
 9       you know, I never heard of the result, if it ever
10       became a case or anything like that, but, you know,
11       we were getting thousands of complaints, so it's
12       playing whack-a-mole.
13              Q      Have you raised any concerns since
14       you became employed with the Secretary's Office
15       about that type of incident?
16              A      I would say that I have used my
17       knowledge of what I saw voters experience at the
18       polls and the various breakdowns that do occur, as
19       when you have millions of people voting, even if
20       you are working with a 99.99 percent degree of
21       accuracy.  That's still thousands of people that
22       will experience some sort of hangup.  And I think
```

Page 23

1          I've tried to apply that knowledge to better the

2          voting experience for all Georgians.

3                  Q      Have you raised specifically with

4          anyone in the Secretary's Office the concern that

5          the BMD system may not always generate a ballot

6          that reflects what the voter has selected on the

7          BMD screen?

8                  A      I have none of those concerns.

9                  Q      Isn't that the situation you just

10         described?

11                 A      No.

12                 Q      Okay.  What did I get wrong?

13                 A      Well, the voter stated that they

14         accidentally pressed the wrong button.  That is

15         not, to me, a fault of the BMD system.  That is a

16         fault that is called user error.

17                 Q      I see what you're saying.  Okay.

18         Sorry.  So I was confused.

19                        So the situation that you're talking

20         about, what the voter reported was they selected

21         the wrong thing themselves --

22                 A      Yeah.

1          Q     -- on the screen --

2          A     Yeah.

3          Q     -- but the election worker told them

4     to go ahead and scan the ballot?

5          A     Yes.

6          Q     Got it.  Okay.

7                Are you -- are you aware of -- did

8     any reports come in of any instance where someone

9     reported that the ballot printed by the system, the

10    BMD system, did not reflect what they had selected?

11         A     Not to my knowledge.

12         Q     Okay.

13               All right.  Take a look back at

14    Exhibit 1, your LinkedIn profile.

15         A     Okay.

16         Q     So in February of -- or, I'm sorry,

17    in March of 2020 -- hold on, let me get the timing

18    right.  Yeah, sorry.

19               So in February of 2021, you left the

20    Trump Campaign and became the director of

21    Constituent Services at the Georgia Secretary of

22    State's Office?

Page 25

```
 1          A     Yes.

 2          Q     Okay.  Did you apply for that

 3     position or did someone from the Secretary's Office

 4     reach out?

 5          A     I had just been in contact with the

 6     Secretary of State's office.  I had built a good

 7     relationship with them throughout the campaign.  I

 8     was in contact regularly reporting issues, doing a

 9     little bit of intel on what I'm seeing.

10                I had a good relationship with them.

11     And I don't really remember if it was me

12     specifically reaching out or them, but yeah, you

13     know, I -- I had respected the job that they did

14     under the circumstances.

15                Throughout the campaign, I was not

16     one of those guys that was of the belief that the

17     Secretary of State's Office had some, you know,

18     role in Trump losing Georgia.  And, you know, I

19     felt it to be an honor to continue my career with

20     them.

21          Q     Did you believe in at least the

22     November/December 2020 time frame that Trump had
```

1          actually won the election in Georgia?

2                    A     About a week.  You know, limited

3          time, I thought that there were things that may

4          have occurred that, through research, I stated --

5          you know, I discovered that no, that's not exactly,

6          you know, how it went.  There was, you know,

7          significant amounts of disinformation floating

8          around.

9                    I was getting hundreds of e-mails or

10         inquiries a day on, "You've got to go look at this.

11         You've got to go look at that."  Yeah, I mean,

12         there was -- there was a time period where I was

13         like, "Something's not right here."  But I'd say

14         that that changed into "Well, maybe some of the

15         counties didn't do their jobs properly."

16                    And then even after I left the

17         campaign, I still had some doubts, but, you know, I

18         put those doubts kind of into a thing and talked to

19         experts, talked to election people about it.  And,

20         you know, a lot of those were just as bunk as, you

21         know, the thermostats controlling the software, you

22         know.

Page 27

```
 1            Q     You said there was about a week when
 2       you believed Trump had actually won the Georgia
 3       election.  Was that shortly after the election --
 4            A     Yes.
 5            Q     -- in November?
 6            A     Yeah.
 7            Q     Okay.  And so after -- after that
 8       week, it sounds like through some research or
 9       information you garnered, you no longer held that
10       belief?
11            A     Yeah.  I mean, I thought there were
12       still maybe procedural failures, but not the
13       conspiracy that kind of certain elements held on
14       to.
15            Q     I just want to make sure I really
16       understand.  After this week, and shortly after the
17       election, understanding that there were some
18       procedural errors -- and there are often procedural
19       errors in elections, right?
20            A     Exactly.
21            Q     -- you no longer questioned the
22       result for Joe Biden in Georgia.  Is that fair, in
```

Page 28

1      terms of the tabulation of the system?

2             A      In terms of the voting system,

3      tabulating the ballots accurately, I didn't have

4      those concerns.

5             Q      Okay.  And did you have any concerns

6      that there was a problem with the tabulation of the

7      system, meaning the system didn't work, the

8      machines themselves, the software didn't work

9      right?

10            A      No, I didn't have those concerns.

11            Q      The concerns you had at that point

12     were sort of procedural or human error that -- that

13     often happens in elections?

14            A      Yeah.  I mean, we looked into a

15     significant amount of reports of, you know, vote

16     flipping, as you might call it, and each one of

17     those, in my mind, panned out to be human error,

18     programming errors, things like that.  Not

19     programming errors for -- not a glitch, but not

20     aligned properly, not calibrated properly by a

21     human being.

22            Q      And today do you hold the belief that

1           Joe Biden was the sort of rightful winner of the

2           election in Georgia, according to the way that the

3           system was supposed to work?

4                    A       Yeah.

5                    Q       And that was a belief that you had

6           reached, it sounds like, by late November, early

7           December?

8                    A       I don't know because I hadn't really

9           given much thought to that.  My focus was, "Does

10          this action, does this thought yield me more poll

11          watchers and more resources?"  So what was

12          happening nationwide, what was happening, you know,

13          wasn't really of my concern.

14                           You know, I believed at the time that

15          there may have been voters who were not eligible to

16          vote.  I don't hold those beliefs so much anymore.

17          But not that the system failed.  That was maybe --

18          maybe I believed that for a short period of time,

19          but that wasn't really one of my premier thoughts

20          on the matter.

21                   Q       But you did spend a fair amount of

22          time in the November 2020 time frame at least, into

1      December maybe and beyond, specifically looking for

2      evidence that would suggest or show that -- that

3      Donald Trump had actually -- should have been the

4      rightful winner, right?

5            A     Yeah, we looked at evidence because

6      that's what you do in that scenario, you try to

7      find it.  If you have a case, if you're advocating

8      for a client, you try to find evidence that

9      supports your, you know, client's belief.

10           Q     By the end of November, you had not

11     seen any evidence that would -- that would indicate

12     that Trump should have won that election based on

13     some conspiracy, criminal conduct, or misuse or

14     failure of the election system in Georgia, right?

15           A     Not a failure of the election system,

16     no.  I know there were a lot -- there were isolated

17     incidents that I looked into.  I couldn't connect

18     the dots -- you know, I couldn't, people that were

19     working with us couldn't, connect the dots that

20     there had been some, you know, whatever.

21                 You know, I still believe that there

22     were some instances of bias toward Republicans,

1       some effort to maybe, you know, sway them from

2       voting, but nothing, you know, in the mechanics of

3       the actual way the election was administered as it

4       relates to, you know, voting machines, the

5       software, that sort of thing.

6               Q       The effort that you were a part of on

7       the Trump Campaign in late 2020, you guys did not

8       find any instance of any vote swapping or switching

9       in Georgia.  Is that right?

10              A       Not to my knowledge.

11              Q       And that was not for a lack of

12      looking?

13              A       That was not for a lack of looking.

14      I mean, there were -- you know, we investigated

15      every report.  But, you know, to clarify, the Trump

16      Campaign, in my mind, is Donald J. Trump for

17      President, the actual campaign.  There were

18      peripheral actors, which I think you know of, that

19      were doing all sorts of things.  But to my

20      knowledge, the campaign didn't have any evidence of

21      vote flipping.

22              Q       But you -- you're well aware through

Page 32

```
 1         public reports and through your role at the

 2         Secretary's Office of the breach of the Georgia

 3         voting system that occurred in January of 2021 in

 4         Coffee County, right?

 5              A    I have been aware through media

 6         reports of unauthorized access into those systems.

 7              Q    But you were actually -- you were

 8         aware of that situation before the media reports,

 9         before it came to light in this case?

10              A    No.

11              Q    No one communicated with you about

12         that breach last year?

13              A    No.

14              Q    But you know Eric Chaney?

15              A    I have spoken with him twice in the

16         course of my regular duties as EDO director.  I was

17         reaching out to hundreds of election officials

18         across the state trying to find, you know,

19         Republican board members.

20                   You know, we ran a comprehensive

21         poll-watching effort.  I think we reached 110 out

22         of 159 counties.  Coffee County was a low-priority
```

Page 33

```
 1          county, so we didn't have much interaction.  But

 2          no, I was not aware of any of that.

 3                  Q     When you say "BDO," what is that?

 4                  A     EDO.

 5                  Q     Oh.

 6                  A     Election Day Operations.

 7                  Q     Got it.

 8                  A     My -- my role.

 9                  Q     Okay.  But didn't you specifically

10          speak with Eric Chaney about concerns about the

11          reliability of the Dominion System?

12                  A     I got hundreds of reports and phone

13          calls from people about their concerns with the

14          voting system.  I took very little action, if any,

15          on those because there was so much disinformation

16          out in the ether.

17                  Q     And you also communicated with Misty

18          Hampton in late 2020 as well, right?

19                  A     I don't believe in late 2020, but

20          early 2020, she had reached out to me about a

21          county commissioner meeting and asked me to submit

22          a FOIA -- or an open records request for the
```

1     transcript.

2                        I received it.  It was a discussion,

3     you know, about the machines.  I forwarded that off

4     to attorneys and didn't really think twice about

5     it.  Coffee County really wasn't -- you know, I'm

6     more focused on Fulton, DeKalb, Gwinnett, you know,

7     larger counties.  It was not within my scope of my

8     role to have, you know, concerns about the voting

9     system.  I'm a pragmatist.  I can't change that.  I

10    can get poll watchers.  But, you know, people had

11    their theories.

12             Q    So if Coffee County was not in the

13    scope of your responsibilities and wasn't a

14    priority --

15             A    Well, it wasn't --

16             Q    Hold on.

17             A    Okay.

18             Q    -- given what you just said about

19    that, why did you organize an entire lawsuit

20    involving Shawn Still --

21             A    I didn't organize --

22                  MR. TYSON:  Object to form.

```
                                                      Page 35
 1                     You can answer if you can.

 2                     THE WITNESS:  What's that?

 3                     MR. TYSON:  I said object to form.

 4         You can answer it if you can.

 5                     THE WITNESS:  I didn't organize a

 6         lawsuit.

 7         BY MR. CROSS:

 8              Q     You didn't organize the declarations?

 9              A     Organize the declarations?  Can you

10         clarify?

11              Q     There were declarations that were

12         filed as part of Shawn Still's lawsuit in Coffee

13         County, right?

14              A     Yes.

15              Q     Didn't you literally notarize them?

16              A     Yeah, I notarized them.  Yes.

17              Q     But Coffee County wasn't in the scope

18         for you and it wasn't important?

19              A     Not -- it was not important for me,

20         but I was asked to -- I mean you're referring to

21         going down with Alex Kaufman, he needed a notary,

22         he asked me if I was available.  I said, "Yeah,
```

1          I'll get the hell out of Atlanta for a night."

2                    I went down there and served as a

3     notary.  What -- what the lawyers were doing was

4     their thing, you know?  If they needed something

5     from me, they needed assistance, I'd give it.

6          Q    How did you get there?  Did you fly

7     or drive?

8          A    He's a pilot, he flew.

9          Q    You flew all the way to Douglas,

10    Georgia simply to serve as a notary on a lawsuit in

11    a county that was outside your scope, that was

12    unimportant, and a lawsuit that you say you didn't

13    understand.  Is that your testimony?

14                    MR. TYSON:  I'll object to form.

15                    You can answer.

16                    THE WITNESS:  Coffee County was not

17    my personal priority.  My understanding of the

18    lawsuit is that they wanted to raise questions that

19    could benefit the Republican effort in the runoff

20    and they needed a notary.

21    BY MR. CROSS:

22          Q    Is it your belief that there are no

1        notaries in Douglas, Georgia or anywhere closer

2        than Atlanta that requires a flight or --

3                A     It was a Saturday, you know?  I

4        went -- I was like, "Okay.  I'll go.  Sure."

5                Q     Do you know that the UPS store has

6        notaries?

7                A     Yeah.

8                Q     But you flew down there -- your

9        testimony under oath is you flew down there simply

10       to notarize documents?

11               A     He needed a notary.  He wanted a

12       notary with him.  The mechanics of the lawsuit, I'm

13       not as familiar with, yeah.  Fly on a plane and get

14       out of Atlanta, yeah.  Sure.

15               Q     I'm sorry, who was "he" again?

16               A     Alex Kaufman.

17               Q     Who is Alex Kaufman?  It's Kaufman?

18               A     Kaufman.

19               Q     Is that K-A-U-F-M-A-N?

20               A     Yeah.

21               Q     And who is he?

22               A     He was deputy general counsel to the

Page 38

1          Georgia GOP.

2                    Q      When did you fly down there for that?

3                    A      December 12th, I want to say.

4                    Q      Okay.  How long were you there?

5                    A      Twelve to 18 hours.  I think we got

6          there in the evening and left there in the morning

7          or midafternoon.

8                    Q      Okay.  Have you remained in touch

9          with Alex Kaufman?

10                   A      I saw him last April.  I would not

11         consider him a friend at this point.

12                   Q      Does he work at the law firm of Hall

13         Booth today?

14                   A      I believe so.

15                   Q      Do you know when he started that

16         position?

17                   A      I do not.

18                   Q      You mentioned earlier -- you said

19         they were filing the Shawn Still lawsuit, and you

20         described your understanding of the purpose of

21         that.  Who's the "they"?

22                   A      Alex and I believe Kurt Hilbert filed

```
 1      that.
 2              Q     Who is Kurt Hilbert?
 3              A     He's an attorney.
 4              Q     Where was he at the time employed?
 5              A     He has his own law firm.
 6              Q     Is that still the case today?
 7              A     Yeah, I believe so.
 8              Q     Who all did you meet with when you
 9      were in Douglas on or around December 12th of 2021?
10              A     We went to a steakhouse and just, you
11      know, started asking, you know, "Hey, what's your
12      voting experience?"  And ran into a couple of
13      people that had hangups in the voting process.  And
14      then I think Alex wanted to -- I think the whole
15      purpose was to interview some -- a guy that owns
16      like the local paper.
17              Q     What was the steakhouse called?
18              A     I don't know.
19              Q     You guys went into a restaurant in
20      Douglas and asked random people what their
21      experience was with voting in the November 2020
22      election?
```

1          A     You have an 80 percent Trump county

2     and you say you're working for Trump, they treated

3     us like royalty.

4          Q     This wasn't something that you had

5     arranged in advance.  You -- you went into the

6     restaurant and then asked people --

7          A     Yeah.

8          Q     -- you introduced yourselves as

9     associated with the Trump Campaign --

10          A     Fly by the seat of your pants.

11          Q     -- and asked people about their

12     voting experience?

13          A     Yeah.

14          Q     And is that where some of the

15     declarants came from in the lawsuit?

16          A     Yes.

17          Q     And was it just you and Mr. Kaufman

18     that was having those conversations with these

19     folks or was someone else involved?

20          A     Just us I believe.

21          Q     Okay.

22          A     I mean, we're the only ones that went

Page 41

1          down there, so . . .

2                    Q     From Atlanta?

3                    A     Well, I mean, it was he and I.

4                    Q     And so you notarized the declarations

5          that day?

6                    A     Yes.

7                    Q     So between the time that you guys

8          identified the declarants, you know, some of the

9          folks who were at the steakhouse, and you notarized

10         them, who actually typed them up?

11                   A     I think Alex did.

12                   Q     How did you print them?

13                   A     I think there was a printer at the

14         Hampton Inn.

15                   Q     I see.

16                         So you could talk to people at the

17         steakhouse, find declarants, kind of get their

18         story, type it up, print it at the hotel, and then

19         have them sign it and you could notarize it the

20         same day?

21                   A     Yeah.

22                   Q     Okay.

```
 1              A    And then there was like a thing in
 2        place, an executive order that you could do like
 3        virtual.  So, you know, we would get their phone
 4        number, swear them, I'd stamp it, or something like
 5        that, yeah.
 6              Q    Okay.  Do you know why that lawsuit
 7        was dropped on January 7th, 2021, the same day that
 8        the initial breach occurred in the Coffee County
 9        Election Office?
10              A    No --
11                   MR. TYSON:  Object to form.
12                   You can answer if you can.
13                   THE WITNESS:  -- I don't.
14        BY MR. CROSS:
15              Q    No one communicated with you about
16        that?
17              A    No.
18              Q    When you were in Douglas on or around
19        December 12th, it's your testimony that you did not
20        have any interactions or communications with any
21        members of the Coffee County Election Board?
22              A    I don't believe I did.
```

Page 43

```
 1              Q     Is that the same with respect to

 2        anyone who worked in the Coffee County Election

 3        Office?

 4              A     Like did I meet with anyone?  No, I

 5        don't believe we did.

 6              Q     Did you communicate with them at all

 7        while you were there?

 8              A     No.

 9              Q     Have you ever been to that election

10        office?

11              A     No.

12              Q     Have you ever communicated with Cathy

13        Latham about the Shawn Still lawsuit?

14              A     Not regarding the Shawn Still

15        lawsuit.

16              Q     Do you know whether she was involved

17        in that effort at all?

18              A     In the lawsuit?

19              Q     Organizing that lawsuit or -- or any

20        decision-making around it.

21              A     I don't believe that to be the case.

22              Q     Have you ever communicated with Cathy
```

Page 44

1          Latham about the breach that occurred in the Coffee

2          County Election Office?

3                    A     I have not.

4                    Q     Have you ever communicated with

5          anyone about that subject?

6                    A     With anyone?

7                    Q     Yeah.

8                    A     As the communications director for

9          the Secretary of State's Office, we have had

10         communications regarding that, you know, to media,

11         to internal deliberations.

12                   Q     Have you communicated with anyone

13         about the breach of the voting system in Coffee

14         County outside of your official role as a

15         spokesperson for the Secretary's Office?

16                   A     I don't believe that.  I mean, I

17         might have, you know, discussed it among friends,

18         you know, people sending me an article and like,

19         "It's crazy, you know."  And I'm like, "Yeah, you

20         know, people are nuts."  But not like in a -- not

21         like in a -- not with those people and not in a,

22         you know -- yeah, no.

Page 45

```
 1                    MS. CINO:  Do you want to --

 2                    MR. CROSS:  Yeah, thank you.

 3          BY MR. CROSS:

 4                Q     Okay.  Let me hand you Exhibit 2.

 5                    (Sinners Deposition Exhibit Number 2

 6                     marked for identification.)

 7          BY MR. CROSS:

 8                Q     Take a moment to flip through this

 9          and just tell me if this is something that you've

10          ever seen before.

11                A     Yeah, I wasn't involved in this in

12          any way.

13                Q     So let me just ask you, Exhibit 2, do

14          you see that it's an e-mail exchange with Paul

15          Maggio, Sidney Powell, and others, and the most

16          recent date is January 8, 2021?

17                A     Sure, yeah, I can see that.

18                Q     Okay.  And just the question was:

19          Have you ever seen this document before?

20                A     No.

21                Q     Okay.  Have you, yourself, ever had

22          any communications with Paul Maggio?
```

Page 46

1           A     No.

2           Q     Have you ever had any communications

3     with Sidney Powell?

4           A     No.

5           Q     Throughout your entire time working

6     with the Trump Campaign, you never communicated

7     with her at all?

8           A     She was nuttier than a fruitcake.

9     No.

10          Q     Well, she was a prominent

11    spokesperson for the campaign you worked with.

12          A     I would dispute that

13    categorization -- or that characterization.

14          Q     In what way?

15          A     I was not familiar that she was

16    working for "the campaign" in any capacity.

17          Q     What is your understanding of what

18    Sidney Powell's role was with respect to the effort

19    to have Donald Trump named as the winner of the

20    2020 election?

21          A     She was one of these auxillary

22    personalities that I think Trump liked.  But yeah,

```
                                              Page 47
1        I mean, I don't believe she had any role with the
2        actual campaign, with the Donald J. Trump For
3        President, Inc., but she was one of these
4        peripheral characters doing her own thing.
5             Q     When you say "doing her own thing,"
6        are you -- you're not suggesting that what she was
7        doing was not -- was -- was somehow done not at the
8        direction of Trump or other senior folks in the
9        campaign, are you?
10            A     Trump, perhaps.  You know, maybe Mark
11       Meadows or, you know, these folks.  But like I --
12       my understanding is that Justin Clark and, you
13       know -- who's -- I'm missing a name, but like
14       Justin Clark and, you know, the campaign manager --
15       I'm blanking right now -- thought she was crazy,
16       you know.  Every -- a lot of people did.
17            Q     Have you ever had any communications
18       with Rudy Giuliani?
19            A     No.
20            Q     But he was also someone who was
21       involved with the campaign and trying to change the
22       outcome of that election, right?
```

```
                                              Page 48

 1                  MR. TYSON:  I'll object to form.

 2                  You can answer if you know.

 3                  THE WITNESS:  That he was someone

 4         involved, like, with the campaign?  Yeah, I mean,

 5         he, I think, came on as like a secondary -- you

 6         know, there was -- like people were talking about

 7         Rudy.  He may have had a formal role with the

 8         campaign, but I kind of view these guys as

 9         outsiders.

10                  You know, it's been publicized that

11         he led an effort and -- you know, at the

12         direction of the campaign, and the Georgia GOP

13         participated in the electors under the

14         understanding that there was a pending legal

15         challenge, and that this was a mechanism to

16         preserve that legal challenge.

17                  But afterwards, there was so much

18         chaos, and I think the direction of the Trump

19         effort -- the overall Trump effort, not

20         specifically the campaign, but was going

21         somewhere I didn't want to go, and so I focused

22         my attention 100 percent on the runoff.
```

```
 1        BY MR. CROSS:

 2                 Q     Well, Mr. Sinners, that's not quite

 3        accurate, is it?

 4                        MR. TYSON:  I'll object to form.

 5                        You can answer if you know.

 6        BY MR. CROSS:

 7                 Q     You spent considerable time on behalf

 8        of the campaign in December of 2020 organizing an

 9        alternate slate of electors who would vote on

10        behalf of the State of Georgia Trump as the

11        presidential winner, right?

12                        MR. TYSON:  I'll object to form.

13                        You can answer if you know.

14                        THE WITNESS:  I would not agree with

15        that characterization.  I did not spend

16        considerable time.  I was told -- I was told by

17        senior Trump campaign officials, campaign

18        officials, and senior GA GOP leadership that this

19        needed to happen in order to preserve legal rights

20        under law.  And multiple attorneys gave the

21        go-ahead.

22                        And, you know, it probably took
```

Page 50

1         four hours of effort, you know?  At the time, I

2         thought it was just something -- okay, this is

3         the final like, you know, dealing with the --

4         with the Trump Campaign in this sense of Trump's,

5         you know, post-election efforts.  And then turned

6         my attention to the runoff.

7    BY MR. CROSS:

8              Q      Have you ever communicated with Jesse

9    Binnall?

10             A      No.

11             Q      But you are familiar with him as one

12   of Donald Trump's lawyers, right?

13             A      I know who he is.

14             Q      Have you ever communicated with

15   Brendan Sullivan at SullivanStrickler?

16             A      I have not.

17             Q      Have you ever communicated with

18   anyone at SullivanStrickler?

19             A      I have not.

20             Q      Have you ever communicated with Doug

21   Logan?

22             A      No.

Page 51

1          Q     But you're familiar with him, right?

2          A     I'm familiar with him.

3          Q     Have you ever communicated with Scott

4     Hall?

5          A     He called me one time after the

6     election, and, frankly, the conversation was no

7     longer than a few minutes.  And he had some wild

8     theories.  And, again, going back to my original

9     statement that, you know, is he helpful with

10    getting me more poll watchers?  Is he helpful with

11    actual things that happened in an election

12    precinct?  No, he is not.  So I excused myself, and

13    I never spoke to him ever again.

14         Q     And you say that you were thinking

15    about whether he was helpful with getting poll

16    watchers, but you spoke to him after the election,

17    didn't you?

18         A     Yeah.  We still needed people for the

19    runoff and the recount and we had a, you know,

20    runoff -- or the recount and the audit, and then we

21    had a runoff coming up.  And when a guy calls you

22    and says they're from Gwinnett County and that

1          they -- to the effect of, "I have evidence of

2          Venezuela and" -- you know, he was one of the

3          thermostats in the -- you know, China and the

4          thermostat guys, and I thought he sounded bonkers,

5          so I never -- you know, he was not on my go-to list

6          at all.

7                    Q     Who was on your go-to list?

8                    A     If people could give helpful

9          information as poll watchers, I put them in

10         priority precincts.

11                   Q     Have you ever communicated with

12         Jeffrey Lindberg?

13                   A     No.

14                   Q     Have you ever communicated with Jim

15         Penrose?

16                   A     No.

17                   Q     Have you ever communicated with Alex

18         Cruz?

19                   A     No.

20                   Q     Have you ever communicated with

21         Russell Ramsland?

22                   A     No.

Page 53

1              Q    I'm sorry.  We talked about Giuliani.

2                   Have you ever communicated with

3    Mr. Giuliani?

4              A    No.

5                   (Sinners Deposition Exhibit Number 3

6                   marked for identification.)

7    BY MR. CROSS:

8              Q    I'm handing you Exhibit 3.

9                   Just flip through that if you would.

10   And you'll see it's an engagement agreement between

11   Jesse Binnall and the SullivanStrickler firm.  And

12   tell me if you've ever seen that before.

13             A    No, I have not.

14             Q    So that's not something you had any

15   involvement with?

16             A    No.

17             Q    Okay.  Let me hand you Exhibit 4.

18                  (Sinners Deposition Exhibit Number 4

19                   marked for identification.)

20   BY MR. CROSS:

21             Q    And you'll see that is an engagement

22   between Sidney Powell and the SullivanStrickler

Page 54

1          firm from December 6th, 2020.  Is that something

2          you've seen before?

3                    A     No.

4                    Q     And you didn't have any involvement

5          in that?

6                    A     No.

7                    Q     Go back to -- let me get the numbers,

8          it's the e-mail thread to -- Exhibit Share.

9                    MR. CROSS:  Thanks, Bryan.

10         BY MR. CROSS:

11                   Q     And flip to -- if you'll look at the

12         bottom, you'll see these little production numbers.

13         Flip to the one that ends in 038 if you would.

14                   A     Okay.

15                   Q     And if you look in the middle of that

16         page, you see there's an e-mail from Sidney Powell

17         on December 8, 2020 to Paul Maggio and others.

18                   A     Sure.

19                   Q     Yeah.  And the subject line, it has

20         SSA1722, then Jim Penrose.

21                   A     Yeah.

22                   Q     And then it refers to Michigan

```
                                                Page 55
 1      Forensics Engagement Agreement.  Do you see that?
 2              A     Yes.
 3              Q     And below Ms. Powell wrote, "Nevada
 4      must be paid by the campaign."  Do you see that?
 5              A     Sure.
 6              Q     Do you have any insight into what the
 7      campaign was doing with the SullivanStrickler firm
 8      in terms of getting access to voting equipment
 9      there?
10              A     No.  And my understanding is that
11      Sidney's firm was paying for these, from what I --
12      I mean, from what I've read in the media, so it was
13      probably she was under the impression that the
14      campaign would pay.  And I had every reason to
15      believe that the campaign, as the actual campaign,
16      was probably like, no, you know?
17              Q     But why would she expect the Trump
18      Campaign to pay that, if that's your testimony?
19                    MR. TYSON:  I'll object to form.
20                    You can answer if you know.
21                    THE WITNESS:  Because she's Sidney
22      Powell and she thought a lot of things that were
```

Page 56

```
1        incorrect.

2        BY MR. CROSS:

3             Q      Have you ever communicated with Phil

4        Waldron?

5             A      No.

6             Q      Have you ever communicated with Mike

7        Lindell?

8             A      No.

9                 (Sinners Deposition Exhibit Number 5

10                 marked for identification.)

11                   MR. CROSS:  Five, Exhibit 5.

12                   MS. CINO:  Yes.

13       BY MR. CROSS:

14            Q      All right.  Let me hand you

15       Exhibit 5.  And you can take a moment to flip

16       through it if you need.  You'll see at the top it's

17       an e-mail exchange between you and Harry MacDougald

18       from November 10 of 2020.

19            A      Yeah.

20            Q      If you come to page 11, the second to

21       the last page in the exhibit, you'll see the thread

22       begins within an e-mail from MacDougald to Mark
```

Page 57

1          Johnson on November 9, 2020.  Do you see that?

2                    A     Sure.

3                    Q     The subject line is, "Data file

4          needed for vote swapping/switching," right?

5                    A     Sure.

6                    Q     Who is Mark Johnson?

7                    A     I have no idea.

8                    Q     So Mr. MacDougald writes here, "We

9          need to test the Georgia voting results for the

10         presence of vote swapping or switching."

11                         Do you see that?

12                   A     Uh-huh.

13                   Q     Yes?

14                   A     Yeah, I see that.

15                   Q     And then he goes on, "This is

16         reasonable to do because, one, we know vote

17         swapping or switching happens on the Dominion

18         System."

19                         Do you see that?

20                   A     Sure.

21                   Q     Do you agree with that?

22                   A     No.

1          Q     But at no point in this e-mail thread

2     do you ever respond that that is not a true

3     statement, do you, sir?

4          A     This would be probably one of the

5     hundreds of e-mails where I got sent threads of

6     people espousing various things.  And I think --

7     "Yeah, I can say this is a serious issue that our

8     team has actively been investigating.  We are

9     recording all of the facts, and I think there's a

10    reason to believe this could be the case in

11    Georgia."  That's boilerplate language.

12               "We are assembling a team for" --

13    see, I pivot, "We are assembling a team for the

14    recount and runoff elections and we need all hands

15    on deck.  Please pass this form" -- link to a

16    form -- "out to your trusted friends and

17    colleagues.  It asks for great detail so that we

18    can vet submissions properly.  I hate to be

19    dismissive, but we simply don't have enough

20    credible evidence of software glitches at this

21    point.  Most issues can be explained by user error.

22    However, it is my belief that there was a

1        coordinated effort in some counties to

2        disenfranchise Republican voters due to vague

3        statutes and loopholes.  I appreciate you sending

4        this my way, Frank."

5                  So to me, that's me saying, "I'm not

6        dealing with this.  You want to be a poll watcher

7        for me, come help."

8              Q    Mr. Sinners, in response to that

9        e-mail from Mr. MacDougald, stating, "We know vote

10       swapping or switching happens on the Dominion

11       System," and that's the reason to look for that in

12       Georgia, you wrote back, "I think there's reason to

13       believe this could be the case in Georgia."

14                 Those are your words, are they not,

15       sir?

16                 MR. TYSON:  I'll object to form.

17                 You can answer.

18                 THE WITNESS:  I mean, I don't even

19       believe I read through this whole thread.

20       BY MR. CROSS:

21             Q    Did you write that or did you not,

22       Mr. Sinners, those words?

Page 60

1          A     Yeah, I wrote those words.  I just

2     read them.

3          Q     Okay.  If you look at page 10, you'll

4     see at the top there's an e-mail from Mark Johnson

5     in this thread.  This is November 9, 2020, and he

6     writes "Sidney Powell called Don Brown, a Charlotte

7     lawyer."  It goes on to say, "Don said he needed

8     pleadings from an election case before

9     Judge Totenberg."

10               Do you see that?

11         A     Sure.

12         Q     Do you know Don Brown?

13         A     No.

14         Q     And is it still your testimony that

15     Sidney Powell was not involved in the same effort

16     that you were involved in looking for vote swapping

17     or switching in Georgia?

18         A     I really wasn't involved in an effort

19     looking for vote swapping or switching.  We gave it

20     some attention, but it was kind of the land of make

21     believe and bonkers.  I mean, here's a Gateway

22     Pundit article.  The Gateway Pundit caused me more

1           pain and suffering on the campaign and does now

2           because people believe it as truth.

3                   And yeah, I mean my response, as you

4           can see, was, "Please pass this form out to all

5           your trusted friends and colleagues," as in, "Let

6           me redirect you to be able to be helpful rather

7           than engage in this."

8               Q    Mr. Sinners, you understand you're

9           under oath today, right?

10              A    Yeah.

11              Q    And you just testified this was not

12          an important issue that you spent much time on, but

13          when you wrote it at the time, you wrote, "I can

14          say this is a serious issue that our team has

15          actively been investigating."

16                  Those are your words, correct?

17              A    Sure.  Four days after the election

18          we're looking into is there any legitimacy to this.

19          And so I came to the conclusion that, you know, as

20          I said previously, most of these allegations

21          involving vote flipping can be explained by human

22          error.  And they were.  And there's nothing wrong

Page 62

1          with doing a little digging.

2                 Q     Flip to the page -- page 4, if you

3          would, please.

4                 A     Okay.

5                 Q     Here, Mr. MacDougald sends an e-mail

6          on November 10, 2020.  Do you see that?

7                 A     Yeah.

8                 Q     And do you see that Frank Strickland

9          of Taylor English is on this e-mail?

10                A     I do.

11                Q     What was his involvement or the

12         involvement of the Taylor English firm in the

13         effort to identify vote swapping or switching in

14         Georgia in this time frame?

15                A     I'm not sure.

16                Q     And then if you come down, do you see

17         in the third paragraph there's a discussion of a

18         slide deck that Russ Ramsland had presented?

19                A     Sure.

20                Q     And is it still your testimony that

21         Mr. Ramsland was not involved in the effort to find

22         vote swapping or switching in Georgia?

Page 63

```
 1                    MR. TYSON:  Object to form.

 2                    You can answer.

 3                    THE WITNESS:  Yeah, I don't believe

 4        that was my testimony.  I just had never dealt with

 5        him.

 6        BY MR. CROSS:

 7             Q     I see.  Okay.  I'm sorry.

 8                    You personally have never

 9        communicated with him.  You don't know one way or

10        the other to the extent to which he was involved in

11        this effort?

12             A     I never dealt with him.  All I saw

13        was him in a senate hearing saying all sorts of

14        kooky crap.  He was not somebody I was dealing

15        with.

16             Q     And you don't know Mark Johnson?

17             A     I -- no.

18             Q     So then if you look at the bottom of

19        page 3, you'll see that Mark Johnson is the one

20        that added you to this thread, right?

21             A     Sure.  Yeah.

22             Q     It says, "Which Frank suggested that
```

1    I do."  Why did Frank Strickland, if you didn't

2    have any involvement with him, suggest that you be

3    pulled into this?

4              A      With Frank or Mark?  I know Frank

5    Strickland.  I mean, I don't know who Mark Johnson

6    is.  It's possible I could have met him.  I had

7    volunteers every day.  He may have been on my

8    e-mail list for attorneys to help.

9                   The -- the context is that my e-mail

10   and my cellphone were getting put on national

11   e-mail list servers.  Every county party chair in

12   Georgia had my cellphone.  I was the guy to call if

13   they wanted some sort of, you know, issue with the

14   elections.  I was getting hundreds of calls, you

15   know?  I'm sure if he had my e-mail, it's probably

16   that he picked it up through something like that.

17   I mean, I can't really explain it, but, you know,

18   Mark does not ring a bell, so . . .

19              Q      Did anyone call you on January 7,

20   2021, about the breach in Coffee County?

21              A      No.

22              Q      Have you looked at your phone records

Page 65

1          to confirm that?

2                    A      No.

3                    Q      But you didn't produce your phone

4          records in response to the subpoena, did you?

5                    A      I don't have my phone records, but I

6          can say truthfully that I did not discuss the

7          breach.

8                    Q      The carrier has your phone records,

9          right?

10                   A      Sure.

11                   Q      Do you have any objection to us

12         pulling those?

13                   A      I think that's an invasion of my

14         personal privacy.  I don't think it's relevant,

15         because as I told you, I had nothing to do with

16         this.  So yeah, I do have an objection to that

17         because I have nothing to do with this.

18                   Q      Are you willing to produce redacted

19         phone records -- well, strike that.

20                          Are you willing to produce phone

21         records for the November 2020 through January 2021

22         period, for that small window?

Page 66

1              A     No.  I value my privacy.  I had

2        nothing to do with this.

3                    MR. CROSS:  I think we are at

4        Exhibit 6.

5                    (Sinners Deposition Exhibit Number 6

6                    marked for identification.)

7        BY MR. CROSS:

8              Q     Take a moment to flip through it, if

9        you need, Mr. Sinners.  The -- the document is an

10       e-mail that you received from Harry MacDougald on

11       November 10th, 2020, right?

12             A     Sure.

13             Q     And the subject line is, "Technical

14       Evidence on Log Analysis of the Dominion System."

15                   Do you see that?

16             A     Yeah.

17             Q     And then there's two declarations

18       attached from a cyber -- an election security

19       expert named Harri Hursti.

20                   Do you see that?

21             A     Yeah.

22             Q     And do I understand Mr. MacDougald

1    sent you this as part of the same effort that we

2    saw in the prior exhibit with Mr. MacDougald

3    looking into whether the Dominion System operated

4    correctly in terms of counting and tabulating votes

5    in the November 2020 election?  Is that fair?

6           A    I -- I guess.  I mean, he sent me

7    that e-mail.

8           Q    Okay.  And Mr. MacDougald indicates

9    here that these declarations came from this

10   lawsuit?

11          A    Sure.  Your lawsuit was quite popular

12   amongst some of the more-excited individuals on the

13   Republican side.

14          Q    And Mr. MacDougald writes that Harri

15   Hursti is one of the top experts in the country on

16   this topic.  Do you see that?

17          A    Sure.

18          Q    What did you do with this e-mail and

19   this information when you got it?

20          A    Probably ignored it.

21          Q    You said "probably."  Do you have any

22   specific recollection of whether you forwarded this

Page 68

1    or shared it with anyone?

2              A    No.

3              Q    You just don't remember one way or

4    the other?

5              A    Yeah.  I mean, it, again, wasn't

6    really -- it looks like it's a lot of reading.  My

7    time was of the essence.  I really wasn't worried

8    about a lawsuit that, you know, was -- yeah.  I'm

9    not a lawyer.  It didn't seem to have any value.  I

10   probably didn't do anything with it.

11             Q    If you look at -- so if you look at

12   the bottom of Mr. MacDougald's e-mail on the first

13   page, he writes, "The good news is that this fact,

14   in and of itself, is a powerful argument against

15   certification of the results."  Then he writes,

16   "Now back to the conflict issue.  I will be so bold

17   as to recommend," and then he has two

18   recommendations.

19                  Do you see that?

20             A    Yeah.

21             Q    In the second one he writes, "That

22   you NOT" -- the "not" is in caps -- "give these

Page 69

1        declarations to the Taylor English or Robbins Alloy

2        teams or let them have any oversight of the

3        analysis of the technical problems in the Dominion

4        System revealed by these affidavits or any analysis

5        your team is conducting into those questions.  You

6        have to have un-conflicted lawyers running that

7        part of your litigation strategy."

8                    Do you see that?

9            A       Uh-huh.

10           Q       What was your understanding of what

11       he meant by "un-conflicted lawyers" with respect to

12       those firms?

13           A       There was kind of the more hard-core

14       Trumpers that thought their defense of the

15       Secretary of State -- you know, the Secretary of

16       State kind of became the bad guy to a lot of these

17       people.  Yeah, I remember hearing that, you know?

18       But kind of every excitable opinion -- you know,

19       everybody has got opinions.

20                    (Sinners Deposition Exhibit Number 7

21                     marked for identification.)

22

```
 1        BY MR. CROSS:
 2                Q     All right.  Let me hand you
 3        Exhibit 7.
 4                A     Yes.
 5                Q     So have you seen -- you can flip
 6        through it if you need.  Have you seen Exhibit 7
 7        before?
 8                A     It looks like text messages.
 9                Q     Have you seen -- does this particular
10        document look familiar to you?
11                A     No.
12                Q     Okay.  So I will tell you, Exhibit 7
13        is a text thread between Misty Hampton and Eric
14        Chaney.  We covered this in Mr. Chaney's
15        deposition.
16                A     Okay.
17                Q     It came from Misty Hampton, so the
18        green texts are texts that Misty Hampton is
19        sending.
20                A     Uh-huh.
21                Q     And the grey are Chaney's responses.
22        Do you understand that?
```

Page 71

1              A      Yeah.

2              Q      So go to page 15 if you would.  The

3       page number is in the bottom right-hand corner.

4              A      Okay.

5              Q      So if you look in the middle, you'll

6       see it says November 19, 2020, at 5:19 p.m.  And

7       there's a text from Eric Chaney to Ms. Hampton that

8       reads, "Do you have the election bulletin from the

9       Secretary of State's Office, about how the audit

10      had proved the machines were reliable and that

11      notes should certify the original numbers?"

12                    Do you see that?

13             A      Uh-huh.

14             Q      Yes?

15             A      Yeah, I do.

16             Q      And then Ms. Hampton responds, "I

17      will go back on Firefly and find them."  Mr. Chaney

18      writes, "E-mail them to me, please.  Trump's man

19      wants them."  And she writes, "Okay."

20                    Do you see that?

21             A      Okay.

22             Q      Trump's man, that's you, right?

1           A     I don't believe so.

2           Q     You weren't communicating with

3     Mr. Chaney in this time frame around about this

4     issue?

5           A     November 19th?  No, I don't think

6     that's me because I would have been able to just

7     get the election bulletin from the Secretary of

8     State's Office.  I wouldn't have needed to -- to

9     get that from them.  I don't think -- I don't think

10    that's me.

11          Q     Okay.

12          A     And then thereafter, the "SOS" and

13    "Gov," yeah, I was not after the SOS and the Gov,

14    so . . .

15          Q     Did you ever ask Mr. Chaney or anyone

16    else for this election bulletin?

17          A     I think I asked Eric Chaney for a

18    letter at some point about like not recertify --

19    not decert -- or not being able to certify.  But

20    yeah, I don't think this is regarding me,

21    especially 11/19, November 19th.  Yeah, I don't

22    think that's me.

Page 73

1          Q      Just hang on to that if you would.

2                 I'll hand you Exhibit 8.

3          (Sinners Deposition Exhibit Number 8

4          marked for identification.)

5     BY MR. CROSS:

6          Q      Exhibit 8 is an e-mail that you

7     received from Eric Chaney regarding Dominion voting

8     machine concerns on November 11, 2020, right?

9          A      Yeah.

10         Q      And he writes, "I appreciate the

11    opportunity to speak with you yesterday."

12                Do you see that?

13         A      Yeah.

14         Q      So in addition to this e-mail, you

15    actually had a conversation with him the day

16    before, right?

17         A      Yeah, I guess.  Yeah.

18         Q      And in this e-mail, he describes a

19    concern that he has with the operation of the

20    Dominion voting machines and software.  And he puts

21    into all caps, "This is the avenue for fraud on the

22    largest scale imaginable."

Page 74

1              Do you see that?

2         A     Yeah, in all caps.

3         Q     And was that a concern that you

4    discussed with folks other than Mr. Chaney?

5         A     I'm not sure.  I think this was part

6    of my outreach to Republican board members.  I --

7    you know, we had heard of stuff going on in various

8    counties.  I know they were having problems in

9    Coffee.  And yeah, I probably called him, because

10   he's the Republican board member.  I think he was

11   the chairman at the time.  I think this had to do

12   with like the open records request that I sent.

13   But, you know, he had a lot of theories, and so

14   yeah, I mean, he shot me this e-mail.

15              Did I respond?

16        Q     That's my question:  Did you respond?

17        A     I don't see a response logged, so I

18   assume I didn't.

19        Q     But you don't remember either way,

20   right?

21        A     Yeah, I don't remember either way.

22

Page 75

```
 1                (Sinners Deposition Exhibit Number 9
 2                marked for identification.)
 3                    MR. CROSS:  Exhibit 9.
 4          BY MR. CROSS:
 5                Q    All right.  Let me hand you
 6          Exhibit 9.  And flip to the -- you're welcome to
 7          read through the whole thing, but flip to the
 8          bottom -- the last page, the one in chronological
 9          order.
10                A    Yeah, this makes sense.
11                Q    And so this is the day before the
12          e-mail that we just saw with Mr. Chaney.  This is
13          November 10th of 2020.  And you reached out to
14          Misty Hampton --
15                A    Yeah.
16                Q    -- and you asked for official meeting
17          minutes and audio of this morning's November 10
18          board of elections or commissioners meeting.
19                    Do you see that?
20                A    Yes.
21                Q    Why were you asking for that?
22                A    Misty had called me, as I said
```

1      previously, and, you know, suggested I send an open

2      records request.  What I got back was like a

3      discussion on the machines.  You know, I probably

4      talked to Eric Chaney in that process.  And, you

5      know, it was a lot of speculation.

6                  I may have forwarded it to attorneys,

7      to the campaign, you know, "Hey, take a look."

8      But, you know, I wasn't really, you know, able to

9      devote a whole lot of time to this sort of thing,

10     you know.

11          Q    And you're saying that you made this

12     request because Misty Hampton called you beforehand

13     and asked you to make the request?

14          A    Yeah.  She said there was an

15     interesting meeting that came up and -- or an

16     interesting topic that came up that the campaign

17     should know about.  You know, that was my role

18     to -- if we get a, you know, complaint, we would

19     look into it.  I don't really recall taking a whole

20     lot of action on this, you know?

21          Q    You don't indicate in your e-mail

22     here that you had had a conversation or that you

1          were -- that you were sending this request because

2          she asked for it, right?

3                    A     Sure, I guess not.

4                    Q     Did you ever receive the minutes and

5          the audio?

6                    A     I think I did to this Georgia EDO

7          address.  And, you know, I don't have access to

8          that.

9                    Q     Why not?

10                   A     Because it's a, like, secondary

11         e-mail.

12                   Q     What does that mean?

13                   A     It's, you know, not

14         Rsinners@DonaldTrump.com.

15                   Q     Sorry.  Can you explain that?

16                   A     Yeah.  It's a separate e-mail

17         account.

18                   Q     From your Rsinners?

19                   A     Yeah.

20                   Q     But why do you not have access to it?

21                   A     Because the Trump Campaign is over.

22         I just have what's in my Outlook, and that wasn't

1     in my Outlook.  That was a special, like, log-in

2     account.  That's where we get, like, incident

3     reports and stuff sent to.

4            Q     But that e-mail account still exists,

5     right?

6            A     I don't know.

7            Q     That's not something that you

8     searched?

9            A     I don't have access to that.  That is

10    the Trump Campaign, you know?

11           Q     What is the basis for your testimony

12    that you no longer have access?

13                 Have you tried to access it?

14           A     I don't know how to.  I don't have

15    access.  The Trump Campaign, to my knowledge, does

16    not exist.  And it was not in my Outlook.  Rsinners

17    was in my Outlook.

18           Q     You think that the Trump Campaign

19    does not exist?

20           A     As this entity.  I mean, I don't

21    know.  You can take it up with them.

22           Q     But the Georgia

1          EDO@Donaldtrump.campaign -- .com, that was an

2          e-mail address that you used, right?

3                    A     Yeah.

4                    Q     Did anyone else use that address?

5                    A     I think so.

6                    Q     But you had access to that, you used

7          that for some period of time?

8                    A     I used it to filter through incident

9          reports, yep.

10                   Q     Okay.  And to send --

11                   A     Yeah.

12                   Q     -- record requests?

13                         Okay.  Well, we would ask that you

14         actually take the steps to see if that is still

15         accessible and whether it contains responsive

16         documents for the subpoena.

17                   A     I doubt it would.

18                   Q     Well, we would ask that you confirm

19         that.

20                         MR. CROSS:  Are we at Exhibit 10?

21                         MR. BROWN:  Yes.

22

1                (Sinners Deposition Exhibit Number 10

2                marked for identification.)

3        BY MR. CROSS:

4                Q    Okay.  Take a look at Exhibit 10, if

5        you would.  Do you see this is an e-mail that you

6        received, along with Scott Hall and others, on

7        November 20, 2020?

8                A    Sure.

9                Q    And the subject is, "List Request."

10       Do you see that?

11               A    Yep.

12               Q    Who is David Shafer?

13               A    Chairman of the Georgia GOP.

14               Q    Is that still his role?

15               A    That is.

16               Q    And he writes to you and Mr. Hall,

17       and others, "Scott Hall has been looking into the

18       election on behalf of the President at the request

19       of David Bossie.  I know him."

20                    Do you see that?

21               A    Uh-huh.

22               Q    Who is David Bossie?

Page 81

1              A    I think he's, like, the chairman of

2         the Maryland GOP, like he's RNC, big guy, you know?

3              Q    And he has a relationship with Scott

4         Hall.  Is that right?

5              A    I would assume by this e-mail.

6                   I feel like I've already spoken to

7         Scott Hall at this point and gotten no value or,

8         you know, what I perceive to be credibility.  David

9         Shafer had an amazing way of introducing people

10        that had already been introduced.  And this wasn't

11        really my purview.

12                  I don't have a list of voters who

13        told us that they returned their absentee ballots,

14        but that those ballots do not show as having been

15        accepted.  That would have been more of a data

16        thing, so I'm not sure I took any -- I don't -- I

17        can say I probably didn't take any action on this

18        e-mail.

19             Q    I'm going to hand you what's been

20        marked as Exhibit 11.

21                  (Sinners Deposition Exhibit Number 11

22                   marked for identification.)

```
                                                    Page 82
 1                    MR. CROSS:  This is Tab 13 for my
 2        team.
 3                    MR. TYSON:  Is this a completing
 4        letter or -- there's only one page on this version?
 5                    MR. CROSS:  Yeah, it's -- it looks --
 6        it was produced to us this way --
 7                    MR. TYSON:  Okay.
 8                    MR. CROSS:  -- is my understanding.
 9        BY MR. CROSS:
10                Q    Mr. Sinners --
11                  (Discussion had off the record.)
12        BY MR. CROSS:
13                Q    All right.  Do you recognize
14        Exhibit 11?  It's a document that you produced.
15                A    I think it's the letter -- the letter
16        regarding certification or whatever for Coffee
17        County.
18                Q    It's actually a draft --
19                A    Yeah.
20                Q    -- of the letter, right?
21                A    Yes.
22                Q    Why did you receive a draft of that
```

Page 83

1          letter before it went to the Secretary's Office?

2                   A      I don't know.  I mean, this is around

3          the same time that Eric and Misty reached out, so,

4          you know, they sent me whatever they had and their

5          concerns.  And, you know, I probably sent this to

6          attorneys and then moved on with my day.

7                           MR. CROSS:  Mr. Sinners, why don't we

8          take a break.  We've been going about an hour and a

9          half.

10                          VIDEOGRAPHER:  The time is 10:40 a.m.

11         We are off video record.

12                     (Recess from 10:40 a.m. to 10:43 a.m.)

13                          VIDEOGRAPHER:  The time is 10:43 a.m.

14         We are back on video record.

15                     (Recess from 10:40 a.m. to 10:43 a.m.)

16                          VIDEOGRAPHER:  The time is 10:43 a.m.

17         We are back on video record.

18                          MR. CROSS:  We're at Exhibit 12?

19                     (Sinners Deposition Exhibit Number 12

20                      marked for identification.)

21         BY MR. CROSS:

22                   Q      All right.  Let me hand you what's

1          been marked as Exhibit 12.  Exhibit 12, the cover

2          e-mail is from Eric Chaney to you on December 8th,

3          2020, right?

4                 A     Yep.

5                 Q     And there's an attachment entitled,

6          "Signed Letter to NOT" -- "not" is in all caps --

7          "Certify Electronic Recount."

8                       Do you see that?

9                 A     Yes.

10                Q     And there's another attachment

11         entitled, "Discrip" -- D-I-S-C-R-I-P -- "in

12         recount."  Do you see that?

13                A     Yep.

14                Q     And he's ending you an e-mail that

15         Misty Hampton had forwarded -- or sorry, that had

16         sent to Eric Chaney and Matt McCullough below the

17         same day.  Do you see that?

18                A     Yes.

19                Q     And then if you turn, you'll see the

20         two attachments.  One is a letter from the chair of

21         the Coffee County Board of Elections to Brad

22         Raffensperger, dated December 4th of 2020,

Page 85

1      indicating that the board was not going to certify

2      the electronic recount numbers.

3                  Do you see that?

4           A     Yeah.

5           Q     And what did you do with the

6      information that Mr. Chaney sent you here?

7           A     I think I gave it to the attorneys.

8      You know, we had been hearing of things going on,

9      that they had an issue, that they were not going to

10     certify, so we wanted a copy of the letter.

11          Q     So this was something that you guys

12     had requested, the letter?

13          A     I think attorneys working for the

14     GOP, you know the Republican team, requested it.  I

15     might have reached out and said, "Hey, can you

16     forward me the letter?"

17                  But yeah, I mean, you know, that was

18     more of a legal thing.  Yeah.

19          Q     And you say -- you said a few times

20     that there were things that you probably forwarded

21     on to the attorneys.  What attorneys are you

22     talking about?

```
 1              A     Probably Alex Kaufman, Ray Smith.
 2       Ray was our local campaign counsel that advised the
 3       campaign.  You know, there are probably ten
 4       attorneys that were kind of working tangentially.
 5       By then, a lot -- a couple have trailed out, but I
 6       probably forwarded this to, you know, Ray or Alex
 7       or somebody to take a look.  I know -- I think that
 8       this letter had involvement in the lawsuit against
 9       Coffee County, the Still v. Raffensperger.
10              Q     I'm sorry.  Say that again.
11              A     I -- I think this letter played into
12       the lawsuit of Still v. Raffensperger.
13              Q     How so?
14              A     I think it was one of the things they
15       included.
16              Q     In the filing you mean?
17              A     Yeah.  Yeah.
18              Q     One of the things that was sought --
19              MR. CROSS:  Sorry.
20              MS. CINO:  It's coming on at 11.
21              MR. CROSS:  Okay.  That's fine.
22
```

Page 87

```
 1      BY MR. CROSS:

 2            Q     One of the things that was sought in

 3      Shawn Still's lawsuit in Coffee County was access

 4      to the voting equipment.  Is that right?

 5            A     I don't believe that, but it's

 6      possible.

 7            Q     Okay.

 8            A     I'm not really familiar with the

 9      filing.

10            Q     All right.  Let me hand you

11      exhibit --

12                  MR. CROSS:  Is this 13?

13                  MR. BROWN:  13.

14                  MR. CROSS:  All right.

15               (Sinners Deposition Exhibit Number 13

16                 marked for identification.)

17      BY MR. CROSS:

18            Q     Exhibit 13 is an e-mail that -- the

19      first e-mail in the thread is one that you sent as

20      an open records request from your Gmail account --

21            A     Yes.

22            Q     -- on November 10, 2020.  That's
```

Page 88

1          Coffee County, right?

2                A      I sent that to, I think, 159

3          counties.

4                Q      Including Coffee County?

5                A      Yeah.

6                Q      And Ms. Hampton sent you a response

7          on December 2nd of 2020 saying, "Are you still

8          working with the Trump Campaign???"  Right?

9                A      Sure.

10               Q      And did you respond to this?

11               A      No.

12               Q      Why not?

13               A      Because I was not really checking my

14         Gmail.  I mean, you may not have ever, you know,

15         worked on a campaign, but your personal life kind

16         of goes sideways and, you know, I was primarily

17         only going through my campaign account.  And yeah,

18         I mean, I don't remember ever responding.  And I

19         have no record of it.

20               Q      So you -- you sent an e-mail from

21         your Gmail account to 159 counties asking for

22         information --

Page 89

1           A      On the review panels.

2           Q      Right.

3           A      Yeah.

4           Q      And it's your testimony that you

5      didn't really check your Gmail, that you weren't

6      concerned about whether you got responses to that?

7           A      No.  I mean, I -- I did, I think -- I

8      mean, the filing -- the filling of the requests was

9      not, I guess you would say, done accordingly.  Vote

10     review panels for the 2020 November election, if

11     this is Tuesday, they were happening Wednesday,

12     Thursday, Friday, Saturday, and Sunday.  So it just

13     kind of timed out and I forgot about it.  Because,

14     you know, I got back probably ten records out of

15     159.  We just needed to see those records to make

16     sure that they were staffed.

17          Q      So we've seen at least three e-mails

18     that you used in this time frame.  One is the Gmail

19     account here, one was the Georgia EDO account, then

20     you had your own Rsinners@DonaldTrump.com, right?

21          A      Yeah, that's correct.

22          Q      How did you determine -- when you

1      were doing work with respect to the election issues

2      in 2020 and 2021, how did you determine which

3      e-mail that you used?

4           A      Whichever one was quickest to the

5      browser that I was currently in.  I mean, I -- I

6      think maybe the context you're missing is the

7      absolute boiler room that is a campaign.  The most

8      important resource you have is time.  You can only

9      respond to a hundred issues a day, yet, you have a

10     thousand.

11             So there wasn't really any strategy

12     behind which e-mail account was -- was used.  It's

13     kind of whatever someone asked you to do at the

14     time, whatever you think needs to be done at the

15     time.

16             You know, I think with this one -- I

17     don't know.  I think maybe there was some belief

18     that the Trump e-mail would be shut down afterwards

19     and we want that information for the runoff.

20          Q      What e-mail accounts did you search

21     in response to the subpoena?

22          A      My Gmail, my SOS account, and what

Page 91

1        was in my in-box from Rsinners@DonaldTrump.

2                Q     And when you say in-box for

3        Rsinners@Donald Trump, what do you mean?

4                A     Like preserved e-mails in Outlook.

5                Q     And did you search that -- what kind

6        of device was that on?

7                A     A laptop.

8                Q     So data --

9                A     And in my SOS account.

10               Q     The Rsinners@DonaldTrump, that's an

11       account that you still have access to?

12               A     Yeah.

13               Q     And that's an Outlook account?

14               A     I mean, yes, it's through Outlook.

15               Q     It's accessible through Outlook?

16               A     Yeah.

17               Q     And when you searched that -- you

18       said you searched the in-box -- did you search all

19       folders, like deleted, spam, sent mail, or just the

20       in-box?

21               A     I only have an in-box.  I don't have

22       any out-going.  It's the way that I preserved it.

1           I had a belief that following the events of

2      January 6th, 2021, that there would be people who

3      would be asking questions in the future, so I made

4      an attempt to preserve as many e-mails as I could.

5           Q     But you're saying that the

6      Rsinners@DonaldTrump is set up through Outlook, but

7      it doesn't have any of the normal folders, it

8      literally only has an in-box folder?

9           A     That's the archive that I saved.

10          Q     Okay.  I see.

11                So you're -- you're searching --

12          A     It has no responsive server.  It's

13     just static e-mails that were archived.

14          Q     Sitting locally on your laptop?

15          A     Yes.

16          Q     So you -- is it a PST file?

17          A     I don't know.

18          Q     So when you -- when you open those

19     e-mails now, you just go into Outlook and you pull

20     up whatever you have preserved, whatever you have

21     archived?

22          A     I can do a keyword search, you know,

Page 93

1          that sort of thing.

2                  Q      And these are documents -- these are

3          e-mails that you selected for preservation at some

4          point after January 6th?

5                  A      Yes.

6                  Q      Okay.  And so those are sitting in an

7          in-box.

8                         When you did that preservation, did

9          you also preserve e-mails that you had sent or were

10         sitting in deleted folders or other folders beyond

11         the in-box?

12                 A      There wasn't a way to.

13                 Q      Why?

14                 A      I -- I'm not a tech guy.  I've got

15         what I received in my in-box.

16                 Q      Okay.  So the only thing that you

17         preserved was what was sitting in the in-box?

18                 A      Yeah.

19                 Q      Some set of that?

20                 A      Yeah.

21                 Q      Okay.  What happened to the e-mails

22         that were originally sitting in that account in

Page 94

1      like your sent folder or deleted or any other

2      folders that were set up?

3                    MR. TYSON:  Object to form.

4                    You can answer if you know.

5                    THE WITNESS:  I guess they're with

6      the Trump Campaign.  I don't know if they keep

7      archives.  I don't know, I think there was an

8      option and it was like download in-box and I

9      clicked that.  You know, I don't know how to --

10     yeah.

11     BY MR. CROSS:

12            Q     So you no -- you're saying that you

13     no longer have access to this account sitting on

14     whatever server it sits on --

15            A     Yeah.

16            Q     -- you only have what you stored

17     locally on your computer?

18            A     Yes.

19            Q     Did you make any effort to try to get

20     access to that account, such as contacting anyone

21     at the Trump Campaign?

22            A     Don't have a reason to.

Page 95

```
1              Q     Well, you're under subpoena, that's a

2         pretty compelling reason.

3              A     Well, if I don't have it, I don't

4         have it.  I gave you everything that you asked for,

5         and things that I thought may have gone up to that

6         line, I gave it.  I wanted to be more than

7         forthcoming, because when you have nothing to do

8         with this, I have no reason.

9              Q     Okay.  But you --

10             A     Up to the line of you personally

11        invading my privacy and this, frankly, what I feel

12        has been a harassment campaign for the past three

13        months against me, but I'm willing to help as much

14        as I can, and that is how I can help.  I was fully

15        compliant in your subpoena.

16                   MR. TYSON:  So we're five minutes

17        out, when you get to a point for a break.

18                   MR. CROSS:  Yeah, let me just wrap

19        this up.

20        BY MR. CROSS:

21             Q     Okay.  Well, we would ask that you

22        look to see whether you can get responsive e-mails
```

Page 96

1          from that account as well.  You can talk it over

2          with your lawyers, but your obligation under a

3          subpoena is not just what's in your physical

4          possession, it's what you also have control or

5          access to.

6                    A     I don't have control and access to

7          any of that.

8                    Q     Well, that's something that should be

9          explored with the Campaign.

10                   Oh, just quickly, have you ever used

11         Signal?

12                   A     I have.

13                   Q     Do you use it now?

14                   A     No.

15                   Q     Did you search Signal for the

16         subpoena?

17                   A     I did.

18                   Q     And you didn't find anything

19         responsive?

20                   A     No.

21                   Q     Is your Signal set up to delete

22         messages after some point in time?

1          A     I think that goes by the per chat.

2          Q     So different chats have different

3     settings that you set up?

4          A     Yes.

5          Q     Some chats have a setting to delete

6     over some course of time and others don't?

7          A     Yeah, but I mostly texted.  There

8     were just some poll watchers and, you know, people

9     that like privacy.  You know, Signal, I guess, is

10    more secure.

11         Q     Okay.

12         A     I don't really care.  I never found a

13    benefit either way.

14         Q     Okay.  Did you use Signal for any of

15    the work that you did with respect to the

16    November 2020 election or the senate runoff?

17         A     Yeah, I would say so.

18         Q     But you didn't find any responsive

19    messages?

20         A     No.

21         Q     And the text messages you produced,

22    those are all the text messages you found

Page 98

1          responsive to the subpoena?

2                    A      Yeah.

3                    Q      Did you use text message to

4          communicate with people regarding the work you did

5          with respect to the November 2020 election or the

6          senate runoff?

7                    A      I texted people, yeah.

8                    Q      And what's your normal process for

9          text messages?

10                   Do you just keep them or do you

11         delete them from time to time?

12                   A      Delete them from time to time

13         whenever my phone is getting more, you know,

14         overloaded.

15                   Q      Did you ever communicate with anyone

16         who had any responsibility for elections in Coffee

17         County by text message or Signal?

18                   A      Don't believe so.

19                   Q      Have you ever had a Proton e-mail

20         account?

21                   A      No.

22                   Q      Have you ever had any e-mail accounts

1        other than the three that we've discussed?

2               A     Have I ever?  Yeah.  I mean, I grew

3        up with e-mail.

4               Q     Fair point.  I'm old, so that's --

5               A     Same as you.

6               Q     I did not grow up with e-mail sadly.

7        Let me ask a better question.

8                     Were there any e-mail accounts that

9        you used with respect to election issues involving

10       the State of Georgia beyond the e-mail accounts we

11       have discussed?

12              A     I don't believe that to be the case.

13              Q     Okay.

14                    MR. CROSS:  All right.  Let's take a

15       break.  Thank you.

16                    VIDEOGRAPHER:  The time is 10:58 a.m.

17       We are off video record.

18               (Recess from 10:58 a.m. to 11:30 a.m.)

19                    VIDEOGRAPHER:  The time is 11:30 a.m.

20       We are back on video record.

21                    MR. CROSS:  All right.  I lost track

22       of our exhibit numbers.

1               MR. BROWN:  14 is the next one.

2               MR. CROSS:  14, okay.

3               (Sinners Deposition Exhibit Number 14

4               marked for identification.)

5       BY MR. CROSS:

6               Q     All right.  Let me hand you

7       Exhibit 14.  Do you recognize this?

8               A     Sure.  Text messages with Alex

9       Kaufman.

10              Q     Okay.  So these are text messages

11      that you produced to us from your phone, right?

12              A     Sure.  Yeah.

13              Q     So the blue is you and the grey is

14      Alex Kaufman?

15              A     Yeah.

16              Q     Okay.  And the date that this begins

17      is December 13, 2020, right?

18              A     Yeah.

19              Q     So it's at 6:02 a.m, "Has this been

20      investigated?"  Do you see that?

21              A     Yep.

22              Q     So the -- do you still have the prior

Page 101

1      part of this thread on your phone or does it start

2      at this date?

3              A     It was something that was like --

4      that, "Has this been investigated," seemed to be

5      like probably something that he sent the night

6      before.  And it was like an article about something

7      completely irrelevant.

8              Q     Okay.  Do you have that -- like, do

9      you -- are you able to look at your phone and see

10     what he's talking about or you don't have the text

11     that precedes this one?

12             A     I think I do, but I don't have my

13     phone on me.

14             Q     Okay.  So how did you determine what

15     excerpts of text messages to produce in response to

16     the subpoena?

17             A     I think you asked me for anything

18     like relevant to Coffee County and whatever you

19     phrased it, or like voting systems, or whatever.

20     It wasn't -- you know, it was probably something to

21     do with -- I -- I don't know.  I don't want to

22     speculate.  But it didn't --

Page 102

1          Q    Okay.

2          A    -- have any bearing.  Like I said, I

3    have been more than forthcoming with my subpoena by

4    you guys.

5          Q    Okay.  But as you sit here now, this,

6    "Has this been investigated," you don't recall

7    specifically what that was?

8          A    No.  I think it was something

9    completely different.

10          Q    Okay.  And then you respond that

11    morning, "I'm not entirely sure ETA plane?"  He

12    writes, "Nothing yet.  Is there still fog over the

13    runway?"  And you write back, "I don't know.  Going

14    back to bed."

15               Do you see that?

16          A    Yeah.

17          Q    What was this about, the ETA plane?

18          A    Getting out of Douglas, Georgia.

19          Q    Okay.  So you flew down to Douglas on

20    the 12th.  And what day did you leave?  Was it the

21    13th or later?

22          A    Yeah, the 13th.

Page 103

```
 1              Q      The 13th.

 2                     And so you were delayed getting out

 3        because of fog, it looks like?

 4              A      That would be my belief.

 5              Q      And you guys flew from Atlanta into

 6        the -- the small Douglas Airport?

 7              A      Yeah.

 8              Q      I'm sorry, you said yes?

 9              A      Yep.

10              Q      Okay.  And that was on a plane that

11        Alex Kaufman flew?

12              A      Yeah.

13              Q      Was that like a little Cessna or what

14        was that?

15              A      Something like a prop plane.

16              Q      Okay.  Two-seater or bigger?

17              A      Not a two-seater, but I was sitting

18        in the back.

19              Q      Okay.

20              A      It was just he and I, and I think

21        either the copilot or whoever the charter guy was.

22              Q      Did Alex -- was he the pilot?  Did he
```

Page 104

1      fly it?

2              A      Yeah.   He needed hours.

3              Q      I see.

4                     So he flew it, he had a copilot with

5      him, and then you were in the back?

6              A      Yes.

7              Q      Anybody else?

8              A      No.

9              Q      No?

10             A      No.

11             Q      Okay.   Do you remember the copilot's

12     name or anything about him?

13             A      No.

14             Q      Had you ever met him before?

15             A      No.   He wasn't like -- no.   He was a

16     pilot.

17             Q      Okay.   Did he stay with you guys

18     during the day or did he stay at the airport?

19             A      I think he flew back immediately, I'm

20     pretty sure.   He was not like traveling with us in

21     that capacity.

22             Q      So you guys flew in, was it the

1    morning of the 12th?

2            A     I'd say it was late afternoon.

3            Q     Okay.  So the late afternoon on the

4    12th, copilot was with you.  Are you saying he took

5    the plane back or --

6            A     Yeah.

7            Q     Okay.  So the plane didn't stay

8    overnight in Douglas?

9            A     We flew in a different plane, so I

10   cannot confirm where the plane went after that, but

11   it was like a charter out of PDK and we took a

12   different plane back.

13           Q     I see.  Okay.  Sorry.  That's where I

14   got lost.

15                 So the flight down on the 12th, Alex

16   flew with a copilot, you were in the back in a prop

17   plane?

18           A     Yeah.

19           Q     Okay.

20           A     That seems right.

21           Q     And is that Alex's plane or who owns

22   that plane, if you know?

Page 106

1              A      No idea.

2              Q      Okay.  So you left the airport, went

3        to the steakhouse, did what you guys did with the

4        declarants, stayed overnight at the Hampton Inn?

5              A      Yes.

6              Q      And then at some point on the 13th,

7        you flew out?

8              A      Yeah, like in the morning.

9              Q      On a different plane?

10             A      Yeah.

11             Q      Was that out of the same Douglas

12       Airport?

13             A      Yeah.

14             Q      And how -- who flew that plane?

15             A      Alex.

16             Q      Was there a copilot on that, too?

17             A      I'm pretty sure there was.

18             Q      Was there anyone else on that plane?

19             A      No.

20             Q      I see.

21                    And do you know where that plane came

22       from?

                                                    Page 107

1                A    I assumed PDK.

2                Q    What's PDK?

3                A    Peachtree-DeKalb Airport.

4                Q    Oh, okay.

5                     So it sounds like these were charter

6        flights.  Alex chartered a plane to go down and

7        chartered a plane to go back and had a copilot with

8        him?

9                A    Yeah.

10               Q    Okay.  Got it.

11                    All right.  If you'd go to the second

12       and third page of Exhibit 14, your text thread with

13       Alex Kaufman, do you see where it indicates "Tap to

14       download" and there's a three megabyte file?

15               A    Yeah.

16               Q    Did you download that to see what

17       that was?

18               A    I'm not able to.  I think it came

19       from some sort of like -- I don't know.  I've tried

20       with some of those attachments and it just keeps

21       "tap download, tap download."

22               Q    So you tried when you were producing

1      this to download that and it wouldn't download?

2              A    I think that probably has to do with

3      there's still fog over the runway.  And that

4      probably has to -- "look out your window.  It looks

5      at the runway."  I assume that's probably a photo

6      that I took of the runway, because the hotel is

7      like right across from the airport.  And I assumed

8      that would probably be a photo.  And probably it's

9      not on my phone anymore so, you know, yeah.

10             Q    Okay.  But you just -- you don't know

11     for sure, and you weren't able to download it?

12             A    No.

13             Q    Okay.

14             A    I mean, I'm going with affirmative,

15     "Is there still fog over the runway?"

16             Q    Yeah.

17             A    That seems like the logical

18     conclusion.

19             Q    Yeah, no, I get it.  I got you.

20             A    Okay.

21             Q    I guess there's like a whole chunk

22     that's missing here.

Page 109

1                    MR. CROSS:  Can we go off the record

2        for just a moment?

3                    MR. TYSON:  Yeah.

4                    VIDEOGRAPHER:  The time is 11:38 a.m.

5        We are off video record.

6                (Recess from 11:38 a.m. to 11:39 a.m.)

7                    VIDEOGRAPHER:  The time is 11:39 a.m.

8        We are back on video record.

9        BY MR. CROSS:

10               Q     All right.  So go back to the exhibit

11       with the e-mail thread between Ms. Hampton and

12       Mr. Chaney.  I forget what number that was.

13               A     This text thread?

14               Q     Yeah, the text thread.

15                    MR. TYSON:  Exhibit 7.

16                    MR. CROSS:  Exhibit 7.  Thanks.

17       BY MR. CROSS:

18               Q     And turn to page 23, if you would.

19               A     Okay.

20               Q     Actually, I'll tell you what, start

21       on page 22, and see how the context --

22               A     Yeah.

Page 110

1              Q      If you look in the middle, do you see

2       there's a date of January 6, 2021, 4:26 p.m.,

3       Ms. Hampton, in the green, sends a text message to

4       Eric Chaney saying, "Scott Hall is on the phone

5       with Cathy, but wanting to come scan our ballots

6       from the general election like we talked about the

7       other day"?

8              A      Uh-huh.

9              Q      Yes?

10             A      Yes, I see that.

11             Q      Then if you come to the bottom of

12      that same page, do you see -- January 7, 2021,

13      10:18 in the morning, Ms. Hampton texts Eric

14      Chaney, "Are you coming to the office?  I need a

15      board member to be here when we transfer ballots."

16      He says, "I'll be there at 11:00."

17                    Do you see that?

18             A      Yeah.

19             Q      And then January 7th, 7:24 p.m.,

20      Mr. Chaney sends a phone number to Ms. Hampton and

21      writes, "Let's switch to Signal."

22                    Do you see that?

Page 111

1              A      Yeah.

2              Q      So we're looking at the day when we

3      now know that the SullivanStrickler team, Scott

4      Hall, someone identifies a programmer with Scott

5      Hall, went into the Coffee County Election Office

6      with Cathy Latham and Eric Chaney and others to

7      copy voting election equipment and data.  That's

8      the day that we're looking at, right?

9              A      Sure.

10             Q      Okay.  And the number that Mr. Chaney

11     sends to Ms. Hampton, that's your personal cell,

12     right?

13             A      That is.

14             Q      And is it your testimony that no one

15     spoke to you, texted you, messaged you,

16     communicated with you in any way about what

17     happened in the election office that day?

18             A      Yeah.

19             Q      You don't have any idea why

20     Mr. Chaney sent your cell number to Misty Hampton

21     at the time that they were wrapping up or had just

22     finished copying the voting software and the data?

1          A     Probably because I was the guy on the

2     Trump Campaign dealing with this sort of stuff, and

3     I don't recollect them ever reaching out.  I know I

4     never discussed, "Hey, people were allowed into the

5     election office."  Every activist in the state had

6     my cell number.

7                I remember at this specific time

8     looking through stuff, that I was sitting there in

9     the office looking through lists of provisional

10    voters for the runoff.  This was well beyond the

11    time that I had disengaged from, you know, the

12    Trump Campaign operations and was fully focused on

13    the runoff.  And then, you know, a day or two after

14    that, Perdue conceded and the campaign was over.

15          Q     You stated this was well beyond the

16    time that you had disengaged with the Trump

17    Campaign efforts, but that's not quite right, is

18    it?

19          A     I think that's pretty correct.  I

20    mean, our election challenge, the electors, was

21    pretty much the end, let the court system handle it

22    out from then.  And then we got a runoff in three

Page 113

```
 1      weeks, and I was an essential member of the runoff

 2      team doing the same thing that I was doing in the

 3      hotline.

 4                  I mean, if we got, you know, a phone

 5      call that was, you know, relevant, I would forward

 6      it on, create an incident report.  But, you know, I

 7      was not actively talking about the campaign,

 8      certainly not talking about letting people into the

 9      election office.

10           Q      This is the day after the Vice

11      President and Congress certified the election --

12           A      This is the day after the riot at the

13      Capitol.

14           Q      Right, which is the same building --

15           A      And the idea that I, at that time,

16      would have wanted anything to do with these nutjobs

17      that were linked to the people that attacked the

18      building that I worked in for a good part of the

19      year, and think it's hallowed ground, is insane.

20           Q      Okay.  So the time we're talking

21      about when Mr. Chaney sent Ms. Hampton your

22      cellphone, which is -- is after the breach is
```

1    wrapping up and the day after the election was

2    certified in Congress, right?

3         A    Yeah.

4         Q    Okay.  And you were working on behalf

5    of the Trump Campaign to organize an alternate

6    slate of electors for Georgia who would vote for

7    Trump leading up to the certification, right?

8         A    I wouldn't characterize it in that

9    way.  I was -- as I've said previously, we had a

10   pending legal challenge.  The lawyers advised that

11   these needed to be, in a sense, provisional in case

12   the legal challenge would have moved forward.  I

13   would say that was one of the last substantial

14   Trump efforts, as far as I was concerned.  My

15   attention and focus was purely to the runoff.

16              MR. CROSS:  Let's go off the record

17   for just a second.

18              VIDEOGRAPHER:  The time is 11:46 a.m.

19   We are off video record.

20        (Recess from 11:46 a.m. to 11:53 a.m.)

21              VIDEOGRAPHER:  The time is 11:53 a.m.

22   We are back on video record.

Page 115

1                    MR. CROSS:  All right.  What do we

2        have?

3                    MR. BROWN:  This will be 15.

4                    MR. CROSS:  15.  All right.

5                 (Sinners Deposition Exhibit Number 15

6                 marked for identification.)

7        BY MR. CROSS:

8                Q    Let me hand you Exhibit 15.

9                     So there were some press coverages in

10       one of the articles, this is from June of this

11       year, that covered an e-mail that you sent

12       regarding organizing this alternate slate of

13       electors.

14                    Do you recall that?

15               A    Yes.

16               Q    And do you recall the e-mail?

17               A    Yeah.

18               Q    Do you still have that e-mail?

19               A    Probably, yeah.

20               Q    That wasn't produced to us, was it?

21               A    No.

22               Q    Okay.  Why not?

Page 116

1              A     Because it didn't cover the scope of

2       your subpoena.

3              Q     Okay.  So you read the subpoena as

4       not covering that?

5              A     Yeah.

6              Q     Okay.

7              A     I think you already have it but . . .

8              Q     In this e-mail, you indicated that

9       the effort to organize this slate of alternate

10      electors required complete secrecy.  Do you recall

11      that?

12             A     Secrecy and discretion.

13             Q     You say, "I must ask for your

14      complete discretion in this process."  Do you see

15      that?

16             A     Sure.

17             Q     And you wrote, "Your duties are

18      imperative to ensure the end result of" --

19             A     Uh-huh.

20             Q     -- "a win in Georgia for President

21      Trump that would be hampered unless we have

22      complete secrecy and discretion."

Page 117

1                    Do you see that?

2          A     Yeah.

3          Q     You also instructed the electors to

4     tell security guards at the building that they had

5     an appointment with one of two state senators.

6          A     Yeah.

7          Q     Do you remember that?

8                But that wasn't actually the reason

9     they were there, right?

10         A     That was a meeting with two state

11    senators.  You didn't need to provide great

12    context, just, yeah, we're going to meet with

13    these, you know -- yeah.

14         Q     But the purpose of them being there

15    was to ensure the end result, a win in Georgia for

16    President Trump, right, that's what you wrote?

17         A     I believe that had the election

18    challenge moved forward, that this was imperative

19    to that because state law requires it.  It had to

20    be at the Capitol.  And as -- you know, they -- the

21    lawsuit was pending.  I was told by attorneys

22    that -- that this had to happen.

1            Q     What happened to --

2            A     And it was cleared by legal.

3            Q     What attorneys?

4            A     Trump Campaign attorneys, GA GOP

5      attorneys, a number of them.  Ray Smith was our

6      local counsel, who was retained by the Trump

7      Campaign.  He brought a court reporter.  He was

8      there on-site managing the process.  There were

9      assurances that there was no, you know, illegality

10     whatsoever.

11           Q     What lawyers gave those assurances?

12           A     Ray Smith.

13           Q     Any others?

14           A     Yeah.  Trump Campaign attorneys.

15           Q     Who specifically?

16           A     Josh Findlay.  He was, you know, our

17     local election day operations counsel.  And there

18     were a couple of others.  I can't recall exactly

19     who, but, you know, five or six attorneys signed

20     off on it.  And they were normal attorneys that I

21     trusted, not some of these fringe wackos.  Yeah, I

22     mean . . .

1          Q     But despite all that, you instructed

2     these folks, the alternate electors, at no point

3     should you mention anything to do with presidential

4     electors or speak to the media?

5          A     Yeah, don't speak to the media.

6     Don't say, "Hey, we're the Republicans showing up

7     to do that."  Republican activists have a way of

8     showing up in hats and garbs and waving American

9     flags.

10               There were, for months, people

11    protesting at the Capitol.  The Capitol was a zoo.

12    You had Alex Jones and Vernon Jones driving a tank

13    around the Capitol.  You had armed protesters

14    showing up.  It was "Be discreet."  And then, you

15    know, David Shafer gave media interviews right

16    after.  Just wanted to make sure it got done

17    because those were the instructions I was given.

18          Q     And your testimony today under oath

19    is that your repeated directions to these folks,

20    the complete secrecy was required, that they should

21    not mention anything to do with presidential

22    electors when they went into the building, had

1    nothing to do with any concerns about the legality

2    of what you were doing.  Is that fair?

3         A    Yeah.  I mean, David Shafer gave

4    interviews five minutes after it was done to local

5    news and national news.  I mean, there were more

6    reporters in the room then there were people

7    affiliated with the GOP.  I don't know if that is a

8    factual statement, excuse me, but there were

9    multiple reporters, you know?

10        Q    So through November and December, you

11   have what we've seen as a number of communications

12   directly with Eric Chaney and Misty Hampton about

13   concerns regarding the reliability of the Dominion

14   Voting System at the same time you're organizing a

15   slate of alternate electors for the end result of

16   having Donald Trump win the election.  And you flew

17   down to Douglas and gathered up declarants for a

18   lawsuit that was filed in Coffee County, which is

19   then voluntarily dismissed on January 7th.  And

20   Mr. Chaney sends your personal number to

21   Ms. Hampton the night of the breach.

22             And your testimony today under oath

Page 121

1          is that you have no idea why he did that and you

2          have no knowledge of the events of the breach until

3          it somehow was uncovered in this case?

4                    A     Well --

5                          MR. TYSON:  Object to form.

6                          You can answer if you can.

7                          THE WITNESS:  Well, I wouldn't agree

8          with your characterization.  I didn't have any

9          knowledge of the breach -- or, excuse me,

10         unauthorized access.  But, you know, every election

11         board member reached out to me.  I sifted through

12         calls all day and all night, vetting various

13         theories people had.  And I only had a number of

14         hours in the day to indulge with that.

15                          And at the end of the day, I was

16         asked to help with this.  David Shafer signed

17         off, the lawyers signed off.  It took four hours

18         of my day.  And at that time, I was worried about

19         my job security for the runoff.  And so I said,

20         "Sure, the legalese sounds good.  I trust Ray."

21                          But as far as Misty and Eric Chaney

22         go, I mean, I engaged in some correspondence, you

Page 122

```
1        know, two to three e-mails or phone calls.  But
2        they did nothing.  They offered me personally no
3        value because they couldn't get me poll watchers.
4        Coffee County isn't a high-priority target.  I'm
5        focused on Fulton and Gwinnett.
6                    And yeah, I mean, going into the
7        runoff, I had no interest in Coffee County.  It
8        was like -- you know, I think the Still V.
9        Raffensperger suit was -- I think what they were
10       still asking for related to the runoff.
11       BY MR. CROSS:
12            Q    Going into the runoff, you had no
13       interest in Coffee County apart from getting on a
14       flight and spending two days down there finding
15       declarants for a lawsuit?
16            A    If it helped in the runoff.  Alex is
17       a good lawyer, but he's not -- I mean, he's -- I
18       have thoughts on him personally, but -- at this
19       point.  But I think he's a good lawyer.  I think he
20       has a good head on his shoulders.  I think he saw
21       this is our weak point.
22                    Part of the whole job of EDO is to
```

Page 123

1       identify weak points in the system and find ways to

2       correct them.  I thought he saw that as a, you

3       know, weak point in the system that would help get

4       us some sort of relief for the runoff.  That's my

5       understanding of the lawsuit at least.

6               Q     Sure.

7                     How was the Shawn Still lawsuit going

8       to help the runoff?

9               A     I'm not really sure, but I think that

10      was one of the things they asked for, was like

11      continued relief.  You know, maybe something with

12      the way votes are processed or absentee voting.

13      I'm really not versed on the lawsuit.

14                    But there was kind of a quiet move to

15      the runoff by a lot of people because Trump v.

16      Raffensperger was out there.  If it got moved on by

17      a judge, there may be something that happens there.

18      But you can't spend your time focused on the past

19      when you have a runoff coming up in three weeks.

20              Q     So you were hired into the

21      Secretary's office in February of 2021, right?

22              A     That's correct.

Page 124

1              Q     What day?

2              A     Probably the 1st, if I had to guess.

3              Q     Okay.  So you were hired into the

4       Secretary's office almost immediately after

5       individuals went into Coffee County and gained

6       unauthorized access to the voting equipment there,

7       right?

8                    MR. TYSON:  I'll object to form.

9                    You can answer.

10                   THE WITNESS:  I've never made that

11      connection, but, you know, sure.  You know, maybe I

12      was hired after people ransacked the Capitol.  I

13      was hired after a guy went through a stop sign.  I

14      mean, there's a lot of -- I was looking for a new

15      job.

16      BY MR. CROSS:

17             Q     Did anyone who ransacked the Capitol,

18      to your knowledge, send your personal cellphone

19      number to others who ransacked the Capitol in the

20      way that Mr. Chaney and Ms. Hampton did on the day

21      of the breach?

22                   MR. TYSON:  I'll object to form.

Page 125

1                       You can answer.

2                       THE WITNESS:  I'm not aware of that.

3       I don't know anyone personally that did.

4       BY MR. CROSS:

5            Q     And roughly when did -- when did you

6       first learn that there had been an allegation of

7       unauthorized access in Coffee County?

8            A     I think when Marilyn Marks released

9       the transcript a year after it happened.

10           Q     You mean an audio recording?

11           A     I'm not sure, but it came up on my

12      radar, you know, I guess sometime in the spring.

13           Q     And then you were promoted to

14      communications director in the office in June of

15      this year, right?

16           A     Yeah.

17           Q     That's still your role today?

18           A     Yes.

19           Q     Have you listened to the audio call

20      between Ms. Marks and Mr. Hall?

21           A     I may have.  Yeah, I may have.  I'm

22      familiar with, like, what he said.

```
                                          Page 126
1            Q     You said -- are you familiar with
2        Mr. Hall, but you never had -- sorry, strike that.
3                  You had some communications with
4        Scott Hall?
5            A     He called me one time.  You know, I
6        know he's a bail bondsman.  I thought he was a
7        little, shall I say, excited.
8            Q     But you had never spoken to him about
9        any events in Coffee County?
10           A     No.
11           Q     Let me hand you --
12                 MR. CROSS:  Where are we at?
13                 MR. TYSON:  16.
14                 MR. CROSS:  Thank you.
15              (Sinners Deposition Exhibit Number 16
16                 marked for identification.)
17       BY MR. CROSS:
18           Q     Let me hand you Exhibit 16.  This is
19       a declaration that was filed by Ryan Germany in our
20       case.  Have you seen this before?
21           A     I have not.
22           Q     But you obviously know Ryan Germany,
```

Page 127

1    right?

2              A    I do.

3              Q    He's general counsel in the

4    Secretary's office?

5              A    He's a wonderful man.

6              Q    Do you work with him regularly?

7              A    Yeah.

8              Q    If you look at -- well, let me ask

9    you, based on the communications you had with Scott

10   Hall, you said he was excited.  What did you mean?

11             A    Well, I mean, when a guy who says

12   he's a bail bondsman calls you and says essentially

13   the same thing you've been hearing from multiple

14   sources of disinformation that, you know, there's

15   these huge concerns and -- you know, for the

16   purpose of this deposition, you know, the things

17   equivalent to Venezuela and China and North Korea

18   and, you know, Henry Fonda broke into the voting

19   machines through satellites, you're just kind of

20   like, "Okay, well, nice to speak with you."

21             Q    Is it fair to say he sounded crazy?

22             A    Yeah.

1          Q     He certainly did not sound credible?

2          A     He did not sound like somebody that

3     would provide me value in my role.

4          Q     Your understanding of the call

5     between Ms. Hall -- I'm sorry, Mr. Hall and

6     Ms. Marks, is it your understanding -- what is your

7     understanding of how long that call was?

8          A     No idea.

9          Q     Do you have any understanding of --

10     of how much of that call was focused on Mr. Hall's

11     allegations about Coffee County?

12          A     No idea.

13          Q     Okay.  You mentioned that Ms. Marks

14     didn't produce it for a year.  Take a look at

15     Mr. Germany's declaration if you would.  And go to

16     paragraph ten.

17          A     Okay.

18          Q     And you'll see here, Mr. Germany

19     points out that after the 2020 presidential

20     election, Scott Hall made a number of allegations

21     about the administration of elections in Georgia.

22                Do you see that?

Page 129

1          A     Okay.

2          Q     And then he details some of those in

3    paragraphs 11 and 12, some of which overlaps with

4    kind of some of the crazy stuff that you were

5    saying that you dealt with, right?

6          A     Okay.

7          Q     So if you look at paragraph 14, even

8    on this call between Mr. Hall and Ms. Marks,

9    Mr. Germany points out in this declaration Mr. Hall

10   made some pretty outrageous claims involving

11   Nigerians?

12         A     Yeah.  That rings a bell.  Yeah, I

13   think he was talking about Gypsies.

14         Q     He talked about a Hispanic lady who

15   disappeared.  Do you see that in paragraph 15?

16         A     Right, disappeared.  She probably

17   went on a lunch break.

18         Q     And then if you come to paragraph 18,

19   Mr. Germany himself points out, "The total time

20   where Coffee County is being discussed in this one

21   hour, 22 minute call and 55 seconds, constitutes

22   about three minutes."

1                    Do you see that?

2            A     Uh-huh.  Yeah.  Sure.

3            Q     Were you aware before today that in

4     this call that lasted nearly an hour and a half in

5     which Mr. Hall said all sorts of things that were,

6     fair to say, crazy, that only three minutes related

7     to Coffee County?

8            A     Sure.  I mean -- or was I aware

9     before?  I haven't really given it much

10    consideration.

11           Q     If you look at paragraph 19,

12    Mr. Germany states here under oath, "The

13    Secretary's office was not on notice about

14    Mr. Hall's allegations until receiving the

15    recording."

16                   Do you see that?

17           A     Sure.

18           Q     And he indicates that recording he

19    received in March of 2022.  Do you see that in the

20    same paragraph?

21           A     Yeah.

22           Q     Okay.  Now, as the director of

Page 131

1        communications at the Secretary's office, you

2        worked directly with Secretary Raffensperger and

3        others on the public communications, right?

4             A    Yes.

5             Q    That includes things like press

6        interviews?

7             A    Yeah.

8             Q    In fact, Secretary Raffensperger just

9        recently gave a relatively lengthy press interview

10       somewhere north of 15 minutes with a local TV

11       station, did he not?

12            A    Yeah.  And that was done through the

13       campaign.

14            Q    I'm sorry.  What does that mean?

15            A    I did not coordinate that, nor did

16       anyone in the office, and -- yeah, that was through

17       the campaign.

18            Q    Meaning his reelection campaign for

19       Secretary of State?

20            A    Yes.

21            Q    All right.  Did you or anyone else in

22       the Secretary's office involved -- who has

                                              Page 132

1          responsibility for communications, to your

2          knowledge, were they aware that was going to

3          happen?

4                    A     We were not aware.

5                    Q     Have you listened to that interview?

6                    A     Yes.

7                    Q     What Secretary Raffensperger reports

8          about the investigation in Coffee County and what

9          his office knew was dramatically different than

10         what Ryan Germany testified in his declaration.  Is

11         that fair?

12                         MR. TYSON:  I'll object to form.

13                         You can answer if you can.

14                         THE WITNESS:  I will simply state

15         that there was an agreement shortly after that the

16         Secretary was not properly briefed.

17         BY MR. CROSS:

18                    Q     What does that mean?

19                    A     He was not properly briefed.

20                    Q     By whom?

21                    A     By the office.

22                    Q     His office?

Page 133

```
 1              A      Yes.

 2              Q      Not properly briefed on what?

 3              A      I'd say the circumstances of this

 4       issue.

 5              Q      Meaning the -- the unauthorized

 6       access in Coffee County?

 7              A      There were multiple parts of that

 8       interview, and it is my personal belief that for an

 9       interview that touches on multiple issues such as

10       that, there needs to be more thorough briefings

11       beforehand done by the official office.

12              Q      When you say he was not properly

13       briefed on this issue, what is "this issue"?  What

14       did you mean?

15              A      Sure.

16                     Coffee County election equipment,

17       there seemed to be some things in that interview

18       that didn't line up with the message that the

19       official office was coordinating.

20              Q      And what do you mean by that?

21              A      I think he -- I think he's off on

22       some dates, and I think it can throw people off.
```

Page 134

1      And I think in future interviews there needs to be

2      more of a -- more coordination, shall we say, if

3      the campaign wants to pursue media opportunities.

4           Q     Why would the Secretary need a

5      briefing in particular on the events of Coffee

6      County, the unauthorized access, for a press

7      interview?

8                MR. TYSON:  I'll object to form.

9                You can answer if you know.

10     BY MR. CROSS:

11          Q     You said he wasn't properly briefed.

12     Why did he need any additional briefing beyond what

13     he had?

14          A     I think there was some dates that

15     were wrong, and I think he could have confused some

16     people.  I don't think he had any intention to, but

17     I think he -- this issue as the, shall we say,

18     media event has just risen over the past week or

19     so, or two weeks or so, and I feel like he probably

20     didn't have the most accurate and up-to-date

21     information.

22          Q     Fair to say as the Secretary's

Page 135

1      office -- as his lawyers have said in this case,

2      the issue of unauthorized access in Coffee County

3      is a very serious issue?

4              A     It's very serious, absolutely.

5              Q     So help me understand why the

6      Secretary would need a briefing on that to do a

7      press interview instead of just knowing the basic

8      facts of what happened and when on something that

9      serious that he's responsible for.

10                    MR. TYSON:  I'll object to form.

11                    You can answer if you can.

12                    THE WITNESS:  He is not in court

13     litigating the case.  He wasn't there in Coffee

14     County.  I think any elected official has staff

15     provide them information and updates and the

16     interview kind of came out of nowhere, and, you

17     know, we want -- it seems to be this has -- the

18     information is leaking every day.  Why not, you

19     know, have a little -- make sure -- make sure

20     everybody's on the same page.  You do that in any

21     organization.

22     BY MR. CROSS:

Page 136

```
 1              Q    All right.  Let me hand you -- I
 2       think we are at Exhibit 17.
 3                   (Sinners Deposition Exhibit Number 17
 4                   marked for identification.)
 5       BY MR. CROSS:
 6              Q    So this is an article that the
 7       station released along with the interview.  And you
 8       can see where the two interview segments were
 9       embedded.  It's entitled, "Raffensperger:  Coffee
10       County Probe Stalled Because Local Officials Lied."
11                   Do you see that?
12              A    Sure.
13              Q    And so you've watched the video?
14              A    Yes.
15              Q    Okay.  And I will go ahead and hand
16       you this to make it easy.
17                   (Sinners Deposition Exhibit Number 18
18                   marked for identification.)
19       BY MR. CROSS:
20              Q    All right.  This is going to be 18.
21       So we made transcripts of two interviews just so we
22       wouldn't have to deal with the video today.  But
```

1          the first one I'm going to give you is Exhibit 18.

2          And that one is entitled, "Raffensperger:  Coffee

3          County Probe Stalled Because Local Officials Lied."

4                          And then the second --

5                          MR. TYSON:  Do you know who made the

6          transcripts?

7                          MR. CROSS:  What's that?

8                          MR. TYSON:  Do you know who made the

9          transcripts?

10                          MR. CROSS:  We did.

11                          MR. TYSON:  Okay.  We?

12                          MR. CROSS:  Our team, across the two

13          Plaintiff groups.

14          BY MR. CROSS:

15                   Q    And then Exhibit 19 is entitled,

16          "Questions Raised in Timeline of State Response to

17          Coffee County Breach."

18                          (Sinners Deposition Exhibit Number 19

19                           marked for identification.)

20          BY MR. CROSS:

21                   Q    Oh, I'm sorry.

22                          And that, my understanding, is the

1          transcript of the full -- what the station has

2          released is the full interview.  I'll just give you

3          those for reference --

4                    A      Sure.

5                    Q      -- since we don't have the videos to

6          play.

7                         MR. TYSON:  Are we going to watch the

8          full video the station released or just the clips,

9          because those are two different things?

10                        MR. CROSS:  So Exhibit 18 is from the

11         shorter clip that they played, and it's -- if you

12         look on Exhibit 17, my understanding is it's that

13         short clip that's at the top of the article.

14                        MR. TYSON:  Uh-huh.

15                        MR. CROSS:  My team will tell me if I

16         have that wrong, but my understanding is that's

17         just the short excerpt that they originally

18         released.  And then 19 is the full -- what they

19         characterized as the full interview, which is about

20         16 minutes.  That was originally embedded at the

21         end of Exhibit 17.  It was pulled down at the

22         direction of the Secretary's office, according to

Page 139

1      the station, and then it came back up again in an

2      article that I will give you guys.

3                  (Sinners Deposition Exhibit Number 20

4                  marked for identification.)

5                  MR. CROSS:  This will be Exhibit 20,

6      I think.

7                  MS. CINO:  Uh-huh.

8                  MR. CROSS:  This is the article that

9      has the same title as the second longer transcript

10     I gave you, which is Exhibit 19.  And that now has

11     what the station has said is the original full

12     interview.  So there's two different articles that

13     have come out about this interview, and we've

14     created a transcript of each --

15                 MR. TYSON:  Okay.

16                 MR. CROSS:  -- based on listening to

17     it.

18                 MR. TYSON:  Just so I'm clear, 19 is

19     the transcript of what's posted on 20?

20                 MR. CROSS:  Uh-huh.  Yes.

21                 MR. TYSON:  Okay.  And we confirmed

22     that Mr. Sinners has watched that video?

Page 140

```
 1                     MR. CROSS:  Well, that's why I was

 2          going to --

 3                     MR. TYSON:  Okay.

 4                     MR. CROSS:  -- sort of walk through

 5          this.

 6                     MR. TYSON:  Okay.

 7          BY MR. CROSS:

 8               Q     All right.  So, Mr. Sinners, grab

 9          Exhibit 17 if you would.  That's the one that's got

10          the red video on the cover.

11               A     Sure.

12               Q     Have you watched sort of the shorter

13          clip that ran live, it's a couple of minutes, two-

14          or three-minutes long, of Doug Richards doing an

15          interview of Secretary Raffensperger where he talks

16          about the Coffee County issue?

17               A     I think I watched the -- the full

18          interview.

19               Q     Okay.  And so that would be, if you

20          look -- have you seen this article, which is

21          Exhibit 20, "Questions Raised in Timeline of State

22          Response to Coffee County Breach"?
```

```
                                              Page 141

1            A    I may have.  I mean there's so many

2      of them.

3            Q    Okay.  But the longer interview,

4      which runs about 16 minutes, you -- you recall

5      watching that?

6            A    Yeah.

7            Q    Okay.  If you -- grab Exhibit 18 if

8      you would.

9            A    Is that this?

10           Q    That's the shorter transcript.

11           A    Okay.

12                MR. TYSON:  This one?  The other

13     one -- the one -- yeah.

14     BY MR. CROSS:

15           Q    And if you want it for reference, you

16     can also look at Exhibit 17 at the same time since

17     they kind of go together.  But what Secretary

18     Raffensperger said in this interview just recently

19     was that the investigation into the unauthorized

20     access in Coffee County began almost immediately

21     after the breach, right?

22           A    Sure.  And I think that was a little
```

Page 142

1      twisted.  There were, to my knowledge, three active

2      investigations into Coffee County at that time, and

3      I think he might have been getting those wires

4      crossed.

5             Q    So let's -- let's talk through that,

6      because he -- Secretary Raffensperger is very

7      specific in this interview about steps that were

8      taken, even to the level of saying that his

9      investigators interviewed Misty Hampton, the former

10     election director, right?

11            A    I'm sure they did, yeah.  I mean,

12     she's the election director and you have three

13     active investigations at that time.  I'm sure at

14     some point that she was investigated.  I'm not

15     sure, because I don't know, but that seems logical.

16            Q    Why does that seem logical?

17            A    Because she's the elections director.

18     If you have three SEV cases, you probably talk to

19     the elections director.

20            Q    So let's break that down.  When you

21     say three active cases, what are you talking about?

22            A    There was one with a person who did

1         not receive an absentee ballot.  There was another

2         one regarding to their -- you know, discrepancy

3         they had in the recount, you know, their failure to

4         certify, and then there was another one.  I'm not

5         really sure what that one was off the top of my

6         head, but there were three active investigations

7         into Coffee County, from what I understand.

8              Q    Okay.  But what Secretary

9         Raffensperger was talking about was specifically

10        the issue of unauthorized access that has come to

11        light in Coffee County, right?

12             A    Yeah.  And I believe he was incorrect

13        in his statement.

14             Q    Okay.  So when he said, "Our

15        investigators went down there, the former -- she's

16        now the former election director, she did not

17        provide truthful statements to us," you're saying

18        he was just confused, that no one from the

19        Secretary's office has actually spoken to her

20        about --

21             A    I have no idea.

22             Q    Okay.  Well, then what's the basis

1      for saying that he wasn't properly prepped and what

2      he said there is wrong?

3                  What he says --

4            A    I -- I do not know.  My belief is

5      that no one in our office knew about, you know, any

6      of this idea until this phone call was released.  I

7      didn't.  I mean, frankly, I think you would have to

8      ask them.  You know, I was not in the

9      communications role prior to June.  I had some

10     input because I do have a background in

11     communications.  But this was not an issue that I

12     was actively following up until, you know, a couple

13     of weeks ago.

14           Q    But it's an issue that you have been

15     very active on with the press, including drafting

16     the responses to the press for the Secretary's

17     office, right?

18           A    Initially, yeah.

19           Q    When you say "initially," did that

20     change?

21           A    Yeah, because you guys subpoenaed me

22     and I didn't want to be involved in it.

Page 145

1           Q     Okay.  I was going to ask you about

2       that, because we noticed that those communications

3       to the press on this issue are now being handled by

4       someone else.  And that's because of your

5       involvement in this case?

6           A     Yeah, that wasn't their decision,

7       that was mine.  The first rule in communications is

8       don't get your emotions involved in something

9       you're communicating about.

10          Q     So if you look back at Exhibit 18,

11      Mr. Richards asks a very specific question --

12          A     Which is Exhibit 18?

13          Q     Sorry.  It's the -- it's one page.

14          A     One page.

15          Q     If you want to write the numbers on

16      them, that might be easier.

17          A     Yeah.

18          Q     Normally we would have stickers, but

19      we're --

20                All right.  So if you look at the

21      shorter transcript, Mr. Richards asks a very

22      specific question, "At that time and the time of

Page 146

1      the breach, the investigators had not seen the

2      surveillance video" -- sorry, strike that.  Let me

3      get the whole context.

4                    "Secretary Raffensperger says our

5      investigators went down there.  The former election

6      director, she did not provide truthful statements

7      to us."

8                    Mr. Richards follows up, "At that

9      time, investigators had not seen the surveillance

10     video of Coffee County officials allowed into the

11     secured election office.  Operatives connected to

12     former Donald Trump attorney Sidney Powell,

13     allowing them to access the county's computerized

14     election equipment."

15                   "Secretary Raffensperger responds in

16     part" -- because this is the shorter video -- "Did

17     not speak truthfully and so we were not aware of

18     some of these components until a little bit later.

19     Then when their new election director had been

20     hired, that's when we found out that her passwords

21     had been shared with an outside company."

22                        Do you see that?

Page 147

1              A      Sure.

2              Q      What's he talking about?

3              A      I guess that posting on the, you

4       know, video of the password of the EMS.

5              Q      But you don't -- I don't want you to

6       guess.  You don't know what he's talking about?

7              A      "When their new election director had

8       been hired, that's when we found out the password

9       had been shared with an outside company."

10                    Yeah, I mean, I'm -- my understanding

11      is that Misty posted the passwords on a YouTube

12      video.

13             Q      But that means late in December of

14      2020.  And, in fact, there was a meeting with Misty

15      Hampton in the elections office about that, right?

16             A      I guess.

17             Q      Okay.

18             A      I don't know.

19             Q      So he's not talking about that

20      because he says, "We found out later after there

21      was a new elections director that her passwords had

22      been shared with an outside company."

Page 148

1               So you just don't know what he's

2        referring to?

3               A     No.

4               Q     Okay.  So let's look at Exhibit 21.

5               A     "Passwords had been shared with an

6        outside," yeah.

7               Q     All right.  So have you seen

8        Exhibit 21 before?

9                     MR. CROSS:  And this is tab 17.

10                    THE WITNESS:  I think I've seen this

11       at some point, yeah.  It's when they switched out

12       the e-mail.

13                    (Sinners Deposition Exhibit Number 21

14                    marked for identification.)

15       BY MR. CROSS:

16              Q     Right.

17                    So if you take a look at the second

18       page -- really the third page of Exhibit 21, you'll

19       see it's an e-mail from James Barnes to Chris

20       Harvey on May 7th of 2021.  Do you see that?

21              A     Sure.

22              Q     The subject line is "Coffee County."

Page 149

1                    Do you see that?

2          A    Sure.

3          Q    And you're aware at this time Chris

4    Harvey was still the State Elections Director?

5          A    Yes.

6          Q    And there's an attachment that says,

7    "Cyber Ninja."  Do you see that?

8          A    Uh-huh.

9          Q    And if you look at the next page,

10   you'll see that's the attachment that Mr. Barnes

11   sent to Mr. Harvey, and it's Doug Logan's Cyber

12   Ninjas business card.

13                   Do you see that?

14         A    Uh-huh.

15         Q    And here Mr. Barnes informed Chris

16   Harvey, "The Dominion e-mail today pertaining to

17   Cyber Ninjas was alarming to me.  When I took over

18   the Coffee County office, the attached business

19   card was at the base of Misty Hayes' computer

20   monitor."

21                   Do you see that?

22         A    Sure.

1          Q     You're aware Ms. Hampton is sometimes

2     called Misty Hayes?

3          A     Hayes, Martin, all sorts of things.

4          Q     All right.  Mr. Barnes then goes on,

5     "I thought nothing of it until I heard about the

6     situation in Arizona with the DoJ.  If she did not

7     use them, she was at the very least in contact."

8               Do you see that?

9          A     Yep.

10          Q     Now, if you come to the first page of

11     Exhibit 21, you'll see that Chris Harvey --

12          A     Sure.

13          Q     -- responds.  He says, "Thanks for

14     sending this.  I think it might be prudent to see

15     if there's been any contact between the person on

16     the card and anyone in your office and/or if they

17     have had any access to any of your equipment."

18          A     Sure.

19          Q     Do you see that?

20               Mr. Harvey adds Frances Watson, who

21     was the head of the investigative unit at the time,

22     right?

Page 151

1          A    Yeah.

2          Q    He adds Michael Barnes who was, and

3     still is, the head of CVS?

4          A    Uh-huh.

5               MR. BROWN:  I'm sorry.  You need to

6     say yes.

7               THE WITNESS:  Yes.

8     BY MR. CROSS:

9          Q    And then Ms. Watson forwards this

10    e-mail on to someone in the Secretary's office

11    named Pamela Jones, the same day.  Do you see that?

12         A    I see -- yeah, I see that.

13         Q    And Ms. Watson says to Ms. Jones,

14    "Can you contact the County and verify what, if

15    any, contacts Cyber Ninjas had with any election

16    equipment?"

17               Do you see that?

18         A    Yes.

19         Q    Now, if you look back at the

20    interview Secretary Raffensperger gave, when he

21    says that it was only after they interviewed

22    Ms. Hampton, who he says was not truthful about

1       what had occurred, it was only later that they

2       learned -- in his words, "That's when we found out

3       that her passwords had been shared with an outside

4       company."

5                    What he's talking about is the alert

6       that they received from James Barnes in May, right?

7                    MR. TYSON:  I'll object to form.  I

8       think he's already testified that he didn't know

9       about this interview.

10                   But you can answer again.

11                   THE WITNESS:  Can you repeat the

12      question?

13      BY MR. CROSS:

14           Q     Sure.

15                   When Secretary Raffensperger said

16      publicly --

17           A     Yeah.

18           Q     -- that they only found out that

19      Ms. Hampton had shared her passwords with an

20      outside company after his office had interviewed

21      her, which he said occurred shortly after the

22      original breach --

Page 153

1              A      Okay.

2              Q      -- what he's talking about is the

3      alert that James Barnes sent his office in May of

4      2021, or do you just not know?

5                    MR. TYSON:  I'll object to form.

6                    Answer if you know.

7                    THE WITNESS:  I mean, I think this

8      might have to do with them replacing the EMS, just

9      as a precautionary measure.  I mean, this -- to me,

10     a business card doesn't show proof that systems are

11     compromised.  So I think that was a precautionary

12     measure.

13     BY MR. CROSS:

14             Q      Well, essentially where I'm going,

15     which is what is the basis for the Secretary's

16     understanding that his office learned that Misty

17     Hampton had shared her passwords for the voting

18     system with an outside company?  What's the basis

19     for that?

20                   MR. TYSON:  Object to form.

21                   You can answer if you know.

22                   THE WITNESS:  The basis?  I mean, she

1      put them out on the internet, you know?

2      BY MR. CROSS:

3            Q     No, that's not what we're talking

4      about.

5            A     I -- I don't know.

6            Q     You just don't know.

7            A     What is the basis?

8            Q     Yeah, of what he said.

9            A     I don't know.

10           Q     Okay.

11           A     I mean, I -- I assume that this would

12     be a precautionary.  You know, Cyber Ninjas had

13     some sort of contact with them, replace the EMS.

14           Q     Are you aware that the Secretary's

15     office has said that the password stopped working

16     on the EMS server in Coffee County at some point by

17     the time Mr. Barnes had taken over in the spring of

18     2021?

19                 MR. TYSON:  I'll object to form.

20                 You can answer.

21                 THE WITNESS:  I thought Michael

22     Barnes was --

1                  MR. TYSON:  Just answer.

2          BY MR. CROSS:

3                  Q    James Barnes.  Sorry.  When James

4          Barnes took over as elections supervisor.

5                  MR. TYSON:  Same objection.

6                  THE WITNESS:  I've heard that.

7          BY MR. CROSS:

8                  Q    You were a director of communications

9          in the office, right?

10                 A    Now I am.

11                 Q    Okay.  Who do you report to?

12                 A    Gabriel Sterling.

13                 Q    So you are so senior that you report

14         directly to Gabriel Sterling, who is, what, the

15         chief operating officer?

16                 A    He is interim deputy chief of staff.

17                 Q    And so he reports directly to

18         Secretary Raffensperger?

19                 A    Yes.

20                 Q    So you are so senior in

21         communications that you are only one level removed

22         from Secretary Raffensperger?

1          A     There are six people that work in the
2     front office.
3          Q     Is my question -- is the answer to my
4     question yes?
5                There's only one --
6          A     So senior --
7          Q     There's only one --
8          A     I'm the communications director.
9          Q     And there's only one person between
10    you and Secretary Raffensperger in your reporting
11    chain, right?
12         A     I would think that's accurate.
13         Q     Okay.  Is there anyone senior to you
14    in communications, someone you report to
15    specifically for communications?
16         A     No.
17         Q     Okay.  And --
18         A     Well, Ryan, Ryan Germany.
19         Q     As general counsel?
20         A     Yeah.
21         Q     Okay.  And is it my understanding
22    that as the most senior communications official in

```
 1        the Secretary's office, as you sit here, you have

 2        no idea what the Secretary was talking about in

 3        this interview when he gave a timeline in very

 4        specific details that are at significant odds with

 5        what Ryan Germany swore in court and what his

 6        lawyers have said?

 7               A     I am not --

 8                     MR. TYSON:  I will object to form.  I

 9        think he's already made it clear what his knowledge

10        is here.

11                     But you can answer it if you can.

12                     THE WITNESS:  I am not sure of the

13        timeline.  Yeah, I'm not sure of the timeline.

14        BY MR. CROSS:

15               Q     So until very recently, you were one

16        of the people -- one of the principal people tasked

17        with handling communications for the office on this

18        issue, right?

19               A     I would disagree with that

20        assessment.

21               Q     Well, we can go through the

22        documents.
```

Page 158

```
 1              A      Yeah, I -- the initial response, I
 2        helped draft, and then within hours or days, it
 3        seemed, I found out through the AJC that I had
 4        received a subpoena in this matter.  And so judging
 5        by the way that this whole, shall we just say, 2020
 6        election is still part of my life, I thought it
 7        would be best to let our voting public information
 8        officer handle these issues.
 9              Q      Okay.  But even into late August, you
10        were still handling press inquiries for the
11        Secretary's office on the issue of unauthorized
12        access in Coffee County, right?
13              A      I don't believe in that assessment,
14        because you're saying even until -- this didn't
15        become an issue until like a month ago.  So maybe
16        right out of the gate, you know, for a couple of
17        weeks.  I mean, I still see what's being made, but
18        I'm not, I would say, the primary point of contact.
19              Q      I get you're not the primary point of
20        contact today, but you were handling communications
21        for the Secretary's office on this specific issue
22        for a period of time, including in -- in August,
```

Page 159

1    right?

2              A     A little bit, yeah.

3              Q     Okay.  And is it my understanding

4    that it wasn't important to you to figure out the

5    timeline and the specific events of what actually

6    occurred in Coffee County to handle those

7    communications?

8                   MR. TYSON:  I'll object to form.

9                   THE WITNESS:  I don't believe my

10   involvement encompassed enough of a time to really

11   figure that out.  I'm not really aware of a full

12   timeline, yeah.

13   BY MR. CROSS:

14             Q     Grab Exhibit 19 if you would.  That's

15   the longer transcript that says, "Questions Raised"

16   at the top.  And you're welcome to grab the article

17   that goes with it if you'd like.  In fact, start

18   with the article, which is Exhibit 20.  Maybe put

19   them side by side.

20             A     This?

21             Q     Yeah, put those two together.

22             A     Okay.

Page 160

1           Q     We see here the same local station

2     that Secretary Raffensperger gave this interview

3     with has now released a follow-up article entitled,

4     "Questions Raised in Timeline of State Response to

5     Coffee County Breach."

6                 Do you see that?

7           A     Yep.

8           Q     And it indicates, if you look at the

9     second paragraph, "Last Thursday, 11Alive's Doug

10    Richards interviewed Secretary Raffensperger and

11    asked him on camera when he first learned about the

12    breach.  Raffensperger initially answered January

13    of 2021, but within minutes of answering, an aide

14    to Raffensperger corrected the Secretary of State's

15    response off camera and offered May of 2021 as the

16    correct date."

17                Do you see that?

18          A     Yep.

19          Q     As the director of communications,

20    and one of the most senior officials in his office,

21    do you know what the exact date is?  What's the

22    correct date when his office first learned of

Page 161

1     allegations of unauthorized access in Coffee

2     County?

3                MR. TYSON:  I'll object to the form.

4     He's not here as a 30(b)(6), David.  If he knows

5     the answer, he can --

6                MR. CROSS:  Bryan, I've been patient.

7     You can object to form and that's the end of it.

8     No speaking objections, please.

9                THE WITNESS:  I do not know right

10    now.

11    BY MR. CROSS:

12         Q     Okay.  Then if you look another

13    paragraph down at the bottom, you'll see it says,

14    "However on Friday, the representative with the

15    Secretary of State's office clarified that the

16    office did not know about or begin investigating

17    Coffee County until July 2022."

18         A     Sure.

19         Q     So according to the journalist with

20    whom Secretary Raffensperger felt comfortable with

21    giving an interview, his office has given three

22    different dates on when it first learned about the

Page 162

1          breach in Coffee County.

2                    A     Okay.

3                    Q     As the director of communications,

4          you can't offer any insight into what the right

5          date is?

6                         MR. TYSON:  I'll object to form

7          again.

8                         THE WITNESS:  I have essentially

9          recused myself from this because, you know, I'm

10         here right now.  I'm not clearheaded about it.

11         And, frankly, I think there's better things for our

12         office, as a communications plan, to be moving

13         forward, such as voter information, giving people

14         access to ballots, communicating with the public,

15         highlighting events he's going to.  That's been my

16         focus the past couple of weeks.

17         BY MR. CROSS:

18                   Q     Better things than understanding when

19         bad actors breached the voting system and when the

20         Secretary's office knew of that?

21                        What could be more important than

22         that to voters?

```
                                        Page 163
  1                 MR. TYSON:  I'll object to form.
  2                 THE WITNESS:  I think a lot of things
  3       because the voting systems in Coffee County have
  4       been replaced.  The systems are secure.  It's a
  5       good voting system.  And I think voters are more
  6       interested in how they want to cast their ballot,
  7       via absentee, in person, or by mail.
  8       BY MR. CROSS:
  9            Q    So if you wanted to know what
 10       Secretary Raffensperger was talking about in this
 11       interview, who would you ask?
 12            A    Who would I ask?
 13            Q    Yeah.
 14            A    I believe the Secretary.
 15            Q    Now, if you --
 16            A    I mean, it's hard to accurately
 17       respond to some of these when reporters call you
 18       out of the blue about this saying they've gotten
 19       documents from some individual and they're writing
 20       a story with an hour deadline, you know?
 21            Q    No, I understand that, but this
 22       wasn't out of the blue.  This is an interview that
```

Page 164

1          Secretary Raffensperger --

2                A     It --

3                Q     -- set up -- hold on -- set up, and

4          presumably did some kind of preparation for.

5                A     For the official office, this was out

6          of the blue.

7                Q     So if you were to get a request from

8          the press today on when the Secretary's office

9          first learned of the breach in Coffee County, you

10         would have no answer?  You just don't know?

11               A     I just don't know.

12               Q     If you wanted to know, who would you

13         ask?

14               A     Probably Ryan.

15               Q     Ryan Germany?

16               A     Yeah.

17               Q     As you sit here, you don't know why

18         Secretary Raffensperger gave a very different set

19         of facts on this issue than Mr. Germany did in his

20         declaration?  You just don't know one way or the

21         other?

22               A     I don't know one way or the other.

Page 165

1          Q     And as you sit here, you also don't
2     know which one of those -- since you don't know one
3     way or the other why that is, you don't know which
4     one of those accounts is accurate?
5          A     No.
6          Q     Okay.  And you mentioned a moment ago
7     that the Coffee County voting system has been
8     replaced.  What's the basis for that understanding?
9          A     That -- I mean the basis for that
10    understanding is that the Coffee County voting
11    system has been replaced.  I mean, all components
12    of it, it seems, have been replaced.  You know, I
13    think a hundred BMDs and poll pads and -- yeah.
14         Q     The EMS server and the ICC were
15    replaced in the summer of 2021, right?
16         A     Yeah.
17         Q     And there have been at least three
18    elections in Coffee County since then, correct?
19         A     Yeah.
20         Q     And all of the equipment used in
21    those three elections, other than the EMS server
22    and the ICC, all the equipment and devices are the

1          same ones that the SullivanStrickler team, Jeff

2          Lindberg, Doug Logan, and others, had access to in

3          January of 2021, right?

4                              MR. TYSON:  I'll object to form.

5                              THE WITNESS:  I -- I don't know.

6          BY MR. CROSS:

7                    Q     Have you seen the surveillance video

8          from Coffee County that shows Scott Hall, Jeff

9          Lindberg, Doug Logan, and others, the

10         SullivanStrickler team, accessing and copying that

11         equipment?

12                   A     I've seen, you know, the clips and

13         articles.

14                   Q     Have you seen any of the photos that

15         Paul Maggio produced showing all the many thumb

16         drives and CompactFlash and other devices,

17         including poll pads, that they copied?

18                   A     No.

19                   Q     Okay.  But just to be clear, all of

20         the devices, all of the voting equipment that the

21         SullivanStrickler team, Doug Logan, Scott Hall,

22         Jeff Lindberg had access to and copied in January,

Page 167

1          all of that equipment was used in three elections

2          in Coffee County except for the EMS server and the

3          ICC.  Do you understand that?

4                          MR. TYSON:  I'll object to form.

5                          THE WITNESS:  Sure.  I think it

6          actually proves the security of the system.

7          BY MR. CROSS:

8                  Q     And the Secretary's office, even

9          though -- sorry.

10                         The Secretary's office has now, I

11         think yesterday -- what's today -- on Monday

12         replaced a lot of the election equipment, but did

13         not replace the EMS server and the ICC.  Is that

14         right?

15                 A     I think because they've already been

16         replaced is my understanding.

17                 Q     Right.

18                         But even though the EMS server and

19         the ICC that are there now have been used with

20         election equipment that was breached, and that the

21         Secretary's office concluded needed to be replaced,

22         even though those things had been used together,

Page 168

```
 1        they kept the EMS server and the ICC in place?
 2                 A      Is that --
 3                        MR. TYSON:  I'll object to form.
 4                        THE WITNESS:  Is that how it actually
 5        works?
 6                        I mean, the systems are air-gapped.
 7        They're not plugged into the Wi-Fi or each other.
 8        They're -- you know, they're static systems.  I
 9        wouldn't see the relevance of that, but sure,
10        they've been used.
11        BY MR. CROSS:
12                 Q      Right.
13                        What's the basis --
14                        MR. TYSON:  I'm sorry.  I was going
15        to try to catch you.  It's 12:45, we're probably at
16        a good -- I don't know how much longer you have on
17        this line.  I think we're close to probably where a
18        lunch break makes sense.
19                        MR. CROSS:  Yeah, no, I think that's
20        right.  Let me just finish this up.
21        BY MR. CROSS:
22                 Q      What's the basis for your testimony
```

Page 169

1          that the system is air-gapped?

2                A     Because that's my understanding -- I

3          mean, that's my understanding of how the process

4          worked.  That's how election systems function.

5          They are cut off from other pieces of equipment and

6          are essentially static.

7                      I mean, I don't know the basis, but,

8          you know, I think electronic voting machines create

9          a user-friendly, quicker results solution for local

10         election officials.  They reduce adjudication

11         rates, they reduce the -- the likelihood of people

12         to make errors on their ballots.

13               Q     Mr. Sinners, that's not my question.

14               A     Okay.

15               Q     You said it's air-gapped.

16               A     Sure.

17               Q     Okay.  You understand that the way

18         the system works, that there are -- there's

19         removable media, thumb drives, flash drives that

20         are plugged into internet-connected computers and

21         they're -- those same devices are then plugged into

22         the County and the State EMS servers?  Did you know

Page 170

1      that?

2            A      I know that they're removed for

3      reporting purposes and stuff.

4            Q      And is your understanding that

5      constitutes air-gapped?

6                  MR. TYSON:  I'll object to form.

7                  You can answer if you know.

8                  THE WITNESS:  I don't know what

9      you're referring to.

10     BY MR. CROSS:

11           Q      All right.  Let me hand you --

12                  MR. CROSS:  What are we up to, 21?

13                  MR. BROWN:  Yeah.

14            (Sinners Deposition Exhibit Number 22

15             marked for identification.)

16     BY MR. CROSS:

17           Q      Are you familiar with a man named

18     Michael Shamos?

19           A      No.

20           Q      Michael Shamos is an election

21     security expert that the Secretary's office

22     retained to testify in this case in 2019.  You've

Page 171

1       never heard of him?

2             A     I'm not familiar with him.

3             Q     All right.  So take a look -- this is

4       an excerpt from his testimony from 2019.

5             A     Okay.

6             Q     Look at page 70.

7             A     Okay.

8             Q     When you look at the top, you'll see

9       there's a discussion here about air-gapping.  Do

10      you see that?

11                  "There are air gap systems."  Do you

12      see that at the top of page 70?

13            A     Yeah.

14            Q     If you come down to the bottom of 70

15      at line 19, the question to him was:  "So you say

16      except for removal of media" -- "so you would

17      consider a system" -- this is the question:  "So

18      you would consider a system where removal of

19      media" -- it's supposed to say removable on the

20      transcript.  The court reporter got that wrong.

21                  The question was:  "So you would

22      consider a system where removable media is

Page 172

1          sometimes connected to an internet-facing computer

2          and it's also connected to that standalone system,

3          would you still consider that system air gapped?"

4                    And his answer was "No."

5          A     Okay.

6          Q     "The systems in use for election

7          management should never at any point in their life

8          have ever been or ever be connected to the

9          internet."

10                   "Question:  Including by removable

11         media, that at some point it was connected to an

12         internet-facing computer for example?

13                   "That's right.

14                   "Question:  Why is that?

15                   "Answer:  Because of the possibility

16         of infections from malware."

17                   Do you understand that?

18         A     Yeah, I mean --

19         Q     So you weren't aware before today

20         that the Secretary's own election security expert

21         testified that the election system used in the

22         state is not, as you have said, air-gapped because

Page 173

1        they use removable media with internet-connected

2        computers and then plug it in to core election

3        components, like the EMS server?  You just didn't

4        know that?

5                    MR. TYSON:  I'll object to form.

6                    THE WITNESS:  That's your opinion.

7        BY MR. CROSS:

8             Q    No, that's -- that's your boss'

9        expert's opinion as --

10            A    Okay.

11            Q    -- his election security expert.  Do

12       you understand that?

13            A    Cool.

14                  MR. TYSON:  Object to form.

15       BY MR. CROSS:

16            Q    So --

17            A    I'm not an election security expert,

18       nor do I portray myself as one.

19            Q    Well, you have represented both here

20       in this deposition and publicly on behalf of the

21       office that the system is air-gapped, right?

22            A    I don't believe I've gotten into that

Page 174

1        level of detail, but I've said that to you.

2              Q     You have never written anything where

3        you said the system was air-gapped?

4              A     I may have, yeah.  I mean, I believe

5        the system is air-gapped.  If I'm wrong, I'm wrong.

6        Whatever.

7              Q     Do you understand now that the

8        Secretary's election security expert testified that

9        you're wrong?

10                   MR. TYSON:  I'll object to form.

11                   THE WITNESS:  It's really not a

12       concern of mine.

13       BY MR. CROSS:

14             Q     Whether the voting system is

15       air-gapped?

16                   MR. TYSON:  Object to form.

17                   THE WITNESS:  I believe the voting

18       system is secure.  I believe we did a -- there was

19       a recount after the 2020 election on the scanners,

20       and there was a hand audit that showed that the

21       results were accurate.  And I believe that.

22                   MR. TYSON:  Can we take a lunch break

Page 175

1      while you find what you're looking for and then we

2      can pick up after that?

3                      MR. CROSS:  Yeah, that's probably

4      fine.  Just give me one second, if you don't mind.

5                      MR. TYSON:  Uh-huh.

6                      MR. CROSS:  That's fine.

7                      VIDEOGRAPHER:  The time is 12:50 p.m.

8      We are off video record.

9              (Recess from 12:50 p.m. to 1:21 p.m.)

10                      VIDEOGRAPHER:  The time is 1:21 p.m.

11      We are back on video record.

12      BY MR. CROSS:

13              Q      All right.  Can you grab Exhibit 18

14      again?  I guess it's the shorter transcript that

15      says, "Raffensperger:  Coffee County Probe

16      Stalled."

17              A      Sure.

18              Q      And if you could turn -- that's

19      the -- yeah, and then the transcript that goes with

20      it, the shorter one, which is Exhibit 18.  It has

21      the same title, the one page.

22              A      Yeah, here we go.

Page 176

1              Q     If you look at the bottom of the

2         second page, on the last three entries, Doug

3         Richards asked Secretary Raffensperger in this

4         interview, "If a bad actor wanted to undermine the

5         upcoming election, wouldn't they do something

6         exactly like they did in Coffee County?"

7                    And the Secretary responded, "They

8         would attempt to -- they would attempt to that, but

9         you have to also understand if there's any question

10        of what happens with a ballot-marking device,

11        you'll see it immediately."

12                    And then Richards goes on to explain

13        that Secretary Raffensperger says that, "Voters

14        checking their printouts after they voted on the

15        Dominion voting machines can double-check whether

16        there was a security breach on their particular

17        ballot."

18                    Do you see that?

19              A     Yep.

20              Q     Do you know what he's talking about

21        there?

22                    How can voters do that?

Page 177

```
 1              A     Because the ballots are voter

 2       verified.  You can look at your selection, confirm

 3       your choices.  Yeah, that's how -- that's how you

 4       do it.

 5              Q     And --

 6              A     And there's a risk-limiting audit

 7       after the election to see that those selections

 8       matched up.

 9              Q     Do you have the ability to read a QR

10       code?

11              A     I do not.

12              Q     Okay.  And a QR code is what gets

13       tabulated in Georgia elections, not the

14       human-readable portion, right?

15              A     Sure.

16              Q     So it's actually not true that in the

17       Dominion voting system used in Georgia, the voters

18       can verify that their ballot will get tabulated the

19       way they intended, right?

20                    MR. TYSON:  I'll object to form.

21                    THE WITNESS:  I totally disagree with

22       that statement, but --
```

Page 178

1          BY MR. CROSS:

2                  Q     Okay.  So explain to me how a voter

3          verifies that the QR code is going to tabulate all

4          of the selections that they made exactly the way

5          they made it.

6                        How does a voter do that looking at

7          the QR code?

8                        MR. TYSON:  Object to form.

9                        You can answer if you know.

10                       THE WITNESS:  Because the selections

11         are printed right on the ballot and then there's a

12         risk-limiting audit afterwards to confirm that

13         those selections match.  I mean, it's the same

14         theory that I've been dealing with for two years

15         from Mike Lindell, Lin Wood, and all these people.

16         BY MR. CROSS:

17                 Q     Okay.  That is a ridiculously

18         offensive thing to say.  If you could just answer

19         the questions, this day is going to go a lot

20         quicker and a lot easier.

21                 A     Then I -- then I don't know.

22                 Q     Okay.  Let's try it again.

Page 179

1            The human-readable portion of a

2       ballot in Georgia is not tabulated, correct?

3            A    It is tabulated in the risk-limiting

4       audit.

5            Q    Okay.  What statute in Georgia says

6       that even in a risk-limiting audit, the

7       human-readable portion is what will govern as the

8       official election results as opposed to the QR

9       code?

10           A    That is a legal --

11                MR. TYSON:  I'll object to form.

12                You can answer if you know.

13                THE WITNESS:  That is a legal

14      question.  I do not know.

15      BY MR. CROSS:

16           Q    So as you sit here, even though

17      you're claiming that the human-readable portion

18      will govern the election result in a risk-limiting

19      audit, you can't identify any legal basis, any

20      statute that authorizes that, can you, sir?

21           A    I don't know.

22                MR. TYSON:  Object to form.

```
 1                      Answer if you know.
 2                      THE WITNESS:  I don't know.
 3    BY MR. CROSS:
 4             Q      You don't know.  Okay.
 5                    It's also -- are you aware that a
 6    risk-limiting audit is mandated only once every
 7    other year for a single statewide election contest?
 8             A      Yes.
 9             Q      Okay.  And in 2020, there was only
10    one thing that came anywhere close to a
11    risk-limiting audit, and that was the statewide
12    hand count of the presidential contest?
13             A      The full hand count.
14             Q      Right.
15             A      And that matched almost with
16    99.999 percent of accuracy.
17             Q      There was no risk-limiting audit of
18    the senate elections in 2020, right?
19             A      I'm not sure.  I don't believe so.
20             Q      Right.
21                    There was no risk-limiting audit of
22    any election contest at the state level, county
```

1          level, municipal level, any contest in all of

2          Georgia, apart from the presidential election,

3          right?

4                        MR. TYSON:  I'll object to form.

5                        Answer if you know.

6                        THE WITNESS:  Was there any other --

7          say that question again.

8          BY MR. CROSS:

9               Q     There was no risk-limiting audit of

10         any election contest anywhere in the state of

11         Georgia in 2020 apart from the presidential race

12         where there was a hand count, right?

13                        MR. TYSON:  Object to form.

14                        THE WITNESS:  I don't know.  I think

15         some counties independently go through their own

16         checks and stuff.  I know they've been doing that

17         for a while.

18         BY MR. CROSS:

19              Q     I'm not asking you to guess.

20                    As you sit here --

21              A     I don't know.

22              Q     Okay.  Now, so when you say the voter

1       can verify their ballot because the human-readable

2       portion will be reviewed in a risk-limiting audit,

3       that's true at most for a single statewide contest

4       every other year, right?

5              A     I disagree with that assessment.

6              Q     Okay.  So where did I get it wrong?

7                    How does a voter verify that the --

8       that the ballot that they cast in a BMD will be

9       tabulated in the way that they intended in any

10      election where there's not an RLA?

11                   MR. TYSON:  And I'll object to form.

12                   THE WITNESS:  Because they're

13      verifying their selections and the machines are

14      designed to produce the selections that they

15      intend.

16      BY MR. CROSS:

17             Q     But how does the voter know that the

18      QR code that's printed on that ballot captures the

19      same selections that are in the human-readable

20      text?  How does a voter do that?

21                   MR. TYSON:  Object to form.

22                   THE WITNESS:  I mean, you're asking

1          me theoreticals to which I don't -- I don't know.

2          BY MR. CROSS:

3                  Q     I'm really not.  I'm asking you a

4          very practical question.

5                  A     How do they --

6                  Q     Based on --

7                  A     How do they --

8                  Q     Hold on.  Hold on.  Hold on.

9                  A     I think it goes a different way.  I

10         mean, the selections are the choice -- I mean, it's

11         their choice.

12                 Q     You're assuming that every ballot

13         that's printed on a BMD in the state of Georgia,

14         that the QR code, which voters cannot read, you're

15         assuming that every single one of those QR codes

16         will be tabulated in the same way as the

17         human-readable selections on those ballots, right?

18                        MR. TYSON:  Object to form.

19                        THE WITNESS:  Yes, like -- I feel

20         like most normal people would.

21         BY MR. CROSS:

22                 Q     Okay.

1            A    Yes.

2            Q    That's an assumption.  There's no

3    ability for a voter to actually verify that on the

4    ballot.  They cannot verify that because they can't

5    read the QR code.  Are we agreed on that, sir?

6            A    We --

7                 MR. TYSON:  Object to form.

8                 THE WITNESS:  We don't -- we don't --

9    I don't read -- I don't know how to read a QR code.

10   BY MR. CROSS:

11           Q    Right.

12                So when you -- when you print your

13   ballot -- let's take a step back.

14                Have you voted on a BMD in Georgia?

15           A    Yes.

16           Q    Okay.  When you printed the ballot,

17   did you review it?

18           A    Yes.

19           Q    What did you look at?

20           A    The ballot and confirmed that the

21   choices were my choices.

22           Q    On the human-readable portion, right?

1          A      Yeah.

2          Q      You can't read the QR code?

3          A      No.

4          Q      Okay.  And so then you scan your

5     ballot, right?

6          A      Yeah.

7          Q      The point at which you're scanning

8     your ballot, you're assuming -- you're trusting

9     that the system has worked so that that QR code

10    will be tabulated exactly the way that you read the

11    human-readable portion, right?

12         A      I --

13               MR. TYSON:  Object to form.

14               THE WITNESS:  I do believe that is

15    the case of how voting machines work, yes.

16    BY MR. CROSS:

17         Q      But that's an assumption.  You have

18    no ability to verify that that QR code will be

19    tabulated in any given way because you can't read

20    it?

21               MR. TYSON:  Object to form.

22               THE WITNESS:  I have not seen any

                                              Page 186

1        evidence that they do.  I mean, the only thing that

2        I've seen allegations-wise are conspiracy videos

3        from Mike Lindell.  But, you know, I don't believe

4        in any of that.

5        BY MR. CROSS:

6               Q     Okay.  Well, we're going to come back

7        to that, but I'm not asking you -- I'm asking you a

8        very specific question.

9                     MR. TYSON:  You keep asking it and

10       he's answered it.  I'm not sure there's any benefit

11       to keep going down this road, but I'll keep

12       objecting.

13       BY MR. CROSS:

14              Q     You mentioned Mike Lindell and some

15       others.  It doesn't concern you -- well, let me ask

16       it this way:  Does it concern you as a voter and as

17       the director of communications for the Secretary's

18       office, that the State is continuing to use a

19       voting system, including equipment, that was

20       accessed by people who are working for individuals

21       that you have characterized as crazy and

22       wackadoodle, like Sidney Powell and Mike Lindell?

```
 1                    Does that concern you?
 2                    MR. TYSON:  Object to form.
 3                    THE WITNESS:  I think these systems
 4         have been replaced.  And, frankly, if these things
 5         that have been stated are true, I think it actually
 6         confirms the security of the system.  You've had
 7         these bad actors that may have had code and
 8         software for two years making these claims that
 9         there's algorithms and there's flips.  And there's
10         been no evidence of that.  So I think it actually
11         confirms that the results are accurate.
12         BY MR. CROSS:
13              Q    You say there's no evidence of that.
14         What steps has the Secretary's office taken to
15         evaluate whether any of the voting equipment in
16         Coffee County, or elsewhere, was infected by
17         malware, for example, by the individuals we all
18         agree were bad actors and unreliable that got
19         access to that equipment?  What steps has the
20         office taken?
21                    MR. TYSON:  Object to form.
22                    THE WITNESS:  I think you're asking
```

Page 188

1      about specific investigations, and I do not have

2      access to those investigations, therefore, I do not

3      know.

4      BY MR. CROSS:

5              Q    So let's put --

6              A    Other than what's been made public.

7              Q    Okay.  So let's put aside the

8      investigation into what happened.

9              A    Okay.

10             Q    I'm asking you a different question,

11     which is:  The Secretary's office is continuing to

12     use the Dominion System, right?

13             A    Yes.

14             Q    Okay.  As a director of

15     communications, the senior official in the office,

16     is there anything that you can describe for me that

17     the Secretary's office has done to ensure that the

18     access that occurred in Coffee County did not

19     infect the system in some way that it could affect

20     votes or election outcomes?

21             A    What do you mean --

22                  MR. TYSON:  I'll object to form.

 1      BY MR. CROSS:

 2              Q      The Dominion equipment.

 3              A      Which equipment?  In Coffee County?

 4      In Fulton?  Elsewhere?

 5              Q      All of it.  Any of it.  Start with

 6      Coffee County and then go more broadly.  What has

 7      been done to test that?

 8                     MR. TYSON:  I'll object.  He can

 9      answer to his personal knowledge.

10      BY MR. CROSS:

11              Q      And if you don't know, that's fine.

12              A      Yeah, I don't know.  Logic and

13      accuracy testing happens regularly.  It's happening

14      now.  Multiple tests are going through.  They've

15      had independent evaluators, I think, in some of

16      your litigation.  I have no reason to believe that

17      the election equipment in the state is compromised.

18      And, frankly, I think it's an absurd idea.

19              Q      It's an absurd idea that individuals

20      who you have characterized multiple times as

21      unreliable, as wackadoodle, as bad actors, you

22      think it's an absurd idea to think that when they

1      had access to that equipment over the span of

2      almost a full month, that they may have done

3      something to compromise it?

4                     MR. TYSON:  Object to form.

5      BY MR. CROSS:

6           Q     That's absurd to you?

7           A     I think it's absurd to think that a

8      bunch of crazy, you know, attorneys had some sort

9      of ability to do that.

10          Q     Doug Logan is not an attorney.  Are

11     you aware of that?

12          A     I don't know enough about him.

13          Q     Are you aware that Doug Logan,

14     Jeffrey Lindberg, that they have computer science

15     backgrounds?

16          A     Sure.

17          Q     Are you aware that Lindberg spent

18     almost every day for five days in that office

19     accessing the system?

20          A     No.

21                     MR. TYSON:  I'll object to form.

22     BY MR. CROSS:

Page 191

```
 1              Q    You didn't know that?

 2              A    No.

 3              Q    Okay.  Were you aware that Mike

 4     Lindell flew into Douglas, Georgia in the middle of

 5     the night in February of 2021?

 6                   MR. TYSON:  Object to form.

 7                   THE WITNESS:  I heard about that in

 8     media articles.

 9     BY MR. CROSS:

10              Q    But you don't have any insight on why

11     he was there or what he did?

12              A    No.

13                   MR. TYSON:  Object to form.

14                   THE WITNESS:  I never dealt with Mike

15     Lindell.

16     BY MR. CROSS:

17              Q    Okay.

18              A    He's a nut.

19              Q    We agree.

20                   MR. CROSS:  What are we up to, does

21     anybody know?

22                   MS. CINO:  23.
```

                                        Page 192

1                    MR. BROWN:  23.

2                    MR. CROSS:  Okay.  Thank you.

3                (Sinners Deposition Exhibit Number 23

4                marked for identification.)

5        BY MR. CROSS:

6            Q    All right.  I'm going to hand you

7        Exhibit 23.  Have you seen Exhibit 23, which is

8        Tab 69?  Have you seen this before?

9            A    Yes, I have.

10           Q    And this is -- has been represented

11       to us by Dominion as a report that they engaged a

12       company called MITRE to prepare in response to

13       Dr. Halderman's July 2021 report.

14                When did you first see this?

15           A    I don't know.

16           Q    Well, was it recently?  Was it --

17           A    Yes, it was recently.

18           Q    Okay.  How recently?  In the last

19       month?

20           A    I don't know.

21           Q    Six months?

22           A    I don't know.

Page 193

1          Q     Was it earlier this year?

2          A     I don't -- I don't know.  I don't

3     believe so.  I've read this recently.

4          Q     What is your understanding of the

5     purpose of this report?

6                MR. TYSON:  Object to form.

7                THE WITNESS:  The purpose is to

8     present a technical review of claims made against

9     the voting systems and provide a real-world

10    implication of what those earlier findings mean.  I

11    guess that's the way I would characterize it.

12    BY MR. CROSS:

13         Q     And that was something that Dominion

14    engaged MITRE to do?  That's your understanding?

15         A     Sure.  I guess it says that right at

16    the top.

17         Q     Right.

18               If you look at the executive

19    summary -- and this executive summary has been

20    publicly filed.  If you come down to the second to

21    the last paragraph that begins, "The researcher's

22    proposed attacks."  Do you see that?

Page 194

1                A      Yeah.

2                Q      And here MITRE states, "The

3        researcher" -- referring to Dr. Halderman -- do you

4        understand that?

5                A      Yeah.

6                Q      MITRE writes, "The researcher's

7        proposed attacks were assessed by MITRE NESL to be

8        operationally infeasible given two parameters:  The

9        normal operating procedures of a voting precinct

10       and associated officials and scale considerations."

11               It goes on to say, "Each of the

12       attacks requires access and/or opportunity that

13       remains unavailable in the operational

14       environment."

15               Do you see that?

16               A      Uh-huh.

17               Q      Yes?

18               A      Yes.

19               Q      Okay.  And we're agreed that that is

20       not an accurate statement, right?

21               MR. TYSON:  I'll object to form.

22               THE WITNESS:  We are in agreement

1       that -- no.  I think this is a very accurate

2       statement.

3       BY MR. CROSS:

4              Q     It's an accurate statement that

5       access and opportunity to the Dominion voting

6       equipment is unavailable in Georgia?

7                    You think that's accurate after what

8       we know about Coffee County?

9                    MR. TYSON:  Object to form.

10                   THE WITNESS:  Yeah, I think that's

11      highly inaccurate.  I think that to play out

12      something like this, you would have to have

13      multiple people involved.  If you, say, found a way

14      to switch votes in every precinct, I feel like

15      there would have to be some actors in those

16      precincts involved.

17                   You would have a conspiracy on your

18      hands.  And I think someone would get found out

19      eventually.  I think it's an access control

20      issue, because most election officials are honest

21      people.

22      BY MR. CROSS:

Page 196

```
 1          Q     Is it lost on you that you literally

 2    just described what happened in Coffee County in

 3    January of 2021?

 4                MR. DELK:  Object to form.

 5                THE WITNESS:  I didn't know there was

 6    an election involved that they were doing that to,

 7    so . . .

 8    BY MR. CROSS:

 9          Q     Okay.  So looking at the footnote

10    here, Footnote 2 states, "MITRE's assessment of the

11    researcher's proposed attacks" --

12          A     Where are we?

13          Q     Sorry.  Footnote 2 at the very bottom

14    of the page.  It indicates that, "MITRE's

15    assessment of the researcher's" -- meaning

16    Dr. Halderman's -- "proposed attacks assumes" --

17          A     Yeah.

18          Q     "So MITRE indicates explicitly that

19    for its findings MITRE assumes strict and effective

20    controlled access to Dominion election hardware and

21    software."

22                     Do you see that?
```

Page 197

1              A     Sure.  Yeah.

2              Q     That is not an assumption that holds

3        in light of Coffee County.  Do we agree on that?

4                    MR. TYSON:  Object to form.

5                    THE WITNESS:  I don't think we've

6        agreed on that.  I think in any election's

7        environment, you have to have honest officials.

8        Who's to say that somebody like Misty Martin

9        couldn't have a stack of hand-marked paper ballots

10       and go switch those out as she finds it convenient.

11       I mean, you have to have honest people in place.

12       The voting system here, it doesn't matter if it was

13       on a toaster in my mind.

14       BY MR. CROSS:

15             Q     Do you dispute that the assumption

16       here that there's strict and effective controlled

17       access to Dominion election hardware and software,

18       that that is not a sound assumption in light of

19       what we know about Coffee County?

20                   MR. TYSON:  I'll object to form.

21       He's not an expert.

22                   THE WITNESS:  I think she was a

1          dishonest, you know, election person.  She should

2          have known better.  You have to have honest people

3          in elections.  But it doesn't matter what kind of

4          voting system is in place for bad things to come

5          when people do bad things.

6          BY MR. CROSS:

7                   Q     Well --

8                   A     It's irrelevant.

9                   Q     Yeah, let's pause on that because one

10         of the things MITRE talks about is the scalability

11         of an attack.  Okay?

12                   Do you understand, just as the

13         State's election security experts have acknowledged

14         in this case, an attack on a BMD system can be

15         scaled much more broadly than an attack on

16         hand-marked paper ballots?

17                        MR. TYSON:  I'll object to form.

18                        THE WITNESS:  I disagree with your

19         assessment.

20         BY MR. CROSS:

21                   Q     Okay.  So you said, for example,

22         Misty Hampton could have hand-marked paper ballots

1        that are fraudulent she can put into the system?

2                A      Yeah.

3                Q      How long do you think it would take

4        an elections supervisor to create, let's say, 500

5        hand-marked paper ballots, create them, sneak them

6        into the set of hand-marked paper ballots without

7        anyone realizing, also figure out a way to do that

8        and account for the fact that that's going to be a

9        different paper count than the tabulation that's

10       coming out of the precinct scanners?

11                      How long do you think it would take

12       them to do all that?

13                      MR. TYSON:  Object to form.

14                      THE WITNESS:  An hour or two.

15       BY MR. CROSS:

16                Q      Okay.  And are you aware that what

17       Dr. Halderman found is that someone could walk into

18       the voting booth and in just a couple of minutes

19       plug a USB device into one of the Dominion

20       machines, upload malware, and that then could

21       change votes, at least on that one BMD where there

22       might be literally thousands of voters on a given

Page 200

1          election day?

2                        MR. PARKER:  Object to form.

3                        THE WITNESS:  So how is he going to

4          get in there?  Is he going to check in like

5          normally on the poll pads and then go or is he

6          going to be --

7          BY MR. CROSS:

8                  Q     Sure, he could be a voter that just

9          walks in, no one thinks otherwise, they're in the

10         voting booth.

11                 A     I'm not sure how he would get access

12         when you're dealing with one machine.  I don't

13         think that's going to impact the election in a huge

14         devastating way.  And I don't even know if it's

15         possible.  I mean, you're asking me election

16         security questions that -- I think I might be

17         speculating a little bit.

18                 Q     Well, I'm asking because you keep

19         making the claim that the election system in the

20         state is secure, it's reliable.  And what we're

21         getting at is you actually -- you just don't know,

22         you don't know enough about the security of the

Page 201

1          system to be able to say that one way or the other,

2          right?

3                      MR. TYSON:  Object to form.

4                      THE WITNESS:  I think operating on

5          the assumption that it's insecure leads to lowered

6          confidence in elections, which is what I've been

7          fighting for the past two years and was even

8          substantially fighting on the Trump Campaign.  I

9          hate election disinformation.

10         BY MR. CROSS:

11              Q    So in your mind, there are only two

12         ways that you can proceed.  One is assume that the

13         system is secure or assume that it's not.  There's

14         no in between or middle ground?

15              A    I think --

16                      MR. TYSON:  Object to form.

17                      THE WITNESS:  -- there's

18         vulnerabilities in any system.  Any system has

19         vulnerabilities.

20         BY MR. CROSS:

21              Q    And you don't know enough about this

22         system to be able to speak to the vulnerabilities

Page 202

1          and the degree to which they can be exploited?

2                          MR. TYSON:  Object to form.

3                          THE WITNESS:  I think the MITRE

4          report is correct in that you would have to have a

5          huge scale, multiple people involved, a lot of

6          shady dealings.  And yeah, I just -- I don't buy

7          it.

8          BY MR. CROSS:

9                  Q     You said you think the MITRE report

10         is correct, but I thought you just said you're

11         speculating on election security because you don't

12         know about election security.  So you're assuming

13         that the MITRE report is correct, right?

14                 A     I believe the MITRE report is

15         correct.  Yeah, I believe this would be correct.

16                 Q     And you believe that the system is

17         reliable.  Is that fair?

18                 A     I think the system is reliable.

19         Every speculative claim that I took a look at from

20         June 2020 to present day has been explained by

21         human error.

22

Page 203

1                 (Sinners Deposition Exhibit Number 24

2                 marked for identification.)

3        BY MR. CROSS:

4                 Q     All right.  Let me hand you

5        Exhibit 24.  So Exhibit 24, if you look at the top,

6        is an e-mail that you sent to Jordan Fuchs on

7        May 21st of last year.  Do you see that?

8                 A     Yep.

9                 Q     And if you come to the beginning of

10       the thread on the third page, do you see it begins

11       with an e-mail from a registered voter in New

12       Jersey?

13                A     Sure.

14                Q     And the voter here asks Secretary

15       Raffensperger directly, "To instill confidence in

16       the election system to conduct a full forensic

17       audit of the November 2020 election."

18                      Do you see that?

19                A     Yep.

20                Q     And then do I understand correctly

21       you were tasked with drafting the response to that?

22                A     Yeah.

Page 204

1          Q     So the -- so if you look at the

2     e-mail at the bottom of the first page that you

3     sent on May 21st, 2021, what follows there that's

4     signed, "Sincerely Brad Raffensperger," that's a

5     draft that you prepared for him to respond.

6                Is that right?

7          A     That would be correct.

8          Q     And then you cut that down a little

9     bit based on some feedback from Ms. Fuchs.  Is that

10    right?

11         A     Yeah.

12         Q     If you look at the longer draft on

13    the second page, you wrote, "Our office is working

14    with a premier technical university" -- which is

15    capitalized -- "to conduct an expanded state

16    audit."  What was that?

17         A     Technical, yeah.  "Additionally, our

18    office is working with a premier technical

19    university to conduct an expanded state audit."  I

20    think there was some discussion about bringing in

21    Georgia Tech or something to do like a -- some sort

22    of an audit, but I don't think that went anywhere,

1       hence, it was deleted.

2              Q    So as you sit here, are you aware of

3       any work that the Secretary's office has done with

4       Georgia Tech or another technical university on the

5       issue of election integrity or election security?

6              A    I'm not aware.

7              Q    Okay.

8              MR. CROSS:  We're at 25?

9              MR. BROWN:  Uh-huh.

10          (Sinners Deposition Exhibit Number 25

11            marked for identification.)

12       BY MR. CROSS:

13             Q    Let me hand you what's been marked as

14       Exhibit 25.  If you look at the top -- and this is

15       Tab 36.  If you look at the top of Exhibit 25,

16       there's an e-mail to Jordan Fuchs, sent to Ryan

17       Germany on March 3rd of 2021.  It says, "DVS

18       response."  And Ms. Fuchs writes, "Robert is a

19       content machine and I like his work."

20                  Do you see that?

21             A    Yep.

22             Q    If you come back earlier in the

1      thread, the bottom of the first page, you'll see

2      there's an e-mail from a Yahoo account on March 1st

3      of 2021.  Do you see that?  Bottom of the first

4      page.

5              A      Pack?

6              Q      Yeah.

7              A      Okay.

8              Q      And that's addressed to

9      Security@Dominionvoting.com, and then a litany of

10     other folks, including Secretary Raffensperger.  Do

11     you see that?

12             A      Sure.

13             Q      And then you see John Poulos at

14     Dominion Voting forwards this e-mail on to Jordan

15     Fuchs on March 2nd, right?

16             A      Okay.

17             Q      And John Poulos is the head of

18     Dominion, right?

19             A      Yep.

20             Q      And the subject line here is,

21     "Georgia QR code, Dominion Voting System."  Do you

22     see that?

1          A     Yeah, that's in the subject line.

2          Q     Right.

3                And Mr. Poulos writes to Jordan Fuchs

4     on March 2nd, "Jordan, I'm assuming you've seen

5     this."  She then forwards it on to you the same day

6     and says, "Can you draft a response e-mail?"

7                Do you see that?

8          A     Okay.

9          Q     And then if you flip to the last two

10    pages of the document, you'll see there's a draft

11    response here that reads "Mr. McKibben."  Do you

12    see that?

13         A     Yeah.

14         Q     And do I understand correctly -- this

15    attachment is what's included with this e-mail in

16    the production.  Do I understand correctly you

17    drafted that at Ms. Fuchs' direction?

18         A     Probably, yes.

19         Q     Okay.  So it begins, "Dominion Voting

20    System is the nation's premium voting systems and

21    elections solutions provider in the United States."

22                Do you see that?

Page 208

1          A     Sure.

2          Q     And as you sit here, you don't have

3     any reason to believe that what's written here is

4     not what you drafted, right?

5          A     No.

6          Q     Okay.  How often do you draft

7     communications for Dominion in your role at the

8     Secretary's office?

9                MR. TYSON:  Object to form.

10               THE WITNESS:  I haven't, but, you

11    know, I think that this was something in terms of

12    reaching out to us and needing a response to a

13    constituent as John Poulos forwarded it.  Yeah, it

14    seems like something I'd write.  It has a lot to do

15    with Georgia, yeah.

16    BY MR. CROSS:

17         Q     Why were you and the Secretary's

18    office writing a response for John Poulos?

19         A     I think probably because all these

20    legislatures were involved, would be my

21    understanding.  I mean, she asked a lot of

22    Georgia-specific questions.

Page 209

```
 1              Q     If you look at what you wrote here,

 2       come down to the fifth paragraph, you wrote --

 3              A     Yeah.

 4              Q     -- "Logic and accuracy testing," you

 5       refer to there, and you said, "This ensures the

 6       machines are properly calibrated, functional, and

 7       most importantly have not been corrupted."

 8                    Do you see that?

 9              A     Uh-huh.

10              Q     Yes?

11              A     Yes.

12              Q     Are you aware that the state's own

13       election security experts have acknowledged that

14       logic and accuracy testing does not, and cannot,

15       determine whether voting equipment has been

16       corrupted?

17                    MR. TYSON:  Object to form.

18                    THE WITNESS:  I'm not aware of that.

19       BY MR. CROSS:

20              Q     So as you sit here, it's your belief

21       that L&A testing can determine whether voting

22       equipment has been corrupted such as by malware?
```

Page 210

1               A     I'm not aware.  I mean --

2               Q     You just don't know one way or the

3        other?

4               A     Yeah.  I don't have an opinion on

5        that.

6               Q     Do you know Ed Voyles?

7               A     I do not.

8               Q     You don't recognize the name?

9               A     Car dealer.

10              Q     Have you had --

11              A     Ed Voyles Chevrolet, I think, around

12       here.

13              Q     Have you ever communicated with

14       someone named Ed Voyles?

15              A     No.

16              Q     No communications with Mr. Voyles

17       regarding Coffee County, for example?

18              A     I don't believe so.

19              Q     All right.  Let me hand you what's

20       been marked as Exhibit 26.

21                    (Sinners Deposition Exhibit Number 26

22                     marked for identification.)

Page 211

1          BY MR. CROSS:

2                  Q      Exhibit 26, do you recognize this as

3          a text thread that you produced?

4                  A      Sure.

5                  Q      Who is Marshall?

6                  A      Marshall Cohen with CNN.

7                  Q      Sorry, with who?

8                  A      CNN.

9                  Q      Oh, CNN.

10                 So Marshall Cohen on this text thread

11         is a journalist?

12                 A      Yep.

13                 Q      So Mr. Cohen reached out to you on

14         April 13th with some questions.  He says, "Can I

15         call you in a few?"  You write back, "Sure."  And

16         then you sent a video here.

17                 Do you see that video?

18                 A      Yeah.

19                 Q      Do you recognize the individuals in

20         that video?

21                 A      No.

22                 Q      Why did you send that video?

Page 212

1              A     He had called me about Coffee County

2        and was like -- you know, I think there was a video

3        that spurred everybody up, and that's, you know,

4        where I think this is coming from and sent him the

5        video.

6              Q     Then you reference on the second

7        page -- you are talking about Gabriel Sterling's

8        deposition where the recording with Ms. Marks and

9        Mr. Hall was played.  Do you see that?

10             A     Yeah.

11             Q     Marshall writes back, "I'm sorry, I

12       think you're right.  This is a bunch of crossed

13       wires."  What does that mean?

14                   What -- what did you think was a

15       bunch of crossed wires?

16             A     Well, I didn't think this had

17       happened.  I didn't think there was people let in.

18       There had been a lot of rumors floating around.

19       And, you know, it was like another rumor.

20             Q     And here you wrote back, "I think so.

21       I would love to find an election supervisor who

22       would give access to the crazies."

1                    Why was that something you wanted to

2          find?

3                A    I would say that was poorly written,

4          but, you know, it would make a good story.  And

5          then as I said previously, I think it proved the

6          security of the system.  You have -- if you had

7          that kind of stuff out there in the ether, you

8          know, you haven't had Mike Lindell coming around

9          saying, "I finally got my proof, here's the

10         algorithm, and we got it from Coffee County," yeah.

11                    And, secondly, I mean, that would be

12         completely highly illegal and -- yeah.  Like, some

13         of these people that are responsible for the hell

14         that, you know, election officials are going

15         through have committed a crime.

16                Q    And, again, you're not aware of any

17         measures by the Secretary's office to determine

18         whether the individuals who got access to the

19         election equipment in Coffee County, whether they

20         injected malware or otherwise compromised that?

21                A    I've never been involved on those

22         discussions.

Page 214

1          Q      If you turn to -- there are no page

2     numbers, but if you flip maybe six, seven pages

3     in --

4          A      Yeah.

5          Q      -- at the top it says, "Last

6     night" -- turn to the next page, if you would.

7     "Last night the elections board voted not to renew

8     their maintenance contract with Dominion.  And this

9     guy is on record floating Dominion conspiracies and

10    he's the board chair."

11         A      Yep.

12         Q      What's that about?

13         A      The Daily Beast ran an article about

14    this guy, and I think it's Spalding County, who's

15    all sorts of out there.  And, like, it's a good

16    narrative to -- you know, these reporters are

17    looking for the crazies and I was like, "Here you

18    go."

19         Q      And then if we flip through, you

20    actually got a copy of Gabriel Sterling's

21    deposition and sent some screenshots of portions of

22    it to CNN here.  Is that right?

Page 215

1                    A       Yeah.

2                    Q       And your conclusion was, "It looks

3          like a nothingburger."

4                    A       Yeah.

5                    Q       What did you mean by that?

6                    A       It looked like it was a

7          nothingburger.  I did not believe in this

8          unauthorized access.

9                    Q       You didn't believe it had happened?

10                   A       I didn't believe it happened, yeah.

11                   Q       And, in fact, around the same time or

12         a little bit before I think -- I don't remember the

13         exact date, but in April of 2021, were you aware

14         that Gabriel Sterling, at a conference, publicly

15         stated that the Secretary's office had investigated

16         the allegations of a breach in Coffee County and

17         concluded it did not happen?

18                   A       I was -- I'm aware of that now.  I

19         don't know if I was aware of it then.

20                   Q       And --

21                   A       It's The Carter Center speech you're

22         referring to, right?

Page 216

1                Q      I think that's right.

2                A      Okay.

3                Q      But that -- that statement, the

4       conclusion was not accurate?

5                       Yes?

6                A      I assume.

7                Q      Well, you don't need to assume

8       because we all know that there was unauthorized

9       access in Coffee County.

10               A      Okay.

11               Q      Right?

12               A      I assume -- I assume that to be the

13      case by what I've read in the media.

14               Q      Why would you assume that when you've

15      seen the video and the screenshots, the

16      documentation showing that it happened?  Why is

17      that an assumption?

18               A      Yeah, it happened, sure.

19               Q      Okay.

20               A      I just don't know to what level.  I

21      mean, there are so many things that are being

22      figured out.  Sure.

Page 217

1               Q     Okay.

2               A     And maybe that was a poor

3        characterization on my part.

4               Q     Okay.  No, that's fine.

5                     As director of communications in the

6        Secretary's office, have you had any conversations

7        with Mr. Sterling about what led him to make that

8        statement, for that to be the conclusion?

9                     MR. TYSON:  I'll object to form.

10                    THE WITNESS:  I wouldn't say so.

11       BY MR. CROSS:

12              Q     So you've not had any communications,

13       written, oral or otherwise, with Mr. Sterling about

14       his statement that the -- that the breach in Coffee

15       County didn't happen?

16              A     I -- I don't know because this has

17       all kind of come out in the past two weeks.  And,

18       again, as I said, you know, having been dragged

19       into this, I've kind of let other people with a

20       clearer head take charge.

21              Q     So you have no insight into -- into

22       what led Mr. Sterling to make that statement?

1           A       No.

2           Q       No insight into what led the

3    Secretary's office to conclude that the breach did

4    not happen?

5           A       I think no one had seen any evidence

6    of it.  And I think a lot of people operate on -- I

7    mean, it's kind of like the claims of -- that Trump

8    made.  It's like assuming the negative isn't a

9    healthy way to go through life.

10          Q       You keep saying that like that's the

11   only alternative.  You either assume the positive

12   or assume the negative.  You recognize in the real

13   world there's an in between where people can ask

14   healthy questions and verify --

15          A       And I believe in discourse for sure.

16          Q       Let me just make sure I get the

17   questions done, because otherwise it gets hard for

18   Felicia.

19                  You understand in the real world, you

20   don't have to just assume that something is black

21   or white, you can ask healthy questions and have a

22   dialogue and verify assumptions, right?

Page 219

1                    MR. TYSON:  Object to form.

2                    THE WITNESS:  Sure.

3          BY MR. CROSS:

4                 Q     Right.

5                        And with like an election system,

6          instead of just assuming that it's functioning as

7          it should and has not been infected by people who

8          had a month-long access to it with bad motives, you

9          could take affirmative steps to verify, like having

10         an election security expert come in and examine the

11         system for malware.  That could be done, right?

12                Q     Sure.

13                   MR. TYSON:  Object to form.

14         BY MR. CROSS:

15                Q     Do you know -- all right.

16                   MR. CROSS:  27?

17                   MR. BROWN:  Yes.

18                   Thanks.

19              (Sinners Deposition Exhibit Number 27

20               marked for identification.)

21         BY MR. CROSS:

22                Q     All right.  So I'm handing you

Page 220

1       Exhibit 27.  So Exhibit 27, this is an e-mail that
2       you and Ryan Germany received on August 26 of 2022
3       from Kate Brumback.  Is that right?
4              A      Sure.
5              Q      And Kate Brumback is an Associated
6       Press reporter, right?
7              A      Uh-huh.
8              Q      Yes?
9              A      Yes.
10             Q      And you deal with her from time to
11      time in your role at the Secretary's office?
12             A      I mean, I -- she has been active in
13      this Coffee County stuff.  And like I say, you
14      know, I'm cc'd on some things, but yeah, Mike's
15      kind of handling her.
16             Q      So if you look at your Mike
17      Hassinger -- am I saying that right?
18             A      Yeah.
19             Q      He's the one who engages with Mark
20      Niesse, for example, on August 16th, it looks like
21      Doug Richards, the same person who did the
22      interview on August 30, 2022, and Kate Brumback on

Page 221

1          August 26 of 2022.

2                         Do you see that?

3                    A    I -- I guess, yeah.  I mean, this is

4          pretty recent, so I have a pretty -- you know, this

5          is familiar, yep.

6                    Q    And you -- my understanding is that

7          Hassinger is handling this instead of you because

8          of your involvement through our subpoena.  Is that

9          fair?

10                   A    Yeah.

11                   Q    Okay.  So if you look at the e-mail

12         on the third page, the one ending in 014 from your

13         production, Mr. Hassinger writes to Doug Richards

14         on August 30th regarding Coffee County.  Look at

15         the bottom, the last paragraph.  In the last full

16         sentence at the bottom it says, "This office only

17         learned about the possible scope of

18         unauthorized" --

19                   A    Am I on the right --

20                   Q    I'm sorry.  It ends in 014.

21                   A    Okay.

22                   Q    Mr. Hassinger writes --

Page 222

```
 1                    MR. TYSON:  Yeah, it's the middle of
 2       the last paragraph on the page right here.
 3                    THE WITNESS:  Yeah, I got it.
 4       Thanks.
 5       BY MR. CROSS:
 6            Q     Mr. Hassinger wrote, "This office
 7       only learned about the possible scope of
 8       unauthorized" -- I think he probably meant to
 9       include the word access -- "possible scope of
10       unauthorized to Coffee County's election equipment
11       when Ms. Marks decided to make them public."
12                    Do you see that?
13            A     Yeah.
14            Q     But do I understand correctly that
15       you don't actually know whether that's an accurate
16       statement, because we covered before you don't know
17       when the Secretary's office learned about those
18       allegations, right?
19            A     My belief is that's correct.  I mean,
20       she sat on evidence for a year.
21            Q     That's not my question.
22            A     Well, okay.
```

1          Q     My question is:  You don't know

2     whether that's an accurate statement because --

3          A     I believe that's an accurate

4     statement.

5          Q     Okay.  Well, do --

6          A     Do I have certainty?  No, I do not.

7          Q     You don't know -- you do not have

8     knowledge whether that's an accurate statement

9     because you don't know when the office first

10    learned of the allegations, whether it was when

11    Secretary Raffensperger said in January of 2021,

12    when his aide said in May of 2021, or some other

13    time, you just don't know?

14               MR. TYSON:  Object to form.

15               THE WITNESS:  I believe that --

16    BY MR. CROSS:

17          Q     I'm not asking for your belief.  I'm

18    asking what you know.

19          A     I don't know.

20          Q     Okay.  And you don't think it's

21    important for the communications folks in the

22    Secretary's office to actually know whether the

```
 1        information they're providing to the press is

 2        accurate?

 3                        MR. TYSON:  Object to form.

 4                        THE WITNESS:  Again, I've stated that

 5        Mike is handling these issues, so I have not been

 6        as involved.

 7        BY MR. CROSS:

 8             Q     The current platform for the Georgia

 9        Republican Party is calling for hand-marked paper

10        ballots in lieu of the Dominion System, right?

11             A     I don't know.

12             Q     You don't know?

13             A     No.

14             Q     You don't still work with the

15        Republican Party?

16             A     No.  They think I'm a turncoat.  I

17        have some contacts over there, but I don't go, you

18        now, to party events and stuff.

19                        MR. CROSS:  I think this is 28.

20                   (Sinners Deposition Exhibit Number 28

21                    marked for identification.)

22        BY MR. CROSS:
```

Page 225

```
 1              Q      Okay.  Turn to page 7 of 10.
 2                     MR. TYSON:  What platform is this?
 3       This is the resolutions, right?
 4                     MR. CROSS:  That's the resolution.
 5                     MR. TYSON:  Okay.
 6       BY MR. CROSS:
 7              Q      So 2021 Convention Resolutions
 8       Committee Report.  Do you see this?
 9              A      Uh-huh.
10              Q      Yes?
11              A      Yes.
12              Q      And if you turn to the Heading 7 on
13       page 7, the resolution calling for increased
14       election integrity in Georgia.  Do you see that?
15              A      Yes.
16              Q      What the Georgia Republican Party
17       calls for, it says, "It is imperative that voters
18       in Georgia have faith and confidence in the
19       integrity of the elections."
20                     Do you see that?
21              A      Yeah.
22              Q      And then there is a resolution.
```

1           Part 2 states, "Replacing all Dominion Voting

2       Systems with secure hand-marked paper ballots which

3       should be scanned and tabulated using a device that

4       is not connected to the internet."

5                       Do you see that?

6               A     Sure.   Yeah.

7               Q     You were not aware of that resolution

8       before now?

9               A     I think I was at this convention as a

10      guest.

11              Q     And do you disagree with that

12      resolution?

13              A     Yeah.   I think it's not even based on

14      anything factual.

15              Q     Have you been involved in any

16      discussions in the Secretary's office about whether

17      to switch to or otherwise to use hand-marked paper

18      ballots in elections?

19              A     I wouldn't say any substantive

20      conversations.

21              Q     Any conversations, any communications

22      at all?

Page 227

```
 1              A      I don't know.

 2              Q      You don't know?

 3              A      I -- I -- this isn't like a big --

 4       you know, we don't see the same way on that.  I

 5       respect your position, but the voting system is the

 6       voting system.  So it's not really something we

 7       entertain.

 8              Q      Well, that's what I'm trying to find

 9       out.  Are you aware of any discussions at the

10       Secretary's office about using hand-marked paper

11       ballots at the polls in any elections?

12              A      No, I'm not.

13              Q      Okay.  Do you have any insight into

14       why the Secretary's office is unwilling to do that?

15              A      I think because elections --

16              Q      And I don't want you to guess.

17              A      Okay.

18              Q      I'm not asking you to speculate.

19              A      Okay.  No.

20              Q      If you wanted to know why Secretary

21       Raffensperger is unwilling to do that, who would

22       you ask?  Would you ask him?
```

Page 228

1            A      Probably the elections division.

2            Q      What is that?

3            A      The elections division of the

4       Secretary of State's office that runs the voting

5       process, in that limited capacity -- counties run

6       elections.  You know that.

7            Q      You said the elections division.  Are

8       you talking about the elections director?

9            A      Yeah, I imagine that would be, you

10      know, either the State Board or the elections

11      division would make -- you know.  Probably the

12      Secretary, yeah.  It's up to him.

13           Q      It's up to -- it's up to Secretary

14      Raffensperger?

15           A      I would assume.

16           Q      Right.

17                  And when you say elections division

18      director, is that James Blake?

19           A      James -- no Blake Evans.

20           Q      Blake Evans.  I don't know where I

21      came up with James Blake.  Too many names.

22                  Okay.  But you have not -- you have

1          not had any communications with the Secretary or

2          others about that that you can recall?

3                    A     Yeah, no.

4                    Q     Okay.

5                    A     Are others -- I mean, you get callers

6          calling in and you have a discussion, you know,

7          constituent services-type stuff, but I don't recall

8          any -- you know, that has not been a discussion

9          within the office to my knowledge.

10                   Q     Okay.

11                         MR. CROSS:  All right.  Let's take a

12         break.  I'm close to done.  I know Bruce is going

13         to have some questions as well.  Let me take a

14         break and kind of gather.

15                         VIDEOGRAPHER:  The time is 2:11 p.m.

16         We are off video record.

17               (Recess from 2:11 p.m. to 2:23 p.m.)

18                         VIDEOGRAPHER:  The time is 2:23 p.m.

19         We are back on video record.

20                   (Sinners Deposition Exhibit Number 29

21                    marked for identification.)

22         BY MR. CROSS:

Page 230

1          Q     Let me hand you what's been marked as

2     Exhibit 29, Mr. Sinners.

3          A     Okay.

4          Q     Exhibit 29 is a text thread that you

5     produced in this case.  Is that right?

6          A     Yes.

7          Q     And who is Chris?

8          A     Chris Gardner was an attorney with

9     Kurt Hilbert and came down to help with the

10    election operation.

11         Q     And Gardner, is that just

12    G-A-R-D-N-E-R?

13         A     Yeah.

14         Q     When he writes, "Have you heard

15    anything about these machines allegedly seized in

16    Ware County," you say, "It's bullshit."  What is

17    that about?

18         A     There was a Gateway Pundit article

19    that went out, and I probably got 20 inquiries

20    about it.  And it was phone calls.  We probably got

21    dozens, if not hundreds, of calls about it.  And it

22    was bullshit.  It made my job harder.

1                Q     If you come to -- there aren't page

2         numbers.  If you look about five pages in, there's

3         a path to download an image at the top.  If you

4         flip -- "So that's Judge Preston."

5                A     Are you sure?

6                Q     Yep, there you go.

7                      "So that's Judge Preston.  So

8         different guy.  Could be his dad though."  Then you

9         write, "Can you nail that down who we need to talk

10        to when we land?"

11                     Do you see that?

12               A     Sure.

13               Q     Land where?

14               A     In Coffee County.

15               Q     So that was about the trip to Coffee

16        County on December 12 and 13?

17               A     Yes.

18               Q     Okay.  And what -- sorry, go ahead.

19               A     Continue.

20               Q     What was Chris Gardner's involvement

21        with that trip?

22               A     He was working at Kurt's law firm and

Page 232

1      was on the ground, I think -- what time was this

2      exchange?  5:12.  Yeah, I think this was Alex

3      flying and me -- yes, when we land, yeah, like

4      we're flying low, still have cell service.  Like,

5      "Who do we need to talk to?"

6                Q     So Chris Gardner helped with the

7      efforts that you and Alex Kaufman did in the

8      December 12th and 13th days in Coffee County?

9                A     Yeah.

10               Q     Okay.

11               A     He was at Kurt's firm.

12               Q     Okay.

13               A     Kurt filed the lawsuit.

14               Q     And what is Kurt's last name?

15               A     Hilbert.

16               Q     Okay.  And did you try to download

17     all of the things in this thread that say, "Tap to

18     download," and you couldn't get them to come down?

19               A     Yep.

20               Q     And then here on December 12, 2020,

21     at 8:38 p.m., you wrote -- or Chris writes to you,

22     "Did you get the verification from Shawn?"

```
 1                Is he talking about Shawn Still

 2       there?

 3            A     Yes.  Because I needed to notarize

 4       it, and I think Alex had talked about something

 5       that needed to change.

 6            Q     And then Chris Gardner -- you wrote

 7       back and you make his edit real quick.

 8            A     Sure.

 9            Q     Do you know what that was?

10            A     I don't.  I think Alex was talking to

11       one of them giving an interview or something.

12            Q     Okay.  And then Mr. Gardner writes

13       back, "On the phone with our expert for this case

14       so I can't talk to Kurt about whether we want to

15       make that change."

16                Who was the expert for the case?

17            A     No idea.

18                (Sinners Deposition Exhibit Number 30

19                 marked for identification.)

20       BY MR. CROSS:

21            Q     Let me hand you Exhibit 30.  So

22       Exhibit 30 are some screenshots from some of the
```

Page 234

1      surveillance video that Coffee County produced from

2      the elections office.  And if you look near the

3      top, you'll see the date and time for the

4      screenshots.  So December 11, 2020 10:01 a.m.

5                Do you see that?

6           A    Yeah.

7           Q    And do you see the individual -- the

8      bald individual there?  Do you recognize him as one

9      of the investigators with the Secretary's office?

10          A    I don't.

11          Q    Okay.  Were you aware that on

12     December 11th, investigators from the Secretary's

13     office came in and met with Misty Hampton, Tony

14     Rowell, and maybe others, as part of an

15     investigation they were doing at that time?

16          A    I think that's probably what's

17     referred to in some of the articles that kind of

18     made Alex want to go down there.

19          Q    If you look at December 11, 2020 at

20     10:31 a.m., the next page --

21          A    This one here?

22               Yes.

Page 235

1          Q      -- do you recognize her as Frances

2     Watson?

3          A      Yeah, that looks like Frances.

4          Q      Right.

5                 And she's at the door of the

6     elections office, right?

7          A      Sure.  Yes.

8          Q      Is it customary for state

9     investigators to show up to a meeting like this

10    armed?

11         A      Yeah.

12                MR. TYSON:  Object to form.

13                THE WITNESS:  Yeah, they carry their

14    guns.  They're sworn law enforcement officers.

15    BY MR. CROSS:

16         Q      Are firearms allowed in an elections

17    office?

18         A      I think if you're a law enforcement

19    officer, you probably have some duty to carry it.

20         Q      And then if you look at the next

21    page, December 11, at 10:32 a.m., you'll see

22    Ms. Watson, you can see the same bald

1          investigator -- I hate to call him that way, but I

2          can't remember his name -- sitting around the

3          table.

4                    A     Okay.

5                    Q     Now, if you flip forward, you will

6          see that there's a picture -- a screenshot of

7          January 19, 2021 --

8                    A     Okay.

9                    Q     -- at 8:53 a.m.  And you'll see

10         there's a couple of individuals coming into the

11         elections office.  Do you see that?

12                   A     Yes.

13                   Q     The one with the beard and the blue

14         suit, the backpack, do you recognize him as Jeffrey

15         Lindberg?

16                   A     I don't know what the guy looks like.

17                   Q     Okay.  Have you ever seen or met

18         Jeffrey Lindberg?

19                   A     No.

20                   Q     Okay.  If you keep flipping to the

21         next one, page 6, page 7, you'll see that same

22         investigator we saw on December 11 at the

1          Secretary's office comes into the elections office

2          on January 20 in the morning around 10:50 a.m.

3                    Do you see that?

4          A     Yep.

5          Q     And if you keep flipping -- and do

6          you know why he was there?  Why that investigator

7          was there on January 20th?

8          A     I have to assume because I --

9          Q     I don't want you to guess.

10         A     I --

11         Q     If you don't know, that's fine.

12         A     I don't know.  There were three

13         active investigations from my understanding.

14         Q     If you wanted to know why he was

15         there, who would you ask?

16         A     Probably elections division, or

17         investigations division.

18         Q     Investigations division?

19         A     Yes.

20         Q     And who heads that up today?

21         A     Sara Koth.

22         Q     How do you spell her last name?

```
 1               A    K-O-T-H.

 2               Q    Okay.  Did she take over immediately

 3       after Frances Watson left?

 4               A    Yeah.

 5               Q    And when did Ms. Watson leave?

 6               A    I don't know.

 7               Q    You don't know.

 8                    Now if you come to page 11 --

 9               A    Okay.

10               Q    -- January 26, 2021, 10:35 a.m.,

11       you'll see Jeffrey Lindberg come in again holding a

12       bag of some sort.  And then if you flip to page 12,

13       you'll see that he comes in and goes into Misty

14       Hampton's office.  Do you see that at 10:35 a.m.?

15               A    Sure.

16               Q    And do you understand in Coffee

17       County -- I think most counties are this way, but

18       in Coffee County, the EMS server room is attached

19       to the election supervisor's office?

20                    MR. TYSON:  And I'll object to form.

21                    THE WITNESS:  I've never seen Coffee

22       County's election office, so . . .
```

Page 239

1      BY MR. CROSS:

2              Q     Okay.  So you just don't know one way

3      or the other?

4              A     Yeah, I've never seen it.

5              Q     That's fine.

6                    So if you look at pages 12 and 13,

7      you'll see that Jeffrey Lindberg comes into the

8      elections office --

9              A     Is that this guy?

10             Q     Yes.

11             A     Okay.

12             Q     He comes in at 10:35 a.m., and about

13     half an hour later, that same Secretary's

14     investigator comes into the office, comes inside

15     and meets with Ms. Hampton.  Do you see that?  If

16     you flip through pages 14 and 15.

17             A     Okay.

18             Q     And so they're talking at 11:08 a.m.

19     Do you see that?

20             A     Okay.

21             Q     And then you can see also at 11:08,

22     11:09 a.m., Jeffrey Lindberg is coming and going,

Page 240

1          the same guy with the grey beard.

2                    A      Yeah.   Okay.

3                    Q      And then on page 21, you can see the

4          Secretary's investigator leaving or walking out of

5          Misty's office at 11:12 a.m.

6                    A      Okay.

7                    Q      Do you see that?

8                    A      What, 12 -- yeah.

9                    Q      Pages 21 and 22.

10                   A      Yeah.

11                   Q      So do you have any insight into what

12         communications there were in the Secretary's office

13         coming out of the Secretary's investigator being in

14         the office at the same time Jeffrey Lindberg was

15         there?

16                   A      No.

17                   Q      Okay.   Who -- if you wanted to know

18         whether this investigator shared any information

19         with others at the Secretary's office about that,

20         who would you ask?

21                   A      Probably Frances.

22                   Q      Who would you ask who's still there

Page 241

1          today?

2                    A     I don't know.

3                    Q     Well, presumably he's an

4          investigator.  Would the investigative unit be the

5          place to go?

6                    A     Yeah.

7                    Q     Okay.  And so as you sit here, you

8          just don't know one way or the other whether what

9          Secretary Raffensperger said in his interview about

10         an investigator speaking with Ms. Hampton in

11         January, whether he was talking about this

12         individual?  You just don't know?

13                   A     No idea.

14                   Q     Okay.  Have you -- we looked at the

15         MITRE -- part of the MITRE report, the summary, as

16         a response to the Halderman report.  Have you,

17         yourself, read Dr. Halderman's July 2021 report in

18         this case?

19                   A     I don't believe I have.

20                   Q     Okay.  And have you ever had any

21         communications with Mark Meadows?

22                   A     No.

Page 242

1          Q     So do you know to what extent he was
2     involved in any efforts in association with Donald
3     Trump or the campaign to get access to voting
4     equipment?
5          A     I don't.
6          Q     So not someone that you communicated
7     with or you were aware that others in your orbit
8     were communicating with on that subject?
9          A     No.
10         Q     Okay.  Does Mike Hassinger report to
11    you as the director of communications?
12         A     Yeah.
13         Q     How many direct reports do you have?
14         A     Just him.  Just me and him.
15         Q     Is Pamela Jones still with the
16    Secretary's office?
17         A     I'm not aware.
18         Q     You just don't know?
19         A     I don't know who she is.
20         Q     Okay.
21         A     There's 200, 300 employees, I think.
22               MR. CROSS:  All right.  Thank you,

Page 243

1        Mr. Sinners.  I do not have any further questions

2        for you at this time.

3                    THE WITNESS:  Thank you, Mr. Cross.

4          EXAMINATION BY COUNSEL FOR COALITION PLAINTIFFS

5        BY MR. BROWN:

6                    Q    Mr. Sinners, my name is Bruce Brown.

7        I represent the Coalition Plaintiffs in this case.

8        I want to go back to your testimony about the Open

9        Records Act request with Misty Hampton.

10                   A    Okay.

11                   Q    Do you recall that?

12                   A    Yep, I do.

13                   Q    Is what -- I just didn't understand

14       the back and forth there.  She contacted you and

15       told you to make an Open Records Act request on her

16       behalf to the board.  Is that what happened?

17                   A    I don't know if it's on behalf, but I

18       think I had gotten a phone call.  It was an

19       interesting discussion with our board.  And it may

20       be of interest and so I put in an open records

21       request.

22                   Q    So was that -- I don't mean in any

Page 244

1         bad way, but as sort of a tip to get more

2         information?

3               A     It was a tip.

4               Q     Okay.  Moving ahead a little bit to

5         your visit to Coffee County.

6               A     Sure.

7               Q     That was, I think, you said on the

8         12th of December.  Is that correct?

9               A     That is correct.

10              Q     Who did you see down there that you

11        already knew or that you knew of?

12                    I know you met some people at the

13        steakhouse, but who else did you meet when you were

14        down there?

15              A     Nobody.

16              Q     Mr. Preston?

17              A     He had -- he had -- he got

18        interviewed by Alex Kaufman.

19              Q     So you didn't see him?

20              A     I may have seen him, I may have

21        shaken his hand.  But that was my understanding,

22        Alex wanted to interview him for Still v.

Page 245

1         Raffensperger.  That's my understanding.

2                    Q     And where did this interview take

3         place?

4                    A     I think the Hampton Inn.

5                    Q     Who else was at that interview?

6                    A     I think it was just Alex.  There may

7         have been, you know, like a family member.  Nobody,

8         to my knowledge, from the election -- we didn't --

9         I didn't, at least.  I don't think Alex did, you

10        know, communicate with election board members or

11        anything like that.  I think -- I thought the

12        lawsuit was kind of adversarial to that, if that

13        makes sense.

14                   Q     Right.

15                         But you had communicated with at

16        least two of the defendants, Misty Hampton, right?

17                   A     At -- yeah, like sometime before.

18                   Q     Right.  A couple of weeks before.

19                         And a number of instances with Eric

20        Chaney, correct?

21                   A     I would say like two with Eric

22        Chaney.

1          Q     What about with Tony Rowell, do you

2     know him, Rowell?

3          A     I don't know.

4          Q     You never heard that name?

5          A     Nope.

6          Q     Apart from Mr. Preston and from the

7     voters that you ran into at the steakhouse --

8          A     Uh-huh.

9          Q     -- who else did you speak to in

10    Coffee County about voting at all?

11         A     I -- I don't believe there was

12    anybody.

13         Q     I believe you testified you never --

14    you don't recall any communications with Ed Voyles?

15         A     I don't -- I don't know him

16    personally.  He could have been there, but I was

17    off in a separate room.  I don't believe he was.  I

18    never met anyone that I -- oh, Ed Voyles.

19         Q     But do you recall him being

20    associated with Coffee County elections?

21         A     No.

22         Q     Okay.  You -- you know Cathy Latham?

1          A     Yes.

2          Q     And you know her because she was a

3     prospective elector, one way, right?

4          A     That would be one way to which I know

5     her.  I knew her initially because she is the -- or

6     was the 80,000-county chairwoman of the Georgia

7     GOP, and so she managed kind of the smaller

8     counties.  So I communicated with her on, you know,

9     issues of poll watching and getting volunteers.

10         Q     She was the head of the committee

11    that dealt with counties that were less than

12    80,000?

13         A     That's my understanding.

14         Q     Okay.  And Coffee County is one of

15    those?

16         A     Yes.

17         Q     Okay.  So you knew her in that

18    capacity.  And she was also a -- what kind of -- I

19    don't want to be derogatory.  What do you call the

20    electors?

21         A     Alternate elector.

22         Q     Alternate elector.  Okay.

```
 1                 And she was also an alternate

 2      elector --

 3           A      Uh-huh.

 4           Q      -- right?

 5                 But is it your testimony that you --

 6      you never communicated with Cathy Latham, either by

 7      text, by Signal, by telephone, in person, or in

 8      writing, about anyone getting access to the voting

 9      equipment in Coffee County in January of 2021?

10           A      About this -- about that issue?  No.

11      She never tipped me off, she never -- no.

12           Q      Did you ever talk to her after it

13      happened, including up to today, about it?

14           A      Not about -- not about that issue.

15           Q      Okay.

16           A      She had sent me some information in

17      early January about like -- I guess, like, an issue

18      outside the voting precinct.  She was concerned

19      that there were people, like, having parties and

20      that would, you know, influence votes or something,

21      you know, that would -- you know, the -- the -- the

22      150-feet thing regarding the runoff.  But no, I
```

1          never communicated with her on voting machines, you

2          know, being accessed.

3                    Q     That was January of 2021, correct?

4                    A     Yeah.

5                    Q     Take me through your employment

6          history just a little more precisely.  You worked

7          for the Trump Campaign, right?

8                    A     Yes.

9                    Q     And then at some point, you started

10         working for the Republican Senate -- a senatorial

11         campaign, correct?

12                   A     For the runoffs.

13                   Q     Okay.

14                   A     Yeah.

15                   Q     How did that -- how did that

16         transition work?

17                   A     Because, you know, as I said

18         previously, I think after the lawsuit was filed,

19         the operations of the Trump Campaign went to zero,

20         and my relationship was that I was more of a

21         Georgia GOP staffer running their election day

22         operation.  And so when the senate runoffs came

Page 250

```
 1        into full view, that's where my attention went.

 2              Q      And which -- you referred to the

 3        lawsuit.  There are a lot of --

 4              A      Trump v. Raffensperger.

 5              Q      Okay.  And is the Trump v.

 6        Raffensperger case the one that was tied to the

 7        alternative electors?

 8              A      That would be my understanding.

 9              Q      Okay.  So they were prospective in

10        that they weren't electors unless and until that

11        lawsuit was successful?

12              A      That -- that would be an accurate

13        characterization.

14              Q      And you -- when you talk about it,

15        you're careful to say "prospective electors."  And

16        you have not represented to people that they were

17        actual members of the electorial college, right?

18                    MR. TYSON:  Object to form.

19                    THE WITNESS:  I don't believe that to

20        be the case.  Yeah, there's no -- no idea in my

21        mind that they were the real ones.  It was that

22        they -- we need -- the campaign and the Georgia GOP
```

Page 251

1       needed to have them in waiting in the event that

2       this court challenge was successful.

3       BY MR. BROWN:

4               Q      The -- okay.

5                      I want to turn a little bit to the --

6       to the Still lawsuit and we'll go through some

7       things quickly on that.

8               A      Okay.

9                      MR. BROWN:  Bryan is serving as my

10      assistant on the exhibit number front for today.

11                     MR. TYSON:  31 is your magic number,

12      sir.

13                     MR. BROWN:  Thank you, sir.

14              (Sinners Deposition Exhibit Number 31

15               marked for identification.)

16      BY MR. BROWN:

17              Q      Let me hand you what I will mark as

18      Exhibit 31.

19                     MR. BROWN:  It was Tab 53?  You just

20      said the number and I forgot.

21      BY MR. BROWN:

22              Q      Okay.  Exhibit 31 is an e-mail from

1      Alex Kaufman to you, correct?

2             A      Yes.

3             Q      And Alex Kaufman was a lawyer for Fox

4      Rothschild representing the Trump Campaign?

5                    MR. TYSON:  Object to form.

6                    THE WITNESS:  I believe his -- his

7      role was deputy general counsel for the Georgia

8      Republican Party.

9      BY MR. BROWN:

10            Q      Oh, I'm sorry.

11                   And in this, you're exchanging a

12     draft affidavit for Michelle McClain, right, April

13     Michelle McClain?

14            A      Yes.

15            Q      And I take it, this is based upon

16     discussions you had with Ms. McClain while you were

17     down there in Coffee County?

18            A      Yep.  I think, yeah, we probably

19     found her.  She said she couldn't vote.  She

20     believed she was a registered voter.  Yep.

21            Q      And I noticed that a couple of

22     these -- that the affidavits that you obtained to

Page 253

1      support the case had to do with messed-up

2      registration, for the most part, correct?

3              A    I -- sure.

4              Q    I mean, it wasn't like vote

5      flipping --

6              A    No.

7              Q    -- or anything like that?

8              A    No.

9              Q    Okay.  And then let me hand to you,

10     this will be quick, Exhibit 32.

11                 (Sinners Deposition Exhibit Number 32

12                  marked for identification.)

13     BY MR. BROWN:

14             Q    And Exhibit 32 is another similar

15     e-mail between you and Mr. Kaufman, attaching an

16     affidavit that was to be used in the Still's

17     lawsuit, correct?

18             A    Yes.

19             Q    If you would turn back to 31.

20             A    To April McClain?

21             Q    Yeah.

22             A    Yeah.

Page 254

1          Q     Was there any effort to -- before you

2     filed the lawsuit, do you know, to determine

3     whether these people actually should have been

4     recognized as registered voters?

5          A     I don't know.  You know, I was just

6     there for the notary.

7          Q     I'm going to give you this

8     opportunity, and please take this the right way --

9          A     Okay.

10         Q     -- okay?

11               But to flesh out your testimony on

12     why you were down there and what you were doing --

13     and there's nothing illegal about collecting

14     affidavits for a lawsuit.  Okay?

15         A     Okay.

16         Q     There's nothing illegal about

17     notarizing affidavits for a lawsuit, even if the

18     lawsuit is completely frivolous.  That's not

19     illegal either.

20               On the day that you also e-mailed the

21     fake electors -- I'm sorry, the prospective

22     electors, to keep everything discrete --

Page 255

1              A      Uh-huh.

2              Q      -- you're in Coffee County for the

3      sole purpose of notarizing affidavits, when you end

4      up notarizing those affidavits over Zoom anyway,

5      right?

6              A      I don't know.  I think this might

7      have been -- or I don't see where -- I need

8      clarification on where you're --

9              Q      Well, I mean, you said -- in response

10     to questions from Mr. Cross, you said you went down

11     there because you were a notary and --

12             A      Yeah.

13             Q      -- you know, didn't have anything

14     else to do?

15             A      Helping out with the campaign however

16     I could.

17             Q      Okay.  And -- but you really didn't

18     need to be down there to be notarizing, because you

19     could have done that -- because, as David pointed

20     out, there's plenty of notaries in Coffee County.

21     And if they specifically needed you to notarize,

22     you could have done it over Zoom, right?

```
 1              A     I don't --
 2                    MR. TYSON:  Object to form.
 3                    THE WITNESS:  I don't if at 8:30 at
 4        night.  He wanted some help and asked me if I could
 5        go with him.
 6        BY MR. BROWN:
 7              Q     All right.
 8              A     He didn't want to have to go, you
 9        know, drive around and find a notary.
10              Q     Is there anything else that you could
11        tell us that would make it seem a little bit less
12        implausible that that's the only reason why you
13        went down there?
14              A     I mean, I went --
15                    MR. TYSON:  Object to form.
16                    THE WITNESS:  -- down there because
17        it had been described that Coffee County had
18        bungled their election and there was an interest in
19        finding out anything related to the election and
20        future elections and the runoff.  And I think --
21        you know, I don't recall the Still suit, but I
22        think there's -- they were asking for some relief
```

1          in regards to the runoff.

2          BY MR. BROWN:

3                  Q     Okay.  We'll get to that in a second.

4                        This is changing the topic slightly,

5          but it's in the right time period.  Let me hand you

6          what's been marked as Exhibit 33.

7                  (Sinners Deposition Exhibit Number 33

8                   marked for identification.)

9          BY MR. BROWN:

10                 Q     Exhibit 33, for the record, is a

11         December 16, 2020 Presidential Findings.  This is a

12         draft executive order.  Do you -- if you -- have

13         you seen this before, the draft executive order?

14                 A     I've heard about it.

15                 Q     You heard it was presented to the

16         President and never executed?

17                 A     Yeah, I've heard that in the media.

18                 Q     And did you know that this

19         presidential order specifically references Coffee

20         County?

21                 A     Sure.

22                 Q     And --

1           A       Coffee and Ware Counties, yeah.

2           Q       And did you -- did you have any role

3      in getting information to anybody that was involved

4      in the presidential findings?

5           A       Not that I'm aware of.

6           Q       Okay.  I understand not to --

7           A       I have -- I have never -- yeah, this

8      stuff, no.

9           Q       Just one thing is like I don't

10     remember being an NBA player either, but --

11          A       I have never discussed a presidential

12     order or going and getting information for a

13     presidential order ever.

14          Q       And had you, you would have

15     remembered it, fair to say?

16          A       I would have remembered it.

17          Q       Okay.  Fair enough.

18                  All right.  Let me hand you what's

19     been marked as Exhibit 34.  Exhibit 34 is Tab 56,

20     which is the Still -- which we have been referring

21     to as the Still lawsuit.

22

Page 259

1              (Sinners Deposition Exhibit Number 34

2              marked for identification.)

3      BY MR. BROWN:

4              Q     And you testified that that group of

5      prospective electors that we've been talking about,

6      and that you advised to be discreet, were not

7      official electors and that you did not represent

8      them to be official electors, correct?

9              A     I didn't represent them period.

10             Q     Okay.  Represent them to be, say that

11     they were.

12             A     Yeah.

13             Q     And they were not official until --

14     unless and until there was a successful election

15     challenge, correct?

16             A     That was my understanding of how that

17     process was supposed to unfold.

18             Q     Okay.  Well, look at how Shawn Still

19     describes himself in the very top of this lawsuit.

20             A     Okay.

21             Q     Right at the very top.

22                   Shawn Still, what does it say?

Page 260

1              A      "In his capacity as a voter and as an

2       official presidential elector."

3              Q      That's false, correct?

4              A      Yeah, I don't believe that that's

5       accurate.

6              Q      And then he says it again in the

7       first -- and he knew that, too, right?

8                     MR. TYSON:  Object to form.

9                     THE WITNESS:  I can't speak for what

10      Mr. Still thought or believed.

11      BY MR. BROWN:

12             Q      But I mean, you've talked to -- you

13      talked to Mr. Still before this was filed, correct?

14             A      I think to notarize something.

15             Q      And you didn't -- do you know of

16      anybody telling him that he was an official

17      presidential elector?

18             A      I do not.

19             Q      Do you know of any facts that would

20      have led him to believe that he was an official

21      presidential elector?

22             A      I do not.

Page 261

1                   MR. TYSON:  Object to form.

2           BY MR. BROWN:

3                   Q    Let me direct your attention to the

4           first paragraph of the lawsuit --

5                   A    Okay.

6                   Q    -- where it says, "Comes now

7           Petitioner, Shawn Still, in his capacity as a voter

8           and presidential elector."  Do you see that?

9                   A    Sure.

10                  Q    And he didn't do anything in the

11          capacity as a presidential elector, did he?

12                       MR. TYSON:  Object to form.

13                       THE WITNESS:  I don't believe that

14          would be the case.

15          BY MR. BROWN:

16                  Q    Okay.  Turn to the last page of

17          Exhibit 34.

18                  A    Okay.

19                  Q    Now, you notarized that, correct?

20                  A    I did.

21                  Q    Now, there's -- when you notarize

22          something, you understand that you're not saying

1           that what the affiant is saying is true --

2                   A      True.

3                   Q      -- you're saying that the affiant

4           signed it, correct?

5                   A      I don't believe that the job of a

6           notary is to attest to the truth of the document --

7                   Q      Exactly.

8                   A      -- but that they presented itself as

9           being true and believed that they were true and

10          took an oath that it's true.

11                  Q      Correct.

12                  A      And I swore him as.

13                  Q      And so -- but Shawn Still actually

14          did verify this lawsuit, right?

15                  A      That's -- yeah.

16                  Q      But he knew at the time, and you knew

17          at the time, that the lawsuit was false?

18                          MR. TYSON:  Object to form.

19                          THE WITNESS:  I never read the

20          lawsuit, so . . .

21          BY MR. BROWN:

22                  Q      But he would have known that it was

Page 263

1      false?

2              A     He may have.

3                    MR. TYSON:  Object to form.

4      BY MR. BROWN:

5              Q     Okay.

6              A     I'm not aware.  I can't speak for

7      Shawn.

8                    And also this was filed before the

9      electoral college met, so he -- yeah, I don't know.

10             Q     False, but hopeful, would that be a

11     better way to describe it?

12             A     I don't know.

13             Q     Given -- given your role, whatever it

14     was, with the alternative electors, did you speak

15     with Shawn or with Kurt Hilbert or with CG --

16     what's his name?

17             A     Chris.

18             Q     -- Chris, about Shawn Still taking

19     the position in a lawsuit that because he was a

20     presidential elector and because he was a member

21     of -- of the electoral college, that he needed to

22     get immediate relief?

```
                                            Page 264

 1              A    I did not discuss the details of the

 2       lawsuit as I am not a lawyer.

 3              Q    I didn't ask about details.

 4                   Did you talk about any of that

 5       generally or notionally or anything?

 6              A    I -- no.  I mean, not that I'm aware

 7       of.

 8              Q    Okay.  Now, the -- the -- I'm not

 9       going to get you to go through this, okay, but it

10       doesn't -- it's not about the senatorial campaign.

11       You know that, right?

12              A    Fair.  I mean, I didn't get involved

13       in the litigating as I'm not a lawyer, so . . .

14              Q    Okay.  So instead, it makes

15       allegations about the problems in Coffee County.

16       You knew that, right?

17              A    Yeah.  We had been hearing about

18       problems in Coffee County a lot.

19              Q    Right.

20                   And Coffee County at that -- when

21       this was drafted, the problems in Coffee County

22       weren't about the senate election, they were about
```

Page 265

1        the --

2                A     Yeah, they were about --

3                Q     -- presidential election?

4                A     -- the presidential election.

5                Q     Okay.  Do you know why the Shawn

6        Still lawsuit was filed if the main -- well, let me

7        back up a little bit.

8                      And you may have touched on this in

9        your answers to Mr. Cross, but with the Trump v.

10       Raffensperger case already pending --

11               A     Uh-huh.

12               Q     -- what did the Shawn Still versus

13       Brad Raffensperger case add to the mix from the

14       Republican Party's standpoint?

15                     MR. TYSON:  I'll object to form.

16                     You can answer if you know.

17                     THE WITNESS:  It may have -- I don't

18       know.  Yeah, I can't speculate.  It may have been

19       another area of opportunity for the Republican

20       Party.

21                     MR. CROSS:  Which exhibit is the

22       filing?

Page 266

1                    Which one was Exhibit 32?

2                    MS. CINO:  Exhibit 32 --

3                    MR. TYSON:  Alyssa Hope Taylor, the

4        e-mail from Alex Kaufman to Rsinners, attaching

5        affidavit of Alyssa Hope Taylor.

6        BY MR. BROWN:

7               Q     In some ways, though, the Still

8        lawsuit is sort of a friendly lawsuit in that Still

9        is filing suit against Chaney, who already sort of

10       agrees with the Plaintiff, right?

11              A     They may have.  They're Republicans,

12       they probably thought something was off.  I don't

13       know.

14              Q     Now, the -- hold on a second.

15                    MR. BROWN:  Just for the record, I'm

16       going to get this in.

17       BY MR. BROWN:

18              Q     I'm handing you what's been marked as

19       Exhibit 35.

20                   (Sinners Deposition Exhibit Number 35

21                    marked for identification.)

22

```
 1        BY MR. BROWN:
 2              Q    Do you recall that -- well, let me
 3        back up a second, Mr. Sinners.
 4                   You got back on the plane to go back
 5        to Atlanta, and then it was your understanding that
 6        the lawsuit was going to be filed right away,
 7        right?
 8              A    Yeah, I imagine that.
 9              Q    Okay.  And the next day the
10        prospective electors met, right?
11              A    Yes.
12              Q    Okay.  And you needed to get the
13        lawsuit filed within five days of the
14        certification, correct?
15                   MR. TYSON:  Object to form.
16                   THE WITNESS:  I --
17        BY MR. BROWN:
18              Q    Do you recall that?
19              A    I think that -- I think there's
20        something wrong about that.
21              Q    Okay.  And just for the record,
22        Exhibit 35 is the "Motion and Incorporated Brief in
```

Page 268

1     Support of Relate Filing Date Back to Initial

2     Submission Date."  Do you see that?

3            A     Sure.

4            Q     And do you recall the difficulties

5     that Mr. Hilbert was experiencing getting the

6     Fulton Superior Court to actually docket the

7     complaint on time or promptly?

8                  Do you remember any of that?

9            A     I heard some vague conversation that

10    people were having issues filing lawsuits, but I

11    thought it related to -- yeah, I mean, this was all

12    happening at Kurt's firm.  I -- yeah.

13           Q     Did you do anything with the lawsuit

14    in between the time it was filed and the time that

15    it was dismissed, which is the same -- well --

16           A     Like this lawsuit?

17           Q     Yes, the Still lawsuit.

18           A     No.

19           Q     Okay.  Were you -- did you

20    participate in any sort of discussions relating to

21    getting the lawsuit filed on the defendants,

22    formally filed?

Page 269

1              A    I don't know.  I need some

2      clarification.  I didn't discuss the filing and the

3      lawyering of this lawsuit, like -- no.

4              Q    Who was paying Mr. Hilbert to file

5      this lawsuit?

6                   MR. TYSON:  Object to form.

7                   THE WITNESS:  I believe he had been

8      retained at some point by the Trump Campaign, but I

9      don't know if that's to file this.  I mean, I don't

10     know.

11     BY MR. BROWN:

12             Q    Okay.  He was just -- he was

13     generally on retainer by the Trump Campaign and

14     this might have come out of the funding.  Is that

15     right?

16                  MR. TYSON:  Object to form.

17                  THE WITNESS:  I believe Trump -- I

18     believe Kurt overtook, like, the dealings with the

19     original Trump v. Raffensperger lawsuit.

20     BY MR. BROWN:

21             Q    Okay.  So he handled the Trump v.

22     Raffensperger lawsuit and the Still lawsuit, to the

Page 270

1        best of your knowledge?

2               A     I believe at some point he, like,

3        became involved in that initial --

4               Q     Okay.

5               A     -- lawsuit.

6               Q     I see.

7                     I'll hand you what we marked as

8        Number 36.

9                     MR. BROWN:  I'm sorry, it's Tab 59.

10                  (Sinners Deposition Exhibit Number 36

11                   marked for identification.)

12       BY MR. BROWN:

13              Q     There's just one thing that I want to

14       ask you about on this one, on 36.  36 is also the

15       Shawn Still lawsuit, is the certificate of service

16       of summons petition and discovery.  Do you see

17       that?

18              A     Sure.

19              Q     On page 2, it says that Anthony

20       Rowell, the Coffee County attorney, informed

21       counsel for petitioners that he would acknowledge

22       and waive Service of Process.

Page 271

1              Did you have any knowledge of the

2       attorney for Coffee County acknowledging and

3       waiving Service of Process of the papers?

4              A     No.

5              Q     And did you know that Mr. Rowell

6       never gave a copy of the lawsuit to any of the

7       board members?  Did you know that?

8              A     No.

9              Q     And did you know that Mr. Rowell is a

10      partner of one of your prospective electors, Brad

11      Carver.  Did you know that?

12             A     Is he at Hall Booth Smith?

13             Q     He is.

14             A     Okay.

15             Q     Let me hand you what's been marked as

16      Exhibit 37, which is Tab 25.

17                 (Sinners Deposition Exhibit Number 37

18                  marked for identification.)

19      BY MR. BROWN:

20             Q     Thirty-seven is an e-mail from you to

21      Kurt Hilbert, right?

22             A     I don't believe that's accurate.

Page 272

1          Q     Oh, I'm sorry.  I apologize.

2                It's an e-mail from Shawn Still to

3     Kurt Hilbert that copies you, correct?

4          A     Sure.

5          Q     And in it Shawn Still says, "Good

6     morning.  Just checking in.  Haven't seen anything

7     online about this yet."

8                Do you know what they're referring

9     to?

10         A     Probably about the lawsuit.

11         Q     About his lawsuit?

12         A     Yeah.

13         Q     And if you go down further, right in

14    the middle, he says, "Hi all, I'm wondering if this

15    was received by the court and if any action will be

16    taken this morning.  Meeting at the Capitol today

17    at 11:00."

18                That would have been your meeting

19    that you -- I'm sorry.  The meeting that you

20    described earlier of the prospective electors,

21    correct?

22         A     Yes.

Page 273

1              Q     So what was the relationship, if any,

2      between the filing of the Still lawsuit and the

3      meeting of the electors?

4                    MR. TYSON:  Object to form.

5                    THE WITNESS:  I can't think of any.

6      I mean, I believe I was cc'd on this because we

7      needed this verification completed, so I notarized

8      it.

9      BY MR. BROWN:

10             Q     Who is Christina Reed?

11             A     She is a lawyer who helped out on

12     the, like, hotline.

13             Q     Who does she work for?

14             A     No idea.

15             Q     Like one of the volunteer lawyers?

16             A     Yeah, she was a legal volunteer.

17             Q     I'm going to hand you what's been

18     marked Exhibit 38, Tab 28.

19                 (Sinners Deposition Exhibit Number 38

20                  marked for identification.)

21     BY MR. BROWN:

22             Q     All right.  What were you notarizing

Page 274

1          for Eric Chaney on or about December 10?

2                    A     I would assume it would have to have

3          been an affidavit.

4                    Q     For the lawsuit?

5                    A     It says "For today's testimony

6          virtually notarized."  I was like the only notary

7          in the --

8                    Q     Did -- I can go back and look, but

9          did he -- did he notarize anything in the lawsuit?

10                   A     I don't know.

11                   Q     Okay.  So you just don't remember

12         what he was having notarized?

13                   A     I think it probably had your

14         affidavit "for today's testimony virtually

15         notarized."  I would assume that meant he had an

16         affidavit and for today's testimony to be virtually

17         notarized.

18                   Q     What testimony was he giving today?

19                   A     Probably one of those hearings or

20         something.

21                   Q     Do you think it was for a legislative

22         hearing or a court hearing?

Page 275

```
 1              A      Probably the legislative hearing.

 2              Q      Or the senate hearings --

 3              A      Yes.

 4              Q      -- one of those things?

 5                     You have -- you have described -- I

 6       think your frustration had a lot of -- of the

 7       incredible allegations that were being made -- or

 8       allegations that you learned to be not credible in

 9       the November/December/January time frame.  Fair to

10       say?

11              A      Yeah.

12              Q      And that like, for example, what

13       Scott Hall was telling you about those elections,

14       right?

15              A      Sure.

16              Q      And as a citizen, and now as a public

17       official, you would agree that it's important not

18       to repeat or broadcast incredible claims that might

19       damage the integrity or the faith that people have

20       in the elections, right?

21                     MR. TYSON:  Object to form.

22                     THE WITNESS:  Yeah, I -- I think if
```

```
 1        you know something to be wrong, don't -- don't be
 2        spreading it out on the airwaves.
 3        BY MR. BROWN:
 4             Q    And I believe that even after you
 5        heard the recording of Mr. Hall speaking with
 6        Ms. Marks, you still didn't believe it, correct?
 7             A    Yeah, I didn't believe it.
 8             Q    And you described Mr. Hall, I think,
 9        as crazy?
10             A    I would say he seemed to me to be a
11        little excited.
12             Q    And therefore not credible?
13             A    I did not believe that he was an
14        authoritative source of election information.
15             Q    Right.
16                  And that he was bonkers?
17             A    Those are your words.
18             Q    But the Secretary has seen fit to
19        attack Ms. Marks for not immediately broadcasting
20        and repeating the allegations that he had made,
21        which you did not even believe a year later when
22        you heard them in a recorded telephone
```

Page 277

1          conversation, right?

2                         MR. TYSON:  Object to form.

3                         THE WITNESS:  I believe she has

4          described that as evidence and did not share that

5          with the appropriate authorities.  True the Vote

6          has done the same exact thing, they have been

7          saying, evidence, evidence, evidence, not even

8          turned over anything to the SEB.

9          BY MR. BROWN:

10                        Q     Well, I don't --

11                        A     My beef is not with Marilyn Marks.

12                        Q     Right.

13                              But the Secretary to deflect

14         criticism for the way the Secretary's handling of

15         this investigation says -- first it gives various

16         accounts for their investigation, they're on it,

17         they've been on it, right?

18                              And then the next thing they say is

19         some variation of, if this were important, than

20         Marilyn Marks should have disclosed it earlier, as

21         if it's not a legitimate area of inquiry.

22                              But you're telling us today that the

Page 278

1      very person that Marilyn Marks didn't trust enough

2      to make a public broadcast of it, to you was

3      bonkers, crazy, excitable, not credible, not an

4      authoritative source for election information,

5      correct?

6                      MR. TYSON:  Object to form.

7                      THE WITNESS:  I don't believe he's an

8      election expert.  That doesn't mean he didn't break

9      into the machines.  See something, say something.

10     BY MR. BROWN:

11          Q     Do you think it's fair to -- to

12     attack Ms. Marks for not immediately repeating

13     what --

14          A     I think if you have a belief --

15                      MR. TYSON:  Object to form.

16                      THE WITNESS:  -- to use in a lawsuit,

17     maybe share it with somebody.  I mean, that's just

18     my personal opinion.

19     BY MR. BROWN:

20          Q     Right.

21                      But when you have enough

22     corroborating evidence to make it credible,

1      correct?  But not before then, correct?

2                      MR. TYSON:  Object to form.

3                      THE WITNESS:  I don't know.  If it's

4      a tip.

5      BY MR. BROWN:

6          Q     But did you -- with -- with what he

7      told you about Venezuela.  Okay?

8          A     I don't know if he said that, but

9      that is to the effect of the things he was --

10         Q     I'm using that as a for example.

11         A     Right.

12         Q     You didn't turn around and call the

13     Secretary of State then to make a tip, did you,

14     about what Hall told you?

15         A     No, but --

16                     MR. TYSON:  Object to form.

17                     THE WITNESS:  -- I think they've

18     known about those sort of claims being made.  I

19     mean, Mike Lindell, and all the other election

20     advocates, were out there saying all sorts of

21     stuff, so you know.

22     BY MR. BROWN:

Page 280

1          Q     That's just too easy.

2                All right.  Let me hand you what's

3     been marked as 39.

4                (Sinners Deposition Exhibit Number 39

5                 marked for identification.)

6     BY MR. BROWN:

7          Q     This is Tab 29.

8          A     I think this is the same thing you

9     just gave me.  Yeah, I think this is the same thing

10    that you just gave me.

11         Q     Okay.  Hand it back.  Yeah, hand it

12    back.  I'm going to hand to you -- I'm going to

13    mark what I've already handed to you as Exhibit 39,

14    which is Tab -- probably Tab 29.  And see if that's

15    the same.

16                MR. TYSON:  Do you have this yet?

17    You don't have this one yet.

18                MS. CINO:  This is 37.

19                MR. TYSON:  Oh, it's the same as 37?

20    Okay.

21                THE WITNESS:  This seems to be the

22    same thread.

Page 281

1                    MR. TYSON:  It is the same thread,

2          but it's a different e-mail.

3                    THE WITNESS:  It is a different

4          e-mail, but it's the same words.

5                    MR. BROWN:  Okay.  I'll withdraw

6          that.  We are not marking anything yet as 39.

7                    Let me hand you what I will for

8          real mark as 39, and that is Tab 33.

9                    MR. TYSON:  So this is 39?

10                   MR. BROWN:  Yes.  And Exhibit 39 is

11         Tab 33.

12         BY MR. BROWN:

13                   Q     Who is Christina Norton?

14                   A     She was a team member for the NRSC.

15                   Q     What is the NRSC?

16                   A     National Republican Senatorial

17         Committee.

18                   Q     I'm trying to figure out what this is

19         about, but what is the war room that she is

20         referring to?

21                   A     The election incident hotline.

22                   Q     I just didn't hear you.

```
                                          Page 282
 1          A     The election incident hotline.

 2          Q     And is that something that is here or

 3    somewhere else?

 4          A     It was at the Georgia GOP.  It's what

 5    I ran for the campaign.

 6          Q     Okay.  Let me back up.  I was asking

 7    you a minute ago and then we got sidetracked about

 8    your transitions and your work.

 9          A     Okay.

10          Q     When you were working on the Trump

11    Campaign, who was your direct report?

12          A     An RNC official named Tom Stoner.

13          Q     Sterner?

14          A     Stoner.

15          Q     Stoner.

16                And did people work for you?

17          A     I had an intern like ten hours a week

18    for up until August, and then Chris Gardner came

19    down and helped me.  But yeah, I was the only EDO

20    staffer.

21          Q     Okay.  And then when you transitioned

22    over to the -- I guess the Georgia Republican
```

Page 283

1          Party, correct?

2                A     Well, NRSC.  I mean, all of this work

3          was done at the Georgia GOP.  Campaigns don't

4          exactly -- in a presidential year, you don't

5          exactly have much compartmentalization for a

6          post-election ever.

7                Q     Okay.  But your employer -- just

8          technically your employer was -- take me through

9          your technical employers from before the election

10         until you joined the Secretary of State.

11               A     From before the election?

12               Q     Yes.

13               A     Like I --

14               Q     Mid 2020.

15               A     Mid 2020.  Yeah.  I came down in June

16         to Georgia to oversee the election day operation

17         for the Trump Campaign --

18               Q     And your --

19               A     -- at the Georgia Republican Party.

20               Q     You don't need to pay me.

21               A     As a Georgia Republican Party, right,

22         so all the campaigns tend to share information and

Page 284

1          share the effort.  And the election day operation

2          was the Georgia Republican Party's in that sense.

3          And then after the -- after the, you know,

4          campaign, the general election, we focused our

5          efforts for the runoff.

6                    Q      For the senate runoff?

7                    A      For the senate.

8                    Q      But you didn't change -- officially,

9          you did not change employers in that time frame?

10                   A      I was a contractor for the NRSC.

11                   Q      Okay.  Just -- just explain to me

12         your -- that employment history.  I mean, I can try

13         to guess the right questions or you can just tell

14         me.

15                        MR. TYSON:  Can I help here, Bruce?

16                        MR. BROWN:  Yeah, tell me.

17                        MR. TYSON:  Do you know what entity

18         paid your salary when you got paid?

19                        MR. BROWN:  Thank you.

20                        THE WITNESS:  It was Donald J. Trump.

21                        MR. TYSON:  Okay.

22         BY MR. BROWN:

Page 285

1          Q     Donald J. Trump, the person?

2          A     No, the campaign.

3          Q     Okay.

4                MR. TYSON:  Was that true for the

5     January runoff as well or was there a change in who

6     paid you?

7                THE WITNESS:  There were both.

8                MR. TYSON:  Both what?

9                THE WITNESS:  NRSC, Donald J. Trump.

10    BY MR. BROWN:

11         Q     Okay.  So Donald J. Trump Campaign

12    paid you until when?

13         A     I believe I got my final paycheck on

14    January 1st.  And yeah, I mean the campaigns, you

15    know, end on, you know, around the night after, you

16    know, concession.

17         Q     Okay.  After -- wait.  Okay.

18                After Senator Perdue's concession?

19         A     Yes.  And Senator Loeffler.

20         Q     Okay.  And then who paid you after

21    Trump before the concession?

22         A     I don't understand your question.

Page 286

1          Q    Okay.  You said you got your last

2     paycheck from Donald J. Trump around --

3          A    Yes.

4          Q    -- January --

5          A    I had gotten a check from the NRSC to

6     assist with their efforts, and then, you know, the

7     campaign ends.  You go on to bigger and better

8     things.  I went down to Savannah for five days on

9     vacation, and then I went to Key West, then looked

10    for new jobs.

11         Q    Okay.  Thank you for that

12    information.

13              I'm just going to hand you 12.  It

14    has my notes on it, but I'm just going to ask you a

15    very quick question about it.  Yeah, it's going to

16    be down a bit.

17              MR. TYSON:  It's this one.

18              THE WITNESS:  Sure.

19    BY MR. BROWN:

20         Q    Do you know who prepared the schedule

21    that is attached to Exhibit 12?

22         A    Like this?

Page 287

1          Q      Yes.

2          A      No.

3          Q      Okay.  I don't want to get into the

4     details of what happened in Coffee County, but the

5     bottom line is the hand recount confirmed that the

6     votes for Trump and for Biden on election day were

7     exactly correct.

8          A      Okay.

9          Q      Is that about right?

10         A      I -- I don't know.  I thought it was

11    like a vote discrepancy or something.

12         Q      Right.  That -- that Jorgensen got

13    one more vote in the recount?

14         A      Okay.

15         Q      Right?  Isn't that correct?

16         A      Sure.  I'll take a look.  Sure.  Yep.

17         Q      Explain to me, given your initial

18    skepticism right after the election, going to your

19    resistance to the deniers, how towards the end of

20    that process you would file suit against Coffee

21    County when they were one vote off.

22         A      I didn't file suit against Coffee

Page 288

 1    County.

 2              Q     But you -- you were comfortable with

 3    the people that you were working with filing suit

 4    against Coffee County for that?

 5              A     I was --

 6              MR. TYSON:  Object to form.

 7              THE WITNESS:  -- comfortable with the

 8    lawyers that the Trump Campaign had retained, the

 9    lawyers for the Georgia GOP, Alex Kaufman.  I mean,

10    I -- I believe they're good lawyers, and their

11    judgment -- you know, I trust their judgment.

12    BY MR. BROWN:

13              Q     I may have asked this.  Did you make

14    any other visits to Coffee County other than the

15    one on December 12th?

16              A     No.

17              Q     I believe you testified that you had

18    never communicated, to your knowledge, with Phil

19    Waldron.  Is that right?

20              A     No, I have not.

21              Q     Let me -- when you were in Coffee

22    County, you're looking for people -- you said you

Page 289

1          arrived there like royalty because you were with

2          the Trump Campaign --

3                    A     Uh-huh.

4                    Q     -- right?

5                          This is December 12th, after the vote

6          had been certified by the Secretary of State,

7          correct?

8                    A     That makes sense.

9                    Q     And this is after you already -- your

10         initial skepticism in the accuracy of the results

11         had gone away, correct?

12                   A     Yeah.  I mean, you know, I still

13         thought maybe there was something that we could

14         find.  I remember in the recount that they were

15         finding ballots that got unscanned in Floyd County

16         and Fayette County, and stuff like that.  So, you

17         know, you always want to unturn every stone.

18                   Q     Well, up to what point?

19                   A     I mean, until it seemed impractical.

20         And the fact that you have a senate runoff three

21         weeks away, that you're already dealing with some

22         of these wackos that are telling people not to

Page 290

1      vote, that the machines will flip your votes and

2      you're trying to do damage control.

3           Q    Let me -- you -- you -- we've seen

4      the things from Harry MacDougald and others, and

5      you've testified that following the general

6      election, the November -- the election day in

7      November, following that --

8           A    Uh-huh.

9           Q    -- you received a lot of complaints

10     from people about the Dominion System and how

11     unreliable it is and how it can -- how people can

12     use it to switch votes, et cetera.

13               Are you with me?

14           A    Sure.

15           Q    Did any of those people complain

16     before Donald Trump lost the election on

17     November 3rd?

18           A    I don't recall.

19           Q    Do you recall receiving any

20     complaints about the Dominion System prior to

21     Donald Trump being defeated on November 3rd, 2020?

22           A    I think there had been people kind of

Page 291

1   working that angle for a while.  You know, the

2   occasional -- I think there were people before

3   voting stopped, like, putting articles and stuff

4   about it -- I mean, you know, I think this whole

5   disinformation campaign is deeper than we all

6   suspect.

7                   I think there may have been, you

8   know, external actors involved or people with very

9   bad intentions.  I can't really speak to the

10  complaints I was getting before the election, but

11  it is possible.

12          Q     And then the Secretary is aware that

13  the Dominion System is -- was released and was

14  uploaded to the internet, right?

15          A     I'm unaware.

16          Q     Okay.  You didn't know that from

17  the -- from --

18          A     No.

19          Q     -- this lawsuit?

20          A     I don't recall uploading to the

21  internet.

22          Q     You weren't aware that

Page 292

1          SullivanStrickler made a copy?

2                  A      Yeah, I mean, it has come to my

3          attention that that -- that that was the case.

4                  Q      Right.

5                         And that the -- and that

6          SullivanStrickler's client -- that

7          SullivanStrickler had uploaded it to the -- to a

8          ShareFile on the internet.  You knew that, correct?

9                  A      Yes.

10                 Q      Right?

11                 A      Yes.

12                 Q      And that an -- actually, an

13         unknowable number of people --

14                 A      Sure.

15                 Q      -- had made copy to it, right?

16                 A      Sure.

17                 Q      Okay.  You were asked some questions

18         about the -- Secretary Raffensperger's interview

19         with Channel 11.

20                 A      Sure.

21                 Q      Okay.  He wasn't, like, blindsided,

22         like, coming out of the office with that interview,

Page 293

1     was he --

2                A      No.

3                Q      -- and caught offguard?

4                MR. TYSON:  Object to form.

5                THE WITNESS:  I believe the -- the

6     campaign set that up, and I was unaware of it.

7     BY MR. BROWN:

8                Q      And you understandably sort of

9     distanced the Secretary's office, Secretary of

10    State as an office, from what he said as a

11    campaigner.  Can you -- can you explain that a

12    little bit?

13               A      I don't agree with your

14    characterization.

15               Q      Well, how -- characterize it

16    correctly.

17               A      I didn't do anything.  I mean, I kind

18    of had taken a step back from those issues.  I -- I

19    don't believe that it was -- as a communications

20    director, that is not the interview that I would

21    have selected for him.

22               Q      It being fact-free?

1          A     No.  I think there were facts in

2     there.  I just --

3          Q     Incorrect ones?

4          A     I'm not aware of the -- the whole

5     timeline and everything you're referencing.  So I

6     mean, it seemed to me like he had not been properly

7     briefed.

8          Q     But -- and obviously he should be

9     properly briefed and give accurate information

10    whether or not he's working for his campaign or in

11    his capacity as Secretary of State, correct?

12              MR. TYSON:  Object to form.

13              THE WITNESS:  I believe that any

14    individual in a position should have the most

15    accurate and up-to-date information, if possible.

16    BY MR. BROWN:

17         Q     Do you know if the Secretary of

18    State's -- the office is planning to publish any --

19    a correction or a retraction to the statements that

20    the Secretary made to Channel 11?

21         A     I am unaware.

22         Q     You haven't heard that scuttlebutt

Page 295

```
 1        around the office or anything?

 2                A     No.

 3                Q     No one has said, "You know, he blew

 4        it.  We need to publish something to correct it" --

 5                A     No.

 6                Q     -- "so then people don't think

 7        incorrectly that the Secretary has been honest for

 8        much longer than he really has"?

 9                A     No.  I mean --

10                MR. TYSON:  Object to form.

11                THE WITNESS:  -- there were, you

12        know, open investigations into Coffee County.  And

13        I think -- you know, I'm not sure what those

14        composed.  I think if you're an elections official

15        being interviewed by an SOS investigator and you

16        don't share "Oh, by the way, I have these -- you

17        know, these random people in my office scanning

18        voting machines," I think you're not being

19        truthful.  So I don't think there's a whole -- you

20        know, that's not an incorrect interview.  It's just

21        not a good interview.

22        BY MR. BROWN:
```

```
 1            Q     Well, yeah, there are many
 2       representations there, and one was this
 3       characterization that -- about Misty Hampton, okay,
 4       and that she had not told the whole truth.
 5            A     Yes.
 6            Q     Fair enough?
 7            A     I believe that to be accurate.
 8            Q     Other representations though were
 9       about when the Secretary's office had begun the
10       investigation.  Those also were not correct, right?
11                  MR. TYSON:  Object to form.
12                  THE WITNESS:  I mean, there were
13       three investigations into Coffee County, so --
14       BY MR. BROWN:
15            Q     Okay.  But you know -- you know and I
16       know -- don't play games with me.
17            A     I'm not playing games.
18            Q     You know that the Secretary and
19       Channel 11 wasn't talking about that stray absentee
20       voter complaint in Coffee County when he was
21       talking to Doug Richards on Channel 11, instead the
22       subject matter was the breach that -- that was in
```

1        the news, right?  That's what Raffensperger -- what

2        Secretary Raffensperger was talking about?

3                A    He was discussing --

4                     MR. TYSON:  Object to form.

5                     THE WITNESS:  -- the breach and --

6        and the unauthorized access in the news.

7        BY MR. BROWN:

8                Q    Right.

9                     And so he was talking about that

10       unauthorized access.  And he said, "We've been

11       investigating that since right after it happened."

12                    And that is just not true, right, or

13       is it?

14                    MR. TYSON:  Object to form.

15                    THE WITNESS:  I disagree.  I mean, I

16       believe when you go and you replace an EMS and from

17       what you've shown me about Chris Harvey's e-mails,

18       that they looked into it.  So, you know.

19       BY MR. BROWN:

20               Q    Okay.  So before they knew about it,

21       they looked into it.  Is that what you're telling

22       me?

Page 298

1                    MR. TYSON:  Object to form.

2                    THE WITNESS:  I don't -- I don't

3          know.  I mean, I'm not sure of the timeline.

4          BY MR. BROWN:

5                Q    Okay.

6                A    So --

7                Q    But in any event, you're not aware of

8          any efforts by the Secretary of State's office to

9          set the record straight following his interview

10         with Doug Richards, right?

11               A    Yeah.  It seems like Mike sent some

12         updates to reporters of "This is the actual date."

13         Yeah, he had done that.

14               Q    Who was the -- who was his assistant

15         who corrected him while he was actually being

16         interviewed, do you know?

17                   MR. TYSON:  Object to form.

18                   THE WITNESS:  I don't know if there

19         was -- I don't know.

20         BY MR. BROWN:

21               Q    You don't know his assistant?

22               A    I'll find it.  Hang on a second.

Page 299

```
 1                    MR. TYSON:  And this is the interview
 2       that the campaign set up, so I'm not sure -- I
 3       think we've established he didn't have any
 4       knowledge, but you can ask him.
 5                    THE WITNESS:  Right.  I don't know
 6       what -- I don't know.
 7       BY MR. BROWN:
 8            Q    But there -- there was a staffer who
 9       was referenced who actually miscorrected the -- the
10       Secretary, I think.  And you'll see the timeline.
11                    Would you look at Exhibit 20?
12            A    Yeah.
13                    MR. TYSON:  Yeah.  All right.  Those
14       are the highlights, yeah.
15       BY MR. BROWN:
16            Q    Exhibit 20 is the exhibit that says,
17       "Questions Raised in Timeline of State" --
18            A    Yeah.
19            Q    -- "Response to Coffee County
20       Breach."  Do you see that?
21            A    Yes.
22            Q    Do you know who the aide to
```

1          Raffensperger is there?

2                  A      "A representative with the Secretary

3          of State's office clarified"?

4                  Q      Yeah.

5                  A      It probably would have been Mike.

6                  MR. TYSON:  But do you know?

7          BY MR. BROWN:

8                  Q      Mike who?

9                  A      Hassinger.

10                 Q      Okay.  But Mr. Hassinger doesn't

11         work -- does he work for the campaign also?

12                 A      No.

13                 Q      Okay.  Who is the aide to

14         Raffensperger, corrected the Secretary?  It's

15         almost real time.

16                 MR. TYSON:  It's in the interview,

17         yeah.  It was during the interview it seems like.

18                 MR. BROWN:  Right.

19                 MR. TYSON:  Yeah.

20                 THE WITNESS:  I mean he may have had,

21         like, Jordan with him.  I -- she was the campaign

22         manager.  I do not know who -- who his aide is.

Page 301

1      BY MR. BROWN:

2             Q     Okay.  It's all right.

3                   You were asked some questions about

4      the RLAs and the barcodes, and I just wanted to

5      clarify your response to that.

6                   Do you recall that back and forth?

7             A     Sure.

8             Q     Mr. Cross had asked some questions,

9      but you acknowledged that it's the barcode that

10     actually gets counted, not the human-readable text.

11                  Are you with me?

12            A     Sure.

13            Q     Okay.  Are you aware of anything in

14     the RLA that checks the barcode to the

15     human-readable text?

16            A     No.

17            Q     Okay.

18                  MR. BROWN:  I have more questions,

19     but I need to get organized.  So let's take a

20     ten-minute break.

21                  VIDEOGRAPHER:  The time is 3:38 p.m.

22     We are off video record.

Page 302

```
 1              (Recess from 3:38 p.m. to 4:05 p.m.)
 2                  VIDEOGRAPHER:  The time is 4:05 p.m.
 3      We are back on video record.
 4      BY MR. BROWN:
 5              Q    Mr. Sinners, we've talked a lot about
 6      the Coffee -- the trip to Coffee County.  I just
 7      have a couple more on that.
 8              A    Okay.
 9              Q    You testified that Alex had spoken
10      with -- Alex Kaufman had spoken with Mr. Preston, I
11      think.
12              A    Yes.
13              Q    Who else did he speak with down
14      there?
15              A    I'm not sure.
16              Q    Did he speak with other people, you
17      just weren't in the room or --
18              A    There may have been two or three
19      witnesses they interviewed.  I'm -- you know, I'm
20      not entirely sure.
21              Q    Do you know whether he spoke with any
22      Coffee County election officials when he was down
```

1      there?

2             A     I don't believe that to be the case.

3             Q     You don't believe he did?

4             A     I don't think he did.

5             Q     Okay.  Who set up the meeting with

6      Preston?  How did you know to contact him?

7             A     I'm not sure where that came from.  I

8      think because Preston had put out an article and

9      that was of interest to Alex.

10            Q     Now, when you were in Coffee County,

11     you still were employed by the Trump Campaign,

12     correct?

13            A     Yes.

14            Q     And the Trump Campaign was also, to

15     the best of your knowledge, probably funding the

16     Still lawsuit, correct?

17            A     Perhaps.  I don't know.

18            Q     Okay.  Do you know anything about

19     Misty Hampton's termination by the Coffee County

20     Board of Elections?

21            A     No.

22            Q     Do you know --

Page 304

1              A      I know she's no longer there.

2              Q      But do you know why she was

3      terminated?

4              A      I've heard something about, like,

5      false time sheets or something like that from the

6      media.

7              Q      Anything else?

8              A      No.

9              Q      Are you aware of any litigation that

10     had been threatened against the Coffee County Board

11     of Education, at or about the time of January 2021?

12             A      No.

13             Q      In his interview with Channel 9, the

14     Secretary referenced certain grand jury testimony.

15             A      Uh-huh.

16             Q      Are you familiar with that?

17             A      I've -- yeah, I'm -- I saw that

18     interview.

19             Q      Do you know what he's referring to?

20             A      I do not.  I have reason to believe

21     maybe Fulton, but I -- I don't know.

22             Q      Do you know of any grand jury

1          testimony that relates to the Coffee County breach?

2                    A     I do not.

3                    Q     And, again, the same question:  Any

4          effort by the Secretary of State's office to

5          correct or explain what he -- what the Secretary

6          said about the grand jury as it relates to Coffee

7          County?

8                         MR. TYSON:  Object to form.

9                         THE WITNESS:  Just of what, you

10         know -- what Mr. Hassinger has done in those

11         e-mails.

12         BY MR. BROWN:

13                   Q     And he works for you, right,

14         Mr. Hassinger?

15                   A     Yes.

16                   Q     What do you know about any

17         investigation about the password change to the EMS

18         server?

19                   A     I'm not aware.

20                   Q     When you came on to work for the

21         Secretary of State, one of your job

22         responsibilities was to address and, if

Page 306

1           appropriate, debunk fraud theories about the

2           election.  Fair to say?

3                    A      That's fair to say.

4                    Q      In the course of doing that, did you

5           speak with anybody in the Secretary of State's

6           office about Coffee County in any -- with respect

7           to any Coffee County issue?

8                    A      I don't believe that to be the case.

9           It really wasn't an issue that people were, you

10          know, e-mailing about.

11                   Q      We've focused our attention on Coffee

12          County -- the Coffee County breach.  Are you aware

13          of any allegations that any other county's election

14          system had been breached in any way, like Coffee

15          County or even not like Coffee County?

16                   A      There was that Gateway Pundit article

17          that I included in discovery.  And, you know, I

18          called the elections supervisor and I was like, "Is

19          there any truth to this?"

20                          And I remember it -- it was Carlos

21          Nelson.  And he was like, "No."

22                          And then I remember speaking with

```
 1        someone affiliated with Jody Hice, who was
 2        concerned about it.  And I said, "Yeah, I don't
 3        think there's any truth to that."  And then the guy
 4        tweeted it out on his Twitter.  It really pissed me
 5        off actually because I had to deal with the
 6        cleanup.
 7               Q     What did he -- what did he tweet out?
 8               A     Like the Gateway Pundit -- I mean, I
 9        don't know specifically.  But, you know, that's a
10        site that is carried on multiple, you know,
11        conspiracy theories for -- yeah.
12               Q     And Carlos Nelson was affiliated with
13        what county?
14               A     He was -- he is, I think, the Ware
15        County election supervisor.  And I called him and I
16        asked him, "Hey, is there any validity to people
17        seizing voting machines?"
18                     And he's like, "Nope."
19               Q     And did you ask that in such a way
20        that it was broad enough to encompass any kind of
21        fraudulent activity like that?
22               A     I would say, "Hey, is there any truth
```

1        to these allegations that I'm sure you are dealing

2        with as the elections supervisor?  And you're

3        probably getting phone calls.  Is there any truth

4        to this?"

5                     He said "No."  So I believe -- you

6        know, yeah, I have no reason to doubt that.

7               Q     And then you -- you referenced

8        another incident that came your way through Jody

9        Hice, correct?

10              A     No.

11              Q     So what was the Jody --

12              A     That was this -- I got a phone call

13       about that issue and --

14              Q     But are we talking about Ware in

15       both --

16              A     In Ware County.

17              Q     Both in Ware County, not another

18       county?

19              A     No.

20              Q     Okay.  Do you recall telling anybody

21       that Ms. Marks had made up the allegations about

22       the Coffee County breach to win the lawsuit?

Page 309

1           A      I probably said I don't believe that
2      those allegations are correct.
3           Q      And they were, right?
4           A      I -- that someone had accessed the
5      voting system in Coffee County?
6           Q      Yeah.
7           A      I accept that.
8           Q      Do you know Bob Cheeley?
9           A      I've met him one time.
10          Q      And what dealings have you had with
11     Bob Cheeley?
12          A      He wanted a meeting with Ryan Germany
13     regarding some lawsuit.  I think it was about an
14     inspection case.  And I sat in on that meeting with
15     Ryan.
16          Q      When was that?
17          A      Probably in the spring.
18          Q      Spring of this year?
19          A      Yeah.
20          Q      Was that Fulton County?
21          A      I think it might have been the --
22     his -- yeah, probably, probably.  I don't -- I'm

Page 310

```
 1    not sure.

 2            Q     Any other dealings with Bob Cheeley?

 3            A     Not to my knowledge.

 4            Q     What about Alex Cruz, do you know

 5    him?

 6            A     No, don't know him at all.

 7            Q     You -- you spoke about Alex Kaufman

 8    as being a friend in the -- in the past tense.

 9    What was it that caused your relationship to sour?

10            A     I think he strongly believes that the

11    election was stolen and that Brad Raffensperger

12    worked against Donald Trump to steal that, and I

13    don't believe that.

14            Q     You had described in your testimony

15    to the January 6th committee that -- I believe the

16    phrase you used were "useful idiots" or something

17    like that, to that effect.

18            A     Yes.

19            Q     Can you just, for the record, explain

20    what you meant by that?

21            A     I stand by that.

22            Q     And what did you mean by that?
```

1          A     That was in regard to the electors.

2     I clearly did not have the full picture of what had

3     happened.  I had never communicated with, like,

4     John Eastman, and I think that there may have been

5     people looking to do things that were blatantly

6     illegal.  And had I known that there was that

7     intent, you know, that's not something -- I'm not

8     dying on the hill for even them.  You know, I'm not

9     going out of my way to -- I'm not going to break

10    the law on someone else's behalf.

11         Q     What was the difference between what

12    you felt was happening with the prospective

13    electors and what you then came to understand the

14    fake electors were going to be used for through

15    people like John Eastman and those?

16         A     I think that they wanted to put

17    pressure on the vice president and coerce our

18    system of Government to go in to their demands and

19    keep Donald Trump in power.  And my understanding

20    was that, you know, a lawsuit gets heard in a --

21    the court of law.  No.  You know, the lawsuit gets

22    killed.

Page 312

1              Those electors, they mean nothing,

2      you know.  And I think there were people in the

3      fringe orbit that were dealing with this to

4      pressure Congress to do something that I think

5      would have been unconstitutional.

6              Q     Getting back to Coffee County

7      specifically, Mr. Sinners, the -- you saw the

8      e-mails.  I don't need to get them out, but you saw

9      the e-mails with the Cyber Ninjas' business card?

10             A     Yeah.

11             Q     We call it a clue.

12             A     Yeah.

13             Q     And it was sent from James Barnes,

14     the then-director of elections for Coffee County,

15     to Chris Harvey.  Do you recall that?

16             A     Yes.

17             Q     And then Chris Harvey flipped it to

18     Frances Wilson, who then flipped it to Pamela

19     Jones.  Do you recall that?

20             A     Sure.

21             Q     We -- you don't have to believe me,

22     but I'm telling you, we have seen no record of any

Page 313

1        action taken by Pamela Jones in response to

2        receiving that tip.

3                Do you know of any action that she

4        took or that Frances Wilson took in reaction to

5        receiving that tip, that clue?

6        A        I don't even know who Pamela Jones

7        is.  And, you know, I wasn't -- I'm not in the

8        investigations division.

9        Q        Okay.  So you don't have any more

10       information about what happened with that?

11       A        No.

12       Q        Okay.  Now, the law provides that the

13       State Election Board is supposed to conduct

14       investigations.  You understand that?

15               MR. TYSON:  I'll object to form.

16               THE WITNESS:  I understand our

17       investigations division oversees elections, so I

18       think you're getting into the legal technicality

19       that I'm not in a position to answer.

20       BY MR. BROWN:

21       Q        Do you recall that State Election

22       Board member Anh Le recommended -- or was -- or the

Page 314

1        board resolved to send the earlier investigation

2        involving Coffee County to the Attorney General, to

3        bind it over to the Attorney General.  Are you

4        familiar with that?

5              A     No.

6              Q     Cathy Latham, who you know, has

7        stated -- or others -- other people have stated on

8        her behalf that she was, quote, a whistleblower.

9        Are you familiar with that?

10             A     I believe she characterized herself

11       as that.

12             Q     And what was she blowing the whistle

13       on, do you know?

14             A     I don't know.

15             Q     You don't know anything about that?

16             A     No.

17             Q     Do you know why she -- you need to

18       say "No, I don't know."

19             A     I don't know.

20             Q     And so you don't know the -- any

21       basis for her to be a, quote, whistleblower?

22             A     I think there were issues that were

Page 315

1        reported about the way Coffee County conducted its

2        election.  I mean, I don't know of her specific

3        situation.

4               Q     Same questions for Misty Hampton.

5        Are you familiar with her claiming that she was a

6        whistleblower?

7               A     I think in their, you know,

8        certification letter and whatnot.  And I think they

9        probably thought of themselves as that.

10              Q     But do you -- you don't know anything

11       about their -- anything other than them pointing

12       out the difficulties in Coffee County?

13              A     That wasn't going to get me any more

14       poll watchers and volunteers.

15              Q     Fair enough.

16                    You moved from the Trump Campaign to

17       work on the senate election?

18              A     Contemporaneously.

19              Q     Right.

20                    And are you aware of any fraud of any

21       kind of any -- that had any effect on the results

22       with respect to the senate election?

1           A      I don't think that it had any effect

2      on the result.

3           Q      In other words, there might have been

4      some incidental issues one way or the other, but it

5      didn't affect the result?

6           A      I -- I believe the senate election

7      was the election.  And, frankly, adding to that,

8      when you tell people these drummed-up conspiracy

9      theories, that hurts voter turnout.  I've said

10     publicly that there is an article -- I think last

11     spring I went on the record and I said that, you

12     know -- I forget what the context was, but, you

13     know, blaming something for the runoff like Mike

14     Lindell had done one of his shticks and Newsweek

15     asked me about it.

16              And I said, "No.  Like I'm adding to,

17     you know, these -- these people's belief that the

18     election was stolen depresses turnout.  That's what

19     you can blame the senate election for."  I think,

20     you know, if you lose a campaign, don't blame the

21     voting machines, blame your campaign.

22           Q      The question on the timing of your

Page 317

1        knowledge of the Coffee County breach, you spoke

2        with -- you texted with CNN about the Coffee County

3        breach.

4                A       Yeah.

5                Q       Do you recall that?

6                A       Yes.

7                Q       I think that was in April of 2022.

8        And was that before or after any media actually

9        published about it?

10               A       I'm not sure.

11               Q       Okay.  But the -- had you -- had you

12       heard any -- well, you got the text about Gabe

13       Sterling's deposition testimony in which he was

14       confronted with the recording.  Are you with me?

15               A       Sure.

16               Q       And before that time, you didn't know

17       of any connection between Hall and Coffee County,

18       correct?

19               A       No.

20               Q       Did you talk to David Shafer about

21       Hall and about his role in Coffee County?

22               A       I believe he sent me that e-mail in

Page 318

1      November.  I mean, when I went to the Secretary of

2      State's office, David Shafer went on a full-on

3      campaign against me.  So I mean, I've -- I have not

4      spoken with David Shafer since, you know, December.

5              Q     And he went against you because you

6      had changed your mind about the election or --

7              A     Yeah.  I mean, he was trying to pin

8      everything on the Secretary of State's office to,

9      you know, save face.  And, you know, even -- even

10     initially, I think, I had reservations about the

11     Secretary of State's office being responsible for

12     an election loss when our own candidate is

13     demonizing absentee voting during the biggest

14     pandemic of the century.

15             Q     Have you been interviewed or

16     contacted in any way from investigators from the

17     Secretary of State's office in relation to what you

18     know about Coffee County and about the fact that

19     you were down there, you know, you were in contact

20     with Scott Hall, Chaney, and Latham?

21             A     I haven't been in contact with these

22     people about this during that time.  No, I have

Page 319

1     not.

2              Q     Did you go to the investigators and

3     say, "Look, Hall -- you know, Shafer give me the

4     heads-up on Hall a while back," anything like that?

5              A     If I had reached out to law

6     enforcement about every single wing-nut conspiracy

7     theory that someone contacted me about, I would

8     still be there until next Christmas.

9              Q     I take that as a no?

10             A     No.

11             Q     Okay.  I'm going to ask you again,

12    there were a lot of e-mails in which Ed Voyles

13    appears copied with you, and your testimony is you

14    don't know him, you don't remember him?

15             A     I'm not familiar with those e-mails.

16             Q     Well, in any event, is your testimony

17    that you don't know Ed Voyles and you don't

18    remember dealing with him about Coffee County at

19    all?

20             A     No.

21             Q     Okay.

22             A     Can you show me those e-mails?

Page 320

```
 1              Q     Probably.  It'll take a minute, but
 2        what I need is your recollection.  Is your
 3        recollection --
 4              A     I don't remember seeing any e-mails
 5        with him, so . . .
 6              Q     Okay.  Yeah, I don't -- a lot of
 7        these are copies and things like that.  I don't
 8        mean to suggest that you were -- he e-mailed you or
 9        you e-mailed him.  I don't mean to suggest that.
10              A     I can pretty certainly say that I
11        have had no contact with him.
12              Q     And you would remember the name, of
13        course?
14              A     Right.
15              MR. TYSON:  Ed Voyles is a car dealer
16        in the Atlanta area, in Coffee County.
17              THE WITNESS:  I picked up on that.
18        BY MR. BROWN:
19              Q     Yeah, he's very well known, or it's
20        probably his father or grandfather.
21              A     Everybody's related in the south.
22              Q     I think you mean Alabama.  I don't
```

Page 321

1      think you mean the south.

2                      You testified that you understood

3      that the Secretary replaced the EMS server from

4      Coffee County back in June of 2021.  Do you recall?

5              A     Yeah.  I think that's accurate.

6              Q     Do you know what the Secretary did or

7      the office did with that server when they got it?

8              A     No idea.

9              Q     You don't know if they checked it for

10     malware or anything, do you?

11             A     I heard -- I think there was some

12     sort of analysis done, but I'm not sure.

13             Q     But not then, just recently, correct?

14             A     I'm not sure.

15             Q     Okay.  And you don't know what they

16     found?

17             A     I'm not sure.

18             Q     Did they find any malware or anything

19     like that?

20             A     Not to my knowledge.

21             Q     The -- the State has this gigantic

22     contract with Dominion, right?

Page 322

1          A     Sure.

2          Q     Dominion's software gets copied in

3    Coffee County under the control of a Georgia

4    County, correct?

5          A     Sure.

6          Q     Are you aware of any contact by

7    Dominion to the Secretary of State's office or

8    Coffee County relating to the, I'm going to call

9    it, theft of their software in Coffee County?

10         A     I'm not.

11         Q     Have you heard any talk about

12   communication between the Secretary and Dominion,

13   with respect to the Coffee County caper?

14         A     I --

15               MR. TYSON:  Object to form.

16               THE WITNESS:  I think John Poulos is

17   there today at the State Election Board.  I have to

18   imagine there would be some, but that is not my

19   wheelhouse.

20   BY MR. BROWN:

21         Q     Okay.  So you've heard a little bit

22   about it, but nothing substantive.  Is that fair to

Page 323

1      say?

2              A    I think substantively.  I assume if

3      you're at the head -- in front of the State

4      Election Board today, there's probably been some

5      communication.

6                      MR. BROWN:  Your turn, Bryan.

7                      MR. TYSON:  All right.  Well, I'm

8      going to be very easy because I don't have any

9      questions for you.  We're all set.

10                     MS. CINO:  No questions.

11                     MR. CROSS:  Do you have questions?

12                     MR. BROWN:  Mr. Sinners, thank you

13     for your testimony.  I appreciate it.

14                     THE WITNESS:  Thank you.

15                     VIDEOGRAPHER:  The time is 4:29 p.m.

16     This concludes the videotaped deposition.  We are

17     off video record.

18                 (Whereupon, at 4:29 p.m., the videotaped

19                 deposition of ROBERT A. SINNERS was

20                 concluded; signature reserved.)

21

22

Page 324

1                    CERTIFICATE OF NOTARY PUBLIC

2          I, FELICIA A. NEWLAND, CSR, the officer before whom

3     the foregoing videotaped deposition was taken, do

4     hereby certify that the witness whose testimony

5     appears in the foregoing deposition was duly sworn

6     by me; that the testimony of said witness was taken

7     by me in stenotype and thereafter reduced to

8     typewriting under my direction; that said deposition

9     is a true record of the testimony given by said

10    witness; that I am neither counsel for, related to,

11    nor employed by any of the parties to the action in

12    which this deposition was taken; and, further, that

13    I am not a relative or employee of any counsel or

14    attorney employed by the parties hereto, nor

15    financially or otherwise interested in the outcome

16    of this action.

17

18

19    _____

20    FELICIA A. NEWLAND, CSR

      Notary Public

21

      My commission expires:

22    September 15, 2024

Page 326

1    Curling, Donna  v. Raffensperger, Brad

2    Robert A. Sinners (#5468186)

3                    E R R A T A   S H E E T

4    PAGE 13____ LINE _1___  CHANGE _No Conviction_____

5    _____

6    REASON _Inaccurate_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    10/31/22

24   Robert A. Sinners                        Date

25

Page 327

1   Curling, Donna  v. Raffensperger, Brad

2   Robert A. Sinners (#5468186)

3              ACKNOWLEDGEMENT OF DEPONENT

4        I, Robert A. Sinners, do hereby declare that I

5   have read the foregoing transcript, I have made any

6   corrections, additions, or changes I deemed necessary as

7   noted above to be appended hereto, and that the same is

8   a true, correct and complete transcript of the testimony

9   given by me.

10

11  _____          10/31/22

12  Robert A. Sinners                     Date

13  *If notary is required

14                      SUBSCRIBED AND SWORN TO BEFORE ME THIS

15       30    DAY OF October       , 20 22.

16

17

18       _____

19            NOTARY PUBLIC

20       My Commission Expires May 24 2024

21

22

23

24

25

Created with Scanner Pro