UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

Civil Action No. 1:17-cv-02989-AT

_____

DONNA CURLING, et al.,

     Plaintiffs,

vs.

BRAD RAFFENSPERGER, et al.,

     Defendants.

_____

VIDEOTAPED DEPOSITION OF EMILY MISTY HAMPTON

DATE:          November 11, 2022

TIME:          10:49 a.m. to 6:07 p.m.

LOCATION:     Courtyard by Marriott Warner Robins
               589 Carl Vinson Parkway
               Warner Robins, Georgia 31088

REPORTED BY:  Felicia A. Newland, CSR

Veritext Legal Solutions
1250 Eye Street, N.W., Suite 350
Washington, D.C. 20005

```
 1              A P P E A R A N C E S

 2    On behalf of the Curling Plaintiffs:

 3         HANNAH ELSON, ESQUIRE (via Zoom)

 4         DAVID D. CROSS, ESQUIRE (via Zoom)

 5         JENNA CONAWAY (via Zoom)

 6         Morrison & Foerster LLP

 7         2100 L Street, Northwest, Suite 900

 8         Washington, D.C. 20037

 9         helson@mofo.com

10         dcross@mofo.com

11         jconaway@mofo.com

12    On behalf of the Coalition for Good Governance

13    Plaintiffs:

14         BRUCE P. BROWN, ESQUIRE (via Zoom)

15         Bruce P. Brown Law

16         1123 Zonolite Road, Northeast, Suite 6

17         Atlanta, Georgia 30306

18         bbrown@brucepbrownlaw.com

19         MARILYN MARKS, ESQUIRE

20         Attorney At Law

21         7035 Marching Duck Drive, E504

22         Marilyn@uscgg.org
```

```
 1              A P P E A R A N C E S (Cont'd)

 2   On behalf of the State Defendants:

 3        JAVIER PICO PRATS, ESQUIRE (via Zoom)

 4        Robbins Firm

 5        500 14th Street, Northwest

 6        Atlanta, Georgia 30318

 7        dhernandez@robbinsfirm.com

 8        -- and --

 9        DIANE LAROSS, ESQUIRE

10        BRYAN JACOUTOT, ESQUIRE (via Zoom)

11        Taylor English Duma, LLC

12        1600 Parkwood Circle, Southeast, Suite 200

13        Atlanta, Georgia 30339

14        dlaross@taylorenglish.com

15        bjacoutot@taylorenglish.co

16   On behalf of the Fulton County Attorney's Office:

17        DAVID LOWMAN, ESQUIRE (via Zoom)

18        Fulton County Attorney's Office

19        141 Pryor Street, Suite 4038

20        Atlanta, Georgia 30303

21        david.lowman@fultoncountyga.gov

22
```

```
 1                    A P P E A R A N C E S

 2    On behalf of the Witness, Emily Misty Hampton:

 3         JONATHAN R. MILLER, III, ESQUIRE

 4         Attorney At Law

 5         5420 New Jesup Hwy

 6         Brunswick, Georgia 31523

 7         jrmilleratty@gmail.com

 8    Also Present:  (Via Zoom)

 9         Donna Curling

10         Ernestine Thomas-Clark

11         Kevin Skoglund

12         Oluwasegun Joseph

13         Susan Greenhalgh

14         Duncan Buell

15         Adam Sparks

16         Alexander Denton

17         Caroline Middleton

18         Veronica Ascarrunz

19         Philip Stark

20         Duncan Bell

21         Sonja Swanbeck

22    Videographer:  Scott Bridwell
```

1                    C O N T E N T S

2    EXAMINATION BY:                                    PAGE

3         Counsel for Coalition Plaintiffs           11

4         Counsel for Curling Plaintiffs            208

5         Counsel for State Defendants              240

6         Counsel for Coalition Plaintiffs          254

7                 HAMPTON DEPOSITION EXHIBITS

8    NO.  DESCRIPTION                                   PAGE

9    1   Article, Secretary of State's Office        25

10       Opens Investigation into Coffee County's

11       Handling of Recount

12   2   Text string messages, Gary with Dominion     30

13   3   String of text messages with Eric Chaney     34

14   4   String of text messages between Misty        87

15       Hampton and Eric Chaney

16   5   Chart of "Confidential" text messages       126

17   6   Messages - Andy Thomas & Ernestine          146

18       Thomas-Clark & Eric Chaney & Matthew McC

19       & Wendell Stone

20   7   E-mail from Misty Hampton to Open           149

21       Records Request, dated March 31, 2021

22   8   Time sheet review                           151

Page 6

|  1 |  9 | Text messages from James Dom tech | 152 |
|  2 | 10 | Misty video production - CCBOE responses | 160 |
|  3 |    | to Plaintiffs subpoenas |  |
|  4 | 11 | Lindell lands in Douglas | 160 |
|  5 | 12 | Shawn Still Complaint | 175 |
|  6 | 13 | Misty Hampton e-mailing Robert Sinners' | 182 |
|  7 |    | personal e-mail |  |
|  8 | 14 | E-mail from Christina Read, Thursday, | 184 |
|  9 |    | December 10, 2020 |  |
| 10 | 15 | Misty Hampton e-mails from other county | 185 |
| 11 |    | users |  |
| 12 | 16 | Photograph of password for 2020 Election | 194 |
| 13 | 17 | Photograph, Miles Latham on January 7 | 195 |
| 14 | 18 | Photograph of young man walking to | 197 |
| 15 |    | building |  |
| 16 | 19 | Photograph, Alex Cruce, on January 7 | 197 |
| 17 | 20 | Photograph of Misty's office, GEMS room | 206 |
| 18 | 21 | Series of photographs | 207 |
| 19 | 22 | Still shots from DouglasNow YouTube | 211 |
| 20 |    | video |  |
| 21 | 23 | EMS computer password | 214 |
| 22 | 24 | Photograph, Coffee County GEMS password | 216 |

Page 7

1   25   Photograph, (exterior only) Lenberg -        224

2        January 27, 28, 29

3   *(Exhibits attached to transcript.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

```
 1                P R O C E E D I N G S

 2                    * * * * * * *

 3                VIDEOGRAPHER:  Good morning.  We are

 4      going on the record at 10:49 a.m., 11/11/2022.

 5      Please note the microphones are sensitive and may

 6      pick up any whispering or private conversations.

 7      Please mute your phones at this time.

 8                    Audio and video recording will

 9      continue to take place unless all parties agree

10      to go off the record.

11                    This is Media Unit 1 of the

12      video-recorded deposition of Emily M. Hampton,

13      taken by counsel for the plaintiff in the matter

14      of Donna Curling versus Brad Raffensperger, filed

15      in the United States District Court for the

16      Northern District, Case Number 1:17-cv-02989-AT.

17      The location of the deposition is being at the

18      Courtyard by Marriott, Warner Robins, Georgia.

19                    My name is Scott Bridwell,

20      representing Veritext Legal Solutions.  I am the

21      videographer.  The court reporter is Felicia

22      Newland, from the firm Veritext Legal Solutions.
```

```
 1                    I'm not authorized to administer an
 2      oath, I'm not related to any party in this
 3      action, nor am I financially interested in the
 4      outcome.
 5                    If there are any objections to
 6      proceeding, please state them at the time of your
 7      appearance.  Counsel and all present, including
 8      remotely, will now state their appearance and
 9      affiliations for the record, beginning with the
10      noticing attorney.
11                    MR. BROWN:  This is Bruce Brown.  I'm
12      counsel for Coalition Plaintiffs.
13                    MS. ELSON:  This is Hannah Elson,
14      Morrison & Foerster, here on behalf of Curling
15      Plaintiffs.
16                    MS. LAROSS:  This is Diane LaRoss.
17      And I'm here on behalf of the State Defendants.
18                    MR. LOWMAN:  This is David Lowman.
19      And I am here on behalf of the Fulton County
20      Defendant.
21                    MR. MILLER:  I'm sorry, who is this
22      last person?
```

Page 10

1                     MR. LOWMAN:  David Lowman.

2                     MR. MILLER:  And who are you with,

3      Mr. Lowman?

4                     MR. LOWMAN:  Office of the Fulton

5      County Attorney.

6                     MR. MILLER:  Okay.  We're -- this --

7      this is a deposition on the Curling case, this is

8      not a deposition for the Fulton County, and I --

9      we're not going to participate if Fulton County is

10     here.

11                    MR. LOWMAN:  Fulton County is a party

12     to this case, sir.

13                    MR. MILLER:  What branch of Fulton

14     County are you working for?

15                    MR. LOWMAN:  The Office of the Fulton

16     County Attorney.

17                    MR. MILLER:  Okay.  Not the district

18     attorney, the attorney?

19                    MR. LOWMAN:  Correct.

20                    MR. MILLER:  I apologize for not

21     understanding.

22                    MR. LOWMAN:  No problem.

Page 11

1                    MR. MILLER:  And do I need to make my

2      announcement?

3                    This is Attorney Jonathan Miller,

4      here on behalf of Ms. Hampton.

5                    VIDEOGRAPHER:  I'm assuming that the

6      rest of you attorneys are not going to go on the

7      record today?

8                    Madam Court Reporter, if you would,

9      please in the witness.

10                    *  *  *  *  *  *  *

11     Whereupon,

12                    EMILY MISTY HAMPTON

13     was called as a witness and, having been first duly

14     sworn, was examined and testified as follows:

15       EXAMINATION BY COUNSEL FOR COALITION PLAINTIFFS

16     BY MR. BROWN:

17          Q     Please state your name for the

18     record.

19          A     Emily Misty Hampton.

20          Q     Ms. Hampton, my name is Bruce Brown.

21     And I represent the Coalition Plaintiffs.  I'm

22     going to be asking you some questions today.  One

1    thing, particularly since we're on Zoom, it's very

2    important that I let you finish your answer before

3    I ask the next question, and that you do the same

4    with respect to my questions.

5              If you don't understand a question,

6    let me know.  If you ever need a break, feel free

7    to take a break.

8              MR. BROWN:  Or, Jonathan, if you need

9    a break, let us know.

10   BY MR. BROWN:

11        Q    Ms. Hampton, by whom are you

12   currently employed?

13             MR. MILLER:  She's waiting on the

14   videographer to fix something.

15             VIDEOGRAPHER:  I'm staying out of the

16   way.  You all could have went ahead.  You can see

17   everybody.

18             THE WITNESS:  I am employed by

19   Specialized Structures.

20   BY MR. BROWN:

21        Q    And what do you do for Specialized

22   Structures?

```
 1          A      A little bit of everything.

 2          Q      And are you represented today by

 3   counsel?

 4          A      I am.

 5          Q      And who are you represented by?

 6          A      Mr. Jonathan Miller.

 7          Q      Who are your other lawyers with

 8   respect to this matter?

 9                 MR. MILLER:  You have one.

10                 THE WITNESS:  I have one.

11   BY MR. BROWN:

12          Q      Just Jonathan?

13          A      (Moving head up and down.)

14          Q      Okay.  Have you been represented by

15   Ms. Stephanie Lambert in the past?

16                 MR. MILLER:  You can answer that.

17                 THE WITNESS:  Yes, I have.

18   BY MR. BROWN:

19          Q      And does she represent you now?

20          A      She does.

21          Q      Do any other lawyers represent you

22   now?
```

1          MR. MILLER:  Why don't you rephrase

2    that question?

3          VIDEOGRAPHER:  Are you objecting to

4    the form of the question, sir?

5          MR. MILLER:  No, no, I'm not

6    objecting, I'm just asking her to reform it so that

7    she might understand it better.

8    BY MR. BROWN:

9          Q    Okay.  Do any other lawyers represent

10   you now?

11         A    I don't know how to answer that

12   because I speak with Jonathan.  I speak with

13   Mr. Miller.

14         Q    Are you involved in another

15   litigation right now?

16         A    Not right now.

17         Q    In the past year have you been

18   represented by other lawyers other than Ms. Lambert

19   and Mr. Miller?

20         A    No, sir.

21         Q    Okay.  How about in 2021?

22         A    As a personal matter, no, sir.

1          Q      And are you distinguishing, what, by

2     saying "as a personal matter"?

3          A      When I was employed with the Coffee

4     County Board of Elections, I was.

5          Q      And who -- who were your lawyers when

6     you there -- when you were there?

7          A      The County Attorney.

8          Q      Tony Rowell?

9          A      Yes.

10         Q      Have you ever been represented by

11    Charles Bundren?

12         A      Not that I'm aware of.

13         Q      Oh, just for the record, your last

14    name now is Hampton, right?

15         A      Correct.

16         Q      And have you had other last names in

17    the past couple of years?

18         A      I have.

19         Q      And what -- what are those?

20         A      Hayes or Martin.

21         Q      And when did you -- did you become

22    Hampton?

```
 1          A     That's my maiden name.

 2          Q     Okay.  Thank you.

 3                And when did you return to your

 4    maiden name?

 5          A     I think it was February of '21.

 6          Q     And were you Martin before that?

 7          A     Correct.

 8          Q     Okay.  Ms. Hampton, you were the

 9    Coffee County Election supervisor.  Is that right?

10          A     Correct.

11          Q     And what was -- when did you start

12    with Coffee County Election Office, the office

13    itself?

14          A     2012, I think.

15          Q     And what was your position when you

16    started?

17          A     Clerk.

18          Q     And when did you become the election

19    supervisor, roughly?

20          A     I think somewhere around '15.

21          Q     And running forward to, let's say,

22    the 2019 period onward, who reported to you in the
```

Page 17

1    Coffee County Election Office?

2           A     I had one full-time employee, and

3    that was Jil Ridlehoover.

4           Q     Did you have any part-time employees?

5           A     Yes, sir.

6           Q     And who were they?

7                 Some of -- just working on separate

8    elections --

9           A     Yes, sir.

10          Q     -- contractors?

11                Did you have any part-time employees

12   that worked like, let's say, more than ten hours a

13   week other than Jil?

14          A     No, sir, not unless it was election

15   season.

16          Q     And to whom did you report?

17          A     I reported to the Coffee County Board

18   of Elections.

19          Q     Was there a particular member on the

20   board that you reported to or was it the board as a

21   whole?

22          A     The board as a whole.

Page 18

1          Q     How often did you meet with the Board

2    of Elections?

3          A     Once a month.

4          Q     And those were the regularly

5    scheduled board meetings?

6          A     Correct.

7          Q     Ms. Hampton, I'm going to skip around

8    a little bit, so just bear with me, and make sure

9    that you understand my question.  But I want to

10   turn now to the video that you made showing the

11   issue with electronic adjudication.

12                Do you remember that?

13         A     Yes, sir.

14         Q     And when -- about when did you make

15   that?

16         A     I think it was in December of '20.

17         Q     That would have been several weeks

18   after the general election?

19         A     Correct.

20         Q     And what prompted you to make the

21   video?

22         A     I discovered how an election

1    supervisor could change a vote during adjudication

2    by accident, and I showed a board member and he

3    wanted to bring it before the Board so that the

4    Board could see everything.

5         Q    And which board member did you bring

6    it to?

7         A    Eric Chaney.

8         Q    And who actually made the video?  Or

9    who made it with you, I should say?

10        A    The Board.

11        Q    The entire Board?

12        A    Correct.

13        Q    And how did -- did you make the video

14   public?

15        A    I did not make the video public.

16        Q    Was it made public to your knowledge?

17        A    Yes.

18        Q    What was it on?  Twitter?

19        A    I do not know.

20        Q    And what sort of reaction did you get

21   from people to the posting of your video?

22             MR. MILLER:  Object to form.

Page 20

1    BY MR. BROWN:

2         Q    I mean, did you get questions?

3    Support?  Criticism?  What sort of reaction did you

4    get, if any?

5              MR. MILLER:  Same.

6              THE WITNESS:  All kinds of reactions

7    from across the board.

8    BY MR. BROWN:

9         Q    Such as?

10        A    Some were praising, some were

11   objecting to it, some were in shock that someone

12   could do that.

13        Q    Did the Secretary of State ever make

14   any inquiry into your findings relating to the

15   problem with the adjudication?

16             MS. LAROSS:  Objection as to form.

17             MR. MILLER:  Bruce, can -- let's stop

18   for just a second.  I apologize.  I'm sitting here

19   looking at -- 6, 9, 12, 15 -- 19 people's names

20   that are apparently listening in on this.  Is it

21   possible that we could have their names put on the

22   record and what their relationship to this case is?

1                    MR. BROWN:  I mean, it's -- we

2      typically don't do that.  I don't have any strong

3      objection to doing that.

4                    MR. MILLER:  Well, I just think my

5      client would like to know who she's talking at.

6                    MR. BROWN:  Well, she's under oath.

7      I mean, this is a public proceeding.

8      BY MR. BROWN:

9           Q    You understand that, don't you,

10     Ms. Hampton?

11          A    I do.

12          Q    Okay.  And you don't have a problem

13     testifying under oath, do you?

14          A    No, sir.

15          Q    Okay.  Well, then let's continue.

16                   MR. MILLER:  Let me ask one other

17     question on that.  Is there any person on this list

18     of 20 names with law enforcement?

19                   MS. ELSON:  Yes.

20                   MR. BROWN:  You mean --

21                   MR. MILLER:  Yes?

22                   MS. ELSON:  My name is Hannah Elson.

1    I'm an attorney for the Curling Plaintiffs.  I work

2    at Morrison & Foerster.

3                    MR. MILLER:  I do not -- you don't

4    work with the State?

5                    MS. ELSON:  Correct.

6                    MR. MILLER:  Okay.  So you -- so you

7    are not with law enforcement.

8                    MS. ELSON:  Oh, you said "law

9    enforcement."  I apologize.  I heard Morrison &

10   Foerster.

11                   MR. MILLER:  Okay.  You know, as long

12   as there's no one with law enforcement on this, I

13   understand that it's a public deposition, but there

14   are considerations there.  Bruce, I apologize for

15   jumping in in the middle of that.  Please continue.

16   BY MR. BROWN:

17        Q    I think my question was whether you

18   received any inquiry from the Secretary of State

19   with respect to your video showing the issue with

20   electronic adjudication.

21                   MS. LAROSS:  And I believe I lodged

22   an objection as to form.

```
 1                    THE WITNESS:  So can I answer?

 2                    MR. MILLER:  Yes, you may answer.

 3                    THE WITNESS:  I did.

 4     BY MR. BROWN:

 5            Q     And who contacted you?

 6            A     The investigator.  I can't remember

 7     his name off the top of my head.

 8            Q     The investigator from -- from the

 9     State?

10            A     Correct.

11            Q     And what did he ask you or what did

12     you tell him?

13            A     He and two other investigators came

14     to the office.

15            Q     About when did they come to the

16     office?

17            A     I remember it was on a Friday, I

18     don't remember the date.

19            Q     Was it before Christmas or after

20     Christmas?

21            A     I don't remember the date.

22            Q     Was it before you finished the
```

Page 24

1    recount?

2          A     At this time I -- I can't remember if

3    it was or was not.

4          Q     What was the substance of the meeting

5    you had with the investigators?

6          A     It was during the recount, or I think

7    it was after certification of the recount because

8    they came to investigate the recount as well.

9          Q     And what -- what was it about the

10   recount that they were investigating?

11         A     There was a 50-ballot difference.

12         Q     And did you and the investigators

13   resolve the 50-ballot difference?

14         A     We did.

15         Q     And how did you resolve it?

16         A     Counted the ballots by hand, put them

17   in stacks of a hundred.

18         Q     And after you did that, did you

19   reconcile the -- the totals?

20         A     To the penny.

21         Q     Getting -- getting back to your --

22   your video, are you aware of any instance in which

1    ballots in the state of Georgia were changed

2    incorrectly because of the adjudication function?

3                MR. MILLER:  Object to form.

4                MS. LAROSS:  I also object as to

5    form.

6                THE WITNESS:  I don't know of any.

7    BY MR. BROWN:

8        Q    We're going to try to do the Exhibit

9    Share.  And I would like to pull up Tab 5 and mark

10   it as Exhibit 1.

11               (Hampton Deposition Exhibit Number 1

12               marked for identification.)

13               MR. BROWN:  And I can't do that.

14               MS. CONWAY:  This is Jenna Conway.

15   I'm doing it right now.

16               MR. BROWN:  Great.  Thank you, Jenna.

17               MR. MILLER:  Bruce, do you all have a

18   hard copy of that for us here today?

19               MR. BROWN:  We do not.

20               MS. MARKS:  It's on -- let me adjust

21   the screen.  It's just showing --

22               VIDEOGRAPHER:  It shows on her?

 1                MS. MARKS:  I'm talking about Misty's

 2       screen.  She may need -- we may need help.  I

 3       thought it was only her picture would show.  I was

 4       just going to make sure she was -- she's going to

 5       be able to see it in Exhibit Share.

 6                VIDEOGRAPHER:  I think when we do

 7       Exhibit Share, it takes over.  Right now she's

 8       under -- and I'm not a professional on this, I'm

 9       not an IT person.  My wife is, she tells me what to

10       do.  When he does Exhibit Share, it will take over

11       pretty much the whole screen, but I have to have

12       her on the spotlight so that everybody can see her.

13                And, ma'am, if that does come up

14       and you can't see it good enough, I will try and

15       do my best.  I'll come over and assist any way

16       possible.

17                THE WITNESS:  Okay.  May I have

18       another one of those napkins, please?

19                MS. CONWAY:  Hey, Scott, this is

20       Jenna Conway.  My experience with Exhibit Share is

21       that it's a completely separate program.  It's not

22       at all a part of the Zoom, and so it won't take --

1    it won't go screen share, it won't take over.

2    It's -- I think the witness typically looks at it

3    on a separate laptop that's logged into Exhibit

4    Share.  If that's not set up, we might have to do a

5    screen share, which, I guess, means I would have to

6    be made a co-host in order to do that.

7                    VIDEOGRAPHER:  Okay.  That is -- that

8    is not set up at this moment.

9                    MS. CONWAY:  Yeah.

10                   VIDEOGRAPHER:  I have -- that's

11   why --

12                   MS. CONWAY:  Marilyn, are you able to

13   pull up on Exhibit Share on a laptop and give it to

14   Misty?

15                   MS. MARKS:  Yeah, I --

16                   MR. CROSS:  Are we still on the

17   record?

18                   VIDEOGRAPHER:  Yes, we are on the

19   record.

20                   MR. CROSS:  We need to go off the

21   record, guys.

22                   MR. BROWN:  Yeah.  Thank you, David.

1            MR. MILLER:  Just help us out, she

2     needs to be able to see it.

3            VIDEOGRAPHER:  We are going off the

4     record at 11:10 a.m.

5        (Recess from 11:10 a.m. to 11:20 a.m.)

6            VIDEOGRAPHER:  We are on the record

7     at 11:20.

8     BY MR. BROWN:

9        Q    Okay.  Back on the record.

10            Ms. Hampton, you should have in front

11     of you Exhibit 1, which is a press release from the

12     Secretary of State's Office.  Do you see that?

13        A    I do.

14        Q    And do you recall, in general, the

15     issue of -- of the delays, if there were delays, in

16     the recount for Coffee County for the general

17     election of 2020?

18        A    I do.

19        Q    And Coffee County was the last county

20     to certify its results in the 2020 election.  Is

21     that right?

22            MR. MILLER:  Object to form.

Page 29

1             You may answer.

2             THE WITNESS:  Coffee County was the

3   last county.

4   BY MR. BROWN:

5        Q    You mentioned before that there was a

6   50 -- you were resolving a 50-ballot discrepancy.

7   Do you recall that?

8        A    I do.

9        Q    And what was -- and it was a

10  discrepancy between what and what?

11       A    There were 50 more ballots than there

12  were turned in.

13       Q    And that was in the recount?

14       A    The electronic recount when the

15  printout from Dominion showed 50 more ballots.

16       Q    And then did you recount them by hand

17  and it was resolved?

18       A    Correct.

19       Q    And you got some criticism for taking

20  as long as you did, correct?

21             MS. LAROSS:  Objection as to form.

22             MR. MILLER:  Thank you.

    1                    THE WITNESS:  I did.

    2     BY MR. BROWN:

    3          Q     And did -- I mean, did anybody tell

    4     you to slow down the process or delay or anything

    5     like that?

    6          A     No, sir.

    7          Q     And was your office working as fast

    8     as you could?

    9          A     Yes, sir.

   10          Q     Let me mark as Exhibit 2 Tab 24.

   11             (Hampton Deposition Exhibit Number 2

   12                marked for identification.)

   13     BY MR. BROWN:

   14          Q     And if you could tell me when that

   15     appears.

   16                    MS. MARKS:  She doesn't have it yet.

   17     Just a second, Bruce.

   18                    Can you see it now, Misty?

   19                    THE WITNESS:  I do.

   20     BY MR. BROWN:

   21          Q     Okay.  Can you see Exhibit 2?

   22          A     I do.

Page 31

```
 1          Q      And are these your text messages with
 2     a Gary W?
 3          A      It's Gary with Dominion, yes, sir.
 4          Q      Okay.  And was he assigned to Coffee
 5     County?
 6          A      He was the regional tech.
 7          Q      And he helped you out with issues as
 8     they arose?
 9          A      Yes, sir.
10          Q      Let me have you turn to page 7 of
11     Exhibit 2.  Do you see that?
12          A      I do.
13          Q      And let me -- drop down a little bit
14     down the page to the December 3rd, 2020 entry.  You
15     say there you're waiting on the Board to make a
16     decision.  Do you -- and then you say, "Could I do
17     a different database and run the ballots again?"
18     Could you describe what was going on then?
19          A      I don't remember.
20          Q      Let me -- if you would just turn the
21     page to page 7.
22                 MS. MARKS:  It looks like page 7 --
```

1    which one --

2              MR. MILLER:  Bruce, we're looking at

3    the bottom of page 7 right now.

4              MR. BROWN:  I'm sorry, page 8.  My

5    bad.

6    BY MR. BROWN:

7         Q    Do you see that?  Are you with me,

8    page 8?

9         A    Yes.  I think that's page 8.  Yes,

10   that's page 8.

11        Q    This is -- and you see the text dated

12   December 4th.  Do you see those?

13        A    I do.

14        Q    And this is right around the time

15   that you were getting a lot of pressure to get the

16   recount done, right?

17        A    I don't remember the date of the

18   recount.

19        Q    And do you recall the press release

20   where the Secretary of State was trying to get in

21   touch with you?

22              MS. LAROSS:  Objection as to form.

```
 1                 THE WITNESS:  No, sir, I don't recall
 2    a press release.
 3    BY MR. BROWN:
 4         Q    Do you -- well, that was Exhibit 1,
 5    but let's just keep moving.
 6                 In this text you say -- right in the
 7    dead center of the page, you say, "Oh, well, we'll
 8    see Monday.  Laugh out loud.  I'm not worrying
 9    about it all weekend."  Do you see that?
10         A    Correct.
11         Q    So you all didn't work over the
12    weekend to get the recount done, right?
13                 I'm not suggesting that you should
14    have, I'm just asking if you did.
15         A    I did not.
16         Q    If you turn the page to page 9 of
17    Exhibit 2, you'll see a text to Gary with Dominion.
18    You say, "Hey, is there any way that you could get
19    me a statement to cover me to the Board that you
20    don't understand why the ICC is not scanning
21    correctly."
22                 Do you see that?
```

 1          A      I do.

 2          Q      What was that about?

 3          A      The ICC not scanning correctly.

 4          Q      Like it says.  What was it doing?

 5          A      Not scanning correctly.

 6          Q      How did it -- how did the errors

 7   manifest themselves?

 8          A      I don't know.

 9          Q      How did you know it wasn't scanning

10   correctly?

11          A      It was kicking ballots back.

12          Q      Did you fix it?  Was it fixed?

13          A      Partially.

14          Q      You mention a report.  Did you get

15   some sort of report from Gary W on that?

16          A      No, sir.

17              MR. BROWN:  I'm going to mark as

18   Exhibit 3 Tab 2.

19          (Hampton Deposition Exhibit Number 3

20           marked for identification.)

21   BY MR. BROWN:

22          Q      And just let me know when that's in

Page 35

1    front of you.

2              Do you see it?  Do you have it?

3         A    No, sir.

4              MS. MARKS:  It's not up yet.  Bruce,

5    it's not loaded into Exhibit Share yet.

6              MR. BROWN:  Okay.

7              THE WITNESS:  It's there.

8    BY MR. BROWN:

9         Q    And is Tab 2 your text messages with

10   Eric Chaney?

11        A    Yes, it is.

12        Q    And if you could go to page 10 of

13   Exhibit 2 -- of Exhibit 3.

14        A    Okay.

15        Q    In the middle on November 9,

16   Mr. Chaney texted to you, he says, "We are going to

17   have a guest tomorrow at the board meeting.  Make

18   sure we have an audience participation on the

19   agenda."

20              Do you see that?

21        A    I do.

22        Q    Who was that?

1          A     I do not recall.

2          Q     Was it Ed Voyles?

3          A     I do not recall.

4          Q     You don't remember anything about

5     the -- about the -- about the guest?

6          A     I do not recall.

7          Q     If you would turn the page to page 11

8     of Exhibit 3.  At the top -- well, I'm sorry, back

9     up to the bottom of page 10.  Do you see where you

10    ask, "Can I legally give out minutes of the board

11    before they have been approved by the board?"

12               Do you see that?

13         A     Yes.

14         Q     Had you been asked by Robert Sinners

15    to produce minutes of board meetings before they

16    were approved by the Board?

17               MS. LAROSS:  Objection as to form.

18               THE WITNESS:  I do not recall.

19    BY MR. BROWN:

20         Q     You might have been, might not have

21    been?

22               MR. MILLER:  Object to form.

Page 37

```
 1                    THE WITNESS:  I do not recall.

 2    BY MR. BROWN:

 3         Q     Let me direct -- let me mark as

 4    Exhibit 4 Tab 27.  Oh, wait.  Let's wait on that.

 5    Hang on a second.  Go back to -- I'm sorry, I made

 6    a mistake.  If you'd go back to Exhibit 3, page 15.

 7                    Are you with me?

 8                    MS. MARKS:  Getting there.

 9    BY MR. BROWN:

10         Q     If you look at Exhibit 3 right in the

11    middle, November 19th, Mr. Chaney says, "Trump's

12    man wants them."  Do you see that?

13         A     I do.

14         Q     Who is Trump's man?

15         A     I have no idea.

16         Q     Did you know at the time?

17         A     No, sir.

18         Q     Did you ask him, "Who -- what are you

19    talking about?  Who is Trump's man"?

20         A     Not that I recall.

21         Q     You just said, "Okay," right,

22    indicating that you probably knew who Trump's man
```

1   was or you just didn't know?

2          A     He was -- Eric is a board member.

3                MR. MILLER:  Object to form.

4                You can answer.

5                THE WITNESS:  Eric is a board member,

6   I answer to him.  If he asked me to do something, I

7   did it.

8   BY MR. BROWN:

9          Q     Were you -- and you never asked him

10  who Trump's man was?

11         A     Not that I recall.

12         Q     Why would an election board member be

13  funneling information to Trump's man?

14               MR. MILLER:  Objection to form.

15  BY MR. BROWN:

16         Q     Did he tell you why he needed to give

17  it to Trump's man?

18         A     No, sir, not that I recall.

19         Q     And what was it that you were giving

20  to Mr. Chaney so that he could give it to Trump's

21  man?

22         A     I do not recall.

1          Q      Do you see where Mr. Chaney says,

2     "Thereafter the Secretary of State and Governor"?

3     Do you see that?

4          A      Yes.

5          Q      Do you know who he was referring to

6     with the pronoun "their" or "they"?

7          A      I do not.

8          Q      In response you said, "Good."  Do you

9     see that?

10         A      I do.

11         Q      I take it you were supportive of

12    going after the Secretary of State and the

13    Governor?

14         A      I don't know how to answer that.

15         Q      Well, were you?

16         A      Excuse me?

17         Q      Were you supportive of efforts to go

18    after the Secretary of State and the Governor?

19                MR. MILLER:  I'm not going to let her

20    answer that when she's going to take the Fifth.

21                MR. BROWN:  I -- I hear that you're

22    take the Fifth, Jonathan.  Is the witness going to

Page 40

1    take the Fifth?

2              MR. MILLER:  I'm asking her to take

3    the Fifth, which means you have to say that, Dear.

4              THE WITNESS:  As advised by my

5    attorney, I take the Fifth.

6              MR. BROWN:  Okay.  Jonathan, do you

7    have the full Fifth Amendment recitation that --

8    that we can use or are you just going to use that?

9              MR. MILLER:  I'm just going to use

10   that.

11             MR. BROWN:  Okay.

12   BY MR. BROWN:

13        Q    You then say, "I'll help them any way

14   I can."  Do you see that?

15        A    I do.

16        Q    And what did you mean by that?

17        A    I'll help them any way I can.

18        Q    And did you?

19             MR. MILLER:  She's -- take the Fifth.

20             THE WITNESS:  I'm going to take the

21   Fifth Amendment.

22

Page 41

1    BY MR. BROWN:

2         Q    If you would turn the page to page

3    16 -- I'm sorry, page 16.  Do you see that?

4         A    I do.

5         Q    Do you see where there is a little

6    advertisement of something featuring Lin Wood and

7    Sidney Powell?  Do you see that?

8         A    I do.

9         Q    And did you communicate with either

10   Sidney Powell or Lin Wood about this time?

11             MR. MILLER:  She's going to take the

12   Fifth on that.

13             THE WITNESS:  I take the Fifth.

14   BY MR. BROWN:

15        Q    Did you ever communicate with Sidney

16   Powell or Lin Wood?

17             MR. MILLER:  I think you can answer

18   that.

19             THE WITNESS:  Not that I'm aware of.

20   BY MR. BROWN:

21        Q    At the bottom of the page you

22   indicate on December 2, that, "Trump is going to be

Page 42

1    in Valdosta Saturday afternoon!!!  Campaign for

2    Perdue and Kelly."

3              Do you see that?

4         A    I do.

5         Q    You say, "I need to get to him," were

6    you referring to David Perdue or Donald Trump?

7         A    I do not remember.

8         Q    Did you ever -- did you ever talk to

9    David Perdue or Donald Trump?

10             MR. MILLER:  You can answer.

11             THE WITNESS:  Not that I'm aware of.

12   BY MR. BROWN:

13        Q    Okay.  Is talking to Donald Trump

14   something that you might -- it might have happened

15   and you just don't remember doing it?

16        A    I've never spoke to Donald Trump.

17        Q    Okay.  Did you ever speak with David

18   Perdue?

19        A    Not that I'm aware of.

20        Q    In the next text you say, "So who do

21   we know that can get us" -- and then it's -- "Calle

22   of talking to him!!"

Page 43

1          Do you know what that meant, what you

2   meant?

3          A     No, sir.

4          Q     Is that a typo or is that a person or

5   what?

6          A     I don't know.

7          Q     Do you know a Calle?

8          A     Excuse me?

9          Q     Do you know a person named Calle,

10  C-A-L-L-E?

11         A     Yes, sir.

12         Q     Who's that?

13         A     A pageant friend.

14         Q     A -- a what?  I just didn't hear you.

15         A     A pageant girl.

16         Q     Okay.  Is that who you were referring

17  to here?

18         A     No, sir.

19         Q     And then in response, Mr. Chaney says

20  "Dominic's buddy."  Do you see that?

21         A     I do.

22         Q     And do you know he was -- who he was

Page 44

```
 1    referring to when he says "Dominic"?

 2         A    I do.

 3         Q    Who's that?

 4         A    Dominic LaRiccia.

 5         Q    And who's he?

 6         A    He's a pest control guy from Douglas

 7    who is, I think, a House Representative.

 8         Q    And then who is Ross Goodman?

 9         A    I do not know.

10         Q    And if you would turn to page 17.  Do

11    you see that?

12              Do you see the text at the top where

13    you tell Mr. Chaney, "We need to talk to him so we

14    can get to talk to Trump and explain in person"?

15              Do you see that?

16         A    I do.

17         Q    What were you going to explain to

18    Trump in person?

19         A    I do not remember.

20         Q    Okay.  You're talking to Eric Chaney

21    about explaining something to President Trump

22    shortly after the general election and you're
```

Page 45

1    telling me you don't remember what you wanted to

2    talk to President Trump about?

3            A    Correct.

4            Q    Okay.  Ms. Hampton, you're under

5    oath.  I don't need for you to recall every

6    specific thing that you wanted to talk to Trump

7    about, but do you remember generally what you

8    wanted to talk to Trump about?

9            A    At this time no, I do not.

10           Q    You don't remember anything about it?

11           A    No, sir.

12           Q    If you would drop down to the middle

13   of page 17 of Exhibit 3, do you see where you say

14   to Mr. Chaney, "Are you going to be here with Ed

15   and Robert Preston"?

16                Do you see that?

17           A    I do.

18           Q    And is the Ed, Ed Voyles?

19           A    Yes.

20           Q    And who is Robert Preston?

21           A    Reporter in Douglas.

22           Q    And what was the occasion for meeting

1    with Mr. Voyles and Robert Preston?

2         A    I do not remember.

3         Q    In the next entry you'll see

4    Mr. Chaney asks, "Think we can get James to give a

5    statement."  Do you see that?

6         A    I do.

7         Q    He's referring to James from

8    Dominion, correct?

9         A    Yes.

10        Q    And what was your understanding of

11   what statement James might have given, or what was

12   it about?

13        A    At this time I don't remember.

14        Q    Then you say, "No, he does not want

15   to be involved."  Do you see that?

16        A    I do.

17        Q    And does that jog your recollection

18   about what Mr. Chaney wanted to get from James in a

19   statement?

20        A    Not at this time.

21        Q    If you go down to December 9, and you

22   say, "Does Wendell think he's going to change the

1    vote to not go tomorrow?"  Do you see that?

2         A    I do.

3         Q    And that's Board Member Wendell

4    Stone.  Is that right?

5         A    Correct.

6         Q    And what were you referring to in

7    that text message?

8         A    I do not remember.

9         Q    Okay.  Then Mr. Chaney says, "I'm

10   about to puss this joker off."  And you say, "Good

11   cause I'm getting pissed."

12              Do you see that?

13        A    I do.

14        Q    And do you recall anything about this

15   exchange?

16        A    I do not.

17        Q    If you'd go to the next page, page 18

18   of Exhibit 3, you will see an exchange starting in

19   December -- on December 11th at 2:19.  You say,

20   "The funny thing the Dominion guys can not get the

21   computer to work.  They are both in there and on

22   Facetime."

1              Do you see that?

2        A    I do.

3        Q    And do you recall that event?

4        A    I do.

5        Q    What was going on?

6        A    That was when the State was there to

7   investigate and they brought the two Dominion reps

8   with them and they were trying -- Dominion was

9   in -- the two guys from Dominion was in the -- what

10  I used to call the GEMS room trying to get the

11  scanner to communicate with the computer.

12       Q    And were they able to do so?

13       A    I'm sorry?

14       Q    Were they able to do so?

15       A    Were they able to get the computer to

16  communicate?

17       Q    Yes.

18       A    I mean the scanner to communicate?

19       Q    Yes.

20       A    No.

21       Q    And what was -- what was the purpose

22  of the State being down there at that time?

```
 1                    MS. LAROSS:  Objection as to form.

 2                    THE WITNESS:  That's when they were

 3      investigating the recount.

 4      BY MR. BROWN:

 5           Q    And what did they do when they were

 6      there in their investigation of the recount other

 7      than trying to get the scanner to communicate with

 8      the system?

 9                    MS. LAROSS:  Objection as to form.

10                    THE WITNESS:  That's when we did

11      the -- that's when we hand counted the ballots?

12      BY MR. BROWN:

13           Q    Okay.  Who actually did the -- the

14      hand counting?

15           A    The three investigators from the

16      State.

17           Q    Anybody else?

18           A    They counted them.

19           Q    And that was the final count that you

20      did in Coffee County?

21           A    Yes, sir.

22           Q    Let me direct your attention to the
```

Page 50

1    next page, which is page 19 of Exhibit 3.  And do

2    you see the -- I guess, are these photographs here

3    that you texted to Mr. Chaney?

4              A    Yes.

5              Q    And what do the photographs show?

6              A    The poll pads.

7              Q    And what are the poll pads showing?

8              A    Netflix.

9              Q    So you could get Netflix on a poll

10   pad?

11             A    That's correct.

12             Q    Did you ever tell Russ Ramsland about

13   this feature of the poll pads?

14             A    Not that I recall.

15             Q    If would turn the page to page 20 of

16   Exhibit 3.  What do the photographs at the top of

17   the page of page 20 of Exhibit 3 show?

18             A    A computer screen.

19             Q    And what's shown on that computer?

20             A    Solitaire.

21             Q    So the -- is that the ICC scanner

22   computer?

```
1            A     I don't remember the name of it, but

2     it's the one that the scanner was hooked to.

3            Q     And it's connected to the internet?

4                  MS. LAROSS:  Objection as to form.

5                  THE WITNESS:  I do not know.

6     BY MR. BROWN:

7            Q     Well -- okay.  So the Solitaire might

8     have been a -- just an application on the -- on

9     that particular computer?

10           A     Correct.

11           Q     And then if you look at the second

12    photo on page 20 of Exhibit 3, what does that show?

13           A     The EMS server computer.

14           Q     And what's on the screen there?

15           A     That's the Window home screen.

16           Q     What is the significance of that to

17    you?

18                 MR. MILLER:  Object to form.

19                 MS. LAROSS:  Objection as to form.

20                 THE WITNESS:  It shows games.

21    BY MR. BROWN:

22           Q     And are the games in an app that's on
```

1    the computer or are those accessed through the

2    internet?  Do you know?

3         A    An app on the -- I mean the Windows

4    home.

5         Q    Right.

6              MR. MILLER:  She can answer, but I'm

7    going to object to form.

8              THE WITNESS:  It's just the Windows

9    home, like the little icon down there.

10   BY MR. BROWN:

11        Q    Okay.  Who is Preston Haliburton?

12        A    I have no idea.

13        Q    Do you see where he -- his name and

14   e-mail address is texted to you by Eric Chaney?

15        A    I do.

16        Q    And do you know why -- well, what is

17   your understanding of the reason you would be given

18   Preston Haliburton's e-mail address.

19             MR. MILLER:  Object to form.

20             THE WITNESS:  I do not remember.

21   BY MR. BROWN:

22        Q    Tell me about your communications

```
 1   with Mr. Haliburton.

 2         A     I do not know a Mr. Haliburton.

 3         Q     Do you recall ever communicating with

 4   him?

 5         A     No, sir.

 6         Q     Do you know who he is?

 7         A     No, sir.

 8         Q     In the -- if you'd go to the next

 9   page, it's page 22 of Exhibit 3.  Do you see that?

10         A     I do.

11         Q     Let me direct your attention to the

12   January 6th entry where you say to Mr. Chaney,

13   "Scott Hall is on the phone with Cathy about

14   wanting to come scan our ballots from the general

15   election like we talked about the other day.  I am

16   going to call you in a few."

17               Do you see that?

18         A     I do.

19         Q     And how did -- how did you know that

20   Scott Hall was on the phone with Cathy?

21               MR. MILLER:  Object to form.

22               THE WITNESS:  I don't recall.
```

Page 54

1    BY MR. BROWN:

2          Q    Was Cathy Latham just standing in

3    front of you talking to Mr. Hall probably?

4          A    I don't --

5               MR. MILLER:  Object to form.

6    BY MR. BROWN:

7          Q    You don't remember?

8          A    Correct.

9          Q    And you knew Scott Hall by this time,

10   right?

11              MR. MILLER:  Object to form.

12              THE WITNESS:  No, sir.

13   BY MR. BROWN:

14         Q    So you said Scott Hall, but you

15   didn't know who he was.  I guess did Mr. Chaney

16   know who he was?

17              MR. MILLER:  Object to form.

18              THE WITNESS:  I do not know.

19   BY MR. BROWN:

20         Q    In this text you say, "Like we talked

21   about the other day."  So you spoke with Mr. Chaney

22   about scanning ballots.  Is that right?

Page 55

1                    MR. MILLER:  Let me advise my client,

2       please.

3                    (Counsel speaking to client off the

4               record.)

5                    THE WITNESS:  I'll take the Fifth

6       Amendment.

7       BY MR. BROWN:

8               Q      And scanning ballots was code for

9       making a forensic copy of the entire Coffee County

10      Election System, right?

11              A      I'll take the Fifth.

12              Q      Scott Hall wasn't about to come just

13      to scan ballots, was he?

14                   MR. MILLER:  Object to form.

15                   THE WITNESS:  I do not know.

16      BY MR. BROWN:

17              Q      You don't remember when you first

18      learned the name Scott Hall?

19              A      No, sir.

20              Q      You didn't know who he was on

21      January 6th?

22              A      I do not recall.

Page 56

1        Q        The Cathy you refer to here is Cathy

2    Latham?

3        A        Yes.

4        Q        Who is she?

5        A        Head of the Republican Party.

6        Q        Right.

7                 So what is the head of the Republican

8    Party doing -- arranging for someone to come scan

9    the ballots?

10                     MR. MILLER:  Object to form.

11                     THE WITNESS:  I do not know.

12   BY MR. BROWN:

13       Q        She wasn't associated formally with

14   the election's office, right?

15       A        She was the Republican who, along

16   with a Democrat and a board member, that we used

17   for vote review panel.

18       Q        Oh, I see.  So the Democrat and Cathy

19   Latham were going to work with Scott Hall to -- to

20   scan ballots?

21                     MR. MILLER:  Object to form.

22                     THE WITNESS:  That's not what I said.

Page 57

1    BY MR. BROWN:

2          Q    Right, but was she -- was she

3    involved with Scott Hall in her capacity as a

4    member of the vote review panel or just a stranger

5    from the Republican Party?

6                    MR. MILLER:  Object to form.

7                    THE WITNESS:  Not as the vote -- vote

8    review panel, no.

9    BY MR. BROWN:

10         Q    Okay.  And then tell me about the

11   conversation you had with Eric Chaney about,

12   "Someone coming to scan our ballots for the general

13   election."

14         A    I do not recall.

15         Q    You don't remember talking with Eric

16   Chaney about someone coming to scan ballots for the

17   general election?

18         A    I'll take the Fifth Amendment.

19         Q    And as of January -- well, just

20   fast-forward a little bit.  January 7th is when the

21   team from SullivanStrickler came to Coffee County,

22   right?

1          A      I don't remember the date.

2          Q      All right.  Let me just say for the

3    record, and you don't have to believe me, but just

4    for moving forward, the day before they got there,

5    did you know they were coming the next day?

6          A      I don't recall.

7          Q      So SullivanStrickler shows up at your

8    election's office with a bunch of computer

9    equipment, knock on the door, you never -- never

10   heard of them coming and you said, "Come on in," or

11   did you know in advance that they were going to be

12   down there?

13         A      I take the Fifth.

14         Q      When the SullivanStrickler team

15   arrived, what was your understanding of what they

16   were there to do?

17         A      I take the Fifth.

18         Q      Prior to their arrival, the days or

19   week before, when did you first learn that someone

20   might be coming to Coffee County to make --

21         A      I take the Fifth.

22         Q      -- to make copies of the election

1    software?

2         A     I take the Fifth Amendment.

3         Q     Did you, by the force of your own

4    Authority, allow SullivanStrickler's team to make

5    the forensic copies of the Coffee County election

6    software?

7               MR. MILLER:  Bruce, can we go off the

8    record for just a moment?

9               MR. BROWN:  Sure.

10              VIDEOGRAPHER:  Hold on for a second.

11   We are going off the record at 12:01.

12         (Recess from 12:01 p.m. to 12:12 p.m.)

13              VIDEOGRAPHER:  We are on the record

14   at 12:12.

15   BY MR. BROWN:

16        Q     Ms. Hampton, let me go at it this

17   way:  The team from SullivanStrickler was inside

18   the Coffee County Election's Office on January 7,

19   2021, correct?

20        A     I don't remember the date.

21        Q     But they were in there in early

22   January, correct?

Page 60

```
 1          A     Yes.

 2          Q     And there's a couple of possibilities

 3     as to under what authority they were there, and

 4     that's what I want to ask you about.  The first

 5     possibility is that they snuck in there and you did

 6     not see them and they copied the election software

 7     without you knowing about it.  That's Option 1, you

 8     didn't know about it, they just did it.

 9                Did that -- was that -- did that

10     happen?

11          A     No.

12          Q     So you knew about it?

13          A     I didn't say that.

14          Q     Okay.  You were there when they were

15     copying the election software, correct?

16          A     Yes.

17          Q     Did you know what they were copying?

18                MR. MILLER:  Object to form.

19                THE WITNESS:  Yes.

20     BY MR. BROWN:

21          Q     What were they copying?

22                MR. MILLER:  Object to form.
```

```
 1                    THE WITNESS:  I don't know how -- I'm
 2    trying to think of how to word it.  Hold on.
 3    BY MR. BROWN:
 4            Q      Were they copying everything?
 5            A      "Everything" is a broad word.
 6                    MR. MILLER:  Object to form.
 7    BY MR. BROWN:
 8            Q      Okay.  What didn't they copy?
 9                    MR. MILLER:  Object to form.
10                    THE WITNESS:  I don't know what they
11    didn't copy.
12    BY MR. BROWN:
13            Q      Okay.  Let's go through each thing
14    then.
15                    MR. MILLER:  Bruce, why don't you go
16    back to the question that you asked before we took
17    the break.
18    BY MR. BROWN:
19            Q      Did they copy the Dominion Election
20    Management Server software?
21                    MR. MILLER:  Bruce, can you repeat
22    that question?
```

Page 62

```
 1    BY MR. BROWN:

 2            Q      Did they copy the EMS server, the

 3    EMS?

 4            A      I take the Fifth.

 5            Q      Did they copy the ImageCast Central

 6    Tabulator?

 7            A      I take the Fifth.

 8            Q      Did they copy the laptop containing

 9    the Dominion software?

10            A      I take the Fifth.

11            Q      Did they copy the 20 KNOWiNK poll

12    pads?

13            A      I take the Fifth.

14            Q      Did they copy CompactFlash cards used

15    to program the -- the ImageCast precinct scanner

16    tabulators?

17            A      I take the Fifth.

18            Q      Did they copy USB thumb drives used

19    to program ImageCast X -- capital X --

20    ballot-marking devices?

21            A      I take the Fifth.

22            Q      Did they get passwords for all of
```

```
 1    those equipments -- equipment from you?

 2          A     I take the Fifth.

 3          Q     I'm going to refer to what I just

 4    described in my questions, and that is the copying

 5    of the election equipment in Coffee County as

 6    "SullivanStrickler's work."

 7                Do you follow me?

 8          A     Okay.

 9          Q     Did you give SullivanStrickler

10    permission to do their work on January 7, 2021?

11          A     I did not do anything without the

12    direction of the Board.

13          Q     And who specifically on the Board

14    gave you the Authority to give SullivanStrickler

15    the permission to do their work?

16          A     Eric.

17          Q     Who else?

18                Is that Eric Chaney?

19          A     Correct.

20          Q     Anybody else on the Board?

21                MR. MILLER:  Just tell him the truth.

22                THE WITNESS:  Ernestine.
```

Page 64

1    BY MR. BROWN:

2            Q     Who else?

3            A     Matthew.

4            Q     Who else?

5            A     I can't recall.

6            Q     So those three, you told -- well,

7    describe for me the circumstances in which you

8    received authority from these three board members

9    to give authority to SullivanStrickler to come into

10   the election county offices and Coffee -- and copy

11   the election system?

12           A     I don't understand your question.

13           Q     Did you have a meeting to talk about

14   it?  Did you text them?  Did you call them?  Did

15   you all meet there?

16                 How did they convey to the authority

17   to allow SullivanStrickler to do their work on

18   January 7?

19           A     I don't really recall.

20           Q     Okay.  If someone were to say to

21   doubt you and to say, "No, you did this all on your

22   own, you did not have the authority of the Board,"

1     what would you point to or is there any evidence

2     that you're aware of that these board members did

3     give you this authority or direction?

4                    MR. MILLER:  Object to form.

5                    THE WITNESS:  I don't remember the

6     actual way that Eric told me about it.

7     BY MR. BROWN:

8          Q     Did -- did Eric -- did Ernestine tell

9     you directly or was this secondhand through Eric?

10         A     Through Eric.

11         Q     What about Matthew, did Matthew tell

12    you directly or was it through Eric?

13         A     Through Eric.

14         Q     And so Eric Chaney told you in effect

15    that these board members want you to allow someone

16    to come in and copy the election software, correct?

17                   MR. MILLER:  Object to form.

18                   THE WITNESS:  Yeah.

19    BY MR. BROWN:

20         Q     And when in relation to January 7,

21    which is the day they got there, did Mr. Chaney

22    convey that to you?

1          A     I don't remember that.

2          Q     A couple days before?  A day before?

3    Months before?  After?

4          A     I don't remember that.

5          Q     Was it clear to you that Mr. Chaney

6    was giving you authorization to give

7    SullivanStrickler the authorization, not just to

8    scan ballots, but to actually make forensic copies

9    of the election software?

10                MR. MILLER:  Object to form.

11                THE WITNESS:  At the time I didn't

12   know that it was -- I can't even say their legal

13   name, but he never told me the actual name.

14   BY MR. BROWN:

15         Q     Right, but -- and I -- you understand

16   that the -- the -- my questions aren't directed

17   towards whether the authority was given to

18   SullivanStrickler or to somebody else, but just to

19   the people who were going to do this work, the

20   authority was to be given, not only to scan

21   ballots, but to, in fact, make copies of the entire

22   software, correct?

1          A     Authority was given, yes.

2          Q     Okay.  By the -- by Eric Chaney to

3     you and from you to the people who came to do the

4     work, correct?

5          A     Correct, because I did as Eric, as a

6     board member, directed.

7          Q     Okay.  And what was your

8     understanding of the purpose of doing this work?

9                MR. MILLER:  Object to form.

10               THE WITNESS:  The purpose, is that

11    what you asked?

12    BY MR. BROWN:

13         Q     Yes.

14         A     To see why the scanner would not

15    function properly, I guess is the right technical

16    term.

17         Q     And how was copying the entire

18    election management system going to achieve the

19    purpose of seeing why the scanner would not

20    function properly?

21               MR. MILLER:  Object to form.

22               THE WITNESS:  I do not know.

Page 68

1    BY MR. BROWN:

2         Q    Why didn't you just put in a service

3    order for the scanner?

4              MR. MILLER:  Object to form.

5              THE WITNESS:  Stating multiple times

6    that the scanner was not working properly.

7    BY MR. BROWN:

8         Q    Okay.  So because the State was not

9    responding to your request to get your equipment

10   fixed, Coffee County elected to allow a company to

11   come in and copy the software, correct?

12             MS. LAROSS:  Objection as to form.

13             MR. MILLER:  Concur.

14             THE WITNESS:  I don't know how to

15   answer that one.

16   BY MR. BROWN:

17        Q    "Yes" is good.  "Yes" is good.

18             MR. MILLER:  Now, you're not going

19   to -- it's a yes-or-no question.

20             THE WITNESS:  Right.

21             Repeat the question.

22             MR. BROWN:  Ms. Newland, if you could

1   repeat the question, please.

2          (The reporter read as requested.)

3            THE WITNESS:  Coffee County wanted

4   help.

5   BY MR. BROWN:

6        Q   Right.  I need you to answer the

7   question.  I understand they wanted help, and we

8   can get to that, but I need you to answer the

9   question.

10          And if this is that you -- you were

11   not getting the help that you needed from the

12   State, so you needed in a sense to -- to do it on

13   your own, right?

14          MS. LAROSS:  Objection as to form.

15          MR. MILLER:  If it's the correct

16   answer, then that's the correct answer.

17          THE WITNESS:  Yes.

18   BY MR. BROWN:

19        Q   And tell me what you did to try to

20   get help from the State -- or the Secretary of

21   State before deciding that you needed to try to get

22   help on your own.

Page 70

1          A       There was e-mails sent to the

2    Secretary of State liaison, there was phone calls

3    made, there were letters sent from the Board.

4          Q       And the subject of the communications

5    with the liaison and the phone calls and the

6    letters, was what specific mail functioning of the

7    system?

8          A       I'm sorry, you broke up on that.

9          Q       Yeah.  What specifically were you

10   referring -- what was the precise issue that you

11   were trying to have the Secretary address in your

12   communications with the liaison, with the phone

13   calls and with the letters?

14         A       Why the scanner was not scanning the

15   ballots.  It was kicking them back or saying "not

16   scanned."  It would say a misread or so have you,

17   and we would look at the ballot, there were no

18   marks, stray marks that is, on the ballot, no

19   reason for it not to be read.

20         Q       And did you have an understanding

21   with SullivanStrickler or with anybody else, that

22   once -- that it was -- that they were going to fix

1    it, SullivanStrickler was going to fix it?

2              MR. MILLER:  Object to form.

3              THE WITNESS:  No, sir.

4    BY MR. BROWN:

5         Q    Right.

6              I mean, you -- you let these people

7    into your election's office, they come in and they

8    copy all your election software.  And the purpose

9    of that is to get the scanner fixed, did they fix

10   it?

11             MR. MILLER:  Object to form.

12             THE WITNESS:  Not that I'm aware of.

13   BY MR. BROWN:

14        Q    Did you call them up after they came

15   and made the copies and say, "Hey, look, how is the

16   fix coming on our scanner"?

17             Did you --

18        A    No, sir.

19        Q    Did you ever follow up to see that

20   the purpose of allowing them in there had been

21   achieved?

22        A    No, sir.

Page 72

1          Q     Why not?

2                MR. MILLER:  Object to form.

3                THE WITNESS:  Because I answer to

4     Eric.

5     BY MR. BROWN:

6          Q     So you -- you didn't follow up on

7     whether the purpose of allowing them to copy had

8     been achieved because you report to Eric.  Is that

9     right?

10         A     I never questioned it.

11         Q     I understand that, but the reason for

12    it was to address the problems with the scanner.

13    The State wasn't doing it, so these other people

14    came in to copy it, but then no effort was made, I

15    take it, to follow up with that company to see if

16    any progress had been made in seeing whether they

17    could fix the scanner, right?

18         A     I don't know your question.  I'm

19    sorry.

20         Q     Well, you sent something out to get

21    fixed, you follow up with them and say, "Hey, is it

22    fixed," right?

Page 73

```
 1                    Here you --

 2        A      I never sent anything out.

 3        Q      Pardon me?

 4        A      I never sent anything out.

 5        Q      Okay.  They came in to get it, right?

 6        A      No.

 7        Q      The reason why --

 8        A      They came to the office.

 9        Q      I understand that you're saying that

10    they came in there and they made a copy.  And the

11    purpose of them doing that was to address the

12    scanner issues that you identified, correct?

13                    MR. MILLER:  Object to form.

14                    THE WITNESS:  Correct.

15    BY MR. BROWN:

16        Q      Right.

17                    But after they left, you did not

18    follow up with anyone ever to determine whether the

19    scanner issue had been addressed, right?

20        A      I don't recall.

21        Q      Do you recall if Mr. Chaney ever did

22    that?
```

```
 1          A      I do not recall.

 2          Q      Did you ever get any feedback from

 3   anyone based upon their analysis of the copies of

 4   Coffee County's software that were made on

 5   January 7?

 6          A      No, sir.

 7          Q      Did you ask for any?

 8          A      I don't recall.

 9          Q      Now you testified that a reason for

10   allowing SullivanStrickler to come in there and

11   make all the copies was to address the scanner

12   issue.  Was there any other reason?

13                 MR. MILLER:  Object to form.

14                 THE WITNESS:  I don't recall.

15   BY MR. BROWN:

16          Q      I'm not suggesting that you needed

17   it, but did you get any authority from any lawyer

18   to allow SullivanStrickler to come in there and

19   copy the election software?

20          A      I got the authority from Eric,

21   that's --

22          Q      Do you know if he had run it past
```

Page 75

1    Tony Rowell?

2                    MR. MILLER:  Object to form.

3                    THE WITNESS:  I do not know.

4    BY MR. BROWN:

5          Q    Do you know if he had run it past any

6    lawyer?

7                    MR. MILLER:  Object to form.

8                    THE WITNESS:  I do not know.

9    BY MR. BROWN:

10         Q    Did you -- do you or, to your

11   knowledge, did anyone associated with Coffee County

12   ask anyone associated with Dominion whether it be

13   appropriate to allow a third party to come in and

14   copy the election software?

15                   MR. MILLER:  Object to form.

16                   THE WITNESS:  I do not know.

17   BY MR. BROWN:

18         Q    Did you tell Dominion at any time

19   that third parties had come in and made forensic

20   copies of Coffee County's election software?

21         A    I do not recall.

22         Q    Did you ever discuss at any time with

1    anybody from Dominion the fact that a third party

2    had made forensic copies of Coffee County's

3    election system software?

4            A     I don't recall.

5            Q     Do you have any reason to believe

6    that Dominion, prior to your termination as the

7    election supervisor, knew that third parties had

8    come in and made forensic copies of the election

9    software?

10                  MR. MILLER:  Object to form.

11                  THE WITNESS:  Can you repeat that,

12   please?

13   BY MR. BROWN:

14           Q     Do you have any reason to believe

15   that Dominion knew that third parties had come in

16   to election's office and made the copies of the

17   election software?

18           A     I can't answer to what Dominion knew

19   and didn't know.

20           Q     No, you can't.  I said, do you have

21   any reason to believe, in other words, you told

22   them, someone else told them, you saw it on the

1   internet, it was Twittered?

2            There's all sorts of ways that you

3   might have known that they might have had some

4   knowledge of that.  That's why I'm asking it that

5   way.  It may have been are poorly formed.

6            For all you know -- let me ask it

7   this way:  For all you know, Dominion had no idea

8   that a third party had come in to make copies of

9   the election equipment in Coffee County, correct?

10            MR. MILLER:  Is that prior to or

11   after it was done?

12            MR. BROWN:  Prior to or after.

13            THE WITNESS:  Not that I recall.

14   BY MR. BROWN:

15       Q    Are you aware of any claim or

16   complaint or litigation that Dominion threatened

17   relating to the copying of Coffee County's election

18   software?

19       A    I'm not aware.

20       Q    You testified that at some point

21   before January 7, Mr. Chaney conveyed to you the

22   direction that a third party should be allowed to

```
 1   come in to copy the software, correct?

 2        A    I'm sorry.  Say that again.

 3        Q    At some point, a couple days, maybe a

 4   week, before January 7, Mr. Chaney conveyed to you

 5   that you should allow a third party to come in and

 6   copy the election software, correct?

 7        A    Correct.

 8        Q    What preparations did you need to

 9   make or did you make before January 7th, for

10   SullivanStrickler's visit to Coffee County?

11        A    Ask that again, please.

12        Q    They came on January 7th.  What did

13   you need to do beforehand to prepare for their

14   visit?

15             I mean, it may be nothing, I don't

16   know.

17        A    I did nothing.

18        Q    And Cathy Latham told you that they

19   were coming in advance?

20        A    I don't recall that.

21        Q    Who -- who told you?

22        A    Eric.
```

Page 79

1          Q     Okay.  So Eric told you "They're

2     coming tomorrow," something to that effect?

3          A     I don't recall what he told me.  No,

4     sir, I don't remember that.

5          Q     Prior to January 7th, did you talk to

6     anyone other than Eric Chaney and Cathy Latham

7     about the people coming to make the copies on

8     January 7th?

9          A     Are you asking did I talk to someone?

10         Q     Right.  Anybody else?

11         A     No, sir, not that I recall.

12         Q     Do you know who was paying

13    SullivanStrickler to do their work?

14         A     No, sir.

15         Q     You never learned that?

16               MR. MILLER:  Object to form.

17               THE WITNESS:  I do not know.

18    BY MR. BROWN:

19         Q     Did you ever ask?

20         A     No, sir.

21         Q     Did you know that they had been hired

22    by Sidney Powell?

Page 80

```
 1          A     No, sir.

 2          Q     When is the first you learned that

 3     they had been hired by Sidney Powell, if ever?

 4                MR. MILLER:  Object to form.

 5                THE WITNESS:  In a deposition.

 6     BY MR. BROWN:

 7          Q     What deposition?

 8          A     I don't remember that one.

 9          Q     But recently, right?

10          A     Correct.

11          Q     Did you know that Sidney Powell at

12     the time was Cathy Latham's lawyer?

13                MR. MILLER:  Object to form.

14                THE WITNESS:  No, sir.

15     BY MR. BROWN:

16          Q     Do you know Jim Penrose?

17          A     No, sir.

18          Q     Have you communicated -- did you

19     communicate with Jim Penrose?

20          A     Not that I'm aware of.

21          Q     You don't recall that -- that name

22     doesn't ring a bell at all?
```

Page 81

1          A     It rings a bell, but...

2          Q     But you don't remember anything other

3    than maybe recognizing the name?

4          A     Correct.

5          Q     Do you know -- if the -- if the --

6    the reason why SullivanStrickler made the copies

7    from your standpoint was because the scanner wasn't

8    working right, why was Sidney Powell paying for it?

9          A     I didn't --

10               MR. MILLER:  Object to form.

11               THE WITNESS:  I didn't know she was.

12   BY MR. BROWN:

13         Q     Was it your understanding based upon

14   your directions from Mr. Chaney that there should

15   really be no restrictions on what SullivanStrickler

16   could copy in the office?

17         A     I'm sorry, you're breaking up.  Can

18   you repeat that?

19         Q     I'm sorry.

20               Based upon your discussions with

21   Mr. Chaney before January 7th, was it your

22   understanding that SullivanStrickler, or whoever

Page 82

1    was going to come, should be allowed without

2    restriction to copy what they needed to copy in the

3    election's office?

4                  MR. MILLER:  I'm going to object to

5    form.

6                  But you can answer the question if

7    you know.

8                  THE WITNESS:  I don't recall.

9    BY MR. BROWN:

10        Q    Okay.  On January 7th, the day that

11   they were there, did SullivanStrickler finish their

12   work copying all of the election equipment?

13        A    I don't remember.

14        Q    Do you recall when they left, did

15   they say, we need to get -- we still need to get

16   this done or that done, or do you just don't recall

17   one way or the other?

18        A    I don't recall.

19        Q    Okay.  Let's go back to Exhibit 3.

20   Is that in front of you, ma'am?

21        A    Yes, it is.

22        Q    If you would turn -- you may be there

Page 83

1    already, but if you would turn to page 22.

2            A    Okay.

3            Q    At the bottom of the page you text to

4    Mr. Chaney, "Hey, are you coming" -- and this is at

5    10:18 a.m., "Hey, are you coming to the office?  I

6    need a board member to be here when we transfer

7    ballots."

8                 Do you see that?

9            A    I do.

10           Q    And -- and Mr. Chaney and you had

11   worked out a -- some sort of code where when you

12   said something like "transferring ballots," what

13   you meant was make a complete forensic copy of

14   every piece of election software in the office,

15   right?

16                MR. MILLER:  Object to form.

17                THE WITNESS:  Incorrect.

18   BY MR. BROWN:

19           Q    Okay.  And did you need him to be

20   there to transfer ballots?

21           A    Yes.

22           Q    Okay.  Why?

```
 1          A      Because it was the runoff election
 2    and we had -- I'm trying to think of the word.  I
 3    went totally blank.  When they go to the wrong
 4    precinct and they vote on a paper ballot that they
 5    need to transfer to the correct precinct so the
 6    vote will go to the right precinct, provisional.
 7          Q      Oh, provisional votes.
 8                 So that's why you needed Mr. Chaney
 9    there?
10          A      Yes, sir.
11          Q      So you need Mr. Chaney there every
12    time you had a provisional ballot?
13          A      We had to have a board member there,
14    yes, sir.
15          Q      Okay.  And that -- the same day was
16    when SullivanStrickler was in there copying your
17    equipment.  Is that right?
18          A      I don't recall that.
19          Q      Right.
20                 You'll see at the -- on the next
21    page, which is page 23 of 24 of Exhibit 3, at the
22    top you'll see a phone number.
```

Page 85

1          A     I do.

2          Q     And do you recall receiving that

3    phone number from Mr. Chaney?

4          A     It's on the screen, so I guess it was

5    there.

6          Q     Do you recall calling that number?

7          A     No, sir.

8          Q     For the record, that number is the

9    number for Robert Sinners.  Do you know who he is?

10         A     I do now.

11         Q     Did you ever call Mr. Sinners?

12         A     No, sir, not that I'm aware of.

13         Q     Do you know why you received that

14   phone?

15         A     I actually thought that was the

16   number to his -- to Eric's Signal account.

17         Q     So you did try?

18         A     No, sir, I did not.

19         Q     Oh.

20         A     I said I thought.

21         Q     And then immediately after texting

22   Robert Sinners' phone number to you, he says,

1      "Let's switch to Signal."  Do you see that?

2              A      Correct.

3              Q      Okay.

4              A      I didn't learn that was Robert

5      Sinners' number until the deposition.

6              Q      I understand.

7                     And then the next day you say, "Did

8      you check signal?"  Do you see that?

9              A      I do.

10             Q      And what -- what was the substance of

11     your communications with Mr. Chaney via Signal?

12             A      I do not recall.

13             Q      Pardon me?

14             A      I do not recall.

15             Q      And have you attempted to recover

16     your Signal text messages?

17             A      I did.

18             Q      And were you successful?

19             A      No, sir.

20             Q      Okay.  Some of this is duplicative,

21     but if I could have you -- if we could mark Tab 9

22     as Exhibit 4.

1                (Hampton Deposition Exhibit Number 4

2                marked for identification.)

3    BY MR. BROWN:

4            Q     Is that in front of you?

5            A     No, sir.

6            Q     If you would just let me know when

7    that comes up, I'd appreciate it.

8            A     It's there.

9            Q     If you would turn to the third page

10   of Exhibit 4, which is Tab 9.  Do you see that?

11           A     I do.

12           Q     And these are text messages from

13   Cathy Latham to you.  Is that correct?

14           A     That's between Cathy and I, yes.

15           Q     Okay.  And so -- just so I get this

16   straight, at the top "okay" is -- is you, right?

17           A     The blue is me.

18           Q     Okay.  I can't tell the colors.

19                 But if you would -- I have blackened

20   my copy of it.  I'm not looking at the screen.

21                 The "okay" is I take it blue, and

22   that's yours, correct?

Page 88

```
 1        A      Correct.

 2               MR. MILLER:  Bruce, she's on the

 3    right side of the -- hers are on the right side of

 4    the screen, whoever the other person is is on the

 5    left-hand side.

 6               MR. BROWN:  Thank you.  I -- I am

 7    colorblind, but I do know my left hand from my

 8    right, so that was very helpful.

 9               MR. MILLER:  Sure.

10    BY MR. BROWN:

11        Q      Okay.  Now, Ms. Latham says, "How is

12    it today?  Finished?"  Do you see that?

13        A      I do.

14        Q      And she's referring to the copying of

15    the election software, correct?

16               MR. MILLER:  Object to form.

17               THE WITNESS:  I have no idea.

18    BY MR. BROWN:

19        Q      I may have that wrong.

20               Do you see where she says, "Scott has

21    landed and the rest of the team is almost to

22    Douglas"?  Do you see that?
```

Page 89

1          A     I do.

2          Q     And then you say, "Okay.  Democratic

3    man is still here."  Do you see that?

4          A     I do.

5          Q     Is there like more than one

6    democratic man in Coffee County?

7                I mean, it says, "The democratic

8    man."  Who was the Democratic man?

9          A     He was the poll watcher, I think is

10   what he was.

11         Q     Okay.  Why would he have been there

12   on January 6th or 7th?

13         A     He also was a -- what was he called?

14         Q     Is that the -- the vote review panel?

15         A     I think he was part of the vote

16   review panel.

17         Q     Is it John Terry?  Is that his name?

18         A     I do not know.

19         Q     Okay.

20         A     I remember he had one of those little

21   beanie hats on.

22         Q     Okay.  Why was it -- why -- why was

1    it important for you or why did you tell Cathy

2    Latham that the democratic man is still here?

3          A     I don't recall.

4          Q     Well, you didn't want the democratic

5    man being there while SullivanStrickler was there

6    copying equipment, right?

7          A     Again, correct.

8                MR. MILLER:  Object to form.

9    BY MR. BROWN:

10         Q     Okay.  So it had nothing to do with

11   him coming in and copying the equipment?

12         A     No, sir.

13         Q     Okay.  Okay.  Then at 3:48 on the

14   7th, you tell Latham -- Ms. Latham, "Going great so

15   far."  Do you see that?

16         A     I do.

17         Q     And was that relating to getting

18   people provisional ballots or was that relating to

19   the work that SullivanStrickler was doing?

20         A     I don't remember.

21         Q     If you drop down, you say, "I'm

22   inviting you to install Signal."  Do you see that?

1          A      I do.

2          Q      And did the three of you, you and

3    Eric Chaney and Ms. Latham, then communicate via

4    Signal together?

5          A      Not that I recall.

6          Q      Do you recall in the day -- a couple

7    of days before the January 7 copying that

8    Mr. Chaney getting into a disagreement with

9    Dominion?

10         A      I don't know what you call a

11   disagreement, what your meaning about a

12   disagreement.

13         Q      A disagreement.

14                Did they have words?

15         A      Did he speak with Dominion?  Yes.

16         Q      Was there an issue?

17                Did -- did Mr. Chaney express any

18   sort of disagreement with Dominion or who -- how

19   they were working or handling the equipment itself?

20         A      Yes.

21         Q      Okay.  And what was the nature of

22   the -- what was the issue?

Page 92

1          A     The scanner.

2          Q     And what did Mr. Chaney say and what

3    did the Dominion person say?

4                MR. MILLER:  Object to form.

5                THE WITNESS:  He was speaking with

6    Gary from Dominion.  Gary was in the office.  And

7    two or Dominion techs were there.  And the scanner

8    was kicking back ballots and he asked them -- asked

9    Gary who did he report to.  And he told him Scott

10   Hall, so he asked him could he get him on the

11   telephone.

12               And he called -- Mr. Scott -- or

13   Gary called Mr. Scott, and Eric told him he had

14   30 minutes to get the scanner fixed or he was

15   going to call every news station within a

16   hundred-mile radius and invite them into the

17   office to show them what piece of crap the

18   Dominion machine was.  And Mr. Gary asked -- I

19   mean Mr. Scott asked him was that a threat or a

20   promise.

21   BY MR. BROWN:

22               Q     And Mr. Chaney said both?

1         A      He said, "That's a promise."   And

2    Mr. Scott hung up the phone.

3         Q      And then what happened?

4         A      Gary and the two techs -- or Gary and

5    one of the techs went outside.  One of the techs

6    was escorted by a police officer to a neighboring

7    county to borrow another scanner.

8         Q      And then what happened?

9         A      Those two techs stayed outside for a

10   good 20, 30 minutes.  Came back inside.  Gary told

11   me that -- to scan the -- that if I would just

12   trust him one time, the machine would work, just

13   trust him.  And he said, "Give it one more shot,"

14   and so we did.

15        Q      And did it work then?

16        A      Perfectly.

17        Q      And was that the same scanner that

18   they fixed or did they bring one in from another

19   county?

20        A      The same scanner.

21        Q      Do you know or were you told what

22   Dominion did to make it work?

Page 94

1          A      No, sir.  They never touched the

2    scanner.

3          Q      Do you know how they fixed it without

4    touching it?

5          A      No, sir, I do not.

6          Q      Do you have any speculation as to how

7    they did it?

8                 MR. MILLER:  Object to form.

9                 But go ahead and answer.

10                THE WITNESS:  I think it was hacked

11   into.

12   BY MR. BROWN:

13         Q      Somehow remotely it was -- it was

14   fixed?

15         A      I think so.

16         Q      Okay.  And is -- is that because --

17   well, I can -- you arrived at that conclusion

18   because there's no other alternative basically?

19         A      Well, they never touched it, but it

20   all of a sudden scanned every ballot perfectly,

21   even a ballot that had food substance all over it.

22         Q      Did Gary -- did you ask Gary how they

Page 95

1   fixed it?

2          A      No, but Gary stood there and kept

3   saying, "I told you so.  I told you so.  I told you

4   so," very cocky.

5          Q      Well, he was right to be cocky,

6   right?

7          A      I guess so.  But he was standing

8   there with his phone in his hand propped up against

9   the door panel and the scanner was probably three

10  feet from him.

11         Q      So do you think he did -- he did

12  saying by his phone or that he was calling someone

13  who did it some other way?

14         A      I do not know.

15         Q      Did that -- so that -- did that fix

16  the scanner for good or did this other problem

17  still remain?

18         A      I don't know.  That was the last

19  election I used that scanner.

20         Q      Right, but two days later, the people

21  came in for the very purpose of fixing that

22  scanner, right?

1                    MR. MILLER:  Object to form.

2      BY MR. BROWN:

3           Q     So I'm confused, because what you're

4      telling me is that Dominion magically fixed the

5      scanner, and then a couple of days later, Eric --

6      at Eric's direction the people came in to copy the

7      entire suite of election software for the purpose

8      of doing something that was no longer necessary,

9      and that is to fix the scanner?

10                    MR. MILLER:  Object to form.

11                    THE WITNESS:  I don't know that

12     that's correct.

13     BY MR. BROWN:

14          Q     What's wrong with that?

15          A     Because I didn't run another election

16     on it.

17          Q     I understand that, but on the --

18     January 5th, was the disagreement between Eric

19     Chaney and Dominion, in which he demanded that

20     Dominion fix the scanner, Dominion, we're not sure

21     how, fixed the scanner, right?

22          A     It scanned every ballot.

1          Q      Right.

2                 And then two days later, at

3     Mr. Chaney's direction, you authorized third

4     parties to come in and copy the entire election

5     software for the purpose of fixing what Dominion

6     had just fixed two days before, correct?

7                 MR. MILLER:  Bruce, I'm sorry,

8     she's --

9             (Counsel conversing with witness off the

10            record.)

11                MR. BROWN:  Not while my question is

12    pending, Jonathan.

13                MR. MILLER:  I'm sorry?

14                MR. BROWN:  Not -- don't whisper to

15    her while my question is pending.

16                MR. MILLER:  I said, "You're going to

17    have to plead the Fifth to that."  I apologize for

18    whispering that.

19                THE WITNESS:  I plead the Fifth.

20    BY MR. BROWN:

21          Q      Okay.  So you -- you told me about

22    the scanner being fixed on the 5th, you told me

1    about the purpose of the copying on the 7th, but

2    you're taking the Fifth as to the relationship

3    between those two events that you've already

4    testified to, correct?

5                Okay.  I'm going to need a copy of

6    what you're writing to your lawyer.  Can you hand

7    that to Ms. Marks?

8                And I'm not trying to pry,

9    Ms. Hampton, but --

10               MR. MILLER:  I understand.

11   BY MR. BROWN:

12        Q    -- but while my question is pending,

13   between my question and your answer, please do not

14   talk to your lawyer.

15               MS. MARKS:  Are there other pages?

16               MR. MILLER:  No, that's it.

17               MR. BROWN:  Thank you.

18               MR. MILLER:  May I whisper into

19   Ms. Marks' ear?

20               Bruce, did you hear that?

21               MR. BROWN:  I did, and I'm -- I'm not

22   in a position -- I don't think I have the right to

Page 99

```
 1    object or not to that.

 2                    MR. MILLER:  Okay.

 3                    MS. LAROSS:  Can I see the note as

 4    well, Jonathan?

 5                    MR. MILLER:  Sure.

 6                    I don't have -- I'm -- I'm done,

 7    Bruce.  Whenever you want to get back.

 8                    MR. BROWN:  I'll withdraw -- I'll

 9    withdraw the question.  But, Jonathan, you may want

10    to reconsider taking the Fifth as to the last one.

11                    MR. MILLER:  Well, if Ms. Marks will

12    send you an e-mail or a text message real quick.

13    BY MR. BROWN:

14         Q    Now, Ms. Hampton, you authorized

15    SullivanStrickler to have access to the election

16    equipment in Coffee County's Election office,

17    correct?

18         A    I'm sorry?

19         Q    You authorized SullivanStrickler on

20    January 7th to have access to Coffee County's

21    election software in your Coffee County's election

22    office, right?
```

Page 100

```
 1          A     Under the direction of Eric, yes.

 2          Q     And you -- you could see them

 3    actually copying the software, correct?

 4          A     I don't know that I -- I didn't know

 5    that it was software that they were copying.

 6          Q     What did you think they were copying?

 7          A     I'm not a computer tech, so I really

 8    did not know.

 9          Q     Okay.  But you saw them working at

10    the server, correct?

11          A     Correct.

12          Q     And the ICC scanner computer,

13    correct?

14          A     Correct.

15          Q     And you saw them with all the

16    CompactFlash cards and USB drives, you saw them

17    copying all those, right?

18          A     Correct.

19          Q     Okay.  And you saw them copying

20    the -- the poll pads also, correct?

21          A     I can't recall the poll pads but ...

22          Q     Maybe yes, maybe no, right?
```

Page 101

1          A     I can't recall for sure the poll

2     pads.

3          Q     Okay.  At any time did you tell Tony

4     Rowell that SullivanStrickler or anyone had been

5     given access to make copies of the election

6     equipment in Coffee County?

7          A     I did not know.

8          Q     You don't know of anybody informing

9     him?

10         A     I do not know.

11         Q     Okay.

12              MR. BROWN:  I'm going to -- I'm going

13    to have -- for everybody's knowledge, I'm going to

14    go through one other small topic, short topic, and

15    then we'll take a break for lunch, if that's okay

16    with everybody.

17    BY MR. BROWN:

18         Q     What I would like to do is ask you

19    some questions on sort of the events of

20    January 7th, in and out.

21              On the day that SullivanStrickler was

22    there, you opened the door for them, correct?

Page 102

```
 1          A     I think I did one day, yeah.

 2          Q     And who else was there when the team

 3    of -- the four people from SullivanStrickler came?

 4    Who else was there in your office?

 5          A     Eric Chaney, Ed Voyles, Jil

 6    Ridlehoover.  I think Cathy Latham was.  I can't

 7    remember anyone else.

 8          Q     Do you recall Scott Hall being there?

 9          A     Yes.

10          Q     Do you recall a gentleman with

11    Mr. Hall named Alex Cruce being there?

12          A     I do not.

13          Q     Do you remember somebody with him,

14    somebody with Mr. Hall?

15          A     I -- yes.

16          Q     Okay.  And can you describe him or do

17    you recall?

18          A     I do not recall.

19          Q     What was Mr. Voyles doing there?

20                MR. MILLER:  Object to form.

21                THE WITNESS:  I do not know.  I don't

22    recall.
```

Page 103

1    BY MR. BROWN:

2         Q     Did you -- but he was there while

3    they were -- they were copying the election

4    software, right?

5         A     I know he was in the office.

6         Q     Do you recall how long he was there?

7         A     No, sir, I do not.

8         Q     Did he -- did you talk to him about

9    what the team from SullivanStrickler were doing?

10        A     I don't remember if I did or did not.

11        Q     At any time did you talk with

12   Mr. Voyles about the third parties coming in there

13   and making a copy of the election software?

14        A     I don't know if I did or did not, I

15   can't remember.

16        Q     Was Miles Latham there at any time?

17   Do you recall?

18        A     I don't recall to be sure, no, sir.

19        Q     Let me back up a second to -- to your

20   testimony about the discussion between Mr. Chaney

21   and -- and Dominion, Greg from Dominion.  He -- he

22   asked to speak with the supervisor.  And could you

Page 104

1    tell me again the name of the supervisor?

2            A       Gary's supervisor?

3            Q       Yes.

4            A       Scott Hall -- no, Scott Tucker.

5            Q       Right.  That's why I wanted to ask

6    you again.

7            A       Okay.  Thank you.

8            Q       Now you told me that and I'm thinking

9    wait a minute.  That's too much of a consequence.

10                   So Scott Tucker is --

11           A       Sorry.

12           Q       So when you were mentioning "Scott,"

13   you were talking about Scott Tucker, correct?

14           A       Correct.  Correct.

15           Q       Okay.

16           A       Thank you for that.

17           Q       That's all right.

18                   So getting back to what we were

19   talking about before, Miles Latham might have been

20   there, might not have, you can't recall.  Is that

21   right?

22           A       I can't recall.

1          Q     Now, to -- Ms. Latham knew before

2     the -- the SullivanStrickler people came that they

3     were coming down, right?

4                You talked to her about it?

5                MR. MILLER:  Object to form.

6                THE WITNESS:  I remember her -- I

7     don't remember the extent of the conversation.

8     BY MR. BROWN:

9          Q     Okay.  But -- but she -- did she just

10    show up at the election office coincidentally or

11    did she know this was going on, as far as you know,

12    as far as you could tell?

13                MR. MILLER:  Object to form.

14                THE WITNESS:  I mean, per the text,

15    she knew that Scott was going to be there.

16    BY MR. BROWN:

17         Q     Right.

18                Do you know how she was involved in

19    the decision to allow -- or do you know whether and

20    how she was involved in the decision to allow the

21    third parties to come in and copy the software?

22                MR. MILLER:  Object to form.

Page 106

1                    THE WITNESS:  I do not.

2                    MR. BROWN:  Okay.  Why don't we take

3    a 30-minute break and get a break -- get a bite.

4    Is that all right with you, Jonathan?

5                    MR. MILLER:  Yeah, that's fine with

6    me.

7                    MR. BROWN:  Okay.  So we'll be back

8    on at about ten till 2:00.  Okay?

9                    MR. MILLER:  Okay.  My diabetes will

10   be happy.

11                   MR. BROWN:  Thank you, Ms. Hampton.

12   And we'll see you in a little bit.

13                   THE WITNESS:  Okay.

14                   VIDEOGRAPHER:  Okay.  We are going

15   off the record at 1:14.

16             (Recess from 1:14 p.m. to 2:04 p.m.)

17                   VIDEOGRAPHER:  We are back on the

18   record at 12:04 p.m.

19   BY MR. BROWN:

20        Q    Ms. Hampton, we're back --

21                   VIDEOGRAPHER:  I'm sorry.  We are on

22   the record at 2:04 p.m.

Page 107

```
 1                    THE WITNESS:  I was about to say we
 2      went backwards in time.
 3                    VIDEOGRAPHER:  You can proceed, sir.
 4                    MR. BROWN:  Thank you.
 5      BY MR. BROWN:
 6           Q     Ms. Hampton, have you had your
 7      deposition taken before?
 8           A     Yes, sir.
 9           Q     How many times?
10           A     Probably less than five.
11           Q     Have you had your deposition taken in
12      connection with elections or your work as an
13      election director?
14           A     I don't think so.
15           Q     So the -- you mentioned in response
16      to one of my questions that you've learned
17      something in a deposition.  What were you referring
18      to?
19           A     The time that we met with Ms. Marks,
20      but I don't know that that was a -- I mean, it
21      wasn't recorded or anything so ...
22           Q     Okay.  But you haven't -- were you --
```

Page 108

1    did you testify in front of the grand jury?

2          A     Yes.

3          Q     Okay.  When was that?

4          A     Last month.

5          Q     Okay.  I need to ask this just for

6    formality, but -- I should have asked it at the

7    beginning, but are you under any medication that

8    would prevent you from testifying accurately today?

9          A     No, sir.

10          Q     Okay.  I asked you if you knew that

11    Sidney Powell was paying for SullivanStrickler's

12    work, and I believe your response was you did not

13    know that one way or the other, correct?

14          A     That's correct.

15          Q     Did you -- did you have any idea of

16    who was paying for the work?

17          A     No, sir.

18          Q     Okay.  We were talking about the

19    malfunctioning scanner at Coffee County that was at

20    issue.  Was that the ICC scanner?

21          A     I don't remember the technical terms

22    of them.  I'm sorry.

Page 109

```
 1          Q      Is it the -- is it the central

 2   scanner?

 3          A      It's the scanner that's hooked to the

 4   main computer.

 5          Q      Okay.

 6          A      Not the ones that's at the actual

 7   precincts.

 8          Q      Right.

 9                 We were discussing Mr. Chaney's

10   discussion with the Dominion representatives.

11   Mr. Tucker was on the phone, right?

12          A      Correct.

13          Q      And were -- were Dominion

14   representatives present with you all or was it all

15   on the phone?

16          A      The techs were on the phone -- I mean

17   were present.

18          Q      Okay.  Was that Gary and James?

19          A      Correct.

20          Q      And --

21          A      And there was another one there, but

22   I can't -- I want to say his name was Sam or
```

1    Samuel.  I can't remember his last name.

2         Q     Okay.  And James didn't work for

3    Dominion very much longer after that, right?

4         A     I have no idea.

5         Q     Okay.  Did you see him again after

6    that?

7         A     No, I did not.

8         Q     Okay.  You don't know if he was let

9    go or transferred, one way or the other.  Is that

10   right?

11        A     I do not because it was not very long

12   that I was forced to resign, so I have no idea.

13        Q     Okay.  I had asked you if you had

14   called what we now know is Robert Sinners'

15   telephone number and you said you did not call it.

16   I should have asked:  Did you text that number?

17        A     Not that I'm aware of, no, sir, not

18   to my memory.

19        Q     Okay.  You testified that three of

20   the board -- that Mr. Chaney had indicated that

21   Matt and Ernestine and Mr. Chaney concurred in the

22   decision to allow the third parties to have access

Page 111

1    to the election equipment.

2                    Do you recall that testimony?

3           A      Yes, sir.

4           Q      Did Mr. Stone also concur with that

5    directive?

6           A      I do not know.

7           Q      Did he disagree with it or take issue

8    with it in any way?

9           A      I do not recall anything with

10   Mr. Stone.

11          Q      One way or the other?

12          A      No, sir.

13          Q      Okay.  Now, you testified that

14   Ms. Ridlehoover -- am I saying that correctly,

15   Ridlehoover?

16          A      Ridlehoover.

17          Q      -- Ridlehoover was in the election

18   office at least most of the day on the 7th, when

19   SullivanStrickler had been given access to the

20   equipment.

21                    Do you recall that?

22          A      Correct.

1        Q      Okay.  And was her desk facing your

2   office such that she could see what they were

3   doing?

4        A      Her desk was facing the office, but

5   she had two monitors in front of her.

6        Q      Okay.  And did you direct her to keep

7   quiet about what she saw that day?

8        A      I -- I told her to do her job.

9        Q      Did you tell her to not talk to

10  anyone about what she was witnessing?

11       A      No, sir.

12       Q      I may have asked this, but I want to

13  make sure -- it was subject to an objection by

14  Mr. Miller, and I want to make sure I got it

15  correctly, but before the third parties, who became

16  SullivanStrickler, were granted access to the

17  Coffee County Election System, did anybody -- did

18  you tell anybody at Dominion, whether it was James

19  or Gary or anybody else, that the third parties

20  were going to have access to your equipment and to

21  your software?

22              A      To the best of my memory, no.

Page 113

1          Q     To the best of your memory, did you

2     tell anyone at Dominion after SullivanStrickler had

3     been given access to your equipment and software

4     that that had happened?

5          A     To the best of my memory, no.

6          Q     Okay.  And you -- you took a while to

7     answer, and I -- I do appreciate that, but is there

8     something that you're remembering that you might

9     have told them or they might have found out that

10    you're thinking about?

11         A     No, sir, just running through my

12    brain.

13         Q     Okay.  I want to shift a couple of

14    days to January 17th, it's about ten days after

15    SullivanStrickler was there.  Do you recall being

16    visited by Mr. Lenberg and Mr. Logan?

17         A     Yes, sir.

18         Q     And what were they doing at the

19    Coffee County Election's Office?

20              MR. MILLER:  Object to form.

21              THE WITNESS:  I do not recall.

22

Page 114

```
 1    BY MR. BROWN:

 2         Q    You just don't remember?  You don't

 3    remember Mr. Lenberg being there day after day?

 4         A    That's not what I said.

 5         Q    Do you remember why they were there?

 6         A    No, sir, I do not remember exactly

 7    why they were there.

 8         Q    Do you remember generally why they

 9    were there?

10         A    No, sir.

11         Q    Did you give either Mr. Lenberg or

12    Mr. Logan any authorization to have access to the

13    equipment?

14         A    They were -- I mean, I was there, so

15    I had given them, you know, authorization, you

16    know, from direction of Eric.

17         Q    Was the -- was your understanding

18    that the direction from Mr. Chaney extended from

19    the access that was given on the 7th to additional

20    access that was given on the 17th and the 18th?

21         A    Correct.

22         Q    Okay.
```

Page 115

1          A      Yes.

2          Q      And how was that conveyed to you?

3          A      How was that conveyed to me, is that

4     what you asked?

5          Q      Yes.  How did you know that?

6          A      He never said no.

7          Q      Well, if somebody just came off the

8     street, right, that you didn't know and said, you

9     know, "Can I hang out and sort of poke around your

10    election equipment," would you allow them to do

11    that?

12              I mean, I'm trying to move this

13    along.  Okay?  I mean, they -- they showed up.  How

14    did you know they were getting there -- they were

15    coming?

16              What authority did you have to allow

17    them -- did you do this just on your own?

18         A      As I stated before, I did it with

19    direction from Eric.

20         Q      All right.  So Mr. Chaney told you,

21    "There are going to be two more people coming on

22    January 17th and 18th"?

1              Did he tell you that?

2         A     No, sir.

3         Q     Okay.  How did you know to allow

4    Mr. Lenberg and Mr. Logan to have access to the

5    election equipment on the 17th and 18th?

6         A     I don't know how to answer that.  It

7    was a continuation, I guess.  I mean, I -- that's

8    an assumption but ...

9         Q     Well, who told you that they were

10   coming?

11        A     I don't recall that.

12        Q     Was it Sidney Powell?

13        A     As I've stated before, I've never

14   spoken with Sidney Powell.

15        Q     Was it Mr. Chaney?

16        A     I don't recall.

17        Q     Okay.  So these two gentlemen showed

18   up, you don't recall -- you recall having been

19   given the direction to allow them to have access to

20   your equipment, you just simply can't remember

21   specifics.  Is that right?

22        A     Correct.

1          Q      Okay.  And what do you recall about

2   what either of them -- well, let's -- let's talk

3   about Mr. Lenberg first.

4                 What do you recall Mr. Lenberg doing

5   when he was there?

6          A      Discussing the election equipment.

7          Q      With you?

8          A      Yes, sir.

9          Q      And so he was trying to figure out

10  how it worked.  Is that right?

11         A      Correct.

12         Q      And you told him, right?

13         A      Yes, sir.

14         Q      You answered his questions, right?

15         A      That's correct.

16         Q      And did he -- did you give him sort

17  of hands-on access to the equipment or did he ask

18  you to do things to the equipment and then answer

19  questions?  If that makes any sense.

20         A      That don't make any sense.

21         Q      Okay.  Did you allow him access to

22  the equipment, hands-on?

Page 118

```
 1          A      Did he touch the machines, is that

 2   what you're asking?

 3          Q      Well, okay, did he touch the

 4   machines?

 5          A      No.

 6          Q      Okay.  Did he ask not to touch the

 7   machines?

 8          A      Not that I recall.

 9          Q      Okay.  So how did -- how did -- did

10   he examine the machines -- the machines through

11   you?  Did you do it for him?

12          A      I was the one that was physically

13   touching the machines, yes.

14          Q      Right.  Okay.

15                 And give me an example of what you

16   can recall about Mr. Lenberg asking you to do on

17   the machines.

18                 MR. MILLER:  Object to form.

19                 THE WITNESS:  I don't recall, sir.

20   BY MR. BROWN:

21          Q      But basically he was trying to figure

22   out how they worked, right?  Fair to say?
```

1          A     I would say so.

2          Q     And did he ask you to make any copies

3     of any of the equipment or the software or the

4     thumb drives or anything else in there?

5          A     I'm going to plead the Fifth on that.

6          Q     Okay.  And I believe the video shows

7     that Mr. Lenberg came over a period of days.  Is

8     that consistent with your recollection?

9          A     Yes, sir.

10          Q     Okay.  And so he would come and ask

11     you questions and have you do certain things on the

12     machines, leave and then come back the next day and

13     do -- do that some more, right?

14          A     Correct.

15          Q     Okay.  And was the purpose of this

16     again to fix your ICC scanner or was there another

17     purpose for Mr. Lenberg's visit?

18               MR. MILLER:  Object to form.

19               THE WITNESS:  I can't answer that.

20     BY MR. BROWN:

21          Q     Do you know why he was there, why he

22     was allowed to be there?

Page 120

1                    MR. MILLER:  Object to form.

2                    THE WITNESS:  No, sir, I do not.

3     BY MR. BROWN:

4          Q    Okay.  So Mr. Chaney gave you the

5     instruction, you followed it, but you did not know

6     what the purpose of it was, correct?

7          A    I didn't do anything without the

8     direction of Eric Chaney.

9          Q    Right.

10                   At Mr. Chaney's direction, you

11    allowed Mr. Lenberg to have access to the equipment

12    and you answered his questions.  And you do not

13    know specifically why that was being done, correct?

14                   MR. MILLER:  Object to form.

15                   THE WITNESS:  Correct.

16    BY MR. BROWN:

17         Q    Okay.  Is it fair to say that it had

18    to be for some reason other than fixing the ICC

19    scanner?

20                   MR. MILLER:  Object to form.

21                   THE WITNESS:  I don't know how to

22    answer that question.

Page 121

1    BY MR. BROWN:

2         Q    Did Mr. Lenberg ask you to change the

3    clock on the system?

4         A    I don't recall.

5         Q    So he might have or might not have,

6    you just don't another one way or the other?

7         A    I do not recall.

8         Q    Well, I don't recall being an NBA

9    player, but I can also say to a metaphysical

10   certitude that I was not.

11             What I'm trying to get is, is this a

12   situation where maybe he did ask you to change the

13   clock?  Maybe he didn't?  I don't remember one way

14   or the other?

15        A    I do not --

16        Q    Something that you can remember

17   like -- like talking to President Trump.

18             Do you recall when you said you do

19   not recall talking to President Trump, so the

20   correct answer was you know you didn't?  That's

21   what I'm trying to get to here.  Okay?

22             Did Mr. Lenberg ask you to change the

Page 122

1    clock?

2         A    I do not recall.

3         Q    So he might have, correct?

4         A    I do not recall.

5         Q    So if he said he did, you would not

6    deny it, right?

7         A    I do not recall.

8         Q    I want an answer to my last question.

9              MR. MILLER:  Object to form.

10             Go ahead and answer.

11             THE WITNESS:  I don't remember if he

12   told me to or not.

13   BY MR. BROWN:

14        Q    So he could have or he could not

15   have, you just don't know one way or the other,

16   right?

17        A    He could be a millionaire, I don't

18   know.

19        Q    No, it's different, Ms. Hampton.

20   There are things that you would -- you would

21   remember.  Isn't changing the clock on the computer

22   something you would remember if he asked you to do?

Page 123

1          A      Mr. Brown, I do not remember.

2          Q      Okay.  So he might have, right?

3          A      I do not remember if he did or did

4     not.

5          Q      Okay.

6          A      I'm not going to answer a question

7     that I do not remember the answer to.

8          Q      I'm not asking you if you remember,

9     I'm -- I mean, there are -- he didn't -- you recall

10    that he didn't drive his car through the office,

11    correct?

12                That did not happen, right?

13         A      No, he did not drive his car through

14    the window -- through the office.

15         Q      Right.

16                You don't remember that happening,

17    right?

18         A      No, he did not drive his car through

19    the office.

20         Q      Okay.  But you cannot say for sure

21    that he did not ask you to change the clock, right?

22         A      Correct, I cannot say for sure.

Page 124

1          Q      Okay.  Now, other than Mr. Chaney,

2     who did you discuss Mr. Logan and Mr. Lenberg's

3     visit to the Coffee County Election's Office with?

4          A      I don't recall.

5          Q      Okay.  Do you recall referring to the

6     activities of Mr. Lenberg and Mr. Logan as, quote,

7     measuring your desk?

8                 Do you recall that?

9          A      I do.

10         Q      And why did you use that code to

11    describe the work that they were doing?

12                MR. MILLER:  Object to form.

13                THE WITNESS:  I plead the Fifth on

14    that.

15    BY MR. BROWN:

16         Q      Did you think that there was

17    something wrong with what they were doing?

18                MR. MILLER:  Object to form.

19                THE WITNESS:  I plead the Fifth on

20    that.

21    BY MR. BROWN:

22         Q      Did Mr. Voyles know that -- or did

Page 125

1    you tell Mr. Voyles that Mr. Logan and Mr. Lenberg

2    were there, that they had been there or that they

3    were going to be there?

4            A    I don't recall.

5            Q    Did they get what they came for?

6                 MR. MILLER:  Objection.

7                 THE WITNESS:  I don't know.  It

8    wasn't long after that that I was forced to resign,

9    so I have no idea.

10   BY MR. BROWN:

11           Q    Well, was there any -- was there any

12   connection between you letting them in and you

13   getting terminated?

14                MR. MILLER:  Object to form.

15   BY MR. BROWN:

16           Q    There was, wasn't there?

17           A    I'm sorry, you cut out on that.

18           Q    Was there any connection between you

19   allowing either SullivanStrickler to have access

20   and Mr. Logan and Mr. Lenberg to have access and

21   the fact that you were terminated?  Do you know?

22                MS. LAROSS:  Objection as to form.

Page 126

```
 1                    THE WITNESS:  I do not know.

 2    BY MR. BROWN:

 3         Q    Let me direct your attention to what

 4    is going to be marked as Exhibit 5, which is Tab

 5    25.

 6              (Hampton Deposition Exhibit Number 5

 7               marked for identification.)

 8    BY MR. BROWN:

 9         Q    And before I do that, let me ask some

10    of the same questions about -- about -- about

11    Mr. Logan.  This is going to be repetitive, but the

12    questions I had asked you before was about

13    Mr. Lenberg.

14              You recall Mr. Logan being in your

15    offices.  Is that right?

16         A    Yes.

17         Q    And you do not know the purpose of

18    his visit, correct?

19         A    Correct.

20         Q    And you don't recall whether he asked

21    you one way or the other to change the clock,

22    correct?
```

Page 127

1          A     Correct.

2          Q     And he did not touch -- actually

3    touch the equipment, correct?

4          A     Correct.

5          Q     Instead he asked questions and you

6    answered them.  Is that right?

7          A     Correct.

8          Q     And in some instances he asked you to

9    do things on the computer.  Is that right?

10                And you would do that according to

11   his instructions.  Is that right?

12         A     Correct.

13         Q     And as far as you know, did he make

14   any copies of anything that he saw there or -- or

15   worked on there?

16         A     I don't recall.

17         Q     And you don't know -- okay.  That's

18   good.

19                And before he got there -- or while

20   he was there, did you know that he was associated

21   with the group Cyber Ninjas?

22         A     No, sir.

Page 128

1          Q     Okay.  Now, let me direct your

2     attention to Tab 5, which is Tab 25.  I'll

3     represent to you that Exhibit 5 was produced to us

4     by Doug Logan.  And you don't have to believe this,

5     but I'll tell you that Mr. Logan says that this is

6     a compilation of Signal texts that he recovered

7     that relate to you or to Coffee County.

8                And so you used Signal to communicate

9     with people, right?

10         A     Did I use Signal to communicate with

11    people?

12         Q     Yes.

13         A     Yes.

14         Q     Okay.  And you communicated with

15    Mr. Logan over Signal, correct?

16                I will get to it.  If you look at the

17    first page of Exhibit 5.  Do you see Mr. Lenberg

18    sent a text -- I'm not sure if it's to you, I don't

19    know that it is, but it's right in the middle.

20    It's on the 17th at 15:09.  He says, "I'm -- I am

21    now in Coffee County.  It turns out that Misty is

22    tied up with her family through much of Monday.

1    She will be able to help on Tuesday."

2              Do you see that?

3         A    I do.

4         Q    Do you recall communicating with

5    Mr. Lenberg prior to their visit concerning your

6    own work schedule?

7              A    I don't recall it, but I guess -- I

8    mean, the screen says so.

9         Q    It looks like you did, yeah.  Okay.

10             And then do you see the -- the

11   messages at the bottom of the first page of Exhibit

12   5?  Do you see Jim Penrose has a text, I think it's

13   to you, but I'm not positive.  And it says, "Quick

14   question, how do you get your vote totals from

15   Coffee County to Georgia Secretary of State?  How

16   do you report them up?"

17             Do you see that?

18        A    I do.

19        Q    And then it looks like your response

20   is, "I report it thru Election Night Reporting."

21   Do you see that?

22             A    I do.

Page 130

1          Q     So it appears that you were in

2     communication through -- through Signal with --

3     with Mr. Penrose.  Is that right?

4          A     I guess so.

5          Q     And when I asked you earlier if you

6     remembered him, you said the name was familiar, but

7     you couldn't quite place it.  Is that right?

8          A     Correct.

9          Q     And then if you go down, Mr. Logan

10    says, "Is that a website?  If so, do you have the

11    URL?"  Do you see that?

12         A     I do.

13         Q     And I think Mr. Penrose answers that

14    on the next page.  Do you see that?

15         A     No, sir.

16         Q     Well, can you turn the page.

17              MS. MARKS:  It's coming.

18              MR. MILLER:  It's not quite there

19    yet, Bruce.

20              MR. BROWN:  It's all good.  Thank

21    you.

22              MS. MARKS:  Let me try and refreshen

Page 131

1    this.

2    BY MR. BROWN:

3         Q     Are you with me?

4         A     I am.

5         Q     Okay.  Good.

6               Now, it looks like there's a number

7    of different Signal texts between you and

8    Mr. Penrose and Mr. Logan about how you get the

9    results uploaded, correct?

10        A     Correct.

11        Q     And then if you go down to about the

12   middle of the page, your message, you say, "I

13   download on a thumb drive from the EMS computer,

14   and then take the thumb drive to my desk computer

15   and put it on the Scytl site.  And then I assume

16   that sends it straight to the State."

17               Do you see that?

18        A     I do.

19        Q     And how do you -- what -- is it --

20   how do you pronounce the site?

21        A     Scytl.

22               MR. BROWN:  And it's -- for the

Page 132

1    record, it's capital S-C-Y-T-L.

2    BY MR. BROWN:

3         Q    And so you -- do you repeat that

4    multiple times on election night, go from the EMS

5    to the other computer to upload it?

6              How do you -- how do you physically

7    do that?

8         A    Correct, you -- you take a thumb

9    drive from the EMS and it downloads to the -- you

10   have the thumb drive into the EMS and it downloads

11   to the thumb drive, then you take the thumb drive

12   and take it to the Scytl site.

13        Q    And do you have to do that multiple

14   times?

15        A    Used to they asked for at least three

16   uploads.

17        Q    Okay.  So three duplicate uploads,

18   just for -- for security or for confirmation or for

19   what?

20        A    Three different uploads, so yeah.

21        Q    So you'd break the whole load down

22   into three different uploads, right?

```
 1          A     Used to it would be like after

 2    advancing voting totals, and then after you got a

 3    few precincts in, totals, and then -- then at -- at

 4    least three through the night.

 5          Q     Okay.  Thank you.

 6                And did you gain an understanding of

 7    why Mr. Penrose was asking you about this process?

 8                MR. MILLER:  Object to form.

 9                THE WITNESS:  To understand the

10    process of how it got to the State site.

11    BY MR. BROWN:

12          Q     And did you have any concern about

13    giving this kind of information to a third party

14    like this?

15          A     No, sir.

16          Q     Okay.  Okay.  I'll pull down a little

17    bit.

18                Just -- did you keep in touch with

19    Mr. Penrose after Mr. Logan and Mr. Lenberg left?

20          A     Not that I'm aware of, no, sir.  I

21    don't recall.

22          Q     Okay.  These pages aren't numbered,
```

Page 134

1   so bear with me for a second.

2           If you would scroll down to -- it's

3   about the fifth page and the first -- the top row

4   is from Greg Freemyer to Doug Logan, and it's

5   February 27th.  Can you go to that page?  I think

6   it's the fifth page of this Exhibit 5.

7       A    What's the time on the first line?

8       Q    13:31.

9       A    Okay.  I think she's there.

10      Q    Great.  Thank you.

11          Now, on that page if you -- well,

12   first let's just ask, do you know Greg Freemyer?

13      A    Not to my knowledge, no, sir.

14      Q    I will represent to you that Greg

15   Freemyer is from SullivanStrickler.  And I want to

16   ask you a question about the row that's about in

17   the middle of the page, the big fat row.  It says,

18   "Doug, we just got a call from Spalding County,

19   Georgia to do a preservation of their equipment."

20          Do you see that?

21      A    I do.

22      Q    Do you hear -- ever hear about

```
 1    Spalding County having their election equipment

 2    preserved?

 3                    MR. MILLER:  Object to form.

 4                    THE WITNESS:  I don't know anything

 5    about that.

 6    BY MR. BROWN:

 7            Q    Okay.

 8                    MR. MILLER:  I'm sorry, Bruce, who

 9    did you represent Greg Freemyer as being with?

10                    MR. BROWN:  SullivanStrickler.

11                    Is that correct?  Are you -- is

12    that wrong?

13                    MR. MILLER:  I don't have a clue.

14    That's the first time I've ever heard his name.

15                    MR. BROWN:  Okay.

16    BY MR. BROWN:

17            Q    Do you know a person named Conan

18    Hayes?

19            A    No, sir.

20            Q    How about Todd Sanders?

21            A    Excuse me?

22            Q    Todd Sanders.
```

Page 136

```
 1          A     No, sir.

 2          Q     If you would come down about five

 3   more pages at least where the top row is

 4   January 14th, 2021.

 5          A     What's the time on it?

 6          Q     22:53.

 7          A     What's the time on it again?

 8          Q     22:53 -- I'm sorry, 22:56.

 9          A     Okay.

10          Q     Sorry about that my bad.  Are you

11   with me?

12          A     I am.

13          Q     Okay.  The first row Mr. Penrose, on

14   the 14th says, "Can you run a cast vote report --

15   cast vote report in JSON format from the EMS for

16   Coffee County?"

17                Do you see that?

18          A     I do.

19          Q     Do you recall any communications or

20   discussion about making a cast vote report in JSON

21   format from the EMS from Coffee County at any time?

22          A     I've never heard of JSON.  I don't
```

Page 137

1    even know what that is.

2           Q     Do you recall anybody ever putting up

3    the cast vote record from Coffee County on the

4    internet?

5           A     I don't recall that, no, sir.

6           Q     Okay.  And, again, do you know

7    Charles Bundren?

8           A     No, sir.

9           Q     Okay.

10          A     Where is that name?

11          Q     Let me drop down to -- so about

12   two-thirds of the way down on the same page, and

13   it's a message from Phil Waldron.  Do you see that?

14          A     I do.

15          Q     It's dated September 22nd, 2021.  Do

16   you see that?

17          A     I do.

18          Q     It says, "Misty from Coffee County is

19   getting hammered like Tina in Mesa County.  Do you

20   have a copy of the image?  We need to get to our

21   lawyer - Bundren - ASAP for her defense."

22                Do you see that?

Page 138

1        A     I do.

2        Q     What is he talking about?

3        A     I have no idea.

4        Q     He refers to you as "getting hammered

5    like Tina in Mesa County."  Do you have any idea

6    what he's talking about?

7        A     No, sir.

8        Q     What was going on with you, if

9    anything, relating to anything of this in September

10   of 2021?

11       A     I have no idea.

12       Q     Let me direct your attention to the

13   next page, which is -- in the first row of the next

14   page is January 2021, 13:18 text from Jim Penrose.

15             Do you see that?

16       A     I do.

17       Q     In this Mr. Penrose says to

18   Mr. Logan, "If you can draft a report for review on

19   Friday morning with Charles Bundren, that would be

20   best.  We only have until Saturday to decide if

21   we're going to use this report to try to decertify

22   the senate runoff election or if we hold it for a

Page 139

1    bigger movement later."

2              Do you see that?

3    A    I do.

4    Q    Were you aware of any efforts to

5    decertify the senate runoff election?

6              MR. MILLER:  Object to form.

7              THE WITNESS:  No, sir.

8    BY MR. BROWN:

9    Q    Was the visit by Logan and Lenberg to

10   your offices on 17th -- on January 17th and 18th

11   related in any way to any effort to decertify the

12   senate runoff election?

13             MR. MILLER:  Object to form.

14             THE WITNESS:  I have no idea.

15   BY MR. BROWN:

16   Q    Do you -- do you have any idea what

17   Mr. Penrose is referring to as the, quote, bigger

18   movement later?

19             MR. MILLER:  Object to form.

20             THE WITNESS:  No, sir.

21   BY MR. BROWN:

22   Q    Did you -- after they -- well, if we

Page 140

1    go halfway down, you'll see the thread name is

2    "Special Report," which is the far left-hand

3    column.

4              Do you see that?

5         A    Yes, sir.

6         Q    Do you know what that was?

7         A    No, sir.

8         Q    Were you aware of some sort of

9    special project that Logan and Lenberg was working

10   on that was associated with a special report?

11             MR. MILLER:  Object to form.

12             THE WITNESS:  No, sir.

13   BY MR. BROWN:

14        Q    In this text, which is at

15   January 2021 at 18:11, Mr. Lenberg says, "Misty can

16   do some before we go back.  I will not -- I will

17   work with her on that."

18             Do you know what Mr. Lenberg is

19   referring to?

20        A    No, sir.

21        Q    Were you working with Lenberg on his

22   special report?

Page 141

```
 1          A     I don't know what the special report

 2     is.

 3          Q     You don't know what he was doing with

 4     the information that you were giving him, right?

 5          A     Correct.

 6          Q     If you drop down to the 22nd,

 7     Mr. Lenberg says at 14:11, "Hey guys.  Whenever Jim

 8     is available, we three should get up to date.

 9     Status here in Coffee County has changed quite a

10     bit and I am having to shift plans."

11                Do you see that?

12          A     I do.

13          Q     Do you know what on or about

14     January 27th would have changed the status --

15                MR. MILLER:  Object to form.

16     BY MR. BROWN:

17          Q     -- in Coffee County?

18          A     No, sir.

19          Q     Let me direct your attention to the

20     circumstances around your termination from Coffee

21     County.  And the -- the stated reason for your

22     termination was that you had falsified time
```

Page 142

1   records, right?

2         A     Correct.

3         Q     And it's your belief that that is not

4   the real reason you were fired, correct?

5         A     Well, I was forced to resign so ...

6         Q     I'm sorry, I -- I knew that.  Let me

7   ask it again.

8               That the falsification of your time

9   sheets was not the reason you were forced to

10  resign, correct?

11              MS. LAROSS:  Objection to form.

12              MR. MILLER:  Ditto.

13              THE WITNESS:  Correct.

14  BY MR. BROWN:

15        Q     What do you believe was the reason

16  that you were forced to resign?

17              MR. MILLER:  Object to form.

18              THE WITNESS:  I believe that I was

19  forced to resign because -- I'm trying to think of

20  how to put it without being very hateful.  I think

21  I was forced to resign, one, because of the video

22  that was created, and the State and Dominion was

Page 143

1    coming down on Coffee County.  It's just my belief.

2    BY MR. BROWN:

3         Q    Is it -- why was Dominion coming down

4    on Coffee County?

5              MR. MILLER:  Object to form.

6    BY MR. BROWN:

7         Q    Well, let me -- let me correct it.

8              MR. BROWN:  Jonathan, you're correct.

9    BY MR. BROWN:

10        Q    So let me -- let me try to summarize

11   what you're saying, because I think I get it.

12             On the video you were critical of

13   Dominion's equipment, correct?

14        A    Correct.

15        Q    And you believe that at least one of

16   the reasons for being forced to resign was not

17   falsifying time sheets, but was the fact that you

18   had been critical of Dominion and, by extension,

19   the Secretary of State, correct?

20             MS. LAROSS:  Objection as to form.

21             THE WITNESS:  Correct.

22

Page 144

1    BY MR. BROWN:

2         Q    I'm not suggesting that you need any

3    more evidence, but do you have any evidence other

4    than simply sort of the chronology of events that

5    would lead you to that conclusion?

6         A    The chairman of my Board -- of the

7    Board, excuse me, signed off on every time sheet

8    that was turned in and I was a salary employee.

9         Q    So that was obviously bogus, right?

10             MS. LAROSS:  Objection as to form.

11   BY MR. BROWN:

12        Q    I mean, what you're saying is it --

13   since you were a salary employee and since your

14   time sheets are signed off, it's highly unlikely

15   that that was the reason that you were terminated.

16   Fair to say?

17             MS. LAROSS:  Objection as to form.

18             MR. MILLER:  You can answer.

19             THE WITNESS:  I think so.

20   BY MR. BROWN:

21        Q    Okay.  Did anybody suggest to you, in

22   any kind of communication, that the reason -- the

Page 145

1    real reason that you were being asked to resign was

2    because you were critical of Dominion's system?

3            A      Yes.

4            Q      Who?

5            A      A lot of people in the public that

6    saw the video.

7            Q      Anybody associated with Coffee

8    County, Coffee County Board, Board of Elections?

9            A      No, sir.

10           Q      I'm not suggesting -- I'm not

11   suggesting that -- that you needed to support your

12   belief, because you've already answered why you

13   believe it, but I just need to get all the facts

14   down.

15                  Like did Mr. Chaney ever suggest that

16   that's why you were asked to resign?

17           A      No, sir.

18           Q      Or Ernestine?

19           A      No, sir.

20           Q      Okay.  And do you recall being

21   terminated right around January -- or, I'm sorry,

22   February 25th?  Does that sound right?

Page 146

1          A     Yes, sir.

2          Q     Okay.  Let me direct your attention

3    to Exhibit 6, which is going to be Tab 1.

4               (Hampton Deposition Exhibit Number 6

5                marked for identification.)

6    BY MR. BROWN:

7          Q     Tab 1 is going to be Exhibit 6.

8          A     It's up.

9          Q     Okay.  Let me direct your attention

10   to page 2.  And during the month on the 24th,

11   you -- you mentioned that you were being asked to

12   speak to the Rotary Group on the 24th.  Do you see

13   that?

14         A     I do.

15         Q     And then was there a board meeting

16   that day or the next day?  Do you recall?

17         A     I found out later that night that

18   there was, yes.

19         Q     Okay.  And so the Board met without

20   you.  Is that right?

21         A     Excuse me?

22         Q     Did the Board meet without you?

Page 147

1         A     Yes.

2         Q     Is that what happened?

3         A     Yes.

4         Q     Okay.  And is it your belief that in

5    that board meeting they decided to ask for your

6    termination.  Is that right?  Ask for your

7    resignation?

8                   MR. MILLER:  Object to form.

9                   MS. LAROSS:  Objection as to form.

10                   THE WITNESS:  Yes.

11   BY MR. BROWN:

12        Q     Okay.  And that in that meeting they

13   also discussed pending or threatened lawsuits.  Do

14   you -- do you know anything about that?

15                   MR. MILLER:  Object to form.

16                   THE WITNESS:  Yes.

17   BY MR. BROWN:

18        Q     And what were those pending or

19   threatened lawsuits?

20        A     They did not tell me.

21        Q     Did it -- did those lawsuits have

22   anything to do with your -- their decision to ask

Page 148

1     you to resign?

2                    MR. MILLER:  Object to form.

3                    THE WITNESS:  I think so.

4     BY MR. BROWN:

5          Q     In what way?

6          A     That they didn't -- they didn't want

7     to stand behind me.

8          Q     And was there a lawsuit with respect

9     to which they needed to stand behind you?

10         A     I don't know what lawsuits were ...

11         Q     Was somebody threatening to -- to --

12    were any of the threats of litigation related to

13    you though or your work?

14         A     I don't know.

15         Q     Had Dominion threatened to -- to file

16    a claim or a suit relating to Coffee County?

17         A     I don't know.

18         Q     What made you say that the lawsuits

19    might be -- might have been related to your -- to

20    them deciding to ask you to resign?

21         A     Because of the texts that's on this

22    screen that was done on February the 24th at

Page 149

1    9:00-something at night.

2         Q    So there was some -- some

3    connection -- you didn't know what the lawsuits

4    were about, but your -- your belief is that there

5    was some connection between the lawsuits, or the

6    threatened lawsuits, and you and your work, right,

7    something to do with you?

8         A    Correct.

9         Q    But you don't know what the lawsuits

10   were about or who -- or the threatened lawsuits

11   were about or who was threatening to sue, correct?

12        A    Correct.

13        Q    Did you ever talk with Ernestine

14   Thomas-Clark about the lawsuits?

15        A    After February 25th, I have not

16   spoken to Ernestine or Eric.

17        Q    Okay.  I'd like to make Tab 18

18   Exhibit 7.

19             (Hampton Deposition Exhibit Number 7

20             marked for identification.)

21   BY MR. BROWN:

22        Q    Do you see that?

Page 150

1          A      I do.

2          Q      And you made an Open Records Act

3    request to get the -- the videos that would show

4    the comings and goings at the -- at the elections

5    office, correct?

6          A      Correct.

7          Q      Do you know if that video that you

8    received was edited in any way before you got it?

9          A      I never picked it up.

10         Q      Okay.  And you didn't pick it up

11   because by the time it was ready, sort of you were

12   just over it.  Is that the idea?

13         A      It was a good bit after the open

14   records request before I was notified that it was

15   ready.

16         Q      Okay.  And by then you were no

17   longer -- you were no longer needed, right?

18         A      I was hurt pretty bad by the Board,

19   so I really tried to let it go.

20         Q      I understand.

21                All right.  Let me mark as Exhibit 8

22   Tab 20.

Page 151

1          (Hampton Deposition Exhibit Number 8

2          marked for identification.)

3     BY MR. BROWN:

4          Q     Are you with me?  My notebook fell

5     apart.  Sorry.

6          A     It's not up yet.

7          Q     Three-hole punch.

8          A     Okay.  It's up.

9          Q     Is this a sample of what they showed

10    you to purportedly justify why you needed to

11    resign?

12         A     I've never seen this.

13         Q     Okay.  But did they show you

14    something like this?

15         A     No, sir.

16         Q     Did you need any kind of tally or any

17    kind of proof of your -- of your hours from them?

18         A     No, sir.

19         Q     Do you know who administratively

20    would -- would have been responsible for figuring

21    out if you were not telling everything correctly on

22    your time sheets?

Page 152

1              MR. MILLER:  Object to form.

2              THE WITNESS:  No, sir.  I don't know

3    directly.

4    BY MR. BROWN:

5         Q    Probably somebody in the county

6    manager's office?

7         A    That's who we got paid by was the

8    county manager's office.

9         Q    But you don't know who collected the

10   information relating to your time sheets or Jil's

11   time sheets?

12        A    No, sir.

13        Q    Okay.  Let me mark as Exhibit 9, Tab

14   22.

15            (Hampton Deposition Exhibit Number 9

16             marked for identification.)

17   BY MR. BROWN:

18        Q    And I'm not sure if you can, but I

19   can't on my black-and-white copy, but can you see

20   the date of this document?

21        A    It's not up yet.

22        Q    Oh, sorry.

Page 153

1          A     It's still not up.

2          Q     It's not even that important, but I'm

3     stubborn, so since I mentioned it, I don't want to

4     back down.  Is it up yet?

5          A     No.

6          Q     Okay.

7                MS. LAROSS:  Can we ask how long

8     we've been on the record while we're waiting?

9                VIDEOGRAPHER:  You can ask.  You want

10    the actual minutes of record time?

11               MS. LAROSS:  Yes, just --

12               MR. MILLER:  There it is now.

13               THE WITNESS:  There it is.  Oops,

14    never mind, it's still -- it's there.

15    BY MR. BROWN:

16         Q     Okay.  Thank you.

17               And please turn to the least

18    significant exhibit in the history of earth.  I

19    just need to ask you about it.  And this -- you're

20    looking at, I think, it's Tab 9 -- I mean, I'm

21    sorry, Exhibit 9, Tab 22, correct?

22         A     It says Tab 21 on the top of the

Page 154

1    screen.

2           Q    Oh, no wonder it took so long.

3                MR. MILLER:  Does it have a picture

4    of a cake with, "Happy Birthday Misty" on it?

5                MR. BROWN:  That's okay.  We can look

6    at that one.

7    BY MR. BROWN:

8           Q    All right.  Tab 21, Exhibit 10,

9    correct?

10               MS. MARKS:  This is 9.

11               THE WITNESS:  It says Exhibit 9, Tab

12   21.

13   BY MR. BROWN:

14          Q    Okay.

15          A    Is that right?

16          Q    It is now.

17               Okay.  Tab 21, with the cake is

18   Exhibit 9.  And these are text messages between you

19   and James.  Is that correct?

20          A    Yes.

21          Q    Okay.  Just one second.

22               If you would refer to page 16 of

Page 155

1    Exhibit 9.

2          A      Yeah, it makes me sick.  I can't

3    watch it.  Okay, page 16?

4          Q      Yes, ma'am.

5          A      Okay.

6          Q      Right in the middle on December 11,

7    2020, you say to James, "Want to know something

8    funny???  These guys in here can not get it to go

9    from scanner to RTR!  And they are the big wigs."

10                What was the occasion for that

11   remark?

12         A      That's when the State came to

13   investigate and brought the two Dominion guys with

14   them.

15         Q      And those are the -- those are the

16   bigwigs?

17         A      Correct.

18         Q      And what is -- for the record, what

19   is the "RTR"?

20         A      It's on the main computer.  I don't

21   remember the actual -- what it means.

22         Q      Okay.

Page 156

1        A      It's the computer -- I mean, the

2    scanner connects to the computer, so ...

3        Q      Okay.  And do you recall why you

4    needed the password or didn't have it?

5        A      Remember the password?  That's when

6    Scott Tucker was trying to reboot it to see if he

7    could get it to communicate correctly.

8        Q      Okay.

9        A      Scott Tucker did.

10       Q      Okay.  If you go down to page 18.

11   And if you can just tell me when you're there.

12       A      We're here.

13       Q      The -- this is dated December 31st,

14   2020.  This would be after the recount and the

15   certification, correct?

16       A      Correct.

17       Q      And what -- if you look way down, you

18   see -- you say, "This Samuel guy just called me the

19   tech that will be here.  He is from Denver flying

20   in Monday."

21              Do you see that?

22       A      I do.

1          Q     And then you say, "Yes, he said he

2    will be here for additional help."  Do you see

3    that?

4          A     Can you scroll up, please?  Yes.

5          Q     And he was -- he was the one that

6    said it needs cleaning often.  Is that right?

7          A     Yes.

8          Q     And you had heard that before, right,

9    that the reason why the scanner wasn't working was

10   that it needs to be cleaned for every hundred

11   ballots or something?  Is that right?

12         A     Something like that, some odd number.

13         Q     And your -- in your view was that was

14   not correct, right?

15         A     Correct.

16         Q     Okay.  James says, "There's something

17   that I don't know which they did not or are not

18   telling me."  Do you see that?

19         A     I do.

20         Q     Did you ever learn what he didn't

21   know that they weren't telling him?

22         A     Why they were sending this Samuel

Page 158

1    guy.

2            Q     I mean, was there something about the

3    equipment or something that Dominion wasn't

4    disclosing, or what was it?

5            A     He and I were talking about why they

6    were sending Samuel.

7            Q     It seemed to be a mystery?

8            A     Correct.

9            Q     Okay.  And then did Samuel show up?

10           A     Yes, sir.

11           Q     And then this would have been, I

12   guess, early January, right?

13           A     I think so.

14           Q     So that -- he would have been -- this

15   would have been in advance of the meeting with Eric

16   that we talked about before when Eric had words

17   with the Dominion people.  Is that right?

18           A     I think Samuel came that morning.

19           Q     Okay.  So it was Samuel, Gary and

20   James and Scott Tucker, right, were the Dominion

21   people that Eric was talking to, either in person

22   or over the phone?

Page 159

1          A      Correct.

2          Q      Okay.

3                 MR. BROWN:  Let's take a -- I need

4      to -- I need to rearrange my notes because my

5      notebook fell apart.

6                 MR. MILLER:  Thank God.

7                 MR. BROWN:  Sorry about that.  But,

8      Jonathan, if you -- if you give me a little break

9      here, I'll actually be able to move faster so ...

10                MR. MILLER:  Oh, I want the break.

11                MR. BROWN:  Okay.  Oh, I thought you

12     were complaining again.

13                MR. MILLER:  No, huh-uh.

14                MR. BROWN:  We'll take --

15                VIDEOGRAPHER:  We are going off the

16     record at 3:17.

17          (Recess from 3:17 p.m. to 3:33 p.m.)

18                VIDEOGRAPHER:  We are on the record

19     at 3:33.

20     BY MR. BROWN:

21          Q      I want to mark as the next exhibit,

22     which is Exhibit 10, I believe, Tab 6.

Page 160

```
 1              (Hampton Deposition Exhibit Number 10

 2           marked for identification.)

 3              MS. LAROSS:  It looks like Exhibit 10

 4     is Tab 22.

 5              MR. BROWN:  Okay.  Fair enough.

 6     Exhibit 10 is Tab 22, Exhibit 11 is Tab 6, correct?

 7              MS. LAROSS:  Correct.

 8              MR. BROWN:  Thank you.

 9              (Hampton Deposition Exhibit Number 11

10           marked for identification.)

11              THE WITNESS:  Which one are you

12     asking for?

13     BY MR. BROWN:

14         Q    Tab 6.

15         A    It's up.

16         Q    Ms. Hampton, why did Mike Lindell,

17     also known as My Pillow guy, come to Douglas,

18     Georgia on February 21, 2021?

19              MR. MILLER:  Object to form.

20              THE WITNESS:  I plead the Fifth on

21     that.

22
```

Page 161

1   BY MR. BROWN:

2        Q    Did you speak with Mr. Lindell or

3   someone who represented him prior to his visit to

4   Douglas?

5        A    I plead the Fifth on that.

6        Q    Did you give to Mr. Lindell anything

7   that you had taken from the Coffee County Election

8   Office?

9        A    I plead the Fifth on that.

10       Q    Who else besides you had keys to

11  the -- well, let me back up a bit.

12            Mr. Lindell's plane, according to Tab

13  6, was in Douglas on the 25th and the 26th.  Do you

14  see that?

15            Well, let me just ask you this:  Did

16  you know that he was in Douglas on or about the day

17  that you were terminated?

18       A    I plead the Fifth.

19       Q    Have you ever spoken with any -- with

20  Mr. Lindell or any representatives of Mr. Lindell?

21       A    I plead the Fifth.

22       Q    Has Mr. Lindell paid you any money?

Page 162

1          A      No, sir.

2          Q      Have you received compensation

3     directly or indirectly from Mike Lindell, anyone

4     associated with Mike Lindell?

5          A      No, sir.

6          Q      Did Mr. Lindell ever come to the

7     Coffee County Election Office, to your knowledge?

8          A      Not that I'm aware of.

9          Q      Was Mr. Lindell's visit to Douglas

10    related in any way to the work that

11    SullivanStrickler, Mr. Logan or Mr. Lenberg did

12    with respect to Coffee County's election system?

13               MR. MILLER:  Object to form.

14               THE WITNESS:  I plead the Fifth on

15    that one.

16    BY MR. BROWN:

17         Q      Had you -- have you met Mr. Lindell

18    in person?

19         A      I plead the Fifth on that.

20         Q      Besides you, who else in Coffee

21    County knew that Mr. Lindell was in Douglas in

22    February of 2021?

Page 163

 1                    MR. MILLER:  Object to form.

 2                    THE WITNESS:  I have no idea.

 3     BY MR. BROWN:

 4          Q     Did he come to meet with Mr. Chaney?

 5     And by "he," I mean Mr. Lindell.

 6                    MR. MILLER:  Object to form.

 7                    THE WITNESS:  I have no idea.

 8     BY MR. BROWN:

 9          Q     Had you ever been on Mr. Lindell's

10     airplane?

11          A     No, sir.

12          Q     Did you meet with a man named Ben

13     Cotton and Stephanie Lambert in Michigan?

14                    MR. MILLER:  I'm going to object to

15     that being beyond the scope of your need to know on

16     that.  Stephanie Lambert is an attorney and

17     anything that she did with Stephanie Lambert would

18     be privileged and she cannot answer those

19     questions.

20                    MR. BROWN:  Okay.  Privilege doesn't

21     extend to everything you do with your attorney, so

22     I'll ask it again.

Page 164

1    BY MR. BROWN:

2         Q    Did you meet with Stephanie Lambert

3    and Ben Cotton in Michigan or thereabouts ever?

4              MR. MILLER:  I'm going to have her

5    plead the Fifth.

6              THE WITNESS:  I plead the Fifth.

7    BY MR. BROWN:

8         Q    Did you know that Ben Cotton was

9    being paid to do his work by Mr. Lindell?

10        A    I plead the Fifth.

11        Q    Did you know that Stephanie Lambert

12   was being paid by Mr. Lindell to represent you?

13        A    I plead the Fifth.

14        Q    Did you pay Ms. Lambert to represent

15   you?

16        A    I plead the Fifth.

17        Q    Did you engage Ms. Lambert -- well,

18   let me back up a second.

19             Was Mr. Cotton engaged by Ms. Lambert

20   to serve as your expert witness in any pending or

21   threatened litigation?

22             MR. MILLER:  Object to form.

1                    THE WITNESS:  I plead the Fifth.

2      BY MR. BROWN:

3            Q     Did you know that Mr. Cotton obtained

4      a copy of what SullivanStrickler copied from Coffee

5      County?

6                    MR. MILLER:  Object to form.

7                    THE WITNESS:  No, I did not.

8      BY MR. BROWN:

9            Q     Did you ever have a whistleblower

10     lawsuit that you were thinking about filing against

11     anybody?

12                   MR. MILLER:  She's going to plead the

13     Fifth.

14                   THE WITNESS:  I plead the Fifth.

15     BY MR. BROWN:

16           Q     Was Mr. Lindell's visit to Coffee

17     County related to your whistleblower lawsuit?

18           A     I plead the Fifth.

19           Q     Did you speak with Mr. Lindell about

20     getting a job with the Trump organization?

21           A     With who, please?

22           Q     With the Trump organization or the

1    Trump campaign or with the then-former President

2    Trump?

3              A     No, sir.

4              Q     Did you ever speak with anyone about

5    getting a job with the Trump organization, the

6    Trump campaign or with Mr. Trump?

7              A     No, sir.

8              Q     Did you ever tell anybody that you

9    had been offered a job with the Trump organization

10   or the Trump campaign or Mr. Trump?

11             A     I plead the Fifth.

12             Q     Let me turn back to the visit by

13   Mr. Logan and Mr. Lenberg to Coffee County.  Some

14   of the video records suggests that Mr. Lenberg

15   visited the Coffee County Election Office on every

16   day between the 25th and the 29th of January 2021.

17   Is that consistent with your recollection?

18             A     I don't remember the dates.

19             Q     But it was several consecutive days,

20   correct?

21             A     To the best of my knowledge, I don't

22   remember exactly.

Page 167

1          Q     And do you recall Inspector, I think

2     it's, Blanchard also coming when Mr. Lenberg was

3     there doing his work at your election's office?

4          A     I don't recall that.

5          Q     So you were -- do you remember that

6     inspector coming to Coffee County?

7          A     He came on multiple occasions.

8          Q     Okay.  And do you know one way or the

9     other whether Mr. Lenberg's reference to things

10    having changed in Coffee County that we saw before

11    was related to the Investigator Blanchard arriving

12    in Coffee County right during Mr. Lenberg's visit?

13               MR. MILLER:  Object to form.

14               MS. LAROSS:  Object as to form.

15               THE WITNESS:  I -- I don't have a

16    clue.

17    BY MR. BROWN:

18         Q     Did Mr. Lenberg tell you or did you

19    understand that Mr. Lenberg was for some reason

20    unable to complete his work at -- at Coffee County?

21         A     I didn't understand your question.

22    I'm sorry.

Page 168

 1          Q      Did he tell you if -- that he had not
 2     been able to finish his work, Mr. Lenberg?
 3          A      I don't recall.
 4          Q      Okay.  Did you ever say no to any
 5     request that Mr. Lenberg made for information or
 6     access to Coffee County equipment?
 7          A      I don't recall.  I'm sorry.
 8          Q      Same question for Mr. Logan.  Do you
 9     recall ever saying no to Mr. Logan to any request
10     for information or access to -- to any equipment in
11     the Coffee County Election Office?
12          A      I don't recall.
13          Q      If you would turn back to Exhibit 4.
14          A      Okay.
15          Q      If you would turn to the page that is
16     numbered four at the bottom left of that exhibit.
17     And this would be a text from Cathy Latham to you,
18     correct?
19          A      I think so, yes.
20          Q      And it says -- it's dated July 15th.
21     Do you know what year that was?
22          A      2021.

Page 169

1          Q      And do you know -- did you have any

2     understanding or did you ask Ms. Latham why in July

3     she was asking you about the identity of the people

4     who came to Coffee County in January?

5          A      No, sir.

6          Q      But you gave her the information that

7     Scott Hall and Jeff Lenberg had been there in

8     January.  Do you see that?

9          A      Yes, sir.

10         Q      And then -- and then she also asked

11    you about the Dominion guy that was from Colorado,

12    the one who was extra.  Do you see that?

13         A      I do.

14         Q      And did you have an understanding of

15    why Ms. Latham was asking about him?

16               MR. MILLER:  Object to form.

17               THE WITNESS:  No, sir.

18    BY MR. BROWN:

19         Q      But that was Samuel, correct?

20         A      Correct.

21         Q      Ms. Hampton, I made a series of

22    mistakes in the dates of the visits of Mr. Logan.

Page 170

1    And it appears from the record that Mr. Logan was

2    there on the 18th and the 19th, and I think I said

3    the 17th and the 18th.  Would that change your

4    responses to any of my questions about their visit?

5          A     No, sir.

6          Q     Thank you.  Sorry about that.

7                If you would turn to page 5 of

8    Exhibit 4.  And this takes us back to January 5,

9    2021.  Do you see that?

10         A     I do.

11         Q     And are those your -- your words to

12   Ms. Latham, "You -- you okay?"  Do you see that?

13         A     Yes.

14         Q     And do you recall what you were --

15   you were referring to?

16         A     I think that's when she had a student

17   at school that committed suicide.

18         Q     Okay.  The next text you say, "If you

19   need me Friday, get me the same thing you got and

20   the board can't stop me."

21               Do you see that?

22         A     I do.

1      Q      And what were you referring to?

2      A      I don't recall.

3      Q      In the next text you say to

4    Ms. Latham, "I hope and pray you are not catching

5    any heat from your work today."

6             What were you referring to?

7      A      She had done a -- a live feed from

8    the -- like go live, or whatever it was called, a

9    video, and some of the activists in the community

10   was being ugly to her, telling her like how she

11   shouldn't be a teacher, and that kind of stuff.

12     Q      Is that relating to the -- the work

13   that she does as a teacher?

14     A      Excuse me?

15     Q      Is that related to her teaching?

16     A      Yes, sir.

17     Q      Not about politics or the election?

18     A      No, sir.

19     Q      Okay.

20     A      Not that I can remember.

21     Q      And then the next text she sends you

22   the -- the e-mail address of Scott Hall.  Is that

Page 172

1    right?

2           A      I have no idea whose e-mail that is.

3           Q      Okay.  And then the next page, page 6

4    of Exhibit 4, she -- Ms. Latham texts you that

5    says, "Team left Atlanta at 8."  Do you see that?

6           A      I do.

7           Q      Does that indicate that -- that you

8    knew what was going on at that time, correct -- by

9    that time, right?

10          A      At that moment, yes, sir.

11          Q      Okay.  She also tells you that,

12   "Scott, first name only, is flying in."  Do you see

13   that?

14          A      I do.

15          Q      She then says, "I could not get Lane

16   to commit.  I trust you all."  Do you know what she

17   was referring to?

18          A      The vote review panel.

19          Q      Okay.  So that relates to the -- to

20   people coming in for the vote review panel.  Is

21   that right?

22          A      Yes, sir.

Page 173

1          Q      The next text you say -- or she says,

2     I'm sorry, "How is it today?  Finished?"  Do you

3     see that?

4          A      I do.

5          Q      And the answer may be somewhere, it's

6     not on the next page, but let me continue.

7                 And on the next page, page 7, you say

8     at 3:48, "Going great so far."  Do you see that?

9          A      I do.

10         Q      Now, that's referring to

11    SullivanStrickler's access to the equipment and

12    software.  Is that right?

13         A      I don't recall.

14         Q      If you skip over to page 8, on

15    January 10.

16         A      Can you scroll up, please?

17         Q      Had you borrowed Cathy Latham's

18    church's scanner?

19         A      I remember she brought a scanner.

20         Q      What for?

21                MR. MILLER:  Object to form.

22                THE WITNESS:  I'm trying to remember.

Page 174

1    BY MR. BROWN:

2           Q     Were you scanning ballots at that

3    time?

4           A     I don't recall.

5           Q     At any point after the senate

6    runoffs, were you scanning ballots?

7           A     I don't remember.  I'm sorry.  I

8    don't recall.

9           Q     If you turn the page to page 9 of

10   Exhibit 4, Ms. Latham says, "Are you going to be on

11   the Georgia Secretary of State webinar today?"  Do

12   you see that?

13          A     I do.

14          Q     And you tell Ms. Latham -- you ask

15   Ms. Latham, "Do I need to be looking for

16   something?"  Do you see that?

17          A     I do.

18          Q     Do you know what she was referring to

19   when she says, "I looked at the -- looked at the

20   itinerary and didn't see anything suspicious"?

21                Do you see that?

22          A     I do.

1          Q     Do you know what she was referring

2    to?

3                MR. MILLER:  Object to form.

4                THE WITNESS:  Not at this time.  I

5    don't remember.

6    BY MR. BROWN:

7          Q     And if we could mark Tab 26 as

8    Exhibit 12.

9             (Hampton Deposition Exhibit Number 12

10            marked for identification.)

11   BY MR. BROWN:

12         Q     And just let me know when that comes

13   up.

14                MS. ELSON:  Bruce, I'm sorry, can you

15   say --

16                MR. BROWN:  Yeah, Tab -- Tab 26 was

17   the -- which is the Shawn Still lawsuit.

18                MS. ELSON:  Thank you.  I apologize.

19   That should be up momentarily.

20                MR. BROWN:  And I believe that's

21   Exhibit 12, right?

22                MS. ELSON:  Correct.

Page 176

```
 1                THE WITNESS:  It's up.

 2    BY MR. BROWN:

 3           Q      Were you aware that a lawsuit had

 4    been filed against you by Shawn Still in the Fulton

 5    County -- in the Superior Court of Fulton County?

 6           A      I remember briefly of a lawsuit, but

 7    I don't remember what it was.

 8           Q      Did you give Tony Rowell the -- the

 9    permission to accept service of process of this

10    lawsuit on your behalf?

11           A      Not that I'm aware of, no, sir.

12           Q      When is the first time you saw a copy

13    of this lawsuit, if you recall?

14           A      Oh, Lord, I don't remember.  I mean,

15    I don't even know which -- I don't know what this

16    lawsuit is.

17           Q      It's a lawsuit, it's against Coffee

18    County.  You don't remember the substance of a

19    lawsuit against Coffee County relating to the

20    presidential election of 2020?

21           A      I vaguely remember one, but I don't

22    remember its contents.  I don't remember what it
```

Page 177

1    was about.

2            Q    Turn, if you will, to the paragraphs

3    32 of the complaint.  And what -- and is that on

4    page 32, do you think?  I'm trying to get mine to

5    cooperate.  Hold on one second.

6                    MS. MARKS:  It's behind Exhibit 2.

7                    THE WITNESS:  He's not there right

8    now.

9                    MS. MARKS:  Okay.

10                   THE WITNESS:  Is it behind Exhibit 2

11   Ms. Marks asked?

12                   MR. BROWN:  It's Exhibit 12.

13                   MS. MARKS:  Within Exhibit 12, is it

14   right behind Exhibit 2?

15                   THE WITNESS:  Within Exhibit 12, is

16   it behind Exhibit 2?

17                   I mean, can you message him that?

18                   MR. BROWN:  Hang on a second.  Well,

19   look at the -- look at the 32nd page of the PDF.

20                   THE WITNESS:  If you scroll --

21                   MS. MARKS:  We can't see those

22   numbers.  We can't see the PDF numbers, but I

```
 1    think --

 2                   MS. LAROSS:  If you hover along the

 3    bottom, in that little black box --

 4                   MS. MARKS:  Oh, there is -- thank

 5    you.

 6                   MS. LAROSS:  32 and 83, that's

 7    what --

 8                   MS. MARKS:  That is 32 of 83.  Thank

 9    you, Diane.

10                   MS. LAROSS:  You're welcome.

11                   THE WITNESS:  Okay.  There's a

12    worksheet on the screen.

13    BY MR. BROWN:

14          Q     Exactly.

15                   And -- and the plaintiff is Shawn

16    Still.  Do you know how Mr. Still or his lawyers

17    got the information that's in the worksheet that is

18    on page 32?

19          A     I do not.

20          Q     Do you know how they got any of the

21    information in this lawsuit about Coffee County?

22          A     I do not.
```

Page 179

1          Q      Did you know about any of the

2     meetings between Robert Preston, Alex Kaufman, and

3     Robert Sinners in Douglas?

4          A      No, sir.

5          Q      Do you know who prepared the

6     worksheet that's on page 32 of the complaint?

7          A      I think I did.

8          Q      And did you -- did you provide that

9     to the plaintiff, either in response to an Open

10    Records Act or otherwise?

11         A      Not that I recall.

12         Q      Was it a public document?

13         A      I think so because it was part of a

14    board meeting, I think.

15         Q      Okay.  Turn to page 40.  Are you with

16    me?

17         A      I am.

18         Q      Do you see that worksheet?

19         A      I do.

20         Q      Do you know who prepared that

21    worksheet?

22         A      I think I typed it.

Page 180

```
 1          Q     And do you know how the plaintiff got
 2   it?
 3          A     No, sir.
 4          Q     Turn over to page 42.
 5          A     I'm there.
 6          Q     Is that your worksheet also?
 7          A     Yes, sir.
 8          Q     And do you know how the plaintiff got
 9   that worksheet?
10          A     No, sir.
11          Q     Did you give these worksheets to your
12   lawyer, Tony Rowell?
13          A     Yes, sir.
14          Q     And did you understand that he was
15   going to give them to the plaintiffs?
16          A     No, sir.
17          Q     And why did you give them to Tony
18   Rowell?
19          A     Because he was the county attorney.
20          Q     And it was normal for you to give
21   that kind of information because he was the county
22   attorney?
```

Page 181

1          A      If he asked for it, yes, sir.

2          Q      And he asked for this information?

3          A      He's the one that told me the numbers

4     to put in there --

5          Q      He's the one --

6          A      -- after the report.

7          Q      He's the one that told you what?  I'm

8     sorry, I just didn't hear you.

9          A      The numbers to put in there after

10    reading the report.

11         Q      Which report?

12         A      The election summary report, I

13    believe.

14         Q      What was the occasion for him asking

15    you to do that?

16                Was it at a board meeting or just a

17    normal reporting or -- or what?

18         A      This is --

19                MR. MILLER:  Object to form.

20                THE WITNESS:  This was during the

21    recount.

22

Page 182

 1    BY MR. BROWN:

 2         Q     And did he tell you why he needed

 3    this information?

 4         A     I think it was included in a letter

 5    that we sent up to the Secretary of State's office.

 6         Q     Do you know why the lawsuit -- or did

 7    anyone tell you why the lawsuit was dismissed the

 8    same day as SullivanStrickler was there getting

 9    access to the election equipment?

10         A     No, sir.

11         Q     And do you recall Robert Sinners

12    making several Open Records Act requests to you?

13         A     I remember there being multiple open

14    records requests, I didn't -- don't remember the

15    names of them, no, sir.

16         Q     Okay.  And let me mark Tab 17 as

17    Exhibit 13.

18              (Hampton Deposition Exhibit Number 13

19               marked for identification.)

20                  THE WITNESS:  It's there.

21    BY MR. BROWN:

22         Q     And Exhibit 13 is an e-mail from you

Page 183

1    to Mr. Sinners' Gmail e-mail address, correct?

2          A    Correct.

3          Q    And here's where I'm curious, you're

4    responding to an e-mail that's dated November 10th.

5    Do you see that?

6          A    I do.

7          Q    So he's asking you under the Open

8    Records Act for information.  And your response is,

9    "Are you still working with the Trump campaign?"

10               Do you see that?

11          A    I do.

12          Q    Why did you ask him that in response

13    to his question under the Open Records Act?

14          A    I think that was in reference to an

15    open records request that he sent directly to me

16    first that had the Trump campaign on it or

17    something.

18          Q    Is -- was Mr. Sinners' Trump's man

19    that was referred in one of the text?

20          A    I have --

21               MR. MILLER:  Object to the form.

22               THE WITNESS:  I have no idea.

Page 184

1    BY MR. BROWN:

2           Q     I'm going to mark Tab 4 as Exhibit

3    14.

4                (Hampton Deposition Exhibit Number 14

5                marked for identification.)

6    BY MR. BROWN:

7           Q     Do you have that in front of you?

8           A     I do.

9           Q     Do you know who Christina Read is?

10          A     I do not.

11          Q     Have you seen this document before?

12          A     No, sir.  Not that I'm aware of, no,

13   sir.

14          Q     Did you know that Mr. Chaney was

15   involved in collecting affidavits with Mr. Sinners?

16          A     I was not aware, no, sir.

17          Q     Did Mr. Chaney share with you the

18   fact that he was collecting affidavits?

19          A     You're going in and out on me.  I'm

20   sorry.

21          Q     Oh, I'm sorry.

22                Did you ever discuss with Mr. Chaney

Page 185

1        the fact that he was working with Mr. Sinners

2        collecting affidavits that would be used in the

3        lawsuit against Coffee County?

4               A       Not to my recollection, no, sir.

5               Q       Do you recall anyone that was

6        associated with Coffee County Elections assisting

7        in any way the plaintiff in the lawsuit against

8        Coffee County?

9               A       No, sir.

10              Q       And just for the record, I need to

11       get another one in the record.  If would you mark

12       Tab 16 as Exhibit 15.

13                     (Hampton Deposition Exhibit Number 15

14                      marked for identification.)

15       BY MR. BROWN:

16              Q       And I'm not sure how that page has

17       come out in the exhibit, because mine are

18       backwards, but --

19              A       It's up.

20              Q       If you could do me a favor, I want to

21       make sure our pagination is correct, but what is

22       the -- if you look at the bottom of the page of

1    Exhibit 15, what is the page number that's centered

2    in the bottom?

3         A    207.

4         Q    Okay.  If you would go to the last

5    page of this exhibit, which is actually page 205.

6    Are you with me?

7         A    Yes, sir.

8         Q    And these are e-mails between you and

9    Mr. Sinners, correct?

10        A    If she'll be able to keep it still,

11   I'll be able to read it.

12             MS. MARKS:  Oh, I'm sorry.

13             THE WITNESS:  It says, "Thank you,

14   Robert."

15   BY MR. BROWN:

16        Q    And do you recall him asking for the

17   meeting minutes?

18        A    There was -- I guess so.  I mean, the

19   document speaks for itself.

20        Q    Ms. Hampton, the County has been

21   unable to recover your old e-mails or Jil's old

22   e-mails.  Were -- would you have kept copies of

1    those e-mails on the desktop computer at the

2    election office?

3              A      I don't recall.

4              Q      Do you know how they were saved or if

5    they were archived?

6              A      I think we used Outlook.

7              Q      Was it Outlook on the -- on the web

8    or did you have a specific -- or did you have a

9    desktop application?

10             A      I had a desktop icon, so I don't

11   know.  I can't answer that.

12             Q      Okay.  And you didn't do any -- did

13   you do anything to -- I'm not suggesting you did,

14   but did you do anything to destroy your e-mails

15   when you left?

16             A      No, sir.

17             Q      After you left did you have access to

18   your Coffee County election's e-mails?

19             A      No, sir.

20             Q      Do you have any reason to believe

21   that Jil was -- was Jil set up the same, she had

22   a -- a desktop with the Outlook on the desktop?

Page 188

1          A      Yes, sir.

2          Q      And you don't know whether she

3    destroyed any of her e-mails, do you?

4          A      I can't answer that question.  No,

5    sir.

6          Q      Ms. Hampton, I have some questions

7    about the passwords that you used to access the

8    election software.  The -- the EMS -- the main EMS

9    server was password protected, correct?

10         A      Correct.

11         Q      To get into the EMS server, did you

12   need one password or were there a couple of

13   gateways that you needed additional passwords for?

14         A      I don't remember how many passwords.

15         Q      As far as you know, there was one?

16         A      I know there was one, but I don't

17   know if there was more or not, I can't remember.

18         Q      Now, do you recall that in your video

19   there was a Post-It note that showed a password?

20   Do you recall that?

21         A      I do.

22         Q      And what was that a password for?

Page 189

```
1          A     I -- it was for the system, but I

2    don't remember -- I mean, it was for that election,

3    the 2020 election.

4          Q     Was it the password that was specific

5    to that election or was it for the EMS server, if

6    that makes any sense?

7          A     For that election.

8          Q     Okay.  So you needed that to get

9    information from the Secretary of State about the

10   2020 election, correct?

11         A     The Secretary of State's office gave

12   us those passwords.

13         Q     And that was different than the

14   password to the EMS server itself, correct, or was

15   it the same?

16         A     I can't recall.  I know -- I know it

17   was a password given by the Secretary of State, but

18   I don't remember exactly which program it went to.

19         Q     After the password was exposed

20   online, did anyone ask you to change the password?

21         A     That password was for the 2020

22   election and the 2020 election was over when the
```

Page 190

1    video went live or went over the internet.

2         Q     Okay.  Did you ever change the

3    password to the EMS server?

4         A     Not that I recall, no, sir.

5         Q     Did you -- did you have the

6    authority -- the administrative authority to change

7    the password on the EMS computer?

8         A     No.  Not that I was aware of, no,

9    sir.

10        Q     Okay.  And who did, to the best of

11   your knowledge?

12        A     The Secretary of State's office.

13        Q     And I'm referring to the server

14   itself, not to an election-specific password.  Do

15   you follow me?

16        A     I -- yes, sir, I follow you.

17        Q     Okay.  It's your understanding that

18   the local election people did not have the

19   administrative authority to change the -- the

20   password on the EMS server, correct?

21        A     Correct.

22              MS. LAROSS:  Objection as to form.

Page 191

1    BY MR. BROWN:

2         Q    Do you know if Dominion changed the

3    password on the EMS server?

4         A    I do not know that.

5         Q    Did you -- did you hear that after

6    you left, the election's people there in Coffee

7    County could not access the server because they

8    didn't know the password?

9              Did you hear that?

10        A    I heard that.

11        Q    And how did you hear that?

12        A    I don't remember how I heard that.

13        Q    It seems odd that if the Secretary of

14   State is the only person who can change the

15   password, then it would be hard to find out the

16   password was.  I mean, couldn't you just -- the

17   right person call the Secretary of State and say,

18   "Hey, what's my password"?

19             MR. MILLER:  Object to form.

20             MS. LAROSS:  Object as to form.

21   BY MR. BROWN:

22        Q    Right?

Page 192

1            If you get two people objecting, that

2    usually means you're getting warm to something, but

3    let me ask a better question.  The objections were

4    good.

5            Was it -- James Barnes was the

6    election director after you, correct?

7        A    I do not know.

8        Q    Okay.  But somebody was having

9    difficulty getting into the EMS server after you

10   left, correct?

11       A    I do not know.

12       Q    Okay.  I just asked you -- maybe I

13   misunderstood, but I just asked you whether after

14   you left you knew that they were -- people were

15   having difficulty getting into the EMS server.  Do

16   you recall that?

17       A    Correct.

18       Q    Okay.  And do you recall what the

19   trouble was in getting in -- into the EMS server?

20       A    I was told by rumor that they

21   couldn't get into the password.

22       Q    Okay.  That they didn't have the

Page 193

1    password?

2         A    That they could not get into it with

3    the password.

4         Q    Even with the password, or with the

5    password they had, right?

6         A    Correct.

7         Q    And did they ask you about what the

8    password was?

9         A    I have not been contacted by anyone

10   from that Board.

11        Q    Okay.

12        A    After nine years of devoting my world

13   to them, and as a family, no one has ever reached

14   out to me from that Board.

15        Q    Did any other Coffee County official

16   have access to the server besides you?

17        A    Jil did.

18        Q    Other than Jil and you?

19        A    I don't know that anyone knew how to

20   operate it.

21        Q    But as far as you know, no one else

22   had the pass code or had access to it, correct?

Page 194

1          A      Correct.

2          Q      If -- if I could mark Exhibit 37 as

3    Exhibit 16 -- Tab 37 as Exhibit 16.

4              (Hampton Deposition Exhibit Number 16

5               marked for identification.)

6              THE WITNESS:  It's up.

7    BY MR. BROWN:

8          Q      And what is Exhibit 16?

9          A      It looks like a password.

10         Q      Is that your handwriting?

11         A      At the top, yes.

12         Q      And do you know what that was a

13   password to?

14         A      Something to do with the election of

15   2020.

16         Q      Does that look like an

17   election-specific password?

18         A      Yes.

19         Q      So is it your testimony that that

20   would not be the password for the EMS server itself

21   probably?

22         A      That's a password given by the State

Page 195

1     for an election and each election has a different

2     password.

3           Q     And -- and just to get at this again,

4     it's a different password than you would need to

5     get into your particular EMS server, correct?

6           A     Correct.

7                 MR. BROWN:  Okay.  I'm going to take

8     a break until 4:45 and then try to wrap it up.  I'm

9     not saying we'll wrap it up quickly, because I need

10    to work and get organized, so if we could take

11    about a 15-minute break, I would appreciate it.

12    Thank you.

13                VIDEOGRAPHER:  We are going off the

14    record at 4:29.

15          (Recess from 4:29 p.m. to 4:51 p.m.)

16                VIDEOGRAPHER:  We are on the record

17    at 4:51.

18    BY MR. BROWN:

19          Q     Ms. Hampton, let me show what has

20    been marked as Exhibit 17, which is Tab 41.

21                (Hampton Deposition Exhibit Number 17

22                 marked for identification.)

Page 196

1                    THE WITNESS:  It's up.

2      BY MR. BROWN:

3           Q     And what does Tab 41 show -- I'm

4      sorry, Exhibit 17 show?

5           A     It looks like a video of -- or a

6      frame of the election's office.

7           Q     And is there a date stamp on it?

8           A     Yes.

9           Q     And what's the date?

10          A     January the 7th of '21.

11          Q     And do you see the gentleman behind

12     Cathy Latham?

13          A     I do.

14          Q     Is that Miles Latham?

15          A     Yes.

16          Q     And do you see -- is Jil's desk in

17     the Exhibit -- shown in Exhibit 17?

18          A     It is.

19          Q     And it faces -- if you're sitting on

20     the desk, it would face your office, correct?

21          A     Correct.

22          Q     And your office has a -- has a glass

Page 197

1   window?

2           A       Correct.

3           Q       So Ms. Ridlehoover could see right

4   into your office, correct?

5           A       Ms. Ridlehoover, yes.

6           Q       Thank you.  Sorry.

7                   I would like to mark as Exhibit 18

8   Tab 39.

9               (Hampton Deposition Exhibit Number 18

10              marked for identification.)

11  BY MR. BROWN:

12          Q       Do you see that?

13          A       Not yet.

14                  It's up.

15          Q       And do you know who that is shown in

16  tab -- in Exhibit 18?

17          A       I do not.

18          Q       I'd like to mark as Exhibit 19, Tab

19  40.

20              (Hampton Deposition Exhibit Number 19

21              marked for identification.)

22                      THE WITNESS:  It's up.

Page 198

 1    BY MR. BROWN:

 2         Q     And do you recognize the people in

 3    Tab 40 -- I'm sorry, Exhibit 19?

 4         A     Two of them positively.

 5         Q     And who are the -- could you describe

 6    them with reference to Exhibit 19?

 7         A     The female is Cathy Latham, and the

 8    one with the Coffee hat on, or the "C," is Eric

 9    Chaney?

10         Q     Okay.  And who else do you see in

11    Exhibit 19 that you recognize?

12         A     I can't see their faces.

13         Q     Is one of them Mr. Cruce?

14         A     I have no idea.

15         Q     Okay.  Ms. Hampton, the -- the videos

16    of your office show a number of -- of meetings in

17    your office from time to time.  And it appears that

18    throughout December you had a number of meetings

19    with Ed Voyles.  And -- and could you just describe

20    generally why you would be meeting with Ed Voyles?

21         A     Ed was the ex-chairman of the Board.

22         Q     Right, but he's ex-chairman of the

Page 199

1    Board, meaning he was not a board member, right?

2         A    Correct.

3         Q    And so what business did you have

4    with him relating to elections?

5         A    He was a voter of Coffee County.

6         Q    Right, but what did he contribute to

7    those meetings?

8              What was -- what was he doing in the

9    meetings?  Was he just being a voter?

10        A    He would stop by from time to time to

11   check in, see how things were going.  I mean, he

12   was a friend and didn't have to have a agenda to

13   stop by.

14        Q    And did -- did you tell him to come

15   by on January 7th?

16        A    I don't recall.

17        Q    You might have?

18        A    I don't recall.

19        Q    The videos also show a number of --

20   of meetings, some of which Mr. Voyles was also

21   present, in which Tony Rowell was in your office in

22   December quite frequently.  And what were the

Page 200

1    purpose of those meetings?

2         A    Tony Rowell was the county attorney.

3         Q    Right, but -- and -- and -- but in

4    many of those meetings they were people like

5    Mr. Voyles who attended.  What were you all talking

6    about?

7              MR. MILLER:  Object to form.

8              THE WITNESS:  I can't remember our

9    conversation, sir.

10   BY MR. BROWN:

11        Q    Let me direct your attention back to

12   Exhibit 5, which is the Signal texts that were

13   produced by Mr. Logan.

14        A    Okay.

15        Q    And on the first page there,

16   Mr. Penrose says, "I'd like to introduce ? and ?

17   they work on my team doing the investigation.  I

18   want them to start this group so we can get to the

19   bottom of any outside access to your voting

20   machines."

21              Do you see that?

22        A    I do.

1        Q      Was -- was there some concern that

2   someone had had outside access to your voting

3   machines?

4        A      I don't know what that's pertaining

5   to, sir.

6        Q      And did you know Mr. Penrose before

7   this such that he would be the one introducing you

8   to Lenberg and Logan?

9        A      I don't know Mr. Penrose as a -- I

10  don't know.

11       Q      But it looks like he's introducing

12  people to you in a way that he already knew you,

13  right?

14       A      I don't know that he's talking about

15  me.

16       Q      Okay.  And you don't recall the

17  objective of Mr. Lenberg and Mr. Logan's work in

18  Coffee County to be relating to getting to the

19  bottom of any outside access to your voting

20  machines?

21       A      Repeat the question, please.

22       Q      You don't recall that the -- that the

1    work of Mr. Logan and Mr. Lenberg might have been

2    related to outside access to your voting machines?

3         A      I'm going to plead the Fifth on that.

4         Q      I didn't hear what you said.

5         A      I said I'm going to plead the Fifth

6    on that.

7         Q      Okay.  Do you know anything about

8    someone having outside access to your voting

9    machines other than the people that you gave

10   authorization to?

11        A      No, sir.

12        Q      Did Mr. Logan or Mr. Lenberg speak

13   with you about work that they were doing for other

14   counties in Georgia relating to their election

15   equipment?

16        A      Not to my recollection, no, sir.

17        Q      Did anyone other than you have a key

18   to the election office?

19        A      Yes, sir.

20        Q      Who?

21        A      Jil, C.T. Peavy.

22        Q      Okay.

Page 203

1          A     Wesley Vickers.

2          Q     Who -- who is Ms. Peavy?

3          A     Who is who, please?

4          Q     Ms. Peavy -- was it Ms. Peavy?  Is

5    that what you said?

6          A     No, sir. C.T. Peavy.

7          Q     Okay.  Who -- who is that?

8          A     He was a board member.

9          Q     How do you spell his name?

10         A     The letter C, dot, T, dot, Peavy,

11   P-E --

12         Q     And he was a --

13         A     -- V-E-Y, I think.

14         Q     And he was an election board member?

15         A     Yes, sir.

16         Q     Okay.  Did -- and did -- do you

17   recall our discussion before when we were going

18   through the board members who had spoken with

19   Mr. Chaney about getting a third party to have

20   access to the election equipment?

21               Do you recall that testimony?

22         A     Yes, sir.

Page 204

1          Q     And did Mr. Peavy -- I'm sorry, what

2    was his name again?

3          A     Peavy.

4          Q     Okay.  Did -- did Mr. Chaney indicate

5    that Mr. Peavy had concurred in the direction for

6    you to give the third party access to the election

7    equipment?

8                MR. MILLER:  Object to form.

9                You can answer the question.

10               THE WITNESS:  Mr. Peavy was at that

11   time -- I think it was close to the end of the

12   year, the last couple of months he was inactive

13   basically because of the health of -- I think it

14   was his wife or either his dad, I can't remember.

15   BY MR. BROWN:

16         Q     Okay.  So he would not have been

17   involved in that decision then?

18         A     No, sir.  He wasn't even at the last

19   couple of meetings.

20               MR. MILLER:  Object to form.

21   BY MR. BROWN:

22               Q     And then who was the -- the last

Page 205

1    person that you mentioned that had a key?

2         A    Wesley Vickers.

3         Q    And who's that?

4         A    County manager.

5         Q    Anybody else have keys?

6         A    I don't know.  Not that I know of.

7         Q    Did Eric Chaney have a key?

8         A    I don't know.

9         Q    Do you know whether Mr. Lindell

10   obtained Coffee County voting system data?

11        A    I do not know.

12        Q    Have you heard anyone say that

13   Mr. Lindell had Coffee County voting data?

14        A    Not to my knowledge.

15        Q    Did Mr. Lindell bring with him to his

16   trip to Douglas a -- an expert or a technical

17   person of some kind?

18        A    I don't know.

19        Q    Did you speak with Ms. Latham about

20   Mr. Lindell's visit to Douglas?

21        A    I don't recall.

22        Q    Do you recall speaking with anybody

Page 206

1    else about Mr. Lindell's visit to Douglas?

2            A      I don't recall.

3            Q      I'd like to mark Tab 29 as Exhibit

4    20.

5                   (Hampton Deposition Exhibit Number 20

6                   marked for identification.)

7    BY MR. BROWN:

8            Q      And just tell me when it comes up.

9            A      It's up.

10           Q      And do you see the time -- is there a

11   timestamp on that still photo?  I don't think there

12   is.

13           A      I don't see one.

14           Q      And is this a photograph of the

15   SullivanStrickler people in the Coffee County

16   Offices?

17           A      Yes, I think so.

18           Q      That's your -- that's your office,

19   isn't it?

20           A      Yes.

21           Q      All right.  I would like to mark Tab

22   30 as Exhibit 21.

Page 207

1                   (Hampton Deposition Exhibit Number 21

2                   marked for identification.)

3      BY MR. BROWN:

4                   Q      And just tell me when that comes up.

5                          MS. ELSON:  This is a large file, so

6      it may be a minute.

7                          MR. BROWN:  Okay.

8                          THE WITNESS:  Okay.  It's up.

9      BY MR. BROWN:

10                  Q      And does that appear to be a

11     photograph taken inside the Coffee County Election

12     offices?

13                  A      What page are you talking about?

14                  Q      Okay.  I'm on Tab 30.  Is that what

15     you're on?

16                  A      Yes, sir.

17                  Q      Mine is just one page.

18                  A      Ours is multiple pages.

19                  Q      Okay.  Well, looking at the first

20     page, do you -- do you see a photograph of two

21     gentlemen?

22                          MS. MARKS:  Ask him if this is --

Page 208

1    where is this from, that one right there.

2                THE WITNESS:  Ms. Marks is asking is

3    it the one with the laptop in front?

4    BY MR. BROWN:

5         Q    Yes.

6         A    Okay.

7         Q    Do you see that?

8         A    I do.

9         Q    And who's the gentleman on the right

10   who's smiling?

11        A    Ed Voyles.

12        Q    And who is the gentleman in the

13   middle with the baseball cap on?

14        A    That is Eric Chaney.  That's what --

15   what page?  Page 12.

16        Q    Thank you.

17             MR. BROWN:  Okay.  I'm going to turn

18   over the examination to co-counsel at this time.

19      EXAMINATION BY COUNSEL FOR CURLING PLAINTIFFS

20   BY MS. ELSON:

21        Q    Hi, Ms. Hampton.  My name's Hannah.

22   I am here representing different parties in this

1    case, Curling Plaintiffs.  And I know these things

2    are a marathon, so we really appreciate your time.

3    Just a couple more questions.

4              So I know you mentioned that one of

5    the scanners in the Secretary's office -- or that

6    the Secretary's office wanted you to use was giving

7    you a hard time.

8              Would you prefer using hand-marked

9    paper ballots in elections in Coffee County?

10             MS. LAROSS:  Objection as to form.

11             THE WITNESS:  I don't have a

12   preference.

13   BY MS. ELSON:

14        Q    Besides what we've already discussed

15   today, while you were working with Coffee County,

16   did you ever notice any security flaws or

17   vulnerabilities that concerned you with the

18   Dominion equipment?

19             MS. LAROSS:  Objection as to form.

20             THE WITNESS:  Vulnerabilities, is

21   that what you asked?

22

Page 210

1    BY MS. ELSON:

2           Q     Yes, security flaws or

3    vulnerabilities.

4           A     Yes.

5           Q     Can you tell me about those?

6           MS. LAROSS:  Objection as to form.

7           THE WITNESS:  One would be the

8    adjudication process.  If you don't have an honest

9    supervisor or an honest person doing the

10   adjudication, they can change the vote of a voter.

11   No one should have that access.

12   BY MS. ELSON:

13          Q     Any other security flaws or

14   vulnerabilities you can recall?

15          MS. LAROSS:  Object as to form.

16          THE WITNESS:  Poll pads being able to

17   be connected to wifi.  It was an actual Apple iPad.

18   BY MS. ELSON:

19          Q     All right.  I know Bruce just asked

20   some questions about passwords.  I just want to

21   straighten up some facts about these passwords, so

22   I'm going to introduce -- what exhibit are we on --

Page 211

1  Exhibit 21.

2          A      Exhibit 22.

3          Q      Oh, yeah, thanks.  Apparently I can't

4  count.  All right.  Bear with me, I'm doing two

5  things at once.

6              (Hampton Deposition Exhibit Number 22

7              marked for identification.)

8  BY MS. ELSON:

9          Q      All right.  Let me know when you can

10  see that exhibit.

11          A      And who do you represent again?  I'm

12  sorry.

13          Q      The Curling Plaintiffs.  We are

14  co-plaintiffs with Mr. Brown's clients.

15          A      It's up.

16          Q      All right.  Is this you in the image?

17          A      It is.

18          Q      And where are you seated?

19          A      In the GEMS room, as I called it.

20          Q      Do you see the -- that small paper

21  Post-It that's attached to the bottom of the

22  computer monitor?

Page 212

```
 1            A      I do.

 2            Q      I have a zoomed-in copy if you can't

 3     see that, but my question for you is, what is that?

 4            A      That was a password to the election.

 5            Q      And by "password to the election"

 6     you're referring to those election-specific

 7     passwords that the State released for the election?

 8            A      Yes.  It's the same one that's on the

 9     memo that is on the desk.

10            Q      I understand.  Thanks.

11            A      That is issued by the State.

12            Q      And does the State issue the same

13     password to each county for each election?

14                   MR. MILLER:  Objection as to form.

15                   MS. LAROSS:  Objection as to form.

16                   THE WITNESS:  Yes.

17     BY MS. ELSON:

18            Q      Okay.  And who has access to that

19     password, besides you obviously?

20            A      Jil had access to it.  The Board

21     members had access to it, but I mean they didn't

22     know how to ...
```

Page 213

1          Q     I'm sorry, I don't want to interrupt

2     you.  Were you finished?  I think you were saying

3     they don't know how to something.

4          A     I mean, it's the password to the

5     database, so Jil had it, I had it, but I was the

6     one that always used the computer.

7          Q     I see.

8                Do you see the smaller Post-It note

9     on your desk?  It's a yellow Post-It.

10         A     I do.

11         Q     And I also have a zoomed-in copy of

12    that if you need it, but what is that?

13         A     I can't read it.

14         Q     Okay.  Does the second page of that

15    tab help?

16         A     It's very blurry on this side.

17         Q     Okay.  While I'm looking for a

18    clearer image, I will represent to you that that

19    Post-It says "SOS_Georgia."  Does that refresh your

20    recollection at all?

21         A     It was a password, I can't remember

22    which program it went to.

Page 214

```
 1              Q      Okay.  Could it have been the

 2      password to the EMS?

 3              A      Like I said, I can't remember which

 4      program it went to.

 5              Q      I got you.

 6              A      What's it say under it?

 7              Q      Great question.  And I do not know.

 8      I have an associate looking for a clearer image of

 9      that.

10                     In the meantime, so we don't waste

11      time, I'm going to introduce Exhibit 23.

12                     (Hampton Deposition Exhibit Number 23

13                     marked for identification.)

14      BY MS. ELSON:

15              Q      Tell me when you can see that.

16              A      It's up.

17              Q      Do you recognize this image?

18              A      I do.

19              Q      And what is it?

20              A      It's the same sticky note.

21              Q      And what's the sticky note taped to?

22              A      The computer.  I can't remember what
```

Page 215

1    that piece is called.

2           Q       Oh, yeah.

3           A       I called it "the box" but --

4           Q       Modem?

5           A       Yeah, hard drive, whatever.  Yeah.

6           Q       And when you say "computer," do you

7    mean the computer that's attached to that monitor

8    we saw in the picture we were just looking at?

9           A       Yes.

10          Q       So this is the box attached to the

11   monitor in the GEMS room?

12          A       Yes.

13          Q       Okay.  Does this refresh your

14   recollection any more about what the SOS_Georgia

15   password is for?

16          A       I think that's the one to the actual

17   computer.

18          Q       And by that you mean when you turn on

19   the computer, you have to log into a user account

20   and that would be the password you use?

21                  And I -- I'm sorry, I know you

22   haven't answered, but I'll just add that, you know,

Page 216

```
 1    you don't need to speculate.  So if you don't know,

 2    that's fine, but if you want to say that, you know,

 3    it might be that password or -- that's also --

 4         A     I remember the password and I

 5    remember typing that, but I don't remember which

 6    program it went in to.

 7         Q     Okay.  Could it be the password to

 8    the EMS server?  I know you don't remember it

 9    completely.

10              MR. MILLER:  Object to form.

11              THE WITNESS:  I don't remember.  I'm

12    sorry.

13    BY MS. ELSON:

14         Q     No need to be sorry.  Thank you.  All

15    right.  One more password for you.

16         (Hampton Deposition Exhibit Number 24

17          marked for identification.)

18    BY MS. ELSON:

19         Q     I'm going to introduce Exhibit 24.

20    Let me know when you can see this one.

21         A     It's up.

22         Q     All right.  I apologize.  Do you
```

Page 217

1    recognize this password?

2          A    I do.

3          Q    And what is this the password for?

4          A    That is the password issued by the

5    State for the election.

6          Q    Do you remember which election?

7          A    2020.

8          Q    And would this be the same case as

9    previously, in that the State issued the same

10   password to every county for this election?

11              MR. MILLER:  Object to form.

12              MS. LAROSS:  Objection as to form.

13              THE WITNESS:  Correct.

14   BY MS. ELSON:

15         Q    Okay.  All right.  Did you ever --

16   and this question doesn't have to do with this

17   picture.

18              Did you ever change a password to an

19   EMS server?

20         A    No, I did not.

21         Q    Did anyone ever ask you to?

22         A    No.

1          Q      Were you aware of anyone ever

2     changing a password to the EMS server?

3          A      No, I was not.

4          Q      Okay.

5          A      If they would look underneath the

6     desk, there's a password taped to the bottom of the

7     desk.

8          Q      And that password would be for the

9     EMS server?

10         A      For the actual -- yeah, to log into

11    the computer for the first time.

12         Q      Okay.  And to the best of your

13    knowledge, does each county have a different EMS

14    server password?

15                MR. MILLER:  Object to form.

16                MS. LAROSS:  Objection as to form.

17                THE WITNESS:  I don't know that

18    answer.

19    BY MS. ELSON:

20         Q      Okay.

21         A      I don't know other counties.

22         Q      That's fine.  Thank you.

Page 219

1                    All right.  So I know Cathy Latham

2      was brought up earlier.  And it's my understanding

3      that you knew her.  I'm curious, what's your

4      relationship with her?

5              A     She's a teacher in Coffee County.

6              Q     Did you meet her through her job as a

7      teacher?

8              A     Yes.

9              Q     When's the last time you communicated

10     with Ms. Latham?

11             A     I don't remember.

12             Q     Fair to say it was a while ago?

13             A     It's -- it's been a while, yes.

14             Q     We understand from surveillance video

15     that we've seen that Ms. Latham was here when Scott

16     Hall and SullivanStrickler -- and I'm sorry, by

17     "here," I mean the Coffee County Election Office,

18     that Ms. Latham was there when Scott Hall and

19     SullivanStrickler were there.

20                    What's your understanding of what her

21     involvement was with those visits?

22                    MR. MILLER:  Object to form.

Page 220

1          THE WITNESS:  I don't know what her

2   involvement was.

3   BY MS. ELSON:

4        Q     Was she involved in arranging their

5   visits?

6          MR. MILLER:  Object to form.

7          THE WITNESS:  I don't know if she

8   arranged them.

9   BY MS. ELSON:

10       Q     Did she speak to people while they --

11   let me rephrase.

12          Did she speak to Scott Hall or

13   SullivanStrickler on January 7th, while they were

14   in the Coffee County Office?

15       A     I don't know if she did or not.

16       Q     Okay.  Do you -- can you tell me

17   anything about Ms. Latham's relationship with Scott

18   Hall?

19          MR. MILLER:  Object to form.

20          THE WITNESS:  No, ma'am, I cannot.

21   BY MS. ELSON:

22       Q     Okay.  All right.  I have a couple of

Page 221

1    follow-up questions about Signal messages.  We

2    really appreciate you trying to access your -- your

3    old Signal messages.

4                  Could you walk me through what

5    exactly you've done to try and recover those?

6         A     I tried to log into it.

7         Q     To the Signal app on your phone?

8         A     I did.

9         Q     And were you -- you were unable to

10   log in?

11        A     I was unable to log into the one I

12   used previous, yes.

13        Q     And by "previous," and -- by

14   "previous," you mean it was a previous account you

15   used different from the one you use today?

16        A     Correct.

17        Q     Okay.  Was it a problem with a

18   forgotten password?

19                  Why were you unable to log in, if you

20   know?

21                  MR. MILLER:  Object to form.

22                  THE WITNESS:  I don't know why I

Page 222

1    couldn't log in.

2    BY MS. ELSON:

3         Q    Would you be willing to allow us to

4    try and recover your Signal messages?

5              MR. MILLER:  I'm not going to let her

6    answer that question.  I object to form.

7              MS. ELSON:  Okay.  You're instructing

8    her not to answer?

9              MR. MILLER:  Yeah, I am, I am

10   instructing her to take the Fifth.

11             MS. ELSON:  Okay.

12             THE WITNESS:  I take the Fifth on

13   that.

14   BY MS. ELSON:

15        Q    And this was discussed previously, so

16   I'm sorry to be a bit duplicative, I just want to

17   make sure I understand something.

18             It was Eric Chaney who thought it

19   would be a good idea for you to make this YouTube

20   video to educate people about the scanner issue,

21   correct?

22        A    Correct.

Page 223

```
 1          Q     And you had nothing to do with that

 2    video being released to the public?

 3          A     Correct.

 4          Q     When was the last time you spoke to

 5    Mr. Chaney?

 6          A     February the 25th.

 7          Q     Of 2022?

 8          A     '1.

 9          Q     2021.  Okay.

10                Why was Mr. Chaney dismissed?

11                MS. LAROSS:  Objection as to form.

12                THE WITNESS:  I have no idea.

13    BY MS. ELSON:

14          Q     So I know we spoke a bit about the

15    SullivanStrickler visit on January 7th, and the

16    visits later that month by Doug Logan and Jeff

17    Lenberg.

18                Did anyone help you with the

19    logistics of arranging the visit by Doug Logan and

20    Jeff Lenberg to the office?

21                MR. MILLER:  Plead the Fifth.

22                THE WITNESS:  I take the Fifth on
```

Page 224

1    that.

2    BY MS. ELSON:

3        Q    And I understand that January 18th

4    was a holiday, so the office was closed.  Who --

5    did someone tell you that it was okay to open the

6    office on that day?

7        A    I take the Fifth on that.

8        Q    Okay.  Random question for you.  I'm

9    going to introduce the next exhibit.

10            (Hampton Deposition Exhibit Number 25

11            marked for identification.)

12   BY MS. ELSON:

13       Q    Let me know when you can see that.

14            VIDEOGRAPHER:  This is going to be

15   Exhibit 25, ma'am?

16            MS. ELSON:  Thank you, sir.

17            THE WITNESS:  It's up.

18   BY MS. ELSON:

19       Q    Thank you.

20            It's my understanding that the item

21   this person is holding is one of those ring lights

22   that people use behind them when they're live

Page 225

1    streaming or Zooming.  Do you agree with that?

2           A     I can't tell what that is.

3           Q     Okay.  Did Doug Logan or Jeff Lenberg

4    use a ring light while they were in the Coffee

5    County Election Office?

6           A     Not to my recollection, no.

7           Q     Did either of them live stream or

8    have a Zoom call while they were in the office?

9           A     Not that I remember.

10          Q     Okay.  Do you recall a GBI

11   investigator showing up while the two of them were

12   in the office?

13          A     No, ma'am.

14          Q     And I know this was already discussed

15   too, but, again, I just want to get a couple of

16   facts straight about the activities during that

17   day.

18                So neither Doug -- is it correct that

19   neither Doug Logan nor Jeff Lenberg touched any of

20   the equipment while they were in the Coffee County

21   Office?

22          A     Correct.

Page 226

1          Q     Did they access the equipment through

2     a wireless connection or wifi?

3               MR. MILLER:  Object to form.

4               THE WITNESS:  I do not know.

5     BY MS. ELSON:

6          Q     And I'd like to learn a little bit

7     more, if possible, about what they were asking you

8     to do.  Were you entering data or pulling commands?

9               And I know that's not a

10    straightforward question, I'm just giving you some

11    potential examples to try and show the kinds of

12    information we're trying to -- to learn here.

13              MR. MILLER:  She's going to plead the

14    Fifth to any questions associated with that line of

15    questioning.

16              MS. ELSON:  Okay.

17              MR. BROWN:  Excuse me, the witness

18    needs to put that --

19              MR. MILLER:  I was going to say she

20    needs to do it.

21              THE WITNESS:  I plead the Fifth.

22              MS. ELSON:  Thank you.

Page 227

1    BY MS. ELSON:

2         Q    Did you bring in a BMD into the room

3    while Doug Logan and Jeff Lenberg were there?

4         A    I plead the Fifth.

5         Q    Did you bring in an ICP?

6         A    I plead the Fifth.

7         Q    Okay.  I know you mentioned that no

8    one from the Coffee County Board has contacted you

9    since you were forced to resign.  Has anyone from

10   the Secretary's office contacted you?

11        A    Yes.

12        Q    And who is that?

13        A    I don't remember his name.  He was an

14   investigator.

15        Q    Do you know who he was an

16   investigator with?

17        A    He was an investigator with the

18   Secretary of State's office.

19        Q    And about when did he contact you, or

20   exactly if you know?

21        A    I don't remember.

22        Q    But it was after you had been forced

Page 228

1    to resign from your post?

2           A      Yes.

3           Q      Okay.  And did you speak with the

4    investigator?

5           A      I did.

6           Q      Did you -- how did you speak with

7    him?  Did you meet in person?  Did you e-mail?

8    Have a phone call?

9           A      We had a phone call.  It was about

10   a -- an activist in Coffee County that had touched

11   the machines.

12          Q      Did you speak about anything else

13   with the investigator?

14          A      Did not.

15          Q      What activist were you discussing

16   with the investigator?

17          A      Olivia Pearson.

18          Q      And when did she -- when did

19   Ms. Pearson touch the equipment in Coffee County?

20          A      I don't remember the date.  I'm

21   sorry.

22          Q      That's okay.

Page 229

```
 1                      And what other details can you tell
 2      me about the conversation you had with that
 3      investigator?
 4           A      That's an ongoing investigation and
 5      so I don't think I can discuss it.
 6           Q      Okay.  Has anyone from the State
 7      Election Board contacted you in regards to the
 8      Coffee County visits by SullivanStrickler or Logan
 9      or Lenberg?
10           A      Have not.
11           Q      Has anyone from the Center for
12      Election Security contacted you about that topic?
13           A      Not that I'm aware of.
14           Q      Has anyone from any other law
15      enforcement bodies contacted you about that topic?
16           A      None.
17           Q      Okay.  Did the State ever
18      contacted -- contact you about -- or I'll start
19      over.
20                      I know that Mr. Brown asked you if
21      Coffee County ever contacted you requesting your
22      help after you were forced to resign to get James
```

Page 230

1    Barnes, your replacement, access to the EMS, and

2    your answer was no.

3              Did the State ever contact you after

4    you were forced to resign asking for help getting

5    into -- or help with the password for the EMS

6    server?

7         A    No, ma'am.

8         Q    Okay.  And a few quick questions

9    going back to SullivanStrickler's visit on

10   January 7th.  Did -- what equipment did they bring

11   with them into the room?

12        A    I don't recall.

13        Q    And what did you observe them doing

14   while they were in your office?

15              And this can be anything you

16   remember.

17        A    I remember them taking pictures of

18   the SD cards.

19        Q    And what SD cards, or what were the

20   SD cards for?

21        A    The scanners.

22        Q    Okay.  Did they take those pictures

Page 231

1    with their phones or cameras?

2          A     I think it was a little digital

3    camera.

4          Q     Okay.  Did they open any equipment

5    while they were in your office?

6                MR. MILLER:  Object to form.

7    BY MS. ELSON:

8          Q     I know it was a while ago.

9          A     I don't recall.

10         Q     Did they plug in any devices into the

11   equipment?

12         A     I don't recall.

13         Q     Okay.  Did they tell you what they

14   were doing at any point while they were there?

15         A     Did they tell me what they were

16   doing?  Can you --

17         Q     Yeah.  Did they chat with you or

18   comment to you about, you know, why they were doing

19   what they were doing with the equipment?

20               I know you mentioned one example

21   being them taking pictures of SD cards, but I guess

22   what would be helpful to know is if they kind of

Page 232

1   made any comments to you about what they were doing

2   while they were in your office?

3          A     Taking inventory, I guess is what

4   you'd call it.

5          Q     And by "taking inventory," are you

6   meaning counting the numbers of each kind of

7   equipment, or can you describe to me a bit about

8   what that meant to you?

9          A     Like what it -- what was used for an

10  election, I guess, is what that would be.

11         Q     I see.

12               Would it be fair, and you correct me

13  if this is not a correct interpretation of what

14  you're saying, would it be fair to say they were

15  trying to learn about how the equipment was used in

16  your office?

17               MR. MILLER:  Object to form.

18               THE WITNESS:  I would say that's a

19  fair statement.

20  BY MS. ELSON:

21         Q     Okay.  Did they take pictures of

22  anything else that you remember besides the SD

Page 233

1    cards?

2           A     I can't recall.

3           Q     Okay.  Did they plug in any cords,

4    you know, unrelated to the equipment?

5                 Did they plug in any of their own

6    equipment in that room?

7           A     I don't recall.

8           Q     Okay.  Did they ask to see any

9    equipment that wasn't already in the room when they

10   got there?

11          A     I don't recall.

12          Q     Okay.  Do you remember whether they

13   had wireless connections while they were in your

14   office?

15          A     I don't remember.

16          Q     Okay.  Were you connected to the

17   internet while they were in your office?

18          A     The computer on my desk was connected

19   to the internet.

20          Q     Okay.  And that computer is separate

21   from the computer in the GEMS room.  Is that

22   correct?

Page 234

```
 1          A      Correct.

 2          Q      Did the visitors log onto your

 3   computer or interact with your computer after you

 4   had logged on?

 5          A      Not that I recall.

 6          Q      Okay.  Did they interact with their

 7   own computers while they were in the room?

 8          A      I do not know.

 9          Q      You don't remember?

10          A      No, I do not.

11          Q      Okay.  All right.  One last password

12   question.  I'll represent to you that the witness

13   for the Secretary of State testified to us that he

14   understood, and I'm going to read you a quote from

15   testimony, "Ms. Hampton changed the password on the

16   EMS server on December 14th of 2020, which the

17   Secretary's office had directed her to do because

18   the original password was publicly released in the

19   video, but then that password was not shared with

20   the incoming elections director, James Barnes."

21                 MS. LAROSS:  Objection as to form.

22
```

Page 235

1    BY MS. ELSON:

2         Q     What's your reaction to that

3    testimony?

4               MR. MILLER:  Who did the testimony?

5    I'm sorry.

6               MS. ELSON:  This was Gabriel

7    Sterling.

8               THE WITNESS:  I did not -- do not

9    recall any of that.

10   BY MS. ELSON:

11        Q     Just going to drill down a bit.  So

12   did you change the password to the EMS server on

13   December 4th?

14        A     I did not.

15        Q     Were you directed to change the

16   password?

17        A     No, I was not.

18        Q     Thank you.  Okay.  Almost done.

19               Did anyone install malware on any

20   Georgia voting equipment?

21               MR. MILLER:  Object to form.

22               THE WITNESS:  I do not know.

Page 236

1    BY MS. ELSON:

2          Q     Did anyone try to do that?

3                MR. MILLER:  Object to form.

4                MS. LAROSS:  Objection as to form.

5                THE WITNESS:  I don't know.

6    BY MS. ELSON:

7          Q     Did anyone alter any software on the

8    Georgia voting equipment?

9                MR. MILLER:  Object to form.

10               MS. LAROSS:  Objection as to form.

11               THE WITNESS:  I do not know.

12   BY MS. ELSON:

13         Q     Did anyone alter any votes casted in

14   Georgia?

15               MR. MILLER:  Object to form.

16               MS. LAROSS:  Objection as to form.

17               THE WITNESS:  I do not know.

18   BY MS. ELSON:

19         Q     And did anyone alter any election

20   outcomes in Georgia?

21               MS. LAROSS:  Objection as to form.

22               MR. MILLER:  Object to form.

1                    THE WITNESS:  I do not know.

2      BY MS. ELSON:

3           Q     Okay.  Last question for me right

4      now.  And I'll just remind you that you're under

5      oath.  My question is:  Have you produced all of

6      the documents that you have that are responsive to

7      the subpoenas that the Plaintiffs served on you?

8           A     To the best of my knowledge, I have.

9           Q     Okay.  Give me one second.

10                    I know I said that was my last

11     question, I have one more to clean up.

12                    So you told me that no one had

13     contacted you from the Secretary of State's office,

14     Coffee County's office, State Election Board

15     regarding these visits, or even regarding anything

16     after you were forced to resign, besides the

17     investigator who you discussed the activist,

18     Ms. Pearson with.

19                    Did anyone from the Georgia Bureau of

20     Investigations contact you after you were forced to

21     resign?

22          A     No, ma'am.

Page 238

1          Q      Okay.

2                 MS. ELSON:  That's it for me.  I

3     really appreciate your time.  I know others on the

4     call might have a few questions, but yeah, it

5     was -- it was nice talking to you.  And I know that

6     these days are long, so thank you.

7                 MR. MILLER:  May I add something in

8     there for clarification about whether or not

9     investigators have contacted her?  They have not

10    contacted her personally, but I've had two

11    investigators contact me about her.

12                MR. BROWN:  Who and when?

13                MR. MILLER:  Bruce, I have his

14    number -- or his name and number written down.

15                MR. BROWN:  What's the organization,

16    and just generally what time frame?

17                MR. MILLER:  Since -- since we have

18    talked -- after we had our first meeting together,

19    it was the head investigator from GBI, and then I

20    also had legal counsel from the Attorney General's

21    Office contact me.

22                MR. BROWN:  And so that would have

Page 239

1    been sometime in the last three months, right?

2                   MR. MILLER:  Yes.  Yes.

3                   MR. BROWN:  Okay.

4                   MR. MILLER:  It was all after we

5    had -- let me see, the attorney from the Attorney

6    General's Office contacted me two days before we

7    had our meeting and then the other gentleman

8    contacted me the day after that.  And I will get

9    you his name and telephone number.

10                  MR. BROWN:  Thank you so much.  I

11   appreciate it, sir.

12                  MR. MILLER:  Chris Baldwin at GBI.

13                  MR. BROWN:  Okay.

14                  MR. MILLER:  And the gentleman from

15   the Attorney General's Office, I don't remember.

16                  MS. ELSON:  I apologize, can you

17   repeat the first name you said?

18                  MR. BROWN:  Chris Baldwin.

19                  MR. MILLER:  Thank you.

20                  MS. ELSON:  Thank you.

21                  MR. MILLER:  And Brian Kern from the

22   Attorney General's Office.

Page 240

1              MS. ELSON:  Thank you.

2              MR. BROWN:  I don't have any more

3     questions.  Does anybody else have any other

4     questions?

5              MS. LAROSS:  I have some questions.

6     This is Diane.  I don't know if the other lawyers

7     have questions.

8              So why don't I go ahead and

9     proceed.  Is that all right with everyone?  Or if

10    you just want to take a moment to take a breath,

11    I -- everyone here will understand, if you need

12    to do it.  I don't have a lot of questions, but

13    that's up to you.  I want you to make sure,

14    Ms. Hampton, that you're comfortable.

15             THE WITNESS:  I'm ready to get home,

16    so let's go on.

17        EXAMINATION BY COUNSEL FOR STATE DEFENDANTS

18    BY MS. LAROSS:

19        Q    Okay.  All right.  As I mentioned

20    previously, my name is Diane LaRoss.  And I

21    represent the State Defendants and the Secretary of

22    State and also the State Board Elections in this

Page 241

1    case, the State Defendants.

2              So you testified already concerning

3    access by third parties to the Coffee County server

4    on January 7th, 2021.  And I'm going to ask you a

5    couple of questions about that.

6              So the -- before anyone -- any of the

7    third parties arrived at the Coffee County Office

8    to access the server and the election equipment,

9    did you inform anyone at the Secretary of State's

10   office that they were coming or that you expected

11   that they would be accessing the equipment?

12        A    I did not.

13        Q    And after they were there, did you

14   contact anyone from the Secretary of State's office

15   to report that there had been access by third

16   parties to the election equipment on January 7th,

17   2021?

18        A    Not to my knowledge.

19        Q    So -- and I know -- so you said that

20   you didn't -- didn't contact anyone before they

21   came on July -- or sorry, on January 7th, before

22   the third parties came, so you didn't check in with

Page 242

1    the Secretary's office to make sure that their

2    visit was okay.  Is that correct?

3                   MR. MILLER:  Object as to form.

4                   THE WITNESS:  I was doing direction

5    as my board member told me to do.

6    BY MS. LAROSS:

7         Q    And that, I think you mentioned in

8    your prior testimony, was Eric Chaney?

9         A    Correct.

10        Q    And Mr. Chaney was the one then that

11   told you that the third party was going to be

12   coming -- folks from the third party were going to

13   be coming to access the computer on January 7th,

14   correct?

15        A    Correct.

16        Q    And was it your understanding that he

17   had contacted any -- do you have any understanding

18   whether or not he had contacted anyone from the

19   Secretary of State's office?

20        A    I do not know if he did or not.

21        Q    And you had mentioned that you didn't

22   contact anyone from the Secretary of State's office

Page 243

1     after their visit.  And I'm just going to name some

2     folks and see if that jogs your memory at all.

3                    Did you contact Michael Barnes

4     that -- after the January 7th, 2021 event where the

5     third parties accessed the server and the election

6     equipment in Coffee County?

7           A     I did not.

8           Q     How about, did you tell any county

9     liaisons or any investigators from the Secretary of

10    State's office that folks had accessed the Coffee

11    County server on January 7th?

12          A     I did not.

13          Q     And why did you not let the

14    Secretary's office know that there had been access

15    to the election equipment in Coffee County in -- on

16    January 7th, 2021?

17                    MR. MILLER:  I'm going to advise you

18    accordingly, take the Fifth.

19                    THE WITNESS:  I take the Fifth

20    Amendment.

21    BY MS. LAROSS:

22                    Q     And the same question for why you did

Page 244

1    not inform the Secretary's office before the folks

2    came on January 7th, 2021, to access the Coffee

3    County server and election equipment?

4          A     I do not answer to the Secretary of

5    State's office, I answer to the Board.  The Board

6    answers to the Secretary of State's office.

7          Q     So you didn't think it important to

8    let the Secretary's office know that something like

9    that was going to happen?

10         A     Again, I reported to the Board.

11         Q     And I understand that Mr. Lenberg and

12   Mr. Logan were in the Coffee County Election

13   Office, I believe, in January 18th and 19th.  And

14   you've already testified about that so I'm going to

15   ask you similar questions about that visit.

16               Did you inform anyone at the

17   Secretary of State's office before Mr. Lenberg and

18   Mr. Logan came to the Coffee County Office, as you

19   described earlier in your testimony, in late

20   January of 2021?

21         A     I did not.

22         Q     And why did you not let the

Page 245

1    Secretary's office know?

2                    MR. MILLER:  I advise you to take the

3    Fifth.

4                    THE WITNESS:  I take the Fifth.

5    BY MS. LAROSS:

6         Q     And then after their visit, did you

7    inform anyone from the Secretary's office that they

8    had visited the Coffee County Election Office on

9    January 18th and 19th?

10        A     I did not.

11        Q     And I believe you described

12   previously in your testimony that Mr. Lenberg and

13   Mr. Logan didn't actually touch the election

14   equipment.

15                   Do I recall that correctly?

16        A     To the best of my knowledge.

17        Q     And so you didn't see them while you

18   were with them?  You didn't see them touch the

19   equipment?

20        A     I'm sorry, I didn't hear you.

21        Q     So you didn't -- you didn't actually

22   see them touch the equipment while you were there

Page 246

1    with them on January 18th and the 19th in 2021, in

2    the Coffee County Election Office?

3              A       Not to my knowledge.

4              Q       And I think you described that they

5    were there asking you questions and you physically

6    were going onto the system.  Do I have that

7    correct?

8              A       Yes.

9              Q       And what did they ask you to do?

10             Do you remember anything that they

11   asked you to do or what they wanted you to -- asked

12   you to look at?  What questions they had?

13             A       I don't recall.

14             Q       Did you print out anything that they

15   took from the office on the occasion when

16   Mr. Lenberg and Mr. Logan were in the office -- the

17   Coffee County Office in January 18th and 19th in

18   2021?

19             A       I don't remember.

20             Q       And I'm not sure I asked you, after

21   Mr. Lenberg and Mr. Logan were in the Coffee County

22   Office, did you inform anyone at the Secretary of

Page 247

1    State's office or connected with the Secretary of

2    State's office that they had visited the office?

3          A      I did not.

4          Q      And why not?

5                 MR. MILLER:  I would advise you to

6    take the Fifth.

7                 THE WITNESS:  I take the Fifth.

8    BY MS. LAROSS:

9          Q      You testified earlier you said that

10   you gave a deposition and that you also met with

11   Ms. Marks previously.  Do I have that correct?

12         A      That's.

13         Q      Okay.  On how many occasions did you

14   meet with Ms. Marks?

15         A      I think it's been one, I think.

16         Q      Okay.  And at that meeting who else

17   was in attendance at the meeting with Ms. Marks?

18         A      Not counting my attorney?

19         Q      Oh, sure.  So your attorney was

20   there.  So Jonathan was there with you certainly.

21   Okay.

22                And was -- Ms. Marks, was her

1    attorney there or was there any other people at the

2    meeting besides you and your attorney?

3            A     There was a gentleman and a lady

4    besides Ms. Marks, but I don't remember the names.

5            Q     Could the gentleman have been

6    Mr. Brown, who has been asking you questions today,

7    or do you -- any of those -- I don't know if you

8    can see him on Zoom well enough, but --

9            A     I think he was on the phone.

10           Q     Oh, okay.  Someone was on the phone

11   and Ms. Marks was in person.

12           A     Yes.

13           Q     Is that correct?

14                 Okay.  And where did that meeting

15   take place?

16           A     I don't remember the name of the

17   hotel in Douglas.

18           Q     But it was in Douglas --

19           A     Yes.

20           Q     -- Georgia?

21           A     Yes.

22           Q     And when did that meeting happen?

Page 249

1          A      I don't remember the date.

2          Q      Was it within the last few months or

3     was it in the last year?  Can you estimate for me a

4     time frame?

5          A      It's been in the last few months, but

6     my time is all missed -- runs together.

7          Q      Okay.  So perhaps in the summer or

8     into the fall of this year?

9          A      Yeah.

10          Q      And what did you all discuss in

11     your -- during your meeting when you and your

12     attorney met with Ms. Marks and someone on the

13     phone?

14          A      Some of the same information as

15     today.

16          Q      And what information was that, just

17     generally, if you can point to what type of

18     information you all discussed?

19          A      Oh, Lord.  Just questions as to the

20     password, the Secretary of State's office, the

21     Board of Election.

22          Q      And did you speak specifically about

Page 250

1    the third party accessing the Coffee County server

2    on -- on January 7th, 2021?

3                    MR. MILLER:  You can answer.

4                    THE WITNESS:  I'm trying to -- yes,

5    we did.  I was trying to remember the questions.

6    BY MS. LAROSS:

7         Q    Okay.  Is there anything that you all

8    discussed that you haven't spoken about today

9    during your deposition?

10        A    No.

11        Q    Did you bring any documents, either

12   hard copies or electronically, to the meeting with

13   Ms. Marks?

14        A    I don't think I did.

15        Q    So then I -- you didn't provide any

16   documentation to her during that meeting -- at that

17   meeting, correct?

18        A    I don't think I did.

19        Q    What about any pictures or videos,

20   anything else?

21                    I mean, did you provide anything else

22   that I may not have spoken about to Ms. Marks

Page 251

1    during that meeting?

2                    MR. MILLER:  May I interject?

3                    MS. LAROSS:  Sure.

4                    MR. MILLER:  Did you send me some

5    e-mails that I forwarded to Ms. Marks and the other

6    attorneys?

7                    THE WITNESS:  Yes.

8                    MR. MILLER:  Okay.

9    BY MS. LAROSS:

10         Q     And those e-mails that you provided

11   that your attorney just described, have you looked

12   at them or saw those emails during this deposition

13   as one of the exhibits or multiple exhibits?

14         A     Yes.

15         Q     And all of the e-mails that you

16   provided to Ms. Marks, were they you included in

17   the exhibits attached to -- that will be attached

18   to your deposition that we've talked about?

19         A     To the best of my knowledge, yes.

20         Q     Did Ms. Marks provide you with any

21   documentation or any -- or show you anything during

22   that meeting during your discussion?

Page 252

```
 1          A      Not that we haven't discussed today,
 2    no.
 3          Q      Let me take a second, I just want to
 4    make sure.
 5                 I think you had talked about the
 6    Secretary of State Inspector Blanchard.  Do you
 7    know who I'm speaking about?
 8          A      Uh-huh.
 9          Q      And you'll have to say verbally for
10    the record.
11          A      Yes.  Sorry.
12          Q      Okay.  Now, Inspector Blanchard, I
13    think you mentioned during your testimony that he
14    was at the Coffee County Offices on multiple
15    occasions.  Would that be concentrate?
16          A      Yes.
17          Q      And at any time did you let him know
18    that there had been third parties that had accessed
19    the Coffee County server or Coffee -- or sorry,
20    Coffee County server or any of the election
21    equipment?
22          A      No, because at that time -- I mean,
```

1    he came multiple time during my tenure there.

2              Q     Oh, okay.

3              So did he -- do you recall him coming

4    to the office after the January 7th, 2021 event

5    where the third parties accessed the equipment?

6              A     No, I do not.

7              MR. MILLER:  I need to clarify.

8    There were -- in the original subpoena, documents

9    were requested.  Okay?

10             MS. LAROSS:  Okay.

11             MR. MILLER:  Based on that, she went

12   through her phone, she had no e-mails because all

13   of her e-mails were on her computer that was at the

14   office.  Or when I say emails, I said it

15   incorrectly, it's text messages.

16             MS. LAROSS:  Text messages.  Thank

17   you for that clarification.

18   BY MS. LAROSS:

19             Q     So emails that you had, like a

20   personal e-mail that you used for any of the

21   business that you conducted at Coffee County

22   Election Office.  Is that right?

Page 254

1          A     I didn't use any personal e-mail.

2          Q     Okay.  I think that's all that I

3     have.  I'm just taking a moment to check my notes.

4     I'm sorry, this is going to take just a second.

5                Those are all of the questions that I

6     have, Ms. Hampton.  Thank you.

7          A     Thank you.

8          Q     I appreciate your time today.  We --

9     we all understand this has been a long day.

10               MR. MILLER:  Bruce, have you got any

11    cross?

12               MS. LAROSS:  Does the Fulton County

13    have --

14               MR. LOWMAN:  No questions from Fulton

15    County.

16               MR. BROWN:  I have just one follow-up

17    question.

18     EXAMINATION BY COUNSEL FOR COALITION PLAINTIFFS

19    BY MR. BROWN:

20          Q     In one of your text messages to Gary

21    of Dominion in May of 2021, you said that you were

22    doing programming for another county.  Do you

Page 255

1      recall that?

2             A      I do.

3             Q      And what programming were you doing

4      for who?

5             A      What date was that?

6             Q      May of 2021.

7             A      Treutlen County.

8             Q      And -- and what sort of work were you

9      doing for them?

10            A      You're breaking up on me.

11            Q      I'm sorry.  What sort of work were

12     you doing for them?

13            A      They had a special election.

14            Q      Okay.  And you were helping them out

15     with the special election?

16            A      Correct.

17                   MR. BROWN:  And -- and, Jonathan, you

18     may be able to help us on this, but do you have the

19     number for James from Dominion, a telephone number

20     text or -- a text -- a telephone number or contact

21     information?

22                   MR. MILLER:  She's going to have that

1   from where she downloaded those text messages from

2   you all.  I'll get that to you, because it's --

3   it's not on the -- it's not on the text messages

4   that we sent, is it?

5              MS. MARKS:  Right.

6              MR. MILLER:  I'll just -- yeah, I'll

7   have her look that up before we leave and -- and

8   give that to Marilyn.

9              MR. BROWN:  That would be great.

10             Thank you very much -- thank you

11  very much, Ms. Hampton.

12             Jonathan, thank you very much for

13  your help.  We appreciate it.  That's all I've

14  got.

15             MR. MILLER:  Okay.  Well, Bruce, you

16  have succeeded for the second time in making it

17  dark before I get home.

18             VIDEOGRAPHER:  Does anyone have

19  any -- anyone else have any questions they need to

20  ask before we go off the record?

21             Okay.  We are going off the record

22  at 6:07 p.m.

1              (Whereupon, at 6:07 p.m., the

2          video-recorded deposition of EMILY MISTY

3          HAMPTON was concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

```
 1              CERTIFICATE OF NOTARY PUBLIC

 2    I, FELICIA A. NEWLAND, CSR, the officer before whom

 3    the foregoing video-recorded deposition was taken,

 4    do hereby certify that the witness whose testimony

 5    appears in the foregoing deposition was duly sworn

 6    by me; that the testimony of said witness was taken

 7    by me in stenotype and thereafter reduced to

 8    typewriting under my direction; that said deposition

 9    is a true record of the testimony given by said

10    witness; that I am neither counsel for, related to,

11    nor employed by any of the parties to the action in

12    which this deposition was taken; and, further, that

13    I am not a relative or employee of any counsel or

14    attorney employed by the parties hereto, nor

15    financially or otherwise interested in the outcome

16    of this action.

17

18

19                              _____

20                              FELICIA A. NEWLAND, CSR
                                Notary Public
21
      My commission expires:
22    September 15, 2024
```

1           A C K N O W L E D G E M E N T   O F

2                     D E P O N E N T

3

4    I, EMILY MISTY HAMPTON, do hereby acknowledge I have

5    read and examined the foregoing pages of testimony,

6    and the same is a true, correct and complete

7    transcription of the testimony given by me, and any

8    changes or corrections, if any, appear in the

9    attached errata sheet signed by me.

10

11

12

13

14   _____            _____
     Date                        EMILY MISTY HAMPTON
15

16

17

18

19

20

21

22

1    Donna Curling, et al. vs. Brad Raffensperger, et al.

2                    EMILY MISTY HAMPTON

3    INSTRUCTIONS TO THE WITNESS:

4        Please read your video-recorded deposition over

5    carefully and make any necessary corrections.  You

6    should state the reason in the appropriate space on

7    the errata sheet for any corrections that are made.

8        After doing so, please sign the errata sheet

9    and date it.

10       You are signing same subject to the changes you

11   have noted on the errata sheet, which will be

12   attached to your deposition.

13       It is imperative that you return the original

14   errata sheet to the deposing attorney within thirty

15   (30) days of receipt of the deposition transcript by

16   you.  If you fail to do so, the deposition

17   transcript may be deemed to be accurate and may be

18   used in court.

19

20

21

22

```
 1   Veritext Legal Solutions
     1250 Eye Street, N.W., Suite 350
 2   Washington, DC 20005
     (202) 857-DEPO
 3

 4              E R R A T A  S H E E T

 5   Case Name:  Donna Curling, et al. vs. Brad
     Raffensperger, et al.
 6
     Witness Name:  EMILY MISTY HAMPTON
 7
     Deposition Date:  Friday, November 11, 2022
 8
     Page No.  Line No.   Change/Reason for Change
 9

10

11

12

13

14

15

16

17

18

19

20

21   _____        _____
     Signature                       Date
22
```