Page 1

1                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
2                           ATLANTA DIVISION
3                           CASE NO.:  1:17-cv-2989-AT
4        DONNA CURLING, et al.,
5             Plaintiffs,
6        vs.
7        BRAD RAFFENSPERGER, et
         al.,
8
9             Defendants.
    _____/
10   VIDEOCONFERENCE
     VIDEOTAPED
11   DEPOSITION OF:        DOUG LOGAN
12   DATE:                 FRIDAY, NOVEMBER 18, 2022
13   TIME:                 9:02 A.M. - 3:54 P.M.
14   PLACE:                VIA VIDEOCONFERENCING TECHNOLOGY
15   STENOGRAPHICALLY
     REPORTED BY:          JAZZMIN A. MUSRATI, RPR, CRR
16                         Registered Professional Reporter
                           Certified Realtime Reporter
17
18
19
20
21
22
23
24
25

```
 1      A P P E A R A N C E S: (VIA ZOOM VIDEOCONFERENCE)
 2      APPEARING ON BEHALF OF THE COALITION FOR GOOD
        GOVERNANCE PLAINTIFFS:
 3      BRUCE P. BROWN, ESQUIRE
        OF: Bruce P. Brown Law
 4         1123 Zonolite Road Northeast
           Suite 6
 5         Atlanta, Georgia 30306
           bbrown@brucepbrownlaw.com
 6
        MARILYN MARKS, ESQUIRE
 7      OF: Attorney At Law
           7035 Marching Duck Drive
 8         E504
           Charlotte, North Carolina 28210
 9         marilyn@uscgg.org
10      APPEARING ON BEHALF OF THE CURLING PLAINTIFFS:
        WAIL JIHADI, ESQUIRE
11      JENNA CONAWAY, ESQUIRE
        HANNAH ELSON, ESQUIRE
12      OF: Morrison & Foerster, LLP
           2100 L Street Northwest
13         Suite 900
           Washington, D.C. 20037
14         wjihadi@mofo.com
           jconaway@mofo.com
15
        APPEARING ON BEHALF OF THE STATE DEFENDANTS:
16      DIANE LaROSS, ESQUIRE
        BRYAN TYSON, ESQUIRE
17      BRYAN JACOUTOT, ESQUIRE
        OF: Taylor English
18         1600 Parkwood Circle Southeast
           Suite 200
19         Atlanta, Georgia 30339
           dlaross@taylorenglish.com
20
        ANNA EDMONDSON, ESQUIRE
21      DANIELLE HERNANDEZ, ESQUIRE
        ALEXANDER DENTON, ESQUIRE
22      JAVIER PICO-PRATS, ESQUIRE
        OF: Robbins Litigation & Regulatory Law
23         500 14th Street Northwest
           Atlanta, Georgia 30318
24         aedmondson@robbinsfirm.com
25
```

Page 3

1    A P P E A R A N C E S:
     (VIA ZOOM VIDEOCONFERENCE) (Cont'd)

2

3    DAVID R. LOWMAN, ESQUIRE
     OF: Fulton County Attorney's Office
4    141 Pryor Street, Suite 4038
     Atlanta, GA, 30303
5    david.lowman@fultoncountyga.gov
6    ALSO PRESENT:
7    Duke Stephenson - Videographer
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
1                   C O N T E N T S
2      TESTIMONY OF DOUG LOGAN                        PAGE
3          DIRECT EXAMINATION                          8
       BY MR. BROWN
4          CROSS-EXAMINATION                          198
       BY MR. JIHADI
5          CROSS-EXAMINATION                          209
       BY MS. LaROSS
6          CERTIFICATE OF OATH                        226
           CERTIFICATE OF REPORTER                    227
7          ERRATA SHEET                               228
           READ AND SIGN LETTER                       229
8
9                   PLAINTIFF EXHIBITS
10     EXHIBIT                                         PAGE
```

```
11     Exhibit 1...................................  36
          7/27/22 Ichter Davis Letter
12     Exhibit 2...................................  36
          4/19/21 Board of Selectment Meeting
13     Exhibit 3...................................  75
          Logan Messaging Thread
14     Exhibit 4...................................  75
          Logan Messaging Thread
15     Exhibit 5................................... 106
          Data Log
16     Exhibit 6................................... 124
          SullivanStrickler Log Files
17     Exhibit 7................................... 133
          Photographs
18     Exhibit 8................................... 159
          1/8/21 Email String From Paul Maggio To
19        Sidney Powell
       Exhibit 9................................... 184
20        Screenshot
       Exhibit 10.................................. 195
21        Coalition Plaintiffs' Response on Brief
          on Law Enforcement Investigative
22        Privilege
23
24
25
```

Page 5

S T I P U L A T I O N S

1

2        It is hereby stipulated and agreed by and between

3    the counsel for the respective parties and the deponent

4    that the reading and signing of the deposition

5    transcript be reserved.

6                            ------

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

P R O C E E D I N G S

* * * * * * * * *

(Whereupon, the proceedings began at 9:02 a.m.)

1

2

3

4          THE VIDEOGRAPHER:  Good morning, everybody.

5     We're going on the record at 9:02 a.m. Eastern

6     Standard Time, on Friday, November 18th, 2022.

7          Please note that this deposition is being

8     conducted virtually.  Quality of recording depends on

9     quality of camera and internet connection of

10    participants.  What is seen from the witness and

11    heard on screen is what will be recorded.  Audio and

12    video recording will continue to take place unless

13    all parties agree to go off the record.

14         This begins Media Unit 1 of the video recorded

15    deposition of Doug Logan, taken in the matter of

16    Donna Curling v. Raffensperger.

17         This deposition is being conducted remotely via

18    Zoom.  My name is Duke Stephenson; I'm the

19    videographer.  And the court reporter today is

20    Jazzmin Musrati.  We both represent Veritext.

21         Will counsel please introduce themselves, after

22    which will the court reporter please swear in the

23    witness.

24         MR. BROWN:  Bruce Brown for the plaintiffs.

25         MR. JIHADI:  Wail Jihadi for the Curling

Page 7

1        plaintiffs.

2              MS. LaROSS:  Diane LaRoss for the State

3        defendants.

4              MR. JACOUTOT:  Bryan Jacoutot for the State

5        defendants.

6              MS. HERNANDEZ:  Danielle Hernandez for the

7        State defendants.

8              MR. PICO-PRATS:  Javier Pico-Prats for the

9        State defendants.

10             MS. EDMONDSON:  Anna Edmondson for the State

11       defendants.

12             MR. JACOUTOT:  We're also joined by Bryan Tyson

13       for the State defendants.

14             MR. LOWMAN:  And this is David Lowman for the

15       Fulton County defendants.

16             THE STENOGRAPHER:  Raise your right hand,

17       please.

18             Do you swear or affirm the testimony you are

19       about to give will be the truth, the whole truth, and

20       nothing but the truth?

21             THE WITNESS:  Yes, ma'am.

22       Thereupon,

23                        DOUG LOGAN,

24       having been first duly sworn or affirmed, was examined

25       and testified as follows:

DIRECT EXAMINATION

1

BY MR. BROWN:

2

   Q.  Please state your name for the record.

3

   A.  Douglas Logan.

4

   Q.  Mr. Logan, first, thank you for appearing today.

5

      I first need to ask you a formal question.  Are

6

you under any medication or any drugs that would have

7

any impact upon your ability to testify truthfully

8

today?

9

   A.  No, sir.

10

   Q.  You have had the flu?  Are you feeling -- had a

11

cold.  Are you feeling okay?

12

   A.  I'm feeling all right today.  Not 100 percent

13

yet, but it's okay.

14

   Q.  Okay.  Well, if you need a break, or counsel, if

15

anybody else needs a break, just so indicate, and that's

16

fine.  Typically I will take a break about every hour

17

anyway, just so everybody can stretch and regroup.  But

18

if you need a break, that's fine.

19

      Particularly, since we're on Zoom, it's easy to

20

talk over each other and difficult for the court

21

reporter to straighten out the testimony.

22

      So I will do my best not to interrupt you, and if

23

you could do the same for me.

24

      If there are any questions that I have that are

25

1    not clear, just let me know and I will reframe it the

2    best I can.

3          Mr. Logan, I'm going to ask just a couple of

4    general questions about your background.  Where did you

5    go to college?

6       A.   Milford College.

7       Q.   And what was your degree?

8       A.   So I have a double major in business management

9    and accounting with minors in computers and technology

10   and peace and conflict studies.

11      Q.   And do you have any post graduate degrees?

12      A.   No, sir.

13      Q.   In the last ten years, just tell me very

14   generally your employment or business history.

15      A.   So for the vast majority of the last ten years, I

16   ran my own company called Cyber Ninjas, and for a few

17   years before that to cover ten years, I was in the same

18   field.  So I am doing application security.

19      Q.   Did you say -- I just didn't hear you --

20   application security?

21      A.   Application security.

22      Q.   And what does that mean?

23      A.   So it's an area of cybersecurity that focuses on

24   making sure that application development is secure.  So

25   I work with developers in order to help ensure that

Page 10

1    the -- the applications are properly made to be secure.

2         Q.   Are you -- are you still working with Cyber

3    Ninjas?

4         A.   No.  Cyber Ninjas went out of business 1st of

5    January of this year.

6         Q.   And what -- what is your work now?

7         A.   I am unemployed.

8         Q.   And did Cyber Ninjas file for bankruptcy?

9         A.   No, sir.

10        Q.   Okay.

11        A.   Based on consultations with attorneys, there was

12   no value.  Bankruptcy does not actually resolve debts

13   for corporations anyway, so...

14        Q.   Okay.  I need to ask you another just formal

15   question.

16             You don't have any electronic devices that you're

17   messaging with other people right now, are you?

18        A.   No, sir.

19        Q.   Okay.  Thank you.

20             Mr. Logan, when did you first get involved in

21   election analysis using voting system data?

22        A.   It was after the 2020 election.

23        Q.   When did you begin seeking access to Georgia

24   voting systems after the 2020 election?

25        A.   So November 14th, I was introduced to someone who

1    was on the way to Lin Wood's house to help with Election

2    Integrity efforts.  And around that time period that I

3    met with them and talking to the counsel there, there

4    was an interest in getting forensic images of systems in

5    order to support litigation.

6        Q.  Was that litigation to -- relating to the 2020

7    election?

8        A.  Yes, sir.

9        Q.  Was the purpose to see if the election might be

10   reversed?

11       A.  The purpose was to discover exactly what had gone

12   on, because there was a number of statistical anomalies

13   that happened in the election.

14       Q.  What kind of statistical anomalies?

15       A.  My background is not -- not specifically in that

16   type of math.  But I have been told by a number of

17   people who are that there was a number of different

18   standard tests that do -- that they do over elections,

19   that this last election failed.

20       I think one of them is called the BeneSys

21   analysis or something like that.  But there's -- I mean,

22   elections are one of the most well studied areas of

23   statistics across the globe because of interest in

24   ensuring democracy.  And some of this analysis showed

25   that there was -- there was potential problems in this

1   election.

2       Q.  The -- you said you were introduced to someone,

3   and then you mentioned Lin Wood.  Could you describe

4   that, who it was that you got involved with Lin Wood's

5   group?

6       A.  So I had a friend of mine who asked me if they

7   figured out who was working on the election stuff, if I

8   would be willing to take a look into it.  I said yes.

9   So she introduced me to somebody, who introduced me to

10  Jim Penrose, who was on his way to Lin Wood's house, and

11  he called me up, and I went with him and went there.

12      Q.  Did you know Jim Penrose before?

13      A.  No, sir.

14      Q.  And who is Jim Penrose?  Who does he work for?

15  What does he do?

16      A.  I do not know who he currently works for.  His

17  background is with the NSA.  I believe he was the

18  individual who originally set up the counterintelligence

19  unit at the NSA.

20      Q.  And what -- what was his work at the time that

21  you met him?

22      A.  He worked for some contractor.  I don't -- I

23  don't remember the details.  I'm sorry.

24      Q.  Do you know who he was paid by, directly or

25  indirectly?

Page 13

1     A.  I don't remember.  If you said the name, I might

2     recognize it, but I don't remember.

3     Q.  And so he called you and said what, generally?

4     A.  Something along the lines of, hey, we're going to

5     work on this, I am going to Lin Wood's house, if you

6     want to come with us.  So I packed up a bag, and I went.

7     Q.  When was that?  You mentioned the day

8     November 14th before.

9     A.  Yeah.  That's the day I left was November 14th.

10     Q.  And do you mind giving me the name of your friend

11     who referred you to Jim Penrose?

12     A.  I do mind.

13     Q.  I might have to come back to that, but we'll move

14     on for now.

15          The -- when you got to Lin Wood's -- it's called,

16     what, Tomotley Plantation; is that right?

17     A.  Correct.

18     Q.  Who else was there?

19     A.  I don't know if I remember exactly who was there

20     at the time when I got there.  There -- I mean, there

21     was -- of course, Lin Wood was there.

22     Q.  Penrose?

23     A.  Penrose -- Penrose was there.  There was some guy

24     from the CIA.  I don't know if I'd even remember his

25     name if you said it.  He was a published author of some

1  sort.  Specifically I think he did a lot of work in

2  Venezuela, as I recall it.  There is a guy who has some

3  product association with Ali Alexander.  I am not

4  remembering his name.  That may be enough for you to

5  remember.  Not -- not long afterwards, Sidney Powell

6  came for a short period of time before coming back at a

7  later date for a longer period of time.

8         I -- I might be forgetting somebody.  This is two

9  years ago.  Trying to remember all of these details is

10 kind of hard.

11    Q.  Do you remember, was Mike Flynn there?

12    A.  He was not there when I went there initially.  He

13 did eventually come.

14    Q.  Did he -- did he come while you were there?

15    A.  Yes.

16    Q.  And how long was he there?

17    A.  I don't -- I don't think I would be accurate if I

18 give you any number.

19    Q.  How long were you there?

20    A.  Besides a few trips, you know, I was there pretty

21 much from November 14th until Christmas Eve.

22    Q.  Was Patrick Byrne there?

23    A.  He stopped by I think for a few days, if I

24 remember correctly.  But, no, he was not generally

25 there.

Page 15

1    Q.  How about Scott Hall?

2    A.  No.

3    Q.  How about Jesse Binnall, he's an --

4    A.  No.

5    Q.  -- attorney?

6        Dave Bossie?

7    A.  Don't even know who he is.

8    Q.  Okay.  How about Russ Ramsland?

9    A.  He was not there.

10   Q.  Could you just describe for me, generally,

11   what -- what you were doing while you were at the

12   Tomotley Plantation?

13   A.  So it was a number of different things.  I think

14   most of this really is not very relevant for anything

15   that you're doing.  But there was a lot of sorting

16   through information that was being given by grassroots

17   movements across the country and connecting people who

18   were working on similar things so that they could have

19   effectiveness.  I also in general helped out with a lot

20   of IT related stuff.  He had a system administrator who

21   had recently left, and there was a lot of stuff that

22   needed to be maintained associated with that.

23   Q.  And then what work did you do on things that you

24   think are relevant to this?

25   A.  I mean, besides potentially phone calls and stuff

1    in Georgia, that's -- that's about -- that's about it.

2    But none of the work that we did at that point in time

3    resulted in any forensic images.

4         So, I mean, I think what -- let's step that back

5    a little bit.  When Matt DePerno got the order from the

6    court in order to be able to get forensic images there,

7    somehow he reached out and connected, and we had already

8    found a forensic company to potentially do that when the

9    time -- you know, when something was there.  So Sidney

10   Powell was able to assist with that.

11   Q.  So for the record, who is Matt DePerno?

12   A.  Matt DePerno is an attorney out of Michigan who

13   was the primary counsel on the Antrim, Michigan case.

14   Q.  And is it your testimony that at some point he

15   informed the group that he had obtained what?

16   A.  I was not involved in those conversations.  But

17   what I can tell you is that in preparation for

18   potentially being able to capture forensic images to

19   support litigation, I had reached out to a number of

20   people in the industry, and Jim Penrose had done the

21   same, and everyone had recommended SullivanStrickler as

22   a highly reputable firm who would be capable to do it

23   the proper way so it was legally admissible.  And so

24   that had already been established.  I don't know if they

25   already had a contract or not.

1           But when they -- when Matt DePerno got

2      permission -- got the court to be able to collect the

3      forensics images, they were able to send someone to do

4      that collection because they had that relationship

5      established.  I don't know exactly what happened behind

6      the scenes.  Quite frankly, most of those discussions

7      happened with Jim Penrose and others; it was not

8      directly with me.

9           Q.  Was it your understanding that Sidney Powell or

10     her organization was funding the work of

11     SullivanStrickler for Mr. DePerno?

12          A.  Correct.  That's my understanding.  The Defending

13     the Republic's goal was to -- to fund operations like

14     that across the country for whatever needed to be done

15     for the legal thing.  So as far as I know, she had no

16     involvement in the case in Antrim, Michigan.  But she

17     assisted in that manner to -- to help with the

18     timeliness, to help with what was happening.

19          Q.  And then before we get to Georgia, was anything

20     done with respect to Arizona when you were at Tomotley?

21          A.  Nothing was done in Arizona.  Well, I mean, we

22     got reports from patriots across the country, going

23     through information related to that stuff.  But, no,

24     nothing really directly with that.

25          But, again, I would say what is -- what is the

1    relevance to how could that potentially be relevant to

2    your case?

3        Q.   Yeah.   The -- in terms of what is discoverable,

4    Mr. Logan, it's not just what's strictly relevant.   It's

5    what might lead to the discovery of admissible evidence.

6    I'm not going to go off on a tangent because we don't

7    have enough time.   But I do appreciate your comment.

8            With -- specifically with respect to Georgia,

9    what was discussed, if you recall, about Georgia when

10   you were at Tomotley?

11       A.   I'm sorry, that's too vague to answer.   Can you

12   be more specific, please?

13       Q.   Well, you mentioned Michigan, right, with

14   Mr. DePerno?   Did I say that right?

15       A.   Uh-huh.

16       Q.   And that you learned, directly or indirectly,

17   that he had a court order and that SullivanStrickler was

18   engaged to assist with the Michigan work, right?

19       A.   (No audible response.)

20       Q.   You need --

21       A.   Yes.

22       Q.   -- to say yes.

23           I saw you nodding your head, but the court

24   reporter has to take down your words.   Sorry.

25           When did any attention, if ever, turn to the

1    state of Georgia with respect to its election or its

2    election systems?

3        A.   So there was a lot of conversations with

4    individuals in Georgia.  And there was one point --

5    there was one point in time where SullivanStrickler, I

6    don't remember the county or whatever, but they actually

7    called SullivanStrickler and was deployed to a location.

8    And Jim and I actually went to that location to check it

9    out.  And in the conversations, it was pretty -- pretty

10   evident that no one with the proper authority was there.

11   And so canceled and pulled it off, because everything we

12   wanted to be legally admissible.  And if there -- you

13   can't -- if you don't have someone engaged who has the

14   appropriate legal authority to do anything.

15        And I believe that cut -- that call was actually

16   made from -- from one of the attorneys.  And I -- you

17   would have to talk to Jim as to exactly who it was.

18   They called up and said, hey, this is what is going on.

19   And they're like, no, that's not going to work.

20        Q.   Okay.  And you said you were deployed.  Did you

21   actually go or you're thinking about going?

22        A.   We actually drove from -- from South Carolina to

23   somewhere in Georgia.

24        Q.   Where did you go in Georgia?

25        A.   I don't remember.

Page 20

1      Q.  Do you remember how long it took you to get there

2   from Tomotley?

3      A.  It was -- it was a long drive, but it was

4   something we did in a day.  I want to say it was three

5   or four hours, but that's -- honestly, that's probably

6   speculation.

7      Q.  Sure.

8          Was it Ware County?

9      A.  I really don't know.  I'm -- you -- if you want

10   accurate results of where it is, I'm sure that

11   SullivanStrickler billed for it, and I'm sure they

12   turned in documents on that.  It shouldn't be hard for

13   you to figure that out.  I'm not trying to be evasive, I

14   just don't know.

15      Q.  I understand.

16          So who all went to this other location in

17   Georgia?

18      A.  So Jim and I did.  And when I was out there, and

19   I don't -- I don't know how they were involved or

20   whatever, but Todd Sanders and Conan --

21      Q.  Hayes?

22      A.  -- Hayes.

23      Q.  Yeah.

24      A.  They were there.  That's the first time I ever

25   met them.  They were out there.  And there was a

Page 21

```
 1    whole -- like, when we went out there to meet with them,

 2    we ended up -- ended up at someone's house that was

 3    having some sort of party or some sort.  I don't know

 4    why.  So there was a lot of other people there, but

 5    they -- I don't think they're relevant to you.  And I

 6    couldn't name them if you wanted me to, so...

 7        Q.  So it was -- it was you and Mr. Penrose, Todd

 8    Sanders, Conan Hayes.

 9            And were people from SullivanStrickler there

10    also?

11        A.  Yes.

12        Q.  And who was it, Paul Maggio?

13        A.  I really don't remember well enough to tell you.

14    There were definitely two or three people there from

15    SullivanStrickler, but I couldn't tell you who.  I'm

16    sorry.

17        Q.  Was it Freemyer?  Do you remember, was he there?

18        A.  I mean, I talked with -- with Greg Freemyer a lot

19    of times.  It's possible, but I really don't remember.

20    And I can't tell you if I don't remember.

21        Q.  I understand.

22            And so you all collect in this place in Georgia.

23    And then did you meet with local officials?

24        A.  There were some local people there, but I think

25    the conclusion was that they weren't in whatever
```

Page 22

1    authority.  I think I was only there for, like, 20,

2    30 minutes and then we drove back.  Like, it was not --

3    it was a no, this is not going to work, and we left.

4    So...

5        Q.  Were the local people associated with elections

6    at all, or just sort of --

7        A.  They -- they -- they were, if I recall correctly.

8    But I don't remember how much in periphery -- I mean,

9    honestly, I didn't have a lot of those conversations.

10   You would really need to talk to Jim.

11       Q.  So -- but the sense that you got is Jim and the

12   others checked it out and it was -- this isn't going to

13   work, right?

14       A.  Yeah.  It wasn't going to work.  I mean, the

15   whole goal was to get things for -- for a potential

16   legal action, it had to be obtained legally, or you

17   can't use it, you know, in a lawsuit.  And so if -- it

18   we went someplace and there was not the appropriate

19   authority, then you don't -- you don't proceed, you

20   know.

21       Q.  And so then you packed up and -- or didn't even

22   need to unpack.  So you probably didn't pack back up.

23   But you went back up to Tomotley; is that right?

24       A.  Correct.

25       Q.  And did you -- before going to Coffee County, did

1    you attempt to -- to do work in any other Georgia

2    county?

3        A.   I don't recall anything specifically.   There was

4    a lot of phone calls.   Because we were spending a lot of

5    time trying to aid different patriots in what they were

6    doing across the country, there was -- I had a lot of

7    phone calls with a lot of different people at times.

8    But I don't have any recollection of anything else

9    specific in Georgia that looked like it was going to

10   materialize.

11       I think the one exception that was much later on,

12   when I was in the audit, someone connected me with

13   someone who -- in a county in Georgia, that said that

14   their election -- they had -- they had come out and they

15   found their election equipment door was wide open in a

16   public space, and they asked what we should do.   And I

17   said, if I were you, I would treat it like a compromised

18   system like you do, and I would get forensic images, but

19   you need to follow up with whoever ran it.

20       And they asked me, who would you recommend for

21   that.   I said, the only company I know that does that is

22   SullivanStrickler.   Here is their phone number.   But as

23   you can see, with everything that's happened, this stuff

24   is politically charged, and you'd probably be better off

25   going with another forensics firm, and any forensics

Page 24

1   firm could do this work.  And you could just capture it

2   and sit on it.  If you want to do something in the

3   future, you can, and if you don't want to do something

4   in the future, you don't have to.  And that's all I

5   heard about that.  I don't know if anything happened.

6        Q.  Do you know which county that was?

7        A.  I -- I think it's actually listed in my messages.

8   And I want to say that it's -- that it's Spalding, but

9   I'm not positive.  I would go off the messages.  And

10  most of what I found on those messages were -- they were

11  like reading something brand new to me when I found

12  them.

13       Q.  I know the feeling.

14            You mentioned Spalding County was the later

15  incident, after you went to Coffee County, when you were

16  in Arizona, correct?

17       A.  Correct.  And that wasn't tied with any work that

18  I was doing with anyone.  Just someone said they had

19  questions, and I try to help people when they have

20  questions.  It's what I do.

21       Q.  Sure.

22       A.  So if I can connect people, I connect people.

23       Q.  Just to get back to the earlier attempt to go to

24  a -- a place in Georgia where you were not comfortable

25  with the authorizations, that wasn't Spalding, I take

Page 25

1   it, right?

2       A.   I -- I assume not, but I honestly don't remember.

3       Q.   Okay.

4       A.   Yeah, I really -- I don't know.

5       Q.   Okay.  So you -- you testified that you left

6   Tomotley on Christmas Eve, correct?

7       A.   (No audible response.)

8       Q.   You need to say -- you need to say yes.  Or New

9   Year's Eve?

10      A.   No.  I -- I ceased being -- staying at Tomotley

11  on Christmas Eve.  Correct.  Yes.

12      Q.   So by the time you left, had Coffee County been

13  identified as a potential location to do additional

14  work?

15      A.   As far as I knew, you know, after things finished

16  at the end of -- as of December, there was no more --

17  there was not going to be any more attempts to have any

18  forensic images.  You know, I was surprised by the

19  Coffee County stuff.

20      Q.   And by the end of December, was that because the

21  election was finished or finished enough?

22      A.   Yes, sir.

23      Q.   Okay.  So then how did -- how did Coffee County

24  come up in 2021, from your perspective?

25      A.   So I -- I got a phone call from Jim saying that

1    they had gotten forensic images, and I was really

2    surprised.  And I asked -- I asked, how?  And I don't

3    remember the specific details of what was said, but he

4    told me that -- I think the wording was that, like,

5    everyone had approved of it, that the board had approved

6    of it even.

7         But I am not sure how good my memory is on that

8    right now honestly.  There's a lot of things I've gotten

9    wrong when I've looked back to the facts, from messages

10   or other things in that regard.

11   Q.  Sure.  Particularly on dates and sequences, that

12   can happen a lot.  I understand.  Be careful --

13   you're -- I appreciate you being very careful about your

14   level of confidence in your recollection, and that is

15   very helpful.

16        Now, so he -- he called at some point in January

17   saying -- let me piece that apart a little bit.

18        When he called you, the data had already been

19   captured, correct?

20   A.  Correct.

21   Q.  And did you understand at that time that

22   SullivanStrickler had done it?

23   A.  I don't know.

24   Q.  And it was your understanding that contrary to

25   other attempts in Georgia, this one had been authorized;

Page 27

1    is that right?

2        A.  Well, it -- we -- I think that's a poor question.

3    I mean, the goal was always to have it be authorized,

4    but it was not successful because we had not gotten

5    authorization.  And in this particular case, there --

6    there was authorization.

7        Q.  And Mr. Penrose -- or your -- to the best of your

8    recollection, Mr. Penrose told you that it had been

9    cleared by members of the board or people of authority,

10   correct?

11       A.  Correct.  And I even asked who the attorney was,

12   you know, and I was told that, you know, Charles Bundren

13   was the primary attorney working on it.

14       Q.  And who -- who was his client?

15       A.  I -- I don't remember.  I probably knew at the

16   time.

17       Q.  Did you have an -- an understanding, when

18   Mr. Penrose called you, as to the purpose of capturing

19   these images, now that the election was -- had been

20   decided?

21       A.  I -- I don't remember.  I can tell you that after

22   the election happened, you know, our goal was to make

23   sure that the elections were secure going forward, and

24   that's always been -- at least that's always been my

25   personal goal.  I can't speak for everybody.

1           And so my assumption would be that at that point

2      that that was what I was thinking about.  But that's --

3      again, that's speculation, you know.  I know what I

4      think about, and I know what I cared about, so I can

5      pretty safely say that, but...

6      Q.  Well -- yeah, I don't -- don't take this as

7      sarcastic at all, but I just need to get you to fill it

8      in from your perspective.

9           What was the relationship between making

10     elections more secure going forward and capturing a

11     forensic copy of the election system?

12     A.  A lot of the mathematical models that said there

13     was problems with things showed distinct patterns in the

14     way the results were turned in.  Like literally I'm

15     thinking counties in Georgia, I think it was some of the

16     work of I think Edward Solomon and I think even Bobby

17     Piton had some stuff that showed actual literal ratios

18     on the votes that went through.

19           And so -- so those type of manipulations, if that

20     analysis was accurate, the -- the only strong way to do

21     that would be through a computer system.  Otherwise, you

22     would not have such clear, fixed numbers in it.  So if

23     that's true and proving whether it was true or not true

24     is important for elections.

25           I think one of the things that -- I mean, it can

1     be as destructive to democracy if no one trusts

2     elections as much as it can be if we're actually

3     insecure.  And so getting to the bottom of whatever

4     theories are and proving them true or false is extremely

5     important for our country.

6         Q.  You mentioned Edward Solomon.  And who was the

7     other I guess statistician?

8         A.  Yeah.  Bobby Piton.

9         Q.  And can you describe just in a little bit greater

10    detail the -- what anomaly, if that's the right word, of

11    the ratio of votes you were describing?

12        A.  What you literally found was that the ratio

13    between -- between candidates were exactly a certain

14    ratio among a large number of the precincts.  I'm pretty

15    sure all of that information is public.

16        Q.  Right.

17        A.  And just an example of the sort of things that we

18    did is, you know, I would take stuff like Edward

19    Solomon, and I'd pull another mathematician I'd be

20    talking with and say, does his stuff make sense?  You

21    know, is it accurate?  Is he making -- is he making

22    mistakes in this stuff?  Is it solid?  What is -- what

23    is the deal on that?  And, you know, I would get them

24    working together to get better results and more accurate

25    results to make sure that it wasn't, you know,

Page 30

1    misinformation out there.

2        Q.   Sure.

3            I have a lot of -- I'm going to have other

4    questions in between, but now that we're on this topic,

5    fast forward to after the work on Coffee County had been

6    done by you and by others.  Did you determine any causes

7    of that anomaly from the system?

8        A.   Are you reference -- when you say "that anomaly,"

9    are you referencing specifically the -- the stuff I

10   mentioned with Edward Solomon's work?

11       Q.   Yes.

12       A.   No, I have -- I have not confirmed that.  You

13   know, quite frankly, I haven't had a lot of time to ever

14   dive into the Coffee work.  And so I have not spent

15   considerable time even looking at that.

16       Q.   You said you hadn't confirmed.  Were you able to

17   rebut it?

18       A.   No, sir.

19       Q.   When I asked you about the anomaly, you quite

20   correctly asked me to be specific about the ratios that

21   Solomon and others had identified.  Were there other

22   flaws in the system that you investigated one way or the

23   other, potentially?

24       A.   Specifically in Coffee County, Misty stated --

25   I'm going to -- I'm going to talk about this as

Page 31

1      generically as I can, because I don't -- I don't want to
2      say specifics that are wrong.  But what I was -- what
3      was relayed to me about the situation was that there was
4      a problem with the ballots, where they tried to run the
5      machine, and it would stop on candidates.  And they
6      would have to -- you know, they would have to refeed it
7      if it was the ICP, or if it was the ICC device, they
8      would literally had to find the problem ballot and point
9      it out.  And she stated that it was always a Republican
10     candidate.
11          And so someone had a discussion with the Dominion
12     rep that was onsite and said something to the effect of,
13     if you don't have this fixed in the next 30 minutes, you
14     know, we're going to go to press, and it's been a
15     repetitive issue for a very long time over and over
16     again.
17          The Dominion rep walked outside, got on the
18     phone, 30 minutes came -- 30 minutes later came back in
19     and said it -- try it now.  And not only did it work
20     then, but they never had the issue ever again.
21          And so the question became, how is it that
22     something could -- that has been a regular problem over
23     and over again, somehow not be an issue after there's --
24     a Dominion rep goes and makes a phone call.  What on
25     earth could they have done?  Are they remotely accessing

Page 32

1    the machines?  You know, what's -- what exactly is

2    happening there?

3        Q.  And were you able to determine the answer to

4    that?

5        A.  No, sir.

6        Q.  I'm not suggesting that this is false, but what

7    was the -- the evidence, either anecdotal or otherwise,

8    that, in fact, prior to Dominion's telephone call, that

9    Republican ballots had been rejected with greater

10   frequency while scanning?

11       A.  I believe it was all anecdotal.  I think it's

12   something that had been mentioned -- noticed by the

13   people doing the work.  But that's -- I mean, as you've

14   seen the expert report that -- the issue from when I was

15   in Coffee County, part of what was testing was trying to

16   find a scientific way to figure out if that is, in --

17   was, in fact, accurate.  And the numbers suggested it

18   was.

19       Q.  The numbers from your report suggested it was?

20       A.  Correct.

21       Q.  We'll get to that in a second.

22           We have mentioned two things:  One was the -- the

23   Edward Solomon issue; the other one was Misty Hampton's

24   observations about the rejection of the Republican

25   ballots.

Page 33

1          Before I move on, which scanner was rejecting it?
2     Was it the precinct scanner or the central scanner?
3          A.   I believe it was both.
4          Q.   Both?
5          A.   And it was the ICC device, the ImageCast Central
6     device, which was the one that magically started
7     functioning properly.
8          Q.   Were you able -- ever able to determine
9     whether -- what Dominion did to make it magically start
10    working again?
11         A.   I -- I was never able to determine that.
12         Q.   Do you know if anybody was?
13         A.   I believe Jeff has some -- some theories that
14    he's proving out some of them.
15         Q.   That's Jeffrey Lenberg?
16         A.   Yes, sir.
17         Q.   Okay.  Other than -- I'm not saying that's
18    insufficient to cause concern.  But other than those two
19    types of issues, were there other things that you were
20    looking for or concerned about with respect to the
21    Coffee County data?
22         A.   No, sir.
23         Q.   Okay.  I'm going to jump back to -- to Tomotley.
24    And this is a different track, and I am just going to go
25    through some questions about your emails.

Page 34

1      A.   Okay.

2      Q.   When -- when you were introduced to Lin Wood, is

3  that when you started using his domain for your email?

4      A.   Shortly thereafter.  I'm a very -- I can be a

5  very organized person.  So if I am doing work, I try to

6  keep it on something.  And so Election Integrity stuff,

7  I was doing it for Lin Wood, and we kept it on an email

8  address.

9      Q.   And then what happened to those emails?

10      A.   I -- I don't know.  I mean, I ceased having

11  access to that -- I remember sometime during the audit I

12  was trying to look at the contacts and saw I no longer

13  had access to it.  And I wasn't -- so I don't know if

14  they still have them or if they destroyed them.  I

15  really don't know.  I just know I don't have access to

16  them.

17      Q.   And that was when you were in Arizona; is that

18  right?

19      A.   Correct.

20      Q.   And when was that?

21      A.   I couldn't tell you.

22      Q.   2021?

23      A.   Yeah.  I mean, but beyond that, I couldn't tell

24  you.  Sometime during the audit in 2021.  That whole

25  time period is a blur for me.

Page 35

```
 1      Q.  What -- don't you have copies of those emails
 2   somewhere?
 3      A.  That would be unethical.
 4      Q.  Well, they're from you?
 5      A.  You -- so if you went and worked for a company
 6   doing work for them, you think it would be perfectly
 7   ethical for you to maintain and keep a copy of all your
 8   business records?  That would be absolutely unethical.
 9   No, I would not do that.
10      Q.  So is that a no, you don't have copies?
11      A.  No.
12      Q.  Have you asked Lin -- I'm not suggesting that you
13   have to, you might -- but have you asked Lin Wood or
14   anybody associated with them whether you can have access
15   to those emails?
16      A.  No.  I have not talked with Lin Wood in a long
17   time.
18      Q.  I take it from your answers, but I just need to
19   ask.  You haven't deleted any of those emails, have you?
20      A.  No.
21      Q.  In addition to Coffee County and Arizona, what
22   other jurisdictions' election management server contents
23   have you seen or analyzed?
24      A.  Besides Arizona and you said --
25      Q.  Georgia.
```

Page 36

1     A.   -- Coffee County?

2     Q.   Yeah.

3     A.   I have done work in Michigan.

4     Q.   And when did you do work in Michigan?

5     A.   I was an expert on the Antrim, Michigan case.

6          MR. BROWN:  Let me do two things.  First, if I

7     could mark as Exhibit 1, Tab 1, which I think is your

8     subpoena, just to get that in the record.

9          (Whereupon, Plaintiff Exhibit 1 was marked for

10    identification.)

11         MR. BROWN:  I think it's going to -- it should

12    appear on your screen.

13         THE WITNESS:  I've probably got to switch

14    screens to get over to this -- Exhibit Share, is that

15    where I should see something?

16         MR. BROWN:  Yes, sir.  Thanks.

17         THE WITNESS:  I don't see anything yet, so...

18         MR. BROWN:  Okay.  If we could load both 1 and

19    2.  Tab 1 will be Exhibit 1; Tab 2 will be Exhibit 2.

20         (Whereupon, Plaintiff Exhibit 2 was marked for

21    identification.)

22         THE WITNESS:  Is something supposed to pop up?

23    Nothing is coming up.

24         MR. BROWN:  Okay.  Hold on one second.

25         MS. MARKS:  Jenna, are you uploading, or do you

Page 37

1     want me to do that, Jenna?

2          She may be away.  I will go ahead and upload.

3     A.  Okay.  The Tab 1, Logan subpoenas and cover

4     letter, I have now up.

5     BY MR. BROWN:

6     Q.  And you -- you received a copy of that subpoena,

7     obviously?

8     A.  To the best of my knowledge, if this is the

9     one -- I believe it's the one I received, but it's hard

10    to validate that quickly.

11    Q.  And you have -- you have produced all documents

12    in your possession or control that were responsive to

13    that subpoena; is that correct?

14    A.  Yes, sir.

15    Q.  Now, going back to Tomotley, was Peter Sharar

16    there, S-H-A-R-A-R?

17    A.  Who?

18    Q.  Peter Sharar, do you know him?

19    A.  I don't think I ever heard that name.  I could be

20    wrong.  But he definitely was not there.

21    Q.  I believe you mentioned the IT person at

22    Tomotley.  Is that Dave Hancock?

23    A.  He's former, yeah.  He had left by the time I was

24    there.

25    Q.  And have you spoken to him since you were there?

1      A.   I think he pinged me after the audit at one

2    point, saying, sorry, he made -- he made my life hell,

3    because he was saying nasty things to the press during

4    the audit, so...

5      Q.   Turn to Exhibit 2, which is Tab 2.

6      A.   Okay.

7      Q.   What is Exhibit 2?

8      A.   I don't know.  It says Board of Selectmen

9    Meeting, Minutes of April 19th.

10          What is this?

11     Q.   Hang on just one second.

12          For the record, this is Board of Selectmen

13   Meeting, Minutes of November (sic) 19th, 2021.

14     A.   From where?

15     Q.   I believe this is from New Hampshire.

16     A.   Oh.  This is Windham, okay.

17     Q.   Okay.  And turn to Page 2.

18     A.   Okay.

19     Q.   If you -- if you go down, it says, "Doug Logan,

20   CEO of Cyber Ninjas, advised his was an application

21   security company specializing in malicious code

22   detection."

23          Do you see that?

24     A.   Yeah.  So I have done malicious code detection

25   work.  I pioneered some of that with Cyber Ninjas.

Page 39

1      Q.  And I believe you represented, as you have today,

2    that you did forensic work in Michigan and Georgia,

3    correct?

4      A.  I don't recall saying.  But, you know, if these

5    are the minutes, then maybe I did.  But obviously I -- I

6    have said I looked at stuff in Coffee County, so it's

7    not wrong.

8      Q.  And did -- did you submit a proposal to New

9    Hampshire with Russ Ramsland and Phil Waldron, were you

10   all together in some proposal, or did separate people

11   make proposals?

12     A.  I don't recall if I actually ever submitted a

13   proposal or not.  I did show up to this hearing.  But

14   like I said, a lot of that time was a whirlwind.  But I

15   was definitely not submitting a proposal with Phil and

16   Russ Ramsland.  I was kind of annoyed after this hearing

17   that Phil had claimed that he had designed the Arizona

18   audit, which he had not taken part in any of that work.

19     Q.  What other dealings had you had with Phil

20   Waldron, apart from -- he was at Tomotley -- was he at

21   Tomotley?

22     A.  I do not believe so.

23     Q.  Okay.

24     A.  But Phil had a regular meeting with Jim Penrose.

25   Every now and then I would come in via -- via something

Page 40

1   like Zoom.  I think it was Wickr that was used during

2   that time period.  Every now and then I was a part of

3   that meeting.  But I was not even on a regular basis on

4   that.  So I don't -- I probably had a few conversations

5   with him outside of that while I was at Tomotley.  I'm

6   sure there is something I'm not thinking of at this --

7   you know...

8       Q.  What was the relationship, if any, between Phil

9   Waldron and Jim Penrose?

10      A.  I think they were just trying to share

11  information.  Because apparently they were working on

12  things and wanted to make sure that, you know, effort

13  wasn't wasted.  So that it was a tech meeting to share

14  what we had found, if anything, and vice versa.

15      Q.  Who did Waldron work for?

16      A.  I believe Phil Waldron worked for ASOG.

17      Q.  And what is ASOG?  Whose company was ASOG?

18      A.  It's Russ Ramsland's company.  I think Phil might

19  actually be a partial owner, but I don't know that.

20      Q.  And it states here that Phil Waldron said he had

21  worked with Mr. Logan in Antrim County.  Was that

22  correct?

23      A.  I do believe that he was engaged to some level in

24  Antrim.  I don't remember exactly what he did.  I know

25  that people from ASOG definitely were because they wrote

1    that report, so...

2         Q.   And so Bundren is the attorney for ASOG; is that

3    right?

4         A.   I do not believe I knew that at that time with

5    Coffee County.  But, yes, I have -- I have come to that

6    information.

7         Q.   You state on Page 6, I think it is, at the top --

8    or they -- they say you state at the top certain text --

9    excuse me.  It says, "He just encouraged all to watch

10   what they are doing in Maricopa; adding transparency is

11   critical."

12         Do you see that?

13        A.   Yeah.

14        Q.   And just describe what you mean by "transparency"

15   in this context and --

16        A.   Well, they were going to do -- do an audit.  You

17   know, live streaming every last little bit of what

18   you're doing 24/7 is a very critical part of that

19   transparency, and, you know, making sure that you're

20   holding accountable and you do things to a high

21   standard.

22        Q.   What do you know of the work that Phil Waldron

23   did in Georgia?

24        A.   Not much.  I don't -- I don't know.  Yeah.

25        Q.   I may have asked you this before, but what role

1    did Patrick Byrne play in supporting the effort to

2    obtain Georgia voting system information?

3        A.   I don't recall any specific involvement that he

4    had.

5        Q.   Do you know him or know who he is?

6        A.   Yes, sir.

7        Q.   And who is he?

8        A.   Patrick Byrne, he is the former CEO of Overstock

9    and founder of Overstock.

10       Q.   Was it your impression that he was funding some

11   of these efforts?

12       A.   I know that he's funded other efforts.  I do not

13   know of anything that he funded associated with the

14   Georgia or things of that time.  So I really don't know.

15       Q.   While we're on that topic, were you paid for the

16   work that you did in Georgia?

17       A.   No, sir.

18       Q.   Should you have been paid?

19       A.   Yes.  I would -- I would characterize myself as

20   working pro bono.

21       Q.   Pro bono?

22            But did -- did you have an agreement that you

23   would or might be paid by somebody?

24       A.   No, sir.

25       Q.   Sometimes I refer to it -- my line of work as

Page 43

```
1    half bono, meaning you might get paid something, you
2    might not.
3          Was there some expectation that you would get
4    paid by somebody for your work?  I'm not suggesting it's
5    bad or anything else.  Just as a business person, what
6    you were thinking?
7    A.   No.  There was no expectation whatsoever.  I
8    mean, my attitude at the time was this was an
9    opportunity to give back to my country to get to the
10   bottom of what was happening.  And as long as I had a
11   profitable company that was providing what I needed, you
12   know, to live and survive and just continue to function
13   well, I didn't see any reason to collect any funds.
14         And so I paid almost all of my expenses
15   associated with it.  And, you know, I -- and I was --
16   worked pro bono in that time.
17   Q.   Did you have anybody working with you at Cyber
18   Ninjas on the Georgia -- on the work you did for
19   Georgia?
20   A.   No, sir.
21   Q.   Okay.
22   A.   Up until the audit, I was trying to keep
23   everything very separate from my company.
24   Q.   And then do you know Scott Hall?
25   A.   I do not believe I ever talked with him.  But if
```

```
 1    he was involved in Election Integrity work in Georgia,
 2    the probability is high I had a phone call with him at
 3    some point.
 4       Q.  But you don't -- you don't recall?
 5       A.  No.  He's not in my contacts.  Yeah.
 6       Q.  I want to explore one sort of piece of this.  In
 7    the time period prior to you actually physically going
 8    to Coffee County, say December 1st -- I mean,
 9    January 1st, after you left Tomotley, to when you went
10    to Coffee County.  Are you with me?
11       A.  Uh-huh.
12       Q.  And before you left Tomotley, you had not
13    received any information about any specific plan to do
14    any work in Georgia, correct?
15       A.  I did not have any specific plans of any work
16    that was going to happen in the future.  Obviously I
17    talked about the things, you know, that we had -- we had
18    tried to do in Georgia prior.
19       Q.  And then at some point, mid January, I guess,
20    Penrose called you and said, we got some data out of
21    Georgia; is that right?
22       A.  Correct.
23       Q.  And were you involved in any way in planning or
24    facilitating the trip that SullivanStrickler took to
25    Georgia in the first or second week of January?
```

Page 45

1        A.   No, sir.

2        Q.   Did you know it was happening at the time?

3        A.   I don't believe I knew about it at the time.

4        Q.   And then shortly thereafter, we'll get to the

5    documents, but shortly thereafter, Penrose told you, and

6    you obtained access to the data on -- on

7    SullivanStrickler's ShareFile, correct?

8        A.   Yeah.  When Jim called me up to tell me about it,

9    I recall being very surprised that -- that it had even

10   happened, so...

11       Q.   And before going to Georgia, did you speak to

12   anyone else about going to Georgia in mid January, other

13   than Jim Penrose?

14       A.   Yeah, Jeff Lenberg.

15       Q.   Who else?

16       A.   I don't remember exactly where in the time line I

17   talked with Charles Bundren, but I think one of the

18   times was before I went there.

19       Q.   And Bundren -- was Bundren your attorney at that

20   time?

21       A.   He was the attorney that -- yeah, that we were

22   doing work under.  Jim told me he was engaged

23   specifically, you know, for this stuff, and he was the

24   main attorney on this work.

25       Q.   And I just need to ask it again:  You were not

Page 46

1    aware at the time who -- who his client was?

2        A.  I probably was aware at the time.  I do not

3    recall.

4        Q.  Do you know who it might have been, like it might

5    have been one of several?

6        A.  It would be my assumption, but this is

7    speculation, that it was the County itself.

8        Q.  Did you ever speak with any of the attorneys on

9    the ground for the County?

10       A.  No, sir.  I do not believe so.

11       Q.  Had you ever spoken with a gentleman named Tony

12   Rowell, R-O-W-E-L-L?  Do you remember that?

13       A.  No.

14       Q.  Prior to your visit, or even during your visit,

15   did you speak with any Georgia officials or Georgia

16   people that you can remember other than Misty Hampton?

17       A.  No, sir.  I mean, there's a possibility for that

18   on my phone calls I had conversations with -- with

19   someone who might have been.  I don't really recall

20   directly.  But nothing specific to the Coffee County

21   work or anything being done at Coffee.  The only people

22   I talked with about that is -- was Jim and Jeff and

23   possibly Charles Bundren, as far as I recall.

24       Q.  And then what -- what was your prior relationship

25   with Jeff Lenberg?  How -- how did that connection get

Page 47

1    made?

2        A.  I don't -- I don't remember.  I mean, Jim, I

3    think was the one who introduced me to him, but I don't

4    remember the context exactly.  I don't remember.

5        Q.  Was it your understanding that Penrose sort of

6    decided or suggested that the both of you go to Coffee

7    County?

8        A.  I -- I really don't know.  I am not sure if he

9    was the one who orchestrated that detail or not.  He

10   told me that Jeff needed help and...

11       Q.  Did you have -- did you have an understanding at

12   the time of the purpose of your visit?

13       A.  As I recall, it was -- he said that some -- you

14   know, that some weird stuff had happened in Coffee

15   County and the clerk had some questions about it.  And

16   so I had -- I went there with very vague information.  I

17   remember that for sure.  I don't remember exactly how

18   much information I had.

19       Q.  Since the election system had already been copied

20   and you had access to it, why did you need to go to the

21   county, physically, to do your work?

22       A.  Because they -- they -- the clerk had questions

23   on things.  I -- I don't know.  I was told I needed --

24   that Jeff needed some help, you know, and he was --

25   needed some answers and questions of the clerk there.

1    You know what we did, you have a copy of our report, you

2    know.

3        Q.  And so when you got there, in Coffee County, did

4    Misty Hampton explain to you the questions that she had,

5    that she wanted you to look into?

6        A.  Yes, sir.

7        Q.  And just --

8        A.  And she was just looking for answers.  I mean, I

9    wouldn't say she wanted us to specifically look into.

10   You know, she was looking for answers on things.  And so

11   we answered questions as best we could, and we said --

12   you know, Jeff came up with a way to -- to assess the

13   system.  He suggested that it should be done as a way to

14   validate if what she said was real or not.

15       Q.  And so --

16       A.  And the people in the office did the work to make

17   it happen.  You know, mostly I observed, you know...

18       Q.  The -- why did you change the clock on the -- on

19   the EMS?

20       A.  If you have malicious code that's in place to

21   enact imperfect -- well, here's the best way to give an

22   example.  Are you familiar with Volkswagen?  Have you

23   heard about --

24       Q.  Yes.

25       A.  -- you know, Volkswagens, the way that they

Page 49

1    passed their diesel emissions test?  You know what I'm

2    talking about?

3         Q.  I do know what you're talking about, but for the

4    record --

5         A.  So for the record, there's been very strict

6    diesel tests that are very hard for car manufacturers to

7    pass.  And so in the case of Volkswagen, they actually

8    programmed their motor to identify when it's in a test

9    mode and to perform differently so that it would not

10   have the emissions output that it needed, so they could

11   pass when it was under a test, but when it was in the

12   real world, it could get the full performance of a

13   diesel engine and all the smog or whatever is associated

14   with it.  So they basically backdoored their own system

15   with a code triggered under certain circumstances to

16   have a certain behavior.

17        So our assumption was that if you're -- if you

18   wanted to pass logic and accuracy testing, or any of the

19   other validations that went in place, that you would

20   likely, very similarly, have some sort of trigger.  The

21   simplest trigger to have is a date based trigger.

22        And so if you want to test a system in the same

23   exact manner which gets used on election day, you put

24   the date to that time period of what it was on election

25   day.  And then you know that if any sorts of triggers

Page 50

1    that could have been in place are likely also to trigger

2    again, then you would see the -- the resulting behavior.

3          Because we didn't know if there was anything.  So

4    we wanted to mimic the real world situation as much as

5    possible to make sure we have a scientific test that

6    would have a chance of reproducing the issue, if it

7    existed.

8          Q.  Did you set the clock back when you left?

9          A.  I didn't set the clock or unset the clock.  So

10   that was something that was -- that was done by the

11   County.  So I don't -- I assume that it was done, but I

12   really don't know.

13         Q.  And did -- how did the County know to do that?

14   Did you or Mr. Lenberg suggest, first let's change the

15   date?

16         A.  Part of the suggestion is in order to test it and

17   in order to explain as to why that would be -- create a

18   better test.

19         Q.  And so when y'all were down there, the County

20   actually -- or Misty Hampton actually changed it

21   pursuant to your -- did you tell her how to do it?

22         A.  I don't recall.  Misty is very proficient on a

23   computer.  I don't think I'd need to tell her something

24   like that.  But I have no idea if we did or didn't.

25         Q.  And you don't know whether it was reset, right?

1      A.  I don't know.  I mean, I can tell you that on

2   Windows it will automatically fix itself on certain time

3   intervals.  So it should, you know, at least on the

4   Windows system.  And I know that when you -- when you

5   boot up the ICP device, I believe one of the things that

6   displays for you to check and validate before you start

7   an election is the date and time.  So, yes, it should

8   have been fixed.  You know, naturally those things

9   should have resolved themselves, but I don't -- I don't

10   know.

11      Q.  And then you also made a number of -- did you

12   scan a number of ballots when you were down there?

13      A.  Did I scan any ballots?  No.  I did not scan any

14   ballots.

15      Q.  Were --

16      A.  Per the test, yes, ballots were run through

17   the -- for the ICP device.

18      Q.  And those were ballots from the 2020 election?

19      A.  I do not recall exactly how those were created.

20   That was not something I was a part of.

21      Q.  Who was doing that?

22      A.  I believe it was all done by -- by people in the

23   office.  But beyond that, I'm not sure.

24      Q.  Was it done pursuant to your instruction or -- or

25   what?

Page 52

1      A.  I mean, beyond saying, hey, we need to equi- --

2    equivalent ballots to run a good test, I don't know if

3    there was any -- any direction or instruction involved,

4    you know.  You know, it was -- this is a way to do a

5    scientific test if you want to implement it.

6      Q.  And the -- this particular test is something that

7    could not be evaluated simply by looking at the copy of

8    the software that SullivanStrickler had made, right?

9      A.  Oh, absolutely.  I mean, while it's -- there is

10   no -- there is no substitute for having a live version

11   of the systems.  What you can do with a live version of

12   the system is drastically different than what you can do

13   with a forensic copy.  It is immensely more complicated,

14   more difficult to work -- to do anything, similar type

15   of test of any sort.  So, no, we could not just look at

16   a forensic image and know whether this was the case.

17   Absolutely not.

18     Q.  Did it -- did it concern you, at any time, that

19   if you could have access, that kind of access to the

20   Coffee County system, that someone who didn't have your

21   motivation and integrity could also gain access and

22   figure out, for example, how to implant malware in the

23   system?

24     A.  I mean, there's a statement in the security field

25   called security via obscurity, and they say security via

1    obscurity is no security at all.  And what that means is

2    just because you think that no one knows about

3    something, you know, from a professional opinion

4    standpoint, and everyone in the industry would agree,

5    you know, that is no basis that someone doesn't have

6    access to it.  You're supposed to -- the general thought

7    for security stuff now is to assume compromise in

8    everything that goes on.

9         So by all means, the -- it was -- I was careful

10   and wanted to make sure that none of the stuff I had got

11   in the hands of someone else.  But I can assure you that

12   China can get their hands on this stuff.

13        You know, it's -- I mean, you're trusting, you

14   know -- by -- by the way election systems are designed,

15   they're in the hands of county clerks across the nation

16   that tend to not be the most computer savvy people.  If

17   you think that someone can't find some way by which to

18   get some clerk to compromise the system via just purely

19   malware standpoint, you know, you're -- I mean, it's

20   just a very poor argument to make that no one in the

21   field would ever, ever suggest.  I'm surprised it's a

22   legal argument in your case because it has no bearing

23   whatsoever.

24   Q.  It's the defendant's legal argument.  We're the

25   plaintiffs.

Page 54

1     A.  I understand.  It -- it has -- it has absolutely

2     no basis whatsoever.  It is absolutely ridiculousness.

3     Q.  It's -- well, the ridiculousness is assuming that

4     the systems are physically secure enough to prevent

5     someone from having the kind of access that you obtained

6     in Coffee County, correct?

7     A.  Correct.  It's well documented -- well documented

8     across the country.  It's absolutely well documented

9     across the country that people have stumbled into their

10    clerk's office and found the door open to something or

11    whatever.  Not to mention -- I mean, there's known

12    accounts of individuals who -- who have literally --

13    this is not specific to election equipment, but the same

14    thing applies -- where they have paid people 250 to 500

15    bucks to plug in a USB into a computer, and people who

16    don't understand what the impact of that is, will do so

17    in the company.

18    Q.  Well, what --

19         MS. LaROSS:  Can you guys -- excuse me.  This

20    is Diane LaRoss.  Can you hear me?

21         MR. BROWN:  Yes.

22         MS. LaROSS:  I just wanted -- I've had trouble

23    getting off my mute button.  But I did want to

24    interpose an objection to the references to the

25    defendant's argument in this case.

Page 55

1           MR. BROWN:  That's noted.  Thank you.

2      BY MR. BROWN:

3           Q.  What you've described, Mr. Logan, is frightening

4      to Georgians with the system in 159 counties.  What do

5      you do about it?

6           A.  I mean, the best security is always to make a

7      properly designed system in the first place.  And I

8      mean, I have been involved in over 2,000 application

9      assessments.  The software that I have assessed

10     associated with election stuff is -- is in the bottom

11     15 percent.  You know, that's -- that's ridiculous for

12     stuff -- for what it does.  So, I mean, it's -- I mean,

13     if the emperor has no clothes, you know, do you really

14     want everyone to be quiet?

15          Q.  No.

16              What you described was -- you said it quickly --

17     but in the range of the quality of the security of

18     software and applications that you have seen, the

19     Dominion software in Georgia would fall in the bottom

20     15 percent of security and quality; is that correct?

21          A.  I believe so.  Especially when you take into

22     consideration that you view it as a high risk system and

23     you know that it's going to be deployed into

24     environments where you have got clerks who are not as

25     technologically savvy across the country.  I mean, the

Page 56

1    standard needs to be higher in those -- those states as

2    it's not -- you know, it's not a baseline.  But I have

3    tested inventory control software with more controls and

4    stuff in place than I have, you know, Dominion's

5    software.

6        Q.  You said hybrid -- what do you mean by that?

7        A.  I'm --

8        Q.  Maybe I misheard you, but I thought you said

9    hybrid in connection with the system.  Maybe you didn't.

10       A.  I said I've tested inventory control software

11   with a higher level of security than -- than the

12   election stuff that I have looked at.

13       Q.  Are there particular -- without getting into the

14   weeds too much, are there particular features of the

15   Dominion software that push it to the bottom 15 percent,

16   in terms of security?

17       A.  Sure.  Let's just talk about public stuff.  Okay.

18   So in Antrim, Michigan, based on Halderman's report,

19   they -- the votes for one candidate got assigned to

20   another candidate because they used sequential numeral

21   IDs, and they didn't match up what was on the card to

22   what was in the system.  Okay.

23           It is a trivial check.  An absolute trivial check

24   to validate that it's not just the number, but the name

25   that is on the ICP device also matches the name that's

1    in the system.  And you might say, okay, they made a

2    mistake.  You know, people make mistakes, it happens --

3    make mistakes, it happens.  This is the first time it's

4    been reported to them.  Right?  So, no, no.  There's a

5    news reporting out of the Philippines, I want to say in

6    2016, where the exact same issue that happened in Antrim

7    happened there as well.  So they knew about the issue.

8    They're aware about the issue.  And they didn't resolve

9    or fix the issue.

10          There's issues in DeKalb County, Georgia, that

11   something similar might have happened again, you know,

12   just based on the publicly available information.  You

13   know, again, that's never as precise as actually looking

14   at things.

15          But when you have a company that cannot -- that's

16   software is designed in such a way that it does not have

17   the routine checks that should be in place, you know, to

18   make sure that the results are accurate, which is the

19   one job it has to do.  You know, forget about just

20   vulnerabilities.  User error should not be able to allow

21   to make it so that one candidate's votes gets attributed

22   to another candidate.  It's not that hard to do that.

23        Q.  Is there something about the software

24   architecture or -- that also makes it vulnerable rather

25   than the specific problems relating to the

1    identification of the device and the -- and the -- and

2    what the device is in Antrim?

3       A.   Sure.  I have a public report that's associated

4    with the Antrim case issued from Cyber Ninjas where I

5    have a number of things documented.  The one thing, the

6    encryption key that's used to encrypt everything is in

7    plain text in the database.  And the database security

8    and the way they have things is the user that you're

9    logged into the computer on, like by default, with a

10   password that never changes, that in some counties many

11   people have access to, or in some cases it's on a

12   Post-It note, that password has access to get the

13   encryption key that's more than enough to change the

14   results on the cards.

15      Q.   What else?  I'm not saying that's insufficient,

16   but what else?

17      A.   I mean, that -- you know, passwords in the

18   database are just hashed once, whereas industry

19   standards for over ten years has been to salt them and

20   to hash them a hundred or more times and just to, you

21   know -- to explain that for the record, for those that

22   are not technically savvy.  Okay.

23           So what a hash is, it takes a password, and it

24   converts it to a format that's not the password anymore

25   and can't easily be reversed back to the password, but

1    it's a unique value.  So if I take the word hello, it's

2    going to generate a hash.  It will look like a string of

3    gibberish to you.  And if I type the word hello1, which

4    is only one character different, it's going to be a

5    completely different string with no resemblance

6    whatsoever to it.  And so it's a way to store

7    information.

8         But the problem is, if you store it in the

9    database, just hashed once, it becomes possible to go

10   through the dictionary or other things and generate all

11   the hashes beforehand and then just say, hey, this value

12   doesn't match this value, oh, I know your password was

13   hello.  So it's easy to match up.

14        So the best practice for over ten years has been

15   to -- to -- to use an adaptive hashing algorithm, which

16   basically means you hash it a whole bunch of different

17   times and you throw salt in front of it beforehand,

18   which is nothing more than just a random string on it,

19   so that you have to -- you know, you have to do

20   exceptionally, computationally intensive things to ever

21   figure out what the password is.

22        Another one that's not really string

23   vulnerability, but it's crazy.  So there's a software

24   out there -- there's an open source software out there

25   called OpenSSL.  Okay.  OpenSSL is a library that a lot

Page 60

1    of different organizations use as a basis for their

2    encryption and decryption of stuff.  It is a very common

3    thing.  There's libraries all across the board to make

4    it happen in almost every programming imagine --

5    programming language you can imagine.

6         Again, this is in my report -- actually, this one

7    might not be in my report.  The Dominion software,

8    rather than calling a library to do encryption calls, it

9    actually calls an executable and runs the executable on

10   the device to do the calculations in it, which is just

11   poor programming.

12        And it's like one of those things, if you see a

13   car driving down the street, and it's got smoke coming

14   out of it, you don't need to be a mechanic to know that

15   there's a problem with the vehicle.  It's not supposed

16   to -- you know, if you're running programs instead of

17   calling libraries as a programmer, you don't have to dig

18   that deep to see that the quality of programming is not

19   high.

20   Q.  Specifically with respect to the scanner, the --

21   the ICC -- well, either one -- either scanner, was

22   your -- was your work in Coffee County focused on that

23   device or on the EMS or on the BMD?  Are you following

24   me?

25   A.  As I stated prior, I actually have not done much

1   analysis on Coffee County, besides the initial review.

2   I couldn't tell you the exact number of hours in that.

3   Most of the work I've done has been elsewhere, and I'm

4   talking about things that I've publicly -- publicly

5   disclosed in my expert testimony, which is why I can

6   reference them.

7        Q.  And -- but what you were referencing in the

8   issues with the quality of the software, you're

9   referring specifically to Dominion software, correct?

10       A.  Correct.

11       Q.  And as it is in Antrim and in Arizona; is that

12   correct?

13       A.  Correct.

14       Q.  And in Coffee County, correct?

15       A.  Yes.  The majority of what I'm referencing is

16   what I did in Antrim, Michigan, that's in my public

17   report.  But as I put in my declarations, they're

18   substantially similar, the software across the board.

19   When you have a naming convention, which is a number and

20   A or a number and B, that means those things are

21   virtually identical except for small differences.  And

22   this is -- I can tell you that, you know, from observing

23   and seeing the way the software works and different

24   stuff, there's no visual discernible difference between

25   them.  And that's what the small numbers mean, is those

Page 62

1    things are practically the same thing.

2        Q.   What information did you get, if any, before you

3    went to Coffee County about the anomalies that

4    Ms. Hampton had reported with respect to the scanning?

5        A.   I don't believe I had any information until I got

6    there, but it's possible I had a small brief.

7        Q.   And did she describe for you, when you were

8    there, the phenomenon that she was complaining about or

9    concerned about?

10       A.   Yes, sir.

11       Q.   And that's substantially what you reported back

12   today, right?

13       A.   Correct.

14       Q.   And did she give you any -- not that she had

15   to -- but did she give you any data or any support for

16   her assertion that the scanner was rejecting Republican

17   ballots with greater frequency than Democrat ballots?

18       A.   No.  And as I recall at the time, she wasn't even

19   saying it was definitely true.  She -- you know, she was

20   saying, I felt like it was this way, but I don't know

21   any way to test it, how do we validate that?  You know,

22   she definitely thought it was extremely weird, the

23   system just started working after the Dominion person

24   went outside.  I think that was her biggest concern.

25   This she just thought was a weird anomaly that she

Page 63

1    mentioned.

2        Q.   And, again, you weren't -- to your knowledge,

3    now, neither you nor Mr. Lenberg were able to figure out

4    how Dominion did that, right?

5        A.   On the ICC device, I believe that Lenberg has

6    isolated a setting which put it back in that same

7    behavior, a setting that does not make any sense to

8    control that.

9        Q.   Okay.  Explain that to me.

10       A.   You're going to have to ask Mr. Lenberg for it to

11   be accurately represented.  But the ICC device did not

12   have the behavior when ballots were run through it, but

13   if you changed the setting that was un- -- didn't seem

14   like it should be related to anything at all, it had

15   that -- that -- that behavior where it behaved

16   differently whether the candidate was Republican or

17   Democrat after you switched the setting from one side to

18   the other.

19       Q.   Just looking back, I don't want to get into all

20   the statistics, but if you -- if you need to in your

21   answer, that's fine.

22            But if you look at Georgia, the results -- the

23   overall results of the -- of at least the Presidential

24   election were not out of line with the polling just

25   prior to the election.  Do you recall that?

Page 64

1       A.  I don't recall that.  What's -- what is the

2   relevance?  What question do you want answered?

3       Q.  Could you just explain in a little bit greater

4   detail, what -- well, the -- the mathematicians

5   determined that the -- that the ratios between the

6   candidates was too static across the various --

7       A.  Be consistent.  I mean, like, let's give an

8   exaggerated example.  If every single precinct all

9   across Georgia had five for one candidate and seven for

10  another candidate, exactly, wouldn't you think there was

11  some problem?

12      Q.  Right.  But that was exactly the opposite of what

13  happened in Georgia, where you had dramatic differences

14  in votes between the candidates depending which county

15  you're in.  And if you're in Clayton County, it was

16  about 90 percent for Biden.  If you were in Coffee

17  County, it was about 30 percent.  So what was the --

18  what were they comparing it to?

19      A.  You would have to revisit -- you would have to

20  look at the work of Edward Solomon in order to get it.

21  But there was that equivalent from a mathematician

22  standpoint in how perfect the numbers were when you

23  looked at it in a certain way.  And I'm sorry, I can't

24  give you -- if you'd asked me two years ago, I probably

25  could have given you a lot better explanation than I can

Page 65

1    give you now at this point in time.

2        Q.  This is a -- sort of a personal question.  But

3    have you resolved, in your own mind, whether or not that

4    analysis was correct --

5        A.  No, sir.

6        Q.  -- one way or another?

7        A.  No, sir.

8        Q.  Okay.

9        A.  I would need more data before I would ever say

10   that it was -- it was definitely true.

11       Q.  Okay.  I appreciate that.

12           MR. BROWN:  Why don't we take a ten-minute

13   break, if that's okay, and I will get organized and

14   we'll be right back.  Thanks.

15           THE WITNESS:  Thank you.

16           THE VIDEOGRAPHER:  Okay.  Off the record at

17   10:22 a.m.

18           (Whereupon, a break was taken from 10:22 a.m.

19   to 10:39 a.m.)

20           THE VIDEOGRAPHER:  This begins Media Unit

21   Number 2, and we're back on the record at 10:39 a.m.

22   BY MR. BROWN:

23       Q.  Mr. Logan, back on the record.

24           We talked about setting a clock back on the EMS,

25   do you recall that, when you were in Coffee County?

Page 66

1        A.   Yes, sir.

2        Q.   Is it your recollection that it was -- it also

3    would have been set back on the ICC computer?

4        A.   For it to work, it would had to -- I mean, for it

5    to be effective, you would have to done it on all

6    systems.  Yeah.  You would want them to be in alignment.

7        Q.   The -- the analysis that we have done indicates

8    that the date was changed to November 5, which is the

9    day after the election.  Do you know -- do you know why

10    it would have been set to that date?

11        A.   I don't, no.

12        Q.   And also --

13        A.   Maybe that was the day that the Dominion thing

14    happened?

15        Q.   The odd thing about this scanning anomaly, as

16    reported by Ms. Hampton -- now, let me run this past

17    you, see if it jogs your recollection -- is that in

18    Coffee County, the -- they did a hand count after the

19    general election.  And so they did a regular election

20    using the Dominion system, using the scanners, and then

21    they did a hand count of the presidential election.  And

22    in the hand count it was off by one vote, the third

23    party candidate got one more or one less vote in the

24    hand count, recount of the general election, indicating,

25    I think, that the scanner issue, in terms of rejecting

1    Republican candidates, was not a problem in the actual

2    2020 general election.

3         Now, if that's the case, do you know -- do you

4    know what the sort of either anecdotal or evidentiary

5    source of Ms. Hampton's concern as to the frequency of

6    the rejection of Republican ballots?

7    A.   Well, just that it was -- it was an anomaly and

8    that it stuck out.  And first of all, the rejection --

9    when you talk an ICP device, you lit- -- it literally

10   spits the ballot back out.  And you have to -- you can

11   reinsert it, I mean, as talked about in the analysis.

12   The ICC device, you'd have to take a stack and go

13   reprocess it.  And reprocessing it, it will actually

14   rerun, you know, some of those other ballots.

15        So I don't -- I don't know specifically.  I don't

16   remember that.  And, you know, I don't remember exactly

17   what it was.  I believe that some of this was actually

18   off of run-off data as well, but because the run-off had

19   just recently been run on the stuff.  So it wasn't

20   necessarily that.  But I don't remember the specifics to

21   go into any more detail.

22   Q.   Do you recall that -- and Coffee County and other

23   places in Georgia, there were potentially three

24   different counts of the presidential election:  The

25   regular election day accounting, hand recount, and then

Page 68

1    an electronic recount next.

2         Did you know that that was what happened?

3    A.   That -- that sounds vaguely familiar.  But, you

4    know, my involvement in Coffee County really, I think I

5    was there two different days, as I recall it, you know,

6    somewhere around two or three hours each day.  I'm

7    sure -- you guys have the video footage, you can

8    probably be more precise than that.  So I don't -- I

9    didn't have a lot of information before I walked into

10   that, and I had done some work, you know, related to

11   Georgia in general, so I had some knowledge on that

12   stuff.  But, no, I don't know.

13   Q.   What work had you done in general prior to going

14   down there?

15   A.   Just all of the stuff we've already talked about,

16   you know, about talking to people throughout Georgia

17   about things they observed and things that had been

18   going on.

19   Q.   The -- getting back to the visit -- to your trip

20   to Georgia in December that didn't result in any

21   activity because of the difficulty with getting

22   authority, you drove down there with Penrose?

23   A.   Correct.

24   Q.   And then who came -- who else came with you?

25   A.   Well --

1    Q.  Was Conan -- Conan and Sanders with you in the

2  car going down there?

3    A.  No, they came some other route.

4    Q.  Did anybody fly in there?

5    A.  I don't know.  It's possible.

6    Q.  Did you -- do you recall going to the election

7  offices themselves?  You mentioned a random party.  Was

8  there any other --

9    A.  No.

10    Q.  -- place to collect -- you don't remember going

11  to the election office there?

12    A.  I never went to the election office there.

13    Q.  Did anybody ask you to sign in or some sort of

14  sign-in log or anything like that?

15    A.  No, sir.  I was -- it was a party.

16    Q.  And do you --

17    A.  It was just a place to meet to have everyone talk

18  to figure out what -- what was happening.  So, yeah.

19    Q.  Now, to contrast it with Coffee County, your

20  understanding was that, indeed, you did have the

21  authority to do what you were doing, correct?

22    A.  Correct.

23    Q.  And how was that -- again, I want to make sure I

24  have it -- is that first, obviously, you get to the

25  election offices, and the person who says she's the

Page 70

1    elections director lets you in, right?

2        A.  Correct.  I mean, if -- first of all, I mean,

3    the -- being told that an attorney is engaged

4    specifically on this.  I believe I talked with an

5    attorney.  Attorneys usually aren't into breaking the

6    law.  That's just not their thing, you know.  You know,

7    asked to be looked in by an expert by people that I

8    trust, you know, have in the past when it was clear

9    authority wasn't there have not proceeded with things.

10   Going to a place, there's elected people there.  They

11   know -- you know, they know that you're -- we're coming.

12   We're welcomed.  I mean, what reason would I ever have

13   to suspect that it wasn't authorized?

14       Q.  That actually isn't the point of my question.

15           And that is, was there -- was there anything that

16   would give you any indication that you didn't have full

17   authority to do what you were doing?

18       A.  No, sir.

19       Q.  I'm not suggesting that what you said is

20   insufficient to establish authority, but did you have

21   any indication or anybody tell you that the board of

22   elections had approved of your visit or had -- had

23   engaged you or Bundren for -- for assistance?

24       A.  I don't remember precise enough to answer that.

25   I believe that the answer to that is yes, but I would

Page 71

1    not, like --

2        Q.   Nothing specific?

3        A.   As I stated earlier, with Jim Penrose, I asked if

4    permission had been obtained.  I'm pretty sure that was

5    part of the conversation.  And I'm pretty sure he said

6    it was the board.  But I don't -- that was a long time

7    ago, and I cannot -- you know, that's somewhat

8    speculation based.

9        Q.   You --

10       A.   If there's any indication that it wasn't

11   authorized, I wouldn't have done it, like...

12       Q.   You mentioned Dave Hancock from Tomotley?

13       A.   Well, I think you mentioned him.  But, yeah.

14       Q.   You're right, I mentioned him.

15            And he apparently provided a number of emails

16   from the FightBack account to ProPublica.  Did you know

17   that?

18       A.   No, I didn't know that.  I'm not surprised by

19   that, but I...

20       Q.   Is it fair to say that although you both worked

21   together, that Lenberg was the lead of the two of you in

22   that effort to go down to Georgia?

23       A.   I would definitely say that's true.

24       Q.   When you reset the clock on the EMS and the

25   scanner, I take it that the -- at that point the scanner

Page 72

```
 1    was working correctly, right?
 2        A.  The ICC device, what functioned with the
 3    configuration in place and did not have any issues
 4    processing ballots, you know, it behaved exactly like it
 5    had after the -- whatever happened whenever the Dominion
 6    rep had the phone call, correct.
 7        Q.  And then you detected some code that could be
 8    easily switched to make it malfunction; is that a fair
 9    summary?
10        A.  You need to talk to Jeff about that.  That was
11    the stuff that Jeff was working on.  I can only tell you
12    what he has told me about that work.
13        Q.  Do you know anything about -- do you know Bob
14    Cheeley?
15        A.  I'm familiar with the name.
16        Q.  And how are you familiar with the name?
17        A.  Probably in reading through the Curling stuff,
18    but I'm really not sure.
19        Q.  Did you have any communications with him?
20        A.  Not that I know of.
21        Q.  And do you know about his operation in Georgia to
22    analyze Georgia election data, either in Fulton County
23    or anywhere else in Georgia?
24        A.  Was he ever an attorney for Garland Favorito?
25        Q.  He was.
```

1     A.   Okay.   I have talked to Garland Favorito's team

2     before.   So there's a chance I -- I guess I probably

3     talked with him then.

4     Q.   Did you do any work for Garland Favorito or his

5     operation?

6     A.   I have answered a few questions about voting

7     machines before.   Probably had two or three conference

8     calls.   I couldn't even place when those were, I mean.

9     So I guess I have advised in some regard.   I wouldn't

10    really call it work.   I just, you know...

11    Q.   Do you recall any specifics about the subject

12    matter of the advice, if you can disclose it?

13    A.   I don't.

14    Q.   You don't remember or you're not going to

15    disclose it?

16    A.   No, I don't remember it.   It's my understanding

17    for the most part I don't have the option not to

18    disclose it.

19    Q.   Yeah, that's true.

20         Have you ever -- do you know Alex Cruse?

21    A.   I don't know.

22    Q.   Have you ever communicated with him?

23    A.   I do not believe so.

24    Q.   And I think I asked you this before, but you've

25    never heard of David Bossie, right, B-O-S-S-I-E?

1      A.   I don't think so.   I mean, the name sounds

2    familiar, but I have no idea who that is.

3      Q.   Did -- before I forget, have you reviewed

4    Dr. Halderman's report?

5      A.   Which report?

6      Q.   The most recent report.  It's partially under

7    seal, but there may be copies around.  About the

8    vulnerabilities of the Dominion system?

9      A.   I -- I believe I -- at one point in time, I read

10   a declaration associated with the report.  But I have

11   never read any of the actual report.

12     Q.   Do -- did you -- reading the declaration about

13   the report, do you recall any observations about what --

14   whether it was consistent with your understanding of the

15   Dominion system, or invalid, or smart, or anything like

16   that?

17     A.   I don't recall there being enough specifics to

18   make any conclusion one way or another, besides what was

19   represented.

20     Q.   When -- when you came to Georgia, was it your

21   understanding that you were doing work that was -- to

22   finish what SullivanStrickler had done, or was it sort

23   of a different enterprise, if that makes sense?

24     A.   It's my -- my opinion -- my understanding it was

25   something completely different.

Page 75

1      Q.  I'm going to hand to you a document, Exhibit 3,

2   which is going to be Tab 4, and then also if you would

3   mark as Exhibit 4, Tab 4.5.

4           (Whereupon, Plaintiff Exhibit 3 was marked for

5       identification.)

6           (Whereupon, Plaintiff Exhibit 4 was marked for

7       identification.)

8      A.  Okay.  I'm opening Exhibit 3 now.  I figured.

9   BY MR. BROWN:

10      Q.  Yeah.  And could you, for the record, tell me

11   what Exhibit 3 is.

12      A.  So Exhibit 3 looks like a copy of the Signal

13   messages I pulled and turned over.

14      Q.  And going -- I'm going to ask you some questions

15   about the chart that you have here.

16      A.  Yeah.

17      Q.  First, how did you select the -- the text to put

18   in this chart?

19      A.  So I did searches specifically for Coffee, Coffee

20   County, Misty, I believe Georgia, GA, in addition to

21   specifically looking at the individuals that I could

22   remember had any association with anything associated

23   with Coffee County, and specifically looking through

24   their communications in the time period where they might

25   have said something.

1    Q.  And did you prepare a list of the search terms

2   that you used, or do you have it?  You don't have to

3   divulge it now, but did you prepare that?

4    A.  No, I did not prepare that.  I believe what I

5   just told you is pretty extensive.

6    Q.  Okay.  And then on the -- just going column to

7   column on Exhibit 3, you will see that the first column

8   says ThreadName at the top.

9       Do you see that?

10   A.  Yes, sir.

11   Q.  And what does that mean?

12   A.  So what that means is that was the individual or

13  the group message that was being talked to.  So in the

14  first example on the first page, you know, I had direct

15  messages with Ben Cotton on Signal.  But if you go down

16  a little bit farther, you've got the

17  Coffee_County_Misty, and that is a Signal group where

18  messages were sent.

19   Q.  And then the next column is obviously Message

20  From, right?

21   A.  Correct.  Who it was, who the text is from.

22   Q.  Then the -- it's -- in terms of who the messages

23  were to, all of these would be to you, at least; is that

24  fair to say?

25   A.  Yes.  You know, in the case of -- if it says Ben

Page 77

1    Cotton in the thread, maybe, the same as one of the

2    parties in it, then it was messages back and forth

3    between me and that party.

4         If it was a group, then everyone in the group

5    would have received that message, but I was a member of

6    that group or I never would have gotten it in the first

7    place.

8    Q.  How can we tell if it's a group or not?

9    A.  If the thread name is not the name of a person.

10   Q.  Okay.  And then it's a -- it's a group?

11   A.  Yeah.

12   Q.  Okay.  I think the phone number and Sent Time is

13   clear enough.

14        And then the Message Text, that's just a --

15   that's exactly what the text was, right?

16   A.  Correct.

17   Q.  Okay.  If you would --

18   A.  I mean, obviously if you take a look, there's

19   some weird characters go through.  I don't know

20   exactly -- somewhere in the process, the process -- it

21   means there's some small changes and stuff like that.

22        If you look at Number 3 of the -- the second one,

23   "yeah, but the arena" -- I mean, obviously there wasn't

24   really a trademark symbol in that.  I don't know exactly

25   where that came from or how that worked, but...

1      Q.   Okay.   I think there's question marks in there

2    that are sort of bizarre also?

3      A.   Yeah.   There's just some character changes.   I

4    don't know exactly how or why that happened.   Something

5    to do with the process I used to try to extract these,

6    but...

7      Q.   Fair enough.

8         Turn, if you will, to Exhibit 4.

9      A.   Okay.   I'm not seeing Exhibit 4.

10      Q.   It might take a minute for them to load it.

11      A.   Oh, there we go.   I got it now.

12      Q.   And just for the record:   Did you receive the

13    email from me with this document last night?

14      A.   The one that you sent at midnight?   Yes.   I

15    received it about, you know -- about 20 minutes before I

16    connected to this stuff.   I have not had a chance to

17    review anything.

18      Q.   Well, I will represent to you that it is an

19    attempt to sort by date Exhibit 3.   Are you with me?

20      A.   Yes, sir.

21      Q.   The documents are what they are.   In other words,

22    there's ways to verify the completeness of it.   But just

23    for purposes of expediting your examination, I found

24    that if -- if we were going through Exhibit 3, we would

25    get whiplash going back and forth because of the dates.

Page 79

1    And so I thought it might be easier to go

2    chronologically.

3         But do you see that, looking at Exhibit 4?

4    A.   I see that.  But I -- I don't have any way to

5    test whether they're the same.  And I don't have enough

6    recollection of these conversations where I am going to

7    catch things that are a word different, which can make a

8    significant impact.

9    Q.   Okay.  Well, do you see the -- we can go back and

10   forth, if you want.  But what I have also done, in

11   columns F and H, is include the original page number and

12   the original line number on that page.

13   A.   If you -- if you would like me to have general

14   comments or general information, you know, I'm

15   comfortable utilizing this.  But if you're going to say,

16   did you say XYZ, I'm going to want to see it in the

17   format I gave it to you.

18   Q.   That's fine.

19        One of the things about your -- I'm not

20   criticizing you on this.  One thing I -- I don't know

21   how this happened, but when I made Exhibit 4, there

22   appeared a pre A column that had the line number on it.

23   Do you follow me on that?

24   A.   I hear what you're saying.  I have no idea why

25   that would be the case.  That's not anything that

Page 80

1    existed, so...

2        Q.  You didn't -- you didn't -- I'm not suggesting

3    this is bad or anything, but you didn't hide any columns

4    in your printout, did you, or you didn't intend to?

5        A.  No.  No, sir.  I mean, in Signal, there's a

6    conversation I.D., which is a GUID, which is basically

7    very long text that's associated with it.  And so

8    before, I didn't bother to give you guys that, and I --

9    you know, I hid that before I printed it out.  But it's

10   nothing like 1234.  I mean, it's literally random As,

11   Bs, 1s, and so forth about -- of a certain character.

12   So I didn't figure that would be much use to you.

13       Q.  No, it was very -- it was very helpful.  And I

14   appreciate that.

15            What I'm saying, just for the record, is that I

16   did not put that column there.  That is something that

17   appeared when I did the sort.

18       A.  It must have been something when you converted

19   the PDF to.  So it must have added it somehow.

20       Q.  And then I will represent the -- that the

21   original page number and the original line number, to

22   the right, is something that I added to this --

23       A.  Okay.

24       Q.  -- for purposes of being able to check back and

25   forth, the accuracy on it.

Page 81

1        Okay.  Let's go to Exhibit 4 and take a look at

2    it.

3        A.  This is 4.5?  Tab 4.5?  Or Exhibit 4?

4        Q.  Exactly.  Exactly.  Thank you.

5        And you started your search, it looks like at

6    January 14, correct?

7        A.  No, sir.  I searched everything I had access to.

8        Q.  So going far -- how far back?

9        A.  Based on the analysis that my Signal messages

10   went back to January 10th.

11       Q.  So you started using Signal on January 10?

12       A.  No, sir.  I -- used Signal for a very long period

13   of time.  However, the way I was ultimately able to

14   extract these were from the desktop portion use of

15   Signal.  And I had some issues with my computer that had

16   required me to format my hard drive.  Some were

17   around -- I think I ended up doing it somewhere around

18   January 9th.  And so this is from Signal messages from

19   that point on, is when I finally reinstalled Signal on

20   the device.

21       Q.  And so the date that you chose was a function not

22   of the information, but of the -- the limitations of

23   what was actually on your computer?

24       A.  Correct.  If I put a date range on this, you

25   probably wouldn't have gotten some of the other messages

Page 82

1    that I found that happened later on from the audit and

2    stuff.  I didn't put any ranges on it.  I searched

3    everything I had.

4        Q.  Okay.  So there may -- there may have been Signal

5    messages before that were germane, but you're just

6    unable to recover them; fair to say?

7        A.  Correct.  It's -- I do not believe this is

8    anything before this associated with Coffee County.  But

9    in generically, if you're talking about conversations

10   with Georgia, there's a high probability that I had a

11   Signal message sometime after November, you know, in --

12   between November and January 10th, there was some

13   message over -- over -- on Signal that was associated

14   with Georgia in some fashion that I don't have a copy of

15   at all.  It's highly likely.

16       Q.  Okay.  Let's start going through these.  And I'm

17   not going to go through every text, trust me.

18            But the first one, the thread name is Jim

19   Penrose.  That means it's just Jim Penrose that you're

20   communicating with, correct?

21       A.  Correct.

22       Q.  And then it indicates here on January 14th, "I

23   just heard Conan say that 105 remote log-ins happened on

24   the EMS"?

25       A.  Uh-huh.

Page 83

1        Q.   Do you see that?

2        A.   Yes, sir.

3        Q.   And there's some back and forth of whether or not

4    that information from Conan was correct.  Do you recall

5    that?

6        A.   Yep.

7        Q.   And what was the issue there?

8        A.   I don't know what he was looking at.  I did not

9    see it.  And I think that shows in the chat messages.

10       Q.   Right.  And so you weren't able to verify that

11   there were in fact 105 remote log-ins, right?

12       A.   All of the remote log-ins I found were not from

13   any external IP address, as I recall from -- and just to

14   be clear, I'm basing this mostly off of these messages

15   themselves.  I don't have any recollection of this

16   conversation directly.

17       Q.   And what you're referring to on "remote log-ins

18   happened on the EMS," are you referring to the EMS that

19   was on the SullivanStrickler ShareFile site?

20       A.   Correct.  Correct.  Specifically in the Windows

21   event logs there is an entry called a remote log-in.

22   There's various different remote log-in types that you

23   have.  You know, literally they have a code, I think

24   it's -- was it 1 through 4 or something like that?  And

25   that's -- when we're talking about remote log-ins,

Page 84

1    that's what I'm talking about.

2        Q.  I'm taking my time.  And by doing that I'm

3    actually shortening the questions and answers because

4    I'm skipping over things that we don't need to talk

5    about.  But let me just run through these real quick.

6            If you would turn to Page 2 of Exhibit 4.  On the

7    first line, you say to Mr. Penrose, "BTW" -- which I

8    guess means by the way -- "the public IP would never be

9    in the logs unless it was sitting directly on the" --

10   and then it stops here.

11           But is that what you were just referring to?

12       A.  Sorry.  I'm just looking at this closely.

13           Yeah.  I'm saying the logs would never have the

14   public IP, unless it was literally directly on the

15   internet without a firewall in front of it.  I don't

16   believe in my messages that's truncated.  I believe that

17   has the whole statement.

18       Q.  Okay.  And then your -- the next message is, "Did

19   you see my question before about the leaked NSA tools?"

20           What are you referring to there?

21       A.  So somewhere around this time period -- I mean, I

22   know what the leaked NSA tools are.  I actually have no

23   recollection of saying this.  So I'm going to tell you

24   about publicly available information.

25           So somewhere around this period of time, there

1   was a hacking group that had released some tools that

2   were available at the NSA that allowed -- that one of

3   which allowed the scrubbing of logs in order to, you

4   know, make things no longer appear in the Windows event

5   logs.

6          And so my concern was as to whether data had been

7   removed from the Windows event logs or not if, you

8   know -- if anything hadn't happened.  Because my

9   assumption in all of this has always been that -- you

10  know, a nation state, foreign actors, most likely

11  adversary, to be potentially interested in voting

12  equipment.

13  Q.  So the concern was that the NSA tools could erase

14  event logs to obscure or erase some sort of penetration?

15  A.  Correct.  So, hypothetically, if there had been a

16  remote log-on from some other site, where the system was

17  accessed and things were changed, if you had the tools

18  that had been made publicly available, a/k/a they were

19  available to more than just the NSA, it would be

20  possible to then remove those logs and then -- and then,

21  you know, there would be no necessary record to that.

22         I seem to recall -- I don't remember if this

23  conversation or just in general, where I asked -- asked

24  Jim if there was any indications of that happening, if

25  there was any telltale signs of that happening.  So I

Page 86

1    remember his background was the NSA, and so my hope was

2    to find out, you know, is there any way we could tell if

3    that happened.

4         Q.  And what was his response, if you recall?

5         A.  I don't recall him having any answer that was

6    material.  So if he knew the answer, he probably

7    couldn't tell me, but I don't recall him even suggesting

8    he knew the answer.

9         Q.  Okay.  A couple of lines down you ask -- or the

10   next line down, sorry -- and we're still on

11   January 14 -- he says -- oh, you say, I'm sorry -- by

12   the way, "did you get ahold of Ben?"

13        Do you see that?

14        A.  I do see that.

15        Q.  Is that Ben Cotton?

16        A.  I really have no recollection.  It's -- it's

17   unlikely.  I don't think I knew Ben Cotton at that point

18   in time.

19        Q.  Okay.  And do you know who -- what y'all were

20   talking about, "I may have another guy to go to" -- or

21   "guy to go"?

22        A.  No.  It's possible -- I mean, just reading this,

23   it's possible that I'm wrong on when I talked to Ben,

24   and I did know him then.  I don't know.

25        Q.  Okay.

Page 87

1      A.  I'm -- I don't know -- I really -- most of these

2  messages, I have no recollection of them, besides

3  reading them myself now.  So it's hard for me to give

4  additional context.

5      Q.  Sure.

6          And when did you -- just put aside this exhibit

7  for the moment, and without -- without referencing the

8  Signal exhibits, how did you come in contact with Ben

9  Cotton, to the best of your recollection?

10     A.  How did I meet him?

11         I don't remember.  Someone introduced me to

12  someone who introduced me to someone.  It was not

13  direct.  I feel like -- I don't know.  Anything I have

14  would be speculation.

15     Q.  Sure.

16         He -- Mr. Cotton has given a deposition in this

17  case, and his name also appears on the log of downloads

18  that we obtained from SullivanStrickler.

19     A.  Uh-huh.

20     Q.  So you knew that he also had access to the Cotton

21  County (sic) data, right?

22     A.  I knew that he eventually got access to that,

23  correct.

24     Q.  Okay.  And that he worked with Penrose, or

25  some -- somehow worked with Penrose, did you know that?

Page 88

1    A.  Yes.  I --

2    Q.  Actually, you can skip that one.  But did he work

3    with Penrose?

4    A.  I do believe that he worked with Penrose at

5    times, correct.

6    Q.  And who is Dennis Montgomery?

7    A.  I -- you know, I -- I know more now than I knew

8    at the time.  Dennis Montgomery, former government

9    worker, I think is the idea supposedly he is an expert

10   when it comes to -- I don't know.  It -- it's hard to

11   explain.  He's -- I believe he's the -- one of the

12   proponents of the Hammer and Scorecard stuff, which is a

13   theory by which all voting machines were remotely

14   accessed by some special software created for the

15   government to compromise systems and that the votes were

16   changed through that.

17   Q.  You said that with a little skepticism.  Was that

18   intentional?

19   A.  I mean, I think my opinion was likely reflected.

20   Q.  Well --

21   A.  I have seen nothing that I find credible to

22   suggest that.

23   Q.  You called -- you called him supposedly an

24   expert, sort of like you would say supposedly a good

25   lawyer?

Page 89

1      A.   I -- I did not purposely do that.  But, yes.  I

2   have been told he was an expert in such things.  I have

3   never talked to him.  I don't know.

4      Q.   And so Conan was working with Montgomery then,

5   apparently?

6      A.   Apparently.  I didn't -- I didn't know any of

7   this at this point in time.  This again -- it's always

8   fun to read your old messages.

9      Q.   Right.

10          If you go down to the message at 21:50, there's

11   several, but one of them says, "Has Conan run all of the

12   IPs via ARIN to figure out who owns the targets?"

13      A.   I'm sorry, what line are you in?

14      Q.   It's -- it's about sixth from the bottom, 21:50,

15   "has Conan," do you see that?

16      A.   Yes.

17      Q.   Just to translate, but what is ARIN, A-R-I-N?

18      A.   So ARIN is a database that lets you take an IP

19   address and convert it into a physical location and who

20   owns it as well.  You know, it's what organization and

21   usually has a physical location with it as well.

22          So around this time period there was a

23   spreadsheet that had been provided, presumptively from

24   Dennis Montgomery, that said, hey, here's a list of

25   places that have been compromised by this as to the

1    Hammer and Scorecard thing, and here's the IP address

2    that it came from, and here's the IP address that they

3    attacked, here's how many votes were changed.

4          And this is a conversation -- based on my reading

5    of it -- it's a conversation based on that spreadsheet,

6    where I said, hey, if you say you're attacking Coffee

7    County, you shouldn't have an address for -- did I say

8    it was Kansas?  You know, it should say Georgia.  This

9    is part of what made that data make no sense and it just

10   looked fabricated.

11       Q.  Okay.

12       A.  Happy to keep talking about this, but I don't

13   think anything here is going to be useful to you.

14       Q.  I'm with you there.  That's okay.

15          Let me drop down to -- well, turn the page to

16   Page 3 of Exhibit 4.

17       A.  Is that one page beyond where we are?  Sorry, I

18   lost track.

19       Q.  That's correct, yeah.  Page 3.

20       A.  Okay.

21       Q.  The third line you say, "Are you physically with

22   C and T now?"

23          Do you see that?

24       A.  Uh-huh.

25       Q.  That's to Jim Penrose.

Page 91

1          Who were you referring to?

2      A.  I would assume it was Conan and Todd.

3      Q.  And then if you look at two lines down, he asks,

4  "Can you run a cast vote report in JSON format from the

5  EMS for Coffee County."

6          Do you see that?

7      A.  Yes, I do.

8      Q.  And did you run a cast vote report in JSON format

9  from the EMS for Coffee County?

10     A.  I actually don't remember this at all.  But in my

11 files that I turned over to you, included cast vote

12 records, so I believe the answer is yes.

13     Q.  Do you recall the cast vote records being posted

14 on the internet by anybody?

15     A.  I know that Jeff O'Donnell is having people FOIA

16 and request them and has a whole bunch of them on his

17 site.  But beyond that, no, I don't.  I'm not familiar

18 with that.

19     Q.  And who was that that you mentioned?

20     A.  Jeff O'Donnell.

21     Q.  And who is he?

22     A.  He is an individual that's done a lot of analysis

23 and posts cast vote records, and specifically has a

24 website that does analysis on them to look for various

25 different things.

Page 92

```
 1        Q.  So sort of a library of cast vote records?
 2        A.  Correct.  He has thousands of them from across
 3   the country at this stage in time.
 4        Q.  And the next line is from Penrose, it says,
 5   "Charles Bundren wants us to give it to one of his
 6   analysts."
 7            Do you see that?
 8        A.  Correct.
 9        Q.  And do you know anything more than -- do you
10   remember anything more about that, other than what
11   appears here?
12        A.  It would be my assumption that the next chat
13   section where it's a conversation with Larry was with
14   the analyst in question.
15        Q.  Yeah, I don't see Larry.
16        A.  Go down to what's -- Line 65 on that same page.
17        Q.  Yes -- oh, Doug_Larry -- oh, he's a group, okay.
18            And so who -- who are Doug and Larry in the Doug
19   and Larry reports field thread?
20        A.  Well, I'm Doug.
21        Q.  All right.  And Larry is who?
22        A.  I believe it's Larry Marso.
23        Q.  How do you spell that?
24        A.  It's actually in the column Message From.
25        Q.  I got that.  M-A-R-S-O.
```

1           And who -- who is he?

2      A.   It's my understanding that he is a former

3   Dominion employee who has built software to do analysis

4   in cast vote records specifically.  And I don't know if

5   I knew this at that point in time.  You know, I think it

6   was just, you know, Jim did an introduction.  Jim was

7   part of that group as well, as you can see from the chat

8   messages.

9      Q.   If you look at Line 63, and I'm referring to the

10  far left column line.

11     A.   Yeah.

12     Q.   This is the -- in the Coffee_County_Misty thread

13  name.

14          Do you see that?

15     A.   Yep.

16     Q.   And so that was a group of people that that

17  Signal message would have gone to, correct?

18     A.   Correct.

19     Q.   And do you know who was in that group?

20     A.   I believe it was Jim, Misty, Jeff, and I, if I

21  recall correctly.

22     Q.   And there's some funny characters here, but the

23  general thrust of this is, it looks like Jim introducing

24  Misty to you and Mr. Lenberg; is that fair to say?

25     A.   Correct.

1    Q.  Here Mr. Penrose says, "I wanted to start this

2    group so we can get to the bottom of any outside access

3    to your voting machines."

4         Do you see that?

5    A.  Yes.

6    Q.  And is that with -- is that with reference to

7    outside access generally or specifically with a

8    particular suspicious event?

9    A.  It would be my understanding, in what I know in

10   reading that message now, that that has to do with what

11   I described earlier, where Dominion went outside, and

12   then things started to work.  And therefore the

13   presumption would be what type of outside access

14   happened in order to enable that to happen.

15   Q.  Given your expertise, what would you look at on a

16   system to determine if there had been that kind of

17   outside access?  What sort of tracks would be left if

18   that occurred, if any?

19   A.  Specifically, one of the things I would take a

20   look at is the Windows event logs to look for remote

21   log-ons and remote access in that regard.

22        Beyond that, in general, these EMS servers and

23   Windows event logs have their log levels set to the

24   default for Windows, which is not sufficient to really

25   dive into the details of what happened.

1          I will specifically state that my background is

2     in applications security, which is a different thing

3     than incident response.  And so I can -- I can know how

4     to answer these questions to a certain level, but it's

5     not my expertise specifically to dive into the details

6     of what happened in a breach.

7          Q.  So incident response would be if there is a

8     hacking or some kind of event, go and figure out what

9     happened, right?  And that's a different kind of

10    expertise?

11         A.  Correct.  That's the sort of expertise that

12    someone like Ben Cotton brings in.

13         Q.  In your -- in your experience -- I probably

14    should have asked this before -- but the -- your field

15    is a -- is a vast field with a lot of different

16    subspecialties.  Do you follow me?

17         A.  Yes, sir.

18         Q.  And how -- how do you, just in terms of your

19    business, separate out the different fields?

20         Like, you know, for me, it would be litigation,

21    corporate law, labor law, whatever.  But how -- how

22    would you distinguish between different subspecialties

23    in your field?

24         A.  You know, you would have application security

25    focused.  You have network security focused.  I mean,

Page 96

1    applications securities is my expertise.  Then you tend

2    to have more your in-house -- so you have your security

3    operations center and everything associated with them,

4    and then the incident response, and respond to things

5    that happen.

6        You -- sometimes people divide things out more

7    generically, you know, and have offensive security,

8    because you've got your teams that do primarily

9    penetration testing.  And sometimes within penetration

10   testing they'll have a focus usually on network security

11   and along those lines.

12       I don't know if that -- that's probably not

13   concise enough, but hopefully it's helpful.

14   Q.  In terms of applications, would you necessarily

15   have to be -- have expertise in both application

16   software and operating software, correct?

17   A.  I am not sure if I understand what your question

18   is.

19   Q.  Well, a lot of times people separate application

20   software from operating systems.  Is that -- but yours

21   would necessarily encompass both, right?

22   A.  Yeah.  If -- with application security, if

23   anything is built from an application standpoint, then

24   it does apply to application security.  Whereas

25   typically your Windows operating system -- like it

Page 97

1    really -- it's -- any of these areas, there is some --
2    you know, there's overlap between things, if that makes
3    sense.
4        Q.  Sure.
5        A.  So typically in your application security, you're
6    going to work with custom-built applications.  So I
7    would be hired by the person who is building an
8    application to assess its security, to make sure that
9    it's not vulnerable and in order to help them remediate
10   any issues that are found through things.  And that
11   could be through application security penetration
12   testing where I'm testing for vulnerabilities.  That
13   could be through code review.  And that could be a
14   generic code review just looking for specific
15   vulnerabilities or malicious code review, which is
16   something we pioneered, which is specifically looking
17   for code that had been changed, potentially on purpose.
18           There's also areas where you're doing what's
19   called threat modeling which you're enumerating the
20   risks associated with a given system.  Everything I did
21   was from an application security standpoint.  And so
22   with that skill set and the capability, I might -- I
23   could be hired by Microsoft to take a look at the actual
24   full operating system, but it's not very typical for me,
25   you know, to do so because it's a very specialized sort

1    of thing.

2         Whereas your network security individual is the

3    one who is going to understand systems on a network,

4    that usually understands operating systems, operating

5    system vulnerabilities really well.  We -- my company

6    does a small amount of network security, and so, like, I

7    know some of that stuff.  But that's certainly not what

8    I would say is my expertise.

9         Q.  Did you do a malicious code review in Coffee

10   County?

11        A.  I never had the source code, and malicious code

12   detection really requires as much information as

13   possible.  Ideally you have both the source code and

14   access to version controls so you can see what changes

15   were done by developers over time in order to ever make

16   any type of attribution as to whether it could or

17   couldn't be a malicious code.

18        Q.  So you wouldn't have been able to do a malicious

19   code review even if you wanted to; is that fair to say?

20        A.  There's some analysis that can be done to take a

21   look to try to identify if malicious code had been

22   injected.  I would never classify it as malicious code

23   review because I didn't have access to the code.

24        When you're taking a look at an application,

25   there's -- there's two basic ways to take a look at

1    things.  There's what's called dynamic analysis, which

2    means you're -- you're working with an application

3    that's been deployed.  And so literally a web

4    application is in process and use.  You know, an

5    application is running at the time.  And your standard

6    penetration testing is usually done on dynamic analysis

7    or some automatic vulnerability scanners are there.

8         And there's static analysis is when you're taking

9    a look at the code review and going through it.  There

10   are levels of static analysis that can be done where you

11   are just looking at DOLs and so forth, and some of that

12   analysis stuff could be done, you know, on a system.

13   But for the most part, no, it can't.  It would require

14   the code to do any type of in-depth analysis.

15        Q.  Looking back to Exhibit 4.

16        You'll see the dates on this.  This is

17   January 15.  This looks like the days running up to your

18   actual visit there on the 18th.  Is that consistent with

19   your recollection?

20        A.  I don't specifically remember these messages.

21   But obviously I know when I was there, and these dates

22   match up with it.  So, yes, it makes sense.

23        Q.  Let me direct your attention to the next page of

24   Exhibit 4.

25        And if you look at Line 88, it's a message from

Page 100

1      Jim Penrose to the Coffee_County_Misty thread.

2          A.   Uh-huh.

3          Q.   It says, "Quick question, how do you get your

4      vote totals from Coffee County to Georgia?"

5               Do you see that?

6          A.   Uh-huh.

7          Q.   And then there's some back and forth.  She says

8      it's "through election night reporting."

9               Do you see that?

10         A.   Uh-huh.

11         Q.   And do you recall why that was -- why that was

12     important for what you were doing?

13         A.   I don't think it was necessarily directly tied

14     with what we were doing.  We had just -- were curious as

15     to how results got reported all the way across the board

16     in order to explain any general anomalies that we had

17     throughout.  I don't think it was directly tied.  And

18     that was one of the bits of information that was

19     surprisingly hard for anyone to ever mention is exactly

20     how -- what steps does -- do results when they get

21     reported, where do they hit along the way?

22         Q.   Did you get satisfactory answers to those

23     questions?

24         A.   (No audible response.)

25         Q.   Well, you indicated it was difficult to figure

Page 101

1    out or to get a straight answer to.

2        A.  Yeah, I'm just -- I'm just trying to remember

3    exactly.  I mean, I think that the answers we got from

4    Misty, that the best that we had so far, which were in

5    here, were okay.  I still wanted -- I'm still really

6    curious how Edison gets the data, you know, as an

7    example, you know, how -- what exactly where it pulls it

8    from and, you know -- and -- because every single point

9    where something touches something, is a point where

10   something touched something is a point where something

11   could be intercepted or manipulated in some manner.  So

12   it's always good to understand the flow of information

13   and how -- how votes are being sent.

14       Q.  If you go to the next page, Line 97, Misty --

15   Misty says, "I download on a thumb drive from the EMS

16   computer then take the thumb drive to my desk computer

17   and put it on the" -- how do you say it -- "Scytl site"?

18       A.  Scytl.

19       Q.  -- "and then I assume that sends it straight to

20   the state."

21           Do you see that?

22       A.  Yes, sir.

23       Q.  And so to get the -- these are actual election

24   results that she's referring to, correct?

25       A.  Correct.  She's saying that after an election she

Page 102

1    takes a USB drive, plugs it in EMS server, which is

2    supposed to be air gapped and off the internet, and gets

3    those results, goes to her computer and uploads them to

4    effectively -- you know, Scytl is a third party.  And

5    then apparently Scytl is the one who reports it to the

6    State.

7        Q.  Is that a secure or advisable way of transmitting

8    the information?

9        A.  If you have an air gap system, the only way you

10   can interface it is through something through a thumb

11   drive.  So in that -- in that regards, you know, they

12   don't have any other option.

13          But as far as the -- the -- is the first place I

14   want results published to a third party that has, if I

15   recall correctly, gone out of business and it's unclear

16   whose ownership is?  No, that doesn't sound like a very

17   good -- very good process.

18          And also specifically, I asked -- I think it

19   might have been part of this conversation, I know I

20   asked Misty at some point, is there anything that

21   requires you to later on compare the official results to

22   make sure it matches your real results?  And I believe

23   she said that she does that, but, no, there's no

24   official process in that.  And that means if someone

25   changed those results in the middle, no one would even

Page 103

1    necessarily know because there's no process that

2    requires them to make sure they're the same thing.

3          And certainly if it was changed by tens of

4    thousands of votes, everyone notice.  But what if it

5    was -- what if it was 1 percent of the votes everywhere,

6    you know?  And we certainly are finding that more and

7    more elections are determined by less than 1 percent of

8    the votes.

9    Q.  Well, and then there's also the down ballot races

10   that people don't spend that much -- might not look at

11   more closely, right?

12   A.  Correct.

13   Q.  And I believe the exchange that you're referring

14   to between you and Misty is on Page -- Line 101 and 102.

15   "Is there any part of the process where" --

16   A.  Yeah.

17   Q.  -- "you are supposed to confirm," and she says,

18   she does it, right?

19   A.  Yeah.  But if -- if it's not part of the process,

20   the mandated process, then -- then your average clerk

21   isn't going to do it.  And I think Misty was

22   exceptionally functional and good at her job in making

23   sure the right things were happening.  You know, not

24   everyone is that way with their jobs.

25   Q.  Were the messages that we see here on Exhibit 4

Page 104

1    your first communications with Misty Hampton?

2         A.   Yes.   To the best of my recollection, yes.  And I

3    don't know how it would be any way different than I

4    remember.

5         Q.   Do you know Greg Freemyer?

6         A.   I do.  I've talked with him a number of times.

7         Q.   And when did you first start communicating with

8    him about access to Georgia?

9         A.   About access to Georgia?

10        Q.   Yeah.  Or about getting information about

11   Georgia, about the Georgia election system.

12        A.   I can tell you that when we were looking for --

13   possibly for getting forensic images places and we were

14   looking for vendors, it's somewhere late -- you know,

15   late November, I'd say probably within -- within a week

16   of -- somewhere between November 14th and November 21st

17   is probably when I first reached out and talked to him.

18   Certainly within a week from that date if I am

19   remembering wrong, as a possible person to do

20   acquisitions.  I don't remember if it was specific about

21   Georgia or not.

22        Q.   That's what I was going to ask.  At that point,

23   it may or may not have been specific to Georgia, right?

24        A.   Being that they're a Georgia based firm, we

25   probably had Georgia in mind.

Page 105

1    Q.  But you don't recall specifically if Georgia was

2    on the hit list from the very beginning, right?

3    A.  Without a doubt, we were -- we were calling and

4    trying to find places within Georgia around that time

5    period.  So, yes, I don't think I can say that it wasn't

6    on the hit list.  I don't remember any specifics.

7    Q.  And was it on the list because the election was

8    so close or because of anomalies or some other

9    information?

10   A.  I -- I think it was because the -- the attorneys

11   in question were licensed in Georgia.

12   Q.  And who -- who was that?

13   A.  So specifically, initially, we were working with

14   Lin Wood.

15   Q.  Okay.

16   A.  And, you know, I think eventually Sidney Powell

17   ended up working there, and she had someone on her staff

18   at least who was licensed in Georgia.

19   Q.  Do you recall who that was?

20   A.  What was her name?  No.  No, I don't think I do.

21       I mean, obviously, Georgia was also a

22   battleground state, so ...

23   Q.  Right.  Let's look at -- this is a little bit out

24   of sequence, but I'm going to go to Tab 12, which is

25   the -- and mark it as Exhibit 5.

1          (Whereupon, Plaintiff Exhibit 5 was marked for

2     identification.)

3          MR. BROWN:  And Tab 12 should be the

4     SullivanStrickler log file.

5     A.  There we go.  Okay.

6  BY MR. BROWN:

7     Q.  Is Christina Reed the name of Sidney Powell's

8  lawyer in Georgia?  Does that ring a bell?

9     A.  That doesn't ring a bell at all.

10    Q.  Do you know Stephanie Lambert?

11    A.  I do.

12    Q.  How do you know her?

13    A.  She was added as counsel on the Antrim, Michigan

14 case.  I'm trying to think if that's the first time I

15 met her.  I think it might have been the first time I

16 met her.  But because of my work on Antrim case is where

17 I really got to know her, for sure.

18    Q.  And did you know she also represented Misty?

19    A.  I -- I'm aware of that information.  I do not

20 know when I became aware of that information.  I don't

21 think I knew that at the time of the audit.

22    Q.  Did you ever discuss with Misty Hampton her

23 bringing a whistleblower case of some kind?

24    A.  Did I personally talk with her about?

25    Q.  Right.

Page 107

1       A.  I don't believe so.  I mean, that's not really my

2   field.

3       Q.  I understand.

4           Do you know -- actually this is relevant to the

5   case, we're not just fishing -- do you know what legal

6   matter Misty was engaging Lambert for?

7       A.  I don't know.

8       Q.  Okay.  Let's -- let's turn to Exhibit 5.

9       A.  Okay.

10      Q.  And have you seen this log before, in some form?

11      A.  Yes, I have.

12      Q.  And could you describe it for the record?

13      A.  So it's -- I believe it's an export of the access

14  logs associated with ShareFile, which is the tool that

15  SullivanStrickler uses in order to securely make

16  forensic images available.

17      Q.  And when were you given access to that ShareFile?

18      A.  The first time I was given access to that was

19  when I was finally given permission to look at and work

20  on the Antrim data, which I don't remember the dates,

21  sometime in December.

22      Q.  And so you -- you already had access to

23  SullivanStrickler's site before Coffee County; is that

24  right?

25      A.  Correct.

1      Q.  Okay.  And then --

2      A.  And just because I have access to the site

3   doesn't mean I have access to everything on it.  But,

4   yes, that's I think why they gave you two logs:  One

5   that showed what people had permission to, and one that

6   showed the download history.

7      Q.  Okay.  And so Page 1 of Exhibit 5 is what?  Can

8   you tell?

9      A.  It looks like it's access logs as to what someone

10   has access to.

11      Q.  And the -- if you look at the right, the TRUE,

12   FALSE, TRUE, FALSE, is what they have access to do; is

13   that correct?

14      A.  That's what it looks like to me.

15      Q.  And does this -- does this log indicate when

16   different things were actually downloaded, or is that --

17   would that be a different log?

18      A.  That's a different log.

19      Q.  Okay.

20      A.  That's why they gave you two sets of logs.

21      Q.  All right.  If you look at Page 1, a lot of these

22   people we have already talked about.  But just quickly,

23   do you know who Scott is from ASOG?

24      A.  Yeah, that's actually -- it looks like Todd.

25      Q.  Oh, Todd, okay.

Page 109

1          Okay.  And for some reason he's also called

2      Scott?

3          A.  My guess is he just didn't want his real name in

4      the logs.

5          Q.  Okay.  But that's -- that's Todd Sanders?

6          A.  The email address t@█████████ is Todd

7      Sanders' email address.  And therefore my assumption is

8      that that is Todd Sanders.  I have no direct knowledge

9      to know that.  I mean, I have no direct knowledge to

10     know that Scott T., specifically beyond the email

11     address I recognize.

12         Q.  Sure.

13          I'm just looking through here.  Most of these we

14     know.  I'm just trying to see if I have any more

15     questions for you on this.

16         A.  Well, this version you have here is pretty

17     blacked out.  So there's not a lot of people.

18         Q.  Well, it's not as blacked out on the pages that

19     follow.

20         A.  Okay.

21         Q.  I will have to tell you, it's so blacked out it's

22     still printing on my printer, and I loaded it to print

23     this morning.  Because any time you redact anything, the

24     printers don't like it.  So -- because it's so much --

25     it's so big.

Page 110

1      A.   Yeah.   I imagine you go through ink a little bit

2    faster that way.

3      Q.   Yeah.

4           Who is Michal Pospiezalski,

5    P-O-S-P-I-E-Z-A-L-S-K-I?

6      A.   Do you have a page number?

7      Q.   Yeah.   It's Page 9.   Right in the middle.

8      A.   Oh, Michal.

9      Q.   And who is -- who is he or she?

10     A.   He is an application security expert that -- man,

11   I didn't -- I didn't know he had any access to any of

12   this stuff.   He is an application security expert.   At

13   some point in time, someone sent his information to -- I

14   don't -- I don't know which party it was, whether it was

15   Lin Wood or Sidney Powell, and they asked me to vet him.

16   And I looked through his résumé, and he actually -- he

17   used to work for a company called Sigital (phonetic),

18   which is -- was one of the leading application security

19   companies that I also worked with.   So, yeah.

20     Q.   If you look at his permissions, there's -- it's

21   FALSE across the board.   What does that mean?

22     A.   Well, I mean, you got to go back to the top to

23   see what each row is.   But if it's FALSE across the

24   board, then he couldn't do anything.   But that's

25   probably not true.   It's probably at least -- he could

Page 111

1    probably just download.  So it's probably -- the first

2    column's TRUE.  So it looks like that was the first

3    column --

4        Q.  That's right.

5        A.  -- is download.

6        Q.  And the other columns say FALSE, but that also

7    just means that they were FALSE at the time this

8    printout was generated, correct?

9        A.  ShareFile should have a log of any of those

10   changes.  My guess and expectation would be, though,

11   that most likely they never changed access for someone.

12   You know, they'd only do that if it requested, so -- but

13   ShareFile should track that information.

14       Q.  And then do you know who John Basham is, right

15   above Michal P.?

16       A.  I don't.  I mean, I was working with Michal at

17   times.  There is a high likelihood I was involved with

18   him somehow being part of this.  But I have no

19   recollection of it whatsoever.

20       Q.  Do you know where he is now?

21       A.  I think he's part of a startup and he moved to

22   Miami, if I recall correctly.

23       Q.  Do you know -- do you know his company name?

24       A.  I don't recall, but the company he's involved in

25   is trying to create the next generation voting machine.

Page 112

1     Q.  If you go to Page 10, on the second visible line

2  is Patrick Colbeck?

3     A.  Uh-huh.

4     Q.  Who is he?

5     A.  He's someone out of Michigan.  I think he used to

6  be a politician there.

7     Q.  Do you know what he's doing on this list?

8     A.  No, sir.

9     Q.  And just for the record, I sort of skipped over

10  this on this chart, but in I think it's the second

11  column, that's -- that's for the particular device or

12  folder.

13        Do you see that?

14     A.  Yeah, hold on.  I got to look at the beginning of

15  this.  I'm not really familiar with these logs.

16        Yeah, it does.  It says the path and then the

17  folder.  So the second column is the folder.  And so

18  they're saying their access was specifically limited.

19  You know, when they're saying that specifically, it is

20  limited to the thumb drives folder.

21     Q.  And do you recall who issued you your credentials

22  to get on -- specifically to the Cotton County (sic)

23  folders?

24     A.  I believe that Jim Penrose requested that

25  SullivanStrickler give me access.  That -- that would at

Page 113

1    least be the normal flow of things.  But I don't -- I

2    don't know for sure.  I just know the access was

3    granted.

4        Q.  Did you -- did you always sign in under your own

5    name and credentials, or did you ever use someone else's

6    credentials?

7        A.  I would never use someone else's credentials.

8    No.  I always signed in under my credentials.

9        Q.  Did you know that Ben Cotton would sign on using

10   Jim Penrose's credentials?

11       A.  I understand that while he was waiting for his

12   own credentials, to expedite things, he logged in as

13   his -- that Jim provided him his credentials for him to

14   log in that time.

15       Q.  Are you aware of anyone else logging in under

16   credentials that were not their own with --

17       A.  No, sir.  The only reason why I know that is

18   because I saw it come up in his deposition.

19       Q.  Okay.  Hang on just one second.

20           Sorry for the delay.

21       A.  That's fine.

22       Q.  I think my last -- I think I was interrupted here

23   before I could focus on your answer to my last question,

24   which was whether you're aware of anyone else getting --

25   using credentials that were not their own with respect

Page 114

1    to Coffee County.

2        A.   I'm not aware of anybody else using credentials

3    to access data besides their own, besides what you have

4    already specifically talked about with Ben.

5        Q.   And do you -- do you recall -- do you recall who

6    you -- well, to go back to the cast vote records, the

7    JSON format, do you recall you actually doing that, or

8    is it simply looking at the Signal text messages?

9            Does that make any sense?

10       A.   Yeah, I don't recall doing that.  But I do

11   recall -- I do recall, like, in the -- in the user

12   interface, knowing how to create a cast vote record.  So

13   obviously I had to do it at some point to figure it out.

14   So besides the text messages, I don't really remember

15   that, though.

16       Q.   Had you ever heard that Mike Flynn or Roger Stone

17   had obtained various voting systems or copies of various

18   votes -- voting system images to make vulnerability

19   testing on them?

20       A.   No, I am not familiar with any statements similar

21   along that -- those grounds.  But I will say that

22   General Flynn was a part of the board of Defending the

23   Republic at one point in time.  So it could be related

24   to this stuff that they're talking about.

25       Q.   Do you know if Defending the Republic is still

Page 115

1    engaged in collecting images of electronic voting

2    systems?

3        A.  I don't know anything about that, no.

4        Q.  Do you know what --

5        A.  And I don't -- I would say that's kind of a

6    mischaracterization, they weren't like in the business

7    of doing that.  So I don't know anything about their

8    involvement and what they're doing right now, besides

9    occasionally I see, you know, them put out various

10   things that comes across my social media feeds of sorts.

11   That's all I know about what they're doing right now.

12       Q.  Did you or to your knowledge Mr. Lenberg return

13   to Coffee County after your initial visit on the 18th of

14   January?

15       A.  I never returned to Coffee County.  I do believe

16   that Jeff did.  But don't you have surveillance footage

17   on that?  I don't have any details.

18       Q.  Yeah, we do.  But do you know -- do you know --

19   based upon your recollection, do you know why he stayed

20   longer and you left?

21       A.  As I recall, he said that he was going to

22   complete any of the work that needed to be done.  And I

23   had a lot of things on my plate, so I didn't even really

24   follow up with it any further.  So he was --

25       Q.  But he was --

Page 116

1      A.  He was still trying to figure things out on the
2   ICC devices.
3      Q.  So he was continuing the same work that you two
4   were doing; fair to say?
5      A.  That is my understanding, but you'll have to ask
6   him.
7      Q.  Did -- the security footage indicates -- I'll
8   just tell you, you don't have to believe me -- indicates
9   that a Secretary of State investigator actually came to
10   the elections office while Mr. Lenberg was there.  Did
11   any -- do you recall that or did you hear about that?
12      A.  I do believe I was told about that.
13      Q.  And who told you?
14      A.  I believe Jeff mentioned something to me.
15      Q.  And what was -- what was his concern?
16      A.  I don't recall.
17      Q.  Okay.  Did that change his plans or his
18   operations there in any way?
19      A.  I'm not sure.  You would have to ask him.
20      Q.  Did you talk to anyone at SullivanStrickler
21   before you went to Coffee County to see if you needed to
22   follow up on anything they had done?
23      A.  I mean, I don't recall doing so.  But obviously
24   there was a message in the chat message, where I reached
25   out to Greg and asked him some questions.  And that

Page 117

1    happened, I believe -- you know, I think the date of

2    that message was when I was in Coffee County.

3        Q.  I will get to that in a second.

4            For the record, did you ever hear that anybody --

5    anybody was paying Misty Hampton for her to get access

6    to anybody?

7        A.  No.  I have never heard anything even suggested.

8        Q.  Were you required to sign any kind of

9    confidentiality agreement with respect to any of the

10   Coffee County data that you obtained?

11       A.  I -- I believe -- I'm not sure, is the short

12   answer.  I could not find any agreements that

13   specifically highlighted things in that.  But I do

14   believe that -- like, for example, I know that I have a

15   confidentiality agreement with Stephanie Lambert.  I

16   might have signed one with Defending the Republic at one

17   point in time.  And, unfortunately, if I did, it was on

18   the email address that I don't have access to, and I

19   don't have a copy of it.  But I'm not -- honestly not

20   possibly sure.

21       Q.  This -- this visit was done under

22   Mr. Bundren's -- for Mr. Bundren, or your understanding

23   that he was the attorney involved in this one?

24       A.  Yeah, he definitely did not have me sign

25   anything.

1      Q.   Okay.  Did you have any communications with a

2  gentleman from Coffee County named Ed Voyles?

3      A.   Not that I know of.

4      Q.   Did you have any communications with Eric Cheney

5  who was --

6      A.   Not that -- yeah, not that I know of.

7      Q.   I think I already asked you about Tony Rowell.

8  Do you recall having any communications with him?

9      A.   Not that I know of.  I'm sorry.  I need to speak.

10     Q.   Did -- did Ms. Hampton give you any indication or

11 did you have any understanding that any local attorneys

12 for Coffee County had given authorization for you and

13 Mr. Lenberg to be in the offices in the middle of

14 January of 2021?

15     A.   I -- I'm not sure if I understand the nature of

16 your question.  Why -- why would we need an attorney's

17 authorization to be in an office?

18     Q.   You didn't -- you wouldn't need it.  She might

19 have needed to give it to you, is what I'm getting at

20 it.

21          Is that you had an attorney, Bundren, who had

22 engaged you to -- or had a client who engaged you to do

23 this work, right?

24     A.   (No audible response.)

25     Q.   You need to say yes.

Page 119

```
 1        A.  Yes.
 2        Q.  Okay.  Misty Hampton worked for Coffee County.
 3    Do you know if Coffee County had any legal advice with
 4    respect to the propriety of letting you do that?
 5        A.  I -- I don't.  I don't know.  If the person
 6    wasn't there, physically, I doubt I would remember,
 7    quite frankly.
 8        Q.  Okay.  Do you -- you never -- you never kept your
 9    work in Coffee County a secret, did you?
10        A.  I -- not sure if that's an -- I mean, it wasn't
11    trying to be a secret, as in anything wrong was done
12    there.  But I was told that -- to -- that this -- that
13    they didn't want it talked about until whatever legal
14    action they had was in place.  You know, so I -- I have
15    always -- if I ever referenced anything in Coffee
16    County, I refer to as, you know, I have done some work,
17    you know, at a county in Georgia, rather than
18    specifically naming it.
19        Q.  So although it wasn't clandestine, it was work
20    that you kept confidential for purposes of your
21    engagement; fair to say?
22        A.  Yeah.  I mean, that's the professional thing to
23    do.  If you're told not to talk about something until,
24    you know, legal action happens, you don't talk about
25    something until legal action happens.
```

1    Q.  Did Mr. Bundren ever give you any sort of written

2    or specific instructions as to what you were looking for

3    or to do?

4    A.  I had at least one call with him, and I think it

5    was three calls with him.  But I do not recall anything

6    specific with it.  I think the most specific thing I

7    have right now is the message from Jim Penrose and the

8    conversation where he says, you know, well, we're trying

9    to figure out whether we're going to do something with

10   this now or wait for something later on.  Specifically,

11   so whether they're going to use it for something for

12   the -- I think it was for the run-off or not.

13   Q.  Right.

14   A.  So that's the most specific information I have at

15   this point that I remember.

16   Q.  And you're referring to a Signal text message

17   that I think we'll get to in a second.  Okay.

18   A.  Correct.

19        And I have no recollection of that whatsoever

20   besides going through the messages, so...

21   Q.  Right.  What was Russell Ramsland's role in your

22   work in Georgia on the elections in Coffee County?

23   A.  I don't recall him having involvement in Coffee

24   County, besides -- besides those messages that are later

25   on, when I was at the audit and he called me up.  I

Page 121

1    mean, you -- I'm sure we'll go through those messages.

2    But, you know, beyond that, I don't recall any

3    involvement.  But it doesn't mean he wasn't -- wasn't

4    there or wasn't behind the scenes.

5         Todd and Conan did a lot of work for ASOG.

6    They're not employees for ASOG, but they were

7    contractors of them.  And they were obviously engaged

8    based on everything that we have.  And so he could have

9    been engaged at some level, and I either didn't know or

10   I don't remember.

11   Q.  Okay.  Was there anybody else present in the

12   Coffee County offices when you were there on the 18th

13   and 19th, besides you and Mr. Lenberg and Ms. Hampton?

14   A.  Yeah, there -- there was two other people in the

15   office that worked for the office.

16   Q.  Was one of them Jill?

17   A.  I -- I couldn't tell you anymore.  I'm sorry.

18   Q.  That's okay.

19        Did you take any pictures of the components or

20   any of your activities there when you were there?

21   A.  I don't believe I did.

22   Q.  Do you know if Jeffrey Lenberg took any pictures

23   or videos?

24   A.  I think he might have.  You would have to ask

25   him.

Page 122

1     Q.  Okay.  You know, one of the photos shows him with

2     I think a ring, like one of those rings that you use to

3     give better light for a video.  Were you there when he

4     was doing that?

5     A.  There was a ring?

6     Q.  You know -- I don't know what you call them, but

7     the light ring that you use -- you've seen it now with

8     people using Zoom, to make a better --

9     A.  Yeah.  I don't recall that.  I think I would.

10    Q.  Did Ms. Hampton bring in a BMD for you all to

11    work on?

12    A.  No, sir.

13    Q.  Okay.  And were you --

14    A.  Not any time while I was there, at least.

15    Q.  And were you able to work on the BMD software at

16    all?

17    A.  No, sir.  Until you told me that there was --

18    theoretically one of the thumb drives there was a copy

19    of an ADK file, I didn't even think that stuff had been

20    captured in Coffee.

21    Q.  Okay.  I want to dive a little bit in greater

22    detail, the tests that you did in Coffee County while

23    you were there.

24         Just sort of physically, can you walk me through

25    what you did, what you asked her to do, and what you did

Page 123

1      while you were there?

2          A.  Well, the idea was that if -- if -- if it's

3      rejecting a ballot based on the race of the candidate,

4      then that's something that should be reproducible.  And

5      therefore, if you had -- you know, if you had ballots

6      from one candidate and the other candidate, you're going

7      to see different rejection rates that are noticeably

8      different between them if you feed through the machine.

9      That was the concept and the idea to prove if, you know,

10     Misty's theory was accurate.

11         So I forget the numbers, I think they're in the

12     report, but it was something like 10 or 20 of each

13     ballot -- each ballot type was repetitively fed through

14     a machine.  And periodically those results were pulled

15     off of the card.  You know, all that stuff was done by

16     Misty and the person helping her and compared against,

17     you know, what the printout was, making sure the

18     printouts were, you know, accurate, and it was, you

19     know, the right numbers, and that the rejection rates

20     were compared.  It was pretty simple.

21         Q.  What I'm going to do now is take a lunch break,

22     because I need to get some documents as exhibits, and I

23     don't want to waste any time.  So if we could take a

24     45-minute break, and then I will get organized and we'll

25     be able to march through the rest of your deposition

Page 124

1    quicker.  Is that all right?  So have some lunch and see

2    you a little bit before 1:00.

3        A.  Sounds good.

4        Q.  Thank you, sir.  Appreciate it.

5            THE VIDEOGRAPHER:  Off the record at 12:05 p.m.

6            (Whereupon, a break was taken from 12:05 p.m.

7        to 12:55  p.m.)

8            THE VIDEOGRAPHER:  This begins Media Unit

9        Number 3.  We're back on the record at 12:55 p.m.

10   BY MR. BROWN:

11       Q.  Mr. Logan, this -- we're back on the record.  I

12   would like to mark, I believe, as Exhibit 6, they'll

13   correct me if I'm wrong, Tab 15.

14            (Whereupon, Plaintiff Exhibit 6 was marked for

15       identification.)

16   BY MR. BROWN:

17       Q.  And that may take a minute to appear.  Let me

18   know when that comes up.

19       A.  There we go.

20       Q.  And I am not sure if the first part of that is

21   the same as what we have seen before, but if you would

22   scroll down to the twelfth page of that PDF.

23       A.  Okay.

24       Q.  And does this show the activity on that

25   particular folder that SullivanStrickler had?

Page 125

1      A.   Yeah, this looks like the download logs.

2      Q.   Okay.  And if you would scroll over to -- or

3   scroll down to, let's see, Page 15.

4      A.   Okay.

5      Q.   You'll see in the middle of the page that you are

6   uploading things to the site.

7           Do you see that?

8      A.   Yes, sir.

9      Q.   And what were you uploading?

10      A.   So I had converted the forensic image into a

11   virtual machine, and I uploaded that result to the site.

12      Q.   So you uploaded a virtual machine; is that what

13   that is?

14      A.   Correct.

15      Q.   And just for the record, tell me what that is and

16   how was that different than what -- from what you

17   downloaded?

18      A.   So a forensic image, when it's captured, it's

19   captured in a manner that is immutable, you cannot

20   change it.  And it's designed, you know, for that so

21   that you have the official record what the system looked

22   like if you were using it in a court case.  But

23   converting it to a virtual machine allows you to

24   potentially, you know, boot up the device and be able to

25   utilize it like it was the computer in order to take a

1    look at the way the things operate, and more closely

2    examine it like it was a local system you were using.

3        Q.  If you look on that same -- and so you did that,

4    it looks like, on January 16th; is that correct?

5        A.  If that's what the log says, then that's correct.

6        Q.  And then if you look at the bottom of that same

7    page, over to the next page, what is the reference to

8    fixed?  What does that mean, in this third column?

9        A.  So the first time I did the conversion, something

10   happened, and it seems to have taken out a bunch of

11   files, and it didn't actually function and work right.

12   I don't -- to this day, I don't really understand

13   exactly what was wrong.  But I redid the process and

14   uploaded a version that actually functioned.

15       Q.  So which part wasn't working, the virtual

16   machine?

17       A.  The virtual machine had a lot of files missing

18   from it when it booted up, which that shouldn't have

19   happened.  I don't really understand it.  I've never

20   seen, you know, a partial conversion in such that

21   matter, but that's what had happened somehow.

22       Q.  And were you ever able to determine the cause of

23   that issue?

24       A.  I wasn't concerned with it.  I mean, I just

25   assumed that something hadn't copied right.

Page 127

1    Q.   Right.

2    A.   So, no, I just created a new version of it.

3    Q.   And then a little bit further down, on Page 16,

4    it says upload ICC.  And that's the central scanner; is

5    that right?

6    A.   Yeah.  There's a Windows machine that has an

7    off-the-shelf scanner plugged into it, which is what

8    makes up the ICC device with the software.  And so that

9    is the Windows machine converted into a virtual machine.

10   Q.   And then how do you -- you use a virtual machine,

11   in real life?  I mean, what do you do with it?

12   A.   You -- you, like -- what do you mean?  Like, what

13   are the normal uses for it?

14   Q.   Yeah.

15   A.   Well, the normal use is in order to be able to

16   run multiple systems on a single machine, a single

17   computer, sharing the resources of that computer or, you

18   know -- or to do, you know, analysis for stuff like

19   this.

20   Q.   And given your -- how did you personally use the

21   information that you got from the SullivanStrickler file

22   from Coffee County?

23   A.   I didn't actually spend a lot -- I mean, it -- do

24   I remember well enough to answer this question?

25   Q.   First, do you remember well enough to answer the

Page 128

1   question?

2       A.   So I -- I don't recall specifically how I used

3   the Coffee County stuff.  I -- typically I would do

4   something like that in order to see how the applications

5   work and function.  But I don't remember specifically in

6   Coffee County how far I made it or what I was doing

7   exactly in it.  I know I took a look at the -- the

8   actual logs, Windows event logs.  But I also could have

9   extracted those straight out of the forensic image for

10  that type of analysis.

11      Q.   So some of the things you did you might have done

12  onsite or using the virtual machine that you had

13  downloaded, right?

14      A.   No, sir.  Some of that stuff, I could have done

15  via the forensic image that was downloaded or in the

16  converted format of the forensic image, you know, which

17  I uploaded.  I'm not talking about anything on site.

18      Q.   Thank you.  I'm sorry.  I misunderstood.

19  Appreciate that.

20           So give me an example -- so you can -- you can

21  test a system -- the way you would test a system and how

22  it functions would be using a virtual machine?

23      A.   Correct.  In a virtual machine you can actually

24  get software running, log into software, et cetera.  You

25  know, so you can utilize it like it was a -- you know,

Page 129

1    like it was a machine.

2        Q.  If you turn the page -- I mean, the dates are the

3    dates.  I'm not trying to trick you or anything.  But it

4    looks like you might have uploaded -- this is on

5    Page 17.  You might have uploaded the EMS on the 11th?

6        A.  I don't know what page you're talking about.

7    It -- I mean, I'm not -- you said Page 17?

8        Q.  Yeah.  The page numbers should appear at the top,

9    but it's also -- might be the seventeenth page of the

10   PDF.

11       A.  It looks like the -- no, I didn't upload

12   anything.  That's administrator.  Where are you seeing

13   me uploading something?

14       Q.  If you look -- let me make sure we're on the same

15   page.  Do you see the Bates Number at the bottom of the

16   page, small --

17       A.  Yeah, I'm on Page 17.  How many lines down are we

18   talking about?

19       Q.  15.

20       A.  Okay.  So are we talking about 1/11/21 at

21   9:41 a.m.?

22       Q.  Yes.

23       A.  I guess technically -- yeah, 9:37 a.m.  Yeah.

24       Q.  And then it looks like you deleted a file; is

25   that right?

Page 130

1      A.  Yeah.  Because the version was -- was broken.  I
2   deleted it and then I uploaded the fixed version.
3      Q.  Okay.  But this chart would show the earliest
4   date that you had access to it, right, if we just looked
5   at the dates?
6      A.  If you looked at the dates, correct.  And based
7   on looking on this -- this log, it looked like the first
8   time I downloaded something was on the 9th.
9      Q.  Okay.
10     A.  I haven't found it in this version of what you
11  have here.  But as I recall, when I've looked at it in
12  the past, it said that.
13     Q.  When did you first have access to the log file?
14     A.  What do you mean the log file?
15     Q.  Well, I mean, you didn't see this just today,
16  right?
17     A.  No.  When did I see that?
18          I don't know.  It was when I was trying to
19  prepare for all of this stuff.  I did research.  I
20  wanted to find out what was out there.  I think this was
21  actually attached as part of the case, a copy of this,
22  and I got it that way, but ...
23     Q.  That's what I wanted to get, is if you got it
24  independent from this case to the best of your
25  recollection.

1      A.   I believe I pulled it from the case, but I'm not

2    positive.

3      Q.   Okay.  Yeah, I'm not quibbling, but if you look

4    at the Page 18, it says, create folder, Doug Logan, just

5    beneath the black line.

6      A.   Okay.

7      Q.   Would that be the first time, or maybe or maybe

8    not?

9      A.   I mean, as I recall, when I went through the

10   this, the first thing I did was download something,

11   which was on the 9th, if I remember correctly.

12     Q.   Okay.

13     A.   So that would have been earlier than the 10th.

14   But it looks like that the folder I created to upload

15   stuff was, you know, I -- because I didn't have upload

16   access initially.  I believe I had to reach out to ask

17   for that.

18     Q.   Okay.  Who did you reach out to, to Penrose?

19     A.   I probably talked with Greg, Greg Freemyer.  And

20   I probably talked to both of them, honestly.

21     Q.   Okay.  I wanted to finish off with that exhibit,

22   because that was earlier than your personal visit to

23   Coffee County.  But let me return to Coffee County, when

24   you were actually there in person.

25     A.   Okay.

Page 132

1    Q.  Did you touch any of the equipment at Coffee
2    County?
3    A.  No, sir.
4    Q.  I take it you instructed or asked Ms. Hampton to
5    do so?
6    A.  As I stated initially when you asked a very
7    similar question, she presented a problem she had, and
8    mostly Jeff came up with a way to test that.  And then
9    the test was conducted, you know.
10   Q.  Was there anything you asked -- you or
11   Mr. Lenberg asked her to do that she refused to do?
12   A.  I -- nothing -- nothing comes to mind.  But I
13   don't -- I don't believe there was clear instructions,
14   do A, B, C, D, E.  The idea was -- you know, we -- to
15   rerun an election with predefined ballots to see what
16   the results are.  She knew very well how to run an
17   election.  We didn't have to give her any instructions
18   on that.  She was the one who could instruct us on how
19   to do that effectively.  She was doing advanced logic
20   and accuracy testing.
21   Q.  Did you go into the small EMS server room when
22   you were there?  They call it the Gems room.
23   A.  I -- I know what you're talking about.  And, yes,
24   I do believe I was in that room at one point in time.
25   Q.  And was Ms. Hampton there with you when you were

1   there?

2       A.   There was always someone with me whenever I was

3   around any of this equipment.  I don't remember

4   specifically if it was her.  It was probably her.

5       Q.   Okay.  So you mean -- just to follow up on

6   that -- somebody from Coffee County, either her or her

7   assistant, was with you at all times?

8       A.   Correct.

9       Q.   Did you -- did you have a Cellebrite kit when you

10  were there?

11      A.   No, sir.

12      Q.   I'm not going to quibble with you, but let me

13  just show you what we'll mark as Exhibit 7, Tab 10.

14          (Whereupon, Plaintiff Exhibit 7 was marked for

15      identification.)

16  BY MR. BROWN:

17      Q.   And while it's coming up, what is a Cellebrite

18  kit used for?

19      A.   I assume you're talking about a dongle to use the

20  Cellebrite software, and Cellebrite software is used for

21  capturing specifically mobile devices.

22          MS. MARKS:  Bruce, could you say the tab number

23      one more time for me?

24          MR. BROWN:  Tab 10.

25          MS. MARKS:  Got it.

Page 134

1       A.   Okay.  So Exhibit 7, Tab 10?

2    BY MR. BROWN:

3       Q.   Yes, sir.

4       A.   Okay.

5       Q.   Is that you?

6       A.   It looks like me.

7       Q.   And what's that in your left hand, if you know?

8       A.   I have absolutely no idea.  Let's see if I can

9    zoom in.

10      Q.   I think the next page is a little bit closer.

11      A.   Back buttons changes exhibits.  I want to go to

12   the next page.

13           I don't know what that is.

14      Q.   Okay.  It's not a Cellebrite kit?

15      A.   Not that I know of.  I would think I would

16   remember that.

17      Q.   Did you --

18      A.   What is that?

19      Q.   It's on the second day that you were there,

20   January 19th, that morning.

21      A.   Okay.

22      Q.   But you just don't have any recollection of what

23   that would be?

24      A.   No.  I don't.

25      Q.   And would you have any reason to have a kit that

1    copied mobile devices when you were there?

2        A.   I can't think of any reason I would.  I mean, I

3    know we talked with Jeff when we were first there that

4    we weren't going to touch any of the devices.  And I

5    know that after my conversation with Greg, we had that

6    further conversation, just didn't think it was a good

7    idea.  So I have no idea why I would be carrying

8    something in there --

9        Q.   Okay.

10       A.   -- you know, that was anything other than that.

11   I don't know what that is, though.  I really don't --

12   have no idea.

13       Q.   So you didn't attempt to copy any software,

14   firmware, or data when you were there, right?

15       A.   No, sir.

16            But what on earth is that?

17       Q.   Well, if it comes to you, let us know.

18            Let's go back to Exhibit 4, which is a list of

19   your Signal messages sorted by date.

20       A.   Yes, sir.

21       Q.   And specifically, if you could go to Page 6.

22       A.   Yes, sir.

23       Q.   Who is Jovan Hutton Pulitzer?

24       A.   That is Jovan.  Don't you know who Jovan is?

25   Everyone knows who Jovan is.

Page 136

1    Q.   What is his connection to Coffee County?

2    A.   I had no recollection he had any involvement.

3    Based on just reading the stuff it sounds like he was

4    engaged by the attorney to look at the ballots, but...

5    Q.   Is that his line of work?

6    A.   That is currently his line of work, I would say.

7    Q.   Looking at ballots, election things?

8    A.   Correct.

9    Q.   And he was at the Lin Wood plantation?

10   A.   No.

11   Q.   You didn't see him there or talk to him there?

12   A.   I talked with him on the phone once there.

13   Q.   What -- what was that about?

14   A.   He was talking about his accomplishments, and he

15   was talking to a few other people that were on speaker

16   phone, and I was listening in on that conversation.

17   Q.   What type of accomplishments?

18   A.   All of his patents that he has filed.

19   Q.   Anything specific relating to his findings about

20   elections or election security?

21   A.   No.  No.  In fact, I've told him this as well,

22   but I thought he was one of the most arrogant people I'd

23   ever talked to.  I really did -- did not like him when I

24   talked to him at that point in time.

25   Q.   Was there another party or another occasion that

Page 137

1    you saw him or ran into him?

2       A.  Yeah.  Yeah.  Yeah.  I talked with him in

3    association with the Arizona audit.

4       Q.  Okay.  And in these emails he says, "Who has the

5    Coffee County password for ballots?"

6          Do you see that?  That's on Line 116?

7       A.  Correct.

8       Q.  And what is he talking about there, do you know?

9       A.  My assumption is, because everything on the

10   ShareFile site had passwords associated with it, that he

11   did not have the password in order to decrypt ballot

12   stuff.  But I really don't know anything about his

13   access or what he got.

14      Q.  And did he have access -- to your knowledge, did

15   he have access to the SullivanStrickler site?

16      A.  I do not know anything about that, whether he did

17   or didn't.  All I have is what is in this message.  I

18   honestly -- I didn't -- I didn't think he had any

19   association with Coffee County until I saw this in my

20   messages.

21      Q.  You reached out to Greg Freemyer on the 18th.

22          Do you see that?

23      A.  Yes, sir.  I knew you'd ask me about this one.

24      Q.  So tell me about reaching out to Greg Freemyer.

25      A.  I -- I don't remember this really much at all.  I

1     do know that I was disappointed that they hadn't been

2     able to capture the ICP device, and I was researching

3     how that would be done, and I was reading a DEFCON

4     report associated with it.  And so I had reached out to

5     him just to ask some questions.  And I think based on

6     that conversation, on what was necessary in order to do

7     things properly, and talking with Jeff, we were like,

8     no, we definitely -- that's a really bad idea.  We're

9     not going to -- not even going to try anything like

10    that, so...

11        Q.  Not going to try anything like what?

12        A.  We're not trying to capture any type of forensic

13    stuff.  We thought it was better to stick to the plan to

14    not touch anything and just leave that to --to really

15    what the experts are.  Because I'm not a forensics

16    person.  If their -- if we had captured anything at that

17    time or touched anything at that time, it would be very

18    difficult to defend any of that in court, because it's

19    not my expertise, it's not my background, it's not my

20    certifications.  And we didn't want to jeopardize any

21    potential legal stuff in there.  So the idea was to

22    never touch or do anything with it, even if it hadn't

23    been captured because, you know, it was too big of a

24    risk to even consider something like that.

25        Q.  And I'm going to come back to this exchange.

Page 139

1      But did anything come of the work that you did in
2   Coffee County in terms of support for a lawsuit or any
3   kind of action?
4      A.  So when -- when I left Coffee County, and Jeff
5   said he was going to finish things up, my assumption
6   would be that all follow-up was in there.  I got very
7   busy with planning the Arizona audit after that and I
8   didn't get back to it.
9      Q.  So to your knowledge -- well, but you haven't --
10  have you seen it used anywhere in any litigation or
11  any --
12     A.  I have not seen it used in any litigation
13  anywhere, no.
14     Q.  Or any sort of public forum or anything like
15  that?
16     A.  If I thought I had any legitimate claim to
17  attorney work product, I would be using that today.  But
18  after it was clear that Mr. Bundren didn't intervene on
19  this stuff, I don't -- I don't feel like I have that --
20  you know, that privilege.  That's why I'm answering all
21  of these questions.  You know, otherwise --
22     Q.  Right --
23     A.  Yeah.
24     Q.  But, I mean -- I'm not -- I'm not parsing words.
25  I'm just trying to figure out, you did -- you and Jeff

Page 140

1    Lenberg did this work in Coffee County?

2        A.  Correct.

3        Q.  And then how was that work used by you or Jeff or

4    anybody else to your knowledge?

5        A.  It -- it wasn't used.  The goal was to do work

6    for attorneys, and they're the ones that have to do

7    something with it.  As an expert, you don't go out and

8    use your own stuff.  You provide it to the attorneys who

9    use it for their work.  So I can't tell you.  You have

10   to ask the Charles Bundren as to why it was never used

11   for something.

12       Q.  But you give your report to Mr. Bundren, correct?

13       A.  Correct.

14       Q.  And gave --

15       A.  I believe I gave to Jim who gave it to

16   Mr. Bundren.  But, yes.

17       Q.  And did Mr. Lenberg give his own report?

18       A.  He did.

19       Q.  And that's -- from your perspective, that's the

20   last you heard of it, I guess, right?

21       A.  Yeah, until I got that -- that Phil or Russell

22   reaching out to me, which I'm sure you said we're going

23   to talk about later.  So whenever we jump to that.

24       Q.  Yeah.  I think we'll get to that.

25            But going down here, you say on the 19th, "Hey

Page 141

1    Greg, I'm onsite at Coffee.  I think I figured out how

2    to access the" -- and then it doesn't --

3        A.  You need to go back to my -- the actual exhibits

4    I gave you.  It's not cut off in what I gave you.

5        Q.  Okay.  Fair enough.  I will.  I don't want to

6    waste your time with that.

7        A.  Because I explained -- I think even then I talked

8    about the DEFCON report, you know, what I've already

9    said to you right now is actually in the real messages

10   and what I provided you.

11       Q.  Yeah.  Let's go to Exhibit 3.

12           And if my notes are correct, it should be on

13   Page 4, toward the bottom.

14       A.  Yep.

15       Q.  I'm glad you pointed that out, Mr. Logan.  The

16   message actually says, "Hey Greg, I'm onsite at Coffee.

17   I think I've figured out how to access the CompactFlash

18   of the ICP devices to get an image of the OS."

19       A.  Yeah.  And that was based on looking at the

20   DEFCON report, which I send to him later on in that

21   communications thread.  It was not based on any

22   knowledge I even did in the office.  It was just in

23   continued reading that I found in the DEFCON stuff.

24           As I recall, actually, the DEFCON report was an

25   older version of the ICP anyway.  So it wasn't even the

Page 142

1    same thing.

2        Q.   And what is the ICP?

3        A.   ImageCast Precinct.  It's the thing that looks

4    like a giant trash can or shredder that at a precinct

5    someone feeds stuff into.  And for the record, you would

6    never use Cellebrite on it.

7        Q.   On something like that, right?

8        A.   No.  My Cellebrite is specific to iOS or Android.

9    And so it would be applicable if you're talking about

10   election equipment, it would be applicable to the poll

11   pads, or it would be applicable to the BMDs, both of

12   which had already been imaged.  So it wouldn't make any

13   sense for me to walk in there with a Cellebrite.

14       Q.   Okay.

15       A.   And I really want to know what it is, though.

16       Q.   I understand.

17            Let's go to -- on Exhibit 4, Page 12, because I

18   want to make sure that I have the whole message.

19       A.   Okay.  Exhibit 4, if the page number on the

20   bottom corner is right, it goes only up to Page 10.

21            Am I looking in the right spot --

22            MS. MARKS:  I just got -- this is Marilyn

23       Marks.  I just got a message from Bruce saying that

24       he lost power in his office.  So maybe we can go off

25       the record, Court Reporter and Mr. Videographer,

Page 143

1       until Bruce recovers?

2               THE VIDEOGRAPHER:  Yeah.  No problem.  I was

3       looking at that.

4               Off the record at 1:22 p.m.

5               (Whereupon, a break was taken from 1:22 p.m. to

6       1:28 p.m.)

7               THE VIDEOGRAPHER:  All right.  Back on the

8       record at 1:28 p.m.

9    BY MR. BROWN:

10      Q.   Mr. Logan, we were talking about your Signal

11   messages on Exhibit 4.  And if you look at the --

12   there's a thread name that's called Special_Report.

13           Do you see that?

14      A.   Yeah.

15      Q.   And what was the Special_Report?

16      A.   That's the report that you have a copy of.

17      Q.   That's the report that you were in the process of

18   preparing, correct?

19      A.   Correct.

20      Q.   And Mr. Penrose says to you, or to the others --

21   well, who was in the -- who was in the group for the

22   special report?

23      A.   I'm not sure offhand.  I believe -- I know that

24   it's obviously Jeff, myself, and Jim.  I think those

25   were the only people, but I'm not positive.

Page 144

1      Q.   Okay.  And it says, "Here's the plan.  Let's keep
2      this close hold," I guess?
3      A.   Okay.
4      Q.   And then if you look at the entry at 13:18,
5      Mr. Penrose says, "If you can draft a report for review
6      on Friday morning with Charles Bundren, that would be
7      best.  We only have until Saturday to decide if we're
8      going to use this report to try to decertify the Senate
9      run-off election, or if we hold it for a bigger movement
10     later."
11          Do you see that?
12     A.   Yes, sir.
13     Q.   Do you recall how your report would have been
14     used to decertify the Senate run-off election?
15     A.   I don't think I ever knew that.  So, no, I have
16     no idea.
17     Q.   Was part of the -- was one of the purposes of --
18     of your being down there to get evidence to certify --
19     to decertify the Senate run-off election?
20     A.   I don't recall that -- that being discussed at
21     any point in time.  But as I said, in all of these
22     messages, I don't --
23     Q.   I mean, was it possible that -- that your work
24     was going to be used for purposes that you did not
25     intend it to be used for or that you didn't know the

Page 145

1    purpose of what you were doing?

2         A.  I mean, that's always a possibility.

3         Q.  But you didn't -- when you were down there -- or

4    before you went down there, the instructions weren't --

5    weren't something, like, look, there's a Senate run-off,

6    we've got to get evidence to decertify quickly?

7         A.  No, absolutely not.  It was, hey, Jeff is working

8    on something in Coffee County; can you meet with him?

9    It was really pretty light.

10        Q.  The line here, though, is or "we hold it for a

11   bigger movement later."

12             Do you know what that is referring to?

13        A.  I would -- I would assume a lawsuit, but I don't

14   know.

15        Q.  Did you talk about other purposes of this

16   information, like for a -- specifically for a lawsuit or

17   some sort of challenge of any kind?

18        A.  It was always my understanding this step was

19   being utilized as part of litigation, so...

20        Q.  Do you --

21        A.  I don't know -- I don't know what else to say.  I

22   don't have a very clear memory of every conversation I

23   had.  Like I've said, most of these messages, you know,

24   I'm reading them, but I'm not even remembering that they

25   happened, you know, type of thing.

Page 146

1      Q.  No, I under --

2      A.  So I don't know how I can give any more

3   additional context than that.

4      Q.  I appreciate that.

5          Then on -- a minute later he says, "I'm not going

6   to brief Sidney on these findings yet."

7          Do you see that?

8      A.  Yes, sir.

9      Q.  And that -- and that would have been Sidney

10   Powell?

11      A.  That would be my understanding.

12          But I -- I was surprised by that because when

13   I -- when the audit happened and I reached out to Greg

14   and asked him, I was like who even signed the contract?

15   I remember being very surprised that it was Defending

16   the Republic.  So any involvement she had was minimal in

17   this, at best.  So I don't know if I knew or didn't know

18   she was involved in this at that time, obviously.  I

19   must have known based on that message, but I don't

20   recall that.

21      Q.  Okay.  If you go down, this is still on

22   Special_Report, but it's one -- January 20th at 18:11.

23      A.  Okay.

24      Q.  Do you see where you say, "Also I'm making a

25   revisit plan to really nail all of this down"?

1           Do you see that?

2      A.   That's where Jeff says that?

3      Q.   Yes, sir.

4      A.   Okay.

5      Q.   And that's referring to, as far as you can tell,

6      him revisiting and continuing to work on it?

7      A.   That's my understanding.

8      Q.   If you skip down to Page 13, Line 12.

9      A.   Do you really mean Page 13 -- oh, I see what

10     you're doing, you're using the lines on the inside.

11     Q.   Yeah.

12     A.   Okay.

13     Q.   Yeah, I'm still on the real one that you gave,

14     not my incomplete selection.

15     A.   Okay.  Well, you told me to look at Exhibit 4,

16     which is the other one.  So I'm looking at the other

17     one.

18     Q.   I'm sorry.

19     A.   You're fine.

20     Q.   Okay.

21     A.   So, yeah -- so, yes, I see what you're talking

22     about:  "Here is a version of the ICP analysis with my

23     suggested edits."  Yeah.

24     Q.   Right.  So you and Mr. Lenberg are working on

25     the -- on the ICC analysis report together, correct?

Page 148

1      A.  He reviewed my ICP analysis report.  I do not

2      believe I worked on the ICC analysis report.  That was

3      just him.

4      Q.  Okay.  So you did an ICP report, and he did an

5      ICC analysis, correct?

6      A.  Correct.

7      Q.  Okay.  If you -- we'll look at January 24 -- this

8      is actually easier on Page -- on Exhibit 4, but feel

9      free to go to Exhibit 3.  Go to -- go to Exhibit 3,

10     Page 5.

11     A.  Okay.

12     Q.  Mr. Freemyer says, "Doug, I have finally run a

13     series of triage reports on the three computers imaged

14     at Coffee County."

15          Do you see that?

16     A.  Yep.

17     Q.  And what is he -- what is he referring to?

18     A.  He took the forensic images and he ran them

19     through a tool in order to see, if I recall correctly,

20     whether USB devices had been plugged in, and what USB

21     devices and when had been plugged in.

22     Q.  And do you recall any findings from that

23     analysis?

24     A.  I don't recall anything significant.  I mean, I

25     don't recall anything, an issue with his findings,

Page 149

1    period, which probably means there was not something

2    significant.

3        Q.  Do you know -- there's a reference in here by

4    Misty on the February 17th.  It's Line 166 on Exhibit 4.

5        A.  You just put me back in Exhibit 3.

6        Q.  Yeah.

7        A.  What page on Exhibit 3?

8        Q.  On -- on Exhibit 3, it's Page 3, Line 2.

9        A.  Okay.  Okay.

10       Q.  And she says, "How to" -- it says a question

11   about how to program these security key fob.

12           Do you recall what that was about?

13       A.  I'm just trying to read the context and see if

14   it...

15       Q.  And watch out for the date, because this is

16   February.

17       A.  No, I don't remember that at all.  I don't know

18   what she's talking about.

19       Q.  Do you recall why you were communicating with

20   Misty Martin in February, a couple of weeks after you

21   left?

22       A.  I mean, I probably had follow-up questions

23   related to when I poked at the forensic images stuff.

24   That would be my guess, but that's pure speculation.

25       Q.  If you look at Page 3, Line 7.  There's a message

Page 150

1      from Conan Hayes, I think, at 11:21.

2          A.  Yep.

3          Q.  And he says, "What's up buddy!?!  Can you please

4      send me the passwords for Coffee County?"

5              Do you see that?

6          A.  Yep.

7          Q.  What passwords is he trying to get from you?

8          A.  I think as you can tell from the conversation, I

9      wasn't very clear what passwords he was trying to get.

10         Q.  You say login or decrypt, right?

11         A.  Yeah.  Is he asking for the credentials to log

12     into the Windows machine?  Is he asking for the

13     credentials to decrypt the files, because all of them

14     were actually encrypted on the ShareFile site?  You

15     know, were -- were they the password to the virtual

16     machine I created, or was it the forensic data collected

17     by SullivanStrickler?  Like, what password do you need?

18         Q.  Did you give him any passwords?

19         A.  I believe in that thread, I sent some over, and

20     he said, hey, those are the ones he they already had.

21     But I'm going off of the messages.  I don't really

22     remember this conversation.  So I'm only going by what I

23     read, which is the same thing you read.  I certainly

24     knew that he had access to those systems and had been

25     authorized, so I would not have thought anything giving

Page 151

1   him credentials.

2        Q.   Okay.   Just one second.

3             THE VIDEOGRAPHER:   Mr. Logan, in the meanwhile,

4        is there like a lamp or something you can put on in

5        front of you?   You're getting a little bit dark.

6             Not behind you, in front of you.

7             THE WITNESS:   I mean, I can change the aim of

8        this -- no, I can't change it.

9             THE VIDEOGRAPHER:   Okay.

10            THE WITNESS:   Is that any better?

11            THE VIDEOGRAPHER:   I mean, that's fine.   That's

12       fine.   Just wondered if we can get a little more

13       light.   You're good.

14            THE WITNESS:   Sorry.   For this I ended up at a

15       hotel room.   I don't have a lot of flexibility from a

16       lighting standpoint, so...

17            THE VIDEOGRAPHER:   Thanks for trying.   All

18       right.

19            THE WITNESS:   If I was at my house, you know, I

20       would have more flexibility.   But then my power

21       probably would have gone out a couple of times.

22            MR. BROWN:   No, I'm -- I'm in my office, I have

23       no excuse.   I just have better lighting when my

24       laptop is out of AC range, and so I have to switch --

25       my laptop finally expired on me.   So I had to move.

Page 152

1      As you can tell, I had to move my location.

2    BY MR. BROWN:

3      Q.  Did you -- I know that you prepared the report

4    for your attorney, Mr. Bundren.  Did you give any report

5    on your findings to Misty Hampton or anybody associated

6    with Coffee County?

7      A.  I don't believe we ever got a copy of the report.

8    But Misty is the one who did the work.  I just

9    documented it, you know.  So, I mean, people in our

10   office did the work.  So, no, I mean, there wasn't any

11   need.  They knew exactly what had been done.  They did

12   it, you know.

13     Q.  But in terms of any findings that you -- any

14   findings that you made, did you deliver those to Misty

15   or did she have any -- I mean, what did they do with the

16   information -- we talked about the fact that Bundren

17   never did -- to your knowledge, never did anything with

18   the information that you produced, right, to your

19   knowledge?

20         Did Coffee County, to your knowledge, do

21   anything, either Misty, or the board, or anybody

22   associated with Coffee County?

23     A.  I -- I mean, I -- I never talked with anyone in

24   Coffee County, besides Misty.  And I think after --

25   after I left, besides those messages you see, I didn't

Page 153

1    have much communication with Misty.  In fact, I'm not
2    sure if there was much of any communication.
3         So, no, to the best of my knowledge, besides the
4    stuff that she was a part of in doing -- and I think I
5    mentioned this, but I didn't do a lot of analysis in
6    Coffee County.  I did enough analysis to -- to see that
7    they were similar and some initial poking around, but
8    nothing extensive.  So there wasn't like this long list
9    of findings that needed to be communicated with her.  In
10   any case, if I had findings like that, I would
11   communicate it with an attorney, I wouldn't go directly
12   to the person.  I would leave it to the attorney to
13   communicate it with them.
14        Q.  Got it.
15        Let me direct your attention to -- on Exhibit 4,
16   if you would scroll down to your discussion with Greg
17   Freemyer.  It's on Line 196 on Exhibit 4.
18        A.  Oh, I actually -- I've got Exhibit 3 open, but
19   I'm in the Greg Freemyer conversation.  What do you want
20   to look at?
21        Q.  It's on Page 6 of Exhibit 3.
22        The -- if you sort of pull back a little bit,
23   Mr. Logan, this is a good three months after
24   SullivanStrickler went to Coffee County.  A little bit
25   less than that when you went.  Do you recall the

Page 154

1    occasion for SullivanStrickler being interested again in

2    what you had done in Coffee County and how that arose?

3        A.  I was talking with them about something else, if

4    I recall correctly, but it wasn't relevant to any of the

5    subpoena data.

6        Q.  About another project that you were working on

7    with them?

8        A.  I -- I don't recall offhand the specifics on

9    exactly what it was.

10       Q.  And then you corrected their labeling of the ICP,

11   correct?

12       A.  I mentioned that to them, so they would know

13   that, correct, yes.

14       Q.  Right.  And then couple of lines down, at 22:01,

15   you say, "We just haven't figured out how to image it

16   yet."

17           Do you see that?

18       A.  Yeah.

19       Q.  Why are you still concerned with that, if you

20   were, at that late date?

21       A.  Because I was about to start the audit in Arizona

22   that had very similar equipment, and I wanted to be able

23   to capture images of ICP devices.

24       Q.  So you were using the data that you captured from

25   Coffee County to assist in your analysis of the system

1    in Arizona?

2        A.   That's not what I said.

3        Q.   That's a new question.

4        A.   I -- I don't recall any of the specifics about --

5    in here.  But that's -- would definitely be why I was

6    concerned on, what was that, April 12th, which the --

7    the audit I believe started -- we arrived on site around

8    April 19th, if I remember correctly.  So I would have

9    been very concerned with how to capture forensic images

10   of ICP devices to capture and do analyses and plans.

11       Q.   If you go down, you tell Mr. Lenberg -- this is

12   in the Jeff Lenberg thread -- "Talk to Jim to get

13   Charle's (sic) approval."

14            Who -- that's Penrose, I guess.  And who is

15   Charlie?  Or Charles?

16       A.   If it's Charles, it's probably Charles Bundren.

17   But, I'm sorry, where are you?

18       Q.   It's -- on Exhibit 4, it's Line 204.

19       A.   I'm still on Exhibit 3.

20       Q.   Then it's on Page 9, Line 16.

21       A.   Yeah.  I mean, that would be Charles Bundren

22   if --

23       Q.   Okay.

24       A.   -- it's Coffee County.  Yeah.

25       Q.   If you look at the June 11, 2021, entry, so with

```
 1    Todd Sanders.

 2        A.   Uh-huh.

 3        Q.   And I'm trying to figure out who it's from and

 4    who it's to.  You emailed him:  "Do you know who CJames

 5    is on telegram?"

 6             Do you see that?

 7        A.   Correct.

 8        Q.   He says, "No."

 9             What was your question or your concern at that

10    time?

11        A.   Well, at that point in time, someone had

12    mentioned to me that they had a copy of the Coffee

13    County VM.  And that really concerned me, because that

14    stuff should not be circulating anywhere.  And I -- I

15    asked them where they got it, and they said they got it

16    from CJames on Telegram.

17        Q.   And did you figure out who he was?

18        A.   Yes.

19        Q.   Who was he?

20        A.   Conan Hayes.

21        Q.   So he was using a pseudonym on Telegram?

22        A.   I mean, I think his middle name is James.  So

23    CJames is Conan James Hayes, so...

24        Q.   And so he had authorization from Penrose to

25    access the -- that data anyway, correct?
```

Page 157

1      A.   Correct.  I mean, I believe it was actually

2  authorized from Charles Bundren directly, quite frankly,

3  but I don't -- I don't know if I had visibility into

4  that, if I ever knew that.

5      Q.   Okay.  If you could go down to -- there's an

6  entry from Phil Waldron, September 22nd, 2021.  It's on

7  Line 239, on Exhibit 4; Page 12, Line 12 on Exhibit 3.

8      A.   Yep.

9      Q.   And so you were in communication with Phil

10  Waldron from time to time, then?

11      A.   Correct.

12      Q.   What about?

13      A.   Various, different things.  Different things

14  going on with Election Integrity efforts.  He would talk

15  to me at times.  He -- I mean, he introduced me to a

16  couple of people in Arizona when I was out there for the

17  audit as well, so...

18      Q.   And then he says on September 22nd, there's two

19  question marks, but "Misty from Coffee County is getting

20  hammered like Tina in Mesa County."

21           Do you see that?

22      A.   Uh-huh.

23      Q.   And do you recall what he was referring to?

24      A.   I don't know what he was talking about to this

25  day, but he said that somehow Misty was in trouble, and

Page 158

1      I still don't know what that was about.  And he said he
2      needed an image.  I told him I wasn't giving it to him.
3          Q.  And did he get it from somebody else?
4          A.  I don't know.  I think actually what he had me do
5      is call Russ, which is why you see the message, "I heard
6      you need to talk with me."
7          Q.  And did you --
8          A.  I mean, you've seen when you follow these, I
9      mean, there's a conversation with Greg, where when I
10     talked with Russ, he basically threatened me that I was
11     going to be blowing -- holding some lawsuits if I didn't
12     give him the data.  And I told him, no, I'm not going to
13     just give data to a random person because they asked me.
14     That's not what you do with data.
15         Q.  So Ramsland -- Ramsland was threatening you with
16     a lawsuit if you didn't give them the data; is that
17     right?
18         A.  I -- that's not -- that's not completely
19     accurate.  He was saying that things were blowing up for
20     Misty and I was going to be pulled into it.  But it was
21     not -- it's not really in the most friendly tone or
22     friendly way, as I recall.
23         Q.  Well, how would you get pulled into it?
24         A.  I have no idea.  He was trying to -- I don't
25     know.

Page 159

1      Q.  I mean, what -- what possible trouble could Misty
2   Hampton been in, in September of 2021, do you know?
3      A.  I have absolutely no idea.  I don't even know if
4   this is -- if that was real or if they were just trying
5   to get at the data.  I can't tell you.  All I can tell
6   you is I didn't give them the data, and they requested
7   it.
8      Q.  Do you know if they got it from somebody else?
9      A.  I do not know.
10         MR. BROWN:  Okay.  Let me mark as the next
11      exhibit, Tab 11.  And that's going to be Exhibit 8.
12         (Whereupon, Plaintiff Exhibit 8 was marked for
13      identification.)
14      A.  Okay.
15   BY MR. BROWN:
16      Q.  Have you recently reviewed these emails?
17      A.  I don't think so.
18      Q.  Do you recall being in the loop in -- in January
19   with Sidney Powell and Paul Maggio and others relating
20   to the Coffee County collection?
21      A.  I am aware that email address I had was
22   apparently copied on those messages.  I have no
23   recollection of ever reading those messages.  And I
24   believe that I did not.
25      Q.  I'm not -- I'm not questioning you.

Page 160

1          But why would you be put on there in the email

2     address as a CC if you -- if you weren't really getting

3     these messages?  Do you follow me?

4          A.  Because as I mentioned, from November through

5     December, I was working closely with Jim and others on

6     things.  And I was involved.  But after I stopped and

7     worked for -- for Lin Wood, I stopped checking that

8     email address on a regular basis.  And certainly after,

9     you know -- if I -- I mean, I don't know about you,

10    maybe you're one of those people that reads every

11    message no matter what.  But if I found out that I'd

12    received a whole bunch of emails for something that

13    already happened, I wouldn't go back and read them, you

14    know.

15         Q.  And in fairness, this is -- these are emails from

16    Sidney Powell, who is not actually in -- you know, it's

17    not like getting an email, for example, from MyPillow or

18    something other junk mail you might get, just to pick a

19    name out of the blue.

20         I mean, you're saying you didn't -- that if you

21    got an email from Sidney Powell, you just sort of blew

22    it off?

23         A.  I'm saying that if there was a thread associated

24    with Coffee County in some way, and a forensic

25    acquisition already happened, and I found out about it

Page 161

1    after the fact, no, I wouldn't go back and read that.  I

2    mean, I -- I --

3        Q.  Wait, wait -- don't ask -- don't answer until I

4    ask you a question, be careful, because we have a

5    document here, you need to review it before talking

6    about what you remember or don't remember.  So please be

7    cautious.

8            If you scroll down, you'll see that on

9    December 21st -- and this might give you some more

10   context, okay.  Scroll down to the second page of

11   Exhibit --

12       A.  Okay.  I'm looking at something that starts with

13   Rule 183-1-12.01, securing voting system components.  Is

14   that what you're intending to be the exhibit?

15           MS. MARKS:  Excuse me, Bruce, that is because I

16       uploaded Tab 8.  But now he should have Exhibit 8,

17       Tab 11.

18           MR. BROWN:  Okay.

19           MS. MARKS:  Sorry.

20           MR. BROWN:  That's all right.

21   BY MR. BROWN:

22       Q.  Yeah, you need -- I'm sorry, you need to -- we'll

23   sort of restart on this because we were looking at

24   different documents.  Tab 11 is Exhibit 8.  And I need

25   for you to focus on that string of emails.

Page 162

1    A.   Okay.  And what about the string of emails?  Do

2    you want me to read the whole string, or what do you

3    want me to do?

4    Q.   No.  I mean, listen, I know it's been a couple --

5    you know, a couple years.  But the testimony that we had

6    before was you were with the Lin Wood people on their

7    plantation to the end of December, stop, and then the

8    next contact you had was, let's go to Coffee County in

9    mid January.  And I asked you about what you knew about

10   the Coffee County collection by SullivanStrickler in

11   early January, and you couldn't recall anything.

12        So I'm trying to see if that is still your

13   recollection, that you were not involved in -- in that.

14   A.   I wasn't involved in it.  And let me -- I mean, I

15   know depositions, you're not supposed to just provide

16   other information.  But I can give you context how I

17   know that I didn't read these email messages and how I

18   know I didn't receive it.  Because on --

19   Q.   That's helpful.

20   A.   -- on January 6th, I had stayed up all night to

21   put together an information sheet called election facts

22   and figures, trying to aggregate information that I put

23   together with core information, like SEC filings and so

24   forth that supported it for every last little thing, in

25   order to be sent to someone who said they would give it

Page 163

1    to the Senators so they could enter it into the

2    congressional record when they went through to certify

3    the vote.

4          Being up all night long, I was extremely tired.

5    And at that point in time when I was front of my

6    computer, the mouse moved on its own.  And when I went

7    to move it back over, I freaked out and I see my

8    computer was compromised, and I shut it down.

9          Later on that day I went to sleep, you know, I

10   was sleep for several hours, and then I came back and

11   found all the craziness about January 6th.

12         But meanwhile, I was thinking about what I wanted

13   to do with my machine, and I didn't have my new machine

14   up and running until I formatted the system, which is

15   why I formatted it and rebuilt the entire system.  It

16   didn't have the Signal messages passed.

17         So I know for a fact that it didn't have any

18   messages on those systems.  All the emails were not

19   coming to my cell phone.  I didn't -- wasn't even using

20   my cell phone for several days in there.  So I had no

21   way to receive those message.

22         So I know I didn't receive these messages, and I

23   know I didn't read them, because I didn't have any

24   operational system on it, which is why I was surprised

25   when Jim gave me a phone call.

Page 164

1      Q.  I'm just -- I'm looking through the rest of these

2    emails to see if -- what impact that has on my

3    questions.

4      A.  Now, is it possible I could have at some point

5    come back and read them?  But really, like I was so

6    inundated trying to keep my company running and do all

7    this extra stuff, that I wasn't going back to read

8    emails for something that already happened.  Like, I

9    just wouldn't do that.

10     Q.  Right.  But, I mean, it -- forget about the

11   emails for a second.

12         But it's your testimony that you were not

13   involved in the -- in the planning to send

14   SullivanStrickler to Georgia in January -- on

15   January the 7th, correct?

16     A.  Correct.  And I can't imagine that I'd have any

17   type of serious memory stuff enough to get that wrong.

18   But I have been surprised at what I haven't remembered

19   here.  But as I told you, what I explained would explain

20   exactly why I didn't have -- didn't have any of that

21   stuff, and I wasn't involved in it.

22     Q.  Let me direct your -- I'm with you.  I'm going to

23   move on -- this is not in response to what you just

24   said, but I need to ask you another question about this

25   exhibit.

Page 165

1      A.   Okay.

2      Q.   Now I lost it.  Hang on.  It wasn't a -- hang on

3   just one second.

4           Do you know Brendan Sullivan?

5      A.   That name sounds really familiar.

6      Q.   He's the -- he's the Sullivan in

7   SullivanStrickler.

8      A.   I'm -- I don't think I talked with him then.

9      Q.   Okay.

10      A.   I mean, mostly, I talked with Greg Freemyer.  I

11   occasionally talked with Paul.  And I think there was a

12   Jennifer.  I think those are the main people I ever,

13   ever talked with over at SullivanStrickler.

14      Q.   Okay.  If you go back to the first page of

15   Exhibit 8.

16      A.   Okay.

17      Q.   There's an email address there is

18   magnolia64@█████████████?

19      A.   I have no idea.  I'm sorry.

20      Q.   That's -- we believe that's Scott Hall's email

21   address.  And does that -- do you recall his involvement

22   in this collection?

23      A.   I never interfaced with him as best I know on any

24   of this stuff with this collection.  So I don't -- I

25   can't really talk about that.

Page 166

1        Q.  Okay.

2        A.  I mean, you guys have talked with a lot of

3    people.  I would think that someone would have

4    contradicted the story if I was wrong.

5        Q.  SullivanStrickler said you were.  But they --

6    it -- I don't want to, you know...

7        A.  I mean, when -- they were engaged before, and I

8    was often part of that contact.  You know, so that's the

9    only thing I can think of, maybe they were confused.

10       Q.  But you were involved in the engagement of

11   SullivanStrickler generally, but not with respect to the

12   specific January 7 capture; is that fair to say?

13       A.  Correct.  If you asked SullivanStrickler who ran

14   things on our end -- you know, on this end of things,

15   they would probably say Jim and Doug.

16           Now, in reality, Jim probably functioned, you

17   know, like you'd say a manager.  He was the one who had

18   all the interfacing conversations with more people than

19   I did.

20       Q.  Upper management?

21       A.  Yeah.  A lot of times he would be the one who

22   would talk to the attorneys, and, you know, I wouldn't

23   have those direct conversations.

24       Q.  I just need to ask some things.  Okay.  Bear with

25   me.

Page 167

1        Did you or anyone else to your knowledge try to

2    reverse engineer any of the software or firmware taken

3    or copied from Coffee County?

4        A.  To the best of my knowledge, no, for Coffee

5    County.

6        Q.  With respect to other jurisdictions?

7        A.  Please define "reverse engineer."

8        Q.  Well, what do you -- how do you use that term?

9        A.  I don't generally use that term.

10       Q.  Did you -- well, reverse engineer, meaning to

11   figure out how it worked by -- well, how -- just tell me

12   how -- what you -- I mean, I know you don't like the

13   term, but how do you understand it to be?

14       A.  So reverse engineer -- reverse engineer gets

15   complicated on the DMCA, because it's viewed as a way to

16   try to get competitive intelligence under software in

17   order to compete with it in some manner.

18       So did I try to figure out the way the software

19   functioned and worked to see if there was problems that

20   were exploited by someone?  Yes, I did.

21       Would I ever call that reverse engineering?  No.

22       Could someone call it reverse engineering?

23   Possibly.

24       Q.  Okay.  Have you heard of any reaction by Dominion

25   to learning that their software had been copied in

Page 168

1    Coffee County, or anywhere else?

2        A.   No, sir.

3        Q.   Did you ever get any contact made with you,

4    directly or indirectly, from Dominion about any

5    copyright issues or any sort of trade issues, with

6    respect to their intellectual property?

7        A.   No, sir.

8        Q.   You left -- or someone left your business card,

9    I'm sure you have seen this, in the Coffee County

10   elections office, right?

11       A.   Yes, sir.

12       Q.   And was that probably you?

13       A.   It was probably me.  I don't remember doing that,

14   but it was probably me.

15       Q.   And it was found there by the next elections

16   director, Mr. Barnes.

17            Did you get -- when is the first time that any

18   law enforcement from the State of Georgia, or the

19   Secretary of State, or the State Election Board

20   contacted you, if ever, about Coffee County?

21       A.   Somewhere in the last two months someone left a

22   voicemail on an old phone number I had.

23       Q.   And who was that?

24       A.   Someone with the Georgia Bureau of Investigation.

25       Q.   Is that the only contact you have had with any of

1    those groups?

2        A.   Correct.

3        Q.   So the Secretary of State and the State

4    defendants have taken the position that they were

5    actively investigating this starting in April of 2022.

6            Are you with me?

7        A.   Uh-huh.

8        Q.   And although they were actively investigating

9    this, I take it they didn't contact you until, what,

10   about a month ago?

11       A.   Not that I'm aware of.

12       Q.   Did you speak with the GBI, or did he just leave

13   you a message?

14       A.   He left me a message.

15       Q.   Have you been contacted by the January 6th

16   Committee?

17       A.   No, sir.

18       Q.   The FBI?

19       A.   No, sir.

20       Q.   The Fulton County Attorney?

21       A.   No, sir.

22       Q.   So we're the only ones that have contacted you,

23   right?

24       A.   So far.  I mean, the sky is the limit now that

25   we've had this deposition, right?

Page 170

1     Q.  You've answered all of the questions, you know.

2  No need for your testimony anymore.

3     A.  I wish it worked that way, but we'll see.

4     Q.  It might.

5        So I take it, just to follow up on the Dominion

6  question, there haven't been any threats of any

7  litigation against you, right?

8     A.  No, sir.  It's my understanding, if there was any

9  threats, that they should be directed at the attorneys

10  that, you know, brought me on to do work and not at me

11  personally.  I have not distributed anything.  I have

12  not given anything outside of any access.  I haven't

13  made defamation statements about Dominion publicly.

14     Q.  And you're not aware of any -- any litigation or

15  any litigation threats against your attorneys or the

16  people that you worked with either, right?

17     A.  No, sir.

18        I mean, that's a very, very vague sentence.  I

19  mean, obviously Sidney is fighting the defamation battle

20  with -- with Dominion.  And, obviously, I said I worked

21  with her some in this stuff too.  So, like, that's

22  probably too vague for me to answer blanketly.  But not

23  tied with anything that I -- that I have been involved

24  in.

25     Q.  That's -- that was the intent of my question.

Page 171

1      With respect to any work that you did, you're not

2   aware of any of your colleagues being subject to any

3   litigation, correct?

4      A.  Correct.

5      Q.  Okay.  Did -- did you know that Misty Hampton was

6   terminated about a month after you were there?

7      A.  I was told that at some point.

8      Q.  And did you talk with her about that?

9      A.  No, sir.

10     Q.  Did you know that on the same day that she was

11  terminated, or the day before, or the day after, Mike

12  Lindell, also known as the MyPillow guy, flew into

13  Douglas, Georgia?  Did you know that?

14     A.  I would expect that's unrelated.  But, no, I

15  didn't know that.

16     Q.  And do you know Mr. Lindell?

17     A.  I do know Mr. Lindell.

18     Q.  How do you know him?

19     A.  On the -- the -- was it -- so the Arizona

20  injunction case that I did out in -- there was an

21  injunction case out in Arizona to try to prevent the use

22  of voting machines that I did an expert declaration on

23  that you guys cited on.  And I know that he closely

24  followed what was going on with that, and I talked with

25  him associated with that work.

Page 172

1      Q.  Have you talked with him associated with anything
2   involving Georgia?
3      A.  No.
4      Q.  Do you -- do you know why he was in Coffee County
5   in February of 2021?
6      A.  I don't know why he was in Coffee County in
7   February 2020 -- whatever -- at any point in time.  And
8   furthermore, I would say that a lot of the different
9   Election Integrity groups don't necessarily get along
10   with each other very well, and I'd be very surprised if
11   anyone with Election Integrity also was pulling him in.
12   My guess is that's unrelated, but you do your own
13   research.
14      Q.  Well, but the group that he's involved with is
15   not associated with other Election Integrity groups; is
16   that right?  Is that the suggestion?
17      A.  Correct.
18      Q.  Okay.  So which would be your camp?  I don't mean
19   to make it sound too --
20      A.  I'm not really in a camp.  I have worked with
21   almost every one.  My goal has been to figure out what
22   happened, and anyone who seems to be honestly working
23   towards that, I have worked with them.  That's probably
24   one of the unique things, you know, that -- that's --
25   there's not -- there's not a lot of people who have.

Page 173

1      Q.  And so Mr. Lindell would -- what you're saying is

2   that it's unlikely that he would be associated in a

3   positive way with who?  Not with you, not with

4   Mr. Lenberg?  Who else?

5      A.  So as far as I know, he hasn't done work with --

6   with ASOG, and certainly not at the time period which,

7   as you've said, and I've later, you know, discovered,

8   Charles Bundren associated with.  I don't believe he

9   does work with Sidney Powell or Defending the Republic,

10  which apparently signed the contract.  You know, so I

11  don't see how it is that someone who is not actively

12  working with people would be involved deeply in a

13  project that, for the most part, people who were on

14  said, hey, don't talk about this and wait until there's

15  litigation -- you know, litigation associated with it,

16  when they're not actively working with it.  It doesn't

17  make any logical sense.

18     Q.  Had you heard that Mr. Lindell was in Douglas in

19  February of 2021?

20     A.  Sometime since the criminal case in the last few

21  months someone mentioned it to me as it had come up.

22  But -- so this is not the first time I heard it, but I

23  couldn't even place when it was.  Certainly nothing at

24  the time.  You know, it was all very recent.

25     Q.  Probably out of this litigation, is the best of

Page 174

1    your recollection?

2        A.   Correct.

3        Q.   This is a similar to a question that I asked, but

4    not exactly the same.

5             I know that you weren't contacted by the

6    Secretary of State, or the State Election Board, or the

7    GBI until very recently, but do you know when the

8    Secretary of State, Georgia State officials, found out

9    that SullivanStrickler or you had had access to the

10   Coffee County election equipment in January of 2021?

11       A.   No infor- --

12            MS. LaROSS:   Object to the form.

13       A.   -- I don't have --  I'm sorry, what was that?

14   BY MR. BROWN:

15       Q.   She's logging an objection.  Go ahead and answer.

16       A.   I have no knowledge of that whatsoever outside of

17   what I have read in the case.

18       Q.   Okay.  Do you know Kurt Olsen?

19       A.   Yes, sir, I do.

20       Q.   How do you know him?

21       A.   He was one of the attorneys on the Arizona case.

22       Q.   Do you know him in any other capacity?

23            Well, he's Lindell's attorney, right?

24       A.   Yeah, he's -- he's done attorney work for a

25   number of different people, not just Lindell.  I don't

Page 175

1    know -- remember exactly when or how I met Kurt.  I met

2    him somewhere along the way.  I've talked with almost

3    everyone working Election Integrity at some point in

4    time.  So sometimes it's hard for me to place exactly

5    when and where.

6        Q.  Do you recall what politicians or other people

7    from Georgia, other than Lin Wood, were at the Lin Wood

8    plantation in December of 2020?

9        A.  I don't recall any politicians ever going to his

10   plantation.

11       Q.  Do you know Cathy Latham?

12       A.  I am familiar with the name from this -- from

13   this litigation, but I do not believe I've talked with

14   her prior.

15       Q.  Okay.

16       A.  I haven't talked with her, period.  I haven't

17   even talked with her as part of this, but I don't think

18   I knew about her prior.  Now, if she was involved in

19   Election Integrity, there's a chance I talked with her

20   over the course of time, but nothing -- nothing, you

21   know, that I know about, certainly nothing extensive.

22       Q.  I'm almost positive I have asked you this, but

23   Eric Cheney, you don't recall knowing him either?

24       A.  Yes.  Same thing.  Yeah.

25       Q.  What about Alex Kaufman, do you know him?  Or

Page 176

1    have you ever talked to him?

2         A.   I don't -- Alex Kaufman, I don't think so.

3         Q.   Kurt Hilbert?

4         A.   I don't think so.

5         Q.   Robert Sinners, do you know him?

6         A.   I have read -- I think part of this case is where

7    I know that name.  But otherwise, no, I don't think so.

8         Q.   And I believe you testified that you do know

9    Stephanie Lambert and you both were involved in the

10   Michigan case together, correct?

11        A.   Correct.

12        Q.   And did you work with her in any way relating to

13   Georgia?

14        A.   I don't think anything I have done -- I think

15   since she took over Misty more recently, she might have

16   asked me to take a look at Coffee County stuff again,

17   but I haven't done so.  So I think that would apply.  I

18   have done a lot of expert work for her, answering

19   questions and so forth over time.

20        Q.   Okay.  Has she engaged -- are you -- are you

21   currently under engagement with her or anything?

22        A.   I -- she continues to ask me questions at times.

23   I am working -- I have been working pro bono and have

24   not been paid for that work.  And so I would say

25   potentially yes, but since I don't have a written

Page 177

1    contract, it's not quite as clean-cut.

2        Q.  Is it -- does it relate to Georgia in any way?

3        A.  There's nothing specifically I have talked with

4    her recently, specifically or as it relates to Georgia.

5        Q.  I have to ask -- the way you answered that, I

6    need to ask:  Generally relates to Georgia?

7        A.  Stephanie is constantly talking about doing

8    lawsuits, almost anywhere in the country.  It is

9    possible that she has mentioned something about doing

10   something in Georgia.  I do not know of any active plans

11   to do stuff.  I don't want to misspeak, but I don't

12   know -- I don't really know how to answer your question

13   precisely.

14       Q.  Fair enough.

15           And I asked you a question about Roger Stone, but

16   I didn't ask generally whether you know him or have

17   worked with him.

18       A.  I -- I don't believe I ever talked with him.

19   Wouldn't that preclude working with him?

20       Q.  It could.  But you haven't worked with him,

21   either, correct, silently?

22       A.  Correct.  Oh, you're talking about literally, if

23   I had a -- we never speak, we only text.  No, I am not

24   using playing with words.

25       Q.  I'm looking for that employee that can work that

1    way.

2          How about Ron Watkins, do you know Ron Watkins?

3          A.   I do know who Ron Watkins is.   And I -- I have

4    not talked with him in a long time, but I did talk with

5    him while I was at the Tomotley.

6          Q.   And what -- what -- who is he?

7          A.   He is -- I would say he is just a social media

8    guy who has a large following that has been interested

9    in Election Integrity stuff and has a pretty active

10   group base.   I mean, I would reach out to him at times

11   and say, hey, can you see if anyone can find me

12   publicly, you know, Dominion manuals on XYZ, and, you

13   know, he would send them to me and stuff like that, you

14   know, because he just had a lot of people, or he put out

15   a request for it, and people followed it, some would do

16   their own research and find data.

17         Q.   Have you ever -- do you know Bill Ligon,

18   L-I-G-O-N?

19         A.   I don't think so.

20         Q.   Do you know Preston Haliburton, lawyer?

21         A.   No.

22         Q.   Lawyer Harry McDougall?

23         A.   That name -- doesn't he work with Sidney?

24         Q.   He might.

25         A.   I -- I think so.   I think I do know him.

Page 179

1    Q.  And do you recall the context for working with

2    him or communicating with him?

3    A.  I think he had questions about voting machines,

4    and I sat down and talked with him for a while, as I

5    recall.

6    Q.  And you sat down with him in person?

7    A.  Correct.

8    Q.  There was a lawsuit filed in Georgia in December

9    by a gentleman named Shawn Still, and it was against

10   Coffee County.  And it related to the errors, or

11   apparent errors, in Coffee County's system.  Were you

12   familiar with that litigation?

13   A.  That name sounds familiar.  But, no, I don't

14   think I knew anything about it.

15   Q.  It was dismissed on January 7th of 2021.  Do you

16   recall hearing anything about the lawsuit against Coffee

17   County being filed --

18   A.  Okay.  So, wait.  Let me place it.  So you're

19   saying, so before forensic images, after the 2020

20   election, there was a lawsuit filed in Georgia.  Because

21   I was at Tomotley, I probably did know about that

22   lawsuit because we were, you know, tracking stuff like

23   that.  So I probably did.  But obviously nothing

24   specific enough that I -- wouldn't know enough to

25   even -- sorry, what was your question now?

Page 180

1      Q.  Well, I just -- if you knew about that litigation

2   is what I was asking.

3      A.  I -- I probably did.  I don't remember any

4   specifics.

5      Q.  So Tomotley, the group was sort of tracking all

6   the different ways to collect information, see if it was

7   possible to -- depending on your point of view --

8   overturn or correct the election, correct?

9      A.  I wouldn't use either of those terms.

10     Q.  What term --

11     A.  My goal always was to figure out what happened.

12     Q.  But that was the goal of the group, then, right?

13     A.  I -- I think so, based on the conversations I had

14   with people.  I believe that was always the goal, is

15   just to figure out what happened.

16     Q.  And specifically the group was tracking all

17   litigation in the country that related to the election,

18   correct?

19     A.  The majority of the people at Tomotley were doing

20   was helping -- helping work with grassroots individuals

21   in order to, you know, try to get information and vet

22   information, and connect people that were working on it,

23   you know, to see if we can get to the bottom of exactly

24   what happened.

25          Now, the attorneys, as part of that, any attorney

Page 181

1     that is involved in litigation, tracks other litigation

2     involved in the same topic.  It's what you do.  And so,

3     you know, at times they would tell us, hey, there's this

4     case or that case.  So the probability is high that we

5     were informed about that.  I don't specifically remember

6     that.  If it was late in December, it might not have --

7     you know, maybe I might not have known about it.  I

8     just -- I don't know.

9         Q.  It was actually filed, I think, like, mid

10    December, and the -- the lead plaintiff was what some

11    people call a fake elector.

12        A.  So it's possible I wouldn't have known about it

13    at that point.  By late December, most people had left

14    Tomotley.  Things were dying down.  People were getting

15    back to, you know, other stuff, so...

16            I don't know, I guess we're in heavy speculation

17    here --

18        Q.  I understand.  If you don't know something,

19    that's fine.

20        A.  I need to just say I don't know and stop

21    speculating.  Theoretically that's not something I'm

22    supposed to do in a deposition.

23        Q.  Okay.  That's fine with me.

24            MR. BROWN:  Let's do this.  Let's take a break

25    until 2:45.  I'm going to have my wind-up questions,

Page 182

1     and then after that there will be other counsel that

2     may have questions for you.  I'm not the only one

3     asking you questions, although I'm probably asking

4     you most of the questions.

5          THE WITNESS:  I hope so.

6          MR. BROWN:  So let's take a break until 2:45.

7     I'm giving 20 minutes so I can really coordinate with

8     the other people as to what -- what more we need to

9     ask you about.  Thank you, though, for your patience.

10          THE WITNESS:  Okay.

11          THE VIDEOGRAPHER:  Okay.  Thank you.  Off the

12     record at 2:25 p.m.

13          (Whereupon, a break was taken from 2:25 p.m. to

14     2:48 p.m.)

15          THE VIDEOGRAPHER:  This begins Media Unit

16     Number 4, and we're back on the record at 2:48 p.m.

17     BY MR. BROWN:

18     Q.  Mr. Logan, in your Signal text, you referenced

19     Wickr, W-I-C-K-R.  What is Wickr?

20     A.  It's another communications platform, like

21     Signal, and primarily, it was used at that time because

22     it allowed screen sharing and video, which at that point

23     in time, Signal did not.

24     Q.  And were those messages searched for documents

25     responsive to the subpoena?

Page 183

1    A.  I do not have -- even have my credentials for the

2    Wickr account I used at the time.  Just didn't maintain

3    them.  So, no, those were not searched.  But I don't

4    have access to them.

5    Q.  Could you get your credentials or find them?

6    A.  Well, unfortunately, that was also on the email

7    address, so I can't do a password reset because I don't

8    have access to the email.

9    Q.  So the password reset is tied to your Lin Wood

10   email?

11   A.  Correct.  I'm not even sure what the retention is

12   because it's three-tier client.  It might auto-delete as

13   well.  I'm not very familiar with Wickr as to what its

14   policy is and how that works.  There might not be

15   anything there.

16   Q.  Fair enough.  And it may be beyond our reach.

17   But do you recall the volume of messages that you had on

18   Wickr with Mr. Penrose or with others?

19   A.  I don't think it was much.  As I recall, mostly

20   used it if you wanted to, you know, share something on

21   your screen, or do a video chat.  So, you know, there's

22   not much remnants behind when you're doing video chat

23   anyway, you know.

24   Q.  If you -- if you look at the logs showing the

25   downloads from SullivanStrickler, there's a number of

Page 184

1    people downloading the software, correct?

2        A.   That's, yeah, my understanding.

3        Q.   And other than the reports that you made up from

4    your onsite work in Coffee County, are you aware of any

5    work that was done or published by anybody who had

6    access to the SullivanStrickler files?

7        A.   I am not aware of any.

8        Q.   The --

9        A.   The only other person I know actually did an

10   analysis, that I know did an analysis, is Ben Cotton.

11   And you've deposed him, so...

12       Q.   Okay.

13           MR. BROWN:   I'm going to mark as the next

14       exhibit, Tab 18.

15           (Whereupon, Plaintiff Exhibit 9 was marked for

16       identification.)

17   BY MR. BROWN:

18       Q.   And that's going to be Exhibit 9.

19           Do you see Exhibit 9 in front of you, sir?

20       A.   Not yet.  It hasn't shown up.

21           Yeah, I still don't see anything.

22           MR. BROWN:   Let me see what's going on here.

23       Hang on.

24           MS. MARKS:   Bruce, it's me trying to -- it

25       looks like I've got to rotate it.  So let me try to

Page 185

1      do that and I will put it up.  Sorry.

2              MR. BROWN:  That's all right.

3              MS. MARKS:  If there's another one you can do,

4      it's going to take me a minute to learn how to do

5      this, Bruce.

6              MR. BROWN:  Okay.  If you would go ahead and do

7      that, and I'll move to the next question.

8              MS. MARKS:  Okay.  I apologize.  This is all

9      new to me.

10             MR. BROWN:  That's all right.

11     BY MR. BROWN:

12     Q.  Was Greg Freemyer was at Tomotley?

13     A.  No, sir.

14     Q.  Do you know if his political associations are

15     with those who are concerned about Election Integrity

16     after the November --

17     A.  No, sir, as far as I know, SullivanStrickler was

18     always apolitical, they were just doing a job.

19     Q.  And you're not aware of any political connections

20     that they had?

21     A.  No, sir.

22     Q.  Did you -- your Signal messages that you lost,

23     were they also on your phone?  I mean, they would have

24     been on your phone, wouldn't they?

25     A.  Correct.  They were on my phone at one point in

Page 186

1    time.

2        Q.   And could you retrieve them that way, from your

3    phone, if your desktop was unavailable?

4        A.   I -- I do not have them.

5        Q.   I understand that's the conclusion.  But can

6    you -- you can't get them off your phone?

7        A.   I can't get them off my phone.  No, they're not

8    on my phone.

9        Q.   Okay.  The -- did you ever hear of Conan Hayes

10   flying into Georgia for election work?

11       A.   I -- that's really vague.  I mean, I know that he

12   was in when I met with him, when we were at that --

13   whatever that place was that we didn't do stuff.  He

14   probably flew in because he -- I don't think he was

15   local to Georgia.  But I don't know any other --

16   anything else beyond that.  I mean, is that knowing of

17   him flying in?

18       Q.   Fair enough.

19           But you -- you went to -- did you go to other

20   counties in Georgia trying to see if you could have

21   access, legitimately, to their election equipment?

22       A.   We did not go to counties to try to gain access

23   to systems.  We -- we called contacts and explained what

24   we were trying to do and why we were trying to do it

25   from a lawsuit standpoint, and if they had the

1    appropriate authority and were interested, you know,

2    then we would call someone like SullivanStrickler, you

3    know, in order to see to try to arrange something.  But

4    we didn't go, like, shop -- show up on someone's door

5    and knock and just say, hey, can we have your voting

6    system?

7        Q.  Did you -- how did you get the contact

8    information to -- to call people?

9        A.  You know, it's -- a lot of it was this -- the

10   grassroots patriot network.  People would -- people

11   would be saying, hey, we talked to this person here, we

12   talked to that person there.  And, you know, they would

13   say, I have a contact here, you should talk to them.

14   And that's, you know, how some of those phone calls

15   happened.

16       Q.  Do you know if -- do you know how the Coffee

17   County name got into that hopper?

18       A.  I have no idea.  I was not expecting anything to

19   happen.  You know, I was surprised when they called me

20   up and said there had been a capture.  You know, I

21   thought all that type of stuff was done.

22       Q.  Okay.  If we could look at exhibit 9 now, I think

23   it's up.

24           Before I do that.  Your contacts in the Georgia

25   counties was by telephone, not -- you didn't actually

Page 188

1   drive around the countryside looking for --

2       A.  Yes, sir.

3       Q.  And to the best of your recollection, the only

4   physical visits were that one county that you can't

5   remember and Coffee County, right?

6       A.  I -- I know that we talked to more places, but I

7   could not give you any more details if I wanted to.

8       Q.  Okay.  Okay.  Do you recognize Exhibit 9?

9       A.  Should I?

10      Q.  Well, I believe you produced it and -- or it was

11  in the -- might have been in the drive that you

12  produced.

13      A.  Oh, okay.

14          So, I mean, I recognize the tools that are on the

15  screen.

16      Q.  And what are those tools?

17      A.  So process monitor keeps track of files that

18  are -- that are currently in use and what registries are

19  being used and so forth and so on.

20          And it looks like immunity debugger, interesting.

21  Immunity debugger is used to put break points.  You can

22  stop running an application at certain points to figure

23  out what's going on.

24      Q.  And did you use a debugger?

25      A.  I -- I didn't think I had for Coffee County.  So,

1    I mean, obviously if this came from images I provided,

2    then the answer is yes.  I thought I had solely done

3    that part in Antrim.

4        Q.  Did you -- where -- use the debugger to analyze

5    the code?

6        A.  The only thing I ever recall using the debugger

7    for was to try to figure out how they were handling

8    encryption keys on -- on the device.  But, again, I did

9    not think that was something that I did in Coffee

10   County.

11       Q.  Okay.  So you just don't -- you -- you testified

12   earlier about the encryption.  But you don't recall

13   whether that was specific to Coffee County or to another

14   examination of Dominion equipment; is that fair to say?

15       A.  Well, I -- I know that I have looked in the

16   database -- pretty sure I looked in the database in

17   Coffee County, and it was across the board that things

18   were clear text for clear text.  But I don't recall

19   specifically what I was doing, if this was from the

20   stuff I sent over.  I mean, I sent you my virtual

21   machine as were, with whatever snapshots that were in

22   them.  So, you know, you have a lot of data information.

23   You probably could tell me better what I did than I

24   could tell you right now.

25       Q.  Well, the -- well, I will represent to you that

Page 190

1      one of our experts made a screenshot from your device --

2      your drive, and this is a screenshot from it.  Does that

3      make -- does that look right, or can you tell?

4          A.  That's definitely plausible.

5          Q.  Okay.  You testified that you discovered the

6      Dominion software was making a call to external

7      software.

8              Do you recall that?

9          A.  Correct.

10         Q.  Is this how you would have discovered it?

11         A.  I would have used a tool like process monitor to

12     discover that, yes.

13         Q.  Okay.  But you don't have any specific

14     recollection of doing that?

15         A.  Not -- no.  I mean -- no.  I mean, not

16     specifically for Coffee County.

17         Q.  Okay.  I want to get back to Tomotley, and I will

18     be brief because we've covered it some.

19             You were there for, you know, over a month.  And,

20     I mean, it sounds like you sat around and talked all

21     day.  I know that there was work being done, but the --

22         A.  You make it sound so easy.

23         Q.  I mean, it does.  You're on a Georgia plantation.

24     You're talking and planning.

25             But the -- was the goal basically to collect

Page 191

1    information, if possible, to support potential

2    litigation, right?

3        A.  Yeah.  The goal was to understand what happened

4    and to support litigation as needed in that -- in that

5    regard.  So I mean, that's why we were working with

6    attorneys for.

7        Q.  Was there someone who seemed to be in charge?

8        A.  Unfortunately, no.

9        Q.  Many people in charge, I guess?

10       A.  Yeah, something like that.  Yes.

11       Q.  Therefore nobody in charge?

12       A.  A mixture of too many people in charge and nobody

13   in charge, depending on exactly why.

14       Q.  And what was the discussion about the -- the

15   legality or boundaries of the legality of capturing

16   images from election offices?

17       A.  It's -- you know, most of those discussions I

18   think Jim had directly with the attorneys.  But from my

19   understanding of what he told me is that based on

20   lawsuits and filings by the State, the State actually

21   said the counties were responsible for their elections,

22   and therefore they were individuals that had authority

23   over the machines.

24       Q.  You're talking about Georgia specifically?

25       A.  I believe so, yes.

Page 192

1      Q.  And so in Georgia, at least, the authorization,
2   if it were to be given, would be given at the county
3   level, correct?
4      A.  That -- I'm not an attorney.  You know, that's --
5   you're kind of asking for a legal opinion here.  But
6   that was my understanding of what was relayed to me.
7      Q.  In that group -- in those group discussions, were
8   there concerns expressed about copyright infringement?
9      A.  I mean, there wasn't really group instruction --
10  I mean, discussions, I mean, that I recall in that
11  regard on it.  It was just ask questions of what we were
12  looking for.  Copyright stuff, was there individuals
13  concerned specifically about copyright stuff?  I don't
14  recall any specific conversations on that or whether
15  that came up.
16     Q.  I may have asked this before, but I'm going to
17  ask this real quick to make sure I've covered it.
18        Did you have any -- I'm going to ask you -- I'm
19  going to list -- give you a bunch of names and the
20  question is:  Did you ever meet in Georgia with any of
21  these people, okay?
22     A.  Like meet in person?
23     Q.  Meet in person, right.
24     A.  Okay.  That should be easier questions.
25     Q.  Okay.  Robert Sinners?

Page 193

1      A.   No.

2      Q.   Cathy Latham?

3      A.   No.

4      Q.   Todd Sanders?

5      A.   Yes.

6      Q.   He -- he was with you in the one -- the first

7    trip to Georgia, right?

8      A.   Yeah.

9      Q.   Any --

10      A.   I don't -- I don't recall any other time -- I

11    don't think there's any other time.

12      Q.   Greg Freemyer?

13      A.   Did I ever meet him in person?  I don't think I

14    ever met Greg in person.

15      Q.   Jim -- well, Jim Penrose we have talked about.

16      A.   Oh, yeah, all the time.  All the time.

17      Q.   Did you meet with Jovan Pulitzer?

18      A.   Nope.

19      Q.   And then Conan Hayes would have been in that

20    first trip as well, correct?

21      A.   Correct.  And I can't think of another time

22    besides that.

23      Q.   What about Joshua Merritt, do you know Joshua

24    Merritt or did you meet with him in Georgia?

25      A.   Oh, Joshua Merritt, he -- he does work with ASOG,

Page 194

1    right?

2        Q.   Exactly.

3        A.   Okay.  I -- no.  I didn't meet him there.  I have

4    met him before.

5        Q.   Okay.  And then Russ Ramsland, did you meet with

6    him in Georgia?

7        A.   I don't think he ever showed up anywhere, no.

8        Q.   Did you ever meet with any members of the Georgia

9    General Assembly in association with your work in

10   Georgia?

11       A.   We're talking in person?

12       Q.   Yes.

13       A.   No.

14       Q.   Did you talk with them on the telephone?

15       A.   I believe there was some, I couldn't even tell

16   you who.  I believe there was one or two that we did.

17       Q.   When would that have been?

18       A.   I couldn't place it.

19       Q.   When you were up in Tomotley, probably?

20       A.   Most likely, yeah.

21       Q.   But you don't remember who it was?

22       A.   No.

23       Q.   Probably Republican?

24       A.   Most likely, yeah.

25       Q.   Just one second.

Page 195

1    A.  When we were talking to them, I'm not sure if

2   they wanted to talk to us.  It depends on what was going

3   on, so...

4          MR. BROWN:  I'm going to mark -- I'm going to

5      mark the exhibit that has Mr. Skoglund's declaration,

6      which is Tab 6.

7          (Whereupon, Plaintiff Exhibit 10 was marked for

8      identification.)

9    A.  So I should be looking for Exhibit 10, Tab 6.

10   BY MR. BROWN:

11   Q.  That's correct.  It will come up shortly.

12   A.  It takes a little longer to check now because I

13   have to scroll.

14   Q.  Has it come up yet?

15   A.  No.

16       Yeah, still nothing.

17          MR. BROWN:  Yeah.  Hang on a second.  Sorry.

18          MS. MARKS:  Bruce, I'm sorry, I was away.  What

19      tab do you need?

20          MR. BROWN:  Tab 6.

21          MS. MARKS:  Okay.

22   BY MR. BROWN:

23   Q.  While we're doing that, just to reorient, I had

24   asked you about the -- the cast vote records in JSON

25   format that appeared on the internet.

Page 196

1     A.  Yeah.

2     Q.  One of our experts is a gentleman by the name of

3     Kevin Skoglund, and he has given a declaration in this

4     case.  And I just want to see if that's consistent

5     with -- with what you understand.  And that's going to

6     be the next exhibit.  And that's going to be the -- the

7     last -- the last of my questions, at least.

8          MS. MARKS:  Bruce, I think it's up.  Tell me if

9     it's not.

10    BY MR. BROWN:

11    Q.  Do you see it, Mr. Logan?

12    A.  Yeah, I'm sorry.  I'm looking at it.  I'm reading

13    through it.

14    Q.  Okay.

15    A.  So just generally, he's saying that the cast vote

16    record is in the public domain and accurate and

17    therefore it should be allowed to be used for something;

18    is that the idea?

19    Q.  No.  It's simply that the prominence of the cast

20    vote records file that appeared on the internet appears

21    to be from Coffee County's EMS, correct?

22    A.  Yeah.  I -- without seeing it, I don't -- I can't

23    make any attestation whether is or isn't.  The best way

24    to do that is it's a ZIP file and there's a hash

25    associated with it.  So if you download it and generate

Page 197

1   a hash and it matches the hash of the file that I

2   generated, you know it's the same thing and you can

3   prove it.  If it doesn't, then someone might have

4   tampered with it.  It's hard to say.

5       Q.  I'm not -- I'm not suggesting any tampering, but

6   when you -- you could have created the JSON -- you could

7   have done all of this in January 17, 2021.  I'm not

8   suggesting there's anything wrong about it.  But this is

9   something that you could have done based upon your

10   access to the system that SullivanStrickler uploaded to

11   the internet, right?

12      A.  Anyone who had access to -- to the data that

13   SullivanStrickler uploaded or had access to the EMS

14   server itself could generate a CVR, yes.

15      Q.  Okay.

16          MR. BROWN:  Those are all my questions,

17      Mr. Logan.  Thank you very much.  I will follow up

18      with you offline, we don't need to take it on the

19      record, about whether there are existing sources of

20      documents or -- documents that you might have access

21      to, and we can talk about that offline and figure

22      that out, if necessary.  But I appreciate your time

23      today.

24          THE WITNESS:  Thank you.

25          MR. BROWN:  And with that, if there's -- I

Page 198

1         think we have -- Mr. Jihadi is going to go next.

2         Thank you very much.

3                           CROSS-EXAMINATION

4     BY MR. JIHADI:

5         Q.  Hello, Mr. Logan.  I'm Wail.  First of all, thank

6     you so much for sitting with us today.  I can understand

7     how this can be gruelling.

8              To begin with, I just want to clarify on certain

9     testimony that you provided earlier.  So I'm just going

10    to ask a couple follow-up questions and for

11    clarification based on what Mr. Brown has already asked.

12             First, earlier you were discussing how you were

13    using -- you were essentially working pro bono on some

14    of these matters earlier on.  Were you using your own

15    personal devices or were you using devices from Cyber

16    Ninjas at the time?

17        A.  That's an interesting question.  I was using my

18    laptop, which was also a laptop that I used with Cyber

19    Ninjas at the time.

20        Q.  Okay.  And did you -- is this the laptop that you

21    searched to see if anything was responsive to the

22    document subpoena?

23        A.  I searched more than just that system.  But, yes.

24        Q.  Okay.  And in terms of -- I also have a question:

25    Do you know what pulse means or what it means to be

Page 199

1      pulsed?  Does that have any meaning to you?

2           A.   Not -- not really.  Do you have more context?

3           Q.   We could go to -- can you pull up Exhibit 4

4      again.  We spoke about it earlier.

5                Go to Exhibit 4, go to Line 109, and that should

6      be -- do you have that in front of you?

7           A.   Yeah, I'm trying to get to Line 109.

8                I assume he just means he pinged her.

9           Q.   Okay.  So --

10          A.   I don't know why -- I have never heard someone

11     use pulsed.

12          Q.   Okay.  Because there are a lot of different

13     communications tools that have been used, so I just

14     wanted to clarify that wasn't another communication

15     tool.

16          A.   If it is, I don't know about it.

17          Q.   Okay.  Perfect.

18               And who -- earlier on you were mentioning that --

19     a friend or a contact was the one that connected you

20     with Lin Wood when it came to the data collection and

21     the Election Integrity issues.

22               Did you -- who was this friend, and can you

23     elaborate on what the communications were?

24          A.   I just had a friend who was tracking things, and

25     she connected me with someone who connected me with Jim

Page 200

1    Penrose that went to, you know -- that is how I ended up
2    at Lin Wood's house.
3        Q.   Okay.  And how was your friend connected in
4    this -- in this entire environment?
5        A.   She wasn't connected.  She didn't even know the
6    person.  She connected me with someone who connected
7    with someone else.
8        Q.   Okay.  And are you comfortable sharing who the
9    friend is?
10       A.   I'm not.  Everyone gets docked and attacked and
11   all this stuff, and I don't believe it has any relevance
12   to the case.  You know, I'd even say object on
13   relevance, so...
14       Q.   Okay.  And then earlier we were also discussing
15   possible Georgia election officials that you could have
16   had contact with.
17            Who were all of the Georgia election officials
18   that you had been in contact with, leading up to the
19   efforts in Coffee County, or since then?
20       A.   I have absolutely no idea.  I couldn't name --
21   I'm not even positive I talked to them.  I just feel
22   like there's this vague remembrance that I could have.
23       Q.   Okay.  But nobody that you could actually name at
24   this moment?
25       A.   No.  I mean, there was a few elected officials

Page 201

1   that came out to the audit, that I'm sure if you said

2   their names I'd recognize them, but I couldn't even tell

3   you why I recognize them if you gave them to me.

4       Q.  Okay.  And also we were talking about certain

5   people that you could have come in contact with in

6   Georgia.  I don't know if you answered this, but did you

7   come in contact with Robert Sinners?

8       A.  Been asked that, like, three times.  So already

9   asked and answered.  But, no.

10      Q.  You were not.  Okay.  Perfect.

11          And moving forward, so you also mentioned the

12  potential for certain data, possibly either being

13  legally admissible or not.  Who were -- who was giving

14  this legal guidance at this time?

15      A.  I heard it through Jim.  You would have to ask

16  him.  I'm not sure which of the attorneys he got that

17  from.

18      Q.  Who, Jim Penrose?

19      A.  Correct.

20      Q.  Okay.  And earlier we also talked about Garland,

21  Favorito, I believe.  Did Garland know about the Coffee

22  County capture?

23      A.  I don't think so.  I don't know how he would

24  have.

25      Q.  Okay.  And we also were talking about ASOG.  So

Page 202

1    who was the attorney for ASOG?

2         A.   I -- I have been told that Charles Bundren is an

3    attorney for ASOG.  I have no idea if that's their only

4    attorney or not.

5         Q.   Okay.

6         A.   And I have been told that after -- you know,

7    after.  I didn't know that at the Coffee County time.

8    At least I don't believe I did.

9         Q.   Okay.  And what was -- I'm sorry if you did

10   answer this earlier, but just for clarification:  What

11   was Bundren's relationship to the Coffee County data

12   collection?

13        A.   I -- I don't recall.  I don't know if I ever knew

14   and don't remember or what.

15        Q.   Do you know who would know?

16        A.   Possibly Jim.

17        Q.   Okay.  And earlier -- if you can please open up

18   Exhibit 8.  It's one that we have already introduced

19   earlier.

20        A.   Tab 11?

21        Q.   It is Tab 11.  And then on the bottom right you

22   should see the numbers that end -- go down to the one

23   that ends from 39, go to 39 to 40, please.

24        A.   37, 38, 39.  Okay.

25        Q.   Okay.  And do you see the email from Jim Penrose

Page 203

1    at the bottom of the page?  It -- at 39, it just begins

2    with Paul, and then the rest is on 40.

3        A.  Yeah.

4        Q.  Okay.  Do you see how in the last two sentences,

5    do you see that, the one that says --

6        A.  Yes, sir.

7        Q.  -- "Please do not communicate about any

8    additional forensics work in Arizona to the other legal

9    teams.  Keep that in confidential channels with me,

10   Sidney, and Doug only."

11           What confidential channels were you, Sidney, and

12   Jim Penrose utilizing at this time?

13       A.  I think it was just Signal.  Possibly Wickr?  I

14   don't know.

15       Q.  Okay.  And these you searched for, any of these

16   communications when you were going through your Signal

17   communications, right?

18       A.  Yeah.  I searched through all of the Signal

19   communications I had.  I did not -- as stated earlier, I

20   did not search through Wickr because I do not have

21   access to that account.

22       Q.  Okay.  But based on your searches on Signal,

23   you used some of the search terms that you decided on,

24   but you didn't end up filtering that afterwards based on

25   what you perceived to be relevant or not, right?

Page 204

1       A.   I mean, when the word came up coffee, and they're

2   talking about the coffee to drink that night, yes, that

3   was filtered out.  But, no, if they were talking about

4   Coffee County, I didn't filter it out.

5       Q.   What about efforts that were just generally in

6   Georgia, did you search up Georgia as well?

7       A.   I do believe I did.

8       Q.   Okay.  And can you make sure that you also

9   searched Georgia after this, if possible?

10      A.   I can go back, but I can also tell you that, as

11  mentioned, I have my Signal messages back to

12  January 10th.

13      Q.   Okay.

14      A.   And I didn't do anything in Georgia, besides

15  Coffee County, after January 10th.  So there won't be

16  anything.  I mean, I searched it before and I can search

17  it again.  But I didn't do any work in Georgia, besides

18  Coffee County, past January 10th, so...

19      Q.   Okay.  And we can follow up on that.

20           Earlier, also I do want to ask you about the

21  virtual machines.  So sorry if I require clarification.

22  Clearly I don't have as much experience in this as you.

23           But you were mentioning the virtual machines.  So

24  what does the virtual machine actually allow a user to

25  do when it comes to, like, studying the voting system?

Page 205

1    Could you please clarify that?

2         A.  So you can actually run the voting system, so

3    that just makes it much easier to see how it works and

4    operates if you can actually run the voting system,

5    so -- and I should say, that isn't the entirely true,

6    because you can really just run the individual

7    components, and the voting systems require complex

8    hardware.

9         So like the ballot marking devices, you know, as

10   an example, without a physical working copy of that,

11   that would be very difficult to do anything with.  You

12   know, similar sorts of thing with the ICC, you need

13   the -- you would need the actual scanners with it in

14   order to use it in that manner.

15        Q.  Okay.

16        A.  But the EMS server, you know, the standard

17   reporting and everything you can run and you can utilize

18   that.  The EMS server primarily is what is the -- the

19   easiest to -- to use somewhat in a live environment.

20        Q.  Okay.  And then that's how -- is that how someone

21   would use it to, like, run a test on the virtual system

22   or, like, could you provide an example of how someone

23   would actually use it to run a test on it?

24        A.  Sure.  You know, so if you wanted to see exactly

25   how it functioned and if there were -- there was

1    vulnerabilities in it.  I mean, you had the advantage,

2    you can actually snapshot it at a certain state, and you

3    can try different things.  And if you discover anything

4    in it, or you accidentally correct the data, you can

5    revert back to the snapshot, you know.  Whatever you

6    need to do in order to work with it to get an idea of

7    how it functions and what it's doing.  Did they follow

8    security best practices; did they not?  You know, as the

9    report I issued out of Michigan, Antrim, Michigan

10   showed.

11       Q.  Okay.  And you -- and you worked on a report.

12   Are you aware of other reports that -- like, similar

13   findings have resulted in them being produced, or just

14   conducted?

15       A.  So I -- I did a report in Antrim, Michigan.

16   There was a lot of work done in Antrim, Michigan.  If

17   you go to Matt DePerno's website, you can download all

18   the experts.  There's probably 30 expert reports on

19   various things that were done associated with them.

20   Wake, TSI did something out of Fulton County

21   Pennsylvania, not Georgia, like someone's affidavit was

22   improperly -- you know, attested to in your case.

23        There was -- you know, there's the Mesa County

24   stuff that various different people have done reports

25   off of.  There's the Maricopa audit report that had

1    specifically election related findings in it.

2           That's all that comes to mind right now that I

3    know of that -- there's all the DEFCON reports that

4    include software, some of the stuff that is included is

5    very similar to what is being used in Georgia.

6    Specifically Dominion ICP devices, versions of those

7    were tested and exploited as part of the DEFCON voting

8    village.

9       Q.  Okay.  And so on the same subject of the virtual

10   machines, who else worked with the uploaded virtual

11   machines in the SullivanStrickler ShareFiles?

12      A.  I don't recall that.  But based on my messages,

13   Jeff was asking for a copy of them, so he obviously did

14   at some point in time.  Conan was asking about that, so

15   he obviously worked them at some point in time.  Anybody

16   else would just be speculation for me to even mention

17   it.

18      Q.  Okay.  And we don't want you to speculate right

19   now.

20          Also, when it comes to -- we discussed Mike

21   Lindell earlier.  Have you ever flew with Mike Lindell

22   or been on his plane?  Because there has been some

23   activity with Mike Lindell's plane.

24      A.  I have never been on Mike Lindell's plane.

25      Q.  Okay.  So never been to Douglas County -- or

1     Douglas, Georgia, on his plane, nothing?

2          A.   No.

3          Q.   Okay.

4          A.   Every time I went to Coffee County, which was

5     once, I drove there.  It would have been much nicer to

6     fly on an airplane.  I would love to do that.

7          Q.   Sure.

8               And then earlier you also mentioned that the GBI

9     has recently contacted you and left you a voicemail,

10    correct?

11         A.   (No audible response.)

12         Q.   Which phone number did they use?

13         A.   The -- the 941 number that -- I mean, it ends in

14    360.  How do you want me the specify it?  Like --

15         Q.   Well, was it, like, the same phone number that

16    was on the business card, the --

17         A.   Yes.  Yeah.

18         Q.   -- what phone number is that?

19         A.   Yes.

20              MR. JIHADI:  Okay.  And right now we're going

21         to take a 10-minute break -- or we'll do a 10-minute

22         break real quick, see if there are any last minute

23         questions, and then we should be done afterwards, at

24         least on my side.

25              THE WITNESS:  Okay.

Page 209

1          THE VIDEOGRAPHER:  Off the record at 3:24 p.m.

2          (Whereupon, a break was taken from 3:24 p.m. to

3      3:30  p.m.)

4          THE VIDEOGRAPHER:  Back on the record at

5      3:30 p.m.

6          MR. JIHADI:  Okay.  Thank you so much,

7      Mr. Logan.  That is all the questions I have right

8      now.  And we will turn it over to anybody else that

9      has questions.  Thank you.

10                    CROSS-EXAMINATION

11     BY MS. LaROSS:

12     Q.  Mr. Logan, my name is Diane LaRoss, and I guess

13     I'll go next.

14     A.  Sounds good.

15     Q.  We appreciate your time today.  Thank you.  And I

16     thought I'd better turn my video on so you could see a

17     face to the voice.

18          As you know, I represent the State defendants.  I

19     have chimed in a couple of times during your -- the

20     deposition thus far today.

21          So I have a couple of questions for you.  You

22     mentioned that when you were in Coffee County, in

23     January, I believe it was on January 18th and 19th, and

24     you were in the Coffee County election office, you had

25     testified earlier about the clock being changed on the

Page 210

1    election equipment.

2          Do you recall that testimony earlier?

3    A.   Yes, ma'am.

4    Q.   Okay.  And you also testified, I believe, that

5    you never physically touched the election equipment in

6    Coffee County, correct?

7    A.   Yes, ma'am.

8    Q.   And did you instruct Misty Hampton how to change

9    the clock on that occasion?

10   A.   I don't recall.  I don't believe so.  But it's

11   possible.  I really don't know.

12   Q.   And do you know -- well, do you recall if she

13   knew how to do it herself, or if you -- or did someone

14   else instruct her to do it --

15   A.   I'd be really surprised if she didn't know how

16   to.  She's very computer proficient.  But I really don't

17   remember.

18   Q.   So did Mr. Lenberg instruct her on changing the

19   clock, as you recall?

20   A.   I -- I don't recall any instruction with changing

21   the clock, you know, on how to do it or whatever.  I

22   really am not sure.

23   Q.   Okay.  And the clock was changed.  Was it changed

24   in Windows, or in the files, or what part of the

25   computer system was the clock changed?

Page 211

1      A.  I don't remember the specifics.  But if I was

2   going to do it today, in order to try to mimic what

3   happened with the election, you know, on the EMS server,

4   you would have to change it on the Windows machine, and

5   on a device like the ICP device, you would have to

6   change it on that device in order to have it all match

7   up.  So it would by my assumption that's what happened.

8      Q.  Are you aware of any other equipment in Coffee

9   County other than what you've mentioned on which the

10   clock may have been changed?

11      A.  The ImageCast Central, the ICC machine,

12   potentially.  But those were the only three machines

13   that were used for that, so...

14      Q.  And you said that you thought if the clock had

15   been changed, that the change would be back to election

16   day?  Do I have that -- your testimony correct?  And

17   tell me if am wrong.

18      A.  That would my understanding, yes.  You know, back

19   to a time when ballots were being processed.  Because

20   if -- you know, if you wanted to reproduce an anomaly,

21   if you had some malicious code that was triggered based

22   on a date, you'd want the date to coincide with

23   wherever, you know, that would happen.  So, yes, it

24   would be on election day or a day it was -- where

25   ballots were being processed.

Page 212

1         They said it was actually a couple of days

2    afterwards.  I don't know why exactly that would be.

3    But it's possible that the ballots were still being

4    processed on that day, and then if that was the day the

5    anomaly was detected, then that might have been a date

6    that would have been set up next.

7         Q.  So would it have been counting ballots in

8    January 2021, or would it be to go back in time to the

9    November 2020 election?

10        A.  The dates on all the systems would have been set

11   back to -- to whatever date it was from the stuff.  I

12   don't remember.  I'm sorry.  I can't tell you

13   specifically.  Jeff might be able to tell you more.  I

14   understand he has a deposition on Monday.

15        Q.  Do you recall the clock being reset after the

16   work was done on the machine, or the --

17        A.  I don't specifically recall it being set or

18   specifically recall it being reset.  I would imagine it

19   would have been, but I really -- I'm sorry, that was

20   almost two years ago.

21        Q.  Sure.  And we understand that.

22             And so you've mentioned the ballots, malicious

23   code, in your explanation here today.  Did you find any

24   malicious code in the Coffee County equipment?

25        A.  No, ma'am.

Page 213

1     Q.  Did you insert any malicious code in the Coffee

2     County equipment?

3     A.  Definitely not.

4     Q.  We need to have a clear record.  So that's the --

5     A.  I suppose that would be a bad one to take the

6     Fifth, right?

7          Yeah, no.  Definitely.  I have never written

8     malicious code for any election equipment.  I have never

9     written really I'd say malicious code.  I guess proof of

10    concepts I have done in penetration testing possibly,

11    but nothing associated with any election equipment,

12    ever, nor I wouldn't do so.

13    Q.  Then going back to the Coffee County equipment,

14    are you -- so I need to ask all the questions.  So are

15    you anywhere of anyone else who looked at the Coffee

16    County equipment in January 2021 and found malicious

17    code?

18    A.  No, ma'am.

19    Q.  And I -- I guess I need to ask this other

20    question too:  But are you aware of any individuals who

21    inserted malicious code in any of the Coffee County

22    equipment?

23    A.  No, ma'am.  And if I -- if I was aware of that, I

24    would report it to law enforcement.

25    Q.  I'm going to ask you a couple of questions about

Page 214

1    your preparation for your deposition today.

2         What all did you do to prepare for your testimony

3    today?

4    A.  I took out my Federal Rules of Civil Procedures

5    that I've had to become familiar with lately, and I had

6    some lovely light reading there.  I did some Google

7    searches associated with questions and objections

8    associated with depositions to get a better idea on

9    things.  And that was the majority of my preparation.

10   Q.  So did you review any documents related to the

11   Coffee County incident that we've talked about today?

12   A.  Over the course of producing documents that I

13   turned over, I reviewed things during that.  But, no, I

14   did not specifically go and read through documents to

15   prepare for the deposition today.

16   Q.  And you mentioned that I believe in talking about

17   Exhibit 6, that -- and I think that that was the

18   SullivanStrickler log file, that you had pulled that

19   from the case file.

20        Do you recall that testimony?

21   A.  Yeah.  I -- I do believe that's where I got it.

22   But there's a number of people that are -- that are

23   sending me stuff associated with this case, and I am not

24   positive that specific file is something someone sent me

25   or whether that was something that I went and pulled

Page 215

1    myself.

2        Q.   And when you say the case file, what are you

3    talking about?

4        A.   When you go into PACER and go to the case.

5        Q.   So you mean the official court documents that

6    have been generated in relationship to this

7    litigation --

8        A.   Correct.

9        Q.   -- on PACER; is that --

10       A.   Correct.

11       Q.   Okay.

12       A.   It had all the redactions and everything, if

13   that's what you're asking, so --

14       Q.   Okay.  Very good.

15            And have you reviewed any deposition transcripts

16   of anyone else who has testified, with respect to the

17   Coffee County incident in this litigation?

18       A.   Yes, ma'am.  I read through the deposition of Ben

19   Cotton.

20       Q.   And how did you obtain a copy of the deposition

21   transcript of Ben Cotton?

22       A.   I think Kevin Mancala gave me that one.

23       Q.   Was that at your request, or he provided it to

24   you on his own accord?

25       A.   I'm not sure.

Page 216

1      Q.  And I understand that you have had contact with

2    Marilyn Marks; is that correct?

3      A.  Besides a handful of emails associated with

4    arranging this deposition, no, I have not talked with

5    her.

6      Q.  Okay.  When did you -- let me ask it this way:

7    So when did you first hear the name Marilyn Marks?

8      A.  It was definitely associated with this case.  But

9    I believe it was -- yeah, just associated with this

10   case.  I don't know the exact time frame, but it would

11   have been in the last three to six months.  I don't

12   believe I've ever talked with her.  I mean, she's on

13   this call.  Maybe I'm remembering wrong.  I don't

14   believe I've ever talked with her.  Yeah.

15     Q.  Just asking for your best memory, Mr. Logan.

16          So when you first learned her name, would that

17   have been before your December 2020 visit to Georgia,

18   let's say?

19     A.  No.

20     Q.  I know you mentioned it was --

21     A.  It definitely -- would have definitely been

22   after.  I believe it was the time period when they

23   started subpoenaing people for Coffee County is when I

24   first heard her name.

25     Q.  Okay.  So would that have been, perhaps, last

Page 217

1    December?

2         A.  It wasn't that long ago.  It was sometime this

3    summer, I believe.  June, July, something like that.

4         Q.  Okay.  And so -- and you said you've had a few

5    contacts with her.  And was that entirely by email?

6         A.  Yeah.  It was all associated with this deposition

7    in the last, what, week or two.

8         Q.  Okay.  But -- and, again, so that was by email, I

9    think you said?

10        A.  Correct.

11        Q.  Okay.  And did you have any -- let me start that

12   over.

13            So have you ever had a telephone conversation

14   with Ms. Marks?

15        A.  I don't believe so.

16        Q.  How about with Bruce Brown, have you had a

17   telephone conversation -- any conversation by telephone

18   with Bruce Brown?

19        A.  Yes, ma'am.

20        Q.  And how many times?

21        A.  Two or three times.

22        Q.  And when were those two or three times that you

23   had phone conversations with Bruce Brown?

24        A.  They were all in the last few weeks related with

25   the motion to compel, which I represented myself pro se

Page 218

1    on.  And this deposition -- actually I think it was all

2    the motion to compel stuff.

3        Q.  Did you talk with Mr. Brown about your testimony

4    during this deposition?

5        A.  No, ma'am.

6        Q.  And in the conversations you said that you pretty

7    much mostly spoke about the motion to compel, anything

8    else that you discussed with Bruce Brown on -- sorry --

9    during your telephone conversations with him?

10       A.  He had some questions for me related to why I

11   didn't have documents, and some of those had a few other

12   questions with it.  I don't remember the specifics

13   exactly on it.  But we had -- you know, we had a

14   conversation about those things.

15       Q.  Did he provide you any documents before your

16   deposition today?

17       A.  There was one email that -- for a short period of

18   time I had an attorney that was helping me that he

19   provided to them for me to take a look at, because I

20   said I didn't have it -- any documents.  And I had to

21   explain why I no longer had access to that email account

22   in question.

23       Q.  Do you recall what document it was that they

24   sent, that was sent to you by Mr. Brown?

25       A.  It was one of the -- the emails that I was, you

1    know, copied -- cc'd on, you know, at my -- at my

2    doug@██████████.  I don't remember the specifics

3    beyond that.

4       Q.  And in your discussions with Mr. Brown, was there

5    anything about the Coffee County incident that you have

6    not told us about today?

7          MR. BROWN:  I object.  That's -- that's too

8       vague to comprehend.

9          And, Diane, I can give you a copy of the email

10      that I sent to the witness with the attached email.

11      And I will also send to you the email that I sent to

12      Bryan Tyson immediately prior to sending that email

13      to Mr. Logan, confirming that -- showing Mr. Logan

14      that confidential document was appropriate.  I will

15      do that after this deposition.

16        MS. LAROSS:  Okay.  Yeah, Bruce, I appreciate

17      that.  Thank you very much.

18    BY MS. LaROSS:

19       Q.  And so he can object, Mr. Logan, but I'd still I

20    like you to answer the question, there's anything

21    that --

22       A.  Nothing comes to mind.

23       Q.  Okay.  In your testimony earlier, I just wanted

24    to clarify something.  I -- my notes may be incorrect.

25        Did you mention that in January of 2021, that

Page 220

1   Coffee County BMDs had been copied to your knowledge?

2       A.   To my knowledge, I thought that they had not been

3   copied.  And I actually used that in my response in part

4   of the motion to compel.  And in a conversation with --

5   with Mr. Brown, he said, actually, on one of the thumb

6   drives, there is a copy of the BMD application package,

7   and I could look at the copy I had of it and confirm

8   that he was in fact correct and I just didn't realize it

9   was there.

10      Q.   Okay.  So you discovered that as a result of the

11  conversation with Mr. Brown?

12      A.   Yes, ma'am.

13      Q.   And that would have been in the last few weeks or

14  was in relation to scheduling this deposition or the

15  motion to compel?

16      A.   Yeah.  Everything would have been in the last

17  30 days.

18      Q.   You also earlier in your testimony talked about a

19  special report.  I think you were referring to the

20  Exhibit 3, which was the document that you had prepared

21  concerning your Signal messages.  And your discussion

22  earlier with Mr. Brown, you had both referenced a

23  special report.

24           Do you recall that testimony?

25      A.   Yes.  That is part of the documents I turned over

Page 221

1    as part of discovery.

2        Q.   Okay.   So that -- so that was my next question:

3    So that would have been included in the documents that

4    you produced in response to the subpoena in this case to

5    you?

6        A.   Correct.   Yes, specifically with the motion to

7    compel, I listed that document on attorney work product,

8    but said I wasn't sure if the attorney was going to

9    exert that on it.   So the judge ruled to give him ten

10   days to exert privilege on it.   He did not.   And so that

11   document was provided as part of discovery.

12       Q.   You spoke a good bit during your testimony

13   concerning election results in Georgia.

14           Do you think that Trump won the Presidential

15   election, actually won the Presidential election here in

16   Georgia in 2020?

17       A.   I don't have a clear opinion as far as it comes

18   to Georgia.

19       Q.   Okay.   So you don't -- you don't think that Biden

20   actually won or -- you don't have an opinion as to who

21   won?

22       A.   Biden was -- is our rightful President.   Do I

23   think there was cheating that was involved in this

24   election?   Yes, I do.

25       Q.   And is it your testimony that that occurred in

Page 222

1    Georgia?

2         A.   I don't have any firsthand knowledge to specify

3    whether that's true or not true in Georgia.

4         Q.   Do you think that Georgians can trust the results

5    from the 2020 election as accurate, the results that

6    have been reported by the Secretary of State's office?

7         A.   I have reviewed a lot of discrepancies associated

8    with Georgia and the way the audits were done and so

9    forth that I've reviewed at times.  And I am skeptical

10   of the reports.  First, for a race that was this close,

11   I really don't think I could say whether they should or

12   shouldn't trust in them.  I absolutely believe that

13   electronic voting machines lack the transparency

14   necessary for proper elections in place, and

15   specifically the software being used as vulnerable,

16   extremely vulnerable, and should not be in place and

17   could be easily exploited by foreign adversary.

18        So do I have knowledge of something being done

19   with it?  No.  But do I trust it?  Do I trust the

20   results?  No.

21        Q.   And getting back, I think I asked you about

22   telephone conversations with Mr. Brown.  Did you also

23   receive emails or have other communication with him,

24   other than the telephone calls?

25        A.   Yes, ma'am.  We had emails.

1     Q.  And what did the emails pertain to?

2     A.  All associated with the motion to compel and this

3  deposition.

4     Q.  Okay.  Did any of the emails pertain to your

5  testimony that you have given here today?

6     A.  As far as what I was going to say?

7     Q.  Yes.

8     A.  Yeah.  So I -- I believe there was nothing from

9  Mr. Brown, but I was originally told that this

10  deposition was going to be in my personal capacity.  And

11  I did notify Mr. Brown that if it got into my expertise,

12  that the Thirteenth Amendment does not allow you to just

13  force someone to use their expertise and that I would

14  potentially bill him for the work.  And so in that

15  regards, I mean, that's a little bit more beyond, you

16  know, what things are, but he never agreed or even

17  replied to that message.

18     Q.  Did you ever speak with Mr. Brown concerning the

19  events about -- that you testified to today that

20  occurred in Coffee County in January 2021?

21     A.  Not outside the context of explaining why I did

22  not have the records he was requesting.

23     Q.  And I think you said you received emails from

24  Ms. Marks.

25     What did those emails pertain to?

Page 224

1      A.  Primarily, I live pretty rural, and I do not have
2    reliable internet access.  It goes out for five, ten
3    minutes at a time.  And so primarily my emails with her
4    were in regards to setting up a place at a hotel where I
5    could do this deposition.
6      Q.  And at any time, or in any part of those emails,
7    did she discuss the events in Coffee County or the
8    Georgia election system?
9      A.  No, ma'am.
10         MS. LaROSS:  I think that's it.  But let me
11    just check, if you don't mind, I will just take a
12    second here.
13         Okay.  Thank you, Mr. Logan.  Those are all the
14    questions that I have.  Appreciate your time, sir.
15         MR. BROWN:  No redirect.  Thank you, Mr. Logan.
16    And have a safe trip back home.
17         THE WITNESS:  Thanks.
18         MR. BROWN:  We can go off the record now.
19         THE VIDEOGRAPHER:  Just a moment.  This
20    concludes the video recorded deposition, and we're
21    off the record at 3:53 p.m.
22         Thank you.
23         MS. MARKS:  And, Jazzmin, I will take a copy of
24    the deposition, the transcript.  Thank you.
25

Page 225

1          (Thereupon, the proceedings concluded at

2      3:54 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 226

1                       CERTIFICATE OF OATH

2

3     STATE OF FLORIDA:

4     COUNTY OF ORANGE:

5

6        I, Jazzmin A. Musrati, RPR, CRR, Notary Public, State

7     of Florida, do hereby certify that DOUG LOGAN personally

8     appeared before me via videoconferencing technology on

9     November 18, 2022, and was duly sworn and produced

10    driver's license/I.D. as identification.

11

12                       Signed on December 2, 2022.

13

14

15           _____
              Jazzmin A. Musrati, RPR, CRR
16            Notary Public - State of Florida
              My Commission No. GG984252
17            My Commission Expires: May 4, 2024

18

19

20

21

22

23

24

25

Page 227

1                    CERTIFICATE OF REPORTER

2      STATE OF FLORIDA:

3      COUNTY OF ORANGE:

4

5         I, Jazzmin A. Musrati, RPR, CRR, Notary Public, State

6      of Florida, certify that I was authorized to and did

7      stenographically report the deposition of DOUG LOGAN;

8      that a review of the transcript was requested; and that

9      the foregoing transcript, Pages 1 through 229, is a true

10     and accurate record of my stenographic notes.

11        I further certify that I am not a relative, employee,

12     or attorney, or counsel of any of the parties, nor am I

13     a relative or employee of any of the parties' attorneys

14     or counsel connected with the action, nor am I

15     financially interested in the action.

16

17              DATED:  December 2, 2022.

18

19

20     _____

       Jazzmin A. Musrati, RPR, CRR

21     Registered Professional Reporter

       Certified Realtime Reporter

22

23

24

25

Page 228

1   Doug Logan

2   ██████████████████████

3                              \

4   RE:    Curling, Donna  v. Raffensperger, Brad

5         11/18/2022, Doug Logan (#5591036)

6         The above-referenced transcript is available for

7   review.

8         Within the applicable timeframe, the witness should

9   read the testimony to verify its accuracy. If there are

10  any changes, the witness should note those with the

11  reason, on the attached Errata Sheet.

12        The witness should sign the Acknowledgment of

13  Deponent and Errata and return to the deposing attorney.

14  Copies should be sent to all counsel, and to Veritext at

15  cs-midatlantic@veritext.com

16

17   Return completed errata within 30 days from

18  receipt of testimony.

19    If the witness fails to do so within the time

20  allotted, the transcript may be used as if signed.

21

22                  Yours,

23                  Veritext Legal Solutions

24

25

Page 229

1    Curling, Donna  v. Raffensperger, Brad

2    Doug Logan (#5591036)

3                   E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____    _____

24   Doug Logan                              Date

25

Page 230

1    Curling, Donna   v. Raffensperger, Brad

2    Doug Logan (#5591036)

3                    ACKNOWLEDGEMENT OF DEPONENT

4        I, Doug Logan, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____   _____

12   Doug Logan                         Date

13   *If notary is required

14                        SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                        _____ DAY OF _____, 20___.

16

17

18                        _____

19                        NOTARY PUBLIC

20

21

22

23

24

25