Page 1

1           UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF GEORGIA

3                  ATLANTA DIVISION

4

5           Civil Action No. 1:17-cv-02989-AT

6      _____

7      DONNA CURLING, et al.,

8           Plaintiffs,

9      vs.

10     BRAD RAFFENSPERGER, et al.,

11          Defendants.

12     _____

13        VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

14                 JEFFREY E. LENBERG

15     DATE:          November 21, 2022

16     TIME:          10:05 a.m. to 6:21 p.m. Eastern

17     LOCATION:      Witness location

18

       REPORTED BY:  Felicia A. Newland, CSR

19

20             Veritext Legal Solutions

           1250 Eye Street, N.W., Suite 350

21             Washington, D.C. 20005

22

Page 2

1                    A P P E A R A N C E S

2       On behalf of the Witness:

3            DAVID K. CLEMENTS, ESQUIRE

4            David Clements

5            davidclements13@protonmail.com

6       On behalf of the Curling Plaintiffs:

7            CAROLINE MIDDLETON, ESQUIRE

8            DAVID CROSS, ESQUIRE

9            JENNA CONAWAY

10           Morrison & Foerster LLP

11           2100 L Street, Northwest

12           Suite 900

13           Washington, D.C. 20037

14           cmiddleton@mofo.com

15           jconaway@mofo.com

16

17

18

19

20

21

22

1           A P P E A R A N C E S (Cont'd)

2      On behalf of the Coalition for Good Governance

3      Plaintiffs:

4           BRUCE P. BROWN, ESQUIRE

5           Bruce P. Brown Law

6           1123 Zonolite Road, Northeast, Suite 6

7           Atlanta, Georgia 30306

8           bbrown@brucepbrownlaw.com

9           -- and --

10          MARILYN MARKS, ESQUIRE

11          Attorney At Law

12          7035 Marching Duck Drive, E504

13          Marilyn@uscgg.org

14     On behalf of the State Defendants:

15          DANIELLE HERNANDEZ, ESQUIRE

16          JAVIER PICO PRATS, ESQUIRE

17          ALEXANDER DENTON, ESQUIRE

18          Robbins Firm

19          500 14th Street, Northwest

20          Atlanta, Georgia 30318

21          Jpicoprats@robbinsfirm.com

22          dhernandez@robbinsfirm.com

Page 4

1              A P P E A R A N C E S (Cont'd)

2        On behalf of the State Defendants:

3              DIANE LAROSS, ESQUIRE

4              BRYAN JACOUTOT, ESQUIRE (via Zoom)

5              Taylor English Duma, LLC

6              1600 Parkwood Circle, Southeast, Suite 200

7              Atlanta, Georgia 30339

8              dlaross@taylorenglish.com

9              bjacoutot@taylorenglish.co

10       On behalf of the Fulton County Attorney's Office:

11             DAVID LOWMAN, ESQUIRE (via Zoom)

12             Fulton County Attorney's Office

13             141 Pryor Street, Suite 4038

14             Atlanta, Georgia 30303

15             david.lowman@fultoncountyga.gov

16

17

18

19

20

21

22

1                    A P P E A R A N C E S (Cont'd)

2           Also Present:  (Via Zoom)

3                Bryan Tyson

4                Kevin Skoglund

5                Oluwasegun Joseph

6                Susan Greenhalgh

7                Hannah Elson

8                Duncan Buell

9                Philip Stark

10          Videographer:  Helen Hebert

11

12

13

14

15

16

17

18

19

20

21

22

1                        C O N T E N T S

2        EXAMINATION BY:                          PAGE

3             Counsel for Coalition Plaintiffs        10

4             Counsel for Curling Plaintiffs          229

5             Counsel for State Defendants            307

6             Counsel for The Witness                 321

7             Counsel for Coalition Plaintiffs        325

8                    LENBERG DEPOSITION EXHIBITS

9        NO.   DESCRIPTION                          PAGE

10       Exhibit 1   Subpoena                             11

11       Exhibit 2   Jeffrey Lenberg Declaration, October 21,   15

12                   2022

13       Exhibit 3   Logan Signal messages               73

14       Exhibit 4   Harvey memo on system copies        96

15       Exhibit 5   Coffee County ICC & ICP Reports    114

16       Exhibit 6   Coffee County and Pierce County Records   136

17                   Request

18       Exhibit 7   Color photograph, Cellebrite kit for   154

19                   copying

20       Exhibit 8   Measuring the desk message         157

21       Exhibit 9   Color photograph, Lenberg light ring   181

22       Exhibit 11  Color photograph, pictures coming -   193

Page 7

1                going

2     Exhibit 13   Handwritten notes                          195

3     Exhibit 12   ICP - Analysis - Updated, Dominion 5.5     199

4     Exhibit 14   Thumb drive contents - CCBOE Docs          200

5                  Responsive to Subpoenas

6     Exhibit 15   Ben Cotton Signal & Coffee County          206

7                  Related E-mails

8     Exhibit 16   Moncla Signal Communications Annotated     210

9     Exhibit 17   Lenberg vote stealing attack               234

10

11      *(Exhibit 10 not marked.  Exhibits attached to

12      transcript.)

13

14

15

16

17

18

19

20

21

22

1                    P R O C E E D I N G S

2                      *  *  *  *  *  *  *

3                    VIDEOGRAPHER:  Good morning.  We are

4        going on the record at 10:05 a.m. on November 22nd,

5        2022.  Please note that this deposition is being

6        conducted virtually.  Quality of the recording

7        depends on the quality of camera and internet

8        connection of participants.  What is seen from the

9        witness and heard on screen is what will be

10       recorded.

11                    Audio and video recording will

12       continue to take place unless all parties agree

13       to go off the record.

14                    This is Media Unit 1 of the

15       video-recorded deposition of Jeffrey Lenberg

16       taken by Counsel for Plaintiff in the matter of

17       Donna Curling, et al. versus Brad Raffensperger,

18       et al., filed in the United States District Court

19       for the Northern District of Georgia, Civil

20       Action No. 1:17-cv-02989-AT.

21                    This deposition is being conducted

22       remotely using virtual technology.

Page 9

```
 1                    My name is Ellen Hebert
 2         representing Veritext.  I am the videographer.
 3         The court reporter is Felicia Newland from
 4         Veritext.
 5                    Would counsel please identify
 6         yourselves and affiliations for the record,
 7         beginning with the noticing attorney.
 8                         MR. BROWN:  Bruce Brown for the
 9         Coalition Plaintiffs.
10                         MS. MIDDLETON:  Caroline Middleton,
11         counsel for Curling Plaintiffs.
12                         MR. PICO PRATS:  Javier Pico Prats
13         for the State Defendants.
14                         MR. CLEMENTS:  David Clements on
15         behalf of the witness, Jeffrey Lenberg.
16                         MR. LOWMAN:  David Lowman on behalf
17         of the Fulton County Attorney's Office.
18                         VIDEOGRAPHER:  Anyone else?
19                         Mr. Denton has just entered the
20         Zoom meeting.
21                         If you'd care to introduce
22         yourself, Mr. Denton.
```

1                    MS. HERNANDEZ:  Yes, Alexander Denton

2       and Danielle Hernandez are also here on behalf of

3       the State Defendants.

4                    VIDEOGRAPHER:  Thank you very much.

5                    MS. HERNANDEZ:  You're welcome.

6                    VIDEOGRAPHER:  Will the court

7       reporter please swear in the witness?

8                         *  *  *  *  *

9       Whereupon,

10                    JEFFREY E. LENBERG

11      was called as a witness and, having been first duly

12      sworn, was examined and testified as follows:

13         EXAMINATION BY COUNSEL FOR COALITION PLAINTIFFS

14       BY MR. BROWN:

15              Q    Good morning.  Please state your full

16       name for the record.

17              A    Jeffrey Earl Lenberg.

18              Q    And you're in New Mexico right now.

19       Is that right?

20              A    That's correct.  That's correct.

21              Q    And you are represented by counsel?

22              A    I am.

Page 11

1           Q     And that's Mr. Clements?

2           A     That's correct.

3           Q     And how -- how long have you been

4      represented by Mr. Clements?

5           A     Since yesterday, was our formal

6      agreement.

7           Q     I have to ask this, are you under any

8      drugs or medication that would have an impact upon

9      your ability to give accurate and truthful

10     testimony?

11          A     No.

12               MR. BROWN:  Let me mark as Exhibit 1,

13     Tab 1, which is the subpoena in this case.  And

14     make sure we have the Exhibit Share working there.

15               (Lenberg Deposition Exhibit Number 1

16                marked for identification.)

17               MR. BROWN:  Are you able to see that

18     exhibit on your screen, Mr. Clements?

19               MR. CLEMENTS:  I am not.

20               MR. BROWN:  We are going to be

21     showing the witness exhibits using Exhibit Share.

22     Did you get the link to Exhibit Share?

1           MR. CLEMENTS:  I did, but I didn't

2      know if it was going to come through on the actual

3      Zoom meeting interface.

4           THE WITNESS:  We're not able -- are

5      you not able to display it on the screen so I can

6      see it?

7           MR. BROWN:  You will be able to see

8      it from the -- from the laptop that Mr. Clements

9      has.  It works better because then we can still see

10      each other.  And so we have found that it works

11      better using Exhibit Share, so if you would just

12      work with us on that.

13           MR. CLEMENTS:  Just a second.

14           MR. BROWN:  Thank you.

15           VIDEOGRAPHER:  Counsel, I'm not

16      seeing an exhibit either.

17           MR. BROWN:  Okay.  Can we go off the

18      record a second?  And we'll set it up and make sure

19      that everybody has it.  Thank you.

20           VIDEOGRAPHER:  Going off the record.

21      The time is 10:10 a.m.

22           (Recess from 10:10 a.m. to 10:15 a.m.)

```
 1                    VIDEOGRAPHER:  Going back on the
 2        record.  The time is 10:15 a.m.
 3        BY MR. BROWN:
 4             Q     Thank you, Mr. Lenberg, for --
 5             A     Well, hold on -- hold on a second.
 6        We're not on the right screen.  Here it is.  Okay.
 7        I'm sorry.  I'm back on the correct screen now.  I
 8        was --
 9             Q     Okay.
10             A     I can see you.
11             Q     Thank you very much.  And whenever
12        there are any documents in front of you, take your
13        time in reviewing them.  And if there's
14        transmission difficulties, just let us know.
15             A     Okay.  Thank you.
16             Q     And also, I should just say, I like
17        to take fairly frequent breaks, but if at any time
18        you need a break, that's fine.  In these
19        depositions, as you may know, there's frequent
20        breaks, and a lot of times the breaks are necessary
21        actually to speed the examination up so we can all
22        get organized and be able to compare notes and not
```

Page 14

1          go over testimony that we've already gotten, but if

2          you ever need a break, just let me know.

3                  A     I appreciate that very much.  I'm 66,

4          so I'm getting at the age where I need breaks

5          regularly.

6                  Q     Don't say that because I'm almost

7          there.  So you've got me by about a year and a

8          half.

9                  A     Okay.

10                 Q     Okay.  You have obviously seen

11         Exhibit 1, the subpoena for your testimony,

12         correct?

13                 A     That's correct.

14                 Q     And you have produced documents in

15         response to that subpoena.  Is that right?

16                 A     Correct.

17                 Q     I'm going to have further questions

18         about that, including some questions on the

19         documents that were produced this morning, but --

20                 A     Okay.

21                 Q     -- let's go ahead and go on with

22         your -- with your testimony.

Page 15

1                  I'm going to right now, to speed

2        things up, mark as Exhibit 2 what we previously

3        marked as Tab 2.  And that's your declaration dated

4        October 21, 2022.

5                  A      Uh-huh.

6                     (Lenberg Deposition Exhibit Number 2

7                      marked for identification.)

8        BY MR. BROWN:

9                  Q      And just let me know when that's in

10        front of you.

11                  A      Yes, I have it.

12                  Q      I want to direct your attention to

13        the last page of your declaration, page 10.

14                  A      We're getting there.

15                         Now, the last page of my text or the

16        attachments?

17                  Q      What I'm looking for is your CV.

18        It's the last --

19                  A      Oh, the CV.  Yes, we're on the CV.

20        Uh-huh.

21                  Q      And is that a reasonably up-to-date

22        copy of your CV?

```
 1              A     Yes.  A brief CV, yes.  It's
 2       obviously one page, but yes.
 3              Q     And let me ask you, I'm going to come
 4       back to this probably in a little bit greater
 5       detail, but what generally is your experience in
 6       testing or evaluating electronic election systems?
 7              A     Well, I have quite a bit at this
 8       point.  Since I did testing in Georgia, in Coffee
 9       County, I've done quite a bit of testing associated
10       with a court case in Michigan.  And I -- those are
11       the two places where I -- I've tested the equipment
12       itself.  I also -- it depends on how you define
13       testing.  I have -- I've run EMS software as well
14       and evaluated EMS software.
15              Q     Which did you work on first, Coffee
16       County or Michigan?
17              A     Coffee County was the first location
18       that I actually had an opportunity to go to and try
19       to help.
20              Q     And prior to going to Coffee County,
21       did you have experience with electronic voting
22       systems?
```

Page 17

```
 1              A     I had experience from 1994/'95 time

 2       frame, but it was more the data associated with the

 3       electronic voting systems versus hands-on

 4       equipment.

 5              Q     Okay.  And what is your first

 6       experience with the Dominion Voting System?

 7              A     That was Coffee County.

 8              Q     Okay.  Your background is extensive,

 9       I realize that, and it's -- it has many different

10       facets to it, but one of them is in testing.  Is

11       that correct?

12              A     That's correct.

13              Q     And could you just describe for the

14       record how you would characterize your expertise in

15       testing?

16              A     It's quite extensive.  I've spent 11

17       to 12 years developing and designing satellite

18       systems and designing software to do automated

19       testing of satellite systems, as well as designing

20       test procedures to do that testing, as well as

21       doing all kinds of maintenance on orbit testing of

22       satellites after launch, using software that I had
```

1          been involved in developing.

2                     And then I ended up actually being a

3          manager of a test development group where I had

4          about 20 people working for me developing test

5          systems, as well as later on I had another group.

6          I switched and managed another group that was

7          running operational test systems.  So I have all

8          that experience, about 11 years worth of doing

9          that.

10                    The kind of testing we did was

11         extremely high-reliability testing.  We had to test

12         a satellite system for years before it was

13         launched.  The -- I put in my documents a

14         picture -- you probably wondered why it was in

15         there, it was a group of satellites, an early

16         warning satellite system that I had a lot to do

17         with designing circuits.  I have hardware flying on

18         that, but a lot of testing associated with that.

19                    And we test for years.  And at 20,000

20         miles out in space you don't get a chance to go fix

21         it, so you've got to get it right.  So the testing

22         is quite extensive.  And it's not just testing for

1        function, it's thermal testing, shock testing, all

2        kinds of mechanical, radiation testing, EMC

3        testing, that's electromagnetic connectivity

4        interference, electromagnetic interference testing,

5        acoustic testing.  You name it, I -- I have done

6        the testing.  I had the good privilege of working

7        at a laboratory that had the most advanced test

8        facilities probably in the United States, maybe in

9        the world.

10                       And in addition to that, I did

11       on-orbit testing after we launched our satellites,

12       and so I had to obviously test the systems once

13       they got on orbit.  But I also did maintenance on

14       the systems once they were on orbit.  So there was

15       a time or two when I was called because of a

16       problem with a payload on orbit on that particular

17       satellite that I showed in the picture there, where

18       I personally went to the ground station of an

19       operational satellite and spent hours testing it

20       and then putting back into a working configuration.

21                       Each one of those satellites was an

22       800 million-dollar satellite, $400 million for

1       the -- the satellite itself and $400 million,

2       approximately, to launch it.  And I was handed

3       control of -- of that satellite.  And I personally

4       was the only one sitting there doing the testing,

5       reconfiguring.

6                        The particular one that I'm thinking

7       of, I was directed to call the watch officer at

8       NORAD on a secure telephone, which I did, and that

9       was two o'clock in the morning, and he had

10      instructions to wake up the Four Star General that

11      is the head of Space Command and let him know that

12      his -- his primary asset was fully operational once

13      again.

14                       So yes, I have very extensive test

15      experience.

16              Q       And then you retired in 2012 from

17      Sandia Labs.  Is that right?

18              A       Late 2011.

19              Q       Okay.  And then after that, I see you

20      had a -- or have a project in Nairobi, Kenya.  Is

21      that right?

22              A       I have a small company based in

Page 21

1      Nairobi, Kenya called Worldwide Africa.  And we

2      develop energy systems for nonprofits and others

3      down there, homes, residences, businesses, schools,

4      people that do not have access to electricity.

5              So since that time, leaving Sandia,

6      that's been one of the things that I've done is

7      spend quite a bit of time in Africa, in Kenya,

8      Uganda, current projects in Malawi, Sierra Leone,

9      and bringing energy systems to especially schools

10     that don't have access to it.

11         Q    And that's a nonprofit group.  Is

12     that right?

13         A    My companies are for profit.  We work

14     with nonprofits.

15         Q    Okay.  So I understand you had some

16     election experience in the '90s.

17             MR. BROWN:  I think the screen is

18     frozen.

19             Felicia --

20             COURT REPORTER:  Yes, he's frozen.

21     BY MR. BROWN:

22         Q    We might have missed a little bit of

1          your last sentence here.  You froze up there for a

2          second, but I'll -- I'll move on.

3                  A       Okay.

4                  Q       You had some experience with

5          elections in the 1990s, I believe --

6                  A       That's correct.

7                  Q       -- but recently -- but recently when

8          was your interest in election integrity or election

9          systems renewed?

10                 A       August 2020, is when it got renewed.

11                 Q       And what trigged that?

12                 A       Well, the upcoming election and the

13         fact that I believe we were in the middle of the

14         COVID situation at the time.  And part of my

15         background is doing broad spectrum analysis.  When

16         you look at vulnerabilities -- you haven't gotten

17         to that part yet -- but I look at things across the

18         board.

19                         And so I was paying attention at that

20         point -- began to pay attention to what was going

21         on in the world, and there were just a lot of

22         concerns about what was happening and what might

Page 23

1      happen in the election, especially with all kinds

2      of changes happening due to COVID.  And with my

3      experience from 1994/'95 time frame, thought that I

4      might be able to be helpful and beginning to look

5      at that.  And just keep an eye to see if anything

6      untoward might happen in the 2020 election.

7              Q      The way I'm going to do this is I'm

8      going to skip forward and then move back to see

9      exactly your connection to this case.

10             A      Okay.

11             Q      But at some point you were introduced

12     to Doug Logan, correct?

13             A      That's correct.

14             Q      And who introduced you to Doug Logan?

15             A      Jim Penrose did.

16             Q      And who introduced you to Jim

17     Penrose?

18             A      Seth Keshel.

19             Q      Who is Seth Keshel?

20             A      Seth Keshel -- let's see, you can

21     probably find out a lot about him on the internet.

22     I don't have his bio in front of me.  I know that

1          he has spoken a lot about election integrity

2          related issues nationwide in many different forums.

3          And he was -- I got his phone number from someone.

4          I was trying to get data, I think, from Arizona,

5          just after the election and calling around trying

6          to find out did anybody have data that we could

7          look at to analyze it, and somehow I got Seth's

8          phone number.

9                     And when I called Seth, he got me in

10         contact with Jim Penrose and said, "Oh, hey, you're

11         a tech guy, the guy that you want to talk to is Jim

12         Penrose."  So he got me in touch with Jim, and that

13         would have been in either late November or early

14         December of 2020.

15                Q     So you -- you reached out to -- to

16         Seth after the 2020 election.  Is that right?

17                A     That's correct.  That's correct.

18                Q     And your interest was in data from

19         the Arizona election?

20                A     At that time, yeah.  I was trying to

21         get data, uh-huh.

22                Q     And then he referred you to Jim

Page 25

```
 1    Penrose?

 2             A      That's correct.

 3             Q      And who did you understand Jim

 4    Penrose was or what his job was or what he was

 5    doing?

 6             A      Well, my understanding was there was

 7    a loose collection of people that came together

 8    that were trying to understand what happened in the

 9    election.  And there were anomalies being reported

10    all over the country, many people filing affidavits

11    and so on.

12                    And that they were a group of people,

13    obviously there were lawyers and others out looking

14    at stuff, but there were also some technical people

15    that kind of showed up, from all different walks,

16    different locations.  And I was one of those that

17    somehow I got plugged in to just -- really just to

18    Jim.  I didn't really get plugged into the group.

19    I was sort of on the side.

20                    But in any case, my understanding

21    with Jim was loosely in -- in charge of this, what

22    I would call, kind of a ragtag group of people,
```

1         some of them, I think, quite professional and some

2         of them on the other side of the spectrum, maybe in

3         there even to subvert things.

4              Q     Subvert what, the group, or subvert

5         the election?

6              A     Subvert the group.  In other words,

7         to bring in disinformation, to send people down

8         false trails, to mislead.

9              Q     And who were those people?

10             A     Excuse me?

11             Q     Who were those people?

12             A     They're -- let's see, I -- I guess I

13        need advice on that, whether I should be naming

14        people or not, because I don't have any hard

15        evidence.  All I have is circumstantial evidence

16        that in my mind makes me believe that there are

17        people that likely were getting misinformation or

18        disinformation on purpose.

19                  MR. CLEMENTS:  And, Bruce, what I'm

20        going to do is -- I know the subpoena relates to

21        Georgia and Coffee County, but mental impressions

22        that he's learned through his work in Michigan,

Page 27

1    Arizona, and other places identified, I'm going to

2    go ahead and assert work product privilege.

3              MR. BROWN:  Right.  The subpoena is

4    not limited to Coffee County, and most of my

5    questions are going to involve some sort of mental

6    impression, I hope.  So I'm not sure I'm going to

7    yield to --

8              MR. CLEMENTS:  Well, I'm going to

9    instruct him not to answer questions that get into

10   work product because it's protected.

11   BY MR. BROWN:

12        Q     Okay.  Your attorney has indicated a

13   work product privilege.

14              Were you working for an attorney

15   during this time frame?

16        A     I was in Michigan, when I was in

17   Michigan.  That's what he was referring to in

18   particular, I believe.

19        Q     Okay.  You were talking about the --

20   the group that you were, in some sense, associated

21   with, although I think you described yourself as

22   sort of being on the sidelines.

```
 1              A      Uh-huh.

 2              Q      But you were describing the group as

 3      being some -- a group of professionals and lawyers

 4      and then some people who were trying to subvert the

 5      group.  And was -- did you learn that in connection

 6      with your work in Michigan or somewhere else?

 7              A      It was over a period of time, as I

 8      observed, let's say, the same person or persons

 9      showing up in multiple locations and doing things

10      that were not helpful to election integrity and

11      getting to the truth, which has really been my goal

12      all along, is just to find out what happened and

13      get to the truth.

14                     And I believe that was the objective

15      of -- of the bulk of the people that I came into

16      contact with, is just trying to understand what

17      happened in the election.

18              Q      Okay.  I may come back to that.

19                     You said you were referred to Jim

20      Penrose.  Was this all by phone or by e-mail?  Or

21      how did you all communicate with -- how did you

22      communicate first with Seth?
```

Page 29

```
 1              A     I believe it was -- I -- you know,

 2         this is a little distant memory right now, so I'm

 3         sure it was a phone call, but it probably was

 4         Signal at that point in time.

 5              Q     And the same question with Jim

 6         Penrose; did you communicate with him over the

 7         phone and via Signal most likely?

 8              A     That's generally correct.  Either

 9         that or I was sitting next to him in -- in the D.C.

10         area or elsewhere.

11              Q     And when did you first meet?

12                    MR. BROWN:  Felicia, I think he froze

13         up again.

14                    THE WITNESS:  I mean, there were

15         times when --

16         BY MR. BROWN:

17              Q     We lost you there for a second just

18         because of the transmission.  You were describing

19         how you met with Mr. Penrose.

20              A     It was mainly Signal.

21              Q     And you also met him in person?

22              A     That's correct.
```

```
 1              Q     When's the first time you met him in
 2        person, if you recall?
 3              A     December of 2020.  I can't remember
 4        exactly which day.
 5              Q     And where were you?  In D.C.?
 6              A     I was in Maryland.
 7              Q     And who else did you meet with when
 8        you were meeting with Mr. Penrose?
 9              A     Who else did I meet with?  When I met
10        with Jim Penrose, he was the only one I met with.
11              Q     And what did you talk about in that
12        December meeting with Mr. Penrose?
13              A     We talked about election integrity
14        concerns.
15              Q     And what actions were contemplated at
16        that meeting, if any, about election integrity
17        concerns?
18              A     What actions?  The primary one was to
19        try to understand where anomalies were occurring
20        and what they meant.
21              Q     In any particular jurisdictions?
22              A     I believe I -- I would -- there were
```

Page 31

1           a number of jurisdictions.  Obviously Antrim had

2           already occurred, stuff had happened in Georgia

3           that was of great concern.  I think those were

4           probably the primary two.  Pennsylvania.

5                   Q     Those were also the states where the

6           margin was smaller than some of the other states?

7                   A     I believe that's correct.

8                   Q     And do you recall what stuff had

9           happened in Georgia by the time of your -- or had

10          been reported to have happened in Georgia by the

11          time of your meeting with Mr. Penrose in D.C. in

12          December of 2020?

13                  A     Yes.  I believe -- at that point, I

14          don't believe the runoff had occurred, but I do

15          believe the -- the recount had occurred.  I'm

16          trying to remember back to the exact sequence.  But

17          in the recount in Coffee County, you may remember,

18          it was in the press, that they had trouble

19          certifying it because they could not get the same

20          count when they ran the recount with the machines.

21                        And that was a major red flag, and

22          even to the point where they refused to certify.

Page 32

1          And the rest of the details, I just think there was

2          a big to-do about it.  But it was a big red flag

3          that, in my opinion, should have been investigated

4          by the State to find out why did those machines not

5          properly count those ballots.  And, instead, I

6          think the State just certified -- actually, I think

7          the County certified, but I can't swear to that.

8               Q     And so did you develop an action plan

9          with Mr. Penrose at that December meeting with

10         respect to the concerns that you have identified?

11              A     No, I don't believe we did at that

12         time.

13              Q     Do you have an understanding of who,

14         if anybody, Mr. Penrose was working for?

15              A     I believe he was associated with

16         Sidney Powell and Defending the Republic.  I

17         believe that was the primary group.

18              Q     Was he associated with the Trump

19         Campaign?

20              A     Not that I know of.

21              Q     And then after you met with

22         Mr. Penrose, what was the next time that you

Page 33

1     communicated with him, if you recall?

2          A     I communicated probably -- I can't

3     say the exact time.  I would just say we

4     communicated a fair amount over Signal.

5          Q     And at some point -- and I'll come

6     back to this, but at some point you were dispatched

7     to go to Georgia.  And my question is:  Between the

8     meeting in December with Mr. Penrose and actually

9     going to Georgia --

10         A     Uh-huh.

11         Q     -- did you undertake any other

12    actions relating to election security with

13    Mr. Penrose?

14         A     Related to Georgia or related to

15    anything?

16         Q     Related to anything, and then I'll

17    focus on Georgia.

18         A     Okay.  Please repeat that.  You said

19    related to anything but focus on Georgia?

20         Q     No, I'll ask -- related to anything

21    first.  My first question is:  Did you have any

22    dealings -- well, let me back up a little bit.

```
 1            I'll make it easier.

 2                      Eventually you went to Georgia.

 3     Between December and when you went to Georgia, did

 4     you discuss with Mr. Penrose, or anyone associated

 5     with Mr. Penrose, any other project relating to

 6     election integrity?

 7            A     Yes.

 8            Q     What was that?

 9                      MR. CLEMENTS:  Objection, without

10     getting into particulars.  Work product privilege

11     with respect to the Michigan Antrim case.

12     BY MR. BROWN:

13            Q     Okay.  So you were involved in

14     Michigan between December 2020 and January.  Is

15     that right?

16            A     Let's see, I -- I was aware of the

17     Antrim.  I'm trying to think how to characterize

18     it.  We were all aware of Antrim at that point.  I

19     think the ASOG report had some out that was out on

20     the internet.  So there was certainly contemplation

21     of that.  I wasn't directly involved, so there

22     were -- I'm not sure how to answer that.
```

1          Q      Well, did you actually do anything

2     with respect to the Antrim situation between your

3     meeting with Mr. Penrose and going to Georgia or

4     were you just sort of in the loop of information?

5          A      I think I was just in the loop of

6     information.

7          Q      And did you -- did you go to Michigan

8     during that time frame?

9          A      No.

10         Q      Just so I can get some overall

11    understanding, when did your work relating to

12    Antrim in Michigan actually begin in earnest

13    relative to Coffee County?

14         A      It was after I left Georgia.  It was

15    after Georgia.

16         Q      Okay.  Tell me how you -- okay.

17    Well, let me back up and make sure we have

18    everything.

19              So you reached -- you were looking

20    for information about Arizona, you made contact

21    with Seth Keshel, who referred you to Jim -- Jim

22    Penrose, right?

1              A     Right.

2              Q     And then you and Penrose had some

3    communications, I take it, but then at some point

4    met in Washington, D.C., correct?

5              A     Correct.

6              Q     And then at that meeting, you talked

7    about election integrity concerns.  Georgia was

8    already on the radar because of the issues with the

9    recount, to the best of your recollection?

10             A     Yes, that's correct.

11             Q     And then at some point after that

12   meeting, you were also in the loop relating to

13   Antrim, Michigan, but had not yet been deployed to

14   do any actual work for Antrim.  Fair to say?

15                   MR. BROWN:  He's either very focused

16   on my question or he's frozen.

17                   MR. CLEMENTS:  Bad connection.  We

18   didn't hear you, Mr. Brown.

19                   MR. BROWN:  I'm sorry.

20                   THE WITNESS:  Can you go back about

21   60 seconds?

22

Page 37

1      BY MR. BROWN:

2              Q     Sure.

3                    I was just reviewing your -- your

4      testimony.  At your meeting with Mr. Penrose, you

5      discussed Georgia because of the recount issues,

6      and other jurisdictions perhaps.  And than after

7      your meeting with Mr. Penrose, but before you

8      actually went to Georgia, you were in the

9      information loop about Antrim, Michigan, but did

10     not actually do any work with respect to that

11     project, correct?

12             A     That's correct.

13             Q     Okay.  And then in that same time

14     frame, that is between the meeting with Penrose and

15     going to Georgia, what communications did you have

16     with anybody about Georgia, about Coffee County in

17     particular, but if there are other jurisdictions,

18     I'd like to know those, too?

19             A     Before going to Georgia, is that what

20     you're asking?

21             Q     Yes, sir.

22             A     I believe my conversations were

```
 1      limited to Jim Penrose.

 2              Q      And when you started discussions --

 3      okay.  When you -- when you started discussing with

 4      Mr. Penrose, Georgia, was it limited to Coffee

 5      County or were there other jurisdictions within

 6      Georgia that were a subject of interest?

 7              A      Can you repeat that, please?  You

 8      just cut for a few seconds, just a few seconds.

 9      Repeat the question, please.

10              Q      No problem at all.

11                     When your attention was drawn to

12      Georgia, were there other counties in Georgia that

13      were of interest other than Coffee County?

14              A      Yes.

15              Q      And what counties were those?

16              A      Liberty County was the -- was the

17      primary one.  I had done some looking at the, you

18      know, publicly available results from Georgia,

19      and -- so yes.

20              Q      Any other counties?

21              A      I had a list of counties, I believe.

22      I don't remember which other ones were on the list
```

Page 39

1      except for maybe Dougherty, I believe is one of the

2      counties there.  And I mention that because in --

3      in finding my notes, I noticed a note that said

4      Dougherty.

5              Q    Okay.

6              A    So I think I did call someone in

7      Dougherty.  I didn't go there, but I did ask about

8      it.

9              Q    Was there some --

10             A    There -- there was one other one, and

11     that was Ware County.

12             Q    Ware County.  Okay.

13                  Now, when --

14             A    Oh, and -- at that time, yes.

15             Q    So Mr. Logan testified that the group

16     had undertaken some effort to locate a county that

17     would give access to the group to their election

18     equipment.  Are you familiar with that effort?

19             A    I --

20                  MR. CLEMENTS:  Don't speculate.  If

21     you don't know --

22                  THE WITNESS:  I don't know.

```
 1        BY MR. BROWN:
 2              Q      Did you -- did you contact any county
 3        and ask them whether they would make their election
 4        equipment available for inspection or testing?
 5              A      I did not.
 6              Q      But your understanding is that other
 7        people did with your organization, correct?
 8                    MR. CLEMENTS:  Objection.  Form.
 9        BY MR. BROWN:
10              Q      Go ahead.
11                    MR. CLEMENTS:  If you can answer.
12                    THE WITNESS:  Please repeat the
13        question.
14        BY MR. BROWN:
15              Q      Was it your understanding that other
16        people in the group had undertaken to make
17        inquiries of other counties in Georgia to determine
18        whether they would grant access to the group?
19                    MR. CLEMENTS:  Objection to form.  We
20        have some ambiguity as to what constitutes "group."
21        BY MR. BROWN:
22              Q      Anyone in the group -- the group
```

Page 41

1      would be anyone associated with Jim Penrose.

2                     MR. CLEMENTS:  Don't speculate.

3                     THE WITNESS:  I don't know.  I was in

4      contact directly with Jim and essentially no one

5      else about that stuff.

6      BY MR. BROWN:

7           Q     So you do not have any personal

8      knowledge of any efforts undertaken to obtain

9      authorization to inspect or have access to election

10     equipment in Georgia other than Coffee County,

11     correct?

12          A     So I'm thinking --

13                    MR. CLEMENTS:  Don't speculate.

14                    THE WITNESS:  I -- I'm not -- I don't

15     know.  I -- I can't speculate, but I don't believe

16     so.

17     BY MR. BROWN:

18          Q     Okay.  Now, you -- your attorney is

19     correct that we don't want you to speculate, but

20     you are obligated to tell the whole truth, of

21     course.

22          A     Right.

Page 42

```
 1              Q    And so if you do remember something,
 2       please be fair about your response so that we can
 3       get accurate testimony.  Fair enough?
 4              A    I -- fair enough.  I want to do that,
 5       too.
 6              Q    Okay.
 7              A    I do want to be accurate.  I don't
 8       want to speculate.  If I don't recall, I'll tell
 9       you I don't recall.  And I'm not making it up.
10              Q    Fair enough.
11                   Now, when did you first learn that
12       you might be going to Coffee County?
13              A    I think it was just before we went.
14       So mid-January would have been the time.
15              Q    And what was your understanding of
16       that time of the purpose of going to Coffee County?
17              A    The purpose was at that point the
18       runoff had occurred and another major anomaly
19       occurred in Coffee County that was reported by
20       the --
21                   (Witness froze.)
22                   THE WITNESS:  -- and the pieces
```

Page 43

1      there, we understood --

2      BY MR. BROWN:

3          Q    Let me -- let me interrupt you.  We

4      lost you there for a second.  And let me try to go

5      back so we can give you a chance to get on the

6      record.

7                  MR. BROWN:  He's still frozen.

8                  MR. CLEMENTS:  Do you still have us?

9                  MR. BROWN:  No, we lost you there.

10     I'm not --

11              (Discussion had off the record.)

12                  THE WITNESS:  I can switch to another

13     network if you -- if you want to go off the record.

14                  MR. BROWN:  Let's go off the record

15     for a second.  Thank you.  I appreciate it.

16                  VIDEOGRAPHER:  Going off the record.

17     The time is 10:49 a.m.

18              (Recess from 10:49 a.m. to 10:54 a.m.)

19                  VIDEOGRAPHER:  Going back on the

20     record.  The time is 10:54 a.m.

21                  MR. BROWN:  And then, Felicia, what

22     was the last question and answer that you actually

1      got?

2                    (The reporter read as requested.)

3                         THE WITNESS:  I will pick up there.

4      BY MR. BROWN:

5              Q     Yes, sir, please.

6              A     Okay.  So yeah.  So the runoff had

7      occurred, we got notice, Penrose did, that another

8      major anomaly had occurred during the runoff in

9      Coffee County.  And that in particular was that it

10     appeared that the machine, the ImageCast Central,

11     which is the high-speed scanner which is hooked to

12     the Election Management System via a bridge had

13     been remotely reconfigured by Dominion apparently.

14     So that was the concern, is that, geewillikers, how

15     is this thing being communicated.

16                    And the concern about it is, of

17     course, not just the machine seem to be

18     reconfigured to make it work, but also it was

19     connected to the EMS, so if there was any way to

20     reach that machine remotely, then you could reach

21     the EMS also.  And so that was a major concern that

22     was felt needed to be investigated to try to find

1      out what actually occurred there and whether or not

2      there were any remote communications going on.

3          Q     And did you -- I believe with respect

4      to the remote communications, at some point you

5      discovered that the ICC motherboard had both a

6      Wi-Fi and a Bluetooth chip on it.  Is that correct?

7          A     Yeah.  Let me clarify that.  So the

8      ICC is made up of two components, an off-the-shelf

9      optical high-speed scanner from Canon, or there's

10     another brand or two that they use as well, but the

11     one in Coffee was Canon.

12              And then this is a Dell computer.

13     And all -- the optical scans, all of the processing

14     of those scans and tallying and so on, interpreting

15     is done, on the Dell computer.  I got the model of

16     that Dell computer, I looked it up, and that model

17     by default has a Wi-Fi and a Bluetooth built into

18     the motherboard.  So I got that off of the

19     specification sheet from Dell.

20          Q     And so you can't purchase that laptop

21     without Bluetooth and Wi-Fi?

22          A     I don't know.

Page 46

1          Q      Did you ask?

2          A      I did not ask Dell.

3          Q      Did you physically inspect that

4     computer to determine the contents of the

5     motherboard?

6          A      No, I did not.

7          Q      And so if the evidence were that the

8     Dell computers that are used in Georgia do not have

9     the Wi-Fi or Bluetooth chip on the motherboard, you

10    would have no basis to refute that, correct?

11         A      If -- that's correct, if they had

12    been removed.

13         Q      Or not ordered in the first place,

14    right?

15         A      I don't believe that is an option.

16         Q      Okay.  And --

17         A      I don't believe those were optional,

18    that those were standard features on that

19    motherboard.

20         Q      The default features, correct?

21         A      They were standard features according

22    to the specifications, as I remember it.

1          Q      Okay.

2          A      They were standard features.  They're

3     not optional features.

4          Q      And let's go back.  We were -- we got

5     off on this rabbit trail in response to my question

6     about the purpose of going to Coffee County.  And

7     you mentioned by that time there -- there had been

8     another major anomaly.  And I'll get back to that.

9                 But what was the -- I understand the

10    conditions that you were hearing, but what was the

11    purpose of your visit?  What were you going to do?

12         A      The purpose was to see via testing

13    Ms. Hampton doing the testing, but being able to

14    see if that issue could be recreated that they saw,

15    where the machine was working very, very poorly

16    until Dominion was contacted, and 30 minutes later,

17    this is after hours of having problems with that

18    machine not being able to get anywhere essentially

19    or -- or very, very slow going, and Dominion came

20    in and said, "Try one more time."

21                This is all secondhand from Misty, by

22    the way.  I was not there for the runoff.  So

Page 48

 1      everything I know about this was given to me from

 2      Ms. Hampton.  So as you know, a third party may not

 3      get all of the details exactly in memory correctly.

 4               But if my memory serves me correctly,

 5      she said that they had tried and tried, they

 6      cleaned, they cleaned, they did all kinds of stuff,

 7      it wasn't going to work, it wasn't working.  And

 8      that eventually I believe one of the board members

 9      called the Dominion folks or -- or somehow got them

10      on the line and -- and said, "Hey, you need to fix

11      this thing."  And 30 minutes later, supposedly

12      without any physical access directly to the ICC

13      computer, the machine began to work perfectly.

14               And so when I arrived there, that was

15      one of the major things was to see if the machine

16      was still working perfectly via testing and whether

17      or not there was any way to potentially reconfigure

18      it, have Ms. Hampton reconfigure it to get it back

19      into a misbehaving state.  And that might prove

20      that at least there was a vulnerability concern

21      with the machine, that it can be put into states

22      that make it inoperable.

Page 49

```
 1            Q     Was your purpose in going to Georgia
 2      to -- to verify the results of the 2020 election?
 3            A     No.
 4            Q     Was it to refute or to show that the
 5      results of the 2020 election, as reported by
 6      Georgia, were incorrect?
 7            A     Not at all.
 8            Q     Did you ever determine that the
 9      results in the 2020 election in Georgia were
10      incorrect?
11            A     Partially.  I didn't determine that
12      the overall results were incorrect, but the data
13      that I got from Liberty County suggests that there
14      was an anomaly there in the vote count that should
15      have been investigated.
16            Q     And what was the Liberty County
17      anomaly?
18            A     It appears from the data that I
19      received through an information records request to
20      the election supervisor there, they provided all of
21      their batch sheets.  It was from their recount --
22      from the manual recount that occurred, so they --
```

1      they provided the paper tapes the actual election.

2      This is in the exhibits, by the way.  All of this

3      was turned over to you.

4                   So in the exhibits there is the paper

5      tapes from the election, there are the EMS server

6      summary that the election supervisor printed out

7      for me, as well as another detailed record from the

8      EMS that she printed out, and then the batch

9      sheets.

10                  So there were all the batch sheets

11     from the manual recount that was done statewide.

12     And when you compare those, it appears that --

13     appears because, you know, I never went back there

14     to try to dig in and confirm it, but it appears

15     that the early voting tabulators, of the four of

16     them, one of them had 500 ballots out of, I

17     think -- I don't remember the exact number, but it

18     is in my Otero briefing, the one slide in there

19     related to Liberty County is in there.

20                  I turned that over, if you find that

21     exhibit that says Otero.  And one of the tabulators

22     had 500 missing ballots, if you will -- excuse me

Page 51

1    500 missing votes so -- and then another one had

2    1,500 -- of the early voting machines had 1,500

3    extra votes above the number of ballots that were

4    hand tallied according to the batch sheets that I

5    received from the county.

6         Q    Were you -- but you were never able

7    to sufficiently verify one way or the other whether

8    the results in Liberty County were correct or

9    incorrect?

10        A    That's correct, I was never able to

11   do that.  I was on to other anomalies that I was

12   looking at, yeah.

13        Q    Okay.  So you mentioned -- you

14   mentioned Coffee County in response to my question

15   of whether you were able to determine if the

16   results in the 2020 election were correct or

17   incorrect.

18             Was there any other instance in which

19   you found that with further investigation there

20   might be a problem with the counting of the votes?

21        A    I'm sorry, I'm thinking.  Are you

22   saying something that I specifically found or that

1      other people were concerned about?

2             Q      That you found.

3             A      That I found.  No.  In Georgia, no,

4      nothing else.

5             Q      In Coffee County, you didn't find any

6      evidence that the votes were miscounted in Coffee

7      County, did you?

8             A      That's correct.

9             Q      Did you ever report nationally or on

10     any sort of blog or anything that you had been to

11     Georgia, that you looked at it, that you're an

12     expert, and that you have these qualifications.

13     And based upon what you --

14                   MR. CLEMENTS:  Objection to the form

15     of the question.  There are several questions

16     there.  Maybe take each one in turn, please.  It's

17     compound.

18     BY MR. BROWN:

19            Q      Did you ever report to anyone that

20     based upon your review, the results out of Coffee

21     County appeared to be correct?

22                   MR. CLEMENTS:  Make sure you

1    understand the question.

2              THE WITNESS:  Correct or incorrect?

3    BY MR. BROWN:

4         Q    Correct.

5         A    I don't believe I did.

6              You're talking about the vote tally?

7         Q    Yes.

8         A    Okay.  I don't believe I reported

9    either that it was correct or incorrect.  That was

10   not my purpose for being there.

11        Q    Okay.  So other than -- not that this

12   was insufficient, but other than investigating the

13   anomaly relating to Dominion changing, or

14   apparently changing, the configurations remotely on

15   the ICC scanner, were there any other anomalies

16   related to Coffee County that you were -- that you

17   went there to investigate?

18        A    Yes.  And so the ICPs, which are the

19   slow-speed tabulators used at the precincts that

20   scan the QR codes, QR-coded ballots, you know,

21   they're made by the ballot-marketing devices, the

22   ICXs that are used in Georgia, the concern there

Page 54

1      was also whether or not those were having any

2      issues.

3                      And at that point in time, the ASOG

4      report from Antrim had already come out, which had

5      reported from the system log files that there was a

6      very anomalous number of reversals of ballots as

7      high as 86 percent in one of the townships in

8      Antrim.  And I later on determined that the average

9      in Antrim was about 30 percent, reversals of the

10     ballots, which is totally unacceptable from the

11     standards that are published nationally, way beyond

12     the standard, which is 1 in 500.

13             Q     And by reversal, you don't really

14     mean reversal, you mean more like ejectment or

15     rejection, correct?

16             A     What I mean is reversal in the sense

17     that is the term that is used in the log file.  It

18     says the ballot has been reversed.  And what it

19     means is a physical reversal of the ballots.  So

20     the ballot goes in, it's scanned, it's actually

21     interpreted, because the point of that feature --

22     the -- the valid point for that feature is that it

1        can detect, for example, if there is an overlook.

2                        If someone voted twice in a contest

3        where you can only vote once and it will then pop

4        up on the screen a message typically that says,

5        "Hey, there's an overvote, do you want to cast this

6        ballot any way or do you want to reject it?"  And

7        if you reject it, it reverses it, and then you take

8        it over to the election official, the ballot is

9        spoiled, the voter is given a new ballot, and --

10       and they revote and the original ballot is

11       destroyed.

12                       However, with these reversals -- and

13       that's what they're called in the log files -- what

14       happens is it comes out, but everybody across the

15       country that's now -- I found out this over time.

16       I did not know because I was just learning these

17       systems in Coffee County when I got there, but

18       everybody has learned to just put it in the second

19       time.

20                       And they put it in a second time and

21       it might take it, it often takes it the second

22       time.  Or put it in a third time if it rejects it

1      twice and it will take it the third time, with no

2      apparent reason for rejecting it the first time.

3      So it rejects it, you put it in.  And that is

4      totally -- as an engineer, that's totally

5      unacceptable.

6                 If the ballot is rejected the first

7      time, it should tell me why.  And if it's rejected

8      for some reason, it shouldn't reject it the second

9      time, the third time, every time it should reject

10     it.  It's very unacceptable to have a machine that

11     will reject it and then take it on the second or

12     the third try.

13                And, yet, that's happening all over

14     the country.  In Coffee County, it appeared to

15     be -- in our testing, it appeared to be around

16     15 percent of the ballots were being reversed on

17     the ICPs, not the ICC, but the slow-speed

18     tabulator, that they were reversing around

19     15 percent.

20                And they were reversing a ratio of, I

21     believe, it was six to one or seven to one for

22     Trump.  So not only were they reversing, but they

Page 57

1          were reversing preferentially for one candidate

2          over the other.

3                       And, in addition, keep in mind that

4          these were QR-coded ballots, so it wasn't a matter

5          of interpreting the name of the candidate, it was

6          in the QR code that it was reading.  And for some

7          reason, which is quite suspicious, it was reversing

8          one candidate far more than the other candidate.

9          That's a problem.

10              Q     I'm going to come back to your

11          findings in -- in a second.  But just so we get

12          this in the record right here, what you're

13          describing is not what was happening in the

14          election, but what was happening when you were

15          testing it with Misty Hampton, correct?

16              A     I'm not positive.

17                       MR. CLEMENTS:  Don't speculate.

18          BY MR. BROWN:

19              Q     What you're describing is what was --

20          what was happening with your testing, not with the

21          actual election, correct?

22                       MR. CLEMENTS:  If you don't know,

Page 58

1      don't answer, if you don't know.

2                  THE WITNESS:  I -- I don't know.

3      BY MR. BROWN:

4           Q     So you -- well, you don't know

5      anything or you don't know what you were testing

6      with Misty Hampton or --

7           A     Please -- please repeat the question.

8           Q     Okay.  You were describing --

9           A     Please --

10          Q     You were describing a phenomena in

11     which the ICP was rejecting with too great a

12     frequency ballots.  Are you with me?

13          A     Yes.

14          Q     And that phenomena was based upon

15     your observations of your testing, correct?

16          A     Correct.

17          Q     It was not based upon your

18     observation of the actual election, correct?

19          A     Correct.

20          Q     And in the actual election, Coffee

21     County, after everybody had scanned their ballots

22     and had them rejected or not, and after they were

Page 59

1      tabulated, Coffee County did a hand recount of

2      those same ballots, correct?

3              A      Yes.  They -- I think -- the --

4      you're talking about the original election, the

5      November 3rd election?

6              Q      That's right.

7              A      Yes.  Uh-huh.

8              Q      And in the hand recount, what was the

9      difference between the votes for Trump in the hand

10     recount and the original election results?

11             A      I -- I don't know the exact number.

12     There was a difference, but I don't know the exact

13     number.

14             Q      Isn't it true that it was exactly the

15     same?

16             A      No, that's not true.

17             Q      What about the votes for -- for

18     Biden, were they the same?

19             A      I don't know for certain.  I do know

20     that the results were different during the -- now

21     you are talking about -- excuse me.  I'm confused,

22     the hand recount or the machine recount?

Page 60

1          Q     I'm talking about the hand recount.

2          A     Okay.  The machine recount I was

3     answering.  I'm sorry.  I stand corrected.  There

4     was a difference there.

5                The hand recount, I do not know.

6          Q     Isn't it true --

7          A     I didn't do that.

8          Q     Isn't it true that in the hand

9     recount, the results were the same except for a

10    one-vote difference with the third-party candidate?

11                MR. CLEMENTS:  He already answered

12    the question.

13                THE WITNESS:  I don't know.

14    BY MR. BROWN:

15          Q     Okay.  So you don't -- if that were

16    true, if, in fact, the hand recount confirmed the

17    results of the original election, then the anomaly

18    that you later saw in testing did not have an

19    impact upon the results in the Coffee County

20    election?

21          A     I don't believe you can reach that

22    conclusion from what you just said.

1          Q     Why not?

2          A     Because it doesn't follow logically.

3     It -- it -- the testing that showed the reversing

4     very well may have been occurring during the

5     election.  The reversals may have been occurring.

6          Q     I didn't ask that.  I wasn't asking

7     about the reversals --

8          A     Uh-huh.

9          Q     -- I was asking about the results.

10         A     Okay.  Rephrase the question, please,

11    or ask it again.

12         Q     Okay.  The phenomena that you

13    described based upon your testing apparently did

14    not have a -- did not have an impact upon the

15    actual tally of the votes in the election?

16              MR. CLEMENTS:  Objection to

17    foundation.

18              THE WITNESS:  Yeah, I can't answer

19    the question because I didn't check it.  I don't

20    know.  I did not check that specific thing, so I do

21    not know the answer to the question.

22

Page 62

1      BY MR. BROWN:

2           Q    Well, I believe you say so in your

3      material that the best way to determine the vote is

4      to do a hand count of the vote, correct?

5           A    That is the best way, yes.

6                If you would like, I can speak to

7      that briefly, the hand recount.  What I can say is

8      that I'm aware -- I was told that the batch sheets

9      were all on the Secretary of State website, that

10     anybody could go verify it themselves.

11               So, in fact, when I showed up at

12     Liberty County and I asked for those, they said,

13     "Just get them off the Secretary of State's

14     website."

15               And I said, "I've already tried.

16     There are 29 on the website."

17               They said, "Well, that's odd, we gave

18     them all to the Secretary of State.  There's

19     250-some of them."  Some number like that.  Only 29

20     were on the website.

21               So -- and others that I have seen

22     reporting on showed that it actually did go through

Page 63

1    all of the batch sheets that were available on the

2    Secretary of State website found that 25 percent of

3    the batch sheets were missing, 25 percent added up

4    to nearly a million votes were missing.  So I would

5    say that the recount was totally unverifiable.

6         Q     Right, and your -- I want to stick

7    with your personal knowledge.

8         A     The hand recount.

9               What's that?

10        Q     I want to stick with what you know

11   rather than what you've read.

12        A     Okay.  What I know is in Liberty

13   County, there were 29 of the sheets available on

14   the Secretary of State website.  I got two hundred

15   and some from the Liberty County election

16   supervisor via records request.  I looked at their

17   numbers and they did not seem to add up.  The --

18   the batch sheets from the State did not -- it did

19   not add up correctly in Liberty County.  It did not

20   come out to the correct number of votes.

21        Q     But other than Liberty County and

22   Coffee County, did you have any personal knowledge

Page 64

1          of anomalies in Georgia relating to the election,

2          the 2020 election?

3                    A      No.

4                    Q      Okay.  Getting back to my question --

5                    A      Oh, excuse me.  Excuse me.  Yes,

6          there's one.  I'm sorry.  I forgot about Ware

7          County.  I had made -- I had made a call -- go

8          ahead, yes.

9                    Q      What was the issue in Ware?  Thank

10         you.

11                   A      Yeah.  It had been reported that

12         during the machine recount, not the manual recount,

13         but the machine recount, that there was an anomaly

14         in Ware County.  And that anomaly was that there

15         was 37 votes less for Trump and 37 votes more for

16         Biden in that county in the manual recount.

17                          I was given the phone number for the

18         election supervisor for Ware County.  Very nice

19         gentleman.  I called him up, and we just talked on

20         the phone.  And I asked him about it and asked him

21         about the -- what had happened.

22                          And so he explained that they had

Page 65

1       been doing all the recount on a high-speed scanner,

2       ICC, and that they had a jam that occurred where it

3       stopped, kind of like Misty's, which went on and on

4       and on, but -- but theirs was just a one-time or a

5       two-time thing during the entire recount.

6                   And because the Dominion Systems that

7       year were new, he said, to the State, they did not

8       properly reset the ICC when they put the ballots

9       back through.  When they -- when it -- when it

10      stops, you have to take the ballot stack, redo it,

11      and put it back in.  And you have to do it in a

12      very specific way so it's accurate.  And you have

13      to reset the machine.

14                  So apparently they were supposed to

15      reset it to where it would start over and they

16      didn't reset it.  And so it ended up counting more

17      than -- they were doing 100 batch -- 100 ballot

18      batches.  And it ended up counting more than 100

19      ballots.

20                  And so that got my interest because I

21      had theorized the way you might pass on LAT, a

22      logic and accuracy test, is to have a trigger

1        level, a certain number of ballots built into the

2        machine.  And if you exceed that level, then the

3        subversion would take place.  And if you did not

4        exceed that level, then it would work perfectly.

5                       And in most states -- and I believe

6        this is true in Georgia -- the test ballots and the

7        number of test ballots are dictated by the voting

8        machine company created by them sent to the

9        counties.  And I know that's true in New Mexico.

10       And they run exactly that for the LAT testing.

11                      And so in Ware County, I was

12       concerned that possibly what had occurred was that

13       they hit a trigger level and that it actually

14       shifted votes within the machine, or it potentially

15       could have been a subversion that shifted votes in

16       the machine.  Because it would be pretty odd that

17       it was exactly 37 votes from one candidate given to

18       the other candidate.  And that the trigger -- they

19       may have met a trigger level by accidentally doing

20       more than 100 ballots at a time.

21                      Interestingly, in Maricopa the number

22       was 200 ballots at a time for the early voting

Page 67

1          machines, whereas, in Georgia, they were all

2          instructed to run 100 ballots at a time.

3                 Q     You said the subversion level.  And

4          that is some sort of malware that's triggered upon

5          the event of the scanners -- the group being

6          greater than 100 or greater than 200?

7                 A     That's what I'm theorizing, is -- is,

8          as a vulnerability expert, that would be something

9          that a bad actor could do, is get it into the

10         firmware.  Because you have to pass the logic and

11         accuracy test, right?  So if -- if the number of

12         ballots in the test was 40, and you have it set to

13         trigger at 50, you can run LAT tests all day long

14         and they'll run perfectly, the machine will run

15         perfectly, and so it will not trigger the

16         subversion until you run above the trigger level.

17                Q     Were you able to determine one way or

18         the other whether in Ware County had been

19         victimized by some sort of malware?

20                A     I was not able to.  I -- I did not go

21         there.  I was not able to pursue it further.

22                Q     Okay.  Any other counties other than

Page 68

1          Coffee, Liberty, and Ware?

2                   A     What's the question?

3                   Q     Oh, I'm sorry.  Good question to

4          make.

5                         Other than Liberty County, Coffee

6          County, and Ware County, were there other counties

7          in Georgia that you observed have a reason to

8          believe the counting of the votes was incorrect?

9                   A     Let's see, the form of your question

10         is odd.  I wasn't there trying to determine if the

11         vote count was incorrect in any of the elections in

12         Georgia.  I was looking at the anomalies trying to

13         determine if those anomalies were machine related

14         or not.  I was not there trying to determine if any

15         vote count was correct or not.

16                        Does that help you with your

17         question?

18                  Q     It does.

19                        Were there other counties that you

20         investigated with respect to the anomalies in the

21         machines?

22                  A     There is one other county that I --

 1          in my notes I found.  I mentioned earlier that I

 2          had called Dougherty County.  And I have one sheet

 3          where they gave me some information about how many

 4          tabulators they have and how many voters were

 5          casted, how many voters, that kind of stuff.  It

 6          appears to be on that sheet.

 7                    In addition, Pierce County was one

 8          that Ms. Hampton knew the election supervisor in

 9          Pierce County, said that she had some concerns.  So

10          I ended up speaking with her and visiting with her.

11          And submitting records request to her, which is in

12          the exhibits that I provided to you, was Pierce

13          County.

14                    And her -- her main concern was that

15          the -- the number of absentee ballots in -- was

16          extremely high, of course due to COVID, so it was

17          naturally high because of COVID, but it's -- the

18          way she explained it -- and, again, it's just my

19          recollection of it.  But she said, "Look, you know,

20          we're a small county.  We pretty much know who our

21          people are here."  And she just felt like it felt

22          odd that there was maybe a lot of voting going on

1    of people that she didn't know who they were or had

2    never, you know, recognized names and stuff before.

3                I don't know.  It was just a concern

4    she had about what she felt was an abnormal number

5    of absentee votes.  And, of course, those all get

6    counted typically on the high-speed scanners, on

7    the ICCs, which is what we were looking at in

8    Coffee County, the potential anomalies on those.

9         Q    Were you able to follow up on that

10   concern with respect to Pierce County?

11        A    No.  They never produced results to

12   that records request that I -- I believe I sent to

13   them.

14        Q    How about Dougherty County, other

15   than that conversation with the elections director

16   there, were you able to pursue that at all?

17        A    I did not.

18        Q    Okay.  Any other counties other than

19   Pierce, Dougherty, Ware, Liberty, and Coffee?

20        A    Not that I recollect.

21        Q    Okay.  Going back up to Coffee

22   County -- I have got to keep my place in my

Page 71

```
 1      notebook here, but you identified two anomalies.
 2      One was the remote with Dominion, the other was
 3      the, what you called, reversals, or rejection, rate
 4      relating to the ICPs.  Were there any other
 5      anomalies with respect to the machines that you
 6      investigated in Coffee County?
 7           A      Not that I recollect.
 8           Q      Did you investigate anything relating
 9      to the poll pads?
10           A      Ms. Hampton -- while I was there,
11      keep in mind, this was the first time I had seen
12      this, you know, current generation of voting
13      machines, other than me voting at my voting
14      location in New Mexico, so I was learning as much
15      as I could.  And she was very helpful in
16      explaining, you know, basic voting systems, Georgia
17      election law.  She was quite knowledgeable about
18      Georgia election law.  And also about her voting
19      machines.  She -- she runs herself.  She knows the
20      whole thing.
21                  And so the pollbooks, they actually
22      showed me the pollbooks.  I believe they actually
```

Page 72

1    demonstrated to me the pollbook.  But other than

2    telling me how it worked, demonstrating it, they

3    showed me that -- or she showed me that it was

4    connected to the internet during its operation and

5    that they literally could go order Domino's Pizza

6    and have it delivered while it was connected to the

7    internet.

8         Q    Okay.  Let me shift gears a little

9    bit.

10        Did you know --

11        MR. CLEMENTS:  How much --

12   BY MR. BROWN:

13        Q    Do you know --

14        MR. CLEMENTS:  Bruce, if you're about

15   to shift gears, is there a way that we could maybe

16   take a quick restroom break?

17        MR. BROWN:  Absolutely.  Let's break

18   for ten minutes.  Thank you.  Thank you.

19        VIDEOGRAPHER:  Going off the record.

20   The time is 11:28 a.m.

21        (Recess from 11:28 a.m. to 11:42 a.m.)

22        VIDEOGRAPHER:  Going on the record.

Page 73

1           The time is 11:42 a.m.

2                       MR. BROWN:  I would like to go back

3           on the record and mark as Exhibit 3, Tab 3.

4                       (Lenberg Deposition Exhibit Number 3

5                        marked for identification.)

6           BY MR. BROWN:

7                   Q    If you all could pull that up.

8                       MR. CLEMENTS:  Bruce, I have got an

9           Exhibit 1, Tab 1, and I've got an Exhibit 2, Tab 2.

10          I'm not seeing an exhibit -- is it 3?

11                      MR. BROWN:  3.

12                      THE WITNESS:  Yeah.

13          BY MR. BROWN:

14                  Q    Well, while that gets uploaded, let

15          me go ahead and ask you some questions that -- that

16          are not depended upon that.

17                      MR. BROWN:  And then, Jenna, if you

18          could pull that up, that would be great, or

19          Marilyn.

20                      MS. CONAWAY:  It's up.  Could you

21          refresh --

22                      MR. CLEMENTS:  There was a folder for

Page 74

1      marked exhibits.  I clicked on that and see it.

2                      MR. BROWN:  Okay.  Thank you.

3      BY MR. BROWN:

4              Q     Okay.  If you would look at

5      Exhibit 3.

6                      MR. BROWN:  For the record, Exhibit 3

7      is a document that was produced by Doug Logan,

8      which he represented to be a capture of his Signal

9      messages.

10     BY MR. BROWN:

11             Q     And do you see that there,

12     Mr. Lenberg?

13             A     Yes, I do.

14             Q     And you communicated with Mr. Logan

15     via Signal, correct?

16             A     Yes.

17             Q     And at some point -- I believe you

18     testified at some point in mid-January you were

19     deployed to Coffee County, correct?

20             A     Yeah.  I see a date of January 17th,

21     and that would be correct.  That would be the time

22     we went there, Doug and I.  Jim, you know --

Page 75

1           basically, I went down at Jim's suggestion, and

2           agreement with me to do that.  And then he

3           contacted Doug to see if he could come up and work

4           with me on -- on it.

5                   Q     Had you worked with Mr. Logan before?

6                   A     I had met Mr. Logan in Washington,

7           D.C.

8                   Q     And what was the occasion for meeting

9           him in Washington, D.C.?

10                  A     I -- I don't remember a specific

11          reason.  I was with Jim Penrose and -- and was at a

12          meeting of some of these tech people.  I actually

13          only attended one of those meetings.  Doug was at

14          that meeting, and so basically I met Doug there,

15          but I did not work with Doug at that time.  I had

16          not done any work with him until I went to Georgia.

17                  Q     Okay.  And so in D.C., you met with

18          Penrose once, I believe, by yourself, just the two

19          of you.  Is that right?

20                  A     The first time, yeah.

21                  Q     And then another time you had a

22          meeting with tech people.  Is that right?

Page 76

```
 1              A     Yes.  I was in a meeting that had a

 2        group of tech people.  I could not name them all.

 3              Q     Can you name some of them?

 4              Well, Mr. Logan.  Who else?

 5              A     I can't remember all of the people

 6        that were there.

 7              Q     Was Ben Cotton there?

 8              A     I'm quite certain -- I -- I didn't

 9        meet Ben until Michigan --

10              Q     So quite certain --

11              A     -- which was after Georgia, so I'm

12        certain Ben was not there.

13              Q     And how about Russ Ramsland?

14              A     I'm thinking.  Again, I -- I don't

15        know everybody.  I was new to the group, so I'm not

16        even sure I knew everybody at the time.  I was just

17        learning, but I don't recollect Russ Ramsland being

18        there.

19              Q     How about -- was Penrose in that

20        meeting as well?

21              A     Yes.  Yeah.  He's the one who brought

22        me to the meeting, yes.
```

1          Q     Were any attorneys there?

2          A     Not that I know of.  Again, I didn't

3    know everybody in the room, so I can't tell you for

4    sure.

5          Q     Was Mike Flynn there?

6          A     I believe he was.

7          Q     Was Sidney Powell?

8          A     I don't believe she was.  Those two I

9    knew who they were from the media.

10         Q     How about Stephanie Lambert?

11         A     She was not there to my recollection.

12    I did not meet Stephanie until later, much later.

13         Q     What about Charles Bundren?

14         A     I still don't know who Charles

15    Bundren is.

16         Q     How about Todd Sanders?

17         A     I -- I don't know for sure.

18         Q     You might have --

19         A     I knew -- what's that?

20         Q     He might have been there, you just

21    don't recall?

22         A     He might have been there.  I -- I

1        cannot say for sure.

2                Q     How about Mike Lynch?

3                A     He was not there.  I did not meet him

4        until much later.

5                Q     How about Patrick Burn?

6                A     I believe he was there.

7                Q     Conan Hayes?

8                A     I believe he was there.

9                Q     Cathy Latham?

10               A     I have never met Cathy Latham.

11               Q     Was anybody there from Georgia?

12               A     I wouldn't know because I didn't know

13       everybody in the room.

14               Q     Not that you know --

15               A     No one that I knew --

16               Q     Okay.

17               A     -- at that point in time or

18       afterwards.

19               Q     And what was the -- what was the --

20       was Steven Bannon there?

21               A     No.

22               Q     Was anybody associated with the Trump

Page 79

1        Campaign there?

2              A     Not that I know of.  Again, I don't

3        know everybody that was in the room, but to my

4        knowledge -- the ones that were public figures,

5        I -- I didn't -- I didn't notice or recognize any

6        of them in the room.

7              Q     And about what date was this in

8        December, do you know --

9              A     I couldn't --

10             Q     -- or can you say?

11             A     I'm pretty sure it was December, but

12       I cannot tell you the date.

13             Q     Okay.

14             A     I don't know.

15             Q     Do you remember the -- do you

16       remember anybody that I haven't mentioned?

17             A     No.

18             Q     And where physically was the meeting?

19             A     It was in Washington, D.C.

20             Q     Was it in the Mayflower Hotel?

21             A     It was not.

22             Q     Do you recall where it was?

Page 80

```
 1              A     It was in a building that I was taken
 2         to, and I do, even now, not know what the address
 3         is of that building.
 4              Q     Was it like the United States Post
 5         Office?  Was it the east wing of the --
 6              A     No.  No.
 7              Q     Okay.  You don't know the
 8         organization that it was associated with, the
 9         building?
10              A     No, I don't recollect.
11              Q     Now, was anybody -- was it a
12         government building?
13              A     Not that I know of.
14              Q     Was anybody associated with the
15         President there, meaning the executive branch?
16              A     No one that I know of.  Again, I --
17         I -- keep in mind, I was -- I'm not political.  I
18         don't sit and watch the stuff.  I -- I -- I don't
19         campaign for any political parties, and so I was
20         not aware of who was who.  Literally, I was meeting
21         people for the first time, all of those people.
22         So -- but the big names that were in the press at
```

Page 81

1         the time, no, none of those were there that --
2         that --
3                  Q      Well, Flynn and Burn were there,
4         right?
5                  A      Other than -- other than the two that
6         I mentioned, there were none others there that I
7         know of.
8                  Q      And what was discussed in that
9         meeting?
10                 A      Various anomalies in different
11        places, and, you know, what was being looked at in
12        different places.
13                 Q      And what was the, for lack of a
14        better expression, sort of the purpose of the
15        meeting to do?
16                        To just talk about it or to do
17        something about it?
18                 A      I -- I can't answer that question.  I
19        didn't call the meeting.  I didn't run the meeting,
20        so I'm not sure what all the objectives were of the
21        meeting.
22                 Q      Who called it?

Page 82

1          A     I don't know.  Jim Penrose said,

2     "Hey, I'm taking you to this meeting."

3          Q     Okay.  And did you --

4          A     So --

5          Q     Did you fly in for that meeting or

6     were you already there?

7          A     I was already in the vicinity, yeah.

8          Q     And was there an agenda?  Talking

9     points?  Anything like that?

10          A     Not at all.  It was very impromptu.

11     I -- it was nothing like that.  It was not

12     organized at all.

13          Q     Was there anything resolved about

14     what would happen as a result of that meeting?

15               Any instructions or anything like

16     that?

17          A     Nothing that I recollect.  It -- it

18     seemed to me to be more status about, you know,

19     what anomalies were being found at different places

20     and what affidavits people were finding, or

21     whatever.  And to be honest, I wasn't tracking on

22     any of the affidavit stuff.  I was looking at

1      machines, listening for any problems with machines

2      so that I could try to determine if they were real

3      or not and -- and to get to the truth.

4           Q      Were you aware that around that time

5      that a draft executive order was presented to the

6      President relating to Coffee County -- or that

7      mentioned Coffee County?

8           A      I was not aware at that time.

9           Q      And when did you become aware of

10     that?

11          A      More recently there's been some

12     videos out there and people talking about that sort

13     of thing, and that's when I became aware of some --

14     I think they mentioned some sort of executive order

15     that was drafted.  The first I heard about that was

16     in literally the last couple of months.  I believe

17     it was maybe even -- yeah, it was the last couple

18     of months.  It's been recent.  I -- I had no ideal

19     about an executive order.  Sorry.

20          Q      What was the discussion in that

21     meeting about what executive action might be taken

22     relating to the subject matter of the meeting?

Page 84

1                    MR. CLEMENTS:  Objection.

2        Foundation.

3        BY MR. BROWN:

4               Q     You need to answer.

5                    MR. CLEMENTS:  If you can.

6                    I don't think you've established a

7        foundation, Bruce.  We're a little confused.

8                    THE WITNESS:  Can you reword the

9        question maybe?

10       BY MR. BROWN:

11              Q     Yeah.

12                   What discussion, if any, was there in

13       that meeting which you attended was there relating

14       to any executive action that might be taken with

15       respect to the subject matter of the meeting?

16                   MR. CLEMENTS:  I want to be clear,

17       what do you mean by "executive"?  I think we need

18       to flesh that out, Bruce.

19       BY MR. BROWN:

20              Q     Well, are you -- you're familiar with

21       the three branches of government, right?

22                   MR. CLEMENTS:  I understand, but some

Page 85

1      people -- we have executives and that might be a --

2      you know, the order of a meeting, but when I hear

3      the word "executive," I'm trying to distinguish for

4      Mr. Lenberg what you mean.

5                    MR. BROWN:  It's actually a very good

6      objection.

7      BY MR. BROWN:

8          Q     I mean the executive branch, not like

9      the CEO objective.  I mean the executive branch.

10                   Was there any discussion about what

11     the executive branch might do with respect to the

12     elections?

13         A     So you mentioned the executive order

14     a minute ago.  So that's executive branch, right?

15     So --

16         Q     That's correct.

17         A     -- I was not aware, nor do I

18     recollect any discussion in that meeting about

19     anybody creating an executive order.  I -- I was --

20     I did not hear that.  I was not aware of that in --

21     in that meeting.

22         Q     Apart from creating the executive

Page 86

1          order, was there any discussion about any action

2          that might be taken by the executive department

3          relating to the elections?  The executive branch, I

4          should say.

5                    A    I can't recall the specific

6          discussion in that meeting.  I -- I -- you know,

7          I -- I would be speculating if I said something.  I

8          can't recall any specifics.

9                    Q    Was there any discussion about

10         seizing voting machines?

11                   A    Not that I recollect.

12                   Q    Was this meeting at the Willard

13         Hotel?

14                   A    No.

15                   Q    Was it -- and it wasn't a government

16         building?

17                   A    No.

18                   Q    Was -- was a man by the name of Bill

19         Ligon, L-I-G-O-N, there, if you know?

20                   A    I don't know that name.

21                   Q    Was Rudy Giuliani there?

22                   A    No.  I would have recognized him.

Page 87

1       No.

2               Q       How about Preston Haliburton?

3               A       I don't recognize that name.

4               Q       How about Peter Shara, S-H-A-R-A?

5               A       I don't recognize that name.

6               Q       How about Phil Waldron, was he there?

7               A       I don't know.

8               Q       He might have been?

9               A       Possibly, but I -- I can't say either

10      way.

11              Q       Okay.  And I think -- I don't

12      recall -- we started talking about this, but you

13      did not meet Mr. Logan there, correct?

14              A       I -- actually, I did meet Mr. Logan.

15      I believe he was at that meeting.

16              Q       Okay.  He was there.

17              A       I believe he was, but I can't say for

18      certain.  I'm sorry.  I did meet him in that time

19      frame through Jim Penrose.

20              Q       And then at some point you and

21      Mr. Logan were dispatched to Coffee County,

22      correct?

Page 88

1          A     Correct.

2          Q     And you flew to Coffee County, right?

3          A     Uh-huh.  Flew and drove.

4          Q     Okay.  Now, looking at Exhibit 3,

5    which is the Signal exhibit that we pulled up.

6          A     Uh-huh.

7          Q     Do you have that in front of you?

8          A     Uh-huh.

9          MR. CLEMENTS:  We have the -- there's

10   multiple pages, Bruce.  Are we on page 1?

11          MR. BROWN:  We are.

12          MR. CLEMENTS:  Okay.

13          THE WITNESS:  Yes.  Uh-huh.

14   BY MR. BROWN:

15          Q     And do you see your text message

16   right in the middle of page 1 where you say, "I am

17   now in Coffee County," right?

18          A     Uh-huh.  I do.  Yes, I do.

19          Q     If you go down one line, it's on

20   the -- also on the 17th.  You -- you say, "It will

21   be Monday evening.  She thinks that she can do it

22   then."  Do you see that?

Page 89

1          A     Yes, I do.

2          Q     And the "she" is -- is Misty Hampton?

3          A     I believe so.

4          Q     And what does the "it" refer to in

5     that sentence?

6          A     To be able to do some testing with

7     her machines at -- at -- you know, under her

8     control.  And obviously we were trying not to

9     impact her normal work schedule also.  She had

10    plenty of work to do, so we were trying to be

11    accommodating.

12         Q     Okay.  Let's skip to page 8 of

13    Exhibit 3.  Sadly, these messages are not in -- in

14    date order, they're in order of the thread name.

15    So we're going to have to skip around a little bit.

16         A     Uh-huh.  I see some 1/17/21.  What --

17    what particular message are you -- do you want us

18    to look at?

19         Q     Right in the middle of the page, you

20    will see a January 16, actually, a text -- Signal

21    message from you.  Do you see that?

22         A     Yes, I see that.

Page 90

1          Q     And you're saying, "I'm planning a

2     trip to met up with Misty in Coffee County.

3     Leaving tomorrow."  Do you see that?

4          A     I do, yeah.

5          Q     And then in the next line, Mr. Logan

6     says, "For your interest, she's in that group

7     you're riding in."

8          A     Uh-huh.

9          Q     Do you know what that refers to?

10         A     There was a Signal group that I -- I

11    don't know everybody that was on it, but at one

12    point in time there was a Signal group that Doug

13    and -- at least Doug and Misty and I were in, and I

14    don't know who else was.

15         Q     Okay.  So you -- so the record

16    reflects that the next day, on the 18th --

17         A     Uh-huh.

18         Q     -- you actually visited the Coffee

19    County Elections, correct?

20         A     I believe that's correct.

21         Q     And what is your understanding of the

22    authorization that you had to do what you were

1      doing in Coffee County?

2              A      Well, my understanding is that

3      Ms. Hampton was the election supervisor for the

4      county and that she had full authority -- as long

5      as she kept everything under her chain of custody,

6      that she had full authority to test her machines or

7      get consultants to come in to help her look at what

8      her machines were doing that she was concerned

9      about.

10             And so as I already mentioned, there

11     had been a couple of major anomalies raised and as

12     a result, she was interested in having expert

13     consultants, like Doug Logan and I, come in and

14     help see if we could figure out possibly what the

15     anomaly might have been about.

16             Q      So were you working for her or was

17     she your client, as it were?

18             A      I don't know how to answer that.

19     It -- it was a volunteer thing.  I did not -- you

20     know, they didn't pay me, no one paid me.  Okay?

21     So to be there, I was volunteering as an expert

22     trying to help, trying to learn at the same time

Page 92

1      about these systems and trying to understand so we

2      could figure out is there a real problem with the

3      machines or is there not.  That's what we were

4      trying to determine at the time.

5                    So it was my understanding that she

6      had full authority to be able to test her machines.

7      She runs logic and accuracy testing just like

8      everybody else does, so running an additional test

9      and allowing us to observe it did not seem to be

10     improper at all.

11          Q     Now, the -- I'm not suggesting that

12     this was necessary, but I just need to ask you.

13     You didn't have like a court order allowing you to

14     do this, did you?

15          A     There was no court order to do it.

16          Q     And were you doing this pursuant to

17     any kind of engagement with a lawyer?

18          A     I did not have any specific

19     engagement with a lawyer.

20          Q     It was your understanding, I take it,

21     that -- that Misty's authorization was sufficient

22     for you to have permission to enter the Coffee

1        County Election's Office and work with her on the

2        election systems, correct?

3               A     That's correct.  In fact, I've done

4        that several places in the country.  It's -- it's

5        not a problem.  All election offices are in -- you

6        know, have a locked door to get into them.  And I

7        have visited across the country with -- with

8        different election officials, never had any concern

9        about that.  As long as they bring you in, right?

10       If they bring you in and they escort you so that

11       they have full chain of custody.  Obviously, you're

12       on video and so on.

13              Q     And did you have an understanding of

14       whether Misty had authority to give you that

15       authority?

16              A     Please reword the question.

17              Q     If you were -- she is employed by the

18       Coffee County Elections and by -- and reports to

19       the Coffee County Board of Elections, right?

20              A     That's right.

21              Q     You knew that, right?

22              A     Yes, that's correct.

Page 94

```
 1              Q     And do you know if the Coffee County

 2        Board of Elections or any of the board members

 3        approved her giving you authorization to do your

 4        work there?

 5              A     I do not know.

 6              Q     Did you ask?

 7              A     I don't recall asking that question.

 8              Q     Did you --

 9              A     Again, it was based on the fact that

10        they do logic and accuracy testing.  I've observed

11        it in other locations.  This was really no

12        different than visiting any other election office,

13        as far as I was concerned, to be able to observe

14        the testing.

15              Q     And did you touch the equipment

16        yourself?

17              A     I did not.  Neither did Doug Logan.

18        We specifically when we went in said, "Look, we're

19        here to help.  We don't want to break any chain of

20        custody in any way, so we will be very careful not

21        to, you know, be in any of your space unescorted.

22        And we are not going to operate your equipment."
```

Page 95

1          So they operated -- Misty operated her equipment,

2      the ICP, the ICC, and so on.  We did not, Doug and

3      I did not.

4              Q    Well, she operated it pursuant to

5      your instructions, correct?

6              A    We helped develop test criteria for

7      her in trying to be able to repeat the -- the issue

8      that she saw on -- during the runoff election.

9              Q    Right, but she --

10             A    So we guided her testing, yes.  We

11     guided her testing.  We gave her recommendations.

12             Q    And she followed them?

13             A    Yes.

14             Q    Was there any instance in which she

15     refused to do something that you asked her to do

16     with respect to the election equipment?

17             A    Not -- that's -- that's a strange

18     question.  It's -- I'm trying to -- I'm not -- can

19     you reword the question?

20             Q    Yeah.

21                  Did there ever -- you're giving her

22     direction or you're talking about different things

Page 96

1        she should do with the equipment.

2                A      Uh-huh.

3                Q      Did she ever say, "No, I'm not going

4        to do that for you"?

5                A      I don't recollect asking her to do

6        anything that she -- that she had to say no to.  I

7        don't believe I did.  I mean, we were -- we didn't

8        ask that, yeah.  So I think the answer to your

9        question is no.

10                       MR. BROWN:  Yeah.  Let me mark as the

11       next exhibit, which I believe is Exhibit 4, Tab 7.

12                       (Lenberg Deposition Exhibit Number 4

13                        marked for identification.)

14                       MS. MARKS:  Okay.  Bruce, I'm doing

15       it now, so hold on just a second.

16                       THE WITNESS:  We're still waiting for

17       it to come up.

18                       MS. MARKS:  It should be up.

19                       MR. CLEMENTS:  We got it.

20                       THE WITNESS:  I think we got it.

21                       MR. CLEMENTS:  Okay.  It's up.

22                       THE WITNESS:  We see it.

Page 97

1      BY MR. BROWN:

2            Q     And is this the official election

3      bulletin, November 17th, 2020?

4            A     I have no idea.

5            Q     Well, I'm just making sure we're

6      looking at the same thing.

7            A     Oh, yes.  It says at the top,

8      "Official Election Bulletin, November 17th, 2020."

9      I see that.

10           Q     Okay.  Have you seen that document

11     before?

12           A     I don't believe so.

13           Q     Okay.  This is from the Elections

14     Division Director, Chris Harvey, to County Election

15     Officials.

16           A     Uh-huh.

17           Q     Do you see that?

18           A     I see who it's to, yeah.

19           Q     And were you aware of any of the

20     regulation or laws that Mr. Harvey cites in this

21     memo?

22           A     I haven't read the memo.

Page 98

1          Q     Go ahead and take a look at it.

2          A     Okay.  I'll have to get a little

3     closer to the exhibit computer here, give me just a

4     second.

5                MR. CLEMENTS:  Take your time.

6                THE WITNESS:  Being old also means

7     that I don't have great eyesight.

8                Okay.  It's just over a page long.

9     Is that correct?

10    BY MR. BROWN:

11         Q     That's correct.

12         A     Okay.  There's a mouthful there.

13    I'll have to refer to it.

14         Q     I'll just focus your attention to the

15    last paragraph on page 1 --

16         A     Okay.

17         Q     -- starting with "Additionally."  Do

18    you see that?

19         A     Yes, I do.

20         Q     And it states, "Documents or

21    information that if made public would endanger the

22    security of any voting system used or being

1      considered for use in the state or any component

2      thereof, including, but not limited to, electronic

3      ballot markers, DREs, ballot scanners, pollbooks,

4      and software or databases used for voter

5      registration shall not be open for public

6      inspection except upon order of a court of

7      competent jurisdiction."

8           Do you see that?

9      A      I do.

10      Q      Now, you were given access to

11      electronic ballot markers, correct?

12      A      No.  I don't know what an electronic

13      ballot marker is.

14      Q      To the BMDs?

15      A      No.

16      Q      To scanners, you were, right?

17      A      Well, not -- I mean, I -- I observed

18      them, but anybody in the public can observe the

19      scanners during logic and accuracy testing or other

20      times they visit an election supervisor.

21      Q      And the pollbooks, right?

22      A      Same thing, yeah.  I visually

1      observed the pollbooks, correct.  I was not given

2      access to the data.

3              Q    And the software, you've had access

4      to the software, right?

5              A    No, that's not correct either.  I did

6      not have access to the EMS software.

7                   When you say "software," we have to

8      be very careful what you mean by software.

9              Q    I'm not -- I'm not being clever.  Do

10     you think you had access to the software?

11             A    I did not have access to the

12     software, the EMS software or the ICC software.  I

13     did not have access to that.

14             Q    Did you ever gain access to that?

15             A    Not that I know of.

16             Q    Did you ever get the --

17             A    I -- go ahead.

18             Q    Did you ever get access to what

19     SullivanStrickler copied and put on the internet --

20     or put on their ShareFile, I should say?

21             A    There's an e-mail that we included

22     in -- in the -- the exhibits that we sent you that

Page 101

1          I -- by the way, I was not involved in the forensic

2          imaging that apparently SullivanStrickler did.

3          I -- you know, I found out about it after the fact

4          even that it was done.

5                    But in the e-mail, when I was

6          searching to find anything related, what I found

7          was a message that -- that a disk drive from

8          SullivanStrickler requested by Penrose and

9          Stephanie Lambert was being sent to Michigan, and

10         that disk went to Michael Lynch.  Michael Lynch

11         brought it over to the location I was at.  I had a

12         safe for safekeeping of any items.  It was put in

13         the safe.

14                    At some time, they asked me to make a

15         copy of that, which they -- I do not know what they

16         did with it.  It was provided to them to do

17         something with it, but I was directed by Lambert

18         and Lynch to make a copy.  And then Michael Lynch

19         retrieved the -- that disk that was sent.  And he

20         took it for safekeeping somewhere else.  So it was

21         gone from my possession.

22              Q     Okay.  So you had possession of that

Page 102

1      disk, made a copy of it, gave it to them, and then

2      gave the original back, right?

3                MR. CLEMENTS:  I need to object

4      really quick.  I want to make sure we're talking

5      about Michigan now.  So can you be a little more

6      precise on what disk, pertaining to what exactly?

7      We've been talking about Georgia for the past hour

8      or so.

9                MR. BROWN:  Excellent point.

10     BY MR. BROWN:

11               Q    You were talking about Georgia's

12     system that you got from Lynch, correct?

13               A    It was the e-mail that I was

14     referring to.  So it was the e-mail Coffee County

15     forensic FedEx request.  I was not involved in the

16     chain until the very end because they wanted me to

17     make a copy, which they were going to do something

18     else with.

19                    They sent me the password to be able

20     to unlock it because it was encrypted.  And so for

21     me to be able to copy it, I needed to unencrypt it,

22     give them a copy, you know, properly and -- and

Page 103

1           then gave them the disk back.

2                   Q       And you don't -- and you don't know

3           what they were doing with it?

4                   A       I do not know where it went.

5                   Q       And you don't know what they did with

6           it?

7                   A       No, I don't know what Lynch did with

8           it.  I do know he took it back in his possession.

9                   Q       And who is Lynch?

10                  A       Michael Lynch worked with Stephanie

11          Lambert.  I believe he's kind of a private

12          investigator, that even before the elections was

13          working with Stephanie Lambert.  And once Stephanie

14          got involved in the election stuff, I believe Lynch

15          was kind of her right-hand man, so doing stuff for

16          him -- for her.

17                  Q       And your understanding is that he --

18          or he told you he put what you had given him in a

19          safe of some kind.  Is that right?

20                  A       He did -- I don't know where he put

21          it.

22                  Q       Did you ever -- getting back to

Page 104

1       Coffee County and the issue of authorization.  At

2       any time, did you communicate with anybody on the

3       Board of Coffee County Elections about the work

4       that you did in Coffee County?

5              A     I did not.

6              Q     Do you know Eric Chaney?

7              A     I do not.

8              Q     Have you ever spoken to Eric Chaney

9       or communicated with him?

10             A     I have not.

11             Q     Do you know who he is?

12             A     I've heard the name in association

13      with Coffee County Board of Supervisors recently.

14      I mean, I didn't know any of those people back at

15      the time when I was there.

16             Q     Okay.  Let's go back sort of

17      physically to your work at Coffee County.  So you

18      were there on the 18th?

19             A     Uh-huh.

20             Q     You and Mr. Logan went into the

21      election office, correct?

22             A     Correct.

Page 105

1          Q      Who else was there?

2          A      Ms. Hampton was there and I believe

3    there was an office worker there.  It's a small

4    office in that her office has a secretary or an

5    admin person, something like that.  And I don't

6    know the person's name.  I'm sure I was introduced.

7    And so she was there, you know.

8                  Actually, part of the chain of

9    custody was good to have someone there, because in

10   the video that was leaked out to the Washington

11   Post and CNN that was used to basically accuse me

12   of doing bad things in Coffee County, if you look,

13   that person was sitting over in the corner at their

14   desk in that room when I went in.  That's on video.

15                  And, of course, I knew it was on

16   video.  You know, I am a security vulnerability

17   guy.  So I -- I wasn't doing anything untoward or

18   that any citizen -- normal citizen couldn't do.

19   Anybody could do that without any kind of court

20   order or subpoena.

21          Q      Well, it's odd the way you said that,

22   it was leaked to the Washington Post, that this is

Page 106

1       a video that you knew was being taken.  And it

2       wasn't leaked, it was produced by Coffee County,

3       right?

4              A     Well, apparently my understanding, I

5       watched part of a podcast that I believe you were

6       on and -- and Marilyn Marks was on, and during that

7       podcast, there was some discussion about how hard

8       it had been for you to get access to the security

9       video, that it had been very difficult.  And that

10      you finally had gotten access to it, and that going

11      through that video you just happened to find some

12      people in the office, particularly me and Doug

13      Logan.

14                   And that that went out -- that

15      information that you acquired somehow ended up in

16      the hands of the Washington Post and CNN, both of

17      which wrote pieces that I believe created a false

18      narrative that Doug Logan and I were bad guys doing

19      bad things.  And that's -- that was the way those

20      pieces were framed.

21             Q     I want to address your false

22      narrative in which you said it was leaked.  Don't

1      you -- when you say it leaked, don't you mean that

2      it was disclosed improperly?

3              A     I don't --

4              Q     Is your -- is your testimony that

5      giving it to the newspaper is improper?

6              A     Well, I don't know.

7              Q     Okay.

8              A     I'll take it back.  I do not know.

9      All I know is that you folks said it was very hard

10     to come by.

11             Q     Right, so --

12             A     And security video should be a little

13     bit hard to come by.  And once you had it in your

14     possession, somehow the Washington Post got it.

15     Maybe they requested it from Coffee County.  I

16     don't know.  I did --

17             Q     No, they did not request it from

18     Coffee County.

19             A     Okay.

20             Q     You take back the word "leaked,"

21     right?

22                   That was -- that was --

Page 108

```
 1                    MR. CLEMENTS:  Bruce, if we're going
 2          to start doing this, we certainly need to take back
 3          the word "breach," because we're talking about
 4          Ms. Marks, who actually used that term.  And from
 5          our standpoint, that is implication of a criminal
 6          act.  That's defamatory, per se.
 7                    MR. BROWN:  I don't know if that
 8          happened.  And ever since first year of contracts,
 9          the word "breach" is used in a civil action, not a
10          criminal one.
11                    MR. CLEMENTS:  It denotes
12          unauthorized access.  And it's unauthorized,
13          then -- then that's the suggestion.
14                    MR. BROWN:  Right.
15                    MR. CLEMENTS:  That was the headline.
16          So let's just move on from this bickering over
17          "leak" versus "breach."
18          BY MR. BROWN:
19                    Q     But the video is a public record,
20          unlike what you were working on in Coffee County,
21          right?  Fair to say?
22                    A     Yeah, but let's put it -- yeah, go
```

Page 109

1      ahead.

2              Q      All right.  There -- you were

3      there -- we got offtrack because you brought up the

4      idea of the security video and incorrectly stated

5      that it was leaked.

6                     But let me get back to where we were;

7      and that is you went into the election office on

8      the 18th.

9              A      Uh-huh.

10             Q      Walk me through what you did with

11     Misty Hampton, not -- what I want to do is -- well,

12     let me back up and make this easier.

13                    You were there on the 18th and the

14     19th, correct?

15             A      Correct.

16             Q      And then you, but not Mr. Logan, came

17     back the next week, correct?

18             A      That's correct.

19             Q      You were there from the 25th to the

20     29th, correct?

21             A      I think -- I don't remember the exact

22     hours, but a little bit each day, I believe, I was

1    back there.

2            Q       Okay.

3            A       Uh-huh.

4            Q       Walk me through what you and

5    Mr. Logan and then what you, yourself, did in the

6    election office in Coffee County.

7            A       Okay.  To the best of my

8    recollection, I will.  I didn't keep, you know,

9    detailed minute-by-minute notes, so it'll be, you

10   know, as good as I can recall.

11               So on the 18th, again, we went there

12   because of this -- what we considered to be a major

13   anomaly, trying to determine if it was a real issue

14   or not.  The desire was to try to have them run

15   testing on the equipment at our suggestion,

16   recommendation, to see if we could reveal or get

17   anomalies to occur.  And so that's what we did.

18               So we showed up there.  The -- if I

19   recollect correctly, and I'm pretty sure I do, the

20   ICPs, the slow-speed tabulators, needed to have

21   QR-coded -- well, they can read either type of

22   ballot, but I believe what was done was Misty got

Page 111

1       on her BMD, an ICX that she had there, and she

2       created a number of ballots.  I believe she created

3       like 20 for Biden and 20 for Trump, if I remember

4       correctly.

5                    Meanwhile, she got out, I believe, 40

6       blank ballots that were left over from the 2020

7       election, and we helped fill out those ballots by

8       hand.  And those were the ballots that were used to

9       test the ICC.  Where typically the ICC will be

10      running absentee ballots that are not made on a

11      BMD, they're made -- you know, filled in by hand.

12      And so we purposely created paper ballots by hand.

13      And then they were used for the testing.

14                   And so what happened was the ICP

15      testing, I believe, if I recollect, Misty's

16      daughter, and I don't remember her name, but she's

17      an election trained official.  She actually runs

18      one of the precincts there, or did at that time,

19      run one of the precincts during the election, she

20      came in to assist.  And she ran the ICP, while Doug

21      observed that, and Misty Hampton ran the ICC, while

22      I observed that.

1                     And we basically ran lots.  When you

2          do testing like this, you've got to get statistics

3          right, so you run batch after batch after batch.

4          And we were running the same ballots over and over

5          and over and over, which by the way is an

6          interesting thing to note is we learned a lot of

7          things.

8                     Coffee County was a great learning

9          experience to begin to understand our election

10         systems and the concerns with it.  And one of them

11         that was-- would surprise most voters in the

12         country is that you can take a ballot, any ballot,

13         and you can run that same ballot through a machine

14         thousands of times and it will not object at all.

15         It does not know that it's not -- it does not know

16         that it's the same ballot being run over and over.

17                    So if you take a high-speed scanner,

18         for example in Maricopa County, and -- and you just

19         run that over and over, or the video that we saw in

20         Fulton, where -- where observers were not there and

21         it was being run, or in Michigan there was

22         testimony of an observer watching a machine

Page 113

```
 1        operator run the same set of ballots multiple

 2        times.  So anyway that was a surprise to us that we

 3        could do that, so -- but we did it.  And it worked

 4        successfully.  And we discussed statistics.

 5                       And then we ended up at the end, Jim

 6        wanted a brief summary of our findings.  We didn't

 7        write formal reports.  We just wrote up -- because,

 8        of course, we were drinking from a firehose at that

 9        point and looking at anomalies and hearing about

10        anomalies all over the place.  So we wrote brief

11        reports, which you have copies of, the ICC report

12        and the ICP report.

13                       I apologize if they aren't pretty.

14        They seem to be like stuff missing or whatever, but

15        it's not missing.  That was what I had, that's the

16        actual report.  It wasn't intended to be put out to

17        the press, it was intended for a quick note back to

18        Jim Penrose.

19                       MR. BROWN:  Let's go ahead and mark

20        as Exhibit 5 Tab 9, which is Mr. Lenberg's Coffee

21        County ICC and ICP reports.

22                       THE WITNESS:  Yeah.  And they are
```

Page 114

1          very brief.  They are.

2                      (Lenberg Deposition Exhibit Number 5

3                      marked for identification.)

4                      MR. CLEMENTS:  We are waiting for it

5          to load.

6          BY MR. BROWN:

7                  Q     While that's loading, you described

8          you -- so you created the ICP ballots from the BMD?

9                  A     Misty did, Misty Hampton.

10                 Q     Misty did.  I'm sorry.

11                      And then I think Misty also found

12         extra blank ballots that were used -- that you

13         filled out by hand that you used for the ICC?

14                 A     That's correct.  Correct.

15                 Q     And then you ran a number of tests to

16         determine whether and to what extent the ballots

17         were rejected or reversed, correct?

18                 A     Yeah.  It was different for the ICP.

19         The ICP would reverse them.  The ICC would just

20         stop.  So the ICC doesn't have the capability of

21         reversing.  What it does when it doesn't like

22         something is it just stops.

1            And then on the computer associated

2      with it, the scanner stops on the computer.  It

3      gives you a message that says, "Oh, there's a

4      problem with ballot X, Y, Z, you are going to have

5      to go back like three ballots or something."

6            Because it actually before -- because

7      it's being processed on the ICC computer and not on

8      the scanner, the scanner actually keeps going for a

9      little bit past when it finally detects that there

10     was a problem with the ballot.  So that means --

11     because it's high speed.  That means you have to

12     actually be very careful to get back to the point

13     where the objection was, the ballot that had a

14     problem, otherwise you can easily miscount the

15     ballots.

16            And so that's one of my, by the way,

17     vulnerabilities of the system.  It is -- it is not

18     easy for the operator -- when a problem occurs with

19     a ballot that the software detects, it is not easy

20     to get it back to the correct ballot.  It's -- it's

21     error prone, let's put it that way.  It's certainly

22     error prone to get back to the correct ballot.

Page 116

1              Q      And then let's go ahead and look at

2       your report if that's pulled up yet.

3              A      Okay.

4              Q      And do you see it?

5              A      Which one -- yeah, we do.

6                     Which one?

7              Q      Let's go to the ICC one first, if we

8       could.

9              A      Okay.

10             Q      Which is the last page.

11             A      Yeah.  The ICC one is the one I

12      wrote.  Doug wrote the other one.

13             Q      Okay.

14             A      I'm a man of few words.  I only have

15      one page.

16             Q      If you look at the results, which I

17      want to go to, you state, "The scanner worked

18      extremely well with no rejects for almost all of

19      the configurations that we -- that were run over a

20      several-hour period.  Midway through the testing,

21      we reconfigured the ICC to have a date of

22      November 5th instead of the current date."

Page 117

1                      Do you see that?

2           A     Yes, I do.

3           Q     And why did you change the date?

4           A     The reason I did that is, again, I'm

5     a testing expert and I'm also a vulnerability

6     spotter expert, if you will, assessment, and -- and

7     I'm an expert in that area.  So one of the things

8     that a bad actor would do potentially is use the

9     date as a trigger.  Okay?  So they -- they would

10    potentially us a date.

11                 So, for example, they could say --

12    they could put in the firmware, you know, prior to

13    November 3rd, worked perfectly, and then on and

14    after November 3rd, for a period of time do the

15    subversion that's built in.  And, oh by the way, if

16    40 days goes by, or whatever the canvassing period

17    is, go back to working perfectly.

18                 So that was the reason it dawned on

19    me, wait a second, it's been working perfectly all

20    this time.  And, again, we were trying to see if we

21    could get it back into the state where it was

22    misbehaving on the -- during the runoff.

1              And so it crossed my mind that, wait

2      a second, it may be date dependent, so let's

3      reverse the date on the machine.  I asked Misty to

4      do that, to set the date back to November 5th, so

5      that it would be within a reasonable period of time

6      of the election in case that was being used as a

7      trigger mechanism.

8              Q      Why didn't -- why did you pick the

9      5th instead of the election day?

10             A      I wanted it to appear as a recount,

11     right?  So that's why.  Instead of the original

12     election day, I -- I was -- look, if -- if -- a lot

13     of people don't realize the way that recounts are

14     done in most of the states, they will label them as

15     a manual recount.  It turns out most states that do

16     manual recounts don't do manual recounts, they just

17     call it a manual recount.

18             What they mean by -- even the state

19     law in New Mexico is that you take randomly 100

20     ballots out of the actual ballots that were voted,

21     or so, and it's usually a small number, like 100 or

22     125, 150, and you manually score those.

Page 119

1              You set up the election.  You run

2    those 100 or 150 through.  You compare it to the

3    hand scoring.  If they agree, then you start all

4    over and run thousands of ballots through that

5    machine.  You set up a new election and -- and you

6    run thousands through the machine.

7              The problem with that is that if

8    there's a trigger level, that's not going to catch

9    it.  And obviously, you've got to be able -- if --

10   if a recount is done, your machines better -- and

11   if they're misbehaving, you need them to misbehave

12   the same way they did on election night.  And so

13   that is why I picked something close, but not

14   exactly election.

15             Does that make sense?  Have I

16   confused you?  That is pretty techy, but have I

17   confused you?

18        Q    No, I understood it, but it seems

19   like if you were trying to detect if there was a

20   subversion when the votes were counted, you would

21   date it when the votes were counted first.

22        A    Well, keep in mind that they did do a

Page 120

1      manual -- I mean, they did a machine recount, and

2      apparently -- you said apparently the number came

3      out correct.

4              Q      Not on the machine recount, on the

5      hand recount.

6              A      Oh.

7              Q      What you were doing --

8              A      I'm sorry, I'm confused.

9                    But in any case, I don't remember the

10     exact reason why other than I was trying to do

11     something close to the election, but not the

12     election, to make sure I was in what might be a

13     window in which a subversion was authorized or --

14     or not authorized, but triggered, if you will.

15     Let's call it triggered.

16                    I looked for triggers on -- on if the

17     firmware were subverted, anybody that creates

18     something like that would have to create the proper

19     trigger mechanism so that they could defeat logic

20     and accuracy testing and survive a machine recount.

21             Q      Right.

22                    But your trigger here was after the

1          actual election night, correct?

2                    A      That's correct.

3                    Q      Okay.  And you -- you asked Misty to

4          change the date in both the EMS and the ICC,

5          correct?

6                    A      I believe so.

7                    Q      And did you ask her after your

8          testing was done to reset the clock?

9                    A      I did.  To my recollection, I did.  I

10         asked her to set it back.

11                   Q      Okay.  And do you know if she did one

12         way or the other?

13                          I mean, did you see her reset it?

14                   A      You're asking me detail that I --

15                   Q      You don't remember?

16                   A      I don't remember.

17                   Q      Okay.  Did you think that it was

18         necessary for you to obtain -- or Misty to obtain

19         any additional authorization to change the clock on

20         the EMS server?

21                   A      No.

22                   Q      You say after you mention in your

Page 122

1          report -- or the same sentence -- well, you say,

2          "Through the testing we'll reconfigure the ICC to

3          have a date of November 5th instead of the current

4          date."

5                    A     Uh-huh.

6                    Q     Okay.  And then you report that you

7          happened upon a set of scanner configuration

8          parameters.  Do you see that?

9                    A     Yes.  Yeah.  So what happened was --

10                        MR. CLEMENTS:  Let's stop.  Is there

11         a question?

12                        THE WITNESS:  Yes, what's the

13         question?

14                        MR. BROWN:  I was about to get it --

15         I was about to get to it.  Thank you, Mr. Clements.

16         BY MR. BROWN:

17                   Q     You say, "We happened upon it."  Did

18         those scanner settings just appear or did you run

19         through -- did you have her run through different

20         configuration parameters?

21                   A     I'm trying to think if that is a

22         multiple question or not, but --

Page 123

```
 1            Q     So you say, "We happened upon it,"
 2       sort of like the British expression, "It went
 3       missing."  You know, it's like how -- how did you
 4       happen upon a set of scanner configuration
 5       parameters?
 6            A     Yes.  So let me explain.  So I had
 7       access through Misty there to the manual that
 8       explained how that system works.  So I scanned
 9       through that looking for how it worked.  Keep in
10       mind, I was trying to learn how these machines
11       worked so that I could find out if there was any
12       particular issue or not.  These manuals, by the
13       way, are generally available on the internet.  You
14       can go out and find manuals on -- on these machines
15       available on the internet.
16            So I looked through -- in fact, I
17       might have even looked through one before I showed
18       up there.  I can't recollect, but I spotted a
19       couple things that were odd.  And this is a strange
20       thing about the way my brain works, is I look
21       outside the box by default.  So most people look
22       inside the box.  I look outside the box.  That's
```

1        both a blessing and a curse.

2                      But anyway.  So I looked for

3        anomalous things, things that don't make sense,

4        that shouldn't be there.  And what I saw were two

5        different things, but one was that there was a --

6        there was a definition in there of how to change

7        the optical scanner settings.  In other words, how

8        the scanner would scan.

9                      So built into the Dominion software

10       is an interface to tweak the scanner settings, the

11       optical scanner settings.  That was of great

12       concern to me.  When I saw that, I thought this is

13       an extreme vulnerability, this should never be

14       available in a voting system.

15                      And if it is required for some odd

16       reason, it should be totally buried, need very

17       strong passwords to get access to it, and very

18       limited number of people to have access to it.

19       Well, it turns out it was in there.  And if you

20       were the administrator on a system like Ms. Hampton

21       was, she, it turns out, had access to it.  And you

22       could tweak it.  You could change those settings.

1            Now, the reason this is horrible to

2       even consider it being in a machine is that you

3       shouldn't be allowed to go in and change the way

4       votes are interpreted.  I mean, the way that votes

5       are actually detected off the ballot.  And that's

6       what this software purportedly allows you to do.

7            In fact, at the time there was a -- I

8       remember it, in late 2020 there was a news story

9       circulating that -- and maybe even before the

10      election, that the super -- that the Dominion

11      technicians were adjusting the sensitivity of

12      tabulators and scanners.  And I thought that made

13      no sense at all.  You shouldn't be able to adjust

14      the sensitivity.  It should either detect the vote

15      or not detect the vote.  And being able to tweak

16      the sensitivity of it made no sense to me at all.

17           And so that -- red flags are going

18      off.  Okay?  Alarm bells going off.  This does not

19      belong here.  All right?  You can change the way

20      votes are actually detected if -- if -- if this

21      worked, if the software was actually doing

22      something.  And at that time, I had already heard

Page 126

```
 1          the story about Dominion techs saying that they
 2          were adjusting the sensitivity of the -- in the
 3          press.  I don't remember the exact articles, but
 4          how the sensitivity was being adjusted on -- on how
 5          ballots were being read.  There's no reason to
 6          design a voting system that way, a tabulator that
 7          way.
 8                      So I was drawn to that.  And so what
 9          I did is I asked Misty to start changing those
10          parameters to see if they made any difference.  So
11          there's a whole series of those parameters that
12          were changed.  There were several parameters there.
13                      In the note supplement that we sent
14          this morning that I came across -- sorry it came in
15          late -- but we did find some notes, you know,
16          working notes.  And I sent photographs of those to
17          you this morning, or David did.  In there, it
18          actually shows some notes where we -- I thought it
19          would be helpful for this conversation.  I
20          suspected that it would come up that -- you know,
21          the actual parameters that we changed.
22                      So like D skew was in there, contrast
```

1     was in there, sensitivity of -- light sensitivity,

2     or something like that was in there.  Gamma.  There

3     were a bunch of different settings that were in

4     there where you could change the way the optical

5     scanner was going to read the ballot, supposedly.

6     And I was surprised that Misty, through her admin

7     interface, could actually adjust it, but she was

8     able to.

9              So -- so we went through them one by

10    one and started adjusting them.  And running

11    ballots.  And by the way, at that point, somewhere

12    in there, I mean we ran quite a few ballots through

13    and that machine worked perfectly.

14              Just -- since it had been so-called

15    fixed, potentially remotely on -- during the

16    runoff, it worked perfectly.  It was not stopping

17    on any ballots at all.  It literally -- in fact,

18    Ms. Hampton commented she had never seen the

19    tabulator work that well.  It had never worked that

20    well.  And it was working extremely well.

21              So we were adjusting them.  We

22    were -- she was checking them on the EMS to see if

Page 128

1          it matched what we know we put in, because we had

2          20 Biden, 20 Trump.  We would run 20 at a time, and

3          it was working perfectly as we adjusted down

4          through, as you'll see in the notes, several

5          different settings.

6                     And then the last setting out of, I

7          don't know, half a dozen to ten settings that we

8          changed, was a very strange setting.  It was

9          called -- well, it had to do with color pens

10         writing on the ballot.

11                    So it turns out there's a setting

12         where you can say, ignore red, ignore green or

13         ignore blue or ignore none.  And the default is to

14         ignore red.  And the reason that's in there --

15         there's a good reason for that, is that sometimes

16         if election officials need to write on a ballot for

17         some reason and they will use a red pen typically,

18         and so having a setting that says "ignore red"

19         makes sense.  You know, that you would want to have

20         the software ignore any red marks that are on

21         the -- the ballot.  So we got to that one.  It was

22         set to ignore red.  We changed it to "none."

Page 129

1                    Now, keep in mind, to my knowledge
2        the ballots that we had didn't have any red on
3        them.  I'm not positive, but I don't think any part
4        of the writing on there was red.  But when we
5        changed it to "none" instead of "no red," it began
6        behaving, according to Misty Hampton's description,
7        exactly like it did on the runoff night.  We no
8        longer could run a set of 20 Trump ballots through
9        without the machine stopping.  We could regularly
10       run a set of 20 Biden ballots through without the
11       machine stopping.
12                   And that occurred in our last hour,
13       hour and a half of testing.  And if I remember
14       correctly, I think Doug Logan had some schedule
15       deadline for some reason that he had to leave and
16       so we wrapped up right there.
17                   And -- but that was right towards the
18       end of the testing, we were able to get it back
19       into that mode.  And then I believe I had Misty go
20       ahead and reconfigure it back to the correct
21       settings and -- and we left.  So that was that
22       portion of the visit.

Page 130

1          Q     Okay.  And so you went through a

2     number of different configuration parameters that

3     did not cause this anomaly, correct?

4          A     That's correct.

5          Q     Did any of the other parameters cause

6     other anomalies, like Biden getting rejected?

7          A     No, not that I remember.  I don't

8     recollect.  In fact, I was surprised that changing

9     all of those other settings didn't seem to have any

10     impact on how the scanner ran.  I was actually

11     surprised by that.

12               It was almost like, well, these are

13     dummies, they're not working.  You know, if I

14     change the contrast way off scale or the light

15     sensitivity or the gamma or something, I expected

16     it to work -- you know, to break something, make it

17     work differently, but it didn't.  It continued to

18     work properly.

19          Q     But to sort of go back to the top,

20     the 2020 general election in Coffee County happened

21     on election day, they got the results that were

22     confirmed with one vote off in the hand recount --

Page 131

```
 1                A      Uh-huh.

 2                Q      -- which would indicate that the

 3       scanners didn't -- whether they functioned properly

 4       or not --

 5                      MR. CLEMENTS:  I'm going to object to

 6       the form of the question, Bruce.

 7                      MR. BROWN:  You know where I'm going,

 8       David.

 9                      MR. CLEMENTS:  Just opened --

10       BY MR. BROWN:

11                Q      So that's the -- that's the -- so

12       election night in the hand recount, Coffee County

13       nails it exactly correctly with one vote off for

14       Jorgensen, and then --

15                      MR. CLEMENTS:  Objection to form.

16       BY MR. BROWN:

17                Q      -- in the electronic recount, your

18       thesis is that Dominion made some kind of remote

19       change to the configuration parameters?

20                      MR. CLEMENTS:  Objection to the form

21       of the question.  There are probably six

22       independent statements, and we're not getting any
```

Page 132

1      answer from the witness as to each of those

2      statements.

3      BY MR. BROWN:

4             Q      Your theory is that between the --

5      between or during the electronic recount, that

6      Dominion -- I guess my question is:  The -- so at

7      some point between the general election, which as

8      far as you know, was flawless --

9                   MR. CLEMENTS:  Objection.  That's not

10     his testimony.

11     BY MR. BROWN:

12            Q      Well, you don't know of any flaws in

13     the general election, right?

14            A      No.

15            Q      Okay.  Then let me -- so between the

16     general election, with respect to which you are not

17     aware of any flaws, and the electronic recount,

18     something was reset on the configuration parameters

19     to make the machine malfunction in the electronic

20     recount.  Is that right?

21            A      What I can tell you is what we

22     observed and -- and why we were there.  We were not

Page 133

1        there to try to determine if the count was correct

2        or not correct either for the election or the

3        recount.  We were there because of the fact that it

4        appeared that that machine had been remotely

5        reconfigured.  And that's what we were trying to

6        determine, if there was a possibility, if you could

7        even make it get into the mode where it misbehaved,

8        which we were able to do.

9                     Now, if it was remotely reconfigured,

10        then keep in mind anybody that had that remote

11        access at any time before, during, after the

12        election, before the recount, after the machine

13        recount, you know, and so on, could have gone in

14        and done anything, including a complete download of

15        the EMS software.

16                     So everything on there, the

17        CompactFlash cards, the results files, the election

18        files, everything, could have been downloaded.

19        It's an extreme vulnerability, I believe, that

20        these systems have -- apparently have, and that is

21        that the ICCs are hooked to the EMS, they

22        apparently have the ability to be remotely

Page 134

1          accessed, which means off-scale vulnerability.

2          Anybody could download any software, any results,

3          any files, and reconfigure anything they want as

4          far as how the system is going to operate.

5                    Q     Now, the -- you looked at the -- you

6          had looked at the manuals -- or at some point, you

7          looked at the manuals describing the parameters.

8          Is that right?

9                    A     Yes.

10                   Q     Now, my question is:  Why did you

11         have to be inside of Coffee County's election

12         office hands on to the equipment to be able to --

13         to --

14                   MR. CLEMENTS:  Objection.  Lack of

15         foundation.  Hands on, I believe the testimony has

16         been observation of Misty Hampton and the other

17         election worker.

18                   MR. BROWN:  Okay.  A very refined and

19         excellent objection.  Let me reframe my question.

20         BY MR. BROWN:

21                   Q     You described the -- the manuals that

22         Dominion has about the parameters, correct?

Page 135

1           A      Correct.

2           Q      Given the information that is

3      publicly available, why did you need to be inside

4      of Coffee County directing or working with Misty

5      Hampton physically on the machines to be able to

6      detect this vulnerability?

7           A      I have no idea how I would do that

8      remotely.  I -- you know, have you ever tried to

9      help someone on a computer, you know, over a phone?

10     I've done that many times.  It's very, very

11     difficult to try to help them.

12                 You're saying that I could have

13     directed her how to change things over the phone?

14     Is that what you're saying?

15          Q      No.  What I'm saying is that having

16     you physically present is a material enhancement to

17     your ability to evaluate the vulnerability of the

18     system, correct?

19          A      Because I could see what was on the

20     EMS screen.  I could see the actual settings that

21     were on the screen, I could observe them, I could

22     observe the changed behavior or not changed

Page 136

1      behavior.  I can't do that over the phone or a Zoom

2      call.

3              Q    Okay.  We're going to take a break in

4      a few minutes to -- to get a bite, although I know

5      it's earlier there than here, but bear with me.

6                  MR. BROWN:  If we could mark as the

7      next exhibit, which is Exhibit 6, Tab 16.

8                  (Lenberg Deposition Exhibit Number 6

9                   marked for identification.)

10                 MR. CLEMENTS:  It's still loading.

11                 THE WITNESS:  By the way, you guys

12     might notice I keep looking up, I -- I have

13     graduated lenses.

14                 MR. BROWN:  I do, too.

15                 THE WITNESS:  And so you know the

16     behavior.  I'm not trying to be, you know, in any

17     way condescending or anything.  It's --

18                 MR. BROWN:  I want to -- I want to

19     make sure the court reporter doesn't note that as a

20     yes.

21                 THE WITNESS:  That's correct, that is

22     not meant to be a yes.  It's I'm trying to read

Page 137

1          something on the screen, and to do it, I have to

2          move my head around to get it in focus.  So I --

3                        MR. BROWN:  This is off the record

4          just for a second.

5                    (Discussion had off the record.)

6      BY MR. BROWN:

7                   Q    Just let us know when Exhibit 6 comes

8          up.

9                   A    We've got Exhibit 6.

10                  Q    The first -- the first page of

11         Exhibit 6 is your cover sheet, and then the second

12         page is your February 4 letter to Leah Rich.  Do

13         you see that?

14                  A    Yes, I do.

15                       In Pierce County?

16                  Q    Yeah.  And she's in Pierce County.

17                  A    Uh-huh.

18                  Q    Your re clause there probably was

19         copied from an earlier letter is incorrect?

20                  A    Yeah, that's correct, yes, sir.

21                  Q    Okay.  And you say that you are doing

22         independent research to help verify the accuracy of

Page 138

1      the 2020 general election.  Do you see that?

2            A     Right.  I'm trying to understand

3      whether it was accurate or not, whether or not

4      their anomalies had any bearing on the election.

5      That's what I was trying to do.

6            Q     Yeah, but you -- I asked you that

7      specifically before and you said over and over

8      again that you were not there to verify the

9      accuracy of the election.

10           A     Well, I wasn't there to verify the

11     accuracy of the vote count in the election.  What I

12     was there to do is try to understand whether or not

13     the machines had any potential accuracy problems.

14                 Because, keep in mind, the machines

15     that you use in Michigan -- or excuse me, you use

16     in Georgia are identical to the model that's used

17     in Michigan and other places.  So anything I

18     learned, and could learn, from looking in Georgia

19     and understanding any anomalies would help me

20     understand how accurate the machines are in

21     counting votes.

22                 The fact that in this particular

1       case, it didn't make any difference, it didn't

2       matter.  There were major anomalies that we were

3       looking at trying to understand what those

4       anomalies really were and how they might

5       potentially be used elsewhere as well.  So it

6       doesn't matter if they were used in that particular

7       case or not, we were trying to understand can the

8       machines be inaccurate, if you will.

9               Q       Sure.

10              A       Can they -- can they inaccurately

11      register the votes.  That's what I meant by that,

12      not the overall vote tally in Coffee County or in

13      Georgia.

14              Q       I understand.

15                      And then you say the same thing to

16      Tracie Vickers, who's the county clerk in Coffee

17      County --

18              A       That's correct.

19              Q       -- if you go to the next page.

20                      And then you -- to wrap up the first

21      visit to Coffee County, I may have some follow-up

22      questions to that, but you testified that it --

Page 140

1          that you detected the anomaly with the red value

2          before --

3                    A       Right.

4                    Q       -- the end of the day on the 18th.

5          Fair to say?  I'm sorry, the 19th.

6                    A       It might have been the 19th, that

7          sounds correct.

8                    Q       And then after that Mr. Logan had to

9          leave, correct?

10                   A       Yes.  And I left at the same time

11         that he did.

12                   Q       And then you came back a week or

13         so --

14                   A       That's correct.

15                   Q       -- later, right?

16                   A       That's correct.

17                   Q       What did you do when you came back?

18                   A       Do you want a break before we get --

19         that could go for a while if you want.  I don't

20         know that it will.

21                   Q       Just tell me generally and then we'll

22         break.

Page 141

```
 1            A      Well, I came back.  I was hoping for
 2       an opportunity maybe to do some additional testing
 3       to refine what we had learned, especially on the
 4       ICC, and see if we could get it back out of that
 5       state.  Okay?  We ran out of time there because it
 6       took us almost the entire time that we had just to
 7       get it to do something.  We didn't find it until
 8       the last hour and a half.  So the hope was that we
 9       could come back and do some additional testing with
10       Misty Hampton on that.
11                   And also just taking the opportunity.
12       Keep in mind, I was learning about these systems at
13       that point, and Ms. Hampton is extremely -- was
14       extremely knowledgeable about her election systems.
15       And so I -- I was taking the opportunity to learn
16       as much as I could from her experience having
17       done -- her having done elections there for many
18       years.
19            Q      But was the second visit -- did you
20       undertake any other testing?
21            A      It turned out we were not able to.
22            Q      Why weren't you able to?
```

1          A     I -- I -- I'm not -- I don't

2     recollect exactly why other than I know Misty

3     got -- Misty Hampton got very busy, and so she was

4     only able to give me a little bit of time.  And I

5     think -- I think we were trying to see about

6     getting access to those additional records.  I know

7     it's dated at the end of the time I was there, I

8     put that in, but I think Misty maybe had made a

9     request to the Board or someone to see if I could

10     get the additional records, but --

11          Q     But you were there like every -- you

12     were there like every day, not for the whole day,

13     but you visited every day that week.  Is that all

14     you can remember about what you were doing that

15     week, Mr. Lenberg?

16          A     That's pretty much it, was asking

17     Misty about things.  That -- it's in that period

18     that she explained the pollbook to me.  We talked

19     about that already.  She showed me the pollbook,

20     she explained how it worked.  She told us how they

21     used it in their setting in Coffee County.  I'm

22     sure that was one of the visits.  You know, it was

1        that kind of stuff she was explaining to me.

2                        And also I think I was asking, you

3        know, "Did you get an okay to give me this

4        additional information?"  And I think in the end

5        she said, "Look, just generate a memo, a records

6        request, put it in, and -- and we'll see what

7        happens."  And I never got any result from that, by

8        the way.

9                        So I think part of coming back was to

10       see if I could find out if -- if I had been able to

11       get access to the additional paper tapes and all of

12       that kind of stuff.

13               Q     The stuff that we got overnight, what

14       was that?

15               A     That was -- the zip file is a copy of

16       the CompactFlash cards from the election which

17       contains the system log files.  And at that point,

18       I was extremely interested in those because of the

19       ASOG report up in Antrim, Michigan that came out.

20                      That's how they detected the high

21       reversal rate on the ballots in Michigan, was

22       looking at those system log files.  And so the

Page 144

1        system log files are -- are on those cards.

2                I was just learning what was on those

3        cards.  I expected them to be, you know, the

4        results from the election, was on those cards

5        because we all heard in the media about cards that

6        were found and then the results were tallied.  And

7        so I, at that point, thought that they were result

8        cards, but then in that time frame, especially the

9        ASOG report, we learned about these system log

10       files that existed that had, you know, detailed

11       operation where every ballot is in the system log

12       file.  And if it reversed, it's in there.

13              It, you know, gives a fair amount of

14       information.  Nothing that's sensitive.  In fact,

15       they don't encrypt that file.  They do encrypt the

16       result files and they encrypt -- we found out later

17       that the election files were on there, and that's

18       the major concern.  Those are encrypted also.

19              But the reason we hesitated in our

20       sending those to you until this morning was getting

21       approval from someone.  Because after that, my

22       subsequent studies and work determined, as well as

1        Alex Halderman in the CISA report that was based on

2        his reporting.  I believe, in your case, that this

3        year CISA put out a report, Alex Halderman.  It's

4        in one of the Signal messages that Kevin sent me,

5        said it was based -- the CISA report was based on

6        his reporting of the flaws in the ICX.

7                      And one of the things he said in

8        there was that the election files -- specially

9        crafted election files could basically allow you to

10       run any kind of election scope you wanted on an

11       ICX.  Obviously, that's a huge vulnerability.

12                      I disagree with the conclusion of the

13       ICX report, which says don't worry about it because

14       you'd have to get access to the EMS.  That's

15       absolutely not true.  And the reason I tell you

16       it's not true is that the election files are very

17       seldom created on the EMS.  They're almost always

18       created by the voting machine company or one of its

19       subcontractors who creates the election files.  And

20       they're encrypted before they come -- they come

21       through a project file that's delivered to your

22       county typically and delivered to your EMS.

Page 146

1        They're already encrypted.

2                    So that's one of my major points and

3        concerns that I learned in Michigan with election

4        files, is I claim that a bad actor can, by getting

5        access to the election designer software

6        application and putting a subversion into it that

7        spreads to all of the subcontractors in the

8        country, and there aren't that many of them that do

9        the election design and create the election files,

10       that you could subvert every tabulator through the

11       election files in the entire country that use that

12       company's election designer software.

13                   And each company -- EMS has their

14       own, and I'm sure Hart does as well.  So if you got

15       into two or three companies as an insider or broke

16       into them and got on their servers, you could

17       centrally manipulate the elections for the entire

18       United States.  And it would literally take one

19       person to do that.  Not thousands, not hundreds,

20       one person.  And the local election officials would

21       have no idea.  This local Secretary of State and

22       all -- it wouldn't require anybody in the county to

1    be aware of it at all.  So that's one of my big

2    major concerns that I learned from my studies in

3    Michigan about election files.

4              And that's why I was so sensitive in

5    how we got those to you is because that would be my

6    concern is bad guys learning the structure of those

7    files and, thus, being able to manipulate them,

8    according to Alex Halderman, and according to

9    myself as well.

10             You've all probably seen the video

11   from May of 2021, I believe it's in the videos that

12   I sent you, that showed me flipping votes within a

13   tabulator.  And it was done by modifying the

14   election file, just as Alex Halderman stated, you

15   can do it on an ICX.

16        Q    You mentioned Dr. Halderman's report.

17   And you were -- I want to make sure I get the

18   direction in which you were critical, it might be

19   too strong of a word, but your opinion was

20   different than Dr. Halderman.

21        A    My conclusion is different.  I agree

22   with him.  He is an expert.  I agree with him on

1    the vulnerability.

2         Q     But your -- your -- his conclusion,

3    you thought, was a little bit optimistic or a

4    little what?

5         A     Actually, it wouldn't be his

6    conclusion.  It's the conclusion of the EAC -- or

7    CISA, not EAC, but the CISA report.  I don't know

8    who wrote the CISA report, but the CISA report

9    basically says, "Don't worry about this because

10   people would have to have access to an EMS to do

11   this subversion of the election files."  And that's

12   absolutely not true.

13        Q     Okay.

14        A     That's absolutely not true.

15        Q     Okay.

16        A     In fact, that's a really hard place

17   to do it because the files are already encrypted

18   there.  The best place to do it is before the files

19   are encrypted, and that is a central location.

20             MR. BROWN:  Okay.  Let's take a break

21   now for lunch.  And if we can come back at 2:05

22   Eastern, or thereabouts.

Page 149

1                     THE WITNESS:  Okay.

2                     MR. BROWN:  Is that all right?

3                     THE WITNESS:  Sounds good.

4                     MR. BROWN:  Thank you very much, sir.

5                     THE WITNESS:  Thank you.

6             (Recess from 1:05 p.m. to 2:06 p.m.)

7                     VIDEOGRAPHER:  Going back on the

8        record.  The time is 2:06 p.m.

9        BY MR. BROWN:

10               Q    Mr. Lenberg, we're back on the

11       record.  I wanted to go back to some of my

12       questions.  I used the term "hand recount" to refer

13       to the second counting of the votes in Coffee

14       County.  I think the better term for that would be

15       the "hand-count audit."

16                    Are you with me?

17               A    Yeah.  If I understand correctly, we

18       had the election, we had the machine recount, and

19       then we hand the hand count.

20               Q    Yeah.  That wasn't the sequence

21       though.  It was the election, the -- it was the

22       hand-count audit.  Do you understand that?

1          A     No.  I'm confused.  I believe the

2     sequence, if I remember correctly, was

3     November 3rd, then first there was a machine

4     recount.  Okay?  And then I believe after that

5     there was a statewide manual recount, hand count of

6     the ballots using Arlo, is my understanding.

7          Q     Okay.  And you understand that the

8     result of the hand-count audit was very close to or

9     the same as election night?

10          A     I believe that that's what was

11     reported in the -- in the press.

12          Q     Okay.  Now, the -- you testified

13     about --

14          A     I would just add to that, I've

15     already mentioned it, but I'll mention it again, in

16     trying to verify that with batch sheets, various

17     people have shown that a quarter of the batch

18     sheets were missing.  So that particular hand

19     recount, in my opinion, is very suspect and my own

20     personal dealing with Liberty County showed an

21     issue as well.

22          Q     Let me -- I didn't ask you about any

Page 151

1        of that, no offense.  And I need to ask you --

2              A     Well, you asked me if it was accurate

3        or not, right?  If the --

4              Q     I did this morning.  I didn't just

5        now.  I was --

6              A     Well, I thought you did.  What was

7        the question you asked?

8              Q     Okay.  So what you're -- what I'm

9        talking about is the terminology.  Okay?

10             A     Okay.

11             Q     You understood that when I said "the

12       hand recount," I was referring to the hand-count

13       audit, right?

14             A     Which would be the one that was done

15       with Arlo, correct?

16             Q     I do not know.  You need to ask them.

17                   But your understanding of the

18       sequence was that the machine recount came last or

19       second?

20             A     No.  It -- it came first after the

21       election and then the -- a statewide hand recount

22       using Arlo was done after that, is my

1    understanding.

2              Q    All right.  Well --

3              A    I may be wrong, but that's -- that's

4    my recollection.

5              Q    Okay.  Well, we'll move on.

6                   You mentioned that you -- you

7    obtained a copy of what SullivanStrickler had

8    uploaded from Michael Lynch or Stephanie Lambert.

9    Is that correct?  Did I get that right?

10             A    Correct.  Michael Lynch delivered

11   that to me.  It was apparently shipped to him.

12             Q    Okay.  And how did he get it?

13                  He got it from SullivanStrickler or

14   from Penrose?

15             A    I -- I don't know where he got it,

16   other than what I see in the e-mail, that it was

17   being FedExed.

18             Q    And what was your understanding of

19   Lynch's role in all of this?

20                  What was he -- he was a PI for

21   Lambert?

22             A    He is basically a PI for Lambert

Page 153

1     doing, you know, whatever tasks she needed him to

2     do.

3              Q     Okay.  You mentioned your May 2021

4     video showing the vote-flipping.  Do you recall

5     that?

6              A     Yes.

7              Q     Did you make that in Lynch's office?

8              A     No.

9              Q     Where did you make it?

10             A     That was in Michael Lynch's

11    apartment.

12             Q     Okay.  Where did you get the ICP that

13    you used?

14             A     It was the one that Michael Lynch

15    provided and Stephanie Lambert provided.

16             Q     Did you notice anything that you

17    obtained from Coffee County?  Configuration?

18    Information?  Intelligence?

19             A     No, absolutely none.  That was all

20    Antrim obtained through the forensic image that the

21    court ordered in the Antrim case.

22                    MR. BROWN:  Let me mark as the next

Page 154

1      exhibit Tab 10.

2                      (Lenberg Deposition Exhibit Number 7

3                      marked for identification.)

4                      MR. CLEMENTS:  Is this still

5      Exhibit 6 or are we looking at a new exhibit that's

6      being uploaded?

7                      MR. BROWN:  Tab 10 should be a new

8      exhibit.

9                      MR. CLEMENTS:  Still waiting on it.

10     BY MR. BROWN:

11             Q     Okay.  Just while we're waiting on

12     that, did you say where Lynch got the ICP from?

13             A     I do not know exactly where he got it

14     from.

15             Q     Do you know generally where he got it

16     from?

17             A     Michigan somewhere.  He acquired it.

18     He wasn't in the practice of saying where he got

19     the equipment from.

20             Q     And do you know whether it was

21     lawfully obtained?

22             A     I asked that question.  I was told it

Page 155

```
 1          was lawfully obtained.

 2                    Q     By who?

 3                    A     By Stephanie Lambert.

 4                    Q     All right.  Has that come up yet, the

 5          next exhibit?

 6                          MR. CLEMENTS:  It's just come up.

 7                          MR. BROWN:  And, Felicia, what number

 8          are we at?

 9                          COURT REPORTER:  I'm sorry, I wasn't

10          able to write it down.

11                          MR. BROWN:  Okay.  I think it's 7 is

12          what I have.

13                          COURT REPORTER:  Let me check.  Yes,

14          I think it's Exhibit 7.

15          BY MR. BROWN:

16                    Q     Looking at Exhibit 7, do you

17          recognize that as Doug Logan?

18                    A     I do.

19                    Q     Walking into the Coffee County

20          elections on January 19th apparently?

21                    A     I do.

22                    Q     And is that a Cellebrite mechanism in
```

Page 156

1       his left hand?

2               A     I don't know what's in his left hand.

3               Q     You don't know what that is?

4               A     No, I don't.

5               Q     Did you all use a Cellebrite

6       instrument?

7               A     I don't even know what a Cellebrite

8       is.

9               Q     Do you know what a Cellebrite kit is?

10              A     No, I don't know what it is.

11              Q     You don't know what it's used for?

12              A     No.  I've never heard the term

13      before.  Cellebrite?  I never heard of it.

14              Q     Okay.  I want to get you back to the

15      next week, the 25th to the 29th.

16              A     Okay.

17              Q     You described talking to Misty

18      Hampton about the pollbooks and about different

19      things.  It doesn't really give me a very full

20      picture of what you did for five days there or at

21      least portions of the five days.  Did you do any

22      testing at all on anything?

1          A     Not that I recollect.  I -- I had

2     wanted to, but we -- she was too busy, I think.

3     Came in, she was -- gave me a little bit of time to

4     be able to ask her questions that I had come up

5     with about, you know, elections in Georgia, you

6     know, pollbooks, various things like that.  But no,

7     to my knowledge, we did not do any additional

8     testing.

9          Q     Did you ask her to show you how

10     equipment other than the pollbooks operated?

11          A     Not other than -- let me think.  Not

12     other than the ICC and ICP, which I've already

13     talked about in detail.

14          Q     Let me go -- this may be going back

15     in time.

16               MR. BROWN:  But if we could mark Tab

17     19 as Exhibit 8.

18               (Lenberg Deposition Exhibit Number 8

19                marked for identification.)

20     BY MR. BROWN:

21          Q     You can scroll -- these are text

22     messages between Misty Hampton and Eric Chaney.

Page 158

```
 1            A     Okay.

 2            Q     If we could scroll down to

 3       January 19.

 4                  MR. CLEMENTS:  Wait, first confirm.

 5       BY MR. BROWN:

 6            Q     I'm sorry, it's right on the first

 7       page, right in the middle.

 8                  MR. CLEMENTS:  So what's the

 9       question, Bruce?

10       BY MR. BROWN:

11            Q     Do you see where she refers to -- she

12       says, "The guys measuring my desk are still here."

13       Do you see that?

14                  MR. CLEMENTS:  Can we get a question

15       on whether or not Mr. Lenberg even knows what he's

16       looking at first?

17                  THE WITNESS:  Yeah, I'm not sure what

18       I'm looking at.

19       BY MR. BROWN:

20            Q     These are texts between Misty Hampton

21       and Eric Chaney.

22                  MR. CLEMENTS:  We don't have the
```

Page 159

1          foundation for that so --

2                          THE WITNESS:  What date?

3      BY MR. BROWN:

4          Q     Okay.  I'm representing to you that

5      these are text messages between Eric Chaney and

6      Misty Hampton.  You do not have to believe me.  Do

7      you follow me?

8          A     Okay.

9          Q     Do you know -- do you know why Misty

10     Hampton would have been referring to your

11     activities as "the guys measuring my desk"?

12         A     I don't see that in here.  Where's it

13     at?

14         Q     January 19, 10:35 a.m.

15         A     I've never heard that term.

16         Q     Do you know why she would have had to

17     have a code to describe your activity?

18                         MR. CLEMENTS:  Objection.

19     Foundation.

20                         Don't answer unless you know.

21     BY MR. BROWN:

22         Q     Did you suggest that she use a code

Page 160

1       to describe your activities there?

2              A      I -- I don't know.  I can't answer

3       that.

4              Q      You don't remember that?

5              A      I wasn't in that conversation.

6              Q      I didn't ask that.  I said -- I asked

7       if you advised her to create a code to describe

8       your activities?

9              MR. CLEMENTS:  You didn't ask that,

10      Bruce.  You're implying it.  So if you want to ask

11      a question, ask it clearly.

12      BY MR. BROWN:

13             Q      Well, all right.  Well, I meant to

14      and must have misspoke, but let me ask it this way:

15      Did you discuss with Misty Hampton the need to use

16      a code to describe your activities there?

17             A      I did not.

18             Q      All right.  Referring to the 25th

19      now.  This is skipping -- skipping up a week.  You

20      can ignore that exhibit for now.

21             A      Okay.

22             Q      Now, was your visit there, was it

Page 161

1      interrupted by anything?

2              A      At one point there was a -- what I

3      believe someone from the Georgia Investigative

4      Office that showed up that needed to ask Misty some

5      questions, Ms. Hampton some questions.  I was in

6      the office chatting with her and when the gentleman

7      showed up, I politely left so that he could have

8      whatever interaction he needed with her.

9              Q      Did you know -- did you talk with the

10      investigator while he was there?

11              A      I did not.  I didn't have any

12      discussion with the investigator.  I just politely

13      said, "Here, you know, you need to talk with her,

14      I'll go ahead and leave."

15              Q      Did he ask -- did he say "Who are

16      you?  What are you doing here"?

17              A      I did not.

18              Q      Did he ask you that?

19              A      Not that I recollect.

20              Q      Did he -- okay.

21                     And your testimony -- your testimony

22      is that -- that you couldn't do what you were there

Page 162

1    to do because Misty was busy.  Is that -- is that

2    what happened?

3            A    That's what I recollect, that she had

4    lots of stuff to do and wasn't able to spend the

5    time on it.  Was able to give me a little bit time

6    to help.  You know, I came in with questions that I

7    might have developed overnight.  I might have been

8    looking online at manuals, or whatever, and trying

9    to understand things.  And, yeah, so I came in for

10   a short while until I could get a few minutes of

11   her time.

12              Again, I was trying to learn the

13   systems and -- and better understand how the -- how

14   they operated so I could in -- in the whole

15   election process so that I could really do a much

16   better assessment of it.

17           Q    If you would refer back to Exhibit 3,

18   which is the log of the Signal messages.

19           A    Uh-huh.

20              MR. CLEMENTS:  What page, Bruce?

21              MR. BROWN:  The last page, page 12.

22

Page 163

1        BY MR. BROWN:

2                Q      And specifically toward the bottom of

3        the page the entry on January 27, 2021.

4                A      January 27th?

5                Q      Yes.

6                       MR. CLEMENTS:  Page 13?

7                       MR. BROWN:  Yes.  The last page of

8        the exhibit.

9                       THE WITNESS:  Okay.  We're on that

10       page.  We still don't see it.

11                      MR. CLEMENTS:  What date are you

12       looking at?

13                      MR. BROWN:  Go to page 12.  I may be

14       missing a page on my copy.

15                      MR. CLEMENTS:  Go to page 12.  Okay.

16       There's nothing bearing a date of what the -- the

17       27th, is that what you're --

18                      THE WITNESS:  We don't see any 27th

19       in the log.

20                      Go down further and see if you can

21       find it down further.

22

Page 164

1    BY MR. BROWN:

2            Q      Look on page 13:

3                   MR. CLEMENTS:  Oh, there's one --

4                   THE WITNESS:  There it is.  Okay.

5    Yeah.  Yeah, we see it down towards the very end of

6    the line.

7    BY MR. BROWN:

8            Q      Right, on page 13, or the 13th page?

9                   And do you see -- do you see where

10   you say, "Hey guys, whenever Jim is available, we

11   three should get up to date.  Status here in Coffee

12   County has changed quite a bit and I'm having to

13   shift plans."

14                  Do you see that?

15           A      Correct, I do.

16           Q      And what did you mean by, "Status in

17   here in Coffee County has changed quite a bit"?

18           A      Well, as I mentioned already, I had

19   gone back with hopes of being able to do more

20   testing related to the anomaly and better

21   understand, for example, could we put it back into

22   a working state, but due to Misty's schedule, we

1     weren't available to do that, and so then I moved

2     on.   And I looked into other situations, like

3     Pierce County, called Dougherty, you know, spent

4     some time looking at some of the other issues that

5     had been raised while I was there.

6            Q     So, Mr. Lenberg, your testimony is

7     that the status changed was Misty's schedule and

8     nothing else?

9            A     That's correct, her schedule is --

10    has changed.   I mean, she just was not able to

11    spend the time with me.   I -- I really don't know,

12    you know, exactly what was going on behind the

13    scenes, so if she was getting calls or anything

14    else, I don't know.   I just don't know.

15           Q     On the same -- while we're here --

16    and this is jumping around a little bit out of

17    time, but if would you go to the page before, which

18    is page 12, the bottom of the page.

19           A     Uh-huh.

20           Q     And you were in this group, right,

21    this special report group?

22           A     Apparently.   I don't know if I was or

Page 166

1         not.  The special report group?

2                 Q     Special report thread name.

3                       MR. CLEMENTS:  Don't speculate,

4         just --

5                       THE WITNESS:  I don't -- I don't

6         know.

7         BY MR. BROWN:

8                 Q     Okay.

9                 A     But I have checked my Signal, and

10        I -- I did not find any messages in this time

11        frame.  There's various reasons why that might be,

12        but I did not have anything.

13                Q     Yeah, the discussion about your

14        report.  If you'd go to the next page, you'll see

15        Jim Penrose's e-mail at the top there on January

16        the 20th.  He says, "If you can draft a report for

17        review on Friday morning with Charles Bundren, that

18        would be best.  We only have until Saturday to

19        decide if we're going to use his report to try to

20        decertify the senate runoff election or if we hold

21        it for a bigger movement later."

22                      Do you see that?

Page 167

1          A      I see it.

2          Q      Do you recall discussions about

3     potentially using your reports to decertify the

4     senate runoff election?

5          A      I have no idea if they're talking

6     about my report or not because there were many

7     reports been generated all over the place.  So I do

8     not recollect this.  I don't recollect being in

9     this discussion group.  I might have been, but I

10    don't recollect it.  And, again, I've never met

11    this Charles Bundren.  I -- I really don't know.

12    So I doubt that I was in this group.  And -- and I

13    doubt -- I don't know what report they're referring

14    to.  It could have been the ICC report or ICP

15    report or it may have been some other report, I

16    have no idea.

17         Q      Okay.  If you go down on the same

18    special report thread, you will see one of the

19    e-mails is from you.  Do you see that?

20         A      Okay.

21         Q      And you say, "Just landed in

22    Albuquerque."  Do you see that?

Page 168

1          A     Yeah.  So was that -- okay.

2          Q     At least --

3          A     That looks like I was in the group,

4      if that's -- if that was from me in that group.

5          Q     You don't know anything about a

6      bigger movement later.  Is that right?

7          A     I don't.  Let me read what I said

8      there.

9          Q     I'm talking about Penrose's e-mail --

10      I'm sorry, Penrose's Signal message to you.

11                MR. CLEMENTS:  To the group.

12                THE WITNESS:  Which one now?

13                MR. CLEMENTS:  Which specific --

14      which message?  Give me a date and time, please.

15                MR. BROWN:  I'm sorry.  January 20,

16      13:18.

17                MR. CLEMENTS:  Okay.  There's a bunch

18      were 13:18s.

19      BY MR. BROWN:

20          Q     At the top of the page on page 13 of

21      Exhibit 3.

22          A     From reading this, I don't recollect

Page 169

1    this, but from reading it, it sounds like he may

2    have been referring to the ICC and the ICP reports

3    that he asked us to generate.

4            Q     Okay.  But you don't recall any

5    discussion about trying to decertify the senate

6    runoff election?

7            A     I -- I don't.

8            Q     And I believe your testimony was that

9    you weren't aware that your report was going to be

10   used for -- to decertify the senate runoff

11   election?

12           A     That's correct, I don't recollect

13   that.  Someone else may have had that idea, but

14   I -- I don't know.

15           Q     If you go back down -- if you go down

16   a page to January 20, 18:11, this is before your

17   second visit to Coffee County, right?

18           A     Yeah.  That's having to do with the

19   report and wanting to do additional testing because

20   I really wanted to be able to confirm that we could

21   switch it back and forth.

22           Q     So your plan was to nail all of this

Page 170

1          down to make it bulletproof.  And I take it that

2          effort was unsuccessful?

3                  A     We were not able to do additional

4          testing to be able to switch it back and forth,

5          which is what I was referring to here is we were

6          short on time, that first time we got it to fail,

7          and we wanted to switch it back the other way and

8          we were not able to do that due to Misty's schedule

9          and really be able to confirm it.

10                 Q     Okay.  If you go to page 1, there's a

11         February 17 entry that I need to ask you about, I

12         think.

13                 A     Okay.

14                 Q     I'm sorry, page -- I'm sorry.  My

15         bad.  Page 2.

16                 MR. CLEMENTS:  We're on page 2.

17         BY MR. BROWN:

18                 Q     Okay.  If you look at the bottom of

19         the page, there is a thread that's called "Coffee

20         County Misty"?

21                 A     Uh-huh.

22                 Q     And I believe if you look at the next

Page 171

1          page, you'll see that you're in that group.  And

2          on --

3                   A      Yep.

4                   Q      -- February 17th, Misty says, "This

5          is a piece you will need to program the fob."  Do

6          you see that?

7                       MR. CLEMENTS:  That's not from Mr. --

8          that's from Misty on February 17th.  The only entry

9          with Mr. Lenberg is ten days later on June 27th, so

10         I want to establish, are we -- are we suggesting

11         that this chain is on the same date, because it's

12         not?

13                      MR. BROWN:  I meant to ask, as a

14         foundational question, that he was in the Coffee

15         County Misty thread name and I pointed out that he

16         does appear to be if you look at the entries on the

17         next page.

18                      MR. CLEMENTS:  Okay.

19         BY MR. BROWN:

20                  Q      So let me ask again --

21                  A      On the previous page or -- I'm trying

22         to find where -- where -- the quote that you had.

Page 172

1          Give us the date and time, please.

2                    Q      February 17, 12:21.

3                    A      The previous page.

4                    MR. CLEMENTS:   Okay.

5          BY MR. BROWN:

6                    Q      Do you see that?

7                    A      I see something there about a fob,

8          yeah.

9                    Q      Okay.  It's something.  It says,

10         "This is a piece you will need to program the fob."

11         Do you know what she is talking about?

12                   A      Probably referring to the fobs that

13         are used for the ICP.  And I suspect this is

14         referring to the work in Michigan.  Misty did come

15         up and she was consulting with Stephanie Lambert on

16         helping out in Michigan.

17                   Q      And based upon her expertise in --

18         from Coffee County?

19                   A      Apparently.

20                   Q      So she was -- she was -- okay, she

21         was working for Stephanie Lambert then?

22                   A      Well, I -- I don't know.  At some

Page 173

1          point later, I don't know the exact dates because I

2          haven't looked at the timeline, but that's what I'm

3          suspecting it's referring to.   I should not

4          suspect, sorry.

5                    Q      Did you use your expertise in

6          developing the video that you shot at Michael

7          Lynch's apartment?

8                    A      Misty was retained after she left

9          Coffee County, after she was dismissed.   She did

10         come up to Michigan and she explained how elections

11         were run to enable us to do our testing there.

12                   Q      And to also help you do the video,

13         right?

14                   A      No.   She did not participate at all

15         in the video.

16                        MR. CLEMENTS:   And I think I'm going

17         to go ahead and object and insert work product

18         privilege here because this is talking about Antrim

19         County.

20         BY MR. BROWN:

21                   Q      Okay.   If you look at the next page,

22         there's an e-mail -- I mean a Signal message from

Page 174

1        you on the 27th of February.

2               A     Uh-huh.

3               Q     It says, "Hi Misty, please remind me

4        when you ran the adjudication software, were all

5        scanned ballots available for you to alter or only

6        those that were somehow marked for adjudication in

7        that batch?"

8                     Do you see that?

9                     MR. CLEMENTS:  And before the witness

10       answers, I want to clarify another -- or have

11       another question on whether Mr. Lenberg believes

12       this is related to Coffee County or Antrim County?

13       BY MR. BROWN:

14              Q     You can answer.

15              A     I -- I believe this is related to

16       Coffee County, this question.  And what I was

17       wanting to know was whether or not the adjudication

18       software on her ICC, when she ran it -- you may all

19       know the famous video that was put out by her and

20       her election board showing that when you ran the

21       ICC, that you can manipulate any of the votes any

22       way she wanted because she had administrative

1        privileges.  And she had stated that it didn't

2        matter whether it was one marked for adjudication

3        or not, and I just wanted to verify that was

4        actually the case.  So that's why I was asking her

5        the question, it was based on the video that --

6        that they had released from Coffee County.

7                Q     And do you know who paid Misty for

8        the work that she did in Michigan?

9                A     Stephanie Lambert did.

10               Q     Let's go down to page 9.

11                     MR. CLEMENTS:  Which page, Bruce?

12       BY MR. BROWN:

13               Q     I think it's page 9 of that exhibit.

14       And it's the -- just a point of reference, the

15       first message that I have on this page is 1/18 at

16       9:47, to make sure we're on the same page.

17               A     Yes, I see that.

18               Q     Okay.  If you -- if you scroll down,

19       you will see a message from you on April 20, 2021.

20       "Did you get Misty's EMS running in a VM?  If so,

21       can I download it as soon as possible?"

22                     Do you see that?

Page 176

1          A     Where was this?

2          Q     This is on April 20, 2021, at 2:33.

3          A     Yes, I see that.

4          Q     And -- and who is this directed to,

5     if you recall?

6          A     It would have had to have been Doug

7     Logan.  Doug's the only guy that I know of that

8     would be able to do that.  And he would have had

9     access to that through Sullivan and Strickler --

10    or -- yeah.

11         Q     He's referring to a virtual machine.

12    Is that right?

13         A     That's correct.

14         Q     And were you able to download it?

15         A     I did not download it.

16         Q     If you -- if you keep going there, it

17    says --

18         A     That I recollect.  I -- I don't

19    recollect downloading it, let's put it that way.

20         Q     No.  Fair enough.

21               If you go down a couple of hours to

22    the same day at 4:37, Doug says, "Talk to Jim to

Page 177

1       get" -- is it Charles's approval?

2              A      That's what it says.  I don't know

3       who it's referring to though.

4              Q      Is that Mr. Bundren maybe?  You don't

5       know?

6              A      I don't know.

7              Q      And then a couple of minutes later,

8       you say, "Got it."  Do you -- do you mean

9       understand what he said or you got permission?

10             A      I don't recollect getting permission

11      or doing anything with it so I assume I just was

12      responding and saying, "Yeah, I got your message, I

13      understand."

14             Q      Did you ever get access to the

15      virtual machine folder?

16             A      Not that I recollect.  I don't

17      believe I was ever directly connected to Strickland

18      and Sullivan's FileShare, or whatever you want to

19      call it.  Not that I recollect.

20             Q      Okay.  If you turn over to -- to page

21      11.  I'm sorry, page 12.  And I'm going to ask you

22      about a message from Phil Waldron.  And I will

Page 178

1    caution you that this may not be from -- to or from

2    you or in your thread, but I still have a question

3    about it.

4              Phil Waldron says, "Misty from Coffee

5    County is getting hammered like Tina in Mesa

6    County.  You have a copy of the image.  We need to

7    get it to our lawyer Bundren ASAP for her defense."

8              Do you see that?

9         A    I see that the message.

10        Q    Do you recall anything about that?

11        A    I don't.  Yeah, I don't recall

12   anything about that.

13        Q    Do you recall changing the ICC system

14   time again after you changed it -- after you had it

15   changed initially?

16        A    You mean changing it back to what it

17   was?

18        Q    No.  Changing it to November 3rd.

19        A    I don't recollect, but we might have.

20   I -- I -- I don't know either way.  It's possible.

21        Q    If the -- if the records reflected

22   that the ICC system time was changed to

1    November 3rd, that second week that you were there,

2    does that refresh your recollect?

3                    MR. CLEMENTS:  We would have to see

4    it, Bruce.  You can't refresh it through an oral

5    representation, but if you've got something for him

6    to look at, let's go ahead and do it.

7    BY MR. BROWN:

8            Q     Do you remember doing that or having

9    her do that?

10           A     I don't remember.

11           Q     Would there be any -- would there be

12   any reason to change the clock again if you were

13   not continuing to run the ballots?

14           A     If -- if we were going to test, we

15   would want to change the time, so it's possible.

16           Q     As a security professional, do you

17   think it's problematic for a third party, even

18   accessing through a local official, to be changing

19   a clock on voting system equipment?

20           A     Not if it's changed back to the

21   appropriate time.

22           Q     But you don't know if this one was or

1       not, right?

2               A       I don't know for sure.

3               Q       Why did you bring a light -- a ring

4       light into the Coffee County election's office?

5                       MR. CLEMENTS:  Objection.

6       Foundation.

7       BY MR. BROWN:

8               Q       Or did you bring one in there?

9               A       I bring when I go various places lots

10      of stuff with me that I may or may not use.  I very

11      well could have brought a ring light in there.

12      Again, I was trying to learn, so the possibility

13      that I might want lighting to take, you know, a

14      video of the pollbook or something like that or a

15      video of something so that I could see how it

16      actually, you know -- so I could remember what

17      Misty said about how the system functioned.  I

18      could imagine wanting to do that.  I can't

19      recollect whether we did that or not, to be honest,

20      I -- I don't know.

21                      MR. BROWN:  Let me mark as the next

22      exhibit Tab 17.

1                    (Lenberg Deposition Exhibit Number 9

2              marked for identification.)

3                    MR. CLEMENTS:  Will this be

4        Exhibit 9?

5                    COURT REPORTER:  Yes.

6                    MR. CLEMENTS:  Okay.

7                    MR. BROWN:  Thank you.

8                    MR. CLEMENTS:  Still waiting for it.

9                    THE WITNESS:  Uh-oh, what happened to

10       the site?

11                   MR. CLEMENTS:  It looks like there's

12       a server malfunction, so we'll have to re-access

13       it.

14                   THE WITNESS:  We just lost your site.

15                   MR. BROWN:  Okay.

16                   THE WITNESS:  We are going to try to

17       re-access it.

18                   MR. CLEMENTS:  I tried the link sent

19       through the e-mail and I got the same --

20                   THE WITNESS:  Let me see if we've got

21       the same network.  We're connected, we've got

22       internet access, we're good.  We have internet

Page 182

```
 1        access.  We're trying to access -- there we go, it

 2        came back up.  We must have temporarily lost the

 3        internet connection for some reason, but it's back.

 4        Well, that's from the deposition, that's his

 5        deposition of Alex.

 6                     MR. CLEMENTS:  Yeah, it looks like we

 7        got loaded to a different --

 8                     THE WITNESS:  It brought up -- is

 9        that Alex Halderman or Andrew Cruce.  We're on the

10        wrong deposition when we clicked on the accept

11        invitation.  There we go.  There it is.  Okay.

12        Found it.

13                     MR. CLEMENTS:  All right.  Exhibit 9.

14        I think we got it now.  Okay.  We're good.

15        BY MR. BROWN:

16               Q     So Exhibit 9 is a photograph.  Does

17        that appear to be you?

18               A     Yeah, that would probably be me.

19               Q     Hang on just one second, we have some

20        technical issues on our end.  Hold on.

21               A     Uh-huh.

22                     MS. MARKS:  Bruce, were you waiting
```

Page 183

1    on me to upload something?  I lost my sound for a

2    moment, and I -- if you asked me to, I didn't hear

3    it.

4                    MR. BROWN:  That's okay, I'm just

5    writing you a text.  We're good.

6                    MS. MARKS:  Okay.  Somehow when

7    Mr. Lenberg lost his access, I lost my sound.  I

8    don't know what happened.  I could see it, but

9    couldn't hear it.

10   BY MR. BROWN:

11           Q    Okay.  Looking at Exhibit 9, that's

12   you with the box there, right?

13           A    Yes.

14           Q    And that's the ring light box.  Is

15   that right?

16           A    If you say so, I can't tell from this

17   picture, but it very well could be.

18           Q    Okay.  And did you take any videos

19   when you were there?

20           A    You know, I honestly don't recollect

21   if I did or not.

22           Q    Did you --

Page 184

1            A     I might have.  I -- I don't remember,

2      but I didn't find any during my search for videos.

3            Q     And then if you scroll down, it looks

4      like Misty Hampton has the same box after you left

5      on the 29th, right?

6            A     I don't -- I can't tell from the --

7      from the --

8            Q     You don't -- you don't recall taking

9      any videos there?

10           A     I really don't recall either way.

11           Q     Do you remember taking any

12     photographs when you were -- when you were there?

13           A     I don't -- I don't recall.  I

14     haven't -- I did a search for video and photographs

15     and I can't find any in my search, so I -- I can't

16     say definitely either way.

17           Q     Okay.  I want to switch gears to the

18     zip file that you produced overnight that we do not

19     have the password for.  I believe the -- the files

20     that you sent overnight contained the CompactFlash

21     cards.  Is that right?

22           A     That's my belief, the zip that I

Page 185

1      still don't have a password, but yes, that's my

2      understanding is that it had the SLOG -- the text

3      files on it.  And I learned later probably the

4      election files as well as the result files in

5      encrypted format.

6             Q     And that would have included ballot

7      images?

8             A     It would have included what?

9             Q     Ballot images.

10            A     It would have included ballot images,

11     yes.

12            Q     And it would include the sequence of

13     the ballots?

14            A     The CompactFlash cards would have

15     contained that.

16            Q     And for what elections -- election or

17     elections would that information be about?

18            A     To be honest, at this point, since I

19     haven't opened that guide and studied it, I don't

20     know if that was the 2020 November 3rd or if that

21     was from the machine recount.  I'm not sure which

22     one.

Page 186

1          Q     It's possible it could have stored
2     information about more than one election, correct?
3          A     No.
4          Q     Don't they just override and to the
5     extent they override it?
6          A     Overwrite.   They overwrite.
7          Q     But it may -- but they don't erase it
8     before putting another election on it, do they?
9          A     The machine does.   It -- it reformats
10    before it does it.
11         Q     How do you know that?
12         A     I observed it in my work in Michigan.
13         Q     Do you know if that's the way they do
14    it in Coffee County?
15         A     Say again, please.
16         Q     Do you know if they do that in Coffee
17    County, reformat the CompactFlash drives before
18    they put any more information on it?
19         A     It's not up to the worker.   The
20    system does it.   And the system in Coffee County
21    appears to be the same as the system in Michigan
22    and so it would do the same thing.

Page 187

```
 1              Q     Okay.  But in any event, you're not
 2      sure -- so it would be one election, but you're not
 3      sure which election it was.  Is that fair --
 4              A     That's correct.
 5              Q     -- to say?
 6              A     That's correct, I'm not sure which
 7      one it was.
 8              Q     And the -- but the CompactFlash would
 9      also have information relating to the configuration
10      of the ICP, correct?
11              A     Yes.
12              Q     And the log files, that kind of
13      thing?
14              A     SLOG files, yes.  The system log
15      files.
16              Q     And did you figure out how to access
17      the information on those CompactFlash drives?
18              A     You know, I don't recollect if I did
19      or not.  There was so much going on at the time and
20      I was up in Michigan pretty quick and moved on from
21      Georgia, so to what extent I analyzed that from
22      nothing to whatever, I don't know.  I -- I don't
```

Page 188

1    recollect what it was.

2            Q    And how did you get this information

3    from Misty Hampton?

4            A    I believe it was a memory stick.

5            Q    And you asked for it and she gave it

6    to you, right?

7            A    I believe so.

8            Q    It wasn't in response to an Open

9    Records Act request, right?

10           A    I don't believe so.

11           Q    And is it your understanding that she

12   had the authorization to give you this kind of

13   information?

14           A    Yes, I believe so.  That was my

15   understanding.

16           Q    And I may have asked you this but --

17   or you may have testified, is that this -- is it

18   the same information that SullivanStrickler would

19   have had on their ShareFile site or different?

20           A    I would expect it to be the same.

21           Q    And you got it from Misty because at

22   that time you did not have access to the

1        SullivanStrickler file, right?

2              A     That's not true.  I -- I -- I don't

3        know that I had access or not, but me getting it

4        from Misty was so that -- in particular I was

5        learning about this stuff in the system log files,

6        so the idea was that at some point I could look at

7        those system log files and try to look for

8        reversals.  And, again, I don't recollect how much

9        analysis I did on that, if any.  But that was what

10       idea, was to be able to look at the system log

11       files which are available via records request,

12       apparently across the country in most

13       jurisdictions.

14             Q     Did you give the information on those

15       flashcards to anybody else?

16             A     No.

17             Q     Were you working for an attorney in

18       connection with obtaining those files or was that

19       just on your own?

20             A     That was essentially on my own.

21             Q     And what were you going to use them

22       for again?

```
 1              A     The primary thing is I had learned

 2       about the system log files and the fact that it

 3       recorded how the machines behaved, the tabulators

 4       behaved per ballot, as far as whether or not they

 5       reversed them.  And that is what I was particularly

 6       interested in, as we've already -- I've already

 7       testified about, the testing of the machines and

 8       reversals.  So that was the primary reason for

 9       getting it.  At that point I didn't even know

10       that -- necessarily if the election files were on

11       there.

12              Q     And this would have been toward the

13       conclusion of your visit in Coffee County or do

14       you -- the second meeting?

15              A     That's correct, the date on that file

16       is the 28th, which I believe was the last day,

17       uh-huh.

18              Q     Before I forget, has the Secretary of

19       State of Georgia ever contacted you to ask you any

20       questions about your work in Coffee County?

21              A     No.

22              Q     Has the --
```

Page 191

```
 1          A     Not that I'm aware of.
 2          Q     Well, you probably would know if they
 3     tried to, I guess, right, or maybe not?
 4          A     I -- if they had called and left a
 5     message, we screen our calls like everybody else
 6     does because we get so many crank calls, so had
 7     they called and left a message, I might have
 8     responded to that.  But I did not get a message
 9     like that, nor did I get an e-mail or any other
10     physical contact that I'm aware of.
11          Q     I asked you about the Secretary of
12     State.  Let me just go through the other
13     organizations.
14                Has the State Election Board
15     contacted you about your work in Coffee County?
16          A     No.
17          Q     Has the GBI contacted you about your
18     work in Coffee County?
19          A     No.
20          Q     Has the Fulton County Attorney
21     contacted you about your work in Coffee County?
22          A     No.
```

Page 192

1          Q     Has the FBI contacted you about your

2     work in Coffee County?

3          A     No.

4          Q     Just one second.

5                And finally, has the January 6

6     Committee -- the House January 6th Committee

7     contacted you about your work in Coffee County?

8          A     No.

9                By the way, I'm ready for a quick

10    break whenever you guys are.

11         Q     Thank you for asking.  That would be

12    great.  I appreciate it.

13         A     Okay.  What are we taking?

14         Q     Let's take 10 minutes.

15         A     So to 1:00.

16         Q     I'm sorry, 1:05 your time, 3:05 our

17    time.

18               VIDEOGRAPHER:  Going off the record.

19    The time is 2:55 p.m.

20            (Recess from 2:55 p.m. to 3:11 p.m.)

21               VIDEOGRAPHER:  Going back on the

22    record.  The time is 3:11 p.m.

Page 193

1                    MR. BROWN:  I would like to mark as

2          the next exhibit Tab 4, I believe it's Exhibit 10

3          or 11.

4                    COURT REPORTER:  It's 11.

5                    MR. BROWN:  Thank you.

6                    (Lenberg Deposition Exhibit Number 11

7                    marked for identification.)

8                    MR. CLEMENTS:  We don't have it yet,

9          we'll let you know.

10                   MR. BROWN:  Okay.  And then just

11         for -- to save time, if you would also load as 12

12         and 13, Tabs 26 and Tab 21 respectively.

13                   MR. CLEMENTS:  We have Exhibit 11

14         uploaded if you want to ask questions pertaining to

15         that, Bruce.

16                   MR. BROWN:  Sure.

17         BY MR. BROWN:

18              Q    Do you see Exhibit 11, the photograph

19         on the first page of Exhibit 11?

20              A    I do.

21              Q    And what was in the plastic bag?

22              A    I -- I have no idea.  I can't tell --

Page 194

1      I can't tell from here what it -- what it was.  I

2      can't tell.

3            Q      And did you -- you didn't introduce

4      any software or data into the election equipment,

5      did you?

6            A      No, I did not.

7            Q      And apart from the thumb drive that

8      you got from Misty, you didn't take any data from

9      there physically, did you?

10           A      Not that I recollect.

11           Q      And then the first picture is

12     January 18, 4:20 in the afternoon.  Do you see

13     that?

14           A      Okay.

15           Q      And then the next photo has you

16     leaving the same day at 8:00?

17           A      Okay.

18           Q      And who is that in front of you?

19           A      I -- I believe it's Misty.

20           Q      And that's Mr. Logan with you?

21           A      I suspect.  It looks like it probably

22     is.

Page 195

1          Q     And then the page 3 is it looks like

2     you arriving -- you and Mr. Logan arriving the next

3     day at 8:52, correct?

4          A     Correct.

5          Q     And then the final page is you

6     leaving on the 19th at 6:19, correct?

7          A     Let me check the time.  Those are two

8     different times -- oh, this is -- yes, that appears

9     to be 6:19.

10          Q     Do you know who that is to the right

11     of you there?

12          A     I believe that's Misty's daughter.

13          Q     Okay.

14          MR. BROWN:  And then if you would

15     load Tab 26 as Exhibit 12.

16              (Lenberg Deposition Exhibit Number 13

17               marked for identification.)

18          MR. CLEMENTS:  All right.  Exhibit 12

19     is opened.

20          MS. MARKS:  Bruce, you wanted Tab 12

21     I thought is --

22          MR. BROWN:  Tab 26.

Page 196

```
 1                    MS. MARKS:  Right, that's loaded as

 2         13.

 3                    MR. BROWN:  Okay.  What I'm looking

 4         for is the exhibit that is the January 28th

 5         handwritten notes.

 6                    MS. MARKS:  That is Exhibit 13.

 7         BY MR. BROWN:

 8              Q    Okay.  Let me show you what has been

 9         marked as Exhibit 13.  Do you see that?

10                    MR. CLEMENTS:  Tab 26?

11                    THE WITNESS:  Yes.

12         BY MR. BROWN:

13              Q    Is that your handwriting on

14         Exhibit 13?

15              A    I believe so.

16              Q    It's dated January 28, 2021?

17              A    Correct.

18              Q    And to the best of your knowledge and

19         recollection, does that mean it was probably

20         written on that date by you?

21              A    Correct.

22              Q    And it -- and it -- if you look
```

1       toward the middle of the page, it says, "3:30

2       Penrose," then, "Ray Speer."  Who is Ray Speer?

3               A       I do not recollect who Ray Speer is

4       honestly.  I don't know.

5               Q       And then to the right it says,

6       "Alex," and then I can't read that word.

7               A       Alex Gason.  I do recognize that.

8       I -- that is a partner that I have in my energy

9       business based in the UK.

10              Q       And so that -- that doesn't have

11      anything to do with this case?

12              A       It has nothing to do with Coffee

13      County.  And that may be true throughout these

14      notes, there may be additional notes in here that

15      have nothing to do with Coffee County.

16              Q       Fair -- fair enough.

17                      You say in this -- this note, "We

18      know the machines 'reverse' a lot of ballots with

19      ICC unnecessarily."

20                      Do you see that?

21              A       That is correct.

22              Q       And you're referring to the -- what

Page 198

1       the machine says reverse when it does not -- when

2       it takes it and then reverses the information that

3       it initially logged for that particular ballot,

4       correct?

5               A       No, not quite correct.  It reverses

6       the physical ballot out of the machine and forces

7       you to either spoil it and get a new one or try

8       putting it in again.

9               Q       Right.

10              And you say, "We know they favor

11      Trump over Biden"?

12              A       That's correct, that's in our

13      reports.

14              Q       And did you mean they favored Biden

15      over Trump?

16              A       No.  Mean that the reversals, there

17      are more reversals for Trump than there are for

18      Biden.

19              Q       Okay.

20              A       That's what I meant by that note, I

21      believe.

22              Q       No, I understand.

Page 199

1          A      And keep in mind, I -- some of these

2      scribbles I may not know what I meant so --

3          Q      I got it.  I got it.  I'm not trying

4      to trick you into something there.  I hear what

5      you're saying.

6          A      But I believe that it's consistent

7      with the report we noticed that they were reversing

8      Trump more than Biden, which what that explains to

9      me is that the machine can arbitrarily for some

10     reason reverse one candidate more than the other,

11     which is a huge vulnerability in my opinion.

12         Q      And then let me direct your attention

13     to Exhibit 12, which is Tab 21.

14         A      We've got it.

15             (Lenberg Deposition Exhibit Number 12

16              marked for identification.)

17     BY MR. BROWN:

18         Q      And then if you look at the bottom,

19     there's an e-mail from you to open records request.

20     Do you see that?

21         A      No, not in Tab 12.  Tab 12 for us is

22     the ICP Dominion report, the ICP Analysis Update.

Page 200

1             Q     Then we --

2                   MS. MARKS:  I think you're looking

3        for Exhibit 14.

4                   MR. BROWN:  No, I'm looking for Tab

5        21.

6                   MS. MARKS:  Which is Exhibit 14.

7        BY MR. BROWN:

8             Q     Okay.  Exhibit 14, do you see that

9        there?

10            A     We're looking for it.  We haven't got

11       it yet.

12                  MR. CLEMENTS:  We have got Exhibit

13       13, and for whatever reason --

14                  THE WITNESS:  The thing down at the

15       bottom is frozen.  Oh, that is Exhibit 14, the one

16       that you've got highlighted down at the bottom.  If

17       you click there, it should come up.  Oh, I'm sorry.

18                  MR. CLEMENTS:  I'm trying to -- here

19       we go.  Exhibit 14, Tab 21.

20                  (Lenberg Deposition Exhibit Number 14

21                   marked for identification.)

22

Page 201

1    BY MR. BROWN:

2            Q     Correct.  Do you see that -- and just

3        to make sure we're looking at the same document, do

4        you see at the bottom of that page an e-mail from

5        you to open records request.

6            A     I see from -- yes, I see at the

7        bottom it says to someone, "Subject:  Open records

8        request."  I believe that was the County.  Yes, I

9        see that.

10           Q     And did Misty ever fulfill that Open

11       Records Act request?

12           A     No.  I never received the results of

13       this one.

14           Q     She says, "He gave me a thumb drive

15       and I put it on the thumb drive."  Do you think

16       she's referring to the CompactFlash information

17       that she gave you?

18           A     I -- I don't know what she's

19       referring to.

20           Q     Okay.

21           A     I -- I don't remember it being

22       fulfilled.

Page 202

```
 1          Q     Well, we did not receive any

 2     documents unless -- well, let me just put it this

 3     way, I'm not trying to play tricks on you, but my

 4     next question was, why didn't you produce to us the

 5     documents that she produced to you.  But your

 6     recollection is that you did not get any documents

 7     in response to this Opens Record Act request.  Is

 8     that right?

 9          A     That's correct.  I don't believe I --

10     I got any paper tapes and some of the other things

11     that were requested here.  In fact -- well, I --

12     I -- when I left, I don't believe this had been

13     fulfilled.  That's how -- that's what I recollect.

14          Q     And I just want to get the -- the --

15     the sequence correct on how you obtained a copy of

16     the SullivanStrickler forensic copy.

17          A     That's not correct.  I got a copy

18     directly from the election supervisor, who I

19     believe was authorized to give it to me.  It did

20     not go through SullivanStrickler, or however you

21     say their name, Sullivan and Strickler.  It wasn't

22     a copy of what they did.  Now, they apparently did
```

Page 203

```
 1        a forensic image, but -- but the copy I got, I

 2        believe, was made by Misty Hampton.

 3               Q     Right.  I'm referring to what you got

 4        FedExed -- what was FedExed --

 5               A     Oh, different -- different thing.

 6        Okay.  You're talking about the disk that was sent

 7        to Michigan?

 8               Q     Yes.

 9               A     Oh, okay.  Sorry.  Wrong topic.  Go

10        ahead and ask the question again, please.

11               Q     No, I -- I confused you because I --

12        I didn't have a transition in my questions and

13        so --

14               A     Okay.

15               Q     -- I apologize for that.

16                     But what I'm referring to is a

17        forensic copy that SullivanStrickler made and had

18        on their ShareFile site.

19                     But the sequence of that is, just

20        goes over some of your own testimony, I'm just

21        trying to get it together, is that you had asked

22        Doug Logan for a copy -- you weren't able to get
```

Page 204

1      approvals for that apparently, but then you did

2      obtain it from Michael Lynch, correct?

3              A    No, not quite.  The -- those are two

4      independent things that I believe you put together

5      there.  What I recollect is from the e-mail, and

6      it's consistent with that, is that Jim Penrose and

7      Stephanie asked if that disk be sent up there.  And

8      the disk we sent up there -- and I'm just repeating

9      myself -- Michael Lynch received it, Michael Lynch

10      delivered it to me.  I was asked to make a copy

11      that was utilized for I don't know what, but it was

12      handed over to them.  And then the original disk

13      was taken by Michael Lynch.

14              Q    And were you stationed, for lack a

15      better term, in Michigan in that April time frame

16      then working with them?

17              A    What's the question again?

18              Q    Were you physically in Michigan

19      working on --

20              A    I was.

21              Q    -- working on the --

22              A    I was.

Page 205

1          Q     Do you know Ben Cotton?

2          A     Yes, I know Ben Cotton.

3          Q     And did he assist you in your

4     evaluation of the Cotton County -- Coffee County

5     information?

6          A     Not that I recollect.  Did he assist

7     me?  Not that I recollect.

8          Q     Did you communicate with him about

9     the information that you obtained in Coffee County

10    or the information that he obtained in Coffee

11    County?

12         A     Not that I recollect.

13         Q     I'm going to sort of close the loop

14    on some of these emails, but before I do that, you

15    used the e-mail to ask for the Open Records Act

16    request in Exhibit 14.  Did you -- we -- we have --

17    we have received very few e-mails, as far as I

18    know, in your document production.  Is that because

19    you didn't have very many or what?

20         A     That's correct.  There were very few

21    e-mails that met the requirement in the subpoena

22    for document discovery.  I -- I used Signal

Page 206

1         heavily, I did -- hardly ever used e-mail.

2                     MR. BROWN:  Let's mark as the next

3         exhibit, Tab 6.  I believe that's Exhibit 15.

4                  (Lenberg Deposition Exhibit Number 15

5                     marked for identification.)

6                     THE WITNESS:  I don't think we have

7         it yet.  It looks like it's just 14 now.  You said

8         it's Exhibit 15?

9                     MR. BROWN:  Yes.  And that's going to

10        be Tab 6.

11                    THE WITNESS:  I believe we're still

12        waiting for it.  I believe we have it.

13        BY MR. BROWN:

14              Q     And this is a collection of -- that

15        you produced, correct?

16              A     That is correct.

17              Q     If you scroll down to about the third

18        page, you'll see it looks like an e-mail from Doug

19        Logan.  Do you see that?

20              A     It's actually I believe a calendar

21        invite.  It says Douglas Logan at the top, from to

22        Misty Hampton, and VAguy20.  Is that correct?  Is

1          that the one you're talking about --

2                    Q     Yes.

3                    A     -- March 24th?

4                    Q     Yes.

5                    A     That was a calendar invite, uh-huh.

6                    Q     Hence the -- the bar that says

7          "event," right?

8                    A     Right.

9                    Q     And it -- it's an event that -- well,

10         first, it's to Misty Hampton, correct?

11                   A     It was to Misty Hampton and myself,

12         correct.

13                   Q     And who's VAguy20@███████████.com?

14                   A     That's my proton mail address.

15                   Q     And it looks like it was to schedule

16         a four-and-a-half-hour meeting.  Is that right?

17                   A     That's what it appears to be.

18                   Q     What was the meeting about?

19                   A     I have no idea.  I really don't know

20         what -- what it was about, nor do I know how long

21         it actually lasted.

22                   Q     But this is in March 24th, this would

Page 208

```
1        have been a couple of months after you left Coffee

2        County, correct?

3                        MR. CLEMENTS:  Let me ask a question

4        here.  Can we just establish whether or not he even

5        remembers a meeting even took place, just because

6        you have a calendar notice, you need to lay some a

7        foundation there.

8                        MR. BROWN:  Fair enough.

9        BY MR. BROWN:

10               Q     Do you recall if a meeting even took

11        place?

12               A     I don't recall.

13               Q     Do you recall --

14               A     I -- I -- you know, there were

15        hundreds of meetings occurring, so I don't recall

16        if this one did or not.

17               Q     And hundreds of meetings about the

18        Michigan issue.  Is that right?

19               A     About all kinds of stuff, but yeah,

20        lots in Michigan, Arizona, and so on.

21               Q     Well, other than Michigan, what was

22        Misty Hampton continuing to be involved in in March
```

Page 209

1      of 2021?

2              A     I don't know what else Misty was

3      involved in, you would have to ask her.

4              Q     If you would scroll down to the ninth

5      page of this PDF, you will see an exchange from

6      federal attorney -- with federal attorney.  Do you

7      see that?

8              A     I do.

9              Q     That's Stephanie Lambert, correct?

10             A     That's correct.

11             Q     And if you go down further, there's a

12     e-mail message from Paul Maggio.  Do you see that?

13             A     I see that.

14             Q     And I believe you referenced this

15     e-mail actually in your earlier testimony.  And

16     this is the transmittal information from Paul

17     Maggio to Stephanie Lambert?

18             A     That's correct, apparently from that

19     message.

20             Q     And the -- this would have been a

21     copy of the SullivanStrickler forensic image of the

22     system?

Page 210

1              A       That's what it appears to be.

2              Q       Okay.  And JP Comms is Penrose,

3      right?

4              A       That's correct.

5              MR. BROWN:  Okay.  Let's mark as the

6      next exhibit which is Exhibit 16, Tab 5.

7              (Lenberg Deposition Exhibit Number 16

8               marked for identification.)

9              THE WITNESS:  We're still waiting for

10     it.  It's loading.  Okay.  It's loaded.

11     BY MR. BROWN:

12             Q       Let me -- and who is Kevin Moncla?

13             A       Kevin is someone that I was

14     introduced to in apparently in the end of August

15     time frame of this year.

16             Q       And are you working with him now?

17             A       Working with his -- the answer is no.

18             Q       Have you given him some assistance in

19     the claim that he has filed with the SEB?

20             A       I did generate the thing I called

21     declaration, which you've already shown.  And I

22     gave him permission to include that with his filing

Page 211

1          with the SEB.

2                    Q      I see.

3                           If you go down to page 24 on Exhibit

4          16.

5                    A      We're getting there.  Okay.

6                    Q      And you will see that -- is it your

7          messages on the right?

8                    A      That's correct.  That's correct, mine

9          are on the right, Kevin Moncla's are on the left.

10                   Q      Okay.  So you say at the top of the

11         page, "Have you tried to get the firsthand account

12         from Ms. Hamilton?"

13                          Do you see that?

14                   A      Yes, I see that.

15                   Q      And he says she's represented by

16         Stephanie Lambert, right?

17                   A      Correct.

18                   Q      And then why do you say "not good"?

19                   A      On September 7th of 2021, I severed

20         my relationship with Stephanie Lambert.

21                   Q      Why?

22                          MR. CLEMENTS:  Before you answer the

Page 212

```
 1        question, in the privilege log we identified a NDA.

 2        I just want to caution Mr. Lenberg to think through

 3        any NDAs that he has entered into before answering

 4        the question and if it doesn't apply, then you have

 5        to answer.

 6                    THE WITNESS:  Yeah, I do have to be

 7        careful because obviously there are things in

 8        Antrim, Michigan that are still going on but --

 9                    MR. CLEMENTS:  Can you answer the

10        question?

11                    THE WITNESS:  What is the question

12        again?

13        BY MR. BROWN:

14             Q      Why did you sever your relationship

15        with Stephanie Lambert in September -- is it 2021?

16             A      That's correct, September 2021.

17             Q      Why did you sever your relationship

18        with her in September of 2021?

19             A      Does this violate the NDA?  I will

20        just say I lost trust in her.

21             Q      And who introduced you to Moncla in

22        the first place?
```

Page 213

```
 1              A     A fellow named Brian Loophole.

 2              Q     And who's he?

 3              A     He is a podcaster, I believe, and an

 4        investigator and podcaster.

 5              Q     And can you say what event triggered

 6        you losing trust in Ms. Lambert?

 7                    MR. CLEMENTS:  I'm going to object.

 8        I think we're getting into areas of privileged and

 9        his mental impressions.

10        BY MR. BROWN:

11              Q     Well, she wasn't your lawyer, right?

12              A     I understand, but she had an

13        arrangement with Attorney Matt DePerno, and it was

14        that team -- that legal team that -- that I think

15        was leading the Antrim --

16                    MR. CLEMENTS:  That's correct.

17                    THE WITNESS:  -- investigation.

18                    MR. CLEMENTS:  Yes.

19        BY MR. BROWN:

20              Q     So you were engaged as an expert by

21        Lambert and DePerno.  Is that right?

22              A     That's correct.
```

Page 214

1          Q     And you severed your relationship, I

2     take it, with both of them, correct?

3          A     Not correct.

4          Q     Okay.  So you retained your -- your

5     engagement with Mr. DePerno, but severed your

6     relationship with Ms. Lambert, correct?

7          A     That is correct.

8          Q     And the reasons for that severance --

9          MR. CLEMENTS:  I want to object on

10    privilege.

11         MR. BROWN:  No, I'm just going to say

12    the reason -- I'm just establishing that, David.

13    BY MR. BROWN:

14         Q     And that you can say nothing further

15    about the reasons for your severance with

16    Ms. Lambert because of privilege, correct?

17         A     Uh-huh.

18         MR. CLEMENTS:  You need to say yes.

19         THE WITNESS:  Correct.

20         MR. CLEMENTS:  Okay.

21    BY MR. BROWN:

22         Q     In the next couple of messages

Page 215

1        Mr. Moncla says, "I don't want to put you in a bad

2        position in any way, I just want the record and

3        facts to be complete."

4                    Do you see that?

5            A    Yes, I see that.

6            Q    And then you say, "It would be

7        interesting for you to ask and see what Lambert's

8        response is.  I expect her to say no which would

9        confirm some things."

10                   Are you able to tell me what

11       Ms. Lambert would say no to?

12           A    No.

13           Q    Because of privilege?

14           A    Yes.

15           Q    A couple of lines down you say, "I

16       believe Lambert and Lynch are working for some

17       other entity."

18                   Do you see that?

19           A    I do.

20           Q    And can you say what other entity

21       that might be?

22           A    No, I can't.

Page 216

```
 1            Q     And is that because it's privileged
 2       for the record?
 3            A     I do not know.
 4            Q     Oh, you just don't know.  Okay.
 5            A     I don't know.
 6            Q     Okay.  A couple of lines down, I
 7       believe here at 6:56, you confirm the instance in
 8       which an investigator came to Coffee County, but
 9       you did not interact with the investigator.  Is
10       that right?
11            A     At what time?  6:56?
12            Q     6:55, I think.
13            A     Let us find it, please.
14            Q     It starts with, "Thanks."  It may be
15       on the next page, I'm scrolling pretty fast.
16            A     Are you talking about the comment
17       that says, "Thanks.  One did come in to see Miss
18       Hampton, so I politely left her office so that they
19       could" -- it's covered up by something --
20                  THE WITNESS:  Would you scroll down
21       so I can see what's behind that arrow?
22                  MR. CLEMENTS:  It's blocked.
```

Page 217

1                   THE WITNESS:  You can't scroll up and

2          down?  There you go.  Okay.  That's fine.  There it

3          is.

4                   "So that they could meet.  I did

5          not interact with the investigator."  I believe

6          that's consistent with what I said before.

7          BY MR. BROWN:

8                   Q     It is.  It is.  Thank you.

9                   You then ask about the redacted and

10         unredacted version of Gabriel Sterling's

11         deposition.  Do you see that?

12                  A     I do see that.

13                  Q     And you assumed that it was Marilyn

14         Marks that redacted it and not the State that

15         produced it.  Is that right?

16                  A     Kevin told me that.  Whether that's

17         accurate or not, I don't know, but that's what he

18         told me.

19                  Q     If you would go down to the next

20         page, it's page 28.  Your first message, you say

21         that you have a suspicion that they don't want to

22         depose me because they are afraid of what I would

1    reveal.

2                    Do you see that?

3           A     No, not yet, let me find it.  What

4    timestamp?

5           Q     8:16.

6           A     8:16.  Yeah, what I'm referring to is

7    that Kevin, in this list, had sent me a notice

8    of -- from the court there -- and by the way, I

9    wasn't even familiar with the Curling case until

10   Kevin mentioned it to me, so I had no idea this

11   case was going on.  And then he began communicating

12   with me a bunch about -- mainly sending me stuff, I

13   commented back very little.

14                    But what happened was he sent me a

15   notice that there was an additional discovery

16   period of three weeks.  And -- and so I was at

17   home, I was expecting -- and my name was at the top

18   of that list on that -- on that document, and I was

19   expecting a -- someone to knock on the door any day

20   or, you know, someone to call me or leave a message

21   or send me an e-mail.  And those three weeks went

22   by and there was absolutely no attempt to contact

Page 219

1      me, that I could tell.

2                  And then somewhere in that time frame

3      I saw a podcast that said -- basically that implied

4      that -- that I was avoiding -- you know, avoiding

5      being -- avoiding a subpoena, which I have never

6      avoided.

7            Q     I understand.

8                  And then you say, "They don't want to

9      depose me because they are afraid of what I would

10     reveal."  What is it that you think the plaintiffs

11     were afraid you would reveal?

12           A     Well, the fact that the election

13     systems in -- in all of my travels, what I see is

14     we have an incredibly flawed election system

15     documented in several different cases.  And you've

16     got the narrative out there is that we have a

17     secured election system.  And -- and that those

18     kinds of details they do not want to be revealed.

19                  Part of the false narrative is that

20     in the media, that is, that all of these court

21     cases have occurred and none of them have showed

22     any substance and that shows that there is no

Page 220

1      problems with the election system.  Well, that's

2      absolutely not true because in every case that I

3      know of the case was never actually taken anywhere

4      due to usually standing, is my understanding, it

5      was rejected.  And so --

6              Q      And you're not -- you're not -- you

7      said you weren't aware -- let me interrupt you

8      because it's going beyond my question.  But you're

9      not aware -- are you aware of what the plaintiffs

10      contend in Curling?

11              A      Actually, I am now.

12              Q      Okay.

13              A      I am.  And I think I'm supportive of

14      the idea of getting rid of the ICXs because of the

15      vulnerabilities.  And I would say IC -- the ICPs

16      and the ICCs, and actually our entire election

17      system, all brands, having very insignificant

18      vulnerabilities.  And so I support the idea that we

19      can't really use any of them.

20              Q      Who is Clay Parikh, P-A-R-I-K-H?

21              A      He apparently is someone that worked

22      for Pro V&V.  That's what Kevin told me.  He sent

Page 221

1    me contact information.  I have never contacted

2    him.

3              Q     And what did he know that -- or what

4    did you think he knew or what did Mr. Moncla convey

5    to you that he had information about?

6              A     I -- I really don't know the

7    specifics.

8              Q     But he worked for Pro V&V --

9              A     All I know was he worked for Pro V&V,

10   and that Kevin had interacted with him a bunch.

11   And he no longer for work Pro V&V.  Those are the

12   facts that I know.

13             Q     Do you know where he's located or --

14             A     I do not know where he's located.

15             Q     Okay.  Let's try to race through

16   this.  I'm about done.  Let's go to the very last

17   page of this exhibit -- or, I'm sorry, page 52.  It

18   may not be the last page -- yes, it is.  Okay.

19             A     Okay.  Page 52, I believe we're

20   there.

21             Q     Mr. Moncla says, "All of the files

22   have been obtained directly from the counties

1          themselves through open records requests with the

2          exception of two SLOG files from Coffee County

3          which were provided to us through Alex Cruce."

4                    Do you see that?

5          A     I see that.

6          Q     And do you know Mr. Cruce?

7          A     I do not.

8          Q     And did you understand that Mr. Cruce

9          had given Moncla two SLOG files from Coffee County?

10         A     All I know is what you know from that

11         note.  That's everything I -- I know is what he

12         wrote there.

13         Q     Have you -- do you know Cruce,

14         Mr. Cruce?

15         A     Please repeat the question.

16         Q     Do you know Alex Cruce?

17         A     I do not.

18         Q     Have you communicated with him?

19         A     I have not.

20         Q     Did -- did Misty talk to you about

21         her termination over the months that you worked

22         with her after her termination?

Page 223

1          A     I believe she did.  Again, that's

2     probably where I got the firsthand account from

3     her, secondhand from me, about what happened to

4     her.

5          Q     And did she convey to her -- to you

6     her belief that she may have gotten fired for

7     providing access to the voting system?

8          A     No, she did not convey that.

9          Q     What did she convey was the real

10     reason for her termination in her -- from her

11     perspective?

12          A     For pursuing the anomalies, which she

13     felt she was fully authorized to do as election

14     supervisor and -- and that there was pressure, she

15     said to me, pressure from someone outside.  I don't

16     have any documentation.  You've asked for it, I

17     have none.  It was all just secondhand from Misty,

18     that there was outside pressure on the county

19     basically about the fact that the county had been

20     very vocal about issues with their equipment.

21          Q     Have you heard anything about

22     threatening litigation about Coffee County for

Page 224

1          permitting the release of the Dominion software?

2                    A     I have not.

3                    Q     Have you heard anything about

4          Dominion's reaction to the fact that forensic

5          copies were made of their software?

6                         MR. CLEMENTS:  I'm going to object

7          because we are referring to Dominion, obviously not

8          a corporate person, could we be a little bit more

9          precise if there is someone that you're thinking of

10         from Dominion.

11                        MR. BROWN:  That's a good question.

12         BY MR. BROWN:

13                   Q     I mean anybody from Dominion.

14                   A     Not that I know of.

15                   Q     Have you ever -- do you have any

16         information suggesting that the Secretary of State

17         learned of your access or SullivanStrickler's

18         access to the system before that access was made

19         public by the press?

20                   A     I have no idea.

21                   Q     Oh, I meant to ask you, did you ever

22         go physically to Pierce County?

Page 225

1            A     I did.

2            Q     And what did you do there?

3            A     I went in and met with the election

4      supervisor.

5            Q     And did you examine the equipment?

6            A     I did not.

7            Q     Did you obtain copies of any data or

8      software or anything like that?

9            A     I did not.  I did put in that open

10     records requests as you've already received.

11           Q     Okay.  I can't remember.  Did you get

12     a response from them?  I just can't remember.

13           A     I don't believe I ever got a

14     response.

15           Q     Do you know what we refer to -- or

16     what they refer to as the GEMS room in the Coffee

17     County election's office?

18           A     As the what now?

19           Q     GEMS, G-E-M-S, room.

20           A     I do not know what that is.

21           Q     Were you in a room that contains the

22     ICC?

Page 226

```
 1              A     I was.

 2              Q     And was somebody there with you all

 3       the time or --

 4              A     Yeah.  Misty Hampton was always

 5       there.  We never were in -- anywhere in her office

 6       area without supervision of one of the election's

 7       personnel.

 8              Q     I asked you about the motherboard on

 9       the Dell computer and whether it would have had a

10       bluetooth or wifi chips.  And let me just follow up

11       with that line of inquiry.

12                    Did you do anything to -- other than

13       that observation, do you know of any other way that

14       that machine was connected or was capable of being

15       connected to the internet?

16              A     There was one other potentially, and

17       that is through -- there was a bridge to the EMS,

18       and I have no idea if that EMS was in any way

19       connected to any other network.

20              Q     Do you know whether Clay Parikh ever

21       got a copy of the Coffee EMS files?

22              A     Who is that now?
```

Page 227

1          Q     Clay, the gentleman we saw in the --

2     well, never mind.  Let me skip over that.

3                Do you know Michael Lindell?

4          A     I do know Mike Lindell.  I -- well,

5     do I know Mike Lindell?  I know who he is, let's

6     put it that way.

7          Q     And have you communicated with him or

8     his attorney, Kurt Olsen?

9          A     I have not.

10         Q     Did you ever hear that Misty Hampton

11    was going to get --

12         A     Let me -- let me -- let me be precise

13    about Mike Lindell.  I had a brief, probably

14    30-second, interaction with him at a meeting in

15    Washington, D.C., period.  And then I was at an

16    event in Tre Ritos, New Mexico, I was a speaker, he

17    was speaker.  I never spoke with him while -- at

18    that event, nor at any other time.

19         Q     And --

20         A     And same with Chris Olsen.

21         Q     And did you -- did you ever learn

22    that Mike Lindell had offered Misty Hampton a job?

Page 228

1          A     That's the first I've heard of that.

2          Q     Were you aware that Mr. Lindell came

3     to Douglas, Georgia about a month after you left?

4          A     I was not aware of that.

5               MR. BROWN:  Those are all of my

6     questions at this time.  And at this moment we may

7     take a short break and I'll give it to Caroline for

8     the Curling Plaintiffs.  Thank you very much, sir.

9     I appreciate your time today.

10                  THE WITNESS:  You're welcome.

11                  MR. CLEMENTS:  Bruce, how much time?

12     Ten minutes?  Fifteen?

13                  MR. BROWN:  Caroline, ten minutes?

14     Fifteen?  What sounds good?

15                  MS. MIDDLETON:  That sounds great

16     yeah.  Let's go with ten.

17                  MR. BROWN:  Ten's good.  Thanks

18     again.

19                  MS. MIDDLETON:  Okay.  Thanks.

20                  VIDEOGRAPHER:  Going off the record.

21     The time is 3:52 p.m.

22               (Recess from 3:52 p.m. to 4:11 p.m.)

Page 229

```
 1                    VIDEOGRAPHER:  Going back on the
 2         record.  The time is 4:11 p.m.
 3            EXAMINATION BY COUNSEL FOR CURLING PLAINTIFFS
 4         BY MS. MIDDLETON:
 5                    Q    Hi, Mr. Lenberg.  My name is
 6         Caroline.
 7                    A    Hello.  Nice to see you.  Your camera
 8         just has you cut off at the nose.
 9                    Q    Okay.  Let me try.  Thank you.
10                    A    I can't quite see you.  There we go.
11         Now we can see you.  Nice to meet you.
12                    Q    Thank you.
13                         Let's see if it stays.  Did it go
14         back?
15                    A    That's a little better.
16                    Q    All right.  Great.
17                         So I represent the Curling
18         Plaintiffs.  We are co-plaintiffs with the
19         Coalition, Mr. Brown, who you spoke with earlier.
20         And I appreciate you being here today.  It gets
21         long, so if you need breaks or more frequent
22         breaks, I'm happy to stop at any time, just let me
```

Page 230

1        know.

2                A        Okay.

3                Q        All right.  So you testified earlier

4        that you went to Coffee County for a couple of

5        reasons, and I just want to see if I understand

6        them.  Correct me if I'm wrong.  I think one of

7        them was to test whether you could recreate

8        Dominion reconfiguring the machines remotely, was

9        one thing I heard.  And another thing was to test

10       ICP or ICC reversal rates, whether there were

11       anomalies with the machines that were related to

12       the machines or not.  Those two issues.  Is that

13       correct, sir?

14               A        Pretty close.  The first one was not

15       to try to remotely do it, but to try to create the

16       same behavior of the -- of the -- what appeared to

17       be reconfigurations.  So just to be a little more

18       accurate, we were trying to see if we can get it

19       back into that state that it was in when it was

20       taken out of that state apparently remotely.  So we

21       weren't trying to remotely access it, we were

22       trying to get it back -- we were trying to get the

1    configuration to do what it did during the runoff.

2           Q    Was there any other reason that you

3    went to Coffee County?

4                I ask because there is a January 5th

5    text from Jim Penrose to a group, which included

6    you, and this is on Exhibit 3 that says, that, "We

7    want to get to the bottom of any outside access to

8    your voting machine."  So I was wondering if you

9    could talk to me about that and tell me what you

10   think that meant.

11               MR. CLEMENTS:  Caroline, which --

12   which --

13               MS. MIDDLETON:  So it's on Exhibit 3,

14   on the first page.

15               MR. CLEMENTS:  Okay.  And what date

16   and timestamp?

17               MS. MIDDLETON:  Okay.  One second,

18   sir.  It's a January 5th -- 15th text.  I'm just

19   going to go to it myself.  I didn't write down the

20   time, but if you will bear with me.  It is at

21   10:54, it's about in the middle of the page on the

22   first page.  It says, "So we can get to the bottom

Page 232

```
 1        of any outside access to your voting machines."

 2        So --

 3                    MR. CLEMENTS:  The message from Jim

 4        Penrose?

 5                    MS. MIDDLETON:  I'm sorry, sir, could

 6        you repeat what you said?

 7                    Jim Penrose to a group that

 8        included Mr. Lenberg, is my understanding.

 9                    MR. CLEMENTS:  Yeah, but I think the

10        statement that you're referring to was made by

11        Mr. Penrose.

12                    MS. MIDDLETON:  Yeah, I was just

13        trying to get context to see what Mr. Lenberg

14        understood that to mean.

15                    THE WITNESS:  Correct.  It means

16        exactly whatever I said, the reason that I went

17        there was that we could try to determine if it was

18        reconfigurable.  In other words, did they have the

19        possibility of making that machine to remotely

20        change that configuration.  So that's consistent

21        with what I talk about here, is we were concerned,

22        she was concerned, we were concerned, that Dominion
```

Page 233

1      had reconfigured their own machine to make it work

2      and did it without touching the machine.  So -- and

3      that's when I subsequently found out looking at the

4      specification sheet for that model of Dell computer

5      that it has a wifi and bluetooth built in on the

6      motherboard.

7      BY MS. MIDDLETON:

8                Q      Understand.  Thank you, sir.

9                       I also wanted to ask you about

10     another reason that you may have been in Coffee

11     County.  And this relates to a report that you did

12     on June 9th from 2021, that was filed in the Antrim

13     lawsuit where you described a vote-stealing attack

14     that could be carried out with access to an EMS.

15                      And I'm wondering whether or not when

16     you were in Coffee County if you had an opportunity

17     to test this or a similar attack in Coffee County?

18                A      Can you be more specific about

19     which -- I did a lot of expert reports and in

20     Antrim.

21                Q      Sure.  Sure.

22                       MS. MIDDLETON:  Yeah, if we would

Page 234

1        mark Tab 14 as the next exhibit, that would help

2        you, I think.

3                      THE WITNESS:  Yes, that would be very

4        helpful.  Exhibit 14 -- or wait, was it Tab 14

5        or --

6                      MS. MIDDLETON:  It's Tab 14, sir.  I

7        don't know -- I think it should be Exhibit 16.

8                      MR. CLEMENTS:  Okay.  We're bringing

9        up 16 -- 16 is --

10                     COURT REPORTER:  I think it should be

11       17.

12                     MS. MIDDLETON:  Seventeen.  Okay.

13                     THE WITNESS:  Okay.

14            (Lenberg Deposition Exhibit Number 17

15               marked for identification.)

16       BY MS. MIDDLETON:

17            Q    So in here you describe a

18       vote-stealing attack that can be carried out with

19       access to an EMS.  And my question for you is

20       whether or not you were able to test this or a

21       similar attack in Coffee County?

22            A    Give me just a second to --

Page 235

1             Q     Okay.

2             A     -- re-read this.  At least the

3       executive summary --

4             Q     Sure.

5             A     -- so I can remember which one it

6       was.

7             Q     Let me know when you're ready.

8             A     Okay.  I've re-read it.  What's your

9       question again now?

10            Q     My question, sir, was whether or not

11      you were able to test this or a similar attack in

12      Coffee County?

13            A     No.  This -- this -- it was an --

14      yeah, no, I did not, nor was I -- let's see.  What

15      I am talking about is a potential attack here.

16      Okay?  Not one that I observed, but one that I'm

17      very concerned about.  And the fact is that the

18      election files are generated on the election

19      designer software by a third party, almost never

20      the county.  And, for example, ElectionSource, a

21      subcontractor for Dominion in the case of Michigan.

22      And so the concern is that even without the

Page 236

1       knowledge of the person running the election

2       designer, if that software is subverted, it runs a

3       bunch of macros that the person running it has no

4       idea what the software is doing, when it creates

5       the election files, you push a button and it does

6       all these things that show up in the system log

7       file and show that that's occurring.  You know, but

8       they have no idea, the person running it has no

9       idea what it's actually doing.

10                      And as part of it, it generates the

11      election files and it encrypts them.  So from then

12      on, no one even knows -- as a good security

13      measure, no one even knows what's in those election

14      files.

15              Q       Uh-huh.

16              A       Those then goes into a project file,

17      which is then delivered to the county.  That's how

18      it's typically done.  The project file is

19      physically delivered to the county in some way.

20      Most often it's physical.  I understand sometimes

21      they transmit electronically, which is not a good

22      idea because that means EMS is hooked into the

Page 237

1          internet.  And they do that in Michigan, and in

2          some places, and they said they're going to stop

3          that practice, but they have actually done it.

4                    So it's delivered to the EMS.  And

5          then that is what's used.  Once that project file

6          is loaded onto the EMS, the Election Management

7          System, then the county election people are able to

8          burn the CompactFlash cards, or the SD cards

9          depending on the situation.  But the CompactFlash

10         cards that then have those election files that can

11         go into the tabulator.  The CompactFlash cards gets

12         inserted into the tabulator.

13                   So what I was pointing out in this

14         report is that single person, either insider or

15         outsider, that manage to get into the election

16         designer software, somewhere in the cycle, and

17         modify it, could affect every election that

18         election designer software touches.

19                   Q    So were you able to test this -- I

20         understand you said you didn't do it while you were

21         in Coffee County, or that's what I was asking

22         about, but were you able to test this attack with

Page 238

1        Coffee County data or software or test this attack

2        in any relation to Coffee County?

3               A     I was not able to do that from the

4        election designer software, no.

5               Q     Okay.  All right.  Thank you.

6                     And just following up on one more

7        reason you may or may not have been in Coffee

8        County.  You had testified earlier that you were

9        trying to get Arizona data to analyze.  And --

10              A     Uh-huh.

11              Q     -- there was a text from Doug Logan

12       to Greg Freemyer, who's at SullivanStrickler,

13       saying, "I'm on-site at Coffee" -- and this is

14       Mr. -- this is Exhibit 3 on page 4, a January 19th,

15       2021 text.

16              A     Okay.  So --

17              Q     Going back to Exhibit 3.  I apologize

18       for jumping around on you.

19              A     All right.  So I'm at Exhibit 3.

20                    MR. CLEMENTS:  And if you could give

21       us a page number, please.

22                    MS. MIDDLETON:  Page 4, sir.  And

```
 1      it's January 19th.

 2                  MR. CLEMENTS:  Okay.  And you're

 3      identifying messages between a Greg Freemyer and

 4      Doug Logan?

 5                  MS. MIDDLETON:  Yes, sir.  And so

 6      I -- yes, I'm just going to ask --

 7                  THE WITNESS:  And what time?  Which

 8      one?

 9      BY MS. MIDDLETON:

10          Q     There are two, sir.  There's one that

11      starts, "I am on-site at Coffee.  I think we

12      figured out how to access the CompactFlash of the

13      ICP."  And then a second one is, "Any

14      recommendations on how to best image that following

15      all appropriate protocols, et cetera."

16          A     I don't see it.

17          Q     Am I on the wrong page?

18                  MR. CLEMENTS:  Well, I think you're

19      asking him to provide an answer on someone's else

20      statement.  So at --

21                  MS. MIDDLETON:  I'm laying it for

22      context, sir.  I'm just trying to ask him if there
```

Page 240

1          was a separate reason he had testified he was

2          trying to get Arizona data to analyze.  And my

3          question is whether or not you were in Georgia

4          trying to get -- trying to image any of the

5          election equipment.

6                         THE WITNESS:  I was not.

7          BY MS. MIDDLETON:

8                  Q     Were you able --

9                  A     I was not.  Strickland and Sullivan

10         apparently had already gotten the image, I was not.

11                 Q     Did you image any election's

12         equipment in Coffee County?

13                 A     Did I do what?

14                 Q     Did you image any election's --

15                 A     No.

16                 Q     -- equipment in Coffee County, sir?

17                 A     No, I did not.

18                 Q     Why did Doug Logan accompany you to

19         Coffee County?

20                         MR. CLEMENTS:  Don't speculate.

21                         THE WITNESS:  It was to help me do

22         testing.  That's not speculating.  I mean, it was

1          to help me do the test that we did on the ICP and

2          the ICC.

3          BY MS. MIDDLETON:

4                  Q     What did you need help with that, for

5          example, Ms. Hamilton or her daughter could not

6          help you with?

7                  A     We were observing two different

8          things.  We were not doing it, we were observing.

9                  Q     Uh-huh.

10                 A     And so Doug observed the ICP and I

11         observed the ICC.

12                 Q     Okay.  All right.

13                       So turning now to what you did do in

14         Coffee County.  In Exhibit 9, there were -- we had

15         looked at some pictures of you walking into the

16         election's office.  And in those pictures, we had

17         talk about -- or you had talked with Ms. Brown

18         about a ring light, but I noticed that you are also

19         holding a backpack.  And you testified that you

20         typically bring a lot of stuff that you may or may

21         not use.  And I'm curious what kind of stuff that

22         you typically bring with you when you visit an

Page 242

1    election's office?

2          A     I -- I just carry all kinds of stuff

3    with me.  You know, notepads, laptop.  You know,

4    you name it, I carry it, that I might need at any

5    point in time.

6          Q     Can you list anything --

7          A     By the way --

8          Q     -- other than a notepad or laptop?

9          A     By the way --

10         Q     I'm sorry, sir.

11         A     Let me note, we're looking at that

12   picture.  You said Exhibit 9, Tab 17, it shows the

13   ring light.  Just so people will know, I was

14   holding that over my head because it was raining.

15   Okay?  That was to keep the rain off my glasses.

16         Q     Okay.  I can see that, sir.

17         A     So some people might think it was to

18   cover up from the video.  I knew the video was

19   there, I was not trying to cover up from it, I was

20   trying to keep the rain off my glasses.  Okay?

21               So anyway, what was your question

22   again?

Page 243

1          Q     I was asking you, sir, if you could

2     remember anything other than a laptop and a

3     notebook as far as what you would typically bring

4     with you when you would visit an election's office.

5     For example, were there any tools or anything else

6     in that backpack, because it was pretty full?

7          A     It's always full of stuff.  There's

8     cords.  You know, there's probably food in there.

9     I bring stuff.  And another one you saw me carrying

10    in some bottles of Gatorade or something.  So I

11    probably had snacks in there.  You know, you name

12    it.  I don't know, a -- a -- what do you call them,

13    a battery bank for a phone and so on.  It's -- it's

14    full of that kind of stuff typically.

15         Q     Do you typically bring -- would one

16    thing be a USB?

17         A     A USB what?

18         Q     Any kind of flash drives or thumb

19    drives or anything along those, removable media?

20    Anything like that?

21         A     Very possibly I would have had those

22    with me.  I typically have some.

Page 244

```
 1             Q     What about a camera?  Do you
 2       typically bring a camera when you visit?
 3             A     I sometimes do.
 4             Q     Uh-huh.
 5             A     And I may have had one in there.  I
 6       can't tell you for sure.
 7             Q     And as far as the ring light, you
 8       testified that you couldn't recall whether or not
 9       you used the ring light for any videos or
10       photographs.  Do you remember whether or not you
11       did any zoom calls from the election's office while
12       you were there?
13             A     That's a good question.  You know,
14       we're talking a couple of years ago almost.  I
15       cannot recollect.  I -- I cannot recollect either
16       way if we did a zoom call or the equivalent.  I --
17       I don't know.
18             Q     If you had done a zoom call, and this
19       may be from visits to other, would you typically
20       use it for -- doing a record of what you were
21       testing, or what would you do a zoom call for?
22                   To loop in someone from the -- you
```

Page 245

1      know, to talk to someone else who is directing your

2      testing, for example?

3                   MR. CLEMENTS:  I'm going to object to

4      the form of the question.  It's very ambiguous.

5                   THE WITNESS:  Yeah, can you specify

6      more clearly, please?

7      BY MS. MIDDLETON:

8           Q     Did you talk a zoom call -- did you

9      talk over zoom with anyone who was directing your

10     testing?

11          A     Not that I recollect.

12          Q     Did you use that ring light for any

13     other purposes, such as to -- for better lighting

14     in the election's office?

15          A     I don't really remember if I --

16          Q     Do you ever --

17          A     It may have been used for lighting.

18     That would not be unusual just because I have eye

19     problems.  I'm blind -- nearly blind in one eye.

20          Q     So what -- when you -- you say it

21     wouldn't be unusual, what would you be lighting --

22     what would you illuminating with a ring light, sir?

Page 246

```
 1              A     Just something that even to read a
 2       piece of paper, sometimes I need light.
 3              Q     Would it be to illuminate any pieces
 4       of the equipment, such as a motherboard?
 5              A     I don't know.  I -- I'm not -- I --
 6       we did not look at a motherboard on -- we didn't --
 7       we did not access -- that's been asked before, but
 8       I did not access that -- that machine, the Dell.
 9              Q     And on September 11th you did a
10       podcast.  And one of the things that you talked
11       about in that podcast was that your head works like
12       black hat.
13                    Do you recall that, sir?
14              A     I do.
15              Q     Okay.  What is a black hat?
16              A     Well, there's a little different
17       terminology across the industry.  I -- I wasn't
18       deeply embedded in the industry, I will just say
19       this that we went beyond penetration testing at
20       Sandia National Labs.  We really looked to see on
21       national-level systems whether or not someone had
22       penetrated them.  In other words, we were really
```

Page 247

```
 1       looking at -- acting like we are the bad guys and
 2       trying to figure out what they would try to do and
 3       then go look for that specific kind of stuff.
 4                  So yes, penetration testing was part
 5       of that, but in addition, we -- we really did a
 6       much more broader and -- and even more specific
 7       look.  And we -- at Sandia, we called ourselves
 8       black hats.
 9            Q     And for that penetration testing
10       or -- do you believe that you would have been able
11       to hack the election's equipment at Coffee County?
12            A     Would I have been able to hack it?
13       I -- I can't see whether or not I would have been
14       able to hack it.
15            Q     Would you use the word penetrate --
16       would you have been able to penetrate the security
17       of that election's equipment?
18            A     Again, without having actually tried
19       to do it, I don't know.  And I did not try to do
20       it.
21            Q     Do you think you're capable of doing
22       it, sir?
```

1          A      Me personally, I -- that would be

2     speculation.

3          Q      Why wouldn't you be able to do it,

4     sir, with your experience?

5          A      I usually have a team of a lot of

6     people behind me, with a lot of expertise in a

7     bunch of different areas.  I'm very broad, I do

8     software, I do hardware, I do a lot of different

9     things, testing, and so on, but I rely on experts

10    in different areas to be able to do very specific

11    things, like a Doug Logan or a Ben Cotton.  I'm

12    neither one of those.  I'm not a cyber IT expert

13    like Doug Logan is, I'm not a forensics expert like

14    Ben Cotton is.

15              I am a very broad-base guy that looks

16    across the whole thing, including personnel and all

17    kinds of different aspects of vulnerabilities

18    and -- and penetration.  But I usually have a team

19    with me.  And, in fact, my opinion is our systems

20    and what we've seen, the flaws and the failures,

21    that have been highlighted in various different

22    places, that the United States Government should

Page 249

1    have literally hundreds of people working on this

2    to get to the bottom of it.  And, to my knowledge,

3    there's been absolutely nothing done, and that very

4    much concerns me.

5         Q    So let's talk more about your -- you

6    had testified about your extensive background in

7    testing and designing these tests.  I didn't see in

8    any of the documents that you produced, but maybe

9    it came today, but I'm wondering, did you create a

10   log of the testing that you did in Coffee County?

11        A    No, I did not, other than what I

12   produced in the notes about the different

13   configurations, you know, they were scribbles

14   really, that we asked Misty to set it to de-skew,

15   or whatever, and then she ran a bunch of ballots

16   through the ICC and we saw the results come up on

17   the EMS and they matched, okay, until we were able

18   to make it not match.  So that is the extent of it.

19   I didn't have any formal log like you would have if

20   we were doing formal testing, which we weren't.

21        Q    So if I could direct you to Exhibit

22   3, sir.  This is on page 13, it's a January 20th

Page 250

```
 1      text.

 2                      MR. CLEMENTS:  Page again?

 3                      MS. MIDDLETON:  Thirteen, please.

 4      BY MS. MIDDLETON:

 5           Q     One of the things that you wrote

 6      to -- you texted to a group titled, "Special Report

 7      is, "We need to make the testing and recording very

 8      systematic."

 9           A     Where do I say that?  Which

10      timestamp, please?

11           Q     Okay.  One second, please.  It's at

12      6:11 on January 20th.  It's kind of right in the

13      middle of the page.

14           A     6:11.  There, I see it.  "Also I'm

15      make a revisit" -- (witness reading document.)  "We

16      need to do a lot more to make it bulletproof and --

17      we need to make testing and requirements

18      systematic."

19                      Yeah, what I was referring to there

20      was the fact that we were very haphazard because we

21      were so understaffed and there were so many

22      different anomalies occurring over all the place,
```

Page 251

1        it was sort of my plea for, "Let's get some extra

2        help to really, you know, manage all of this."

3        Because it was like drinking from a firehose, there

4        were so many problems all over the place.

5                        Again, I could have used the staff of

6        at least 50 to 100 people to just try to track all

7        this stuff down that really I feel like our

8        government should have been tracking and

9        investigating states and the federal should have

10       been doing investigations all over the place.  And

11       to my knowledge none were done.

12                   Q    So for the stuff --

13                   A    I never ran into an investigator

14       anywhere.

15                   Q    So for the Coffee County work, then

16       is it correct that you did not follow a systematic

17       progress?

18                   A    I did not log it.  I did what I

19       consider systematic testing as far as going through

20       a sequence to try to get it to misbehave.  I took,

21       you know, what little notes I did there to show the

22       results.  And so I did it at that level.  When

Page 252

1          you're doing, for example, satellite testing, it

2          would be very, very formal with, you know, all

3          kinds of detailed records and -- and, you know,

4          very detailed stuff going on.  We didn't have the

5          resources or staff to do that, and that's what I

6          was complaining about there --

7                    Q    I got it.

8                    A    -- is that we really need to get more

9          help.

10                   Q    I got it.

11                        When you were in the Coffee County

12         election's office, were you in the same room as the

13         EMS server?  Were you the little room that's -- I

14         think that was the one where the investigator came

15         in to.

16                   A    Not correct.  I was in the same room

17         as the ICC and the EMS with Misty Hampton.

18         Ms. Hampton, the election supervisor, invited me in

19         there to observe her running.  That's where her ICC

20         was, was in that room.  And I believe that's -- to

21         my knowledge, that's where it normally is.  And so

22         yes, I was invited in there to watch her run it.

Page 253

```
 1              Her office is right next to that, and
 2      that was the room I was sitting and talking with
 3      her in the office when that investigator came in --
 4         Q     Okay.
 5         A     -- it was in her office, yeah.
 6         Q     Thank you for that clarification.
 7              Were you in the same room?
 8              We just talked about the EMS server
 9      and the ICC.  Were you ever in the same room as the
10      ICX -- the ICXs or the ICCs?
11         A     I was never, to my knowledge, in the
12      room where they stored their ICPs.  And I forget
13      how many of them they had, but they had a storage
14      room in there somewhere with the equipment stored
15      in it.  It is, by the way, not that room in your
16      video and so -- or the video that was put out,
17      that's not where the ICPs are stored, they're
18      stored somewhere else.  When I was there, that
19      equipment was not in that general admin room that's
20      out front when you first come through when you come
21      in.
22         Q     What about the ICXs, the BMD
```

Page 254

1       machines, were ever in the same room as them?

2             A     I'm trying to recollect where Misty

3       ran the ICX.  I -- I can't not tell you for sure

4       where she ran it.  I don't know.

5             Q     Did you --

6             A     I know she accessed it to make the

7       test ballots.  Where it was located, I -- I'm not

8       sure.  I -- I don't know.

9             Q     How much time would you estimate you

10      were in with that equipment in the office, the EMS

11      server and the ICC for example?

12            A     It's pretty much what you -- what

13      I've already testified to.  So it was on the 18th,

14      in the evening, through the afternoon of the 19th,

15      that's when I was in that room with Misty Hampton

16      at all times.

17            Q     So while you were at the election's

18      office, you were with the equipment.  Is that

19      correct, sir?

20            A     No.  The election office -- well, it

21      depends on how you define it.  Do you want to

22      define what you mean with the equipment?

Page 255

```
 1                    I mean, there's equipment in the
 2        building.  Do you mean in the same room as the
 3        equipment was in?
 4               Q     Right, in close proximity, sir, yeah.
 5               A     Most of the time I was at that
 6        office, I was not in room with the equipment.
 7               Q     Were you ever alone with any of the
 8        equipment?
 9               A     Never alone with any of the
10        equipment.
11               Q     If I could just go back, sir.  I know
12        we talked about the ICX, but I -- is it your
13        testimony that you weren't -- you didn't -- you
14        weren't with the ICX at the Coffee County?  I
15        understood that you were.
16               A     I --
17               Q     And Misty brought it into her office
18        while you were there.  Is that not correct?
19               A     I don't know -- I don't recollect
20        where she made the ballots.  She could have made
21        them in her office, I don't know.  It would be
22        speculation.  I don't know where she did it.  I
```

Page 256

1      don't recollect where she did it.  I know she made

2      them on the ICX.  In any case, I was never alone

3      with it, if I was even with it.  I don't -- I don't

4      recollect me being with it.

5              Q    So let's go back then, if we can

6      circle back to the actual testing that you were

7      there to do.  One of the things is we talked about

8      at the very beginning was testing to see whether

9      you could recreate Dominion reconfiguring the

10     machines.  And you were testing to see if you could

11     exploit that same vulnerability.  Is that correct,

12     sir?

13             A    I was trying to see if we could get

14     it back into the state that they took it out of

15     on -- apparently took it out on election night,

16     that's correct.

17             Q    And can you walk me through that

18     testing if you were just doing step by step, tell

19     me --

20             A    Yes.

21             Q    -- more about that, please.

22             A    Yes, I can.

Page 257

1              So it's already been mentioned that

2        we were -- well, Misty was running the machine and

3        we went through -- and my notes show this, that

4        we -- I had already identified that scanner

5        settings -- and this is my previous testimony, I'm

6        just repeating, but the scanner settings stuck out

7        to me, that that was an inappropriate application

8        to be available in that software for anybody at the

9        election office to be able to modify.

10             So because it was a red flag, I

11       thought, well, maybe someone is using that to -- a

12       bad guy using that interface to be able to set

13       their settings.  Okay.  So what we did is we went

14       through one by one, we started going through those

15       settings, modifying it and running a batch, modify

16       it, run a batch, modify it, run a batch.  There

17       were a bunch of batches.  We ran a bunch.

18                 And the reason we did for each

19       setting run quite a few ballots was that the

20       concern was there might be a trigger level and so

21       we wanted to make sure we would exceed the trigger

22       level, if there was a level trigger, we wanted to

Page 258

1      exceed it.  So we ran quite a few ballots through.

2                     And for the bulk of the testing, the

3      machine worked perfectly.  It started out working

4      perfectly.  It worked perfectly that evening of the

5      18th.  And on the 19th it worked perfectly most of

6      the day.  And towards the end of the time, the last

7      hour or so was when we finally did that last

8      parameter change, which was the one I described as,

9      "ignore red, ignore blue, ignore green or none."

10     And we changed it from "ignore red" to "none," and

11     that's when the machine went into what appeared to

12     be the exact same misbehaving state from the runoff

13     night where she had so much trouble with it.

14                    Q     And when you were making these

15     parameter changes --

16                    A     I wasn't making them -- excuse me.  I

17     wasn't making them, Misty was making those changes.

18                    Q     Okay.  At your direction.  Is that

19     right, sir?

20                    A     That's correct.

21                    Q     Okay.  So were you altering any

22     programs or settings on the -- this was on the ICC.

Page 259

1       Is that correct, sir?

2               A     ICC.

3               Q     Okay.

4               A     This is the high-speed scanner

5       ImageCast Central.

6               Q     So on the -- were you -- were you --

7       did you alter any programs or settings when you

8       were doing these -- changing these parameters?

9               MR. CLEMENTS:  Objection.  Once again

10      to form.  You -- he's already established that he

11      did not touch anything to alter.  Misty was in

12      physical possession of the machine.  And the

13      continuing asking the question basically implicates

14      that he's the one touching it is improper.

15      BY MS. MIDDLETON:

16              Q     Did you direct Misty Hampton to alter

17      any programs on the ICC, sir?

18              A     Not to alter any program.

19              Q     What did you direct her to alter,

20      sir?

21              A     As already reported, I recommended to

22      her that we change -- that she change the date so

Page 260

1          that in case that was causing the trigger, that was

2          a trigger requirement, that it would meet that

3          requirement.  So she did change the date on it.  So

4          that was one thing that was changed.

5                    Q     Did you change anything else, sir?

6                    A     You know, I believe there was one

7          more that --

8                    MR. CLEMENTS:  Objection once again

9          to directing whether he's changing things.  You

10         need to be more precise on the record, please.

11         BY MS. MIDDLETON:

12                   Q     Did you direct Misty Hampton to

13         change anything else, sir?

14                   A     Yes, there was one other item that

15         comes to my mind and that was something else that

16         stuck out as a red flag as I was looking at the

17         documentation, and that was that there was a

18         setting that was a bolded to not change it in the

19         documentation.  And since I think outside of the

20         box, I thought we probably need to change that

21         because they made a big deal about not changing it.

22                        And what it had to do with was

 1        whether -- it was a crazy setting about how many

 2        ballots you could run in a batch.  Okay.  And

 3        typically when you put the ballots in, the default

 4        is that it -- whatever stack you put in, it runs

 5        and stops.  And the next set you put in will be a

 6        new batch.  This particular setting, you could

 7        change it so that it would add them to the same

 8        batch until -- until you told it not to.  And the

 9        documentation said, you know, "Only do this if you

10        need to exceed the input bin of the ICC."  And the

11        input bin was, like, 500 ballots, or something, it

12        was very large, and it might have even been higher

13        than that.  It was one of those things that

14        probably would never expect nobody to use, but they

15        bolded it and said, "Don't change it unless you

16        absolutely need to run more than, you know, the

17        capacity of the scanner."

18                 So we went ahead, Misty changed it.

19        And the reason I did that was that it enabled a

20        batch to be a larger number.  Remember I talked

21        earlier about a trigger.  And if it's triggering on

22        a certain number in a batch, you want a higher

Page 262

1    number to get past the trigger level.  So I asked

2    her to change that setting so that it would be able

3    to create larger batches.  So other than that, I

4    don't believe I changed any others.

5           Q    And maybe this is asked, and excuse

6    my ignorance, sir, if I'm asking the same thing.

7    But did you change -- or did you direct Ms. Hampton

8    to change any settings on the ICC?

9                My previous question is whether you

10   changed any programs, so if we could talk about

11   that.

12          A    Any settings on what?

13          Q    On the ICC, sir.  So I'm just trying

14   to get at -- I had asked you before if you had

15   changed -- if you had directed Ms. Hampton to

16   change any programs, so I'm trying to drill down

17   and see if you changed any setting -- if you

18   directed her to change any settings, sir?

19          A    The ICP has very limited ability to

20   change items on ICP.  It's all pretty much locked

21   in in the configuration files that are on the

22   CompactFlash cards in those election definition

Page 263

1          files and there's a set of configuration files.

2          So, however, you do get to set the date and time.

3          That is something when you boot up the tabulators,

4          it allows you to set the date and time.

5                    So for the same reason that we did on

6          the ICC, we directed Misty to set the date and time

7          back to November some time close to the election or

8          maybe even on election day, I don't remember which

9          it was, to be able to get back into the correct

10         time frame in case there was a trigger mechanism

11         that required, you know, the date to be within a

12         certain window of the election.

13              Q    We're still on the ICC, right, sir?

14              A    The ICP, correct.

15              Q    Okay.  I'm sorry.  I thought we were

16         talking about the ICC.  So we -- you reset the

17         clock on the ICC, is that right, in the EMS?

18                   MR. CLEMENTS:  Objection again.

19         BY MS. MIDDLETON:

20              Q    You directed Misty Hampton?

21              A    I -- I think you've confused the two.

22              Q    Okay.  Straighten me out, sir.

Page 264

1           A       Okay.   The ICC is the high-speed

2       scanner ImageCast Central --

3           Q       Uh-huh.

4           A       -- that has a Dell computer hooked to

5       a high-speed off-the-shelf optical scanner.   That

6       Dell computer, through a bridge, is hooked to the

7       Election Management -- excuse me, Management

8       System.   That's what we were talking about when I

9       was talking about changing the scanner settings to

10      de-skew and read red only and so on.   So that is

11      much more configurable, the ICC, than the ICP.

12              The ICP is the ImageCast Precinct,

13      which is the slow-speed scanner that's typically

14      out in the precincts and does -- you know, goes

15      much slower.   That is highly pre-configured with

16      very little configuration that you can change

17      on-site.   And the one thing that everybody gets a

18      chance to do when you boot up from scratch is to

19      set the date and time.   So when you power up the

20      ICP, it asks you typically for the date and time,

21      and you put in whatever date and time you want.

22          Q       Okay.

Page 265

1          A     So we directed them on the ICP, the

2      precinct tabulator, the slow-speed guy, to set

3      the -- the date and time to that window I was

4      talking about similar to what we did on the ICC,

5      setting the date back.

6          Q     Okay.  And did you -- on the -- going

7      back to the ICC, sir, did you change any -- you had

8      mentioned configuration files.  Did you change

9      any -- did you direct Ms. --

10                 MR. CLEMENTS:  Objection.

11     BY MS. MIDDLETON

12         Q     -- Hampton to change any

13     configuration files?

14         A     The answer is no, we didn't.

15         Q     Did you direct Ms. Hampton to run any

16     programs on the ICC?

17         A     Not that I recollect.

18         Q     Did you -- did you direct Ms. Hampton

19     to install anything on the ICC to help you in your

20     testing?

21         A     Not that -- not that I recollect at

22     all.

Page 266

1          Q     This testing was to help establish

2     whether or not Dominion had remotely accessed the

3     ICC.  Is that correct?

4          A     It was in that direction, yeah.  It

5     was, "Could we reproduce the behavior, put it back

6     into the state that they apparently took it out

7     of" --

8          Q     Uh-huh.

9          A     -- "on election night?"  And we were

10    able to accomplish that, that goal.

11         Q     And what -- were you able to answer

12    that question, sir?

13         A     We were able to answer the question

14    that you could get it -- by changing something on

15    the ICC, which was these parameter -- scanner

16    parameters, that I thought shouldn't be there, you

17    were able to.

18              And what this establishes is if you

19    have some sort of external access, via wifi,

20    bluetooth, or some other thing that happens to be

21    embedded that no one knows about, then you could

22    have, first of all, fixed it on -- on election

Page 267

1    night and make it work properly or vice versa, you

2    could have remotely, via wifi or bluetooth, put it

3    into that state, or for that matter what it

4    establishes, I believe, is that you could pretty

5    much do anything you want because that machine was

6    also directly connected to the EMS, which means

7    that whoever had that access, assuming it was

8    really there, and it appears to have been there,

9    you could download the entire EMS software set and

10   download all the CompactFlash files, election

11   files, configuration files, everything could have

12   been downloaded, and that would have been a huge

13   problem.  And I believe is a huge problem, just

14   like any EMS being connected to the internet.  And

15   we know in Michigan, and many or places, EMS are

16   regularly connected to the internet.

17            Q     Okay.  So if I understand you right,

18   sir, you directed to -- directed Ms. Hamilton to

19   change a couple of settings and, therefore, you

20   were able to establish or redo whatever --

21            A     Recreate.

22            Q     -- you had done to get remote access.

Page 268

1         Is that right, sir?

2               A     We were able to recreate the

3     behavior.

4               Q     By changing some program -- by

5     directing Mr. Hampton?

6               A     My directing Ms. Hampton to

7     reconfigure some scanner settings, we were able to

8     reproduce the behavior from election night.

9               Q     Okay.  When you were doing that, sir,

10    did you direct Ms. Hampton to connect any external

11    devices to the ICC, to physically connect to the

12    ICC?

13              A     Not that I recollect.

14              Q     No keyboard?

15              A     No.

16              Q     Mouse?

17              A     Not that I recollect.

18              Q     Did you use or direct Ms. Hampton to

19    use a USB?

20              A     Not that I recollect.

21              Q     How did access or direct Ms. Hamilton

22    to access the ICC?

Page 269

```
 1                    MR. CLEMENTS:  I'm going to object
 2           because "or" which is necessarily inclusive of
 3           Mr. Lenberg.  I want to be very clear that this
 4           line of questioning is sloppy.  And I'm -- I'm
 5           tired of these objections.  It's implicating what
 6           could be denoted as criminal activity.  And --
 7                    MS. MIDDLETON:  Sir, if you could
 8           please keep your objection to form.  I will --
 9                    MR. CLEMENTS:  Objection to form, but
10           I stated the same objection over and over again
11           and --
12                    MS. MIDDLETON:  And Mr. -- I'm sure
13           Mr. Lenberg understands the objections, sir.  So I
14           will do my best --
15                    MR. CLEMENTS:  That's my
16           responsibility, to protect my client, so I'm
17           objecting to the "or."  If you could ask it and
18           make sure that you are precise with who is doing
19           what.
20                    MS. MIDDLETON:  Okay.  Sir, if you
21           could keep your objections to form, I will do my
22           best to do that also.  Thank you.
```

Page 270

1          BY MS. MIDDLETON:

2                  Q      Mr. Lenberg, we were talking about

3          how you directed Ms. Hampton to access the ICC?

4                  A      Not quite correct.

5                  Q      Okay.  Can you explain to me how

6          that's not quite correct?

7                         I'm wondering if you directed --

8                  A      Ms. Hampton --

9                  Q      -- physically, like at a computer or

10         if this was over a network?

11                 A      You're using the wrong term.

12                 Q      Okay.

13                 A      Ms. Hampton, by virtue of her being

14         an election supervisor, has full access to all of

15         the equipment, all of the software, she has access.

16         I did not direct her to access anything, she had

17         full access to it.  What I directed her to do -- or

18         asked her to do, recommended she do, is change some

19         parameter settings having to do with the optical

20         scanner.

21                 Q      Uh-huh.

22                        And what commands did you run -- or

Page 271

1      direct her to run?  What commands did you direct

2      Ms. Hampton to run in order --

3             A     I did not --

4             Q     -- to change the computer --

5             A     I did not direct her to run any

6      commands.

7             Q     And after you -- after you were done,

8      did you direct Ms. Hampton to change everything

9      back to its original state?

10            A     I believe I did.  That's my

11     recollection, that I asked her to put everything

12     back in the correct state.

13            Q     And do you know if she did this, sir?

14            A     No, I don't for sure.

15            Q     Did you do anything to verify whether

16     she did this?

17            A     I don't recollect to be honest if I

18     verified it or not.

19            Q     So if we could switch from the ICC to

20     the ICP.  We touched on it a little bit, and I

21     thank you for the explanation about how they're

22     different.  That is helpful to understand that the

Page 272

1     ICP is a little more simplistic and anyone can

2     change -- it sounded like from your testimony,

3     anyone can change the date on that as it starts up.

4               I believe you testified that you

5     directed Ms. Hampton to perform tests on the ICP

6     also.  Is this correct, sir?

7          A    That's correct.  We -- we requested

8     it.

9          Q    And some of these questions will be

10    the same, so if you will bear with me as we go

11    through them.

12              Did you direct Ms. Hampton to alter

13    any programs on the ICC -- ICP?  Excuse me.

14              MR. CLEMENTS:  Objection.  Could you

15    please define how you mean alter?

16    BY MS. MIDDLETON:

17         Q    Change.  Did you change any programs

18    on the ICP, sir, or direct Ms. Hampton to change

19    any programs on the ICP, sir?

20         A    Just to make it clear, I didn't

21    direct Misty Hampton to do anything.  I did request

22    that she make changes.  I was not somehow her

Page 273

1      supervisor or her -- in charge of her.

2              Q     I'm not -- okay.  I'll use the word

3      "request."  I don't mean to be offensive or

4      implying anything, so if -- whatever words you're

5      comfortable with, I will use those words.

6              A     "Request" would be fine.

7              Q     Okay.

8              A     Thank you.

9              Q     Okay.  Thank you.  I want this to be

10     a conversation, not to be -- have you feeling like

11     I'm attacking you.  That is definitely not my

12     intent.  So thank you for telling me that.  So let

13     me start over on that line of questions.

14              So we were talking about the ICP.

15     And my question was:  Did you ask Ms. Hampton to

16     change any programs on the ICP?

17              A     Caroline, since we just switched to

18     the ICP, would it be okay to take a short break?

19              Q     Could you just answer that one

20     question, please, sir, and then we can that a

21     break?

22              A     Okay.  Would repeat the question,

Page 274

1        please?

2                Q    Sure.

3                     Did you ask Ms. Hampton to change any

4        programs on the ICP?

5                A    No.

6                Q    Okay.  So we can take a break.  Do

7        you need five minutes?  Is that okay, or is ten

8        minutes better?

9                A    Ten.

10                    MR. CLEMENTS:  Ten minutes.

11                    THE WITNESS:  Ten would be good.

12       Thank you.

13                    MS. MIDDLETON:  Okay.  We'll see you

14       back in ten minutes.  Thank you.

15                    THE WITNESS:  Thank you.

16                    VIDEOGRAPHER:  Going off the record.

17       The time is 4:58 p.m.

18              (Recess from 4:58 p.m. to 5:11 p.m.)

19                    VIDEOGRAPHER:  Going back on the

20       record.  The time is 5:11 p.m.

21       BY MS. MIDDLETON:

22                Q    Hi, Mr. Lenberg.

Page 275

1            So we were talking about before the

2    break a message that Doug Logan had sent to Greg

3    Freemyer at SullivanStrickler.  So if we would go

4    back to Exhibit 3, please, sir.  I just wanted to

5    ask you a couple of follow-up questions.

6            A    Which page?

7            Q    One second, sir.  It is on page 4, I

8    believe.  It is -- we looked at those messages,

9    they're January 19th at 9:35.

10           A    Okay.

11           Q    And those are the messages that

12   say -- they're from Doug Logan to Greg Freemyer

13   again.  "Hey, I'm on site at Coffee.  I think I

14   figured out how to access the compact flash to the

15   ICP devices to get an image of the operating

16   system.  Any recommendations on how to best image

17   that following all appropriate protocols?"

18                Do you see where I am, sir?

19           A    I see where you're at.

20           Q    And you were with Doug Logan at

21   Coffee County on that date.  Is that right, sir?

22           A    I -- at that time we had already

Page 276

1    left, I believe.

2         Q    You had -- on the 19th?

3         A    Yeah.  By that time -- was that

4    9:35 a.m. or p.m."  That's a.m.  We -- I believe we

5    were probably there at that time, if that was

6    morning, yeah.

7         Q    You were with Doug Logan when he sent

8    that -- or maybe not in the same room, but you were

9    both in Coffee County when he sent that message to

10   Greg Freemyer?

11        A    By the way, I don't know who Greg

12   Freemyer is.

13        Q    Sure.  Okay.

14             And did Doug -- I'm sorry.  Go ahead,

15   sir.

16        A    I don't know who is he.

17        Q    Okay.  He is an employee at

18   SullivanStrickler.

19        A    Okay.  I never met any of those

20   folks.

21        Q    Sure.

22             Did Mr. Logan talk to you at all

Page 277

1        about imaging the ICP device --

2                A    No.

3                Q    -- is what this message that he was

4        sending -- anything about that message -- relating

5        to this message that he was sending to Greg about

6        getting an image of the operating system?

7                A    No.  He didn't talk to me about it.

8        I have no idea what he's referring to.

9                Q    Is the ICP device image on the

10       CompactFlash drive that we're waiting for the

11       password on?

12               A    No, it is not.

13               Q    Did you ever receive a copy of the

14       ICP device operating system that Mr. Logan is

15       talking about here?

16               A    You need to be clearer because I

17       think you're mixing terms up.

18               Q    Okay.  So Mr. Logan is referring to a

19       CompactFlash of the ICP devices operating -- image

20       of the operating system of the ICP device.  My

21       question for you, sir, is whether or not you got an

22       image of that?

```
 1            A     I do -- I'm looking at the record

 2       here and I do not know what they were communicating

 3       between them.  I don't know Greg.  I don't know

 4       what Doug was referring to here.  I think you need

 5       to ask Doug, because I -- I really don't know what

 6       they're referring to here.  I honestly don't.

 7            Q     Uh-huh.  Okay, sir.

 8                  We were talking about testing and we

 9       went through the ICP and the ICC, and I was

10       wondering if we can change to the ICX.  Did you

11       ever perform any kind of tests on the ICX while you

12       were at Coffee County?

13            A     No.

14            Q     Did you ever touch the ICX?

15                  I think we talked about whether or

16       not you were in the same room as the ICX.

17            A     I think you've asked this before or

18       at least someone has and --

19            Q     Uh-huh.

20            A     -- to my knowledge, I never touched

21       it.

22            Q     Uh-huh.
```

Page 279

```
 1                    What did you do with the Coffee
 2      County EMS?
 3            A     Nothing.
 4            Q     Is it -- was it your earlier
 5      testimony, sir, that you changed the clock -- or,
 6      excuse me.
 7            A     No.
 8            Q     Let me go back.
 9                    That you directed Ms. Hampton to
10      change the clock on the EMS?
11            A     That's correct, I requested that she
12      change it.
13            Q     Okay.  So walk -- if you could walk
14      me through everything that you requested
15      Ms. Hampton to do for the EMS, please.
16            A     Okay.  We're repeating whatever we've
17      already done before.  Do you really want to do
18      that?
19            Q     Yeah.  So my understanding is I asked
20      you questions about the ICC, the ICP, and the ICX.
21            A     Right.  And we said on the ICX --
22      which one are we on now, ICX or the --
```

Page 280

1          Q    We're on the EMS, sir.

2          A    Okay.  There was no -- other than the

3     request on the clock, there was no other request

4     having to do with the EMS at all.

5          Q    So you didn't ask Ms. Hampton to

6     change any other settings on the EMS?

7          A    Not that I recollect at all.

8          Q    Did you request that she change any

9     configuration files?

10         A    No.

11         Q    Has she run -- did you request that

12    she run any programs?

13         A    No.

14         Q    Did you request that Ms. Hampton

15    perform any other tests on any other equipment in

16    the office, such as pollpads, printers, any

17    peripherals, anything along those lines?

18              MR. CLEMENTS:  Objection to form.

19              THE WITNESS:  Yeah, do you want to

20    name specifically the question as --

21    BY MS. MIDDLETON:

22         Q    Sure.  We'll go one at a time.  I was

Page 281

1    trying to make it easier, sir, because it sounded

2    like you were getting exhausted from my questioning

3    on the equipment.  I would be happy to identify

4    them one by one for you.

5           A    Go ahead.

6           Q    So if we could start with the

7    pollpads, sir.  If we could go back and discuss

8    whether or not you asked Ms. Hampton to make any

9    changes to the pollpads or -- yeah.

10          A    No.

11          Q    Walk me through what you did with the

12   pollpads while you were at Coffee County.

13          A    I did nothing with them other than

14   observed what -- demonstration from Ms. Hampton.

15          Q    Did you perform any test -- did you

16   request that Ms. Hampton perform any tests on the

17   printers?

18          A    No.

19          Q    Did request that Ms. Hampton perform

20   tests on any peripherals?

21          A    No.

22          Q    When you completed your testing, how

Page 282

1        did you make -- what did you do to ensure that any

2        changes made to any equipment wouldn't impact

3        future elections?

4               A       Misty Hampton was a -- was a very

5        highly skilled election supervisor, who knew her

6        equipment inside and out.  I recommended she change

7        them back.  You would have to ask her to verify

8        whether she did or not.

9               Q       Earlier today you testified that you

10       developed software in your line of work.  Did you

11       develop any software related to Coffee County?

12              A       No.

13              Q       When you in the Coffee County

14       election's office, did you notice any security

15       flaws or vulnerabilities that concerned you about

16       the Dominion equipment?

17              A       Several.

18              Q       Are those ones you've already

19       identified, sir, or are there ones additional?

20              A       I'm thinking.  This equipment is the

21       same equipment that is used in Michigan, literally

22       the same model of ICP that is used in Michigan.

Page 283

1        You're probably aware of my expert reports, those

2        are exhibits that you have.  And in there, I

3        identified many vulnerabilities associated with

4        this equipment.  And so those vulnerabilities apply

5        in Georgia just as well as Michigan even though I

6        identified them after Georgia.

7                       So the answer to your question is,

8        the equipment has very significant vulnerabilities,

9        not just the ICX, but the ICP and the ICC.  I also

10       identified vulnerabilities in Maricopa having to do

11       with the ICCs, very significant, very concerning

12       ones.  And so those ICCs there are, I believe, the

13       same version that are used in Coffee County, unlike

14       the ICPs, they are a different version than

15       Maricopa, but the ICP is essentially the same.  And

16       there are many vulnerabilities.  I don't have time

17       right now.  You can read the expert reports and

18       read some details on the Maricopa report where I

19       can tell you about those.

20                       I'll just tell you one right now on

21       the ICC in Maricopa.  And that is that out of the

22       2.3 million ballots cast in Maricopa County, when

Page 284

1        we were allowed to do an assessment of the EMS
2        System, which we did under legal authority there in
3        that audit, what I discovered, and other guys
4        confirmed, other people confirmed as well, is that
5        the images from the early voting high-speed
6        scanners, which are the ICC machines, and they had
7        several of them, I believe they had six or eight of
8        them, in any case, they worked perfectly, all the
9        images were perfect up until November 1st, and
10       following -- starting November 1st, when we got
11       access to the system, there were hundreds of
12       thousands of ballot images that were corrupted.
13                   That's a problem with the voting
14       system.  If your security -- your verification
15       security, which is an image, is corrupted to where
16       you cannot read the image, it's like turning off
17       the video surveillance camera, right, for a
18       facility.  A bad guy will defeat the camera so you
19       can't see what they're doing.  And that's what
20       happened in --
21                   Q      Okay, sir.
22                   A      -- that's what happened in Maricopa.

Page 285

```
 1            Q     Okay.  Sir.

 2            A     So those -- those, I believe, apply

 3      to Georgia as well.

 4            Q     Okay, sir.  Thank you.

 5                  Doug Logan testified that you came up

 6      with a way to access the system.  Do you know what

 7      he was talking about?

 8            A     I -- I don't know what he was

 9      referring to there.  It could have been anywhere.

10      That didn't necessarily refer to Georgia, it could

11      have referred to Michigan, other -- other locations

12      where work was going on at the time.

13            Q     I'm going to go back to the text

14      again.  And this is on Exhibit 3, page 4.  It's a

15      January 18th text from Doug Logan again to Greg

16      Freemyer, who is an employee at SullivanStrickler.

17            A     Which page?

18            Q     Page 4, sir.

19            A     Okay.

20            Q     It's the big boxes in the middle of

21      the page that starts with, "Hey Greg.  Question for

22      you."  Do you see where I am?
```

1          A     Yes, I see it.

2          Q     It says, "Is there a log or something

3     similar I can look at to get a list of USB or other

4     devices plugged into a computer?  Or perchance a

5     log of historical wireless connections made by a

6     system?  In both cases it would be Win 10 box."

7                And Greg Freemyer responds saying, "I

8     use USB Detective for the USB side of that.  Not

9     sure about the wireless side, but I would try with

10    IEF to see what it finds.  I can probably run USB

11    Detective tomorrow.  IEF maybe too."

12         A     I --

13         Q     What do you understand they are

14    talking about here, sir?

15         A     I don't know, you would have to ask

16    Doug Logan or Greg Freemyer because I'm --

17         Q     Did you find -- I'm sorry.  Go ahead,

18    sir.

19         A     I'm not sure what they're referring

20    to.

21         Q     Did you find a list of USB or other

22    devices that were having been plugged into the EMS?

Page 287

1          A     To my knowledge, I -- I did not run

2     any applications.

3          Q     What is an IEF, sir?

4          A     I don't know.  You would have to ask

5     them.  I really don't know what it is.

6          Q     So you testified earlier that the

7     easiest place to implant malware would be at the

8     voting machine company.  Did you explore that in

9     your testing at Coffee County?

10         A     That question doesn't make sense.

11         Q     So did you test -- okay.  I'll move

12    on.

13               Did you find --

14         A     They're not -- Coffee County is not

15    the voting machine company so --

16         Q     I understand that, sir.  I'm trying

17    to get at the malware.

18               Did you find any malicious code in

19    Coffee County?

20         A     I did not look for it.  That's not

21    why I was there.

22         Q     Did you insert any malware into any

Page 288

1          Coffee County software or equipment?

2                  A     I did not.

3                  Q     Did you direct or ask Ms. Hampton to

4          install any malware?

5                  A     I did not.

6                  Q     Did you direct Ms. Hampton to install

7          anything on the election equipment?

8                  A     I did not.

9                  Q     You testified that you didn't touch

10         the equipment, but you did look at it.  Is that

11         right, sir?

12                 A     That's correct.

13                 Q     Did you notice anything about the

14         equipment?  I'm talking about the condition of the

15         equipment.

16                 A     You would have to be more specific in

17         your question, please.

18                 Q     Did you notice any damage to the

19         equipment, sir?

20                 A     Any damage to the equipment?

21                 Q     Right.

22                 A     I don't know that I was looking for

Page 289

1      that.  I -- I -- I -- I did not notice either way.

2               Q     Did you notice any broken seals?

3               A     I don't know.  I -- I didn't look for

4      it.

5               Q     So I'll just be specific.  On the

6      ICP, did you notice any of the tamper evidence

7      seals were broken?

8               A     I don't remember looking for it.

9               Q     While you were there did Ms. Hampton

10      open any equipment?

11               A     I believe she did.

12               Q     What equipment, sir?

13               A     She had a ICP that was being sent

14      back for repair.  And she -- because she wanted to

15      know whether or not there was remote access, she

16      took the cover off, she's very mechanical minded,

17      and let us look inside to see whether or not there

18      was a modem inside the equipment.

19               Q     By "a modem inside the equipment,"

20      sir, do you mean that someone installed a modem or

21      can you go into that more, please, sir?

22               A     The question would be was there a

Page 290

1        modem installed inside the equipment similar to one

2        of the reports in Michigan where we were allowed to

3        access equipment there and we found a modem

4        installed inside the equipment.

5                     So this would be a card, a cell modem

6        card, if it was installed.  That's what we were

7        looking for is whether or not there might have been

8        a cell modem.  Because of the fact she was

9        concerned about the remote access to her equipment,

10       that that appeared to her to have occurred.

11              Q     What did you find, sir?

12              A     We found a slot that -- where you

13       could add in a card that was near the outside.  It

14       appeared that it could have been a modem add-in,

15       there's is no guarantee, but we did not see

16       anything that appeared to a modem to us inside.

17              Q     Did you find anything that appeared

18       that anything had been added at any time in the

19       past?

20              A     Not that I could tell.

21              Q     Did Ms. Hampton break any seals on

22       equipment when you were in the office?

Page 291

```
 1              A     I do not know that.  I -- cannot say

 2         that because I didn't see her break any seals.

 3              Q     Did Ms. Hampton manipulate --

 4              A     I --

 5              Q     I'm sorry, sir.  Go ahead.

 6              A     I -- I just don't know the answer to

 7         whether or not she broke the seals.

 8              Q     Okay.  Did you -- did Ms. Hampton

 9         manipulate --

10              A     You would have to ask her.  Go ahead.

11              Q     Did Ms. Hampton manipulate the

12         hardware in any other way that we haven't

13         discussed?

14              A     Not that I know of, just that repair

15         unit that was being sent out to be repaired.

16              Q     You had testified earlier today about

17         a Secretary of State investigator coming into the

18         election's office on January 26th while you were

19         there.

20              A     Uh-huh.

21              Q     Did you overhear his conversation

22         with Ms. Hampton?
```

1             A      I did not.

2             Q      Were you aware of whether or not he

3       gave Ms. Hampton anything?

4             A      I am not.

5             Q      Another topic you testified about

6       earlier today, sir, was about an open records

7       request that you made on January 27th.  And I

8       believe your testimony, correct me if I'm wrong,

9       was that you made an open records request, but you

10      did not receive any data.  Is that correct, sir?

11            A      That's correct.  The -- the paper

12      tapes and all that stuff, I did not ever get.  What

13      I requested there, to my knowledge, I never

14      received what was on that request.

15            Q      So is it correct, though, that you

16      left your USB or a thumb drive, but you never got

17      it back?

18            A      I can't remember for sure if I left a

19      thumb drive there or not.

20            Q      If we could go to Exhibit 14, sir.

21            A      Okay.

22            Q      At the top of it there's Misty

Page 293

```
 1        Martin, Ms. Hampton testing -- or no, she's
 2        e-mailing Tracie Vickers.  And she says, "He gave
 3        me a thumb drive and I put it on the thumb drive."
 4        I'm just wondering if that refreshes your memory at
 5        all as far as giving Ms. Hampton a thumb drive to
 6        put the information on?
 7                    MR. CLEMENTS:  Objection to
 8        foundation.
 9                    THE WITNESS:  Can you rephrase the
10        question?
11        BY MS. MIDDLETON:
12             Q    Did you give Ms. Hampton a thumb
13        drive in connection with this open records request?
14             A    I may have given her one.  As I said
15        I'm not positive, but I may have.  And the idea
16        would be she could put stuff on it and send it to
17        me once they got approval for it.  That's why I
18        would have given her one so they wouldn't have to
19        purchase one if -- if -- if I did give her one.  I
20        honestly don't recollect if I gave her one or not.
21             Q    Uh-huh.
22             A    I guess I'm getting to be an old guy,
```

Page 294

1      but yeah.

2              Q     Did you make open records request

3      from other counties?

4              A     I did.  I did for Pierce County.

5      And -- and you have a record of that.

6              Q     Uh-huh.

7              A     And I actually did also for Liberty

8      County, for all the material I received from

9      Liberty County, I did a records request.  I do not

10     have a copy of that, but that was gotten through a

11     records requests and produced by an election

12     supervisor there, but I could not find the -- a

13     copy of that records request.

14             Q     Correct me if I'm wrong, sir, but I

15     understood your earlier testimony to be that you

16     received Coffee County data from Mr. Lynch and then

17     you returned it after you made a copy of it.  Is

18     that correct, sir?

19             A     I was directed to make a copy for an

20     unknown purpose and give it to them.  And then at

21     some point after that, it was kept in a safe.

22     Mr. Lynch requested it back and I gave it back do

Page 295

1      him out of that safe.

2              Q     What software was that, sir?

3              A     It was -- I truly -- it was whatever

4      was on that drive that was sent from Strickland and

5      Sullivan -- Sullivan and Strickler, I get their

6      name backwards.

7              Q     SullivanStrickler, sir.

8              A     -- that they sent from Georgia to

9      Michigan to Michael Lynch.  So I --

10             Q     Did you --

11             A     I can't tell you exactly what was on

12     it other than it apparently was related to Coffee

13     County.

14             Q     And did you share it with anyone

15     other than Mr. Lynch?

16             A     No, I did not.

17             Q     To your knowledge, did anyone receive

18     this data from Mr. Lynch?

19             A     No.  I don't know where that copy

20     went.

21             Q     Do you know -- are you familiar with

22     Lindell symposium when the Arizona and Antrim data

1       was publicly distributed?

2               A       I know a symposium occurred, I do

3       not --

4               Q       Uh-huh.

5               A       Yeah, I know a symposium occurred.

6       What's your specific question?

7               Q       Do you know why the Coffee County

8       data wasn't leaked at that symposium?

9                       MR. CLEMENTS:   Objection.

10      Foundation.

11                      THE WITNESS:   I --

12                      MR. CLEMENTS:   Form.

13                      THE WITNESS:   I have no idea.

14      BY MS. MIDDLETON:

15              Q       Earlier you testified that Stephanie

16      Lambert paid Ms. Hampton for technical help.   Do

17      you know when the time frame for when Ms. Hampton

18      was providing services?

19              A       I don't remember the exact dates.   It

20      was after she was dismissed in Coffee County.

21              Q       Do you know where the money came from

22      to pay Ms. Hampton?

Page 297

1          A     I have no idea.

2          Q     Do you know how she was paid?  For

3     example, was she paid by a check, cash, Venmo?

4          A     I have no idea.

5          Q     Do you know if she was salaried?

6     Hourly?  Fixed fee?

7          A     I have no idea.

8          Q     Do you know how much she was paid?

9          A     I don't know that either.

10          Q     Do you know what specific work she

11     was doing?

12          A     She came to help us understand,

13     because we were all learning, how to run an

14     election so that we could do the testing up there

15     that we needed to do.

16          Q     And how long -- what was -- do you

17     know approximately the duration of her work?

18          A     I don't remember exactly, but maybe

19     three days.

20          Q     Do you know if she provided any work

21     product in connection with her services?

22          A     Separate from training us, I don't

1    believe so.

2             Q    Was Ben Cotton there when she was

3    doing this work?

4             A    I cannot remember either way.  It's

5    possible because Ben was in and out of there, so I

6    don't know.  I can't confirm either way.

7             Q    You talked a little bit about Mr.

8    Lindell earlier, that you met him at a hotel in

9    Washington D.C. -- or, excuse me, that you met

10   Mr. Lindell in Washington, D.C.  Was this at a

11   hotel?

12            A    It was.

13            Q    Do you remember the name of the

14   hotel?

15            A    The name was the Trump Hotel where --

16   yes, it was the Trump Hotel.

17            Q    And how did you run into Mr. Lindell?

18            A    I was asked to give a briefing, along

19   with a number of other people, and there were a

20   bunch of people in the room and one of the people

21   in the room was Mike Lindell.

22            Q    Do you talk to Mr. Lindell?

Page 299

```
 1              A     In no substantive way did I talk to
 2        him.  I think it was "hi."  That was it.
 3              Q     And who else was there when you met
 4        Mr. Lindell?
 5              A     I don't recollect all of the people
 6        that were there.
 7              Q     Do you recollect --
 8              A     Uh-huh.
 9              Q     Do you recollect anyone, sir?
10              A     Well, Jim Penrose was there.
11              Q     Uh-huh.
12              A     He was briefing with me.  Sidney
13        Powell was there.  She also did some sort of
14        briefing.  There were three senators, U.S.
15        senators.  There were --
16              Q     Do you remember who they were, sir?
17              A     -- they were participating.
18                    One was Ron Johnson, who was trying
19        to find out more about what was going on with
20        anomalies and systems.  I believe one was a senator
21        from North Dakota.  And the other one I'm not sure.
22        I don't remember who it was.
```

Page 300

1          Q     Did you speak with Sidney Powell when

2     you were there?

3          A     Again, like Mike Lindell, I did for

4     maybe 30 seconds of "hi," kind of stuff.  That was

5     it.

6          Q     Was Jesse Binnall or anyone from

7     Binnall's firm at this D.C. meeting?

8          A     I don't know.

9          Q     Have you meet Mr. Binnall?

10         A     I don't know that I've ever met him.

11    If I did, I -- I don't know.  I just don't know

12    that I've ever met him.

13         Q     Is it fair to say you do not know him

14    then, sir?  Or do you know Mr. Binnall?

15         A     I don't know him.  I've heard of

16    him --

17         Q     Uh-huh.

18         A     -- but I -- I do not know him

19    personally.

20         Q     Do you know Mr. Giuliani?

21         A     I have never met Mr. Giuliani.

22         Q     After you left the Coffee County

Page 301

1      election's office on January 29th, did you return?

2                    Did you return to the Coffee County

3      election's office at any period of time after you

4      left on January 29, 2021?

5           A     Not that I can recollect.  I don't

6      believe I ever did.

7           Q     You testified earlier about Misty --

8      Ms. Hampton's authority to -- that it was

9      sufficient for you to enter the election's office

10     and work with her on the election system.  Is that

11     correct, sir?  Did I get that correct?

12          A     Can you be more specific of what

13     you're asking?

14          Q     Is it correct that you testified that

15     you believed Misty's -- Ms. Hampton's authority was

16     sufficient for you to enter the election's office

17     and work with her on the election system?

18          A     That's correct.  That's similar to

19     what they do for public testing -- logic and

20     accuracy testing.  The public is welcome to come

21     and observe that testing, anybody in the public is

22     welcome to do.  And that's similar to what we were

1    doing.

2           Q     So you understood that Ms. Hampton

3    had the authority to give you authority to be

4    there, to give you permission to be there?

5           A     That's correct.

6           Q     Do you know if the Coffee County

7    Board of Electors -- Board of Elections approved

8    her giving you this?

9           A     I do not know.

10          Q     Do you have any concerns that what

11   you did in Coffee County was illegal?

12          A     No.  I believe that -- my belief is

13   that as the election's supervisor in Coffee County,

14   that she had full authority to -- it's her

15   responsibility, it's my understanding, to make sure

16   that the election systems are secured and

17   functional and properly count votes and so on.

18   She's the person, I understand -- and this is true

19   across the country -- is that county clerks and

20   election supervisors are the ones who sign-off that

21   their equipment, their system, is ready for an

22   election that's been properly set up, inspected,

Page 303

1      tested, and so on.  So it's my belief that

2      Ms. Hampton had full authority to do that.  It's

3      still my belief that she had full authority to do

4      that.

5              Q    Did you investigate that authority at

6      all, sir, her -- her authority to grant you

7      permission?

8              A    I -- no, I did not.  You would have

9      to check with lawyers.  I'm not a lawyer.

10             Q    Did you look into whether the law

11      allows you to be in the EMS room under any

12      circumstance?

13             A    You would have to check with lawyers

14      to find out.  I'm not a lawyer.

15             Q    No, I'm asking you, sir, whether you

16      investigated the -- looked into whether the law

17      allows you to be in the EMS room?

18                  MR. CLEMENTS:  I'm going to object.

19      You're calling for a legal --

20                  MS. MIDDLETON:  No, I'm asking -- I'm

21      asking him did he research the law to see whether

22      he would be allowed in the EMS room under any

Page 304

1          circumstance.

2                        THE WITNESS:  It's my belief that the

3          election supervisor can demonstrate that equipment

4          any time they want to to anybody.  There are

5          videotapes on the internet showing EMSs, ICCs being

6          demonstrated.  That's exactly what Misty did, Misty

7          Hampton did.  So it's my belief that it is legal,

8          even now, for any election supervisor to have the

9          authority to -- to demonstrate this equipment to

10         anybody they want any time they want.

11         BY MS. MIDDLETON:

12             Q     Did you ask Misty -- Ms. Hampton

13         herself if she had authority to share all of that

14         data, all of the equipment with you?

15             A     All of that data, all of the

16         equipment --

17             Q     Well, did you ask Ms. Hampton if she

18         had authority to share the data with you, the

19         Coffee County data and software?

20             A     Ms. Hampton was a very experienced

21         election supervisor, I am sure she knew the law

22         quite well, if -- if -- it's my belief, she knew

Page 305

1        the law quite well and that if she thought any

2        request I made was inappropriate, she would have

3        told me no.

4                Q    And, sir, I was asking you a

5        yes-or-no question.

6                     Did you ask Ms. Hampton if she had

7        authority to share all that data or software with

8        you?

9                A    I don't recall asking her that

10       question.

11               Q    Have you heard anything about

12       Ms. Hampton considering a whistleblower lawsuit?

13               A    I have not.

14               Q    All right, sir.  Let's take a

15       15-minute break.  And then we'll get back together.

16               A    Sounds good.

17               Q    Thank you.

18               A    Thank you.

19                    VIDEOGRAPHER:  Going off the record.

20       The time is 5:41 p.m.

21               (Recess from 5:41 p.m. to 5:54 p.m.)

22                    VIDEOGRAPHER:  Going back on the

Page 306

1      record.  The time is 5:54 p.m.

2      BY MS. MIDDLETON:

3              Q    Hi, Mr. Lenberg.

4                   This morning your counsel sent over

5      some zip files.  Do you know who put the password

6      on those zip files?

7              A    I do not.

8              Q    Do you recall accessing the files

9      after they were password protected?

10             A    I do not.

11             Q    You don't recall?

12             A    I don't recall.

13             Q    Did your decision to terminate your

14     relationship with Stephanie Lambert have anything

15     to do with Georgia's Election System?

16             A    No.

17                  MR. CLEMENTS:  And I'm going to

18     object, privileged to any other line of questions

19     about Stephanie Lambert.

20                  Don't answer.

21                  THE WITNESS:  Okay.  Thank you.

22                  MS. MIDDLETON:  That's it for me,

Page 307

1        sir.  I appreciate your time.  I think a few --

2        some others on the call may have some questions for

3        you.  It was nice talking to you.

4                         THE WITNESS:  Thank you.

5                         MS. MIDDLETON:  Thank you.

6              EXAMINATION BY COUNSEL FOR STATE DEFENDANTS

7        BY MR. PICO PRATS:

8                  Q     Hi, Mr. Lenberg.  How are you?

9                  A     I'm doing okay.  How about you?  It's

10       been a long day.

11                 Q     I know.

12                 A     Other than that, I'm doing okay.

13                 Q     I think I might be the last one, I

14       think so, and I'll be by far the briefest.

15                 A     And who are you with?  Who do you

16       represent?

17                 Q     I'm Javier Pico Prats.  And I'm

18       representing the State Defendants of the case.

19                 A     Okay.  Thank you.

20                 Q     And so just to follow up on a few of

21       the questions that you've been asked.  At the

22       beginning -- so let me rephrase that.

Page 308

```
 1              You only went to Coffee County twice.
 2      Is that correct?
 3           A    I believe that's correct.
 4           Q    Okay.  And the first time that you
 5      went, you mentioned that you were still learning
 6      about election systems, correct?
 7           A    Well, both times when I went I was
 8      coming up to speed on election systems.  And a lot
 9      of it was -- Ms. Hampton is quite an expert, she's
10      very knowledgeable, and so I was learning about
11      election systems.  The current version of them.  I
12      knew about past ones, obviously I'm 66, I've voted
13      in almost 50 years worth of elections now.  So --
14      but the current, getting up to speed on it, Misty
15      is extremely knowledgeable, and so I was learning.
16           Q    Okay.  Then when --
17           A    And by the way, as part of my
18      understanding, that is one of the roles of an
19      election supervisor, is to educate the public on
20      how their systems work.  They regularly give
21      seminars.  And I've seen videos online and podcasts
22      and all kinds of things where they're explaining
```

Page 309

1      how the election system works to the public.

2      That's basically what Misty was doing for me, or

3      for us.

4              Q     That -- that's what happened during

5      the first and second visit?

6              A     Yeah, as well as the testing that

7      I've already testified to.  So we were -- we were

8      observing her running her system similar to a logic

9      and accuracy test.

10             Q     During the second visit, you said you

11     didn't get to spend a lot of time with Misty.  Is

12     that correct?

13             A     I don't remember the exact amount of

14     time each day.  I do know that, you know, I was in

15     there for some amount of time, but I can't remember

16     how much.  But yeah, I was not there for long

17     lengths of time that I recollect.

18             Q     Did you get to run tests during the

19     second visit?

20             A     I don't remember being able to run

21     any.  If we did, I -- I don't remember it.  So I

22     just don't remember.

Page 310

```
 1              Q     And I'm aware this -- oh, go ahead.
 2       I'm sorry.
 3              A     I'm sorry.  Go ahead.
 4              Q     And I was going to say that I'm aware
 5       this wasn't the reason why you went, but either of
 6       the two visits did you find any definitive answer
 7       that the election results for the runoff were
 8       incorrect?
 9              A     I was not looking for that.
10              Q     But no, you didn't find anything that
11       would lead you to believe that --
12              A     I didn't find it since I wasn't
13       looking for it.  I really was interested in the --
14       how the machines operated and whether or not they
15       were operating correctly or anonymously, so I
16       didn't -- honestly I did not go in and -- and you
17       know, compare results at all.  I wasn't trying to
18       do that there.  That wasn't my goal.
19              Q     Okay.
20              A     It may have been other people's
21       goals, but it wasn't my goal.
22              Q     Okay.  Thank you.  And then just one
```

Page 311

1       more line of questioning.

2                   Going back to Exhibit 13, if you want

3       to look at it.

4             A     Yes.  Yeah, what -- what page?  Oh,

5       it's just the one page.

6             Q     It's just the one page.

7             A     What's the question?

8             Q     It's discussing the reversal ballots,

9       correct?

10            A     Yes.

11            Q     So when you were discussing the

12      reversal ballots, did you only observe this in --

13      actually, strike that.

14                  What counties overall, it could have

15      been anywhere in the U.S., did you observe the

16      reversal ballots?

17            A     I have observed it in -- I'm thinking

18      trying to be complete here.  In Antrim County, I

19      observed reversals at very high rates, an average

20      of 30 percent.  And one township was 86 percent of

21      the ballots were reversed and then fed in again.

22      So -- apparently fed in again, it's a little hard

Page 312

1          to tell if the SLOG file.  But 86 percent is

2          totally unacceptable for any election.

3                    The requirement -- the national

4          requirement the AC puts out in their guidelines is

5          one out of 500 ballots reversed.  So Antrim was a

6          particular problem.  Coffee County in Georgia was.

7          In Maricopa, I believe we saw reversals there.

8          I've seen stuff that Kevin Moncla sent me that had

9          reversals.  I believe you printed that out as an

10         exhibit.  It's one of the files.  Basically every

11         file that he sent me, I printed out for you, since

12         you guys asked me to produce that.  And one of

13         those files that I printed out was like 7,000

14         reversals in Georgia in the primary, in the 2022

15         primary.

16                    That was -- you would have to ask

17         Kevin, but that was across a bunch of counties.  I

18         believe there's 65 counties he told me had

19         reversals in them in Georgia.  I know you have a

20         lot counties there.  You guy have, what, like 159

21         counties or something?

22              Q    One hundred fifty-nine counties.

Page 313

```
 1              A    It's got to be the most in the United

 2        States.  That's incredible, the number of counties.

 3                  But in any case, many counties in

 4        Georgia.  We observed it in New Mexico.  Basically,

 5        you know anyplace that we looked at in this detail,

 6        we have seen reversals occur.  And generally at way

 7        higher rates than allowable by the guidelines.

 8              Q    And --

 9              A    Which is why -- which is one of the

10        reasons why I believe the machines -- someone

11        should be complaining about this, someone should be

12        investigating it.  And the machines -- just that

13        one alone, unexplained reversal, I believe, should

14        be cause for decertification of the machines, until

15        someone can find out why they're doing that bad

16        behavior.

17                  And let me explain why, with my

18        background, why I'm concerned about that.  There

19        are unexplained reversals.  Okay.  There are

20        explained reversals, like an overvote, but those

21        are very few and far between.  And those are in the

22        record when those occur.  We're talking about
```

Page 314

1           unexplained reversals where you feed the ballot in

2           the second or third time in, it takes.

3                     Here's the problem.  As a bad guy,

4           what they might do is put this kind of behavior in

5           and let it operate that way and give correct

6           results for a year or two, maybe two, three, four

7           election cycles, get everybody accustomed to

8           knowing that reversals just occur, when they do,

9           you put it in again and it will take it.  And oh,

10          yeah, we've checked it before, it always comes out

11          with the correct answer.  And then one day, after

12          everybody is totally accustomed to accepting

13          something that they shouldn't accept, which is

14          unexplained reversals at extremely high rates, then

15          one day, as a bad guy, what you do is instead of --

16          when it reverses, instead of doing nothing, you

17          actually use that to double count that ballots.

18                     And let me explain how that works.

19          The way that would work is that the first time it

20          goes in, it actually scans the ballot and

21          interprets the ballot.  We know it does that

22          because the reason it's able to even reverse and do

Page 315

1     this is it puts a message on the screen, for

2     example, "overvote," to give you a chance to

3     reverse, you know, to say whether or not you want

4     to accept it.  All right.

5                 So we know it actually interpreted it

6     the first time and, yet, it's still holding the

7     ballot and it can reverse it.  So if someone

8     subverted that machine, what it could do is instead

9     of -- in the software loop, instead of deleting

10    that ballot when it reverses it, what if it counts

11    it?  And then the second time you put it in it

12    counts it again.  And the third time, if you have

13    to take three times, it counts it again.  It's a

14    way to multiply the number of votes, which was one

15    the things that was concerning about the 2020

16    election, all the statisticians, myself included,

17    that looked at it said the number of votes was off

18    scale, but unbelievable really in the 2020

19    election.  The tens of millions of increased votes

20    was way, way higher than anybody really expected.

21                 And there's the appearance, it's in

22    my declaration, in Torrance County, if you read my

Page 316

1        declaration, very recently there was a county

2        commission meeting in the New Mexico, where the

3        county manager was asked to do a hand recount of

4        the election -- the primary election for 2022.

5        And, to my knowledge, to this date, there are still

6        260 to 280, somewhere in there, depending on how

7        you count it, missing ballots.  In other words, the

8        official system, the paper tapes, the EMS, the

9        Secretary of State all agree essentially and they

10        report out votes that are hundreds of votes higher

11        than the number of physical ballots that were

12        counted.

13                Now, this hasn't been totally

14        investigated and confirmed, but if it does get

15        confirmed, what it would show is that the machines

16        have the potential of actually multiplying the

17        images from a certain set of ballots, actually

18        giving you extra votes, if you will.  And if you

19        couple that with what we learned -- I believe we

20        learned in Coffee County, that the reversals seem

21        to be settable to be preferential to a candidate.

22        On your ICPs, we learned that, that it was QR coded

1      on an ICX by your election supervisor, all done

2      officially correctly.  There's absolutely no reason

3      why it would reverse Trump over Biden or Biden over

4      Trump, and yet it was, by a very large number, like

5      one to six, one to seven.

6                    If you use that in an actual

7      election, after everybody got accustomed to

8      reversals and just accepting them, than what could

9      happen is you would have it programmed for a

10     particular party, it could be any party.  By the

11     way, if the systems can be subverted, they can be

12     subverted for any candidate.  That's part of my

13     concern, bipartisan, is you can cheat for

14     democrats, republicans, libertarians, you could

15     cheat for anybody if the systems are subvertible.

16     Okay.

17                    So my concern is that may have

18     occurred in Torrance County and may have occurred

19     in the 2020 election, is that in some places they

20     might have used reversals and triple counted them

21     or double counted them.  It's a long answer, but

22     I'm sorry, just trying to make it --

1          Q     I wanted to let you finish.  I
2     appreciate that, sir.
3                Based on that, when you said that you
4     saw the reversals were primarily for Trump, did you
5     only observe this in counties that voted majority
6     for Trump?
7          A     I'm sorry, I had trouble
8     understanding that.  Could you repeat the question,
9     please?  It was garbled.
10         Q     Did you see -- when you experienced
11    that reversals happened for the majority of the
12    time for Trump, did you see that happen, occur only
13    in counties that voted majority for Trump?
14         A     The only place I was able to test
15    this was in your -- your county -- or, excuse me,
16    Coffee County.  I didn't get to test this anywhere
17    else, so I can't answer that question.  And in
18    Michigan we did some testing there, but it -- it
19    wasn't clear either way.
20         Q     And did you compare reversals rates
21    observed for the overall results in that county?
22                MR. CLEMENTS:  What's "that county"?

```
 1                    THE WITNESS:  Yeah, which county?

 2         BY MR. PICO PRATS:

 3                    Q      In Coffee County.

 4                    A      Did I -- what's the question again?

 5                    Q      Did you compare reversal rates

 6         observed to the overall results in Coffee County?

 7                    A      Did I -- what's the -- I'm sorry, I

 8         still missed the key word there.  Did I do what?

 9                    Q      Compare the reversal rates observed

10         to the overall results in Coffee County?

11                    A      I did not -- to my knowledge, I did

12         not do that analysis.  It -- it -- I -- to my

13         knowledge, I didn't do that.

14                    Q      And in your expert opinion, you know,

15         assuming this was a real phenomenon and it was

16         happening indiscriminately, do you believe it would

17         have happened in rough proportion to the result in

18         Coffee County?

19                    A      I'm not sure what you're asking.

20         Please -- it may be getting late in the day, I

21         don't know what's going on here, but could you ask

22         it one more time, please?
```

Page 320

1          Q     Do you believe that the reversal rate

2     would have happened in rough proportion to the

3     election results in Coffee County?

4          A     I don't know.

5                MR. BROWN:  I'm going to object.  He

6     made no testimony as to the actual reversal rates

7     in Coffee County.

8                THE WITNESS:  Yeah, I did for the

9     testing that we did.  As far as the actual

10    elections, I don't know that I gave any specific

11    numbers for that.  The -- the reports that we gave

12    were for the testing that we did, so I -- I -- I

13    don't know that I can answer that.  But, again, I

14    would say that was not my purpose for being there.

15    My purpose was to understand the anomaly and then

16    that helped me understand the systems and look for

17    potential manipulation using that kind of so-called

18    subversion or feature that might be in the system.

19                So whether or not it existed in

20    Coffee County in 2020, was, you know, not my

21    concern.  I was just really trying to understand

22    is there a anomaly here?  Is it, you know,

Page 321

1      understandable?

2                      MR. PICO PRATS:  Okay.  That's all

3      the questions I have, sir.

4                      THE WITNESS:  Okay.

5                      MR. BROWN:  I have a -- I'm sorry, is

6      there someone else that has questions?

7                      MR. CLEMENTS:  Well, I was going to

8      ask maybe one or two questions, Bruce, but go

9      ahead.

10                     MR. BROWN:  No, no, you go and then

11     I'll finish.

12         EXAMINATION BY COUNSEL FOR THE WITNESS

13     BY MR. CLEMENTS:

14         Q    Mr. Lenberg, you testified earlier

15     about your time with Sandia National Labs.  And

16     what was the ultimate purpose of your efforts

17     working there?

18                     Because we heard a little bit about

19     black hats.  What your ultimate purpose?

20         A    So people may not be familiar with,

21     but Sandia National Labs is a Department of Energy

22     Laboratory that has major missions, including

Page 322

1   really the maintenance and security of our national

2   stockpile.  And so what we are about at Sandia

3   Natural Labs is protecting the nation.  That's what

4   we do in a major, major way.  We do it in a number

5   of different ways is -- the focus of the work there

6   is to protect the nation.

7                So my 31-year career, you saw early

8   warning satellites.  That's protecting the nation.

9   When I was working in Washington, I was protecting

10  the nation.  And now -- and then at the end, the

11  vulnerability stuff I did, it was all about

12  protecting the nation from external attacks against

13  our country.

14           Q     And more broadly, Mr. Lenberg, you've

15  had the opportunity to evaluate many moving parts

16  or different parts of the election system.  What

17  has been your overall purpose in doing so?

18           A     Yeah.  So I think I mentioned this in

19  my declaration as well, but the bigger picture here

20  that is of great concern to me is that I believe,

21  as an expert, and in a very broad look at things,

22  that the security of our election system is

Page 323

1    equivalent -- the need for security of our election

2    system is equivalent to the need for security for

3    our nuclear weapons.

4                    Literally, you can take down our

5    country -- one reason people don't attack us is we

6    have nuclear weapons and we make sure that they are

7    secure and that they function and all that kind of

8    stuff.  A simpler way, a more direct way to take

9    down our country would be through our election

10   system.  Because if you can control the election

11   system, you can control essentially every

12   leadership position in the entire country down to

13   the city and county and state and federal level.

14                    So it ought to have security

15   sufficient -- or equivalent, in my opinion, to our

16   nuclear weapons.  And, yet, the security it has, I

17   would assess that it's equivalent to -- and I'm not

18   demeaning the people that drive away in the Walmart

19   parking lot, the Prius that drives along with the

20   little flashing light, in my assessment, what I've

21   seen across the country and looking under the hood,

22   I'm not talking about the pretty processes you see

Page 324

1          in the check sheets and so on -- and I'm not

2          blaming our election officials at all, I want to

3          make this very clear, I think we have an incredible

4          group of dedicated election officials across the

5          country, yes, there may be a few bad apples in

6          there in various places that runs ballots multiple

7          times, but that's -- that's no my concern, my

8          concern is really that our election system is

9          extremely vulnerable and unprotected.  And the

10         people that should be looking for the anomalies,

11         fully investigating the anomalies, for example,

12         Williams in Tennessee, what we saw there, that has

13         not been fully investigated.  What we saw in Antrim

14         was totally ignored.  And -- and they say it was

15         debunked.  It wasn't debunked.  They said it was

16         human error.  It wasn't human error.  The machines

17         miscounted the vote.

18                    So anyway, I -- I think the election

19         system has got to be far better protected than it

20         is.  It's -- it's -- it's a huge problem for our

21         country, and that's why I have spent an incredible

22         amount of money and time is I believe it's --

Page 325

1          it's -- the future of our country literally depends

2          on us having an accurate and secure election

3          system.  And we do not have that right now.  It has

4          got extreme flaws in it that no one seems to be

5          willing to address.

6               Q     And the last question, Mr. Lenberg.

7          Did you share those same concerns for the election

8          system in Coffee County?

9               A     I -- I do share those.  Significant

10         flaws -- well, the main reason, not just what I

11         found in Coffee County with the testing that we

12         did, but also you used the same model that they use

13         in Michigan.  If you read my expert witness

14         reports, all the flaws are there, the same flaws.

15                    MR. CLEMENTS:  Okay.  No further

16         questions.

17                    MR. BROWN:  I just have one question

18         about your testimony in response to the questions

19         from the Counsel for the State Defendants.

20           EXAMINATION BY COUNSEL FOR COALITION PLAINTIFFS

21         BY MR. BROWN:

22               Q     And this is just a followup to the

Page 326

1      reversals.  I believe you testified that one

2      potential malicious use of the reversals is to

3      increase the risk that the reversed ballot is

4      counted twice, correct?

5              A     Correct.  Correct.

6              Q     And so if you wanted to increase the

7      chance that Trump's ballots were counted twice, you

8      would increase the number of Trump ballots that

9      were reversed, correct?

10             A     That would be correct.

11             Q     And so your findings would not -- in

12     Coffee County with respect to Trump, would reveal a

13     flaw, but they would not reveal a flaw that would

14     likely to have benefited Biden, correct?

15             A     Well, let me answer that question.  I

16     sort of answered it a minute ago, and that is the

17     fact that the machine is reversing and then you do

18     a count and it's correct, I believe, could be --

19     very likely could be a sensitizing or desensitizing

20     election officials to a problem that they should

21     not accept.  They should have demanded that the

22     machines work properly.  And to --

Page 327

1              Q     I understand that, but did you --

2              A     But let me finish.

3              Q     Okay.  All right.

4              A     So what I learned from Coffee County

5        is that the machines appear to be configurable to

6        preference one candidate over the other, which

7        means that you could do it for my candidate.  Okay.

8        And if I'm a bad guy trying to desensitize people,

9        I wouldn't necessarily do it for the candidate I

10       eventually want to do it for, I might do it for the

11       opposite party.  Okay.  So that if it's caught,

12       people would go just write it off, ignore it, or

13       whatever.

14              So I don't think what you're

15       suggesting proves anything.  What I think we have

16       found in Coffee County is there's a major flaw in

17       the system, it can be candidate-specific.  It

18       should not be acceptable, the reversals shouldn't

19       at all.  The fact that it reversed one candidate

20       over the other by a margin -- major margin is a

21       huge problem independent of which candidate it was.

22              Q     Right, but did you point out in any

1    of your reports or any of the blogs or any of your

2    communications up line that the reversals for Trump

3    was reversed eight times over Biden could very well

4    be somewhat an indication of a pro-Trump bias?  Did

5    you ever indicate that?

6         A    I believe so.  You can see in our

7    report, the AC report that Doug did, it shows the

8    actual reversal rates in favor of Trump.  You have

9    that.  But again the point is -- this is not

10   partisan at all, okay, this isn't about republicans

11   and democrats, it's an election system that I

12   believe is highly manipulatable, highly flawed.

13   You could cheat for anybody.  You could cheat for

14   republicans, you can cheat for democrats, you could

15   cheat for anybody.

16            And if you want to put a specific

17   republican in because let's say they're corrupted

18   or they're corruptible, or they have a

19   particular -- you know, I don't know, they've been

20   paid off, who knows, whatever the -- I don't know

21   what the motivations might be, but the point is the

22   system, I believe, could be used to cheat for

Page 329

1    anybody, and likely has been.

2              Q     But you saw no evidence in Georgia

3        that actual votes were wrong because of the

4        reversals, correct?

5              A     I don't believe I looked for that.

6        What I did see of course in Liberty County, I

7        believe, some counts didn't add up, but I don't

8        believe at that point I was tying it to reversals.

9        So I'm not sure because I don't believe I ever got

10       SLOG files from Liberty County, so I don't know if

11       it's associated with the reversals or not, but

12       Liberty County definitely has some things that

13       should have been investigated and were not.

14             Q     Okay.

15             MR. BROWN:   That's all the questions

16       I have.  We would like the transcript expedited.

17       We reserve the right to continue the subpoena

18       deposition when we obtain the password or other

19       access to the zip file that was password protected,

20       but request that this portion of the deposition be

21       transcribed straight away.  Thank you very much.

22       Thank you for your time, sir.  We appreciate it.

 1                    MR. CLEMENTS:  Yes.  And, Bruce, what

 2        we'll do is we'll do a diligent search over the

 3        next 24 hours on whether or not Mr. Lenberg can

 4        identify any password and we'll let you know.  But

 5        I think he's answered those questions.  And we'll

 6        disclosure our efforts in figuring out whether he's

 7        got a password or not anywhere.

 8                    MR. BROWN:  Thank you so much.

 9                    THE WITNESS:  Yeah, I'm sorry, I

10        can't guarantee that.

11                    MR. CLEMENTS:  And, Felicia, what is

12        the standard time for getting a copy of the video

13        transcript.

14                    COURT REPORTER:  Do you want to go

15        off the record and discuss that, go off the video

16        record?

17                    MR. CLEMENTS:  Off the record is

18        fine.  This is just housekeeping.

19                    VIDEOGRAPHER:  We are off the record

20        at 6:21 p.m.  This concludes today's testimony

21        given by Jeffrey Lenberg.  The total number of

22        media files used is nine and will be retained by

Page 331

1          Veritext.

2                          (Whereupon, at 6:21 p.m., the

3                          video-recorded videoconference deposition

4                          of JEFFREY E. LENBERG was concluded;

5                          signature reserved.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 332

1                    CERTIFICATE OF NOTARY PUBLIC

2         I, FELICIA A. NEWLAND, CSR, the officer before whom

3         the foregoing videotaped videoconference deposition

4         was taken, do hereby certify that the witness whose

5         testimony appears in the foregoing deposition was

6         duly sworn by me; that the testimony of said witness

7         was taken by me in stenotype and thereafter reduced

8         to typewriting under my direction; that said

9         deposition is a true record of the testimony given

10        by said witness; that I am neither counsel for,

11        related to, nor employed by any of the parties to

12        the action in which this deposition was taken; and,

13        further, that I am not a relative or employee of any

14        counsel or attorney employed by the parties hereto,

15        nor financially or otherwise interested in the

16        outcome of this action.

17

18

19        _____

20             FELICIA A. NEWLAND, CSR

             Notary Public

21

     My commission expires:

22   September 15, 2024

Page 333

1    David Clements, Esquire

2    davidclements13@protonmail.com

3                        November 22, 2022

4    RE:    Curling, Donna  v. Raffensperger, Brad

5          11/21/2022, Jeffrey E Lenberg (#5593203)

6          The above-referenced transcript is available for

7    review.

8          Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                     Yours,

23                     Veritext Legal Solutions

24

25

Page 334

1   Curling, Donna  v. Raffensperger, Brad

2   Jeffrey E Lenberg (#5593203)

3                    E R R A T A   S H E E T

4   PAGE_____ LINE_____ CHANGE_____

5   _____

6   REASON_____

7   PAGE_____ LINE_____ CHANGE_____

8   _____

9   REASON_____

10  PAGE_____ LINE_____ CHANGE_____

11  _____

12  REASON_____

13  PAGE_____ LINE_____ CHANGE_____

14  _____

15  REASON_____

16  PAGE_____ LINE_____ CHANGE_____

17  _____

18  REASON_____

19  PAGE_____ LINE_____ CHANGE_____

20  _____

21  REASON_____

22

23  _____    _____

24  Jeffrey E Lenberg                         Date

25

Page 335

1    Curling, Donna  v. Raffensperger, Brad

2    Jeffrey E Lenberg (#5593203)

3                 ACKNOWLEDGEMENT OF DEPONENT

4        I, Jeffrey E Lenberg, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Jeffrey E Lenberg                        Date

13   *If notary is required

14                   SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                   _____ DAY OF _____, 20____.

16

17

18                   _____

19                   NOTARY PUBLIC

20

21

22

23

24

25