Page 1

1          UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF GEORGIA

3               ATLANTA DIVISION

4

5          Civil Action No. 1:17-cv-02989-AT

6    _____

7    DONNA CURLING, et al.,

8         Plaintiffs,

9    vs.

10   BRAD RAFFENSPERGER, et al.,

11        Defendants.

12   _____

13

14        VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

15                 ALEX ANDREW CRUCE

16   DATE:          November 22, 2022

17   TIME:          10:03 a.m. to 3:49 p.m. CDT

18   LOCATION:      Witness location

19

     REPORTED BY:  Felicia A. Newland, CSR

20

21             Veritext Legal Solutions

             1250 Eye Street, N.W., Suite 350

22                Washington, D.C. 20005

Page 2

1               A P P E A R A N C E S

2      On behalf of the Witness:

3           COURTNEY KRAMER, ESQUIRE

4           Binnall Law Group

5           717 King Street

6           Suite 200

7           Alexandria, Virginia 22314

8           courtney@binnall.com

9      On behalf of the Curling Plaintiffs:

10          DAVID D. CROSS, ESQUIRE

11          JENNA CONAWAY

12          OLUWASEGUN JOSEPH, ESQUIRE

13          Morrison & Foerster LLP

14          2100 L Street, Northwest

15          Suite 900

16          Washington, D.C. 20037

17          mkaiser@mofo.com

18          dcross@mofo.com

19          ojoseph@mofo.com

20

21

22

```
                                           Page 3
 1              A P P E A R A N C E S (Cont'd)
 2      On behalf of the Coalition for Good Governance
 3      Plaintiffs:
 4            BRUCE P. BROWN, ESQUIRE
 5            Bruce P. Brown Law
 6            1123 Zonolite Road, Northeast, Suite 6
 7            Atlanta, Georgia 30306
 8            bbrown@brucepbrownlaw.com
 9            -- and --
10            MARILYN MARKS, ESQUIRE
11            7035 Marching Duck Drive, E504
12            Marilyn@uscgg.org
13      On behalf of the State Defendants:
14            DANIELLE HERNANDEZ, ESQUIRE
15            JAVIER PICO PRATS, ESQUIRE
16            ALEXANDER DENTON, ESQUIRE
17            Robbins Firm
18            500 14th Street, Northwest
19            Atlanta, Georgia 30318
20            alexander.denton@robbinsfirm.com
21            Jpicoprats@robbinsfirm.com
22            dhernandez@robbinsfirm.com
```

Page 4

1              A P P E A R A N C E S (Cont'd)

2        On behalf of State Defendants:

3              DIANE LAROSS, ESQUIRE

4              BRYAN JACOUTOT, ESQUIRE

5              Taylor English Duman, LLC

6              1600 Parkwood Circle, Southeast

7              Suite 200

8              Atlanta, Georgia 30339

9              dlaross@taylorenglish.com

10             bjacoutot@tylorenglish.com

11       On behalf o Fulton County Attorney's Office:

12             DAVID LOWMAN, ESQUIRE

13             Fulton County Attorney's Office

14             141 Pryor Street

15             Suite 4038

16             Atlanta, Georgia 30303

17             david.lowman@fultoncountyga.gov

18

19

20

21

22

Page 5

1                A P P E A R A N C E S (Cont'd)

2        Also Present:

3             Bryan Tyson

4             Kevin Skoglund

5             Susan Greenhalgh

6             Duncan Buell

7             Philip B. Stark

8        Videographer:  Akil Wade

9

10

11

12

13

14

15

16

17

18

19

20

21

22

1                    C O N T E N T S

2    EXAMINATION BY:                              PAGE

3          Counsel for Coalition Plaintiffs        8

4          Counsel for Curling Plaintiffs        133

5          Counsel for State Defendants          157

6          Counsel for Coalition Plaintiffs      190

7              CRUCE DEPOSITION EXHIBITS

8    NO.  DESCRIPTION                             PAGE

9    Exhibit 1  Subpoena                           47

10   Exhibit 2 E-mail with Slogs from Misty, dated   47

11             January 7, 2021

12   Exhibit 3  Color photographs                  75

13   Exhibit 4  Binnall Maggio Engagement Letter   87

14   Exhibit 5  Washington Post Inquiry           103

15   Exhibit 6  Recording transcript              103

16   Exhibit 7  OCR Additional Docs Cruce         131

17

18   *(Exhibits attached to transcript.)

19

20

21

22

```
 1                    P R O C E E D I N G S

 2                       *  *  *  *  *  *  *

 3                  VIDEOGRAPHER:  Today's date is

 4      November 22nd, 2022, and the time is 10:03 a.m.

 5      This will be the videotaped deposition of Alexander

 6      Andrew Cruce.

 7                  Would Counsel please identify

 8      themselves for the record, after which the court

 9      reporter will swear in the witness remotely.

10                  MR. BROWN:  Bruce Brown for the

11      Coalition Plaintiffs.

12                  MS. KRAMER:  Courtney Kramer,

13      attorney for Alex Cruce, the witness.

14                  MS. LAROSS:  Diane LaRoss for the

15      State Defendants.

16                  MR. LOWMAN:  David Lowman for the

17      Fulton County Defendants.

18                  MR. JACOUTOT:  Bryan Jacoutot for the

19      State Defendants.

20                  MR. BROWN:  Okay.  I think that's it.

21

22
```

1                    * * * * * * *

2        Whereupon,

3                    ALEX ANDREW CRUCE

4        was called as a witness and, having been first duly

5        sworn, was examined and testified as follows:

6          EXAMINATION BY COUNSEL FOR COALITION PLAINTIFFS

7        BY MR. BROWN:

8                Q    Good morning, Mr. Cruce.  My name is

9        Bruce Brown, and I represent the Coalition

10       Plaintiffs in this case.

11                   I'm going to be asking you some

12       questions.  The court reporter needs to take down

13       my question and your answer, so it's important that

14       I don't interrupt you and you don't interrupt me.

15                   If you ever need any breaks at all,

16       just raise your hand or -- or say so and we'll take

17       a break.  That will be fine.

18                   Please state your full name for the

19       record.

20               A    Alexander Cruce.

21               Q    And where are you now physically?

22               A    I'm in Jacksonville at my home.

1          Q     And do you work in Jacksonville?

2          A     Yes, sir.

3          Q     Where do you work?

4          A     Anheuser-Busch.

5          Q     What is your job at Anheuser-Busch?

6          A     Continuous improvement engineer.

7          Q     Can you just tell us quickly about

8     your educational background?

9          A     I have a physics degree from Georgia

10    Southern University, a Ph.D. in physical chemistry

11    from the University of Alabama.

12         Q     And when did you get your doctorate?

13         A     2015.

14         Q     How did you become involved in

15    analysis on the 2020 election?

16         A     I just noticed some anomalies from

17    personal accounts and also from the media.

18         Q     And prior to working at

19    Anheuser-Busch, could you take your employment back

20    just maybe three years -- or five -- five years?

21         A     Five years.

22               So before Anheuser-Busch, I was doing

1      consulting work for a company that I call Custos,

2      LLC, where I was owner/operator, the only employee.

3      And before that, I worked at the Cheeley Law Group

4      in Alpharetta.  And before that, I worked at OFS,

5      LLC.  And I think that's five years, yes.

6             Q     Okay.  When did you work for Cheeley

7      Law Group, roughly?

8             A     From July to the end of August.

9             Q     What year?

10            A     2021.

11            Q     And then when -- Custos, LLC was a

12     sole proprietorship?

13            A     No, it was an LLC.

14            Q     And it was just you.  Is that right?

15            A     Yes.

16            Q     And when was that your primary work?

17     What years?

18            A     October 2021 until June 2022.

19            Q     And then some time after June 2022,

20     you went to work for Anheuser-Busch?

21            A     Yes.

22            Q     Okay.  What did you do immediately

```
                                                         Page 11

 1         before working for the Cheeley Law Group?

 2                 A      I was a research engineer -- research

 3         and development engineer for OFS, LLC.

 4                 Q      And -- and what does that company do?

 5                 A      They manufacture optical fiber.

 6                 Q      And how long were you with that

 7         organization?

 8                 A      It was close to four years.

 9                 Q      And did you own that or were you an

10         owner of it?

11                 A      No, sir.

12                 Q      Was that full-time work when you

13         worked there?

14                 A      Yes.

15                 Q      And that would have been, say,

16         2018/2019 through the time that you were employed

17         by the Cheeley Law Group?

18                 A      So October of 2017, was my start date

19         at OFS, if I recall, and my last day of work there

20         was middle of June.

21                 Q      Of '21?

22                 A      Yes.
```

Page 12

1              Q      And what does that -- you may have

2       said, and I apologize, but what does OFS, LLC do?

3       What type of business is it?

4              A      So it's the third largest

5       manufacturer of optical fiber in the world.

6              Q      And where were you located when you

7       were working for OFS?

8              A      Norcross, Georgia.

9              Q      Okay.  So you became interested about

10      the 2020 election while you were working for OFS,

11      LLC, correct?

12             A      That is correct.

13             Q      Okay.  And then what was the nature

14      of your work for the Cheeley Law Group from July to

15      August 2021?

16             A      So two things; working Fulton

17      ballots -- a Fulton County ballots case and also a

18      research consultant for the cases that they had --

19      the ballot cases they had going on.

20             Q      Were you an independent contractor or

21      an employee of -- or were you an employee of

22      Cheeley Law Group?

Page 13

```
 1                A      I was an employee.

 2                Q      In the Fulton County ballots case, is

 3        that the case brought by Garland Favorito?

 4                A      I'm not sure, but I think he might

 5        have been one of the plaintiffs.

 6                Q      And then what were the other matters

 7        with respect to which you were a research

 8        consultant for Cheeley Law Group in July and August

 9        of 2021?

10                      MS. KRAMER:  I'm going to object

11        to -- the work he did for the Cheeley Law Group is

12        privileged information.

13                      MR. BROWN:  Okay.

14        BY MR. BROWN:

15                Q      Okay.  But you were only there for

16        two months.  Is that right?

17                A      Yes.

18                Q      Why did you leave?

19                A      Lack of work.

20                      MR. JOSEPH:  I'm sorry I have to

21        interrupt.  I need to state my appearance.  I'm

22        Oluwasegun Joseph with Morrison & Foerster for the
```

Page 14

1      Curling Plaintiffs.

2                    MR. BROWN:   Thank you.

3      BY MR. BROWN:

4            Q      Who did you report to at the Cheeley

5      organization?

6            A      Bob Cheeley.

7            Q      And when you went to work for -- or

8      when you formed, I guess, Custos, LLC, did you

9      continue -- was that the same work that you would

10     eventually do for Cheeley Law Group or is that

11     different?

12           A      It's different.

13           Q      And what was the nature of the work

14     of Custos, LLC?

15           A      Just analysis of elections.

16           Q      And who did you work for -- or who

17     did Custos, LLC work for?

18           A      I'm not sure I understand that

19     question.

20           Q      Well, was it -- were you -- was the

21     organization paid by anybody to do any work or did

22     it just work on its own?

1          A     No.  So I did work for the Mary

2     Norwood campaign.  But I would like to clarify, it

3     was not directly for Mary Norwood.  It was -- I

4     don't recall the lady who was running for mayor at

5     the time.

6          Q     Okay.  So it was involved with

7     consulting with political organizations or

8     candidates?

9          A     Yes.

10          Q     All right.  Let me turn back to your

11     focus on the 2020 election.

12          A     Uh-huh.

13          Q     After you became interested in the

14     2020 election, what were some of the activities

15     that you engaged in relating to that interest,

16     starting in November of 2020?

17          A     Well, my background in data

18     analytics, big data analytics, I was interested

19     right away in public data from the Georgia

20     Secretary of State website.  So I was downloading

21     periodically voter history file and also the

22     statewide absentee file, along with buying the

Page 16

1      voter registration list from the Secretary of State

2      statewide, so . . .

3             Q     And who did -- did you work with

4      other individuals with respect to that information?

5             A     At times, yes.

6             Q     And when did you first meet or speak

7      with Scott Hall?

8             A     November 4th.

9             Q     2020?

10            A     Yes.

11            Q     And how did you communicate with

12     Mr. Hall?

13                  What was the occasion for

14     communicating with him?

15            A     I was connected with him regarding

16     just elections and his interest in the election

17     itself.

18            Q     Who put you into contact with

19     Mr. Hall?

20            A     It's a lady named Amber Conner.

21            Q     And who is she?

22            A     Just a neighbor in Buckhead.

```
 1              Q      And what was her connection to Scott
 2       Hall, if you know?
 3              A      I don't know.
 4              Q      But she found out that you were
 5       interested in the election and were -- had some
 6       expertise in data analytics and got you connected
 7       with Scott Hall?
 8              A      Yes.
 9              Q      And then what did you and Scott Hall
10       talk about the first time you spoke with him?
11              A      I don't -- I don't really recall.  It
12       was a long time ago.
13              Q      Well, did that lead to further
14       communications about elections?
15              A      Yes.
16              Q      Tell me about those.
17              A      What -- what would you really -- what
18       do you really want to know?  I'm not sure.
19              Q      Okay.  Between November 4th, 2020,
20       and the time period in which you took a private
21       plane with him to Coffee County, describe for me
22       your communications with him and your relationship
```

1        with him.

2                       I can do it day by day or you can

3        tell me generally and I can come back and ask you

4        specifics, but can you just tell me generally?

5               A     Generally, you know, we were meeting,

6        discussing some of the things that I had found

7        through the data analytics.  He would send me, you

8        know, different articles and things like that

9        concerning the election.  And that's -- that's

10       about it.

11              Q     And then did you meet him in person

12       at any time before going to Coffee County?

13              A     Yes.

14              Q     About how many times?

15              A     I'm not sure.

16              Q     Ten or 11?  Two or three?

17              A     Two or three --

18              Q     And did you meet --

19              A     -- at the most.

20              Q     Did you meet with him by yourselves

21       or were there other people in those meetings?

22              A     I believe there were other people --

1          Q     Do you recall --

2          A     -- in the meetings.  We did have -- I

3     had dinner with him and Bob Cheeley and Charles

4     Bundren.

5          Q     And when was that?

6          A     I don't recall.

7          Q     And was Scott Hall a client of the

8     Cheeley firm at that time?

9          A     I don't know.

10         Q     What was discussed at that meeting

11    with Bob Cheeley, Scott Hall, and Mr. Bundren?

12              MS. KRAMER:  I'm going to object to

13    privilege.

14              MR. BROWN:  He just said that he

15    didn't know if Scott Hall was a client of Bob

16    Cheeley.  There's no foundation for a privilege.

17    BY MR. BROWN:

18         Q     Go ahead, Mr. Cruce.

19         A     There was some smalltalk of the

20    election, but it was more Scott just wanted to

21    introduce me to these two.

22         Q     And what did you understand -- and

1       I'm sorry, Mr. Cruce, yeah, I think you told me,

2       but when -- when was this dinner?

3              A      I'm not sure.  I can't really

4       remember.

5              Q      Would it have been in the

6       November/December time frame?

7              A      I'm not sure.

8              Q      But obviously, it was after you had

9       first been introduced to Mr. Hall and before you

10      went to Coffee County, right?

11             A      I'm not sure.

12             Q      Okay.  Well, it couldn't have been --

13      could it have been you were talking about your trip

14      to Coffee County in that meeting?

15             A      No.

16             Q      Okay.  So it was probably before that

17      meeting?

18             A      I'm not really sure.

19             Q      Okay.  Smalltalk about the election.

20                    Did you have an understanding of who

21      Scott Hall -- what Scott Hall's role was with

22      respect to the election, if all -- if anything?

Page 21

```
 1              A      Not really, no.

 2              Q      What about Mr. Bundren, do you know

 3     what -- what his role was?

 4              A      No.

 5              Q      Do you know who his clients were?

 6              A      No.

 7              Q      Was he ever your attorney?

 8              A      No.

 9              Q      Was -- this was while you were

10     working at -- at OFS, LLC, right?

11              A      Yes.

12              Q      And did they -- at that meeting, were

13     you asked to do anything or is this just a

14     discussion, or what?

15              A      No, just a discussion.

16              Q      Were there any action plans that were

17     laid out in that meeting by the group?

18              A      No.

19              Q      Where was the dinner?

20              A      I don't remember.

21              Q      In Atlanta?

22              A      It was around Atlanta.  I'm not sure
```

Page 22

```
1        if it was in Atlanta.

2               Q     And did you send e-mails or other

3        communications setting up the dinner or accepting

4        an invitation to the dinner?

5               A     No.

6               Q     Do you recall in your review of the

7        documents in response to the subpoena seeing any

8        documents relating to that dinner in any way?

9               A     No.

10              Q     Okay.  You mentioned maybe two or

11       three meetings with Scott Hall.  Do you recall any

12       other meetings with Scott Hall?

13              A     I do.  We met -- we met by video on a

14       Zoom call --

15              Q     Okay.

16              A     -- multiple times.

17              Q     And what -- and who else were on

18       these video calls?

19              A     It -- there was a range of

20       different -- different people, data analytics.

21       Just people with different, you know, backgrounds,

22       expertises.
```

Page 23

1           Q     And do you recall just the time frame

2      in which you would have been having these video

3      calls with Scott Hall and others?

4           A     We had video calls up until probably

5      May, May of this year, 2022.

6           Q     And you said "we."  Was there sort of

7      a name for this group of people who had -- who

8      would have had video calls up until May of 2022,

9      this year?

10          A     I'm sorry, would you repeat that?

11          Q     You said "We would have calls."  Was

12     there a group, either formal or informal, that

13     would have these video calls?

14          A     It was never really the same people.

15          Q     Who would organize the calls?

16          A     Scott would.  Sometimes I would.

17          Q     And what was the purpose of the

18     calls?

19          A     Just stuff that I found doing data

20     analytics.

21          Q     And is there a documentary record,

22     say, through e-mails or Zoom e-mails or Windows

1          Teams, that would show when these videos -- these

2          video communications were made or who was on it?

3                    A     I'm sorry, could you explain the

4          question a little better?

5                    Q     Sure.

6                          A week from now I'll be able to go

7          back through my e-mails and tell you every Zoom

8          call I've had in this last year.  It's simple.

9          Microsoft Teams or text messages, all of that

10         information leaves a trace obviously.

11                         What I want to know is what trace did

12         these video meetings leave in the records that you

13         have?

14                   A     Well, the e-mail.

15                   Q     Okay.  You set them up by e-mail,

16         probably?

17                   A     I'm sure.

18                   Q     And who would -- who would -- I know

19         that there was a different group of people with

20         each meeting, but if you could just list for me

21         the -- the range of people who would have been on

22         either one or another of those meetings.

Page 25

1                    And let me back up a second.

2                    These calls started when?

3            A      Shortly after the 2020 election.

4            Q      Okay.  And then tell me the people

5       who were on these calls, to the best of your

6       recollection.

7                    And I understand you're saying that

8       they weren't on all of them, but anybody who was on

9       some of them.

10           A      David Cross, Garland, John Wable.

11           Q      Can you spell that last name, please?

12           A      W-A-B-L-E.  He was on just a few.  He

13      worked for Scott Hall.

14           Q      Okay.  Who else?

15           A      Let's see, I don't remember their

16      last names, but Benny.

17           Q      And who did Benny work for?

18           A      I'm not real sure.  I don't know.

19           Q      Who else?

20           A      Let's see.  Kevin Moncla.  I -- I'm

21      sorry, I'm drawing a blank.

22           Q      Okay.

```
                                               Page 26

 1              A      I can't remember.

 2              Q      I'll come back to some of the names.

 3                     Did anybody take minutes or notes of

 4         these meetings, to your knowledge?

 5              A      No, I didn't.

 6              Q      And then why did you stop having

 7         these video meetings in May of 2022?  It just sort

 8         of petered out?

 9              A      Yeah.

10              Q      I'm going to ask you, just since

11         we're on the topic of different people involved,

12         about a number of different names.  With each --

13         with respect to each of these, I want to know if

14         you've met or communicated with them in any way,

15         that includes e-mail, video, anything at all.  And

16         then we can -- a lot of these people may be an easy

17         no and then some of them I may come back to and

18         drill down a little bit.

19                     Have you met or communicated with

20         Sidney Powell?

21              A      No.

22              Q      In video chat or anything?
```

Page 27

```
 1              A     No.

 2              Q     How about Michael Flynn?

 3              A     No.

 4              Q     Have you met or communicated with

 5      Rudy Giuliani?

 6              A     No.

 7              Q     How about Jenna Ellis, have you met

 8      or communicated with Jenna Ellis?

 9              A     I'm not sure.

10              Q     Do you know who she is?

11              A     Not really.  The names, I just -- I

12      don't really have a -- I don't really remember

13      names that well, but I don't want to say it's

14      impossible that I haven't met her.

15              Q     Fair enough.

16                    What about Phil Waldron, have you met

17      or communicated with Phil Waldron?

18              A     No.

19              Q     How about Doug Logan, have you met or

20      communicated with Doug Logan?

21              A     No, I don't believe.  I just don't

22      know these names, but . . .
```

Page 28

1          Q     How about Jeffrey Lenberg, did you

2     meet or communicate with Jeffrey Lenberg?

3          A     No.

4          Q     Okay.  Going back to Doug Logan.

5     Doug Logan's company is Cyber Ninjas.  Does that

6     refresh your recollection?

7          A     That's -- that's where I've heard of

8     that name.  It's possible in passing I might have

9     communicated with him or somebody that worked with

10    him but nothing memorable.

11         Q     And Jeff Lenberg, and just so you

12    know, Lenberg and Logan went to Coffee County the

13    week after you were there.

14         A     Uh-huh.

15         Q     Did you meet or communicate with

16    Jeffrey Lenberg?

17         A     No.

18         Q     Did you -- have you met or

19    communicated with Patrick Burn?

20         A     No.

21         Q     Do you know who he is?

22         A     I've heard the name.

```
 1              Q     Do you know what his relationship is

 2     with Scott Hall?

 3              A     I don't.

 4              Q     Did you ever hear or understand that

 5     he was providing funding of -- of operations in

 6     Georgia?

 7              A     No.

 8              Q     Have you ever met or communicated

 9     with Lin Wood?

10              A     No.

11              Q     Do you know who he is?

12              A     Yes.

13              Q     And did you --

14              A     Well, I don't know who he is, but

15     I've heard of his name.

16              Q     Okay.  And do you recall the -- that

17     he had a group of analysts and lawyers at his

18     plantation in, I think, South Carolina in November

19     and December of 2020?

20                    Did you ever hear about that?

21              A     No.

22              Q     How about Dave Hancock, have you met
```

1     or communicated with Dave Hancock?

2              A      No.  I don't recognize the name.

3              Q      How about Mike Lindell, also known as

4     the My Pillow Guy, did you ever meet or communicate

5     with Mike Lindell?

6              A      I met Mike Lindell at CPAC, shook his

7     hand and that was it.

8              Q      And when was that?

9              A      I'm not sure.  It was this year,

10    maybe March.

11             Q      And did you speak with him in any --

12    on any substantive level?

13             A      No.

14             Q      Any other meetings or communications

15    with Mike Lindell?

16             A      No.

17             Q      How about Kurt Olsen, O-L-S-E-N, have

18    you met or communicated with Kurt Olsen?

19             A      No.

20             Q      He's the lawyer -- he's one of the

21    lawyers for Mike Lindell.  Does that refresh your

22    recollection?

```
1              A     It's possible I've been on e-mail

2        chains or something, but it's -- it just doesn't

3        strike.

4              Q     Have you done any work for

5        Mr. Lindell or anyone associated with Mr. Lindell?

6              A     Yes, I have.

7              Q     And when did you do that?

8              A     That was in 20- -- late 2021, in

9        October, November maybe, late 2021.

10             Q     What did you do for him or his

11       organization?

12             A     So I consulted on the data in -- for

13       Georgia, so Georgia Secretary of State website.

14             Q     And what was your -- what election

15       were you looking at?

16             A     We weren't looking at any election.

17             Q     What data on the Secretary of State's

18       website were you looking at?

19             A     The voter history file, the statewide

20       absentee file, and also the statewide voter

21       registration.

22             Q     And was there a -- for lack of a
```

Page 32

```
 1          better expression, a deliverable that you had for

 2          that work that you did for Mike Lindell's

 3          organization?

 4                  A     Yes.  It was just a timeline of data.

 5          So the Secretary of State, I believe, the voter

 6          history file goes back to 2012, so the data is a

 7          little tricky, where you have to -- you have to

 8          find the right delimiters.  So it's just showing

 9          them how to understand what the Secretary of State

10          was -- what their data was.

11                  Q     And who -- who at Mr. Lindell's

12          organization was your point of contact?

13                  A     I think one name that stuck out, I

14          think, was Jay Valentine.  I think that was his

15          name.

16                  Q     And your understanding is he works

17          for Mr. Lindell?

18                  A     I believe so.

19                  Q     But is he like in-house or like a

20          lawyer for him or what?

21                  A     I'm not --

22                        MS. KRAMER:  Bruce, I'm -- Bruce, I
```

Page 33

 1          just have one question.   I just kind of want to

 2          know where this line of inquiry is going, just

 3          given the case.   This is Curling v. Raffensperger.

 4          What -- what these people have to do with the case

 5          at hand and why Alex is here today.

 6                         MR. BROWN:   Good question.   Mike

 7          Lindell was in Coffee County two weeks or three

 8          weeks after Mr. Cruce was, and when we asked the

 9          Coffee County election supervisor why he was there,

10          she pled the Fifth, so I'm going to ask about

11          Mr. Lindell.   Thanks.

12          BY MR. BROWN:

13               Q     And then I think I was asking you Jay

14          Valentine, was he a lawyer for Mr. Lindell's

15          organization or in-house, or do you know?

16               A     I don't recall.

17               Q     And then that work stopped

18          October/November '21.   Is that right?

19               A     Yeah, about that time.

20               Q     Did you do any other work for

21          Mr. Lindell's organization?

22               A     No.

1           Q       And how were you -- do you know how

2      you were introduced to Lindell's organization or

3      who got you that work?

4           A       I don't recall, yeah.

5           Q       Were you doing -- were you paid for

6      that work?

7           A       Yes.

8           Q       And was this through your -- your

9      LLC?

10          A       Yes.

11          Q       Okay.  Then Ben Cotton, have you met

12     or communicated with Ben Cotton?

13          A       Ben Cotton?  I don't recall.  I

14     don't --

15          Q       It doesn't ring a bell?

16          A       I don't recall.

17          Q       Okay.  Are you familiar with the

18     SullivanStrickler firm?

19          A       What do you mean "familiar"?

20          Q       Well, you've heard of them, right?

21                  Well, let me back up.  Let me back

22     up.  That was a bad question.

```
                                                  Page 35

 1                    Apart from being with them on

 2        January 7th, 2021, have you had other occasions to

 3        meet with or communicate with the SullivanStrickler

 4        firm or any of its employees?

 5               A     No.

 6               Q     Have you met or communicated with

 7        Russ Ramsland?

 8               A     No.

 9               Q     Other than the dinner in Atlanta,

10        have you met or communicated with Charles Bundren?

11               A     Sorry.  Repeat that one more time.

12               Q     Other than your dinner in Atlanta,

13        have you met or communicated with Charles Bundren?

14               A     Yes.

15               Q     What was the occasion or reason for

16        meeting or communicating with him?

17               A     At the Cheeley Law Firm.

18               Q     Was that in connection with the work

19        that you were doing for the Cheeley Law Firm?

20                    MS. KRAMER:  Objection.

21                    THE WITNESS:  Yes.

22
```

Page 36

1      BY MR. BROWN:

2              Q      Have you met with Mr. Bundren with

3      respect to work that you weren't doing for the

4      Cheeley Law Firm, if that makes --

5              A      No.

6              Q      -- any sense?

7              A      No.

8              Q      How about Preston Haliburton, have

9      you met or communicated with Preston Haliburton?

10             MS. KRAMER:  Objection.

11             Alex, I'm going to instruct you

12     that when you're around legal communication

13     between any of these lawyers and their clients,

14     and if you were working for them, that's

15     privileged information.

16             MR. BROWN:  The fact that he was

17     working for them is not.

18     BY MR. BROWN:

19             Q      Have you met or communicated with

20     Preston Haliburton?

21             A      Yes.

22             Q      Was that in connection with his legal

Page 37

```
 1      work?
 2              A      No.
 3              Q      Tell me about your meetings or
 4      communications with Mr. Haliburton.
 5              A      He was also at the Cheeley Law Firm.
 6              Q      And what was he doing at the Cheeley
 7      Law Firm?
 8              A      I don't -- I don't recall.
 9              Q      Who was the client?
10              A      I'm not certain.  I don't know.
11              Q      What do you -- what do you remember
12      about meeting Preston Haliburton?
13              A      Nice guy.
14              Q      And what was he -- what was he doing
15      there?
16              A      I'm not real sure.  I don't know.
17              Q      Who was he -- who was he meeting
18      with?
19              A      I'm not sure.  I would assume Bob
20      Cheeley.  That's an assumption though.
21              Q      Other than meeting with him -- was
22      that in Atlanta that you met with him or in D.C.?
```

1                    I'm sorry, let me --

2          A    Atlanta.

3          Q    Atlanta.  Okay.

4                    Other than in Atlanta in connection

5     with the Cheeley firm, did you have any meetings or

6     communications with Preston Haliburton?

7          A    No.

8          Q    How about Georgia Senator Bill Ligon,

9     L-I-G-O-N, have you meet or communicated with Bill

10    Ligon?

11         A    No, not to my recollection.

12         Q    How about Stephanie Lambert, have you

13    met or communicated with Stephanie Lambert?

14         A    I don't recall.

15         Q    How about Jim Penrose, have you met

16    or communicated with Jim Penrose?

17         A    I don't think so, no.

18         Q    Heard of the name?

19         A    Not really.  Not really.

20         Q    And I believe you testified that you

21    worked on a matter related to Garland Favorito,

22    right, or that he was a party?

 1              A      It was the Fulton ballots case, just

 2      whoever the plaintiffs were in that.

 3              Q      And you -- you've had, I guess, a

 4      number of communications with Mr. Favorito.  Is

 5      that right?

 6              A      I wouldn't say a number.  I mean,

 7      what is a number?  How much does a number mean?

 8              Q      More than half a dozen.

 9              A      Communicating in what regards?

10              Q      Well, what were you communicating

11      with Mr. Favorito about?

12              A      I mean, election --

13              MS. KRAMER:  I'm going to object that

14      if any of these conversations had to do with the

15      Fulton ballots case, Alex, that you do not answer

16      it because that is attorney-client privilege.

17      BY MR. BROWN:

18              Q      Okay.  What about Robert Sinners,

19      have you met or communicated with Robert Sinners?

20              A      It's not standing out.  I don't

21      recall.

22              Q      How about Harry MacDougald, have you

1          met or communicated with Harry MacDougald?

2                  A    I'm not sure.  It's possible through

3          certain e-mail chains I could have.  I'm not sure

4          though.  I --

5                  Q    Okay.

6                  A    -- never directly carried on a long

7          conversation or anything.

8                  Q    What about Kurt Hilbert?

9                  A    I have met Kurt Hilbert at CPAC as

10         well.  I had dinner with Kurt.

11                 Q    And was that this last year?

12                 A    Yes.

13                 Q    Any other occasions?

14                 A    No.

15                 Q    How about Shawn Still, do you know

16         Shawn Still?

17                 A    It sounds familiar, but I did not --

18         I don't know.  I don't --

19                 Q    Did you -- let me back up a second.

20                      At your dinner with Mr. Hilbert, did

21         you speak to him with respect to Coffee County?

22                 A    No.

Page 41

```
 1              Q      How about David Shafer, have you met
 2       or communicated with David Shafer?
 3              A      I have communicated with David
 4       Shafer.
 5              Q      When and what about?
 6              A      This past primary, I was working on
 7       the primary election and analyzed the GOP database
 8       that was given to a -- the lady I was working for
 9       at the time who was running, and I was pointing out
10       some of the issues that I was seeing in that
11       database compared to databases that I have
12       compiled.
13              Q      And then apart -- this was the 2022
14       primary?
15              A      Yes.
16              Q      Okay.  Have you had any
17       communications or meetings with David Shafer
18       outside of your work for him related to the 2022
19       primary?
20              A      No.
21              Q      How about Todd Sanders, or Saunders,
22       have you ever met or communicated with Todd
```

Page 42

1     Saunders?

2          A     It's not ringing a bell.

3          Q     How about Conan Hayes, have you met

4     or communicated with Conan Hayes?

5                MS. KRAMER:  Bruce, I just have one

6     point of clarification.  When you are asking these

7     people, can you please identify what their -- how

8     they're relevant to the case at hand and to what

9     Alex is testifying?

10               MR. BROWN:  Yeah.  Conan Hayes --

11               MS. KRAMER:  Just to clarify.

12               MR. BROWN:  Yeah.  Conan Hayes and

13    Todd Saunders, we have information that they made

14    trips to Georgia counties also and -- to make

15    forensic copies of election equipment.  And so

16    that's why I'm asking him.

17               MS. KRAMER:  Thank you.

18    BY MR. BROWN:

19         Q     Do you -- did either -- did you meet

20    or communicate at any time with Todd Saunders or

21    Conan Hayes?

22               A     No.

```
                                                    Page 43
 1              Q     Okay.  And I believe you already

 2      testified with respect to SullivanStrickler

 3      generally, but Paul Maggio is an employee of -- of

 4      SullivanStrickler.  Outside of your meeting him on

 5      January 7th, 2021, have you met or communicated

 6      with Paul Maggio?

 7              A     No.

 8              Q     Have you met or communicated with Ed

 9      Voyles?

10                    And for context, Ed Voyles is one of

11      the people who is shown in the video on January 7th

12      in Coffee County.

13              A     I may have had contact with him, but

14      I don't know -- I don't know the guy.

15              Q     Apart from contact with him that day,

16      do you recall any meetings or communications with

17      Mr. Voyles?

18              A     No.

19              Q     What about Eric Chaney?

20                    And just for context, Mr. Chaney also

21      was shown in those videos.  Have you had any

22      communications or meetings with Eric Chaney apart
```

Page 44

1    from on January 7th?

2              A      No.

3              Q      Who is Will P. at Defending the

4    Republic?  Do you know him?

5              A      I'm sorry.  Could you repeat that?

6              Q      Are you familiar with a person who

7    identifies himself as Will, and then the initial P,

8    at Defending the Republic?

9              A      I don't know him.

10             Q      It doesn't ring a bell?

11             A      No.

12             Q      But you know the organization

13   Defending the Republic, correct?

14             A      I'm not real big into the media.  I

15   don't really know.

16             Q      Okay.  But are you familiar -- did

17   you know that that was Sidney Powell's

18   organization?

19             A      Not until now.

20             Q      And I believe you testified that

21   David Cross of Georgia would meet with you and

22   others via video.  Did you ever communicate with

1      David Cross about Coffee County?

2           A    Yes.

3           Q    And tell me about that; when, where,

4      and what about.

5           A    He wanted -- he wanted the log file

6      from Coffee County.

7           Q    And when did he want that?

8           A    Sometime this year.

9           Q    And is he a lawyer or what -- what --

10     what did he want it for, if you know?

11             It's a compound question, but do you

12     know what he wanted it for?

13           A    I don't know.

14           Q    Was he just sort of poking around or

15     was he going to use it for some lawsuit or

16     something?

17           A    I'm not sure.

18           Q    Did you give him the log file?

19           A    I don't recall if I did or not.

20           Q    But that would be reflected in

21     e-mails, I guess, probably?

22           A    It should be, but I'm not sure.

Page 46

1           Q     And when did he make this request?
2     And when might you have given him the log files?
3           A     I'm not sure.
4           Q     Do you know what the log files were
5     from?  Like what device or computer?
6           A     No.  They were sent to me by Scott
7     Hall.
8           Q     So Scott Hall sent you the log files
9     and then you sent the log files on to David Cross?
10          A     I'm not sure if I did that or not.
11          Q     And who did you -- do you recall
12     sending the log files to anyone else?
13          A     I don't recall.
14          Q     Do you know how -- how Scott Hall got
15     the log files?
16          A     From e-mail with Misty.
17                MR. BROWN:  Let me mark for
18     exhibit -- well, just for the record, if we could
19     mark as Exhibit 1, Tab 1, which is the subpoena for
20     documents.  And then I'm going to mark as
21     Exhibit 2, Tab 6.
22

Page 47

```
 1              (Cruce Deposition Exhibit Numbers 1 & 2

 2              marked for identification.)

 3    BY MR. BROWN:

 4              Q     Do you have your Exhibit Share up,

 5    Mr. Cruce?

 6              A     No.

 7              MR. BROWN:  Okay.  Let's take a

 8    break.  And why don't you go ahead and log into the

 9    Exhibit Share, because that's how we show you the

10    exhibits.

11              VIDEOGRAPHER:  The time is 10:54 a.m.

12    We are now off the record.

13              (Recess from 10:54 a.m. to 11:11 a.m.)

14              VIDEOGRAPHER:  The time is 11:11 a.m.

15    And we are back on the record.

16    BY MR. BROWN:

17              Q     Mr. Cruce, we're back on the record.

18    And where we left off was we were discussing your

19    communications with various people.  And we made it

20    to David Cross of Georgia.  And you indicated that

21    he was on the video meetings with you and the

22    others, but that you had also e-mailed to him the
```

Page 48

1      logs.

2                     Do you recall that?

3              A     I said I wasn't sure.  I don't recall

4      if I --

5              Q     Okay.

6              A     -- e-mailed him that or not.

7              Q     The -- and just for the record,

8      Exhibit 1 is your subpoena.  I want to get that in

9      the record.

10                    Let me show you Exhibit 2, which is

11     January 7th.  Do you have that in front of you?

12             A     Exhibit 2, yes.

13             Q     And Exhibit 2 should be a January

14     7th, 2021 e-mail from Scott Hall.

15             A     Uh-huh.

16             Q     Do you see that?

17             A     Uh-huh.  Yes.

18             Q     And that's to you, right?

19             A     Correct.

20             Q     And that's your --

21                    MS. LAROSS:  I just want to -- excuse

22     me, it's Diane LaRoss.  I just wanted to ask you,

1      what folder in the Exhibit Share are the marked

2      exhibits for today's deposition?  Because I'm not

3      seeing a folder for today.  I just have a folder

4      for November 9th, 2022, and the marked exhibit

5      folder is empty.

6                    MR. BROWN:  And, yeah, let's

7      straighten that out for you, Diane.  Hang on a

8      second.

9                    MS. MARKS:  Bruce, you might want to

10     go off the record because she's not the only one

11     with that problem.  I have that same issue.  Some

12     of us are not seeing today's folder.

13                    MR. BROWN:  Okay.  Let's go off the

14     record and get this fixed.  Thanks.

15                    VIDEOGRAPHER:  The time is 11:13 a.m.

16     We are now off the record.

17                    (Recess from 11:13 a.m. to 11:28 a.m.)

18                    VIDEOGRAPHER:  The time is 11:28 a.m.

19     And we're back on the record.

20                    MR. BROWN:  Thank you.  And thank you

21     to all of those helping to get the exhibits loaded.

22     This is difficult.  We got the documents yesterday

Page 50

1          afternoon and we're doing the best we can.

2          BY MR. BROWN:

3                Q     Do you see Exhibit 1, that's your

4          subpoena, Mr. Cruce?

5                A     Exhibit 1 or is it Exhibit 2?

6                Q     Exhibit 1 is your subpoena, right?

7                A     Is this the same subpoena that you

8          issued at my place of work --

9                Q     Yes.

10               A     -- on Friday, October 28th?  Nothing

11         has changed since then?

12               Q     No, sir.

13               A     I didn't notice the proof of service

14         document in my subpoena, but it's -- it appears to

15         be it.

16               Q     Okay.  You don't need to authenticate

17         the proof of service.  That's something that we get

18         from the process server.  You may not have seen

19         that before.

20                     But you -- together with your

21         counsel, you collected documents responsive to that

22         subpoena.  Is that right?

Page 51

1           A     Yes.

2           Q     Okay.  I'll come back to that in a

3     second.  Let's look at Exhibit 2.

4           A     Okay.

5           Q     And is Exhibit 2 a January 7 e-mail

6     from Scott Hall to you?

7           A     Yes.

8           Q     And he's forwarding an e-mail from

9     Misty Martin, correct?

10          A     Correct.

11          Q     And she's also known as Misty

12    Hampton.  Is that your understanding?

13          A     I don't know.

14          Q     She's the elections director of --

15    she was the election director in Coffee County,

16    right?

17          A     I believe so, yes.

18          Q     And what are the files that she sent

19    to Scott Hall and that Scott Hall sent to you?

20          A     Well, the ICC log and SLOG.  I

21    downloaded them into a notepad, so a bunch of

22    numbers and dates, sequences.

1              Q      Is it --

2              A      I'm not sure where she actually

3       downloaded it from.

4              Q      Did you have an understanding when

5       you got this what those files were or what they

6       were for?

7              A      Not really, no.

8              Q      Well, you know what the ICC -- what

9       the ICC is, right?

10             A      I do know that, yes.

11             Q      And what is it?

12             A      Let's see --

13             Q      It's the big scanner?

14             A      I'm trying to remember the acronym,

15      but I -- I believe it's scanner for absentee by

16      mail ballots.

17             Q      Is it -- it's the large scanner in

18      the computer that's in the election office,

19      correct?

20             A      I'm not certain of that.

21             Q      And then what -- do you know what log

22      it was from that device?

Page 53

```
 1              A     Not really.
 2              Q     What about the SLOG, does that
 3       typically -- what does that stand for in your line
 4       of work?
 5              A     In my line of work?
 6              Q     Yeah.  In -- what does that mean?
 7              A     What does my line of work mean?
 8              Q     No, what does SLOG mean.
 9              A     I'm not sure.
10              Q     You don't know?
11              A     Not really, no.
12              Q     But then you -- without knowing what
13       these documents were, you sent them to David Cross?
14              A     I'm not sure that I sent them to
15       David Cross.
16              Q     Okay.  He asked you for them.  Is
17       that correct?
18              A     Yes.
19              Q     And you don't recall whether you sent
20       them to him or not.  Is that fair to say?
21              A     Yes.
22              Q     And do you know the purpose of these
```

1    logs or what they do or what they show?

2         A    Just by looking at them, it looks

3    like a history of what the machines did during the

4    election as far as when they scan the votes.  I'm

5    not certain of that but just a description.

6         Q    So it's a computer-generated log of

7    what the computer did during the election?

8         A    I guess.  I don't know.

9         Q    And then we were -- the topic was

10    your communications with David Cross.  And we

11    talked about the logs and we talked about the

12    videos, the video meetings.  What other

13    communications or meetings did you have with David

14    Cross?

15         A    As far as meeting in person or like

16    video meetings?

17         Q    Well, yeah, meetings in person, we'll

18    start with that.

19         A    So I know he works in money

20    management, and when I left the Cheeley Law Firm, I

21    rolled my IRA into an account with him.  Strictly

22    business.  So we met with that.  I never met with

1      him in person, I don't believe.  I don't recall if

2      we met in person.

3              Q      Okay.  And did you have other

4      communications with David Cross about elections,

5      not about your -- your 401(k) or your IRA?

6              A      Yes.

7              Q      And tell me about those.

8              A      Well, in 2020, there was a lot of

9      hype around the anomaly from the Edison data, it's

10     like a feed to The New York Times.  And he was --

11     he was -- he was all about that and I was not, so I

12     was in meetings where they talked about this, but I

13     wasn't very attentive.

14             Q      Okay.  Other than the Edison data,

15     what other communications did you have with David

16     Cross, if you recall?

17             A      Is my video frozen?

18             Q      It is.

19                    Can you hear me?

20             A      I can hear you.

21                    Can you hear me?

22             Q      Yeah, but let's just wait until your

Page 56

```
 1     video catches up here.

 2                     VIDEOGRAPHER:  Do you want to go off

 3     the record?

 4                     MR. BROWN:  Yeah, let's go off the

 5     record.

 6                     VIDEOGRAPHER:  The time is 11:36 a.m.

 7     We are now off the record.

 8             (Recess from 11:36 a.m. to 11:38 a.m.)

 9                     VIDEOGRAPHER:  The time is 11:38 a.m.

10     And we're back on the record.

11     BY MR. BROWN:

12          Q     All right.  Mr. Cruce, we were

13     talking about Mr. Cross of Georgia.  And other than

14     the subject matter of the Edison data, what other

15     communications did you have with Mr. Cross about

16     elections, just generally?

17          A     So he was also working with -- so

18     there was a case after Fulton ballots, I think -- I

19     believe with David Perdue.  He was trying to raise

20     up anomalies -- actually, I don't believe it was

21     actually affiliated with David Perdue, but they

22     were sending mail to, I think, the governor or
```

Page 57

```
 1        somebody affiliated with the governor about

 2        anomalies in the election.

 3                    And he had seen the work that I had

 4        done with, you know, ballot IDs and just analysis

 5        on the Secretary of State data, so we talked about

 6        that a lot, me sending -- he was wanting the data

 7        from me, and I did not comply with that.  And that

 8        was that.  And then I was on maybe one or two

 9        meetings this year with him.  And at that point in

10        one of those meeting, I believe, he brought up this

11        ICC log and SLOG file.

12             Q    From Coffee County?

13             A    Yes.

14             Q    And did he tell you why he was

15        interested in it?

16             A    No.  Well, this is what I remember

17        from it, is that there is a version of, I believe

18        it was the Dominion software, that supposedly

19        wasn't verified with the election commission, VAC,

20        and the version is on that -- on that log file or

21        SLOG.  I can't remember which one.  But at the

22        point where we were meeting, I had already really
```

1      checked out.  I mean, I wasn't really following too

2      much of what he was saying.

3            Q     But he apparently knew that you

4      and/or Scott Hall had the system log information

5      from Coffee County?

6            A     I'm not sure what he knew.

7            Q     When was this discussion?

8            A     Earlier this year.

9            Q     Like -- like when?

10           A     Over three months ago.

11           Q     Over six months ago?

12           A     No.  It would be over -- today is --

13     I started Anheuser-Busch in July, so yeah, around

14     six months, at least six months.

15           Q     Okay.  And tell me everything you can

16     about this conversation in which he asked for the

17     system logs from Coffee County.

18           A     I'm sorry.  Can you define that a

19     little better?

20           Q     Yeah.

21                 You -- you -- you brought up the idea

22     that he asked for the system logs and that you

Page 59

```
 1       can't remember whether you gave it to him or not, I

 2       think was what you said.

 3              A      Scott or David?

 4              Q      David.   David Cross.   I may have

 5       misspoken.

 6              A      All right.   So will you please

 7       rephrase the question again?

 8              Q      Sure.

 9                     At some point in time, David Cross of

10       Georgia asked to obtain the system logs from Coffee

11       County, right?

12              A      Right.

13              Q      And --

14              A      Actually, I don't think it was

15       specific to Coffee County.   He was searching for

16       log files in general, I believe.

17              Q      Log files --

18              A      Again, I'm not -- I'm not certain

19       actually.   I --

20              Q      But it was --

21              A      He was asking about log files.   I'm

22       not sure it was just about Coffee.   I think it was
```

Page 60

1      in general.

2              Q     But it was Dominion log files,

3      correct?

4              A     I don't remember the exact phrasing,

5      but sure.

6              Q     But, I mean, you were trying to find

7      out what version -- or he was trying to find out

8      what version Georgia had, correct?

9              A     I think that was a piece of it.  I

10     don't really know everything they were trying to

11     find.

12             Q     And what was the purpose of their

13     inquiry as they explained it to you or as you

14     understood?

15             A     I believe they heard that I had had

16     this file and they wanted it.

17             Q     What did they say that led you to

18     believe that they had heard you had that file?

19             A     Probably through conversation with

20     Scott Hall.

21             Q     And did you hear Scott Hall tell them

22     that you had that file or that he had that file?

Page 61

1           A       Hear?  No.  No.

2           Q       Did you read him -- did you read

3     something that he had said that indicated that?

4           A       I'm not sure.

5           Q       You don't remember one way or the

6     other?

7           A       I'm -- I don't really understand what

8     you're saying.

9           Q       Well, I'm trying to figure out how

10    they knew you or Scott Hall had these files.  Okay?

11    And that's what I'm trying to get at.

12                  And did you tell him you had those

13    files?

14          A       I'm not sure how he found out.

15          Q       Do you recall any communications

16    reflecting what he did with the files if he got

17    them?

18          A       No.  It cut off from there.

19          Q       Okay.  I'm going to go back to some

20    of your communications with these people.

21                  Now, I asked you if you had met or

22    had communications with Sidney Powell.  Do you

1    recall that?

2             A     Yes.

3             Q     Have you -- have you met or had

4    communications with anybody who was working for or

5    with Sidney Powell?

6             A     Yes.

7             Q     Who?

8             A     So leading up to January 6th or 7th,

9    I was -- I did a full audit of all of the

10   databases, so the Secretary of State, just

11   comparing the voter history files and state

12   absentee to -- along with the recount, some of the

13   batch files.  And I was sending it to, I believe,

14   somebody that represented her.  It was through a

15   person named Jack Magan, M-A-G-A-N.

16            Q     And so you sent that data to Jack

17   Magan.  And you had the understanding that he

18   worked for or with Sidney Powell.  Is that right?

19            A     With the people that represented her.

20            Q     And who were those people?

21            A     I don't recall.  I'm pretty sure it

22   was one of the males, but I don't remember any of

Page 63

```
  1          their names.
  2                  Q       And what other communications did you
  3          have with Sidney Powell or her organization or
  4          people who worked with her prior to going to Coffee
  5          County?
  6                  A       I don't -- I don't recall any.
  7                  Q       How about after you went to Coffee
  8          County?
  9                  A       I don't recall anybody with Sidney
 10          Powell.
 11                  Q       When you were -- when you had these
 12          video meetings with the group that we discussed,
 13          how did you share documents with the group?
 14                  A       E-mail.
 15                  Q       Would you -- did you use Slack?
 16                  A       Slack?
 17                  Q       Yeah.  It's a type of communication
 18          program application.
 19                  A       Not -- I didn't use it.
 20                  Q       Do you recall meeting or
 21          communicating with a man named Greg Freemyer?
 22                  A       Greg Freemyer?  That doesn't ring a
```

Page 64

```
 1      bell.
 2              Q      Mr. Freemyer is with
 3      SullivanStrickler.  Does that help you remember one
 4      way or the other?
 5              A      And who is SullivanStrickler again?
 6              Q      Greg Freemyer, he works for
 7      SullivanStrickler.
 8              A      SullivanStrickler is?
 9              Q      SullivanStrickler is the company that
10      hired the people, Maggio and others, to go down to
11      Coffee County the day you were there.
12              A      Oh, okay.
13              Q      Freemyer -- Freemyer, we don't think
14      Freemyer was there, so I don't want to mislead you
15      on that, but he does appear on communications
16      relating to Coffee County.  And what I wanted to
17      know is whether you recall having any meetings or
18      communications with Greg Freemyer.
19              A      No.
20              Q      What about Cathy Latham, did you ever
21      meet or have communications with Cathy Latham?
22              A      So I met her down in Coffee County.
```

Page 65

```
 1          That was the first time I met her.  And soon
 2      thereafter, because I was looking for a GOP
 3      database, voter information, and she said that she
 4      could -- she could try to work something out.  And
 5      that never came to fruition, and that's the only
 6      thing that I had ever talked to her about.
 7              Q    So the two occasions were actually --
 8      and I'll come back to this, but actually in person
 9      in Coffee County, right --
10              A    Yes.
11              Q    -- on January 7th?
12                   And then thereafter, you reached out
13      to her to get a GOP database, but that never panned
14      out.
15              A    No.
16              Q    Fair to say?
17              A    Huh-uh.
18              Q    Anything else with Cathy Latham?
19              A    No.
20              Q    In your -- prior to going to Coffee
21      County, do you recall discussions with anyone about
22      the need or desire to obtain a forensic copy of
```

Page 66

1      Georgia's election equipment?

2             A      I guess -- so are you -- like, the

3      need or the desire, what do you mean?

4             Q      Any -- let me make it broader.  Any

5      discussion about obtaining a forensic copy or a

6      copy of Georgia's election software?

7             A      I think it was known that that would

8      be the only way to understand if the election, you

9      know, was valid or not, but as far as setting up

10     something to do that, no.

11            Q      So who said or how was it discussed

12     that obtaining a copy of the election software was

13     the only way to figure out if the election was

14     correct or not?

15            A      That was a broad discussion around

16     websites, people talking in meetings.  It's -- it

17     would be the only way to ever know.

18            Q      To ever know --

19            A      Just a general -- it's a general

20     thought.

21            Q      Right.

22                   In other words, to determine if the

Page 67

```
 1          vote totals were correct, you needed to get a
 2          forensic copy of Georgia's election software?
 3                  A     I -- I wouldn't state it like that.
 4          It was --
 5                  Q     How would you --
 6                  A     It wasn't ever --
 7                  Q     How would you state it?
 8                  A     I didn't really -- I didn't really
 9          know the innards, I don't think anybody really did,
10          of how the system was set up.  I was just saying
11          that, you know, to be a fair election, that there's
12          machines involved, and that's it.  And other people
13          agreed.  And there was no promotion of that, no --
14          no.
15                  Q     But the thinking was to determine
16          whether this past election was fair or not, we need
17          to look closer at the machines.  Fair enough?
18                  A     That's -- yeah, a broad, you know,
19          media driven, everybody was saying this, yeah.
20                  Q     Okay.  And then at some point, were
21          there any specific plans to obtain a copy of
22          Georgia's election software arising out of this
```

Page 68

1      need to determine whether the election was fair?

2              A     A plan for me or a plan -- what do

3      you mean?

4              Q     I'll get to you, but a plan for

5      anybody.

6              A     Anybody that I know?

7              Q     Yeah.

8              A     No.

9              Q     Okay.  What about -- are you -- were

10     you aware of --

11             A     I wasn't -- I wasn't aware of it, no.

12             Q     I mean, did you hear discussion about

13     it?

14             A     No.

15             Q     Okay.  So before you went down to

16     Coffee County, you did not hear of any discussion

17     or any communications about the need to obtain a

18     copy of Georgia's election software so that you

19     could determine if it was a fair election?

20             A     I don't recall, no.

21             Q     Okay.  Tell me about going to Coffee

22     County on January 7.

Page 69

```
1                         I take it that you already knew Scott

2          Hall, right?

3                 A       Correct.

4                 Q       And he knew that -- that you were --

5          you had a lot of expertise in data analytics,

6          correct?

7                 A       Correct.

8                 Q       And tell me -- so he called you to go

9          down there?

10                A       If I recall correctly, yes.

11                Q       And then that was the day before or a

12         couple of days before?

13                A        It might have been late the night

14         before or early that morning.  It was a very abrupt

15         invitation.

16                Q       And -- and what did he say to you

17         when he -- I take it he asked if you would join

18         him.  Is that right?

19                A       I believe so.  I can't remember -- I

20         can't remember if I -- yeah, I believe it was if I

21         would like to go.

22                Q       And did you -- before you spoke with
```

Page 70

1      Scott Hall on the evening before or the morning of

2      going to Coffee County, had you heard from anybody

3      that he was going down there or that anybody was

4      going down there to look at the election equipment?

5              A      No.

6              Q      So the first you heard of it was when

7      Mr. Hall called you?

8              A      Yes.

9              Q      And he -- to the best of your -- and

10     this is not hugely important, but just tell me what

11     was said on that -- on that telephone conversation.

12             A      Just saying he's going down to Coffee

13     County and that -- it's hard to recall exactly what

14     was said.  I don't want to misspeak, but it was in

15     the order of, you know, "Do you want to go with me?

16     Let's fly down there."

17                    It was to the extent that they had

18     access to, I guess, an elections office and we were

19     going to go down there and meet people there.

20             Q      And he asked you to go with him or if

21     you wanted to go with him?

22             A      Yes.

Page 71

1              Q      And did he indicate to you in that

2       telephone conversation what he wanted you to do

3       other than accompany him?

4              A      We talked about the fact that there

5       were things that -- a lot of things that I didn't

6       really know about the election system, not

7       necessarily the system, but the processes of an

8       election.  So the idea was to go down and talk with

9       Misty and understand what her role is and what she

10       does on election night and how data is being

11       reported, because, again, I was focused mainly on

12       the data.

13              Q      And at that time, did you know who

14       Misty Hampton was?

15              A      Yes, I did.

16              Q      How did you know who she was?

17              A      Scott showed me videos of her prior

18       to that, kind of, you know, causing a scene.  Yes,

19       I think at some point she was -- went semi viral or

20       viral or something with the system.  She was very

21       outspoken, so . . .

22              Q      And Mr. Hall had shown that to you or

Page 72

1      you had at least seen it before you went down to

2      Coffee County.  Is that right?

3           A     I'm sorry.  Could you repeat that?

4           Q     So you -- when he called you, you

5      already knew about Misty Hampton and -- and Coffee

6      County, right?

7           A     Yes.

8           Q     Because you had seen the video and

9      the video had gone viral, right?

10          A     Sure.

11          Q     Okay.  And then any -- did he rent a

12     plane or was it his own private plane or what?

13          A     I'm not sure if it was his own or

14     not, but it was a -- it was a jet.

15          Q     And was it just you -- was it just

16     you two and the pilots?

17          A     Yes.

18          Q     And where did you leave from, if you

19     recall?

20          A     I can't remember the airport name,

21     but it's close -- it's a private airport in

22     Atlanta.  I think it's Peachtree Dunwoody or

Page 73

1       something maybe.  Is that what it's called?

2                Q     Sure.  Off Clairmont?

3                A     I believe so.

4                Q     Okay.  And then you -- so it's just

5       the two of you flew down to Douglas, Georgia,

6       right?

7                A     Yes.  If that's in Coffee County,

8       yes.

9                Q     Then who -- who picked you up at the

10      airport, if anybody?

11               A     Nobody picked us up.

12               Q     How did you get to the election

13      office?

14               A     We drove a van from there.  I believe

15      it was a van.

16               Q     Did you rent it?

17               A     I didn't.  I mean --

18               Q     I mean, do you recall, did Scott rent

19      it?

20               A     I hope so.  We didn't steal it.

21               Q     And then did Mr. Hall tell you or did

22      you discuss what his role had been in setting up

1      the meeting and work in Coffee County that day?

2             A     They didn't really tell me a lot on

3      that end.  At the time, I felt like he was very

4      involved and knew, but no, I don't -- I don't know

5      what he knew of what was going on because he didn't

6      really discuss that with me.

7             Q     Did -- did there come a time where

8      your understanding of his involvement changed?

9             A     Yes.

10            Q     And how so?

11            A     Because he spoke about actually

12     obtaining the data that this group got in Coffee

13     County.  And he's told me multiple times that he's

14     never seen that data.

15            Q     So he wanted the data, never got it,

16     and that led you to conclude that he might not have

17     been as involved as he represented?

18            A     Sure.

19            Q     Okay.  So you took the plane, then a

20     van.  And then you got to the Coffee County

21     elections office.  And who greeted you there?

22            A     I don't -- I don't remember off the

1    top of my head.

2              Q    Who all was there when you got there?

3              A    I don't really -- I can't really put

4    faces with names that long ago, but there were a

5    few people there, I think, that worked with Coffee

6    County Elections.  When we got there, Misty was

7    there.  I can't remember if Cathy was there yet or

8    not.  I don't -- it's kind of hard to go back that

9    far.  I'm not sure.

10             Q    Well, let me -- let me do this, let

11   me mark as Exhibit 3 some of the still photos that

12   we have collected as Tab 5.  It's going to be

13   Exhibit 3.

14                  (Cruce Deposition Exhibit Number 3 marked

15                   for identification.)

16   BY MR. BROWN:

17             Q    Those may take a minute to load, but

18   if we could do that.

19             A    All right.  I have it up.

20             Q    All right.  Do you see Exhibit 3, the

21   first page?  Do you see that?

22             A    Yes.

Page 76

1           Q      And I believe all of these are going

2      to be dated January 7, 2021.  Do you see the date

3      stamp on this photo?

4           A      Yes.

5           Q      And can you identify who is in this

6      photo?

7           A      I can identify two of them.

8           Q      Go ahead.

9           A      One of them is myself.

10          Q      Holding the water bottle in the right

11     hand, correct?

12          A      Yes.

13          Q      And then who is --

14          A      And --

15          Q      Go ahead.  I'm sorry.

16          A      The other is, I believe, Scott.

17          Q      Scott is the gentleman to the right

18     of the lady who's holding the door open, correct?

19          A      Correct.

20          Q      And do you know who the lady is?

21          A      I -- I don't recall.

22          Q      Okay.  If you would scroll down to

Page 77

```
 1        the next photograph in Exhibit 3.
 2               A     Okay.
 3               Q     This is the same day.  The time is
 4        11:51.
 5               A     Uh-huh.
 6               Q     And you are shaking someone's hand.
 7        Do you see who -- do you know who that is?  Whose
 8        hand you're shaking?
 9               A     No, I don't recall.
10               Q     And what about the lady here that's
11        in front of you, is that Cathy Latham?
12               A     I don't -- I don't know.
13               Q     And do you know --
14               A     I don't know who that is.
15               Q     Do you recall that the gentleman
16        whose hand you're shaking is Ed Voyles?  Did you
17        know that?
18               A     No.
19               Q     And then to your left, the gentleman
20        in the jacket who's shaking somebody's hand, who is
21        the gentleman?
22               A     It looks like Scott.
```

Page 78

```
 1          Q     And that's Misty Hampton whose hand
 2     he is shaking?
 3          A     I'm not certain of that.
 4          Q     Okay.  Let's go to the next photo,
 5     which is at 3:53.  Do you see that?
 6          A     Yes.
 7          Q     And you're sitting at the desk at the
 8     bottom of the photograph, correct?
 9          A     Yes.
10          Q     And to your left, is that one of the
11     people from the SullivanStrickler team, as far as
12     you can tell?
13          A     I'm not certain.
14          Q     Can you identify other people in that
15     still photograph?
16                I'm sorry, that still of the video, I
17     should say.  And, again, we're on -- just for the
18     record, we're still on Exhibit 3.  And this is the
19     photo at 3:53.
20          A     I don't remember any of their names
21     and faces.
22          Q     And there's a man with a cup in his
```

Page 79

1          left hand in a baseball cap sitting at the table

2          with you to your right.  Do you know who that is?

3                    I can't hear you, Mr. Cruce.  I don't

4          know if anyone else can.

5          A     I'm thinking, just a second.

6          Q     Okay.

7          A     I don't recall his name.

8          Q     Do you recall any of the people

9          representing to you that they were on the Board of

10         Elections?

11         A     The Board of Elections?  I don't -- I

12         don't recall them saying they were on the Board of

13         Elections, no.

14         Q     Well, let me ask it this way, and let

15         you sort of tell your own story on this.  You

16         understood -- did you understand that you had

17         permission to be in that office?

18         A     Yeah, they opened the door.

19         Q     Right.

20                    And one of them was Misty Hampton,

21         was the elections director, right?

22         A     She's the elections director.

```
 1              Q      And do you recall meeting anyone else
 2        associated with Coffee County Elections who was
 3        there?
 4              A      I believe so.  I think there was more
 5        people from Coffee County there.
 6              Q      And do you recall who they were, what
 7        their position was, or what their name was?
 8              A      I don't remember their names.
 9              Q      Did you meet Eric Chaney?  Does that
10        name ring a bell?
11              A      I don't -- I believe -- I believe I
12        did.  I'm not -- I'm not certain that I can recall
13        back that far, remembering their names.
14              Q      Looking at this photograph -- looking
15        at the still of the video at 3:53, do you know who
16        the gentleman directly to your right is with the
17        baseball cap and shorts?
18              A      I remember speaking to him briefly
19        about -- about the election and things of that
20        nature, but I don't remember his name.
21              Q      Okay.  Let's go to the next
22        photograph.
```

Page 81

1              A      All right.

2              Q      I'm going to come back and get you to

3       testify about what you were doing when you were

4       there.  I'm just trying to get sort of the layout

5       here.

6              A      Okay.

7              Q      Do you -- do you know the person

8       right to your right was Mr. Maggio?  Did you know

9       that?

10             A      At the time, I didn't know what firm

11      or what -- I believe he introduced himself, but I

12      don't believe I ever got his last name.  I just

13      don't remember names and things.

14             Q      Well, let's go to the next slide,

15      which is at 12:19.

16             A      Uh-huh.

17             Q      And is that you in that photograph?

18             A      Yes.

19             Q      And what are you standing on -- what

20      piece of equipment are you standing over?

21             A      I believe that is -- it is the ICP

22      scanner, I believe.

Page 82

```
 1              Q     That's the precinct scanner?

 2              A     Yes.

 3              Q     If you would go to the next

 4      photograph at 12:32, and that's -- that's you

 5      speaking to a gentleman with the sweater.  Is that

 6      right?

 7              A     Yes.

 8              Q     And sitting here, you don't recall

 9      his name, right?

10              A     Yes, I understand you've pointed out

11      his name, but at the time I didn't remember.  I

12      don't remember.

13              Q     Fair enough.

14                    And then the next photograph is at

15      12:44 --

16              A     Uh-huh.

17              Q     -- and to the best of your

18      recollection, that's Misty Hampton speaking with

19      you?

20              A     Yeah, I believe that is Misty.  Yes.

21              Q     And then if you look at the next

22      slide at 1:49, and that's you showing Misty Hampton
```

Page 83

1      something.  Is that right?

2              A     Yes.

3              Q     And do you recall what you were

4      showing her or asking her?

5              A     I don't -- I don't know.  I don't

6      remember.

7              Q     Skip down to the last page of these

8      photographs --

9              A     Uh-huh.

10             Q     -- do you see that -- does that

11     appear to be you leaving at 4:46?

12             A     Yes.

13             Q     And what did you take with you that

14     you had gotten from Coffee County when you left?

15             A     I don't -- I don't remember if I took

16     anything from Coffee County.

17             Q     Did you make copies of anything?

18             A     Did I make copies of anything?

19             Q     Right.

20             A     No.

21             Q     Were you given copies of anything

22     like on a thumb drive or a hard copy or anything

Page 84

1      like that?

2                A      I don't recall.

3                Q      Do you recall Misty Hampton giving

4      you a thumb drive?

5                A      Yes, I do believe she -- she did.

6                Q      And do you recall what was on that

7      thumb drive?

8                A      I'm sorry.  I believe it was the ICC

9      and log and the SLOG file.

10               Q      Anything else?

11               A      I don't -- I don't think so, no.

12               Q      And did you ask her for that data?

13               A      I did not.  I didn't understand what

14     the log files were.

15               Q      And so she just gave that to you

16     without you asking for it?

17               A      I'm not -- I'm not sure.  She -- I

18     think she had the most information about it and she

19     wanted me to analyze it.

20               Q      Okay.  And did you analyze it?

21               A      A little bit.

22               Q      And those files are the files that

1      you produced to us, right, that are attached to

2      that e-mail from Scott?

3           A    Yes.  So e-mailed, and I believe that

4      the thumb drive, I believe, it was the same thing.

5      It was nothing -- I don't think -- I'm not sure

6      exactly.

7           Q    Well, if you -- if you --

8           A    The only thing that I have in my --

9      on my computer and belongings from -- from Coffee

10     County are this ICC and SLOG file, so . . .

11          Q    And those are the ones that are

12     identified on Exhibit 2?

13          A    Yes.

14          Q    Okay.  So it looks like before you

15     left, Scott Hall e-mailed those files to you.  Is

16     that right?  If you look --

17          A    That's what it looks like, yeah.

18          Q    And so could you have made a -- and

19     did you download those onto a thumb drive before

20     you left or what?

21          A    I don't -- I don't remember.  I don't

22     recall.

```
 1              Q     And do you have a copy of the
 2         contents of that thumb drive that Misty gave you?
 3                    Or do you have the thumb drive still,
 4         for that matter?
 5              A     I'm not -- I'm not sure.
 6              Q     Have you looked for it?
 7              A     I really had forgotten that I had
 8         that.  I could look for it.
 9              Q     If you would, that would be great.
10         We would appreciate it.  We'll follow up on that.
11                    Other than that thumb drive, did you
12         take anything else with you from Coffee County?
13              A     I don't recall if I did.
14              Q     Okay.  Then you -- after leaving the
15         elections office, you came back to Atlanta.  Is
16         that right?
17              A     Yes.
18              Q     And did you ever go back to the
19         Coffee County Elections -- did you ever go back to
20         Coffee County?
21              A     No.
22              Q     Okay.
```

Page 87

1                   MR. BROWN:  Let me make as Exhibit 4
2        Tab 3.
3                   (Cruce Deposition Exhibit Number 4 marked
4                   for identification.)
5        BY MR. BROWN:
6              Q     Have you seen tab -- Exhibit 4
7        before?
8              A     No.
9              Q     And just for the record, Exhibit 4 is
10       a 30 November 2020 Engagement Agreement Forensic
11       Analysis presented to Jesse Binnall.  Do you see
12       that?
13             A     Yes.
14             Q     Were you aware that the Binnall Firm
15       had engaged Paul Maggio and SullivanStrickler?
16             A     I did not know that.
17             Q     You didn't know that the Binnall Firm
18       was involved in the Coffee County capture?
19             A     No.
20             Q     Let me direct your attention to
21       page 5 of Exhibit 4.
22             A     Okay.

Page 88

1          Q      And do you see where it says, "State
2      of Georgia Work"?  Do you see that?
3          A      Yes.
4          Q      And it goes through forensic
5      collection, computer hard drives, Windows or Linux,
6      et cetera.  Do you see that?
7          A      Yes, I see a list of prices and --
8      yeah.
9          Q      But you -- you were not aware that
10     SullivanStrickler had been engaged by your law firm
11     to do this work?
12         A      No.
13         Q      Okay.  Well, just backing up, did
14     you -- did you gain an understanding when you were
15     there what the purpose of making the forensic
16     copies of the election equipment was?
17         A      Could you be a little more specific?
18         Q      Why were they copying the equipment?
19         A      Why were they copying the equipment?
20         Q      Why were they making a forensic copy
21     of the -- of everything there?
22         A      I don't know what they were thinking.

1          Q    I understand that, but you were

2     sitting there throughout the entire day watching

3     them do it and speaking with them.  Did you gain an

4     understanding of what they were doing?

5          A    They looked like they were copying

6     something.  I mean --

7          Q    Do you know -- do you know why they

8     were copying it?

9          A    I mean, that's sort of a loaded

10    question.  I don't know why they were doing it.

11         Q    Well, you were there, too.  Okay?

12         A    Right.  Right.

13         Q    And -- and so it's fair for me to ask

14    you what you thought they were doing, and it's not

15    credible for you to have no idea of what they were

16    doing or why.  Okay?

17          So you need to tell me the whole

18    truth and what you thought they were doing and why

19    they were doing it.  And if -- I mean, you know

20    they weren't doing it to put malware in there,

21    right --

22          A    I honestly --

```
 1              Q     -- or do you?
 2              A     I have no clue what they were doing
 3       there, honestly.  I was told by Scott, "Well, they
 4       were going to copy things or whatever", but I
 5       personally don't know what they did there.
 6              Q     Were you curious?
 7              A     Of course.
 8              Q     Did you ask anybody what they were
 9       going to do -- what they were wanting to do with
10       the forensic copy?
11              A     Yes.
12              Q     And what did they say?
13              A     They didn't know.  Scott didn't know.
14              Q     So they had a client, I guess your
15       law firm, that engaged them to make a forensic copy
16       of the Coffee County Elections, and they didn't
17       know why they were asked to do it, for all you
18       know, right?
19              A     I've already stated that I didn't
20       know Binnall was this involved with the people that
21       were there.
22              Q     Okay.  Now, the -- do you know -- did
```

1           you understand if they had somebody that they were

2           working for, if it wasn't -- the -- the law firm

3           might have engaged them, but was there an end user

4           that was identified who would be using the

5           information from Coffee County?

6                     A     I have no clue.

7                     Q     Okay.  You don't know who the Binnall

8           Firm's client would have been.  Is that right?

9                     A     No.

10                    Q     And did you understand that this was

11          being done for Sidney Powell's group?

12                    A     No.

13                    Q     Okay.  Just take me through

14          throughout the day, the best that you can recall,

15          what you did -- what you personally did when you

16          were there.

17                    A     Well, I looked at the equipment,

18          never -- never touched or tried to work anything.

19          Asked a lot of questions from Misty and some of the

20          people that were there during the election night.

21          Spoke very briefly with -- with a few people at

22          lunch.  I was asking questions, you know, of the

Page 92

1      people that were there.

2              Q      Okay.

3              A      I was just curious and looking at

4      things.

5              Q      Were there particular anomalies in

6      the performance of the equipment that you were

7      focused on or asked questions about?

8              A      No.  My -- my biggest thing there

9      was -- was to understand how data was being

10     uploaded.  Also understand the -- all the processes

11     with the absentee-by-mail ballots.  You know, who

12     sent them out, who -- you know, did the Secretary

13     of State send them out, and things of that nature.

14                   Just had an opportunity with an

15     elections supervisor to learn more about the

16     process so I could kind of create a picture with

17     the data that I had been working on, not just, you

18     know, solely on the numbers.

19             Q      Makes sense.

20                   You said how the -- the data was

21     uploaded.  What data and from where to where?

22             A      On election night when they report

1      out their numbers.

2            Q     How -- how they get their numbers

3      from the precinct and then how they are reported up

4      the line.  That kind of information?

5            A     Yeah.

6            Q     Do you recall any discussion of any

7      issue of remote access to the equipment?

8            A     Remote access for me or --

9            Q     No.  Anybody.  Anybody.

10           A     I -- I don't recall.

11           Q     And the -- and in gaining an

12     understanding of the process of absentee ballots,

13     you're talking about sort of administratively how

14     that was done?

15           A     Yes.

16           Q     Do you recall any discussions or

17     attention to the -- any malfunctions of the

18     equipment?

19           A     Yes.  Misty told me that -- I believe

20     it was during the runoff, that they were having

21     failures and with the scanning it kept on shutting

22     off.  And she said she made a call to, I guess,

Page 94

1       somebody at the Secretary of State or it could have

2       been somebody with the system and said, "If y'all

3       don't fix this, then I'm going to get the news down

4       here."

5                   And then she said it started working,

6       I think is what -- something to that manner, but

7       she was very adamant about something being wrong

8       with the system.

9            Q     And did she explain what she

10      thought -- was it rejecting ballots?

11           A     I believe so.  That's not what I

12      recall exactly, but something was --

13           Q     And what is --

14           A     -- something was -- it was like a

15      hiccup or something.  I'm not sure.

16           Q     And did she -- was the thrust of what

17      she said that somehow sort of magically it was

18      fixed?  Was that the sense of it?

19           A     I mean, that's what she said.  It

20      had -- something to that manner, how it didn't have

21      any more issues.

22           Q     And was there a discussion about how

Page 95

1        that could have happened?

2                A      I don't -- I don't really recall.

3                Q      Do you recall generally?

4                A      I mean, there were a few conspiracy

5        theories, but I didn't really pay attention too

6        much.  I'm sure they talked about it, but I -- I

7        don't remember listening very well.

8                Q      Other than that anomaly, were there

9        other system malfunctions or anomalies that you

10       discussed?

11               A      She brought up the fact that

12       somebody, if I recall correctly, maybe her daughter

13       was able to get on Netflix with one of the poll

14       pads or something.  And that's -- that's what I --

15       I think it was Netflix or something.  She was able

16       to get on to an app and use Wi-Fi or something on

17       it.

18               Q      Anything else other than the scanner

19       and the poll pads and Netflix that you recall

20       discussing about the functioning or malfunctioning

21       of the equipment?

22               A      No.  That's -- I think that's all I

Page 96

1    can really remember.

2              Q     And did you assist in any way in the

3    copying of any of the software?

4              A     No.

5              Q     Did you operate -- did you sort of

6    learn how to operate the equipment in any way?

7              A     No.  I looked over Misty's shoulder

8    while she showed me how to report to election

9    night.  So that was during the process of when I

10   was learning, but I never -- never learned any of

11   the machines or anything, how they worked.

12             Q     And did she show you any other

13   processes while you were there?

14             A     She told me how they received and

15   sent out absentee by mail.  I don't really remember

16   the exact instructions, but she gave me an

17   overrun -- overview of how that happened, how that

18   works.

19             Q     Did you have discussions while you

20   were there with Cathy Latham?

21             A     I'm sure, but just mostly about data

22   that I was seeing.

Page 97

1          Q      Mostly about what?  I just didn't

2     hear you.  I'm sorry.

3          A      About the data analysis and work that

4     I had done in the previous months.

5          Q      And was she there most of the time

6     you were there?

7          A      I don't -- I don't recall.

8          Q      And do you recall what her role was

9     there?

10                I mean, was she like an official from

11    Coffee County?

12         A      I -- I can't really remember what she

13    was there for.  I knew she worked -- she was

14    affiliated with the GOP, so she had some sort of

15    stature, but I don't really know what she was

16    representing.

17         Q      Do you recall anybody being there who

18    you understood to be a representative of the Coffee

19    County Board of Elections?

20         A      It's just I'm trying to understand

21    the titles.  There were multiple people there from

22    Coffee County that were involved in the elections,

1    so I -- probably.

2             Q     But you don't recall specifically

3    their status or their title.  Is that fair to say?

4             A     Yeah.

5             Q     To the best of your understanding,

6    was that the first visit that had been made to

7    Coffee County to -- to attempt to obtain forensic

8    copies of the software?

9             A     I don't know -- I don't know if it

10   was the first or last or what.

11            Q     Was there any question as to the

12   accuracy of the results from Coffee County?

13            A     I think the 2020 election, Misty

14   brought up during the recount there was an issue, I

15   believe.  And there was some sort of a ruckus

16   caused about that.

17            Q     So I think that you said they had

18   some difficulty in the electronic recount

19   reconciling the numbers to the original election

20   results?

21            A     I believe that's what it was, yeah.

22            Q     But was there any -- that was the

Page 99

```
 1        electronic recount.  Was there any discussion that
 2        the actual results that were reported and certified
 3        were inaccurate?
 4              A     I don't really recall.
 5              Q     You don't recall any discussion about
 6        that?
 7              A     I mean, she was adamant about
 8        something being wrong with the election and talked
 9        about a lot of things.
10              Q     But not specifically that the results
11        were wrong, right?
12              A     I don't -- I don't remember.
13              Q     Did you have any -- well, let me
14        strike that.
15                    Did you do any work relating to
16        Coffee County after you went to Coffee County?
17              A     No.
18              Q     Who did you tell that you had gone to
19        Coffee County?
20              A     Let's see, I believe I told my mom
21        and dad, my wife.  I don't know, maybe a few people
22        here and there.  I'm not -- it wasn't a lot of
```

Page 100

1       people, mainly because I was still working at OFS

2       at that time, so . . .

3              Q     Did you tell anybody that you had

4       gone and that the system had been copied while you

5       were there?

6                    I mean, other than your mom and dad

7       and your wife.

8              A     I don't know.  I don't know.

9              Q     Do you recall discussing your visit

10      at any time in 2021 -- well, let me -- let me back

11      up and make it better.

12                   Do you recall at any time in 2021

13      discussing your trip to Coffee County with anyone

14      other than your mom and dad and your wife?

15             A     So I spoke with Marilyn Marks a good

16      bit towards the end of the year 2021, and I believe

17      I spoke with her a little bit about Coffee County.

18             Q     And did you disclose to her that you

19      had gone there?

20             A     No, I don't -- I don't recall if I

21      ever did or not.

22             Q     Did you speak with anyone other than

Page 101

1      Marilyn Marks about Coffee County in 2021?

2            A     I don't remember if I did.  I didn't

3      really talk about it a lot.

4            Q     Okay.  Then in 2022, this year,

5      before the -- there was some news accounts of this

6      that came out.  Do you recall those?

7            A     Yes.

8            Q     And before the news accounts came out

9      in 2022, do you recall speaking with anyone about

10     your traveling to Coffee County?

11           A     Yes.  So I had a Wall Street

12     journalist out of nowhere reach out to me and asked

13     me questions about it.

14           Q     And who was that?

15           A     I can't remember her name.

16           Q     And how did she communicate with you?

17     By phone?  By e-mail?

18           A     Phone and e-mail.

19           Q     And you produced those e-mails?

20           A     I don't remember her name, but sure,

21     I can send them to you.

22           Q     Okay.  And who else did you speak

Page 102

1      with?

2             A     In 2022?

3             Q     Yeah.

4             A     Again, Marilyn.  She asked me if I

5      knew the people that were there and -- yeah.

6             Q     And then was -- was the name of The

7      Wall Street Journal reporter Alexa Corse?

8             A     I don't -- I don't recall.

9             Q     Do you recall seeing an article that

10     came out in The Wall Street Journal about this?

11            A     Yes.  Along with The New York Times,

12     The Washington Post, all of them, yeah.

13            Q     And you were contacted by The New

14     York Times, right?

15            A     I don't believe so, not The New York

16     Times.

17            Q     How about The Washington Post?

18            A     I believe they were the only one,

19     yeah.

20            Q     And then let me go ahead and -- we're

21     going to break for lunch soon, but let me go ahead

22     and mark as Exhibit 5, Tab 7.

Page 103

1          (Cruce Deposition Exhibit Number 5 marked

2          for identification.)

3     BY MR. BROWN:

4          Q     Do you see that e-mail from Emma

5     Brown to you?

6          A     Emma Brown, that's the name, yeah.

7          Q     Okay.  And is Emma -- were you

8     thinking about The Washington Post in addition to

9     The Wall Street Journal or was there -- is this

10    what you were thinking about?

11         A     This is the only thing that I was

12    thinking about.  That's the only outlet that

13    reached out to me.

14         Q     Okay.  And then take -- what I'd like

15    to do is to -- before we break for lunch is to mark

16    as Exhibit 6 Tab 4.

17         (Cruce Deposition Exhibit Number 6 marked

18          for identification.)

19    BY MR. BROWN:

20         Q     And Exhibit 6 is a transcript of a

21    telephone conversation that is in the record in

22    this case.  And it's a call between Scott Hall and

Page 104

1     Marilyn Marks.  And I'm going to have some

2     questions about it, so I'm just giving it to you

3     beforehand so you can take a look at it.

4                    MR. BROWN:  But if we could -- if we

5     could take a break until 1:45.  Is that all right,

6     sir?

7                    THE WITNESS:  Sure.

8                    MR. BROWN:  Thank you very much.  I

9     appreciate it.

10                    VIDEOGRAPHER:  We are off the

11    record --

12                    MS. KRAMER:  I just have a quick

13    question before we break.  About how long after

14    lunch do you think we are going to be?  I'm just

15    asking for just, like, timing purposes and so Alex

16    can just kind of gauge.

17                    MR. BROWN:  Of course.  I think I

18    have about another hour after that and then there

19    might be other questions from other people.

20                    MS. KRAMER:  Okay.  Thank you.  I

21    appreciate that.

22                    MR. BROWN:  All right.  Thank you.

Page 105

```
 1                    VIDEOGRAPHER:  The time is 12:42 p.m.

 2         We are now off the record.

 3                    (Recess from 12:42 p.m to 1:48 p.m.)

 4                    VIDEOGRAPHER:  The time is 1:48 p.m.

 5         And we're back on the record.

 6         BY MR. BROWN:

 7              Q    Good afternoon, Mr. Cruce.  Let me

 8         direct your attention to Exhibit 5.  And is

 9         Exhibit 5 an e-mail that you received from Emma

10         Brown of The Washington Post?

11              A    Yep, it looks that way.

12              Q    And did you speak with her?

13              A    I believe I did talk to her on the

14         phone maybe once or twice.

15              Q    And what you told her was truthful.

16         Is that right?

17              A    I don't even remember what I told

18         her.

19              Q    But it would have been truthful,

20         right?

21              A    I'm not sure.

22              Q    Did you see the articles that she
```

Page 106

1    published about Coffee County?

2              A    Yeah, I glazed over them.

3              Q    Did you notice anything in them that

4    was inaccurate from your perspective or personal

5    knowledge?

6              A    Nothing sticks out.  I didn't really

7    analyze it too much.

8              Q    Let me direct your attention to

9    Exhibit 6, which is the transcript that I referred

10   to before lunch.

11             A    Uh-huh.

12             Q    And have you had a chance to look at

13   that?

14             A    Yes.

15             MR. BROWN:  And for the record,

16   Exhibit 6 also appears in the docket in this case

17   at 136401.

18   BY MR. BROWN:

19             Q    And the first exchange, Mr. Hall says

20   that he heard zero.  And that's consistent with

21   what Mr. Hall told you, right, that he had not

22   received any of the data that they had captured in

Page 107

```
 1        Coffee County?

 2               A     Yes.

 3               Q     And did you observe the group

 4        scanning every freaking ballot or something to that

 5        effect?

 6               A     I don't remember seeing them scanning

 7        ballots, but . . .

 8               Q     What did you see them actually

 9        copying?

10               A     Again, I don't know -- I don't know

11        for sure that they were copying anything.  I just

12        don't want to -- that's them whenever they were

13        there, but I don't know that they were copying.

14               Q     Okay.  He says here, "And the

15        elections director and her assistant lost their

16        job."

17                     Did you hear anything about Misty

18        Hampton and her assistant losing their job -- jobs?

19               A     Yes, I believe so.

20               Q     What did you hear about that?

21               A     Let's see, it was a while ago.  I

22        think she was just replaced or something.  I
```

Page 108

```
 1      know -- I think it had something to do with this
 2      January 7th visit.
 3              Q     And what's -- why do you think that?
 4              A     I think that's what the article --
 5      what I heard.  I'm just not sure, but . . .
 6              Q     Did you hear anybody from Coffee
 7      County talk about why they were terminated?
 8              A     I don't think so.
 9              Q     Did you talk to Ms. Hampton or her
10      assistant about their termination?
11              A     I don't believe so.
12              Q     And did you know that -- did you know
13      that when you were in Coffee County, or at any
14      point in time, that the same group that was doing
15      the copying in Coffee County also had been
16      dispatched to Michigan to make forensic copies up
17      there?
18              A     I don't remember if I knew that or
19      not.  Afterwards, from reading the articles and
20      things, it kind of refreshed everything, but I'm
21      not sure if I knew that at the time.
22              Q     He -- he -- Ms. Marks asked him, "How
```

Page 109

1          in the world did you get permission to do that?"

2          Did you see that?

3                    A      Yes.

4                    Q      And he said, "We basically had the

5          entire elections committee there."  I believe your

6          testimony was you thought there were some local

7          officials, but you did not know exactly who they

8          were or what their position was.  Is that fair to

9          say?

10                   A      Yeah, I knew they were from Coffee

11         County and had something to do with elections, but

12         I didn't know their titles.

13                   Q      And he also recounts Misty saying

14         that the poll pads had internet access.  And I

15         believe you testified to that as well?

16                   A      Yeah.

17                          Hold on, I think I froze again.  I'm

18         sorry.

19                   Q      If you look at the second page of

20         exhibit --

21                   A      One second.  Bruce, can you -- can

22         you hear me?

Page 110

1           Q     Yeah, you're very focused and still.

2           A     I'm not.  It says Zoom is not

3     responding.

4           Q     I appreciate your laser-like focus.

5     Do you want to try to log back in or something?  I

6     don't know what the best thing to do is.

7           A     Yes, let me -- I'll just get right

8     back on the Zoom.  It should be okay.  Sorry about

9     this.

10          Q     It's all good.

11                VIDEOGRAPHER:  The time is 1:55 p.m.

12    We are now off the record.

13               (Recess from 1:55 p.m. to 1:57 p.m.)

14                VIDEOGRAPHER:  The time is 1:57 p.m.

15    And we are back on the record.

16    BY MR. BROWN:

17          Q     Mr. Cruce, let me refer you to the

18    second page of Exhibit 6, where in the transcript

19    of the conversation Scott Hall says, "And then you

20    know as recently as I think yesterday, I'm getting

21    images from Fulton County.  I've got people that

22    are still dumpster diving near the English Street

Page 111

```
 1       Warehouse.  Yeah, they're throwing away poll pad
 2       boxes."
 3                       Do you see that?
 4              A     Yes.
 5              Q     Do you know anything about getting
 6       images from Fulton County?
 7              A     Images from Fulton County?  I don't
 8       know.  Images?  I don't know.  Maybe photographs.
 9       I'm not sure what "images" entails right there.
10              Q     Did you ever hear about people
11       dumpster diving down there to get images or other
12       data?
13              A     Yeah, I think on phone calls I've
14       heard something like that.
15              Q     What was it?
16              A     People were trying to see if they
17       were trying to throw away things that would cover
18       up a crime, I guess.
19              Q     So they were dumpster diving to get
20       evidence of election malfeasance of some kind?
21              A     I guess so.
22              Q     Who was doing this or directing or
```

Page 112

```
 1          ordering this dumpster-diving effort?
 2               A    I don't -- I don't believe anybody
 3          was directing anybody to do it.  It was just folks
 4          coming from different directions trying to help
 5          and -- I don't know.  I didn't really see the point
 6          in it, but . . .
 7               Q    And you don't know the identity of
 8          any of the individuals who were doing that?
 9               A    I don't -- don't recall.
10               Q    Did you know at some time?
11               A    It's possible.  I don't know.  I
12          would have to think about it.
13               Q    And was Scott Hall behind that effort
14          or involved in that effort?
15               A    I don't know how involved he was.  I
16          don't -- he has never told me he has jumped in
17          dumpsters or anything.
18               Q    Do you know if he was involved in
19          collecting information from Fulton County English
20          Street Warehouse?
21               A    I don't -- I don't know if he -- what
22          he directed with that.  I don't know.
```

Page 113

1          Q     Did you hear that he was flying

2     drones over the English Street Warehouse?

3          A     I didn't hear that, no.  That's the

4     first time I've heard that.

5          Q     But did he make frequent trips to the

6     English Street Warehouse for one reason or another

7     that you're aware of?

8          A     You know, I'm not -- not sure if he

9     did or not.  I don't know.

10         Q     Okay.  Are -- are you paying your

11    lawyers at Binnall to represent you or is it pro

12    bono?

13         A     Is that -- how does that pertain

14    to --

15         Q     Well, I'm entitled to know if you're

16    paying the lawyers at Binnall.  I don't need to

17    know details of it, but are you paying or is

18    someone paying for you?

19              MS. KRAMER:  Alex, he can -- he can

20    ask that.

21              THE WITNESS:  Okay.  I'm paying

22    myself.

Page 114

1        BY MR. BROWN:

2                 Q      Okay.

3                 A      A lot of -- a lot of money, yeah.

4                 Q      Okay.  And who referred --

5                 A      So thank you, Bruce.

6                 Q      And who referred you to the Binnall

7        Firm?

8                 A      A guy named J.B. Davis.

9                 Q      And who is he?

10                A      So he's a guy that I met while

11       helping Mary Norwood.  I think he's worked with

12       campaigns in the past over in Atlanta.

13                Q      Okay.

14                A      And yeah, I didn't have a lot of

15       knowledge of lawyers or anything like that, so I --

16       you know, I asked for help and he put me onto

17       Courtney.

18                Q      Okay.  And then I had -- going back

19       to your meetings and communications with people, I

20       neglected to ask you, did you ever take any trips

21       to D.C. after November 2020?

22                A      No.

Page 115

1          Q     I wasn't -- I don't think I asked

2     very good questions about David Shafer.

3                I recall you testified that you did

4     work for David Shafer relating to the 2022

5     midterms.  Is that correct?

6          A     I didn't do work for him, no.

7          Q     But did you meet with him in

8     connection with some work that you were doing

9     relating to --

10         A     Yeah, I talked on the phone with him,

11    I think once.

12         Q     And apart from that, those

13    communications, had you had communications with

14    David Shafer before?

15         A     Other than these humongous e-mail

16    chains that were sent out right after the election

17    and stuff, I think he might have showed up a few

18    times, but I never communicated with him directly.

19         Q     And you never met with him?

20         A     No.

21         Q     Getting back to your trip to Coffee

22    County.  Were you ever able to obtain any of the

1      data that was acquired at that trip?

2              A     No.  Wait.  From -- from who?

3              Q     From Coffee County.

4              A     Oh, from --

5              Q     From anybody.

6              A     Well, Misty sent Scott that ICC log.

7              Q     I should have -- I should have asked

8      more carefully.

9                    Other than that thumb drive, did you

10     receive any data that was collected on January 7 in

11     Coffee County?

12             A     I'm not certain that I actually got

13     any information from the thumb drive.  I'd have to

14     do some research on that.

15             Q     Okay.

16             A     But other than that, no, I've never

17     seen anything from there.

18             Q     And did you know that

19     SullivanStrickler had uploaded a copy of what they

20     captured in Coffee County to a ShareFile site on

21     the internet?

22                   Did you know that?

Page 117

1              A      No.

2              Q      And you may have answered this, but

3       just let me ask quickly.  You were not -- were you

4       paid by anybody to go on that trip?

5              A      No.

6              Q      Were you -- did anybody reimburse

7       your expenses, if you had any, for that trip?

8              A      No.

9              Q      When you got to Coffee County to the

10      elections office, were you able to go immediately

11      into the office or did you have to wait outside for

12      a little bit?

13             A      I don't -- I don't remember.

14             Q      At the time you visited Coffee

15      County, do you believe that the Secretary of

16      State's office was aware of your visit?

17             A      I don't know.

18             Q      When -- based upon what you know when

19      would have been the first that the Secretary of

20      State learned that Coffee County's software had

21      been copied in January of 2021?

22             A      I don't know.

Page 118

```
 1          Q      Were -- was there any attorney for
 2    Coffee County in the Coffee County offices when you
 3    were down there that you know of?
 4          A      An attorney as far as?
 5          Q      Someone representing -- yeah, someone
 6    representing Coffee County, like an attorney for
 7    the County.
 8          A      I'm not -- I don't -- not that I know
 9    of.  I don't know if somebody was a lawyer there or
10    not.
11          Q      Based upon the discussions that you
12    overheard, did it -- did the SullivanStrickler team
13    seem to be able to obtain all of the data that they
14    were looking for?
15          A      I never heard a soul about the data
16    they got or if they got it or what about it really.
17    I mean, Scott was my connection to that, and I
18    never heard a word about it, so . . .
19          Q      But Cathy Latham was there and was
20    talking with the people about what they were doing
21    when you were there?
22          A      I mean, yeah, it was a pretty big
```

Page 119

1          group of people.  I mean, they were all talking.  I

2          don't really know -- I didn't hear any business

3          dealings or anything like that, that I remember, or

4          anything of importance --

5                    Q      Did you hear any --

6                    A      -- about the election.  I don't know.

7                    Q      Did you hear any concern expressed by

8          anyone when you were down in Coffee County that

9          accessing and copying the Dominion software might

10         be against the law?

11                   A      I -- I didn't hear -- I didn't hear

12         people talking about it.

13                   Q      Did you hear people --

14                   A      I guess --

15                   Q      -- talk about how it was authorized,

16         like, "We can do this because blank"?

17                   A      I don't -- I don't recall really what

18         was said, a lot of things that were said.  It's

19         just been a while.  I'm sorry.

20                   Q      I'm just going through my notes real

21         quick.

22                          Did you make any notes or describe in

Page 120

1      any document to anybody what you did in Coffee

2      County in January 2021?

3              A      No, I don't think so.

4              Q      Did you hear anything about any

5      efforts by the Trump Campaign to visit Coffee

6      County in December of 2020 to obtain information

7      for litigation relating to the election?

8              A      No.

9              Q      Did you hear anything to the effect

10     that the information that was being obtained or

11     copied while you were there was for any litigation,

12     whether it was election related or anything else?

13             A      No.

14             Q      Did Mr. Hall ever ask your assistance

15     in getting the data out of SullivanStrickler in any

16     way?

17             A      No.

18             Q      Did you ever communicate with Misty

19     Hampton after that January 7 visit?

20             A      I don't -- I don't recall.  It's

21     possible I asked her about certain processes or --

22     I believe I did get her to check a few names on a

215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 121

```
 1          voter roll from her end.

 2                    Q     And why did you --

 3                    A     And that would be --

 4                    Q     Why did you need that information?

 5                    A     I was just doing data and trying to

 6          confirm whether people were actually people.

 7                    Q     Whether they were genuine voters?

 8                    A     Yes.

 9                    Q     And who was that -- who were you

10          working for or with in that effort?

11                    A     It was just my own -- own research.

12                    Q     And when was that roughly?

13                    A     I can't remember.  It was -- I

14          believe it was sometime after maybe February,

15          March, something like that.

16                    Q     This year?

17                    A     No.  2021.

18                    Q     Okay.  Okay.  I have some questions

19          about your -- your document production.  Do you

20          still have responsive documents that you have not

21          had the time to produce?

22                    A     I've done as much due diligence as
```

Page 122

1    possible.  You brought up this notion of a -- of a

2    hard drive or a thumb drive, and I'm thinking I

3    need to look for that.

4              Q     Okay.

5              A     But other than that, I -- I've dumped

6    a lot of stuff in there for you, a lot of analysis

7    that I've done.  Yeah, I have done my best.

8              Q     Did you -- you used the Discord

9    platform to communicate, right?

10             A     I did at one time, yes.

11             Q     And did you search that application

12   for responsive documents?

13             A     Yeah, I think --

14                   THE WITNESS:  Go ahead, Courtney.

15                   MS. KRAMER:  Yeah, I was going to

16   say, we talked about this this morning.  And,

17   Bruce, thank you for bringing it up.  I am still

18   trying to figure out how to get those off of there

19   for you to review.

20                   MR. BROWN:  Okay.

21                   MS. KRAMER:  It's not -- like, it's

22   not a platform where you can just go and download

Page 123

1    it like an e-mail or anything like that.

2                MR. BROWN:  Okay.

3                MS. KRAMER:  And so I have my people

4        trying to figure out how to do that.  So the second

5        we can or if there's -- like if you know how,

6        please tell me.  I have no -- there's -- it's very

7        complicated.

8                MR. BROWN:  No, I understand.  What

9        other applications -- while we've got you on,

10       Courtney, what other applications are you doing

11       that with?

12               MS. KRAMER:  I mean, I -- that's the

13       only other method of communication that we have

14       that I haven't been able to get.  I mean, I've

15       looked at his e-mails and I typed in, you know,

16       your relevant keywords and your people that you put

17       in the subpoena into -- into his e-mail addresses,

18       but the other -- like the only thing is Discord.

19               MR. BROWN:  Okay.

20       BY MR. BROWN:

21            Q    And then you also used text messages,

22       Mr. Cruce, is that right, to communicate?

Page 124

1               A       Yes.

2               Q       Have you --

3               A       Yes.

4               Q       Have you looked at your text messages

5       for responsive documents?

6               A       Yeah.  I thought that I had sent them

7       over.

8                       MS. KRAMER:  We have -- there's

9       one -- that's the only other thing is a thread, and

10      I think it was only with Scott Hall, that I was --

11      that he had it with, that I'm aware of.  And I have

12      to -- I have to take out -- it's in one massive PDF

13      document, so I can't produce the whole thing for

14      obvious reasons, but I -- we're also trying to

15      extract certain things out.  So it's just been --

16      like I said, I'm not trying to, like, hide

17      anything.  It's just been very time consuming --

18                      MR. BROWN:  No, I understand.

19                      MS. KRAMER:  -- to try to go through

20      that.  But, I mean, like, the second I can get all

21      of that done, I will send it over immediately.

22                      MR. BROWN:  Okay.  And we've got --

Page 125

```
 1        so from you, Courtney, we have the Discord --

 2                     MR. MILLER:  Uh-huh.

 3                     MR. BROWN:  -- we have the text

 4        messages.

 5        BY MR. BROWN:

 6             Q     And then what about Signal, do you

 7        use Signal, Mr. Cruce?

 8             A     Yes.

 9             Q     And have you been able to review your

10        Signal messages for responsive documents?

11             A     Yeah.  I sent those over to -- to

12        Courtney as well.

13             Q     Okay.

14                     MR. BROWN:  Okay.  Courtney, have

15        you --

16                     THE WITNESS:  Did I or did I not?

17                     MS. KRAMER:  I -- I don't think I

18        have -- I don't think I have any.  I haven't gotten

19        any.

20                     MR. BROWN:  Okay.  We'll look forward

21        to those as well.

22
```

Page 126

1      BY MR. BROWN:

2              Q      Are there other communication

3      platforms that you use other than Signal, text

4      messages, Discord, and e-mails?

5              A      I think that's -- I think that's it.

6              Q      Okay.  And have you -- and this may

7      be for Courtney, but have you withheld some

8      documents based upon -- that are responsive that

9      are based upon either a work product or an

10     attorney-client privilege?

11                   MS. KRAMER:  Yes, there are some

12     documents that are -- we would definitely classify

13     as attorney-client privilege.

14                   MR. BROWN:  Okay.  If we could get a

15     log of those.  And if -- if it's -- if it's more

16     sensible to log those by category --

17                   MS. KRAMER:  Okay.

18                   MR. BROWN:  -- then we can talk about

19     whether we need more detail.  You know what I'm

20     saying?

21                   MS. KRAMER:  Yeah.  Yeah, yeah, yeah.

22

Page 127

1          BY MR. BROWN:

2                  Q      Okay.  And, Mr. Cruce, what e-mail

3          addresses do you use?

4                  A      (Redacted.)

5                         Is this going to be a public

6          document?

7                  Q      Well -- okay.  Eventually it will, so

8          why not -- well, let me ask it this way, Mr. Cruce,

9          to avoid this and we can find out --

10                 A      Well, let me explain, Bruce.  I --

11         personally, I don't mind giving any information

12         that you don't already have if I do, but I do not

13         want to be attacked and my family or anything by

14         people --

15                 Q      Okay.

16                 A      -- that know my information.  That is

17         a scary thing for me.

18                 Q      Don't disclose anything you don't

19         feel comfortable disclosing.

20                 A      Can we strike through -- I'm going to

21         ask that you please strike through my e-mail that I

22         just gave.

Page 128

1                Q     Yes.

2                      MR. BROWN:  Unless there is an

3        objection by other counsel, will the court reporter

4        please strike that e-mail address from the record?

5                      THE WITNESS:  Thank you.

6                      COURT REPORTER:  Of course.

7                      MR. BROWN:  Is that taken care of,

8        Felicia?

9                      COURT REPORTER:  Yes.

10                     MR. BROWN:  Okay.

11       BY MR. BROWN:

12               Q     No problem.

13                     Okay.  So how many e-mail addresses

14       do you have that you use?

15               A     Two outside of work and one inside of

16       work at Anheuser-Busch.

17               Q     And is one of them Gmail and one of

18       them Proton, the outside-of-work e-mails?

19               A     Yes.

20               Q     Okay.  Other than the thumb drive

21       that we've talked about, do you have any other

22       storage devices that has data that might contain

Page 129

1       responsive documents?

2               A       I do have another store -- I do have

3       storage that I used as backup, but I can go through

4       them again and make sure.

5               Q       And what were they backing up?  What

6       was that storage backing up?

7               A       Just my laptop.

8               Q       Okay.  And when -- and when -- what

9       would be the date that that storage was created?

10      What would it cover?  What dates would it cover?

11              A       I mean, I have data going back to

12      November 4th.

13              Q       Okay.  And what sort of data is in

14      there?  Just documents and e-mails or whatever?

15              A       It's not e-mails, but just data and

16      analysis documents.

17              Q       Is it like a crash-plan type of

18      thing?  Do you know what that is?

19              A       It's like a backup?

20              Q       Yeah.

21              A       I can't remember if I had that set up

22      or not, but, you know, I did -- I did back up a lot

1    of my files, especially what I had saved,

2    because -- I don't know, the documents that I did

3    provide, you know, I don't know if you noticed that

4    I kept a timeline of all of the data from the

5    Secretary of State, so it was important that I had

6    that timestamp in my analysis.

7                    MR. BROWN:  Okay.  Let me -- if I

8    could get marked Tab 12.  And if we could take a

9    three-minute break or a five-minute break and then

10   I'm going to wind up.  I need to get this document.

11   It's not coming up on my computer.  So if we could

12   take a five-minute break, then I'm going to wind up

13   and then I'm going to hand it over to other

14   lawyers.  Thanks.

15                    VIDEOGRAPHER:  The time is 2:22 p.m.

16   We are now off the record.

17               (Recess from 2:22 p.m. to 2:28 p.m.)

18                    VIDEOGRAPHER:  The time is 2:28 p.m.

19   We are back on the record.

20   BY MR. BROWN:

21          Q      Mr. Cruce, if you could take a look

22   at Exhibit 7, that's a collection of your

Page 131

1       documents.  Is that correct?

2              A      Yep.

3                     (Cruce Deposition Exhibit Number 7 marked

4                     for identification.)

5       BY MR. BROWN:

6              Q      And if you look at page 2, do you see

7       an e-mail from kilowatt1776 to

8       WP@DefendingtheRepublic?  Do you see that?

9              A      Yes.

10             Q      And who is WP?

11             A      I don't know.

12             Q      It's just somebody at Sidney Powell's

13      organization, but you don't know who it is?

14             A      I don't know.  Sometimes I didn't

15      read e-mails.  And yeah, I don't -- a lot of things

16      that were sent to me, I just didn't really pay

17      attention to or -- I don't know.  Wait.  This is

18      July of 2021?

19             Q      Yeah.

20             A      I do remember being on a call with

21      that Ed Solomon guy who was explaining his work.  I

22      do remember that.

Page 132

```
 1            Q    And what was his work about?
 2            A    So he -- I don't know.  A lot of
 3      mathematical terms, but he used like a 7-degree
 4      polynomial wheel to try to describe an algorithm in
 5      the Georgia election and tough to follow.
 6            Q    Did it make any sense to you?
 7            A    I -- I just didn't really put a lot
 8      of thought and time into it, because personally I
 9      think writing an algorithm about an algorithm that
10      might not be there, might not be real is -- I don't
11      think it has much basis for anything.  It's just a
12      personal view, and I didn't really look into it
13      after that.
14            Q    Mr. Cruce, are you involved in doing
15      election work now or data collection or anything
16      related to elections now?
17            A    No.  I completely stopped July --
18      shoot, it was probably sometime around June to find
19      a real job, so . . .
20            Q    And you've gotten one and two little
21      kids now?
22            A    Yeah.  Yeah.
```

1              MR. BROWN:  Well, good luck to you.

2     I may have a few follow-up questions, but I'm going

3     to turn it over to counsel.  Thank you.

4              THE WITNESS:  All right.  Thank you,

5     Bruce.  Thank you for your patience by the way.

6     Thanks.

7        EXAMINATION BY COUNSEL FOR CURLING PLAINTIFFS

8     BY MR. JOSEPH:

9         Q    Good afternoon, Mr. Cruce.  My name

10    is Joseph.  My first name is quite difficult to

11    pronounce, so I'll just stick with Joseph.  I think

12    that's better and it helps you.  So I represent the

13    Curling Plaintiffs.  So I do have a few questions

14    to ask you.

15        A    Joseph, I'm sorry, I can't really

16    understand you very well.  It's a little bit

17    muffled.

18             MS. KRAMER:  Joseph, who do you

19    represent again?  I'm sorry, I didn't get that.

20             MR. JOSEPH:  The Curling Plaintiffs.

21             MS. KRAMER:  Say that again.

22             MR. JOSEPH:  Hold on.  Let me take

1       off my microphone.  I think it's my microphone.  I

2       don't know what's going on with it.  Can you hear

3       me better now?

4                    THE WITNESS:  Yes, much better.

5       BY MR. JOSEPH:

6            Q      All right.  Thank you.

7                    So I represent the Curling Plaintiff.

8            A      The Curling Plaintiff?

9            Q      Yes.

10           A      Okay.

11           Q      Is there a lag or can you hear me all

12      right, the video?  Okay.  So I just have a few

13      follow-up questions to ask you.

14                   So earlier you said David Cross was

15      asking for the log files in general and not just

16      the Coffee County log files, correct?

17           A      Yes.

18           Q      And you also said you are not sure

19      how he found out that you had the files with you,

20      correct?

21           A      I'm not certain of it.  It could have

22      been Scott, it could have been a few people.  I

1     don't know.

2          Q    Okay.  So did you ask him who might

3     have told him how he knew you had the files with

4     you?

5          A    No.  Honestly, I was trying to

6     just -- I was done about that time with all of

7     everything, of the elections.

8          Q    Okay.  And at the time, the only log

9     files you had with you were the Coffee County log

10    files, correct?

11         A    Yeah.

12         Q    Okay.  So that was the only log files

13    you could have given him, even though he was asking

14    for log files in general, correct?

15         A    From -- my understanding is that

16    election officials around the state of Georgia had

17    been handing over SLOG files.  It was a lot that

18    actually were giving them to people.  So I think he

19    was just trying to gather more from different

20    elections, so . . .

21         Q    Okay.  And the log files, you said

22    Scott sent you an e-mail containing, which is the

1        exhibits shown, the two log files, correct?  The

2        SLOG and the other one, the ICC log, correct?

3                A       Correct.

4                Q       Okay.  And did you open them?  Did

5        you open the files?

6                A       Yeah.

7                Q       Okay.  And did you know what was in

8        the files?

9                A       Did I know what was in them?

10               Q       Yes.  When you opened the files, did

11       it -- it said -- it reads ICC log and SLOG.  You

12       had to open it, correct, to know what was in the

13       files, correct?

14               A       No.  I mean, I didn't -- I just

15       opened them.  I didn't really know what was already

16       in them.  I didn't really know that until I opened

17       them.

18               Q       Yes.  So that was the question that I

19       was asking.

20                       When you opened them, then you

21       realized what was in them, correct?

22               A       Sure.

Page 137

1          Q     Okay.  And what, if anything, did you

2     do with the log files that Scott gave you?

3          A     So I -- I looked at them briefly,

4     maybe for a night.  It was, you know, a text file

5     with a lot of different things.  It was hard to

6     really sort and analyze it.  A lot of numbers, a

7     lot of translation and things like that.

8                I felt like it was just a small piece

9     of the whole thing and I would need a lot more

10    information to make any kind of assumption on that

11    file, so I -- I left it very soon.

12         Q     Okay.  So you said you would have

13    needed more information on the files.  And did you

14    ask anyone for more information in order to

15    accurately interpret the data?

16         A     No.  I -- I was basically -- I was

17    more on the data side in a public way.  I really

18    was trying to understand the election system in

19    a -- I guess you could say a very legal way.  So I

20    was analyzing all data that was accessible and

21    trying to understand exactly, you know, how the

22    voting system works, especially when they record

Page 138

1      people's votes.  Because in the very beginning I --
2      I noticed that there -- there was a way for you to
3      verify your vote outside of just typing in your
4      name, you know, on a certain website.
5                    So, you know, through the absentee
6      file, I was able to really understand how to vote,
7      because the absentee file, you can actually sort
8      that file without manipulation and see
9      chronological vote in early voting.
10                   So you can see when people, you know,
11     first voted, the very first person at an
12     election -- early voting center to the very last.
13     And I knew this because a husband and wife spoke
14     together, and you would see them with a serial
15     number back to back.  So the fact that the
16     Secretary of State could actually know the order of
17     people and when they voted, early voting, scared me
18     because all you had to do was sort the ballots --
19              Q      Okay.
20              A      -- to know which ballot belonged to a
21     person.
22              Q      All right.  Thank you.

Page 139

```
 1            A    And that's what Curling versus

 2      Raffensperger -- that's what you all are trying to

 3      get at, right?

 4            Q    Thank you for the answer.

 5                 And so the data, was that the same --

 6      when you were -- okay.  I'm going to go back.

 7                 You were at Coffee County on

 8      January 7, correct?

 9            A    Correct.

10            Q    And just jumping forward, when you

11      received -- Bruce asked you about a thumb drive,

12      which you received, and it contained the same log

13      files --

14            A    I'm not -- I'm not sure I received

15      that, that thumb drive.

16            Q    Okay.  So could you have received it?

17            A    I'm not going to go on speculation.

18            Q    All right.

19            A    I'm not sure.

20            Q    Okay.  So did you receive any of the

21      logs -- the same logs through Scott, did you

22      receive it through any other means?
```

Page 140

1          A     I'm not sure.

2          Q     Okay.  And when you were at the

3    Coffee County office, you met a lady called Cathy

4    Latham, right?  Correct?

5          A     Yes.

6          Q     And did you speak with her?

7          A     A little bit.

8          Q     And what did you talk to her about

9    during your time at Coffee County?

10         A     I don't know.  I mean, it was

11   election stuff, but just kind of smalltalk.

12         Q     The elections talk, could it have

13   been about the scanners?  The ballots?  The ICC?

14         A     No, just the general election, what

15   happened, and what she had heard and things of that

16   nature.  It was mostly -- it wasn't really about

17   machines.

18         Q     And what did she tell you she --

19         A     If I recall right.  I mean, it was

20   such a long time ago.  I mean, I don't remember

21   getting any substance where I would remember today,

22   so -- but it was just smalltalk.

Page 141

```
 1              Q     So any discussion you might have had
 2        with Cathy, you most likely don't remember.  You
 3        don't remember, is that what you're saying?
 4              A     I do remember talking to her, but,
 5        you know, after that, I think that what came from
 6        that discussion was that she had access to the GOP
 7        database, and what she -- she was going to try to
 8        get me access to that as well so I could just check
 9        the voter rolls and she never did.
10              Q     Okay.  And did you speak with any
11        other person at the office -- at the Coffee County
12        office?
13              A     Yeah.  I spoke to close to probably
14        everybody there most likely.  But, again, it was --
15        I had data that I had already done and I was
16        showing people.  And, you know, it was a lot of
17        smalltalk, yeah, nothing -- nothing technical about
18        the machines other than descriptions.
19              Q     So you did say Scott Hall invited you
20        over to the Coffee County, correct -- the office,
21        correct?
22              A     Yeah.
```

```
 1              MS. KRAMER:  Joseph, before we keep

 2      going, I just want to -- a lot of this -- these are

 3      questions that Bruce has already asked and Alex has

 4      already answered, like all this whole morning.  Is

 5      there a way we can limit the questions to things

 6      that have not already been discussed?

 7              MR. JOSEPH:  Yeah, I'm trying to get

 8      at things that have not been discussed.  That's why

 9      I'm asking the questions, because some of them I am

10      not sure if Bruce had asked him earlier, so I am

11      making sure that I'm actually asking the questions

12      that I need to ask.

13              MS. KRAMER:  Okay.

14      BY MR. JOSEPH:

15          Q    And you said you are a data analyst,

16      correct, not scientist, analyst?

17          A    Well, I have a Ph.D. in physical

18      chemistry, so I'm a scientist, and data analytics

19      falls under that umbrella I guess.

20          Q    Okay.  So you are both?

21          A    Sure.

22          Q    All right.  And you said earlier --
```

1    I'm sure Bruce asked these next -- you didn't know

2    why Scott invited you over to the Coffee County

3    office.  Is that correct?

4         A    I never said that.

5         Q    No, I'm asking.  Is that correct,

6    that you didn't know why or do you know why he

7    invited you over?

8         A    I mean, I'd been working on the

9    election stuff a lot.  I wanted to learn about the

10   processes for -- you know, for the elections

11   office, what they do on election night, and Scott

12   thought it would be a good -- a good way for me to

13   do it, you know, to see how everything is laid out

14   and what they did.

15        Q    And did he tell you about from the --

16   what -- did he tell you there was going to be any

17   copying of any data from the machines?  Did he tell

18   you anything about that?

19        A    Yeah.  I mean, I -- I don't recall

20   every conversation, but there was -- there was an

21   implication that people would be there to do

22   something, but I didn't really have a lot of

Page 144

1      knowledge about who and why and who it's coming

2      from and all that.

3              Q      Okay.  So I'm going to turn to

4      Exhibit 3, Tab 5, which I believe are the pictures.

5      So going to timestamp 1:49, I believe it's the

6      eighth picture on the file, the eighth one.

7              A      I am only seeing seven.

8              Q      So there's a 1:49, the timestamp.

9      Can you see it?

10             A      What exhibit is that again?

11             Q      Exhibit 3, Tab 5.  Those are just the

12     pictures.

13             A      Oh, okay.  Gotcha.  Gotcha.  Uh-huh.

14     Okay.

15             Q      So there's a timestamp of 1:49,

16     27 seconds.  So do you see the lemon-colored boxes

17     on the table and on the floor, on the ground?  Gray

18     and lemon boxes, lots of boxes on the --

19             A      You're talking about the second

20     picture down?

21             Q      No.  The eighth, number eight on the

22     list.  If you count one to eight, the eighth

Page 145

1     picture.

2              A     Okay.  Give me one second.  Let me

3     count.

4              Q     I believe you have a lady you

5     identified as Misty?

6              A     Six, seven, eight.

7                    Yes, it's Misty.  Yeah.

8              Q     Okay.  So you see the boxes, the

9     lemon boxes over there, lemon, gray, the boxes,

10    multiples of them?

11             A     Yes.

12             Q     Do you know what these are?

13             A     I believe they're poll pad boxes.

14             Q     Poll pad boxes.

15                   And you see there's -- one of them is

16    opened, it's clearly opened?

17             A     Yeah, that's what it looks like.

18             Q     Did you or anyone in the office have

19    access to the poll pad?

20                   Did you check it out?  Did you take

21    it?  Did you turn it on?

22             A     I didn't touch them.  If I did, it

1      might have been to move it out of the way, but I

2      didn't touch any of that equipment.

3              Q      Okay.  So while you were at the

4      office, you never touched the ICC, the ICP,

5      nothing, none of the equipment?

6              A      It's possible I might have grazed

7      something or -- you know, while I was looking at

8      it, but never operated, never -- never did anything

9      with intent to those machines.

10             Q      Okay.  So if you go back to the top

11     picture, one, two, three, the top picture on the

12     list with the timestamp of 3:53, the boxes are all

13     gone except for one.  Do you see the picture, 3:53?

14             A      Yes.

15             Q      Do you know -- do you know who packed

16     the boxes?  Do you know who moved them?

17             A      I can't remember that.  I don't -- I

18     don't know.

19             Q      Do you know if they were ever

20     returned back to storage or if they were taken out?

21             A      I don't know.  I don't remember

22     anybody leaving with them --

```
 1              Q      Okay.
 2              A      -- out the door.  I also don't
 3       remember them actually being put back anywhere
 4       either.
 5              Q      Okay.
 6              A      I just can't remember a lot.
 7              Q      Okay.  So while you were there, in
 8       most of the pictures, the same exhibits, you have
 9       your computer open.
10              A      Uh-huh.
11              Q      Do you remember what you were doing
12       on your computer?
13              A      Not really.  I -- I don't -- I mean,
14       like I said, I was doing a lot of data analysis at
15       the time, and I was asking them questions, because,
16       you know, I was there and the election officials,
17       what they were saying overnight, because all the
18       data I was looking at, I was just looking for
19       anomalies.  And I was noticing certain things, and
20       I would ask them just to see if it would fit.
21              Q      Okay.
22              A      That's it.  I don't remember what
```

```
 1        I --
 2             Q     And the data you're talking about,
 3        are you talking about Coffee County data?  Is that
 4        the data you're talking about, you're analyzing?
 5             A     My data was more general, the whole
 6        2020, like the whole state of Georgia.
 7             Q     Okay.  So Coffee County could have
 8        been there also, correct?
 9             A     They're part of the whole picture,
10        sure, because I did it on all of the counties, not
11        just one county.
12             Q     Okay.
13             A     Let me clarify.  I did my own data
14        analysis on public data on all the counties.
15             Q     What do you mean "public data"?
16                   What do you mean by "public data," if
17        you don't mind explaining?
18             A     So the Secretary of State has two
19        files that are readily available right now.  We can
20        get the voter history file, which just gives you a
21        list of everybody who cast a vote, in the, say,
22        2020 election, but you can -- you can go all the
```

1        way up to this past gubernatorial race if you'd

2        like.  It's all there, you can download it.

3                    And also the absentee file, which is

4        in the same manner.  But it's a -- it's a more

5        descriptive set of data that gives a person's name,

6        vote registration ID, date they -- date they

7        applied for the vote, the date that they actually

8        cast the vote, the type of absentee by mail they

9        used, whether it was electronic, absentee by mail,

10       early in person, because the district gives two

11       sets of numbers, ballot ID and a post number.  And

12       those are like serial numbers given to a ballot

13       when they're actually -- when they are issued.

14                   And yeah, so the whole election --

15       whoever voted absentee is on that list, and then

16       election day is on the voter history file.  As soon

17       as the election uploads, everybody who voted on

18       election day and a couple of weeks after the

19       election day.

20            Q     Okay.  So -- and earlier you said --

21            A     And also -- and also, the official

22       statewide voter registration list, you can buy from

Page 150

1          the Secretary of State for $250.

2                    Q      Okay.  Thank you.

3                    So also earlier you did say you were

4          there to learn how the process worked?

5                    A      Uh-huh.

6                    Q      And when you got to Coffee County,

7          did Scott ever talk to you about what he was there

8          to do at that time?

9                    A      I think it was known that people were

10         coming in to do whatever they were doing.  I mean,

11         I -- you know, he said, "Do you want to come to

12         Coffee County?  They're letting us in.  You know,

13         people are going to be doing some work there."

14                    So I don't really remember the exact

15         conversation, but all I knew is that the doors were

16         open, you know, nobody was breaking into anything.

17         It seemed quite welcoming.  It's not like it was in

18         the dark and one person, you know, on the weekend

19         popped open the door or anything.  It seemed very

20         inviting to me.

21                    Q      All right.  So if you go to the same

22         exhibit, 3, Tab 5, I believe you have Cathy Latham

Page 151

1          standing over you, timestamp 1:10.  I believe

2          that's the picture.  Let's see, 11, Number 11 on

3          the list, the picture.

4                    A     Is that one from the bottom or three

5          from the bottom?

6                    Q     If you count from the top down,

7          Number 11, Picture 11.  I guess that's a better way

8          instead of using the timestamp.  Number 11, Picture

9          11.

10                   A     Okay.

11                   Q     You have Cathy Latham.

12                   A     How many are there in all?

13                         One, two, three, four, five, six,

14         seven, eight, nine, ten, eleven.  Okay.  I'm there.

15                   Q     So I believe that is Cathy, right,

16         correct, the lady in the -- with the white hair?

17                   A     I thought Cathy had blonde hair for

18         some reason, but if you say so, I guess.  Hell, I

19         don't --

20                   Q     Oh, no, no.  I'm asking you, is that

21         Cathy Latham?

22                   A     I don't really know for sure.

Page 152

1          Q    But would you recognize her if you

2     saw her today, would you?

3          A    No.  If I saw her on the street, I

4     wouldn't recognize her, no.

5          Q    So if you go to Picture 1, the very

6     first picture, there's a lady you identified

7     earlier before --

8          A    Yeah, I didn't -- I said I didn't

9     know.  I'm not sure who it could be.

10          Q    Okay.

11          A    I don't know.

12          Q    So either way, you are showing her

13     something on your computer, you're pointing at

14     something on your computer?

15          A    Yeah.

16          Q    And is that part of the Coffee County

17     data you were analyzing?

18          A    Let me see if I can -- I don't

19     think --

20          Q    It's Number 11 on the list.

21          A    Number 11?

22          Q    Yeah.  If you count from the top

1    down, Picture 11.

2         A    I don't -- I don't believe that

3    was -- I don't believe that was Coffee County.  I

4    don't -- I'm not sure though, but I don't -- I

5    didn't really do any analysis on Coffee County.  It

6    was more of all of Georgia.

7         Q    So while you arrived at the Coffee

8    County office, all you came there to -- all you

9    were there to do is just to analyze data on your

10   computer?

11        A    No.  I was there just to learn, learn

12   about the processes.  And to be honest with you, I

13   just thought it was kind of cool to drive a private

14   jet down there -- to ride in a private jet down

15   there.  I mean, it's the truth.  It was kind of

16   cool.

17        Q    Okay.  And so what did you learn

18   while you were there?  What did you learn about the

19   process?  Can you talk about that?

20        A    So I remember the biggest thing that

21   I really wanted to understand is how an election

22   official uploaded the data to the Secretary of

Page 154

1          State, because at the time I was just hearing so

2          much chatter about the Edison feed and hundreds of

3          thousands of votes being dumped all at once and

4          things like that.  And, you know, I wanted to

5          understand how that would be possible, because at

6          the time the data and what people were bringing up,

7          they didn't necessarily understand significant

8          numbers.

9                    Because there's 5 million people in

10         the state of Georgia that voted, they were all

11         looking at percentages and converting them to

12         actual numbers, but they were only going to -- to

13         two places, you know, 50.01 percent.  But when you

14         have 5 million people, you need seven significant

15         numbers.  And percentages, there's no such thing as

16         a percentage of a vote.  So I was trying to get

17         people to focus on non-conspiracy-type things.

18              Q    Okay.

19              A    And -- yeah.

20              Q    So going back to Exhibit 2, Tab 6,

21         which is the e-mail from Scott to x025, I believe

22         that's you, about the ICC log and the SLOG.  And

Page 155

1        the date on that is January 7, 2021, at 1:23 p.m.

2                        You were at the Coffee County office

3        at the time you received the e-mail, correct?

4                A        Yep.

5                Q        And did you open it while you were at

6        the office?

7                A        I can't remember if I did or not.

8                Q        All right.  And do you wonder why

9        Scott sent you the log?

10               A        I mean, at that time, Scott would

11       send me everything he knew and understood about the

12       election.  I think mainly because of my degree

13       and -- and things like that.  He tried to

14       understand things he would send me.  So, you know,

15       that, at times, did actually get quite frustrating

16       because I -- I wasn't as interested in the machines

17       as -- as he was and a lot of other people.

18               Q        So just a few more questions.

19                        So did you decide to leave at the

20       time you left?  I believe that is exhibit --

21               A        It's 4:00, almost 5:00, something

22       like that.

Page 156

```
 1              Q      Yes, that's 4:46.

 2                     So when you left the Coffee County,

 3       did you leave on your own or did you leave with

 4       Scott?

 5                     Was Scott behind you or did other

 6       people -- did you leave with anyone?

 7              A      No.  I'm pretty sure we took the jet

 8       back, yeah.

 9              Q      Oh, so you left together?

10              A      Yep.

11              Q      Okay.  And did you disclose anything

12       that happened at the Coffee County office while you

13       were leaving or while you were in the jet?

14              A      Did I disclose anything?  What do you

15       mean?

16              Q      Did you discuss anything that

17       happened at Coffee County?  What you were there to

18       do?  What you achieved?  Whatever it was that could

19       have been?  Did you --

20              A      I'm sure we talked about -- about

21       that, yeah.  I mean specifics, no.

22              Q      So you don't remember anything, but
```

Page 157

1     you remember speaking about the Coffee County

2     office?

3            A     Yeah, I mean, sure, that's where we

4     just left from all day.  I mean, it's possible.

5     I'm sure that something was brought up about that

6     day.

7            Q     Okay.

8            A     Actually, I guess that means I'm not

9     sure, but . . .

10           Q     Okay.

11                 MR. JOSEPH:  All right.  Thank you.

12    Those are all of the questions that I have for you.

13    And thank you for your time.

14                 THE WITNESS:  Thank you, Joseph.

15       EXAMINATION BY COUNSEL FOR STATE DEFENDANTS

16    BY MS. LAROSS:

17           Q     Mr. Cruce, this is Diane LaRoss, and

18    I represent the State Defendants.  I'm going to try

19    and get my camera on so you'll have a face to go

20    with the -- with my voice.  Can you hear me okay?

21           A     Yes.

22           Q     Okay.  Here I am.  Let's just see if

Page 158

1      we can get this a little -- okay.  That will

2      probably be easier.

3                      Okay.  Mr. Cruce, thanks so much.

4      And I do want to check in with you.  Do you need a

5      moment to take a break?  I don't have a lot of

6      questions, but of course if you need to, that would

7      be entirely fine.

8              A    No, I'm ready.  We can go.

9              Q    Okay.  Great.  Thanks so much.  And

10     to your attorney's point, I will do my best not to

11     repeat questions that have already been asked, but

12     there may be times where I overlap in order --

13             A    It's okay.

14             Q    -- to -- if there's some follow-up,

15     then I'll be --

16             A    It's okay.

17             Q    So I'm not trying to confuse you or

18     anything like that.

19             A    It's okay.

20             Q    You spoke about the -- reviewing the

21     Secretary of State's data.  I believe you said

22     there were three files, two files that you

Page 159

```
 1          downloaded from the Secretary of State website and

 2          then the third that you obtained from the Secretary

 3          of State's office directly.  And I believe you

 4          testified that that was in your analysis of the

 5          2020 election.

 6                    Am I correct about that?

 7          A     So let me -- what I obtained directly

 8          from the Secretary of State's office is you can

 9          purchase the statewide voter registration list for

10          $250.

11          Q     Sure.  Sure.  Yeah, I'm -- I just

12          wanted to point to the three files that you talked

13          about that you analyzed.

14          A     Yeah.  Yeah.  So yeah, all publicly

15          accessible data, right.

16          Q     Sure.

17                    And that -- and the reason that you

18          were looking at those files was to analyze the 2020

19          election.  Is that correct?

20          A     Incorrect.  And I worked on other

21          elections, too, because I wanted to compare, you

22          know, the data in different elections as well, so
```

Page 160

```
 1        yeah.

 2                Q      Okay.  And I think you said that you

 3        started the analysis of the 2020 election in -- of

 4        course in November of 2020.  Do I have that

 5        correct?

 6                A      Yeah, early.  Just right after the

 7        election, correct.

 8                Q      And what conclusions did you draw

 9        from your analysis of the three reports that you

10        discussed that you reviewed?

11                A      So -- so with my research that -- I

12        found that -- something called the GAVREO

13        Conference, I believe, which is held yearly, where

14        state officials, election officials from around the

15        state meet up.  And they give presentations on

16        different aspects of the election, as far as

17        resources go, how things worked.

18                        And I found -- I found a

19        presentation.  I can't remember his name right now,

20        but somebody from the Secretary of State that

21        stated what a ballot ID was in the absentee file.

22                        And from that file, what it's used
```

Page 161

1    for is to allow election officials to look up

2    people if they call in and ask if their vote -- you

3    know, if they voted on a certain day or if their

4    vote had counted or not or if they're just

5    verifying.

6                    And the way to look those people up

7    was to look up their combo number, which is a

8    number that's located on the ballot as well.  And

9    it describes your ballot pretty much, you know,

10    what district you live in, state congress, state

11    senate, you know, wherever.

12                    And with that and a ballot ID, would

13    let them know if they voted absentee by mail or

14    early.  So not for election day, but this file was

15    used to verify that.  So that means that that

16    should be a unique combination.  And I found across

17    the state, through data analysis, that -- that

18    within counties that -- that it was duplicated, I

19    believe, somewhere around 35,000 times.

20                    So now, to me, in conversations --

21    and I continuously -- I reached out to the

22    Secretary of State about this and things of that

Page 162

1       nature, very hard to communicate, you know, nothing

2       bad or anything about that, because I'm sure they

3       were -- I wasn't the only person working on things

4       in 2020, but that was one thing.

5                   Another thing that I found was that

6       when I sorted these ballot ID numbers, with the

7       early voting locations, I noticed that -- so for

8       instance, there is a vote center ID that's on the

9       absentee file, and that ID is specific to an early

10      voting center, right?

11                  So, for example, State Farm Arena,

12      that's one of the really big voting centers in the

13      2020 election.  I think it was denoted as 60843, I

14      think, and it was given a number combination.  And

15      whenever I would sort the ballot ID within those

16      vote centers, I could tell -- I would look over and

17      see when they actually issued those ballots, and I

18      noticed that the dates were in chronological order.

19      So that told me that this number was given in

20      sequential order with the actual voter themselves.

21                  So that means if you were the first

22      person to vote at State Farm Arena, your ballot ID

Page 163

1      would be Number 1.  The last person to vote

2      there -- I think there was somewhere around 38,000

3      people that voted in the State Farm Arena.  That

4      last ballot ID should be 38,000.  Okay?

5                  So what I noticed with that is -- and

6      another thing to verify that as well is husband and

7      wives go vote together, and you can see this as

8      well, that their numbers are sequential or very

9      close back to back.

10                 So knowing that, along with what's

11     called the post number in that absentee file -- let

12     me explain the post number, which is another column

13     that goes with the voter, what it does is no matter

14     what type of ballot, whether it's early, whether

15     it's absentee by mail, electronic, whatever, it's

16     just a all-encompassing serial number.

17                 So the very first absentee-by-mail

18     ballot that was applied or that was issued would be

19     Number 1, and I think there was somewhere around

20     438,000 absentee by mail that were issued in the

21     2020 election.  So it should be right around

22     438,000, would be your last post number.

Page 164

1                    Do you understand where I'm headed

2        with that?

3                    So that means that if I actually

4        plotted this, the post number and the ballot ID, I

5        could actually see a trend of people voting with

6        the X axis being ballot ID.  So from one to however

7        many, 38,000, you know, would be the most, State

8        Farm, I could plot all of these vote centers with

9        respect to the post number.

10                    So the post number gave you an idea

11        of every ballot that was out, and the ballot ID

12        would give you an idea of where that ballot was as

13        far as what vote center it was at.

14                    And what I noticed is that there were

15        natural trends and it should be a linear trend,

16        right?  So over time you're going to have some

17        inflections because of rainy days, you know, the

18        last day to early vote, people are all going to

19        rush in at once.  You'll see an uptick there.

20                    But what I noticed halfway through,

21        three-quarters of the way through, that some early

22        voting centers would shut off completely just that

1    day, you know, whether it was a Tuesday or a

2    Wednesday, would not have anybody vote there, but

3    other voting centers would triple their average

4    rate.

5                So what it -- what it looked like to

6    me is that there was some sort of communication,

7    some sort of mechanistic intervention involving the

8    machines.  And, you know, as far as being able to

9    verify that, you know, I -- I just don't have

10   enough information.  But it was very rampant in

11   2020 in Fulton County.  And then when I looked at

12   it in 2021, the same thing appeared, not as bad.

13               So I did the gubernatorial race as

14   well in 2020 -- no, I'm sorry, it was the City of

15   Atlanta mayoral race.  I also looked at that as

16   well.  And some very interesting things that came

17   from that is that I was able to predict the

18   election day total in the City of -- the mayoral

19   election, the total amount of election day votes

20   that -- Andre, I think his name is Dickens, he got

21   within, I think, five or six votes of what his

22   election day count would be on election day.  So

Page 166

1    five o'clock that day before the results were

2    reported.

3              And how I did that was I -- I took

4    the total ballot ID, and I subtracted all of the

5    missing ballot IDs, so that were supposed to be in

6    sequential order.  And that's how I came up with

7    election-day votes.

8              And another assumption that I had was

9    because the same ballot, the same system, was used

10   on election day as it is in early voting.  It's the

11   same ballots, so you wouldn't be able to tell

12   whether or not if it was an election-day ballot or

13   an early-voting ballot.  So that's a few of the

14   things.

15             I also did a lot of work on the

16   statewide voter registration list over time.  I

17   noticed there were huge chunks of people that were

18   taken off and put back on.  I noticed an anomaly

19   that people that didn't have a date last voted

20   blank in those statewide voter registration lists.

21             I started with the January 2020 voter

22   list all the way up to the election, and the total

Page 167

```
 1          amount of people that had blank in their date last

 2          voted, meaning they were added very, very recently,

 3          it came to within, I think, 11 from Biden's totals.

 4                    So, you know, again, the basis on

 5          that, it's just me playing a lot with numbers, but

 6          it is pretty amazing to get within, you know,

 7          two-million-something votes that -- that are

 8          anomalies from the statewide voter registration

 9          list.

10                    So multiple things I looked at.  But,

11          you know, 99 percent of my work came from reported

12          data and understanding, you know, what was going on

13          in the history leading up to it and even after.

14               Q    So is there anything that you learned

15          or data that you obtained on January 7, 2021,

16          during your visit at Coffee County that informed

17          the findings that you've just kind of outlined for

18          us here?

19               A    No.  I -- I didn't -- I didn't see

20          anything there.  You know, I think a lot of people

21          thought things and stuff like that.  I refused to

22          take this -- making assumptions and -- which I made
```

Page 168

1      a lot of assumptions, but it was just I didn't have

2      enough information.  And I left it at that.  I

3      never did any analysis on that and it never really

4      helped me in any way.

5              Q    And you mentioned -- forgive me, I

6      may not repeat this correctly, but you mentioned

7      that some of your findings you thought would have

8      been connected to the voting machines themselves,

9      but you were unable to verify it because you didn't

10     have enough information.

11              Do I have that correctly?

12              A    Right, I -- you know, I didn't -- I

13     didn't ever see the insides of those voting

14     machines, except I guess that's the closest that

15     I've been.  Now, there has been groups of people

16     that have done ORRs, you know, for that election,

17     for other elections.  There's data share, so I've

18     looked at a lot of their stuff that they shared,

19     but not anything like forensics.  You know, I've

20     never looked at that.

21              Q    Okay.  So -- again, so you didn't

22     look at any of the forensics of the election

Page 169

1       equipment in Georgia, correct?

2             A     No.  I -- I don't -- it's not really

3       my expertise.  I don't really know where to --

4       really where to begin in that stuff.

5             Q     And the findings that you've outlined

6       for us today, did you reduce those to a report, a

7       written report?

8             A     Yep.  There's a few.  At times -- at

9       times, there were -- I had a lot of stuff that

10      really weren't finished as well.  And I was working

11      full-time and I was doing this at night, so I

12      was -- I wasn't getting a lot of sleep.

13                  It caused a lot of -- you know, it

14      was just really trying to understand, you know, if

15      it was right or not.  You know, I -- it wasn't

16      necessarily political for me.  It was more trying

17      to solve a puzzle that I don't think is possible to

18      solve.

19            Q     And I think you mentioned that the

20      puzzle that you were trying to solve, that was

21      something that was really for your own information,

22      correct?

1          A      Yeah, I -- you know -- you know, I

2     was looking at The New York Times November 3rd, and

3     I saw that Trump had a 75 percent chance of

4     winning.  And then he lost, and that -- you know,

5     just his numbers.  And also next door around me

6     where I lived in Buckhead, there were just a

7     numerous amount of people that were saying that

8     their vote was not counted.

9               And, you know, for example -- I don't

10    know if -- probably with the research you all have

11    done on me, you've seen the video, but there was a

12    lady that I knew who was 94 years old.  That ate me

13    up, so I -- it -- I wanted to find out if it was --

14    if it had any validity or not.

15         Q    You mentioned that you did a full

16    audit of the Secretary of State files, and sent

17    the -- sent a report to someone who represented or

18    were connected with Sidney Powell.

19               Do I have that correct?

20               Can you hear me?

21         A    Yes.  I'm sorry, my headphones went

22    out.

Page 171

1          Q     Okay.  Okay.  Let me ask that again

2     then.

3                I believe you mentioned in your

4     earlier testimony that you did a full audit of the

5     Secretary of State files and sent a report to

6     someone connected with Sidney Powell.  Do I have

7     that correct?

8          A     Yeah.  I -- it's just what people

9     said, you know?  At the time, you have to picture

10    me, I'm in a -- I'm in an attic, like I haven't

11    slept in a while, things like that.  I was sending

12    out reports to whoever would take them who had any

13    kind of connection.

14                You know, I don't know for -- you

15    know, in all seriousness, if they were connected or

16    if they even got it to her or not.  It was -- I was

17    doing some, I believed, important work and it

18    needed to be looked at.

19                And it was -- it was just -- it was

20    work -- it was an audit, you know?  It was with

21    public -- public data and their system.  There was

22    no -- I wasn't making any assumptions.  I was just

1   comparing databases, kind of like the IRS does an

2   audit on a company.  That's -- that's what I did.

3         Q     So the -- that audit or the -- is --

4   the other audits that you have identified, were any

5   of those at the direction of someone who hired you

6   to perform the audit?  Or I guess -- as I

7   understand your testimony, that it was really done

8   just in your own personal interest, but I want to

9   make sure I'm accurate about that.

10        A     Yeah.  Audits and -- yeah, that was

11  all -- all me with the -- with an angry wife at

12  home, yeah.

13        Q     Okay.  And those audits were like --

14  when you talk about the audits, were they reduced

15  to a writing in an e-mail?  In a report?  How

16  did --

17        A     So I finally --

18        Q     -- you compile them?

19        A     -- I finally finished it and put them

20  all together.  And I actually sent it in an ORR

21  request to the Secretary of State.  Because what I

22  did is -- because I downloaded the voter history

Page 173

1        file, kind of the record of the uploads of casted

2        votes starting, I think it was, November 8th,

3        November -- yeah, November 8th, which did not have

4        election-day votes yet, and then the 15th.

5                    And I think the -- which it also

6        didn't have election-day votes, and then the 28th

7        and then December, and then -- so I monitored, you

8        know, votes as they were being put on.  And what I

9        found is that they -- they took -- they took off

10       close to 5,000 people.  I believe it was 5,000

11       people around November 8th to the 10th, and then

12       there were over 11,000 that were added after

13       January 26th, 2021.

14                    So yeah, I mean, you know, the margin

15       of victory was 11,700 something.  And, you know,

16       again, I'm just told, "Well, you know, these are

17       just -- it's not official.  These are just rolls,"

18       and things like that.  But I mean, it's supposed to

19       be a direct download from UNET, which is the -- the

20       program that they use to keep track of all cast

21       votes in Georgia.  So nobody really cared though,

22       so . . .

1          Q     So the audits that you talked about,

2     did you produce them in the documents that you

3     provided to Mr. Brown?

4          A     I think I tried.  I believe -- I

5     don't know if Courtney held that out or not.

6               MS. KRAMER:  Well, I'm -- so we've

7     been -- it's been very time-consuming, and so

8     there -- if it wasn't in one of these batches, it's

9     going to be in the next batch that Bruce and I kind

10    of talked about.  It's just -- like I said, it's

11    been very time-consuming to go through everything

12    and making sure that we are being compliant with --

13    with the subpoena.  So if it's not in one of those

14    two batches, then it's going to be in the next one

15    or two.

16               MS. LAROSS:  Okay.  And, Courtney,

17    would it be all right with you if I put my e-mail

18    address in the chat, so whatever you produce to

19    Mr. Brown, you could copy me on?  Would that be all

20    right with you?

21               MS. KRAMER:  Absolutely.

22               MS. LAROSS:  Okay.  Great.  Thanks

Page 175

1      very much.

2                      MS. KRAMER:  Of course.

3      BY MS. LAROSS:

4              Q     Okay.  Getting back, Mr. Cruce, to

5      your visit to Coffee County on January 7th, 2021.

6      Did you download any data from any of the Coffee

7      County equipment or any equipment at the Coffee

8      County Elections office onto either your laptop or

9      any other device that you brought with you that

10     day?

11             A     No, I did not.

12                   And just to -- just to make sure what

13     you're saying is that I didn't -- you're saying I

14     didn't physically do that.  I -- I'm trying to

15     remember if Misty gave me a thumb drive or not, and

16     it's -- I have to -- I have to see if that -- if I

17     have that.  I'm not sure.

18             Q     Sure.

19             A     I would -- I'm not sure.

20             Q     But you're going to take a look for

21     that.  And that's fine.

22                   A     But the thing is, though, is that

1    there was nothing of any significance.  I -- if

2    anything, it might have been that ICC log and

3    things like that, but it was nothing, nothing from

4    what these people -- these other folks were doing.

5           Q    Okay.  Yeah, because I had just in my

6    notes, and I may be incorrect, when looking at the

7    downloads, the ICC log and then the SLOG, I had a

8    note that you downloaded that onto a notepad.

9               Do I have that correct?

10          A    I might have said that it opens up on

11   a notepad.  It's like a text file.  It's just

12   really hard to do any analysis.  So I tried to

13   transport it into Excel at one point.  I think it

14   was at night or right around that time, and it was

15   just such a mess.  I didn't really understand any

16   of it, so . . .

17          Q    Okay.  So that would have been on the

18   notepad on your laptop that you opened those log

19   files that you got at Coffee County.  Is that

20   correct?

21          A    I don't remember if I did it -- I did

22   it there or that night or the next day.  I don't

1          know, but it was very brief.

2                    Q     You mentioned that when you were at

3          Coffee County on January 7, 2021, that there were a

4          few things that you did.  I believe you said you

5          looked at the equipment.  And you said you did not

6          touch any of it unless you just nudged it walking

7          by or --

8                    A     Yeah.

9                    Q     -- something like that --

10                   A     Yeah.

11                   Q     -- but you didn't go into it or open

12         up any of the equipment?

13                   A     No.

14                   Q     And then you asked questions of

15         Misty.  And then also discussed some questions

16         briefly over lunch with some of the other folks.

17                   A     Yes.

18                   Q     Is there anything else you did that

19         day that you recall?

20                   A     That I did that day?

21                   Q     Yes, sir.

22                   A     I -- I looked at -- I looked at some

1    of the ballots they were using.  I think that's

2    about it.  It was just seeing the process mostly,

3    you know, what kind of envelopes they used and

4    where they came from, along with, you know, the

5    process that she took when she reported out the

6    results.

7            Q     And you went through some -- so other

8    than what you've described to us, is there anything

9    else that you did at Coffee County on January 7,

10   2021?

11           A     I don't know.

12           Q     Okay.  You will need to answer

13   verbally for the court reporter.

14           A     So anything else regarding what?

15           Q     Just anything else while you were in

16   the Coffee County Election office on January 7,

17   2021, other than what you've already described for

18   us.

19           A     No.

20           Q     And you mentioned that you asked some

21   questions of -- of Misty.  And I think you said she

22   showed you how to report an election on election

1      night.  Is that correct?

2              A      Yeah.  So I looked over her shoulder

3      and she showed me where she would drag data in and

4      then report it out on -- on the website.  Pretty

5      much what all of the election supervisors do.  You

6      know, just a basic process, which I already -- I

7      already read about that anyways, so -- but I just

8      wanted to see if there was any difference that she

9      did.

10             Q      Okay.  Yeah.

11             So what did you learn, if anything,

12     from her showing you the report, how -- how data is

13     reported on election night?

14             A      I didn't really learn too much.  I --

15     it was three, four, just copying files from the

16     machine over to the computer and then uploaded it

17     on to -- I think it was Scytl, or something like

18     that, the election night reporting, I believe is

19     what it was.  I mean, you read instructions and

20     then, you know, that's what they did, so . . .

21             Q      Anything else that you recall that

22     you learned from Misty during your visit in Coffee

Page 180

1      County on January 7th, 2021, other than what you've

2      already described for us?

3              A      I noticed that the system said GEMS

4      on it, the GEMS room.  And I asked her do they

5      still use that program and she said, no, that was

6      from the old election system.  Because -- the

7      reason why I was interested was because Benny was a

8      guy who worked on elections in Kentucky, and he had

9      a video out showing Fraction Magic or something

10     like that, and it involved the GEMS program from

11     ES&S.

12             Q      Okay.  So you mentioned the GEMS

13     program.  Did Misty mention to you what she

14     referred to in -- or discussions with her the GEMS

15     room at the Coffee County Election office?

16             A      I'm sorry, do what?  I'm sorry.  So

17     can you repeat that?

18             Q      Sure.

19                    Let me ask it this way:  Have you

20     ever heard of something called the GEMS room at an

21     election office -- at the Coffee County Election

22     office?

Page 181

1           A     That's what she described it as,

2     because I saw it on the door.  You know, it said

3     "GEMS," and I asked about it.  And she said that's

4     where they upload the election data.

5           Q     Okay.  So -- sorry, excuse me.  I

6     didn't mean to cut you off.

7           A     It's okay.

8           Q     Okay.  So did you go in the GEMS room

9     at any time during your visit at Coffee County on

10    January 7th?

11          A     Yeah, I -- I did briefly to watch --

12    watch her show me how she would report out the

13    election night data.  I believe that was the GEMS

14    room.

15          Q     So she -- please, I'm sorry, excuse

16    me.

17          A     I -- I -- I believe that was the GEMS

18    room.  She showed me that.  I'm not certain, but --

19    yes, it was the GEMS room.  Yes.

20          Q     Okay.  And while you were in the GEMS

21    room, was Misty there with you at all times?

22          A     Yes.  Yep.

Page 182

1          Q     And why you were in the GEMS room, I

2      think you said she demonstrated uploading election

3      data and how she does it on election night.  Is

4      that correct?

5          A     Yeah, just the process.  It was kind

6      of a mock -- you know, she didn't actually do

7      anything.  She just kind of showed me how she would

8      take it over to the other computer.

9          Q     All right.  And then I think -- I

10     know you had testified that you didn't open up any

11     of the election equipment or look inside any of it.

12              At any point, did you connect your

13     laptop or any other devices you had with you to any

14     of the election equipment at Coffee County?

15         A     No.

16         Q     And while you were there on

17     January 7, 2021, did you overhear or come to

18     understand that anyone else had inserted or

19     uploaded data into any of the election equipment?

20         A     Inserted data into it?

21         Q     Sorry.  Say that again.

22         A     You said inserted data into the

Page 183

1      machines?

2            Q     Yeah.  Yeah.  Or uploaded anything

3      into the machines.

4            A     I mean, there were people there

5      working on them.  I'm not exactly sure what they

6      did, but there were people around those machines.

7      Personally, I cannot remember if -- I do remember

8      poll pads being out and there being work done on

9      those, but other than -- just because I was sitting

10     there most of the time, but other things were -- I

11     didn't see other instruments or other equipment.  I

12     didn't see.

13            I'm just -- I'm sorry, I'm trying to

14     remember.  No.  They were definitely working close

15     to machines, but am I certain that they were

16     putting data into it?  I would assume they were,

17     but I'm not -- I can't remember exactly.

18            Q     Sure.

19            And I was also wondering if there was

20     anything folks mentioned that you overheard that

21     left you with that impression?

22            And maybe not, the answer may be no

Page 184

```
 1    on that one.
 2            A     Well, you know, Scott -- Scott's
 3    phone call, you know, I heard that on the media,
 4    you know, with everybody else.  You know, he was
 5    interested in the data at the time, I remember, and
 6    I thought -- I thought he was actually going to get
 7    the data.
 8                  And looking back, I don't know that
 9    he played as much of a role as -- as -- as I
10    thought.  So he never -- because I asked him a few
11    times after that, you know, "Did you ever hear
12    anything about that?"
13                  And he said, "No."
14                  So I . . .
15            Q     Okay.  Also you testified -- I'm
16    going to go to a little bit of a different topic.
17                  You mentioned that you spoke with
18    Marilyn Marks towards the end of 2021 about the
19    Coffee County Board of Election or the Coffee
20    County office.  Do I have that correct?
21            A     Yes.
22            Q     And what all did you discuss with her
```

Page 185

1          concerning Coffee County?

2                    A      I'm not sure because we spoke a lot

3          after that, so it could have been after late 2021,

4          but, you know, at the time she was -- she was

5          actually trying to -- to help me find a job because

6          I had left Cheeley Law Group, and, you know, she

7          was very -- very -- very nice, trying to help

8          things out on that end.   And just she had a lot of

9          knowledge as well, you know, with the voting system

10         and the different machines.   But I do remember

11         talking to her about Coffee County.

12                    I know recently I've talked to her

13         about it.   Probably around July, I sent her a text

14         complaining that she wasn't looking at 2000 votes

15         that weren't counted in DeKalb County on the

16         machines and she was more interested, you know, in

17         Coffee County.   And so here we are.

18                    Q      How did you first meet Ms. Marks?

19                    A      How did I meet Marilyn?   I don't

20         know.   It could have been Scott, because I do

21         remember -- you know what, I was doing a lot of

22         research, so I was reading actually a lot of the --

Page 186

1    these court documents from 2018 with the same case,

2    and -- and Scott said he knew her at one point

3    before all of this, but I'm not exactly sure how I

4    got in touch with her.

5              Q     Do you know when you first got in

6    touch with her?

7              A     I think it was late 2021.  It was

8    after -- after I left Cheeley and was working on

9    Mary Norwood's race -- well, not Mary Norwood's

10   race, but the lady that was running as a Democrat

11   for the mayor of Atlanta, Felicia -- Felicia Moore,

12   I think is her name.  Is that right?  Yeah, so

13   sometime after November, I believe.

14             Q     And did you contact her first or did

15   she contact you first?

16             A     I don't remember.

17             Q     Okay.  And I asked you a lot of

18   questions about Misty.  I -- and forgive me if you

19   testified to this, but before January 7th, 2021,

20   had you ever met Misty or had any contact with her?

21             A     I don't -- I don't know.  It's -- for

22   some reason I want to say yes, but it had to be

Page 187

1       brief, because I think after the YouTube video and

2       things -- Scott was good about, you know, reaching

3       out to people that had these problems to try to

4       understand, you know, what was wrong with the

5       election, and I think that's how she might have

6       been on a -- might have been on a phone call or

7       something, but I don't remember.  It could have

8       been us just watching her video or something.  I

9       don't -- I'm not certain.

10              Q     Okay.  Could you go ahead -- do you

11      still have the exhibits up on the Exhibit Share?

12                    If you could please go to

13      Exhibit Number 3.  And those are the still shots.

14      And I -- once you get there, I'd ask you to go to

15      page 14, if you would.  And let me know when you're

16      there.

17              A     Yeah.

18              Q     And what is this -- what -- is that

19      you in the frame on page 14 --

20              A     Yes.

21              Q     -- of the exhibit?

22                    And what are you reviewing --

Page 188

1           A      It looks --

2           Q      -- in that photo?

3           A      I don't remember doing this, but it

4    looks like a ballot.  I'm not sure though.  Yeah,

5    I'm not sure what that is or where it's -- where

6    it's from though.

7           Q      Do you remember how you obtained it

8    or who gave it to you or --

9           A      No.

10          Q      -- anything like that?

11          A      No.

12          Q      Okay.  And before January 7th, 2021,

13   had you ever visited the Coffee County Election

14   office?

15          A      No.

16          Q      I'm going to quickly look through my

17   notes, Mr. Cruce, which will not take me long, and

18   then I may be finished.

19                 I think you mentioned that Misty had

20   wanted you to analyze files or particular files on

21   January 7th, 2021.  Do I -- am I correct that you

22   stated that earlier?

Page 189

```
 1              A     I'm not sure what she wanted, but she
 2       sent it to Scott and Scott sent it to me.
 3              Q     Did you analyze the data that Misty
 4       sent?
 5              A     So the ICC log and the other SLOG
 6       file, yeah.  So I mentioned earlier, I pulled it up
 7       briefly, but I couldn't really sort it.  It was a
 8       text file.  You could tell it was like a log of,
 9       you know, the machines, but there's just a lot of
10       numbers and things, like that that's just a piece
11       of the pie.  I needed more information and I wrote
12       it off real fast.  It wasn't very useful for me.
13              Q     Okay.  Yeah, I just wanted to
14       understand if she wanted you to look at any other
15       files other than the -- you know, the log file or
16       the SLOG file.  I think you've answered that.
17              A     Yeah, I don't know what she wanted,
18       but that's the only thing that I -- I looked at
19       from Coffee County, was those log files.
20                    MS. LAROSS:  Okay.  Those are all my
21       questions, Mr. Cruce.  Thanks so very much.  I know
22       it's been a long day and we -- we appreciate your
```

Page 190

1    time.

2                        THE WITNESS:  That's okay.  Thank

3    you.

4                        MR. BROWN:  Courtney, do you have any

5    questions?

6                        MS. KRAMER:  No, not really.  Just if

7    we could also get a copy of the transcript whenever

8    you guys get it, that would be awesome.

9                        MR. BROWN:  Yeah, I have just two

10   more questions, 60 seconds.

11                       MS. KRAMER:  Take it away.

12      EXAMINATION BY COUNSEL FOR COALITION PLAINTIFFS

13   BY MR. BROWN:

14            Q    Mr. Cruce, did you meet with

15   investigators from Rudy Giuliani in 2020?

16            A    Yes.

17            Q    And who were they?  And why were you

18   meeting with them?

19            A    I don't really remember their names,

20   but I don't know.  I think Scott or Garland, or

21   somebody, had set it up, set up the meeting.  I

22   joined the meeting through Zoom, yeah.  Not much

```
 1     substance there though.

 2             Q     And what -- what was -- what were you

 3     talking about on the Zoom?

 4             A     I don't know.  They -- they were

 5     talking about vote -- it was pretty much everybody

 6     had their own view of the election and there were

 7     some -- a few things that -- that I believed

 8     didn't -- weren't very relevant.

 9                   All I really remember from that

10     meeting is that they were gathered around like a

11     YouTube video and trying to understand what trucks

12     were parked out by State Farm or something.  It

13     was -- I don't know.  I -- it didn't have a lot of

14     substance.

15             Q     And tell me again when this was.

16             A     I don't know.  Maybe it -- maybe late

17     November/December 2020.

18             Q     And other than Scott Hall, do you

19     know the name of anybody else who was on that phone

20     call?

21             A     Well, some of them actually met in

22     person.  I believe -- I believe -- I don't remember
```

Page 192

1       Garland being there.  Excuse me.  I'm pretty sure

2       Scott was there.  I think there were like three

3       investigators or something.  They were all like

4       retired police officers from New York.

5              Q     And all of this meeting was about

6       trucks outside of the State Farm Arena?

7              A     It started out there was a

8       presentation about the anomalies that were seen and

9       things.  And then it quickly, I remember, getting

10      offtrack to, you know, looking up YouTube -- stuff

11      on YouTube and whatnot.  And I checked out pretty

12      fast.

13             Q     And where was this meeting?

14             A     I forget where it was at.  I don't --

15      I was -- I joined through Zoom, but --

16             Q     Okay.

17             A     -- they were meeting somewhere.  I

18      can't remember where they were meeting.

19             Q     Is that the only meeting you recall

20      with Giuliani's folks?

21             A     Yeah.

22             Q     Have you been contacted by the

1    Secretary of State relating to your trip to Coffee

2    County?

3            A    No.

4            Q    Have you been contacted by the State

5    Election Board about your trip to Coffee County?

6            A    No.

7            Q    Have you been contacted by the GBI

8    about your trip to Coffee County?

9            A    Now, there was somebody that called

10   maybe last week or the week before that from the

11   GBI.  I haven't returned their call as of yet.

12           Q    And I take it you haven't been

13   contacted by the FBI, correct?

14           A    No.

15           Q    Or the January 6th Committee,

16   correct?

17           A    No.

18           Q    And the first you had heard from any

19   investigator from the State of Georgia was last

20   week.  Is that fair to say?

21           A    Well, there was also somebody from --

22   I talked to a DA investigator from Fulton County,

Page 194

1        Fani Willis' -- a guy in their office.  And he said

2        he was going to e-mail me a subpoena, so hopefully

3        we can just play this recording back.

4                Q     Have you gotten the subpoena yet?

5                A     Nope.  But I do have to come up with

6        much more money to pay another lawyer, so . . .

7                        MR. BROWN:  Thank you for your time

8        today.

9                        THE WITNESS:  Yes, thank you.

10                       VIDEOGRAPHER:  The time is 3:49 p.m.

11       This concludes the deposition.  We are now off the

12       record.

13                       (Whereupon, at 3:49 p.m., the

14                       video-recorded deposition of ALEX A.

15                       CRUCE was concluded; signature reserved.)

16

17

18

19

20

21

22

Page 195

1                   CERTIFICATE OF NOTARY PUBLIC

2          I, FELICIA A. NEWLAND, CSR, the officer before whom

3     the foregoing video-recorded deposition was taken,

4     do hereby certify that the witness whose testimony

5     appears in the foregoing deposition was duly sworn

6     by me; that the testimony of said witness was taken

7     by me in stenotype and thereafter reduced to

8     typewriting under my direction; that said deposition

9     is a true record of the testimony given by said

10    witness; that I am neither counsel for, related to,

11    nor employed by any of the parties to the action in

12    which this deposition was taken; and, further, that

13    I am not a relative or employee of any counsel or

14    attorney employed by the parties hereto, nor

15    financially or otherwise interested in the outcome

16    of this action.

17

18

19

20                   FELICIA A. NEWLAND, CSR

                     Notary Public

21

      My commission expires:

22    September 15, 2024

Page 196

1              A C K N O W L E D G E M E N T   O F

2                    D E P O N E N T

3

4       I, ALEX A. CRUCE, do hereby acknowledge I have read

5       and examined the foregoing pages of testimony, and

6       the same is a true, correct and complete

7       transcription of the testimony given by me, and any

8       changes or corrections, if any, appear in the

9       attached errata sheet signed by me.

10

11

12

13

14     _____          _____

       Date                      ALEX A. CRUCE

15

16

17

18

19

20

21

22    5595374

Page 197

1      Donna Curling, et al. vs. Brad Raffensperger, et al.

2                          ALEX A. CRUCE

3      INSTRUCTIONS TO THE WITNESS:

4          Please read your videotaped deposition over

5      carefully and make any necessary corrections.  You

6      should state the reason in the appropriate space on

7      the errata sheet for any corrections that are made.

8          After doing so, please sign the errata sheet

9      and date it.

10         You are signing same subject to the changes you

11     have noted on the errata sheet, which will be

12     attached to your deposition.

13         It is imperative that you return the original

14     errata sheet to the deposing attorney within thirty

15     (30) days of receipt of the deposition transcript by

16     you.  If you fail to do so, the deposition

17     transcript may be deemed to be accurate and may be

18     used in court.

19

20

21

22

Page 198

```
 1      Veritext Legal Solutions
        1250 Eye Street, N.W., Suite 350
 2      Washington, DC 20005
        (202) 857-DEPO
 3
 4                E R R A T A   S H E E T
 5      Case Name:   Donna Curling, et al. vs. Brad
        Raffensperger, et al.
 6
        Witness Name:  ALEX A. CRUCE
 7
        Deposition Date:  November 22, 2022
 8
        Page No.  Line No.   Change/Reason for Change
 9
10
11
12
13
14
15
16
17
18
19
20      _____          _____
21       Signature                             Date
22      5595374
```