PURSUANT TO PROTECTIVE ORDER

Page 1

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION
3    DONNA CURLING, ET AL.,        )
                                   )
4         Plaintiffs,              )
                                   )
5    vs.                           )      CIVIL ACTION NO.
                                   )
6    BRAD RAFFENSPERGER, ET        )      1:17-CV-2989-AT
     AL,                           )
7                                  )
          Defendants.              )
8
9
10
11     THIS DEPOSITION CONTAINS INFORMATION DESIGNATED
         CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER
12
13     VIDEOTAPED 30(b)(6) DEPOSITION OF RICHARD BARRON
14                 (Taken by Plaintiffs)
15                   January 31, 2022
16                     10:07 a.m.
17
18
19
20
21
22
23
24
25     Reported by:   Debra M. Druzisky, CCR-B-1848

Page 2

```
 1              APPEARANCES OF COUNSEL
 2      On behalf of the Curling Plaintiffs:
 3          DAVID D. CROSS, Esq.
            LOGAN WREN, Esq.
 4          SONJA SWANBECK, Esq.
            Morrison & Foerster
 5          2100 L Street NW, Suite 900
            Washington, D.C.  20037
 6          (202) 887-8795
            dcross@mofo.com
 7          lwren@mofo.com
            sswanbeck@mofo.com
 8
            -and-
 9
            HALSEY G. KNAPP, JR., Esq.
10          ADAM M. SPARKS, Esq.
            1201 West Peachtree Street, Suite 3250
11          Atlanta, Georgia  30309
            (404) 888-9700
12          hknapp@khlawfirm.com
            asparks@khlawfirm.com
13
14      On behalf of the Defendants Georgia Secretary of
        State and State Election Board:
15
            CAREY MILLER, Esq.
16          Robbins Ross Alloy Belinfante Littlefield
            500 14th Street
17          Atlanta, Georgia  30318
            (678) 701-9381
18          carey.miller@robbinsfirm.com
19          -and-
20          DIANE F. LAROSS, Esq.
            Taylor English Duma
21          1600 Parkwood Circle, Suite 200
            Atlanta, Georgia 30339
22          (770) 434-6868
            dlaross@taylorenglish.com
23
24
25
```

PURSUANT TO PROTECTIVE ORDER

Page 3

1          APPEARANCES OF COUNSEL (Continued.)
2     On behalf of the Defendant Fulton County Voter
      Registration and Elections:
3
          CHERYL RINGER, Esq.
4         DAVID LOWMAN, Esq.
          Office of the Fulton County Attorney
5         141 Pryor Street, Suite 4038
          Atlanta, Georgia  30303
6         (404) 612-4000
          cheryl.ringer@fultoncountyga.gov
7         david.lowman@fultoncountyga.gov
8
      Also Present:
9
          Akil Wade, videographer
10        Marilyn R. Marks
11                      --oOo--
12
13
14
15
16
17
18
19
20
21
22
23
24
25

PURSUANT TO PROTECTIVE ORDER

Page 4

```
 1                    INDEX TO EXAMINATION
 2     Witness Name:                               Page
 3     RICHARD BARRON
 4        By Mr. Knapp                               7
 5
 6
 7               INDEX TO PLAINTIFF'S EXHIBITS
 8        No.            Description              Page
 9     Exhibit 1    1-18-22, Curling Plaintiffs'   10
                    Third Amended Notice of
10                  Deposition of Fulton County
                    Defendants re: The
11                  above-captioned action.
12     Exhibit 9    State Defendants 110465 thru   49
                    466, 9-29-20, E-mail string from
13                  Scott Tucker to Blake Evans re:
                    Two ballots printing.
14
       Exhibit 10   State Defendants 108781 thru   54
15                  783, 6-9-20, E-mail string from
                    Chris Harvey to Richard Barron
16                  re: Fulton County - Machines
                    Down and Polling Places Not
17                  Open.
18     Exhibit 11   (Exhibit withdrawn by counsel.)  75
19     Exhibit 13   State Defendants 110802 thru    81
                    803, 8-11-20, E-mail string from
20                  Blake Evans to Richard Barron,
                    Dwight Brower, Sharon Benjamin
21                  and Johnny Harris re: Elections
                    complaint from Thomas Elliott.
22
       Exhibit 19   9-10-20, E-mail string from    119
23                  Richard Barron to Brigitte
                    Bailey, Gabriel Sterling and
24                  Dwight Brower re: Fulton Advance
                    Voting Issue.
25
```

PURSUANT TO PROTECTIVE ORDER

Page 5

1      INDEX TO PLAINTIFF'S EXHIBITS (Continued.)
2        No.              Description              Page
3    Exhibit 25   State Defendants 178061 thru      90
                  072, PowerPoint re: Fulton
4                 Election Day Issues.
5    Exhibit 26   Dominion 43406 thru 407, 6-9-20,  97
                  E-mail string from Ryan Germany
6                 to Frances Watson and Chris
                  Harvey re: Polling Machine
7                 Issues.
8    Exhibit 27   State Defendants 110834 thru      99
                  841, 7-16-20, E-mail string from
9                 Richard Barron to Julie Houk and
                  Ryan Germany re: Urgent demands
10                to send corrected absentee
                  ballots to Fulton Co. Voters...
11
     Exhibit 31   State Defendants 68326 thru 329,  128
12                12-14-18, E-mail from Richard
                  Barron to list re: Voting system
13                input from Fulton County, and
                  1-3-19 E-mail from Joseph Kirk
14                to list re: My thoughts about
                  our next voting system.
15
     Exhibit 32   (Exhibit withdrawn by counsel.)   136
16
     Exhibit 33   State Defendants 115631 thru      138
17                632, 9-17-19, E-mail string from
                  Gabriel Sterling to Chris Harvey
18                re: Fulton County ExpressPolls.
19   Exhibit 34   State Defendants 118794 thru      95
                  808, 11-2-20, Seven Hills
20                Strategies report re: State
                  Election Board.
21
     Exhibit 35   1-12-21, Seven Hills Strategies   154
22                report re: State Election
                  Board - Post-Election Executive
23                Summary.
24                             - - -
25

PURSUANT TO PROTECTIVE ORDER

Page 6

1           THE VIDEOGRAPHER:  Today's date is
2      January 31st, 2022, and the time is 10:07
3      a.m.  This will be the 30(b)(6) deposition
4      of Fulton County, given by Richard Barron.
5           Would the counsel please identify
6      themselves for the record, after which the
7      court reporter will swear in the witness
8      remotely?
9           MR. KNAPP:  Thank you.  My name's
10     Halsey Knapp with the Krevolin & Horst law
11     firm here in Atlanta, Georgia.  My
12     colleague, Adam Sparks, is with us here
13     today, and I believe my co-counsel David
14     Cross of the Morrison & Foerster law firm.
15          MS. RINGER:  Cheryl Ringer
16     representing Fulton County Board of
17     Registration and Elections and Richard
18     Barron.
19          MS. LAROSS:  Diane LaRoss for the
20     state defendants.  I believe Carey Miller
21     is also on the line with us.
22          MS. RINGER:  And I forgot to
23     identify --
24          MS. MARKS:  This is --
25          MS. RINGER:  -- my co-counsel, David

PURSUANT TO PROTECTIVE ORDER

Page 7

1          Lowman, also with Fulton County.

2                    MS. MARKS:  This is Marilyn Marks

3          with Coalition for Good Governance, a

4          plaintiff.

5                         RICHARD BARRON,

6      having been first duly sworn, was examined and

7      testified as follows:

8                         EXAMINATION

9      BY MR. KNAPP:

10         Q.   Mr. Barron, my name's Halsey Knapp, and

11     I'll be asking questions at the beginning of this

12     deposition.  I expect it's going to take a period

13     of time.

14              I understand you've been deposed before.

15     Is that correct?

16         A.   Yes.

17         Q.   Let's go over the ground rules to make

18     sure that we both have a clear understanding of how

19     we're going to proceed here.

20              First of all, you're entitled to a fair

21     question.  So if I ask a question that's confusing

22     or uses terminology that you don't understand upon

23     or is ambiguous in some way that causes you

24     concern, would you please point that out to me and

25     I'll rephrase my question?

PURSUANT TO PROTECTIVE ORDER

Page 8

1        A.    Sure.

2        Q.    Second, it's important for you to

3    articulate your responses.  And even though I

4    believe we're being recorded, it's important not to

5    have nods of the head that -- or other

6    gesticulations, but rather articulated responses to

7    our questions.

8              Is that agreeable?

9        A.    Yes.

10        Q.    If you need to take a break, I'll be glad

11    to allow you to -- for us to suspend the

12    proceedings momentarily and allow you to take a

13    break.  I generally like to take a break every

14    hour.  I think it's only fair for everybody to get

15    a short couple minutes to clear our head and come

16    back in.

17              But should you need a break, please let us

18    know.  And to the extent that there's not a

19    question pending at the time, we will honor that

20    request.

21              One of the most common issues that arises

22    in a deposition is for the witnesses [sic] to talk

23    over each other.  I hope we don't have that issue

24    here today.

25              I would ask that you pause before you

PURSUANT TO PROTECTIVE ORDER

Page 9

1    respond to my questions, and I will try to pause

2    before I ask any follow-up.  But that's for the

3    benefit of our court reporter so she can take down

4    a clean record.

5            Can we agree to that approach?

6    A.    Yes.

7    Q.    Okay.  I understand you're there with your

8    laptop.  Do you have your E-mail open?

9    A.    Yes.

10   Q.    Do you mind closing your E-mail while this

11   deposition is ongoing?  The same for a social media

12   chat and the like?

13   A.    Okay.  All right.

14   Q.    Okay.  I want to begin with clarifying

15   exactly what subjects you are -- you understand

16   you're here to testify about today.  You do

17   understand that you're a representative of Fulton

18   County appearing in this deposition; is that

19   correct?

20   A.    Yes.

21   Q.    Okay.  And I understand from counsel prior

22   to you came on that there were certain subjects

23   that you've been designated to testify about.  I'd

24   like to go over that list with you to be sure that

25   your understanding is the same as your counsel's.

PURSUANT TO PROTECTIVE ORDER

Page 10

```
 1          MR. KNAPP:  Adam, can you bring up --
 2     excuse me?  Did someone say something?
 3     Noted.  Okay.
 4          Adam, could you bring up Exhibit
 5     Number 1, which is the Third Amended
 6     Notice of Deposition of Fulton County
 7     witnesses?
 8                    (Whereupon, Plaintiff's
 9                    Exhibit 1 was marked for
10                    identification.)
11          MR. SPARKS:  Yes.  Exhibit 1 should
12     now appear on your screen.  It's in the
13     Marked Exhibits folder.
14  BY MR. KNAPP:
15     Q.   Mr. Barron, can you see the first page of
16  this exhibit that's being published on the screen
17  here?
18     A.   Yes.
19     Q.   Okay.  Can we turn to Page 5, which is
20  where the topics in this notice are -- begin?
21  Okay.  Do you see topic number one:
22          "Any efforts made to air gap any
23        components of Georgia's current
24        election system as used in Fulton
25        County" --
```

PURSUANT TO PROTECTIVE ORDER

Page 11

```
1         A.   Yes.
2         Q.   -- "and the success or failure of
3          any such efforts"?
4         A.   Yes.
5         Q.   Do you understand that you've been
6     designated to testify to this subject?
7         A.   Yes.
8         Q.   Okay.  Look at the second topic:
9              "Any connections (direct or
10         indirect), interactions or other
11         actual or potential exchanges of
12         software or data between Georgia's
13         current election system as used in
14         Fulton County and any other computer
15         system or device via the Internet,
16         telephone lines, cable lines,
17         satellites or other third-party
18         system, network, equipment or
19         devices."
20        A.   Yep.
21        Q.   Do you understand that you've been
22     designation to speak to this topic as well?
23        A.   Yes.
24        Q.   Okay.  Let's go to number four, which is:
25             [As read]  "Any oper -- execution
```

PURSUANT TO PROTECTIVE ORDER

Page 12

1           or operational issues or challenges

2           with Georgia's current election system

3           involving any Fulton County 2020 or

4           2021 elections, any solutions or other

5           measures implemented, planned or

6           contemplated to resolve, remediate,

7           mitigate or otherwise address any such

8           issues or challenges, and the success

9           or failure of any such efforts."

10          Do you see that topic?

11     A.   Yes.

12     Q.   Do you understand that you've been

13   designated to speak to that topic?

14     A.   Yes.

15     Q.   Let's go then to topic number five:

16           "Any communications with the

17        Secretary of State about the

18        implementation and operation of the

19        election system in Fulton County."

20          Do you see that topic?

21     A.   Yes.

22     Q.   Do you understand that you've been

23   designated to speak to that topic?

24     A.   Yes.

25     Q.   Let's go to number nine.  I'm not going to

PURSUANT TO PROTECTIVE ORDER

Page 13

1    read number nine because it's quite extensive.  It

2    goes on subparts A, B, C and D.  But can you read

3    that for the moment?  And then after you've read

4    it, will you please advise us whether you

5    understand that you've been designated on behalf of

6    Fulton County to cover it?

7         A.   I'm familiar with it.  I mean, I recognize

8    that.  So yeah, that's fine.

9         Q.   Okay.  And you are -- and you understand

10   that you're to testify to that here today?

11        A.   Yes.

12        Q.   Okay.  Let's look at number ten:

13             [As read]  "Complaints regarding

14         the security, integrity, reliability,

15         accuracy or transparency of Georgia's

16         current election system or its

17         G.E.M.S./D.R.E. election system,

18         including when and by whom such

19         complaints were made and" any

20         responses -- "including any responses

21         thereto."

22             Do you see that?

23        A.   Yes.

24        Q.   And do you understand that you are

25   testifying here today on behalf of Fulton County

PURSUANT TO PROTECTIVE ORDER

Page 14

1     with regard to that topic?

2          A.   Yes.

3          Q.   Okay.  Let's go to number 18:

4               "Communication with the U.S.

5           Election Assistance Commission

6           regarding any software changes

7           involving Georgia's current election

8           system" --

9          A.   Yes.

10         Q.   -- "or otherwise relating to any

11          request for E.A.C. approval for any

12          aspect of Georgia's current election

13          system."

14         A.   Yeah.  I understand.

15         Q.   Okay.  And you're here to testify with

16    regard to that topic; correct?

17         A.   Yes.

18         Q.   How about number 19?  It's also long and

19    with subparts A through D.  And I'll ask you to

20    read that and then answer the same question with

21    regard to topic number 19.

22              (Whereupon, the document was

23           reviewed by the witness.)

24              THE WITNESS:  Yes, I know about this

25         one, that I'm here to testify on that one.

PURSUANT TO PROTECTIVE ORDER

Page 15

1    BY MR. KNAPP:

2        Q.    Great.

3              Number 20:

4              "Any actual or contemplated plans

5          to replace Georgia's current voting

6          software or equipment in Fulton County

7          with different voting software or

8          equipment, such as B.M.D.s that do not

9          generate barcodes for tabulation, or

10         with hand-marked paper ballots as the

11         primary means of in-person voting."

12       A.    I understand that one, too.

13       Q.    Okay.  And are you here to testify with

14   regard to that subject?

15       A.    Yes.

16       Q.    21, again, it has several subparts, so

17   I'll ask you to read 21A and B and then answer the

18   same question with regard to topic 21.

19             (Whereupon, the document was

20         reviewed by the witness.)

21             THE WITNESS:  Yeah, I understand that

22         I'm here to testify on that.

23   BY MR. KNAPP:

24       Q.    Great.  Thank you.

25             And then number 22:

PURSUANT TO PROTECTIVE ORDER

Page 16

1           "Any recommendations from Fulton

2        County to the Secretary of State to

3        make changes to the election system,

4        including, but not limited to,

5        switching to hand-marked paper

6        ballots."

7           Do you see that topic?

8      A.   Yes.

9      Q.   Do you understand that you're here today

10   to testify on behalf of Fulton County with regard

11   to that topic?

12     A.   Yes.

13          MS. RINGER:  Halsey, I don't -- I

14        don't think we designated him for that,

15        but you can go ahead and question him on

16        that.  He's already answered.

17          MR. KNAPP:  Oh, okay.

18          MS. RINGER:  Okay.

19          MR. KNAPP:  Why I had some confusion

20        is because it -- in the earlier part of

21        the 30(b)(6) deposition at Page 5, and

22        this is directed to your counsel --

23          MS. RINGER:  Uh-huh.

24          MR. KNAPP:  -- it says that counsel

25        of record had already confirmed numbers

PURSUANT TO PROTECTIVE ORDER

Page 17

1       also 22, 23, 24, 25 and 26 on --

2              MS. RINGER:  Okay.

3              MR. KNAPP:  -- Monday, January 31st.

4       So I'm trying to reconcile that

5       discrepancy.

6              MS. RINGER:  Got you.  Okay.

7              MR. KNAPP:  Let me just start with

8       you, Counsel.  Is it -- or do you intend

9       to tender Mr. Barron to speak to 23

10      through 26 here today?

11             MS. RINGER:  Well, I do remember us

12      having some issues with whether or not

13      they were relevant.  But if anyone could

14      speak -- if there was anything.  But if

15      anyone could speak to it, it would be

16      Mr. Barron.  So yes, we'll -- yes, we'll

17      tender him for those.

18             MR. KNAPP:  Okay.  Thank you.

19  BY MR. KNAPP:

20      Q.   Now, you've testified in several hearings

21  before Judge Totenberg.  And I don't want to cover

22  old ground, but I do need to get a little bit of

23  background on your employment history.

24             Mr. Barron, would you share with us your

25  employment history?

PURSUANT TO PROTECTIVE ORDER

Page 18

1        A.    Just with Fulton County or all of it?

2        Q.    All of it that's relevant, do you believe,

3     to election administration --

4        A.    Okay.

5        Q.    -- representing companies that are

6     involved in --

7        A.    Sure.

8        Q.    -- the manufacture or sale of election

9     equipment.

10       A.    Yeah.  So I've been with Fulton County

11    since June of 2013 as director.  Prior to that I

12    was with Williamson County, Texas as the elections

13    administrator from February of '07 until June of

14    2013.

15            I was with Hart InterCivic in 2006 for

16    that entire year, from January 1st to the end of

17    the year.  Before that, I was with Sequoia Voting

18    Systems from April of 20 -- April of 2004, I think,

19    to the end of 2005.

20            And then from December of '99 until April

21    of 2004, I was with Williamson Count -- or with

22    Travis County elections as election management

23    coordinator.  And with Hart and Sequoia I -- Hart I

24    was an account manager, with Sequoia I was a

25    regional project manager.

PURSUANT TO PROTECTIVE ORDER

Page 19

1      Q.   And in your responsibilities as account

2    manager for Hart, were you involved in the sale of

3    electronic equipment or computer election equipment

4    or some other role?

5      A.   Implementation once -- I was -- I got

6    involved after the sale had happened.  I would just

7    help the county implement the system.

8      Q.   Did you have any education or other

9    technical training that gave you a background in

10   election systems and implementation of election

11   systems?

12     A.   No.

13     Q.   How is it that you got into this field?

14     A.   I saw a job posted at Travis County

15   elections in 1999 and applied for it.

16     Q.   Did you attend college or university?

17     A.   Yes.

18     Q.   And what years and did you matriculate?

19     A.   I got a B.S. in political science in 1989,

20   and then I got a master's in classical civilization

21   in, that would have been 2000.

22     Q.   And what institution issued those -- or

23   no, better --

24     A.   University of Oregon for the bachelor's,

25   Antioch University for the master's.

PURSUANT TO PROTECTIVE ORDER

1      Q.   Thank you.

2           And what attracted you to the opportunity

3    in Fulton County in 2013?

4      A.   I just kept seeing the position open.  I

5    mean, it was a step up from where I was at.  The

6    position kept opening up over the years.  It opened

7    up I think three or four times over the three --

8    the years that I was with Williamson County.

9      Q.   And given the size of -- what was the size

10   of the vote -- of the vote -- registered voters in

11   Fulton County in roughly 2013?

12     A.   I believe it was somewhere around 600 to

13   650 thousand.  I don't remember.

14     Q.   And your prior county with -- experience

15   with Travis County, how large a voting base did

16   they have?

17     A.   Travis County was -- is similar in size to

18   Fulton, and it has I think pretty much the same

19   growth rate.  I think -- I remember it being at 500

20   to 550 thousand when I left Travis County.

21   Williamson County had about 230 to 250 thousand.

22     Q.   And what kind of system did Travis County

23   have at the time you departed?

24     A.   It started out with hand-marked paper, and

25   then by the time I left they were using Hart

PURSUANT TO PROTECTIVE ORDER

Page 21

1    InterCivic's eSlate.

2         Q.   Could you describe that last system?  I'm

3    not familiar with it.

4         A.   It was a dial -- it's a dial -- I mean, it

5    was -- it's an electronic system, but they used a,

6    like, a dial rather -- it wasn't a touch screen.

7    You just turned and it would -- the screen would

8    change based on where you turned the dial.

9         Q.   Did the system then produce some type of

10   output that the voter had to verify?

11        A.   No.

12        Q.   Why did you -- were you part the

13   recommendation that the Travis County system move

14   from hand-marked paper ballots to this electronic

15   system?

16        A.   I mean, I was part of the process to

17   choose the voting system.  But I mean, I think the

18   county clerk was the one that was involved in

19   changing that.  I mean, that's what --

20        Q.   Were you --

21        A.   -- everybody was doing at that time.

22        Q.   Were you supportive of that change?

23        A.   Yes.

24        Q.   What were your reasoning -- what was your

25   reasoning for that?

PURSUANT TO PROTECTIVE ORDER

Page 22

1      A.    Paper ballots are a pain in the rear,

2    especially during early voting.  They caused so

3    many problems during early voting, paper ballots

4    did, that it just, it was a nightmare.

5           And the way that they were -- the way they

6    had to be sorted and handed out in Texas made

7    them -- made early voting and paper ballots, they

8    were at cross-purposes.

9           And so the bal -- voters would get the

10   wrong ballots a lot.  There was too much human

11   interaction.  Because you needed -- in Texas you

12   had to -- there were -- the number of ballot styles

13   in Texas is astronomical compared to Georgia and --

14   because of all the boundary lines.  None of them --

15   you could have 13 splits in a precinct.

16          And you had to offer each voter -- you

17   would have to put all the vote -- all the ballot

18   styles into file folders and then offer a ballot

19   to -- three ballots to each voter.  They would pick

20   their own ballot of three, and you had to put them

21   back into the file folder.

22          And ballots got put into the wrong file

23   folders, so later on you would end up having

24   sometimes a ballot given out to a voter that was

25   incorrect.  That was a common, common mistake.  And

PURSUANT TO PROTECTIVE ORDER

Page 23

1    they were just always marked incorrectly.  You

2    know, voters didn't fill in the ovals the way

3    they're supposed to.

4         Q.   Was there some type of ballot recog --

5    resolution process that was used to discern the

6    voter's intent on those ballots?

7         A.   Yeah, they have -- we had some -- it was

8    called a ballot board.  At that -- I mean, I wasn't

9    ever involved in overseeing the ballot board, but

10   yeah, there was that sort of thing there.

11        Q.   And was the problem in part caused that

12   the early voting locations were

13   multi-jurisdictional and that's why they had to

14   have all these ballot styles available to the

15   people that showed up to vote there?

16        A.   Yeah.  They had -- they were countywide,

17   so you had to have the ballot styles for every part

18   of the county available at every early voting site.

19        Q.   And that problem wouldn't exist with

20   hand-marked paper ballots for the general election,

21   would it?

22        A.   Yes.  Yeah.  Because during early voting

23   you have to have all the ballot styles at all of

24   the early voting sites.

25        Q.   At the time --

PURSUANT TO PROTECTIVE ORDER

Page 24

```
 1        A.   There aren't as many ballot styles in
 2     Georgia, so it would be a little --
 3             (Whereupon, there was technical
 4         difficulty making the audio
 5         unintelligible.)
 6             (Whereupon, a discussion ensued
 7          off the record.)
 8             THE WITNESS:  Oh, I was just saying
 9         that in Georgia there are fewer ballot
10         styles.  So it would be a somewhat simpler
11         process here than it would be in Texas,
12         but you're still going to have -- you're
13         going to get ballots in incorrect folders
14         however you do it.
15             The early voting -- the number of
16         ballot -- the number of complaints with
17         voters getting the incorrect ballot is
18         going to go way up.  Because it dropped
19         dramatically from -- in Texas when we went
20         to an electronic system after using paper.
21     BY MR. KNAPP:
22        Q.   Could you overcome that problem by having
23     an early voting site for each particular ballot?
24        A.   No.  Because it -- you're required to have
25     them county-wide.  I mean, you -- well, you're
```

PURSUANT TO PROTECTIVE ORDER

Page 25

1    defeating the purpose of early voting at that

2    point, because early voting is so you can vote

3    anywhere.

4           You have to be able to vote anywhere

5    during the early voting period.  So the legislature

6    would have to change the law to make it so that you

7    would have to, like, vote in your precinct almost.

8           And then at that point it's, you know, why

9    do it.  It would be so costly.  You'd have to

10   have -- you'd have to have multiple election days

11   and, you know, that's a lot of money to spend.

12   Because the early voting period's 19 days.

13       Q.   And has the early voting process changed

14   in Fulton County since you came on in 2013?

15       A.   It's expanded.  I mean, we used to --

16   Fulton County would do three to six sites in an

17   election.  We had, like, for the presidential in

18   November 2020 we had 33 sites.

19       Q.   How many early voting sites did you have

20   in June of 2020?

21       A.   Oh, we only had five to start and then

22   eight at the end -- by the end.

23       Q.   And that was many less than you had

24   anticipated before that election took place?

25       A.   We didn't -- we planned on having 24 for

PURSUANT TO PROTECTIVE ORDER

Page 26

1       that election for June 2020.  But we lost most of

2       our workers and, you know, we couldn't do it.

3              Q.   Let's turn our attention now to topic

4       number one.  This is:

5                   "Any efforts made to air gap any

6                components of Georgia's current

7                election system as used in Fulton

8                County and the success or failure of

9                any such efforts."

10                  First of all, do you understand when we

11      use the term "air gap"?

12             A.   Yes.

13             Q.   And would you explain that, please?

14             A.   Well, it's a manner in which you keep --

15      you want to ensure that the -- nothing that is part

16      of the voting system, the B.M.D.s, scanners, the

17      server, that none of those are connected to the

18      Internet or that they have the capability to do

19      that.

20             Q.   And does that also include meaning that

21      those same systems have no connection to other

22      computers that might have access to the Internet?

23             A.   Yes.

24             Q.   Okay.  And what's your understanding --

25      first of all, what did you do to prepare to speak

PURSUANT TO PROTECTIVE ORDER

Page 27

1    to this topic?

2        A.   What did I do to prepare to speak to it?

3    I mean, I -- most of it's just based on my own --

4    it's just my knowledge of the system.

5        Q.   And to -- in your experience, are any

6    components of the Georgia current election system

7    exposed to the Internet in any way?

8        A.   Are you talking about the voting system or

9    are you talking about check-in for voters?

10       Q.   Well, the --

11       A.   I mean, if you're talking about the entire

12   election system, when we check voters in, that part

13   of the system is connected to -- it's connected

14   because we have to be able to access the voter

15   database.  But that system's fully -- I mean, that

16   system isn't part of the voting system.

17       Q.   You're talking about --

18       A.   The voting system is not connected at all.

19       Q.   You're talking about a poll pad system?

20       A.   Yeah.  Poll pad door or laptops for early

21   voting.

22            (Whereupon, there was technical

23        difficulty making the audio

24        unintelligible.)

25            (Whereupon, a discussion ensued

PURSUANT TO PROTECTIVE ORDER

Page 28

1          off the record.)

2              THE WITNESS:  What was I saying?

3      BY MR. KNAPP:

4          Q.   We were talking about the different

5      systems between the registration check-in system,

6      which did have connectivity, versus the actual

7      voting system, and you were drawing a distinction.

8          A.   Yes, we use laptops to check voters in

9      during early voting.  On Election Day we use the

10     poll pads.  The only thing the poll pads are used

11     for during early voting is just to activate the

12     card, the access card to get into the B.M.D.

13         Q.   But the poll pads are used in -- during

14     early voting for that function?

15         A.   Just, yeah, for vote -- yeah, for card

16     creation.

17         Q.   Describe where the card creation occurs

18     between the time a voter shows up and checks in at

19     a poll to when the card is given to the voter?

20         A.   Well, it just depends on the space at the

21     vote -- early voting sites.  Sometimes the poll

22     pad's sitting right next to -- next to the same

23     person that checks the voter in will then take the

24     card and create it to give voter access to their

25     ballot at the B.M.D.  Sometimes it's the next step

PURSUANT TO PROTECTIVE ORDER

Page 29

1      that it's at a different table.

2          Q.   And --

3          A.   It just depends on space and the, I guess

4      the skills of the workers that are assigned to

5      those locations.

6          Q.   And so the voter checks in, then the poll

7      pad generates a card which is given to the voter?

8          A.   Yes.  Somebody has to choose the ballot

9      style on the poll pad.

10         Q.   Okay.  And that's done by a poll worker,

11     the choice of the ballot style?

12         A.   Yes.

13         Q.   And then the voter takes that card and

14     walks over to a B.M.D.?

15         A.   Yes.

16         Q.   And they put that card into a B.M.D.?

17         A.   Yes.

18         Q.   And that activates the ballot style on the

19     B.M.D. for voting by the voter?

20         A.   Yes.

21         Q.   And then that B.M.D. generates a record of

22     the vote that allows the voter to look at that

23     record electronically on the screen?

24         A.   Yeah, it -- well, it prints what the input

25     was on the screen.  It doesn't store the votes.

PURSUANT TO PROTECTIVE ORDER

Page 30

1      Q.   I was just -- I was on the actual stage

2    just before the actual printing.  I was under the

3    impression that the voter had some opportunity to

4    look at the screen to look at their selection

5    before the printing.

6           Is that correct?

7      A.   Yes.

8      Q.   Okay.  And then the B.M.D. prints a paper

9    record; is that correct?

10     A.   Yes.

11     Q.   Describe for me what's on that paper

12   record.

13     A.   The selections that the voter made when

14   the voter voted.  And then what it -- when they hit

15   "cast ballot," that's what prints out.

16     Q.   And that record has a Q.R. code on it?

17     A.   Does it have a Q.R. -- I don't even

18   remember if it has a Q.R. code or a barcode.  I

19   don't know.  It's got a Q.R. code or a barcode on

20   it.

21     Q.   What do you recall what's on a ballot

22   produced by a B.M.D. voting machine in the Fulton

23   County election in the year 2020?

24     A.   I don't remember if it's a barcode or a

25   Q.R. code.  I think it's a barcode.

PURSUANT TO PROTECTIVE ORDER

Page 31

1    Q.   Okay.  And describe for the record, is the
2    barcode something that a voter could read to des --
3    to confirm whether or not that it would -- properly
4    recorded their vote?
5    A.   No.
6    Q.   Okay.  And is there a text portion of the
7    ballot that's been printed as well?
8    A.   Yes.  The ballot is printed out for the
9    voter to review, and it looks like a ballot, like a
10   paper ballot.
11   Q.   Okay.  And then the paper ballot is walked
12   over to a scanner?
13   A.   Yes.
14   Q.   And then fed into the scanner?
15   A.   Yes.
16   Q.   And then the vote is -- the ballot is
17   stored electronically on the scanner?
18   A.   Yeah.  The record -- yeah, the ballot is
19   read by the scanner, and then it drops into a
20   ballot box and the record of that -- of those votes
21   is recorded on the scanner in the on -- and there's
22   a flash card in there to record or store all of it
23   as well.
24   Q.   Now, let's start with the poll pad.  The
25   poll pad is loaded by WiFi?

PURSUANT TO PROTECTIVE ORDER

Page 32

1        A.    Yes.

2        Q.    And those are -- that's a WiFi system

3    maintained at the Fulton election center on English

4    Avenue?

5        A.    Yes.

6        Q.    And how often do the poll pads have to be

7    updated prior to an election so that the

8    information reflected on them is current?

9        A.    Oh, the bulk file is loaded on the

10   Saturday before Election Day.

11       Q.    Okay.

12       A.    There are updates that are done, I think

13   O.S. updates that are done on those in the -- maybe

14   in the days leading up to it.  The new -- I think

15   there's going to be a new process coming soon where

16   there's going to be every -- I think almost, not

17   every day, but several days leading up to it the

18   voter record is going to be updated so that the

19   Saturday upload isn't as bulky, doesn't take as

20   long.

21       Q.    It's a logistical challenge to update

22   everything on that Saturday before the election,

23   isn't it?

24       A.    Yes.  Because, yeah, the State requires us

25   to do something that's unnecessary, and it's,

PURSUANT TO PROTECTIVE ORDER

Page 33

1    frankly, dumb what they ask us to do, which is to

2    put the entire statewide voter file on the poll

3    pads.  There's no reason for it.

4              And KNOWiNK can site -- can cordon off a

5    boundary around your county to get around that, but

6    they don't do it.  The don't do it because the

7    State won't let them.

8        Q.   Have you made this recommendation to them

9    in the past?

10       A.   I've mentioned it, I think, in

11   conversation, but they don't care.

12       Q.   Why don't they care?

13       A.   Because they --

14             MS. LAROSS:  I object to the form of

15        the question.

16             THE WITNESS:  They know best.

17   BY MR. KNAPP:

18       Q.   Do they offer a reason why that approach,

19   which would lighten the load on Fulton County's

20   poll pad updating, isn't to their liking?

21       A.   No.

22       Q.   Now, how is the software on the B.M.D.s

23   loaded?

24       A.   It's updated with a U.S.B. stick.

25       Q.   And where does that U.S.B. stick come

Page 34

1    from?

2         A.   That'll come from the -- we get all of our

3    election files or election project from the State

4    center for election systems.

5         Q.   And do -- does Fulton County do any kind

6    of scan or other inspection of those sticks to see

7    whether or not they've been tampered with or

8    contain any malware?

9         A.   No.   I mean, the county doesn't do that,

10   no.   We get those -- those are delivered -- either

11   we pick them up ourselves or they are delivered by

12   the State to us, and they're sealed, and then we

13   use them from there.   And they go to direct cust --

14   the custody is from the State to the county.

15        Q.   In the June 2020 election, when was the

16   software updated into the B.M.D.s by this method?

17        A.   Well, it would have -- I mean, that --

18   it -- once we start logic and accuracy testing,

19   that starts.   I don't remember when the exact date

20   would have been.

21             But it's usually the ballots are prepared

22   sometime six to eight weeks, they're available six

23   to eight weeks before the Election Day, and then we

24   start doing logic and accuracy testing.

25        Q.   In 2020 how many precincts were in Fulton

PURSUANT TO PROTECTIVE ORDER

Page 35

1    County?

2         A.   Well, you want to know about polling

3    places or just the precincts themselves?

4         Q.   Let's do polling places.  How many

5    polling, active polling places, and I don't know if

6    the number is the same between June and November

7    and the run-offs and so forth, so share with me how

8    all that's configured?

9         A.   The number of precincts we have, I think

10   it's either 377 or 387.  I'd have to verify it.

11   The number of polling places we had for June was,

12   like, 164, I believe.

13        Q.   And who determines how many polling places

14   Fulton County had within any given election?

15        A.   We do, the elections department.  And you

16   know, we planned on having, I think, 204 for that

17   election, or 209, something like that.  We lost,

18   like, a quarter of our locations.

19        Q.   And that was due primarily to COVID?

20        A.   It was all from COVID, yeah.

21        Q.   I'll come back to that later.

22             But so if you, in fact, had 204 polling

23   places, how long did it take you to do the logic

24   and accuracy testing and the uploading of the

25   software onto the B.M.D.s by these sticks for the

PURSUANT TO PROTECTIVE ORDER

Page 36

1    June 2020 election?

2         A.   It takes several weeks.

3         Q.   And is the same thumb drive or hard -- or

4    computer stick that's used, does it change at all

5    during that period of time or is it just one

6    particular upload that's the same across all the

7    B.M.D.s and it did not change at all from the day

8    logic and accuracy testing started till the day the

9    election was run in June?

10        A.   Well, we get that project file on a stick,

11   and that's the one that we use to populate or, I

12   guess, use -- we use that for all of the -- all of

13   the B.M.D.s we have.

14        Q.   Do you take the inform --

15        A.   Or copies of that stick.  So.  Because we

16   have to have multiple sticks in order to do -- to

17   use all the machines, to program all the machines.

18   I'd have to ask Dominic how many we get.  I don't

19   know.

20        Q.   And does your staff duplicate the stick

21   such that it can then have multiple sticks to use

22   to upload the software onto the B.M.D.s?

23        A.   I don't know if the State -- I think the

24   State sends us multiple sticks, and then -- but I

25   don't -- I'd have to ask Dominic.  I don't know.

PURSUANT TO PROTECTIVE ORDER

Page 37

1     Q.    And I assume this all takes place at the

2     election center on English Avenue?

3     A.    Yes.  Or it did then most of the time.

4     Q.    What about the scanners, is there any

5     software loaded onto the scanners by the Fulton

6     County election system?

7     A.    At what?

8     Q.    Are there any -- is there any software or

9     any other accessing of scanners done by your people

10    to prepare the scanners for use in elections in the

11    year 2020 in Fulton County?

12    A.    Just a second.  So there's a siren going

13    by.  Can you say that one more time?

14    Q.    Sure.  Is there any software uploaded by

15    Fulton County to the scanners that are used by it

16    in its elections during the year 2020?

17    A.    Any software that we load onto the

18    scanners?  What kind of -- no.  I mean, we -- what

19    type of software are you referring to?

20    Q.    I'm asking you.

21    A.    We don't put any soft -- we haven't put

22    any software on there.  I mean, we got -- we had

23    one update that we had to put -- which I think was

24    a firmware update in 2020 from Dominion.

25    Q.    And when did Dominion ask you to make that

PURSUANT TO PROTECTIVE ORDER

Page 38

1   update?

2       A.   I don't re -- if some -- I think it was --

3   I don't think it was before the June election.  I

4   think it was before either maybe the August or

5   September election.  I don't remember.

6       Q.   And what was your understanding of what --

7   why it was necessary to upload this update from

8   Dominion to the scanners?

9       A.   I don't remember.

10      Q.   But it's your understanding this was --

11  this was done at each and every scanner that was

12  used in the August, September and November 2020 and

13  later elections that were conducted by Fulton

14  County?

15      A.   Yeah.  Yes.  I don't -- I don't know

16  exactly -- yeah, I don't remember much about that

17  process.  But I remember that we received some kind

18  of word from the State that we were going to have

19  to do some sort of firmware update.  But yeah, my

20  memory's foggy on that.

21      Q.   And this update, was it tested or assessed

22  or evaluated by Fulton County as to whether or not

23  that update contained any malware?

24      A.   We don't, I mean, we don't hand that -- we

25  take custody of those, and then they go into the

PURSUANT TO PROTECTIVE ORDER

Page 39

1    system.  But I believe Dominion had people that

2    came in that did those for -- if I remember right,

3    I think Dominion sent people in to do those

4    updates.  They had a team.  So our people really

5    weren't involved with it.

6        Q.   So just so I'm clear, Dominion's technical

7    people were given access to the scanners in the

8    Fulton election center to upload this firmware

9    update?

10       A.   Yes.

11       Q.   And did we have -- did the Fulton County

12   election officials have any technical people who

13   participated in that process?

14       A.   Did Fulton County have any tech -- I don't

15   know if our -- I don't think that our people helped

16   with that process.  I think we just gave them

17   access.

18       Q.   And do we know -- do your technical people

19   know what changes this update made to the firmware

20   of the scanners?

21       A.   I'm sure, yeah, I'm sure somebody probably

22   remembers what.  I don't remember what it was.

23   You'd have to ask them.

24       Q.   If you had to pick up your phone right now

25   and call someone to get that information, who would

PURSUANT TO PROTECTIVE ORDER

Page 40

1    you call?

2        A.   Dominic Olomo or Derrick Gilstrap, one of

3    those two.  I'm sure they would remember what the

4    purpose of it was.

5        Q.   Now, the Fulton elections facility on

6    English Avenue has a WiFi system installed there,

7    does it not?

8        A.   Yes.

9        Q.   And to what use does Fulton County make of

10   that WiFi system at its Fulton County election

11   center on English Avenue?

12       A.   What do we make of -- use -- what use do

13   we make of it?

14       Q.   Yes, sir.  How do you use it?

15       A.   Well, I mean, in -- there are -- Clerk of

16   Superior Court's over there.  The sheriff's over

17   there.  We're there.  And all of our computers we

18   need -- any of the computers that we use in our

19   offices are connected to that.

20            We do trainings there.  We'll need WiFi

21   for that.  We also do the bulk file upload.  So

22   just routine things that every office building has.

23       Q.   Separate and apart from the routine that

24   every office building has, is there any use of the

25   WiFi system on the elect -- at the English Avenue

PURSUANT TO PROTECTIVE ORDER

Page 41

1    election center that touches the election

2    equipment?

3         A.   No.

4         Q.   The poll pads?

5         A.   Well, yeah, the poll pads get connected to

6    it.  They get connected via Meraki devices, which

7    are secure WiFi access points.  And those are what

8    the information from the bulk -- the bulk files

9    transmitted through those and through a cache box,

10   and then they go into the -- into the poll pads.

11        Q.   And you mentioned again the bulk file

12   upload.  What's that?

13        A.   That's -- the bulk file?

14        Q.   The bulk file upload is what you referred

15   to, yes.

16        A.   That's the voter -- that's the voter list

17   for the State, the statewide voter list.  And it's

18   updated with everyone who's voted early or

19   requested an absentee ballot or returned an

20   absentee ballot.

21        Q.   And when is that done?

22        A.   The Saturday before Election Day.  But the

23   poll pads aren't part of the voting system.

24        Q.   Correct.  That's the check-in system;

25   correct?

PURSUANT TO PROTECTIVE ORDER

Page 42

1        A.    Yeah.

2        Q.    Well, other than they create a card that

3   then is taken and put into the B.M.D.s; is that

4   correct?

5        A.    Yes.  Yeah, they have -- the only

6   information on the card is that there's just -- it

7   just gives you access to a ballot, a ballot style.

8        Q.    Has Fulton County ever done an assessment

9   or evaluation as to whether or not information on

10  those cards is vulnerable or accessible to attack?

11       A.    No.  Not that I'm aware of.

12       Q.    These -- is that metracall (Phonetically)

13  devices?  I'm sure I mispronounced it.  Explain

14  what they are and what function they perform.

15       A.    Which devices?

16       Q.    You -- they -- you said there were certain

17  devices that --

18       A.    Devices, they're just, they're basically

19  WiFi access points, and I -- from my understanding

20  is that they're much more secure than a normal WiFi

21  access point.

22            I don't know if they encrypt the data.  I

23  don't know technically what it is.  But they're

24  used because they have, I think, much higher

25  security standards with them.  Other than that, I

PURSUANT TO PROTECTIVE ORDER

Page 43

1     don't really know anything about them.

2          Q.   How long has Fulton County used them?

3          A.   I think we first used them in the August

4     2020 election.  We did that or it might have been

5     the September 2020.  But they also, they helped us

6     speed up -- the more access points you have, the

7     faster you can get the information from the bulk

8     file onto the poll pads.

9          So you know, we were just having issues

10    with how long that bulk file takes.  I mean, it

11    wasn't just us.  Every county was having issues

12    with the bulk file just taking forever to get onto

13    the poll pads, which is why they're changing their

14    procedures for this year to try to speed it up.

15         Q.   And we'll talk about that.  There's a

16    report that talks about some of the proposed

17    changes.

18         How long -- I know it must have been

19    frustrating for you in that it seemed like it took

20    forever, but can you quantify exactly how long it

21    was taking to load the poll pads the Saturday

22    before the election in November of 2020?

23         A.   Oh, in November of 2020?  It took us --

24    Jesus, that one took about two full days to

25    conclude.  And it -- they -- one of our poll pads

PURSUANT TO PROTECTIVE ORDER

Page 44

1    weren't even ready for supply pick-up on Sunday

2    morning.  We had to deliver them on Monday.

3        Q.   And they were being delivered to --

4        A.   Polling places or poll work -- poll

5    managers or polling places.

6        Q.   And in typical polling places, how many of

7    the poll pads were being delivered?

8        A.   Well, I don't know how many -- I don't

9    remember how many poll pads we had to deliver.  I

10   think, you know, but it was probably somewhere in

11   the neighborhood of 25 to 50 precincts we had to

12   deliver the poll pads to.

13       Q.   And then it was up to the precinct to

14   distribute them out to the separate polling places?

15       A.   No.  We delivered them to the polling

16   places or to the poll manager who was assigned to a

17   polling place.

18       Q.   And --

19       A.   Usually they pick them up on Sunday.

20   Since we got this new voting system, well, several

21   times we've had to deliver these.  It's become

22   common, common practice where it just takes forever

23   for that bulk file.

24            Because the number of poll pads that we

25   have, we don't have enough warehouse space, we

PURSUANT TO PROTECTIVE ORDER

Page 45

1    don't have enough -- you know, if there are -- if

2    there are -- our carriers are in there, the signal

3    interfered -- the carry -- the metal carriers

4    interfere with the signal.

5            There's just a lot of things that compound

6    the problem for us.  That's why we're getting a new

7    facility.

8        Q.   In the June 2020 election, how long did it

9    take to upload the bulk file?

10       A.   I think we got done on Sunday evening,

11   like, maybe -- it was sometime between 5:00 and

12   7:00 or 5:00 and 8:00 on the Sunday evening.  So it

13   took us a long time.

14       Q.   And then once the --

15       A.   We started at 7:00 a.m. on Sun --

16   Saturday.  But we were -- I mean, some counties

17   were doing it still on Monday.

18       Q.   So this was not a problem unique to Fulton

19   County?

20       A.   No.

21       Q.   The -- most of the counties you're

22   referring to, were those metro counties or were

23   there other counties --

24       A.   I talked to --

25       Q.   -- besides Fulton County that had that

PURSUANT TO PROTECTIVE ORDER

Page 46

1    same problem?

2         A.   I talked to several metro director --

3    metro area directors, and they all had issues with

4    them.  Some of them were having to take their poll

5    pads to the State.  Some of them were having to

6    take their poll pads to Dominion warehouse.  Some

7    of -- where KNOWiNK had space and, yeah, in

8    addition to having them go at theirs because it was

9    so slow.

10        Q.   Had the slowness been an issue in the June

11   2020 election?

12        A.   Yeah.  I mean, it wasn't -- yeah, we -- I

13   mean, I just said we got them done between 5:00 and

14   8:00 on Sunday.  Supply pick-up starts at 9:00 a.m.

15   on Sunday.  So if your -- if you don't have your

16   poll pads ready by 9:00 a.m. on Sunday morning,

17   then you're going to have to deliver those.

18        Q.   And how -- and how is the delivery

19   handled?

20        A.   We just have people from our warehouse

21   take them out to either homes or polling places and

22   deliver them.

23        Q.   Is -- has there ever been an occasion

24   where those people were intercepted in some way or

25   some fashion and such that someone took control of

PURSUANT TO PROTECTIVE ORDER

Page 47

1    a poll pad before it got to a polling place?

2         A.    No.

3         Q.    Is there any concern about protecting that

4    delivery such that that doesn't happen?

5         A.    No.  I mean, you -- we're handing -- we

6    hand them out on Sundays to the poll managers, who

7    have put them in, you know, they put them in their

8    cars, either take them to the poll -- you know,

9    it's the same -- it's probably a -- you know, I

10   don't know.

11        I would assume that our delivery probably

12   makes it a more direct process than having the poll

13   managers come pick them up.  But the process is

14   just to hand them out on Sundays anyway to the poll

15   managers.

16        Q.    Is that process common among the other

17   metro counties?

18        A.    Yeah.  I mean, I would -- it's common

19   across the country for some sort of process along

20   those lines to happen.

21        Q.    Okay.  Let's go to topic number four:

22             "Any execution or operational

23         issues or challenges with Georgia's

24         current election system, including any

25         Fulton County 2020 or 2021 elections,

PURSUANT TO PROTECTIVE ORDER

Page 48

1            any solutions or other measures

2            implemented, planned, contemplated to

3            resolve, remediate, mitigate or

4            otherwise address any such issues or

5            challenges, and the success or failure

6            of such efforts."

7                What did you do to prepare for this

8    subject?

9         A.   I mean, I talked with both counsel.  On

10   all of the topics, I mean, the coun -- my counsel,

11   you know, we went through the topics I would be

12   talking about.  Most of it is just going to be from

13   my knowledge of things.

14        Q.   There were reports done on the challenges

15   and operational issues at each one of these

16   elections in '20 and 2021; is that correct?

17        A.   There were reports and what done?

18        Q.   Reports done on the -- Fulton County's

19   elections in 2020 and 2021, one by the Secretary of

20   State and several from an organization called Seven

21   Hills; is that correct?

22        A.   Yeah.  There was -- the Secretary of State

23   appointed a monitor for our November and January

24   election.

25        Q.   What was the name of that monitor?

PURSUANT TO PROTECTIVE ORDER

Page 49

1          A.    Carter Jones.

2          Q.    Is Carter Jones a company or a person?

3          A.    He's a person.  And he -- I think Seven

4     Hills is his -- that's his consulting firm.

5               MR. KNAPP:  Adam, bring up Exhibit

6          Number 9, if you would, please.

7                         (Whereupon, Plaintiff's

8                         Exhibit 9 was marked for

9                         identification.)

10              THE WITNESS:  So at this point I go

11         into --

12    BY MR. KNAPP:

13         Q.    If you could bring up in -- out of

14    Veritext, it's the system, the exhibit system, it

15    would be Exhibit Number 9.  And I'm asking my

16    colleague to publish the document independently on

17    the screen.

18         A.    Oh, okay.

19              MR. SPARKS:  Yes.  I'm doing so now.

20         One moment.

21              THE WITNESS:  This is Exhibit 1?

22    BY MR. KNAPP:

23         Q.    Exhibit Number 9.

24         A.    Oh, okay.  I don't think I have that.  I

25    mean, I don't have that in --

PURSUANT TO PROTECTIVE ORDER

Page 50

```
 1        Q.   Okay.
 2        A.   -- there.
 3             MS. RINGER:  It's in there now.  So
 4        Rick, you would have to maybe push the
 5        refresh, top left-hand, the circle with
 6        the arrow.
 7             MR. SPARKS:  Exhibit 9 has been added
 8        to the Marked Exhibits folder.  I'll share
 9        my screen as well.
10   BY MR. KNAPP:
11        Q.   Mr. Barron, would you take a moment and
12   read this series of E-mails going back and forth
13   between Blake Evans and Scott Tucker and Chris
14   Harvey?
15        A.   Okay.  How many pages are there?
16        Q.   It's just the one page you see on your
17   screen.  It carries over to the second page, and
18   there's some contact information in the signature
19   line from Mr. Evans --
20        A.   Oh.
21        Q.   -- it looks like.
22        A.   Okay.
23             (Whereupon, the document was
24        reviewed by the witness.)
25             THE WITNESS:  Okay.
```

PURSUANT TO PROTECTIVE ORDER

Page 51

1    BY MR. KNAPP:

2         Q.   This E-mail is talking about an incident

3    where two ballots are printed by the B.M.D.s.  Are

4    you familiar with this type of episode at any time

5    in the 2020 elections conducted by Fulton County?

6         A.   I, this, I vaguely remember this.  This

7    looks like it was on Election Day for the September

8    29th election.

9         Q.   And that was a more limited election than

10   the general election in -- presidential election in

11   November?

12        A.   Yeah.  It was about in half the county.

13        Q.   Okay.  And what was the problem that's

14   being discussed here?

15        A.   Well, it looks like somebody tried to

16   print a ballot and it didn't print.  And then maybe

17   the same thing happened to the next guy.  And then

18   when they went and they gave him a new card, it

19   ended up printing both of those ballots.

20        Q.   Are you familiar with whether or not the

21   Dominion system was designed in such a way that, if

22   a ballot was incomplete, that when you came back to

23   the ballot a second time, that it would print both

24   the first iteration of the ballot and then the

25   result of the changes made at the second time the

PURSUANT TO PROTECTIVE ORDER

Page 52

1    ballot was visited by the voter?

2             MS. RINGER:  Objection to the form of

3        the question.

4             You can answer, Rick, if you --

5             THE WITNESS:  Oh.

6             MS. RINGER:  -- know the answer.

7             THE WITNESS:  I mean, I don't -- I

8        don't know how it was designed.  I vaguely

9        rec -- remember this scenario happening,

10       but it's -- if I -- if I remember right,

11       this is the only time I remember hearing

12       of it happen.  But I don't know how the

13       system was designed.

14   BY MR. KNAPP:

15       Q.   Mr. Tucker is with Dominion, which is the

16   manufacturer?

17       A.   Yes.

18       Q.   And were Dominion representatives on call

19   during all these elections to deal with issues like

20   this?

21       A.   Well, we trained people to go out into the

22   field to deal with, you know, general issues.  I

23   don't know that there was anybody that would have

24   had specific knowledge of this, this situation.

25             I think the State might have had some

PURSUANT TO PROTECTIVE ORDER

Page 53

1    technicians out there, but you -- we tried to get

2    our own rather than -- and then have Dominion train

3    them.

4        Q.   Do you have any understanding whether this

5    incident was widespread at any time during the

6    elections conducted by Fulton County in the year

7    2020?

8            MS. RINGER:  Objection to form of the

9        question.

10           Go ahead and answer, Mr. Barron.

11           THE WITNESS:  Okay.

12           I only remember -- I mean, I -- this

13       is the only thing that I have memory of.

14       But if there was something else, then --

15       if this happened another time, I don't

16       know that I'm aware of it.

17   BY MR. KNAPP:

18       Q.   If there's a problem such as this at a

19   polling pre -- a polling place, what's the process

20   for documenting the problem within the Fulton

21   County election administration?

22       A.   Well, if we get something in on a call, we

23   have a system called WebEOC that we log problems

24   into.  If it comes in -- it depends on how, you

25   know, if it -- it depends on how this came in.

PURSUANT TO PROTECTIVE ORDER

Page 54

1          You know, if it -- it could get escalated
2      by phone right away without getting logged in.
3      Everybody's supposed to log their problems into
4      WebEOC.  So.
5          Q.    And what's the name of that log-in system?
6          A.    It's called WebEOC.
7          MR. KNAPP:  Let's turn and publish
8      Exhibit Number 10.
9                          (Whereupon, Plaintiff's
10                         Exhibit 10 was marked for
11                         identification.)
12         MR. SPARKS:  Exhibit 10 has been
13     published.  I'm sharing my screen now.
14     BY MR. KNAPP:
15         Q.    This is a multi-page document, Mr. Barron,
16     two and a half page -- let's, can we start at the
17     back of the document since it's an E-mail chain?
18         A.    Yeah.  Is this in Veritext?
19         Q.    It should -- it should be in Veritext as
20     well.
21         MR. KNAPP:  Is it there, Mr. Sparks?
22         THE WITNESS:  Okay.  I've got it.
23     I'll --
24     BY MR. KNAPP:
25         Q.    Why don't you --

PURSUANT TO PROTECTIVE ORDER

Page 55

1         A.    I'll --

2         Q.    -- click on that and read it.

3         A.    Okay.

4              (Whereupon, the document was

5          reviewed by the witness.)

6              THE WITNESS:   Okay.

7    BY MR. KNAPP:

8         Q.    Okay.   It starts with an E-mail from a

9    gentleman named Harold Franklin, reporting to

10   someone named -- and I don't want to mispronounce

11   Ms. Jenkins' name.

12             Do you know Ms. Jenkins?

13        A.    Yep.

14        Q.    Who's she?

15        A.    Breauna Jenkins.   She was just an

16   administrative coordinator in my department.

17        Q.    Okay.   And what is her responsibility when

18   she receives an E-mail like this that was

19   transmitted on June 9th regarding machines down and

20   polling places not open?

21        A.    She would have escalated it within the

22   office either to, probably to Blake Evans at that

23   point or she could have also, you know, let --

24   Blake would have been the first person she would

25   have contacted with it, I'm sure, along with maybe

PURSUANT TO PROTECTIVE ORDER

Page 56

1    me or Johnny Harris.

2         Q.   If you look at the second E-mail, it looks

3    like she's escalating it to Joe Evans, Johnny

4    Harris, yourself and Sharon Benjamin.  Do you see

5    that?

6         A.   Yep.  Yeah, I guess that's what she would

7    have done.

8         Q.   And what were these people supposed to do

9    when receiving an E-mail with such a notice in it?

10        A.   Well, we would reach out to the polling

11   place and, you know, determine what the issue was.

12   I mean, that -- a lot of issue -- we had a lot of

13   problems in the June election that morning.  So.

14             You know, speaking to -- and specific

15   things is going to be pretty difficult at this

16   point.  But you know, the basic procedure is that

17   you elevate it.  And then either Blake or me or

18   Johnny or Sharon or Nadine may have called the

19   locations to find out what the issues were.

20        Q.   Now, was this the first time that the new

21   B.M.D. system was being used in a widespread manner

22   in an election year in Fulton County?

23        A.   Yes.

24        Q.   And what support, if any --

25        A.   (Inaudible) because of the B.M.D.s.  I

PURSUANT TO PROTECTIVE ORDER

Page 57

1    mean, we weren't having machine -- we weren't

2    having problems with the B.M.D.s.  That's not what

3    was causing this.

4            It was, you know, we had to train workers

5    virtually.  We had a lot of new people.  We had a

6    lot of people drop out.  There were long lines

7    because a lot -- most people didn't vote early at

8    that time because we had very few early voting

9    sites.

10           So I think a lot of people just had

11   problems opening up their equipment that morning

12   because they weren't used to it.  It was the first

13   time the system was used, and I would say that they

14   didn't get the hands-on training that they normally

15   would get.

16   Q.   Let's focus on the issue of being able to

17   open the equipment and get it to operate first

18   thing on the morning of June 9th.  You attribute

19   some of that to training issues.

20           Were there any mechanical issues or issues

21   with regard to power supply or other issues that

22   related to the equipment itself that impaired their

23   ability to open the polls on time?

24   A.   Well, in some cases, yeah, there may have

25   been electrical issues that where maybe some of the

PURSUANT TO PROTECTIVE ORDER

Page 58

1    polling sites, there were too many machines plugged

2    in to the same outlets for -- and were overloading,

3    you know, the circuit on a certain -- a certain

4    electrical circuit would get un -- overloaded.  So

5    yeah, that, that did happen.

6            As far as equipment issues, I don't -- I

7    don't think there were really any issues with the

8    B.M.D.s that were caused by the B.M.D.s.  I think

9    it was more just either electricity or just poll

10   workers not understanding what they needed to do.

11       Q.   Who was responsible for training the poll

12   workers on this new equipment?

13       A.   Johnny Harris and Blake Evans were.

14       Q.   And what role, if any, did the Secretary

15   of State play in preparing them to train these

16   folks?

17       A.   I mean, we all, we received training from

18   Dominion in December on the equipment.  And then we

19   had to get -- I mean, it took us -- it took a lot

20   for us to get the State to produce any kind of poll

21   worker manual on the system.

22            I mean, we essentially had to bug the

23   State, you know, kind of tell them, look, this, we

24   think this is your responsibility to come up with a

25   poll worker manual for the State.  They didn't

PURSUANT TO PROTECTIVE ORDER

Page 59

1    really seem to have any sense of urgency about

2    that.

3            But other than that, I mean, the State was

4    pretty hands-off when it came to the system.  We

5    got -- we got some short training with Dominion.

6    They provided a basic poll worker manual.  And then

7    we had the big, thick Dominion manual, so we had

8    to, you know, come up with a -- with a manual for

9    training.

10           You know, fortunately, most of it was

11   done -- we started training people before the

12   presidential preference primary.  But you know, we

13   were -- during -- it was during early voting when

14   we shut that election down, so most of the election

15   workers didn't receive any in-person training.  And

16   that was really the main problem.

17           With the -- as far as the electrical, the

18   State was -- had -- I think they, if I remember

19   right, they had contracted with someone to go out

20   and check electrical, they did -- to do an electric

21   at survey at polling places.  And I'm thinking it

22   was all before the June election that they were

23   supposed to have done that.

24           I know that after the June election Fulton

25   County went out and we surveyed everything.  We

PURSUANT TO PROTECTIVE ORDER

Page 60

1    figured out which outlets in all of those polling

2    places were the ones that had to be used so that

3    poll workers would, you know, no longer have

4    problems with electricity.

5         Q.   How long did it take the State to prepare

6    the poll workers manual?

7         A.   I don't remember.  I think we got it

8    sometime in February, maybe the latter part of

9    February in 2020, which was just weeks before

10   the -- it was pretty close to when early voting

11   started for the March election.

12        Q.   Did the Secretary of State prepare Fulton

13   County for the different burdens that would be on

14   it as a result of using this new system that the

15   State had elected to purchase?

16             MS. LAROSS:  I object to the form of

17        the question.

18             THE WITNESS:  Did they prepare us?

19   BY MR. KNAPP:

20        Q.   Yes.

21        A.   You know, I mean, they provided the

22   Dominion training.  You know, with the pandemic the

23   way it was, I'm not really sure -- you know, I'm

24   not sure what could have been done at that point.

25             But you know, I mean, obviously looking

PURSUANT TO PROTECTIVE ORDER

Page 61

1    back they -- you know, I think everyone could have

2    done a better job, but I don't think anybody really

3    knew what to do in the middle of a pandemic that

4    was beginning.

5           And nobody -- everybody was uncertain

6    about what was going to happen, if we were going to

7    put people in rooms and try to train them.  So.

8    But I mean, overall I think the State was fairly

9    hands-off.

10   Q.   And in terms of the decision to -- that

11   the Secretary of State made to mail out absentee

12   ballot applications to all the citizens, did you

13   have any forewarning that was about to take place?

14   A.   Yeah.  I don't remember how much.  I mean,

15   I thought it was a good decision to do that.  I

16   just, I don't think that -- you know, obviously --

17   I don't think everyone was prepared for it in the

18   flood of applications that were going to -- that

19   came.

20          I mean, it was -- it would have been

21   better to have an on-line portal, I think.  And

22   from what I was told of two different consulting

23   companies, they had -- they had told the Secretary

24   of State's office that a portal could be -- could

25   be constructed quickly and put up.

PURSUANT TO PROTECTIVE ORDER

Page 62

1      Q.   And that portal would have allowed for the

2   management of the dispersion and collection of

3   absent -- dispersion of absentee ballot

4   applications and the subsequent mailing of --

5      A.   What would --

6      Q.   (Inaudible due to cross-talk).

7      A.   What would have happened is people would

8   have been able to go on-line and apply for the

9   applications, and then it would have been on a

10  dashboard.  And it's my understanding that U.S.

11  Digital Response could have done it probably in a

12  week and that that would have -- that would have

13  made everything a lot smoother.

14          I mean, I'm not going to -- I'm not going

15  to fault the Secretary of State for mailing out

16  those absentee ballot applications, because I think

17  it definitely had to be done.

18          But you know, we just didn't -- just

19  trying to find, for us trying to find the space

20  and, you know, and put all the people together and

21  social distance and get all the computers ready

22  and -- for the amount of applications that came in

23  was just, it was like a flood.

24          And you know, the person that was in

25  charge of absentee by mail got COVID and was out

PURSUANT TO PROTECTIVE ORDER

Page 63

1    for a month.  And one of the other people that was

2    key to him doing that got COVID and died, so not

3    really -- you know, we just had a lot of -- we had

4    technical issues just with the way those things

5    were coming in.

6              So you know, a portal would have been much

7    more helpful.  And when I found out that -- the

8    discussions that had happened up at the State, you

9    know, it was -- and but apparently, the voter

10   registration system, if something happened with the

11   voter registration system, they wouldn't -- that

12   vendor was not keen on allowing someone to build

13   something that would plug into it.

14             So I'm not privy -- I don't have -- I

15   don't have firsthand knowledge to the discussions.

16   I've just been, you know, told by some of the

17   people that were in those discussions what was

18   said.  So it's --

19        Q.   Well, so in prior elections, the workload

20   of your staff to deal with absentee ballots was

21   relatively light in light of the fact that perhaps

22   a thousand absentee votes was the most ever cast in

23   an election prior to June of 2020; is that correct?

24        A.   No.  We had done, I think in the pres --

25   in 2016's presidential we had processed about

PURSUANT TO PROTECTIVE ORDER

Page 64

1    somewhere around 30,000 absentee by mail ballots.

2    But you know, you're also -- we must have got

3    some -- we got around maybe 40,000 applications.

4         For the June election we received

5    somewhere in the neighborhood of, I don't know, is

6    it 160, 180 thousand applications.  And a lot of

7    them, you know, they were duplicates that would

8    come in, because there were different

9    organizations.

10        Not only did the State send applications

11   out, but if I remember right there were some

12   third-party organizations that would send

13   applications out.  So we were getting, you know,

14   sometimes two or three applications from the same

15   person without knowing it until you're processing

16   the application.

17   Q.   And so the amount of resources that it --

18   that Fulton County had to dedicate to handling the

19   absentee ballot applications was certainly

20   materially different in June of 2020 and -- would

21   you agree with that?

22   A.   Oh, it wasn't even -- yeah.  It was

23   nowhere near what we had done before.  It was -- we

24   had people spread out in multiple places throughout

25   a couple of buildings.

PURSUANT TO PROTECTIVE ORDER

Page 65

1    Q.   And if I understand correctly, it was the
2    responsibility of Fulton County, when an
3    application was turned in, to take that information
4    and then input it into, was it an electronic system
5    maintained by the Secretary of State?
6    A.   Yeah.  ElectioNet, the voter registration
7    system.
8    Q.   Right.  And that turned out to be quite an
9    administrative challenge in part because of COVID;
10   is that correct?
11   A.   Yes.
12   Q.   You want to explain how that was -- why
13   that was difficult and how that turned into a
14   problem in part?
15   A.   Well, I mean, we -- you know, for that --
16   the number of applications that came in, we had
17   to -- we had to get -- you know, getting enough
18   staff to come in and process those applications and
19   process all that mail, that was a big undertaking.
20       I mean, and especially trying to do it
21   with spreading people out and trying to keep
22   people, you know, separated while they did this
23   work, trying to find the space for it.  I mean, we
24   had some people working from home with
25   applications.

PURSUANT TO PROTECTIVE ORDER

Page 66

1          We had -- we just had several different

2     areas where we had to place people.  And we had to

3     get all of the laptops up and -- for more people to

4     process those, find the places for them, make sure

5     that there was good WiFi.

6          I mean, the printers that would -- when

7     they came in and people would print off the

8     applications -- because what we were trying to do

9     was print the applications so that we would have

10    them in batches.

11         But for some reason, because of all the

12    different formats they were coming in, our

13    commercial printers, they just did not print off of

14    those like the copier printers that we had.

15         So they would send over ten print jobs,

16    and maybe seven or eight of them would print out

17    and the other two would just sit in spool and it

18    would back up other people's -- other requests that

19    were coming in behind it.

20         We had technicians coming in from, I think

21    it was Canon or whoever had a -- was the vendor for

22    our copiers to just, they were in there all the

23    time trying to clear everything.  And we'd have to

24    go back and try to print what we had sent before.

25         And there were things of all sizes.

PURSUANT TO PROTECTIVE ORDER

Page 67

1    Sometimes you couldn't even read the applications

2    because, I don't know what they scanned them on,

3    but you're getting a 50 megabyte -- 50 kilobyte

4    file and you couldn't even make out what was on the

5    thing.  Sometimes, you know, the files were just

6    gigantic, 15 megabytes.

7             And when they came in before, they would

8    come in to a couple different E-mail addresses, and

9    those were meant to distribute out to several

10   people.  When they distributed out, everybody's --

11   the memory in all of these computers and on -- and

12   on the network would just -- got overwhelmed.

13            So it was like one application would then

14   go out to ten computers, the next application would

15   go out to ten, you know, it would -- so there got

16   to be issues with memory and -- it was a mess.

17       Q.   And did you have any inkling when the

18   Secretary of State sent out these applications that

19   there would be these technical problems as well as

20   manpower problems as well as the COVID problems?

21       A.   Well, we knew there would be -- I mean, we

22   talked about the COVID issues, and we talked about

23   getting enough manpower in there.  But the

24   technical issues I think caught everyone off-guard.

25            And it took a -- it took a little bit of

PURSUANT TO PROTECTIVE ORDER

Page 68

1    time to work through the technical problems to

2    figure out -- I mean, once they figured out what

3    was happening with the E-mail and why, you know,

4    there was basically one application would get just

5    multiplied, and there -- these were pictures, you

6    know, they were photos of applications.

7           So the amount of memory they were taking

8    was just massive.  And I don't think anybody

9    figured out right away what was -- there were

10   people that couldn't even log in to their own --

11   into their own computer anymore because the memory

12   was gone.  They couldn't even get into their

13   E-mail.

14          So it just delayed applications getting

15   processed.  Some applications just were missed.  I

16   mean, you know, it was a good thing to mail them

17   out, but I don't think anybody thought about the

18   ramifications of it.

19          Q.   And --

20          A.   From what I heard from some other counties

21   used some methods that, you know, our I.T.

22   department thought that they were, you know, they

23   weren't the most secure methods for receiving these

24   applications.  So.

25          Q.   And the widespread use of absentee

PURSUANT TO PROTECTIVE ORDER

Page 69

1     ballots, did it have any impact on the lines that

2     occurred in June at the polling places?

3          A.   Yeah.  Yes.  Because you know, people

4     weren't getting their ballots in time or they

5     didn't get them at all, so they went to the polls

6     instead.

7               And usually what happens is if, you

8     know -- and this is going to be compounded this

9     year.  With SB -- what SB-202 has done, it's going

10    to create a similar situation.

11              But it -- if you have -- once early voting

12    starts, if the voter doesn't have their ballot in

13    hand, they usually will go in and they will cancel

14    that application for an absentee by mail in the

15    polling place, and that takes extra time.

16              And that happened back in 2020.  And just

17    depending on how many applications we get or

18    absentee by mail going forward, SB-202 has created

19    a scenario that's going to make that problem just

20    as bad.

21         Q.   And in part the poll worker, when

22    presented with someone who may have applied for an

23    absentee ballot, on occasion would they -- it be

24    necessary for them to have a telephone

25    communication with the main office of the Fulton

PURSUANT TO PROTECTIVE ORDER

Page 70

1    County Election Board to verify whether the status

2    of this voter was, in fact, correctly reflected in

3    the poll pad or elsewhere of the registration

4    system?

5        A.    You're asking whether somebody -- if

6    somebody went into the polling place, whether a

7    phone call would have to be made back to the office

8    to determine whether that person indeed filled out

9    an absentee ballot application or whether

10   we'd received the ballot.

11       Q.    Correct.

12       A.    Right?

13       Q.    Correct.  And whether -- and whether that

14   caused delay in the polling places?

15       A.    Yeah, that causes a delay in the polling

16   places, yes.

17       Q.    And let's digress for a moment.  But in --

18   how -- you know, a lot of the absentee ballots

19   obviously came in through the dropboxes.  I think

20   Fulton County may have had, what, 28?  And now

21   under SB-202 the number is much more limited,

22   perhaps only eight.

23            Is that what you were referring to when

24   you thought SB-202 was going to exacerbate the

25   situation?

PURSUANT TO PROTECTIVE ORDER

Page 71

1        A.    No.   They crunched the time down when we

2   can mail them out before early voting.   So close to

3   when early voting starts, the same thing's going to

4   happen.   Because you can only -- you have to -- you

5   can only mail them out a certain time be -- certain

6   amount of time before Election Day.

7            So people are going to get -- the way the

8   mail system is working now with -- it's slow to get

9   anything through the mail.   They -- by the time

10  early voting starts, no one's going to have their

11  ballots.   And if they don't have their ballots,

12  they're going to go to the polling place and

13  they're going to cancel their absentee by mail.

14           So you know, I mean, the legislature does

15  things without thinking, and this is one of those

16  things that they've done.   They don't -- they don't

17  understand how to administer an election, and so

18  they pass laws that aren't workable.   And I don't

19  think they -- you know, I -- it's hard for me to

20  believe that nobody told them that this is going to

21  happen, but it will.

22           Now, if there -- people aren't going to

23  vote by mail as much, it's not going to be as big

24  of a problem.   But if people had a good experience

25  voting by mail and they can do it again and it's in

PURSUANT TO PROTECTIVE ORDER

Page 72

1    a significant -- you know, significantly higher

2    numbers than we used to get when we would have

3    30,000, it's going to be a problem at the polling

4    place when people go to cancel those applications.

5        Q.   And as a result of these additional

6    processes, does Fulton County have to dedicate more

7    resources to deal with complaints and responding to

8    complaints and answering to issues on Election Day?

9        A.   Yes.  And during early voting.  I mean,

10   we've got now, I mean, since 2020, I mean, we've

11   contemplated it before, but we just weren't getting

12   the money from the County with regard to budget

13   but, you know, we've got -- we usually have a

14   full-time call center now starting at a certain

15   point before the election begins just to handle all

16   this stuff.

17       Q.   Let's talk about provisional ballots for a

18   moment.  Was there a breakdown in the -- in the

19   system for use of provisional ballots in the June

20   2020 election?

21       A.   I don't know.  I -- can you be more

22   specific to what you're referring?

23       Q.   Sure.  Were adequate numbers of

24   provisional ballots at all the voting -- polling

25   places in Fulton County in June of 2020?

PURSUANT TO PROTECTIVE ORDER

Page 73

1    A.   Did we have enough?  I don't remember.  I

2    mean, there may -- we may have -- the thing is, is

3    that, if you -- you can use the B.M.D.s to vote

4    provisionally.

5         So you know, really you never -- you will

6    never run out of the ability to -- there might -- I

7    think we had more of an issue with provisional

8    ballot supplies rather than provisional ballots,

9    because you can print provisional ballots off of

10   the B.M.D.s.

11        I believe there were shortages.  I just

12   don't really remember the details about them.  But

13   I think it had more to do with running out of

14   supplies --

15   Q.   And --

16   A.   -- (inaudible due to cross-talk).

17   Q.   -- following up on that answer,

18   provisional ballots have to be put inside a certain

19   kind of envelope.  Is that -- is that your -- what

20   you recall?

21   A.   Yeah.  There's a provisional ballot

22   envelope.  There's a -- that they're placed in.

23   Q.   And the integrity of the provisional

24   ballot is reliant on it, in fact, being in this

25   envelope.  So if there's a shortage of envelopes,

PURSUANT TO PROTECTIVE ORDER

Page 74

1      then that undermines the ability of that

2      provisional ballot to be counted; is that fair?

3          A.   Well, yeah.  But we -- there's certain

4      information that's needed so that you can do

5      research whether that pro -- the person that has

6      voted provisionally actually is a qualified voter.

7               So if that information is not with the

8      ballot, it is more difficult, yes, or all --

9      impossible, I guess, to determine whether it's a

10     valid vote.

11         Q.   What was the most prevalent complaint that

12     voters made in the June 2020 election?

13         A.   I don't even remember.  I mean, there --

14     it depended upon the day.  I mean, during early

15     voting there were complaints be -- with regard to

16     lines.

17              Because you know, especially the first two

18     weeks, we had about -- we had about one-fifth of

19     our normal early voting sites open.  We had -- by

20     the end it was maybe one-third of our normal early

21     voting sites were open.  So we had problems with

22     lines.  I mean, that was the big thing during early

23     voting.

24              On Election Day there were just a lot of

25     workers that, you know, they didn't understand the

PURSUANT TO PROTECTIVE ORDER

Page 75

1      system that they were operating as well as they

2      could have or should have based on what I'd spoke

3      about earlier with regard to training and an

4      unfamiliarity with the new system.

5              We had fewer polling places and fewer poll

6      workers available, so there were -- there were

7      lines.

8          Q.   Let's look at Exhibit Number 11.

9              MR. KNAPP:  Adam, could you pull that

10     up, please?

11                      (Whereupon, Plaintiff's

12                      Exhibit 11 was marked for

13                      identification.)

14             MR. KNAPP:  And we've been going

15     about an hour and a half.  So after I

16     question you about this exhibit, why don't

17     we take a short break.

18             THE WITNESS:  Okay.

19             MR. SPARKS:  Exhibit 11 has been

20     introduced.  Sharing the screen now.

21             THE WITNESS:  Whoops.  I'm looking at

22     this in Veritext.  Let me review the

23     E-mail.

24     BY MR. KNAPP:

25         Q.   That's good.

PURSUANT TO PROTECTIVE ORDER

Page 76

1          (Whereupon, the document was

2       reviewed by the witness.)

3          THE WITNESS:  Okay.  I read the...

4     BY MR. KNAPP:

5       Q.   Okay.  This starts with an E-mail from the

6     Elections Complaint Alerts at SOS.GA.gov.  Do you

7     see that?

8       A.   Yeah.

9       Q.   What is that?

10      A.   The complaints can go -- any voter can

11    explain to the Secretary of State's office about

12    any election issue.

13      Q.   And is this Web address -- I mean, E-mail

14    address part of the Secretary of State's office?

15      A.   This is the S.O.S. E-mail address you

16    referred -- to which you --

17      Q.   Yes.

18      A.   -- referred?

19      Q.   Yes.

20      A.   Okay.  Yes.

21      Q.   Okay.  And if the Secretary of State's

22    office was forwarding a complaint or an issue to

23    the Fulton County office, who at Fulton is supposed

24    to be responsible for reviewing and handling those

25    complaints?

PURSUANT TO PROTECTIVE ORDER

Page 77

1      A.   Well, they send it -- it goes to an S.O.S.

2      investigator, and then they will -- they will then

3      contact our office.  And some of the investigators

4      that have been there a while -- like, Frances was

5      familiar with my staff.

6           So she -- Frances would send something to

7      me and maybe to one of my staff.  Or just if she

8      knew which staff member could probably handle it,

9      she would just ask them questions about it.

10      Q.   I mean, was it really your responsibility

11      to dealing -- be dealing with individual complaints

12      or were you responsible for systemic issues?

13      A.   Yeah, I mean, I don't -- I don't really

14      respond to individual complaints.  Most of my staff

15      does that sort of thing.

16           Frances, though, will just, I mean, she

17      usually will C.C. me on some things when she's

18      E-mailing my staff.  And some of the other --

19      usually Frank Braun or Paul Braun would -- he

20      would -- he knew my staff pretty well, too.

21           But they -- he would usually either ask me

22      to have a staff member get back to him or just

23      E-mail them specifically and C.C. me on it.

24      Q.   Who's Blake Evans?

25      A.   He was the elections chief in Fulton

PURSUANT TO PROTECTIVE ORDER

Page 78

1    County and -- through the -- through June 2020, and

2    then he became -- now he's the director of

3    elections for the State of Georgia, and he was the

4    deputy -- he got hired by the S.O.S. to be the

5    deputy elections division director after the June

6    election.

7         Q.   Is that a good thing for Fulton County?

8         A.   That he was hired?

9         Q.   Yes.  I mean, you lose a -- you lose a

10   colleague, is that a good thing or a bad thing?

11        A.   Well, I mean, it was good for Blake.  I

12   mean, it was a good -- I mean, he, you know, he --

13   I think he got a job that was more a 40-hour-a-week

14   job and was able to be home with his family.  And

15   he has a young family, and he had a baby on the

16   way.  So.  And it was a -- it's essentially a

17   promotion for him, so I'm not going to, you know,

18   begrudge him for that.

19             With us it -- we -- you know, it kind of

20   put us in a bad spot going into the next elections

21   but, you know, we wished him well and...

22        Q.   How did it kind of squeeze you going into

23   the next election without Mr. Evans there as a

24   resource?

25        A.   Oh, we had to find a new elections chief.

PURSUANT TO PROTECTIVE ORDER

Page 79

1    And so I had to ask my previous elections chief,

2    who had retired, to see if he would come out of

3    retirement and maybe come to work for six months

4    for the rest of the year.

5         Q.    And back to Exhibit Number 11, there's

6    this complaint.  It goes up the chain to Mr. Evans

7    and Mr. Harvey.

8         A.    Yes.

9         Q.    Mr. Harvey is with the Secretary of

10   State's office; is that correct?

11        A.    Yes.

12        Q.    And he asks whether someone can check

13   out -- check this out, and Ms. Watson says okay.

14   Is it part of the responsibility of the Fulton

15   County election staff to go check out every

16   complaint that the Secretary of State might forward

17   to them?

18        A.    Well, what they're doing is they're --

19   they are letting us know in this -- yeah, we'll --

20   I mean, we get -- if we find out about a complaint,

21   we'll usually get in touch with the poll manager

22   unless we already know about it.

23             And I don't -- I don't have any

24   recollection of Warren Jackson School having an

25   issue, but it's -- you know, it could have.  I

PURSUANT TO PROTECTIVE ORDER

Page 80

1      don't know.  But yeah, they'll usually just -- you

2      know, Johnny Harris was responsible for

3      investigating anything that -- if it came to us.

4              Usually, if a -- if something like this

5      happened, we'll get in touch with the poll manager,

6      find out what happened.  And then we'll give the

7      information also to whichever investigator is going

8      to look at the matter.

9              MR. KNAPP:  Okay.  Why don't we take

10        a short break.  It's 10:47.  Why don't we

11        come back -- I mean, 11:47.  Why don't we

12        come back at 12:00 noon.

13              (Whereupon, a discussion ensued

14         off the record.)

15              THE VIDEOGRAPHER:  The time is 11:47

16        a.m.  We are now off the record.

17              (Whereupon, a discussion ensued

18         off the record.)

19              (Whereupon, there was a brief

20         recess.)

21              THE VIDEOGRAPHER:  The time is 12:01

22        p.m., and we're back on the record.

23              MR. KNAPP:  Thank you.

24              Adam, bring up, if you would, Exhibit

25        Number 13.

PURSUANT TO PROTECTIVE ORDER

                                              Page 81

1          MR. SPARKS:  Exhibit 13, stand by.

2                      (Whereupon, Plaintiff's

3                       Exhibit 13 was marked for

4                       identification.)

5          MR. SPARKS:  Exhibit 13 should be

6      published.  Sharing screen now.

7          MR. KNAPP:  Thank you, Adam.

8  BY MR. KNAPP:

9      Q.   I'm showing the witness Exhibit 13, which

10  starts as -- it's a two-page exhibit.  It starts

11  again as an E-mail from the Elections Complaint

12  Alerts at SOS.GA.gov.  It seems to be sent to

13  Elections Complaints at SOS.GA.gov, which is kind

14  of interesting.

15          Have you ever seen this document before?

16  It looks like at the top it was then forwarded to

17  you.

18      A.   If I saw it, I don't -- well, let me read

19  it real quick, but I mean --

20      Q.   Please do.

21      A.   -- I...

22          (Whereupon, the document was

23       reviewed by the witness.)

24          THE WITNESS:  I don't remember this

25      at all.

PURSUANT TO PROTECTIVE ORDER

Page 82

1    BY MR. KNAPP:

2         Q.   Okay.

3         A.   I mean, have I seen it?  I mean, it's

4    possible.  I mean, you know, it went to my E-mail

5    box, so I'm sure I saw it at some point, but I have

6    no recollection of it.

7         Q.   Okay.  The issue of having precincts

8    merged or precinct locations changed, how did

9    that -- did that practice occur in the June 2020

10   election?

11        A.   Yeah.  Yes.  We had to -- we had to

12   consolidate a lot of precincts into polling places.

13   Now, between June and August, I don't remember if

14   we tried to increase the number of polling places

15   between June and August.

16             I would say that you usually don't want to

17   change your polling places between a general

18   primary and a run-off or a general election and a

19   run-off.  So.

20             But I -- so I don't know, we may have

21   added ten more polling places or something, but

22   that merger probably would have been done prior to

23   the June election.

24             Sometimes voters might -- you know, they

25   will log a complaint and they don't have all the

PURSUANT TO PROTECTIVE ORDER

Page 83

1    information.  So I'm not sure, you know, it's

2    hard -- it's kind of hard to -- unless I go through

3    the whole history of what happened between June and

4    August, it'd be really hard to talk about this.

5         Q.   You'd agree that changes in polling

6    locations or precincts is sometimes difficult to

7    voters if they don't keep themselves up to date?

8         A.   Well, yeah.  Yeah.  I mean, you want to

9    avoid polling place changes as much as possible

10   unless they're necessary, especially between an

11   election and its run-off.

12        Q.   And --

13        A.   It doesn't look like he voted -- it

14   doesn't look like he voted in the general election

15   at the polling place.  He went to the run-off --

16        Q.   Correct.

17        A.   -- and voted in person.

18        Q.   Correct.  So it very well may have changed

19   in June and he wasn't aware of it until he actually

20   appeared in person in August, it sounds like.

21        A.   Yes.

22        Q.   Now, back -- going back to June 2020,

23   there was, and my understanding, and correct me if

24   I'm wrong, is that there was significant

25   consolidation in certain precincts, with perhaps

PURSUANT TO PROTECTIVE ORDER

Page 84

1      the most famous being the Park Tavern situation.

2          A.   Yeah.

3          Q.   And of course, that was the one that the

4      national news, of course, took pictures of.  That,

5      aside from that --

6          A.   It was also an analysis done that it was

7      the, I think the third most efficient polling place

8      in the whole state that day processing voters per

9      hour.

10         Q.   Yeah.  It was processing, like,

11     approximately 150 an hour or more?

12         A.   Yeah.  The -- yeah.  But the problem was

13     there were about 400 people in line before the

14     polls opened, so it was behind the eight ball

15     before they even got going.

16         Q.   Of course, you know, the size of the

17     precinct had something to do with it as well;

18     wouldn't you agree?

19         A.   Yeah.  But we also -- we also found out

20     ten days before the election from A.P.S. that Grady

21     High School was going to be no longer available,

22     and we didn't have anywhere else to put those

23     voters except at Park Tavern.

24         Q.   Right.  I'm not trying to suggest that you

25     had a viable alternative.  The circumstances sounds

PURSUANT TO PROTECTIVE ORDER

Page 85

1    like it forced on you to make use of the precincts

2    that you had available to you to handle the voters

3    you had; is that -- is that fair?

4        A.   Yep.

5        Q.   And it appears -- what's the normal number

6    of registered voters that you like to have in a

7    precinct?

8        A.   I mean, it's best to have, I would say,

9    less than 5,000, 5,000 or less.

10       Q.   And due to COVID and the -- and the loss

11   of a number of locations at schools and other --

12   and senior homes and the like in June of 2020, you

13   had to do some precinct consolidation at much

14   larger numbers; is that correct?

15       A.   For June?

16       Q.   Yeah.

17       A.   Yeah.

18       Q.   June 2020.

19       A.   Yeah.  We had, I mean, 40 some polling

20   places that we didn't use.  So --

21       Q.   Okay.

22       A.   -- those voters all got combined with

23   other locations.

24       Q.   Did the Secretary of State play any role

25   in this precinct re-allocations?

PURSUANT TO PROTECTIVE ORDER

Page 86

1          A.   No.

2          Q.   And is it -- how many voters were

3     ultimate -- registered voters were ultimately

4     placed into the Park Tavern precinct?

5          A.   How many registered voters -- you broke up

6     for me.  You said how many voters something.

7          Q.   How many registered voters were

8     consolidated into the Park Tavern precinct for June

9     of 2020?

10          A.   I think there was right around 16,000,

11     something along those lines.

12          Q.   Now, you were bringing perspective to that

13     in part by pointing to the efficiency of that

14     particular precinct; is that correct?

15          A.   Yes.

16          Q.   And it's not simply a measure of

17     necessarily of the size of the precinct but also

18     how efficient that particular precinct is in

19     processing voting; is that correct?

20          A.   Yeah.  And if you have a long line before

21     the polls open, even if you are the most efficient

22     place in the state and you have -- you have 400

23     people in line and you could process 170 voters per

24     hour, just to clear out the line that's there

25     before the poll opens you're going -- you -- that's

PURSUANT TO PROTECTIVE ORDER

Page 87

1    going to take you, you know, three hours, or two

2    and a half hours, just to clear those voters out,

3    not to mention the ones that continue to get in

4    line.

5         Q.   Is there -- is there a way to deal with

6    that?

7         A.   Well, yeah, through early -- well, the

8    best way to deal with it is to have a lot of early

9    voting or absentee by mail, and you take the

10   pressure off of the polling places.  And you also

11   have enough Election Day polling places.

12            You know, by the time November rolled

13   around, I think we had two hundred and, I think, 64

14   Election Day polling places.  We increased the

15   number by a hundred.  And we also, you know, we

16   ran -- we had 33 early voting sites.

17            So we had the most number of people and

18   the highest percentage of people that had ever

19   voted early voted in that November election.  They

20   voted -- the highest proportion, like 60 percent,

21   they voted early, and which broke the 59.1 in the

22   previous presidential.

23            And then we had 28 percent vote by mail in

24   November and -- of the people who voted, they voted

25   by mail.  So only 12 percent of the voters showed

PURSUANT TO PROTECTIVE ORDER

Page 88

1      up on Election Day for the November 2020 election.

2              And now, in June it wasn't even -- the --

3      probably could flip those numbers.  The more people

4      you have showing up on Election Day, you don't have

5      enough Election Day polling places to handle them,

6      you're going to have lines.

7          Q.   And the World Congress Center as a voting

8      site, did that -- did that help carry the load on

9      Election Day?

10         A.   You mean for -- well, we didn't use -- we

11     used the Georgia World Congress Center for logic

12     and accuracy testing.  And then for the January

13     election we used that all for absentee by mail.  We

14     were using State Farm Arena for early voting for

15     the November election.

16             And they, yeah, they, I mean, they could

17     have processed 15,000 voters a day there

18     comfortably.  They were doing 4,000 without

19     straining on some days.

20             And yeah, it was a big help.  Because

21     most, you know, most polling -- early voting

22     polling places, if they do a thousand in a day,

23     they're swamped all day.  So State Farm could do it

24     easily.

25         Q.   Is there any prospect that that number of

PURSUANT TO PROTECTIVE ORDER

 1    polling places and --

 2         A.   I'm there.  I just --

 3         Q.   I know.  I've got a puppy, too.  She rules

 4    my life.

 5              Anyway, is there a prospect that that kind

 6    of intensity of polling places and scope such as

 7    the State Farm Arena are going to be part of the

 8    general practice of the Fulton County elections in

 9    the future?

10         A.   I don't know.  When the presidential rolls

11    around, the president of the Hawks indicated he

12    might be interested in doing something again.  And

13    it's possible that Mercedes-Benz might accommodate

14    it as well, because they jumped in in January.

15              I know for the governor's, I don't believe

16    for the fall election that either one of them are

17    going to be involved.  We'll probably have the same

18    number but, you know, getting a mega-site like

19    that, it -- you know, their, whatever their

20    schedule is is going to determine whether they're

21    going to want to get involved in that.

22         Q.   Did they do that gratis or were --

23         A.   Yes.

24         Q.   -- were you able to compensate them for

25    taking on some of these --

PURSUANT TO PROTECTIVE ORDER

Page 90

1       A.   They did --

2       Q.   -- duties?

3       A.   They did it for free.  And State Farm used

4    their own employees and paid them themself -- paid

5    them to be there.  We only had about maybe four

6    people that we assigned at State Farm, and the rest

7    of them were all Atlanta Hawks State Farm

8    employees.

9       Q.   That's remarkable, isn't it?

10      A.   Yes.

11          MR. KNAPP:  Okay.  Let's see, how

12      about turning to -- let's try Exhibit

13      Number 25.  Let me make sure it's not

14      privileged.  Yes, 25.

15                    (Whereupon, Plaintiff's

16                     Exhibit 25 was marked for

17                     identification.)

18   BY MR. KNAPP:

19      Q.   This is a PowerPoint of a number of pages,

20   perhaps ten.

21          MR. KNAPP:  Adam, can you bring that

22      up, please?

23          MR. SPARKS:  Yes.  I'm working on it

24      now.

25          MR. KNAPP:  Thank you.

PURSUANT TO PROTECTIVE ORDER

Page 91

1          MR. SPARKS:  Exhibit 25 has been

2     published.  Sharing screen now.

3          MR. KNAPP:  It should be in the

4     share -- is it in the Share file as well?

5          MR. SPARKS:  Yes.  It should be by

6     now.

7          THE WITNESS:  I'm checking for it as

8     well.

9  BY MR. KNAPP:

10     Q.   Yeah.  Take your time.  It's kind of long,

11  Rick.  But when you find it, read through it and

12  then tell me when you've had a chance to digest it.

13     A.   Okay.  I've got it up now.

14          (Whereupon, the document was

15      reviewed by the witness.)

16          THE WITNESS:  Okay.  I mean, I've

17     kind of, I've breezed through it.  I've --

18     okay.

19  BY MR. KNAPP:

20     Q.   Have you seen this PowerPoint before --

21     A.   No.

22     Q.   -- Mr. Barron?

23     A.   No.

24     Q.   Okay.  And in your experience as executive

25  director of the Fulton County Board of Elections

PURSUANT TO PROTECTIVE ORDER

Page 92

1    and Registration, was it common to have a

2    PowerPoint like this generated, presumably by the

3    Secretary of State, critiquing the Election Day

4    issues as they were handled by Fulton County?

5         A.    No.

6              MS. LAROSS:  And I object to the form

7         of the question.

8              And also, Halsey, since this is a

9         document that's marked "confidential,"

10        that this portion of the transcript ought

11        to be confidential as well.

12             MR. KNAPP:  That's obviously

13        agreeable.  Thank you.

14    BY MR. KNAPP:

15

16

17

18

19

20

21

22

23

24

25

Page 93



PURSUANT TO PROTECTIVE ORDER

Page 94

18          MS. RINGER:  I'm sorry.  Can I ask

19     that we go off the record for a second?

20          MR. KNAPP:  Sure.

21          THE VIDEOGRAPHER:  The time is 12:21

22     p.m.  We are now off the record.

23          (Whereupon, a discussion ensued

24      off the record.)

25          THE VIDEOGRAPHER:  The time is 12:26

PURSUANT TO PROTECTIVE ORDER

Page 95

1      p.m.  We're back on the record.

2              MR. KNAPP:  Adam, let's pull up

3      Defendant's [sic] Exhibit Number 34.

4              MR. SPARKS:  34, stand by.

5                      (Whereupon, Plaintiff's

6                       Exhibit 34 was marked for

7                       identification.)

8              MR. KNAPP:  Ms. LaRoss, this and

9      several others emanate from the State

10     Election Board, so I'm bringing them up

11     now so that we can determine whether or

12     not you need to get additional information

13     on them to determine whether or not you

14     feel that discussion of them in this

15     deposition would not be appropriate.

16             Okay?

17             34 is marked "confidential."

18             MS. LAROSS:  Sorry.  Sorry.  Excuse

19     me.  I was on mute.  I was responding to

20     you.  Sorry about that.

21             Okay.  So can you send them to me so

22     I can take a look at them before we show

23     them to the witness and have them part --

24     become part of the deposition?

25             MR. KNAPP:  Yes.

PURSUANT TO PROTECTIVE ORDER

Page 96

```
 1          Adam, would you forward it -- forward
 2     Exhibits 34 and 35 and 12 -- 12, 34 and 35
 3     to Ms. LaRoss for her -- and you might as
 4     well send it to -- is it okay to send it
 5     to Mr. Ringer at the same time, Diane?
 6          MS. LAROSS:  Is -- they're documents
 7     that were produced by the State to all
 8     parties in this action --
 9          MR. KNAPP:  That's what -- yeah, it's
10     very --
11          MS. LAROSS:  -- to the attorneys?
12          MR. KNAPP:  Yep, it's -- they're all
13     marked "confidential" -- well, the second
14     one is not even marked "confidential," but
15     I -- it doesn't have a Bates number on it,
16     which makes me curious.
17          Why don't you look at them,
18     Ms. LaRoss, and decide whether they should
19     be shared with Ms. Ringer.  But I don't
20     want to leave her out if it's appropriate
21     for her to review, that's all.
22          MS. LAROSS:  Sure.
23          MS. RINGER:  Thank you.
24          MS. LAROSS:  Okay.  I don't want to
25     leave you out, Cheryl.
```

PURSUANT TO PROTECTIVE ORDER

Page 97

1            All right.  Thanks, Halsey.  I think
2        that's a reasonable request, sure.
3            MR. KNAPP:  Okay.  Let me -- let's go
4        back to Exhibit Number 26.
5                      (Whereupon, Plaintiff's
6                       Exhibit 26 was marked for
7                       identification.)
8            MR. SPARKS:  All right.  I've
9        E-mailed intended Exhibits 34 and 35 to
10       counsel for State defendants and Fulton
11       defendants.  I will now pull up Exhibit
12       26.  Stand by.
13           MS. RINGER:  I will wait to take a
14       look at the documents until Diane notifies
15       me that she thinks it's okay.  I just --
16           MS. LAROSS:  Thank you.  Yeah, I
17       haven't received them yet, but they should
18       be coming any moment.
19           MR. SPARKS:  Exhibit 26 has been
20       published.  Sharing screen now.
21           MR. KNAPP:  Thank you.
22   BY MR. KNAPP:
23       Q.  This appears to be a two-page E-mail
24   chain, starting with a gentleman by the name of
25   Varghese, with Ryan Germany and Jordan Fuchs.

PURSUANT TO PROTECTIVE ORDER

Page 98

1          A.    This is -- this is Number 26 you're

2     wanting me to open?

3          Q.    Yes.  Please open Number 26.

4          A.    Okay.

5          Q.    I don't see you marked on this E-mail

6     anywhere, but let me ask you this.  On Election Day

7     in June of 2020, we've talked some about the

8     machine issues that prevented opening on time, do

9     you -- were you ever contacted by the Secretary of

10    State's office on that day with regard to the

11    complaints being raised by this Mr. Varghese?

12         A.    I don't remember.  I mean, it's possible.

13    I don't -- his name doesn't ring a bell.

14         Q.    Okay.  And there's nothing about this

15    E-mail that I can see that adds any color to the

16    issues we've already discussed about the problems

17    that related to those late openings due to the

18    machines.

19               Is that true for you as well?

20         A.    That -- okay.  Sorry.  I was reading this

21    last -- what?  Can you repeat that, please?

22         Q.    Yes.  I don't see anything that adds any

23    more detail to the discussion we've already had

24    about the causes of the late openings on June 26th.

25               Would you agree?

PURSUANT TO PROTECTIVE ORDER

Page 99

1      A.   No.

2      Q.   No, it doesn't?

3      A.   I don't think so.  I mean, I'm not sure if

4    these are the same polling places listed, but --

5    oh, yeah, these are actually from various counties.

6      Q.   Yeah.  It looks like there's one or two

7    having to do with Fulton.

8      A.   Yeah.

9      Q.   One of them is Liberty Baptist Church, and

10   the other is William Walker Rec Center.  I'm not

11   sure I recall those, but you would know better than

12   I.

13          MR. KNAPP:  Exhibit Number 26,

14      please, Adam -- I mean 27.

15                    (Whereupon, Plaintiff's

16                    Exhibit 27 was marked for

17                    identification.)

18          MR. SPARKS:  Exhibit 27 has been

19      published.  Sharing screen now.

20          MR. KNAPP:  Thank you.

21   BY MR. KNAPP:

22      Q.   Mr. Barron, this is a --

23      A.   Very long E-mail.

24      Q.   -- yeah, eight-page E-mail that starts

25   originally from Julie Houk of the Lawyers'

PURSUANT TO PROTECTIVE ORDER

Page 100

1    Committee for Civil Rights Under the Law.  It began

2    with her entry on July 13th at 3:37 p.m.

3          Do you recall in that time frame an issue

4    arising as to whether non-partisan absentee ballots

5    were be -- for the primary and general run-off

6    election were being distributed instead of

7    Democratic Party ballots?

8        A.   Yeah.  There -- yeah, I remember something

9    about it.

10       Q.   If there --

11       A.   I was --

12       Q.   Go ahead.

13       A.   You want me to read through this to --

14       Q.   Yes.  Refresh your recollection on it, and

15   we'll -- and I'll ask you a further question.

16       A.   Okay.

17          (Whereupon, the document was

18       reviewed by the witness.)

19          THE WITNESS:  Yeah, it references, at

20       some point it references that I had

21       responded to something, but I don't see

22       the res -- my response in there.  And then

23       it goes on.

24          (Whereupon, the document was

25       reviewed by the witness.)

PURSUANT TO PROTECTIVE ORDER

Page 101

```
 1              THE WITNESS:  Okay.  Looks like

 2         there's some correspondence in -- that

 3         isn't in the chain that is referred to.

 4         So.  I mean, I somewhat remember this.

 5    BY MR. KNAPP:

 6         Q.   As best you can given that there is some

 7    part of the conversation that's not before us at

 8    the moment, you do reply to Ms. Houk and say:

 9              "I'm going to ask the State to do

10          this since it was their error."

11              Can you explain why you were of that

12    opinion?

13         A.   If I --

14         Q.   (Inaudible due to cross-talk)?

15         A.   There were, for some reason there were

16    some voters that were sent incorrect ballots.  And

17    it was part of a -- there was a mail-out that was

18    done where the ballots went I think from the ballot

19    vendor, it was probably Runbeck, and those ballots

20    were mailed.

21              And I don't -- I can't -- it was either,

22    like, 700 voters or 1,100 voters that were supposed

23    to receive ballots as part of a, like -- because

24    they had requested them for both elections.

25              They received non-partisan ballots
```

PURSUANT TO PROTECTIVE ORDER

Page 102

1    incorrectly and they -- for the June election, and

2    it was marked that they -- they received ballots

3    from one party.

4              I think that they got Democrat ballots in

5    June, I believe, and then in July -- or for the

6    August election they started receiving -- these

7    voters were all getting non-partisan ballots rather

8    than the ballots from their party.

9              And we weren't involved in that process

10   because they -- it was just something that where it

11   was an auto -- a file that was sent from the State

12   to --

13             (Whereupon, there was technical

14        difficulty making the audio

15        unintelligible.)

16             (Whereupon, a discussion ensued

17        off the record.)

18             THE WITNESS:  -- to Runbeck, the

19        ballot vendor, who would mail these out.

20             And somehow the ballot -- all of

21        these people had a certain -- they were --

22        the ballots were supposed to go, from a

23        certain party were supposed to go to those

24        voters.  I believe that they were Democrat

25        ballots.

PURSUANT TO PROTECTIVE ORDER

Page 103

1           Whatever happened in -- with the file

2       that went from the State to Runbeck, they

3       were marked incorrectly, and so they were

4       sent non-partisan ballots instead.

5   BY MR. KNAPP:

6       Q.   So let me review and see if I understand

7   the process correctly.  The Secretary of State

8   would receive --

9       A.   (Inaudible).

10      Q.   -- would receive from various counties a

11  request for an absentee ballot which would be

12  loaded into the ENet system; is that what you said?

13      A.   Yeah.  And these would have been entered

14  in before the June election.  So they would have --

15      Q.   Okay.

16      A.   Their -- they would already have the

17  designation, and the designation would have been

18  correct in June.

19      Q.   All right.  And then the Secretary of

20  State would compile those into a transmittal that

21  it would take to Runbeck, who was the company that

22  was going to print the actual ballots and mail them

23  directly back to the individual voters?

24      A.   Yeah.

25      Q.   Okay.

PURSUANT TO PROTECTIVE ORDER

Page 104

1      A.    If I remember right, there was some

2    confirmation that we went back in and we looked at

3    these voters and noticed that they, when they had

4    been processed in the June election, they had

5    then -- something was changed in the file between

6    June and the August election.

7      Q.    And --

8      A.    They had been entered correctly initially.

9    So.

10      Q.    Okay.  And did your staff have continuing

11    access to the ENet system such that it's possible

12    that they were the ones that made these changes

13    or --

14      A.    This was --

15      Q.    -- are you of a different belief?

16      A.    This was something that was --

17          MS. LAROSS:  I object to the form of

18      the question.

19          Excuse me, Mr. Barron.

20    BY MR. KNAPP:

21      Q.    Go ahead.

22      A.    Me?

23      Q.    Yes.

24      A.    Yeah, I, I mean, I don't remember all of

25    the details.  It's been a couple years.  But I just

PURSUANT TO PROTECTIVE ORDER

Page 105

1    remember that where it went -- the error was on the

2    side of the State.

3        Q.   And it goes on and the discussion kind of

4    transforms --

5        A.   I can tell you this, the process is

6    supposed to be automatic.  So we would not have

7    been involved in those ballots going out to the

8    voters in August.  Because --

9        Q.   Got it.

10       A.   -- it was already designated what would --

11   the disposition of those prior to June.

12       Q.   Okay.  And is --

13       A.   It was on a rollover list.  It was a list

14   that would just, that would be generated and

15   automatically they would be sent.

16       Q.   And then the discussion moves to a

17   discussion where it says, quote:

18           "Rick Barron E-mailed me to advise

19        me that he would be issuing some sort

20        of guidance on the submission of

21        absentee ballot applications via

22        E-mail..."

23           Was there an issue with using E-mail as an

24   application means of communication that you found

25   not to be ideal?

PURSUANT TO PROTECTIVE ORDER

Page 106

1        A.   Well, there were no standards set for how

2     they would be accepted.  I mean, you could get them

3     in all sorts of file formats.

4             And so we wanted them to be of a certain

5     size, like, one megabyte to five megabytes in size,

6     and then you could only submit them in either

7     P.D.F. or I think -- what's the other -- there's

8     P.D.F. and P.N.G., and I don't remember what the --

9     there's, like, three or four common formats to

10    submit ballots.

11       Q.   Uh-huh.

12       A.   And so we were going to limit them to

13    that.  And if they were not submitted in a common

14    format, we were going to have the voter resubmit

15    them.

16            Because we didn't want to have the issues

17    with our printers again, and we wanted there to be

18    some sort of standard set about how voters could

19    submit the applications through E-mail.

20       Q.   And has that happened since that time,

21    that the more standard format requirements have

22    been in -- put in place by the Secretary of State?

23       A.   Well, no.  We did it at our -- at the

24    county level.

25       Q.   Okay.  And --

PURSUANT TO PROTECTIVE ORDER

Page 107

1        A.    The State put in a port -- then we built

2    our own portal as well through U.S. Digital

3    Response that was ready before the November

4    election.  We had a -- I think we got it ready in

5    August of 2020.  And I think the State came out

6    with their portal in September.

7        Q.    Okay.

8        A.    The portals made it much easier to process

9    the absentee applications.

10        Q.    It would have been helpful to have them in

11    the spring of 2020; correct?

12        A.    Yes.

13        Q.    All right.  Let's turn back to Exhibit

14    Number 1, which is the notice of deposition, and

15    look at topic number five.  But for the two

16    documents we have under consideration, I'm done

17    with looking at topic four, and let's look at topic

18    number five.

19        A.    What exhibit?

20        Q.    It's Exhibit Number 1.  And I'll have

21    Mr. Sparks republish that.

22        A.    Okay.  Oh, I see Exhibit 1 on there.

23        Q.    And turn to Page 6, if you would, please.

24        A.    Okay.

25        Q.    It reads, topic number five:

PURSUANT TO PROTECTIVE ORDER

1            "Any communications with the

2         Secretary of State about the

3          implementation and operation of the

4          election system in Fulton County."

5      A.   Okay.

6      Q.   Well, first let me ask, what, if anything,

7    did you do to prepare to speak to this topic?

8      A.   I mean, I spoke with my attorneys on it

9    about these things.

10      Q.   Did you review any documents?

11      A.   I haven't reviewed any specific documents,

12    no.

13      Q.   Okay.  Have you had -- have you, on behalf

14    of the Fulton County Board of Elections and

15    Registrations, had any communications directly with

16    the Secretary of State about the implementation and

17    operation of the election system in Fulton County?

18      A.   I mean, yeah.  I mean, it was -- I think

19    started in 2019, I guess.

20      Q.   Tell me as best you can recall of the

21    issues that you were discussing with the Secretary

22    of State.

23      A.   With the vote with the implementation?

24      Q.   Really it's not limited to any par --

25    subset of issues with the election system, but any

PURSUANT TO PROTECTIVE ORDER

Page 109

1    issue that you might be discussing with him over

2    that period of time.

3        A.   Are -- and are you talking specifically

4    about Secretary of State Raffensperger or just the

5    office?

6        Q.   I'm talking about the office as a whole.

7        A.   I mean, there were -- you know, they, I

8    think, would let us know when they thought we were

9    going to get our equipment delivered.  There were

10   communications about the training manual.

11           You know, there have been -- any issue, if

12   we had any issues arise -- I mean, I don't -- are

13   there specific issues you want to talk about?

14   Because...

15       Q.   Well, that --

16       A.   There have been, I'm sure there have been,

17   you know, conversations here and there throughout

18   the whole thing on a variety of topics, but I don't

19   know how to narrow that down for what you want

20   to...

21       Q.   Well, this is actually designed to elicit

22   all of those.  So you've got to help me break it

23   into digestible pieces, I guess is the way to say

24   it.

25       A.   I mean, we talk about the schedule, the

PURSUANT TO PROTECTIVE ORDER

Page 110

1    delivery schedule.  You know, they told us we'd

2    probably have all of our equipment delivered by

3    sometime in -- towards the end of January of

4    2020 --

5         MS. RINGER:  Rick, can you come

6         forward to your computer?  I think she's

7         having trouble, the court reporter is

8         having trouble hearing you.

9         THE WITNESS:  I think by the end of

10        January of 2020 we were supposed to have

11        all or most of our equipment.  They told

12        us, you know, the quantities we were going

13        to receive.  You know, there were

14        communications about picking up the old

15        equipment.

16        Do you have any questions on that

17        topic?

18   BY MR. KNAPP:

19        Q.   No.  I think we've explored those pretty

20   thoroughly.

21        A.   Okay.  You know, I mean, we've complained

22   about the poll pads taking forever and -- to upload

23   the bulk file.  And we -- I know that we made at

24   least one request about getting rid of this having

25   the statewide bulk file, you know, breaking it down

Page 111

1    into smaller portions so it didn't take so long to

2    update that.

3              I don't know what else I...

4        Q.   Well, did you ever have any discussions

5    with their office as to the impact that COVID was

6    having on your office, particularly with regard to

7    the June 2020 election?

8        A.   Oh, yeah.  Yeah, we -- I had some phone

9    calls.  Like, Blake and I talked to Chris Harvey a

10   few times about that, just about that we, you know,

11   we were losing polling places almost by the day at

12   some point.  And we were losing workers.

13             We were losing -- we didn't -- we had

14   lost -- we lost, like, six out of every seven early

15   voting worker that we would normally bring in.

16   They just didn't want to work.  We were losing

17   Election Day poll workers.  We were losing polling

18   places.  Yeah, we were talking about the impact.

19             We talked about the issues we were having

20   with regard to the absentee by mail process prior

21   to the June election.  And those were -- those were

22   some common -- we were trying to keep, I guess, in

23   fairly regular contact with them about that.  You

24   know, just the difficulties not being able to train

25   people in person was an issue.

PURSUANT TO PROTECTIVE ORDER

Page 112

1      Q.   Did they have any helpful recommendations

2    or resources they made available with you to deal

3    with these -- any of these issues?

4      A.   No.  It was mostly just keep, you know,

5    keep us abreast of developments.  You mean were

6    they offering help?

7      Q.   Yeah.  Were they help -- offering help?

8      A.   No.  But we were wanting to let them know

9    that there were -- you know, seemed like that the

10   train was about ready to derail.

11     Q.   And let me ask this, have you ever had any

12   conversations directly with actually Secretary of

13   State Raffensperger?

14     A.   No.  I don't think he would stoop so low

15   as to talk to me.

16          MS. LAROSS:  Again, I object to the

17        responsiveness of the answer.

18   BY MR. KNAPP:

19     Q.   Do you think the refusal -- no, I don't

20   know if "refusal" is the right word.

21          Would you have been better able to

22   discharge your duties and responsibilities if, in

23   fact, the Secretary of State Raffensperger would

24   have spoken to you if needed on cert -- on any of

25   these issues?

PURSUANT TO PROTECTIVE ORDER

Page 113

1          MS. LAROSS:  Object as to form.

2          THE WITNESS:  I don't know.  I don't

3      know what kind of -- I don't know what

4      kind of help they could have given unless

5      they were -- because I don't think they

6      have -- they didn't, I don't think they

7      had any resources to, you know, to provide

8      to any of the counties.

9          I think they have probably a limited

10     budget and they're stuck with what that

11     budget, you know, allotted to them.

12  BY MR. KNAPP:

13     Q.   Let me ask the same question with regard

14  to the State Election Board.  Have you ever had any

15  conversations with the State Election Board that

16  would be outside of an ongoing investigation?

17     A.   You mean about the new voting system?

18     Q.   Yes.

19     A.   I don't think so.  I mean, I had a couple

20  conversations years ago with -- just, you know,

21  informal conversations with a couple.  One of the

22  members used to be on a voter protection line.  And

23  so sometimes on Election Days he would call me if

24  he had an issue he wanted me to check on.  But

25  other than that, no.

PURSUANT TO PROTECTIVE ORDER

Page 114

1      Q.   Okay.  Were you expecting to have more

2    contact and communication with the Secretary of

3    State's office than you had during this period of

4    implementing a new election system?

5              MS. RINGER:  Objection to the form of

6         the question.

7              MS. LAROSS:  Same objection.

8              MR. KNAPP:  Let me hold on for a

9         moment.  And what is the objection?

10             MS. RINGER:  Calls for speculation.

11             MR. KNAPP:  Oh, okay.

12   BY MR. KNAPP:

13       Q.   Please answer if you can, Mr. Barron.

14       A.   You know what, I don't know.  You know, I

15   mean, I think when Kemp was Secretary of State, he

16   called on the phone probably three times, probably

17   E-mailed a few times, you know, personally, and

18   there wasn't a new voting system in place.

19             So you know, I would think that on

20   occasion, yeah, I guess I would have expected there

21   to be some, you know, with the biggest county,

22   there at least to be some conversation here and

23   there every once in a while.

24       Q.   Was the Fulton County's experience with

25   the lack of communication with the Secretary of

PURSUANT TO PROTECTIVE ORDER

Page 115

1    State himself common to the other counties as well

2    to your knowledge?

3        A.   No.

4            MS. LAROSS:  Objection to the form of

5        the question.

6            THE WITNESS:  Not from my

7        conversations with other directors.

8    BY MR. KNAPP:

9        Q.   And what did you learn from other

10   directors about the pattern of communications their

11   offices had with the Secretary -- with

12   Mr. Raffensperger?

13       A.   I just -- I mean, they told me that they,

14   you know, some of them have had -- some of them

15   have regular contact with him in some form or

16   fashion.  I don't know if it's phone calls or

17   whatever.

18           But you know, they either will be invited

19   to things or they will -- or they'll be, you

20   know -- I don't know what -- on what occasions they

21   speak to him, but it seems to me that there are at

22   least some regular conversations that happen

23   sometimes between him and some of the other

24   counties.

25       Q.   Do you have any understanding as to why

Page 116

1      the Fulton County experience was different than

2      these other counties?

3          A.   I can speculate as to --

4              MS. LAROSS:  Objection as to form.

5              THE WITNESS:  -- that but, you know,

6          that's -- all I can do is just speculate

7          on it.  So I only know him from, you know,

8          what he says and what he has his people

9          say about us and the adversarial

10         relationship he likes to have with us.

11         So.

12     BY MR. KNAPP:

13         Q.   Is the adversarial relationship helpful to

14     your mission to conduct elections within Fulton

15     County?

16         A.   No.

17             MS. LAROSS:  Objection as to form.

18             THE WITNESS:  No.  But I also think

19         the whole set-up in Georgia, which is --

20         seems to be unique to Georgia, is -- just

21         creates that atmosphere, the State

22         Election Board, the investigations of the

23         counties, the punitive punishments from

24         the State Election Board, binding things

25         over to the attorney general, these types

PURSUANT TO PROTECTIVE ORDER

Page 117

1          of things.
2              I mean, you know, the other states in
3          which I've worked, you know, the Secretary
4          of State's office is there as a helpful
5          resource to the counties.  And you
6          definitely -- I don't think you can say
7          that is the case in Georgia.
8              And I think the State Election
9          Board's relationship with the counties is
10          nothing but adversarial.  And it's -- you
11          know, I don't know what you want to call
12          it.  They're like kangaroo court sessions.
13          But that's, you know, here in Georgia
14          that's -- you just have to deal with it.
15     BY MR. KNAPP:
16          Q.   And do you have specific examples of such
17     dealings with the Secretary -- the State Election
18     Board in Fulton County?
19          A.   Well, I think, you know, you -- your -- a
20     complaint comes in, an investigator does a
21     complaint, they present it at the State Election
22     Board.  Sometimes you get notice a week ahead of
23     time of what's coming.
24              You don't even -- you might not even have
25     any records left because every two years you

PURSUANT TO PROTECTIVE ORDER

Page 118

1    dispose of the election records.  You may not have

2    any records to where you can present any sort of

3    defense on some of these charges that come up.

4            And it just seems like, you know -- I've

5    had outside observers mention to me that it seems

6    like, with regard to Fulton, everything gets bound

7    over to the attorney general on a -- for the same

8    type of case that it -- they will issue a letter of

9    instruction to one county but they send it over to

10   the attorney general for Fulton.

11           I don't -- I've never sat down and -- I

12   don't really pay attention to State Election Board

13   hearings.  If we have something, I'll appear for

14   it, but.

15           I don't know if it's true, but there are

16   quite a few people that say that that's the case.

17   And you know, it's -- I don't understand the

18   purpose of the State Election Board, to tell you

19   the truth.  I don't, you know, it doesn't -- it

20   doesn't serve any good purpose.

21           You know, the Secretary of State's office

22   in Texas when I was there, they got complaints,

23   they would forward them to you so that you could

24   look into them.

25           You know, they had a -- they have a staff

PURSUANT TO PROTECTIVE ORDER

Page 119

1      of attorneys that were there to answer questions.

2      They didn't tell you to just contact your county

3      attorney like we get at ours.  They -- it was a

4      helpful relationship and -- but now here it's just

5      top down.

6              MR. KNAPP:  It's 1:00 o'clock, and

7          let's break for lunch.  How long would you

8          like to break, everybody?  This is a

9          question to everybody.

10             THE VIDEOGRAPHER:  The time is 1:01

11         p.m.  We are now off the record.

12             (Whereupon, a discussion ensued

13          off the record.)

14             (Whereupon, there was a luncheon

15          recess.)

16             THE VIDEOGRAPHER:  The time is 1:57

17         p.m.  We are back on the record.

18             MR. KNAPP:  All right.  Adam, would

19         you publish document number 19?

20             MR. SPARKS:  Yes.  Stand by.

21                     (Whereupon, Plaintiff's

22                      Exhibit 19 was marked for

23                      identification.)

24             MR. SPARKS:  Exhibit 19 has been

25         published.  Sharing screen now.

PURSUANT TO PROTECTIVE ORDER

Page 120

1          MR. KNAPP:  Thank you, Adam.

2     BY MR. KNAPP:

3          Q.   Mr. Barron, this is a four-page document.

4          A.   Uh-huh.

5          Q.   And it starts with an E-mail from David

6     Greenwalt at KNOWiNK.com to Mr. Sterling,

7     Mr. Tucker at Dominion, regarding Fulton Advance

8     Voting Issue.  And then after that it gets

9     forwarded by Mr. Sterling to Bailey Brigitte -- or

10    Brigitte Bailey, I guess it is.

11         Are you fa -- would you read through this

12    and familiarize yourself with this issue, and then

13    I want to ask you some questions about KNOWiNK and

14    what's being described in Exhibit Number 19.

15         A.   Okay.

16         (Whereupon, the document was

17      reviewed by the witness.)

18         THE WITNESS:  Okay.  I've read

19    everything.

20    BY MR. KNAPP:

21         Q.   Okay.  It looks like in September of 2020

22    you were pulled into a conversation going on about

23    advanced voting and the status of the poll pads --

24    pads, yes; is that correct?

25         A.   Yes.

PURSUANT TO PROTECTIVE ORDER

Page 121

1      Q.   Tell me what you understand what was going

2   on there and what your views of the issues were.

3      A.   I don't know exactly what the issue was

4   based on this during the -- it sounds like we were

5   supposed to do a hard reset on all the poll pads,

6   which my guys were saying that they did.

7           EPulse is something that is available that

8   KNOWiNK has.  And I think sometime after this I

9   ended up having a meeting with the C.E.O. of

10   KNOWiNK, might have been in September, late

11   September.

12          But I think what the -- we wanted to

13   get -- we had purchased these things called -- or

14   we were about to purchase these things called

15   access point -- I'm forgetting the name at the

16   moment.

17      Q.   Okay.

18      A.   But what they do is would allow us, you

19   can set them up in the polling place and they will

20   allow you to have -- to see the status of the

21   polling place -- or of all the poll pads in the

22   polling place in real time throughout the day.

23          And if there is an issue, you can more

24   easily, I think, diagnose what the problem is and

25   what you need to do and whether you need to get a

PURSUANT TO PROTECTIVE ORDER

Page 122

1    technician out there to actually deal with it

2    instead of, you know, resetting it.

3            It also allows you to do things like you

4    know how many voters have been there with -- on

5    Election Day.  It would essentially just give you

6    more eyes on your own equipment in the field.

7            And it's something that I know, like, when

8    I worked in Texas back in 2009, '10, '11, we

9    were -- we already -- we had this technology

10   available to us through a vendor at Williamson

11   County a long time ago.

12           And for whatever reason, the State won't

13   let us have access to ePulse even once we purchased

14   the equipment that would allow us to do that.  So

15   we have -- so but I don't know what the exact issue

16   is.  I know we were just wanting to be able to have

17   status to look in on these things.

18           Oh, they were called cradle points.

19   That's what we purchased.  We wanted to be able to

20   look in so that we could do our own diagnosis and

21   solve problems and -- without having to call the

22   State and KNOWiNK and have to get a middleman

23   involved to do something that we could do

24   ourselves.

25           Q.   Was it called ePulse, E-P- --

PURSUANT TO PROTECTIVE ORDER

1      A.   Yeah.

2      Q.   -- -U-L-S-E?

3      A.   EPulse is the dashboard that gives you a

4   look at everything.

5      Q.   Okay.

6      A.   The cradle points are what -- are, like, a

7   router that you hook up in your -- in each -- you

8   plug into the wall in your polling place, and it'll

9   allow you from ePulse to see what is going on on

10   the poll pads.

11      Q.   Okay.  And it appears that this was a

12   culmination of some less than satisfactory

13   relationship with KNOWiNK up to this point in time?

14      A.   Well, and I would say that what I -- what

15   I'll say about this is that, you know, KNOWiNK was

16   attached onto the back end of that voting system

17   contract, and I don't think they were ever really

18   given an opportunity to provide direct customer

19   service, because everything had to run through

20   Dominion.

21           So I think it was within a month or so

22   after this E-mail that I ended up meeting with the

23   C.E.O. of KNOWiNK, and I think he just -- he

24   expressed some frustration with the fact that he

25   wasn't able to provide customer service to the

PURSUANT TO PROTECTIVE ORDER

Page 124

1    counties that were using his equipment going

2    through Dominion and the State.

3            And so he wanted to, you know, I guess

4    forge some kind of different relationship with

5    Fulton and maybe some of the bigger counties once

6    the contract was out.

7            And then he -- but he did offer to help us

8    in November, at their own cost have someone come in

9    and help us evaluate what's going on with our poll

10   pads and the bulk file update.  And we learned a

11   lot more about the product once that started

12   happening.

13       Q.   So that turned out to be a positive

14   development?

15       A.   Yes.  Yeah, because I think, you know, I

16   think what -- you know, you could have got a poll

17   pad that was -- there are different configurations

18   of the poll pad that can be purchased, and I think

19   State went with the cheapest one.  And I think it

20   could be a much better, more effective process --

21   product in the right environment.

22       Q.   And what were some of the enhancements

23   that you thought were attainable if that ePulse or

24   other approach was implemented?

25       A.   Well, I think we'd be able to be much more

PURSUANT TO PROTECTIVE ORDER

Page 125

1    responsive to any poll pad issues if we're able to

2    have ePulse and we could see what the status is

3    ourselves.

4            I mean, that's one of the big things is

5    just being able to look in on your equipment

6    remotely.  You might be able to just reset it

7    remotely.  You might be able to just -- you can get

8    a technician out there quicker, we aren't having to

9    go through the vendor to deal with that.

10           Or the other thing is some of the

11   enhancements, for example, now we've added a poll

12   worker sign-in that's on the poll pad that the poll

13   workers can just sign in on there rather than using

14   this paperwork that we'd used before.

15           When that -- that file can then be sent at

16   the end of the night so we can start processing

17   poll worker payroll on Election Day.  And once they

18   sign in in the morning, we can even -- we can even

19   start on it then if we need to.

20           There are some other -- some other things

21   that, you know, I think that there's a capability

22   if they were cellular that we could end up sending

23   messages.  We used to be able to send messages in

24   Texas to our poll workers and prioritize the

25   message, whether it was high, medium or low

PURSUANT TO PROTECTIVE ORDER

Page 126

```
 1    priority.
 2           And if it was high priority, we could ping
 3    a precinct and the poll worker could not even
 4    operate their -- the poll book that we used without
 5    reading that message first depending.  And you
 6    know, for low priority, they could get to it later.
 7           But those types of capabilities are
 8    available, I think, with KNOWiNK, but we just
 9    don't, in Georgia we don't have access to that.
10    Q.    Okay.  Look if you would to the
11    next-to-the-last paragraph on the front page.  It
12    begins with the words, "In addition, when Blake was
13    here."
14    Q.    [As read]  "He and Chris Harvey
15           struck a deal for us to print ballots
16           from the B.M.D.s in order to -- us to
17           avoid having paper ballots in every
18           style as emergency provisional ballots
19           in all of our polling places."
20           I think that's referring to provisional
21    ballots.
22    Q.    Right.
23    A.    So I mean, we ordered 20 percent of the
24    voter regis -- the -- we -- the total number of
25    registered voters in a precinct, we would order
```

PURSUANT TO PROTECTIVE ORDER

Page 127

1    20 percent to have them on hand in case of an

2    emergency.

3              But you can also, you can print

4    provisional ballots in -- from the B.M.D.s in the

5    precinct as well.  If you were to run out of

6    ballots, you can actually just print out the ballot

7    for the voter so that they can -- they can mark

8    them up and --

9        Q.   They would then have to put that in an

10   envelope and --

11       A.   Yeah.

12       Q.   -- it would be treated like the other

13   provisional ballots?

14       A.   Yes.

15       Q.   And so do I understand this correct --

16   correctly to mean that the Secretary of State's

17   representative, Mr. Harvey, was saying this

18   approach was oh -- was --

19       A.   Yes.

20       Q.   -- okay with the --

21       A.   Yeah, that --

22       Q.   -- Secretary of State?  Okay?

23       A.   Yeah, that was --

24            MS. LAROSS:  Let me just object to

25       the form of the question.

PURSUANT TO PROTECTIVE ORDER

Page 128

1          THE WITNESS:  Yeah, Chris Harvey was
2      the director of elections for the State,
3      and he told us -- gave us permission to do
4      that, yes.
5  BY MR. KNAPP:
6      Q.   Okay.
7          MR. KNAPP:  Let's try Exhibit 31,
8      Adam, see if you can pull that up, please.
9                  (Whereupon, Plaintiff's
10                  Exhibit 31 was marked for
11                  identification.)
12         MR. SPARKS:  Exhibit 31 has been
13     published.  Sharing screen now.
14         MR. KNAPP:  Thank you.
15         THE WITNESS:  All right.  I'm reading
16     the E -- you want me to read the E-mail?
17  BY MR. KNAPP:
18     Q.   Yeah.  It's your E-mail to the S.A.F.E.
19  Commission, so why don't you just read that.
20  That's the first two pages.  Let's not -- we'll
21  talk about this next -- the last two separately.
22     A.   Oh, okay.
23         (Whereupon, the document was
24      reviewed by the witness.)
25         THE WITNESS:  Okay.

PURSUANT TO PROTECTIVE ORDER

Page 129

1    BY MR. KNAPP:

2         Q.    Okay.  This is your letter to the S.A.F.E.

3    Commission in December of 2018; correct?

4         A.    Yes.

5         Q.    And would you walk me through the opinions

6    that you expressed here on what you think are

7    important aspects of a voting system that Georgia,

8    specifically Fulton County, would like to see as

9    the S.A.F.E. Commission was considering a new

10   system?

11        A.    Well, it looks like at the time I was

12   advocating for a VVPAT system, which would -- I

13   just thought that it was -- I mean, my feeling was

14   that, if we went to a scanner and a printer, it

15   would just -- the more -- the more components you

16   add, the more pain points there are.

17             I had worked with a VVPAT system in Nevada

18   in 2004 and '5, and it didn't require that the

19   voter grab a ballot and go -- take -- print the

20   ballot, take it over to a scanner.  It just, it was

21   connected to the unit itself.

22             And if they were going to go away from

23   D.R.E.s, at least do something that was -- it would

24   still require a printer, but it was much less, I

25   guess I considered it to be, cumbersome than what

PURSUANT TO PROTECTIVE ORDER

Page 130

1     we currently have.

2            But I didn't really think that they were

3     going to go with a VVPAT.  I had heard that they

4     weren't even going to consider one.  They were only

5     going to go with something that printed out a

6     ballot.  But I at least wanted to get my opinion on

7     record.

8        Q.   Okay.  And can you describe for me the

9     various components that would -- you called it the

10    VPAP system?  I'm not sure I understand.

11       A.   Voter verifiable paper audit trail.  And

12    it's --

13       Q.   Okay.

14       A.   -- just a printer that connects to the

15    side of the D.R.E.  And it -- you -- the print --

16    the selections are printed, and the voter can --

17    you can sit there -- like, on this new system, once

18    you print out the ballot, the screen goes away.  So

19    you can't verify, you can't take the ballot and

20    look at your screen, so -- to compare what you

21    voted.

22            The VVPAT, you have a side-by-side view

23    of -- you can look -- you can look at the summary

24    page and you can look at the -- or you can go back

25    and you can look at what's printed under glass on

PURSUANT TO PROTECTIVE ORDER

Page 131

1    the VVPAT printer.  And so to me it was a much more
2    simple user-friendly way of having the voter verify
3    what was on the -- what they selected on the
4    screen.
5              Then once you hit "cast ballot," the
6    screen will go away.  On this one you can't do it
7    at the same time for whatever reason.
8        Q.   So particularly if you're in a situation
9    with a long ballot, that would be useful, wouldn't
10   it, to have the ability to compare side by side?
11       A.   I think so, yeah.
12       Q.   And it also -- you in here talk again
13   about your concerns that early voting and it has
14   its own unique characteristics that also have to be
15   acknowledged and recognized; is that fair?
16       A.   Yeah.  I mean, for a small county it's not
17   as -- you know, if you've got a county that's got
18   one early voting polling place, it doesn't really
19   matter to them.  It's the big counties that have a
20   ton of early voting where it gets to be a big
21   concern.
22             And I think when the State purchases a
23   uniform system for the whole state, they seem to
24   purchase the systems with only the rural and medium
25   sized counties in mind and not what the big

PURSUANT TO PROTECTIVE ORDER

Page 132

1    counties need.  And there's a -- there's a wide

2    variety of needs with these "one size fits all."

3    Sometimes it doesn't work.

4         Q.   I mean, the scale of the election

5    operation you have to run would influence your

6    opinions as to which system would be best, I

7    assume; correct?

8         A.   Yes.

9         Q.   I note here in the third paragraph you

10   portended that the 2020 cycle will be contentious.

11   You obviously looked into the future.

12            "...we will need to serve the

13        voters in Fulton County in a manner

14        that makes it easy and convenient for

15        them to vote.

16            [As read]  "Also, a system with a

17        paper back-up that is similar to

18        operation in what we already have will

19        make the transition to a new system

20        easier for our Georgia voters."

21            That certainly turned out to be true,

22   didn't it?

23        A.   Yeah.  I guess so.  I -- yeah, I mean,

24   I --

25            MS. RINGER:  Object to the form of

PURSUANT TO PROTECTIVE ORDER

Page 133

1           the question.

2                 THE WITNESS:   Until you brought this

3           up, I had forgotten about this E-mail.

4           But yeah, I thought there were systems out

5           there that would essentially make it --

6           they were very similar to the Diebold

7           system that we were using, but a printer

8           could just be attached to the side.   And I

9           just thought that would be much simpler

10          for voters.

11    BY MR. KNAPP:

12          Q.   And then in the last paragraph or -- on

13    the first page, you start talking about

14    ExpressPolls and the ability to move people into

15    the voting system in the polling areas and to

16    perhaps even consider polling wide -- countywide

17    polling locations; correct?

18          A.   Yes.

19          Q.   And again, why did you favor that

20    approach?

21          A.   To go to countywide polling locations?

22          Q.   Yes.

23          A.   Well, then you -- anybody can vote

24    anywhere on Election Day, and you don't have to

25    restrict them to a precinct on Election Day.   It

PURSUANT TO PROTECTIVE ORDER

Page 134

1    just seems very outdated that we're still -- well,

2    you almost eliminate paper provisional ballots,

3    too, completely if you have countywide --

4              (Whereupon, there was technical

5          difficulty making the audio

6          unintelligible.)

7              THE WITNESS:  Voters that vote

8          provisionally on Election Day do it

9          because they are out of precinct.

10   BY MR. KNAPP:

11       Q.   Okay.

12       A.   You want to eliminate 90 percent of your

13   provisional ballots, just go to countywide

14   locations.  It's a really --

15       Q.   And then that --

16       A.   -- simple way --

17       Q.   That --

18       A.   It's a really simple way to administer an

19   election.

20       Q.   And you would assume, then, also that the

21   three-day cure period for the provisional ballots

22   would be less demanding if, in fact, most of them

23   were eliminated by a voting system where you had

24   countywide voting; correct?

25       A.   Yes.

PURSUANT TO PROTECTIVE ORDER

Page 135

1      Q.   Okay.  You were in favor of machine-marked

2   ballots because of the issue of eliminating the

3   need for voter reconciliation where the mark wasn't

4   clear what was intended by the voter?

5      A.   Yeah.  I mean, I think -- yeah, I'm just

6   not a proponent of hand-marked paper ballots.  So I

7   mean, you know, the system we had for me is fine,

8   but I think there were better systems on the

9   market.

10     Q.   Did you -- did you ever get a response to

11  your letter to the S.A.F.E. Commission?

12     A.   No.

13     Q.   Okay.

14     A.   Not that I remember.  Yeah, and I

15  remember, too, that -- I see now there's a P.S.

16  where I found out about this meeting the day before

17  it happened.

18     Q.   And it was not in Atlanta, was it?

19     A.   No.  Looks like it was in Macon.

20     Q.   Okay.  Mr. -- the Secretary of State,

21  Mr. Raffensperger, is shown as one of the people

22  that you sent this E-mail to.  Did you ever hear

23  any comments from him or anybody from his office in

24  response to your E-mail of December 14th, 2018?

25     A.   No.  In fact, I didn't really even realize

PURSUANT TO PROTECTIVE ORDER

Page 136

1    he was on the S.A.F.E. Commission.  Well, I guess

2    that was -- he was still -- he was in the House of

3    Representatives at that point, I guess.

4          Q.   Interesting.  Interesting.

5               Okay.  Let's see and try Exhibit 32.

6                         (Whereupon, Plaintiff's

7                         Exhibit 32 was marked for

8                         identification.)

9          MR. SPARKS:  Mr. Knapp, Exhibit 32 is

10   stamped "attorneys' eyes only."  Did you

11   also want to run this by --

12         MR. KNAPP:  Yes.  Please do not

13   pub --

14         MR. SPARKS:  (Inaudible due to

15   cross-talk).

16         MR. KNAPP:  Please do not publish

17   that.

18         Cheryl, do we need to go off the

19   record to talk about this?  This seems to

20   be a communication between Mr. Barron and

21   people in the Secretary of State's office.

22         Do you know why it has an attorneys'

23   eyes only designation?

24         MS. RINGER:  I do not.

25         MS. LAROSS:  I haven't had a chance

PURSUANT TO PROTECTIVE ORDER

Page 137

1      to look at it either, so I can't answer
2      that --
3              MR. KNAPP:  Okay.
4              MS. LAROSS:  -- question.  So maybe
5      we should go off the record and --
6              MS. RINGER:  Yeah, let's go off the
7      record.
8              MR. KNAPP:  Well, let's -- I'll put
9      that aside for the moment and let me ask
10     some other -- different exhibits, and then
11     we'll come back to that when you have
12     time --
13             MS. RINGER:  Okay.
14             MR. KNAPP:  -- to check into it.
15     Okay.
16             But just remind me we need to look at
17     Exhibit 32 again.  All right.
18             MS. RINGER:  Adam, if you could send
19     that to me and Ms. LaRoss, we can maybe
20     take a look.
21             MR. SPARKS:  Yes, I'm happy to do so.
22             MS. RINGER:  Okay.  Thank you so
23     much.
24             MR. KNAPP:  Adam, and when you get
25     done with that, if you could bring up

PURSUANT TO PROTECTIVE ORDER

Page 138

1         Exhibit Number 33.

2              MR. SPARKS:  I will.

3                    (Whereupon, Plaintiff's

4                     Exhibit 33 was marked for

5                     identification.)

6              MR. SPARKS:  Exhibit 33 has been

7         published.  Sharing screen now.

8              MR. KNAPP:  Thank you very much.

9              (Whereupon, the document was

10          reviewed by the witness.)

11             THE WITNESS:  Okay.

12    BY MR. KNAPP:

13        Q.   This is an E-mail chain that starts with

14    the Secretary of State's office and ends up --

15    well, it actually stays there.  But it recites that

16    Mr. Harvey had a conversation with you and Blake

17    Evans about an incident in 2019 where two

18    ExpressPolls were stolen from a precinct.  The

19    precinct was purportedly located at the Grove Park

20    Recreation Center located at 750 Frances Place

21    Northwest.

22             Do you have any recollection at all of an

23    incident of that type?

24        A.   Yeah, I remember this.

25        Q.   Tell me what you recall of this incident

PURSUANT TO PROTECTIVE ORDER

Page 139

1    and whether they were ever recovered or whether

2    there was any -- did it ever turn into any more

3    than an issue that appears -- than the fact that it

4    was reported.

5        A.   It looked -- so I think from what the

6    police discerned when they investigated is that it

7    looked like a couple guys broke in there, were

8    going to steal some stuff in the kitchen.  They

9    were probably were going after the microwave and

10   something else, because they had unplugged those or

11   moved them.

12           And then it looks like they just gave up

13   in the middle and grabbed the suitcases that held

14   the -- the suitcase or suitcases that held the

15   ExpressPolls.

16           And I don't know, I don't remember if they

17   had stolen anything else, but they did not take the

18   stuff in the kitchen that they had started to

19   remove.  And not -- as far as I recollect, these

20   were never recovered, no.

21       Q.   Has there -- was there any evidence from

22   Fulton County's perspective that this somehow

23   provided these people some unauthorized access into

24   the ExpressPoll system?

25       A.   No.  I mean, that -- they would have had

PURSUANT TO PROTECTIVE ORDER

Page 140

1  to have a password to open it.  But I'm sure if

2  they thought that they were getting -- they

3  probably thought that they were getting some kind

4  of computers in there, and they probably realized

5  what a terrible piece of technology they had

6  just -- a worthless piece of technology that they

7  had just stolen.

8       Q.   Okay.  Let's turn now to Exhibit Number

9  34.  This is a long one, so it'll take a while to

10 read it.

11      A.   This is an E-mail?

12      Q.   No.  This is the Seven Hills November 2nd,

13 2020 election report.

14      A.   Oh, okay.  Is this the appendix or the

15 executive summary?

16      Q.   I couldn't -- I can't tell because I don't

17 know.  It --

18      A.   Okay.

19      Q.   It looked --

20      A.   I mean, I've read this at some point.  I'm

21 pretty -- I know that I've read this thing.  You

22 want me to read it all again or you just want to

23 start with your questions and I can --

24      Q.   Sure.

25      A.   -- read if I need to remember.

PURSUANT TO PROTECTIVE ORDER

Page 141

1      Q.   I'll spare you from having to read the
2   whole thing and just focus you in on the different
3   issues that it talks about.
4      A.   Okay.
5           MR. SPARKS:  Exhibit 34 has been
6      published.  Sharing screen now.
7   BY MR. KNAPP:
8      Q.   Seven Hills Strategies was the monitor put
9   in place by the Secretary of State to observe the
10   activities of the Fulton County Election and
11   Registration's activities in the February -- excuse
12   me, the November 3rd, 2020 general election; is
13   that correct?
14      A.   Yes.
15      Q.   Okay.  And what kind of interaction, if
16   any, did you have with them as they performed that
17   task?
18      A.   It was just Carter Jones.  And you know, I
19   wouldn't see him every day, but I would say that
20   he, I mean, he started -- I think my initial
21   meeting with him was somewhere around October 19th
22   or 21st, and then he did something.
23           And I think he -- he did a couple brief
24   trainings to kind of get himself up to speed on a
25   couple of things.  And I'm not sure who provided

PURSUANT TO PROTECTIVE ORDER

1    it, whether it was the State that trained him or

2    what he did.   I don't remember, but.

3            And then he just started observing at

4    different parts of the election process.   And he

5    would talk to staff.   He had a notebook, and he

6    seemingly wrote every single thing that happened

7    down in it.

8        Q.   Did you have any understanding of what

9    skills or experience he brought to this assignment?

10       A.   My -- I was told that he had done some

11   election observation missions or election

12   observation jobs he had had overseas.   I think all

13   of them may have been in Africa.

14           He had done that, and I think that was all

15   of the elections experience he had, he had done

16   some of that observation.   I don't remember what

17   his other credentials were.

18       Q.   Did he appear to have any experience with

19   Dominion's B.M.D.s?

20       A.   I don't think so, no.

21       Q.   Did he appear to have any experience with

22   the poll pads?

23       A.   No.   Not that I recall.

24       Q.   Did he seem to have any experience with

25   processing absentee ballots?

PURSUANT TO PROTECTIVE ORDER

Page 143

1          A.    I don't remember.

2          Q.    Okay.

3          A.    I don't think he had any specific domestic

4     elections experience, if I remember.  What he -- he

5     had just done some things overseas.  And I don't

6     know for whom he did that.  It might have been

7     N.R.I. or N.D.I. or -- I don't remember.

8          Q.    Have you -- have you seen this report

9     before, Exhibit Number 34?

10         A.    Yes.

11         Q.    Okay.

12         A.    Yeah, and I talked to him about -- and

13    most of the things that are in it were

14    unsurprising, because he and I had either talked

15    about these things or, you know, he had made some

16    recommendations.

17         Q.    Do you recall any of his recommendations

18    surprising you or being really out of line with

19    what you expected to see?

20         A.    Not really.  I mean, no.  I get, just get

21    more surprised with how some people cherry-picked

22    things out of them and they don't have -- they

23    don't know the context or the background.

24              But I mean, you know, other than that, I

25    don't think anything really caught me off guard,

PURSUANT TO PROTECTIVE ORDER

Page 144

1     no.

2          Q.   And do you think it was an accurate

3     portrayal of the topic that he was asked to assess?

4          A.   I think for the most part -- I don't

5     remember -- I mean, it's been -- the last time I

6     read this was probably, it's been more than a year,

7     I think, or about a year since I read it.  But I

8     don't remember being that taken aback by anything

9     in it.

10          I mean, I think there were some things in

11     the appendix that I may have taken issue with at

12     the time, but no, I didn't really feel like -- I

13     didn't have any major disagreements with him on

14     anything.  I might not have agreed with everything

15     in it.

16          Q.   Right.  How has this report been used, to

17     your knowledge?

18          A.   Well, I don't know.  I mean, I know

19     there's a couple of commissioners that -- for

20     Fulton County that I think misuse it.  That's my

21     opinion on it.  I think they've taken a couple

22     sections out of it, and they use it for their own

23     political purposes because their candidate lost.

24          Q.   Overall how would you rate the performance

25     of the Fulton County election effort in November of

PURSUANT TO PROTECTIVE ORDER

Page 145

1    2020?

2         A.   If you consider the fact that we lost 34

3    people to COVID within three weeks of the election,

4    I would say we did pretty damn well.  We delivered

5    the absentee ballots.  We got them scanned.  We --

6    our early voting was almost perfect.  You know,

7    there were things we could have tightened up.

8              But I think some of the things that we had

9    issues with were just the result of the pandemic.

10   I mean, you know, we lost five of six managers in

11   the warehouse.  We lost 26 guys in the warehouse.

12   So you know, that was a -- it gutted half of our

13   work horse and all of our management staff but one

14   person out there.

15             I think given, you know, as far as -- we

16   received so many compliments from voters and even

17   got great press that I felt like the election went

18   really well.

19             The criticism, once Trump decided to do

20   what he does and the Georgia legislature decided to

21   pull in the -- you know, America's court jester,

22   Rudy Giuliani and his group, I -- you know, then

23   everything just seemed to -- there was just a lot

24   of revisionist history that was written.

25             I don't think the Jan -- the January

PURSUANT TO PROTECTIVE ORDER

Page 146

1      election went extraordinarily well, even better

2      than November.

3            Q.   One could almost say flawless.

4            A.   Yeah.

5            Q.   And again, talking about new procedures,

6      had there ever been an R.L.L. -- R.L. audit of an

7      election before, of a presidential election?

8            A.   We -- no.  I mean, we had done a pilot of

9      a -- of an R.L.A., and it was pretty simple.  And

10     we were set up to -- you know, we were going to --

11     we were told by the State that they were going to

12     pull about 250 to 275 ballots for our risk-limiting

13     audit for the November election, and then it turned

14     out we had to count every one by hand.

15           Q.   Are those the kind of surprises that gives

16     you, people like you a nightmare?

17           A.   What, a full -- a full hand count of an

18     election?

19           Q.   Well, after expecting an R.L.A. of only

20     270,000 votes to suddenly ramp up to have to count

21     every vote?

22           A.   Well, I mean, it wasn't --

23                MS. LAROSS:  Object to the --

24                THE WITNESS:  We weren't --

25                MS. LAROSS:  -- form of the question.

PURSUANT TO PROTECTIVE ORDER

Page 147

1           Excuse me, Mr. Barron.  Go ahead.

2           THE WITNESS:  Yeah, no, it was like

3       275 ballots we were going to have to

4       count.

5   BY MR. KNAPP:

6       Q.   Oh.

7       A.   And we had to count 527,000.  So yeah, it

8   was a -- it was stunning.  Especially knowing that,

9   even if we did that hand count, that with the

10  margin of victory that Biden had we were going to

11  have to do the machine recount anyway, and that

12  Trump would request the machine recount even though

13  we just did the hand count, it just seemed to me to

14  be a complete waste of resources.

15          It cost us almost 900,000 dollars, I

16  think, to do that hand audit.

17      Q.   Who ended up paying that?

18      A.   The County.

19      Q.   And then let's see here.

20      A.   And the tool that we were given to record

21  all the counting was just -- I -- it can't be

22  termed as anything but a complete joke.

23      Q.   Explain what those tools were, and explain

24  what would be a much more legitimate and -- way to

25  go about that task.

PURSUANT TO PROTECTIVE ORDER

Page 148

1      A.    Well, we got a piece of software called

2   Arlo.  And it was not built for this.  You -- we

3   were only given one user, permission for one user.

4   And so every county got permission for one user no

5   matter the size.  And we had to enter all of the

6   batch sheets.

7            After somebody -- after teams of two would

8   count, they would turn in a batch sheet with their

9   totals on it, and those would have to be entered.

10  And when you would enter it, the system would just

11  spin like it -- you know, like, when Apple has the

12  little twirly --

13     Q.    Hourglass?

14     A.    (Inaudible due to cross-talk).

15     Q.    Uh-huh.

16     A.    It will -- it just will be non-responsive.

17  And so somebody would just enter the information

18  again without realizing that the system had already

19  probably accepted the previous entry.

20            And there was also no search feature in it

21  unless -- the only way you could search for

22  something is if you -- you had to know how the

23  batch number and the description was entered

24  previously.

25            And if you -- if you didn't know whether

PURSUANT TO PROTECTIVE ORDER

Page 149

1    it was upper case or lower case, if you just put in

2    all lower case and it had been entered upper and

3    lower, you would not get anything out of your

4    search result.

5          So trying to go back and do any

6    reconciliation was almost impossible.  I mean, we

7    finally just had to -- it was just not built for --

8    that system was not built for what -- for the

9    purposes for the counties to use it for a hand

10   audit.

11       Q.   This was --

12       A.   So it was very hard to record all of the

13   information afterwards.  It would have been better

14   just to do an express -- an Excel spreadsheet.

15       Q.    Interesting.

16            Who selected the software?

17       A.    The State.

18       Q.    What input, if any, did they ask of you or

19   your office in making that selection?

20       A.    I don't think they consulted with any

21   counties on it.  That's from what I've been told

22   from other counties.

23       Q.    Do you have any understanding why they

24   thought this tool would be sufficient to perform

25   this task?

PURSUANT TO PROTECTIVE ORDER

Page 150

1          MS. LAROSS:  Object to the form of

2      the question.

3          THE WITNESS:  No, I have -- I have no

4      idea.

5  BY MR. KNAPP:

6      Q.   Are you aware of products in the

7  marketplace that are suitable for performing a

8  recount of this nature?

9      A.   No.  But I think it would have been easier

10 to use a Google document.  I mean, at least you

11 could have had multiple people working on it at

12 once.  And I think the hand audit, the results of

13 the hand audit would have come out much easier and

14 quicker.

15     Q.   Do you feel that the voter observation

16 rules are adequate to allow the poll workers to

17 actually perform their tasks on an Election Day or

18 in a tabulation of the vote?

19     A.   Voter observation?  Are you talking about,

20 like, poll watchers?

21     Q.   Actually both.  But start with poll

22 watchers, and then we'll talk about tabulation

23 observation.

24     A.   Well, I think most poll watchers are okay.

25 But in some instances, and especially when you talk

PURSUANT TO PROTECTIVE ORDER

Page 151

1    about -- when you're talking about the hand audit

2    or the recount, there were a lot of very

3    aggressive, rude individuals that were there just

4    to make trouble.

5              And I think that's what's happening with a

6    lot of the poll watchers now as well.  I mean, it

7    just seems to -- something's changed about the way

8    poll watchers operate in polling locations and how

9    they behave.  I think they're there to instigate

10   conflict, which is unfair to the people that are

11   working the election and -- because they have their

12   own agenda.

13             So I mean, voters, as far as voters

14   observing, I -- are you just talking about when

15   they're in line what did they see?

16        Q.   No.  I was talking more about the recount

17   and the R.L.A., what went on in the --

18        A.   Oh.

19        Q.   -- Georgia World Congress Center and all

20   that.

21        A.   Yeah, there -- the guidelines, you know,

22   they -- I think the State sent -- had the Carter

23   Center do some observation.  And the Carter Center

24   observers were appalled at one group of people that

25   seemed to be there for no reason other than to

PURSUANT TO PROTECTIVE ORDER

Page 152

1    cause problems.

2         Q.   Is there any way to shield future

3    elections from that unhelpful influence?

4         A.   Yeah.  I think if the -- yeah, the State

5    could set down strict rules and enforce -- you

6    know, they could put -- lay down strict guidelines

7    for observers to follow and ensure that, because

8    the parties are the ones that have to do the

9    training, ensure that the parties are -- political

10   parties are training them correctly.

11        Because there's no reason for there to be

12   these -- you know, for people to act the way they

13   do in the polling places.

14        Q.   Have you ever personally been threatened

15   because of your role in the election system?

16        A.   Because of -- well, you mean because of

17   the election system or just in my role as director?

18        Q.   In your role as director.

19        A.   Yeah.  I mean, I -- yeah, I've got a bunch

20   of threats.  My staff, I think there were members

21   of my staff that received way more than me.  My

22   staff was subjected to a ton of racial slurs, and a

23   few of them, about three of them got lots of death

24   threats.  Some of them had people coming to their

25   house.

PURSUANT TO PROTECTIVE ORDER

Page 153

1              I had my warehouse people were -- they

2       were followed home from the warehouse.  They had

3       people flying drones over.  They had people trying

4       to get into the warehouse.  People would take

5       pictures of them entering and exiting the building,

6       took pictures of all their license plates.  Yeah,

7       we had a lot of that.

8          Q.   Have you seen a decline in willingness of

9       either volunteers or your staff to work with future

10      elections because of all this?

11         A.   We've had, up until -- before 2020 --

12      before 2021, we had more turnover in 2021 than

13      we've had in my previous eight years combined.  And

14      I think a lot of people are really burned out.

15         Q.   Are you confident that adequate numbers of

16      properly motivated people could be trained in time

17      to handle future elections?

18         A.   Yes.  I mean, for poll workers and such?

19      Yeah, I think there's going to be enough interest

20      to get people in place.  I think, you know, you

21      read around the country where, like, a third of all

22      the elections directors in Pennsylvania have

23      resigned.  There's several in Georgia that have

24      resigned or retired early.

25              And you -- there are other people in the

PURSUANT TO PROTECTIVE ORDER

Page 154

1    offices, in these elections offices that are

2    leaving.  It's, you know, at some point it's going

3    to have an effect, a negative effect.

4         Q.   Let's look at Exhibit Number 35, and then

5    we'll take a break.

6                        (Whereupon, Plaintiff's

7                         Exhibit 35 was marked for

8                         identification.)

9         MR. SPARKS:  Exhibit 35 has been

10    published.  Sharing screen now.

11         THE WITNESS:  Is this another -- is

12    this -- did I click on the right wrong?

13    This is another -- okay.  Post-election

14    executive summary.  Oh, so is the other

15    one --

16   BY MR. KNAPP:

17         Q.   The other one was, and I'll read the title

18   for you, State Election Board Report, November 2nd,

19   2020.  The Exhibit Number 35 --

20         A.   Oh.

21         Q.   -- seems to be the executive summary.

22         A.   That was, like, after the January election

23   and the -- okay.  I understand the differences now.

24         Q.   Okay.  Have you seen Exhibit Number 35

25   before?

PURSUANT TO PROTECTIVE ORDER

Page 155

1      A.   Yes.  But now I think I need to correct my

2   comments, because I think the one -- the November

3   2nd one, I think I read that one shortly after the

4   November election.  This -- so that one's been

5   longer than a year.  This one I think -- this

6   covered all the elections from -- or I think this

7   covered, I don't know if it covered December, but

8   this included January.

9      Q.   That's correct.

10      A.   So okay.  Yeah.  I read this one probably

11   a year ago.

12      Q.   And again, this Seven Hills Strategies,

13   was this work performed by --

14      A.   Carter Jones.

15      Q.   -- Carter Jones?

16      A.   Yes.

17      Q.   And again, he did a lot of his work

18   directly with you?

19      A.   Yes.

20      Q.   And he says in the -- in the paragraph

21   under the title Fulton County's Compliance With

22   Terms of Section 12 of the Consent Order that he

23   witnessed no dishonesty, fraud, intentional

24   malfeasance, ballot stuffing, double counting,

25   fraudulent conduct of any nature while acting in

PURSUANT TO PROTECTIVE ORDER

Page 156

1    this role; correct?

2        A.    Yes.   Yeah, and he, I mean, he was on -- I

3    would say he was on-site with different members

4    of -- in different areas of the election.   He was

5    spending at least eight hours a day observing

6    things throughout the entire process for weeks on

7    end.

8        Q.    Turning to the second page here, he's

9    talking about in Paragraph Number 2:

10            "Although Fulton County allocated

11        ample resources for absentee ballot

12        processing leading into the general

13        elections, the processes themselves

14        were extremely sloppy and replete with

15        chain of custody issues as the massive

16        tied of ballots bounced around the

17        Fulton governor's headquarters

18        building."

19            You've talked about this previously,

20    didn't you?

21        A.    Today?

22        Q.    Yes.

23        A.    Yeah, I talked -- yeah, we had, I think we

24    had seven or eight locations where we were -- where

25    we were managing the absentee process from.

PURSUANT TO PROTECTIVE ORDER

Page 157

1          Q.   And if you move down two more paragraphs,

2     there's a paragraph that reads as follows:

3               [As read]  "Given the

4          inefficiencies of this system, the

5          volume of absentee ballots received,

6          there was no way that Fulton could

7          possibly comply with the mandate to

8          process all absentee ballots by the

9          close of business on the next business

10         day after the ballot is received."

11              Do you see that?

12         A.   Yeah.

13         Q.   Do you know where that mandate comes from,

14    that all of the --

15         A.   I think that was part of -- I think that

16    was in the, I don't know if Cheryl would remember,

17    but I think -- I think that has to do with

18    something that was in the consent order between

19    County and the State.

20         Q.   Would you agree with Mr. Jones' opinion

21    that it's virtually impossible to comply with

22    that -- with that mandate?

23              MS. LAROSS:  Objection as to form.

24              THE WITNESS:  "To process all

25         absentee ballots by the close of business

PURSUANT TO PROTECTIVE ORDER

Page 158

1          on the next business day."

2               I think that -- well, we had so

3          many -- we had so many rooms which we were

4          working from.  I don't know -- I mean,

5          I -- maybe if we had had more -- I mean,

6          one thing that he pointed out to me is he

7          just thought we had too few middle

8          managers to oversee all of the processes.

9               So had we had more full-time staff

10         that were managers in place, maybe.  I

11         don't think it would have been possible,

12         no.

13              But maybe given the way -- once they

14         kind -- came into the building through the

15         mail, to get them completely processed by

16         the end of the next business day, yeah,

17         that was -- it was pretty challenging at

18         that time.

19              But was it impossible?  I guess if we

20         would have the -- enough staff, it

21         wouldn't have been impossible.  But maybe

22         given what it was, yeah.

23     BY MR. KNAPP:

24         Q.   And does the -- did you as executive

25     director have sufficient resources that you could

PURSUANT TO PROTECTIVE ORDER

Page 159

1    hire enough people to make that happen?

2         A.   I actually can't really bring in managers,

3    because they -- I mean, I don't know where we would

4    have got them.  We didn't have the -- you know, we

5    didn't have the budget to bring in new full-time

6    staff.

7              Those would have had to have been

8    authorized by the Board of Commissioners, and we

9    would have to go through the whole H.R. process

10   and -- no, we wouldn't have been able to do that.

11             But I think what -- you know, if you go

12   down a couple paragraphs, or the next paragraph,

13   you know, by the June election -- or by the January

14   election, excuse me, we had moved everything to

15   G.W.C.C. and the process, you know, the entire

16   process seemed to run much smoother even without

17   all of the managers because we had everything in

18   one place.

19        Q.   Yeah, see, he's very complimentary.  He

20   says:

21             [As read]  "The run-off was a

22               stark dichotomy and comparative great

23               success.  With the eyes of the world

24               watching, Fulton was able to report

25               106,117 absentee ballots, the vast

PURSUANT TO PROTECTIVE ORDER

Page 160

1      majority on Election Day itself.

2           [As read]  "By the time the

3      operation was closed at 2:00 a.m.,

4      fewer than 5,000 absentee ballots were

5      left to process.

6           "This small remainder, all

7      received from ballot dropboxes on the

8      evening of January 5th, is a testament

9      to how hard the Fulton team worked to

10     comply with this item in the consent

11     order."

12     A.   You know, I --

13     Q.   Okay.

14     A.   You know, you've got -- what you just

15     read, too, and the way this report -- you asked

16     earlier how this report is being, you know, used, I

17     think first of all, I don't think people understand

18     why we were using so many areas in the county just

19     to get the process -- just to -- just to achieve

20     what we did -- with the absentee by mail process,

21     and then taking it -- and why we had so few

22     managers in place.

23          And then once you get to January -- and we

24     paid a ton of rent to get that area out at G.W.C.C.

25     I mean, we were just -- you know, because of the

PURSUANT TO PROTECTIVE ORDER

Page 161

1    grant money that came in and because of the care

2    response, we were able to just to -- just to expend

3    money like there was no tomorrow to make sure that

4    we could try to improve the system or the processes

5    we had in place.

6            But you know, we don't have quite access

7    to that same kind of money anymore.  But I don't

8    anticipate seeing absentee by mail numbers like

9    this again, because the legislature's pretty much

10   made sure that they're going to stamp down on

11   people voting by mail.

12       Q.   And SB-202 also eliminates your ability to

13   accept grants from outside organizations, too, does

14   it not?

15           Are we freezing up here or --

16       A.   Oh, I, after I said something, then I

17   just, I heard what sounded like somebody's voice

18   got a half a word out, and that was the last I

19   heard.

20       Q.   Okay.  Let me rephrase the question.

21           And you understand, do you not, that

22   SB-202 has eliminated the ability of the county to

23   accept --

24       A.   Hello?

25       Q.   -- money from third parties to help

PURSUANT TO PROTECTIVE ORDER

Page 162

1    finance such efforts; correct?

2              Okay.  You froze again, it seems.

3              MR. KNAPP:  Adam, why don't you take

4         down that exhibit, if you can?

5              THE VIDEOGRAPHER:  Do you want to go

6         off the record?

7              The time is 3:03 p.m.  We are now off

8         the record.

9              (Whereupon, a discussion ensued

10         off the record.)

11              (Whereupon, there was a brief

12         recess.)

13              THE VIDEOGRAPHER:  The time is 3:19

14         p.m., and we're back on the record.

15    BY MR. KNAPP:

16         Q.   Okay.  Let's move on to a different topic.

17              MR. KNAPP:  Adam, if you would pull

18         up Exhibit Number 1 again, and go to Page

19         7.

20              MR. SPARKS:  Sharing the screen.

21         It's up.

22    BY MR. KNAPP:

23         Q.   Exhibit [sic] nine which starts on page --

24              MR. KNAPP:  I'm sorry?

25    BY MR. KNAPP:

PURSUANT TO PROTECTIVE ORDER

Page 163

1      Q.   Okay.  Are we ready?

2      A.   Yes.

3      Q.   As you see, exhibit -- topic nine starts

4    on Page 7, carries over to Page 8.  Tell me, what

5    knowledge, if any, do you have of any evaluation,

6    study, investigation or assessment of the

7    integrity, security or vulnerability of the

8    Georgia's current election system or its prior

9    G.E.M.S./D.R.E. election system?

10      A.   This is at the top of number nine?  This

11   is topic number nine, you said?

12      Q.   Yes, sir.

13      A.   Hello?

14      Q.   Yes.  Can you not hear me?  It's the

15   top -- topic number nine in the paragraph, full

16   paragraph at the top of number nine.

17      A.   Oh, the paragraph before number nine?

18      Q.   No.  The actual -- well, it's all -- it's

19   all one and the same.  The paragraph is part of

20   Paragraph 9, and then it then goes on to have

21   additional Subparts A through D.

22      A.   Okay.

23      Q.   It's now highlighted by Mr. Sparks -- and

24   I appreciate that -- in blue, it looks like.

25      A.   Any testing, examination, re-examination,

Page 164

1    evaluation, study, analysis, investigation of the

2    security, integrity, rely -- have we done any of

3    these things?

4        Q.   That's --

5        A.   No.

6        Q.   -- the question.

7        A.   No.

8        Q.   To your knowledge has the Secretary of

9    State's office done any of these things?

10       A.   I don't know.

11       Q.   To the best of your knowledge, do you know

12   if the Secretary of State has retained any outside

13   party to engage in any of these activities?

14       A.   Not that -- not of which I'm aware.  I

15   mean, I've heard that some legislatures -- well,

16   and some legislators have brought in some different

17   voting system vendors that were up for the -- that

18   were under consideration with the S.A.F.E.

19   Commission and that they've brought them in since

20   the November election.

21       Q.   Are you familiar with any evaluations or

22   work performed for the Secretary of State by

23   Fortalice?

24       A.   No.  I've heard the name, and I think -- I

25   think, and I don't remember where it was from, it

Page 165

1    was -- I think it had to do with something on a --

2    with a computer that they may have looked at at

3    some point, but I'm not familiar with them.

4         Q.   In the -- in this suit Alex Halderman

5    of -- one of the leading experts on voting systems,

6    examined the system and found vulnerabilities.

7    Have you ever seen that report?

8         A.   I've seen one report that was, like,

9    authored in -- no, it was -- I don't think it was a

10   report.  I've seen something that he wrote for the

11   Court in 2019.  That's the only thing that I'm --

12   of which I'm aware.

13        Q.   Okay.  And do you recall what it is that

14   Dr. Halderman said in that report that was provided

15   to the Court?

16        A.   It seems like it was basically warning

17   about what he considered to be some of the

18   potential vulnerabilities of the system.

19        Q.   And at this point in time, were the -- was

20   the system the D.R.E. system?

21        A.   No.  I think it was considering the new

22   voting system.  And I don't -- I don't know if when

23   he wrote that that the State had already decided

24   upon Dominion's system.  That may have been right

25   after they -- the State purchased Dominion.

PURSUANT TO PROTECTIVE ORDER

Page 166

1          I can't re -- I don't know the exact date

2     in which he submitted that to the Court, but it

3     seemed as though it was pointing out things

4     specific to Dominion.

5          Q.   Do you agree or disagree with the various

6     elements that Dr. Halderman set forth in that

7     report that he, in his view, deemed to be

8     vulnerabilities?

9          A.   Not -- well, in whatever it was that I

10    read that he wrote in 2019, I don't -- I can't

11    remember what they call those, it wasn't -- they

12    weren't interrogatories.  It was more of like a --

13    I can't remember what legal statement it was, but

14    it was, like, 11 pages long.

15         Q.   Like an affidavit?

16         A.   Yeah.  Maybe that was it.  I didn't really

17    find anything of concern in what he wrote.  Because

18    it just seemed like he was speculating on things

19    that could possibly happen if this, this, this and

20    this were in place, you know.

21         To me it was -- you know, it wasn't

22    anything that caused me concern.  But if he's

23    written something since then, I don't know to what

24    you're referring.

25         Q.   Okay.  And would it be correct to assume

PURSUANT TO PROTECTIVE ORDER

Page 167

1    that you've not read any recent affidavit from

2    Dr. Halderman that's different from the 2019

3    affidavit that you believe you saw?

4         A.   I don't think so.  I mean, I don't know

5    what you mean by "recent."  But I would say if it

6    was within the last year, definitely I haven't read

7    it.  I have not read anything.  And if it was in

8    2020, I'm not sure how much I would -- how much

9    attention I would have paid to it or remembered

10   from it.

11        Q.   Do you think it's prudent for Fulton

12   County, or for that matter the State of Georgia, to

13   periodically make an attempt to have an outside

14   service to assess whether or not the system has any

15   vulnerabilities?

16        A.   Do I think it would serve a purpose for

17   the State to have somebody come in and look at it?

18        Q.   Yes.

19        A.   No.  I mean, not -- I don't know.  I just

20   don't -- you know, from what I've seen of the

21   system, you know, yeah, it's got -- it's two --

22   it's expensive and it costs too much money, and

23   it's put an unfunded mandate upon all the counties.

24             I think if you talk to all the big

25   counties, they're going to tell you -- not, maybe

PURSUANT TO PROTECTIVE ORDER

Page 168

1      not even the big counties, the small ones, too --

2      that it's going to -- it's -- our election costs

3      have gone up three times over what they were from

4      the previous system.

5              So it is an expensive system to run.  I

6      mean, that's pretty -- that's, like, the most

7      bothersome thing about it.

8          Q.   In term --

9          A.   You know, my --

10         Q.   Go ahead.

11         A.   I mean, at the moment there are some

12     people that think that voters aren't looking

13     comparing their ballots to -- you know, reading or

14     reading over their ballots to make sure what

15     they -- what they voted is correct on the ballot.

16             I see that mostly as a -- as a -- the

17     responsibility of the voter or -- I don't think

18     that's a county function to tell voters that they

19     have to look at their ballot or try to force them

20     to.

21             I mean, I think that would be more of a

22     State responsibility to put out a campaign to do

23     that.  So I mean, they're the ones that purchased

24     the system.

25         Q.   If --

PURSUANT TO PROTECTIVE ORDER

Page 169

1      A.   But I think, just given the physical

2   security that's in place and some other things, I

3   think for the most part, you know, the system is --

4   it's okay.  It is too expensive, though.  And

5   there's too many parts to it.

6      Q.   If, in fact, Dr. Halderman revealed

7   vulnerabilities, would you like to see the

8   Secretary of State to try to address a cure for

9   those vulnerabilities?

10          MS. LAROSS:  Object to the form of

11      the question.

12          THE WITNESS:  I guess it would depend

13      on what kind of vulnerabilities they were

14      and whether they were -- you know, I've

15      seen people make claims about

16      vulnerabilities in certain systems but

17      then -- and have theories on what could

18      happen and what -- you know, but I -- then

19      I've never seen any evidence that any of

20      this stuff ever -- has ever happened.

21          So I don't know.  I -- that's --

22      there's, I guess, too much -- too much in

23      that -- that's a loaded question.

24   BY MR. KNAPP:

25      Q.   Well, I understand in part perhaps where

PURSUANT TO PROTECTIVE ORDER

Page 170

1    that's coming from as there are different people in

2    media today that use these type of issues for

3    purposes other than to ensure the integrity of the

4    system, whatever that might be.

5         A.    Uh-huh.

6         Q.    But your last response sort of reminds me

7    of, like, well, we have to have a failure before we

8    acknowledge that a vulnerability is something that

9    has to be addressed.

10             Is that really what you feel, I mean?

11        A.    Well, I mean, my thing is that, you know,

12   we've had what I call conspiracy theorists get out

13   and say this, that and the other about these

14   systems for 18 years, and they've never provided

15   any evidence that anything -- in real -- the real

16   world.

17             I will acknowledge that professors that

18   can get a system, get access to a full system in a

19   lab can break into it and do whatever they want

20   with it, I mean, I -- that's -- but it doesn't seem

21   like they're ever real world scenarios.

22             And so that's where I kind of draw the

23   line on, you know.  Especially in the states where

24   you have -- every county has its own system, it

25   makes it even more and more difficult to do

PURSUANT TO PROTECTIVE ORDER

Page 171

1    something.

2            I mean, if you're going to do something, I

3    guess, you know, you want to attack at the State

4    level here because they've got one place that

5    provides the election projects for every county.

6            But once it's dispersed out to the

7    counties, it gets harder and harder and harder to

8    crack a system, because every county is separate.

9    Nothing's connected to the network or the Internet.

10   It just gets more and more difficult.

11           So I just, again, yeah, I just don't see

12   that these laboratory things are real world

13   scenarios that'll -- that would -- that would

14   happen.  I'm not saying it's impossible, but it's

15   highly unlikely.

16       Q.   If, in fact, one of the scenarios did

17   actually fit your real world sense of things and

18   represented a material vulnerability, do you think

19   that there's a responsibility of the Secretary of

20   State to try to cure such a -- such a condition?

21           MS. LAROSS:  Object to the form of

22       the question.

23           THE WITNESS:  Yeah, I mean, if

24       it's -- you know, I guess if somebody was

25       able to come up with something where

PURSUANT TO PROTECTIVE ORDER

Page 172

```
 1        thumb -- one thumb drive could somehow

 2        bounce something to every single B.M.D.,

 3        you know, you can think of these scenarios

 4        that could occur, or you have a rogue

 5        employee, you could probably do something

 6        to one county or have an effect on

 7        something in one county.

 8             But I don't know.  I, you know, I

 9        would have to, I don't know, I guess see

10        something that was real.

11             I don't -- I think professors and

12        certain people have a role in the process

13        to make sure that things are secure and to

14        remind people that they need to be secure.

15             But I also think that it's easy, it's

16        nice and easy and sterile in a laboratory

17        to produce results that don't necessarily

18        translate out into the real world.

19   BY MR. KNAPP:

20        Q.   If in the real world there was a

21   vulnerability that allowed someone to get to the

22   G.E.M.S. server, would that change your answer?

23        A.   Oh, if somebody could get access to a

24   server?  You know, you don't -- and it was

25   undetectable?  Yeah, I mean, you could -- again, I
```

PURSUANT TO PROTECTIVE ORDER

Page 173

1    think -- yeah, I would -- but I don't -- I mean, I

2    find it kind of hard to speculate on this stuff.

3         Q.   Well, you've been hearing a lot of

4    theories for a long time; right?

5         A.   Yeah.  Maybe my problem is that I seem to

6    trust the people or my colleagues in my county and

7    other counties that, you know, they're going to do

8    the right thing.  Maybe anymore after 2020 that's

9    naive, but.

10        Q.   I understand that you're no longer the

11   executive director in Fulton County; is that

12   correct?

13        A.   I am until April 1st.

14        Q.   Okay.  Do you anticipate staying in the

15   industry?

16        A.   No.

17        Q.   May I, if it's not too intrusive, may I

18   ask why not?

19        A.   Well, I don't, I mean, I don't really want

20   to deal with -- I mean, most -- some of it has to

21   do with personal life matters, and some of it has

22   to do with I don't have really much respect for the

23   elected officials involved in these things anymore.

24            I mean, you know, I've got -- there seems

25   to be a big group of elected officials out there

1    that are cowards, and they don't want to -- they

2    are in a cult now, the cult of Trump, and they're

3    trying to ingratiate themselves with him. They're

4    scared of their constituents. And so they allow

5    all this crap to go on and these lies to be told.

6           And it's just kind of sickening and sad to

7    me that we've come to this place where you have

8    such a large number of elected officials that have

9    no backbones and no principles. So I really don't

10    want to be involved in the process that gets them

11    elected anymore.

12           And unfortunately, most of them are in one

13    party now. And I don't -- I'm not a part of

14    something -- I don't care for either party really,

15    especially being in this job for so long, but.

16           You know, I also don't really -- I don't

17    want to deal with all the death threats and stuff.

18    And I think the politicians, the elected officials

19    could put a stop to a lot of this, but they don't

20    really care about election workers or election

21    officials, they just care about getting reelected.

22           And so all the threats and all the

23    conspiracy theories and all that are going to just

24    keep going on and on and on and on until they

25    decide to stand up. And by that point it might be

PURSUANT TO PROTECTIVE ORDER

Page 175

1      too late.  So.

2             And in Georgia it's just adversarial, I

3      think.  It's not worth the stress.  It's not worth

4      the money I get paid to deal with this stuff.  I've

5      been doing it 22 years, and I've never seen it like

6      this.  So.

7         Q.   Let me try the next topic, which would be

8      topic number ten.  This essentially is complaints

9      by third parties with regard to the security,

10     integrity, reliability of the -- Georgia's current

11     system.  You touched on this in part with the last

12     extended response that you gave.  And let me

13     reshape the topic slightly.

14            Have you had any what I -- what you would

15     call real world complaints that you had to take

16     seriously and at least investigate that called into

17     question the integrity of the Georgia current

18     election system or the prior G.E.M.S./D.R.E.

19     election system?

20        A.   Ones that I thought were systemic issues?

21     Nothing that would have been systemic.  I can't

22     remember specific examples.  I mean, I've had

23     complaints where it's like I asked staff to do you

24     think you can reproduce this or, you know, those

25     types of things.

PURSUANT TO PROTECTIVE ORDER

Page 176

1           And you know, usually what we do is we
2    get -- we'll get an -- I mean, most of the
3    complaints that we get are from people who say, I
4    received this ballot -- this candidate was not on
5    my ballot.
6           And so we have to look up the ballot combo
7    and determine whether that race -- and which
8    candidates and which races are on that and
9    determine if this voter, you know, if it was a
10   human error in choosing the ballot combo on the
11   poll pad.
12          You know, it's never really been anything
13   with B.M.D.s or the printers.  It's usually a human
14   error with selecting a ballot combo on a poll pad.
15   And whenever you have humans picking something,
16   you're going to have an error from now -- now and
17   then.
18          I don't remember anything specific that
19   concerned me about the current voting system, you
20   know.  Usually what it turns out to be is human
21   error on things when we look into it.  I mean, if I
22   get a complaint, I usually will assign staff to
23   look at them.
24      Q.   Let's move on to topic number 18.
25          MR. KNAPP:  Adam, if you'd pull up

PURSUANT TO PROTECTIVE ORDER

Page 177

1        Page Number 12 to Exhibit 1.

2   BY MR. KNAPP:

3        Q.   Topic 18 has to do with any

4   "communications with the U.S. Election Assistance

5   Commission," or the E.A.C. as it's known --

6        A.   Uh-huh.

7        Q.   -- "regarding any software changes

8   involving Georgia's current election system or

9   relating to any request for E.A.C. to approve" any

10  aspect or change to Georgia's past or current

11  election system.

12       A.   Okay.  I don't remember having any -- I

13  don't remember communicating with anybody from the

14  E.A.C. about anything having to do with the

15  election system.  I mean, if I've been C.C.'d on an

16  E-mail or something, I just have no recollection of

17  that.

18       Q.   Are you aware of anybody else in your

19  office who had communications with E.A.C. about

20  approvals?

21       A.   No.  And I'd be surprised if anyone -- I

22  mean, I think most of my staff, they probably don't

23  even know who the -- what the E.A.C. is.

24       Q.   From your answer I infer that it's not

25  something that has much relevance to what your

PURSUANT TO PROTECTIVE ORDER

Page 178

1    staff does on a day-to-day basis?

2        A.    Right.

3        Q.    Okay.  Are you aware of any communications

4    between the Secretary of State's office and the

5    E.A.C. regarding requests for approvals of

6    equipment or changes of equipment or software

7    involved in the Georgia system?

8        A.    No.  I mean, I'm sure there was

9    communication around that firmware update.  I

10   don't -- but I don't know what it would have been.

11       Q.    You're not directly involved with that

12   firmware update approval process?

13       A.    No.

14       Q.    Do you know who was on behalf of the

15   Secretary of State?

16       A.    I don't.  I mean, I'm sure that somebody

17   having to do with their -- I mean, I would imagine

18   Gabe Sterling would have been or Chris Harvey.

19   Because I think Gabe was in charge of the

20   implementation of the voting system, so I'm sure he

21   would have been the one that would have had

22   communication with them if anybody did.

23       Q.    Let's look at topic number 19:

24            "The voter verifiability and

25         auditability of ballots generated by

PURSUANT TO PROTECTIVE ORDER

Page 179

1          B.M.D.s used in Fulton County for 2020

2          and 2021 elections."

3              We've talked a little bit about the screen

4     on the B.M.D.s and different systems as to whether

5     or not, when a paper is printed, whether you can

6     compare that back to the what was on the screen in

7     terms of a voter verifying that the paper that's

8     been generated by the B.M.D. is an accurate

9     portrayal of their vote.

10             Do you have any other opinions about

11    whether or not the B.M.D. produces a paper -- a

12    record that a voter can verify?

13        A.   Do I have what about the voter record that

14    could be verified?

15        Q.   Whether the voter can verify that their

16    individual vote has been accurately recorded by the

17    election system.

18        A.   You mean do I -- do I have any views on

19    whether or not the voters -- can you restate, like,

20    the -- a question?

21        Q.   I'll be glad to.  I'm sorry.  It was

22    probably obtuse.

23             Are you aware of any policies implemented

24    by Fulton County to ensure that the voters can

25    verify that the paper ballot generated by the

Page 180

1    system accurately records their vote?

2         A.   No.  I mean, we don't have anything in

3    place that says, you know, voters need to -- you

4    need to have the voters, make sure the voters

5    verify what's on their ballot before they deposit

6    it into the scanner.

7              I mean, I think we train poll workers to

8    remind, you know, voters that they can -- you know,

9    to follow the instructions that are on the screen,

10   and before they -- before they put their ballot

11   into a scanner, you know, if they -- if they're

12   unsure that they received the correct ballot, to

13   make sure a poll worker is aware of that before

14   they deposit their ballot in the scanner.

15             Once you put your ballot into a scanner,

16   the -- you know, you've cast it.  But we don't do

17   anything actively to tell voters they have to

18   review their ballot for -- to see if it was

19   correct.

20        Q.   You're aware that the actual vote is

21   embedded into whatever the, we didn't know whether

22   it was a Q.R. code or just a barcode on the paper

23   that's printed by the B.M.D.; correct?

24        A.   Yeah.

25        Q.   And so --

PURSUANT TO PROTECTIVE ORDER

Page 181

1        A.   Yeah, there's no way for the voter to

2    verify what's in that.  So you know, they just have

3    to -- they're supposed to review their ballots

4    before they put it into the scanner.  I mean, I

5    don't know -- I know Alex Halderman did something

6    where he -- it's, like, less than 10 percent of the

7    voters actually do that.

8            That's probably even in line with what --

9    and when I was part of the team that put the system

10   in in Nevada with the VVPATs, you know, most people

11   didn't look -- didn't really spend much time

12   comparing their ballot to the -- what was under the

13   glass.

14           And a lot -- most of them would say, well,

15   we live in Nevada, if somebody's going to try to

16   hack in and steal something, it's not going to be

17   the votes, it's going to be the money, you know.

18   Really, I mean, I mean, it was a lot of voters in

19   Nevada would say that.

20       Q.   Well, maybe we don't have as vulnerable of

21   money here, that's why voters are more concerned.

22           And do the same concerns carry over to

23   whether or not the paper that's printed by the

24   B.M.D.s can actually be audited, whether it's a

25   risk-limiting audit or actual recount given the

PURSUANT TO PROTECTIVE ORDER

Page 182

1    Q.R. -- the code, whatever it is, is where the
2    vote's embedded and not the text at the bottom of
3    the ballot?
4         A.   You mean does it -- is it a concern for me
5    that what's in the code, the code is not the same,
6    the Q.R. code is not -- may not be the same as
7    what's printed, the bubbles on the --
8         Q.   Yeah.
9         A.   -- his mark is not in the bubbles, there's
10   no way for the voter to verify those two things?
11        Q.   Yeah.  That those two things express the
12   same vote.
13        A.   I mean, I think that with you -- if you do
14   a risk-limiting audit, you should be able to verify
15   that.  I know some people have different views on
16   what -- how extensive the audit needs to be to
17   verify that.
18             And I don't have a problem with more
19   extensive audit, you know.  I don't know.  I mean,
20   I guess if you get rid of the Q.R. code and barcode
21   and you use a sys -- oh, I just got a message on
22   my -- can you guys hear me?
23        Q.   Yeah.
24        A.   Okay.  I, you know, I guess it would be --
25   the best thing to do would be for there to be

PURSUANT TO PROTECTIVE ORDER

Page 183

1    minimal barcodes or Q.R. codes, and then whatever
2    is on the ballot gets scanned somehow, just the
3    content of the ballot.  But I don't know what's
4    involved in that.
5         Q.   Are you aware that Dominion can provide
6    "ballot on demand" printers?
7         A.   That they can provide "ballot on demand"
8    printers?  Oh, you mean, like, for early voting
9    locations?
10        Q.   Or any application within either early
11   voting or the actual Election Day in-person voting.
12        A.   No, it doesn't surprise me that they can
13   do that.
14        Q.   And --
15        A.   Yeah, I think I knew that.
16        Q.   And if the State elected to add this to
17   the current system, that the poll workers could
18   print a ballot, a paper ballot for each voter when
19   they check in?
20        A.   And then have them mark it?
21        Q.   Yeah.  Then you could -- then you could
22   have them mark it, you wouldn't have to have
23   pre-printed ballots ahead of time, but it would
24   allow the voter to use a hand-marked paper ballot
25   and then -- to use that and deposit that into the

PURSUANT TO PROTECTIVE ORDER

Page 184

1    existing scanners that the State has and conduct an

2    election in that manner?

3         A.   Yeah, I mean, that's the one way you can

4    get a -- you can solve early voting, I guess, as

5    long as your system's up and running.

6              The problem is that, if you -- during

7    early voting, even if you do that, with "ballot on

8    demand" printers, if the system is down, you've got

9    to have every ballot available and every -- you

10   know, that's -- I think it complicates early voting

11   if you go to that model.

12             Even -- because if the power goes down or

13   something happens to the network for three or four

14   hours, you're -- you've got a -- you've got a major

15   issue.

16             So now you've got to switch to a system

17   where they -- the voter has -- or the poll workers

18   have to start handing ballots out, make sure they

19   get the right ones out of the right folders, a lot

20   of storage room, a lot of -- you have to have a lot

21   of ballots available and have a mechanism to store

22   them, train them on that entire procedure, the

23   back-up procedure.

24             And it just enters -- a lot of other

25   things are -- enter the process at that point with

PURSUANT TO PROTECTIVE ORDER

Page 185

1    that.  So I don't -- I just don't think it works

2    very well for early voting.

3         Q.   Well, early voting is going to -- if the

4    power goes down, it doesn't matter what system you

5    have, if you have any electronic element, you're

6    going to have a problem of that type; correct?

7         A.   Yeah.  But if you -- if you've got

8    B.M.D.s, then the printer's in place.  I mean, I

9    guess you've got -- you've got back-up batteries.

10   And I suppose -- I mean, those "ballot on demand"

11   printers seem to require more than the printers we

12   use now.  I guess you could have a back-up.  I

13   don't know.

14        Q.   Well, if you --

15        A.   I just -- sorry.  I think that -- I think

16   it just works better during -- on Election Day.

17        Q.   Do you -- are you giving any weight to the

18   fact that the voter might feel more comfortable

19   with that system being able to say that they're

20   hand marking their ballot and, therefore, not --

21   are not susceptible to this problem of the code

22   embedded in a paper ballot versus the text as to

23   which is actually the correct representation of

24   their vote?

25        A.   You know, the thing is that, it might

PURSUANT TO PROTECTIVE ORDER

Page 186

1    sound funny, but we get people that, if the
2    system's down and they have to vote a hand-marked
3    paper ballot or they're in emergency ballot
4    procedure for whatever reason, the poll pads are
5    down and -- we get people that complain about
6    having to hand mark their ballots.
7            And it may seem like that wouldn't happen,
8    but it does.  I think people are so used to using
9    touch screens, at least in Georgia, that, you know,
10   you move away from that and I don't -- you know, I
11   don't know if they're going to trust any system at
12   this point.
13       Q.   Let's look at topic number 20.
14            MR. KNAPP:  Thank you.
15   BY MR. KNAPP:
16       Q.   Mr. Sparks highlighted that in blue:
17            "Any actual or contemplated plans
18        to place Georgia's current voting
19        software or equipment in Fulton County
20        with different voting software or
21        equipment, such as B.M.D.s that do not
22        generate barcodes for tabulation, or
23        with hand-marked paper ballots as the
24        primary means of in-person voting."
25       A.   Have we content -- have we contemplated

PURSUANT TO PROTECTIVE ORDER

Page 187

1    that?

2        Q.   Yes.

3        A.   I think there's been a couple of elected

4    officials in Fulton County that have talked to

5    vendors, but my office hasn't.  And I've been

6    contacted by a couple of vendors that have -- I

7    mean, there are a couple of vendors, I think, that

8    have come to Georgia on the behest of legislators

9    to replace the system.

10           But I mean, Fulton County hasn't ever --

11   like, my board and my department, we haven't done

12   anything with regard to that.  But I know there are

13   people out there that are -- that are trying to

14   contact elected officials to get them to change the

15   system.

16       Q.   And in Fulton County, we have sort of a

17   unique system where you've got the Fulton County

18   Commission which oversees the Fulton County Board

19   of Elections and Registration, who then oversees

20   your work?

21       A.   Yeah, I mean, the Fulton County Board of

22   Commissioners, the only thing that -- they give

23   us -- they approve our budget.  The Board of

24   Elections and Registrations actually oversees the

25   department.

PURSUANT TO PROTECTIVE ORDER

Page 188

1     Q.   Okay.  And that board, again, to put the

2     question back to you again, has that -- have any

3     members of that board ever discussed with you any

4     contemplation of changing the voting software

5     equipment currently used in the Fulton County

6     system from 2020 forward?

7     A.   Oh, I think, yeah, I mean, Chairman Pitts

8     asked me before whether there was any way that

9     Georgia could change the system.  And I told him

10    that the State -- the State is the one that -- the

11    State makes that determination.

12         And we at the county level, there's really

13    nothing that can be done.  We just have to -- we

14    have to use and operate the system that the State

15    mandates.

16    Q.   At different times in litigation, the

17    Secretary of State's contended that a lot of the

18    operations and manners of elections are really up

19    to the county and not to them.

20         Has that been your experience?

21    A.   Yeah.  I mean, that's true for the most

22    part, yes.  I think when you introduce a new

23    system, it's up to the State to -- you know, I

24    think in -- from what I read in 2000 whenever it

25    was when the new -- the first -- the last system

PURSUANT TO PROTECTIVE ORDER

Page 189

1    was implemented in 2002 or 2004 and then again this

2    time, that many people at the county level felt

3    that the State did not do a good enough job in

4    supporting the counties in rolling out the new

5    system.

6           I think this time the COVID pandemic

7    impacted that somewhat.  But it sounded like it was

8    a similar situation in both time periods where, you

9    know, the, I think, counties expected a little more

10   support from the Secretary of State offices back in

11   early 2000 whatever it was and this time.

12        Q.   Topic number 21 is very similar, so let's

13   move on to that.

14           MR. KNAPP:  Adam, can you pull up

15       Exhibit Number 1 again?

16   BY MR. KNAPP:

17        Q.   Has there been any talk that you're aware

18   of at all among people responsible for Fulton

19   County elections that there might be any

20   implementation of hand-marked paper ballots as the

21   primary means of voting in person in Georgia

22   elections?

23        A.   No.  I mean, we considered it as a -- as

24   an emergency procedure for November if we couldn't

25   get our logic and accuracy testing done, but -- for

PURSUANT TO PROTECTIVE ORDER

Page 190

1    Election Day.

2         But as far as implementing it as the

3    primary means of voting, no.  I mean, I would -- I

4    would have never supported it for -- if early

5    voting was involved in it.  There's no way.

6         Q.   Even with --

7         A.   If I had --

8         Q.   Even with -- go ahead.

9         A.   If I had my choice, I would go back to

10   D.R.E.s without printers, because those were my --

11   that was my favorite system.  I think it's the

12   simplest thing to maintain and operate, but.  I

13   think those are -- you know, people just -- people

14   don't trust anything anymore.  So.

15        Q.   Let's talk about topic number 22 while

16   we're at it, any Fulton County recommendations to

17   the Secretary of State, including changes to the

18   election system, are you aware of any

19   recommendations made by anybody at Fulton County to

20   the Secretary of State about changes to the current

21   election system?

22        A.   No.  Not to change it out.  I don't think

23   so.

24        Q.   Okay.  And I think the question fairly

25   encompasses also any kind of material change,

PURSUANT TO PROTECTIVE ORDER

Page 191

```
1    something short of swapping out the whole system
2    but still a change that would be perhaps systemwide
3    or serious in some form or fashion.
4              MS. LAROSS:  Object to the form of
5         the question.
6              THE WITNESS:  I don't recall ever
7         making any recommendations to the State.
8         But I don't think that I would ever
9         recommend anything to the State, because I
10        just don't think that they would care to
11        listen anyway.  So.
12             And I don't think -- I mean, they
13        don't have any sort of ability to make
14        those changes themselves.  Because I think
15        the way the law reads, I think the
16        legislature, you know, it's pretty much --
17        I don't -- I don't think they could just,
18        excuse me, change out a system even if
19        they wanted to without going to the
20        legislature and having them, you know,
21        pass something.
22   BY MR. KNAPP:
23        Q.   I don't disagree with your understanding
24   of the system, but the question's slightly
25   different than that.  And just it goes to whether
```

PURSUANT TO PROTECTIVE ORDER

Page 192

1    or not there's ever been any recommendations by

2    somebody in Fulton County to the Secretary of

3    State's office as to changes that they were

4    promoting to the system that they'd like the

5    Secretary of State to consider.

6              MS. LAROSS:  Object to the form of

7         the question.

8              THE WITNESS:  I don't -- I don't

9         recall anything.

10   BY MR. KNAPP:

11        Q.   Okay.

12        A.   Except, you know, I mean, except some of

13   the things I mentioned before, which the bulk file,

14   you know, making that -- limiting how many -- you

15   know, just limiting it to your surrounding counties

16   for the -- who you're going to -- for what you're

17   going to upload in the bulk file.  You know, some

18   of those -- there's some simple things that could

19   be changed to make the process easier.

20              But I mean, the voting system, when I hear

21   a voting system or election system, usually to me

22   that means the components of the voting system.  It

23   doesn't mean every single part of the election

24   system of -- so I don't know if you're

25   concentrating mostly on the B.M.D.s, printers,

PURSUANT TO PROTECTIVE ORDER

Page 193

1    scanners, that system, or if you're delving into

2    other parts of the entire process from beginning to

3    end.

4        Q.   I think you correctly inferred that my

5    primary focus is on the B.M.D., scanner system,

6    poll pad system.  But it also does encompass any

7    other changes to the system.

8        A.   I mean, I think that I mentioned to

9    somebody at the State you -- the poll pads, at

10   least my personal preference would have been for

11   them to integrate it into ElectioNet, or whatever

12   V.R. system is there, and have cellular enabled

13   poll pads so that we don't have to use laptops.

14            I thought the system originally when they

15   had purchased poll pads, that it was going to be a

16   cellular enabled poll pad that was going to allow

17   us to check in live, voters check -- we were going

18   to be able to log in to ElectioNet through those

19   poll pads and mark voters that way, and we can't.

20            And so I didn't really understand why you

21   go to all that expense and you don't just spend a

22   little bit more on the system and make it simpler

23   and more efficient.  I mean, to me it was a waste

24   to go as far as they did without taking it another

25   step further.

PURSUANT TO PROTECTIVE ORDER

Page 194

1      Q.   Are you aware of any discussions to, in

2  fact, take it a step further in the manner you

3  describe?

4      A.   I think that, with this new V.R. system,

5  that may be on the horizon at some point.  But I

6  don't know.  I mean, I -- pretty much I know

7  about -- as much about the new V.R. system as

8  what's been released in the press.

9          MR. KNAPP:  Let's take a ten-minute

10      break.  I think I'm very close to being

11      done, but I want to make sure, check with

12      my colleagues.  Why don't we come back at

13      4:20.

14          THE WITNESS:  Okay.

15          THE VIDEOGRAPHER:  The time is 4:08

16      p.m.  We are now off the record.

17          (Whereupon, a discussion ensued

18       off the record.)

19          (Whereupon, there was a brief

20       recess.)

21          THE VIDEOGRAPHER:  The time is 4:23

22      p.m.  We are back on the record.

23          MR. KNAPP:  I just have a few

24      questions, and then I'm going to rest with

25      this witness.

PURSUANT TO PROTECTIVE ORDER

Page 195

1    BY MR. KNAPP:

2         Q.    Mr. Barron, were you involved at all in

3    the collection of documents that were responsive to

4    the documents requests that our clients served on

5    the -- Fulton County?

6         A.    You mean recently or just any time?

7         Q.    Recently.

8         A.    Oh, I remember having -- I had a

9    conversation with a few of my staff and Marilyn

10   Marks and our attorney and I think talking about

11   the production of some of that stuff.

12             And then -- I mean, when we get those, I'm

13   usually the one that direct -- tells -- directs the

14   staff, who on the staff needs to get those

15   documents, but I don't search for any of them, I

16   mean, unless if the thing's directly to me.

17        Q.    That's -- seems reasonable.

18             And to whom have you -- did you direct the

19   collection of documents in this case on your staff?

20        A.    In the most recent round, it's probably, I

21   don't remember all the requests, but it -- I'm sure

22   it was Dominic and Derrick and Nadine and -- I

23   don't know who else it would have been besides

24   them.  And they're usually the ones that get most

25   of the work for that.  And then they may have

PURSUANT TO PROTECTIVE ORDER

Page 196

1   somebody help them.

2       Q.   Are you familiar with the Fulton County

3   Board of Elections and Registrations document

4   management policies?

5       A.   I guess, yeah, in general.  You're talking

6   about, like, our retention rec -- retention and

7   that sort of thing?  Yeah.  Yeah, I mean, I --

8   yeah, we retain records for a couple of years and

9   that -- you know, I have a general knowledge of it.

10      Q.   Do you know how long y'all retain E-mails

11  from your E-mail system?

12      A.   That, I don't know.  That would be I.T.

13      Q.   From time to time have you ever had need

14  to go back and look into past E-mails' history to

15  look up a subject and encounter that you weren't

16  able to reach back far enough?

17      A.   I don't know if I've ever encountered

18  something that I can't find, you know, if I -- if

19  I'm not at my P.C. or not logged in by V.P.N. --

20  well, I think even with the V.P.N.

21          If I'm not at my P.C., there's stuff

22  that's in the Enterprise fault which I can -- I'll

23  be able to read, like, the first sentence of an

24  E-mail, but I have to be at my P.C. to actually

25  retrieve that.  So.

PURSUANT TO PROTECTIVE ORDER

1      Q.    To these people that you delegated the

2      responsibility of collecting documents, can they

3      reach into the vault to see --

4      A.    Yeah.

5      Q.    -- those things?

6      A.    Yeah.  Everybody can get into the

7      Enterprise vault from their own -- for their own

8      E-mails --

9      Q.    Okay.

10     A.    -- yes.

11     Q.    What if they were assigned the --

12     A.    I don't know how far that goes back.

13     Q.    What if they were assigned the

14     responsibility of searching your E-mails, that is,

15     it would not be their own, how far back can they go

16     in the vault?

17     A.    The only person that can search my E-mails

18     is my secretary.  I.T., I think, can go in and they

19     can probably get to everything as far back as

20     they -- but I don't know how far back they retain

21     E-mails.

22     Q.    Are you aware of any documentation

23     relating to the management of the election system

24     in Fulton County that was inadvertently destroyed

25     in recent years?

PURSUANT TO PROTECTIVE ORDER

Page 198

1        A.    The management of what that was destroyed?

2        Q.    Any documents relating to the election

3    system maintained -- the documents maintained by

4    Fulton County relating to the election system that

5    may have been inadvertently destroyed or deleted in

6    the last several years.

7        A.    With the current -- I don't know.  Like,

8    what kind of documents?

9        Q.    I wouldn't know.  Because I don't know --

10       A.    I don't remember any.

11       Q.    -- if they were.

12            MR. KNAPP:  I don't have any further

13       questions of this witness at this time.

14            THE WITNESS:  Is everybody frozen?

15            MR. KNAPP:  I think they are.

16       They're stunned.

17            THE WITNESS:  Oh.  I didn't know if

18       everybody was frozen for a second.

19       Because I had asked what kind of documents

20       to which you were referring, so I

21       didn't -- I don't know if you heard that.

22            MR. KNAPP:  I did.

23            THE WITNESS:  Okay.

24            MR. KNAPP:  And I -- did the court

25       reporter, Debra, did you hear that?

PURSUANT TO PROTECTIVE ORDER

Page 199

1          I think we're good.  I have no
2     further questions for you at this time,
3     Mr. -- I appreciate your diligence in
4     being here and answering these questions
5     to the best of your ability, and I wish
6     you the best.
7          THE WITNESS:  Thank you.
8          MS. RINGER:  Just a second, Rick.
9     Hold on.  Let me check my notes to make
10    sure I don't want to redirect.  Just one
11    second.
12         Okay.  I'm fine.  Ms. LaRoss?
13         MS. LAROSS:  I have no questions.
14    Thank you for your time today, Mr. Barron.
15    Appreciate it.
16         THE WITNESS:  You're welcome.
17    Thanks.
18         THE VIDEOGRAPHER:  The time is 4:29
19    p.m.  This concludes the deposition.  We
20    are now off the record.
21         (Whereupon, a discussion ensued
22     off the record.)
23         (Whereupon, the reading and
24     signing of the deposition by the
25     witness was reserved.)

PURSUANT TO PROTECTIVE ORDER

Page 200

1                          - - -

2            (Witness excused.)

3                          - - -

4            (Whereupon, the deposition

5       concluded at 4:30 p.m.)

6                      --oOo--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PURSUANT TO PROTECTIVE ORDER

Page 201

1                    VERITEXT LEGAL SOLUTIONS
2                 FIRM CERTIFICATE AND DISCLOSURE
3
4              Veritext represents that the foregoing
    transcript as produced by our Production
5    Coordinators, Georgia Certified Notaries, is a
    true, correct and complete transcript of the
6    colloquies, questions and answers as submitted by
    the certified court reporter in this case.
7
8              Veritext further represents that the
    attached exhibits, if any, are a true, correct and
    complete copy as submitted by the certified
9    reporter, attorneys or witness in this case;
10             And that the exhibits were handled and
    produced exclusively through our Production
11    Coordinators, Georgia Certified Notaries.  Copies
    of notarized production certificates related to
12    this proceeding are available upon request to
    litsup-ga@veritext.com.
13
14             Veritext is not taking this deposition
    under any relationship that is prohibited by OCGA
    15-14-37(a) and (b).  Case-specific discounts are
15    automatically applied to all parties at such time
    as any party receives a discount.  Ancillary
16    services such as calendar and financial reports are
    available to all parties upon request.
17
18
19
20
21
22
23
24
25

PURSUANT TO PROTECTIVE ORDER

Page 202

1      R E P O R T E R    C E R T I F I C A T E
2 STATE OF GEORGIA )
   COBB COUNTY      )

3

4       I, Debra M. Druzisky, a Certified Court
   Reporter in and for the State of Georgia, do hereby
5 certify:
       That prior to being examined, the witness
6 named in the foregoing deposition was by me duly
   sworn to testify to the truth, the whole truth, and
7 nothing but the truth;
       That said deposition was taken before me
8 at the time and place set forth and was taken down
   by me in shorthand and thereafter reduced to
9 computerized transcription under my direction and
   supervision.  And I hereby certify the foregoing
10 deposition is a full, true and correct transcript
   of my shorthand notes so taken.
11        Review of the transcript was requested.
   If requested, any changes made by the deponent and
12 provided to the reporter during the period allowed
   are appended hereto.
13        I further certify that I am not of kin or
   counsel to the parties in the case, and I am not in
14 the regular employ of counsel for any of the said
   parties, nor am I in any way financially interested
15 in the result of said case.
       IN WITNESS WHEREOF, I have hereunto
16 subscribed my name this 14th day of February, 2022.
17
18
19

20      _____
      Debra M. Druzisky
21      Georgia CCR-B-1848
22
23
24
25

PURSUANT TO PROTECTIVE ORDER

Page 203

1          R E P O R T E R   D I S C L O S U R E

2     DISTRICT COURT   )   DEPOSITION OF
      NORTHERN DISTRICT)   RICHARD BARRON
3     ATLANTA DIVISION )

4               Pursuant to Article 10.B of the Rules and
      Regulations of the Board of Court Reporting of the
5     Judicial Council of Georgia, I make the following
      disclosure:

6               I am a Georgia Certified Court Reporter.
      I am here as a representative of Veritext Legal
7     Solutions.

8               Veritext Legal Solutions was contacted by
      the offices of Krevolin & Horst to provide court
      reporting services for this deposition.  Veritext
9     Legal Solutions will not be taking this deposition
      under any contract that is prohibited by O.C.G.A.
10    9-11-28 (c).

11              Veritext Legal Solutions has no contract
      or agreement to provide court reporting services
      with any party to the case, or any reporter or
12    reporting agency from whom a referral might have
      been made to cover the deposition.

13              Veritext Legal Solutions will charge its
      usual and customary rates to all parties in the
14    case, and a financial discount will not be given to
      any party in this litigation.

15

16

17              Debra M. Druzisky
                Georgia CCR-B-1848

18

19

20

21

22

23

24

25

PURSUANT TO PROTECTIVE ORDER

Page 204

1    Cheryl Ringer, Esquire

2    cheryl.ringer@fultoncountyga.gov

3                        February 9, 2022

4    RE:    Curling, Donna  v. Raffensperger, Brad

5          1/31/2022, Richard Barron (#5043387)

6          The above-referenced transcript is available for

7    review.

8          Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                      Yours,

23                      Veritext Legal Solutions

24

25

PURSUANT TO PROTECTIVE ORDER

```
                                              Page 205

 1    Curling, Donna  v. Raffensperger, Brad

 2    Richard Barron (#5043387)

 3                   E R R A T A  S H E E T

 4    PAGE_____ LINE_____ CHANGE_____

 5    _____

 6    REASON_____

 7    PAGE_____ LINE_____ CHANGE_____

 8    _____

 9    REASON_____

10    PAGE_____ LINE_____ CHANGE_____

11    _____

12    REASON_____

13    PAGE_____ LINE_____ CHANGE_____

14    _____

15    REASON_____

16    PAGE_____ LINE_____ CHANGE_____

17    _____

18    REASON_____

19    PAGE_____ LINE_____ CHANGE_____

20    _____

21    REASON_____

22

23    _____    _____

24    Richard Barron                              Date

25
```

PURSUANT TO PROTECTIVE ORDER

Page 206

1    Curling, Donna  v. Raffensperger, Brad

2    Richard Barron (#5043387)

3                ACKNOWLEDGEMENT OF DEPONENT

4        I, Richard Barron, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   Richard Barron                          Date

13   *If notary is required

14                    SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                    _____ DAY OF _____, 20____.

16

17

18                    _____

19                    NOTARY PUBLIC

20

21

22

23

24

25