## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## COALITION PLAINTIFFS' BRIEF IN CONSOLIDATED RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT
## (DOC. NOS. 1568 & 1571)

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ........................................................................ ii

TABLE OF AUTHORITIES ................................................................ vii

I.      INTRODUCTION ....................................................................... 1

II.     STANDARD OF REVIEW; DEGREE OF PROOF
        REQUIRED ON SUMMARY JUDGMENT ........................................... 3

III.    STANDING AND THE MERITS ARE DISTINCT
        QUESTIONS ................................................................................. 4

IV.     EVIDENCE SUPPORTS COALITION PLAINTIFFS'
        STANDING ..................................................................................... 5

        A.      Elements of Standing ..................................................... 6

                1.      Injury-in-Fact ......................................................... 6

                        a.      Invasion Of A Legally Protected Interest ................... 7

                        b.      Concreteness ............................................. 7

                        c.      Particularization ......................................... 8

                        d.      Imminence ................................................. 9

                        e.      No Minimum "Quantum" of Injury ........................... 9

                2.      Causation/Traceability ......................................... 10

                3.      Redressability ..................................................... 11

        B.      Evidence Shows Individual Plaintiffs And CGG Non-
                Party Members Are Threatened By Particularized
                Injuries-In-Fact .......................................................... 12

                1.      Exposure To Future Injuries From In-Person
                        Voting ................................................................ 13

|   | a. | Injuries-in-Fact ........................................................... 15 |
|   | b. | Causation .................................................................... 21 |
|   | c. | Redressability ............................................................. 22 |
|   | d. | Requested Relief......................................................... 22 |
| 2. | | Exposure To Injuries From Voting By Mail......................... 23 |
| 3. | | Exposure To An Unconstitutional Condition ....................... 28 |
| C. | | Evidence Shows Coalition for Good Governance Has Standing.......................................................................... 28 |
| 1. | | CGG's Associational Standing ............................................ 28 |
|   | a. | Law ............................................................................. 28 |
|   | b. | Evidence ..................................................................... 29 |
| 2. | | CGG's Diversion of Resources............................................ 30 |
|   | a. | Law ............................................................................. 30 |
|   | b. | Evidence ..................................................................... 30 |
| D. | | Each of Defendants' Arguments Against Standing Fails................ 32 |
| 1. | | None Of Plaintiffs' Injuries Is A Generalized Grievance .................................................................... 32 |
| 2. | | Plaintiffs' Injuries Are Not Speculative................................. 35 |
| 3. | | Plaintiffs' Injuries Are Fairly Traceable To Conduct By All Defendants .................................... 37 |
| E. | | Coalition Plaintiffs' Standing, If Not Conclusively Established, Is *At Least* Disputed—Thus No Grounds For Summary Judgment.......................................................... 38 |

V.   EVIDENCE SUPPORTS COALITION PLAINTIFFS'
     CLAIMS ON THE MERITS ......................................................................... 39

     A.   Applicable Law ............................................................................... 39

          1.   Plaintiffs' Section 1983 Claims ............................................... 39

               a.   Count I—Fundamental Right To Vote ......................... 39

               b.   Count II—Equal Protection ......................................... 40

          2.   *Anderson-Burdick* Governs The Merits ................................... 40

          3.   The Unconstitutional-Conditions Doctrine ............................. 41

     B.   This Court Has Already Made Evidentiary Findings And
          Conclusions Of Law Regarding Burden Under *Anderson-
          Burdick*—These Preclude Summary Judgment ................................. 42

          1.   Doc. 309 (Sep. 17, 2018) ........................................................ 44

          2.   Doc. 579 (Aug. 15, 2019) ....................................................... 44

          3.   Docs. 918, 965, And 966 (Sep. 28–Oct. 12, 2020)................ 45

          4.   Doc. 964 (Oct. 11, 2020) ........................................................ 45

     C.   Additional Evidence Shows That System Components
          Continue To Present A Substantial Risk That Voters Will
          Suffer Significant, Substantial, Or Severe Burdens......................... 48

          1.   Burdens On The Fundamental Right To Cast An
               Accountable Vote..................................................................... 48

          2.   Burdens On The Rights Of In-Person Voters To
               Cast An Equally Effective Vote................................................ 49

          3.   Burdens Of Being Forced To Vote Using An
               Inherently Unreliable Voting System ...................................... 50

               a.   System Is Easily Hacked, Thus Unreliable ................. 50

b. Advanced Persistent Threats Are "Here To Stay".............................................................. 51

c. System Is Now In The Wild—Coffee County........................................................................ 52

d. BMD Results Cannot Be Audited .............................. 54

e. Recounts Provide No Protection ................................. 55

f. Logic And Accuracy Testing Is Insufficient .............. 56

4. Burdens Imposed By The Lack of Ballot Secrecy................. 57

5. Burdens Of Ratifying BMD Interpretations Of Voter Intent ....................................................................... 58

6. The Burdens Imposed On In-Person Voters Are Not Excused By The Option To Vote By Mail .................... 59

D. The Only Tenable Conclusion Is That Significant, Substantial, Or Severe Burdens On Voters Are Caused By Requiring Them To Use This Voting System ............................ 61

VI. THE INTERESTS THAT DEFENDANTS ASSERT TO JUSTIFY THE THREATENED BURDENS ON VOTERS' RIGHTS ARE LEGALLY INSUFFICIENT UNDER *ANDERSON-BURDICK* ................................................................. 62

A. Avoiding Discrimination Against Disabled Voters ......................... 63

B. "Providing" Clear "Voter Intent".................................................... 64

C. Protecting Ballot Secrecy ................................................................ 65

D. Interest In Maintaining The BMD System Without Change......................................................................................... 65

VII. DEFENDANTS' OTHER ARGUMENTS PROVIDE NO GROUNDS FOR SUMMARY JUDGMENT............................................ 66

A. Mootness Of DRE Claims................................................................ 66

B.      Eleventh Amendment Immunity ........................................................ 67

VIII.  MODES OF VIOLATION UNADDRESSED BY THE
        MOTIONS ................................................................................................ 68

A.      Ballot Secrecy ..................................................................................... 68

        1.      Display Violation ..................................................................... 69

        2.      Traceability Violation ............................................................. 72

B.      Central-Count (ICC) Scanner Settings ............................................. 74

C.      PollPads .............................................................................................. 75

D.      New Arguments In Reply Briefs Not Proper .................................... 79

IX.    THE MOTIONS MUST BE DENIED ....................................................... 79

X.     CONCLUSION ........................................................................................... 80

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Allen v. Wright,*
    468 U.S. 737 (1984)...............................................................34

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983)...............................................................40

*Arcia v. Sec'y of Fla.,*
    772 F.3d 1335 (11th Cir. 2014) ..............................................10, 29, 30

*Bischoff v. Osceola Cty.,*
    222 F.3d 874 (11th Cir. 2000) .................................................4, 5

*Bochese v. Town of Ponce Inlet,*
    405 F.3d 964 (11th Cir. 2005) .................................................7, 35

*Bourgeois v. Peters,*
    387 F.3d 1303 (11th Cir. 2004) ..............................................41, 60

*Burdick v. Takushi,*
    504 U.S. 428 (1992)...............................................................40

*Campbell v. Rainbow City,*
    434 F.3d 1306 (11th Cir. 2006) ..............................................40

*Carney v. Adams,*
    141 S. Ct. 493 (2020)............................................................12

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986)...............................................................5

*Citizen Center v. Gessler,*
    770 F.3d 900 (10th Cir. 2014) .................................................7

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013)...............................................................9, 37

*Clark v. Coats & Clark, Inc.*,
929 F.2d 604 (11th Cir. 1991) ............................................................3

*Common Cause/Ga. v. Billups*,
554 F.3d 1340 (11th Cir. 2009) .........................................................29

*Crawford v. Marion County Election Bd.*,
553 U.S. 181 (2008)................................................................40, 41

*Crystal Dunes Owners Ass'n v. City of Destin*,
476 Fed. Appx. 180 (11th Cir. 2012)..................................................40

*Curling v. Raffensperger*,
50 F.4th 1114 (11th Cir. 2022) .......................... 12, 68, 74, 76, 77, 78

*Curling v. Sec'y of State of Georgia*,
761 Fed. Appx. 927 (11th Cir. 2019)..................................................68

*Day v. Bond*,
500 F.3d 1127 (10th Cir. 2007) ...........................................................4

*Democratic Exec. Comm. of Fla. v. Lee*,
915 F.3d 1312 (11th Cir. 2019) .........................................................40

*Duke Power v. Carolina Environmental Study Group, Inc.*,
438 U.S. 59 (1978).................................................................................4

*Fla. State Conference of the NAACP v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ..............................................9, 29, 36

*Ga. Ass'n of Latino Elected Offs., Inc. (GALEO) v. Gwinnett Cty. Bd.
of Registration & Elections*,
36 F.4th 1100 (11th Cir. 2022) ...................................7, 8, 9, 10, 30, 33

*Garcia-Bengochea v. Carnival Corp.*,
Nos. 20-12960, 20-14251, 2023 U.S. App. LEXIS 544 (11th Cir.
Jan. 10, 2023)...........................................................4, 10, 11, 38

*Gill v. Whitford*,
138 S. Ct. 1916 (2018).................................................................11, 33

*Greater Birmingham Ministries v. Sec'y of Ala.*,
992 F.3d 1299 (11th Cir. 2021) .........................................................29

viii

*Harper v. Va. Bd. Of Elections*,
  383 U.S. 663 (1966) .................................................................................33, 34

*Hunstein v. Preferred Collection & Mgmt. Servs.*,
  48 F.4th 1236 (11th Cir. 2022) ............................................................7

*Johnson v. Clifton*,
  74 F.3d 1087 (11th Cir. 1996) ............................................................79

*Jones v. Governor of Fla.*,
  975 F.3d 1016 (11th Cir. 2020) ..........................................................33

*In re Kellogg*,
  197 F.3d 1116 (11th Cir. 1999) ..........................................................67

*LaMarca v. Turner*,
  995 F.2d 1526 (11th Cir. 1993) ..........................................................11

*Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*,
  51 F.3d 982 (11th Cir. 1995) ..............................................................43

*Lewis v. Casey*,
  518 U.S. 343 (1996) ....................................................................11, 35

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................................3

*Made in the USA Found. v. United States*,
  242 F.3d 1300 (11th Cir. 2001) ..........................................................11

*Matamoros v. Broward Sheriff's Office*,
  2 F.4th 1329 (11th Cir. 2021) ............................................................43

*Moody v. Holman*,
  887 F.3d 1281 (11th Cir. 2018) ............................................................4

*Muransky v. Godiva Chocolatier, Inc.*,
  979 F.3d 917 (11th Cir. 2020) ...........................................7, 8, 18, 20, 35

*Nat'l All. for the Mentally Ill v. Bd. of Cty. Comm'rs*,
  376 F.3d 1292 (11th Cir. 2004) ..........................................................30

*Perez v. McCreary, Veselka, Bragg & Allen, P.C.*,
   45 F.4th 816 (5th Cir. 2022) .................................................................8

*Reeves v. Commissioner*,
   23 F.4th 1308 (11th Cir. 2022) ...............................................4, 11, 37

*Resnick v. AvMed, Inc.*,
   693 F.3d 1317 (11th Cir. 2012) .........................................................10

*Salcedo v. Hanna*,
   936 F.3d 1162 (11th Cir. 2019) .........................................................10

*Schiavo ex rel. Schindler v. Schiavo*,
   403 F.3d 1289 (11th Cir. 2005) ...................................................12, 68

*Sears v. Roberts*,
   922 F.3d 1199 (11th Cir. 2019) .........................................................61

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016)..............................................................6, 7, 8, 9

*Stein v. Ala. Sec'y of State*,
   774 F.3d 689 (11th Cir. 2014) ...........................................................61

*Strickland v. Norfolk S. Ry.*,
   692 F.3d 1151 (11th Cir. 2012) ...........................................................4

*Tashjian v. Republican Party*,
   479 U.S. 208 (1986)...........................................................................78

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017)..........................................................................6

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021).................................................................8, 37

*United States v. Students Challenging Regulatory Agency Procedures
   (SCRAP)*,
   412 U.S. 669 (1973)...........................................................................10

*WBY, Inc v. Dekalb County, Ga.*,
   695 Fed. Appx. 486 (11th Cir. 2017)................................................79

*Wexler v. Anderson,*
  452 F.3d 1226 (11th Cir. 2006) .......................................................25

*Williams v. Vermont,*
  472 U.S. 14 (1985)...........................................................................61

*Women's Emergency Network v. Bush,*
  323 F.3d 937 (11th Cir. 2003) ...........................................................6

*Wood v. Raffensperger,*
  No. 20-14813, 2021 U.S. App. LEXIS 23376, ___ Fed. Appx. ___
  (11th Cir. Aug. 6, 2021).................................................................32

*Wooden v. Bd. of Regents of the Univ. Sys.,*
  247 F.3d 1262 (11th Cir. 2001). ....................................................17

*Wreal, Ltd. Liab. Co. v. Amazon.com,*
  38 F.4th 114 (11th Cir. 2022) .........................................................43

**Statutes**

42 U.S.C. § 1983 .................................................................................39

52 U.S.C. § 21081(a)(1)(A)(i) .........................................14, 15, 17, 57

52 U.S.C. § 21081(a)(1)(A)(ii) ........................................14, 16, 17, 57

52 U.S.C. § 21081(a)(3)........................................................................63

Help America Vote Act....................................14, 15, 17, 57, 63

O.C.G.A. § 21–2–2(7.1).......................................................................14

O.C.G.A. § 21–2–281...........................................................................62

O.C.G.A. § 21–2–300...........................................................................21

O.C.G.A. § 21–2–300(a)(2) .....................................................13, 14, 66

O.C.G.A. § 21–2–31(1).........................................................................21

O.C.G.A. § 21–2–334...........................................................................22

O.C.G.A. § 21–2–365(6).......................................................................14

O.C.G.A. § 21–2–368(a) ...................................................................21

O.C.G.A. § 21–2–368(b) ...................................................................21

O.C.G.A. § 21–2–379.2(a) .................................................................21

O.C.G.A. § 21–2–379.2(b) .................................................................21

O.C.G.A. § 21–2–379.22 (5) .......................................................14, 15

O.C.G.A. § 21–2–379.22(6) ...................................................17, 56, 58

O.C.G.A. § 21–2–379.24 ....................................................................14

O.C.G.A. § 21–2–379.25(c) ................................................................56

O.C.G.A. § 21–2–383(c) .....................................................................13

O.C.G.A. § 21–2–384(b) .....................................................................17

O.C.G.A. § 21–2–385(a) .....................................................................26

O.C.G.A. § 21–2–409(b) .....................................................................63

O.C.G.A § 21–2–438(b) & (c) ............................................................37

O.C.G.A. § 21–2–452(h) .....................................................................63

O.C.G.A. § 21–2–568.1 .......................................................................16

O.C.G.A. § 21–2–70(13)..........................................................14, 21, 70

O.C.G.A. § 21–2–70(13).......................................................................37

O.C.G.A. §§ 21–2–70 to –77 ...............................................................21

O.C.G.A. § 21-2-379.22 (5)...........................................................57, 70

## Other Authorities

Fed. R. Civ. P. 56 ................................................................................69

Ga. Comp. R. & Reg. 183–1–12–.01 ..................................................62

Ga. Comp. R. & Reg. 183–1–12–.11(2)(b) .......................13, 17, 58, 59

Ga. Comp. R. & Reg. 183–1–12–.11(2)(c).............................................................62

Ga. Comp. R. & Reg. 183–1–12–.11(2)(d) ..........................................................62

Ga. Comp. R. & Reg. 183–1–15–.03(1)(b) ...........................................................56

Ga. Const. art. II, § 1, ¶ 1 ....................................................................................14

National Academy of Sciences, Securing the Vote: Protecting
    American Democracy (2018)..........................................................................59

U.S. Const. amend. I ................................................................14, 40, 41, 44

U.S. Const. amend. IV ...........................................................................................41

U.S. Const. amend. XI ..............................................................................67, 68

U.S. Const. amend. XIV ...........................................................14, 40, 44

U.S. Const. amend. XIV, § 1, Equal Protection Clause .......................34, 39, 46, 61

U.S. Const. art. III .................................................................................11, 38

Coalition Plaintiffs respectfully submit this Brief in Consolidated Response to Motions for Summary Judgment to address the motions and arguments by State Defendants (Doc. 1568) and Fulton County Defendants (Doc. 1571) (the "**Motions**"), stating as follows:

## I.    INTRODUCTION

The claims in this case must proceed to trial. Summary judgment is only appropriate for those cases in which claims are not supported by evidence. It is incredible that Defendants could imagine this case fits in that category, especially after *eight* motions for preliminary injunction have resulted in no less than *four* Orders[1] issued by this Court that have expressly found—on the basis of record evidence—that Plaintiffs have a substantial likelihood of succeeding on the merits of at least some of their claims. Two trips to the Eleventh Circuit have produced decisions that confirm in unequivocal terms that Defendants are subject to suit and that Coalition Plaintiffs had organizational standing as of the preliminary injunction stage. While the most recent appellate decision reversed an injunction obtained by Coalition Plaintiffs, it notably did not reach that result by concluding that there was any lack of evidence. That is the standard that applies to the Defendants' Motions, and it is a standard that they simply cannot meet in view of

---

[1] Coalition Plaintiffs have filed as Appendix 1 excerpts of the Courts' Orders that are cited in this case.

the massive record of evidence showing not only that Coalition Plaintiffs have standing, but also that Defendants' BMD voting system imposes burdens on voters in a variety of ways that bear on the merits of Plaintiffs' constitutional claims. Weighing those burdens is not the task currently before this Court; the only question is whether Plaintiffs' claims are supported by evidence. There is no world in which the answer to that question at this stage of proceedings, after nearly six years of litigation, is anything other than a resounding "yes."  The merits of the Coalition Plaintiffs' constitutional claims must be allowed to go to trial.

In their Motion (Doc. 1568), State Defendants seek summary judgment on Coalition Plaintiffs' claims raised in the Third Amended Complaint (Doc. 226) and in the First Supplemental Complaint (Doc. 628). In their Motion (Doc. 1571), Fulton County Defendants only seek summary judgment on Coalition Plaintiffs' claims raised in the First Supplemental Complaint.[2] (Doc. 1571, at 1, 2.) None of Defendants' arguments for summary judgment has any merit.

In this Response Brief, Coalition Plaintiffs proceed as follows: Part II explains the standard of review and degree of proof required for standing and on the merits. Part III discusses the significant distinction between the particularized injuries required for Plaintiffs to have standing, on one hand, and the generalized

---

[2] Fulton County's Motion and supporting brief consistently refer to the *proposed* First Supplemental Complaint, or Doc. 601. This Brief presumes Fulton County intends to target the *docketed* First Supplemental Complaint, or Doc. 628.

burdens on voters that bear on resolution of the merits, on the other hand. Part IV

outlines the evidence in the record that shows Coalition Plaintiffs have standing.

Part V outlines the evidence in the record that shows Coalition Plaintiffs have

demonstrated the existence of burdens on constitutional rights caused by

Defendants' challenged conduct. Part VI explains why the interests Defendants

offer to justify their conduct are legally insufficient. Part VII addresses why

Defendants' other arguments for summary judgment are wrong. Part VIII discusses

Defendants' failure to even attack three key mechanisms by which Plaintiffs'

constitutional rights are violated by the BMD voting system. Part IX ties the

various arguments together and shows why Defendants' Motions must be denied.

Part X concludes by asking this Court to deny the Motions.

## II.   STANDARD OF REVIEW; DEGREE OF PROOF REQUIRED ON SUMMARY JUDGMENT

The Court is well familiar with the standards for granting summary

judgment, so it only bears noting that Defendants bear the initial burden to show

there are no genuine issues of fact. "Only when that burden has been met does the

burden shift to the non-moving party to demonstrate that there is indeed a material

issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929

F.2d 604, 608 (11th Cir. 1991). On the issue of standing, statements in Plaintiffs'

declarations "will be taken to be true." *Lujan v. Defenders of Wildlife*, 504 U.S.

555, 561 (1992). "Where a fact-finder is required to weigh a

deponent's credibility, summary judgment is simply improper." *Strickland v. Norfolk S. Ry.*, 692 F.3d 1151, 1162 (11th Cir. 2012). "[W]hen determining standing, a district court should resolve disputed factual issues either at a pretrial evidentiary hearing or at trial." *Bischoff v. Osceola Cty.*, 222 F.3d 874, 879 (11th Cir. 2000).

## III.   STANDING AND THE MERITS ARE DISTINCT QUESTIONS

Standing and the merits are distinct questions. *See, e.g.*, *Moody v. Holman*, 887 F.3d 1281, 1286 (11th Cir. 2018) ("[W]e . . . have endeavored to treat the concepts of [standing and the merits] distinctly[.]"). "We must assume the validity of a claim in assessing standing." *Garcia-Bengochea v. Carnival Corp.*, Nos. 20-12960, 20-14251, 2023 U.S. App. LEXIS 544, at *11 (11th Cir. Jan. 10, 2023) "There is no need for a plaintiff to demonstrate a connection between the injury he claims and the rights being asserted." *Reeves v. Commissioner*, 23 F.4th 1308, 1317-18 (11th Cir. 2022) (cleaned up) (citing *Duke Power v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 78 (1978)). In other words, "the alleged injury upon which the plaintiffs rely to establish standing" can be "distinct from the merits of claims they assert." *Day v. Bond*, 500 F.3d 1127, 1138 (10th Cir. 2007).

Coalition Plaintiffs assert infringements on constitutional rights on the merits that certainly comprise injuries-in-fact for standing purposes. But it is

critical to emphasize, given the degree to which Plaintiffs' standing has been attacked by Defendants in this case, that the evidence before the Court plainly demonstrates numerous injuries-in-fact that are capable of conferring standing even *without* being constitutional violations that are dispositive on the merits. It can be beneficial to focus on such lesser injuries-in-fact during the threshold determination of standing because doing so ensures the standing analysis is not improperly conflated with the merits—and vice versa. The distinction matters because the merits are ***permitted*** to be decided on the basis of constitutional burdens that are themselves much more generalized than the particularized injuries-in-fact required to give Plaintiffs standing.

## IV.   EVIDENCE SUPPORTS COALITION PLAINTIFFS' STANDING

In their Motions, Defendants utterly fail to show an "absence of evidence" on any element of Plaintiffs' standing. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) . The burden never properly shifts to Coalition Plaintiffs to demonstrate otherwise. The Motions should simply be denied insofar as they assert a lack of standing. Nonetheless, to eliminate all doubt, Coalition Plaintiffs show below that the record contains abundant evidence establishing every required element of several forms of standing—individual, organizational, and associational. When "we accept Plaintiffs' evidence as true," *Bischoff*, 222 F.3d at 885, the only possible conclusion is that Coalition Plaintiffs' standing, if not conclusively

established, is *at least* disputed—and thus provides no grounds for granting summary judgment.

### A.    Elements of Standing

"Our cases have established that the 'irreducible constitutional minimum' of standing consists of three elements. .... The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). A "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought"—*i.e.*, damages, injunctive relief, or declaratory relief. *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650–51 (2017). Where there are multiple plaintiffs, only one needs to have standing. *Id*.

#### 1.    Injury-in-Fact

"To establish individual standing, a plaintiff must first demonstrate that he suffered an injury-in-fact as a result of the defendant's conduct." *Women's Emergency Network v. Bush*, 323 F.3d 937, 946 (11th Cir. 2003). An injury-in-fact is defined as "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Robins*, 578 U.S. at 339 (cleaned up).

6

### a.   Invasion Of A Legally Protected Interest

A legally protected interest is one that "is protected by statute or otherwise." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 980 (11th Cir. 2005). To be protected, an interest "must consist of obtaining compensation for, or preventing, the violation of a legally protected right." *Id.* at 980. An invasion exists if "the plaintiffs have a legal right to do what is allegedly being impeded." *Citizen Center v. Gessler*, 770 F.3d 900, 910 (10th Cir. 2014).

### b.   Concreteness

"An injury is concrete if it actually exists—that is, if it is 'real, and not abstract.'" *Hunstein v. Preferred Collection & Mgmt. Servs.*, 48 F.4th 1236, 1242 (11th Cir. 2022). "[I]intangible injuries can nevertheless be concrete." *Robins*, 578 U.S. at 340.

Violations of constitutional rights are *per se* "intangible harms that are also both direct and concrete." *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 926 (11th Cir. 2020) (giving examples of free speech and free exercise). Suffering a "disadvantage" in exercising the right to vote is both a "concrete and particularized injury." *Ga. Ass'n of Latino Elected Offs., Inc. (GALEO) v. Gwinnett Cty. Bd. of Registration & Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022). Statutory violations that lead "to a type of harm that has historically been recognized as actionable" are also concrete, with the caveat that violations of

statutory rights without substantive harm are not concrete injuries. *Muransky*, 979

F.3d at 926.

Being exposed only to a *risk* of harm, without any other actual harm, can be

a concrete injury, depending on the type of relief sought. For claims seeking

retrospective relief like damages (which are not at issue in this case), exposure to a

risk of future harm is a concrete injury ***only*** if "the exposure to the risk of future

harm itself causes a *separate* concrete harm"—*e.g.*, emotional distress. *GALEO*, 36

F.4th at 1114 (original emphasis) (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct.

2190, 2210–11 (2021). "But the story is different where a plaintiff requests a

'forward-looking' remedy such as an injunction or declaration." *Perez v.*

*McCreary, Veselka, Bragg & Allen, P.C.*, 45 F.4th 816, 827 (5th Cir. 2022). For

those kinds of claims seeking *prospective* relief (such as Coalition Plaintiffs seek

in this case), the mere exposure to "a risk of future harm" ***does*** satisfy the

concreteness requirement "so long as the risk of harm is sufficiently imminent and

substantial." *TransUnion*, 141 S. Ct. at 2210.

### c.    Particularization

A "particularized" injury is one that affects the plaintiff "in a personal and

individual way." *Robins*, 578 U.S. at 339. "The fact that an injury may be suffered

by a large number of people does not of itself make that injury a nonjusticiable

generalized grievance," so long as "each individual suffers a particularized harm.

*Id.* at 339 n.7 (giving example of widely share injuries from a mass tort).

### d.     Imminence

"An imminent injury is one that is 'likely to occur immediately.'" *Fla. State Conference of the NAACP v. Browning*, 522 F.3d 1153, 1161 (11th Cir. 2008). This definition has two components—immediacy and likelihood. The first of these, immediacy, has a temporal connotation but "requires only that the anticipated injury occur with[in] some fixed period of time in the future, not that it happen in the colloquial sense of soon or precisely within a certain number of days, weeks, or months." *Id.*

Likelihood, by contrast, connotes a sense of *probability* akin to the "sufficiently imminent and substantial" requirement for concreteness discussed above. "A plaintiff seeking prospective relief to prevent future injuries must prove that their threatened injuries are 'certainly impending.'" *GALEO*, 36 F.4th at 1114 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013)). "To be likely enough, the threatened future injury must pose a 'realistic danger' and cannot be merely hypothetical or conjectural. How likely is enough is necessarily a qualitative judgment[.]" *Browning*, 522 F.3d at 1161.

### e.     No Minimum "Quantum" of Injury

"There is no minimum quantitative limit required to show injury; rather, the focus is on the qualitative nature of the injury, regardless of how small the injury

may be." *Salcedo v. Hanna*, 936 F.3d 1162, 1172 (11th Cir. 2019). Injury-in-fact "serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem." *Arcia v. Sec'y of Fla.*, 772 F.3d 1335, 1340 (11th Cir. 2014). "The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973).

### 2.   Causation/Traceability

After injury-in-fact, the second element of standing is traceability, or causation. "To satisfy the traceability requirement, a plaintiff must establish a 'causal connection between the injury and the conduct complained of.'" *Garcia-Bengochea*, 2023 U.S. App. LEXIS 544, at *17–18. "The injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *GALEO*, 36 F.4th at 1115. "A showing that an injury is fairly traceable requires less than a showing of proximate cause." *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) . "[T]he presence of multiple actors in a chain of events that lead to the plaintiff's injury does not mean that traceability is lacking with respect to the conduct of a

particular defendant." *Garcia-Bengochea*, 2023 U.S. App. LEXIS 544, at *21.[3]

### 3.    Redressability

The third and final element of standing is redressability. "Redressability simply requires a plaintiff to seek a remedy that is likely to redress the injury which is fairly traceable to the challenged conduct. The remedy need not be complete or relieve every injury alleged in order to satisfy Article III standing." *Reeves*, 23 F.4th at 1318 (cleaned up). "[P]artial relief is sufficient for standing purposes." *Made in the USA Found. v. United States*, 242 F.3d 1300, 1310 (11th Cir. 2001).

The conduct by Defendants that causes the standing injuries-in-fact defines the scope of the relief that Plaintiffs can obtain. The relief awarded "must of course be limited to the inadequacy that produced the injury in fact," *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018) (citing *Lewis v. Casey*, 518 U.S. 343, 357 (1996)), but "statewide" relief is justified if standing injuries-in-fact can only be solved by a broad remedy, *see id*. at 1930–31. This Court has "broad discretion" to fashion appropriate equitable relief for an existing wrong. *LaMarca v. Turner*, 995 F.2d 1526, 1543 (11th Cir. 1993).

---

[3] This authority largely disposes of Fulton County's argument that the availability of relief against the State makes the County a superfluous defendant.

**B.    Evidence Shows Individual Plaintiffs And CGG Non-Party Members Are Threatened By Particularized Injuries-In-Fact**

Evidence in the record shows individual Coalition Plaintiffs and non-party members of CGG have individual standing to challenge the lawfulness of Defendants requiring all in-person voters to use BMDs and related aspects and components of the system in their current configurations.

Because standing must be maintained throughout a case, *Carney v. Adams*, 141 S. Ct. 493, 399 (2020), Coalition Plaintiffs' standing has been tested multiple times and has always been found sufficient. This Court has already found that Coalition Plaintiffs properly alleged standing from the beginning of the case for both operative complaints. (Doc. 309, at 16–29; Doc. 751, at 34–45.) In addition, the Eleventh Circuit held in 2022 that Coalition Plaintiffs had "credibly" shown organizational standing at least through the appeal of the 2020 preliminary injunction hearings. *Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022).[4] The present record evidence only strengthens the successful showing of standing that Coalition Plaintiffs have consistently made at all previous stages of the case.

---

[4] The appellate holding, in particular, is law of the case that is "binding in all subsequent proceedings in the same case in the trial or on a later appeal." *Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1289, 1291 (11th Cir. 2005).

### 1.   Exposure To Future Injuries From In-Person Voting

Certain Coalition Plaintiffs (and members of CGG) wish to vote in person, either early or on Election Day, in upcoming Georgia elections.[5] Defendants intend to enforce O.C.G.A. § 21–2–300(a)(2), § 21–2–383(c), and related rules and practices[6] in those same upcoming Georgia elections. This means Defendants will require these Plaintiffs and members to vote using the BMDs and related components in their current configurations.[7] Defendants' conduct will thus subject these Plaintiffs and members—with certainty—to imminent invasions of certain legally protected interests. The threatened injuries are both concrete and particularized. Coalition Plaintiffs thus have standing to seek prospective relief from Defendants' enforcement of O.C.G.A. § 21–2–300(a)(2), O.C.G.A. § 21–2–383(c), and related rules and practices.

As an initial matter, those Coalition Plaintiffs (and CGG members) who

---

[5] *See* SOAF ¶  12; *see also* Doc.1597 (Decl. Nakamura) ¶¶ 6–8;  Doc. 1592 (Decl. Forney) ¶ 7, 27; Doc. 1593 (Decl. Dufort) ¶¶ 22–23; Doc. 1595 (Decl. Missett) ¶¶ 6–7, 13; Doc. 1591 (Decl. Davis) ¶¶ 7–8; Doc. 1617 (Decl. Wasson) ¶ 15.

[6] For example, SEB Rule 183-1-12-.11(2)(b) requires all in-person voters to verify the contents of the ballot card generated by their BMD *after* they have completed all of their selections on the touchscreen—effectively saddling every in-person voter with the burdensome chore of doublechecking the accuracy of machines that have supposedly already been certified by State Defendants as safe and accurate to use and put through pre-election testing.

[7] As used in this brief, "in-person voters" is meant to include most early and election-day voters, but not those who cast provisional and emergency ballots. Provisional and emergency ballots are hand-marked paper ballots.

wish to vote in person have numerous legally protected interests that will be affected by Defendants' challenged conduct. These interests include: the fundamental right to vote and to have that vote counted correctly, U.S. Const. amend. XIV; the federal constitutional right to equal protection, U.S. Const. amend. XIV; the federal constitutional right to speak and associate through the ballot, U.S. Const. amend. I; the federal statutory interests under the Help America Vote Act ("**HAVA**") in being able to "verify (in a private an independent manner) the votes selected by the voter on the ballot before the ballot is cast and counted," 52 U.S.C. § 21081(a)(1)(A)(i), and to "to change the ballot or correct any error before the ballot is cast and counted," 52 U.S.C. § 21081(a)(1)(A)(ii); the state constitutional right to cast a "secret ballot," Ga. Const. art. II, § 1, ¶ 1; the state statutory rights to "voting in absolute secrecy" using BMDs, O.C.G.A. § 21–2–379.22(5); *see also* O.C.G.A. § 21–2–365(6); O.C.G.A. § 21–2–70(13); the interest under Georgia law in voting on a "safe and practicable for use" voting system, O.C.G.A. § 21–2–300(a)(2), that has been correctly certified as capable of being "safely and accurately used by electors," O.C.G.A. § 21–2–379.24; the interest under Georgia law in using "an elector verifiable paper ballot," O.C.G.A. § 21–2–2(7.1), which "is marked with the elector's choices in a format readable by the elector," O.C.G.A. § 21–2–379.22(6); the interests to choose to vote in person, to choose to vote in a polling place, and to choose to vote on Election Day itself; and

others. These are the sorts of legally protected interests that will be invaded when the State and Fulton Defendants require the Coalition Plaintiffs and CGG members to use BMDs and related components for in-person voting or vote by mail instead.

### a.    Injuries-in-Fact

Evidence in the record shows the foregoing legally protected interests of individual Plaintiffs and CGG members will be invaded in a variety of ways by Defendants' challenged conduct. For example:

*Plaintiffs using BMD touchscreens to make voting choices, will ...*

- …be forced to vote on an excessively large touchscreen that, because of its physical size and brightness, makes it difficult to conceal their vote selections from others in the polling place. This BMD design flaw will impede these voters' legally protected interest in "voting in absolute secrecy so that no person can see or know any other elector's votes." O.C.G.A. § 21-2-379.22 (5).[8]

- … be forced by the excessively large touchscreens to verify and change their touchscreen vote selections in a manner visible to others, in violation of their interest under HAVA in doing so "in a private … manner." 52 U.S.C.

---

[8] These threatened injuries are particularized. (Doc.1592 (Decl. Forney) ¶ 8-19; Doc. 1593 (Decl. Dufort) ¶¶ 15-17); *see also* Coalition Plaintiffs Supplemental Statement of Additional Facts ("**CGG SOF**") Nos. 26, 27.

§ 21081(a)(1)(A)(i)–(iii).[9]

- … be forced, while voting, to undertake the difficult task of attempting to simultaneously vote and memorize the ballot content of multiple screens of races to be able to try to verify their ballot after it is printed.[10]

- … be forced to endure the risk of appearing to commit and to be accused of committing a felony under O.C.G.A. § 21–2–568.1(b), by observing another voter's vote selections displayed on the excessively large touchscreens.[11]

- … be treated differently than similarly situated voters who vote by mail in the same election and who are allowed to (1) vote *without* being required to memorize all their on-screen vote selections for subsequent comparison to the content of a printed ballot card; (2) vote *without* being required to risk being accused of committing felony observation of other voters' ballots; (3) vote on

---

[9] Plaintiff Megan Missett, (Doc.1595 (Decl. Missett) ¶ 19), and CGG director and member Rhonda Martin, (Doc. 1594 (Decl. Martin) ¶ 8), have a legal right to privately skip voting in certain races, but that privacy will be invaded by the public display of undervote notifications on oversized voting touchscreens. *See* CGG SOF No. 3.

[10] Plaintiff Megan Missett, (Doc. 1595 (Decl. Missett) ¶¶ 16–17), and CGG members Nakamura, (Doc.1597 (Decl. Nakamura) ¶¶ 49–51), and Martin, (Doc. 1594 (Decl. Martin) ¶ 10), state that, given the length of the ballots, it would be nearly impossible to memorize the contents of their long ballots and thus to verify the printout. *See also* CGG SOF No. 4.

[11] CGG members Nakamura, (Doc. 1597 (Decl. Nakamura) ¶ 43), and Throop, (Doc. 1596 (Decl. Throop) at ¶ 25) stated that they have concerns about being accused of a felony of attempting to see another voter's touchscreen selection. *See also* CGG SOF No. 2.

ballots *with* secrecy sleeves that preserve the secrecy of their vote selections rather than displaying those selections publicly;[12] and (4) skip voting on some races and correct errors *without* public visibility on a large touchscreen. The "exposure to unequal treatment … constitutes the injury-in-fact giving rise to standing." *Wooden v. Bd. of Regents of the Univ. Sys.*, 247 F.3d 1262, 1279 (11th Cir. 2001).

*Plaintiffs and members, after printing their BMD ballot cards, will …*

- … be unable to verify the content of the QR-encoded official vote selections that they are about to cast,[13] in violation of the right to vote, the rights to verify and correct errors under HAVA, 52 U.S.C. § 21081(a)(1)(A)(i)–(ii), and the right to cast votes in a human-readable format under O.C.G.A. § 21-2-379.22(6);[14]

- … be forced under SEB Rule 183-1-12-.11(2)(b) to verify the natural

---

[12] O.C.G.A. § 21–2–384(b) requires the use of mail-ballot secrecy sleeves.

[13] *See* Doc. 1592 (Decl. Forney) ¶ 23; Doc. 1595 (Decl. Missett) ¶ 21; Doc. 1596 (Decl. Throop) ¶ 32; Doc. 1593 (Decl. Dufort) ¶ 13; Doc. 723 (Decl. Nakamura) at 41, ¶ 12; Doc. 1617 (Decl. Wasson) ¶ 19.

[14] Plaintiffs Missett, (Doc. 1595 (Decl. Missett) ¶ 21), and CGG member Wasson, (Doc.1617 (Decl. Wasson) ¶ 19), attest to their inability to read QR-encoded votes. *See also* CGG SOF No. 5.

language portion of their ballot card's contents[15]—a difficult and time-consuming[16] memory chore that most voters cannot do accurately, and which is pointless given that the natural language portion is not what is counted by the tabulator;[17] and

- … be treated differently than similarly situated voters who vote by mail in the same election and who are allowed to (1) create the official record of their own vote selections by marking a paper ballot by hand, without relying on a computer intermediary; (2) vote on a paper ballot that shows their official vote choices in a format that is readable and verifiable by humans; (3) make their vote selections only once *without* being required to verify the completeness and accuracy of how those vote selections are reproduced on a computer-generated ballot card; and (4) know the vote selections they made by hand are the only record of their selections and thus will be utilized during a hand count or audit, unlike the

---

[15] Former State Election Director Chris Harvey acknowledged in a public information video that the voter is "charged with making sure that they have reviewed and confirmed their ballot choices." *See* CGG SOF No. 6.

[16] *Muransky*, 979 F.3d at 930 (wasted time is an injury-in-fact if pled). Coalition Plaintiffs pled facts showing that verification of BMD ballot cards would be "tedious and repetitive" and would be skipped if there were lines of others waiting to vote. (Doc. 628, at 38, ¶ 117; *see also* ¶¶ 140, 198.)

[17] Plaintiff Missett, (Doc. 1595 (Decl. Missett) ¶ 21), and CGG member Martin, (Doc. 1594 (Decl. Martin) ¶ 11), state the printed text on their ballot cards they are required to verify is not the marked vote that will be counted by the voting system. *See* CGG SOF No. 9.

QR-encoded selections on a BMD ballot card.[18]

*Plaintiffs, when using the precinct (ICP) scanner, will ...*

- … be forced to cast a ballot that is recorded on the precinct ICP memory card in the chronological order it is cast, creating the risk that insiders with access to ICP memory cards can connect the voter to the ballot cast.[19] [20]

- … be forced to cast a ballot that is recorded in the sequence voted and assigned a predictable record number that becomes part of the cast vote record and is publicly accessible through audits and public records requests. (Doc. 1569-44 (Decl. Stark) ¶¶ 24–29.) The predictable sequence number permits identifiable voters to be connected with their ballots. (Docs. 1589-10, 1590-1.)

- … be treated differently than similarly situated voters who vote by mail in the same election and who are allowed to vote using a voting method (hand-marked paper ballots counted centrally) that does not make individual voters' ballots traceable back to them.

*Plaintiffs, when checking in to the polling place at the outset, will ...*

- … be at risk of being disenfranchised due to being turned away at the

---

[18] Only mail ballots that are damaged or otherwise unreadable are duplicated onto or otherwise converted into BMD ballots. *See* CGG SOF No. 14.

[19] *See* Section VIII.B.2 for explanation of these two ballot secrecy violations, the "traceability violations."

[20] *See supra* note 8 concerning the substantial harms that Dr. Forney and Ms. Dufort stand to suffer if their personal voting choices are exposed.

polling place when the PollPad shows an inaccurate county of residence.[21]
Disenfranchisement can also occur if the voter is required to vote the wrong ballot
content by voting in the wrong location;[22]

- … be at risk of suffering wasted time during voting,[23] which can be a
standing injury if pled. *See Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917,
930 (11th Cir. 2020);

- … be at risk of having to vote a provisional ballot, which is delayed in
counting, may disenfranchise a voter from voting in some local races, and may
require voter follow-up for cure of ballot;[24]

- … be at risk of obtaining the wrong ballot content (and being
disenfranchised) where PollPad errors assign voters to the wrong polling place;[25]

- … being unable to check in to vote in case of a cyberattack.[26]

---

[21] *See* SOAF #13 (incident of PollPad errors causing voter to be unable to vote).

[22] CGG members Nakamura, (Doc. 1071-5 (Decl. Nakamura) ¶ 27), and Martin,
(Doc. 1594 (Decl. Martin) ¶ 13), intend to avoid voting in-person on Election Day
to avoid electronic poll book errors that would delay their voting, their counting of
their ballot, and the risk of partial or full disenfranchisement.

[23] *See* Doc 258-1 (Decl. Clark) ¶¶ 14–15; Doc. 628, ¶ 198 (alleging "long lines to
vote").

[24] CGG member Nakamura intends to avoid in-person voting on Election Day to
avoid this risk. (Doc. 1071-5 (Decl. Nakamura) ¶ 27.)

[25] *See* CGG SOF No. 16; Doc. 1596 (Decl. Throop) ¶ 42.

[26] CGG member Nakamura observed back up pollbooks were not available in
polling places. (Doc. 1597 (Decl. Nakamura) ¶¶ 68–70.)

In addition to these component-specific injuries, the design of the Dominion BMD System generally makes in-person voters less likely to cast an effective vote than absentee mail voters, who are allowed to vote on a hand-marked paper ballot that the voter marks without a computer intermediary, and with the confidence that they can see and read the vote they cast. Mail ballot voters, who are allowed to cast hand-marked paper ballots, make their own ballot markings and thus do not need to perform any additional verification or accuracy testing to confirm that the marks on their paper ballot are the choices they selected on the touchscreen.

### b.   Causation

All the foregoing injuries-in-fact are causally traceable to conduct by both the State Defendants and the Fulton County Defendants. The Secretary of State is responsible for approving or discontinuing the use of Georgia's voting systems, O.C.G.A. § 21–2–379.2(a), –379.2(b), –368(a), –368(b), and for determining the voting equipment to be used in Georgia's elections, O.C.G.A. § 21–2–300. The State Election Board is responsible for promulgating rules and regulations to obtain uniformity in election practices, O.C.G.A. § 21–2–31(1), which includes pre-election system testing and post-election audit practices. Fulton County is directly responsible for conducting elections in Fulton County, O.C.G.A. §§ 21–2–70 to –77, for doing so in a manner that guarantees the secrecy of the ballot, O.C.G.A. § 21–2–70(13), and for determining whether to use paper ballots if the use of

21

voting machines is not practicable, O.C.G.A. § 21–2–334. All Defendants play a role in enforcing the requirements for in-person voters to use the BMD system.

### c.    Redressability

All the foregoing threatened injuries are redressable by injunctive relief, as a general matter, because they are future harms that can be prevented by an order from this Court that, *e.g.*, stops the required use of BMDs and ballot-card printers and requires an effective backup for unreliable electronic pollbooks. If Defendants are enjoined from enforcing requirements for all in-person voters to use BMDs, these harms will not occur.

### d.    Requested Relief

Coalition Plaintiffs are seeking injunctive relief that will remedy their threatened injuries-in-fact. First, Coalition Plaintiffs are requesting an injunction that stops Defendants from requiring in-person voters to use BMDs. Coalition Plaintiffs propose that the Court should instead require Defendants to permit in-person voters to use hand-marked paper ballots. The prohibitory portion of this requested relief will prevent the future harms the BMDs and ballot-card printers will otherwise cause.

Second, Coalition Plaintiffs are requesting an injunction that stops Defendants from continued use of the precinct (ICP) scanners with their current software configurations, which permit traceability of ballots. The Court should

instead require Defendants to update the ICP software to avoid the traceability flaw ballot sequence recording, or change ballot handling processes to permit secure shuffling of ballots prior to scanning. Such relief will prevent harms the precinct (ICP) scanners will otherwise cause.

Third, Coalition Plaintiffs are also requesting an injunction that stops Defendants from continued exclusive reliance on the vulnerable electronic pollbooks, in combination with an outdated paper voter list, to check in in-person voters on Election Day. This Court should instead require Defendants to make adequate provision for the predictable failures and malfunctions of electronic pollbooks by requiring the State to provide and the Fulton County Defendants to use, as a backup to the electronic pollbooks, a pollbook obtained from the master voter registration list, updated to be current as of the close of early voting, on a secure read-only USB stick or a paper back up pollbook. This relief will prevent the future harms the electronic pollbooks will otherwise cause.

### 2.    Exposure To Injuries From Voting By Mail

Certain Coalition Plaintiffs (and members of CGG) will vote by mail instead of voting early in person or in person on election day.[27] These individuals are

---

[27] Plaintiff Ricardo Davis, (Doc. 1591 (Decl. Davis) ¶ 9), and CGG member Nakamura, (Doc. 1596 (Decl. Nakamura) ¶¶ 8, 46, 54, 58, 65–66), intend to vote by mail ballot to avoid the risks of voting on the BMD system. *See also* CGG SOF No. 11.

exposed to a number of threatened injuries to legally protected interests that arise both from the mail voting process and from the use of central-count (ICC) scanners to tabulate mail-in votes.

*Mail Voting—Processes Prior To Tabulation*

This Court has already recognized from evidence in the record that mail voting in Georgia's current system entails "potential uncertain postal delivery issues, untimely processing by the registrar's office, signature matches, etc.," as well as the "significant burden resulting from the accuracy and voter invalidation issues that affect Dominion's scanner/tabulators and adjudication software used for determining voter intent and tallying hand-marked absentee ballots." (Doc. 964, at 83.) Coalition Plaintiffs and CGG members who intend to vote by mail will be subjected to all those same burdens and injuries, as well as, at least, the following ones simply by virtue of how Defendants conduct mail voting:

- … being burdened in exercising the right to vote by having to apply for ballots using a long application, to monitor Defendants' receipt of ballot applications, to track issuance of their ballots, and then to monitor Defendants' receipt and acceptance of their completed ballots after mailing them back. These processes are both more time-consuming than in-person voting and subject the

24

mail voter's ballot to greater risks of votes not counting.[28]

- … having their interest in safeguarding the privacy of their personally identifiable information being invaded because ballot envelopes sent through the mail in both directions publicly expose that information.

- … having their mail ballots, if damaged in processing, be converted to BMD ballots without their knowledge.[29]

- … being treated differently than similarly situated voters who vote in person in the same election, and casting votes that are less likely to be effective as a result, *Wexler v. Anderson*, 452 F.3d 1226, 1231 (11th Cir. 2006), since in-person voters (1) are not exposed to the same risks of not receiving their ballots;[30] (2) do not have to suffer the same exposure of personally identifiable information to

---

[28] Plaintiff Missett, (Decl. ¶ 9–13), and CGG member Wasson, (Doc. 1617 (Decl. Wasson) ¶¶ 8–14, 22), have suffered these burdens while applying for, monitoring, and timely receiving mail ballots, and will do so again. *See also* CGG SOF No. 10.

[29] CGG member Dufort is at risk of involuntarily having her hand marked ballot converted to a BMD ballot in the mail ballot duplication process. (Doc. 1593 (Decl. Dufort) ¶¶ 8–21.)

[30] CGG members Nakamura, (Doc. 1597 (Decl. Nakamura) ¶¶ 77–78), and Martin, (Doc. 1594 (Decl. Martin) ¶ 18), declare that the Secretary of State's records show that they did not participate in certain elections where they did, in fact, cast an absentee ballot—apparently ineffectively.

vote;[31] (3) do not have to go through all the same time-consuming and error-prone procedural steps to be able to obtain and timely return their ballots;[32] and (4) enjoy the benefit of being able to wait until Election Day to make their voting decisions.[33]

### Mail Voting—Tabulation By Central-Count (ICC) Scanners

As this Court has previously concluded, "evidence supports a finding that the modified scanner settings [on Defendants' central-count (ICC) scanners used to tabulate hand-marked absentee, provisional, and emergency ballots] may well still result in the rejection of valid votes and ballots falling through the identified crack in the system by failing to flag visibly clear voter marks for adjudication by a review panel." (Doc. 964, at 139.)

The Court recognized the injury of "specific voter disenfranchisement" was

---

[31] CGG members Dufort, (Doc. 1593 (Decl. Dufort) ¶¶ 30–31), and Wasson, (Doc. 1617 (Decl. Wasson) ¶¶ 9–10), fear the risk of putting their personally identifying information on mail ballot envelopes which can be read by those handling ballots at the USPS or Dropbox pick up.

[32] CGG member Wasson (Doc. 1617 (Decl. Wasson) ¶¶ 7–10 ), drives 16 miles to hand deliver her applications and her mail ballots because of security and postal service concerns.  CGG member Nakamura had to drive her ballots 34 miles roundtrip for hand delivery to submit timely because of late delivery of mail ballot. (Doc. 1597 (Decl. Nakamura) ¶ 82.)

[33] CGG member Wasson, (Doc. 1071-7 (Decl. Wasson) ¶ 15), is injured by having to mark her mail ballots *prior* to Election Day, even if she plans to deliver it *on* Election Day, *see* O.C.G.A. § 21–2–385(a). Voting by mail necessarily impedes Plaintiffs' ability to enjoy their legally protected interest in making their voting choices on Election Day.

threatened "by operation of the optical scanners/tabulators in tandem with the
BMD adjudication software."  (Doc. 964, at 140.) The record contains no evidence
that these scanner settings have been changed, much less improved, since the Court
last addressed them in its Order deferring relief in December 2020. (Doc. 1021.)
Accordingly, the same evidence this Court found sufficient in 2020 to justify
findings of injuries-in-fact threatened by the central-count scanner settings remain
sufficient today. Coalition Plaintiffs and CGG members who intend to vote in
upcoming elections by mail will continue to have their mail ballots tabulated by the
ICC scanners using the defective settings used in 2020. All mail voters are also
subject to involuntarily having their hand marked paper ballots converted to BMD
QR-encoded ballots during the ballot duplication process for damaged ballots
which will be tabulated on ICC scanners during mail ballot processing. (Doc. 1593
(Decl. Dufort) ¶¶ 8–13.)

The issue of ICC scanner settings highlights why Fulton County is
appropriately included as a defendant in this lawsuit. Because there is no legal
requirement that Fulton County must use the State's default settings, Fulton
County has discretion to adopt its own ICC scanner settings, other than the
threshold settings that are preset in the database. Alternatively, Fulton County has
discretion to manually review ballots for light and marginal marks before scanning

### 3.    Exposure To An Unconstitutional Condition

Finally, concrete injuries are also threatened because Plaintiffs and other CGG members who wish to *avoid* the injuries of voting in person must accept the burdens that voting by mail entails if they opt for that as an alternative means of voting—and vice versa. Being subjected to a burden on the right to vote—by whatever voting method—as a condition of enjoying the benefit of choosing to vote by that method is itself a constitutional injury.[34]

### C.    Evidence Shows Coalition for Good Governance Has Standing

In addition to the individual standing of the individual Coalition Plaintiffs, the organizational Plaintiff Coalition for Good Governance ("CGG") also has two forms of standing—associational standing derived from its members' injuries and organizational standing derived from its own diversion of resources made to oppose Defendants' unconstitutional voting system.

### 1.    CGG's Associational Standing

#### a.    Law

An organization has associational standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c)

---

[34] The unconstitutional-conditions doctrine is discussed in greater detail below in Section V(A)(3).

28

neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Birmingham Ministries v. Sec'y of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021). For prospective relief, the first prong is satisfied if "at least one member faces a realistic danger" of future injury. *Browning*, 522 F.3d at 1163. The second prong is satisfied where the "interests at stake in the litigation are germane to the purposes and goals of the" organization. *Arcia*, 772 F.3d at 1342. For the third prong, "when the relief sought is injunctive, individual participation of the organization's members is not normally necessary." *Browning*, 522 F.3d at 1160. It is unnecessary to determine an entity's associational standing if the entity has organizational standing. *See Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009).

### b.    Evidence

Though naming names is not necessary, *Browning*, 522 F.3d at 1160, evidence shows that at least one of CGG's named members would have individual standing to sue in their own right.[35] Defendants may be dissatisfied with how CGG keeps internal membership records, (Doc. 1568-1, at 12–13, 27–30), but each of the foregoing declarants—including each of the named individual Plaintiffs— unequivocally attests in the record to their own individual status as a CGG member. Nothing more is required. Evidence also exists that the "interests at stake

---

[35] *See* CGG SOF Nos. 1, 2, 3, 4, 5, 7, 8, 9, 10, 11, 12, 15.

in the litigation" are germane to CGG's "purposes and goals." *Arcia*, 772 F.3d at 1342. Evidence of associational standing thus exists.

### 2. CGG's Diversion of Resources

#### a. Law

Another of the "distinct forms of standing" is organizational standing. *Nat'l All. for the Mentally Ill v. Bd. of Cty. Comm'rs*, 376 F.3d 1292, 1295 (11th Cir. 2004). "To establish standing under a diversion of resources theory, an organizational plaintiff must explain where it would have to 'divert resources away *from* in order to spend additional resources on combating' the effects of the defendant's alleged conduct." *GALEO*, 36 F.4th at 1114.

#### b. Evidence

CGG is a small organization that has curtailed or delayed projects in Georgia and other jurisdictions to pursue efforts to challenge Defendants' adoption of the BMD-based voting system and its various components. Evidence shows CGG has delayed, suspended, or reduced its allocation of staff and volunteer time elsewhere:

- Education efforts for political leaders and lawmakers on Ranked Choice Voting decisions under discussion in the legislature. (Doc. 1597 (Decl. Nakamura) ¶ 88–91).

- Vote Accuracy Project for use by the public in jurisdictions with Clarity Election Night Reporting system for monitoring and creating a results-

reporting audit trail. (Doc. 1597 (Decl. Nakamura) ¶ 92–94; Doc. 1593 (Decl. Dufort) ¶ 53).

- Formal Rule-Making proposals to the State Election Board. (Doc. 1619 (Decl. Marks) ¶ 31.)

- Advocacy and education efforts with Georgia municipalities currently considering independently conducting their elections. (Doc. 1597 (Decl. Nakamura) ¶¶ 95–96.)

- Activities and projects listed in Marks's February 2021 Declaration. (Doc. 1071-2 (Decl. Marks) ¶¶ 9–11.)

Instead, CGG has focused staff and volunteer time on litigation and educating about the harms of Defendants' voting system and readily available mitigation. (Doc. 1619 (Marks Decl.) ¶¶ 25–31.)

Defendants criticize CGG for not tracking volunteer hours, but there is no such requirement. Records are not more credible than sworn testimony by the person who would create them, and CGG's Executive Director has provided ample testimony to establish that opposing BMDs has caused CGG to divert resources from other priorities it would be pursuing in the absence of BMDs. In any event, a cursory review of the many declarations filed in this case by CGG volunteers shows that the organization has spent thousands of hours opposing the use of BMDs through this litigation and otherwise. (Doc. 1618 (Decl. Marks) ¶¶ 25–29).

### D.      Each of Defendants' Arguments Against Standing Fails

Defendants have made several arguments attacking Coalition Plaintiffs' standing. None of these arguments has any merit.

### 1.      None Of Plaintiffs' Injuries Is A Generalized Grievance

State Defendants argue that Coalition Plaintiffs lack standing because their injuries are only generalized grievances. (Doc. 1568-1, at 2.). They invoke *Wood v. Raffensperger*, No. 20-14813, 2021 U.S. App. LEXIS 23376, ___ Fed. Appx. ___ (11th Cir. Aug. 6, 2021), as support for their view that unequal treatment of in-person and absentee votes is not an injury, but a "textbook" generalized grievance. (Id. at 23–25.)

As an initial matter, Defendants misunderstand why the injuries that were (properly) disregarded as generalize grievances in *Wood* are unlike the injuries Coalition Plaintiffs are threatened with here. First, in *Wood*, the plaintiff's equal protection claim was premised on vote dilution. Yet Wood failed to show why his vote being diluted in the same proportion as all other votes had subjected him specifically to any distinct disadvantage. *Id*. at *5–7. This is unlike Coalition Plaintiffs' injuries, which will be personally experienced.

Second, Wood's other insufficient standing injuries were only generally shared concerns about election integrity. *Id*. at *7–8. Coalition Plaintiffs are certainly concerned about legal violations and other burdens the voting system

places on all voters, but such concerns about broader violations, harms, and burdens all bear on the merits, not on standing. Coalition Plaintiffs' standing injuries are individualized to the Coalition Plaintiffs and CGG members; they are particularized harms supported by evidence, and they confer standing.

Burdens on voting are not non-justiciable generalized grievances simply because they may universally apply to all voters. "We have long recognized that a person's right to vote is 'individual and personal in nature.'" *Gill*, 138 S. Ct. at 1929. Individually suffering an invasion of their ***own*** right to vote is what gives Coalition Plaintiffs "a personal stake in the outcome, distinct from a generally available grievance about government." *Id.* at 1923.

"Voters who allege facts showing disadvantage to themselves as individuals have standing to sue as they have alleged a concrete and particularized injury." *GALEO*, 36 F.4th at 1114 (quoting *Gill*, 138 S. Ct. at 1929) (cleaned up). What matters is whether the universal burdens are ultimately experienced in distinctly personal ways by different affected voters.

Reinforcing this point is the fact that some of the most canonical cases in American constitutional law have addressed voting laws that applied to everyone. *Cf. Jones v. Governor of Fla.*, 975 F.3d 1016, 1030 (11th Cir. 2020) ("Consider first *Harper*, which invalidated a $1.50 poll tax under the Equal Protection Clause. This poll tax applied to the Virginia electorate generally; any voter who wished to

cast a ballot in a state election had to pay the tax.") (William Pryor, J.) (describing *Harper v. Va. Bd. Of Elections*, 383 U.S. 663 (1966)). Like *Harper*, this case asserts violations of the Equal Protection Clause. For purposes of standing, each Plaintiff will individually experience—and individually be harmed by— Defendants' denial of equal protection. Just as minorities disadvantaged by segregation were individually harmed by universally applicable policies requiring "separate-but-equal" treatment of students, restaurant-goers, and public-transportation users, so too do Plaintiffs here stand to suffer individualized harms from Defendants' policies of treating voters unequally based on how they may choose to vote. The existence of cases where universally applicable burdens were no obstacle to standing demonstrates the sufficiency of the burdens asserted by Coalition Plaintiffs in this case. *See Allen v. Wright*, 468 U.S. 737, 751–52 (1984) ("In many cases the standing question can be answered chiefly by comparing the allegations of the particular complaint to those made in prior standing cases.") Whether such differences are sufficiently harmful to permit Plaintiffs to prevail on the merits is irrelevant to Plaintiffs' standing because those two issues are distinct.

Nor does Coalition Plaintiffs' request for systemwide relief in any way detract from the particularization of their injuries-in-fact. Plaintiffs' individual standing injuries stem from voting system defects that threaten injury to them personally. This is entirely consistent with their claims that the system's defects are

"widespread enough to justify systemwide relief." *Lewis*, 518 U.S. at 359.

Plaintiffs are permitted to seek statewide injunctive relief that redresses their own threatened injuries even if that relief will also collaterally benefit all voters. *See Bochese*, 405 F.3d at 984 (if standing exists, "the court's judgment may benefit others collaterally").

Given the "individual and personal in nature" right to vote that extends to voting a secret ballot, it is instructive to consider the example of personal nature of the loss of secret ballot protections in the case of two CGG members, Jeanne Dufort and Virginia Forney. Dr. Forney's primary concerns in protecting her right to vote an absolutely secret ballot is the potential impacts on her medical practice if her votes are available to her staff and patients. (Doc. 1592 (Forney Decl.) ¶¶ 8–10). One of Ms. Dufort's primary personal concerns is the requirement that, as an officer in the local Democratic Party, she must not to disclose her primary candidate preferences. Both Dr. Forney and Ms. Dufort are affected by the same violations of ballot secrecy, and the injunctive relief requested would provide both with the needed remedy. Yet their injuries are individualized and personal to them.

## 2. Plaintiffs' Injuries Are Not Speculative

Defendants also argue that Coalition Plaintiffs' asserted harms fail to amount to injuries-in-fact because they are hypothetical or speculative. (Doc. 1568-1, at 24.) They cite *Muransky*, 979 F.3d at 933, as authority for their view

that an "increased risk" of malfunctioning election equipment is not an injury-in-fact.

But as this Court has already concluded, the injuries Coalition Plaintiffs rely upon for standing are both supported by evidence and are ***not*** speculative:

> The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of "might this actually ever happen?" – but "when it will happen," especially if further protective measures are not taken. Given the masking nature of malware and the current systems described here, if the State and Dominion simply stand by and say, "we have never seen it," the future does not bode well."

(Doc. 964, at 146.) Indeed, State Defendants now appear to be adopting the very attitude this Court expressly cautioned against—that because Plaintiffs have identified no actual malware and none has been publicly exposed—even though all evidence shows that sophisticated malware is likely to be completely undetectable—then Plaintiffs must be engaged in speculation when they call the system unreliable or untrustworthy. (Doc. 1568-1, at 20.) The evidence is absolutely to the contrary. Sadly, the Court was right to anticipate and pre-empt Defendants taking this indefensible position.

Where future injuries "are foreseeable and the expected results of" known defects in a voting system, such that "someone is certain to get injured in the end," the injuries do not depend on conjecture so likelihood and immediacy—and thus imminence—are satisfied. *Browning*, 522 F.3d at 1163-64. Plaintiffs' threatened

36

injuries-in-fact are not speculative or hypothetical, nor are they "only vulnerabilities."(Doc. 1568-1, at 4.)  On the contrary, the risks of injury Coalition Plaintiffs face are "certainly impending," *Clapper*, 568 U.S. at 401, and the harms threatened are in all respects "sufficiently imminent and substantial" to satisfy the injury-in-fact requirements recently addressed by the Supreme Court in *TransUnion*, 141 S. Ct. at 2210.

### 3. Plaintiffs' Injuries Are Fairly Traceable To Conduct By All Defendants

Fulton County Defendants argue they should not be defendants in this case at all because none of Coalition Plaintiffs' injuries are traceable to conduct of Fulton County Defendants or can be redressed by an order against them. (Doc. 1573, at 4–5, 25–35). Fulton County Defendants are wrong. Fulton County cannot reasonably claim it is helpless to stop the violations of law and reckless security practices that its own activities of conducting elections will cause. Coalition Plaintiffs' counsel wrote Fulton County's counsel urging the Fulton Board to adopt hand marked paper ballots to address security vulnerabilities and ballot secrecy violations. (Doc. 1590-10.) Fulton County has a duty to ensure ballot secrecy. O.C.G.A. § 21–2–70(13). Fulton County has a duty to count all legal votes on ballots. O.C.G.A § 21–2–438(b) & (c). Relief can be obtained against Fulton County Defendants even if no other relief is awarded. Redressability, after all, is satisfied even by the ability to obtain partial relief. *Reeves*, 23 F.4th at 1318 ("The

remedy need not be complete or relieve every injury alleged in order to satisfy Article III standing.").

Nor are Fulton County Defendants any more correct in arguing that relief cannot be sought against them unless it is also sought against the other 158 counties in Georgia, or that the availability of relief against the Secretary of State makes Fulton Count's role as a party superfluous. "[T]he presence of multiple actors in a chain of events that lead to the plaintiff's injury does not mean that traceability is lacking with respect to the conduct of a particular defendant." *Garcia-Bengochea*, 2023 U.S. App. LEXIS 544, at *21.

### E.   Coalition Plaintiffs' Standing, If Not Conclusively Established, Is *At Least* Disputed—Thus No Grounds For Summary Judgment

Defendants are wrong that ***no*** evidence supports Coalition Plaintiffs' standing. The opposite is true. An abundance of evidence in the record shows Defendants' challenged conduct invades legally cognizable interests of the Coalition Plaintiffs. Standing plainly exists. Even if the Court is not prepared at this juncture to conclusively determine the standing issues in Coalition Plaintiffs' favor, summary judgment cannot be justified by a lack of evidentiary support. Since each component of the BMD system causes particularized injury-in-fact to Plaintiffs that can be redressed by injunctive relief, Coalition Plaintiffs have standing to seek relief not just for themselves, but for all voters.

## V.  EVIDENCE SUPPORTS COALITION PLAINTIFFS' CLAIMS ON THE MERITS

Turning to the merits of Coalition Plaintiffs' two constitutional claims, summary judgment cannot properly be entered because the record contains voluminous evidence of burdens on constitutional rights. Some of this evidence has already led this Court to make findings of fact that favored Coalition Plaintiffs on the merits during preliminary-injunction proceedings. Given the record before the Court, summary judgment on the merits of Coalition Plaintiffs' claims is precluded.

### A.  Applicable Law

### 1.  Plaintiffs' Section 1983 Claims

The private cause of action established by 42 U.S.C. § 1983 permits Coalition Plaintiffs to pursue relief for constitutional violations that occur "under color of state law." Coalition Plaintiffs bring two claims—for violations of the fundamental right to vote and of the Equal Protection Clause.

### a.  Count I—Fundamental Right To Vote

To show a violation of the fundamental right to vote, Coalition Plaintiffs must establish that Defendants' challenged conduct unduly burdens the right to vote. "A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest. And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight

still must justify that burden." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019).

### b.    Count II—Equal Protection

To show an equal-protection violation, Coalition Plaintiffs "must establish that they are being treated differently than a similarly situated comparator." *Crystal Dunes Owners Ass'n v. City of Destin*, 476 Fed. Appx. 180, 185 (11th Cir. 2012). "[T]o be considered 'similarly situated,' comparators must be prima facie identical in all relevant respects." *Campbell v. Rainbow City*, 434 F.3d 1306, 1314 (11th Cir. 2006). "Plaintiffs need not demonstrate discriminatory intent … because we are considering the constitutionality of a generalized burden on the fundamental right to vote." *Lee*, 915 F.3d at 1319.

### 2.    *Anderson-Burdick* Governs The Merits

The standard set forth in *Anderson v. Celebrezze*, 460 U.S. 780 (1983), and refined in *Burdick v. Takushi*, 504 U.S. 428 (1992), (the "***Anderson-Burdick***" framework) is used to evaluate constitutional challenges to state election laws under the First and Fourteenth Amendments. To prevail under the *Anderson-Burdick* framework, Coalition Plaintiffs must show the burden imposed upon their constitutional rights by the conduct they are challenging outweighs any interest asserted by the State as a justification the conduct. *See, e.g.*, *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 190 (2008) ("a court evaluating a constitutional

challenge to an election regulation weigh[s] the asserted injury to the right to vote against the 'precise interests put forward by the State as justifications for the burden imposed by its rule.'"). "However slight that burden may appear, … it must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Id.* at 191.

### 3.   The Unconstitutional-Conditions Doctrine

Forcing voters to choose one constitutional burden to avoid another violates the unconstitutional conditions doctrine. In *Bourgeois v. Peters*, 387 F.3d 1303, 1324 (11th Cir. 2004), a city government defendant argued protestors could avoid a magnetometer scan that violated the Fourth Amendment simply by choosing to exercise their First Amendment rights elsewhere. The Eleventh Circuit held that imposing a choice of burdens in this manner was itself a constitutional violation because it presented the "especially malignant unconstitutional condition" of requiring the surrender of one constitutional right as the price to exercise another. *Id.* The unconstitutional-conditions doctrine is significant for this case because Defendants insist the burdens they impose on in-person voters can easily be avoided because voters can simply choose to vote by mail. The unconstitutional-conditions doctrine precludes this argument where, as here, the evidence shows (and this Court has found) the same voting system imposes *different* burdens on mail voters' constitutional right to vote.

**B.    This Court Has Already Made Evidentiary Findings And Conclusions Of Law Regarding Burden Under *Anderson-Burdick*—These Preclude Summary Judgment**

Much evidence already exists in this case that defeats the Motions before they leave the starting gate. Over the life of the action, Coalition Plaintiffs have filed four motions seeking injunctive relief from harms threatened by the DRE-based voting system, including its electronic-pollbook component, (Docs. 258, 327, 419, 605), and four motions seeking injunctive relief from harms threatened by the BMD-based voting system, including its electronic-pollbook and ICC scanner components, (Docs. 640, 756, 800, 809.)

In response to these motions, this Court has made evidentiary and legal findings favorable to Coalition Plaintiffs both *without* awarding injunctive relief, (*e.g.*, Doc. 309, 768, 964), and *while* granting injunctive relief, (*e.g.*, Doc. 579, 637, 918, 965, 966.) This Court has expressly found *at least four times* that Coalition Plaintiffs were "substantially likely to succeed on the merits of one or more of their constitutional claims." (Doc. 309, at 38; *see also* Doc. 375, at 51 (summarizing earlier holding); Doc. 579, at 130 (claims about DRE voting system); Doc. 918, at 63 (claims about voter registration database and electronic pollbook system); Doc. 964, at 133 (claims about ICC scanners))

The Court's many Orders have been based on the abundance of evidence presented by all Plaintiffs in support of their claims against both voting systems

and their problematic components. As this Court itself explained,

> The Court's Orders in the course of the case were extraordinarily detailed and careful, two of them stretching over 150 pages. They explained at length the evidentiary and legal basis of the Court's findings and legal rulings. The evidence was presented in the record before this Court. The Court meticulously considered the evidence presented both by Plaintiffs and Defendants.

(Doc. 969, at 28.)

All this previously considered evidence remains in the record and fatally prejudices the present Motions. *Wreal, Ltd. Liab. Co. v. Amazon.com*, Inc., 38 F.4th 114, 123 n.5 (11th Cir. 2022) ("Evidence introduced at a preliminary injunction hearing becomes part of the record, and it is properly before the district court and may be considered when ruling on motions for summary judgment.").

To obtain preliminary injunctive relief, Coalition Plaintiffs previously had to present enough evidence to show "a substantial likelihood of success on the merits." *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995). This Court has found the evidence sufficient to support such a showing multiple times. To resist summary judgment now, by contrast, Plaintiffs need only show a "factual dispute exists where a reasonable factfinder could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict." *Matamoros v. Broward Sheriff's Office*, 2 F.4th 1329, 1336 n.5 (11th Cir. 2021). This Court's own Orders show this standard was met before the Motions were even

43

filed. The following sections detail some of the most pertinent holdings by this Court that dictate why the Motions must be rejected.

### 1. Doc. 309 (Sep. 17, 2018)

The Court denied the first motions for preliminary injunction. In so doing, however, the Court found Plaintiffs were "substantially likely to succeed on the merits of one or more of their constitutional claims." (Doc. 309, at 38.) Specifically, the Court found "Plaintiffs had shown a substantial likelihood of success on the merits of their claims that Defendants' implementation of the DRE voting system absent an independent paper audit trail of the vote puts Plaintiffs at imminent risk of deprivation of their fundamental right to cast an effective vote that is accurately counted." (Doc 768, at 2 (characterizing Doc 309).) The Court only declined to grant relief because the "eleventh-hour timing" put the Court's decision too close to the 2018 general election. (Doc. 309, at 41, 41–44.)

### 2. Doc. 579 (Aug. 15, 2019)

Just under a year later, the Court granted relief after Plaintiffs renewed their efforts. The Court found, "Plaintiffs have continued to demonstrate a likelihood of prevailing on the merits of their claims that the current non-auditable Georgia GEMS/DRE voting system, as implemented, burdens and deprives them of their rights to cast secure votes that are reliably counted, as guaranteed under the First and Fourteenth Amendments" (Doc. 579, at 130.) The Court described Plaintiffs'

"threatened, ongoing injury" as "one that goes to the heart of the Plaintiffs' participation in the voting process and our democracy." (Doc. 579, at 131.)

The Court found that "the significant voter registration database and related ExpressPoll deficiencies and vulnerabilities demonstrated in this case" were "a major concern both relative to burdening or depriving voters' ability to actually cast ballots." (Doc 579, at 152–52.)

### 3.    Docs. 918, 965, And 966 (Sep. 28–Oct. 12, 2020)

After Georgia purchased a BMD-based voting system in Fall 2019, Coalition Plaintiffs sought injunctive relief against the new system's components—BMDs, electronic pollbooks, and ICC scanners, (Docs. 640, 756, 800, 809.)  This Court granted pollbook relief, (Doc. 918, 965, 966), after finding Coalition Plaintiffs "are likely to succeed on the merits of their claim regarding the security and reliability of the voter registration database and electronic pollbook system." (Doc. 918, at 63.) Later characterizing its Order requiring the provision of updated paper backups as relief for pollbook problems and cyber vulnerabilities, this Court explained, "the Court found that *Plaintiffs' evidence* indicates that such a backup would serve both the Defendants' stated interests as well as the constitutional interests advocated by Plaintiffs." (Doc. 969, at 27–28 (original emphasis).)

### 4.    Doc. 964 (Oct. 11, 2020)

With respect to BMDs, the Court separately held Coalition Plaintiffs showed

"demonstrable evidence that the manner in which Defendants' alleged mode of implementation of the BMD voting system, logic and accuracy testing procedures, and audit protocols deprives them or puts them at imminent risk of deprivation of their fundamental right to cast an effective vote (i.e., a vote that is accurately counted)." (Doc. 964, at 79.) Plaintiffs' showing included "a formidable amount of evidence that casts serious doubt on the validity of the use of the RLA with the current system." (Id. at 77.) The Court viewed "the burden and the threatened deprivation" that resulted from being forced to use BMDs to be "significant under the *Anderson/Burdick* balancing framework." (Id. at 79.)

The Court recognized that, "To avoid being denied the ability to verify their votes on the BMD system, Plaintiffs must trade one unfavorable burden for another" where voting absentee meant "potential uncertain postal delivery issues, untimely processing by the registrar's office, signature matches, etc.," as well as enduring the different "significant burden resulting from the accuracy and voter invalidation issues that affect Dominion's scanner/tabulators and adjudication software used for determining voter intent and tallying hand-marked absentee ballots." (Id. at 83.) The Court captured the unconstitutional conditions problem perfectly:

> A choice between two evils is no choice at all; the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election regardless of which method they choose to cast their vote. That

> Plaintiffs and other voters have the alternative of casting an absentee hand-marked paper ballot does not lessen or absolve the State of the burdens imposed by the State's chosen, preferred, primary voting system[.]

(Id. at 83–84.)

Although the Court did not ultimately grant injunctive relief against the BMDs, it held unequivocally that substantial evidence supported Coalition Plaintiff's challenges to the required use of BMDs, the lack of BMD auditability, and the settings of the ICC scanners. (Id. at 84 (recognizing "Plaintiffs' strong voting interest and evidentiary presentation that indicate they may ultimately prevail in their claims."); id. at 86 ("Plaintiffs have presented a massive and complex record," including "an expanded array of expert affidavits as well as voter and election evidence" that "helped to bring into sharper focus the evidentiary issues in this case").)

Despite Coalition Plaintiffs' "persuasive evidence," which the Court recognized as showing "severe burdens experienced by Plaintiffs and other voters in casting votes in the new BMD-equipped system," the proximity of the upcoming election again prevented the Court from enjoining the requirement for in-person voters to use BMDs. (Doc. 964, at 88.) The Court understood binding appellate authority to prevent "imposition of such a sweeping change in the State's primary legally adopted method for conducting elections at this moment in the electoral cycle…. So, for this [timing] reason alone, despite the strength of Plaintiffs'

evidence," the Court refrained from awarding BMD relief. (Doc. 964, at 89.)

Defendants did not appeal these findings or seek reconsideration, and the evidence that supported the findings remains in the record. The Motions for summary judgment must be resolved consistently with this Court's well-supported conclusion that, "The substantial risks and long-run threats posed by Georgia's BMD system, at least as currently configured and implemented, are evident." (Doc. 964, at 89.)[36]

In sum, the evidence already in the record is properly preclusive of summary judgment. But in case there was any doubt, the record has expanded still further, as the next sections explain.

### C.   Additional Evidence Shows That System Components Continue To Present A Substantial Risk That Voters Will Suffer Significant, Substantial, Or Severe Burdens

Coalition Plaintiffs have abundant additional evidence that shows their rights (and the rights of other voters) are burdened by Defendant's challenged conduct. This evidence adds to the record of burdens already before the Court.

### 1.   Burdens On The Fundamental Right To Cast An Accountable Vote

This Court has recognized "democracy's critical need for transparent, fair, accurate, and verifiable election processes that guarantee each citizen's

---

[36] The Court's findings on ballot secrecy are addressed below in Section IX.A.

fundamental right to cast an accountable vote." (Doc. 309, at 46.) BMDs violate this right because they do not create an independent, accountable record of voters' choices. BMDs, like DREs, allow a computer to author the artifact that constitutes the voter's "official" vote selections. Because the Dominion BMD System deprives voters of any ability to read and verify the undecipherable QR code that contains the voter's choices, the Dominion BMD System is a quintessential "black box"— the opposite of an accountable voting system. Twenty-four leading voting systems experts, cybersecurity experts, and election quality leaders warned that a valid BMD-election audit is "impossible." (Doc. 419-1, at 427.) The inherent lack of auditability of BMD ballots is described below. *See infra* § V.C.3.d.

### 2. Burdens On The Rights Of In-Person Voters To Cast An Equally Effective Vote

Because ballot cards are printed after voters finish making their selections on touchscreens, BMDs expose in-person voters to a higher likelihood than other voters that their votes will not be effective when and if a BMD in their polling place malfunctions or is affected by malware.

BMDs interpose a delay between a voter's ephemeral indication of intent and the voter's review (on paper) of what was purportedly recorded. If the voter detects an error and reports a malfunctioning machine to a pollworker, there is no way for the worker to tell if the machine actually malfunctioned or if the voter is simply mistaken, since the paper printout will be the only potential evidence of the

voter's touchscreen selections—unreliable evidence at that.

Many voters will be reluctant even to show pollworkers their ballot card to try to demonstrate the inaccuracies, because doing so will reveal their private ballot choices. Since real-time polling place testing of BMDs for possible misconfiguration or hacking is impractical, pollworkers will be forced either to keep the potentially defective machine in service or to take voters at their word and take machines out of service, actions which will cause longer lines and delays.

### 3.   Burdens Of Being Forced To Vote Using An Inherently Unreliable Voting System

"Ultimately, an electoral system must be accurate and trustworthy." (Doc. 375, at 51.) If it is not, the system imposes "burden and risks" this Court has already found to outweigh any asserted state interest in maintaining the system without significant change. (Doc. 375, at 52.) Voters "have the right to cast a ballot vote that is properly counted on machinery that is not compromised or that produces unreliable results."  (Doc. 964, at 59.) Evidence shows the current voting system is impossible to characterize as "accurate and trustworthy."

### a.   System Is Easily Hacked, Thus Unreliable

There is no genuine dispute that the BMD system, like any computer system, is vulnerable to being hacked.  With admirable candor, on February 10, 2022, Secretary Raffensperger remarked: "So he [Halderman] had total access to it for 12 weeks. And he comes back with his report and he said 'well, if you had that kind of

access that you could change things.' Well duh yeah… So you don't have that kind of access." Ironically, numerous unauthorized actors had already had access to the entire suite of Georgia's voting software for more than a year and had loaded it on virtual machines. Plaintiffs have submitted a massive amount of evidence demonstrating the vulnerability of the BMD system, evidence that is discussed in detail in the Curling Plaintiffs' Response Brief.

**b.   Advanced Persistent Threats Are "Here To Stay"**

State Defendants do not deny the BMD system has vulnerabilities but contend those vulnerabilities do not burden the right to vote because there is no "concrete evidence that any Georgia election result has been tampered with, manipulated, or altered." (Doc. 1568-1, at 3-4.) That State Defendants continue[37] to make this argument given their responsibilities for securing the BMD system demonstrates an insensitivity to risk that itself aggravates the system's vulnerabilities. Manipulation of the election system will not be detectable because of "advanced persistent threats." As Professor Richard DeMillo explained:

> Undetectable manipulation is the most common, widely recognized, and serious threat facing computer systems, including election systems. . . .[T]he threat is not speculative or theoretical but rather is the fundamental building block of modern cyber security and cyber

---

[37] This is the same argument that the Defendants made over four years ago, claiming that "[e]vidence of 'undetectable manipulation' is oxymoronic." (Doc. 265, at 11.)

warfighting.

(Doc. 277, at 55). The Court agreed: "Advanced persistent threats in this data-driven world and ordinary hacking are unfortunately here to stay." (Doc. 309, at 45).

### c.    System Is Now In The Wild—Coffee County

Georgia's system is fatally compromised because of the breach that began in Coffee County, putting the entire statewide system at risk. The breaches of Georgia's election system uncovered by Plaintiffs is chronicled in the Curling Plaintiffs' Response Brief and in Plaintiffs' Joint Statement of Additional Facts. For a comprehensive account that summarizes the voluminous evidentiary record on Coffee County, the Court is referred to the December 5, 2022, declaration of Kevin Skoglund. (Doc. 1561, at 190–263.) In their Motions, Defendants do not address the Coffee County events or the security impacts of the resulting statewide breach. Though the implications of Coffee County are far reaching and complex, for the purpose of this Response, Coalition Plaintiffs emphasize two realities.

First, Coffee County shows that Georgia's election systems are not, and will never be, secure enough physically to deter attack, manipulation, or compromise. The breaches initiated in Coffee County were conducted in the light of day with the active cooperation of local election officials and political leaders. The breaches are extraordinary in their duration and scope, but there is little about them that

suggest the same thing could not or will not happen again in any Georgia county. Slow to react to the breach of the State's voting system, State Defendants have done nothing to bolster the security of Georgia's elections. Like advanced persistent threats, the threat of unsophisticated copycat breaches of the security of Georgia's voting system is likewise "unfortunately here to stay." (Doc. 309, at 45).

Second, Coffee County also has magnified the vulnerabilities of Georgia's election system because the Dominion software that runs Georgia's election is now in the wild, distributed without limitation or security around the globe. As Mr. Skoglund explains in detail, widespread distribution greatly facilitates the potential for subversion of the election software. "Possession of the software is *invaluable*" to the process of developing techniques or code to subvert its intended operation:

> The precise details of its operation can be closely inspected. An adversary can test theories and evaluate the results. An adversary can craft modifications to the software, verify their work, and then refine them to be more potent or less detectable. Any adversary with the software can build a hands-on engineering laboratory, or several.

(Skoglund Decl. at 65 ¶ 183). Dr. Halderman agrees: "[R]isk that a future Georgia election will be attacked materially increased with the outside group['s] copying and distribution of the proprietary software that operates Georgia's election system and specific system configurations." (Nov. 2022 Halderman Decl. ¶ 6).

Given this threat, it is even more important than ever that elections in

Georgia do not depend on the physical security of the machines, but on systems that are strongly software independent and that may be verified with robust audits relying upon trustworthy ballots.  The BMD system is not strongly software independent and cannot produce trustworthy, auditable ballots.

### d.    BMD Results Cannot Be Audited

Dr. Philip Stark has described in his extensive declarations the numerous reasons that Georgia's post-election process offers no protection against wrong outcomes being certified. (Joint Resp. Defendant State of Undisputed Facts ("**Jt. Resp.**" Nos. 295, 303, 304.) The reasons include, among many others, (1) the fact that Georgia law provides for no remedy in the event the audit finds the wrong outcome was declared; (2) the fact that elections conducted on BMDs do not create trustworthy ballots for auditing; and (3) the fact that Georgia's ballot accounting and chain of custody are inadequate for reliable audits. Dr. Stark found that the Secretary of State's 2020 and 2022 audits were "not genuine or effective RLAs." Dr. Stark's findings concerning Georgia's auditing methods are compiled in his expert reports.

In its October 2020 Order, this Court stated "the RLA is deemed by all of the experts as a control valve essential to election integrity."  (Doc. 964 at 77). The Court discussed in the detail the competing evidence, concluding, "the Plaintiffs have marshalled a formidable amount of evidence that casts doubt on the validity

of the use of the RLA with the current system." (*Id.*)  The Court found, "there is no audit remedy that can confirm the reliability and accuracy of the BMD system, as Dr. Stark has stressed." (*Id.*). Ignoring the Court's admonition, the following month, Secretary Raffensperger directed Georgia's first statewide "audit," with its fatal flaws as detailed by Dr. Stark. (Jt. Resp. No. 295.)

An RLA cannot be conducted on an election using BMDs as the primary method of voting because BMDs do not create trustworthy ballots. Stark @.[38]  This is because the vast majority of voters do not, or cannot, check the accuracy of their BMD-generated ballots. (Opp. Ex. X, Appel Dep. at 48:5-9 ("[I]t is the scientific consensus that elections conducted with most voters using BMDs are not securable, not fully auditable, and audits cannot reliably detect or correct the effects of hacking").) Defendants offer no evidence disputing the facts which underlie Plaintiffs' experts' opinions.  Nor do Defendants present expert testimony of their own challenging this "scientific consensus." Forcing in-person voters to vote on an election system that lacks this "control valve essential to election integrity" is a severe burden on the right to vote.

### e.      Recounts Provide No Protection

Georgia statutes provide for the printed text of the BMD ballots to be

---

[38]In addition to this fundamental inability of a BMD to produce trustworthy ballots, so-called RLAs as conducted in Georgia suffer from numerous other deficiencies, as fully explained by Dr. Stark in his Declaration.

tabulated, O.C.G.A. § 21–2–379.22(6), although the Dominion Voting System does not tabulate the natural language text. The QR-encoded votes are what is tabulated. (Jt. SOF No. 87.) Recounts are conducted by machine count, Ga. Comp. R. & Reg. 183–1–15–.03(1)(b), meaning systemic errors or malware impacting the first machine count will likely affect the recount. Dr. Stark conducted some limited testing on the machine recount of the November 2020 presidential election and concluded that, "Even if Fulton County did not rely on ballot-marking devices for virtually all in-person voters, the lack of basic accounting controls makes it impossible to determine who really won an election contest, even by hand counting the votes: the record of the vote could easily be incomplete or adulterated." (SMF Ex. 42 Stark. Decl. ¶ 83).

### f.    Logic And Accuracy Testing Is Insufficient

Despite these threats to the State's vulnerable election system, the State does not even do the bare minimum of pre-election testing. "Logic and accuracy testing" is "an important operations verification practice and standard in jurisdictions across the nation that use any form of computerized voting equipment." (Doc. 964, at 51.) Georgia law requires election superintendents, before every election, to test each BMD to confirm it will correctly record the votes "for all offices and on all questions." O.C.G.A. § 21–2–379.25(c). As this Court found in 2020, the State's procedures require "testing of only one candidate race per BMD for each ballot

style." (Doc. 964, at 54.) After addressing the expert testimony of Kevin Skoglund and others, the Court concluded that the State's procedures constituted a "serious short cut that truncates L&A testing's basic objective." The Court recommended the Secretary and the SEB "expeditiously review" the adequacy of the then current procedures and determine what modifications were appropriate. (Doc. 964, at 59–60.) Forcing the use of improperly tested machines seriously burdens voting.

### 4. Burdens Imposed By The Lack of Ballot Secrecy

Whether or not the fundamental right to vote inherently requires secrecy in voting, there can be no doubt that the presence or absence of ballot secrecy has a significant impact upon the individual voter's ability to freely exercise the right to vote. Secrecy in voting is protected by both federal and state laws. Under the federal Help America Vote Act, voting systems must permit the voter to have privacy in the marking of their ballots and making changes or corrections to them. 52 U.S.C. § 21081(a)(1)(A)(i)–(ii). Under Georgia law, BMDs must "Permit voting in absolute secrecy so that no person can see or know any other elector's votes, except when he or she has assisted the elector in voting, as prescribed by law;" O.C.G.A. § 21-2-379.22 (5).

The fact that secrecy in voting is such a well-protected legal interest obviously establishes that depriving voters of secrecy burdens the right to vote. Weighing that burden is not the issue on summary judgment. Only the existence of

the burden matters for present purposes. Defendants' complete failure to address

secrecy, and the abundant evidence of mechanisms by which Georgia's voting

system violates it, are set out in § VIII.A, *infra*. Though Coalition Plaintiffs' ballot

secrecy "claim" is discrete in that it would remain viable even if the Court did

enjoin the use of BMDs because they fail to ensure an accountable vote, the fact

that BMDs also violate ballot secrecy increases the overall burden of the BMDs in

the *Anderson-Burdick* balance.

### 5.    Burdens Of Ratifying BMD Interpretations Of Voter Intent

Under Georgia law, BMDs must "Produce a paper ballot which is marked

with the elector's choices in a format readable by the elector;" O.C.G.A. § 21–2–

379.22 (6). After all the voter's selections in all races on all voting screens have

been made—which in many elections may involve over forty selections, (CGG

SOF No. 15)— the BMD generates a printed ballot card containing both a QR code

embedded with the voter's selections and a text summary of the voter's choices. As

a practical matter, the voter is required by law to memorize their touchscreen

selections and to ratify that the printout reflects those choices. *See* SEB Rule 183–

1–12–.11(2)(b). To do so, a voter must rely exclusively upon his or her memory to

review the text summary and confirm it is complete and correct, with all races

included and no extra races added. Because of the length and complexity of ballots

in many primary and general elections, requiring voters to verify even a human-

readable text summary of their touchscreen choices is a severe burden on the right to vote that will cause in-person voters to be less likely cast an effective vote than are mail absentee voters.[39] Many, if not most, in-person voters will lack the memory and cognitive skills to be able to verify that the printout produced by the Dominion BMD System has completely and correctly recorded their touchscreen selections. It is nearly impossible to verify long ballots. (CGG SOF No. 4.)

Even the National Academy of Sciences has warned: "Unless a voter takes notes while voting, BMDs that print only selections with abbreviated names/descriptions of the contests are virtually unusable for verifying voter intent." National Academy of Sciences, Securing the Vote: Protecting American Democracy (2018), at 79.[40] Forcing a voter to verify text that a computer has generated is another substantial burden on voting, particularly when the human readable text is neither tabulated nor recounted despite being the official "vote."

### 6.    The Burdens Imposed On In-Person Voters Are Not Excused By The Option To Vote By Mail

The State from time to time has argued that the foregoing burdens imposed on in-person voters are in some sense "manufactured" because they can be avoided

---

[39] This requirement is not merely a practical requirement, but it is a legal obligation imposed on voters by SEB Rule 183-1-12-.11 2)(b).

[40] Available at https://www.nap.edu/catalog/25120/securing-the-vote-protecting-americandemocracy (last visited Feb. 10, 2023).

if a voter simply chooses to vote by mail instead.  This argument has two fatal defects.

First, voting by mail burdens the right to vote in its own way, as this Court has already found. (Doc. 375, at 47 ("absentee voting is not without its constitutional problems"); Doc. 964, at 83–84 ("A choice between two evils is no choice at all.")). Forcing voters to choose the constitutional burdens of mail voting simply to avoid suffering the different burdens of voting by BMD is itself a violation of the unconstitutional conditions doctrine. *Bourgeois*, 387 F.3d at 1324–25 ("The ability of protestors to avoid the searches by declining to participate in the protest does not alleviate the constitutional infirmity of the City's search policy[.] … [T]he existence of other vehicles through which protestors could voice their disagreement … does not in any way alleviate the unconstitutional conditions problem.").

Second, the superficial choice voters have to place themselves into the category of "absentee voters" instead of  "in-person voter" does not cause the two different groups of voters to cease being "similarly situated" for purposes of the constitutional right to equal protection of the law. Voters in the same jurisdiction voting in the same election remain prima facie identical in all ***relevant*** respects where it is only the State's provision of different voting methods that creates a distinction between them.

> A State cannot deflect an equal protection challenge by
> observing that in light of the statutory classification all
> those within the burdened class are similarly situated.
> The classification must reflect pre-existing differences; it
> cannot create new ones that are supported by only their
> own bootstraps. "The Equal Protection Clause requires
> more of a state law than nondiscriminatory application
> within the class it establishes."

*Williams v. Vermont*, 472 U.S. 14, 27 (1985). In other words, voters do not

sacrifice equal protection by *choosing* to vote in person instead of by mail. The

constitutional burdens imposed by requiring in-person voters to use BMDs may not

be disregarded because voters can choose a different voting method.

### D.    The Only Tenable Conclusion Is That Significant, Substantial, Or Severe Burdens On Voters Are Caused By Requiring Them To Use This Voting System

Evidence in the record clearly exists that permits this Court to draw a

reasonable inference that Defendant's conduct will burden the Coalition Plaintiffs'

(and other voters') constitutional rights. Moreover, this Court can readily conclude

from this same evidence that the magnitudes of these burdens is significant,

substantial, or severe—not slight.

Unless some authority is determinative of the question as a matter of law,

the severity of any burden imposed on constitutional voting rights by a defendant's

conduct is a question of fact. *See Stein v. Ala. Sec'y of State*, 774 F.3d 689, 697

(11th Cir. 2014). At this stage, the Court's task is not to weigh evidence, *Sears v.*

*Roberts*, 922 F.3d 1199, 1205 (11th Cir. 2019), but only to determine whether

evidence exists that Defendants' conduct burdens Coalition Plaintiffs' rights. If evidence of burdens exists, summary judgment must be denied. Evaluating the severity of the burdens and weighing or balancing them (however slight or severe they may be) against the State's countervailing interests must await trial.

## VI.   THE INTERESTS THAT DEFENDANTS ASSERT TO JUSTIFY THE THREATENED BURDENS ON VOTERS' RIGHTS ARE LEGALLY INSUFFICIENT UNDER *ANDERSON-BURDICK*

Though the Court should not be weighing burdens at this stage, the outcome of doing so would favor Coalition Plaintiffs in any event. The State's asserted interests in requiring in-person voters to use the Dominion BMD voting system are legally incapable of justifying *any* burdens under *Anderson-Burdick*.

State Defendants offer several purported justifications they claim are sufficient under *Anderson-Burdick* to outweigh the burdens their conduct places on the rights of voters. These asserted interests are not, in fact, sufficient to allow the State Defendants to prevail in an *Anderson-Burdick* balancing exercise—either because evidence shows the asserted interests are not actually served by the BMD system or because the interests are not legally sufficient to justify burdening constitutional rights. There can be no legitimate government interest in utilizing an unconstitutional voting system, especially where state law expressly permits hand marked paper ballots to be used instead. *See* O.C.G.A. § 21–2–281; Ga. Comp. R. & Reg. 183–1–12–.01 and 183–1–12–.11(2)(c) and (d).

## A.    Avoiding Discrimination Against Disabled Voters

State Defendants argue that requiring all in-person voters to use BMDs serves a legitimate governmental interest in avoiding discrimination against voters with disabilities. The rationale is that BMDs provide accessibility for such voters, which the Help America Vote Act (HAVA) requires, 52 U.S.C. § 21081(a)(3), and unless *all* voters are required to use BMDs, voters with disabilities will be treated differently by virtue of being the only people who do use BMDs, causing their limited number of machine-marked votes to be traceable to the voter. (Doc. 1568-1, at 17–18.) This argument lacks merit, not least of all because it plainly concedes that the use of traceable ballots harms voters in the exercise of their right to vote.

The State first made this argument against Coalition Plaintiffs' BMD claims when seeking dismissal of the First Supplemental Complaint over three years ago. As Coalition Plaintiffs have repeatedly showed this Court, (Doc. 650, at 24–25; Doc. 680, at 17–19), the State's argument is wrong because people with disabilities may vote in person using a paper ballot instead of by machine, if they prefer, O.C.G.A. § 21–2–452(h), and because these voters have the right, with few exceptions, to receive assistance in voting from any person the voter selects, whether voting in person or absentee, O.C.G.A. § 21–2–409(b).

The State's perverse argument that *all* in-person voters must vote on BMDs, and have their constitutional rights violated, simply because Georgia has chosen to

make BMDs available as an *optional* voting system for people with disabilities turns the protection of constitutional rights on its head. The asserted interest in protecting disabled voters is an invalid justification for burdening the rights of all voters by requiring them to use BMDs.

### B.    "Providing" Clear "Voter Intent"

State Defendants justify burdening voters' rights by arguing that "BMD-marked paper ballots provide clear voter intent." (Doc. 1568-1, at 19.) This obtuse argument ignores the substance of the parties' whole dispute over BMDs. What Defendants call "clear voter intent" is the product of a computer, not a voter. Copious evidence shows that whatever output an insecure and compromised BMD may print onto a ballot-card cannot be reliably taken to reflect the choices made by the voter on the touchscreen, (Jt. SOF No. 88); that voters don't reliably check the contents of their ballot cards for errors, (Jt. SOF No. 90); that voters who do check are often incapable of perceiving errors in any event, (Jt. SOF No. 91); and that what the tabulator counts in Georgia is not even the human-readable part of the ballot card anyway, (Jt. SOF No. 88.) Defendants' argument also ignores that touchscreen entry errors made by voters are unknowable and undetectable, whereas hand-marked ballot errors ***are*** often detectable and correctable by Vote Review Panel members who can discern voter intent from hand-marked ballots. (Doc. 1593 (Decl. Dufort) ¶ 39.)

Calling the contents of a BMD ballot card "clear voter intent" mislabels the output of a computer program as being the work of the voter. In a properly functioning system, the two should be identical. This case was brought because security and reliability concerns eliminate the ability to adopt that presumption.

## C. Protecting Ballot Secrecy

For the third and final interest they assert to justify burdening voters' rights, State Defendants themselves offer ballot secrecy. (Doc. 1568-1, at 19–20.) They continue to falsely claim that the ICP scanners record ballot images in a randomized sequence that cannot be correlated with the order in which ballots were fed into the scanner. Although Coalition Plaintiffs certainly believe "ballot secrecy" requires protection, all the evidence refutes the State's attempt to claim preservation of ballot secrecy as a virtue of the BMD system.  The complete opposite is true. *See infra* § VIII(A). The State's "interest" in protecting ballot secrecy, therefore, cannot justify requiring in-person voters to use BMDs.

## D. Interest In Maintaining The BMD System Without Change

This Court held regarding the DRE system that, "the State's apparent asserted interest in maintaining the DRE system without significant change cannot by itself justify the burden and risks imposed given the circumstances presented." (Doc. 375, at 51–52 (explaining its order in Doc. 309).) The same rationale defeats the State's desire to maintain its current BMD system without significant change.

The validity of this conclusion is reinforced by the fact that the State, as a matter of law, lacks any legitimate interest in *not* complying with Georgia's own statutes. Thus, to the extent the State wishes to utilize a system that counts votes encoded in QR codes, rather than the human-readable portion of the BMD ballot cards, the State declares an interest in utilizing a system that violates Georgia law. *See* O.C.G.A. § 21–2–300(a)(2). That can hardly be a ***valid*** state interest.

## VII.   DEFENDANTS' OTHER ARGUMENTS PROVIDE NO GROUNDS FOR SUMMARY JUDGMENT

Defendants only make two other arguments apart from standing and *Anderson-Burdick*. First, the State Defendants assert that Coalition Plaintiffs' "DRE claims" are moot. Second, the Fulton County Defendants reiterate an immunity defense that the Eleventh Circuit rejected and that the State Defendants have themselves dropped. Neither of these final arguments has any merit and certainly neither justifies summary judgment.

### A.      Mootness Of DRE Claims

State Defendants argue the DRE claims set out in Coalition Plaintiffs' Third Amended Complaint (the "**TAC**") are moot. (Doc. 1568-1, at 3, 22, 34–36.) To the extent "DRE claims" only include Coalition Plaintiffs' challenges to the DRE machines themselves, Coalition Plaintiffs agree, and they have already sought severance of such claims into a "DRE Case" for which final judgment could be entered in Plaintiffs' favor. (Doc. Nos. 1182, 1182-1.)

But the TAC's challenges to the State's conduct relating to other problematic components of the DRE-system, namely the voter-registration database and the electronic pollbooks, continue to persist. This Court has thus already rightly rejected the State's argument that Georgia's transition from DREs to BMDs rendered *all* claims in the TAC moot, reasoning that DREs would indeed not be used again because they were barred, but that the TAC's claims about voter registration and pollbook problems nevertheless remained alive. (Doc 751, at 15–25.)

Nothing has changed that justifies revisiting this conclusion. State Defendants are, in effect, misusing their Motion to seek reconsideration of an issue already decided, without appropriate justification. *See, e.g.*, *In re Kellogg*, 197 F.3d 1116, 1119 (11th Cir. 1999) ("The only grounds for granting [a motion for reconsideration] are newly-discovered evidence or manifest errors of law or fact."). This argument that "DRE claims" are moot has no bearing on summary judgment.

## B.     Eleventh Amendment Immunity

Fulton County argues that Eleventh Amendment immunity bars Plaintiffs' claims, (Doc. 1573, at 15–17), an argument the Eleventh Circuit squarely rejected in 2020.[41] This argument for summary judgment is frivolous. State Defendants

---

[41] Fulton County initially invoked qualified immunity also, (Doc. 1573, at 12–15), but has since properly withdrawn that inapplicable defense. (Doc. 1584.)

asserted Eleventh Amendment immunity in their first interlocutory appeal, and the Eleventh Circuit ruled that "any number of binding precedents demonstrate" why Plaintiffs' claims are not barred on that ground. *Curling v. Sec'y of State of Georgia*, 761 Fed. Appx. 927, 932, 930–34 (11th Cir. 2019) (unpublished). That appellate decision is law of the case and thus "binding in all subsequent proceedings in the same case in the trial or on a later appeal." *Schiavo*, 403 F.3d at 1291. The holding was reiterated in a second interlocutory appellate decision. *Curling*, 50 F.4th at 1121 n.3.

## VIII.  MODES OF VIOLATION UNADDRESSED BY THE MOTIONS

Defendants' fail entirely to address several of the specific mechanisms by which Coalition Plaintiffs claim their constitutional rights are violated when voters are compelled to use Georgia's BMD voting system. This omission concedes the burdens claimed by Plaintiffs and renders summary judgment unavailable.

### A.    Ballot Secrecy

Defendants do not address the Coalition Plaintiffs' ballot secrecy claims,[42]

---

[42] On ballot secrecy, State Defendants offer only a concession—that Coalition Members have suffered injury in fact because of ballot-secrecy violations (Doc. 1568-1, at 27)—and a misstatement of the record: "Further, Paragraph D, F, and G of the TAC [Doc. 628, pp. 75–76] are also moot, because no ballot-secrecy claim survives after this Court's ruling on the motion to dismiss, no pilot remains active, and State Defendants are not using any DREs." (Doc. 1568-1, at 36.)

incorrectly contending this Court dismissed them in its Order on Defendants'

Motion to Dismiss (Doc. 751). This Court dismissed Coalition Plaintiffs' Count III

claim alleging procedural due process violations, (*id.* at 45–51), but it denied

Defendants' Motion to Dismiss the Coalition Plaintiffs' fundamental right to vote

and equal protection claims. (*Id.* at 52). Each of those surviving claims is also

based, in part, on the BMD system's violations of ballot secrecy. That the ballot-

secrecy violations survived the Court's Order on Defendants' Motion to Dismiss is

beyond debate because, three months later, this Court, in its Order on Plaintiffs'

Motion for Preliminary Injunction, addressed ballot secrecy on the merits. (Doc.

964, at 89–93). Defendants did not address ballot secrecy violations in their

Motions, much less meet their prima facie burden of showing an absence of

evidence of such violations under Rule 56. Nonetheless, Coalition Plaintiffs will

explain the continuing factual and legal viability of secrecy violations as grounds

for their constitutional claims.

There are two types of ballot secrecy claims in the challenge to the

Dominion voting system components: one is the visibility of voters' selections on

the BMD touchscreens (the "display violation"), and the other is the ICP's

recording of the sequence of each ballot scanned (the "traceability violation").

### 1.    Display Violation

There is no dispute that Defendants have the affirmative obligation to

"guarantee the secrecy of the ballot."   O.C.G.A. § 21-2-70(13). There is overwhelming evidence that Defendants, because they require all in-person voters to make their selections on the large, brightly lit BMD screens, are not guaranteeing the secrecy of the ballot. (Doc. 964 at 90 (citing evidence that BMD touchscreens "were clearly visible to the public from 30 to 50 feet away").)

This is a severe burden on the right to vote for which there is no countervailing governmental interest. Indeed, the government's interest is the same as the voters: protecting ballot secrecy, an interest that is confirmed in Georgia law's uncompromising command that no BMD can be "adopted or used" unless it provides for "*absolute* secrecy so that no person can see or know any other elector's votes."   O.C.G.A.§ 21-2-379.22(5) (emphasis added).

Given this unjustified burden on the right to vote, the only remaining issue is the appropriate remedy: must the use of BMDs be enjoined to protect ballot secrecy, or are there other alternatives to protect ballot secrecy?  In its denial of Coalition Plaintiffs' Motion for Preliminary Injunction on this claim, the Court found "it is not necessary to scrap the new voting machines where a less burdensome fix exists," noting that the Secretary had issued equipment layout guidance to local officials to improve voter privacy, and if that guidance was not followed, "the State Election Board can undertake an investigation and/or enforcement action as necessary."  (Doc. 964, at 91).

70

The Secretary's instructions to local election officials, however, has been singularly ineffective; Defendants have been either unwilling or unable to fix the problem. The photographs below from a Gwinnett County polling place, taken in March 2020, and from Fulton County taken in November 2022, show visible screens long after the Secretary issued its guidance to local county election officials and after three years of complaints:

 

(Doc. 1596-3 (Decl. Throop) ¶ 20); Doc. 1621-1 (Decl. Brown) ¶ 3.)  Voters, pollworkers, poll watchers, and members of the press walking through these polling places can see "other electors' votes," in plain violation of the law.  In July 2020 emails to Rick Barron, Fulton BRE member Dr. Kathleen Ruth noted touchscreen visibility in her polling place, and former Fulton BRE member Vernetta Nuriddin added the observation, "the BMD screens are set up in a manner that makes many of the screens CLEARLY visible to polling staff and other voters waiting in line up to 20 feet away."  She concluded,  "casting a private ballot is impossible for our voters." (Doc. 1618-1 (Decl. Marks) ¶ 10; CGG SOF No. 22,

23.)

Coalition Plaintiffs have submitted numerous recent eyewitness accounts from all over the state confirming BMDs are routinely positioned so virtually anyone in the polling location can see how voters vote. (CGG SOF No. 8.) Voters in the pictured polling location are being forced to use BMDs that plainly do not protect their right to ballot secrecy. In a SEB-directed study of the Fulton County election during the 2022 mid-terms, the Carter Center found that in Fulton County, "[t]he height and angle of the BMD screen within the equipment container inadvertently undermined the secrecy of the voting process, especially in locations where tight space did not allow for optimal placement of the equipment containers." (Doc. 1590-6 (Decl. Marks) at 13.)

There is therefore substantial evidence supporting multiple manifestations of Coalition Plaintiffs' ballot secrecy claim relating to the BMD screens.

### 2.    Traceability Violation

The Dominion ICP scanners enable voted ballot content to be connected to individual voters using two different methods when combined with other information from the polling place. Both methods are based on the order voters' ballots are cast in the precinct ICP scanner.  The core ballot secrecy flaw in the ICP scanner is that ICP memory cards record the ballot images in the sequence in which they are scanned with a time stamp of all scanning activity. (Doc. 1590-1

(Decl. Marks) at 2.) Insiders can determine the exact time each ballot was cast by comparing the sequence of the scanned ballot images from the memory card to the timestamps in the ICP's slog.txt file, which records a timestamp each time the ICP scans a ballot. *Id.*

In addition, the public may, through public records requests, obtain copies of ballot images or the cast vote records, either of which will disclose the ballot content and "record ID numbers" that are pseudo-random numbers. These can be easily "un-shuffled" to put the records back into time sequence.  (Doc.1569-44 (Decl. Stark) at 15; CGG SOF No. 37.) In Georgia, the timestamps in the slog.txt files are available as public record well. (Doc. 1618 (Decl. Marks) ¶ 38.) Dr. Halderman describes several methods in which the ballot choices can be connected to the voter when the voting sequence is known. (Doc. 1590-1, at 3 *et seq.*)[43] Public video security records of the polling place showing voters scanning their ballots in sequence is one such source of sequence information. (Doc. 1618 (Decl. Marks) at ¶ 20; CGG SOF No. 39.)

For the foregoing reasons, even had Defendants advanced any argument or evidence relating to Coalition Plaintiffs' ballot secrecy claims, genuine issues of

---

[43] This evidence contradicts Dr. Coomer's statements that there is no timestamp information on the memory cards or "associated with" the ballot image. (Doc. 658-2, at ¶ 10.) Obviously, there is a disputed fact.

material fact remain to be tried.

## B.    Central-Count (ICC) Scanner Settings

Defendants also do not address Coalition Plaintiffs' scanner settings claim.

The factual background of this claim is described in detail in this Court's Order of

October 11, 2020. (Doc. 964 at 93-133). The Court concluded:

> Plaintiffs have presented enough evidence to establish a
> substantial likelihood of success on the merits of their
> claim that the State Defendants' use of an arbitrary
> threshold on its ballot scanners to discard voter markings
> for specific candidates or initiatives that are obvious to
> the human eye results in a violation of the fundamental
> right of each voter to have his or her vote accurately
> recorded and counted.

(*Id.* at 133). The Court directed Coalition Plaintiffs to submit a proposed order

delineating the specific relief sought. (Doc. 964 at 141- 42). Coalition Plaintiffs did

so. (Doc. 990.) Before the Court could act on Plaintiffs' proposed order, the State

filed a notice of appeal. (Doc. 991; *see also* Doc. 1021). The Eleventh Circuit

dismissed the appeal relating to the scanner settings, holding that no preliminary

injunction had been entered. *Curling,* 50 F.4th at 1126.

Since this Court's Order, State Defendants have not resolved the scanner

issue. In her declaration, Jeanne Dufort describes how, yet again, the scanner used

in Morgan County did not detect obvious markings for a specific candidate.

"I served on the Vote Review Panel again in the November 3, 2020 election, and

was surprised to see the first ballot image we were asked to adjudicate included

74

marks not detected by the scanner." (Doc. 1593 (Decl. Dufort) ¶ 39.) Were it not for the fortuity that the ballot was flagged because of an unrelated error, the vote would never have been counted. Scanners in Georgia continue to "discard voter markings for specific candidates" that are "obvious to the naked eye." (Doc. 964 at 133.)

Because the Coalition Plaintiffs have already established they are substantially likely to succeed on the merits of their scanner settings claim, they clearly have carried their much lighter burden of showing genuine issues of material fact to be tried.

### C.    PollPads

Defendants also do not address Coalition Plaintiffs' Pollpad paper back-up claim, except to argue (again) it is not a part of the case.[44] (Doc.1568-1, at 6, 7). As this Court has recognized numerous times, the PollPad claim is "properly before this Court" and part of this case. (Doc. 969, at 5, 5–11; *see also, e.g.*, Doc. 918, at 4; Doc. 751, at 20–25; Doc. 637, at 2–3; Doc. 598, at 4; Doc. 579, at 88–89; Doc 309, at 15–16.) Problems with the electronic-pollbook and voter-registration component of the old and new voting systems are expressly alleged in Coalition

---

[44] The only mention of pollbooks in the State Defendants' Statement of Material Fact is to the alleged injury to Coalition member Brian Blosser caused by pollbooks (SMF 208), and two unrelated statements relating to audits (SMF 382, 384; Doc. 1569, at 36, 63.)

Plaintiffs' two operative complaints. (Doc. 226, ¶¶ 59, 120, 131–32, 151–52; Doc. 628, ¶¶ 177–78, 181–82, 189).

The facts supporting this claim are discussed in detail by this Court in its Order granting injunctive relief. (Doc. 618.) The Court concluded:

> The evidence the Coalition Plaintiffs provided in support of their motion demonstrates a system wide problem of malfunctioning electronic PollPads beginning with the November 2019 pilot elections, again in the June 2020 primary election, and most recently in the August 2020 runoff elections in tandem with wholly inadequate backup plans and voter registration data deficiencies that resulted in voter disenfranchisement and that is likely to continue in the upcoming Federal Presidential election.

(Doc. 918, at 63.) The Eleventh Circuit reversed, holding that this Court had not properly weighed the burden on the right to vote against the State's interest in not providing paper pollbook backups. *Curling*, 50 F.4th at 1125. Notably, the Eleventh Circuit did not hold that the Coalition Plaintiffs' pollbook claim was deficient as a matter of law or that there were no conceivable facts that would entitle the Coalition Plaintiffs to relief. Instead, the Eleventh Circuit merely held that, on the record that existed at the time of the appeal, the Coalition Plaintiffs had not carried their heavy burden of showing a substantial likelihood of success on the merits for purposes of obtaining a preliminary injunction.

Moreover, trial on the merits is warranted because new evidence on both sides of the *Anderson-Burdick* equation shifts the balance toward granting

equitable relief. On the burden side of the equation, the Eleventh Circuit reasoned that since State Defendants were already required by state regulation to distribute paper pollbook backups to every precinct, the fact that the pollbooks were not updated with the most current voter information did not cause voters a severe burden. *Curling*, 50 F.4th at 1122. There is now substantial evidence in the record that, notwithstanding the regulations cited by the Eleventh Circuit, the State Defendants *do not* update and distribute paper pollbook back-ups when critically needed in runoff elections, such as the high turnout U.S. Senate Runoff elections. At the same time, two days before the December 6, 2022, U.S. Senate runoff, a December 4, 2022, email from the State Elections Division to all county election managers, with a web link to current list of electors, stated that it "is critical you distribute these in the event a polling location should experience an emergency." (Doc. 1621-2 (Decl. Brown) ¶ 4.)

Moreover, the electronic PollPads—which are now connected to the Internet (unlike the previous electronic pollbooks, the ExpressPollbooks)—are subject to the severe cybersecurity risks that are faced by the rest of the electronic voting system. A recent AP news account reports on the increasing concern over electronic pollbooks' vulnerability. (Doc. 1621-2 (Decl. Brown) ¶ 5.) Jeffrey Lenberg, who gained access to the Coffee County voting system in January 2021, testified that he watched the local election official connect the PollPad to the

Domino's Pizza web site. (Doc. 1613, at 72:1-7.) If there is a cybersecurity attack on the pollbooks (or, more likely, *when* they are attacked), without reliable backup pollbook data, the State will have no means of conducting an election.

On the state interest side of the equation, the only justification State Defendants have ever offered for not providing updated paper backups is administrative inconvenience. State election officials agree that updating the paper backups would be a good idea;[45] they apparently resist doing so only because Coalition Plaintiffs sued to require it. Though the Eleventh Circuit held administrative inconvenience was sufficient to justify what it found was a slight burden, *Curling*, 50 F.4th at 1124, it is woefully insufficient to justify what the evidence will show is a substantial burden on the right to vote. *Tashjian v. Republican Party*, 479 U.S. 208, 218 (1986) (neither a State's "financial considerations" nor "its own administrative convenience" can justify restraining constitutional rights). In any event, whether the State's interest outweighs the significant burden on the right to vote is quintessentially a matter that requires the weighing of evidence, which is not appropriate for summary adjudication.

---

[45] Doc. 618, at 54–55 (noting that State Election Director and Fulton County Election Director agreed that paper pollbook backups would be helpful).

### D.     New Arguments In Reply Briefs Not Proper

Any belated effort by Defendants to address these violations in their Reply

Brief should be rejected, for "reply briefs are not a vehicle to present new

arguments or theories." *WBY, Inc v. Dekalb County, Ga.*, 695 Fed. Appx. 486, 491-

92 (11th Cir. 2017) (holding that it was within the district court's discretion to

decline to address a theory raised for the first time in a reply brief).

## IX.    THE MOTIONS MUST BE DENIED

In view of the foregoing arguments and the evidence in the record, the

Motions must be denied for at least three reasons. First, standing exists. At the very

least, material facts pertaining to standing are disputed and must await resolution at

trial. Second, material facts are disputed as to the existence and magnitude of the

burdens on voters. These issues must therefore be decided at trial. Finally, the task

of weighing the burdens shown by Plaintiffs against the justifications for those

burdens asserted by the State and Fulton County—to the extent Defendants have

even advanced interests legally capable of justifying *any* burdens on constitutional

rights—is a merits question that cannot properly be resolved on summary

judgment, especially where the district court must view the evidence and all factual

inferences in the light most favorable to the nonmoving party. *Johnson v. Clifton*,

74 F.3d 1087, 1090 (11th Cir. 1996). Summary judgment is not warranted. The

Motions should be denied. This case must proceed to trial.

## X.   CONCLUSION

Both motions for summary judgment should be denied.

Respectfully submitted this February 11, 2023.

| | |
|---|---|
| */s/ Bruce P. Brown* | */s/ Robert A. McGuire, III* |
| Bruce P. Brown | Robert A. McGuire, III |
| Georgia Bar No. 064460 | Admitted Pro Hac Vice |
| BRUCE P. BROWN LAW LLC | (ECF No. 125) |
| 1123 Zonolite Rd. NE | ROBERT MCGUIRE LAW FIRM |
| Suite 6 | 113 Cherry St. #86685 |
| Atlanta, Georgia 30306 | Seattle, Washington 98104-2205 |
| (404) 386-6856 | (253) 267-8530 |

*s/ Russell T. Abney*
Russell T. Abney
Georgia Bar No. 000875
WATTS GUERRA, LLP
4 Dominion Drive, Building 3
Suite 100
San Antonio, TX 78257
(404) 670-0355

*Counsel for Coalition for Good Governance*

*/s/ Cary Ichter*
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Atlanta, Georgia 30326
(404) 869-7600

*Counsel for William Digges III, Laura Digges,
Ricardo Davis & Megan Missett*

80

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**                                    **Civil Action No. 1:17-CV-2989-AT**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing document has been prepared in

accordance with the font type and margin requirements of LR 5.1, using font type

of Times New Roman and a point size of 14.

/s/Robert A. McGuire, III
Robert A. McGuire, III

81

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**                                      Civil Action No. 1:17-CV-2989-AT

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

## CERTIFICATE OF SERVICE

I hereby certify that on February 11, 2023, I served a copy of the foregoing upon counsel for the Defendants via CM/ECF.

/s/Robert A. McGuire, III
Robert A. McGuire, III

82