**APPENDIX 1 – COURT ORDER EXCERPTS**

**COALITION PLAINTIFFS' RESPONSE TO MOTIONS FOR SUMMARY JUDGMENT**

       Pursuant to the Court's instructions, Coalition Plaintiffs file this Appendix with excerpts from the Court's orders that are cited in the Coalition Plaintiffs' Brief.  Since this is being file as an Appendix to the Brief, and further "sub-filings" are not possible, the excerpts are in a single pdf, attached.   For ease of reference, however, the following table shows in the first column the page of the pdf in which the excerpts for a particular Court order appear.

| PDF # | Docket Number | Date | Pages |
|---|---|---|---|
| 1 | 309 | Sept. 17, 2018 | 15-29; 38, 41-46 |
| 25 | 375 | May 21, 2019 | 47, 51, 52 |
| 30 | 579 | August 15, 2019 | 88-89, 130-131, 151-52 |
| 38 | 598 | September 4, 2019 | 4 |
| 41 | 637 | October 23, 2019 | 2, 3 |
| 45 | 751 | July 30, 2020 | 20-25, 34-35, 45-51 |
| 62 | 768 | August 7, 2020 | 2 |
| 65 | 918 | September 28, 2020 | 4, 63 |
| 69 | 964 | October 11, 2020 | 51, 59-60, 77, 79, 83-133, 139, 140-146 |
| 135 | 965 | October 12, 2020 | All |
| 152 | 966 | October 12, 2020 | All |
| 157 | 969 | October 14, 2020 | 5-11, 27-28 |
| 168 | 1021 | December 2, 2020 | All |

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| DONNA CURLING, *et al.*, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:17-CV-2989-AT |
| BRIAN KEMP, *et al.*, | : | |
| | : | |
| | : | |
| Defendants. | : | |

## ORDER

I.   Introduction ................................................................... 2

II.  Background ..................................................................... 4

III. Threshold Jurisdictional Issues ................................. 16

     A. Standing ................................................................. 16

     B. Eleventh Amendment Immunity ....................................... 29

IV.  Plaintiffs' Motions for Preliminary Injunction ....................... 31

V.   Conclusion .................................................................... 45

Plaintiffs also seek somewhat varied relief for these claims in their Second Amended Complaint:

- A court order declaring that Defendants violated the Fourteenth Amendment, and

- An injunction prohibiting Defendants from using DREs or other voting equipment that fails to satisfy state requirements.[18]

As stated above, both sets of Plaintiffs seek more limited and immediate relief in their motions for preliminary injunction. The Curling Plaintiffs ask the Court to order the following relief prior to the November 2018 general election: (1) enjoin the State Defendants to direct all counties that the use of DREs in the November 2018 election (and the December 2018 runoff election) is prohibited, with the exception for electors with disabilities; (2) enjoin the State Defendants to direct all counties to conduct elections using paper ballots; and (3) require the State Defendants to promulgate rules requiring and specifying appropriate procedures for conducting manual audits of election results. Similarly, the Coalition Plaintiffs ask the Court to: (1) prohibit Defendants from conducting the November 2018 election (and the December 2018 runoff election) with DRE

---

[18] Additionally, the Curling Plaintiffs bring a state-law claim under O.C.G.A. § 9-6-20 for a writ of mandamus ordering Defendants to discontinue the use of DRE machines and to either use (a) an optical scanning voting system or (b) hand-counted paper ballots. The Curling Plaintiffs seek a writ of mandamus against the following Defendants: the members of the State Election Board in their official capacities; the State Election Board; Richard Barron in his official capacity as the Director of the Fulton County Board of Registration and Elections; the members of the Fulton County Board of Registration and Elections in their official capacities; and the Fulton County Board of Registration and Elections.

machines for in-person voting; (2) order Defendants to conduct such elections using paper ballots, as permitted by Georgia law, with certain exceptions made for persons with disabilities; (3) order the State Election Board Members to promulgate rules requiring and specifying appropriate procedures for conducting manual audits of election results; and (4) order the Secretary of State, before October 1, 2018, to audit and correct any identified errors in the DRE system's electronic pollbook data that will be used in both such elections.

The Court now turns to the jurisdictional issues raised in Defendants' motion to dismiss before addressing the Plaintiffs' motions for preliminary injunction.

## III. Threshold Jurisdictional Issues

### A. Standing

The State Defendants argue that both the Curling Plaintiffs and the Coalition Plaintiffs lack standing to bring their claims in federal court. According to the State Defendants, Plaintiffs fail to establish each of the three elements required for standing. The Fulton County Defendants' Motion to Dismiss incorporates by reference the State Defendants' arguments on standing. (*See* Fulton Mot. to Dismiss, Doc. 82-1 at 5.)

The Supreme Court has set forth the standard for determining whether a party has standing:

> It is by now well settled that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest

that is (a) concrete and particularized, and (b) actual or imminent, not
conjectural or hypothetical. Second, there must be a causal connection
between the injury and the conduct complained of. . . . Third, it must
be likely, as opposed to merely speculative, that the injury will be
redressed by a favorable decision.

*United States v. Hays*, 515 U.S. 737, 742–43 (1995) (quoting *Lujan v. Defenders
of Wildlife*, 504 U.S. 555, 560–561 (1992)) (internal quotation marks omitted).
"[A] plaintiff must demonstrate standing for each claim he seeks to press and for
each form of relief that is sought." *Town of Chester, N.Y. v. Laroe Estates, Inc.*,
137 S. Ct. 1645, 1650 (2017) (quoting *Davis v. Federal Election Comm'n*, 554 U.S.
724, 734 (2008)).

As to the first element, Defendants contend that Plaintiffs have not
sufficiently alleged a concrete "injury in fact." Defendants argue that Plaintiffs'
allegations that the DRE voting machines are vulnerable to hacking and are
"presumed to be compromised" convey only a speculative, generalized fear, thus
falling short of establishing a concrete injury.

These arguments are unavailing. For one, Plaintiffs have alleged that the
DRE voting system was *actually* accessed or hacked multiple times already – albeit
by cybersecurity experts who reported the system's vulnerabilities to state
authorities, as opposed to someone with nefarious purposes. (Curling Complaint,
Doc. 70 ¶¶ 42-43, 45-49; Coalition Complaint, Doc. 226 ¶¶ 95-106.) Contrary to
Defendants' characterizations, Plaintiffs' allegations are not premised on a

theoretical notion or "unfounded fear"[19] of the hypothetical "possibility" that Georgia's voting system might be hacked or improperly accessed and used. Plaintiffs allege that harm has in fact occurred, specifically to their fundamental right to participate in an election process that accurately and reliably records their votes and protects the privacy of their votes and personal information. (Curling Complaint, Doc. 70 ¶ 14 ("Curling also chose to exercise her right to cast her vote using a verifiable paper ballot in the Runoff, so as to ensure that her vote would be permanently recorded on an independent record. To do so, Curling persisted through considerable inconvenience – only to be incorrectly told by Defendants Kemp and the Fulton County Board of Registration and Elections that she had not, in fact, cast a ballot, creating irreparable harm that her ballot was not counted."); ¶ 16 (Donna Price "cast her vote on a DRE in the 2016 General Election," and "[w]ithout the intervention of this Court, Price will be compelled to choose between relinquishing her right to vote and acquiescing to cast her vote under a system that violates her right to vote in absolute secrecy and have her vote accurately counted"); ¶ 38 ("DREs produce neither a paper trail nor any other means by which the records of votes cast can be audited."); ¶¶ 42-43 ("Lamb was able to access key components of Georgia's electronic election infrastructure . . . . In accessing these election system files, Lamb found a startling amount of private information," including driver's license numbers, birth dates, and the last four digits of Social

---

[19] *See* State Defendants' Motion to Dismiss Coalition Plaintiffs' Third Amended Complaint, Doc. 234-1 at 1.

Security numbers); Coalition Complaint, Doc. 226 ¶ 152 (member of CGG, Brian
Blosser, "was prohibited from voting on April 18, 2017 . . . when his name did not
appear on the eligible voter rolls" for the Sixth Congressional District and "was
instead erroneously listed" as a resident of another district, an error that Fulton
County Board members blamed on a "software glitch"); ¶ 154 (members of CGG,
Mr. and Ms. Digges, previously in 2017 "chose to vote by mail-in paper absentee
ballot because they were aware that an electronic ballot cast using an AccuVote
DRE was insecure," and they "were required to undergo the inconvenience of
requesting paper ballot[s] and the cost of postage to mail their ballots" "well before
Election Day"); ¶ 72 ("Georgia's AccuVote DREs do not record a paper or other
independent verifiable record of the voter's selections."); ¶ 92 ("[D]esign flaws
render the electronic ballots cast on AccuVote DREs capable of being matched to
voter records maintained by pollworkers and pollwatchers," and thereby expose
citizens' candidate selections to poll workers); ¶ 97 ("Lamb freely accessed files
hosted on the 'elections.kennesaw.edu' server, including the voter histories and
personal information of all Georgia voters . . . .  Lamb noted that the files had been
publicly exposed for so long that Google had cached (i.e., saved digital backup
copies of) and published the pages containing many of them."); ¶ 138 ("Fulton
Board Members have adopted voting procedures under which individual electronic
ballots bearing a unique identifier are transmitted from Fulton County's AccuVote
DREs located in satellite voting centers to Fulton County's central GEMS
tabulation server in clear text (i.e., unencrypted) over an ordinary, unsecured

telephone line on Election Night. This practice violates fundamental security principles because it subjects the transmitted votes to manipulation (such as man-in-the-middle interception and substitution of votes) and exposes the votes with their unique identifier to third-party interception, violating voters' rights of secrecy in voting.").)

Plaintiffs also allege the threat of future harm. For instance, in upcoming elections, Plaintiffs allege that Defendants are requiring them to vote early, mail a paper absentee ballot, and pay for postage to avoid having to use unsecure DRE machines, thereby subjecting them to unequal treatment. Furthermore, Plaintiffs plausibly allege a threat of a future hacking event that would jeopardize their votes and the voting system at large. Despite being aware of election system and data cybersecurity threats and vulnerabilities identified by national authorities and the DRE system's vulnerability to hacking as early as August 2016 – when Logan Lamb, the computer scientist, first alerted the State's Executive Director of the CES of his ability to access the system – Defendants allegedly have not taken steps to secure the DRE system from such attacks. (Curling Complaint, Doc. 70 ¶ 46 ("[N]ot only did Georgia fail to take remedial action when alerted to the problem Lamb raised, it failed to act even in the face of the detailed information on the cybersecurity threats facing the nation's election systems, and the recommended specific steps to reduce the risk, which were disseminated by the FBI, the DHS and

the EAC[20].”); Coalition Complaint, Doc. 226 ¶ 112 (“[N]o efforts have been made to remediate the compromised software programs and machines or to identify and remove any malware that was likely introduced during the lengthy security breaches referred to herein on the ‘elections.kennesaw.edu’ server that hosted the election-specific software applications and data that are re-installed on every piece of voting and tabulation equipment used to conduct Georgia’s elections in advance of each election conducted using Georgia’s Voting System.”).)

Importantly, courts have recognized these sorts of alleged harms as concrete injuries, sufficient to confer standing. In particular, courts have found that plaintiffs have standing to bring Due Process and Equal Protection claims where they alleged that their votes would likely be improperly counted based on the use of certain voting technology. *See, e.g.*, *Stewart v. Blackwell*, 444 F.3d 843, 855 (6th Cir. 2006) (“The increased probability that their votes will be improperly counted based on punch-card and central-count optical scan technology is neither speculative nor remote.”), *vacated* (July 21, 2006), *superseded*, 473 F.3d 692 (6th Cir. 2007) (vacated and superseded on the grounds that the case was rendered moot by the county’s subsequent abandonment of the DRE machines at issue); *Banfield v. Cortes*, 922 A.2d 36, 44 (Pa. Commw. Ct. 2007) (finding that the plaintiffs had sufficiently alleged standing under similar Pennsylvania law, based on “the fact that Electors have no way of knowing whether the votes they cast on a

---

[20] DHS is the acronym for the U.S. Department of Homeland Security, and EAC is the acronym for the U.S. Election Assistance Commission.

DRE have been recorded and will be counted," which "gives Electors a direct and immediate interest in the outcome of this litigation"); *c.f. Stein v. Cortes*, 223 F. Supp. 3d 423, 432-33 (E.D. Pa. 2016) (where plaintiffs sought a vote recount, post-election, based on the use of unsecure DREs, finding no standing based on the plaintiffs' "less than clear" allegations that the DRE machines are "hackable"; that the Pennsylvania Election Code's recount provisions are "labyrinthine, incomprehensible, and impossibly burdensome"; and that the past vote count was inaccurate – which plaintiffs merely posed as a "seemingly rhetorical question").

Turning to causal connection, the second element of standing, Defendants raise different arguments in response to the Curling Plaintiffs' claims versus the Coalition Plaintiffs' claims. For the Curling Plaintiffs, Defendants argue that any injury would be traced to illegal hacking into the DREs, not the use of the DREs themselves. Here, as discussed above, the Curling Plaintiffs have alleged that Defendants were aware of serious security breaches in the DRE voting system and failed to take adequate steps to address those breaches. Notably, even after Mr. Lamb first alerted the State about his access of the voting system, he and another cybersecurity expert were able to access the system *again* about six months later. (Curling Complaint, Doc. 70 ¶ 47.) Plaintiffs allege that Defendants have continued to fail to take action to remedy the DRE system's vulnerabilities. (*Id.* ¶¶ 46, 61, 62, 72.) And they allege that this failure, in turn, impacts the integrity of the voting system and their ability as citizens to rely upon it when casting votes in this system. (*Id.*) At the motion to dismiss stage, these allegations plausibly show

causal connection, even if indirectly, between Defendants' continued use of unsecure DREs and the injury to Plaintiffs' constitutional rights. *Focus on the Family v. Pinellas Suncoast Transit Auth*., 344 F.3d 1263, 1273 (11th Cir. 2003) ("[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action . . . .").

For the Coalition Plaintiffs, Defendants make the same argument above regarding causation (which fails) and another slightly different argument. Defendants take issue with the Coalition Plaintiffs' request for relief enjoining the State Defendants from enforcing O.C.G.A. § 21-2-383(b) and State Election Board Rule 183–1–12–.01. Defendants assert that the State Defendants (the Secretary and the State Election Board) do not mandate the use of DREs; rather, state law requires the use of DREs. Defendants maintain that the State Defendants are merely implementing the governing state law, which they are bound to do, and therefore Plaintiffs miss the mark by seeking to enjoin the State Defendants' actions instead of challenging the state law itself. In this way, Defendants argue that Plaintiffs have not linked their injury to any action by the State Defendants.

But O.C.G.A. § 21-2-383(b) does not *require* the use of DREs as Defendants claim it does. The statute requires absentee electors who vote in-person in the advance voting period to vote by DRE, but only "in jurisdictions in which direct recording electronic (DRE) voting systems are used at the polling places on election day." The statute simply specifies the use of DREs under certain circumstances. Rather, it is the State Election Board that issued a rule requiring

the use of DREs in "all federal, state, and county general primaries and elections,
special primaries and elections, and referendums," and requiring the use of DREs
by "persons desiring to vote by absentee ballot in person."  Ga. Comp. R. & Regs. r.
183–1–12–.01.  When read together, the state statute and the State Election Board
rule indicate that the State Defendants have chosen to enforce state law so as to
generally require the use of DREs in elections statewide.

Even apart from the statutory language, the Coalition Plaintiffs have
plausibly alleged that the State Defendants play a critical role in directing,
implementing, programming, and supporting the DRE system throughout the
state.  The Coalition Plaintiffs allege that the Secretary provided the counties with
the DRE machines and the software on which they operate.  (Coalition Complaint,
Doc. 226 ¶ 59.)  Additionally, from 2002 to December 2017, the Secretary allegedly
contracted with Kennesaw State University to create the Center for Election
Services ("CES") "to assist the Secretary in the fulfillment of his statutory duties to
manage Georgia's election system."  (*Id.* ¶ 93.)  The CES maintained a central
computer server containing sensitive voting-related information such as software
applications, voter registration information, ballot building files, and "other
sensitive information critical to the safe and secure operation of Georgia's Voting
System."  (*Id.* ¶¶ 94, 119.)  These factual allegations, when considered with the
Third Amended Complaint as a whole, show that the Coalition Plaintiffs have
alleged enough of a causal link between the State Defendants' conduct and their
injury for standing purposes.

24

Finally, on the third element of redressability, Defendants raise some of the same arguments as they do for the second element. Defendants argue that an injunction prohibiting the State Defendants from using DREs would not actually stop the deployment of DREs. Defendants maintain that county officials not included in this suit would continue to use DREs, as the State is not the entity that enforces the law requiring DREs. Defendants also argue that a different balloting system would not eliminate potential third-party interference, as no election system is flawless.

As stated above, the Court finds that the Coalition Plaintiffs have sufficiently alleged that the State Defendants play a significant role in the continued use and security of DREs, and therefore the requested injunction would help redress some of the Coalition Plaintiffs' injury. The Secretary of State both has the authority and obligation to investigate complaints regarding the accuracy and safety of the DRE voting system and to take appropriate corrective action in connection with the continued use of the DRE system. O.C.G.A. § 21-2-379.2. The Third Amended Complaint describes how the Secretary of State could play a critical role in conducting an in-depth investigation and formulating a remedy. As alleged in the Complaint, the State of California commissioned a study in 2007 to examine the security of its own Diebold AccuVote DRE system, the same type of system used in Georgia. Upon the study's findings that the DRE system was inadequate, had serious design flaws, and was susceptible to hacking, California's Secretary of State then decertified its DRE system in 2009. (Coalition Complaint, Doc. 226 ¶¶ 81,

25

84, 86.)  The Complaint similarly alleges that the Secretary of State for Ohio commissioned an independent expert study of a newer version of the DREs than those used in Georgia and reached similar conclusions as to the lack of trustworthy design and vulnerability to attack of the election system.  (*Id.* ¶¶ 81, 83, 85.)

The State Defendants here are similarly in a position to redress the Plaintiffs' alleged injury.  Thus, if the Court were to grant at least part of the requested injunctive relief as to the suspended use of the DRE voting system, any injunction would likely enjoin both the State Defendants as well as the Fulton County Defendants (as there is no argument that the County would not be enjoined).  Furthermore, as to Defendants' argument that no election system is flawless, the Coalition Plaintiffs rightly point out that this is not the standard for redressability.  Plaintiffs are seeking relief to address a particular voting system which, as currently implemented, is allegedly recognized on a national level to be unsecure and susceptible to manipulation by advanced persistent threats through nation state or non-state actors.  Plaintiffs are not asking for a system impervious to all flaws or glitches.

Defendants assert three additional arguments related to standing: that the Coalition Plaintiffs cannot manufacture standing by inflicting harm on themselves, that the individual Plaintiff Coalition for Good Governance ("CGG") lacks organizational and associational standing, and that Plaintiffs must reside in the jurisdiction for which they seek to enjoin DRE use.

The first of these arguments fails because the cases relied on by Defendants are distinguishable. Here, the Coalition Plaintiffs are suffering injury from the voluntary exercise of their *fundamental right to vote*, not from just any sort of activity that they decide to engage in. In *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013), the plaintiffs voluntarily spent money to take certain protective measures, based on a hypothetical fear of being subject to surveillance. And in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), the plaintiffs expressed an intent to voluntarily return to certain places they had visited before, which would deprive them of the opportunity to observe animals of an endangered species. These activities do not invoke the protection associated with exercising fundamental rights, such as the right to vote. The Coalition Plaintiffs aptly point out that Defendants' logic would bar many voting rights cases, based on individuals choosing to vote by one method or another, which certainly is not how courts have assessed standing in this context.

Defendants' challenge of CGG's standing similarly fails. "An organization has standing to enforce the rights of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Fla. State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1160 (11th Cir. 2008) (internal quotation marks omitted). The State Defendants argue that the Coalition Plaintiffs merely "presume" harm to their own members, without sufficiently

27

alleging harm to one or more of their members. (State Mot. to Dismiss, Doc. 234-1 at 31.) They also argue that CGG cannot assert that individuals are "members" merely because they are listed on CGG's mailing list. (*Id.*) The Coalition Plaintiffs, however, have alleged that the individual Plaintiffs – Laura Digges, William Digges III, Ricardo Davis, and Megan Missett – are all members of CGG. Contrary to Defendants' assertion, these particular Plaintiffs do not allege that they are members of CGG solely because they are on the mailing list. Furthermore, at least one of these Plaintiffs also alleges harm to his or her individual rights under the federal Constitution, as discussed above, so that they could presumably sue Defendants in their own right. (Coalition Complaint, Doc. 226 ¶¶ 24-27.) The Court finds these allegations sufficient to confer associational standing to CGG.[21]

As for Defendants' argument that Plaintiffs must reside in the county where they seek injunctive relief, this argument misses the mark. The Court need only find that one plaintiff (from each of the two sets of Plaintiffs) has sufficiently alleged standing, and that is the case here. *Am. Civil Liberties Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009) ("Because Balzli has standing to raise those claims, we need not decide whether either of the organizational plaintiffs also has standing to do so."). Specifically, the Curling Plaintiffs allege that Donna Curling is a resident of Fulton County and intends to vote in the upcoming elections in Fulton County. (Curling Complaint, Doc. 70 ¶

---

[21] The Court need not reach Defendants' challenge to CGG's *organizational* standing, as the Court has already found the Coalition Plaintiffs sufficiently alleged *associational* standing for CGG. *See Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009).

13.)  The Coalition Plaintiffs likewise allege that Megan Missett is a resident of Fulton County who intends to vote in the County's upcoming elections.  (Coalition Complaint, Doc. 226 ¶ 27.)  Based on the current allegations, both Ms. Curling and Ms. Missett have established the required elements of injury in fact, causation, and redressability as discussed above.

In sum, the Court finds that both sets of Plaintiffs have sufficiently alleged standing to bring their claims at this juncture.

### B.  Eleventh Amendment Immunity

Defendants argue that Plaintiffs' two federal claims are barred by the Eleventh Amendment.  Defendants acknowledge the *Ex Parte Young*[22] exception to Eleventh Amendment immunity, which allows claims against state officers in their official capacities for prospective injunctive relief.  But Defendants assert that the exception does not apply here for the following reasons: Plaintiffs seek to enjoin the enforcement of a state law that they do not challenge as unconstitutional; Plaintiffs have not alleged an ongoing or continuous violation of federal law; Plaintiffs seek to remedy past, not prospective, conduct; and Plaintiffs' requested relief implicates special state sovereignty interests.

Defendants' arguments are meritless.  First, Plaintiffs rightly point out that the *Ex Parte Young* exception applies to as-applied challenges to state statutes, not just facial challenges as Defendants imply.  Here, Plaintiffs specifically challenge the application of Georgia's law by Defendants to require in-person voting by DRE.

---

[22] 209 U.S. 123 (1908).

As the Court noted at the preliminary injunction hearing, rapidly evolving cybertechnology changes and challenges have altered the reality now facing electoral voting systems and Georgia's system in particular. And it is this reality that Plaintiffs substantiated with expert affidavits and testimony as well as an array of voter affidavits and documentation. Defendants sidestep the fact that Georgia is only one of five states that rely on a DRE voting process that generates no independent paper ballot or audit record. Yet the Plaintiffs' evidence as to the problems of security, accuracy, reliability, and currency of Georgia's system and software have hardly been rebutted by Defendants except via characterizations of the issues raised as entirely hypothetical and baseless. Ultimately, an electoral system must be accurate and trustworthy. The State's apparent asserted interest in maintaining the DRE system without significant change cannot by itself justify the burden and risks imposed given the circumstances presented. *Burdick*, 504 U.S. at 434.

Plaintiffs are substantially likely to succeed on the merits of one or more of their constitutional claims, though this finding is a cautious, preliminary one, especially in light of the initial state of the record. Plaintiffs have so far shown that the DRE system, as implemented, poses a concrete risk of alteration of ballot counts that would impact their own votes. Their evidence relates directly to the manner in which Defendants' alleged mode of implementation of the DRE voting system deprives them or puts them at imminent risk of deprivation of their fundamental right to cast an effective vote (i.e., a vote that is accurately counted).

38

to quantify, though even a minor alteration of votes in close electoral races can make a material difference in the outcome.

Finally, the Court considers together the last two factors in evaluating whether preliminary injunctive relief should be granted: whether the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and, if issued, whether the injunction would not be adverse to the public interest. The Court considers these factors in tandem, as the real question posed in this context is how injunctive relief at this eleventh-hour would impact the public interest in an orderly and fair election, with the fullest voter participation possible and an accurate count of the ballots cast.

*This assessment involves a true catch-22.*

While Plaintiffs have shown the threat of real harms to their constitutional interests, the eleventh-hour timing of their motions and an instant grant of the paper ballot relief requested could just as readily jeopardize the upcoming elections, voter turnout, and the orderly administration of the election. Defendants introduced substantial evidence from Elections Directors from counties with major populations (e.g., Fulton, Cobb, Gwinnett, Muscogee, and Richmond Counties) regarding the fiscal, organizational, and practical impediments and burdens associated with a court order that would require immediate implementation of paper ballot and ballot scanning voting systems for the 2018 election cycle. (*See* Testimony of Richard Barron at Preliminary Injunction Hearing; Doc. 265-3; Doc. 265-6.) Various representatives of the

Secretary of State's office provided testimony regarding similar organizational and fiscal challenges.  Some of these concerns, such as authority for emergency purchase orders of ballot paper or scanners, clearly are resolvable based on emergency purchase provisions under state and local law.  The Court's greater concern, in considering the evidence, is that the massive scrambling required to implement such injunctive relief in roughly 2,600 precincts and 159 countries will seriously test the organizational capacity of the personnel handling the election, to the detriment of Georgia voters.

Plaintiffs have submitted evidence from various jurisdictions in other states of their ability to smoothly roll out a paper ballot/optical scanning system in an expedited time frame as well an affidavit from the administrator overseeing Maryland's transition over an expedited, but still far longer, time frame.  The challenges presented in these jurisdictions are not comparable to managing a rapid implementation of a balloting system, associated technology, and administrative transition in less than seven weeks on a statewide basis in large population centers as well as tiny ones simultaneously.  Nor is it likely simple to roll out a paper ballot system with proper, efficient scanning, when many polling station personnel throughout the state have never handled this scope of a paper ballot exercise – or used accompanying scanners on a massive basis.

Further, early elections begin mid-October.  This poses an even earlier deadline for action and organization.  Fulton County's Elections Director testified that the County would only be able to cope with the challenges of an immediate

ballot requirement by limiting early voting to one central location, rather than offering it at 20 locations spread throughout the county. This, of course, would likely directly impact voter turnout and access to voting.

Ultimately, any chaos or problems that arise in connection with a sudden rollout of a paper ballot system with accompanying scanning equipment may swamp the polls with work and voters – and result in voter frustration and disaffection from the voting process. There is nothing like bureaucratic confusion and long lines to sour a citizen. And that description does not even touch on whether voters themselves, many of whom may never have cast a paper ballot before, will have been provided reasonable materials to prepare them for properly executing the paper ballots.

The Court attempted to expedite this case at earlier times to no avail. The Court understands some of the reasons why Plaintiffs may have been unable to file a preliminary injunction motion before new counsel for the Coalition Plaintiffs filed a Third Amended Complaint in June 2018. But the *August* filing of their motion for preliminary injunction effectively put the squeeze on their proposed remedial relief. Requiring injunctive relief on this broad of a scale, and on an abrupt, time-limited basis, would likely undermine a paper ballot initiative with a scanned audit trail that appears in reality to be critically needed.

Meanwhile, the State Defendants have also stood by for far too long, given the mounting tide of evidence of the inadequacy and security risks of Georgia's DRE voting system and software. The Court is gravely concerned about the State's

pace in responding to the serious vulnerabilities of its voting system – which were raised as early as 2016 – while aging software arrangements, hardware, and other deficiencies were evident still earlier.  The Secretary of State's Secure, Accessible, & Fair Elections (SAFE) Commission has held just two meetings since its establishment in April 2018, though it is tasked with making recommendations to the legislature that convenes in January 2019.  The State and the County's arguments about the time and resource constraints at issue, in the event the Court granted the requested injunctive relief, are compelling right now, with the November election just weeks away.  But these arguments only weaken the more that time passes and if Defendants continue to move in slow motion or take ineffective or no action.  For upcoming elections after November 2018, Defendants are forewarned that these same arguments would hold much less sway in the future – as any timing issues then would appear to be exclusively of Defendants' own making at that point.

Upon considering the totality of the evidence in connection with the four factors that must guide the Court's determination regarding the grant of extraordinary relief as to Plaintiffs' constitutional claims, the Court finds that the Plaintiffs have not carried their burden of persuasion to establish these prerequisites for such extraordinary injunctive relief in the immediate 2018 election time frame ahead.

## V.  Conclusion

While Plaintiffs' motions for preliminary injunction [Docs. 258, 260, 271] are **DENIED**, the Court advises the Defendants that further delay is not tolerable in their confronting and tackling the challenges before the State's election balloting system.  The State's posture in this litigation – and some of the testimony and evidence presented – indicated that the Defendants and State election officials had buried their heads in the sand.  This is particularly so in their dealing with the ramifications of the major data breach and vulnerability at the Center for Election Services, which contracted with the Secretary of State's Office, as well as the erasure of the Center's server database and a host of serious security vulnerabilities permitted by their outdated software and system operations.

A wound or reasonably threatened wound to the integrity of a state's election system carries grave consequences beyond the results in any specific election, as it pierces citizens' confidence in the electoral system and the value of voting.

Advanced persistent threats in this data-driven world and ordinary hacking are unfortunately here to stay.  Defendants will fail to address that reality if they demean as paranoia the research-based findings of national cybersecurity engineers and experts in the field of elections.  Nor will surface-level audit procedures address this reality when viruses and malware alter data results and evade or suppress detection.  The parties have strongly intimated that this case is headed for immediate appeal.  But if the case stays with or comes back to this Court, the Court will insist on further proceedings moving on an expedited

schedule.  The 2020 elections are around the corner.  If a new balloting system is to be launched in Georgia in an effective manner, it should address democracy's critical need for transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote.

**IT IS SO ORDERED** this 17th day of September, 2018.

**Amy Totenberg**
**United States District Judge**

# EXHIBIT 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| **DONNA CURLING, *et al.*,** | : | |
| | : | |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION NO.** |
| | : | **1:17-CV-2989-AT** |
| **BRAD RAFFENSPERGER, *et al.*,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

## ORDER

This case challenges the constitutionality of the State of Georgia's use of Direct Recording Electronic voting machines ("DREs") and associated software systems in today's era of heightened cybersecurity threats.

Approximately two weeks the November 2018 general election, the Court held a full day evidentiary hearing on Plaintiffs' Motion for Preliminary Injunction, and in so doing, considered Defendants' jurisdictional related defenses. Following the hearing, the Court entered an Order denying Defendants' Motions to Dismiss Plaintiffs' claims based on Eleventh Amendment immunity and for lack of standing. The Court also denied Plaintiffs' Motion for Preliminary Injunction seeking to require the State of Georgia to use paper ballots for the 2018 general election. Although the Court found (with a measure of caution) that Plaintiffs demonstrated a likelihood of success on the merits for at least some of their claims,

absentee ballot to avoid having to use unsecure DRE machines, thereby subjecting them to unequal treatment. Such a "choice" requires the voter to undergo the inconveniences of (i) requesting an absentee paper ballot sufficiently in advance of the date of a scheduled election, (ii) the costs of postage necessary to mail in an absentee ballot, (iii) forcing the voter to place his voted ballots in the mail well before election day to ensure their timely delivery and to give himself the ability to ensure receipt, (iv) being deprived of the ability to await the latest campaign information before making his voting decisions, and (v) foregoing voting in person on election day with his fellow electors, thereby depriving him of exercising his right of political association. (Coalition Compl. ¶ 155.) These burdens are exacerbated when voters are faced with a constrained timeframe for absentee voting in the case of a runoff or special election, as was experienced by Plaintiff Ricardo Davis in November 2017 when he "was unable to submit his mail-in ballot application in time and was required to choose between not voting at all and voting by DRE." (*Id.* ¶ 156.) As evidenced by the most recent election, absentee voting is not without its constitutional problems. *See Martin v. Kemp*, 341 F.Supp.3d 1326 (N.D. Ga. 2018) (concluding that additional burdens and procedures required by absentee voters were violative of due process guarantee of Fourteenth Amendment); *see also Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312 (finding that plaintiffs had established a likelihood of success on

47

in this challenging era when data system vulnerabilities pose a serious risk of opening election data, processes, and results to cyber manipulation and attack.

According to Defendants, the State has a compelling interest in maintaining its use of DREs. Defendants point to HAVA's requirement that the state provide persons with disabilities access to voting technology that provides them with the means to vote in private and independently "through the use of at least one direct recording electronic voting system or other voting system equipped for individuals with disabilities at each polling place." 52 U.S.C. 21081(a)(3). But, as court after court has recognized, states also have an "undoubtedly important" interest "in preserving the integrity of the electoral process" that is "particularly strong with respect to efforts to root out fraud, which not only may produce fraudulent outcomes, but has a systemic effect as well: It 'drives honest citizens out of the democratic process and breeds distrust of our government.'" *John Doe No. 1 v. Reed*, 561 U.S. 186, 198 (2010) (quoting Purcell v. Gonzalez, 549 U.S. 1, 4 (2006) (per curiam )); *see also Crawford v. Marion County Election Bd.*, 553 U.S. 181, 196 (2008) (opinion of STEVENS, J.). This Court previously noted that Defendants sidestep the fact that Georgia is only one of five states that rely on a DRE voting process that generates no independent paper ballot or audit record. As Defendants offer no real answers to Plaintiffs' claims as to the problems of security, accuracy, reliability, and currency of Georgia's system and software, the Court earlier found Plaintiffs were likely to prevail on the merits of their claims. Ultimately, an electoral system must be accurate and trustworthy. Thus, the Court already found

in its prior Order that the State's apparent asserted interest in maintaining the DRE system without significant change cannot by itself justify the burden and risks imposed given the circumstances presented.[38]   *Burdick*, 504 U.S. at 434; *Democratic Executive Committee of Florida v. Lee*, 915 F.3d at 1325-26 (holding that "the state's interest in preventing fraud is not in conflict with the voters' interest in having their legitimately-cast ballots counted, the state has not shown that its interest in facilitating timely and orderly election processing will be impaired by providing the injured voters with a reasonable opportunity to have their votes counted; and public faith in elections benefits from providing injured voters the opportunity to have their legitimately cast ballots counted when the reason they were not counted was not the voters' fault").

In sum, the Plaintiffs have alleged that Defendants were aware of serious security breaches in the DRE voting system and failed to take adequate steps to address those breaches.  Notably, even after Mr. Lamb first alerted the State about his access of the voting system, he and another cybersecurity expert were able to access the system *again* about six months later.  (Curling Complaint, Doc. 70 ¶ 47.) Plaintiffs allege that Defendants have failed to take action to remedy the DRE system's vulnerabilities.  (*Id.* ¶¶ 46, 61, 62, 72.)  And they allege that this failure, in

---

[38] The Court recognizes that the Georgia legislature passed Act No. 24/House Bill 316, signed by the Governor on April 2, 2019, and approved funds for a new system of voting technology slated to go into effect in 2020.  As the state has yet to choose which specific vendor's proposal will be selected and implemented, how these issues will play out in the context of new voting technology remains an open question.  Nonetheless, a number of elections are anticipated to take place using the current DRE system in 2019.

# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,          :
                                  :
                                  :
     Plaintiffs,                  :
                                  :
v.                                :          CIVIL ACTION NO.
                                  :          1:17-CV-2989-AT
BRAD RAFFENSPERGER, *et al.*,     :
                                  :
                                  :
     Defendants.                  :

## ORDER

I.    Introduction ................................................................................   3

II.   Joinder of Municipalities Conducting November 2019 Elections............   12

III.  Continuing Vulnerability and Unreliability of Georgia's GEMS/DRE
      System and Voter Registration System and Database .............................   21

      A.   Georgia's DREs operate on outdated and vulnerable software......   21

      B.   The DREs work in tandem with the Global Election
           Management System ("GEMS") interface, which poses
           additional problems for election integrity and security .................   25

      C.   The DRE/GEMS system is particularly susceptible to
           manipulation and malfunction.........................................................   33

      D.   The State's expert Dr. Shamos essentially agrees that Georgia's
           DRE/GEMS system is not reliably secure.......................................   42

      E.   "What's Past is Prologue." ...............................................................   62

      F.   The experience of voters in the 2018 election demonstrates
           serious problems and failures in the State's DRE/GEMS and
           ExpressPoll systems........................................................................   90

consequences. Mr. Beaver's view neglects to consider that any cyber intruder's scraping of voter personal information from the My V0ter Page website could easily be used in other nefarious ways in the election process. Indeed, this concern clearly was identified in warnings provided by the FBI and the Department of Homeland Security as well as in the United States' 2018 indictment of multiple Russian agents.

Most recently, on July 1, 2019, the SOS assumed operational responsibility for hosting the SOS/PCC Technology database. However, the Secretary of State has continued to contract with PCC to maintain its software application for which needed patches are not available and which Fortalice viewed as critically vulnerable. It is unclear, given the history here as well as the SOS's new contract with Dominion, what this change actually encompasses. The voter registration database, containing millions of Georgia voters' personal identifying information, plays a vital role in the proper functioning of the voting system. Yet it has been open to access, alteration, and likely some degree of virus and malware infection for years, whether in connection with: CES/KSU's handling of the system and data and failure to address these circumstances upon transfer of CES's functions back to the SOS; failure to remediate the database, software and data system flaws and deficiencies; or exposure of the widespread access to passwords to the voter registration data system throughout the SOS, CES/KSU, the 159 counties, or the public via the virtual open portal maintained at CES/KSU. Most significantly, the programming and use of ballots in both the DRE and future

Dominion BMD system is tied to the accuracy of voter precinct and address information.   Inaccuracy in this voter information thus triggers obstacles in the voting process.   New Dominion express poll machines bought as part of the new contract with Dominion cannot alone cleanse the voter database to be transferred and relied upon.

In sum, the Court recognizes that the Secretary of State's Office and its leadership have likely benefited from the information provided in the Fortalice evaluations. Hopefully, this information translates into true intervention. All told, though, the picture remains that in the current cyber environment, the *present* voting system and voter registration database and system, as constituted and administered by the SOS and counties, bear critical deficiencies and risks that impact the reliability and integrity of the voting system process.  The transference of defective voter data from one express poll electronic gateway to another one (whether or not the software is PCC's or Dominion's) remains a formidable obstacle to essential change of the voting system.[70] If voters' capacity to cast votes

---

[70] The State's contract with Dominion provides that "Dominion's Democracy Suite Election Management System shall have the capability of importing election data from the State of Georgia's current database to generate ballot layout used to conduct an election." (Contract, Ex. B, § 10.8 at p. 61.)  According to the State's filing in response to this Court's inquiry, "the database referred to in Section 10.8 is the voter registration database," which "creates a flat, delimited text export file that contains no executable code and includes precinct and ballot combo information for import into [Dominion's] EMS."  (Doc. 556 at 3.)  The State's RFP provides that the vendor's new EPoll Data Management System must have the following capabilities: (i) being "[u]sed to combine voter registration and election ballot data into an election-specific elector's list that power the electronic poll book (EPoll) and provides each voter with the properly assigned ballot style;" and (ii) "[a]ccept[ing] imports of voter registration data from eNet on removable memory devices for the purposes of building an elector's list for any given election.  The data transferred from eNet includes but is not limited to: voter name, voter address, driver's license number, voter registration ID, voter status, assigned precinct, assigned district combination value, assigned polling place, polling place address, [and] absentee status."

This Court previously determined that Plaintiffs' evidence (even at the preliminary stage) established a substantial likelihood of prevailing on their claims that the State's failure to remedy known security breaches and exposures compromising Georgia's electronic voting machines and election servers violates their Fourteenth Amendment substantive due process and equal protection rights.  Specifically, the Court found:

> Plaintiffs have shown that their Fourteenth Amendment rights to Due Process and Equal Protection have been burdened.  Put differently, the State's continued reliance on the use of DRE machines in public elections likely results in "a debasement or dilution of the weight of [Plaintiffs'] vote[s]," even if such conduct does not completely deny Plaintiffs the right to vote.  *Bush v. Gore*, 531 U.S. 98, 105 (2000) (quoting *Reynolds*, 377 U.S. at 555). . . . Plaintiffs have so far shown that the DRE system, as implemented, poses a concrete risk of alteration of ballot counts that would impact their own votes. Their evidence relates directly to the manner in which Defendants' alleged mode of implementation of the DRE voting system deprives them or puts them at imminent risk of deprivation of their fundamental right to cast an effective vote (i.e., a vote that is accurately counted). *United States v. Classic*, 313 U.S. 299, 315 (1941); *Stewart*, 444 F.3d at 868.  Plaintiffs' evidence also goes to the concern that when they vote by DRE, their vote is in jeopardy of being counted less accurately and thus given less weight than a paper ballot.

*Curling v. Kemp*, 334 F. Supp. 3d 1303, 1322 (N.D. Ga. 2018).

As discussed further below, the Court again finds that the Plaintiffs have continued to demonstrate a likelihood of prevailing on the merits of their claims that the current non-auditable Georgia GEMS/DRE voting system, as implemented, burdens and deprives them of their rights to cast secure votes that are reliably counted, as guaranteed under the First and Fourteenth Amendments

of the United States Constitution.  The threatened, ongoing injury here is an irreparable injury – one that goes to the heart of the Plaintiffs' participation in the voting process and our democracy.  But the Court must also consider, in determining whether preliminary injunctive relief should be granted, whether the threatened injury to Plaintiffs outweighs whatever damage the proposed injunction may cause the Defendants; and, if issued, whether the injunction would not be adverse to the public interest. And again, the Court must consider how Plaintiffs' requested injunctive relief during an interim cycle of elections could negatively impact the public's interest in the State's ability to marshal in a new election system – using electronic ballot markers that produce paper ballots tabulated using ballot scanners – in the coming months in time for the 2020 Presidential primary election cycle, which is the State's target deadline under the terms of its contract with Dominion.

"When a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." *Reynolds v. Sims*, 377 U.S. 533, 566 (1964) (quoting *Gomillion v. Lightfoot*, 364 U.S. 399, 347 (1960)); *see also Lassiter v. Northampton Cty. Bd. of Elections*, 360 U.S. 45, 50 (1959) ("The States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised, absent of course the discrimination which the Constitution condemns." (citations omitted)).  While the Constitution affords the states broad

## VI.    CONCLUSION

The Plaintiffs' voting claims go to the heart of a functioning democracy.  As the Court commented in its Order last year, "[a] wound or reasonably threatened wound to the integrity of a state's election system carries grave consequences beyond the results in any specific election, as it pierces citizens' confidence in the electoral system and the value of voting."  *Curling*, 334 F. Supp. 3d at 1328.  The reality and public significance of the wounds here should be evident – and were last year as well.

The long and twisting saga of Georgia's non-auditable DRE/GEMS voting system – running on software of almost two decades vintage with well-known flaws and vulnerabilities and limited cybersecurity – is finally headed towards its conclusion.   The new Georgia electronic BMD voting system legislation adopted in 2019 was accompanied by a major funding appropriation.  The legislation is an essential step forward out of the quagmire, even if just to terminate use of an antiquated vulnerable voting system, with funding for a replacement voting system and the initiation of some measure of future ballot audit protocols.  The wisdom or legal conformity of the Secretary of State's selection of a new vendor's particular ballot system though is not the question now before the Court.[102]

---

[102]   As discussed at length in this Order, the premier 2018 Report of the National Academies of Sciences, Engineering, and Medicine recommends the use of paper ballots based on its finding that "[c]omplicated and technology-dependent voting systems increase the risk of (and opportunity for) malicious manipulation."  (NAS Report, Doc. 285-1 at 128.)

The past may here be prologue anew – it may be *"like déjà vu all over again."*[103]   The Defendants have previously minimized, erased, or dodged the issues underlying this case.    Thus, the Court has made sure that the past is recounted frankly in this Order, to ensure transparency for the future.

For the reasons discussed at length in this decision, the Court **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' Motions for Preliminary Injunction [Docs. 387 and 419].  The Court **DENIES** Plaintiffs' request to enjoin the use of the GEMS/DRE system in the 2019 elections, but it **GRANTS** Plaintiffs' motion to the extent that the Court **PROHIBITS** any use of the GEMS/DRE system after 2019.  The Court grants additional measures of relief, as described at the conclusion of Section V above.  The Court specifically grants narrowly tailored relief measures to ensure that the GEMS/DRE system is not resorted to as a stopgap default system in the event the Secretary of State and its contractor are unable to fully and properly rollout the new BMD system in time for the 2020 Presidential Preference Primary or any of the ensuing elections. And it requires that the State Defendants promptly file with the Court all proposed and final audit requirements that the State Elections Board and Secretary of State's Office considers or approves in connection with elections to be held in 2020 or thereafter.  Finally, the Court views the significant voter registration database and related ExpressPoll deficiencies and vulnerabilities demonstrated in this case as a major concern both relative to burdening or depriving voters' ability to

---

[103]  Quotation attributed to Yogi Berra.

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,                   :
                                           :
                                           :
        Plaintiffs,                        :
                                           :
v.                                         :        CIVIL ACTION NO.
                                           :        1:17-CV-2989-AT
BRAD RAFFENSPERGER, *et al.*,              :
                                           :
                                           :
        Defendants.                        :

## **ORDER**

The Court held a conference with all parties' counsel on August 27, 2019 to address pending discovery disputes, Defendants' Consolidated Motion to Clarify Preliminary Injunction Brief, and other related issues raised in the Coalition Plaintiffs' Status Report.  (Docs. 582, 584, 586.)  In the course of the conference, the Court answered and addressed each of the Defendants' specific requests for clarification regarding remedial directives contained in the Court's Order of August 15, 2019. The Court therefore deems the Defendants' Motion to be resolved.[1] (Def.'s Mot. For Clarification, Doc. 584; Order, Doc. 579.)  The Court also requested further information from Defendants' counsel concerning changes in the handling of the voter registration data system, PPC eNet voter registration related software application, and the Dominion Electronic Poll Book (EPoll) express poll voter

---

[1] Accordingly, the Court DIRECTS the Clerk to terminate Defendants' Motion [Doc. 584].

Remedial paragraphs (1) and (5) of the Court's Order of August 15th were intended to address significant voter registration security, exposure, and accuracy eNet issues that interfaced with the integrity of the GEMS/DRE voting system. These issues had their roots in major software and network management deficiencies, among other sources. And they were identified both in Fortalice's October 2017 and February 18, 2018 Reports, (Docs. 510-5, 510-7), as well as in an array of other evidence presented in the preliminary injunction record. The Court has proceeded on the premise that the parties will use good judgment and their knowledge of the Court's Order in construing the provisions of the Court's Order. In the event there is any lack of clarity, the Court notes that remedial paragraphs (1) and (5) anticipated the need for close examination and tackling of voter registration data system exposure, data accuracy, and software issues. And the Court in turn recognizes that accuracy problems baked into the SOS voter database (whether due to defective software, exposure, hacking, etc.) would transfer or migrate to the new Dominion EPoll system unless properly addressed.

**IT IS SO ORDERED** this 4th day of September, 2019.

**AMY TOTENBERG**
**UNITED STATES DISTRICT JUDGE**

4

# EXHIBIT 5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,                  :
                                          :
                                          :
        Plaintiffs,                       :
                                          :
v.                                        :        CIVIL ACTION NO.
                                          :        1:17-CV-2989-AT
BRAD RAFFENSPERGER, *et al.*,             :
                                          :
                                          :
        Defendants.                       :

## <u>ORDER</u>

This matter is before the Court on the Coalition Plaintiffs' Motion to Amend the Court's August 15, 2019 Order Granting in Part Plaintiffs' Motions for Preliminary Injunction [Doc. 605].

The Court appreciates the reasons the Coalition Plaintiffs have requested more detailed relief and monitoring provisions. However, the Court considered the fundamental issues posed in this case and Plaintiffs' original requests for relief (Docs. 387-8 and 419-2) in fashioning relief in its Order of August 15, 2019. It endeavored to provide meaningful relief without intruding excessively into the State's and counties' operational administration of the voting system. Further, the Court promptly responded to issues pertaining to the parties' disputes and requests for clarification as to relief issues during its conference with counsel on August 27, 2019 and its follow-up Order of September 4, 2019. (Doc. 598.) The

Court at that time also reiterated its expectation that the parties would use good judgment and their knowledge of the Court's Order of August 15th as a whole in proceeding. (*Id.* at 4.)

For the foregoing reasons, the Court **GRANTS IN PART** the Coalition Plaintiffs' motion in so far as the Court's Order of September 4th already further clarifies the scope and intent of remedial Paragraphs (1) and (5) but otherwise **DENIES** the additional requested amendments to the Court's Order of August 15, 2019.  Consistent with this ruling, remedial paragraphs (1) and (5) of the August 15, 2019 Order require the State Defendants' "close examination and tackling of voter registration data system exposure, data accuracy, and software issues." (Doc. 579 at 149-150.)  And the Defendants should be guided by the recognition that "accuracy problems baked into the Secretary of State's voter database (whether due to defective software, exposure, hacking, etc.) would transfer or migrate to the new Dominion EPoll system unless properly addressed." (Doc. 598 at 4.)

The Coalition Plaintiffs request that the Court modify directive 2 on page 150 of the preliminary injunction Order to require the use of a paper pollbook backup at each precinct, rather than the voter registration list.  The Court recognizes the Coalition Plaintiffs' motion was timely filed, however, a number of pragmatic considerations make the Court hesitant to modify this provision of the Order now that early voting has begun for the November 2019 election cycle.  The Court is potentially willing to consider this request for subsequent election cycles but only after hearing more concretely from the State regarding pragmatic implementation

issues at a short conference or hearing. Therefore, the Coalition Plaintiffs' request that the Court modify directive 2 on page 150 of the preliminary injunction Order to require the use of a paper pollbook backup is **DENIED** at this time.

Accordingly, the Coalition Plaintiffs' Motion to Alter or Amend the Judgment [Doc. 605] is **GRANTED IN PART AND DENIED IN PART.**

**IT IS SO ORDERED** this 23rd day of October, 2019.

**Amy Totenberg**
**United States District Judge**

# EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,                    :
                                            :
     Plaintiffs,                           :
                                            :
v.                                          :          CIVIL ACTION NO.
                                            :          1:17-cv-2989-AT
BRAD RAFFENSPERGER, *et al.*,               :
                                            :
     Defendants.                           :

## **ORDER**

During the pendency of this lawsuit and following the 2018 gubernatorial general election, the Georgia Legislature enacted legislation requiring the Secretary of State to implement a new voting system that includes a voter-verifiable paper record. In addition to their original claims aimed at the State's former electronic voting machines, Plaintiffs' newly amended claims challenge the ballot marking device system chosen by the Secretary of State which tabulates votes using an encrypted 2D barcode that Plaintiffs allege cannot be voter-verified. The State Defendants' Motion to Dismiss Curling Plaintiffs' Third Amended Complaint and Coalition Plaintiffs' First Supplemental Complaint [Doc. 645] is now pending before the Court.[1]

---

[1] After the Court granted Plaintiffs leave to file amended complaints, both the Coalition's First Supplemental Complaint (Doc. 628) and the Curling Plaintiffs' Third Amended Complaint (Doc. 627) were filed on October 15, 2019.

and general elections; (3) the Court also has prohibited the State's use of "the GEMS/DRE system in conducting elections after 2019;" and (4) the State has decertified the DREs and has collected and stored them in a suitable facility in a fiscally prudent manner for testing of a sample and future disposal per the parties' agreement and the Court's approval.[10] (*See* Consent Order on Storage of DREs, Doc. 745) (addressing storage, testing of DRE memory cards and/or DRE Recap Sheets for purposes of identifying a sample of DRE machines to evaluate for assessment of electronic hacking/access issues in dispute).

Defendants are correct that all of this precludes the possibility of the DRE machines being used again in Georgia elections.[11] And the Court has indicated that it does not intend to grant any further relief relating to the use of the old DRE voting machines. But Plaintiffs' original claims challenged elements of the voting system beyond the DRE voting machines themselves. As highlighted extensively in this Court's prior orders, Plaintiffs' claims encompassed the security of the Secretary of State's election technology infrastructure and the actual breach of the Center for Election Systems ("CES") servers, computer networks, and data and the State's electronic voter registration system and database.[12] These concerns were at

---

[10] The Court recognizes that at the time this Order is being issued, both the 2020 Presidential Preference Primary and Georgia's Statewide Primary elections (pre-runoffs) have been conducted on the BMD system and DREs are no longer being used for any elections.

[11] At the time when Plaintiffs' amended complaints were filed and these motions were being briefed in 2019, DREs were still being used to conduct a small number of local elections and runoffs.

[12] Given the State's strong desire to protect the total confidentiality of its central GEMS server, the Court has authorized discovery of a sample of DRE voting machines, pursuant to Consent Order, to allow Plaintiffs' access to potentially relevant evidence in connection with these security, breach, and data integrity claims.

the center of the Court's consideration in ordering relief in August 2019 and remain

a focus of this case even as the State implements the BMDs in connection with

multiple other components and the State's main election system server. Plaintiffs

allege in their amended/supplemental complaints that elements of the former

system, including the voter registration database, will carry over into the new

election system. And as this Court noted in its August 15, 2019 Order:

> The voter registration database, containing millions of Georgia voters' personal identifying information, plays a vital role in the proper functioning of the voting system. Yet it has been open to access, alteration, and likely some degree of virus and malware infection for years, whether in connection with: CES/KSU's handling of the system and data and failure to address these circumstances upon transfer of CES's functions back to the SOS; failure to remediate the database, software and data system flaws and deficiencies; or exposure of the widespread access to passwords to the voter registration data system throughout the SOS, CES/KSU, the 159 counties, or the public via the virtual open portal maintained at CES/KSU. Most significantly, the programming and use of ballots in both the DRE and future Dominion BMD system is tied to the accuracy of voter precinct and address information. Inaccuracy in this voter information thus triggers obstacles in the voting process. New Dominion express poll machines bought as part of the new contract with Dominion cannot alone cleanse the voter database to be transferred and relied upon.

(August 15, 2019 Order, Doc. 579 at 88-89.)

Defendants admit that the voter registration database (ENET), which is used

by county registrars to maintain and update voter registration records is not being

replaced and that information from this system will be loaded into the new

electronic pollbooks for each election. (Defs.' Mot. at 11, n. 14; *see also* Dec. 6, 2019

Tr. at 11) (explaining that the ENET system "used to program ExpressPoll check-

in units for the GEMS/DRE system" is "not being replaced" and that "[t]he same

database and same data, a flat text file, will be used to populate the Poll Pads").
They contend that the information is not electronically transmitted, and therefore
cannot corrupt the new pollbook system, because only a flat text file from ENET
(that will be run through a security scan) will be loaded into the pollpads for use
during elections. Defendants offer nothing, however, to show that any action has
been taken in response to issues experienced by voters in November 2018 (and
prior elections or allegedly, during more recent elections) to ensure that the
information from ENET is reliable, accurate, and updated. Due to the volume of
evidence of voter issues at the polls detailed in the Court's August 2019 Order,
Plaintiffs' allegations that errors and deficiencies in the voter registration system
and database are likely to carry over into the new system and cause another round
of voter disenfranchisement are plausible and remain a material concern. And of
course, Defendants' motion is not being decided in a vacuum. As the Court is aware
from the evidence presented in the context of the Plaintiffs' prior preliminary
injunction motions, Defendants' contentions that the other two voter registration
systems, the My Voter Page (MVP) and the Online Voter Registration system, do
not interface with ENET are challenged by Plaintiffs. Plaintiffs have offered
testimony of cybersecurity experts to rebut the State's assertions.[13]  Clearly, to the

---

[13] Plaintiffs presented evidence that the State's technology failures (whether caused by malicious
interference, out of date software, or even human error by county registrars in failing to update
voter registration information) have resulted in voter disruption and have potentially been left
unremediated. Numerous declarations from voters highlighted instances where a voter's
registration status on MVP, the "outward-facing system used to provide information to voters"
did not match the voter registration status in the electronic pollbooks used to check in voters at
the voting polls. At the December 6, 2019 hearing, counsel for the State explained it this way: "The
My Voter page is a snapshot of the ENet database at a particular point in time. So it is a read only.

extent that the Court views the MVP system as part of the Plaintiffs' continuing challenge, the State's position on the MVP interface issue conflicts with this evidence provided to date.

Although O.C.G.A. § 21-2-221.2 (f) requires that "the Secretary of State shall employ security measures to ensure the accuracy and integrity of voter registration applications submitted electronically," the Plaintiffs have demonstrated a detailed account of the Secretary of State's deficient security practices in Georgia's pre-2020 elections. The Court therefore required the State Defendants to develop procedures and take other actions to address the significant deficiencies in the voter registration database and the implementation of the ExpressPoll system.

It is unclear what actions, if any, the State has undertaken to address these deficiencies in the electronic pollbooks and MVP voter registration interface or new versions of such in advance of June 2020 elections or the elections to be held in August and November 2020. While the Court at this juncture has only preliminary evidence in the record before it that addresses these claims in their current form, the Court notes that alleged significant problems relating to the express pollbooks were reported by the media during the June 2020 election cycle. The Court makes no findings whatsoever based on this reporting, but simply finds

---

A voter can look up their information. But if they click to say I want to change something, they are taken to the online voter registration system. That system will then send information to the county registrars that they are then able to say we're not going to put this in or will put this in. So it is not like a voter is able to actively edit the ENet database themselves. They have to do that – all of those systems will remain in place, the ENet system, the My Voter page, the online voter registration. None of those systems are changing with the adoption of the new voting system for the election process." (December 6, 2019 Tr., Doc. 679 at 12-13.)

that given the body of evidence originally presented and presented in connection with Plaintiffs' newest amended complaints, the Plaintiffs' claims relating to continuing, critical deficiencies in the MVP and voter registration system and electronic pollbooks are, at very least, plausible and not moot. Similarly, in the absence of evidence of the Secretary of State's progress or timeline for enactment or measures to address Plaintiffs' claims for relief regarding the deficiencies in the voter registration database relied on as the foundation of the voting system, the Court cannot find that these registration related claims are moot. *See Fanin v. United States Department of Veterans Affairs*, 572 F.3d 868, 876 (11th Cir. 2009) (finding that the plaintiff's case was not moot because there was "a wide gulf between the [defendant] being 'in the process' of implementing new procedures and it having those new procedures fully in place"). Thus, the Court cannot say that Plaintiffs' allegations have an insufficient basis or are sheerly speculative given this record.

Accordingly, although the portion of Plaintiffs' claims challenging the DRE voting machines themselves may for all practical purposes be moot because the DREs have been barred from use past 2019 as explained above, these other aspects of Plaintiffs' claims are not.[14] Nor would Plaintiffs' claims relating to the handing

---

[14] This Court has twice indicated its view that Plaintiffs' original claims challenging the constitutionality of the DRE/GEMS voting system were not moot as a result of the passage of Act No. 24/H.B. 316. First, in April 2019 (and before the DREs were enjoined for use past 2019), the Court noted that because the DREs were still being used for elections in 2019, the claims were still very much alive at that time. Indeed, the Court ordered substantive preliminary injunctive relief on those claims in its August 2019 Order. Second, the Court noted in November 2019 that "[w]hile the Court finds that discovery relating to the DREs and GEMS systems is not necessary to the Court's resolution of the Plaintiffs' claims based on the current posture of the case, the Court does

of security of the current voting system be moot to the extent that evidence is introduced linking this to prior security issues and breaches.

**B.     Plaintiffs' Claims Are Not Barred by Eleventh Amendment Immunity**

State Defendants have renewed their argument that Plaintiffs' claims are barred by the Eleventh Amendment.  Implicitly recognizing the failure of their first attempt at an Eleventh Amendment defense, Defendants assert that "Plaintiffs' Complaints raise different Eleventh Amendment questions than those the Court previously addressed."  (Mot., Doc. 645-1 at 15.) They argue that the Eleventh Amendment bars claims in the amended/supplemental complaints because Plaintiffs' requested relief: (1) seeks redress of *past* harm; (2) is drastically different and more comprehensive than before; and (3) impermissibly seeks removal of the State's constitutional authority to oversee the details of elections. These are the exact arguments previously raised by the State in connection with Plaintiffs' claims challenging the DREs and rejected by both this Court and the Eleventh Circuit on appeal.

---

not agree with the State Defendants' characterization of Plaintiffs' claims as being entirely moot. The State has declined to concede that it will not seek to appeal the Court's August 15, 2019 injunction order upon entry of a judgment in the case. The State has further declined to agree to stipulate to the conversion of the Court's order as a permanent injunction. As such, Plaintiffs' claims challenging the DRE/GEMS election system are not legally moot." (November 22, 2019 Ord., Doc. 668 at 2-3.)

**C.      Plaintiffs' Allegations Are Sufficient to Establish Standing to Assert Claims Challenging Constitutionality of BMDs**

As they did with the DREs, Defendants argue that Plaintiffs lack standing to bring their BMD claims in federal court.  Defendants' motion asserts first that Plaintiffs have failed to allege harm from the BMD voting system that affects them in "a personal and individual way," and instead allege threatened injuries that are purely theoretical and speculative. Second, Defendants argue that the alleged injuries are not fairly traceable to State Defendants or to the challenged conduct of the State but are instead attributable to third-party nefarious actors. And third, Defendants assert that the BMD-related injuries alleged by Plaintiffs are not redressable because Plaintiffs' requested relief of hand-marked paper ballots suffer from the same potential harms as those associated with the BMDs.  These arguments are largely the same as those raised by Defendants in the prior motion to dismiss Plaintiffs' claims challenging DREs.

Standing is a "threshold question in every federal case, determining the power of the court to entertain suit.'" *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269 (11th Cir. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 499 (1975)); *see also Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1349 (11th Cir. 2009) (quoting *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005)).  Standing has three elements:

> a plaintiff must show that he is under threat of suffering "injury in fact" that is concrete and particularized; the threat must be actual and imminent, not conjectural or hypothetical; it must be fairly traceable

34

> to the challenged action of the defendant; and it must be likely that a
> favorable judicial decision will prevent or redress the injury.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citing *Friends of Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180–181 (2000).  The requirement that a plaintiff demonstrate standing "assures that there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Id.* (internal citations omitted).

    "Foremost among these requirements is injury in fact – a plaintiff's pleading and proof that he has suffered the invasion of a legally protected interest that is concrete and particularized, i.e., which affects the plaintiff in a personal and individual way." *Gill v. Whitford*, --- U.S. ----, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, and n. 1 (1992)) (internal quotation marks omitted).  The Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature.'" *Gill*, 138 S. Ct. at 1929 (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). "Thus, 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)).  The Eleventh Circuit recently held in *Jacobson v. Florida Sec'y of State* that although "voters have no judicially enforceable interest in the *outcome* of an election," they do "have an interest in their ability to vote and in their vote being given the same weight as any other."  957 F.3d 1193, 1202 (11th Cir. 2020) (emphasis in original).  "A plaintiff need not have the franchise wholly denied to

to cast votes that are actually properly counted and fails to produce a voter-verifiable auditable paper trail that is recognized as essential on a national level by election security experts. "Plaintiffs are not asking for a system impervious to all flaws or glitches." *Id.* They are seeking to vindicate their right to effectively and reliably cast a verifiable vote reflective of their ballot choices.

In sum, the Court finds that Plaintiffs have sufficiently alleged standing to bring their claims at this juncture.

### D. Coalition Plaintiffs Have Failed to State a Claim for Procedural Due Process Regarding the BMD Voting System

Defendants moved to dismiss Count III of Coalition Plaintiffs' First Supplemental Complaint[25] because: (i) Coalition Plaintiffs have failed to sufficiently allege the deprivation of a constitutionally protected liberty or property interest, (ii) the complaint does not allege that Plaintiffs have been subjected to inadequate process; and (iii) the availability of a state remedy necessarily prevents Plaintiffs from maintaining a procedural due process claim as a matter of law. Alternatively, Defendants also argue that "even assuming a liberty or property interest existed for a preferred voting system, there is no deprivation of that interest, given the State's no-excuse absentee voting system by hand-marked paper ballots."[26] (Defs.' Mot., Doc. 645 at 21.)

---

[25] The Curling Plaintiffs do not assert a procedural due process claim. (Curling Resp., Doc. 651 at 29.)

[26] The Court rejected this argument raised in connection with Plaintiffs' substantive due process claims raised in the Defendants' prior motion to dismiss. The Court found that the "choice" between undergoing additional burdens on their right to vote by absentee ballot to avoid having to use unsecure voting machines was itself a burden that Plaintiffs had plausibly alleged subjected

In Count Three of the First Supplemental Complaint, Coalition Plaintiffs allege that by implementing the Dominion BMD voting system, Defendants will violate their procedural due process rights because it will "severely restrict and/or arbitrarily and capriciously deprive" the Coalition Plaintiffs of the following "state-created liberty and property interests" without proper notice:

- The right of voters under Georgia statutes to have their official votes counted in an initial count.
- The right of voters under Georgia statutes to have their initial votes recounted in a recount or examined in an audit.
- The right of voters under Georgia statutes to cast their votes using a voting system that has been properly certified as safe for use.
- The right of voters under Georgia statutes to cast their votes on a voting system that is fundamentally compliant with Georgia law.
- The state statutory and state constitutional rights of voters to vote by secret ballot.

(Doc. 628 ¶ 240.) Plaintiffs allege generally that "Defendants' threatened conduct will violate the procedural requirements of the Due Process Clause of the Fourteenth Amendment to the United States Constitution." (*Id.* ¶ 242.)

A violation of procedural due process occurs where the state fails to provide due process in the deprivation of a protected property or liberty interest. *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) (en banc). "A procedural due process

---

them to unequal treatment. The Court further found that the additional burdens and inconveniences associated with voting by absentee paper ballot were not mere trivial concerns and noted that "[a]s evidenced by the most recent election, absentee voting is not without its constitutional problems. *See Martin v. Kemp*, 341 F.Supp.3d 1326 (N.D. Ga. 2018) (concluding that specific additional burdens and procedures imposed on absentee voters there were violative of due process guarantee of Fourteenth Amendment); *see also Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312 (finding that plaintiffs had established a likelihood of success on constitutional challenge to Florida's signature-match requirement for vote-by-mail paper ballots)." (May 21, 2019 Order, Doc. 375 at 47-48.)

claim has three elements: (1) a deprivation of a constitutionally-protected liberty or property interest; (2) state action; and (3) a constitutionally-inadequate process." *Doe v. Fla. Bar*, 630 F.3d 1336, 1342 (11th Cir. 2011). It is not the deprivation of a protected interest that causes a violation, but rather, "[i]t is the state's failure to provide adequate procedures to remedy the otherwise procedurally flawed deprivation of a protected interest that gives rise to a federal procedural due process claim." *Id.* Accordingly, only when the state refuses to provide a process sufficient to remedy the procedural deprivation does an actionable constitutional violation arise. *Id.* Therefore, Plaintiffs carry the burden of "alleging that, as a result of some state action, the plaintiff was deprived of a constitutionally protected interest, and the state did not afford the plaintiff adequate process to challenge the deprivation." *Searcy v. Prison Rehab Industries & Ent, Inc.*, 746 F. App'x. 790, 795 (11th Cir. 2018).

As to the first element of the procedural due process claim, Defendants contend that there is no state-created liberty or property interest in a preferred choice of voting systems, citing the Georgia Supreme Court's decision in *Favorito*, 285 Ga. at 797–798. Plaintiffs' allegations in Count III are not based on a preference of one voting system over another. Rather, the Coalition Plaintiffs allege that Defendants' failure to comply with certain provisions and requirements of Georgia law deprives them of their constitutional rights, including the right to have their votes accurately counted, the right to a properly certified voting system,

47

the right to an auditable voting system, and the right to a secret ballot as guaranteed by the Georgia constitution.

Because the Court finds that Plaintiffs have failed to sufficiently allege the third element of a procedural due process claim – a constitutionally inadequate process – the Court assumes without deciding that Plaintiffs' allegations adequately establish the alleged deprivation of their constitutionally protected voting interests. As this Court has recognized, once a state creates a statutory voting regime, the state "must administer it in accordance with the Constitution." *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338 (N.D. Ga. 2018), *appeal dismissed sub nom. Martin v. Sec'y of State of Georgia*, 18-14503-GG, 2018 WL 7139247 (11th Cir. Dec. 11, 2018). The Supreme Court has long held that state-created statutory entitlements can trigger due process. *See Goldberg v. Kelly*, 397 U.S. 254, 262 (1970); *Paul v. Davis*, 424 U.S. 693, 710-12 (1976).

Coalition Plaintiffs, however, have failed to allege, except in the most general and conclusory fashion, that the State Defendants have failed to provide adequate procedures to remedy the alleged harms.[27] "The law is well established that the

---

[27] Plaintiffs' allegations in their supplemental complaint are distinguishable from those in which courts have recognized a claim based on inadequate procedures in the context of voting. For example, in *Georgia Muslim Voter Project v. Kemp*, (consolidated with *Martin v. Kemp*) the plaintiffs alleged that under Georgia law, county elections officials were required to reject all absentee ballots whose signature "does not appear to be valid" because the signature does not match the signature on file. *See* 1:18-cv-4789, Compl. ¶¶ 1, 30 (citing O.C.G.A. § 21-2-386(a)(1)(C)). Plaintiffs there further alleged: This determination is made by election officials who are not required to receive training on handwriting analysis or signature comparison and no statute or regulation provides standards to make such determinations or distinguish natural variations in a person's handwriting or to consider extrinsic evidence that might confirm the identify of the voter. *Id.* ¶¶ 5-6, 36. When these rejections occur, voters are not provided any pre-rejection notice or an opportunity to be heard or to otherwise ensure that their absentee ballot

48

mere failure to follow state procedures does not necessarily rise to the level of a violation of federal procedural due process rights." *Democratic Party of Georgia, Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1345 (N.D. Ga. 2018) (finding that plaintiffs had not established substantial likelihood of success on claim of a lack of adequate process to remedy the rejection of mail-in ballots because the challenge "of failure to follow state procedures" did not establish a federal denial of due process); *Maddox v. Stephens*, 727 F.3d 1109, 1124 (11th Cir. 2013) ("[W]e emphasize that the violation of a state statute outlining procedure does not necessarily equate to a due process violation under the federal constitution. If otherwise, federal courts would have the task of insuring strict compliance with state procedural regulations and statutes."); *Harris v. Birmingham Bd. of Educ.*, 817 F.2d 1525, 1528 n.15 (11th Cir. 1987) (holding that although plaintiff had a state given property interest of continuing employment in the absence of just cause for termination, he received what was due under the Constitution, and declining to

---

will be counted. *Id.* ¶1. The elections officials' determination is final without any review or appeal. *Id.* ¶¶ 1, 31 (citing O.C.G.A. § 21-2-386(a)(1)(B)-(C)). The same process applies to the absentee ballot application process. *Id.* ¶¶ 19-24 (citing O.C.G.A. § 21-2-381(b)(1)-(3)). With respect to the applications, while there is no procedure by which an elector can contest the registrar's decision, the statutes do not prevent an elector whose application is rejected from applying a second time or voting in person. Plaintiffs alleged, however, that there is no reason to believe that the same signature will not be rejected again, and that a second application would not be futile. *Id.* ¶ 24. The district court found that these claims had merit and granted a preliminary injunction requiring the Secretary of State to instruct county election officials to cease rejecting absentee ballots and applications based on perceived signature mismatch and requiring them to provide pre-rejection notice and an opportunity to resolve the alleged signature discrepancy to the absentee voter and ordered that absentee voters shall have the right to appeal any absentee ballot rejection following the outcome of the court-ordered process. 341 F. Supp. 3d 1326, 1341-42 (N.D. Ga. 2018).

49

address whether the plaintiff had a cause of action in the state courts for failure of the board of education to strictly comply with the state's notice statute).

Coalition Plaintiffs' allegation that "there is no adequate legal remedy" for the alleged deprivations is likewise couched in entirely conclusory terms. (Coalition Pls.' Compl. ¶ 245.) Fellow District Court Judge Steve Jones recently addressed a similar constitutional challenge to the Secretary of State's compliance with provisions of H.B. 316 in *Fair Fight v. Raffensperger*, Civil Action No. 1:18-cv-5391-SCJ. In denying the plaintiffs' request for a preliminary injunction that would have required an interpretation of the new state election law for the first time by a federal court, Judge Jones noted that "Plaintiffs also have an additional remedy in the form of seeking a mandamus in the state courts." December 27, 2019 Order, Doc. 188 at 18-20) (citing inter alia, *Roe v. State of Ala.*, 43 F.3d 574, 582 (11th Cir. 1995).[28]

Accordingly, the Court finds that Coalition Plaintiffs have failed to sufficiently allege a claim for procedural due process and **GRANTS** Defendants' Motion to Dismiss Count III of their First Supplemental Complaint. As Plaintiffs

---

[28] A plaintiff cannot rely on the failure of the state to provide her due process where adequate state remedies are available. As the Eleventh Circuit has explained, if the state courts generally would provide an adequate remedy for the procedural deprivation the plaintiff claims to have suffered, there is no federal due process violation regardless of whether the plaintiff has taken advantage of the state remedy or attempted to do so. *Horton v. Bd. of County Comm'rs of Flagler County*, 202 F.3d 1297, 1300 (11th Cir. 2000). Thus, if Georgia law provides an adequate means to remedy the alleged procedural deprivation, Plaintiff's procedural due process claim fails. In applying Georgia law, the Eleventh Circuit has previously held that the writ of mandamus can be an adequate state remedy to ensure a party was not deprived of her due process rights. *See Cotton v. Jackson*, 216 F.3d 1328, 1332 (11th Cir. 2000); *A.A.A. Always Open Bail Bonds, Inc. v. DeKalb County, Ga.*, 129 F. App'x. 522, 525 (11th Cir. 2005).

are not foreclosed from pursuing their state remedies, Count III is **DISMISSED**

**WITHOUT PREJUDICE**.

> ### E. Defendants' Contentions That Plaintiffs' Requested Remedy Violates the ADA is not an Appropriate Basis on Which to Dismiss the Claims

In their final argument for dismissal, State Defendants contend that Plaintiffs' proposed remedy of using hand-marked paper ballots for the majority of voters and to reserve the use of BMDs solely for disabled voters would require the State to provide disabled individuals with a voting system that is not equal as that provided to others, in violation of the Americans with Disabilities Act and the Rehabilitation Act. Despite the potential merits of their position, Defendants' motion does not explain the legal authority that would require the Court to accept Defendants' argument over the Plaintiffs' allegations and therefore that would support the dismissal of Plaintiffs' claims. Plaintiffs are correct that Defendants' arguments regarding the propriety of the relief Plaintiffs seek in their motion for preliminary injunction have no bearing on the sufficiency of the allegations of their complaints under Rule 12.[29] While the Court may ultimately be required to weigh the interests of the impact of any proposed remedy on disabled voters in fashioning any potential relief on Plaintiffs' claims, Defendants have failed to demonstrate that Plaintiffs' Complaints require dismissal at this stage on this basis.

---

[29] As Curling Plaintiffs note in their Response in opposition to Defendants' Motion to Dismiss, they do not request that disabled voters be forced to use the Dominion BMD system. Rather, they request only that Defendants "make available at each polling place at least one electronic or mechanical BMD that is in compliance with the Americans with Disabilities Act and Help America Vote Act." (Doc. 619 at 2.)

# EXHIBIT 7

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,                    :
                                            :
          Plaintiffs,                       :
                                            :
v.                                          :          CIVIL ACTION NO.
                                            :          1:17-cv-2989-AT
BRAD RAFFENSPERGER, *et al.*,               :
                                            :
          Defendants.                       :

## ORDER

In this case, Plaintiffs challenge the constitutionality of the State of Georgia's electronic voting machines and associated software and voting data systems and their implementation. Now in the third act of this dispute at the center of Georgia's elections, though the voting machines at issue are new, the parties' legal positions remain essentially unchanged. Plaintiffs have filed their third round of Motions for Preliminary Injunction [Docs. 619, 640] seeking again to bar the use of voting machines and require hand-marked paper ballots.

## I.    BACKGROUND

### A.    Act One

When this case was filed in 2017, Plaintiffs' claims targeted Georgia's use of Direct Recording Electronic voting machines ("DREs") and highlighted significant security flaws in the State's Global Election Management Systems ("GEMS") servers and online voter registration database. In the late summer of 2018, the

Plaintiffs moved to enjoin the use of DREs in the November 2018 gubernatorial general election.

Two months before the general election, the Court denied Plaintiffs' request to enjoin the use of DREs in the November 2018 general election because a last-minute switch to hand-marked paper ballots would likely adversely impact the public interest in an orderly and fair election. But, in concluding that the Plaintiffs had shown a substantial likelihood of success on the merits of their claims that Defendants' implementation of the DRE voting system absent an independent paper audit trail of the vote puts Plaintiffs at imminent risk of deprivation of their fundamental right to cast an effective vote that is accurately counted, the Court noted that:

(1) The State Defendants had delayed in grappling with the heightened critical cybersecurity issues posed for the State's dated, vulnerable voting system that provides no independent paper audit trail and that further delay would not be tolerable; and

(2) Because the 2020 elections were around the corner, if a new balloting system is to be launched in Georgia in an effective manner, it should address democracy's critical need for transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote.[1]

---

[1] While the case was originally pending, the Georgia legislature failed to pass a bill introduced in 2018 to phase out DREs by 2024. Legislation authorizing the funding of voting machines to replace the DREs was later enacted during the 2019 legislative session on April 2, 2019.

# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,                    :
                                            :
        Plaintiffs,                         :
                                            :
v.                                          :        CIVIL ACTION NO.
                                            :        1:17-cv-2989-AT
                                            :
BRAD RAFFENSPERGER, *et al.*,               :
                                            :
        Defendants.                         :

## **OPINION AND ORDER**

This case requires the Court to consider whether Georgia's practices and procedures for administering voter access to the ballot at the polls unconstitutionally impact the voting process and unduly burden the exercise of qualified citizens to choose their elected representatives. The relief that the Coalition Plaintiffs seek here is a limited common sense remedy to the real and repetitive voting impediments Plaintiffs have experienced at the precinct threshold and the substantial threat that they will face from these impediments anew in the 2020 general election if preliminary injunctive relief is not granted.

In tandem with the Plaintiffs' motions for injunctive relief seeking to bar the State of Georgia from requiring the use of electronic ballot marking devices (BMDs) for all in-person voters on election day, the Coalition Plaintiffs have filed a stand-alone Motion for Preliminary Injunction on Paper Pollbook Backups [Doc.

relevant legal context, rulings, and factual findings. (*See, e.g.*, Doc. 309, September 17, 2018 Order (denying motion to dismiss and motion for preliminary injunction); Doc. 579, August 15, 2019 Order (granting in part preliminary injunction motions); Doc. 751, July 30, 2020 Order (granting in part and denying in part Defendants' most recent motion to dismiss including new BMD claims); Doc. 768, August 7, 2020 Order (denying without prejudice Plaintiffs' initial motions for preliminary injunction, Docs. 619 and 540, that facially challenged the BMD system and were filed in October, 2019, long prior to the 2020 election cycle, and summarizing case history).

Consequently, the Court notes that it has already addressed and rejected the State Defendants' renewed contention that Plaintiffs' request for relief related to pollbooks falls outside the bounds of the case as pled and presented to this Court. (*See, e.g.*, Order on Motion to Dismiss, Doc. 751 at 20-25; August 15, 2019 Order, Doc. 579 at 88-89.) The relief measures requested by the Coalition Plaintiffs are clearly associated with their contentions regarding the Defendants' non-implementation of some of the relief granted in the Court's August 15, 2019 Order. The Secretary of State still maintains the voter registration data system and its multiple interfaces with other databases through its ENET system. Starting in the summer of 2019, the Secretary of State's Office assumed exclusive management responsibility for day-to-day operations of the ENET system, in place of its contractor. The State's ENET system still feeds precinct level voter data and data reports to the electronic pollbooks for poll workers' use in voter check-in and

4

to date information on eligibility and qualification of voters) administration of the election.

## IV. Remedy

As explained above, the Court finds that Plaintiffs are likely to succeed on the merits of their claim regarding the security and reliability of the voter registration database and electronic pollbook system, that they will be irreparably harmed if deprived of their right to vote, that the balance of equities weigh in Plaintiffs' favor, and that an injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (The public has a "strong interest in exercising the fundamental political right to vote."); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247-48 (4th Cir. 2014) ("By definition, [t]he public interest ... favors permitting as many qualified voters to vote as possible.'") (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012); *Madera v. Detzner*, 325 F. Supp. 3d 1269, 1283 (N.D. Fla. 2018) ("The public interest is always served by more equitable, easier access to the ballot.").

The evidence the Coalition Plaintiffs provided in support of their motion demonstrates a system wide problem of malfunctioning electronic PollPads beginning with the November 2019 pilot elections, again in the June 2020 primary election, and most recently in the August 2020 runoff elections in tandem with wholly inadequate backup plans and voter registration data deficiencies that

63

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| DONNA CURLING, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:17-cv-2989-AT |
| BRAD RAFFENSPERGER, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## OPINION AND ORDER

### I.      Introduction and Overview

In the 1983 film Groundhog Day, weather man Phil Connors is doomed to repeat the same day over and over again: "I wake up every day, right here, right in Punxsutawney, and it's always February 2nd, and there's nothing I can do about it." The Court can relate; it feels like it's February 2nd in Punxsutawney. But quite likely, the Court is not alone in this sentiment in many respects. Amidst the many other serious concerns facing the public in this challenging era, issues surrounding election system security, reliability, fairness, and the correct counting of votes continue on the forefront of citizen concerns. And so too, in turn, does voting litigation perforce continue.

cause for grave concern as to the future security and consistent functionality of the new system.

### 4. Logic and Accuracy Testing

Pre-election Logic and Accuracy Testing (L & A) is an important operations verification practice and standard in jurisdictions across the nation that use any form of computerized voting equipment. L & A testing is required under the 2019 Georgia statutory provisions enacted as part of the adoption of legislation approving the statewide usage of the BMD system. As discussed below, L & A testing is designed to verify pre-election that all voting equipment, BMD touchscreens, printers, scanners, and PollPads are properly configured and functioning. L & A testing should also confirm that the voting system tabulators are accurately tabulating cast ballots going into the election. The testing gives election staff an opportunity to identify basic errors in election and ballot configuration and related vote attribution in scanning and ballot printing as well as to address other basic functionality problems.

O.C.G.A. § 21-2-379.25(c) provides:

> On or before the third day preceding a primary or election, including special primaries, special elections, and referendum elections, the superintendent shall have **each electronic ballot marker tested to ascertain that it will correctly record the votes cast for all offices and on all questions and produce a ballot reflecting such choices of the elector in a manner that the State Election Board shall prescribe by rule or regulation.** Public notice of the time and place of the test shall be made at least five days prior thereto; provided, however, that, in the case of a runoff, the public notice shall be made at least three days prior thereto. Representatives of political parties and bodies, news media, and the public shall be permitted to observe such tests.

O.C.G.A. § 21-2-379.25(c). However, the Secretary of State's January 2020 Procedures Manual is plainly inconsistent with the state statutory objective and requirements. The issue before the Court, though, is not whether any particular set of procedures is in full compliance with state law or a mere error in judgment by the Secretary of State's Office. Voters do not have a First or Fourteenth Amendment constitutional right to perfect implementation of state statutory provisions guiding election preparations and operations. But they do have the right to cast a ballot vote that is properly counted on machinery that is not compromised or that produces unreliable results. L & A testing is not complex. It is tedious – but it is essential homework that protects the system and voters as the elections commence.

Recognizing that early voting starts on October 12, 2020 and the imminence of the November 3, 2020 general election, the Court must defer to the Secretary of State's Office and State Board of Elections determination of whether additional measures are pragmatically feasible at this juncture to strengthen the scope of L & A preparations for a general election with a huge anticipated turnout. As L & A testing has already commenced on BMD equipment to be deployed at early voting locations, the Court is not prepared to issue a ruling on the L & A testing issue purely standing on its own. Accordingly, the Court recommends that the Secretary of State and State Election Board expeditiously review in conjunction with Dominion: (1) the adequacy of the current January 2020 procedures, particularly in light of evidence of prevailing protocols used in states nationwide for conducting

for logic and accuracy tests; (2) what modifications can and will be made by the time of the January 2021 elections runoffs and thereafter, or beforehand (if at all feasible). The Court further recommends that the process for evaluation and change in procedures shall be made public on a timely basis and that the results of such evaluation and any changes be made public on a timely basis.[56]

### 5.  Audits

Plaintiffs assert that the Dominion BMDs should not be used in Georgia's elections because unlike hand-marked paper ballots the BMDs are unauditable.  In conjunction with their request to enjoin the use of BMDs and to require hand-marked paper ballots as the primary voting method for in-person voting, Plaintiffs request that the State be required to adopt more robust election audit procedures based on generally accepted audit principles.  Specifically, the Coalition Plaintiffs' motion seeks an order "commanding the State Defendants to issue rules requiring meaningful pre-certification audits of election results, focusing on contested candidate races and ballot questions, with such auditing to be based on application of well-accepted audit principles in order to establish to a scientifically appropriate level of confidence that any incorrect outcomes will be detected in time to be remedied prior to certification of results."  (Doc. 809.)  The Curling Plaintiffs similarly request that the Court order Defendants to file "a plan providing specific

---

[56] State Defendants' counsel has pointed to two counties' successful flagging of the U.S. Senate ballot problem through their L & A testing.  The Court agrees – this was a positive net result of the testing.  For that very reason, though, thorough L & A testing, consistent with standard protocols across the country and Georgia law, would seem to be essential.

say that it got close to understanding the rationale or specific contours of the sampling methodology to be used by Voting Works.

Suffice it to say, the experts here are in hot debate and approach these issues from different backgrounds and areas of expertise. The Court recognizes that the RLA is deemed by all of the experts as a control valve essential to election integrity. The question they differ on is whether a RLA can be validly implemented in the context of Georgia's QR code BMD voting system.  While the Plaintiffs have marshalled a formidable amount of evidence that casts serious doubt on the validity of the use of the RLA with the current system (including the specific RLA methodology that VotingWorks is pursuing here), unless the Court determines that the BMDs must be enjoined from use in Georgia's upcoming elections, the requested remedy appears irrelevant.  Absent such an injunction, there is no audit remedy that can confirm the reliability and accuracy of the BMD system, as Dr. Stark has stressed.  Plaintiffs do not request, and have not offered, any other proposed audit procedures to accomplish the goal of the RLA.  Nor is the Court in a position to reach a judgment regarding whether the Secretary of State's plan to conduct a single RLA assessment in one statewide race under these circumstances provides any meaningful protection or guidance regarding the accuracy of tabulation of the overall voting results (or system).  The Court has some major doubts, given the entirety of the evidence discussed here.  But under O.C.G.A. § 21-2-498(e) the Secretary of State will be required to implement risk-limiting auditing for all statewide elections "beginning not later than November 1, 2024."  The

by the State to cast a ballot on the BMD system that cannot be confirmed or verified as reflecting their actual vote choices because the votes are tabulated solely from a computer generated QR barcode that is not human-readable and is vulnerable in the current system to failure or breach. They further assert that this injury is exacerbated because votes cast by BMDs pose the significant risk of having the votes altered, diluted, or effectively not counted.[72]  Plaintiffs have shown demonstrable evidence that the manner in which Defendants' alleged mode of implementation of the BMD voting system, logic and accuracy testing procedures, and audit protocols deprives them or puts them at imminent risk of deprivation of their fundamental right to cast an effective vote (i.e., a vote that is accurately counted).

The Court views the burden and the threatened deprivation as significant under the *Anderson/Burdick* balancing framework.  The right to vote derives from the right of individuals to associate for the advancement of political beliefs that is at the core of the First Amendment and is protected from state infringement by the Fourteenth Amendment. *E.g., Williams v. Rhodes*, 393 U.S. 23, 30–31 (1968); *NAACP v. Button*, 371 U.S. 415, 430 (1963).  "Writing for a unanimous Court in *NAACP v. Alabama*, Justice Harlan stated that it 'is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable

---

[72] In addition to a burden on the fundamental right to vote, Plaintiffs also assert in-person voters are subject to unequal treatment as compared to provisional and absentee voters whose paper ballots are capable of being meaningfully recounted, reviewed against an independent record to verify the accuracy of the vote tabulation, and may have discrepancies detected and corrected through audits.

much constitutional litigation where the implementation of these procedures resulted in the rejection of absentee ballots and voter disenfranchisement. To avoid being denied the ability to verify their votes on the BMD system, Plaintiffs must trade one unfavorable burden for another. Plaintiffs are left with the choice of having to run another gauntlet of the absentee voting process because of potential uncertain postal delivery issues, untimely processing by the registrar's office, signature matches, etc. As discussed in Section III D herein, Plaintiffs have shown a significant burden resulting from the accuracy and voter invalidation issues that affect Dominion's scanner/tabulators and adjudication software used for determining voter intent and tallying hand-marked absentee ballots. A choice between two evils is no choice at all; the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election regardless of which method they choose to cast their vote.

That Plaintiffs and other voters have the alternative of casting an absentee hand-marked paper ballot does not lessen or absolve the State of the burdens

---

or if the voter's signature on the absentee ballot envelope does not match the signature on their voter registration card. O.C.G.A. § 21-2-381(b)(2)(3). Once received and completed, voters must sign an oath on their absentee ballot envelope and personally mail or deliver their ballot to the board of registrars or absentee ballot clerk or to a dropbox. O.C.G.A. § 21-2-385(a). Georgia does not provide pre-paid postage for the return of the absentee ballot, and thus, voters must pay for their own return postage to vote by mail. The State of Georgia does not count mail ballots received after the closing of polls at 7:00 p.m. on Election Day. *See* O.C.G.A. § 21-2-386(a)(1)(F). This is true even if a ballot arrives late for reasons objectively outside the voter's control, and even if the ballot was postmarked weeks before Election Day or alternatively, on Election Day. Absentee ballots will be rejected if not received by election day or "[i]f the elector has failed to sign the oath, or if the signature does not appear to be valid, or if the elector has failed to furnish required information or information so furnished does not conform with that on file ... or if the elector is otherwise found disqualified to vote[.]" O.C.G.A. § 21-2-386(a)(1)(C).

imposed by the State's chosen, preferred, primary voting system, in which it invested hundreds of millions of taxpayer dollars. The State opposes a court-ordered switch to hand-marked paper ballots for in-person voters at the polls. The State does not wish to be forced into an administratively burdensome system of carrying out an election using hand-marked ballots and voters do not wish to be forced into an absentee regime that contains its own distinct array of burdens and uncertainties associated with whether the ballot will be accepted and counted.

While the Court recognizes Plaintiffs' strong voting interest and evidentiary presentation that indicate they may ultimately prevail in their claims, the Court must perforce address the posture of this case as a whole as well as the Plaintiffs' burdens "against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997); *New Georgia Project v. Raffensperger*, ---F.3d. ---- 2020 WL 5877588, at \*2 (11th Cir. 2020).

In election cases, the Supreme Court and Eleventh Circuit have made ever more abundantly clear the mandate that district courts must exercise great restraint in considering the grant of injunctive relief that requires new rules on the cusp of an election where the Court's Order could cause electoral disruption and voter confusion. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006); *Republican National Committee v. Democratic National Committee*, --- U.S. ---, 140 S.Ct. 1205, 1207 (2006); *Republican Nat'l Comm. v. Common Cause R.I.*, --- U.S. ---, 2020 WL 4680151, at \*1 (U.S. Aug. 13, 2020); *Merrill v. People first of Alabama*, ---S. Ct ---

-, 2020 WL 3604049 (U.S. July 2, 2020); *New Georgia Project v. Raffensperger*, 2020 WL 5877588 at *3. The Court expressed its concerns anew to Plaintiffs' counsel about this timing issue when Plaintiffs filed a renewed motion for preliminary injunction in August 2020, shortly after the denial without prejudice of their initial October, 2020 preliminary injunction motions targeting the BMD system and other voting practices.[75] The timing of the relief sought plays a paramount role in the evaluation of the practicality of granting the requested remedy at this point.

Litigation since Plaintiffs' amendment of their claims to include a challenge to the BMD system as a whole has stretched on since October 2019, with plenty of delays occurring. But these delays were not attributable to any lack of litigation diligence or aggressiveness on Plaintiffs' counsel's part. For a variety of reasons, including multiple motions to dismiss that stalled discovery, the Court's own schedule especially after the advent of the Covid-19 pandemic, and challenges posed by the difficulty of the case as a whole, Plaintiffs' motions for preliminary injunction were not heard until September in this Presidential election cycle year. Some evidentiary challenges at that point reared their heads. Due to Dominion's own historic unwillingness to provide independent cybersecurity researchers with

---

[75] The first initial motions for preliminary injunction seeking to enjoin the BMD system, filed in October 2019 (Docs. 619, 640), were denied without prejudice in August 2020. At that juncture, the Court viewed the evidence as presented as closer to a quasi-facial challenge rather than one that was rooted, at least in part, in the record evidence involving the actual use of the BMD machines and associated Dominion equipment and attached KnowInk registration check-in PollPad tablets at voting precincts. Covid-19 pandemic ramifications triggered major election scheduling delays and changes that resulted in the March presidential primary being moved ultimately to early June 2020.

access to the Dominion Suite software and equipment package (through sale or otherwise), Plaintiffs obtained only last-minute, court-ordered access to the Dominion system for hands-on testing.  Finally, as State Defendants have not maintained a practice of regular independent cybersecurity testing and evaluation of vulnerability issues in their own systems impacting the elections realm and had asserted work product privilege over the one extant report, these types of reports were not available to the parties or Court when the hearing was about to commence.

Plaintiffs have presented a massive and complex record in this matter for the Court's review that has consumed its attention for long swaths of time. Plaintiffs also in the course of their hearing preparation presented an expanded array of expert affidavits as well as voter and election evidence, collected primarily from the June and August 2020 statewide primary and runoff elections. These elections produced more substantive empirical evidence and helped to bring into sharper focus the evidentiary issues in this case.

Defendants also have presented substantive evidence in support of their overarching legal defense.  They generally minimize the claims, concerns, and risk threats documented in Plaintiffs' challenge.  At core, the State Defendants' counsel argue that Plaintiffs' legal claims boil down to their disagreement with the policy choices legally vested in the Secretary of State and State Election Board's purview. In turn, they contend that Plaintiffs have suffered no cognizable threat of harm or burden in their exercise of their First and Fourteenth Amendment rights.

Defendants also maintain that they have taken sufficient proactive measures in implementation of the new voting system to ensure its security and reliability.

The preliminary injunction hearing started on September 9, 2020 and concluded on September 13, 2020.  But that was not the end, by any means, of the parties' continuing supplemental submissions to the Court.  And record developments such as the State Defendants and Dominion's last-minute introduction of a modified system-wide software change to the voting system and dealings with the EAC continued to roll out before the Court – some of which was directly relevant to the evidentiary issues before the Court.  Early voting in Georgia with the use of BMD voting machines, will commence now in one day, on October 12, 2020.

Some of Plaintiffs' claims pursued involved discrete and limited relief that do not upset the election apple cart. The Court has considered relief in two instances where there was strong evidence of state-imposed burdens to Plaintiffs' First Amendment constitutionally protected exercise of the franchise as well as narrowly tailored relief that was fully consistent with state law. The Court in those instances balanced the state's interests and burdens as well as relief issues relative to the operation of the elections before granting any form of narrowly tailored relief or delaying such relief until after the election.  Indeed, the Court's Pollbook relief[76] was expressly framed based on the State's emergency ballot voting statutory and regulatory provisions to ensure that these emergency procedures could

---

[76] *See* Court's Opinion and Order of September 28, 2002. (Doc. 918.)

pragmatically be implemented on Election Day, November 3, 2020, if necessary so as to mitigate the severe burdens experienced by Plaintiffs and other voters in casting votes in the new BMD-equipped system during the June and August 2020 elections.

By comparison, the Plaintiffs' BMD systemic injunctive challenge and request for replacement of the system with hand-marked paper ballots pose relief issues of an entirely different, more expansive scope. After reviewing all of the evidence in scrupulous detail, the Court must step back at this juncture, despite the persuasive evidence that Plaintiffs have provided. Plaintiffs' central claim seeks statewide relief, requesting that the Court enjoin implementation of the State's newly designated BMD voting system under O.C.G.A. § 21-2-300 and require instead the state's implementation of a hand-marked ballot system in its 159 counties. The problems posed obviously go beyond whatever the State's and counties' purported capacity issues are in connection with the purchase of ballot paper stock or printing arrangements. The requested relief would entail a fundamental modification in the election system that the Secretary of State and county election offices are not now equipped or prepared to administer. The Court has already seen in the record of this case enough election chaos, operational deficiencies, and challenges on all levels, plus stress in the system spiked further by Covid-19 complications, that the Court cannot embrace a rosy view of the simplicity of moving to a total, comprehensive paper ballot system with so little time to prepare for such a major transition. And this would likely have been true

also even if such relief had been ordered on September 15th, the day after the injunction hearing concluded, based on election operations evidence presented in connection with the hearing. The substantial risks and long-run threats posed by Georgia's BMD system, at least as currently configured and implemented, are evident. However, the Court – especially after reviewing evidence regarding election staff management and operations challenges in the June and August 2020 elections – cannot envision that state and county elections staff (including paid temporary contract personnel) would be equipped to move the system and voters through such a major operational change without chaotic disruptions occurring anew.

Risks are posed both by a sudden shift to a statewide hand-marked paper system and proceeding with the BMD system. Ultimately, the Court must find that imposition of such a sweeping change in the State's primary legally adopted method for conducting elections at this moment in the electoral cycle would fly in the face of binding appellate authority and the State's strong interest in ensuring an orderly and manageable administration of the current election, consistent with state law. So, for this reason alone, despite the strength of Plaintiffs' evidence, the Court must decline the Plaintiffs' Motions for Preliminary Injunction.

### C. Coalition Plaintiffs' Claims Relating to Ballot Secrecy

The Coalition Plaintiffs seek to enjoin the use of BMDs on the basis that they severely burden the fundamental right to vote by depriving voters of secrecy of the ballot. They assert two theories as to how BMDs result in the deprivation of ballot

secrecy: (1) the large size of the BMD touchscreens, if not configured to shield the screens from public view, permit anyone in the polling place to observe how a voter is voting; and (2) the precinct scanners record timestamp information such that a voted BMD ballot card can be traced back to the individual in-person voter by comparing the timestamps on the scanned cast vote records with the order in which voters used the machines.

In support of their first challenge, the Coalition Plaintiffs presented declaration testimony from 7 individuals who served as poll watchers in the June and August elections that the BMD touchscreens were clearly visible to the public from 30 to 50 feet away during the voting process. Additionally, there was some affidavit evidence of voter discomfort at the perception of the exposure of the voting process. (*See* Doc. 853-4 at 25.) Despite these observations, Plaintiffs have not established a resulting First Amendment injury where there is no evidence from any Plaintiff or any other voter claiming that the publication of their vote selections subjected them to threats, harassment, reprisals, or other "chilling" of the free exercise of the franchise from either Government officials or private parties. *See Buckley v. Valeo*, 424 U.S. 1, 64, 74 (1976) (per curiam); *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 343 (1995) (noting that the "respected tradition of anonymity in the advocacy of political causes . . . is perhaps best exemplified by the secret ballot, the hard-won right to vote one's conscience without fear of retaliation"); *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 366-67 (2010).

For Plaintiffs, this is an all or nothing proposition, as they seek to enjoin the BMDs outright and do not propose other solutions to the ballot secrecy problems posed by the oversize BMD touchscreens. However, it is not necessary to scrap the new voting machines where a less burdensome fix exists. Georgia's Election Code places the responsibility of arranging voting equipment at polling places to ensure voter privacy with "the governing authority of each county and municipality." O.C.G.A. § 21-2-267. The Secretary of State's Office has undertaken measures to instruct local election officials on proper polling place layout and arrangement of BMDs to maintain voter privacy. (Harvey Decl. ¶ 3, Doc. 834-3; Ex. 1 to Harvey Decl., Doc. 834-3 at 7-11) ("The Secretary of State's office has provided guidance to county election officials about the setup of precincts so that [touch]screens will not be visible to other voters when they are being used by a voter."). If the counties fail to follow the requirements of O.C.G.A. § 21-2-267 and the guidance provided by the Secretary of State and voter privacy rights are violated, the State Election Board can undertake an investigation and/or enforcement action as necessary.

In support of their second contention, Plaintiffs assert that the "Dominion precinct scanners record timestamp information directly onto the digital cast vote record that is created when a ballot is scanned, with the result that a voted BMD ballot card can easily be connected afterward with the individual voter who cast that ballot by simply comparing the scanned cast vote records (ordered by timestamps) with the order in which voters are observed going through the voting process." (Br. Supp. Mot., Doc. 809-1 at 32-33.)

91

The Coalition Plaintiffs have not offered a single instance of actual infringement of voter anonymity as a result of the use of digitally recorded scanner timestamp records. And despite the lack of evidence of any local election official going to such great lengths to discover how someone voted, the evidence in the record describing and illustrating how the precinct scanners actually operate does not bear this out.

Instead, the Coalition Plaintiffs rely on scanned ballot images from Fulton County bearing timestamps recorded by the ICC central count scanner used to tabulate absentee and provisional ballots by election personnel at the county election office. The timestamp recorded on the digital record of ballots tabulated by the ICC correlates to the time the ballot is run through the scanner by an election official and has no demonstrated correlation to the individual voter having marked an absentee ballot at home (or a voter having marked a provisional ballot at the precinct). *See* O.C.G.A. § 21-2-386 (providing that "[t]he process for opening the inner envelopes of and tabulating absentee ballots on the day of a primary, election, or runoff as provided in this subsection shall be a confidential process to maintain the secrecy of all ballots). The Coalition Plaintiffs have not offered any theory to suggest that absentee and provisional ballots can be linked back to individual voters using the timestamp recorded in the digital record by the ICC central scanner.

Unlike the ICC central scanner, the ICP precinct scanner does not record a digital timestamp on the ballots of in-person voters. Rather, ballots scanned on

92

the ICP precinct scanner/tabulator includes a "randomized sequence number" that "preserves voter anonymity as there is no way to correlate the sequence number to either an individual voter, or a specific point in time that the ballot was cast. When results and images are stored on the removable memory (Compact Flash cards), no date-timestamp information is included which prevents the ability to recreate the sequence of how the ballots were cast thus preserving voter anonymity." (Coomer Decl. ¶ 10; Doc. 821-1; *see also* Ex. 19-A to Decl. of Marilyn Marks, Doc. 853-4 at 6 (showing ballot image from ICP scanner without any timestamp).) Dr. Coomer confirmed this again at the September 11 hearing, stating that there is no timestamp associated with ballot images scanned and stored in the digital cast vote records created by the ICP precinct scanner/tabulator. (Tr. Vol. II at 91-92.)

Accordingly, the Coalition Plaintiffs have failed to establish a likelihood of succeeding on the merits of their claim that the BMD system violates their right to ballot secrecy.

### D. Hand-Ballot Scanning and Its Impact on Counting of the Vote

The Coalition Plaintiffs request that the Court require the State Defendants "to adopt scanning threshold settings for the Dominion scanners and vote review procedures that will ensure all voter marks on mailed and hand marked paper ballots are counted." (Br. Supp. Mot., 809-1 at 10.) They assert that the Dominion scanner and tabulation software and equipment are failing to count all legal votes as defined under Georgia law, resulting in an unconstitutional denial of review of the ballot before arbitrarily discarding perceptible ballot votes containing such

93

marks. Plaintiffs contend that Defendants' challenged practices in connection with scanning and tabulation of such hand ballot votes violate Georgia law, which requires votes to be counted if the intent behind a voter's mark can be ascertained upon review. *See* O.C.G.A. §§ 21-2-438(b)& (c); *see also* O.C.G.A. § 21-2-483(g) (requiring manual review by the vote review panel of any overvote detected by the central tabulator).[77] And Plaintiffs also argue the current system and its configuration is a violation of equal protection because in-person voters who use BMD voting machines are not subject to having their votes rejected by a scanner due to faint marks. Each of the individual Plaintiffs additionally have submitted affidavits in this case indicating that while they strongly prefer to vote in person, they have felt compelled to vote by absentee ballot because of their concerns about whether their ballots would be accurately counted in the State's BMD and prior DRE systems. (Decl. of Donna A. Curling, Doc. 785-3; Decl. of Donna Price, Doc. 785-4; Decl. of Jeffrey H. Schoenberg, Doc. 785-5; Decl. of Megan Missett, Doc.

---

[77] Sections (b) and (c) of O.C.G.A. § 21-2-438 provide as follows:

(b) At elections, any ballot marked by any other mark than a cross (X) or check (✓) mark in the spaces provided for that purpose shall be void and not counted; provided, however, that no vote recorded thereon shall be declared void because a cross (X) or check (✓) mark thereon is irregular in form. A cross (X) or check (✓) mark in the square opposite the names of the nominees of a political party or body for the offices of President and Vice President shall be counted as a vote for every candidate of that party or body for the offices of presidential elector.

(c) Notwithstanding any other provisions of this chapter to the contrary and in accordance with the rules and regulations of the State Election Board promulgated pursuant to paragraph (7) of Code Section 21-2-31, if the elector has marked his or her ballot in such a manner that he or she has indicated clearly and without question the candidate for whom he or she desires to cast his or her vote, his or her ballot shall be counted and such candidate shall receive his or her vote, notwithstanding the fact that the elector in indicating his or her choice may have marked his or her ballot in a manner other than as prescribed by this chapter.

640-1 at 149-154; Decl. of William Digges, III, Doc. 640-1 at 167-170; Decl. of Laura Digges, Doc. 640-1 at 162-65; Decl. of Ricardo Davis, Doc. 640-1 at 156-160.)

The Coalition Plaintiffs have presented ballot images that they assert are evidence of clear voter disenfranchisement. The 5 ballot images shown below depict actual unadjudicated ballot images from Fulton County's August 11, 2020 election, showing the ICC scanner interpreted as a "blank contest" several voter marks that indicate a clear visible selection for the candidate[78]:



---

**FULTON COUNTY**
877-11N

**OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT**

**OFFICIAL DEMOCRATIC PARTY PRIMARY AND
NONPARTISAN GENERAL ELECTION RUNOFF BALLOT
OF THE STATE OF GEORGIA
AUGUST 11, 2020**

To vote, blacken the Oval (⬤) next to the candidate of your choice. To vote for a person whose name is not on the ballot, manually WRITE his or her name in the write-in section and blacken the Oval (⬤) next to the write-in section. If you desire to vote YES or NO for a PROPOSED QUESTION, blacken the corresponding Oval (⬤). Use only blue or black pen or pencil.

Do not vote for more candidates than the number allowed for each specific office. Do not cross out or erase. If you erase or make other marks on the ballot or tear the ballot, your vote may not count.

If you change your mind or make a mistake, you may return the ballot by writing "Spoiled" across the face of the ballot and return envelope. You may then mail the spoiled ballot back to your county board of registrars, and you will be issued another official absentee ballot. Alternatively, you may surrender the ballot to the poll manager of an early voting site within your county or the precinct to which you are assigned. You will then be permitted to vote a regular ballot.

*I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law.* [O.C.G.A. 21-2-284(e) and 21-2-383(a)]

| For District Attorney of the Atlanta Judicial Circuit (Vote for One) | NONPARTISAN GENERAL ELECTION RUNOFF |
|---|---|
| ○ Paul Howard (Incumbent) | For Judge, Superior Court of the Atlanta Judicial Circuit (To Succeed Constance C. Russell) (Vote for One) |
| ⊘ Fani Willis | ⊘ Melynee Leftridge Harris |
| **For Sheriff** (Vote for One) | ○ Tamika Hrobowski-Houston |
| ○ Theodore "Ted" Jackson (Incumbent) | |
| ⊘ Patrick "Pat" Labat | |

05150_00003_000029.tif scanned at: 12:58:26 on 08/04/20.

Scanned on: ICC   Tabulator: 5150   Batch:  3
Poll ID:   625   Ballot ID: 472

DEM - District Attorney - Atlanta
   BLANK CONTEST
DEM - Sheriff
   Patrick "Pat" Labat
Superior Court - Atlanta - Russell
   BLANK CONTEST

---

**FULTON COUNTY**
531-12S

**OFFICIAL ABSENTEE/PROVISIONAL/EMERGENCY BALLOT**

**OFFICIAL DEMOCRATIC PARTY PRIMARY AND
NONPARTISAN GENERAL ELECTION RUNOFF BALLOT
OF THE STATE OF GEORGIA
AUGUST 11, 2020**

To vote, blacken the Oval (⬤) next to the candidate of your choice. To vote for a person whose name is not on the ballot, manually WRITE his or her name in the write-in section and blacken the Oval (⬤) next to the write-in section. If you desire to vote YES or NO for a PROPOSED QUESTION, blacken the corresponding Oval (⬤). Use only blue or black pen or pencil.

Do not vote for more candidates than the number allowed for each specific office. Do not cross out or erase. If you erase or make other marks on the ballot or tear the ballot, your vote may not count.

If you change your mind or make a mistake, you may return the ballot by writing "Spoiled" across the face of the ballot and return envelope. You may then mail the spoiled ballot back to your county board of registrars, and you will be issued another official absentee ballot. Alternatively, you may surrender the ballot to the poll manager of an early voting site within your county or the precinct to which you are assigned. You will then be permitted to vote a regular ballot.

*I understand that the offer or acceptance of money or any other object of value to vote for any particular candidate, list of candidates, issue, or list of issues included in this election constitutes an act of voter fraud and is a felony under Georgia law.* [O.C.G.A. 21-2-284(e) and 21-2-383(a)]

| For District Attorney of the Atlanta Judicial Circuit (Vote for One) | NONPARTISAN GENERAL ELECTION RUNOFF |
|---|---|
| ○ Paul Howard (Incumbent) | For Judge, Superior Court of the Atlanta Judicial Circuit (To Succeed Constance C. Russell) (Vote for One) |
| ⊘ Fani Willis | ⊘ Melynee Leftridge Harris |
| **For Sheriff** (Vote for One) | ○ Tamika Hrobowski-Houston |
| ⊘ Theodore "Ted" Jackson (Incumbent) | |
| ○ Patrick "Pat" Labat | |

05150_00006_000002.tif scanned at: 13:46:05 on 08/04/20.

Scanned on: ICC   Tabulator: 5150   Batch:  6
Poll ID:    302   Ballot ID: 488

DEM - District Attorney - Atlanta
   BLANK CONTEST
DEM - Sheriff
   Theodore "Ted" Jackson (I)
Superior Court - Atlanta - Russell
   BLANK CONTEST



(Pls.' Hrg. Ex. 7; *see also* Decl. of Marilyn Marks ¶ 17, Doc. 809-5; Ex. 19-D to Decl.

of Marilyn Marks, Doc. 853-4 at 41.)

The State Defendants assert in opposition to Plaintiffs' motion that "[t]he only possible burden on a voter arising from the scanner-threshold settings is if the voter disregards the instructions that come with the ballot. That is not a burden on the right to vote — it is a voter choosing to not follow the required regulatory structure of the state." (State Defs.' Resp., Doc. 834 at 25.)  In essence, the State Defendants contend that a voter who marks their absentee paper ballot with a check mark or an X, rather than filling in the oval to the left of the candidate name, does not have a right to have their vote counted.  (*See* Suppl. Decl. of Chris Harvey, Doc. 834-3 ¶¶ 4-5) ("The instructions for absentee ballots instruct voters to fill in the bubble next to the preferred candidate name and instructs voters not to make check marks or X to mark their ballot. Tabulating absentee ballots where voters do not follow the instructions takes additional time for county election officials."). Defendants' litigation position, as explained below, is not in line with the requirements of Georgia's Election Code and the State Election Board's regulation providing that if the voter "has marked his or her ballot in such a manner that he or she has indicated clearly and without question the candidate for whom he or she desires to cast his or her vote, his or her ballot shall be counted, notwithstanding the fact that the elector in indicating his or her choice may have marked his or her ballot in a manner other than as prescribed."[79] Ga. Comp. R. & Reg. r. 183-1-15-.02(2)(2).

---

[79] A potential explanation for the phenomenon of some voters marking their absentee ballots without filling in the designated oval is two-fold.  Hand marked ballots, where votes were cast

### 1.    Operation of the Scanners

The Dominion precinct (ICP)[80] and central count (ICC)[81] scanners do not interpret the text of a hand marked paper ballot.[82]  (Decl. of Dr. Eric Coomer ¶ 9, Doc. 658-2.) Instead, the scanners detect votes by reading particular coordinates on the ballot, what is known as a "target area" inside an oval next to a voter's choice as shown below:



---

with an X or check, were used prior to the introduction of the DRE system in Georgia in 2002. And this may be found in Georgia's existing election regulation that contains different provisions for vote tabulation in statewide versus municipal elections.  *See* Rule 183-1-15-.02(2)(2)&(3).  The Dominion BMD/optical scan system is required to be used in all statewide elections.  But Georgia still allows for other voting systems to be used in non-statewide "municipal" elections (*see* provisions of rule that still pertain to lever systems, Rule 183-1-15-.02(2)(1) and non-optical scan, i.e., hand counted paper ballots, Rule 183-1-15-.02(2)(3)).  For optical scan paper ballots, the voter must "fill in the oval" to mark their vote choice. Rule 183-1-15-.02(2)(2)(a).  But for non-optical scan paper ballots, the voter must "place an X, a check, or other similar mark" in a square to mark their vote choice.  Rule 183-1-15-.02(2)(3)(a).  This might account for why a number of voters are placing either an X or a check in the oval rather than filling it in and may create a problem if the ICP and ICC scanners in operation disregard these types of markings on the optical scan ballots without further review.  Further, the Court notes, that prior to the instant 2020 ballot cycle, a vote with an X or check on an absentee or provisional ballot would not have been subject to adjudication software review programmed to kick out marks that were too light to register on the scanner, but to the human eye were visible as an X or check vote designation.

[80] The ImageCast Precinct Scanner and Tabulator is an optical scan ballot tabulator used to scan marked paper ballots and interpret voter marks on the paper ballot.  It is a proprietary Dominion product. (Tr. Vol. II at 81.)

[81] The ImageCast Central Scanner consists of a Canon DR-G1130 commercial off-the-shelf digital high-speed document scanner configured to work with the ImageCast Central Software for high speed ballot tabulation.

[82] The scanner does not work like a camera – it does not take a picture of the paper ballot.  (Tr. Vol. I at 140-41.)

(Coomer Decl. ¶ 9; Ex. A to Coomer Decl., doc. 658-2 at 9.)  The target areas correlate to the voter choices represented on the ballot.  (*Id.*)  According to Dominion's documentation,

> When a ballot is fed into an ImageCast tabulator – at the precinct level or centrally – a complete duplex image is created and then analyzed for tabulation by evaluating the pixel count of a voter mark.  The pixel count of each mark is compared with two thresholds (which can be defined through the Election Management System) to determine what constitutes a vote.  If a mark falls above the upper threshold, it's a valid vote.  If a mark falls below the lower threshold, it will not be counted as a vote.

(Ex. M to Decl. of Harri Hursti, Doc. 809-3 at 48.) However, if a mark falls between the two thresholds, in what is known as the "ambiguous zone," it will be deemed as a "marginal mark"[83] and the ballot should be flagged for review by a vote review panel – either manually or using Dominion's vote adjudication software application. (*Id.*)

The default scanner threshold settings in Democracy Suite 5.5A for both the ICP and ICC are 12% for the low-end and 35% for the high-end.  (Defs.' Hrg. Ex. 4 at 1, Doc. 887-4 at 2.)  Dominion's "Democracy Suite 5.5A is not designed to register voter intent from a hand-marked ballot if the vote target area (oval to the left of the choice) is not marked in some manner" and does not meet or exceed the

---

[83] According to Dr. Coomer, when an in-person voter scans a hand-marked paper ballot (i.e., an emergency ballot) on the precinct scanner, the scanner will alert the voter if the ballot is rejected as having contained an ambiguous mark and that voter will have the opportunity to correct the ballot. (Tr. Vol. II at 75-76; *see also* Ex. M to Hursti Decl., Doc. 809-3 at 48.)  However, because of the configuration of the ICP scanner in Georgia, if the voter marked a selection, but the scanner did not recognize that as a vote, the voter would not be alerted if an undervote is detected for a particular contest. (Tr. Vol. II at 75.)  The ICP will only alert an in-person voter if the ballot is completely blank for all races. (*Id.* at 76.)

high-end threshold setting. (*Id*.) A visual representation of the threshold interpretation of voter marks is shown below:



(Doc. 809-3 at 48.)

For all elections conducted on the new Dominion voting system to date, including the June 2020 primary and August 2020 runoff elections, the ICP and ICC scanners were set to the default threshold settings. Using these default settings, when a ballot is scanned by either the ICP or ICC scanners, the scanners are programmed to interpret voter marks as follows: (a) any mark deemed by the scanner to be less than 12% darkened within the vote target areas (i.e., ovals) is designated as a blank vote for the given contest; (b) any mark deemed by the scanner to be equal to or greater than 35% darkened within the target ovals is designated as a vote for the choice associated to the target area marked; and (c) any mark deemed by the scanner to be equal to 12% or less than 35% darkened within the vote target ovals is designated as an ambiguous mark. (Defs.' Hrg. Ex. 4 at 1, Doc. 887-4 at 2.) Any ambiguous mark within a vote target oval does not

count toward the vote total.  (*Id.*) Instead, "[i]t is anticipated that ballots isolated by the ICP or ICC scanners containing scanner-deemed ambiguous marks are adjudicated manually or electronically by the designated election official in order to determine the voter intent that is in question by the ICP or ICC scanners." (*Id.*)

According to the Coalition Plaintiffs' expert Harri Hursti, Dominion's precinct and central count scanners cannot be relied upon to accurately count all votes using the default threshold settings and the current configuration for image resolution. (Tr. Vol. I at 125.)  In addition to the use of arbitrary default threshold settings, Hursti criticizes Dominion's configuration of the ICC central count scanner to intentionally downgrade the resolution quality of the scanned image. Hursti testified that the ICC central count scanner "can be configured to capture higher quality and more information retaining images" and is capable of producing images of a significant higher order of magnitude than it currently produces based on Dominion's programming.  (*Id.* at 126, 133-34.)  As Hursti explained, "the way the scanner is used in this environment is like driving your sports car locked on the first gear." (*Id.* at 134.) The central count scanner is recording a lower quality image than it is capable of because "as part of the configuration, that scanner is instructed to produce low quality images with a reduced amount of information." (*Id.*)  For example, the image produced by the ICC is only 200 dots per inch ("DPI") which is "a fraction of what the scanner is capable" of producing and the image "has been reduced to have only black or white pixels based on algorithms and so-called business logic and the scanner itself is capable of producing color images and gray

scale images." (*Id.* at 135-36.)  Dominion also configured the ICC scanner to "drop out" or ignore red pigment from the scanned image. (*See* Ex. E to Hursti Decl., Doc. 809-3 at 40.)  As a result, any red markings do "not meet the internal algorithm criteria for black, therefore [red] gets erased to white instead." (Hursti Decl. ¶ 61, Doc. 809-3.)

During the September 10, 2020 injunction hearing, Mr. Hursti explained that he would have expected the ICC scanner to have counted the clear voter marks shown in the ballot images of the Fulton County August 11 election interpreted by the ICC as "blank" contests. (Tr. Vol. I at 136.)  The problem according to Hursti is that "the scanner is reducing all information to either black or white and that predetermination tells what the image is recording. And after that, a mathematical algorithm is applied which is only blindly counting how many black and white pixels it sees and based on that make[s] a determination if there is a vote or not. So based on that reduced information, the system didn't cross the threshold to see [those markings] as a vote or even as ambiguous mark[s]." (*Id.* at 137.)  An ambiguous mark means "that the system sees something, which it says that it is not clear whether it is a mark or not. And that would have then gone to the human [ballot review] process." (*Id.* at 138.)  But in the case of the Fulton County ballot images in Plaintiffs' Hearing Exhibit 7, "the system didn't even see that there would be a mark requiring a human observation." (*Id.*)

The Coalition Plaintiffs conducted an examination of test ballots scanned on the ICP precinct scanner/tabulator using test ballots with various types of

markings and different colors of pens.  (*See* Pls.' Hrg. Ex. 7.1, Doc. 888-6.) Plaintiffs' Hearing Exhibit 7.1 illustrates two images of the same ballot produced by two different image resolutions and qualities and the scanner's resulting interpretation of the voter markings from the lower quality scan.[84]  According to Mr. Hursti, the visible differences in the two images are "hallmarks of bad quality scanning and bad quality technology."  (Tr. Vol. I at 139.) The poor quality of the ballot image scanned on the ICP does not even show the ovals that would be filled in by the voter. (*Id.*)  Mr. Hursti believes that for the ICC scanner, the DPI level could be increased from the current 200 DPI configuration to 300 DPI, which is the standard setting for commercial off-the shelf scanners in order to improve the quality of the image of the ballots scanned for interpretation by the system software threshold settings.[85]

During the court-authorized testing of the Dominion equipment supplied by Fulton County, Coalition member Jeanne Dufort marked and scanned a series of test ballots to see how the marks were interpreted and tabulated by the scanner. To replicate the various ways voters might feed paper ballots into the scanner, Dufort scanned the same ballot multiple times "top side up, top first and then bottom first, and bottom side up, top first, and then bottom first to see if it made

---

[84] As shown in Exhibit 7.1, the ballot image on the left illustrates what the ballot looks like to the human eye when voted.  The ballot image on the right shows the ballot recorded by the ICP scanner and is the image that is tabulated for vote counting.
[85] To be fair to his testimony, Mr. Hursti opined that in order to maximize the accuracy of the ICC tabulation scanner, the ICC should be configured to capture additional information from the images, such as gray scale or color, in addition to an increase in the DPI.

any difference in how the scanner saw the vote." (*Id.* at 178.) As Dufort described at the September 10 hearing, the test ballot "had five contests on it. Three were races, and two were questions. When I put it through, the first thing I did was put it through each of the four possible ways to feed it. And each time, I got a different message from the scanner. It would return it with an error saying there were ambiguous marks, but it never pointed out the same ambiguous marks." (*Id.* at 179.) More specifically, she testified that "the first time when we put it in face up like you see first, it told us that one SPLOST race, one of the contests on the backside, was ambiguous. The second time when I put it in bottom first, it told me that the liquor sale vote was what was ambiguous and it didn't tell me anything about the SPLOST. The third time when I turned it over and put it backside facing up top end, it told me the SPLOST and one of the judge races was ambiguous. Then the fourth time when I put it backside bottom in, it told me the SPLOST and the liquor sales was in there." (*Id.*) Each of the four times Dufort fed the same ballot through the scanner, she got four different responses from the scanner. (*Id.* at 179-80.) Dufort repeated the experiment again, this time feeding the ballot in the same direction five separate times and still each time she got a different response from the scanner. (*Id.* at 180-81.)

Dr. Eric Coomer, the Director of Security for Dominion Voting Systems disagrees with Plaintiffs' contention that the Dominion scanners either discard or disregard valid votes or do not count certain marks as a vote even though the marks are obvious to the human eye as indications of a vote. (Tr. Vol. II at 73, 77.)

According to Dr. Coomer, the system is simply scanning the image and detecting the percentage fill of the target area. Based on the settings, it will automatically say whether it is a valid counted vote, whether it is an ambiguous mark, or whether the system does not characterize it as any. "There are further processes in the system, mainly adjudication, which allows secondary review – voter review for voter intent issues, which is integral to the system, which is where you can apply voter intent guidelines and processes to essentially characterize a vote that the system is not automatically specifying as a vote." (*Id.* at 73.)

During the hearing on September 11, 2020, Dr. Coomer was shown the Fulton County ballot images in Plaintiffs' Hearing Exhibit 7. Although Dr. Coomer disagrees with the contention that the scanners do not count certain marks that are visible to the human eye as votes, he admits that the mark shown by candidate Theodore "Ted" Jackson's name on the first page of Plaintiffs' Hearing Exhibit 7 looked like a vote to him but that according to the AuditMark created at the time of scanning, the ICC did not recognize the mark as a vote and did not count it as a vote. (*Id.* at 73-74.) Dr. Coomer also admitted that if a voter's mark is below the low-end threshold, it does not register as either an ambiguous mark or a vote. (*Id.* at 77.) According to Dr. Coomer's hearing testimony, the AuditMark created at the time of scanning, which contains the text indicating how the scanner interpreted the voter mark, does not indicate whether the ballot fell within the ambiguous threshold required for adjudication. (*Id.* at 75.) Therefore, one cannot tell from the AuditMark for the ballot image at page one of Plaintiffs' Hearing Exhibit 7

whether the ballot was flagged for adjudication. (*Id.*) Dr. Coomer stated that the "AuditMark simply shows everything that was counted as a vote. There is additional metadata in the cast vote record, which is the electronic record, that includes information about ambiguous marks. And that is the data that is used to determine whether it is sent to adjudication." (*Id.* at 78.) But then when asked "[i]f the ballot in this particular case had been adjudicated to be a vote, would that adjudication show up on this AuditMark?," Dr. Coomer replied "Yes, it would." (Id.) And again, he was asked "if it had been adjudicated in the course of a normal election process, you would have seen that on the AuditMark in front of us; right?," Dr. Coomer responded, "Yes. Yes."[86] (*Id.* at 79.) But the AuditMark on this ballot – Hearing Exhibit 7 – did not reflect that it had been flagged for adjudication.

Dr. Coomer also disagrees with Mr. Hursti, testifying that the accuracy of the ICP and ICC scanners "has absolutely nothing to do with the scanner resolution, the DPI setting." (*Id.* at 72.) According to Dr. Coomer, because the "Dominion scanners capture the percentage fill of the targets for every mark that is made on the ballot, that has absolutely nothing to do with the scanner resolution, the DPI setting, whether a mark is characterized as a ballot vote, an ambiguous mark, or not a vote is wholly dependent on the threshold settings of the lower and upper threshold limits as well as the percentage fill of the target detected by the

---

[86] This is consistent with the representations made in the Dominion contract that "[a]fter a ballot is adjudicated, the ballot image is appended with a record of that decision including the user's name, action taken by the user, and date and time of the action. This adjudication AuditMark is appended to the ballot image under the original AuditMark, which was manifested during tabulation." (Doc. 619-8 at 54.)

system." (*Id.*) He went on to "categorically state that going from the current 200 DPI to some higher level of 300 DPI does not improve the accuracy of the system." (Tr. Vol. II at 147.) Referring back to the ballot images in Plaintiffs' Hearing Ex. 7, Dr. Coomer explained that "just to put it simply, we have all seen the images. And the images clearly show the voter's mark . . . if you had a physical ballot and you had some mark on there and then you showed the [scanned ballot] image and that mark wasn't there, then we could talk about DPI. But the fact is we're looking at the image. The mark is there" so the issue is "not the fact that the image is not, you know, sufficiently fine enough resolution to capture that." (*Id.* 147-48.) But, the ballot images in Plaintiffs' Ex. 7.1 show the exact scenario Dr. Coomer admits might indicate a problem with low DPI resolution. In these side-by-side images of the same ballot, the first image scanned at high resolution shows clearly the voter marks while the second image scanned on the ImageCast shows several of the voter marks having been erased by the system and some portions of the ballot printing totally distorted due to the poor image quality.

Dr. Coomer also attempted to explain why Jeanne Dufort experienced inconsistent results when she scanned the same ballot through the ICP scanner multiple times. According to Dr. Coomer, "the scanners have what is called a CIS array. It is contact image sensor array. That is what is used to actually digitize the image of the ballot. And those inherently, like all electronic systems, have some variability, plus or minus ten percent. So on one scan you could certainly have a target area that registers 12.5 percent and you round that up to 13. And on the next

scan it could be 11.9 percent. There is inherent variability in all electronic systems . . . that is irrespective of the resolution setting that's on the system. (Tr. Vol. II at 148-149.)

### 2. Vote Review Panel Evidence

The Coalition Plaintiffs presented testimony from individuals who either served on or observed vote review panels. According to Coalition member Jeanne Dufort, who testified at the September 10 hearing and serves on the adjudication panel in Morgan County, the vote review panel "makes up for the limits of technology. We take ballots that can't be scanned or ballots that have marks that the scanner can't interpret, and we put human eyes on them. So I like to think of us as backstop to make sure that every vote ... where voter intent is clear gets counted." (Tr. Vol. I at 171.) Under the new system, counties have the option to use the Dominion adjudication software to review scanned ballot images cued up on a computer screen. (*Id.*)

Adam Shirley served on the Clarke County Vote Review Panel for the June 9, 2020 Presidential Preference Primary and General Primary. (Decl. of Adam Shirley, Doc. 809-7.) Out of approximately 15,000 scanned absentee ballots, about 350 were flagged for adjudication by the software. When adjudicating a ballot, a scanned image of the complete ballot was displayed on the screen. The software indicated the flagged contests for human review by outlining them in red. The software used highlighting to indicate how it had interpreted the voter's mark. This highlighting was used for the entire ballot, not only the contests that were

flagged for adjudication. Green highlighting indicated the software recognized the mark as a vote and counted it unless it was also flagged as an overvote. Yellow highlighting indicated the software categorized the mark as ambiguous and would not be counted until there was a vote review panel adjudication. When at least one oval in a contest was darkened sufficiently to be categorized as "ambiguous," the software highlighted the ambiguous option(s) in yellow, outlined the contest in red, and sent the entire ballot to an adjudication queue. Below is an example illustrative of the adjudication screen:



(Exhibit 2 to Shirley Decl., Doc. 809-7 at 12.)

The most common reason for ballots to be flagged as ambiguous was the voter having marked their intent with check marks or X marks. The Clarke County review panel adjudicated vote marks categorized as "ambiguous" to count votes that were clear as to voter intent. The panel took the approach that for any votes flagged for adjudication, the vote should be counted if voter intent was clear from

the on-screen image.  In its review, the panel attempted to answer two questions: (1) could the voter's intent be discerned?; and (2) what was that intent?  While only a simple majority was required, the bipartisan vote review panel's decision on each ballot reviewed was unanimous.

In the course of reviewing the entire ballot to inform their adjudication of flagged contests, the panel discovered clear ballot markings made by the voter that had not been highlighted by the software for adjudication.  These markings were not counted as a vote (and therefore were not highlighted in green by the software) nor were they categorized as ambiguous (and therefore were not highlighted in yellow by the software).  Below is the scanned image on one such marked ballot.



(Ex. 3 to Shirley Decl., Doc. 809-7 at 13.)  The top and middle contests bear the red box flagging them for adjudication and yellow highlighting showing marks the

software has classified as ambiguous. The bottom contest, though clearly marked by the voter, bears no red box or highlighting of any kind. This shows the software did not count that vote and was programmed not to send such a ballot to adjudication. The system seemed to simply ignore such votes.

In every instance the panel encountered where the system had not counted such votes (or flagged them for adjudication), the review panel agreed without question that the voter had made their intent clear though the vote had not been counted. The panel therefore instructed the software to count the previously-ignored votes on the ballots, although the software had not flagged these particular votes for adjudication by the panel. Based on his review of hundreds of ballots, it is Shirley's opinion that it is possible that there were ballots with uncounted votes that would never be corrected by human review because no other marks on those ballots triggered flagging for adjudication.

The vote review panel expressed these concerns to elections staff, Election Director Charlotte Sosebee, and the Board of Elections. In response to these concerns, the Board of Elections ordered a pre-certification partial recount of only the absentee ballots for 5 of Clarke County's 24 precincts. The partial recount took place on June 17. The Election Board was not authorized by statute or rule to conduct a recount using any method other than what had been used for the first count. In the recount, 2,665 absentee ballots were re-scanned and 76 ballots were flagged for adjudication. For those 76 ballots, the vote review panel unanimously agreed that 35 individual votes had not been counted by the software. Those votes

112

were spread across 12 separate ballots. A Dominion technician confirmed the software was programmed to classify votes in one of three ways: a normal vote (highlighted in green), an ambiguous mark (highlighted in yellow), and an uncounted vote (which the system recognized, quantified, but was programmed not to count and not to be flagged for review).

As a voter, Shirley finds such a high rate of missed votes – nearly 16% of the adjudicated ballots – to be alarming. He also found concerning the procedures followed by the review panel in not providing a paper audit trail, not verifying the record of changes made to vote tallies, and not referencing the original ballot to determine if the low quality image was an accurate depiction of the voter-marked ballot. Shirley also found troubling that there was no attempt to reconcile the votes added to the vote tally before and after the adjudication process, leaving the opportunity for unauthorized changes to the tallies by others with access to the system.

Jeanne Dufort, served on the Vote Review Panel for the Morgan County Board of Elections and Registration for the combined Presidential Preference and General Primaries in June 2020. (Decl. of Jeanne Dufort, Doc. 809-6.) When she arrived at 8pm on June 9 for her duties, the elections office was still in the process of opening absentee ballots. Dufort assisted the team in opening the remainder of approximately 3,000 mail ballots. Ballots were scanned from 10pm to 2am. Dufort noticed voters marking their choices in a number of ways, including filling in the

oval, circling the oval, making X or check marks, and one who made smiley faces in the oval to mark their selection.

The Vote Review Panel convened on the afternoon of June 10. Morgan County used the adjudication software provided by Dominion. The Election Supervisor Jennifer Doran instructed the Dominion technician to pull up all ballots with overvote and ambiguous marks. There were about 150 out of 3,000 ballots to review. The Morgan County review panel used the same procedure described by Adam Shirley.

The first time the panel encountered a contest with no highlights (meaning it was deemed blank by the software), but with a clearly marked vote, Dufort asked the on-site Dominion technician whether that vote was counted, and he said "of course, that's a vote," and assured the panel it was counted. The panel moved on to the next ballot. This time Dufort asked the Dominion technician to show her the cast vote record for the ballot. It showed "blank contest" for the race with no highlights, despite the presence of a clear vote. By unanimous agreement, the panel adjudicated that contest to show the vote, overriding the inaccurate tabulator software. The panel returned to the previous ballot and did the same. During the course of review of about 150 ballots, Dufort estimates the panel found and adjudicated about 20 votes that were clearly marked by the voters, but the software had interpreted as a "blank contest."

Dufort attended the Morgan County Election Board meeting on June 11, and spoke about her concerns as a review panel member and the need to expand the

adjudication process to determine whether other votes had been rejected by the system. The Morgan County Election Board denied the motions of board member Helen Butler to expand the adjudication process to review the remaining 2,700 mail ballots to see if there were additional uncounted votes.

Coalition member Rhonda Martin observed somewhat similar adjudication procedures at the Fulton County Elections Preparation Center on August 14, 2020. (Decl. of Rhonda J. Martin, Doc. 809-4.) The adjudication process took place entirely on a low resolution black and white on-screen image, without looking at the original paper ballot. Based on her observation of the two vote review panels used by the Fulton County elections office, the panel members quickly clicked here and there and switched from one view to another as they examined the ballot images, without making a record of who approved each vote change or why the decision was made. Martin also observed that at times, the panel members appeared to almost forget to confer with one another and confirm that they agreed on the interpretation of the vote because they were so focused on operating the adjudication software.

Of the ten ballots Martin observed being adjudicated, three appeared to be completely blank with no votes marked anywhere on the ballot. The first review panel to encounter a blank ballot with no single vote shown paused to ask the Registrations Chief, Ralph Jones, what to do. After waiting for a while for Mr. Jones to finish up with the second review panel, the first review panel decided to accept the blank ballot so they could continue adjudicating other ballots. They did

not request to see the original paper ballot to confirm that it was, in fact, blank. While not impossible, Martin found it odd that a voter would go to the trouble of returning a ballot with no vote marks at all.

### 3. The Secretary of State's Center for Election Systems Study on Scanner Settings

When Plaintiffs filed their motion in August 2020, the State Election Board was considering proposed revisions to the regulation providing for "the definition of a vote" to designate specific settings for the ballot scanners used to tabulate optical scan ballots marked by hand. Plaintiffs' expert Harri Hursti asserted that before the State sets threshold standards for the Dominion system, extensive testing is needed to establish optimal configuration and to identify a setting that will not have the widespread effect of discarding at least some valid votes. (*See* Hursti Decl. ¶ 77, Doc. 809-3.) At that time, neither Mr. Hursti nor the Plaintiffs were aware of a study undertaken by the Center for Election Systems of the Secretary of State's Office in July of 2020 to determine "how various reductions to the default, ambiguous mark threshold setting within Democracy Suite 5.5A would impact the scanning and interpretation of ambiguously marked ballot samples" on the ICC central count scanner. (Defs.' Ex. 4 at 1, Doc. 887-4 at 2.) "The examination was done in an effort to increase absentee ballot scanning efficiency and reduce the need to adjudicate ballots that reflect a clear voter intent." (*Id.*) A draft copy of the report prepared by CES's Michael Barnes was subsequently produced during expedited discovery prior to the injunction hearing.

116

As further explained in the draft report, CES undertook an examination to determine whether "the high-end setting of 35% is forcing election officials to review ballots that should instead be processed as marked by the ICC scanner on the initial read by the IC scanner" and counted as a valid vote. (Defs.' Ex. 4 at 2, Doc. 887-4 at 3.) Because "Democracy Suite 5.5A gives the end user the ability to adjust ambiguous mark threshold settings used by the Dominion scanners to interpret voter intent on hand-marked optical scan ballots," CES ran ballot test decks through the ICC scanner using various threshold settings. (Defs.' Ex. 4 at 1, Doc. 887-4 at 2.)

At the start of the examination, a "test deck of 100 hand-marked optical scan ballots was prepared. The instructions at the top of the ballot instruct the voter to fill in the oval next to the candidate of their choice. The filling in of the oval (vote target area) is designed to provide a clear intent for the ICC scanner to interpret." (Defs.' Ex. 4 at 2, Doc. 887-4 at 3.) To examine the various ways the scanner might interpret different marks, the testers did not fill in the vote target areas as instructed. Instead, "testers placed a variety of marks that only darkened a portion of the vote target areas" on the deck of test ballots. "Testers also used differing marking devices (i.e., blue ink, black ink, red ink, pencil, etc.) and marking pressures." On some ballots, testers marked outside the vote target area (by circling or underlining the candidate name rather than filling in the oval) "to confirm that marks [placed] outside the vote areas would not be recognized" by the scanner. (*Id.*)

Each test ballot had three contests with a total of 6 vote target areas (two ovals per contest). "Testers used the same type of variable mark within each of three contests when marking a ballot in an attempt to simulate how an individual voter would most likely mark each oval on their ballot in the same manner throughout." (*Id.*) As described in the CES draft report, the scanner will interpret a marked ballot in one of three ways: (1) Marked – the scanner will "interpret the mark within all vote target areas on the ballot and increment vote totals and ballots cast total forward" (the mark falls above the high-end threshold and is counted as a vote); (2) Blank – the scanner "will interpret the vote area as not including a mark and would not increment vote total forward, but would increment the ballots cast forward" (the mark falls below the low-end threshold and is not counted as a vote in the vote totals); and (3) Ambiguous – the scanner will "not be able to determine marks and set the ballot aside for review" (the mark falls below the high-end threshold to count as a vote but above the low-end threshold to register as a blank). (*Id.*)

After marking the test ballots, the test deck was scanned a total of two times on an ICC scanner configured with the default low-end 12% and the high-end 35% settings. This process created two batches collected by the ICC scanner, each batch containing 100 ballots. Each batch was then loaded into Dominion's Adjudication Client application. The Adjudication Client application was set to review all ballots within the batch and isolate any ballots containing Ambiguous Marks, Blank Ballots, and Overvotes (the standard Adjudication Client settings). The testers

created 6 criteria into which each ballot could fall under for review: (1) Marked – all contests on ballot contained a single interpretable mark; (2) 1/3 Ambiguous – one of the three contests on the ballot contained a mark requiring review; (3) 2/3 Ambiguous – two of the three contests on the ballot contained a mark requiring review; (4) Ambiguous – all three contests on the ballot contained a mark requiring review; (5) Blank Ballot – all three contests on the ballot contained no interpretable marks; and (6) Overvote – all contests on ballot contained multiple interpretable marks. (Defs.' Ex. 4 at 2-3, Doc. 887-4 at 3-4.)

Upon completing the review of each scanned batch within the Adjudication Client software, the testers documented the following results:

- Marked          53
- 1/3 Ambiguous   15
- 2/3 Ambiguous   11
- Ambiguous       12
- Blank           9
- Overvote        0

(Defs.' Ex. 4 at 3, Doc. 887-4 at 4.)   A total of 47 ballots required some level of review after being processed by the ICC.   The testers were concerned that nearly half of the test deck required additional review to determine voter intent.

In an effort to assess what impact a reduction in the high-end setting level would have on potential ambiguous marked ballots being registered on the ICC, testers reduced the default high-end setting 3 times: from 35% to 30%, from 30% to 25%, and finally from 25% to 20%.  (Defs.' Ex. 4 at 3-5, Doc. 887-4 at 4-6.)  In the third test pass, the testers ran the test deck through the scanner following the

same protocol but the ICC scanner was configured with the low-end default setting of 12% but the high-end setting was reduced from 35% to 20%. (Defs.' Ex. 4, Doc. 887-4 at 5.) Using a high-end setting of 20%, testers documented the following results for each batch within the Adjudication Client software:

- Marked              70
- 1/3 Ambiguous       10
- 2/3 Ambiguous       8
- Ambiguous           1
- Blank               10
- Overvote            1

(Defs.' Ex. 4 at 4-5, Doc. 887-4 at 5-6.) With a low-end 12% and high-end 20% setting, there was a 36% reduction in the number of ballots (47 to 30) after scanning needing further review, in relation to the original default setting. (Defs.' Ex. 4 at 5, Doc. 887-4 at 6.) The adjustment of the high-end setting down to 20% also resulted in 17 more ballots being processed as marked (an increase of 53 to 70) and voter intent being registered and tabulated without need of further review or adjudication. The reduction to 20% also resulted in a potential overvote being detected in the test deck that had previously been undetected using the higher high-end settings. This reduction in the high-end setting from 35% to 20% also decreased the number of ballots with all three contests registering ambiguous marks from 12 ballots down to 1 ballot. The reduction did not eliminate the presence of ambiguous marks, but it does appear to reduce the number of instances where the review of all contests on a ballot would be needed. (*Id.*)

In an effort to reveal if there were any additional ambiguous marks that could be detected and made available for review to users, the testers reduced the low-end threshold setting from 12% to 10% (keeping the high-end at the adjusted 20% threshold). (*Id.*) The testers ran the test deck through the scanner following the same protocol described above, but the ICC scanner was configured with the low-end at 10% and the high-end at 20%. Using this configuration, testers documented the following results upon reviewing the test ballots within the Adjudication Client software:

- Marked            71
- 1/3 Ambiguous     13
- 2/3 Ambiguous     6
- Ambiguous         2
- Blank             7
- Overvote          1

(*Id.*) With the low-end 10% and high-end 20% settings, there was a 38% reduction in the number of ballots (47 to 29) after scanning needing further review, in relation to the original default setting. This configuration reduced the number of instances of ambiguous (12 to 2) and blank ballots (9 to 7) from the original default settings. Under these settings, 29 ballots remained as needing some physical review. (Defs.' Ex. 4 at 6, Doc. 887-4 at 7.) Of those 29, 7 ballots were seen by the ICC as completely blank. Upon physical review of the 7 ballots, 5 ballots contained no physical mark anywhere within the vote target oval, but did have the candidate name circled or underlined. The remaining 2 ballots seen as blank by the ICC, upon visual review, did have discernable marks within the vote target area,

however, the mark was made with red ink.  While it did not remove the detection of ambiguous marks or blank ballots, it does appear the combination of these settings eliminated the need to review some ballots and reduced the number of contests per ballot needing review when a ballot review was detected. (Defs.' Ex. 4 at 5, Doc. 887-4 at 6.)

During the assessment, the testers made note of whether the type and placement of marks in and around the vote target oval had an impact on the scanner's interpretation. (Defs.' Ex. 4 at 6, Doc. 887-4 at 7.) In addition to partial filling in of the vote target oval, the ICC scanner registered various types of marks, including an X, checkmark, dash, and dots, when they were placed within the vote target oval.  The darker the mark within the vote target area, the easier the ICC registered the mark.  These findings indicate that instructions to voters should inform the voter to fill in the oval next to the candidate name and to avoid circling, underlining, or placing checkmarks or Xs, or otherwise marking the candidate name outside the vote target oval.  Voters should also be warned to NOT use red ink.

### 4.    Georgia's Election Code and Regulations Pertaining to Optical Scan Ballots

Based on the results of the CES study in July 2020, the State Election Board proposed a rule adopting the adjusted threshold settings that was.  The regulation, approved by the Board on September 10, 2020 now provides:

> Ballot scanners that are used to tabulate optical scan ballots marked  by hand shall be set so that:

1. Detection of 20% or more fill-in of the target area surrounded by the oval shall be considered a vote for the selection;

2. Detection of less than 10% fill-in of the target area surrounded by the oval shall not be considered a vote for that selection;

3. Detection of at least 10% but less than 20% fill-in of the target area surrounded by the oval shall flag the ballot for adjudication by a vote review panel as set forth in O.C.G.A. 21-2-483(g). In reviewing any ballot flagged for adjudication, the votes shall be counted if, in the opinion of the vote review panel, the voter has clearly and without question indicated the candidate or candidates and answers to questions for which such voter desires to vote.

Ga. Comp. R. & Regs. 183-1-15-.02(2)(k).

The State Election Board's regulation providing for the definition of a vote, states that for optical scan paper ballots, the voter must "fill in the oval" to mark their vote choice. Ga. Comp. R. & Regs. 183-1-15-.02(2)(2)(a). Where an optical scan ballot marked by hand has been rejected by the scanner/tabulator as containing an overvote in accordance with O.C.G.A. § 21-2-483(g), in reviewing such a ballot: (1), if "it appears that there is a properly cast vote and what is clearly a stray mark which has caused the ballot scanner to read the vote for such office as an overvote, the properly cast vote shall be counted and the stray mark shall be ignored;" and (2) if "a voter marks his or her ballot in a manner other than that specified by law and this rule, the votes shall be counted if, in the opinion of the vote review panel as provided in O.C.G.A. § 21-2-483(g)(2)(B), the voter has clearly and without question indicated the candidate or candidates and answers to questions for which such voter desires to vote." Ga. Comp. R. & Regs. 183-1-15-.02(2)(2)(c)&(d). Under O.C.G.A. § 21-2-483(g)(1), "[t]he central tabulator shall be programmed to reject any ballot, including absentee ballots, on which an

overvote is detected and any ballot so rejected shall be manually reviewed by [a] vote review panel . . . to determine the voter's intent as described in subsection (c) of Code Section 21-2-438."  O.C.G.A. § 21-2-438(c) in turn provides that "if the elector has marked his or her ballot in such a manner that he or she has indicated clearly and without question the candidate for whom he or she desires to cast his or her vote, his or her ballot shall be counted and such candidate shall receive his or her vote, notwithstanding the fact that the elector in indicating his or her choice may have marked his or her ballot in a manner other than as prescribed by this chapter."

Similarly, "[i]f, in reviewing an optical scan ballot marked by hand, a discrepancy is found between the voter's mark on the ballot that clearly and without question indicated the voter's intent and the result tabulated by the ballot scanner, the voter's mark shall control and be counted."  Ga. Comp. R. & Regs. 183-1-15-.02(2)(2)(e).  Finally, "[w]hen an optical scan ballot marked by hand contains stray marks or marks which prevent the ballot scanner from properly recording valid votes as determined under this rule and by law, the ballot shall be duplicated in accordance with law to correct such problems and the duplicate shall then be tabulated."  Ga. Comp. R. & Regs.  183-1-15-.02(2)(2)(f).  The regulation further provides that "[n]othing herein shall be deemed to disallow the use of ballot scanners for tabulation of ballots." Ga. Comp. R. & Regs.  183-1-15-.02(2)(2)(e).

## 5.   Plaintiffs' Proposed Remedy

Coalition Plaintiffs seek from this Court "[a]n order commanding the State Defendants to standardize required settings of Dominion precinct and central ballot scanners and related tabulation software to ensure that all perceptible votes written on mailed and hand marked paper ballots are either counted as votes or flagged for human review by a Vote Review Panel, and requiring that Dominion scanner sensitivity settings and tabulation software be uniform across all counties." (Mot., Doc. 809 at 2).  According to their motion, the full problem with the ballot scanners will not be solved by the State's new rule, but it can be solved by restraining the State from requiring scanner settings that automatically discard any degree of perceptible voter markings.  In response, the State Defendants assert that Plaintiffs do not propose any solution beyond ensuring every single stray mark on every hand-marked ballot is reviewed by a human.

For the reasons that follow, the court will not grant the requested relief for the November general election based on pragmatic timing considerations where absentee voting has already begun and alteration of the scanner settings would require changes to the election system database and would result in disruption of the ongoing administration of the election by the State and the Counties. Instead, the Court has directed the State to itself explore and determine whether a solution exists for the discounting of votes resulting from system deficiencies in the tabulator/scanning and the potential implementation of remedial measures in time for any runoffs in January 2021.

125

There is no question that the default scanner settings used in elections conducted to date on the Dominion system caused certain voter marks to register as blank and therefore prevented some valid votes on hand-marked ballots from being counted.  (*See* ballot images at Doc. 809-5.)  The testimony of the vote review panelists clearly establish the differences between the scanner's perception and human perception of voter intent.  In addition, the ballots provided in the record show that different results were reached by the scanners and the vote review panel members about whether voter markings counted.  Dr. Coomer acknowledged that the scanners will not count marks that fall below the low-end threshold setting.  It is also evident that the State's adjustment of the Dominion default settings (used to date) pursuant to the SEB's newly promulgated regulation will not cause the scanner software to capture all perceptible ballot vote markings and count them as votes in the upcoming November election. (*See* Defs.' Ex. 4 at 6, Doc. 887-4 at 7) (noting that even after the adjustment, 7 out of 100 test ballots were seen by the ICC as completely blank though voter markings could be discerned upon physical human review).

The scanners are programmed to flag overvotes[87] for review and adjudication.  They are not, however, programmed to flag undervotes (i.e., blank contests) for review.  As evidenced by the Fulton County ballots shown in Plaintiffs' Exhibit 7, the result is that some votes are not recorded by the scanners and are

---

[87] An overvote occurs when the scanner/tabulator registers more than one legible vote for a single contest.

not counted. Under the current procedures used with the Dominion system, these votes escape any review before being rejected – resulting in irreversible voter disenfranchisement.[88] It appears that prior to the use of the Dominion system and introduction of the adjudication software, no voter's ballot choices were getting kicked out based on their visible designations of candidate choices with an X or check mark, as these markings are recognized under Georgia's Election Code as clear manifestations of voter intent. These circumstances are quite troubling and present an opportunity to potentially disenfranchise older voters in particular – based on their historical experience voting under the State's prior systems – at a greater percentage than younger voters.

To decide whether Plaintiffs have established a substantial likelihood of prevailing on the merits of their claim related to the scanner settings, the Court must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment." *Anderson*, 460 U.S. at 789. The Court must then "weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden and consider the extent to which the State's concerns make the burden necessary." *Timmons*, 520 U.S. at 358.

---

[88] This is the result unless they can be discovered in a subsequent manual recount, like the one conducted by Clarke County that recovered some of these types of lost votes by allowing full examination of the ballots with "blanks" in the 5 districts where such re-counting was allowed. The panel's bipartisan members agreed on all of the vote determinations.

Here the asserted injury is that Plaintiffs and other absentee mail voters face a risk of suffering a diminished ability to participate fully in the democratic process and to elect the candidates of their choosing if the scanners do not recognize their ballot markings as valid votes. To echo the late Congressman John Lewis, "The vote is precious. It is the most powerful non-violent tool we have in a democratic society, and we must use it." As this Court has repeatedly recognized in this case, "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds*, 377 U.S. 533, 555 (1964). This right carries with it the right not only to cast a ballot but to have it counted. *United States v. Classic*, 313 U.S. 299, 315 (1941); *Democratic Exec. Comm. of Florida v. Lee*, 915 F.3d at 1315 ("of course, voting alone is not enough to keep democracy's heart beating. Legitimately cast votes must then be counted"). The loss of a vote cast is permanent.[89] The significance of the indelible nature of the injury cannot be overstated.

It is precisely because of the character and magnitude of the interest at stake that voters themselves have an independent responsibility to proceed with care

---

[89] *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018) ("The Court finds that [p]laintiffs have established irreparable injury as a violation of the right to vote cannot be undone through monetary relief and, once the election results are tallied, the rejected electors will have been disenfranchised without a future opportunity to cast their votes."); *see also League of Women Voters of N.C.*, 769 F.3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury . . . [because] once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin the law.").

and caution when exercising the franchise.  Georgia has implemented a voting system that relies on the efficiencies afforded by technology.  The State Election Board has adopted a regulation for processing and tabulating hand marked ballots using optical scanners that requires the voter to "fill in the oval" to mark their vote choice. Ga. Comp. R. & Regs. 183-1-15-.02(2)(a).  Under the regulation, markings that trigger "detection of 20% or more fill-in of the target area surrounded by the oval shall be considered a vote for the selection," while markings that trigger "detection of less than 10% fill-in of the target area surrounded by the oval shall not be considered a vote for that selection."  Ga. Comp. R. & Regs.  183-1-15-.02(2)(k). The burden on voters to read and follow the instructions for marking their absentee, provisional, or emergency ballots is minimal.[90]  The burden to do so in a manner consistent with the regulation's adopted scanner settings to ensure their vote is automatically accepted by the scanner software is a different matter. Certain well-informed voters may be aware of this new regulation adopted just weeks ago.  Other voters may have read recent news articles documenting the problems with Georgia's scanners in failing to recognize certain types of voter markings during the June primary elections.  The average voter, however, is likely unaware that their failure to adequately darken the oval to a certain percentage may cause their vote to be rejected by the scanner and in turn, not counted

---

[90] Although the burden is minimal, the evidence indicates the instructions are not effective or are ignored by a number of voters.

altogether. The Court therefore finds this burden to be more than minimal but less than severe and will apply an intermediate level of scrutiny.

The Court must weigh the burden on the right to vote against "'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration the 'extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789); *see also People First of Alabama v. Sec'y of State for Alabama*, 2020 WL 3478093, at *6 (11th Cir. June 25, 2020) (Rosenbaum, J. & Pryor, J., concurring) ("But whatever the burden, no matter how slight, 'it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.'") (internal citations omitted).

State Defendants assert that any burden on the right to vote created by the 10% threshold for discarding voter marks is justified by the regulatory interests of the State as outlined by the Secretary of State's Director of Elections, Chris Harvey. Mr. Harvey attested that "[r]equiring a manual review of every stray mark that happens to be in a target area would require significant time by county officials and would result in delays of finalizing results, certifying results, and conducting audits." (Decl. of Chris Harvey, Doc. 834-3 ¶ 9.) According to Harvey, "[u]sing a 10% threshold for scanners minimizes the burden on election officials while still ensuring that ambiguous marks are properly evaluated." (*Id.* ¶ 10.)

The Court understands that the State does not want to make the standard so low that it sweeps in thousands of ballots with actual blank contests and some truly

errant marks for adjudication panel review because it might lead to an unreasonably inefficient process and become potentially unmanageable in the timeframe permitted under Georgia law for finalizing the results of the election. However, there is no evidence in the record of any burden on the Counties were the Court to grant some form of relief to address the ballot scanner settings. No evidence has been presented from any county election official to support Mr. Harvey's supposition that changes to the scanner, tabulation, and adjudication software to ensure that all perceptible votes written on mailed and hand marked paper ballots are either counted as votes or flagged for human review by a Vote Review Panel would create an undue administrative burden on county officials and would "result in delays of finalizing results, certifying results, and conducting audits." And notably, Fulton County's response to Plaintiffs' motion is silent on the issue of the ballot scanner settings.

Each county election superintendent must certify the county's consolidated election results not later than 5:00 P.M. on the second Friday following the date of the election (i.e., Friday, November 13, 2020) and immediately transmit the certified returns to the Secretary of State, "provided, however, that such certification date may be extended by the Secretary of State in his or her discretion if necessary to complete a precertification audit." O.C.G.A. § 21-2-493(k). The Secretary of State must certify the election results not later than 5:00 P.M. on the seventeenth day following the date of the election, in this year that date falls on Thursday, November 20, 2020. O.C.G.A. § 21-2-499(b). Prior to final certification,

Georgia's election code requires the Secretary of State "[u]pon receiving the certified returns of any election from the various superintendents . . . shall immediately proceed to tabulate, compute, and canvass the votes cast," prior to certifying the returns. *Id.* § 21-2-499(a). "In the event an error is found in the certified returns presented to the Secretary of State or in the tabulation, computation, or canvassing of votes . . . the Secretary of State shall notify the county submitting the incorrect returns and direct the county to correct and recertify such returns. Upon receipt by the Secretary of State of the corrected certified returns of the county, the Secretary of State shall issue a new certification of the results." *Id.*

Under these provisions, the counties have ten days to tabulate and certify their results to the Secretary of State,[91] who in turn has an additional seven days to certify the election after a thorough review of the returns. The State Defendants' fear of an unsupported and unquantified "delay" in certification caused by review of additional ballots by a Vote Review Panel is outweighed by the burden on voters. *See Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270 (N.D. Ga. 2018) (rejecting the State's argument that remedy requiring measures to ensure proper counting of provisional ballots would delay certification of election under statutory timeline for certification); *Doe v. Walker*, 746 F. Supp. 2d 667, 678–80 (D.Md. 2010) (finding that Maryland's statutory deadline for the receipt of absentee

---

[91] This deadline can be extended by the Secretary of State, if necessary, in order to perform an audit.

132

ballots imposed a severe burden on the absent uniformed services and overseas voters that was not justified by the state's interest in certifying election results).

The Court finds that Plaintiffs have satisfied the first two prerequisites for preliminary injunctive relief. Plaintiffs have presented enough evidence to establish a substantial likelihood of success on the merits of their claim that the State Defendants' use of an arbitrary threshold on its ballot scanners to discard voter ballot markings for specific candidates or initiatives that are obvious to the human eye results in a violation of the fundamental right of each voter to have his or her vote accurately recorded and counted. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008) (holding that state and local laws that unconstitutionally burden the right to vote are impermissible); *Democratic Exec. Comm. of Florida v. Lee*, 915 F.3d at 1321 (characterizing disenfranchisement by signature mismatch rules as imposing a serious burden on the right to vote); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) ("[E]ven one disenfranchised voter—let alone several thousand—is too many.") The threat of this injury is substantial and irreparable if relief is not granted before the election. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion) (The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018) ("The Court finds that [p]laintiffs have established irreparable injury as a violation of the right to vote cannot be undone through monetary relief and, once the election results are tallied,

That said, the evidence supports a finding that the modified scanner settings may well still result in the rejection of valid votes and ballots falling through the identified crack in the system by failing to flag visibly clear voter marks for adjudication by a review panel. Although the Court will not require further changes to the scanner settings prior to the November election, another potential measure may allow for an expanded review of optical scan hand-marked ballots in connection with the adjudication software. Ballot contests flagged for human review by the adjudication software appear on the review screen with a red box outline around the contest. The adjudication software assigns green highlighting to voter marks that meet the high-end threshold setting to count as a vote and assigns yellow highlighting to voter marks that fall between the high and low-end threshold settings and deemed by the scanner as ambiguous. Currently, the adjudication software does not assign any highlighting to voter marks that are deemed blank because they fall under the low-end threshold setting.[94] Because the adjudication software is capable of isolating ballot marks flagged as ambiguous, it would make sense that the software could similarly be configured to isolate ballot marks interpreted as "blank." It therefore appears likely that the adjudication software can be used to review ballot images flagged with blank contests to verify that no clearly discernable ballot marks are present on the ballot

---

scanned hand marked ballots along with the original ballots, consistent with the penultimate "voter intent" standard established under Georgia law.

[94] Dr. Coomer, however, testified that the scanner software (not the adjudication software) is programmed to provide an alert where a ballot is scanned that registers as completely blank.

images that have not been recognized by the scanner software as falling within the designated threshold to constitute a vote.[95]  As the vote review panel testimony indicates, the adjudication software allows the reviewer to quickly scan and move through the flagged ballot images on the review screen.[96]  The Court recognizes the potential for a large number of ballots with truly blank contests (those where a voter intentionally chose not to mark a vote for a particular candidate or ballot question) are swept in for review.  For this reason, a thorough examination of the feasibility of using the adjudication software for this purpose may reveal that any material increase in burden on election officials to perform this additional review measure weighs against its consideration as a potential method of relief in future elections after November.

Accordingly, the Court **GRANTS** relief that is narrowly tailored to address the specific voter disenfranchisement by operation of the optical scanners/tabulators in tandem with the BMD adjudication software raised in

---

[95] Every hand-marked paper ballot has a unique corresponding ballot ID number printed at the bottom that is recorded by the scanner/tabulator and reflected on the AuditMark associated with the ballot image.  The AuditMark that indicates the disposition of the candidate choices on each scanned ballot contains a record of the ballot ID from the paper ballot. The AuditMark on the scanned ballot image is therefore traceable to the original paper ballot.  As a result, the original paper ballots can be compared, as needed under the circumstances, to the AuditMark to confirm that voter intent has been accurately recorded by the scanners.

[96] To the extent questions arise whether voter marks are clearly discernible on the scanned image, the Vote Review Panels can review the original paper ballots if necessary. Every hand-marked paper ballot has a unique corresponding ballot ID number printed at the bottom that is recorded by the scanner/tabulator and reflected on the AuditMark associated with the ballot image.  The AuditMark that indicates the disposition of the candidate choices on each scanned ballot contains a record of the ballot ID from the paper ballot. The AuditMark on the scanned ballot image is therefore traceable to the original paper ballot.  As a result, the original paper ballots can be compared, as needed under the circumstances, to the AuditMark to confirm that voter intent has been accurately recorded by the scanners.

Plaintiffs' motion. The Court finds that injunctive relief is warranted but based on the testimony and evidence in the record, recognizes that there will not be an "instant fix" of this issue, though in any event, remedial measures should be in place by the next election cycle following the January 2021 election cycle, or if feasible, by the January 2021 runoff elections.

The Court has reviewed the Coalition Plaintiffs' requested relief (Docs. 809, 817) and finds that the relief identified is at once broader than what is called for to address the specific injury identified[97] and on the other hand, insufficiently precise. Accordingly, the Court **DIRECTS** Plaintiffs to submit a proposed injunctive relief order that delineates the specific measures or course of action they are seeking that the Court adopt to address this vote counting issue **by October 26, 2020**. In that connection the Court recognizes the State Election Board and Secretary's staff and/or Plaintiffs may likely need to conduct a further review with Dominion and other potential experts of some additional suitable options to address the issues raised here and to run sample tests to further assess such options; to consider the remedy of red outlined vote target ovals on hand marked ballots as used in other jurisdictions contracting with Dominion that facilitate the reading of a fuller range of voter markings; and the schedule for proceeding if programming changes must be made to implement the chosen option(s) in conjunction with the build of the ballot database for the election in question, as Dr. Coomer indicated would be necessary for some changes. This is how Dominion

---

[97] *See, e.g.,* Paragraph (a) of proposed Order at Doc. 809-17.

proceeded with the build of the database for the current election while a proposed regulation for modified threshold percentages was pending before the State Election Board.

In a rational world, the parties' representatives would sit down and discuss these matters together to discuss alternative remedial courses of action and further review. The Court would be more than willing to facilitate this by modifying timelines. In any event, the expanded method(s) to address the scanner/tabulator and adjudication software's per se "blank" exclusion of marks that may reasonably be considered by an adjudication panel as indicating voter intent must be in place no later than the next election cycle following the conclusion of the January 2021 runoffs.  The Court will enter a further relief order upon receipt of Plaintiffs' proposed remedy by October 26, 2020 and Defendants' response within 14 days of receipt of the Plaintiffs' proposal.

## IV.  Conclusion

The Constitution's preamble speaks first of "We, the People," and then of their elected representatives. The judiciary is third in line and it is placed apart from the political fray so that its members can judge fairly, impartially, in accordance with the law, and without fear about the animosity of any pressure group.

In Alexander Hamilton's words, the mission of judges is "to secure a steady, upright, and impartial administration of the laws." I would add that the judge should carry out that function without fanfare, but with due care. She should decide the case before her without reaching out to cover cases not yet seen. She should be ever mindful, as Judge and then Justice Benjamin Nathan Cardozo said, "Justice is not to be taken by storm. She is to be wooed by slow advances."[98]

---

[98] Justice Ruth Bader Ginsburg – Opening Remarks to Senate Judiciary Committee in her 1993 Senate Confirmation Hearing.

Plaintiffs' challenge to the State of Georgia's new ballot marking device QR barcode-based computer voting system and its scanner and associated software presents serious system security vulnerability and operational issues that may place Plaintiffs and other voters at risk of deprivation of their fundamental right to cast an effective vote that is accurately counted. While these risks might appear theoretical to some, Plaintiffs have shown how voting equipment and voter registration database problems during the 2019 pilot elections and again in the June and August 2020 primary elections caused severe breakdowns at the polls, severely burdening voters' exercise of the franchise. (*See* September 28, 2020 Order, Doc. 918.)

Established Supreme Court authority recognizes that States retain the authority and power to regulate their elections and the voting process itself, subject to the preservation of citizens' fundamental First and Fourteenth Amendment rights. And the Supreme Court has repeatedly emphasized in the last months the principle that district courts must exercise great restraint in considering the grant of injunctive relief that requires major new electoral rules on the cusp of an election where a court's order could cause electoral disruption and potential voter confusion. The posture of this case collides with this latter principle. The sweeping injunctive relief that Plaintiffs seek would require immediate abandonment of the ballot marking device voting system enacted by the Georgia Legislature in 2019 that is in its first year of implementation by the Secretary of State pursuant to his

authority under Georgia law.  Though major difficulties have arisen during the course of this new system's rocky first year, the Court recognizes that the staff of the Secretary of State's Office and county election offices have worked hard to roll out the system in short order during a Covid-19 pandemic era that presents unique hurdles.  That hard work though does not answer the fundamental deficits and exposure in the system challenged by Plaintiffs.

Thus, although Plaintiffs have put on a strong case indicating they may prevail on the merits at some future juncture, the Court must exercise real caution in considering the grant of their request for extraordinary injunctive relief, given its obligation to follow governing Supreme Court and Eleventh Circuit authority. Despite the profound issues raised by the Plaintiffs, the Court cannot jump off the legal edge and potentially trigger major disruption in the legally established state primary process governing the conduct of elections based on a preliminary evidentiary record. The capacity of county election systems and poll workers, much less the Secretary of State's Office, to turn on a dime and switch to a full-scale hand-marked paper ballot system is contradicted by the entire messy electoral record of the past years.  Implementation of such a sudden systemic change under these circumstances cannot but cause voter confusion and some real measure of electoral disruption. As with any systemic change, implementation of a statewide hand-marked paper ballot system as the State's primary electoral system would require long term planning and advanced poll worker training.  Accordingly, based on the binding appellate legal authority, the State's strong legal interest in ensuring an

orderly and manageable administration of the current election, and the Court's assessment of the operational realities before it, the Court must deny the Plaintiffs' Motions for Preliminary Injunctive Relief in so far as they request immediate replacement of the current BMD system with a statewide hand-marked paper ballot system. [99]

But the Court cannot part with that message alone. The Court's Order has delved deep into the true risks posed by the new BMD voting system as well as its manner of implementation. These risks are neither hypothetical nor remote under the current circumstances. The insularity of the Defendants' and Dominion's stance here in evaluation and management of the security and vulnerability of the BMD system does not benefit the public or citizens' confident exercise of the franchise. The stealth vote alteration or operational interference risks posed by malware that can be effectively invisible to detection, whether intentionally seeded or not, are high once implanted, if equipment and software systems are not properly protected, implemented, and audited. The modality of the BMD systems' capacity to deprive voters of their cast votes without burden, long wait times, and insecurity regarding how their votes are actually cast and recorded in the unverified QR code makes the potential constitutional deprivation less transparently visible as well, at least until any portions of the system implode

---

[99] For the reasons discussed in Section III D, the Coalition Plaintiffs' Motion is **GRANTED IN PART** in connection with the scanner/tabulator settings in tandem with Dominion's adjudication software that as currently configured allow certain voter marks on hand-marked absentee and provisional ballots to disregarded and not be counted.

because of system breach, breakdown, or crashes. Any operational shortcuts now in setting up or running election equipment or software creates other risks that can adversely impact the voting process.

The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of "might this actually ever happen?" – but "when it will happen," especially if further protective measures are not taken. Given the masking nature of malware and the current systems described here, if the State and Dominion simply stand by and say, "we have never seen it," the future does not bode well.

Still, this is year one for Georgia in implementation of this new BMD system as the first state in the nation to embrace statewide implementation of this QR barcode-based BMD system for its entire population. Electoral dysfunction – cyber or otherwise – should not be desired as a mode of proof. It may well land unfortunately on the State's doorstep. The Court certainly hopes not.

The Court recognizes the major challenges facing the Secretary of State's Office in rapidly implementing a new statewide voting system. Yet the vital issues identified in this case will not disappear or be appropriately addressed without focused State attention, resources, ongoing serious evaluation by independent cybersecurity experts, and open-mindedness. The Secretary of State and Dominion are obviously not without resources to tackle these issues. And at very least, the Court cannot fathom why, post-election, the State and Dominion would not at least be moving toward consideration of the software upgrade option Dominion

# EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,                         :
                                                 :
      Plaintiffs,                          :
                                                 :
v.                                               :          CIVIL ACTION NO.
                                                 :          1:17-cv-2989-AT
BRAD RAFFENSPERGER, *et al.*,                     :
                                                 :
      Defendants.                          :

## ORDER

On September 28, 2020, this Court entered an Order granting the Coalition Plaintiffs' motion for a preliminary injunction regarding paper pollbook backups. (Order, Doc. 918.)  Four days later, the State Defendants filed a Notice of Appeal to the Eleventh Circuit Court of Appeals, and on October 6, 2020 they filed a Motion to Stay the Court's Order pending the appeal (Doc. 951).

The Coalition Plaintiffs have moved under Rule 59(e) of the Federal Rules of Civil Procedure to alter or amend this Court's Opinion and Order of September 28, 2020 which granted their motion for a preliminary injunction regarding paper pollbook backups [Doc. 958][1].  For the following reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the motion.

---

[1] Plaintiffs filed their original motion on October 8, 2020 at Doc. 956.  The next day, Plaintiffs filed a Corrected Motion at Doc. 958.  As the Corrected Motion (Doc. 958) is the operative motion, the Clerk is **DIRECTED** to terminate the original motion at Doc. 956.

## I.     DISCUSSION

In light of arguments made by State Defendants in connection with their Motion to Stay the Order pending appeal, Coalition Plaintiffs assert that "certain aspects of the Court's Opinion and Order require minor clarifications in the form of relatively straightforward but important amendments to the Court's Order." Specifically, they seek modification of the Order to (1) ensure that the Order is narrowly tailored to effectuate the intended relief; (2) clarify that the Order does not enjoin operation of O.C.G.A. § 21–2–388(2); and (3) clarify that both the Court's findings of imminent harm to voters and the injunctive relief granted apply not just to the November 2020 general election, but also to elections in December 2020, January 2021, and thereafter.  In addition, Plaintiffs seek to modify the Order to (1) require the Secretary of State to be responsible for the cost of printing and delivery of the paper pollbook backup; and (2) specify that the Secretary should require county superintendents to have enough emergency paper ballots on hand for at least 40% of the number of registered voters at each polling place as the minimum number of emergency paper ballots for election day.

According to Plaintiffs, the Motion seeks only to make the relief granted by the Order itself more likely to be effective in view of the State Defendants' "evident determination to misconstrue potential ambiguities in the Order" and the proposed amendments will "make the injunctive relief granted more explicit . . . and less susceptible to misinterpretation."

## A. The Information Required To Be Included In The Updated Electors List For Printing

In their opposition to Plaintiffs' request for paper pollbook backups, the State Defendants asserted the relief was unnecessary because Georgia law already requires the provision of a paper copy of the supplemental voter lists. However, as Plaintiffs presented in their motion, the supplemental lists currently provided in paper do not show voting status (as should be reflected in the updated information in the electronic pollbooks) and so they cannot be used in the same way for check-in and issuance of access cards to the voting machines when the electronic pollbooks experience outages or malfunctions. In fashioning relief, the Court endeavored to make clear that the paper pollbook backup must be updated at the conclusion of absentee and in-person early voting to include all information necessary to determine a voter's eligibility on election day, which would necessarily include the same information provided by the electronic pollbooks. Therefore, the Court ordered that "the Secretary of State shall generate and transmit to each county election superintendent at the close of absentee in-person early voting an updated electors list in a format capable of printing by the election superintendent that includes all of the information located in the electronic pollbook" and "direct every county election superintendent (1) to print and provide at each polling place at least one paper back-up of the pollbook for use on Election Day, which paper back-up shall be updated after the close of absentee in-person voting (early voting) [and] (2) to use the paper back-up of the pollbook in the polling place to attempt

3

to adjudicate voter eligibility and precinct assignment in the event of equipment malfunction or an emergency as defined by Ga. R. & R. 183-1-12.11(2)(d)." (Order, Doc. 918 at 64-65.) The Court noted that, like the information in the electronic pollbooks, the list must include *accurate* information regarding all persons who have been issued or cast absentee ballots during the advanced/early voting period prior to election day. (Order at 64, *id.* at 64 n. 26) (quoting O.C.G.A. § 21-2-224(b) ("The registrars shall, prior to the hour appointed for opening the polls, place in the possession of the managers in each precinct one copy of the certified electors list for such precinct, such list to contain all the information required by law. The list shall indicate the name of any elector who has been mailed or delivered an absentee ballot.").)

Plaintiffs now assert, that by requiring an updated paper list that "includes all the information located in the electronic pollbooks," the Court's Order, though "not unduly burdensome [] may require more printing than is actually necessary" because the new electronic pollbooks that are delivered to each precinct now include information on all 7 million registered voters in Georgia. However, because poll "workers at any given polling place only need a small subset of this information to check in the voters assigned to their polling place," Plaintiffs assert that the Court should clarify that the Secretary is ordered to provide "an updated electors list in a format capable of printing by the election superintendent that includes all of the information located in the electronic pollbook *necessary for printing precinct-level information required in each polling place* to check in

voters and issue ballots to eligible voters." (Pls.' Mot., Doc. 958-1 at 3-5) (emphasis added).

This is precisely what the Court intended by its reference to O.C.G.A. § 21-2-224(b). *See* O.C.G.A. § 21-2-224(b) ("The registrars shall, prior to the hour appointed for opening the polls, place in the possession of the managers in each precinct *one copy of the certified electors list for such precinct*, *such list to contain all the information required by law*. The list shall indicate the name of any elector who has been mailed or delivered an absentee ballot.") (emphasis added). Accordingly, to the extent modification of the Order is needed to clarify that the paper pollbook to be used as an emergency backup contains updated precinct-level information required in each polling place, the Plaintiffs' Motion is **GRANTED**.

Plaintiffs also seek modification of the Order to indicate that "the Secretary may assume responsibility for the printing and delivery of these lists for each polling place" and to require that the Secretary is "responsible for the cost of printing and delivery of lists to polling places." Of course, the Secretary of State may opt to provide printed lists at its own cost. The Court will not, however, modify the terms of the Order to require the Secretary to absorb the cost for providing paper pollbook backups for each polling location in all of Georgia's 159 counties absent evidence from Plaintiffs regarding such costs in the context of a permanent injunction. Accordingly, the Court **DENIES** Plaintiffs' request for modification of the preliminary injunction on these grounds at this time.

5

**B.** **Amendment of the Order to Clarify the Procedure In O.C.G.A. § 21−2−388(2) is Not Enjoined**

In their opposition to Plaintiffs' request for updated paper pollbook backups for use in the event of problems with the electronic pollbooks on election day, the State Defendants asserted that "[e]ven if an updated electors list could be printed by precinct and delivered to the counties in three days between the end of early voting and election day, a paper printout of the updated electors list would not account for every voter's status, as absentee ballots are continuously being returned" therefore "an updated electors list could not adjudicate voter eligibility in all situations." (Resp. at 24.) State Defendants further argued that use of a paper pollbook to determine voter eligibility would insert an entirely new protocol just weeks prior to the election.

But as the Court explained in its September 28th Opinion and Order, the paper pollbook backup ordered by the Court would provide the same information contained in the electronic pollbook as required by state law and therefore could be used in the same manner as the electronic pollbook to determine voter eligibility (as necessary in the event of emergencies, electronic outages, or disruptions). (*See* Order at 12-13) (quoting O.C.G.A. § 21-2-401(b) requiring that "[t]he registrars shall, prior to the hour appointed for opening the polls, place in the possession of the managers in each precinct one copy of the certified electors list for such precinct, such list to contain all the information required by law. *The list shall indicate the name of any elector who has been mailed or delivered an absentee*

6

*ballot*") (emphasis added); (*see also* Order at 17-19) (summarizing testimony of Elections Director, Chris Harvey, that, "[w]hen a voter requests an absentee ballot but then appears at the polls on Election Day without their ballot in hand, the poll official should check with the registrar to ensure that no absentee ballot has been accepted for that voter prior to having the voter execute a cancellation affidavit and then vote using the BMD" and "[t]hat process applies whether the voter is checked in using the PollPad or a paper list"); (*see also* Order at 56-57) (explaining that under the Secretary of State's own training manual, poll workers are currently trained to use a paper list of electors in the precinct and are directed to refer to the paper list to keep processing voters if the polling place loses power or the PollPads stop working and that the only change would be that the paper backup copy Plaintiffs request would be more complete and accurate than the current paper lists and would mirror the information in the e-pollbook).)

The Court recognized Defendants' concern that "a paper printout of the updated electors list would not account for every voter's status, as absentee ballots are continuously being returned" and therefore "an updated electors list could not adjudicate voter eligibility in all situations." But the Court found that this concern did not justify denying relief where an updated list can be used to properly adjudicate voter eligibility for some voters and for others would require the poll workers to follow their existing protocol of contacting the county elections offices to confirm voter eligibility. (*See* Order at 57) ("A poll manager, consistent with

current practice, would simply then call the County Elections Office to confirm the voting status for a much smaller, select number of voters.").

Plaintiffs' proposed order, however, did not expressly account for the situation described by Defendants, and instead asked the Court to require county election superintendents to "to use the paper back-up of the pollbook in the polling place to attempt to adjudicate voter eligibility and precinct assignment" and "to allow voters who are shown to be eligible electors on the paper pollbook backups to cast an emergency ballot that is not to be treated as a provisional ballot." Therefore, the Court included provisions in its relief intended to address this gap and to indicate that the State's existing procedures for handling such voter eligibility issues would still apply. Specifically, the Court ordered the Secretary of State to direct every county election superintendent to "allow voters who are shown to be eligible electors on the paper pollbook backups who are not shown on the updated list as having requested an absentee mail-in ballot to cast a regular [or] emergency ballot that is not to be treated as a provisional ballot" and "allow voters who are shown to be eligible electors on the paper pollbook backups but who are shown on the updated list as having requested an absentee mail-in ballot to have their absentee ballot canceled[2] and to cast a regular or emergency ballot that is not to be treated as a provisional ballot, provided that such voter either surrenders the absentee ballot to the poll manager of the precinct or in the case of a voter who has

---

[2] *See* O.C.G.A. § 21-2-388 (providing for cancellation of absentee ballots and permitting voters to cast votes in person upon cancellation); *see also* Ga. Comp. R. & Regs. 183-1-14-.06 (regarding procedures for spoiled absentee ballots).

requested but not yet received their absentee ballot completes an elector's oath[3] affirming the voter has not marked or mailed an absentee ballot for voting in such primary or election." (Order at 65.)  The Court expressly referred to the procedures outlined in O.C.G.A. § 21-2-388, providing for cancellation of absentee ballots and permitting voters to cast votes in person upon cancellation.  (*See id.* at 65, n. 28.)

State Defendants argue in their Motion to Stay the Order pending their appeal that the Order alters the State's procedure and effectively excises the requirement in O.C.G.A. § 21-2-388(2) that registrars "confirm[] that the elector's absentee ballot has not yet been received by the board of registrars" prior to allowing a voter to vote in the precinct on Election Day "because the Court orders the Secretary to direct every superintendent that no such additional check is required before voters who are shown as 'having requested an absentee mail-in ballot' are allowed to vote on the BMDs." (Mot. at 14.)  This is a glaring mischaracterization and an entirely inaccurate interpretation of the Court's ordered relief.

As the Court indicated repeatedly in its Order, the relief is narrowly tailored and manageable within the framework of the current statutory and regulator system without any major changes required of the Secretary of State or local election superintendents.  The remedy's conformity with the overall regulatory scheme imposed no changes to Georgia's statutory procedures relating to voters who requested absentee ballots, but who instead decide to vote in-person.

---

[3] *See* O.C.G.A. § 21-2-384.

Nonetheless, because the State Defendants are laboring under a flawed misinterpretation, the Court **GRANTS** Plaintiffs' Motion as necessary to clarify that voter eligibility shall be determined in accordance with O.C.G.A. § 21-2-388 and the existing practices as described by Mr. Harvey.

### C.   The Court's Findings and Relief Apply to Elections After November 2020

According to Plaintiffs' motion, "it is apparent that the Defendants have misapprehended the Court's injunction as applying only to the upcoming November 2020 election, not to any other elections." Although Plaintiffs believe it is already clear from the terms of the Order which expressly apply "UNTIL FURTHER ORDER OF THIS COURT," Plaintiffs request that the Court amend the Order to expressly state that "its findings of imminent harm apply with respect to all upcoming elections, not just the November 2020 election, and to explicitly award relief not just for the November 2020 election, but also for the elections following after November."

Accordingly, to the extent it is necessary to expressly clarify that its findings apply to all elections until further order of this Court, Plaintiffs' Motion is **GRANTED**.

### D.   Request for Modification of Order to Specify the Minimum Number of Emergency Paper Ballots Per Precinct Polling Place

At the conclusion of the injunction hearing on September 13, 2020, and again in a subsequent order entered on September 15, 2020, the Court asked the

parties to address whether and why relief tailored to facilitating the uniform implementation of the State's established emergency ballot process would be a feasible alternative to Plaintiffs' request for a wholesale switch to hand-marked paper ballots. Thereafter, on September 28, 2020, the Court entered an Order requiring the Secretary of State to (1) take every reasonable measure to ensure that county election officials and poll workers are trained as to how to generate and use paper pollbook backups and emergency ballots and handle the casting and counting of emergency votes in conformity with this Order directly as emergency ballots, if necessary; and (2) maintain a sufficient stock of emergency paper ballots. The Court noted this relief is consistent with State Election Board Rule 183-1-12-.11(2)(c) that requires that election superintendents "shall cause each polling place to have a sufficient amount of emergency paper ballots so that voting may continue uninterrupted if emergency circumstances render the electronic ballot markers or printers unusable. For any primary or general election for which a state or federal candidate is on the ballot, a sufficient amount of emergency paper ballots shall be *at least* 10% of the number of registered voters to a polling place." (emphasis added).

At no time prior to the entry of the Order did either group of Plaintiffs offer any evidence or make any specific request regarding what would be a sufficient amount of emergency paper ballots for use in the November 3, 2020 election, despite presenting evidence of the scope of the malfunctions of the BMD voting system equipment in the pilot and primary elections. Days after the entry of the

11

Court's Order, non-party Common Cause Georgia filed an amicus brief asserting that according to its research, the minimum threshold provided in Georgia's regulations – an amount equivalent to at least 10% of registered voters in a polling place – is "nowhere near 'sufficient' to meet the demands that Georgia polling places are projected to see on Election Day." (Doc. 931 at 1-2.) Rather, according to its "data-based analysis," the appropriate number of emergency and provisional ballots would be equal to 40% of registered voters assigned to a polling place.

Based on this information, which was not timely provided to the Court in connection with the preliminary injunction motions, Plaintiffs now seek a modification of the September 28, 2020 Order to require that each polling place open with an initial stock of emergency paper ballots totaling at least 40% of the number of registered voters to a polling place and that the cost of obtaining this initial stock be borne by the Secretary of State's Office.

The Court **DENIES** this request as it invites the Court to plunge into the task of advising election officials on precise details of election administration, a function that is vested in the State Defendants' and local election superintendents' discretion. Contrary to Plaintiffs' contention, SEB Rule 183-1-12-.11(2)(c) does not pre-determine that a sufficient amount of emergency ballots is equal to only 10% of the number of registered voters in a polling place. Instead, the Rule provides that election superintendents shall determine what is a sufficient amount of emergency paper ballots "so that voting may continue uninterrupted if emergency circumstances render the electronic ballot markers or printers unusable" and

provides that for "any primary or general election for which a state or federal candidate is on the ballot, a sufficient amount of emergency paper ballots shall be *at least* 10% of the number of registered voters to a polling place." *Id.* (emphasis added). As the evidence and reports of the voting conditions during the primary reflected, some polling places experienced significant disruption and long lines, while others were not impacted or backed up at all. Thus, it is likely that the number of emergency paper ballots necessary to facilitate voting – in the event such measures are necessary – may vary wildly from polling place to polling place.

## II. CONCLUSION

Accordingly, the Court **GRANTS IN PART** the Coalition Plaintiffs' Motion [Doc. 958] and will enter a separate Amended Order as follows:

UNTIL FURTHER ORDER OF THIS COURT:

Effective immediately for each scheduled primary, general, and runoff election, the Secretary of State **IS ORDERED** generate and transmit to each county election superintendent at the close of absentee in-person early voting an updated electors list in a format capable of printing by the election superintendent that includes all of the information located in the electronic pollbook necessary for printing precinct-level information required in each polling place to check in voters and issue ballots to eligible voters (referred to as the "updated paper pollbook backup").[4] The Secretary of State shall further direct every county election

---

[4] Consistent with O.C.G.A. § 21-2-224(b) and State Election Board Rule 183-1-12-.19(8), this list must include *accurate* information regarding all persons who have been issued or cast absentee ballots during the advanced/early voting period prior to election day. *See* O.C.G.A. § 21-2-224(b)

superintendent (1) to print and provide at each polling place at least one paper backup of the pollbook for use on Election Day, which paper backup shall be updated after the close of absentee in-person voting (early voting); (2) to use the updated paper pollbook backup in the polling place to attempt to adjudicate voter eligibility and precinct assignment in the event of equipment malfunction or an emergency as defined by Ga. R. & R. 183-1-12.11(2)(d);[5] (3) to allow voters who are shown to be eligible electors on the paper pollbook backup who are not shown as having requested an absentee mail-in ballot to cast a regular or emergency ballot that is not to be treated as a provisional ballot; (4) to allow voters who are shown to be eligible electors on the paper pollbook backup but who are shown as having requested an absentee mail-in ballot to have their absentee ballot canceled and to cast a regular or emergency ballot that is not to be treated as a provisional ballot, provided that such voter's eligibility is confirmed by the county registrar's office and the voter's absentee ballot is canceled in accordance with the provisions of

---

("The registrars shall, prior to the hour appointed for opening the polls, place in the possession of the managers in each precinct one copy of the certified electors list for such precinct, such list to contain all the information required by law. The list shall indicate the name of any elector who has been mailed or delivered an absentee ballot."); Ga. Comp. R. & Regs. 183-1-12-.19(8) ("Prior to delivery to a polling place, the election superintendent or registrars shall cause the electronic poll books to accurately mark all persons who have been issued or cast absentee ballots in the election."). The Secretary may generate this information directly from the PollPads or from ENET and the Absentee Voter Report referenced in their filing at Doc. 895. Alternatively, the Secretary may assume responsibility at its discretion for the printing and delivery of the updated paper pollbook to county election superintendents.

[5] The State Election Board's Emergency Rule, Ga. R. & R. 183-1-12.11(2)(d), defines the types of events that may be considered emergencies as "power outages, malfunctions causing a sufficient number of electronic ballot markers to be unavailable for use, or waiting times longer than 30 minutes."

O.C.G.A. § 21-2-388;[6] (5) to take every reasonable measure to ensure that county election officials and poll workers are trained as to how to generate and use paper pollbook backups and emergency ballots and handle the casting and counting of emergency votes in conformity with this Order directly as emergency ballots, if necessary; and (6) maintain a sufficient stock of emergency paper ballots in compliance with Ga. Comp. R. & Regs. 183-1-12-.11(2)(c) and 183-1-12-.01.[7]

While the Court has ordered that a minimum of one paper pollbook backup should be made available for each polling place, it is likely that more than one copy would be needed in large precincts per the testimony of Fulton County's Director of County Registration and Elections. As precincts vary in size enormously across the counties and the State, the Court **FURTHER ORDERS** that the Secretary of State direct all local election superintendents to evaluate the need for issuance of additional copies of the pollbook backup printouts as back-up tools for precincts

---

[6] *See* O.C.G.A. § 21-2-388 (providing for cancellation of absentee ballots and permitting voters to cast votes in person upon cancellation by either surrendering their absentee ballot to the poll manager of the precinct or in the case of a voter who has requested but not yet received their absentee ballot by completing an elector's oath affirming the voter has not marked or mailed an absentee ballot for voting in such primary or election); *See* O.C.G.A. § 21-2-384 (regarding elector's oath); *see also* Ga. Comp. R. & Regs. 183-1-14-.06 (regarding procedures for spoiled absentee ballots).

[7] This relief is consistent with State Election Board Rule 183-1-12-.19(1) that requires that election superintendents equip each polling place with the electronic pollbooks, a paper backup list, and ensure that "poll workers [] be adequately trained in checking in voters on both electronic poll books and paper backup list." Ga. Comp. R. & Regs. 183-1-12-.19(1); *see also* Ga. Comp. R. & Regs. 183-1-12-.11(2)(c) (providing that the "election superintendent shall cause each polling place to have a sufficient amount of emergency paper ballots so that voting may continue uninterrupted if emergency circumstances render the electronic ballot markers or printers unusable. For any primary or general election for which a state or federal candidate is on the ballot, a sufficient amount of emergency paper ballots shall be at least 10% of the number of registered voters to a polling place"). County election superintendents shall determine what is a "sufficient number" of emergency paper ballots necessary at individual polling locations, which number may exceed 10% of the number of registered voters at the polling place as needed.

based on the number of registered voters in each county precinct or polling location and to promptly advise the County Registrar's Office of the number of such additional copies needed.

　　**IT IS SO ORDERED** this 12th day of October, 2020.

　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　**Amy Totenberg**
　　　　　　　　　　　　　　　　**United States District Judge**

# EXHIBIT 11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,      :
                             :
      Plaintiffs,         :
                             :
v.                           :      CIVIL ACTION NO.
                             :      1:17-cv-2989-AT
BRAD RAFFENSPERGER, *et al.*, :
                             :
      Defendants.         :

## **AMENDED ORDER**

The Court's Opinion and Order of September 28, 2020 granting the Coalition Plaintiffs' motion for a preliminary injunction regarding paper pollbook backups, (Order, Doc. 918), is hereby **AMENDED** as follows.

UNTIL FURTHER ORDER OF THIS COURT:

Effective immediately for each scheduled primary, general, and runoff election, the Secretary of State **IS ORDERED** generate and transmit to each county election superintendent at the close of absentee in-person early voting an updated electors list in a format capable of printing by the election superintendent that includes all of the information located in the electronic pollbook necessary for printing precinct-level information required in each polling place to check in voters and issue ballots to eligible voters (referred to as the "updated paper pollbook backup").[1]  The Secretary of State shall further direct every county election

---

[1] Consistent with O.C.G.A. § 21-2-224(b) and State Election Board Rule 183-1-12-.19(8), this list must include *accurate* information regarding all persons who have been issued or cast absentee ballots during the advanced/early voting period prior to election day. *See* O.C.G.A. § 21-2-224(b)

superintendent (1) to print and provide at each polling place at least one paper backup of the pollbook for use on Election Day, which paper backup shall be updated after the close of absentee in-person voting (early voting); (2) to use the updated paper pollbook backup in the polling place to attempt to adjudicate voter eligibility and precinct assignment in the event of equipment malfunction or an emergency as defined by Ga. R. & R. 183-1-12.11(2)(d);[2] (3) to allow voters who are shown to be eligible electors on the paper pollbook backup who are not shown as having requested an absentee mail-in ballot to cast a regular or emergency ballot that is not to be treated as a provisional ballot; (4) to allow voters who are shown to be eligible electors on the paper pollbook backup but who are shown as having requested an absentee mail-in ballot to have their absentee ballot canceled and to cast a regular or emergency ballot that is not to be treated as a provisional ballot, provided that such voter's eligibility is confirmed by the county registrar's office and the voter's absentee ballot is canceled in accordance with the provisions of

---

("The registrars shall, prior to the hour appointed for opening the polls, place in the possession of the managers in each precinct one copy of the certified electors list for such precinct, such list to contain all the information required by law. The list shall indicate the name of any elector who has been mailed or delivered an absentee ballot."); Ga. Comp. R. & Regs. 183-1-12-.19(8) ("Prior to delivery to a polling place, the election superintendent or registrars shall cause the electronic poll books to accurately mark all persons who have been issued or cast absentee ballots in the election."). The Secretary may generate this information directly from the PollPads or from ENET and the Absentee Voter Report referenced in their filing at Doc. 895. Alternatively, the Secretary may assume responsibility at its discretion for the printing and delivery of the updated paper pollbook to county election superintendents.

[2] The State Election Board's Emergency Rule, Ga. R. & R. 183-1-12.11(2)(d), defines the types of events that may be considered emergencies as "power outages, malfunctions causing a sufficient number of electronic ballot markers to be unavailable for use, or waiting times longer than 30 minutes."

O.C.G.A. § 21-2-388;[3] (5) to take every reasonable measure to ensure that county election officials and poll workers are trained as to how to generate and use paper pollbook backups and emergency ballots and handle the casting and counting of emergency votes in conformity with this Order directly as emergency ballots, if necessary; and (6) maintain a sufficient stock of emergency paper ballots in compliance with Ga. Comp. R. & Regs. 183-1-12-.11(2)(c) and 183-1-12-.01.[4]

While the Court has ordered that a minimum of one paper pollbook backup should be made available for each polling place, it is likely that more than one copy would be needed in large precincts per the testimony of Fulton County's Director of County Registration and Elections. As precincts vary in size enormously across the counties and the State, the Court **FURTHER ORDERS** that the Secretary of State direct all local election superintendents to evaluate the need for issuance of additional copies of the  pollbook backup printouts as back-up tools for precincts

---

[3] *See* O.C.G.A. § 21-2-388 (providing for cancellation of absentee ballots and permitting voters to cast votes in person upon cancellation by either surrendering their absentee ballot to the poll manager of the precinct or in the case of a voter who has requested but not yet received their absentee ballot by completing an elector's oath affirming the voter has not marked or mailed an absentee ballot for voting in such primary or election); *See* O.C.G.A. § 21-2-384 (regarding elector's oath); *see also* Ga. Comp. R. & Regs. 183-1-14-.06 (regarding procedures for spoiled absentee ballots).

[4] This relief is consistent with State Election Board Rule 183-1-12-.19(1) that requires that election superintendents equip each polling place with the electronic pollbooks, a paper backup list, and ensure that "poll workers [] be adequately trained in checking in voters on both electronic poll books and paper backup list." Ga. Comp. R. & Regs. 183-1-12-.19(1); *see also* Ga. Comp. R. & Regs. 183-1-12-.11(2)(c) (providing that the "election superintendent shall cause each polling place to have a sufficient amount of emergency paper ballots so that voting may continue uninterrupted if emergency circumstances render the electronic ballot markers or printers unusable. For any primary or general election for which a state or federal candidate is on the ballot, a sufficient amount of emergency paper ballots shall be at least 10% of the number of registered voters to a polling place"). County election superintendents shall determine what is a "sufficient number" of emergency paper ballots necessary at individual polling locations, which number may exceed 10% of the number of registered voters at the polling place as needed.

based on the number of registered voters in each county precinct or polling location and to promptly advise the County Registrar's Office of the number of such additional copies needed.

**IT IS SO ORDERED** this 12th day of October, 2020.

_____
**Amy Totenberg**
**United States District Judge**

4

# EXHIBIT 12

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,          :
                                  :
      Plaintiffs,         :
                                  :
v.                                :          CIVIL ACTION NO.
                                  :          1:17-cv-2989-AT
BRAD RAFFENSPERGER, *et al.*,     :
                                  :
      Defendants.         :

## ORDER

On September 28, 2020, the Court entered a preliminary injunction, requiring that every polling place in Georgia must have at least one updated paper pollbook backup to prevent bottlenecks at the polls on Election Day if electronic pollbooks used to check in voters experience disruptive outage or malfunction. State Defendants have filed a Motion to Stay the Order Opinion and Order of September 28, 2020, pending an appeal to the Eleventh Circuit Court of Appeals [Doc. 951]. State Defendants assert that "the Court has taken it upon itself to rewrite Georgia's election code" and that "[s]taying the preliminary injunction here will ensure at least a modicum careful deliberation before mandating such a drastic change." (Mot. at 2, 12.) This argument is a fallacy and simply removed from the *actuality* of the content of the Court's Order.[1]

---

[1] Defendants' arguments spark memories of old episodes of The Twilight Zone: "You are about to enter another dimension. A dimension not only of sight and sound but of mind. A journey into a wondrous land of imagination. Next stop – *The Twilight Zone*."

Defendants, and the Court's Order will harm the State by changing the law on the eve of the election and jeopardizing the accuracy of the election.

The Court has previously addressed nearly every one of these arguments. For the reasons stated in this Court's Orders on Defendants' Motion to Dismiss and the Coalition Plaintiffs' Motion for Preliminary Injunction (Docs. 751 and 918), the Court finds that the State Defendants have not made a strong showing that they are likely to succeed on the merits of their appeal, that they will suffer harm absent a stay, or that a stay of the injunction is in the public interest.

**1. The Coalition Plaintiffs' Claim Regarding Deficiencies in the Security and Reliability of the State's Electronic Voter Registration Database and Pollbook System is Properly Before the Court**

Plaintiffs' claims in this case challenge the security and reliability of Georgia's voting system based on known and demonstrated risks and vulnerabilities in the computerized components of the system. This includes claims relating to the security and reliability of Georgia's voter registration database and electronic pollbooks. (Coalition Pls.' Third Am. Compl., Doc. 226 ¶¶ 93-120, 131-32, 152; Coalition Pls.' First Suppl. Compl., Doc. 628 ¶ 189.) Defendants know this and their attempts to pretend otherwise are not persuasive.

Despite State Defendants' selective parsing of the pleadings, Plaintiffs' allegations and claims regarding the State Defendants' handling of compromises to the "elections.kennesaw.edu" server which housed sensitive voter data have been front and center in this case since its inception and remain a concern today.

In their Third Amended Complaint, the Coalition Plaintiffs alleged security breaches of the election server previously housed at Kennesaw State University's Center for Election System compromised Georgia's voting system. (Doc. 226 ¶¶ 93-120.) Among the electronic files contained on the server were voter information registration information, voter histories and personal information of all Georgia voters. (*Id*. ¶¶ 94-97.) Plaintiffs alleged that despite warnings from an independent cyber security specialists, Defendants failed to ensure that the elections software, files, and sensitive voter data on the "elections.kennesaw.edu" server was secure and allowed the server to remain easily accessible from the public Internet for nearly a year. (*Id*. ¶¶ 97-108.) Plaintiffs further alleged that "both prior to and since the 2016 presidential election[,] foreign governments and other unknown suspect parties have actively probed state election systems in attempts to gain unauthorized access and manipulate the voter information and computer systems used to conduct American elections" and "that these efforts targeting American voting systems have included unauthorized intrusions into the very same kind of computer systems . . . found to be completely unprotected from external access in Georgia for at least seven consecutive months from August 2016 through February 2017." (*Id*. ¶¶ 107-08.) The complaint alleges that Defendants "knew that software applications, password files, encryption keys, voter information registration information, and other sensitive information critical to the safe and secure operation of Georgia's Voting System had been unsecured, breached, and compromised." (*Id*. ¶ 110; *see id*. ¶ 111 ("From at least August 2016 until the

present, the Secretary and his agents – and from at least March 2017 all Defendants – knew or should have known that the software, data, and voter information hosted on the "elections.kennesaw.edu" server at KSU had been repeatedly compromised by unauthorized access.")).   As a result, the Coalition Plaintiffs allege that voters, including Coalition member and Fulton County voter Brian Blosser, were deprived of the right to cast ballots based on errors in the system that "caused eligible voters to appear to be voters in other congressional districts or unregistered."  (*Id.* ¶¶ 131-132; *see also* ¶ 152 ("Blosser was prohibited from voting on April 18, 2017, in the CD6 Special Election when his name did not appear on the eligible voter rolls for CD6, and was instead erroneously listed as a resident of CD11. Blosser was not permitted to vote a provisional ballot, even after he made repeated attempts to have Fulton County election officials correct this system error. At a public meeting on April 22, 2017, Barron and the Fulton Board Members blamed this error on a "software glitch.")).

As Defendants' note and the Court has explained at length in prior Orders, this case began in 2017 as a suit to enjoin Georgia's Direct Recording Electronic ("DRE") based voting system.[4]  Plaintiffs' original claims challenged elements of the voting system beyond the DRE voting machines themselves.  As highlighted extensively in this Court's prior orders, Plaintiffs' claims encompassed the security

---

[4] Plaintiffs' claims also sought to enjoin the State's Global Election Management Systems ("GEMS") as a result of significant security flaws.  In prior orders, the Court has referred to the prior system as the DRE/GEMS system.  For ease of reference in this Order, the Court refers to the prior system as the DRE system.

of the Secretary of State's election technology infrastructure and the actual breach of the Center for Election Systems ("CES") servers, computer networks, and data and the State's electronic voter registration system and database. The Court rejected Defendants' arguments that it lacked jurisdiction to hear these claims in 2018. Defendants appealed and lost.

After Georgia enacted legislation to replace the DREs with an electronic ballot-marking device ("BMD") based voting system, the Court enjoined the State's continued use of DREs past the completion of the 2019 election cycle.[5] The voter registration database (ENET), which is maintained by the Secretary of State and used by county registrars to update voter registration records was not replaced in the State's transition to the BMD system. The voter history and information from the State's pre-existing voter registration database is used to populate the new electronic pollbooks for each election.[6]

___

[5] In that same order, entered on August 16, 2019, the Court also found that the Coalition Plaintiffs were entitled to injunctive relief on their claim that the State's voter registration database and electronic pollbook system, as constituted and administered by the Secretary of State and Georgia counties, bore critical deficiencies and risks that impact the reliability and integrity of the voting system process. (Doc. 579.) The Court found that the evidence in the record demonstrated that the Defendants' administration of a vulnerable and compromised voter registration database and inaccurate voter registration express pollbook voting check-in had substantially burdened voters' capacity and their right to cast votes. Noting that the State's adoption of a new electronic pollbook for voter check-in for use with the State's legacy voter registration software and database would not remedy these demonstrated problems or alleviate the imminent threat to voters' exercise of their right to vote, the Court required Defendants to take remedial action. Specifically, the Court ordered the State Defendants, among other things, to (1) develop and implement procedures to be undertaken by election officials to address errors and discrepancies in the voter registration database and (2) require all County Election Offices to furnish each precinct location with at least one printout of the voter registration list for that precinct.

[6] See Defs.' Mot. to Dismiss at 11, n. 14; see also Dec. 6, 2019 Tr. at 11 (explaining that the ENET system "used to program ExpressPoll check-in units for the GEMS/DRE system" is "not being replaced" and that "[t]he same database and same data, a flat text file, will be used to populate the Poll Pads").

The Plaintiffs amended their Complaints in October 2019 to include additional claims challenging the incoming BMDs.[7] The allegations and claims in the Coalition Plaintiffs' First Supplemental Complaint "are additional to, and do not supersede or replace, the allegations and claims stated in" their Third Amended Complaint addressing the prior DRE voting system. (Coalition Pls.' First Supp. Compl. at 6, Doc. 628.) The Coalition Plaintiffs First Supplemental Complaint expressly challenges the implementation of the new BMD voting system components and the integration of these devices with "Georgia's current, defective voter registration system."[8] (Coalition Pls.' First Suppl. Compl., Doc. 628 ¶ 189.) These concerns were at the center of the Court's consideration in ordering relief in August 2019 and remain a focus of this case even as the State implements the BMDs in connection with multiple other components and the State's main election system server.[9]

---

[7] Plaintiffs had previously asserted that their Complaints already encompassed a challenge to the new BMD system. The Court rejected this notion and indicated that if Plaintiffs wished to proceed with such a challenge, an amendment of the complaint to expressly deal with the BMD system would be necessary. The Court granted the Plaintiffs' motions to amend to add the BMD claims based on Defendants' written indication of their consent on the condition that they retained their right to "to file motions to dismiss on the merits of the new claims," and that discovery would be stayed pending a ruling on the motions.

[8] Plaintiffs challenge the State Defendants' implementation of the BMD voting system with known and demonstrated vulnerabilities that include, among other things, the Secretary of State's failure to remedy compromises in its current voter registration and internal IT systems. (Curling Pls.' Compl. ¶¶ 75-88; Coalition Pls.' Compl. ¶¶ 135, 176-186.)

[9] As the Court found in its August 15, 2019 Order:

> The voter registration database, containing millions of Georgia voters' personal identifying information, plays a vital role in the proper functioning of the voting system. Yet it has been open to access, alteration, and likely some degree of virus and malware infection for years, whether in connection with: CES/KSU's handling of the system and data and failure to address these circumstances upon transfer of CES's functions back to the SOS; failure to remediate the database, software and data system flaws and deficiencies; or exposure of the widespread access to

9

Thus, any arguments that this case has nothing to do with the security of the State's voter registration database and system or the reliability of the electronic pollbooks are fantastical.

Defendants assert they are likely to succeed on appeal because "the legal basis on which Coalition Plaintiffs sought the relief this Court granted is unknown," and the Court's Order does not "offer any clarity as to which provisions of the U.S. Constitution demands paper pollbook back-ups." (Mot., Doc. 951 at 12.)

To be clear, the Court must correct one central element of the State's erroneous description of the issues in this case: Plaintiffs do not and have never challenged the State's determination to use electronic pollbooks for voter check-in – this simply was not the issue before the Court. Instead, the issue posed is that significant problems in functionality of the e-pollbooks in tandem with the defective voter registration database could effectively block voters at the threshold of the polls and preclude or burden their exercise of the franchise. (*See* September 17, 2018 Order, Doc. 309 at 4-12, 34-38; August 15, 2019 Order, Doc. 579 at 21-90; September 28, 2020 Order, Doc. 918 at 20-47.) The relief ordered was narrowly

---

passwords to the voter registration data system throughout the SOS, CES/KSU, the 159 counties, or the public via the virtual open portal maintained at CES/KSU. Most significantly, the programming and use of ballots in both the DRE and future Dominion BMD system is tied to the accuracy of voter precinct and address information. Inaccuracy in this voter information thus triggers obstacles in the voting process. New Dominion express poll machines bought as part of the new contract with Dominion cannot alone cleanse the voter database to be transferred and relied upon.

(August 15, 2019 Order, Doc. 579 at 88-89.)

tailored, based on the State's own designated emergency ballot statute and regulations to address these issues. Voters who are not shown on the State's official electors list in the pollbook are not permitted to vote, except in certain situations by provisional ballots that may not ultimately be counted. The State's failure to address inaccuracies in the official electors list (whether from compromised voter registration data or from providing an incomplete voter list as a paper backup) may result in the denial of eligible and qualified voters' rights to cast a ballot and have their vote counted. The legal grounds for the Coalition Plaintiffs' claims are the alleged violations of the fundamental right to vote and substantive due process rights guaranteed by the First and Fourteenth Amendments. The Court did not hold that the Constitution requires paper pollbook backups. The Court held that the State cannot unconstitutionally burden the right of qualified voters to cast their ballots and have them counted. It is plain and simple.

> **2. The Court's Paper Pollbook Backup Order Imposes No Changes to Georgia' Statutory or Regulatory Regime and Requires No Changes to Georgia Election Officials' Election Procedures**

Defendants assert that "the Court ordered significant changes to [the] voting process after the election is underway, and it will continue to cause irreparable harm as long as it remains in place." This is incorrect for a number of reasons. Here are three.

**First**, the updated paper pollbook backup is a reinforcement to be used *only on* Election Day and *only then* in the event of an emergency or where the electronic

Defendants do not articulate how, in their words, the Court either (i) applied the wrong legal standard, (ii) created its own "novel analytical framework," or (iii) "misapplied its own new approach to Constitutional law." Instead, Defendants simply disagree with the Court's view of the evidence, its assessment of the burden on Plaintiffs' interest in their ability to cast votes at the polls as severe, and its findings that the State's proffered interests were insufficient to outweigh that burden.

Defendants advance a convoluted theory that the Court flipped the burden to Defendants to prove they had taken steps to guard against imposing burdens on voters. It did not. The Court considered and addressed the only interest put forward by the State Defendants to justify their refusal to provide a reconciled and updated paper backup: a generic "interest in timely and accurate administration of elections" and in the use of electronic pollbooks as the primary method of determining voter eligibility. (Resp., Doc. 815 at 19-20.) Because Plaintiffs are not challenging use of electronic pollbooks, the Court's relief does not alter State's requirement that electronic pollbooks shall be used as the primary method of determining voter eligibility. The Court simply noted that Defendants did not explain how the requested relief – provision of an updated paper backup for use during emergency situations where pollbooks become inoperable or errors in the electronic system persist – was inconsistent with their "interest in timely and accurate administration of elections." And the Court found that *Plaintiffs'*

27

*evidence* indicates that such a backup would serve both the Defendants' stated interests as well as the constitutional interests advocated by Plaintiffs.

### 7. The Court's Relief is Not Based on Evidence Outside the Record

To create the appearance of error, Defendants contend that the Court "took judicial notice of disputed evidence and findings in other cases in this district to support its findings." (Mot., Doc. 951 at 21.) The Court's Orders in the course of the case were extraordinarily detailed and careful, two of them stretching over 150 pages. They explained at length the evidentiary and legal basis of the Court's findings and legal rulings. The evidence was presented in the record before this Court. The Court meticulously considered the evidence presented both by Plaintiffs and Defendants. To the extent that the Court took notice of any other court rulings relative to the State's same processes (i.e., use of provisional ballots due to issues in the State's voter registration database and electronic pollbooks), this was as a point of comparison – that the same electoral issues appeared, for instance, in *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270 (N.D. Ga. 2018). Defendants object to the Court's reference to its own findings and review of the evidence in connection with its injunction[14] issued in *Common Cause*, a case that was transferred to the undersigned as related to the instant case because of the allegations related to the security breach of the State's voter registration database. (*See* 1:18-cv-5102 November 6, 2018 Order, Doc. 4, reassigning case.)

---

[14] The Secretary of State did not appeal the preliminary injunction order entered in *Common Cause*.

# EXHIBIT 13

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,  :
                                  :
                                  :
     Plaintiffs,            :
                                  :
v.                             :     CIVIL ACTION NO.
                                 :     1:17-cv-2989-AT
BRAD RAFFENSPERGER, *et al.*,  :
                                  :
                                  :
     Defendants.        :

## **ORDER**

This matter is before the Court on the Coalition Plaintiffs' request for injunctive relief related to scanner settings for tabulating hand-marked absentee, provisional, and emergency ballots in connection with the January 5, 2021 runoff election [Doc. 990]. Although the Court previously indicated it would potentially consider a remedy in connection with any runoff election scheduled in January, the Court will defer consideration of Plaintiffs' request until after certification of the January 5, 2021 runoff election. It is understandable that Plaintiffs seek a remedy here as soon as possible – and in time for the runoffs. But the non-stop demands that have been placed on the Secretary of State's Office and counties in the past month in connection with concluding the November general election count, audit, and recount, as well as preparing for the runoffs are far too great for the Court to consider relief issues that would require work and discussion prior to completion of the entire runoff cycle. So, further consideration of Plaintiffs' requested relief is **DEFERRED** until after the completion of the January 5, 2021 runoff election.

**IT IS SO ORDERED** this 2nd day of December, 2020.


_____
**Amy Totenberg**
**United States District Judge**