# EXHIBIT 29

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                       ATLANTA DIVISION

3

4   DONNA CURLING, ET AL.,          :
                                    :
5           PLAINTIFFS,             :
    vs.                             :  DOCKET NUMBER
6                                   :  1:17-CV-2989-AT
    BRAD RAFFENSPERGER, ET AL.,     :
7                                   :
            DEFENDANTS.             :
8

9


10    TRANSCRIPT OF HEARING ON PRELIMINARY INJUNCTION PROCEEDINGS

11            BEFORE THE HONORABLE AMY TOTENBERG

12              UNITED STATES DISTRICT JUDGE

13                      JULY 25, 2019

14                       10:10 A.M.

15                     VOLUME 1 OF 2

16

17

18

19

20

21    MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                  TRANSCRIPT PRODUCED BY:

23

    OFFICIAL COURT REPORTER:        SHANNON R. WELCH, RMR, CRR
24                                  2394 UNITED STATES COURTHOUSE
                                    75 TED TURNER DRIVE, SOUTHWEST
25                                  ATLANTA, GEORGIA  30303
                                    (404) 215-1383
```

4

## I N D E X   T O   P R O C E E D I N G S

**WITNESS**                                                    **PAGE**

SANFORD MERRITT BEAVER

     Cross-Examination
      by Mr. Cross                                        21
     Cross-Examination
      by Mr. Brown                                        49
     Direct Examination
      by Mr. Russo                                        54
     Recross-Examination
      by Mr. Cross                                        61
     Examination
      by The Court                                        63

MICHAEL LEON BARNES

     Cross-Examination
      by Ms. Bentrott                                     73
     Cross-Examination
      by Mr. Brown                                        81
     Direct Examination
      by Mr. Russo                                        96
     Examination
      by The Court                                       105
     Recross-Examination
      by Ms. Bentrott                                    106

TERI ADAMS

     Direct Examination
      by Mr. Brody                                       109
     Cross-Examination
      by Mr. Lake                                        111

AMBER MCREYNOLDS

     Direct Examination
      by Mr. Brown                                       116
     Voir Dire Examination
      by Mr. Belinfante                                  120
     Direct Examination (Continued)
      by Mr. Brown                                       124
     Cross-Examination
      by Mr. Belinfante                                  138

1    (...cont'd...)

2        **WITNESS**                                          **PAGE**

3            Cross-Examination
               by Ms. Burwell                                   147
4            Redirect Examination
               by Mr. Brown                                     157
5            Recross-Examination
               by Mr. Belinfante                                159
6
     MICHAEL LEON BARNES
7
             Reexamination
8              by The Court                                     161
             Redirect Examination
9              by Mr. Russo                                     172
             Recross-Examination (Further)
10             by Mr. Brown                                     172
             Reexamination (Further)
11             by The Court                                     173
             Recross-Examination (Further)
12             by Mr. Brown                                     174

13   JASMINE CLARK

14           Direct Examination
               by Mr. Powers                                    175
15           Cross-Examination
               by Mr. Lake                                      182
16
     SARA LECLERC
17
             Direct Examination
18             by Mr. Brown                                     190
             Cross-Examination
19             by Mr. Lake                                      194

20   KATHY POLATTIE

21           Direct Examination
               by Mr. Powers                                    196
22           Cross-Examination
               by Mr. Lake                                      199
23
     THERESA PAYTON
24
             Cross-Examination
25             by Mr. Cross                                     205

1    (...cont'd...)

2    **WITNESS**                                          **PAGE**

3        Direct Examination
             by Mr. Tyson                                     238
4        Recross-Examination
             by Mr. Cross                                     273
5        Redirect Examination
             by Mr. Tyson                                     280
6        Examination
             by The Court                                     283
7        Recross-Examination (Further)
             by Mr. Cross                                     292
8        Redirect Examination (Further)
             by Mr. Tyson                                     294
9
     MICHAEL SHAMOS, PH.D. (Videotaped Deposition)       303
10
                              * * *
11
     CERTIFICATE                                         313

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  A.   No.

2  Q.   Well, you're not taking the position that it is different

3  from the Cobb County one -- the structure; right?

4  A.   The table names are the same in the Cobb County database

5  as what we use in Georgia's GEMS database.

6  Q.   The structure is the same?  If you were to put those

7  screenshots side-by-side, they are virtually identical, are

8  they not, sir?

9       MR. RUSSO:  Objection, Your Honor.  They haven't

10  authenticated this Cobb County database.

11       THE COURT:  Well, he says he has now looked at it.

12  So that is -- that is an adequate foundation.

13  Q.   (BY MR. CROSS)  The tables themselves are also virtually

14  identical if we look at them side-by-side; right, sir?

15  A.   From what I can tell, the table names are the same.

16  Q.   You retained a company called Fortalice to do

17  cybersecurity assessments in 2017 and 2018; right?

18  A.   Yes.

19  Q.   And the networks that they examined for that included

20  elections-related networks; correct, sir?

21  A.   Yes.

22  Q.   The first assessment that they produced was in October of

23  2017; right?

24  A.   Yes.

25  Q.   And they identified 22 -- 22 security risks in the

1    networks that they examined; right?

2    **A.**    Yes.

3    **Q.**    They then completed another assessment on November 30 of

4    2018; correct?

5    **A.**    Correct.

6    **Q.**    And you personally requested that assessment, did you not,

7    sir?

8    **A.**    I request them every year since I have been employed by

9    the Secretary of State.

10   **Q.**    So as of November 30 of last year, as of that assessment,

11   only 3 of the 22 risks identified in 2017 had been remediated;

12   right?

13   **A.**    I don't know that that is true.  I'm not sure where you

14   got that information.

15   **Q.**    Have you not read -- well, let me take a step back.

16          Do you know who Theresa Payton is?

17   **A.**    Yes.

18   **Q.**    And she actually heads up Fortalice, the company that you

19   engaged; right?

20   **A.**    Yes.

21   **Q.**    Have you read the declaration that she submitted in this

22   case?

23   **A.**    No.

24   **Q.**    Well, she states, of the risks outlined in the 2017

25   report, Fortalice found that as of the November 2018 assessment

1   three risks had been remediated with compensating controls and

2   another three were in process of being fixed.

3       You didn't read that before?

4   **A.**   No.

5   **Q.**   Do you have any reason to think that Ms. Payton who

6   oversaw the risk assessment is wrong?

7   **A.**   I would have to review what she said.  I don't believe

8   that we only covered three.  In fact, I'm confident that we've

9   covered more than three.  And maybe her understanding of what

10  was done wasn't clear.

11  **Q.**   So the Court cannot rely on Ms. Payton's representations

12  about the risks associated with your system, right, because she

13  may not understand?

14  **A.**   No, that is not true.

15  **Q.**   Well, you just represented --

16  **A.**   The risks that were identified in '17 weren't necessarily

17  the risks that were identified in '18.

18  **Q.**   I understand.  I'm asking you a simple question,

19  Mr. Beaver.  I need you to listen and answer my question.

20  Okay?

21      Are you representing to the Court that it cannot take as

22  fact Ms. Payton's representation that 19 of the 22 risks

23  identified in 2017 had not yet been remediated as of November

24  30 of 2018?  Can she not take that as fact?

25  **A.**   I need to understand her measurement because remediate may

1    be completely fixed versus in process or partially fixed.

2    **Q.**    You are aware that there was an election in the state on

3    November 6 of last year; right?

4    **A.**    Yes.

5    **Q.**    So at least according to Ms. Payton, at the time that the

6    state went through an election in which almost 4 million voters

7    voted including at the highest levels in the state government

8    for the governor, at least according to her, 19 of 22

9    significant risks -- she characterized them as significant --

10   were still outstanding as of the election; right?

11   **A.**    Okay.

12   **Q.**    But you just don't know one way or the other as you sit

13   here as to whether that is right; correct?

14   **A.**    I would have to see her document.

15   **Q.**    Some of the risks that she identified, the first one,

16   Number 1, the most significant was what she called widespread

17   local administrative rights.

18        Do you recall that?

19   **A.**    Yes.

20   **Q.**    What that meant was that every Georgia Secretary of State

21   user was granted administrative rights on their work stations?

22   **A.**    Yes.

23   **Q.**    Correct?  What that means is they don't just log in and

24   use the computer?  With administrative rights, every single

25   user has the ability to download software if they want to to

1    that computer; right?

2    **A.**    Yes.

3    **Q.**    Administrative rights enables them to affect the

4    programming of that computer; right?

5    **A.**    Correct.

6    **Q.**    You're aware, as Fortalice pointed out, that this created

7    a significant risk of malware infecting the networks that they

8    were examining; correct?

9    **A.**    Are we talking about the 2017?

10   **Q.**    I'm talking about the risk assessment that was done in

11   2017.

12   **A.**    Yes.

13   **Q.**    And, again, we have established the networks that she was

14   examining -- Fortalice was examining included election-related

15   networks; right?

16   **A.**    Correct.

17   **Q.**    In fact, Fortalice pointed out that the risk was

18   particularly significant for the Georgia Secretary of State

19   because not only did every user have administrative rights on

20   their own work station but they had administrative rights for

21   every work station in the Secretary of State's office.

22        Do you recall that?

23   **A.**    Yes.

24   **Q.**    Meaning that someone with access to a single work station

25   had administrative rights to every other work station and could

1    do all the things we just talked about; right?

2    **A.**    In 2017, that was correct.  That has been remediated in.

3    2017.

4    **Q.**    So you know that that was remediated, but you don't know

5    about the other 19 that Ms. Payton said were not remediated as

6    of the election?

7    **A.**    I would have to see them.

8    **Q.**    Another vulnerability that Ms. Payton and her team found

9    was that the Georgia Secretary of State relied on legacy

10   systems and software that were no longer supported or receiving

11   security patches even when new vulnerabilities were identified;

12   right?

13   **A.**    Correct.

14   **Q.**    And this created a significant risk that a hacker could

15   easily exploit unpatched devices, which is what you were using;

16   right?

17   **A.**    Correct.

18   **Q.**    Fortalice even found security --

19   **A.**    You didn't ask me whether we had remediated it.

20   **Q.**    I'll get there.

21   **A.**    Okay.

22   **Q.**    Fortalice even asked -- I'm sorry.  Fortalice even found

23   significant cybersecurity risks with the voter registration

24   database in Georgia; right?

25   **A.**    Can you repeat that, please?

1   **A.**   You mean one through ten?  Is that what you're talking

2   about?

3   **Q.**   Yes.  At the bottom of the page.

4   **A.**   Yes.

5   **Q.**   Number 10 is lack of security controls for PCC, Inc.;

6   right?

7   **A.**   Yes.  That is in the semi likely row.

8   **Q.**   Right.  That is not what I asked you.

9   **A.**   Okay.  I'm just verifying where I'm at.

10  **Q.**   Lack of security controls for PCC, Inc., is Number 10.

11  We're agreed on that; right?

12  **A.**   Yes.

13  **Q.**   Okay.  And Number 10 corresponds to the security risks

14  with the voter registration database because PCC is the company

15  that owns and operates the voter registration database; right?

16  **A.**   At the time, yes.

17  **Q.**   And ten, if we look under the columns of significant, is

18  to the far right in the risk heat map, so it is in the

19  significant column of risk; right?

20  **A.**   Yes.  And it is in the row -- what is the row?

21  **Q.**   Mr. Beaver, one of the concerns that was noted was the

22  overarching concern of the lack of control and oversight that

23  the state exercised over the registration database at the time.

24      Do you recall that?

25  **A.**   Yes.

1   **Q.**   And Fortalice urged you in October of 2017 to require the

2   vendor, PCC, to conduct certain tasks and update its security;

3   correct?

4   **A.**   Correct.

5   **Q.**   And then four months later in February of 2018, there was

6   another assessment by Fortalice; right?

7   **A.**   Yes.

8   **Q.**   And at that point, they identified 15 security risks just

9   with PCC with the voter registration database?  Do you recall

10  that?

11  **A.**   I recall there are two different assessments that assessed

12  different data centers.  So the assessments of one do not apply

13  to the other.

14  **Q.**   So the assessments in February of 2018 were different

15  additional risks with the voter registration database beyond

16  what was identified four months earlier; right?

17  **A.**   They are separate.

18  **Q.**   Separate?  15 more?

19  **A.**   We had an assessment of one data center where we have some

20  applications running.  We had an assessment of another data

21  center where the election system is running.  The election

22  system is not in the first assessment.

23  **Q.**   So the election system is in the second assessment where

24  Fortalice identified in February of 2018 15 security risks;

25  correct?

1    **A.**   Is that this report?  That is not this report.

2    **Q.**   That is the February 2018 report.  You don't recall that?

3    **A.**   I do recall the February one.  But I don't remember the

4    count.

5    **Q.**   So you need to see that too?

6    **A.**   That would probably be good.

7          MR. CROSS:  Your Honor, we'll mark this as Exhibit 2.

8    **Q.**   **(BY MR. CROSS)**  Mr. Beaver, you now have in front of you

9    what is the February 2018 risk assessment that was done by

10   Cloudburst and Fortalice; right?

11   **A.**   Yes.

12   **Q.**   As you pointed out, this one as you can see in the first

13   sentence in Exhibit 2 indicates that they conducted a vendor

14   cyber risk assessment on PCC Technology, Inc., again the

15   company that owns and operated at least as of this time the

16   voter registration database; correct?

17   **A.**   Correct.

18   **Q.**   And if you come to the second paragraph, do you see they

19   reported Cloudburst Security suggests remediating the 15

20   identified security risks included in this report?  Do you see

21   that?

22   **A.**   Yes.

23   **Q.**   Does that refresh your recollection that as of February of

24   2018 your independent security vendor identified 15 risks that

25   needed to be remedied?

1    **A.**    Yes.

2    **Q.**    In the November 2018 assessment, Fortalice did not look at

3    PCC at all again; right?  Do you remember you put that outside

4    of scope?

5    **A.**    Yes.  It is a different data center.

6    **Q.**    Are you aware of any attempt to hack a Georgia voter

7    registration database around the time of the November 6

8    election last year?

9    **A.**    It wasn't a database -- I mean, the voter registration

10   database.  It was the My Voter page.

11   **Q.**    Which includes voter registration information; right?

12   **A.**    It is a feeder that pulls data from that.

13   **Q.**    Right.  The My Voter page has access -- the data moves

14   back and forth between that and the voter registration

15   database?

16   **A.**    Not back and forth.  It is a one-way transfer, meaning the

17   voter registration system feeds an extract of the database to

18   My Voter page.  So if anything happens in My Voter page, it has

19   no impact -- cannot have any impact on the voter registration

20   system.  It is an isolated system for security purposes.

21   **Q.**    In the November 2018 assessment, Fortalice made 20

22   additional -- beyond the reports we have looked at before, made

23   20 additional recommendations to the Secretary of State to

24   improve cybersecurity; right?

25   **A.**    Yes.

1   **A.**   Security is not a --

2   **Q.**   Yes or no.  That did not appear in your declaration?

3   **A.**   It did not appear.

4   **Q.**   You go on in that same sentence as an example of one of

5   the ways you protect the system -- you say, including

6   conducting regular cyber assessments with penetration testing;

7   right?

8   **A.**   Yes.

9   **Q.**   So you were representing to the Court that penetration

10  testing is one of the ways that you confirm that your system is

11  secure; right?

12  **A.**   That is one of the ways.

13  **Q.**   In the October 2017 assessment, again less than a year

14  before your August 2018 declaration to the Court, Fortalice

15  actually conducted one of those penetration tests; correct?

16  **A.**   Yes.

17  **Q.**   And it was successful?  They penetrated the network,

18  didn't they, sir?

19  **A.**   They -- not the election system network.  They penetrated

20  the Secretary of State data center, which does not have the

21  election system in it.

22  **Q.**   They penetrated --

23  **A.**   There are two different data centers I said earlier, the

24  one at the Secretary of State's office which holds our

25  corporations database, our professional licensing database, our

1  website, but does not contain the elections -- the voter

2  registration system.

3        The system they penetrated was the one from the Secretary

4  of State's data center.  That was not the election system.

5  **Q.**   Is the answer to my question yes, they did a penetration

6  test, like you represented to the Court, that allowed them to

7  penetrate some aspect of the Secretary of State's network?

8  That is true; right, sir?

9  **A.**   That is very true.

10 **Q.**   And, in fact, the penetration enabled them to obtain

11 domain administrator rights on the network that they

12 penetrated; correct?

13 **A.**   Correct.

14 **Q.**   And we've talked about the expansive abilities of

15 administrator rights already.  That is what they obtained;

16 right?

17 **A.**   Correct.

18 **Q.**   In fact, they point out they were able to gain access to

19 network security systems?  That was one of the things they

20 identified; correct?

21 **A.**   Correct.

22 **Q.**   They point out that they were able to review the

23 enterprise architecture and system configurations; correct?

24 **A.**   Correct.

25 **Q.**   And so when you represented to the Court that one of the

1    Q.    The internal memory of the DRE voting machines themselves

2    has never been tested or checked in any way; is that correct?

3    A.    The internal memory -- the election files that are

4    collected after each election, in some cases the county may

5    have to access that file and bring it forward, if something

6    happened to a memory card that had been previously in use for

7    an election.

8         But has there been an inspection of that by the state?

9    No.

10   Q.    Is it -- it is still part of your practice to load files

11   from the GEMS server on to a USB drive and to insert that drive

12   into a Secretary of State public computer; correct?

13   A.    That is correct.

14   Q.    That computer is connected to the internet; right?

15   A.    The Secretary of State's computer, yes.

16   Q.    And after inserting that USB into the internet-facing

17   computer, you will insert it back into the GEMS server; right?

18   A.    Only after it is reformatted on the public computer after

19   we have moved the file from the GEMS computer to the public

20   computer for distribution to the county, particularly like a

21   PDF file or reports that the county may need.  After that file

22   has been moved over to the public side, the USB drive that has

23   been inserted into the public computer is then reformatted.

24   Q.    And then reinserted back into the GEMS server?

25   A.    After it is reformatted on the public, it is then at a

1   later point in time inserted back into the private system.

2   **Q.**   Thank you.  I would like to hand you what we'll mark as

3   Exhibit 4 -- Exhibit 4.

4          MS. BENTROTT:  And for the record, this is Senate

5   findings -- a summary of Senate findings called Russian

6   Targeting of Election Infrastructure During the 2016 Election,

7   Summary of Initial Findings and Recommendations, dated May 8,

8   2018.

9   **Q.**   **(BY MS. BENTROTT)**  And you can see in the section on the

10  first page summary of initial findings the first bullet reads,

11  at least 18 states had election systems targeted by

12  Russian-affiliated cyber actors in some fashion.

13       Do you see that finding?

14  **A.**   I do.

15  **Q.**   And in the second bullet, it says almost all of the states

16  that were targeted observed vulnerability scanning directed at

17  their Secretary of State websites or voter registration

18  infrastructure.

19       Do you see that finding as well?

20  **A.**   I do.

21  **Q.**   Neither of these findings has changed your operations in

22  any way; correct?

23  **A.**   That is correct.

24  **Q.**   You testified in your deposition that you weren't aware of

25  any current or previous lapses in security in Georgia's voting

```
 1   Q.    And if you -- but to sort of cut to the chase, your office
 2   provides the programming and configuration for GEMS databases
 3   and for the ballots for a vast majority of the elections in
 4   Georgia; correct?
 5   A.    That is correct.
 6   Q.    And that would include all county elections?
 7   A.    That is correct.
 8   Q.    And all municipal elections when the municipality is
 9   having the Secretary of State either directly or through the
10   county program and configure its database; correct?
11   A.    The relationship is between the municipality and county.
12   That is where that is governed.  The Secretary of State -- we
13   provide support for election ballot building for county
14   elections offices.  If county elections offices then contract
15   with municipalities to execute the municipality election, then
16   the Secretary of State's office through my division is building
17   the database to provide to the county for that purpose.
18   Q.    Are you familiar with the state's contract with -- ES&S's
19   contract for ballot building support services?
20   A.    I am.
21   Q.    Mr. Barnes, what does ES&S do pursuant to that contract?
22   A.    They assist my division in constructing the GEMS databases
23   that are used within county elections.
24   Q.    And so the state is outsourcing the building of the
25   ballots; is that right?
```

1   **A.**   We are using ES&S as a contractor to help us assist in

2   that production.

3   **Q.**   And I believe the contract for 2019 is for $150,000; is

4   that right?

5   **A.**   I believe that is correct, yes.

6   **Q.**   How many full-time people is that from ES&S that are

7   actually working on Georgia ballots?

8   **A.**   I believe ES&S has three individuals that work solely on

9   Georgia election databases.

10  **Q.**   And that would be in addition to the individuals in your

11  office?

12  **A.**   That would be in addition to the individuals in my office,

13  yes.

14  **Q.**   Okay.  And so does ES&S actually sit in your office and do

15  this ballot building work?

16  **A.**   They do not.

17  **Q.**   Where do they do their ballot building work?

18  **A.**   They do their ballot building work within their own

19  purviews.  We provided to ES&S when this contract was initially

20  put together specifications on how that hardware must be

21  configured, also with a specific image of build for that

22  specific unit that they would be using to construct those

23  databases.

24  **Q.**   So -- and where is this done?  Omaha?

25  **A.**   No.  It is all done within the State of Georgia.  It is

```
 1   all done within -- I believe the individuals work from home.
 2   Q.   So we have individuals from an outside contractor working
 3   at home on their own PCs on Georgia's GEMS databases, which
 4   program the ballots for all of Georgia's elections; is that
 5   correct?
 6   A.   We have three individuals, two of whom were previously
 7   employees of mine at the Center for Election Systems with over
 8   a decade's experience in building GEMS databases.  And then the
 9   third individual is a former county elections official from
10   Cobb County with over 25 years of experience in Georgia
11   elections.
12   Q.   I understand their experience.  But they are at home
13   working on their laptop, I guess, designing --
14   A.   It is not a laptop.
15   Q.   Or a PC.  It is a desktop; right?
16   A.   It is a desktop, yes.
17   Q.   They are working on a desktop.  And they are designing and
18   they are configuring the GEMS databases, which basically
19   determine how a voter's choice at that electronic string gets
20   transmitted into the tabulations; correct?
21   A.   They are constructing the database, yes, sir.
22   Q.   Okay.  And do you know what sort of security they have in
23   their homes?
24   A.   They are under the same purviews as we are in relation to
25   their equipment, that it must be air gapped as our equipment
```

1   for ballot building purposes is.  And they deliver --

2   hand-deliver those copies of databases to the Secretary of

3   State's office for direct inspection.

4        Once those databases come into our possession, they are

5   not then returned back to ES&S if any corrections or any issues

6   are found within the database.  All corrections to issues found

7   are then corrected within our office, reviewed by members of my

8   staff, and then images provided to direct counties for

9   inspection.

10  **Q.**   Do they have any particular physical security at their

11  homes or garages where they are doing this work for the State

12  of Georgia's voting system?

13  **A.**   I don't know which -- I don't know what security

14  parameters each individual has within their home.

15  **Q.**   Okay.  And do you recall the protocols that the Judge in

16  this case approved for our experts' handling of the GEMS

17  databases?  Were you involved in that?

18  **A.**   Only tangentially.

19  **Q.**   Do you recall that it was in a special room at the

20  University of Michigan with tight security and videotape?  Do

21  you recall all of those?

22  **A.**   I do.

23  **Q.**   Are any of those protections or security measures taken

24  with respect to the three individuals who do not even work for

25  the Secretary of State at their homes or garages while they are

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1   locked USB drive?

2   **A.**    It is a lockable USB drive, yes.

3   **Q.**    And can you -- could you walk us through the process that

4   you go through when you are taking data and putting it onto the

5   USB drive.

6   **A.**    Right.  First off, start off with a drive.  Verify that it

7   has been formatted.  I do that on my public-facing computer, my

8   SOS public-facing computer.  Format the drive.  Once the drive

9   has been formatted, then I remove it from the public computer

10  and proceed to my private computer on the private GEMS system.

11       Then the data files are copied from the GEMS computer and

12  placed onto the USB drive.  The USB drive is then removed from

13  the private drive and then placed into its locked position.  It

14  is then transferred -- pulled over to the public computer --

15  inserted into the public computer.  And then the files are

16  copied from that drive onto the public computer for

17  distribution to counties.

18       Once that process is completed, then we unlock the drive

19  and then format the drive.

20  **Q.**    Now, when the drive is inserted into the internet-facing

21  computer, is it -- do you know if it is scanned for malware at

22  that point?

23  **A.**    It is my understanding that the Secretary of State's

24  office has a protocol in place that for any drive that is

25  inserted it is immediately scanned.

1          MS. BENTROTT:  Objection.  Lacks foundation.

2          THE COURT:  Is it an understanding based on -- do you

3    have personal knowledge, or has somebody else told you that?

4          THE WITNESS:  My Secretary of State's IT office has

5    told us that every drive that is placed in whether it is --

6          THE COURT:  All right.  But that is based on some

7    information they provided to you?

8          THE WITNESS:  Yes.

9          THE COURT:  You haven't been present?  You haven't

10   observed that yourself?

11         THE WITNESS:  When I insert a USB drive, there is

12   always something that pops up that gives us indication that

13   something has taken place with that drive.

14         THE COURT:  All right.  So that is the basis of your

15   knowledge?

16         THE WITNESS:  Yes.

17         THE COURT:  You don't have any personal knowledge

18   from having participated in this over at the Secretary of

19   State's office?

20         THE WITNESS:  Correct.

21         THE COURT:  All right.

22   Q.   **(BY MR. RUSSO)**  Do you know if there are any other

23   restrictions that are in place on the Secretary of State's

24   network for pulling -- when you want to pull data onto that USB

25   drive?

1  **A.**   Again, my understanding of what we have been educated by

2  our IT office is that any time that a file is generated and

3  generated by, say, for example, eNet -- when we have to pull

4  data files from eNet for ExpressPoll purposes, that when that

5  data file is built it is scanned for malware.  And then when it

6  is transitioned to a jump drive, it is then encrypted

7  information.  Because all data that comes off of the SOS public

8  computers, that data must be encrypted in order to be moved.

9          MS. BENTROTT:  Same objection, Your Honor.  Lacks

10  foundation.

11          THE COURT:  All right.  I'm going to strike that

12  unless you can create a foundation.

13  **Q.**   **(BY MR. RUSSO)**  Is there anything that you need to click

14  on your computer screen to --

15          MS. BENTROTT:  Objection.  Leading the witness.

16          THE COURT:  All right.  I just need him to explain

17  what he -- the basis of his testimony.

18          MR. RUSSO:  That is what I'm trying to ask him.

19          THE COURT:  Just don't lead.

20  **Q.**   **(BY MR. RUSSO)**  Whenever he is trying to transfer files

21  over, do you click on anything that indicates it has been

22  encrypted?

23          MS. BENTROTT:  Objection.  Leading.

24          MR. RUSSO:  Well, I'm asking him.

25          THE COURT:  We're going through a lot of leading

1   questions.  Just simply:  What is the basis of your testimony

2   as to the eNet data?

3            THE WITNESS:  When I have copied data from my public

4   computer onto a jump drive, if I take that jump drive over to

5   my private computer, in order to -- in order for the data to be

6   read by my private computer, I first have to put in a password

7   on my jump drive that allows access to the data.

8            THE COURT:  All right.  So you understand that

9   that -- that is the system at least relative to your experience

10  of it?

11           THE WITNESS:  If I -- I first have to put a password

12  in to access the drive.  Once I have accessed the drive, I

13  actually have to launch an executable within the folder.  If I

14  don't launch the executable within the drive folder, if I just

15  move the file over, just literally drag it, it is unreadable.

16           So that is my understanding of it being encrypted.

17  That I actually have to run a process to launch the decryption.

18           THE COURT:  Do you know that that is the process for

19  anyone else or not?

20           THE WITNESS:  That is the process for all SOS

21  employees when moving data from the public computer to any

22  other computer.

23           THE COURT:  Okay.  Does this -- are these eNet files

24  also sent to county personnel?

25           THE WITNESS:  County election officials have access

1    to eNet.  But the data files that I'm speaking of are the data

2    files that are used to produce the electors' list that is seen

3    on ExpressPoll within the polling location.

4                 THE COURT:  Go ahead.

5    Q.   **(BY MR. RUSSO)**  Mr. Barnes, are you familiar with the

6    state's contract with ES&S for ballot building?

7    **A.**   I am.

8    **Q.**   And do you know if that contract has any security measures

9    in it to ensure that the ballot building process follows the

10   state's current procedures?

11   **A.**   I believe it does.

12                 MR. RUSSO:  No further questions, Your Honor.

13                 THE COURT:  Have you reviewed the contract?

14                 THE WITNESS:  Yes, ma'am.  I believe it is about four

15   or five pages in length with a very detailed section in

16   relation to what security requirements they are to uphold.

17                 MR. RUSSO:  Thank you.

18                 THE COURT:  Could I just ask a few questions that are

19   follow-up.  And, again, they don't count against anyone.  And

20   take a minute for my questioning as it is off beforehand.

21                              EXAMINATION

22   BY THE COURT:

23   **Q.**   Do you have any familiarity with the contract between the

24   Georgia Secretary of State's office and PCC?

25   **A.**   No, ma'am, I do not.

1    **Q.**   And are you involved in the voter registration database at

2    all?

3    **A.**   I have access to the voter registration database in order

4    to obtain files to build the electronic data set for

5    ExpressPoll, but I do not work in the voter registration

6    division.

7    **Q.**   All right.  But the data from the -- that is being

8    manipulated or in the past was manipulated on the software and

9    operations of PCC, would that be transferable then to the

10   Secretary of State's office?

11   **A.**   I do not know.

12            THE COURT:  All right.  Thank you very much.

13            MS. BURWELL:  No questions, Your Honor.

14            MS. BENTROTT:  Some redirect, Your Honor.

15            THE COURT:  All right.

16                       RECROSS-EXAMINATION

17   BY MS. BENTROTT:

18   **Q.**   Thank you, Mr. Barnes.  When you plug the USB drive into

19   your public-facing computer to reformat it, you have to unlock

20   the USB drive; correct?

21   **A.**   After I have placed the locked drive into the computer to

22   move -- copy the files over, I then remove the unlocked

23   drive -- I remove the locked drive, switch it to unlocked,

24   reinsert the drive back into the public computer, and then do

25   my formatting.

1  **Q.**   And that is true for the USB drive that you plug into the

2  GEMS servers; correct?

3  **A.**   That is the -- yes.  It is formatted on the public side

4  before it is placed back into the private side.

5          MS. BENTROTT:  Thank you.  Nothing further.

6          THE COURT:  May this witness step down?

7          MR. BROWN:  No further questions, Your Honor.

8          THE COURT:  Thank you very much.

9          I just want to get back again to the contract between

10  the Secretary of State's office and the PCC.  I don't know

11  whether the contract that just renewed is the same contract

12  other than date frame as the one that was reviewed in the cyber

13  risk assessment of 2018.  But if it is the same other than the

14  time frame, I don't need to see the one that was looked at in

15  2018.  But if it is a different one, I'll need both.

16          MR. TYSON:  Okay.  And, Your Honor, on that point, in

17  communicating with the Secretary of State's office, there are

18  some changes regarding the hosting obligation.  So it will be

19  different.  But the belief is that the auditing functions were

20  included.  So we're going to go ahead and get that for you.

21          THE COURT:  Okay.  Thank you very much.

22          MR. BROWN:  Your Honor, Bruce Brown.  We were going

23  to -- I was going to reference this in my opening.  But this

24  relates to the testimony of Mr. Barnes.  With your permission,

25  we're going to serve and file a hearing brief on evidentiary

1          THE COURT:  What was the letter?  What was the
2     exhibit number or letter of the affidavit?
3          MS. BURWELL:  Her affidavit is Document 277 starting
4     at Page 93.
5          THE COURT:  Okay.  It is not in this group.  All
6     right.  Thank you.
7          Do you remember what the mid level price was?
8          THE WITNESS:  Twenty-six cents per ballot.
9          When you -- and this is something that we did when we
10    transitioned.  But when you factor in the cost of, you know,
11    less equipment, less delivery, all of that, coupled with the
12    cost of the ballot printing, you actually see more of a savings
13    when you are not having to have as much equipment out in the
14    field and process all of that out in the field.  So it varies.
15    But we saw a savings.
16         THE COURT:  All right.  Thank you.
17         MR. BROWN:  I just have one follow-up question, Your
18    Honor.
19                    REDIRECT EXAMINATION
20    BY MR. BROWN:
21    **Q.**  You testified that you saw some savings.  And just so the
22    record is clear, you saw some savings in the transition from
23    DREs to hand paper ballots?  Is that what you meant?
24    **A.**  Yes.  So we no longer needed a warehouse.  We had a
25    40,000-square-foot warehouse where we had DREs that went away.

1                        THERESA PAYTON,

2       after having been first duly sworn, testified as follows:

3                        CROSS-EXAMINATION

4    BY MR. CROSS:

5    **Q.**   Good afternoon, Ms. Payton.

6    **A.**   Good afternoon.

7    **Q.**   Do you consider yourself an expert on election security?

8    **A.**   Yes, Your Honor, I do, on certain aspects of election

9    security.

10   **Q.**   Specifically involving cybersecurity in elections?

11   **A.**   Yes.

12   **Q.**   And --

13             THE COURT:  What aspects do you not feel like you're

14   an expert on?

15             THE WITNESS:  Well, it will depend as we go into sort

16   of the context of different parts of it.  But as it relates to

17   cybersecurity, pretty much any hardware or software and sort of

18   oversight of a process, we look at that at Fortalice Solutions,

19   whether it is election security or any other process.

20   **Q.   (BY MR. CROSS)**  Ms. Payton, as someone with some expertise

21   in election security, your biggest worry and concern going into

22   the midterm elections of last year was that citizens would not

23   trust election results and that the election process would lose

24   legitimacy; right?

25   **A.**   That is correct.  I'm actually working on a book that I've

1  been working on the better part of two years around -- I call

2  it sort of the security of the ecosystem, everything from

3  campaigns, to the party headquarters, to how the different

4  states run things in the elections, as well as the manipulation

5  that occurred on social media.

6  **Q.**   And going into the midterm elections of last year, you had

7  grave concerns about election interference; correct?

8  **A.**   I did, yes.  Still do.

9  **Q.**   In fact, going into the midterms of last year, you believe

10  that one thing that we can be sure of is that a U.S. election

11  will be hacked, no doubt about it; right?

12  **A.**   Yes.  Now, as far as kind of --

13          THE WITNESS:  If you don't mind, Your Honor, I would

14  like to give a little bit more context if you want it or I can

15  give more context later.

16          MR. CROSS:  Since it is on my time, I would rather

17  her just rely on redirect.

18          THE COURT:  That is fine.

19          THE WITNESS:  Sure.

20          MR. CROSS:  Thank you, Your Honor.

21  **Q.   (BY MR. CROSS)**  Did you watch any of the Congressional

22  hearings with Robert Mueller?

23  **A.**   I listened to it first thing in the morning on the way in

24  to work.  You mean the one that occurred this week, sir?

25  **Q.**   Yesterday.

1    **Q.**   In fact, you have praised Wisconsin for the fact that it

2    uses paper ballots; right?

3    **A.**   Yes.  In the op-ed, that is correct.

4    **Q.**   In the Georgia system, you mentioned a running print.

5    There is not actually a running print?  There is just the

6    single total at the end; right?

7    **A.**   That is -- as I understand it from the demonstrations I

8    have seen, yes.

9    **Q.**   Now, you agree that suppressing even a relatively small

10   handful of votes, particularly in a local election with a small

11   number of voters, could be enough to change the outcome of an

12   election; right?

13   **A.**   It is possible.  You certainly don't want a single vote

14   suppressed.

15   **Q.**   And you are aware of cyber attacks in 2018 on the

16   infrastructure that could actually suppress voter turnout in

17   the U.S.; right?

18   **A.**   There is the possibility.

19       Are you referring to Illinois or a specific event or just

20   in general?

21   **Q.**   Well, you're aware that in 2017 and 2018 security

22   researchers discovered that Russian hackers were probing the

23   U.S. electrical grid?

24   **A.**   That is correct.  Department of Homeland Security and

25   others went out to talk to the states that had those probes.

1   assessments, including whether any attempts to penetrate

2   systems have been successful.  If you need to take a look at

3   that, go ahead.

4   **A.**   Uh-huh (affirmative).

5   **Q.**   So we've heard a lot about it.  But just to lay the

6   groundwork, you conducted, your team, three assessments in 2017

7   and 2018, one in October '17, one in February of '18, and one

8   in November of '18, for the Secretary of State; right?

9   **A.**   That's correct.

10  **Q.**   So the assessments you are talking about here in

11  Paragraph 4 -- you are talking about those assessments in

12  looking for attempts to penetrate -- to see whether penetrate

13  systems have been successful; right?

14  **A.**   Uh-huh (affirmative).  Yes.

15  **Q.**   Just so we are clear, that work did not include examining

16  GEMS servers, DREs, memory cards, scanners; right?

17  **A.**   That is correct.

18  **Q.**   So I gather you were not engaged to do that analysis for

19  your declaration either; right?

20  **A.**   That is correct.

21  **Q.**   Or for those three risk assessments; correct?

22  **A.**   Correct.

23  **Q.**   In Paragraph 4 of your declaration, you say that the risk

24  assessments included an attempt to isolate malicious activity;

25  right?

1    **A.**    Yes.

2    **Q.**    You did not conduct that analysis for the purpose of those

3    risk assessments or your declaration with respect to GEMS

4    servers, DREs, memory cards, or scanners; correct?

5    **A.**    That is correct.

6    **Q.**    You could have, but you were not engaged to; right?

7    **A.**    That is correct.  They -- it was a different focus and a

8    bigger part of the ecosystem.

9    **Q.**    In Paragraph 4, you also point out that your risk

10   assessments included an attempt to determine where any

11   malicious activity originates; right?

12   **A.**    Yes.

13   **Q.**    And as with the other, that assessment did not include

14   GEMS servers, DREs, memory cards, or scanners; right?

15   **A.**    Correct.

16   **Q.**    You could have done it, but you were not engaged for that;

17   right?

18   **A.**    Correct.

19   **Q.**    You participated -- strike that.

20        So let's talk about the October of 2017 assessment, which

21   is Exhibit 1.  If you need a copy of it, let me know.

22   **A.**    I would like to have it.

23   **Q.**    Sure.

24   **A.**    We write hundreds of reports every quarter.  So I would

25   just like to have it.

```
 1    Q.   I understand.  Are the exhibits still up on the stand?  It
 2    may be in front of you.  It is Exhibit 1.
 3              THE COURT:  I think it is going to be larger than
 4    that.
 5              COURTROOM DEPUTY CLERK:  Mr. Beaver took the exhibits
 6    when he left.
 7              MR. LAKE:  We may have it.  Which one are you looking
 8    for?
 9              THE COURT:  Exhibit 1.
10              THE WITNESS:  I don't have it.
11              THE COURT:  He was ready to leave.
12              MR. CROSS:  He was eager to get out.
13              Thanks, Bryan.
14              MR. TYSON:  How many do we need?
15              MR. CROSS:  Just one for her.
16              May I approach, Your Honor?
17              THE COURT:  Yes.
18              Are you handing her a redacted one or not redacted?
19              MR. CROSS:  This is unredacted just for her so she
20    has full context.
21    Q.   (BY MR. CROSS)  So, Ms. Payton, you have what has been
22    marked as Exhibit 1.  And this is a copy of the assessment that
23    your team prepared in October of 2017 for the Georgia Secretary
24    of State; right?
25    A.   Yes.
```

1  Q.   And your team assessed the Secretary of State IT security

2  as Tier 2 on the NIST scale?  I think you mentioned NIST a

3  moment ago; right?

4  A.   Yes, sir.

5  Q.   What that means is that awareness of cybersecurity

6  risks -- that they had an awareness of cybersecurity risks at

7  the organizational level but an organization-wide approach to

8  managing cybersecurity risks had not been established.  That is

9  what that meant; right?

10  A.   That is what it means, yes.

11  Q.   And your team at that time identified 22 security risks in

12  the Secretary of State's IT operations; correct?

13  A.   We did.

14  Q.   And you characterized most of those as significant risks;

15  right?

16  A.   We did.

17  Q.   One of those risks was widespread local administration

18  rights or administrative rights; correct?

19  A.   That's correct.

20  Q.   And that meant that all Georgia Secretary of State users

21  who had any sort of log-in credentials were granted

22  administrative rights on their work stations; right?

23  A.   Yes.  In some cases, yes.

24  Q.   And by administrative rights, that means they have the

25  ability to, for example, download software; right?

**A.**   Yes.  If they know that is there.  Not all users do.

**Q.**   You understood -- in fact, advised the Secretary of State
that this increased the likelihood that malware or a malicious
actor would be able to successfully compromise a user's work
station through email, web, or removal of media?

**A.**   Yes.  It is one of the first things we look for.  This is
actually pretty common to see this vulnerability in private
sector firms and government organizations.

**Q.**   Ms. Payton, the problem was particularly acute at the
Georgia Secretary of State though because users not only had
administrative rights on their own work stations but they
had -- any individual users had administrative rights on all
work stations?  You found that; right?

**A.**   In some cases, yes.

**Q.**   This meant that an attacker who took advantage of having
access to the administrative rights could -- with access to a
single work station could quickly access any other work station
and gain administrative rights to spread malware, install
remote access tools, or access sensitive data?  That is what
you found; right?

**A.**   Yes.

        Do you want some context, or you just want yes or no?  I
just want to be respectful of your time.

**Q.**   I appreciate that.  I'm on the clock, and there are a lot
of really smart people across the aisle that will have lots of

1  good questions for you.

2  **A.**   Okay.

3  **Q.**   Another risk you identified was the lack of two-factor

4  authentication for remote access; correct?

5  **A.**   Yes.  That is correct.

6  **Q.**   And that meant that the Georgia Secretary of State users

7  were able to remotely access the Secretary of State network

8  using only a user name and a password?

9  **A.**   At that time, yes.

10  **Q.**   And best practice, even as of this time, was to go to at

11  least a two-factor authentication?  You recommended that?

12  **A.**   Absolutely.  Two-factor whenever you can do it.

13  **Q.**   You found that this level of security was insufficient,

14  particularly given the possibility of fishing attacks or the

15  theft of credentials; right?

16  **A.**   Yes.

17  **Q.**   And this particular vulnerability involves remote

18  access -- people remotely accessing their Secretary of State

19  accounts outside of the office; correct?

20  **A.**   Yes.  This is something we very commonly find in many

21  organizations.

22  **Q.**   Did you hear today that the Secretary of State relies on

23  individuals to design and develop GEMS databases working out of

24  their personal homes?

25  **A.**   I did not.  I don't think I was here for that, sir.

1  **Q.**   Have you ever heard that before today?

2  **A.**   I had not.

3  **Q.**   So that is not something you evaluated for your risk --

4  either of the three risk assessments; right?

5  **A.**   No.  That is correct.

6  **Q.**   That is not something you evaluated for your declaration;

7  correct?

8  **A.**   Correct.

9  **Q.**   Another risk that you identified was the use of nonunique

10  local administrator passwords; right?

11  **A.**   That is correct.

12  **Q.**   And that risk you advised the Secretary of State could

13  allow an attacker who compromises one work station on the

14  network to obtain the local administrator account credentials

15  and then use those credentials to gain access to any other work

16  stations or servers; right?

17  **A.**   Yep.  Again, this is a common attack vector that we see

18  attackers take.  And it is something we very commonly see as a

19  deficiency in organizations.

20  **Q.**   You keep saying that.  But let's be clear.  Nowhere in

21  your declaration do you state that the risk factors that you

22  have identified -- that those are present in the election

23  systems or in any way in the Secretary of State's office of any

24  other state?  That does not appear in your declaration;

25  correct?

223

1   **A.**   Correct.

2   **Q.**   That also does not appear in any of the three assessments

3   that you did for the Secretary of State; correct?

4   **A.**   What doesn't appear?

5   **Q.**   That the risk factors that you have identified, that each

6   of those -- let's just take 2017.  That the 22 risk factors you

7   identified, that you had conducted a similar analysis of a

8   Secretary of State and found the same risk factors?  That does

9   not appear in your assessments?

10  **A.**   That is correct.  It does not.

11  **Q.**   On the one we were just talking about, nonunique local

12  administrator passwords, when you did your third assessment,

13  which completed November 30 of 2018, you found that that one

14  was still present; right?

15  **A.**   We did.  It is very common.  It is hard to get things

16  fixed.  And sometimes the fixes break other things.  So that is

17  why sometimes it is a little bit more complex than just turning

18  it on.

19  **Q.**   But you did recommend in October of 2017 that they fix

20  that?

21  **A.**   Yes, we did.

22  **Q.**   So by the time we got beyond the midterm election of 2018

23  where 4 million voters in the State of Georgia voted, you found

24  that that assessment -- that risk was still present; correct?

25  **A.**   That's correct.  What I can tell you is these roadmaps

1    when we -- first of all, we get paid to find things.  That is

2    our job.  But secondly --

3    **Q.**   Ms. Payton, I promise you are going to get an opportunity

4    to explain from them.

5    **A.**   Okay.

6    **Q.**   So we have the timing right, the 22 risks -- your team

7    identified these 22 risks and successfully even penetrated the

8    Georgia systems as reflected in your October 2017 report;

9    right?

10   **A.**   Yes.

11   **Q.**   And this occurred after it was widely publicly known that

12   Russia had attempted to interfere in the 2016 elections; right?

13   **A.**   It was becoming more publicly known at that point.  Yes.

14   **Q.**   So then for the February 2018 assessment, that one focused

15   on the PCC technology which at that time owned and operated the

16   voter registration database; right?

17   **A.**   Yes.  That is correct.

18   **Q.**   And they continued to own and operate the registration

19   database through the midterm elections of last year; right?

20   **A.**   Yes.

21   **Q.**   In fact, we heard today I think that only recently until

22   July of this year has there been efforts undertaken to switch

23   that and to give some more authority to the Secretary of

24   State's office?  Had you heard that?

25   **A.**   I was not in the room for that.

1   **Q.**   In the February 2018 assessment, you identified 15

2   security risks with PCC involving the voter registration

3   databases; right?

4   **A.**   I believe that is correct.  I'm trying to flip -- do

5   you -- do you know where it is in here?  I just want to make

6   sure.

7   **Q.**   I think it is right in the front of the February

8   assessment.  I think it is on the first page.

9   **A.**   This is a thick document.  So hold on a second.  Let me --

10  **Q.**   Do you have the February one up there, or do you need that

11  one too?

12          MR. TYSON:  We have the February one.

13          THE WITNESS:  Yeah.  I just have the 2017.

14          MR. CROSS:  May I approach?

15          THE COURT:  Yes.

16  **A.**   What page are you on?

17  **Q.   (BY MR. CROSS)**  I think it is the first.  Let's see.  If

18  you look at the second paragraph, you see it reads --

19  **A.**   On Page 3?

20  **Q.**   First substantive page, Page 3.  Are you there?

21  **A.**   Yes.

22  **Q.**   Thank you.  It reads, Cloudburst Security suggests

23  remediating the 15 identified security risks included in this

24  report.  Do you see that?

25  **A.**   Yes, I do.

1  **Q.**   So does that refresh your recollection that as of the

2  February 2018 report your team had identified 15 security risks

3  with respect to the PCC and the voter registration?

4  **A.**   Yes.

5  **Q.**   As part of the assessment you did, you actually reviewed

6  the contract between the Secretary of State's office and PCC;

7  right?

8  **A.**   Yes.

9  **Q.**   And you found that the contract did not contain any

10 cybersecurity requirements at all; correct?

11 **A.**   Yes.  Also common oversight.

12 **Q.**   But, again, there is no indication in this report that the

13 Secretary of State didn't need to take that seriously because

14 it just happens all over the country?  That doesn't show up in

15 there; right?

16 **A.**   Just because it happens other places doesn't mean I don't

17 take it seriously or tell my clients not to.

18 **Q.**   Thank you.  That would be the point.

19     You found that PCC was relying on outdated software that

20 was known to contain critical security vulnerabilities; right?

21 **A.**   Correct.

22 **Q.**   You noted that an attacker with sufficient time and

23 resources could exploit those vulnerabilities; right?

24 **A.**   Yes.

25 **Q.**   You identified certain remote access vulnerabilities as

1    well; right?

2    **A.**    Yes.

3    **Q.**    In particular, PCC did not block VPN connections from IP

4    addresses of known threat sources or foreign countries; right?

5    **A.**    Correct.

6    **Q.**    And you identified a number of missing critical operating

7    system patches, unsupported software, and vulnerable

8    third-party software; right?

9    **A.**    Correct.

10   **Q.**    Then you did a third assessment that was between September

11   and November 30 of 2018; right?

12   **A.**    Yes.

13   **Q.**    That actually --

14   **A.**    May I have a copy of that just to be on the safe side?

15   **Q.**    Yes, ma'am.

16   **A.**    Thanks.  Thank you.

17          MR. CROSS:  I'm afraid Mr. Tyson is going to hand

18   me -- he is going to trick me here and give me something I

19   shouldn't show you.

20   **Q.**    **(BY MR. CROSS)**  So you have that one in front of you?

21   **A.**    Yes, I do.

22   **Q.**    And based on the assessment that you did that ended on

23   November 30 of 2018, you made 20 additional recommendations to

24   the Secretary of State to improve their cybersecurity; right?

25   **A.**    We did.

228

```
1   Q.   And according to your declaration -- I think it is
2   Paragraph 7 if you want to grab a copy.
3        Do you have that in front of you?
4   A.   Yes.
5   Q.   Of the risks outlined in the 2017 report, your team found
6   that as of the November 30, 2018, reassessment, you say three
7   risks have been remediated with compensating controls; right?
8   A.   Yes.
9   Q.   So 3 out of the 22 that you had identified in 2017 had
10  been remediated as of November 30; right?
11  A.   Yes.
12  Q.   And another three were in process; right?
13  A.   Yes.
14  Q.   Meaning that as of November 30, weeks after the midterm
15  election, your team found that of the 22, 19 had not been
16  remediated at all; right?
17  A.   Correct.
18  Q.   And 16 were not even in process; right?
19  A.   That's correct.
20  Q.   So you weren't here for Mr. Beaver's testimony, I believe
21  you said?
22  A.   No.
23  Q.   Mr. Beaver testified that he thought you were wrong about
24  that.  So I'll ask you:  Were you careful when you prepared
25  your declaration?
```

1   **A.**   Yes.

2   **Q.**   Were you careful when you conducted these assessments?

3   **A.**   Yes.

4   **Q.**   Did you adhere to professional standards when you

5   conducted each of these assessments?

6   **A.**   Yes.

7   **Q.**   Did you follow the scope of the work as it was laid out

8   for you?

9   **A.**   Yes.

10   **Q.**   And were you honest and accurate in the declaration you

11   provided here?

12   **A.**   Yes.

13   **Q.**   As you sit here today, do you have any reason to believe

14   that you're mistaken, that your team was wrong in saying only 3

15   of the 22 risks had been remediated as of November 30, 2018?

16   **A.**   I stand by what I have in my affidavit.

17   **Q.**   And when you prepared the November 30, 2018, risk

18   assessment, did anyone at that time from the Secretary of

19   State's office say to you, you've made a mistake, we have

20   actually remediated more?

21   **A.**   No.

22   **Q.**   And since you prepared your declaration, has anybody on

23   behalf of the state told you that your declaration was wrong in

24   any way?

25   **A.**   No.

```
 1   Q.   We talked earlier that you mentioned NIST.  You actually
 2   provided a numeric score to Georgia Secretary of State as part
 3   of your November 30, 2018, assessment; right?
 4   A.   Yes.
 5   Q.   And that score ranges from 0 to 100; right?
 6   A.   Which score?
 7   Q.   Well, you gave them --
 8   A.   Are you talking about the NIST score or the risk weighting
 9   model that we use?
10   Q.   It is the one -- if you look at the bottom, you see there
11   on the report it has your name and then there is a little
12   series of numbers, Payton and then zero zero zero.
13   A.   Uh-huh (affirmative).
14   Q.   Look at the one that ends in Page 112, if you will.
15   A.   120?
16   Q.   112.
17   A.   I'm sorry.  I feel dumb.  I don't know what -- oh, you
18   mean from 2017.  And then I'm looking for 112?
19   Q.   Yes.  Sorry.
20            THE COURT:  Are we talking about 112 in the 2018
21   report?
22            MR. CROSS:  Yeah.  The 2018 report.
23            THE COURT:  The November 2018?
24            THE WITNESS:  Sorry.
25            MR. CROSS:  The one you had.
```

1            THE WITNESS:  I'm sorry.

2            MR. CROSS:  It is Page 43 of your report, if that

3    makes it easier.

4            THE WITNESS:  Yes.  Thank you.

5    **Q.   (BY MR. CROSS)**  So here you have -- there is a chart, and

6    you give them a score based on your overall assessment; right?

7    **A.**   Yes.

8    **Q.**   And that score is between 0 and 100; right?

9    **A.**   That's correct.

10   **Q.**   What is good?  0 or 100?

11   **A.**   100, just like grade school.

12   **Q.**   I figured.  The score you gave them was only 53.98 on your

13   overall assessment; right?

14   **A.**   Correct.  It is a little different -- well, I'll just say

15   correct.

16   **Q.**   Thank you.

17   **A.**   Save you the time.

18   **Q.**   You are very kind.

19        In October of 2017, your team expressed -- going back to

20   October '17, your team expressed an overarching concern for the

21   lack of control and oversight the state was able to maintain

22   over the voter registration database; right?

23   **A.**   Correct.

24   **Q.**   In February 2018, you identified, as we discussed earlier,

25   15 security risks involving the same registration databases;

1   **Q.**   I think so.  If you start on 191 -- just so we're clear,

2   look at the bottom of 191.  Do you see it indicates that these

3   are the notes of the interview with Chris Harvey?

4   **A.**   Yes, I do see that.  Yes.

5   **Q.**   Do you see in the middle where you were looking -- do you

6   see in all caps who hosts it?  Do you see that?

7   **A.**   Yes.

8   **Q.**   The answer is PCC vendor from 2012.  Do you see that?

9   **A.**   Yes.

10  **Q.**   And to get there, again, we're talking about the voter

11  registration databases; right?

12  **A.**   Yes.  That's correct.

13  **Q.**   And Mr. Harvey indicated at this time that, being the

14  voter registration databases, that is what Russian hackers

15  would want to get into?  Do you see that?

16  **A.**   Yes.

17  **Q.**   So that was -- that feedback was at least among the

18  factors that you and your team considered in advising the

19  Secretary of State to remediate the risk that you found with

20  the voter registration database at that time; right?

21  **A.**   Yes.

22  **Q.**   You then did your November 2018 assessment.  But at that

23  point in time having looked at the voter registration database

24  twice before and found a number of risk factors, by the time we

25  get to the timing of the midterm elections, the Secretary of

1    State directed you that PCC and the voter registration database

2    was out of scope for the November 2018 assessment; correct?

3    **A.**    Yes.

4    **Q.**    So we're clear, for the November 30, 2018, assessment,

5    coinciding with the midterm elections, you did not conduct an

6    assessment of PCC or the voter registration databases in the

7    way that you had for the prior reports?

8    **A.**    Correct.

9    **Q.**    Do you recall that your team interviewed Lorri Smith, the

10   chief operating officer?

11   **A.**    I do.  I don't remember the notes exactly.

12   **Q.**    I can direct you if you need it.  But do you recall that

13   she informed your team that she thought the state's weakest

14   link is their employees?

15   **A.**    That is actually a common saying of the cybersecurity

16   industry, that the human is the weakest link.

17   **Q.**    That was one of the things you heard here; right?

18   **A.**    I didn't hear it here.  I wasn't here for --

19   **Q.**    Your team did?

20   **A.**    During the interviews?

21   **Q.**    Yes.

22   **A.**    Yes.  Yes.  I mean, Secretary of State of Georgia was

23   incredibly candid and critical of themselves throughout the

24   interviews.

25   **Q.**    Which, again, is what helped you identify 22 risks in

275

1   **A.**   I wouldn't want to run my stuff on it.  But you can get --

2   you can pay for patches.  The banks are paying for patches for

3   ATMs.

4   **Q.**   You anticipated where I was going.

5        Are you aware that from the evidence we have seen the last

6   patch to the current election system using GEMS and DREs is

7   from -- at least for GEMS, I think, is 2005?

8   **A.**   No.  I was not aware.

9   **Q.**   You did penetration testing in November 2018 that

10  successfully gave your team administrative rights over the

11  Secretary of State's domain; right?

12  **A.**   Correct.

13  **Q.**   You talked about your Fortune 500 clients today.  And I

14  don't want to reopen a door.  But since the judge allowed some

15  of that, I just briefly want to touch on it.

16       But just so we are clear, you are not offering an opinion

17  in this case that the same level of security that would be

18  appropriate for, say, a Fortune 500 company dealing with their

19  own private data -- you are not offering an opinion to the

20  Court that that would be appropriate security for managing an

21  election and election data and election equipment; right?  That

22  is not an opinion you have offered in this declaration; right?

23  **A.**   I have not offered that in the declaration.  That is

24  correct.

25  **Q.**   The risk assessments you did, that was only for the

276

1    Secretary of State; right?

2    **A.**    And the vendor.

3    **Q.**    And the vendor?

4    **A.**    Yes.

5    **Q.**    You didn't do a similar risk assessment for any of the 159

6    counties in Georgia; right?

7    **A.**    That is correct.

8    **Q.**    So in looking at the vulnerabilities -- cybersecurity

9    vulnerabilities, you did not assess the degree to which each of

10   the counties, for example, having their own GEMS servers --

11   what vulnerability that might present for the Secretary of

12   State; right?

13   **A.**    That's correct.

14   **Q.**    Are you aware that county election servers are connected

15   to phone lines using modems?  Was that something you knew?

16   **A.**    We did not look at that architecture.

17   **Q.**    Were you here for Mr. Barnes' testimony?

18   **A.**    Part of it, I believe.  I came in towards the end of

19   somebody's testimony.  I'm sorry if I -- I think it was

20   Mr. Barnes.

21   **Q.**    Are you aware that Mr. Barnes testified today and then

22   again in September of last year that he has a USB drive he

23   plugs in to his public-facing computer, which means he is

24   connected to the internet, and then he plugs that same USB

25   drive into what he calls an air-gapped GEMS server?  Do you see

```
 1                    C E R T I F I C A T E

 2

 3    UNITED STATES OF AMERICA

 4    NORTHERN DISTRICT OF GEORGIA

 5

 6         I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7    the United States District Court, for the Northern District of

 8    Georgia, Atlanta Division, do hereby certify that the foregoing

 9    312 pages constitute a true transcript of proceedings had

10    before the said Court, held in the City of Atlanta, Georgia, in

11    the matter therein stated.

12         In testimony whereof, I hereunto set my hand on this, the

13    2nd day of August, 2019.

14

15

16

17                         _____
                           SHANNON R. WELCH, RMR, CRR
18                         OFFICIAL COURT REPORTER
                           UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT