# EXHIBIT 30

Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION
 3
       DONNA CURLING, ET AL.,
 4
                  Plaintiffs,
 5                                    CIVIL ACTION FILE
            vs.                       NO. 1:17-CV-2989-AT
 6
       BRAD RAFFENSPERGER, ET AL.,
 7
                  Defendants.
 8
 9
10
11           VIDEOTAPED ZOOM DEPOSITION OF
                      JAMES OLIVER
12
                   January 17, 2022
13                    8:09 A.M.
14
15      Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC
16
17
18
19
20
21
22
23
24
25
```

1       system?
2                 MS. LaROSS:  Objection as to form.
3                 THE WITNESS:  And I don't recall.  I mean,
4          I received -- I received a -- I received a
5          report of engagement that they had done during
6          portions of the time that the election system
7          had been -- was under the Secretary of State's
8          control, but I don't -- I don't recall to what
9          extent.
10      BY MR. CROSS:
11           Q.   What can you tell me about what you recall
12      about any work Fortalice did with respect to the
13      Georgia election system?
14                MS. LaROSS:  Objection as to form.
15                THE WITNESS:  Right now, it's sketchy.
16         But, I mean, I know -- I know that they did
17         some assessment work as to -- when I say
18         "assessment," as far as reviewing the --
19         reviewing the infrastructure and making
20         recommendations as to what -- what should be
21         improved or what could be improved or
22         identifying any -- any weaknesses that they
23         felt needed to be strengthened.
24      BY MR. CROSS:
25           Q.   And what weaknesses, if any, did Fortalice

1    identify with the Georgia election system at any
2    point, to your knowledge?
3         A.   I don't recall.
4         Q.   You just can't recall specifically what
5    they were?
6         A.   No, I can't recall specifically what they
7    were, no.
8         Q.   What recommendations or improvements did
9    Fortalice recommend with respect to the weaknesses
10   with the Georgia election system?
11            MS. LaROSS:  Objection as to form.
12            THE WITNESS:  And I can't -- I can't say
13        that they recommended anything in regards to
14        the election system specifically.
15            They made recommendations as to the
16        infrastructure -- to the infrastructure, which,
17        like I said, at some point included the --
18        certain portions of the election system.  But
19        it wasn't -- it wasn't -- to my knowledge, I
20        can't -- I don't recall of any specific
21        recommendations to the election system itself.
22   BY MR. CROSS:
23        Q.   All right.  Let me pull up the next
24   exhibit for you.
25            (Plaintiffs' Exhibit 4 was marked for

Page 96

1    occurred, what response there was, anything like
2    that; is that right, sir?
3         A.   That is correct, sir.
4              MS. LaROSS:  Object as to form.
5    BY MR. CROSS:
6         Q.   You said the voting machines are never
7    supposed to be on the Internet.
8              Do you know whether any of the voting
9    equipment that's currently used in Georgia has ever
10   been connected to the Internet, or you just don't
11   know one way or the other?
12        A.   I don't know one way or the other.
13        Q.   Are you aware of whether the election
14   management server that the Secretary of State
15   manages for the existing Dominion voting equipment,
16   are you aware of whether that's supposed to be air
17   gapped?
18             MS. LaROSS:  Objection as to form.
19             THE WITNESS:  And just in the general
20        state of the question, I would say, yes, that
21        it should be air gapped.
22   BY MR. CROSS:
23        Q.   And what does "air gapped" mean in the
24   cybersecurity context?
25        A.   Basically means that it doesn't -- it

1     doesn't have access to the general Internet, meaning
2     that my -- my son sitting at home should not be able
3     to go on the Internet and access that system by any
4     means.
5          Q.   Do you know whether the election
6     management server that the Secretary of State has
7     is, in fact, air gapped?
8          A.   I -- I don't -- I don't recall.
9          Q.   Okay.  To ensure that it's air gapped, it
10    would have to be completely detached, disconnected
11    from other parts of the IT infrastructure that the
12    Secretary manages that do have Internet connections;
13    right?
14              MS. LaROSS:  Object as to form.
15              THE WITNESS:  In theory -- in theory, that
16         is correct, yes.
17    BY MR. CROSS:
18         Q.   Okay.  And given that you were the manager
19    for security and managed significant aspects of the
20    IT infrastructure, wouldn't you need to be involved
21    to ensure that the election management server itself
22    is air gapped?
23              MS. LaROSS:  Objection as to form.
24              THE WITNESS:  In general -- in general
25         theory, that should -- that would be correct,

Page 98

1      yes.
2   BY MR. CROSS:
3      Q.   But do I understand correctly you were not
4   involved in any efforts one way or the other to
5   determine whether that -- that server is air gapped;
6   is that right?
7           MS. LaROSS:  Objection as to form.
8           THE WITNESS:  To my knowledge, no.
9   BY MR. CROSS:
10     Q.   Okay.  All right.  Let's take a look at
11  Exhibit 8, Mr. Oliver.  I'll pull it up here in just
12  a moment.
13          (Plaintiffs' Exhibit 8 was marked for
14      identification.)
15          MR. CROSS:  And by the way, I'm happy to
16      take a break whenever you want.  I was going to
17      keep going because I want to get you out of
18      here as quickly as we can on a holiday, but if
19      you want to take a break, just say the word.
20          THE WITNESS:  All right.
21          MR. CROSS:  All right.  Let me share this.
22      This is all a lot easier when you're in person.
23  BY MR. CROSS:
24     Q.   All right.  Can you see Exhibit 8 here?
25     A.   Yes, I see Exhibit 8, yes.

Page 140

1  voters that have brought constitutional challenges,
2  claims that allege that the voting machines that are
3  used in Georgia are not constitutional because they
4  are too unreliable to guarantee the right to vote?
5        Do you understand that?
6    A.  I -- I understand the statement, yes, but
7  I was not aware that that's how the lawsuit had
8  instituted, no.
9    Q.  And are you aware that in this same
10 litigation, the judge actually entered an injunction
11 in 2019, August of 2019, preventing the State from
12 using the old DRE system?
13   A.  That, I am aware of.  I had received --
14 I -- I saw that -- I saw that in public forum.  I
15 was -- I didn't have any, like, official information
16 on that, but based on public forum, I knew that the
17 judge had made that ruling, yes.
18   Q.  And were you aware that that ruling was
19 based, in part, on testimony from our expert,
20 Dr. Alex Halderman?
21   A.  No, I was not aware of that, no.
22   Q.  Are you aware that Dr. Halderman has
23 analyzed the voting equipment that's used in Georgia
24 today, specifically the BMD, the scanner, the
25 printer that's used, to assess the reliability and

1      security of that equipment?
2          A.   No, I was not.
3               MS. LaROSS:  Object to form.
4               Go ahead, Mr. Oliver.
5               THE WITNESS:  I think I -- I think I
6      got -- I think I answered it already.
7      BY MR. CROSS:
8          Q.   So you weren't aware that he issued a
9      detailed report finding that the current system
10     suffers from many significant vulnerabilities?
11     That's not something you heard before?
12         A.   No.
13              MS. LaROSS:  [Inaudible.]
14              COURT REPORTER:  I'm sorry.  I can't hear
15         the objections.  You're cutting out.
16         Ms. LaRoss, did you have an objection?  I'm
17         sorry, Ms. LaRoss, I did not hear your
18         objection.
19              MS. LaROSS:  Sure.  Objection as to form.
20         Thank you.
21     BY MR. CROSS:
22         Q.   Do you understand that the current BMD
23     system uses QR codes to tally votes?
24         A.   The answer to that would be yes, but only
25     because I'm a voter in the state of Georgia.

Page 142

1    Q.   Did you -- are you aware that the current
2    election equipment can be hacked in a way that QR
3    codes can be changed so that they don't reflect what
4    the voter actually intended when they voted on the
5    BMD?
6         MS. LaROSS:  Objection as to form of the
7    question.
8         THE WITNESS:  No, I -- I -- I was not
9    aware that that particular vulnerability
10   existed.
11   BY MR. CROSS:
12   Q.   As the former security manager for the
13   Secretary of State's office, if you were still in
14   that role today and had responsibility for the
15   voting equipment, would you take measures to
16   eliminate that vulnerability?
17        MS. LaROSS:  I object as to form of the
18   question.
19        THE WITNESS:  And ask that question for me
20   again.  I'm trying to formulate the answer
21   here.  Could you -- could you repeat that for
22   me?
23   BY MR. CROSS:
24   Q.   Yeah.
25        If you were -- if you were still with the

1    Secretary's office today as the security manager and
2    had responsibility for the election systems,
3    including the voting equipment, and you learned that
4    QR codes could be changed so that they did not
5    capture the selections voters intended when they
6    voted on the BMD, would you take measures to
7    eliminate that vulnerability?
8            MS. LaROSS:  I object to the form of the
9        question.
10           THE WITNESS:  And my answer would be kind
11       of in two parts.
12           Having the responsibility would be one
13       thing.  Having the authority to actual --
14       actually take actions to mitigate such a
15       vulnerability is another thing.
16           Given the fact -- given that you had both
17       the responsibility and the authority to -- to
18       do so, then my answer would be, yes, I would
19       recommend.  Because as the security manager,
20       you can -- you -- your job is to recommend;
21       it's up to the owners of the data to take any
22       kind of mitigation action.  But would I
23       recommend various -- investigate and recommend
24       any solutions if there were any?  Yes.
25

1         vulnerability, yes.
2    BY MR. CROSS:
3         Q.   Would it surprise you to learn that the
4    Secretary of State's office has taken no measures to
5    mitigate, much less eliminate, any of the
6    vulnerabilities Dr. Halderman has found with the
7    existing system?
8              MS. LaROSS:  Object to the form of the
9         question.
10             THE WITNESS:  No.
11   BY MR. CROSS:
12        Q.   Why not?
13             MS. LaROSS:  Again, I object to the form
14        of the question to the extent it relies on the
15        predicate question.
16             THE WITNESS:  I guess why not would be
17        kind of -- I would -- I would base it -- I
18        would -- the answer would be based on -- based
19        on my -- my experience as security manager in
20        the role at the Secretary of State.
21   BY MR. CROSS:
22        Q.   Can you explain that?
23        A.   Well, it would be -- not -- not all
24   recommendations -- not all recommendations were
25   accepted.

Page 149

1         C E R T I F I C A T E
2
3
         STATE OF GEORGIA:
4
         COUNTY OF FULTON:
5
6
         I hereby certify that the foregoing transcript was
7        taken down, as stated in the caption, and the
         questions and answers thereto were reduced to
8        typewriting under my direction; that the foregoing
         pages represent a true, complete, and correct
9        transcript of the evidence given upon said hearing,
         and I further certify that I am not of kin or
10       counsel to the parties in the case; am not in the
         regular employ of counsel for any of said parties;
11       nor am I in anywise interested in the result of said
         case.
12
13
14
15       *Lee Ann Barnes*
16
         LEE ANN BARNES, CCR B-1852, RPR, CRR, CRC
17
18
19
20
21
22
23
24
25