# EXHIBIT 31

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF GEORGIA
 3                   ATLANTA DIVISION
 4

     _____
 5

     DONNA CURLING, ET AL.,
 6

                Plaintiffs,       CIVIL ACTION FILE
 7                                NO. 1:17-CV-2989-AT
     vs.
 8

     BRAD RAFFENSPERGER, ET AL.,
 9

                Defendants.
10   _____
11
12        VIDEO-RECORDED 30(b)(6) DEPOSITION
13          TAKEN VIA VIDEOCONFERENCE OF
14       GEORGIA SECRETARY OF STATES' OFFICE
15           BY: SANFORD MERRITT BEAVER
16                     AND
17            SANFORD MERRITT BEAVER
18           IN HIS PERSONAL CAPACITY
19             (Taken by Plaintiffs)
20              Atlanta, Georgia
21          Wednesday, February 2, 2022
22                  9:08 a.m.
23
24

             Reported stenographically by
25      V. Dario Stanziola, CCR (GA)(NJ), RPR, CRR
```

Page 6

1    Exhibit 24: E-mail string with the      214
     top from Merritt Beaver dated
2    11/12/2020
3    Exhibit 25: E-mail from Jason           220
     Matthews dated 11/3/2020
4
     Exhibit 26: E-mail string with the      224
5    top from Kevin Robertson dated
     8/14/2020
6
     Exhibit 27: E-mail string with the      226
7    top from Merritt Beaver dated
     3/3/2019
8
     Exhibit 28: E-mail from Nick Salsman    240
9    dated 8/14/2020
10   Exhibit 29: Document entitled           250
     Election Office Notes: 10 am
11   6/15/2020 Meeting
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
                                              Page 8
 1              THE STENOGRAPHER:  I can't hear him.
 2        A.    Can you hear me?
 3        Q.    You kind of cut in and out I think with
 4   the microphone.
 5        A.    I can sit closer.
 6              Is that -- is that better?
 7        Q.    Little bit.  It tends to lose the first
 8   word or two is what I hear.
 9        A.    I'm not sure what -- what to do for
10   you.
11              THE VIDEOGRAPHER: I can walk him
12         through making a quick adjustment, counsel,
13         that it should help.  Would you like to --
14         it could -- it's pretty quick.  We can do
15         it on the record or go ahead and go off
16         real fast.
17              MR. CROSS:  We can go off.
18              THE VIDEOGRAPHER:  The time is 9:10.
19         We're off the record.
20              (A DISCUSSION WAS HELD OFF THE RECORD.)
21              THE VIDEOGRAPHER:  The time is 9:11.
22         We're back on the record.
23   BY MR. CROSS:
24        Q.    Good morning, Mr. Beaver.
25        A.    Good morning.
```

1    You can flip through it.

2         A.    This looks -- yeah, this looks like the

3    document that counsel had shown me before.

4         Q.    Okay.  So scroll down to -- oh, there

5    are no page numbers.  The -- sorry about that.

6    The page that has amended topics on the top.  It

7    looks like it's page 7 of the PDF.

8         A.    I'm there.

9         Q.    And do you see topic 1 reads,

10   Implementation and operation of Georgia's current

11   election system limited to the following

12   subtopics and then there's subtopic A; do you see

13   that?

14        A.    Yes.

15        Q.    And then subtopic B and C are at the

16   top of the next page.

17             Do you see that?

18        A.    Yes.

19        Q.    And do you understand you've been

20   designated by the Secretary's office to testify

21   today on topics 1 A, B and C?

22        A.    Yes.

23        Q.    Okay. And then scroll down to topic 10,

24   if you would, please, which is on page 14 of the

25   PDF.

1        A.   I see.  Yes.

2        Q.   And do you understand you've been

3    designated to testify on that topic today?

4        A.   Yes.

5        Q.   And then if you come to the last topic,

6    18, on page 15; do you see that?

7        A.   Yes.

8        Q.   And do you understand you've been

9    designated to testify on that topic today as

10   well?

11       A.   Yes.

12       Q.   Are there any other topics in here that

13   you understand you're designated to testify on

14   today that we've not addressed?

15       A.   Give me a moment.  No.

16       Q.   Okay.  All right.  Come back to topic

17   1A, if you would, please.

18       A.   1A.  I'm here.

19       Q.   And what did you do to prepare to

20   testify on topic 1A today?

21       A.   I went and validated -- first off,

22   let's define malware.  Malware is an application

23   program that runs on a computer that was

24   basically designed to do an action of some sort,

25   all right?

1    to do anything with the old system.  When we

2    finished using the old system we just turned it

3    off.

4         Q.    When did that happen?

5         A.    We walked away from it.

6         Q.    When did that happen?

7               When did you turn off the old system?

8         A.    It was -- I'd have to go back and look.

9    I mean, I'd be guessing right now.

10        Q.    Do you have any time frame?

11              Was it 2019 when you rolled out the new

12   system or was it 2020?

13        A.    We had the old system still on -- I'll

14   say turned on.  But we essentially -- we call it

15   put it over in the corner because nobody was

16   using it for about six months just in case there

17   was any questions about something that was done

18   in that system.  So it would be somewhere towards

19   the end of '19, probably into early 2000 that we

20   literally unplugged it.

21        Q.    And did servers from the old system sit

22   in the same environment as the new system at any

23   point?

24        A.    Nope.  They were in totally different

25   racks.  In fact, the rack was on wheels.  When we

Page 17

```
 1    finished we literally rolled it into a caged area
 2    that was locked, pulled all the cables off of it
 3    and left it in a secure area.  So it -- nobody
 4    could accidentally get into it.  It would have
 5    taken somebody from my group to go reset it up.
 6         Q.   Okay.  Who did you meet with you said
 7    about two or three weeks ago to validate this for
 8    the system?
 9         A.   Who did I meet with?  My director of
10    technology.  My -- a couple of the people that
11    work with him.
12         Q.   What's his name?
13         A.   Jason Matthews.
14         Q.   You said Jason Matthews?
15         A.   Yeah, Jason Matthews.
16         Q.   And who else did you meet with?
17              What are their names?
18         A.   Ronnell Spearman and Kevin Fitts.
19         Q.   And they are report to the director of
20    technology?
21         A.   Yes.
22         Q.   And were they the ones that were
23    responsible for setting up the -- the new system
24    and turning off the old one?
25         A.   Ronnell was involved in that group,
```

Page 18

```
 1    Jason was involved in that group.  I think Kevin
 2    was more on the sidelines, was being informed as
 3    to what was going on.  He was part of the team
 4    that -- that was more consulted as to what we
 5    should do.  But I don't know that he had any
 6    hands-on.
 7         Q.   Do they have log-in credentials for the
 8    Dominion EMS server at the state?
 9         A.   Yes.
10         Q.   Do you?
11         A.   No.
12         Q.   Who else has log-in credentials for the
13    state Dominion EMS server?
14         A.   On the -- it's called the
15    infrastructure team.  Those are the IT people
16    that manage the servers.  They're probably maybe
17    two, two other people.
18         Q.   And they're on the infrastructure team?
19         A.   Yes.
20         Q.   Okay.  Do you know if anyone in Michael
21    Barnes's office has log-in credentials?
22         A.   I have one person that's on the
23    infrastructure team that works over in his group.
24    And I believe he does.  His group is actually in
25    a different building.  So we -- we have to have
```

1    somebody on site to support his group.

2         Q.   You said there's no equipment used with

3    the old system that's used with the new system.

4    Did I understand that right?

5         A.   Correct.  The old system was

6    Windows-based running access.  It's a very old

7    Windows 2000 environment.  The new system is

8    Android-based.

9         Q.   The -- the individuals who have log-in

10   credentials for the new system for the EMS

11   server, did you guys replace all of their laptop

12   computers, any electronic equipment that they use

13   for their work with respect to elections?

14        A.   Are you saying the -- the people that

15   work over in the -- in election center?  The

16   people that use this new environment?

17        Q.   I'm saying anyone who has access or

18   uses this new environment, did you replace all of

19   their electronic equipment that they use for

20   their work?  So computers, laptops, removable

21   media?

22        A.   Yes, all -- all desktops, everything

23   connected to that new environment, including the

24   wires in the wall, were all brand new.  The

25   desktop computers that they used to tie into it

Page 20

1    were brand new.  We started clean, fresh.  We did

2    not take any chances by introducing anything old.

3         Q.   And how do you -- I'm sorry.  Go ahead.

4         A.   We did not share any of the networking

5    infrastructure.  That was all new.

6         Q.   And are you saying -- you're also

7    saying that there is no data in the old system

8    that's used with the new system?

9         A.   Correct.  As I said, it's not

10   compatible.

11        Q.   So how does that work for the data in

12   E-Net?  Doesn't --

13        A.   So -- so for the new system, we had to

14   go back to E-Net and get new data and bring it

15   over to the new system.

16        Q.   All right.  So how did you do that?

17             I thought you said there's no data from

18   the old system used in the new system?

19        A.   The old system -- there are multiple

20   systems.  Their E-Net is not the voter -- the

21   votering balloting system.  The question that

22   this test talks about is all of the ballot and

23   voting system, not the voter registration system.

24   So when you're speaking of the system, I need you

25   to tell me which system you're talking about.  So

1    voter registration system is different than the

2    ballot generation system that feeds the -- the

3    vote-taking system, the voting system.  It's two

4    complete environments.  Two totally different

5    systems.

6         Q.   So you don't --

7         A.   The only thing that comes from one to

8    the other is E-Net will export information about

9    candidates over to the balloting system.

10        Q.   Do you not consider Georgia's voter

11   registration system part of the state's election

12   system?

13        A.   That is an umbrella statement.  And

14   when you say the election system, there are

15   numerous systems.  They're not tied together.

16   They're all independent systems that are run and

17   managed independently.  So you can't apply

18   something about one system to the other system.

19   Operating systems are different, applications are

20   different.  The actual users are different.

21        Q.   So let me -- let me just make sure I

22   understand.  I just want to see -- so does

23   Georgia's election system include the voter

24   registration database or that's something

25   separate?

1    included in the election system today?

2          A.    So they -- at the data center where the

3    election system is held there is a whole network

4    environments which components for security and

5    basically segmenting networks, the actual

6    environment itself.  Each of our environments

7    have those kind of components in it.  They're not

8    necessarily the same.  They're different based on

9    the system that it's protecting and the system

10   it's supporting.

11         Q.    Anything else, any other components?

12         A.    I'm sure there's other more detailed --

13   I mean, depending on how granular we want to get

14   into defining what an environment is holding.

15   But those are the high level things.

16         Q.    Okay.  What interactions are there, if

17   any, between the Dominion air gaps election

18   system that you talked about earlier that you

19   said is air gapped and the voter registration

20   database or E-Net?

21         A.    Well, there is not necessarily

22   interaction between the two.  There is a data

23   transfer that happens for each election where

24   somebody from the election center will download a

25   file from E-Net, it will go through numerous

1    security checks and then it gets uploaded into

2    the air gap environment following NIST protocols,

3    that's the National Institutes of Science and

4    Technology.  They're the ones that define that we

5    follow defining an air gapped environment.

6         Q.   And you said that -- so the data gets

7    transferred from E-Net into the Dominion EMS for

8    a particular election and it goes -- that process

9    goes through numerous security steps.

10             What are those security steps?

11        A.   So the device that gets used gets

12   formatted by an independent device that's not

13   tied to a computer.  It's strictly a formatter.

14   It's literally a hardware device that you plug

15   electricity into the wall.  That's it.  It has no

16   operating system other than a hard program that's

17   formats a USB.  So nothing could ever get stored

18   on it.  It formats the USB drive to clean it so

19   that we know nothing has ever moved to it or

20   anything that was on it is off.

21             Then it gets inserted into a PC that's

22   tied into the election system.  It is immediately

23   scanned -- once the file comes down to that thing

24   it's immediately scanned for any malware, any

25   strange things that could be also on it.  Then it

1  gets moved over to the -- a PC that's tied into

2  the air gapped environment and it gets uploaded.

3       Q.   And is that device, is that a hard

4  drive?

5       A.   It's a flash drive.

6       Q.   Oh, okay.  And is that a new flash

7  drive every time these transfers are done or are

8  those flash drives reused?

9       A.   Potentially could be reused.  But as I

10 said, they get completely formatted by a box that

11 is not tied to any Internet.  Cannot have

12 anything stored on it.  So if there was anything

13 on that flash drive, doesn't matter what it was,

14 it can't transfer off to the formatter.  The

15 formatter will format that completely blank.

16          So anything on it, malware, anything is

17 erased.  There's no transferring of old data to

18 the formatter because the formatter is not

19 intelligent to be actually able to hold anything.

20 It just has a function of format.  So it is

21 probably cleaner than a brand new purchased -- in

22 fact, I'll tell you it is cleaner than a brand

23 new purchased flash drive.  Even if we use a

24 brand new purchased flash drive, we clean it

25 first just in case the manufacturer had something

1    on that drive that they didn't know about, we

2    don't trust it.  We clean it.

3         Q.   Are ballot definition files stored on

4    the state EMS for each election?

5         A.   On the state EMS?  What do you mean?

6         Q.   The state EMS server, are ballot

7    definition files uploaded to that server each

8    year or for each election?

9              MR. DENTON:  Objection.

10        A.   I don't know the term EMS.

11        Q.   Election management system, the

12   Dominion -- the state server that we're talking

13   about.

14        A.   Oh, the ballot building system.

15        Q.   Yes.  Yes.  They're -- let's just back

16   up, make sure we're talking about the same thing.

17   What we've been talking about is a server that

18   the state uses that has the Dominion software on

19   it to run elections, right?

20        A.   Yes, that's the ballot building system.

21        Q.   Okay.

22        A.   So when you say EMS, now I understand

23   what you're saying.

24        Q.   Right.

25             And have you heard the term election

1    the process.  You can't use any of the old system

2    information in the new environment.

3        Q.   But you don't know, for example,

4    whether the counties use some of the same USB

5    drives, flash drives that they plugged in or used

6    with the old system, you don't know whether some

7    of them used those with the new system, right?

8        A.   As I said, it's incompatible.  The

9    flash drives were not the same as the current USB

10   drives.  They weren't USB.  They were a different

11   format.  The plug on them wouldn't fit.

12       Q.   You're saying that it's your belief

13   that the USB drives the counties use with the

14   with respect to elections on the GEMS system, the

15   DRE system, those wouldn't even plug into

16   equipment that they used with the BMD system; is

17   that -- is that really your belief?

18       A.   The DREs, this is the Windows-based

19   voting equipment, had a different format for

20   their flash drive.  They were a square drive

21   device that had, I don't know, 40-hole --

22   pinholes in it.  Wouldn't even come close to

23   fitting in a USB drive, which has got a very

24   rectangular slide-in port.  So the DREs took a

25   different format flash drive.

Page 35

1      Q.   But the DREs are not the only part of

2   the election system at the county level that uses

3   flash drives, right?

4           They also use desktop computers, laptop

5   computers, they have their own election servers

6   such as for election night reporting, for

7   managing their own system.  And those would take

8   the same flash drives that would fit on equipment

9   today, right?

10     A.   You asked me about a DRE interface.  I

11  answered you about a DRE interface.  So now then,

12  now you're asking me whether or not they have

13  computers that use USB flash drives, which is

14  yes.  The new system has computers which can

15  accept USB drives, yes.

16     Q.   And you've not undertaken any

17  investigation to determine whether the counties

18  got rid of all their old flash drives and

19  replaced them with new flash drives when the new

20  Dominion system was rolled out; is that fair?

21     A.   So if you're asking me if a USB drive

22  that was used with the old DRE system that was

23  running a Windows application using an access

24  database program that potentially could have had

25  malware that was attacking that system, which

Page 42

1    built it out, as I said, as a clean system.  We

2    did not use anything that was tied to the

3    Internet where malware can come into it, get in,

4    infect it.  We have only entered the information

5    that has been scanned for malware into that

6    environment.

7         Q.   So no one, to your knowledge, has

8    actually gone in and done any kind of forensic

9    analysis of any of the BMDs or the Dominion

10   servers at the state or county level to see if

11   they are infected with malware; is that right?

12        A.   I'm not aware of that.

13        Q.   Do you know why that has not been done

14   even on a sampling basis, for example?

15        A.   Not aware that there's any sign that

16   there is any malware on it.  That's usually the

17   first trigger to look for malware.  That would be

18   it.

19        Q.   Well, you understand malware can

20   successfully operate in the background without

21   giving an indication that it's there, right?

22             MR. DENTON:  Objection.

23        A.   Yes, I do.  But then I follow back to

24   the tenet we talked earlier is that malware has

25   to somehow physically get onto that environment

1    and have programming logic that is compatible

2    with the environment that it's in.

3          Q.   Right.

4               And I understand that, Mr. Beaver.

5          A.   Okay.

6          Q.   But -- okay.  I get it.  Thank you.

7               All right.  Take a look at topic 1 B,

8    please.  Just let me know when you're there.

9          A.   Yes.  Yes, I'm there.

10          Q.   This is any efforts made to air gap a

11    components of Georgia's current election system

12    and the success or failure of any such efforts.

13          A.   The answer -- the answer is yes.

14          Q.   Right.

15               And so what are those efforts?

16          A.   So Secretary of State's IT group,

17    department built an air gapped environment based

18    on NIST standards using NIST protocols to hold

19    the Dominion ballot building environment.  And

20    continues to maintain that air gapped environment

21    per the NIST protocols.

22          Q.   And that was built sometime in 20- --

23          A.   '19.

24          Q.   Oh, 2019?

25          A.   I think it was -- yes.

Page 44

1      Q.   All right.  And this was what you were

2   talking about earlier that it's all new

3   equipment, even new wires in the wall?

4      A.   Yes.

5      Q.   Okay.

6      A.   It does not share anything with any

7   other network environment.  It does not

8   cohabitate in any racks or environment.

9      Q.   Right.

10         But it does share data with the voter

11  registration system, though, right?

12     A.   Yes.  And that data is transferred

13  using the NIST protocol.

14     Q.   Okay.  Who at the Secretary's office is

15  actually responsible for transferring that data?

16     A.   That would be Michael Barnes's group.

17     Q.   Okay.  Who is responsible for uploading

18  any data or files to the state EMS server for any

19  given election?

20         Is there anyone on your team that does

21  that or is that also Mr. Barnes's group?

22     A.   That's Mr. Barnes.

23     Q.   Okay.  All right.  Take a look at topic

24  1 C, please.

25     A.   Okay.

Page 46

1    component?

2         A.   Oh, hold on.

3         Q.   It's for the --

4         A.   Component list limited to the following

5    equipment for election...

6              So this all looks like it's speaking to

7    the current Dominion environment, meaning the

8    ballot building device --

9         Q.   Yes.

10        A.   -- environment.

11        Q.   Yes, that's right.

12        A.   It doesn't speak to any of the voter

13   registration system, the my voter page, the

14   online registration page.  It's just the Dominion

15   environment.

16        Q.   Correct.  Yeah.

17        A.   Okay.

18        Q.   And so let's --

19        A.   So now --

20        Q.   Yeah, let's start with that.  So take a

21   look at -- with that definition in mind, are you

22   aware of any connections to the Internet,

23   telephone lines, cable lines, satellites or other

24   third-party system or network for any of the

25   components identified in footnote two for the

Page 47

1    current election system?

2         A.    None.

3         Q.    And what's the basis for that belief?

4         A.    We have built an air gapped

5    environment, follows, as I've said, the NIST

6    protocols on its own dedicated hardware network

7    environment.  Does not share anything with an

8    environment that has any of these types of

9    things, Internet, telephone, cable, satellites or

10   other third-party networks, is not tied to

11   anything that would have those things connected

12   to it.

13        Q.    Okay.  But you don't know, for example,

14   whether any of the 159 counties have ever

15   connected any of those components to any Internet

16   or third-party system, right?

17             MR. DENTON:  Objection.

18        A.    We're talking about what was described

19   above and that everything that's described above

20   is that Dominion environment, which is based in

21   our election center in Marietta.  So the counties

22   don't have access to that.

23        Q.    Well, no.  Look -- if you look at

24   footnote two it includes the Dominion BMDs, the

25   printers used with the Dominion BMDs, the

Page 48

1    scanners used to scan ballots, servings --
2    servers containing election management system --
3           A.   So you're talking about the actual
4    equipment that's in the field?
5           Q.   Correct.   That's part of it.   Yeah.
6                And so you don't -- so you don't know
7    as you sit here whether any of the 159 counties
8    in Georgia has ever connected any of that
9    equipment to the Internet or to a third-party
10   system, right?
11          A.   No.   I mean, there's some of the stuff
12   that can't be connected, like the BMDs don't have
13   a network connection to go into that.   Now, a
14   laptop, I'm not sure what a laptop -- what they
15   would use a laptop for, a desktop computer, not
16   sure how that would be involved in this whole
17   environment.   So I can't speak to those things.
18   Smart phones, same thing, like I -- it's -- it's
19   listed in this list, but it isn't necessarily
20   used in the Dominion environment.
21                So this is a very large list of things,
22   but not all of them have anything to do with the
23   Dominion environment.   But I can't speak to, you
24   know, what the counties have done with these
25   kinds of things.

Page 49

1          Q.   All right.  The Dominion BMDs used in

2     Georgia have a standard USB port on them, right?

3          A.   Yes.

4          Q.   In fact, the detached printer that

5     prints the ballot connects to the BMDs with

6     standard USB port, right?

7          A.   Yes.

8          Q.   And are you aware that the Dominion BMD

9     USB ports are not sealed, meaning that a voter,

10    for example, has access to plug in a USB drive to

11    a BMD used in an election?

12         A.   I don't believe that's true.  It was a

13    term it's sealed.  It's not sealed.  I have never

14    seen an environment where it's not sealed.  So

15    I'm not sure where that comes from.  So I guess I

16    can't answer that that would be true.  I am not

17    aware that that -- that system is not sealed.

18         Q.   So what is the basis for your

19    understanding that the USB port on each of the

20    30,000 BMDs in Georgia is sealed?

21         A.   I've seen them and they're sealed.  And

22    that is our protocol is to keep it sealed.

23         Q.   Well, I assume you haven't seen all

24    30,000 BMDs, right?

25         A.   No, I -- yeah, I haven't seen 30,000

Page 50

1   BMDs.  But, as I said, the protocol is to keep
2   them sealed.  And when I say sealed, they're
3   locked -- locked away.  They have a sealing
4   device that will show tampering if somebody
5   unseals it.  So I have not heard of any counties
6   that have had an issue with BMDs being unsealed.
7   I have not heard that.
8        Q.   Okay.  And is that something you would
9   expect to know as the state CIO?
10       A.   I would have heard it.  It isn't the
11  counties report to me.  You could probably ask
12  Mr. Michael Barnes if he's heard it.  I think
13  he's more in touch with the counties than I am.
14       Q.   And why is sealing the BMDs important?
15       A.   Many type of layers of security.
16  Security is not just one thing.  It is a layer
17  approach.  Sealing the BMD is just one of the
18  many security aspects to that -- verifying that
19  we have a very secure system.  Sealing is a piece
20  of it.
21       Q.   But what is the sealing of a BMD
22  intended to protect against?
23       A.   Just what you described, somebody
24  having access to do something to it that's
25  unknown.

Page 51

1          Q.   Got it.

2              Okay.  And would it be fair to say that

3     if -- that if -- if a county found that its BMDs

4     were unsealed, the seals were broken, for

5     example, before an election, they should not use

6     those, right?

7          A.   Correct.  That is the protocol.

8          Q.   Okay.  What's the device that's used to

9     seal the USB ports on the BMDs?

10         A.   I don't know what that device is.

11         Q.   All right.  Jump to topic ten, please.

12         A.   Okay.

13         Q.   Topic ten is any instance in 2020 or

14    2021 within the knowledge of the Secretary of

15    State's office when a person or entity other than

16    an authorized election worker of Georgia state or

17    county official obtained voting data from a

18    Georgia election or images of voting equipment

19    used in a Georgia election.

20              Do you see that?

21         A.   Yes.

22         Q.   And are you aware of any such instance?

23         A.   I am not aware of any instance.

24         Q.   And would you expect to be aware of

25    this as the state CIO if -- if this was known to

1    does have the authority to require cybersecurity

2    assessments of its vendors, right?

3                MR. DENTON:  Objection.

4         A.   I don't know.  That's a good question.

5         Q.   You're not aware of a rule that

6    actually requires the Secretary of State's office

7    to ensure that vendors that are related to the

8    election system do cybersecurity assessments?

9         A.   Are you saying annually?

10        Q.   Annually or on any schedule.  Sorry, go

11   ahead.

12        A.   I am not aware of a rule or any

13   legislation or anything that says that.  I think

14   that is good practice that we have built over the

15   years since I've been here.  But I don't know of

16   any rule.  I've never been told of any rule that

17   states that.

18        Q.   Okay.  The cybersecurity assessment for

19   CES that's done annually, is that -- is there a

20   written report of that?

21        A.   We don't do written reports now.

22        Q.   When you say now, when did that -- when

23   did that start?

24        A.   The last two years.

25        Q.   Why are there no written reports of ooh

1    cybersecurity assessments for the Secretary's

2    office as of the last two years?

3              MR. DENTON:  Objection.

4         Q.   You can answer it.

5              Do you know why?

6         A.   Yes.  They're taken out of context by

7    the public.

8         Q.   What do you mean?

9         A.   They read them, they don't understand

10   them, they take them out of context.

11        Q.   So how is the cybersecurity assessment

12   the -- the steps that are taken and the findings

13   conveyed to folks at the Secretary's office if

14   not in writing?

15        A.   We have conference calls.  I have a

16   working team that works with Fortalice.  We

17   review things that they say you need to be

18   looking at this, you need to be looking at that.

19   We look at our project lists of tasks that we

20   need to do across the board to figure out how do

21   we mold some of those in.  Or not some of those,

22   but mold those things in.  Made our life

23   difficult.

24        Q.   You mentioned Fortalice.  Is Fortalice

25   the one that does the annual cybersecurity

Page 75

1      Q.    Why not?

2      A.    We didn't have any events or incidents

3   that required it.

4      Q.    The monthly reporting, is that

5   typically in writing or is that also now not in

6   writing?

7      A.    Not in writing.  And in the -- we're

8   not necessarily having any monthly reporting for

9   a while, probably for almost the last year.

10     Q.    ███████████████████████████

███████████████████████████████████████████████

███████████

█████  █████

█████  ███████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████

█████  █████

█████  ████████████████████████████

███████████████████████████████████████

██████

█████  █████  ███████████  ██████████████████  ███

█████████████████  █████████████

█████  ███████████████████

█████  ███████████████████████  ████

██████████████████  █████████████████











Page 84

19    Q.   Okay.  All right.  Come to paragraph 13

20  of your 2019 declaration, if you would.

21  Exhibit 2.

22          MR. DENTON:  Sorry, David, is this

23      Exhibit 2 or 3?

24          MR. CROSS:  Oh, good question.  Maybe

25      it's Exhibit 3.  Let's see.

1    that also the same process today with Dominion

2    and the poll pad software that's used?

3         A.   That would be a Michael Barnes

4    conversation.

5         Q.   Okay.  Is it your belief that logic and

6    accuracy testing done on BMDs provide

7    cybersecurity assessments for those machines?

8         A.   It is one of the layers we use.

9    Remember I said that security is not one thing,

10   it's one of many layers.  It's an important to

11   valid validate that the software that's on there

12   is what you expect to be on there and there's

13   nothing else on that system.  So yes, it is one

14   of the layers.

15        Q.   And is it your understanding that logic

16   and accuracy testing actually validates the

17   software that's on a given BMD?

18        A.   It validates that it matches a hash

19   test.  Means if you hash the file, you will get a

20   respondent hash.  If you hash a file that has

21   been modified at all or is of a different

22   structure, meaning something hiding there with

23   the same name, it will come back a different

24   hash.  And it will fail.

25        Q.   But do you understand that it's common

Page 92

1    with malware to design malware so that it defeats

2    the hash test, meaning it will spit back the same

3    hash that you're looking for when you're doing

4    something like logic and accuracy testing?

5              MR. DENTON:  Objection.

6         A.   I don't have any -- any document that

7    says that.

8         Q.   That's not something you've heard

9    before?

10        A.   Nope.

11        Q.   Okay.  All right.  Take a look at

12   paragraph 18, please.

13             Do you have that in front of you?

14        A.   Yes, I do.

15        Q.   And here you wrote, State defendants

16   also conducted parallel testing on election day

17   for a copy of an actual county GEMS database is

18   used with a voting machine set up in the

19   Secretary of State's office and set an election

20   mode for a specific real county precinct.

21             Do you see that?

22        A.   Yes.

23        Q.   Is that same sort of parallel testing

24   done today with the Dominion system?

25        A.   I'm not aware of that.

Page 133

1        A.    Yes.

2        Q.    Do you have an understanding as to

3    whether the Dominion BMD system is software

4    independent?

5        A.    I'm not sure I understand your

6    question.  It's software independent.

7        Q.    Sorry.  The question is just that do

8    you have -- do you have any understanding as to

9    whether the Dominion BMD system used in Georgia,

10   whether it's considered software independent?

11            MR. DENTON:  Objection.

12       A.    I've never heard that term.

13       Q.    Okay.  Where she goes on to say that

14   the system must be auditable and its tabulation

15   record cannot be based solely on its software, do

16   you have an understanding of whether the

17   tabulation record in Georgia with the DM -- the

18   BMD system is based on the software?

19            MR. DENTON:  Objection.

20       A.    I can tell you there's no voting on a

21   BMD system.  All you're doing is marking a

22   ballot.  So if somebody says you are maliciously

23   changing votes, there are no votes counted on a

24   BMD.  So I am -- you know, I can only speculate

25   here.  But the whole conversation is sideways.

Page 141

```
 1        Q.   Okay.  All right.  Thank you.
 2             All right.  You can put that aside.
 3             Sorry.  I accidentally closed Exhibit
 4   Share.
 5             (Exhibit 9: Document entitled
 6              Information Technology Security Program
 7              Charter marked for identification, as of
 8              this date.)
 9        Q.   All right.  Let me put up the next
10   exhibit.  This will be Exhibit 9, Mr. Beaver.
11             MR. DENTON:  David, while that's
12             loading, if you're through with Exhibit 8,
13             I don't know whether you are, but I know
14             there have been people on this deposition
15             who should not have access at this time.
16             And that I know, for example, Ms. Marks was
17             in here earlier and indicated that she had
18             access to Exhibit Share.  So it might make
19             sense to pull Exhibit 8 back out of the
20             share folder for now.
21             MR. CROSS:  I don't have a problem with
22             that.  But I don't think I have the ability
23             to do that.  Looks like maybe I could block
24             it.  See what this does.
25             THE VIDEOGRAPHER:  This is the
```

Page 142

```
 1              videographer.  I'm not sure about the
 2              ability to lock or unlock.  But I know once
 3              a exhibit is introduced into Exhibit Share,
 4              the only people that could remove it is
 5              Veritext.  So I can e-mail them and ask
 6              them to remove it if I need to.
 7         Q.   Mr. Beaver, see if -- and you can try
 8     to, see if you can open Exhibit 8 now.  I just
 9     locked it.  I don't know if that means you guys
10     can no longer open it.
11         A.   I just opened it again.
12         Q.   Oh, you did?
13         A.   Yes.
14              MR. CROSS:  Alex, can you open
15          Exhibit 8?
16              MR. DENTON:  I can as well.
17              MR. CROSS:  Oh.  All right.  It doesn't
18          let me pull it out.  But...
19         A.   Can we lock out people from joining?
20              MR. CROSS:  I don't think Ms. Marks is
21          coming back.  But if she comes on, we can
22          -- we can deal with that.
23              MR. DENTON:  Yeah, my -- I don't have a
24          full understanding how of how Exhibit Share
25          works.  I think you can probably
```

Page 143

1           independently access it at any point
2           whether you -- regardless of whether you're
3           in Zoom.  So to the extent --
4                THE VIDEOGRAPHER: That is correct.
5                MR. DENTON:  To the extent that that's
6           something that needs to be -- have limited
7           disclosure right now, it sounds like from
8           Mr. Miller that we may -- Jonathan Miller
9           that we may need to ask Veritext to pull
10          that back.
11               MR. CROSS:  Okay.  All right.
12               THE VIDEOGRAPHER:  Would you all like
13          me to ask them to do so, counsel?
14               MR. CROSS:  Yeah, why don't you, if you
15          don't mind, ask them to pull Exhibit 8 out.
16               THE VIDEOGRAPHER.  Exhibit 8.  Got it.
17          I'll take care of it.  Thank you, sir.
18               MR. CROSS:  All right.  Thank you.
19     BY MR. CROSS:
20          Q.   All right.  Mr. Beaver, do you have
21     Exhibit 9 in front of you?
22          A.   Yes, I do.
23          Q.   All right.  Have you seen Exhibit 9
24     before?
25          A.   Is there a date on it?  Oh, let's see.

Page 144

1   So this is --

2       Q.   So it's entitled Information Technology



1   ████████████████████████    ██████████

████████████████████████████████████████████

██████

4        Q.    Okay.

5        A.    But I don't recall it specifically.

6        Q.    Okay.  All right.  I'll give you the

7   next exhibit.

8            MR. DENTON:  And David, I guess a

9        similar comment as to Exhibit 9, this looks

10       like a forward produced document under the

11       confidential AEO designation.  So it

12       probably requires the same treatment as

13       Exhibit 8.

14           MR. CROSS:  So let's do this, what

15       we've done in the past is -- I don't want

16       to start pulling exhibits out.  It's going

17       to get really confusing.  Jonathan, can you

18       just -- are you still there?

19           THE VIDEOGRAPHER:  Yes, sir.

20           MR. CROSS:  Can you just ask Veritext

21       to remove Marilyn Marks' access to this

22       exhibit folder if she has it.  That's what

23       we've done in the past.  So she will not --

24           THE VIDEOGRAPHER:  I will ask if they

25       can do that.  They may or may not be able

Page 146

1           to do that.  I'm not hundred percent sure.
2           But I will ask.
3                MR. CROSS:  Okay.  I know they've done
4           it in the past when we've had a situation
5           --
6                THE VIDEOGRAPHER:  And she specifically
7           needs to not have access to Exhibit 8 only?
8                MR. CROSS:  No, just pull that access
9           to Merritt Beaver entirely.  Because there
10          are going to be a number of confidential or
11          AEO documents.
12               THE VIDEOGRAPHER:  Pull her access to
13          the folder for today entirely, correct?
14               MR. CROSS:  That's correct.
15               THE VIDEOGRAPHER:  Okay.  That's easy
16          to do.  I can -- I can take care of that.
17               MR. CROSS:  All right.  Thank you.
18               (Exhibit 10: Document entitled
19          Fortalice Solutions Web Vulnerability
20          Remediation Checks Secretary of State
21          Georgia Draft - July 14, 2020 marked for
22          identification, as of this date.)
23     BY MR. CROSS:
24          Q.   Okay.  All right.  Grab Exhibit 10,
25     please, Mr. Beaver.

Page 159

```
 1    file, somebody's taken over my computer when in
 2    reality it was a pilot error.  So this was
 3    classified as an event, not an incident.
 4        Q.   Okay.  And what's the distinction you
 5    draw between event and incident?
 6        A.   So an event is when something has
 7    flagged as a suspicious activity or something
 8    that looks wrong that deserves somebody to do
 9    investigation.  Once you identify, you know, that
10    there is malicious activity going on, it gets
11    transferred to status of an incident and you
12    start a process called an incident response
13    process, which is bringing in the -- you know,
14    the appropriate people, starting to document it,
15    things like that.
16        Q.   Okay.  And do I understand correctly
17    that there's no written report on Fortalice's
18    findings because of the policy for them not to
19    generate reports on this?
20             MR. DENTON:  Objection.
21        A.   I don't recall -- I don't recall.  Even
22    a -- like a document.  I just remember hearing
23    oh, it's -- there's nothing there.  They've
24    searched it.
25             (Exhibit 13: E-mail string with the top
```

1          A.     Yeah.

2          Q.     And he writes, I am the IT director for

3      the Georgia Secretary of State.

4                 Do you see that?

5          A.     Yes.

6          Q.     Are you familiar with them?

7          A.     With Clark Rainer?

8          Q.     Yes.

9          A.     Yes.  He used to work for me.

10         Q.     Okay.  And is he gone now too?

11         A.     Yes.  He's the CIO for the -- I think

12     it's the AG office.

13         Q.     The Georgia Attorney General's office?

14         A.     Yes.

15         Q.     When did he move into that role,

16     approximately.

17         A.     It was I think early 2020.

18         Q.     Okay.  If you come down --

19         A.     It was after Raffensperger came over.

20     It was soon after Raffensperger came over.

21         Q.     Okay.  If you come down to the bottom

22     of the first page, do you see he's got four

23     bullets?

24         A.     Yes.

25         Q.     And the last bullet on that page,

Page 165

1    number 4 reads, Just got an e-mail from MS-ISAC

2    with some more information I'll forward on in

3    just a minute.  Also showing you may have a

4    malware infection.

5              Do you see that?

6       A.   Yes.

7       Q.   And this is being sent to Josh Hood,

8    professional services technician.

9              Do you see that?

10      A.   Yes.

11      Q.   Who is Josh Hood?

12             Do you know who that is?

13      A.   No, I don't.

14      Q.   Okay.  What do you know, if anything,

15   about this situation in the -- what Mr. Clark or

16   what Mr. Rainer wrote about a possible malware

17   infection?

18      A.   Nothing.  We get -- we get reports from

19   counties I'll say on a regular basis about

20   different malware attacks where a county office

21   will -- somebody will have clicked on something

22   and they realize that something happened to their

23   network and they'll send out a message to

24   everyone saying hey, you know, we're in the

25   process of cleaning our systems because of X, Y

Page 166

1    and Z.  This looks like this might be a very

2    similar thing where they were reaching out to us

3    for some help.

4           Q.    Okay.

5           A.    But I don't have any specific recall of

6    this event.

7           Q.    And you don't recall whether there was

8    any investigation or any findings?

9           A.    No.  As I said, it is not an unusual

10   conversation to go with the counties when they

11   have an event where somebody clicks on something

12   that they'll notify us just to make sure that,

13   you know, we know what's going on so that if --

14   if for some reason we start getting e-mails from

15   them that look weird or something like that, we

16   know like, oh, they've got something that's

17   happened in their environment, let's be careful.

18           So, I mean, Clark was just trying to be

19   helpful in that, you know, we reached out to --

20   we have a tie -- most of the counties have a tie

21   into MS-ISAC also.  I'm sure he had reached out

22   to MS-ISAC with this information and may have

23   gotten information that -- back from them.  I

24   mean, they cover election systems across the

25   country.  One of the reasons we work with them is

Page 167

1    because we get to see a -- a national view of

2    attacks.  And so if one state is getting attacked

3    -- has an attack going on or something happens,

4    we can get that information and helps us protect

5    ourselves against similar attacks.  So Clark is

6    just trying to help him understand, you know,

7    that MS-ISAC may have a bigger view into what's

8    going on.

9              (Exhibit 15: E-mail string with the top

10         from Dave Hamilton dated 8/13/2020 marked

11         for identification, as of this date.)

12        Q.   Okay.  So grab Exhibit 15, if you

13    would, please.

14        A.   Dave Hamilton potential leak -- leakage

15    of voter data.

16        Q.   Yes.

17              So this is an e-mail that Dave Hamilton

18    sent on August 13, 2020, right?

19              Do you see that?

20        A.   Okay.

21        Q.   And if you come down to the earliest

22    e-mail on the thread at the bottom, it's an

23    e-mail from -- the name is K-I-J-Y-U-U, and the

24    last name it looks like is Tradebit,

25    T-R-A-D-E-B-I-T, August 12, 2020.

1           Do you see that?

2      A.   Are you on the last page?

3      Q.   I'm at the top of the last page, bottom

4  of the second to last page.

5      A.   Oh, yeah, yeah, yeah, yeah, Tradebit,

6  Tradebit.

7      Q.   And so if you come to the -- the e-mail

8  this person sends indicates in the first

9  sentence, I would like to say someone anonymous,

10  but I am contacting you because I have worked

11  with you in the past a little and I knew you

12  would be a good person to contact.

13           Do you see that?

14      A.   Yep.

15      Q.   And then he goes on in the next

16  paragraph to indicate that he's discovered a flaw

17  on the page that allows you to see other people's

18  voter information.

19           Do you see that?

20      A.   Yes.

21      Q.   And then Mr. Barnes responds -- Michael

22  Barnes responds the same day.

23           Do you see that?

24      A.   Where is Barnes?  Oh, yeah, here.

25      Q.   And then if you keep scrolling up

Page 169

1    you'll see on -- let's see, the middle of the

2    third page there's an e-mail from Dave Hamilton

3    on August 12th, 2020 at 6:03 p.m.

4              Do you see that?

5        A.    Yes.

6        Q.    And that one is to you, right?

7        A.    Yep.

8        Q.    What do you recall about this situation

9    and the vulnerability alleged in the -- the

10   initial e-mail?

11       A.    So it looks like this is a -- if I

12   remember right, this was a county website, not

13   the Secretary of State website, had a similar

14   issue with their system where people could go in

15   and pull up prior polling locations.  In other

16   words, by taking the web address and incrementing

17   the number backwards, you could pull up prior

18   documents.  So, again, it was not a breach, but

19   bad coding practice that needed to be fixed.  And

20   you could go back in time and see the last X

21   number of documents that people had pulled up.

22   But you wouldn't be able to change anything.  It

23   just was bad practice.

24              So that's why he said it was similar to

25   what we addressed with PCC on our website.  So

1     that would be the -- the problem we had with the

2     MVP page where you could increment the number and

3     see other peoples' documents that they had

4     pulled, you know, up until a point that the

5     server clears cache.

6          Q.   And was this -- sorry.  Was this

7     remediated?

8          A.   As far as I know, it was remediated

9     fairly quickly because we explained to them how

10    to fix it.

11         Q.   And what's the basis for your

12    understanding that it was remediated?

13         A.   It seems to me I had a conversation

14    with Dave afterwards that he had worked with them

15    to -- to understand -- you know, explain to them

16    what it was to fix.  I think they actually pulled

17    the page down until they could fix it.

18              (Exhibit 16: E-mail string with the top

19               from Chris Harvey dated 12/30/2020 marked

20                for identification, as of this date.)

21         Q.   Okay.  All right.  Grab Exhibit 16,

22    please.

23         A.   Chris Harvey, voter registration

24    certificate.

25         Q.   Yes.

Page 171

1          So this is an e-mail you can see that

2     Chris Harvey received on December 30th, 2020.

3          Do you see that from Ryan Germany?

4     A.   Yes, yes.

5     Q.   And if you come down the beginning of

6     the thread it begins with an e-mail that Dave

7     Hamilton sent on December 24, 2020.

8          Do you see that?

9     A.   Yes.

10    Q.   And he sends that to you and Mr.

11    Germany at the Secretary's office, right?

12    A.   Okay.

13    Q.   And the subject line is 2020 rule

14    590-8-3 attestation and assessment.

15         Do you see that?

16    A.   Yes.

17    Q.   And this concerns the assessment

18    attestation or certification that the Secretary's

19    office has to put out each year, it's a security

20    risk assessment that the Secretary has to attest

21    to each year, right?

22    A.   Yes.

23    Q.   And so Mr. Hamilton looks like was

24    handling the attestation in December of 2020.

25         Do you recall that?

1          A.    I know it gets done every year, so --

2     and it needs to be the done the first -- by the

3     end of the year or at least before -- you know,

4     early on.  I think the target is by the end of

5     December.

6          Q.    Okay.  So do you see here --

7          A.    I vaguely remember this.

8          Q.    Okay.  You see Mr. Hamilton writes

9     Civix just got me the last two artifacts for

10    this; do you see that?

11         A.    Yes.

12         Q.    What is Civix?

13         A.    Civix is PCC.  PCC changed their name

14    to Civix.

15         Q.    Okay.  And he goes on, They apparently

16    have never completed a security risk assessment.

17              Do you see that?

18         A.    Yes.

19         Q.    And do you have any reason to believe

20    that Mr. Hamilton was wrong about whether Civix

21    or PCC had ever completed a security risk

22    assessment?

23              MR. DENTON:  Objection.

24         A.    I can't speak to that.

25         Q.    Okay.

Page 173

1        A.   I know he -- Dave was a hard-core
2   security person and he didn't like -- he was
3   basically -- was very much this is how he felt
4   things should be done.  People doing something a
5   different way rubbed him.  So this doesn't
6   surprise me.
7        Q.   And Hamilton was the chief information
8   security officer while he was at the Secretary's
9   office, right?
10       A.   Yes.
11       Q.   Okay.
12       A.   He did a good job.
13       Q.   If you come to the second paragraph, do
14  you see he writes, Hope this suffices.  I did my
15  level best to meet all of these items.  Not sure
16  how James ever signed this with a straight face.
17            Do you see that?
18       A.   Yep.
19       Q.   And by James he's referring to James
20  Oliver, the former security manager, right?
21       A.   Yes.
22       Q.   And did you share Mr. Hamilton's
23  concern about how James Oliver was able to sign
24  this attestation in prior years?
25       A.   As I said --

1           MR. DENTON:  Objection.

2       A.    -- Dave was a -- I'll say a

3   perfectionist.  He was very judgmental of other

4   people.  And if they didn't do things his way, he

5   wasn't satisfied.  There are lots of people in

6   the securities world.  Dave was a very hard-core

7   and that he had his vision of how things should

8   be done.  Not that his was the only way to do

9   something, but he had his way and he spoke his

10  mind.  Here he is speaking his mind.  Whether or

11  not James actually met the level of the law, I

12  felt he did.

13          Now, did Dave have a harder view on

14  things and drive the organization better?  Yeah,

15  he did.  That's why he essentially replaced

16  James.  But James did what he was supposed to do.

17  He worked within the legal law of what

18  requirements were.  Dave was unhappy with Civix

19  because he -- his view on security was one thing

20  and they had a different.  Security is a broad

21  topic.  Dave was very opinionated and he

22  basically would voice his opinion all the time.

23  So you're reading it.

24      Q.    And the concern that Dave Hamilton

25  expresses in this e-mail thread is that the --

Page 175

```
 1    the Secretary of State is actually not in
 2    compliance with the rule at this time because he
 3    can't find the evidence, what he calls artifacts,
 4    of that compliance, right?
 5               MR. DENTON:  Objection.
 6         A.    Yeah. He doesn't say here what the
 7    artifacts are.  I know he and I have talked about
 8    this on multiple occasions.  As I said, he was a
 9    perfectionist.  The attestation applies only,
10    only to the voting -- voter registration system,
11    the election system.  Dave felt it should apply
12    to all things that the Secretary of State
13    managed.  But the attestation specifically only
14    applied to election.  So Dave was always on a --
15    on a course to say we should have things like
16    artifacts that cover everything, whether it's the
17    corporate registration system, whether it is the
18    security system, professional licensing system.
19    He felt all of them should fall under the same
20    level of security that elections did.  But the
21    attestation clearly does not include anything but
22    elections.  And that was always a rub to Dave.
23               Does that answer your question?
24         Q.    I think so.  I was going to grab
25    another exhibit for you.
```

Page 176

```
 1        A.   Oh, all right  I didn't -- one of those
 2   pregnant pause moments --
 3        Q.   Yes.  Sorry.
 4             (Exhibit 17: E-mail string with the top
 5              from Dave Hamilton dated 12/21/2020 marked
 6              for identification, as of this date.)
 7        Q.   All right.  Grab Exhibit 17.
 8        A.   This looks like it's the same topic.
 9        Q.   Yes, yes, a little bit earlier.  So I
10   wanted to -- a little more context.
11             So if you go to the top, you'll see
12   this is an e-mail that Dave Hamilton sent you on
13   December 21, 2020 regarding the rule 590 -- or
14   the 590 rule attestation, right?
15        A.   Okay.
16        Q.   If you come down in the earliest e-mail
17   of the thread is an e-mail that Mr. Hamilton
18   sends to you December 19, 2020 and he copies
19   itsecurity@sos.ga.gov.
20             Do you see that?
21        A.   Yes.
22        Q.   What is the IT security e-mail there?
23   Is that some sort of like team or group
24   distribution list?
25        A.   It's just an e-mail box that if we
```

Page 177

1    have, like, vendors sending reports, like

2    Cybraics is one of our monitoring systems.  It

3    monitors network traffic between nodes inside the

4    network.  It sends out a regular e-mail of alerts

5    of activity and stuff like that.  Rather than

6    having it go to a specific security person, it

7    goes to a security -- IT security mailbox that

8    all of the security people see.

9         Q.   Okay.  Do you know whether that e-mail

10   in box was searched for relevant e-mails for this

11   case?

12        A.   If we do a search on 365, it's

13   included, which would be the answer is yes, it

14   was included.

15        Q.   Meaning if they did a search on 39- --

16   365 that it encompassed that e-mail advice?

17        A.   It should, yes.

18             MR. DENTON:  Objection.

19        Q.   Okay.  All right.  So Mr. Hamilton

20   writes here regarding this rule attestation in

21   the first sentence and started after the comma,

22   he writes, I really don't understand how my

23   predecessor was ever able to attest to meeting

24   the set of regulations.  I handled this just like

25   an assessment.  If we can't come up with an

Page 178

1    artifact that proves something is real, it

2    doesn't exist.

3              Do you see that?

4         A.   Yep.

5         Q.   And do you agree with Mr. Hamilton, the

6    former CISO's position, that for the attestation

7    provided by this rule, that if you cannot come up

8    with an artifact that proves that something is

9    real, it doesn't exist?

10        A.   This is the same response I gave the

11   last one, which is he had a view of an

12   attestation that was broader than the rule

13   actually is written for.  And he was trying to

14   position that we should cover all systems under

15   that attestation, thus find artifacts that

16   basically mark our -- you know, that we meet the

17   590 rule across every system.  Well, there are

18   things that are in 590 that the other systems

19   don't necessarily do.  I don't have that list.

20   But I know that that's part -- that was his big

21   rub.  And so that's -- he's -- this was probably

22   his -- one of his early sort of discoveries as

23   he's trying to go through that list and find

24   those artifacts.  And he's looking for them for

25   systems outside of what 590 truly covers, which

1    is the election system, and he can't find them.

2    Because they don't exist because not everything

3    that's in 590 applies to all systems for

4    Secretary of State.  He wanted them to, but they

5    didn't.  So he was frustrated.

6         Q.   So if you come up to the e-mail that he

7    sent you on December 21 and come down towards the

8    bottom of the page, you see that paragraph that

9    begins on our part, we did everything?

10        A.   Yes.

11        Q.   And then the third line at the end he

12   writes, My plan was to produce an amendment

13   shortly after the first of the year.  Once E-Net

14   lands and I can verify the risk gaps are

15   minimized.

16             Do you see that?

17        A.   No.  I've lost you.  I'm down on the

18   first -- bottom of the first page.

19        Q.   Yeah, the paragraph that reads, on our

20   part.

21        A.   Oh, yeah.  Okay.  We did everything we

22   could to meet these rules.

23        Q.   Come to the end of the third line, the

24   sentence begins my plan.

25        A.   The one that says, My plan has to

Page 180

1    produce an amendment?

2         Q.   Yes.

3              Do you know what was meant by once

4    E-Net lands?

5         A.   No.

6         Q.   Was there any change contemplated with

7    E-Net at this time that you recall?

8         A.   No.  I don't know of any.

9         Q.   Okay.  And then he then goes on -- he

10   goes on to the third paragraph -- the next

11   paragraph -- two paragraphs after that.  You see

12   where it reads, the largest impact?  And he

13   writes, The largest impact can be made by getting

14   Civix to produce their part of this.  We can go

15   from 66 percent up to over 80 percent quickly.

16             Do you see that?

17        A.   Yep.

18        Q.   And what Mr. Hamilton found at this

19   time, was it looking only at PCC or what he

20   refers to here as Civix, the state was only --

21   only at 66 percent in compliance with what's

22   required under this rule, right?

23        A.   I don't know the context.

24        Q.   What do you mean you don't know the

25   context?  This is an e-mail that he sent to you?

Page 181

1          A.   Yes.  But he's saying we can go from 66
2     up to over 80 quickly.  I don't know whether he's
3     talking about the context of Civix in like --
4     like we talked earlier, fixing their code so that
5     they can't do sequel injection and things like
6     that so we don't have to use external tools to
7     remediate, that could very well be where he is.
8     Because that was also a big thing is he wanted
9     them to fix their code so it was a true fix, not
10    a remediation using a different solution.  That
11    could very well be where he's talking.  And if
12    you notice this date timeline is all around that
13    same time frame.
14         Q.   Okay.  But do you understand that the
15    concern he was expressing was that with respect
16    to what PCC was handling, the state was only in
17    compliance with 66 percent of the requirements
18    under the rule based on --
19              MR. DENTON:  Objection.
20         Q.   -- research he had done?
21         A.   I see that.  As I said, Civix code did
22    not meet some of the requirements that we had to
23    have from security inspection.  So we had to put
24    things in front of it to reach the level of
25    security we needed.  He was a truest.  He wanted

Page 182

```
1     the code to do it on its own.
2              So we've already talked about this
3     topic of Civix couldn't fix their code to do what
4     it is because it would break it.  And they would
5     have to do a major rewrite to do what really
6     needed to do to fix the sequel injection, the
7     cross-side scripting, those kind of things.
8         Q.   Okay.
9         A.   They didn't like the fact that we had
10    to use other tools like Cloudflare to fix
11    problems to meet our attestation levels.  He
12    wanted to see them -- like he said, we could
13    quickly get there if Civix would just fix this.
14    We knew that.  But we couldn't -- we -- get them
15    to fix it.
16        Q.   All right.
17        A.   It was a point of frustration for him.
18        Q.   The Secretary's office has announced
19    that they're actually moving away from E-Net,
20    right?
21        A.   Yes.
22        Q.   And why is that?
23        A.   It's an old system, to start with.
24    Civix has changed vendors -- or has been
25    purchased I think at least twice, maybe three
```

Page 183

1    times in the last four years, four or five years.

2         Q.   When was the decision made to move away

3    from E-Net?

4         A.   Last year.

5         Q.   Who made that decision?

6         A.   Front office.

7         Q.   And by front office who do you mean?

8         A.   Secretary.

9         Q.   Oh, Secretary Raffensperger?

10        A.   Yes.  Those kind of decisions, it comes

11   down to him to make the call.  We present

12   proposals and it's up to him to say yay, nay.

13        Q.   What --

14        A.   It's a big decision.

15        Q.   Sorry.

16        A.   Yeah, that was a big, big decision.

17        Q.   What were those specific reasons that

18   he decided to move -- to replace E-Net?

19        A.   One was the age, one was the ability

20   for us to get, like this, certain fixes put in

21   place that we wanted to see.  Some of it was

22   security related, some was just functionality

23   related.  The application was built I think like

24   in 2012 when we first purchased it.  And the --

25   but the actual application was probably built a

1    year or two before that.  So the core code was

2    ten years old.  Getting very old.  Technology has

3    changed.  So it was time to look at another

4    solution.  We were in the process of also looking

5    at some of our other systems and we decided to do

6    basically an overall refit of everything.

7         Q.    What's the new solution that you're

8    bringing in in place of E-Net?

9         A.    I think they've announced -- already

10   announced that it's Salesforce based.

11        Q.    And will that be a cloud solution

12   hosted by Salesforce?

13        A.    Yes.

14        Q.    Okay.  What's the process for migrating

15   data from E-Net to Salesforce; do you know?

16        A.    It hasn't been done yet.  We're in the

17   process of trying to come up with a migration

18   plan.

19             (Exhibit 18: 2020 Security of the voter

20         registration system artifacts and

21         attestation pursuant to Rule 590-8-3-.01

22         December 18, 2020 marked for

23         identification, as of this date.)

24        Q.    All right.  Grab Exhibit 18, please.

25        A.    2020 security of voter registration

Page 185

1    system, artifacts and attestation.

2         Q.   Yeah, so we're still on the same

3    subject of the same time frame of the e-mails we

4    were looking at between you and Mr. Hamilton

5    about this rule attestation.

6              Do you see that?

7         A.   Yes.

8         Q.   And this is dated December 18, 2020.

9    Do you see that on the front page?

10        A.   Yes, I've got it.

11        Q.   And if you come down to the bottom of

12   the cover page, do you see David Hamilton's

13   signature is there next to CISO?

14        A.   You're saying all the way to the

15   bottom?

16        Q.   If you just go to the bottom of the

17   first page.  Not the end of the whole document.

18        A.   Oh, bottom of the first page.  Sorry, I

19   went to the bottom of the document.

20        Q.   Yeah, sorry.

21             Bottom of the first page, you'll see

22   his signature there.

23        A.   Yeah.

24        Q.   So okay.  I'm sorry, you said yes?

25        A.   Yes, I did.

Page 186

1        Q.   And then have you seen this before?

2             Is this -- do you recall him

3    circulating this to you?

4        A.   He probably copied me on it.  I don't

5    know that I read it completely.  I can tell you

6    at 40 some pages I doubt I read the whole thing.

7        Q.   Okay.

8        A.   We probably talked through it.

9        Q.   If you come to page 6 of the PDF,

10   you'll see it says Executive Summary.

11            Do you have that?

12       A.   I'm looking for -- what year -- you

13   don't know what page that is, do you?

14       Q.   Page 6.  If you look in the bottom

15   right corner, it's page 6.  And at the top it

16   says, Executive Summary.

17       A.   Got it.  Yep.

18       Q.   And here in the second paragraph it

19   states, Currently our agency does not, not is in

20   all caps, meet the requirements of the rule.  Out

21   of the 38 requirements, we only meet 66 percent.

22   Most short falls are Civix related.  If we accept

23   their items, we are at 81 percent, which is

24   better.

25            Do you see that?

Page 187

1          A.    Yes.
2          Q.    And if you come down below that, do you
3     see the dashboard?
4          A.    Yes.
5          Q.    And under -- it's got a -- a subsection
6     of the rule, a description and then status,
7     whether it's met, fully met, partially met not
8     net or an exception.
9                Do you see that?
10         A.    Yes.
11         Q.    And am I reading this right that what
12    -- what's indicated in the dashboard below, that
13    indicates what Mr. Hamilton concluded about
14    whether some -- each particular subsection of the
15    rule is met at this time?
16         A.    Yes.  That's his perspective.
17         Q.    Okay.  All right.  We've been going a
18    while.  Why don't we take another short break,
19    Mr. Beaver, and then we'll -- we'll get you out
20    of.  Sorry, you need to leave by 4:15; is that
21    right?
22         A.    Yes.
23         Q.    Okay.  All right.  Let's take a short
24    break.
25                THE VIDEOGRAPHER:  The time is 2:24.

Page 192

1   whole technology team.

2        Q.    All right.  Can you come back, if you

3   would, please, to Exhibit 19, which was the cover

4   e-mail for the remediation task list.

5        A.    Got it.

6        Q.    And so in Mr. Hamilton's e-mail to you

7   he writes, How much do we want to share of this?

8   Normally how we prioritize and what we are

9   working on is not ever meant for public eyes.

10  And then he goes on to say, This level of detail

11  I don't think we should give anyone outside the

12  agency because it can be used to pinpoint where

13  our holes are and give a road map to bad actors.

14          Do you see that?

15       A.    Yep.

16       Q.    Did you share his concern that if you

17  were going to make public the attachment that it

18  could be used to pinpoint where holes were in the

19  Secretary's network and give a road map to bad

20  actors?

21       A.    I think anytime you reveal any security

22  information about an organization, you give a

23  road map to bad actors.  That is -- that is like

24  the number one thing that bad actors look for is

25  any public information about how a system's

1    designed, known information about it.  That's why

2    bad actors typically scan sites all the time

3    looking for holes.  So anytime you give them

4    something, that's not good.  You're just

5    basically making it even more difficult on

6    yourself to protect your system.

7           Q.   If you can pull up Exhibit 20 again.

8           A.   Yes.

9           Q.   Are there any specific risks in here

10   that you can identify as an example where it --

11   you would be concerned about making them public

12   because of the road map concern?

13          A.   I don't know that I can answer that.  I

14   -- any risk -- this is what you hear in the paper

15   all the time that, you know, Adobe has no risk.

16   Well, more than likely nobody knows about it but

17   maybe a researcher someplace.  But as soon as you

18   open it up, now people can say oh, let me go look

19   over there.  I mean, the Internet is a wide

20   field.  As soon as you start to point to well,

21   here is a potential area, it let's people focus

22   on that and you would become more exposed.

23              That doesn't mean that the risk it --

24   probability of somebody actually penetrating it

25   is very high at all.  Because somebody still has

Page 246

1          A.   So the typical configuration of the
2     office is you have a desk on one side, you turn
3     one way and you're working on your PC for daily
4     e-mail and stuff and it's tied to the Internet.
5     And you turn around and you face the opposite
6     direction and you're working on PC that's on the
7     air gap network.
8          Q.   Got it.
9               Okay.  And so I may have said this
10    before.  How many people have those PCs in their
11    offices?  Just approximately.
12         A.   Oh, five, maybe eight.  It's depending
13    on -- I think at the beginning when we had a big
14    push we had as many as eight.  But I think
15    they're down to about five now.
16         Q.   Okay.  And then if you come to where --
17    see where it says supports SQL Express and Win
18    10, do you see that, just where we were?
19         A.   Yes.
20         Q.   And then below that it reads, Windows
21    10 running XP guest to access old system.
22              Do you see that?
23         A.   Yes.
24         Q.   Do you know what that refers to?
25         A.   So we were still -- remember we were

Page 247

1    running in parallel in a different environment,

2    the old GEMS system.  Because we hadn't

3    completely switched over.  So they were -- as

4    part of the project they had to make sure that

5    they had the machines that could run the old

6    system, they had machines that could run the new

7    system.  The old system had to run XP because the

8    GEMS application run -- ran with XP.

9        Q.   All right.

10       A.   Two totally different environments.

11       Q.   And just so I understand, when you say

12   two totally different environments, the Dominion

13   EMS server you said was locked in the cage

14   somewhere.  Was the old GEMS system, whatever

15   servers it was still running on, was that locked

16   in a different cage somewhere?

17       A.   It was in a different rack.  A

18   different rack.  You know what a rack is?

19       Q.   Yes, yes, yes.  So it's all in the same

20   locked cage?

21       A.   Locked area.

22       Q.   But it's on a different server rack?

23       A.   Yes.

24       Q.   Got it.

25            And you're saying there were no -- no

Page 256

```
 1              REPORTER'S CERTIFICATE

 2

 3         I, V. Dario Stanziola, a Certified

 4   Court Reporter in the State of Georgia, duly

 5   commissioned and authorized to administer oaths

 6   and to take and certify depositions, do hereby

 7   certify that on Wednesday, February 2, 2022,

 8   Sanford Merritt Beaver, being by me personally

 9   duly sworn to tell the truth, thereupon testified

10   as above set forth as found in the preceding

11   pages, this examination being recorded

12   stenographically by me verbatim and then reduced

13   to typewritten form by me, that the foregoing is

14   a true and correct transcript of said proceedings

15   to the best of my ability and understanding; that

16   I am not related to any of the parties to this

17   action; that I am not interested in the outcome

18   of this case; that I am not of counsel nor in the

19   employ of any of the parties to this action.

20              IN WITNESS WHEREOF, I have hereto set

21   my hand, this the 8th day of February 2022.

22

23   _____

     V. DARIO STANZIOLA, CCR (GA)(NJ), RPR, CRR

24   Certification Number: 4531-3928-0743-6288

25
```