## IN THE UNITED STATES DISTRICT COURT FOR
## THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, et al.,**<br><br>**Defendants.** | **CIVIL ACTION FILE NO.:**<br>**1:17-cv-2989-AT** |

## DECLARATION OF MARILYN MARKS

**MARILYN MARKS** declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      I have personal knowledge of the facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

2.      I am the Executive Director of Coalition for Good Governance ("CGG").

3.      In the ordinary course of CGG's work, CGG obtains records from members, voters, government agencies, experts, and others in the field of election security and governance, and makes many of those records available to interested parties.  These records include government reports, responses to Open Records Act requests, academic and scientific studies, emails, correspondence, and other

records.  Attached to this declaration are true and correct copies of documents that CGG obtained and maintained in the regular course of its work.

4.      Exhibit 1 is a true and correct copy of an October 11, 2022 email from Dr. J. Alex Halderman to Director of Elections Blake Evans, of the Secretary of State's office, which email encloses Dr. Halderman's October 10, 2022 paper entitled "Vulnerbility Disclosure: Privacy Flaw Affecting Dominion ICP and ICE Tabulators."  Dr. Halderman sent this email to me in response to my request.

5.      Exhibit 2 is a true and correct copy of a paper by Dr. Halderman and others entitled, " Unclear Ballot: Automated Ballot Image Manipulation." I obtained this paper from Dr. Halderman's website at

https://jhalderm.com/pub/papers/unclear-evoteid19.pdf

6.      Exhibit 3 is a true and correct copy of the Georgia Secretary of State's Power Point training presentation on Emergency Back Up Procedures and Provisional Ballots that CGG obtained in response to an records request.

7.      Exhibit 4 is a true and correct copy of the Cobb County Emergency Action Plan provided to Cobb County Poll Workers and obtained by CGG in response to an open records request.

8.      Exhibit 5 is a true and correct copy of The Carter Center's report entitled *Performance Review Board Report on Fulton County Elections* conducted

for the State Election Board.  I obtained the report from the Secretary of State's

website:

https://sos.ga.gov/sites/default/files/forms/Performance%20Review%20Board%20

Report%20on%20Fulton%20County%20Elections%20%281-13-23%29.pdf

*9.*      Exhibit 6 is a true and correct copy of The Carter Center's report

entitled *2022 General Election Observation: Fulton County, Georgia.*    I obtained

the report from The Carter Center's website:

https://www.cartercenter.org/resources/pdfs/peace/democracy/u_s_elections/fulton

-county-election-observation-report.pdf.   CGG also obtained a copy of this report

from Fulton County in response to an open records request.

10.      Exhibit 7 is a true and correct copy of training materials for Georgia's

county election officials regarding post-election audits, which I obtained from the

Cobb County Elections Office in response to an open records request.

11.      Exhibit 8 is a true and correct copy of certification statements for the

Dominion Voting System as located on the Georgia Secretary of State's website

https://sos.ga.gov/sites/default/files/2022-02/2020_seb.pdf (specifically March 11,

2020 meeting transcript Exhibit 2.)

12.      Exhibit 9 is a true and correct copy of the Secretary of State's online

publication *A Guide for Registered Voters, An Overview of Georgia's Absentee*

3

*Voting Process* available at

https://sos.ga.gov/sites/default/files/forms/Absentee_Voting_In_Georgia_Rev_3-30-22.pdf

13. Exhibit 10 is a true and correct copy of an October 3, 2020 letter sent by CGG's counsel Bruce Brown to counsel for the Fulton County Board of Registration and Elections.

14. Exhibit 11 is a true and correct copy of the DeKalb County Voter Registration & Elections Board material for the July 14,2022 meeting regarding the May 24, 2022 Commissioner District 2 Election Analysis, excerpted from the complete board book available at

https://www.dekalbcountyga.gov/sites/default/files/users/user3597/Board%20Materials%202022-07-14.pdf

15. Exhibit 12 is a true and correct copy of a June 3, 2022 press release entitled "Georgia Election System Ensures Accuracy of DeKalb Results" posted on the Georgia Secretary of State's website at https://sos.ga.gov/news/georgia-election-system-ensures-accuracy-dekalb-results .

16. Exhibit 13 is a true and correct copy of a June 7, 2022 e-mail I received from Dr. Alex Halderman concerning a ballot image in the May 24, 2022 DeKalb election.

17.     Exhibit 14 is a true and correct copy of a July 12, 2022 press release entitled *Secretary of State Trains Local Officials on New Voter Registration System*. https://sos.ga.gov/news/secretary-state-trains-local-officials-new-voter-registration-system

18.     Exhibit 15 is a true and correct copy of a ballot image from the Barrow County November 3, 2020 election produced by the State Defendants in the discovery process in this case.

19.     Exhibit 16 is a photograph of a document included in the mail ballot packet that Fulton County Elections Office sent to voters in connection with the June 6, 2020.  Exhibit 16 was sent to me by Dr. Richard DeMillo who stated it was included in his mail ballot packet. It is identical to other notices that CGG received from other Georgia voters with questions about the instruction.

20.     Exhibit 17 is a true and correct copy of email exchanges on which I was copied between CGG counsel, State Defendant's counsel, and Cobb County counsel regarding the retention and production of Cobb County ballot images for the November 2020 election.

21.     Exhibit 18 is a true and correct copy of the Election Assistance Commission ("EAC") publication, "*Ten Things to Know About Selecting a Voting System*" available on the EAC website at

https://www.eac.gov/documents/2017/10/14/ten-things-know-about-selecting-voting-system.

22.     Exhibit 19 is a true and correct copy of the transcript of Georgia's State Election Board meeting of September 28, 2022 posted on the Secretary of State's website at

https://sos.ga.gov/sites/default/files/forms/2022%20Transcripts_3.pdf

23.     Exhibit 20 is a screenshot I made of the list of elections for which the Secretary of State's Office has published results on its website for the period January 28, 2020 through January 31, 2023.

https://results.enr.clarityelections.com/GA/

Executed on this date, February 4, 2023

_____
Marilyn Marks

# EXHIBIT 1

From: J. Alex Halderman <jhalderm@umich.edu>
Date: Tue, Oct 11, 2022 at 7:03 AM
Subject: Vulnerability Disclosure: Privacy Flaw Affecting Dominion ICP and ICE Tabulators
To: <bevans@sos.ga.gov>
Cc: <team@dvsorder.org>

Dear Director Evans,

I am writing to notify you about a serious privacy vulnerability that affects Dominion ImageCast Precinct (ICP) and
ImageCast Evolution (ICE) tabulators. The vulnerability, which we call DVSorder, can potentially be discovered and
exploited by anyone, without any access to equipment or breach of controls. It allows anyone to "unshuffle" ballot-level
data from these tabulators, such as ballot images or cast vote records, and learn the order in which they were scanned.
In some scenarios, this can make it possible to determine how individuals voted. The problem can potentially be
exploited by members of the public if jurisdictions release ballot-level data.

In the attached letter, my collaborators and I further describe the vulnerability and explain how election officials can
take steps to "sanitize" ballot-level data from affected tabulators. By properly sanitizing cast vote records and ballot
images before publishing them, jurisdictions can prevent the public from exploiting the flaw with no loss of
transparency.

Since many localities across the country are likely to publish vulnerable ballot-level data after the November election,
we will be making our findings public this Wednesday, October 12. We suggest that jurisdictions act now to pause any
pending release of vulnerable data until appropriate measures to sanitize it are in place.

We would be happy to provide any information or help we can in support of your efforts to mitigate the vulnerability
and continue to safeguard elections.

Sincerely,

J. Alex Halderman
Professor, Computer Science and Engineering
Director, Center for Computer Security and Society
University of Michigan
https://jhalderm.com
734-647-1806

1



**COLLEGE OF ENGINEERING**
# COMPUTER SCIENCE & ENGINEERING
UNIVERSITY OF MICHIGAN

J. Alex Halderman • Professor

October 10, 2022

Blake Evans
Director of Elections
State of Georgia

**Vulnerability Disclosure: Privacy Flaw Affecting Dominion ICP and ICE Tabulators**

Dear Director Evans:

We are computer scientists at the University of Michigan and Auburn University. We are writing to notify you about a serious privacy vulnerability that affects ballot-level data produced by Dominion ImageCast Precinct (ICP) and ImageCast Evolution (ICE) tabulators. The vulnerability can potentially be discovered and exploited by anyone, without any access to equipment or breach of controls. We believe that Georgia is among 22 states where at least some jurisdictions use these devices.

We were able to discovered the vulnerability, which we call DVSorder, using only publicly available information, so there is an appreciable risk that malicious parties may discover it independently from our work or have already done so. We notified Dominion about the problem on August 23 and informed EAC and CISA on September 2. Since many localities are likely to publish vulnerable data after the November election, **we will be making our findings public this Wednesday, October 12**. Our goal is to inform all entities that operate the ICP or ICE about the risks of publishing vulnerable ballot-level data and about steps they can take to "sanitize" such data so that the vulnerability cannot be exploited by the public. We suggest acting immediately to pause any pending release of vulnerable data until measures are in place to sanitize it.

Many jurisdictions publish ballot-level election data, such as cast-vote records (CVRs) and ballot images. When such data is produced from ICP or ICE tabulators, the DVSorder vulnerability makes it possible for anyone to unshuffle the ballots and learn the order in which they were cast. In some scenarios, knowing the order could make it possible to identify individuals' ballots and determine how they voted. What appear to be CVRs and ballot images from counties throughout Georgia are available online[1], and we have confirmed that we can unshuffle ballots in this data that were voted on the affected equipment.

When a ballot is cast on an ICP or ICE, the tabulator assigns it a random-looking "record ID" number. Dominion's EMS software later shuffles the data from the ballots to mask the order in which they were cast[2], but each ballot is still labeled with the original record ID. The vulnerability is that the ICP and ICE are flawed such that they assign ballot record IDs in a predictable manner. This allows anyone to use the record IDs in CVRs or ballot image filenames to determine the order in which the ballots were scanned.

---

[1]See, e.g., https://www.zebraduck.org/election-files/georgia2020-11-03/ballot-images/ and https://ordros.com/cvr/Georgia/.

[2]Dominion documentation implies that the shuffled data can be safely distributed without compromising privacy (e.g., https://www.sos.state.co.us/pubs/elections/VotingSystems/DVS-DemocracySuite511/documentation/UG-RTR-UserGuide-5-11-CO.pdf#page=101: exported CVRs entail "[n]o compromise to voter privacy"), as does information Dominion provided during equipment purchasing in some states (e.g., https://www.michigan.gov/-/media/Project/Websites/dtmb/Procurement/Contracts/MiDEAL-Media/008/7700117.pdf?rev=ab164daef7e2459eb741fa7d775f64f0#page=187: "The ballot images are given a random ID number as their file name, and when the images are extracted by the [EMS] application, they are randomized, thus ensuring the ballot images are de-coupled from voter order.").



**COLLEGE OF ENGINEERING**
# COMPUTER SCIENCE & ENGINEERING
UNIVERSITY OF MICHIGAN

**J. Alex Halderman** • Professor

The problem appears to affect all versions of the ICP and ICE, but it does not affect ImageCast Central scanners or ImageCast X DREs. Only data that represents individual ballots and their record IDs is vulnerable; summary results such as statements of votes cast (SoVCs), precinct- or scanner-level totals, election-night result reports, and poll tapes are not susceptible to the privacy flaw.

Here are some scenarios where an attacker could exploit the flaw to identify how individuals voted:

- In most of the country, scanners display a public counter that shows how many ballots have been cast. Anyone can note the counter value when they vote and thereby learn the ballot sequence numbers of people who vote before and after. For example, suppose a man uses the scanner immediately after his neighbor. By noting the counter value, the man can later identify his neighbor's ballot in published CVRs or ballot images and see how she voted.



- Poll workers or election observers could similarly note the public counter value to target specific voters. They could also keep a complete record of who uses the scanner, in order, which would allow them to deanonymize all ballots cast at the precinct.

- Some voters publicly disclose their polling places and voter numbers on social media or to others, as in the tweet shown here. As long as the voter has accurately stated their position in the ballot sequence, this would allow anyone to determine how they voted from vulnerable CVRs or ballot images, even for past elections.



- Some localities publish surveillance footage from inside polling places. (This image is from a day-long video from Georgia, obtained by others prior to our work via an open-records request.) If the locality also releases vulnerable CVRs or ballot images, anyone can associate each ballot with footage of the voter casting it. Many jurisdictions also treat voter check-in records or poll books as public records. These can heighten the risks posed by the vulnerability, as they often track the order in which voters receive their ballots, which can match or closely approximate the order of casting.



- Some localities publish scanner log files (`slog.txt`) from the ICP or ICE. Although these logs by themselves pose little risk to privacy, they can be combined with the DVSorder vulnerability to

Bob and Betty Beyster Building
2260 Hayward Street, Ann Arbor, MI 48109

https://**jhalderm.com**
jhalderm@umich.edu



COLLEGE OF ENGINEERING
# COMPUTER SCIENCE & ENGINEERING
UNIVERSITY OF MICHIGAN

**J. Alex Halderman** • Professor

determine the exact time that each CVR or ballot image was cast (subject to the accuracy of the scanner's internal clock). This provides an additional route to identify voters' ballots.

While this vulnerability is a privacy flaw and does not directly affect the integrity of election results, the secret ballot is itself an important security mechanism. Some voters—particularly the most vulnerable in society—may face real or perceived threats of coercion if the privacy of their votes is not strongly protected. Nevertheless, public access to election data, including CVRs and ballot images, can be a valuable form of transparency that helps uphold voter confidence, so long as the data is carefully prepared to protect privacy.

Fortunately, localities that use the ICP or ICE can prevent the DVSorder flaw from being exploited by the public with no loss of transparency if they take specific steps to "sanitize" ballot-level data before publishing it. Dominion cast-vote records (CVRs) in CSV format use a simple data scheme that can be sanitized manually. To do so, open the `.csv` file in Excel and delete column D, labeled "RecordId", then save the file. Removing ballot record IDs from ballot images (where they they occur in the filenames) and JSON-format CVRs is more labor intensive, so we have developed a software tool to process these files. The tool can sanitize CVRs in `.csv` or `.zip` format and folders of ballots images in `.tif` format. As with any third-party software, jurisdictions should not run our sanitization tool on their EMS computers; instead, we recommend copying vulnerable CVRs or ballot images to an external system and running the tool there. The tool will be available as free open-source software at https://DVSorder.org/ beginning on Wednesday.

Adequately sanitizing ballot-level data makes it just as safe to publish as if the DVSorder vulnerability did not exist. However, even if jurisdictions sanitize the data they make public (or if they do not publish any ballot-level data), the flaw still carries risks. For instance, unsanitized data could be stolen in a data breach or accessed by malicious insiders. Completely mitigating these risks will require Dominion to change the ICP and ICE firmware to use a secure method of generating ballot record IDs. The EAC has told us that Dominion plans to correct the flaw in a future software update, but our understanding is that no patches will be available (at least for federally certified versions) until after the November election. Election officials should contact Dominion for further information and to inquire as to patch availability.

We would be happy to provide whatever information or help we can in support of your efforts to mitigate the vulnerability and strengthen the security and privacy of elections.

Sincerely,

J. Alex Halderman                          Drew Springall

Professor                                  Assistant Professor
Computer Science & Engineering             Computer Science and Software Engineering
University of Michigan                      Auburn University

Braden Crimmins, Dhanya Narayanan, and Josiah Walker
Student Researchers, University of Michigan

# EXHIBIT 6

# 2022 General Election Observation:
# Fulton County, Georgia

Prepared by The Carter Center for the Fulton County Board of Elections and Registration and the Georgia State Election Board's Performance Review Board on Dec. 15, 2022.



THE
CARTER CENTER

# Table of Contents

Summary and Key Takeaways ..........................................................................................................3

Background and Context on the Carter Center's Fulton County Observation ...............................4

Observation Methods ......................................................................................................................5

    Observer Recruitment and Training .............................................................................................6

    Polling Place Observer Deployment/Coverage ..........................................................................6

    Data Collection ...........................................................................................................................7

Observations on Voting (Oct. 17 – Nov. 8, 2022) ........................................................................7

    General Atmosphere ....................................................................................................................7

    Voting Locations .........................................................................................................................7

        Accessibility of Voting Locations .........................................................................................8

        Signage and Campaigning Outside the 150-foot Boundary ..................................................8

    Lines ............................................................................................................................................9

    Staffing ......................................................................................................................................10

    Poll Openings ............................................................................................................................11

    Voting Operations .....................................................................................................................12

        Check-in processes ...............................................................................................................12

        Voting ..................................................................................................................................12

            Nonstandard Processes ....................................................................................................13

        Accessibility of Voting Procedures .....................................................................................13

        Closings ...............................................................................................................................13

        Transparency and Observer Access .....................................................................................14

    Other Observations of Note ......................................................................................................14

        Wrong Locations ..................................................................................................................14

        Voter Credit Error ................................................................................................................14

The Runoff ....................................................................................................................................15

Internal County Operations ..........................................................................................................16

    Absentee ballot applications .....................................................................................................16

    Absentee Ballot Processing ......................................................................................................16

    Election Night Drop-off ............................................................................................................17

    Early Tabulation & Sequestration .............................................................................................17

    Results Reporting ......................................................................................................................18

Risk-limiting Audit .......................................................................................................................18

    Audit Premises ..........................................................................................................................18

    Training for Audit Boards .........................................................................................................18

    Vote Review Panels ..................................................................................................................18

    Data Entry .................................................................................................................................18

Conclusion ....................................................................................................................................19

Appendices ....................................................................................................................................19

## Summary and Key Takeaways

The Carter Center, which has observed more than 100 elections in 39 countries since 1989, was invited by the Georgia State Election Board-appointed Performance Review Board (PRB) and the Fulton County Board of Elections and Registrations (BOER) to observe the Nov. 8, 2022, general election. This observation fell under the framework of the performance review provisions of a state law known as SB202. Although this observation was conducted at the invitation of both the Performance Review Board and the Fulton County Board of Elections and Registration, The Carter Center conducted its observation as an independent organization, and the conclusions herein are its own.

Carter Center nonpartisan observers collected firsthand data on early voting and election day processes, as well as processes within the Fulton County election offices. This report summarizes the findings of The Carter Center and is intended to assist Fulton County in the continued improvement of its election administration processes and to inform the report of the Performance Review Board as it completes the performance review of Fulton County.

Based on its observation of the November 2022 general elections, The Carter Center considers Fulton County to have successfully implemented the key aspects of the elections that it observed. Within the parameters of its observation efforts, The Carter Center did not observe any election administration irregularities that would call into question the ability of the Fulton County Department of Registrations and Elections to administer secure and accessible elections for the citizens of Fulton County. Indeed, the Center noted that the Nov. 8, 2022, election showed many improvements in Fulton County's election administration practices compared to those noted during 2020.[1] Election workers paid particular attention to reconciliation processes, quality assurance checks, and security measures like chain-of-custody documentation, which made a marked improvement on the overall trustworthiness of the election.

Recognizing that Fulton County strives for continuous improvement of its election administration processes, The Carter Center offers the following summary of our observations and recommendations for future elections:

***Contextualized Training for Election Workers:*** Carter Center observers noted that Fulton County election workers are generally well-trained, as demonstrated by the effective and consistent implementation of most procedures.  While some variation in the application of procedures is to be expected given the temporary nature of the workforce, this can be minimized through poll worker training that not only focuses on the steps of the process, but also helps workers understand the big-picture "why" of what they are doing. At times, it seemed that election workers didn't have a full understanding of the importance of particular administrative steps (checking seals, for example, or providing provisional ballots) to the overall security and accessibility of the election. A better understanding of how each step in the process fits into the multiple layers of safeguards could ensure more consistent application.

Training should also emphasize the following procedures:
- Announcing each step of the opening and closing processes, particularly for ballot security and chain-of-custody steps, to enhance transparency and public confidence;
- Optimal placement of voting equipment containers to ensure ballot secrecy;
- Processes associated with nonstandard situations (e.g., provisional balloting or challenged voters);
- Pulling seals tight and immediately recording seal numbers; and,
- Reminding voters to check their paper ballots before placing them in the scanner.

---

[1] Seven Hills Strategies, LLC (SHS) was contracted by the State Election Board (SEB) to serve as an independent, nonpartisan monitor for the pre-electoral processes in Fulton County leading up to the Nov. 3, 2020, general election and January 2021 runoffs. The report from that observation can be found here: https://www.documentcloud.org/documents/20484973-fulton-county-state-election-board-report (accessed Dec. 10, 2022).

3

- Training audit boards on the proper procedures before beginning the risk-limiting audit, ideally in the presence of observers.

**Staffing:** Overall, Carter Center observers reported that Fulton County staff and temporary election workers were enthusiastic, took their roles seriously, and wanted to provide voters with a good voting experience. The Carter Center notes that Fulton County met its staffing needs to administer the election, although the Thanksgiving holiday made it more challenging to recruit for advance voting for the Dec. 6 runoff election, as did confusion over whether Saturday voting would be allowed. Despite a long voting calendar that took its toll on election workers, Fulton County staff demonstrated a deep commitment to the process and the voters of Fulton County.

**Voter Education about Voting Locations:** On election day in both November and December, Carter Center observers noted many instances in which voters showed up to vote at the wrong voting location. In some cases, this resulted from confusion about the difference between voting during advance in-person voting (at vote centers) versus election day (at assigned precincts). In others, it appeared to be the result of changes to voting locations following redistricting. Fulton County mailed voters information about their correct voting location, but The Carter Center suggests that more be done by the county, the political parties, and others who conduct voter education to encourage voters to check their voting location in advance of going out to vote on election day.

**Runoff Advance Voting Locations and Check-in Processes:** During advance voting for the Nov. 8 elections, Carter Center observers generally reported smooth and efficient voting processes and short wait times. Advance voting for the Dec. 6 runoff, however, was characterized by wait times of over an hour. A number of factors likely contributed to the length of the lines (see below for additional detail). Going forward, the Center recommends that Fulton County open additional advance voting locations and have additional check-in stations inside early-voting locations for federal and statewide runoffs to facilitate faster movement of voters through the process.

**Standard Operating Procedures:** As Fulton County Registrations and Elections moves into its new facility in 2023, The Carter Center encourages the department to take the opportunity to revisit and update its standard operating procedures to help ensure consistency in procedure implementation. This was a priority already identified by the Fulton County Department of Elections for 2023.

**Sequestration During Advance Vote Tabulation:** Sequestration rules for early tabulation, governing the practice of restricting movement and communication of persons who could have knowledge of early vote totals prior to close of polls, were not effectively enforced during the Carter Center's observation. While we have no reason to think this affected the election, once Fulton County's purpose-built election space is complete next year, a dedicated space to sequester staff and observers should be made available for this purpose. Elections staff should also be trained to enforce the rules directly, rather than relying on temporary security staff.

## Background and Context on the Carter Center's Fulton County Observation

In August 2021, in response to a request from the Georgia General Assembly, the Georgia State Election Board appointed a Performance Review Board (PRB) to conduct a performance review of the Fulton County Board of Elections and Registration (Fulton BOER) pursuant to OCGA § 21-2-106. The duty of the PRB is to make a thorough and complete investigation and issue a written report of its findings to the Secretary of State (SOS), the State Election Board (SEB), and the local governing authority that shall

include such evaluations, judgments, and recommendations as it deems appropriate. See OCGA § 21-2-106.

As part of the performance review process, the PRB conducted interviews of Fulton BOER staff and observed elections processes, absentee ballot processing, early voting, and election day voting. To fulfill its duties under Georgia law, the PRB wanted to conduct further observation and analysis during the November 2022 general election in Fulton County. This observation effort would allow the PRB to complete its report by the end of the 2022 calendar year.

Recognizing the Carter Center's decades of experience with independent and impartial analysis of elections and election observation, the PRB, SEB, and Fulton BOER agreed that the Carter Center's independent and objective analysis would be beneficial to all parties within the framework of the ongoing performance review. To that end, and at the invitation of the PRB and Fulton BOER, The Carter Center agreed to conduct independent, nonpartisan observation of the Nov. 8, 2022, general election. This invitation was formalized in a memorandum of understanding (MOU) that was entered into on Oct. 13, 2022, following a 4-1 vote of approval by the Fulton BOER.

The Carter Center did not conduct this observation on behalf of the PRB, SEB, or Fulton BOER; this report makes its observations and analysis available to the PRB so that additional independent and objective analysis can inform the PRB's report to the SEB.

Under the MOU (see Appendix 1), the Carter Center's specific scope of work for this observation effort included observation of early voting, election day polling places, and procedures at the Fulton County election office before and after election day. Carter Center observation efforts began on Oct. 17, 2022, and continued through the Dec. 6 runoff. The Carter Center agreed to make its final report available to both the PRB and the Fulton BOER simultaneously on Dec. 15, 2022.

In conducting this observation effort, The Carter Center received the full cooperation of the Fulton County Department of Registrations and Elections. In particular, the Fulton County interim director of registrations and elections, Nadine Williams, and her deputy, Patrick Eskridge, made themselves and other staff available to The Carter Center team to respond to any and all questions.[2]

## Observation Methods

Nonpartisan election observation is an impartial process where observers systematically gather data to determine whether an election was fair, peaceful, and credible. Unlike partisan observers — also called "challengers" or "poll watchers" — who generally look for activity that could undermine their own party's or candidate's interests, nonpartisan observers have no stake in the election outcome. They do not interfere in the election day process, even if they see something take place that should not happen. They are trained to understand the election process as specified by law and report on whether election day procedures are being correctly followed.

The Carter Center has observed more than 100 elections in 39 countries since 1989 and was a pioneer in establishing the election observation methods now widely used around the world. The Carter Center's election observation approach focuses not only on areas for improvement but also on strengths that should be replicated in the future to ensure the validity, fairness and accuracy of an election process that is secure and accessible for voters.

---

[2] Nadine Williams has served as the interim elections director since the departure of Richard Barron from the post on April 1, 2022.

5

The Carter Center's analysis is based on direct observation, desk analysis of documents provided by Fulton County, and conversations with Fulton County elections staff. This report captures the analysis of data collected over the eight weeks between Oct. 17 and Dec. 12, 2022.[3]

## Observer Recruitment and Training

The Carter Center's election observation efforts were supported both by subject matter experts in the field of elections and election administration and by volunteers. Subject matter experts (often former election administrators or individuals who have worked closely with election administrators) observed processes within Fulton County's election office as well as some aspects of the voting process. Carter Center volunteer observers watched processes at voting locations only.

Carter Center volunteer observers were recruited through several channels, including from among the Carter Center's staff, volunteers, and interns; the Carter Center's Board of Councilors (made up of community and business leaders in the Atlanta area); the Democracy Resilience Network (a Georgia-based cross-partisan group of community leaders); and faculty and students from Atlanta area colleges and universities, including Emory, Georgia Tech, Georgia State, and Morehouse.

The Carter Center required all observers to attend training, virtually or in person, sign a code of conduct for nonpartisan election observers (see appendices), and receive proper observation credentials. Observer training focused on polling place procedures, data collection methods, the roles and responsibilities of nonpartisan observers, and the observer code of conduct. All Carter Center observers were U.S. citizens.

## Polling Place Observer Deployment/Coverage

During the early voting period for the Nov. 8 election, The Carter Center deployed 64 observers to all 36 early voting locations (vote centers) and the four "outreach" advance voting locations, collecting over 330 observation reports on early voting. Each early voting center was observed at least six times. Each outreach location was observed at least once during early voting. Observers were deployed in approximately six-hour shifts to a cluster of four voting locations organized by geographic proximity to one another.[4] Carter Center observers were not able to observe opening through closing of the polls in every location for every day of early voting or election day.[5]

On Nov. 8, the Center deployed 104 observers to 217 of 249 Fulton County polling locations. Each observer was assigned two to three polling places grouped by geographic proximity to one another. Of the 32 election day polling places not observed, 12 were early voting locations The Carter Center had already observed numerous times, leaving only 20 polling places unobserved.

Two Carter Center observers also attended the Nov. 17 risk-limiting audit in Fulton County.

For the Dec. 6 runoff, the Center's observation footprint was much smaller, with eight observers who followed up on a small number of preliminary findings from the Nov. 8 election observation effort. This smaller-scale effort was in part necessitated by the completion of this report by the Dec. 15 deadline.

---

[3] The Carter Center notes that by Oct. 17, many preelection processes were already complete or near complete. As such, the Center is unable to offer an assessment of those processes. If similar observations are undertaken in the context of future reviews, an earlier start date for the effort is recommended to allow for additional areas of observation.

[4] The Carter Center deployed observers every day of early voting, except for Oct. 18. This was due to volunteer shortages that day.

[5] Carter Center observers were present for poll opening at 26 early voting locations and 63 election day locations and at poll closing at 23 early voting locations and 61 election day locations.

## Data Collection

Carter Center election observers always use data collection instruments to ensure the systematic collection of information about the processes observed. For the Fulton County observation, Carter Center volunteer observers used paper checklists to avoid the use of mobile telephones in polling places. The checklists included questions about the exterior and interior of polling places, accessibility, staffing, equipment, voting procedures, efficiency, special circumstances, and a space for additional notes. Subject matter experts also collected qualitative information about the processes that they observed.[6] The Carter Center also held multiple virtual debriefing sessions following both early voting and election day to collect more qualitative data about observation. This report summarizes and synthesizes the data collected through these methods.

## Observations on Voting (Oct. 17 – Nov. 8, 2022)

Advance voting for the November general election took place in 36 early voting centers across Fulton County from Oct. 17 through Nov. 4, 2022. In addition, the county opened four outreach locations on college campuses. These outreach locations were open for two days each during the 19 days of early voting. Voting took place at 249 polling places on election day.

As outlined above, The Carter Center observed advance voting at each of the advance voting locations on multiple days in advance of the Nov. 8 elections, and at about 87% of election day locations.  The Carter Center observations recorded here draw from data collected during the Oct. 17-Nov. 8 period. Observations regarding the runoff are included below.

### General Atmosphere

Carter Center observers noted the calm and peaceful atmosphere that characterized both the early voting and election day processes. There were no reports of systematic voter intimidation or anyone blocking access to the polls. During early voting, there was only one report of unusual or potentially disruptive activity outside the early voting locations observed, and election workers promptly addressed the issue. Similarly, on election day, observers noted one instance of poll workers disrupting operations and arguing with a poll manager, but the offending parties were quickly removed and replaced. A security presence was standard across the majority of polling places both during early voting and on election day.

### Voting Locations

Voting took place in a variety of locations in Fulton County, from schools to churches to art museums. The Carter Center observers noted that each location affected the voter experience differently.

Early voting locations were often public libraries, community or senior centers, gyms, government facilities, or public spaces (e.g., the High Museum). Carter Center observers reported that some locations were more suitable for use as voting locations than others. In some cases, there was adequate space to accommodate election equipment and facilitate the movement of voters; in other cases, the space was more restricted. Gyms and government buildings provided more space for voting, while libraries tended to be more challenging. Observers noted that the space in eight of the 17 libraries used for early voting affected the flow and movement of voters around the polling place but did not appear to deter voters from casting their ballots.

In some cases, the small space available for early voting limited the ability of party poll watchers and nonpartisan observers to easily observe the voting process, as they had to be seated out of the way. In a small number of cases, it was also noted that the space restrictions could make it more difficult for voters

---

[6] Observations were entered into an Excel form in a secure environment (through Microsoft forms) for analysis by the Carter Center team.

in wheelchairs to maneuver around a polling place. Parking was noted as a specific challenge at a few locations, either because the lot was small or because there was a parking structure or other facility that was challenging to navigate or required parking validation.

On election day, two locations were highlighted as being especially hard to find: The Center for Civil & Human Rights and the Sandtown Middle School. Where only a portion of the area/campus is being used, especially an area away from the main access point, additional signage would be helpful. Observers reported adequate parking capacity in over 95% of locations but noted that three locations (West Manor Road Recreation Center, Dogwood Senior Center, and the Center for Civil & Human Rights) lacked capacity.

Locations using paid parking lots or garages for voter or poll worker parking on election day were uniquely problematic, with observers noting that it was often unclear whether free parking was available and where it was available. Observers also reported cars being booted or towed at two locations, requiring election officials to take time away from their duties to address the situation and, in at least one case at Morehouse College's Archer Hall, incur costs to retrieve their vehicles.

### Accessibility of Voting Locations

Overall, the locations selected for voting appeared to be accessible for persons with disabilities. Clearly marked accessible parking, an easily accessible entrance, and a clear path to allow voters with disabilities access to the location were present at over 90% of voting locations observed on election day, and those percentages were even higher during advance voting. For urban locations using garages, Fulton County could consider temporary street parking right in front of the building as an alternative.

Most sites used the main entrance to the building as the accessible entrance. However, when separate entrances were used, observers noted that additional signage directing voters to the accessible entrance would have been useful (e.g., Dad's Garage Theater, Bethune Elementary, Birmingham Falls Elementary, New Prospect Elementary). Approximately 13% of election day sites lacked a working automatic door opener and had doors too heavy to open comfortably from a seated position; for these reasons, The Carter Center suggests propping exterior doors open (weather permitting) or stationing a poll worker at the entrance to assist voters.

### Signage and Campaigning Outside the 150-foot Boundary

Most advance voting and election day locations for the Nov. 8 election were clearly marked with exterior signage. In a small number of early voting locations, signage was missing. The 150-foot boundary was marked in most locations during early voting and on election day. However, it was noted that the 150-foot campaigning boundary sign was sometimes hard to find and even harder to read. The Center recommends the state review the design of the sign, and Fulton County move to using lawn or A-frame signs to indicate the boundary.

Of the more than 330 observations over the 19 days of early voting, observers only noted eight instances of campaign materials being placed within the 150-foot boundary. During subsequent observation at those locations, the campaign materials were moved back outside the 150-foot radius, indicating that election teams were monitoring this and taking measures to ensure that rules were followed.

On election day, signs at locations where precincts had changed were helpful but also may have caused misunderstandings, with observers noting that it sometimes appeared that a location was not in use rather than simply being used for a different precinct. For the future, signs stating the precincts served at each location, in addition to any that are no longer in use, would be ideal.

8

## Lines

During early voting for the Nov. 8 elections, lines were generally short at locations observed by the Center. Wait times varied from none to a maximum of 25 minutes at a handful of locations across the early voting period. The last day of early voting saw longer lines, with Metropolitan Library experiencing particularly long lines. This may have been exacerbated by a get-out-the-vote event nearby which was reportedly driving voters to that location to vote. Voters over the age of 75 and those with disabilities were consistently allowed to move to the front of the line.

Wait times observed at election day sites on Nov. 8 generally stayed under 15 minutes throughout the day, apart from lines at the beginning and end of the day. Most voters waited far less than 15 minutes, with 57% of sites observed having no wait at all and another 38% at five minutes or less during observation. Lines at opening were manageable at all locations observed on Nov. 8, with the longest line at 43 people, and observers reported that lines cleared quickly.

The voter throughput for polling places on Election Day was an average of 36 voters per hour, with an hourly distribution shown in Figure 1. This is faster than voting progressed during advance voting, which averaged around 32 voters per hour (Figure 2), chiefly due to the simplified check-in process on election day: no application requirement to vote in-person absentee; voter confirmation via ID scan rather than manual entry; and no precinct configuration requirement when programming ballot activation cards.

Figure 1



9

Figure 2



## Staffing

Voting locations were staffed by teams that included a poll manager, assistant poll manager(s), clerks, a technician, a line manager, and a compliance officer. A public safety officer was present and visible at most locations observed.

Observers noted the friendly and enthusiastic attitudes of election workers at many voting locations, that they were helpful and supportive of voters, and that there was a strong emphasis on customer service. Observers commented that election administration staff took their roles seriously and recognized the significance of their work.

During advance voting, Carter Center observers found that many poll managers had considerable experience working the polls and that this was particularly beneficial in ensuring the smooth operation of advance voting centers — a difference from election day, when many more inexperienced staff were working. Even with the mix of experience among election workers on election day, the consistent grasp of their various tasks across locations indicated a successful training program. The emphasis placed on training workers for particular roles, rather than cross-training every worker in everything, paid dividends.

In particular, the presence of two specific roles — early voting compliance officers, tasked with performing quality assurance measures like ballot reconciliation throughout the day, and technical personnel, trained to troubleshoot machines — were especially helpful in streamlining processes and enhancing efficiency. On election day, several observers noted that locations reporting IT problems during setup waited for technical support when voting began. The Carter Center understands that Fulton County's goal is to have a trained technician at every voting location and agrees that having more technical personnel available, especially early on election day, would be helpful.

In almost all cases, the early voting locations had sufficient staff to ensure the smooth operation of the voting center. Likewise, the number of poll workers recruited for election day was adequate. Over 90% of locations observed had all assigned staff in attendance on Nov. 8, and the county ensured that replacements were available and ready to fill gaps where needed.

The use of staffing agencies for election worker recruitment continues to pose challenges regarding temporary election staff retention. This election, an increase in pay (minimum $15/hour) for early voting

10

and election day workers appears to have helped to attract temporary workers. However, the 14-hour workdays over 19 days of early voting did take a toll. In addition, recruiting staff for the runoff was a challenge given the Thanksgiving holiday.

The Fulton County call center was staffed by 20-30 people (depending on whether it was the early voting period or election day). The call center appeared to be responsive to the needs of poll managers.

As noted above, Fulton County opened outreach locations on college campuses during early voting. Of the advance voting locations observed, the outreach locations appeared to have the most significant staffing challenges. Experienced poll managers were working with inexperienced staff — often students — at times giving them on-the-job training. At two outreach locations, observers reported that the flow of voters was confusing. Additional training for student poll workers would be helpful, with an emphasis on directing traffic in the polling location.

## Poll Openings

The Carter Center observed 47 openings of advance voting locations across the county and 63 openings on Nov. 8. In several cases, observers arrived at the advance voting locations at 6:15 a.m. to find that the advance voting center was already set for the opening. Like the experience during early voting, observers arriving at 6 a.m. on election day often found voting sites already set up, as poll workers had arrived at 5 a.m.[7]

Ballot chain of custody and machine security measures, like checking and recording seal numbers, were generally consistent. However, it was clear that poll workers did not understand why these steps were required. They were simply focused on completing their paperwork and, without an understanding of why they were recording numbers on various "recap" sheets, often took simplifying shortcuts. For example, practices like cutting all the seals off at once and recording the seal numbers afterward, or recording the seal numbers before putting the seals on, streamline the process but also separate the act of checking/recording the seal number from opening/closing the machines. If an incorrect seal number had been found under these circumstances, for example, it might not have been discovered until after the seal was cut and the machine opened, which defeats the purpose. Additionally, poll workers need to pull the zip-tie-style seals tight, closing the loop of the seal as much as possible, to minimize the opportunity for tampering. Placing more emphasis on the purpose of recap paperwork and seal procedures during training would help poll workers better understand their role in the election security process.

In many instances, election workers moved through the opening procedures to maximize efficiency, following procedures but not taking the time to explain what they were doing to party poll watchers or observers. This would be a valuable and simple way to increase transparency in the process.

Wall space was often inadequate for the number of signs required, and election workers struggled to find space. Since many of the state-mandated signs are clearly perfunctory, with text that is both too small and too lengthy to read in the context of voting (see appendices), we recommend that the state reassess signage requirements in view of what is both practical and useful. Including nonessential signage may train voters to ignore signage altogether, missing notices that are necessary to read.

Over 80% of early voting locations and 90% of election day polling places were rated by Carter Center observers as "good" or "very good" on their opening procedures, and none were ranked below "average."

---

[7] In these cases, observers backfilled by asking questions where procedures appeared to have been completed before their arrival.

11

## Voting Operations

Carter Center observers reported that early voting was largely well-run, with only one observation noting below-average ratings during the time of observation.[8] Fulton County's election day voting locations were consistently well run, with 93% of observed locations rated as "very good" or "good" by Carter Center observers and no location rated below "average."

### Check-in processes

During advance voting, Carter Center observers noted that check-in procedures were followed. There were a few instances where voters expressed confusion about the paper absentee ballot application form that needs to be completed during advance voting check-in. Election officials were generally able to explain the process to voters.

On election day, general procedures for voter check-in, including verifying voters' identity, confirming eligibility, and preparing a ballot activation card, were completed smoothly and consistently across the board.

### Voting

Voting processes generally unfolded smoothly at locations where The Carter Center observed. Voters appeared able to use the ballot marking devices (BMDs) and ballot scanners without confusion — observers noted that there is now a level of familiarity with the equipment for many voters. Indeed, on election day, 95% of observers reported that both BMDs and scanners were used without confusion by voters, and poll workers were available to help answer questions that did arise. It was noted that at times acceptance of the ballot by scanners took several tries.

Carter Center observers noted that the equipment containers used by Fulton County made voting location setup efficient and easy for election workers. While equipment containers have many benefits with regard to ease of transportation and setup, observers also noted several challenges:

- The size of the containers in the smaller voting locations made the locations especially cramped (see points on size of locations — particularly for early voting — above);
- The height and angle of the BMD screen within the equipment container inadvertently undermined the secrecy of the voting process, especially in locations where tight space did not allow for optimal placement of the equipment containers (see voting location diagrams in Appendices). Voters' bodies could not always adequately shield the screen while they were voting, though Carter Center observers noted that this did not appear to deter voters from participating. Going forward, the doors to the containers should be more consistently used as privacy screens to block visibility from the side and, if possible, the angle of the screen adjusted to help increase voter privacy. Privacy filters for the screens could also be considered, although they would need to be tested to ensure that they did not negatively impact overall usability.

During early voting, Carter Center observers reported several instances where election workers quickly addressed voter cell phone usage inside the early voting locations. Unrestricted phone usage was much higher during election day than during early voting, with 43% of observers reporting that phones were used at their location.

Carter Center observers noted that election workers rarely verbally prompted voters to review their paper ballots before inserting them into the scanner, although they noted that some voters did so anyway. Forty

---

[8] The below average rating was for the outreach location referenced above where there was more confusion about processes than at other locations observed. This did not appear to deter voters from voting or have other effects on the process.

percent of observations from early voting and 49% of election day observations record that voters were never asked to review their ballots. Given that voter review of the human-readable text on the paper ballot is essential to ensuring an auditable paper trail and codified by administrative rule,[9] The Carter Center strongly recommends re-emphasizing this point in poll worker training and ensuring that this becomes a standard part of procedure for the staff working the scanner. (It should be noted that signage to this effect was present but has been shown to be relatively ineffective; verbal prompts, generally by the poll worker at the ballot scanner, are considered best practice.)

*Nonstandard Processes*

Nonstandard processes like voter challenges, provisional ballots, and canceling mail absentee ballots were rare, but the process widely varied from place to place. Many poll workers were unsure of how to proceed even after reviewing documentation and simply called their regional manager for guidance. The Carter Center recommends implementing that escalation path as the standard practice, as those who tried to complete these procedures alone were not always successful. In addition, providing very clear step-by-step checklists/decision trees for each scenario would be helpful.

Provisional ballots, in particular, create a burden for poll workers. Training on the subject was made significantly harder by SB202, which added complexity to the circumstances under which a provisional ballot should be completed. Despite these challenges, provisional ballots provide one of the best stopgaps against administrative problems that could otherwise disenfranchise voters. Fulton County can and should place greater emphasis on provisional ballot procedures and importance during poll worker training, to ensure that provisional ballots are readily available when voters need them.

*Accessibility of Voting Procedures*

In all locations, accessible BMDs and lower scanners were available for use by people with disabilities, though the angle of the screen at the accessible BMD was described as difficult for some as it required raising one's arm to head height or higher to vote.

Observers noted several instances of voters requiring assistance to vote. Election workers followed the procedures, requiring those giving assistance to sign the appropriate assistance form. In addition, during advance voting, observers reported a few instances where language assistance was requested. After a phone call and a short wait, an interpreter would arrive to help. On election day, language assistance was requested in 11 locations and generally provided. In a single instance, the poll manager expressed the view that voters didn't need translated ballots since it was "just names" that they needed to read (though we note that the general election ballot also contains instructions and ballot initiative text that should be translated).

*Closings*

The Carter Center collected 41 observations on the closing process during early voting for the Nov. 8 election and 61 on election day. Carter Center observers rated all advance voting closings but one as "average," "good," or "very good." On election day, all but three were rated at least "average," with the three locations rated negatively suffering from inexperienced poll managers who had difficulty completing the closing procedures in a timely manner after polls closed at 7 p.m.

As with openings, in many cases observers noted election workers moved through the closing process with efficiency as a key consideration. However, they often did not take the time to explain what they were doing as they moved through the closing process, making it difficult for party poll watchers and Carter Center observers to follow along. Where observers could follow the process more closely, they noted that while

---

[9] Rule 183-1-12-.11 (8)

there was some variability in the implementation of closing procedures, steps related to the chain of custody and the integrity of the election equipment were generally consistently followed.

### Transparency and Observer Access

Carter Center observers noted party poll watchers in about one-third of early voting observations for the Nov. 8 election. During advance voting, Democratic Party monitors were observed almost twice as frequently as Republican Party monitors. In less than 10% of reports did Carter Center observers note the presence of both parties. On election day, the number of Democratic and Republican party monitors was more even, but both parties were present in just 6% of polling places observed. In a small number of locations, representatives of third parties were present.

Throughout the process, party poll watchers largely conducted themselves according to Fulton County's observer guidelines at almost all locations observed. In three cases during early voting, Carter Center observers noted that poll watchers were disruptive — in particular, speaking loudly in the quieter environment of the polling location and sometimes promoting partisan views. Poll watcher credentials were not consistently checked in places where the Center observed.

As many as 12% of early voting observation reports mentioned some limitation on the ability of observers to watch the process. Often this was because party poll watchers and observers were seated in spaces that restricted their ability to observe key procedures due to space constraints. In these cases, observers were often allowed to move around and check scanner numbers etc. when there were no voters present.

In a few instances, Carter Center observers were not initially granted access to observe early voting by the poll manager. This was generally addressed by a phone call to the poll manager from the Fulton County interim elections director. On election day, poll workers were not always aware that observers were allowed to witness the voting location setup procedures and seemed uncomfortable allowing access to polling locations before 7 a.m., even to observers with credentials and badges. Several observers were denied entry and so were unable to observe opening procedures. In all cases, observer access was resolved.

## Other Observations of Note

### Wrong Locations

On election day, Carter Center observers at specific locations noted significant numbers of voters turned away because they were not at their correct polling place, including: Buckhead Library, North Fulton Annex, St. James UM Church, Adams Park Library, Therrell D.M. High School, Love T. Nolan Elementary, Springfield Missionary Baptist Church, Metropolitan Library, East Point First Mallalieu UM Church, and Roswell Library. Some confusion is generally present when moving from vote centers during early voting, where voters can choose to vote at any location, to assigned polling places on election day. However, the fact that this was a significant problem for large numbers of voters beyond the sites also in use for early voting indicates a larger issue. The most logical explanation is that changes to assigned locations due to redistricting were to blame. Redistricting after the 2020 census occurred between the primary and general elections this year, and we note that Fulton County notified voters whose precincts had changed via postcards mailed prior to the election. However, the impact of redistricting seemed to be largely ignored by the political parties. Parties provided the most widespread communications prior to the election but failed to warn voters that their assigned location may have changed.

### Voter Credit Error

In one location, a Carter Center observer noted that poll workers had an "Application to Vote Early In-Person" form that they could not finish processing as the statewide voter registration database indicated the voter had already voted the day before at a different early voting location. The poll worker did not note the presence of an earlier ballot record during the check-in process for the voter (during which they added a

14

new ballot record in the statewide voter registration database but did not finish processing it), so the voter was allowed to vote. Only when poll workers did final data entry for that application later in the night, checking they had entered information correctly and processing the added ballot records in the database, did the system prevent them from entering a duplicate record. The poll manager at the early voting location responded quickly and effectively and immediately called her supervisors for assistance. The Carter Center also raised this case with the Fulton County Elections Department and was subsequently informed that the case had been elevated to the Office of the Secretary of State for further investigation (which is ongoing at the time of writing this report).

The Carter Center cannot confirm that this was a case of double voting. It could have been the result of data entry error at either of the early voting locations. The poll manager should be commended for identifying the error during her reconciliation process and taking the appropriate steps to ensure timely resolution of the issue through the correct channels. Looking forward, ensuring that the ballot record for the voter is completely created during voter check-in, with voter credit assigned is critical. The introduction of new early voting check-in practices (to be rolled out statewide in 2023 in advance of the 2024 elections) may also help reduce the opportunity for error.

## The Runoff

The Carter Center deployed a smaller number of observers for the runoff to follow up on outstanding questions from the Nov. 8 observation effort. Carter Center observers found many aspects of the process on Dec. 6 to be like those observed in November. The principal difference, well reported in the press, was the longer wait times at early voting locations.

Early voting for the Dec. 6 runoff election took place in 24 locations around the county and at three outreach locations on college campuses. The outreach locations were open for two to three days during the seven days of early voting. According to Fulton County, the reduction in locations was the result of budgetary constraints and the considerable challenge of recruiting sufficient staff over the Thanksgiving holiday (the latter shared by other counties). Runoffs also tend to have significantly lower voter turnout, which may also have been a factor in deciding to open fewer locations.

During early voting for the Dec. 6 runoff election, lines were considerably longer than in November, with wait times of an hour or more at many of the locations on multiple days during the seven-day voting period. This may be explained by a number of factors, including: voter enthusiasm (news outlets reported voters lining up hours in advance of polls opening); the shorter timeframe for early voting for the runoff (seven days as opposed to 19 days); and the reduced number of early voting locations.[10] It should be noted that several of the more populous counties around Georgia experienced longer wait times for the runoff than for the Nov. 8 elections.

Observers noted that the check-in process caused a bottleneck within polling places, as election workers completed the multistep process for a high volume of voters during the condensed early voting timeframe. Locations observed addressed this problem differently; some locations allowed voters to fill in most of the form while waiting in line, which allowed voters to move through the check-in process much more quickly. In other locations, the voters completed the form at the check-in table; observers noted that this slowed the check-in process considerably. The new check-in process to be rolled out statewide in 2023 should help address these delays by streamlining the process.[11] The Center also recommends that additional early voting

---

[10] 188,003 people voted early in person for the Dec. 6, 2022, runoff election (https://sos.ga.gov/data-hub-december-6-2022-runoff accessed Dec. 11, 2022)

[11] For example, Cobb County, which piloted the use of the new check-in process in the 2022 midterm elections, appeared to have consistently shorter wait times at early voting locations.

locations be opened for federal and statewide runoffs in the future, and that appropriate budgetary allocations be made to accommodate this need.

Election day was markedly different from the early voting experience. Voters were processed quickly and seldom had to wait more than a few minutes.

## Internal County Operations

### Absentee ballot applications

Absentee ballot processing began with the applications, which were received from five different sources. Observers witnessed paper applications received by the mailroom, timestamped, opened, and batched in groups of 50 for processing. Batch cover sheets were used to track each group of 50 through the process, recording the total accepted or rejected, and counts were reconciled each night. Electronic applications were also printed, and all applications were scanned, ensuring both a paper and electronic record. Totals of applications received and processed were reconciled to the voter registration database each night.

Fulton County, like some other counties in Georgia, uses a process where rejected absentee ballot applications are returned to the voter with a provisional ballot included in addition to the paperwork needed to cure the application. This streamlines the process considerably as a voter can complete the cure paperwork and return a marked provisional ballot in a single step. Assuming the cure of the application is successful and no further errors are found, the provisional ballot can be counted.

### Absentee Ballot Processing

Fulton County took full advantage of the opportunity to process absentee ballots prior to election day, beginning the process on Monday, October 31, after issuing a notice of its intent to do so. Carter Center observers and party poll watchers were in attendance during the process. This extra processing time ensured that mail ballots did not accumulate and could be dealt with promptly.

Observers witnessed absentee ballot processing from initial receipt, logging, and storage to the verification, opening of envelopes, ballot extraction and flattening, vote review and duplication (where necessary), and eventual tabulation. Best practices were evident at each step in the process, including using small batches (50 ballots), tracking each batch via a cover sheet that logged any ballots that were removed for further processing (e.g., rejected during verification, or needing to be duplicated before tabulation), and reconciling counts of ballots at various stages throughout the process.

Election law changes in SB202, requiring that both absentee applications and completed ballots include a driver's license/state ID number or other acceptable photo ID as proof of identity, have eliminated the need for election officials to match signatures. This has streamlined the process and made it easier for election officials since they can simply check that all the necessary information is present and correct.

Vote review panels, comprised of both a Republican and a Democrat, were comfortable with the process used to duplicate unreadable ballots and were able to review and interpret ballots efficiently. While most panels were following the standard procedure, having both members look at each vote on the ballot and both members confirm that it matched the vote entered on screen, a few teams had only one person reading the ballot and the other only entering data. Reminding panels of the importance of checking each other's work will ensure that each duplicated ballot goes through consistent checks and balances.

16

## Election Night Drop-off

On election night, nine intermediate drop-off locations throughout the county were set up to receive materials from the precincts. Not only did this prevent a high number of people and cars at the main Election Preparation Center warehouse, but it also allowed for a detailed inventory of materials to be compiled very quickly after polls closed. Fulton County split the deliveries from the precincts into two groups; runners from each voting location, responsible only for the memory cards from the scanners, were dispatched to the drop-off location as soon as possible. All the other materials, including completed ballots, followed in a separate delivery. Once all the memory cards had been received at a particular drop-off location, they could be transferred to the Election Preparation Center — escorted by police — without delay. For the most part, this system worked well. Observers noted that some precincts went to the wrong drop-off location, so providing a phone list for the precincts would have been helpful in coordinating the proper destinations.

Sites consistently had problems with the handheld scanners used to log materials into the electronic inventory system, perhaps due to limited internet connectivity, but they had ample paper records as an alternative. Different drop-off sites also had varying procedures for fixing problems (e.g., a bag accidentally sealed inside another bag). Some site managers would break seals, noting the action on the chain-of-custody forms, remedy the situation, reseal the container, and note the new seal number on the form. Others were adamant about not breaking seals to fix anything, simply recording the problems on the chain-of-custody forms. Retraining personnel on which method is preferred would be helpful for future elections.

## Early Tabulation & Sequestration

Sequestration — the practice of restricting movement and communication for those who could have knowledge of early vote totals until the close of polls when totals can legally be released — during early tabulation of absentee ballots on election day (required by O.C.G.A. § 21-2-386 (a)(6)) is one of the few areas where Fulton County could make considerable improvements. Due to space constraints, early tabulation was done in one section of the main floor at the Election Preparation Center warehouse rather than in an enclosed space. No attempt was made to sequester staff, and they were using cell phones throughout the day, often walking in and out of the tabulation area to attend to other duties. Observers were similarly not constrained and were allowed to use cell phones and walk in and out freely for most of the day. One member of the public was even soliciting in the area during the general election, handing business cards to observers and vote review panelists. A modest attempt was made to limit observers' cell phone use after a complaint was made, but unfortunately, the security guard informed observers that they could simply leave the room if they wanted to make a call.

During the runoff election, the processes improved somewhat, as cell phones were taken from observers before entering the room. However, both observers and staff were still allowed in and out of the sequestered area and able to retrieve and use their phones anytime they stepped outside. It should be noted that Carter Center observers did not report any ill-effects from this lapse in sequestration, and there is no evidence that any vote totals were revealed prematurely. Still, the public perception of such lapses is problematic and should be addressed when Fulton County moves to its new warehouse in 2023.

Observers also witnessed members of the public and party poll watchers at the Election Preparation Center being given name tags that said "Election Official" at the top, presumably because these were what the county had available. There was no evidence that inappropriate access was granted based on these name tags, but in the future, it would be best to avoid labeling anyone as an election official if they are not.

17

## Results Reporting

Results reporting was efficient and orderly, with memory cards processed as soon as they arrived at the Election Preparation Center warehouse from the drop-off locations. Three tables of staff, set up in view of observers, logged receipt of each location's sealed transfer bags and had the transport team sign chain-of-custody paperwork. Staff then proceeded to inventory each returned bag, checking to see that each arrived appropriately sealed, with all the necessary memory cards, and contained the correct cards for the scanners in that location. Memory cards were then walked over to the election management server, housed in a corner of the warehouse's main room, and results were loaded onto the server. Results of all ballots tabulated through election night were available by midnight. Given the interest in this process from party poll watchers, it would be helpful to have an election staff member tasked with explaining the process stationed with the observers in the future.

# Risk-limiting Audit

Fulton County participated in the Nov. 17, 2022, risk-limiting audit (RLA) of the secretary of state contest.[12] The audit began at 8 a.m., proceeded smoothly, and was completed by 10a.m.

## Audit Premises

The Fulton County audit was conducted at the Georgia International Convention Center. There was ample space for the audit operations (17 audit boards, one vote review panel, ballot storage, a ballot check-in/check-out station, and data entry). There was a clearly defined space for public observers. The audit floor was well organized, with plenty of room for monitors to move around without crowding the audit boards. The ballot storage area was always secure and guarded and ballot containers were well organized in the storage area. Election workers checked batches in and out of storage, and runners carried containers between storage and audit boards.

## Training for Audit Boards

No audit board training took place during the time observers were present; it is unknown whether any training was held earlier or whether audit board members were election staff familiar with handling ballots. The secretary of state's training video, which focused on counting procedures, was displayed (without audio) on two screens. Observers reported that audit boards asked supervisors many questions while auditing the first batches, and fewer questions as the day progressed. This training strategy was adequate for conveying "sort and stack" counting, and supervisors could easily handle questions, given the lack of time constraints and the small number of ballots to be audited. The Carter Center recommends that training be conducted before auditing begins to prepare auditors and election staff for their tasks.

## Vote Review Panels

Fulton County staffed one bipartisan vote review panel, but there was nothing to adjudicate, since voter intent issues occur only on handwritten mail ballots. Of the audit boards observed, only one had a mail ballot batch, consisting of eight ballots. Most of the observed audited ballots were advance voting (2,302 ballots assigned to one audit board) and election day (847 ballots).

## Data Entry

Tally sheets completed by audit boards were entered as soon as auditing was complete. Data entry was generally done by a team of two, with one checking the other, but observers were not consistently able to view the computer data entry screens. Best practice calls for both the tally sheet and computer screen to be readily viewed by observers. In some jurisdictions, this is done by overhead screen projection so that anyone

---

[12] The Carter Center deployed observers to 34 Georgia counties during the statewide RLA, including Fulton County.

can confirm the accuracy of data entry without interfering with the operators. Again, the process was adequate for the small amount of data to be entered, but future audits may be more challenging.

In sum, Fulton County conducted its RLA carefully, smoothly, and expeditiously. These findings should support citizen confidence in the reported outcome. Increased attention to systematizing procedures would ensure smooth audit operations should more challenging conditions occur in the future.

## Conclusion

Overall and within the parameters of its observation efforts, The Carter Center did not observe any election administration irregularities that would call into question the ability of the Fulton County Department of Registrations and Elections to administer secure and accessible elections for the citizens of Fulton County. The minor issues observed and noted in this report are consistent with the kinds of small hiccups that occur within any complex election administration process; Fulton County residents should feel confident these snags did not affect the election results. The aspects of the election process the Center observed were clearly improved from 2020 and demonstrated the implementation of best practices (for example, frequent reconciliation and prioritization of chain of custody and security).

Election processes are complex logistical exercises. As such, there are always opportunities for continuous improvement of processes to bolster efficiency and maximize appropriate and contextualized transparency. This process of continuous improvement relies on the observation of systems and processes and the creation of monitoring feedback loops so that lessons from one election can be integrated into systems to improve future elections. It is in this spirit that the Center has offered recommendations and suggestions for improvement throughout this report.

Finally, The Carter Center notes that the Fulton County Department of Registrations and Elections cooperated fully with the observation effort and demonstrated an openness to transparency and learning that is to be commended. The Carter Center thanks the Performance Review Board and Fulton County Board of Elections and Registration for the invitation to observe the 2022 general election.

## Appendices
1. Memorandum of Understanding
2. Sample Observer Checklists – Election Day
3. Code of Conduct of Nonpartisan Election Observers
4. Signage within the Polling Place
5. Voting Location Diagrams

## MEMORANDUM OF UNDERSTANDING
## BETWEEN
## PERFORMANCE REVIEW BOARD,
## FULTON COUNTY BOARD OF ELECTIONS AND REGISTRATION,
## AND
## THE CARTER CENTER

In August 2021, pursuant to a request from the Georgia General Assembly, the State Election Board appointed a Performance Review Board ("PRB") to conduct a performance review of the Fulton County Board of Elections and Registration ("Fulton BOER") pursuant to OCGA § 21-2-106. The duty of the PRB is to make a thorough and complete investigation and issue a written report of its findings to the Secretary of State ("SOS"), the State Election Board ("SEB"), and the local governing authority which shall include such evaluations, judgments, and recommendations as it deems appropriate. *See* OCGA § 21-2-106.

To date, the PRB has conducted interviews of Fulton BOER staff, observed election processes, observed processing of absentee ballots, observed early voting, and observed Election Day voting. To fulfill its duties under Georgia law, the PRB would like to conduct further observation and analysis during the 2022 November General Election in Fulton County ("Election"). The Carter Center ("TCC") has a well-deserved reputation for independent and objective observation and analysis of election administration. Within the framework of the ongoing performance review, the PRB and Fulton BOER believe that the independent and objective analysis and observation that TCC is known for would be beneficial to all parties. The PRB would like to complete it's report by the end of calendar year 2022 and believes that TCC observation will help the effort to finalize the performance review by that time. To that end, at the invitation of the PRB and Fulton BOER, TCC has agreed to conduct independent, non-partisan observation of the Election. TCC does not conduct this observation on behalf of the PRB, SOS, SEB, or Fulton BOER, but will make its observations and analysis available to the PRB so that additional independent and objective analysis can inform the PRB's report to the SEB.

Therefore, PRB and Fulton BOER invite TCC to conduct independent, non-partisan observation and analysis of the Election. TCC agrees that it will follow all guidelines and respect any restrictions, as determined by the parties, appropriate for an accredited independent non-partisan observation effort. TCC will also follow instructions given by Fulton BOER while observing the election process to ensure the observation does not interfere with day-to-day election activities.

As an accredited observer, TCC will be provided with adequate and meaningful access to all stages of the work involved in the election, so that TCC's observers can credibly report on the process, including:

- access to relevant training materials and training sessions, either for poll-workers or staff;

- access to speak with PRB and Fulton BOER officials about their work and processes;
- access to internal documentation and records about the elections process, including but not limited to chain-of-custody documentation, recap sheets, drop box ballot transfer forms etc.
- ability to observe and accompany Fulton BOER officials and staff through their work process from start to finish.

Observation by The Carter Center will begin on October 14, 2022 and will terminate on December 15, 2022 unless an extension of the observation effort is agreed by all parties.

The specific scope-of-work for this observation effort includes:

- Observation of pre-Election procedures at the Fulton County election office
- Observation of absentee ballot issuance and receipt procedures
- Observation of equipment preparation
- Observation of early voting
- Observation of Election Day polling places
- Observation of Election Day procedures at the Fulton County election office
- Observation of post-Election procedures
- Delivery of a final report of observations by December 15, 2022. The final report will be delivered to both the PRB and Fulton BOER simultaneously.

The Carter Center will deploy a sufficient number of observers to adequately assess the aforementioned processes. All Carter Center observers will receive training on Georgia's election rules and procedures.

TCC reserves the right to:
- Select the dates, times, and locations of the observation, subject to the availability of Fulton BOER officials.
- Provide all parties a preliminary statement about the observation by November 30, 2022 and a more detailed final report, including key findings and recommendations for future efforts, no later than December 15, 2022.
- In coordination with the PRB and Fulton BOER, release public statements in advance of the election to announce our observation efforts and educate the public on the purpose of nonpartisan election observation and the role of TCC in this effort.

TCC will not:
- Attempt observation beyond the specific scope included here
- Violate the Observer Code of Conduct included here
- Divulge any information protected from disclosure by state law
- Interfere in the elections process

DocuSign Envelope ID: 820BB0EC-4793-4E4B-AB84-076D996F8E4E

- Handle ballots or other sensitive materials
- Divulge any documents or confidential information shared with them about the election process without approval from the PRB and Fulton BOER.
- Divulge any documents or confidential information to any person regarding the election process or observation if that person is adverse in litigation to the State of Georgia or any county elections office

-----------------------

Observer Code of Conduct

The purpose of election observation is to help ensure the integrity of the election process, by witnessing and reporting accurately and impartially on each aspect of the process to evaluate whether it is conducted in an open and transparent manner and in conformance with applicable laws and electoral regulations. Election observation and monitoring also seeks to ensure the integrity of the election process by calling on all electoral actors (including the candidates, political parties, those supporting or opposing referendum initiatives, election officials, other governmental authorities, mass media, and voters) to respect the laws and election-related rights of all citizens and to hold accountable those who violate the law or any person's election-related rights.

**While serving as an election observer, I will:**

- **Be an informed observer**
    - I will attend all required election observation training sessions and familiarize myself with relevant election law and processes prior to the election
- **Be an objective observer**
    - Report what I see – whether positive or negative - impartially, accurately, and in a timely manner, and include sufficient documentation of serious problems to allow for verification
- **Respect the election process**
    - I will respect state and federal laws governing elections, follow the instructions of election officials, and maintain a respectful attitude at all times
- **Remain politically neutral**
    - I will not publicly express any preference for or against any candidate, political party, or initiative, in accordance with laws prohibiting electioneering
- **Protect the integrity of the election**
    - I will not interfere unlawfully or inappropriately with election processes or procedures, where I have objections or concerns, I will elevate them through established channels

**Appendix 2 – Sample Observer Checklist**

**Fulton County Election Day Observation Checklist – Cover Sheet**

*Instructions:*

*Please fill in Part A **as soon as you reach the voting location where you are observing**, and **fill out Part B as you are leaving the voting location**. You will need a separate checklist for each location you observe throughout the day. Please fill out only the parts applicable to the processes you observed, and thank you!*

**PART A: Observer Info**

Your Name: _____

Voting Location Name/Address: _____

Today's date *(e.g. 10/31/22)*: _____

Time you arrive at the voting location *(e.g. 2:30 PM)*: _____

Public count of votes cast on the scanner(s) when you arrive: _____

**PART B: Post-observation Questions**

Time you leave the voting location *(e.g. 2:30 PM)*: _____

Public count of votes cast on the scanner(s) when you leave: _____

*(If you answer "no" to any of these, please explain on the "Notes" form)*

| B1 | Were you allowed to observe? | O Yes   O No |
|----|------------------------------|--------------|
| B2 | Were you able to observe all procedures without restrictions? | O Yes   O No |
| B3 | Did the pollworkers cooperate with you? | O Yes   O No |
| B4 | Were party pollwatchers able to observe in accordance with pollwatcher rules? | O Yes   O No |

**I have, to the best of my ability, conducted myself in accordance with the Carter Center's Code of Conduct for Observation and provided truthful, complete answers to these questions**

_____

*(Sign on the above line)*

1

**PART C: Physical Space (Exterior)**

*(If you answer "no" to any of these, please explain on the Notes form)*

| C1 | Is there adequate parking in the parking lot? (i.e. spaces are available if more voters arrive right now) | O Yes O No O Don't know |
|---|---|---|
| C2 | Is the required exterior signage present? *This includes:* <br> • *A sign identifying the voting location ("Vote Here" etc.)* <br> • *A sign marking the 150ft electioneering boundary* | O Yes O No   O Don't know |
| C3 | Are there clearly-marked accessible parking spots? *(i.e. blue lines and obvious signage)* | O Yes O No O Don't know |
| C4 | Is there an accessible path from the parking space to the building entrance (paved and clear of stairs, narrow doorways, and physical obstacles that would make it hard for a wheelchair user or visually-impaired person to enter)? | O Yes O No   O Don't know |
| C5 | Is the wheelchair-accessible entrance to the building the main entrance or a side/back entrance? | O Main   O Side/back |
| C6 | Is the wheelchair-accessible entrance clearly marked? | O Yes   O No   O Don't know |
| C7 | Is the wheelchair-accessible entrance unlocked? | O Yes   O No   O Don't know |
| C8 | Are the doors light enough to open easily *OR* have button-activated openers? *(Either option is acceptable)* | O Yes   O No   O Don't know |
| C9 | Are there campaign materials or campaign activity <u>outside</u> the 150-foot radius of the voting location? | O Yes   O No   O Don't know |
| C10 | Are there campaign materials or campaign activity visible <u>inside</u> the 150-foot radius of the voting location? | O Yes   O No   O Don't know |
| C11 | Is there tension or unrest in the area around the voting location? *(If yes, please describe in Notes section)* | O Yes   O No   O Don't know |
| C12 | Is there any indication of pressure/intimidation of voters in the area around the voting location? *(If yes, please describe in Notes section)* | O Yes   O No   O Don't know |
| C13 | Are people blocking access to the voting location or acting violently? | O Yes   O No   O Don't know |

|  | (If yes, please describe in Notes section) |  |
|--|--|--|

## PART D: Physical Space (Interior)

*(If you answer "no" to any of these, please explain on the Notes form)*

| | | |
|--|--|--|
| **D1** | Is there an accessible path through the building from the exterior door to the voting location? (e.g. smooth and clear of stairs, narrow doorways, and physical obstacles that would make it hard for a wheelchair user or visually-impaired person to navigate) | O Yes   O No   O Don't know |
| **D2** | How many check-in stations are set up? | Count: |
| **D3** | How many voting stations are set up (including accessible stations)? | Count: |
| **D4** | How many scanning stations are set up? | Count: |
| **D5** | Is a separate station set up to process voters who need provisional ballots (separate from the normal check-in table)? | O Yes   O No   O Don't know |
| **D6** | Is there a clear flow indicated in the room – where voters should go 1st, 2nd, 3rd  etc? | O Yes   O No   O Don't know |
| **D7** | Are people able to move smoothly around the room to complete each step of the voting process? | O Yes   O No   O Don't know |
| **D8** | Is there enough space for a wheelchair to maneuver through each station to complete the voting process? | O Yes   O No   O Don't know |
| **D9** | Is a lower-height accessible voting station, suitable for a chair or wheelchair, available for use? | O Yes   O No   O Don't know |
| **D10** | Are all voting stations, including the accessible station, placed to ensure ballot secrecy (no one should see the screen)? | O Yes   O No   O Don't know |
| **D11** | Are accessibility aids (headphones, accessible keypads, etc) available at the accessible station? | O Yes   O No   O Don't know |
| **D12** | Is all appropriate signage present? *This includes:* | O Yes   O No   O Don't know |

3

| | *(Outside Voting Location)* | |
| |     a.  *Vote Here signs* | |
| |     b.  *150 ft No Campaigning* | |
| |     c.  *Accessible parking signs* | |
| | *(Inside Voting Location)* | |
| |     d.  *Poll Worker Area* | |
| |     e.  *No Leaving With Ballot* | |
| |     f.  *Large Print Viewing* | |
| |     g.  *Voter Notice (Wrong/Incorrect Ballot)* | |
| |     h.  *Ballot Review* | |
| |     i.  *Georgia Voting Information* | |
| |     j.  *Card of Instructions* | |
| |     k.  *Identification Required* | |
| |     l.  *Notice of Penalties* | |
| |     m. *Sample Ballots (2)* | |
| |     n.  *Prohibition of Electronics Notice* | |
| |     o.  *Magnified Ballot Request* | |
| |     p.  *Notice to Voters 75 Years & Older* | |
| |     q.  *Acceptable Proof of Citizenship* | |
| |     r.  *Video Surveillance* | |
| | *(At Each Voting Station)* | |
| |     s.  *Voting Instructions* | |
| |     t.  *Large Print Viewing* | |
| |     u.  *Voter Notice* | |
| |     v.  *Return Voter Card* | |

D13: Draw the approximate layout of the voting area. Example:

Use arrows to indicate voter flow, be sure to mark entrances/exits, and indicate which voting booths are lower/accessible. If a drop box or separate provisional ballot processing station are used, draw those.

4

**PART F: Pollworkers & Others**

| F1 | How many pollworkers are present, including the head pollworker? *[2-digit number]* | Count: |
|---|---|---|
| F2 | How many party pollwatchers did you observe while you were there? | Count: |
| F3 | If pollwatchers are present, what parties did they represent (if you can tell)? *(Circle all that apply)* | DEM        REP |
| F4 | Did a pollworker check the credentials of all pollwatchers present? | O Yes   O No   O Don't know |
| F5 | Were any pollwatchers disruptive? | O Yes   O No   O Don't know |
| F6 | Did pollwatchers attempt to challenge any voters? | O Yes   O No   O Don't know |
| F7 | Are media present at this voting location? | O Yes   O No   O Don't know |
| F8 | IF YES: what media outlet do they represent? | Outlet: |
| F9 | Are uniformed law enforcement or security present? | O Yes   O No   O Don't know |
| F10 | Did anyone report a problem to you that you did not directly observe? *(If yes, describe on the Notes sheet)* | O Yes   O No   O Don't know |
| F11 | Did you witness anyone being removed from the voting location for any reason? *(If yes, describe on the Notes sheet)* | O Yes   O No   O Don't know |

**PART G: Voting Procedures**

| G1 | Are voters being asked to present valid photo ID at check-in (or providing one without being asked)? | O Always<br>O Mostly<br>O Sometimes<br>O Never |
|---|---|---|
| G2 | Are pollworkers scanning the voter's ID into the Poll Pad OR manually entering their name to find the voter's record and verify that they are on the voter list? | O Always<br>O Mostly<br>O Sometimes<br>O Never |

5

| G3 | Are voters being asked to check their current information on the Poll Pad and then signing their name onscreen? | O Always<br>O Mostly<br>O Sometimes<br>O Never |
|---|---|---|
| G4 | Are voters able to use the BMD without confusion/questions?<br>*(If no, describe in the Notes section)* | O Always<br>O Mostly<br>O Sometimes<br>O Never |
| G5 | Are voters being prompted to check their printed summary ballot before inserting it into the scanner? | O Always<br>O Mostly<br>O Sometimes<br>O Never |
| G6 | Are voters checking their summary ballot (any time after printing but before placing it into the scanner)? | O Always<br>O Mostly<br>O Sometimes<br>O Never |
| G7 | Are voters placing their own ballot in the ballot scanner? | O Always<br>O Mostly<br>O Sometimes<br>O Never |
| G8 | Are voters able to use the ballot scanner without confusion/questions?<br>*(If no, describe in the Notes section)* | O Always<br>O Mostly<br>O Sometimes<br>O Never |
| G9 | How many times did you see the ballot scanner return a ballot to the voter/fail to scan the first time a ballot is inserted? | Count: |
| G10 | Are voters returning their voter card to a pollworker before leaving? | O Always<br>O Mostly<br>O Sometimes<br>O Never |
| G11 | How many times did a voter exit the voting location with either their paper summary ballot or their voter card instead of turning it in? | Count: |
| G12 | Are voters offered an "I Voted" sticker before they leave? | O Always<br>O Mostly<br>O Sometimes<br>O Never |

6

| G13 | How many times did a voter ask for language assistance? | Count: |
|---|---|---|
| G14 | How many times did a voter ask for a caretaker or helper to assist with voting? | Count: |
| G15 | Did any voter(s) ask to spoil their ballot and start over after printing? *(If yes, describe why on Notes form – voter mistake, voter thinks printout is wrong, etc.)* | O Yes    O No    O Don't know |
| G16 | Did the scanner ballot box fill to capacity/need to be emptied at any point? | O Yes    O No    O Don't know |
| G17 | IF YES, did pollworkers do the following in view of the public: announce what was happening, break the seal on the ballot box, remove ballots to the black ballot transport bag, seal the black ballot transport bag, seal the ballot box, and fill out the 'Voted Ballot Removal Form' and the 'Scanner Recap Sheet' with the new seal numbers and other appropriate information? | O Yes    O No    O N/A |
| G18 | Did any voter use their phone in the voting location? | O Yes    O No    O Don't know |
| G19 | Is anyone using derogatory or abusive language towards pollworkers or voters? *(If yes, describe the situation in Notes)* | O Yes    O No    O Don't know |
| G20 | Did anyone attempt to inappropriately access, manipulate, or otherwise interfere with any voting equipment? *(If yes, describe the situation in Notes)* | O Yes    O No    O Don't know |
| G21 | Were any voters above 75 years of age or voters with disabilities invited to skip the line? | O Yes    O No    O N/A |
| G22 | Did anyone lodge an official complaint with the pollworkers while you were there? | O Yes    O No    O Don't know |
| G23 | The overall voting process in this voting location is: | O Very Good<br>O Good<br>O Average<br>O Bad<br>O Very Bad |

7

**PART H: Voting Procedures for Special Circumstances**

| | | |
|---|---|---|
| **H1** | VOTER NOT ON LIST:<br>Are voters not on the voter list (either via the Poll Pad or on the supplemental list) being redirected to the provisional ballot station and offered a provisional ballot? | O Always<br>O Mostly<br>O Sometimes<br>O Never<br>O N/A |
| | VOTER IN WRONG PLACE:<br>Are voters being redirected to the correct location or, if they want to vote at this location:<br>  - BEFORE 5 PM, being told that they can cast a provisional ballot but it will not count<br>  - AFTER 5 PM, being told that they can cast a provisional ballot and the contests that they are eligible to vote in will count | O Always<br>O Mostly<br>O Sometimes<br>O Never<br>O N/A |
| **H2** | NO ACCEPTABLE ID:<br>Are voters who are told they lack acceptable ID being offered a provisional ballot? | O Always<br>O Mostly<br>O Sometimes<br>O Never<br>O N/A |
| **H3** | VOTER SENT MAIL BALLOT:<br>If the Poll Pad shows voters were sent a mail ballot, are pollworkers asking voters to surrender/cancel their mail ballot before being allowed to vote? | O Always<br>O Mostly<br>O Sometimes<br>O Never<br>O N/A |
| **H4** | VOTER SENT MAIL BALLOT – CANNOT SURRENDER:<br>If voters who were sent a mail ballot do not have their ballot with them, are pollworkers:<br>- confirming that the county has not received the mail ballot before allowing the voter to vote as normal, or<br>- if the county has received the ballot/is not available, only allowing a voter to vote a provisional ballot (if they wish)? | O Always<br>O Mostly<br>O Sometimes<br>O Never<br>O N/A |
| **H5** | VOTER ALREADY VOTED IN PERSON:<br>If the Poll Pad shows voters have already voted early in-person, are pollworkers asking the voter whether they have already voted and:<br>  - If the voter says yes, refusing them any ballot and providing contact information for the county to answer any questions | O Always<br>O Mostly<br>O Sometimes<br>O Never<br>O N/A |

8

| | - If the voter says no, only allowing the voter to vote a provisional ballot (if they wish)? | |
|---|---|---|
| H6 | CHALLENGED VOTER:<br>If the Poll Pad shows voters have been challenged, are voters offered the chance to cure via an affidavit or, if they cannot cure, redirected to the provisional ballot station and offered a challenged provisional ballot? | O Always<br>O Mostly<br>O Sometimes<br>O Never<br>O N/A |

**PART J: Efficiency**

| | | |
|---|---|---|
| J1 | How long did a typical voter have to wait in line before voting?<br>*(To measure, pick a voter who has just entered the line and time how long it takes until they reach the front of the line. E.g. "10 minutes")* | Time: |
| J2 | How long did it take a typical voter to complete the voting process?<br>*(To measure, pick a voter who has just started to check in and time how long it takes until they cast their ballot and exit. E.g. "10 minutes")* | Time: |
| J3 | What was the longest line you saw, and at what time did this occur?<br>*(e.g. "23 people, 7 am")* | Length:<br>Time: |
| J4 | Was the number of pollworkers sufficient for a timely and orderly process? | O Yes   O No   O Don't know |

9

**PART X: Notes and Other Observations**

Use these pages to either:

- **Give more detail on your answers to any question earlier on the form**
- Describe other observations you feel are important to record

For each comment, include a reference to the **question ID** from the form. Start a **new row for each question**.

For comments **not related to any specific questions in the form, put "0" in the question ID column.**

*EXAMPLE:*

*G13    10:30-11:00. Long discussions with challengers from another nonpartisan organization about the location of this polling station. It is located in a building owned by one of the candidates.*

| Question ID | Commments |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

10

**Fulton County Election Day Checklist – OPENING THE POLLS**

**PART E: Opening the Polls**

*(If you answer "no" to any of these, please explain on the Notes form)*

| | | |
|---|---|---|
| E1 | Are all poll workers in attendance? | O Yes   O No   O Don't know |
| E2 | Are all poll workers sworn in? | O Yes   O No   O Don't know |
| E3 | Are all poll workers wearing name badges? | O Yes   O No   O Don't know |
| E4 | *(Check-in station)* Do poll workers check that the serial numbers on Poll Pad case and tablet match? | O Yes   O No   O Don't know |
| E5 | *(Check-in station)* Do poll workers check that the Poll Pad tablet is turned on and functioning correctly? | O Yes   O No   O Don't know |
| E6 | *(Check-in station)* Do poll workers check that the Poll Pad is set for the correct polling location? | O Yes   O No   O Don't know |
| E7 | *(Check-in station)* Do poll workers check that the check-in count reads zero? | O Yes   O No   O Don't know |
| E8 | *(Check-in station)* Is the supplemental voter list present? | O Yes   O No   O Don't know |
| E9 | *(Check-in station)* Is the paper backup voter list present? | O Yes   O No   O Don't know |
| E10 | *(Equipment carriers)* Do poll workers verify the seal numbers on the doors of the equipment carriers match the numbers on the "Equipment Carrier/Voting Booth Security Seals Form" before seals are broken/doors are opened? *(This refers to the grey doors into the supply/scanner areas of the carriers, not the black doors over the voting stations)* | O Yes   O No   O Don't know |

11

| E11 | *(Scanner in equipment carrier)* Do poll workers verify that the seals on the Emergency Ballot Box door (above the scanner) and the Ballot Box door match the number on the "Scanner/Ballot Box Recap Form," before opening both boxes, confirming that they are empty, resealing them, and noting the new seal numbers on the recap forms? | O Yes   O No   O Don't know |
|---|---|---|
| E12 | *(Scanner in equipment carrier)* Do poll workers verify that the two seals on the front of the scanner are intact, and match the numbers on the Scanner/Ballot Box recap form? | O Yes   O No   O Don't know |
| E13 | *(Voting Stations)* Do poll workers verify the seal numbers on the black doors securing the BMDs in the equipment carriers match the numbers on the "Equipment Carrier/Voting Booth Security Seals Form" before seals are broken/doors are opened?<br><br>*(This refers to the black doors that enclose the touchscreens in the carriers, not the grey doors)* | O Yes   O No   O Don't know |
| E14 | *(Voting Stations)* Once the black doors are opened, do poll workers check the seal/serial numbers on the sides of the BMDs – <u>WITHOUT OPENING SEALS</u> - and record them on the recap sheet?<br><br>*(two seals on the left side of the touchscreen, top and bottom, and one on the upper right side)* | O Yes   O No   O Don't know |
| E15 | *(Voting Stations)* Do poll workers check that the voting machines are turned on and functioning correctly? | O Yes   O No   O Don't know |
| E16 | *(Voting Stations)* Do poll workers check that the date/time on each machine is correct? | O Yes   O No   O Don't know |
| E17 | *(Voting Stations)* Do poll workers check that the public counter on each machine reads zero? | O Yes   O No   O Don't know |

12

| | | |
|---|---|---|
| E18 | *(Standalone Scanning Station)* Do poll workers check the seals on both the Ballot Box and the Emergency Ballot Box match the recap form before opening both boxes, confirming that they are empty, resealing them, and noting the new seal numbers on the recap form? | O Yes   O No   O Don't know |
| E19 | *(Standalone Scanning Station)* Do poll workers check the rest of the existing seal numbers on the scanner – <u>WITHOUT OPENING THEM</u> - and record them on the recap sheet?<br><br>*(Admin & Poll Worker memory card slots, scanner lock)* | O Yes   O No   O Don't know |
| E20 | *(Standalone Scanning Station)* Do poll workers check that the date/time is correct? | O Yes   O No   O Don't know |
| E21 | *(Standalone Scanning Station)* Do poll workers check that the ballot counter is zeroed, and the two zero reports are printed & stored? | O Yes   O No   O Don't know |
| E22 | Are poll workers comfortable with the technology & setup process? | O Yes   O No   O Don't know |
| E23 | If poll workers had a problem, did they know how to contact HQ and resolve it?<br>*(Please describe any issues on Notes form: missing materials, machine malfunctions, procedural confusion etc.)* | O Yes   O No   O Don't know |
| E24 | Did the voting location open on time at 7 AM? | O Yes   O No   O Don't know |
| E25 | IF NO: at what time did the voting location open for voting? | Time: |
| E26 | If the voting location opened <u>late</u>, what was the cause? | O Missing materials<br>O Absent pollworkers<br>O Locked facility |

| | | O Not set-up |
| | | O Unrest |
| | | O Other (add Notes) |
| | | O N/A |
| E27 | How many people were in line at polls open? | Count: |
| E28 | The overall conduct of the opening of this voting location was: | O Very Good<br>O Good<br>O Average<br>O Bad<br>O Very Bad |

**Fulton County Election Day Checklist – CLOSING THE POLLS**

**PART I: Closing the Polls**

*(If you answer "no" to any of these, please explain on the Notes form)*

| | | |
|---|---|---|
| I1 | At 7 PM, do pollworkers:<br>- announce that polls are closed,<br>- position a pollworker at the end of the line to ensure that no one in line after 7 pm is allowed to vote, and<br>- allow voters already in line to vote? | O Yes   O No   O Don't know |
| I2 | If the county notifies pollworkers that a court has ordered polls to stay open longer, do the pollworkers comply? | O Yes   O No   O Don't know |
| I3 | At what time did the last voter cast their ballot?<br><br>*(e.g. "7:04 pm")* | Time: |
| I4 | (Check-in Stations) Do pollworkers note the final check-in number for each Poll Pad on the Poll Pad Recap Sheet before turning them off and storing them? | O Yes   O No   O Don't know |
| I5 | (Voting Stations) Do pollworkers record the total count of voters for each voting machine on the | O Yes   O No   O Don't know |

| | Touchscreen Recap Sheets before turning off the machines? | |
|---|---|---|
| I6 | (Voting Stations) Do pollworkers recheck and/or replace the necessary seals and record seal numbers on the Touchscreen Recap Sheets when sealing the black doors in front of the touchscreens? | O Yes    O No    O Don't know |
| I7 | (Scanning Stations) Do pollworkers unseal the emergency ballot box on the scanner, scan any ballots found there through the scanner, and then reseal the emergency ballot box, noting the new seal number on the Scanner/Ballot box Recap Form?<br><br>*(This must be done prior to printing the results tape)* | O Yes    O No    O Don't know |
| I8 | (Scanning Stations) Do pollworkers record the public count on the Scanner/Ballot Box Recap Form and the Ballot Recap Sheet before printing the results tape and turning off the scanners? | O Yes    O No    O Don't know |
| I9 | (Scanning Station) Do pollworkers close polls and print 3 copies of the results tape, posting one copy on the door/window of the polling place? | O Yes    O No    O Don't know |
| I10 | (Scanning Station) Do pollworkers unseal & remove the memory card(s) from the scanner(s), sealing it in the yellow memory card transport bag and resealing the memory card slot on the scanner? | O Yes    O No    O Don't know |
| I11 | Do pollworkers unseal & remove ballots from the ballot box in the scanner(s), sealing them in the black ballot transport bag? | O Yes    O No    O Don't know |
| I12 | Did the sealed ballot bag and all other materials to be transferred remain in sight of the pollworkers until they were loaded into a vehicle for transfer? | O Yes    O No    O Don't know |
| I13 | Was the yellow memory card bag dispatched to a team of (2) runners to return to the election office? | O Yes    O No    O Don't know |

15

| I14 | Are any spoiled or unaccompanied ballots documented on the Spoiled and Unaccompanied Ballot Recap Sheet and properly stored? | O Yes   O No   O Don't know |
|-----|------|------|
| I15 | Are any provisional ballots documented on the Provisional Ballot Recap Sheet and properly stored? | O Yes   O No   O Don't know |
| I16 | Are Poll Pads, unused paper ballots, recap sheets and the numbered list of voters, the supplemental voters list and the backup paper voters list, spoiled/provisional/unaccompanied ballots and other materials securely sealed and stored? | O Yes   O No   O Don't know |
| I17 | Do pollworkers check to make sure that the number of check-ins from the Poll Pad(s) matches the public count on the BMDs and the public count on the scanner? *(Note that spoiled, emergency, & unaccompanied ballots may also need to be factored in.)* | O Yes   O No   O Don't know |
| I18 | Did the pollworkers have difficulties in completing the closing procedure and paperwork? | O Yes   O No   O Don't know |
| I19 | The overall closing process in this voting location is: | O Very Good<br>O Good<br>O Average<br>O Bad<br>O Very Bad |

**Appendix 3 – Nonpartisan Observer Code of Conduct**

# Election Observer Code of Conduct

The purpose of election observation is to help ensure the integrity of the election process, by witnessing and reporting accurately and impartially on each aspect of the process to evaluate whether it is conducted in an open and transparent manner and in conformity with applicable laws and electoral regulations. Election observation and monitoring also seeks to ensure the integrity of the election process by calling on all electoral actors (including the candidates, political parties, those supporting or opposing referendum initiatives, election officials, other governmental authorities, mass media, and voters) to respect the laws and election-related rights of all citizens and to hold accountable those who violate the law or any person's election-related rights.

**While serving as a Nonpartisan Election Observer, I will:**

- **Be an informed observer**
  - I will complete all required election observation training, familiarize myself with relevant election law and processes prior to the election, and adhere to the observation methods used by The Carter Center.

- **Be an objective observer**
  - I will report what I see – whether positive or negative – impartially, accurately, and in a timely manner. I will adhere to the highest standards of accuracy of information and impartiality of analysis. I will document my observations and return this documentation to The Carter Center. If I report a serious problem, I will include documentation sufficient to allow for verification.

- **Respect the election process**
  - I will respect state and federal election laws, follow the instructions of election officials, and maintain a respectful and professional attitude at all times.

- **Remain politically neutral**
  - I will not publicly express or exhibit any preference for or against any candidate, political party, initiative, or public official.

- **Protect the integrity of the election**
  - I will not interfere with election processes or procedures. If I have objections or concerns, I will elevate them using the methods from my training.

- **Follow the rules and guidance of the observer organizations**
  - I will follow this code of conduct, and any written or verbal instructions given by the Carter Center's observation effort leadership. I will report any conflict of interest that I may have and report any improper behavior that I see conducted by any other observers that are part of this effort.

11

- **Refrain from speaking about the observation process on social media, to the media or to the public**
  - I will refrain from making any personal comments on my observations to the media or members of the public (including through social media). I will refer all media enquiries to The Carter Center leadership team.

I understand that my violation of this Code of Conduct may result in my accreditation as observer being withdrawn and my dismissal from the observation effort.

NAME (please print):

Signature:

Date:

12

# Voting Area Posters and Signs

Signs to be placed  INSIDE POLLING SITE:



**POLL WORKER AREA**

**NO LEAVING WITH BALLOT**



**LARGE PRINT VIEWING**



**VOTER NOTICE**



**BALLOT REVIEW**



**VIDEO SURVEILLANCE**



**PROOF OF CITIZENSHIP**



**NOTICE OF PENALTIES**



**GEORGIA VOTING INFORMATION**



**SAMPLE BALLOT - WALL POSTERS**

*Sample Ballot flyers will also be provided for distribution to voters*



**CARD OF INSTRUCTIONS**



**IDENTIFICATION REQUIRED**



**NOTICE TO VOTERS 75 OR OLDER**



**PROHIBITION OF ELECTRONICS**

**Appendix 5: Voting Location Diagrams**

As part of their checklist, observers were asked to make a rough sketch of the layout of each voting location they observed. They are included here to show variation in layout and placement of the equipment containers. From top to bottom, the diagrams show: Sutton Middle School, Roswell High School, and Buckhead Library.





# EXHIBIT 10



Bruce P.
**Brown**
Law

October 3, 2020

**By Email**

Cheryl Ringer
Office of the County Attorney
141 Pryor St., SW
Suite 4038
Atlanta, Georgia 30303

Re: Fulton County Board of Elections' Ongoing Violations of State Law

Dear Cheryl:

The Fulton County Board of Elections has made many recent and welcome efforts to make voting more convenient and accessible. We enthusiastically commend such efforts. Given the Secretary of State's numerous reckless decisions regarding the upcoming election, however, Fulton is being lured into serious violations of Georgia's Election Code, as detailed below.

This week the Secretary of State disclosed that all of the existing software (and data, including evidence, from prior elections required to be preserved) must be wiped from the BMDs and replaced with new, uncertified, untested software that was written by Dominion just this past weekend. Fulton is complying with the State's ill-considered instructions, despite the fact that such actions are in plainly in violation of the Georgia Election Code.

You and the Board Members will recall that the Secretary unfairly blamed the Board for the "complete meltdown" that was the June Presidential Primary. The Secretary is either deliberately setting up the Board again to take the blame for another meltdown, or is recklessly unable to deploy its new systems in compliance with state law or federal constitutional requirements. Either way, the Board should not, and as a matter of Georgia law, cannot, allow it to continue.

We are confident that if the Board is made aware of these statutory violations that it will immediately bring Fulton County into compliance. The Board can do so by invoking the provisions for O.C.G.A. § 21-2-281, which allow the Board to switch to hand marked paper ballots in the event that using the BMDs is ***impossible*** or ***impracticable***. The conditions are expanded by State Election Board Rule 183-1-12-.11(2) (c) stating that if the BMDs are ***unusable***, impracticable or impossible for voting (c), and 183-1-12-.11(2)(d) adding that if ***insufficient*** BMDs are available, hand marked paper ballots should be used.

Ms. Cheryl Ringer
October 3, 2020
Page 2

What follows a partial list of the Georgia statutes and Rules that the Board is currently violating:

1.  **Illegal software is being installed on Fulton's BMDs (**violation of O.C.G.A. §§ 21-2-368(d); 21-2-379.24; 21-2-300(a)(3))

Georgia law requires, at a bare minimum, that the following three steps be taken before voting system software may be used on election equipment:

First, O.C.G.A. §21-2-300(a)(3) requires that the system be certified by the federal EAC. At this very moment, Dominion technicians, at the direction of the Secretary, are installing new software on Fulton's BMDs, software that Dominion has confirmed to Judge Totenberg has *not* been certified by the EAC. This is *not* just a "patch" or revision: the prior election software is being wiped from the equipment and replaced in its entirely by new, uncertified, untested software. This software has never been run in any election in any jurisdiction—not even a mock election—and was written this past weekend.

Second, Voting System Rule 590-8-1.01(d)(6) requires that, after the system is EAC certified, it be sent to a state certification agent for further testing and a report. With no EAC certification, this of course has not occurred.

Third, Voting System Rule 590-8-1.01(d)(7) requires that, after the state certification agent issues its report, the Secretary of State must make a determination whether to certify the system. Certification of new voting systems is required by O.C.G.A § 21-2-379.24. The Secretary certified the prior BMD system, but not the system that Dominion technicians are installing on Fulton's BMDs this week.

Further, O.C.G.A. § 21-2-368(d) requires the Fulton Board: "At least ten days prior to any primary or election, including special primaries, special elections, and referendum elections, the election superintendent shall verify and certify in writing to the Secretary of State *that all voting will occur on equipment certified by the Secretary of State*."

Early voting begins in ten days and this Board has not, and cannot, make the necessary certification without misrepresenting the undisputed facts.

These are not hyper-technical or bureaucratic requirements, but mandatory provisions of Georgia law that were enacted to protect the security and reliability of the voting systems and voters' constitutional rights to cast an accountable ballot. Untested and uncertified software can create errors in the operation and tallies of the BMDs and can carry bugs and malware into the database that can affect absentee ballots, reporting capabilities, and possibly pollbooks.

Ms. Cheryl Ringer
October 3, 2020
Page 3

    **2.**    **Fulton is not conducting mandatory acceptance testing of the new software** (violation of Election Rule 183-1-12-03(1))

The Secretary of State's Voting Systems Rule 590-8-1-.01(d)(8) states, "[a]cceptance tests shall be performed in the user's environment to demonstrate that the voting system as delivered and installed is identical to the system that was certified by the State and satisfies the requirements specified in the procurement documents."

State Election Board Rule 183-1-12-03(1) states: "Upon the receipt of new, repaired, or upgraded components of the voting system, including electronic ballot markers . . . the election superintendent of the county is responsible to check that an acceptance test has been performed on the device in accordance with standards issued by the Secretary of State. No component of the voting system shall be placed into service until such time as the unit satisfactorily passes the prescribed acceptance tests."

Crucially, this Election Rule gives the *Board* the responsibility of assuring that satisfactory acceptance testing has been conducted. But Fulton has not done *any* acceptance testing or generated any of the required documentation. The Board is about to "place into service" components that have *not* passed "the prescribed acceptance tests," in complete violation of this Rule.

    3.    **Fulton is failing to conduct complete Logic and Accuracy Testing** (violation of O.C.G.A. §§ 21-2-379.25 (a) and (c))

O.C.G.A. §§ 21-2-379.25 (a) and (c) require that the county "verify that ***each*** device is properly recording votes and producing proper ballots," and that "the superintendent shall have ***each*** electronic ballot marker tested to ascertain that it will correctly record the votes cast for ***all offices and on all question***."

Testing being conducted by Fulton, based on the Secretary's guidance, does not comply with this statute because it fails to "have each electronic ballot marker tested ... for all offices and on all questions." As laid out in detail in the *Curling v. Raffensperger* litigation and discussed extensively in recent conferences with the Court where this Board was represented, the Secretary's procedure for LAT falls far short of the minimum statutory requirements that this Board is obligated to obey. The Secretary of State's representative testified in a recent hearing that conducting the LAT on BMD units at the levels required by statute is ***impractical*** and too time consuming to accomplish. The Board, however, remains legally obligated to voters to ensure that the statutorily required LAT be conducted.

Ms. Cheryl Ringer
October 3, 2020
Page 4

   **4.    Fulton is failing to review accuracy of the election database**
(violation of Rules 183-1-12-.19 (5); 183-1-12-07(1))

   Election Board Rule 183-1-12-07(1) states that "the election superintendent shall review the electronic databases used to generate ballots for correctness and accuracy."

   Election Board Rule 183-1-12-(.19)(5) requires that "the county election superintendent shall provide to the Secretary of State or his or her designee a final copy of the election management system database for the county."

   Again, in this Rule the State Election Board has transferred the responsibility for database review to this Board. We do not believe that Fulton is conducting the required database review for accuracy of its voluminous contents and configuration of the ballots and tabulation instructions, as required by the Election Code, or that it is sending a final corrected database to the Secretary prior to the election.

   **5.    Violation of absolute secrecy in voting** (O.C.G.A. §§ 21-2-379.22(5) and 21-2-70)

   O.C.G.A. § 21-2-70 directs this Board to guarantee the secrecy of the ballot:

   Each superintendent within his or her county or municipality shall exercise all the powers granted to him or her by this chapter and shall perform all the duties imposed upon him or her by this chapter, which shall include the following: . . .

   **(13)** To conduct all elections in such manner as to *guarantee the secrecy of the ballot.*

The large well-lit BMD displays, however, advertise Fulton voters' votes to others in the polling place. O.C.G.A. § 21-2-379.22 further provides:

   No electronic ballot marker shall be adopted or used in primaries or elections in this state unless it shall, at the time, satisfy the following requirements: . . .

   **(5)** Permit voting in *absolute secrecy* so that no person can see or know any other elector's votes, except when he or she has assisted the elector in voting, as prescribed by law;

Fulton's failure to take necessary action to ensure ballot secrecy not only is violating voters' rights but also invites challenges to the outcome because the secrecy of the ballot is not being guaranteed.

Ms. Cheryl Ringer
October 3, 2020
Page 5

### Security failures

There are numerous gravely serious security failures at EPC that must be addressed. We have detailed some of them in our pleadings in the Curling case, and we continue to offer, without response from this Board, to have a meeting with the Board or management to share our concerns in more detail.

### Remedy Provided by the Election Code

The Georgia Election Code provides for adopting hand marked paper ballots instead of BMDs in cases like this one where it is impossible or impracticable to do so. Given that it is impossible to use the system and comply with many mandates of Georgia law, it is the duty of the Board to adopt hand marked paper ballots, which can be read with the optical scanner and thoroughly audited. Georgia statutes (O.C.G.A. §§ 21-2-281, 21-2-334) call for this solution, and recent SEB Election Rule 183-1-12-.11(2)(c)-(d) specifically supports its application when BMDs are impractical to use.

We would very much like the opportunity to discuss our concerns with you and the Board and urge the Board to not install or use this unreliable, untested and illegal system.

Please let me know if you have any questions.

Sincerely,

Bruce P. Brown

cc:     Kaye Burwell
        David Lowman
        Marilyn R. Marks
        Cary Ichter
        Robert A. McGuire