# IN THE UNITED STATES DISTRICT COURT FOR
# THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| DONNA CURLING, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>BRAD RAFFENSPERGER, et al.,<br><br>Defendants. | CIVIL ACTION FILE NO.:<br>1:17-cv-2989-AT |

## DECLARATION OF AILEEN NAKAMURA

**AILEEN NAKAMURA** hereby declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

1.      My name is Aileen Nakamura.  I am over 18 years old.  I am Japanese American.

2.      I have personal knowledge of all facts stated in this declaration, and if called to testify, I could and would testify competently thereto.

3.      This declaration supplements my declarations filed on December 16, 2019 (Doc. 680-1, Ex. N); March 11, 2020 (Doc. 723, Ex. F); August 2, 2020

(Doc. 755, Ex. 4); February 12, 2021 (Doc. 1071-5 Ex. E); and December 5, 2022 (Doc. 1569 Appendix 5).

4.      I am a registered voter residing in Sandy Springs in Fulton County, Georgia, and have been an active Georgia voter since my family moved to Sandy Springs in 2007.  I make a practice of voting in every election for which I am eligible and plan to continue to vote in every such election.

5.      I am also a member and an active volunteer for the Coalition for Good Governance ("CGG") and have now spent well over 150 volunteer hours observing and poll watching during Georgia elections as well as pre- and post-election activities in Fulton, Cobb, Gwinnett, Paulding, Bartow, and Cherokee counties, such as polling place opening and closing, Logic and Accuracy testing, absentee ballot tabulation, post-election county tabulations, and post-election audit activities.

**Ballot secrecy concerns**

6.      Ever since I turned 18 and could vote, I have always preferred to vote in person, during Early Voting or on Election Day.  I like the community aspect of voting, and I like thanking the poll workers for their vital contribution in keeping democracy running.

7.      I miss this community association when I vote by mail.  I also miss being able to proudly wear the "I Voted" sticker for the rest of the day to show I have exercised my right and expressed my voice at the polls.

8.      However, I am not comfortable voting in person if I must use an electronic ballot marking device ("BMD") and will instead opt to use an absentee ballot as long as Georgia law requires in-person voters to vote using a BMD. There are multiple reasons for this.

9.      First and foremost, the large Dominion BMDs that I have observed across the state permit people in the polling place to see voters' touchscreen selections.  I believe our votes should be private and no one should be able to see how I vote.

10.      I live in a highly politically divided area, where our mailbox was bashed in after we put out a political yard sign.  When I first saw the large, bright, upright BMDs in 2019, I was concerned that an "angry neighbor" seeing the way I vote could mean more retribution.  Because the new screens now publicly displays my BMD vote selections, I felt for the first time that voting in person carried a definite risk.

11.      I have had to vote in person twice because my timely requested absentee ballots did not arrive, as stated in my declaration filed February 12, 2021 (Doc. 1071-5 Ex. E p.3-9).  The first time I had to do so, I went to vote with my

child, Saya Abney, who also did not receive their absentee ballot. I checked in after Saya, and was troubled that as I walked towards Saya to find an open BMD to vote at, I could clearly see Saya's BMD screen.

12. I do not want my adult children to think that not having privacy when voting should be sanctioned by anyone, especially the government. Households where parents, children, or spouses who go to vote together but have differing political views, need to be able to vote in private.

13. I am very aware that hate crimes against Asian Americans have been escalating across the nation. I am normally not a fearful person, but because we live in fraught political times, I feel that voting without privacy could give a passing person with the right predisposition – another voter, a poll worker, a technician, or poll watcher – a reason to want to cause me or my family harm. The violation of ballot secrecy puts me at more risk than necessary, especially in Fulton County.

**Ballot secrecy violation in Fulton and Cobb counties**

14. As a Fulton County resident, I have poll watched or observed at numerous Fulton polling places since 2019, and have regularly attended (in person or virtually,) Fulton Board of Registration and Elections ("BRE") meetings since January 2018.

4

15.     The Georgia State Election Board ("SEB") in August 2021 appointed a bipartisan three-member panel to conduct a performance review of the Fulton BRE.  The review, entitled "Performance Review Board Report on Fulton County Elections," is published on the Secretary of State's website.[1]

16.     The Fulton Performance Review Board asked for The Carter Center's assistance in providing non-partisan observations throughout Fulton County for the review process.  The Carter Center's "2022 General Election Observation: Fulton County, Georgia" report, is available on the Carter Center's website.[2]

17.     The Fulton County Performance Review Board document states, "one thing Fulton can pay more attention to is the layout of equipment at polling places. Voter privacy, voter flow, and appropriate transparency for certified partisan monitors should all be considered when determining setup and layout." (Performance Review Board Report, p.16.)  They also acknowledge, "[o]f course, given that available space will not always be perfect, it is not always possible to maximize each of those considerations."  Based on my personal observations, in every polling place I have observed, it is almost always possible to see how voters

---

[1] https://sos.ga.gov/sites/default/files/forms/Performance Review Board Report on Fulton County Elections %281-13-23%29.pdf

[2] https://www.cartercenter.org/resources/pdfs/peace/democracy/u_s_elections/fulton-county-election-observation-report.pdf

are voting from certain angles or when one is walking past a voter, no matter the equipment configurations attempted.

18.     While this problem exists in every county and polling place that I have observed (see my declarations filed on December 16, 2019 (Doc. 680-1 Ex. N ¶4-12); March 11, 2020 (Doc. 723 Ex. F ¶6-9); and February 12, 2021 (Doc. 1071-5 Ex. E ¶20-25), there was one marked difference between the Fulton elections I observed in early 2020 as opposed to August 2020 and later. The "BMD carriers," have made the touchscreen ballot secrecy issue much worse in the many installations I have seen. One type of carrier houses four Dominion BMD/printer units, and the other houses two BMD/printer units plus a Dominion precinct ICP (Imagecast Precinct) scanner.

19.     The photographs attached as Exhibits 1, 2, and 3 show why the BMD carriers have made Fulton's ballot secrecy violations much worse. Exhibit 1, from my declaration filed on March 11, 2020 (Doc. 723 p.38 Ex. A), is a photograph I took on March 9, 2020, before Fulton started using the carriers. It shows how the poll workers placed a blue screen around each BMD, and positioned them facing the walls to attempt to increase voter privacy. (However, even with this setup I have been able to easily see how a person is voting when walking behind or standing next to them.)

20.     Exhibit 2 is a photograph I took on August 11, 2020, from about the same location as Exhibit 1 at the Sandy Springs Library, showing four BMD carrier units in a row.  As noted by the handicap sign posted on the carrier, in a 2-unit carrier, one BMD is placed lower so that they are easily accessible for wheelchair users or for anyone who needs to sit while voting.

21.     Exhibit 3 is a photograph from a January 26, 2023 article[3] in the Atlanta Journal Constitution.  This photograph shows how tall and upright the units are, with voters standing in front of them.  Comparing Exhibits 1, 2, and 3, it can be seen that the BMD carrier greatly raises the height and increases the visibility of the touchscreens.

22.     After observing hundreds of voters at BMDs in multiple counties, and voting on a BMD myself, I have observed that the touchscreen ballot secrecy issue is far worse for people of short stature like myself (I am 5'1" tall), because the shorter you are, the less your body blocks the big touchscreen.  And as I stated in my prior declaration filed December 2019, (Doc. 680-1 Ex. N at ¶10), I have observed that a seated person has no privacy at all.   I have seen no improvement in ballot secrecy in any of my recent polling place observations.

---

[3] https://www.ajc.com/neighborhoods/north-fulton/north-fulton-cities-to-partner-and-takeover-local-elections-process-from-county/TEJ4RS2F3NFZ3FVWQC47G6L7O4/

23.     The Carter Center Report states:

"Carter Center observers noted that the equipment containers used by Fulton County
made voting location setup efficient and easy for election workers. While equipment
containers have many benefits with regard to ease of transportation and setup,
observers also noted several challenges:
- The size of the containers in the smaller voting locations made the locations
  especially cramped…
- The height and angle of the BMD screen within the equipment container
  inadvertently undermined the secrecy of the voting process, especially in locations
  where tight space did not allow for optimal placement of the equipment
  containers… Voters' bodies could not always adequately shield the screen while
  they were voting…" (Carter Center Report, Doc. 1590-6 at 13)

24.     These Carter Center observations are consistent with mine, except that

I have visited many polling places that were not small or cramped in any way, but

the BMD carriers still made it impossible for total ballot secrecy for each BMD.

This is shown in photographs that I took from outside the gym door at North

Springs High School (Exhibit 4), and from outside the school door at Ison Springs

Elementary School (Exhibit 5).  As these photographs show, even from far away,

the selections of voters may be seen on the bright, upright BMDs.

25.     A final example of how visible BMDs are (whether they are in the

BMD carriers or not) is that in my visits to different polling places, I have often

been able to see them through a window from another room, or even from outside

a building.  Exhibit 6 is a photograph I took from outside the Sandy Springs

Library, along the path voters take from the parking lot to the voting entrance.  To

8

avoid breaking the law, I did not take photographs of voters voting while I was passing by outside the buildings.

26.     Another issue I have observed is that when using the 4-unit BMD carriers, some BMD units will be hidden from view of poll workers on the opposite end of the voting location, making it much easier to tamper with machines. The dilemma is that if poll workers can see the unit to prevent mischief, they are also likely to be able to see the voters' selection on the giant, bright screens.

**Violation of ballot secrecy and election officials**

27.     In addition to Fulton BRE meetings, I have also regularly attended (or watched remotely,) Georgia SEB meetings. I have made numerous public comments at both Fulton BRE and SEB meetings against the use of the Dominion BMD voting system due to the violation of ballot secrecy, equipment problems I have witnessed, the need for updated pollbook backups, lack of poll worker training, and other such issues.

28.     Attached as Exhibit 7 is a true and correct copy of a photograph taken by a friend of Representative Shea Roberts (House District 52) and mine at the Fulton BRE meeting on November 14, 2019. At that meeting, Representative Roberts and I made public comments on our voting system concerns.

29.     Exhibit 7 shows the life-size mock-ups of the Dominion touchscreens which I had constructed to show the BRE members just how easy it is to see

9

people's votes from quite a distance, as Fulton had not yet received their new Dominion voting equipment at the time. I conferred with other CGG members in preparing my comments and this demonstrative exhibit.

30.     Part of our goal in making this early presentation to the Fulton BRE in November 2019 was to ask Board members to object to the choice of equipment prior to the 2020 Presidential primary, and to address their legal responsibility to provide for absolute secrecy of the ballot.

31.     After the meeting, then-BRE member Vernetta Nuriddin told Representative Roberts and me that she had not seen the actual Dominion equipment yet, and that "Your mock-up freaked me out – I could read everything!", even though she had been about 30 feet away from where we spoke and demonstrated. (Doc. 680-1 Nakamura Decl. at 128 ¶14.)

32.     Since that BRE meeting over three years ago, I and other members of CGG have repeatedly spoken about our constitutional right to and the need for ballot secrecy at numerous SEB and Fulton County BRE meetings.

33.     Although I had attended or listened to almost every Fulton BRE meeting since January 2018 and have made numerous public comments during the meetings about the violations of ballot secrecy (as have other voters), until

10

recently, the first time I heard ballot secrecy raised by the Fulton Board members during a meeting was on July 9, 2020.

34.    The June 6, 2020 election had been the first time most people had used the new BMDs to vote.  Not surprisingly, many people complained about ballot secrecy, both to the Secretary of State's office and to their county elections offices, and I heard much ire about violations of voter privacy during public comments at the Fulton BRE meeting that followed.  I had even noticed people complaining on my neighorhood Nextdoor app, a true and correct sample is attached as Exhibit 8.

35.    On July 9, 2020, a BRE board member (Aaron Johnson) addressed Elections Director Rick Barron over ballot secrecy (at the 30:38 mark of this recording: https://youtu.be/F2htnwibjK0): "The privacy concerns, I've heard that a lot.  And they're right, even when I was down and especially when we were down at the South Service Center, you could literally stand in the hallway and see two rooms over a person's ballot.  By the way, the machine was sitting against the back wall. And it was at an angle.  If you're standing outside, you can literally just peek around into room number one and into room number two and see it.  So what are we going to do to mitigate voters' concerns about their privacy because it – the machines are standing straight up?"

11

36.     Mr. Barron replied, "These screens are much larger, much brighter than the old voting system.  And they also… when you make a selection, lights up the entire line rather than just putting a checkbox as the old system did. So it does create issues."

37.     It has been three years since then, and I have observed no improvements to the ballot secrecy problems in Fulton County.

38.     Despite CGG and voters' complaints for over three years, to my knowledge, neither the Secretary of State nor the State Election Board have made any public recommendations or rules to address compliance with laws concerning ballot secrecy together with the need for poll workers to be able to visually monitor the equipment against tampering or damage.

39.     My most recent observations from poll watching will demonstrate the point that effective changes have not been made.

**Recent observations on ballot secrecy**

40.      On November 30, 2022, I was observing Early Voting for the U.S. Senate runoff election at the Dorothy Benson Community Center in Fulton County. The location was crowded and there was a constant line of voters waiting outside the building. Attached as Exhibit 9 is my diagram of the Dorothy Benson Community Center voting area on November 30, 2022.

41.    I checked in as a poll watcher with the poll manager, and she told me I could sit at one of three chairs for poll watchers. As Exhibit 9 shows, from that location I could clearly see one BMD on the end of a 4-unit carrier, and had to turn my head away whenever a voter came to use that machine.

42.    I wanted to be able to observe the check-in stations, so I walked across the room to find another seat from where I could observe the six Poll Pad stations, the two scanners, and the voters as they went from some of the BMDs to the scanners.  I noticed I could see three BMDs on the end quite clearly, as could poll workers and voters who were walking past them. From both locations, there were also many BMDs I could not see at all.  Poll watchers and poll workers could not watch for machine tampering without seeing voters' selections on the touchscreens.

43.    The poll manager and assistant poll manager soon told me to move because I could "see how voters are voting."  Not wanting to be accused of a felony for observing a voter's displayed selections (a new law from SB202), I returned to my first seat.

44.    On December 6, 2022, Election Day for the runoff, I was at the Sandy Springs Library as a poll watcher, and sat where I could observe all the election activities.  From that location I could see one BMD screen very clearly, so I had to

13

turn my head every time a voter came to that station to vote to avoid seeing the voter's selections.

45.     I also have notes from many other polling place observations in 2022 that show the lack of ballot secrecy.  My observations are consistent that touchscreen ballot secrecy is a problem across the state.

**BMD printout verification**

46.     The second – and equally important – reason that I do not wish to vote on a BMD is that BMD outcomes are not auditable.

47.     Over the years of poll watching, on multiple occasions I have watched voters to see if they appear to review their ballot printouts.  I continue to observe that at least 90% of voters that I have observed do not look at their printed ballot long enough to check their selections on the ballot printout.

48.     I have also observed that a small percentage of voters do take a very quick glance of a second or two, which seems to be more of a check to see that the printer did print, as opposed to reviewing the paper long enough to check the accuracy of the printed list of voter selections.  Only the rare voter checks their entire printout.  However, I have never seen a voter check a long ballot against a 'cheat sheet' – a list of candidates they are voting for, or a sample ballot they have filled out previously – like the ones I bring on the occasions when I have had to vote in person.

14

49.     Since Fulton County ballots often have over 30 contests, I am not able to remember every contest on the ballot, particularly when there are multiple races for judges and other non-partisan positions on the ballot.

50.     Attached as Exhibits 10, 11 and 12 are true and correct copies of Fulton County sample Democratic, Republic, and Non-partisan ballots, respectively, from the June 6, 2020 primary election (postponed from May 19, 2020).  The sample Democratic Party ballot is the same ballot content that I voted in that election.

51.     With forty-eight contests on it, without a 'cheat sheet', there is absolutely no possibility that I could have memorized the entire ballot to be able to verify that my choices were accurately recorded by the BMD on a paper printout.

52.     Across the various years and locations I have observed, I have seen only a small percentage of poll workers instruct voters to check their printouts. When such instruction occurs, it is usually in the form of a question such as, "Have you checked your ballot?"  My observation is that even after such a prompt, if there is a lengthy ballot, most people will not look at their ballot long enough to review all their selections.  I have also observed people who had ***not*** checked their printout reply, "Yes," and without looking at their printout, proceed to scan it. (Doc. 680-1, Ex. N ¶37.)

15

53.    The University of Georgia study commissioned by the Secretary of State's office (Doc. 1589-4) also found that most voters do not check their ballots for more than five seconds.  This aligns with my observations.

**Ballot secrecy of scanned ballots**

54.    The third reason I do not wish to vote in person using the Dominion equipment is that I am aware of Dr. Alex Halderman's work on DVS Order (Doc. 1589-10) showing that printouts, ballot images, or Cast Vote Records scanned by the Dominion scanners can be traced back to the voter due to its 'non-random' algorithm.

55.    While poll watching at the Dorothy Benson Community Center on November 30, 2022, I noticed that there was a live security camera (red light flashing) in an upper corner of the room.  I was seated underneath it, about 10 feet to the left of the camera, so I could surmise that the camera would be able to record voters at one or more BMDs, as well as both of the scanners that were being used.

56.    With Dr. Halderman's work in mind, I decided to observe the voters scanning their ballots. I had just checked the BMDs' and scanners' public counters, and was sitting close to the two scanners, so I could easily check the scanner numbers again when there were no voters present.

57.    Between 12:39 and 12:54pm, I took detailed notes on the 14 voters who scanned their ballots – what they were wearing, which scanner they used and

16

the public counter number that showed on the scanner after each cast their ballot. I did this so that CGG's experts, if required, could request the video and demonstrate that voter sequence can be learned by members of the public and used to connect certain voters to their ballots.

**Poll Book and Voter check-in issues**

58. The fourth reason I do not wish to vote in person in the polling place is to avoid the risk of disenfranchising or inconvenient check-in issues I have witnessed while poll watching. On November 8, 2022, Election Day for the midterm, I was told that the Mt. Vernon Baptist Church polling place in Sandy Springs was turning away voters because of "technical issues." When I arrived to observe, only two of four Poll Pads were functional, and technicians were trying to fix the two which were being rebooted. The technician told me the Poll Pads had been "encoding wrong" and had "crashed."

59. I spoke with three observers from the ACLU who had been there all morning. They told me that shortly before I arrived, the poll manager had shut down the check-in for close to an hour due to problems checking people in and the inability to provide the correct SmartCard that activates the BMD.

60. ACLU watchers told me that voters were told that they had to choose between voting or coming back later. When I asked if they were given the option to vote on an emergency paper ballot, the answer was "No." Only three people had

17

opted to vote provisionally.  I was told there were about seven other voters who said they would return later – I do not know if they did.

61.    I observed that since the problem was apparently with SmartCard encoding and not in looking up voters on the Poll Pad, the poll manager should have used emergency paper ballots.  I also noted that had they been using hand-marked paper ballots, there would be no need for SmartCards and voting would not have been interrupted.

62.    In addition, on two separate occasions I have witnessed voters who, upon checking in, were told by pollworkers that they were registered in a different county and could not be issued a ballot.  On November 8, 2022, I met Travis Edwards, who tried to vote at the North Fulton Service Center where I was a poll watcher.  When he checked in, I observed that he was told that he was registered in Gwinnett County, although he stated he was a Fulton County registered voter.

63.    He talked to the poll worker and poll manager for a while, but was eventually turned away.  When I caught up with him outside and asked him what had happened, he said that he could not understand why his registration had come up showing Gwinnett to be his county – he had lived there temporarily at one time but had never voted there.  He said had voted in Valdosta (Lowndes County) in 2016 and in DeKalb in 2020, and was quite sure he had registered in Fulton, since he had lived here for a year at that time.

18

64.     Regardless of whether he had successfully changed his registration to Fulton County or not, it was strange that Gwinnett came up as his county of residence.  I encouraged him to go and check his status at the registration office and see if they could help him.  He told me he was quite discouraged and wasn't sure if he wanted to spend more time trying to "fix things."

65.     I do not wish to have these types of hassles, or worse, not be able to vote, because of the kinds of issues that I have witnessed, read testimony about, or been told others have had trying to check in to vote.  I tolerate the time-consuming demands and additional expense of voting by absentee ballot to avoid such risks.

**Backup paper pollbooks**

66.      Another reason I prefer not to vote in person using the Dominion equipment is that if the Poll Pads become inoperable (due to a power outage, cyberattack, or technical problems), voters will not be able to check in.  *See* Stone Decl. Doc 755 at 137 (Cobb County voters had to wait two hours for electronic pollbooks to be fixed so they could vote).

67.     During recent elections, I made it a point to ask a poll manager in both Fulton and Cobb counties to see if they had any comments on whether this situation had improved.  Neither poll manager reported any improvement.

68.     During the U.S. Senate runoff on December 6, 2022, I spoke with poll manager Soun Sengara, and assistant poll manager Linda Arnold at the Sandy

Springs Library.  I asked about the backup paper poll book, and both managers told me that they had never heard of it.  This was Ms. Arnold's third time being an assistant manager.

69.    When I explained that the purpose of an updated backup paper poll book was to ensure that voters could be checked in so voting would not be interrupted should the Poll Pads became inoperable, Ms. Arnold, who was in charge of provisional ballots, said using one would "make a lot of sense."

70.    Both managers looked for the backup paper poll book among their materials but could not locate one.  When I asked Ms. Arnold what would happen if all the Poll Pads went down right then, she replied that they would have voters fill out provisional ballots.

71.    It was not surprising to learn that no backup paper pollbook could be found for this December 6, 2022 U.S. Senate runoff, despite the importance and high turnout of the election.  It is my understanding from CGG's observations that the state does not provide new back up paper pollbooks for runoffs, as the Court has also found.  (Doc. 918 at 19.)

72.    Later that afternoon, I visited the East Cobb Government Center (a Cobb County polling location), where I spoke with poll manager Alex Thompson. He said that it was his second time being a poll manager, but when asked about the backup paper poll book, he said he had never heard of it.

20

73.     However, upon further inquiry he searched his poll manager materials and found an Emergency Action Plan document issued by Cobb County, which he permitted me to read.  Exhibit 13 is a true and correct copy of this manual that CGG subsequently obtained through a public records request.

74.     I noted that the instructions on page 3 for checking in voters when Poll Pads are inoperable include a reference to the backup paper list to determine if a voter is marked "AB" to determine whether they are required to cast a provisional ballot.  It is my understanding that AB means "Absentee Ballot" for voters who had requested Absentee Ballots in early voting ("Absentee In Person") or by mail.

75.     For this runoff election, if a paper pollbook had been provided by Fulton County elections to poll manager Sengara, it would have been last updated prior to the November 8, 2022 election, offering little information to the poll manager about who was eligible to vote on December 6, 2022.

**Absentee ballot experiences**

76.     Even though I do not wish to vote in person using the Dominion BMD equipment, this does not mean that voting by absentee ballot is easy for me to successfully accomplish.  In my declaration filed February 12, 2021 (Doc. 1071-5 Ex. E ¶9-19, 26, 28), I explain that my adult child Saya and I had to vote in person

for the June and August 2020 elections because our absentee ballots did not arrive on time, despite being timely applied for.

77.     I recently checked each of our voter histories on our respective MVPs to make sure the state accurately reflected that Saya and I voted in person for both the June and August elections in 2020.  Instead, I was shocked to find our MVPs show that we did ***not*** cast a ballot in either of those elections.

78.     Attached as Exhibit 14 are screenshots from our two MVPs showing that Saya and I did not vote in June or August, 2020.  It concerns me greatly that we were not credited for an election for which we showed up to vote and did vote.

79.     In December 2018, Saya, who is also a member of CGG, was disenfranchised and could not vote for the runoff election because their absentee ballot did not arrive in time.  They were attending college in California at the time, and because we know of many students who had problems receiving their absentee ballots at their college addresses that year, we had Saya's ballot sent to our house.

80.     The ballot finally arrived in our mail on Friday, November 30, 2018. However, unless we had sent it to Saya overnight and had them return it to Atlanta overnight, there was no way the ballot would make it to the Fulton elections office by 7 pm on Tuesday, December 4th, Election Day.

81.     It would have cost close to $100 to mail the absentee ballot overnight both ways.  As a family, we believe every vote is precious and important, but at the

time we just could not justify spending $100 for something that we know should be free – Saya's right to vote.

82.     My younger child, Del Abney, also a member of CGG, is currently attending college in Massachusetts.  Del's ballot arrived in Massachusetts from Fulton County on Wednesday, November 30, 2022, just six days before the December 6, 2022 U.S. Senate runoff.  To cast the ballot on time, Del had to quickly fill out the ballot, take an Uber to the closest post office, and send it to Georgia via priority mail, costing a total of $50.  I received it the evening before election day, and had to drive downtown to the Fulton Elections Office the next morning to cast the ballot before 7pm.

83.     My mother, Atsuko Nakamura, another CGG member, was also almost disenfranchised when the absentee ballot she filled out for the November 8, 2022 general election, was rejected.  On election day, when I checked my family's MVP statuses to check that our absentee ballots had been accepted, I saw that Mom's ballot had been "REJECTED" for "INSUFFICIENT ID."  She told me that she had received no email, text, or letter from Fulton County informing her the rejection.  I verified this by checking her texts and emails on her smartphone.

84.     Fortunately, we were able to get her ballot cured only because I checked the MVP website in time, knew whom to call, had the ability to photocopy Mom's driver's license, print out the affidavit for Mom to fill out and sign, had the

23

technical knowledge to attach the affidavit and the copy of her license, and return it to the correct email address for her.

85.     My family members' experiences in attempting to vote by absentee mail ballot demonstrate the many obstacles and difficulties that can be associated with mail ballot voting, and is similar to the experiences of many other voters I have talked to and assisted through my volunteer CGG work.  I have helped many voters who had issues with their absentee ballots, mainly by working with the statewide absentee voter files.

86.     I had to vote in person for the December 2022 U.S. Senate runoff because I missed the absentee ballot application deadline.  Even though I am immersed in elections information daily, I had forgotten that due to SB202, the absentee ballot application deadline is now a week earlier than the previously.

87.     This meant I had to vote in person using an unauditable BMD ballot for the runoff election if I wanted to exercise my right to vote.

**CGG's allocation of resources**

88.     Finally, I would like to address how this litigation and CGG's administrative and lobbying challenges to the BMD system have prevented, reduced or delayed much of CGG's important work.  For me personally, it has meant that many CGG projects that I have been working on, or would like to be

working on, have been put on the back burner, although the needs for those and other projects continue to grow.

89.     The 2023 legislative term started just a few weeks ago, but CGG volunteers are having to help with litigation support for the response to the Motion for Summary Judgment.  As this is the beginning of a two-year legislative term, we normally would be speaking with members of the legislature about possible legislation to improve elections processes and general government transparency. We had hoped to propose legislation on clarifying open records laws this year but have not been able to do so because of the needs for litigation support.

90.     My plan for January had been to use the expertise of CGG concerning Ranked Choice Voting ("RCV") to work with other CGG members to lobby legislators on the reasons not to choose RCV as an alternative to having runoff elections – a hot topic this year.  Explaining the many reasons why RCV would not be in the best interest of Georgia is a time-consuming endeavor which is best done in person, and with explanatory materials we have not had the time to create.

91.     On CGG's behalf, I attended one meeting of voting rights leaders in which where RCV information was a key agenda item. CGG is not currently able to provide the needed follow up input for this group on the RCV topic because of our intense effort in litigation support in this case.

92.     With four Georgia elections which just occurred on January 31, I had intended to be working with Scrutineers on the second beta testing of the joint CGG/Scrutineers 'Accurate Uploads' project (Exhibit 15) which we launched during the U.S. Senate runoff election. This project aims to check election night uploads from counties in real time and create an audit trail to monitor for anomalies. Such anomalies may indicate simple mistakes which we have seen in previous elections, like a memory card which was not uploaded, or one which was counted twice.

93.     On behalf of CGG, I pitched this project to Emily Levy, Director of Scrutineers, when she was looking for a way Scrutineers could help election security and oversight in Georgia during the December 2022 runoff. I have been working with her since to help develop a macro which can be tailored to look for specific anomalies for each election. Because the application works with the Clarity Election Night Reporting records used by many states, our goal is to perfect this in Georgia and then promote in other states, with Pennsylvania being the likely next test site.

94.     The pilot for the project was rolled out on December 6, 2022, and like all software projects, we found bugs and issues that Ms. Levy and the developer have been ironing out with CGG input. Due to litigation support needs, I had no

time to observe tabulation operations, polling place voting and the further testing of the monitoring application, as Scrutineers had requested.

95.    There are also Municipal elections coming up in November this year. The cities of Milton, Johns Creek, and Alpharetta in North Fulton have voted to run their own elections using hand-marked paper ballots, because Fulton County's rates for running elections for municipalities have more than doubled since 2021.

96.    At a CGG meeting recently, my colleagues asked me to attend the meetings that the city of Roswell is conducting on this topic. They also asked me to research Gwinnett County municipal elections which are conducted by the municipalities, so we can share what CGG considers to be "best practices" with the North Fulton cities.  While I have made several phone calls and attended a public meeting for this educational effort, my time has been quite limited due to the litigation support I have been doing.

Executed on this date, February 7th, 2023

Aileen Nakamura

E
X
H
I
B
I
T

1

**Nakamura Exhibit 1:**
Sandy Springs Library polling place, March 9, 2020



EXHIBIT

2

**Nakamura Exhibit 2:**
Sandy Springs Library polling place, August 11, 2020



EXHIBIT

3

**Nakamura Exhibit 3:**
Fulton County BMD carriers as shown in AJC article of January 26, 2023



EXHIBIT

4

**Nakamura Exhibit 4:**
Photo through gym door at North Springs High School on Nov 8, 2022



EXHIBIT

5

**Nakamura Exhibit 5:**
Photo from outside door at Ison Springs Elementary School, Jan. 5, 2021



E

X

H

I

B

I

T

6

**Nakamura Exhibit 6:**
Photo from outside a Sandy Springs Library window, Nov 8, 2022.



EXHIBIT

7

**Nakamura Exhibit 7:**
November 14, 2019 Fulton County BRE Meeting with Shea Roberts <mark>and BMD mockups</mark>



EXHIBIT

8

**Nakamura Exhibit 8:**
Nextdoor App Screen Shot



EXHIBIT

9

**Nakamura Exhibit 9:**
My diagram of Dorothy Benson Community Center voting area, Nov. 30, 2022.



EXHIBIT 10

**Nakamura Exhibit 10:**
June 9, 2020 Fulton County Democratic Primary Sample Ballot



E

X

H

I

B

I

T

11

**Nakamura Exhibit 11:**
June 9, 2020 Fulton County Republican Primary Sample Ballot



EXHIBIT

12

**Nakamura Exhibit 12:**
June 9, 2020 Fulton County Non-Partisan Primary Sample Ballot



EXHIBIT

13

# EMERGENCY ACTION PLAN

A step by step guide to process voters in any situation on Election Day.





# EMERGENCY ACTION PLAN
## What to Do If…

### ❖ Poll Pads will not encode cards:

1) First, check that the silver side on the encoder and the arrow on the voter card are matched up when card is inserted.

2) Second, check that the encoder is firmly seated into the lightning port and that the card is firmly seated into encoder. The card reader should indicate Green in color on the Poll Pad.

3) If the card still doesn't encode, proceed with Method 1 (Ballot Activation) or Method 2 (Paper Ballots), or both.

### Method 1 - Ballot Activation on Touchscreen

1) Set up:

   a) Two workers are assigned to Ballot Activation using:

   - Manual Ballot Activation Instructions & Codes (Pink Paper)
   - Quad or Duplex Passcode (blue or yellow) card
   - Security Lanyards

2) Poll Pad workers continue to check in voters as normal, recording the District Combo number and Precinct Code in upper right-hand corner of Voter Certificate but selecting **Emergency Paper Ballot** instead of Touchscreen. (This will mark the voter on the Poll Pad Numbered List.)

   a) Poll Pad worker passes paper Voter Certificate with District Combo number, Precinct Code and Party (if Primary) recorded in upper right-hand corner to Ballot Activation worker.

3) Ballot Activation worker takes voter, with stylus, Voter Certificate, Manual Activation Instructions & Ballot Activation Codes (Pink sheet) to BMD Touchscreen and inserts Orange Poll Worker card.

   a) Type in Quad or Duplex passcode and select Ballot Activation option

   b) Using Ballot Activation Codes (Pink sheet) and Manual Activation Instructions, worker selects appropriate ballot activation code by Party & District Combo to match the paper Voter Certificate written by the Poll Pad worker

   c) Remove the Orange Poll Worker Card and instruct voter to make ballot selections then to proceed to Review Station or Scanner after printing ballot

   d) Return paper Voter Certificate to Poll Pad worker to place on the Voter Certificate binder.

1

# EMERGENCY ACTION PLAN

## What to Do If…

- ❖ **Poll Pads will not encode cards**, <u>OR</u>
- ❖ **Touchscreens are inoperable**, <u>OR</u>
- ❖ **Printers won't print**

### <u>Method 2 - Paper Ballots</u>

1) Set up:

   a) Place one worker at a table near Poll Pad station, with Emergency paper ballots organized by Party (If Primary) & District Combo.

   b) Verify the number of ballots you have is the number on the Emergency Ballot Recap and sign under the "verified by" field. At Closing, complete the Recap.

   c) Give each Poll Pad worker:

   - Ballot marking pens to give to voters to mark paper ballots

2) Poll Pad workers continue to check in voters as normal, recording the District Combo number and Precinct Code in upper right-hand corner of Voter Certificate, but selecting **Emergency Paper Ballot** instead of Touchscreen. This marks the voter on the Poll Pad Numbered List.

   a) Poll Pad worker passes paper Voter Certificate with District Combo number, Precinct Code and Party (if Primary) recorded in upper right-hand corner of Certificate to Ballot table worker

3) Ballot table worker selects appropriate ballot by Party (if Primary) & District Combo

   a) Tear ballot from stub, record the stub number on the Voter Certificate and hand ballot and certificate back to check-in worker

   b) If a pad of ballots is completely used, place ballot stubs into Ballot Stub Ziploc. After emergency balloting is completed, tear off the used stubs and place in the Ballot Stub Ziploc.

4) Poll Pad worker checks that proper ballot has been returned from the Ballot Table worker and places certificate on Voter Certificate binder.

   a) Give ballot and ballot-marking pen to voter

   b) Direct voter to Review Station privacy screens or voting booth to mark paper ballot

   c) Instruct voter to proceed to scanner after marking and to scan ballot.

5) Scanner worker retrieves ballot-marking pen, sanitizes and returns to Poll Pad worker.

2

# EMERGENCY ACTION PLAN

## What to Do If…

### ❖ Poll Pads are completely inoperable and you cannot check-in voters:

1) Set up:

   a) Greeters Station with Voter Certificates: Before voters check-in, all voters must complete and sign a voter certificate.

   b) Two check-in workers, with:
   - Paper Precinct list
   - Writing pens
   - Rulers
   - Numbered Lists

   c) Place one or two workers near check-in, establishing a ballot table containing:
   - Ballots organized by Party & District Combo
   - Voter Certificate Binders
   - Ballot pens

2) Ballot station worker verifies the number of ballots is the number on the Emergency Ballot Recap and signs under the "verified by" field. At Closing, complete the Recap.

3) Check-in worker reviews ID and records ID type on voter certificate. Worker checks for voter signature and initials the Certificate.

4) Use paper precinct list to find voter name

   a) If voter is marked "AB" on the list, complete a Request for Authorization form and call Poll Manager to escort voter to Provisional Station with Request for Authorization and Certificate.

   b) Write "REP", "DEM" or "NP" (if Primary) or "EL" (if Election) in EL column or RO column (if Runoff), depending on whether this is the original primary/election or if it is the runoff.

   c) Use ruler to underline from EL or RO column through to Address column.

   d) Record Precinct, Party (if Primary) & District Combo on top right corner of voter certificate.

   e) Write voter's name on the appropriate Numbered List of Voters (by Party if Primary)

   f) Pass voter certificate to worker at ballot table and ask voter to step to that station.

# EMERGENCY ACTION PLAN

## ❖ **Poll Pads are completely inoperable (continued):**

5) Ballot table worker selects appropriate ballot by Party (if Primary) & District Combo

   a) Tear ballot from stub, record the stub number on the Voter Certificate

   b) If a pad of ballots is completely used, place ballot stubs into Ballot Stub Ziploc. After emergency balloting is completed, tear off the used stubs and place in the Ballot Stub Ziploc.

   c) Give ballot and ballot pen to the voter

   d) Direct voter to Review Station privacy screens or voting booth to mark paper ballot

   e) Instruct voter to proceed to scanner after marking ballot and to scan ballot.

   f) Put completed voter certificate into voter certificate binder and number sequentially on the back to keep track of certificates in the binder. Return completed voter certificates in the Voter Certificate Ziploc.

6) Scanner worker retrieves ballot-marking pen, sanitizes and returns to Ballot worker.

E
X
H
I
B
I
T

14

**Nakamura Exhibit 14:**
MVP Screenshots showing missing votes for June 2020 and August 2020 Elections



E
X
H
I
B
I
T

15

**Nakamura Exhibit 15:**
Press release on the Scrutineers/CGG joint 'Accurate Uploads' project



**MEDIA ADVISORY**

For Immediate Release

December 5, 2022

For more information, contact:
Marilyn Marks, Coalition for Good Governance
704-292-9802
Marilyn@uscgg.org

Jeanne Dufort, Coalition for Good Governance
(706) 343-8006

Emily Levy, Scrutineers
(408) 827-5242
Media.team@Scrutineers.org

**ELECTION WATCHDOG GROUPS LAUNCH EFFORT TO ENSURE EACH PRECINCT'S VOTES ARE COUNTED ONCE AND ONLY ONCE IN SENATE RUNOFF**

*Nonpartisan election transparency advocates aim to build voter confidence by ensuring errors similar to the missing memory card in the midterms in Cobb County are quickly detected and counties are alerted*

ATLANTA, GEORGIA – While election workers in each of Georgia's 159 counties process election results for tomorrow's Senate runoff election, two nonpartisan groups focused on fair and transparent elections will be checking the numbers for apparent anomalies in real time. Recent discoveries of precincts whose votes weren't all counted, such as in Cobb County in the November 8 election and in DeKalb County in the May 24 primary, have brought attention to the need for additional real-time checks on the voting system pre-certification reporting.

Scrutineers.org and Coalition for Good Governance are teaming up for this project, which they say will reveal very quickly whether significant numbers of votes from any precincts have failed to upload properly, have been double-counted, or show irregularities.

"We know that county election workers are doing their best under very difficult conditions," says Scrutineers Executive Director Emily Levy. "Unfortunately, the computers aggregating votes from the precincts don't always alert the operator if an inserted memory card cannot be read. It's also easy to overlook missing precinct memory cards in the rush of election night."