# EXHIBIT 51

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*,                       :
                                               :
      Plaintiffs,                        :
                                               :
v.                                             :          CIVIL ACTION NO.
                                               :          1:17-cv-2989-AT
BRAD RAFFENSPERGER, *et al.*,                  :
                                               :
      Defendants.                        :

## **ORDER**

During the pendency of this lawsuit and following the 2018 gubernatorial general election, the Georgia Legislature enacted legislation requiring the Secretary of State to implement a new voting system that includes a voter-verifiable paper record.  In addition to their original claims aimed at the State's former electronic voting machines, Plaintiffs' newly amended claims challenge the ballot marking device system chosen by the Secretary of State which tabulates votes using an encrypted 2D barcode that Plaintiffs allege cannot be voter-verified. The State Defendants' Motion to Dismiss Curling Plaintiffs' Third Amended Complaint and Coalition Plaintiffs' First Supplemental Complaint [Doc. 645] is now pending before the Court.[1]

---

[1]  After the Court granted Plaintiffs leave to file amended complaints, both  the Coalition's First Supplemental Complaint (Doc. 628) and the Curling Plaintiffs' Third Amended Complaint (Doc. 627) were filed on October 15, 2019.

and general elections; (3) the Court also has prohibited the State's use of "the GEMS/DRE system in conducting elections after 2019;" and (4) the State has decertified the DREs and has collected and stored them in a suitable facility in a fiscally prudent manner for testing of a sample and future disposal per the parties' agreement and the Court's approval.[10]  (*See* Consent Order on Storage of DREs, Doc. 745) (addressing storage, testing of DRE memory cards and/or DRE Recap Sheets for purposes of identifying a sample of DRE machines to evaluate for assessment of electronic hacking/access issues in dispute).

Defendants are correct that all of this precludes the possibility of the DRE machines being used again in Georgia elections.[11]  And the Court has indicated that it does not intend to grant any further relief relating to the use of the old DRE voting machines.  But Plaintiffs' original claims challenged elements of the voting system beyond the DRE voting machines themselves.  As highlighted extensively in this Court's prior orders, Plaintiffs' claims encompassed the security of the Secretary of State's election technology infrastructure and the actual breach of the Center for Election Systems ("CES") servers, computer networks, and data and the State's electronic voter registration system and database.[12]  These concerns were at

---

[10] The Court recognizes that at the time this Order is being issued, both the 2020 Presidential Preference Primary and Georgia's Statewide Primary elections (pre-runoffs) have been conducted on the BMD system and DREs are no longer being used for any elections.

[11] At the time when Plaintiffs' amended complaints were filed and these motions were being briefed in 2019, DREs were still being used to conduct a small number of local elections and runoffs.

[12]  Given the State's strong desire to protect the total confidentiality of its central GEMS server, the Court has authorized discovery of a sample of DRE voting machines, pursuant to Consent Order, to allow Plaintiffs' access to potentially relevant evidence in connection with these security, breach, and data integrity claims.

the center of the Court's consideration in ordering relief in August 2019 and remain a focus of this case even as the State implements the BMDs in connection with multiple other components and the State's main election system server.  Plaintiffs allege in their amended/supplemental complaints that elements of the former system, including the voter registration database, will carry over into the new election system.  And as this Court noted in its August 15, 2019 Order:

> The voter registration database, containing millions of Georgia voters' personal identifying information, plays a vital role in the proper functioning of the voting system. Yet it has been open to access, alteration, and likely some degree of virus and malware infection for years, whether in connection with: CES/KSU's handling of the system and data and failure to address these circumstances upon transfer of CES's functions back to the SOS; failure to remediate the database, software and data system flaws and deficiencies; or exposure of the widespread access to passwords to the voter registration data system throughout the SOS, CES/KSU, the 159 counties, or the public via the virtual open portal maintained at CES/KSU.  Most significantly, the programming and use of ballots in both the DRE and future Dominion BMD system is tied to the accuracy of voter precinct and address information.   Inaccuracy in this voter information thus triggers obstacles in the voting process.  New Dominion express poll machines bought as part of the new contract with Dominion cannot alone cleanse the voter database to be transferred and relied upon.

(August 15, 2019 Order, Doc. 579 at 88-89.)

Defendants admit that the voter registration database (ENET), which is used by county registrars to maintain and update voter registration records is not being replaced and that information from this system will be loaded into the new electronic pollbooks for each election.  (Defs.' Mot. at 11, n. 14; *see also* Dec. 6, 2019 Tr. at 11) (explaining that the ENET system "used to program ExpressPoll check-in units for the GEMS/DRE system" is "not being replaced" and that "[t]he same

database and same data, a flat text file, will be used to populate the Poll Pads").
They contend that the information is not electronically transmitted, and therefore
cannot corrupt the new pollbook system, because only a flat text file from ENET
(that will be run through a security scan) will be loaded into the pollpads for use
during elections.  Defendants offer nothing, however, to show that any action has
been taken in response to issues experienced by voters in November 2018 (and
prior elections or allegedly, during more recent elections) to ensure that the
information from ENET is reliable, accurate, and updated.  Due to the volume of
evidence of voter issues at the polls detailed in the Court's August 2019 Order,
Plaintiffs' allegations that errors and deficiencies in the voter registration system
and database are likely to carry over into the new system and cause another round
of voter disenfranchisement are plausible and remain a material concern.  And of
course, Defendants' motion is not being decided in a vacuum.  As the Court is aware
from the evidence presented in the context of the Plaintiffs' prior preliminary
injunction motions, Defendants' contentions that the other two voter registration
systems, the My Voter Page (MVP) and the Online Voter Registration system, do
not interface with ENET are challenged by Plaintiffs. Plaintiffs have offered
testimony of cybersecurity experts to rebut the State's assertions.[13]  Clearly, to the

---

[13] Plaintiffs presented evidence that the State's technology failures (whether caused by malicious
interference, out of date software, or even human error by county registrars in failing to update
voter registration information) have resulted in voter disruption and have potentially been left
unremediated. Numerous declarations from voters highlighted instances where a voter's
registration status on MVP, the "outward-facing system used to provide information to voters"
did not match the voter registration status in the electronic pollbooks used to check in voters at
the voting polls. At the December 6, 2019 hearing, counsel for the State explained it this way: "The
My Voter page is a snapshot of the ENet database at a particular point in time. So it is a read only.

extent that the Court views the MVP system as part of the Plaintiffs' continuing challenge, the State's position on the MVP interface issue conflicts with this evidence provided to date.

Although O.C.G.A. § 21-2-221.2 (f) requires that "the Secretary of State shall employ security measures to ensure the accuracy and integrity of voter registration applications submitted electronically," the Plaintiffs have demonstrated a detailed account of the Secretary of State's deficient security practices in Georgia's pre-2020 elections.  The Court therefore required the State Defendants to develop procedures and take other actions to address the significant deficiencies in the voter registration database and the implementation of the ExpressPoll system.

It is unclear what actions, if any, the State has undertaken to address these deficiencies in the electronic pollbooks and MVP voter registration interface or new versions of such in advance of June 2020 elections or the elections to be held in August and November 2020.  While the Court at this juncture has only preliminary evidence in the record before it that addresses these claims in their current form, the Court notes that alleged significant problems relating to the express pollbooks were reported by the media during the June 2020 election cycle. The Court makes no findings whatsoever based on this reporting, but simply finds

---

A voter can look up their information. But if they click to say I want to change something, they are taken to the online voter registration system. That system will then send information to the county registrars that they are then able to say we're not going to put this in or will put this in. So it is not like a voter is able to actively edit the ENet database themselves. They have to do that – all of those systems will remain in place, the ENet system, the My Voter page, the online voter registration. None of those systems are changing with the adoption of the new voting system for the election process." (December 6, 2019 Tr., Doc. 679 at 12-13.)

that given the body of evidence originally presented and presented in connection with Plaintiffs' newest amended complaints, the Plaintiffs' claims relating to continuing, critical deficiencies in the MVP and voter registration system and electronic pollbooks are, at very least, plausible and not moot. Similarly, in the absence of evidence of the Secretary of State's progress or timeline for enactment or measures to address Plaintiffs' claims for relief regarding the deficiencies in the voter registration database relied on as the foundation of the voting system, the Court cannot find that these registration related claims are moot. *See Fanin v. United States Department of Veterans Affairs*, 572 F.3d 868, 876 (11th Cir. 2009) (finding that the plaintiff's case was not moot because there was "a wide gulf between the [defendant] being 'in the process' of implementing new procedures and it having those new procedures fully in place"). Thus, the Court cannot say that Plaintiffs' allegations have an insufficient basis or are sheerly speculative given this record.

Accordingly, although the portion of Plaintiffs' claims challenging the DRE voting machines themselves may for all practical purposes be moot because the DREs have been barred from use past 2019 as explained above, these other aspects of Plaintiffs' claims are not.[14] Nor would Plaintiffs' claims relating to the handing

---

[14] This Court has twice indicated its view that Plaintiffs' original claims challenging the constitutionality of the DRE/GEMS voting system were not moot as a result of the passage of Act No. 24/H.B. 316. First, in April 2019 (and before the DREs were enjoined for use past 2019), the Court noted that because the DREs were still being used for elections in 2019, the claims were still very much alive at that time. Indeed, the Court ordered substantive preliminary injunctive relief on those claims in its August 2019 Order. Second, the Court noted in November 2019 that "[w]hile the Court finds that discovery relating to the DREs and GEMS systems is not necessary to the Court's resolution of the Plaintiffs' claims based on the current posture of the case, the Court does

of security of the current voting system be moot to the extent that evidence is introduced linking this to prior security issues and breaches.

### B.   Plaintiffs' Claims Are Not Barred by Eleventh Amendment Immunity

State Defendants have renewed their argument that Plaintiffs' claims are barred by the Eleventh Amendment.  Implicitly recognizing the failure of their first attempt at an Eleventh Amendment defense, Defendants assert that "Plaintiffs' Complaints raise different Eleventh Amendment questions than those the Court previously addressed."  (Mot., Doc. 645-1 at 15.) They argue that the Eleventh Amendment bars claims in the amended/supplemental complaints because Plaintiffs' requested relief: (1) seeks redress of *past* harm; (2) is drastically different and more comprehensive than before; and (3) impermissibly seeks removal of the State's constitutional authority to oversee the details of elections. These are the exact arguments previously raised by the State in connection with Plaintiffs' claims challenging the DREs and rejected by both this Court and the Eleventh Circuit on appeal.

---

not agree with the State Defendants' characterization of Plaintiffs' claims as being entirely moot. The State has declined to concede that it will not seek to appeal the Court's August 15, 2019 injunction order upon entry of a judgment in the case. The State has further declined to agree to stipulate to the conversion of the Court's order as a permanent injunction. As such, Plaintiffs' claims challenging the DRE/GEMS election system are not legally moot." (November 22, 2019 Ord., Doc. 668 at 2-3.)

### (i) Curling Plaintiffs' claim for declaratory relief regarding DREs

State Defendants assert that "in Counts I and II of their Amended Complaint, Curling Plaintiffs *still* seek *retrospective* declaratory relief regarding use of the 'DRE Voting System' in the 'Relevant Previous Elections,'" and that the Eleventh Amendment bars such claims for retrospective relief.  (Mot., Doc. 645-1 at 16) (citing Pls.' Third Am. Compl., Doc. 627 ¶¶ 98(a), 110, 112(a)). Defendants' argument is misplaced, mischaracterizes Plaintiffs' allegations in Counts I and II, is contrary to the Eleventh Circuit's decision on appeal, and ignores the aspects of Plaintiffs' claims that challenge elements of the voting system that persist despite the passage of HB 316 as discussed above.

First, the Curling Plaintiffs are not *reasserting* claims challenging the DREs. Rather, the Curling Plaintiffs filed a Third Amended Complaint to add claims challenging the BMDs to their existing claims from the Second Amended Complaint.[15]  While Plaintiffs have not omitted their prior allegations and claims regarding the DREs, the Court does not view the Curling Plaintiffs' retention of these allegations that form the basis of relief already granted as seeking any new or additional relief regarding the defunct DRE voting machines.

Second, Defendants mischaracterize Plaintiffs' allegations as seeking relief related to past elections.  When the Third Amended Complaint was filed, and when

---

[15] Rather, the purpose of the amended complaint was to "adds claims related to GA SOS's proposed implementation of a voting system relying on ballot-marking devices ("BMDs") that produce a 2D barcode scanned for tabulation, along with a written summary of a voter's selections," and to "update[] the named defendants based on resignations and subsequent elections, and updates the factual assertions to reflect the passage of time."  (Pls.' Mot. for Leave, Doc. 581 at 2.)

Defendants filed their Motion to Dismiss, elections were still being conducted on DREs, including a runoff in December 2019.  Although the complaint details deficiencies in the State's DRE/GEMS voting system in prior elections that resulted in alleged denial of the Plaintiffs' constitutional rights that form the basis of the claims, the complaint further alleges continuing violations as a result of the State's choice to continue using DREs in elections through the end of 2019 until such time as the BMDs are fully implemented.  Therefore, at the time it was filed the Curling Plaintiffs' claims in Counts I and II sought relief for future elections in 2019.

Third, the State's recycled arguments were already rejected by the Eleventh Circuit in its decision on the State Defendants' appeal of the denial of their earlier motion to dismiss.  The Eleventh Circuit held that Plaintiffs' claims fell squarely within the *Ex parte Young* exception to Eleventh Amendment immunity because Plaintiffs alleged ongoing violations of federal law against the State Defendants in their official capacities and sought only declaratory relief and an injunction against enforcing the election system in future elections and that the State's arguments to the contrary ran "counter to the complaints' allegations and settled precedent." *Curling v. Secretary of Georgia*, 761 F. App'x 927, 932 (11th Cir. 2019) ("Here, there is no question that, like the plaintiffs in *Grizzle*, Plaintiffs seek only an injunction barring the State Defendants from enforcing election rules that allegedly violate Plaintiffs' constitutional rights. Since they allege those rules will violate their constitutional rights in the future, they have satisfied *Ex parte Young's*

exception.") (citing *Grizzle v. Kemp*, 634 F.3d 1314, 1317–19 (11th Cir. 2011) (holding that claims of plaintiffs challenging constitutionality of a Georgia election law by seeking to enjoin the Secretary of State and members of the State Election Board from enforcing the law in upcoming elections the way they had in past elections sought "prospective injunctive relief" and fell within the *Ex parte Young* exception to Eleventh Amendment immunity).

Most important, the Court has already granted the relief requested in the form of a preliminary injunction and found that Plaintiffs had shown a substantial likelihood of success on the merits of their claims that the State's DRE/GEMS voting system violated the constitutional rights of Plaintiffs and other Georgia voters and has enjoined the use of DREs in elections after 2019. The State is not immune from those claims just because they are based on evidence of past wrongdoing and harm. The Eleventh Circuit rejected the State's argument that Plaintiffs only sought relief for past harms because "Plaintiffs seek to succeed in showing the unreliability (and thus unconstitutionality) of the DRE machines in past elections), explaining "Plaintiffs use these allegations only to show that past is prologue to their future injuries caused by the same election system." *Id.* (citing *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984) ("Past wrongs do constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction.")).

Defendants rely on *Green v. Mansour* to support their argument that they are immune because that the State's statutory changes have eliminated any alleged

28

ongoing violation of constitutional rights based on the DRE System. *Green v. Mansour,* 474 U.S. 64, 68 (1985).[16]  As explained above, because Plaintiffs' claims challenge as unconstitutional other aspects of the voting system (apart from the DREs machines) that will allegedly continue and seek prospective relief in future elections from such harm, these claims *still* fall within the *Ex parte Young* exception.  Therefore, *Green* is inapplicable.[17]

---

[16] In *Green*, the plaintiffs conceded on appeal that any claim they might have had for the specific type of injunctive relief approved in *Ex parte Young* was rendered moot by the amendments to the program under which plaintiffs sought benefits. They nevertheless sought "notice relief" and and a declaration that the defendant's prior conduct violated federal law, arguing that notice is an independent form of prospective relief protected against the Eleventh Amendment bar by *Ex parte Young*.  474 U.S. at 68.  The Supreme Court held that "[b]ecause 'notice relief' is not the type of remedy designed to prevent ongoing violations of federal law, the Eleventh Amendment limitation on the Art. III power of federal courts prevents them from ordering it as an independent form of relief." *Id.* at 71.  Therefore, "a request for a limited notice order will escape the Eleventh Amendment bar if the notice is ancillary to the grant of some other appropriate relief that can be 'noticed.' Because there is no continuing violation of federal law to enjoin in this case, an injunction is not available. Therefore, notice cannot be justified as a mere case-management device that is ancillary to a judgment awarding valid prospective relief." *Id.* at 72.

[17] Defendants also incorrectly assert that Plaintiffs are seeking relief that would only indirectly encourage compliance with federal law through deterrence which is "insufficient to overcome the dictates of the Eleventh Amendment," citing *Fla. Ass'n of Rehabilitation Facilities, Inc. v. State of Fla. Dep't of Health and Rehabilitative Svcs.*, 225 F.3d 1208, 1219 (11th Cir. 2000). (*See* Defs.' Mot. at 16). In that case, the Eleventh Circuit explained that "Plaintiffs' suit originally fell within the *Ex parte Young* exception. Their suit was directed against state officials in their official capacities and asked for prospective injunctive relief to halt continuing violations of federal law. Plaintiffs are not barred by the Eleventh Amendment from seeking enforcement, in a federal court, of a federal statute which state agents have violated. Defendants, in fact, do not argue that Plaintiffs' suit was barred from the outset. Instead, they make a more focused argument that much of the relief ordered by the district court is retrospective rather than prospective. They assert that, to the extent the district court directed them to make changes to the State's Boren-era reimbursement plan retroactive to September 4, 1991, it essentially required them to redress inequities in their past reimbursement payments from 1991 to the date of final judgment (April 1999), and potentially to reimburse Plaintiffs for those past deficiencies. We reluctantly agree." *Id.* at 1220.  The Eleventh Circuit held that the Defendants were entitled to immunity because although "the Eleventh Amendment does not generally prohibit suits against state officials in federal court seeking only prospective injunctive or declaratory relief, but bars suits seeking retrospective relief such as restitution or damages" and if "the prospective relief sought is "measured in terms of a monetary loss resulting from a past breach of a legal duty," it is the functional equivalent of money damages and *Ex parte Young* does not apply." *Id.*  Plaintiffs' claims here challenging the constitutionality of the State's election system have nothing to do with reimbursement or restitution for monetary damages.  And Plaintiffs do not simply seek indirect

to the challenged action of the defendant; and it must be likely that a
favorable judicial decision will prevent or redress the injury.

*Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (citing *Friends of Earth,
Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180–181
(2000).  The requirement that a plaintiff demonstrate standing "assures that there
is a real need to exercise the power of judicial review in order to protect the
interests of the complaining party." *Id.* (internal citations omitted).

"Foremost among these requirements is injury in fact – a plaintiff's pleading
and proof that he has suffered the invasion of a legally protected interest that is
concrete and particularized, i.e., which affects the plaintiff in a personal and
individual way." *Gill v. Whitford*, --- U.S. ----, 138 S. Ct. 1916, 1929 (2018) (quoting
*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, and n. 1 (1992)) (internal
quotation marks omitted).  The Supreme Court has "long recognized that a
person's right to vote is 'individual and personal in nature.'" *Gill*, 138 S. Ct. at 1929
(quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). "Thus, 'voters who allege
facts showing disadvantage to themselves as individuals have standing to sue' to
remedy that disadvantage." *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)).
The Eleventh Circuit recently held in *Jacobson v. Florida Sec'y of State* that
although "voters have no judicially enforceable interest in the *outcome* of an
election," they do "have an interest in their ability to vote and in their vote being
given the same weight as any other."  957 F.3d 1193, 1202 (11th Cir. 2020)
(emphasis in original).  "A plaintiff need not have the franchise wholly denied to

suffer injury. Any concrete, particularized, non-hypothetical injury to a legally protected interest is sufficient." *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009).

At the pleading stage, the plaintiff is only required to provide "general factual allegations of injury." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). "[H]owever, those allegations must nevertheless contain sufficient detail for the Court to determine that plaintiffs 'have made factual averments sufficient, if true, to demonstrate injury in fact.'" *Summers*, 555 U.S. at 493 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982) ("extreme generality" of allegations insufficient to demonstrate standing)). In a case like this one, where a plaintiff seeks declaratory or injunctive relief, as opposed to damages for injuries already suffered, "the injury-in-fact requirement insists that a plaintiff 'allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future.'" *Strickland v. Alexander*, 772 F.3d 876, 883 (11th Cir. 2014) (quoting *Malowney v. Fed. Collection Deposit Grp.*, 193 F.3d 1342, 1346 (11th Cir. 1999)). In ruling on a motion to dismiss for lack of standing, the court must accept as true all material allegations of the complaint and construe them in the Plaintiffs' favor. *Warth v. Seldin*, 422 U.S. 501-02 (citations omitted). At the same time, it is within the court's power to consider by affidavits further particularized allegations of fact deemed supportive of plaintiff's standing to determine whether the plaintiff's standing adequately appears from all materials of record. *Id.* Here, the Court is able to refer both to the Amended Complaints and a host of expert and other

affidavits in connection with Plaintiffs' Motions for Preliminary Injunction relating to the additional claims asserted in their Amended Complaints. The Court also can draw on its knowledge of the record in the case as context. The question of whether the Plaintiffs ultimately will prevail on the merits of their asserted claims is not the question before the Court in assessing standing.

As to injury in fact, Defendants contend that Plaintiffs are attempting to bootstrap their way into standing for their BMD allegations by relying on their previous claims about DREs. Defendants also contend that Plaintiffs have not sufficiently alleged a concrete "injury in fact" because they "fail to allege that they are under threat of suffering a prospective injury that is '<u>real</u> and <u>immediate</u>' regarding Georgia's new BMD voting system." (Mot. at 25) (emphasis in original). Specifically, Defendants assert that Plaintiffs' allegations of generalized fear that malicious activity might occur is insufficient to confer standing:

> Plaintiffs allege that that the BMDs "remain susceptible to manipulation," are "vulnerable to intentional [and] unintentional forms of manipulation," and that these vulnerabilities "could cause" BMDs to malfunction or improperly tabulate votes. *Id.* In sum, Plaintiffs' injury allegations are that: (1) a malicious hacker *might* hack BMDs; (2) voters *might* not review the ballot; (3) the optical-scan unit *might* incorrectly count votes; (4) post-election audits of the ballot or an election challenge *might* not catch any errors.

(*Id.* at 26.) Defendants also argue that "Plaintiffs have complete control over whether they are 'injured' because they can review their selections on their BMD-marked paper ballot." (*Id.*)

These arguments mischaracterize the alleged injury.  While voting security issues obviously form an important context surrounding the operation of elections and vote counts, the injury Plaintiffs allege is that they will be required to cast a ballot that cannot be read or verified as reflecting their actual choices because the votes are tabulated solely from an encrypted barcode that is not human readable. This injury is not speculative; it is "certainly impending," since Plaintiffs intend to vote in person in each upcoming election in Georgia.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

Contrary to Defendants' characterizations, Plaintiffs' allegations are not *solely* premised on a theoretical and hypothetical possibility that the new BMD voting system might be hacked or improperly accessed and manipulated.[20] Defendants' motion focuses exclusively on allegations about security vulnerabilities and the potential for hacking, which they claim only implicates injuries that will be legally caused by nefarious third parties, instead of by the State. The State does not address Plaintiffs' other allegations, which assert that the operation of the Dominion BMD System *as designed* will injure in-person voters by depriving them of their fundamental right to cast a verifiable vote and have *that* vote counted, and their right to be treated equally with similarly situated absentee

---

[20] According to the Curling Plaintiffs, the BMD claims are legally identical to the DRE-related claims that this Court previously ruled Plaintiffs have standing to pursue, and no new facts should materially alter the Court's standing analysis here.  (Curling Pls.' Resp., Doc. 651 at 18.) To be sure though, the posture of Plaintiffs' BMD claims is markedly different from the claims regarding DREs.

voters.[21]  (Coalition Pls.' Compl. ¶¶ 99–120, 129; Curling Pls.' Compl. ¶¶ 70-90.)[22]
Defendants ignore the fundamental basis of Plaintiffs' claims – the allegation that
the Dominion system ballot scanner only tabulates votes from the encrypted
barcode that is indecipherable to the human eye.

Plaintiffs allege that the BMD system's reliance on a BMD generated
condensed summary of voter electoral choices in tandem with ballot counting
based on an unverified barcode does not provide a means by which completed
ballots can be accurately counted, tested, or verified, thereby depriving or

---

[21] Plaintiffs each also assert equal protection violations based on allegations that by planning to
allow electors to vote using two different methods, the unverifiable BMD system and paper ballots
available to provisional and absentee voters that are verifiable and recountable, they are being
subject to unequal treatment.  (Doc. 627 ¶¶ 124, 129) ("The voters of the respective ballots have
not been treated equally in that the votes of those who will vote using the Proposed Election
System cannot be meaningfully recounted, reviewed against an independent record to verify, or
have discrepancies detected and corrected. These votes are unequally weighted, with greater
weight given to those who vote by absentee paper ballot, whose votes can be verified as to voter
intent, can be accurately recounted, and can have processing errors identified and corrected, while
votes cast under the Proposed Election System, whose votes do not share those essential
advantages."); (Doc. 628 ¶ 145) ("The Dominion BMD System deprives in-person voters of the
right to have their official votes audited that other voters enjoy."); (*Id.* ¶ 231) ("Voters who are
similarly situated in all respects but who instead cast their votes on mailed paper ballots in the
same election will be treated differently and will suffer none of the foregoing burdens, risks, and
harms, including the inability to read and verify the votes they cast.")  The fact that an individual
Plaintiff could choose to vote by absentee ballot rather than voting in person using a BMD in order
to cast a ballot that is verifiable and auditable does not diminish standing to assert an equal
protection claim here. As Plaintiffs have alleged, voting by absentee ballot carries its own burdens,
ranging from the minimal cost of postage (without consideration of pandemic conditions) to
severe (the risk that a ballot is rejected for signature mismatch or is lost in the mail and never
received for counting by the elections office).  Because Plaintiffs may have a preference for one
alternative method of voting over another does not destroy their standing to bring a claim
challenging the Defendants' failure to provide uniform procedures for recounts and audits to both
in person and absentee voting. This Court recognized previously that "[t]he right to vote is
protected in more than the initial allocation of the franchise. Equal protection applies as well to
the manner of its exercise. Having once granted the right to vote on equal terms, the State may
not, by later arbitrary and disparate treatment, value one person's vote over that of another." *See
Bush v. Gore*, 531 U.S. 98, 105 (2000) (finding that application of different standards to determine
voter intent in conducting a recount led to the unequal evaluation of ballots).
[22] Coalition Plaintiffs also separately allege that BMDs infringe their right to vote using a secret
ballot. (Coaltion Pls.' Compl. ¶¶ 39–41, 121–28.)

burdening their voting franchise rights.  (Curling Pls.' Compl. ¶¶ 71-75, 89-90, 116, 125; Coalition Pls.' Compl. ¶¶ 63, 66, 80, 82, 87, 88, 100, 103, 106, 203, 223; Affidavit of Plaintiffs' Expert Dr. Philip B. Stark at Doc. 680-1[23]).  And because the State has yet to adopt and implement a post-election audit procedure to verify that the barcode tabulations match the human-readable voter selections, voters cannot verify that the votes they cast were the votes that were counted. (Coaltion Pls.' Compl. ¶¶ 130-36, 142-47; Curling Pls.' Compl. ¶¶ 89-90.)

Plaintiffs separately allege, as they did with DREs, that their votes will "likely be improperly counted" under the BMDs system due to security vulnerabilities that have already been identified in the Dominion system and because of the Secretary of State's failure to act to address voting systemic vulnerabilities in its existing IT infrastructure.  Plaintiffs challenge the State Defendants' implementation of a barcode-based system with known and demonstrated vulnerabilities contrary to the recommendations of voting system experts that is incapable of being properly audited.  These include: (i) the State of Texas's refusal in February 2019 to certify Dominion's election management system based upon several problems with the software, (ii) the 2019 DEFCON Voting Village Report that found twenty vulnerabilities in a Dominion BMD system similar to the one being employed in Georgia, (iii) the National Academy of Sciences warning that BMDs that print only

---

[23] Dr. Stark's affidavit discusses, among other things, the various reasons why "there is no way to establish that the BMD printout is a trustworthy record of what the BMD displayed to the voter or what the voter expressed to the BMD."  (Doc. 680-1 at 4.)  His affidavit addresses in turn why this makes a trustworthy, accurate full recount or audit of VMD votes cast not possible.

selections with abbreviated names/descriptions of the contests are virtually unusable for verifying voter intent, (iv) the opinion of the State's own retained expert, Dr. Shamos, that if a BMD is going to be used, the more reliable approach is to use a BMD that produces a ballot readable by a human voter, rather than a barcode, and (v) the Secretary of State's failure to remedy compromises in its current voter registration and internal IT systems.  (Curling Pls.' Compl. ¶¶ 75-88; *see also* Coalition Pls.' Compl. ¶¶ 135, 176-186.)   In sum, Plaintiffs allege that despite the fact that cybersecurity experts and government officials recommended a voting system that included a voter-verified paper trail, Georgia's BMD System will rely on a non-voter-verified barcode as the elector's actual vote.[24] (Curling Pls. Compl. ¶¶ 74-75; *see also* Coalition Pls.' Compl. ¶¶ 164-175.)

Accordingly, the Court finds that Plaintiffs' allegations of the threat of imminent harm are sufficient at this stage of the proceedings to establish injury to their constitutional rights and demonstrate standing to proceed on their asserted claims.

Turning to the second standing element, "to satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Jacobson v. Florida Sec'y of State*, 957 F.3d

---

[24] Although Plaintiffs' Complaints can be read as a criticism of the State of Georgia's selection of the BMD voting system over a hand-marked paper ballot system, the Court does not view Plaintiffs' claims as challenging the legislature's passage of HB 316 itself as unconstitutional. Rather, the Court views Plaintiffs as challenging the Secretary of State's implementation of a barcode-based BMD system for the reasons discussed herein.

1193, 1207 (11th Cir. 2020) (quoting *Lujan*, 504 U.S. at 560 (alterations adopted)). Defendants assert that to the extent any injuries arise, they are the result of third-party actions, not the actions of the State Defendants because "[t]he theoretical hacking, potential auditing issues, and hypothetical bar-code problems could be traced either to illegal hacking by third parties; improper conduct by election officials; or voters' failures to verify their paper ballots – not the State of Georgia's implementation of BMDs." (Mot. at 27-28.)  Defendants have essentially recycled the same argument (with the exception of blaming the voters themselves) previously raised in connection with Plaintiffs' DRE claims.  The same reasoning applies to reject this argument now.

Again, Plaintiffs' injury stems from Defendants' implementation of an alleged unconstitutional voting system that is subject to the same demonstrated vulnerabilities as the DREs and that is not a voter-verifiable and auditable paper ballot system.  Pursuant to H.B. 316 mandating the statewide use of "electronic ballot markers [that] shall produce paper ballots which are marked with the elector's choices in a format readable by the elector," Georgia's new Election Code placed the responsibility of selecting the equipment for the new voting system with the Secretary of State.  *See* O.C.G.A. § 21–2–300(a).  The law expressly requires that the "equipment used for casting and counting votes in county, state, and federal elections shall be the same in each county of this state and shall be ***provided to each county by the state, as determined by the Secretary of State***." O.C.G.A. § 21–2–300(a)(1) (emphasis added).  The Election Code

further requires the Secretary of State to certify the new BMD voting system as "safe and practicable for use" in compliance with the Rules of the Georgia State Election Board prior to authorizing its implementation in state, federal, and county elections in the State.  O.C.G.A. § 21–2–300(a)(2); *see also* Ga. Comp. R. & Reg. r. 590–8–1–.01(d).  The Election Code also tasks the Georgia State Election Board with promulgating rules and regulations governing audit procedures and requires that "[t]he procedures prescribed by the State Election Board shall include security procedures to ensure that collection of validly cast ballots is complete, accurate, and trustworthy throughout the audit."  O.C.G.A. § 21-2-498(b)&(d).

Plaintiffs challenge the actions of the Secretary of State and the State Election Board, not some potential absent third party hackers.  Plaintiffs allege that State Defendants ignored the recommendations of election security experts to ensure that a proper audit regime was in place to verify the State's voting machine election results.  And Plaintiffs allege that in implementing a mandatory statewide electronic barcode-based voting system without current or sufficient audit protocols in place in upcoming elections, Defendants are requiring Plaintiffs to exercise their right to vote using a system incapable of producing verifiable results. (*See, e.g.,* Curling Pls.' Compl. ¶¶ 89-90, 117; Coalition Pls.' Compl. ¶¶ 130, 135, 137, 145-47.) They also allege that the Secretary of State's failure to act to address the security and reliability vulnerabilities in its voting data systems and infrastructure over a sustained period of time continues to pose threats in implementation of the new BMD system.  (Curling Pls.' Compl. ¶¶ 34-90; Coalition

Pls.' Compl. ¶¶ 176-186.)  The Coalition Plaintiffs further allege that the Secretary of State failed to properly certify the new BMD machines as required under HB 316 prior to their use in Georgia elections, and failed to test "whether the operation of the system would permit valid auditing of the results."  (Coalition Pls.' Compl. ¶¶ 155-63.)  At the motion to dismiss stage, these allegations are sufficient to show a causal connection, even if arguably indirectly, between Defendants' implementation of the BMD system and the injury to Plaintiffs' constitutional rights.  *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003) ("[E]ven harms that flow indirectly from the action in question can be said to be 'fairly traceable' to that action . . . ."); *Lewis v. Governor of Alab*ama, 944 F.3d 1287, 1301 (11th Cir. 2019) ("it must be the effect of the court's judgment on the defendant" – not an absent third party – "that redresses the plaintiff's injury, whether directly or indirectly").

Finally, State Defendants argue that "Plaintiffs also cannot show redressability, because the same concerns allegedly associated with BMDs (lack of audits, hacking, and interference from election officials) are present in Plaintiffs' requested relief" of hand marked paper ballots. (Mot. at 37).  As this Court previously indicated in its September 15, 2019 Order rejecting Defendants' argument that Plaintiffs' claims are not redressable because "no election system is flawless," this is not the standard for redressability.  *Curling*, 334 F. Supp. 3d at 1318. Plaintiffs are seeking relief to address a particular voting system which they allege, as designed *or as implemented by Defendants*, burdens Plaintiffs' capacity

to cast votes that are actually properly counted and fails to produce a voter-verifiable auditable paper trail that is recognized as essential on a national level by election security experts.  "Plaintiffs are not asking for a system impervious to all flaws or glitches." *Id.*  They are seeking to vindicate their right to effectively and reliably cast a verifiable vote reflective of their ballot choices.

In sum, the Court finds that Plaintiffs have sufficiently alleged standing to bring their claims at this juncture.

### D.   Coalition Plaintiffs Have Failed to State a Claim for Procedural Due Process Regarding the BMD Voting System

Defendants moved to dismiss Count III of Coalition Plaintiffs' First Supplemental Complaint[25] because: (i) Coalition Plaintiffs have failed to sufficiently allege the deprivation of a constitutionally protected liberty or property interest, (ii) the complaint does not allege that Plaintiffs have been subjected to inadequate process; and (iii) the availability of a state remedy necessarily prevents Plaintiffs from maintaining a procedural due process claim as a matter of law. Alternatively, Defendants also argue that "even assuming a liberty or property interest existed for a preferred voting system, there is no deprivation of that interest, given the State's no-excuse absentee voting system by hand-marked paper ballots."[26] (Defs.' Mot., Doc. 645 at 21.)

---

[25] The Curling Plaintiffs do not assert a procedural due process claim.  (Curling Resp., Doc. 651 at 29.)

[26] The Court rejected this argument raised in connection with Plaintiffs' substantive due process claims raised in the Defendants' prior motion to dismiss. The Court found that the "choice" between undergoing additional burdens on their right to vote by absentee ballot to avoid having to use unsecure voting machines was itself a burden that Plaintiffs had plausibly alleged subjected

### III.   CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss the Curling Plaintiffs' Third Amended Complaint and the Coalition Plaintiffs' First Supplemental Complaint [Doc. 645]. The Motion to Dismiss is **GRANTED** as to Count V of the Curling Plaintiffs' Third Amended Complaint and Count III of the Coalition Plaintiffs' First Supplemental Complaint and those claims are **DISMISSED WITHOUT PREJUDICE**.  The motion is **DENIED** in all other respects.

The Court **AUTHORIZES** discovery on these claims to begin immediately upon entry of this Order.  Finally, the Court **DIRECTS** Defendants to file a response to Plaintiff's proposal on the scope and schedule for expedited discovery on Monday, August 3, 2020.

**IT IS SO ORDERED** this 30th day of July, 2020.


**Amy Totenberg**
**United States District Judge**