# EXHIBIT 56

Page 1

1          THE UNITED STATES DISTRICT COURT

          FOR THE NORTHERN DISTRICT OF GEORGIA

2                    ATLANTA DIVISION

3    DONNA CURLING, et al.,

4          Plaintiffs,

                              CIVIL ACTION FILE

5      vs.

                              NO. 1:17-CV2989-AT

6    BRAD RAFFENSPERGER, et

     al.,

7

          Defendants.

8    _____

9

10              VIDEOTAPED DEPOSITION OF

11               ANDREW W. APPEL, Ph.D.

12          TAKEN BY REMOTE VIDEOCONFERENCE

13

14               January 27, 2022

15                  7:33 a.m.

16

17

18

19

20

21   REPORTED REMOTELY BY:

22   LAURA R. SINGLE, CCR-B-1343

23

24

25

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 25

1          Q.    And if you'll bear with me here, 4.11 there

2     that you quote in your declaration, it reads:

3     Elections should be conducted with human readable

4     ballots.  These may be marked by hand or by machine

5     using a ballot marking device.  They may be counted

6     by hand or by machine using an optical scanner.

7               Is that correct?

8          A.    That's what it says.

9          Q.    In paragraph 34 there you state:  Our report

10    represents the true scientific consensus not only of

11    the committee itself but also to the best of our

12    ability of the broader scientific community.

13              Do you see that?

14         A.    I see that.

15         Q.    Okay.  And at the time you wrote this

16    declaration, you believed that to be accurate?

17         A.    The scientific consensus at the time I wrote

18    that declaration was in flux.  It certainly

19    represents the true scientific consensus as of June

20    of 2018 when that National Academies report was

21    written.  Since June of 2018, you know, new science

22    developed.

23         Q.    I'm going ask you that question again.

24              At the time you wrote this declaration, was

25    that your opinion that's contained there in paragraph

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 30

1   declaration you're responding to the November 2019

2   declaration of Dr. Gilbert; but in the course of my

3   questions, if you have any reason to doubt me on

4   that, just let me know if you want to take some time

5   to look at it a little further.  Okay?

6        A.   All right.

7        Q.   So if you'll turn with me here to page 6,

8   paragraph 21.

9        A.   All right.

10       Q.   And you see the references to BMDs here,

11  right?

12       A.   Yes.

13       Q.   So if I told you that at this time Georgia

14  was transitioning to the BMD system, do you have any

15  reason to doubt me on that?

16       A.   No.

17       Q.   And you say there in the last sentence of

18  paragraph 21:  The outcomes of elections conducted on

19  current BMDs, therefore, cannot be confirmed by

20  audits.

21            Do you see that?

22       A.   Yes.

23       Q.   And you're quoting out of your paper there,

24  right?

25       A.   Yes.

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

                                                        Page 31

1       Q.    And you still believe that to be the case?

2       A.    Yes.

3       Q.    If you'll flip a couple of pages over here

4    to paragraph 20 -- I'm sorry.  Yes, paragraph 28,

5    page 8.

6       A.    Got it.

7       Q.    Do you see there where you say in paragraph

8    39A:  Professor Gilbert opines that hand-marked paper

9    ballots cannot be audited because some voters might

10   make imperfect marks?

11          Do you see that?

12      A.    Yes.

13      Q.    Okay.  I'm going to mark another exhibit for

14   you here and these two, the one you're looking at now

15   and this next one, we will flip back and forth a

16   decent bit on.

17          (Exhibit 6 was marked for

18          identification, attached at the end of

19          the original transcript.)

20   BY MR. MILLER:

21      Q.    If you'll just let me know when you see that

22   on your end.

23      A.    What number would this exhibit be?

24      Q.    This is going to be Exhibit Number 6.

25      A.    Okay.  I've got it.

Andrew W. Appel , Ph.D.          January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 35

1       accurately have written Professor Gilbert opines

2       that hand-marked paper ballots would lead to a

3       worst case scenario for audits.

4    BY MR. MILLER:

5       Q.    So if you go back to Exhibit 5.

6       A.    All right.

7       Q.    Paragraph 30 is the next page over from

8    where we just were.

9       A.    Yes.

10      Q.    And you say:  He writes ambiguous marks

11   cannot occur on a BMD.  The voter's intent is clear

12   on the ballot summary.

13            Do you see that?

14      A.    Yes.

15      Q.    Do you believe ambiguous marks can occur on

16   a BMD?

17      A.    I believe that ambiguous marks are highly

18   unlikely to occur on a BMD, but that's not at all the

19   same as what the second part of Dr. Gilbert's

20   sentence says that the voter's intent is clear in the

21   ballot summary.  And I definitely disagree with that.

22   So Dr. Gilbert's sentence is written as if those two

23   things are the same thing, but they are very

24   different.

25      Q.    So let's go back to paragraph 39C of

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 36

1    Dr. Gilbert's declaration.  I apologize.

2         A.    39C.

3         Q.    That would be Exhibit 6.

4         A.    Yes.

5         Q.    So that subparagraph reads:  Ambiguous marks

6    cannot occur on a BMD.  The voter's intent is clear

7    in the ballot summary and an auditor will not be

8    asked to interpret voter intent.

9              Right?

10        A.    That's what it reads.

11        Q.    Okay.  So the first part of that sentence,

12   ambiguous marks cannot occur on a BMD, do you

13   disagree with that?

14        A.    I agree that ambiguous marks is generally

15   not a problem with BMDs.  Ambiguous marks can occur

16   but are not necessarily significantly enough for me

17   to disagree with the first seven words of Professor

18   Gilbert's 39C.

19        Q.    Okay.  And ambiguous marks in the sense of,

20   say, on a hand-marked paper ballot at a voter writing

21   an X over the name or crossing out a line, those

22   types of things don't happen on a BMD, right?

23        A.    That's right.

24        Q.    So what type of ambiguous marks are you

25   referring to?

Andrew W. Appel , Ph.D.                January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 37

1          A.    Some BMD's may have printers that don't
2    print very clearly.
3          Q.    So like if a printer is running out of ink,
4    for example?
5          A.    Right; or just a printer is badly adjusted.
6          Q.    Low quality printer?
7          A.    Low quality printer.
8          Q.    Okay.  And in last portion of that sentence,
9    it says:  An auditor will not be asked to interpret
10   voter intent.
11              Do you see that?
12         A.    Yes.
13         Q.    And do you disagree with that statement?
14         A.    No.  I think that statement is -- that part
15   of the statement is generally accurate.
16         Q.    So your quibble here is the voter's intent
17   is clear in the ballot summary; is that right?
18         A.    I think it's more than a quibble.  I think
19   it goes to the heart of this case.
20         Q.    Okay.  I'll rephrase it as your disagreement
21   here.  Would that be accurate?
22         A.    That's right.
23         Q.    Okay.  And can you explain to me why that
24   is?
25         A.    If the BMD is malfunctioning, especially if

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 38

1   it's malfunctioning because it's been hacked to

2   cheat, it may well print on to the ballot summary a

3   candidate selection that completely disagrees with

4   the voter's intent as the voter expressed it in

5   touching the touch screen.  So in that case the

6   voter's intent would be absolutely not clear in the

7   ballot summary.

8       Q.   Got it.

9            So the only time where you disagree with the

10  voter's intent being clear is with respect to a

11  malfunctioning BMD whether because of hacking or

12  other reasons?  Is that accurate?

13      A.   That's right.

14      Q.   Okay.  So let's go back to Exhibit 3, and

15  that would be your July -- the date of June 28, 2021.

16  I apologize.  I will mix those up.  I refer to them

17  as July because that's when they were served to us --

18      A.   Got it.

19      Q.   -- just so -- so if you'll scroll with me to

20  paragraph 12.

21      A.   Got it.

22      Q.   You state there:  I've not been asked to

23  perform a forensic cyber security examination of any

24  specific voting machine.

25            Do you see that?

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 39

1        A.    Yes.

2        Q.    And is that still accurate?

3        A.    Yes.

4        Q.    Have you performed any other type of

5   examination of a specific voting machine for your

6   report in this case?

7        A.    In this case, no.

8        Q.    Okay.  Of course, you've looked at many

9   different voting machines, many different kinds of

10  examinations.  Would that be right?

11       A.    I have performed some examinations of

12  specific voting machines myself, and I have read the

13  scientific literature for detailed descriptions of

14  other examinations of other voting machines, yes.

15       Q.    Okay.  And have you read the scientific --

16  excuse me.  I'm going to strike that.  There's a fire

17  truck passing.  I apologize.

18             Have you read the scientific literature or

19  any other reports as it relates to the Dominion

20  voting machines utilized in Georgia?

21       A.    I've read various things about the Dominion

22  machines, but I have not read a cyber security

23  examination report for those machines.

24       Q.    What kind of things have you read about the

25  machines?

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 40

1      A.    I've read the Dominion literature.  I may

2  have read the independent test lab report.  I may

3  have interviewed people who have used similar types

4  of Dominion machines in other states.

5      Q.    When you say interviewed people, who did you

6  interview?

7      A.    Most recently I talked to a voter in Camden

8  County, New Jersey, who used a similar machine in

9  2019.

10     Q.    Just a general voter you found?

11     A.    She had contacted me because she was

12  interested in Camden County's selection process for

13  voting machines.

14     Q.    Do you recall this person's name?

15     A.    Rena, R-E-N-A, and I can't recall her last

16  name at the moment.

17     Q.    That's okay.

18          So in light of not performing any

19  examination of the machines utilized in Georgia, you

20  don't feel that prevents you from offering your

21  opinions in here; is that right?

22     A.    That's right.

23     Q.    Okay.  And sort of related to the not

24  examining machines, have you examined any other

25  election system adjacent items utilized in Georgia?

Andrew W. Appel , Ph.D.          January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 41

1   And by that I mean items like the voter registration

2   database or the IT infrastructure of the Secretary of

3   State's office?

4        A.   No.

5        Q.   And with respect to specific voting machine,

6   would that include the poll pads used for voter

7   check-in?

8        A.   I have not examined those.

9        Q.   Okay.  So if you'll scroll with me to

10  paragraph 20.

11       A.   Yes.

12       Q.   And you say there:  It is a clear scientific

13  consensus that any computer-based voting machine can

14  be hacked.

15            Do you see that?

16       A.   Yes.

17       Q.   Do you understand any expert in this case to

18  disagree with you on that statement?

19       A.   No.

20       Q.   So you go on in paragraph 21 to say:  It is

21  a clear scientific consensus that the only practical

22  solution to this problem (that is secure enough for

23  use in public elections) is to mark votes on

24  voter-verified paper ballots that can be recounted or

25  audited by hand.

Andrew W. Appel , Ph.D.                          January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 45

1       A.    That's right.

2       Q.    Okay.  So then in paragraph 22 you go on to

3   say:  There's clear evidence and a growing scientific

4   consensus that ballots -- paper ballots marked by

5   touch screen ballot marking devices are not voter

6   verified in a strong enough sense to secure

7   elections.

8           Do you see that?

9       A.    Yes.

10      Q.    You go on to say:  And there's no known way

11  of remedying the problem other than to abandon BMDs

12  except for those voters who cannot mark a paper

13  ballot with a pen.

14          Right?

15      A.    Right.

16      Q.    So in this paragraph you get more specific.

17      A.    That's right.

18      Q.    And when you say growing scientific

19  consensus, what do you base that on?

20      A.    I base that on many discussions that I've

21  had with experts.  I base it on the process conducted

22  by the verified voting foundation which has many

23  experts on its board of technical advisors and its

24  board of directors who are independent of me and will

25  not believe something just because I say so but will

Andrew W. Appel , Ph.D.                     January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 46

1    come to their own scientific conclusions, who

2    discussed this question mostly in the year 2019 and

3    came to their formal recommendation that BMDs should

4    not be used for voters who can mark a ballot with a

5    pen.

6              I based it on, you know, my discussions with

7    other independent experts who by the end of 2019 had

8    come to this conclusion; and I find almost no

9    experts -- so consensus does not mean unanimity.  I

10   know for example that Dr. Gilbert does not fully

11   agree with me on this, that this really is a

12   consensus and it's driven by scientific findings both

13   about voter behavior of human beings who actually

14   vote and of the inability of election procedures to

15   correct the problem if there is some evidence of it.

16        Q.    Okay.  So I don't want to parse words too

17   much here, but that's what us lawyers do.  So the

18   difference between paragraph 21 and paragraph 22, if

19   you've got those there in front of you.

20        A.    Yeah.

21        Q.    You state in paragraph 21:  It is a clear

22   scientific consensus that the only practical solution

23   to this problem is to mark votes on voter-verified

24   paper ballots that are recounted or audited by hand.

25              And that's what we discussed earlier that

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 47

1    isn't specific as to one type of mark on the ballot

2    or the other.  Is that accurate?

3          A.   I would say that paragraph 21 is an accurate

4    description of the scientific consensus in 2018 and

5    an accurate description of the scientific consensus

6    in 2022; but paragraph 22 addresses an issue, the

7    significance of which was not recognized generally by

8    scientists in 2018 and was clearly recognized by

9    2020.

10         Q.   So at the time you wrote this declaration,

11   which I think we saw earlier, was June 28, 2021,

12   right?

13         A.   Yes.

14         Q.   Do you recall that?

15         A.   Yes.

16         Q.   Okay.  In paragraph 22 there, you use some

17   slightly different terminology.  Rather than a clear

18   scientific consensus, you say a growing scientific

19   consensus.  Is there a distinction there?

20         A.   Yes.  There's not a perfect way that one can

21   measure exactly the scientific consensus among all

22   the experts in a given field on any particular day,

23   and the scientific consensus doesn't change all at

24   once in one day.

25         Q.   So, Dr. --

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 48

1      A.   When I wrote that paragraph 22, I did not

2   want to make a stronger statement than I could

3   absolutely warrant at that time.  I will say, though,

4   that it is the scientific consensus -- it's not an

5   anonymous consensus, but it is the scientific

6   consensus that elections conducted with most voters

7   using BMDs are not securable, not fully auditable,

8   and audits cannot reliably detect or correct the

9   effects of hacking.

10      Q.   So, Dr. Appel, I'm going to note one more

11   time an objection for a nonresponsive answer.  I do

12   appreciate you're trying to explain here, and you're

13   welcome to explain after you answer the question.

14          My question to you is, did you intend a

15   specific distinction between paragraph 21 and

16   paragraph 22, yes or no?

17      A.   Yes.

18          MR. CROSS:  Objection; asked and answered.

19   BY MR. MILLER:

20      Q.   And that distinction you were intending

21   there, is that what you were just describing to me?

22      A.   Yes.

23      Q.   Okay.  But at the time you wrote this, am I

24   incorrect in taking from this you did not believe

25   there was a clear scientific consensus as to

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 54

1      represents the true scientific consensus to the

2      best of our ability of the broader scientific

3      community; and in June of 2018, the best of our

4      ability to represent the true scientific

5      consensus was as it was in 2018.

6   BY MR. MILLER:

7      Q.   Okay.  And so it changed, in your opinion,

8   the true scientific consensus definitely between 2018

9   and 2021.  Do I have that right?

10     A.   Yes.

11     Q.   About when did that shift occur?

12     A.   Mostly during 2019.

13     Q.   So throughout 2018, in your opinion -- I'm

14  not talking about the scientific consensus -- you

15  still agree that this was consistent with -- with --

16  strike that.

17          Throughout 2018, it is your opinion that the

18  scientific consensus remains what was reflected in

19  the NASEM report, right?

20     A.   Right.

21     Q.   It says, some time in 2019 on -- I'm trying

22  to nail down where this shift occurred in your

23  opinion.

24     A.   Right.  I would say the shift occurred

25  mostly during 2019.

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 55

1      Q.    Okay.  So if we go back to Exhibit 3 of your

2   July 2021 expert report.

3      A.    Got it.

4      Q.    If you'll turn to page 13 with me.

5      A.    All right.

6      Q.    And on page 40 there you draw a distinction

7   between voter-verifiable paper ballots and

8   voter-verified paper ballots.  Do you see that?

9      A.    Yes.

10     Q.    Okay.  Can you explain that distinction to

11  me?

12     A.    Yes.  These are terms that had been used

13  more or less interchangeably between, let's say, 2003

14  and 2010, maybe even up to 2018.  The

15  voter-verifiable paper ballot is one that a voter

16  could look at and read to see what candidates are

17  indicated either by having their names printed or by

18  having an oval blackened next to the name of a

19  candidate as opposed to an unverifiable ballot such

20  as one that's encoded in a QR code or not even

21  printed on paper at all but hidden inside the memory

22  of some computer.

23          So a voter-verifiable paper ballot is one

24  that a voter could look at and read.  A

25  voter-verified paper ballot is one that a voter has

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 56

1    actually looked at and checked, that is to say

2    verified, that it contains the candidate selections

3    that the voter had indicated and intended.

4         Q.   So would my understanding be correct that a

5    voter-verifiable paper ballot can become a

6    voter-verified paper ballot depending on the action

7    of the voter?

8         A.   That's right.

9         Q.   Okay.  And, in your opinion, would that

10   apply to BMD ballots as used in Georgia?

11        A.   The BMD ballots as used in Georgia can be

12   voter-verifiable paper ballots depending on how

13   election procedures and auditing procedures and

14   recount procedures handle the difference between QR

15   codes and the human readable portion of the ballot,

16   but generally the plain text portion of a BMD ballot

17   is a voter-verifiable paper ballot.  It is not

18   generally a voter-verified paper ballot.

19        Q.   But just so that I am clear, it can become a

20   voter-verified paper ballot if the voter looks at it

21   and you mentioned election procedures, auditing, and

22   recounts.  We talked about that in detail but --

23        A.   Right.  Generally, yes, a BMD ballot as used

24   in Georgia can become a voter-verified paper ballot

25   if the voter reads it carefully with the exception of

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 57

1    the QR code printed on the ballot, which can never be

2    a voter-verified paper ballot.

3         Q.    So if you rule out a hack or a malfunction

4    of the BMD with respect to the QR code, you would

5    agree that can always become a voter-verified paper

6    ballot depending on the action of the voter?

7              MR. CROSS:  Objection to form.  It misstates

8         facts.

9    BY MR. MILLER:

10        Q.    Do you understand the question I'm asking,

11   Dr. Appel?

12        A.    Yeah.  The human readable portion of

13   the BMD -- of the BMD ballot used Georgia that lists

14   all the candidate selections can become a

15   voter-verified paper ballot if the voter reads and

16   studies it carefully and compares it to the voter's

17   own memory of what choices they indicated.

18        Q.    Okay.  And have you done any study yourself

19   on the accuracy rate of hand-marked paper ballots

20   reflecting voter intent?

21        A.    No.  I read several other scientific studies

22   and I have studied the data from the Minnesota 2008

23   senate contest, which was a recount of 3 million

24   hand-marked paper ballots, to see what the evidence

25   indicated there about ambiguous marks on paper.  So

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 70

1          So with respect to this sentence in

2     paragraph 27, if a malicious actor were to install a

3     fraudulent program that switches both the printed

4     text and the QR code, would you -- would you agree

5     with me that an individual voter would not be

6     disfranchised if they verify their ballot?

7               MR. CROSS:  Objection to form.

8     BY MR. MILLER:

9          Q.   Do you understand my question, Dr. --

10    Dr. Appel?

11         A.   Yeah.  So I would like to distinguish

12    between human individual voters and exceptional

13    individual voters.

14         Q.   Dr. Appel, I'll ask you briefly if you could

15    answer the question yes or no and then, of course,

16    feel free to explain.

17              MR. CROSS:  Carey, don't interrupt him.

18         Okay?

19              Go ahead, Doctor.

20              THE WITNESS:  If an individual voter were to

21         spend the 30 to a hundred or more seconds to

22         inspect each contest on the ballot -- and the

23         amount of times it takes will depend on how many

24         contests are on the ballot -- to read carefully

25         the name of the candidate selected and compare it

Page 71

 1     with who they indicated on the touch screen that

 2     they were voting for, then a person like that

 3     could defend themselves against their own ballot

 4     being hacked by a BMD.  And unfortunately human

 5     voters can't or won't generally do that.

 6         When a voter votes on a ballot-marking

 7     devices installed and supervised by the

 8     government, they are generally trusting that the

 9     ballot-marking device will indicate on the paper

10     the selections they made on the touch screen.

11     And measurements of real people show that they

12     generally do not and cannot accurately notice

13     errors.  And I make a distinction between do not

14     and cannot.

15         They do not and they don't understand the

16     importance of checking the paper and as seen in

17     practice, they generally don't check the paper;

18     and they cannot in the sense that it is actually

19     quite difficult to read a long, complicated

20     ballot paper, especially when there's more than

21     five or ten contests on the ballot, and actually

22     notice a difference.

23         Humans are better at marking something than

24     they are at proofreading something, especially in

25     the kind of ballot formats printed by BMDs.  All

Page 72

1          of what I am saying has been measured in

2          scientific studies.

3     BY MR. MILLER:

4          Q.    Okay.  So the first part of your answer

5     there when you said a voter who was very astute, paid

6     attention and read every single aspect could avoid

7     this disenfranchisement; is that correct?

8               MR. CROSS:  Objection to form.

9               THE WITNESS:  Yes; up to the limits of even

10          such a voter's ability to accurately proofread,

11          which is less perfect than one might imagine.

12     BY MR. MILLER:

13          Q.    Okay.  Does that proofreading concept apply

14     to hand-marked paper ballots?

15          A.    Generally, the mark made by a pen on a

16     hand-marked paper ballot is actually the mark that

17     the voter indicated.  Whereas, on a ballot-marking

18     device, the voter indicates something on the touch

19     screen by touching a specific place; and what's

20     printed on the ballot card may vastly differ from

21     that if the BMD is malfunctioning.  There is no way

22     on a hand-marked paper ballot to have a different

23     mark on the paper than the one that the voter

24     actually indicated.

25          Q.    So you used the term "indicated" there, but

Andrew W. Appel , Ph.D.                          January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 76

1      Q.   Okay.  All right.  If you'll turn with me

2   briefly to paragraph 85 of this report.

3      A.   Exhibit 3?

4      Q.   I'm sorry.  Yes.

5      A.   Got it.

6      Q.   Here you're talking about accessible voting

7   machines for disabled voters, right?

8      A.   Yes.

9      Q.   Okay.  So in paragraph 85 here, you use the

10   phrase "I know of no perfect design."  Do you see

11   that?

12      A.   Yes.

13      Q.   And then above that in paragraph 84, you

14   say, this is not a perfect solution, right?

15      A.   Right.

16      Q.   I didn't understand your opinion as to use

17   of hand-marked paper ballots to be one that such a

18   system is perfect for the general populus.  Am I

19   wrong on that?

20      A.   Nothing is perfect; but with hand-marked

21   paper ballots, it's possible to conduct a secure and

22   accurate election even in the presence of

23   computerized voting machines that may be hacked and

24   may be trying to cheat.  And with the use of BMDs, it

25   is not possible to conduct secure and accurate

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 77

1    elections in the presence of computerized voting

2    systems that have been hacked.  So hand-marked paper

3    ballots successfully resist the efforts of hacked

4    voting machines to corrupt elections and BMD-marked

5    ballots cannot.

6        Q.   Okay.  I guess my question here is more of

7    the use of the term "perfect design" here.

8        A.   Right.

9             So I guess what I'm referring to in

10   paragraphs 84 and 85 is that they may contemplate the

11   use of BMDs for voters with disabilities that lead

12   them unable to mark a paper ballot by hand even

13   though that solution will not fully protect their

14   vote in the case that computerized voting systems may

15   be hacked.

16            In that sense, voters with disabilities who

17   would use BMDs would have somewhat less protection of

18   their vote than voters who were able to mark a paper

19   ballot by hand.  Such voters may still have some

20   protection, and they can get it by the means that I

21   described in paragraph 84, and they can get it in

22   other ways.  So that's what I'm talking about in

23   paragraphs 84 and 85.

24       Q.   Okay.  All right.  Dr. Appel, if it's okay

25   with you, I'm going to suggest we take a short break

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 85

1    this, right?

2         A.   Yes.

3         Q.   Okay.  Are you aware of fraudulent software

4    like that that self-propagates to multiple BMDs?

5         A.   Yes.

6         Q.   And where is that?

7         A.   The concept of fraudulent software that

8    propagates on removable media from one computer to

9    another, not specifically in the context of

10   elections, was first explained to me in approximately

11   1979.  And the first demonstration of this on actual

12   voting machines was done by a scientific study at

13   Princeton University in -- published in 2006 where it

14   was done on the exact model of voting machine that

15   was in use in Georgia between about that time and

16   2018.

17        Q.   So I think my question was a little more

18   specific to that as to BMDs.  Are you aware of such

19   software existing?

20        A.   Am I aware that someone has created any such

21   software specifically for a BMD, no.

22        Q.   Okay.  And in that Princeton study you were

23   referring to, how did that fraudulent software

24   self-propagate?

25        A.   It propagated on the removable media that

Case 1:17-cv-02989-AT   Document 1630-6   Filed 02/13/23   Page 27 of 54
Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 86

1    election administrators used to download the ballot

2    definition file from the county election

3    administration computer to the voting machine.

4         Q.   And --

5         A.   And then they used that same removable media

6    to upload the vote results from the voting machine to

7    the county election administration computer; and the

8    hack, the vote stealing virus, could piggyback on

9    that removal media in both directions to go from one

10   voting machine to a county election administration

11   computer and then from that computer to many other

12   voting machines and so on.

13        Q.   And this fraudulent software that you refer

14   to on the DREs, was it adaptable to multiple ballot

15   styles?

16        A.   It's certainly straightforward to write

17   software that's adaptable to multiple ballot styles.

18   I'm not sure whether that particular thing was

19   demonstrated in the 2006 scientific paper.

20        Q.   Okay.  So conceptually you believe that it

21   could be done.  Is that accurate?

22        A.   Yes.

23        Q.   But you've never seen such adaptable

24   self-propagating software on the DREs; is that right?

25        A.   I've seen adaptable vote stealing software

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 87

1    that automatically adapts itself to different ballot

2    styles.  This is pretty easy to write given that a

3    typical ballot style will identify the political

4    party of each candidate.  So the vote stealing

5    software doesn't have to work very hard to figure out

6    which is the Republican and which is the Democrat.

7    And I have seen vote -- you know, self-propagating

8    software.  I haven't specifically seen the

9    combination of self-propagating and adaptable

10   software, but that would entirely straightforward to

11   combine.

12        Q.   Okay.  I don't mean to pump your ego here,

13   but you're a preeminent expert in this field, right?

14        A.   Yes.

15        Q.   But you haven't seen that combination?

16        A.   No.

17        Q.   Okay.  Let's -- I'm going to share with you

18   another exhibit here.

19             (Exhibit 9 was marked for

20        identification, attached at the end of

21        the original transcript.)

22   BY MR. MILLER:

23        Q.   Just let me know when it shows up on your

24   end.

25        A.   Got it.

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 99

1      Q.    On 30,000 BMDs, right?

2      A.    Okay.

3      Q.    And let's assume that implanting the same

4   malware or similar malware -- strike that.

5           Let's assume that implanting the vote

6   flipping fraudulent software takes about the same

7   time as your demonstration in the New Jersey case,

8   seven minutes.  Okay?

9      A.    I don't know why we would assume that.

10     Q.    Do you have any reason to think it would be

11  shorter or longer?

12     A.    Yeah.  It would be much different, actually.

13  If one wanted to install fraudulent software on any

14  machines statewide in the kind of modern system used

15  in Georgia now or in the kind of DRE that Georgia

16  used between 2003 and 2018, one would not have to do

17  it one machine at a time with a screwdriver.  One

18  would generally do it with automatic propagation

19  particularly from one machine to another, although

20  that's possible but more likely from one central

21  place to all the machines.  The central place could

22  be state election administration computers, county

23  elections administration computers or a hacker who

24  manages to hack into Dominion election systems

25  itself.  So I would not expect that the most

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 100

1    efficient method a hacker could use is to do it one

2    machine at a time by a screwdriver.

3         Q.   We just discussed that you're not aware of

4    both self-propagating and adaptable malware, right?

5         A.   I'm aware of how straightforward it is in

6    principal to build each of those and combine them

7    together.  I am not aware of a hacker who has done

8    that to an actual BMD.

9         Q.   Whether in a lab or in an actual election,

10   right?

11        A.   Right.

12        Q.   So if you're not aware of it, let's talk

13   about what we know you are aware of, which is

14   individually adaptable but not self-propagating,

15   right?

16        A.   Yeah.

17        Q.   Okay.  So that would require access to

18   individual BMDs; would it not?

19        A.   If it's not self-propagating.

20        Q.   Okay.

21        A.   Well, there's self-propagating and -- yeah.

22   All right.  If you want to -- if you want to talk

23   about malware that does not propagate by means of

24   network server removable media, that would require

25   access to individual BMDs.

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 101

1          Q.    I'm trying to use the same terminology

2     you --

3          A.    Yeah.  I'm not aware of a specific piece of

4     malware that is both self-propagating and adaptable,

5     but there is no scientific difficulty in combining

6     those two concepts into the same piece of malware.

7          Q.    Okay.  But you've never done it?

8          A.    I've never done it.

9          Q.    And you're not aware that anybody has ever

10    done it, right?

11         A.    Right.

12         Q.    Okay.  So accepting that, let's talk about

13    what we are aware of, which is adaptable but not

14    self-propagating, right?

15         A.    We can talk about adaptable but not

16    self-propagating malware.

17         Q.    So do you have -- going back to the

18    seven-minute timeframe, do you have any reason to

19    believe implanting that adaptable but not

20    self-propagating malware into a BMD would take any

21    shorter or longer time than what it took you to

22    implant it on this --

23         A.    I would expect it would take a shorter time.

24    The seven minutes it took me to install the malware

25    in a Sequoia AVC Advantage BMD required, you know,

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 102

1   picking the lock on the door of the voting machine,

2   unscrewing ten screws, prying out one computer chip,

3   installing another computer chip in its place,

4   replacing a certain cover that was held down by those

5   ten screws, screwing back in the ten screws, closing

6   the door and picking the lock again to get it to

7   lock.

8          And on a more modern piece of equipment, it

9   might well be possible to install malware by just

10  sticking a USB cartridge into a slot for five

11  seconds.

12     Q.   Okay.  So --

13     A.   It really depends on the voting machine.

14     Q.   Okay.  So five seconds -- if you wanted to

15  infect BMDs statewide, you would need access to those

16  machines, right?

17          MR. CROSS:  Objection to form.

18          THE WITNESS:  In this hypothetical where one

19      is not doing it by the more efficient method of

20      automatically propagating it.

21  BY MR. MILLER:

22     Q.   Correct.

23          But if you use your seven-minute estimate,

24  my back-of-the-napkin math is that's 210,000 minutes

25  of total time just implanting the malware, right?

Andrew W. Appel , Ph.D.                     January 27, 2022
Curling, Donna v. Raffensperger, Brad

                                                     Page 103

1          MR. CROSS:  Objection to form.

2          THE WITNESS:  Yeah.  If Georgia were using

3      Sequoia AVC Advantage DREs and someone wanted to

4      install the same kind of malware I installed in

5      2008 into one of those at seven minutes per, that

6      would be 210,000 minutes.

7  BY MR. MILLER:

8      Q.    And you are -- strike that.

9            Are you aware of who the responsibility for

10  storing voting machines falls on in Georgia?

11      A.    Not specifically.

12      Q.    Would you have any reason to doubt me if I

13  represent to you that each county is responsible for

14  storing their voting equipment consistent with state

15  law and regulations around physical security?

16          MR. CROSS:  Objection to form.  It misstates

17      facts.

18          THE WITNESS:  Certainly in a lot of states

19      each county is responsible for -- each county's

20      election officials are responsible for the

21      storage of their own county's voting machines.

22      So I could easily believe that Georgia organizes

23      itself that way.

24  BY MR. MILLER:

25      Q.    Are you aware there are 159 counties in

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 104

1    Georgia?

2         A.    I'm aware there's something like that.

3         Q.    An unreasonably large number.

4              And so, of course, to implant any malware

5    you would have to have knowledge of where those BMDs

6    are stored and arranged in our hypothetical scenario,

7    right?

8              MR. CROSS:  Objection to form.

9              THE WITNESS:  In this hypothetical scenario

10             where the hacker is choosing to use this

11             inefficient method of attacking each machine

12             retail, then -- instead of centrally wholesale,

13             then they need access to as many machines as they

14             want to hack.

15             Number one, it's not necessary for them to

16             hack all 30,000 machines in order to get a whole

17             lot of votes to be switched.  Number two, it's

18             not necessary to hack them while they're in the

19             county's election warehouse.  I have been in

20             election warehouses in a couple of different

21             states, and I can say that the security of

22             election warehouses is not always as good as one

23             might want.

24             And then the other point is that there may

25             be places to access these voting machines when

Andrew W. Appel , Ph.D.                              January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 105

1          they're not in election warehouses such as when

2          they're being transported to the polling places,

3          when they're in the polling places before or

4          after an election, or whether -- where they're

5          being transported from the polling places.

6               And you might think that when voting

7          machines are being transported from the polling

8          places after an election it's too late to hack

9          them to make them misbehave in that election, but

10         it's not too late to install adaptable vote

11         stealing software that will misbehave in many

12         future elections.

13              So there are a variety of places that an

14         attacker might have access to voting machines to

15         be able to install fraudulent malware that may

16         misbehave in future elections for a decade or

17         more.

18    BY MR. MILLER:

19         Q.   Have you ever been to an election warehouse

20    in Georgia?

21         A.   No.

22         Q.   Have you ever been to a polling place in

23    Georgia?

24         A.   No.

25         Q.   Do you have any knowledge of the security

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 108

1      Q.   And would you agree with me that it's a

2   continuum of sorts on the acceptability of the use;

3   in other words, DREs are way out on the bad side in

4   your opinion and paper ballots are way out on the

5   good side and in between you have the DRE with VD

6   pad, all-in-one BMDs, and BMDs like those used in

7   Georgia?

8           MR. CROSS:  Objection to form.

9           THE WITNESS:  Are you talking about my

10      opinion or are you talking about the current

11      scientific consensus?  Are you talking about the

12      scientific consensus.

13   BY MR. MILLER:

14      Q.   That's a fair point.  That's a fair point.

15   I'm talking about your opinion here.

16           Would you agree with me that there are

17   levels of acceptability, for lack of a better term,

18   on each form of voting system?

19      A.   I would say that DREs are unacceptable.

20      Q.   Right.

21      A.   DREs with a VD pad are unacceptable in light

22   of current scientific understanding.  All-in-one BMDs

23   that display something behind glass or that have the

24   ability to both mark a ballot and deposit it in a

25   ballot box are unacceptable.  Those are not at issue

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 109

1    in this case.  And BMDs are acceptable for use only

2    for those voters who cannot mark a paper ballot by

3    hand.

4           Q.    Okay.  And then the next step would be

5    optical scan -- hand-marked paper ballots with

6    optical scanners are acceptable, period, your

7    preferred system in your opinion for security

8    reasons?

9           A.    Right.

10          Q.    Okay.  So if you scroll with me here to page

11   3 and it's your footnote 2.

12          A.    All right.  I read footnote 2.

13          Q.    You talk about the understandable preference

14   of mainstreaming disabled voters, right?

15          A.    Right.

16          Q.    And you say that's a legitimate desire, but

17   on balance you think the competing legitimate desire

18   for trustworthy election outcomes wins out.  Is that

19   accurate?

20          A.    Right.

21          Q.    Is this statement assuming the presence of

22   malware that you have actual knowledge of versus the

23   presence of malware that in theory could be created?

24          A.    The statement is in view of the

25   susceptibility of computerized voting equipment to be

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 110

1    hacked by malware.

2         Q.    To be hacked by malware that you have actual

3    knowledge of or that conceptually you believe could

4    be developed?

5         A.    The ability of computers to be reprogrammed

6    with new software has been an essential feature of

7    the concept of the computer since 1950 when the

8    stored program computer was invented.  So it is an

9    inherent aspect of a computer that it can be

10   reprogrammed, that -- and so any voting machine based

11   on a computer can be hacked, can be reprogrammed.

12            This has been demonstrated repeatedly on one

13   kind of voting machine after another after another

14   after another, but it's such an inherent part of the

15   nature of a computer that you can download new

16   software into it that in some sense it didn't even

17   need to be demonstrated on one kind of voting machine

18   after another after another.  And so it's an inherent

19   fact of computer science that the next voting

20   machine, if it's run by software in a computer, will

21   be hackable.

22        Q.    I think you may be misunderstanding my

23   question.

24            With your statement that this is made in

25   light of your opinion on the hackability of a

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 119

1   malware that could adapt and self-propagate right in

2   theory?

3        A.   Right.  Right.

4        Q.   And I should ask a clarifying question.  I

5   noticed in your report you for the most part stick to

6   the term "fraudulent software" as opposed to malware.

7   Is there a distinction there or is that a term of

8   art?

9        A.   I guess by fraudulent software I mean

10  software that pretends to be what it's not.  Some

11  malware does that.  Some malware is more explicit and

12  doesn't even try and pretend.

13       Q.   Okay.  So are you aware of -- strike that.

14            Based on your opinion, knowledge, and

15  experience do you believe conceptually malware or

16  fraudulent software could be implanted on to a DRE

17  and snake its way into the Dominion BMDs?

18       A.   Yes.  I think that would be possible,

19  although it doesn't seem the most likely way that a

20  hacker might want to install malware on the Dominion

21  BMDs.

22       Q.   And, of course, that would have to have been

23  installed prior to the last use of the DRE -- DREs

24  themselves, right?

25            MR. CROSS:  Objection to form.

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 120

1           THE WITNESS:  If what you're trying to say

2       is should we be worried about the particular

3       pathway of someone installing malware in a

4       Diebold BMD or in GEMS and then that propagating

5       to the Dominion systems, I would say that is not

6       a likely way for a malware to propagate to the

7       Dominion systems.  There are other ways that

8       hackers would be more likely to use than that to

9       propagate malware on to the Dominion systems.

10          And part of the reason for that is that if

11      the Diebold system has not recently been in use,

12      then the malware would have had to have been

13      installed on it at the time it was, you know,

14      turned on.  So that's not the pathway I would

15      most worry about.

16  BY MR. MILLER:

17      Q.   I do want to briefly clarify one point.  I

18  think you said Diebold BMD, but you meant Diebold

19  DRE, right?

20      A.   That is right.

21      Q.   Okay.  And for that malware or fraudulent

22  software to work to flip a vote in the theoretical

23  ways we've described, the person installing it on the

24  DRE would have to have some knowledge as to the

25  system that was follow -- following it, right?

Andrew W. Appel , Ph.D.                          January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 121

1          MR. CROSS:  Objection to form.  It calls for

2       speculation.

3          THE WITNESS:  You know, I could describe

4       another method by which malware in the GEMS

5       system would make it easier for a hacker to flip

6       votes on a Dominion BMD.

7    BY MR. MILLER:

8       Q.   That's not the question I'm asking.

9       A.   Well, it very closely related to the

10   question you asked.  You asked is it possible that

11   malware on the Diebold system could flip votes on the

12   Dominion BMD; and there's an assumption built into

13   that question about how malware actually works, so I

14   want to address that assumption.

15          One very important way that malware works is

16   to open up back doors in computer systems that

17   hackers can later use to exploit, and the way they

18   might exploit it is by delivering a payload that

19   actually does the malicious function such as stealing

20   money or switching votes.

21          I would think it unlikely that somebody

22   would have designed such a payload in 2018 for the

23   Dominion BMDs that got delivered in 2019.  It is

24   certainly possible that malware installed in

25   computers used to manage Georgia's elections could

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 122

1   have opened up back doors that might still remain in

2   Georgia's current computers that manage Georgia's

3   elections; but as to the question with the assumption

4   that you built into it that this would be about the

5   payload that switches votes, I would expect that that

6   payload would not have been designed and installed

7   into the Diebold machines and transfer itself to the

8   Dominion machines.

9        Q.   Okay.  And so when I am talking about an

10  election management system, do you understand that

11  I'm referring to software that runs on a computer and

12  not the computer itself?

13       A.   All right.  If you want to refer to it that

14  way.

15       Q.   And does it make any difference -- let me

16  ask it this way.  Is your statement there assuming

17  that it's the same computer that the EMS software is

18  running on or does it matter?

19       A.   In this very hypothetical scenario we're

20  talking about where an attacker who hypothetically

21  managed to compromise Georgia's election systems in

22  2018 or prior, they would still be able to leverage

23  to still make it easier to compromise Georgia's

24  election systems in 2019 and subsequent.  The reuse

25  of the same computers could be relevant if Georgia is

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 126

1   concerned if you were to learn that election workers

2   were using USB devices with the new BMD system that

3   they previously had used with the old DRE system?

4        A.   Yes, I would be concerned.

5        Q.   Would that, in your opinion, be consistent

6   with sound election security practices, meaning to

7   use those same USB devices?

8        A.   Right.  In light of the insecurity of USB

9   systems in general it's a general security

10  recommendation, not just for elections specifically

11  but in any application where you actually care about

12  security, is not to reuse USB devices that have been

13  out of your physical possession in places you don't

14  necessarily trust.  And so the idea of using fresh

15  USB devices in every election or certainly using

16  fresh USB thumb drives and you switch to a new set of

17  equipment that would be a prudent security

18  recommendation in general.  I haven't studied it

19  specifically on how it would apply to the machines in

20  this case.

21       Q.   As an elections security expert, would you

22  be concerned if poll workers in Georgia were

23  connecting USB drives to voting equipment that had

24  also been connected to internet connected device like

25  a server or a computer?

Andrew W. Appel , Ph.D.                      January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 127

1      A.   Yes, absolutely.  The kind of

2   self-propagating malware that was identified and

3   demonstrated as early as 2006, you know, in a

4   scientific paper about voting equipment can propagate

5   malware from computers in the sense of things that

6   look like computers and have keyboards and screens to

7   voting machines.  So if you have computers that are

8   routinely connected to the internet where they are

9   vulnerable to attack from anywhere on the internet

10  and then those computers may be corrupted, they can

11  be corrupted in such a way as to distribute malware

12  through USB devices to all the voting machines in the

13  normal process of installing ballot definitions for

14  each election.  And this attack factor, this kind of

15  vulnerability, has been well understood for about

16  15 years now.

17      Q.   As an election security expert, would you be

18  concerned if election workers in Georgia, the

19  passwords that they use to access and operate voting

20  equipment, if those passwords were transmitted via

21  FTP?

22      A.   Yes, I would be concerned.  FTP is an

23  obsolete of method of transferring information over

24  the internet, and the specific reason its obsolete

25  for at least ten years now is because it is insecure.

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 128

1   It's not protected by encryption in any -- in any

2   way.  So any computer systems that you know want to

3   transmit information like that will use other

4   protocols now, and indeed even most modern browsers

5   for compute -- you know, for consumer use have FTP

6   disabled because it's not even safe enough for

7   ordinary consumers to use.

8       Q.   Related to that, Dr. Appel, as an elections

9   security expert, would you be concerned if the

10  passwords that election workers in Georgia use to

11  access or operate voting equipment were stored on

12  servers that are connected to the internet?

13      A.   That would definitely be a concern.  A

14  servers connected to the internet are vulnerable to

15  possible infiltration by hackers who can read and

16  modify any data that's stored there.  So that would

17  be a way that hackers could potentially get access to

18  those passwords.

19      Q.   Do you know whether the current Dominion

20  voting equipment that's used in Georgia can scan and

21  tabulate hand-marked paper ballots?

22      A.   I believe that it can.

23      Q.   And could ballots that voters can mark by

24  hand -- is there equipment available today for those

25  to be printed at the precinct on demand?

Page 129

1      A.    Yes.   So what you're talking about is called

2   a ballot on-demand printer, and I've had

3   conversations with Howard Kramer, the vice president

4   of Dominion, about every -- about two or three times

5   a year for the last two or three years about this

6   line of Dominion election equipment.   Most of these

7   conversations are not specifically motivated by my --

8   by this Georgia case but just generally for the

9   possible adoption of Dominion equipment in other

10   states.

11          And so he has very clearly clarified to me

12   that these same scanners are compatible with

13   hand-marked optical scanned paper ballots and that

14   these same scanners are compatible with ballot

15   on-demand printers.   These are basically ordinary

16   desktop laser printers that would sit next to e-poll

17   book where voters check in and it could print an

18   unmarked optical scan paper ballot with ovals for the

19   voter to fill in.   That these Dominion systems that

20   Georgia already uses are adaptable to be used in this

21   way at a fairly low additional cost, which is to say

22   the ballot on-demand printers are not expensive.

23      Q.    And just finally here, Dr. Appel, can you

24   pull up Exhibit 12 again?   Do you have that in front

25   of you?

Andrew W. Appel , Ph.D.                     January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 132

1  infrastructure?

2       A.    Absolutely, yes.

3       Q.    And based on your experience and expertise

4  as an elections security expert, would you expect

5  officials who are responsible for elections in the

6  state of Georgia to take reasonable measures to

7  address any security weakness Dr. Halderman

8  identified in his analysis of the equipment?

9       A.    Yes.

10            So although we know that computerized voting

11 machines are vulnerable to hacks in general, we would

12 certainly want to minimize as best we can the ability

13 of hackers to get into those machines and perform

14 hacks.

15            So when makers of election equipment take

16 steps to improve the security of the equipment they

17 sell, that's a good thing.  When election

18 administrators who deploy this equipment take steps

19 to improve the security of their deployment, that's a

20 good thing.  When election administrators put

21 pressure on the vendors who sell them equipment to

22 improve the security of the equipment they sell,

23 that's a good thing.

24            We should do all of these things even though

25 we recognize that we can never fully defend against

Andrew W. Appel , Ph.D.                     January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 133

1    hacks and so that we should run elections in a way

2    that we can still trust in their accuracy even though

3    the equipment may have been hacked.

4            Or to put it another way, when, for example,

5    hand-marked paper ballots are used risk-limiting

6    audits can detect and recount -- can correct

7    elections that are inaccurate because of hacks or

8    other failures; but we should improve the security of

9    the computers and the computerized voting machines so

10   that that's less likely to happen.  It's less likely

11   that flawed elections occur to be detected and

12   recounts would be necessary to correct them.

13       Q.   Dr. Appel, as a -- I think as Mr. Miller

14   referred to you earlier, as a preeminent election

15   security expert, is providing voters -- election

16   officials themselves providing voters incomplete or

17   inaccurate information about known security

18   vulnerabilities in the election system -- is that a

19   sound way to generate voter confidence in that

20   election system?

21           MR. MILLER:  Objection; relevance, lack of

22       foundation.

23           Dr. Appel, you're permitted to answer over

24       the objection.

25           THE WITNESS:  Yeah.  Let's -- I can -- I can

Andrew W. Appel , Ph.D.                                   January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 135

1    to specifically compare the QR code to the human

2    readable text on the ballot as long as the entire

3    risk-limiting audit or recount is done based only on

4    the human readable portion of the ballot.

5        Q.   Are you assuming that the official election

6    count -- the official election results will then be

7    based on the tabulation of the recount rather than

8    the original tabulation from the machines?

9        A.   If you recount what's written on the human

10   readable portion of the ballots, which I'm not sure

11   is always how recounts work in Georgia, and if the

12   voters carefully reviewed the human readable portion

13   of the ballots, which we know that most of them do

14   not, then you could achieve a recount of the

15   voter-verified intent.

16            If you leave out either of those portions

17   and if the BMDs are hacked, then you cannot achieve a

18   recount of the voter's intent.  If you leave out

19   examining the human readable portion of the ballot,

20   then you're vulnerable to the attack by which the QR

21   code is fraudulent but the human readable portion is

22   accurate.

23            And if you leave out the voter spending a

24   whole minute, you know, carefully reviewing every

25   line of the ballot, then you're vulnerable to the

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 136

1    attack where both the QR code and the human readable

2    portion are vulnerable.

3         Q.   Lastly, Dr. Appel, if you look back at

4    Exhibit 12, the fourth paragraph that Mr. Miller

5    asked you about, the two sentence reads:  Technical,

6    physical, and procedural safeguards complicate the

7    task of maliciously exploiting election systems as

8    does monitoring of likely adversaries by law

9    enforcement and the intelligence community.

10             Do you see that?

11        A.   Yes.

12        Q.   Why was the word "complicate" use instead of

13   prevent in that sentence?

14        A.   The unfortunate fact about computer security

15   in this part of the 21st Century is we cannot prevent

16   all attacks from being successful.  Even the most

17   sophisticated companies that produce software, that

18   run data centers, that run commerce both brick and

19   mortar and e-commerce and the U.S. government itself

20   have been subject to malicious attacks and have

21   successfully infiltrated their system and stolen and

22   altered information.

23             So the modern state of cyber security is

24   that defenses can help.  They can complicate the life

25   of the attacker.  They can shut off the attack paths

Andrew W. Appel , Ph.D.                January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 137

1    that we know about, but they cannot shut off all the

2    attack paths that we don't yet know about.  So

3    complicate the task is the best bet we know how to do

4    in cyber security in general and election systems as

5    an example of cyber security.

6         Q.    Thank you, Dr. Appel.

7                        FURTHER EXAMINATION

8    BY MR. MILLER:

9         Q.    Dr. Appel, I've got just a couple of quick

10   follow-up questions, and I'll be brief.

11              Do you recall Mr. Cross asking you about

12   ballot on-demand printers?

13        A.    Yes.

14        Q.    Okay.  And are you offering an opinion in

15   this case regarding the feasibility of the

16   Plaintiffs' requested relief?

17        A.    To the extent that the relief involves the

18   use of the same Dominion equipment that Georgia

19   already has deployed but with ballot on-demand

20   printers so that the voter is generally handed a

21   paper ballot to fill out and only those voters who

22   can't mark a paper ballot with a pen use the

23   ballot-marking device, I am offering an opinion that

24   that would be feasible, practical, and cost

25   effective.

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 138

1      Q.    So by feasible, practical, and cost

2   effective first --

3      A.    Feasible means available from the vendors.

4   It does not require new scientific research to figure

5   out.

6      Q.    Right.

7      A.    Meaning other states use this kind of ballot

8   on-demand method and it works and cost effective in

9   that, you know, the cost of ballot on-demand printers

10  is actually significantly less than the cost of

11  voting machines such as optical scanners and BMDs.

12  So that the additional cost to add ballot on-demand

13  printers to the Georgia system would not be nearly so

14  great as the cost that Georgia has already invested

15  in these systems already.

16     Q.    Have you ever administered an election?

17     A.    No.

18     Q.    Have you ever worked as a poll worker?

19     A.    No.

20     Q.    Have you ever trained the local election

21  officials on how to run a polling place?

22     A.    No.  I read the training materials.

23     Q.    So is your statement that you are offering

24  feasibility to the extent, do you mean by that you're

25  offering an opinion on feasibility that the various

Andrew W. Appel , Ph.D.                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 142

1    vulnerability that the good guys haven't discovered

2    yet but maybe the bad guys have already.

3         Q.   Correct.

4              Whack a mole, right?

5         A.   Right.

6              MR. MILLER:  That's all I have.

7                   FURTHER EXAMINATION

8    BY MR. CROSS:

9         Q.   One follow-up questions, Dr. Appel on the

10   last point.

11             Is it sound cyber security practice to

12   ignore known vulnerabilities simply because there may

13   be other unknown vulnerabilities in an election

14   system?

15        A.   No.

16             MR. CROSS:  No further questions.

17             THE VIDEOGRAPHER:  This concludes the

18        deposition.  The time is 11:58 a.m., and we're

19        now off the video record.

20             THE COURT REPORTER:  Do y'all want to order

21        the transcript?

22             MR. CROSS:  Yes.

23             MR. MILLER:  I think we have a standing

24        order on this.  We'll take a rough when it's

25        available.

Andrew W. Appel , Ph.D.                                    January 27, 2022
Curling, Donna v. Raffensperger, Brad

Page 145

1                          CERTIFICATE
2    STATE OF GEORGIA:
3    COUNTY OF GWINNETT:
4              I hereby certify that the foregoing
     transcript was taken down, as stated in the caption,
5    and the colloquies, questions and answers were
     reduced to typewriting under my direction; that the
6    transcript is a true and correct record of the
     evidence given upon said proceeding.
7              I further certify that I am not a
     relative or employee or attorney of any party, nor am
8    I financially interested in the outcome of this
     action.
9              I have no relationship of interest in
     this matter which would disqualify me from
10   maintaining my obligation of impartiality in
     compliance with the Code of Professional Ethics.
11             I have no direct contract with any
     party in this action and my compensation is based
12   solely on the terms of my subcontractor agreement.
               Nothing in the arrangements made for
13   this proceeding impacts my absolute commitment to
     serve all parties as an impartial officer of the
14   court.
               This the 13th day of February, 2022.
15
16
17
18

19              _____

                LAURA R. SINGLE, CCR-B-1343
20
21
22
23
24
25