# EXHIBIT 69

Page 1

1              IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION
3
    DONNA CURLING, ET AL.,
4
              Plaintiffs,
5                                  CIVIL ACTION FILE
        vs.                        NO. 1:17-CV-2989-AT
6
    BRAD RAFFENSPERGER, ET AL.,
7
              Defendants.
8
9
10
11         REMOTE VIDEOTAPED ZOOM DEPOSITION OF
                     DAVID HAMILTON
12
                  January 18, 2022
13                   10:06 A.M.
14
15      Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC
16
17
18
19
20
21
22
23
24
25

Page 23

```
 1          identification.)
 2               THE WITNESS:  Oops, it logged me out.
 3          Hang on a second.
 4     BY MS. KAISER:
 5          Q.    Sure.
 6          A.    Crap.  I'm looking at the wheel.  Hang on.
 7     It's thinking.
 8               Okay.  Number 2.
 9          Q.    Do you recognize this document,
10     Mr. Hamilton?
11          A.    Uh-huh.  Yes.
12          Q.    Is this a copy of your profile from
13     LinkedIn?
14          A.    Looks like it.
15          Q.    And is this something that you update
16     regularly?
17          A.    I haven't in a while.  Since -- since I
18     landed at -- at Shepherd, there's not much point in
19     it.
20          Q.    Okay.  And that was -- when did you begin
21     with Shepherd?
22          A.    June, right as I left TrustPoint.
23          Q.    In 2021?
24          A.    Yes, ma'am.
25          Q.    On -- at the bottom of page 1 of this
```

Page 24

1      document, it indicates that you worked for

2      TrustPoint Solutions from October 2013 to June 2021;

3      is that correct?

4           A.   It is.

5           Q.   And what is TrustPoint Solutions?

6           A.   They're a provider of security and

7      infrastructure services predominantly in healthcare.

8      They have some business outside in the public

9      sector.

10          Q.   Sorry.  I think you mentioned this, but

11     during the time that you had the title of chief

12     information security officer for the Georgia

13     Secretary of State's office, were you employed by

14     TrustPoint Solutions?

15          A.   Yes, ma'am.

16          Q.   So did you do work for the Secretary of

17     State's office on a contract basis?

18          A.   No, not directly.  Always through

19     TrustPoint.

20          Q.   So you mean you, yourself, were not under

21     contract; the company --

22          A.   Correct.

23          Q.   -- TrustPoint was?

24          A.   Correct.

25          Q.   How much time did you spend per month on

Page 25

1    work at the Secretary of State's office, roughly?

2         A.   I guess it averaged out to be probably

3    half-time.  There was some spikes there where it was

4    more full time as things ramped up for events such

5    as elections and things, incorporations.  End of

6    year was a pretty busy time for the corporation

7    side.  But as you look across, I would imagine it

8    would compute to be about half-time.

9              There were some times where I didn't --

10   wasn't there at all during a week because I was at a

11   different client.

12        Q.   When you say "there at all," were you

13   physically at the Secretary of State's office?

14        A.   Yes, ma'am.

15        Q.   And when did you begin working for the

16   Georgia Secretary of State's office?

17        A.   Summer of 2018.  That's when the

18   engagement first began.

19        Q.   And so from roughly summer of 2018 until

20   June of 2021, you spent approximately half your time

21   working on security issues for the Georgia Secretary

22   of State's office; is that correct?

23        A.   Yes, ma'am.

24        Q.   And what were your responsibilities for

25   the Georgia Secretary of State's office?

1          A.    Just overseeing the -- the corporate

2     information security program, which included the --

3     the election side as far -- insofar as it -- the

4     registration side of the house.  Not the Dominion

5     side, but the -- the corporation side of the house,

6     which is where you get a business license in

7     Georgia, and then also the Bureau of Licensing,

8     which is all the professional boards, the nursing

9     board and the barbershop folks and all those folks.

10    It's where you kind of go for -- that was the only

11    place that had PHI, so -- protected health

12    information.

13         Q.    Understood.  Okay.

14               And when you said -- you said that that

15    encompassed the election side insofar as the

16    registration side of the house.

17               Can you explain what you mean by that?

18         A.    Well, there's -- there was a couple of

19    different buckets, right?  The -- the -- the main

20    things that I was concerned with is the -- is the

21    voter registration, the MVP site; security of the --

22    more or less the public-facing sites that managed

23    the registration of a voter.

24               Didn't have anything to do with the

25    tabulation of votes or the voting machines

Page 27

```
 1    themselves.  All that was handled by the vendor.

 2          Q.   Interesting.  Okay.

 3               Who did you report to at the Secretary of

 4    State's office?

 5          A.   Mr. Beaver.  Merritt Beaver, the CIO.

 6          Q.   And did anybody report to you?

 7          A.   Yes.  There was -- we had a couple of --

 8    three.  At one point there was one, then it got back

 9    up to three when we restaffed.  There were several

10    names in there.  Do you want me to try to recall

11    them?

12          Q.   Yes, if you can.

13          A.   Okay.  When I got there, it was -- I just

14    can't recall his name.  Heavyset fella.  I can't --

15    probably have to go to LinkedIn to figure that one

16    out.  I can't recall his name.

17               When I left --

18          Q.   Do you recall -- I'm sorry.  Please

19    finish.

20          A.   I was just going to say when I left, I can

21    tell you who those folks were.

22               Ronnell Spearman, who is -- who I think is

23    still there; Kevin Fitts; and then there was one

24    person that hired just as I was leaving.  I actually

25    never got to meet him in person and I can't recall
```

1        A.   I -- I didn't spend an awful lot of time

2    reading them.  We just kind of glazed over them.

3             But, no, I -- I felt pretty good about my

4    memory about things, what happened.  So...

5        Q.   Did you ever recommend to the Secretary of

6    State at any point that they should have a full-time

7    chief information security officer?

8        A.   Yes.

9        Q.   Do you recall approximately when you made

10   that recommendation?

11       A.   I think, basically, when -- when James

12   Oliver -- he was my predecessor.  He was a full-time

13   employee.

14            I think initially when we came in, you

15   know, our edict was to kind of coach him up and get

16   him, you know, kind of more out there.

17            And James, very nice man, but he was kind

18   of reserved and quiet, and it's kind of hard to do

19   this job when you seal yourself in your office.  You

20   kind of have to be out there and evangelize security

21   and get people excited about it, and he just didn't

22   have that gene.

23            So I -- you know, when the Secretary of

24   State made the decision to part ways with James, I

25   really thought the next step was for me to help the

Page 36

```
 1      Secretary of State find another full-time employee.
 2                  In the end, it wasn't.  What they decided
 3      to do is do a fractional kind of a situation where
 4      they'd continue that relationship and kind of let me
 5      sit in the chair.
 6                  That's not unheard of, but it's -- I mean,
 7      I would have rather have them have a full-time
 8      employee just for consistency, right?  Because you
 9      never know if I'm going to get pulled away on
10      another -- on another deal or -- you know.  It would
11      have been better, I think, to have a full-time, and
12      I could advise that person kind of as a -- think of
13      it as like a mentor relationship.
14          Q.   And I believe you said that you didn't --
15      you personally didn't have a budget.
16                  Did you ever make a recommendation that
17      the chief information security officer should have a
18      budget?
19          A.   No.  I mean, they -- they had a budget for
20      security; it's just I wasn't -- I didn't have any
21      signing authority.  I couldn't go spend money.  You
22      know, I didn't have an expense account or anything
23      like that.
24                  Anything I wanted to spend money on, I had
25      to go to -- go to Merritt for, and he worked it out
```

1    BY MS. KAISER:

2         Q.   Did you have any --

3         A.   -- the wrong place to put it.

4         Q.   Did you have any involvement with making

5    that transition of the Kennesaw server?

6         A.   No, ma'am.  No, ma'am.  That was way

7    prior.  2016, I guess.  So...

8         Q.   We've mentioned Fortalice several times

9    now.

10             Are you aware that Fortalice conducted a

11   series of cyber risk assessments for the Secretary

12   of State's office in 2017 and 2018?

13        A.   Yes, I -- I have knowledge of those.

14        Q.   What role, if any, did you have in working

15   with Fortalice on those cyber risk assessments?

16        A.   The second one in 2018, I believe that was

17   during my tenure, at least I got the report.  The

18   2017, I think they just passed it to me as history.

19   So...

20        Q.   And can you tell me, in general terms,

21   what Fortalice found in its 2017 and 2018 cyber risk

22   assessments for the Secretary of State's office?

23        A.   There was a number of items.  They

24   classified them as high, medium, low, based on their

25   experience, and then gave us an opportunity to

Page 46

```
 1      either accept or -- or deny, you know, what was
 2      going on.
 3              It gives us a good basis for kind of
 4      reprioritizing our work within the State to figure
 5      out where we should spend our money and time trying
 6      to go after the things that are the most vulnerable.
 7      It's a judgment call.
 8              MS. KAISER:  Can you pull up Tab 3,
 9          please.
10              (Plaintiffs' Exhibit 4 was marked for
11          identification.)
12              THE WITNESS:  Is there another document?
13          I'm sorry.
14      BY MS. KAISER:
15          Q.   It's being loaded right now.
16          A.   Okay.  I'm sorry.
17          Q.   It takes a minute with larger documents,
18      so apologies --
19          A.   Gotcha.
20          Q.   -- for the delay.
21          A.   Okay.  Exhibit B.  Okay.
22          Q.   So if you scroll down to the next page,
23      you'll see this is the cover page of the report.
24              Do you recognize this as the 20- --
25      November 2018 report that Fortalice provided to the
```

1     Secretary of State's office?

2          A.   I think so.  Let me go down to the meat of

3     it here.  Hang on.

4               MR. MILLER:  Mary, this is another sealed

5          document.  I can't recall from the 2019 hearing

6          if we -- how we designated this.

7               THE WITNESS:  Yeah, this kind of thing

8          should never be made public, but I get it.

9               MR. MILLER:  So, Mary, I'll -- I'll ask at

10         this point if we treat it as attorneys' eyes

11         only.

12              And, Ms. Marks, if you could please drop

13         off for the period of time.

14              MS. MARKS:  Sure, I will.  And if you will

15         let me know when I can safely come back on.

16         Thank you.

17              (Ms. Marks left the Zoom deposition.)

18    BY MS. KAISER:

19         Q.   Mr. Hamilton, have you had a chance to

20    take a look at the document now?

21         A.   I have, yep.

22         Q.   And do you recognize this as Fortalice's

23    2018 Red Team Penetration Test and Cyber Risk

24    Assessment?

25         A.   I do, yep.

Page 48

1          Q.    If you could turn to page 8 of the report.

2          A.    Okay.

3          Q.    The top section there says "███████████

   ██████████████████████████"

5                Do you see that?

6          A.    Correct.

7          Q.    That next paragraph reads, "████████████

   ████████████████████████████████████████

   ████████████████████████████████████████████

   ███████████████████████████████████"

11         A.    Right.

12         Q.    If you skip one sentence, it says, "██████

   ████████████████████████████████████████████

   ███████████████████████████████████████

   ████████████████████████████████████████

   ██████████████████████████████████"

17                Do you see that?

18         A.    I do.

19         Q.    So do you understand this section of the

20    report to address progress made on the top ten risks

21    identified by Fortalice in 2017?

22         A.    Uh-huh.  Yes.

23         Q.    Do you know why three of those top ten

24    risks were not tested in 2018?

25         A.    I do not.  Usually, it's a -- when a --

Page 49

1    when a security firm does a -- a pen test or a

2    security assessment, they use last year and the

3    current year to show progress or show kind of a

4    trend, are you getting better or are you getting

5    worse.  So usually you test the same things.

6              The only reason I would think that we

7    missed is if they were specifically taken out of

8    scope.

9         Q.   Okay.  And this report says that of the

10   top ten risks identified in 2017, only three had

11   been remediated in 2018; is that correct?

12        A.   That's what this states, correct.

13        Q.   If you can flip to page 5 of the report.

14        A.   Okay.  Hang on.  It's back.  Hang on.

15             Okie-doke.  I'm here.

16        Q.   The second paragraph on page 5, it reads,

17   "████████████████████████████████████████████████

     ███████████████████████████████████████

     █████████████████████████████████████

     ██████████████████████████████████

     ██████████████████████████████."

22             Do you see that?

23        A.   Right.

24        Q.   And that first bullet point reads, "██████

     ████████████████████████...."

Page 50

1          Do you see that?

2     A.   I do.

3     Q.   And are those recommendations detailed on

4     pages 6 and 7 of the report --

5     A.   I believe so.

6     Q.   -- in this table?

7     A.   Yeah.

8     Q.   What steps did the Georgia Secretary of

9     State's office take to implement these 20

10    recommendations from Fortalice?

11    A.   I can't speak to the first half of that

12    year because I wasn't there, but it might have had

13    something to do with -- and this is a little bit of

14    speculation on my part -- is that that might have

15    been the reason for our involvement, is that Merritt

16    didn't feel like things were moving along fast

17    enough.

18          So he wanted -- that was one of the things

19    that we were to come in and coach up for James

20    Oliver is to kind of get him excited about this

21    stuff and get moving on some of these things that

22    were identified.

23          And I think this was the list that I gave

24    the status on I guess about halfway through the

25    tenure.  That was one of the exhibits or the

Page 51

1 statements that I made to the Court.

2    So I don't know what the status is now, of

3 course, because I've been gone six months, but they

4 were well on their way to taking care of those

5 and -- and others that were found along the way.

6 So...

7    Security is -- itself truly is a -- it's a

8 journey; it's not a destination.  You're never done.

9 I mean, there's always -- the threat landscape

10 changes every day.  Things change every day.

11    So, you know, it's a snapshot in time.  At

12 the time that Fortalice did this, this is what they

13 found.  They could have waited three weeks and did

14 another one and found something else and not found

15 three others.  So it's just a snapshot in time.

16   Q. Sure.

17    At the bottom of page 5 of the report, the

18 last paragraph there, it says, "█████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████████

███████████████████████████████████."

23    Do you see that?

24   A. I do.

25   Q. To your knowledge, did the Secretary of

Page 52

1    State's office dedicate any additional resources to

2    addressing the security risks Fortalice identified?

3              MR. MILLER:  Objection.  Lack of

4         foundation.

5              THE WITNESS:  I believe I was one of those

6         resources.

7    BY MS. KAISER:

8         Q.   Do you have any awareness of whether

9    internally at the Secretary of State's office, any

10   additional resources were applied to addressing

11   these security risks?

12        A.   Yeah, when -- I was able to recall that

13   gentleman's name, Adam Abell.  He -- he was the one

14   that was working with James on a day-to-day basis.

15   So it was only the two of them.

16             Shortly after my arrival, they moved

17   Ronnell Spearman over from the services side of the

18   house and opened up a req for adding another party

19   to the security.  I think all of that was based on

20   the findings.

21             So most of the time that I was there, we

22   were at a staff of three and -- not including me,

23   except when we ended up letting one guy go and that

24   gap of time when we were looking for the next

25   person.

Page 53

```
1            MS. KAISER:  Will you add Tab 4, please,
2       Zach.
3    BY MS. KAISER:
4       Q.   We're going to bring up the next exhibit,
5    Mr. Hamilton.
6       A.   Okay.
7            (Plaintiffs' Exhibit 5 was marked for
8       identification.)
9    BY MS. KAISER:
10      Q.   If you scroll down to the second page, I
11   believe you -- you stated that you -- you know, you
12   made a statement in this case.
13           Do you recognize this to be the
14   declaration that you provided in this case?
15      A.   Yes, ma'am.  One of two, correct.
16      Q.   Correct.
17           Let's see.  This one is dated August --
18   August 25, 2020.
19           Do you see that?
20      A.   That sounds about right, yep.
21      Q.   Okay.  Did you draft this document, sir?
22      A.   I did.
23      Q.   And the purpose of your declaration, as
24   you mentioned, was to go through the recommendations
25   from Fortalice and give a status update on how they
```

Page 54

 1    were being resolved or remediated; is that right?

 2        A.   Correct.

 3        Q.   I just want to walk through a couple of

 4    these.

 5             So Number 2, the "Two-Factor

 6    Authentication," do you see that?

 7        A.   Uh-huh.

 8        Q.   It says the "Status" was "Accepted and

 9    Partially Remediated."

10        A.   Uh-huh.

11        Q.   Do you see that?

12             All right.  And Number 5 was "Non-Unique

13    Local Admin Passwords."

14             Do you see that?

15        A.   I do.

16        Q.   The "Status" was "Accepted and

17    Compensating Control Applied."

18             Do you see that?

19        A.   Correct.

20        Q.   What did you mean by "compensating control

21    applied"?

22        A.   The long-term solution would be to go to a

23    PAM, which is a privileged account management

24    solution, but that's a pretty heavy lift

25    financially.

1           So in the short term, what we did is apply

2      the out-of-the-box LAP Solution that allows the --

3      the encryption of the endpoints.

4           And also we put in some policy and

5      procedures that when the guys were out working on

6      people's machines, that they -- they have to go to a

7      centralized password vault to be able to access

8      them.

9           They -- in the past, they had the same

10     administrative password on all the systems to make

11     it easy to maintain, you know, your IT help desk

12     guys.  But it was a problem for me because I -- I

13     knew that, you know, there was some churn in that,

14     and it's just not a best practice.  You should have

15     a unique admin password on every endpoint.

16        Q.   Number 10 is "Lack of Security Controls

17     for PCC."

18           You see that?

19        A.   Right.

20        Q.   And the "Status" for that is "Accepted and

21     Remediation On-Going."

22        A.   Yeah.  I -- I -- during my tenure there at

23     the State, I think that was the most difficult

24     vendor to deal with, the PCC folks, because they

25     would say one thing and do another.

Page 56

1           And I even got to the point where I sent

2      them an attestation of a -- basically, a list of

3      minimum security.  I just wanted somebody to sign

4      their name to the fact that, you know, some -- the

5      minimum is being done.  And they signed it, but in

6      my heart of hearts, I kind of knew that they

7      probably weren't doing it.

8           So -- but at that point, they had already

9      made the decision to remove PCC and move to another

10     vendor, so it would have been kind of wasted breath

11     at that point.  Which was, I -- I think, a good -- a

12     good decision to move away from PCC.  They just --

13     they just weren't the right guys.  That's all.

14          Q.   And we'll come back to PCC later on

15     today --

16          A.   Okay.  Okay.

17          Q.   -- but just quickly, what did they have

18     responsibility for with respect to the election

19     system?

20          A.   The coding, the actual coding of the

21     program itself.  The Secretary of State didn't

22     employ anybody that -- that actually wrote computer

23     code, that developed applications.  They -- they

24     always relied on third-party vendors for that.

25          And they did the ENET system and they did,

1      you know, the corporation side and -- and also some

2      of the licensing sites as well.  They were kind of

3      the go-to company for all things Secretary of State.

4              I think prior to my arrival, the word

5      was -- is they were a lot better back then.  But

6      they had some changes.  A lot of people left, good

7      people left, that kind of thing, and over time it

8      just became a problem.  So...

9          Q.   A problem from a security perspective, was

10     that your view?

11         A.   Yeah.  Even -- yeah, even the stability of

12     the code line, I think, was wearing very, very thin

13     on the customer, being the Secretary of State.  They

14     were getting tired of, you know, things that -- you

15     had mentioned before the confidential --

16     confidentiality, integrity, and availability.  That

17     availability part of that triad is pretty important

18     when it comes to the Secretary of State.  They

19     always want to be available because they don't want

20     to be viewed as, you know, not on the -- not on the

21     ball.

22             So -- and there were some availability

23     problems with PCC.  Some of their practices were not

24     best -- best practice.  And they would fix things on

25     the fly and although it fixed it at the moment, they

1   wouldn't move that fix back into the code line, so

2   the very next time they did a revision, they would

3   re-break the thing.

4           And that is kind of a, you know, 101

5   change control operation.  Somebody wasn't watching

6   the store.  So...

7           And we tried to help grow them.  You know,

8   we gave them a lot of feedback, probably a lot more

9   than they ever wanted.

10          And then they were purchased by another

11  firm, and that gentleman -- they had a CISO there.

12  He's the gentleman that actually attested to the

13  fact that their minimum security met the minimum

14  based on what I had sent them.  I think he was

15  hopeful that it would get that way, but I had my --

16  like I said, I had my doubts, so to speak.

17      Q.   All right.  Well, going back to your

18  declaration, Mr. Hamilton, we can -- we can keep

19  walking through them one by one, but by my count,

20  there were 11 out of 20 recommendations that,

21  according to your declaration, had not been fully

22  remediated.

23      A.   Right.

24      Q.   Does that sound about right?

25      A.   (Nodded head.)

Page 59

1          Q.   Okay.  And that was the status as of
2     August 2020; correct?
3          A.   Correct, so basically three months into my
4     tenure.  That's about right, yeah.
5          Q.   Three months into your tenure.  Okay.
6               And -- but that was nearly two years after
7     Fortalice issued their cyber risk assessment in
8     November 2018; is that correct?
9          A.   Correct.
10               MR. MILLER:  Objection.  Lack of
11          foundation.
12     BY MS. KAISER:
13          Q.   And so nearly two years after Fortalice
14     issued that report, at least half of their
15     recommendations had not been fully implemented; is
16     that correct?
17               MR. MILLER:  Objection.  Asked and
18          answered.
19               THE WITNESS:  It sounds like it, yeah.
20     BY MS. KAISER:
21          Q.   Based on your experience and training,
22     does it seem reasonable to have a cybersecurity
23     vendor identify security risks in your system and
24     then not take recommended steps to address those
25     risks for nearly two years?

Page 60

```
 1            MR. MILLER:  Objection to form.  Lack of
 2       foundation.  Calls for speculation.
 3            THE WITNESS:  In -- in my professional
 4       opinion, it's not uncommon.  Some of -- some of
 5       the things that we're faced with have budgetary
 6       constraints.
 7            The bottom line is we present -- as
 8       security people, we present to the business and
 9       say, "Here's the nine things we've got to do.
10       You know, what's our bucket of money look like?
11       What does it take, you know, horsepower,
12       people, whatever?"  And then the business makes
13       the decision finally on -- on what -- what to
14       focus on.  We make recommendations and then we
15       move on those.
16            But we made pretty good headway, I
17       think --
18  BY MS. KAISER:
19       Q.  Were you pushing the Secretary of
20  State's --
21       A.  -- before I left.  So...
22       Q.  Were you pushing the Secretary of State's
23  office to move faster or make more headway on these
24  recommendations from Fortalice?
25       A.  Yes, ma'am.  I was kind of the evangelist,
```

1    and, yeah, I was -- I was not shy about it.  So...

2            Q.    Why were you pushing that?

3            A.    Just to get -- get moving, right?  We had

4    the time and some of the things, like was outlined,

5    are low cost or no cost.  It doesn't mean that it --

6    I mean, no cost is nobody has to write a check to a

7    vendor.

8            But the big thing is -- is the headcount.

9    It's the talent that you have in-house that are able

10    to do these tasks.  And a lot of my time there

11    was -- was training, mentoring, kind of teaching

12    people how to kind of ramp things up.  So -- yep.

13            Q.    Have you -- you felt that these

14    recommendations from Fortalice were good ones,

15    correct, that would improve the security of the

16    system?

17            A.    Yeah.  That's why on -- on the -- on the

18    statement where I said "Accepted" -- in any -- in

19    any situation where a -- a security firm comes in

20    and does an assessment or a pen test and they

21    present you with the findings, you're able to accept

22    those or not accept them.

23            An example of not accepting is either it

24    was out of scope or something that had long been

25    fixed and they missed it.  You know, things like

1    that.

2              So in most of these cases, I believe I

3    accepted most of these because I verified that they

4    were still valid.

5         Q.   Has Fortalice done any additional work for

6    the Secretary of State's office since the

7    penetration testing in 2018?

8         A.   I -- I -- they had an annual -- they had

9    an annual test and assessment, a pen test.

10        Q.   And when you say "pen test" --

11        A.   I know we --

12        Q.   -- is that --

13        A.   Penetration test.  That's somebody from

14   the outside tries to get in.  There's three forms of

15   that.  There's, you know, the white hat, the black

16   hat, and the gray hat.

17             So this was very much -- we did not give

18   them the keys to the castle.  We wanted them to

19   replicate the outside world, so that becomes a black

20   hat operation.

21             Gray hat is when you give them a little

22   bit of a path, you know a little bit about the

23   environment.

24             And then white hat, of course, is you give

25   them carte blanche to the environment and then they

```
 1       just go -- usually that's an internal pen test.

 2                But all of these were external.

 3          Q.    And to your understanding, Fortalice did

 4       one of these pen test assessments each year since --

 5          A.    Yes, ma'am.

 6          Q.    -- 2018?

 7                And did they test the -- the entire part

 8       of the Secretary of State's network or -- or

 9       portions of it in those years, do you know?

10          A.    Most of it was just the business network,

11       right?  It was the business network and the

12       public-facing websites, nothing specific to --

13                You know, every business has a certain

14       number of IP addresses that face the public, and I

15       think in previous years, because of cost, they had

16       kind of truncated that list a little bit.  Because

17       they do charge per IP address.

18                And I know one of the years that I was

19       there, I went ahead and had them test everything,

20       every public IP address that we had.  It was

21       expensive to do, but you -- you kind of want a basis

22       to kind of run from.  So...

23          Q.    Did these pen -- penetration tests include

24       the portions of the election system that the

25       Secretary of State is responsible for?
```

Page 64

1          A.   Yes, ma'am.  The registration side, yes.

2          Q.   Did you personally work with Fortalice on

3     these penetration tests?

4          A.   No.  I -- I'm just the client.  They're

5     done in a vacuum and then they report back in a

6     draft mode and we talk about them, and then they

7     make a final report.

8          Q.   Did they provide those reports to --

9          A.   To Merritt, yeah.  Again --

10         Q.   Did you review --

11         A.   -- that was done because they were the

12    customer.

13         Q.   Correct.

14              But did you review those reports?

15         A.   I did.

16         Q.   And you said that there were discussions

17    of the reports.

18              Were you involved in the discussions?

19         A.   I would say most of them, but maybe not

20    all of them.

21         Q.   So to your knowledge, Fortalice conducted

22    and provided a report regarding a penetration test

23    in 2019; is that correct?

24         A.   I would think so, yes.

25         Q.   And in 2020?

Page 68

```
 1            MR. MILLER:  Objection.  Lack of
 2        foundation.
 3      BY MS. KAISER:
 4        Q.   Let's see.  If you move forward on this
 5      document to the February 26, 2021, entry.
 6        A.   Okay.
 7        Q.   It's on the page ending in -2785.
 8        A.   -2785.  Okay.  I got it.
 9        Q.   The last bullet there says, "Weekly
10      update."  It says, "vCISO services have been
11      mentioned."
12        A.   Right.
13        Q.   "Kyle and Paul are setting up meeting to
14      discuss with Dave Hamilton to get them caught up on
15      a backlog of security tasks."
16            Do you --
17        A.   Right.
18        Q.   -- see that?
19        A.   Right.
20        Q.   Do you know what that is referring to?
21        A.   Yeah.  I had mentioned to Fortalice that I
22      was planning on leaving the State as soon as I found
23      another position and that they needed to -- you
24      know, as the other partner, if they had the ability
25      to step in.
```

Page 69

```
 1          You know, I wanted to take care of the
 2    State.  TrustPoint did not have any resources they
 3    had left, so there wasn't anybody from our firm.
 4    And I checked it out with my boss and he said it
 5    would be fine to kick it to them and say, "Listen,
 6    you know, we want to take care of our customer and
 7    if you're getting ready to leave, then, you know,
 8    you need to give it to them."
 9          They subsequently decided that they
10    couldn't fill that seat because of a conflict of
11    interest.
12       Q.   What was the backlog of security tasks
13    that are --
14       A.   I think --
15       Q.   -- mentioned here?
16       A.   I think I pitched to them that there was
17    definitely work to be done, it was a work in
18    progress, and it wasn't going to be -- I think my
19    emphasis there was for -- for them to please be
20    interested, you know.
21          Because they would want to bill,
22    obviously.  They didn't want to just come in and be
23    a -- more of a maintainer than a fixer, right?  So
24    my emphasis there was just to kind of get them
25    interested in coming in and stepping in for me.
```

Page 70

1          Q.    In your view, why was there a backlog of
2     security tasks?
3          A.    Well, I think it was just, you know, we
4     needed some help.  You know, we had some staff
5     turnover and some people leave and I was getting
6     spread pretty thin between there and Imperial and I
7     wasn't there every week, and I just felt like I
8     needed to kind of get people interested in coming to
9     help.
10         Q.    If you move forward in the document to the
11    entry for April 16, 2023 [sic], it's on the page
12    ending in -2784.
13         A.    -2784.  Okay.  April 16 you said?
14         Q.    16, yes.
15         A.    Yes, ma'am.  Got it.
16         Q.    It says "Project Status," and the second
17    bullet point there says, "Pen test wrapping up."
18              Do you see that?
19         A.    Okay.  Adam Brown.  Okay.
20              Yeah, I worked with --
21         Q.    Does that suggest --
22         A.    -- Adam.
23         Q.    Does that suggest to you that Fortalice
24    did conduct penetration testing in 12 --
25         A.    Sounds like it, yeah.

Page 106

1       if you insist, then let the games begin.  Fair

2       warning."

3                    Do you see that?

4            A.   Yep.

5            Q.   And it looks like -- it looks like this

6       was sent to soscontact@sos.ga.gov?

7            A.   Right.  That's just the -- the basic

8       website.  It's like sending a note to the webmaster,

9       right.

10           Q.   Okay.  And then this was forwarded on to a

11      group of people, including -- let's see -- including

12      Chris Harvey and Kevin Rayburn.

13                   Do you see that?

14           A.   Yep.  James Oliver.  Right.

15           Q.   Right.

16                   But you don't recall -- you don't have any

17      recollection of this email or this incident?

18           A.   No, ma'am.

19           Q.   And you don't recall any similar threats

20      during your time at the Secretary of State's office?

21           A.   No, nothing like that.  It's been my

22      experience that people who threaten usually don't do

23      it.  It's the people that don't say anything that do

24      things like this.

25           Q.   Do you know whether there has ever been a

1    cybersecurity assessment done of Georgia's voting

2    equipment?

3         A.   I do not.  As I understood it, that was

4    the privy of the Dominion folks and that they were

5    independently certified.  I don't know much about

6    that process.

7         Q.   So you're not aware of any cyber

8    assess- -- cybersecurity assessment of the voting

9    machines?

10         A.   No, ma'am.

11         Q.   Are you aware of any reports or

12    conclusions regarding any security vulnerabilities

13    with the BMD system?

14         A.   Not -- not specifically, because it kind

15    of fell outside my scope.  So...

16         Q.   Are you generally aware of any?

17         A.   No, I -- I can't recall any that -- I

18    mean, there was always the underpinnings of somebody

19    trying to do something, but we live with that every

20    day.  So...

21         Q.   So you're not personally aware of any

22    security breaches or vulnerabilities involving the

23    BMD system.

24              MR. MILLER:  Objection.  Asked and

25         answered.  Lack of foundation.

Page 108

```
 1            THE WITNESS:  Yeah, I -- not that I can
 2       recall.
 3   BY MS. KAISER:
 4       Q.   Are you aware of any complaints regarding
 5   the security of the BMD system?
 6       A.   No.  I -- I think I read some news stories
 7   and things like that, but nothing specific.
 8       Q.   What is the Election Center?
 9       A.   I think that's the hardened facility that
10   they moved to.  I've never been in it.  Not meaning
11   like moved the servers to.  I think that was like
12   the -- the war room, so to speak.  It's where the
13   people went during an election.
14       Q.   The people but not the servers, you said?
15       A.   No.  Servers are maintained in -- in
16   secure data centers.
17       Q.   Okay.  What server is the election
18   management system for the new BMD election system,
19   where is that currently hosted?
20            MR. MILLER:  Objection.  Foundation.
21            THE WITNESS:  Yeah, I can only -- I can
22       only speak to the stuff for the election side
23       of the house for the registration side, and
24       those are housed in -- here in Atlanta, and
25       then there's -- there's a backup site that gets
```

Page 122

1    reason people patch is because they're afraid of the

2    Internet.  It's not on the Internet; we don't need a

3    patch.

4              That's not necessarily the way I think,

5    so -- you still gotta be current for the support

6    reasons.

7         Q.   So why did you include a frowny face after

8    that comment?

9         A.   Just -- it's kind of -- for me, when I see

10   a frowny face, it's to kind of remind me that that

11   was a bad thing.  Just a note-taking style.

12        Q.   So that was something that you thought

13   needed to be changed?

14        A.   Yes.

15        Q.   Two bullets down from that, it says, "Need

16   to be able to scan every USB attached storage device

17   connected to prior [sic] use.  Cannot ensure USB is

18   free from malware, keylogging, etc."

19              Do you see that?

20        A.   Yes.

21        Q.   What did you mean by that comment?

22        A.   So it was common practice for the -- for

23   the data to be shared with the counties once they

24   drafted or came up with a -- a strawman of what

25   their ballot looks like.  They would share that data

Page 123

```
 1    via USB.  They would, you know, FedEx it to them and
 2    then they'd -- they'd mark up changes and then
 3    they'd FedEx the USB key back.
 4              Even though Michael had an internal
 5    process that when he started the event, he would
 6    take a USB drive out of the package and start, he --
 7    he thought that was good enough and -- because he
 8    encrypted it and did a lot of other things.
 9              But, you know, I had a different
10    experience in life, so I decided that I thought that
11    he needed to go to a more secure managed solution
12    for USB drives, and I proposed moving to a -- an
13    actual managed USB key program.
14              And I'm not sure if that ever got funded
15    or not.  It was not an insignificant amount of
16    money, but I think they decided that the -- you
17    know, the juice wasn't worth the squeeze, so to
18    speak.
19         Q.   So to -- to your knowledge, at the time
20    you left the Secretary of State's office, that
21    recommendation had not been implemented --
22         A.   No.  They had -- they had quotes -- we had
23    quotes and we actually had sample units that Michael
24    Barnes had where he was using it for his work flow
25    to see how it moved.
```

Page 124

1              But I think I left before that decision
2       was made.  So...
3              Q.   And why did you make that recommendation?
4              A.   Because he was using commodity-based USB
5       drives.
6              Q.   And why was that not a best practice, in
7       your view?
8              A.   Because they're not made in the U.S.
9       They're -- they could have all kinds of things on
10      them.  We don't know.
11             The only way to really make sure is to,
12      you know, wipe the thing free of -- it has to go
13      through a process of sanitization before you use it.
14             And, you know, I just -- I really like the
15      idea of a managed USB.  The name of it is called
16      DataLocker, and -- and it actually has code on it
17      that you're able to track, much like a LoJack, and
18      it keeps a log of every file ever written and a
19      log -- a file of every -- every time it's read,
20      every time it's loaded, every time anything happens
21      to it, and it uploads it to a cloud-based service so
22      you can see where these drives are; and if someone
23      got ahold of one of these drives and put it in a USB
24      slot that wasn't authorized, that it would wipe the
25      contents securely and -- kind of like bricking a Mac

Page 125

```
 1      if you don't -- if you're not the owner kind of
 2      deal.
 3              But it was a pretty significant outlay of
 4      cash to get that done.  And I think he liked the
 5      idea.  I think -- he wasn't as paranoid as I was.
 6      Michael Barnes.  Sorry.  Didn't mean to say "he."
 7              MS. KAISER:  Can you add Exhibit 12,
 8          please -- Tab 12?
 9              THE WITNESS:  14.
10              (Plaintiffs' Exhibit 14 was marked for
11          identification.)
12      BY MS. KAISER:
13          Q.  If you look at the first email in this
14      chain, it's from Michael Smith at DataLocker.
15              Do you see that?
16          A.  Yeah, all the way at the bottom?  Got it.
17      Okay.
18          Q.  Is this the vendor that you were just
19      discussing?
20          A.  Yes, ma'am.
21          Q.  So it looks like in July of 2020, you
22      reached out to DataLocker and they sent you a
23      response.
24          A.  Correct.
25          Q.  And then your email at the top of
```

1    BY MS. KAISER:

2         Q.    This is --

3         A.    Okay.

4         Q.    This is a report from Fortalice Solutions.

5               Do you see that?

6         A.    Yes.

7         Q.    Dated July 14, 2020?

8         A.    Right.

9         Q.    If you look at page 2 of the report --

10   it's the third page of the document, but it says

11   page 2 at the bottom --

12        A.    Okay.

13        Q.    -- under Section 1.1, "Overview," it says,

14   "In June of 2020, Secretary of State Georgia

15   received report of two vulnerabilities in a web

16   application hosted at

17   https://www[.]mvp[.]sos[.]ga[.]gov."

18              Do you see that?

19        A.    Correct.  Yep.

20        Q.    All right.  So this is -- the "MVP" is the

21   My Voter Page; is that right?

22        A.    Yes.

23        Q.    And the next sentence says, "Upon

24   attempted remediation, SoSGA requested that

25   Fortalice validate the remediation attempts."

Page 160

```
 1              Do you see that?
 2         A.   I do.
 3         Q.   Do you recall anything about this
 4    incident, about --
 5         A.   Yeah.  Basically --
 6              (Cross-talk.)
 7         A.   Basically, we were asking Fortalice to
 8    verify what we were being told by PCC as "it's
 9    fixed."  Because we didn't have the -- the
10    wherewithal to, you know, go through this stem by
11    stem, we got Fortalice to do it as a third -- third
12    party.  So...
13         Q.   And what did Fortalice find?
14         A.   They found that actually they had not
15    remediated it sufficiently, and they made a
16    suggestion on how to fix it the right way.  And we
17    fed that information back to PCC.
18         Q.   This is in 2020; correct?
19         A.   Probably.  Yeah.
20         Q.   Did PCC still have responsibility for the
21    MVP page in 2020?
22         A.   No.
23         Q.   So why did you need to feed the fix back
24    to PCC?
25         A.   Because they still write the code.  They
```

                                        Page 161

1      still manage the application, they just don't manage

2      the hardware.  So they're still responsible for the

3      code line.

4          Q.   So when you identified a vulnerability on

5      the My Voter Page, you still had to rely on PCC to

6      fix it?

7          A.   Correct.

8          Q.   If you look at page 4 of the Fortalice

9      report --

10         A.   Okay.

11         Q.   -- under "Conclusion," it says, "The

12     remediation attempts that are currently in place

13     partially fix the issues in the original report, but

14     more work needs to be done to secure the website

15     from potential attacks."

16              Do you see that?

17         A.   Right.

18         Q.   "In addition to the checks performed,

19     Fortalice noticed other areas of potential impact

20     that, while unconfirmed, Fortalice believes could be

21     used to further exploit the site or the servers

22     hosting it.  Fortalice recommends having the

23     application thoroughly reviewed for similar issues."

24              Do you see that?

25         A.   Correct.  Right.

Page 162

1      Q.   Do you know whether that recommendation

2   was accepted, to have the application reviewed for

3   similar issues?

4      A.   I -- I didn't.  I didn't have an

5   application-specific review done for them because

6   I -- I think at that point, the decision had been

7   made to jettison PCC.

8           So I think leadership looked at it as,

9   "We're going away from them, so, you know, we're

10  going to spend the time on the new stuff."

11          We did feed all this information back to

12  them, that there might be some other areas and, you

13  know, as a partner, we expect them to, you know,

14  find some of their own issues.  We don't want to

15  be -- be their QA group.  So...

16     Q.   I just want to make sure I understand the

17  timing, because, you know, I -- I've understood you

18  to say that PCC was jettisoned in 2019; is that

19  right?

20     A.   From the operational standpoint, right,

21  the care and feeding of the servers, the patching,

22  that kind of stuff, and the contract of housing the

23  servers and we're paying them to do that service.

24          But the actual code line, the development

25  and the -- and the -- you know, the changes that

Page 163

1    were made to MVP and all those -- OLVR, all those

2    systems, were still under their control because they

3    were the developers.

4          Q.    Right.

5                And so by 2020, the Secretary of State's

6    office had taken over with respect to the security

7    of these applications; is that right?

8          A.    Well, insofar as we can handle it from

9    the -- from the edge.  But as far as internal to the

10   actual application, we still have to rely on PCC to

11   do what they profess they're experts at.

12               So that's why we run these monthly checks,

13   and what we do with Fortalice with pen tests is to,

14   you know, trust but verify, right?  We verify what

15   they told us to be true.

16               Because the Secretary of State doesn't

17   employ any developers, that's -- that's a bit of

18   a -- a hill to climb.  We didn't have anybody in

19   there that wrote code, so we couldn't really

20   challenge them on a code line level.  We just

21   identified, "Hey, this doesn't work right; go fix

22   it."

23         Q.    So when --

24         A.    This --

25         Q.    -- Fortalice recommended -- recommended a

Page 164

1        thorough application review, is that --
2               A.    Uh-huh.
3               Q.    -- something that the Secretary of State's
4        office could carry out, or would you have to rely on
5        PCC?
6               A.    No, no, no.  We would have to actually
7        hire another company to do that as a third party.
8                     So they would take the source code, they
9        would go review the source code and how the program
10       is written, and make recommendations, look at common
11       security vulnerabilities.
12                    There's a term "OWASP."  It's for the --
13       you know, the top 25 things that people do wrong in
14       programs.  And they were missing some of the basic
15       stuff, so we started beating up on them about being
16       at least OWASP compliant.
17                    But it would have been a third party.  I'm
18       not sure if -- if Fortalice provided that.  They --
19       they may or may not have had that as -- it sounds
20       like it is.  It sounds like, "Oh, by the way, you
21       know, we could do this for you," cha-ching, you
22       know, that kind of thing.
23              Q.    But to your knowledge, that kind of
24       thorough review of the application for similar
25       issues to the ones you identified at the time was

Page 165

1    never done?
2          A.   Not while I was there.  It might have been
3    done after I left, but, again, that's --
4          Q.   You're not aware of that?
5          A.   I'm not aware of it, right.
6                MS. KAISER:  Tab 18, please.  I'm adding
7          Exhibit 20.
8                THE WITNESS:  Okay.
9                (Plaintiffs' Exhibit 20 was marked for
10         identification.)
11               THE WITNESS:  Okay.
12   BY MS. KAISER:
13         Q.   This is an email from you dated April 29,
14   2021.
15         A.   Right.
16         Q.   Do you see that?
17               And it says to Ronnell Spearman, Derek
18   Hawkins, and DeVon King.
19         A.   Right.
20         Q.   And are those -- are those the three
21   security analysts that reported to you --
22         A.   At that --
23         Q.   -- at this time?
24         A.   -- time, right.
25               COURT REPORTER:  One at a time, please.

Page 183

1    operational world of running a business, we have to

2    do these things and reprioritize.

3              So that's basically what that was.

4         Q.   Do you understand that Dr. Halderman has

5    analyzed the voting equipment that is used in

6    Georgia today to assess the reliability and security

7    of that equipment?

8         A.   I didn't know that he personally had done

9    it, no.  I know --

10        Q.   So you weren't aware that he's issued a

11   detailed report finding that the current system

12   suffers from many significant vulnerabilities?

13        A.   I didn't --

14             MR. MILLER:  Objection.  Lack of

15         foundation.

16             THE WITNESS:  Yeah, I -- I didn't.  Sorry.

17   BY MS. KAISER:

18        Q.   You didn't know -- you just didn't know

19   about that report one way or the other?

20        A.   No.  I'm not --

21             MR. MILLER:  Objection.

22             THE WITNESS:  -- in the academic world.  I

23         don't spend a lot of time reading papers and

24         things like that.  So...

25

Page 184

```
 1      BY MS. KAISER:
 2           Q.   I'm sorry.  It was not a paper, but a
 3      report in this case.
 4           A.   Yeah, that's fine.
 5                MR. MILLER:  Objection.  Lack of
 6           foundation.
 7      BY MS. KAISER:
 8           Q.   So you were not -- not aware of it?
 9                MR. MILLER:  Same objection.
10                COURT REPORTER:  The answer again, please?
11                THE WITNESS:  No, I -- I was not aware of
12           it.
13                COURT REPORTER:  Thank you.
14      BY MS. KAISER:
15           Q.   Do you understand that the current BMD
16      voting system uses QR codes to tally votes?
17           A.   I do --
18                MR. MILLER:  Objection --
19                THE WITNESS:  -- and only because I vote
20           in Georgia.  I saw them.  So...
21                COURT REPORTER:  The objection again,
22           please?
23                MR. MILLER:  Lack of foundation.
24                COURT REPORTER:  Thank you.
25                Please -- please let him get in an
```

Page 185

```
 1           objection and her finish the question.  Thank
 2           you.
 3                THE WITNESS:  All right.
 4      BY MS. KAISER:
 5           Q.  Are you aware that the current election
 6      equipment can be hacked in a way that QR codes can
 7      be changed so that they don't reflect what the voter
 8      actually intended when they voted on the machine?
 9                MR. MILLER:  Objection.  Lack of
10           foundation.
11                THE WITNESS:  I did not.
12      BY MS. KAISER:
13           Q.  Based on your experience and training, if
14      that were the case, would you take measures to
15      eliminate that vulnerability?
16                MR. MILLER:  Objection.  Lack of
17           foundation.
18                THE WITNESS:  I don't know if I have
19           enough information, but, yeah, it would
20           definitely go on the list.
21      BY MS. KAISER:
22           Q.  Would it be a high priority on the list?
23                MR. MILLER:  Same objection.
24                THE WITNESS:  I -- again, it -- it all
25           depends on what else was going on at the time.
```

1          So...

2     BY MS. KAISER:

3          Q.   A vulnerability that would allow a QR code

4     to be changed to change votes, would that be

5     considered high priority?

6               MR. MILLER:  Objection.  Lack of

7          foundation.  Asked and answered.

8               THE WITNESS:  But the -- the issue is is

9          that -- that system is out of scope for me in

10          my role for Secretary of State.  It -- it all

11          belongs to Dominion.

12               So for them, I would imagine it would

13          cause some heartburn, but not -- I -- out of

14          scope for me.

15     BY MS. KAISER:

16          Q.   Would it surprise you to learn that the

17     Secretary of State's office has taken no measures to

18     mitigate or eliminate any of the vulnerabilities

19     that Dr. Halderman has found with the existing

20     equipment in Georgia?

21               MR. MILLER:  Objection.  Lack of

22          foundation.  Form of the compound question.

23          Misstates testimony.

24               THE WITNESS:  Yeah, I -- I -- I don't know

25          what he -- he brought out.  I don't know what

1           his list was.

2     BY MS. KAISER:

3           Q.   Based on your experience and training in

4     cybersecurity, if a cybersecurity expert identifies

5     vulnerabilities with a voting system, would you

6     think it would be a high priority to address those

7     vulnerabilities?

8                MR. MILLER:  Objection.  Lack of

9           foundation.  Calls for speculation.

10               THE WITNESS:  Yeah, I don't -- I would

11          be -- I'd be suspect of it.  Just -- I'd want

12          to look at it myself.

13    BY MS. KAISER:

14          Q.   Would you look at it yourself, though?

15               MR. MILLER:  Same objection.

16               THE WITNESS:  If given the opportunity, I

17          guess, yeah.

18    BY MS. KAISER:

19          Q.   And if you, yourself, identified security

20    vulnerabilities, would it be a high priority --

21    priority to fix those vulnerabilities?

22               MR. MILLER:  Objection.  Lack of

23          foundation.  Calls for speculation.

24               THE WITNESS:  All depends on the -- the

25          judgment at the time, I guess, of what's going

Page 188

1          on.

2     BY MS. KAISER:

3          Q.   If you had responsibility for voting

4     equipment and you identified a security

5     vulnerability in that equipment, would you consider

6     that an important thing to -- to fix?

7          A.   Yes.

8               MR. MILLER:  Objection.  Lack of

9          foundation.  Calls for speculation.

10              THE WITNESS:  Sorry.

11    BY MS. KAISER:

12         Q.   Your answer was?

13         A.   Yes.

14         Q.   Thank you.

15              MS. KAISER:  All right.  Mr. Hamilton, if

16         you'll give us just a minute to confer, I think

17         we're -- we're reaching the end of our

18         questions.

19              THE WITNESS:  Okay.

20              MS. KAISER:  So we'll go off the record

21         for just a minute, please.

22              VIDEOGRAPHER:  The time is 2:15.  We're

23         off the record.

24              (Off the record.)

25              VIDEOGRAPHER:  The time is 2:27.  We're

Page 189

1          back on the record.

2      BY MS. KAISER:

3          Q.   Just a few more questions for you,

4      Mr. Hamilton.

5               Are you aware that Dr. -- Dr. Halderman

6      got access to Fulton County's voting equipment in

7      August of 2020?

8          A.   No, I didn't.

9          Q.   Okay.  You were chief information security

10     officer at the time, August 2020; correct?

11         A.   Yes.

12         Q.   All right.  And were you aware that

13     Dr. Halderman testified in an evidentiary hearing in

14     September of 2020 about that election -- about

15     vulnerabilities in that equipment?

16         A.   Was that the same one that I did my

17     testifying in or is that a different one?

18         Q.   I'm sorry.  Did you ever testify at a

19     hearing?

20         A.   Yes, ma'am.  I was -- I had, like, two

21     questions asked of me, but yeah.  It was a

22     federal -- I thought it was the Curling case, the

23     initial part of it, with Judge Totenberg.  She asked

24     me to clarify a couple of terms.  But --

25         Q.   Okay.

Page 190

1          A.   -- that was when -- that was when we -- we
2     got Zoom bombed that day.  Do you recall that?
3          Q.   You know, I wasn't present at the hearing,
4     so I can't recall.
5          A.   Okay.
6               MS. KAISER:  And, Carey, I'm not sure if
7          you recall either if that was the
8          September 2020 hearing.
9               MR. MILLER:  My understanding of the
10         question, I think so, yeah.
11              MS. KAISER:  Okay.
12    BY MS. KAISER:
13         Q.   Well, so did -- were you present for
14    Dr. Halderman's testimony --
15         A.   No.
16         Q.   -- in a -- in a hearing?
17         A.   No, no, no.  I only -- the only people I
18    saw were the ones that were on that day, and he was,
19    I think, on a previous day.  That's why I had to
20    respond in writing for his stuff.
21         Q.   And are you aware -- are you aware that he
22    testified that he was able to hack the election
23    equipment from Fulton County?
24              MR. MILLER:  Objection.  Lack of
25         foundation.  Calls for speculation.

```
                                          Page 191
 1              THE WITNESS:  Yeah, I -- I didn't realize.
 2         No, I didn't hear that.
 3    BY MS. KAISER:
 4         Q.   And he was able to do so in just three
 5    days?
 6              MR. MILLER:  Objection.  Lack of
 7         foundation.  Calls for speculation.
 8    BY MS. KAISER:
 9         Q.   You're --
10         A.   And this is the --
11         Q.   -- not aware of that testimony?
12         A.   No.  Just as it pertains to that list that
13    I gave.
14         Q.   This is not -- this is not about the list
15    of -- from Fortalice; this is --
16         A.   Okay.
17         Q.   -- this is separate.
18         A.   Yeah.  I wasn't present for any of that.
19         Q.   Okay.  And you were not made aware of
20    Dr. Halderman's testimony regarding hacking the
21    actual election equipment from Fulton County?
22         A.   No, I was not.
23              MR. MILLER:  Objection.  Asked and
24         answered.
25              THE WITNESS:  Sorry.
```

Page 192

1    BY MS. KAISER:

2         Q.   Would you expect to be made aware of

3    that -- of testimony that the election equipment

4    that Georgia had and was using was able to be hacked

5    in three days?

6              MR. MILLER:  Objection.  Calls for

7         speculation.

8              THE WITNESS:  Yeah, I would think so.

9    BY MS. KAISER:

10        Q.   And as -- in your role as chief

11   information security officer for the Secretary of

12   State's office, that's something that you would have

13   liked to know about; is that right?

14             MR. MILLER:  Objection.  Calls for

15        speculation.

16             COURT REPORTER:  The answer again, please?

17   BY MS. KAISER:

18        Q.   But nobody told you about that testimony

19   from Dr. Halderman?

20             MR. MILLER:  Objection.  Lack of

21        foundation.  Asked and answered.

22             COURT REPORTER:  I didn't hear the

23        previous answer to the question -- the previous

24        question.

25             THE WITNESS:  No.  "No" was on both.

Page 193

1          Yeah.

2                COURT REPORTER:  Thank you.

3                MS. KAISER:  I just want to make sure,

4          Ms. Barnes -- I'm sorry, I don't have access to

5          the realtime -- which question did you not have

6          an answer to?

7                COURT REPORTER:  One moment, please.

8                (Whereupon, the record was read by the

9          reporter as follows:

10                     Question, "In your role as chief

11          information security officer for the Secretary

12          of State's office, that's something that you

13          would have liked to know about; is that

14          right?")

15                THE WITNESS:  And I said, yes, that would

16          be nice to know.

17     BY MS. KAISER:

18          Q.   Do you have any idea why nobody told you

19     about this testimony from Dr. Halderman?

20                MR. MILLER:  Objection.  Calls for

21          speculation.

22                THE WITNESS:  I don't.

23     BY MS. KAISER:

24          Q.   Are you aware of any measures to mitigate

25     the hack that Dr. Halderman executed on the Fulton

Page 194

1     County election equipment?

2          A.   No, I --

3               MR. MILLER:  Objection.  Lack of

4          foundation.  Calls for speculation.

5               THE WITNESS:  No, I -- I would expect that

6          to be a Dominion thing.  So...

7     BY MS. KAISER:

8          Q.   You think -- do you think the Georgia

9     Secretary of State's office would be involved,

10    though?

11              MR. MILLER:  Objection.  Calls for

12         speculation.

13              THE WITNESS:  I -- I would think as a

14         customer, yeah.

15    BY MS. KAISER:

16         Q.   And who within the -- the Georgia

17    Secretary of State's office would have

18    responsibility over that?

19         A.   Over the machines themselves?

20         Q.   Yes, or -- yeah, over identifying or

21    mitigating vulnerabilities with the machines

22    themselves.

23              MR. MILLER:  Objection.  Lack of

24         foundation.

25              THE WITNESS:  Yeah, it was my

Page 195

```
 1              understanding that all of them are actually
 2              owned by the individual counties.  So --
 3                   But, yeah, I still think the Secretary of
 4              State would want to know that information and
 5              then do -- you know, get somebody excited about
 6              fixing it if that was the case.
 7      BY MS. KAISER:
 8         Q.   And the person within the Secretary of
 9      State's office under whose purview that would fall,
10      don't you think that would be the chief information
11      security officer?
12                   MR. MILLER:  Objection.  Calls for
13              speculation.  Lack of foundation.
14                   THE WITNESS:  I guess if it was in scope,
15              probably, yep.
16      BY MS. KAISER:
17         Q.   So this shouldn't just be a Dominion
18      thing, as you said earlier; right?  That's something
19      that --
20         A.   Well, I mean, it's their -- it's their
21      equipment and it's their code line, so, you know, we
22      can't fix it for them.  They would have to do it for
23      us, much like PCC would have to fix their software
24      for us.
25         Q.   But the Secretary of State's office would
```

Page 196

1     have a great interest in making sure that those

2     vulnerabilities were fixed; correct?

3          A.   I would think --

4               MR. MILLER:  Objection --

5               THE WITNESS:  -- so.

6               MR. MILLER:  -- asked and answered.  Calls

7          for speculation.

8               MS. KAISER:  Did you get that answer,

9          Ms. Barnes?

10              COURT REPORTER:  I heard, "I would think

11         so."

12    BY MS. KAISER:

13         Q.   Are you aware, Mr. Hamilton, that

14    Fortalice conducted an assessment of the BMD

15    equipment in 2019?

16         A.   No, actually, not -- you mean the actual

17    polling equipment in the --

18         Q.   (Nodded head.)

19         A.   No, I didn't realize they did that.  That

20    must have been on a -- on a separate statement of

21    work.

22         Q.   So you had no involvement with -- with

23    that assessment by Fortalice of the equipment

24    itself?

25         A.   No.  And it might be just because it was

Page 197

1    excluded from my statement of work from TrustPoint.

2    You know, it was specifically excluded that the

3    actual voting tabulating, Dominion or whatever, was

4    excluded from my responsibilities.

5              MS. KAISER:  All right.  Just one -- one

6         more minute, Mr. Hamilton.  Thank you.

7              THE WITNESS:  Okie doke.

8              VIDEOGRAPHER:  Would you like to go off

9         the record, Counsel, or stay on?

10             MS. KAISER:  [Inaudible], please.

11             VIDEOGRAPHER:  I'm sorry.  You broke up.

12             MS. KAISER:  I said go off the record,

13        please.

14             VIDEOGRAPHER:  The time is 2:35.  We are

15        off the record.

16             (Off the record.)

17             VIDEOGRAPHER:  The time is 2:38.  We're

18        back on the record.

19   BY MS. KAISER:

20        Q.   Mr. Hamilton, just -- I just want to make

21   sure the record is clear.

22             You're not aware of any request by anyone

23   from the Secretary of State's office to Dominion to

24   fix any of the vulnerabilities that Dr. Halderman

25   identified with the Fulton County voting equipment;

1      is that correct?

2              A.    That is --

3                    MR. MILLER:  Objection --

4                    THE WITNESS:  -- correct.

5                    MR. MILLER:  -- lack of foundation.

6                    THE WITNESS:  I -- I don't recall any

7          conversation specific to Fulton County except

8          for that notebook we talked about.

9      BY MS. KAISER:

10             Q.    That was a laptop.

11             A.    Laptop, yeah, notebook.  Sorry.

12             Q.    Right.

13                   So with respect to the Fulton County

14     voting equipment that Dr. Halderman tested and was

15     able to hack, you don't recall any instruction to

16     Dominion to fix anything related to that?

17             A.    No.

18                   MR. MILLER:  Objection.  Lack of

19         foundation.  Asked and answered.

20                   THE WITNESS:  No.

21                   MS. KAISER:  All right.  No further

22         questions from me, Mr. Hamilton.  Thank you

23         very much for your time today.

24                   THE WITNESS:  Thank you.

25                   MR. MILLER:  Dave, I'm going to have a

Page 201

1    you never worked on the ballot-marking devices

2    themselves?

3         A.    No, sir, not in any --

4         Q.    Never worked on the printer?

5         A.    Nope.

6         Q.    Never worked on the scanner into which the

7    ballots were fed?

8         A.    No, sir.

9         Q.    Okay.  And was that type of work beyond

10   your work scope?

11        A.    It was.

12        Q.    So Ms. Kaiser asked you a couple of

13   questions concerning Dr. Halderman.

14              Do you recall that?

15        A.    Yes.

16        Q.    Are you aware that the report he worked on

17   concerned hacking of that same voting equipment?

18        A.    I -- I didn't correlate the two, no.

19        Q.    Okay.  Knowing that, that would then be

20   outside of your work scope; right?

21        A.    Yes.

22        Q.    You talked earlier with Ms. Kaiser about

23   the EMS system.

24              Do you recall that?

25        A.    Uh-huh.

Page 207

1                    C E R T I F I C A T E
2
3

     STATE OF GEORGIA:
4
     COUNTY OF FULTON:
5
6

     I hereby certify that the foregoing transcript was
7    taken down, as stated in the caption, and the
     questions and answers thereto were reduced to
8    typewriting under my direction; that the foregoing
     pages represent a true, complete, and correct
9    transcript of the evidence given upon said hearing,
     and I further certify that I am not of kin or
10   counsel to the parties in the case; am not in the
     regular employ of counsel for any of said parties;
11   nor am I in anywise interested in the result of said
     case.
12
13
14
15
16

     LEE ANN BARNES, CCR B-1852, RPR, CRR, CRC
17
18
19
20
21
22
23
24
25

Page 208

1                  COURT REPORTER DISCLOSURE
2
3        Pursuant to Article 10.B. of the Rules and
         Regulations of the Board of Court Reporting of the
4        Judicial Council of Georgia which states: "Each
         court reporter shall tender a disclosure form at the
5        time of the taking of the deposition stating the
         arrangements made for the reporting services of the
6        certified court reporter, by the certified court
         reporter, the court reporter's employer, or the
7        referral source for the deposition, with any party
         to the litigation, counsel to the parties or other
8        entity. Such form shall be attached to the
         deposition transcript," I make the following
9        disclosure:
10
11       I am a Georgia Certified Court Reporter. I am here
         as a representative of Veritext Legal Solutions.
12       Veritext Legal Solutions was contacted to provide
         court reporting services for the deposition.
13       Veritext Legal Solutions will not be taking this
         deposition under any contract that is prohibited by
14       O.C.G.A. 9-11-28 (c).
15
16       Veritext Legal Solutions has no contract/agreement
         to provide reporting services with any party to the
17       case, any counsel in the case, or any reporter or
         reporting agency from whom a referral might have
18       been made to cover this deposition. Veritext Legal
         Solutions will charge its usual and customary rates
19       to all parties in the case, and a financial discount
         will not be given to any party to this litigation.
20
21
22       _Lee Ann Barnes_

23       LEE ANN BARNES, CCR B-1852B, RPR, CRR, CRC
24
25