# EXHIBIT 71

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2            FOR THE NORTHERN DISTRICT OF GEORGIA

3                     ATLANTA DIVISION

4

5    DONNA CURLING, et al.              )
                                        )
6              Plaintiffs              )
                                        )
7                vs.                   )Case No.
                                       )1:17-CV-2989-AT
8    BRAD RAFFENSPERGER, et al.         )
                                        )
9              Defendants              )
     _____)

10

11

12

13

14

15

16       VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF

17                JUAN GILBERT, Ph.D.

18             Friday, October 29, 2021

19                    Volume I

20

21

22    Reported by:
      CARLA SOARES
23    CSR No. 5908

24    Job No. 4871592

25    Pages 1 - 289

Page 13

1   said, "incomplete report."

2       Q   You said you read what was given to you.

3   I just wanted to confirm that, to your

4   understanding, what was given to you was

5   Dr. Halderman's complete July 1 report; is that

6   right?

7       A   Yes.

8       Q   Did I understand correctly, you reviewed

9   that report carefully before responding to it,

10  right?

11      A   Yes.

12      Q   But nowhere in your July 16 declaration do

13  you indicate that you've conducted any examination

14  of any election equipment used in Georgia; is that

15  right?

16      A   Correct.  I have not examined any

17  equipment.

18      Q   You did not think that was relevant to

19  respond to Dr. Halderman's analysis, examining that

20  equipment?

21      A   In my response, no.

22      Q   Why not?

23      A   I only responded to things that I could

24  respond to without having examined the equipment

25  using the expertise that I have in the area.

Page 41

```
 1              MR. CROSS:  It should be in the "Marked
 2    Exhibits" folder.  I'm not sure exactly how to
 3    change the exhibit name.  Here we go.
 4              (Exhibit 2 was marked for identification
 5         and is attached hereto.)
 6    BY MR. CROSS:
 7         Q   Do you see Exhibit 2?
 8         A   Let me refresh.  I don't see it.
 9              MR. MILLER:  David, just for your
10    awareness, they're not labeled as Exhibit 1 -- the
11    first one is, but there's no Exhibit 2.
12              MR. CROSS:  Say again?
13              MR. MILLER:  I'm just saying, for your
14    awareness, the files are not labeled Exhibit 2, like
15    the file name.
16              MR. CROSS:  I just renamed it.  It should
17    show up now as Exhibit 2.
18              MR. MILLER:  Okay.
19              THE WITNESS:  Okay.  I found it.
20    BY MR. CROSS:
21         Q   Okay.  So if you can open that, let me
22    know when you have it, Dr. Gilbert.
23         A   Got it.
24         Q   Do you see that this is -- it says
25    "Georgia Voter Verification Study, January 22nd,
```

Page 42

1    2021"?

2        A   I see that.

3        Q   Do you understand that this is a study

4    that was actually commissioned by the Georgia

5    Secretary of State looking at actual elections in

6    certain counties in 2020?

7        A   I do not understand that as I have not

8    read this, so I don't.  All I have is the title that

9    I can see, and all I can gather is what I can gather

10   from the title.

11       Q   In fact, you don't reference this study in

12   your July 16 report, correct?

13       A   I don't believe so.  I'm looking at this

14   trying to see if I've seen this.

15           Okay.  Yeah, I don't believe I reference

16   this study.  Georgia, University of Georgia.  No.

17           The study that I recall was, I believe, a

18   study in Tennessee where people were observing

19   whether or not individuals were verifying their

20   ballots off of a BMD, and they were recording the

21   amount of time spent.

22           But I don't recall this particular study.

23       Q   Were you aware that the state had

24   commissioned this study and that at least a draft of

25   the report was available six months before you

Page 43

1    issued your declaration on behalf of the state in
2    this case?
3           A    I do not.  I don't -- I'm looking at this.
4    I don't recall this study.  I don't recall getting
5    this study.
6           Q    Do you recall that Dr. Stark,
7    Dr. Halderman and Dr. Appel all discussed this study
8    in their declarations in response to your July 16
9    declaration?
10          A    I don't recall that.
11          Q    So even though all three of them
12   emphasized this study in their response to your
13   declaration, you never read it before this moment?
14          A    I don't believe I've read this study.  It
15   does not look familiar to me.  I'm trying to go
16   through it and see.  I don't -- I don't recall this
17   study.
18          Q    Have you read the reply declarations from
19   those three experts in response to your July
20   declaration?
21          A    I may have.  I don't know.  If we could
22   look at one, I could tell you if I've seen it
23   before.
24          Q    So you didn't review those, for example,
25   in preparation for your deposition today?

Page 55

1    But I did not read it, and so that's -- that's where
2    I stand on it.
3         Q    Well, if it's not because you don't want
4    to read it, why have you not read it, especially
5    given that three different experts pointed it out in
6    their response to you?
7         A    I have to go back and see where they
8    pointed it out, and I could answer why I didn't read
9    it after reading what they -- what their claims
10   were.
11        Q    If reminding voters to verify their
12   ballots before they're tabulated is sufficient, as
13   you use that term, to address the concerns about the
14   reliability of BMDs, then why have you bothered to
15   create this new BMD, which you said is intended to
16   resolve that concern?
17        A    Because it's an improvement.  By that
18   analogy, you know, we improve technology in a lot of
19   areas that either work or are sufficient or whatever
20   the case would be, but it's an improvement.
21        Q    Why do you need to make an improvement if
22   the measure you've identified is already sufficient?
23        A    Because that's what I do.  I make things
24   work.  I make things better.  I improve upon them.
25   That's the kind of work we do.

Page 56

1          Q   You improve things that are already
2      sufficient in the way they currently operate?
3          A   Yes.  We can do that, too.  Yes.
4          Q   Dr. Gilbert, you recognize that BMDs are
5      often nontransparent, right?
6          A   I don't understand what that means.
7          Q   You don't understand what that means?
8          A   No, I do not.  What do you mean by
9      "nontransparent"?
10         Q   Do you agree that BMDs are often hackable?
11         A   No, I do not.
12         Q   Do you agree that BMDs are often overly
13     complex?
14         A   No, I do not.
15             (Exhibit 3 was marked for identification
16             and is attached hereto.)
17     BY MR. CROSS:
18         Q   All right, Dr. Gilbert.  Grab Exhibit 3 if
19     you would.  It should pop up here in just a minute
20     for you.
21             Let me know when you have it.
22         A   You said 3?  Okay.  I found it.
23         Q   Do you have it, Dr. Gilbert?
24         A   Yes, I do.
25         Q   Exhibit 3 is a patent dated June 15 of

Page 57

```
 1   this year for which you are the inventor; right,
 2   sir?
 3         A    Yes, this appears to be the patent.
 4         Q    Have you seen this patent before?
 5         A    This appears to be what we submitted, yes.
 6         Q    If you turn to the page -- it looks like
 7   it's -- if you go past the figures, so after
 8   Figure 6, you'll get to where it starts to describe
 9   the patent, and it has "Transparent Interactive
10   Printing Interface."
11              Do you see that?
12         A    Yes.
13         Q    And this concerns the new BMD prototype
14   that we've been discussing today that you developed,
15   right?
16         A    Yes.
17         Q    Do you see under "Background"?
18         A    Yes.
19         Q    Do you see what's written here in this
20   patent that you helped prepare, and for which you're
21   identified as the inventor, it reads,
22   "Ballot-marking devices (BMDs) such as electronic
23   ballot markers (EBMs) electronically-assisted ballot
24   markers, in voting machines are often
25   nontransparent, hackable, and overly complex."
```

Page 58

1          That's written here; correct, sir?

2      A   Yes, it is.

3      Q   It also goes on, "Such conventional

4  devices often result in a trade-off between

5  consistency and transparency," right?

6      A   Yes.

7      Q   And at the end it reads, "It is typically

8  difficult or impossible to fully examine and trace

9  the process and result of entering selections for a

10  ballot using conventional BMDs and EMDs."

11          Do you see that?

12      A   Yes, I do.

13      Q   In preparing the patent for which you're

14  identified as an inventor, were you careful to be

15  accurate and truthful in the information that you

16  included there?

17      A   I was careful to be truthful in the

18  information and as accurate as possible using

19  language that I've seen in other places about BMDs.

20          These are allegations against BMDs.  And I

21  would say I don't necessarily agree with all the

22  allegations, but these are common allegations

23  against BMDs.  So I'm stating what is the common

24  allegation against BMDs.  And that's why it's in

25  background, to say these are the common allegations

Page 59

1    against BMDs.

2           Q    Dr. Gilbert, nowhere here does it say that

3    these are allegations that you do not believe to be

4    true; right, sir?

5           A    Right.  In a patent submission, I don't

6    think I would say that I don't agree with these or I

7    don't believe these things.  I wouldn't say that in

8    a patent application.

9                What I'm doing is stating what is commonly

10   said or communicated in the -- in a community around

11   BMD allegations.

12               These allegations that I am setting forth

13   are -- even right as we're here now -- are the bases

14   for these allegations.  So these are, I would argue,

15   common -- common allegations that are said.

16          Q    Dr. Gilbert, do you understand you're

17   under oath today?

18          A    Yes, I am under oath, and I would say --

19          Q    Do you understand --

20          A    -- they're common allegations.

21          Q    Do you understand that not being truthful

22   under oath today is a felony?

23          A    Yes, sir.

24          Q    Okay.

25               MR. MILLER:  Object.  This is --

Page 68

1      Q    The testing that you did with the ES&S BMD

2   years ago, was that cybersecurity testing?

3      A    No, it was accessibility testing.

4      Q    You've never done cybersecurity testing on

5   BMD equipment or software; is that right?

6      A    I don't -- what do you mean by "cyber"?

7           So I just -- as I explained, I created a

8   transparent voting machine which we did election

9   security testing to get at a vulnerability

10  Dr. Halderman had identified as voters not

11  verifying.  So that's an example where I have done a

12  test of election security, not cybersecurity.

13  Election security.

14     Q    Thank you.  That's a fair distinction.

15  Let me ask a better question.

16          As I understand it, you have not conducted

17  any test to determine the extent to which any BMD

18  software or hardware can be hacked; is that fair?

19     A    Can be hacked?  I have not hacked any,

20  so -- that's not what I do.  I don't know if that

21  answers your question or not.  But I don't hack

22  these systems.  I said that time and time again.

23          MR. MILLER:  David, I don't know where you

24  are on your timeline.  Do you want to take a short

25  break and come back, if that's all right with you?

Page 70

1    innovating, but I'm not a cybersecurity person.

2         Q    But you also emphasize that risk-limiting

3    audits are also needed to address reliability issues

4    with BMDs, right?

5         A    I think, again, doing a NASEM report,

6    National Academies report, we've recommended

7    risk-limiting audits, and I'm supportive of that

8    recommendation.

9         Q    But RLAs do not have any ability to

10   determine whether an individual vote has been

11   counted correctly, right?

12        A    Yes.  My understanding -- again, I'm not

13   an audit expert -- but my understanding is if you

14   had hand-marked paper ballots and you send them

15   through a scanner, and the scanner gave you a wrong

16   tabulation, that the RLA would catch that improper

17   tabulation.  So then it would essentially get the

18   right outcome.

19        Q    Are you talking about a situation where

20   the QR code does not match the human-readable text?

21        A    Any ballot -- what I said was if you have

22   a hard-marked paper ballot and you send them through

23   a scanner, but the scanner has been compromised and

24   gives you the wrong out -- number, gives you the

25   wrong determination, the RLA should catch that and

Page 71

1    give you the right tally.

2         Q    Right.  The right tally, but it's not

3    going to tell you whether any individual ballot was

4    altered, right?

5         A    Would it tell you if an individual ballot

6    was altered?  If I sent a ballot through the

7    scanner -- I guess it would depend.  Again, I'm not

8    an audit expert.  It just depends on how far you

9    investigate to determine if the ballot was correct.

10            So in other words, if a hand-marked paper

11   ballot -- if a person made an oval but the scanner

12   recorded that oval improperly, but if you looked at

13   the record of the scanner and the ballot, then you

14   would be able to get the correct record vote.  So

15   that way -- that's one way you would get a

16   correction.

17        Q    Dr. Gilbert, do you understand that in

18   Georgia, the QR code is the official ballot of

19   record for tabulation?

20            MR. MILLER:  Object to form.

21            THE WITNESS:  I believe in prior

22   declarations, I've referenced documents that showed

23   that the human-readable text is what was used in the

24   audit and would be the determining part of the

25   tally.  That is my understanding.

Page 72

1    BY MR. CROSS:

2         Q   Do you understand when votes are tabulated

3    in the ordinary course of an election in Georgia,

4    they're tabulated using the QR code for a BMD

5    ballot?  Do you understand that?

6         A   My understanding is that they are put

7    through the tally machine and then they are tallied

8    on the QR code and followed by the -- again, the

9    RLA.  But yes, it does read the QR code.

10        Q   When you say, "followed by the RLA," why

11   do you think there's an RLA of every contest in

12   Georgia?

13        A   I didn't say, "every contest."  Again, I

14   just said there's an RLA.  And I -- never mind.

15        Q   So when you said that the way votes are

16   tallied in Georgia is they go through -- the QR is

17   tabulated and then it's followed by an audit, that's

18   not accurate except for a single election statewide

19   every two years, right?

20            MR. MILLER:  Objection.  Calls for a legal

21   conclusion.

22            THE WITNESS:  I'd have to go back and

23   confirm how it's actually done in Georgia by any

24   statute.

25   ///

Page 73

1    BY MR. CROSS:

2        Q    As you sit here today, do you have any

3    reason to believe that Georgia is auditing anything

4    other than a single election statewide every two

5    years?

6        A    I don't -- I don't know.

7        Q    So for any election where Georgia is not

8    conducting an RLA, do you understand that the QR

9    code is the only thing that gets tabulated?

10       A    In any election that they don't do an RLA,

11   then the QR code would be the tabulation that comes

12   from a computer that is a scanner.  I'm going to

13   refer to it as a scanner.

14       Q    And you understand for any election where

15   there's no RLA but there's a recount, the recount

16   relies on the QR code.  They just run the ballots

17   back through the scanners.

18            Do you understand that, sir?

19       A    No, I do not.

20            My understanding, I believe -- again, I

21   have to go back to those previous declarations where

22   I -- my understanding is that they would actually

23   recount the human-readable text.

24       Q    Even in a recount as opposed to a

25   risk-limiting audit?

Page 74

```
 1          A    I thought the recount did that.
 2          Q    Is that the understanding you have for
 3     your opinions?
 4          A    Which opinion?
 5          Q    The opinions you've offered in this case.
 6          A    It depends on the opinion.
 7          Q    Is that the understanding you have for any
 8     of these opinions you've offered in this case?
 9          A    I guess I would have to know what opinion
10     you're asking me about.
11               In other words, I'm not connecting this to
12     my opinions in any kind of way.  So the things
13     you're asking me, I'm not following how -- how is
14     this related to my opinions is what I'm asking.
15          Q    You understand that one of the ways that a
16     ballot can be hacked with a BMD is to change both
17     the QR code and the human-readable text; that's a
18     concern that's been raised, right?
19          A    I understand that's a possibility.  If you
20     can get in and manipulate things, you could
21     manipulate the QR code and/or the human-readable
22     text.
23          Q    And the Rice study and the Michigan study
24     show that very few, if any, voters would be expected
25     to find that change, right?
```

Page 75

1        A    Find what change?

2        Q    That their ballot, even as to the

3    human-readable text, does not accurately reflect all

4    of their selections.

5        A    Those studies suggest that a few number

6    would identify a human-readable change on that

7    ballot.

8        Q    In the scenario where that happened, where

9    both the QR code and the human-readable text has

10   been changed with respect to one or more selections

11   voters made, an RLA would not detect that; right,

12   sir?

13       A    If a human didn't detect the change, then

14   the RLA would not detect it if the QR code and the

15   human-readable text match.

16       Q    In the State of Georgia, even if an RLA

17   were to find -- strike that.

18            In the State of Georgia, even if an RLA

19   were to generate a different outcome for an election

20   than what was originally reported and certified

21   based on the tabulation of running the ballots

22   through the scanners at the polls, there's no legal

23   authority in Georgia that allows the Secretary of

24   State or anyone to rerun the election, right?

25            MR. MILLER:  Objection.  Calls for a legal

Page 88

1          A    No.

2          Q    I gather you're not aware that he

3     testified in this case on behalf of the state that

4     he advises not using QR codes for BMDs; you were not

5     aware of that?

6          A    No, I was not aware of that.

7          Q    And you disagree with Dr. Shamos on that?

8          A    I think that you can do it without the QR

9     code.  I think that's a solution that would get rid

10    of a lot of these issues that we're discussing.  So

11    I think it's feasible to do that.

12              Since you're asking about QR code, I guess

13    I'll be full disclosure here.

14              I have a forthcoming -- a paper under

15    review where we've created something called informed

16    optical character recognition, IOCR, that has given

17    100 percent accuracy in OCR for ballots.  So that's

18    a forthcoming solution in probably 2022.  So I have

19    worked in this area as well.

20         Q    Are you aware that the Dominion equipment

21    that's used in Georgia currently already has the

22    ability to scan and count the human-readable portion

23    of the BMD ballot rather than the QR code?

24         A    I can't remember -- I get them mixed up.

25    I can't remember if they had that, but I don't

1  know -- I haven't seen any data to see how accurate

2  it is, how it works.  I haven't seen any of that.

3       Q   That's not something you considered for

4  your opinions; is that right?

5       A   I haven't seen it, so I don't know that I

6  can opine on that as far as Dominion's -- how they

7  do it, the accuracy.  I don't have any knowledge of

8  that.

9       Q   Do you share Dr. Shamos's recommendation

10 against using QR codes with BMDs for elections in

11 the United States?

12      A   I think BMDs can -- QR codes can be used,

13 so I'm not totally against them.  But I think -- if

14 I had my choice, I would recommend not using them to

15 eliminate all these discussions and concerns around

16 them.

17      Q   Looking at paragraph 15 of your July

18 declaration again -- and if you need to pull that up

19 again, Dr. Gilbert, feel free.  It's --

20      A   I got it.

21      Q   Okay.

22      A   Okay.  I got it.  Yeah.

23      Q   Where you indicate here that you're not

24 aware that Dr. Halderman has provided equipment

25 marred by undetectable hacks to any other

1    independent researcher to test his theory that it

2    is, in fact, undetectable and not correctable, did

3    you recommend to your client, the Secretary of

4    State's office in this case, that they do that?

5              MR. MILLER:  Dr. Gilbert, I'm going to

6    instruct you not to answer that question on the

7    basis of privilege.

8    BY MR. CROSS:

9         Q    Are you declining to answer?

10        A    I decline.

11        Q    Have you made any recommendations to

12   anyone that this independent research that you

13   identified in paragraph 15, that that should occur

14   in the State of Georgia for its election system?

15        A    I don't recall.

16        Q    And why would you not make that

17   recommendation as an election security expert who's

18   concerned about the reliability of elections in

19   Georgia and elsewhere?

20        A    My understanding is getting access to the

21   equipment for general studies like that is a

22   complicated matter, as I mentioned before.

23        Q    But you now know that it's available here

24   just as it was to Dr. Halderman.  I think we've been

25   over this, right?

1     terms of manipulation through the computer equipment

2     because there's extra equipment, right?

3          A    I -- I take issue with that from the

4     perspective of just counting and saying that there's

5     more computer equipment, therefore, there's more

6     risk.  I don't agree with that.  I don't agree with

7     that analogy.

8          Q    One of the things that you point out is

9     that with hand-marked paper ballots, an insider can

10    alter votes where there are undervotes or overvotes,

11    for example, right?

12         A    Yes.

13         Q    And an insider can also alter votes in a

14    BMD system; we're agreed on that, right?

15         A    Can you give me the scenario by which

16    you're referencing that?

17         Q    Sure.  Any of the ways that Dr. Halderman

18    identifies in his July 1 report.

19         A    In the ways that he designated, an insider

20    with a certain level of technical expertise could

21    certainly do that versus with a hand-marked paper

22    ballot, 100 percent of the people inside can do

23    that.

24         Q    Taking the undervote, for example, where

25    a -- a situation where, on a hand-marked paper

Page 105

1        Q   There are hacks that he identifies in his
2    report that allow that, right?
3        A   It depends on which hack.  Can you tell me
4    which hack you're referencing?
5        Q   We're going to get to that.  But right now
6    I'm trying not to get into the sealed stuff.  I
7    just -- I just -- do you agree that there are hacks
8    identified in Dr. Halderman's report, at least one
9    or more hacks, that would allow an insider to change
10   votes on a mass scale, thousands, tens of thousands
11   or hundreds of thousands of votes, in a matter of
12   minutes with malware?
13            MR. MILLER:  Objection.  Asked and
14   answered.
15            THE WITNESS:  Again, I need to know the
16   specific hack.  I -- I don't want to claim that that
17   is the case without knowing the hack.
18   BY MR. CROSS:
19       Q   As you sit here, you don't remember
20   whether there are any such hacks in his report?
21       A   I need the context.  I don't -- I need the
22   context.
23       Q   What about a hack where the malware
24   changes the QR code and flips it from the intended
25   selection by the voter?  Are you with me?

```
 1        A    Okay.

 2        Q    You understand that that is a hack that is

 3   included in his report, right?

 4        A    Okay.

 5        Q    And you understand that an insider that is

 6   able to put that malware into the system could do

 7   that in a matter of minutes and change votes on a

 8   mass scale, right?

 9             MR. MILLER:  Object to form.

10             THE WITNESS:  I don't know on a mass

11   scale.  An insider could do that and -- again, it

12   depends on the hack.

13             So my colleagues, Dr. Halderman,

14   Dr. Appel, several of them have said to me

15   repeatedly, when we do have the opportunity to talk,

16   that if they were going to hack an election, they

17   wouldn't change every vote.  They'd selectively

18   change.

19             So when you say change a certain quantity,

20   that's why I need more context.  Because even they

21   won't admit that they're changing every vote from a

22   candidate to another candidate.

23             So to say that it's a large scale, to say

24   that it would change a certain number, I need more

25   specifics, and then I can answer your question
```

1    accurately.

2             Because the context that I've been given

3    by them repeatedly is that, "No, no, no, no, no.

4    The reason no one is going to detect is because we

5    don't change all of them all the time.  We don't

6    change that frequently."

7             So I hear that from them repeatedly.  And

8    then your line of questioning suggests something

9    otherwise, so I need you to be specific so we have

10   this accurately recorded.

11   BY MR. CROSS:

12        Q   All right.  Let's do it this way:  You've

13   got an insider who's changing votes on a hand-marked

14   paper ballot that takes them two to five seconds at

15   least, right?

16        A   Okay.

17        Q   Okay.  So let's say an average of 3.5

18   seconds.  We'll split it right down the middle.  Are

19   you with me?

20        A   Okay.

21        Q   So we've got 10,000 votes that are getting

22   changed every 3.5 seconds, right?  That gets us to

23   about 2,800 seconds.  We divide that by 60, we get

24   to 47 -- make sure I get this right.  Hold on.

25   Sorry.  I did that wrong.  I'll do this again.

Page 108

1          Right.  So 10,000 ballots at three and a

2     half seconds would be 35,000 seconds on average to

3     change 10,000 ballots, right?

4          A    Okay.

5          Q    Okay.

6               MR. MILLER:  Object to form.

7     BY MR. CROSS:

8          Q    And we divide that by 60, we get to over

9     583 minutes.  Divide by 60 again, we get to almost

10    ten hours that it would take an insider to change

11    ballots in the way that you've suggested for

12    hand-marked paper ballots, which they would have to

13    do in an environment where they have access to the

14    ballots for ten hours and can do it undetected,

15    right?

16         A    Right.  According to your analysis, that

17    scenario plays out.

18         Q    Do you understand that Dr. Halderman has

19    identified hacks -- for example, one that's commonly

20    discussed with these types of BMDs is changing --

21    flipping the QR code in a way that that could happen

22    in minutes, right, where an insider can embed the

23    malware in the BMD within minutes and flip 10,000

24    votes?  You understand that, right?

25         A    No.  So let me make sure I understand what

Page 109

1    you're asking.

2              Someone inserts malware that's going to

3    change the QR code, so it's going to change 10,000

4    votes and only 10,000 votes.

5              So what happens if that particular

6    precinct only has 5,000 votes?  So it changed all

7    5,000 votes.  And is it changing the QR code and the

8    human-readable text or just the QR code?

9              There's so many -- I need more context.  I

10   don't know how else to put it.

11        Q    Okay.  All right.  We'll come back to it

12   when we walk through Dr. Halderman's report.

13             Do you have your declaration in front of

14   you again?

15        A    Yes.

16        Q    Okay.  In paragraph 8, you write, "Neither

17   of the Curling experts offer any scientific research

18   regarding voters' proclivity to review hand-marked

19   paper ballots to ensure their ballots are marked and

20   will count as intended."

21             Do you see that?

22        A    Yes.

23        Q    And you don't identify any such research

24   yourself, right?

25        A    Right.

Page 134

1    But yeah, I think that what I'm getting

2    at, the point that I'm making is a small number of

3    individuals whose votes get flipped would speak up,

4    and this would -- I don't know what the protocols

5    are or the steps are.  Again, that's something we're

6    working on, what to do when this occurs.  But I

7    don't know what the scenarios are currently in place

8    for something like this.

9         MR. CROSS:  Let's go off the record.

10         THE VIDEO OPERATOR:  Okay.  Going off the

11    record at 1:08.

12         (Recess, 1:08 p.m. - 1:45 p.m.)

13         THE VIDEO OPERATOR:  Back on the record at

14    1:45.

15    BY MR. CROSS:

16         Q    Dr. Gilbert, we've talked about a couple

17    of ways that you've identified where hand-marked

18    paper ballots can be altered such as with changing

19    undervotes and overvotes, right?  We talked about

20    that today?

21         A    Right.

22         Q    That can only happen after the ballots

23    have been tabulated in a system where the ballots

24    are tabulated on the scanner in the polls, right?

25         A    It happens whenever the opportunity

Page 135

1   presents itself.  So it depends on the precinct and

2   how they handle their ballots.  If they -- do the

3   voters automatically do it?  Is it a centralized

4   tally?  It just depends on the scenario.

5        Q   So let's talk about a specific scenario, a

6   scenario in which Georgia has voters vote on

7   hand-marked paper ballots at the polls.  That voter

8   takes that ballot, walks over to the scanner in

9   exactly the way they do today, and puts it into the

10  scanner themselves.

11        The only way that that vote could be

12  altered or that ballot could be altered in the way

13  that you've described would be after it runs through

14  the scanner and is tabulated, right?

15        A   In that particular scenario, that seems to

16  be the case.

17        Q   And so whatever alteration might happen to

18  that ballot after it's tabulated would not affect

19  the outcome of that election based on the results

20  that come out of the tabulation of the ballots,

21  right?

22        A   Not necessarily.

23        My understanding is that certain margins

24  require an audit or recount; therefore, it would

25  have an impact.

Page 143

1          A    Yes.

2          Q    And do you understand that when Governor

3    Kemp was the Secretary of State, he personally

4    selected Wenke Lee to serve as a cybersecurity

5    expert on the SAFE Commission specifically to help

6    determine a more -- new and more reliable election

7    equipment?

8          A    Okay.

9          Q    Do I understand correctly that you think

10   cybersecurity experts don't have the necessary

11   expertise to opine on election security?

12              MR. MILLER:  Objection.

13              THE WITNESS:  No, I never said that.  No,

14   that's incorrect.

15   BY MR. CROSS:

16         Q    In fact, we agree that cybersecurity

17   experts like Wenke Lee, Dr. Halderman, Dr. Appel,

18   have the necessary expertise to evaluate the

19   security of election equipment like BMDs in Georgia,

20   right?

21              MR. MILLER:  Object to form.

22              THE WITNESS:  No, I didn't say that,

23   either.

24              Dr. Appel, Dr. Halderman, I would agree

25   with.  I know them.  I don't know Dr. Lee and his

Page 144

1    background, so I cannot speak to his credentials.

2            The fact that he was appointed to some

3    commission and given a title does not guarantee he

4    knows what he's doing or his credentials.  So I

5    can't speak to that.  I'm sorry.

6    BY MR. CROSS:

7        Q   No, no.  That's fair.  That's fair.

8            You're not disputing that experts like

9    Dr. Halderman and Dr. Appel have the necessary

10   computer science expertise to evaluate the security

11   of election systems like that used in Georgia,

12   right?

13       A   No, I do not dispute that.  In fact, if I

14   was asked the question, "I have an election system.

15   We need someone to evaluate the security of it to

16   find vulnerabilities," at the top of my list would

17   be Appel, Halderman.  That's where I would start.

18       Q   Now, if you look here, if you continue on

19   in Exhibit 4, Dr. Lee goes on to say, "I ultimately

20   chose to vote against the Commission's final report

21   even though we agreed on many points."

22           Do you see that?

23       A   Yes.

24       Q   If you go to the next paragraph, he

25   writes, "The SAFE Commission was charged with

Page 173

1    are used with BMDs, both the BMD and the printer,

2    right?

3         A    Technically, there are fewer points of

4    computing devices as it relates to a hand-marked

5    paper ballot versus a BMD.

6         Q    Right.  Now let's come back to where we

7    were.  I'm trying to get to a simple point.

8              An RLA is designed to confirm election

9    outcomes.  It is not designed or capable of

10   confirming that an individual ballot counted the way

11   it was intended, right?

12        A    I'm fine with that.  Again, I -- go ahead.

13   I'm trying to understand your point.

14             I don't think you're understanding my

15   point about the RLA as it relates to hand-marked

16   paper -- the scanner giving you the wrong number

17   because it was hand-marked or if it gave you the

18   wrong number because of the QR code.  No matter

19   what, it gave you the wrong number.

20             And again, Dr. Stark, who is very well

21   respected when it comes to these areas, and our

22   committee acknowledged that, and I find it hard to

23   believe that he would be wrong about this.  I don't

24   think he's wrong.

25        Q    I understand what you're saying.  We're

Page 180

1      want to make sure, there are people on the line

2      other than --

3                  MR. CROSS:  Yeah.

4                  MR. MILLER:  Okay.

5                  THE WITNESS:  I have it.

6      BY MR. CROSS:

7           Q    Okay.  Go page to page 15, and you'll see

8      a copy of the Fayette County official ballot.

9           A    15?

10          Q    Page 15, and you'll see an image of --

11          A    Okay.  I got it.

12          Q    You have that in front of you?

13          A    Yes.

14          Q    Okay.  How many of the election selections

15     on that ballot are not Republican selections for the

16     candidates?

17          A    Wait.  Say that again.  I didn't --

18          Q    How many of the selections made on that

19     ballot are not Republican candidates that were

20     selected?

21          A    Are not Republican?  So count everyone

22     who's not a Republican?

23          Q    Correct.

24          A    I counted six.

25          Q    And point out the ones that you're

Page 186

1     top.

2          A   I got it.  I got it.  I'm on that page

3     now.

4          Q   Okay.  If you come down below, do you see

5     the third paragraph where Dr. Halderman wrote, "████

6     ████████████████████████████████████████████████████

7     ███████████████████████████████████████████

8     ████████████████████████████████████████████████████

9     ██████████████████████████████████████████

10    ████████"?

11         Do you see that?

12         A   I do see that.

13         Q   Were you asked, for the purpose of your

14    engagement, to conduct the same type of analysis or

15    were you asked to do something different?

16         A   I was not asked to do that.  No, I was

17    not.

18         Q   If you come down below, you'll see the

19    next heading is "████████████████████."

20         Do you see that?

21         A   Yes, I do.

22         Q   And then at the bottom, you'll see, just

23    before the number 1 paragraph, it reads, "████████

24    ████████████████████████████████████████

25    ██████████████

```
 1              Do you see that?
 2         A    I do.
 3         Q    And in your declaration, you don't dispute
 4    that any of the number of vulnerabilities that he
 5    has in paragraphs 1 through 7 are present in the
 6    election equipment used in Georgia, right?
 7              MR. MILLER:  Object to form.
 8              THE WITNESS:  Number one, ███████████
 9    ███████  that -- I trust that he was able to do that,
10    so I don't dispute that.
11              I would say, you know, given access and
12    time that he was given, I think these -- I don't
13    question him being able to accomplish any of these.
14    BY MR. CROSS:
15         Q    Come to the -- it's page 7 of 97.  Near
16    the top it says, "███████████  in bold.
17         A    Got it.
18         Q    Do you see here -- do you see the
19    sentence, it's the second sentence that begins,
20    "However"?
21         A    Yes.
22         Q    And Dr. Halderman wrote, "███████████████
23    ████████████████████████████████████████████████████
24    ███████████████████████████████."
25              Do you see that?
```

Page 188

1          A    I do.

2          Q    In your declaration, you don't disagree

3     with that opinion, right?

4          A    I don't agree -- I don't know that I agree

5     or disagree with it as far as what he -- what he's

6     constituting as patching.  I don't know what that

7     means.  Merely patching, I'm not sure what the

8     context is, what that means.

9          Q    You didn't undertake any analysis into

10    what kind of patching could be adopted to mitigate

11    the vulnerabilities he identifies in his report,

12    right?

13         A    No, I did not.  And I would say that -- I

14    would like -- it would be interesting for

15    Dr. Halderman to say what patching he's referring

16    to.

17              In addition to that, I go back to our

18    previous discussion about this.  When he says the

19    patching, is that referencing reliably secure?  Is

20    that the same thing or not?

21         Q    All right.  If you come down, do you see

22    below that, it says, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮"?  It's

23    Section 1.2?

24         A    Yes, I do.

25         Q    And then he's got a number of paragraphs

Page 189

```
 1    set off by bullets.
 2              Do you see that?
 3         A    Yes.
 4         Q    And in your declaration, you don't dispute
 5    any of the technical findings that he has listed
 6    there, right?
 7         A    The ██████████████, I do not agree with
 8    that.
 9         Q    What paragraph are you at?
10         A    The second bullet.
11         Q    Where in your declaration do you dispute
12    that?
13         A    I don't -- I don't know if I spoke
14    directly to this in my declaration or not, but I --
15    you know, this particular notion that ████████████
16    ████████████████, I -- I don't agree with that.
17         Q    Do you see -- I'm sorry.  I didn't mean to
18    cut you off.
19         A    You asked me, do I disagree with any of
20    the points, and I'm telling you that I disagree, for
21    example, with that point immediately.  I can look at
22    the others, but I can tell you, just looking at it,
23    I saw DRE and I saw that comment, I can immediately
24    tell you I do not agree with that.
25         Q    My question was actually more precise
```

Page 190

1    about whether you disagree in your declaration,

2    because my focus is on the opinion you've put in

3    this case.  But I understand your testimony.

4            Looking at this particular piece or this

5    particular point about the DREs, do you see where

6    his writes in the second sentence of that paragraph,

7    "█████████████████████████████████████████████

8    ████████████████████████████████████████████████

9    ██████████████████████████████████████████

10   ████████████████████████████████████████████████████

11   █████████████████"?

12           Do you see that?

13       A    Yeah, I see that.

14       Q    And he goes on, "████████████████████████

15   ████████████████████████████████████████████████

16   ██████████████████████████████████████████████

17   ████████████████████████████████████████████████

18   ████████████████████████."

19           Do you see that?

20       A    I see that.

21       Q    And in your declaration responding to this

22   report, you don't dispute his opinions in either of

23   those sentences, right?

24       A    I don't recall.  Let me pull up my

25   declaration.  I can look.

Page 191

1          But if I didn't dispute them, I'm telling
2     you now I do dispute it.  It may have not appeared
3     in my declaration, but I do not agree that the BMD
4     is at the same level in any comparison as the DRE.
5          Because just as he did a study on voters
6     verifying their ballots, in a real election
7     scenario, in the scenario where some people are
8     actually worried about votes flipping, and they're
9     all verifying their ballots, you're going to tell me
10    that somehow you're going to change the outcome of
11    an election with this -- with everyone verifying?  I
12    don't believe that.  Whereas the DRE, you could
13    easily do that because it's impossible to verify.
14    Here, you can verify.  DRE, you cannot.  So I think
15    that's disingenuous to compare the two at that
16    level.
17         Q    Where does Dr. Halderman say here that
18    what he's looking at has anything to do with
19    changing election outcomes?
20         A    That's the whole intent of the hack.
21         Q    Okay.  That's your understanding of what
22    he's saying here?
23         A    My understanding of Dr. Halderman's
24    overall objective is to change the outcome of the
25    election undetected and where it can't be corrected.

1          Q    You don't have an understanding that

2     Dr. Halderman is looking at whether individual

3     voters can be disenfranchised by having their

4     individual votes altered even if the election

5     outcome is not altered?  You don't understand that

6     part of his analysis?

7          A    I've never heard him say that, and I don't

8     see that as his analysis.  That's not how I'm

9     interpreting anything he's written.  No.

10         Q    So you -- in responding to his report

11    here, his July 1 report, your understanding was that

12    what he was talking about was only about whether

13    these hacks can result in changes to the election

14    outcomes as opposed to simply changing individual

15    votes that may not rise to the level of changing

16    outcomes?

17         A    I think the -- the context that I read his

18    work and his declaration is the ability to change

19    the outcome of the election, changing both so that

20    it's undetectable and can't be corrected.

21         Q    And in this paragraph we're looking at

22    where he is comparing the ICX BMDs to the AccuVote

23    TS and TS-X DREs, you understand that what he's

24    comparing there are specific cybersecurity

25    vulnerabilities within the computer equipment,

1   right?

2         A    Well, in the next sentence where he talks

3   about ████████████████████████████████████,

4   ████████████, those are things he's referencing.  From

5   that perspective, that's what he's referencing.  I

6   see that.

7         Q    There are these bulleted technical

8   findings that we're looking at under his main

9   conclusions.  Are there any others that you dispute

10  in your declaration?

11        A    I don't recall directly disputing -- I

12  don't know -- it goes to my declaration.  I have

13  to -- I need to pull out my declaration and go point

14  by point down my declaration and see -- look at each

15  one of these points and then go back and see if I

16  reference that or talk about it in my declaration.

17             Do you want me to do that exercise?

18        Q    Unfortunately I have to have you do that

19  exercise because I need to know whether you're

20  talking a position that your declaration refutes any

21  of these points.

22        A    Okay.  So point 1, "██████████████████

23  ████████████████████████████" -- okay.  Point 1 is

24  not specific.

25             I already addressed point 2.

```
 1            Point 3, "████████████████████████████
 2    ██████" -- all right.  So Point 3, he's saying that
 3    ███████████████████████████████████████████████
 4    ███████████████████████████, which you were
 5    asking, do I understand the context.  That's exactly
 6    what he just said here.
 7            Let's see.
 8        Q    Let's just pause there so we're on the
 9    same page.
10            He says the ████████████████████████
11    █████████████████████████  ████████████████████
12    ████████████████████████████████████████████████.
13            That's what he wrote there, right?
14        A    Those are different things?
15        Q    You don't understand that individual votes
16    are distinct from election outcomes?  You consider
17    them the same?
18        A    Election outcomes are based on individual
19    votes, are they not?
20        Q    But you understand that a voter can be
21    disenfranchised when their vote does not count even
22    if the election outcome is not altered by the
23    failure to count their vote, right?
24            MR. MILLER:  Objection.  Calls for a legal
25    conclusion.
```

```
 1            THE  WITNESS:   Can you point to me in this
 2     declaration that we're looking at for Dr. Halderman
 3     where he says that?  I may have missed it.  I'm
 4     sorry.
 5     BY MR. CROSS:
 6            Q    You mean where he writes, "███████████
 7     ████████████████████████████████████████████████
 8     ██████████████████████████████████████████████████
 9     █████████████████████"?
10            Are you asking for something other than
11     what he wrote there?
12            A    You're saying that the disenfran- -- how
13     did you say -- disenfranchisement of an individual
14     vote and not changing the outcome of an election?
15            Q    Do you understand that a voter --
16            A    Wait.  Wait.  Before you ask me that, I'm
17     asking you, can you point to me in the document
18     where he said that?
19            Q    I'm not -- Dr. Gilbert, I'm not the
20     witness, and I'm not representing you about language
21     of disenfranchisement, okay?
22            You asked me to show you where he talks
23     about evaluating the impact on individual votes and
24     on election outcomes.  We're reading a sentence
25     here.
```

Page 196

```
 1              If you'd like to go through it and find

 2       others, we can do that.  I'm trying to make sure I

 3       understand your view here.

 4              Do you understand that a voter can cast a

 5       vote in an election, have that vote not count

 6       because it is altered in some way, it's lost, any

 7       variety of things could happen, and yet that does

 8       not alter the election outcome?  Are we agreed that

 9       that is a scenario that can happen?

10       A    Yes, I agree that's a scenario that can

11       happen.

12       Q    And in that scenario, that individual

13       voter has been harmed by not having their vote

14       counted.

15              MR. MILLER:  Objection.  Legal conclusion.

16       BY MR. CROSS:

17       Q    I mean, do you dispute that, that every

18       voter wants their vote to count?

19       A    No, I don't dispute that.

20       Q    Okay.

21       A    I guess the point that I'm making is, if

22       individual votes change -- outcomes are determined

23       by individual votes.  So I was trying to understand

24       where you were going, but I see your point.

25              You're talking about disenfranchisement of
```

Page 197

```
 1    individual voters, which I would also say I would
 2    agree with that.  Just as I stated earlier, people
 3    with disabilities are individual voters, and they
 4    want the right to a private ballot and a fair ballot
 5    as well.  Shouldn't their votes be counted and not
 6    be disenfranchised either?
 7              So yes, I completely agree with that.
 8    Yes.  You're right.  Individual voters, every one,
 9    including those with disabilities.
10         Q    I will say, Dr. Gilbert, that we have
11    found something that we're in violent agreement on,
12    particularly for voters with disabilities.
13         A    Okay.  So he's talking -- the third one is
14    about QR codes.  Let's see.  In my -- let's see.
15    Let me look for QR codes.  Do I talk about QR codes
16    in here?
17              In my declaration, paragraph 12, I talk
18    about QR codes.
19         Q    Just so we're clear, you don't dispute
20    that -- strike that.
21              You don't dispute Dr. Halderman's finding
22    that the ████████████████████████████████████████
23    ███████████████████████████████████████ that's
24    used in Georgia; you don't dispute that, right?
25         A    I do not dispute that, given time and
```

Page 198

```
 1     access, that you can ████████████████████████
 2     ███████████████████████████████████████████.
 3     I do not dispute that.
 4          Q    And you haven't undertaken any analysis to
 5     determine how much time it would take for a hacker
 6     to do that if they wanted to do it, right?
 7          A    No, I have not done that.  As I mentioned
 8     earlier, I don't hack systems.  That's not my
 9     expertise, so I wouldn't have done that.
10               That's a great question to ask
11     Dr. Halderman, how long does it take to do such an
12     exercise.
13               MR. CROSS:  You might want to write that
14     down, Carey.
15               THE WITNESS:  And with that, as far as the
16     time it takes, again, that's not my area, but I
17     think it would be interesting to find the answer to
18     that.
19               And I'd be interested -- again, in the
20     same spirit that I mentioned earlier about
21     Dr. Halderman hacking a system and giving it to a
22     third party, the same thing could be true where
23     Dr. Halderman is given a system and then put on the
24     clock to determine how long it takes him to hack it,
25     not one that he's seen for 12 months.
```

Page 199

1      BY MR. CROSS:

2          Q   Are you aware that there are individuals

3      that are claiming to have released proprietary

4      election management software from Dominion like that

5      used in Georgia?

6          A   I am not aware of that, but I am not

7      surprised that -- whether it's true or not, the

8      allegation would be out there is not a surprise to

9      me.

10         Q   Why not?

11         A   It's the climate we live in.  Just

12     misinformation, disinformation.  Just, I'm not

13     surprised.

14         Q   Would you be concerned if that allegation

15     is true that proprietary election software from

16     Dominion was leaked, for example, by a clerk who had

17     access to it in one of the election challenge

18     proceedings in a state like Arizona?

19             MR. MILLER:  Object to form.

20             THE WITNESS:  I wouldn't be severely

21     concerned.

22             Again, I think the verification piece is

23     more important to me.  So I would -- you know, and

24     I'm willing -- I'd be willing to consider this.

25     That was another piece.

Page 200

1        If people are verifying their ballots and

2   it's wrong, they correct them, and that would tell

3   you things, so you would get it right.

4        So even if you did hack it, if people were

5   verifying it, you'd get it right.

6   BY MR. CROSS:

7        Q    Isn't one of the challenges with voter

8   verification is that even if you're right that

9   voters can reliably identify when their votes are

10  being altered from what they cast, that only occurs

11  once the election is underway, right?

12       A    Right.

13       Q    So shouldn't you, as an election security

14  expert -- don't you agree that rather than the

15  mechanism for securing an election being one that

16  has to play out when the election is already

17  underway, there should be measures that are taken

18  before the election even begins to make the election

19  as secure as it can reasonably be?

20       A    I think that's a good approach, and I hope

21  that Dr. Halderman and others will -- I hope you

22  will communicate to them to relay publicly what is

23  reasonable security so that we can implement those,

24  and those standards can be used if they are willing

25  to accept what they are.

1          So yes.  What you just said is a reference

2     to reasonable security implementation for these

3     systems which none of them, to my knowledge, have

4     ever said.  But if they can do that recommendation,

5     I appreciate it.  And again, I said I'm working on

6     things in this area, which I look forward to

7     engaging them on in '22.

8          Q    You've testified in your declaration and

9     here today that voter verification is one of the

10     primary ways to protect against the particular hacks

11     that Dr. Halderman identifies in his July 1 report,

12     right?

13          A    Right.

14          Q    As an election security expert, don't you

15     think that the better approach would be to actually

16     remedy the hack, to take measures that prevent the

17     hacking in the first place, rather than leaving it

18     to voters to discover it on their ballots in the

19     middle of an election?

20          A    That's -- to me, that's an ideal scenario.

21     But I would say that my colleagues, Dr. Halderman

22     and Dr. Appel, et cetera, would say there is no way

23     to secure a machine, given time and access,

24     100 percent.  The verification is the one thing we

25     can secure independent of the hacks that they

Page 202

1    implement.

2            So again, I'm going back to the reference

3    of reasonably secure.  I suspect that doesn't exist

4    because I don't think they can live with themselves

5    saying that there's a way -- a computer system that

6    would be acceptable in voting because their job is

7    to break things.

8            But if they were to announce that and say

9    that, that would be a remarkable thing we could all

10   agree upon and move forward in a positive direction

11   upon if there is such a reasonable secure standard.

12   Q    You keep talking about Dr. Halderman and

13   Dr. Appel, but -- and I understand that you perceive

14   a disagreement among you.

15           I'm really focusing right now on your

16   position.  Your position, as I understand it, is

17   that BMDs can be reliably used.

18           And my question to you is, rather than

19   relying on voter verification to catch a hack or a

20   glitch in the system once an election is already

21   underway, don't you agree as an election security

22   expert that those who are responsible for these

23   machines and for elections should take reasonable

24   measures to prevent the hacking in the first place,

25   for example, taking measures to mitigate what

Page 203

1    Dr. Halderman has found with these machines?

2                    MR. MILLER:  Objection.  Vague, asked and

3    answered.

4                    THE WITNESS:  Well, I would say I agree

5    with reasonable measures.  You and I agree on that,

6    and I hope Dr. Halderman and them -- I'm so excited

7    to hear this, and I am eager to see what comes out

8    of this.

9                    But yeah, reasonable measures.  See, to

10   me, the question is, what is reasonable?  And I want

11   to hear what reasonable is.

12                   You're using the term, and I'm -- I'm

13   using the term, and hopefully we are on the same

14   page what that actually was going to look like.

15                   But yeah, I think that's true.  Reasonable

16   security, that makes sense to me.

17   BY MR. CROSS:

18        Q    As an election security expert, why would

19   it be sensible to use an election system that

20   possesses all of the vulnerabilities that

21   Dr. Halderman has identified in Georgia and leave it

22   to voters to identify a hack by carefully reviewing

23   their ballots, including ballots like the one you

24   just looked at, from an actual election in Georgia,

25   rather than taking necessary measures on the front

Page 204

1     end to mitigate those vulnerabilities?

2           A    I think you could take necessary measures

3     to make it reasonable, as you said.  But again, even

4     in a hand-marked paper ballot scenario, I gave you

5     an example where voters don't verify those and you

6     have issues.

7                 So the burden is on the voter either way

8     to actually verify the ballot.  Even hand-marked

9     paper ballots have to be verified.

10          Q    Right.  But what we've established is, I

11    thought, that the burden on the voter is much higher

12    with BMDs because the BMD allows a hack that can

13    change votes on a large scale the voters may not

14    even be able to detect on their ballot such as a

15    change in the QR code, right?

16          A    A change in the QR code cannot be detected

17    by the voter.  I think we all agree on that.

18          Q    And the type -- sorry.

19          A    What I'm saying is, in the case of the

20    hand-marked paper ballots, I gave you examples where

21    large-scale votes were changed.  Large-scale votes.

22    Large.  So you can't minimize the impact either way

23    of voter verification.  There's -- the burden is

24    there in both scenarios.

25          Q    Just be precise.  You've not given a

Page 205

```
 1     situation where large-scale votes were changed in a
 2     hand-marked paper ballot.  You're testifying about
 3     the situation in Florida where the vote they cast
 4     was not the vote they intended.  But their vote
 5     wasn't changed from the way it was cast on the
 6     ballot, right?
 7          A   It wasn't changed the way they cast, but
 8     they cast it -- the design caused them to cast it
 9     the wrong way.  I don't see a distinction either
10     way.
11          Q   I didn't want to cut you off when you were
12     looking at the main conclusions.
13              Are there any other -- any findings here
14     that you dispute?
15          A   Okay.  I talk about QR codes.  I talk
16     about using BMDs for only with people with
17     disabilities.
18          Q   Which bullet are you on?
19          A   The second-to-the-last bullet, using
20     vulnerable -- and it talks about all in-person
21     voters.
22              Okay.  So I know I talk about those things
23     in my declaration.
24          Q   All right.  Go to page 19 of 97, if you
25     would.  And the heading is "4.2 ███████████."
```

1     A   Got it.

2     Q   Do you see in the third paragraph down

3  that begins "██████████████"?

4     A   Yes.

5     Q   And here Dr. Halderman writes, "██████

6  ████████████████████████████████████████

7  ████████████████████████████   ██████████,

8  ████████████████████████████████████████████

9  ██████████████████████████████████████.  "

10         Do you see that?

11     A   Yes.

12     Q   And you don't dispute in your declaration

13  that the printer that's used with the BMD system in

14  Georgia is, in fact, an off-the-shelf printer like

15  the one that Dr. Halderman used, right?

16     A   No, I do not dispute that.  I don't have

17  access to the actual printer being used, but I

18  didn't dispute that at all.

19     Q   And then if you come down, do you see the

20  paragraph that begins, "████████████████" on the same

21  page, a couple below where we were?

22     A   Let's see.

23     Q   Two paragraphs --

24     A   I got it.  I see it.

25     Q   Here Dr. Halderman wrote, "██████████████

Page 207

```
 1   ██████████████████████████████████████████
 2   ████████████████████████████████████████████
 3   ████████████████████████████████████████████
 4   ████████████████████████████████████████
 5   ████████████
 6          Do you see that?
 7      A   Yes.
 8      Q   He goes on to talk about the election
 9   packages that he received.
10          Do you see that?
11      A   Yes.
12      Q   You don't address that data in your
13   declaration, right?
14      A   No, I do not.
15      Q   Do I understand, is that not something
16   you've analyzed?
17      A   No, I have not analyzed that.
18      Q   If you come to the next paragraph, do you
19   see where it reads, "███████████████████████████"?
20      A   Yes.
21      Q   He writes, "███████████████████████
22   ████████████████████████████████████████████████
23   ████████████████████████████████████████████
24   ██████████████████████."
25          He goes on to say, "█████████████████
```

Page 208

1  ███████████████████████████████████████

2  ███████████████████████████████████████

3  ████████████████████████████████

4  ███████████████████████."

5          Do you see that?

6      A   Yes.

7      Q   And you don't dispute his opinion there on

8  what that indicates in your declaration, right?

9      A   I do not discuss that in my declaration.

10     Q   You previously testified in this case that

11 your understanding is that the BMD election system

12 is air-gapped, right?

13     A   Yes.

14     Q   I think you testified before that you're

15 assuming that to be true based on some materials you

16 looked at describing how the system is supposed to

17 operate and be set up; is that right?

18     A   Correct.

19     Q   You've not yourself confirmed that any

20 aspect of Georgia's election system is, in fact,

21 air-gapped, right?

22     A   I have not had a Georgia system in my

23 possession to do any evaluation.

24     Q   And you did not undertake any analysis or

25 investigation with your client in this case to

```
                                              Page 213

1              Do you see that?

2         A    Yes, I see that.

3         Q    Mr. Tucker writes, "Michael, is the state

4    providing new USB drives for the counties to send

5    their L&A exports and E-Day exports to you on or

6    should they use the USB drive they have from the

7    previous system?"

8              Do you see that?

9         A    Yes.

10        Q    Do you understand that January of 2020 is

11   in the time frame of when Georgia was rolling out

12   the new BMD system, switching from the DREs to the

13   Dominion system?

14        A    Okay.

15        Q    Do you recall one way or the other whether

16   that's right?

17        A    I don't recall when they -- when they did

18   that, but --

19        Q    Okay.

20        A    -- okay.

21        Q    And then Mr. Barnes responds same day

22   saying, "The counties can use the USB that the state

23   has previously provided."

24             Do you see that?

25        A    Yes, I do.
```

1      Q    Are you aware that this is an exhibit that

2  we introduced during the hearing in September of

3  last year in which you also testified?

4      A    Like I said, I don't remember this, but

5  okay.

6      Q    There's no indication in your declaration

7  that you've had any -- conducted any investigation

8  into what's being discussed here and whether USB

9  drives that were used with the DRE system have also

10  been used with the new BMD system.  That's not

11  something you've looked into, correct?

12            MR. MILLER:  Objection.  Relevance.

13            THE WITNESS:  No, I have not.

14  BY MR. CROSS:

15      Q    And you previously testified in this case

16  that the new BMD system is completely separate and

17  unconnected to the old DRE system, right?

18      A    Yes, I did.

19      Q    But if the counties were using USB drives

20  with the new Dominion system that they previously

21  had used with the DRE system, that certainly would

22  raise the possibility for an exchange of data

23  between those two systems, right?

24            MR. MILLER:  Objection.  Relevance.

25            THE WITNESS:  I think you said it

Page 215

1    correctly.  Possibility.

2           So it's possible that these drives could

3    have been completely wiped and reformatted.  It's

4    possible that they could have been tainted.  So it's

5    possible a lot of different things based on what you

6    are saying.

7    BY MR. CROSS:

8           Q   You didn't think that it was relevant for

9    your opinions in this case to determine whether the

10   counties or the state are using USB drives with the

11   new system that were previously used with the DRE

12   system without wiping them, without securing them,

13   without ensuring that they're not compromised?

14          A   I did not ask that question.

15          Q   Do you think that that's a relevant

16   question for evaluating the security of the new

17   election system?

18          A   I think that is a relevant question, and

19   it should be asked.

20          I think the protocol of what's obviously

21   exchanged -- anything connected to the voting system

22   should be evaluated, obviously.

23          Q   Evaluated how?

24          A   All kinds of ways.  It depends on what

25   you're connecting to it.

1           Q    I'm sorry.  Can you explain what you mean?

2           A    For example, if you're connecting a USB to

3      the system, it should be wiped.  That's a clean -- a

4      way to clean the -- keep the system clean, avoid

5      issues.  Standard protocol in many places in shops

6      that have technology.

7                So evaluating what is connected, what's

8      the data on there, those questions are things that

9      have to be looked at.

10          Q    Why didn't you look at that on behalf of

11     the state with respect to things like the USB drives

12     that we see being discussed here for your work?

13          A    I was -- I was focused on what was

14     given -- I was not given USB drives.  I was not

15     given any technology.

16               My focus, again, was on Dr. Halderman and

17     Appel's analysis.  That's where my focus was on.  I

18     don't have any equipment, never have received any

19     equipment, technology, from the State of Georgia.

20          Q    If you come back to Dr. Halderman's

21     report, the July 1 report, the page we were on

22     before, page 19 of 97 --

23          A    Okay.

24          Q    -- at the bottom, do you see where it

25     says, Section 4.3, "███████████████"?

1        A   Yes, I do.

2        Q   You don't offer an opinion in this case

3    that Dr. Halderman's methodology for his analysis in

4    his report was in any way improper or unsound,

5    right?

6        A   I do not.

7        Q   Come to page 22 of 97.  You'll see there's

8    a heading in the middle of the page, Section 5.2,

9    "██████████████████████████████."

10       A   Yes.

11       Q   And here he writes, "██████     ██████████

12   ████████████████████████████████████████████████

13   ████████████████████████████████████████████

14   ████████████

15           Do you see that?

16       A   Yes.

17       Q   You don't dispute in your declaration that

18   ICX QR codes are not protected against replay

19   attacks, right?

20       A   I do not.

21       Q   If you come down to page 24 of 97, do you

22   see where it says, "████████████████"?

23       A   Yes.

24       Q   And here he wrote, "████████████████

25   ██████████████████████████████████████████████████

Page 218

1    ████████████████████████████████  ████████████

2    ███████████████████████████████████

3    ████████████," and he refers to Section 11.1.  He

4    says, "███████████████████████████████

5    ███████████."

6                Do you see that?

7         A    I do see that.

8         Q    And you don't dispute in your declaration

9    his finding on the ability to copy the ballots,

10   right?

11        A    I do not.

12        Q    Next, he refers again to the ███████

13   ██████████

14                Do you see that?

15        A    Yes.

16        Q    Come to page 29 of 97.

17        A    Okay.

18        Q    Do you see there's a picture at the top

19   of -- it looks like access cards?

20        A    Yep.

21        Q    Do you see where it says, "██████████

22   ██████████"?

23        A    Yes.

24        Q    And then he writes, "████████████████

25   ████████████████████████████

Page 219

1     ██████████████████████████████████████████."

2          Do you see that?

3     A   Yes, I do.

4     Q   He goes on to say at the end, "██████

5     ████████████████████████████████

6     ████████████████████."

7          Do you see that?

8     A   I do.

9     Q   You don't dispute that finding in your

10    declaration, right?

11    A   I do not.

12    Q   If you come down to the heading 6.1 on the

13    same page --

14    A   Yep.

15    Q   -- it reads, "████████████████████████

16    ████████████████."

17         Do you see that?

18    A   I do.

19    Q   Here he writes, "████████████████████

20    ████████████████████████

21    ████████████████████████████

22    ████████████████████████."

23         Do you see that?

24    A   I do.

25    Q   And you don't dispute that finding in your

```
                                              Page 220

 1     declaration, right?

 2          A    I do not.

 3          Q    All right.  Come to the next page, heading

 4     6.2.

 5          A    Yes.

 6          Q    It says, "███████████████████████████

 7     ████████████████████████."

 8               Do you see that?

 9          A    I do.

10          Q    And here he writes, "████████████████

11     ███████████████████████████████████████████████

12     ██████████████     ███████████████████████████████

13     ███████████████████████████████████████████████

14     █████████████████."

15               Do you see that?

16          A    I do.

17          Q    And you don't dispute that finding in your

18     declaration, right?

19          A    No, I do not.

20          Q    Come down to the next page, please,

21     heading 6.3.

22          A    Got it.

23          Q    Here it reads, "████████████████████████

24     ████████

25               Do you see that?
```

1       A   Yes.

2       Q   He writes, "█████████████████████

3   ████████████████████████████████████████████

4   ██████████████████████████████████████████

5   ██████████████████

6           Do you see that?

7       A   I do.

8       Q   You don't dispute that finding in your

9   declaration, correct?

10      A   I do not.

11      Q   Come to the next page, 33 of 97,

12  heading 7.

13      A   Page 33, you said?

14      Q   Yes, sir.  Heading 7.

15      A   I'm there.

16      Q   Okay.  Come down to heading 7.1.

17          Do you see that?

18      A   Yeah, I'm there.

19      Q   He writes, "██████████████████████

20  ████████████████████████████████████████████

21  ████████████████████████████████."

22          Do you see that?

23      A   Yes.

24      Q   You don't dispute that finding in your

25  declaration, correct?

Page 222

```
 1         A   I do not.

 2         Q   Come to the next page, please,

 3    heading 7.2.

 4         A   Yes.

 5         Q   Here he writes -- the heading is

 6    "███████████████████."  And he writes, ███████

 7    ████████████████████████████████████████████████,

 8    ██████████████████████████."

 9             Do you see that?

10         A   Yes.

11         Q   You don't dispute that finding in your

12    declaration, correct?

13         A   I do not.

14         Q   Go on page 36 of 97, please.

15         A   Okay.

16         Q   He has heading 7.5, "████████████████████

17    █████████

18             Do you see that?

19         A   I do.

20         Q   He writes, "██████████████████████████████

21    ████████████████████████████████████████████████████

22    ██████████████████████████████████████████

23    ██████████████████."

24             Do you see that?

25         A   I do.
```

1          Q    You don't dispute that finding in your

2     declaration, correct?

3          A    I don't think I dispute this.  No, I do

4     not.

5          Q    And then he goes on to refer to defeating

6     logic and accuracy testing.

7               Do you see that?

8          A    I do.

9          Q    And he -- at the end of that paragraph, he

10    concludes, "███████████████████████████████████

11    ██████████

12              Do you see that?

13         A    At the end of that paragraph?  I don't see

14    it.

15         Q    Do you see the short paragraph that has

16    the bolded language, "████████████████████████████████

17    ██████████

18         A    Yeah, I do.

19         Q    If you come to the end of that short

20    paragraph, the last sentence reads, "████████████

21    ██████████████████████████████."

22         A    I don't see that anywhere.  I see

23    "████████████████████████████" --

24         Q    You're too far down.  I'm sorry.  Come up

25    above -- just below the heading 7.5, the bolded

Page 224

1    language, "████████████████████████."

2           A    Okay.  I'm there.

3           Q    So stay in that same short paragraph.

4           A    I see it.  I see it.  "████████████

5    ██████████████████."  I see it now.  The last

6    sentence in that paragraph.  Okay.

7           Q    Yes.  And you don't dispute that finding

8    in your declaration, right?

9           A    I did not dispute that in my declaration.

10          Q    Okay.  If you come down to where you were

11   looking at a moment ago, the bolded language at the

12   bottom of that page that reads, "████████████

13   ████████," do you see that?

14          A    Yes.

15          Q    At the end of that paragraph, still on the

16   same page, he concludes, ████████████████████

17   ██████████."

18          Do you see that?

19          A    Yes.

20          Q    You did not dispute that finding in your

21   declaration, correct?

22          A    No, I did not.

23          Q    Okay.  Come to the next page, please.

24          A    Okay.

25          Q    Do you see at the bottom of the next page

```
                                              Page 225

1    there's a bold heading, "████████████████

2    ██████

3         A   Yes.

4         Q   If you come down just three or four lines,

5    the sentence that begins "However"?

6         A   Yes.

7         Q   He writes, "██████████████████

8    ████████████████████████████████

9    ██████████████████████████████████

10   ██████████████████"

11            Do you see that?

12       A   Yes.

13       Q   You don't dispute that finding in your

14   declaration, right?

15       A   I did not.

16       Q   If you come to the next page --

17       A   Yes.

18       Q   -- at the top he writes, "████████████

19   ████████████████."

20            Do you see that?

21       A   Yes.

22       Q   Come to the beginning of the very next

23   paragraph.  Do you see where it begins, "██████████

24   ██████"?

25       A   Yes.
```

1        Q   And he writes, "██████████████████

2   ██████████████████████████████████████

3   ██████████████████████████████████."

4        Do you see that?

5        A   I do.

6        Q   You don't dispute that finding in your

7   declaration, right?

8        A   I do not.

9        Q   Come to the next bold heading on the same

10   page that reads, "████████████████████████████

11  ██████████

12        Do you see that?

13        A   Yes.

14        Q   He writes, "██████████████████████

15  ███████████████████████," right?

16        A   Right.

17        Q   And we're agreed on that, right?

18        A   Yes.  To my knowledge, I don't know how

19   they would verify it.  The only way I've seen

20   that -- and I don't -- I haven't seen this.  But I

21   know other systems -- and when we designed -- we

22   designed this many years ago -- take the ballot and

23   stick it in another machine to get a summary

24   display, or have the tally, the scanner, give you

25   a -- I guess a ballot summary, and you can compare

Page 227

1     it to the ballot summary that's on there.

2                But I -- other than that, people cannot

3     read the QR code itself.

4          Q    One of the things you suggested in an

5     earlier declaration in this case is that the state

6     should do parallel testing of a single BMD during an

7     election.

8                Do you recall suggesting that?

9          A    Yes.

10         Q    Do you think that testing a single BMD out

11    of over 30,000 that are used across the state

12    provides a meaningful test of the security and

13    reliability of those BMDs as a whole?

14         A    That's not what I recommended.  But to

15    answer your question, no, that would not.  You have

16    all those, and you're just testing one?  No, that

17    wouldn't make a difference.  But if you test one in

18    every precinct, that's different.

19         Q    Okay.  So it's your recommendation to test

20    one in every precinct during the election in

21    parallel testing?

22         A    That is something I have recommended.  It

23    has pros and cons.  But that's way better than just

24    picking one particular BMD in the State of Georgia

25    and parallel testing it.  Yeah, that wouldn't make

Page 228

```
 1    much sense.
 2          Q    Okay.  Come to page 40 of 97 in
 3    Dr. Halderman's report, section heading 8.1.
 4          A    Got it.
 5          Q    You see it reads, ████████████████
 6    ████████ "?
 7          A    Yes.
 8          Q    And he writes, ████████████
 9    ████████████████████████████████████████████
10    ██████████████████████████████████████████
11    ████████████████████████████████████."
12          Do you see that?
13          A    I do.
14          Q    You don't dispute that finding in your
15    declaration, correct?
16          A    I do not.
17          Q    Come down to the next page under the
18    pictures.
19          A    Okay.
20          Q    Do you see where it says, "Figure 9"?
21          A    Yes.
22          Q    And here it reads, "█████████████████
23    ████████████████████████."
24          Do you see that?
25          A    I do.
```

Page 229

1       Q   Dr. Halderman writes, "███████████

2   ███████████████████████████████████████.

3   ████████████████████████████████████████

4   ███████████████████████████████████████

5   ██████████████████████████████████

6   ████████████████████████████████████████

7   ████████████████████████."

8       Do you see that?

9       A   I do.

10      Q   And you don't dispute that finding in your

11  declaration, correct?

12      A   I do not.

13      Q   Come to the top of the next page, please.

14      A   Okay.

15      Q   You see there's a picture, and below that

16  it says, "Figure 10"?

17      A   Yes.

18      Q   And then it reads, "████████████████

19  ████████████████████."

20      Do you see that?

21      A   I do.

22      Q   And here Dr. Halderman writes, "████████

23  ████████████████████████████████

24  █████████████████████████████████

25  ███  █████████████████████████

Page 230



1 ████████████████████████████████

2 ██████████████████████████████████

3 █████████████████████████████████

4 ██████████████████████ "

5          Do you see that?

6     A   I do.

7     Q   And you do not dispute that finding in

8 your declaration, correct?

9     A   I do not.

10    Q   Go to section heading 8.2.

11    A   Okay.

12    Q   It reads ██████████████████

13         Are you with me?

14    A   Yes, I am.

15    Q   And then Dr. Halderman writes, " ████

16 ██████████████████████████████

17 ██████████████████████████████████

18 ████████████████████████████████

19 ██████████████████████████████ ."

20         Do you see that?

21    A   I do.

22    Q   And you don't dispute that finding in your

23 declaration, right?

24    A   I do not.

25    Q   If you stay in that same section, do you

Page 231

1     see the very next paragraph begins, "█████

2     ███████████ "?

3          A   Yes, I see it.

4          Q   Dr. Halderman writes, "████████████████

5     ███████████████████████████████████████

6     ████████████████████████████████████████

7     █████████████████████████████████████████████

8     ████████████████████ ."

9          Do you see that?

10         A   Yes.

11         Q   In the next paragraph he writes, "████

12    ████████████████████████████████████████

13    ███████████████████████████████████

14    ███████ ████████████████████████████████

15    ████████████████████████████████████

16    ███████████████████████████████ ."

17         Do you see that?

18         A   I see that.

19         Q   You don't dispute that finding in your

20    declaration, correct?

21         A   I do not.

22         Q   If you stay on that same page, the

23    paragraph we just read, do you still have that in

24    front of you?

25         A   I do.

1        Q    If you come above, do you see where

2   Dr. Halderman indicates that he previously drew an

3   analogy to the Boeing 737 MAX aircraft, where a

4   small, last-minute change to correct a single

5   problem inadvertently created a much more dangerous

6   failure mode that reportedly led to two fatal

7   crashes?

8              Do you see that?

9        A    I do.

10       Q    Are you familiar with that situation with

11   Boeing?

12       A    I am not.

13       Q    Come to page 44 of 97, if you would.

14       A    Real quick, the Boeing example that you

15   gave, just to make a note, I'm not familiar with

16   that, but that's an example of what cybersecurity

17   people would be very well aware of.

18       Q    Got it.  Understood.

19       A    Where do you want me to go?

20       Q    Sorry.  Page 44 of 97.

21       A    Okay.  I'm there.

22       Q    Do you see the heading 8.3?

23       A    Yes.  Got it.

24       Q    And it reads, " ███████████████████████

25   ██████████████████████████ ."

Page 233

```
 1          Do you see that?
 2     A    I do.
 3     Q    And then Dr. Halderman writes, "████████
 4  ██████████████████████████████████████████
 5  ███████████████████████████████████████████████
 6  ███████████████████████████████████████████."
 7          Do you see that?
 8     A    Yes.
 9     Q    You don't dispute that finding in your
10  declaration, correct?
11     A    I do not.
12     Q    All right.  Come to the next page, please,
13  under heading 8.5.
14     A    Okay.
15     Q    And here it reads, "████████████████████
16  ████████████    right?
17     A    Yes.
18     Q    And Dr. Halderman writes, "████████████
19  ███████████████████████████████████" -- I'm sorry.  Let
20  me try that again.
21          Here Dr. Halderman writes, "███████████
22  ██████████████████████████████████████████████████
23  ████████████████████████████████████████
24  ██████████████████████████████████████████████
25  ██████████████████████    ████████████████████████
```

Page 234

1  ████████████████████████████████████████

2  ████████████████████████████████."

3         Do you see that?

4    A   Yes.

5    Q   And you don't dispute that finding in your

6  declaration, correct?

7    A   I do not.

8    Q   Come to page 47 of 97, please.

9    A   Okay.

10   Q   Actually, go up one page -- sorry -- to

11 page 45 of 97 just so you see the heading 8.6 at the

12 bottom.

13   A   Got it.

14   Q   It reads, "█████████████████████████

15 ███████████████████████."

16        Do you see that?

17   A   I do.

18   Q   If you come to the top of the next page,

19 do you see at the very top of that page

20 Dr. Halderman writes, "████████████████████

21 ██████████████████████████████

22 ████████████████████████████████████

23 ██████████████████████████████

24 ████████████████████████████

25 ████████████

Page 235

```
 1              Do you see that?
 2         A    I do.
 3         Q    You don't dispute that finding in your
 4    declaration, correct?
 5         A    I do not.
 6         Q    All right.  Come down to the next section,
 7    please, 8.7.
 8         A    Okay.
 9         Q    Here it reads, "███████████████████████
10    ██████████████████."
11              Are you with me?
12         A    Yes.
13         Q    Here Dr. Halderman writes, "████████████
14    ████████████████████████████████████████████████
15    ██████████████████████████████."
16              Do you see that?
17         A    Yes.
18         Q    You don't dispute that finding in your
19    declaration, correct?
20         A    I do not.
21         Q    Come to page 50 of 97, please.
22         A    Okay.
23         Q    Do you see at the top there's what looks
24    to be some computer code and then it says, "██████
25    underneath?
```

Page 236

```
1        A    Yep.

2        Q    And here Dr. Halderman writes, "████

3   ████████████████████████████████████████,

4   ██████████████████████████████████████████

5   ███████████████████████████████████████

6   ████████████████████████████████." "

7             Do you see that?

8        A    I do.

9        Q    You do not dispute that finding in your

10  declaration, correct?

11       A    I do not.

12       Q    Then if you come down one paragraph, do

13  you see the heading that reads "██████████████

14  ██████████████"?

15       A    I do.

16       Q    If you come down to the second paragraph

17  under that heading, do you see where it reads --

18  it's just two sentences -- two lines -- it reads,

19  "██████████████████████"?

20       A    I do.

21       Q    In there Dr. Halderman writes, "█████

22  ████████████████████████████████████████████

23  ██████████████████████████████

24  ████████   and he identifies two examples, one at the

25  county level, one at Dominion.
```

Page 237

```
 1              Do you see that?
 2         A   I do.
 3         Q   You don't dispute that finding in your
 4    declaration, correct?
 5         A   I do not.
 6         Q   Come to the next -- top of the next page,
 7    please.
 8         A   Okay.
 9         Q   Do you see section 9.2, "████████
10    ████████████████████████"?
11         A   I do.
12         Q   Here Dr. Halderman writes, "████████
13    ████████████████████████████████████████████████
14    ████████████████████████████████████████████████
15    ████████████████████████████████████████████████
16    ██████
17              Do you see that?
18         A   I do.
19         Q   You don't dispute that finding in your
20    declaration, correct?
21         A   I do not.
22         Q   Come down to the next section, please,
23    9.3.
24         A   Okay.
25         Q   It reads, "████████████████████████████
```

Page 238

1   ██████████

2        Do you see that?

3        A   I do.

4        Q   Here Dr. Halderman writes, "██████████

5   ████████████████████████████████████████

6   ██████████████████   ██████████████████

7   ████████████████████████████████████████

8   ████████████████████████████████████

9   █████████████████████."

10       Do you see that?

11       A   I do.

12       Q   You do not dispute that finding in your

13   declaration, correct?

14       A   I do not.

15       Q   Come to page 54 of 97, please.

16       A   I'm there.

17       Q   Do you see the heading 9.6, "██████████

18       A   I do.

19       Q   Do you see the second paragraph that

20   begins, "████████████████"?

21       A   Yes.

22       Q   Here Dr. Halderman writes, ████████████

23   ████████████████████████████████████████████

24   ██████████████████████████████████████████,

25   ██████████████████████████████████████████

Page 239

1       ████████████████████████████████████████████."

2              Do you see that?

3       A    I see it.

4       Q    You don't disagree with that statement in

5       your declaration, correct?

6       A    I do not.

7       Q    You see he goes on to explain --

8       Dr. Halderman does -- "████████████████████

9       █████████████████████████████████████

10      ████████████████████████████████████████████

11      ████████."

12             Do you see that?

13      A    Yes.

14      Q    Do you recall that vulnerability that was

15      discovered?

16      A    I do not.

17      Q    Dr. Halderman explains, "██████████████,

18      ██████████████████████████████████████████

19      ████████████████████████████████████

20      ███████████████████████

21             Dr. Halderman concludes, "███████

22      ████████████████████████████████████████."

23             Do you see that?

24      A    I see it.

25      Q    And you don't dispute that finding in your

1    declaration that ███████████████████████████

2    ████████████████████, right?

3         A   I do not dispute it in my declaration, but

4    I do not agree with it.

5         Q   And what's the basis for disagreeing with

6    that when you've not examined the security -- the

7    cybersecurity of the equipment at issue here?

8         A   I don't need to examine it to make this

9    statement.

10             The DRE does not have a paper trail.  If

11   there's a vulnerability on the BMD and voters verify

12   it, you can catch it.  In other words, you can

13   prevent it.  He can hack it and change it all he

14   wants.  But if they are verifying it, he can't

15   change the outcome of the election.  He can't

16   disenfranchise people.  The DRE, you can change it

17   and it's impossible to know.

18             So Dr. Shamos is right in the context of

19   the DRE, but that doesn't apply to a BMD the same

20   way.  It is not the same.

21        Q   Voter verification does not prevent any of

22   the hacks that Dr. Halderman has identified from

23   occurring, right?

24        A   Voter verification would not prevent the

25   hack from occurring.  It would prevent the hack from

Page 241

1    being successful.

2         Q    When you say, "Voter verification will

3    prevent the hack from being successful," you mean if

4    a voter has the time and the ability to reliably

5    verify every selection on their ballot before it's

6    tabulated, correct?

7         A    Yes.

8         Q    Come to page 55 of 97, please.

9         A    Okay.

10        Q    Actually, we should be more precise.

11             When you say -- when you say, "Voter

12   verification will prevent the hack from changing a

13   vote or an election outcome," that's only if the

14   voter has the time and the ability to verify each of

15   the selections on their bullet, and they actually do

16   that for each selection, right?

17        A    If they actually do it for each selection,

18   yes.  It has to be a verification for those

19   selections.  Yes.

20        Q    All right.  I'm sorry.  Take a look at

21   page 55 of 97.

22        A    Page 55, I'm there.

23        Q    Sorry.  I'm just thinking about the

24   question I just asked you.

25             There's also an additional step that's

Page 242

```
 1    needed to protect the voter, which is there also has
 2    to be an audit, right?  A reliable audit?
 3         A    It depends on the -- on the technology and
 4    how it all fits together.
 5              But we recommended for the NASEM report
 6    that if you're going to have a scanner, then you
 7    need to have an audit because the scanner could be
 8    compromised.
 9         Q    All right.  I'm sorry.  Take a look at
10    page 55 of 97 now, heading 10.1.
11         A    Got it.
12         Q    Here you have the heading "███████████
13    ██████████████."
14              Do you see that?
15         A    I do.
16         Q    And Dr. Halderman writes, "███████████
17    ████████████████████████████████████████████████
18    ██████████████████████████████████████████████
19    █████████████████████████."
20              Do you see that?
21         A    Yes.
22         Q    You don't dispute that finding in your
23    declaration, correct?
24         A    I do not.
25         Q    He then goes on in the same section, "████
```

Page 243

1   ████████████████████████████████████████

2   ████████████████████████████."

3          Do you see that?

4      A   I do.

5      Q   You don't dispute that finding in your

6   declaration, correct?

7      A   I do not.

8      Q   Come to the page 57 of 97, please.

9      A   I'm there.

10     Q   Do you see the heading 11.1, "████████

11   ████████████████████████"?

12     A   Yes.

13     Q   Here Dr. Halderman writes, ██████████

14   ████████████████████████████████████████

15   ████████████████████████████████

16   ████████████████████."

17         Do you see that?

18     A   I do.

19     Q   You did not dispute that finding in your

20   declaration, correct?

21     A   I did not.

22     Q   Do you see the next heading, 11.2, on the

23   same page?

24     A   I do.

25     Q   Here it reads, "██████████████████████

Page 244

1 ███████████████████████████████████

2 ███████████████."

3          Do you see that?

4      A   I see it.

5      Q   Dr. Halderman writes, "████████████

6 ████████████████████████████████

7 ██████

8          Do you see that?

9      A   I do.

10     Q   You do not dispute that finding in your

11 declaration, correct?

12     A   I do not.

13     Q   Dr. Halderman goes on here to write, "████

14 ████████████████████████████████████

15 ██████████."

16          Do you see that?

17     A   I do.

18     Q   You do not dispute that finding in your

19 declaration, correct?

20     A   I do not.

21     Q   Come to the next page, please, Section

22 11.3.

23     A   Okay.

24     Q   The report itself is not 97 pages long, so

25 we're getting towards the end.  I imagine this is

Page 245

1   getting monotonous.

2           Take a look at Section 11.3.  Do you see

3   where it reads, "████████████████████████████████

4   ██████████████████████"?

5       A   Yes.

6       Q   Here Dr. Halderman writes, "███████████████

7   ██████████████████████████████████████████,

8   ████████████████████████████████."

9           Do you see that?

10      A   I do.

11      Q   You do not dispute that finding in your

12  declaration, correct?

13      A   I do not.

14      Q   He then goes on in the same section to

15  write, "█████████████████████████████████████████

16  ██████████████████████████████████████████

17  ██████████

18          Do you see that?

19      A   I do.

20      Q   You did not dispute that finding in your

21  declaration, correct?

22      A   Did not.

23      Q   Come to page 62 of 97, please.  There's a

24  heading, "████████████████████

25      A   Got it.

Page 267

1    system?

2         A    I -- I don't know.  You have to give me

3    details, and then I could tell you if I heard about

4    it.  I've been involved in many cases and I read a

5    lot of this information.  So to just ask me that

6    question, it's a tough one for me to say yes.

7              Again, I live in Florida, not Georgia.  If

8    I was in Georgia, I'd probably be able to answer

9    that question easily.

10        Q    Are you aware that in 2018, the state

11   represented, including under oath, that the DRE

12   system was air-gapped, and it came to light during

13   the course of a hearing, where their witnesses were

14   cross-examined, that, in fact, it was not

15   air-gapped, that there were connections to the

16   Internet or to devices that are connected to the

17   Internet?

18             Is that something you reviewed and

19   considered for your opinions in this case?

20             MR. MILLER:  Objection.

21             THE WITNESS:  I was not aware of that.

22   BY MR. CROSS:

23        Q    Don't you think that that is relevant

24   information in determining whether you can rely on

25   documentation or representations from the state on

Page 269

1    representations that you just presented as

2    unreliable in the past.  I'll say it again.  I was

3    not aware of them.

4              This is news, the first time I'm hearing

5    it, number one.  The documents that were provided to

6    me, again, are cited in my declaration, and they,

7    from my interpretation, are official documents.

8              But if they are unofficial or if they're

9    false, that would be good information for me to be

10   aware of.

11      Q    Are you aware that the Secretary of

12   State's office engaged a company called

13   Forless (phonetic) to do some cybersecurity

14   assessments on behalf of the state?

15      A    That does not ring a bell.  I don't -- I'm

16   not familiar with that company.

17      Q    So in formulating your opinions in this

18   case, you haven't reviewed or considered any reports

19   by Forless that were prepared on behalf of the

20   Secretary of State's office; is that right?

21      A    I don't think so.  That doesn't ring a

22   bell.  The name -- that name doesn't resonate with

23   me right now.

24              MR. CROSS:  All right.  Let's go off the

25   record.

Page 288

1            I, the undersigned, a Certified Shorthand

2     Reporter of the State of California, do hereby

3     certify:

4            That the foregoing proceedings were taken

5     before me at the time and place herein set forth;

6     that any witnesses in the foregoing proceedings,

7     prior to testifying, were administered an oath; that

8     a record of the proceedings was made by me using

9     machine shorthand which was thereafter transcribed

10    under my direction; that the foregoing transcript is

11    a true record of the testimony given.

12            Further, that if the foregoing pertains to

13    the original transcript of a deposition in a Federal

14    Case, before completion of the proceedings, review

15    of the transcript [x] was [ ] was not requested.

16            I further certify I am neither financially

17    interested in the action nor a relative or employee

18    of any attorney or any party to this action.

19            IN WITNESS WHEREOF, I have this date

20    subscribed my name.  Dated this 5th day of November, 2021.

21

22

23

24

25                    CARLA SOARES

                      CSR No. 5908