# EXHIBIT 87

```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF GEORGIA
2                            ATLANTA DIVISION

3

4    DONNA CURLING, ET AL.,              :
                                         :
5              PLAINTIFFS,               :
     vs.                                 :  DOCKET NUMBER
6                                        :  1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,         :
7                                        :
               DEFENDANTS.               :
8

9

10      TRANSCRIPT OF HEARING ON PRELIMINARY INJUNCTION VIA ZOOM

11                           PROCEEDINGS

12            BEFORE THE HONORABLE AMY TOTENBERG

13               UNITED STATES DISTRICT JUDGE

14                    SEPTEMBER 10, 2020

15                        1:00 P.M.

16                        VOLUME 1

17                        REDACTED

18

19

20

21    MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                  TRANSCRIPT PRODUCED BY:

23
     OFFICIAL COURT REPORTER:          SHANNON R. WELCH, RMR, CRR
24                                     2394 UNITED STATES COURTHOUSE
                                       75 TED TURNER DRIVE, SOUTHWEST
25                                     ATLANTA, GEORGIA  30303
                                       (404) 215-1383
```

<pre>
 1                I N D E X   T O   P R O C E E D I N G S

 2                                                          PAGE

 3    OPENING STATEMENT

 4         by Mr. Cross                                      22
          by Mr. Brown                                      27
 5        by Mr. Tyson                                       30

 6         WITNESS                                          PAGE

 7    PHILIP B. STARK, Ph.D.

 8         Direct Examination
 9          By Mr. Brown                                     40
          Cross-Examination
10          By Mr. Miller                                    56
          Redirect Examination
11          By Mr. Brown                                     81
          Examination
12          By The Court                                     82

13    J. ALEX HALDERMAN, Ph.D.

14         Direct Examination
          By Ms. Ascarrunz                                  86
15
      HARRI HURSTI
16
          Direct Examination
17          By Mr. McGuire                                  117
          Cross-Examination
18          By Mr. Tyson                                    144
          Redirect Examination
19          By Mr. McGuire                                  162
          Recross-Examination
20          By Mr. Tyson                                    165
          Examination
21          By The Court                                    166
          Redirect Examination (Further)
22          By Mr. McGuire                                  168
          Recross-Examination (Further)
23          By Mr. Tyson                                    169

24    JEANNE DUFORT

25         Direct Examination
          By Mr. Brown                                     170
</pre>

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
1    (...cont'd...)

2        WITNESS                                    PAGE

3        Cross-Examination
           By Mr. Russo                             185
4        Examination
           By The Court                             189
5        Redirect Examination
           By Mr. Brown                             191
6
                                    *  *  *
7

     CERTIFICATE                                     209
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1   California on matters related to election security, as well as

2   the election commissions of Nigeria, Mongolia, and Denmark.

3        I was asked to co-author a manual or report on election

4   forensics for the Venice Commission of the Council of Europe.

5   A number of other things.

6   **Q.**   Thank you.

7              MR. BROWN:  Your Honor, I would tender Dr. Philip

8   Stark as an expert in the fields of election auditing and

9   election security.

10             THE COURT:  Any objection?  Is there any objection?

11             MR. MILLER:  I apologize.  This is Carey Miller.  We

12   were unmuting.  We are readjusting for our Zoom issues.

13             I -- the State defendants would assert an objection

14   to the extent that the expertise of Dr. Stark is being offered

15   for.  It goes beyond the concept of auditing.

16             And if Your Honor would prefer, we can conduct a voir

17   dire at this point or subsequent in our cross-examination.

18   That is perfectly fine too.

19             THE COURT:  You can do it later.

20             MR. MILLER:  Thank you.

21   **Q.   (BY MR. BROWN)**  Dr. Stark, have you developed an opinion

22   on whether BMDs, like the BMDs used in Georgia, guarantee a

23   transparent, fair, accurate, and verifiable election?

24   **A.**   Yes.  They do not.

25   **Q.**   And in general terms, why don't they?

**A.**   Introducing electronics between the voter and the paper

record in effect makes the paper record hackable.  The machines

themselves are vulnerable to misconfiguration, software bugs,

and hacking.

Evidence is that the vast majority of voters do not notice

errors in the BMD printout.  Those who do have no mechanism by

which they can cry foul and prove to a poll worker or election

official or anybody else that there was, in fact, a

malfunction, that the ballot-marking device didn't do what it

was supposed to do.

There is essentially no practical way to detect hacking of

ballot-marking devices.  And as a result, the paper record

produced by ballot-marking devices is not a trustworthy record

of voter intent.

**Q.**   Dr. Stark, you may have heard in the opening that counsel

for the State asserted that Georgia was going to do a

risk-limiting audit of these elections.

And I want to ask you:  Would a risk-limiting audit of

these elections be effective and, if they are effective, what

would they show or not show?

**A.**   If they were to conduct a genuine risk-limiting audit

including a compliance audit to ensure that the chain of

custody of the paper hadn't been broken, that the paper trail

is as it was when it was cast by the voters, all that a

risk-limiting audit could accomplish is to confirm that the

44

1    whole manual tabulation of the paper record would give the same

2    winner or winners as the electronic tabulation of that paper

3    record did.  It would do nothing to detect or correct any

4    problems in the generation of that paper record by the

5    ballot-marking devices.

6        To the extent that ballot-marking devices misprinted

7    voters' intentions, there is nothing that a risk-limiting audit

8    could do to detect that or recover from it.

9    **Q.**   Dr. Stark, you mentioned vulnerability.  Does your opinion

10   about the efficacy of a risk-limiting audit depend upon the

11   degree of vulnerability that the Court might find that the

12   Georgia system is subjected to?

13   **A.**   Unless there were a way to guarantee that every single BMD

14   printout was correct, that it correctly reflected what was

15   shown to the voter on the screen or spoken into the voter over

16   the audio interface, then there is a problem that cannot be

17   rectified by any kind of auditing.

18       So provided they are not perfect, this problem exists.

19   The materiality of the problem is going to depend on the number

20   of voters who vote using ballot-marking devices.

21   **Q.**   Dr. Stark, the evidence will show that there is some --

22   there's studies that have been conducted that show that some

23   voters do, in fact, verify their ballots.

24       Why isn't that enough to either be a random kind of

25   sampling or enough to alert officials there might be a problem?

**A.**   There are several questions wrapped up in that.  I'll try to untangle it.

So first of all, some voters noticing that there was an error in the printout and requesting a fresh opportunity to mark a ballot does nothing for the voters who didn't check or didn't request a fresh opportunity.  So it only corrects those votes where the errors were caught.

Secondly, the number of voters who would request a fresh opportunity to mark a ballot may be very, very small.  Certainly not enough to arouse suspicion.

Conversely, if election officials were willing to take voters' assertions that the device misbehaved as proof that the device misbehaved, the only recourse would be to hold a new election.  There is no way to go back and figure out which votes were affected, how many votes were affected, and what the correct outcome of the contest should have been.

**Q.**   Dr. Stark, is there some kind of pre-election testing though that the State could conduct that would ensure that the BMDs don't misbehave in such a manner?

**A.**   There is pre-election testing that the State should conduct routinely, logic and accuracy testing.  But that testing can generally only detect gross misprogramming errors, gross configuration errors.

There is no way that it can suffice to show that on election day the devices do not alter enough votes to change

1    the electoral outcome of one or more contests.

2    **Q.**   I also heard the assertion that, you know, a BMD printout

3    is in English, the voter is free to verify it.

4        How can there be question of voter intent if the voter has

5    that opportunity?

6    **A.**   Well, again, there's several issues there.  BMD, kind of

7    by its nature, erases all direct evidence of voter intent.

8    There's no way to tell from a BMD printout what the voter

9    actually saw on the screen, what the voter did with the device,

10   what the voter heard through the audio interface.  So it really

11   becomes trusting the computer at that point.

12       Yes, the ballots are printed in English.  Ballots in

13   Georgia, ballots in California are quite long.  They typically

14   vote on very many things.  I understand that in the primary

15   this summer there were something like 29 issues to vote on in

16   Fulton County, if I'm recalling correctly.

17       The evidence is that most voters don't check, that those

18   who do check often miss problems that are actually there.  And

19   I personally would not be able to recall how I voted on 29

20   different things without using a sample ballot or some kind of

21   paper record of what -- how I intended to vote.

22   **Q.**   I want to focus your attention on:  Of the few voters who

23   might check their ballot and the fewer still who might check --

24   detect an error, if they go to a poll worker, what are the poll

25   workers' options?

**A.**   Well, in most states -- and I assume in Georgia as well -- the poll worker should give the voter a fresh, unmarked ballot to have a do-over, to mark the ballot again, or mark a fresh piece of paper.

The -- the poll worker or the election official is really in a bind because there is no way for an election official to tell whether when a voter requests a new opportunity to vote it is because the voter made a mistake, the machine malfunctioned, or the voter is just crying wolf and trying to cast out on the outcome of the election.

The fundamental problem with ballot marking or a fundamental problem with ballot-marking devices is that they make voters responsible for the security of the system but don't provide the voters with evidence that the voters can then show anyone else to demonstrate that this was a problem.

**Q.**   Dr. Stark, have you looked at the issue of how many hacks would be necessary to go detected or undetected in an actual election given some assumptions about the number of voters who might detect that problem?

**A.**   Yes, sir.  I prepared a demonstrative exhibit using as an example the Attorney General's conference -- I'm sorry -- contest in Georgia in 2018.

MR. BROWN:  And at this point, Your Honor, I would like to ask that Dr. Stark's Demonstrative Exhibit Number 1 be shared on the screen.

1  is less of a concern because you are talking about whether the

2  voter properly marked it; is that right?

3  **A.**   No, sir.  That isn't an accurate reflection of my -- at

4  least what I intended to say.

5  **Q.**   Please correct me.

6  **A.**   Whether a voter verifies his or her hand-marked paper

7  ballot is up to the voter.  And if a voter makes a mistake and

8  doesn't correct that mistake, that is on the voter on some

9  level.

10       In contrast, a voter can check a review screen on a

11  ballot-marking device or listen to the audio output of a

12  ballot-marking device.  And yet what gets printed on the

13  printout isn't necessarily what the voter saw, what the voter

14  heard, or what the voter did.  What is on a hand-marked paper

15  ballot is necessarily what the voter did.

16  **Q.**   Okay.  And I believe I understand your --

17            THE COURT:  Could you just take down the Florida

18  recount because it is not helping our -- what we're trying to

19  see here.

20            MR. MILLER:  Your Honor, if I could have the witness

21  read one sentence off of this.

22            THE COURT:  You just read it.  Read it aloud what you

23  -- there is no point in --

24            MR. MILLER:  Okay.

25            THE COURT:  Read what you want to ask him about.

```
 1            MR. BROWN:  Objection, Your Honor.  He was not
 2     finished with his answer.  Again, we have --
 3            MR. MILLER:  Your Honor, I'm not trying to cut off
 4     the witness.  But at some point this is a cross-examination
 5     with yes-or-no questions and not (unintelligible).  I realize
 6     we are on Zoom, and I'm not trying to be difficult.
 7            THE COURT:  Let Professor Stark finish the answer if
 8     he hasn't.
 9            THE WITNESS:  Thank you, Your Honor.  I actually
10     don't remember what I was going to say.
11            THE COURT:  All right.  Go ahead, Mr. Miller.
12     Q.   (BY MR. MILLER)  On the exhibit you discussed in your
13     direct testimony, you referred to a hack rate; correct?
14     A.   Yes, sir.
15     Q.   And just to be clear, that document was not produced in
16     discovery; right?
17     A.   That's correct.
18     Q.   Was that document cited and included in your declaration?
19     A.   No, sir.
20     Q.   And so on those hack rates, you mentioned earlier you are
21     unaware of any study as to hand-marked paper ballot
22     verifiability.
23          How did you determine the hack rate relative to, say,
24     50 percent of hand-marked paper ballots in your hypothetical?
25     A.   In the hypothetical involving 50 percent hand-marked paper
```

1   ballots, the only votes that were changed were votes that were

2   printed using ballot-marking devices.  And I assume that there

3   was no change to votes made on hand-marked ballots.

4   **Q.**   So you just assumed that there was no issue with a

5   hand-marked paper ballot; right?

6   **A.**   No, sir.  I assumed that electronic hacking can't change a

7   hand-marked paper ballot.

8   **Q.**   And would you agree with me that a hack with a pencil or

9   pen could change a hand-marked paper ballot?

10  **A.**   If there isn't a good chain of custody of ballots, if

11  insiders can alter marks on ballots, then there is a problem,

12  whether it is hand-marked paper ballot or ballot-marking device

13  output.

14  **Q.**   And that chain of custody becomes even more difficult when

15  there is central tabulating scanners; correct?

16          THE COURT:  When they are essential what?

17          MR. MILLER:  I'm sorry.  Central tabulating scanners.

18  Central count scanners, for example, in Colorado.

19  **A.**   I don't see why that would be the case.

20  **Q.**   **(BY MR. MILLER)**  And when the voter is not him or herself

21  inserting the ballot into the scanner?

22  **A.**   I don't think that that cuts one way rather than the

23  other.  The chain of custody of the ballots matters regardless

24  of where the ballots are collected.

25  **Q.**   And you have a couple of comments in the -- in your

1  declaration regarding the Fulton County pilot audit.

2      And just real briefly, you do understand that is a pilot;

3  correct?

4  **A.**   It clearly was a pilot, but it was not represented as a

5  pilot by the Secretary of State's office.

6  **Q.**   Would you agree with me that a press release is not the

7  equivalent of binding state policy?

8  **A.**   Sir, obviously, it is not binding state policy.  But it

9  was completely misleading.  It said that it was a risk-limiting

10  audit.  It said that it could catch and correct errors.  It

11  said it validated the results.  It said it followed best

12  practices established by experts in election integrity.  And it

13  was none of those things.

14  **Q.**   It was an example of trying to learn and work out the

15  kinks of implementing best practices?  Would you agree with me

16  on that?

17          THE COURT:  I really don't think this is helpful.  I

18  mean, you are arguing with the witness about an article -- an

19  article about, I guess, the Secretary of State's office --

20          MR. MILLER:  Your Honor, if I may, this is contained

21  in his declaration.

22          THE COURT:  I understand that.  But I don't think it

23  is going to materially make a difference to me.  That is what

24  I'm trying to tell you.

25          MR. MILLER:  Your Honor, one last subject matter here

1    and I'll be done.

2    **Q.    (BY MR. MILLER)**  And I would ask that we put the screen

3    share back on briefly.

4        Dr. Stark, can you see this on your screen?

5    **A.**    Yes, sir.

6    **Q.**    Okay.  And do you see your name there at the top in the CC

7    line?

8    **A.**    I do.

9    **Q.**    Okay.  I just want to ask you just a few general

10   questions.

11       Who is David Dill?

12   **A.**    David Dill is a computer scientist formerly at Stanford

13   University.  He has gone to Facebook from Stanford.  He was the

14   founder of Verified Voting Foundation.

15   **Q.**    And am I correct in assuming the other individuals on the

16   email are associated with Verified Voting?

17   **A.**    That would not be correct.  It is true of some of them but

18   not all of them.

19   **Q.**    I understand.  And so you yourself, Dr. Stark, are you

20   affiliated with Verified Voting?

21   **A.**    No longer.  I was on the advisory board for some years,

22   and I was on the board of directors for some years, and I

23   resigned last year.

24   **Q.**    And how about Barbara Simmons?  Do you know if she is

25   affiliated with Verified Voting?

**A.**   Yes.   Dr. Simons is the chair of the board of Verified

Voting.

**Q.**   I apologize.   Thank you for correcting me on her name.

     Mr. Favorito, is he affiliated with Verified Voting?

**A.**   Not to the best of my knowledge.

          THE COURT:   Tell me where you are going, Mr. Miller,

because right now you have gone longer than Mr. Brown.   So just

tell me where you are going with this and how much longer are

you going to be.

          MR. MILLER:   Your Honor, the point as to this

exhibit, which is the only piece of evidence that was produced

in discovery, is that it demonstrates a disagreement, frankly,

within the organization as to what a risk-limiting audit is.

And it includes plaintiffs in this case.

          THE COURT:   Ask him a point-blank question rather

than -- why are we going through each of the individuals.   If

you want to ask him, let him read the document and ask him a

question about it or else --

          MR. MILLER:   Yes, Your Honor.   I guess the basis is

to form the foundation on the individuals listed here.   I will

just ask him about two other individuals on this email chain if

that is okay.

          THE COURT:   Two.   I mean, I just don't really see the

point.   But that is -- I'm not going to restrict you.   But I'm

telling you at this point, you know, you have one minute to

1    this point is unreasonable.

2    **Q.**   So any other individual that disagrees with you is

3    unreasonable?  But you have the exact testimony; right?

4    **A.**   Well, on this particular issue, I did come up with the

5    idea.  The whole principle that it is supposed to fulfill, the

6    whole point of the audit is that it has a large chance of

7    correcting the reported outcome if the reported outcome is

8    wrong.  And everything flows from that.

9        So some people are trying to redefine it so that it only

10   corrects some kinds of errors, so that it is fine to do it even

11   on an untrustworthy paper trail.  I don't think that that is

12   the spirit of it.  That is certainly not what I intended it to

13   be.  That is not what the papers say.

14            MR. MILLER:  Thank you, Your Honor.  No further

15   questions.

16            THE COURT:  Mr. Brown, do you have anything more?

17            MR. BROWN:  I have one follow-up question.

18                      REDIRECT EXAMINATION

19   BY MR. BROWN:

20   **Q.**   Dr. Stark, putting aside your risk-limiting audit for the

21   moment, do you know of any audit no matter how well conducted

22   that could confirm this upcoming election in Georgia is

23   accurate if Georgia does not replace the BMDs?

24   **A.**   No, sir.  There is no pre-election, during the election,

25   or post-election process that can check whether BMDs altered

1   votes -- enough votes to change the outcome of the contest,

2   even if the resulting paper were tabulated perfectly.

3           MR. BROWN:  Thank you, sir.

4           THE COURT:  All right.  Let me just ask you one

5   question, Dr. Stark.

6                           EXAMINATION

7   BY THE COURT:

8   **Q.**   When you were responding to the last questions that

9   Mr. Miller was making about whether you found it -- whether you

10  were right, whether they were right, I want to make sure I

11  understand this.  I mean, you had -- when you developed the

12  concepts and principles of a risk-limiting audit, you indicated

13  that this was a -- basically a whole paradigm development and

14  construct of how it was done and you did this sort of as a

15  mathematician and as a scientist, if I understand your prior

16  affidavits and your resumes?  Is that basically a fair summary,

17  or am I missing something?

18  **A.**   I apologize, Your Honor.  But I didn't quite understand

19  the question.

20  **Q.**   All right.  Well, my understanding -- I'm just looking --

21  was that you are an expert on statistics, on mathematics, and

22  you developed -- and that you developed the whole concept of

23  principles around risk-limiting audits.

24          And is that correct?

25  **A.**   Yes, Your Honor.

A.    So in that area in one of the locations, the ballot
marking -- I arrived to the location because there was a report
that there was irregularities in the ballot-marking device
operations.  I was told that the ballot-marking device produces
test ballots.

      And while I was observing, I saw a voter who went to scan
their ballot.  The poll worker -- after the machine rejected
multiple times, the poll -- he sent the -- told that this is a
test ballot.  The voter went back with the test ballot and
picked up the real ballot and returned the test ballot into the
tray.  So I observed that, and I didn't see the ballot, but I
believe that the poll worker when -- when the poll worker said
that this is a test ballot.

Q.    So you detailed that in other observations in your
declaration; correct?

A.    Correct.

Q.    Okay.  As far as your August 11 visit to Fulton County
election center, are your observations in your declaration --
does that substantially capture what you saw that day as well?

A.    Correct.

Q.    Okay.  So, Mr. Hursti, I want to ask you:  Based on your
expertise and based on what you observed, the things that you
have detailed in your declarations, do you have an opinion
about whether the Dominion voting system using BMDs is capable
of producing an accountable election result?

**A.**    Taking into account that I, as I detailed in the
declarations, saw multiple different kinds of irregularities
and an unexplained behavior, there is a serious doubt that the
system was operating correctly.  And in a theoretical level, as
detailed already by Professor Stark, when you don't have an
end-to-end chain of the voter's intent, when there is a system
which can either maliciously or by honest error reproduce wrong
kind of evidence, you don't have a capability of auditing.

**Q.**    Okay.  So without a capability of auditing, can you trust
the election results coming -- and without the chain of custody
and other issues you have described, you know, can you trust
the results coming out of the Dominion voting system?

**A.**    I personally would say I cannot trust it.  And also this
is not an election-specific issue.  Any other industry, any
other system with similar faults in those same areas would be
equally untrustworthy.

**Q.**    Okay.  In your opinion, specifically looking at this as an
election system, as a voting system, is there a solution to the
problem of the system's untrustworthiness?

**A.**    Yes, I believe there are.  Based on the fact -- fact and
observations and what I have gathered, the solution would be
two-fold:  First, moving to the hand-marked paper ballots.  And
in the case of a precinct in-person voting, the deficences of
that scanner can be overcome by instructing voter carefully to
vote and providing a pen, which will be known to be recorded

1    well by the scanner, what would be a black felt pen so that it

2    gives no reflection.  And at the same time, in home voting and

3    email voting -- home voting and mail-in voting, the solution

4    would be to use already existing scanners with more efficient

5    way producing a higher quality, more information, retaining

6    files to be used.

7    Q.   Okay.  So let me just break that down.  Are you suggesting

8    the continued use of the BMDs?

9    A.   I am not suggesting the continued use of BMDs.  I am

10   strongly recommending to go to the hand-marked paper ballots

11   for the reasons being that when the system in between cannot be

12   trusted the chain of custody is broken.

13   Q.   Okay.  Let me ask you a question about scanners.  Do you

14   have an opinion whether the Dominion system's precinct and high

15   volume scanners, the two different kinds of scanners, can be

16   relied upon to accurately count all the votes?

17   A.   Not at this current type of settings and the way they

18   operate.

19   Q.   Is that no, you don't have an opinion or no, they can't be

20   trusted?

21   A.   No, they can't be trusted under the current configuration

22   and how they are currently being used.

23   Q.   Okay.  So is there a solution to that problem for the

24   precinct scanners?

25   A.   Yes, there is a solution.  As I stated before, my opinion,

```
 1                  C E R T I F I C A T E

 2

 3    UNITED STATES OF AMERICA

 4    NORTHERN DISTRICT OF GEORGIA

 5

 6         I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7    the United States District Court, for the Northern District of

 8    Georgia, Atlanta Division, do hereby certify that the foregoing

 9    208 pages constitute a true transcript of proceedings had

10    before the said Court, held in the City of Atlanta, Georgia, in

11    the matter therein stated.

12         In testimony whereof, I hereunto set my hand on this, the

13    12th day of September, 2020.

14

15

16

17                         _____
                           SHANNON R. WELCH, RMR, CRR
18                         OFFICIAL COURT REPORTER
                           UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```