# EXHIBIT 129

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

```
------------------------------  )
DONNA CURLING, et al.,          )
                Plaintiffs,     )Case No.
        vs.                     )1:17-cv-2989-AT
BRAD RAFFENSPERGER, et al.,     )
                Defendants.     )
------------------------------  )
```

REMOTE DEPOSITION OF MATTHEW MASHBURN

NOVEMBER 4, 2021

REPORTED BY: Tina Alfaro, RPR, CRR, RMR

of multiple different considerations. Security is -- security is one of them. 10:33:29 10:33:36

Q. Understood. 10:33:40

Would you support the use of an election system that could be hacked in a few minutes by a voter in the voting booth? 10:33:43 10:33:45 10:33:48

A. I would not -- I would -- I would want to see the data on -- on how that could be done, but generally hacking is not a good idea. It's something that you'd like to -- like to oppose, but I'd like -- I'd have to see the particular circumstances. If it could be hacked in a -- in a courtroom under artificial circumstances, that's very different than being hacked in the wild. 10:34:01 10:34:05 10:34:10 10:34:18 10:34:21 10:34:23 10:34:30 10:34:33

Q. But from your answer is it -- am I understanding correctly that you would not support an election system that could be hacked in a few minutes by a voter in the voting booth? 10:34:42 10:34:45 10:34:48 10:34:51

MS. JOHNSON: (Inaudible) taking Mr. Mashburn's opinion in his personal capacity. He's here in his capacity as a member of the State Board of Elections, but you can answer. 10:34:56 10:34:56 10:35:01 10:35:07

A. You would want to avoid a system that could be hacked by a random person in the wild. 10:35:08 10:35:12

Q. Are you familiar with BMD's? 10:35:16

A. Sure. 10:35:21

Q. Do you know how they work? 10:35:22

A. Yes. I just used one the other day. 10:35:23

Q. What company manufacturers the BMD's? 10:35:28

A. I don't know. 10:35:31

Q. What company does the State of Georgia have a contract with that provides the BMD's to the State of Georgia? 10:35:35 10:35:42 10:35:45

A. I don't know. 10:35:46

Q. Are you familiar with Dominion? 10:35:52

A. I've heard -- I've heard of them, yes. 10:35:55

Q. Are you aware that the State of Georgia has contracted with Dominion for Dominion to provide BMD's to the State of Georgia? 10:36:00 10:36:03 10:36:07

MS. JOHNSON: He stated he wasn't aware who the State of Georgia had a contract with. You can answer. 10:36:11 10:36:17 10:36:19

A. Yeah, I don't know who the contract's with. 10:36:20 10:36:22

both the QR codes and the human readable text could be altered? 10:41:06 10:41:12

MS. JOHNSON: (Inaudible.) 10:41:16

THE REPORTER: I'm sorry. I couldn't hear you, Melanie. 10:41:17 10:41:19

MS. JOHNSON: Object to form and lack of foundation. 10:41:20 10:41:22

A. Well, spec- -- all right. Ask me the question again, please. Just repeat the question. 10:41:23 10:41:29

Q. Would you support the use of an election equipment that could be hacked in such a way that both the QR codes and the human readable text could be altered? 10:41:36 10:41:40 10:41:43 10:41:47

MS. JOHNSON: Objection. You can answer. 10:41:49

A. If it was a theor- -- if it was a theoretical possibility, it would just depend on a lot of other factors, but you have the voter who checks it. So it would be really strange to have a system that alters it before the voter looks at it and the voter doesn't know -- none of the voters that look at it notice. That just would -- I just can't -- I just can't anticipate that that could be 10:41:53 10:41:57 10:41:59 10:42:04 10:42:09 10:42:16 10:42:19 10:42:22

possible. 10:42:26

Q. How about a system -- sorry. Strike that. 10:42:28

So just going back on your previous 10:42:50
answer, you noted that you couldn't anticipate that 10:42:51
it would be possible, but regardless of whether you 10:42:56
can anticipate that it's possible, let's assume it 10:43:02
is possible. Would you support the use of an 10:43:09
election equipment that could be hacked in such a 10:43:12
way that both QR codes and human readable text 10:43:17
could be altered? 10:43:20

MS. JOHNSON: Object to form, misstates 10:43:21
his prior testimony, lack of foundation, and 10:43:23
relevance. 10:43:27

A. Yeah. I just -- I don't think it's 10:43:27
possible to have a system where you hack and none 10:43:30
of the voters who review their ballots don't catch 10:43:32
that it's -- that it's switched. The voters are 10:43:35
too concerned about their votes. We had so many 10:43:38
questions about calibrations on the DRE's, the 10:43:42
voters were all over it. So I can't support or -- 10:43:49
or oppose a system that's just not possible. 10:43:55

Q. Understood. 10:43:58

You testified a few minutes earlier that you understood that only -- initially only the QR codes are tabulated and not the human readable text, correct? 10:44:00 10:44:02 10:44:08 10:44:11

A. The scanner reads the QR codes, correct. 10:44:14

Q. Okay. So would you support the use of election equipment that could be hacked in such a way that only the QR codes are altered but the human readable text shows the voter's intent? 10:44:19 10:44:22 10:44:26 10:44:32

MS. JOHNSON: Same objection. 10:44:39

A. If I knew -- if I knew that it was possible -- if I knew it was happening -- scratch that. 10:44:45 10:44:48 10:44:52

If I knew it was possible to do that, that would not be a system that I support. I would want to know -- I would want to know more information as to how somebody's marketing a system that that could happen. How did that -- how did that meet the request -- how did that meet the proposal, request for proposals. 10:44:53 10:44:55 10:45:04 10:45:07 10:45:10 10:45:14 10:45:17

Q. Understood. 10:45:20

As a member of the State Election Board do 10:45:24

A. Yes. 11:31:23

Q. Do you know who those experts are? 11:31:23

A. No. 11:31:26

Q. Have you discussed the retention of experts in this litigation with members of the State Election Board? 11:31:32 11:31:35 11:31:40

A. Not to my knowledge. 11:31:44

Q. So how did you become aware that experts have been retained by both parties in this litigation? 11:31:45 11:31:48 11:31:52

A. I think I read it in an Atlanta Journal article. 11:31:52 11:31:57

Q. And so do you know who the experts are that have been retained? 11:32:03 11:32:07

A. No. 11:32:11

Q. Are you familiar with Alex Halderman? 11:32:12

A. No. 11:32:14

THE REPORTER: What was the last name, Tamara? 11:32:17 11:32:18

MS. WIESEBRON: Halderman, H-A-L-D-E-R-M-A-N. 11:32:19 11:32:20

THE REPORTER: Thank you. 11:32:23

Q. And so you're not aware that he provided an expert report in this litigation? 11:32:28 11:32:32
A. No. No. Sorry to have interrupted you. I apologize, but no. 11:32:34 11:32:39
Q. All right. 11:32:46
And do you -- so you're not aware that he is a cybersecurity expert? 11:32:54 11:32:57
A. I don't know him. 11:33:00
Q. Okay. And would you be interesting -- interested to find out what is in his expert report? 11:33:04 11:33:10 11:33:14
MS. JOHNSON: Object to form. You can answer. 11:33:17 11:33:18
A. If I -- yeah. If I knew who he was and I knew if he had anything relevant, sure. I'm always up to reading anything I can -- anything I can read to educate myself. 11:33:20 11:33:24 11:33:27 11:33:31
Q. And so you mentioned earlier that you're not familiar what this case is about? 11:33:40 11:33:45
A. Not offhand, no. 11:33:50
Q. And have you discussed this case with other State Election Board members? 11:33:53 11:33:57

A. Not that I particularly recall this case. We do have executive sessions where counsel comes in and briefs the board on pending litigation, but we've been sued a lot. So this case doesn't stand out in my mind. 11:34:03 11:34:06 11:34:10 11:34:15 11:34:23

Q. Got it. 11:34:25

And have you personally discussed this case with anyone? 11:34:26 11:34:28

A. No particular conversations come -- come to mind. I suspect that if somebody came and said, hey, I talked to you about this, I wouldn't have any information to dispute them, but I don't recall any particular conversations about this particular case other than I talked to the lawyer yesterday or the day before that I was having a deposition. 11:34:31 11:34:34 11:34:43 11:34:45 11:34:48 11:34:51 11:34:56

Q. Do you know anything about the serious vulnerabilities that Mr. Halderman found? 11:35:02 11:35:07

MS. JOHNSON: Object to form. You can answer. 11:35:11 11:35:12

A. I don't know anything about Halderman. 11:35:13

Q. Would you be interested to know what those serious vulnerabilities are? 11:35:21 11:35:25

MS. JOHNSON: Same objection. 11:35:28

A. Sure. If he's -- if he's -- if it's a credible person who has relevant information, I would be interest- -- always interested to hear it. We get a lot of crackpots, but if he's -- if he's -- if he's wise and has good data, I'm always interested to hear it. 11:35:28 11:35:32 11:35:35 11:35:38 11:35:41 11:35:45

Q. Do you know whether the State Election Board or anyone from the Secretary of State's office has done anything to remedy the vulnerabilities pointed out by Mr. Halderman? 11:35:53 11:35:56 11:36:01 11:36:05

MS. JOHNSON: Same objection. 11:36:10

A. I wouldn't know. 11:36:10

Q. Are you aware -- 11:36:12

A. I mean, if -- if I don't know about him, I don't know about his recommendations, I wouldn't know that I was instituting his recommendations, but we might have instituted something of his recommendations without me knowing it was attributable to him. So it's hard to -- hard to know. Or he might have had the same idea as someone else. You never know. 11:36:13 11:36:17 11:36:20 11:36:23 11:36:26 11:36:28 11:36:30 11:36:39

Q. Are you aware that Plaintiffs have asked the Secretary of State's office to provide a proposal to allow the Secretary of State and State Election Board members to have access to some or all of Mr. Halderman's sealed report? 11:36:40 11:36:42 11:36:46 11:36:52 11:36:54

MS. JOHNSON: Same objection. 11:37:00

A. I don't know -- I don't know anything about Mr. Halderman. 11:37:00 11:37:02

Q. Would you want to have been advised as a member of the State Election Board that a professor in cybersecurity has written a report about the vulnerabilities of -- 11:37:12 11:37:14 11:37:22 11:37:26

MS. JOHNSON: Same objection. 11:37:29

Q. -- Georgia's system? 11:37:29

MS. JOHNSON: I apologize. Same objections. 11:37:30 11:37:33

A. Yeah. If I -- if I knew the person's background and knew whether they were credible and what their theories were. There's a lot of professors writing a lot of stuff. So, you know, it would depend. 11:37:36 11:37:39 11:37:44 11:37:46 11:37:50

Q. But admittedly, someone that has a Ph.D. 11:37:55

has some expertise in the area of cybersecurity, right? 11:38:00 11:38:07

A. I mean, there's a lot of crackpots that have Ph.D.'s writing a lot of stuff about election law out there. 11:38:09 11:38:14 11:38:17

Q. Like who? 11:38:20

A. A guy named Bonifaz out in Ohio somewhere comes -- springs to mind immediately. 11:38:23 11:38:28

Q. All right. 11:38:37

A. Wrote a book about how the election was stolen from John Kerry in Ohio. 11:38:37 11:38:40

Q. Got it. 11:38:47

Are you aware that the Secretary of State has hired their own experts in this litigation? 11:38:50 11:38:52

A. I think I read that from the same Atlanta Journal article, but I would assume so. 11:38:58 11:39:03

Q. All right. Are you familiar with Dr. Juan Gilbert? 11:39:04 11:39:08

A. No. 11:39:08

Q. And so are you familiar with the work he has done in this case? 11:39:13 11:39:16

A. No. 11:39:17

Q. So you would not know whether the Secretary of State's expert actually disputes the presence of vulnerabilities found in Alex Halderman's report, right? 11:39:19 11:39:25 11:39:29 11:39:35

MS. JOHNSON: Objection, form. You can answer. 11:39:37 11:39:38

A. Yeah. I don't know what their contentions -- I don't know what either person's contentions are. 11:39:39 11:39:41 11:39:44

Q. Would you want to find out whether Dr. Gilbert disputed the presence of the vulnerabilities that Mr. Halderman found? 11:39:45 11:39:47 11:39:51

A. The same limitations as on the previous person. If they're -- if they're a wise person with good experience and useful knowledge, sure, I'm always up for more information rather than less. 11:39:56 11:39:59 11:40:02 11:40:06 11:40:10

Q. Has the State Election Board ever had a cybersecurity expert examine the BMD election system? 11:40:14 11:40:17 11:40:23

A. Not that -- not that comes to my mind. It could have been, but doesn't come to my mind. 11:40:25 11:40:28

recount that took place in the November 2020 election to take place in all future contests? 11:52:49 11:52:52

A. It really -- it depends -- it depends. We don't have but two elections -- two major elections, the primary and the general -- well, three now, the runoff, and so it's going to really depend. You might have a presidential race that's 10 points, 12 points, and you might have a governor's race that's 300 votes. So you would recount the governor -- you might recount the governor's race instead of the presidential race. So it's going to really depend -- excuse me -- but the level of scrutiny is not going to -- is not going to diminish. 11:52:59 11:53:03 11:53:07 11:53:10 11:53:14 11:53:18 11:53:21 11:53:25 11:53:30 11:53:33 11:53:35 11:53:38

Q. Okay. 11:53:39

And you mentioned earlier that the Secretary of State explained to you that they did -- how they did the audit; is that right? 11:53:42 11:53:47 11:53:50

A. No. He reported to me that the audit -- the hand count and the machine tally were similar. 11:53:55 11:53:58

Q. Okay. And can you explain in more detail how they figure that out? 11:54:02 11:54:06

A. No. He just came to me and said we've -- we've done the full recount and the results are similar. 11:54:09 11:54:12 11:54:16

Q. Okay. But you know -- you've testified earlier that the machine -- the votes that are tabulated by the machine are reflected in the QR code, right? 11:54:17 11:54:21 11:54:27 11:54:36

A. That's the way I understand it, yes. 11:54:36

Q. And now you're testifying that the audit counted the human readable version of the receipt, right? 11:54:38 11:54:40 11:54:44

A. Yeah. What I watched down in Fulton, they compared what the humans counted to what the machine counted. 11:54:45 11:54:50 11:54:52

Q. Right. And how do they do that? 11:54:56

A. They threw dice, they cut the stack of ballots, they counted those ballots, and they ran it through the machine and they compared whether they were the same or not. And they said there was some kind of tolerance that it was allowed to be within 1 percent or something and it was some fraction of that, like 1/10th of 1 percent was the 11:54:59 11:55:03 11:55:10 11:55:12 11:55:17 11:55:20 11:55:23

difference. So it was well within the tolerances. 11:55:26
That's all I remember. 11:55:30
Q. But do you know -- 11:55:38
A. And -- go ahead. 11:55:40
Q. Okay. Do you know whether they compared 11:55:41
each single paper ballot to the machine-recorded 11:55:45
ballot? 11:55:53
MS. JOHNSON: Object to form. 11:55:55
A. Yeah. My recollection was they did them 11:55:56
in batches. 11:55:58
Q. Okay. So just to clarify, you did not 11:56:04
hear from the Secretary of State that they compared 11:56:08
every single paper ballot to that same single 11:56:13
machine-recorded ballot, right? 11:56:19
A. Yeah. I would have -- I would have 11:56:23
thought that would have been a very time-consuming 11:56:25
waste of time to run each ballot individually 11:56:28
through the machine. I would think that would take 11:56:32
forever. 11:56:36
Q. Understood. 11:56:39
Let's see. Okay. Are you aware that 11:56:45
malware could be introduced to BMD machines through 11:57:01

A. But they never have explained what that meant. I always ask them what do you -- what do you mean by that, and no one's been able to tell me. 12:47:40 12:47:42 12:47:44 12:47:46

Q. And you mentioned earlier that you assist -- that you witnessed at least part of the Fulton County recount for a primary race. Was any -- 12:47:47 12:47:49 12:47:53 12:47:58

A. I think -- 12:47:59

Q. I'm sorry? 12:48:00

A. I think it was the primary. 12:48:01

Q. Okay. What you think was a primary race, do you recall if any other State Election Board member was there with you? 12:48:03 12:48:07 12:48:11

A. I was the only one. 12:48:14

Q. Okay. 12:48:22

And so when discussing the -- the rules about recount procedure do you recall whether you discussed whether individual ballots should be compared to the machine-casted ballot? 12:48:24 12:48:33 12:48:39 12:48:44

A. That sounds like something I would have recalled if it came up just because it's so 12:48:55 12:48:57

preposterous, but I don't recall it coming up. I would have recalled it if it came up because I would have had a very adverse reaction. 12:49:00 12:49:04 12:49:06

Q. Okay. So fair to say that in any audits that took place while you were on the State Election Board the audits did not check the QR code against a human readable selection for each ballot during the audit? 12:49:10 12:49:20 12:49:26 12:49:30 12:49:36

MS. JOHNSON: Object to form. You can answer. 12:49:38 12:49:39

A. Correct. I've only seen it done in batches, and it only makes sense to me to do it in batches. 12:49:40 12:49:42 12:49:46

Q. Understood. We can take the exhibit down or at least you can stop looking at it if you want. 12:49:47 12:49:57

Is privacy important to you as a State Election Board member? 12:50:06 12:50:10

A. Super critical. 12:50:13

MS. JOHNSON: Object to form. You can answer. 12:50:14 12:50:16

THE WITNESS: I'm sorry. Super critical. 12:50:16

Q. Have you heard -- 12:50:19

CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

I, TINA M. ALFARO, Registered Professional Reporter, Certified Realtime Reporter, and Notary Public, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; that reading and signing was requested; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 17th day of November, 2021.

My Commission expires October 31, 2025.

Tina M. Alfaro

________________________________

NOTARY PUBLIC IN AND FOR THE DISTRICT OF COLUMBIA