# EXHIBIT 130

Page 1

1   IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION
3
      DONNA CURLING, et al.
4
                  Plaintiffs
5                                      CIVIL ACTION FILE
6        vs.                           NO. 1:17-CV-2989-AT
7
8     BRAD RAFFENSPERGER, et al.
9
10                Defendants
11
12
13
14
15
16
17            VIDEOTAPED ZOOM DEPOSITION OF
18             REBECCA NASH SULLIVAN, ESQ.
19
20                  November 5, 2021
21                     2:03 P.M.
22
23
24
25        Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC

1   Q.   And what exactly is tabulated by hand
2   during a risk-limiting audit?
3   A.   The votes.
4   Q.   Given that in this case there are two
5   pieces of the printed paper, can you be more
6   specific when you say "the vote"?
7   A.   I'm sorry.  I didn't understand your
8   question about two pieces of paper.
9   Q.   Yeah.  That was -- I misspoke.
10       Given in this case that there are two
11   pieces of information on each ballot, a portion of
12   text and a QR code, can you detail what you mean by
13   "the vote"?
14   A.   In a risk-limiting audit, they're counting
15   the printed text is my understanding.
16   Q.   Okay.  Does the risk-limiting audit ever
17   compare the printed text on a ballot to the QR code
18   on that same ballot?
19   A.   I am not an expert on risk-limiting
20   audits.
21   Q.   So as a State Election Board member, you
22   don't know whether during a risk-limiting audit, the
23   printed text on the ballot is compared to the QR
24   code on that ballot?
25            MR. MILLER:  Object to form.

Page 35

1           THE WITNESS:  I mean, I believe that there
2       is -- I don't know specifically what you're
3       asking me.
4  BY MS. ELSON:
5       Q.   During a risk-limiting audit -- strike
6  that.
7            If a QR code was changed from what the
8  voter selected, would a risk-limiting audit be able
9  to pick up on that change?
10           MR. MILLER:  Objection.  Calls for
11      speculation.
12           THE WITNESS:  I'm sorry.  Could you
13      rephrase your question?
14  BY MS. ELSON:
15      Q.   If somehow a QR code reflected something
16  differently than the human readable portion of a
17  voter's ballot, would a risk-limiting audit be able
18  to detect that discrepancy?
19           MR. MILLER:  Same objection.
20           THE WITNESS:  I think you're -- you're
21      getting into technical issues which I don't
22      have any real knowledge of.  I am not an expert
23      regarding QR codes.
24  BY MS. ELSON:
25      Q.   Do you think it's important that each

1   voter's vote is counted when they cast a ballot in
2   the Georgia election?
3           MR. MILLER:  Object to form.
4           THE WITNESS:  Yes.
5   BY MS. ELSON:
6       Q.  And is there any mechanism available in
7   Georgia for a voter to be sure that their vote is
8   counted as they cast it?
9       A.  They can review the printed text on their
10  ballot and be -- I think that can be safe that their
11  vote is counted.
12      Q.  And can you say more about what you mean
13  when you say "they can be sure" -- or "they can be
14  safe" -- "it's safe that their vote was counted"?
15      A.  We don't have any reason to believe in
16  Georgia that the vote that is -- the printed ballot
17  is not what is count -- the -- the vote as reflected
18  in the printed text does not reflect the vote that
19  was calculated via QR code.
20      Q.  And a risk-limiting audit as you've
21  described them to me today does not assess the
22  content of the QR codes; correct?
23          MR. MILLER:  Objection.  Asked and
24      answered.
25          THE WITNESS:  The risk-limiting audit,

1         it's my understanding, reflects the -- is a
2         hand count of the printed text.
3    BY MS. ELSON:
4         Q.   What would happen if the results of an
5    audit indicate a different outcome than the one the
6    machines tabulated?
7              MR. MILLER:  Objection.  Calls for a legal
8         conclusion.  Calls for speculation.
9              THE WITNESS:  I don't know specifically
10        what would happen in that scenario.
11   BY MS. ELSON:
12        Q.   You don't know whether there's any way for
13   that election outcome to be declared invalid or to
14   rerun the election?
15             MR. MILLER:  Same objection.
16             THE WITNESS:  I believe that it is
17        addressed in the law, but I don't know
18        specifically how -- what happens at that point
19        in the process.  I have not seen that occur.
20   BY MS. ELSON:
21        Q.   And what do you mean when you say -- well,
22   strike that.
23             We've talked a bit about RLA audits.
24             What is a recount as you understand the
25   term to mean in the context of Georgia elections?

Page 45

1    functions, but I'm not -- that -- that is just my
2    understanding.  I don't have any personal knowledge
3    about this issue.
4         Q.   Okay.  When the DREs were in place, how
5    often was election security with the DREs discussed
6    at State Election Board meetings?
7              MR. MILLER:  Objection.  Relevance.
8              THE WITNESS:  I don't remember any
9         specific conversations, but just like with the
10        ballot marking devices, there are rules in
11        place regarding the security of the -- those
12        devices.
13   BY MS. ELSON:
14        Q.   And are those rules promulgated by the
15   State Election Board?
16        A.   There were some rules promulgated by the
17   State Election Board regarding security of the
18   devices, yes.
19        Q.   And you're referring to both DREs and
20   BMDs?
21        A.   Yes.
22        Q.   What information does the
23   State Election Board receive to assist it in
24   assessing proposed rules about security?
25             MR. MILLER:  Object to form.

1              THE WITNESS:  That's a very general
2         question.  Can you ask me a more specific
3         question or rephrase it?
4    BY MS. ELSON:
5         Q.   Yeah.  When the State Election Board is
6    considering a rule that has to do with, say, the
7    security of BMD machines, does the
8    State Election Board receive any briefing or outside
9    presentations regarding those machines?
10             MR. MILLER:  Object to form.
11             THE WITNESS:  I don't recall any specific
12        briefings, but we -- recommendations are made
13        by the Secretary of State staff.
14   BY MS. ELSON:
15        Q.   Were you aware of any security
16   vulnerabilities associated with the previous DRE
17   machines?
18             MR. MILLER:  Objection on form.
19        Relevance.
20             THE WITNESS:  I'm not an expert regarding
21        the technical aspects of DREs.
22   BY MS. ELSON:
23        Q.   So you're not aware of any
24   vulnerabilities -- oh, sorry.  Strike that.
25             Did the State Election Board ever discuss

Page 50

1      okay?
2           A.   How about five?
3           Q.   Five's fine.
4           A.   Okay.
5                (Cross-talk.)
6                VIDEOGRAPHER:  Sorry.  Off record at 2:55.
7                (Off the record.)
8                VIDEOGRAPHER:  Back on the record.  The
9           time is 3:02.
10     BY MS. ELSON:
11          Q.   All right.  Are you aware that an expert
12     in this case named Alex Halderman has examined
13     Georgia's voting equipment and issued a report about
14     it?
15          A.   I have heard that.
16          Q.   What do you know about that report or what
17     have you heard about it?
18          A.   I just know that it has been done.
19          Q.   Have you read about Dr. Halderman's public
20     reply or his declarations?
21          A.   I have not.
22          Q.   Have you heard news reports covering
23     Dr. Halderman's work?
24          A.   I don't have any knowledge of his work,
25     no.

1     Q.   If you were to hear that Dr. Halderman
2  found that Georgia's current election system can be
3  hacked in numerous ways, would that concern you?
4          MR. MILLER:  Object to form.
5          THE WITNESS:  I don't have any specific
6     knowledge of his report and do not feel like
7     it's appropriate to comment on that.
8  BY MS. ELSON:
9     Q.   Would it concern you if a cybersecurity
10 expert were to tell you that they examined Georgia's
11 election system and found that it could be hacked?
12         MR. MILLER:  Objection.  Calls for
13     speculation.
14         THE WITNESS:  I would certainly want to
15     know the circumstances of that and I don't have
16     the circumstances of that.
17 BY MS. ELSON:
18    Q.   Has the State Election Board taken any
19 action to learn more information about
20 Dr. Halderman's report?
21         MR. MILLER:  Objection.  Relevance.
22         THE WITNESS:  I have not, no.
23 BY MS. ELSON:
24    Q.   Have other State Election Board members,
25 to your understanding?

1      A.   I don't know.
2      Q.   Would you like to know more information
3  about the vulnerabilities that Dr. Halderman found?
4           MR. MILLER:  Object to form.
5           THE WITNESS:  I'm sorry.  Would I like to
6      know more about it?
7  BY MS. ELSON:
8      Q.   Yes.
9      A.   It is -- it is good generally for the
10 board to be aware of things regarding the election
11 system that we can effect by changes through rules.
12 If there are rules that we can pass that make better
13 security, I think that is always a good thing.
14     Q.   Do you think that having information about
15 security vulnerabilities in the election system
16 would assist the State Election Board in
17 promulgating rules related to security?
18          MR. MILLER:  Object to form.
19          THE WITNESS:  We're speaking
20     speculatively.  I think that would depend on
21     what kind of concerns they're talking about.
22 BY MS. ELSON:
23     Q.   Are you aware that plaintiffs in this case
24 have asked the Secretary of State's office attorneys
25 to provide a proposal to allow both the Secretary of

BY MS. ELSON:

Q. Does hearing that affect your confidence in Georgia's voting system?

MR. MILLER: Same objection.

THE WITNESS: I don't have any knowledge of the expert report, so I can't form an opinion on that.

BY MS. ELSON:

Q. As a State Election Board member, have you ever reached out to a source for assistance or guidance on an issue within that source's specific expertise?

MR. MILLER: Object to form.

THE WITNESS: I'm not -- I'm -- I -- I mean, that was a very broad question, but I can't think of any specific scenario that is responsive.

BY MS. ELSON:

Q. So you've never reached out to -- strike that.

Some examples would be a cybersecurity expert or an election security expert.

Has the sec- -- have you as a -- have you as an SEB member ever reached out to experts such as those?

Page 56

1         A.   I have not.
2         Q.   Has the State Election Board ever had a
3    cybersecurity expert examine the BMD election
4    system?
5              MR. MILLER:  Objection.  Relevance.
6              THE WITNESS:  The State Election Board has
7         not.  I do not know whether or not the
8         Secretary of State's office has.
9    BY MS. ELSON:
10        Q.   Did I understand your earlier testimony to
11   be that you have no knowledge of how the RLA audit
12   works, the risk-limiting audit works?
13        A.   I am not an expert on risk-limiting
14   audits, no.
15        Q.   I guess I'm asking less about whether
16   you're an expert than I am whether you have
17   knowledge about how such an audit works.
18             Do you have any knowledge of how the RLA
19   works?
20        A.   There is a rule that we have passed
21   regarding an RLA that sets some bas- -- basic
22   frameworks, but I do not have that rule memorized.
23        Q.   And you testified earlier that you have no
24   knowledge of the technical aspects of the BMDs;
25   correct?

C E R T I F I C A T E

STATE OF GEORGIA:

COUNTY OF FULTON:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the questions and answers thereto were reduced to typewriting under my direction; that the foregoing pages represent a true, complete, and correct transcript of the evidence given upon said hearing, and I further certify that I am not of kin or counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in anywise interested in the result of said case.

*Lee Ann Barnes*

LEE ANN BARNES, CCR B-1852, RPR, CRR, CRC

COURT REPORTER DISCLOSURE

Pursuant to Article 10.B. of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia which states: "Each court reporter shall tender a disclosure form at the time of the taking of the deposition stating the arrangements made for the reporting services of the certified court reporter, by the certified court reporter, the court reporter's employer, or the referral source for the deposition, with any party to the litigation, counsel to the parties or other entity. Such form shall be attached to the deposition transcript," I make the following disclosure:

I am a Georgia Certified Court Reporter. I am here as a representative of Veritext Legal Solutions. Veritext Legal Solutions was contacted to provide court reporting services for the deposition. Veritext Legal Solutions will not be taking this deposition under any contract that is prohibited by O.C.G.A. 9-11-28 (c).

Veritext Legal Solutions has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition. Veritext Legal Solutions will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

*Lee Ann Barnes*

LEE ANN BARNES, CCR B-1852B, RPR, CRR, CRC