# EXHIBIT 142

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2           FOR THE NORTHERN DISTRICT OF GEORGIA
 3                      ATLANTA DIVISION
 4
 5           Civil Action No. 1:17-cv-02989-AT
 6   _____
 7   DONNA CURLING, et al.,
 8        Plaintiffs,
 9   vs.
10   BRAD RAFFENSPERGER, et al.,
11        Defendants.
12   _____
13
14      VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF
15                  EDWARD H. LINDSEY, JR.
16   DATE:          August 31, 2022
17   TIME:          9:34 a.m. to 11:46 a.m.
18   LOCATION:      Witness location
19
     REPORTED BY:   Felicia A. Newland, CSR
20
21              Veritext Legal Solutions
                1250 Eye Street, N.W., Suite 350
22              Washington, D.C. 20005
```

Page 9

1    cooperative.  That's all I'm saying.
2    BY MS. SWANBECK:
3            Q    Okay.  Fair enough.
4                 When did you learn about the
5    litigation, this case?
6            A    Oh, it was probably shortly after I
7    got appointed.  This, along with numerous other
8    cases, I was basically told, "Congratulations on
9    your appointment, you're about to be sued multiple
10   times."
11           Q    And when were you appointed?
12           A    Whatever the Friday before the second
13   Tuesday in January was.  It was the second Monday
14   of January it was.
15                MS. SWANBECK:  I'm going to introduce
16   the first exhibit, Tab 1 as Exhibit 1.
17           (Lindsey Deposition Exhibit Number 1
18           marked for identification.)
19   BY MS. SWANBECK:
20           Q    And just looking at the cover page of
21   this report here, do you recognize this report?
22           A    I'm generally -- I've seen it before,

Page 10

1  yes.
2       Q    You have seen it before?
3       A    Yes.
4       Q    When did you first see it, do you
5  remember?
6       A    I do not.  It's been a while, but I
7  have seen it before.
8       Q    Were you aware that the Plaintiffs in
9  this case provided this report to your counsel in
10 July of last year?
11      A    I don't know the exact date.  I know
12 that -- that both sides have exchanged expert
13 reports over the course of this litigation.  I
14 don't -- I don't know the exact times.
15      Q    Because it was provided in July of
16 last year, why didn't you review it earlier?
17           MR. DENTON:  Object to form.
18           THE WITNESS:  I think I just said
19 that I reviewed it earlier than -- than now, but I
20 was appointed in January this year.
21 BY MS. SWANBECK:
22      Q    So you didn't review it earlier

Page 11

1  because you hadn't been appointed.  Is that fair to
2  say?
3              MR. DENTON:  Object to form.
4              THE WITNESS:  I think that would be
5  fair to say.
6  BY MS. SWANBECK:
7        Q    Did the report raise any concerns to
8  you about Georgia's voting system?
9        A    It raised questions for me, as well
10 as any type of report that I see that -- that
11 raises questions regarding our system, yes.
12       Q    What kinds of questions did it raise
13 for you?
14       A    Well, I want to -- you know, it
15 raised questions regarding that, both in terms of
16 his pointing out as to potential vulnerabilities
17 and as to his conclusions.  It also prompted me to
18 take a look at what some other people had said as
19 well.
20       Q    And do you recall what else you
21 looked at?
22       A    Generally speaking, I think I've seen

Page 12

1  some analysis by other experts in this case.  I've
2  seen the report by CISA.  And I've seen the -- I've
3  seen of -- I haven't actually seen the report, I'd
4  like to see the report, from the experts that were
5  retained by Dominion that apparently issued a
6  report in May of this year.  So I've either seen
7  reports or seen -- or heard of various reports with
8  different conclusions.
9          Q    What did you think after seeing all
10 of those reports?
11         A    Well, like any other system of
12 voting, there are vulnerabilities, and the State
13 needs to be aware of vulnerabilities and take
14 necessary steps to minimize it.  You know, with any
15 election, or with any voting system, there's always
16 going to be potential vulnerabilities, whether it
17 be hand ballots or some of the earlier versions of
18 eVoting or the -- or this one, we have to be
19 consciously aware of potential vulnerabilities and
20 be constantly asking questions as to how those
21 vulnerabilities can be minimized.
22         Q    Do you know what steps the State of

Page 21

1   recommendations?
2           A    Yes.
3           Q    Is that because you've read this
4   advisory previously?
5           A    Yes.
6           Q    Do you know if the State of Georgia
7   followed any of these recommendations to mitigate
8   the vulnerabilities identified in the advisory?
9           A    I am in the process now as a board
10  member seeking information about whether they have
11  responded to these or have come up with reasons why
12  it's not necessary.  That would be the best way I
13  could answer that.
14          Q    So you are actively seeking that
15  information of what -- what steps have been taken?
16          A    And -- or that matter -- yeah, what
17  need to be taken and whether or not -- and how
18  secure our system is given the questions that were
19  raised by CISA, yes.
20          Q    Could you say specifically so far
21  what the State of Georgia has done to mitigate each
22  of these vulnerabilities?

Page 22

1    A    I -- I think it would be better to
2    ask the State of Georgia that question.  I have
3    been -- I've been talked -- I've had people talk in
4    generalities to me regarding safeguards that they
5    believe are sufficient.  I have asked for a hearing
6    on this matter to -- for them to be able to address
7    to reassure the people of Georgia that the system
8    is secure.  That would be the best way I could
9    answer that question.
10        Q    And has that hearing been scheduled?
11        A    Not yet.
12        Q    Who have you asked for the hearing?
13        A    The Chair.
14        Q    Who did you talk to about the steps,
15   or potential steps, for mitigation?
16        A    I've talked with -- in addition to
17   counsel, I have also talked with the state election
18   head.  And I've talked to Gabe Sterling.  And I've
19   also talked within the Secretary of State's office.
20   I believe that's it.
21        Q    Who's the state election head?
22        A    You're going to find pretty quickly

Page 23

```
1       that I'm lousy on names.  And I apologize.  I know
2       them well and -- but as I'm sitting here today
3       being deposed, he's well known to both sides.  And
4       I do apologize, but I'm -- I'm lousy sometimes with
5       names.
6              Q    Is that Mr. Harvey?  Does that ring a
7       bell?
8              A    No, that's not Mr. Harvey.
9              Q    Or Blake Evans.
10             A    That's him.
11             Q    Blake Evans?
12             A    Yeah.  Thank you.  Sometimes I'm
13      going to need to phone a friend here when it comes
14      to names.
15             Q    Are you aware of any specific steps
16      the State has taken, other than generalities, can
17      you name any specific steps that the State has
18      taken on mitigation?
19             A    I would hesitate to try to say that
20      at this time.
21             Q    Why?
22             A    Because my memory may not be as good
```

Page 24

```
 1        as it should be when it comes to technical matters.
 2             Q    Are you satisfied that the State is
 3        working to mitigate these vulnerabilities?
 4             A    I'm satisfied as to their good-faith
 5        efforts, yes.  Am I satisfied as to whether or not
 6        we've done everything possible?  I reserve that
 7        until I hear from everybody.
 8             Q    Who else do you want to hear from?
 9             A    Well, anybody that wants to provide
10        certain expertise.  Like I said, I would like to
11        see the report from the Dominion expert.  Once
12        again, I need to phone a friend here in terms of
13        the name of the company, which is also highly
14        recognized.  And I would like to look more fully at
15        some of the other experts in the case.  And -- and
16        I'll go back and look again at your expert's
17        deposition or your expert's report.
18             Q    You stated just now that you asked
19        for a hearing for the purpose of assuring the
20        public that the system is secure.  How --
21             A    Yes.
22             Q    -- can you believe that the system is
```

Page 53

1   What exactly safeguards are in place in order to
2   keep that exploitation from taking place?  And what
3   exactly was in place to be able to detect what that
4   exploitation does?  Those are the questions that I
5   have.
6           Q    Given that the November elections are
7   coming up pretty quickly, how will you evaluate
8   those safeguards that you've been describing in
9   time to determine whether they are enough to secure
10  the election?
11          A    Well, I'm -- I'm working on it.  And,
12  quite frankly, the Secretary of State's office, I
13  know, is working on it.  And -- and, quite frankly,
14  I hope that you guys are working on it.  So between
15  all of us, I hope that we can show confidence to
16  the -- to the people that the 2022 election is --
17  the results will be accurate.
18          Q    Are you aware of any specific steps
19  that have been taken to address these safeguards?
20          A    I know that --
21               MR. DENTON:  Object to form.
22               THE WITNESS:  I'm sorry.  Thank you.

1      hearing sometime in September.
2      BY MS. SWANBECK:
3            Q    Do you expect to have the information
4      that you need by the November 2022 elections?
5            A    Yes.
6                 MR. DENTON:  Object to form.
7      BY MS. SWANBECK:
8            Q    What would you -- what would you do
9      if the investigation showed that the system was not
10     secure?
11           A    Well, that once again calls for
12     speculation.  I believe that the system -- based on
13     everything that I've seen, including the various
14     reports that I've seen, or the various reports that
15     I've heard of, including the reports from CISA, the
16     report that I've heard of from Dominion, the -- the
17     conclusions of our experts that this is an issue
18     that is soluble.  I do believe that to be true,
19     based on the -- based on the totality of what I've
20     heard so far.
21                What exactly that is, I can't tell
22     you at this point, but based on everything that

Page 81

1  I've seen and heard from -- from a wide range of
2  individuals is I believe this is an issue that --
3  that -- that we can deal with.
4       Q    So the CISA report, and the other
5  reports that you've mentioned, were published a
6  while ago before the -- the news of the Coffee
7  County breach came out as a public matter.
8            Do you believe -- does this -- sorry,
9  strike that.
10           Does the fact that the Coffee County
11 data was breached or -- was breached, does this not
12 change your opinion in -- in any way, given that
13 those reports don't reflect on such a -- such a
14 massive breach?
15           MR. DENTON:  Object to form.
16           THE WITNESS:  The question is how
17 massive the breach was, Counselor, and whether or
18 not it can be rectified.  My understanding is that
19 these are issues that can be.  Let's -- let's see
20 though.
21 BY MS. SWANBECK:
22      Q    How do you believe they can be

Page 112

1     CERTIFICATE OF NOTARY PUBLIC

2     I, FELICIA A. NEWLAND, CSR, the officer before whom

3     the foregoing videotaped deposition was taken, do

4     hereby certify that the witness whose testimony

5     appears in the foregoing deposition was duly sworn

6     by me; that the testimony of said witness was taken

7     by me in stenotype and thereafter reduced to

8     typewriting under my direction; that said deposition

9     is a true record of the testimony given by said

10    witness; that I am neither counsel for, related to,

11    nor employed by any of the parties to the action in

12    which this deposition was taken; and, further, that

13    I am not a relative or employee of any counsel or

14    attorney employed by the parties hereto, nor

15    financially or otherwise interested in the outcome

16    of this action.

17

18    *[signature]*

19    _____

20    FELICIA A. NEWLAND, CSR

      Notary Public

21

      My commission expires:

22    September 15, 2024