# EXHIBIT 149

Page 1

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION
3
4

   Donna Curling, et al.,

5
                  Plaintiffs,
6                                    CIVIL ACTION FILE
          vs.
7                                    NO. 1:17-cv-02989-AT
   Brad Raffensberger, et
8   al.,
9                  Defendants.
   ~~~~~~~~~~~~~~~~~~~~~~~~~
10
11
12

                 VIDEO 30(b)(6) DEPOSITION OF
13                    SECRETARY OF STATE
                         THROUGH
14               ROBERT GABRIEL STERLING
15
16                    October 12, 2022
17                       9:26 a.m.
18
19

            Suite 3250, One Atlantic Center
20               1201 W. Peachtree Street
                   Atlanta, Georgia
21
22
23
24

            S. Julie Friedman, CCR-B-1476

25

1          Will the court reporter please swear in

2      the witness.

3          ROBERT GABRIEL STERLING, having been first

4      duly sworn, was examined and testified as

5      follows:

6          THE VIDEOGRAPHER:  Counsel, you may

7      proceed.

8      CROSS-EXAMINATION

9      BY MR. CROSS:

10     Q.     Good morning, Mr. Sterling.

11     A.     Good morning, Mr. Cross.

12     Q.     So do you understand your testimony today

13   as a representative of the Office of the Secretary of

14   State for Georgia.

15     A.     That's my understanding.  Yes.

16     Q.     And you understand that means that you're

17   testifying to the knowledge the Secretary's Office

18   has on a particular topic?

19     A.     Yes.

20     Q.     Okay.  Let me go ahead and hand you the

21   first exhibit, which is Tab 2, the notice.

22          If you could, share that with everybody

23   else.

24     A.     Is it the same thing here?

25     Q.     Yeah.

Page 12

```
 1      A.    Okay.

 2      Q.    No problem.

 3            (Exhibit 1 was marked for identification.)

 4            MR. TYSON:  Thank you.

 5            THE VIDEOGRAPHER:  Exhibit 1?

 6            MR. CROSS:  Exhibit 1.

 7            THE COURT REPORTER:  Oh, no.

 8            MR. CROSS:  And --

 9            THE COURT REPORTER:  Give me a second,

10      please.

11            MR. CROSS:  Sure.

12            THE COURT REPORTER:  The late attendees.

13            MR. CROSS:  Do we need to go off the

14      record?

15            THE COURT REPORTER:  Yeah.  We can for a

16      second.  I'm so sorry.

17            MR. CROSS:  That's okay.

18            THE VIDEOGRAPHER:  We're going off the

19      record at 9:30.

20            (Recess from 9:30 to 9:31 a.m.)

21            THE VIDEOGRAPHER:  We're on the record at

22      9:31.

23      Q.    (By Mr. Cross)  Mr. Sterling, before we

24      look at Exhibit 1, just you understand you're under

25      oath?
```

Page 13

1      A.    Yes.  I just took it.

2      Q.    Yeah.  And is there any reason you cannot

3  give full and complete testimony today?

4      A.    Not that I'm aware of.

5      Q.    Okay.  And have you ever been convicted of

6  or charged with any crime?

7      A.    No.

8      Q.    Okay.  All right.  Take a look --

9      A.    Wait.  Do speeding tickets count?

10      Q.    No.

11      A.    Okay.

12      Q.    Those are not crimes.

13            Take a look at Exhibit 1, if you would,

14  and turn to Page A-4 where it says, "AMENDED TOPICS."

15      A.    Yes, sir.

16      Q.    And you'll see that there's a topic there,

17  No. 1; and it continues on to the top of the next

18  page.

19            And are you prepared to testify to the

20  knowledge of the Secretary's Office on that topic

21  today?

22      A.    Yes.

23      Q.    Okay.  Now what did you do to prepare for

24  your testimony today?

25      A.    Interviewed several individuals in the

Page 46

1                (Exhibit 4 was marked for identification.)

2                THE WITNESS:  Okay.

3                Oh, I'm sorry.  Give him.  Pass them down.

4        Q.     (By Mr. Cross)  This is Tab 1-B.

5                So this is --  Exhibit 4 is a Tweet that

6        you sent on October 1st of this year.

7                Do you see that?

8        A.     Yes.

9        Q.     And in here you write thank you Ben Adida

10       for being a rational expert in elections.  And he's

11       right.  The fear mongers need to stop.  The

12       statements undermine Americans' faith in elections,

13       the same outcome as Trump's stolen election claims.

14       Often they say the same thing and reinforce each

15       other.

16                Do you see that?

17       A.     Yes, sir.

18       Q.     So you tweeted out the thread that Mr.

19       Adida had posted, right?

20       A.     Yes, sir.

21       Q.     Did you actually read that before you put

22       it out before you re-tweeted it?

23       A.     I read his -- most of them.  I -- back and

24       forth for what while, but I didn't --  I don't know

25       the timing of when I tweeted versus when the replies

Page 47

1   might have been put on there, so I couldn't say.

2        Q.    Well, did you see that in his statement in

3   the -- the tweet that you re-tweeted, he stated that

4   the breach, the unauthorized access in Coffee County

5   lasted only a few hours; and that's why there's not

6   cause for concern?

7        A.    No.  I didn't see that part.

8        Q.    But that's not an accurate statement.

9   Right, sir?

10       A.    That is correct.

11       Q.    In fact, we know from the surveillance

12  video is that the unauthorized access lasted over a

13  period of -- of many days and many hours throughout

14  the month involving a variety of different people?

15       A.    Yes.  He also said on that particular item

16  that we have to operate as if they already have all

17  the source code already.  I believe it's the same

18  thread, but could have been a different thread, so

19  the length of it has less to do with, I think, from

20  my point of view and from --  I'm not going to speak

21  for Mr. Adida here.

22            But I don't believe that's misleading.

23  No.

24       Q.    To --  To tell the voters publicly that --

25  that the unauthorized access in Coffee County lasted

Page 48

```
 1  only a few hours as opposed to -- five, six -- eight
 2  days?
 3      A.    Again, I don't find it to be --  That's
 4  when Mr. Adida did, and I didn't necessarily see that
 5  particular thing so --
 6          But my point is the underlying part of
 7  that is that he also said we have to act as if they
 8  already have all this information already, so it
 9  doesn't matter if it's eight hours or eight days in
10  terms of that situation.
11      Q.    But --  But even that is directly at odds
12  with the position that the Secretary's Office has
13  taken before this breach came to light, right?
14      A.    I'm not sure what you mean.
15      Q.    Do you recall -- if I can --  I can pull
16  it up if we need to.
17          Do you recall that Secretary Raffensperger
18  did an interview where he said that Dr. Halderman's
19  findings had no value in the real world, because he
20  got access to the equipment and the software in a way
21  that would never happen.
22          But now you're saying Mr. Adida says we
23  should just assume that.
24      A.    No.  Two different things about this, Mr.
25  Cross; and I don't want to verbally spar with you.
```

1      Q.    If you look down towards the bottom, do
2  you see Mark Niesse with the AJC asked a question 39
3  minutes into the interview?
4      A.    39 minutes, 43 seconds --
5      Q.    Right.
6      A.    -- yes.
7      Q.    And then Secretary Raffensperger responds
8  by saying you're talking about the Halderman report.
9  And Halderman was given actually the security code,
10  so he had total access to the equipment; and he had
11  it for 12 weeks.  And he comes back with his points.
12  He said, well, if you have that kind of access, that
13  you can change things.
14            And Secretary says, well, Doug, yeah.
15  Just like the guy that's got to come in and work on
16  your server, your security system for your house, he
17  can have all the access codes.  Yeah.  I guess he can
18  come back maybe at 2:00 a.m.
19            The question I was asking you was --
20            Well, let me ask you one more foundational
21  question.  Are you aware that the Secretary of
22  State's Chief Information Officer, Merritt Beaver,
23  testified in his deposition as a 30(b)(6) witness, as
24  a corporate rep, that it's critically important to
25  protect the Dominion software because releasing it

1    provides a roadmap -- that was his word --

2         A.    Yeah.

3         Q.    -- a roadmap for hacking the system?

4         A.    Yes.

5         Q.    Do you disagree with that?

6         A.    No.

7         Q.    Okay.  So my question to you is:

8    You're --  You're citing that Adida is saying, well,

9    we should just assume that bad actors have not just

10   the software, but the source code, whereas Secretary

11   Raffensperger is saying no, no.  We don't even have

12   to worry about Dr. Halderman's findings because he

13   had access to the software.  How do you reconcile

14   those positions?

15             MR. TYSON:  I'll object to form.

16             THE WITNESS:  Two different ways.  Our

17        office has to run an entire election system, and

18        that's what Secretary Raffensperger is referring

19        to in terms of the overall system would still be

20        safe given these -- this level of access he had.

21        Q.    (By Mr. Cross)  Uh-huh.

22        A.    Coffee County itself had a breach.  Part

23   of the security of our system overall is there's 159

24   different jurisdictions.

25             And, again, I'm not a technical expert;

1    out of the norm from what we see in most of our

2    investigations, in most situations.

3              And no doubt having all the information we

4    have now versus when we have it then, we would have

5    acted differently probably; but that's the situation

6    we had at the time.

7              So it looked, had every hallmark of

8    misinformation, disinformation.  Had every hallmark

9    of every other claim.

10              So that was where --  That was the

11   information at the time; and I should have said

12   there's always a possibility, just like I normally

13   caveat things; but I was --  In my brain at that time

14   I was pretty sure this is another pile of garbage the

15   same way most of these other claims were piles of

16   garbage.  Most of the Trump claims -- let's all be

17   fair -- were piles of garage.

18       Q.    All right.  Let me hand you the next

19   exhibit.  It's Tab 58.

20       A.    Thanks.  I didn't hand it out.  Sorry.

21              THE COURT REPORTER:  Exhibit 7.

22              (Exhibit 7 was marked for identification.)

23

24

25

Page 78



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 79



```
1
2
3
4
5
6
7
8
9
10
11
```

12      Q.    Okay.  The Secretary's Office is aware

13   that every county in this -- that every county

14   election office in the state has video surveillance,

15   right?

16           Let me --  Let me ask a better question.

17   You were aware that this county elections office has

18   video surveillance, right?

19      A.    Yes.

20      Q.    Okay.  Why didn't you ask for that?

21   Wouldn't that be step one?

22      A.    I believe I just explained to you that

23   James Barnes went to their --  As I understand it was

24   explained to us --  And this is verbal.  There's no

25   unfortunate --  There's no e-mail about this.

Page 81

1            He went to them and said, well, we did --
2    That's all been deleted by now.
3            He was unaware that Misty Hampton had done
4    an ORR.  Because like I said, the left hand and right
5    hand didn't know what they were doing.
6            So even if we had gone to ask them, we
7    would have gone through James Barnes, who would have
8    gone to the County and perhaps gone to the county
9    attorney; but that's a hypothetical at this point,
10   because he said it doesn't exist.
11       Q.    Wait.  But you guys are the -- are --
12   are --
13            You're the Secretary's Office.  You have
14   law enforcement authority to conduct an investigation
15   into election security breaches, right?
16       A.    Potential ones, yes.
17       Q.    Okay.  Why in the world would you rely on
18   James Barnes, who was brand new to the office,
19   instead of sending your investigator yourself to find
20   out whether that surveillance video existed?
21            Wouldn't that be the normal course of a --
22   of a -- of a sound investigation?
23       A.    If the person who --
24            MR. TYSON:  Object to form.
25            THE WITNESS:  If the person who reported

Page 130

```
 1              MR. KNAPP:  Yes.
 2              THE VIDEOGRAPHER:  We're going off the
 3       record at 11:28.
 4              (Recess from 11:28 a.m. to 11:43 a.m.)
 5              THE VIDEOGRAPHER:  We are on record at
 6       11:43.
 7         Q.   (By Mr. Cross)  Mr. Sterling, are you
 8  aware of any changes made to the original EMS server
 9  after the Secretary's Office took possession from
10  Coffee County?
11         A.   The Coffee --  You mean the Coffee County
12  EMS, not --
13         Q.   Correct.
14         A.   -- made by Coffee County.
15              I am not aware of any changes that would
16  have been made to that.  No.
17         Q.   Okay.  And what about the ICC?
18         A.   Not that I'm aware of.
19         Q.   Okay.  The --  The Secretary's Office took
20  the EMS server from Coffee County in June of 2021, as
21  I understand it, because the password didn't work; is
22  that right?
23         A.   June 8th.  Yes.
24         Q.   Okay.  Why did the --  And sorry.  Just to
25  take a step back, are you aware that James Barnes
```

1  understanding from a year out or something --

2       Q.    Uh-huh.

3       A.    -- like that.

4       Q.    The --  Why did the Secretary's Office

5  take the ICC when it took the EMS server?

6       A.    I think they're connected.  I don't know.

7       Q.    But you're aware that the password, the

8  ICC password still worked.  It was fully operational?

9       A.    Maybe it was.  I don't know.  I don't have

10  an understanding as to why they took both of them.

11       Q.    Okay.

12       A.    I think I said that they're --

13       Q.    Well, and I'm not asking you to

14  speculate --

15       A.    Okay.

16       Q.    -- if you don't know.

17       A.    I'm going to say one thing.  As I

18  understand it, their SOP is to just do that.  Like I

19  said --  Like I said, take it down there and replace

20  it, so that's -- I didn't --

21       Once they said they did that, I just kind

22  of left it at that.

23       MR. TYSON:  David, do you want us to check

24      with CES on a break on that point on what the --

25       MR. CROSS:  Sure --

1    their modus operandi.  Their modus operandi before

2    the breach in Coffee County was to be very public, as

3    you pointed out, right?  To say, look, we're doing

4    this.  We're getting access, and we're going to show

5    that the election was wrongly decided, right?

6         A.    Except in the other cases where they were

7    public, they were granted access by some authority

8    that seemed to be okay with it.  In -- In Arizona,

9    the State Senate, obviously.  In Michigan, I believe

10   there was, I believe, another group that did that.

11         So this goes back to looking back at what

12   we know now.  Misty and them all realized there were

13   violating laws and rules here.  Maybe we don't waive

14   a flag at this until we know for certain we found

15   something, so maybe they'd gotten more sophisticated,

16   'cause they'd gone through the November time period

17   and the December time period.  I can't remember where

18   the Arizona ridiculous thing was going on at that

19   point.

20         So, again, I can't get into their

21   mind-set, and you're right.  This seems a little bit

22   different; but the rationale behind it might have

23   been, hey, I don't want to go to jail.

24         Q.    Well, but you're drawing the distinction

25   that I'm -- I guess I'm having hard time to

```
 1   understand.
 2            Because according to the folks that did
 3   this -- Misty Hampton, SullivanStrickler -- they have
 4   the same authorization they had in other
 5   circumstances.  They had the authorization of the
 6   elections director.  They had the authorization of
 7   multiple members or at least one member of the Coffee
 8   County Election Board, and they had Cathy Latham
 9   holding herself out as an election official telling
10   them they were authorized.
11      A.    But she wasn't an election official.
12            MR. TYSON:  Object to form.
13      Q.    (By Mr. Cross)  Sure.  But -- but --
14      A.    My point is it wasn't a public kind of
15   thing on that front, so I think there's a --
16            I can't get in their mind-set.  You're
17   right.
18      Q.    Uh-huh.
19      A.    I can't know why they didn't do it that
20   way; but, again, everything we've seen shows that.
21   And, again, new information you just gave me as to
22   that, it looks like they were trying to see what was
23   the configuration with those dates, if something
24   different would happen.  That's why --  Maybe that's
25   why they moved those dates on those machines, if
```

Page 147

1   anything or do anything.  I don't know if they had

2   skill sets or not.

3            But you're --  You're right.  We can't

4   know that with suppositions based on what we've seen

5   and the evidence that we can get that I don't have

6   access to now, because the GBI is now in charge of

7   the investigation.

8            So I can't know for certain.  You are

9   correct.

10       Q.    So one -- one key difference here with

11   respect to the access in Coffee County versus others

12   is that they kept it quiet, despite having

13   authorization from local officials.  And I'm not

14   suggesting that's lawful authorization.

15       A.    Yeah.

16       Q.    They were authorized by local officials.

17            Another key difference is timing.  Right.

18   This is January 7th through the end of the month.

19   This is after Congress has already certified the

20   election and Biden is declared the winner.

21            So my question to you is:  Has your office

22   considered whether that -- those set of

23   circumstances, coupled with the amount of time they

24   spent there, the changes that they made to the EMS

25   server that we know of so far, whether any of that

1       can have confidence in the outcomes, and the

2       election is run well.  That's the overall

3       rationale behind doing that.

4            I got a thumbs up from the court reporter,

5       People.  I was good.  I did good.

6            MR. KNAPP:  Now keep up your record.

7            THE WITNESS:  That's going to be hard.

8       Dave's going to ask me questions and get me

9       irritated, and I'll get ramped up again.

10      Q.    (By Mr. Cross)  Do you know whether anyone

11   has looked at any of the voting equipment taken from

12   Coffee County to determine whether any kind of

13   malware was tested on the system?

14      A.    Not yet.  I think we're discussing about

15   trying to --  I'm working on getting a long-term

16   contract, Pro V & V, through our procurement process

17   to allow for us to go, through, do investigations

18   like that.  Potentially, we had discussion about

19   potentially Fortalice coming in or some other

20   third-party group to look just to assure that; and

21   then if there is anything, loading a golden record;

22   and even if there's not any discussion about loading

23   a new golden record on.

24           And subsequently, as I mentioned before,

25   we're looking at moving to 5.17 on Democracy Suite

Page 159

```
 1   point, well, maybe we should look at something like
 2   that, again, when we run elections, we have to look
 3   at everything we're doing, this just being one sliver
 4   of the cybersecurity side.  You have to look at all
 5   of the processes and thing -- and everything going
 6   on.
 7              So it would have been more chaotic and
 8   more risky to then change it out at that -- by the
 9   time it had reached that point; but there was an
10   internal debate about it, because, again, most people
11   are under the impression nothing else -- we -- we got
12   everything else out of there.  This is a new EMS, so
13   there shouldn't be any issue with that, so that was
14   kind of the -- the thought process behind it at the
15   time.
16              We were trying to act reasonably as we
17   could, given the situation we were in.
18        Q.   Well, what all did the Secretary's Office
19   replace in Coffee County last month?
20        A.   I believe, if memory serves, and if I --
21   This may not be completely --
22        Q.   Uh-huh.
23        A.   -- all of it; but I remember it was the
24   BMDs, the printers, the cords.  I believe we might
25   have changed out the battery supplies, but I don't
```

Page 160

```
 1    recall for certain on that one.  The --  The
 2    scanners.  The ICPs.  The memory cards, and I believe
 3    the jump drives for everything.
 4              In fact, we were originally going to
 5    change all those out.  There never a question
 6    internally that we were going to do that.  That was
 7    going to be done, but then I think all of that was
 8    changed out.
 9              And then the Poll Pads.  Pardon me.  I
10    forgot.  Them as well.
11         Q.   I mean --
12         A.   And the cords and all their --
13         Q.   Right.
14         A.   All the parent --  All the parent-child
15    things within the system were changed out.
16         Q.   There are over a hundred BMDs in Coffee
17    County, right?
18         A.   Correct.  I --  I think it's just barely
19    over a hundred, but I believe that's correct.
20         Q.   Somewhere between a hundred and a hundred
21    twenty, I think, is what we --
22         A.   Something --
23         Q.   -- refer to.
24         A.   Yeah.  I think it was a hundred and nine,
25    if memory serves, but something like that.
```

Page 161

1          Q.    So I guess where I'm kind of struggling is

2     why it would be more chaotic or difficult to just add

3     two more pieces of equipment when you're already

4     replacing over a hundred BMDs and dozens of thumb

5     drives and flash drives and Poll Pads and printers?

6               You're literally adding two additional

7     pieces of equipment that are core to that system that

8     have been used with equipment that you know had been

9     improperly accessed.

10         A.    You're conflate --  You're conflating two

11    different decisions.

12         Q.    Okay.

13         A.    We replaced everything; and from our point

14    of view, we already replaced those two pieces of

15    equipment.  Okay.  So we replaced everything else.

16              Now it came up later on.  Said, well,

17    since they interacted with this, maybe that could be

18    another secret -- super secret way that malware could

19    go from one thing to the other.

20              And we said, well, again, highly unlikely;

21    but by the time we kind of got to a point that maybe

22    we should do that, we had --

23              I remember I was in a Home Depot talking

24    to Ryan over the phone about this; and once we

25    decided, well, maybe we should look at that, at that

Page 211

```
 1        A.    He's passed away.

 2        Q.    Okay.  I'm sorry.

 3        A.    He -- He left first, and then he passed

 4   away suddenly.

 5        Q.    Okay.

 6        A.    He was very young.  He was only 47.  He

 7   had a heart attack.

 8        Q.    Jesus.  That's terrible.  Okay.  Oh, I'll

 9   need to be healthier.

10              Okay.  So and in this e-mail, Mr. Germany

11   writes, "... can you download the file below and pen

12   an investigation into below."

13              Do you see that?

14        A.    Yes.

15        Q.    And then Mr. Callaway responds, "I got it,

16   Ryan.  I'm clear."

17              Do you see that?

18        A.    Yes.

19        Q.    And then we come up to --  The most recent

20   e-mail is one that you're sending where you're

21   conveying information from Nicole at Dominion.

22              Do you see that?

23        A.    Yes.

24        Q.    Who was Nicole?

25        A.    Nicole Nollette who is their vice
```

1   president of operations.

2        Q.    How do you spell her last name?

3        A.    I believe N-O-L-L-E-T-T-E.

4        Q.    And so when you're conveying this, is this

5   the text like from an e-mail or a text message or

6   something?

7        A.    Yes.

8        Q.    Okay.  Text message or e-mail?

9        A.    I don't recall.

10       Q.    Okay.  So she says, Gabe, you are right.

11  April 11th I was up there.  When I was at CES, I had

12  to go to Best Buy.  I just remembered this.  I looked

13  up my account, and the purchase was April 11.

14       A.    Yes.

15       Q.    And then you explain below she was working

16  to gain access to the server that had the password

17  change, right?

18       A.    Yes.

19       Q.    And that's the Coffee County server we've

20  been talking about?

21       A.    Correct.

22       Q.    What led the Secretary's Office to decide

23  to bring Dominion in, in the April timeframe of this

24  year to try to get access to that server?

25       A.    Well, we actually made the decision in

Page 213

1   March; but they already had a previously scheduled

2   trip, so it didn't seem logical to make them do an

3   additional trip down; and it was basically it's their

4   server.  They should be able to know how to get into

5   it through a -- if the password's been changed.

6            And they thought they might be able to.

7   They had a couple ways they were thinking about doing

8   it, and their engineers were working on it, so

9   that's --  It seemed a logical first step of doing

10  what we're trying to do, which was to figure out if

11  there had been any -- anything untoward on the

12  machine, was to go to them first.

13       Q.    Sorry.

14            But was it the --  The recording that you

15  received from Mr. Hall or the recording of Mr. Hall,

16  it -- it -- was that the impetus to say, okay, let's

17  go look at this server that we've had for a while?

18       A.    We had had some discussions about it, so

19  let's listen to the whole thing.  As I said earlier,

20  I wasn't sure of the timeframe.  I think it was post

21  getting the full thing or free.

22            We --  We already decided we've got to

23  figure out how we're going to do this, and I couldn't

24  tell you when we originally called either Tom Feehan

25  or Nicole Nollette to say, hey, we need to get into

Page 214

1   the server.  How do we do that.

2            So it was around --  They're all

3   contemporary to one another in that timeframe.

4       Q.    Did anybody come with Miss Nollette on

5   April 11th from Dominion?

6       A.    Not that I recall, but I -- I may not be

7   aware.

8       Q.    Okay.

9       A.    I know that she was talking to people

10  remotely in the Denver office about this from CES,

11  'cause we had discussions about that.

12      Q.    So is it your understanding that she's the

13  one who came up, and it was --  She's the one who

14  tried to get access to the server?

15      A.    And to a point where she'd gone to Best

16  Buy and said, hey, get this and see if this can help

17  you do that kind of thing.  That --  That was where

18  that came down from because we had an initial

19  discussion.

20            She --  In her brain, she thought it was

21  later that she'd come down in April; but I said no.

22  I'm pretty sure it was around this time.

23            And she went back and checked, and that's

24  how --  That was the impetus behind this particular

25  discussion on the e-mail.

Page 215

1        Q.    Do you know what it is she purchased from

2   Best Buy to try to help with that?

3        A.    I don't.

4        Q.    If you wanted to know that, who would you

5   ask?

6        A.    Nicole.

7        Q.    But whatever she bought, fair to say it

8   didn't work?

9        A.    Correct.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          So I don't know if that was stated or not.
2     It was not stated to me.
3          Q.    Mr. Barnes testified that --
4          A.    Michael or James?  Sorry.
5          Q.    Yes.  Thank you.  That's a good
6     correction.
7               James Barnes testified that when the
8     Secretary's Office swapped out the -- the EMS server
9     and the ICC in June of last year, he said it was Mr.
10    Patel and someone named Chris.
11              Was that Chris Bellew?
12         A.    Chris Bellew.  Correct.  And that's
13    spelled B-E-L-E-W (sic).
14         Q.    Is it two L's?
15         A.    I think it's just one.
16         Q.    Oh, okay.
17         A.    I could be wrong, but I'm pretty sure it's
18    just one.
19         Q.    Okay.  And just so I understand, your
20    knowledge is that the only documentation that exists
21    within the Secretary's Office about replacing the EMS
22    server and the ICC is that L&A testing report that we
23    received?
24         A.    As I sit here right here, yes.  We're
25    obviously going to check the next break.

Page 261

1    Office in January of 2021, a video?

2         A.    Investigation of that time period?  Now --

3         Q.    Yes.

4         A.    -- at that time period?

5         Q.    Correct.

6         A.    Okay.  I'm not aware of one; but, again,

7    this is in GBI's hands right now, so I think that

8    would be something that would probably fall into that

9    purview.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 262



Page 263



Page 264



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 265



1      Persinger.  Say this is what this does.  This is

2      what that does kind of thing.

3      Q.     (By Mr. Cross)  Okay.  What is Mr.

4  Greenwalt's first name?

5      A.     David.

6      Q.     David.  Can you tell me when KNOWiNK was

7  first alerted to the unauthorized access in Coffee

8  County?

9      A.     I can probably go back and look, but it

10  would have been around all the same time we finally

11  figured out, so probably July-August range in that --

12      Q.     Okay.

13      A.     -- I believe when they first would have

14  known.

15      Q.     Of this year?

16      A.     Yes.

17      Q.     Do you know when Dominion first learned

18  about the breach in Coffee County?

19      A.     Again, I'm making the assumption it'd be

20  around the similar time that we discovered it, which

21  would have been that July; and then it was coming off

22  of July 4th holiday; and then we had to confirm.  It

23  was somewhere in that range of probably mid to late

24  July.

25      Q.     Okay.

Page 274

1      A.     Although I think it was relatively

2   quickly.  We said, guys, we --  There is a situation

3   that we've discovered from our own internals.  Look

4   at this.

5      Q.     Well, right, I mean, we -- we know --

6             I guess what I was trying to figure out

7   when -- when Nicole Nollette came in on April 11th,

8   was she there, in part because of the -- the

9   unauthorized access concerns that had come to light

10  with the Scott Hall call?

11     A.     She wasn't there because of that itself.

12  She added on something else to her trip.  She was

13  doing work with Fran Leathers, who had been hired

14  as -- as a Dominion rep, and they were going -- doing

15  some sales calls and stuff.

16            So she was there then.  While you're here,

17  can you see if you can get into this thing, because

18  of the claim that we saw in the -- come out of the

19  deposition that I did.

20     Q.     Do you know whether anyone in the

21  Secretary's Office or at their direction has talked

22  to Dominion about whether they were aware of the

23  breach earlier than that?

24     A.     I don't --  When we had discussions, I

25  mean, about this, as I said, starting from when it

1    was first brought to us in February, at the end of

2    February, our position was given the people involved

3    and the claims involved, this seemed like it was

4    another false flag --

5         Q.    Uh-huh.

6         A.    -- fake pile of stuff.

7               So we said, hey, this claim is there.  Run

8    it up the flagpole, so, you know, it out there kind

9    of thing; but it was sort of a --  I will tell you

10   that we didn't think there was probably anything

11   there, given that the people involved and --

12              So we said be aware of it; but, again, we

13   need to go through the investigation to show this, so

14   that's why we need to get into the server.  So that

15   was kind of --  They were in that same timeframe.

16              It was like okay.  Let's look into this,

17   'cause this is a real thing.  We've got -- have to

18   look at it now, because it's been claimed publicly in

19   a way that's, you know, even though we know the

20   players here have -- have been historically full of

21   crap.  So it was Scott Hall and -- and then, of

22   course, with Miss Marks, and then knowing --

23              I didn't understand at the time; but,

24   again, our take on it was it's probably --  We have

25   to go through this investigation to show that nothing

Page 276

1   happened and --  Or and if it did, then we need to

2   really know, so that was kind of our position we were

3   in at that point.

4        Q.    Right.  And sorry.  And I was asking a

5   narrower question, which is:  Do you know whether

6   anyone has -- anyone has spoken to anyone at Dominion

7   to determine whether they have any knowledge about

8   the potential breach before the Scott Hall call was

9   disclosed to you guys?

10       A.    I lost the script on that question.  My

11  point in saying it that way was we all kind of had

12  the same indication.

13            And I believe our relationship with

14  Dominion would be like, well, we had heard some --

15  They would have said something to us had they been

16  aware, but a specific question was not asked of like

17  have you heard about this before --

18       Q.    Uh-huh.

19       A.    -- because that's not how you communicate

20  something like that with a partner on something on

21  that sort of front.

22       Q.    No.  I -- I --  I get that you -- you

23  expect that they would have told you.  But I just

24  want to make sure that you're not aware of any

25  communications anyone for the Secretary's Office with

1    anyone with Dominion asking the question -- did you

2    have any inkling or awareness of the breach before

3    the Scott Hall call?

4         A.    The specific question phrased that way in

5    that timeframe, no.  But I'm not going to say we were

6    laughing about it to a degree, but that's sort of the

7    tone.  You're saying like, god, it's another one of

8    these damn things.  At least that's sort of --  That

9    was sort of the tone of conversation.

10              And if it had been something different, I

11   believe it -- my --

12              If we asked the question and they had said

13   no, that would be one thing; but if we discussed it

14   and they said no, that would have been, if they did

15   know, then a lie by omission, because I believe --

16              But I don't --  I don't believe that is

17   the case, and so it didn't occur.  Say, hey, did you

18   know about this beforehand so --

19        Q.    Do you know whether Dominion has ever

20   threatened any litigation against Coffee County or

21   the Board of Elections involving the breach?

22        A.    I do not know.

23        Q.    Do you know whether there's been any --

24   any invest -- we --

25              Take a step back.  You were talking about

Page 324

1   ballots in and of themselves are more easily hackable

2   in terms of low tech ways of doing it, ballot

3   stuffing.

4           Part of the reason we got to a lot of

5   these computerized things, if you looked at the

6   history of why we went to voting machines is to avoid

7   those kind of situations.

8       Q.    But the scaleability --

9       A.    It's --

10      Q.    -- is massively different.  We agree on

11  that, right?

12      A.    It --

13      Q.    The scaleability of an attack on

14  hand-marked paper ballots --

15      A.    No.  I don't agree on that, 'cause, again,

16  if all -- all the suppositions in Dr. Halderman's

17  things essentially say a lot of if, then; if, then;

18  if, then to get to that point of huge scaleability.

19          My contention is it is much more

20  detectable, even with all those things.  There's so

21  many pieces and processes and the RLAs, and I know he

22  says we only have one mandated RLA every two years.

23          I think that's too few.  The Secretary

24  thinks that's too few.  We've tried to argue the last

25  two times in legislation we need more auditing in the

Page 325

```
 1  law.  We're trying to look at now can we do it by

 2  rule.  We're --  We're having a discussion.

 3      Q.    Well, can't the SEB or the Secretary do as

 4  many audits as they want?  It doesn't have to be

 5  mandated by --

 6      A.    The Secretary can't just tell a county to

 7  go do it.  You have to have some legal authorization

 8  to do it.

 9            So my point is we can't -- we can't --

10  the --  The chief elections officer can't just make

11  things up for them to do.  We can't just say from now

12  on, you're doing this.  You have to go through the

13  rule making.

14            So like I said, we're having discussions

15  about how do you construct an SEB rule to do this and

16  how do you structure it best, because my point on the

17  RLAs is I think it's crazy to only do one every two

18  years, because if you're doing ballot batching and

19  all the necessary steps for that.

20            If you do every two years just to do it;

21  you need to do it every single election, whether it's

22  a special, a primary -- I don't care -- a runoff.

23  You have to go through the process so you get the

24  muscle memory back.  There's enough human beings at

25  the county level to do those things.
```

Page 326

1          So this isn't a perfect universe versus

2     hell.  This is like a system that we know functions

3     versus a system that people can argue this a little

4     more secure, functions better.  This is a little more

5     secure, functions less.  It's a policy discussion.

6          And that's why, no, I don't believe that;

7     and I believe that the decisions that we've made

8     through several laws --

9          You've got to remember.  We procured this

10    using the State procurement law after the passage of

11    HB 316, and we're following the law.  We continue to

12    follow the law.

13         I mean, this Office now rather famously

14    said we follow the law and we follow the evidence and

15    we tell the truth about these things, and that's what

16    we're trying to do is to get to a system that works

17    that has -- provides the security that's necessary.

18         And there's never a hundred percent

19    security on any system.  I think we can all agree on

20    that.

21         You're right in your statement that there

22    might be scalable stuff; but if someone gets to

23    scanner --  If they can get to an EMS, they can get

24    to scanners, which is equally scaleable.  In fact, I

25    would argue that trying to go to BMDs is physically

Page 349

1    that people can fundamentally and honestly disagree

2    on.

3           Q.    You agree today that the vulnerabilities

4    Dr. Halderman identified in July of last year that

5    CISA validated in June, those are serious

6    vulnerabilities that need to be mitigated; is that

7    fair?

8           A.    I'm not going to get into the word

9    "serious," because, as we said, the MITRE --

10          Q.    Well, that's fair.  That's fair.

11          A.    -- given all of them are operationally

12   infeasible.

13          Q.    That's fair.  Let me ask --

14          A.    They're all vulnerabilities.  Correct.

15          Q.    Let me ask a different question.

16                You agree that those -- that they are

17   vulnerabilities, however one wants the characterize

18   the magnitude, that should be mitigated as CISA

19   advised in June?  Do you we agree on that?

20                MR. TYSON:  I'll object to scope.

21                THE WITNESS:  I would agree to that; and

22          when we look through those lists, we do nearly

23          all of those things already for the physical

24          security and those kind of things.  Obviously,

25          we have a bad actor on one.

Page 350

1          There is one in there that I think is

2      functionally infeasible for CISA's side, where

3      every poll worker needs to have a separate

4      log-in.  There would be chaos.  There was no way

5      that --

6          I mean --  I want you to imagine Fulton

7      County trying to have thousands of different

8      passwords attached to thousands of different

9      things.  It's difficult when they have a few

10     hundred just to get into the e-mail system right

11     now for early voting and doing that properly.

12     And that we got -- they -- kicking and screaming

13     on us not to do that.  They wanted to have one.

14          Well, no.  You're going to have separate

15     ones for each one, because we're going to keep

16     track of what people do on this.  This is very

17     difficult in the real world to do some of these

18     things that make sense in an academic

19     environment in the cybersecurity standalone

20     environment.  Then the actual functioning would

21     get in the way of the system actually working.

22     Q.    (By Mr. Cross)  You keep talking about the

23  MITRE report, but you gloss over that there -- there

24  are two critical assumptions that underlie those

25  findings.  When they say it's operationally

1  infeasible, they made clear what they mean --

2      A.    Yes.

3      Q.    -- because they assume that no one can get

4  access to the equipment system.  But we know from

5  Coffee County that's -- that's a very poor

6  assumption, right?

7      A.    Well, I believe --  I think you're

8  characterizing it one way, but they may mean another,

9  and I may characterize it another way reading the

10  same words on a piece of paper.

11          Obviously, having access to machines can

12  give you a better roadmap mobility to do it.  You

13  still have to have access to nearly all of the

14  machines in most of the situations that were

15  described in Dr. Halderman's report.  You have to be

16  able to --

17      Q.    But not all of them.

18      A.    I didn't say all of them.  I said in most

19  of them.

20          So, again, even those would require --  If

21  we go to the umpteenth one was the top one, which is

22  now functionally incorrect, because Dominion is not

23  the --  There's not one person in Dominion doing the

24  ballot building now.  That was one of the main things

25  he said.  You could plant something there.

Page 400

```
 1        A.    No.

 2        Q.    Okay.

 3        A.    We had --  I think she was originally told

 4   by Chris Harvey to change it once the video came out.

 5   She didn't do it.

 6            And then on December 11th, I believe it

 7   was, they came down and said you changed it.  No.

 8   Change the password.

 9            On the 14th, the password was changed, so

10   that's -- that's where it goes in for all these

11   things.  There's no way for CES to be remotely made

12   aware of that, because it's not connected to the

13   Internet.

14        Q.    Okay.  So she was told --  She was

15   recommended or told to change it.

16        A.    Uh-huh.

17        Q.    And then at some point after that, it was

18   changed.  Fair to say?

19        A.    Yes, sir.

20        Q.    Okay.  And at the time, the Secretary of

21   State was not made aware of the change?

22        A.    Correct, sir.

23        Q.    Okay.  And I guess didn't know it was

24   changed until the next spring.

25        A.    May, I believe, is when --
```

1      Q.     When they picked it up.

2      A.     -- James Barnes --

3             Well, we became aware that there was an

4    issue when James Barnes first called, so that was

5    when we --  Something's gone on here.

6             And we --  Frankly, we couldn't know it

7    was changed.  The assumption is it was, because of

8    the situation that occurred previously; and so --

9    But we didn't know for certain it was changed and

10   what date until Mr. Persinger got into the machine to

11   look at the log file.

12     Q.     I want to make sure we have all the

13   documents, but you -- and to sort of source of your

14   knowledge on some of these things.

15     A.     Uh-huh.

16     Q.     You testified that James Barnes, after the

17   Cyber Ninja card was found --

18     A.     Yes, sir.

19     Q.     -- he sends it upstream.  He --  There's a

20   call back from, I guess, Pamela Jones; and the

21   information that came back was that he had spoken

22   with the board and the employees down there.  Was

23   that --

24     A.     Are you talk --  Like looking back, you

25   know, it's the basis of it.  We talked to people, and

Page 435

1                     C E R T I F I C A T E

2

3

4   STATE OF GEORGIA:

5   COUNTY OF FULTON:

6

7              I hereby certify the foregoing transcript

8         was taken down, as stated in the caption, and

9         the questions and answers thereto were reduced

10        to typewriting under my direction; that the

11        foregoing pages 1 through 434 represent a true,

12        complete, and correct transcript of the evidence

13        given upon said hearing, and I further certify

14        that I am not of kin or counsel to the parties

15        in the case; am not in the regular employ of

16        counsel for any of said parties; nor am I in

17        anywise interested in the result of said case.

18             This, the 17th day of October, 2022.

19

20

                    S. JULIE FRIEDMAN, CCR-B-1476

21

22

23

24

25