# EXHIBIT 175

1          UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF GEORGIA

3              ATLANTA DIVISION

4

5        Civil Action No. 1:17-cv-02989-AT

6    _____

7    DONNA CURLING, et al.,

8        Plaintiffs,

9    vs.

10   BRAD RAFFENSPERGER, et al.,

11       Defendants.

12   _____

13

14      VIDEOTAPED DEPOSITION OF DEAN M. FELICETTI

15   DATE:        September 2, 2022

16   TIME:        9:12 a.m. to 4:28 p.m.

17   LOCATION:    Witness location

18

     REPORTED BY:  Felicia A. Newland, CSR

19

20            Veritext Legal Solutions

            1250 Eye Street, N.W., Suite 350

21             Washington, D.C. 20005

22

1      example?

2              A     Yes.

3              Q     And there was a hard drive that was

4      also produced by Mr. Maggio.  Were you aware of

5      that?

6              A     Produced how?

7              Q     It was a literal hard drive that had

8      files and data on it.

9              A     Produced?

10             Q     To us.

11             A     Oh, no.

12             Q     Okay.  Were you aware before now that

13     there was a hard drive that was produced by

14     Mr. Maggio?

15             A     I know there was a hard drive.  I'm

16     not sure where it was produced to.

17                   Does that make sense?

18             Q     Yes.

19                   So, just for context, when you talk

20     about the team members that -- and the services

21     provided, you're talking about the services that

22     were provided by a team that included Paul Maggio

Page 19

```
 1        with respect to copying and preserving data from

 2        election equipment in Coffee County.  Is that

 3        right?

 4               A     Yes.

 5               Q     Okay.  And are you aware that

 6        Mr. Maggio produced to us a hard drive that had

 7        data that that team had copied from Fulton County?

 8               A     Yes.

 9               Q     Okay.  I'm sorry, I --

10               A     No, no.  I should have asked.

11               Q     Let me clean up the question because

12        I misspoke.

13               A     Yeah.

14               Q     Produced to us a hard drive that had

15        the data that that team copied from Coffee County?

16               A     Yes.

17               Q     Okay.  And did you look at -- at

18        those files in whatever form the firm has them?

19               A     No.  I looked at the reports, not the

20        actual files.

21               Q     Okay.  And when you say "reports,"

22        what do you mean?
```

Page 48

```
 1              Q     Who engaged SullivanStrickler to do
 2       the work in Coffee County?
 3              A     Jim --
 4              Q     Penrose?
 5              A     Yes, Jim Penrose and Doug Logan.
 6              Q     When did they first reach out to
 7       SullivanStrickler for the work, approximately?
 8              A     Early January for Coffee County.
 9              Q     What's the basis for that testimony?
10              A     Can you repeat the question?
11              Q     Sure.
12                    What's -- what's the basis for your
13       understanding that Mr. Penrose and Mr. Logan
14       reached out to the firm, specifically for Coffee
15       County, in early January?
16              A     By virtue of requests for other
17       services outside of Coffee County.  The request
18       came in that pointed to Coffee County, I believe,
19       in early January.
20              Q     Okay.  And just so I understand, for
21       that testimony, are you relying on documents you
22       looked at or people you spoke with or both?
```

```
 1        discussions with Mr. Maggio and others?

 2                A     Yes.

 3                Q     The work that was done in Coffee

 4        County, was that done -- was the customer for that

 5        work Sidney Powell?

 6                A     Sidney Powell paid the bills.

 7                Q     What's your understanding of who the

 8        customer was for the purpose of the engagement

 9        agreement for the Coffee County work?

10                A     Sidney Powell.  Very good.

11                Q     So is it SullivanStrickler's

12        understanding still today that Sidney Powell had

13        all of the necessary legal rights and permissions

14        for the work that she engaged SullivanStrickler to

15        do in Coffee County?

16                A     Yes, sir.

17                Q     What is the basis for that

18        understanding?

19                A     Borrowed license at the time -- no,

20        see, I don't -- I don't know.

21                Q     That's okay.

22                A     Yeah, sorry.
```

Page 111

1          Q     Okay.  Are you familiar with Scott
2     Hall?
3          A     I am.
4          Q     How do you know Scott Hall?
5          A     Based on discussions with the team
6     and his involvement in the collections.
7          Q     What is your understanding of his
8     involvement with the collections?
9          A     That he was on-site.
10         Q     In Coffee County on January 7th --
11         A     Yes, sir.
12         Q     I'm sorry, let me just make sure I
13    get the question done.
14         A     Yeah.  Yeah.  I'm sorry.
15         Q     No, you're good.  It's common.
16               All right.  And did you discuss with
17    Mr. Maggio Mr. Hall's involvement in the Coffee
18    County project?
19         A     Yes, sir.
20         Q     What did Mr. Maggio have to say about
21    Mr. Hall's involvement?
22         A     He was a senior --

Page 114

1      sends, right?

2              A     Yes, sir.

3              Q     Okay.  So what we see here is on

4      January 7, 2021 at 11:09 a.m., Ms. Latham sends a

5      text to Mr. Maggio with an address in Douglas,

6      Georgia.

7                    Do you see that?

8              A     Yes, sir.

9              Q     Are you aware that that's the address

10     for the Douglas local airport?

11             A     I am not.

12             Q     Okay.  And then Mr. Maggio responds a

13     minute later, "Received.  We will pick up Scott."

14     Do you see that?

15             A     Yes, sir.

16             Q     Did you understand that Scott Hall

17     flew into the Douglas, Georgia airport on the

18     morning of January 7 --

19             A     Yes, sir.

20             Q     -- of 2021?

21                   Okay.  And so what we see here is

22     Ms. Latham coordinating with Mr. Maggio on somebody

1      is picking up Scott Hall from the airport, right?

2              A     Yes.

3              Q     And then another minute later

4      Mr. Maggio writes back, "Better yet, have Eddie

5      pick up Scott.  Our vehicle is full.  We will meet

6      him there."

7                    Do you see that?

8              A     Yes, sir.

9              Q     Who actually drove the team to

10     Maggio?  Like literally drove the vehicle?

11             A     Jim Nelson.

12             Q     Do you know what kind of vehicle they

13     were in?

14             A     I know he has a truck.

15             Q     Okay.  Like a pickup truck?

16             A     Yeah.  But I don't know if that's

17     what he drove.  And as far as in that truck, there

18     were three people; so it was Jim, Paul, and

19     Jennifer.

20             Q     And how did Ms. Naik get there?

21             A     She had to drive and pick up a

22     Cellebrite, one of our forensic tools.  So she had

Page 116

1          to go and get it from, I believe, the office and

2          then meet everyone there.

3                    Q      So Ms. Naik separately drove to

4          Douglas?

5                    A      To -- not to Douglas.  Is that where

6          Coffee County is?

7                    Q      Yes.

8                    A      Oh, then yes.  Yes.  Sorry.

9                    Q      That's okay.

10                   And she drove there alone?

11                   A      Yes.

12                   Q      Did she drive back alone?

13                   A      Yes, sir.

14                   Q      And the other three rode back in

15         Mr. Nelson's vehicle?

16                   A      Yes, sir.  Well, I believe his

17         vehicle.  He drove.

18                   Q      Understood.

19                   Okay.  Then Ms. Latham writes back to

20         Mr. Maggio at 11:30 a.m., "How far out" -- sorry.

21         She writes back, "How -- how far out are you?"

22                   Do you see that?

Page 117

1           A     Yes, sir.

2           Q     And Mr. Maggio responds, "We are in

3    town waiting for Scott to let us know when to pull

4    in."  Do you see that?

5           A     Yes, sir.

6           Q     Where did the team wait for the green

7    light from Scott Hall?

8           A     I believe the parking lot.

9           Q     Of the Coffee County elections

10   office?

11          A     Yes, sir.

12          Q     A pen with a light on it?

13          A     Oh, it's very cool.  I got it

14   yesterday.  I'm sorry.  I don't even use it.  It

15   kind of tweaks me out a little, so I want to

16   apologize.

17          Q     Oh, no, that's fine.

18          A     I'm sorry.

19          Q     Do I understand correctly, the team

20   was waiting for Mr. Scott Hall to give them

21   direction that it was time to go into the elections

22   office?

1          A      Yes, sir.

2          Q      Do you have any understanding of what

3     they were waiting for?

4          A      Other than Scott being a senior --

5     sorry, a senior leader on this effort in Coffee

6     County, no.

7          Q      When did the firm first start taking

8     direction from Scott Hall for Coffee County as

9     opposed to taking direction directly from Jim

10    Penrose, Doug Logan or Sidney Powell?

11         A       It wasn't as much direction as

12    general, if you have an issue, you collect

13    everything type of deal.

14         Q      Okay.

15         A       Nothing is specific.  And that was

16    provided by the other folks.

17         Q      Since the Coffee County was done

18    pursuant to the engagement with Sidney Powell, was

19    it the understanding of SullivanStrickler that

20    Scott Hall was part of that Sidney Powell team, and

21    that's --

22         A      Yes.

1          Q      Okay.  And what was the basis for

2     that understanding?

3          A      I don't know.

4          Q      Okay.  And so, again, looking back at

5     the text between Mr. Maggio and Ms. Latham

6     coordinating the team's arrival and getting Scott

7     Hall there, do I understand correctly that

8     Ms. Latham was also a key point of contact for the

9     SullivanStrickler team with respect to the Coffee

10    County work?

11         A      Yes, sir.

12         Q      So she was one of the primary points

13    of contact for organizing and facilitating the work

14    in Coffee County?

15         A      Yes, sir.

16         Q      Oh, do you know who Eddie is?

17         A      I do not.

18         Q      Do you know how Scott Hall got from

19    the airport in Douglas to the Coffee County

20    elections office?

21         A      I do not.

22         Q      Do you know if someone traveled with

1      Scott Hall?

2              A      I do not.

3              Q      In your prep for this, did you learn

4      that Mr. Hall arrived at the elections office with

5      another person?

6              A      I did not.

7              Q      Okay.

8              A      Yeah.

9              Q      If we look at the next page,

10     January 7 at 11:42 a.m., this is a text from Cathy

11     Latham to Paul Maggio, sending a picture of Scott

12     Hall, right?

13             A      I --

14             Q      I'm sorry.  No, no, I got that wrong.

15     I got that wrong.  This is a separate text.

16             A      Yeah.

17             Q      This is a text from Scott Hall to

18     Paul Maggio sending a picture of himself?

19             A      Yes, sir.

20             Q      Got it.  Okay.

21                    And that's at 11:42 a.m. on

22     January 7th?

Page 121

1           A     Yes, sir.

2           Q     Okay.

3                 All right.  Let me hand you

4     Exhibit 10.

5           A     Yes, sir.

6              (Felicetti Deposition Exhibit Number 10

7              marked for identification.)

8     BY MR. CROSS:

9           Q     Actually before you look at that, a

10    couple of questions that I forgot to ask you.

11          A     Yes, sir.

12          Q     So your standard practice is to --

13    you typically are engaged by lawyers or law firms

14    for your work.  Is that fair?

15          A     Yes.

16          Q     And so the lawyers or law firms, they

17    will have a client that they are working on behalf

18    of for the work that they hire you for?

19          A     Yes.

20          Q     Who is Mr. Binnall's client for that

21    engagement?

22          A     For?

Page 122

1                Q      For the engagement agreement that we

2        saw signed.

3                A      I don't know.

4                Q      Okay.  And if you wanted to know, who

5        would you ask?

6                A      Paul Maggio.

7                Q      Okay.  And who was Ms. Powell's

8        client for the engagement that we saw with respect

9        to Coffee County?

10               A      I don't know.

11               Q      Okay.  Who would you ask?

12               A      Paul Maggio.

13               MR. CROSS:  Could we ask before the

14       deposition ends if he could ask Mr. Maggio who the

15       clients were?

16               MR. COLEMAN:  Yeah, that's fine.

17               MR. CROSS:  Okay.  Thank you.

18       BY MR. CROSS:

19               Q      And then you mentioned Ms. Naik

20       picked up a -- is it a Cellebrite kit?

21               A      Yeah, Cellebrite.  Yeah, a dongle

22       kit.

Page 123

1          Q      What is that used for?

2          A      It's used for forensically capturing

3     certain devices.

4          Q      What types of devices?

5          A      Mobile typically, iPads.

6          Q      Was that needed for the poll pads in

7     Coffee County?

8          A      It was.

9          Q      Where did Ms. Naik get that kit?

10         A      I believe at our office.

11         Q      In Atlanta?

12         A      Yes, sir.

13         Q      So that's -- that's a standard device

14    that you guys have?

15         A      Yes.

16         Q      Okay.

17                All right.  Take a look at

18    Exhibit 10, if you would.  You, yourself, have not

19    been on-site in the Coffee County elections office?

20         A      I have not been on-site.

21         Q      Okay.  So what we have here, we had a

22    deposition with the Coffee County Board of

Page 124

1       Elections yesterday on this.  These -- these are

2       screenshots from surveillance video that was

3       produced by Coffee County to us.

4               A       Okay.

5               Q       So what it is, there is a camera

6       sitting outside the front door of the elections

7       office and it shows people going in and out of the

8       elections office.

9                       Do you understand that?

10              A       Yes, sir.

11              Q       Okay.  So let me just see -- there

12      are some people I want to ask you about.

13                      MR. COLEMAN:  I was going to say I

14      don't think it's uploading to the FileShare.

15                      MR. CROSS:  The photos?

16                      MR. COLEMAN:  Yeah.

17                      MR. CROSS:  Yeah, it's a little bit

18      slow, I think, because it's a very large document.

19                      Do we happen to have an extra one?

20                      MR. SPARKS:  We don't.

21                      MR. CROSS:  Okay.

22                      MR. SPARKS:  I'm getting ready to --

Page 125

```
 1                   MR. CROSS:  Yeah, it's a very, very

 2        large -- yeah.

 3                   We can go off the record for a

 4        moment.

 5                   VIDEOGRAPHER:  The time is 11:16 a.m.

 6        We are off video record.

 7              (Recess from 11:16 a.m. to 11:17 a.m.)

 8                   VIDEOGRAPHER:  The time is 11:17 a.m.

 9        We are back on video record.

10        BY MR. CROSS:

11              Q     Before we look at the picture, we

12        talked earlier that Ms. Latham was one of the

13        principal points of contact organizing the Coffee

14        project.  Do you recall that?

15              A     Yes, sir.

16              Q     Ms. Latham was literally the person

17        who welcomed Mr. Maggio and his team at the

18        elections office the morning of January 7th, 2021.

19        Is that right?

20              A     Yes, sir.

21              Q     And when they arrived, she presented

22        herself as a Coffee County elections official.  Is
```

Page 126

```
 1          that right?
 2                  A     Yes, sir.
 3                  Q     If we look at page 33 in Exhibit 10
 4          in the -- the screenshots of the video provided by
 5          Coffee County, you'll see here Mr. Maggio is in the
 6          grey sweater, right?
 7                  A     Uh-huh.  Yes, sir.
 8                  Q     And Jim Nelson is next to him in the
 9          khaki pants?
10                  A     Yes.
11                  Q     Jennifer Jackson is in front in the
12          pink jacket?
13                  A     Yes.
14                  Q     And do you understand that's Cathy
15          Latham escorting them into the building?
16                  A     I don't know.
17                  Q     Okay.  That's fine.
18                        Then if we come to the next page, we
19          see the same woman with grey hair holding the door
20          open and Mr. Maggio and Mr. Nelson are walking in,
21          right?
22                  A     Yes, sir.
```

Page 127

1              Q     And this is at 11:43 a.m. on

2       January 7, 2021, right?  If you look at the top,

3       the timestamp.

4              A     Oh, okay.  Yes, sir.

5              Q     All right.  Flip to, it looks like,

6       page 38.  So here you have -- do you see the

7       timestamp just above the photo, January 7, 2021 at

8       11:50 a.m.?

9              A     Yes, sir.

10             Q     We have the same woman with grey

11      hair.  Do you see her?

12             A     Yes, sir.

13             Q     She's escorting two individuals into

14      the building, right?

15             A     Yes, sir.

16             Q     Do you recognize the one behind her

17      as Scott Hall, the person that we saw in the

18      picture before?

19             A     I do.

20             Q     Okay.  And then do you know who the

21      second individual is coming in with Mr. Hall and

22      Ms. Latham?

Page 128

```
 1              A      I do not.

 2              Q      If you wanted to know who that

 3      individual was, who would you ask?

 4              A      One of the team members from

 5      SullivanStrickler that were there.

 6                    MR. CROSS:  Amanda, if we could get

 7      that answer before the end of the deposition?

 8                    MS. CLARK-PALMER:  Yes.

 9                    MR. CROSS:  Thank you.

10      BY MR. CROSS:

11              Q      All right.  Now come to page 42.

12                    MR. SPARKS:  One second.  I need this

13      in an e-mail, I think, maybe in order to do that.

14                    MR. CROSS:  Yeah, we will do that.

15      E-mail Jenna.  I think we may have to do it as a

16      FileShare, an FTP, because it's big, but --

17                    MR. SPARKS:  I will.

18                    MR. CROSS:  Thanks.

19                    MR. RUSSO:  Can you put on the record

20      the page number for that?

21                    MR. CROSS:  In the exhibit?

22                    MR. RUSSO:  Yeah.  The page -- the
```

Page 129

```
 1      page that you're looking at there.  You may have

 2      sent it, but I --

 3                   MR. CROSS:  Page 38, yeah.  I'm

 4      sorry.

 5      BY MR. CROSS:

 6           Q     All right.  Flip to page 42.  So here

 7      we have Mr. Nelson and Mr. Maggio walking out of

 8      the building at 12:15 p.m. on January 7, right?

 9           A     Yes.

10           Q     And then again at 12:17 p.m.,

11      January 7, we have Mr. Maggio and Mr. Nelson coming

12      back in, right?

13           A     Yes, sir.

14           Q     Mr. Maggio is carrying a black bag?

15           A     Yes.

16           Q     What was in that bag?

17           A     Forensic collection materials,

18      devices.

19           Q     Standard devices you would --

20           A     Standard -- industry-standard

21      forensic tools.

22           Q     And do you see that Mr. Nelson is
```

Page 130

```
 1        wheeling some kind of case in?

 2              A      Yes, sir.

 3              Q      What was in that case?

 4              A      Forensic collection tools.

 5              Q      So this is something Mr. Nelson

 6        brought in with him?

 7              A      Yes, sir.

 8              Q      All right.  Did the SullivanStrickler

 9        team take any equipment or devices from the Coffee

10        County office when they left?

11                     Sorry, let me ask a better question.

12        Obviously it's a really broad one.  Let me ask a

13        better question.

14                     Did the SullivanStrickler team take

15        any of the -- did they take any equipment or

16        devices from Coffee County when they left the

17        Coffee County office that they did not themselves

18        bring in?

19              A      They did not.

20              Q      So, for example, did they take a BMD

21        with them, the vote -- the touchscreen voting

22        devices?
```

Page 131

1          A     No, sir.

2          Q     So the only thing they took out were

3     any devices they brought in, plus the data that

4     they copied from inside the office?

5          A     Yes.

6          Q     All right.  Flip to page 51.  So

7     we're at 12:56 p.m. on January 7, 2021.  Do you see

8     that?

9          A     Yes.

10          Q     So Mr. Nelson is holding a Coffee

11     County elections office door open.  Mr. Maggio is

12     standing with him, right?

13          A     Yes, sir.

14          Q     Who's the woman they're talking to?

15          A     That is Karuna Naik.

16          Q     And she has a bag also, right?

17          A     Yes, sir.

18          Q     Did she also -- she brought in a

19     Cellebrite kit, right?

20          A     Yes, sir.

21          Q     Did she bring any other devices?

22          A     She may have.

Page 132

1              Q      Okay.  But she also did not take

2      anything out of the office that she, herself, or

3      the team did not bring in?

4              A      Correct.

5              Q      Other than the data?

6              A      Yes, sir.

7              Q      Okay.

8                     All right.  Flip to page 55.  So now

9      we're at January 7, 2021 at 1:19 p.m.  Cathy Latham

10     is standing at the door talking to a man in a black

11     hat.

12                    Do you see that?

13             A      Yes, sir.

14             Q      Do you know who that is?

15             A      I do not.

16             Q      And then if you come back to page 57,

17     the same man, it looks like he's bringing in

18     takeout containers at 1:23 p.m.

19                    Do you see that?

20             A      Yes, sir.

21             Q      Someone brought lunch in for the team

22     so they could continue working in the office,

```
 1      right?

 2              A     Yes, sir.

 3              Q     Did Scott Hall pay for the lunch?

 4              A     I don't know.

 5              Q     Do you know who took care of lunch in

 6      terms of going to get it, organizing it?

 7              A     I don't.

 8              Q     Will you look at page 60?

 9                    There's a man coming in, grey hair,

10      grey beard, January 7, 2021 at 1:39 p.m.  Do you

11      recognize him as Ed Voyles?

12              A     No.

13              Q     Do you know the name Ed Voyles?

14              A     I do not.

15              Q     Do you know the name Eric Chaney?

16              A     I know the name Eric Chaney.

17              Q     And do you understand that Eric

18      Chaney was a member of the Coffee County Elections

19      Board at the time of the Coffee County collection?

20              A     I did not.

21              Q     During the time that the

22      SullivanStrickler team was in the Coffee County
```

Page 134

1       election office on January 7, you're aware that

2       there was at least one member of the Coffee County

3       Elections Board who was there for that work, right?

4               A      Yes, sir.

5               Q      And to the best of your

6       understanding, was Eric Chaney that person or do

7       you not know?

8               A      I don't know.

9               Q      All right.  Go to page 62, January 7,

10      2021 at 2:21 p.m.  There's a young man coming in in

11      a red hat.  Do you know who that is?

12              A      I do not.

13              Q      All right.  Go to page 72.  So if you

14      look at 72 and 73 together, January 7, 2021,

15      between 4:46 and 4:49 p.m., here we see Scott Hall

16      and the individual who came in with him.  We see

17      them leaving the elections office, right?

18              A      Yes.

19              Q      The individual that came in with him

20      has a blue backpack, right?

21              A      Yes.

22              Q      Do you know what was in that

1        backpack?

2                A       I do not.

3                Q       Mr. Hall leaves with a black backpack

4        and a brown bag of some sort.  Do you see that?

5                A       Yes, sir.

6                Q       Do you know what was in those bags?

7                A       No.

8                Q       Do you know whether Mr. Hall or his

9        colleague took anything out of the Coffee County

10       elections office that they did not bring in?

11               A       No.

12               Q       You just don't know?

13               A       I don't know.

14               Q       Would that be -- who would you ask if

15       you wanted to know?

16               A       One of the team members.

17               Q       Okay.

18                       MR. CROSS:  If we can get an answer

19       to that, too.

20                       MS. CLARK-PALMER:  Who were the

21       people you said?  I missed that.  Who are the

22       people you want to know whether or not they took

Page 136

1      anything back?

2                       MR. CROSS:  Well, the question would

3      be whether any -- whether SullivanStrickler knows

4      if anyone took anything out of the elections office

5      that they did not bring in.

6                       MS. CLARK-PALMER:  Okay.

7                       MR. CROSS:  And, in particular,

8      whether anyone took any of the voting equipment out

9      of the office.  Thank you.

10     BY MR. CROSS:

11            Q     All right.  Flip to pages 76 and 77.

12     So here we have someone coming into the elections

13     office, January 7, 2021 at 5:24 p.m.  Do you know

14     who that is?

15            A     I do not.

16            Q     But on January 7, 2021, the only

17     people that SullivanStrickler had in the office

18     were the four we've talked about?

19            A     Yes, sir.

20            Q     Okay.  Flip to page 80.  The two

21     individuals in baseball caps coming into the office

22     at 6:53 p.m. on January 7, 2021, do you know who

Page 137

1          those folks are?

2                    A       I do not.

3                    Q       Flip to pages 84 and 85.  So here we

4          are January 7, 2021 at 7:42 and 7:43 p.m., and this

5          is when we see the SullivanStrickler team leave,

6          right?

7                    A       Yes, sir.

8                    Q       And on page 72, it's Paul Maggio

9          and -- and Jim Nelson leaving, right?

10                   A       Correct.

11                   Q       It looks like they're leaving with

12         the same bags they brought in, right?

13                   A       Yes, sir.

14                   Q       And then in page 85, we see Ms. Naik

15         and Ms. Jackson leaving, right?

16                   A       Yes, sir.

17                   Q       Are they leaving with the same bags

18         they brought in?

19                   A       Yes.

20                   Q       All right.  Flip to the last page,

21         87.  So now we're at January 7, 2021 at 7:49 p.m.

22         There's a white car out front.  Do you see that?

1          A      Yes, sir.

2          Q      Do you know whose vehicle that is?

3          A      I do not.

4          Q      Not one of the vehicles that anyone

5     from SullivanStrickler drove, or you don't know?

6          A      It's not their vehicles that I know

7     that they own.

8          Q      Okay.

9          A      Do you know what I mean?

10         Q      Yes.

11         A      Okay.

12         Q      Yes.  That's good.

13                Did anyone from SullivanStrickler

14     ever go back to Coffee County after January 7 to do

15     any additional work?

16         A      No.

17         Q      So just the one day?

18         A      One day.

19         Q      Let me show you Exhibit 11.

20             (Felicetti Deposition Exhibit Number 11

21              marked for identification.)

22                THE WITNESS:  Do you mind if I take a

Page 139

1      bio break?  Is that okay?

2                    MR. CROSS:  No.  Any time you want.

3                    VIDEOGRAPHER:  The time is 11:31 a.m.

4      We are off video record.

5             (Recess from 11:31 a.m. to 11:39 a.m.)

6                    VIDEOGRAPHER:  The time is 11:39 a.m.

7      We are back on video record.

8                    MR. CROSS:  Okay.  Do you -- does he

9      have 12?  Oh, he does.  Okay.

10                   THE WITNESS:  Yeah.  Yeah.

11     BY MR. CROSS:

12            Q     Grab Exhibit 20, if you would.

13                   MR. SPARKS:  Exhibit 11.

14     BY MR. CROSS:

15            Q     I'm sorry, Exhibit 11.  It's the tab

16     numbers.  Flip to -- wait a minute, are there not

17     page numbers on this one?  There's not.  Okay.

18                   So flip like two full pages and

19     you'll see a picture of a young man, it looks like,

20     in blue pants, blue sweater, January 8, 2021 at

21     8:53 a.m.

22                   Do you see that?

Page 140

1                  A      Yes, sir.

2                  Q      He's walking out holding some type of

3           equipment.  Do you see that?

4                  A      Yes.

5                  Q      And then at 8:53 a.m., he's heading

6           back into the office in a black mask.  Do you see

7           that?

8                  A      Yes, sir.

9                  Q      Okay.  And he's leaving again, it

10          says 8:55 a.m., with some equipment on sort of a

11          rolling cart.  Do you see that?

12                 A      Yes, sir.

13                 Q      Do you know this individual?

14                 A      No.

15                 Q      Do you have any reason to believe one

16          way or the other whether this person is affiliated

17          with SullivanStrickler?

18                 A      That there would be -- well,

19          there's -- I don't know how to answer that.  Can

20          you rephrase the question?

21                 Q      Yeah.  Sorry, that's not good.

22          That's a -- that's a lawyer question.

Page 141

1              A      Yeah.

2              Q      Is this person affiliated with

3       SullivanStrickler?

4              A      No.

5              Q      Do you know what equipment he's

6       rolling out?

7              A      It looks like a printer maybe, but I

8       can't -- no.

9              Q      You don't know?

10             A      No.

11             Q      That's fine.

12                    MR. CROSS:  All right.  And we were

13      looking at, it looks like, pages 4, 5, and 6 of

14      Exhibit 11, just for the record.

15      BY MR. CROSS:

16             Q      Okay.  The photos that I've shown you

17      today from the security footage outside of the

18      office, have you seen those before today?

19             A      I have not.

20             Q      Did anyone on the SullivanStrickler

21      team try to evade any of the surveillance cameras

22      at the elections office when they were doing their

Page 142

1      work?

2                A      No.

3                Q      And would they have had any reason to

4      do that?

5                A      No, sir.

6                Q      Because the firm's understanding at

7      the time, and still today, is that it had all the

8      legal rights to do what it was doing?

9                A      Yes, sir.

10                Q      All right.  Let me hand you

11     Exhibit 12.

12                     (Felicetti Deposition Exhibit Number 12

13                      marked for identification.)

14     BY MR. CROSS:

15                Q      All right.  So take a moment, if you

16     need, and flip through Exhibit 12.

17                     Do you recognize these as photos that

18     were produced by Mr. Maggio and that were taken by

19     the team on January 7, 2021 in the elections

20     office?

21                A      Yes, sir.

22                Q      Okay.  And we talked before earlier

Page 143

1          that Ms. Jackson, part of her responsibility was to

2          document the work, including taking photos.

3                    Do you recall that?

4          A    Yes, sir.

5          Q    Did she take these photos?

6          A    Yes.

7          Q    Is your understanding that she took

8          all of the photos?

9          A    Yes.

10         Q    Did anyone else with

11         SullivanStrickler take any photos or video?

12         A    No.

13         Q    Okay.  Did anyone else in the room --

14         sorry, strike that.

15                    Did anyone else who was on-site in

16         Coffee County on January 7, 2021 take any photos or

17         video?

18         A    Not that I know of.  I don't know.

19         Q    Did you discuss that specifically

20         with any of the team members?

21         A    I did.

22         Q    And no one on the team was aware of

Page 144

1        anyone else taking photos or video?

2                A      I was directed to Jennifer Jackson

3        whenever it came to that.

4                Q      All right.  Is it fair to say the

5        team's understanding or recollection from the

6        events was that she was the only one who took

7        photos and video?

8                A      Yes, sir.

9                Q      Okay.  All right.  Let's start with

10       the first page.

11               A      Sure.

12               Q      And it's got this little production

13       number ending in 236.  These are pictures of

14       CompactFlash drives, right?

15               A      Yes, sir.

16               Q      And each CompactFlash drive has a

17       little note next to it with the project number

18       SSA1722, right?

19               A      Yes, sir.

20               Q      And then below the project number

21       there's other information.  What is the information

22       that's recorded on each of those notes?

Page 145

1          A     The CF number is a tracking code.

2    And the -- the word next to it or -- yeah, the word

3    to the right of the CF number is the label of the

4    machine, the device that was -- that the cards were

5    removed from.

6          Q     Okay.  So each of the CompactFlash

7    drives, when the team arrived, was installed in a

8    device.  The team pulled the CompactFlash out of

9    the device, copied it.  Is that right?

10         A     No.

11         Q     Oh, sorry.  I'll tell you what, let

12   me just ask.  Walk me through the steps the team

13   took to copy the -- the CompactFlash drives that we

14   see in this picture.

15         A     As I understand it, the CompactFlash

16   disks were given to Karuna to image.  And I can

17   walk you through that process if you want to hear

18   it.

19         Q     We will in a moment.

20         A     Okay.

21         Q     Who gave her the CompactFlash?

22         A     It would have been -- there were a

1    number of people.  It would have been either Misty

2    Hampton -- I would say Misty Hampton, because she

3    directed, "Grab this, get this, get that, get

4    this."

5            Q     Misty Hampton was the elections

6    supervisor in Coffee County at the time?

7            A     As I understand it, yes.

8            Q     Okay.  And you anticipated where I

9    was going to go.

10           Did anyone beyond Ms. Hampton direct

11   the SullivanStrickler team what to copy?

12           A     Yes, I believe so.

13           Q     What's your understanding about

14   others who gave direction?

15           A     Misty directed the larger percent,

16   but as I understand it, Cathy Latham also provided

17   direction on what was required for collection.  And

18   Scott Hall had said, "Get -- are you sure you're

19   getting everything?  Are you getting everything?"

20   So that was interpreted as, "Make sure you get

21   everything that you can."

22           Q     Okay.  And what was the idea for the

Page 147

1      SullivanStrickler team?  Essentially if there was a
2      device in the office that had data on it, the
3      team's task was to extract that data to the extent
4      they could?
5              A     Yes, sir.
6              Q     So looking back at the first picture
7      in Exhibit 12, so let's just take the fourth one
8      down on the left.  So you've got the project number
9      and then "CF04."  And then there's that Braxton-2."
10     Or what is that word?
11             A     It looks -- it does look like Braxton
12     or Broxton, but that information also would be
13     tracked in the chain-of-custody log that was
14     produced.
15             Q     And do you see next to that it looks
16     like there's one that refers to Ambrose?
17             A     Yes, sir.
18             Q     Do you understand that -- that the
19     references here on these notes correlate to voting
20     precincts in Coffee County, or do you know?
21             A     I do not.  We reference them as just
22     labeled.

Page 171

1              A      And I think I referenced it as that.

2       I don't know what this is.

3              Q      Oh, I see.  Okay.

4              A      Do you know what I mean?  I think my

5       original comment was, "I believe this is one of our

6       deliverables."  I don't think it is.

7              Q      So --

8              A      Sorry about that.

9              Q      No, no, no.  That's no problem at

10      all.

11                     Flip to 244.  The desktop computer

12      that's standing up here on the desk, used with the

13      EMS server, that's a Dell computer.  Do you see

14      that?

15             A      Yes, sir.

16             Q      Okay.  Now, if you flip to 248,

17      there's a reference to "EMS 01," and it says, "Dell

18      Basic Warranty."  And if you look, you can see a

19      keyboard in the top right corner, you can see the

20      cables off to the left.

21                     Does it look like this is -- what's

22      pictured here is that desktop computer?

Page 172

```
 1            A      It does.

 2            Q      Okay.

 3            A      Sorry I had to go back.

 4            Q      No, no.

 5            A      Okay.

 6            Q      I'm glad you did that.  That's very

 7       helpful.

 8                   So then we come to 254.  We have a

 9       picture of the same Dell desktop.  You can actually

10       see it now sitting next to the router on the table

11       in the EMS server room.

12                   Do you see that?

13            A      Yes.

14            Q      And there's a Post-it note on it.  Do

15       you know whether that Post-it note is a password

16       that is used for that computer?

17            A      I wouldn't know.  We don't need

18       passwords.

19            Q      Okay.

20            A      So we wouldn't --

21            Q      I was going to ask you that.

22            A      Okay.
```

Page 173

```
 1              Q      The forensic copying that you guys

 2        did in Coffee County, you were able to take all of

 3        the data that you took without needing passwords to

 4        any devices?

 5              A      That is correct.

 6              Q      And how -- walk me through sort of

 7        how that's possible.

 8              A      When -- passwords that are typically

 9        provided, unless they -- that are on local

10        machines, or on machines, if they are not

11        encrypting the actual OS at boot, when it boots,

12        you can forensically image -- we're only looking at

13        a source.

14                    So we can look at -- here's an

15        example:  So if this laptop here had a password on

16        it, when we attach our device and we boot and we

17        point to that to collect, it's just looking at a

18        block of data or the data that's on the disk.  And

19        also pieces of the disk that may not contain data,

20        but fragments of data.  So imagine it just

21        collecting that, whatever's on the disk, then

22        creating an image of that, and then taking that off
```

Page 174

1        with it.

2                    Now, if I was looking to do something

3        targeted where you said to me, you know, "We really

4        only want these files," without doing a forensic

5        image, we would require a password to attach to the

6        machine and then to filter down using Windows tree

7        viewer or searching or whatever to grab the files.

8                    But there's no need -- for the

9        technologies that were here for us to need any

10       passwords to gain that -- to forensically image

11       them.

12            Q    And the forensic image captures, if

13       done correctly, all of the files, all of the data

14       sitting on the device?

15            A    Yes, sir.

16            Q    Once the data is pulled off in that

17       process, is a password needed to then access that

18       data on whatever device it's copied to?

19            A    Yes, sir.

20            Q    So the -- the data that is -- that

21       was taken -- I'll be more precise.  The data that

22       was copied in Coffee County, has anyone at

Page 176

1          would upload the data to the ShareFile, and then

2          whomever asked for access or was given access based

3          on the attorneys, they would say, "All right.   We

4          need access for this, this, and this."  We would

5          create those accounts and then you would be able to

6          pull the data down.

7                      Does that paint a picture?

8          Q      Yeah.

9          A      Does that --

10         Q      Thank you.

11         A      You're welcome.

12         Q      So for anyone accessing that data and

13         wanting to actually look at the data itself, look

14         at the files, they might need a password to the

15         extent that any particular file is password

16         protected at the time you collected it?

17         A      And they would need a password from

18         us.  So everything that gets put on ShareFile is

19         password protected.  So they -- it would require a

20         password no matter what to gain access to that

21         data.

22         Q      Okay.  When the firm shared the data

Page 177

1    from Coffee County via the ShareFile, it provided

2    log-in credentials to the individuals who were

3    given access to that data, right?

4           A    Yes, sir.

5           Q    And so the log-in credentials would

6    be, what, a user name and a password?

7           A    Yes.

8           Q    And that -- once they logged in, they

9    then would have access to -- to whatever was

10   sitting on that ShareFile site for their user

11   account?

12          A    For their account, yes.  So -- yes.

13   So permissions based on access to certain areas

14   within that ShareFile repository.  And permissions,

15   like "Ability to download, yes or no; ability to

16   upload, yes or no; you know, admin rights, no,"

17   this -- things like that.

18          Q    If a user were to share their log-in

19   credentials for your ShareFile site with another

20   individual, you wouldn't have any way of knowing

21   that, right?

22          A    I don't know.  I don't think we would

Page 215

1              I know we talked before, you

2       consolidate the data, then you upload it to the

3       ShareFile site.  That's done physically in the

4       SullivanStrickler office?

5              A     Right.  So a copy is made,

6       consolidated, that we discussed, of all of the

7       targeted data that was collected.  That -- those

8       drives that were utilized to collect the data are

9       then preserved with a preservation copy.  So you

10      have a working copy, a preservation copy.  The

11      preservation copy is then -- that data is then

12      uploaded to the ShareFile.

13             Does that answer your question?

14             Q     Yes.

15             A     Okay.

16             Q     Did SullivanStrickler require anyone

17      who had -- was given access to the ShareFile for

18      the Coffee County data to sign any kind of

19      non-disclosure or any confidentiality agreement?

20             A     No.  We were working under the

21      original agreement information.

22             Q     So the way it would work is your

Page 216

1     points of contact, like a Doug Logan or a Jim

2     Penrose or Sidney Powell, would -- would reach out

3     to SullivanStrickler and say, "Hey, I want you to

4     share the Coffee County data with -- with this

5     individual as well."  And then you guys would give

6     log-in credentials for the ShareFile to that

7     individual?

8          A     That's exactly right.

9          Q     Does each individual have their own

10    log-in credentials for ShareFile?

11         A     Yes.  And permissions.

12         Q     Right.

13               You talked about this before.  Each

14    individual user may have some different

15    permissions, meaning one user can upload and

16    download, but another can only download?

17         A     Or only have access to certain areas

18    within ShareFile.

19         Q     Are you aware that one or more of the

20    individuals that you guys gave log-in credentials

21    to shared their log-in credentials with -- with

22    other individuals?

Page 234

1      because otherwise it's going to throw -- it gets

2      complicated on Exhibit Share.  So just remind me at

3      the end to mark this as an exhibit.  We won't do it

4      for now.

5      BY MR. CROSS:

6              Q    Okay.  So the check came for the

7      Sidney Powell Engagement from Defending the

8      Republic, Inc.  And that's for the Coffee County

9      work?

10             A    Yes.

11             Q    And do you know anything about that

12     organization?

13             A    I do not.

14             Q    Okay.  Let's see.  Oh, was anybody

15     able to identify the person who came in who was

16     with Scott Hall on-site?

17             A    No.

18             Q    Did that person do anything on-site?

19             A    Not as far as collections, no.

20             Q    What did he do?

21             A    As we understand it, he was with

22     Scott Hall as a programmer.

Page 235

```
 1              Q     And when you say "programmer," what
 2      do you mean?
 3              A     That's all I know.
 4              Q     Somebody who would program software
 5      or computers?
 6              A     Yes.
 7              Q     Okay.  Did he have a computer or
 8      devices with him?
 9              A     I don't know.
10              Q     Okay.  Did he offer any direction or
11      guidance to the SullivanStrickler team on what to
12      do?
13              A     He did not.
14              Q     Okay.  He was just there with Scott
15      Hall --
16              A     That's correct.
17              Q     -- as a programmer?
18              A     Correct.
19              Q     Okay.  Did anyone who was there that
20      day on-site, to the knowledge of the firm or the
21      team, take anything with them that they did not
22      bring in themselves apart from data that was
```

Page 264

1      page, below this black redacted line, do you see

2      there's an indication of uploads and the user name

3      is Doug Logan?

4              A      Yes.

5              Q      And then the files that indicate to

6      the left, do you see how they all reference EMS?

7              A      Yes.

8              Q      Do you know why Doug Logan was

9      uploading these EMS files to the SullivanStrickler

10     ShareFile?

11             A      I do not.

12             Q      Do you know where those files came

13     from?

14             A      I do not.

15             Q      Do you know what they are?

16             A      I do not.

17             Q      Okay.  Then come to the next page

18     ending in 141.  You'll see Doug Logan's name

19     continues.  And then you get to Conan H. again,

20     Conan Hayes.  Do you see that?

21             A      Yes.

22             Q      And the first file indicates -- Conan

Page 290

1           A      Sure.

2           Q      The SullivanStrickler team went in

3       and scanned -- or sorry, copied thumb drives and it

4       copied whatever data was on those thumb drives at

5       the moment the team came in to copy them?

6           A      Correct.

7           Q      At the same time in parallel, Misty

8       Hampton is scanning cast ballots with a scanner?

9           A      Yes.

10          Q      Do you know whether -- the scans that

11      Misty Hampton created, whether those scans were

12      also at some point provided to SullivanStrickler?

13          A      Yes, they were put on a thumb drive

14      for us to scan -- to forensically image.

15          Q      Okay.  Got it.  Got it.

16                 And was that done on the 7th or

17      later?

18          A      No, the same day.  So the 7th.

19          Q      Do you know what elections she was

20      scanning ballots from?

21          A      I don't know.

22          Q      Okay.  Did the team see anyone other

Page 291

1    than Ms. Hampton scan ballots?

2            A    Based on my discussion with the team,

3    it was Misty.  That's it.

4            Q    So we've talked about a number of

5    folks, and we looked at pictures outside the

6    building.  Let me just make sure I get a complete

7    picture of the inside.

8                 So in the office during the day while

9    SullivanStrickler was doing its work, it was

10   obviously the four members of the SullivanStrickler

11   team?

12           A    Yes.

13           Q    Cathy Latham was there for most of

14   the day.  Is that right?

15           A    Yes.

16           Q    And I think you said earlier she was

17   helping provide some direction on what to copy?

18           A    Yes.

19           Q    Misty Hampton was there for most of

20   the day, also providing some direction?

21           A    Yes.

22           Q    Scott Hall was there for most of the

Page 301

1        everyone who received the data from Coffee County

2        from SullivanStrickler, right?

3                    There's at least one exception?

4            A     One exception, yes.

5            Q     Okay.  Are you aware of anyone else

6        who received data -- Coffee County data from

7        SullivanStrickler through means other than the

8        ShareFile site?

9            A     I am not.

10           Q     Was that something that you looked

11       into?

12           A     We did, yes.  I looked into that.

13           Q     Okay.  And --

14           A     Sorry.

15           Q     No, please go ahead.

16                 What can you tell me about the steps

17       that were taken to try to collect data from the

18       BMDs?  What was the method?

19           A      The only method that would have been

20       feasible -- and this is -- I wasn't there -- would

21       be to utilize Cellebrite, because of the Android OS

22       that it has on the back-end --

1          Q     Okay.

2          A     -- as far as the operating system.

3     So I would think Cellebrite would have been

4     utilized.

5          Q     Okay.  And do you have any -- any

6     information about why the team was unable to copy

7     data from the BMDs, assuming that's the case?

8          A     I do not, just that it -- they

9     failed.  That's all.

10         Q     Okay.

11         A     The collection failed and I don't

12    know why.

13         Q     Okay.  I do not have any further

14    questions.  Just a few quick things similar to what

15    we talked about earlier.  We do want to get the

16    complete ShareFile logs.

17         A     Oh, as far as the ShareFile logs,

18    what you have is what there is.  There's a timeline

19    limitation on ShareFiles' ability to produce logs

20    after a certain time frame.

21         Q     Okay.  Let me make sure I understand

22    that, because the logs that we have, it looks like

Page 333

1          CERTIFICATE OF NOTARY PUBLIC

2     I, FELICIA A. NEWLAND, CSR, the officer before whom

3     the foregoing videotaped deposition was taken, do

4     hereby certify that the witness whose testimony

5     appears in the foregoing deposition was duly sworn

6     by me; that the testimony of said witness was taken

7     by me in stenotype and thereafter reduced to

8     typewriting under my direction; that said deposition

9     is a true record of the testimony given by said

10    witness; that I am neither counsel for, related to,

11    nor employed by any of the parties to the action in

12    which this deposition was taken; and, further, that

13    I am not a relative or employee of any counsel or

14    attorney employed by the parties hereto, nor

15    financially or otherwise interested in the outcome

16    of this action.

17

18

19

20                    FELICIA A. NEWLAND, CSR

                      Notary Public

21

      My commission expires:

22    September 15, 2024