# EXHIBIT 181

Page 1

1            IN THE UNITED STATES DISTRICT COURT

             FOR THE NORTHERN DISTRICT OF GEORGIA

2                      ATLANTA DIVISION

3

4     DONNA CURLING, et al.,

5          Plaintiffs,

6                                    CIVIL ACTION

           vs.                      FILE NO.:  1:17-CV-2989-AT

7

      BRAD RAFFENSPERGER, et al.,

8

9          Defendants.

10    ------------------------------

11

12

13                 REMOTE DEPOSITION OF

14                    KEVIN SKOGLUND

15                   December 16, 2022

16                       9:00 a.m.

17

18         (All attendees appeared remotely via

19          videoconferencing and/or teleconferencing)

20

21                     Inger Douglas

                     CVR No. 7481

22              CCR No. 5166-3765-6508-0064

23

24

25

Kevin Skoglund                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

                                                      Page 18

```
 1       A    For every one of those people you just listed, they

 2   were deposed and I watched their depositions.

 3       Q    Have you ever been to the Coffee County election

 4   office?

 5       A    I have not.

 6       Q    Did you interview anyone as part of the process of

 7   preparing this report?

 8       A    Besides the depositions, no.  I was not asked to.

 9       Q    And you didn't ask any questions at the depositions,

10   right?

11       A    I'm sorry.  I don't understand.

12       Q    Yeah.  Well, I'm trying to understand your last

13   answer.  So I asked whether you had interviewed anyone, and you

14   said, "Besides the depositions, no."  And so I'm -- it sounded

15   to me like you might consider the depositions interviews that

16   you had done, but you...

17       A    I do not consider them interviews that I did, no.  I

18   watched them be interviewed by others.

19       Q    Have you directly reviewed forensic server images

20   obtained by the plaintiffs in this case from Coffee County?

21       A    I have.

22       Q    Okay.  Did you find any malware on any of those

23   images?

24       A    I did not, but I was not asked to.

25       Q    Okay.  And if you'll please turn to paragraph seven
```

Kevin Skoglund                                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 37

1    in some way.  All the way up to the other end of the spectrum;

2    performing -- you know, reverse engineering and developing

3    malware using the data that was distributed from Coffee County

4    as a sort of, you know, home election lab where you could, you

5    know, trial-and-error your techniques and make malware that was

6    potent and undetectable.  And I think it would be -- it would

7    greatly facilitate, you know, that kind of effort.

8         Q    Has anyone actually used the information these

9    breaches produced to -- and I'm going to borrow some of your

10   phrases here -- to subvert the operation of any aspect of

11   George's election system?

12        A    I don't have any way of knowing that.  It's not in

13   the evidence that I was shown.  And if it has happened, I have

14   not been asked to look at it.  I'm not sure if we would see

15   that evidence.

16        Q    Has anyone actually used the information these

17   breaches produced to reprogram any Georgia election equipment?

18        A    I would give the same answer.  I...

19        Q    Has it -- okay.  Has anyone actually used the

20   information these breaches produced to disable any defense to

21   any aspect of Georgia's election system?

22        A    You're asking questions that are things that I

23   haven't examined or looked at.

24        Q    Has anyone actually used the information these

25   breaches produced to otherwise insert malware into any

Kevin Skoglund                                     December 16, 2022
Curling, Donna v. Raffensperger, Brad

                                                          Page 38

1    component of the Georgia election system?

2         A    Again, that's something I have not been asked to look

3    at.

4         Q    Has anyone found any malware in any Georgia election

5    equipment?

6         A    I'm -- I am unaware of it.  I don't know whether

7    anyone has.

8         Q    And if you wouldn't mind, let's look ahead to

9    numbered paragraph 33 of the report.  This is your discussion

10   of the Coffee County election management server and a data

11   change that was identified.

12        A    Okay.  Thirty-three?

13        Q    Yes, sir.  And was this the -- the data change that

14   you're referring to, was this the change to the date?

15        A    No.

16        Q    What data change was this?

17        A    If you look in paragraph 32 where I describe the fact

18   that the Windows operating system records the connection of USB

19   devices.  So in a -- in a forensic copying of data, if you had

20   used a write blocker, then you would make sure that no data

21   flowed from the technicians' devices to the target device.  In

22   this case, they did not.  And therefore, data did go from their

23   device to the target device; in this case, the election

24   management system.  And we see evidence of that in the data

25   because it logged the connection of those USB -- those USB

Page 39

1    devices.

2         Q    Was the data change evidence that you saw showing

3    anything beyond the logging of the connection of the devices?

4         A    I'm not sure I understand the question.

5         Q    Well, so the evidence of the data change, I think I'm

6    understanding, was that there was a log showing the fact of the

7    connection of these external devices, right?

8         A    Yes, that's correct.

9         Q    Okay.  And did that evidence show with respect to a

10   data change anything else besides the fact of the connection of

11   the devices?

12        A    I did not -- I did not look to determine if that was

13   the case.

14        Q    In paragraph 33, you state your opinion that this

15   data change on the target device was likely due to a mistake by

16   the technician.  Is the basis for that opinion that you did not

17   observe evidence of data changes on any of the other Coffee

18   County election equipment accessed?

19        A    That's correct.  At the time that it happened, one of

20   the Sullivan-Strickler employees was not there yet who was the

21   head forensic expert, at least according to the way they

22   described her role.  I think that it appears that this was, you

23   know, a mistake that was made.  Data was changed.  And then,

24   perhaps upon her arrival, perhaps because they learned from the

25   mistake, I don't know why, that mistake was not repeated on

Page 40

1    other devices.  So the same evidence does not exist on the ICC,

2    for example.

3        Q    And so is there anything other than the absence of

4    that same evidence on the other devices that supported your

5    conclusion that this was a technician mistake, or was that the

6    sole basis for it?

7        A    And the fact that this is not -- this is not

8    something that's desirable from a forensic expert.  This is

9    something that if you asked anyone at Sullivan-Strickler they

10   would say that they would hope not to have done this.  They

11   would -- they would view it as a mistake, I believe.

12       Q    And so is it your opinion that this was an innocent

13   mistake?

14       A    I don't know.

15       Q    You're not saying it was innocent, you're not saying

16   malicious, you don't know either way?

17       A    I won't attribute a motive to it.  I don't know.

18       Q    The -- so then, I think I understand from your

19   testimony that the EMS was the only device that was modified in

20   this way during the breach, right?

21       A    During the -- January 7 when Sullivan-Strickler had

22   their hands on the keyboard, this is the only evidence that I

23   saw of data modification to the target device.

24       Q    Did you see other evidence of data modification to

25   any target devices in Coffee County on any of the other access

1    dates in January of 2021?

2        A    Did I see changes to them?  Yes, absolutely.  Because

3    those were not forensic copying activities.  Those were using

4    the machines which caused them to log a great deal of data.

5        Q    Sure.  All right.  With respect to the EMS and its

6    purpose in the normal operation of the conduction of elections

7    in Coffee County, is it your understanding that the Coffee

8    County EMS was used to configure ballot styles, handed it some

9    ballot layouts for elections conducted in that county?

10       A    Yes.  Let me clarify.  I don't -- that is something

11   that the EMS could be used for.  I'm not saying that it was

12   used for that.  That is a feature of -- of the Dominion EMS.

13       Q    You conclude at paragraph 54 that Sullivan-Strickler

14   data included complete copies of Coffee County election

15   devices, right?

16       A    Yes.

17       Q    Okay.  And does complete copies mean accurate copies?

18       A    Yes.  A forensic image copies the data on the storage

19   device bit for bit, sector by sector.  It really is a way to

20   make a -- for lack of a better word, a photograph, a snapshot

21   in time of the zeroes and ones that existed.

22       Q    And just forgive me for backtracking very briefly.

23   But your expertise includes the area of computer forensics or

24   computer science?

25       A    My expertise is in cybersecurity, which is a field

Kevin Skoglund                     December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 45

1    opinion on whether those results were accurate?

2        A    No.  I -- I haven't looked at that issue at all, and

3    that's not something I was asked to do.

4        Q    With respect to the data that Sullivan-Strickler

5    gathered from Coffee County, did you look at whether there was

6    chain of custody evidence, for example, for the server image

7    before it made it to you?

8        A    So could you just repeat the beginning of that

9    question again?

10       Q    Sure.  So I'm asking about the -- I guess we'll start

11   with the server image from Sullivan-Strickler that you

12   (indiscernible).  Did you look at whether there was chain of

13   custody evidence for that image?

14       A    No.  The chain of custody, as I know it, was that it

15   was produced under subpoena to Mr. Brown who produced it to me,

16   I believe, via relevant data technologies, or it may have been

17   produced to the other plaintiffs.  I -- it may not have been to

18   Mr. Brown.

19       Q    And in further discussing the -- what you described

20   as the extraordinary access of Mr. Logan and Mr. Lenberg,

21   there's -- you're not aware of any evidence that either

22   Mr. Logan or Mr. Lenberg installed malicious code or other

23   malware into any Georgia election equipment or system, right?

24       A    I'm not aware that they installed any malicious code

25   or malware.  I am aware that they made what I consider to be

Kevin Skoglund                           December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 46

1    significant changes to the system.

2         Q    I'd like to ask you about the -- a file that

3    Mr. Lenberg produced.  This is referenced in paragraph --

4    beginning, I think, in the paragraph numbered 129 in your

5    report.  You refer to Mr. Lenberg producing a compressed file

6    in a ZIP format named CoffeeCF.zip.  Do you recall that?

7         A    Sorry.  One second.  At 129?

8         Q    Yes, sir.  It begins on 129, and it's discussed

9    thereafter.

10        A    Okay.  Yes, I do.

11        Q    And in paragraph 130, you indicate that you were able

12   to determine the correct password for that CoffeeCF.zip file;

13   is that right?

14        A    That's correct.

15        Q    What is that password?  I mean, how did you figure it

16   out?

17        A    It is a password that was contained in the data that

18   was produced by Sullivan-Strickler...

19        Q    And where in that data was it contained?

20        A    I don't recall offhand.  That's something that I can

21   discuss with Mr. Brown as to whether can be provided to you or

22   not.  It was something that I discovered by searching through

23   possible passwords in the data and just trying to see if any of

24   them worked, and one of them did.

25        Q    And so was it -- so I'm a novice in this area.  Was

Kevin Skoglund                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 66

1    BY MR. DENTON:

2         Q    Right.  But you're not saying that any of these

3    things has happened, correct?

4              MR. BROWN:  Object -- object to the form.

5              THE WITNESS:  I am not -- I am not offering an

6         opinion on whether these things have happened.  I have not

7         reviewed that evidence.  And I'm not -- I'm not sure that,

8         you know, if they had that it would be in evidence.

9    BY MR. DENTON:

10        Q    You have not seen in your work in this case any

11   evidence of these concerns actually occurring, correct?

12        A    Let me -- let me say I do think there is some

13   evidence that some of the concerns have happened; specifically,

14   the disinformation concerns.  I think that especially Logan and

15   Lenberg during their time there, and also the analysis done by

16   Ben Cotton, which was used in several court cases is my

17   understanding, I think there is evidence that the information

18   about the systems has been used.

19        Q    When you say it's been used, what do you mean?

20        A    So you asked whether it had happened or not.  Maybe

21   happened is the -- is the better term.  There is evidence that

22   my concern that access to these systems would allow

23   disinformation campaigns to be waged; that that has been

24   realized.

25        Q    So disinformation campaigns have been realized --

Kevin Skoglund                        December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 67

 1        A     Yes.

 2        Q     -- based on the access to Coffee County?

 3        A     Yes.

 4        Q     Any of the other concerns that you raise in this

 5   final section that have been realized?

 6        A     I would have to go through them to say -- to rule

 7   them all out.  None...

 8        Q     Let's start with -- I'm sorry.

 9        A     None come to mind, but I -- we could go through them

10   and look.

11        Q     All right.  So let's start with the -- you've got

12   subheadings here, and I think these are your terms hopefully

13   generally described and it will refresh your memory.  So

14   insider threats?

15        A     The insider threat was realized.

16        Q     Explain that to me.

17        A     We have an example of insiders facilitating access to

18   these systems.  So I think that there's very clear evidence

19   that there was an insider threat that wasn't addressed; that

20   the security measures were inadequate to deal with it.

21        Q     Are you talking about something other than what

22   happened in January 2021 in Coffee County?

23        A     I'm specifically talking about that.  I have not

24   reviewed evidence for all others, but there is an investigation

25   by the state into Spalding County that I'm aware of where it

Kevin Skoglund                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 68

1    may be a similar situation.  I haven't -- I don't have the full

2    facts of that case.

3        Q    Have you seen any evidence linking the Spalding

4    County situation that you described to the January 2021 access

5    in Coffee County that we've been talking about?

6        A    Yes.

7        Q    What is that evidence?

8        A    In some of the communications, there is an exchange

9    between Sullivan-Strickler and Doug Logan where

10   Sullivan-Strickler says that they've been asked to bid on a

11   project in Spalding County.  And Doug Logan says, "I know.  I

12   referred you," or something to that effect.

13       Q    Anything beyond that reference?

14       A    Lenberg also, I believe, produced documents, I

15   believe, for Spalding and maybe for some other counties as well

16   that he had been, you know, active in trying to get information

17   or access in other places.

18       Q    And so you're saying that evidence is that Lenberg

19   was active in trying to get information out of Spalding County?

20       A    I believe that's the case.  I don't remember the

21   county names exactly.  But I believe that there was evidence

22   that was produced by Lenberg relevant to Spalding County.

23       Q    And so the connection there between Coffee County and

24   Spalding County that you're drawing is that some of the people

25   who were involved in the access in Coffee County were aware of

Page 69

1     and maybe working on access in Spalding County, right?

2          A     That's a fair characterization.

3          Q     Okay.  And is there -- have you seen any evidence

4     linking the information learned or disseminated from Coffee

5     County by these outsiders to access in Spalding County?

6          A     I'm sorry.  The actual data from Coffee County?

7          Q     Right.  I mean, that's the -- that's the security

8     concern here is that...

9          A     We were talking about insider threats before --

10         Q     Sure.

11         A     -- as the link between the two.  I think that may be

12    the commonality is that there is the potential for insider

13    threats there as well.  That would be a concern of mine.

14         Q     Is that potential -- do you see evidence of a

15    heightened potential for insider threats in Spalding County as

16    a result of the access that occurred in Coffee County?

17         A     Yes.  I see -- in Spalding County and I think in all

18    counties, I think that it's a -- it should be a top-of-mind

19    concern.

20         Q     So is there anything differentiating -- then, with

21    respect to insider threats following the access to Coffee

22    County, is there anything differentiating Spalding County from

23    any other Georgia county?

24         A     The fact that there was evidently a move to actually

25    take action that there was -- I'm not aware of the same

Kevin Skoglund                              December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 70

1     reaching out to Sullivan-Strickler and asking them to bid on

2     the job happening in other counties.  So I think it was -- it

3     was different.

4          Q    Are you aware of any evidence of any relationship

5     between insiders, either current or former, in Coffee County

6     and insiders in Spalding County?

7          A    I'm -- other than the fact that they're election

8     officials, I'm not aware of any connection.

9          Q    And your next section is -- and we're going back to

10    the topic of actual realization of these potential concerns

11    that you raise in your final section.  The next section is

12    manipulation or damage of the Coffee County election hardware.

13    Have you seen...

14         A    Can you tell me the number you're at?

15         Q    This starts, I think, at Page -- at numbered

16    paragraph 156...

17         A    Okay.  I'm there.

18         Q    So is there -- again, looking forward from the access

19    that occurred January 2021 in Coffee County, have you seen

20    concerns or risks actually realized elsewhere after that as a

21    result of what happened in Coffee County?

22              MR. BROWN:  I'm going to object to the form.  Just I

23         don't know if you're speaking generally or if you're back

24         on 156.

25              THE WITNESS:  I'm a little confused on that as well.

Page 71

1    BY MR. DENTON:

2        Q    Sure.  So I am talking about what starts at 156.  I'm

3    talking about the -- and I think in here, am I right that

4    you're talking about manipulation or damage to Coffee County

5    election hardware, correct?

6        A    Correct.

7        Q    Okay.  And so from that, you described a heightened

8    concern that gives you about future security risks, correct?

9        A    Yes.

10       Q    Have you seen a realization of any security risks in

11   that context elsewhere?

12       A    I think that in Coffee County -- we're talking about

13   Coffee County's election hardware in this case.  I think that

14   that has been realized.  The fact that these systems continued

15   to be used in several elections and the fact that they were

16   replaced piecemeal, I think does -- does raise elevated risks.

17   I think that that is -- that is a concern.

18       Q    Have you seen any evidence of the status or

19   functionality of those pieces of equipment used in elections

20   after January of 2021?

21       A    I'm sorry.  Have I -- I missed the middle part of

22   that.

23       Q    Well, in other words, do you have -- have you seen

24   evidence about any damage or manipulation of that equipment as

25   it was used in elections post-January 2021?

Kevin Skoglund                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 72

1        A    So the only evidence that I reviewed of these systems

2    post-January 2021 are the images that were produced by

3    Mr. Persinger and RDT that they took.  And I have not reviewed

4    the actual systems.  And the only equipment that was produced

5    there was the EMS and the ICC.  So other components -- the

6    Sullivan-Strickler data includes more components than the later

7    evidence.

8        Q    Sure.  And so but it's correct that you have not seen

9    evidence of how the equipment in Coffee -- election equipment

10   in Coffee County is operating or has operated in elections

11   conducted after January of 2021, correct?

12       A    That's correct because I haven't been provided that

13   evidence.  So just to be -- to be clear, my understanding is

14   that after the events in January that the election management

15   system and the ICC were removed from Coffee County prior to the

16   next election, but the other components remained.  The EMS and

17   the ICC that were removed are the only data that I've been

18   given access to to review.  So if there was -- there were any

19   kinds of issues at all, those would be on the other equipment

20   that remained in Coffee County after the EMS and ICC's removal,

21   which I have not had any access to that data.  So there's --

22   there is no evidence that I've seen that I've been presented.

23   If presented it I could look at it, but I haven't.  I've only

24   seen equipment that was removed post that date.

25       Q    That's helpful, Mr. Skoglund.  Thank you.  And that's

Kevin Skoglund                December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 73

1    what I'm trying to get at is you're describing concerns about

2    things that could happen in the future based on what happened

3    in the past.  What I'm just trying to understand is you have

4    not seen evidence of those concerns realized in the future?

5              MR. BROWN:  Object to the form.

6              THE WITNESS:  My concern has been realized.  This

7         equipment has been used.  It has been connected to other

8         equipment.  It has -- you know, there is the potential for

9         all of these fears to have happened.  So the concern has

10        been realized.  Is there evidence that the actual event

11        happened?  I have not been given that evidence, so I don't

12        know.  I don't know whether it has or has not.

13   BY MR. DENTON:

14        Q    Thank you.  That's very helpful.  And I appreciate

15   you offering that answer, and that's -- that is what I was

16   getting at was evidence of the actual event happening.  So I

17   appreciate that answer.  And it's the same question for the

18   possible consequences of further distribution of the election

19   software.  You talk about the emboldening of adversaries, the

20   facilitation of public disinformation, subversion of election

21   software, deployment of weaponized code.  Have you seen those

22   things actually happen following what happened in Coffee County

23   in 2021?

24             MR. BROWN:  Object to the form.

25             THE WITNESS:  I have seen it happen, but not with the

Kevin Skoglund                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 88

1    media which makes it also a concern.  So it's -- there are two

2    things there.  It's not reusing it and it's using a different

3    type of media altogether.

4        Q    And the EAC recommendation that you've cited here

5    contains both of those components, the single use and the

6    write-once read-only components?

7        A    Yes, I believe it does.  I'd have to -- single use,

8    yeah.  Single use and write -- write-once and read-only.  The

9    two quotes there have the two pieces.

10       Q    And so had Coffee County followed this EAC

11   recommendation, that would have satisfactorily mitigated that

12   heightened risk that you describe in paragraph 162?

13       A    I wouldn't say satisfactorily.  It would have -- it

14   would have partially mitigated the risk.  It would have lower

15   the risk.  I think -- again, in security we don't ever think of

16   computers as being secure or not secure.  That's not useful to

17   us.  What we look at are what are the risks and how do we

18   mitigate those risks.

19       Q    This idea of a perfectly secure system that relies on

20   computers is not one that in your world exists?

21       A    That is correct.  And that's -- that's why we

22   advocate for what we call evidence-based elections, this idea

23   that we don't have to trust the computers, that if we capture

24   evidence of the voter's intent that we're sure is what the

25   voter intended, and we protect that evidence well, and then we

Page 124

1     was using one set of credentials to log in to these machines.

2     And proper access controls would have either credentials that

3     are based on the role of the person or on their individual

4     identity.  So you would grant the election director certain

5     privileges with a username and password, or you would grant

6     that person serving in that role as the election director a

7     username and password.  So that's not done here either.  So

8     there are a number of examples of access controls that are sort

9     of standard practice in cybersecurity that aren't being

10    followed and that are concerning.

11         Q    You were asked earlier about whether the information

12    obtained in the breach had been used to reprogram voting

13    equipment.  Do I understand correctly that the -- the

14    information that was obtained during the access in Coffee

15    County, was it used at least in part to reprogram the clocks on

16    the ICC and the EMS server?

17         A    Yes, that's correct.  I think Mr. Denton's question

18    was about the data that had left Coffee County.  But the

19    activities inside Coffee County, there is evidence that Doug

20    Logan and Jeffrey Lenberg, during their visit that the clock on

21    the EMS and the ICC were initially reset back to November 5,

22    two days after election day, and then on Jeff Lenberg's

23    subsequent visit was reset twice more to get back to that range

24    around the election day.  In addition, he reconfigured a lot of

25    the standard settings on the ICC and made lots of changes to

Kevin Skoglund                    December 16, 2022
Curling, Donna v. Raffensperger, Brad

Page 125

1    the advanced settings that typically would be, you know, left

2    alone and only -- only used if advised by someone like Dominion

3    to troubleshoot a problem.  He was monkeying around with them.

4    And his testimony was that he didn't know whether they had ever

5    been changed back.  And the clock we know wasn't changed back

6    because that still exists in the forensic images.

7         Q    You were asked a lot of questions about malware

8    today.  And I believe you testified that you were not asked to

9    look for malware, and it might not leave traces in any event.

10   Would it be standard practice -- or is it standard practice in

11   the cybersecurity community when you have a breach of a system

12   like this that the institution that's responsible for securing

13   that system would take measures to determine whether it has

14   been compromised by malware or some other infection?

15        A    Absolutely.  I mean, that's -- I cite in my

16   declaration the CISA incident response plan where, you know,

17   they -- they basically say like here are the steps to follow if

18   you find yourself in the situation.  And, you know, you -- you

19   quarantine the system so that there is no further risk of

20   transmission.  You take those machines out of service.  And

21   then, you know, you can then inspect them to -- to try to

22   understand the scope of what has happened.  That's sort of --

23   incident response is the term that we give it in the

24   cybersecurity world.  If you're responding to an incident and

25   you want to understand what happened, then -- then, yeah, you

Page 136

1                              CERTIFICATE

2      STATE OF GEORGIA

3      COUNTY OF FORSYTH

4

5          I, Inger Douglas, Certified Court Reporter, hereby certify

6      that the foregoing pages numbered 2 through 136 constitute a

7      true, correct, and accurate transcript of the testimony heard

8      before me, an officer duly authorized to administer oaths, and

9      was transcribed under my supervision.

10         I further certify that I am a disinterested party to this

11     action and that I am neither of kin nor counsel to any of the

12     parties hereto.

13         In witness whereof, I hereby affix my hand on this the

14     28th day of December 2022.

15

16     _____

17     Inger Douglas, CVR 7481

18     CCR 5166-3765-6508-0064

19     Certified Court Reporter

20

21

22

23

24

25