# EXHIBIT 230

Page 1

1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTH DISTRICT OF GEORGIA
2                      ATLANTA DIVISION
3
4
                                        )
5    DONNA CURLING, ET AL.,             ) CIVIL ACTION NO.
                                        ) 1:17-CV-2989-AT
6         PLAINTIFFS,                   )
                                        )
7    v.                                 )
                                        )
8    BRAD RAFFENSPERGER, ET AL.,        )
                                        )
9         DEFENDANTS.                   )
     ---------------------------------
10
11
12
13              DEPOSITION OF DONNA PRICE
14                 (TAKEN by DEFENDANTS)
15       ATTENDING VIA ZOOM IN FULTON COUNTY, GEORGIA
16                    MARCH 8, 2022
17
18
19
20   REPORTED BY:        Meredith R. Schramek
                         Registered Professional Reporter
21                       Notary Public
                         (Via Zoom in Mecklenburg County,
22                       North Carolina)
23
24
25

Donna Price                                          March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 18

1       A    Yes.

2       Q    And did you produce those communications in

3    this case?

4       A    I'm trying to decipher what you just said.

5    Did I something about communications?

6       Q    You mentioned that you had had e-mails with

7    Ms. Greenhalgh.  And I was asking if you produced those

8    communications in this litigation.

9       A    I did.

10      Q    In discovery.

11      A    Yes, I did.

12      Q    Did you do anything else to prepare for this

13   deposition?

14      A    No.

15      Q    Tell me a little bit about your education --

16   your education background.  Do you have high school,

17   college, graduate school?

18      A    I'm a college graduate.

19      Q    And where did you attend school?

20      A    San Diego State University.

21      Q    What did you study?

22      A    I studied painting and printmaking.

23      Q    When did you earn your degrees at San Diego

24   State?

25      A    I'm sorry.  When?

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 19

1         Q    I was asking when did you earn those degrees.

2         A    I graduated in 1982.

3         Q    Did you -- do you have any other -- any

4    certifications, anything -- licenses, anything of that

5    sort?

6         A    No, I don't.

7         Q    Do you have any education tied to elections

8    or voting?

9         A    Could I amend that?  I think it was '84.  I

10   think it was '84 because I was young.  Sorry.

11        Q    That's no problem.  And I was asking if you

12   had any education in election law or voting?

13        A    Self-educated and consulting, asking experts

14   to give me, you know, answer my questions, then reading

15   Georgia election law.

16        Q    And have you ever worked at a polling place?

17        A    I was a poll watcher for one election, yes.

18        Q    And do you recall which election that was?

19        A    No, I don't.  It's been a while.

20        Q    Okay.  I was going to ask if maybe it had

21   been a while and so -- to see if you had a general

22   idea.  Was -- when you were a poll worker, was that at

23   a time when Georgia was using the DRE machines?

24        A    I was a poll watcher.  I wasn't --

25        Q    A poll watcher.  I apologize.  Was that at a

Page 20

1    period of time when Georgia was using DRE machines?

2        A    That's correct.

3        Q    And who were you a poll watcher for?

4        A    What party?  What political party?

5        Q    Correct.

6             THE WITNESS:  Do I have to answer that?

7             MR. CROSS:  Was it public?  It is public

8    record.

9             THE WITNESS:  Democratic Party.

10   BY MR. RUSSO:

11       Q    Okay.  And did you receive any training for

12   your poll watcher duties?

13       A    I think we were sent -- we either downloaded

14   from the Internet or were sent a packet with

15   information about how to behave, you know, how to

16   conduct ourselves, and what we could and could not do.

17       Q    And did you receive any training around the

18   voting equipment?

19       A    Secretary Cox, Cathy Cox and Kathy Rogers

20   held some information workshops that I attended.  I

21   can't remember if it was one or more.  But I did go to

22   those.  And they explained how the machines worked and

23   basically how elections were run on the DREs with

24   slides and presentations.

25       Q    And did the -- did any of that training

Page 21

1    include aspects around the hardware or programming of

2    the machines?

3         A    I don't think so.

4         Q    Have you ever received training or education

5    related to computer programming or security -- computer

6    security?

7         A    Like a formal program?

8         Q    We can -- I mean, if it's a -- we can start

9    with that.  Is there a formal -- have you ever received

10   any training or education, a formal program around

11   computer security or computer programming?

12        A    I received web development training, you

13   know, writing code for web development.  I worked at

14   Emory University.  So I took classes.

15        Q    Tell me about that.  What was that training?

16   Was it a course or a program?

17        A    I took courses in various softwares that are

18   used for developing -- writing code for websites.

19        Q    And when was that?

20        A    I worked at Emory for 27 years.  So it was

21   during that time that I worked at Emory.

22        Q    When did you stop working at Emory?

23        A    May the -- May last year, 2021.

24        Q    So when do you recall when the last course

25   you took was?

Donna Price                                   March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 22

1        A    Maybe -- well, I couldn't speculate.  It was
2    in my early years.  So probably within the first ten
3    years of my employment at Emory.
4        Q    And you started in about 1995 or '4?
5        A    I think it was 1994.
6        Q    You founded Georgians for Verified Voting; is
7    that correct?
8        A    That's correct.
9        Q    And why did you -- excuse me.  Why did you
10   found -- why did you start Georgians for Verified
11   Voting?
12       A    I was concerned about the voting system, the
13   security reliability and verifiability of the voting
14   system in Georgia, the DRE voting system.
15       Q    And what do you mean by the "security,
16   reliability, and verifiability of the DRE system"?
17       A    Well, the transparency because the -- what I
18   had learned by 2003 was that the election system was
19   all electronic.  And so there was no
20   software-independent way to determine the election
21   results other than the software code.
22       Q    And so how did you learn about the system
23   that raised these concerns?
24       A    I found experts to talk to and started
25   funding studies.

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 23

1     Q    And what were the security concerns

2     specifically that you'd learned about?

3     A    What I understood was that -- and this was

4     from a National Institutes of Standards and Technology

5     white paper is that voting systems needed a software

6     independent mechanism for -- that would -- that could

7     be used to compare against the election results from

8     the software code.

9     Q    Can you explain that further, the software

10    independent mechanism?  What is that?

11    A    For example, if the software code is all on

12    computer, it's electronic, then a software independent

13    is a paper record.

14    Q    So then -- all on a computer and has a paper

15    record.  It's -- it -- but it would not be a software

16    independent mechanism.

17         Is that what I understand you saying?

18         (Reporter clarification.)

19    Q    So if the -- you said it's -- the software

20    independent system is one that is -- is not all

21    electronic and has a paper component.  And so I was

22    simply asking if it -- the system has any paper

23    component and then it's, according to you, a software

24    independent mechanism; is that correct?

25         I'm just trying to understand what -- exactly

Page 35

1            Do you want to ask her that question?

2            MR. RUSSO:  Yeah.

3            MR. CROSS:  He's asking you what the purpose

4      of the organization is.

5      BY MR. RUSSO:

6        Q    I'll ask it again.

7            What -- what is the purpose of Elections

8      Verification Network?  And I'm sorry.  I might be --

9        A    Since I'm -- I'm not --

10       Q    Can you hear me?

11       A    Yes.  Yes, I can.

12       Q    Okay.

13       A    Since I'm not a participant, I'm not on the

14     board or I'm not aware of -- I think someone who's on

15     the board would have to talk about what their purpose

16     is.  But my purpose as being a part of that, a

17     participant in that, is just educational purpose and

18     learning from experts, having contact, you know.

19            So this would be like a professional

20     organization where you have contact with other people

21     who are working on the same -- for the same goals as

22     far as, you know, the secure, constitutional,

23     democratic election system -- voting systems.

24       Q    I want to turn to the claims in this case.

25     Based on your personal knowledge and understanding,

Donna Price                              March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 36

1    what are the claims that you are currently making

2    against the defendants in this lawsuit?

3           MR. CROSS:  Sorry.  I didn't -- can you

4    repeat that, Vincent?  I'm sorry.

5    BY MR. RUSSO:

6        Q    Sure.  Based on your personal knowledge and

7    understanding, what are the claims that you're

8    currently making against the defendants in this case?

9        A    I think my attorneys have delineated those

10   claims, the legal claims.

11       Q    Okay.  And -- and I'm asking just what --

12   what do you -- what do you understand the claims to be?

13          MR. CROSS:  Objection.  Calls for a legal

14   conclusion.

15   BY MR. RUSSO:

16       Q    In your -- in your personal opinion, what do

17   you -- based on your personal knowledge, what are the

18   claims in this case?

19          MR. CROSS:  Same objection.

20          You can answer.

21          THE WITNESS:  I'm seeking the -- my right to

22   have -- my constitutional right to have -- to be able

23   to vote on the voting system that's transparent, voter

24   verifiable, secure, and accurate.

25

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 37

1    BY MR. RUSSO:

2         Q    And do you have any other -- or do you plan

3    on making -- excuse me.  Let me rephrase that.

4              Do you plan on making any other claims in

5    this case?

6              MR. CROSS:  Objection.  Form.  Instruct you

7    not to answer that.  That would necessarily call for

8    verbal communications with your counsel.

9    BY MR. RUSSO:

10        Q    And -- and I'm not asking whether you -- if

11   you've spoken with your -- what you've spoken with your

12   counsel about.  I'm asking do you have any other claims

13   that you plan on making, or do you have any claims that

14   you haven't made?

15        A    I can't speculate on that.

16             THE WITNESS:  Okay.  I wonder if we could

17   take a break soon?

18             MR. RUSSO:  That's fine.

19             THE VIDEOGRAPHER:  We are off the record at

20   11:16.

21         (Off the record 11:16 a.m. to 11:34 a.m.)

22             THE VIDEOGRAPHER:  Back on the record at

23   11:34.

24             (Exhibit 3 Marked for Identification.)

25

Page 40

1    indicates that you voted in person on -- on a machine,

2    voting machine, at least up to the time that they --

3    through 2000 and -- what -- 4.  And you have voted on a

4    voting machine previously; is that correct?

5         A    I voted on the DREs, yes.

6         Q    Yeah.  And you've never voted on a BMD;

7    correct?

8         A    That's correct.

9         Q    It appears here that you voted on a DRE a

10   number of times.  Would you say you've voted several

11   times on a DRE; right?

12        A    DREs, yes.

13        Q    Yes.  And for the years where you -- you

14   voted in person, do -- do you have any evidence that

15   any of the votes you cast in any of the Georgia

16   elections were not counted?

17        A    That's indeterminate.

18        Q    What do you mean by it's "indeterminate"?

19        A    I don't have any evidence that they were

20   counted correctly or weren't counted correctly since

21   2002.

22        Q    Okay.  And looking at your report, it

23   indicates that you have a ballot that was -- that was

24   recorded.  Is that fair to say?

25        A    When I'm looking at this list, it looks like

Donna Price                          March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 41

1     the ballots were accepted.

2          Q    So you would agree that your ballots were

3     accepted based on this report?

4          A    According to that report.

5          Q    But you have no -- you have no evidence that

6     the ballots were not counted, that the votes were not

7     accurately counted, I should say?

8          A    I have no evidence that they were -- that my

9     votes were or were not since the DRE -- the paperless

10    DRE voting system was installed.

11         Q    Okay.  And looking at your report further

12    down where it begins with the absentee, each time you

13    voted absentee, it was by mail; correct?

14         A    In the 2020 election, I dropped off my ballot

15    at the -- at a drop box.

16         Q    Okay.  And -- and that -- that ballot was an

17    absentee ballot, a hand-marked paper ballot that you

18    received in the mail?

19         A    Yes.  And also for the -- the general

20    election runoff.  I dropped that ballot off at a

21    ballot, you know, drop box.

22         Q    Okay.  And that was also the hand-marked

23    paper ballot --

24         A    That's correct.

25         Q    -- that you had received in the mail?

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

                                                  Page 42

 1          A     That's correct.

 2          Q     And do you -- do you have any evidence that

 3     any of those absentee ballots weren't accurately

 4     counted?

 5          A     I have no evidence that they were or were not

 6     accurately counted.

 7          Q     You said you have no evidence that they were

 8     or were not?  I'm sorry.  My speaker cut out.

 9          A     Yes.  I have no evidence they were or were

10     not counted accurately.

11          Q     And do you have any evidence that any of the

12     votes you cast on the DRE machines were altered in any

13     way?

14          A     No, I do not.

15          Q     What about for the absentee ballots that you

16     voted, do you have any -- any evidence that -- that any

17     of the votes you cast on an absentee ballot were

18     altered in any way?

19          A     I'm sorry.  Could you repeat that?

20          Q     For the absentee ballots that you voted, do

21     you have any evidence that any of those ballots were

22     ever altered in any way?

23          A     No, I don't.

24          Q     And you stated earlier that you have not

25     voted on a BMD ballot, the new current system.  When I

Donna Price                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 43

1    refer to a BMD ballot, unless I say otherwise, I'm

2    referring to Georgia's current voting system.

3        A    I have not voted on a ballot marking device

4    in Georgia's current voting system.

5        Q    And do you have any plans to vote on one in

6    the future?

7        A    I do not.

8        Q    Well, you plan to vote absentee by an

9    absentee paper ballot in the future; is that right?

10            MR. CROSS:  Vincent, can you ask it again?

11   You kind of got hung up.

12   BY MR. RUSSO:

13       Q    I'm sorry.  I said so you said you plan to

14   vote absentee paper ballots in the future by mail-in

15   ballot?

16       A    As long as the voting system is the current

17   ballot marking device voting system, that's correct.  I

18   plan to vote absentee by paper ballot.

19            (Exhibit 4 Marked for Identification.)

20   BY MR. RUSSO:

21       Q    Give me one second.  I apologize here.

22   Marked as Exhibit 4 -- and let me know when you have

23   it.

24            MR. CROSS:  We have it.

25

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 44

1    BY MR. RUSSO:

2        Q    Okay.  I've marked the Curling -- what we've

3    been calling the Curling plaintiffs, such as Donna

4    Curling, yourself, and Jeffrey Schoenberg.  When I

5    refer to the Curling plaintiffs, that's what I'm --

6    that is who I'm referring to.  Is that acceptable for

7    you?

8        A    Yes.

9        Q    And so I'm showing you what's been marked as

10   Exhibit 4, the third amended complaint of the Curling

11   plaintiffs.  Have you -- have you seen this document

12   before?

13       A    So that's 2019.  To the best of my knowledge,

14   yes.

15       Q    And I want to turn to paragraph 16 of the

16   complaint.  It is on page 8.

17       A    Yes.

18       Q    And it says, "Plaintiff Donna Price as an

19   elector of the state of Georgia and a resident of

20   DeKalb County."  Do you see that?

21       A    Yes, I do.

22       Q    And are you still a resident -- you're still

23   a resident of DeKalb County; correct?

24       A    Yes.

25       Q    And if you go down to about the ninth line,

Donna Price                        March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 45

1    it states, "Without the intervention of this Court,

2    Price will be compelled to choose between relinquishing

3    her right to vote and acquiescing to cast her vote

4    under a system that violates her right to vote and to

5    have her vote accurately counted."  Do you see that?

6         A    I see that.

7         Q    And please explain how you'd be compelled to

8    choose between relinquishing your right to vote and

9    acquiescing to cast your vote under a system that

10   violates your right to vote and to have your vote

11   accurately counted unless the Court intervenes.

12            MR. CROSS:  Objection.  Call for a legal

13   conclusion.

14            You can answer, Ms. Price.

15            THE WITNESS:  I agree to what that says,

16   that, if I have to vote on the current voting system,

17   that it does relinquish my right to vote -- to cast a

18   vote under a system that violates my right to vote and

19   have my vote accurately counted.

20   BY MR. RUSSO:

21        Q    And how is that?

22            MR. CROSS:  Same objection.

23            THE WITNESS:  If I vote on the electronic --

24   the current BMD system, I'm not able to cast a

25   voter-verified paper ballot.  If I go onto the -- and

Page 46

1    also, if I vote under the absentee ballot system, there

2    are lots of barriers to being able to cast my vote.

3    And then once I do, I'm not able to, for instance, feed

4    that ballot -- see that that ballot is actually fed

5    into the lockbox, the optical scanner and lockbox at

6    the precinct, like my fellow voters can do if they're

7    using the BMD.

8            And I know that the -- that Georgia does not

9    currently have postelection risk limiting audits.  And

10   that is another component to being able to secure my

11   right to vote.

12   BY MR. RUSSO:

13       Q    And you would agree with me, though, that

14   your -- you'd still be able to cast a ballot -- does

15   that -- on a BMD if you voted in person; correct?

16       A    I don't agree that I would not be able to

17   cast a voter-verified ballot.

18       Q    But would you -- my question is you would be

19   able to cast a ballot; correct?

20       A    Well, a voter-verified ballot is an essential

21   record of my selections in the election.

22       Q    And I -- I understand that you are saying you

23   want to be able to cast a voter-verified paper ballot.

24   And based on your understanding of a voter -- what that

25   means, I'm simply asking:  There's no -- if you went to

Donna Price                              March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 47

1     go vote in the next election in person, there's no --

2     there's no other reason you'd be denied the opportunity

3     to vote?

4              MR. CROSS:  Objection.  Calls for

5     speculation.  Vague.

6              THE WITNESS:  My understanding, if I vote on

7     a ballot marking device, is that the votes are

8     encompassed in a QR code; and I cannot validate that

9     those are the ballots -- the selections that I made.

10    The QR code is what's read by the scanner.

11             So I would not be able to vote in a

12    constitutional manner just only considering that first

13    part of the process, which is marking the ballot on the

14    ballot marking device and printing it out.

15    BY MR. RUSSO:

16       Q    And I -- and I'm just trying to understand

17    how you would not be able to use the device.  I

18    understand that you have a difference in -- in thought

19    of what is a voter-verified paper ballot, but what

20    other burdens are there on your right to vote?

21       A    The primary record of my vote is a

22    voter-verified paper ballot.  Without that, there's no

23    primary record.  There's no record that I have verified

24    to say that that's the votes -- those are the

25    selections that I made for candidates and issues.

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 48

1          Q    Well, let me ask this:  Are there any other

2     burdens on your right to vote in person -- or on voting

3     in person, I should say -- and I -- excuse me.  Any

4     other burdens on voting in person that -- that you --

5     you believe you'd experience if you voted in person?

6          A    I believe I would just be going through the

7     motions of an action that simulates voting.  But

8     without a voter-verified paper ballot, I wouldn't be --

9     I wouldn't be voting.  I'd be giving that -- my vote to

10    whoever is -- and whatever is determining what's in

11    that QR code.  So that's not transparent.

12               I think that a voter verification and the

13    transparency at that beginning step of in-person voting

14    today on Georgia's BMD election system is a barrier to

15    my ability to vote.

16         Q    Do you have any evidence of the -- any QR

17    codes on the BMD ballot containing votes, summaries

18    that are different than those listed on the paper

19    ballot?

20         A    Well, I can't read a QR code.  So I couldn't

21    have any evidence.

22         Q    Do you have -- okay.

23               Do you have any evidence of anyone -- any

24    voter who has selected a candidate on the touch screen

25    of the ballot marking device and the printout has been

Donna Price                      March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 49

1      different -- has printed a different name than the

2      individual selected?

3           A    I have no personal evidence.  I have the

4      knowledge of -- that I've gotten from experts and in

5      our lawsuit -- our experts' declarations that --

6      they're the authorities on it since I'm not an expert

7      on the technology.

8           Q    So you've reviewed the declarations of the

9      experts in this case; is that correct?

10          A    I've reviewed the declarations that are not

11     privileged and confidential.  And those that -- I

12     understand that there is information from our experts

13     that is confidential that might inform me more.  But I

14     haven't -- I haven't been able to see that.

15          Q    You stated earlier about the transparency

16     with the BMD and the QR code and knowing what vote

17     selections are contained within that QR code.  And I

18     just want to make sure I understand.  That -- that is

19     the scope of your complaint with the current BMD

20     system; is that right?

21               MR. CROSS:  Objection to form.

22               THE WITNESS:  No.  That's not correct.

23     BY MR. RUSSO:

24          Q    So what is this -- what is, then, the scope?

25          A    The scope includes voter -- lack of voter

Donna Price                     March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 50

1    verification, nontransparency, concerns about the
2    security of the election system, and the fact that the
3    election system doesn't include postelection risk
4    limiting audits.
5        Q    That's -- so that's the full scope?
6        A    That's also -- that's also the possibility of
7    the -- other than malfeasance or security problems,
8    just problems with the technology, errors that can be
9    made.  So all of the components that I mentioned are
10   essential for -- to protect my constitutional right to
11   cast a vote and have a reasonable -- reasonable
12   expectation that that vote was counted as cast.
13       Q    And how is that different from every voter's
14   reasonable expectation?
15            MR. CROSS:  Objection to form.  Calls for
16   speculation.
17   BY MR. RUSSO:
18       Q    Don't you agree every voter wants to have
19   their vote counted accurately?
20            MR. CROSS:  Objection to form.  Calls for
21   speculation.
22            THE WITNESS:  I can only speak for myself.
23   BY MR. RUSSO:
24       Q    So you -- you don't think other voters want
25   to have their ballot counted accurately?

Donna Price                                   March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 52

1        A    I'd have to guess.

2        Q    Fair enough.  Looking at paragraph 7, it's at

3    the bottom of that page, first -- "The inherent flaws

4    in the DREs render it not possible for the state to

5    comply with the election law or to protect their rights

6    of voters."

7              Do you see that?

8              MR. CROSS:  Where are you?

9              MR. RUSSO:  The first sentence.

10             THE WITNESS:  Yes, sir.  I do.

11   BY MR. RUSSO:

12       Q    And what do you mean by "inherent flaws"?

13             MR. CROSS:  Objection.  Calls for expert

14   conclusions.

15             THE WITNESS:  Because this is about the DREs,

16   and the judge has already determined that those DREs

17   did have flaws enough to -- that the system could not

18   be used, and the Secretary of State decided to retire

19   the system.  I think that -- those -- that has been

20   proved.

21   BY MR. RUSSO:

22       Q    What is your understanding of what the

23   inherent flaws in the DREs that made it not possible

24   for the state to comply with election law or protect

25   the rights of Georgia voters?  What does that mean to

Donna Price                           March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 53

1    you?

2            MR. CROSS:  Objection.  Calls for a legal

3    conclusion.  Expert conclusions.  And asked and

4    answered.

5    BY MR. RUSSO:

6        Q    I'm just asking what it means to you

7    personally.  I'm not asking for a legal conclusion.

8            MR. CROSS:  My objection still stands.

9            THE WITNESS:  I've already stated that the

10   judge made a determination in the case on the DREs,

11   that DREs were retired -- that the state -- Secretary

12   of State also retired the DREs.

13   BY MR. RUSSO:

14       Q    And I'm sorry.  I'm not understanding your

15   answer.  You're not actually saying what your

16   understanding of what these inherent flaws are in the

17   system.

18       A    I think the determination --

19           MR. CROSS:  Hold on.  He hasn't asked you a

20   question yet.  Objection.

21   BY MR. RUSSO:

22       Q    It's the same -- it's the same question.  I'm

23   entitled to get an answer.

24           MR. CROSS:  She's answered it.  You can read

25   the opinion for yourself, Vincent.  She's referenced it

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 54

1     two or three times now.

2     BY MR. RUSSO:

3          Q    So -- so you're -- to be clear, Ms. Price,

4     your answer is that the inherent flaws in the DRE

5     system are the ones that the -- are whatever the judge

6     has found?

7          A    The judge's determination, which was in 2019,

8     she wrote a report on it.  And the flaws were mentioned

9     in that report.

10         Q    Did you read this complaint before it was

11    filed?

12         A    Which complaint?

13         Q    The one we're looking at.

14         A    My practice is to read all the complaints.

15         Q    Turning to -- let's flip to paragraph 8.

16              MR. RUSSO:  It's on the next page, David,

17    page 5.

18              MR. CROSS:  We have it.

19    BY MR. RUSSO:

20         Q    Okay.  It states that "This case is not

21    merely about a technical violation or a theoretical

22    risk.  It is about forcing voters to choose between

23    totally relinquishing their right to vote and

24    acquiescing to cast their vote despite very real risks;

25    the risk that their vote will not be properly counted;

Page 55

```
 1    the risk that the declared results will be contrary to

 2    the will of voters; and furthermore, the risk that

 3    there will be no way to verify the validity of the

 4    election."  Do you see that?

 5         A    I do.

 6         Q    Okay.  And what -- can you explain to me what

 7    the -- well, let me back up.

 8              The -- the three -- the risks identified in

 9    this paragraph, are those -- is that the scope of the

10    very real risks referenced in this paragraph?

11              MR. CROSS:  Objection.  Calls for expert

12    conclusion.

13              THE WITNESS:  So I could repeat my answer

14    before, that the judge made a determination on the DRE

15    voting system.  It was retired in 2019.  And the

16    Secretary of State agreed too that it needed to be

17    retired.

18    BY MR. RUSSO:

19         Q    And, Ms. Price, you understand that this

20    lawsuit is about more than just the DREs; right?

21         A    Yes.

22         Q    And this paragraph refers to what this case

23    is about.  So what I'm trying to understand is what are

24    the very real risks that you referenced in this

25    paragraph, and we'll just focus on the BMDs for now.
```

Page 56

1              MR. CROSS:  Again, calls for expert

2      conclusions.

3              THE WITNESS:  My understanding, this

4      complaint deals with the DREs, not the BMDs.

5      BY MR. RUSSO:

6          Q    And so with respect to the DREs, just to make

7      sure I understand, the risks -- the very real risks

8      that you're referencing in this paragraph are -- you

9      stated one's referenced in the judge's order?

10             MR. CROSS:  Objection.  Misstates her

11     testimony.

12     BY MR. RUSSO:

13         Q    Well, you tell me, Ms. Price, what are the

14     very real risks referenced in paragraph 8 of your

15     complaint?

16         A    I believe I've already answered that, sir.

17         Q    And so that the record's clear, what do you

18     think those very real risks are?  You referenced an

19     order.  Which order is it that you're referencing?

20             MR. CROSS:  Asked and answered.

21             Go ahead, Ms. Price.

22             THE WITNESS:  I've already answered that

23     question.

24     BY MR. RUSSO:

25         Q    You didn't state which order.  Which -- which

Donna Price                              March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 62

1    determinable or indeterminable.  So that means that I

2    can't draw a conclusion.

3         Q    Can you explain -- explain what you mean?

4    You testified that the results were indeterminable and

5    now you've changed it.  So I'm just trying to

6    understand your answer.

7         A    Because our -- our lawsuit says our

8    constitutional rights are violated by the voting

9    system, the BMD voting system -- or the present voting

10   system in Georgia.  So therefore, I have no -- I can't

11   say the voting -- the results are determinable or

12   indeterminable.

13        Q    Now, in your lawsuit, you've asserted that,

14   due to vulnerabilities, the results are indeterminable.

15   So is that not your -- that's not your position any

16   longer?

17             MR. CROSS:  Objection.  Misstates her

18   testimony.

19             THE WITNESS:  I don't believe I've said that.

20   BY MR. RUSSO:

21        Q    Okay.  And what I'm trying to understand,

22   Ms. Price -- and this is -- it's going to be a lot

23   longer day if we're not able to get some answers

24   than -- than both of us, I promise, would like.

25             You know, you've alleged that the results are

1    indeterminable due to the machines.  And now you said

2    you don't know if their determinable or not.  So

3    what -- what are you -- what are you saying?  What is

4    your position?

5                MR. CROSS:  Asked and answered.  Object to

6    the characterization as not being responsive.

7                The challenge here, Vincent, is your

8    questions are often confusing and you cover the same

9    ground many, many times.

10               MR. RUSSO:  Well, the questions aren't being

11   answered, David.  And they're -- I'm simply asking her

12   about the allegations in her complaint and what she

13   means.  So if -- if the question's confusing, maybe

14   there's a problem with the complaint.

15   BY MR. RUSSO:

16       Q    Let's turn -- let's look at paragraph 11.

17   The last sentence states, "Additionally, while

18   defendants are implementing a paper ballot system for

19   certain 2020 elections, they have chosen to force all

20   of Georgia's voters to use ballot marking devices which

21   suffer from the same security vulnerabilities as

22   defendants' flawed DRE voting system."

23               Do you see that?

24       A    Which paragraph is it?  Are we --

25               MR. CROSS:  It's the last sentence of the

Donna Price                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 64

```
 1    paragraph on paragraph 11.  It begins "additionally."

 2              THE WITNESS:  Okay.

 3    BY MR. RUSSO:

 4        Q    My question is:  What are the security

 5    vulnerabilities that you're referencing in this

 6    paragraph?

 7              MR. CROSS:  Calls for expert conclusions.

 8    Vincent, you also keep ignoring that a huge portion has

 9    been withheld from our clients at your insistence.

10              MR. RUSSO:  The complaint was, of course,

11    written prior to any of the reports.

12    BY MR. RUSSO:

13        Q    So what were you referencing when you signed

14    off on this complaint?

15              MR. CROSS:  Let me just caution you not to

16    disclose anything that's privileged.  So any

17    communications you had with counsel in preparing this

18    complaint, you should not disclose as privileged.

19    BY MR. RUSSO:

20        Q    Do you know of -- do you know which security

21    vulnerabilities are referenced in this paragraph?

22        A    I think that our experts have delineated

23    security vulnerabilities, and some of the documents

24    that they have since supplied are not available for me

25    to look at.  So I can't -- I can't say.
```

Donna Price                              March 8, 2022
Curling, Donna v. Raffensperger, Brad

                                                    Page 65

1          Q    At the time that you filed this complaint, do

2     you know of any security vulnerabilities that are being

3     referenced in this paragraph?  I'm just asking do you

4     know of any?

5          A    Well, I do know the security vulnerabilities

6     in terms of the DRE voting system, some of them that

7     were -- that had been a part of our case which include

8     the Kennesaw -- the exposure of the election system

9     data in Kennesaw.

10         Q    And is that -- that alleged security

11    vulnerability one that you are claiming the BMD

12    suffered?

13              MR. CROSS:  Objection.  Calls for an expert

14    conclusion.

15              THE WITNESS:  As I stated before, I have not

16    seen some of the declarations from our experts on the

17    BMDs.  So I don't have the information to give you an

18    answer because they're privileged communication.

19    BY MR. RUSSO:

20         Q    And you understand that this complaint was

21    filed prior to your experts having any information

22    about the BMDs that were subject to, you know,

23    confidential or attorneys' eyes only designations;

24    right?

25         A    I do understand that.

Donna Price                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 66

1        Q    Okay.  So -- but what you're saying is you

2    can't answer this because you haven't seen your

3    experts' reports?

4        A    The expert reports that are referring to the

5    BMDs as far as security vulnerability.

6        Q    Okay.  Let's move to paragraph 12.  It starts

7    for these reasons and those demonstrated below,

8    plaintiffs respectfully ask the court, one, to hold

9    defendants liable for the violations of Georgia voter

10   rights in connection with the Relevant Previous

11   Elections and to ensure that those rights are protected

12   in connection with the scheduled fall 2019 and all

13   future elections and, two, to enter an order providing

14   such relief as is necessary and appropriate to protect

15   Georgia's voters from such future and irreparable harm.

16           What is the relief that you are seeking that

17   you're asking the Court to do?  Say, it was to --

18   excuse me -- and -- and number two, what additional

19   relief, if any, are you seeking?

20           MR. CROSS:  Just object.  Calls for an expert

21   conclusion and a legal conclusion.

22           You can answer, Ms. Price.

23           THE WITNESS:  Yes.  Our attorneys for the

24   lawsuit have written out the complaint and the relief.

25   So they're the ones who provided that information.

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 67

1    BY MR. RUSSO:

2        Q    So you don't know what relief you're seeking?

3            MR. CROSS:  Objection.  Mischaracterizes her

4    testimony.

5    BY MR. RUSSO:

6        Q    Do you know what relief you're seeking?

7        A    For myself, I know that I'm seeking

8    constitutional right to vote on the election system in

9    Georgia and have a reasonable assurance that my vote

10   will be counted as cast.

11       Q    And how would you -- how would you know that

12   your vote is counted as cast under the system that you

13   would like?

14           MR. CROSS:  Objection.  Calls for expert

15   conclusion.

16           You can answer.

17           THE WITNESS:  I rely on the information that

18   I'm given by experts who have testified and provided

19   information for our lawsuit, and other experts on what

20   is a secure, accurate, verifiable, auditable voting

21   system, what's a constitutional voting system.

22   BY MR. RUSSO:

23       Q    So you're relying on your experts?

24       A    That's correct.  And the knowledge of

25   experts.  And I wonder if we could take a break.

Page 68

1              MR. RUSSO:  Can we get through the complaint?

2        We don't have much further to go if that's okay.  If

3        it's an emergency, please.  If you need to use the

4        restroom or it's an emergency, please, let's -- we can

5        take a five-minute break.  I just wanted to try to get

6        through this.  I think we're getting close to being

7        done.

8              MR. CROSS:  How long are you thinking on the

9        complaint?

10             MR. RUSSO:  I've got probably three or four

11       more paragraphs to ask about.  It just really depends

12       on how long each one takes to get an answer.

13             MR. CROSS:  Why don't we keep going?  And if

14       it goes more than five or ten minutes, then we need a

15       break.  Is that okay?

16             MR. RUSSO:  That's fine.

17       BY MR. RUSSO:

18        Q    Let's turn to paragraph 65 on page 21.  I'll

19       direct you to the second sentence that states,

20       "According to the Senate Intelligence Committee,

21       hackers likely tried to access election systems in all

22       50 states during the 2016 elections."  Do you see that?

23        A    I do.

24        Q    Do you believe that hackers trying to

25       access --

Page 69

1          (Technical difficulties.)

2     Q     Sorry about that.  Now, I was asking about

3     paragraph 65.  I don't know where I got cut off.

4          What I was asking about is the sentence that

5     says according to a Senate Intelligence Committee,

6     hackers likely tried to access election systems in all

7     50 states during the 2016 elections.

8          Do you believe that hackers trying to access

9     those election systems made them untrustworthy in any

10    manner?

11         MR. CROSS:  Objection.  Vague.  And calls for

12    an expert conclusion.

13         THE WITNESS:  The experts in that area.  I'm

14    not a computing security expert.

15    BY MR. RUSSO:

16    Q     Okay.  I mean, do you -- is it your personal

17    opinion that hackers trying to access a system makes

18    it -- an election system makes it untrustworthy?

19         MR. CROSS:  Objection.  Calls for

20    speculation.  And overbroad.  Are you talking specific

21    to Georgia?

22    BY MR. RUSSO:

23    Q     Well, I'm really talking about the --

24    referencing this paragraph, but sure, we can narrow it

25    to just Georgia.

Donna Price                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 70

1       A     I rely on the expert information dealing with

2    vulnerabilities to the voting system, and I have my

3    understanding of that the voting system has security

4    vulnerabilities.

5       Q     So you're -- you don't have a personal

6    belief?

7             MR. CROSS:  Objection to form.  Vague.  And

8    asked and answered.

9    BY MR. RUSSO:

10      Q     Ma'am, you stated that you defer to the

11   experts, what the experts would say.  And so I'm asking

12   if, you know, the -- here, according to the Senate

13   Intelligence Committee, hackers likely tried to access

14   election systems in all 50 states in 2016, you don't --

15   you don't have an opinion whether that -- whether you

16   think hackers trying to access an election system makes

17   it untrustworthy?

18            MR. CROSS:  Objection.  Asked and answered.

19   Vague.  Calls for an expert conclusion.

20            MR. RUSSO:  David, calling for an expert

21   conclusion is not an objection to form.  I mean, you

22   know, I've let it go.  You're leading --

23            MR. CROSS:  It is.

24            MR. RUSSO:  -- here.  It's not.

25            MR. CROSS:  You need to study the rules.  It

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 71

1    is.  If we were sitting in court, and you asked a lay

2    witness for an expert opinion --

3              MR. RUSSO:  In court, it would be different,

4    of course.

5              MR. CROSS:  It is an objection to form.  It

6    is literally an objection to the form of the question.

7              If you want to rephrase, you're welcome to.

8    BY MR. RUSSO:

9        Q    Ma'am -- Ms. Price, what is -- what is

10   your -- what is your opinion on whether a hacker trying

11   to access an election system makes such election system

12   untrustworthy?

13             MR. CROSS:  I'll object as overbroad and

14   calls for speculation.

15   BY MR. RUSSO:

16       Q    You can still answer it.

17       A    Okay.  From what I understand you're saying,

18   if experts say a voting system might be attacked and it

19   might -- or might be vulnerable to outside hackers,

20   then do I agree that that makes a voting system

21   vulnerable?  Is that the question?

22       Q    Sure.

23       A    I think I have to rely on security experts,

24   voting security experts, to know whether a specific

25   system, meaning the Georgia BMD voting system, is

Page 73

1    DREs, so I wouldn't be able to answer that.

2    BY MR. RUSSO:

3        Q    Okay.  That's not -- the paragraph statement

4    is what -- the proposed election system will not be

5    safer than the current system, and it goes on.  And I

6    just want -- current system's referring to DREs and

7    then I asked what would make the proposed election

8    system, which is the BMD system, substantially safer?

9              MR. CROSS:  Objection.  Vague.  Calls for an

10   expert opinion.

11             You can answer, Ms. Price.

12             THE WITNESS:  I --

13   BY MR. RUSSO:

14       Q    Sorry.  I didn't hear an answer.  Did you

15   answer?

16             MR. CROSS:  She said she's thinking.

17   BY MR. RUSSO:

18       Q    Okay.  Sorry.

19       A    I think the proposed system, which is the

20   current system, has the same flaws as the BMD voting

21   system.  I mean, as the DRE system.  Sorry.  So it has

22   the same flaws -- the BMD voting system has the same

23   flaws that the DRE voting system had.

24       Q    And so if it didn't have those same flaws,

25   would it then be substantially safer, in your opinion?

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 74

1          MR. CROSS:  Objection.  Speculation.

2          But you can answer.

3          THE WITNESS:  Do you have a specific voting

4     system?  I don't know what voting system you have in

5     mind.

6     BY MR. RUSSO:

7          Q    I'm not asking about -- you said the DRE

8     system has the same flaws as the BMD system.  And I

9     said if they didn't have the same flaws, would the BMD

10    system then be substantially safer in your opinion?

11         MR. CROSS:  Objection.  Speculation.

12         THE WITNESS:  So you're saying that the DRE

13    system has the same flaws as the BMD.  Did you mean

14    the --

15    BY MR. RUSSO:

16         Q    You said that.

17         A    I didn't.

18         Q    You said that.  And so I'm asking if they did

19    not have the same flaws, would the BMD system then be

20    substantially safer, in your opinion?

21         MR. CROSS:  Objection.  That's -- I think you

22    guys are missing each other because that's not what she

23    said.

24    BY MR. RUSSO:

25         Q    Well, try explaining them to me, what you

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

1          A     Could we see the document again?

2          Q     Sure.  That's not a problem.  It's -- it is,

3     I believe, Exhibit 3.

4                MR. CROSS:  We have it up.

5     BY MR. RUSSO:

6          Q     Okay.

7          A     And so can you ask -- can you repeat?  I'm

8     sorry.  Could you repeat the question?

9          Q     Of course.  So I was just simply asking why

10    you stopped voting in person on the machines as of --

11    it appears to be early 2018.

12         A     I'm surprised that it was 2018.  But I know

13    the -- in 2017 is when we found out about Kennesaw, the

14    election system being hacked into.  So I think that

15    probably made it more urgent for me to be hand marking

16    a paper ballot.

17         Q     Because you had started Georgians for

18    Verified Voting back in 2003; right?

19         A     Right.

20         Q     And you mentioned earlier that organization

21    was formed in part due to the DREs and to promote

22    verifiable elections in Georgia; is that right?

23         A     Correct.

24         Q     Okay.  And then in '06, you mentioned --

25    2006, you filed a complaint over the DREs; right?

Donna Price                            March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 78

1        A     What year did you say?

2        Q     2006.  You mentioned it went to the Attorney

3    General?

4        A     Yes.  With the election board, yes.

5        Q     So you didn't think the machines -- voting

6    machines were vulnerable enough at that time to need to

7    start voting absentee by mail?

8              MR. CROSS:  Objection to form.

9              THE WITNESS:  No.  I wouldn't say that.  I

10   don't know why I continued to vote on the DREs except

11   that I stopped after I heard about what happened in

12   Kennesaw.  So it's all I can say.

13   BY MR. RUSSO:

14       Q     And do you recall when you -- do you recall

15   when you heard about what happened in Kennesaw?

16       A     What's that?  March 2017, I think.

17       Q     So you still voted in person it appears at

18   least one more time after March 2017.  That appears to

19   be the general primary election in 2018?

20       A     That's what's recorded there, yes.

21       Q     Do you dispute the accuracy of that record?

22       A     I don't dispute the accuracy of the record

23   except that it doesn't show that I registered to vote

24   in 1992 in Georgia.

25       Q     All right.  But with regards to voting in

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 79

1     person in 2018 after you had learned of Logan Lam

2     Kennesaw State issue in reference to 2017, that record

3     you don't dispute that you voted in person in 2018 in

4     the general primary?

5          A     I don't dispute it.

6          Q     Okay.  How were you injured by the BMD

7     system?

8                MR. CROSS:  Objection.  Calls for a legal

9     conclusion.

10               You can answer, Ms. Price.

11               THE WITNESS:  Firstly, I'm injured by the

12     fact that I can't cast a vote by a verified paper

13     ballot, that the system has been shown by experts to be

14     insecure, that there are no postelection risk limiting

15     audit.  So the system, just in those three points, does

16     not fill the criteria of the experts or a

17     constitutional voter verified, secure, accurate,

18     transparent, and auditable election system.

19     BY MR. RUSSO:

20          Q     But if the experts found otherwise that there

21     was a better verified paper ballot and the

22     vulnerabilities that you're referring to didn't affect

23     your voting, would that change your injury?

24               MR. CROSS:  Objection.  Calls for

25     speculation.  Misstates the facts.

Page 80

1              THE WITNESS:  So that is not the voting

2      system that is offered in Georgia.  You're not

3      describing the BMD voting system in Georgia.

4      BY MR. RUSSO:

5          Q    I'm sorry.  You had said your -- that the

6      injury by the BMD system, it was -- well, let me just

7      ask you.  Is your injury contingent upon what the

8      experts find?

9              MR. CROSS:  Objection.  Calls for a legal

10     conclusion.

11         A    My injury is contingent in the fact that the

12     system that's being used in Georgia now, the BMD voting

13     system, does not protect my constitutional right to

14     vote on a system that is verifiable -- voter

15     verifiable, transparent, accurate, secure and

16     auditable.

17         Q    And how are you personally affected by the

18     BMD system?  Because you still vote; correct?

19         A    Yes.  But I vote by absentee ballot now.

20         Q    In fact, you refuse to vote in person; right?

21         A    On the current system, yes.

22         Q    Now, are you aware of any of the

23     vulnerabilities you mentioned that have in any way

24     altered any votes in any elections?

25              MR. CROSS:  Sorry.  Vincent, can you ask that

Page 81

```
 1     again?  I didn't get that.

 2     BY MR. RUSSO:

 3          Q    I'm simply asking are you aware of any of the

 4     vulnerabilities you mentioned a minute ago being

 5     exploited such that they've changed anyone's votes?

 6          A    I have no information whether votes have been

 7     changed or not changed.  No direct information.

 8          Q    So your fear that your vote will not be

 9     counted accurately, it's not based on any evidence of

10     someone's vote not being counted accurately before?

11               MR. CROSS:  Objection.  Vague.

12               You can answer if you understand.

13               THE WITNESS:  First, I'm not afraid.  So I

14     wouldn't characterize myself as being afraid.  I just

15     rely on information from experts about what is a

16     constitutional voting system, one that protects my

17     constitutional rights.

18     BY MR. RUSSO:

19          Q    And so -- so if an expert has not found that

20     a voting system is unconstitutional, then it's

21     acceptable to you?

22               MR. CROSS:  Objection to form.  Speculation

23     and misstates the facts.  I don't know what expert

24     you're talking about.

25               MR. RUSSO:  She said if the expert -- she
```

Page 82

1    relies on the experts to tell her if it's

2    unconstitutional.  And I said if so, if an expert

3    hasn't found a system to be unconstitutional, then is

4    it acceptable for her.

5                MR. CROSS:  There's no such expert.

6                Go ahead.

7                MR. RUSSO:  Right.  No.  I understand.

8                THE WITNESS:  Yeah.  I would have to

9    speculate on a voting system that you're describing

10   because my participation as a plaintiff in this lawsuit

11   is about the Georgia election system that exists at

12   present, and it was about the DRE voting system that

13   did exist prior to this.  So it relates to these

14   systems, not a hypothetical system.

15   BY MR. RUSSO:

16        Q    And I don't necessarily know that that's what

17   Mr. Cross was objecting to, but if the Court were to

18   order the state to continue using BMDs -- and I realize

19   this is a hypothetical.  But if the Court were to order

20   the state to continue using BMDs as they are but

21   ordered risk-limiting audits as plaintiffs' experts

22   have suggested, would that alleviate your concerns

23   about elections?

24                MR. CROSS:  Objection.  Calls for

25   speculation.

Page 83

1          THE WITNESS:  I think that that would be

2     progress, but I still wouldn't be able to cast a voter

3     verified paper ballot.

4     BY MR. RUSSO:

5          Q    So risk --

6          A    And that's not causing a security risk.

7          Q    Okay.  So -- and maybe you can expand on that

8     a little bit.  So is it -- what is your belief as to

9     what risk-limiting audits -- what is the purpose of

10    risk-limiting audits to you?

11         A    It adds an additional component to the voting

12    system to help confirm the accuracy of the results.

13         Q    But -- and so if the Court ordered the state

14    to use risk-limiting audits in the manner suggested by

15    your experts or plaintiffs' experts, that still would

16    be insufficient for you?

17         A    I would still not be able to cast a voter

18    verified paper ballot, so therefore, the primary

19    document in the election would be missing.

20              (Exhibit 6 Marked for Identification.)

21    BY MR. RUSSO:

22         Q    Okay.  I'm going to introduce what is being

23    marked as Exhibit 5.  It should be up soon.  Let me

24    know when you have it.

25              MR. CROSS:  It looks to be the third amended

Donna Price                               March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 84

1    complaint.  Is it different than what we looked at

2    before?

3                MR. RUSSO:  Yeah, it is.  I don't know why it

4    did that.  Interesting.  Okay.  Because it's pulled

5    up -- all right.  Let's try this again.  We're not

6    introducing that twice.

7                Okay.  Let me know when you have it.  And I

8    guess we're on 6 now, which is fine.  I think whenever

9    it introduced the third amended complaint the second

10   time, it just put another exhibit number on it.  Not

11   that it really matters.  I'm not going back to that

12   exhibit, and we can probably presume that the court

13   reporter can -- I mean, we don't even need to do

14   anything, I don't think.  Okay.  So it's up now, David?

15               MR. CROSS:  Yep.

16   BY MR. RUSSO:

17        Q    Ms. Price, okay.  I'm showing you what's been

18   marked as Exhibit 6 to your first declaration dated

19   August 17, 2018.  Do you recognize that document?

20        A    Yes.

21        Q    And if you flip to the last page, is that

22   your signature on it?

23        A    Yes, sir, it is.

24        Q    And did you write this declaration?

25        A    Is that attorney-client?

Page 85

```
 1              MR. CROSS:  As to when you wrote it?  No.

 2                   (Technical difficulty.)

 3              THE WITNESS:  Yes, I wrote it with the advice

 4     of my attorneys.

 5     BY MR. RUSSO:

 6         Q    Okay.  And so other than your attorneys, no

 7     one else assisted you in drafting it?

 8         A    Oh, no.

 9         Q    But your attorneys did.  I'm not asking about

10     what they assisted with, but your attorneys assisted in

11     drafting?

12              MR. CROSS:  Are you asking whether her

13     lawyers --

14              MR. RUSSO:  Well, I wasn't entirely clear if

15     she said that you actually assisted or not, but if

16     that's her testimony, then it's fine.

17              THE WITNESS:  Yes.

18     BY MR. RUSSO:

19         Q    Okay.  Now, we've already discussed some of

20     your work with Georgians for Verified Voting and other

21     organizations in paragraphs 4, 5, and 6.  And you might

22     just take a look at them and confirm that those are

23     still accurate.

24         A    Okay.  Okay.  Would you repeat the question

25     now?
```

Page 86

1        Q    I was just confirming that those are

2    accurate.

3        A    Yes.

4        Q    Now, turning to paragraph 10.  It states "I

5    have learned of the extreme vulnerability of Georgia's

6    system to undetectable errors and malicious tampering

7    and the failure of the system to provide a

8    voter-verified mechanism independent of software for

9    auditing the electronic results."  Do you see that?

10       A    Yes.

11       Q    And what -- how did you learn of the extreme

12   vulnerability referenced in this paragraph?

13       A    I learned from experts.

14       Q    And -- well, go ahead.  I'm sorry.

15       A    No.  I was just going to say experts in the

16   field.  So election integrity experts and technology

17   experts.

18       Q    And do you recall any particular experts who

19   you learned from?

20       A    Alex Halderman.

21       Q    And what are the undetectable errors in

22   Georgia's voting system that you're referring to?

23       A    Well, in this paragraph, I'm talking about

24   the vulnerability of the system to errors.

25       Q    Okay.  And can you explain that for me, what

Page 87

 1    you mean?

 2         A    I would have to refer to papers from the

 3    courts and other information that I read or obtained

 4    through the experts that I mentioned because I'm not a

 5    technology, you know, a security technology expert.

 6         Q    And what do you -- what are the extreme

 7    vulnerabilities to malicious tampering that you're

 8    referencing?

 9         A    I think I've already answered that.

10         Q    I don't believe we've talked about any

11    malicious tampering.

12         A    It's vulnerability to tampering.

13         Q    Right.  So do you know of any vulnerability

14    to malicious tampering?

15         A    Well, the Kennesaw elections system was

16    extreme vulnerability.

17         Q    So to malicious tampering?

18         A    It was a vulnerability.

19         Q    And was it a vulnerability to malicious

20    tampering?

21         A    From what I understand.

22         Q    And tell me.  What do you understand?

23         A    Well, from what I can remember from the

24    report, passwords for getting into the system were

25    found.  It's all in Logan Lam's report.  So I'd have to

Donna Price                              March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 88

1    refer to that report or just defer to Logan Lam's

2    information about that report.  That's just been

3    introduced into our lawsuit as expert information.

4         Q    And you mentioned a server.  Do you know

5    anything more about -- you know anything about the

6    server that you mentioned?

7         A    Like, I did read the e-mails and I read the

8    reports from Kennesaw about the fact that that election

9    system at Kennesaw was left open to the Internet.

10        Q    Do you have personal knowledge of any of

11   these issues, or are they reliant upon your experts?

12        A    I didn't work at Kennesaw.  I wasn't part of

13   the investigation.

14        Q    I'm sorry.  Go ahead.

15        A    I wasn't involved in -- personally in any way

16   in the investigation or the FBI when they investigated

17   someone.  I had no personal involvement in that

18   activity.

19        Q    Now, earlier you testified that the

20   vulnerabilities -- and we've been referring to your

21   complaint -- the vulnerabilities in the DRE are the

22   same -- the security vulnerabilities are the same as

23   those in BMDs.  Do you recall that?

24             MR. CROSS:  Objection.  Misstates her

25   testimony.  That's not what she said.

Donna Price                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 89

1        You keep reversing it.  You keep turning it

2   around.

3   BY MR. RUSSO:

4        Q    You just stated that the DREs, the

5   vulnerabilities to the DREs were due to compromise.

6   And my question is what are the vulnerabilities that

7   you believe exist in the BMD system?

8             MR. CROSS:  Objection.  Asked and answered

9   numerous times today.  And calls for a legal -- expert

10  conclusion.

11            THE WITNESS:  So as I've said before, there

12  are experts who have given their opinion in this

13  action, this lawsuit as to the vulnerabilities,

14  security vulnerabilities of the system and most of the

15  recent ones with the BMDs have gone -- have been

16  confidential.  So I haven't read those reports.  And I

17  would just be -- even if I had read them, it's the

18  experts who came to those conclusions.

19  BY MR. RUSSO:

20       Q    Okay.  Turning to paragraph 11 on the last

21  page of your declaration, it states "I became even more

22  concerned about the security of Georgia elections in

23  the light of the public disclosure that an election

24  server administered by the state's contractor, Center

25  for Election Systems at Kennesaw State University, left

Donna Price                              March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 90

1    critical election data open on the Internet without a

2    firewall in at least 2016 and 2017 susceptible to

3    anyone with Internet access."

4            Now, how do you know that this server was

5    accessible to anyone with Internet access?

6        A    Because that's what the experts say.  And the

7    report was from Kennesaw.  And the news reports.

8        Q    You refer to, again, election server.  What

9    do you mean here in this paragraph by "election

10   server"?

11           MR. CROSS:  Asked and answered.

12           MR. RUSSO:  I don't think I asked her about

13   this paragraph.

14           MR. CROSS:  You asked about the server.

15           Go ahead.  He justs wants you to repeat

16   yourself throughout the day today.

17   BY MR. RUSSO:

18       Q    I'm just trying to understand if this is

19   what -- do you know anything about this election

20   server?

21       A    Just what I read.  I did have access to

22   e-mails, to news, to reporting from the Secretary of

23   State's office.  So I -- you know, and Logan Lam's

24   declaration in our lawsuit.

25       Q    And then you also mention here critical

Donna Price                                          March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 91

1    election data.  What are you referring to by critical

2    election data?

3                MR. CROSS:  Asked and answered.

4                THE WITNESS:  I already answered that

5    question.  But I know that there were -- from what I

6    understand from Logan's report, there were -- and I

7    didn't -- there was a lot of information that I did not

8    have.  But I believe that passwords, election system

9    passwords, were part of the information that was

10   revealed.  And that's critical election data.  Also P2

11   information.  So that would be voter information.

12   BY MR. RUSSO:

13       Q    And is your determination that the

14   passwords -- you mentioned it's critical election.  Is

15   that based on something that you learned from an expert

16   also?

17       A    Yes.

18       Q    In paragraph 13, you state that you do not

19   believe your vote will count equally and fully.  I'll

20   just read it.  It states "If Georgia conducts the 2018

21   midterm election on the current DRE system, I'll be

22   forced to vote on a system that I do not believe -- I

23   do not believe will count my vote equally and fully or

24   to jump through additional bureaucratic hoops to vote

25   absentee including requesting an absentee ballot by

Donna Price                          March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 92

1    mail."

2              You, in fact, did actually vote on a DRE in

3    2018; correct?

4         A    On the record that you showed me, yes, that

5    would be correct.

6         Q    Okay.  And did you believe your vote didn't

7    count equally and fully at that time?

8         A    I think I've said it.  That's what I've said.

9    I felt forced to vote on a system that I did not

10   believe in.  I did not believe it would count my vote

11   equally and fully or I wouldn't have had to vote on an

12   absentee ballot.

13        Q    Right.  But you didn't vote on an absentee

14   ballot in the 2018 elections.

15        A    That's correct.

16        Q    You voted in person.  And so did you not

17   believe your vote was counted equally and fully?

18        A    I believe it's my right to vote in an

19   election no matter what way I vote particularly in

20   Georgia where either way there are problems with

21   voting.  And it's my constitutional right to vote.

22             MR. CROSS:  And I'll object that your

23   question misstates the facts.

24             MR. RUSSO:  And what do you mean, David?

25             MR. CROSS:  Well, you said she voted on a DRE

Donna Price                            March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 93

1    in the 2018 election.  That's not accurate.

2             MR. RUSSO:  I said in 2018 she voted on the

3    DRE.  And she voted, as she indicated earlier, in the

4    general primary in 2018 on May 22, 2018.

5             MR. CROSS:  You had a follow-up question that

6    said 2018 elections.  And that wasn't accurate.

7    BY MR. RUSSO:

8        Q    I apologize.  And I can ask you the question

9    again and make sure it's clear, Ms. Price.  In the 2018

10   general primary election that was held on May 22, 2018,

11   when you voted on a DRE, did you believe that your vote

12   was not counted fully and equally?

13       A    I believe that.

14       Q    I didn't hear you.  You said --

15       A    Yes.  I believe that.

16       Q    Okay.  And what do you mean by "count my vote

17   fully and equally?"  What do you mean by "equally and

18   fully?"  I'm sorry.  I kind of flipped those words

19   around a few times here.  But in this paragraph, your

20   reference to "equally and fully" what do you mean by

21   that?

22       A    I mean that I should be able to participate

23   with all the other voters in voting at my primary,

24   being able to vote and have my vote counted just like

25   all the other voters without the threat of being -- of

Donna Price                          March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 94

1    having to vote on a ballot that's not voter verified,

2    not auditable and so on.  All the other things that

3    I've mentioned before about flaws in the system.

4              (Exhibit 7 Marked for Identification.)

5              MR. RUSSO:  Okay.  I'm marking -- showing you

6    what's been marked as Exhibit 7.

7              MR. CROSS:  She's asking for a short break.

8              THE WITNESS:  I just need to get some water.

9              THE VIDEOGRAPHER:  Off the record 2:04.

10             (Off the record 2:04 p.m. to 2:13 p.m.)

11             THE VIDEOGRAPHER:  Back on the record at

12   2:13.

13   BY MR. RUSSO:

14        Q    Okay.  Now I believe right when we were --

15   right before we broke, I'd introduced Exhibit 7.  Okay.

16   Do you have that exhibit?  Ms. Price?  I'm sorry.  Do

17   you have that exhibit in front of you?

18        A    Yes, I do.

19        Q    Okay.  The declaration which is signed on

20   May 28, 2019, as Exhibit 7.  And do you recognize this

21   document?

22        A    Yes, I do.

23        Q    And hopefully, we can be somewhat quick with

24   this one because it's similar to your prior

25   declaration.  Now, looking at paragraph 7, it mentions

Donna Price                              March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 95

1    you have "assisted in drafting and lobbying for

2    legislation aimed at ensuring voter verification exists

3    at the state and federal levels working collaboratively

4    with legislatures from the Republican and Democratic

5    and representatives from the Green, Independent, and

6    Constitutional parties."  Do you see that?

7         A    Yes, I do, sir.

8         Q    Did -- now this when you -- this

9    declaration -- excuse me -- is dated it appears to be

10   after House Bill 316 was passed in Georgia.  Were you

11   involved in legislation -- that legislation for House

12   Bill 316?

13        A    What year was that bill?

14        Q    That was in 2019.

15        A    2019?  So I was.

16        Q    And so you followed that legislation?

17        A    (Nods head up and down.)

18        Q    Now, just quickly turning to paragraph 13, it

19   appears that also you state "If Georgia conducts future

20   elections on the current DRE system, I will be forced

21   to vote on a system that I do not believe will count my

22   vote equally or to jump through hoops -- additional

23   bureaucratic hoops to vote absentee including

24   requesting an absentee ballot by mail."  This was after

25   House Bill 316 had passed.  Did you have concerns about

Donna Price                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 96

1    BMDs at this time?

2         A    Let's look at the date on this.

3         Q    Yeah.  If you just look down, it's May 28,

4    2019.  It's right above your signature line.

5         A    I don't think there was an announcement at

6    that time of what system had been purchased for

7    Georgia.

8         Q    And I was simply referring to House Bill 316

9    which required the use of ballot marking devices

10   beginning in 2020.

11            MR. CROSS:  I'm sorry.  What was the --

12   BY MR. RUSSO:

13        Q    I'm simply asking at that time did you have

14   concerns about -- I can't imagine it's a difficult

15   question.

16        A    So it's paragraph 13?

17        Q    Yes, ma'am.

18        A    Okay.  So if Georgia conducts future

19   elections on the current DRE system.  So it's not --

20   that's not a paragraph related to BMD.

21        Q    Right.  So all I asked is did you have

22   concerns about BMDs at this time in light of the

23   legislation having passed?

24        A    I did have concerns about BMD voting systems,

25   yes.

Donna Price                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 97

1        Q    And is that because the legislation had

2    passed at that time?

3        A    I don't remember the timing on the --

4        Q    But you had concerns.  I'm sorry.  I didn't

5    mean to interrupt.

6        A    I don't remember the date of the SAFE

7    Commission studies.  But I did have concerns about BMD

8    voting systems in general.

9            (Exhibit 8 Marked for Identification.)

10   BY MR. RUSSO:

11       Q    Okay.  I'm going to introduce what is being

12   marked as Exhibit 8.  Do you have it?

13       A    Yes, we do.

14       Q    Okay.  Now, I'll direct your attention to

15   paragraph 7.  It states "I've also learned of threats

16   to the security, transparency, and verifiability of

17   Georgia elections posed by implementation of the

18   election system proposed by Dominion Voting Systems,

19   Inc., and selected by the Georgia Secretary of State's

20   office."

21            Now, the threats to security, transparency,

22   and verifiability referenced in this paragraph, are

23   those threats that you learned through experts?

24            MR. CROSS:  Which paragraph?

25

Donna Price                          March 8, 2022
Curling, Donna v. Raffensperger, Brad

                                                    Page 98

1            MR. RUSSO:  Paragraph 7.

2            MR. CROSS:  I'm sorry, Vincent.  Do you mind

3      asking that question again?

4      BY MR. RUSSO:

5         Q    Sure.  I was just simply requesting if the

6      threats referenced in this paragraph are ones that you

7      learned simply through experts or through another

8      source or have personal knowledge of.  And I realize

9      that's a compound question.  So I can kind of break it

10     down.  But we'll just go with the experts first.  Any

11     threats that you learned that are referenced in this

12     paragraph were those ones that you learned through your

13     experts in this case?

14        A    Yes.  There's an expert on the SAFE provision

15     and Dr. Richard DeMillo, Georgia Tech, and then of

16     course the information --

17        Q    I'm sorry.

18        A    The information I read about the proposed

19     election system.

20        Q    Okay.  And you mentioned Dr. DeMillo and --

21        A    Yes, sir.

22        Q    -- Professor Lee; is that right?

23        A    Yes.

24        Q    And this paragraph is referring to the

25     Dominion system specifically.  Did -- what did you

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 99

1    learn from them about the Dominion system?

2              MR. CROSS:  Let me just caution not to share

3    anything that you learned during the course of the

4    litigation because that will be privileged.  But

5    anything you learned outside of that, communications

6    with experts unrelated to the lawsuit, you can share.

7              THE WITNESS:  I'm sorry.  Would you mind

8    repeating that question?

9    BY MR. RUSSO:

10       Q    Sure.  You mentioned that you had learned of

11   the threats from -- through Dr. DeMillo and Lee --

12   Professor Lee.  And he may be Doctor also.  And so I'm

13   simply asking in regards to the Dominion Voting

14   Systems, which is specifically referenced in this

15   paragraph, what did you learn from them about that

16   system?

17       A    I see that I learned about vulnerabilities to

18   BMD voting systems.  And the proposed Dominion system

19   is a BMD voting system.

20       Q    Okay.  So BMD -- versus the specific system?

21       A    Correct.

22       Q    And do you recall when you learned of those

23   threats?

24       A    With Dr. Lee.  It was the SAFE Commission.

25       Q    So prior to 2019?

Page 100

1          A     I believe the SAFE Commission was in the

2     summer of 2019.

3          Q     And so what you learned through the SAFE --

4     well, excuse me.  Let me back up.

5                Did you learn anything outside of something

6     you learned through their work with the SAFE Commission

7     or Dr. Lee's work with the SAFE Commission regarding

8     the BMDs and these threats?

9          A     I was reading -- I've forgotten the

10    professor's name -- Andrew Appel.  He wrote a report on

11    BMDs.  But I don't know that it addressed the Dominion

12    Voting System BMD directly.  But I remember reading

13    that online.

14         Q     Now, the next sentence down refers to -- it

15    says "The proposed election system calls for all

16    in-person voting to be conducted on in-precinct

17    scanners/tabulators that reads summary paper records

18    generated by electronic ballot devices from which votes

19    are tabulated using an unverifiable, non-human-readable

20    2D bar code."

21               What do you mean by "summary paper record"?

22         A     The ballots that are printed by the ballot

23    marking device are summary records of -- they do not

24    list the entire measures or other voting referendum

25    support.  They don't spell them out word for word.  And

Page 101

1    so those are called summary records.

2         Q    So if there are no ballot questions on a

3    ballot or referendum items on a ballot and it only has

4    the names of the candidates who are selected, does that

5    mean it's not a summary record, a summary vote record?

6              MR. CROSS:  Objection.  Vague.

7              THE WITNESS:  The ballots that are paper that

8    are generated by the ballot marking devices are summary

9    records of the election content and even some of the

10   candidate information being truncated just to fit on

11   the ballot, you know, records, paper records of the

12   ballots that's --

13   BY MR. RUSSO:

14        Q    Okay.

15        A    Such as --

16        Q    I'm just simply trying to understand what you

17   meant by a "summary paper record."  And your initial

18   answer is about ballot questions.  So maybe that was

19   tied to that.

20             Okay.  Paragraph 8, first sentence states

21   that "Accordingly, without a durable

22   software-independent, voter-verified record to audit, I

23   have no confidence that the results of a given election

24   conducted using the proposed election system will be

25   accurate and reliable."  That's the last sentence in

Page 102

1    that paragraph.

2              What do you mean by "durable, a durable

3    record"?

4         A    The entire sentence says "a durable,

5    software-independent, voter-verified record."

6         Q    Right.  And so previously, you had referred

7    to software-independent, voter-verified record.  And in

8    this declaration added "durable."  So I'm just not sure

9    what durable -- what is a "durable,

10   software-independent, verified-voter record"?

11        A    That would be a record that can be stored.

12   You know, durable means that it's durable.  It's not

13   going to print -- it's not like vague for the period of

14   time that the records are supposed to be kept by the

15   state --

16        Q    Okay.

17        A    -- and so on.

18        Q    Okay.  I wasn't sure that it was, you know,

19   some technical term that I didn't know about.

20              And do you -- are you -- do you dispute that

21   the BMD system currently in place in Georgia has a

22   durable record?  I'm taking out the voter-verified

23   piece.  Just this paper, do you contend it's not

24   durable?

25              MR. CROSS:  Objection.  Vague.

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 103

1              THE WITNESS:  I have not handled the paper

2      record that's printed by BMD -- by the Dominion Voting

3      System BMD.

4      BY MR. RUSSO:

5          Q    So you don't know based on that if it's

6      durable?

7          A    I don't know if it's durable.  That's

8      correct.

9          Q    And then you go on to say you have no

10     confidence -- "I have no confidence that the results of

11     a given election conducted using the proposed election

12     system will be accurate or reliable."

13              And just so there's no confusion, that

14     defined, the capitalized term "Proposed Election

15     System" is referring to in paragraph 70 the Dominion

16     Voting System just to avoid any confusion.

17              So what do you mean that you have no

18     confidence that the results of any given election

19     conducted on the Dominion BMD system are accurate and

20     reliable or will be accurate and reliable?

21         A    Well, for one, I can't read bar codes.  So

22     does the proposed election system which is the current

23     Dominion ballot marking device system does not allow me

24     to cast voter-verifiable -- voter-verified ballot.

25         Q    And so any election conducted on a BMD system

Donna Price                      March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 104

1      you have no confidence in the accuracy and the

2      reliability of the election results?

3          A    Well, that's what I said.  Without a durable

4      vote -- voter-verified record to audit, I can't have

5      confidence that the results are accurate and reliable.

6          Q    And what would be a type of audit that -- if

7      you could select, you know, any type of audit that

8      Georgia would have, what would be the type of audit

9      that would give you that confidence?

10         A    Well, this particular paragraph is talking

11     about having the voter-verified ballot and having the

12     bar code being a problem with that.  It doesn't address

13     what kind of audit.

14         Q    I'm asking for you, what type of audit would

15     give you confidence?  And that might mean that there is

16     none.

17         A    I think the experts have recommended

18     risk-limiting audits.  And that's part of our lawsuit

19     too.

20         Q    And paragraph 9 of this declaration says "I

21     understand that the proposed election system thus

22     suffers from systemic vulnerabilities to advanced

23     persistent threats just as Georgia's GEMS/DRE election

24     system does."

25              What is your understanding of the systemic

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 105

1    vulnerabilities to advanced persistent threats

2    mentioned in this paragraph?

3           A    I think that I've already answered that.  But

4    without being able to verify that the ballot which I

5    mark as a voter or I mark my selections and I can't

6    verify those selections, then that's a threat to the

7    results of the election being accurate.

8           Q    And what did you mean by "advanced persistent

9    threats" then?

10          A    Well, I would think that an advanced

11   persistent threat would definitely describe what little

12   I know about the reports from our expert -- report from

13   Dr. Halderman that I have not read.  But I think that

14   that would be --

15          Q    And then in paragraph 11, you state "Were the

16   Court to order that Georgia cannot implement and use

17   the proposed election system but must instead use

18   hand-marked paper ballots for all voters who can hand

19   mark which a voter can review to verify that her votes

20   are cast as intended and would be counted as cast, I

21   would perceive less risk in casting my ballot in

22   person."  Do you see that?

23          A    Yes.

24          Q    And I'm going to kind of focus on the part of

25   this that's referring to what you're asking and it's

Page 106

1      these hand-marked paper ballots for voters who can hand

2      mark, which a voter can review and verify that her

3      votes are cast as intended and will be counted as cast,

4      how do you know a vote -- a hand-marked paper ballot as

5      you've requested the Court to do will be counted as

6      cast?

7              A     I think that --

8              Q     What does that mean?

9              A     I've described that earlier as a voting --

10     it's an entire voting system.  So you have the

11     hand-marked paper ballot which is voter verified just

12     by the action of hand marking it.  And then you have

13     the risk of the voting system.  So less risk means that

14     that part of the voting system would be voter verified.

15     The rest of the voting system involves transparency,

16     security for the software and hardware.  And that

17     includes the standards and postelection risk-limiting

18     audits.

19             Q     And -- go ahead.  I'm sorry.  Were you still

20     talking?  All right.  I thought I heard something.

21             And what are you proposing -- and I

22     understand you want the hand-marked paper ballots, and

23     then you said count as cast and that's the rest of the

24     system.  What are you proposing for that here?  In this

25     paragraph, you say you perceive less risk in casting my

Donna Price                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 107

1     ballot in person.  If you have hand-marked paper

2     ballots which a voter can review to verify her votes

3     are cast, we talked about that piece.  And then "will

4     be counted as cast."  And you just stated that that was

5     the rest of the system, and then you mentioned audits.

6     So I'm just trying to get an understanding about that

7     part of what you meant here.

8              MR. CROSS:  Objection.  Vague.

9              THE WITNESS:  I think I --

10    BY MR. RUSSO:

11       Q    Are you -- go ahead.

12       A    I've already answered this.  It's that you're

13    starting off with the primary record in the election

14    which is the voters' verified selections, that they

15    have verified their own selections.  And so that means

16    that the primary record is going to be used in the

17    counting in the tabulation of the election and in the

18    postelection audits.  So that primary record is what I

19    meant in this paragraph.  Because if the primary record

20    is not voter verified, then there's more risk that it

21    will not -- there's risk that it wouldn't be counted as

22    accurate.

23       Q    Are you -- do -- your claims in this case,

24    are you also challenging the scanners that are used?

25    Maybe this will help kind of cut through it.

Page 110

1              (Exhibit 11 Marked for Identification.)

2        BY MR. RUSSO:

3            Q    Okay.  Now I'm marking Exhibit 11.  It does

4        not show the third amended complaint.  So hopefully it

5        won't on yours.  Let me know when you have it.

6            A    You're breaking up a little bit.

7            Q    Okay.  I don't know if it's --

8                 MR. CROSS:  You got a lot of -- you have a

9        lot of -- we have it up.

10       BY MR. RUSSO:

11           Q    You've got it.  Okay.  Great.  Now this is

12       your fifth declaration that's been marked as

13       Exhibit 11.  Do you recognize this declaration?

14           A    Yes, sir.

15           Q    Okay.  Now, you incorporated -- in

16       paragraph 2, you incorporate all your previous

17       declarations into this one.  Did you -- were there any

18       changes to any of your previous declarations as

19       incorporated into this one that you had?  I'm just

20       trying to simply understand to see if you just wanted

21       to get them all into one document and you were

22       incorporating by reference.  And it may be that this is

23       something that your lawyers did quite honestly.

24                MR. CROSS:  Vincent, are you asking if there

25       was anything she wanted to change in her prior

Donna Price                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 111

1    declarations?

2              MR. RUSSO:  Yeah, yeah.  So this is

3    incorporating everything from prior declarations into

4    this one.  I just want to make sure that we understand

5    what the full scope of this declaration is.

6              MR. CROSS:  Yeah.  And that was just an

7    evidentiary thing for the lawyers just to make sure

8    those declarations were still part of the record.

9    BY MR. RUSSO:

10        Q    Okay.  Now, looking at paragraph 6, I'm

11   starting in the last line on that page, on page 2.  It

12   says "This work and my involvement in this case is

13   about more than a single election, election outcome, or

14   political party."

15             What did you mean by that statement?

16        A    I mean that my involvement in this case is

17   not part of -- it's a constitutional right for all

18   eligible citizens to vote.  It's not limited to any

19   party.

20        Q    And you go on to say "I've worked with

21   legislators and members of the Republican, Democratic,

22   and Tea parties and members of the Green, Independent,

23   and Constitution parties."  In your prior declaration,

24   you mentioned you worked with the Republican and

25   Democratic parties.  When did you start working with

Donna Price                                        March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 112

1    the Tea Party?

2         A    With legislation in -- we started writing in

3    it 2017.  It was introduced in the legislative session

4    in 2018.  And one of the sponsors was the Tea Party.

5         Q    Okay.  So back in 2017, even though it's not

6    in your declaration, you were working with the Tea

7    Party?

8         A    (Nods head up and down.)

9              MR. CROSS:  What do you mean it's not in her

10   declarations?

11             MR. RUSSO:  Yeah.  It's just not mentioned in

12   her prior declarations.  She just has the Republican

13   and Democratic parties.  And I just happened to notice

14   that the Tea Party's made its way into this one.

15   BY MR. RUSSO:

16        Q    So I was wondering when you started working

17   with the Tea Party.

18        A    I think that was -- the first time was with

19   that sponsorship of legislation in the 2017, 2018

20   legislative session.

21        Q    And were you still working with the Tea Party

22   as of the date of this declaration?

23        A    Well, I said I have worked with them.  But

24   I'm not currently working on legislation.  I haven't

25   been since -- what was it?-- 2019.

Donna Price                                           March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 113

1         Q     Okay.  And going to, let's see, paragraph 7.

2    You state "It's because my vote matters I have spent

3    years suffering from disenfranchisement inherent in the

4    DRE system and the current BMD which demand I trust

5    without verifying that all those known and unknown

6    behind a wall of secrecy accurately count the votes I

7    intended when using those nontransparent technologies

8    to mark and cast my ballots."

9               What's the wall of secrecy that you're

10   referring to?

11        A     That's another way of saying nontransparency.

12        Q     And just to be clear, the transparency you're

13   referring to is the QR code?

14        A     That would be one nontransparent component.

15   So go back to suffering from the DRE system, which in

16   that, the system -- that system was completely

17   nontransparent because there was no way to accurately

18   audit the system outside the electronic results.

19               So when I cast my vote, whoever is making

20   decisions on the software and the hardware for that DRE

21   system, they were totally in control of the vote.  And

22   that was from 2002 forward.

23        Q     And your reference to those known and unknown

24   who are behind the wall of secrecy are accurately --

25   what do you mean by those -- "all those known and

Page 114

1    unknown"?

2         A    I think that in a voting system like the DRE

3    system, I mean, the ES&S DRE system, there was no way

4    to determine if the votes that I cast were actually

5    being counted accurately.  There was no independent way

6    to audit the voting system.  There was no paper record,

7    voter-verified paper record.  And so -- and the judge

8    determined that that system was not secure.  That was

9    the determination of the DRE system.

10            So if it's not secure, then they're -- it's

11   vulnerable to, you know, people who are behind the

12   scenes who are, you know, hackers, from who knows

13   where.  I mean, the system is -- it's something that I

14   can't know.

15            So when I would go and cast my ballot on the

16   DRE Voting System, it was the same as just giving my

17   vote to whoever was in charge of writing the codes.

18   For instance, we had the -- we found out that the -- in

19   the hearing that we had about the DREs, the last big

20   hearing we had, we found out that the code was being

21   written by people in their own homes.  It wasn't even

22   being in the -- having all the security protections or

23   we didn't even know if they were having any security

24   protections.  So there was no way for me to know.  If

25   someone had hacked into it or altered the code or was

Donna Price                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 115

1    changing the votes, I couldn't -- I just couldn't know.

2         Q    And you testified earlier that you never

3    voted on a BMD.  So can you explain to me what you

4    meant that you have spent years suffering from the

5    disenfranchisement inherent in the BMD system?

6         A    I think I've explained that before.  I've

7    already answered that question.

8         Q    I think the last -- we talked about inherent

9    vulnerabilities, a reference to inherent

10   vulnerabilities in your complaint and your third

11   amended complaint.  What I'm trying to understand is

12   the disenfranchisement inherent in the BMD system that

13   you state in your declaration that you've suffered.

14        A    Because, well, for one, I have had a

15   voter-verified paper ballot.  And --

16        Q    Okay.  Is that -- go ahead.

17        A    That's the primary record that's used in the

18   system.  And there are postelection risk-limiting

19   audits.  The system is vulnerable, from what I

20   understand from experts, to security threats.  And

21   although I don't -- I haven't read those declarations

22   and the study by Dr. Halderman, that's what I

23   understand out from a top level.  It's -- there are

24   security threats.  So that caused me suffering and

25   disenfranchisement.

Donna Price                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 116

1        Q    Okay.  Looking at paragraph 8, you refer to a

2    transparently voter-verified, software-independent

3    record of your votes.  Is this anything different than

4    the durable, software-independent, voter-verified

5    record that we talked about in your previous

6    declaration?

7              MR. CROSS:  Where are you now, Vincent?

8              THE WITNESS:  It is in that first sentence in

9    the last clause.

10             MR. CROSS:  Still paragraph 7?

11             MR. RUSSO:  No, no, no.  Paragraph 8.

12             THE WITNESS:  I agree with that statement,

13   the first sentence.

14   BY MR. RUSSO:

15       Q    And all I was asking is -- I was going to ask

16   you what a transparently voter-verified,

17   software-independent record of your votes, what that

18   is.  I assume that's the same thing as your prior

19   references to a software-independent record, or is this

20   something different?

21       A    It's the same.

22       Q    Okay.  I'm just trying to make sure I

23   understand if you're heading in a different direction

24   when you make those statements in your declaration or

25   not.

Donna Price                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 117

 1           Now, the next sentence says "Unfortunately,
 2   voting by absentee paper ballot imposes other burdens
 3   on me as a voter and even potential disenfranchisement
 4   entirely."
 5           Now, you have -- what do you mean that voting
 6   by absentee paper ballot poses other burdens on you?
 7           MR. CROSS:  Objection.  Asked and answered.
 8   BY MR. RUSSO:
 9      Q    I don't recall asking about the burdens from
10   absentee ballots.  I did ask about burdens on you at
11   the -- what you believe to be the burdens on you for
12   having to vote on a BMD.  So if you could just remind
13   me.  What are -- what burdens are on you by voting by
14   absentee paper ballot?
15      A    I believe in further statements on this
16   declaration, that it goes into more detail.
17      Q    Could you point me?
18      A    I can read it.  It's like "I'm forced to
19   forgo the privilege, honor, and right to vote alongside
20   my fellow voters."
21      Q    So that was the burden?
22      A    Yeah.  It goes on to other paragraphs
23   explaining that.
24      Q    Okay.  So if you want just tell me what those
25   other burdens are, it might help cut some of this down.

Donna Price                                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 118

1    I see what you're -- you're referring to the burdens

2    you say in paragraph 13.  Is that what you're referring

3    to, "minefield"?

4        A    I don't know if there were things earlier,

5    you know, between the paragraphs.  But yes, that's

6    definitely some of them.

7        Q    Okay.  So it's your position that the

8    requirement to request an absentee ballot is a burden?

9        A    Yes.

10       Q    Now, you get to actually request -- make one

11   request, and it counts for all of the elections in an

12   entire cycle; isn't that right?

13       A    Not necessarily.

14       Q    Okay.  And why is that?  What do you mean?

15       A    Well, for example, in the last primary that I

16   voted in -- and it's written about in this declaration,

17   the problems that I had.  And I never really knew it

18   counted.  I was sent an extra ballot by the Secretary

19   of State and I didn't know if I was -- because more

20   candidates had been added to the primary.  And I didn't

21   know if the ballot that I sent in in February posted

22   those elections, which it was only a couple, were

23   counted or should I vote on the new one that I was

24   sent.  And so I tore it up because I knew the threat

25   that people, you know, were being accused of voting

Donna Price                       March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 119

1      twice.  And I didn't want to -- more candidates were
2      added to the runoff.  So I didn't get a ballot --
3      another ballot from the Secretary of State.  So then
4      there was a runoff in June.  And when I realized there
5      were other candidates, then I contacted my election --
6      DeKalb elections.  And they said I should fax a request
7      for a new ballot.  And so I faxed it to the number that
8      they gave me, but I never received that ballot.  So I
9      didn't get to vote in that election.
10         Q    So -- and I guess I want to just direct you
11     to paragraph 12, and I think that's the one you're
12     referring to.  But just check for me.  Are you there?
13         A    Yes.  Is there a question?
14         Q    Yes.  So paragraph 12 -- yeah, yeah.  I was
15     going to ask you about -- in paragraph 12, it states
16     that you -- this is the ballot for the presidential
17     preference primary.  "I requested my absentee ballot on
18     January 27, 2020.  The ballot was issued on
19     February 4th and received February 21st with the
20     original election date on March 24th.  Later the
21     Secretary of State's office sent another ballot to my
22     home without my requesting it.  I thought it was in
23     error.  So I destroyed it."
24              Is that what you're referring to?
25         A    It is.  And --

Page 120

1           (Exhibit 12 Marked for Identification.)

2       BY MR. RUSSO:

3           Q     I was going to say I've marked as Exhibit 12

4       another document if you want to -- that ties to this.

5           A     Okay.

6           Q     If you didn't mind pulling it up.

7                 MR. CROSS:  We have it.

8                 THE WITNESS:  Okay.

9       BY MR. RUSSO:

10          Q     Okay.  And this is your absentee ballot

11      report from E-net.  And you're familiar -- have you

12      seen this document before?

13          A     Yes, sir.

14          Q     So you're referring to -- in this paragraph,

15      it appears that -- let's see.  If you go -- one, two,

16      three, four -- five lines down under the absentee

17      ballot section, it says there's a requested ballot on

18      1/27.  It looks like there's one before that also,

19      which I assume is the one you're referring to.  And it

20      appears that they're all that same date which I think

21      means that you only had to make one request.  But

22      that's besides the point.  The ballot you threw away,

23      do you know what your ballot -- there appears to be two

24      that weren't returned.  Do you know which ballot that

25      was?

Page 121

1          A     No.   I don't remember when the Secretary of

2     State sent out that second one.   I don't remember when

3     I received that.

4          Q     Okay.   So you don't know if the ballot you

5     tore up, which election that was for?

6          A     I thought it was the -- I'm sorry.   The

7     primary.   So yeah.   I thought it was the primary.   And

8     then I only voted in the primary because I sent it in

9     right away if I'm looking at this correctly.   So I

10    sent -- I ordered it the 27th of January, and I mailed

11    it -- it was mailed to me on February the 4th, and then

12    I returned it on February the 21st.   So that's when I

13    voted on that ballot for the primary.

14         Q     And then you don't recall if the ballot you

15    tore up was the one in this record that is -- indicates

16    it was issued/mailed on 4/21/2020 or 7/6/2020?

17         A     I think it was -- let's see.   That's -- I

18    don't recall getting one.   7/6/2020.   So well, yes, I

19    did.   Okay.   Sorry.   I'm trying to figure this out and

20    I'm doing it out loud.   I'm sorry about that.   The

21    April one that I got from the state with more -- that

22    must have had more candidates on it.   But because I was

23    confused because I already voted in that one, then I

24    tore that one up.   The 7/6.   I don't know what 7/6 was.

25         Q     So you don't know if you received it on

Page 122

1      July 6, 2020?

2           A     That's correct.  I don't remember receiving

3      that.  Because that primary was on June -- I think on

4      June the 9th.  So I don't know what the 7/6 -- it could

5      have been -- it was statewide.  So it wasn't county.  I

6      don't know what that one is.

7           Q     Now, turning to paragraph 10.

8                 MR. CROSS:  Turn to where?

9                 MR. RUSSO:  It states that -- 10.

10                MR. CROSS:  Exhibit 10?

11                MR. RUSSO:  Yeah.  No, no, paragraph 10,

12     page 4.

13                MR. CROSS:  Exhibit 11?

14                MR. RUSSO:  We're on the same one.  I just

15     kind of jumped ahead since she had spoken about that

16     incident.

17     BY MR. RUSSO:

18          Q     And the last paragraph -- excuse me.  The

19     last sentence states "Accordingly, without a durable,

20     software-independent, voter-verified record review, I

21     can't know that my personal individual vote counted as

22     intended or that the results of a given election

23     conducted using the election system will be accurate

24     and reliable and reflect the expression of my own

25     unique voice as a voter."

Donna Price                    March 8, 2022
Curling, Donna v. Raffensperger, Brad

Page 123

1        What do you mean that you can't know that the

2    results of a given election conducted using a BMD will

3    reflect the expression of your own unique voice as a

4    voter?

5            MR. CROSS:  Vincent, you broke up for a

6    second.  Would you mind asking that again?

7    BY MR. RUSSO:

8        Q    I'm sorry.  I was asking what you mean by the

9    phrase "reflect the expression of your own unique voice

10   as a voter."

11       A    That would be my voter-verified paper ballot.

12   That's -- that reflects my own unique voice as a voter.

13           MR. RUSSO:  I'm sorry.  What was that?

14           MR. CROSS:  She wants to take a break.  How

15   much longer do you think you've got?

16           THE VIDEOGRAPHER:  Let's go off the record at

17   3:11.

18           (Off the record 3:11 p.m. to 3:26 p.m.)

19           THE VIDEOGRAPHER:  We're back on the record.

20   The time is 3:26.

21   BY MR. RUSSO:

22       Q    Okay.  Ms. Price, I'm going to try to wrap

23   this up as quickly as possible here.  Now turning back

24   to your fifth declaration at the end of paragraph 12.

25   You state "I never received that ballot.  And the

Page 136

1                    CERTIFICATE OF REPORTER

2       STATE OF NORTH CAROLINA          )

3       COUNTY OF MECKLENBURG             )

4            I, MEREDITH R. SCHRAMEK, hereby certify that the

5       witness whose testimony appears in the foregoing

6       deposition was duly sworn by me; that the testimony of

7       said witness was taken by me to the best of my ability

8       and thereafter reduced to typewriting under my

9       direction; that I am neither counsel for, related to,

10      nor employed by any of the parties to the action in

11      which this deposition was taken; and, further, that I

12      am not a relative or employee of any attorney or

13      counsel employed by the parties thereto, nor

14      financially or otherwise interested in the outcome of

15      the action.

16           I further certify that I have no direct contract

17      with any party in this action, and my compensation is

18      based solely on the terms of my subcontractor

19      agreement.

20           Nothing in the arrangements made for this

21      proceeding impacts my absolute commitment to serve all

22      parties as an impartial officer of the court.

23           This, the 14th

                                    *Meredith R Schramek*

24      _____

25           MEREDITH R. SCHRAMEK, RPR, CCR 3040

Page 138

1    Curling, Donna  v. Raffensperger, Brad

2    Donna Price (#5123330)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5     Please see attachment._____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22   DocuSigned by:

23   _Donna Price_____         4/15/2022
       7D361DDE57004E9...                       _____

24   Donna Price                               Date

25

Page 139

1    Curling, Donna  v. Raffensperger, Brad

2    Donna Price (#5123330)

3                    ACKNOWLEDGEMENT OF DEPONENT

4       I, Donna Price, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10   ┌─ DocuSigned by:
     │ *Donna Price*                         **4/15/2022**
11   └─ 7D361DDE57004E9...
     _____          _____

12   Donna Price                              Date

13

14

15

16

17

18

19

20

21

22

23

24

25

## ERRATA SHEET

Case Name:        *Curling v. Raffensperger*, No. 1:17-cv-02989-AT

Corrections to Deposition Transcript of Donna Price
(March 8, 2022)

| Page No. | Line No. | Correction From | Correction To | Reason for Change |
|---|---|---|---|---|
| 14 | 5 | E-vote | Diebold | Transcription error |
| 16 | 4 | No | No, not that I recall | Clarification |
| 22 | 25 | funding | finding | Transcription error |
| 23 | 12 | then a | then | Clarification |
| 25 | 13 | tagged | tabulated | Transcription error |
| 33 | 17 | it's | it was | Clarification |
| 33 | 18 | training, how to train in lobbying | training how to lobby | Clarification |
| 35 | 13 | not a participant | a participant | Transcription error |
| 48 | 12 | a voter verification | not having voter verification | Clarification |
| 69 | 13 | the experts | I rely on the experts | Clarification |
| 70 | 2 | I have my | it is my | Clarification |
| 70 | 3 | of that | that | Clarification |
| 78 | 4 | With the | Filed with the | Clarification |
| 79 | 1 | Lam | Lamb | Transcription error |
| 87 | 25 | Lam | Lamb | Transcription error |
| 91 | 10 | P2 | PII | Transcription error |

| Page No. | Line No. | Correction From | Correction To | Reason for Change |
|---|---|---|---|---|
| 91 | 25 | to jump | have to jump | Clarification |
| 92 | 5 | would be correct | would be correct for the May 2018 primary. | Clarification |
| 92 | 15 | That's correct | That's incorrect. I voted on an absentee paper ballot for the midterm election. | Clarification |
| 95 | 15 | So I was | So I was involved in drafting and lobbying for legislation in the GA General Assembly in 2019 | Clarification |
| 95 | 17 | (nods nead up and down) | Yes, I followed House Bill 316. | Clarification |
| 98 | 14 | provision | commission | Transcription error |
| 100 | 24 | list the entire measures or other referendum support | provide full descriptive language for items on the ballot. | Clarification |
| 101 | 10 | being truncated | can be truncated | Clarification |
| 101 | 11 | the ballot, you know, records, paper records of the ballots that's | on the BMD paper printouts | Clarification |
| 102 | 12-13 | It's not going to print--it's not like vague for the period of | It's not going to -- the print is not going to fade and it will last | Transcription error and Clarification |
| 103 | 22 | does the | the | Transcription error |
| 107 | 21 | counted as | counted | Clarification |

| Page No. | Line No. | Correction From | Correction To | Reason for Change |
|---|---|---|---|---|
| | 22 | accurate | accurately | Clarification |
| 109 | 7 | Yes, I do | Yes | Clarification |
| 109 | 22 | Yeah | Yes | Transcription error |
| 112 | 4 | the Tea | in the Tea | Transcription error |
| 114 | 3 | the ES&S | the Diebold/ES&S | Clarification |
| | 9 | of | the court made about | Clarification |
| 115 | 14 | have had | wouldn't have | Clarification |
| 115 | 23 | out | from | Clarification |
| 117 | 22 | yeah | yes | Transcription error |
| 118 | 17 | it | if it | Transcription error |
| 118 | 21 | posted | was counted for | Clarification |
| 118 | 22 | those elections | the primary | Clarification |
| 118 | 22 | it was only a couple | since that ballot didn't have the same slate of candidates as later ballot or ballots | Clarification |
| 119 | 5 | election | county election department | Clarification |
| 119 | 9 | didn't get to vote in that election. | don't know if my original choice was counted or I would get the opportunity to select from the candidates in the June runoff. | Clarification |
| 121 | 23 | on that one | on the ballot returned on February 21st | Clarification |

3

| Page No. | Line No. | Correction From | Correction To | Reason for Change |
|---|---|---|---|---|
| 121 | 24 | tore that one up | must have torn up the one the Secretary of State sent on 4/12 | Clarification |
| 126 | 22 | the Georgia voting system | Georgia voting system election officials | Clarification |
| 127 | 14 | system voting | system I'm voting | Clarification |
| 132 | 5 | They were | Not in full [Holcomb & Ward] | Correction |

DocuSigned by:

*Donna Price*

7D361DDE57004E9...

Donna Price

4/15/2022

Date

4