# EXHIBIT 249

Page 1

1              UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                  ATLANTA DIVISION
3          Civil Action No. 1:17-cv-02989-AT
4

5    DONNA CURLING, et al.,
6            Plaintiffs,
7    vs.
8    BRAD RAFFENSPERGER, et al.
9            Defendants.
10

11

12            VIDEOTAPED DEPOSITION OF
13               CATHLEEN LATHAM
14

15               August 8, 2022
16                 10:15 a.m.
17

18            Warner Robins, Georgia
19

20

21      Laura M. MacKay, RPR, CCR-B-1736
22            (Appearing remotely)
23

24

25

Page 17

1          And these are public schools, private or
2   both?
3          A.   It's for the Department of Education of
4   Georgia.
5          Q.   And you do that virtually from Texas?
6          A.   I can do it virtually from anywhere.
7          Q.   And is that economics?
8          A.   Yes.
9          Q.   Have you been employed by anyone in Georgia
10  other than teaching at Coffee County department of
11  education?
12         A.   No.
13         Q.   Have you had any other jobs since
14  graduating college beyond the teaching jobs you
15  described?
16         A.   I was a nanny, I was a stay-at-home mom.
17  These are all while I was in Pennsylvania.  I just
18  did odd jobs trying to be a stay-at-home mom, and I
19  also did substitute teaching.
20         Q.   No other jobs in Georgia?
21         A.   No.  Not -- no.
22         Q.   You were at some point the Coffee County
23  Republican Party chair; is that right?
24         A.   Yes.
25         Q.   How long did you serve as the chair?

Page 18

1          MR. CHEELEY:  You know what to --

2      A.  On the advice of lawyers, I respectfully

3  decline to answer on the basis of my rights and

4  privileges under Article 1, Section 1, Paragraph 16

5  of the Georgia Constitution, the Fifth Amendment of

6  the United States Constitution and Georgia law.

7          As the United States Supreme Court has

8  stated, the privilege against testifying protects

9  everyone, including innocent people from answering

10  questions if the truth might be used to help create

11  a misleading impression that they were somehow

12  involved in improper conduct.

13          I was previously labelled as a witness of

14  another investigation and agreed to cooperate, but

15  the District Attorney's Office has now labelled me a

16  target, and so I very reluctantly follow the advice

17  of my counsel and I decline to testify or answer

18  questions in this deposition.

19  BY MR. CROSS:

20      Q.  Ms. Latham, are you worried that indicating

21  the dates that you served as the chair of the Coffee

22  County Republican Party may incriminate you?

23      A.  On the advice of counsel, I decline to

24  testify for the reasons I've previously stated.

25  Thank you.

Page 19

1      Q.  Ms. Latham, do you understand that when you
2  assert a Fifth Amendment in a civil litigation the
3  court can infer that you are -- that you did in fact
4  commit whatever offense you are concerned about?
5      A.  On the advice of counsel, I decline to
6  testify for the reasons I previously stated.
7      Q.  How did you obtain your position as Coffee
8  County Republican Party chair?
9      A.  On the advice of counsel, I decline to
10  testify for the reasons I previously stated.
11          MR. CROSS:  Just to make this go faster,
12      Mr. Cheeley, if she's going to assert a
13      response to all of the questions, if she just
14      says "Fifth Amendment invocation," that will
15      encompass her prior statement.  Is that okay?
16          MR. CHEELEY:  Very well.
17  BY MR. CROSS:
18      Q.  Ms. Latham, did you previously serve as the
19  Georgia GOP under 80,000 caucus chair?
20      A.  Fifth Amendment.
21      Q.  And when did you serve as that chair?
22      A.  Fifth Amendment.
23      Q.  What is the role of the caucus -- of that
24  caucus in the state -- in the Republican Party of
25  Georgia?

Page 20

1      A.  Fifth Amendment.

2      Q.  How did you obtain that position?

3      A.  Fifth Amendment.

4      Q.  What is the role of the caucus chair?

5      A.  Fifth Amendment.

6      Q.  In your time serving as the caucus chair,

7  did you ever hear about problems with the Dominion

8  voting system in Georgia?

9      A.  Fifth Amendment.

10      Q.  Did you at any point report or convey any

11  problems to any election officials in the state of

12  Georgia?

13      A.  Fifth Amendment.

14      Q.  Did you at any point serve on a state

15  Republican executive committee?

16      A.  Fifth Amendment.

17      Q.  What was your role on that committee?

18      A.  Fifth Amendment.

19      Q.  When did you leave that position?

20      A.  Fifth Amendment.

21      Q.  How long did you serve in that position?

22      A.  Fifth Amendment.

23      Q.  Do you know someone named Burt Jones?

24      A.  Fifth Amendment.

25      Q.  Do you have any relationship with

Page 21

1    Mr. Jones?

2        A.  Fifth Amendment.

3        Q.  Do you know someone named Bill Ligon,

4    L-I-G-O-N?

5        A.  Fifth Amendment.

6        Q.  Do you have any relationship with

7    Mr. Ligon?

8        A.  Fifth Amendment.

9        Q.  What was the purpose of the state

10   Republican executive committee?

11       A.  Fifth Amendment.

12       Q.  To your knowledge, did the committee ever

13   make any recommendations to the state on election

14   security?

15       A.  Fifth Amendment.

16       Q.  Did the committee ever take any position on

17   using hand marked paper ballots in lieu of the

18   Dominion system?

19       A.  Fifth Amendment.

20       Q.  Are you aware that the current Republican

21   platform in Georgia calls for replacing the Dominion

22   system with hand marked paper ballots?

23       A.  Fifth Amendment.

24       Q.  Have you ever been a party in a lawsuit?

25       A.  Fifth Amendment.

Page 22

1       Q.   Is Mr. Cheeley representing you today?

2       A.   Yes, sir.

3       Q.   When did you first retain Mr. Cheeley?

4       A.   I don't know, but I'll say Fifth Amendment.

5       Q.   Are you paying for Mr. Cheeley's fees or is

6    somebody else paying?

7       A.   Fifth Amendment.

8       Q.   Did you put in any effort to prepare for

9    today's deposition?

10      A.   Fifth Amendment.

11      Q.   Did you speak with anyone about your

12   deposition before arriving today?

13      A.   Fifth Amendment.

14      Q.   Did you review any documents in advance of

15   the deposition?

16      A.   Fifth Amendment.

17      Q.   You received subpoenas from plaintiffs in

18   this case to produce documents; is that right?

19      A.   Yes.

20      Q.   And did you collect and produce documents

21   in response to those subpoenas?

22      A.   Yes.

23      Q.   What efforts did you undertake to search

24   for responsive documents?

25      A.   Fifth Amendment.

Page 23

1      Q.   Is there anything at all you can tell me

2  today about what you did to search for documents in

3  response to the document subpoena we issued?

4      A.   Fifth Amendment.

5      Q.   Did you search your personal devices?

6      A.   Fifth Amendment.

7      Q.   Did you search any computers?

8      A.   Fifth Amendment.

9      Q.   Search any hard copy files?

10      A.   Fifth Amendment.

11      Q.   Did you speak with anyone other than your

12  lawyer about the subpoenas that you received from

13  us?

14      A.   Fifth Amendment.

15      Q.   What's the relationship between the Coffee

16  County Republican Party chair and the Coffee County

17  election supervisor?

18      A.   Fifth Amendment.

19      Q.   When you served as the Coffee County

20  Republican chair, did you from time to time meet

21  with the Coffee County elections supervisor?

22      A.   Fifth Amendment.

23      Q.   Do you know someone named Missy Hampton?

24      A.   Fifth Amendment.

25      Q.   Are you aware that Missy Hampton is

Page 24

1   sometimes referred to as Misty Hayes?

2        A.   Fifth Amendment.

3        Q.   Have you ever spoken with Misty Hampton?

4        A.   Fifth Amendment.

5        Q.   Are you aware that Missy Hampton previously

6   served as the Coffee County election supervisor?

7        A.   Fifth Amendment.

8        Q.   There's literally nothing you can tell me

9   about any communication you ever had with

10  Ms. Hampton that you don't believe would incriminate

11  you; is that right?

12       A.   Fifth Amendment.

13       Q.   Did you ever visit the election office in

14  Coffee County?

15       A.   Fifth Amendment.

16       Q.   Were you ever physically inside the

17  election office at Coffee County?

18       A.   Fifth Amendment.

19       Q.   Were you ever inside the election office at

20  Coffee County when Misty Hampton was the election

21  supervisor?

22       A.   Fifth Amendment.

23       Q.   Are you familiar with the election

24  management system server that each county in Georgia

25  has to manage the Dominion voting system?

Page 25

1          A.   Fifth Amendment.

2          Q.   Are you aware that in Coffee County there

3     is a room in the election's office where their EMS

4     server is located?

5          A.   Fifth Amendment.

6          Q.   Are you aware in that room there's also a

7     central scanner and a computer called the ICC?

8          A.   Fifth Amendment.

9          Q.   Were you ever at any point in the Coffee

10    County room where the EMS server and ICC are housed?

11         A.   Fifth Amendment.

12         Q.   Did you yourself ever access the EMS server

13    in Coffee County?

14         A.   Fifth Amendment.

15         Q.   Did you ever touch the server?

16         A.   Fifth Amendment.

17         Q.   Did you ever see the server?

18         A.   Fifth Amendment.

19         Q.   Did you ever access the ICC in Coffee

20    County?

21         A.   Fifth Amendment.

22         Q.   Did you ever touch it?

23         A.   Fifth Amendment.

24         Q.   Did you ever see it?

25         A.   Fifth Amendment.

Page 26

1      Q.  Did you at any point ever see anyone in the

2  Coffee County EMS server room other than Coffee

3  County election officials at the time Misty Hampton

4  and her assistant Jil Riddlehouser [sic]?

5      A.  Fifth Amendment.

6      Q.  During your time as Coffee County

7  Republican Party chair, did you ever meet with the

8  Coffee County election board?

9      A.  Fifth Amendment.

10      Q.  When you served as the Coffee County

11  Republican Party chair, was there anyone you

12  reported to?

13      A.  Fifth Amendment.

14      Q.  Did you ever meet with any state or county

15  election officials while you served in that role?

16      A.  Fifth Amendment.

17      Q.  When you served as the Coffee County

18  Republican Party chair -- strike that.

19          When you served as the chair of the under

20  80,000 caucus, did you ever meet with any Georgia

21  election officials?

22      A.  Fifth Amendment.

23      Q.  As the Coffee County Republican Party

24  chair, what involvement, if any, did you have in the

25  administration of the 2020 November elections?

1      A.   Fifth Amendment.

2      Q.   As the Coffee County Republican Party

3  chair, what involvement, if any, did you have with

4  the January 2021 Senate runoff elections?

5      A.   Hold on one second.  I'm catching up.

6  Fifth Amendment.

7      Q.   Were you aware that Ms. Hampton, Misty

8  Hampton made a video that became available online on

9  YouTube of her interacting with the Dominion system

10  in the Coffee County election office?

11      A.   Fifth Amendment.

12      Q.   Have you ever seen that video?

13      A.   Fifth Amendment.

14      Q.   Were you there when the video was made?

15      A.   Fifth Amendment.

16      Q.   Is there anything at all you can tell me

17  about that video?

18      A.   Fifth Amendment.

19      Q.   Were you aware that in the video you can

20  see on her monitor screen a Post-it note with what's

21  supposed to be a confidential password for the MS

22  server in Coffee County?

23      A.   Fifth Amendment.

24      Q.   When you were in the Coffee County

25  elections office, did you ever see that Post-it note

Page 28

1   on her screen yourself?

2        A.   Fifth Amendment.

3        Q.   Are you aware of any efforts by Coffee

4   County or the State of Georgia to address the fact

5   that that Post-it note was probably disclosed

6   online?

7        A.   Could you repeat that, please.

8        Q.   Sure.  Are you aware of any efforts by

9   Coffee County or the State of Georgia to address the

10  fact that Ms. Hampton had publicly disclosed the EMS

11  server password online?

12       A.   Fifth Amendment.

13       Q.   Did you ever discuss that video with

14  anyone?

15       A.   Fifth Amendment.

16       Q.   Do you know Anthony Rowell or Tony Rowell?

17       A.   Fifth Amendment.

18       Q.   Have you ever had any interactions with

19  Mr. Rowell?

20       A.   Fifth Amendment.

21       Q.   Have you ever discussed with Mr. Rowell the

22  disclosure of the EMS password online?

23       A.   Fifth Amendment.

24            MR. CHEELEY:  How do you spell his name?

25            MR. CROSS:  R-O-W-E-L-L.

1          MR. CHEELEY:  Thank you.

2     BY MR. CROSS:

3          Q.  Are you familiar with Paul Maggio?

4          A.  Fifth Amendment.

5          Q.  Have you ever spoken with him?

6          A.  Fifth Amendment.

7          Q.  Have you ever communicated with him at all?

8          A.  Fifth Amendment.

9          Q.  Are you aware of a team that included Paul

10    Maggio traveling to Coffee County on or around

11    January 7th of 2021 to access Coffee County's

12    election equipment?

13         A.  Fifth Amendment.

14         Q.  Are you aware of that team accessing the

15    EMS server in Coffee County at that time?

16         A.  Fifth Amendment.

17         Q.  Have you ever discussed those circumstances

18    with Anthony Rowell?

19         A.  Fifth Amendment.

20         Q.  Have you ever discussed those circumstances

21    with Eric Chaney?

22         A.  Fifth Amendment.

23         Q.  Do you know Eric Chaney?

24         A.  Fifth Amendment.

25         Q.  Have you ever had any communications with

Page 30

```
 1    Eric Chaney?
 2         A.  Fifth Amendment.
 3         Q.  Do you know any members of the Coffee
 4    County election?
 5         A.  Fifth Amendment.
 6         Q.  Have you ever communicated with any of the
 7    members of the Coffee County election board about
 8    Mr. Maggio and others accessing voting equipment in
 9    Coffee County in January of 2021?
10         A.  Fifth Amendment.
11         Q.  Do you know Wesley Vickers?
12         A.  Fifth Amendment.
13         Q.  Have you ever communicated with Wesley
14    Vickers?
15         A.  Fifth Amendment.
16         Q.  Do you know James Barnes?
17         A.  Fifth Amendment.
18         Q.  Have you ever communicated with James
19    Barnes?
20         A.  Fifth Amendment.
21         Q.  Have you ever communicated with anyone at
22    all about Mr. Maggio and others accessing voting
23    equipment in Coffee County in January of 2021?
24         A.  Fifth Amendment.
25         Q.  Are you aware that Misty Hampton left her
```

Page 31

1    position as elections supervisor in February of

2    2022?

3         A.   Fifth Amendment.

4         Q.   Do you know why she left that position?

5         A.   Fifth Amendment.

6         Q.   Have you ever discussed that with her?

7         A.   Fifth Amendment.

8         Q.   Do you know whether she was terminated?

9         A.   Fifth Amendment.

10        Q.   Were you yourself present in the Coffee

11   County elections office when Mr. Maggio and others

12   came in to access the equipment in January of 2020?

13        A.   Fifth Amendment.

14        Q.   Who all was present when that occurred?

15        A.   Fifth Amendment.

16        Q.   Was Scott Paul present?

17        A.   Fifth Amendment.

18        Q.   Was Doug Logan present?

19        A.   Fifth Amendment.

20        Q.   Who all traveled to Coffee County on or

21   around January 6 or 7, 2021 for the purpose of

22   accessing Coffee County's election equipment?

23        A.   Fifth Amendment.

24        Q.   Is there anything at all you are willing to

25   tell me about the individuals accessing Coffee

1    County's election equipment in January of 2020?

2        A.  Fifth Amendment.

3        Q.  Do you believe disclosing any information

4    at all about those circumstances may incriminate

5    you?

6        A.  Fifth Amendment.

7        Q.  Do you believe you have committed any

8    crime?

9        A.  Fifth Amendment.

10        Q.  Did Misty Hampton authorize Paul Maggio or

11    anyone else to access Coffee County's election

12    equipment on or around January 7th of 2020?

13        A.  Fifth Amendment.

14        Q.  Did Eric Chaney authorize that?

15        A.  Fifth Amendment.

16        Q.  Did anyone on the Coffee County board --

17    election board authorize that?

18        A.  Fifth Amendment.

19        Q.  Do you know if anyone on the Coffee County

20    election board was aware that that was happening?

21        A.  Fifth Amendment.

22        Q.  Are you aware that Eric Chaney did in fact

23    know that it was happening?

24        A.  Fifth Amendment.

25        Q.  Do you know what, if anything, the

Page 33

1    individuals who accessed the Coffee County election

2    equipment on or around January 7, 2021, what, if

3    anything, they took with them from that office?

4         A.  Fifth Amendment.

5         Q.  Do you know whether they copied software

6    from any of the election equipment in that office?

7         A.  Fifth Amendment.

8         Q.  Do you know what devices they physically

9    connected to Coffee County's EMS server at that

10   time?

11        A.  Fifth Amendment.

12        Q.  Do you know what equipment they physically

13   connected to the ICC in Coffee County January 7 of

14   2020?

15        A.  Fifth Amendment.

16        Q.  Do you know whether they took a forensic

17   image of any of the voting equipment in Coffee

18   County?

19        A.  Fifth Amendment.

20        Q.  Did they access any of the BMDs at that

21   time in Georgia in Coffee County?

22        A.  Fifth Amendment.

23        Q.  Did they access any of the poll packs in

24   Coffee County at that time?

25        A.  Fifth Amendment.

1      Q.  Did they access any of the flash drives

2   that are used with the voting equipment at that time

3   in Coffee County?

4      A.  Fifth Amendment.

5      Q.  Did they access any computers or other

6   electronic devices in the office at that time?

7      A.  Fifth Amendment.

8      Q.  Did they copy any data from any of the

9   voting equipment or other devices in the Coffee

10  County elections office on or around January 7 of

11  2021?

12     A.  Fifth Amendment.

13     Q.  Mrs. Latham?

14     A.  Yes, sir.

15     Q.  What are you looking at on your phone?

16     A.  My friend just sent me a text, I was just

17  answering her.  I didn't answer her.  She was

18  telling me she ate her kolache.

19     Q.  Is it about this deposition?

20     A.  No, sir.  Would you like to see?

21     Q.  Sure.

22     A.  "I just ate my sausage kolache and they

23  were good."

24     Q.  All right.  Great.

25         Just to keep things simple, let's not

Page 35

1   access any devices while we're --

2        A.   You did.   That's why I took a break.

3        Q.   Right.   But I'm not the witness?

4        A.   Okay.

5             MR. CHEELEY:   You can do it during a

6        break.

7             THE WITNESS:   Okay.   I thought he was

8        taking a break.

9             MR. CROSS:   Thank you.

10   BY MR. CROSS:

11       Q.   Yeah.   I'll let you know if we go off.

12       A.   All right.

13       Q.   Have you ever communicated with anyone in

14   the secretary of state's office about Mr. Maggio or

15   others accessing Coffee County's voting equipment on

16   or around January 7, 2020?

17       A.   Fifth Amendment.

18       Q.   Have you ever communicated with Secretary

19   Raffensperger?

20       A.   Fifth Amendment.

21       Q.   Have you ever communicated with Gabriel

22   Sterling?

23       A.   Fifth Amendment.

24       Q.   Have you ever communicated with Jordan

25   Fuchs?

Page 36

1          A.   Fifth Amendment.

2          Q.   Do you know whether anyone in the secretary

3     of state's office was aware that that occurred at

4     some point after January 7 of 2021?

5          A.   Fifth Amendment.

6          Q.   Has anyone from the secretary of state's

7     office ever contacted you about potential improper

8     access to Coffee County's voting system?

9          A.   Fifth Amendment.

10         Q.   Has anyone, any employee, representative or

11    agent of the State of Georgia at any point ever

12    contacted you about potential improper access to

13    Coffee County's voting equipment?

14         A.   Fifth Amendment.

15         Q.   Do you know Rudy Guiliani?

16         A.   Fifth Amendment.

17         Q.   Have you ever had any communications with

18    Rudy Guiliani?

19         A.   Fifth Amendment.

20         Q.   Have you ever communicated with him about

21    gaining access to Dominion voting equipment in

22    Georgia or elsewhere?

23         A.   Fifth Amendment.

24         Q.   Do you know Sidney Powell?

25         A.   Fifth Amendment.

Page 37

1      Q.  Have you ever had any communications with

2  Sidney Powell?

3      A.  Fifth Amendment.

4      Q.  Have you ever had any communications with

5  Sidney Powell about gaining access to Dominion

6  voting equipment in Georgia or elsewhere?

7      A.  Fifth Amendment.

8      Q.  Do you know Stefanie Lambert?

9      A.  Fifth Amendment.

10     Q.  Have you ever had any communications with

11 her?

12     A.  Fifth Amendment.

13     Q.  Have you ever had any communications with

14 Stefanie Lambert about gaining access to Dominion

15 voting equipment in Georgia or elsewhere?

16     A.  Fifth Amendment.  Sorry.

17         Will you spell her last name?

18     Q.  Stefanie Lambert?

19     A.  Uh-huh.

20     Q.  L-A-M-B-E-R-T.

21     A.  Thank you.

22     Q.  Do you know Lin Wood?

23     A.  Fifth Amendment.

24     Q.  Have you ever had any communications with

25 Lin Wood?

1     A.  Fifth Amendment.

2     Q.  Have you ever communicated with Lin Wood

3 about gaining access to Dominion voting equipment in

4 Georgia or elsewhere?

5     A.  Fifth Amendment.

6     Q.  Do you know Patrick Buirn, B-Y-R-N-E?

7     A.  Fifth Amendment.

8     Q.  Have you ever will any communications with

9 Patrick Byrne?

10     A.  Fifth Amendment.

11     Q.  Have you ever communicated with Mr. Byrne

12 about gaining access to Dominion voting equipment in

13 Georgia or elsewhere?

14     A.  Fifth Amendment.

15     Q.  Do you know Benjamin Cotton?

16     A.  Fifth Amendment.

17     Q.  Have you ever communicated with Mr. Cotton?

18     A.  Fifth Amendment.

19     Q.  Have you ever communicated with Mr. Cotton

20 about gaining access to Dominion voting equipment in

21 Georgia or elsewhere?

22     A.  Fifth Amendment.

23     Q.  Do you know whether Mr. Cotton has ever

24 obtained copies of proprietary Dominion voting

25 software?

1      A.   Fifth Amendment.

2      Q.   Are you aware that he's testified under

3   oath that he gained -- attained that software from

4   Coffee County, Georgia?

5      A.   Fifth Amendment.

6      Q.   Are you aware that he's testified under

7   oath that he has software, Dominion proprietary

8   voting software from Fulton County in Georgia as

9   well?

10      A.   Fifth Amendment.

11      Q.   Do you know how he obtained the software

12   from either of those counties?

13      A.   Fifth Amendment.

14      Q.   Have you ever discussed that with anyone?

15      A.   Fifth Amendment.

16      Q.   Did you assist with that?

17      A.   Fifth Amendment.

18      Q.   Did you help orchestrate that?

19      A.   Fifth Amendment.

20      Q.   Were you aware that it was happening?

21      A.   Fifth Amendment.

22      Q.   Do you know anyone who was involved in

23   obtaining that software for Mr. Cotton?

24      A.   Fifth Amendment.

25      Q.   Do you know Russell Ramsland,

Page 40

1    R-A-M-S-L-A-N-D?

2         A.   Spell that again.

3         Q.   R-A-M-S-L-A-N-D.

4         A.   Fifth Amendment.

5         Q.   Do you know whether Russell -- strike that.

6              Have you ever communicated with Russell

7    Ramsland about obtaining access to Dominion voting

8    equipment in Georgia or elsewhere?

9         A.   Fifth Amendment.

10        Q.   Do you know Steve Bannon?

11        A.   Fifth Amendment.

12        Q.   Have you ever communicated with Mr. Bannon

13   about obtaining access to voting equipment in

14   Georgia or elsewhere?

15        A.   Fifth Amendment.

16        Q.   Do you know if anyone else has ever

17   communicated with Mr. Bannon about obtaining access

18   to Dominion voting equipment in Georgia or

19   elsewhere?

20        A.   Fifth Amendment.

21        Q.   Do you know Doug Franks?

22        A.   Spell that.

23        Q.   F-R-A-N-K-S?

24        A.   Fifth Amendment.

25        Q.   Have you ever communicated with Mr. Franks

Page 41

1   about obtaining access to Dominion voting equipment

2   in Georgia or elsewhere?

3        A.   Fifth Amendment.

4        Q.   Are you familiar with a firm called

5   Sullivan Strickler?

6        A.   Fifth Amendment.

7        Q.   Are you familiar with Paul Maggio of

8   Sullivan Strickler?

9        A.   Fifth Amendment.

10        Q.   Have you ever communicated with anyone at

11   Sullivan Strickler about obtaining access to

12   Dominion voting equipment in Georgia or elsewhere?

13        A.   Fifth Amendment.

14        Q.   Do you know Greg Freemyer from Sullivan

15   Strickland?

16        A.   Fifth Amendment.

17        Q.   Have you ever communicated with him about

18   obtaining access to Dominion voting equipment in

19   Georgia or elsewhere?

20        A.   Fifth Amendment.

21        Q.   Do you know Jenna Ellis?

22        A.   Fifth Amendment.

23        Q.   Have you ever communicated with Jenna Ellis

24   about obtaining access to Dominion voting equipment

25   in Georgia or elsewhere?

1      A.   Fifth Amendment.

2      Q.   Do you know Jennifer Jackson at Sullivan

3 Strickler?

4      A.   Fifth Amendment.

5      Q.   Have you ever communicated with her about

6 obtaining access to Georgia voting equipment in

7 Georgia or elsewhere?

8      A.   Fifth Amendment.

9      Q.   What can you tell me about the access

10 Mr. Maggio or anyone else at Sullivan Strickler had

11 to Coffee County's voting equipment in January of

12 2020?

13      A.   Fifth Amendment.

14      Q.   Have you ever communicated with Scott Hall

15 about obtaining access to Dominion voting equipment

16 in Georgia or else somewhere?

17      A.   Fifth Amendment.

18      Q.   Are you aware that Scott Hall himself

19 traveled to Coffee County on or around January 7 of

20 2021 to help organize access to Coffee County's

21 confidential voting equipment?

22      A.   Fifth Amendment.

23      Q.   Did you help organize that?

24      A.   Fifth Amendment.

25      Q.   Did you communicate with him about that?

Page 43

1          A.   Fifth Amendment.

2          Q.   Were you there?

3          A.   Fifth Amendment.

4          Q.   Do you know Alex -- I think it's Cruce,

5     C-R-U-C-E?

6          A.   Spell that last name.

7          Q.   C-R-U-C-E.

8          A.   Fifth Amendment.

9          Q.   Have you ever communicated with that

10    individual about obtaining access to Dominion voting

11    equipment in Georgia or elsewhere?

12         A.   Fifth Amendment.

13         Q.   Do you know Robert Preston, Jr.?

14         A.   Fifth Amendment.

15         Q.   Have you ever communicated with that

16    individual about obtaining access to Dominion voting

17    equipment or elsewhere?

18         A.   Fifth Amendment.

19         Q.   Do you know Preston Haliburton?

20         A.   Fifth Amendment.

21         Q.   Is Mr. Haliburton an attorney who has

22    represented you, including in a senate -- a Georgia

23    Senate hearing?

24         A.   Fifth Amendment.

25         Q.   Have you ever claimed whistleblower status

Page 44

1    with respect to Georgia election issues?

2              MR. CHEELEY:  You can answer that.

3         A.   Yes.

4    BY MR. CROSS:

5         Q.   In fact, you claimed that publicly in a

6    Senate hearing in Georgia; is that right?

7         A.   Yes.

8         Q.   And in what way were you a whistleblower?

9         A.   Fifth Amendment.

10        Q.   What were you blowing the whistle on?

11        A.   Fifth Amendment.

12        Q.   Do you know Doug Logan of Cyber Ninjas?

13        A.   Fifth Amendment.

14        Q.   Have you ever communicated with Mr. Logan

15   about obtaining access to Dominion voting equipment

16   in Georgia or elsewhere?

17        A.   Fifth Amendment.

18        Q.   Do you know whether Doug Logan was present

19   on or around January 7, 2021, when a team accessed

20   Coffee County's EMS server?

21        A.   Fifth Amendment.

22        Q.   Did you ever communicate with him about

23   that?

24        A.   Fifth Amendment.

25        Q.   Do you know Bernard Kerik, K-E-R-I-K?

Page 45

```
 1        A.   What's his first name?

 2        Q.   Bernard?

 3        A.   Fifth Amendment.

 4        Q.   Have you ever communicated with Bernard

 5   Kerik about obtaining access to Dominion voting

 6   equipment in Georgia or elsewhere?

 7        A.   Fifth Amendment.

 8        Q.   Do you know Kurt Hilbert, H-I-L-B-U-R-T

 9   [sic]?

10        A.   Fifth Amendment.

11        Q.   Have you ever communicated with Kurt

12   Hilbert about obtaining access to Dominion's voting

13   equipment in Georgia or elsewhere?

14        A.   Fifth Amendment.

15        Q.   Individuals associated with the Donald

16   Trump campaign after the November 2020 election were

17   actively seeking access to Dominion voting equipment

18   in the country; is that right?

19        A.   Fifth Amendment.

20        Q.   What, if anything, can you tell me about

21   that?

22        A.   Fifth Amendment.

23        Q.   What steps did you take to help organize

24   that?

25        A.   Fifth Amendment.
```

Page 46

1      Q.   What steps did you take to help organize
2   that in Georgia?
3      A.   Fifth Amendment.
4      Q.   Do you know Dominic -- I'm going to spell
5   the last name -- L-A-R-I-C-C-I-A?
6      A.   LaRiccia?
7      Q.   Yes.   Thank you.
8      A.   Fifth Amendment.
9      Q.   Do you know Dominic LaRiccia?
10      A.   LaRiccia.   Fifth Amendment.
11      Q.   Have you ever communicated with Dominic
12   LaRiccia about obtaining access to Dominion voting
13   equipment in Georgia or elsewhere?
14      A.   Fifth Amendment.
15      Q.   To your knowledge, how many individuals
16   have made forensic copies of software from voting
17   equipment in Coffee County?
18      A.   Fifth Amendment.
19      Q.   How many individuals have made forensic
20   copies of Coffee County's prior EMS server?
21      A.   Fifth Amendment.
22      Q.   Same question regarding Coffee County BMDs?
23      A.   Fifth Amendment.
24      Q.   Same question regarding Coffee County
25   E-poll books?

Page 47

1          A.   Fifth Amendment.

2          Q.   Same question regarding any electronic

3     equipment in the Coffee County elections office?

4          A.   Fifth Amendment.

5          Q.   During the time that a team was in the

6     Coffee County election office on or around

7     January 7, 2021, accessing the election equipment

8     there, what, if anything, did they upload to that

9     equipment?

10         A.   Fifth Amendment.

11         Q.   Did they load any software onto it at all?

12         A.   Fifth Amendment.

13         Q.   Did they alter any of the software or

14    firmware on any of that equipment?

15         A.   Fifth Amendment.

16         Q.   Did they update any malware?

17         A.   Fifth Amendment.

18         Q.   Did they upload anything to any -- to the

19    EMS server that could have any impact on the

20    elections in the state of Georgia?

21         A.   Fifth Amendment.

22         Q.   Did they connect any devices to any

23    election equipment in the Coffee County election

24    office that could have an impact on elections in the

25    state of Georgia?

1        A.   Fifth Amendment.

2        Q.   Was it their intent to do that?

3        A.   Fifth Amendment.

4        Q.   What involvement did you have in helping to

5   obtain a copy of Dominion voting software from

6   Fulton County?

7        A.   Fifth Amendment.

8        Q.   What involvement did you have with

9   obtaining copies of Dominion voting software from

10  any county in Georgia?

11       A.   Fifth Amendment.

12       Q.   What counties in addition to Coffee and

13  Fulton did you help try to identify as potential

14  points of access with Dominion voting equipment for

15  those looking to obtain access?

16       A.   Fifth Amendment.

17       Q.   What was done with any of the data or other

18  information that was extracted from Coffee County

19  voting equipment on or around January 7, 2021?

20            MR. CHEELEY:  Object to the form.

21            You may answer.

22       A.   Just Fifth Amendment.

23  BY MR. CROSS:

24       Q.   Who has that data?

25            MR. CHEELEY:  Object to form.

Page 49

```
 1      A.  Fifth Amendment.
 2  BY MR. CROSS:
 3      Q.  What efforts have been made to use the
 4  information that was gleaned from accessing the
 5  Coffee County voting equipment on or around
 6  January 7, 2021?  What efforts had been made to use
 7  that to manipulate elections in the United States?
 8          MR. PICO-PRATS:  Object to the form.
 9      A.  Fifth Amendment.
10  BY MR. CROSS:
11      Q.  What efforts have been made to analyze that
12  data?
13          MR. CHEELEY:  Object to the form.
14      A.  Fifth Amendment.
15  BY MR. CROSS:
16      Q.  Ms. Latham, let me hand you what's been
17  marked as Exhibit 1.  If you will take a look at
18  that, please.
19          (Exhibit 1 marked.)
20  BY MR. CROSS:
21      Q.  Ms. Latham, Exhibit 1 is --
22      A.  (Inaudible).
23      Q.  Oh, yeah.  I was just going to describe it
24  for you.  I'll wait until you take a look at it.
25  It's a copy of the subpoena for documents that my
```

Page 50

1    group served on you.
2         A.   Wait a minute, Exhibit 1.
3         Q.   Yeah.  And just take a moment to look
4    through it if you need to.
5         A.   I don't -- do you mean Attachment 1A?
6         Q.   Yeah.  Do you see there's a subpoena on the
7    first page?
8         A.   Yeah.
9         Q.   And then behind that if you get to -- do
10   you see where it says Attachment A?
11        A.   Yes.
12        Q.   And have you seen Attachment A before?
13        A.   Yes.
14        Q.   And so do you recognize Attachment A?  And
15   if you turn to page 10 of it, you will see the
16   document request.  Do you recognize this as the
17   document request we served on you?
18        A.   It appears to be the same one.
19        Q.   What steps specifically did you take to
20   search for documents responsive to each of the
21   requests here?
22        A.   Fifth Amendment.
23        Q.   Is there anything at all you can tell me
24   about what you did to search for documents
25   responsive to the request to the exhibit?

1      A.   Fifth Amendment.

2      Q.   Are there any documents responsive to

3  Exhibit 1 that you have not produced?

4      A.   Fifth Amendment.

5      Q.   Are there any documents responsive to

6  Exhibit 1 that you have withheld on some sort of

7  privilege ground or other ground?

8      A.   Fifth Amendment.

9           (Exhibit 2 marked.)

10  BY MR. CROSS:

11      Q.   Let me hand you what's Exhibit 2,

12  Mrs. Latham.  Just tell me if you recognize

13  Exhibit 2.

14      A.   Yes, I recognize it.

15      Q.   Do you recognize Exhibit 2 as a document

16  subpoena that was served on you by the Coalition

17  plaintiffs?

18      A.   Yes.

19      Q.   If you turn to page 10 you will see where

20  the document requests themselves are listed.

21      A.   Uh-huh.

22      Q.   Is that a "yes"?

23      A.   Yes.

24      Q.   And what steps, if any, did you take to

25  search for documents responsive to this subpoena?

1     A.  Yes.

2     Q.  And I would appreciate it if you could do

3  it at a break because I don't want to have to make

4  you come back for another deposition.

5     A.  All right.  What is, it 64?

6     Q.  Magnolia64.

7     A.  Okay.

8     Q.  protonmail.com?

9     A.  I'm sorry, I only searched for Scott Hall,

10  and I apologize.

11     Q.  Okay.  And then when you search your

12  e-mails, did you search just your inbox?

13     A.  I did everything.

14     Q.  Including the trash?

15     A.  Yes.  But my trash deletes every 30 days.

16     Q.  In Gmail?

17     A.  Yes.

18     Q.  How long has that been set up?

19     A.  Forever.

20     Q.  All right.  So let's look back.  So you

21  wake up, you've got an e-mail from Scott Hall, "Team

22  left at 8."  Why did you send that on to Misty

23  Hampton?

24     A.  Because it came to me and I didn't know why

25  it didn't go to her.  So I just sent her the

                                              Page 126

1   information.  I think it -- I think the original

2   message said:  Let Misty know.

3              And I just copied that part.  And I didn't

4   know -- and in my mind I do remember going, I don't

5   know why he let me know.  I went to work.

6        Q.  Did you respond to him?

7        A.  No.

8              What was that?  Your chair fell.

9        Q.  I got short.  Sorry.

10             So you didn't write him back and say, hey,

11  what's this about or why are you e-mailing me or...?

12       A.  No.

13       Q.  No response?

14       A.  No.

15       Q.  Okay.  What was your understanding when he

16  said, "Team left at 8," what was your understanding

17  of what that's about?

18       A.  Oh, I don't know.

19       Q.  Well, you understood that there was a team

20  of individuals led by Paul Maggio that were going to

21  Coffee County from Atlanta, don't you?

22       A.  I got to -- I don't know what I think.

23       Q.  Well, when you got this, did you ask

24  Ms. Hampton what it was about?

25       A.  No, not at this moment, no.

Page 127

1        Q.   And you also wrote, "Scott is flying in."
2        A.   I guess I cleared it up.  Scott is flying
3   in.
4        Q.   Right.
5        A.   Yeah.  So he may have said in the message,
6   you know, let Misty know I'm flying in whatever, but
7   I did cut and copy that and put that in there
8   because the phone number.
9        Q.   Right.  So you copied and pasted you said
10  from an e-mail from Scott Hall the first one and
11  then in the second part you let her know that Scott
12  Hall was flying there?
13       A.   Yeah.  That's probably part of the other
14  little message.  I'm bad about transposing numbers
15  that's why I did that.
16       Q.   All right.  But presumably Scott Hall
17  doesn't refer to himself in third person, so --
18       A.   No.  What I'm saying is he -- I'm just
19  saying from what I can tell from my texting is
20  possibly that he said, I'm also flying in whatever.
21            And so I wouldn't have copied that because
22  that wouldn't have made sense.
23       Q.   Right.
24       A.   Yeah.
25            MR. CHEELEY:  Did somebody just join?

Page 128

1           THE VIDEOGRAPHER:  It's Mary Kaiser.

2           MR. CROSS:  She's with us.  She's one of

3       my colleagues.

4           THE WITNESS:  Okay.

5    BY MR. CROSS:

6       Q.  All right.  So the morning of January 7,

7    2021, you learned from Scott Hall that there was a

8    team of five people heading from Atlanta to Coffee

9    County?

10      A.  I just said, "Team left Atlanta" -- I'm

11   telling you what's there.  It was a very brief

12   message.

13      Q.  But you sent that on to Ms. Hampton because

14   you understood that team was going to meet with her?

15      A.  I'm assuming.  At this point I don't know.

16      Q.  And you understood that Scott Hall was

17   separately flying in to Coffee County, right?

18      A.  It just said, I am flying in or whatever,

19   whatever he would have said.  So I just said, Scott

20   is flying in.

21      Q.  Okay.

22      A.  I just assumed it was all one plane -- I

23   don't know -- that he was coming.

24      Q.  Well, tell me everything you know about the

25   individuals who traveled from Atlanta to Coffee

Page 129

```
 1   County on the morning of January 7, 2021, with

 2   respect to these text messages.

 3        A.  All I know is that there was a guy named

 4   Paul Maggio and Scott was flying in.

 5        Q.  To see Misty Hampton?

 6        A.  They were coming in to Coffee County, yeah.

 7   That's all I know.

 8        Q.  But to the elections office to see Misty

 9   Hampton?

10        A.  I don't know.  I just let her know.

11        Q.  Well, you let me her know because you

12   thought they were going to see her, right?

13        A.  I was sent an e-mail that said, "Let Misty

14   know."

15        Q.  And then she responds "Yay" with four

16   exclamation points.  Do you see that?

17        A.  Yep, I see that.

18        Q.  And then she asks you, "What is Scott's

19   last name?"

20        A.  I said, "Hall."

21        Q.  Right.  You responded "Hall."  And then she

22   writes:  "Is someone coming at 10 to vote review

23   panel?"  Do you see that?

24        A.  Yes.

25        Q.  What was that about?
```

Page 130

```
1        A.  Voter review panel.  There were some
2   ballots that still needed voter review panel for
3   some reason.  And I couldn't take off, and there was
4   another person named Lane, and I couldn't get a
5   commitment from him to go in, so I didn't know
6   whether anybody was going to be there or not.  But I
7   told her, I said, "I trust you all."
8             Because, you know, Ms. Ernestine is very
9   honest.  She trained me in voter review panel,
10  and -- but I trusted them to do the voter review
11  panel.  If there was any questions, they would have
12  called me.
13       Q.  The team that was heading in that morning
14  with Paul Maggio and Scott Hall, do you know they
15  were going to meet with Eric Chaney?
16       A.  I have no idea.
17       Q.  Do you know whether they did meet with Eric
18  Chaney?
19       A.  I have no idea.
20       Q.  Okay.  So then you respond:  "I could not
21  get Lane to commit.  I trust you all."  We just
22  talked about that.
23             Ms. Hampton responds:  "Okay."
24             And then you wrote back:  "How is it today?
25  Finished?"
```

Page 131

1          Do you see that?

2      A.  Uh-huh.

3      Q.  What was that about?

4      A.  Voter review panel I'm assuming.

5      Q.  All right.  Turn to page 3 in Exhibit 6.

6  Yeah, there you go.

7          So if you look at the top you'll see we

8  pick up with that other text left off --

9      A.  Uh-huh.

10     Q.  -- "How is it today?  Finished?"

11  Ms. Hampton writes --

12     A.  Thank you.  I was wondering where the rest

13  of that was.

14     Q.  Yeah, sorry.  It kind of got out of order.

15     A.  Yeah.

16     Q.  And Ms. Hampton writes:  "All were very

17  simple."  Do you see that?

18     A.  That was the voter review panel.

19     Q.  Right.

20     A.  Yes.

21     Q.  And then you write still the morning of

22  January 7:  "Good.  Scott has landed and the rest of

23  team is almost at Douglas."

24     A.  Yep.  Because I got another e-mail message,

25  so I just copied it and copied the concept of the

Page 132

1    message.
2         Q.  Well, this one you didn't copy and paste.
3    You put in your own words?
4         A.  Right, I put in -- that's what I said.  I
5    copied the gist of the message, yeah.
6         Q.  And so why was Mr. Hall communicating with
7    you about this instead of Ms. Hampton?
8         A.  I don't know.
9         Q.  You didn't ask him?
10        A.  It was just -- I got an e-mail, so I just
11   sent it on to her.  And I don't know what time that
12   was.
13        Q.  When you say --
14        A.  But it I will look.  It looks like it was
15   almost after school, so...  Or maybe.  I don't know.
16        Q.  And when you say "...the rest of the team
17   is almost in Douglas," who is the rest of the team?
18        A.  I told you what his e-mail said.
19        Q.  So Paul Maggio and four others?
20        A.  It said the -- I remember him saying, "I've
21   landed, rest of team is almost to Douglas."  I don't
22   know.
23        Q.  But so you understood that Scott Hall flew
24   in and the rest of the team was traveling from
25   Atlanta --

1      A.  Yes.

2      Q.  -- by car?

3      A.  I don't know.

4      Q.  And then she writes back:  "Okay.  The

5  Democratic man is still here."  Do you see that?

6      A.  Yes.

7      Q.  Who was that?

8      A.  I have no idea.  I thought she meant

9  Dominion.  I don't know.

10      Q.  And then January 7, still the same day

11  3:40 p.m. she writes:  "Going great so far."  Do you

12  see that?

13      A.  Yes.

14      Q.  And that was about the work that Mr. Hall

15  and Mr. Maggio were doing; is that right?

16      A.  I am assuming.  I don't know.

17      Q.  But as you sit here, your best recollection

18  of what that was was her giving an update on what

19  Mr. Hall and Mr. Maggio were doing in the election

20  office?

21      A.  I don't know.

22      Q.  And you didn't ask her?

23      A.  No, but I went after 4:00 to go check on

24  the voter review panel because oftentimes they need

25  somebody to sign off and look at the things.  So I

Page 134

1    didn't respond because I was probably on my way
2    there.
3         Q.   To the elections office?
4         A.   Yeah.   I went up there, went and checked to
5    make sure they didn't need my signature, and then I
6    went across the street and had early dinner with my
7    husband.
8         Q.   So you were in the elections office on
9    January 7?
10        A.   I walked into the front part.   I didn't go
11   into the office.
12        Q.   Who did you see in the Coffee County
13   elections building on January 7, 2021?
14        A.   There were people in there, and I get
15   uncomfortable when there's others.   You know what I
16   mean?   So I just went in there, asked if they needed
17   me to do any voter review panel.
18        Q.   When you say "there were people in there,"
19   people where?
20        A.   In -- outside of the -- inside the glass
21   room because I was outside.
22        Q.   So January 7, 2021, sometime in the
23   afternoon or early evening, you arrive at the Coffee
24   County elections office, you see individuals in that
25   room where the ICC and the EMS server are?

```
                                            Page 135
 1        A.   Uh-huh.  No, no, no.  Only in the -- the --
 2   the big room.
 3        Q.   Oh.
 4        A.   The blinds were drawn or any other thing,
 5   so...
 6        Q.   You could see them in the big room where
 7   Misty Hampton's desk was?
 8        A.   There was a couple people in there, yeah.
 9        Q.   And you say the blinds were drawn.  The
10   blinds were drawn in what way?
11        A.   The window that you can see into the --
12   where you tabulate.
13        Q.   Where the ICC is?
14        A.   Yes.  I don't know if that's the server
15   room or not.  I don't -- because to me a server is a
16   big thing.
17        Q.   So the room where the ICC is, was that door
18   closed?
19        A.   No.  It's blinds.  It's a window.
20        Q.   Right.  Right.  But there's a room --
21        A.   I didn't go in, so I don't know.
22        Q.   I understand.
23        A.   The blinds were closed.
24        Q.   Right.  So the blinds were closed, you
25   couldn't see through the glass.  But was the door
```

Page 136

1   open?

2        A.   I couldn't see in because -- I mean, the

3   room -- the glass room that I'm in, that room is

4   here and then there's a door here and then the big

5   room is right here.  Does that make sense?

6        Q.   I see.

7        A.   So if they're around --

8        Q.   I see what you're saying.

9        A.   There's no visibility.

10       Q.   You have visibility of the glass window,

11  you don't have visibility of the door?

12       A.   Huh-uh.

13       Q.   Yeah, right?

14       A.   Yes.  Correct.

15       Q.   Okay.  But you could see the glass window

16  had the blinds closed, but you don't know whether

17  the door was open or closed?

18       A.   No, sir.

19       Q.   Okay.  Got it.  And how long were you in

20  the elections office that night?

21       A.   Just a few minutes.  It wasn't long at all.

22  I can't tell you how long.  But anyway, I asked

23  to -- in fact, I think I only talked to Jil if --

24  did I need to do anything with the voter review

25  panel.

1    Q.  When you came in that night, the person

2    that Ms. Hampton refers to as "the Democratic man,"

3    she's talking about the Democratic rep for the voter

4    review panel; is that right?

5    A.  Excuse me?

6    Q.  When she refers to "Democratic man" on

7    January 7, she's referring to the Democratic rep for

8    the voter review panel?

9    A.  No, the voter review panel was

10   Ms. Ernestine.  I thought when she said "the

11   Democratic man is still here," I thought she meant

12   Dominion.  I don't know who the Democratic man is.

13   Q.  So you don't know who she's talking about?

14   A.  No, I thought she meant the Dominion man.

15   Q.  So when you went into the elections office

16   on January 7, 2021, who was every person you were

17   able to see in that -- in the premises there?

18   A.  I saw Jil.

19   Q.  Who else?

20   A.  I didn't look around.  I asked about the

21   voter review panel.  Did I need to sign off on

22   anything.  I didn't see Ms. Ernestine.  I didn't

23   see -- because she would have signed off on her part

24   of it I would assume.  I saw Jil.  I talked to Jil

25   about the voter review panel.  That's all I can

Page 138

1   remember.  And she said, no, everything was good,

2   and I can't even remember if I talked to Misty or

3   not when I went in like that.

4        Q.  Did you see Misty Hampton?

5        A.  I can't even recall.

6        Q.  But you didn't see Ms. Ernestine?

7        A.  No.

8        Q.  And are you aware that on January 7, the

9   Democrats had a different representative other than

10  Ms. Ernestine to handle the voter review panel?

11       A.  No.

12       Q.  Do you recall seeing any male figure in the

13  office that day?

14       A.  Possibly.  I wasn't paying attention.

15       Q.  Tell me what your best memory is.

16       A.  In the -- in the big room?  I can't

17  remember.  I'm trying to remember.

18       Q.  Did you see Scott Hall?

19       A.  No, Scott came from outside.  And he and I

20  talked outside, and I was glad to have met him.  And

21  then I left.

22       Q.  I'm sorry, when you say he came from

23  outside, what does that mean?

24       A.  Outside the building.

25       Q.  So you saw Scott Hall outside of the

Page 139

1    elections office on January 7?

2         A.   Uh-huh.

3         Q.   "Yes"?

4         A.   Yes, sir, sorry.

5         Q.   Did you ever see him inside the building?

6         A.   He came in from outside and he and I talked

7    in the inner room, and then he and I went outside

8    and I just talked about how nice it was.  And then

9    my phone -- and my husband told me he was on his

10   way, and we went over and had dinner.  We had an

11   early dinner that night.

12        Q.   Okay.

13        A.   Because I was tired.

14        Q.   And I just want to make sure I understand

15   right, so tell me if I have it wrong.  Afternoon,

16   evening, January 7, 2021, you are in the Coffee

17   County elections office, the big room -- when you

18   say "big room" you mean the one that Jil

19   Riddlehouse --

20        A.   Okay.  I was outside.  There's a glass room

21   right here, there's their big room, okay.  I was

22   outside of that talking to Jil through the window.

23        Q.   You were in the big room?

24        A.   I was outside of the big room.  There's a

25   glass, like, reception area.

1      Q.  So sort of a foyer?

2      A.  Yes.

3      Q.  So you're in there talking to Jil

4  Riddlehouse [sic] and then that's when Scott Hall

5  came in from outside?

6      A.  Uh-huh.

7      Q.  "Yes"?

8      A.  Yes, sorry.

9      Q.  And did he speak to Jil too?

10     A.  No.  Because she was behind the glass.

11     Q.  How did you talk to Jil Riddlehouse [sic]

12  if she was behind the glass?

13     A.  There's, you know, the little talking

14  thing.

15     Q.  Ah, okay.

16     A.  Yeah.

17     Q.  Okay.  So she's behind the glass, you're in

18  sort of the foyer area, Scott Hall comes in?

19     A.  Uh-huh.

20     Q.  Was there anyone else in there?

21     A.  In the foyer?

22     Q.  Yes.

23     A.  Not that I can recall.

24     Q.  Was there anyone else inside the building

25  at all that you saw or that you were aware of?

Page 141

1     A.   Not that I can recall.  I saw people, but I
2  wasn't paying attention.
3     Q.   And when Mr. Hall came in, did he approach
4  you immediately?  Did he talk to someone else?  What
5  did he do?
6     A.   He said, "Are you Cathy?"  And he said,
7  "I'm Scott Hall."  And I shook his hand, it was nice
8  to meet him.  And he knew me because I had been on
9  the TV.
10    Q.   How long did you guys talk?
11    A.   I mean, five minutes at the most.  I can't
12 tell you how long.
13    Q.   Did he tell you why he was there?
14    A.   We weren't -- it was just -- I was tired.
15 Talked about stuff, I don't even remember what we
16 talked about.  Like I said, I was exhausted.
17    Q.   Did you ask him why he was there?
18    A.   No, didn't talk about it.
19    Q.   Did he at any point walk over --
20    A.   And at this point I do know he was about to
21 leave, and so -- and I don't know why he was outside
22 and I didn't see him when I came in, but, he was
23 getting ready to leave.  So...
24    Q.   Did he ever -- did you see him talk to Jil
25 Riddlehouse [sic]?

1      A.  No.

2      Q.  Did you see him talk to Misty Hampton?

3      A.  I didn't see Misty.

4      Q.  Did you see him talk to anyone other than

5  yourself?

6      A.  No.

7      Q.  Did you see anyone with him?

8      A.  No.  He came in by himself.

9      Q.  So he came in, you spoke for maybe five

10  minutes and then what did you do?

11      A.  I went out and I'm assuming -- I left him

12  in the foyer so I didn't look.

13      Q.  So when you left, he was still inside?

14      A.  Yes.

15      Q.  Did you ever see him leave the building?

16      A.  No.  I left.

17      Q.  So as you sit here, you don't know when he

18  left the elections office?

19      A.  No, sir.

20      Q.  And so you left, went to dinner with your

21  husband?

22      A.  Yes.

23      Q.  And did you eat locally?

24      A.  Yes, we're isolated.  There's no place to

25  go.

Page 143

1      Q.   Where did you eat?

2      A.   Danny's.

3      Q.   Denny's?

4      A.   Danny's.

5      Q.   Oh, Danny's.  Okay.  Sorry.

6           Is that -- how close is that to the

7   elections office?

8      A.   You can see it.

9      Q.   And so while you were at dinner, you didn't

10   see Mr. Hall leave, for example?

11      A.   No.  Because I would have had to drive

12   around.  It's the one-way street, so I would have

13   had to drive around and go to Danny's.

14      Q.   How long were you at Danny's?

15      A.   I don't know, hour maybe.  And then I went

16   home.

17      Q.   And then you went home?

18      A.   Uh-huh.

19      Q.   And your husband was with you?

20      A.   Yeah.  We were in separate vehicles, we

21   went home.

22      Q.   So you didn't have dinner with Mr. Hall?

23      A.   No.  No.

24      Q.   Are you aware that Mr. Hall bought pizza

25   from a pizza place near the elections office that

Page 144

1  day?

2       A.  If he did, he bought it from Danny's, but

3  we had dinner at Danny's.

4       Q.  But you never saw Mr. Hall come in and buy

5  pizza?

6       A.  No.

7       Q.  And you didn't eat with him?

8       A.  No.

9       Q.  Did he offer you pizza?

10       A.  Hm?

11       Q.  Did he offer you pizza?

12       A.  No.

13       Q.  Okay.  Did you see what vehicle he came in?

14       A.  No.

15       Q.  When he came inside, was he carrying

16  anything?

17       A.  No, not that I know of, maybe a cell phone,

18  but...

19       Q.  Did you see anything in his hands, like did

20  he have a bag, a computer?

21       A.  No.

22       Q.  Did you see a phone at any point?

23       A.  I said maybe a cell phone if he was

24  carrying anything.  But I didn't -- I can't testify

25  to that.

Page 145

1      Q.  Right.  And sorry, that's why I was just
2  trying to clarify.  I don't want you to guess.  Did
3  you see a cell phone?
4      A.  No.
5      Q.  Is there any other details, any other
6  information you can tell me about your conversation
7  you had with him in the elections office?
8      A.  I'm trying to think.  I didn't think he
9  would be a big man, and I think I made a comment
10  about that.  Because, you know, how you try to get
11  an impression or visual of people when you talk to
12  them?  He's a tall man.
13      Q.  You commented that he was taller than you
14  expected?
15      A.  Yes, but I'm short so everybody is tall.
16      Q.  Anything else you remember from the
17  conversation?
18      A.  No.  I can't recall.
19      Q.  Do you recall when you had dinner?
20      A.  It would have been before 5 because I know
21  my husband got off and we went and had an early
22  dinner because I was wondering if there would be
23  somebody to serve because it was before 5:00.  And
24  we would have eaten dinner and hurried up to get
25  home to feed the dogs.

1    Q.  All right.  So look back at Exhibit 6 if

2    you would, please.  And we're still on this page 3?

3    A.  Okay.

4    Q.  So we left off where Ms. Hampton texts you

5    at 3:48 p.m., "Going great so far."  And then you

6    said you arrived shortly thereafter at the elections

7    office, right?

8    A.  Uh-huh.

9    Q.  "Yes"?

10    A.  Oh, say that again, I'm sorry.  I'm just --

11    my mind is going in...

12    Q.  No, no, no, that's okay.

13        So you arrived at the elections office

14    shortly after you got her text at 3:48 p.m. on the

15    7th, right?

16    A.  Yeah, and I probably didn't see it or

17    anything, you know, because I just went in.  So

18    there's no telling.

19    Q.  So somewhere -- somewhere between 3:48 p.m.

20    and about 5:00 you were in the elections office, had

21    a conversation with Scott Hall and then went to

22    dinner with your husband?

23    A.  Yeah, somewhere in between this and I would

24    say 4:30 because I have -- my mind -- we went to go

25    eat somewhere in between 4:30 and 4:45.

1          Q.   And then she sends you a follow --
2     Ms. Hampton sends you a follow-up text at 8:02 p.m.
3     the same day, January 7, right?
4          A.   Yes.
5          Q.   And she invites you to install Signal?
6          A.   Uh-huh.
7          Q.   "Yes"?
8          A.   Yes.
9          Q.   Did you install it?
10         A.   No.
11         Q.   You've never communicated with Ms. Hampton
12    about -- with Signal?
13         A.   No.
14         Q.   You've never installed Signal on your
15    phone?
16         A.   I have Signal on my phone, but I never
17    communicated with Misty on Signal.
18         Q.   So you do have Signal on your phone?
19         A.   Yes, I eventually got Signal on my phone,
20    but I didn't know what it was at this point.  No.
21         Q.   Did you search Signal for responsive
22    communications?
23         A.   Yes.  And I don't have anything from Misty.
24         Q.   Anything with Scott Hall?
25         A.   No.

Page 148

1      Q.  Paul Maggio?

2      A.  No.  I don't -- I never talked to Paul

3  Maggio, so I don't -- the only way I have his phone

4  number is from that text.

5      Q.  But you understood that Ms. Hampton wanted

6  you on Signal because she didn't want to communicate

7  on text anymore, right?

8      A.  From what I remember, she said Eric was

9  going to use it, and that's -- but I didn't put it

10  on there.

11      Q.  And that's Eric Chaney?

12      A.  Yes, sir.

13      Q.  She told you that in person or on a phone

14  call?

15      A.  I can't remember.

16      Q.  What all do you recall about the

17  conversation where she told you Eric Chaney was

18  going to use Signal?

19      A.  I don't remember.

20      Q.  Do you remember anything at all beyond her

21  saying Eric Chaney is going to use Signal?

22      A.  I don't remember, that's all I remember.

23  And I only remembered it because of seeing the text.

24      Q.  And you never used Signal to communicate

25  with Eric Chaney?

1      A.  I did after the fact.  I sent him some
2   articles.
3      Q.  When?
4      A.  I don't remember.  It was just articles,
5   yeah, about stuff I would find about Coffee County.
6   Like what Marilyn Marks was sending out, I would
7   send him those.
8      Q.  Did you communicate with anyone using
9   Signal on January 7, 2021?
10     A.  I don't know.  I wasn't asked to look for
11  that date.  I mean, I sent everything I had.
12     Q.  I would ask you to take a look at that at a
13  break as well whether you have any communications --
14     A.  Okay.
15     Q.  -- I would say within two weeks of
16  January 7, 2021.
17     A.  Is two weeks fair?  I can't tell you
18  everybody.  I mean --
19     Q.  No, no, fair enough.  I don't need everyone
20  but just anyone in association with Coffee County.
21     A.  You mean this, not just Coffee County?
22     Q.  Well, let's be -- let's be clear.  Anything
23  to do with Scott Hall --
24     A.  Okay.
25     Q.  -- or Paul Maggio, their trip in, or any

```
                                                    Page 150
 1    member of the Coffee County elections board or
 2    former --
 3         A.  Okay.
 4         Q.  -- Coffee County elections employee.
 5         A.  Got you.
 6         Q.  Okay?
 7              MR. CHEELEY:  We've been going quite a
 8         while.
 9              MR. CROSS:  Oh, yeah, sorry.
10              MR. CHEELEY:  It's 1:38.  Can we get
11         some lunch?
12              MR. CROSS:  Yes.  Let me -- just give me
13         one minute because I think I can finish up on
14         this.
15              MR. CHEELEY:  You predicted before we
16         started this last time it would be about an
17         hour.
18              MR. CROSS:  Yeah.
19              MR. CHEELEY:  It's been an hour.
20              MR. CROSS:  Right.  Let's close out this
21         point and then -- and then --
22    BY MR. CROSS:
23         Q.  Flip to page 7 real quick.
24              MR. CHEELEY:  I've got a 3:00 Zoom call
25         that I need to take.
```

1      A.  Okay, go ahead.

2   BY MR. CROSS:

3      Q.  So you'll see here -- well, actually,

4   there's nothing of any more substance on that so

5   don't not worry about that.

6         MR. CROSS:  Okay.  Yeah, let's go off

7      the record.

8         THE VIDEOGRAPHER:  Off the video record

9      at 1:39 p.m.

10        (Recess 1:39-2:37 p.m.)

11        THE VIDEOGRAPHER:  Back on the video

12     record at 2:37 p.m.

13  BY MR. CROSS:

14     Q.  All right.  Do you still have Exhibit 6 in

15  front of you?

16     A.  I sure do.

17     Q.  Okay.  If you go to page 3 -- I'm sorry, I

18  couldn't remember if I asked you this before.  When

19  Ms. Hampton texted you at 3:48 p.m. on January 7,

20  "Going great so far, was that about the work that

21  Mr. Hall and Mr. Maggio were doing?

22     A.  I don't know.  It could have been about the

23  voter review panel.  I don't know.  I said it...

24     Q.  You just don't know one way or the other

25  whether --

1      A.   No.   Because I didn't text her and there's

2   no response from me, so I have no idea.

3      Q.   Do you know Jeff Lenberg?

4      A.   No.

5      Q.   Have you ever heard that name?

6      A.   You said it today and then I read back over

7   here and they were talking about it.  But I've never

8   heard that name before or that I recall.

9      Q.   Do you know whether Jeff Lenberg was in the

10   Coffee County elections office on January 7, 2021?

11      A.   Not that I recall.

12      Q.   All right.  Take a look at the first page

13   of Exhibit 6.

14      A.   Yes.

15      Q.   Do you see here this is a text thread

16   between Misty Hampton and Eric Chaney?

17      A.   Uh-huh.

18      Q.   I'm sorry, yes?

19      A.   Yes, I'm sorry.

20      Q.   Everybody does it.  Everybody does it.

21           And you see here on January 6th, there's a

22   text message that reads:  "Scott Hall is on the

23   phone with Cathy about wanting to come scan our

24   ballots from the general election like we talked

25   about the other day.  I'm going to call you in a

Page 153

```
 1   few."  Do you see that?
 2        A.  I do see that.
 3        Q.  That's a text that Ms. Hampton sent Eric
 4   Chaney?
 5        A.  No.  Did she send it to -- or did he -- oh,
 6   okay, I see it now.  Okay, all right.
 7        Q.  Are you with me?
 8        A.  Yep.
 9        Q.  And she sends that at 4:26 p.m. on
10   January 6, right?
11        A.  Yep.
12        Q.  So does that refresh your recollection that
13   you were on the phone with Mr. Hall around 4:30 p.m.
14   on January 6?
15        A.  Which would have been after school, so
16   yeah.
17        Q.  Yeah.
18        A.  Yes.  And then so when I did see this, but
19   I mean, I still do not recall what we talked about,
20   but this right here says what we talked about was
21   scanning ballots.
22        Q.  Right.  And does that refresh your
23   recollection that you discussed with Mr. Hall that
24   he wanted to come down and scan ballots in the
25   election office?
```

1      A.  It doesn't jog my memory, but I will attest

2  that's what this says here.  Like I said, I cannot

3  remember exactly what I talked to him about.

4      Q.  You don't have any reason to believe

5  Ms. Hampton got it wrong, right?

6      A.  No, she would have probably said exactly

7  what I said.

8      Q.  Okay.

9      A.  And I mean scanning ballots.  I mean...

10      Q.  Right.

11      A.  So...

12      Q.  And if you look back at page 5 of

13  Exhibit 6, just so we have the timing right, you can

14  see you sent this magnolia64 e-mail address to

15  Ms. Hampton at 5:06 p.m., so about half an hour

16  after --

17      A.  Right.

18      Q.  -- Ms. Hampton's text to Eric Chaney?

19      A.  So then probably within that phone call,

20  that's where she wanted it.  Took me a while maybe

21  to find me, I don't know.  But yeah, so maybe that

22  was the one phone call.

23      Q.  Okay.

24      A.  There you go.

25      Q.  Okay.  In the magnolia64@protonmail.com,

Page 155

1   that's not your e-mail address?

2        A.   No.

3        Q.   Okay.  Do you have a proton e-mail address

4   or have you ever?

5        A.   I did, but it was a campaign and I don't

6   even use it anymore.  I don't have access to it.

7        Q.   Okay.  When was the last time you used

8   that?

9        A.   It was during a campaign.

10        Q.   Was it before January of 2021?

11        A.   No, it was after.

12        Q.   It was after?

13        A.   Yeah, it was this year.  It was this

14   campaign.  Yeah, so...

15        Q.   Did you have a proton e-mail address in or

16   around January 2021?

17        A.   Not that I -- no, huh-uh.

18        Q.   Okay.  Did you get a chance to look for the

19   documents we talked about?

20        A.   Yes.

21        Q.   What did you find?

22        A.   I found just -- I do have a iCloud, I

23   didn't know I did, but I'm assuming it got set up

24   while I was doing the phone, but I don't use it.  I

25   don't even know what the password is, so I have to

Page 156

1    wait and get on there to look for anything.

2        Q.  Okay.  What about the -- did you search the

3    magnolia64 e-mail address?

4        A.  Uh-huh, yep.  And I sent basically forms

5    that were on the secretary of state's website.  I

6    sent the RLA count from counties, and -- and I

7    shared articles from everything that I have from him

8    is, like, late January and February of 2021.  That's

9    all I have.

10       Q.  Can we see those e-mails?

11       A.  I don't want people's others' names going

12   in there.  But I will show them to you.

13           THE WITNESS:  What do you say?  Yes or

14       no?

15           MR. CHEELEY:  For the e-mails?

16           THE WITNESS:  Uh-huh.

17           MR. CHEELEY:  As long as we have an

18       understanding that you'll redact for

19       publication the names of other people copied

20       or on the e-mails.

21           THE WITNESS:  Yeah.

22           MR. CHEELEY:  Because she doesn't want

23       to subject them to harassment.

24           THE WITNESS:  Yep.  I sent him --

25   BY MR. CROSS:

Page 217

1                          CERTIFICATE
    STATE OF GEORGIA:
2   COUNTY OF FULTON:
                    I hereby certify that the foregoing
3   transcript was taken down, as stated in the caption,
    and the colloquies, questions and answers were
4   reduced to typewriting under my direction; that the
    transcript is a true and correct record of the
5   evidence given upon said proceeding.
                    I further certify that I am not a
6   relative or employee or attorney of any party, nor
    am I financially interested in the outcome of this
7   action.
                    I have no relationship of interest in
8   this matter which would disqualify me from
    maintaining my obligation of impartiality in
9   compliance with the Code of Professional Ethics.
                    I have no direct contract with any
10  party in this action and my compensation is based
    solely on the terms of my subcontractor agreement.
11                  Nothing in the arrangements made for
    this proceeding impacts my absolute commitment to
12  serve all parties as an impartial officer of the
    court.
13                  This the 11th day of August 2022.
14
15
16  _____

    LAURA M. MACKAY, CCR-B-1736
17
18
19
20
21
22
23
24
25