# EXHIBIT 257

Page 1

```
IN THE UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF GEORGIA
             ATLANTA DIVISION
             CASE NO.:  1:17-cv-2989-AT

 DONNA CURLING, et al.,
       Plaintiffs,
 vs.
  BRAD RAFFENSPERGER, et
  al.,

        Defendants.
_____/

VIDEOCONFERENCE
VIDEOTAPED
DEPOSITION OF:       DOUG LOGAN
DATE:                FRIDAY, NOVEMBER 18, 2022
TIME:                9:02 A.M. - 3:54 P.M.
PLACE:               VIA VIDEOCONFERENCING TECHNOLOGY
STENOGRAPHICALLY
REPORTED BY:         JAZZMIN A. MUSRATI, RPR, CRR
                     Registered Professional Reporter
                     Certified Realtime Reporter
```

1   the machines?  You know, what's -- what exactly is
2   happening there?
3       Q.  And were you able to determine the answer to
4   that?
5       A.  No, sir.
6       Q.  I'm not suggesting that this is false, but what
7   was the -- the evidence, either anecdotal or otherwise,
8   that, in fact, prior to Dominion's telephone call, that
9   Republican ballots had been rejected with greater
10  frequency while scanning?
11      A.  I believe it was all anecdotal.  I think it's
12  something that had been mentioned -- noticed by the
13  people doing the work.  But that's -- I mean, as you've
14  seen the expert report that -- the issue from when I was
15  in Coffee County, part of what was testing was trying to
16  find a scientific way to figure out if that is, in --
17  was, in fact, accurate.  And the numbers suggested it
18  was.
19      Q.  The numbers from your report suggested it was?
20      A.  Correct.
21      Q.  We'll get to that in a second.
22          We have mentioned two things:  One was the -- the
23  Edward Solomon issue; the other one was Misty Hampton's
24  observations about the rejection of the Republican
25  ballots.

Page 48

1    You know what we did, you have a copy of our report, you
2    know.
3        Q.   And so when you got there, in Coffee County, did
4    Misty Hampton explain to you the questions that she had,
5    that she wanted you to look into?
6        A.   Yes, sir.
7        Q.   And just --
8        A.   And she was just looking for answers.  I mean, I
9    wouldn't say she wanted us to specifically look into.
10   You know, she was looking for answers on things.  And so
11   we answered questions as best we could, and we said --
12   you know, Jeff came up with a way to -- to assess the
13   system.  He suggested that it should be done as a way to
14   validate if what she said was real or not.
15       Q.   And so --
16       A.   And the people in the office did the work to make
17   it happen.  You know, mostly I observed, you know...
18       Q.   The -- why did you change the clock on the -- on
19   the EMS?
20       A.   If you have malicious code that's in place to
21   enact imperfect -- well, here's the best way to give an
22   example.  Are you familiar with Volkswagen?  Have you
23   heard about --
24       Q.   Yes.
25       A.   -- you know, Volkswagens, the way that they

1  passed their diesel emissions test?  You know what I'm
2  talking about?
3       Q.  I do know what you're talking about, but for the
4  record --
5       A.  So for the record, there's been very strict
6  diesel tests that are very hard for car manufacturers to
7  pass.  And so in the case of Volkswagen, they actually
8  programmed their motor to identify when it's in a test
9  mode and to perform differently so that it would not
10 have the emissions output that it needed, so they could
11 pass when it was under a test, but when it was in the
12 real world, it could get the full performance of a
13 diesel engine and all the smog or whatever is associated
14 with it.  So they basically backdoored their own system
15 with a code triggered under certain circumstances to
16 have a certain behavior.
17          So our assumption was that if you're -- if you
18 wanted to pass logic and accuracy testing, or any of the
19 other validations that went in place, that you would
20 likely, very similarly, have some sort of trigger.  The
21 simplest trigger to have is a date based trigger.
22          And so if you want to test a system in the same
23 exact manner which gets used on election day, you put
24 the date to that time period of what it was on election
25 day.  And then you know that if any sorts of triggers

1   that could have been in place are likely also to trigger
2   again, then you would see the -- the resulting behavior.
3         Because we didn't know if there was anything.  So
4   we wanted to mimic the real world situation as much as
5   possible to make sure we have a scientific test that
6   would have a chance of reproducing the issue, if it
7   existed.
8      Q.  Did you set the clock back when you left?
9      A.  I didn't set the clock or unset the clock.  So
10  that was something that was -- that was done by the
11  County.  So I don't -- I assume that it was done, but I
12  really don't know.
13     Q.  And did -- how did the County know to do that?
14  Did you or Mr. Lenberg suggest, first let's change the
15  date?
16     A.  Part of the suggestion is in order to test it and
17  in order to explain as to why that would be -- create a
18  better test.
19     Q.  And so when y'all were down there, the County
20  actually -- or Misty Hampton actually changed it
21  pursuant to your -- did you tell her how to do it?
22     A.  I don't recall.  Misty is very proficient on a
23  computer.  I don't think I'd need to tell her something
24  like that.  But I have no idea if we did or didn't.
25     Q.  And you don't know whether it was reset, right?

1    A.   Yeah, this looks like the download logs.
2    Q.   Okay.  And if you would scroll over to -- or
3  scroll down to, let's see, Page 15.
4    A.   Okay.
5    Q.   You'll see in the middle of the page that you are
6  uploading things to the site.
7         Do you see that?
8    A.   Yes, sir.
9    Q.   And what were you uploading?
10   A.   So I had converted the forensic image into a
11 virtual machine, and I uploaded that result to the site.
12   Q.   So you uploaded a virtual machine; is that what
13 that is?
14   A.   Correct.
15   Q.   And just for the record, tell me what that is and
16 how was that different than what -- from what you
17 downloaded?
18   A.   So a forensic image, when it's captured, it's
19 captured in a manner that is immutable, you cannot
20 change it.  And it's designed, you know, for that so
21 that you have the official record what the system looked
22 like if you were using it in a court case.  But
23 converting it to a virtual machine allows you to
24 potentially, you know, boot up the device and be able to
25 utilize it like it was the computer in order to take a

1   look at the way the things operate, and more closely
2   examine it like it was a local system you were using.
3        Q.   If you look on that same -- and so you did that,
4   it looks like, on January 16th; is that correct?
5        A.   If that's what the log says, then that's correct.
6        Q.   And then if you look at the bottom of that same
7   page, over to the next page, what is the reference to
8   fixed?  What does that mean, in this third column?
9        A.   So the first time I did the conversion, something
10  happened, and it seems to have taken out a bunch of
11  files, and it didn't actually function and work right.
12  I don't -- to this day, I don't really understand
13  exactly what was wrong.  But I redid the process and
14  uploaded a version that actually functioned.
15       Q.   So which part wasn't working, the virtual
16  machine?
17       A.   The virtual machine had a lot of files missing
18  from it when it booted up, which that shouldn't have
19  happened.  I don't really understand it.  I've never
20  seen, you know, a partial conversion in such that
21  matter, but that's what had happened somehow.
22       Q.   And were you ever able to determine the cause of
23  that issue?
24       A.   I wasn't concerned with it.  I mean, I just
25  assumed that something hadn't copied right.

Page 227

1        CERTIFICATE OF REPORTER
2    STATE OF FLORIDA:
3    COUNTY OF ORANGE:
4
5        I, Jazzmin A. Musrati, RPR, CRR, Notary Public, State
6    of Florida, certify that I was authorized to and did
7    stenographically report the deposition of DOUG LOGAN;
8    that a review of the transcript was requested; and that
9    the foregoing transcript, Pages 1 through 229, is a true
10   and accurate record of my stenographic notes.
11       I further certify that I am not a relative, employee,
12   or attorney, or counsel of any of the parties, nor am I
13   a relative or employee of any of the parties' attorneys
14   or counsel connected with the action, nor am I
15   financially interested in the action.
16
17              DATED:  December 2, 2022.
18
19              [signature]
20              _____
                Jazzmin A. Musrati, RPR, CRR
21              Registered Professional Reporter
                Certified Realtime Reporter
22
23
24
25