# EXHIBIT 264

Page 1

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
2                         ATLANTA DIVISION
3       DONNA CURLING, ET AL.,       )
                                     )
4            Plaintiffs,             )
                                     )
5       vs.                          )    CIVIL ACTION NO.
                                     )
6       BRAD RAFFENSPERGER, ET       )    1:17-CV-2989-AT
        AL,                          )
7                                    )
             Defendants.             )
8
9
10
11
12
13        VIDEOTAPED DEPOSITION OF J. ALEX HALDERMAN, Ph.D.
14                       (Taken by Plaintiffs)
15                         January 3, 2023
16                            3:33 p.m.
17
18
19
20
21
22
23
24
25      Reported by:   Debra M. Druzisky, CCR-B-1848

1      A.    With -- or even with less access.  That's
2   what I mean by "more than sufficient."
3      Q.    Thank you.
4            You mention at the end of that paragraph
5   that an individual could "implant malware to affect
6   future elections."  Do you see that?
7      A.    Yes.
8      Q.    You've examined several of the components
9   from Coffee County; is that correct?
10     A.    What do you mean?
11     Q.    You've examined forensic images of Coffee
12  County election equipment; right?
13     A.    Ah.  I have examined -- I have examined
14  the -- so to be -- to be clear -- I think I see
15  where you're going, Mr. Tyson.
16           And the only access that I have had to
17  information from Coffee County election equipment
18  following the beginning of the breach when Sullivan
19  Strickler imaged the components is images -- is to
20  images of the I.C.C. workstation and the election
21  management system server that were obtained by I
22  believe your expert and by the plaintiff's expert
23  over this past summer.
24           But I haven't had any access to any of the
25  voting equipment, to any of the scan -- the I.C.C.

1   scanners, to any of the B.M.D.s, to any of the poll
2   pads, to any of the U.S.B. sticks, to any of the
3   memory cards from -- following the time of the
4   breach.
5        Q.   And thank you.  That's helpful.
6             So you haven't reviewed any of the images
7   taken by Sullivan Strickler of any of the equipment
8   that they copied, then; is that right?
9        A.   I have reviewed the images that they
10  copied.  But those are presumably from before
11  anyone would have had an opportunity to implant the
12  malware.
13       Q.   So for the images you've reviewed from
14  Sullivan Strickler prior to January of 2021, have
15  you found any malware in any component that you've
16  examined?
17       A.   Well, my -- the scope of my work was not
18  really to systematically look for malware in all of
19  the election system components.  I may have done --
20  I'm sure I've done some spot checking, some looking
21  for some obvious things.
22            But the level of work that it would take,
23  the depth of inspection that it would take to rule
24  out the existence of malware, it would be an
25  enormous undertaking for -- that's part of the

1   basic problem here, that through examination of the
2   piece of election equipment it's extremely
3   difficult, perhaps impossible, to determine that it
4   has not been affected by malicious software.
5        Q.   Okay.  And I think that was a long way to
6   say no.  But regardless of scope, you haven't found
7   any malware, even if you haven't conducted that
8   full review you're referencing; right?
9        A.   As I say, my charge here was not to find
10  mal -- was not to do an extensive search for
11  malware.  So no, I haven't found any, but I'm not
12  aware that anybody has even undertaken the kind of
13  rigorous examination of any of these pieces of
14  equipment that would be necessary to conclude that
15  it was unaffected by malware.
16       Q.   And through your review of the I.C.C.
17  workstation and the E.M.S. server after the access
18  to the equipment, have you located any malware on
19  either of those components?
20       A.   Pardon me.  Can you repeat the question.
21  It just --
22       Q.   Certainly.
23       A.   -- cut out.
24       Q.   For your review of the I.C.C. workstation
25  and the E.M.S. server after the access took place

Page 27

1    in January 2021, have you found any malware on
2    either of those components?
3        A.   So the images that we have from after the
4    Sullivan Strickler -- after Sullivan Strickler was
5    present and after the incident took place are,
6    unfortunately, pretty badly forensically
7    compromised.  So.
8             Those machines were power cycled many
9    times.  The State's expert, Mr. Persinger, appears
10   to have made deliberate changes to the server over
11   the summer.  All of that happened before we got the
12   images.
13            So I, once again, I did some really
14   cursory spot checking, I'm sure, in the course of
15   my other analysis.  But my charge was not to
16   exhaustively search for malware.  Nor am I aware
17   that anyone else has with those images.
18            But I didn't turn up any in a cursory
19   check, but I think there is -- there's no --
20   there's no basis -- that that's not a basis for
21   concluding, unfortunately, that the systems are
22   unaffected by malware.
23       Q.   You indicate later in Paragraph 6 (b)
24   that:
25            "The outside groups copied the

Page 37

1    conclusion is that I don't think there's any
2    evidence that anybody has inspected the voting
3    equipment in Coffee County in a way that would
4    effectively show whether that equipment is working
5    or not -- I mean, whether that equipment is
6    compromised or not.
7         Q.   So it'd be correct to say that no one in
8    Georgia can have any confidence whether the
9    election equipment in Georgia has been compromised
10   and affects voters; right?
11        A.   I don't think anyone can say whether or
12   not it has been compromised as a result of this
13   incident in Coffee County.  But the incident in
14   Coffee County certainly created a risk that it was
15   compromised as part of that incident and certainly
16   increases the risk that it will be compromised in
17   the future.  That's what we can say.
18        Q.   So if an individual called into question
19   an election result in Georgia based on the
20   compromise and the lack of response allegedly from
21   the Secretary's office, you'd agree that person was
22   making a reasonable statement; right?
23        A.   If an individual --
24             MS. MIDDLETON:  Object to form.
25             THE WITNESS:  -- called in -- can

Page 39

1  6 (d), the Secretary's lack of response to prevent
2  potentially compromised election equipment from
3  affecting voters -- are you with me so far?
4       A.   Yes.
5       Q.   So if a person made that statement based
6  on the reference in your report and said we could
7  not know whether an outcome in a Georgia election
8  was the correct outcome, you'd agree that person
9  had a reasonable basis for making that statement;
10 right?
11           MS. MIDDLETON:  Object to form.
12           THE WITNESS:  I think that in general
13      there's -- there is a sense in which
14      that's true.  And that's the sense in
15      which the election system, unfortunately,
16      and this is the central problem, is not
17      operating or designed in a way that
18      produces affirmative out -- evidence of
19      its -- that the outcome is correct.
20           And under those circumstances, it's
21      certainly true that confidence in election
22      outcomes is reduced by the fact of the
23      Coffee County breach.
24 BY MR. TYSON:
25      Q.   Let's go down to Paragraph 6 (f) of your

Page 40

1    report on Page 8.  You begin:
2            "Even if no malware was inserted
3         into Coffee County's election system
4         during the January 2021 incident..."
5            Do you see that?
6       A.  Pardon me.  I'm just scrolling down to it.
7    Yes.
8       Q.  And you'd agree that it is very possible
9    that no malware was inserted in Jan -- the January
10   2021 incident, your statement is we just don't know
11   because no one has looked; right?
12      A.  That's right.  I don't think anyone has
13   looked for -- at the voting equipment in sufficient
14   detail to conclude whether malware was inserted or
15   not, including the Secretary of State's office.
16      Q.  And later in that paragraph you indicate,
17   there's some in dashes and reference that
18   individuals can devout -- "develop malware that
19   could be inserted into Coffee County's new election
20   equipment or the election equipment of other
21   Georgia counties."
22           Do you see that?
23      A.  Yes.
24      Q.  And sitting here today, you don't have any
25   evidence that an individual or -- of any type has

Page 43

1    A.   I -- I think the information that was -- I
2    think that the vulnerabilities of the election
3    system certainly reduce our ability to believe
4    that.  I do.
5    Q.   Okay.  And my question was a little
6    broader than that.  It's that, given the use of
7    ballot marking devices and the compromise of Coffee
8    County and the response to that, it's your view
9    that no one can know whether Georgia's reported
10   election results properly reflect the will of the
11   voters; right?
12   A.   So the fact that Georgia's election system
13   has deep vulnerabilities doesn't automatically make
14   every conspiratorial claim about elections true.
15   But it also makes it much more difficult for --
16   much more difficult for individual voters to know
17   that their votes are being properly counted.
18          I'm not sure if I completely followed the
19   more general question that you're asking,
20   Mr. Tyson, but that's my view.
21   Q.   Okay.  So your view is, while Georgia
22   voters could have confidence that the reported
23   results accurately reflect what the voters
24   intended, it's just a reduced confidence based on
25   the use of ballot marking devices and the Coffee

Page 44

1   County access?
2        A.   The way that it's going to affect an
3   individual voter's confidence is probably going to
4   vary from individual to individual based on, you
5   know, the particular voter's circumstances.
6             But the election system is all, based on
7   the way that it's engineered and operated, does not
8   provide affirmative evidence of its correct -- of
9   the correctness of outcomes.  And we have abundant
10  reason to believe that it may in the past or in the
11  future be compromised.
12       Q.   Do you have a personal belief on whether
13  Senator Warnock was re-elected by a majority of
14  Georgia voters who intended that when they went
15  into the voting booth?
16            MS. MIDDLETON:  I'm going to object.
17            THE WITNESS:  So --
18            MS. MIDDLETON:  Mr. Tyson, I don't
19       see how this relates to his November 22nd
20       declaration.
21            MR. TYSON:  And Caroline, it goes
22       directly to his bias and personal views on
23       the validity of election results.  He said
24       he can't assure the public that the system
25       is safe and reliable and that would be

Page 64

1    A.   I don't know for sure whether it was the
2    method Dominion delivered the system to Georgia or
3    whether that was something that Georgia did
4    in-house.  I'm not sure that it has any bearing on
5    the security posture which of those is the case.
6    Q.   Then you reference that, in Paragraph 29
7    over on the top of Page 22, that zero operating
8    security system patches are installed on the E.M.S.
9    server; right?
10   A.   Yes.
11   Q.   Do you know if this is the way that
12   Dominion delivered the E.M.S. server to Georgia,
13   without any operating system security patches
14   installed?
15   A.   I don't know whether it's the way that
16   Dominion delivered the server or whether the State
17   configured the server in-house following Dominion's
18   instructions in that way.  It's a security risk
19   either way.
20        And whether the State or its vendor is the
21   one that failed to ensure that the system is well
22   patched, it's a security risk to the State and to
23   elections in Georgia in either case.
24   Q.   Okay.  And I believe you said this
25   earlier, but in order for Georgia to have applied

Page 84

# REPORTER CERTIFICATE

STATE OF GEORGIA )
COBB COUNTY     )

I, Debra M. Druzisky, a Certified Court Reporter in and for the State of Georgia, do hereby certify:

That prior to being examined, the witness named in the foregoing deposition was by me duly sworn to testify to the truth, the whole truth, and nothing but the truth;

That said deposition was taken before me at the time and place set forth and was taken down by me in shorthand and thereafter reduced to computerized transcription under my direction and supervision. And I hereby certify the foregoing deposition is a full, true and correct transcript of my shorthand notes so taken.

Review of the transcript was requested. If requested, any changes made by the deponent and provided to the reporter during the period allowed are appended hereto.

I further certify that I am not of kin or counsel to the parties in the case, and I am not in the regular employ of counsel for any of the said parties, nor am I in any way financially interested in the result of said case.

IN WITNESS WHEREOF, I have hereunto subscribed my name this 5th day of January, 2023.

Debra M. Druzisky
Georgia CCR-B-1848