# EXHIBIT 48

Page 1

1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION
3     DONNA CURLING, ET AL.,      )
                                  )
4          Plaintiffs,            )
                                  )
5     vs.                         )     CIVIL ACTION NO.
                                  )
6     BRAD RAFFENSPERGER, ET      )     1:17-CV-2989-AT
      AL,                         )
7                                 )
           Defendants.            )
8
9
10
11
12
13       VIDEOTAPED 30(b)(6) DEPOSITION OF GABRIEL STERLING
14                   (Taken by Plaintiffs)
15                   February 24, 2022
16                       9:07 a.m.
17
18
19
20
21
22
23
24
25       Reported by:   Debra M. Druzisky, CCR-B-1848

1      pulled up.

2    BY MR. CROSS:

3        Q.    Okay.  Have you seen Exhibit 1 before?

4        A.    I don't think I've seen this one, no.

5        Q.    Okay.  All right.

6        A.    Not that I recall.

7        Q.    Scroll down to -- what page is this, page

8    numbers.  It's Page 8 of the P.D.F.  The top of --

9    the top says Amended Topics.  Just tell me when

10   you've got that.

11       A.    I'm there.

12       Q.    Okay.  Have you seen this list of topics

13   before?

14       A.    Allow me a moment.

15       Q.    Sure.

16            (Whereupon, the document was

17       reviewed by the witness.)

18   BY MR. CROSS:

19       Q.    And I can make it easier on you.  There

20   are specific topics in here you've been designated

21   on.  And so if you want to --

22       A.    I know.  I'm just reading them to make

23   sure that they're all the ones I already saw.  So.

24       Q.    Okay.  Yeah.  Got it.  Got it.

25            (Whereupon, the document was

1          reviewed by the witness.)

2              THE WITNESS:  Yeah, this essentially

3          comports to the list I've -- I remember

4          looking over, so yes.

5      BY MR. CROSS:

6          Q.    Okay.  So just so we're on the same page,

7      if you look at topic one.

8          A.    Let me scroll back up to it.  Bear with

9      me.

10         Q.    Okay.

11         A.    The one listed as implementation and

12     operation of Georgia's yadda, yadda, yadda?

13         Q.    Yes, sir.

14         A.    Okay.

15         Q.    Look at that, you'll see topics A, B, C

16     and E, and H.  Are you prepared to testify on those

17     topics today?  So it's A, B, C, E and H.

18              (Whereupon, the document was

19          reviewed by the witness.)

20              THE WITNESS:  Yes.

21     BY MR. CROSS:

22         Q.    All right.  And then if you look at topic

23     two, are you prepared to testify on topic 2(c) to

24     that?

25              (Whereupon, the document was

Page 12

```
 1        reviewed by the witness.)
 2             THE WITNESS:  Yes.
 3   BY MR. CROSS:
 4        Q.   And then are you prepared to testify on
 5   all the other topics here except for 16?
 6        A.   Yes.
 7        Q.   Okay.  And on 16, are you prepared to
 8   testify at least as to documents that you're
 9   familiar with, such as E-mails you sent or
10   received?  Is that fair?
11        A.   Hold on a second.  I'm having a -- there.
12   I had to blow the screen back up.
13             Ask that question again.  I apologize.  I
14   was having a technical issue.
15        Q.   Sure.  On 16 it just involves documents
16   that were produced in discovery by the State
17   defendants, and they said it was a case-by-case
18   basis.
19             But I assume you're prepared today to
20   testify about documents that you're familiar with,
21   like E-mails that you sent or received.  Is that
22   fair?
23        A.   Yeah.  Sure.
24        Q.   Okay.  All right.  We'll come back to
25   this.
```

Page 21

```
 1    other than the fact that I'm 51 years old and been
 2    in and around computers since I was 12 years old,
 3    you know, like anybody born in the early '70s who
 4    came up at the time when we started doing those
 5    things.
 6         Q.   I see you worked on the Bush/Quayle
 7    campaign in '92.
 8         A.   Yes, I did.  I was 21 years old.
 9         Q.   I worked on that campaign in South
10    Carolina.
11              All right.  You're familiar with an
12    election security expert named Alex Halderman;
13    right?
14         A.   I'm aware of him, yes.
15         Q.   And you're aware that Dr. Halderman
16    prepared a report that he produced on July 1 of
17    last year involving his assessment of Georgia
18    voting equipment that was provided by Fulton
19    County; is that right?
20         A.   I didn't know it was provided by Fulton
21    County.  I was aware that there was a report that
22    he did, and I did not know that it was July, but I
23    know that there's a report that was produced.
24              Bear with me a second, because I'm stuck
25    on this exhibit still.  I can't figure out how to
```

Page 22

1    get off of it.

2            MR. RUSSO:  If you just go back to,

3        if you just hit the Zoom -- yeah, there

4        you go.

5            THE WITNESS:  Okay.  There we go.

6        Sorry.  It was just disconcerting looking

7        at this.

8    BY MR. CROSS:

9        Q.   Yeah.  And so what was your understanding

10   of where he got the equipment that he examined?

11       A.   I had no understanding of it.  It didn't

12   matter to me.

13       Q.   Why didn't it matter where the equipment

14   came from?

15       A.   Because it just wasn't anything that I was

16   going to be directly concerned about at the time.

17   In fact, like I said, I don't think I was aware

18   that it was -- existed in July, so I'm not sure --

19   I might have known -- I might have been told it was

20   Fulton, but it just didn't register as something

21   that was necessarily important to know.

22       Q.   When did you first learn about

23   Dr. Halderman's July 2021 report?

24       A.   I don't know.  I knew it existed.  I

25   couldn't tell you when I -- when I discovered that.

1    Q.    Did you learn about it last year?

2    A.    Yes, it would have been last year.

3    Q.    Do you know if it was within a month?

4  Within a few months?  What's your best estimate of

5  when you learned about it?

6    A.    Within a few, more than likely.

7    Q.    And how did you learn about it?

8    A.    I think just discussions within the office

9  that this existed, or with the -- with the

10 attorneys.  I'm not positive.

11   Q.    Okay.  And have you discussed

12 Dr. Halderman's report with anyone other than

13 litigation counsel?

14   A.    Well, it's not a report I've read, so it

15 would be difficult to have a discussion about it.

16   Q.    So I was going to ask you that.  So still

17 today you've not read Dr. Halderman's report?

18   A.    That's correct.

19   Q.    Why is that?

20   A.    I think that it's lawyers' eyes only, as

21 far as I understand it.

22   Q.    It's your understanding that it's still

23 limited only to lawyers?

24   A.    I believe.  I, honestly, I just, I wait

25 for the lawyers to tell me these kind of things.

Page 24

1    So yeah, that's my -- last I heard it was lawyers'
2    eyes only.  I mean, I know that there was a lot of
3    stuff out in the press around it.  I remember being
4    somewhat irritated about that.
5            But yeah, I don't -- I've never seen it.
6    And you know, I mean, I believe Ryan Germany in our
7    office has read it.  I believe, you know, the
8    attorneys have read it.  But that's my -- that's my
9    understanding.
10       Q.   Have you ever asked for permission to read
11   it?
12       A.   No.
13       Q.   So as the State's implementation manager
14   of the Dominion system, you're not curious what a
15   leading election security expert found about
16   vulnerabilities with that system?
17       A.   That's not what I said.  What I said --
18   what you asked specifically was whether or not I
19   was going to read the report.  I wait for the
20   attorneys to tell me what's available and what's
21   the proper thing to do in these kind of situations
22   with litigation.  I lean on the attorneys for those
23   kind of things, not being --
24       Q.   Well --
25       A.   -- an attorney.

Page 26

1    hand-marked paper ballot could be double-marked if

2    you had a bad actor.

3            So most of these vulnerabilities I've

4    heard about, generally speaking.  I don't know if

5    that's what it says in this report, but as I said,

6    I've generally heard before, it requires bad actors

7    doing bad things.

8            So as long as you have the mitigation in

9    place, this may -- again, both process and

10   personnel-wise, you are -- you can mitigate most

11   vulnerabilities.  Because every system in the world

12   has vulnerabilities, especially ones that involve

13   human beings.  Because human beings are the

14   biggest, you know, failure point of any system.

15        Q.   So I gather no one has told you that Judge

16   Totenberg authorized the Secretary of State's

17   office to review Dr. Halderman's July report and

18   that she authorized that weeks or months ago;

19   nobody told you that?

20        A.   No.  I was aware that that happened and

21   that Ryan Germany in our office reviewed it.

22        Q.   But were -- you're not aware before now

23   that she has not restricted that report to

24   attorneys' access in the Secretary's office; is

25   that right?

Page 27

1      A.    I don't believe I said that.  I said we
2  were aware that, you know, that Ryan Germany, he's
3  in our office and he reviewed it.
4      Q.    Well, Ryan Germany is a lawyer; right?
5      A.    But he's inside of our office.
6      Q.    Right.  But you testified earlier you had
7  not read it because you understood it was limited
8  to lawyers.
9      A.    Early on, yes.  Now, you asked me over the
10 whole period of time.  I'm not -- it's not relevant
11 to what I'm working on now.  I'm the C.O.O.  I'm
12 not the voting system implementation manager now.
13          But I also, as I said before, have a basic
14 belief and understanding of what I've seen from
15 most reports like these where, outside of the
16 specifics, that most of them have to involve around
17 bad actors doing bad things, and that's just, that
18 is not rocket science to figure out.  It's not any
19 major thing that I've seen.
20          And I'm sure that there are things in
21 every computer system that can be shored up in some
22 way, shape or form.  And I'm sure that Dominion,
23 who is the manufacturer of these things, is working
24 on those things.  I believe they have access to the
25 report as well now, too.

Page 28

1    Q.   Okay.  So is it now your testimony you do
2   understand that the report is no longer limited to
3   lawyers for the Secretary of State's office; is
4   that right?
5    A.   That is correct.  I didn't say that I -- I
6   said -- I talk to my lawyers and say you need to
7   read it?  I'm not worried -- I wasn't really
8   worried about it yet, because it's nothing that I'm
9   directly working on right now in that particular
10   function.
11    Q.   Who at the Secretary's office has read the
12   report now?
13    A.   As far as I understand it, Ryan Germany.
14    Q.   So the Secretary himself has not read it?
15    A.   I don't know.
16    Q.   Well, you're testifying on behalf of the
17   Secretary's office today as a corporate
18   representative.  So I'm asking --
19    A.   Yes, I am.
20    Q.   I'm asking you as a corporate
21   representative, has the Secretary himself read this
22   report?
23    A.   And my answer remains the same, that I
24   don't know.
25    Q.   Okay.  And how would you find that out?

Page 36

1    alter hand-marked paper ballots in large numbers in

2    a back room somewhere than it ever would be to do

3    something to a B.M.D. from everything I've seen of

4    how these things would have to function, especially

5    considering the regulations and testing around

6    them.

7              I mean, you have L & A testing before each

8    and every one.  After the last election we had hash

9    testing of several -- in several different counties

10   to make sure there wasn't anything that had been

11   changed.

12             And in the L & A testing, we know we have

13   very robust L & A testing in the fact that it

14   caught a couple of issues in both Douglas and

15   Richmond County on the November election ballot

16   having to do with the United States Senate race.

17             So I do, I disagree vociferously with the

18   idea that somehow it is easier to do.  And I

19   believe, in my review for some of these items, that

20   even one of your own experts said it would be

21   easier to go after the scanners than to go after

22   the B.M.D.s.

23        Q.   Where did you read that one of our experts

24   said it's easier to go after a scanner than a

25   B.M.D.?

1          Q.    Okay.  You mentioned L & A testing.  Are

2     you aware that multiple election security experts

3     have testified in this case that L & A testing

4     cannot detect malware?

5          A.    No.

6               MR. RUSSO:  Objection to form.

7               THE WITNESS:  No.

8     BY MR. CROSS:

9          Q.    You mentioned hash testing.  Are you aware

10     that multiple election security experts have

11     testified that hash testing cannot detect malware?

12          A.    No.  And I -- from what little I do know

13     about computer security from my learning over the

14     last few years, that would be very difficult unless

15     the people were -- it would take a her -- it would

16     take a large effort to do -- to get around hash

17     testing.

18               Because usually, if you change any

19     particular number or letter or anything in code, if

20     you use the proper third-party hash testers, you

21     should -- you should be able to get around them.

22     So I don't know that I agree with that even if your

23     experts say that, because I'm sure there are

24     experts that believe otherwise.

25          Q.    Is there any identi -- any cybersecurity

1    elections, like the Senate election; correct?

2         A.    That's correct.

3         Q.    Were you aware --

4         A.    At the same time, there's no evidence that

5    anything -- if you look at -- you saw my degree's

6    in political science.  Nothing that we saw looked

7    untoward or out of place and looked relatively

8    normal in the scheme of how the State has been

9    going for the last few years.

10            So I didn't -- there's no need -- belief

11   on my side that anything was compromised.  And

12   because the presidential race was the highest

13   profile one that was so close, I have no reason to

14   believe that the rest of the ballot wasn't correct.

15   But you're right, we have not done a hand tally on

16   every other thing as well.

17        Q.    Are you aware that, in December of 2020,

18   Dr. Halderman in a hearing showed that he was able

19   to hack the B.M.D. equipment for Fulton County in

20   only three days to change the Q.R. code on a ballot

21   so the Q.R. code would have a different tabulation

22   than what the voter would read?

23            Had you heard that before?

24        A.    The specifics of what you just laid out,

25   not exactly.  But I knew there was some period of

Page 69

1  time he was able to do that, yes.

2      Q.   And did the Secretary's office take any

3  specific steps to protect against that

4  vulnerability in the 2020 or subsequent elections?

5      A.   Well, in September we were probably -- we

6  were getting ready for early voting.  We, again, we

7  did the L & A testing.

8           We can't go through, since I don't even

9  know if we were aware of what he's claiming to be

10  hacked or having done it -- because I don't know

11  that our side got to see what his full claim was or

12  even the path by which he did it.  I just, I'm not

13  aware if we have that information or not.  So it's

14  hard to mitigate against something if you don't

15  have the details of it, A.

16           And B, we have no reason to believe that

17  that occurred.  And having somebody have access for

18  three days would kind of be noticed in most

19  situations in most of our counties, especially as

20  we were doing the run-up to get to.  We were

21  already involved at that point in the absentee

22  ballot processing.  So it would -- we were in

23  election mode then.

24           So the -- we did not do anything specific

25  because there wasn't anything specific that we were

1    aware of that had been verified in any way, shape

2    or form to mitigate.

3        Q.   You said --

4        A.   Similar to when Jovan Pulitzer went on in

5    a State Senate thing and said he had hacked a poll

6    pad.  We had no evidence of that.  Well, what did

7    you do to fix this?  We have no evidence of it.

8        Q.   Well, there's a big difference here, which

9    is the Court required Dr. Halderman to have a video

10   recording of everything he did with the Fulton

11   County equipment, and your counsel received hours

12   and hours of video so they could see step by step

13   what he was doing.

14            Were you aware of that?

15       A.   I'm aware that they had access to

16   something along those lines, yes.  But again, as

17   you pointed out, it took him, a cybersecurity

18   expert, three days to do this.  And with the

19   handling of our equipment, they are locked -- in

20   most counties they are locked in a specific room.

21            And it's one B.M.D. you're talking about.

22   I mean, with the 18,000 ballot styles, you'd have

23   to go through and figure that out which ones you

24   were at -- or it's just, it's monumentally complex.

25            Doing it to one machine is one thing.

1   Doing it to 30 some odd thousand of them is

2   something different, especially considering you

3   have -- there's different paths and different

4   passwords and different pass codes for all of those

5   things.

6       Q.   So just so we're clear, there are no

7   specific steps that you can identify the

8   Secretary's office took to mitigate against the

9   hack that Dr. Halderman demonstrated in September

10  of 2020, there's nothing specific to that; right?

11      A.   Nothing specific to that because we

12  already have equipment handling rules around those

13  things that, if a B.M.D. went missing for three

14  days, it would normally, from my point of view,

15  have been noted by the elections director in

16  whatever county that occurred.

17      Q.   But again, but as you pointed out before,

18  we have to worry about insiders, degrees in the

19  State that said they don't want to use hand-marked

20  paper ballots as the primary means of voting.

21          You wouldn't notice if an insider who

22  already has authorized access to a B.M.D. did

23  something to it; right?

24      A.   I believe you're twisting my words.  My

25  point was, in any system an insider can cause

Page 72

1    problems, period.  We have no reason to believe

2    that there are negative insiders that exist in any

3    of our counties right now.  But of course, if there

4    are bad guys, they may not want you to know that.

5            But again, we've seen no -- there's

6    nothing indicating that anywhere that we've seen in

7    my three years in the office.

8        Q.   So then we need not worry about insiders

9    engaging in bad acts as a reason not to adopt

10   hand-marked paper ballots, we're agreed on that;

11   right, sir?

12       A.   No.  What I said was it's easier if there

13   is somebody to do it that way than the other way.

14   I believe this is a safe -- is a high -- B.M.D.s

15   are safer and better for the voters and also have a

16   level -- added level of security that is more

17   difficult to do things along the lines of hacking

18   thousands and thousands of B.M.D.s versus having

19   stacks of ballots you go through and mark or you

20   have stacks of ballots that are voted and double --

21   basically cancelling out votes by putting multiple

22   marks into a single line.

23           All of them have vulnerabilities.  You

24   have to have systems in place to try to mitigate

25   them regardless.

Page 79

1           Do you see that?

2      A.   Yes.

3      Q.   And do you agree with that assessment?

4      A.   Yes.

5      Q.   And why is it important for Georgians

6  individually to subjectively trust the voting

7  machines and the election process in Georgia?

8      A.   It's important for Georgians and every

9  American to have an implicit trust in the election

10  system to pick our leaders.  If you erode that

11  trust, then the elections and the faith in

12  elections falls apart.

13      Q.   Why is that?

14      A.   If you can't trust the outcomes of

15  elections, then what's the point of elections?

16      Q.   All right.  Come down to the next page, 47

17  of 240.

18      A.   Uh-huh.

19      Q.   And do you see at the bottom of the

20  left-hand column he refers to an op ed that he

21  wrote?

22      A.   Yes.

23      Q.   And then portions of that op ed are in

24  italics on Page 47.  Do you see that?

25      A.   Yes, sir.

Page 81

1      A.   Because it's the foundational section of

2    our democratic republic.

3      Q.   Okay.  And then if you come to the next

4    paragraph, he wrote:

5           "My view is that this election is

6        about using this unique and historic

7        opportunity to create a voting system

8        that is modern, efficient, accurate,

9        secure, safe, verifiable, fair,

10        accessible and trustworthy."

11          Do you see that?

12     A.   Yes.

13     Q.   And do you agree with him on that?

14     A.   Yes.

15     Q.   Just to go back briefly to a subject we

16    talked about earlier, the hand tally that was done

17    with the presidential election in 2020, there was

18    no effort made to determine whether the Q.R. code

19    on any individual ballot actually corresponded to

20    the human readable portion of that ballot.

21          Do I understand that right?

22     A.   Restate the question for me, please.

23     Q.   Sure.  In the hand tally that you referred

24    to in November of 2020, there was no effort in that

25    hand tally to determine whether the Q.R. code on

Page 82

1    any given ballot would be tabulated in the same way

2    as the human readable portion indicated the

3    selections were on that ballot; right?

4        A.    On individual ballots, no.  A whole point

5    of a hand tally in that posture is to get to an

6    aggregate to show that the machines counted them as

7    the ballots were marked.  And that's what that

8    tally showed.

9        Q.    Well, then let's be clear.  I want to make

10   sure we're talking about the same thing.  You

11   said --

12       A.    Okay.

13       Q.    -- that the hand tally showed that the

14   ballots were tabulated as they were marked, but

15   that's, I think you said that's at an aggregate

16   level; right?

17       A.    Yes.  It's not on individual ballots, no.

18   They did not go to say individual ballot 17A

19   matches up.  However, in hand counting five million

20   of them and coming at a point 1053 percent on the

21   totals and point 0099 percent on the margin showed

22   that there's no indication that a Q.R. code did not

23   match the human readable portion.

24       Q.    But you didn't test that?  No one at the

25   Secretary's office or the counties tested that;

Page 83

1    right?

2        A.   Not to my knowledge.  Because in the

3    aggregate it showed what the outcome was.

4        Q.   Well, you understand that malware could

5    alter Q.R. codes so that they don't match the human

6    readable selection, that those could wash out in

7    opposite directions over the course of five million

8    votes; right?

9            MR. RUSSO:  Objection to form.

10           THE WITNESS:  I understand that

11       that's a claim that could be made, yes.

12   BY MR. CROSS:

13       Q.   And the individual voters who had their

14   ballots altered in that way, assuming that

15   happened, and I'm not suggesting it did, but just

16   so we understand the vulnerability, if something

17   like that were to happen, those individual voters

18   would have lost their vote even though the election

19   outcome might be right; right?

20           MR. RUSSO:  Objection.  Form.

21           THE WITNESS:  I'm -- you're -- this

22       is at a level of convoluted to where I'm

23       trying to follow it here.  Are you saying

24       the malware -- walk me through your logic

25       train on this, because I'm not quite

Page 84

1       following it.  I apologize.

2               (Whereupon, Mr. Stark entered the

3        deposition.)

4   BY MR. CROSS:

5       Q.   Yeah.  So let's say that you had a -- you

6   had a situation where malware changed the Q.R. code

7   on a ballot for some small number of ballots so

8   that the Q.R. code tabulated differently than the

9   human readable portion.

10              That's where we are so far.  Do you

11  understand that?

12      A.   I'm getting what you're saying on that.

13  But then you also said it did it the opposite side,

14  so it was a wash.  So again, the outcomes -- if the

15  outcomes remain the same, again, this is where I'm

16  kind of getting lost on --

17      Q.   Got it.

18      A.   -- the individual voter losing their vote,

19  because the outcome is the outcome.  Because if

20  they washed, it was evenly matched, that'd be some

21  super smart malware, because they don't talk to

22  each other and no one know how many people are

23  going to be voting on a B.M.D.

24              So the logic train on this requires a lot

25  of logical leaps to get to that point.  Could it

1      Q.   If you look at the right column and go --
2   the long paragraph that ends towards the bottom
3   half of the second -- of the right column, do you
4   see the sentence, the last sentence that begins
5   "with our outside counsel"?
6      A.   Yes.
7      Q.   And here the Secretary writes:
8           "With our outside counsel at the
9        attorney general's office, who brought
10        in Georgia's leading conservative
11        election lawyers, I was confident we
12        could successfully defend all of our
13        election integrity measures."
14           Do you see --
15      A.   Yes.
16      Q.   -- that?
17      A.   Yes.
18      Q.   Do you know why it was important for the
19   Secretary to bring in specifically conservative
20   election lawyers to defend the election integrity
21   in Georgia?
22      A.   Because I think liberal election lawyers
23   would probably, from our point of view, attack some
24   of the things we considered to be election
25   integrity measures.

Page 117

1      Q.    And why would you assume that?

2      A.    Well, because Marc Elias, and then as

3   discussed in this particular page the Four Pillars

4   program, and they were doing things to attempt to

5   weaken identification of individuals, extend times

6   that ballots can be received, you know, even

7   outside of the normal what the law called for,

8   things along those lines.

9      Q.    Why not obtain -- retain non-partisan

10  counsel to defend the election integrity?

11     A.    Frankly, I couldn't tell you.  Because I

12  don't think the -- seemingly in election law, I'm

13  not sure that there's such a thing as a

14  non-partisan counsel.

15     Q.    All right.  Come to Page 88, please.

16     A.    Yes, sir.  All right.  I'm there.

17     Q.    If you look at the top of the right-hand

18  column and go to the second sentence that begins,

19  "I first explained," do you see that?

20     A.    Yes, sir.

21     Q.    And there Secretary Raffensperger writes:

22          "I first explained that 'counties

23      run elections.'  We have" --

24     A.    Yes.

25     Q.    "We have 159 counties, and more

1          than 150 of them did a great job."

2               Do you see that?

3          A.   Yes, sir.

4          Q.   Do you agree with Secretary Raffensperger

5     that counties run elections in Georgia?

6          A.   Yes, sir.

7          Q.   Who is responsible for securing elections,

8     from the voting equipment to the servers to

9     anything that touches the election system in

10    Georgia?

11         A.   The counties.  We are responsible for our

12    E.M.S. at our Center for Elections, but the

13    counties secure the voting equipment and secure

14    their E.M.S.s.

15         Q.   Does the Secretary's office have any

16    program or practice of doing -- sort of assessing

17    whether the counties are complying with the

18    security measures that need to be taken to secure

19    the election system?

20         A.   We've worked in the past with C.I.S.A.,

21    the -- I always get that acronym wrong, it's

22    C-I-S-A -- to do assessments of counties to make

23    sure they have physical -- they're following the

24    physical protocols necessary.

25               In fact, we just met with them I want to

Page 119

1    say a month ago to request we do another round of

2    that again.  So we do have some of those things

3    where we work with the federal government to help

4    counties move along on that front.

5            We also in the 2020 election cycle set up

6    some grants for security as well to help them

7    mitigate some of the things with the new equipment

8    they had to do.

9            So there's several things along those

10   lines, but it's really fundamentally the counties'

11   responsibility.  I mean, our grants were relatively

12   small, and they're really held for the smaller

13   counties than the bigger counties.

14       Q.   And what have you done with C.I.S.A. to

15   check the security measures at the county level?

16       A.   They physically send inspectors out to

17   look and make sure a block's here, is there a date,

18   is there a file, those kind of items.  Like, the

19   physical security was the biggest front-line thing

20   to try to do with the counties.

21       Q.   How often is that done in Georgia?

22       A.   I don't know the answer to that question.

23   I mean, I know we did it once early on when I was

24   here, and we're talking about them going out and

25   doing it again, you know, in a relatively soon time

1   frame.

2           Like I said, we met last month and had --

3   started having some initial discussions about

4   having that done again.

5       Q.   Does that process generate a report?  Does

6   C.I.S.A. say, here's what we did and here's what we

7   found?

8       A.   I don't know.

9       Q.   How would you find that out?

10      A.   I guess I'd probably go and talk to either

11  our elections director or Ryan Germany.

12      Q.   And Blake Evans is the elections director

13  today.

14      A.   Correct.

15      Q.   Is that right?

16      A.   Yes, sir.

17      Q.   And would it be the responsibility of the

18  counties to address any concerns that come up in

19  those assessments?

20      A.   Yes.

21      Q.   All right.  If you go -- stay on Page 88.

22      A.   Okay.

23      Q.   Look at the middle of the right column.

24  Do you see the second full paragraph that begins,

25  "but the county"?

Page 171

1        significant time."

2             Do you see that?

3        A.    Yes.

4        Q.    Did I understand correctly that the state

5   defendants, including the Secretary's office, did

6   not undertake such an investigation for this

7   response?

8        A.    As we point out in the response itself,

9   these are in the possessions of the counties, and

10  there's over 30,000 of them.  So I think the

11  statement that it would be burdensome and require

12  significant time and resources still applies.

13            So we did not send anybody to go and look

14  at each individual B.M.D. or each individual E.M.S.

15  and printers and scanners, et cetera, that are

16  listed in the lettered items above, correct.

17       Q.    And then if you come to the very last

18  paragraph there, above the heading regarding

19  interrogatory 16, it reads:

20            "In an effort to provide

21        information responsive to this

22        request, state defendants respond that

23        they do not have knowledge of any

24        election equipment used with the

25        Dominion election system being hacked

Page 172

1        in an election in Georgia."

2            Do you see that?

3        A.    Yes.

4        Q.    And do I understand correctly, there was

5    not a specific investigation undertaken for that

6    response; is that right?

7        A.    Well, I think the statement there kind of

8    stands on itself, that we were unaware of anything

9    that was reported or anything.  We have no evidence

10   of anything.  So that I think this, again, stands

11   on its own.

12       Q.    Right.  But you didn't undertake a

13   particular investigation or an inquiry to prepare

14   that response, you just relied on what you'd

15   already known or did not know as of that date;

16   right?

17       A.    We relied on the fact that there was no

18   reports of anything untoward along those lines.

19   And we had done a lot of the other things that we

20   mentioned earlier, which included the hand tally,

21   which included the L & A, which included the hash

22   testing and those kind of items.

23            So things were done, not necessarily at

24   the request of this specific interrogatory, that

25   could give us the ability to say we are not aware

1   of any issues regarding what's being alleged or

2   asked here.

3        Q.   So in preparing this response, for

4   example, you did not go, and before you verified

5   it, you didn't go and review investigative files or

6   speak with Frances Watson or others in the

7   investigative department; right?

8        A.   I personally didn't.  However, employees

9   together, staff, Mr. Germany, Blake, Frances at the

10  time, she's no longer with the office, obviously,

11  I'm sure they were all discussed with them, and it

12  was represented to me that we have no knowledge.

13       And I am still aware of no alleged actual

14  acts other than some of the claims made by the

15  President, some of their failed lawsuits.  So I

16  have no evidence of anything like that happening --

17  former president, pardon me.

18       Q.   But when you verified this, you relied on

19  the representations from counsel that this was

20  accurate; is that right?

21       A.   And staff.

22       Q.   What staff?

23       A.   State staff.

24       Q.   Sorry.  Who specifically?

25       A.   Mr. Germany.  I mean, everybody involved

Page 174

1    in pulling these together, which my assumptions

2    were would be our investigations division,

3    Mr. Germany working with our counsel and, you know,

4    working with our elections divisions.

5            Again, we've seen no evidence of that in

6    the state of Georgia.

7        Q.   I just want to make sure I understand that

8    you're assuming that people in the investigation

9    division or otherwise were consulted in preparing

10   this response, you did not personally confirm that;

11   right?

12       A.   I did not personally go to our acting

13   person and ask that question, no.

14       Q.   Okay.  And you did not personally confirm

15   with counsel, for example, that they or anyone else

16   had consulted the investigations division for this

17   answer; right?

18           MR. RUSSO:  And I'm just going to

19       object to the extent it calls for

20       attorney-client privileged communication.

21           THE WITNESS:  Again, it's sort of

22       like a dog that didn't bark.  It wouldn't

23       occur to me that anything would be

24       represented to me incorrectly.

25   BY MR. CROSS:

Page 175

1      Q.   And I'm not suggesting that it's

2   incorrect.  I just want to understand what you're

3   relying on, Mr. Sterling, versus what you're

4   assuming.  That's all I'm trying to get at.

5      A.   Okay.

6      Q.   So for this response, you did not confirm

7   with counsel or others that, in preparing this

8   response, someone actually consulted the

9   investigations department.  That's something you're

10  assuming happened.  You don't know that it

11  happened.

12           Is that right?

13     A.   That is correct.  I am making an

14  assumption of that particular, very specific

15  statement, yes.

16     Q.   Okay.

17     A.   But also, outside of that I have my own

18  basic knowledge that I talked to the investigators

19  and the chief investigator and the acting chief

20  investigator.  And I'm making an assumption there

21  that if some -- if there was a claim of a hack or

22  there was evidence of it, it would have kind of

23  bubbled up to the top to begin with.  And I am not

24  aware of anything like that.  So it didn't occur to

25  me to say, are you sure?

Page 176

1      Q.   Yeah.  But the -- we've seen that

2  information regarding the security of the election

3  system does not always get shared with folks across

4  the office, including yourself; right?

5           MR. RUSSO:  Objection to form.

6           THE WITNESS:  And again, in the

7      investigation side, I don't have -- that

8      statement is not the case.

9  BY MR. CROSS:

10     Q.   So you're saying you have complete

11 visibility into everything that the investigations

12 department and the Secretary does, what they

13 investigate, how they investigate and what they

14 find with respect to election security?

15     A.   No.  What I said was, if something had

16 reached that level of what would be an accused

17 hacking or anything like that, again, in all

18 likelihood my assumption is it would have bundled

19 up -- bubbled up to the senior leadership, and that

20 did not happen.

21     Q.   And yet it did not bubble up to senior

22 leadership that Dr. Alex Halderman had created a

23 nearly hundred-page report identifying

24 vulnerabilities with the election system in July of

25 2021; right?

1            MR. RUSSO:  Objection.

2            THE WITNESS:  I believe -- I don't

3        believe I said that.  We were aware that

4        happened.  It's inside of a lawsuit, which

5        is litigation, which is a different animal

6        than the actual regular functioning of the

7        office.

8    BY MR. CROSS:

9        Q.   So information that's developed in a

10   lawsuit is treated differently than information

11   that arises in the ordinary course; is that right?

12       A.   I would say in a general statement that

13   that's correct, yes.

14       Q.   All right.  And the response here refers

15   to being "hacked in an election in Georgia."  Do

16   you see that?

17       A.   In the final sentence, yes.

18       Q.   Yeah.  If you come back to the request,

19   which is quoted in that second paragraph we read

20   earlier, "describe with specificity each successful

21   or attempted instance of unauthorized access to or

22   copying or alteration of" the following equipment,

23   I just want to make sure we're not missing each

24   other on terminology.

25            As a representative of the Secretary of

1    State's office, as the individual who verified the

2    responses to these interrogatories, are you aware

3    of any successful instance of unauthorized access

4    to or copying or alteration of data or software on

5    any equipment used with the Georgia election

6    system?

7            MR. RUSSO:  Objection to form.

8            THE WITNESS:  I am not.

9    BY MR. CROSS:

10       Q.   Okay.  And would that include, for

11   example, like, the voter registration system?

12       A.   Yes.

13       Q.   Okay.  Are you aware of any attempted

14   instance of unauthorized access to or copying or

15   alteration of the election system in Georgia?

16            MR. RUSSO:  Objection to form.

17            THE WITNESS:  It depends on what

18       you're defining as the election system in

19       Georgia.  I mean, there was the Logan Lamb

20       issue.  There is, if I remember correctly,

21       around that that was really about an

22       F.T.P. site, not the actual registration

23       system itself.

24            So I want to be careful by answering

25       these things.  I'm unaware of anybody

1    trying to be accomplished by the lack of that word,

2    no.

3         Q.   Okay.  Okay.  All right.  So you're not

4    aware of any interactions, connections or overlap

5    of -- between the data, the equipment or the

6    software from the old D.R.E. system and the new

7    B.M.D. system; is that fair?

8              MR. RUSSO:  Objection to form.

9              THE WITNESS:  Vince, I'm sorry --

10             MR. RUSSO:  I just said, "objection

11        to form."

12             THE WITNESS:  Okay.  That would be a

13        fair statement, yes.

14   BY MR. CROSS:

15        Q.   All right.  Come to 65, please.

16        A.   Okay.  Okay.

17        Q.   And you see 65 says:

18             "Admit that security deficiencies

19         or vulnerabilities identified by

20         Fortalice with the ENet system have

21         not been fully mitigated."

22             Do you see that?

23        A.   I do.  I'm reading it real quick.

24             (Whereupon, the document was

25         reviewed by the witness.)

Page 193

1              THE WITNESS:  Okay.

2      BY MR. CROSS:

3          Q.   And you see the response, the State did

4      not answer this one way or the other.  They don't

5      admit or deny it.

6              Do you know whether security deficiencies

7      or vulnerabilities that Fortalice identified with

8      the ENet system, whether they have been fully

9      mitigated?

10         A.   I know with pretty -- with a lot of

11     certainty that, if not all, the vast majority have.

12     I remember we had a discussion with Merritt about

13     this, God, a while back.

14             And I can't speak to what specifically

15     they were at this point because it's been so long,

16     but I know there were several things that were done

17     on how we managed permissions and passwords and the

18     like.  And I remember there were some bad practices

19     at the county level in some cases where, like, they

20     would have multiple people on a single user ID and

21     password.  That's been stopped.

22             They -- now, if you don't log in for I

23     believe it's 30 days, those credentials are lost.

24     They have to be -- you have to be re-upped.

25     There's multi-factor authentication on all those

1   things.

2          So I do know the vast majority -- I can't

3   recall what they all were.  I do know that the vast

4   majority of those were addressed inside prior to

5   the 2020 election, if memory serves.

6      Q.   As you sit here, you're not aware of which

7   of those deficiencies remains outstanding today; is

8   that right?

9      A.   Or if any, honestly.

10     Q.   Okay.  All right.  Come to 74, please.

11     A.   Okay.

12     Q.   And here it states:

13          "Admit there was no systematic

14       method of tracking the number of

15       Georgia voters that complained that

16       the B.M.D. print-out for their

17       respective votes did not match the

18       selections they each made on the

19       corresponding B.M.D. in the November

20       2020 election."

21          Do you see that?

22     A.   Yes.

23     Q.   And if you come to the second-to-the-last

24   sentence under response, you're welcome to read the

25   whole thing, but that second-to-last sentence says:

Page 202

1        A.    I dis --

2        Q.    -- that you --

3        A.    I dispute that that's the intent of the --

4    of the hand tally that was done.  I do not dispute

5    that that wasn't done, because that wasn't the

6    intent for the hand tally.

7        Q.    Okay.  All right.  Take a look at 81,

8    please.

9        A.    Okay.

10       Q.    It reads:

11             "Admit that the full hand recount

12         performed in connection with the

13         November 2020 election did not check

14         whether the human readable text on

15         B.M.D.-marked ballots actually

16         reflected the selections each voter

17         intended for each of those ballots."

18             Do you see that?

19       A.    Yes.

20       Q.    And is that statement true or false, based

21    on your experience?

22       A.    Again, following the same logic train we

23    had in the last question, that wasn't the intent of

24    this.

25             However, when you have -- come to a point

1      1053 percent on the total ballots cast and point

2      0099 percent on the margin, that the human readable

3      matched what was tallied even within the counties

4      and then statewide as well.

5              There is no evidence pointing to the fact

6      that the Q.R. code did not match the human readable

7      portion of the ballot.

8          Q.   But you didn't -- the State didn't

9      undertake any investigation to determine whether

10     the human readable portion of the ballots that were

11     hand tallied, whether that accurately reflected

12     what the voters selected on the B.M.D. screen;

13     right?

14         A.   That is correct.  Except for that the hand

15     tallied showed that the computers counted the way

16     the hands -- that they were marked by the -- by the

17     voter in the human readable portion.

18         Q.   Right.

19         A.   So knowing that, there's no reason to

20     believe that the Q.R. code does not match that, or

21     that in 25 percent of the ballots that the

22     hand-marked didn't match what they had chosen there

23     as well, the tick marks were somehow off in the

24     computers -- tally marks, pardon me.

25         Q.   Right.  But given that the study that the

Page 224

1      Q.    Sorry.  It's in the middle of that first

2    page.

3      A.    Yes.

4      Q.    And there are a couple of issues that are

5    identified, one with Paulding County and one with

6    DeKalb County.  Do you see that?

7      A.    Uh-huh.  Yes.

8      Q.    And then you write back:

9           "Are they duplicating them on

10       hand-marked or B.M.D.?"

11           Do you see that?

12      A.    Yes.  Yes.

13      Q.    And you were talking about duplicating,

14    was it the absentee ballots that were not scanning?

15      A.    Yes.  That's what I was referring to.

16    Looking at this in context, that's what I would

17    have been referring to, yes.

18      Q.    And are -- when the absentee ballots,

19    which are hand-marked, when those sometimes don't

20    scan, are those duplicated so that they can be

21    scanned?

22      A.    Yes.

23      Q.    And are those duplicated both -- well, let

24    me be more precise.

25           When that duplication occurs, is that

Page 225

1    sometimes by marking a new ballot by hand or other
2    times by generating it on a B.M.D.?
3         A.   Yes.
4         Q.   And how is a duplicate ballot in that
5    situation generated on a B.M.D. given there's not a
6    voter that's coming in and using a voter card to
7    vote on the B.M.D.?
8         A.   They would just, following the same
9    process, they would take this is the ballot style,
10   they would have a card that they would then say
11   this is the ballot style to bring up, they would go
12   to the B.M.D., pull that ballot up, and then
13   basically take the hand-marked in their hand and
14   then vote it the same way it was voted on the
15   B.M.D. ballot, and then they would print the B.M.D.
16   ballot with it.
17             And it's supposed to be, when you
18   duplicate it, you're supposed to be able to track
19   back to this duplicated ballot tracks back to this
20   original document, this original artifact.
21        Q.   And so that's something that the, is it
22   the poll worker, the election workers, who does the
23   duplication in that situation with the B.M.D.?
24        A.   In the sit -- normally in that situation,
25   that's going to be at the county level with the not

Page 226

1    poll workers or poll managers, even it'd be -- it

2    would normally be county workers.

3            As an example, one of the things we saw a

4    lot of the duplications done on were in Fulton

5    County.  When they ran their absentee ballots

6    through the cutters, occasionally the cutting

7    machine would grab the ballot and slice it as well.

8            And they would take those ballots and then

9    put -- and then duplicate them onto the B.M.D. --

10   on the B.M.D. machines at the central absentee

11   ballot processing facility.  Like, I saw Rick

12   Barron himself doing some of those.

13       Q.   Okay.  Are you aware of whether the

14   existing B.M.D.s in Dominion -- or sorry, in

15   Georgia can effectively be used as ballot-on-demand

16   printers at the polls meaning, rather than having

17   voters vote on the B.M.D., you check the voters in

18   on the poll pad and then you just use the B.M.D. to

19   print whatever ballot they're supposed to get, and

20   then they can mark it by hand and have it tabulated

21   by the scanner?

22           Are you aware of whether that's do-able

23   with this system?

24           MR. RUSSO:  Objection to form.

25           THE WITNESS:  The way you've outlined

Page 227

```
 1        it, not that I'm aware of, no.
 2     BY MR. CROSS:
 3        Q.   You say the way I --
 4        A.   And I'm sure -- go ahead.
 5        Q.   Well, I just -- you say the way I outlined
 6     it.  Is there some version of that that you're
 7     aware of that can be done?
 8        A.   Not with this -- not with the current
 9     software.
10        Q.   And what is it about the current software
11     that limits that?
12        A.   Well, it's not limiting.  The software is
13     not designed to do that.
14        Q.   Not designed to do what part of what I
15     just described?
16        A.   What you just said is to print out a
17     hand-marked paper ballot to fit that.  One of the
18     issues you have is, when you're doing a ballot,
19     okay, in the state right now there are several
20     different ballot sizes.  There's not a good way to
21     necessarily shrink it down to have the tick marks
22     line up properly inside the polling place scanner
23     and the B.M.D. as we have right now set on eight
24     and a half by 11 paper.
25             There's a lot of logistical issues around
```

Page 228

1   that you'd have to fix first before moving to the

2   kind of system you're talking about.

3           What a more likely outcome would be was

4   that you do a ballot mark -- you do ballot marking

5   like we currently do where you make your selections

6   on the screen, and you could have a ballot on a

7   face that looks like a handwritten ballot but it's

8   actually printed by the B.M.D., and you could still

9   have the advantages of no over-votes, no

10  under-votes and they can look at it.

11          And again, you don't know how the scanner

12  is going to scan it if something's happened there.

13  But they could potentially do that.  But it's hard

14  right now because, take Fulton County, for

15  instance, when we have ballot questions, you're

16  having 21-inch ballots.  And that's just not

17  something that's do-able right now.

18      Q.   Okay.  Each precinct currently has a

19  Dominion mobile ballot printer; right?

20      A.   No.

21      Q.   Okay.  How many precincts have those?

22      A.   None that I'm aware of.

23      Q.   There are no Dominion --

24      A.   Mobile ballot printers are intended to be

25  used at the central location.  Every county was

Page 248

```
 1    position with respect to the vulnerabilities and
 2    risks identified in Professor Halderman's sealed
 3    expert report.
 4            Now, you have not read the report;
 5    correct?
 6         A.   Correct.
 7         Q.   And has Secretary Raffensperger read the
 8    report?
 9         A.   Not to my knowledge.
10         Q.   Okay.  So on February 11th, 2022, the
11    Atlanta Journal & Constitution reported that
12    Secretary Raffensperger had publicly said the
13    following, quote:
14            "Halderman is way off base.  I'm
15         sure that anyone who has that kind of
16         unlimited access could do something,
17         but it's not the real world," end
18         quote.
19            Are you aware of this statement?
20         A.   In general, yes.
21         Q.   Okay.  Does it continue to be the
22    Secretary's position today that any voting system
23    vulnerabilities and risks identified in the
24    Halderman report are not the real world?
25            MR. RUSSO:  Object to form.
```

1          THE WITNESS:  I'm not necessarily

2     going to say that -- not the real world.

3     Are there vulnerabilities that exist?  I'm

4     sure that there are.

5          Are they vulnerabilities that are

6     easily exploitable in an actual election

7     environment?  I do not know that.  And

8     neither does the Secretary.

9          And most of the time we've seen

10    vulnerabilities that are of a cyber

11    nature, or frankly any nature, there is

12    normally layers of processes and items

13    like testing around them that tend to

14    mitigate that possibility.

15         Secondarily, we rely on our

16    contractor, Dominion Voting Systems.

17    Inside that contract they are supposed to

18    keep security up there.  And if they learn

19    of a vulnerability, they're supposed to

20    identify it.

21         Or if they learn of a -- let me --

22    I'm trying to think back to the contract

23    language itself, so I apologize.  I'm not

24    a lawyer, so I don't necessarily say it

25    always correctly.

Page 250

1          But in general, it's up to them to
2      keep the security up there.  But then we
3      have to deal with our counties to make
4      sure they keep these things secure and
5      away from things so there aren't people,
6      you know, monkeying around with them for
7      three days and a screwdriver, those kind
8      of things.
9   BY MR. MCGUIRE:
10     Q.   So it sounds like you're saying that
11  access is key to whether or not there are
12  vulnerabilities?
13          MR. RUSSO:  Let me --
14          THE WITNESS:  Not ex -- sorry.
15          MR. RUSSO:  Just objection to the
16      form of the question.
17          THE WITNESS:  Not necessarily.  That
18      is a major component.  Physical security
19      is the, obviously the front line of all
20      cybersecurity.  And that's one of our main
21      things we have to worry about at all
22      times.
23          That's why we work with the counties
24      to make sure they have these things under
25      lock and key.  Most counties have a

Page 251

1        limited access log where you have to go

2        into where these things are.

3              And as I stated previously, in a

4        generalized way, every system in the

5        world, be it ES&S, Smartmatic, Clear

6        Ballot, anything that involves a computer

7        somewhere in the process, be it a scanner,

8        an E.M.S., a B.M.D., a D.R.E., any of

9        those things, they're computers.  Things

10       can be done to computers by very smart

11       people.

12             It depends on the access they get,

13       the time they have, the knowledge they

14       have.  So all those things, you know, can

15       happen, but you have to do what you can in

16       a real world environment, in an election

17       environment, in order to mitigate those

18       risks.

19   BY MR. MCGUIRE:

20       Q.   Is there some minimum amount of access

21   that your office believes a bad actor would need to

22   have in order to pose a risk to the system?

23       A.   That's too broad of a question to really

24   answer.  I mean, it depends on which kind of

25   vulnerability they're going to go after and also

Page 252

1    what the risk is.

2            There's a much higher risk for somebody

3    if -- depending on what the goals are, too.  If

4    you're trying to flip votes, if you're trying to

5    cause chaos within the system, the voter

6    registration system, you know, if you wanted to go

7    after something, as I stated earlier, flipping the

8    voter identification numbers could cause chaos, but

9    it wouldn't necessarily hurt outcomes of votes.

10           It's too specific [sic] of a question to

11   give you a specific answer to.  I mean, you would

12   need to really narrow it down and say in this

13   instance here, in this instance here, in this

14   instance here, if that makes sense.

15       Q.   Sure.  The thrust of the Secretary's quote

16   that the Halderman report didn't reflect real

17   world, though, the presumption there, you would

18   agree with me, is that Halderman had more access

19   than other actors have to the voting system;

20   correct?

21       A.   More access and potentially even passwords

22   and things like that, as I understand it.  So yeah,

23   I think in general he would have more access.

24           Now, granted, as I stated earlier in the

25   other part of the deposition, bad actors can be bad

1    actors, whether that's with hand-marked paper

2    ballots or computers.  So you always have to be on

3    the lookout for that potentiality.

4              And you know, there's no way to ever know

5    for certain if there's not a bad actor somewhere.

6    But the vulnerabilities are across every kind of

7    voting system manufactured by every manufacturer

8    and every style.

9        Q.   Okay.  Besides government people, Dominion

10   folks and the experts in this case, including

11   Professor Halderman, are you aware of any

12   unauthorized person who has obtained long-term

13   access to Georgia's voting system, to any of the

14   components or to the software?

15             MR. RUSSO:  Objection to form.

16             THE WITNESS:  When you say "voting

17        system," are you referring to,

18        essentially, all the components of the

19        voting system, E.M.S.s, voter

20        registration, I mean, every part and

21        parcel?

22   BY MR. MCGUIRE:

23       Q.   Yeah.  That's what I'm --

24       A.   I am --

25       Q.   -- referring to.

Page 254

1      A.   -- not aware -- I'm not aware of it, no,

2   other than what was, I think Halderman was given,

3   as I've learned from Fulton County.

4           There were claims of that in some specific

5   cases.  There was a claim that in Ware County

6   somebody -- an independent auditor got ahold of it.

7   But that turned out to be -- not to be true.  They

8   didn't misplace anything.  There wasn't anything

9   that was taken away.

10          But outside of that, no, I'm not aware of

11  anybody having inappropriate access, no.

12     Q.   So your office investigated the Ware

13  County incident and concluded that it was nothing?

14     A.   Yes.  Because there was -- there was no

15  incident.  It just didn't happen.  There was not a

16  Ware County B.M.D. taken out.  I mean, it just

17  didn't happen.

18     Q.   Okay.  And I assume your previous answer

19  encompassed this, but just for clarity let me ask.

20  Do you know of any unauthorized person who has

21  imaged any component of Georgia's voting system and

22  taken away copies with them?

23     A.   No.

24     Q.   Okay.  Do you agree with me that, if

25  someone had done that and thereby obtained

Page 379

1        R E P O R T E R   C E R T I F I C A T E
2    STATE OF GEORGIA )
     COBB COUNTY      )
3
4           I, Debra M. Druzisky, a Certified Court
     Reporter in and for the State of Georgia, do hereby
5    certify:
            That prior to being examined, the witness
6    named in the foregoing deposition was by me duly
     sworn to testify to the truth, the whole truth, and
7    nothing but the truth;
            That said deposition was taken before me
8    at the time and place set forth and was taken down
     by me in shorthand and thereafter reduced to
9    computerized transcription under my direction and
     supervision.  And I hereby certify the foregoing
10   deposition is a full, true and correct transcript
     of my shorthand notes so taken.
11          Review of the transcript was requested.
     If requested, any changes made by the deponent and
12   provided to the reporter during the period allowed
     are appended hereto.
13          I further certify that I am not of kin or
     counsel to the parties in the case, and I am not in
14   the regular employ of counsel for any of the said
     parties, nor am I in any way financially interested
15   in the result of said case.
            IN WITNESS WHEREOF, I have hereunto
16   subscribed my name this 3rd day of March, 2022.
17
18
19
20
            Debra M. Druzisky
21          Georgia CCR-B-1848
22
23
24
25

Page 383

```
 1        R E P O R T E R   D I S C L O S U R E
 2   DISTRICT COURT  )   DEPOSITION OF
     NORTHERN DISTRICT)   GABRIEL STERLING
 3   ATLANTA DIVISION )
 4
              Pursuant to Article 10.B of the Rules and
 5   Regulations of the Board of Court Reporting of the
     Judicial Council of Georgia, I make the following
 6   disclosure:
              I am a Georgia Certified Court Reporter.
 7   I am here as a representative of Veritext Legal
     Solutions.
 8            Veritext Legal Solutions was contacted by
     the offices of Morrison & Foerster to provide court
 9   reporting services for this deposition.  Veritext
     Legal Solutions will not be taking this deposition
10   under any contract that is prohibited by O.C.G.A.
     9-11-28 (c).
11            Veritext Legal Solutions has no contract
     or agreement to provide court reporting services
12   with any party to the case, or any reporter or
     reporting agency from whom a referral might have
13   been made to cover the deposition.
              Veritext Legal Solutions will charge its
14   usual and customary rates to all parties in the
     case, and a financial discount will not be given to
15   any party in this :
16
17
                            Debra M. Druzisky
18                          Georgia CCR-B-1848
19
20
21
22
23
24
25
```