# EXHIBIT 85

Page 1

1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION
3      DONNA CURLING, ET AL.,        )
                                     )
4            Plaintiffs,             )
                                     )
5      vs.                           )      CIVIL ACTION NO.
                                     )
6      BRAD RAFFENSPERGER, ET        )      1:17-CV-2989-AT
       AL,                           )
7                                    )
             Defendants.             )
8
9
10
11
12
13        VIDEOTAPED 30(b)(6) DEPOSITION OF OFFICE OF THE
                       SECRETARY OF STATE
14              (through William "Chris" Harvey)
15              (Taken by the Curling Plaintiffs)
16                    January 28, 2022
17                       8:40 a.m.
18
19
20
21
22
23
24
25        Reported by:   Debra M. Druzisky, CCR-B-1848

1      Q.   Okay.  So let me jump to the topics.  And

2   you were designated on two topics, topics 12 and

3   18.  Do you see topic 12 up here?

4      A.   I do.

5      Q.   And it's:

6           "Communications with the U.S.

7        Election Assistance Commission

8        regarding any software changes

9        involving Georgia's current election

10       system or otherwise relating to any

11       actual or contemplated request for

12       E.A.C. approval for any aspect of

13       Georgia's current election system."

14          And am I right that you're designated to

15   testify on behalf of the Secretary's office on that

16   topic today?

17      A.   That's correct.

18      Q.   What did you do to prepare yourself to

19   testify on that topic?

20      A.   I spoke with counsel and just went through

21   my memory and recollection about communications

22   with the E.A.C.

23      Q.   Did you speak with anyone other than

24   counsel for this topic?

25      A.   No.

Page 25

```
 1     any differences.
 2          Q.   If you wanted to learn the details of what
 3     was done in that examination, who would you ask?
 4          A.   I'd probably ask Jordan Fuchs.
 5          Q.   And do you know, for that examination, did
 6     Pro V&V look at the hash values on the equipment?
 7               MR. RUSSO:  Object.  He's testified
 8          he wasn't involved and didn't know
 9          anything about it.
10               MR. CROSS:  If he doesn't know, he
11          can say he doesn't know.
12     BY MR. CROSS:
13          Q.   If you don't know --
14          A.   I don't know.  I don't know exactly what
15     they did.
16          Q.   Okay.  All right.  That's fine.  I just
17     wanted to see if there was any details you had.
18               Okay.  To the software change in the fall
19     of 2020 we mentioned before, did the E.A.C. express
20     any concerns about that?
21          A.   Not that I'm aware of.
22          Q.   Okay.  All right.  If you can scroll down
23     to topic 18.  It's on -- oh, there are no page
24     numbers on this.  Sorry.  It's the last topic in
25     Exhibit 1, and just let me know if you need help.
```

Page 26

1       A.    Okay.

2       Q.    Do you have that in front of you,

3   Mr. Harvey?

4       A.    I do.

5       Q.    Okay.  And do you see the topic here is,

6   the Secretary's office -- "your" refers to the

7   Secretary's office:

8            [As read]  "The Secretary's

9         office's process for preserving

10         information within your possession,

11         custody or control potentially

12         relevant for this matter, including

13         any communications with counties or

14         other entities or individuals

15         regarding the same."

16            Do you see that?

17       A.    Yes, sir, I do.

18       Q.    And do you understand you were designated

19   to testify on that topic as well?

20       A.    Yes.

21       Q.    Okay.  What did you do to prepare for that

22   topic?

23       A.    I spoke with counsel.  I reviewed a couple

24   of E-mails on this topic and sort of searched my

25   memory for any relevant information.

1   statements or evidence about exactly what had gone

2   on if it was a significant issue.

3        Q.   So you respond to Ms. Watson in this

4   E-mail:

5             "10-4, I assume you're

6        investigating."

7             Do you see that?

8        A.   Yes.

9        Q.   And was there an investigation done of the

10  concern that was raised by Laura Jones here on

11  November 5th of 2020?

12       A.   I don't know.  I assume there -- I assume

13  there was.  This is certainly the kind of thing

14  that would have risen to the level of an

15  investigation.

16       Q.   Who would you ask if you wanted to know

17  whether there was an investigation done and what

18  the outcome was?

19       A.   Well, now I'd ask the current -- I think

20  it's the interim investigator.  His name is James

21  Callaway.  Frances Watson has moved on.  She's no

22  longer there.  So I would ask Interim Chief

23  Investigator Callaway to -- he would be able to

24  give the status of any investigations.

25       Q.   When --

Page 52

```
1        A.   It would be in the investigations
2    division.
3        Q.   Do you know whether any steps were made to
4    preserve and collect documents from the
5    investigations division for this case?
6        A.   I know that the investigative files are
7    kept for I think either five or seven years as just
8    a normal -- in the normal course of business.  I
9    don't know specifically if attempts were made to
10   get them or not or -- as part of discovery.
11       Q.   If you look at the concern raised here by
12   Laura Jones on November 5th, 2020, there are a
13   number of things that she points out here, but one
14   of the things she points out is that they used
15   election equipment where the election database
16   doors that had been opened and seals had been
17   broken.
18            Do you see that?
19       A.   I know that she said the doors were open.
20   Let's see.  Well, she says that:
21            "...we did use all the other
22        machines that had the election
23        database door open."
24            I don't think she says the seals were
25   broken.  But I guess if the doors are open, then --
```

Page 53

1          Q.    Yeah.   If you look at the third line, do
2     you see where she writes -- well, we can start at
3     the beginning so you've got the whole context.   She
4     says:
5              "When we opened the large cabinets
6          containing the voting machines, we
7          discovered that most of the voting
8          machines' 'election database' doors
9          were wide open and not secured with a
10         zip tie" --
11         A.    Right.
12         Q.    -- "with serial" -- she goes --
13         A.    I see that.
14         Q.    Yeah.   She goes on:
15             "Seals were already broken or a
16         zip tie was put on but was not put
17         through the door."
18             Do you see that?
19         A.    I do.
20         Q.    You also indicate --
21             THE VIDEOGRAPHER:   Sorry.   I'm sorry,
22         Mr. Cross.   There's something -- this is
23         the videographer.   There's something a
24         little weird going on with the audio.
25             So if you could --

1          MR. CROSS:  With Mr. Harvey?

2          THE VIDEOGRAPHER:  I don't know if

3      it's coming from Mr. Harvey or from your

4      end, but --

5          MR. CROSS:  Oh.

6          THE VIDEOGRAPHER:  -- if you guys

7      could just give each other maybe a half a

8      beat between questions and answers, maybe

9      that'll help.  I'm not sure.  But there's

10     some kind of interference.

11         MR. CROSS:  Okay.

12  BY MR. CROSS:

13     Q.   Okay.  Mr. Harvey, do you see that she

14  indicates I believe one of the machines -- well, to

15  be precise, she says:

16         [As read]  "One of our machines

17      did show one ballot had been cast on

18      it even though the machines were

19      supposed to show a zero balance at

20      that point."

21         Do you see that?

22     A.   Right.  And then she goes on to say:

23         "We did not use this machine..."

24     Q.   Right.  That one she did not use.

25         Is it fair to say that, using voting

1   machines in an election where the election database

2   doors were open and seals were broken before the

3   election began, that that would not comply with

4   state policies?

5        A.   I think the regulation is that, if there

6   is some type of discrepancy, either with a seal or

7   some concern, it has to be essentially -- I'm not

8   sure what the word would be.  It has to be resolved

9   or it has to be sort of examined and determined if

10   that's an issue or if that's a significant problem.

11   If you can't determine that it's good, you should

12   put it aside.

13        But I think there is -- I think there is a

14   provision in either the law or the S.E.B. rules

15   that does put the onus on the election folks to

16   resolve or, you know, or satisfy themselves that

17   that is good to use before you use it.

18        Q.   Do you know whether any analysis was done

19   of the machines described here after this complaint

20   came in to determine whether they had been

21   compromised or were otherwise unreliable for an

22   election?

23        A.   I don't know.

24        Q.   Who would you ask?

25        A.   I would ask either the Secretary of State

Page 56

1    investigator who did this or I would ask Fulton

2    County.

3         Q.   All right.  Grab the next exhibit, if you

4    would, please, which is Exhibit 6.

5                         (Whereupon, Plaintiff's

6                         Exhibit 6 was marked for

7                         identification.)

8              THE WITNESS:  Yeah, let me refresh

9         here.

10   BY MR. CROSS:

11        Q.   Okay.

12        A.   Okay.  I've got it.

13        Q.   Okay.  Do you see that Exhibit 6 is an

14   E-mail that you received from David Worley on

15   October 10th, 2020?

16        A.   Yes.

17        Q.   Who is David Worley?

18        A.   David Worley at the time was the

19   democratic representative to the -- appointee to

20   the State Election Board.

21        Q.   What organization was he with at this

22   time?

23        A.   Well, he was the Democratic Party

24   representative, and he was a private attorney.  I

25   don't know if that answers your question.

Page 62

1    on November 9, 2020, the description of the

2    violation is "many voting machines unlocked during

3    the day."

4              Do you see that?

5         A.   Yes.

6         Q.   And the location is the Hartwell polling

7    place library.  Do you see that?

8         A.   Yes.

9         Q.   And there's a Twitter link here.  And if

10   you read the whole context of the E-mail, you'll

11   see that whoever sent this in put up photos of

12   voting machines that were apparently, according to

13   this person, unlocked during the day.

14             Do you see that?

15        A.   I see that.

16        Q.   Do you know whether there was an

17   investigation done in this situation?

18        A.   I don't know.  But again, this is one that

19   I would certainly expect an investigation to have

20   been done.

21        Q.   If you wanted to review any -- review the

22   investigation file, any report, and understand what

23   was done and what the findings were, who would you

24   ask?

25        A.   The current acting chief, Mr. Callaway.

1     my -- I -- look at my voting history, I think you'd
2     find I do it about 50/50.
3          Q.   Okay.  When you voted on the B.M.D., is it
4     fair to say that you weren't able to read the Q.R.
5     code on your ballot to determine how that Q.R. code
6     was getting tabulated?  Is that right?
7          A.   That's correct.  I -- but I did see the
8     print-out below it of what my choices were.
9          Q.   Okay.  But you understand that the human
10    readable portion of your ballot does not count in
11    any election in terms of what gets tabulated;
12    right?
13              MR. RUSSO:  Object.  Objection to
14         form.
15              THE WITNESS:  I would, while I would
16         generally agree, I believe, and I'd have
17         to go back and look at the code, I think
18         for -- if there's a recount or something
19         like that, then I think it does count.
20         So.
21              But generally, I agree with your
22         premise.
23    BY MR. CROSS:
24         Q.   A recount in Georgia simply rescans the
25    ballots; right?

1          MR. RUSSO:  Objection.  Form.

2          THE WITNESS:  It does.  But I'm,

3      again, I'm -- I can't cite exactly where

4      it is in the code, but I believe there is

5      a provision somewhere that says, if

6      there's some inconsistency, you go with

7      what's actually printed, the name that's

8      printed on the ballot.

9  BY MR. CROSS:

10     Q.   And in order to examine the human readable

11 portion for tabulation purposes, that can occur

12 only in an audit that's authorized by the Secretary

13 of State; is that right?

14         MR. RUSSO:  Objection to form.

15         THE WITNESS:  Again, I -- I'm not

16     sure about that.  Again, I think there may

17     be some provision that, if there's some

18     type of dispute about a vote, you go with

19     the human readable form.

20 BY MR. CROSS:

21     Q.   Okay.  As a voter, would you prefer to

22 cast a vote that's scanning human readable text for

23 the tabulation rather than a Q.R. code?

24     A.   Probably.

25     Q.   Because then you could actually, you could

Page 73

```
 1    read what's being tabulated in the first instance
 2    yourself; right?
 3         A.   Well, yes.  Assuming that the scanner is
 4    set up and is secure and is tabulating it in
 5    accordance with that.
 6         Q.   Right.  Are you aware that -- well, let me
 7    ask a threshold question.  Are you familiar with an
 8    election security expert named Alex Halderman?
 9         A.   Yes.
10         Q.   In fact, you've, I think you've testified
11    at hearings in this case with -- where you both
12    testified; right?
13         A.   Yes.  Although I've not seen -- I wasn't
14    in the room when he testified, but I'm certainly
15    familiar -- certainly familiar with his reputation
16    and his work.
17         Q.   Okay.  And what are you familiar with
18    regarding his reputation and work?
19         A.   That he's considered an expert in security
20    sys -- or election systems and security and that
21    he's been -- I guess Judge Totenberg, I don't know
22    what the designation is, but essentially designated
23    him or allowed him unprecedented access to check
24    the Georgia voting system.
25              So I mean, obviously he's got credentials
```

Page 74

1    to do this stuff.

2         Q.   Okay.  And you anticipated where I was

3    going.  You mentioned that he got access to

4    election equipment in Georgia.  Are you aware that

5    he prepared a report of nearly a hundred pages on

6    that analysis that was provided to the State's

7    lawyers on July 1st of last year?

8         A.   I just read that in the A.J.C. I think

9    yesterday or the day before.

10        Q.   So you did not know that before the A.J.C.

11   article?

12        A.   No.  And I, remember, I had -- I

13   essentially left the Secretary's office at the end

14   of May.

15        Q.   Okay.  So fair to say you have not read

16   that report?

17        A.   That's correct.  I have not.

18        Q.   Okay.  Would you expect the Secretary's

19   office to address any significant vulnerabilities

20   with the election system that Dr. Halderman

21   identified in that report?

22        A.   I would expect the Secretary of State's

23   office to address any vulnerabilities from any

24   source in an evaluation of, you know, considering

25   all the different factors that come in.

Page 75

1      Q.    Why?

2      A.    Well, because if there's a security issue,

3    it needs to be -- if you can confirm that it is an

4    issue, you'd want to -- you'd want to fix it.  You

5    may get reports that are -- that are not security

6    issues or false reports that you want to be able

7    to, you know, counter with a fact that, hey, this

8    is a -- this is a false report or this is a -- this

9    flaw doesn't exist or whatever the case may be, I

10   think.

11          But I would expect them to certainly

12   consider anything that would come in that would be

13   able to secure the system.

14     Q.    And is it fair to say that taking

15   reasonable measures to mitigate known

16   vulnerabilities with an election system and being

17   able to tell voters that you've done that, that

18   that helps drive voter confidence in the election

19   system?

20          MR. RUSSO:  Objection.  Form.

21          THE WITNESS:  Can you ask the first

22     part of that again?

23   BY MR. CROSS:

24     Q.    Sure.  Taking measures to mitigate known

25   vulnerabilities with an election system and being

1  able to tell voters that those measures have been

2  taken, without getting into specifics, just letting

3  voters know that measures have been taken to

4  address known vulnerabilities with an election

5  system, would you expect that to help drive voter

6  confidence in that system?

7          MR. RUSSO:  Objection to form again.

8          THE WITNESS:  I would think it would

9      be helpful.

10  BY MR. CROSS:

11      Q.   As a voter yourself, would you have more

12  confidence in a system where known vulnerabilities

13  have been addressed or in a system where known

14  vulnerabilities have not been addressed for six

15  months or more?

16          MR. RUSSO:  Objection to form.  Lacks

17      relevance.

18          THE WITNESS:  I'd want issues

19      addressed.

20  BY MR. CROSS:

21      Q.   Okay.  You were still with the Secretary's

22  office in September 2020 when Dr. Halderman

23  testified in a hearing before Judge Totenberg in

24  this case; right?

25      A.   Yes, I was.

Page 77

1          Q.    And I won't get into the specifics of his

2    testimony, but just at a general level, were you

3    aware that he testified and actually did a

4    demonstration by video for the judge showing that

5    he was able to hack Georgia's B.M.D. equipment?

6               MR. RUSSO:  Objection to form.

7               THE WITNESS:  No, I'm not aware of

8          that.

9    BY MR. CROSS:

10         Q.    So even when you were the elections

11   director, no one informed you that Dr. Halderman in

12   the span of only three days with Fulton County's

13   B.M.D. equipment was able to hack it where it would

14   produce Q.R. codes that did not match the

15   selections on the B.M.D.?

16              MR. RUSSO:  Objection to form.  And

17         lacks foundation.

18              THE WITNESS:  I don't believe I -- I

19         don't believe I was aware of that.

20   BY MR. CROSS:

21         Q.    Isn't that something you would expect to

22   know as the elections director so that you could at

23   least be aware of that vulnerability in the system?

24         A.    Yeah, I would want to know that.

25         Q.    And so is it fair to say you're also not

Page 78

1      aware of any measures taken by the Secretary's

2      office or any county to address that vulnerability?

3              MR. RUSSO:  Same objection.

4              THE WITNESS:  I'm not aware of

5          anything that was -- that came as a result

6          of what you're saying he did.

7      BY MR. CROSS:

8          Q.   Okay.  All right.  Take a look at Exhibit

9      8, if you would, please.

10                         (Whereupon, Plaintiff's

11                          Exhibit 8 was marked for

12                          identification.)

13              MR. RUSSO:  And David, before we go

14          into this, I need to take a break in about

15          seven minutes so we can swap.  I have

16          another matter to deal with that I

17          mentioned earlier.

18              MR. CROSS:  Do you want --

19              MR. RUSSO:  I don't know how long --

20          yeah, I don't know how long you're going

21          to need on this exhibit.  I'm not -- my

22          computer actually hasn't even brought it

23          up yet, but.

24              MR. CROSS:  I don't need to take

25          long.  I think we can get through this and

1    reporting page.  But it -- but it never leaves the

2    E.M.S.  It stays on the E.M.S.  And what's on the

3    E.M.S. is the official -- the official vote.

4         Q.   Where do the counties get the U.S.B.

5    drives that they use to copy the election results

6    from the E.M.S. into the E.N.R. system?

7         A.   I think initially we sent them some U.S.B.

8    drives to do that.  I think we had -- we had talked

9    about having a procedure where we would send them a

10   new U.S.B. drive before every election and,

11   basically, have it be disposable.

12            I don't know if they -- if they adopted

13   that.  We hadn't had any other elections before I

14   left.

15        Q.   Okay.  So before you left, the counties

16   were typically reusing the U.S.B. drives instead of

17   getting new ones from the State for each election?

18        A.   They all got new ones for -- with the new

19   system, but I couldn't -- I couldn't tell you if

20   some counties may have reused them or used old

21   systems or got -- old drives or got new drives.

22        Q.   Who would you ask if you wanted to know

23   the answer to that question?  Is that a county

24   level question?

25        A.   I think you'd have to ask each county.

1   work with E.M.S.

2            Now, you know, they often would have the

3   techs at their side doing it, again, in some sense

4   maybe walking them through the process or

5   confirming that they were doing the right thing.

6   But it was -- it was our expectation of the

7   counties that the counties were doing that.

8            Now, you know, depending on how good

9   somebody was with the E.M.S. system, they may have

10   had more or less help with it from a tech.

11        Q.   Who at the state level has administrator

12   access to voting equipment in Georgia?

13        A.   Well, what -- I mean, that's a very big

14   question.  The -- as far as the local E.M.S. and

15   things like that, those would be county

16   restrictions.  So nobody at the state would have

17   access to, you know, Cobb County's E.M.S. password.

18            We would have -- I think state employees

19   might have access to the E.N.R. system to help a

20   county, like, if they got logged out or something

21   like that.

22            But generally speaking, the passwords and

23   the access to local election equipment are -- the

24   state election equipment that's operated by the

25   counties is a county issue that we wouldn't have.

1          I certainly didn't have a notebook that

2     had, you know, county passwords or anything like

3     that.  And nor do I believe anyone in the state

4     did.

5          Q.   Who has administrator access to components

6     of the election system at the state level?

7          A.   Well, I guess it depends on what

8     components you're talking about.  For ENet it would

9     generally be I would have access.  The assistant

10    administrator would have had access.

11          Merritt Beaver and/or people he designated

12    in his team would have had access.  I believe Kevin

13    Rayburn when he was the deputy would have had

14    access.  But a pretty small number of people for

15    the -- for the ENet system, and pretty much

16    everything else was local.

17          I mean, there were -- there are no other

18    really connected networks that talk to each other.

19    I mean, the Lowndes County E.M.S. didn't talk with

20    the -- anything at the state.  It had to be -- the

21    data had to be pulled from it and sent to E.N.R.

22    for us to get it.

23          So there wasn't -- there really weren't

24    statewide networks except for ENet.

25          Q.   Okay.  So you had passwords, you had

1    experience as the elections director for Georgia,

2    are you aware of any effort by anyone to alter or

3    manipulate the outcome of the 2020 election in

4    Georgia?

5         A.   No.

6         Q.   Is that something that you would expect to

7    have been brought to your attention if someone at

8    the Secretary's office had learned that something

9    like that had happened?

10             MR. MILLER:  Objection.  Calls for

11        speculation.

12             THE WITNESS:  I would have -- I would

13        expect something like that to be brought

14        to my attention.

15   BY MR. CROSS:

16        Q.   As a voter in Georgia, is it important to

17   you that your vote is counted as you intended it to

18   be counted?

19        A.   Yes.

20        Q.   Why?

21        A.   Because that's one of my fundamental

22   rights.

23        Q.   What if the election outcome comes out the

24   way you want it but your vote had not been counted,

25   would that matter to you?

1          A.    It would.

2          Q.    Why?

3          A.    Well, assuming that I cast my vote legally

4     and properly, each -- my vote should be a record.

5          Q.    Okay.  Are you aware of a situation where

6     election workers, when they were transmitting

7     ballots coming out of the B.M.D. system, they

8     stopped at one of the election workers' homes, one

9     of them took a shower, the ballots sat in their

10    cars in the driveway for some period of time, and

11    then they finally made it on to the county election

12    facility where those ballots were supposed to be

13    stored and the results were supposed to be

14    transmitted to the State?

15               MR. MILLER:  Object to form.

16               THE WITNESS:  I believe I recall

17         that.  I -- although I don't remember

18         where it was.  But that sounds -- that

19         sounds familiar.

20    BY MR. CROSS:

21         Q.    Fair to say that's not consistent with

22    State protocol or County protocol; right?

23         A.    I agree.

24         Q.    Okay.  Do you know of any efforts that

25    were taken to confirm that that incident did not

Page 219

1     affect the tabulation of the ballots in that county

2     for that election?

3              MR. MILLER:  Objection.  Lacks

4        foundation.

5              THE WITNESS:  I -- I'm not aware of

6        follow-up steps to that.

7     BY MR. CROSS:

8        Q.   Who would you ask if you wanted to know?

9        A.   Probably the county election director.

10       Q.   Okay.

11             MR. CROSS:  All right.  Let's go off

12       the record.  I'm pretty close to done.

13       Let me just look at my notes real quick,

14       if that's all right, Mr. Harvey.

15             THE WITNESS:  Sure.

16             THE VIDEOGRAPHER:  The time is 2:10

17       p.m.  We're off the record.

18             (Whereupon, a discussion ensued

19        off the record.)

20             (Whereupon, there was a brief

21        recess.)

22             THE VIDEOGRAPHER:  The time is 2:15

23       p.m.  We're on the record.

24     BY MR. CROSS:

25       Q.   Mr. Harvey, is voter confidence in an

Page 282

1        R E P O R T E R    C E R T I F I C A T E
2    STATE OF GEORGIA )
     COBB COUNTY      )

3

4            I, Debra M. Druzisky, a Certified Court
     Reporter in and for the State of Georgia, do hereby
5    certify:
             That prior to being examined, the witness
6    named in the foregoing deposition was by me duly
     sworn to testify to the truth, the whole truth, and
7    nothing but the truth;
             That said deposition was taken before me
8    at the time and place set forth and was taken down
     by me in shorthand and thereafter reduced to
9    computerized transcription under my direction and
     supervision.  And I hereby certify the foregoing
10   deposition is a full, true and correct transcript
     of my shorthand notes so taken.
11           Review of the transcript was requested.
     If requested, any changes made by the deponent and
12   provided to the reporter during the period allowed
     are appended hereto.
13           I further certify that I am not of kin or
     counsel to the parties in the case, and I am not in
14   the regular employ of counsel for any of the said
     parties, nor am I in any way financially interested
15   in the result of said case.
             IN WITNESS WHEREOF, I have hereunto
16   subscribed my name this 11th day of February, 2022.
17
18
19
20   _____
             Debra M. Druzisky
21           Georgia CCR-B-1848
22
23
24
25