# EXHIBIT 105

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2               ATLANTA DIVISION
3

   DONNA CURLING, ET AL.,

4
            Plaintiffs,
5                     CIVIL ACTION FILE
     vs.             NO. 1:17-CV-2989-AT
6

   BRAD RAFFENSPERGER, ET AL.,

7
            Defendants.
8

9

10

11        VIDEOTAPED ZOOM DEPOSITION OF
              MICHAEL BARNES
12

         February 11, 2022
13            9:04 A.M.
14

15       Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC
16

17

18

19

20

21

22

23

24

25

```
 1          are off the record.

 2               (Off the record.)

 3               VIDEOGRAPHER:  The time is 9:12 a.m.

 4          We're on the record.

 5     BY MR. CROSS:

 6          Q.   All right.  Mr. Barnes, you have

 7     Exhibit 1?

 8          A.   Yes, sir, I do.

 9          Q.   All right.  So take a look at Exhibit 1 in

10     front of you.

11               And do you understand that you are

12     designated to testify today on Topic 1?

13          A.   Yeah, I remember seeing a list of topics

14     in which I was designated as being the one that

15     would speak.

16          Q.   Okay.  So just read through Topic 1, the

17     subparts a through h, and tell me if you're prepared

18     to testify on that topic today.

19               MS. LaROSS:  And, David, we're going to be

20          reserving all objections except those to the

21          form of the question or responsiveness of the

22          answer until trial; is that correct?

23               MR. CROSS:  Yeah, that's the default under

24          the federal rules, yeah.

25               MS. LaROSS:  Sure.  And I just -- you
```

1          know, we go into each deposition and often say

2          it or don't, but I just wanted to clarify --

3                MR. CROSS:  Okay.

4                MS. LaROSS:  -- we just have that standing

5          agreement with you guys.  That's -- I just

6          wanted the record to be clear.

7                MR. CROSS:  Okay.

8                THE WITNESS:  I've looked at the items in

9          point 1a through h, and those are the items I

10         am familiar with, yes, sir.

11    BY MR. CROSS:

12         Q.   Okay.  Then go on to Topic 2, please, and

13    let me know if you're prepared to testify on that

14    today.

15                MS. LaROSS:  David, I believe David

16         Sterling is designated for 2c.

17                MR. CROSS:  Okay.  Great.  That's right.

18         Sorry.

19    BY MR. CROSS:

20         Q.   So, Mr. Barnes, just look at 2a, b, and d.

21         A.   2a, b, and d, I -- I believe I'm prepared

22    to testify on those items.

23         Q.   Okay.  And then look at Topics -- just to

24    make sure -- yeah, look at Topics 7 through 11, so

25    7, 8, 9, 10, and 11, and let me know if you're

Page 13

1       prepared to testify on those topics today.

2               A.   Yes, sir, I believe I'm prepared.

3               Q.   And then the last one is Topic 18, the

4       last one in the list, and let me know if you're

5       prepared to testify on that, too, please.

6                    MS. LaROSS:  It's my understanding, David,

7                    that that one -- that topic was -- we

8                    designated David Sterling, Merritt Beaver, and

9                    Chris Harvey.

10                   MR. CROSS:  Sorry.

11                   MS. LaROSS:  And some of the topics in the

12                   7 --

13                   MR. CROSS:  Yeah, that's right.  Sorry.

14              Yeah.

15                   MS. LaROSS:  Okay.  No -- no worries.

16                   And some of the topics in 7 through 11 we

17                   also designated either Mr. Sterling or

18                   Mr. Beaver, but there is certainly overlap with

19                   Mr. Barnes.

20                   MR. CROSS:  Yeah.  Okay.

21                   MS. LaROSS:  Great.  Thank you.

22      BY MR. CROSS:

23              Q.   Mr. Barnes, what did you do to prepare to

24      testify on these topics today?

25              A.   I have met with our attorneys.

1   Management System, and then media created and then

2   the testing executed.

3           Q.    And who decided on that process today?

4           A.    It was -- I was involved in that decision,

5   along with attorneys in the Secretary of State's

6   office.

7           Q.    What attorneys?

8           A.    When we set it up last was Ryan Germany

9   and Kevin Rayburn, when he was deputy general

10  counsel.

11          Q.    When the new system was implemented with

12  BMDs, was there any discussion of Mr. --

13  Dr. Shamos's testimony and about the need to test a

14  whole lot more than a single BMD and printer?

15                THE WITNESS:  I --

16                MS. LaROSS:  Objection to the form of the

17        question.

18                THE WITNESS:  I do not recall.

19  BY MR. CROSS:

20          Q.    As the head of CES, is it your view that

21  testing a single BMD and printer on election day is

22  a reliable way of assessing the security and

23  reliability of some 30,000 BMDs and printers across

24  the state?

25          A.    When we enter into the testing, the way

 1     that the project files are built in regards to

 2     programming a BMD, when you're within a single

 3     jurisdiction, there's only one data file created

 4     from that jurisdiction's data election project

 5     that's used to program a BMD.  So the same data file

 6     is used to program all BMDs within a single county.

 7               So if we randomly select a county, have

 8     them create a backup, bring that backup into

 9     Atlanta, install that into a Dominion Election

10     Management computer, then create the election file

11     that's used to program a BMD, we would be putting

12     the same file on one BMD or 500 BMDs.  So it's an

13     expectation that if one BMD shows proper operation,

14     that others would as well.

15          Q.   So is the answer to my question yes, you

16     think that is a reliable method?

17          A.   We have found to be -- we have found it to

18     be reliable in the past.

19          Q.   You've found it to be reliable because

20     it's never shown malware or a glitch with whatever

21     equipment you tested?

22          A.   We --

23               MS. LaROSS:  Objection to the form of the

24          question.

25               You may answer.

```
 1            THE WITNESS:  We have never encountered
 2       any situation where the system did not operate
 3       as expected.
 4  BY MR. CROSS:
 5       Q.   Do you have a background in statistics?
 6       A.   I took some statistical classes in
 7  graduate school, yes, sir.
 8       Q.   So why doesn't the State test a
 9  statistically representative sample of voting
10  equipment, instead of 1 out of some 30,000 pieces?
11            MS. LaROSS:  Objection to the form of the
12       question.
13            THE WITNESS:  As you speak, there are
14       30,000 pieces of equipment.  Depending upon
15       what sampling you were to set up, you would
16       then have to have access to that amount of
17       equipment and a location to set all of that
18       equipment up for testing purposes and manpower
19       to go through that testing exercise.
20  BY MR. CROSS:
21       Q.   And that's not something the State can do?
22       A.   The State, of course, has resources.  My
23  office has a total of seven individuals, and that
24  would be a hard task for us to execute on a single
25  day.
```

Page 30

1      Q.   Are you aware that there are USB ports in

2  the current voting equipment, the BMDs and the

3  printers, that are accessible to voters in the

4  voting booth?

5      A.   I am aware that there are USB ports on the

6  devices.  However, accessible by the voter on

7  election day, I would -- I would raise question of

8  that.

9           Because the B -- the D -- the BMDs on

10 election day, the -- the panels where you would find

11 those USB ports are behind sealed mechanisms.  There

12 are seals that are attached on the sides of the BMD,

13 there are seals that are attached on the sides of

14 the printers, to prohibit access to those locations.

15     Q.   So it's your understanding that all the

16 USB ports on the printers and BMDs are covered by

17 seals on election day?

18     A.   It is my understanding, yes, sir.

19     Q.   But you haven't inspected those; right?

20     A.   I have not been out into a county on

21 election day, no, sir.

22     Q.   And who is responsible for inspecting all

23 of the seals on all of the voting equipment?  Is

24 that at the county level?

25     A.   The counties are responsible for

1     maintaining the security of their voting equipment.

2          Q.   But you're aware that it's happened on

3     numerous occasions the counties have used BMDs in

4     elections where the seals were broken on election

5     day; right?

6               MS. LaROSS:  Objection to the form of the

7               question.

8               THE WITNESS:  Any notification that we

9               have obtained with a county saying that they

10              had a unit that the seal was broken, our

11              direction has always been, well, that needs to

12              be resealed or the unit taken out of operation,

13              preferably take the unit out of operation if it

14              is election day.

15    BY MR. CROSS:

16         Q.   And under what circumstances would you

17    tell a county to just go ahead and reseal a broken

18    seal on a BMD on election day, rather than remove it

19    for testing?

20         A.   To be honest, I don't believe I would ever

21    tell a county just to reseal it.  And if it's in the

22    midst of election day, you're going to turn that

23    machine off and you're going to set it aside.

24         Q.   And why is that?

25         A.   Because we want to try to -- also try to

Page 96

```
 1              has brought that to me.
 2      BY MR. CROSS:
 3           Q.   Are you aware that Dr. Halderman prepared
 4      a report that was submitted to the Secretary's
 5      office -- or to their counsel, I should say, on
 6      July 1 of 2021, where he did a further inspection of
 7      the Fulton County voting equipment?
 8                   MS. LaROSS:  Objection to the form of the
 9              question.
10                   THE WITNESS:  The only thing I'm aware of
11              is a report that was referenced in a news
12              article of a couple of weeks ago.  But that is
13              all the knowledge I have of that.
14      BY MR. CROSS:
15           Q.   So before that news article, you had not
16      heard anything about this report from Dr. Halderman
17      regarding the Fulton County voting equipment?
18           A.   No, sir, I had not.
19           Q.   So no one in the Secretary's office ever
20      told you that a -- an expert had prepared a nearly
21      100-page report detailing numerous security
22      vulnerabilities in the voting equipment that you're
23      responsible for as the head of CES?
24                   MS. LaROSS:  Objection to form of the
25              question.
```

```
 1              THE WITNESS:  No, sir, they had not.
 2         BY MR. CROSS:
 3              Q.   Do you have any insight into why the
 4         decision was made at the Secretary's office not to
 5         share anything about the fact that Dr. Halderman had
 6         found these vulnerabilities with you, with David
 7         Hamilton, with James Oliver, with Merritt Beaver?
 8         Do you know why that is?
 9              MS. LaROSS:  Objection to the form of the
10              question.
11              THE WITNESS:  No, sir, I do not.
12         BY MR. CROSS:
13              Q.   Does that strike you as odd?
14              MS. LaROSS:  I object to the form of the
15              question.
16              THE WITNESS:  I'm sure that members of the
17              Secretary of State's office are doing the
18              things that they feel are necessary need to be
19              done.
20         BY MR. CROSS:
21              Q.   Who would you ask if you wanted to know
22         why the decision was made not to share any
23         information, including that Dr. Halderman had found
24         vulnerabilities, with you and others in the office?
25         Who would you ask?
```

1          A.   My question would probably be asked of

2     general counsel.

3          Q.   Mr. Germany?

4          A.   Yes, sir.

5          Q.   Would you expect the Secretary's office to

6     take measures to mitigate vulnerabilities that were

7     identified in the current voting system?

8               MS. LaROSS:  Object to the form of the

9               question.

10               THE WITNESS:  It's my expectation that the

11               Secretary of State's office would do what it

12               needs to do to make sure that the voting system

13               is functioning properly.

14     BY MR. CROSS:

15          Q.   Properly and securely; right?

16          A.   Yes, sir.

17          Q.   And including taking measures to mitigate

18     any vulnerabilities that were identified with that

19     system; right?

20               MS. LaROSS:  Objection to the form of the

21               question.

22               THE WITNESS:  Again, I can't speak to what

23               may or may not be in the item that you're

24               discussing, so I -- I -- I don't know what the

25               State would need to do to address them.

Page 99

```
 1      BY MR. CROSS:

 2            Q.   Fair enough.

 3                 You don't know the specifics, but you

 4      would expect the State to take some measures to

 5      mitigate vulnerabilities, whatever those measures

 6      might be; right?

 7                 MS. LaROSS:  Objection to form of the

 8            question.

 9                 THE WITNESS:  I have confidence that the

10            State would continue doing its job as the --

11            you know, we are the elections division for the

12            State.  We're part of the elections division,

13            and I would -- I would have a belief that the

14            Secretary of State's office would continue

15            doing its due diligence.

16      BY MR. CROSS:

17            Q.   Well, given none of the senior leadership

18      in the Secretary's IT department and you, as the

19      leader of CES, were informed about anything that

20      Dr. Halderman had found, including even that he had

21      found vulnerabilities at all, who is it you believe

22      in the Secretary's office is actually dealing with

23      those vulnerabilities, if anyone?

24                 MS. LaROSS:  Objection to form of the

25            question.
```

1          THE WITNESS:  I do not know.

2     BY MR. CROSS:

3          Q.   Who would you ask if you wanted to know?

4          A.   Again, the people -- the person that I ask

5     the most questions of in our office is our general

6     counsel.

7          Q.   Mr. Germany?

8          A.   Yes, sir.

9          Q.   As you sit here, though, you're not aware

10    of any specific measures -- there are no measures

11    you can point me to that have been adopted since

12    July 1 of 2021 to address the vulnerabilities of

13    Dr. Halderman's report; right?

14          MS. LaROSS:  Object to the form of the

15          question.

16          THE WITNESS:  That is correct.

17    BY MR. CROSS:

18          Q.   And you can't point me to any measures

19    that have been adopted since September 2020 taken by

20    the Secretary's office to address the hack that he

21    demonstrated in that hearing; right?

22          MS. LaROSS:  Object to the form of the

23          question.

24          THE WITNESS:  I cannot.

25

1    BY MR. CROSS:

2         Q.   Have you participated in any discussions

3    with anyone in the Secretary's office regarding

4    Dr. Halderman generally or his work?

5         A.   No, sir, I -- I can't recall any direct

6    conversations with anybody in the Secretary of

7    State's office in relation to Dr. Halderman.

8         Q.   Are you familiar with the name Dr. Juan

9    Gilbert.

10        A.   I believe he is associated with the

11   University of Florida, or -- or was at some point in

12   time.

13        Q.   And have you worked with him at all or had

14   any communications with him about his work in this

15   case?  Just yes or no.

16        A.   No.

17        Q.   Are you aware that he has -- he was

18   retained and offered testimony on behalf of the

19   Secretary's office as an election security expert in

20   this case?

21        A.   I am not aware.

22        Q.   Were you aware that Dr. Gilbert testified

23   in his deposition that if he wanted to have a

24   cybersecurity assessment done of voting equipment

25   like that used in Georgia, he would turn to two

Page 102

1      experts, Dr. Alex Halderman and Dr. Andrew Appel?

2               MS. LaROSS:  Object to the form of the

3          question.

4               THE WITNESS:  I am not aware of what

5          Dr. Gilbert may have said in his deposition.

6      BY MR. CROSS:

7          Q.   Are you aware that Dr. Gilbert had access

8      to Dr. Halderman's full July 2021 report on the

9      Fulton County voting equipment?

10         A.   No, sir, I am --

11              MS. LaROSS:  Object to the form of the

12         question.

13              THE WITNESS:  No, sir, I am not aware.

14     BY MR. CROSS:

15         Q.   Were you aware that Dr. Gilbert testified

16     under oath that he did not disagree with any of the

17     technical vulnerabilities identified in that report?

18              MS. LaROSS:  Object to the form of the

19         question.

20              THE WITNESS:  No, sir, I'm not aware.

21     BY MR. CROSS:

22         Q.   All right.  Take a look at Topic 9,

23     please, if you would.

24         A.   Sure.

25         Q.   Looking at Topic a, are you aware of any

1    suspected or actual unauthorized access to software

2    or data on any component of the -- of Georgia's

3    Dominion system?

4          A.   No, sir, I'm not.

5          Q.   Are you aware of any suspected or actual

6    unauthorized copying or alteration of software or

7    data on any component of Georgia's Dominion system?

8          A.   No, sir, I'm not.

9          Q.   Did you undertake any investigation or any

10   research in preparation for today to determine

11   whether that happened?

12         A.   No, sir, I have not.

13         Q.   Looking at Topic 9c -- I'm sorry, just

14   actually before we leave 9a, if you were to do some

15   research or some sort of investigation on 9a, who

16   would you ask?  Who would you expect to know the

17   answer to that?

18         A.   I really don't know where I would start

19   with that.

20         Q.   Would the current elections director be a

21   good start?

22         A.   I have discussions with him on a weekly

23   basis, if not more than weekly, about our voting

24   system.  But any time that we feel like we would

25   need to start looking into something, he would be

Page 218

```
 1          workers were not successful in powering on the
 2          equipment as they should have been.
 3     BY MR. CROSS:
 4          Q.    And that's just one of the problems.
 5     There were also problems where the BMD equipment,
 6     even when powered on, didn't function as it was
 7     supposed to.  That happened in some cases; right?
 8          A.    I'm -- I suspect that was the case, but I
 9     can't think of a direct example.  But I will say
10     yes.
11          Q.    Okay.  What emergency paper back- --
12     strike that.
13              What plan did the Secretary adopt as an
14     emergency paper backup for the 2020 election, if
15     any?
16              MS. LaROSS:  Objection as to form of the
17          question.
18              THE WITNESS:  It's my understanding that
19          they had -- Secretary of State's office had
20          instructed counties that as a cause of
21          emergency, that if something were to transpire
22          where the BMD was not operational, that they
23          should have preprinted copies of hand-marked --
24          hand-fillable ballots available to poll workers
25          for distribution to the voters.
```

1           Those hand-marked paper ballots can be

2        scanned by the ICP scanners that are in place

3        at the polling locations on election day.

4    BY MR. CROSS:

5        Q.   Did you at some point see a written plan

6    for using emergency paper ballot backups for the

7    2020 election, the June 2020 election?

8        A.   I don't recall seeing very much of the

9    instructional documentation for process of managing

10   polls that was being sent out from the elections

11   division to counties to try to get them ready for

12   the first rollout.  There was a -- a high number of

13   training materials and official election

14   notifications and such that went from Mr. Harvey's

15   office to the counties to get them ready for that

16   election.

17           So I'm sure that there were those things,

18   but I can't remember -- I can't say to a fact that I

19   saw every single one of those.

20       Q.   If someone were to ask you for a copy of a

21   emergency paper ballot backup plan for the June 2020

22   election, is there a document that you could put

23   your hands on and say, "Here it is"?

24           MS. LaROSS:  Objection to the form of the

25        question.

Page 227

```
 1          private computer and key the information in.
 2               Q.   Okay.  And one last question.
 3                    Are you aware of any forensic examination
 4          that's ever been done of the computers or the server
 5          that sits on the Dominion private network to
 6          determine whether it's ever been compromised in any
 7          way or -- or accessed in any unauthorized fashion?
 8                    MS. LaROSS:  Objection to form of the
 9               question.
10                    THE WITNESS:  The Dominion -- the
11               Dominion-maintained system?
12          BY MR. CROSS:
13               Q.   Yeah.  Let me be clear.
14                    So the -- the private network that now
15          exists as of the summer of 2020 that's used to
16          main- -- run the Dominion system at the Secretary's
17          office.  That's what we're talking about.
18               A.   Okay.  All right.  So -- so state the
19          question again, please.
20               Q.   Are you aware of any forensic examination
21          of any of that equipment, meaning the computers, the
22          server, any part of the equipment that makes up that
23          private network, to determine whether there's ever
24          been any compromise or unauthorized access?
25               A.   I am not aware of one.
```

Page 252

```
 1          are in place for counties to execute on their
 2          equipment.
 3     BY MR. CROSS:
 4          Q.   That's not my question, Mr. Barnes.
 5               My question is:  In 2020, were you under
 6     the belief that the logic and accuracy testing that
 7     you've described would detect malware or any other
 8     compromise of the voting equipment in Georgia?
 9               MS. LaROSS:  Object to the form of the
10          question.
11               THE WITNESS:  It was my belief that the
12          tests that the counties were undertaking would
13          give them some level of confidence that the
14          voting system was matching to what had been
15          certified for use by the State previously.
16     BY MR. CROSS:
17          Q.   So is that a "yes" or a "no" to my
18     question?
19          A.   That's a yes.
20          Q.   All right.  Grab Exhibit 23, please.
21               (Plaintiffs' Exhibit 23 was marked for
22          identification.)
23     BY MR. CROSS:
24          Q.   Just let me know when you've got that.
25          A.   I am looking at it.
```

```
                                            Page 271

 1     BY MR. CROSS:

 2          Q.   Mr. Barnes, let me come back to the

 3     question I asked you.

 4               Do you have a personal view --

 5     irrespective of what any jurisdiction is doing

 6     around the country, as someone who's been working

 7     with elections for two decades, do you have a

 8     personal view on whether hand-marked paper ballots

 9     are a reliable method of voting?

10               MS. LaROSS:   I object to the form of the

11               question.

12               THE WITNESS:   I think any system that

13               jurisdictions use, whether it's a BMD system

14               that's been through federal testing and state

15               testing, whether it's an optical scan system

16               that's been through federal testing and state

17               certification testing, a hand-marked paper

18               ballot system that's been through levels of

19               testing, I believe all of those voting systems

20               are reliable for use by whatever jurisdiction

21               chooses to use them.

22     BY MR. CROSS:

23          Q.   In fact, Georgia does currently process

24     millions of hand-marked paper ballots through its

25     absentee voting system; right?
```

1          A.    It does.

2          Q.    And you certainly would not suggest

3     there's anything unreliable about that system;

4     right?

5          A.    I would not suggest that.  I believe it is

6     very reliable.

7          Q.    Are you aware that the current Dominion

8     system can process, scan, tabulate hand-marked paper

9     ballots at the precincts on election day?

10              MS. LaROSS:  Objection as to form of the

11          question.

12              THE WITNESS:  The -- the ICP scanner that

13          is sent out to a polling location on election

14          day has the ability to process either a

15          hand-marked paper ballot or a BMD-generated

16          ballot.

17     BY MR. CROSS:

18          Q.    Are you aware that BM- -- sorry.  Strike

19     that.

20              Are you aware that Georgia is the only

21     state in the country that uses BMDs as the primary

22     means of voting statewide?

23              MS. LaROSS:  I object to the form of the

24          question.

25              THE WITNESS:  I am not certain on that.

Page 285

1          said.  Okay.  I wish I got an errata.  That's

2          embarrassing.

3     BY MR. CROSS:

4          Q.   Okay.  All right.  So the question I was

5     asking you, Mr. Barnes, was:  If the ballot has a QR

6     code that is of the type that the scanner is

7     designed to tabulate, but it captures different

8     selections than the voter actually cast on the BMD,

9     the scanner would still -- would still tabulate

10    that; right?

11              MS. LaROSS:  Object to the form of the

12         question.

13              THE WITNESS:  The scanner is designed to

14         tabulate what is contained within the QR code.

15    BY MR. CROSS:

16         Q.   Based on your experience with elections

17    over the years and what you know about the current

18    environment of -- of threats -- sophisticated

19    threats to U.S. elections, would you personally be

20    more comfortable with an election system that does

21    not use QR codes, where voters can actually read

22    what's going to get tabulated?

23              MS. LaROSS:  I object to the form of the

24         question.

25              THE WITNESS:  What I can speak to is I do

1     human -- I'm sorry -- scanning hand-marked paper

2     ballots; right?

3              MS. LaROSS:  I object to the form of the

4         question.

5              THE WITNESS:  Yes, I have confidence that

6         our system is scanning hand-marked paper

7         ballots properly and reflecting the intent of

8         the voter.

9              We have a system that actually gives us

10        both options and we are currently using both

11        options, and I have confidence in both options.

12    BY MR. CROSS:

13        Q.   Well, under the -- under the new Georgia

14    statute, it's not as easy to vote absentee as it

15    used to be; right?

16              MS. LaROSS:  Objection to the form of the

17        question.

18              THE WITNESS:  There have been changes to

19        the election statute in Georgia in reference to

20        when absentee ballots -- the length of time

21        absentee ballots can be issued prior to an

22        election, the amount -- how those absentee

23        ballots are returned to the county elections

24        office for tabulation purposes.  There have

25        been changes to the election statute, yes.

Page 296

```
 1          that it's accessible to our voters, and that it
 2          is reflective of what the voters wish to purvey
 3          to the State when an election takes place.
 4   BY MR. CROSS:
 5          Q.   Can you identify one cybersecurity
 6   election expert that has endorsed the current
 7   Georgia system as a reliable voting system?
 8          A.   I cannot.
 9          Q.   Is voter confidence in that system
10   important?
11          A.   Voter confidence in all that we do as the
12   elections divisions important.  It's important that
13   they have confidence in the people that run
14   elections.  It's important that they have confidence
15   in the systems that we use.  It's important that
16   they have confidence in the voter registration
17   system.
18               And we work day in and day out doing what
19   we can to secure the system that we have.
20          Q.   But if you're confident that the system is
21   secure, particularly in an environment now where
22   there have been extraordinary claims made about the
23   reliability of that system, why not just have an
24   election security expert analyze it, examine it, and
25   offer an opinion on whether it's reliable?
```

1           MS. LaROSS:  I object to the form of the

2      question.

3           THE WITNESS:  I'm sure if the

4      Secretary of State decided that he wanted to do

5      that, that that would get done.

6  BY MR. CROSS:

7      Q.   And as you sit here, you don't know why

8  he's not decided that; right?

9           MS. LaROSS:  I object to the form of the

10      question.

11           THE WITNESS:  I do not.

12  BY MR. CROSS:

13      Q.   Do you think voters would have more

14  confidence in a system that did not use QR codes,

15  where what was getting tabulated, they could

16  actually read for themselves?

17           MS. LaROSS:  I object to the form of the

18      question.

19           THE WITNESS:  I don't know.  Voters have

20      confidence in systems, and it seems like in

21      today's environment, voters only have

22      confidence in systems that -- where the people

23      that they supported in the election won and

24      they don't have -- they don't have good

25      confidence in systems when their candidate of

Page 301

BY MR. CROSS:

Q.   You understand that during the audit that
you've just talked about, there was never any effort
made when reading the human-readable portion of a
particular ballot to see whether the QR code on that
ballot captured the same selections?  Are you aware
of that?

          MS. LaROSS:  Objection to form of the
          question.

          THE WITNESS:  I am aware that during the
          audit, that they focused on the text on the
          ballot solely, that they were not correlating
          back the text to the QR code at the time.

BY MR. CROSS:

Q.   So the ballot would -- sorry.  Strike
that.

          The audit that we're talking about would
not catch a situation where the human-readable text
had different selections than the QR code on a
particular ballot.  That would not be captured;
right?

A.   It's my understanding that the audit that
they undertook was solely looking at the text and
were not engaging the QR code at that time.

Q.   Do you know why a decision was made not to

1     conduct at least some reliable statistical sampling
2     of ballots to compare the QR codes to the
3     human-readable text to make sure that they actually
4     correspond?
5              MS. LaROSS:  Objection to the form of the
6         question.
7              THE WITNESS:  I was not privy to the
8         discussions outlining how the audit was going
9         to be performed, so I don't know if those -- if
10        those discussions were discussed or not.
11    BY MR. CROSS:
12         Q.    If you wanted to know, who would you ask?
13         A.    I believe the people that were involved in
14    that discussion at the time, I believe Kevin
15    Rayburn, who was the deputy general counsel for the
16    Secretary of State's office at the time was the --
17    was the preeminent audit person in the Secretary of
18    State's office at the time.  So I believe he was
19    involved with the discussions on the steps that
20    would be taken in that process.
21         Q.    And --
22         A.    I don't think he had left the Secretary of
23    State's office yet at that time.  I know he is now
24    working for EAC, but I'm -- I might be tying up my
25    calendar a little bit.

1        Q.    And that's Kevin Rayburn you're talking

2    about?

3        A.    Yes, sir.

4        Q.    Mr. Barnes, do we agree that the fact that

5    there has not been any known compromise or

6    widespread fraud in Georgia elections to date, that

7    that does not mean that that can never happen in the

8    future?  Are we agreed on that?

9            MS. LaROSS:  Object -- objection as to

10           form of the question.

11           THE WITNESS:  We never know what can

12           happen in the future.  If something bad can

13           happen -- I think Murphy's Law is if something

14           bad can happen, it can happen.

15           So that's why we have the procedures and

16           protocols in place to try to prevent bad things

17           from happening, but none of us can see into the

18           future.

19    BY MR. CROSS:

20       Q.    Were you aware that Theresa Payton, the

21    head of Fortalice, testified in this case that it's

22    not a question of when a U.S. election will get

23    hacked, but if?

24           MS. LaROSS:  Object to the form of the

25           question.

Page 304

1          THE WITNESS:  I am not aware of that

2     testimony.

3          MR. CROSS:  All right.  Sorry I took you a

4     little longer than you asked.  I apologize

5     about that.  Let me let you get out of here.

6          And we will -- we'll keep it open.  I'm

7     not going to litter the transcript.  I'm going

8     to let him out.  We'll send you a letter,

9     Diane, on -- on how to proceed.

10          VIDEOGRAPHER:  Okay.  This suspends the

11     deposition.  The time is 5:04 p.m. and we are

12     now off the video record.

13          (Deposition suspended at 5:04 p.m.)

14          (Pursuant to Rule 30(e) of the Federal

15     Rules of Civil Procedure and/or O.C.G.A.

16     9-11-30(e), signature of the witness has been

17     reserved.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

        STATE OF GEORGIA:

4

        COUNTY OF FULTON:

5

6

        I hereby certify that the foregoing transcript was

7     taken down, as stated in the caption, and the

      questions and answers thereto were reduced to

8     typewriting under my direction; that the foregoing

      pages represent a true, complete, and correct

9     transcript of the evidence given upon said hearing,

      and I further certify that I am not of kin or

10    counsel to the parties in the case; am not in the

      regular employ of counsel for any of said parties;

11    nor am I in anywise interested in the result of said

      case.

12

13

14

15       *Lee Ann Barnes*

16

        LEE ANN BARNES, CCR B-1852, RPR, CRR, CRC

17

18

19

20

21

22

23

24

25

```
 1                   COURT REPORTER DISCLOSURE
 2
 3        Pursuant to Article 10.B. of the Rules and
          Regulations of the Board of Court Reporting of the
 4        Judicial Council of Georgia which states: "Each
          court reporter shall tender a disclosure form at the
 5        time of the taking of the deposition stating the
          arrangements made for the reporting services of the
 6        certified court reporter, by the certified court
          reporter, the court reporter's employer, or the
 7        referral source for the deposition, with any party
          to the litigation, counsel to the parties or other
 8        entity. Such form shall be attached to the
          deposition transcript," I make the following
 9        disclosure:
10
11        I am a Georgia Certified Court Reporter. I am here
          as a representative of Veritext Legal Solutions.
12        Veritext Legal Solutions was contacted to provide
          court reporting services for the deposition.
13        Veritext Legal Solutions will not be taking this
          deposition under any contract that is prohibited by
14        O.C.G.A. 9-11-28 (c).
15
16        Veritext Legal Solutions has no contract/agreement
          to provide reporting services with any party to the
17        case, any counsel in the case, or any reporter or
          reporting agency from whom a referral might have
18        been made to cover this deposition. Veritext Legal
          Solutions will charge its usual and customary rates
19        to all parties in the case, and a financial discount
          will not be given to any party to this litigation.
20
21
22
23        LEE ANN BARNES, CCR B-1852B, RPR, CRR, CRC
24
25
```