# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## CURLING PLAINTIFFS' CORRECTED OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### ORAL ARGUMENT REQUESTED

## TABLE OF CONTENTS

I.    INTRODUCTION ....................................................................................... 1

II.   STATEMENT OF FACTS ......................................................................... 3

      A.   Ballots Produced by Georgia's BMD System are Not Voter-
           Verifiable, *Much Less Voter-Verified.* ........................................ 3

      B.   The *Unrefuted* 2021 Halderman Report Identified Numerous
           Serious Vulnerabilities with Georgia's Current BMD System.................. 6

      C.   An Independent Government Cybersecurity Agency Verified Dr.
           Halderman's Findings and Recommended Important Mitigation
           Measures that Georgia Still Has Not Implemented. ................... 9

      D.   Defendants' Cybersecurity Consultant and CISO Identified
           Numerous, Unremediated Vulnerabilities................................. 10

      E.   Defendants' Experts Never Examined Georgia's Voting Equipment
           and Admit Key Security Vulnerabilities. ................................. 10

      F.   Georgia's Election System Lacks Sufficient Safeguards to Protect
           Against Demonstrated Cybersecurity Vulnerabilities. ............................ 12

      G.   The Coffee County Breach Reveals the Lack of Meaningful
           Safeguards to Protect Georgia's Voting System...................................... 14

           1.   Election Officials in Coffee County Permitted Unauthorized
                Individuals Access to Georgia's Voting System. ......................... 14

           2.   The Coffee County Breach Poses a Serious Threat to the
                Security of Future Georgia Elections. ........................... 18

           3.   State Defendants Ignored All Signs of the Coffee County
                Breach…until Plaintiffs began Uncovering the Facts. ................. 21

      H.   Georgia's Election System Also Lacks Procedural Safeguards
           Because it is Un-Auditable........................................................ 25

      I.   Curling Plaintiffs Have Suffered Particularized Harm. ........................... 27

      J.   Georgia Could Easily Adopt Hand-Marked Paper Ballots Today.......... 31

III.   ARGUMENT .................................................................................................... 33

    A.   Fulton Defendants May Not Incorporate by Reference State Defendants' Arguments that Fulton Defendants Did Not Make. ............ 34

    B.   Curling Plaintiffs' DRE Claims Are Not Moot. ...................................... 35

    C.   Fulton Defendants' Immunity Defense Fails. .......................................... 37

    D.   Fulton Defendants Are Proper Parties to This Case. ............................... 39

    E.   Curling Plaintiffs Have Standing. ........................................................... 40

        1.   The Eleventh Circuit Confirmed Plaintiffs' Standing. ................. 40

        2.   Curling Plaintiffs Each Have Standing to Bring Their Claims Against All Defendants. .................................................................. 42

        3.   Curling Plaintiffs have suffered and will continue to suffer a concrete and particularized injury in fact. .................................... 42

        4.   Curling Plaintiffs' injury is traceable to Defendants. ................... 53

        5.   Curling Plaintiffs' injury is redressable by Defendants. ............... 55

    F.   Georgia's BMD System Violates Plaintiffs' Constitutional Right to Vote. ......................................................................................................... 57

        1.   The Burden on Curling Plaintiffs' Voting Rights is Severe. .......... 58

        2.   Defendants Have Identified No State Interest that Justifies the Severe Burden on Plaintiffs' Right to Vote. ............................. 65

    G.   Fulton Defendants' Claim that They "have not subjected Plaintiffs to any deprivation of rights" Is Hotly Disputed. ...................................... 70

    H.   Defendants Are Barred from Offering New Arguments or Evidence on Reply. ................................................................................................. 72

IV.   CONCLUSION. ................................................................................................ 72

# TABLE OF AUTHORITIES

**Cases**

*Ameris Bank v. Lexington Ins. Co.*,
   2016 WL 5496383 (S.D. Ga. Sept. 28, 2016) ........................................................ 34

*Anderson v. Celebrezze*,
   460 U.S. 780 (1983) ............................................................... 43, 57, 66

*Att'y Gen. Lewis v. Governor of Ala.*,
   944 F.3d 1287 (11th Cir. 2019) (en banc) ................................................. 54

*Baker v. Carr*,
   369 U.S. 186 (1962) ..................................................................... 49

*Baxter v. Palmigiano*,
   425 U.S. 308 (1976) ..................................................................... 18

*Burdick v. Takushi*,
   504 U.S. 428 (1992) ..................................................................... 57

*Carney v. Adams*,
   141 S. Ct. 493 (2020) ................................................................... 50

*Carrizosa v. Chiquita Brands Int'l, Inc.*,
   47 F.4th 1278 (11th Cir. 2022) ......................................................... 72

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ..................................................................... 48

*Cowen v. Ga. Sec'y of State*,
   960 F.3d 1339 (11th Cir. 2020) ..................................................... 57, 70

*Crawford v. ITW Food Equip. Grp. LLC.*,
   977 F.3d 1331 (11th Cir. 2020) ......................................................... 9

*Crawford v. Marion Cnty. Election Bd.*,
   553 U.S. 181 (2008) ..................................................................... 56

*Curling v. Raffensperger*,
   50 F.4th 1114 (11th Cir. 2022) ..................................................... 40, 41

*Curling v. Sec'y of Georgia*,
    761 F. App'x 927 (11th Cir. 2019) ............................................................. 38

*Davis v. DeKalb Cnty., Ga.*,
    2005 WL 8154356 (N.D. Ga. May 31, 2005) ............................................ 34

*De La Fuente v. Kemp*,
    679 F. App'x 932 (11th Cir. 2017) ............................................................. 71

*Democratic Exec. Comm. of Fla. v. Lee*,
    915 F.3d 1312 (11th Cir. 2019) ................................................................. 43

*Dillard v. Chilton Cnty. Comm'n*,
    495 F.3d 1324 (11th Cir. 2007) ................................................................. 51

*Doe ex rel. Rudy-Glanzer v. Glanzer*,
    232 F.3d 1258 (9th Cir. 2000) ................................................................... 18

*Eu v. S.F. Cnty. Democratic Cent. Comm.*,
    489 U.S. 214 (1989) ................................................................................... 66

*Ex Parte Young*,
    209 U.S. 123 (1908) ................................................................................... 68

*Fair Fight Action, Inc. v. Raffensperger*,
    2019 WL 13221296 (N.D. Ga. Dec. 27, 2019) ......................................... 67

*Fair Fight Action, Inc. v. Raffensperger*,
    2022 WL 4725887 (N.D. Ga. Sept. 30, 2022) ........................................... 36

*Fed. Election Comm'n v. Akins*,
    524 U.S. 11 (1998) ..................................................................................... 50

*Fla. ex rel. Att'y Gen. v. U.S. Dep't of Health & Human Servs.*,
    648 F.3d 1235 (11th Cir. 2011),
    *aff'd in part, rev'd in part sub nom.  Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ................................................................................... 40

*Fla. State Conf. of the NAACP v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) ................................................................. 40

*Frontiero v. Richardson*,
    411 U.S. 677 (1973) ................................................................................... 70

*Ga. State Conf. of the NAACP v. DeKalb Cnty. Bd. of Registration & Elections*,
    484 F. Supp. 3d 1308 (N.D. Ga. 2020) ....................................................... 37

*Gill v. Whitford*,
    138 S. Ct. 1916 (2018) .............................................................................. 49, 51

*Gov't Emps. Ins. Co. v. Quality Diagnostic Health Care, Inc.*,
    2019 WL 2245513 (S.D. Fla. Apr. 18, 2019) ........................................... 18

*Green Party of N.Y. v. Weiner*,
    216 F. Supp. 2d 176 (S.D.N.Y. 2002) ................................................. 70, 71

*Jacobson v. Fla. Sec'y of State*,
    974 F.3d 1236 (11th Cir. 2020) ................................................................ 39

*KH Outdoor, LLC v. City of Trussville*,
    458 F.3d 1261 (11th Cir. 2006) ........................................................... 68, 69

*League of Women Voters of Fla. v. Detzner*,
    314 F. Supp. 3d 1205 (N.D. Fla. 2018) ............................... 56, 57, 65, 68

*Lewis v. Clarke*,
    581 U.S. 155 (2017) .................................................................................. 38

*Libertarian Party of Ala. v. Merrill*,
    2021 WL 5407456 (11th Cir. Nov. 19, 2021) ................................... 65, 68

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .................................................................................. 42

*Manders v. Lee*,
    338 F.3d 1304 (11th Cir. 2003) (en banc) .............................................. 37

*McCormick v. City of Fort Lauderdale*,
    333 F.3d 1234 (11th Cir. 2003) ................................................................ 33

*Monell v. Dep't of Soc. Servs. of City of N.Y.*,
    436 U.S. 658 (1978) .................................................................................. 39

*Neagle v. Ill. Tool Works, Inc.*,
    2011 WL 13173913 (N.D. Ga. Feb. 11, 2011) ......................................... 8

*Nemes v. Bensinger*,
    467 F. Supp. 3d 509 (W.D. Ky. 2020) ..................................................... 46

*New Georgia Project v. Raffensperger*,
   976 F.3d 1278 (11th Cir. 2020) ........................................................ 61, 62

O.C.G.A. § 21-2-2(7.1) .......................................................................... 67

*Ouachita Watch League v. Jacobs*,
   463 F.3d 1163 (11th Cir. 2006) ................................................................ 40

*Pub. Citizen v. DOJ*,
   491 U.S. 440 (1989) ................................................................................. 50

*Reynolds v. Sims*,
   377 U.S. 533 (1964) ..................................................................... 49, 51, 57

*Schulz v. Kellner*,
   2011 WL 2669456 (N.D.N.Y. July 7, 2011) ........................................... 46

*SEC v. Watkins*,
   317 F. Supp. 3d 1244 (N.D. Ga. 2018),
   *aff'd*, 810 F. App'x 823 (11th Cir. 2020) .............................................. 34

*SEC v. Weintraub*,
   2011 WL 6935280 (S.D. Fla. Dec. 30, 2011) .......................................... 18

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ................................................................................. 50

*Stewart v. Blackwell*,
   444 F.3d 843 (6th Cir. 2006) .................................................................. 70

*Tashjian v. Republican Party of Conn.*,
   479 U.S. 208 (1986) ................................................................................. 66

*Town of Chester v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017) ............................................................................. 40

*Tsao v. Captiva MVP Rest. Partners, LLC*,
   986 F.3d 1332 (11th Cir. 2021) .............................................................. 52

*United States v. Union Circulation Co.*,
   1982 WL 1912 (N.D. Ga. Aug. 20, 1982) .............................................. 56

*WBY, Inc. v. Dekalb Cnty., Ga.*,
   695 F. App'x 486 (11th Cir. 2017) ......................................................... 71

*Weber v. Shelley*,
　347 F.3d 1101 (9th Cir. 2003) ............................................................... 55, 63

*Wood v. Raffensperger* ("*Wood I*"),
　981 F.3d 1307 (11th Cir. 2020) ................................................................... 50

*Wood v. Raffensperger* ("*Wood II*"),
　2020 WL 7706833 (N.D. Ga. Dec. 28, 2020) .................................... 50, 51

*Wood v. Raffensperger*,
　501 F. Supp. 3d 1310 (N.D. Ga. 2020) ...................................................... 51

**Other Authorities**

Ga. Code § 21-2-492 .................................................................................... 26

Ga. Code § 21-2-493 .................................................................................... 26

Ga. Comp. R. & Regs. 183-1-12-.11(2)(c)-(d) .................................. 32, 54, 55

Ga. Comp. R. & Regs. 183-1-15-.03(2) ...................................................... 45

Ga. Comp. R. & Regs. 183-1-15-.04 ............................................... 24, 45, 63

O.C.G.A. § 21-2-281 ............................................................................. 54, 55

O.C.G.A. § 21-2-300 ...................................................... 3, 35, 55, 67

O.C.G.A. § 21-2-334 ............................................................................. 54, 55

O.C.G.A. § 21-2-70 ...................................................................................... 54

O.C.G.A. 21-2-498(a)(3) ............................................................................. 25

O.C.G.A. 21-2-498(b) ............................................................................ 45, 63

**Rules**

Fed. R. Civ. P. 19(a)(1) ............................................................................... 39

Fed. R. Civ. P. 20(a)(2) ............................................................................... 39

Fed. R. Civ. P. 56(a) .................................................................................... 33

Fed. R. Civ. R. 11(b) .................................................................................... 34

Fed. R. Evid. 801 ............................................................................... 3, 8, 26

Fed. R. Evid. 803 ...................................................................................... 9

## I.    INTRODUCTION

>  *"The [state] told you to reject the evidence of your eyes and ears.*
>  *It was their final, most essential command." – <u>1984</u>, George Orwell*

Defendants would have this Court grant them summary judgment on the *merits* of Plaintiffs' claims while pretending the voluminous factual record in this case simply does not exist. Their recycled arguments—already rejected by this Court and the Eleventh Circuit—are divorced from the record and reality. Defendants do not even approach, much less meet, their high burden to show that the **evidence** *cannot reasonably* support Plaintiffs' claims. This is fatal.

As Secretary Raffensperger admits, Georgia scrapped its DRE system in 2019 because this Court required it to, finding the system so insecure as to be unconstitutional. Unfortunately, the BMD system the Secretary adopted is even less secure. In 2021, Dr. Alex Halderman—whom State Defendants' own election expert admitted he would ask to assess the cybersecurity of voting equipment—identified many serious failings with the current system that could be exploited in mere minutes to alter election outcomes. These findings are unrefuted. Defendants have offered *no* election security expert in this case who endorses the current system. Instead, the Secretary's own election experts advised against it.

Defendants' *only defense* to these damning facts, among many others, has been to vaguely claim that no one could replicate Dr. Halderman's access to Georgia's voting equipment in its operational environment because of unspecified security measures. But that fiction was laid bare in disturbing fashion when

*Plaintiffs* uncovered the extensive, unfettered access in 2021 by numerous individuals to essentially *every* component of Georgia's current voting system *in its operational environment* in a county elections office and the broad dissemination via the Internet and other means of the proprietary software and Georgia election data they copied from that equipment.  The very serious threats to Plaintiffs' individual and deeply personal right to vote are far from theoretical in today's environment of "election deniers" and advanced persistent threats to U.S. elections.  Indeed, what the Secretary's Office called the "roadmap" to hack Georgia's current voting system has been available to countless individuals and entities—including potentially hostile nation states—for over two years.  And yet every voter must still use that system today or suffer the undue burdens and unreliability of Georgia's onerous absentee voting system, which has already disenfranchised Plaintiffs Donna Curling and Donna Price.  This is unconstitutional, and it must end.

As the Court already held, "Plaintiffs' voting claims go to the heart of a functioning democracy," and "'[a] wound or reasonably threatened wound to the integrity of a state's election system carries grave consequences beyond the results in any specific election, as it pierces citizens' confidence in the electoral system and the value of voting.'"  Opp. Ex. 2 at 151 (quoting Opp. Ex. 13 at 45).  The parties agree that voter confidence is critically important.  But while Plaintiffs and leading election experts believe that confidence should be based in truth and science with a secure, reliable, transparent, and voter-verified system, Defendants seek to foster

false confidence through empty claims and incorrect information: they want to *believe* the system is secure and reliable, and so it must be.  But they cannot simply will away the facts—and their idle beliefs do nothing to preserve the right to vote.

Defendants *do not even try* to defend Georgia's voting system against the *evidence*.  As they do in their public claims, they just pretend it does not exist.  But it does exist, in reams—and it disposes of their meritless arguments, which this Court already rejected.  The Court should deny their Motions and proceed promptly to trial.

## II.   STATEMENT OF FACTS[1]

### A.   Ballots Produced by Georgia's BMD System are Not Voter-Verifiable, *Much Less Voter-Verified*.

As Secretary Raffensperger admits,[2] Georgia abandoned its DRE voting system in 2019 at this Court's direction.  SAF Nos. 73-75; O.C.G.A. § 21-2-300(a)(2).  Just after the hearing that culminated in that injunction, Secretary Raffensperger announced his selection of Dominion's Democracy Suite BMD voting system, which remains in place today, and later decertified the DREs.  SAF Nos. 76-78.  This system includes, *inter alia*, ImageCast X Prime (ICX) BMDs, ImageCast Central (ICC) optical scanners, Image Cast Precinct (ICP) optical scanners, KnowInk pollpads for the electronic poll book, and the Democracy Suite

---

[1] To avoid duplication, Curling Plaintiffs' exhibits sometimes are cited only in Plaintiffs' Joint Statement of Additional Material Facts (Dkt. 1620) (SAF) with the corresponding statements of fact that they each support, and those statements of fact are cited herein where appropriate.

[2] Secretary Raffensperger's statements are admissible because, *inter alia*, they are admissions of a party opponent.  *See* Fed. R. Evid. 801(d)(2).

election management system (EMS) software.   SAF No. 79; Dkt. 1131 § 2. Dominion's EMS software is used to create election definition files containing information specific to each election, which are loaded onto each BMD from a USB drive before each election.   SAF No. 80; Dkt. 1131 § 2.2.   The ICX BMD requires voters to make selections on a large, *broadly* visible computer screen and prints ballots using a non-proprietary printer connected by a USB cable.   SAF No. 82; Dkt. 1131 § 5.3.   Printed ballots are fed into an ICC or ICP scanner, which is supposed to tabulate them and deposit them into a ballot box.   SAF No. 81; Dkt. 1131 § 2.3.

Each printed ballot is supposed to contain both a 2D QR barcode and human-readable text, both of which are supposed to capture the voter's selections made on the BMD.   SAF Nos. 83-85; Dkt. 1131 §§ 2, 3.2.   The Dominion ICP and ICC scanners currently used in Georgia already can scan and tabulate votes without a QR barcode.   SAF No. 86.   But Georgia's scanners tabulate BMD ballots using the 2D QR barcode generated by the BMD, not the human-readable text.   SAF No. 87; Dkt. 1131 §§ 2, 3.2, 7.   Electors cannot visually confirm whether the barcode accurately captures their selections.   Opp. Ex. 91 at 82 ("[T]he evidence shows that the Dominion BMD system does not produce a voter-verifiable paper ballot or a paper ballot marked with the voter's choices in a format readable by the voter because the votes are tabulated solely from the unreadable QR code."); SAF No. 88.

Most U.S. jurisdictions use hand-marked paper ballots (HMPBs) as the primary method of voting with BMDs only for voters who need or request them.

4

SAF No. 102; Dkt. 1131 § 2.  This is the "default system" recommended by State Defendants' expert, Dr. Ben Adida.  Opp. Ex. 252.  Election security experts recommend this system because audits of BMD elections cannot detect whether computer errors or hacking altered votes or election results.  SAF Nos. 101, 395-96, 466.

Multiple studies of BMDs in practice show that the rate at which voters check the human-readable text on ballots is nowhere near enough to detect a systematic problem (much less allow for any remedy).  SAF Nos. 90-92.  State Defendants' own commissioned study confirmed this, finding that most voters did not check their ballots at all or spent less than a second glancing at them, and nearly a third spent less than five seconds reviewing.  SAF Nos. 93-94.  By comparison, Dr. Juan Gilbert took over 20 seconds in his deposition just to spot a specific party on an official Fayette County ballot.  SAF Nos. 93, 95; *see also* Dkt. 1131 § 3.2.

Defendants offer no election security expert who endorses the use of BMDs for all in-person voting statewide.  The Secretary's own experts—Drs. Michael Shamos and Wenke Lee—advised against the BMD system Georgia uses.  Opp. Ex. 5 at 56:13-57:21 (testifying that he is "not a fan of bar codes" and that voters cannot test the machine to see if the barcode it produces is accurate); Opp. Ex. 152 at 4 ("[a] secure voting system should use hand-marked paper ballots instead of ballot marking devices. . . . This consensus approach among the cybersecurity research community ensures that votes by the voters are counted accurately."); *see also* SAF Nos. 101,

117, 180-183.  Even Dr. Gilbert, *whom Defendants' Motions omit entirely*, designed a new BMD to try to remedy their failings.  Opp. Ex. 110; *see also* SAF No. 108.

### B.    The *Unrefuted* 2021 Halderman Report Identified Numerous Serious Failings with Georgia's Current BMD System.

Per a Court Order, on September 4, 2020, Fulton County provided Dr. Halderman[3] a BMD and an ICP scanner programmed with Dominion software.  SAF No. 135; Opp. Ex. 91 at 24.  Dr. Halderman conducted extensive testing on the BMD and related equipment and software over the course of 11 work sessions.  SAF No. 136; Dkt. 1131 §§ 1, 4.3.  On July 1, 2021, Dr. Halderman produced a 26,000-word analysis of Georgia's BMD voting system detailing numerous, serious security failings and the steps that a malicious actor could take to exploit them to alter individual votes and election outcomes without detection, including by introducing malware into the system with brief physical access or remotely via an EMS server.  SAF No. 138; Dkt. 1131 § 1.1.  Dr. Halderman showed that the BMD software "███████████████████████████████████████████████████████ ████████," including, *inter alia*, acceptance testing, hash validation, logic and accuracy testing, external firmware validation, and audits.  Dkt. 1131 § 1.1; *see also* SAF Nos. 137, 139.

Dr. Halderman also showed that—even without access to a BMD—an attacker can alter QR codes a BMD prints on ballots to modify voters' selections.

---

[3] Dr. Halderman, a renowned Univ. of Michigan Computer Science and Engineering Professor, has been accepted as an election security expert.  SAF No. 134.

SAF Nos. 140-42; Dkt. 1131 § 5.  Contrary to Dominion's claims (*see, e.g.*, Opp. Ex. 136 at 22), Dr. Halderman showed that "███████████████████," and instead they "█████████████████████████████████████████████████ █████████████." Dkt. 1131 § 5.1; *see also* SAF No. 143.  The QR codes do not contain a unique identifier; thus, "████████████████████████████████ ████████." Dkt. 1131 § 5.2 (emphasis in original); *see also* SAF No. 144.  The ICPs and ICCs will tabulate BMD ballots copied using a standard photocopier or printer; thus, a BMD ballot may be copied and tabulated many times.  SAF No. 145-46; Dkt. 1131 § 5.2.

This QR code vulnerability is just one of seven critical failings in the BMD system identified in the July 2021 report.  SAF No. 147; Dkt. 1131 § 1.1.  These failings—and the many other security issues—reflect insufficient attention to election security during the system's design, software engineering, and testing, yielding a system that is, in some respects, less secure than the enjoined DREs.  SAF Nos. 148-51; Dkt. 1131 § 1.2.  For example, "███████████████████████ ████████████████████" the old DRE system because the BMDs use more modern technology that is simpler to investigate, reverse engineer, and modify than the software used in the DRE system.[4]  Dkt. 1131 §§ 1.2, 7.3; SAF No. 151.

Defendants have provided no expert testimony to refute any—much less all—

---

[4] Defendants refute *none* of the evidence regarding their failure to remediate any of the numerous vulnerabilities that may have been carried over from Georgia's DRE/GEMS system to the current BMD system.  *See* SAF Nos. 32-72.

of Dr. Halderman's July 2021 findings.[5]   Dkt. 1567-1; SAF No. 152.   Fulton Defendants' Motion does not mention Dr. Halderman.  Dkt. 1573.  State Defendants devote only a single paragraph to Dr. Halderman, hyperbolically dismissing his findings as "nothing more than hypothesized security risks."  Dkt. 1567-1 at 15-16. But their own election expert, Dr. Gilbert, did *not* disagree with the many technical failings Dr. Halderman reported and even identified him as one of two election security experts Dr. Gilbert himself would rely on to assess the cybersecurity of voting equipment.  *See infra* § II.E.

Defendants stuck their heads in the sand (again) with the July 2021 report. The SOS Office's Chief Information Officer (Merritt Beaver), Chief Operations Officer (Gabriel Sterling), Director of the Center for Election Systems (CES) (Michael Barnes), Security Manager (James Oliver), and Chief Information Security Officer (David Hamilton) all stated they had not read it.  SAF No. 163; *see also* SAF Nos. 113-133, 157.  And all but one of the current and former State Election Board

---

[5] Defendants' reliance on Dominion's self-serving, untested MITRE report is misplaced.  *See* Dkt. 1506 at 12-13, 1506-2 at 2-3.  It is inadmissible for many reasons, including untimeliness, hearsay, and the lack of any discovery about it; thus, the Court may not consider it.  No one from MITRE has ever been disclosed, timely or otherwise, as an expert in this litigation, for any purpose.  *See* LR 26.2(C) (a party who fails to comply with the disclosure requirements "shall not be permitted to offer the testimony of the party's expert, unless expressly authorized by Court order based upon a showing that the failure to comply was justified").  Second, the MITRE Report is inadmissible hearsay.  *Neagle v. Ill. Tool Works, Inc.*, 2011 WL 13173913, at *1 (N.D. Ga. Feb. 11, 2011) (expert reports generally are inadmissible because they are hearsay); Fed. R. Evid. 801.

members who were asked had not read it either.  SAF No. 164.  The single SEB member who had, admitted that it raised questions regarding the BMD system—for which that SEB member had no solutions, despite his responsibility related to Georgia's elections.  SAF No. 165; *see also* SAF Nos. 166-69.

Secretary Raffensperger repeatedly dismissed Dr. Halderman's findings with the unsupported claim that his access to Georgia's voting equipment could not be replicated by a real-world bad actor.  SAF Nos. 153-54; *see also* SAF No. 155.  Not only does Dr. Halderman refute this, since many failings in the system could be exploited with very little time and access to the equipment, but the Coffee County breach is fatal to the claim.[6]  SAF No. 65; *infra* §§ II.E., G.

## C.  CISA Verified Dr. Halderman's Findings and Recommended Important Mitigation Measures that Georgia Ignored.

On June 3, 2022, the Cybersecurity and Infrastructure Security Agency (CISA)[7] released a public advisory corroborating the July 2021 report findings and detailing nine serious vulnerabilities in the BMD system.  Opp. Ex. 146 §§ 2.2.1-9.[8]

_____

[6] Secretary Raffensperger also misleadingly criticized Dr. Halderman's analyses because he received certain information to assess the Dominion voting equipment.  Opp. Ex. 139.  The SOS Office's CIO and Rule 30(b)(6) deponent admitted that this is standard practice for cybersecurity assessments.  SAF No. 154.

[7] On January 21, 2022, CISA agreed to conduct an analysis of Georgia's BMD system.  SAF Nos. 170-74.

[8] *See also* SAF Nos. 174-76.  The CISA Advisory constitutes public findings resulting from CISA's Coordinated Vulnerability Disclosure process, which analyzed vulnerabilities in Georgia's Dominion voting system.  Opp. Exs. 147, 148.  The CISA Advisory is admissible as a public record.  Fed. R. Evid. 803(8)*; see Crawford v. ITW Food Equip. Grp. LLC.*, 977 F.3d 1331, 1348-49 (11th Cir. 2020).

The CISA Advisory recommends 13 steps for Georgia to mitigate the risk that bad actors could exploit the vulnerabilities, and the SOS Office agreed that the vulnerabilities identified by CISA should be mitigated as CISA advised. SAF Nos. 177-78. Yet there is no evidence that *a single step* has been taken in Georgia. SAF No. 179.

### D.   Defendants' Cybersecurity Consultant and CISO Identified Numerous, Unremediated Vulnerabilities.

Fortalice Solutions, which serves as the SOS Office's Chief Information Security Officer, recently identified *eight* vulnerabilities, including four "High" risks that both could be ████████████████████████████████████ ████████████████████████████████████ " and should be remediated promptly. Opp. Ex. 154 at 5-6; *see also* SAF Nos. 194-223. Fortalice was *not* asked to assess whether these vulnerabilities had been exploited. SAF No. 210; Opp. Ex. 138. Notably, in 2020, the SOS CIO, Mr. Beaver, directed Fortalice to stop preparing reports of its analyses to avoid public scrutiny after earlier Fortalice reports produced in this case revealed he had misled the Court under oath about the efficacy of Fortalice's penetration testing of the SOS IT networks. SAF Nos. 218; 219.

### E.   Defendants' Experts Never Examined Georgia's Voting Equipment and Admit Key Security Vulnerabilities.

Defendants have churned through expert witnesses: (i) Dr. Michael Shamos, who advised against barcoded BMDs like those used in Georgia (SAF No. 180); (ii)

Dr. Wenke Lee, who served as the sole election cybersecurity expert on Georgia's SAFE Commission and who objected to the use of BMDs in Georgia (SAF Nos. 181-83); (iii) Dr. Eric Coomer, who retained Dr. Halderman as his own election security expert regarding Dominion's BMDs (SAF No. 184); (iv) Dr. Ben Adida, Defendants' audit expert who has not testified since 2020 and *who recommends HMPBs,* with BMDs for those who need them (SAF Nos. 101, 185); and (v) Theresa Payton of Fortalice, who found serious security failings with the SOS Office's computer networks and opined that it is only a matter of time until a U.S. election is hacked.  SAF No. 195.

*None* of Defendants' experts have examined Georgia's Dominion voting equipment.  SAF No. 186.  Dr. Gilbert stunningly admitted that he "ha[d] not examined any [election] equipment" used in Georgia, including the Dominion software, and was unaware of critical facts regarding the system, including that (i) Fortalice found serious cybersecurity vulnerabilities with the SOS Office's IT systems; (ii) the prior DRE system was not actually "air gapped" as State Defendants claimed; and (iii) removable media used with the DRE system have been reused with the new BMD system.  Opp. Ex. 71 at 13:16-17; *see also* SAF Nos. 187-89.  Dr. Gilbert conceded that Dr. Halderman had identified numerous attacks that could be readily implemented against Georgia's BMD system, and he did not disagree with Dr. Halderman's findings regarding the manner and ease with which those attacks could be effected in Georgia.  SAF No. 190.  Dr. Gilbert agreed it is possible to

"manipulate the QR code and/or the human readable text" and that only a small number of voters would identify a human-readable change on their respective ballots.  Opp. Ex. 71 at 74:15-75:15.  He did not dispute that malware that could alter votes on a large scale could be transmitted to a BMD in a couple of minutes in the voting booth, whereas altering HMPBs requires many hours to manually change ballots—and importantly, any alteration to a HMPB could occur *only after* the ballot is tabulated by the scanner.[9]  SAF No. 191.  Dr. Gilbert further admitted that eliminating QR codes "would get rid of a lot of the issues" Dr. Halderman found and he "would recommend not using them."  Opp. Ex. 71 at 89:7-13, 90:9-16; SAF No. 193.  *No defense expert* recommends Georgia's BMD system.[19]  SAF Nos. 101, 180-195.

### F.   Georgia's Election System Lacks Sufficient Safeguards to Protect Against Demonstrated Cybersecurity Vulnerabilities.

Defendants' only defense on the merits of Plaintiffs' claims is the empty claim that Georgia has unspecified physical and procedural safeguards that somehow protect the system's integrity.  But whatever these are, they fail, repeatedly:

- Multiple county election officials notified CES Director Michael Barnes that BMD seals had been removed.  SAF No. 233; *see also* SAF Nos. 231-32.  He instructed these counties to place their own seals on the BMDs and continue using them.  SAF No. 233.

---

[9] Dr. Gilbert admits he is not a cybersecurity expert and lacks the expertise to assess the cybersecurity of Georgia's voting system; he suggested Drs. Halderman and Andrew Appel (both of whom have offered expert testimony supporting Plaintiffs' standing and the relief they seek).  SAF Nos. 152, 192; *see generally* Dkt. 1131; SMF Ex. 59.

- Fulton County election workers used BMDs for the November 2020 election that, in violation of election policies, were found with the side doors of the voting machines that cover the removable media ports open, unsealed, and unsecured.  SAF No. 229.  Although an election worker reported the incident to the SOS Office, there is no evidence that an investigation occurred or that the machines were tested for compromise or removed from future use.  SAF No. 230.

- In Hart County, election workers intentionally left "many voting machines … unlocked" during the day while the polls were open for the November 2020 election.  Opp. Ex. 162 at 2; *see also* SAF No. 237. Although the SOS Office learned of this issue, there is no evidence it was ever investigated.   SAF No. 237.

- Counties are free to reuse removable media with voting equipment that could introduce and spread malicious code, including USB drives previously used with the DRE/GEMS system. *See, e.g.*, SAF No. 57.  Such media could spread vote-stealing malware to BMDs throughout a county or the state if connected to a central EMS server.  SAF Nos. 59-71; Dkt. 1131 § 3.1.

- In Fulton County during the November 2020 election, a scanner containing 400-500 ballots was left unsecured overnight and the ballots were not reported to Fulton County.  SAF No. 238; Opp. Ex. 60 at 3.  Further, an election worker stopped at her house to take a shower in the middle of transmitting completed ballots, leaving them unsecured in her personal vehicle for nearly 20 minutes.  SAF No. 239.  Although known to the SOS Office, there is no evidence of any investigation, including whether the election tabulation in Fulton County was affected.  SAF No. 240.

According to the SOS Office, "access to…state election equipment" is "a county issue."  Opp. Ex. 85 at 146:13-25; *see also* SAF No. 226.  This leaves the physical security of Georgia's equipment to the varying practices of 159 counties and countless people with regular access to that equipment, like those in Coffee

County in January 2021.  In one Fulton County warehouse, election workers often left the storage area for the EMS server unlocked.  SAF No. 241.  Infiltration of this hardware could be easily accomplished simply by plugging in a USB drive containing malicious code.  SAF Nos. 65, 236; Dkt. 1131 § 8.5.  Defendants have taken no steps to determine whether that has happened in Fulton County or elsewhere.  SAF Nos. 68, 186.

### G.   The Coffee County Breach Reveals the Lack of Meaningful Safeguards to Protect Georgia's Voting System.

#### 1.   Election Officials in Coffee County Permitted Unauthorized Individuals Access to Georgia's Voting System.

The Coffee County breach eviscerates Defendants' unsupported claims that Georgia's voting system is secure against access by unauthorized individuals or others who could affect votes or election outcomes.[10]  In January 2021, Georgia's voting system was breached by a team from forensics firm SullivanStrickler (SS), orchestrated by, *inter alia*, Coffee County Republican Party Chair Cathy Latham,

---

[10] Dominion's Contract with the SOS Office defines a "Security Breach" as: "(i) unauthorized physical or technical access to any Contractor Computer System; (ii) any circumstance that may constitute or result in, any unlawful or unauthorized acquisition, access, loss, theft, use or disclosure of any Confidential Information, Regulated Information, or State Data in the possession of any of the Contractor Parties; (iii) any breach or attempted breach of the security of any Confidential Information, Regulated Information, or State Data, or of any of the controls of any of the Contractor Parties intended to protect the same; or (iv) any other circumstances or events that could compromise the privacy or security of any of the Confidential Information, Regulated Information, or State Data in the possession of any of the Contractor Parties."  SAF No. 251.

election officials Misty Hampton and Eric Chaney, bail bondsman Scott Hall, and Cyber Ninjas CEO Doug Logan.  SAF No. 252.  The nonprofit of Sidney Powell, a Trump campaign attorney, paid for it.  SAF No. 253.

On January 7, 2021, SS forensically imaged many components of Georgia's voting system in Coffee County, including the ICC, the EMS server, ICPs, a Dominion-supplied laptop, and extensive removable media, including one containing the Dominion ICX BMD software.  SAF Nos. 255-56; Opp. Ex. 75 ¶ 12. SS did this, in part, by connecting various devices, including computers, to the voting equipment.  SAF Nos. 256-57.  SS did not use write-blocking equipment, as is industry best practice, to prevent the inadvertent transfer of data—such as malicious code—to the voting equipment.  SAF No. 260, Opp. Ex. 255 ¶¶ 30-31. Evidence indicates that SS altered data on at least the Coffee County EMS server. SAF No. 261.  During the SS visit, numerous cast ballots were scanned and shared with others.  SAF No. 258.

From January 18-19, 2021, Doug Logan and Jeffrey Lenberg, a computer security consultant who has also analyzed Dominion voting equipment in Michigan in connection with efforts to discredit the 2020 Presidential election, visited the Coffee County elections office.  SAF Nos. 262-63.  Messrs. Logan and Lenberg conducted a series of tests on the voting equipment.  Opp. Ex. 257 at 32:6-18, 48:18-50:7.  During their visits, system dates on several election computers were altered, scanner settings were reconfigured several times, and one precinct scanner was

physically opened to inspect the internal parts.  SAF No. 263.

Mr. Lenberg returned for *five more days* in January to conduct additional experiments, during which the date on the ICC was twice changed (and never changed back) and Misty Hampton gave him voting system data to take with him. SAF Nos. 264-65.[11]

Messrs. Logan and Lenberg's changes to the voting system components were "abnormal and reckless" because they could prevent the system from functioning or accurately recording votes.  SAF No. 277.  Because of this, when unauthorized individuals access election hardware, other states have decommissioned, quarantined, and not used it in future elections.  SAF No. 278.  Georgia *only* replaced Coffee County's EMS server and ICC after the SOS Office learned about a potential compromise of the voting system in May 2021 involving Mr. Logan.  SAF No. 279. State Defendants did not replace the other compromised equipment until September 2022, and only at Plaintiffs' urging.  SAF No. 280.[12]  But they refused to replace the

---

[11] On or about February 25, 2021, Mike Lindell—a leading "election denier" associated with the Trump campaign—mysteriously flew to Coffee County during the night after flying to Washington, DC and Mar-a-Lago that same day.  Opp. Ex. 150 at 155:4-22.  That same day, (i) Misty Hampton and her assistant resigned under pressure and (ii) Conan Hayes accessed data on the SS ShareFile site after weeks of inactivity.  SAF No. 269.  The day before, Ms. Hampton was on Mr. Lindell's website.  SAF No. 270.  At the same time, the SOS Office engaged Fortalice to produce a plan on how to respond to just such a breach, which Fortalice finalized on February 26.  Opp. Ex. 164.  The plan addresses how ████████████████████████████████████████ ████████████████████████████████ " to aid in " ████████████████████████████████████ " *Id.*; Opp. Exs. 190, 191.

[12] *See also* Opp. Ex. 198 at 10:4-11:10 (stating that it seemed like it would be prudent

EMS server and ICC that were used with that potentially infected equipment *for over 18 months*.  SAF Nos. 281-82.

SS uploaded the data it collected from Georgia's voting system—including protected software from nearly every component of that system—to a cloud-based ShareFile site and provided login credentials to download the data to individuals identified by Sidney Powell and others.  SAF Nos. 288-90.  Anyone with login information could access that data.  SAF No. 292.  Login credentials were shared, leaving no complete trail of who accessed the data.  SAF No. 291; Opp. Ex. 253 at 87:2-89:8.  For example, Benjamin Cotton, a cybersecurity consultant who was retained by "election deniers" and analyzed the Coffee County data, downloaded and reviewed the data using credentials James Penrose gave him.  SAF Nos. 294, 296.

At least ten individuals across the country *and outside the U.S.* downloaded and uploaded sensitive Georgia elections data.  SAF Nos. 293, 295-97.  Mr. Logan *uploaded* several files, including virtual machine copies of the voting system components and a new version of the EMS server files, to the ShareFile site from a location in Florida on January 16, 2021.  SAF No. 299.  SS did not know why Mr. Logan uploaded these files, what they were, or where they came from.  *Id.*  Others apparently downloaded data from locations as far-reaching as California, Kansas, England, and Italy.  *See* SAF No. 297.  And still others had the data shipped to them

---

for the SOS Office to replace all of the Coffee County equipment).

on hard drives.  SAF No. 298.  The sensitive data still existed on Mr. Cotton's home computer in Montana as of August 2022.  SAF No. 295.

Ms. Latham, Mr. Chaney, and Robert Sinners lied under oath when questioned about their role in the Coffee County breach.  SAF Nos. 285, 287, 345.  That the people who facilitated and participated in the breach sought to cover it up, including lying under oath, confirms the nefarious intent behind the breach and the serious exposure it presents to Plaintiffs' right to vote.[13]

### 2. The Coffee County Breach Poses a Serious Threat to the Security of Future Georgia Elections.

Dr. Halderman examined forensic images from Coffee County's EMS server and other components of Georgia's voting system and found that the "risk that a

---

[13] The repeated invocation of the Fifth Amendment by Cathy Latham, Eric Chaney, Misty Hampton, and Hampton's assistant, Jil Ridlehoover in response to deposition questions about their involvement in the Coffee County breach warrants adverse inferences from this Court.  A court may form an adverse inference against parties in civil actions when they invoke the Fifth Amendment in response to probative evidence against them.  *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). This is particularly appropriate when "silence is countered by *independent evidence* of the fact being questioned." *Gov't Emps. Ins. Co. v. Quality Diagnostic Health Care, Inc.*, 2019 WL 2245513, at *1 (S.D. Fla. Apr. 18, 2019) (emphasis in original) (quoting *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000)); *see also SEC v. Weintraub*, 2011 WL 6935280, at *6 (S.D. Fla. Dec. 30, 2011).  The *undisputed facts* regarding that breach and their roles in it, including email and text messages, surveillance footage, and co-conspirator admissions, support adverse inferences against these witnesses. *See* SAF Nos. 252-87.  The Court should infer that the answers to the questions where Latham, Chaney, Hampton, and Ridlehoover invoked the Fifth Amendment would be unfavorable to them.

future Georgia election will be attacked materially increased with the outside group(s)'s copying and distribution of the proprietary software that operates Georgia's election system and specific system configurations."   SAF No. 314. Because all 159 Georgia counties use the same Dominion software and the same or similar system configurations, this heightened risk applies to all counties.  SAF Nos. 305, 314-15.  *Importantly, this finding is entirely unrefuted.*  No defense expert has addressed the Coffee County breach, much less its implications for the reliability of Georgia elections.  *See* SAF Nos. 361-373.

Dr. Halderman's analysis uncovered several weaknesses in Georgia's voting system resulting from Defendants' and Dominion's failures.  First, all users of the Coffee County EMS server share a single account, rather than assigning users accounts with differing levels of access based on role and need.  SAF No. 322.  This single account has administrator privileges, such that any authorized user could bypass security controls and alter software, election data, and log files.  *Id.* Additionally, the hard drive on the EMS server and ICC workstation are both unencrypted, even though the operating system supports full-disk encryption.  SAF No. 323.  Such unencrypted systems allow anyone with physical access to use widely available methods to bypass a login password and gain access.  *Id.*

Second, the EMS server and ICC operate on outdated software lacking critical security updates.  SAF Nos. 324-27.  The EMS server uses an August 2016 version

of Windows, and Georgia has never installed *any* security patches.[14]  SAF Nos. 324, 326.  Windows has released *380 software updates* for this version, including *165 "critical" updates* that fix vulnerabilities that hackers are already actively exploiting.  SAF No. 325.  Likewise, the ICC uses a July 2015 version of Windows installed in November 2019.  Since then, the State has not installed *any* security updates on the ICC.[26]  SAF No. 326.  Windows has released *184 software updates* for this version of Windows, of which *101 are "critical."*  SAF Nos. 325; 327.

There is no evidence that Georgia has remediated these vulnerabilities.  SAF No. 283; *see also* SAF Nos. 279-82.  The sharing of this software by SS and others means countless individuals and entities have a "roadmap" to hack Georgia elections—and the Coffee County breach confirms easy access to the system.  Opp. Ex. 31 at 192:16-93:6; *see* SAF Nos. 331, 252-65.

Lacking any evidence to rebut these damning facts and what it reveals about the insecurity of Georgia's voting system, *Defendants collectively devote **two sentences** to this critical issue*.  Dkt. 1567-1 at 16-17.  This is fatal.

---

[14] Dominion had to connect the ICC to *the Internet* to download and install the version of Windows running on the system.  Opp. Ex. 75 ¶ 25.  Connecting old, un-updated systems to the Internet—even a single time—is a critical security risk because common hacking tools exist that can exploit those vulnerabilities soon after the system connects to the Internet.  *Id.* ¶ 26.  This installation method was unnecessary and reckless.  *Id.*

### 3.   State Defendants Ignored All Signs of the Coffee County Breach…until Plaintiffs began Uncovering the Facts.

The Court found that "the State [] 'stood by for far too long' in failing to address the 'mounting tide of evidence of the inadequacy and security risks' posed by Georgia's [DRE] voting system."  Opp. Ex. 2 at 3 (quoting Opp. Ex. 13 at 43). This hasn't changed.

In December 2020, the SOS Office opened an investigation into a YouTube video showing Ms. Hampton demonstrating ways to manipulate Georgia's voting software, with the EMS server password visible on her computer monitor.  SAF Nos. 72, 336.  The SOS Office sent an investigator to Coffee County who visited the elections office at least three times: on December 11, 2020 and on January 20 and 26, 2021.  SAF No. 337.  During the investigator's third visit, Mr. Lenberg was in Ms. Hampton's office or the EMS server room.  SAF No. 338.  Yet apparently the investigator did not question Mr. Lenberg's presence or pursue the issue of unauthorized personnel being allowed in sensitive areas of the elections office.[15] SAF No. 339; *see also* SAF Nos. 340-43.

In late 2020, Robert Sinners was a key "election denier" on the ground in Georgia actively supporting Trump's "Big Lie" about the November 2020 election,

---

[15] On September 28, 2021, the investigator submitted his summary of findings.  Opp. Ex. 76.  The SOS's Office found that the Coffee County Board of Elections and Ms. Hampton violated voting security regulations.  *Id.* at 5.  The findings made no mention of any unauthorized personnel in the Elections Office, including Mr. Lenberg.  *Id.*  Defendants simply ignore these events.

including aiding[16] a bogus lawsuit against Coffee County for which Sinners traveled to the county in December 2020.  SAF Nos. 344-46.  Mr. Sinners was in touch with Mr. Chaney and Ms. Hampton around the same time regarding the November 2020 election.  SAF Nos. 347-48.  On the evening of January 7, 2021, just as SS completed its work, Mr. Chaney sent Mr. Hampton Mr. Sinners' personal cellphone number and told her to switch to Signal (which enables users to delete encrypted messages from *all user devices*, not just their own).  SAF No. 349.  The SOS Office hired Mr. Sinners only weeks later and has promoted him to a senior communications role. SAF No. 350.

On May 7, 2021, Ms. Hampton's successor as Coffee County Elections Supervisor, James Barnes, emailed State Elections Director, Chris Harvey, to report finding a Cyber Ninjas business card for Mr. Logan at the base of Ms. Hampton's former computer.  SAF No. 353; *see* SAF No. 355.  Mr. Harvey promptly directed the SOS Office's chief investigator, Frances Watson, to investigate possible contact between Mr. Logan and anyone at the Coffee County Elections Office.  SAF No. 354*.*  Only a cursory investigation ensued, with State Defendants, at best, simply deferring to Coffee County election officials, including Mr. Chaney who helped orchestrate the breach and lied about it happening.  SAF Nos. 287, 314-15; Dkt. 1471-12.  Secretary Raffensperger later claimed that his office conducted a thorough

---

[16] In November 2020, individuals at the Robbins and Taylor English firms, along with Mr. Sinners and others, apparently assisted with an effort in Georgia to sow doubt about the 2020 Presidential election results.  Opp. Ex. 212 at 2-8.

investigation in May 2021 including interviewing Ms. Hampton.  Opp. Ex. 216.  But Ms. Hampton denies this, and State Defendants have produced no evidence of this investigation apart from a few emails.  SAF Nos. 356-57, 374-75.

Around the time that James Barnes reported the Cyber Ninjas card to the SOS Office, he realized that Coffee County's EMS server password—provided by the SOS Office—did not work.  SAF No. 358.  He reported the issue to the SOS Office's CES, which replaced the EMS server and the ICC workstation on or about June 8, 2021.  SAF No. 359.  Barnes understood the SOS Office replaced that equipment for fear that it was compromised, per the Cyber Ninjas card.  SAF No. 360.

Defendants claim they have *no documents*—including emails, text messages, chain of custody forms, etc.—regarding their unusual replacement of a county's EMS server and ICC workstation apart from a single generic acceptance testing document for an EMS server.  SAF No. 374; *see also* Opp. Ex. 202 (State Defendants did not preserve documents despite knowing EMS server was potentially compromised and thus highly relevant to this case); Opp. Ex. 67 at 117:21-122:2, 131:20-132:22, 134:6-36:15 (testifying that no documentation of the events exists).

The SOS Office retained cyber forensics expert James Persinger *in May 2021*, but inexplicably waited until July 2022 to give him access to the Coffee County equipment taken over a year earlier to try to access it.  SAF No. 361-62.  Dr. Halderman found that Mr. Persinger's activities blatantly violated basic digital forensics principles, which would require all analysis to be performed on a *copy* of

the server.  Opp. Ex. 187 ¶¶ 2, 4; *see also* SAF No. 373.  Instead, Mr. Persinger altered data on the original server, causing *hundreds* of files to be deleted, created, appended, or otherwise modified.   Opp. Ex. 187 ¶¶ 4, 16-18; *see* SAF Nos. 370-71. Mr. Persinger even altered files containing evidence of what occurred during the Coffee County breach, including election project databases, Windows registry files (which store system configuration and user settings), and numerous log files.  Opp. Ex. 187 ¶ 18; SAF No. 372.

In short, State Defendants made no serious effort to investigate the Coffee County breach *until after **Plaintiffs** began investigating it* in the spring of 2022.  SAF No. 375.   And at that time, they repeatedly and wrongly claimed an "ongoing investigation" as a shield to discovery regarding the breach.  Opp. Ex. 204 at 5; Opp. Ex. 270 at 1-2; *see* SAF Nos. 376-77.  State Defendants did not conduct any serious investigation before referring the matter to the GBI in *August 2022.*[17]  Opp. Ex. 271 at 3-4; *see* Opp. Ex. 272 at 21:20-23; *compare* SAF No. 381, *with* SAF No. 334. Nevertheless, the SOS Office's COO, Gabriel Sterling, publicly announced in April 2022 that there was no evidence of any voting system breach in Coffee County.  Opp. Ex. 260; SAF No. 378.  He claimed—unequivocally—that "it didn't happen."  *Id.* Discovery, at great cost to Plaintiffs, belied that claim. But no one has been held accountable for the Coffee County breach still today.  This incentivizes similar or

---

[17] State Defendants represented that the investigation would be completed and Georgia would resolve any security issues *before* the November 2022 elections. Opp. Ex. 142 at 53:11-17; 80:3-5.  That did not happen.

worse breaches in the future.  Opp. Ex. 255 ¶ 9.i.

> **H.     Georgia's Election System Also Lacks Procedural Safeguards Because it is Un-Auditable.**

State Defendants assert that Georgia's election rules, which prescribe a risk-limiting audit (RLA) of the human-readable portion of ballots in *a single state-wide race once every two years* (Ga. Comp. R. & Regs. 183-1-15-.04), mitigate the numerous security vulnerabilities posed by Georgia's BMD system.  Mr. Sterling, called such infrequent audits "crazy."  Opp. Ex. 149 at 325:3-18; *see also* SAF Nos. 390-391.  And Philip Stark, the leading election auditing expert, testified that "[a] risk-limiting audit of one contest every two years is not enough, no matter how rigorous that audit is."  SAF No. 392.  State Defendants misconstrue the facts and the law, presenting an inaccurate picture of the RLAs' (1) number, (2) scope, and (3) ability to identify—much less cure—the critical failings in Georgia's current voting system.

*First*, State Defendants claim that "[n]umerous audits since Georgia implemented the BMDS . . . have confirmed the reliability of the BMDs in accurately counting votes."  Dkt. 1567-1 at 43.  Not so.  "A genuine RLA requires far more than Georgia has yet attempted." SMF Ex. 42 ¶ 87(g); *see also* SAF Nos. 382-84.  State Defendants miscast the 2020 Presidential race hand recount as an RLA.   Dkt. 1567-1 at 9; SAF Nos. 387-89.  Under Georgia law, an RLA uses "statistical methods" and is "designed to limit to acceptable levels the risk of certifying a preliminary election outcome that constitutes an incorrect outcome."  O.C.G.A.

§ 21-2-498(a)(3).  The 2020 recount does meet this definition.  SAF Nos. 387-89; SMF Ex. 42 ¶¶ 23-45; SMF Ex. 44 at 4.

*Second*, State Defendants claim that RLAs are a check on QR code tabulation because they tabulate the human-readable text on the ballots.  Dkt. 1567-1 at 8, 10, 25.  They repeatedly refer to QR code counts as merely an "initial" vote tabulation— which is stunningly misleading.[18]  Dkt. 1567-1 at 9, 11, 25.  This suggests a separate, final tabulation.  But the initial QR code tabulation is the *only* tabulation in Georgia elections, unless there is a full, hand recount (not simply an RLA).  Ga. Code § 21-2-492, 493; SAF No. 386.  And an RLA merely checks whether a manual count of the ballots likely would find the same winner(s)—RLAs do not, and cannot, check the official tabulation of any, much less each, BMD ballot. [19]  SAF No. 383.

*Third*, even if Georgia conducted an RLA for every election contest, that would not mitigate the security risks of Georgia's voting system because (i) audits cannot confirm the correct tabulation of individual ballots, and (ii) audits of Georgia's BMD system cannot confirm that the BMD ballots are themselves accurate.  *See, e.g.*, SMF Ex. 42 ¶ 87(b); SMF Ex. 55 ¶ 10; *see also* SAF Nos. 383, 393-96.  RLAs may flag an incorrect election outcome only if they are based on

---

[18] State Defendants repeatedly and wrongly insist that "if there is any discrepancy between the QR code and the printed *human-readable text*…the *human-readable* 'printed text shall control.'"  Dkt. 1567-1 at 25; *see also id.* at 5-6, 8.  They cite no Georgia statute for this claim—and there is none.

[19] *See also* Opp. Ex. 261.  The SOS Office's press releases are admissible as an exclusion to the hearsay rule because they are admissions of a party opponent.  *See* Fed. R. Evid. 801(d)(2).

voter-verified ballots that are handled by a voting system that is *software independent*. SAF No. 393; SMF Ex. 55 ¶ 4. Audits cannot confirm that Georgia's BMD ballots accurately record what voters selected on the BMDs. SAF Nos. 383, 397; SMF Ex. 42 ¶ 87(g) ("[A]pplying risk-limiting audit procedures to an untrustworthy collection of ballots is 'security theater.'"). Thus, RLAs of BMD ballots, at best, can statistically confirm the tabulation of those ballots *as printed*, but not the actual votes cast by the voters. SAF No. 397.

Unlike HMPBs, Georgia's BMD ballots are not trustworthy (even with proper custody procedures) because a malfunctioning or compromised BMD could print a human-readable text summary that does not reflect what the voter selected on the BMD. SAF No. 395; SMF Ex. 44 ¶ 9. By nature, BMDs erase all direct evidence of voter selections, thus mooting post-election audits. Opp. Ex. 87 at 46:4-11; SAF No. 395.

## I.    Curling Plaintiffs Have Suffered Particularized Harm.

Plaintiff Donna Curling is a voter in the State of Georgia and a resident of Fulton County. Dkt. 627 ¶ 14. Plaintiffs Donna Price and Jeffrey Schoenberg are voters in the State of Georgia and residents of DeKalb County. *Id.* ¶¶ 16-17. Curling Plaintiffs have each voted in almost all previous elections for the last 30 years or so. *Id.* ¶¶ 14, 16-17; Opp. Exs. 273-75. This Court repeatedly has found that each Curling Plaintiff asserts a personal injury to their individual right to vote caused by Defendants' conduct. Opp. Ex. 51 at 35-36; Opp. Ex. 13 at 17-24.

27

Because Ms. Curling was concerned that Georgia's in-person DRE system could not securely record her votes for the June 2017 election, she elected to vote absentee.  SAF No. 405; Opp. Ex. 273 ¶ 12.  After multiple hurdles, burdens, and incorrect information given to her by election personnel, she personally turned in her absentee ballot, and an election worker assured her that her vote would be counted. SAF Nos. 405-09; Opp. Ex. 273 ¶¶ 2-5, 7-11.  She did not learn until filings in this case that her vote was not counted and she had been disenfranchised.  SAF Nos. 410-11; Opp. Ex. 273 ¶ 4; Dkt. 627 ¶ 15.  Ms. Curling lacks confidence in Georgia's BMD system because it lacks transparency since the barcode—not the human-readable portion of the paper ballot—is used to tabulate votes.  SAF No. 412.  She was disenfranchised again in the August 2020 election.  Dkt. 1598 ¶ 10; SAF No. 413.  Because of her concerns that she is unable to verify her vote in Georgia's system, Ms. Curling applied to vote absentee.  Dkt. 1598 ¶ 10; SAF Nos. 414-16. However, she never received a ballot, and therefore she was not able to cast a verified vote.  Dkt. 1598 ¶ 10; SAF No. 413.  She was unable to vote in-person because she has no confidence that Georgia's BMDs will accurately record and count her vote. SAF Nos. 404, 417, 419.   Despite these burdens, including the possibility of disenfranchisement, Ms. Curling intends to continue voting absentee because she cannot trust Georgia's BMD system.   SAF No. 418.   Secretary Raffensperger acknowledges that Fulton County Defendants' actions have disenfranchised voters like Ms. Curling.  Opp. Ex. 229 ("The Department of Justice needs to take a long

look at what Fulton County is doing and how their leadership disenfranchises Fulton voters through incompetence and malfeasance.").

Plaintiff Donna Price is harmed by the fact that, with Georgia's BMD system, she must choose between voting using a ballot that she cannot verify or voting absentee, which presents its own significant burdens. SAF Nos. 421-24. With Georgia's BMDs, Ms. Price could not verify her selections because the QR code is used to tabulate votes and is not human-readable; thus, she would have no verified record of the selections she made and would be stuck with whatever may be in the QR code. SAF Nos. 425-27. And Ms. Price worries that Georgia lacks RLAs that might help secure her right to vote. SAF No. 428.

Accordingly, Ms. Price plans to vote absentee in future elections even though she finds, based on her lived experience, that absentee voting imposes significant burdens as well. SAF No. 429. On January 27, 2020, Ms. Price requested an absentee ballot, which she received on February 21, 2020. SAF No. 430. She promptly mailed the completed ballot back ahead of the primary, which was then scheduled for March 24. SAF No. 431. The SOS Office then sent her another ballot that she had not requested, so she destroyed it, believing it to be an error. SAF No. 432. When the date of the primary changed, she contacted DeKalb County because she was concerned her original ballot would not be counted. SAF No. 435. The county elections office told her to fill out another application. She did, but never received a ballot. *Id.* Ms. Price was also disenfranchised in the August 11, 2020,

election because she requested an absentee ballot, but never received one.  Dkt. 1599 ¶¶ 3-4; SAF No. 433.  If she had received an absentee ballot, she would have voted in that election.  Dkt. 1599 ¶ 3; SAF No. 434.   If she votes absentee in the future, Ms. Price will have no ability to confirm that her ballot goes into a lockbox or scanner, unlike her fellow voters who vote in person.  SAF No. 424.  Voting absentee has its own barriers for Ms. Price; for example, Ms. Price cannot see that the ballot goes into a lockbox or scanner like her fellow voters who vote in person can.  SAF Nos. 424, 463.

Plaintiff Jeffrey Schoenberg takes his right to vote very seriously, considering both his training as a lawyer and career as a U.S. Congressional staffer.  SAF Nos. 446-48.   The act of personally exercising his constitutional right—and having confidence that his vote will be reliably counted—is paramount to him, as Gabriel Sterling has emphasized regarding Georgia voters.  SAF Nos. 436, 449, 452.  Mr. Schoenberg would like to vote in person because it is his preferred method of voting.  SAF No. 437; *see also* SAF Nos. 449, 453-54, 462.  But he is concerned that he will be disenfranchised by Georgia's voting system—that his vote will not be counted accurately, and nobody would be able to tell after the fact.  SAF Nos. 438, 450-51.  This concern has led him to vote by absentee ballot.  SAF Nos. 438-39.

Mr. Schoenberg is also concerned about the reliability of absentee voting due to mail delays and problems obtaining ballots and having them counted when returned.  SAF No. 439.  He thus decided to vote in person in the 2020 Presidential

Preference Primary, but found the process so unreliable, and was so disturbed that the large BMD touch screens compromised ballot secrecy, that he planned to vote absentee thereafter.  SAF Nos. 440-41.  Ahead of the January 5, 2021 elections, he requested an absentee ballot, received confirmation of his request, but never received the ballot.  SAF No. 442.  When he realized the ballot would likely not arrive in time, he voted early in person on a BMD.  SAF No. 443.  Although he successfully put his BMD ballot into the scanner, Mr. Schoenberg left the polling place without confidence that his vote would be counted as cast.  SAF No. 444; *see also* SAF Nos. 455-61, 464.  He feels that choosing between voting in-person or absentee in Georgia is akin to choosing "this poison rather the other."  SAF No. 445.

Although Defendants make much of Curling Plaintiffs' option to vote absentee to avoid using Georgia's BMD system, the choice is actually out of Curling Plaintiffs' control.  It is common practice for elections officials to duplicate absentee ballots onto BMD ballots by taking the absentee ballot to a BMD and selecting the absentee voter's selections.  SAF No. 112; *see* Dkt. 1593 ¶¶ 11-13, Ex. A.  If this were to happen to one of Curling Plaintiffs' absentee ballots, they would not have the opportunity to review their BMD ballot or even know that it exists.

**J.     Georgia Could Easily Adopt Hand-Marked Paper Ballots Today.**

Election integrity experts nearly unanimously recommend HMPBs for all in-person voters (with exceptions for voters with specific accessibility needs).  *See, e.g.*, Opp. Ex. 26 at 103:3-5; Opp. Ex. 152 at 2, 4; Opp. Ex. 99, Hursti Decl. ¶ 18;

31

Opp. Ex. 239 ¶ 21; *see also* SAF Nos. 103-106, 466.  Indeed, the only cybersecurity expert on Georgia's own SAFE Commission, Dr. Wenke Lee, strongly recommended that Georgia adopt HMPBs, concluding "[a] secure voting system should use hand-marked paper ballots instead of ballot marking devices. . . This consensus approach among the cybersecurity researcher community ensures that votes by the voters are counted accurately."  Opp. Ex. 152 at 5.

Georgia could transition swiftly and cheaply to HMPBs, as the primary elements for a HMPB system are already in place.  SAF No. 467; *see, also* Ga. Comp. R. & Regs. 183-1-12-.11(2)(c)-(d); Opp. Ex. 240 at 19.  Use of HMPBs would require *far less* equipment and fewer employees than the use of BMDs, because counties would no longer require complicated, costly machines or printers. Opp. Ex. 29 at 157:9-15; *see also* SAF No. 468.  Georgia law already requires polling places to print enough HMPBs for all voters "in the event of an emergency."  Ga. Comp. R. & Regs. 183-1-12-.11(2)(c)-(d).  And the ICP and ICC scanners Georgia already uses statewide can read barcodes or HMPBs interchangeably.  Opp. Ex. 54 ¶¶ 4, 37-40; *see also* Opp. Ex. 2 at 146 ("the scanning technology provided by Dominion . . . and funds authorized in connection with HB 316" could be used to implement a constitutionally acceptable HMPB voting system); SAF No. 472. Because Georgia already has the ability to print and tabulate HMPBs on a widespread scale, there is minimal additional burden with moving to HMPBs statewide.  SAF No. 473; *see also* Opp. Ex. 54 ¶ 24; Opp. Ex. 56 at 137:14-38:15.

In fact, HMPBs would not even require elections officials and poll workers to be trained on a new voting system; election workers are already trained on the use of HMPBs because they already must be prepared to use them in exigent circumstances. SAF Nos. 469-41, 474.

Finally, a system using primarily HMPBs would be far cheaper than the current BMD system because it would require less equipment production, upkeep, and delivery. Opp. Ex. 29 at 157:9-15. Currently, for every election, numerous county and contract employees take tens of thousands of heavy BMD touchscreens, BMD printers, and BMD backup batteries out of storage and transport them to polling places. SAF No. 475; s*ee also* SAF No. 468. Then they set up, program, test, maintain, and secure that equipment. And after the election, they dismantle the equipment and transport it back to storage. SAF No. 475. With HMPBs, paper ballots and marking pens would replace most BMD touchscreens, printers, and battery backups. SAF Nos. 468, 475-76. HMPBs thus require far less equipment and fewer workers than Georgia's BMD system. SAF No. 476. Counties that use hourly or contract personnel to program, test, delivery, secure, and the BMD equipment would reap cost savings. SAF Nos. 474-76.

## III.   ARGUMENT

Summary judgment is only appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The evidence, and all reasonable inferences, must be viewed in

the light most favorable to the nonmovant." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). Defendants utterly fail to meet this standard as a matter of law and fact. They hardly grapple at all with the extensive record in this case, citing almost no facts—much less undisputed facts—or evidence. These Motions are Rule 12 motions under the guise of Rule 56, recycling wholesale unsupported legal arguments from their previous filings. *See* Opp. Ex. 276 at 8-13, Opp. Ex. 277 at 16-18; Opp. Ex. 278 at 4-11; Opp. Ex. 47 at 12-35; Opp. Ex. 279 at 5-15. But the *evidence* readily disposes of their Motions.

## A.    Fulton Defendants May Not Incorporate by Reference State Defendants' Arguments that Fulton Defendants Did Not Make.

This Court should disregard Fulton Defendants' incorporation of the entirety of State Defendants' brief. *See* Dkt. 1573 at 12. This is an impermissible circumvention of the page limit, effectively totaling 68 pages over the 50 pages allowed. *SEC v. Watkins*, 317 F. Supp. 3d 1244, 1249 (N.D. Ga. 2018), *aff'd*, 810 F. App'x 823 (11th Cir. 2020); *Davis v. DeKalb Cnty., Ga.*, 2005 WL 8154356, at *2 n.3 (N.D. Ga. May 31, 2005) ("[I]ncorporation by reference of arguments made in other briefs ... circumvents the page limitations imposed by the Local Rules of this district."). This tactic would also require Plaintiffs and this Court to divine which of State Defendants' arguments, if any, somehow might apply to Fulton Defendants. *See Ameris Bank v. Lexington Ins. Co.*, 2016 WL 5496383, at *1 (S.D. Ga. Sept. 28, 2016) ("This Court does not accept piecemeal briefs that incorporate by reference arguments contained in other filings, leaving this Court with the

34

dubious task of having to sift through filings and assemble a party's argument."). The Court should consider only the arguments in Fulton Defendants' own brief.[20]

## B.    Curling Plaintiffs' DRE Claims Are Not Moot.

Curling Plaintiffs recognize that the Court "does not intend to grant any further relief relating to the use of the old DRE voting machines."  Opp. Ex. 51 at 20.  Plaintiffs prevailed on their DRE claims with a long-standing injunction, and Defendants replaced the DREs as this Court intended, as Secretary Raffensperger admits.  Opp. Ex. 77 at 6; SAF Nos. 73-75.

But as this Court already held, Plaintiffs' DRE claims are not entirely moot, Opp. Ex. 51 at 23-24, and nothing has changed.[21]   State Defendants claim that Georgia "completely replaced [the DRE voting system] with the BMD system before the 2020 primary election."  Dkt. 1567-1 at 19.  Yet they cite no supporting *evidence*, instead relying only on a state regulation regarding use of BMDs for in-person voting.  Dkt. 1567-1 at 19 (citing O.C.G.A. § 21-2-300).  As this Court recognized in 2020, the DRE system was not limited to the DREs themselves; nor are Plaintiffs' claims.  Opp. Ex. 51 at 20, 23-24; *see also* SAF Nos. 38-46.

Specifically, this Court held that Georgia's ElectioNet (ENET) voter registration database "has been open to access, alteration, and likely some degree of

---

[20] Per Fed. R. Civ. R. 11(b), Fulton Defendants rightly withdrew their qualified immunity arguments (Dkt. 1584), which are no longer before the Court.
[21] State Defendants' mootness argument cites **no facts or exhibits** and just seeks to relitigate their motion to dismiss Plaintiffs' DRE claims.  Dkt. 1567-1 at 18-22.

virus and malware infection for years," (Opp. Ex. 2 at 88) including vulnerabilities that were not addressed even after the CES/KSU functions were transferred back to the SOS Office.  *Id.* at 149; *see also* SAF Nos. 38-39.  This Court noted that it has previously "required the State Defendants to develop procedures and take other actions to address the significant deficiencies in the voter registration database," but that "[i]t [wa]s unclear what actions, if any, the State has undertaken to address these deficiencies . . .  in advance of" the 2020 elections.  Opp. Ex. 51 at 23.  That remains true today.  SAF No. 47.  Until at least late January 2023, county registrars continued to use the *same voter registration database* for voter records, ballot precinct information, and poll pads.  SAF No. 46.  State Defendants offer *no evidence* that they have remediated the serious vulnerabilities with this critical aspect of the DRE system.  Dkt. 1567-1 at 20-21; *see also* SAF No. 47.  Although the SOS Office is phasing out ENET, it remains unclear what data from ENET might have been, or will be, transferred to the BMD system—and what else might unknowingly transfer with that data.  SAF No. 50; *see also* SAF Nos. 6-31, 41-49, 51-69.

Further, the DRE and BMD systems rely on the *same* Internet- facing computers long-used in 159 counties, which share data with the BMD system via USB drives previously used with the DRE system.  SAF Nos. 32, 55-65, 70.

As this Court previously held, Plaintiffs' DRE claims are not moot.  Opp. Ex. 51 at 24-25.  Nor are Defendants entitled to summary judgment on those claims. They do not even attempt to argue the merits of those claims, nor cite to a single

undisputed fact or exhibit regarding the DRE voting system.[22]  Dkt. 1567-1 at 18-
22.  Instead, they simply claim that Plaintiffs have not established that the ENET is
infected with a virus or malware.  Dkt. 1567-1 at 20.  That is not the standard for
summary judgment.  Plaintiffs have compiled sufficient evidence of serious security
failings in key aspects of the BMD system that carried over from the GEMS/DRE
system to preclude summary judgment.  SAF Nos. 6-69.

   C.   **Fulton Defendants' Immunity Defense Fails.**

   Fulton Defendants argue that Plaintiffs' claims are barred by Eleventh
Amendment immunity, but they ignore this Court's and the Eleventh Circuit's
contrary decisions. Dkt. 1573 at 17. No such immunity applies here.

   Fulton Defendants do not, and did not, act as "arms of the state" when they
violated, and continue to violate, Plaintiffs' constitutional rights. The Eleventh
Circuit applies a four-factor test to this issue: "(1) how state law defines the entity;
(2) what degree of control the State maintains over the entity; (3) where the entity
derives its funds; and (4) who is responsible for judgments against the entity."[23] *Ga.
State Conf. of the NAACP v. DeKalb Cnty. Bd. of Registration & Elections*, 484 F.

---

[22] State Defendants cite *Fair Fight Action, Inc. v. Raffensperger*, 2022 WL 4725887
(N.D. Ga. Sept. 30, 2022) for their claim that there are no "widespread, systemic
issues with the State's voter-registration process."  Dkt. 1567-1 at 21.  But that
decision is not *evidence* and did not consider Plaintiffs' *evidence here*.  And the
plaintiffs there alleged "mismanagement" of ENET (*Fair Fight*, 2022 WL 4725887,
at *4), not the serious security failings shown here.
[23] Because this analysis is based on state law, Fulton Defendants' cited cases from
other jurisdictions are inapposite. *See* Dkt. 1573 at 16.

Supp. 3d 1308, 1317 (N.D. Ga. 2020) (quoting *Manders v. Lee*, 338 F.3d 1304, 1309 (11th Cir. 2003) (en banc)). Georgia State Conference, the most recent decision in this district to assess whether county Boards of Registration and Elections ("BREs") act as arms of the state, disposes of Fulton Defendants' argument. It held that although the Georgia Assembly defines many of the BREs' duties, the Dekalb County BRE was not an arm of the state because, even in an election-related duty, (1) the BRE had independent responsibility, (3) Georgia county BREs are funded by the county (not the state), and (3) the Dekalb County BRE would likely pay judgments against it. 484 F. Supp. 3d at 1318-20; *see also* SAF No. 497 (describing Fulton Defendants' relationship with the State Defendants); Opp. Ex. 70 at 115:25-117:14. Fulton Defendants offer no reason for this Court to reach a different result here.

Even if Fulton Defendants could be considered arms of the state, they would only be entitled to the same immunity that applies to the state. *See Lewis v. Clarke*, 581 U.S. 155, 162 (2017) ("[A]n arm or instrumentality of the State generally enjoys the same immunity as the sovereign itself."). In this case, that is none. Fulton Defendants ignore that this Court and the Eleventh Circuit already held that State Defendants are not entitled to Eleventh Amendment immunity. *Curling v. Sec'y of Georgia*, 761 F. App'x 927, 930 (11th Cir. 2019) (holding that Plaintiffs "comfortably satisfy Ex parte Young"); Opp. Ex. 51 at 27-28. This Court confirmed that Plaintiffs' BMD claims, which arose after the Eleventh Circuit decision, "still

fall within the Ex parte Young exception."  Opp. Ex. 51 at 27-29 (emphasis in original).  State Defendants rightly do not claim immunity themselves in their Motions.  Nor can Fulton Defendants.

### D. Fulton Defendants Are Proper Parties to This Case.

Fulton Defendants' argument that they are not proper parties relies on sweeping, unsupported claims—for example, that Fulton Defendants have no authority regarding the enactment of voting systems or discretion over whether to follow state law.  Dkt. 1573 at 24.  Fulton Defendants also conflate whether they are proper parties with the separate issue of whether they are necessary parties.  A proper defendant need not be a necessary party.  Plaintiffs need only show—and have shown—that (i) any right to relief is asserted against Fulton Defendants related to or arising out of the same transaction, occurrence, or series of transactions or occurrences, and (ii) any question of law or fact common to all defendants will arise in the action.  *See* Fed. R. Civ. P. 20(a)(2); *cf*. Fed. R. Civ. P. 19(a)(1).  Fulton Defendants claim that "[f]ailure to dismiss the Fulton Defendants is an improper application of the ruling in *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245-46 (11th Cir. 2020)."  Dkt. 1573 at 24-25.  But *Jacobsen* is about standing and irrelevant to the analysis of who is a proper party.  Fulton Defendants are proper parties to this case concerning *their* use and implementation of the BMD system, for which they have significant discretion.  SAF Nos. 477-97; Dkt. 627.

Fulton Defendants miscast *Monell* to argue that "Fulton County Defendants

cannot be held liable for the execution of the rules of the State Defendants."  Dkt. 1573 at 19.  *Monell* is inapposite because it examines whether a local government entity is liable for the constitutional torts of their employees, *i.e.*, *respondeat superior* liability.  *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694-95 (1978).  Plaintiffs do not rely on *respondeat superior*: Plaintiffs seek appropriate redress (an injunction) from the very parties responsible for their injury.

### E.    Curling Plaintiffs Have Standing.

This Court and the Eleventh Circuit have confirmed Plaintiffs' standing. Defendants cite no evidence or new law that mandates a different result now.

### 1.    The Eleventh Circuit Confirmed Plaintiffs' Standing.

The Eleventh Circuit's 2022 decision on standing is controlling and confirms that all Plaintiffs have standing.  The Eleventh Circuit confirmed Coalition Plaintiffs have standing, holding that "voting advocacy organizations like the Coalition have standing to sue when a policy will force them 'to divert personnel and time to educating volunteers and voters' and to resolving problems that the policy presents 'on election day.'"  *Curling v. Raffensperger*, 50 F.4th 1114, 1121 (11th Cir. 2022) (quoting *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1165-66 (11th Cir. 2008)).  Consistent with the widely recognized One Plaintiff Rule, the Circuit held: "[A]s long as the Coalition or one of its members has standing to sue" for the relief sought, "we have jurisdiction over this case."  50 F.4th at 1121 (citing *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650-51 (2017)).  It is well

established that only one plaintiff need have standing for each claim and form of relief in a case. *Fla. ex rel. Att'y Gen. v. U.S. Dep't of Health & Human Servs.*, 648 F.3d 1235, 1243 (11th Cir. 2011) ("The law is abundantly clear that so long as at least one plaintiff has standing to raise each claim . . . we need not address whether the remaining plaintiffs have standing."), *aff'd in part, rev'd in part sub nom. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012); *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir. 2006) ("So long as one party has standing, other parties may remain in the suit without a standing injury."). Here, *all* Plaintiffs assert the same constitutional challenges to Georgia's BMD system and seek the same relief. *See* Dkt. 627 ¶¶ 91-132; Dkt. 628 ¶¶ 221-45; *see also* SAF Nos. 404-65. State Defendants' contrary argument that Coalition and Curling Plaintiffs assert different claims and seek different relief is misleading. While Coalition Plaintiffs challenge *additional* aspects of the BMD system and seek *additional* relief, their claims fully *encompass* the same claims Curling Plaintiffs assert and the same relief Curling Plaintiffs seek. *Compare* Dkt. 627 ¶¶ 91-132, *with* Dkt. 226 ¶¶ 167-83, *and* Dkt. 628 ¶¶ 221-45.[24] Thus, the Eleventh Circuit's holding that Coalition has standing for its constitutional claims against the BMD system confirms Curling Plaintiffs' standing for the same claims. *Curling*, 50 F.4th at 1121.

---

[24] Curling Plaintiffs' DRE and BMD claims are in their Third Amended Complaint; Coalition Plaintiffs' DRE claims are in their Third Amended Complaint and their BMD claims are in their First Supplemental Complaint.

### 2.    Curling Plaintiffs Each Have Standing to Bring Their Claims Against All Defendants.

Defendants rehash—and at times copy nearly verbatim—their prior standing arguments (*compare, e.g.,* Opp. Ex. 276 at 7-11 & Opp. Ex. 277 at 8-10, *with* Dkt. 1567-1 at 27-36 & Dkt. 1573 at 25-28), even though this Court rejected those arguments (Opp. Exs. 13, 51), declined to certify that finding for interlocutory appeal (Opp. Ex. 280), and denied State Defendants' requests to dismiss for lack of standing (Opp. Ex. 281).  Nothing has changed since those Orders.

Standing has three elements: (1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  Curling Plaintiffs have suffered actual injury and threat of imminent injury to their *individual and personal* right to vote, which is concrete, traceable to Defendants, and redressable. SAF Nos. 404-65.  Thus, even absent the One-Plaintiff Rule, they have standing. And they are entitled to present *all their evidence at a trial* to prove up their standing.

### 3.    Curling Plaintiffs have suffered and will continue to suffer a concrete and particularized injury in fact.

This Court has twice recognized that "the Constitution affords Plaintiffs an interest in transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote."  Opp. Ex. 91 at 78; Opp. Ex. 13 at 46.  Curling Plaintiffs have shown that they each individually must choose between casting a ballot that they cannot review or verify via a BMD that is hopelessly susceptible to malfunction or manipulation in an environment of

42

advanced persistent attacks on U.S. elections (including in Georgia) or voting in a very burdensome absentee system where some of their votes were not counted.  *See supra* § II.I; Opp. Ex. 273 ¶¶ 5-11; Opp. Ex. 227 ¶¶ 5-6; Opp. Ex. 230 at 118:15-19:9; Opp. Ex. 232 ¶¶ 9-10; SAF Nos. 404-65.  This Court has found that this choice causes each of the Curling Plaintiffs an actual, imminent, particularized and concrete injury to their right to vote.  Opp. Ex. 51 at 41; Opp. Ex. 13 at 40.

Unsupported by any *evidence*, and without regard to this Court's prior findings, State Defendants once again challenge Plaintiffs' standing, arguing that (1) they fail to assert a legally cognizable interest; (2) they claim generalized grievances not particular to them; and (3) they alleged harm is purely conjectural and speculative.  The Court already has rightly dispensed with each of these arguments yet again.  Opp. Ex. 51 at 38-41. It should do so again.

> i.    *Curling Plaintiffs assert a legally cognizable interest.*

State Defendants argue that Plaintiffs fail to assert a legally cognizable interest because "voters do not have an independent, constitutional right to 'verify' that their votes were correctly counted."  Dkt. 1567-1 at 25.  But this is a strawman.  Curling Plaintiffs do not, as Defendants proclaim, "allege that their injury-in-fact is the inability to 'verify' that their ballots were correctly cast."  *Id.*  Rather, as Curling Plaintiffs have always maintained, the injury inflicted by Defendants is to "their fundamental right to cast an effective vote (i.e., a vote that is accurately counted)" in a reasonably reliable voting system and to have their vote treated equally to that

43

of any other Georgia voters.  Opp. Ex. 282 at 3; Dkt. 627 ¶¶ 91-132; Opp. Ex. 91 at 79; SAF Nos. 404-65.  As State Defendants concede, courts, including this Court, routinely hold that an individual voter's ability to vote and have that vote given equal weight as any other is a legally cognizable interest.  *Anderson v. Celebrezze*, 460 U.S. 780, 793-94 (1983); *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319 (11th Cir. 2019) (burden on right to vote implicates First and Fourteenth Amendments).

State Defendants attempt to evade this reality by arguing that Curling Plaintiffs' "theory of injury is based on a false description of Georgia's election system."  Dkt. 1567-1 at 26.  *First*, Defendants argue—puzzlingly—that Curling Plaintiffs purportedly allege that voters must vote on BMDs.  *Id*. at 25.  Tellingly, Defendants cite nothing for this incorrect claim.   To the contrary, Curling Plaintiffs—and this Court—have addressed absentee voting in lieu of BMDs at great length.  Opp. Ex. 283 at 2-3; Opp. Ex. 284 at 2, 4-5; Opp. Ex. 91 at 82-84; Opp. Ex. 51 at 38, 39 n.21; SAF Nos. 404-65.   Each of the Curling Plaintiffs has voted absentee—and suffered the unconstitutional consequences of a state-imposed choice as a result.  Opp. Ex. 227 ¶¶ 5-6; Opp. Ex. 232 ¶ 10; SAF Nos. 405-16, 429-34, 439-43.  Curling Plaintiffs have detailed the undue burdens and inequities of being forced to choose between the current absentee system and the BMDs, as shown by their personal experiences, *which they are entitled to prove up at trial*.  SAF Nos. 404-65.  Ms. Curling has been *disenfranchised* twice, and Ms. Price has been *disenfranchised*

once, while attempting to vote absentee.  Opp. Ex. 273 ¶¶ 6-11; Opp. Ex. 228 at 124:6-16; SAF Nos. 410, 416, 434.  Mr. Schoenberg was unable to avoid the BMDs when his timely requested absentee ballot never arrived.  Opp. Ex. 232 ¶ 10; SAF Nos. 441-43.  This Court has agreed that "[a] choice between two evils is no choice at all; the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election regardless of which method they choose to cast their vote."  Opp. Ex. 91 at 83.  State Defendants cannot save an unconstitutional voting system that is poised to disenfranchise Plaintiffs by insisting they may suffer the ills of absentee voting to avoid the only other system available.  *Id.* at 83-84.

*Second*, State Defendants argue that Curling Plaintiffs misrepresent the Georgia voting system because "Georgia law requires that audits to use [sic] the *human-readable* text on the ballot," (Dkt. 1567-1 at 25 (emphasis in original)), and where there is a discrepancy, the human-readable portion controls.  *Id.* at 26.  But this is hotly disputed.  The QR code is the *only* part of the ballot counted *unless* there is a *full hand-recount*, which is very rarely done and not mandated for any—much less all—elections.  Ga. Comp. R. & Regs. 183-1-15-.03(2); SAF No. 386.  Further, an audit is not a recount under Georgia election law.  *See* O.C.G.A. § 21-2-498(b); Ga. Comp. R. & Regs. 183-1-15-.04.  Auditors only look at the human-readable portion of a small, statistical sample of ballots in a given contest; they do not compare the human-readable portion with the votes encoded in the QR code *on any ballot*.  Ga. Comp. R. & Regs. 183-1-15-.04(2)(4); SAF Nos. 382-403.  Thus, it is

not even feasible for an audit to detect discrepancies between a ballot's human-readable text and QR code; indeed, audits at best can verify election outcomes, not the counting of individual votes as cast.  SMF Ex. 55 ¶¶ 4-7; Opp. Ex. 90 ¶¶ 3-7; SAF Nos. 96-100, 138, 150, 383, 393-97; *supra* § II.G.  And were it otherwise, Defendants cite no Georgia law mandating or even allowing RLA results to supplant the official QR code tabulation in any election.  Defendants are simply wrong to claim that RLA results serve as a final tally.  A post-election audit cannot remediate or avoid the constitutional injury suffered by a Plaintiff who can never know if a hopelessly deficient voting system tabulated their individual vote as cast.  *See supra* § II.G.; *see also* SMF Ex. 42 ¶ 87(b); SMF Ex. 55 ¶¶ 9-10; Opp. Ex. 90 ¶ 10; SAF Nos. 89, 150, 395.  And even if it could, Georgia has never conducted a genuine RLA on a state-wide election (SAF No. 384) and has no plans—much less a legal requirement—to conduct RLAs on all election contests.  *See* SAF No. 390.

State Defendants' cited authorities are inapposite.  *See* Dkt. 1567-1 at 26-27 (citing *Nemes v. Bensinger*, 467 F. Supp. 3d 509, 528 (W.D. Ky. 2020) and *Schulz v. Kellner*, 2011 WL 2669456, at *5 (N.D.N.Y. July 7, 2011)).  In *Nemes*, the plaintiffs challenged the emergency reduction of the number of polling places during the Covid-19 pandemic where special procedures had been adopted to encourage voters to vote absentee to avoid the spread of disease.  467 F. Supp. 3d at 515-19.  Similarly, in *Schulz*, the plaintiffs sought to have all votes counted manually and in full public view at every polling station in the state.  2011 WL 2669456, at

\*5.  Curling Plaintiffs seek no such relief—they seek an injunction to have their votes counted accurately.  And the *Schultz* court noted that "[p]laintiffs correctly point out they have a legally protected interest in having their votes counted accurately." *Id.*

As this Court has held, Plaintiffs assert a legally-cognizable interest "in transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote."  Opp. Ex. 91 at 78.

> ii.        *Curling Plaintiffs' injury is particularized and individual.*

This Court has rightly rejected Defendant's argument that Curling Plaintiffs' claims are merely generalized grievances.  Opp. Ex. 51 at 38-39.  As explained at length before (*see, e.g.*, Opp. Ex. 282 at 7-9; Opp. Ex. 284 at 4-5, Opp. Ex. 285 at 10), the harm to each Curling Plaintiff from Defendants' requirement that *all in-person voters* use Georgia's BMD system is personal and individual.  SAF Nos. 404-65.  The system deprives each Plaintiff individually of the right to cast a verified vote reflecting their personal and individual voice, to ensure that vote counts as cast, and to be treated equally with similarly-situated absentee voters.  Opp. Ex. 227 ¶¶ 5-7; Opp. Ex. 231 ¶ 8; Opp. Ex. 236 ¶ 10.  Each of the Curling Plaintiffs has shown instances in which the BMD system already has imposed unconstitutional burdens on their right to vote.  *Id.*; SAF Nos. 404-65; *see supra* § II.I.  The record, including expert analyses, shows concrete, particularized, and actual harm to Curling Plaintiffs' right to vote.  *See, e.g.*, Dkt. 1131 § 1.1; Opp. Ex. 75 ¶ 6; Opp. Ex. 146

§§ 2.2.1-9.[25]   Plaintiffs' concerns are *grounded in facts and science* that they are *entitled to prove up at trial* to obtain the relief they seek.  *See supra* §§ II.A.-I.

State Defendants challenge Curling Plaintiffs' due process claims by recycling incorrect arguments that Curling Plaintiffs (1) are not injured to the extent they vote absentee, (2) allege hypothetical harm that is not certainly impending, and (3) only allege a general interest in freeing themselves of an unlawful election system.  Dkt. 1567-1 at 29-30.  Each of these arguments ignores the *evidence* and is wrong, as this Court previously has recognized.

*First*, while Curling Plaintiffs can *try* to vote absentee—and indeed have done so to try to avoid the unconstitutional DRE and BMD systems—that does not defeat their standing.   This Court already held that Defendants cannot save an unconstitutional voting system by citing onerous alternatives that voters have endured to avoid the offending system.  Opp. Ex. 91 at 82-83.

*Second*, the injury to Curling Plaintiffs is concrete and certainly impending.  Opp. Ex. 51 at 38.  State Defendants rely on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) for their contrary assertion, but this Court already rejected that argument.  Opp. Ex. 13 at 26-27 (the argument that plaintiffs manufacture standing by "inflicting harm on themselves" fails because the cases relied on by Defendants, including *Clapper*, are distinguishable and inapplicable to the injuries asserted).  *Clapper* involved a theory of injury based on "speculation" about possible future

---

[25] *See also* SAF Nos. 127-128, 168, 179, 305, 314-31, 404, 410, 412, 416-17, 423, 425-28, 434, 444-51, 459-61, 478-82, 486-97.

harm and "self-inflicted" costs incurred to avoid a "fear" of possible surveillance. 568 U.S. at 410-14, 417-18.  There, the plaintiffs speculated that they *might* be subject to the government surveillance at issue.  *Id.* at 410-12.  Here, by contrast, Plaintiffs have alleged actual present deficiencies in Georgia's voting system that necessarily harm Plaintiffs because of the state's *requirement* that they vote on a BMD or incur the undue burdens of voting absentee, which may not even avoid the BMDs after all.  SAF Nos. 404-65.  The BMD system causes injury (even if it operates as designed) because voters *cannot even verify their ballots **for tabulation***. Therefore, as this Court has agreed, impending future injury is certain because Curling Plaintiffs intend to vote in each upcoming Georgia election.  Opp. Ex. 51 at 38; Opp. Ex. 13 at 26-27.  Further, the BMD system has suffered a *massive security breach*, in addition to persistent disregard toward cyber- and physical-security measures, which shows with alarming clarity that that system poses an imminent threat to Curling Plaintiffs' fundamental right to vote.  *See* Opp. Ex. 75; Opp. Ex. 255; SAF Nos. 251-65.  Defendants pretend like none of this occurred—but it did. SAF Nos. 334-81.

*Third*, this Court has recognized the "personal and individual" nature of a voter's "interest in their ability to vote and in their vote being given the same weight as any other."  Opp. Ex. 51 at 35 (internal citations omitted).  The recent cases coming out of the Eleventh Circuit—all pre-dating the Eleventh Circuit's standing decision in this case, *see supra* § III.E.1.—do not change that.  Rather, Curling

49

Plaintiffs' claims are supported by long-standing Supreme Court precedent recognizing that individual voters have a particularized interest in protecting their right to vote. *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018); *Reynolds v. Sims*, 377 U.S. 533, 561 (1964); *Baker v. Carr*, 369 U.S. 186, 206 (1962).

State Defendants' challenges to Curling Plaintiffs' Equal Protection claims also fail. Their claim that Plaintiffs' challenges are "common to all members of the public" (Dkt. 1567-1 at 28), is both disputed and irrelevant. Long-standing Supreme Court precedent recognizes that "[t]he fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 n.7 (2016). Rather, plaintiffs lack standing when they allege a widely-shared harm that is abstract and indefinite, such as a "citizen's interest in the proper application of the law." *Carney v. Adams*, 141 S. Ct. 493, 498 (2020). But it is the abstract nature of such harm—not the number of victims—that defeats standing. *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998) ("The fact that other citizens or groups of citizens might make the same complaint . . . does not lessen [their] asserted injury.") (quoting *Pub. Citizen v. DOJ*, 491 U.S. 440, 449-50 (1989)).

Defendants suggest that this long-standing U.S. Supreme Court precedent somehow has been abrogated by Eleventh Circuit decisions regarding the 2020 Presidential election results. Not so. Those cases concern partisan attempts to change an election *outcome*—not to protect the individual right to vote regardless of

50

outcomes. *See Wood v. Raffensperger* ("*Wood I*"), 981 F.3d 1307 (11th Cir. 2020) (post-election request for injunction of certification of election); *Wood v. Raffensperger* ("*Wood II*"), 2020 WL 7706833 (N.D. Ga. Dec. 28, 2020) (seeking to prevent run-off election). These cases also merely alleged generalized requests for the application of the law. *See Carney*, 141 S. Ct. 498. The district court made this distinction clear in *Wood II*, stating that "claims premised on allegations that 'the law . . . has not been followed . . . [are] precisely the kind of undifferentiated, generalized grievance about the conduct of government . . . [and] quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing.'" 2020 WL 7706833, at *3 (quoting *Wood v. Raffensperger*, 501 F. Supp. 3d 1310, 1321 (N.D. Ga. 2020); *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1332–33 (11th Cir. 2007)). Curling Plaintiffs do not simply ask that Defendants follow the law—far from it. Their claims fall squarely in line with long-standing precedent that individual voters have standing to protect their right to vote. *Gill*, 138 S. Ct. at 1929; *Reynolds*, 377 U.S. at 561; *Baker*, 369 U.S. at 206.

iii.      *Curling Plaintiffs' injury is concrete and certainly impending.*

State Defendants argue that Curling Plaintiffs' injuries are merely speculative because they "cannot demonstrate a single instance of hacking or manipulation that actually affected the integrity of the election system." Dkt. 1567-1 at 34. This argument is wrong for at least two reasons.

*First*, Plaintiffs have uncovered numerous circumstances affecting the

51

integrity of Georgia's voting system.  *See supra* § II.F.  These include, for example, the Coffee County breach, which involved exfiltration, alteration, and widespread sharing of sensitive voting software and data; use of unsecured and potentially compromised voting equipment, such as with exposed USB ports and broken or missing seals; use of Internet-facing devices with the voting equipment, including EMS servers; and more.  SAF Nos. 134-79, 229-42, 332-33; *supra* § II.G.  State Defendants simply ignore this *evidence* and cite none of their own, falling far short of their burden under Rule 56.

*Second*, State Defendants mischaracterize Curling Plaintiffs' alleged injury with a myopic focus on the BMD system's vulnerability to "hacking."  Curling Plaintiffs allege that Georgia's voting system violates their right to vote and to have that right be treated equally, *even if it operates as designed*.  Opp. Ex. 51 at 38.  Plaintiffs need not prove a "hack."[26]  The system is inherently injurious to Curling Plaintiffs because it requires them to cast a vote that cannot be verified as reflecting their actual choices if they wish to vote in person.  SAF Nos. 404, 412, 417, 423, 425-28, 444-51, 459-61.  This Court has held that Curling Plaintiffs' injury is "certainly impending" since Plaintiffs intend to vote in person in each upcoming election in Georgia."  Opp. Ex. 51 at 38.

Defendants' cited cases are inapposite.  First, they recycle their reliance on *Tsao v. Captiva MVP Rest. Partners, LLC*, a data breach case that has no bearing on

---

[26] State Defendants do not define "hack," but admit to at least "unauthorized access" to Georgia's voting system.  Opp. Ex. 139; SAF Nos. 306-13.

voting rights.  986 F.3d 1332 (11th Cir. 2021); c*ompare* Opp. Ex. 276 at 11-12 *with* Dkt. 1567-1 at 34-35.  But their argument fairs no better this time.  Mr. Tsao lacked standing because he claimed harm arising from the mere possibility of future identity theft, which was not impending.  *Tsao*, 986 F.3d at 1343.  Curling Plaintiffs are harmed in every election, by casting a vote on a BMD that they cannot verify or have reasonable confidence will be counted as cast, or by voting absentee with the attendant undue burdens, including disenfranchisement as Ms. Curling and Ms. Price already suffered.  SAF Nos. 404-65; Opp. Ex. 91 at 78-79; Opp. Ex. 51 at 38.

### 4.    Curling Plaintiffs' injury is traceable to Defendants.

State Defendants recycle—and not for the first time—their oft-repeated and rejected argument[27] that Curling Plaintiffs' injuries are not traceable to State Defendants because their alleged injury "could only be traced either to illegal hacking by third parties; improper conduct by election officials; or voters' failures to verify their paper ballots–not the State's implementation of BMDs."  Dkt. 1567-1 at 37.  As this Court already found, "Plaintiffs' injury stems from Defendants' implementation of an alleged unconstitutional voting system that is subject to [] demonstrated vulnerabilities . . . and that is not a voter-verifiable and auditable paper ballot system."  Opp. Ex. 51 at 42.  In other words, "Plaintiffs challenge the actions

---

[27] *See* Opp. Ex. 51 at 42 ("Defendants have essentially recycled the same argument (with the exception of blaming the voters themselves) previously raised in connection with Plaintiffs' DRE claims. The same reasoning applies to reject this argument now.")

of the Secretary of State and the State Election Board, not some potential absent third-party hackers." *Id.* at 43. This remains true today.

Plaintiffs' injury is also traceable to Fulton Defendants, who claim—without support—that for Plaintiffs to have standing, "the mandate requiring this system must be traceable to the Fulton County Defendants." Dkt. 1573 at 28. Fulton Defendants also argue that Plaintiffs have not provided evidence that Fulton Defendants "play any role in determining the statewide voting system of Georgia." *Id.* This is neither correct, nor the right legal standard. Fulton Defendants are responsible for conducting elections, including implementing and maintaining the BMD voting system in Fulton County. O.C.G.A. § 21-2-70; Dkt. 1573 at 13-14; SAF No. 477. They have significant discretion and latitude in how they do that. SAF No. 226; Opp. Ex. 70 at 58:14-59:16 (describing the state as "hands-off when it came to the [BMD] system"). And they have authority to implement HMPBs in lieu of BMDs under Georgia law.[28] In short, Plaintiffs challenge, *inter alia*, *Fulton Defendants'* use of BMDs to conduct elections in Fulton County, thereby infringing Plaintiffs' fundamental rights. Dkt. 627 ¶¶ 117-119, 123, 126-29, 131; SAF Nos. 477-96. Since Plaintiffs' injuries stem directly from the use of BMDs to conduct elections, Plaintiffs' injury is fairly traceable to *Fulton Defendants' use of BMDs*.[29]

---

[28] Georgia law authorizes county superintendents to adopt HMPBs instead of BMDs on an emergency basis where the use of BMDs for any reason is not practicable, and to make that determination themselves. O.C.G.A. §§ 21-2-281, 21-2-334; Ga. Comp. R. & Regs. 183-1-12-.11(2)(c)-(d).

[29] Fulton Defendants' cited authority is readily distinguishable. In *Attorney General*

### 5.     Curling Plaintiffs' injury is redressable by Defendants.

The injury to Curling Plaintiffs' fundamental right to vote is redressable by Defendants because the requisite authority lies with both State and Fulton Defendants. *See* O.C.G.A. § 21-2-300(a), 21-2-281, 21-2-334; Ga. Comp. R. & Regs. 183-1-12-.11(2)(c)-(d).

*First*, State Defendants argue that Curling Plaintiffs' claims are not redressable because the concerns they raise with BMDs also arise with HMPBs. Dkt. 1567-1 at 37.  But State Defendants cite nothing for this hotly disputed claim. *See id.*  They just generally claim that "election fraud can never be eliminated." *Id.* at 38 (quoting *Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003)).  Yet as this Court has held, "this is not the standard for redressability."  Opp. Ex. 51 at 44 (citing Opp. Ex. 13 at 26).  Curling Plaintiffs do not seek perfection.  Rather, as this Court recognized, they seek relief particular to the current Georgia voting system which,

*Lewis v. Governor of Alabama*, two minimum-wage employees sued the Alabama Attorney General, asserting an Equal Protection claim against a state statute that prohibited localities from requiring employers to pay higher wages than state or federal law required them to pay.  944 F.3d 1287 (11th Cir. 2019) (en banc).  They attributed their injuries to the Attorney General because: (1) he failed to discharge his "'statutory duty' to notify the Legislature and the Governor...that the then-contemplated [statute] was unconstitutional," and (2) he was enforcing—or intended to enforce—the statute. *Id.* at 1297.  The Eleventh Circuit rejected both theories of injury, finding that the Attorney General had no legal duty "to inform anyone of anything," and the Attorney General was not enforcing, and had never threatened to enforce, the statute.  *Id*. at 1298.  Here, Curling Plaintiffs challenge Fulton Defendants' role in conducting elections with the BMD system—a role they do not dispute.  Dkt. 627 ¶¶ 117-19, 123, 126-129, 131; Dkt. 1573 at 13-14.

"*as implemented by Defendants*, burdens Plaintiffs' capacity to cast votes that are actually properly counted and fails to produce a voter-verifiable auditable paper trail, which is recognized as essential on a national level by election security experts." Opp. Ex. 51 at 44-45 (emphasis in original).  Plaintiffs are entitled to present their evidence at trial, including from State Defendants' own experts objecting to the BMD system and advising HMPBs.  *See* SAF Nos. 180-83, 190-91, 193.

*Second*, Fulton Defendants argue—without citation—that Plaintiffs' injury is redressable only by State Defendants.  Dkt. 1573 at 28.  While Fulton Defendants alone perhaps could not provide all the relief Plaintiffs seek, they—again—have authority to provide some redress for Fulton County residents, including Ms. Curling, but they choose not to.  Dkt. 627 ¶¶ 123, 126-28; SAF Nos. 482, 494.

*Lastly*, Fulton Defendants seem to suggest that they cannot redress Curling Plaintiffs' injury because Curling Plaintiffs did not join the other 158 counties.  Dkt. 1573 at 28-30.  Fulton Defendants cite no authority for this argument, nor support for the proposition that officials from every Georgia county are necessary parties here.  This Court need not—and should not—conduct a Rule 19(b) joinder analysis at this stage; and regardless, such an analysis is irrelevant to Curling Plaintiffs' standing to pursue its claims against the named Defendants.

The injury to Curling Plaintiffs is redressable by the relief requested in this action.  Opp. Ex. 13 at 25-26; Opp. Ex. 51 at 44-45.

**F.     Georgia's BMD System Violates Plaintiffs' Constitutional Right to Vote.**

Defendants' Motions fall far short of their high burden for summary judgment. *See United States v. Union Circulation Co.*, 1982 WL 1912, at *5 (N.D. Ga. Aug. 20, 1982) (denying defendants' summary judgment motion where it "advanced legal arguments which are both incorrect on their face, and mistakenly characterized as genuine issues of material fact").

In evaluating whether a state violates its citizens' right to vote, courts utilize a "sliding-scale balancing analysis." *League of Women Voters of Fla. v. Detzner*, 314 F. Supp. 3d 1205, 1215 (N.D. Fla. 2018) (quoting *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 210 (2008). The Court "must weigh 'the character and magnitude of the asserted injury to the rights . . . that the plaintiff seeks to vindicate against the precise interests put forward by the State as justification for the burden imposed by its rule," and the extent to which those interests make the burden necessary. *Burdick v. Takushi,* 504 U.S. 428, 434 (1992) (quoting *Anderson*, 460 U.S. at 789).[30]  Because the burden on Plaintiffs' right to vote is severe, Defendants must show a compelling state interest that justifies that burden, and the restriction must be narrowly tailored to that interest. *League of Women Voters*, 314 F. Supp. 3d at 1215. Defendants have identified *no* compelling interest in or *need* for the

---

[30] Because courts have applied the *Anderson-Burdick* test to claims involving the right to vote under both the Equal Protection and Due Process Clauses, Curling Plaintiffs address both claims together. *See, e.g., League of Women Voters*, 314 F. Supp. 3d at 1215 (applying *Anderson-Burdick* to claims asserted under the First and Fourteenth Amendments).

offending BMD system.

As this Court has found, "[b]ecause the right to vote is fundamental and the exercise of that right 'in a free and unimpaired manner is preservative of other basic civil rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized.'"  Opp. Ex. 2 at 133-34 (quoting *Reynolds*, 377 U.S. at 562).  In conducting the *Anderson-Burdick* analysis now, the Court must view the "evidence in the light most favorable to the non-moving party."  *See Cowen v. Ga. Sec'y of State*, 960 F.3d 1339, 1341-42 (11th Cir. 2020) (internal citations omitted).

### 1.    The Burden on Curling Plaintiffs' Voting Rights is Severe.

In 2020, this Court held that "Plaintiffs have shown demonstrable evidence that the manner in which Defendants' alleged mode of implementation of the BMD voting system, logic and accuracy testing procedures, and audit protocols deprives them or puts them at imminent risk of deprivation of their fundamental right to cast an effective vote (i.e., a vote that is accurately counted)."  Opp. Ex. 91 at 79.  Since then, Plaintiffs have developed substantial additional evidence.

For example, Dr. Halderman discovered many new failings in Georgia's BMD system that are readily susceptible to exploitation, including malware that changes QR codes and defeats Georgia's acceptance, logic and accuracy, and hash verification testing.  Opp. Ex. 131 ¶¶ 6-9.  Dr. Halderman's findings are unrebutted by Defendants and corroborated by an independent government agency, CISA, which recommended prompt implementation of 13 mitigation steps for Georgia to

take.  Opp. Ex. 146.  But there is no evidence suggesting that Georgia has implemented *any* of those critical mitigations.  SAF 179; Opp. Ex. 149 at 349:3-50:21.  Instead, the SOS simply proclaims the BMD system secure with no supporting analysis or evidence, and despite admitting that anyone with access to the system like Dr. Halderman had could affect how it works.  Opp. Ex. 139 ("Sensationalized media articles and misleading reports from paid activists notwithstanding, Georgia's election system is safe and secure."); Opp. Ex. 137 ("I'm sure that anyone has [sic] that kind of unlimited access to do something.  But it's not the real world").  The claim that Dr. Halderman's access is "not the real world" is true *only insofar as* those responsible for the Coffee County breach—as one example—had **far greater access** than Dr. Halderman did, including to virtually every aspect of the BMD system *in its operational environment* in a county elections office, where the vast majority of the compromised equipment continued to be used in elections.  SAF Nos. 255-59, 262-65.  Defendants have done nothing meaningful to protect voters against this and potentially other breaches.[31]  State Defendants failed to investigate the Coffee County breach *until Plaintiffs uncovered it*, despite multiple warning signs between January and May 2021—and even then, they waited until August 2022 before beginning any meaningful investigation despite representing to this Court that an investigation was "ongoing" during that time.  Opp. Ex. 150 at 176:25-77:22; Opp. Ex. 151 at 167:4-18; Opp. Ex. 271; Opp. Ex. 204 at

---

[31] SAF Nos. 130, 149-50, 159, 179, 227, 335-43, 353-81, 479-85, 487-91, 495-96.

5; Opp. Ex. 270 at 1-2.  State Defendants cannot get their story straight on any investigation they may have conducted, (*compare* Opp. Ex. 272 at 21:20-23, *with id.* at 39:5-8), which leaves them with little to no credibility on this and other important issues here.

To date, *nobody* responsible for that breach has been held accountable, thus incentivizing further and potentially worse breaches of Georgia's voting system.[32] Opp. Ex. 255 ¶ 9.i.  Defendants do not even know if the Coffee County breach led to an infection of Georgia's voting system or alterations that could disenfranchise voters—because they have not checked.  *See* Opp. Ex. 201 ¶ 52.

Additionally, Plaintiffs have amassed evidence of dangerous physical security practices and failures to follow important policies for securing voting equipment, which have gone uninvestigated and unremedied.  Opp. Ex. 85 at 50:9-15, 55:18-23,

---

[32] Whether the Coffee County breach was "authorized" in some manner is of little moment here.  State Defendants have admitted it was not, conceding an unlawful compromise of Georgia's voting system that has gone unremedied and unchecked. Opp. Ex. 195.  But even if it were somehow "authorized," that would be even worse, as that would mean hundreds of county election officials could grant unfettered access to Georgia's voting system to virtually anyone they choose at any time without the State's permission or knowledge—which may already have happened in other instances that have gone undiscovered.  Notably, the Coffee County breach came to light only through *Plaintiffs'* efforts, and despite State Defendants' best efforts to stymy Plaintiffs' discovery.  SAF Nos. 334-43, 353-81. Curling Plaintiffs repeatedly served interrogatories requesting information about unauthorized access to voting system components, which State Defendants refused to answer.  Opp. Exs. 123-25.  State Defendants instead sent an unverified Word document from counsel denying that Georgia's election system had been hacked, which State Defendants have refused to verify despite repeated requests.  Opp. Exs. 123-25.

62:16-20.  These include instances of election workers—including in Fulton County—continuing to use BMDs with broken seals and exposed USB ports in elections and leaving ballots unsecured overnight and in personal vehicles.  *Id.* at 218:5-19:6; Opp. Exs. 60, 160, 162; SAF Nos. 224-50.  With Georgia's Dominion voting software and data broadly dispersed to unknown individuals and entities around the world (Opp. Ex. 31 at 192:16-93:6; Opp. Ex. 253 at 105:19-106:6; SAF Nos. 288-313), Defendants' one and only physical security defense is, at best, hotly disputed and, in reality, a sham.  The Coffee County breach is more than just a bad omen for Georgia's voting system—it is irrefutable evidence that the system is hopelessly insecure, leaving Plaintiffs' right to vote unprotected and illusory.  U.S. elections, including in Georgia, remain under attack, including from sophisticated nation states.  Opp. Ex. 2 at 39-42 (discussing NAS Report and SSCI Report findings).[33]

State Defendants argue Georgia's voting system does not burden Curling Plaintiffs because (1) they are free to vote absentee, (2) there is no evidence of BMD manipulation, and (3) audits and recounts can confirm the reliability of BMDs.  The Court should reject Defendants' recycled arguments as it has before.  *See* Opp. Ex.

---

[33] *See* Opp. Ex. 169 ("The ability of persons located, in whole or in substantial part, outside the United States to interfere in or undermine public confidence in United States elections, *including through the unauthorized accessing of election and campaign infrastructure* or the covert distribution of propaganda and disinformation, continues to pose an *unusual and extraordinary threat* to the national security and foreign policy of the United States." (emphasis added)); SAF No. 244.

91 at 76-78, 84; Opp. Ex. 51 at 38. These are all hotly disputed issues that turn on numerous, fact disputes that this Court must resolve at trial.

*First*, again, Georgia's highly-burdensome absentee system cannot save its unconstitutional BMD system. State Defendants cite *New Georgia Project v. Raffensperger,* 976 F.3d 1278 (11th Cir. 2020) for the claim that a regulation does not implicate the right to vote at all where the state provides numerous avenues to cast a ballot. Dkt. 1567-1 at 42. But they miscast that decision—and such a standard would produce absurd results and bar countless meritorious voting rights cases. The *New Georgia Project* court was only examining the types of *opportunities* the state provided for absentee voters to cast a ballot before Election Day, not whether the state's fundamental *methods* of voting meet constitutional muster. 976 F.3d at 1281-82. As this Court agreed, "the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election regardless of which method they choose to cast their vote." Opp. Ex. 91 at 83. Fulton Defendants' arguments likewise fail. Dkt. 1573 at 32-33.

*Second*, regardless of whether the voting system has been "hacked," it severely burdens Plaintiffs' right to vote. This Court has rightly found that it "views the burden and the threatened deprivation as significant under the *Anderson*/*Burdick* balancing framework." Opp. Ex. 91 at 79. Defendants cite no authority for the argument that Plaintiffs must prove that Georgia's voting system has been "hacked." This would be an absurd requirement that would bar important voting rights cases

and allow for the disenfranchisement of voters.[34]  That said, Defendants ignore, yet again, the substantial record in this case, including the Logan Lamb (SAF Nos. 6-31) and Coffee County breaches (SAF Nos. 251-381).  Defendants' rhetoric that "Plaintiffs' fears are … concerns that have never materialized" borders on bad faith in light of the evidence here.  Dkt. 1567-1 at 46.  Inherent design flaws, critical security failings, futile protective measures, advanced persistent threats, widely leaked voting software and data, extensive outsider access to the voting system in its operational environment, continued use of that equipment in subsequent elections, and persistent inaction by Defendants have *manifested* Plaintiffs' concerns to a degree that seemed unthinkable years ago—leaving Curling Plaintiffs' right to vote unprotected and illusory.

Defendants inaptly compare Curling Plaintiffs' claims to those raised in *Shelley*, which challenged the use of DREs.  Dkt. 1567-1 at 44; Dkt. 1573 at 15 (citing *Shelley*, 347 F.3d at 1106).  But *Shelley* is a 20-year-old case that extolls the virtues of DREs (*id*. at 1106) because it was decided long before a consensus of the election security community (Opp. Ex. 92 at 2-4), U.S. states, and this Court recognized the dangers of "voting machines [that] are unreliable, insecure, and

---

[34] Georgia residents would not have to wait until a *known* structurally-flawed bridge collapsed and severely injured them before the state and county would have to replace it and protect residents from that imminent risk.  Neither must Plaintiffs await the extraordinary crisis of a confirmed "hack" of Georgia's voting system (even if that could be known) via any of its many established and unmitigated failings before they can seek relief to *prevent that from happening*.

unverifiable." Opp. Ex. 2 at 35; SAF Nos. 1-5. Just as Defendants now admit that DREs had to be replaced despite the antiquated view of the *Shelley* court, so must BMDs based on the *current evidence* here, which Plaintiffs are entitled to present at trial to prove up their claims.

*Third*, as addressed at length (*see supra* § II.G.; § III.G.1.i.), audits do not—and cannot—protect Plaintiffs' right to vote in Georgia. Audits only count a small, random sample of ballots and do not compare the human-readable portion of the ballot to the choices encoded in the *QR code that is tabulated*. O.C.G.A. § 21-2-498(b); Ga. Comp. R. & Regs. 183-1-15-.04. Thus, RLAs, when correctly designed and implemented, can decrease the risk that an election outcome is incorrectly decided, but they cannot confirm that any given BMDs are reliable or that any votes cast on BMDs were counted as cast. SMF Ex. 55 ¶ 4; Opp. Ex. 90 ¶ 8; SMF Ex. 44 ¶ 18. And in any event, Georgia has not conducted a proper RLA. Opp. Ex. 221 ¶¶ 23-32. Audits provide Defendants no defense here.

Each Curling Plaintiff is forced to choose between ills: cast a ballot they cannot read or verify for *tabulation* or forgo their right to full and unfettered participation in their right to vote by voting absentee—which has its own severe burdens and risks, including disenfranchisement. *See* Opp. Ex. 91 at 83; Dkt. 1598, Feb. 2023 Curling Decl.; Dkt. 1599, Feb. 2023 Price Decl.

**2.      Defendants Have Identified No State Interest that Justifies the Severe Burden on Plaintiffs' Right to Vote.**

Fulton Defendants do not even attempt to justify Georgia's BMD system.[35] State Defendants allege three generic state interests that do not justify the severe burden the system places on Curling Plaintiffs.  One of the three is not a state interest at all.  State Defendants argue that they "are simply required to show that the status quo better satisfies the State's interests than the Curling Plaintiffs' proposed remedy."  Dkt. 1567-1 at 46.  That is incorrect; Defendants tellingly cite nothing for this claim.  Where, as here, the burden on the right to vote is severe, defendants must show a *compelling* state interest that justifies the burden imposed, and the restriction must be narrowly tailored to that interest.  *League of Women Voters*, 314 F. Supp. 3d at 1215.  And this dispute must be resolved at trial.[36]

            *i.      State Defendants Offer No Compelling State Interest.*

*First*, State Defendants allege an interest in protecting the integrity of Georgia elections from HMPBs.  Dkt. 1567-1 at 47.  This argument is silly—and importantly for present purposes, it turns on numerous fact disputes that must be resolved at trial. Election experts—including State Defendants' own experts—overwhelmingly

---

[35] Fulton Defendants conduct no *Anderson-Burdick* analysis and offer no compelling interest of their own to justify the severe burden on Plaintiffs' constitutional rights. That, alone, is dispositive of their Motion.

[36] Even if the Court were to find that the burden on Plaintiffs' rights is not severe, State Defendants must still show, as they concede, that the challenged regulations "rationally serve important state interests."  Dkt. 1567-1 at 4 (quoting *Libertarian Party of Ala. v. Merrill*, 2021 WL 5407456, at *6 (11th Cir. Nov. 19, 2021)).  Here, State Defendants cannot even meet this standard for the same reasons stated herein.

*recommend* HMPBs as the gold standard for elections, and the majority of states utilize HMPBs for most in-person voting, reserving BMDs for voters with certain disabilities. *See, e.g.*, Opp. Ex. 26 at 103:3-5 (testimony of Dr. Alex Halderman); Opp. Ex. 152 at 2-4; Opp. Ex. 99, Hursti Decl. ¶ 18; Opp. Ex. 239 ¶ 21; Opp. Ex. 102; Opp. Ex. 86 at 4. State Defendants claim that "other courts across the country have noted[] the widespread use of hand-marked paper ballots brings with it numerous problems for election integrity that more than justify the State's adoption of the BMD system." Dkt. 1567-1 at 47. But they cite a *single* Ninth Circuit ruling *from 2003*. That outmoded decision is neither pertinent nor *admissible evidence*. In the last 20 years, election security experts have studied DREs and BMDs extensively and reached a broad consensus that HMPBs are far more secure, transparent, reliable, and cost-effective—*as well as voter-verified. See supra* § II.I.; Opp. Ex. 99, Stark Decl. ¶¶ 6, 15; Opp. Ex. 55 at 15:3-13; Opp. Ex. 92; Opp. Ex. 239 ¶¶ 30, 43, 87; Opp. Ex. 45 at 19; Opp. Ex. 54 ¶ 24; Opp. Ex. 56 at 137:14-138:15; Opp. Ex. 29 at 157:9-15. *All* Defendants' own experts advised against Georgia's current voting system, and Dr. Gilbert is working to design a new voting machine to replace the flawed devices that Georgia uses. Opp. Ex. 5 at 56:13-57:2, 57:13-21; Opp. Ex. 152; Opp. Ex. 110. Defendants offer *no election security expert* who examined and endorses Georgia's current voting system. This disposes of their Motions.

      *Second*, State Defendants cite the Elections Clause as a state interest. Dkt. 1567-1 at 48. But this is a state *power*—not a state *interest*. And this power does

not give State Defendants carte blanche to impose any voting system they please on Plaintiffs, no matter how burdensome.  *See Eu v. S.F. Cnty. Democratic Cent. Comm.*, 489 U.S. 214, 222 (1989) (a state's use of its Elections Clause powers is evaluated under the First and Fourteenth Amendments).  "The power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote."  *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986); *see also Anderson*, 460 U.S. at 806 (states are not free to "choose means that unnecessarily restrict constitutionally protected liberty" (internal quotations omitted)).  Indeed, "[p]recision of regulation must be the touchstone in an area so closely touching our most precious freedoms."  *Id.*  State Defendants' argument entirely lacks merit.

*Third*, State Defendants claim that they have a compelling interest in complying with state law as written, relying upon *Fair Fight Action, Inc. v. Raffensperger*, 2019 WL 13221296, at *9 (N.D. Ga. Dec. 27, 2019).  This argument fails for several reasons.  In *Fair Fight*, the court held—at the preliminary injunction stage—that the *specific regulation at issue there* imposed only a *slight* burden on voters and, thus, that the corresponding state interest "need not be 'compelling,'" but just important.  *Id.*  The court deemed the state's interest in applying the law as written "sufficient to satisfy that obligation under the *Anderson-Burdick* test," meaning sufficiently important to justify a *slight* burden on the plaintiffs' rights.  *Id.*  Here, by contrast, Plaintiffs have put forth sufficient evidence of a severe burden.

*See supra* §§ II.A-I.  Defendants have not, and cannot, establish a *compelling* state interest with admissible, irrefutable evidence here.

Moreover, this Court has recognized that Georgia's BMD system does not accomplish State Defendants' *statutory mandate* and stated goal of providing voters the opportunity to verify their vote before casting a ballot.  *See* Opp. Ex. 91 at 80-83.  Georgia's election code mandates voting on devices that print "an elector verifiable paper ballot" and "produce paper ballots which are marked with the elector's choices in a format readable by the elector."  O.C.G.A. § 21-2-2(7.1); O.C.G.A. § 21-2-300(a)(2).  The BMD system accomplishes neither:

> [T]he evidence shows that the Dominion BMD system does not produce a voter-verifiable paper ballot or a paper ballot marked with the voter's choices in a format readable by the voter because the votes are tabulated solely from the unreadable QR code.  Thus, under Georgia's mandatory voting system for "voting at the polls" voters must cast a BMD-generated ballot tabulated using a computer generated barcode that has the potential to contain information regarding their voter choices that does not match what they enter on the BMD (as reflected in the written text summary), or could cause a precinct scanner to improperly tabulate their votes.

Opp. Ex. 91 at 82.  Georgia's BMD system does not even comply with Georgia law as written, disposing of any argument that merely complying with the law justifies the severe burden on Plaintiffs' right to vote.

Finally, there can be no legitimate—much less compelling—interest in enforcing unconstitutional laws.  *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).  It is well settled law that state officers have no authority

to enforce such laws.  *Ex Parte Young*, 209 U.S. 123, 159-60 (1908).

> ii.    *State Defendants Fail to Prove that the Challenged Restrictions are Narrowly Tailored—Much Less Rationally Related—to Serve State Interests.*

Because the burden is severe here, State Defendants must prove that any restriction on the right to vote is *narrowly tailored* to a compelling state interest. *League of Women Voters*, 314 F. Supp. 3d at 1215.[37]

As this Court has recognized, Georgia has a "strong interest in ensuring an orderly and manageable administration of the current election[.]"  Opp. Ex. 91 at 89. But Defendants make no showing at all that the current BMD system is narrowly tailored or necessary for that precise, or any, interest.  To the contrary, evidence from elections using Georgia's BMD system—including numerous voter and election worker complaints and internal SOS documents—overwhelmingly show that the system is anything but "orderly and manageable."  *See, e.g.,* Opp. Ex. 34 at 49-50 (evidence shows that "the threshold bottleneck during voter check-in significantly has contributed to long lines and waiting periods of hours . . . and caused voters to leave and be deterred from voting. This evidence combined with issues related to the power supply limitations at multiple polling places (causing equipment shutdowns), repeated issues with the operation of the PollPads and BMDs themselves, and

---

[37] Even if this Court were to find that the burden on Plaintiffs is less than severe, the Defendants' have still failed to show the BMD system "rationally serve[s] important state interests."   Dkt. 1567-1 at 4 (quoting *Libertarian Party of Ala.*, 2021 WL 5407456, at *6.

ineffective or nonexistent 'non-technical' backup systems in place has led to a severe burden on the rights of voters"); SAF Nos. 107, 109-111.

Defendants also have an interest in enforcing state law. But as discussed *supra* § III.F.2.i., the BMD system violates state laws as written, undermining any argument that such an interest justifies the burden on Plaintiffs' right to a verified vote. And even if the BMD system were consistent with state law, Defendants have no interest in enforcing unconstitutional laws. *See KH Outdoor*, 458 F.3d at 1272.

State Defendants' claimed interests amount to mere inertia rather than legitimate interests—and the complex, cumbersome, statewide BMD system is *unnecessary* for those purported interests. "Administrative convenience is simply not a compelling justification in light of the fundamental nature of the right." *Stewart v. Blackwell*, 444 F.3d 843, 869 (6th Cir. 2006) (citing *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973)). Plaintiffs are entitled to present their evidence on this issue at trial.

### G. Fulton Defendants' Claim that They "have not subjected Plaintiffs to any deprivation of rights" Is Hotly Disputed.

Plaintiffs' constitutional claims that Fulton Defendants have violated their right to vote must be analyzed under the *Anderson-Burdick* framework. *See Cowen*, 960 F.3d at 1341-42. Fulton Defendants attempt to apply other standards analyzing Equal Protection claims outside the context of the right to vote and in doing so inject misplaced elements of intent and intentional discrimination against a suspect or quasi-suspect class, neither of which applies here. *See* Dkt. 1573 at 17 n.6, 30-32.

Fulton Defendants claim that "[t]here are no actions alleged in this case on behalf of the Fulton Defendants that violate the [Plaintiffs'] constitutional rights." Dkt. 1573 at 32. Not so. Plaintiffs allege numerous facts, supported by evidence, of such actions, directly affecting Ms. Curling in particular. *See, e.g.,* Dkt. 627 ¶¶ 117-19, 123, 126-29, 131.[38]

The single election case Fulton Defendants cite merely held that "[t]here is no constitutional right to any *particular* method of registering and counting votes." *Green Party of N.Y. v. Weiner*, 216 F. Supp. 2d 176, 191 (S.D.N.Y. 2002) (emphasis added). There, the minor party plaintiffs challenged the New York City Board of Elections' decision to conduct the Green Party primary on paper ballots rather than the voting machines used for the major party primaries. The court found that the Equal Protection clause was not violated because "the different technologies for casting and counting votes are in effect utilized in completely distinct, separate elections, and cannot advantage one candidate over another in head-to-head competition." *Id.* at 192. In contrast, here voters' ballots are subject to disparate treatment as compared to other ballots cast in the same contest. *See* Opp. Ex. 227 ¶ 7; Opp. Ex. 232 ¶¶ 8, 10; Opp. Ex. 273 ¶¶ 7-11; Opp. Ex. 228 at 124:6-16. *Green Party of New York* thus has no bearing on Curling Plaintiffs' constitutional claims.

Fulton Defendants further argue that certain claims against it are moot because the elections already have occurred. But Plaintiffs seek only prospective relief for

---

[38] *See also* SAF Nos. 40, 62, 68, 88, 90, 109, 110, 127, 135-51, 226, 229-34.

future elections and do not contest any election outcome here, so cases like *De La Fuente v. Kemp*, 679 F. App'x 932 (11th Cir. 2017) are inapposite.

### H.  Defendants Are Barred from Offering New Arguments or Evidence on Reply.

Given the astonishing scarcity of facts and evidence in Defendants' opening briefs, Defendants might seek to offer new arguments and evidence on reply.  That would be highly improper and prejudicial to Plaintiffs.  The Court should reject any such tactic, as "reply briefs are not a vehicle to present new arguments or theories." *WBY, Inc. v. Dekalb Cnty., Ga.*, 695 F. App'x 486, 491-92 (11th Cir. 2017) (it is within the district court's discretion to decline to address a theory raised for the first time in a reply brief).[39]

## IV.  CONCLUSION.

Defendants have wasted the Court's and Plaintiffs' limited time and resources with largely-recycled Rule 12 motions parading as Rule 56 motions.  Even a cursory review of the Motions—and the mere handful of exhibits cited—confirms their lack of merit.  Facts matter, especially under Rule 56, and simply pretending they do not exist falls far short of Defendants' high burden.  Plaintiffs have amassed substantial evidence supporting their claims, which turn on numerous material fact disputes that

---

[39] Should the Court consider any such new material, Plaintiffs would be entitled to a sur-reply.  *See Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1299 (11th Cir. 2022) ("district courts abuse their discretion when they deny a party a chance to respond to new arguments or facts raised for the first time in a reply brief in support of a motion for summary judgment and subsequently enter judgment on the basis of those new arguments or facts") (internal citations omitted).

must be resolved at trial.[40]  Accordingly, the Court should deny Defendants' Motions and proceed promptly to trial.

---

[40] Summary judgment also is improper here against Curling Plaintiffs based on the facts and evidence as well as legal authority provided with Coalition Plaintiffs' Opposition to Defendants' Motions.

Respectfully submitted this 13th day of February, 2023.

_/s/ David D. Cross_                          _/s/ Halsey G. Knapp, Jr._
David D. Cross (*pro hac vice*)              Halsey G. Knapp, Jr.
Mary G. Kaiser (*pro hac vice*)             GA Bar No. 425320
Hannah R. Elson (*pro hac vice*)            Adam M. Sparks
Oluwasegun Joseph (*pro hac vice*)          GA Bar No. 341578
Wail Jihadi (*pro hac vice*)                Jessica G. Cino
Caroline L. Middleton (*pro hac vice*)      GA Bar No. 577837
Riley Jo Porter (*pro hac vice*)            KREVOLIN & HORST, LLC
Sonja N. Swanbeck (*pro hac vice*)          1201 West Peachtree Street, NW
MORRISON & FOERSTER LLP                      Suite 3250
2100 L Street, NW                           Atlanta, GA 30309
Suite 900                                   (404) 888-9700
Washington, DC 20037
(202) 887-1500

*Counsel for Plaintiffs Donna Curling, Donna Price & Jeffrey Schoenberg*

74

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

<u>*/s/ David D. Cross*</u>
David D. Cross

75

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER , ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2023, a copy of the foregoing

**CURLING PLAINTIFFS' CORRECTED OPPOSITION TO**

**DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** was

electronically filed with the Clerk of Court using the CM/ECF system, which will

automatically send notification of such filing to all attorneys of record.

*/s/ David D. Cross*
David D. Cross