## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## PLAINTIFFS' CORRECTED JOINT RESPONSES TO DEFENDANTS' STATEMENTS OF UNDISPUTED MATERIAL FACTS AND FULTON COUNTY DEFENDANTS' STATEMENT OF MATERIAL FACTS TO WHICH THERE ARE NO GENUINE ISSUES TO BE TRIED

# TABLE OF CONTENTS

Part 1: Responses to State Defendants' Statement of Undisputed
Material Facts.................................................................................2

I.      Georgia's Election System........................................................2

   A.   Georgia's Adoption of the BMD System.....................................2

   B.   How the BMD System works.......................................................8

   C.   The State decertified the defunct DRE system ..........................24

   D.   Policy reasons regarding adoption of BMD System ..................27

II.     The Plaintiffs in this Lawsuit.................................................43

   A.   Donna Curling .........................................................................43

   B.   Donna Price .............................................................................81

   C.   Jeffrey H.E. Schoenberg..........................................................97

   D.   Coalition for Good Governance ..............................................117

   E.   Laura Marie Digges .................................................................134

   F.   William Digges III....................................................................138

   G.   Ricardo Davis ..........................................................................146

   H.   Megan Missett .........................................................................150

III.    The BMD System has provide a secure and accurate method of
conducting Georgia's elections since its implementation ........158

   A.   Numerous risk-limiting audits and hand recounts have confirmed
the accuracy and reliability of the BMD system .....................158

   B.   There is no evidence that the BMD System caused any voter's
vote to not be counted.............................................................175

i

C.    There is no evidence that the BMD Systems have been
compromised or suffer from malware ......................................................190

IV.    Plaintiffs' experts and their findings........................................................205

A.    Dr. Philip Stark........................................................................................205

B.    Kevin Skoglund .......................................................................................222

C.    Dr. Alex Halderman .................................................................................235

D.    Dr. Andrew Appel ...................................................................................240

E.    Plaintiffs' Experts Lack of Malware Findings ..........................................243

V.    Plaintiffs' Requested Remedies ...............................................................244

Part 2:  Objections to Fact Allegations Contained in State Defendants'
Brief but not in State Defendants' Statement of Undisputed Facts..........256

Part 3:  Responses to Fulton County Defendants' Statement Of Material
Facts ........................................................................................................266

# PART 1:  RESPONSES TO STATE DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

## I.    GEORGIA'S ELECTION SYSTEM

### A.    Georgia's Adoption of the BMD System.

1.    In 2017, Georgia began exploring a replacement for the DRE machines it had first purchased back in 2002 in response to the plagued paper-ballot system used in the controversial Bush-Gore presidential election of 2000. Duane D. Stanford, *High-tech voting due November*, Atlanta Journal-Constitution, May 4, 2002 at H1–2, Ex. No. (1) at H1-2.

### Plaintiffs' Response to SMF ¶ 1[1]

DISPUTED.  The cited evidence does not support the statement of fact.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(a); *Sumbak v. Eaton Corp.*, 2021 WL 1521988, at *1-2 (N.D. Ga. Jan. 12, 2021) (excluding statements of fact unsupported by citations to admissible evidence).  Plaintiffs further object to SMF1 because online news articles are generally inadmissible evidence and State Defendants have provided no foundation for the admissibility of this article. *Aldana v. Del Monte Fresh Produce N.A., Inc.* 578 F.3d 1283, 1290 n.3 (11th Cir.

---

[1] Footnotes from State Defendants' Statement of Undisputed Material Facts are not included for purposes of clarify.  Plaintiffs respond to address those footnotes, if applicable, within in their response to the corresponding Statement of Material Fact.

2009) (finding that an online press release did not qualify as a business record within the meaning of the exception to the hearsay rule).  SMF1 is therefore not supported by a citation to admissible evidence, and the Court therefore should not consider it.  LR 56.1(B)(1); *Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996) (the court can only consider admissible evidence in ruling on a motion for summary judgment).  In addition, Plaintiffs object to SMF1 because State Defendants' characterization of the 2000 presidential election presents no material fact.  It is irrelevant, and the Court should not consider it.  LR 56.1(B)(1)(c).

2.      The Georgia House of Representatives created a joint study committee to examine Georgia's voting system and related policy areas, and to consider options for replacement of the DRE voting system. HR 1699, 154th Gen. Assemb., Reg. Sess. (Ga. 2018) <u>available at</u> https://www.legis.ga.gov/legislation/53941.

**<u>Plaintiffs' Response to SMF ¶ 2</u>**

DISPUTED.  Plaintiffs object to SMF2 because State Defendants' characterization of Georgia legislation presents no material fact.  It is legal argument or a legal conclusion, rather than a statement of material fact, and the

Court should not consider it.  LR 56.1(B)(1)(a), (c).

3.     The following legislative session, the General Assembly enacted House Bill 316 ("H.B. 316") on April 2, 2019. HB 316, 155th Gen. Assemb., Reg. Sess. (Ga. 2019), <u>available at</u> https://www.legis.ga.gov/legislation/54991 (Signed by the Governor as Act 24).

**Plaintiffs' Response to SMF ¶ 3**

Undisputed.

4.     HB 316 became effective on April 2, 2019, upon being signed by the Governor of Georgia. HB 316, 155th Gen. Assemb., Reg. Sess. (Ga. 2019), <u>available at</u> https://www.legis.ga.gov/legislation/54991 (Signed by the Governor as Act 24).

**Plaintiffs' Response to SMF ¶ 4**

Undisputed.

5.     This new law required the State to move towards a new voting system utilizing "ballot-marking devices," or "BMDs." *See generally* HB 316, 155th Gen. Assemb., Reg. Sess. (Ga. 2019), <u>available at</u>

https://www.legis.ga.gov/legislation/54991 (Signed by the Governor as Act 24).

**Plaintiffs' Response to SMF ¶ 5**

DISPUTED.  Plaintiffs object to SMF5 because State Defendants'
characterization of Georgia legislation presents no material fact.  It is legal
argument or a legal conclusion, rather than a statement of material fact, and the
Court should not consider it.  LR 56.1(B)(1)(a), (c).

6.     Experts recognize BMDs as a safe and secure voting system. The
National Academy of Sciences, while critical of DREs, recommends paper ballots
(1) marked by either BMDs or by hand and (2) counted using optical scanners or
by hand. Ex. No. (2) at 34.

**Plaintiffs' Response to SMF ¶ 6**

DISPUTED.  The 2018 National Academy of Science report cited by State
Defendants ("NAS Report") is based on the state of scientific knowledge in 2018.
Since then, new science has developed.  Opp. Ex. 56, Appel Dep. at 25:18-22;
54:7-12.  But even in 2018, the National Academies stated "[a]dditional research
on ballots produced by BMDs will be necessary to understand the effectiveness of
[BMD] ballots."  Opp. Ex. 3, NAS Report, 107-08.  In the five years since the

NAS Report, and after additional research by Dr. Alex Halderman[2] and others, the

consensus among election security experts now is that ballots produced by a BMD,

such as the Dominion ICX at issue, have fundamental flaws and are not a secure

method of voting, either in general—*see* SAF No. 103, 106, 134-152—or as

deployed in Georgia by State Defendants—*see* SAF No. 107-08, 110, 129-30, 134-

69, 181, 226-43; *see generally* Doc. 1589 Decl. Stark (collecting literature showing

scientific consensus).

7.      Following the passage of H.B. 316, the Secretary of State engaged in

a competitive bid process for the new BMD system. *See* Request for Proposal for a

Statewide Voting System, available at

https://ssl.doas.state.ga.us/PRSapp/PublicBidNotice?bid_op=194780047800-

SOS0000037.

**Plaintiffs' Response to SMF ¶ 7**

DISPUTED.  Plaintiffs object to SMF7 because State Defendants have

provided no foundation for the admissibility of the cited document, nor do State

---

[2] Dr. Halderman's July 1, 2021, report contains the substance of testimony he will offer at the time of trial.  *See Pritchard*, 92 F.3d at 1135 (noting that an affidavit "can be reduced to admissible form at trial" by calling the affiant as a witness).

Defendants offer any evidence that any bid process was actually "competitive." SMF7 is therefore unsupported by admissible evidence, and the Court should not consider it.  LR 56.1(B)(1)(a).

8.     On August 9, 2019, the Secretary awarded a contract in the amount of $106,842,590.80 to Dominion Voting Systems to provide the new BMD system. *See* Notice of Award, available at http://ssl.doas.state.ga.us/PRSapp/bid-documents/194780047800-SOS0000037242349.pdf.

**Plaintiffs' Response to SMF ¶ 8**

DISPUTED.  Plaintiffs object to SMF8 because State Defendants have provided no foundation for the admissibility of the cited document, nor do State Defendants offer any evidence to show that the decision behind the alleged award had not occurred prior to August 9, 2019.  SMF8 is therefore unsupported by admissible evidence, and the Court should not consider it.  LR 56.1(B)(1)(a).

9.     Pursuant to that contract, the State purchased the Statewide Voting System from Dominion Voting Systems—including 30,500 BMD machines in the first year of the contract—and immediately began helping Georgia's counties to begin implementing the new system.  Declaration of R. Germany, Ex. No. (3) at

7

¶ 5.

**Plaintiffs' Response to SMF ¶ 9**

Undisputed.


10.     The BMD voting systems have been fully distributed and are currently

in use in all counties in Georgia. Ex. No. (3) at ¶ 6.

**Plaintiffs' Response to SMF ¶ 10**

Undisputed.


11.     The BMDs completely replaced the DREs that were previously used

in Georgia, including the November 2018 general elections. Ex. No. (3) at ¶ 7.

**Plaintiffs' Response to SMF ¶ 11**

DISPUTED.  The cited evidence states that "[the] BMD voting systems

completely replaced the DRE voting systems that were previously used in Georgia,

beginning with a special election held on January 28, 2020."  SMF Ex. 3 ¶ 7.  That

is inaccurate.  *See* SAF No. 38, 45-46, 53, 56-57.


**B.     How the BMD System works**

12.     The Dominion system includes an electronic BMD, a printer, and an

8

optical scanner (ICP) connected to a locked ballot box. Declaration of Dr. E. Coomer, Ex. No. (4) at ¶ 3.

**Plaintiffs' Response to SMF ¶ 12**

DISPUTED.  The listed components comprise only a partial list of components of the Dominion system used in Georgia, which also includes PollPads, EMS servers, ICC scanners, related software and other auxiliary components.  Dkt. 1131 ¶ 2; Opp. Ex. 54, August 19, 2020 Declaration of Alex Halderman ("Aug. 2020 Halderman Decl."), ¶ 2; Dkt. 1590-8, Feb. 2023 Marks Decl., Ex. 8 at 2-6.

Plaintiffs object to SMF12 because Dr. Coomer's declaration constitutes inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial.  FRCP 45(c)(1)(A).[3]  Plaintiffs also object to SMF12 because Dr. Coomer was not timely designated as an expert witness.  LR 26.2(C).  SMF12 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should not consider it.  LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.

---

[3] Dr. Coomer was an agent of the State when he made his statements, as an employee of Dominion Voting Systems.  Plaintiffs—unlike Defendants—are thus entitled to rely upon Dr. Coomer's declarations as statements by a party opponent and against State Defendants' interests.  FRCP 801(d)(2) and 804(b)(3).

13.     Under the Dominion BMD System, voters that vote in-person make their selections on an electronic BMD.  Declaration of Dr. E. Coomer, Ex. No. (4) at ¶ 4.

**Plaintiffs' Response to SMF ¶ 13**

DISPUTED.  The cited evidence does not support the statement of fact.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(a); *Sumbak*, 2021 WL 1521988, at *1-2. In-person provisional voters and voters voting emergency paper ballots do not use BMDs, although those circumstances tend to be unusual and the former are especially burdensome for voters.  Dkt. 1590-3, Feb. 2023 Marks Decl., Ex. 3 at 9, 14.

Plaintiffs object to SMF13 because Dr. Coomer's declaration constitutes inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial.  FRCP 45(c)(1)(A).  Plaintiffs also object to SMF13 because Dr. Coomer was not timely designated as an expert witness.  LR 26.2(C).  SMF13 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should not consider it.  LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.

14.     When they are finished making their selections, they are instructed to review their selections for accuracy before printing their ballot. Declaration of Dr.

E. Coomer, Ex. No. (4) at ¶ 4.

**Plaintiffs' Response to SMF ¶ 14**

DISPUTED.  The cited evidence does not support the statement of fact.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(a); *Sumbak*, 2021 WL 1521988, at *1-2.  Plaintiffs object to SMF14 because Dr. Coomer's declaration constitutes inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial.  FRCP 45(c)(1)(A).  Plaintiffs also object to SMF13 because Dr. Coomer was not timely designated as an expert witness.  LR 26.2(C).  SMF14 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should not consider it.  LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.

15.    After confirming their choices, a printer connected to the BMD prints out a ballot containing an electronic QR code that is a computer-readable selection of the voter's choices. Declaration of Dr. E. Coomer, Ex. No. (4) at ¶ 4.

**Plaintiffs' Response to SMF ¶ 15**

DISPUTED.  The cited evidence does not support the statement of fact.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(a); *Sumbak*, 2021 WL 1521988, at *1-2.  Plaintiffs also object to SMF15 because it is premised on the

mistaken assumption that voters are both willing and able to confirm their choices and are comfortable speaking up if they discover a discrepancy. *See* SAF No. 88-94. The QR code may not reflect a voter's choices. *See* SAF No. 89, 137, 142.

Plaintiffs also object to SMF15 because Dr. Coomer's declaration constitutes inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial. FRCP 45(c)(1)(A). Additionally, Plaintiffs object to SMF15 because Dr. Coomer was not timely designated as an expert witness. LR 26.2(C). SMF15 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should not consider it. LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.

16. The printed ballot also contains a written, human-readable list of the voter's choices. Declaration of Dr. J. Gilbert, Ex. No. (5) at ¶¶ 33-35.

**Plaintiffs' Response to SMF ¶ 16**

DISPUTED. The cited evidence does not support the statement of fact. On that basis, the Court should not consider it. LR 56.1(B)(1)(a); *Sumbak*, 2021 WL 1521988, at *1-2. The printed ballot would not necessarily contain a written, human-readable list of the voter's choices if the BMD is mis-programmed or infected with malware. *See* SAF No. 89, 137, 142.

12

17.    Georgia law considers this written, human-readable list to be the voter's official ballot. Ga. Comp. R. & Regs. 183-1-15-.02(h), (j) (defining a "vote" as the choices indicated by the printed paper ballot" and stating that "the printed text shall control" between the QR code and the printed list).

**Plaintiffs' Response to SMF ¶ 17**

DISPUTED.   The cited evidence does not support the statement of fact.   On that basis, the Court should not consider it.   LR 56.1(B)(1)(a); *Sumbak*, 2021 WL 1521988, at *1-2.   When votes are tabulated, the scanner reads the QR code and tabulates the votes encoded in it.   Dkt. 1131 ¶¶ 2, 3.2; SMF Ex. 4, Nov. 2019 Decl. of Dr. Eric Coomer ¶ 9; SMF Ex. 3, Decl. of Ryan Germany ¶ 8 (the precinct scanner scans the QR code); SMF Ex. 59, Appel Report ¶ 53.   Most contests are tabulated only from the QR code (with no recount or audit).   Opp. Ex. 84 at Ex. B, Dominion Solution Order, § 3.1; Opp. Ex. 71, Gilbert Dep. at 72:2-9; Opp. Ex. 85, Harvey Dep. at 71:3-72:8.   The cited regulation applies only in the case of a recount or audit, which does not occur often and typically does not involve comparing the printed text on a ballot to the selections encoded in the QR code. Ga. Comp. R. & Regs. 183-1-15-.02(2)(j) states: "If, in reviewing an optical scan ballot marked by an electronic ballot marker in accordance with O.C.G.A. §§ 21-2-

13

495 or 21-2-498, a discrepancy is found between the voter's choice indicated by the printed text on the ballot and the result tabulated by the ballot scanner, the printed text shall control and be counted."  O.C.G.A. § 21-2-495 and O.C.G.A. § 21-2-498 cover recounts and audits, respectively.

18.    The voter is instructed to review the ballot selections on the printed ballot to ensure that it accurately reflects the choices they made on the BMD. Ga Comp. R. & Regs. 183-1-12-.11(8).

**Plaintiffs' Response to SMF ¶ 18**

DISPUTED.  The cited statute does not support the allegation.  Moreover, voters are often not instructed by poll workers to review their ballot selections. The Georgia Verification study commissioned by the Secretary of State's Office found that only 23.8% of voters in Georgia's 2020 general election were instructed by precinct workers to check their ballots as they moved from the voting booth to deposit their ballot in the tabulator.  Dkt. 1589-4, Feb. 2023 Stark Decl., Ex. 4 (Georgia Verification Study) at 4; Dkt. 1596, Feb. 2023 Throop Decl. ¶¶ 10, 37, 38 (having spent over 100 hours as an observer and poll watcher in multiple counties, Ms. Troop "very rarely hear[s] poll workers reminding anyone to review their BMD printouts, and [she] ha[s] never been reminded to review [her] ballot by poll

14

workers"); Dkt. 1617, Feb. 2023 Wasson Decl. ¶¶ 16-17 (in the December 6, 2022, and December 1, 2020 elections, poll workers did not remind her to check her printout selections).  Even prompting voters to review their ballots only increased the percentage who checked them for at least two seconds from 48% to 53%.  Opp. Ex. 93, Appel Rebuttal Report ¶ 13; Dkt. 1589-4, Feb.  2023 Stark Decl., Ex. 4 at 4.

Plaintiffs object to SMF18 because State Defendants' characterization of regulations of the State of Georgia is legal argument or a legal conclusion, rather than a statement of material fact in dispute, and the Court should not consider it. LR 56.1(B)(1)(c).

19.    After they have done so, the voter inserts the printed ballot into a precinct scanner which scans the QR code and deposits the ballot into a locked box. Ga Comp. R. & Regs. 183-1-12-.11(2)(b); Ex. No. (3) at ¶ 8.

**Plaintiffs' Response to SMF ¶ 19**

DISPUTED.  SMF19 implies that an elector can visually review and confirm whether the bar code accurately conveys their intended selections; they cannot. Dkt. 1131 ¶ 3.2; Opp. Ex. 57, Oct. 2019 Halderman Decl. ¶ 6; *see* Plaintiffs' Response to SMF15.  SMF19 also implies that voters always the ballot selections

on their printed ballots before inserting them into precinct scanners; they do not. *See* Plaintiffs' Responses to SMF15, SMF18.  It is not disputed that, generally, after a voter prints his or her ballot, the voter inserts the printed ballot into a precinct scanner which scans and tabulates the QR code and deposits the ballot into a box.

Plaintiffs object to SMF19 because State Defendants' characterization of regulations of the State of Georgia is legal argument or a legal conclusion, rather than a statement of material fact in dispute, and the Court should not consider it. LR 56.1(B)(1)(c).

20.     An optical scanner is programmed to look for information at particular coordinates and then tabulates votes based on the information at that location—the scanner does not read the text portion of either a BMD-marked ballot or a hand-marked ballot. Declaration of Dr. E. Coomer, Ex. No. (4) at ¶ 9.

**Plaintiffs' Response to SMF ¶ 20**

DISPUTED.  The allegation is misleading and vague as to what is meant by "read" any aspect of a ballot.  The Dominion scanners tabulate, and thus read, the text portion of hand-marked ballots; they do not tabulate or read the text portion of BMD-marked ballots.  Plaintiffs object to SMF20 because Dr. Coomer's

declaration constitutes inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial.  FRCP 45(c)(1)(A).  Plaintiffs also object to SMF20 because Dr. Coomer was not timely designated as an expert witness.  LR 26.2(C).  SMF20 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should not consider it.  LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.

21.     What matters is not the candidate information, but rather the programming for where the computer looks for information at particular coordinates. Declaration of Dr. E. Coomer, Ex. No. (4) at ¶ 9.

**<u>Plaintiffs' Response to SMF ¶ 21</u>**

DISPUTED.  The allegation is misleading and vague as to what is meant by "[w]hat matters."  Certainly "the candidate information" matters a great deal to each voter for their respective ballots when voting.  Plaintiffs object to SMF21 because Dr. Coomer's declaration constitutes inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial.  FRCP 45(c)(1)(A).  Additionally, Plaintiffs object to SMF21 because Dr. Coomer was not timely designated as an expert witness.  LR 26.2(C).  SMF21 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should

not consider it.  LR 56.1(B)(1) *Pritchard*, 92 F.3d at 1135.

22.     The method by which a BMD-marked ballot and hand-marked ballot are read by the optical scanner is identical. Declaration of Dr. E. Coomer, Ex. No. (4) at ¶ 9.

**Plaintiffs' Response to SMF ¶ 22**

DISPUTED.  The cited evidence does not support the statement of fact.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(a); *Sumbak*, 2021 WL 1521988, at *1-2.  BMD-marked ballots are read and tabulated by scanning and decoding a QR code that voters cannot read or decode visually themselves; hand-marked ballots are read and tabulated by looking at target locations and measuring the optical density of human-readable text.  SMF Ex. 4, Nov. 2019 Coomer Decl. ¶ 9, Ex. A; Opp. Ex. 36, Sept. 11, 2020 Hr'g Tr. at 72:17-73:8.

Plaintiffs object to SMF22 because Dr. Coomer's declaration constitutes inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial.  FRCP 45(C)(1)(A).  Plaintiffs also object to SMF22 because Dr. Coomer was not timely designated as an expert witness.  LR 26.2(C).  SMF22 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should not consider it.  LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.

23.     In 2020, BMDs that print barcodes were used in six of the ten largest counties in the country, including Los Angeles, California; Cook County/City of Chicago; Maricopa, Arizona; San Diego, California; Dallas, Texas; and Riverside, California. Of those six counties, five are using the Dominion BMD. Declaration of Dr. E. Coomer, Ex. No. (4) at ¶ 5.

**Plaintiffs' Response to SMF ¶ 23**

DISPUTED.  The cited evidence does not support the statement of fact.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(a); *Sumbak*, 2021 WL 1521988, at *1-2.  Dr. Coomer's declaration was signed on November 13, 2019 and, thus, does not speak to use of BMDs in 2020 or after.  SMF23 is also inaccurate.  In 2020, five of the six counties identified in SMF23 used primarily hand-marked paper ballots: Los Angeles, California (78.94% of voters used hand-marked paper ballots), Cook County/City of Chicago (98% of voters used hand-marked paper ballots),  (Maricopa, Arizona (87% of voters used hand-marked paper ballots), San Diego, California (88% of voters used hand-marked paper ballots), and Riverside, California (89.28% of voters used hand-marked paper ballots).  Dkt. 1617, Feb. 2023 Wasson Decl., ¶ 4, Dkt. 1617-1, Feb. 2023 Wasson Decl. Ex. 1.  Additionally, five or fewer of the identified counties use the

Dominion BMD: Los Angeles and Dallas both used vendors other than Dominion. Dkt. 1617, Feb. 2023 Wasson Decl., ¶¶ 4-5, Dkt. 1617-1, Feb. 2023 Wasson Decl., Ex. 1 (Los Angeles used the Voting Solutions for All People (VSAP) BMD and Dallas used the ES&S Express Vote BMD).

Plaintiffs also object to SMF23 because Dr. Coomer's declaration constitutes inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial.  FRCP 45(C(1)(A).  Plaintiffs also object to SMF23 because Coomer was not timely designated as an expert witness.  LR 26.2(C).  SMF23 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should not consider it.  LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.

24.    The locked boxes of ballots are kept for 24 months to be used in the event of any recounts. O.C.G.A. § 21-2-500.

**Plaintiffs' Response to SMF ¶ 24**

DISPUTED.  O.C.G.A § 21-2-500 requires that the locked boxes of ballots be retained for 24 months, but the statute does not state that ballots are to be kept for 24 months "to be used in the event of any recounts."  Recounts must occur within a matter of days after election certification.  O.C.G.A. § 21-2-495(c).  The

statement of fact is also misleading to the extent that it implies that election officials necessarily comply with the statute, for which State Defendants offer no evidence.

Plaintiffs object to SMF24 because State Defendants' characterization of a Georgia statute is legal argument or a legal conclusion, rather than a statement of material fact in dispute, and the Court should not consider it.  LR 56.1(B)(1)(c).

25.    For mail absentee ballots, voters mark ballots by hand. These hand-marked paper ballots are then scanned and tabulated using a "Central Count Scanner." Ex. No. (3) at ¶ 9.

**<u>Plaintiffs' Response to SMF ¶ 25</u>**

DISPUTED.  Some absentee ballots are not hand-marked paper ballots that are then scanned and tabulated using a "Central Count Scanner" because they are duplicated into BMD-printed ballots.  Opp. Ex. 48 at 224:18-228:17; Dkt. 1593, J. Dufort Decl., ¶¶ 11-13, Ex. A.

26.    Similar to the secure storage of in-person ballots, absentee ballots are stored securely in a locked box. Ga Comp. R. & Regs. 183-1-14-.14(3)(g).

**Plaintiffs' Response to SMF ¶ 26**

DISPUTED.  The cited evidence does not support the statement of fact.  On

that basis, the Court should not consider it.  LR 56.1(B)(1)(a); *Sumbak*, 2021 WL

1521988, at *1-2.  Ga Comp. R. & Regs. 183-1-14-.14(3)(g) states, "The scanned

absentee ballots shall then be placed in a secured container," not "*stored* securely

in a *locked* box."  Plaintiffs also object to SMF26 because State Defendants'

characterization of regulations of the State of Georgia is legal argument or a legal

conclusion, rather than a statement of material fact in dispute, and the Court should

not consider it.  LR 56.1(B)(1)(c).


27.    The Dominion BMD System also includes a new election

management system ("EMS") for the consolidation and tabulation of results, which

replaced the prior GEMS system used for DREs. Ex. No. 5 at ¶ 43.

**Plaintiffs' Response to SMF ¶ 27**

DISPUTED.    The cited evidence does not support the statement of fact.  On

that basis, the Court should not consider it.  LR 56.1(B)(1)(a); *Sumbak*, 2021 WL

1521988, at *1-2.  Dr. Gilbert's cited declaration recognizes at least some

carryover from the GEMS system to the new EMS regarding "the general

framework of building ballot combinations and ballot data."  SMF Ex. 5 ¶ 43; *see*

*also* SAF No. 53, 56.

28.    There is no software continuity between the two systems that could transmit viruses or malware. Ex. No. (5) at ¶ 43.

**Plaintiffs' Response to SMF ¶ 28**

DISPUTED.  Malware could have been transmitted from the DRE/GEMS system to the BMD system, and persist in the BMD system, in at least three possible ways: (1) through re-use in the BMD system of USB sticks used with the DRE/GEMS system, *see* SAF No. 42, 57-58; (2) through the initial transfer of voter registration data from the GEMS system to the BMD system through E-NET (the voter registration system used with both the GEMS system and BMD system) and continued use of ENET with the BMD system, *see* SAF No. 38, 41; or (3) while the State ran both the GEMS system and BMD system in parallel before completely switching over to the BMD system, *see* SAF No. 56; *see also* SAF No. 52-55.  The State has not produced any evidence that any cybersecurity assessment of Georgia's voting equipment has been conducted or that anyone with any requisite expertise has checked or confirmed that there has been "no software continuity between the two systems"—State Defendants have not allowed their own experts to examine Georgia's BMD system including the Dominion

23

equipment.  *See* SAF No. 127, 186-89, 210.

### C.     The State decertified the defunct DRE system

29.     The Secretary of State issued the order to decertify the DREs on

December 30, 2019. Ex. No. (6) at 2.

**Plaintiffs' Response to SMF ¶ 29**

Undisputed. But the allegation omits a key fact:  that this decertification

order occurred only after the Court enjoined further use of that system for 2020

and beyond in its August 2019 preliminary injunction Order; thus, the

decertification order from the Secretary of State was not of his own volition as may

be implied by the allegation.


30.     The decertification order specifies that nothing in the old DRE system

can be used for any Georgia election, effective January 1, 2020:

> [T]he Accu Vote Voting System, consisting of the Global
> Election Management System (GEMS), Accu-Vote TS
> R6 DRE Voting Station, AccuVote TSX DRE Voting
> Station, AccuVote OS Optical Scanner, Ex-pressPoll
> 4000 Electronic Poll Book, and ExpressPoll 5000
> Electronic Poll Book, can no longer be lawfully used in
> Georgia beginning on January 1, 2020. There-fore, the
> previous certifications for the aforementioned system are
> hereby revoked, and the system is no longer certified for
> use in any primaries or elections in this state.

Ex. No. (6) at 2.

**Plaintiffs' Response to SMF ¶ 30**

Undisputed.  But again the decertification order was compelled by the

Court's August 2019 preliminary injunction Order for 2020 and beyond.

31.     Since the Secretary of State decertified the DREs, no elections in

Georgia have been conducted using the DREs. Ex. No. (3) at ¶ 10.

**Plaintiffs' Response to SMF ¶ 31**

Undisputed.

32.     State Defendants have no intention of using the DREs for any election

in the future. Ex. No. (3) at 11.

**Plaintiffs' Response to SMF ¶ 32**

Undisputed.  But the allegation omits a key fact:  that the Court enjoined

further use of the DREs for 2020 and beyond in its August 2019 preliminary

injunction Order; thus, the State Defendants' "intention" regarding their use "for

any election in the future" is immaterial as they are barred from using the DREs

regardless of their intentions.

25

33.     State Defendants have no legal authority to use the DREs for any election in the future. *See* O.C.G.A. § 21-2-300; *see also* Ex. No. (6) at 2.

**Plaintiffs' Response to SMF ¶ 33**

DISPUTED.  Plaintiffs object to SMF33 because State Defendants' characterization of a Georgia statute is legal argument or a legal conclusion, rather than a statement of material fact in dispute, and the Court should not consider it. LR 56.1(B)(1)(c).  Additionally, the allegation omits a key fact:  that the Court enjoined further use of the DREs for 2020 and beyond in its August 2019 preliminary injunction Order; thus, to the extent "State Defendants have no legal authority to use the DREs for any election in the future," that is because of this Court's August 2019 Order—which still stands today.

34.     The Curling Plaintiffs and the Coalition Plaintiffs agree that the DRE Claims are moot. *See generally* Ex. No. (7); Ex. No. (8) at 6; Ex. No. (9) at 1; Ex. No. (10) at 13; Nov. 11, 2019 Hrg, Ex. No. (11) at 73:09–13.

**Plaintiffs' Response to SMF ¶ 34**

DISPUTED.  Plaintiffs object to SMF34 because the phrase "DRE Claims" is impermissibly vague.  Plaintiffs' DRE Claims, as defined by Coalition Plaintiffs in their Motion to Sever (Opp. Ex. 288 at 1-2) and by Curling Plaintiffs in their

26

Notice of Joinder (Opp. Ex. 289 at 1-2) (the "Motions"), were resolved in

Plaintiffs' favor by an injunction issued by this Court.  (Opp. Ex. 2 at 148; *see also*

Opp. Ex. 288).  Plaintiffs' claims for fees relating to their success on the merits of

the DRE Claims are not moot.  In addition, Plaintiffs' Post-DRE Claims, as

defined in the Motions, are not moot.  Opp. Ex. 288 at 1-2.


**D.    Policy reasons regarding adoption of BMD System**

35.    Both BMDs and hand-marked ballots are certified by the EAC as

voting systems for elections in the United States. *See Voluntary Voting System*

*Guidelines Version 1.0*, at Vol. I, V. 1.l, Section 2.3.1.2, publicly <u>available at</u>

https://www.eac.gov/sites/default/files/document_library/files/VVSG.1.0_Volume

_1.PDF.

**Plaintiffs' Response to SMF ¶ 35**

DISPUTED.  Neither BMDs nor hand-marked paper ballots are "voting

systems" as that term is used by the U.S. Election Assistance Commission and

election officials.   Dkt. 1590-18, Feb. 2023 Marks Decl., Ex. 18, "1. What is a

Voting System?" https://www.eac.gov/documents/2017/10/14/ten-things-know-

about-selecting-voting-system.

Plaintiffs object to SMF35 because the evidence cited does not support that

BMDs and hand-marked ballots are certified by the EAC as voting systems for elections in the U.S., and the Court should not consider it.  LR 56.1(B)(1)(a).

36.    The State of Georgia has used electronic voting for more than two decades, so Georgia voters are already familiar with an electronic in-person voting experience. HR 1699, 154th Gen. Assemb., Reg. Sess. (Ga. 2018) <u>available at</u> https://www.legis.ga.gov/legislation/53941.

**<u>Plaintiffs' Response to SMF ¶ 36</u>**

DISPUTED.  The evidence cited does not support that Georgia voters are already familiar with an electronic in-person voting experience, especially Georgia's current and recently-adopted BMDs, and the Court should not consider it.  LR 56.1(B)(1)(a).  Plaintiffs object to SMF36 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).  The allegation also is vague as to "an electronic in-person voting experience," which could include voting in person by marking a paper ballot by hand and then placing it into an electronic scanner for tabulation.

37.    Hand-marked paper ballots are not an option for many voters with

disabilities. Ex. No. (5) at ¶ 40(A).

**Plaintiffs' Response to SMF ¶ 37**

DISPUTED.  The allegation is vague as to "many," and State Defendants

offer no evidence that "many" voters with disabilities possess a disability that

prevents them from marking a paper ballot by hand, including with the assistance

of a trusted individual at their discretion and choosing.

38.     Without the use of technology, voters with disabilities are unable to

mark paper ballots privately and independently. Ex. No. (5) at 658-3, ¶ 40(A).

**Plaintiffs' Response to SMF ¶ 38**

DISPUTED.  SMF38 is misleading because it implies that BMDs are the only

technology that can accommodate voters with disabilities, or that BMDs

accommodate all voters with disabilities.  State Defendants' broad generalization of

voters with disabilities is false and inappropriate.  BMDs are recommended only for

voters with disabilities that inhibit the private use of hand-marked paper ballots.

Opp. Ex. 97, Dec. 2019 Halderman Decl. ¶¶ 47-48.

39.     A separate system for voters with disabilities results in two systems

that are inherently "separate and unequal." Ex. No. (12) at ¶¶ 8, 13.

**Plaintiffs' Response to SMF ¶ 39**

DISPUTED.  State Defendants' broad generalization of voters with disabilities is false and inappropriate.  The majority of election jurisdictions across the U.S. (representing nearly two-thirds of registered voters) use hand-marked paper ballots as the primary method of voting and provide BMDs exclusively for voters who request them.  Dkt. 1131 ¶ 2; Opp. Ex. 102, Verified Voter Data at 2; Opp. Ex. 97, Dec. 2019 Halderman Decl. ¶ 5; Opp. Ex. 88, Aug. 2021 Halderman Decl. ¶ 23. Sixty-nine percent of the country uses hand-marked paper ballot voting systems with BMDs only for voters who request them.  Opp. Ex. 102, Verified Voter Data at 2.  Voters with disabilities are not required to use BMDs.

Plaintiffs object to SMF39 because the cited statements in Mr. Riccobono's declaration constitute inadmissible hearsay and Mr. Riccobono cannot be compelled to testify at trial.  FRCP 45(c)(1)(A).  SMF39 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should not consider it.  LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.  SMF39 is also legal argument or a legal conclusion, rather than a statement of material fact in dispute, and the Court should not consider it.  LR 56.1(B)(1)(a), (c).

40.    Having only voters with disabilities vote on BMDs can result in the

loss of the right to vote by secret ballot. Using BMDs only for voters with disabilities can create a greater risk to election security than using BMDs more broadly. Ex. No. (12) at ¶¶ 9, 11.

**Plaintiffs' Response to SMF ¶ 40**

DISPUTED.  State Defendants' broad generalization of voters with disabilities is false and inappropriate. Having BMDs only for voters with disabilities does not result in the loss of the right to vote by secret ballot, with appropriate procedures. Opp. Ex. 97, Dec. 2019 Halderman Decl. ¶ 36.  The vast majority of jurisdictions around the country that use BMDs use them only for voters who need or request them.  Opp. Ex. 97, Dec. 2019 Halderman Decl. ¶¶ 47-48; Dkt. 1131 ¶ 2; Opp. Ex. 102, Verified Voter Data at 2.  Requiring BMD use by all in-person voters results in some voters with disabilities, such as people who use wheelchairs or walkers, losing their right to vote by secret ballot, which they would have in a hand-marked paper voting system.  Dkt. 1597, Feb. 2023 Nakamura Decl. ¶ 22 (noting after observing hundreds of voters at BMDs in multiple counties that a seated person has no privacy at all); Dkt. 1596, Feb. 2023 Throop Decl. ¶ 24 (because of the great size and electrical demands of BMDs, the wheelchair and walker accessible BMD is often located in the least private location in the polling place).  Moreover, voting on a BMD can result in the loss of right to vote by secret ballot for any voter.  *See,*

31

*e.g.*, Dkt. 1590-1, Feb. 2023 Marks Decl., Ex. 1 at 3; *see* also Plaintiffs' Response to SMF48.

Using BMDs only for voters with disabilities also does not create a greater risk to election security than using BMDs more broadly.  Opp. Ex. 97, Dec. 2019 Halderman Decl. ¶ 36.  Instead, using BMDs for all voters "leads to greatly increased risks for all voters—including the disabled—that their right to vote will be subverted by an attack on the BMDs." *Id*. ¶ 35.  Reserving BMDs for voters that need or request them (as in most jurisdictions that use BMDs) reduces the risk of an outcome-changing attack in any given election because, the fewer BMDs that are used, the fewer vector points there are available to steal votes and hack an election, which translates to greater election security and accuracy.  SMF Ex. 59, Appel Report ¶¶ 22, 84-85; *see also* Opp. Ex. 56, Appel Dep. at 76:20-77:5; Opp. Ex. 88, Aug. 2021 Halderman Decl. ¶ 23.

Plaintiffs object to SMF40 because the cited statements in Mr. Riccobono's declaration constitute inadmissible hearsay and Mr. Riccobono cannot be compelled to testify at trial.  FRCP 45(c)(1)(A).  SMF40 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should not consider it.  LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.  Plaintiffs also object to SMF40 because Mr. Riccobono, the President of the National

Federation for the Blind, (SMF Ex. 12, originally filed at Dkt. 658-4), does not state that he has any expertise in election security or that he is an expert in election security. His opinion testimony relating to election security is therefore inadmissible.

41. BMD-marked paper ballots provide clear voter intent, unlike hand-marked ballots, where voters often circle or "x" through selections instead of filling in bubbles. Deposition of L. Ledford, Ex. No. (13) at 37:8-38:4, 49:8-22; Ex. No. (14) at 262:11-20; Ex. No. (5) at ¶ 39(C).

**Plaintiffs' Response to SMF ¶ 41**

DISPUTED. BMD-marked paper ballots do not provide evidence of voter intent. *See* SAF No. 87-94, 97. Hand-marked paper ballots, on the other hand, do provide evidence of voter intent with respect to the markings the voters themselves made on their own ballots. *See* SAF No. 98. Election officials also have options to help protect voters using hand-marked paper ballots from their own mistakes. *See* SAF No. 99.

42. A voter's mark may be evidence of the intention of a voter to cross-out or circle a candidate in disregard of the ballot's instructions. Ex. No. (5) at

¶ 53.

**Plaintiffs' Response to SMF ¶ 42**

Undisputed.

43.     When a ballot is scanned into a Dominion optical scanner, whether that ballot is hand-marked or marked by a BMD, the scanner creates a digital image of the front and back of the ballot. Ex. No. (4) at ¶ 10.

**Plaintiffs' Response to SMF ¶ 43**

DISPUTED.  Plaintiffs object to SMF43 because Dr. Coomer's declaration constitutes inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial.  FRCP 45(c)(1)(A).  Plaintiffs also object to SMF43 because Dr. Coomer was not timely designated as an expert witness.  LR 26.2(C).  SMF43 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should not consider it.  LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.

44.     The tabulating software also adds a feature called an "AuditMark" to each image. Ex. No. (4) at ¶ 10.

**Plaintiffs' Response to SMF ¶ 44**

DISPUTED.  Plaintiffs object to SMF44 because Dr. Coomer's declaration constitutes inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial.  FRCP 45(c)(1)(A).  Plaintiffs also object to SMF44 because Dr. Coomer was not timely designated as an expert witness.  LR 26.2(C).  SMF44 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should not consider it.  LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.

45.    The AuditMark is a text representation of how the tabulating software interpreted the ballot when it was scanned. Ex. No. (4) at ¶ 10.

**Plaintiffs' Response to SMF ¶ 45**

DISPUTED.  Plaintiffs object to SMF45 because Dr. Coomer's declaration constitutes inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial.  FRCP 45(c)(1)(A).  Plaintiffs also object to SMF45 because Dr. Coomer was not timely designated as an expert witness.  LR 26.2(C).  SMF45 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should not consider it.  LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.

46.    That scanned image can later be used as part of an audit of the election. Ex. No. (4) at ¶ 10.

**Plaintiffs' Response to SMF ¶ 46**

DISPUTED.    The scanned image cannot be reliably used for an audit because malware on the scanner (or EMS) can manipulate the scan and the AuditMark.  Dkt. 1590-2, Feb. 2023 Marks Decl., Ex. 2 at 1; Opp. Ex. 55, Nov. 2021 Halderman Dep. at 101:6-17.  Also, a large fraction of counties fail to retain ballot images such that they could be used as part of an audit as a defense against BMD-based cheating.  Opp. Ex. 88, Aug. 2021 Halderman Decl. ¶ 22; Opp. Ex. 55, Nov. 2021 Halderman Dep. at 99:21-100:2; Opp. Ex. 290 ¶¶ 1-3 (Fulton County did not preserve ballot images from in-person voting for the June 19, 2020, August 2020, and November 3, 2020 elections); Opp. Ex. 291; Dkt. 1590-17, Feb. 2023 Marks Decl., Ex. 17 at 19 (Cobb County did not preserve ballot images from the November 3, 2020 election).  Furthermore, original ballots, not ballot images, are required for post-election audits.  *See* Opp. Ex. 225, Sept. 2018 Stark Decl., ¶ 36; Dkt. 1590-2, Feb. 2023 Marks Decl., Ex. 2 at 1.

Plaintiffs object to SMF46 because Dr. Coomer's declaration constitutes inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial.  FRCP

45(c)(1)(A).  Plaintiffs also object to SMF46 because Dr. Coomer was not timely

designated as an expert witness.  LR 26.2(C).  SMF46 is therefore not supported by

a citation to evidence that could be presented in admissible form at trial, and the

Court should not consider it.  LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.


47.    Each AuditMark includes only (1) what tabulating unit scanned the

ballot and (2) a randomized sequence number. Ex. No. (4) at ¶ 10.

**Plaintiffs' Response to SMF ¶ 47**

DISPUTED.  The AuditMark sequence numbers are not randomized.  Dkt.

1590-1 at 3, Feb. 2023 Marks Decl., Ex. 1 at 3.  "When a ballot is cast on an ICP

or ICE, the tabulator assigns it a *random-looking* 'record ID' number.  Dominion's

EMS software later reshuffles the data from the ballots to mask the order in which

they were cast, but each ballot is still labeled with the original record ID.  The

vulnerability is that the ICP and ICE are flawed such that they assign ballot record

IDs in a predictable manner.  This allows anyone to use the record IDs in CVRs

[Cast Vote Records] or ballot image filenames to determine the order in which the

ballots were scanned."  *Id*. (emphasis added); Dkt. 1589-11, Feb. 2023 Stark Decl.,

Ex. 11; SMF Ex. 55, ¶¶ 23-29; SMF. Ex. 44, Dec. 2022 Stark Decl. ¶¶ 23-29.  Dr.

Halderman notified the State of this privacy vulnerability ("the DVSorder

vulnerability") on October 11, 2022.  Dkt. 1590-1, Feb. 2023 Marks Decl., Ex. 1 at

2.

In addition, each AuditMark also shows the tabulator's interpretation of each

vote.  *See* Dkt. 1590-15 at 4, Feb. 2023 Marks Decl., Ex. 15 at 4.

Plaintiffs object to SMF47 because Dr. Coomer's declaration constitutes

inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial.  FRCP

45(c)(1)(A).  Plaintiffs also object to SMF47 because Dr. Coomer was not timely

designated as an expert witness.  LR 26.2(C).  SMF47 is therefore not supported by

a citation to evidence that could be presented in admissible form at trial, and the

Court should not consider it.  LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.

48.    There is no way to correlate the sequence number to an individual

voter or any point in time that the ballot was cast. Ex. No. (4) at ¶ 10.

**Plaintiffs' Response to SMF ¶ 48**

DISPUTED.  "When [CVRs and ballot images are] produced from ICP or

ICE tabulators, the DVSorder vulnerability makes it possible for anyone to

unshuffle the ballots and learn the order in which they were cast.  In some

scenarios, knowing the order could make it possible to identify individuals' ballot

and determine how they voted."  Dkt. 1590-1, Feb. 2023 Marks Decl., Ex. 1 at 3.

Additionally, "[s]ome localities publish scanner log files (slog.txt) from the ICP or ICE. Although these logs by themselves post little risk to privacy, they can be combined with the DVSorder vulnerability to determine the exact time that each CVR or ballot image was cast (subject to the accuracy of the scanner's internal clock). This provides an additional route to identify voters' ballots." *Id*. at 4-5; Dkt. 1590-15 Feb. 2023 Marks Decl. at 4; Dkt. 1590-1, Feb. 2023 Marks Decl., Ex. 1 at 4-5; see also Dkt. 1589-10, Feb. 2023 Stark Decl., Ex. 10 at 4. Furthermore, election insiders have another method to determine the order in which ballots are cast for purposes of connecting the ballot image to the voter. "█████████████

████████████████████████████████████████████████████

██████████." Dkt. 1131 at 56.

Plaintiffs object to SMF48 because Dr. Coomer's declaration constitutes inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial. FRCP 45(c)(1)(A). Plaintiffs also object to SMF48 because Dr. Coomer was not timely designated as an expert witness. LR 26.2(C). SMF48 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should not consider it. LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.

49.    The optical scanner does not store any date or time-stamp information

with the ballot image. Ex. No. (4) at ¶ 10.

**Plaintiffs' Response to SMF ¶ 49**

DISPUTED.  "█████████████████████████████████

███."  Dkt. 1131 at 56.  The ICP also records (in a log file on the same card) the

time that each ballot was cast.  Dkt. 1590-1, Feb. 2023 Marks Decl., Ex. 1 at 4-5;

*see also* Dkt. 1590-15, Feb. 2023 Marks Decl., Ex. 15 at 4.  "Some localities

publish scanner log files (slog.txt) from the ICP or ICE.  Although these logs by

themselves pose little risk to privacy, they can be combined with the DVSorder

vulnerability to determine the exact time that each CVR or ballot image was cast

(subject to the accuracy of the scanner's internal clock).  This provides an

additional route to identify voters' ballots."  Dkt. 1590-1, Feb. 2023 Marks Decl.,

Ex. 1 at 4-5; *see also* Dkt. 1590-15, 2023 Marks Decl., Ex. 15 at 4.

Plaintiffs object to SMF49 because Dr. Coomer's declaration constitutes

inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial.  FRCP

45(c)(1)(A).  Plaintiffs also object to SMF49 because Dr. Coomer was not timely

designated as an expert witness.  LR 26.2(C).  SMF49 is therefore not supported by

a citation to evidence that could be presented in admissible form at trial, and the

Court should not consider it.  LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.

50.     In short, it is impossible to re-recreate the sequence of the order in which the ballots were cast—meaning it is impossible to determine how someone voted. Ex. No. (4) at ¶ 10.

**Plaintiffs' Response to SMF ¶ 50**

DISPUTED.  It is possible to re-create the sequence of the order in which ballots were cast on Dominion ICPs to determine how someone voted.  "When [CVRs and ballot images are] produced from ICP or ICE tabulators, the DVSorder vulnerability make it possible for anyone to unshuffle the ballots and learn the order in which they were cast.  In some scenarios, knowing the order could make it possible to identify individuals' ballots and determine how they voted."  Dkt. 1590-1, Feb. 2023 Marks Decl., Ex. 1 at 3; *see also* Dkt. 1589-10, Feb. 2023 Stark Decl., Ex. 10 at 4.

Plaintiffs object to SMF50 because Dr. Coomer's declaration constitutes inadmissible hearsay and Dr. Coomer cannot be compelled to testify at trial.  FRCP 45(c)(1)(A).  Plaintiffs also object to SMF50 because Dr. Coomer was not timely designated as an expert witness.  LR 26.2(C).  SMF50 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should not consider it.  LR 56.1(B)(1); *Pritchard*, 92 F.3d at 1135.

51.     Further, the paper ballots jumble in the ballot box, making the precise

order in which they were cast unknowable. Ex. No. (15) at ¶ 7.

**Plaintiffs' Response to SMF ¶ 51**

DISPUTED.   The precise order in which ballots were cast is knowable.

"When a ballot is cast on a Dominion ICP or ICE scanner, it is assigned [and

labeled with] a random-looking 'record ID' number, which uniquely identifies

each ballot within a batch from a particular machine."  Dkt. 1589-10, Feb. 2023

Stark Decl., Ex. 10 at 4; *see also* Dkt. 1590-1, Feb. 2023 Marks Decl., Ex. 1 at 3.

"Unfortunately the Dominion ICP and ICE scanner software is flawed such that

ballot record IDs are assigned in a predictable manner.  This allows anyone to

unshuffle the ballot images or cast vote records and learn the order in which they

were cast."  Dkt. 1589-10, Stark Decl., Ex. 10 at 3; *see also* Dkt.1590-1, Feb. 2023

Marks Decl., Ex. 1 at 3.  Also, "████████████████████████████

████████████"  Dkt. 1131 at 56.


52.     The State of Georgia's ENET database maintains records

demonstrating a voter's voting history, including which elections they voted in and

the method they chose to vote in those elections. Ex. No. (3) at ¶¶ 12, 14-21.

**Plaintiffs' Response to SMF ¶ 52**

DISPUTED.  The E-NET database has been phased out and no longer maintains records demonstrating a voter's voting history.  Dkt. 1590-14, Feb. 2023 Marks Decl., Ex. 14 at 2.  Plaintiffs object to SMF52 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


## II.    THE PLAINTIFFS IN THIS LAWSUIT

### A.    Donna Curling

53.    Donna Curling is a resident of Fulton County, Georgia. D. Curling Dep., Ex. No. (16) at 125:10-16.

**Plaintiffs' Response to SMF ¶ 53**

Undisputed.


54.    Curling has no formal training in election law, election administration, computer security, or cybersecurity. Ex. No. (16) at 29:10-18, 30:1-4.

**Plaintiffs' Response to SMF ¶ 54**

Plaintiffs object to SMF54 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not

consider it.  LR 56.1(B)(1).


55.    Curling has not had any formal training on either Georgia's former Diebold DRE election system or the current Dominion BMD election system. Ex. No. (16) at 31:25-32:7.

**Plaintiffs' Response to SMF ¶ 55**

Plaintiffs object to SMF55 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


56.    Curling has never worked at a polling place, for a campaign, or received any formal training relating to absentee ballots. Ex. No. (16) at 29:10-25.

**Plaintiffs' Response to SMF ¶ 56**

Plaintiffs object to SMF56 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


57.    Curling voted in at least the November 8, 2016 General Election (the "2016 General Election"), the April 18, 2017 6th Congressional District Special

Election ("Special Election"), the June 20, 2017 6th Congressional District Runoff

Election ("Runoff"), the May 2018 and November 2018 General Elections, and the

2020 General Election (the "2020 General Election"). Ex. No. (17) at 5-7; *see also*

D. Curling ENET Report, Ex. No. (18) at 2.

**Plaintiffs' Response to SMF ¶ 57**

DISPUTED.  Ms. Curling's cast ballot for the June 20, 2017 runoff election,

did not count.  Dkt. 1598, Feb. 2023 Curling Decl. ¶¶ 7-8; Dkt. 260-4, Aug. 2018

Curling Decl. ¶ 11; Opp. Ex. 228, Curling Dep. at 124:12-15.

58.    Since the filing of this suit, and up until her deposition on January 19,

2022, Curling voted in 10 elections, and her votes were counted in each of those

elections. Ex. No. (18) at 2.

**Plaintiffs' Response to SMF ¶ 58**

DISPUTED.  Ms. Curling's cast ballots for at least the following elections

did not count:  June 20, 2017, runoff election and the August 11, 2020 election.

Dkt. 1598, Feb. 2023 Curling Decl. ¶¶ 7-8, 10; SMF Ex. 18, D. Curling ENET

Report at 2; Dkt. 260-4, Aug. 2018 Curling Decl. ¶ 11; Opp. Ex. 228, Curling Dep.

at 124:12-15.

59.     For the November 6, 2017 General Election, Curling voted in person on a DRE voting machine. Ex. No. (18) at 2.

**Plaintiffs' Response to SMF ¶ 59**

Undisputed.


60.     For the May 22, 2018 General Primary Election, Curling voted in person on a DRE voting machine. Ex. No. (18) at 2.

**Plaintiffs' Response to SMF ¶ 60**

Undisputed.


61.     For the July 24, 2018 General Primary Runoff Election, Curling voted in person on a DRE voting machine. Ex. No. (18) at 2.

**Plaintiffs' Response to SMF ¶ 61**

Undisputed.


62.     For the November 6, 2018 General Election, Curling voted by absentee ballot. Ex. No. (18) at 2.

**Plaintiffs' Response to SMF ¶ 62**

Undisputed.

63.    For the December 4, 2018 General Election Runoff, Curling voted by absentee ballot. Ex. No. (18) at 2.

   **Plaintiffs' Response to SMF ¶ 63**

   Undisputed.

64.    For the November 5, 2019 General Election, Curling voted in person on a DRE voting machine. Ex. No. (18) at 2.

   **Plaintiffs' Response to SMF ¶ 64**

   Undisputed.

65.    For the December 3, 2019 General Election Runoff, Curling voted in person on a DRE voting machine. Ex. No. (18) at 2.

   **Plaintiffs' Response to SMF ¶ 65**

   Undisputed.

66.    For the June 9, 2020 General Primary Election, Curling voted by absentee ballot. Ex. No. (18) at 2.

**Plaintiffs' Response to SMF ¶ 66**

Undisputed.


67.     For the November 3, 2020 General Election, Curling voted by absentee ballot. Ex. No. (18) at 2.

**Plaintiffs' Response to SMF ¶ 67**

Undisputed.


68.     For the January 5, 2021 General Election Runoff, Curling voting by absentee ballot. Ex. No. (18) at 2.

**Plaintiffs' Response to SMF ¶ 68**

Undisputed.


69.     Curling intends to vote in all future elections. Ex. No. (16) at 33:12-15.

**Plaintiffs' Response to SMF ¶ 69**

Undisputed.


70.     In the early 2000s, Curling volunteered with a group known as Vote

Trust USA. The organization worked with at least one member of the United States House of Representatives to pass legislation to impose a federal ban on DREs. At that time, Plaintiff Curling met Dr. Alex Halderman. Ex. No. (16) at 11:19-23, 12:4-10, 11:22-23.

**Plaintiffs' Response to SMF ¶ 70**

Plaintiffs object to SMF70 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

71.   Vote Trust USA and Curling's opposition to DREs was that the devices presented "no paper trail, and that it was software dependent, and you were literally putting your vote into a black box and assuming, hoping that it would be counted as you cast it, but there were no guarantees and there was no fall-back to verify." Ex. No. (16) at 13:2-8.

**Plaintiffs' Response to SMF ¶ 71**

Plaintiffs object to SMF71 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

72.     Curling currently serves, on a volunteer basis, as the legislative liaison for Georgians for Verified Voting. The only members of Georgians for Verified Voting are Plaintiff Curling and Plaintiff Donna Price. Ex. No. (16) at 34:15, 35:11-12, 35:8-10.

**Plaintiffs' Response to SMF ¶ 72**

Plaintiffs object to SMF72 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

73.     According to Curling, Georgians for Verified Voting's mission to inform voters on the "flaws in [the DRE] system and to encourage them to vote on hand-marked paper ballots so that there would be a record of their vote." Ex. No. (16) at 35:15-19.

**Plaintiffs' Response to SMF ¶ 73**

Plaintiffs object to SMF73 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

74.     By January 2022, Curling could not remember what "was the injury

50

that led [her] to file the third amended complaint." Ex. No. (16) at 95:7-14.

**Plaintiffs' Response to SMF ¶ 74**

DISPUTED.  SMF74 mischaracterizes Ms. Curling's testimony.  In a later SMF, State Defendants acknowledge that Ms. Curling could remember her injury. *See* SMF444 ("Having described her injury as a lack of confidence in her vote…").  Throughout Ms. Curling's deposition she repeatedly described her injuries that led to filing the TAC, including that she was disenfranchised in two elections, *id.* at 74:18-19, the BMD system is subject to manipulation, *Id.* at 83:15, and when she votes on a BMD she has no idea if her vote counted.  *Id.* at 42:24-43:4.  For example, she testified, "I have no idea if my vote counted or was not counted.  That's my injury."  *Id.* at 99:22-23.  *See also* SAF No. 405-421; Plaintiffs' Responses to SMF75, SMF82, SMF83.

Plaintiffs also object to SMF74 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


75.    Curling claims that losing "faith in the system" causes people not to choose not to vote and, therefore, violates voting rights. Ex. No. (16) at 73:15-23.

**Plaintiffs' Response to SMF ¶ 75**

DISPUTED.  SMF75 mischaracterizes Ms. Curling's testimony.  State Defendants' counsel asked her to explain the meaning of a particular sentence in the TAC: "this case is about forcing voters to choose between totally relinquishing their right to vote and acquiescing to cast their vote despite very real risks; the risk that their vote will not be properly counted; the risk that the declared results will be contrary to the will of voters, the risk that there will be no way to verify the validity of the election."  Opp. Ex. 228, Curling Dep. at 73:15-18; TAC ¶ 8.  Ms. Curling testified that by that sentence she meant "if you have no faith in the system that you're using, then it's the same thing as if, okay, I – I don't believe – I don't believe the system can accurately reflect my vote, so, therefore, I just won't vote." Opp. Ex. 228, Curling Dep. at 73:15-23.

Plaintiffs also object to SMF75 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


76.     Curling also identified her injury as having a "lack of confidence in [her] vote," because Georgia's Election System is not, for Curling at least, sufficiently "transparent." Ex. No. (16) at 92:8-22, 96:6-10.

**Plaintiffs' Response to SMF ¶ 76**

DISPUTED.  SMF76 mischaracterizes Ms. Curling's testimony.  Her testimony was that she lacks confidence in BMDs, not in her vote.  While in the cited portion of Ms. Curling's deposition she stated, "So like even an audit isn't going to guarantee me that my vote counts, and this is about my vote and my lack of confidence in my vote," Opp. Ex. 228, Curling Dep. at 92:19-22, she testified more fully that what she lacks is confidence that BMDs will be accurately count her vote because the BMD system lacks transparency.  *Id*. at 67:1-3, 67:7-95:25-96:10.  Through declarations in this case, Ms. Curling similarly stated that she "ha[s] no confidence that [the machines] will accurately record, transmit, and count [her] vote."  Opp. Ex. 293, Oct. 2019 Curling Decl. ¶ 7.

Plaintiffs object to SMF76 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

77.    This lack of transparency Curling describes apparently focuses on "software programming in the machines" that Curling cannot see, and therefore feels that she will be "screwed" by the technology. Ex. No. (16) at 113:3-16; Ex. No. (19) at 1.

53

**Plaintiffs' Response to SMF ¶ 77**

DISPUTED.  SMF77 mischaracterizes Ms. Curling's testimony.  In the question cited by SMF77, Ms. Curling was asked what she meant by a particular sentence in an email where she explained what could cause a hand-marked absentee ballot to be rejected and she gave advice on how to complete the ballot so that the machines would not reject it.  In her email Ms. Curling wrote, "I still worry we will get screwed here bc of the machines, but I don't think they will be rejecting ballots for simple things.  But who knows.  It is terrible to have so little faith but it has been earned."  SMF Ex. 19 at 1.  She explained that by that sentence she meant she worried about the software programming in the machines because the system was not transparent.  Opp. Ex. 228, Curling Dep. at 113:13-16.

Plaintiffs object to SMF77 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

78.    Plaintiff Curling later said her injury was not knowing if her vote were counted as cast. Ex. No. (16) at 99:16-23, 102:6-12 (identifying the lack of knowledge as a due process violation).

**Plaintiffs' Response to SMF ¶ 78**

DISPUTED.  SMF78 mischaracterizes Ms. Curling's testimony.  Ms.

Curling described additional ways her right to vote had been injured as a result of

Georgia's election system.  She was disenfranchised in two elections.  Opp. Ex.

228, Curling Dep. at 74:18-19.  The BMD system is deficient.  *Id*. at 73:15-23;

83:15; 95:25-96:10, 99:16-23, 102:6-12.  Problems with the BMD system result in

voters relinquishing their right to vote.  *Id*. at 73:15-23 ("[I]f you have no faith in

the system that you're using, then it's the same thing as if, okay, I – I don't believe

the – I don't believe the system can accurately reflect my vote, so, therefore, I just

won't vote.").

Plaintiffs object to SMF78 as immaterial because it is not cited in, and State

Defendants do not rely on it in, their briefs.  The Court therefore should not

consider it.  LR 56.1(B)(1).

79.    Curling's lack of knowledge is the basis of her claim that Georgia's

Election System violates the Due Process Clause as alleged in Count III. Ex. No.

(16) at 101:22-102:12.

**Plaintiffs' Response to SMF ¶ 79**

DISPUTED.  SMF79 mischaracterizes Ms. Curling' testimony.  When

asked, in connection with Count III of the TAC, "Can you explain to me your understanding of what the violation of the due process clause is?," which was objected to because it called for a legal conclusion, Ms. Curling responded: "Right to vote."  She was then asked, "And your right to vote – how is your right to vote injured as a result of Georgia's use of the proposed election system as alleged in the complaint?"  Ms. Curling answered: "Because I don't know if my vote is counted as I cast my vote."  Throughout Ms. Curling's deposition, she described additional ways her right to vote had been injured as a result of Georgia's election system, including being disenfranchised in two elections.  *See* SAF No. 405-421.

Plaintiffs object to SMF79 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1)(a).

80.    Curling acknowledged that she would also not have any idea if her vote were counted if she used a hand marked paper ballot with an optical scanner. Ex. No. (16) at 99:25-100:3.

**Plaintiffs' Response to SMF ¶ 80**

DISPUTED.  SMF80 mischaracterizes Ms. Curling's testimony.  Ms. Curling said she would have confidence using hand-marked paper ballots scanned

by a scanner as long as there were risk-limiting audits.  Opp. Ex. 228, Curling Dep. at 45:14-17.  Multiple times she stated that she is not opposed to hand-marked paper "ballots being counted on a machine or tabulated on a machine" "[a]s long as there were risk-limiting audits."  *Id*. at 48:13-22, *id*. at 77:2-6.  She also testified that her requested relief is hand-marked paper ballots and risk-limiting audits.  *Id*. at 46:5-8.

Plaintiffs also object to SMF80 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

81.    Voting causes Curling "anxiety," because she does not trust the machines and finds the absentee-ballot request process cumbersome. Ex. No. (16) at 111:20-112:8; *see also* Ex. No. (19).

**Plaintiffs' Response to SMF ¶ 81**

Plaintiffs object to SMF81 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

82.    When asked about her Equal Protection Claim (Count IV), Curling could not identify anyone who was treated differently as a result of the way that

Georgia conducts elections. Ex. No. (16) at 102:22-25.

**Plaintiffs' Response to SMF ¶ 82**

DISPUTED.  SMF82 mischaracterizes Ms. Curling's testimony.  In response to the question, "Who is treated differently as a result of the way that Georgia conducts elections?," Ms. Curling testified, "I don't know.  I don't know the answer to these questions."  Opp. Ex. 228, Curling Dep. at 102:22-25.  But Ms. Curling repeatedly described how voters are treated unequally as a result of the way Georgia conducts elections.  In response to the question, "why is it not equal?," Ms. Curling replied, "because the people who vote by absentee ballots can verify their vote."  *Id*. at 107:15-17; 112:21-24; 47:2-4.  She also testified that voting absentee can be anxiety provoking because of "the exercise of getting an absentee ballot."  *Id*. at 111:24-112:3.  The Secretary of State's office can be "incredibly late" in mailing ballots, *id*. at 112:3-12, including mailing them so they arrive the Monday before election day.  *Id*. at 112:18-113:1.  In contrast, people who vote on BMD machines cannot verify their votes.  "I could see what the printed out said my vote was as I intended; but I have no idea, when I put into the scanner, the scanner read the QR code."  *Id*. at 43:10-13.  People who vote on BMDs also have "no way to know if [their] vote is counted as cast because [their] vote is translated into a QR code, which is not human readable."  *Id*. at 41:10-12.

58

Plaintiffs object to SMF82 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

83.     Later, she claimed that the Georgia elections are not equal because persons, like her, who vote by absentee ballots can verify their votes. Ex. No. (16) at 107:15-17.

### Plaintiffs' Response to SMF ¶ 83

DISPUTED.  *See* Plaintiffs' Response to SMF82.  In addition, Ms. Curling does not exclusively vote by absentee ballot.  *See supra* SMFs 59-61, 64-65.

Plaintiffs also object to SMF83 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

84.     Curling cannot identify any Georgia voter whose constitutional rights were violated by the conduct of the presidential election in November 2020. Ex. No. (16) at 79:9-15.

### Plaintiffs' Response to SMF ¶ 84

DISPUTED.  SMF84 mischaracterizes Ms. Curling's testimony.  In response

to the question, "Do you believe that the presidential election from November of 2020 violated anyone's constitutional rights?," Ms. Curling testified, "Not that I know of." Opp. Ex. 228, Curling Dep. at 79:9-15. However, Ms. Curling described in detail the anxiety she suffered in casting a ballot in the November general election because she does not trust BMDs. *Id*. at 111:24-113:1; 112:11-12.

Plaintiffs object to SMF84 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs. The Court therefore should not consider it. LR 56.1(B)(1). Plaintiffs also object to SMF84 because it calls for a legal conclusion, rather than a statement of material fact in dispute, and the Court should not consider it. LR 56.1(B)(1)(c).

85.    Curling has no knowledge of a "systematic attack" on a Georgia election. Ex. No. (16) at 87:3-8.

### **Plaintiffs' Response to SMF ¶ 85**

DISPUTED. SMF85 mischaracterizes Ms. Curling's testimony. Ms. Curling was asked, "do you believe that there has been a systemic attack on any Georgia election," which was objected to as speculative, and she replied, "I have no way of knowing either way." Opp. Ex. 228, Curling Dep. at 87:3-6. Earlier in her deposition, Ms. Curling testified about a breach of Georgia's election system.

60

She was asked about a statement from her August 7, 2018 declaration: "I am afraid that my vote will not be counted equally in the upcoming November 2018 midterm election, particularly in light of the active attempts to hack Georgia's system by Russia and others." *Id*. at 35:20-37:9; *see also* Dkt. 260-4, Aug. 2018 Curling Decl. ¶ 4.  Ms. Curling said she made that declaration because "in January or February of 2017 I read about a breach in the system at KSU and knew that the system – the database had been left open to the public for – I don't think it's ever been determined how long the system was just out there and open."  Opp. Ex. 228, Curling Dep. at 36:16-20.  "[T]he system was open and – I mean, based on the things that I had read, I felt like Russia was a possibility; but it also says and others.  I mean, the bottom line is the system was not secure, it was open, and there easily could have been attempts to hack the system."  *Id*. at 37:4-9*; see also* Plaintiffs' Response to SMF342.

Plaintiffs also object to SMF85 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

86.    But she believes that no one could ever prove that a systemic attack did *not* occur. Ex. No. (16) at 87:3-9.

**Plaintiffs' Response to SMF ¶ 86**

DISPUTED.  SMF86 misrepresents Ms. Curling's testimony.  Ms. Curling

testified that she has "no way of knowing either way" whether "there has been a

systemic attack on any Georgia election.  Opp. Ex. 228, Curling Dep. at 87:3-6.

When asked, "How could one prove to you that there has not been a systemic

attack on a Georgia election?," she said, "They probably could not."  Opp. Ex. 228,

Curling Dep. at 87:7-9.

Plaintiffs also object to SMF86 as immaterial because it is not cited in, and

State Defendants do not rely on it in, their briefs.  The Court therefore should not

consider it.  LR 56.1(B)(1).


87.    Similarly, no evidence could satisfy Curling that Georgia's election

system has *not* been hacked. Ex. No. (16) at 89:21-24.

**Plaintiffs' Response to SMF ¶ 87**

Plaintiffs object to SMF87 as immaterial because it is not cited in, and State

Defendants do not rely on it in, their briefs.  The Court therefore should not

consider it.  LR 56.1(B)(1).


88.    Plaintiff Curling does not know whether the "scanners used in the

Dominion system, or the current voting system are reliable, accurate, and capable of secure operation as required by law." Ex. No. (16) at 91:25-92:6.

### **Plaintiffs' Response to SMF ¶ 88**

DISPUTED.  SMF88 is incomplete and inaccurate because, when Ms. Curling was deposed, she had not had, and still has not had, access to Dr. Halderman's July 1, 2021, report (the "July 2021 Halderman Report"), a 26,000-word security analysis of Georgia's BMD voting system, Dkt. 1131 at 5, 19, which was filed under seal pursuant to a motion by State Defendants. *See* Opp. Ex. 132.  SMF88 also mischaracterizes Ms. Curling's testimony.  She testified in response to a follow-up question, "keep in mind that a lot of the things that have been discovered are not known to me.  They're sealed.  I don't know what the experts found, but I know specifically that – that something was found with Dominion system.  And so that makes me reluctant to say whether I would or would not be happy with the Dominion scanner."  Opp. Ex. 228, Curling Dep. at 94:13-19.

Plaintiffs also object to SMF88 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).  Additionally, Plaintiffs object to SMF88 because it calls for an expert or legal conclusion, rather than a statement of material fact in

dispute, and the Court should not consider it.  LR 56.1(B)(1)(c).

89.     Curling had no issue with the existing scanners used in Georgia's
Election System. Ex. No. (16) at 94:12-14.

**Plaintiffs' Response to SMF ¶ 89**

DISPUTED.  SMF89 is incomplete and inaccurate because, when Ms.
Curling was deposed, she had not had, and still has not had, access to the July 2021
Halderman Report.  SMF89 mischaracterizes Ms. Curling's testimony.  She did not
testify that she had "no issue" with the existing scanners.  The question asked was,
"*would you be satisfied* if [hand-marked paper ballots] were scanned on the
existing Dominion systems?"  Opp. Ex. 228, Curling Dep. at 94:10-11 (emphasis
added).  And her testimony was, "I don't think it makes any difference which
scanner is used [for hand-marked paper ballots], but keep in mind that a lot of the
things that have been discovered are not known to me.  They're sealed.  I don't
know what the experts found, but I know specifically that – that something was
found with Dominion system.  And so that makes me reluctant to say whether I
would or would not be happy with the Dominion scanner."  *Id*. at 94:6-19.

Plaintiffs also object to SMF89 as immaterial because it is not cited in, and
State Defendants do not rely on it in, their briefs.  The Court therefore should not

consider it.  LR 56.1(B)(1).

90.     During Curling's deposition, she stated that, other than information

provided to her by her legal counsel, she reviewed no information to familiarize

herself with the Dominion voting equipment now utilized in Georgia. Ex. No. (16)

at 40:23-41:2.

### Plaintiffs' Response to SMF ¶ 90

Plaintiffs object to SMF90 as immaterial because it is not cited in, and State

Defendants do not rely on it in, their briefs.  The Court therefore should not

consider it.  LR 56.1(B)(1).

91.     Despite this lack of information, Curling believes that the Georgia's

Election System prevents her from "know[ing] if [her] vote is counted as cast

because [her] vote is translated into a QR code, which is not human readable." Ex.

No. (16) at 41:7-12.

### Plaintiffs' Response to SMF ¶ 91

DISPUTED.  SMF91 is inaccurate because it is premised on the incorrect

assumption that Ms. Curling has reviewed no information regarding the Dominion

voting equipment, when the question asked specifically excluded such information

provided to her by her legal counsel.  Curling Dep. 40:23-41:2.

92.     Curling also pled that the Dominion system must be "presumed to be compromised," but she could not explain why.  Ex. No. (17) at ¶ 117; Ex. No. (16) at 98:10-14.

**Plaintiffs' Response to SMF ¶ 92**

DISPUTED.  SMF92 mischaracterizes Ms. Curling's testimony because it ignores that, in the same line of questioning, Ms. Curling testified that the Dominion BMD system must be presumed to be compromised because "the system was breached."  Curling Dep. at 98:1-4.

Plaintiffs object to SMF92 as immaterial because whether and why the Dominion system must be "presumed to be compromised" calls for a legal or expert conclusion, and Ms. Curling's view on that issue is not a statement of material fact in dispute; the Court, thus, should not consider it.  LR 56.1(B)(1)(c).

93.     While the Curling Plaintiffs' Third Amended Complaint cites Texas' voting-systems examiners' conclusions about the Dominion BMDs, Curling has no firsthand knowledge of any of these examiners' concerns coming to fruition in Georgia.  Ex. No. (16) at 85:5-11.

**Plaintiffs' Response to SMF ¶ 93**

DISPUTED.  SMF93 is incomplete and inaccurate because, when Ms.
Curling was deposed, she had not had, and still has not had, access to the July 2021
Halderman Report, and Plaintiffs had not yet discovered certain evidence of the
following Texas examiners' concerns coming to fruition in Georgia: 1) the
DVSorder vulnerability, which makes it possible for anyone to learn the order in
which ballots were cast and, in some scenarios, to identify individuals' ballot and
determine how they voted, Dkt. 1590-1, Feb. 2023 Marks Decl., Ex. 1 at 3; 2) the
fact that the Coffee County ICC workstation could be connected to the Internet,
Opp. Ex. 75, Nov. 2022 Halderman Decl. ¶ 25; 3) a misconfiguration of the BMD
equipment led to inaccurate vote counts in DeKalb County, Dkt. 1590-12, Feb.
2023 Marks Decl., Ex. 12 at 2; and 4) ICX BMDs use commercial off-the-shelf
"Industrial Panel PC" tablets and laser printers, Dkt. 1131 ¶¶ 2.2, 4.2.

Plaintiffs object to SMF93 as immaterial because it is not cited in, and State
Defendants do not rely on it in, their briefs.  The Court therefore should not
consider it.  LR 56.1(B)(1)(a).  Plaintiffs also object to SMF93 as immaterial
because whether Texas' voting-systems examiners' conclusions about the
Dominion BMDs have come to fruition in Georgia is a legal or expert conclusion,
and Ms. Curling's view on that issue is not a statement of material fact in dispute;

the Court, thus, should not consider it.  LR 56.1(B)(1)(c).

94.    Curling also pled that a "vulnerability" of the Dominion BMD's are that "remote attackers [could] implement a DNS attack." (Doc. 627 at 26, ¶ 81.) But she neither knows what a DNS attack is nor if one has actually occurred on the Georgia Election System. Ex. No. (16) at 85:18-23.

**Plaintiffs' Response to SMF ¶ 94**

DISPUTED.  Plaintiffs object to SMF94 because State Defendants failed to cite evidence supporting the statement of fact.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(a); *Sumbak*, 2021 WL 1521988, at *1-2.

Ms. Curling did not plead that a "'vulnerability' of the *Dominion BMDs* are that 'remote attackers [could] implement a DNS attack.'"  The cited portion of the TAC concerns Dominion precinct scanners—not BMDs.  TAC ¶ 81; Opp. Ex. 228, Curling Dep. at 85:12-17.  Ms. Curling was asked and she answered a question about a paragraph of the TAC that concerned precinct scanners, not Dominion BMDs.

Plaintiffs also object to SMF94 as immaterial because what constitutes a DNS attack and whether a DNS attack has occurred on the Georgia Election System is a legal or expert conclusion, and Ms. Curling's view on that issue is not

a statement of material fact in dispute; the Court, thus, should not consider it.  LR

56.1(B)(1)(c).

95.     Curling also pled that the Dominion BMDs could be manipulated to

redirect votes to a different candidate, but here again, Curling has no knowledge of

this occurring. Ex. No. (17) at ¶ 81; Ex. No. (16) at 85:24-86:3.

**Plaintiffs' Response to SMF ¶ 95**

DISPUTED.  Plaintiffs object to SMF95 because State Defendants failed to

cite evidence supporting the statement of fact.  On that basis, the Court should not

consider it.  LR 56.1(B)(1)(a); *Trapp v. Great Expressions Dental Ctrs of Ga.*,

2014 WL 12784474 *12-13 (N.D. Ga. July 16, 2014) (citing LR 56.1(B)(1)(a)

(finding that statements of fact must be supported by citation to evidence).  Ms.

Curling did not plead that "Dominion BMDs could be manipulated to redirect

votes to a different candidate."  She was asked about paragraph 81 of the Curling

TAC, which concerns Dominion precinct scanners—not BMDs.  TAC ¶ 81; Opp.

Ex. 228, Curling Dep. at 85:12-17.

Ms. Curling also did not testify that she had no knowledge "that the

Dominion BMDs could be manipulated to redirect votes to a different candidate."

Instead, she was asked and she answered a question about Dominion precinct

scanners.  *Id* at 85:24-86:2.

Plaintiffs also object to SMF95 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1)(a).  Additionally, Plaintiffs object to SMF95 as immaterial because whether Dominion BMDs can be manipulated to redirect votes to a different candidate is a legal or expert conclusion, and Ms. Curling's view on that issue is not a statement of material fact in dispute; the Court, thus, should not consider it.  LR 56.1(B)(1)(c).

96.    Curling has no knowledge of an actual electronic and/or other intrusion and manipulation of the new BMD Election System by an individual or entity without authorization to do so. Ex. No. (16) at 90:11-16.

**Plaintiffs' Response to SMF ¶ 96**

DISPUTED.  SMF96 is incomplete and inaccurate because, when Ms. Curling was asked the cited question at her January 2022 deposition, Plaintiffs had not yet discovered the unauthorized access that occurred in Coffee County.  *See* SAF No. 252-334.  Plaintiffs also object to SMF96 as immaterial because whether there has been an actual electronic and/or other intrusion and manipulation of the new BMD Election System by an individual or entity without authorization to do

so calls for a legal conclusion or an expert opinion, and Ms. Curling's view on that issue is not a statement of material fact in dispute; the Court, thus, should not consider it.  LR 56.1(B)(1)(c).

97.    Curling pled that the Dominion Election System lacked "minimal and legally required steps to ensure that [it] cannot be operated without authorization … [or] unauthorized tampering," but she does not know what that means. Ex. No. (16) at 90:17-91:13; Ex. No. (17) at ¶ 116.

**<u>Plaintiffs' Response to SMF ¶ 97</u>**

DISPUTED.  SMF97 is incomplete and inaccurate because, when Ms. Curling was deposed in January 2022, she did not have access to the July 2021 Halderman Report, a June 3, 2022 public advisory from the Cybersecurity and Infrastructure Security Agency ("CISA") (*see* Opp. Ex. 146, CISA Advisory, Vulnerabilities Affecting Dominion Voting Systems ImageCast X ("CISA Advisory"), and Plaintiffs had not yet discovered the unauthorized access and tampering in Coffee County in January 2021.  *See* SAF No. 252-334.  Plaintiffs also object to SMF97 as immaterial because whether the Dominion Election System lacks minimal and legally required steps to ensure that it cannot be operated without authorization or unauthorized tampering calls for a legal

conclusion or an expert opinion, and Ms. Curling's view on that issue is not a statement of material fact in dispute; the Court, thus, should not consider it.  LR 56.1(B)(1)(c).

98.    For that matter, Curling pled but cannot explain what she meant by the allegation that the Dominion voting equipment "fails to ensure that all such equipment, firmware, and software is reliable, accurate, and capable of secure operation as required by law."  Ex. No. (16) at 91:15-23; Ex. No. (17) at ¶ 116.

**Plaintiffs' Response to SMF ¶ 98**

DISPUTED.  Plaintiffs object to SMF98 because State Defendants failed to cite evidence supporting the statement of fact.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(a); *Trapp*, 2014 WL 12784474 *12-13.  In the cited portion of Ms. Curling's deposition, she was asked about paragraph 116(b) of the TAC, which states: "Defendants threaten to violate Plaintiffs' fundamental right to vote by deploying *the Proposed Election System* that by its design fails to include the minimal and legally required steps to ensure that all such equipment, firmware, and software is reliable, accurate and capable of secure operation as required by law."  Dkt. 627, TAC ¶116(b) (emphasis added).  Ms. Curling was asked and answered a question about the proposed election system, as discussed in the TAC,

not about "Dominion voting equipment."  Opp. Ex. 228, Curling Dep. at 91:15-23.

Plaintiffs also object to SMF98 as immaterial because whether the
Dominion voting equipment "fails to ensure that all such equipment, firmware,
and software is reliable, accurate, and capable of secure operation as required by
law" calls for a legal conclusion or an expert opinion, and Ms. Curling's view on
that issue is not a statement of material fact in dispute; the Court, thus, should not
consider it.  LR 56.1(B)(1)(c).

99.    Curling admits that Georgia's BMD paper ballots can be recounted,
but she presumes that the "general practice" is to re-scan them. Ex. No. (16) at
103:3-8.

**Plaintiffs' Response to SMF ¶ 99**

DISPUTED.  SMF99 mischaracterizes Ms. Curling's testimony.  Ms.
Curling was asked, "Can the paper ballots that come from Georgia's BMD system
be recounted?," which was objected to as vague.  Ms. Curling then answered: "I
assume that they can be, but I think general -- the general practice is to – to re-
scan." Opp. Ex. 228, Curling Dep. at 103:3-8.  Ms. Curling went on to distinguish
absentee paper ballots from paper ballots from BMDs because the former are
verifiable by human review.  *Id*. at 103:10-14.  Additionally, in response to a

different question asking, "can you conduct a constitutional election using the BMDs as Georgia does that have QR codes if there is a risk-limiting audit," Ms. Curling testified "BMDs are susceptible to manipulation; and the proposed system does not provide a meaningful way for a voter to know that their vote is recorded accurately to be counted by the scanner because that is not what is scanned." *Id*. at 83:5-19.

Plaintiffs object to SMF99 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs. The Court therefore should not consider it. LR 56.1(B)(1)(a).

100. Curling concedes that the Dominion BMD equipment utilizes a paper ballot. She also admits that while not her "ideal system," the paper ballot utilized by the BMD equipment can lead to a verified election with the proper procedures. Ex. No. (16) at 52:14-16, 80:8-11.

**Plaintiffs' Response to SMF ¶ 100**

DISPUTED. SMF100 mischaracterizes Ms. Curling's testimony. She was asked, "Would you agree with me that the BMD system utilizes a paper ballot?," and she agreed. Opp. Ex. 228, Curling Dep. at 52:14-16. Ms. Curling was then asked, "Would you agree with me that the BMD paper ballot is verifiable by the

voter?," and she replied, "I would have to disagree with you on that." *Id*. at 52:17-25.  Defense counsel said, "Tell me why you disagree," and Ms. Curling said, "Because on the current system, you can only see what you select; you cannot see what is counted." *Id*. at 53:2-5.

Later in her deposition, State Defendants asked Ms. Curling, "So is it fair to say that the paper is not your ideal system, but it can at least lead to a verified election?," and she replied, "With the proper procedures in place, yes." *Id*. at 80:8-11.  However, she made clear that she was confused by the line of questioning. *Id*. at 80:24-25.  The question was then asked: "[T]here's no way to provide a meaningful way for a voter to audit their vote using the BMD system.  Is that your testimony?" *Id*. at 81:3-5.  Ms. Curling confirmed, "That's my testimony because they have no idea what's in the QR code." *Id*. at 81:9-10.

Plaintiffs object to SMF100 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

101.   Curling also acknowledges that a voter can verify his or her choices identified in text on the paper ballot produced by the BMD. This is like a hand-marked paper ballot where voters bubble in their choice and verifiable by human

review. Ex. No. (16) at 65:3-7, 103:10-25.

**Plaintiffs' Response to SMF ¶ 101**

DISPUTED.  SMF101 mischaracterizes Ms. Curling's testimony.  Before

the question cited in SMF101, Ms. Curling was asked whether she believed BMD-

printed ballots were verifiable, and she replied, "It's not verifiable, no."  Opp. Ex.

228, Curling Dep. at 64:13-22.

In the second cited portion of Ms. Curling's deposition where the

verifiability of hand-marked paper ballots was compared to the verifiability of

BMD paper ballots, *id*. at 103:10-25, Ms. Curling was not asked if a voter can

verify the voter's choices on a BMD-printed ballot but was instead asked, "[a]nd

with a BMD paper ballot, you can *see* the voter's choice identified below the QR

code; isn't that correct?"  *Id*. at 103:19-24 (emphasis added).  And she responded,

"That's correct."  *Id*. at 103:25.

Repeatedly throughout Ms. Curling's deposition she testified that, despite

the human-readable text on a BMD paper ballot, there is no way for a voter to

verify if the voter's vote is counted as cast because the BMD translates the vote

into a QR code, which is not human readable, and the scanner reads the QR code.

*Id*. at 41:10-12; 43:10-14; 53:3-5.  In addition, in her February 12, 2021

declaration, Ms. Curling stated, "for the Presidential Primary Election in June

76

2020, I was very nearly forced to forgo my vote altogether or risk my personal health to vote on a BMD-marked ballot that I could not verify."  Opp. Ex. 227, Feb. 2021 Curling Decl. ¶ 6.

Plaintiffs object to SMF101 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

102.   In January 2022, Curling was unaware that the BMD-produced ballot showed when a voter did not vote in a particular race. Ex. No. (16) at 63:8-17.

**Plaintiffs' Response to SMF ¶ 102**

DISPUTED.  SMF102 mischaracterizes Ms. Curling's testimony.  In a discussion regarding whether a BMD ballot prints a particular race if a voter did not vote for a candidate in it, Ms. Curling was shown a ballot and asked, "Do you see here where it says, blank contest for sheriff?"  Opp. Ex. 228, Curling Dep. at 62:25:63:2.  Ms. Curling said, "Well, if this is what the printer prints, that was not my understanding.  I thought that anything – if you skipped a particular race that it just would not show up; but you're – what you're showing me, it lists each one and it shows that that was blank, that I intentionally left that blank.  Is that correct?" *Id*. at 63:11-17.  State Defendants' counsel responded, "That's – I mean, that's

certainly what the document seems to suggest." *Id*. at 63:18-19.

Plaintiffs also object to SMF102 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

103.   In the 2019 municipal elections, Curling voted on a Dominion BMD machine. Ex. No. (16) at 42:13-43:1.

**Plaintiffs' Response to SMF ¶ 103**

DISPUTED.  SMF103 is inaccurate.  Ms. Curling did not vote on a Dominion BMD machine in 2019.  *See* SMF Ex. 6 at 2 (DREs were used in Georgia through December 30, 2019).   Plaintiffs object to SMF103 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs. The Court therefore should not consider it.  LR 56.1(B)(1).

104.   When Curling voted on the Dominion BMD system in the 2019 municipal election, she could "see what the print[] out said was [her] vote was as [she] intended." She checked the print out for accuracy, and it accurately identified the name of her chosen candidate. Ex. No. (16) at 43:16-24, 43:10-12.

**<u>Plaintiffs' Response to SMF ¶ 104</u>**

DISPUTED.  SMF104 is inaccurate because Ms. Curling did not vote on a Dominion BMD in the 2019 election. *See*  Plaintiffs' Response to SMF103. Plaintiffs object to SMF104 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

105.   Curling maintains, however, that she does not know if her vote counted in the 2019 municipal election. Ex. No. (16) at 43:2-14.

**<u>Plaintiffs' Response to SMF ¶ 105</u>**

DISPUTED.  SMF105 is inaccurate because Ms. Curling did not vote on a Dominion BMD in the 2019 election. *See* Plaintiffs' Response to SMF103. Plaintiffs object to SMF105 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

106.   Curling's ultimate issues with the BMD equipment are the fact that it uses a QR code and the fact that it uses software. Ex. No. (16) at 45:22-45:17.

**Plaintiffs' Response to SMF ¶ 106**

DISPUTED.  SMF106 mischaracterizes Ms. Curling's testimony.  The question underlying SMF106 was, "So is the issue then – and, again, *I'm asking a hypothetical*; and the hypothetical is that you would vote and you would have a ballot like this *without the QR code*.  Is the issue that you're voting by machine and it's a machine that uses software?"  Opp. Ex. 228, Curling Dep. at 45:18-22 (emphasis added).  The question was objected to as compound and because it called for speculation.  Ms. Curling answered, "Yes, I guess so."  *Id*. at 45:18-46:1. Ms. Curling never testified that her "ultimate" issues with the BMD equipment are the fact that it uses a QR code and the fact that it uses software.

Plaintiffs object to SMF106 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

107.   Plaintiff Curling is not concerned about the printers used by the Georgia Election System. Ex. No. (16) at 59:4-5.

**Plaintiffs' Response to SMF ¶ 107**

DISPUTED.  SMF107 mischaracterizes Ms. Curling's testimony.  She also testified, "keep in mind that a lot of the things that have been discovered are not

known to me.  They're sealed.  I don't know what the experts found, but I know specifically that – that something was found with Dominion system." Opp. Ex. 228, Curling Dep. at 94:13-17.  "I don't know if it was the scanner or the B – or the machine or the print – I have no idea what was found." *Id*. at 95:3-5.

Plaintiffs object to SMF107 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

### B.    Donna Price

108.   Donna Price is a resident of DeKalb County. D. Price Dep., Ex. No. (20) at 44:22-24.

### Plaintiffs' Response to SMF ¶ 108

Undisputed.

109.   Price has not received training on the hardware or programing of the DRE voting equipment. Ex. No. (20) at 20:17-21:3.

### Plaintiffs' Response to SMF ¶ 109

Plaintiffs object to SMF109 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not

consider it.  LR 56.1(B)(1).

110.   Price relies on information from experts about vulnerabilities to a voting system. Ex No. (20) at 70:1-4.

**<u>Plaintiffs' Response to SMF ¶ 110</u>**

DISPUTED.  SMF110 mischaracterizes Ms. Price's testimony.  In response to a question regarding whether hackers trying to access Georgia's election system makes it untrustworthy, Ms. Price responded, "I rely on the expert information dealing with vulnerabilities to the voting system, and I have my understanding of that the voting system has security vulnerabilities."  Opp. Ex. 230, Deposition of Donna Price ("Price Dep.") at 69:16-70:4.

Plaintiffs object to SMF110 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

111.   Specifically, Price stated, "I think I have to rely on security experts, voting security experts, to know whether a specific system, meaning the Georgia BMD voting system, is vulnerable to attacks." Ex. No. (20) at 71:23-72:6.

**Plaintiffs' Response to SMF ¶ 111**

Plaintiffs object to SMF111 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

112.   Since the inception of this lawsuit, Price has voted in seven elections in Georgia. Ex. No. (21) at 1-2.

**Plaintiffs' Response to SMF ¶ 112**

Undisputed.

113.   For the May 22, 2018 General Primary Election, Price voted by absentee ballot. Ex. No. (21) at 2.

**Plaintiffs' Response to SMF ¶ 113**

DISPUTED.  Ms. Price voted in-person for the May 22, 2018 election.  SMF Ex. 21 at 2.

114.   For the November 6, 2018 General Election, Price voted by absentee ballot. Ex. No. (21) at 2.

**Plaintiffs' Response to SMF ¶ 114**

Undisputed.

115.   For the December 4, 2018 General Election Runoff, Price voted by absentee ballot. Ex. No. (21) at 2.

**Plaintiffs' Response to SMF ¶ 115**

Undisputed.

116.   For the November 5, 2019 General Election, Price voted by absentee ballot. Ex. No. (21) at 2.

**Plaintiffs' Response to SMF ¶ 116**

Undisputed.

117.   For the March 24, 2020 Presidential Preference Primary Election, Price voted by absentee ballot. Ex. No. (21) at 2.

**Plaintiffs' Response to SMF ¶ 117**

Undisputed.

118.   For the November 3, 2020 General Election, Price voted by absentee

ballot. Ex. No. (21) at 2.

**Plaintiffs' Response to SMF ¶ 118**

Undisputed.

119.   For the January 5, 2021 General Election Runoff, Price voted by absentee ballot. Ex. No. (21) at 2.

**Plaintiffs' Response to SMF ¶ 119**

Undisputed.

120.   Price's votes were counted in each of these elections. Ex. No. (21) at 1-2.

**Plaintiffs' Response to SMF ¶ 120**

DISPUTED.  SMF120 is inaccurate.  Ms. Price requested, but did not receive, an absentee ballot for the August 11, 2020 election.  Dkt. 1599, Feb. 2023 Price Decl. ¶¶ 2-5.  Ms. Price testified that she "do[esn't] have any evidence that [any of the votes she cast in any of the Georgia elections] were counted correctly or weren't counted correctly since 2002."  Opp. Ex. 230, Price Dep. at 40:14-21.

121.   Price founded the organization Georgians for Verified Voting because

she was "concerned about the voting system, the security reliability and verifiability of the voting system in Georgia, the DRE voting system." Ex. No. (20) at 22:6-14.

### Plaintiffs' Response to SMF ¶ 121

Plaintiffs object to SMF121 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1)(a).

122.   By election security concerns relating to the DRE voting system, Price meant that there was no paper record to verify the software tabulation of the votes. Ex. No. (20) at 22:15-23:13.

### Plaintiffs' Response to SMF ¶ 122

DISPUTED.  SMF122 mischaracterizes Ms. Price's testimony.  In response to the question, "what do you mean by the 'security, reliability, and verifiability of the DRE system?," she said, "Well, the transparency because the – what I had learned by 2003 was that the election system was all electronic.  And so there was no software-independent way to determine the election results other than the software code."  Opp. Ex. 230, Price Dep. at 22:15-21.  She continued, "What I understood was that – and this was from a National Institutes of Standards and

Technology white paper is that voting systems needed a software independent

mechanism for – that would – that could be used to compare against the election

results from the software code." *Id*. at 23:3-8.  She was asked, "Can you explain

that further, the software independent mechanism?  What is that?"  *Id*. at 23:9-10.

Ms. Price explained, "For example, if the software code is all on computer, it's

electronic, then a software independent is a paper record."  *Id*. at 23:11-13.

Plaintiffs object to SMF122 as immaterial because it is not cited in, and

State Defendants do not rely on it in, their briefs.  The Court therefore should not

consider it.  LR 56.1(B)(1)(a).

123.   Price does not believe that a BMD produces a voter-verified paper

ballot. Ex. No. (20) at 27:9-15.

**Plaintiffs' Response to SMF ¶ 123**

Undisputed.

124.   Price learned about all of the supposed vulnerabilities to the election

systems that form the basis of her claims from experts in this case, namely Dr.

Halderman. Ex. No. (20) at 86:4-90:24.

**Plaintiffs' Response to SMF ¶ 124**

DISPUTED.  SMF124 mischaracterizes Ms. Price's testimony in the cited portion of her deposition in at least three ways:  1) she never testified about "all of the supposed vulnerabilities to the election system,"; 2) she never testified that the vulnerabilities discussed formed the basis of her claims; and 3) she provided numerous sources of support for her views and testimony in this case, not just experts.  For example, Ms. Price was asked questions about a paragraph from one of her declarations where she wrote: "I learned of the extreme vulnerability of Georgia's election system to undetectable errors and malicious tampering and the failure of the system to provide a voter-verified mechanism independent of software for the auditing of election results."  Opp. Ex. 230, Price Dep. at 86:4-9.  Defense counsel asked her, "And what – how did you learn of the extreme vulnerability referenced in this paragraph?," and she replied, "I learned from experts."  *Id*. at 86:11-13.  She then proceeded to give numerous other sources from which she learned about vulnerabilities, including: (1) "papers from the courts and other information that I read or obtained through experts," *id*. at 87:2-4; (2) Logan Lam's report, *id*. at 87:23-88:2; (3) "the e-mails and . . . reports from Kennesaw about the fact that that election system at Kennesaw was left open to the Internet," *id*. at 88:7-9; and (4) e-mails, news, and reporting from the Secretary

of State's office, *id*. at 90:21-24.

Plaintiffs object to SMF124 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1)(a).

125.   According to Price, her right to vote is burdened by voting absentee because she is "forced to forgo the privilege, honor, and right to vote alongside my fellow voters." Ex. No. (20) at 117:13-20.

**Plaintiffs' Response to SMF ¶ 125**

DISPUTED.  SMF125 mischaracterizes Ms. Price's testimony about the burdens on her right to vote.  In the cited portion of her deposition, Ms. Price was asked about the burdens of voting by absentee paper ballot based on her February 12, 2021 declaration.  Opp. Ex. 230, Price Dep. at 117:9-14.  She read from her declaration, "I'm forced to forgo the privilege, honor, and right to vote alongside my fellow voters." *Id.* 117:18-20.  In response to a follow-up question, "So that was the burden?," Ms. Price enumerated many other burdens.  *Id*. at 117:21-122:6. She testified that the requirement to request an absentee ballot is a burden, *id*. at 118:7-9, and that the inability to confirm that her ballot goes into a lockbox or scanner, unlike her fellow voters who vote in person, is a burden, *id*. at 45:23-46:7.

Elsewhere in her deposition Ms. Price described how Georgia's BMD system forces her to choose between suffering the burdens of voting absentee or voting using a ballot that she cannot verify.  If she were to vote on a BMD, 1) she would not be able to cast a voter-verified ballot, *id*. at 46:13-47:14; 2) because BMDs do not have voter-verified paper ballots, she would not be voting but would be giving her vote to whatever determines what is in the QR code, *id*. at 46:2-11; and 3) she would just be going through the motions of an action that simulates voting, *id.* at 48:1-15.  Ms. Price also testified that the BMD system's vulnerability to security threats causes her suffering and disenfranchisement and she is concerned that Georgia does not perform RLAs that would secure her right to vote. *Id*. at 115:18-25; *see also* Plaintiffs' Response to SMF126.

126.    Price also claims she is burdened by merely requesting the absentee ballot. Ex. No. (20) at 118:7-9.

**Plaintiffs' Response to SMF ¶ 126**

DISPUTED.  SMF126 mischaracterizes Ms. Price's testimony.  Ms. Price was asked, "So it's your position that the requirement to request an absentee ballot is a burden," and she described an experience where the requirement for her to request an absentee ballot resulted in her being deprived of the right to fully

participate in the 2020 presidential primary.  Opp. Ex. 230, Price Dep. at 118:7-
119:9; *see also* Plaintiffs' Response to SMF125.

127.   Since 2018, Price has always voted absentee by mail. Ex. No. (20) at
39:22-24.

**Plaintiffs' Response to SMF ¶ 127**

Undisputed.  But the statement omits a key fact, which is that Ms. Price has
voted absentee by mail because, if she were to vote on a BMD, Ms. Price would
not be able to verify the selections she made because the QR code is used to
tabulate votes and is not human-readable; thus, Ms. Price would have no verified
record of the selections she made.  Opp. Ex. 230, Price Dep. at 46:13-47:14.
Additionally, Ms. Price believes she would just be going through the motions of an
action that simulates voting.  *Id.* at 48:1-15.  Without a voter-verified paper ballot,
she would not be voting but would be giving her vote to whatever determines what
is in the QR code.  *Id.* at 46: 2-11.

128.   Price has not voted on a BMD voting machine in Georgia's current
voting system. Ex. No. (20) at 43:3-4.

**Plaintiffs' Response to SMF ¶ 128**

Undisputed.  But the statement omits a key fact, which is that Ms. Price has

not voted on a BMD voting machine because, if she were to vote on a BMD, Ms.

Price would not be able to verify the selections she made because the QR code is

used to tabulate votes and is not human-readable; thus, Ms. Price would have no

verified record of the selections she made.  Opp. Ex. 230, Price Dep. at 46:13-

47:14.  Additionally, Ms. Price believes she would just be going through the

motions of an action that simulates voting.  *Id.* at 48:1-15.  Without a voter-verified

paper ballot, she would not be voting but would be giving her vote to whatever

determines what is in the QR code.  *Id.* at 46: 2-11.

129.   Price does not have any plans to vote on a BMD in the future. Ex. No.

(20) at 43:5-7.

**Plaintiffs' Response to SMF ¶ 129**

Undisputed.  *See* Plaintiffs' Responses to SMF128, SMF129.

130.   Price has no evidence that any of her absentee ballots were not

accurately counted. Ex. No. (20) at 42:2-6.

**Plaintiffs' Response to SMF ¶ 130**

DISPUTED.  SMF130 is inaccurate.  Ms. Price is uncertain whether her absentee vote in the June 2020 election contained the accurate slate of candidates she selected.  Opp. Ex. 231 ¶¶ 12.  She also requested but did not receive a ballot for the August 11, 2020 election.  Dkt. 1599, Feb. 2023 Price Decl. ¶¶ 2-5.  *See also* Plaintiffs' Response to SMF125.

131.    According to Price, if she votes on the current BMD system, she is not able to cast a voter-verified paper ballot. If she votes an absentee ballot, she is not able see that that ballot is actually fed into the lockbox, the optical scanner and lockbox at the precinct, like voters do if they're using the BMD. Ex. No. (20) at 45:23-46:7.

**Plaintiffs' Response to SMF ¶ 131**

DISPUTED.  SMF131 misrepresents Ms. Price's testimony.  In the cited portion of her deposition she also stated, "if I vote under the absentee ballot system, there are lots of barriers to being able to cast my vote."  Opp. Ex. 230, Price Dep. at 46:1-2.

132.    Price believes Georgia does not currently have post-election risk-

limiting audits, which she believes is another component to being able to secure her right to vote. Ex. No. (20) at 46:8-11.

**Plaintiffs' Response to SMF ¶ 132**

Undisputed.

133.   Price believes that if she votes on a ballot marking device, the votes are encompassed in a QR code, and she cannot validate that those are selections that she made because the QR code is what's read by the scanner. Ex. No. (20) at 47:6-14.

**Plaintiffs' Response to SMF ¶ 133**

Undisputed.

134.   Price also believes the burden on her right to vote is that the primary record of her vote is a voter-verified paper ballot, and without what she believe is a voter-verified paper ballot, there's no record that she has verified to of the selections she made on the ballot. Ex. No. (20) at 47:21-25.

**Plaintiffs' Response to SMF ¶ 134**

DISPUTED.  SMF134 mischaracterizes Ms. Price's testimony.  Ms. Price did not testify as to *the* burden on her right to vote.  Instead, in response to the

94

question, "what other burdens are there on your right to vote?," Ms. Price testified,

"[t]he primary record of my vote is a voter-verified paper ballot.  Without that,

there's no primary record.  There's no record that I have verified to say that that's

the votes – those are the selections I made for candidates and issues."  Opp. Ex.

230, Price Dep. at 47:21-25.  Defense counsel then asked her if there were any

other burdens she would experience if she voted in person, *id*. at 48:1-3, and Ms.

Price replied, "I believe I would just be going through the motions of an action that

stimulates voting.  But without a voter-verified paper ballot, I wouldn't be – I

wouldn't be voting.  I'd be giving that – my vote to whoever is – and whatever is

determining what's in that QR code.  So that's not transparent."  *Id*. at 48:6-11; *see*

*also* Plaintiffs' Response to SMF125.


135.   Without a voter-verified paper ballot, Price does not believe she is

voting. Instead, she contends that she would "be giving that—- my vote to whoever

is—- and whatever is determining what's in that QR code." Ex. No. (20) at 48:8-

15.

**Plaintiffs' Response to SMF ¶ 135**

Undisputed.

136.   Price has no evidence of anyone who voted on a BMD and the printed candidates were not what the person selected. Ex. No. (20) at 48:23-49:7.

**Plaintiffs' Response to SMF ¶ 136**

DISPUTED.  SMF136 mischaracterizes Ms. Price's testimony.  In response to the question, "Do you have any evidence of anyone – any voter who has selected a candidate on the touch screen of the ballot marking device and the printout has been different – has printed a different name than the individual selected?," Ms. Price replied, "I have no personal evidence.  I have the knowledge of – that I've gotten from experts and in our lawsuit – our experts' declarations that – they're the authorities on it since I'm not an expert on the technology."  Opp. Ex. 230, Price Dep. at 48:23-49:7.

137.   Price believes that all elections using BMDs are indeterminable. Ex. No. (20) at 61:17-21.

**Plaintiffs' Response to SMF ¶ 137**

Plaintiffs object to SMF137 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1)(a).

138.   Price cannot have confidence in any election results because she cannot read bar codes. Ex. No. (20) at 103:17-104-5.

**Plaintiffs' Response to SMF ¶ 138**

DISPUTED.  SMF138 mischaracterizes Ms. Price's testimony.  She testified that she lacks confidence in the elections results of any election *conducted on the Dominion BMD system* because she cannot read bar codes so she cannot cast a voter-verified ballot, and without a voter-verified ballot to audit, she cannot have confidence that election results are accurate and reliable.  Opp. Ex. 230, Price Dep. at 103:21-104:5.

139.   Price further stated, "without being able to verify that the ballot which I mark as a voter or I mark my selections and I can't verify those selections, then that's a threat to the results of the election being accurate." Ex. No. (20) at 105:3-7.

**Plaintiffs' Response to SMF ¶ 139**

Undisputed.

**C.    Jeffrey H.E. Schoenberg**

140.   Jeffrey H. E. Schoenberg is a resident of DeKalb County. J. Schoenberg Dep., Ex. No. (22) at 10:8-9.

**Plaintiffs' Response to SMF ¶ 140**

Undisputed.

141.    Schoenberg does not have any formal training or experience in election administration or with election technology. Ex. No. (22) at 32:20-24.

**Plaintiffs' Response to SMF ¶ 141**

Plaintiffs object to SMF141 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

142.    Schoenberg does not have any formal training or experience with computers or IT security. Ex. No. (22) at 32:20-33:2.

**Plaintiffs' Response to SMF ¶ 142**

Plaintiffs object to SMF142 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

143.    Schoenberg has no formal training or experience with risk limiting audits, and has never performed one. Ex. No. (22) at 32:20-33:7.

**<u>Plaintiffs' Response to SMF ¶ 143</u>**

Plaintiffs object to SMF143 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

144.   Plaintiff Schoenberg was asked to join as a plaintiff in this litigation by Representative Scott Holcomb because "they were looking to have somebody to represent voters of DeKalb County on the plaintiffs' group." Ex. No. (22) at 35:16-18.

**<u>Plaintiffs' Response to SMF ¶ 144</u>**

DISPUTED.  SMF144 mischaracterizes Mr. Schoenberg's testimony.  He was asked, "how did you become involved in this case," and he responded, "I became involved because I was asked to join because I lived in DeKalb County, *among other things*.  They were looking to have somebody to represent voters of DeKalb County on the plaintiffs group."  Opp. Ex. 233, Schoenberg Dep. at 35:12-18 (emphasis added).  He further explained, "I am a plaintiff in this case because I am seeking to protect my rights as a voter, to know that my votes are counted as cast, that I have the right to vote on a transparent, auditable, reliable election system; and I know that I'm not getting that now."  *Id*. at 35:6-11.

Plaintiffs object to SMF144 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

145.   Representative Holcomb knew Mr. Schoenberg was interested in the topic of voting machines, and when Representative Holcomb ran for Secretary of State in 2006, he campaigned on the issue of election machinery and a paper trail for voting. Ex. No. (22) at 35:14-36:17.

**Plaintiffs' Response to SMF ¶ 145**

DISPUTED.  SMF145 mischaracterizes Mr. Schoenberg's testimony.  He did not testify that he was interested in the topic of voting machines.  Instead, when asked why Representative Holcomb asked him to join the case, Mr. Schoenberg stated, "He knew that I was interested in the topic."  *Id*. at 36:11.  The topic being discussed was protecting his rights as a voter.  *Id*. at 35:6-11.

Plaintiffs object to SMF145 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

146.   Representative Holcomb was legal counsel for the plaintiffs at the

start of the case. Ex. No. (22) at 36:18-22.

**Plaintiffs' Response to SMF ¶ 146**

Plaintiffs object to SMF146 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

147.   Schoenberg understands that his co-plaintiffs are involved in Georgians for Verified Voting—Ms. Price as co-chairman of the organization and Ms. Curling is involved with the organization. Ex. No. (22) at 38:12-39:8.

**Plaintiffs' Response to SMF ¶ 147**

Plaintiffs object to SMF147 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

148.   Since the inception of this lawsuit, Schoenberg has voted in 11 elections. Ex. No. (23) at 2.

**Plaintiffs' Response to SMF ¶ 148**

Undisputed.

149.   For the November 7, 2017 General Election, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

**Plaintiffs' Response to SMF ¶ 149**

Undisputed.

150.   For the May 22, 2018 General Primary Election, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

**Plaintiffs' Response to SMF ¶ 150**

Undisputed.

151.   For the July 24, 2018 General Primary Runoff Election, Schoenberg voted in person on a DRE voting machine. Ex. No. (23) at 2.

**Plaintiffs' Response to SMF ¶ 151**

Undisputed.

152.   For the November 6, 2018 General Election, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

**Plaintiffs' Response to SMF ¶ 152**

Undisputed.

153.   For the December 4, 2018 General Election Runoff, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

**Plaintiffs' Response to SMF ¶ 153**

Undisputed.

154.   For the November 5, 2019 General Election, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

**Plaintiffs' Response to SMF ¶ 154**

Undisputed.

155.   For the March 24, 2020 Presidential Preference Primary Election, Schoenberg voted in person on a BMD voting machine. Ex. No. (23) at 2; Ex. No. (24) at 1.

**Plaintiffs' Response to SMF ¶ 155**

Undisputed.

156.   For the June 9, 2020 General Primary Election, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

**Plaintiffs' Response to SMF ¶ 156**

Undisputed.

157.   For the August 11, 2020 General Primary Runoff Election, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

**Plaintiffs' Response to SMF ¶ 157**

Undisputed.

158.   For the November 3, 2020 General Election, Schoenberg voted by absentee ballot. Ex. No. (23) at 2.

**Plaintiffs' Response to SMF ¶ 158**

Undisputed.

159.   For the January 5, 2021 General Election Runoff, Schoenberg voted in person on a BMD voting machine. Ex. No. (23) at 2; Ex. No. (24) at 1.

**Plaintiffs' Response to SMF ¶ 159**

Undisputed.

160.   Schoenberg's votes were counted in each of these elections. Ex. No.

(23) at 2.

**Plaintiffs' Response to SMF ¶ 160**

DISPUTED.  Mr. Schoenberg testified that he has no proof that his vote in the 2017 Congressional District 6 Special Election or Special Runoff Election was counted as cast.  Opp. Ex. 233, Schoenberg Dep. at 54:8-19.  He similarly stated in his February 12, 2021 declaration, "I have no more confidence in the BMD system to accurately count my vote in each election than I had in the prior DRE system." Opp. Ex. 232, Feb. 2021 Schoenberg Decl. ¶ 6.

161.   Plaintiff Schoenberg has voted on the BMD system at least twice, and when he did, he personally reviewed the text on the printed ballot. Ex. No. (22) at 81:20-82:1; 96:11-16.

**Plaintiffs' Response to SMF ¶ 161**

DISPUTED.  SMF161 mischaracterizes Mr. Schoenberg's testimony.  He was asked if, when he voted on the BMD he reviewed the printed text on the ballot, and he replied, "I personally reviewed the text.  I knew my action was a nullity, but I did it all the same because I couldn't help myself."  Opp. Ex. 233, Schoenberg Dep. at 81:20-82:1.  Mr. Schoenberg testified again that he "looked to see what [the printed summary of the text on the ballot] said." *Id*. at 98:1.  "[I]t

occurred to me what a silly thing it was to do, because what I was reading was not what was being read by the machine.  So I could get some false sense of security that at least to the stage of the printing of that piece of paper, there was some understanding of what my intention was.  But I had absolutely no faith in my understanding that the system would continue to understand my intention once I went to the scanner and had to rely on the QR code." *Id*. at 98:4-13.

Plaintiffs object to SMF161 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


162.   Plaintiff Schoenberg believes every election is "flawed" because he believes the DRE and BMD election systems are unverifiable, unreliable, and cannot be audited. Ex. No. (22) at 83:25-84:4.

**Plaintiffs' Response to SMF ¶ 162**

DISPUTED.  Mr. Schoenberg testified that "every election *on these systems are* – including the BMD system is flawed because of these unverifiable, unreliable, because it cannot be properly audited. There is no -- there is no record to tell me that these elections are properly counted and that my vote particularly gets counted as cast."  Opp. Ex. 233, Schoenberg Dep. at 83:24-84:4.

163.   Schoenberg contends that voting absentee by mail is burdensome because "it does not feel to [him] like full civic participation in the communal process of voting." Ex. No. (22) at 92:23-93:4.

**Plaintiffs' Response to SMF ¶ 163**

DISPUTED.  Mr. Schoenberg testified more fully about his preference to vote in person, "I much prefer to engage in the process of voting in person where I can thank the workers who are there when I can participate in a communal activity, I can feel like I'm doing something that is exercising my democratic responsibilities.  I like going to vote.  I used to take my children with me to go vote.  It's an important ritual for me."  Opp. Ex. 233, Schoenberg Dep. at 98:22-99:4.

In response to a different question asking him to describe how the absentee ballot system is burdensome, he replied, "I have to plan ahead.  You have to use the mail multiple times.  You have to trust that it's going to be processed in a timely manner. I have recently been forced to use that system, or tried to use that system only to have it fail on me where my requested didn't get processed.  It also commits you to voting potentially, you know, early.  You get the ballot, you don't want to lose it.  You want to vote.  It can be quite a bit earlier than the election,

107

which is not necessarily when you want to cast a vote, if you're me.  It's just far

from ideal." *Id*. at 93:8-19; *see also* Plaintiffs' Response to SMF164.


164.   Additionally, Schoenberg thinks voting absentee by mail is

burdensome because he has to plan ahead, use the mail multiple times, trust that

the ballot will get processed in a timely manner, and it requires him to vote early.

Ex. No. (22) at 93:8-19.

### Plaintiffs' Response to SMF ¶ 164

DISPUTED.  SMF164 mischaracterizes Mr. Schoenberg's testimony.  He

also testified that the absentee by mail option failed him when his request for an

absentee ballot was never processed.  Opp. Ex. 233, Schoenberg Dep. at 93:9-14.

In the cited portion of Mr. Schoenberg's deposition, he stated "[y]ou have to use

the mail multiple times.  You have to trust that [the ballot is] going to be processed

in a timely manner.  I have recently been forced to use that system, or tried to use

that system only to have it fail on me where my request didn't get processed. It

also commits you to voting potentially, you know, early.  You get the ballot, you

don't want to lose it.  You want to vote.  It can be quite a bit earlier than the

election, which is not necessarily when you want to cast a vote, if you're me.  It's

just far from ideal." *Id*. at 93:9-19.

Mr. Schoenberg recounted how ahead of the January 5, 2021, runoff election he requested an absentee ballot, received confirmation of his request, but never received the ballot so he had to vote in person on a BMD.  *Id*. at 93:20-94:3, 96:8-10; Opp. Ex. 232, Feb. 2021 Schoenberg Decl. ¶ 9; *see also* Plaintiffs' Response to SMF163.

165.   Schoenberg claims his absentee by mail ballot did not arrive in the 2021 runoff election, but he did not try to contact the DeKalb County election office about his absentee request and instead voted in person. Ex. No. (22) at 93:20-96:10.

**Plaintiffs' Response to SMF ¶ 165**

Undisputed.

166.   Schoenberg also believes that voting by absentee ballot in Georgia is flawed, burdensome, and "somewhat unreliable." Ex. No. (22) at 99:5-24.

**Plaintiffs' Response to SMF ¶ 166**

Undisputed.

167.   Schoenberg does not know what the minimal and legally required

steps to ensure equipment cannot be operated without authorization would be, and instead he has relied on Dr. Halderman to tell him. Ex. No. (22) at 104:16-105:17.

**Plaintiffs' Response to SMF ¶ 167**

DISPUTED.  SMF167 misrepresents Mr. Schoenberg's testimony.  He did not say he does not know the minimal and legally required steps.  Instead, he testified, "That also requires technical knowledge that I just don't have."  Opp. Ex. 233, Schoenberg Dep. at 104:24-25.  "That's where I rely on experts to tell me if they're telling anybody."  *Id*. at 105:3-4.  SMF9167 is also incomplete and inaccurate because, when he was asked this question at his deposition, Mr. Schoenberg had not had, and still has not had, access to the July 2021 Halderman Report.

Additionally, Plaintiffs object to SMF167 because what the minimal and legally required steps to ensure equipment cannot be operated without authorization would be calls for an expert or legal conclusion, and Mr. Schoenberg's view on that issue is not a statement of material fact in dispute; the Court, thus, should not consider it.  LR 56.1(B)(1)(c).  Furthermore, Plaintiffs object to SMF167 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

168.   According to Schoenberg, "if [Dr. Halderman] said it, I think it's important or we wouldn't have asked him to say it to the judge. So whether in writing or in spoken language, I'm relying on him for what I have said here today." Ex. No. (22) at 108:7-13.

**Plaintiffs' Response to SMF ¶ 168**

Plaintiffs object to SMF168 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

169.   Schoenberg believes he was injured by voting in an unverifiable way. Specifically, Plaintiff Schoenberg testified, "This is not only about risk. This is, the reality is I have been damaged because my vote has not been reliably counted as cast." Specifically, Schoenberg believes there is "no verifiable, human verifiable record of my intent." Ex. No. (22) at 79:1-10, 79:18-80:5.

**Plaintiffs' Response to SMF ¶ 169**

DISPUTED.  SMF169 mischaracterizes Mr. Schoenberg's testimony.  In the cited portion of his deposition, he also testified about the unreliability of the BMD system.  Opp. Ex. 233, Schoenberg Dep. at 79:20-80:5 ("So that when reportedly

the vote gets tallied, there's no way of saying afterwards that it reflected what I intended to have happen with my vote.  I know after every vote I cast on the system that I have essentially put my vote into – my intended vote into a black box, and what comes out the other side may or may not be what I intended, which is a harm to me.  My vote is a precious thing to me.  It's – it is my voice.  It's my participation in democracy and it's valued.  And I don't know for certain that it's getting heard.").

Elsewhere in his deposition, Mr. Schoenberg testified further about the burdens of voting using a BMD, stating, "What I contend is that votes can potentially be manipulated and there would be no record of it such that you could have a verifiable, trustworthy, certifiable, auditable election.  The state can't give me the documented evidence to show that these things do not happen."  *Id*. at 73:25-74:6.  Mr. Schoenberg found the process of voting in-person in the 2020 Presidential Preference Primary so disturbingly unreliable that he planned to vote absentee thereafter.  *Id*. at 132:16-133:16.  He also testified, "And every time I vote on a system that is not reasonably secure, I can't know that I have participated in the democratic process in a meaningful way.  That's the source of the harm here."  *Id*. at 126:2-6; *see also* Plaintiffs' Responses to SMF163, SMF164.

112

170.   Schoenberg also testified that "[m]y rights have been violated because my vote has not reliably been counted as I intended. I cannot know that I am being heard as an individual citizen, and I think that that's wrong and needs to be corrected." Ex. No. (22) at 85:11-16.

**Plaintiffs' Response to SMF ¶ 170**

Undisputed.

171.   Schoenberg testified that he wants to know that when he expresses his opinion through voting, "somebody hears it, that it gets counted, and it gets counted along with the votes from everybody else who voted for whatever reasons and however much they care, they expressed their opinion," but with the BMD system, he does not know "for certain that this system is doing what it's intended to do." Ex. No. (22) at 126:10-127:25.

**Plaintiffs' Response to SMF ¶ 171**

DISPUTED.  SMF171 mischaracterizes Mr. Schoenberg's testimony.  He testified that, when he expresses his opinion through voting, he would also like to also know that the "government works because everyone knows they're involved in it.  I frankly don't know if I'm involved in it the way that I intended because I don't know for certain that this system is doing what it's intended to but not

trustworthy to do." Opp. Ex. 233, Schoenberg Dep. at 127:20-24.

172.   Plaintiff Schoenberg contends that, under the DRE voting system, only voters who cast absentee by mail and provisional paper ballots were able to vote using a verifiable ballot. Ex. No. (22) at 55:12-24.

**Plaintiffs' Response to SMF ¶ 172**

Undisputed.

173.   As to the BMD system, Plaintiff Schoenberg also contends that it is an unverifiable, un-auditable computer system that doesn't produce a verifiable auditable paper trail, and he has no way of verifying that the QR code accurately reflects the intention of the voter. Ex. No. (22) at 76:22-77:14.

**Plaintiffs' Response to SMF ¶ 173**

Undisputed.

174.   According to Plaintiff Schoenberg, "when reportedly the vote gets tallied, there's no way of saying afterwards that it reflected what I intended to have happen with my vote. I know after every vote I cast on the system that I have essentially put my vote into—- my intended vote into a black box, and what comes

out the other side may or may not be what I intended, which is a harm to me.  Ex.

No. (22) at 79:18-80:5.

**Plaintiffs' Response to SMF ¶ 174**

Undisputed.

175.   When Schoenberg voted on a BMD, the only problems he could recall

were his personal belief that the instructions were difficult and someone could see

his screen if they were motivated to see it, but the machine was not hard to touch

and it took his selections. Ex. No. (22) at 96:17-97:16.

**Plaintiffs' Response to SMF ¶ 175**

DISPUTED.  SMF175 mischaracterizes Mr. Schoenberg's testimony.  Mr.

Schoenberg identified other problems he experienced from voting on a BMD,

including having no faith that his ballot was counted as cast because he could not

verify the QR code.  *Id*. at 98:4-13; *see also* Plaintiffs' Response to SMF169.

176.   Schoenberg voted on a BMD in the 2020 Presidential Preference

Primary and did not feel pressured to vote absentee by mail. Ex. No. (22) at 132:9-

16.

**Plaintiffs' Response to SMF ¶ 176**

DISPUTED.  SMF176 mischaracterizes Mr. Schoenberg's testimony.  Mr. Schoenberg was asked, "You didn't feel *forced* to vote by absentee in the 2020 Presidential Primary?"  *Id*. at 132:13-15 (emphasis added).  Mr. Schoenberg answered, "No.  But I mean, again, I really memorable experience voting in that election thinking that there was no privacy and that I couldn't trust that any effort I made to review my ballot made it.  It was an inadequate, disturbing experience to vote using the BMDs.  So it does not surprise me that I was willing to say on this page [of the declaration] that I – that I anticipated I'd be choosing to vote by absentee ballot.  But again, having tried to vote by absentee ballot subsequent to this and finding it burdensome to the point of not working, I have chosen this poison rather than the other in subsequent elections because I like to vote in person."  *Id*. at 132:16-133:3.

177.    Schoenberg's belief that the BMD system fails to protect against intrusion and manipulation is based on what the experts in the case tell him.  Specifically, he testified that "Based on the evidence of the experts in this case, I'm—- I feel very strongly that – that the system is not secure from those kind of external threats." Ex. No. (22) at 101:1-17.

116

**Plaintiffs' Response to SMF ¶ 177**

Undisputed.

### D.    Coalition for Good Governance

178.    Plaintiff Coalition for Good Governance ("CGG") is a non-profit corporation organized under the laws of Colorado. Coalition for Good Governance 30(b)(6) Dep., Ex. No. (25) at 138:5-25.

**Plaintiffs' Response to SMF ¶ 178**

Undisputed.

179.    CGG believes that Georgia voters have a reasonable basis to question every election result for elections conducted on Dominion BMDs and Georgia voters "will never be able to know the outcome" of the November 2020 presidential election in Georgia. Ex. No. (25) at 246:03-246:08, 243:02-243:09.

**Plaintiffs' Response to SMF ¶ 179**

Disputed as stated.  So long as Dominion BMDs are the primary source of votes cast, voters in Georgia have a reasonable basis to question each election in Georgia.  SMF Ex. 25 at 243:02 243:09.  CGG does not question the outcome of the November 2020 presidential election.  SMF Ex. 25 at 243:02 243:09.

180.   Since filing this lawsuit, CGG has provided information and education to its members, served as an information resource, monitored nationwide developments in election law and technology, provided speakers for educational institutions, collaborated with other voting rights and election integrity initiatives, and shared research about election problems. Ex. No. (25) at 142:21-144:14.

**Plaintiffs' Response to SMF ¶ 180**

Undisputed.

181.   Advancing individual rights through the proper administration of elections is a key part of the mission of the CGG. Ex. No. (25) at 142:07-142:10.

**Plaintiffs' Response to SMF ¶ 181**

Undisputed.

182.   Since the filing of this lawsuit, CGG members and prospective members have participated in poll watching, attending public meetings, and other civic activities. Ex. No. (25) at 144:15-22.

**Plaintiffs' Response to SMF ¶ 182**

Undisputed.

183.   CGG will continue educating its members about election issues regardless of whether it receives an injunction banning ballot-marking devices. Ex. No. (25) at 86:13-86:21.

**Plaintiffs' Response to SMF ¶ 183**

Undisputed.

184.   CGG is unable to identify when it diverts resources based on the actions of nonparty counties versus State Defendants. Ex. No. (25) at 48:4-48:19.

**Plaintiffs' Response to SMF ¶ 184**

Disputed.  CGG may be unable to quantify the diversion of resources caused by the actions of nonparty counties as opposed to actions of the State Defendants in certain situations, but it is able, as has, identified when it diverts resources based on the actions of the State Defendants.  SMF Ex. 25 at 48:4-48:19; *see also* Dkt. 1617, Feb. 2023 Wasson Decl. ¶¶ 23-27; Dkt. 1597, Feb. 2023 E. Nakamur Decl. ¶¶ 88-96 ; Dkt. 1593, Feb. 2023 J. Dufort Decl. ¶ 53; Dkt. 1596, Throop Decl. ¶¶ 5-8; Dkt. 1594, Feb. 2023 Martin Decl. ¶¶ 19-25; Opp. Ex. 294, Feb. 2021 Marks Decl. ¶¶ 8-11.

119

185.   CGG diverted resources from planned projects in Colorado, North Carolina, and South Carolina because it spent resources in Georgia. Ex. No. (25) at 74:14-74:25.

**Plaintiffs' Response to SMF ¶ 185**

Undisputed.  Further answering this SMF, CGG's resources were spent challenging the BMD voting system in Georgia as well as on other projects.  *See* CGG Response to SMF 184 (evidence of diversion of resources).

186.   CGG's decision about how to litigate this case contributed to its inability to have time for other projects of CGG. Ex. No. (25) at 116:19-117:12, 117:23-118:3.

**Plaintiffs' Response to SMF ¶ 186**

Disputed.  The cited testimony does not support this SMF.  This litigation contributed to CGG's inability to have time for other CGG projects.  SMF Ex. 25 at 119:5-119:9.  *See* Plaintiffs' Response to SMF 184.

187.   This case is one of the causes of diversion of significant resources of CGG away from its other projects. Ex. No. (25) at 119:5-119:9.

**Plaintiffs' Response to SMF ¶ 187**

Undisputed.

188.   CGG is unable to determine how much of its diversion is due to this litigation and how much is due to other factors. Ex. No. (25) at 119:10-120:2.

**Plaintiffs' Response to SMF ¶ 188**

Disputed.  CGG is unable to quantify with precision the resources that it has diverted due to this litigation, but has diverted substantial resources due to this litigation.  *See* CGG Response to SMF 184 (evidence of diversion of resources). CGG can identify amounts spent on litigation and CGG discloses direct spending by project, including the Curling litigation, annually in its Form 990.  SMF Ex. 25 at 103:25-104:3; *see also* CGG Response to SMF 184 (evidence of diversion of resources).

189.   CGG maintains no written annual budget. Marks Dep. 131:21-23.

**Plaintiffs' Response to SMF ¶ 189**

Undisputed.

190.   CGG cannot identify spending on any specific categories from any

document. Ex. No. (25) at 131:24-132:25.

**Plaintiffs' Response to SMF ¶ 190**

Disputed.  The cited testimony, which addresses an "internal budget," not the identification of expenditures.  SMF Ex. 25 at 131:24-132:25. CGG identifies spending categories in detail in its books and records, and summarizes them in its Form 990.  SMF Ex. 25 at 103:25-104:3 does not support this SMF.

191.   CGG's financial diversion of resources is litigation costs related to this case. Ex. No. (25) at 51:8-51:15.

**Plaintiffs' Response to SMF ¶ 191**

Disputed.  This SMF misstates the cited testimony, in which the witness (Ms. Marks) stated that "litigation costs is an enormous drain on our resources." SMF Ex. 25 51:13-14.

192.   The financial resources CGG is diverting relate to supporting the litigation in this case. Ex. No. (25) at 52:17-54:1.

**Plaintiffs' Response to SMF ¶ 192**

Disputed.  The cited testimony does not support this SMF, which implies CGG's resources support only the litigation.  In addition to supporting litigation,

CGG also incurs substantial expenses outside of this litigation in efforts opposing the use of the BMD voting system in Georgia.  *See* CGG Response to SMF 191.

193.   CGG does not collect dues from its members. Ex. No. (25) at 104:10-104:14.

**Plaintiffs' Response to SMF ¶ 193**

Plaintiffs object to SMF193 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

Undisputed.

194.   CGG cannot identify which requests for assistance it receives that are rejected due to lack of resources. Ex. No. (25) at 112:25-113:13.

**Plaintiffs' Response to SMF ¶ 194**

Disputed.  The cited testimony does not support this SMF.  The testimony does not relate to requests for assistance generally.  Instead, the testimony relates to determining "which requests for assistance [CGG] rejects due to the difficulty of recruiting counsel and which it rejects due to the lack of resources to fulfill that request."  SMF Ex. 25 at 113:1-113:4.  As to CGG's diversion of resources

generally, *see* CGG Response to SMF 184.

195.   CGG has used its participation as a plaintiff in this case for fundraising purposes. Ex. No. (25) at 161:5-161:8, 162:25-163:16, 170:9-22.

**Plaintiffs' Response to SMF ¶ 195**

Undisputed.

196.   CGG fundraising increased every year from the filing of this lawsuit through 2019. Ex. No. (25) at 174:21-174:23.

**Plaintiffs' Response to SMF ¶ 196**

Undisputed.

197.   When CGG represented to potential donors that "all donations go for the direct costs of litigation," it meant the "vast majority of resources are being directed to litigation support." Ex. No. (25) at 171:4-171:22.

**Plaintiffs' Response to SMF ¶ 197**

Undisputed.

198.   CGG educates its members and the general public with the same

message. Ex. No. (25) at 58:13-58:18.

**Plaintiffs' Response to SMF ¶ 198**

Disputed.  The educational message is "generally the same," but active members receive more information and contact.  SMF Ex. 25 at 58:16-18.


199.   The non-financial resources CGG claims it has diverted includes volunteer time but CGG does not track volunteer time. Ex. No. (25) at 87:17-88:14.

**Plaintiffs' Response to SMF ¶ 199**

Undisputed.  Further answering this SMF, CGG has identified substantial resources in the form of volunteer time that has been diverted.  *See* Plaintiffs' Response to SMF 184.  *See* Dkt. 1597 Nakamura Decl. ¶ 5; Dkt.  1596 Throop Decl. ¶¶ 5-8; Dkt. 1594 Martin ¶ 19; Forney Dkt. 1592 ¶ 3; Dkt. 1617 Wasson Decl. ¶¶ 3-4.


200.   While more than 80% of CGG volunteer time is related to this litigation and CGG's efforts related to the Dominion Voting System, the remaining 20% of time includes answering questions about the Dominion Voting System and election administration. Ex. No. (25) at 92:8-94:12.

**<u>Plaintiffs' Response to SMF ¶ 200</u>**

Disputed. This SMF misstates the witness's testimony Ms. Marks estimated that 50% of volunteer time relates to this litigation, 30% related to voting system and audit topics, and 20% related to other election administration activities.  Opp. Ex. 267, Marks Dep. at 92:8-94:12.

201.   More than 90% of CGG's work is dedicated to election related activities. Ex. No. (25) at 154:13-155:4.

**<u>Plaintiffs' Response to SMF ¶ 201</u>**

Undisputed.

202.   CGG's inability to engage on topics it wishes to engage in is due to this litigation and activities related to Dominion BMDs. Ex. No. (25) at 84:23-85:5.

**<u>Plaintiffs' Response to SMF ¶ 202</u>**

Disputed. This SMF misstates the witness's testimony.  CGG's inability to fully engage on topics it wishes to engage in is due in part to the demands of the Curling case and the other non-litigation activities relating to Dominion BMD system.   SMF Ex. 25 at 84:23-85:5.

126

203.   When CGG reported its program service accomplishments to the IRS in 2017, 2018, and 2019, it listed this litigation and other litigation challenging touchscreen voting systems. Ex. No. (25) at 97:8-100:2, 101:3-101:22, 103:25-104:3, 107:10-107:22.

**Plaintiffs' Response to SMF ¶ 203**

Undisputed.


204.   CGG files lawsuits in pursuit of the interests that it exists to protect. Ex. No. (25) at 135:19-135:22.

**Plaintiffs' Response to SMF ¶ 204**

Undisputed.


205.   CGG sometimes serves its organizational purpose by filing litigation. Ex. No. (25) at 142:11-142:20.

**Plaintiffs' Response to SMF ¶ 205**

Undisputed. Witness stated that litigation is a last resort to achieve CGG's goals. SMF Ex. 25 at 128:8.

206.   This litigation was a project of primary focus for CGG in 2021. Ex.

No. (25) at 128:8-128:14.

**Plaintiffs' Response to SMF ¶ 206**

Undisputed.


207.   CGG's interests include jurisdictions using BMDs and advocacy

around the use of electronic voting. Ex. No. (25) at 136:24-137:13.

**Plaintiffs' Response to SMF ¶ 207**

Undisputed.


208.   The injury alleged by CGG member Mr. Brian Blosser related to the

electronic pollbook when he attempted to vote in a 2017 special election. Ex. No.

(26) at ¶ 152; Ex. No. (25) at 199:13-200:4.

**Plaintiffs' Response to SMF ¶ 208**

Undisputed.


209.   CGG cannot state whether Mr. Blosser is currently a member of CGG.

Ex. No. (25) at 187:19-188:10.

**Plaintiffs' Response to SMF ¶ 209**

Undisputed.

210.   Allegations about injuries of member Virginia Forney in the TAC were related to ballot secrecy on DREs, not on BMDs. Ex. No. (26) at ¶ 150; Ex. No. (25) at 206:13-207:20.

**Plaintiffs' Response to SMF ¶ 210**

Undisputed.

211.   CGG advises its members to vote using absentee-by-mail ballots and not in person. Ex. No. (25) at 206:4-206:12.

**Plaintiffs' Response to SMF ¶ 211**

Disputed. This SMF mischaracterizes Ms. Marks' testimony.  In the context of Georgia elections, CGG generally advises its members to vote using absentee by mail ballots. SMF Ex. 25 at 206:4-7.  CGG does not favor mail ballot voting generally, but CGG believes "it is, with all its difficulties, preferable to voting on BMDs." *Id.* at 206:10-12.

212.   The injuries alleged by CGG members Forney and Walker both relate

to ballot secrecy issues. Ex. No. (25) at 206:13-207:20.

**Plaintiffs' Response to SMF ¶ 212**

Disputed. The SMF mischaracterizes Ms. Marks's testimony. She stated that

one of the concerns of Dr. Forney and Ms. Walker was ballot secrecy, but

specifically mentioned mail ballot difficulties (207:5-6) and election security

(207:18-20). Forney and Walker have injuries caused by the violation of ballot

secrecy violations but are not limited to such violation. *See also* Dkt. 1592 Forney

Decl. ¶ 8-13,19, 25.


213.   There is no universal form of how people become members of CGG.

Ex. No. (25) at 180:24-181:13.

**Plaintiffs' Response to SMF ¶ 213**

Plaintiffs object to the statement of fact as immaterial because it is not cited

in, and State Defendants do not rely on it in, their briefs.  The Court therefore

should not consider it.  LR 56.1(B)(1).


214.   There are no membership fees or dues necessary to become a member

of CGG. Ex. No. (25) at 182:7-183:03, 187:13-18.

**Plaintiffs' Response to SMF ¶ 214**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

215.   There are no obligations for CGG members to work together to promote the goals of the organization. Ex. No. (25) at 191:8-191:19.

**Plaintiffs' Response to SMF ¶ 215**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

216.   Members and non-members of CGG both benefit from access to civic activities such as poll watching, auditing election results, and publishing opinion pieces. Ex. No. (25) at 184:24-185:11.

**Plaintiffs' Response to SMF ¶ 216**

Undisputed.

217.   CGG does not have a current list of its members. Ex. No. (25) at

181:22-182:6.

**Plaintiffs' Response to SMF ¶ 217**

Undisputed. CGG's current working list has not been updated to account for members' change in contact details or deaths.  SMF Ex. 25 at 182:3-6.

218.   CGG does not have a current email list for its members. Ex. No. (25) at 183:20-184:16.

**Plaintiffs' Response to SMF ¶ 218**

Undisputed.

219.   If CGG prevailed in this lawsuit, it would still continue its work on county election administration problems and issues. Ex. No. (25) at 48:20-49:19.

**Plaintiffs' Response to SMF ¶ 219**

Undisputed.

220.   CGG contends that voters can never know who voters voted for because of the use of Dominion BMDs in polling places. Ex. No. (25) at 239:8-242:2.

**Plaintiffs' Response to SMF ¶ 220**

Disputed. The cited testimony relates to the verifiability of elections in determining what candidate won.  Opp. Ex. 267, Marks Dep. at 240:3-7. Any implication that all voters' ballots are secret and the identity of the voter cannot be learned and in some cases is disputed.  *See also* Plaintiffs' Response to SMF48.

221.   CGG does not question the results of the November 2020 election in Georgia but believes voters can never know the outcome of the election. Ex. No. (25) at 243:2-243:9.

**Plaintiffs' Response to SMF ¶ 221**

Disputed. The cited evidence does not support the statement.  CGG does not question the outcome of the November 2020 presidential election.  SMF Ex. 25 at 243:4-5.  CGG's position is that it is not possible to verify the outcome of any election primarily conducted on BMDs.  SMF Ex. 25 at 243:10-14.

Plaintiffs object to SMF221 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

222.   CGG contends that voters in Georgia will have a reasonable basis to

question each election conducted in Georgia as long as the Dominion BMDs are the primary source of votes cast. Ex. No. (25) at 246:3-246:8.

**Plaintiffs' Response to SMF ¶ 222**

Undisputed.

223.   Each individual Coalition plaintiff personally opposes BMD-marked paper ballots. Ex. No. (27) at 151-152, 157-158, 163, 168.

**Plaintiffs' Response to SMF ¶ 223**

Undisputed.

**E.   Laura Marie Digges**

224.   Laura Marie Digges is a resident of Cobb County, Georgia. Ex. No. (28) at 11:18-23.

**Plaintiffs' Response to SMF ¶ 224**

Undisputed.

225.   Mrs. Digges does not have any specific education or training with respect to election law, or election administration. Ex. No. (28) at 14:15-24.

**Plaintiffs' Response to SMF ¶ 225**

Plaintiffs object to SMF225 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

226.   Mrs. Digges worked as a poll watcher during the 2018 gubernatorial election and again in 2019, but she did not receive any training relating to the hardware, programming, or cybersecurity of the voting equipment. Ex. No. (28) at 14:25-16:21.

**Plaintiffs' Response to SMF ¶ 226**

Plaintiffs object to SMF226 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

227.   Mrs. Digges has not received any training or education concerning the DRE voting machines, the BMD voting machines, or the operation or function of the BMD scanners. Ex. No. (28) at 17:24-18:14.

**Plaintiffs' Response to SMF ¶ 227**

Plaintiffs object to SMF227 as immaterial.  It is not cited in, and State

Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

228.   Mrs. Digges has voted on a DRE voting machine, but never on a BMD voting machine. Ex. No. (28) at 18:15-19.

**Plaintiffs' Response to SMF ¶ 228**

Plaintiffs object to SMF228 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

229.   Mrs. Digges has no plans to ever vote on a BMD in the future. Ex. No. (28) at 42:17-19.

**Plaintiffs' Response to SMF ¶ 229**

Undisputed.

230.   Mrs. Digges has voted absentee by mail ballot in every election since 2016. Ex. No. (28) at 42:17–19; L. Digges ENET Report, Ex. No. (29) at 1-2.

**Plaintiffs' Response to SMF ¶ 230**

Disputed. Mrs. Digges's testimony is misstated. She stated that she voted by

136

absentee mail ballot in all elections in which she has voted since 2016. SMF Ex. 28 at 42:12-13. Witness did not attempt to review all federal, state, county, and municipal elections since 2016 to determine whether she had participated in every election. [Cite?]

231.   Mrs. Digges read reports on Facebook from unnamed individuals that votes during the November 3, 2020 election were being switched, but she has no evidence that any vote in any race during the November 3, 2020 election was switched. Ex. No. (28) at 46:17-49:13, 49:22-50:3.

**Plaintiffs' Response to SMF ¶ 231**

Plaintiffs object to SMF231 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

232.   Mrs. Digges claims to have seen a voting machine briefly left unattended at a Cobb County election location. She reported the incident to local election official, Janine Eveler, and to CBS 46, but did not make any report to any state election official. Ex. No. (28) at 24:15-26:23.

**<u>Plaintiffs' Response to SMF ¶ 232</u>**

Plaintiffs object to SMF232 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

233.   Mrs. Digges has no evidence that any BMD used in any election was hacked or than any malware was ever inserted into any BMD used in a Georgia election. Ex. No. (28) at 32:24–33:1, 33:2–11.

**<u>Plaintiffs' Response to SMF ¶ 233</u>**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

**F.    William Digges III**

234.   William Digges III is a resident of Cobb County, Georgia. Ex. No. (30) at 15:8-16.

**<u>Plaintiffs' Response to SMF ¶ 234</u>**

Undisputed.

235.   Mr. Digges has a BA in accounting and received a master's degree in information systems in 1995. Ex. No. (30) at 17:8-22.

**Plaintiffs' Response to SMF ¶ 235**

Undisputed.


236.   Mr. Digges voted on DRE voting machines but not on the BMD voting machines. Ex. No. (30) at 22:13-21.

**Plaintiffs' Response to SMF ¶ 236**

Undisputed.


237.   Mr. Digges worked for IBM from 1977 until 2010 when he retired. Ex. No. (30) at 23:6-10.

**Plaintiffs' Response to SMF ¶ 237**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


238.   Mr. Digges worked for Kennesaw State University for a few months in 2010 and then retired from that position. Ex. No. (30) at 24:19-22.

**Plaintiffs' Response to SMF ¶ 238**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

239.   Mr. Digges does not have any training in Georgia election law or election administration or procedures for any state. Ex. No. (30) at 20:5-14.

**Plaintiffs' Response to SMF ¶ 239**

Plaintiffs object to SMF239 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

240.   Mr. Digges has never worked at a polling place or as a poll worker, in any role. Ex. No. (30) at 20:15-17.

**Plaintiffs' Response to SMF ¶ 240**

Plaintiffs object to SMF240 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

241.   Mr. Digges has never received training or education in cybersecurity. Ex. No. (30) at 21:11-13.

**Plaintiffs' Response to SMF ¶ 241**

Undisputed.

242.   Mr. Digges has never received training or education with respect to voting equipment. Ex. No. (30) at 21:14-16.

**Plaintiffs' Response to SMF ¶ 242**

Plaintiffs object to SMF242 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

243.   Mr. Digges has never received training or education related to computer hacking, or the insertion of malware into a computer system. Ex. No. (30) at 21:17-23.

**Plaintiffs' Response to SMF ¶ 243**

Plaintiffs object to SMF243 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

244.   Mr. Digges has never received training or education concerning the operation or function of DRE voting machines, BMD voting machines, or the BMD scanners. Ex. No. (30) at 21:20-10.

**Plaintiffs' Response to SMF ¶ 244**

Plaintiffs object to SMF244 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

245.   Mr. Digges has no evidence that DREs were hacked or that malware was inserted into any Georgia voting machine. Ex. No. (30) at 31:21–31:25, 34:2–34:5.

**Plaintiffs' Response to SMF ¶ 245**

Undisputed.

246.   Mr. Digges has no evidence that any BMD was hacked or that any malware has been inserted into any BMD in Georgia. Ex. No. (30) at 34:6–34:13.

**Plaintiffs' Response to SMF ¶ 246**

Undisputed.

247.   Mr. Digges has been a member of CGG since 2017 and transcribed data for them and attended a few state meetings. Ex. No. (30) at 25:15-26:2.

**Plaintiffs' Response to SMF ¶ 247**

Plaintiffs object to SMF247 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

248.   Mr. Digges's goal as a plaintiff in this lawsuit is to change voting to hand marked paper ballots. Ex. No. (30) at 30:1-5.

**Plaintiffs' Response to SMF ¶ 248**

Undisputed.

249.   Although his July 5, 2019 statement marked as Exhibit WD 0003 stated that he was "expected to lead the Coalition Plaintiffs' review of the [GEMS] database", he only transcribed the Pima County GEMS database from Access into Excel. Ex. No. (30) at 40:7-9, 42:3-9.

**Plaintiffs' Response to SMF ¶ 249**

Plaintiffs object to SMF249 as immaterial.  It is not cited in, and State

Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

250.   He did not review the databases for Hall County and Cobb County. Ex. No. (30) at 42:25-43:6.

**Plaintiffs' Response to SMF ¶ 250**

Plaintiffs object to SMF250 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

251.   It was anticipated that Mr. Digges was going to "lead the team of less experienced analysts in their labor-intensive clerical review of voluminous data" but that never happened. Ex. No. (30) at 46:1-11, Coalition Plaintiffs' Statement on W. Digges, Ex. No. (31) at 2.

**Plaintiffs' Response to SMF ¶ 251**

Plaintiffs object to SMF151 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).  SMF251 is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it.  LR 56.1(B)(1).

252.   Mr. Digges was never prevented from voting by absentee ballot and did not have any trouble doing so. Ex. No. (30) at 52:18-25.

**Plaintiffs' Response to SMF ¶ 252**

Disputed. Cited evidence does not support the statement. While Digges was not prevented from voting a mail ballot, he did suffer injuries in voting by mail ballot. SMF Ex. 30 at 51:18-53:17 (describing numerous injuries associated with voting by absentee ballot).

253.   The challenges he described by voting absentee are the same for a lot of voters. Ex. No. (30) at 53:1-6.

**Plaintiffs' Response to SMF ¶ 253**

Undisputed.

254.   As per Mr. Digges' ENET report, Mr. Digges has only voted by absentee ballot since 2016. Ex. No. (30) at 37:21-38:10, 34:23-24; *see generally* W. Digges ENET Report, Ex. No. (32).

**Plaintiffs' Response to SMF ¶ 254**

Undisputed.

145

255.   Mr. Digges has no plans to vote on a BMD in the future. Ex. No. (30) at 38:25-39:2.

**Plaintiffs' Response to SMF ¶ 255**

Undisputed.

### G.   Ricardo Davis

256.   Ricardo Davis graduated from the University of Arkansas in 1986 with an undergraduate degree in Chemistry. He received a minor in computer science as well. He also received ad Masters Degree in Chemistry from Texas A&M in 1990. R. Davis Dep., Ex. No. (33) at 17:4-18, 17:13-18:20.

**Plaintiffs' Response to SMF ¶ 256**

Undisputed.

257.   Davis has worked in Information Technology since 1995 at various companies. Ex. No. (33) at 21:11-13, 22:11-26:5.

**Plaintiffs' Response to SMF ¶ 257**

Plaintiffs object to SMF257 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it.

LR 56.1(B)(1).

258.   In his job as an IT professional, Davis never worked with an organization that is related to voting or elections. Ex. No. (33) at 35:6-24.

**Plaintiffs' Response to SMF ¶ 258**

Plaintiffs object to SMF258 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

259.   Davis has no specialized training related to election equipment, including the DRE and BMD devices used in Georgia's election system over the last two decades. Ex. No. (33) at 28:6 -22.

**Plaintiffs' Response to SMF ¶ 259**

Plaintiffs object to SMF259 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

260.   Davis has never examined a BMD device apart from viewing it being used in connection with his duties as a poll watcher. Ex. No. (33) at 28:23-30:9.

**Plaintiffs' Response to SMF ¶ 260**

Plaintiffs object to SMF260 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

261.   In his job as an IT professional, Davis never worked with an organization that is related to voting or elections. Ex. No. (33) at 35:6-24.

**Plaintiffs' Response to SMF ¶ 261**

Plaintiffs object to SMF261 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

262.   Davis has no specialized training related to election equipment, including the DRE and BMD devices used in Georgia's election system over the last two decades. Ex. No. (33) at 28:6 -22.

**Plaintiffs' Response to SMF ¶ 262**

Plaintiffs object to SMF262 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs, and the Court should not consider it. LR 56.1(B)(1).

263.   Davis has never examined a BMD device apart from viewing it being used in connection with his duties as a poll watcher. Ex. No. (33) at 28:23-30:9.

**Plaintiffs' Response to SMF ¶ 263**

Plaintiffs object to SMF263 as immaterial.  It is not cited in, and State Defendants do not rely on it in, their briefs, and the Court should not consider it. LR 56.1(B)(1).

264.   Davis has no specialized knowledge of BMD equipment operation apart from reading what is available publicly on the internet and watching expert testimony in this case. Ex. No. (33) at 30:17-32:18.

**Plaintiffs' Response to SMF ¶ 264**

Plaintiffs object to SMF264 as immaterial.  It is not cited in, and State Defendants do not rely on it in, their briefs, and the Court should not consider it. LR 56.1(B)(1).

265.   Davis has no evidence that a DRE has ever hacked during an election in Georgia and no evidence that a BMD in use in Georgia was ever hacked. Ex. No. (33) at 41:16–42:9, 42:16–20.

**Plaintiffs' Response to SMF ¶ 265**

Undisputed.

266.   Davis has no evidence that malware was ever inserted into a Georgia voting machine since 2019. Ex. No. (33) at 42:21–43:5.

**Plaintiffs' Response to SMF ¶ 266**

Undisputed.

267.   Davis has never voted on a BMD in Georgia and does not plan to vote on one in the future. Ex. No. (33) at 43:6-11; *see generally* R. Davis ENET Report, Ex. No. (34).

**Plaintiffs' Response to SMF ¶ 267**

Disputed. After his deposition, Mr. Davis voted on a BMD during the December 2022 U.S. Senate runoff because, under SB 202, there was insufficient time to obtain an absentee ballot by mail.  Dkt. 1591, Feb. 2023 Davis Decl. ¶ 5.

**H.    Megan Missett**

268.   Megan Missett is registered to vote as Margaret Missett. M. Missett Dep. Ex. No. (35) at 5:18-21.

**Plaintiffs' Response to SMF ¶ 268**

Undisputed.

269.   Missett is a member of CGG. Ex. No. (35) at 48:16-18.

**Plaintiffs' Response to SMF ¶ 269**

Undisputed.

270.   Missett is a resident of Fulton County, Georgia. Ex. No. (35) at 15:19-20.

**Plaintiffs' Response to SMF ¶ 270**

Undisputed.

271.   Missett moved to Georgia in 1996. Ex. No. (35) at 15:24-25.

**Plaintiffs' Response to SMF ¶ 271**

Undisputed.

272.   Missett testified in GA legislature regarding voting legislation a number of times. Ex. No. (35) at 16:22-25, 17:6-11.

**Plaintiffs' Response to SMF ¶ 272**

Undisputed.

273.   Missett testified before the Georgia legislature about issues with fair voting and voter suppression and wanting hand marked paper ballots. Ex. No. (35) at 18:14-18.

**Plaintiffs' Response to SMF ¶ 273**

Undisputed.

274.   Missett also contacted legislators in person or by email concerning voting, trustworthiness of voting machines, and systemic bias and access to the ballot. Ex. No. (35) at 20:6-13, 19-22.

**Plaintiffs' Response to SMF ¶ 274**

Undisputed.

275.   Missett graduated in 1986 from Sarah Lawrence College and got her Ph.D. in Clinical Psychology at St. Johns University in 1992. Ex. No. (35) at 27:7-12.

**Plaintiffs' Response to SMF ¶ 275**

Undisputed.

276.   Missett practiced clinical psychology in Mississippi and has not practice since moving to Georgia. Ex. No. (35) at 32:23-24.

**Plaintiffs' Response to SMF ¶ 276**

Undisputed.

277.   Missett worked as a poll watcher in DeKalb a couple of times. Ex. No. (35) at 32:20-33:6.

**Plaintiffs' Response to SMF ¶ 277**

Undisputed.

278.   The first time Missett worked as a poll watcher for the Ossoff campaign. Ex. No. (35) at 33:13-16.

**Plaintiffs' Response to SMF ¶ 278**

Undisputed.

279.   The next time Missett worked at a poll was for CGG's citizen

engagement efforts. Ex. No. (35) at 35:12-17.

**Plaintiffs' Response to SMF ¶ 279**

Undisputed.


280.   Missett also worked outside polling locations to organize people to photograph the poll tapes from DREs on behalf of CGG on three occasions. Ex. No. (35) at 38:15-21, 34-38:2, 38:18-22.

**Plaintiffs' Response to SMF ¶ 280**

Undisputed.


281.   Missett's involvement in photographing poll tapes was in Fulton County, Dekalb, Dougherty, Randolph and Terrell. Ex. No. (35) at 40:12-17.

**Plaintiffs' Response to SMF ¶ 281**

Undisputed.


282.   Missett has not had any formal training in computer hardware in voting machines, cybersecurity, hacking or inserting malware in voting equipment or the operation of voting equipment. Ex. No. (35) at 41:15- 42:19.

**Plaintiffs' Response to SMF ¶ 282**

Undisputed.


283.   As of Missett's deposition on September 28, 2021, Missett has voted

on voting machines twice. Ex. No. (35) at 42:24-43:4; *see generally* M. Missett

ENET Report, Ex. No. (36).

**Plaintiffs' Response to SMF ¶ 283**

Disputed. Cited evidence does not support statement. Missett voted on

BMDs twice as of the date of her deposition, (SMF Ex. 35, Misset Dep. at 43:3-4)

but had also voted on a DRE voting machine. *Id*. at 42:23.)

Plaintiffs object to SMF283 as immaterial.  It is not cited in, and State

Defendants do not rely on it in, their briefs, and the Court should not consider it.

LR 56.1(B)(1).


284.   Missett is affiliated with many voter advocacy groups including Black

Lives Matter, Common Cause and ACLU of GA. Ex. No. (35) at 48:19-21, 49:8-9.

**Plaintiffs' Response to SMF ¶ 284**

Plaintiffs object to SMF284 as immaterial.  It is not cited in, and State

Defendants do not rely on it in, their briefs, and the Court should not consider it.

LR 56.1(B)(1).

285.   Missett was asked by Marilyn Marks to be a plaintiff in the lawsuit. Missett Depo., 54:2-3. She became a Plaintiff in this case at the time of the Third Amended Complaint in February, 2018. Ex. No. (35) at 54:13-17.

**Plaintiffs' Response to SMF ¶ 285**

Undisputed.

286.   Missett's concerns are of the possibility that malware could be inserted in Georgia voting machines. Ex. No. (35) at 57:16-18.

**Plaintiffs' Response to SMF ¶ 286**

Plaintiffs object to SMF286 as immaterial.  It is not cited in, and State Defendants do not rely on it in, their briefs, and the Court should not consider it. LR 56.1(B)(1).

287.   Missett has no evidence that any component of Georgia's election system has been hacked or that malware was inserted. Ex. No. (35) at 66:21–67:6.

**Plaintiffs' Response to SMF ¶ 287**

Undisputed.

288.   Missett has no evidence that votes were changed in Georgia or that any DRE was actually hacked. Ex. No. (35) at 56:1–8.

**Plaintiffs' Response to SMF ¶ 288**

Plaintiffs object to SMF288 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

289.   Missett has no evidence that any malware has been inserted into any BMD in Georgia. Ex. No. (35) at 57:13–57:16, 58:14–58:15.

**Plaintiffs' Response to SMF ¶ 289**

Plaintiffs object to SMF289 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

290.   Missett does not have any plans to vote on a BMD in the future and plans to vote by absentee ballot. Ex. No. (35) at 59:10-12, 19-22.

**Plaintiffs' Response to SMF ¶ 290**

Undisputed as to Missett's plans at the time of her deposition.  Since her

deposition, Missett has voted on BMDs in a number of elections.  *See* CGG

Response to SMF 283.

291.   As long as BMDs are used in Georgia, Missett plans to vote by

absentee ballot. Ex. No. (35) at 60:2-5; 73:21-23.

**Plaintiffs' Response to SMF ¶ 291**

Undisputed.  *See* Plaintiffs' Response to SMF 290.

**III.   THE BMD SYSTEM HAS PROVIDE A SECURE AND ACCURATE METHOD OF CONDUCTING GEORGIA'S ELECTIONS SINCE ITS IMPLEMENTATION**

**A.   Numerous risk-limiting audits and hand recounts have confirmed the accuracy and reliability of the BMD system**

292.   Georgia law requires the Secretary of State to conduct risk-limiting

audits ("RLAs") on at least one general-election race in even years to further

confirm election results for the BMD voting systems. O.C.G.A. 21-2-498(e).

**Plaintiffs' Response to SMF ¶ 292**

DISPUTED.  Plaintiffs object to SMF292 because the cited evidence does

not support the statement of fact, and the Court should not consider it.  LR

56.1(B)(1)(a).  O.C.G.A. § 21-2-498(e) does not reference any requirement of

RLAs "on at least one general-election race in even years."  Instead, it requires the

Secretary of State "to conduct a risk-limiting audit pilot program with a risk limit of not greater than 10 percent in one or more counties by December 31, 2021."

Plaintiffs also object to SMF292 because State Defendants' characterization of a Georgia statute is legal argument or a legal conclusion, rather than a statement of material fact in dispute, and the Court should not consider it.  LR 56.1(B)(1)(c).

293.   RLAs make use of statistical methods like random sampling to validate the accuracy of an election result and are considered the "gold standard for post-election tabulation auditing" by the Carter Center. Ex. No. (37) at 11; Ex. No. (38) at 2; O.C.G.A. § 21-2-498(a)(3).

**Plaintiffs' Response to SMF ¶ 293**

Undisputed.

294.   In conducting an RLA (and in a recount), the printed, human-readable text on the BMD ballot controls and is what officials count. Ga Comp. R. & Regs. 183-1-15-.02(j).

**Plaintiffs' Response to SMF ¶ 294**

DISPUTED.  When votes are initially tabulated, the scanner reads the QR code and tabulates the votes encoded it.  Dkt. 1131 ¶¶ 2, 3.2.  "Election results are

determined from ballot QR codes, which malware can modify, yet voters cannot check that the QR codes match their intent, nor does the state compare them to the human-readable ballot text."  Dkt. 1131 at 6; Dkt. 1590-7, Feb. 2023 Marks Decl., Ex. 7 at 5 ("You cannot audit 'voter intent.'").

SMF294 is misleading in its implication that recounts and RLAs are tabulated based on the same ballot markings.  In an official recount, absent a court order for a manual count, the QR code is tabulated by the scanners, as it was in the original count.  Ga Comp. R. & Regs.  183-1-15-.03(1)(b).  In contrast, in a post-election audit, the printed, the human-readable text is relied on to determine the voters' selections.  Ga Comp. R. & Regs. 183-1-15-.04 (2) (4).

Plaintiffs object to SMF294 because State Defendants' characterization of a Georgia statute is legal argument or a legal conclusion, rather than a statement of material fact in dispute, and the Court should not consider it.  LR 56.1(B)(1)(c).

295.   Since the passage of House Bill 316, Georgia has conducted two statewide RLAs: the first on November 19, 2020 for the 2020 Presidential election, and the second on November 18, 2022 for the 2022 Georgia Secretary of State election. *See generally* November 2020 Risk-Limiting Audit Report, Ex. No. (39); (publicly available at https://sos.ga.gov/news/georgias-2022-statewide-risk-

limiting-audit-confirms-results).

### **Plaintiffs' Response to SMF ¶ 295**

DISPUTED.  The audit activities undertaken by State Defendants to date do not qualify as risk-limiting audits.  Opp. Ex. 220, Stark Dep. 48:3-4 (Georgia's "risk-limiting audit is a risk-limiting audit in name rather than in fact.").  To conduct what qualifies as an RLA,[4] Georgia would need the ability to correct an election outcome before certification if the outcome is wrong.  *Id*. at 48:11-12.  Current Georgia law, however, does not require a full manual recount to correct inaccurate results.  *See* Opp. Ex. 225, Sept. 2018 Stark Decl., at 12 ¶¶ 27-28; Opp. Ex. 220, Stark Dep. at 48:9-25.  For Georgia to conduct a proper RLA it would also need to change its election procedures, including the physical security of the voted ballots, the physical accounting for ballots, and checks of chain of custody. Opp. Ex. 220, Stark Dep. at 19:9-20:06, 20:23-21:14; SMF Ex. 44, Dec. 2022 Stark Decl. ¶ 6).

Dr. Stark found that the November 2020 hand count audit was not a genuine RLA.  SMF Ex. 42, Mar. 2022 Stark Decl. at 30 footnote 29.  He also found that the November 2022 audit "was not a genuine RLA, nor an effective audit."  SMF

---

[4] Though Plaintiffs may refer to audits in Georgia as "RLAs" for convenience, it is Plaintiffs' position that the audits that Georgia conducts are not valid Risk Limiting Audits.

Ex. 44, Dec. 2022 Stark Decl. at 4.  An RLA requires more than what Georgia has yet attempted, including trustworthy paper ballots.  SMF Ex. 42, Mar. 2022 Stark Decl. at 31 ¶ 87 (g).

This Court has found that "there is no audit remedy that can confirm the reliability and accuracy of the BMD system, as Dr. Stark has stressed."  Opp. Ex. 91 at 77; SMF Ex. 44, Dec. 2022 Stark Decl. ¶ 5 (An RLA cannot be conducted on an election utilizing BMDS as the primary method of voting), Opp. Ex. 220, Stark Dep. at 19:9-20:6, 20:23-21:14.  "[E]ven the most robust risk-limiting audit can only assess an election outcome; it cannot evaluate whether individual votes counted as intended."  Dkt. 1131 at 6-7.  *See* SAF No. 384-394, 401.

Plaintiffs object to SMF295 because online news articles are generally inadmissible hearsay, and State Defendants have provided no foundation for the admissibility of this article.  *Aldana,* 578 F.3d at 1290 n.3.  SMF295 is therefore not supported by a citation to evidence that could be presented in admissible form at trial, and the Court should not consider it.  LR 56.1(B)(1); *Sumbak*, 2021 WL 1521988, at *1-2.


296.   The Carter Center observed both RLAs at the State's invitation. *See generally* Ex. (37); *see also* Ex. (38).

162

**Plaintiffs' Response to SMF ¶ 296**

DISPUTED.  Georgia's November 19, 2020, and November 18, 2022, audits were not RLAs or effective audits.  *See* Plaintiffs' Response to SMF295.  Plaintiffs do not dispute that The Carter Center observed post-election audit activities in 2020 and 2022.

297.   The November 19, 2020 RLA was conducted by auditing all 159 counties, examining 41,881 batches, hand-sorting and then hand-tallying each ballot. Ex. No. (39)

**Plaintiffs' Response to SMF ¶ 297**

DISPUTED.   Georgia's November 19, 2020 audits was not a RLA or effective audit.  *See* Plaintiffs' Response to SMF295.  In addition, the number of ballot batches was not 41,881, as the audit worksheet contained errors including missing batches and duplicated batches. *See* SMF Ex. 42, Mar. 2022 Stark Decl., ¶¶ 40-42 (providing examples).

298.   This was the largest hand count of ballots in U.S. history. Ex. No. (39).

**Plaintiffs' Response to SMF ¶ 298**

DISPUTED.  What the document describes as a RLA of the November 2020 presidential contest in Georgia was not a proper RLA, nor was it an official or valid count of ballots.  SMF Ex. 42, Mar. 2022 Stark Decl., at 30 footnote 29; *see also* Plaintiffs' Response to SMF295.

Plaintiffs object to SMF298 because press releases are generally inadmissible hearsay, and State Defendants have provided no foundation for the authentication or admissibility of this press release.  SMF298 is therefore unsupported by admissible evidence, and the Court should not consider it.  LR 56.1(B)(1)(a), (c).

299.   Most counties found no change in their final tally, and the majority of the remaining counties changed fewer than 10 ballots. (Publicly available at https://sos.ga.gov/page/2020-general-election-risk-limiting-audit).

**Plaintiffs' Response to SMF ¶ 299**

DISPUTED.  The cited press release refers to the difference between the audit tally and the original machine count. SMF299 refers to the final tally, which was determined by an official machine recount after the completion of the audit tally referenced in the press release.  Dr. Stark noted that there are discrepancies in

the two machine counts.  SMF Ex. 42, Mar. 2022 Stark Decl. ¶ 61.

Plaintiffs dispute SMF299 to the extent it implies that the audit referenced in the cited press release was a RLA or an effective audit or that the reference audit was accurate or reliable.  *See* Plaintiffs' Response to SMF295.

Plaintiffs object to SMF299 because press releases are generally inadmissible hearsay, and State Defendants have provided no foundation for the admissibility of this press release.  SMF299 is therefore unsupported by admissible evidence, and the Court should not consider it.  LR 56.1(B)(1)(a), (c).  Plaintiffs also object to SMF299 because it is not supported by the cited evidence, and the Court should not consider it.  LR 56.1(B)(1)(a).

300.   103 of the 159 counties showed a margin variation of less than 0.05%, and Georgia's highest error rate in any county recount during the audit was 0.73%.  Ex. No. (39).

**Plaintiffs' Response to SMF ¶ 300**

DISPUTED.  SMF300 is impermissibly vague. It is unclear what a "county recount during the audit" refers to.  The presidential race recount was a second machine count and occurred subsequent to the hand count audit, with the machine recount producing the official final results.  The "highest error rate" referenced in

SMF Exhibit 39 purports to compare the hand count audit to the original official machine count, not the recount.  SMF Ex. 39 at 1; SMF Ex. 42, Mar. 2022 Stark. Decl. ¶ 43; *see also* Plaintiffs' Response to SMF295.

Plaintiffs object to SMF300 because press releases are generally inadmissible hearsay, and State Defendants have provided no foundation for the authentication or admissibility of this press release.  SMF300 is therefore unsupported by admissible evidence, and the Court should not consider it.  LR 56.1(B)(1)(a), (c).

301.   This percentage was well within the expected margin of human error that occur during hand-counting ballots. Ex. No. (39).

**Plaintiffs' Response to SMF ¶ 301**

DISPUTED.  In the 2020 audit process, the State was purportedly auditing the 2020 Presidential election in Georgia, not "hand-counting ballots" as is stated in SMF301. "The Secretary of State attributed all differences between the audit and the original count to human counting error, citing a 2012 study that found hand-count error rates as high as 2 percent. This is simplistic, unfounded, and disingenuous. While human error almost certainly accounts for *some* of the difference, there is no evidence that it accounts for most of the difference,

much less the entire difference, as Secretary of State Raffensperger claimed."
SMF Ex. 42, Mar. 2022 Stark Decl. ¶¶ 49-50.  Additionally, "[t]here is no basis
whatsoever to conclude that the differences [in the original count and the official
recount that was certified] result entirely from human error without investigating
the other possibilities."  Opp. Ex. 221, Jan. 2022 Stark Decl., ¶ 52; *see also*
Plaintiffs' Response to SMF295.

Plaintiffs object to SMF301 because press releases are generally
inadmissible hearsay, and State Defendants have provided no foundation for the
authentication or admissibility of this press release.  SMF301 is therefore
unsupported by admissible evidence, and the Court should not consider it.  LR
56.1(B)(1)(a), (c).


302.   Hand-counting can produce error rates that are up to 2% on average,
according to a 2012 study by Rice University and Clemson University. (Publicly
available at https://sos.ga.gov/news/historic-first-statewide-audit-paper-ballots-
upholds-result-presidential-race); (study publicly available at
https://news2.rice.edu/2012/02/02/hand-counts-of-votes-may-cause-errors-says-
new-rice-u-study/).

**Plaintiffs' Response to SMF ¶ 302**

DISPUTED.  SMF302 misrepresents the cited press release, which says

"hand counting . . . can result in error rates of up to 2%."  The 2% is an upper

bound, not an "average," as stated in SMF302.  *See also* Plaintiffs' Response to

SMF301.

Plaintiffs object to SMF302 because press releases are generally

inadmissible hearsay, and State Defendants have provided no foundation for the

admissibility of this press release or the underlying study.  SMF302 is therefore

unsupported by admissible evidence, and the Court should not consider it.  LR

56.1(B)(1)(a), (c).

303.   After conducting the recount, Georgia showed a mere 0.1053%

variation in statewide total vote count, and a 0.0099% variation in the overall

margin, confirming that the original machine count accurately portrayed the winner

of the election. Ex. No. (39).

**Plaintiffs' Response to SMF ¶ 303**

DISPUTED.  SMF303 is impermissibly vague because it is unclear what

the term "recount" is referring to.  The cited Secretary of State press release

discusses a hand count audit compared to the original machine count, while

SMF303 erroneously references the recount, which is a machine count conducted to determine the official results.  The stated percentages do not accurately reflect the difference between the hand count audit and the original machine count.  SMF Ex. 42, Mar. 2022 Stark Decl. ¶ 43.

Further, Georgia lacks a trustworthy audit record, and absent a trustworthy record of votes, no procedure can provide affirmative evidence that the reported winners(s) really won.  *See* SAF No. 384-401.  Dr. Stark found false the Secretary of State's claim that the post-election audit of the November 3, 2020, presidential contest confirmed the winner of the election.  SMF Ex. 42, Mar. 2022 Stark Decl. ¶¶ 23; *see also* Plaintiffs' Response to SMF295.

Plaintiffs object to SMF303 because press releases are generally inadmissible hearsay, and State Defendants have provided no foundation for the admissibility of this press release.  SMF303 is therefore unsupported by admissible evidence, and the Court should not consider it.  LR 56.1(B)(1)(a), (c)). Plaintiffs also object to SMF303 because it is not supported by the cited evidence, and the Court should not consider it.  LR 56.1(B)(1)(a).


304.   For the statewide audit of the 2022 General Election, county election officials in all 159 counties hand counted a random selection of ballots in order to

confirm the accuracy of the results for the Secretary of State election. (Report

publicly available at https://sos.ga.gov/news/georgias-2022-statewide-risk-

limiting-audit-confirms-

results#:~:text=November%2018th%2C%202022&text=The%20purpose%20of%2

0the%20audit,for%20jurisdictions%20who%20conduct%20RLAs.).

### **Plaintiffs' Response to SMF ¶ 304**

DISPUTED.  The audit of the 2022 Secretary of State's contest was not a

"statewide audit of the 2022 General Election" as claimed by SMF304. The

attempted audit was of only the Secretary of State's race.  "No matter how

rigorous an audit is, an audit of one or more contests provides no evidence that

the outcome of any unaudited contest is correct. Errors and malware may

affect some contests but not others."  SMF Ex. 42, Mar. 2022 Stark Decl. ¶87

(f).

The 2022 audit attempted to address the correctness of the outcome, not

confirm the accuracy of the results, as misleadingly claimed by SMF304.  SMF Ex.

44, Dec. 2022 Stark Decl., at 11 n. 8.  "[E]ven the most robust risk-limiting audit

can only assess an election outcome; it cannot evaluate whether individual votes

counted as intended." Dkt. 1131 at 6-7; *see also* Plaintiffs' Response to SMF295.

Plaintiffs object to SMF304 because press releases are generally

170

inadmissible hearsay, and State Defendants have provided no foundation for the admissibility of this press release.  SMF304 is therefore unsupported by admissible evidence, and the Court should not consider it.  LR 56.1(B)(1)(a), (c).

305.   The risk limit set was 5% for the RLA in the 2022 general election statewide audit. (Report publicly <u>available at https://sos.ga.gov/news/georgias-2022-statewide-risk-limiting-audit-confirms-results#:~:text=November%2018th%2C%202022&text=The%20purpose%20of%20the%20audit,for%20jurisdictions%20who%20conduct%20RLAs</u>.).

**<u>Plaintiffs' Response to SMF ¶ 305</u>**

DISPUTED.  With respect to the risk limit, Dr. Stark stated that because of the lack of information disclosed to the public concerning the choices of audit parameters, "it is impossible for the public to determine whether the initial sample size was set correctly or whether the audit stopped appropriately."  SMF Ex. 44, Dec. 2022 Stark Decl. ¶17; *see also* Plaintiffs' Response to SMF295.

Plaintiffs object to SMF305 because press releases are generally inadmissible hearsay, and State Defendants have provided no foundation for the admissibility of this press release.  SMF305 is therefore unsupported by admissible evidence, and the Court should not consider it.  LR 56.1(B)(1)(a), (c).

306.   328 total batches were audited, of which 279 (85%) had no deviation from the original vote totals. (Report publicly available at https://sos.ga.gov/news/georgias-2022-statewide-risk-limiting-audit-confirms-results#:~:text=November%2018th%2C%202022&text=The%20purpose%20of%20the%20audit,for%20jurisdictions%20who%20conduct%20RLAs.).

**Plaintiffs' Response to SMF ¶ 306**

DISPUTED.  SMF306 is misleading because it implies that the audit at issue was a genuine RLA, which it was not.  SMF Ex. 44, Dec. 2022 Stark Decl., Dkt. 1569-44 ¶ 8; *see also* Plaintiffs' Response to SMF295.  Plaintiffs also object to SMF306 because press releases are generally inadmissible hearsay, and State Defendants have provided no foundation for the admissibility of this press release. SMF306 is therefore unsupported by admissible evidence, and the Court should not consider it.  LR 56.1(B)(1)(a), (c).

307.   Of the 49 other batches, all except for one were within the expected 5% margin of error for a hand count. (Report publicly available at https://sos.ga.gov/news/georgias-2022-statewide-risk-limiting-audit-confirms-results#:~:text=November%2018th%2C%202022&text=The%20purpose%20of%2

0the%20audit,for%20jurisdictions%20who%20conduct%20RLAs.).

**Plaintiffs' Response to SMF ¶ 307**

DISPUTED.  State Defendants themselves alternatively claim that the

expected margin of error for a hand count is 2% on average.  *See* SMF302.  The

cited press release also references a risk limit of 5%, which does not represent an

"expected margin of error."  The risk limit (stated to be 5%) is the largest chance

that the audit will fail to correct an outcome that is incorrect, not a "margin of

error."  Opp. Ex. 225, Sept. 2018 Stark Decl. ¶¶ 30-31.  Additionally, there is no

accepted or expected margin of error for a hand-count audit, and discrepancies are

attributed to the machine errors, as the manual tallies are considered to be accurate.

SMF Ex. 44, Dec. 2022 Start Decl. ¶ 15.  Furthermore, this was not a genuine RLA

or effective audit.  SMF Ex. 44, Dec. 2022 Stark Decl. ¶ 8; *see also* Plaintiffs'

Response to SMF295.

Plaintiffs object to SMF307 because press releases are generally

inadmissible hearsay, and State Defendants have provided no foundation for the

admissibility of this press release.  SMF307 is therefore unsupported by admissible

evidence, and the Court should not consider it.  LR 56.1(B)(1)(a), (c).

308.   This difference was well within the expected margin of error for an

audit of this size. (Report publicly available at https://sos.ga.gov/news/georgias-2022-statewide-risk-limiting-audit-confirms-results#:~:text=November%2018th%2C%202022&text=The%20purpose%20of%20the%20audit,for%20jurisdictions%20who%20conduct%20RLAs.).

**Plaintiffs' Response to SMF ¶ 308**

DISPUTED.  The phrase "the difference" is impermissibly vague, as it is unclear whether it refers to the net state-wide deviation or to one jurisdiction with a 5% error.  Regarding the latter, the Secretary of State assumes, without evidence, that the errors were "likely" "caused by human error during the hand counting process. There is no accepted or expected margin of error for a hand-count audit, and discrepancies are attributed to the machine errors, as the manual tallies are considered to be accurate.  SMF Ex. 44, Dec. 2022 Stark Decl. ¶ 15; *see also* Plaintiffs' Responses to SMF295, SMF307.

Plaintiffs object to SMF308 because the cited press release lays no foundation for "the expected margin of error for an audit of this size."  Plaintiffs also object to SMF308 because press releases are generally inadmissible hearsay, and State Defendants have provided no foundation for the admissibility of this press release.  SMF308 is therefore unsupported by admissible evidence, and the Court should not consider it.  LR 56.1(B)(1)(a), (c).

174

**B.    There is no evidence that the BMD System caused any voter's vote to not be counted**

309.   Curling does not contend that the BMD's switched votes from one candidate to another during the 2020 General Election, nor does she have any evidence to support such a claim. Ex. No. (16) at 24:16-25:5.

**Plaintiffs' Response to SMF ¶ 309**

Plaintiffs object to SMF309 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

310.   Curling is not aware of any facts that support the contention or idea that components of the Election System were hacked prior to or during the elections on November 3rd, 2020. Ex. No. (16) at 16:24-17:5, 21:7-12.

**Plaintiffs' Response to SMF ¶ 310**

Plaintiffs object to SMF310 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

311.   Curling is also unaware of any facts to show that the results of any

election held during the 2020 General Election were changed, manipulated, or

otherwise the result of hacking or insertion of malware into the Georgia Election

System. This response flatly contradicts her sworn response to Secretary

Raffensperger's First Request for Admissions, in which Curling denied she had

"no evidence that any component of the Election System was actually hacked prior

to or during the elections held on November 3, 2020. Ex. No. (16) at 21:15-20,

22:1, 23:5-9, 23:21-24:2; Curling Plaintiffs' Response to Raffensperger's First

Request for Admission, Ex. No. (40) at Response to RFA No. 3.

### **Plaintiffs' Response to SMF ¶ 311**

DISPUTED.  SMF311 mischaracterizes Ms. Curling's testimony.  Ms.

Curling testified that she is unaware "of any facts showing that the results of any

Georgia election on November 3, 2020, were actually changed in any way as a

result of hacking or the insertion of malware into any component of the election

system."  Opp. Ex. 228, Curling Dep. at 21:15-22:1.  Being *unaware* whether

election *results* were changed as a result of hacking is not inconsistent with

denying that she had no evidence that any component of the election system was

hacked.  Plaintiffs also object to SMF311 as immaterial because it is not cited in,

and State Defendants do not rely on it in, their briefs.  The Court therefore should

not consider it.  LR 56.1(B)(1).

312.   Curling is not aware of any incident where the Georgia Election System failed to count any legal vote in the 2020 General Election. Ex. No. (16) at 26:4-9.

**Plaintiffs' Response to SMF ¶ 312**

Plaintiffs object to SMF312 as immaterial.  It is not cited in, and State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

313.   Curling also has no knowledge of an incident where the Georgia Election System counted an illegal vote in the 2020 General Election. Ex. No. (16) at 26:10-14.

**Plaintiffs' Response to SMF ¶ 313**

Plaintiffs object to SMF313 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

314.   Curling maintains that it is "unknown" if any party interfered with Georgia's elections in 2020. Ex. No. (16) at 51:21-23.

**Plaintiffs' Response to SMF ¶ 314**

Plaintiffs object to SMF314 as immaterial.  It is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

315.   Similarly, Curling claims that there is "no way to know" whether any votes were not properly counted on the BMDs, whether the Georgia Election System was hacked by third parties. Ex. No. (16) at 68:15-69:6.

**Plaintiffs' Response to SMF ¶ 315**

Undisputed.

316.   Ultimately, Curling acknowledges that nothing would satisfy her fear that Georgia's Election System was hacked, or that malware was inserted into any component of Georgia's Election System. Ex. No. (16) at 18:21-19:11, 22:9-18, 22:23-24.

**Plaintiffs' Response to SMF ¶ 316**

DISPUTED.  SMF316 mischaracterizes Ms. Curling's testimony.  She did not testify that she feared Georgia's Election System was hacked or that malware was inserted into any component of it, nor did she testify that nothing would satisfy

her "fear."  Instead, she was asked why she denied a request for admission that asked: "Admit that you have no evidence that any component of the election system was actually hacked prior to or during the elections on November 3rd, 2020."  Opp. Ex. 228, Curling Dep. at 18:22-25.  Ms. Curling explained, "I think because there's no way to know one way or the other."  *Id*. at 19:8-9.  She was asked a similar question about malware: "Did you have evidence [on January 21 of last year] that there was actually malware inserted into any component of the election system prior to or during the elections held on November 3rd of 2020?"  *Id*. at 22:10-13.  Ms. Curling said, "I – I would maintain that there's no evidence either way really."  *Id*. at 22:9-24.  Despite defense counsel's repeated attempts throughout the deposition to couch his questions based on Ms. Curling's alleged fears, *id*. at 92:24-93:2; 93:9-11; 93:24-94:1; 94:24-95:2; 95:25-96:2, Ms. Curling testified, "It's not about fear.  It's about that there's no way to know, and I have a problem with that."  *Id*. at 95:25-96:10*; see also* Plaintiffs' Response to SMF342.

Plaintiffs also object to SMF316 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

317.  Curling has "confidence" in the results of the 2020 General Election.

Ex. No. (16) at 19:8-11.

**Plaintiffs' Response to SMF ¶ 317**

DISPUTED.  SMF317 misrepresents Ms. Curling's testimony.  While Ms. Curling stated she had confidence in the election results, Opp. Ex. 228, Curling Dep. at 19:10-11, she also testified that election results cannot be conclusively verified using a BMD system, *id.* at 98:25-99:5; 99:7-9, that Georgia's BMD system cannot reliably determine election results, *id.* at 104:21-105:6, and that she does not know if the results of the November 2020 presidential election were accurate, *id.* at 105:19-106:6.

Plaintiffs object to SMF317 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


318.   Curling admits that the presidential election, in Georgia, in 2020, was verified. Ex. No. (16) at 79:1-4.

**Plaintiffs' Response to SMF ¶ 318**

DISPUTED.  SMF318 misrepresents Ms. Curling's testimony.  While Ms. Curling testified that she believed the presidential election from November 2020 in Georgia was verified, Opp. Ex. 228, Curling Dep. at 79:1-4, she also testified that

election results cannot be conclusively verified using a BMD system, *id.* at 98:25-99:5; 99:7-9, that Georgia's BMD system cannot reliably determine election results, *id.* at 104:21-105:6, and that she does not know if the results of the November 2020 presidential election were accurate, *id.* at 105:19-106:6.  She also testified that she does not "understand exactly what [risk-limiting audit] means and the amount of auditing that would be required to ensure voter confidence."  *Id.* at 53:9-15.

Plaintiffs also object to SMF318 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

319.   Curling voted by mail in 2020, using a hand-marked paper ballot. Ex. No. (16) at 74:3-9.

**Plaintiffs' Response to SMF ¶ 319**

Plaintiffs object to SMF319 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

320.   Schoenberg has no proof that his vote or anyone else's vote was not

counted as cast during the 2017 Congressional District 6 Special Election or Special Runoff Election. Ex. No. (22) at 54:15-55:3.

**Plaintiffs' Response to SMF ¶ 320**

DISPUTED.  SMF320 mischaracterizes Mr. Schoenberg's testimony.  When asked, "Do you have any reason to believe your vote in the 2017 Congressional District 6 Special Election or Special Runoff Election was not properly recorded and counted?," Mr. Schoenberg testified, "I don't have any reason to -- I don't have any specific proof of that, nor do I have any proof that it was counted as cast. I don't think such proof is available in the universe as it currently exists."  Opp. Ex. 233, Schoenberg Dep. at 54:8-19.  Further, when asked if he had "reason to believe" that other voters' votes in the same contest "were not properly recorded and counted as cast?," he testified, "I have no proof that they were not counted as cast, nor do I have proof that they were counted as cast."  *Id*. at 54:20-55:3.


321.   Schoenberg has no information to support any belief that the winner was incorrect in any previous election. Ex. No. (22) at 73:4-9.

**Plaintiffs' Response to SMF ¶ 321**

DISPUTED.  SMF321 mischaracterizes Mr. Schoenberg's testimony.  He was asked, "Do you believe in the relevant previous elections that the incorrect

winner of any election was certified?," to which he replied, "I don't have any information that would support that, nor do I frankly have information that I know for certain that it hasn't happened."  Opp. Ex. 233, Schoenberg Dep. at 73:4-9.

Mr. Schoenberg also testified, "I have evidence of the possibility that hackers could have manipulated that election and others."  *Id*. at 60:19-21.  He also testified, "I don't know that anything has been hacked.  I do know that it's entirely possible that something could be hacked, either a past election or, frankly, a future election, given what we're currently using as a system."  *Id.* at 72:22-73:2.


322.   Schoenberg does not believe his vote was altered in any previous election or contend that anyone else's vote was altered in any way. Ex. No. (22) at 73:10-14.

**Plaintiffs' Response to SMF ¶ 322**

DISPUTED.  SMF322 misrepresents Mr. Schoenberg's testimony.  In a discussion about the November 2016 General Election, April 2017 Special Election, and the June 2017 Runoff Election, Opp. Ex. 233, Schoenberg Dep. at 68:14-23, Mr. Schoenberg was asked, "Do you believe that your vote was altered in any way?," to which he replied, "No, I don't believe that my vote was altered in any way; but I have no proof to suggest it wasn't."  Opp. Ex. 233, Schoenberg

Dep. at 73:10-14.  Defense counsel then asked whether he contended "that any

other votes in the relevant previous elections were altered in any way?," and he

said, "What I contend is that votes can potentially be manipulated and there would

be no record of it such that you could have a verifiable, trustworthy, certifiable,

auditable election.  The state can't give me the documented evidence to show that

these things do not happen.  That's the contention."  *Id*. at 73:22-74:6.

323.   Schoenberg has no evidence to believe the 2018 election results were

manipulated or that the winners were not the correct winners in the elections. Ex.

No. (22) at 84:6-18.

**Plaintiffs' Response to SMF ¶ 323**

DISPUTED.  SMF323 mischaracterizes Mr. Schoenberg's testimony.  Mr.

Schoenberg testified that he does not contend and has no evidence that the

"incorrect winners were certified," but he does not believe the winners can be

properly certified because the system is fundamentally flawed.  Opp. Ex. 233,

Schoenberg Dep. at 84:12-18.

324.   CGG cannot identify any voter whose vote was not counted as a result

of the use of Dominion BMDs, Dominion precinct scanners, Dominion central

count scanners, and the Dominion election management system. Ex. No. (25) at

234:14-235:09.

**Plaintiffs' Response to SMF ¶ 324**

Disputed.  Some voters' votes and entire ballots were not counted. SMF Ex.

25 at 234:22-235:9. CGG has not attempted to identify individual voters whose

votes were not counted because doing so would invade the voters' privacy.

325.   CGG does not know of any person in the state of Georgia who was

not able to vote as a result of the State's use of the Dominion BMDs. Ex. No. (25)

at 231:1-231:7.

**Plaintiffs' Response to SMF ¶ 325**

Disputed.  Although CGG knows of no voter who was unable to engage in

the act of voting as a result of the BMDs, CGG disputes that all voters' votes were

accurately counted in all BMD elections. *See* Plaintiffs' Response to SMF 299.

326.   CGG does not know of any person in the state of Georgia who was

unable to vote because of the lack of necessary audits. Ex. No. (25) at 231:8-

231:14.

**<u>Plaintiffs' Response to SMF ¶ 326</u>**

Disputed.  Although CGG knows of no voter who was unable to engage in the act of voting as a result of inadequate audits, some voters' votes were not counted because of inadequate audits.  *See* Plaintiffs' Response to SMF 325.

327.   Digges admitted she has no evidence establishing that a vote in Georgia was cast but not counted. Ex. No. (28) at 31:6-15.

**<u>Plaintiffs' Response to SMF ¶ 327</u>**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

328.   Davis has no evidence that any votes he cast in any Georgia election were not counted. Ex. No. (33) at 40:20-41:8.

**<u>Plaintiffs' Response to SMF ¶ 328</u>**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

329.   While working as a poll watcher, Missett did not observe anyone having a problem with the BMD. Ex. No. (35) at 35:18-22.

**Plaintiffs' Response to SMF ¶ 329**

Disputed.  SMF 329 is not supported by the evidence. Statement misstates Ms. Missett's testimony. Ms. Missett testified that she saw poll workers having problems with the machines. Dkt. 1558, Missett Dep. at 36:1-4.  Missett arrived at end of voting and saw no one who had a problem "using" a BMD.  *Id.* at 35:18-21. Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

330.   Missett did not have any trouble operating the BMDs. Ex. No. (35) at 43:9-13.

**Plaintiffs' Response to SMF ¶ 330**

Disputed. Ms. Missett had problems using a BMD because of her loss of voter privacy and ballot secrecy, and difficulty verifying the printed ballot.  Dkt. 1595, Feb. 2023 Missett Decl. ¶¶ 16-19.

331.   Missett has no evidence that her vote did not count. Ex. No. (35) at

47:16-17.

**Plaintiffs' Response to SMF ¶ 331**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

332.   Missett does not have any evidence that any votes were changed in GA. Ex. No. (35) at 56:1-4.

**Plaintiffs' Response to SMF ¶ 332**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

333.   Mr. Digges has no evidence that any votes cast on the machines in GA were not counted or were changed. Ex. No. (30) at 31:15-21.

**Plaintiffs' Response to SMF ¶ 333**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

334.   Mr. Digges believes the results of the November 2020 election and the elections in 2020 are valid. Ex. No. (30) at 47:19-48:3.

**Plaintiffs' Response to SMF ¶ 334**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

335.   Mr. Digges believes the results of the January 2021 runoff are valid. Ex. No. (30) at 48:14-18.

**Plaintiffs' Response to SMF ¶ 335**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

336.   Mr. Digges has no evidence that the Georgia election system failed to count any legal votes or counted any illegal votes in 2020. Ex. No. (30) at 50:24-51:6.

**Plaintiffs' Response to SMF ¶ 336**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

337.   Mr. Digges has no evidence that there was a mismatch of the QR codes or with the human readable portion of the hand marked paper ballots in the November 2020 election. Ex. No. (30) at 51:3-17.

**Plaintiffs' Response to SMF ¶ 337**

 Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

**C.    There is no evidence that the BMD Systems have been compromised or suffer from malware**

338.   Curling has no knowledge of any bad actor who actually manipulated Georgia's election process by targeting and infiltrating the Georgia Center for Election System at Kennesaw State University. Ex. No. (16) at 56:10-15.

**Plaintiffs' Response to SMF ¶ 338**

DISPUTED.  SMF338 mischaracterizes Ms. Curling's testimony.  In

response to the question, "do you have any knowledge of any bad actor who actually manipulated the State's elector process by targeting and infiltrating the CES?," Opp. Ex. 228, Curling Dep. at 56:10-13,  Ms. Curling said, "I have no information of that, but I also have no information that it did not occur."  *Id*. at 56:14-15.  She was asked a similar question later, "do you have any knowledge of an actual threat of electronic and other intrusion and manipulation by individuals and entities without authorization to do so," *id*. at 88:24-89:2, and Ms. Curling replied, "[y]es; the KSU system in 2017," which was "hacked" by Logan Lamb. *Id*. at 89:3-11.  She continued, "[H]is access means that a – that many others could have had access who could have [attempted to change the outcome of any election]."  *Id*. at 89:14-16; *see also* Plaintiffs' Response to SMF85.

Plaintiffs also object to SMF338 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


339.   Curling did not know of anyone intending to interfere in Georgia's 2022 elections. Ex. No. (16) at 51:24-52:5.

**Plaintiffs' Response to SMF ¶ 339**

Plaintiffs object to SMF339 as immaterial because it is not cited in, and

State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

340.   Schoenberg has no evidence that anyone has manipulated election results. Ex. No. (22) at 60:11-21, 61:7–8.

**Plaintiffs' Response to SMF ¶ 340**

DISPUTED.  SMF340 mischaracterizes Mr. Schoenberg's testimony.  Mr. Schoenberg testified, "I believe that it's possible" that "sophisticated hackers have manipulated election results in the United States."  Opp. Ex. 233, Schoenberg Dep. at 60:11-14.  He continued, "I have evidence of the possibility that hackers could have manipulated [the Jun 2017 Runoff] election and others.  I'm relying on our experts for that."  *Id*. at 60:17-21; *see also* Plaintiffs' Response to SMF342.

341.   Schoenberg also does not believe any previous elections have been hacked. Ex. No. (22) at 72:22-73:2.

**Plaintiffs' Response to SMF ¶ 341**

DISPUTED.  SMF341 mischaracterizes Mr. Schoenberg's testimony.  In response to the question, "Do you believe that the relevant previous elections were hacked or manipulated in any way," Mr. Schoenberg testified, "I don't know that

192

anything has been hacked.  I do know that it's entirely possible that something

could be hacked, either a past election or, frankly, a future election, given what

we're currently using as a system."  Opp. Ex. 233, Schoenberg Dep. at 72:18-73:2;

*see also* Plaintiffs' Response to SMF342.


342.   Schoenberg is not aware of any Russian manipulation of elections. Ex.

No. (22) at 141:24-145:18.

**Plaintiffs' Response to SMF ¶ 342**

DISPUTED.  SMF342 mischaracterizes Mr. Schoenberg's testimony.  In

response to the question, "So the accounts of individuals from Russia hacking into

elections, are you aware of any accounts establishing that Russians manipulated

elections in that manner?"  Mr. Schoenberg replied, "No, I'm not aware of any

accounts of Russian manipulation of elections.  I believe I am aware of accounts of

Russian hacking into databases that were not supposed to be publicly available in

election other than – election systems other than in Georgia."  Opp. Ex. 233,

Schoenberg Dep. at 145:7-16.

SMF342 is also incomplete and inaccurate because, when Mr. Schoenberg

was deposed, he had not had, and still has not had, access to the July 2021

Halderman Report, which details the high risk that "Georgia's election system

continues to face . . . of being targeted by hostile foreign government, such as Russia, which mounted a complex campaign of cyber attacks against U.S. election infrastructure—including Georgia's—during the 2016 election." Dkt. 1131 at 12.

343.   Mrs. Digges purpose in filing and proceeding with this litigation is that she believes the voting machines to be untrustworthy, and believes they are subject to being hacked and are insecure. However, she is also concerned about absentee voting, and stated that "I would love to vote on the machines if I trusted them." Ex. No. (28) at 30:2-21.

**<u>Plaintiffs' Response to SMF ¶ 343</u>**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

344.   Mrs. Digges has not had any specific training on how to operate a BMD. Ex. No. (28) at 18:4-14.

**<u>Plaintiffs' Response to SMF ¶ 344</u>**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore

should not consider it.  LR 56.1(B)(1).

345.   Mrs. Digges admitted she has no evidence that any BMD used in any Georgia election was hacked. Ex. No. (28) at 32:24-33:1.

**Plaintiffs' Response to SMF ¶ 345**

Undisputed.

346.   Mrs. Digges admitted she has no evidence that any malware was ever actually inserted into any BMD used in a Georgia election since 2019. Ex. No. (28) at 33:2-11.

**Plaintiffs' Response to SMF ¶ 346**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

347.   Mrs. Digges admitted she has no evidence of any malfunctions in the election system that impacted the outcome of the November 3, 2020 presidential election. Ex. No. (28) at 50:8-24.

**Plaintiffs' Response to SMF ¶ 347**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

348.   Mrs. Digges admitted she has no evidence that any illegal votes were counted in the November 3, 2020 election. Ex. No. (28) at 53:2-6.

**Plaintiffs' Response to SMF ¶ 348**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

349.   Mrs. Digges admitted she has no evidence of any mismatch between the QR codes and the human readable portion of the paper ballots in the November 3, 2020 election. Ex. No. (28) at 53:17-24.

**Plaintiffs' Response to SMF ¶ 349**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

350.    Davis has no evidence a BMD in use in Georgia was ever hacked. Ex. No. (33) at 42:16-20.

**Plaintiffs' Response to SMF ¶ 350**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

351.    Davis has no evidence malware was inserted in a voting machine in Georgia since 2019. Ex. No. (33) at 42:21-43:5.

**Plaintiffs' Response to SMF ¶ 351**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

352.    Missett does not have any evidence that there was any malware inserted in any BMD in GA. Ex. No. (35) at 57:13-16, 58:14-15.

**Plaintiffs' Response to SMF ¶ 352**

Plaintiffs object to the statement of fact as immaterial because it is not cited

in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

353.   Missett has no evidence that any component of the Georgia election system was hacked. Ex. No. (35) at 66:21-67:1.

**Plaintiffs' Response to SMF ¶ 353**

Undisputed.

354.   Missett has no evidence of insertion of malware in any component of the Georgia election system prior to or during the Nov. 3, 2020 election. Ex. No. (35) at 67:2-6.

**Plaintiffs' Response to SMF ¶ 354**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

355.   Missett has no evidence that the results of any November, 3, 2020 election were changed. Ex. No. (35) at 67:7-10.

**Plaintiffs' Response to SMF ¶ 355**

Undisputed to the extent that SMF355 is limited to changes made other than by official recounts; otherwise disputed. Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

356.   Missett has no evidence of actual hacking of the Georgia election system. Ex. No. (35) at 67:22-68:2.

**Plaintiffs' Response to SMF ¶ 356**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

357.   Missett does not have evidence that any vote was changed from Biden to Trump due to a problem with the software or an algorithm or any design feature of the election system in the November 3, 2020 election. Ex. No. (35) at 69:8-20.

**Plaintiffs' Response to SMF ¶ 357**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore

should not consider it.  LR 56.1(B)(1).

358.   Missett does not have evidence of any votes changed in any 2020 election. Ex. No. (35) at 69:15-20.

**Plaintiffs' Response to SMF ¶ 358**

Disputed. Ms. Missett testified that she had no evidence that votes were switched from Trump to Biden as a result of a system problem.  SMF Ex. 35 at 69:8-20.  Vote tallies were changed as a result of the official recount.  Dkt. 1617, Feb. 2023 Wasson Decl.  ¶ 28; Dkt. 1617-4, Feb. 2023 Wasson Decl. Ex. 4.

359.   Missett does not have evidence that Georgia election system failed to count any vote in the November 3, 2020 election. Ex. No. (35) at 70:14-18.

**Plaintiffs' Response to SMF ¶ 359**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

360.   Missett has no evidence that the results of runoff elections in January 2021 were changed in any way due to hacking or insertion of malware. Ex. No.

(35) at 77:3-9.

**Plaintiffs' Response to SMF ¶ 360**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

361.   Mr. Digges has no evidence that malware was inserted in any Georgia voting machine. Ex. No. (30) at 34:2-5.

**Plaintiffs' Response to SMF ¶ 361**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

362.   Mr. Digges has no evidence that BMDs were hacked or that any malware was inserted into any BMD. Ex. No. (30) at 34:6-13.

**Plaintiffs' Response to SMF ¶ 362**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

363.   Mr. Digges has no evidence that any component of the Georgia election was hacked or that there was malware inserted in the November 2020 election. Ex. No. (30) at 48:4-12.

**Plaintiffs' Response to SMF ¶ 363**

Undisputed.

364.   Mr. Digges has no evidence that any component of the Georgia election system was hacked or that there was any malware inserted into any component of the election system in the January runoff. Ex. No. (30) at 48:21-49:5.

**Plaintiffs' Response to SMF ¶ 364**

Undisputed.

365.   Mr. Digges has no evidence that there were any votes changed in the 2020 presidential election or any other election in 2020. Ex. No. (30) at 49:11-50:1.

**Plaintiffs' Response to SMF ¶ 365**

Disputed.  Vote tallies were changed as a result of the official recount.  *See* Plaintiffs' Response to SMF 358.

366.   Mr. Digges has no evidence of any malfunction of the election system that impacted the outcome of the November 2020 election. Ex. No. (30) at 50:6-10.

### Plaintiffs' Response to SMF ¶ 366

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

367.   On July 2022, MITRE's National Election Security Lab, retained by Dominion Voting Systems Corp., provided their findings of an independent expert technical review of the claims concerning the security of specific devices used in the conduct of elections in the State of Georgia. *See generally* Ex. No. (41).

### Plaintiffs' Response to SMF ¶ 367

DISPUTED.  Plaintiffs object to SMF367 because the MITRE Report is inadmissible.  No one from MITRE has ever been disclosed, timely or otherwise, as an expert in this litigation, for any purpose.  Not only would any such disclosure now be untimely under the parties' scheduling order, Opp. Ex. 295, but it would not be justified.  *See* LR26.2(C) (a party who fails to comply with the disclosure requirements "shall not be permitted to offer the testimony of the party's expert,

unless expressly authorized by Court order based upon a showing that the failure to comply was justified"); *Deutz Corp. v. Engine Dist. Inc*., 2019 WL 13207635 *11 (Nov. 18, 2019 N.D. Ga.) ("the standard for striking untimely expert testimony is not whether the opposing party is prejudiced, but whether the proffering party's failure to comply was justified").  State Defendants have had the MITRE report for at least eight months and first sought to file it on the docket in October 2022.  The State Defendants could offer no justification for waiting until now—after filing their summary judgment motion—to put forward the MITRE report as expert testimony.  *See* Opp. Ex. 296 at n.1, 4 (striking an expert report from Coalition Plaintiffs as untimely one year ago).

Second, the MITRE Report constitutes hearsay to which no hearsay exception applies.  *Neagle v. Illinois Tool Works, Inc*., 2011 WL 13173913 *1 (N.D. Ga. Feb. 11, 2011) (expert reports generally are inadmissible because they are hearsay); FRCP 801.  This Court previously struck the MITRE Report from the docket and should do so again.  Dkt. 1520 at 2-3 (directing clerk to strike Dkts. 1486-1 and 1487-1, the MITRE Report and Report executive summary and noting that "Dominion's decision to share Dr. Halderman's report with MITRE NESL in the first place potentially violated the Court's Protective Order").

SMF367 is therefore not supported by a citation to admissible evidence, and

the Court should not consider it.  LR 56.1(B)(1).  Plaintiffs also object to SMF367

as immaterial because it is not cited in, and State Defendants do not rely on it in,

their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


## IV.   PLAINTIFFS' EXPERTS AND THEIR FINDINGS

### A.   Dr. Philip Stark

368.   Dr. Philip Stark is a Professor of Statistics at the University of

California–Berkeley. *See generally* Stark March 9, 2022 Decl., Ex. No. (42) at 34-

200.

### Plaintiffs' Response to SMF ¶ 368

Undisputed.


369.   Dr. Stark was previously a member on Georgians for Verified

Voting's Board of Advisors. *See generally* Dr. Stark's Resignation Letter from

Verified Voting, Ex. No. (43) (publicly <u>available at</u>

https://www.stat.berkeley.edu/~stark/Preprints/vv-resign-19.pdf).

### Plaintiffs' Response to SMF ¶ 369

Disputed.  Dr. Stark was not a member of Georgians for Verified Voting

Board of Advisors.  Plaintiffs object to the statement of fact as immaterial because

it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court

therefore should not consider it.  LR 56.1(B)(1).

370.   Dr. Stark's research expertise and interests, according to the

Berkeley's public webpage, include "uncertainty quantification and inference,

inverse problems, nonparametrics, risk assessment, earthquake prediction, election

auditing, geomagnetism, cosmology, litigation, food/nutrition." (Publicly available

at https://statistics.berkeley.edu/people/philip-b-stark).

**Plaintiffs' Response to SMF ¶ 370**

Undisputed.

371.   Dr. Stark offers two opinions generally relevant to this case: (1) that a

risk-limiting audit, in his view, cannot be conducted on an election utilizing BMDs

as the primary method of voting; and (2) that "absent some changes to procedures;

in particular, around the … physical security of the voted ballots and physical

accounting for ballots, checks of chain of custody, and things of that kind,"

Georgia's risk-limiting audits—whether concerning a BMD-based election system

or hand-marked-paper-ballot-based election system—are insufficient. December 5,

2022 Declaration of P. ¶Stark, Ex. No. (44) at  5, P. Stark Dep., Ex. No. (45) at

19:9–20:06, 20:23–21:14.

**Plaintiffs' Response to SMF ¶ 371**

Undisputed as stated.  Dr. Stark has many additional opinions generally relevant to this case.

372.   Dr. Stark's former colleagues on the Board of Advisors of Verified Voting disagree with Dr. Stark's position, with Dr. David Dill (a Professor Emeritus of Computer Science at Stanford University) noting that his "recent definition of RLAs is revisionist." Ex. No. (46) at CURLING-0010018; *see also* Ex. No. (47) at CURLING-0010127; Ex. No. (48) at CURLING-0010142, Ex. No. (49) at CURLING-0010153; Ex. No. (50) at CURLING-0010166; Ex. No. (51) at CURLING-0010181.

**Plaintiffs' Response to SMF ¶ 372**

Disputed.  The cited references do not support the statement.  SMF Exs. 46, 47, 48, 50, and 51 have no reference to Verified Voting Board of Advisors' opinion either at the time of the emails (2019) or more currently.  Current or former members of the Verified Voting Board of Directors and members of Verified Voting Board of Advisors, including Dr. Richard DeMillo, Ron Rivest, and Dr. David Jefferson, and numerous other members of Verified Voting's two

boards have publicly opposed BMDs for all voters.  *See* Dkt. 1589, Feb. 2023

Stark Decl. Dkt. 1589 ¶ 7.

373.   Indeed, Dr. Stark had previously asserted that "RLAs are procedures

that guarantee a minimum chance of conducting a full manual tally of the voter-

verifiable records when the result of that tally would belie the reported outcome."

In doing so, Dr. Stark and his co-authors discussed how various types of RLA

procedures could be successfully utilized in Indian parliamentary elections to

ensure the accuracy of elections. Ex. No. (46) at CURLING-0010018; *see also* Ex.

No. (47) at CURLING-0010127; Ex. No. (48) at CURLING-0010142, Ex. No. (49)

at CURLING-0010153; Ex. No. (50) at CURLING-0010166; Ex. No. (51) at

CURLING-0010181.

### Plaintiffs' Response to SMF ¶ 373

Disputed.  The cited evidence does not support the statement.  Indian

Parliamentary elections and RLAs in India are not referenced in the referenced

exhibits.  Plaintiffs object to the statement of fact as immaterial because it is not

cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore

should not consider it.  LR 56.1(B)(1).

374.   India, however, utilizes "Electronic Voting Machines (EVMs) … fitted with printers that produce Voter-Verifiable Paper Audit Trails," similar to Georgia's BMD system. Vishal Mohanty, et al., *Auditing Indian Elections*, Ex. No. (52) at 1.

### Plaintiffs' Response to SMF ¶ 374

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

375.   Unlike Georgia's BMD system, however, the Indian system does not scan its paper printouts for the initial tally of the vote. Rather, India's paper audit trails consist of a *separate* printout which is collected in a *separate* container. Ex. No. (52) at 2; Ex. No. (53) at 70:18–21.

### Plaintiffs' Response to SMF ¶ 375

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

376.   Dr. Stark asserted that such an RLA in India "may justify confidence

209

of voters, candidates, and parties that election results are correct," Indian Elections

at 2, though he maintains in this case that RLAs conducted in Georgia are not

"genuine risk-limiting audit[s]" because of the use of BMDs and RLAs cannot

determine whether BMDs altered enough votes to change the apparent winner. Ex.

No. (44) at ¶ 5; Ex. No. (45) at 19:13–20:06.

### Plaintiffs' Response to SMF ¶ 376

 Undisputed.


377.   Dr. Stark ultimately resigned from his position with Verified Voting

due to this disagreement, re-iterating that RLAs conducted on BMD ballots "can't

confirm election outcomes" and arguing that Verified Voting's public statement

concerning pilot RLAs in Georgia "has done damage to a case trying to hold

Georgia SoS accountable for historic neglect of election integrity and its ill-advised

decision to buy universal-use BMDs." Ex. No. (43).

### Plaintiffs' Response to SMF ¶ 377

DISPUTED.  SMF377 does not state what "this disagreement" is and it is,

thus, impermissibly vague.  Plaintiffs do not dispute the statements attributed to

Dr. Stark.  *See also* Plaintiffs' Response to SMF 372.

378.   Dr. Stark asked Verified Voting to clarify that statement to explain that, in his view, "basing an audit on BMD output cannot confirm election outcomes," with enough time to allow for that revised statement "to be used in court filings to counter claims that Georgia election officials have made in court documents." However, Dr. Stark noted that "[n]o such statement has been made." Ex. No. (43) at 2.

**Plaintiffs' Response to SMF ¶ 378**

Undisputed.  *See also* Plaintiffs' Response to SMF 372.

379.   Much like the leadership at Verified Voting, the National Academies of Sciences, Engineering and Medicine's 2018 report *Securing the Vote: Protecting American Democracy* recommending the use of RLAs states that RLAs can be done using paper ballots that have been "marked by hand or by machine (using a ballot marking device)." *Securing the Vote: Protecting American Democracy*, National Academies of Sciences, Engineering and Medicine, 2018, Ex. No. (54) at 80 (report publicly available at https://nap.nationalacademies.org/catalog/25120/securing-the-vote-protecting-american-democracy).

**Plaintiffs' Response to SMF ¶ 379**

DISPUTED.  SMF379 is misleading.  First, the National Academy of Science report cited by State Defendants is based on the state of scientific knowledge in 2018.  In the five years since the 2018 National Academy of Science report, after additional research by Dr. Halderman and others, the scientific consensus has changed.  *See also* Plaintiffs' Response to SMF6.  Second, a risk-limiting audit cannot be conducted on an election utilizing BMDs as the primary method of voting.  SMF Ex. 45, Dec. 2022  Stark Decl. at X; SMF Ex. 44 ¶ 5; Opp. Ex. 220, Stark Dep. at 19:9–20:06, 20:23–21:14.

Plaintiffs also object to SMF379 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

380.   Dr. Stark's categorical opposition to conducting an RLA on a BMD-based election is rooted in his opinion that the BMD paper trail cannot be trusted because too few voters verify their ballots. However, Dr. Stark has not reviewed and is "not aware of any studies on the rate at which voters do verify [HMPBs]." *See, e.g.,* Ex. No. (55) at 225, ¶ 13; Ex. No. (53) at 60:1–2.

**Plaintiffs' Response to SMF ¶ 380**

DISPUTED.  SMF380 mischaracterizes Dr. Stark's testimony.  Although Dr. Stark testified in September 2020 that he was "not aware of any studies on the rate at which voters do verify [HMPBs]," he continued "The issue here I believe is not the rate at which voters either make mistakes or correct their own mistakes. The issue is the distinction between a voter being responsible for his or her own work and a voter being responsible for errors introduced by the electronic technology."  SMF Ex. 53, Sept. 10, 2020 Hr'g Tr. at 60:3-7.

381.   Dr. Stark opines that the 2022 RLA conducted on the Secretary of State race was not a genuine RLA, but admitted that he did not "digest the details [of the 2022 RLA] nor [ ] search exhaustively" for such details. Ex. No. (44) at ¶ 8.

**Plaintiffs' Response to SMF ¶ 381**

Plaintiffs object to the statement of fact as immaterial because State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

382.   Specifically, Dr. Stark asserts that, "[t]o the best of his knowledge, there was no mandatory ballot accounting, pollbook reconciliation, eligibility

auditing, chain-of-custody checks, or other measures to ensure that the paper trail was complete and intact." Ex. No. (44) at ¶ 10.

**Plaintiffs' Response to SMF ¶ 382**

Plaintiffs object to the statement of fact as immaterial because State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

383.   However, Dr. Stark could not recall any regulations he had reviewed in coming to that opinion, only that he had reviewed "a 2019 statute." His declaration cites no Georgia regulation or statute concerning RLAs, and includes only a summary for audit software registration, powerpoint slides, and a single email. Ex. No. (44) at 17–74; Ex. No. (45) at 23:18–21.

**Plaintiffs' Response to SMF ¶ 383**

Disputed.  Plaintiffs object to the statement of fact as immaterial because State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).  The cited evidence does not support the statement. Dr. Stark's tenth declaration dated December 5, 2022 (SMF Ex. 45) is 91 pages (with exhibits) and includes far more than "only a summary for audit software registration, powerpoint slides, and a single email."  The exhibits cite the Georgia

214

RLA statute and law at page 34. The fact that Dr. Stark did not recall by number

the statute he read is not disputed. Opp. Ex. 220, Stark Dep. at 23:15-25.

384.   Dr. Stark was not aware that "pollbook reconciliation" is a required

step in Georgia at the time of tabulation. Likewise, Dr. Stark did apparently did not

notice the reconciliation procedures required at the time of an RLA, though it was

noted in the powerpoint slides attached to his declaration. Dr. Stark did however

agree that such redundant checks are a valuable tool. Ga. Comp. R. & Regs., r.

183-1-12-.12; Ex. No. (45) at 27:17–25, 32:01–34:15, 33:03–18.

### **Plaintiffs' Response to SMF ¶ 384**

Disputed. Plaintiffs object to the statement of fact as immaterial because

State Defendants do not rely on it in their briefs.  The Court therefore should not

consider it.  LR 56.1(B)(1).  The stated interpretation of the regulation cited (183-

1-12-.12) is inaccurate, because it only applies to Election Day pollbook recap

sheets, not the entirety of the ballots that are to be audited, which includes early

voting ballots.

385.   Dr. Stark explained that the mandatory ballot accounting he opined

was lacking entailed "keeping track of how many pieces of paper go to each

polling place, [and] how many came back voted, spoiled, or unvoted." Ex. No. (45) at 24:19–20.

### Plaintiffs' Response to SMF ¶ 385

Plaintiffs object to the statement of fact as immaterial because State Defendants do not rely on it in their briefs. The Court therefore should not consider it. LR 56.1(B)(1).

386. State Election Board Rule 183-1-12-.12, which Dr. Stark did not review, requires county poll managers to record the number of ballots printed from each BMD, spoiled ballots, and ballots placed in the emergency bin of the scanner to be recorded on a polling place recap form. Ga. Comp. R. & Regs., r. 183-1-12-.12; Ex. No. (45) at 27:20–23.

### Plaintiffs' Response to SMF ¶ 386

Disputed. *See* Plaintiffs' Response to SMF384.

387. Dr. Stark was unfamiliar with such polling-place recap forms. Ex. No. (45) at 27:04–14.

### Plaintiffs' Response to SMF ¶ 387

Plaintiffs object to the statement of fact as immaterial because State

Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).  *See* Plaintiffs' Response to SMF384.

388.   Dr. Stark described "eligibility auditing" as, for example, "double checking signature verification in some way … for quality control purposes," and ensuring that only eligible voters vote and that they vote the correct ballot. Ex. No. (45) at 38:13–39:10.

**Plaintiffs' Response to SMF ¶ 388**

Plaintiffs object to the statement of fact as immaterial because State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

389.   Dr. Stark clarified in his deposition, however, that he was not offering any opinion on the existing provisional ballot procedures in Georgia. Ex. No. (45) at 39:11–19.

**Plaintiffs' Response to SMF ¶ 389**

Plaintiffs object to the statement of fact as immaterial because State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

390.   Likewise, Dr. Stark noted that he was not offering an opinion as to whether voter eligibility is in fact checked, just that he would like to see a redundant check of eligibility. Ex. No. (45) at 39:20–24.

**Plaintiffs' Response to SMF ¶ 390**

Plaintiffs object to the statement of fact as immaterial because State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

391.   Dr. Stark also opined that "chain of custody checks" were not present. Dec. 7, 2022 Dec. at ¶ 10. Upon reviewing State Election Board Rule 183-1-12-.12 and the documents attached to his declaration, Dr. Stark conceded that chain of custody checks occur both at the tabulation stage and during the RLA. Ex. No. (45) at 36:12–19; Ga. Comp. R. & Regs. r. 183-1-12-.12.

**Plaintiffs' Response to SMF ¶ 391**

Disputed.  Plaintiffs object to the statement of fact as immaterial because State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).  Dr. Stark did opine that "chain of custody checks" were not present.  SMF Ex. 44, Dec. 2022 Stark Decl. ¶ 10.  Dr. Stark did not,

however, testify that chain of custody check actually occurs both at the tabulation stage and during the RLA, only that the cited regulation appeared to require such checks. Opp. Ex. 220, Stark Dep. at 36:12-37:9.

392. Dr. Stark further testified that he "was not aware of any evidence of misbehavior of BMDs," nor tabulators, but that he was aware of "procedural lapses." Ex. No. (45) at 54:23–55:01.

**Plaintiffs' Response to SMF ¶ 392**

Plaintiffs object to the statement of fact as immaterial because State Defendants do not rely on it in their briefs. The Court therefore should not consider it. LR 56.1(B)(1).

393. Dr. Stark did not specify what these "procedural lapses" were. Ex. No. (45) at 54:23–55:01.

**Plaintiffs' Response to SMF ¶ 393**

Disputed. Plaintiffs object to the statement of fact as immaterial because State Defendants do not rely on it in their briefs. The Court therefore should not consider it. LR 56.1(B)(1). The citation is highly misleading. Dr. Stark was not asked to specify the procedural lapses. Instead, after stating that he was aware of

"procedural lapses," counsel for the State Defendants stated: "Ok.  I think that satisfies my questions here."  Opp. Ex. 220, Stark Dep. at 54:23-55:2.   Elsewhere in his deposition (as the State Defendants implicitly concede in their next SMF), Dr. Stark identified procedural lapses, *see id.* at 20 et seq., as he has done in his declarations.  *See, e.g.,* SMF Ex. 44 ¶¶ 9-22 and SMF Ex. 42 ¶¶ 23-84.

394.   Dr. Stark could not say whether these procedural lapses were attributable to the lack of State law or regulation as opposed to local officials failing to adhere to existing law or regulation. Ex. No. (45) at 26:20–03.

**Plaintiffs' Response to SMF ¶ 394**

Disputed.  Plaintiffs object to the statement of fact as immaterial because State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1). Dr. Stark did not so testify.  Instead, when asked whether he was "offering an opinion as to whether state law or regulation itself is adequate or that based on observation of county procedures under such law or regulation that they're not adhering to a regulation, Dr. Stark stated: "So I'm not an attorney.  I won't pretend to be able to interpret the law.  But regardless of what the law says, it seems that this isn't happening in practice, at least not that well."  Opp. Ex. 220, Stark Dep. at 26: 21-27:03.

395.   Dr. Stark did not review the forensic images of the Coffee County
election equipment, which he testified was beyond his expertise in this case. Ex.
No. (45) at 14:16–22.

**Plaintiffs' Response to SMF ¶ 395**

Plaintiffs object to the statement of fact as immaterial because State
Defendants do not rely on it in their briefs.  The Court therefore should not
consider it.  LR 56.1(B)(1).

396.   Dr. Stark was not aware of any evidence that any individual had
corrupted software installed on the Coffee County equipment or otherwise
implanted malware on that equipment, nor that those machines misbehaved in
practice in any way. Ex. No. (45) at 15:12–15, 17:08–15, 54:09–11.

**Plaintiffs' Response to SMF ¶ 396**

Plaintiffs object to the statement of fact as immaterial because State
Defendants do not rely on it in their briefs.  The Court therefore should not
consider it.  LR 56.1(B)(1).

397.   Dr. Stark testified that he is not offering an opinion as to whether the

incorrect winner was certified in any Georgia election and that he would have no

basis for any such opinion. Ex. No. (45) at 55:02–07.

**Plaintiffs' Response to SMF ¶ 397**

Plaintiffs object to the statement of fact as immaterial because State

Defendants do not rely on it in their briefs.  The Court therefore should not

consider it.  LR 56.1(B)(1).

### B.   Kevin Skoglund

398.   Kevin Skoglund ("Skoglund") is an election-system advocate, a

polling-place manager in Pennsylvania for five years, and a consultant for Plaintiff

Coalition for Good Governance. Ex. No. (56) at 114:11-12, 115:12-14, 121:9-16.

**Plaintiffs' Response to SMF ¶ 398**

Undisputed.

399.   Skoglund presents himself as a cybersecurity expert. Ex. No. (56) at

41:23-25.

**Plaintiffs' Response to SMF ¶ 399**

Undisputed.

400.   Skoglund is not an expert in computer forensics. Ex. No. (56) at 41:23-42:2.

**Plaintiffs' Response to SMF ¶ 400**

Undisputed.


401.   Skoglund is not any attorney or legal expert and offers no legal opinions or opinions on legality. Ex. No. (56) at 22:4-7, 28:24-29:1.

**Plaintiffs' Response to SMF ¶ 401**

Undisputed.


402.   Skoglund is not an election-audits expert. Ex. No. (56) at 108:1-3.

**Plaintiffs' Response to SMF ¶ 402**

Plaintiffs object to the statement of fact as immaterial because State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


403.   Skoglund offers no opinion on the accuracy of the reported and certified results of the November 2020 general and January 2021 runoff elections in Georgia. Ex. No. (56) at 44:10-13, 44:24-45:2.

**Plaintiffs' Response to SMF ¶ 403**

Plaintiffs object to the statement of fact as immaterial because State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

404.   Skoglund never has been to the Coffee County, Georgia election office. Ex. No. (56) at 18:3-5.

**Plaintiffs' Response to SMF ¶ 404**

Plaintiffs object to the statement of fact as immaterial.  The Court therefore should not consider it.  LR 56.1(B)(1).

405.   Skoglund reviewed forensic election server images obtained by Plaintiffs from Coffee County, Georgia election equipment and found no malware on any of those images. Ex. No. (56) at 18:19-24.

**Plaintiffs' Response to SMF ¶ 405**

DISPUTED.  SMF405 mischaracterizes Mr. Skoglund's testimony.  Mr. Skoglund testified that he was not asked to search, and did not search, for malware on the servers. Opp. Ex. 181, Skoglund Dep. at 18:24.

406.   Skoglund did not create the forensic election server images he reviewed from Coffee County, Georgia election equipment. Ex. No. (56) at 43:2-8.

**Plaintiffs' Response to SMF ¶ 406**

Plaintiffs object to the statement of fact as immaterial because State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

407.   Skoglund did not compare the forensic election server images he reviewed from Coffee County, Georgia election equipment to the data on the equipment itself as that existed prior to the creation of those forensic server images. Ex. No. (56) at 42:3-24.

**Plaintiffs' Response to SMF ¶ 407**

DISPUTED.  SMF407 mischaracterizes Mr. Skoglund's testimony.  Mr. Skoglund testified that he concluded the forensic images he received were complete copies of Coffee County election devices based on "the fact that those forensic images appear to be legitimate and authentic and have, you know, serial numbers that match other evidence led me to believe that they are authentic."  SMF Ex. 56 at 41:13-42:13.  He further testified that he did not have access to "what those devices looked like" prior to the creation of the forensic image, but that a

225

forensic image "has integrity."  *Id*. at 42:14-43:11.   Plaintiffs object to the

statement of fact as immaterial because State Defendants do not rely on it in their

briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


408.   Skoglund is aware of no one who found any malware in any Georgia

election equipment. Ex. No. (56) at 38:4-7.

**Plaintiffs' Response to SMF ¶ 408**

Plaintiffs object to the statement of fact as immaterial.  The Court therefore

should not consider it.  LR 56.1(B)(1).


409.   Skoglund is not aware of any evidence that Doug Logan or Jeffrey

Lenberg installed malicious code or other malware into any Georgia election

equipment or system. Ex. No. (56) at 45:19-25.

**Plaintiffs' Response to SMF ¶ 409**

Plaintiffs object to the statement of fact as immaterial because State

Defendants do not rely on it in their briefs.  The Court therefore should not

consider it.  LR 56.1(B)(1).


410.   The only data change Skoglund identified in the Coffee County,

Georgia election management server was the logging of a connection of a USB device to that server. Ex. No. (56) at 38:8-39:13.

### Plaintiffs' Response to SMF ¶ 410

Disputed.  The logging of a connection of a USB device to the EMS was the only change by Sullivan Strickler that Mr. Skoglund identified.  Mr. Skoglund also identified in his declaration changes to the date of the EMS made by Mr. Lenberg or Mr. Logan, and testified that there was a great deal of data changed.  Opp. Ex. 181, Skoglund Dep. at 40:24-41:4.


411.   Skoglund is aware of no evidence of anyone actually using information produced from the Coffee County outsider access to subvert the operation of any aspect of Georgia's election system. Ex. No. (56) at 37:8-14.

### Plaintiffs' Response to SMF ¶ 411

DISPUTED.  SMF411 mischaracterizes Mr. Skoglund's testimony.  When asked, "Has anyone actually used the information these  breaches produced to -- and I'm going to borrow some of your  phrases here -- to subvert the operation of any aspect of  George's election system?," he answered, "I don't have any way of knowing that.  It's not in the evidence that I was shown.  And if it has happened, I have not been asked to look at it.  I'm not sure if we would see that

evidence."


412.   Skoglund is aware of no evidence of anyone actually using
information produced from the Coffee County outsider access to reprogram any
Georgia election equipment. Ex. No. (56) at 37:16-18.

**Plaintiffs' Response to SMF ¶ 412**

DISPUTED.  SMF412 mischaracterizes Mr. Skoglund's testimony.  He also
testified, "I think there is evidence that the information about the systems has been
used."  Opp. Ex. 181, Skoglund Dep. at 66:17-18.  "I am aware that [Mr. Logan
and Mr. Lenberg] made what I consider to be significant changes to the system."
Opp. Ex. 181, Skoglund Dep. at 45:24-46:1.  SMF412 also is vague in that "using
information produced" is not defined or explained.


413.   Skoglund is aware of no evidence of anyone actually using
information produced from the Coffee County outsider access to disable any
defense to any aspect of Georgia's election system. Ex. No. (56) at 37:19-23.

**Plaintiffs' Response to SMF ¶ 413**

DISPUTED.  SMF413 is inaccurate.  Mr. Skoglund testified that "there is
evidence that Doug Logan and Jeffrey Lenberg, during their visit that the clock on

the EMS and the ICC were initially reset back to November 5, two days after election day …. In addition [Mr. Lenberg] configured a lot of the standard settings on the ICC and made lots of changes to the advanced settings that typically would be, you know, left alone." Opp. Ex. 181, Skoglund Dep. at 124:19-125:2. *See* Plaintiffs' Response to SMF 412.

414. Skoglund is aware of no evidence of anyone actually using information produced from the Coffee County outsider access to insert malware into any component of the Georgia election system. Ex. No. (56) at 37:24-38:3.

**<u>Plaintiffs' Response to SMF ¶ 414</u>**

Plaintiffs object to this statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs. The Court therefore should not consider it. LR 56.1(B)(1); *see also* Plaintiffs Response to SMF 412.

415. Skoglund is concerned about people outside Georgia having access to information generated from the Coffee County outsider access because "people . . . outside the State of Georgia may not share any of Georgia's interests. They may not be impacted by any problems that are caused." Ex. No. (56) at 55:25-56:2.

**Plaintiffs' Response to SMF ¶ 415**

This Plaintiffs object to this statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

416.   Skoglund's conclusions presented in his Supplemental Report are warnings about areas of heightened concern following the Coffee County outsider access, but he did not see any evidence that any of those heightened concerns actually materialized or happened. Ex. No. (56) at 64:23-66:8.

**Plaintiffs' Response to SMF ¶ 416**

Disputed.  This Plaintiffs object to this statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs. The Court therefore should not consider it.  LR 56.1(B)(1). Mr. Skoglund testified that many of his concerns had in fact already materialized.  Opp. Ex. 181, Skoglund Dep. at 66:10-71:17, 73:3-12.

417.   Skoglund has not reviewed evidence of how election equipment in Coffee County, Georgia operated in elections conducted there since January 2021. Ex. No. (56) at 73:8-13.

**<u>Plaintiffs' Response to SMF ¶ 417</u>**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1). In addition, the citation is inaccurate and should be Opp. Ex. 181, Skoglund Dep. at 72:8-13.


418.   Skoglund is not aware of evidence of data generated from the Coffee County outsider access being put into use in the election system in Georgia. Ex. No. (56) at 76:16-77:14.

**<u>Plaintiffs' Response to SMF ¶ 418</u>**

Disputed.  The cited testimony does not include any statement.  In addition, SMF218 the phrase "being put into use in the election system in Georgia" is vague.


419.   Skoglund has not seen evidence of malware being introduced into the Coffee County, Georgia election equipment, and no one has reported such a finding to him in this case. Ex. No. (56) at 84:5-17.

**<u>Plaintiffs' Response to SMF ¶ 419</u>**

Undisputed.

420.   Aside from the work of Dr. Alex Halderman memorialized in a sealed report in this case, Skoglund is unaware of anyone who has developed a proof-of-concept attack that could be effective on the Georgia election system. Ex. No. (56) at 104:4-11.

**Plaintiffs' Response to SMF ¶ 420**

This Plaintiffs object to this statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

421.   The idea of a perfectly secure voting system that relies on computers is not one that, from a cybersecurity perspective, exists. Ex. No. (56) at 88:19-21.

**Plaintiffs' Response to SMF ¶ 421**

Plaintiffs object to SMF421 as immaterial because it is not cited in, and State Defendants do not rely on it in, either of their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

422.   Access of the sort afforded in the Coffee County outsider access event could impair the trustworthiness of marked paper ballots regardless of how those ballots were marked (i.e., by hand or by ballot-marking device). Ex. No. (56) at

110:1-20.

**Plaintiffs' Response to SMF ¶ 422**

DISPUTED.  SMF422 mischaracterizes Mr. Skoglund's cited testimony. When asked, "Is it -- is it possible that the sort of access that was available to the outsiders who came into Coffee County that we've been talking about in January of 2021, could that access impair the trustworthiness of paper ballots cast in that county regardless of how those paper ballots were marked?," Mr. Skoglund answered, "It -- would it impact them? Yes, but to a significantly different degree depending on the way -- the way that the technology is used. So there's -- yes, it could impact them but at an exponential difference."  Defense counsel then asked, "So the -- from a security perspective, the access that was available to the outsiders in Coffee County in January of 2021 was a concern for both the BMD marked ballots and could be a concern for hand marked ballots cast in that county, right?," to which Mr. Skoglund answered, "I think I just answered that. It's -- it would potentially affect both, but at an exponential difference between them." SMF Ex. 56 at 110:1-21.

Plaintiffs also object to SMF422 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

423.   If all Georgia voters were required to vote on hand-marked paper ballots, the risks Skoglund identified in his Supplemental Report would not be fully mitigated. Ex. No. (56) at 111:10-23.

**Plaintiffs' Response to SMF ¶ 423**

DISPUTED.  Some of the risks identified by Mr. Skoglund in his Supplemental Report would be fully mitigated and other risks would be partly mitigated.  Opp. Ex. 181, Skoglund Dep. at 88:9-14.

424.   The occurrence of the Coffee County outsider access did not change his preexisting opinion that Georgia should not use a ballot-marking device election system. Ex. No. (56) at 119:2-14.

**Plaintiffs' Response to SMF ¶ 424**

Undisputed.

425.   Skoglund has not seen any evidence of voters who were harmed by the Coffee County outsider access. Ex. No. (56) at 112:14-113:2.

**Plaintiffs' Response to SMF ¶ 425**

Undisputed.

426.   Skoglund offers no opinion on whether the Coffee County outsider access burdened anyone's right to vote. Ex. No. (56) at 113:13-18.

**Plaintiffs' Response to SMF ¶ 426**

Plaintiffs object to the statement of fact as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

### C.    Dr. Alex Halderman

**427.**    Dr. Halderman recognizes that the scientific community currently recommends BMDs.  Ex. No. (14) at 151:1-23.

**427.   Plaintiffs' Response to SMF ¶ 427**

DISPUTED.  The scientific community does not currently recommend BMDs.  *See* Plaintiffs' Response to SMF6; SMF Ex. 59, Appel Report ¶ 77; Opp. Ex. 56, Appel Dep. at 48:5-9.

In addition, SMF427 mischaracterizes Dr. Halderman's testimony at the cited July 26, 2019 preliminary injunction hearing.  State Defendants' counsel asked Dr. Halderman about the National Academy of Sciences report from 2018: "And you agree with me that the National Academy of Sciences report on election

systems, Securing the Vote, agrees that ballot marking devices that generate paper

ballots are acceptable for use because they provide independent auditing, correct?"

Opp. Ex. 44, July 2019 PI Hearing Tr. at 151:1-5.  Dr. Halderman replied, "I think

that is what it says.  I don't have it in front of me."  *Id*.at 151:6-7.  Dr. Halderman

then explained that "there has been new research since the National Academy's

result – report that in my mind does call into question the security of ballot

marking devices."  *Id*. at 151:21-23.

In response to State Defendants' footnote 3, Dr. Halderman's expert

opinions do not constitute a "personal disagreement" with the recommendation of

the scientific community.  The "recommendation" referred to in the footnote is not

current or accurate, and Dr. Halderman's professional opinion is consistent with

the expert consensus.  *See* Plaintiffs' Responses to SMF6.

Plaintiffs object to SMF427 because State Defendants failed to cite evidence

supporting the statement of fact.  On that basis, the Court should not consider it.

LR 56.1(B)(1)(a).  Plaintiffs also object to SMF427 because State Defendants

failed to file evidence relied upon for the fact.  On that basis the Court should not

consider it.  LR 56.1(C); Judge Totenberg's Standing Order at III(h).

428.   Dr. Halderman had access to images of Georgia's DREs and GEMS

databases, but never found any evidence of malware on that system. A. Halderman Dep., November 17, 2021, Ex. No. (57) at 33:11–34:4, 35:6–35:20.

**Plaintiffs' Response to SMF ¶ 428**

DISPUTED.  The State selected and provided to Dr. Halderman images of only 10 DREs out of tens of thousands.  Opp. Ex. 55, Nov. 2021 Halderman Dep. at 33:20-22.  On those 10 DRE images, Dr. Halderman did not perform an in-depth search for malware, as that would have been extremely time consuming and was outside the scope of his assignment.  Opp. Ex. 88, Aug. 2021 Halderman Decl. ¶ 24.  Moreover, "[i]nspection is not a reliable way of ruling out the presence of malware.  It can sometimes detect it, but it can't rule it out."  Opp. Ex. 55, Nov. 2021 Halderman Dep. at 35:13-15.  "It's difficult to completely rule out [evidence of malware installed] because of the nature of malware."  Opp. Ex. 55, Nov. 2021 Halderman Dep. at 33:16-19.  "Malware also can take many forms, so if you don't know yet what you're looking for, it can be very difficult to tell whether it's there." Opp. Ex. 55, Nov. 2021 Halderman Dep. at 36:1-4.


429.   Dr. Halderman theorized that it is possible that malware could work on DREs and BMDs, however Dr. Halderman has never designed malware that would work on either voting system. Ex. No. (57) at 30:17–33:10.

**<u>Plaintiffs' Response to SMF ¶ 429</u>**

DISPUTED.  Dr. Halderman implemented working demonstration malware

for both the DRE system and the BMD system.  Opp. Ex. 55, Nov. 2021

Halderman Dep. at 31:14-18.  He demonstrated the DRE malware in court.  Opp.

Ex. 55, Nov. 2021 Halderman Dep. 37:10-12.  The BMD malware is described at

length in the July 2021 Halderman Report.  Dkt. 1131 §§ 5 and 7.  That malware

"could be presumably packaged together by an attacker who wanted to commit

fraud on both" systems.  Opp. Ex. 55, Nov. 2021 Halderman Dep. at 31:14-18.

430.   Despite having access to images and components of the Dominion

equipment accessed in Coffee County, Dr. Halderman still has not identified any

malware that was placed on that equipment nor any indication that votes were

shifted. A. Halderman Dep., January 3, 2023, Ex. No. (58) at 23:23-24:9, 38:13-21.

**<u>Plaintiffs' Response to SMF ¶ 430</u>**

DISPUTED.  Dr. Halderman had access only to images of the ICC

workstation and the election management system server, not the voting equipment

itself.  For example, he did not have access to any of the ICC scanners, BMDs, poll

pads, USB sticks or memory cards following the time of the breach.  Opp. Ex. 264,

Jan. 2023 Halderman Dep. at 24:16-21, 24:24-25:4.  And the images he reviewed

were "presumably from before anyone would have had an opportunity to implant the malware."  Opp. Ex. 264, Jan. 2023 Halderman Dep. at 25:10-12.

Furthermore, the images he received were "pretty badly forensically compromised. . . . Those machines were power cycled many times.  The State's expert, Mr. Persinger, appears to have made deliberate changes to the server over the summer.  All of that happened before we got the images."  . . . Opp. Ex. 264, Jan. 2023 Halderman Dep. at 27:3-12.

Additionally, his "scope of [] work was not really to systematically look for malware in all of the election system components. . . . [I]t would be an enormous undertaking for – that's part of the basic problem here, that through examination of the piece of election eSAFquipment it's extremely difficult, perhaps impossible, to determine that it has not been affected by malicious software."  Opp. Ex. 264, Jan. 2023 Halderman Dep. at 25:17-26:4.  Dr. Halderman testified, however, that while he "didn't turn up any [malware] in a cursory check . . . that that's not a basis for concluding, unfortunately, that the systems are unaffected by malware."  *Id*. at 27:13-22.

To Dr. Halderman's knowledge, "[t]he Secretary of State has not, [], inspected any of the Coffee County voting equipment for evidence of malware or other tampering or taken any effective measures to determine whether the Coffee

County infiltration compromised the voting system."  Opp. Ex. 75, Nov. 2022

Halderman Decl. ¶ 6.d.

### D.    Dr. Andrew Appel

431.    Dr. Appel, like Dr. Halderman, asserts that "[t]he use of BMDs, by

voters who are otherwise able to mark a paper ballot with a pen, is not adequately

secure for use in public elections." A. Appel, June 28, 2021 Expert Report, Ex. No.

(59) at ¶ 86.

#### Plaintiffs' Response to SMF ¶ 431

Undisputed.

432.    Dr. Appel has never forensically examined the Dominion BMDs used

in Georgia. A. Appel Dep., Ex. No. (60) at 38:22–39:03.

#### Plaintiffs' Response to SMF ¶ 432

DISPUTED.   SMF432 is misleading, as Dr. Appel testified that the basis of

his opinions didn't depend on whether he examined the machines used in Georgia.

Opp. Ex. 56, Appel Dep. at 40:18-22.  Dr. Appel had "not been asked to perform a

forensic cyber security examination of any specific voting machine."  Opp. Ex. 93,

Appel Report ¶ 12.  Nobody on either side of this case has "forensically examined

the Dominion BMDs used in Georgia."  Opp. Ex. 264, Jan. 2023 Halderman Dep.

at 27:16-17; Opp. Ex. 75, Nov. 2022 Halderman Decl. ¶ 6.d.

433.   Dr. Appel has never examined the voter registration database. Ex. No.

(60) at 40:23–41:04.

**Plaintiffs' Response to SMF ¶ 433**

Undisputed.

434.   He has never examined the PollPads. Ex. No. (60) at 41:05–08.

**Plaintiffs' Response to SMF ¶ 434**

DISPUTED.   SMF432 is misleading, as Dr. Appel testified that the basis of

his opinions didn't depend on whether he examined the voting machines used in

Georgia.  Opp. Ex. 56, Appel Dep. at 40:18-22; 41:5-8; *see also* Plaintiffs'

Response to SMF431.

435.   Nonetheless, Dr. Appel speculates that because some voters do not

closely verify the printed text on their ballots, a theoretical hacker could alter a

small number of votes without raising alarm, an amount sufficient to "alter the

outcome of several recent elections in Georgia, including the 2020 Presidential

election and one of the January 2021 Senate runoff elections." Ex. No. (59) at ¶ 69.

**Plaintiffs' Response to SMF ¶ 435**

DISPUTED.  SMF435 misrepresents the basis of Dr. Appel's expert

opinion.  Dr. Appel's opinion was not based on "a forensic cybersecurity

examination of any specific voting machine" but was instead based on his

consideration of a variety of materials including a paper published in November

2018 and a study released in 2019 (and published in peer-reviewed form in 2020).

Opp. Ex. 93, Appel Report ¶¶ 12-19, 62-64.

436.   Dr. Appel conceded, however, that he was unaware of malware

capable of doing so and which was both self-propagating (such that it could spread

to infect multiple BMDs on its own) and adaptable (such that it could effectively

alter votes on multiple different ballot styles). Ex. No. (58) at 23:23-24:9, 38:13-

21; Ex. No. (60) at 67:20–25; 85:17–21; 100:03–11; 101:07–11.

**Plaintiffs' Response to SMF ¶ 436**

DISPUTED.  SMF436 mischaracterizes Dr. Appel's testimony.  Dr. Appel

testified, "I'm not aware of a specific piece of malware that is both self-

propagating and adaptable, but there is no scientific difficulty in combining those

two concepts into the same piece of malware."  Opp. Ex. 56, Appel Dep. at 101:3-

6.  It is possible to design fraudulent software that could self-propagate to multiple BMDs throughout Georgia and would be adaptable to multiple ballot styles, including as described in Dr. Halderman's July 2021 report.  Opp. Ex. 56, Appel Dep. at 85:3-16; 85:22--87:11; 99:3-100:8; 101:3-6; Dkt. 1131 at 35, 48-53.

### E.    Plaintiffs' Experts Lack of Malware Findings

437.    None of the Plaintiffs' Experts have been able to find malware on any aspect of Georgia's election system, nor are they aware of any evidence of malware. Ex. No. (45) at 15:12–15, 17:08–15, 54:09–11; Ex. No. (56) at 84:5-17; Ex. No. (58) at 23:23-24:9, 38:13-21; Ex. No. (60) 67:20–25, 85:17–21, 100:03–11, 101:07–11.

### Plaintiffs' Response to SMF ¶ 437

DISPUTED.   Plaintiffs' experts have repeatedly testified that looking for malware was not in their scope of work and that doing so would be an enormous undertaking.  Opp. Ex. 264, Jan. 2023 Halderman Dep. at 25:22-26:15, 40:8-15; Opp. Ex. 88, Aug. 2021 Halderman Decl. ¶ 24; Opp. Ex. 181, Skoglund Dep. at 18:22-24, 37:24- 38:3.  Dr. Halderman was "not aware that anybody has ever undertaken the kind of rigorous examination of these pieces of equipment that would be necessary to conclude that it was unaffected by malware."  Opp. Ex. 264,

Jan. 2023 Halderman Dep. at 25:23-24, 26:10-15.  The State itself has not

performed that examination.  Opp. Ex. 156, Feb. 2022 Beaver Dep. at 42:7-12;

Opp. Ex. 264, Jan. 2023 Halderman Dep. at 26:9-15.  Additionally, "[i]nspection is

not a reliable way of ruling out the presence of malware.  It can sometimes detect

it, but it can't rule it out."  Opp. Ex. 55, Nov. 2021 Halderman Dep. at 35:13-15.

"Malware also can take many forms, so if you don't know yet what you're looking

for, it can be very difficult to tell whether it's there."  Opp. Ex. 55, Nov. 2021

Halderman Dep. at 36:1-4.

Furthermore, Plaintiffs and their experts did not have an opportunity to

examine *even a single BMD* used in an election in Georgia.  Opp. Ex. 264, Jan.

2023 Halderman Dep. at 24:24-25:12.

*See also* Plaintiffs' Response to SMF430.

## V.    PLAINTIFFS' REQUESTED REMEDIES

438.   Curling believes a policy that (a) utilizes hand-marked paper ballots,

including ballots where a voter's choice is marked by filling in a bubble like a test;

(b) has a machine or scanner read and tabulate the ballot; and (c) utilizes risk-

limiting audits would be sufficient. Ex. No. (16) at 47:6-48:17.

244

**Plaintiffs' Response to SMF ¶ 438**

Undisputed.

439.   In the alternative, Curling explained, under oath, that she could be satisfied with an order that kept the BMDs as they are but had risk-limiting audits like those advocated for by Dr. Stark. Ex. No. (16) at 71:8-18, 72:2-3, 7-9, 77:2-6, 93:34-94:7.

**Plaintiffs' Response to SMF ¶ 439**

DISPUTED.  SMF439 mischaracterizes Ms. Curling's testimony.  In response to a question whether audits could cure certain risks, Ms. Curling testified that she thought that experts "could make the system safer to use."  Opp. Ex. 228, Curling Dep. at 71:6-7.   The next question in her deposition (cited in SMF439), which defense counsel stressed was a hypothetical, was, "but if the Court were to say we're going to keep the BMDs as they are but order risk-limiting audits as even Dr. Stark suggests, would your concerns about elections be resolved?"  *Id*. at 71:9-13.  In response, Ms. Curling stated, "I would have to think about it more deeply, but just my first impression is yes."  *Id*. at 71:17-18.

Plaintiffs further object to SMF439 because it suggests that Dr. Stark recommends using risk-limiting audits with BMDs, when in fact he has testified

that a risk-limiting audit cannot be conducted on an election utilizing BMDS as the

primary method of voting.  SMF Ex. 44, Dec. 2022 Stark Decl. ¶ 5; Opp. Ex. 220,

Stark Dep. at 19:9 20:06, 20:23 21:14.


440.   Curling would be satisfied if hand-marked paper ballots were read by

a machine and the results were audited. Ex. No. (16) at 48:12-22, 59:7-11.

### Plaintiffs' Response to SMF ¶ 440

Plaintiffs object to SMF440 as immaterial because it is not cited in, and

State Defendants do not rely on it in, their briefs.  The Court therefore should not

consider it.  LR 56.1(B)(1).


441.   Curling acknowledges, however, that there are risks associated with

hand-marked paper ballots, including: the hacking of scanners, a voter's

inadvertent marking outside of the appropriate line, and having a person falsely

complete ballots and stuff them into a ballot box. Ex. No. (16) at 69:10-70:3.

### Plaintiffs' Response to SMF ¶ 441

DISPUTED.  SMF441 mischaracterizes Ms. Curling's testimony.  Ms.

Curling testified that a risk "could include someone *improperly* completing ballots

and in effect stuffing them into a ballot box," but added: "I mean, I guess it's

theoretically possible; but I -- given the security, I would be surprised if that were possible." Opp. Ex. 228, Curling Dep. at 69:7-70:3 (emphasis added).

442.   Indeed, Curling acknowledges that she would also not have any idea if her vote were counted if she used her requested remedy of a hand-marked paper ballot that was tallied by an optical scanner. Ex. No. (16) at 99:25-100:3; 108:2-5.

**Plaintiffs' Response to SMF ¶ 442**

DISPUTED.  SMF442 mischaracterizes Ms. Curling's testimony.  Ms. Curling testified that she would have confidence using hand-marked paper ballots scanned by a scanner and tabulated on a machine so long as there were risk-limiting audits.  Opp. Ex. 228, Curling Dep. at 45:14-17, 46:5-8, 47:15-23, 48:13-22, 77:2-6.

443.   Curling cannot herself identify whether audits would cure her concerns about the counting of ballots, she simply "think[s] that experts could --- could make the system safer to use." Ex. No. (16) at 71:5-7.

**Plaintiffs' Response to SMF ¶ 443**

DISPUTED.  Plaintiffs object to SMF443 because State Defendants failed to cite evidence supporting the statement of fact.  On that basis, the Court should not

consider it.  LR 56.1(B)(1)(a); *Trapp*, 2014 WL 12784474 *12-13.  The discussion in the cited portion of Ms. Curling's deposition was not about the counting of ballots.  Rather, it was about the risks identified in paragraph 8 of the TAC, which states: "This case is not merely about a technical violation or a theoretical risk." Ms. Curling was asked: "So the theoretical risk of things identified in this paragraph could be cured by audits?"  *Id*. at 71:2-4.  Ms. Curling responded, "Honestly, I feel like it's all outside of my limited knowledge to know; but I think that experts could – could make the system safer to use."  *Id*. at 71:5-7.

Plaintiffs object to SMF443 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


444.   Having described her injury as a lack of confidence in her vote, Plaintiff Curling cannot articulate what would provide her with the confidence that her vote is counted "so [she] could overcome [her] fear." Instead, she is completely dependent upon "the experts [to] guide [her] as to things that could help me to have confidence." Ex. No. (16) at 93:9-22, 24-94:7.

**Plaintiffs' Response to SMF ¶ 444**

DISPUTED.  SMF444 mischaracterizes Ms. Curling's testimony.  First, Ms.

Curling described many injuries she has suffered as a result of the way Georgia conducts elections, including that the case is about both "my vote and my lack of confidence in my vote."  Opp. Ex. 228, Curling Dep. at 92:20-22; *see also* Plaintiffs' Responses to SMF74-76, SMF78-79, SMF82-84.  Second, while defense counsel repeatedly couched his questions as probing Ms. Curling's fears, she said, "[i]t's not about fear.  It's about that there's no way to know, and I have a problem with that."  *Id*. at 95:25-96:10.  Third, Ms. Curling said, "I would want to discuss [the BMD system] with the experts that I know, and let them, you know, guide me as to the things that could help me to have confidence" that her vote counted.  *Id*. at 93:9-15.  Fourth, Ms. Curling testified that "hand-marked paper ballots and – and to be scanned in and risk-limiting audits" would give her confidence her vote counted.  *Id*. at 93:24-94:7.

Plaintiffs also object to SMF444 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


445.   Curling also admitted that there is no evidence that would give her confidence that her votes in any 2020 election were actually counted. Ex. No. (16) at 97:1-7.

249

**Plaintiffs' Response to SMF ¶ 445**

Plaintiffs object to SMF445 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

446.   The relief Price seeks for herself in this case is a "constitutional right to vote on the election system in Georgia and have a reasonable assurance that [her] vote will be counted as cast." Ex. No. (20) at 67:7-10.

**Plaintiffs' Response to SMF ¶ 446**

Plaintiffs object to SMF446 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

447.   According to Price, the scope of her complaint is the lack of voter verification, non-transparency, concerns about the security of the election system, that the election system does not include postelection risk limiting audits, and the possibility of malfeasance or security problems, problems with the technology, errors that can be made. Ms. Price contends that these are "essential for -- to protect my constitutional right to cast a vote and have a reasonable – reasonable

expectation that that vote was counted as cast." Ex. No. (20) at 49:25-50:12.

**Plaintiffs' Response to SMF ¶ 447**

DISPUTED.  SMF447 mischaracterizes Ms. Price's testimony.  Ms. Price did not testify to the "*possibility of* malfeasance or security problems," but instead to the existence malfeasance or security problems.  Opp. Ex. 230, Price Dep. at 50:6-7.  Plaintiffs also object to SMF447 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


448.    Through this litigation, Schoenberg wants to make the state of Georgia "operate a transparent, verifiable, auditable election system where [he] could know for certain that when [he] cast a vote, it was counted as cast," but he does not know what such a system would look like. He believes hand-marked paper ballots would be such as system, but he may be satisfied with a system other than hand-marked paper ballots "if a system could be made where [he is] – [he], the public and the state, can know for certain that the system is working as intended [and] that [his] vote counts the way [he] intended." Ex. No. (22) at 37:1-23.

**Plaintiffs' Response to SMF ¶ 448**

DISPUTED.  SMF448 mischaracterizes Mr. Schoenberg's testimony.

Contrary to State Defendants' statement that "he does not know what such a

system would look like," Mr. Schoenberg provided an example of what would

constitute an auditable, transparent, and verifiable election system—hand-marked

paper ballots.  *Id*. at 37:17-23.

Plaintiffs also object to SMF448 as immaterial because it is not cited in, and

State Defendants do not rely on it in, their briefs.  The Court therefore should not

consider it.  LR 56.1(B)(1).


449.   Schoenberg describes an election system that can guarantee that the

votes were properly counted as cast as follows: "We can have an election using

colored chips in this room and we could go back and know that you counted

properly. There are a myriad number of ways where you can cast -- you can

express your opinion and know that your opinion is counted. You know, the -- I

don't have one answer for what is an adequate election. I -- there has been

conversation about hand-marked paper ballots in this case. It strikes me that hand-

marked paper ballots are generally reliable for what we're talking about, that they

are not subject to the hacking, for example, that was the subject of your previous

question. So that would be an acceptable form of solving the problem, potentially. If you can produce electronic machinery and a system to support that machinery, but you can also demonstrate can't be hacked, or that you can demonstrate if a hack happens, that there is evidence left over that you can go back and correct the results, it can get more and more complicated, but if you've had evidence of that, then maybe you can have a system that's reliable and verifiable and auditable. I haven't seen that in this case." Ex. No. (22) at 103:4-104:1.

### **Plaintiffs' Response to SMF ¶ 449**

Plaintiffs object to SMF449 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

450.   CGG believes that the BMDs should not be required, and that there should be hand-marked paper ballots and audits. Ex. No. (25) at 158:3-159:23.

### **Plaintiffs' Response to SMF ¶ 450**

Plaintiffs object to SMF450 as immaterial because it is not cited in, and State Defendants do not rely on it in, their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

451.   Mr. Digges stated that voting by hand marked paper ballots is his personal preference. Ex. No. (30) at 53:7-10.

**Plaintiffs' Response to SMF ¶ 451**

Plaintiffs object to as immaterial because it is not cited in, and State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


452.   Mr. Digges stated his purpose in participating in the lawsuit is to "get voting moved to paper ballots - - hand-marked paper ballots." Ex. No. (30) at 30:1-8.

**Plaintiffs' Response to SMF ¶ 452**

Plaintiffs object to SMF452 as immaterial because it is not cited in, and State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).


453.   Missett stated that the plaintiffs in this lawsuit are "looking for to see the best practices, best true practices put into place in Georgia, like hand-marked paper ballots, like chain of custody, you know, in general, based on cybersecurity experts or independents." Ed. No. (35) at 53.

**Plaintiffs' Response to SMF ¶ 453**

Plaintiffs object to SMF453 as immaterial because it is not cited in, and State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

454.   Davis stated that his goal is "restoring constitutional legal transparent elections in the state of Georgia" of which instituting hand-marked paper ballots is a part of that. Ex. No. (33) at 39:6-21.

**Plaintiffs' Response to SMF ¶ 454**

Plaintiffs object to SMF454 as immaterial because it is not cited in, and State Defendants do not rely on it in their briefs.  The Court therefore should not consider it.  LR 56.1(B)(1).

455.   Dr. Halderman has explained that people who claim that Georgia's election system is not safe and reliable have a reasonable basis for making that statement and that there is "abundant reason to believe" that Georgia elections in the past have been compromised. Ex. No. (58) at 40:3-7, 42:5-20.

**Plaintiffs' Response to SMF ¶ 455**

DISPUTED.  Plaintiffs object to SMF455 because the cited evidence does

not support the statement of fact.  On that basis, the Court should not consider it.

LR 56.1(B)(1)(a); *Trapp*, 2014 WL 12784474 *12-13.

456.   Dr. Halderman agrees that applying some of the patches he suggests would make the system more secure would require EAC approval. Ex. No. (58) at 64:9-19.

**Plaintiffs' Response to SMF ¶ 456**

DISPUTED.  SMF456 mischaracterizes Dr. Halderman's testimony.  Dr. Halderman did not suggest patches to apply, but instead testified that having zero operating security system patches installed on the EMS server is a security risk. Opp. Ex. 264, Jan. 2023 Halderman Dep. at 64:7-19.

**PART 2:  OBJECTIONS TO FACT ALLEGATIONS CONTAINED IN STATE DEFENDANTS' BRIEF BUT NOT IN STATE DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**

Dkt. 1567-1 at 11.  The individual Curling Plaintiffs have all submitted declarations in this case stating that while they prefer to vote in person, they have felt compelled to vote by absentee ballot due to "concern[s]" about whether their ballots would be accurately counted by the BMD voting systems.  Opp. Ex. 297 ¶

7, Donna Curling Decl.; Opp. Ex. 298 ¶ 11, Donna Price Decl.; Opp. Ex. 236 ¶ 10, Jeffrey Schoenberg Decl.

### Plaintiffs' Response Dkt. 1567-1 at 11

DISPUTED.  Plaintiffs object to this allegation because it is set out only in State Defendants' brief and not in State Defendants' Statement of Undisputed Facts.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(d); *Sumbak*, 2021 WL 1521988, at *9 n.11 (finding that alleged facts that appeared only in plaintiff's brief and not in a statement of material facts were not evidence properly before the court).

Mr. Schoenberg voted on a BMD in the March 24, 2020, and January 5, 2021 elections.  Opp. Ex. 233, Schoenberg Dep. at 77:16-18; 130:2-4.  Additionally, Mr. Schoenberg testified that he did not feel compelled to vote by absentee ballot.  Opp. Ex. 233, Schoenberg Dep. at 132:13-16.  He explained that more than a year earlier he declared that he would be forced to vote by absentee ballot because he anticipated having to do so because of the burdens of voting in person on a BMD, but then he changed his mind after he experienced the unreliability of voting absentee.  Opp. Ex. 233, Schoenberg Dep. at 130:4-7; 132:16-133:3; *see also* SAF No. 441-46.

Dkt. 1567-1 at 12.  Curling perceives less risk when a voter casts a hand-marked paper ballot, as a voter can review and verify that her votes are marked as intended—something which voters are also able to do with ballots cast on a BMD. Opp. Ex. 298 ¶ 12, Donna Price Decl.

### **Plaintiffs' Response Dkt. 1567-1 at 12**

DISPUTED.  Plaintiffs object to this allegation because the cited declaration does not support it as the declaration is from Plaintiff Price, not Plaintiff Curling. On that basis, the Court should not consider it.  LR 56.1(B)(1)(a); *Trapp*, 2014 WL12784474, at *12.  Plaintiffs also object to this allegation because it is set out only in State Defendants' brief and not in State Defendants' Statement of Undisputed Facts.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(d); *Sumbak*, 2021 WL 1521988, at *9 n.11.

Ms. Curling testified: "I could see that the printed out said my vote was as I intended; but I have no idea, when I put into the scanner, the scanner read the QR code.  I don't know."  Opp. Ex. 228, Curling Dep. at 43:10-14.  She did not testify or agree that verifying a voter's selections on a ballot is "something which voters are also able to do with ballots cast on a BMD"—nor are voters able to do that. *See* SAF No. 53, 67.  Rather, she testified: BMD-printed ballots are not voter verifiable because "you can only see what you select; you cannot see what is

counted."  Opp. Ex. 228, Curling Dep. at 52:17-25; *see also id*. at 41:10-12; 53:3-5; 64:13-22; 64:25-65:2; 81:3-10 ("Q: [T]here's no way to provide a meaningful way for a voter to audit their vote using the BMD system. Is that your testimony? A: That's my testimony because they have no idea what's in the QR code.").

Dkt. 1567-1 at 13.  In other words, Price believes that, since she cannot read a QR code, she cannot verify that her ballot reflects her choice (despite the plainly written identification of choices below the QR Code itself).  (State Defendants cite no evidence for this allegation.)

### **Plaintiffs' Response Dkt. 1567-1 at 13**

DISPUTED.  Plaintiffs object to this allegation because it is not supported by a citation to evidence.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(a); *Sumbak*, 2021 WL 1521988 *1.  Plaintiffs also object to this allegation because it is set out only in State Defendants' brief and not in State Defendants' Statement of Undisputed Facts.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(d); *Sumbak*, 2021 WL 1521988, at *9 n.11.

Ms. Price did not testify that the "written identification of choices below the QR Code" are "plainly written" or that the written text would necessarily identify her choices.  Nor is that necessarily correct given the many vulnerabilities that can

259

be readily exploited with Georgia's current voting system whereby the text "below the QR Code" may not accurately reflect a voter's choices, which a voter may not be able to catch on review due to the length, detail, complexity, and resulting confusion often attendant to Georgia ballots. *See* SAF No. 90-94, 97, 190; *see also* Plaintiffs' Response to SMF15.  In fact, Ms. Price testified that the names printed on the ballot are not voter verifiable.  Opp. Ex. 230, Price Dep. at 29:10-18.

Dkt. 1567-1 at 13.  This fear—the purported inability to know how a vote was actually counted—is what [Ms. Price] states serves as the basis for her claim that the BMDs are unconstitutional.  Opp. Ex. 298, Donna Price Decl., ¶ 9, SMF ¶¶ 134-35, 139.

### Plaintiffs' Response Dkt. 1567-1 at 13

DISPUTED.  The cited portions of the SMF do not contain this allegation. Plaintiffs therefore object to this allegation because it is not supported by a citation to evidence.  On that basis, the Court should not consider it. LR 56.1(B)(1)(a); *Trapp*, 2014 WL 12784474, at *12 (N.D. Ga. July 16, 2014).   Plaintiffs also object to this allegation because it is set out only in State Defendants' brief and not in State Defendants' Statement of Undisputed Facts.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(d); *Sumbak*, 2021 WL 1521988, at *9 n.11.

When Ms. Price was asked, "So your fear that your vote will not be counted accurately….," she responded: "First, I'm not afraid.  So I wouldn't characterize myself as being afraid."  Opp. Ex. 230, Price Dep. at 81:8-14.  Ms. Price did not state that "her claim [is] that *the BMDs* are unconstitutional." (emphasis added). Rather, she testified repeatedly that her constitutional right to vote is violated by *Georgia's voting system*, which encompasses much more than just "the BMDs," including the highly ineffective overall security of that system, which allowed the extraordinary breach in Coffee County among many other security lapses that may lead to altered votes or election outcomes.  Opp. Ex. 230, Price Dep. at 62:7-10; *see also* Price Dep. at 36:21-24; 50:9-12; 80:11-15.

Dkt. 1567-1 at 15.  Citing the QR codes, Dr. Halderman's general opinion regarding BMDs is that they "face security risks that are worse than the risks they faced when voting on DREs."  Opp. Ex. 131, Feb 12, 2021 Halderman Decl. ¶¶ 1-2.

### **Plaintiffs' Response Dkt. 1567-1 at 15**

DISPUTED.  Plaintiffs object to this allegation because it is set out only in State Defendants' brief and not in State Defendants' Statement of Undisputed

Facts.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(d); *Sumbak*,

2021 WL 1521988, at *9 n.11.

Dr. Halderman did not simply cite the QR codes as the basis of his opinions

regarding the insecurity of Georgia's voting system.  Nor did he offer a "general

opinion regarding BMDs"; rather, his opinions in this case specifically concern

*Georgia's* voting system based on his robust analyses of *that specific* equipment

and data.  He opined: "At a general level, my analysis of Georgia's new election

equipment has revealed that, despite the addition of a paper trail, individual

Georgia voters who use BMDs face security risk that are *worse* than the risks they

faced when voting on DREs."  Opp. Ex. 131, Feb. 2021 Halderman Decl. ¶ 2

(emphasis in original).


Dkt. 1567-1 at 15.  But [Dr. Halderman] completely dismisses the BMD's

inclusion of human-readable text on the grounds that votes are initially tabulated

using the QR code.  Opp. Ex. 131, Feb. 2021 Halderman Decl. ¶ 2.

### Plaintiffs' Response Dkt. 1567-1 at 15

DISPUTED.  Plaintiffs object to this allegation because it is set out only in

State Defendants' brief and not in State Defendants' Statement of Undisputed

Facts.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(d); *Sumbak*,

2021 WL 1521988, at *9 n11.

DISPUTED.  Dr. Halderman specifically addressed the Georgia BMDs'

inclusion of human-readable text and opined: "[Georgia in-person] voters' ballots

are counted based on barcodes, which voters cannot read or verify.  While the

ballots also contain human-readable text, with rare exceptions this text is

completely ignored during counting."  Opp. Ex. 131, Feb. 2021 Halderman Decl. ¶

4.  The SOS's Office's own study of voter verification of actual Georgia voters in

actual Georgia elections confirmed Dr. Halderman's finding that voters rarely

meaningfully review their BMD-generated ballots before placing them in scanners

for tabulation.  *See* SAF No.  90-95.  Additionally, the claim that "votes are

*initially* tabulated using the QR code" (emphasis added) is not accurate except in

the very rare circumstance where a full hand recount is performed on a contest in a

Georgia election; thus, the QR tabulation is the *only* tabulation of BMD-generated

ballots for virtually every election contest in Georgia.  *See* SAF No. 387.

Dkt. 1567-1 at 16-17.     In January 2021, various supporters of then-

President Donald Trump, including certain since-terminated county election

officials, granted unauthorized accessed to Coffee County's election equipment.

263

Opp. Ex. 299, State Defendants' Notice of Conditional Objection to Sept. 9

Proceedings.

### **Plaintiffs' Response Dkt. 1567-1 at 16-17**

DISPUTED (in part).  Plaintiffs object to this allegation because State

Defendants failed to cite to evidence including a page or paragraph number.  LR

56.1(B)(1)(a); *SEC v. Warren*, 2007 WL 9700603, at *2 n.3 (N.D. Ga. Sept. 26,

2007) (refusing to consider alleged facts that were not supported by citations to

evidence that included page or paragraph numbers).  Plaintiffs also object to this

allegation because it is set out only in State Defendants' brief and not in State

Defendants' Statement of Undisputed Facts.  On that basis, the Court should not

consider it.  LR 56.1(B)(1)(d); *Sumbak*, 2021 WL 1521988, at *9 n.11.

The "since-terminated county election officials" presumably refers to the

former Election Supervisor, Misty Hampton, and her assistant, Jill Ridlehoover.

But they were not terminated; rather, they resigned.  *See* SAF No. 270.

Dkt. 1567-1 at 28.  [Plaintiffs'] due process claim is based on an idea that

they have been unjustly compelled to vote by absentee ballot due to their fears that

Georgia's in-person voting system is potentially vulnerable, unreliable, and

unverifiable for those Georgia voters that do vote in person.  Opp. Ex. 297, Curling

Decl. ¶ 7; Opp. Ex. 298, Price Decl. ¶ 11; Opp. Ex. 236, Schoenberg Decl. ¶ 10.

**Plaintiffs' Response Dkt. 1567-1 at 28**

DISPUTED.  Plaintiffs object to this allegation because it is set out only in

State Defendants' brief and not in State Defendants' Statement of Undisputed

Facts.  On that basis, the Court should not consider it.  LR 56.1(B)(1)(d); *Sumbak*,

2021 WL 1521988, at *9 n.11.

Mr. Schoenberg testified that he did not feel compelled to vote by absentee

ballot.  Opp. Ex. 233, Schoenberg Dep. at 132:13-16.  He explained that more than

a year earlier he declared that he would be forced to vote by absentee ballot

because he anticipated having to do so because of the burdens of voting in person

on a BMD, but then he changed his mind after he experienced the unreliability of

voting absentee.  Opp. Ex. 233, Schoenberg Dep. at 130:4-7; 132:16-133:3.  In

fact, Mr. Schoenberg voted on a BMD in the March 24, 2020, and January 5, 2021

elections.  Opp. Ex. 233, Schoenberg Dep. 77:16-18; 130:2-4.

Both Ms. Curling and Ms. Price testified that they were not afraid.  Opp. Ex.

230, Price Dep. at 81:8-14; Opp. Ex. 228, Curling Dep. at 96:8.  In fact, Ms.

Curling was disenfranchised in two elections when trying to vote absentee; thus,

her concerns were manifested, not just imagined.  Opp. Ex. 228, Curling Dep. at

74:18-19; 124:6-125:9.

The allegation that "Georgia's in-person voting system is potentially

vulnerable, unreliable, and unverifiable for those Georgia voters that do vote in

person" is inaccurate.  This is not a mere potentiality but rather an irrefutable

reality, as confirmed in the wholly-unrebutted expert analyses of that system by

leading election security expert Dr. Alex Halderman (among ample other

evidence).  *See* SAF No. 107-08, 134-169

## PART 3:  RESPONSES TO FULTON COUNTY DEFENDANTS' STATEMENT OF MATERIAL FACTS

1.      The Secretary of State of Georgia is the chief election official in the

State of Georgia and has the responsibility to manage Georgia's electoral system.

(O.C.G.A. §21-2-50).

### Plaintiffs' Response to Fulton SMF ¶ 1

DISPUTED.   The cited evidence does not support the full statement of fact.

On that basis, the Court should not consider it.  LR 56.1(B)(1)(a); *Sumbak*, 2021

WL 1521988, at *1-2.  Plaintiffs also object to SMF1 because Fulton Defendants'

characterization of a Georgia statute is legal argument or a legal conclusion, rather

than a statement of material fact in dispute, and the Court should not consider it. LR 56.1(B)(1)(c).

2.      The Secretary of State of Georgia has the power to: to determine the forms of nomination petition, ballots, and other forms; to determine and approve the form of ballots for use in special elections; to develop, program, build, and review ballots for use by counties and municipalities on voting system in use in the state. O.C.G.A. §21-2-50 (a)(1), (9) and (15).

**Plaintiffs' Response to Fulton SMF ¶ 2**

Plaintiffs object to SMF2 because Fulton Defendants' characterization of a Georgia statute is legal argument or a legal conclusion, rather than a statement of material fact in dispute, and the Court should not consider it. LR 56.1(B)(1)(c).

3.      The equipment used for casting and counting votes in county, state, and federal elections shall be the same in each county in this state and shall be provided to each county by the state, as determined by the Secretary of State. (O.C.G.A. § 21-2-300(a)(1)).

**Plaintiffs' Response to Fulton SMF ¶ 3**

Plaintiffs object to SMF2 because Fulton Defendants' characterization of a

Georgia statute is legal argument or a legal conclusion, rather than a statement of material fact in dispute, and the Court should not consider it. LR 56.1(B)(1)(c).

4.     The State of Georgia's process for moving to a Ballot Marking Device ("BMD") based voting system began in the fall of 2017, and Elections Director Chris Harvey, advised the Georgia General Assembly House of Representatives Science and Technology Committee that Georgia should aim to have a new voting system in place by the 2020 election cycle. (https://sos.ga.gov/admin/uploads/SAFE_Commission_Report_FINAL_(1-10-18).pdf)

**Plaintiffs' Response to Fulton SMF ¶ 4**

DISPUTED.  Plaintiffs object to Fulton SMF4 because State Defendants have provided no foundation for the admissibility of this document.  Fulton SMF4 is therefore unsupported by admissible evidence, and the Court should not consider it.  LR 56.1(B)(1)(a).

5.     Beginning in June of 2020, with the 2020 Presidential Preference Primary/Special Election/General Primary Election, the State of Georgia has utilized a BMD-based voting system. (Declaration of Nadine Williams ¶ 4;

O.C.G.A. § 21-2-300).

**Plaintiffs' Response to Fulton SMF ¶ 5**

Undisputed.


6.      The Fulton County Defendants are, or were at all times, relevant to this action Members of the Fulton County Board of Registration and Elections, which is the superintendent of elections for Fulton County, Georgia. (Declaration of Nadine Williams ¶ 3; O.C.G.A. § 21-2-2 (35)).

**Plaintiffs' Response to Fulton SMF ¶ 6**

Undisputed.


7.      The Fulton County Defendants are required by the Georgia Election Code to utilize the statewide BMD-based voting system for conducting elections in Fulton County, Georgia. (O.C.G.A. § 21-2-300).

**Plaintiffs' Response to Fulton SMF ¶ 7**

DISPUTED.  The Georgia Election Code authorizes superintendents to adopt hand-marked paper ballots ("HMPBs") instead of BMDs on an emergency basis where the use of BMDs for any reason is not practicable.  O.C.G.A. §§ 21-2-281, 21-2-334; State Election Board Rule 183-1-12-.11(2)(c)-(d).

Plaintiffs also object to SMF7 because Fulton Defendants' characterization of a Georgia statute is legal argument or a legal conclusion, rather than a statement of material fact in dispute, and the Court should not consider it. LR 56.1(B)(1)(c).

8.     Plaintiffs' requests for relief include prohibiting the State of Georgia from utilizing the current BMD-based voting system and the implementation of a hand-marked paper ballot voting system in Georgia. (Doc. 1565, Deposition of Coalition for Good Governance, pp. 158-160, 170); (Doc. 1557, Deposition of Donna Price, pp. 28-30, 105-107) (excepts attached as Exhibits 1 and 2).

**Plaintiffs' Response to Fulton SMF ¶ 8**

Undisputed.

9.     There are no mentions of any Fulton County Board of Registration and Elections member in any of the Declarations or Depositions filed in this case.

**Plaintiffs' Response to Fulton SMF ¶ 9**

DISPUTED. Plaintiffs bring this case against Fulton Defendants in their official capacity and have put forth significant evidence, including in depositions, that Fulton Defendants had knowledge of the security failures in Georgia's voting system and have not, as of January 21, 2022, taken any measures to address the

vulnerabilities. *See, e.g.* SAF No. 230-33, 239-43, 246, 248.

Plaintiffs also object to SMF10 as immaterial.  The Court therefore should not consider it.  LR 56.1(B)(1).

10.    There are no mentions of or citations to any policy or custom of the Fulton County Board of Registration and Elections as the basis for any of the alleged constitutional violations in this case.

**Plaintiffs' Response to Fulton SMF ¶ 10**

DISPUTED.  Plaintiffs' challenge, *inter alia*, Fulton Defendants' use of BMDs to conduct elections in Fulton County, thereby infringing on Plaintiffs' fundamental voting rights.  Dkt. 627, ¶¶ 117, 118, 119, 123, 126 – 129, 131.

11.    The Fulton County Defendants cannot, under Georgia law, provide such relief and implement a hand-marked paper ballot system. (Declaration of Nadine Williams ¶ 5; O.C.G.A. § 21-2-300).

**Plaintiffs' Response to Fulton SMF ¶ 11**

DISPUTED.  The Georgia Election Code authorizes superintendents to adopt HMPBs instead of BMDs on an emergency basis where the use of BMDs for any reason is not practicable.  O.C.G.A. §§ 21-2-281, 21-2-334; State Election

Board Rule 183-1-12-.11(2)(c)-(d).

Plaintiffs also object to SMF11 because Fulton Defendants' characterization of a Georgia statute is legal argument or a legal conclusion, rather than a statement of material fact in dispute, and the Court should not consider it.  LR 56.1(B)(1)(c).

Respectfully submitted this 13th day of February, 2023.

 /s/ David D. Cross                              /s/ Halsey G. Knapp, Jr.
David D. Cross (*pro hac vice*)          Halsey G. Knapp, Jr.
Mary G. Kaiser (*pro hac vice*)          GA Bar No. 425320
Hannah R. Elson (*pro hac vice*)        Adam M. Sparks
Oluwasegun Joseph (*pro hac vice*)    GA Bar No. 341578
Wail Jihadi (*pro hac vice*)                 Jessica G. Cino
Caroline L. Middleton (*pro hac vice*)  GA Bar No. 577837
Riley Jo Porter (*pro hac vice*)           KREVOLIN & HORST, LLC
Sonja N. Swanbeck (*pro hac vice*)     1201 West Peachtree Street, NW
MORRISON & FOERSTER LLP                Suite 3250
2100 L Street, NW                              Atlanta, GA 30309
Suite 900                                           (404) 888-9700
Washington, DC 20037
(202) 887-1500

  *Counsel for Plaintiffs Donna Curling, Donna Price & Jeffrey Schoenberg*

/s/ Bruce P. Brown                            /s/ Robert A. McGuire, III
Bruce P. Brown                                  Robert A. McGuire, III
Georgia Bar No. 064460                    Admitted Pro Hac Vice
BRUCE P. BROWN LAW LLC                  (ECF No. 125)
1123 Zonolite Rd. NE                         ROBERT MCGUIRE LAW FIRM
Suite 6                                             113 Cherry St. #86685
Atlanta, Georgia 30306                      Seattle, Washington 98104-2205
(404) 881-0700                                 (253) 267-8530

_/s/ Russell T. Abney_
Russell T. Abney
Georgia Bar No. 000875
WATTS GUERRA, LLP
4 Dominion Drive, Building 3
Suite 100
San Antonio, TX 78257
(404) 670-0355

_Counsel for Plaintiff Coalition for Good Governance_

_/s/ Cary Ichter_
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

_Counsel for Plaintiffs William Digges III, Laura Digges,
Ricardo Davis & Megan Missett_

273

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

|  |  |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ David D. Cross*
David D. Cross

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER , ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## CERTIFICATE OF SERVICE

I hereby certify that on February 13, 2023, a copy of the foregoing

**PLAINTIFFS' CORRECTED JOINT RESPONSES TO DEFENDANTS'**

**STATEMENTS OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF**

**MOTIONS FOR SUMMARY JUDGMENT** was electronically filed with the

Clerk of Court using the CM/ECF system, which will automatically send

notification of such filing to all attorneys of record.

*/s/ David D. Cross*
David D. Cross

275