Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION
3
   DONNA CURLING, ET AL.,        )
4                                )
        Plaintiffs,              )
5                                )  Civil Action
   vs.                           )
6                                )  No. 1:17-CV-2989-AT
   BRAD RAFFENSPERGER, ET AL., )
7                                )
        Defendants.              )
8
9
10        VIRTUAL VIDEOTAPED 30(b)(6) DEPOSITION OF
11     FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS
12                      THROUGH
13                  DOMINIC OLOMO
14             Friday, January 21, 2022
15                    10:29 a.m.
16
17         Robin K. Ferrill, CCR-B-1936, RPR
18
19
20
21
22
23
24
25

```
 1                  APPEARANCES OF COUNSEL
 2   On behalf of the Plaintiffs Donna Curling, Donna
     Price & Jeffrey Schoenberg
 3   ADAM M. SPARKS, Esquire
     HALSEY G. KNAPP, JR., Esquire
 4        Krevolin & Horst, LLC
          1201 West Peachtree Street, N.W., Suite 3250
 5        Atlanta, Georgia  30309-3470
          404.888.9700
 6        sparks@khlawfirm.com
          hknapp@khlawfirm.com
 7
 8
 9   On behalf of the Plaintiffs Donna Curling, Donna
     Price & Jeffrey Schoenberg
10   REEMA S. SHOCAIR ALI, Esquire
     LOGAN WREN, Esquire
11   SONJA SWANBECK, Esquire
          Morrison & Foerster LLP
12        2100 L STREET, NW
          Suite 900
13        Washington, D.C. 20037
          202.887.1550
14        rali@mofo.com
          lwren@mofo.com
15        sswanbeck@mofo.com
16
17   On behalf of the Fulton County Defendants
     DAVID R. LOWMAN,  Esquire
18   CHERYL M. A. RINGER, Esquire
          Fulton County Attorney's Office
19        141 Pryor Street, S.W.
          Suite 4038
20        Atlanta, Georgia  30303-3468
          404.612.0246
21        david.lowman@fultoncountyga.gov
          cheryl.ringer@fultoncountyga.gov
22
23
24
25
```

Page 3

```
 1              APPEARANCES OF COUNSEL CONTINUED
 2   On behalf of the State Defendants
     DIANE F. LaROSS, Esquire
 3   CAREY MILLER, Esquire
     BRYAN B. TYSON, Esquire
 4       Taylor English Duma
         1600 Parkwood Circle SE
 5       Suite 400
         Atlanta, Georgia  30339
 6       678.336.7162
         dlaross@taylorenglish.com
 7       cmiller@taylorenglish.com
         btyson@taylorenglish.com
 8
 9
10   On behalf of the Defendants
     CAREY MILLER, Esquire
11       Robbins Alloy Belinfante Littlefield LLC
         500 14th Street, NW
12       Atlanta, Georgia  30318
         cmiller@robbinsfirm.com
13
14
15   On behalf of Coalition for Good Governance
     CARY ICHTER, Esquire
16       Ichter Davis, LLC
         3340 Peachtree Road, NE
17       Suite 1530
         Atlanta, GA 30326
18       404.869.5243
         cichter@ichterdavis.com
19
20   ALSO PRESENT:
21       MARILYN MARKS, Executive Director
            Coalition for Good Governance
22
23       Krishan Patel, Videographer
24
25
```

Page 4

```
 1                            INDEX
 2        VIRTUAL VIDEOTAPED 30(b)(6) DEPOSITION OF
 3     FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS
 4                           THROUGH
 5                       DOMINIC OLOMO
 6                  Friday, January 21, 2022
 7   EXAMINATION BY                                 PAGE
 8   Mr. Sparks                                      6.
 9
                    DESCRIPTION OF EXHIBITS
10
     EXHIBIT             IDENTIFICATION             PAGE
11
12   Exhibit 1   Curling Plaintiff's Third Amended   11
13               Notice of Deposition of Fulton
14               County Defendants
15   Exhibit 2   E-mail string to Tucker from        20
16               Evans, 9/29/2020, Bates stamped
17               State-Defendants-00113894 - 113995
18   Exhibit 3   E-mail to Harvey from               30
19               Spell-Fowler, 10/27/2020, Bates
20               Stamped State-Defendants-00096447
21               - 96448
22
23          (Original exhibits attached to the Original
24       transcript.)
25
```

```
 1                  VIRTUAL DEPOSITION OF

 2                     DOMINIC OLOMO

 3                 Friday, January 21, 2022

 4           THE VIDEOGRAPHER:  Today's date is

 5      January 21st, 2022, and the time is 10:29 a.m.

 6      This will be the 30(b)(6) videotaped deposition

 7      of Fulton County Board of Registration and

 8      Elections given by Dominic Olomo.  Will counsel

 9      please introduce themselves and any objections

10      to the witness being sworn in remotely.

11           MR. SPARKS:  Good morning.  This is Adam

12      Sparks, Krevolin & Horst.  With me is Halsey

13      Knapp of Krevolin & Horst representing Curling

14      plaintiffs in this litigation.

15           MR. LOWMAN:  This is David Lowman

16      representing Fulton County defendants.

17           MS. LAROSS:  And this is Diane LaRoss

18      representing the state defendants along with

19      Carey Miller and Bryan Tyson.

20           THE VIDEOGRAPHER:  Will the court reporter

21      please swear in the witness.

22   DOMINIC OLOMO,

23           called as a witness, having been duly sworn

24   by a Notary Public, was examined and testified as

25   follows:
```

Page 6

1    EXAMINATION

2    BY MR. SPARKS:

3        Q.   Mr. Olomo, good morning.  My name is Adam.

4    I'm an attorney representing some of the plaintiffs

5    in this case.  And I've got a few questions to ask of

6    you.  Thank you for your patience as we took care of

7    the preliminaries before we started today.

8             A few things before we start.

9             MR. SPARKS:  Attorney Lowman, I presumed

10        you intend, as do I, to reserve objections other

11        than to form of the question and responsiveness

12        of the answer until trial.  Is that accurate?

13             MR. LOWMAN:  That is.

14             MR. SPARKS:  All right.  Thank you.

15        Q.   (By Mr. Sparks) Mr. Olomo, have you been

16    deposed before?

17        A.   Yes.

18        Q.   Have you been deposed in this litigation

19    before?

20        A.   I don't know what that means.

21        Q.   Fair point.  This case is currently called

22    Curling v. Raffensperger.  It's been going on for

23    many months now.  I was asking whether, in your prior

24    deposition, whether it was also related to this case.

25    Do you know?

Page 7

1    A.   I'm not sure.  And I don't know.

2    Q.   Okay.  About when were you deposed before?

3    A.   That was 2020.

4    Q.   2020?

5    A.   Yes.  I don't recall the month but it was

6  2020.

7    Q.   Sure.  And broadly speaking, did it have to

8  do with elections in Fulton County, Georgia?

9    A.   Yes, sir.  Yes.

10    Q.   Have you been deposed any other time?

11    A.   No.

12    Q.   I just want to cover a few of the rules of

13  the road today so that we understand each other going

14  forward.

15         First, as you might have noticed with these

16  remote proceedings, sometimes it's a bit difficult to

17  hear each other or to know when the other person has

18  stopped talking before you respond to a question or

19  ask another, as the case may be.  So I want to ask us

20  not to talk each other -- talk over each other --

21  excuse me, for the sake of the court reporter and the

22  record, and so you and I understand each other.  Is

23  that okay?

24    A.   Okay.

25    Q.   All right.  I'm trying to speak at a large

1    enough volume to where you can hear me well, but not

2    so loud that I'm going to burst your eardrums.  If

3    that needs to change, if I need to speak more loudly

4    or more softly, would you please let me know?

5         A.   I will.

6         Q.   And you understand that I may ask you to

7    speak up or let you know you are loud enough as well.

8    Do you understand that?

9         A.   I do.

10        Q.   It's fine to take a break when you need

11   one.  I imagine I may need one as well.  But I'd ask

12   that you not ask to take a break or take a break in

13   the middle of a question or while there's a question

14   still pending.  Is that okay?

15        A.   Okay.

16        Q.   Great.  I saw you nodded just there and

17   also said okay.  Just for purposes of the record, all

18   of your responses will need to be verbal so that the

19   court reporter can take them down for the record.  Do

20   you understand?

21        A.   I do.

22        Q.   I want my questions to be clear and you

23   should let me know if you don't understand my

24   question.  If you do answer a question, I will assume

25   you understood it or otherwise you would have spoken

Page 9

1   up.  Is that okay?

2          A.    That's okay.

3          Q.    Thank you.

4          MR. SPARKS:  Also, for the record,

5   particularly since we are starting a little

6   late, Curling plaintiffs are going to make a

7   good-faith effort to cover everything we need to

8   with this Fulton County 30(b)(6) deposition with

9   multiple designees in one day.  I would note

10  that we are entitled to the full seven hours for

11  each designee.  It's possible that we will need

12  to leave the deposition open for further

13  examination of one or more of them on the

14  designated topics.  Sitting here today, I don't

15  think that's likely at the moment, and we are

16  going to try in good faith to get through

17  everybody today.  But we are entitled to more

18  and it remains a possibility.  This is the first

19  of two dates on which counsel for the Curling

20  plaintiffs and the Fulton County defendants have

21  agreed to use for a 30(b)(6) deposition.

22          I wanted to also say for the record,

23  counsel for the parties have discussed for some

24  months the dates and topics of this deposition,

25  and I appreciate counsel for the Fulton County

Page 10

1          defendants, particularly Ms. Ringer and

2          Mr. Lowman, their good faith and courtesy in

3          working with us amid some trying circumstances

4          to agree to topics and get this set up and get

5          going, so thank you.

6          Q.   (By Mr. Sparks) Mr. Olomo, I just want to

7     ask, is there anyone else in the room with you today

8     physically?

9          A.   No, no.

10         Q.   Do you have any of your e-mail applications

11    or accounts open right now?

12         A.   Yes, I have my e-mail open.

13         Q.   Okay.  I would ask you to go ahead and

14    close it while you are testifying, please.

15         A.   It's closed.

16         Q.   Do you have any social media messaging,

17    chat or other communications applications open right

18    now?

19         A.   No, on my phone, yes, but not on my

20    computer.

21         Q.   Okay.  So your phone is within reach?

22         A.   Yes, I can put it in the drawer.

23         Q.   Yes, I would prefer that if you can just

24    put it out of sight, out of mind.

25              Thank you.  I appreciate that.

1          I'm going to show you a document and you

2    can see this through Exhibit Share as well, but I

3    will share my screen also.

4          MR. SPARKS:  I wanted to show you this

5       document that's been marked as Exhibit 1 for

6       this deposition.

7          (Exhibit 1, Curling Plaintiff's Third

8       Amended Notice of Deposition of Fulton County

9       Defendants, marked for identification.)

10   Q.   (By Mr. Sparks) Take a look at the

11   document, please.  And once you have reviewed it,

12   please tell me if you recognize it.

13   A.   Yes.

14   Q.   So you understand, this is a deposition

15   notice of the Fulton County Board of Registration and

16   Elections?

17   A.   Yes, correct.

18   Q.   So this deposition is a little different

19   from a deposition in a witness's personal capacity.

20   This deposition is a deposition of the Fulton County

21   Board of Registration and Elections, and I want to

22   make sure you understand this is not about your

23   personal knowledge, that you are testifying on behalf

24   of Fulton County Board of -- excuse me, Board of

25   Registration and Elections.  Do you understand that?

1        A.    Yes, I do.

2        Q.    Further, you understand that you and your

3    attorneys had an obligation to ensure you were fully

4    prepared to testify on certain topics today.  Do you

5    understand that?

6        A.    Yes, I do.

7        Q.    On what topics in this Exhibit 1 have you

8    been designated to testify for Fulton County

9    defendants today?

10        A.    I need to see the entire -- I'm not sure

11    yet.

12        Q.    I'm going to scroll down to where the

13    topics start.  I will represent to you that your

14    attorneys informed us that you would be testifying on

15    topic 15 today and no other.  Does that match your

16    understanding?

17        A.    Yes.  Can I see topic 15, please?

18        Q.    Yes, of course.  Would you like me to

19    scroll down?

20        A.    Yes, please.

21        Q.    I will go down to 15.  You tell me if you

22    want me to go up or down.

23        A.    Yes, correct.  Yes.

24        Q.    Before I get started on that topic,

25    Mr. Olomo, do you understand what this case is about?

1      A.   I will say, yes, I do.

2      Q.   Can you tell me in your own words what this

3  case is about?

4      A.   About the Georgia election system and

5  Fulton County -- no, the Georgia system and how -- if

6  there's been any kind of interference.

7      Q.   And again, for clarity of the record, you

8  understand that I and some of my colleagues represent

9  some plaintiffs in this case who have brought

10  constitutional challenges against portions of that

11  election system, correct?

12      A.   No, I don't.  No, I'm not aware of that.

13      Q.   Okay.  Well, let me tell you now that I

14  represent certain plaintiffs in the case.  They are

15  the ones who are bringing the claims that are

16  challenging as unconstitutional portions of Georgia's

17  election system.  Do you understand what I just said?

18      A.   Yes, I do.

19      Q.   So topic 15 reads, Any vulnerabilities

20  involving the security, integrity, reliability or

21  accuracy of Georgia's current Election System as used

22  in Fulton County, including, a, potential or actual

23  remote access to any component of Georgia's current

24  Election System; b, policies and practices regarding

25  securing the components of Georgia's current Election

1   System, including but not limited to removable media

2   use with the system (and any other equipment or

3   devices used with any such media) and equipment

4   stored overnight in early voting polling places; c,

5   wireless connections involving any components of

6   Georgia's current Election System, including

7   Electronic PollBooks.  Did I read topic 15 correctly?

8        A.   Yes.

9        Q.   All right.  Are you comfortable with me

10  removing the screen share now and you relying on

11  Exhibit Share if you would like to continue to review

12  this document?

13       A.   Yes, yes.

14       Q.   Thanks, I can see you better now.

15            Tell me what research you have done about

16  this topic to prepare to testify today.

17       A.   None.  None.

18       Q.   Okay.  Did you review any documents to

19  prepare to testify today?

20       A.   No.  Just this -- I don't know what it's

21  called.  This one you are showing me right now, but

22  outside, none, nothing.

23       Q.   Whom did you talk to about topic 15 to

24  prepare for this deposition?

25       A.   Derrick Gilstrap.  That's the election

```
 1   system supervisor.  And that was during the meeting

 2   we had with a legal representative yesterday.

 3   Outside that, no one.

 4        Q.   I couldn't quite hear you, sir.  You said

 5   Mr. Gilstrap and --

 6        A.   Yes, Mr. Gilstrap.  Yeah, Mr. Gilstrap and

 7   that was during the meeting we had with our legal

 8   representative, Mr. David Lowman yesterday.

 9        Q.   By representative, you meant the attorney

10   for Fulton County?

11        A.   Yes, yes, yes.

12        Q.   I don't want you to tell me what your

13   attorney told you.  Those -- well, let me put it this

14   way.  What can you tell me about that conversation

15   without telling me anything private that Mr. Lowman

16   told you?

17             MR. LOWMAN:  And I just want to object.  I

18        want to object to the form of the question.  You

19        can answer.

20        Q.   (By Mr. Sparks) Let me try a better

21   question, Mr. Olomo.  Did you talk about topic 15

22   generally to prepare for your testimony today with

23   Mr. Gilstrap and Mr. Lowman?

24        A.   Now, can you repeat the question?

25        Q.   Did you talk generally about topic 15 with
```

1  Mr. Lowman and Mr. Gilstrap to prepare for your

2  testimony today?

3      A.   I -- no.  It was just -- no.  What we

4  discussed, you know, just a discussion between myself

5  and Mr. Lowman and Mr. Gilstrap.  And I'm not sure --

6  you can correct me -- but I think that's, you know,

7  client-attorney privilege, that's covered.

8      Q.   Yes, that's fine.

9           Are you relying on any other sources for

10 your testimony about this topic?

11     A.   No.

12     Q.   Okay.  What do you know about topic 15?

13     A.   It's a way -- do you want me to go directly

14 like from A, B and C or just want to know in general?

15     Q.   That's fine.  If you'd like to break it

16 down, that's fine with me.

17     A.   Okay.  So for A, I have no knowledge of

18 that.  And B, always follow the guidelines from the

19 SOS and Dominion for their system, to comply with any

20 removable media before using it based on Dominion

21 guidelines, to transfer election file from the EMS

22 cyber to the ICC.  That's the central count and

23 scanner and vice versa.  For C -- yes, for C, that

24 will -- that will be a KNOWiNK question because we

25 still have KNOWiNK as a (inaudible) --

1            THE REPORTER:  We have no what?

2            THE WITNESS:  KNOWiNK.  That would be a

3        KNOWiNK question.  KNOWiNK --

4            MR. LOWMAN:  It's a vendor.  It's capital

5        K-n-o-w and then ink, i-n -- I think it's i-n-k.

6            THE WITNESS:  Yes, i-n-k.  Yes.

7        Q.   (By Mr. Sparks) Okay.  Are you restricting

8    your response to part c to only KNOWiNK in the

9    electronic pollbooks?

10       A.   Yes, electronic pollbooks, you mean -- you

11   mean -- you are talking about poll pads.  Poll pads,

12   the vendor that handled poll pads is called KNOWiNK,

13   like I said, and they can, you know, better answer

14   that question because we still have them on

15   retainer -- I'll say on retainer for them to come in

16   and help us during the elections.

17       Q.   Okay.  I have some follow-up questions but

18   I do want to remind you, as we just talked about,

19   that you are here to testify on behalf of Fulton

20   County Board of Registration and Elections.  And

21   regardless of whether someone else could, in your

22   opinion, better answer the question, I do want to

23   know your responses for Fulton County with regards to

24   all of topic 15.  Do you understand that?

25       A.   Okay.  So on c, I will say I have no

1  knowledge of it.

2          MR. LOWMAN:  And Adam, you can ask specific

3      questions about wireless connections, what we

4      know about the wireless connections and going

5      forward.  I just don't want him to try to answer

6      something generally that he doesn't feel like is

7      his main area of expertise, but go ahead.

8          MR. SPARKS:  Well, thank you, David.  I

9      intend to ask questions, but again, he's been

10     put forward for Fulton County, so.

11         MR. LOWMAN:  Got you.  Understood.

12         MR. SPARKS:  Just want to make sure we are

13     in the same place there.

14         MR. LOWMAN:  Got it.

15     Q.   (By Mr. Sparks) Mr. Olomo, let me go back

16  because you did break it up to subtopics for now.

17  Regarding the potential or actual remote access to

18  any component of Georgia's current election system,

19  you were saying that you have no knowledge about

20  which to testify on that subtopic on behalf of Fulton

21  County.  Is that correct?

22     A.   Correct.

23     Q.   Mr. Olomo, are you familiar with the term

24  "cyber attack vulnerability"?

25     A.   The term, yes.

1      Q.    What does that mean?

2      A.    It means your system is vulnerable.

3      Q.    Does it mean vulnerable on the whole or in

4    one or more specific ways?

5      A.    That probably depends on what it -- depends

6    on who are we talking.  It could be kind of a -- we

7    could be vulnerable, the application could be

8    vulnerable.  The system as a whole could be

9    vulnerable.

10     Q.    So are you aware of any cyber attack

11   vulnerabilities either of the system as a whole or of

12   any component of Georgia's election system?

13     A.    Not to my knowledge.

14     Q.    Have you looked?

15     A.    No.

16     Q.    Has Fulton County looked for any such cyber

17   attack vulnerability with Georgia's election system?

18     A.    Not to my knowledge.

19     Q.    Who would look for such cyber attack

20   vulnerabilities in Georgia's election system?

21     A.    That will be the Secretary of State.

22     Q.    You mean the Secretary of State's Office or

23   the Secretary of --

24     A.    Yes, Secretary of State's Office, sorry,

25   yeah.

1      Q.    Would Dominion Voting Systems look for such

2  vulnerabilities?

3      A.    I don't know.

4      Q.    I want to show you a document and bear with

5  me as I work with the system to mark it and put it

6  before you.

7           MR. SPARKS:   All right.   If you want to

8           refresh your marked exhibit folder and pull up

9           what I've just marked as Exhibit 2, you may.

10          I'll also share my screen.

11          (Exhibit 2, E-mail string to Tucker from

12          Evans, 9/29/2020, Bates stamped

13          State-Defendants-00113894 - 113995, marked for

14          identification.)

15     Q.    (By Mr. Sparks) All right.   I have just

16  marked this document as Exhibit 2.

17     A.    Okay.

18     Q.    Please review it and let me know when you

19  have reviewed the document.

20     A.    Okay.   I've gone through the e-mail.

21     Q.    Thank you.   I wanted to ask about the

22  second page of this document.

23     A.    Uh-huh.

24     Q.    The document reads as an e-mail from Blake

25  Evans at sos.ga.gov.   To your knowledge, that's the

1  secretary of state's office e-mail domain, correct?

2       A.   Correct.

3       Q.   There's an e-mail to a representative from

4  Dominion Voting and a Chris Harvey and a Gabriel

5  Sterling included on the e-mail as well.  Do you see

6  where the e-mail reads, Fulton called me to say they

7  have two precincts/polling locations report issues of

8  2 ballots printing from BMDs?

9       A.   Yes.

10      Q.   And then the second paragraph, you see at

11 least one of those instances caused someone to mark a

12 ballot, hit print, two ballots emerged, one belonging

13 to the voter and another one that did not belong to

14 the voter.  That's what the e-mail says, correct?

15      A.   Correct.

16      Q.   Now, if I understood you earlier, you say

17 that the party that would look for cyber attack

18 vulnerabilities in Georgia's election system was the

19 Secretary of State's Office?

20      A.   Correct.

21      Q.   And this e-mail reflects a problem in

22 Fulton that is then relayed to parties with the

23 Secretary of State's Office and Dominion Voting.  Is

24 that fair?

25      A.   Yes.

Page 22

1      Q.   Is this consistent with the way Fulton

2  would approach a problem that it was informed of

3  about a ballot-marking device?

4           MR. LOWMAN:  Object to form of the

5           question.  You can answer.

6      A.   I'm -- it appears -- I don't know -- like I

7  don't -- can you break it down?  Like the question,

8  it's -- I don't understand.

9      Q.   (By Mr. Sparks) I'll try, sure.  If Fulton

10 County Board of Registration and Elections and,

11 Mr. Olomo, for purposes of saving the court reporter,

12 I'm going to refer to the Fulton County BRE as Fulton

13 County from time to time.  Do you mind if I do that?

14     A.   Correct.  Yes, that's fine.

15     Q.   Okay.  Thank you.  So Fulton County learns

16 of a problem with the ballot-marking device such as

17 the one described in this e-mail.  What would it do

18 next?

19     A.   No, that wouldn't be my question to answer.

20 I don't -- I'm not -- I'm not in the position to know

21 what to do.

22     Q.   Could a problem like the one described in

23 this e-mail be construed as evidence of a cyber

24 attack vulnerability?

25          MR. LOWMAN:  Object to the form of the

1      question.  You can answer.

2          A.    Are you expecting me to talk?  I'm sorry.

3     I don't know because I'm not --

4          Q.    (By Mr. Sparks) Yes, the question is to

5     you.

6          A.    Oh, oh, sorry.  Sorry.  Okay, yeah.  I

7     would -- again, I don't -- I don't know.  That would

8     be -- that would be the SOS, for them to determine

9     what's going on with this, yes.

10         Q.    So Fulton County would relay news of this

11    incident to the Secretary of State's Office?

12         A.    Yes, yeah, I don't know what -- I don't

13    know what the -- how do I put it like, what the

14    guideline is or what the procedure should be.  I

15    would -- I don't know.  I don't know that will -- who

16    to refer that to.

17         Q.    So you don't know if there's a policy or

18    procedure regarding a potential threat or

19    vulnerability to securing any component of the

20    election system, such as BMD at issue in this e-mail?

21              MR. LOWMAN:  Object to the form.  You can

22         answer.

23         A.    I don't -- I don't know.

24         Q.    (By Mr. Sparks) So are there policies and

25    practices regarding securing components of Georgia's

Page 24

1    current election system at Fulton County?

2         A.    What do you mean securing?  Like --

3    securing means making sure -- yeah, we do perform L&A

4    on those equipments to make sure they are secure,

5    yes.

6         Q.    Okay.  And L&A, you mean logic and accuracy

7    testing?

8         A.    Yes, yeah.  Logic and accuracy testing,

9    yes.

10        Q.    So logic and accuracy testing is an example

11   of a policy or a procedure concerning the securing of

12   at least a part of Georgia's current election system?

13        A.    And to correct you, not just a part, yeah,

14   we do logic and accuracy on every equipment that goes

15   out, yes.

16        Q.    You mentioned earlier a policy or procedure

17   relating to the transfer of voting data from an EMS

18   to an ICC and vice versa.  Do I remember that

19   correctly?

20        A.    Correct.

21        Q.    An EMS is an election management system?

22        A.    Correct.

23        Q.    And an ICC is -- what is an ICC?

24        A.    Yes, that's image cast central.

25        Q.    That's an obstacle scanner of some type.

Page 25

1   Is that correct?

2       A.   Correct.  Yes.

3       Q.   So aside from the three policies we just

4   named, broadly speaking, having to do with L&A

5   testing with regards to an EMS, ICC data transfer and

6   the other way, a data transfer from ICC to an EMS,

7   are you aware of any other policies or practices

8   regarding security components of Georgia's current

9   election system?

10      A.   Not to my knowledge, no.

11      Q.   Just those three?

12      A.   Yes.  Yes, that I can think of, yes.

13      Q.   Mr. Olomo, please tell me more about the

14  policy of transferring voter data from an EMS to an

15  ICC.  If I have misstated that, please put it in your

16  own words.  I don't mean to do so, if I have.

17      A.   Come again, please.  Sorry.  I got a bit

18  distracted.  Yes.

19      Q.   Okay.  You don't any other programs open on

20  your computer right now, do you?

21      A.   No, no, I was just thinking about what you

22  were saying, and I got -- I think I missed a word or

23  something.

24      Q.   I recall you mentioning earlier that you

25  could testify about a policy or practice of moving

1   voter or voting data -- I may have the word wrong or

2   misheard you -- back and forth between an EMS and an

3   ICC.  Will you please tell me more about the policy

4   you were referencing?

5        A.   So it's to move election files from the EMS

6   cyber to the ICC scanner where absentee by mail, BMD

7   ballots, if necessary, provisional ballots have been

8   scanned and go back to move the results and the

9   images from the ICC to the image cyber for

10  tabulation.

11       Q.   Are there any actual vulnerabilities in

12  that process under the policy that you described?

13       A.   Not to my knowledge.

14       Q.   Are there any potential vulnerabilities

15  under the policy that you described?

16            MR. LOWMAN:  Object to the form of the

17       question.  You can answer.

18       A.   Not to my knowledge.  Not to my knowledge.

19       Q.   (By Mr. Sparks) How do you know?

20       A.   I said not to my knowledge, so I --

21       Q.   Yes, I understand you said not to your

22  knowledge regarding potential vulnerabilities.

23       A.   Yes.

24       Q.   My question is, given the knowledge you do

25  have, why is your answer that there are not any

Page 27

1   potential vulnerabilities, not to my knowledge?  That

2   was a bit of a confusing question.  Please let me try

3   this again.

4          Why is your answer that not to your

5   knowledge are there any potential vulnerabilities in

6   that policy?

7       A.   Because I have no knowledge of any for

8   the -- you know, vulnerability of something.

9          THE REPORTER:  For the what?

10      A.   I don't know what -- like how to break that

11  down.  Like, I do not know.  I do not know, yes.

12      Q.   (By Mr. Sparks) What are you basing your

13  answer on?

14      A.   Based on -- I'm basing my answer on the

15  procedure that is in place and how it's been done.

16      Q.   Can you tell me more about the procedure

17  and how it excludes the potential for cyber attack

18  vulnerabilities from that policy?

19      A.   Again, I will repeat the first, remove

20  election files on a USB and the USB, the same USB

21  would always -- no, not the same.  We use a secure

22  USB from the Secretary of State, then remove the file

23  on the USB to the ICC scanner.  And when ballots is

24  being -- has been finished -- when the ballot has

25  been scanned, provisional absentee or BMD ballot, if

1  need be, we move the images and the results from the

2  ICC, with the same USB, back to the EMS cyber for

3  result tally.

4      Q.   Where do the USB or USBs that you use come

5  from?

6      A.   We get them from -- I'm not sure.  I can't

7  say.  But I think they are from the -- no, I don't --

8  I don't know.  Let me put it like that, but no, I

9  don't know.  Yes.

10     Q.   Are the USBs reused at any point?

11     A.   No.

12     Q.   What happens to them after they are used?

13     A.   They have -- they have to be kept for a

14  period of, I think, two years.  They go into

15  retention, I believe, yes.

16     Q.   Are they retained with other election

17  records, to your knowledge?

18          Are they retained with other election

19  records?

20     A.   They are retained.  Because they are

21  electronic, so they are retained along with where we

22  put our star EMS -- EMS cyber backups, yes.

23     Q.   I may come back to that, but for now I want

24  to move to subtopic c of topic 15.  That reads,

25  Wireless connections involving any components of

Page 29

1   Georgia's current Election System, including

2   Electronic Pollbooks.  Did I hear you correctly that

3   you mentioned poll pads and KNOWiNK earlier?

4        A.   Yes.

5        Q.   What do you know about poll pads and/or

6   KNOWiNK with regard to subtopic c?

7        A.   Poll pads are part of Georgia's system,

8   election system and that they use to check in

9   registered voters on election.  And KNOWiNK, I know

10  KNOWiNK is a vendor that supports poll pads and

11  that's about it.

12       Q.   So the poll pads are connected to WiFi,

13  internet at some point?

14       A.   Yes, during bulk updates, during L&A.

15       Q.   During bulk updates and during L&A.  Is

16  that right?

17       A.   Yes.

18       Q.   Any other time?

19       A.   No.

20       Q.   Are you able to testify about wireless

21  connections involving any other components of

22  Georgia's current election system?

23       A.   No.

24       Q.   So you can't tell me whether Dominion ICX

25  ballot-marking devices are connected to the internet?

1          A.    No.

2          Q.    And you can't tell me about whether the ICX

3    obstacle scanners that we discussed earlier are

4    connected to the -- to wireless internet?

5          A.    No.

6                MR. SPARKS:   I show you one more document,

7          Mr. Olomo.

8                (Exhibit 3, E-mail to Harvey from

9          Spell-Fowler, 10/27/2020, Bates Stamped

10         State-Defendants-00096447 - 96448, marked for

11         identification.)

12               MR. SPARKS:   One moment.

13         Q.    (By Mr. Sparks) Okay.   If you want to check

14   your marked exhibits folder, I have placed an exhibit

15   there marked as Exhibit 3.   If you would take a

16   moment to review it, please.

17               Please tell me when you have reviewed the

18   document, Mr. Olomo.

19         A.    Will do.   I'm done.

20         Q.    My question concerns item Number 1 in this

21   e-mail you see here.   I'll try to highlight it.   I'm

22   not sure if I can.   In any event, item 1 describes a

23   complaint that apparently was received by someone at

24   the Federal Bureau of Investigation regarding an

25   incident on October 23rd, 2020.   Quote, One of the

1  poll worker's computers was accessed remotely

2  somewhere else by taking control of the computer and

3  deleting information from the computer.  Do you see

4  that?

5       A.   Yes, I do.

6       Q.   It goes on to say only one computer at the

7  site was having issues with the WiFi.  Can you tell

8  me anything about the incident described on this

9  item 1?

10       A.   I wouldn't know about the incident because

11  this is the first time I'm reading it.  I can't

12  really say much about it.

13       Q.   Right.  I can't hear you very well.  I'm

14  sorry.  Would you mind repeating your answer?

15       A.   Yes, I said I cannot say much -- anything

16  about this because this is the first time I've

17  seen -- I'm reading about this or hearing about this.

18  So I cannot.

19       Q.   Regarding wireless connections involving

20  the components of Georgia's current election system,

21  would a poll worker's computer at a polling location

22  be considered a component of Georgia's current

23  election system?

24       A.   You mean -- I can't -- I don't understand

25  your question.

1     Q.   Is a computer used at a polling location

2     part of Georgia's current election system?

3          MR. LOWMAN:   And I object to the form, but

4          you can answer.

5     A.   Again, I wouldn't know what you talk about,

6     component, because it's a laptop.  It's a laptop and

7     the laptop is issued by Fulton County IT department,

8     so I will say that's not -- that's not -- probably I

9     would say no.

10    Q.   (By Mr. Sparks) You would say no?

11    A.   Yes.

12    Q.   Bear with me here.  Let's presume that the

13    incident described in this item 1 happened.  What

14    would the -- what should the poll worker do under

15    Fulton County's policies and procedures for

16    cybersecurity of Fulton County's election system?

17    A.   I don't think I'm the one to answer that

18    question.  I don't train poll workers.  I don't know

19    what the procedure is for poll worker training.

20    Q.   So you don't have any familiarity with what

21    the policy would be for --

22    A.   I do not.

23    Q.   -- for this poll worker to do in this

24    situation.  Is that right?

25    A.   Yes, I do not because I'm not in charge of

1    poll workers.

2        Q.    Okay.  So concerning wireless connections

3    to components of Georgia's current election system,

4    are you aware of any vulnerabilities related to the

5    use of ballot-marking devices that are created by

6    lower security wireless connections?

7        A.    No, not to my knowledge.

8        Q.    Do you know who Angelos Keromytis is?

9        A.    Who?

10       Q.    Angelos Keromytis.

11       A.    No.

12       Q.    Mr. Olomo, I think I know the answer to

13   this question but I want to ask.  Have you read any

14   of the expert reports filed in this case?

15       A.    I believe not.  No.

16       Q.    Are you aware of any of them from any other

17   source like a periodical or newspaper or website,

18   anything like that?

19       A.    No.

20       Q.    So if there were vulnerabilities with

21   components of Georgia's current election system with

22   regards to this topic 15, are you able to tell me

23   anything about those assertions?

24       A.    I'm sorry.  I don't understand your

25   question.

Page 34

1        Q.   Are you aware of any asserted
2    vulnerabilities with Georgia's current election
3    system?
4        A.   No, sir.  No.
5        Q.   If there were such a vulnerability, who
6    would have the responsibility for remediating it?
7    Would it be Fulton County?
8        A.   No, sir, because it's the State of Georgia.
9    Yes, so that would be the Secretary of State's
10   question.
11       Q.   And would that agency also have the
12   authority to remediate any asserted vulnerabilities
13   in Georgia's current election system?
14       A.   I can't answer that, sir.  I work for
15   Fulton County.  I can't answer that.
16       Q.   I apologize.  I don't mean to interrupt.
17   Would Fulton County have any authority to remediate
18   those asserted cybersecurity vulnerabilities?
19       A.   I can't -- I don't know.
20       Q.   Does Fulton County generate any of its own
21   guidance, policies or procedures regarding
22   cybersecurity of Georgia's current election system?
23       A.   No, not to my knowledge, no.
24       Q.   Does it receive guidance, policies or
25   procedures from anyone else?

Page 35

1          A.    On how?

2          Q.    I'm sorry?

3          A.    No, you said guidance -- yeah, you said

4     guidance on how -- you know, procedures or how to,

5     you know, how to perform L&A, how to do things.  I

6     want to know what your question is, what are we

7     trying to get to?

8          Q.    That's a fair point.  Let me break up the

9     question.  There might be a better way to ask it.

10    Does Fulton County receive policies on how to secure

11    Georgia's current election system components that

12    Fulton County has from anyone else?

13         A.    Yes.  Secure, yes.  We receive guidance how

14    to perform L&A, how to perform L&A from the Secretary

15    of State, yes.

16         Q.    So it receives it from the Secretary of

17    State.  Did I hear you right?

18         A.    Yes, correct.

19         Q.    Does Fulton County receive guidance on how

20    to implement policies from the Secretary of State as

21    well?

22         A.    I'll say --

23         Q.    Do you not understand my question?

24         A.    I do understand.  Yes, I understand your

25    question.  But I'm just -- I'm going back and, you

Page 36

1    know, I'm reading the SOP back in my head to make

2    sure that I'm not missing something here, but we

3    receive the SOP, but, you know, I'll say, yeah, I'm

4    trained, yes, I'll say yes.

5         Q.   What are the SOP?

6         A.   Standard operating procedures.

7         Q.   Okay.  Tell me more about that.  What are

8    the standard operating procedures for?  Fulton County

9    topic 15?

10        A.   No, it's just -- it's generally for the

11   State of Georgia on how L&A is done.  Yes, it's not

12   for Fulton -- just for Fulton County.

13        Q.   I see.  So you are referring to standard

14   operating procedures regarding cybersecurity that

15   come from the Secretary of State's Office.  Is that

16   right?

17        A.   No.  No, not cybersecurity procedures.  I'm

18   talking about L&A and that's logic and accuracy and

19   yes.  I'm not talking about cybersecurity, no.

20        Q.   Okay.  Do L&A procedures not include any

21   sort of security component?

22        A.   No, it's just -- yes.

23        Q.   Are there policies concerning cybersecurity

24   concerning protection against cyber attack

25   vulnerabilities that come from the Secretary of

Page 37

1    State's Office?

2        A.    No.

3        Q.    Does Fulton County have its own such

4    policies?

5        A.    No.

6        Q.    So has Fulton County assessed or otherwise

7    examined Georgia's current election system for

8    cybersecurity vulnerabilities?

9        A.    No, not to my knowledge.  No.

10       Q.    And forgive me if I'm repeating myself, but

11   does Fulton County have the authority to examine

12   Georgia's current election system for cybersecurity

13   vulnerabilities?

14       A.    I -- yeah, I think my director could answer

15   that.  That's not in my purview.  Position to -- my

16   place to answer the question, no.

17       Q.    Has Fulton County taken any measures to

18   eliminate or remediate cybersecurity vulnerabilities

19   in Georgia's election system?

20       A.    Not to my knowledge.

21            MR. SPARKS:  Can we go off the record for a

22       moment?

23            THE VIDEOGRAPHER:  The time is 11:19 a.m.

24       We are off the record.

25            (WHEREUPON, a recess was taken.)

1        THE VIDEOGRAPHER:  The time is 11:32 a.m.

2     We are on the record.

3        Q.   (By Mr. Sparks) Mr. Olomo, I wanted to ask

4     what your current employment was.

5        A.   I'm information systems manager with

6     department of registration and election Fulton

7     County.

8        Q.   Okay.  Did you hold that same position --

9     well, hold on.  Let me ask this a better way.  How

10    long have you held that position?

11       A.   Four months now.

12       Q.   Okay.  What position did you hold

13    previously?

14       A.   Elections system assistant supervisor.

15       Q.   Okay.  And how long did you hold that

16    position?

17       A.   About nine months.

18       Q.   We are moving.  What about before that?

19       A.   Before that, that I was a contractor

20    with -- I was a contractor with Dominion Voting

21    System assigned to Fulton County.

22       Q.   Okay.  When did you move from Dominion

23    Voting Systems to Fulton County regarding your

24    employment?  I'm doing the math with the months you

25    told me in my head.

1      A.   Yes, yes, I will say but that's from -- I

2    think the -- somewhere around like the second quarter

3    of 2020.

4      Q.   Did you say the second quarter of 2020?

5      A.   Yes.  Yes.

6      Q.   Okay.  Did your responsibilities change

7    when you moved from Dominion to Fulton County?

8      A.   Yes.

9      Q.   How did they change?

10     A.   More workload and -- just more workload.

11     Q.   More workload?

12     A.   Yes, more workload since that I now was

13   responsible for training and supervising system

14   specialists.

15     Q.   So when you moved from Dominion to Fulton

16   County, you picked up some training responsibilities

17   of others employed with Fulton County as well.  Is

18   that right?

19     A.   Correct.  Yes.

20     Q.   And in each of these positions, your

21   responsibilities included, broadly speaking,

22   information technology systems?

23     A.   Correct.

24     Q.   So what credentials do you have that helped

25   you perform those responsibilities?

Page 40

1          A.   Yes, I have a Bachelor's Degree in computer

2     science.  And I have information system security

3     specialist from University of Georgia.

4          Q.   I couldn't hear the last thing you said.

5          A.   Information systems security professional

6     certificate from University of Georgia.

7          Q.   Okay.  Anything else that would be relevant

8     to your responsibilities either at Dominion or at

9     Fulton County through the present?

10         A.   No, no.

11              MR. SPARKS:  Okay.  Mr. Olomo, at this

12          time, that's all the questions that I have for

13          you, understanding that the deposition will

14          continue with a different corporate witness.

15              THE WITNESS:  Okay.

16              MR. LOWMAN:  And you can drop off, Dominic.

17              THE WITNESS:  Okay.

18              MR. LOWMAN:  Thanks.

19              Adam, we are going to grab Mr. Gilstrap if

20          you are ready to proceed or, you know, however

21          you want to do it.

22              THE VIDEOGRAPHER:  Would you like to go off

23          the record?

24              MR. LOWMAN:  Yes, let's do that.

25              MR. SPARKS:  Sure.

Page 41

1          THE VIDEOGRAPHER:   The time is 11:35 a.m.

2     We are off the record.

3          (Whereupon, the proceedings were concluded

4     at 11:35 a.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 42

```
 1              C E R T I F I C A T E
 2    STATE OF GEORGIA   )
 3                       ) ss.:
 4    FULTON COUNTY      )
 5
 6        I,  Robin Ferrill, Certified Court Reporter
 7    within the State of Georgia, do hereby certify:
 8             That Dominic Olomo, the witness whose
 9    deposition is hereinbefore set forth, was duly sworn
10    by me and that such deposition is a true record of
11    the testimony given by such witness.
12             I further certify that I am not related to
13    any of the parties to this action by blood or
14    marriage; and that I am in no way interested in the
15    outcome of this matter.
16              IN WITNESS WHEREOF, I have hereunto set
17    my hand this 9th day of February, 2022.
18
19
20
21
22
23              ROBIN K. FERRILL, RPR
24
25
```

Page 43

```
 1   To: Mr. Lowman
     Re: Signature of Deponent Derric Olomo
 2   Date Errata due back at our offices:
 3   Greetings:
     This deposition has been requested for read and sign
 4   by the deponent.  It is the deponent's responsibility
     to review the transcript, noting any changes or
 5   corrections on the attached PDF Errata.  The deponent
     may fill out the Errata electronically or print and
 6   fill out manually.
 7   Once the Errata is signed by the deponent and
     notarized, please mail it to the offices of Veritext
 8   (below).
 9   When the signed Errata is returned to us, we will
     seal and forward to the taking attorney to file with
10   the original transcript.  We will also send copies of
     the Errata to all ordering parties.
11
     If the signed Errata is not returned within the time
12   above, the original transcript may be filed with the
     court without the signature of the deponent.
13
14   Please send completed Errata to:
15   VeritextProduction Facility
16   20 Mansell Court
17   Suite 300
18   Roswell, GA 30076
19   (770) 343-9696
20
21
22
23   ASSIGNMENT # 5043361
24
25
```

1   ERRATA for ASSIGNMENT # 5043361

2   I, the undersigned, do hereby certify that I have

3   read the transcript of my testimony, and that

4   ____ There are no changes noted.

5   ____ The following changes are noted:

6

      Pursuant to Rule 30(7)(e) of the Federal Rules of

7   Civil Procedure and/or OCGA 9-11-30(e), any changes

      in form or substance which you desire to make to your

8   testimony shall be entered upon the deposition with a

      statement of the reasons given for making them.  To

9   assist you in making any such corrections, please use

      the form below.  If additional pages are necessary,

10   please furnish same and attach.

11   Page _____ Line _____ Change _____

12   _____

13   Reason for change _____

14   Page _____ Line _____ Change _____

15   _____

16   Page _____ Line _____ Change _____

17   _____

18   Reason for change _____

19   Page _____ Line _____ Change _____

20   _____

21   Page _____ Line _____ Change _____

22   _____

23   Reason for change _____

24   Page _____ Line _____ Change _____

25   _____

Page 45

1   Page _____ Line _____ Change _____

2   _____

3   Reason for change _____

4   Page _____ Line _____ Change _____

5   _____

6   Page _____ Line _____ Change _____

7   _____

8   Reason for change _____

9   Page _____ Line _____ Change _____

10  _____

11  Page _____ Line _____ Change _____

12  _____

13  Page _____ Line _____ Change _____

14  _____

15  Reason for change _____

16  Page _____ Line _____ Change _____

17  _____

18

19

                    _____

20                      DOMINIC OLOMO

21  Sworn to and subscribed before me this ____ day of

22  _____, _____.

23  _____

    NOTARY PUBLIC

24

25  My Commission Expires:_____