Page 1

1          UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF GEORGIA

3               ATLANTA DIVISION

4

5        Civil Action No. 1:17-cv-02989-AT

6    _____

7    DONNA CURLING, et al.,

8         Plaintiffs,

9    vs.

10   BRAD RAFFENSPERGER, et al.,

11        Defendants.

12   _____

13              VIDEOTAPED DEPOSITION OF

14              JANICE W. JOHNSTON, M.D.

15   DATE:         August 23, 2022

16   TIME:         9:39 a.m. to 11:10 a.m.

17   LOCATION:     Krevolin & Horst, LLC

                   1201 West Peachtree Street, Northwest

18                 Suite 3250

                   Atlanta, Georgia 30309

19

     REPORTED BY:  Felicia A. Newland, CSR

20

21              Veritext Legal Solutions

              1250 Eye Street, N.W., Suite 350

22              Washington, D.C. 20005

```
 1               A P P E A R A N C E S

 2     On behalf of the Curling Plaintiffs: (Via Zoom)

 3           REILEY PORTER, ESQUIRE

 4           MARY KAISER, ESQUIRE

 5           SONJA SWANBECK, ESQUIRE

 6           Morrison & Foerster LLP

 7           2100 L Street, Northwest

 8           Suite 900

 9           Washington, D.C. 20037

10           mkaiser@mofo.com

11           rporter@mofo.com

12           sswanbeck@mofo.com

13           -- and --

14           ADAM SPARKS, ESQUIRE

15           Krevolin & Horst, LLC

16           1201 West Peachtree Street, Northwest

17           Suite 3250

18           Atlanta, Georgia 30309

19           sparks@khlawfirm.com

20

21

22
```

1             A P P E A R A N C E S (Cont'd)

2       On behalf of the Coalition for Good Governance

3       Plaintiffs:  (Via Zoom)

4            BRUCE P. BROWN, ESQUIRE

5            Bruce P. Brown Law

6            1123 Zonolite Road, Northeast, Suite 6

7            Atlanta, Georgia 30306

8            bbrown@brucepbrownlaw.com

9            -- and --

10           MARILYN MARKS, ESQUIRE (Via Zoom)

11           Attorney At Law

12           7035 Marching Duck Drive, E504

13           Charlotte, North Carolina 28210

14           Marilyn@uscgg.org

15      On behalf of the State Defendants:

16           ALEXANDER DENTON, ESQUIRE

17           DANIELLE HERNANDEZ, ESQUIRE (Via Zoom)

18           JAVIER PICO PRATS, ESQUIRE (Via Zoom)

19           ANNA EDMONDSON, ESQUIRE (Via Zoom)

20           Robbins Firm

21           500 14th Street, Northwest

22           Atlanta, Georgia 30318

1               A P P E A R A N C E S (Cont'd)

2          alexander.denton@robbinsfirm.com

3          javier.picoprats@robbinsfirm.com

4          danielle.hernandez@robbinsfirm.com

5          anna.edmonstron@robbinsfirm.com

6     Also Present:  (Via Zoom)

7          Donna Curling

8          Jenna Conaway

9          Bryan Tyson

10          Duncan Bell

11          Oluwasegun Joseph

12          Wail Jihadi

13          Donna Price

14     Videographer:  Leo Mileman

15

16

17

18

19

20

21

22

1                     C O N T E N T S

2        EXAMINATION BY:                          PAGE

3             Counsel for Curling Plaintiffs         9

4             Counsel for Coalition Plaintiffs       71

5                  JOHNSTON DEPOSITION EXHIBITS

6        NO.  DESCRIPTION                          PAGE

7        Exhibit 1  Plaintiffs' Identification of      10

8                   Outstanding Discovery Disputes Per April

9                   5, 2022 Order

10       Exhibit 2  Security Analysis of Georgia's ImageCast   14

11                  X Ballot Marking Devices, Professor J.

12                  Alex Halderman, Ph.D.

13       Exhibit 3  Excerpt testimony from Videotaped      16

14                  Videoconference Deposition of Juan

15                  Gilbert, Ph.D., Friday, October 29, 2021

16       Exhibit 4  Activity Alert:  ICSA-22-XXX-XX      25

17                  Vulnerabilities Affecting Dominion

18                  Voting Systems ImageCast X

19       Exhibit 5  Key Photos from production       44

20       Exhibit 6  People who have downloaded CC data   48

21       Exhibit 7  Declaration of Benjamin R. Cotton, dated   50

22                  June 8, 2022

Page 6

1      Exhibit 8  May 7, 2021 Barnes' E-mail chain re:        52

2                 Cyber Ninjas

3      Exhibit 9  Excerpt from the deposition of James A.      56

4                 Barnes, Jr., July 20, 2022

5      Exhibit 10 E-mail string, Renewed Letter Petition       61

6                 to State Election Board, dated June 6,

7                 2022, at 10:50 a.m.

8

9        *(Exhibits attached to transcript.)

10

11

12

13

14

15

16

17

18

19

20

21

22

1                    P R O C E E D I N G S

2                       * * * * * * *

3                    VIDEOGRAPHER:  Good morning.  We are

4          on the video record at 9:39 a.m. on August --

5          sorry, Tuesday, 23rd of August 2022.  This is

6          Media Unit 1 of the video-recorded deposition of

7          Dr. Janice Johnston taken by counsel for Plaintiff

8          in the matter of Donna Curling, et al. versus Brad

9          Raffensperger, et al. filed in the U.S. District

10         Court for the Northern District of Georgia, Atlanta

11         Division.  The location of this deposition is

12         Krevolin & Horst in Atlanta, Georgia.

13                    My name is Leo Mileman.  I'm from

14         the firm Veritext.  I'm the videographer.  The

15         court reporter is Felicia Newland from the firm

16         Veritext.

17                    Counsel all present please

18         introduce yourselves, after which the court

19         reporter will swear in the witness.

20                    THE WITNESS:  Leo, this is the 23rd.

21                    VIDEOGRAPHER:  Oh, thank you.

22                    MS. PORTER:  This is Reiley Porter

1        from Morrison & Foerster for the Curling

2        Plaintiffs.  And I'm here with Mary Kaiser, also

3        from Morrison & Foerster for the Curling

4        Plaintiffs.

5                        MR. SPARKS:  Also here for the

6        Curling Plaintiffs is Adam Sparks of Krevolin &

7        Horst.  I should note for the record that Halsey

8        Knapp, also of Krevolin & Horst, may be here for

9        part of the deposition.

10                       Bruce.

11                       MR. BROWN:  This Bruce Brown.  I am

12       here for the Coalition Plaintiffs.

13                       MR. DENTON:  Alexander Denton, here

14       in the room, for the State Defendants.

15                       MR. TYSON:  And Bryan Tyson, via

16       Zoom, also for the State Defendants.

17                       MS. EDMONDSON:  Anna Edmondson for

18       the State Defendants.

19                       MS. HERNANDEZ:  Danielle Hernandez

20       for the State Defendants.

21                       MR. PICO PRATS:  Javier Pico Prats

22       for the State Defendants.

Page 9

1                    MR. JIHADI:  Wail Jihadi for the

2        Curling Plaintiffs.

3                    MR. JOSEPH:  Oluwasegun Joseph for

4        the Curling Plaintiffs.

5                    VIDEOGRAPHER:  I believe that

6        concludes the counsel of record at today's

7        deposition.

8                         * * * * * *

9        Whereupon,

10                   JANICE W. JOHNSTON, M.D.

11      was called as a witness and, having been first duly

12      sworn, was examined and testified as follows:

13         EXAMINATION BY COUNSEL FOR CURLING PLAINTIFFS

14       BY MS. PORTER:

15                   Q    Good morning, Dr. Johnston.  I'm

16       Reiley Porter.  I am counsel on behalf of the

17       Curling Plaintiffs.

18                   Would you please state your name for

19       the record?

20                   A    Janice W. Johnston, M.D.

21                   Q    And do you understand that you're

22       under oath?

1              A      Yes, I do.

2              Q      Is there any reason why you would be

3        unable to give full and complete testimony today?

4              A      No.

5              Q      Thank you.

6                     You are currently a member of the

7        State Election Board, correct?

8              A      Correct.

9              Q      Were you aware that the Plaintiffs

10       asked to depose you in April of this year?

11             A      I'm not aware of that.

12             Q      Thank you.

13                    MS. PORTER:  On Tab 41, Adam, on the

14       physical exhibits.  We're also introducing our

15       first exhibit.

16                    MR. SPARKS:  I am handing to witness

17       and counsel a copy of the document we have

18       predesignated as Exhibit 41.

19                    (Johnston Deposition Exhibit Number 1

20                    marked for identification.)

21                    MS. PORTER:  Thank you.

22

```
                                                        Page 11

 1          BY MS. PORTER:

 2                  Q     Have you seen this filing describing

 3          your refusal to appear for a deposition?

 4                       MR. DENTON:  Object to form.

 5          BY MS. PORTER:

 6                  Q     At the -- it's paragraph 2, the first

 7          sentence describes the refusal of Defendants Ed

 8          Lindsey and Janice Johnston to produce any

 9          documents, answer any discovery requests or appear

10          for deposition on the first page.

11                       MR. DENTON:  Object to form.

12          BY MS. PORTER:

13                  Q     Do you see the sentence I'm trying to

14          point you to?

15                  A     I do see the sentence.

16                  Q     Okay.  Why did you decline to be

17          deposed?

18                       MR. DENTON:  Object to form.

19          BY MS. PORTER:

20                  Q     Why did you decline to be deposed?

21                       MR. DENTON:  Same objection.

22                       MR. SPARKS:  Ma'am, unless your
```

```
 1        counsel directs you not to answer with some sort of

 2        explanation, you're expected to answer the

 3        question.

 4                    MR. DENTON:  To the extent you're

 5        able to answer the question, you should answer it.

 6        That's fair.

 7                    THE WITNESS:  You'll need to explain

 8        further.

 9        BY MS. PORTER:

10             Q    Okay.  I'm asking you a simple

11        question.  Did you decline to be deposed?

12                    MR. DENTON:  Object to form.

13                    THE WITNESS:  I do not see my

14        signature anywhere on this.

15        BY MS. PORTER:

16             Q    Did you direct your counsel to ask

17        the Court to prohibit your deposition?

18                    MR. DENTON:  Object to form.

19                    And, Dr. Johnston, I'm going to

20        direct you not to answer that question to the

21        extent it would require you to disclose

22        privileged or confidential communications between
```

```
 1      you and your counsel.  If you can answer the
 2      question without disclosing privileged or
 3      confidential communications, you may do so.
 4                  THE WITNESS:  I don't understand your
 5      question.
 6      BY MS. PORTER:
 7          Q      Were you aware that the Plaintiffs
 8      asked to depose you in April of this year?
 9                  MR. DENTON:  Object to form.
10      BY MS. PORTER:
11          Q      Have you received a request -- prior
12      to this deposition, have you received a request to
13      appear in this case?
14                  MR. DENTON:  Object to form.
15      BY MS. PORTER:
16          Q      This is a simple question.  Can you
17      please provide an answer?
18                  MR. DENTON:  Ms. Porter, it might be
19      helpful if you specify which requests and which
20      depositions you're asking her about.  I think your
21      question is a little bit unclear.
22                  MS. PORTER:  I am asking if she has
```

```
 1      ever been asked to be deposed in this case prior to

 2      this deposition.

 3                      MR. DENTON:  Which deposition?

 4                      MS. PORTER:  The deposition that we

 5      are currently in.

 6                      THE WITNESS:  This is the first

 7      deposition that I have been asked -- that I know of

 8      that I have been asked to perform.

 9      BY MS. PORTER:

10              Q      Thank you.

11                      MS. PORTER:  Adam, will you please

12      produce Tab 1?

13                  (Johnston Deposition Exhibit Number 2

14                   marked for identification.)

15                      MR. SPARKS:  I'm handing the witness

16      and her counsel what's been predesignated as Tab 1.

17      BY MS. PORTER:

18              Q      Have you ever seen this report

19      before?

20              A      I have not.

21              Q      Are you aware that Dr. Halderman, who

22      wrote this report, uncovered numerous serious
```

1          vulnerabilities in Georgia's current election

2          system, and it's detailed in this one-hundred-page

3          report?

4                         MR. DENTON:  Object to form.

5                         THE WITNESS:  I have not seen this

6          form.

7     BY MS. PORTER:

8               Q     Do you know who Dr. Halderman is?

9               A     I know who Dr. Halderman is.

10              Q     Have you heard that Dr. Halderman has

11         discovered numerous serious vulnerabilities in

12         Georgia's election system --

13                        MR. DENTON:  Object to --

14         BY MS. PORTER:

15              Q     -- from any source?

16                        MR. DENTON:  Object to form.

17                        THE WITNESS:  Would you restate your

18         question?

19         BY MS. PORTER:

20              Q     Yes.

21                        Have you heard that Dr. Halderman has

22         discovered serious vulnerabilities in Georgia's

1          election system from any source?

2                         MR. DENTON:  Same objection.

3                         THE WITNESS:  I'm not sure of the

4          meaning of your question.

5          BY MS. PORTER:

6               Q     Will you tell me what you know about

7          Dr. Halderman?

8               A     My understanding is Dr. Halderman is

9          a computer -- alleged computer expert.

10              Q     And do you know anything about his

11         connection to the Georgia election system?

12              A     No.

13              Q     Thank you.

14                        MS. PORTER:  Adam, Tab 4, please.

15                        MR. SPARKS:  I'm handing the witness

16         and her counsel what has been predesignated as

17         Tab 4.

18                     (Johnston Deposition Exhibit Number 3

19                      marked for identification.)

20         BY MS. PORTER:

21              Q     Are you aware that the Secretary of

22         State retained as its election security expert

Page 17

1        Dr. Juan Gilbert?

2              A     Yes.

3              Q     And I'm going to direct you to the

4        second page of the document that you have at Line

5        13.  The page is marked 144.

6                    MR. DENTON:  Ms. Porter, before you

7        ask your question, if I may, just to be clear on

8        the record, you referred to this document as Tab 4.

9        Is it also Exhibit 4?

10                   MS. PORTER:  It's Exhibit 3.

11                   THE WITNESS:  What page?

12       BY MS. PORTER:

13             Q     It's the second page of the document.

14       It's labeled page 144.  The page numbers are on the

15       top right-hand side.  And we're looking for Line

16       13.

17                   Were you aware that Dr. Gilbert

18       testified that Dr. Halderman was one of two experts

19       he would turn to for a cybersecurity assessment of

20       voting equipment, like Dr. Halderman did for the

21       report produced in this case?

22                   MR. DENTON:  Object to form.

Page 18

```
 1                     THE WITNESS:  I -- I see this answer
 2        to a question from Juan Gilbert, Dr. Gilbert.
 3        BY MS. PORTER:
 4             Q     Yes.  Where he says that he would
 5        turn to Dr. Halderman?
 6             A     I see that.
 7             Q     Were you aware of that testimony?
 8             A     I'm not sure I have seen this
 9        testimony.  Is this a video recording?
10             Q     It is from Dr. Gilbert's deposition
11        in this case.  It's a transcript of that
12        deposition.
13                     Were you aware that Dr. Gilbert did
14        not agree with any of Dr. Halderman's technical
15        findings about the many vulnerabilities with the
16        Dominion equipment?
17                     Oh, let me restate.
18                     Were you aware that Dr. Gilbert did
19        not disagree with any of Dr. Halderman's technical
20        findings about the many vulnerabilities with the
21        Dominion equipment?
22                     MR. DENTON:  Object to form.
```

1      BY MS. PORTER:

2             Q     I will direct you to the page labeled

3      218, which should be the fifth page of your

4      document.

5             MR. DENTON:  Ms. Porter, while we're

6      getting there, to confirm, this is not a complete

7      transcript of this deposition.  Is that correct?

8             MS. PORTER:  That is correct.  This

9      is an excerpt.

10     BY MS. PORTER:

11            Q     Do you see page 218, Line 8?

12            A     On page 217?

13            Q     Yeah, we can look at 217.

14            At Line 17 it says, "You don't

15     dispute in your declaration that ICX QR codes are

16     not protected against replay attacks?  I do not."

17            On page 218, at Lines 8 and 11, you

18     also see he's not disputing findings.  And this

19     continues on for 30 pages of this transcript.

20            Were you aware of that testimony?

21            MR. DENTON:  Object to form.

22            THE WITNESS:  Ms. Porter, I'm aware

1       of these computer experts as part of this Curling

2       case.  I -- I cannot tell you all of the details of

3       this incomplete transcript and what I'm aware of.

4       BY MS. PORTER:

5            Q     Were you aware that the Secretary of

6       State's own witness did not disagree with any of

7       Dr. Halderman's findings?

8                    MR. DENTON:  Object to form.

9                    THE WITNESS:  That is too broad --

10      BY MS. PORTER:

11           Q     So --

12           A     That is too broad of a question.  You

13      need to be more specific.

14           Q     It's a yes-or-no question.  Were you

15      aware that Dr. Gilbert did not agree with any of

16      Dr. Halderman's findings?

17                    MR. DENTON:  Same objection.

18      BY MS. PORTER:

19           Q     Please answer the question.

20           A     Your question is too broad.  You need

21      to be more specific.

22           Q     Were you aware of this testimony?

Page 21

1          A     I am aware that both of these

2     computer experts have been asked questions.

3          Q     And were you aware that Dr. Gilbert

4     did not disagree with Halderman's report?

5          A     I cannot --

6               MR. DENTON:  Object to form.

7               THE WITNESS:  I cannot answer that.

8     BY MS. PORTER:

9          Q     Are you refusing to answer the

10    question?

11         A     I don't have enough information to

12    answer the question.

13         Q     I'm asking what you know.  Were you

14    aware?

15         A     I don't know --

16              MR. DENTON:  Object to form.

17              THE WITNESS:  -- enough to answer.

18    BY MS. PORTER:

19         Q     I'm going to ask you one more time if

20    you had ever seen the Halderman report, which was

21    Exhibit 2, before today?

22              Have you ever seen this report before

215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

```
                                              Page 22

 1      today?

 2                  MR. DENTON:  Ms. Porter, I apologize

 3      again.  I have an objection to the form of that

 4      question.  I also want to be clear on the record, I

 5      had a document marked as Exhibit 1 that is

 6      entitled, "Security Analysis of Georgia's ImageCast

 7      X Ballot Marking Devices."  Is that supposed to be

 8      Exhibit 2?

 9                  MS. PORTER:  Yes.

10                  MR. DENTON:  Okay.  And my objection

11      to your question is -- I'm going to maintain my

12      objection to your question, which you've already

13      asked.

14      BY MS. PORTER:

15            Q     The witness may answer.

16                  MR. DENTON:  Why don't you restate it

17      since we've had some back and forth on the record.

18      BY MS. PORTER:

19            Q     Yes.

20                  Have you ever seen Dr. Halderman's

21      report before today?

22                  MR. DENTON:  Object to form.
```

Page 23

```
 1        BY MS. PORTER:

 2                Q     You don't need to look through the

 3        whole report.  Have you ever seen it?

 4                      MR. DENTON:  Ms. Porter, if she

 5        thinks she needs time to look through the document

 6        that you put in front of her, she's certainly

 7        entitled to do that.

 8                      MS. PORTER:  She's obviously

 9        stalling.

10                      MR. DENTON:  That is not obvious,

11        Ms. Porter.  I disagree.  You asked her the

12        question already once this morning.  It's your

13        choice to go back to that well and ask it again.

14                      MS. PORTER:  It's not a "well," it's

15        a yes-or-no question.

16        BY MS. PORTER:

17                Q     Have you seen this document before

18        today?

19                      MR. DENTON:  It's a question that

20        she's already answered on the record.

21        BY MS. PORTER:

22                Q     The witness may answer the question.
```

Page 24

1           A      I have not seen this report.

2           Q      Has anyone ever told you about this

3      report before today?

4           A      If this is the report that has been

5      disputed in this case, I have heard of this report.

6           Q      What have you heard of this report?

7                  MR. DENTON:  Dr. Johnston, I'm going

8      to direct you not to answer that question to the

9      extent it would require you to divulge privileged

10     communications between you and your attorneys.  If

11     you can answer the question without sharing

12     privileged communications, you may do so.

13     BY MS. PORTER:

14          Q      The witness may answer.

15          A      Restate your question, please.

16          Q      Has anyone ever told you about the

17     Halderman report before today?

18                 MR. DENTON:  Same instruction.

19                 THE WITNESS:  What do you mean told

20     me?

21     BY MS. PORTER:

22          Q      Has someone told you about this

1          report?  Have they talked about this report with

2          you?

3                    A     Talked about this particular report

4          with me --

5                    Q     Yes.

6                    A     -- is the question?

7                          No.

8                    Q     Okay.  I'm going to go to Tab

9          Number 3, which will be Exhibit Number 5 -- 4.  It

10         will be Exhibit Number 4.

11                         (Johnston Deposition Exhibit Number 4

12                          marked for identification.)

13                         THE WITNESS:  May I clarify

14         something?

15                         MR. DENTON:  Sure.

16                         THE WITNESS:  There's a lot of talk

17         about this report, and your question, "Has anyone

18         told me about this report," is so broad because

19         there has been talk on it publicly.

20         BY MS. PORTER:

21                    Q     Please tell us what you know about

22         the report.

Page 26

1                    MR. DENTON:  Ms. Porter, please

2        let --

3                    THE WITNESS:  I don't know the

4        detail --

5                    MR. DENTON:  -- her finish her

6        statement before --

7                    THE WITNESS:  Let me finish.

8                    I don't know the details in this

9        report, but I have heard talk about this report

10       for some time.

11       BY MS. PORTER:

12           Q     Thank you.

13                 Okay.  Going on to Exhibit 4,

14       Tab Number 3.

15                    MS. PORTER:  Adam, do you have that

16       one?

17                    MR. SPARKS:  I am handing the witness

18       and counsel what has been predesignated as Tab 3,

19       what we're marking as Exhibit 4.

20                    MR. DENTON:  And to clarify while

21       we're distributing the documents, was what was

22       originally indicated to be Document 41, should that

Page 27

1      have been Exhibit 1?

2                    MR. SPARKS:  Yes.  Counsel, that was

3      my error.  I should have marked as predesignated as

4      Tab 41.  As you can understand with remote

5      depositions, it's sometimes a bit difficult for

6      counsel to communicate from two different places,

7      and so we have predesignated numbers as tabs for

8      the convenience of opposing counsel, but we are

9      moving through in the ordinary sequential

10     exhibit-numbering format, 1, 2, 3, and 4.

11                   MR. DENTON:  I'm with you now.  Thank

12     you.

13                   MR. SPARKS:  My apologies for the

14     error.

15                   MR. DENTON:  None required.

16                   MR. SPARKS:  Ms. Porter, back to you.

17     BY MS. PORTER:

18          Q     Have you seen this advisory before?

19                Please answer the question.

20                   MR. DENTON:  Ms. Porter, she's

21     reviewing the document.

22                   THE WITNESS:  Yes, I think I have.

1          BY MS. PORTER:

2                    Q       Thank you.

3                            Would you turn to the second to the

4          last page, the section labeled "Mitigations"?

5                            On the second to the last bullet on

6          that page, were you aware that CISA advised against

7          using QR codes for tabulation on ballots as Georgia

8          currently does?

9                            MR. DENTON:  Object to form.

10         BY MS. PORTER:

11                   Q       Were you aware of this recommendation

12         by CISA?

13                   A       I see this next to the last bullet.

14                   Q       Thank you.

15                           Did you know about that before today?

16                   A       Yes.

17                   Q       Did that give you any concerns about

18         the election system in Georgia?

19                   A       Be specific, please.

20                   Q       Did the fact that CISA has

21         recommended not to use QR codes for tabulation, as

22         Georgia currently does, give you any concerns about

Page 29

```
 1        Georgia's current election system?

 2                    MR. DENTON:  Object to form.

 3                    THE WITNESS:  Ms. Porter, as a member

 4        of the State Election Board, I worry about

 5        everything having to do with Georgia elections.

 6        BY MS. PORTER:

 7             Q     Of course.

 8                    Did this recommendation make you

 9        think that Georgia should not continue to use QR

10        codes?

11             A     I have not seen any substantive

12        evidence that compels me to make a recommendation

13        like that.

14             Q     Do you know who CISA is or what CISA

15        is?

16             A     I do.

17             Q     Do you trust their expert

18        recommendation?

19                    MR. DENTON:  Object to form.

20                    THE WITNESS:  A recommendation is

21        only a recommendation.

22
```

1      BY MS. PORTER:

2            Q     Did you review the report?

3            A     I have seen this report.

4            Q     And it gave you no concern about

5      Georgia continuing to use QR codes for tabulation

6      in its voting system?

7                  MR. DENTON:  Object to form.

8                  THE WITNESS:  Ms. Porter, I am

9      concerned about the vulnerability of any voting

10     system in Georgia.

11     BY MS. PORTER:

12           Q     Do you have a specific concern about

13     the use of QR codes for tabulation in Georgia's

14     voting system?

15           A     I have concerns about every voting

16     system and every aspect of it and how it applies to

17     election integrity.

18           Q     Georgia has one voting system.  Do

19     you have a specific concern about its voting system

20     that uses QR codes for tabulation?

21           A     I have a specific concern about any

22     voting system that Georgia chooses.

Page 31

1          Q      You're not answering the question.

2                 Do you have any concerns about

3     Georgia using QR codes for tabulation?

4                 MR. DENTON:  Object to form.  She has

5     answered that question.

6     BY MS. PORTER:

7          Q      The witness may answer.

8          A      I have answered before.

9          Q      Are you refusing to answer the

10    question?

11         A      I have concerns about any voting

12    system in Georgia.

13         Q      I am asking you about Georgia's

14    voting system, its current voting system, that uses

15    QR codes for tabulation.  Do you have concerns

16    about that system?

17         A      I have a concern --

18                MR. DENTON:  Object to form.

19                Sorry.

20                THE WITNESS:  That's okay.

21    BY MS. PORTER:

22         Q      The witness may answer.

Page 32

```
 1              A     I have a concern about any voting

 2        system that Georgia uses.

 3              Q     What is your concern?

 4              A     My concern is if election integrity

 5        can be upheld.

 6              Q     And in this case, CISA believes that

 7        it's important for QR codes -- sorry, let me

 8        restate.

 9                    In this case, CISA has recommended QR

10        codes not be used for tabulation in order to uphold

11        election integrity.  Does that give you any

12        concerns?

13                    MR. DENTON:  Object to form.

14                    THE WITNESS:  CISA's report and

15        mitigations are simply advice.

16        BY MS. PORTER:

17              Q     What has Georgia done based on any

18        recommendations that have come from CISA --

19                    MR. DENTON:  Object to form.

20        BY MS. PORTER:

21              Q     -- in this report?

22              A     You need to clarify your question.
```

1           Q     Can you walk me through any actions

2     that Georgia has taken in response to the

3     recommendations provided by CISA in this report?

4           A     Shall we go through each one of

5     these?

6           Q     What do you know about any steps

7     Georgia has taken to follow these recommendations?

8                 MR. DENTON:  Object to form.

9                 THE WITNESS:  Ms. Porter, these are

10    simply recommendations.

11    BY MS. PORTER:

12          Q     Has Georgia done anything to follow

13    these recommendations?

14          A     I think your question is too broad.

15          Q     Are you aware of any action that

16    Georgia has taken to follow the mitigations advised

17    in this document?

18          A     I think that is a better question for

19    the -- the good people that work in the IT

20    department with Georgia elections.

21          Q     Is your testimony then that you are

22    not aware of any steps that Georgia has taken to

```
 1      follow these recommendations?

 2              A     I think that is a --

 3                    MR. DENTON:  Object to form.

 4                    THE WITNESS:  -- better question for

 5      the IT department.

 6      BY MS. PORTER:

 7              Q     I'm asking what you know.

 8              A     I think that is a better question for

 9      the IT department of Georgia Elections.

10              Q     This is a question for you.  What do

11      you know about any steps Georgia has taken?

12                    MR. DENTON:  Object to form.

13                    You may answer if you know.

14                    THE WITNESS:  As a member of the

15      State Election Board, I view everything within the

16      framework of Georgia Election Code and how it

17      applies to election integrity.  I am -- I am not an

18      IT expert or one that would address all of these

19      advice, recommendations, from CISA.

20      BY MS. PORTER:

21              Q     So are you not aware of any steps

22      Georgia has taken to address these recommendations?
```

Page 35

```
 1          It's a yes-or-no question.

 2                     MR. DENTON:  Object to form.

 3                     THE WITNESS:  It is -- it's -- it's

 4          my opinion that Georgia is constantly attempting to

 5          make sure that the elections are secure and safe.

 6          BY MS. PORTER:

 7               Q     This question is specifically about

 8          these mitigations.  Are you aware of any steps

 9          Georgia has taken to follow them?

10               A     I'm not a computer expert.

11               Q     We're not asking you to be a computer

12          expert.  I'm asking if you're aware of any steps

13          that Georgia has taken.

14               A     I think you need to ask the -- the

15          other -- the proper people this question.

16               Q     Dr. Johnston, you are not answering

17          my question.

18                     My question is whether you are aware

19          of any steps Georgia has taken.  This is about your

20          knowledge.

21               A     These are questions for the election

22          division of the Secretary of State, not a member of
```

Page 36

```
 1      the State Election Board.
 2              Q     So you are not aware of any steps
 3      Georgia has taken to mitigate to these
 4      recommendations?
 5                    Please answer the question.
 6              A     I am unable to answer your question
 7      at this time.
 8                    MS. PORTER:  I am going to state for
 9      the record that the witness has clearly been
10      coached to stall and waste time, and we're going to
11      reserve our right to seek more time from this
12      witness.
13                    MR. DENTON:  Ms. Porter, your
14      assessment of the situation couldn't be more
15      incorrect.  There's been no coaching of the witness
16      in any regard, and specifically the witness has not
17      been directed to stall or waste time.
18                    I strongly disagree with your
19      characterization of the proceedings this morning.
20      It has been your decision to ask the questions
21      that you've chosen to ask the witness, and it's
22      been your decision to use the time as you have
```

Page 37

1         chosen to use it.

2                     MS. PORTER:  I'm asking simple

3         questions.  She is stalling and she's not answering

4         even the simple questions that I am asking.

5                     MR. DENTON:  There is no stalling and

6         she's giving the best answers she can.  If you're

7         not satisfied with her answers, you may wish to

8         move on.

9                     MS. PORTER:  I am just stating for

10        the record that we reserve our rights to ask for

11        more time from the witness.

12                    MR. DENTON:  And if you would like to

13        take that up with the Court, I'm sure you'll do

14        that.

15        BY MS. PORTER:

16             Q      Dr. Johnston, are you aware of a

17        Georgia State investigation regarding the

18        copying -- let me restate.

19                    Are you aware of a Georgia State

20        investigation regarding the copying of election

21        software and records in Coffee County, Georgia?

22             A      Would you repeat that?

Page 38

1              Q      Yes.

2                     Are you aware of a Georgia State

3        investigation regarding the copying of election

4        software and records in Coffee County, Georgia?

5              A      I am aware that an investigation is

6        taking place.

7              Q      When did that investigation begin?

8              A      I do not know.

9              Q      What do you know about that

10       investigation?

11                    MR. DENTON:  And, Dr. Johnston, in

12       answering this question, I'm going to instruct you

13       not to answer by providing information that is

14       privileged communication between you and your

15       attorneys.  If you can answer the question without

16       disclosing privileged communications, you may do

17       so.

18                    THE WITNESS:  I have nothing to

19       disclose.

20       BY MS. PORTER:

21             Q      Who initiated that investigation?

22                    MR. DENTON:  Same instruction.

Page 39

```
 1                  THE WITNESS:  I don't know.
 2          BY MS. PORTER:
 3               Q     Did the State Election Board initiate
 4          that investigation?
 5                  MR. DENTON:  Object to form.
 6                  THE WITNESS:  I don't know.
 7          BY MS. PORTER:
 8               Q     Do you have any role in the
 9          investigation right now?
10               A     No.
11               Q     Is there anything that you can tell
12          us about that investigation that you have not
13          learned from your counsel?
14               A     There's nothing I can tell you.
15               Q     What do you know about what happened
16          in Coffee County?
17                  MR. DENTON:  I'll give you the same
18          instruction, Dr. Johnston.
19                  THE WITNESS:  I don't know anything
20          about the investigation.
21          BY MS. PORTER:
22               Q     I'm not asking you about the
```

1       investigation.  I'm asking if you know anything

2       about the incident that took place in Coffee County

3       that led to the investigation.

4                   MR. DENTON:  And I'll object to form.

5                   THE WITNESS:  I have read newspaper

6       articles, but other than that, I have nothing I can

7       share with you today.

8       BY MS. PORTER:

9            Q     Based on those news articles that you

10      have read, what is your understanding of what

11      happened in Coffee County?

12           A     Actually, I'm not sure what happened

13      in Coffee County.

14           Q     Do you want to know?

15           A     Are you going to tell me?

16           Q     I'm asking if you -- I'm asking if

17      you would like to know what happened in Coffee

18      County.

19           A     I'd like to know a lot of things.

20           Q     As a member of the State Election

21      Board, are you curious about what happened in

22      Coffee County?

Page 41

```
 1              A       Absolutely.

 2              Q       What steps have you taken to find out

 3       what happened in Coffee County?

 4              A       To my understanding, an investigation

 5       is taking place.

 6              Q       And do you have any role in that

 7       investigation?

 8              A       I am not an investigator.

 9              Q       Do you have any oversight over the

10       investigation as a State Election Board member?

11                      MR. DENTON:  Object to form.

12                      THE WITNESS:  My understanding is

13       that an investigation is taking place.  I am not

14       participating in the investigation specifically

15       myself.

16       BY MS. PORTER:

17              Q       Are you getting updates on the

18       investigation?

19                      MR. DENTON:  You can answer if you

20       know.

21                      THE WITNESS:  Yes.

22
```

Page 42

BY MS. PORTER:

    Q    Can you walk me through any specific
steps that have been taken in that investigation to
date?

            MR. DENTON:  Dr. Johnston, I will
give the instruction that you may answer this
question to the extent you may do so without
disclosing privileged communications between you
and your attorneys.

            THE WITNESS:  There's no information
I can share with you today.

BY MS. PORTER:

    Q    Did the State Election Board task the
Secretary of State's office with investigating
potential unauthorized access to Coffee County
voting equipment?

    A    Repeat the question, please.

    Q    Did the State Election Board task the
Secretary of State's office with investigating
potential unauthorized access to Coffee County
voting equipment?

    A    I don't understand your question.

Page 43

```
 1              Q     I'm asking whether the State Election

 2      Board gave the task to the Secretary of State's

 3      office to investigate potential unauthorized access

 4      of Coffee County's voting equipment.

 5              A     I don't know.

 6              Q     Do you know why the Secretary of

 7      State claims that it was tasked with that

 8      investigation?

 9                    MR. DENTON:  Object to form.

10                    THE WITNESS:  I -- I don't have an

11      answer for your question.

12      BY MS. PORTER:

13              Q     You -- it's a yes-or-no question.  Do

14      you know why the Secretary of State claims that it

15      was tasked with the investigation?

16                    MR. DENTON:  Object to form.

17                    THE WITNESS:  I don't know.

18      BY MS. PORTER:

19              Q     Okay.  Are you aware that Paul

20      Maggio, who led the SullivanStrickler forensic team

21      involved in the Coffee County voting equipment

22      incident, has produced photographs taken during the
```

Page 44

1        incident?

2                A      Who?

3                Q      Paul Maggio led the forensic team

4        involved in this breach of the Coffee County voting

5        system.  He has produced photographs taken during

6        that incident.  Were you aware of these

7        photographs?

8                        MR. DENTON:  Object to form.

9                        THE WITNESS:  No, I'm not aware.

10                       MS. PORTER:  Adam, Tab 7.  And this

11       will be Exhibit 5.

12                       (Johnston Deposition Exhibit Number 5

13                        marked for identification.)

14       BY MS. PORTER:

15               Q      These are photos produced by Paul

16       Maggio, who led this forensic team.

17                       MR. SPARKS:  I am now handing the

18       witness and her counsel what has been predesignated

19       as Tab 7 and now marked as Exhibit 5.

20       BY MS. PORTER:

21               Q      Please look at the first photograph.

22       Have you seen this photograph before today?

Page 45

```
 1                 A      No.
 2                 Q      If you look at this photograph,
 3       you'll see SullivanStrickler forensic team members
 4       working at the Coffee County EMS server computer.
 5                        Were you aware that SullivanStrickler
 6       team members copied the Coffee County EMS server
 7       computer?
 8                        MR. DENTON:  Object to form.
 9                        THE WITNESS:  I don't know what
10       anybody did with this Coffee County issue.
11       BY MS. PORTER:
12                 Q      Were you aware that they copied
13       numerous compact flash drives used with the Coffee
14       County voting equipment?
15                        MR. DENTON:  Object to form.
16                        THE WITNESS:  I do not know what was
17       done.
18       BY MS. PORTER:
19                 Q      Is this the first you've heard about
20       that today?
21                        MR. DENTON:  Object to form.
22                        THE WITNESS:  I do not know what I've
```

Page 46

1       heard.

2       BY MS. PORTER:

3            Q     I am asking if you have heard of

4       forensic access to the Coffee County voting system

5       before today.

6            A     I do not have an answer for that.

7            Q     It's a yes-or-no question.  Have you

8       heard of forensic access to the system?

9                 MR. DENTON:  Object to form.

10      BY THE WITNESS:

11           Q     I'll restate.

12                 Have you heard allegations of

13      forensic access to the system?

14                 MR. DENTON:  Object to form.

15      BY MS. PORTER:

16           Q     Please answer the question.

17           A     I have read the articles in the news

18      media.

19           Q     And that's it?

20           A     And that's it.

21           Q     Please look at the third photograph.

22      You'll see two men sitting at a table.

Page 47

1                    MR. DENTON:  And it's double-sided.

2           BY MS. PORTER:

3                Q    Have you seen this photo before?

4                A    No.

5                Q    Are you familiar with Eric Chaney?

6                A    No.

7                Q    Were you aware he was a member of the

8           Coffee County Board of Elections until August 12th

9           of this year when he resigned?

10               A    Okay.

11               Q    Were you aware that Eric Chaney

12          helped organize and facilitate the coping of Coffee

13          County's voting equipment in January of 2021?

14                   MR. DENTON:  Object to form.

15                   THE WITNESS:  Can you restate your

16          question?

17          BY MS. PORTER:

18               Q    Are you aware that Eric Chaney helped

19          organize and facilitate the copying of Coffee

20          County's voting equipment in January of 2021?

21                   MR. DENTON:  Object to form.

22                   THE WITNESS:  I do not know what Eric

Page 48

1       Chaney did.

2       BY MS. PORTER:

3               Q    Do you recognize Eric Chaney sitting

4       in the Coffee County elections office on

5       January 7th, 2021, while Maggio's team copied the

6       Coffee County election equipment?

7                       He's the one in the baseball cap.

8                       MR. DENTON:  Object to form.

9                       THE WITNESS:  I don't know Eric

10      Chaney.

11                      MS. PORTER:  Okay.  Let's move on to

12      Tab 10, which will be Exhibit Number 6.

13                  (Johnston Deposition Exhibit Number 6

14                  marked for identification.)

15                      MR. SPARKS:  I am now handing the

16      witness and her counsel what's been predesignated

17      as Tab 10 and now being marked as Exhibit 6.

18      BY MS. PORTER:

19              Q    Have you seen this document before?

20              A    I do not recognize this document.

21              Q    Were you aware that in early 2021,

22      SullivanStrickler uploaded to the internet hundreds

```
 1        of gigabytes of data copied from Coffee County's
 2        election equipment?
 3                     MR. DENTON:  Object to form.
 4        BY MS. PORTER:
 5              Q    Dr. Johnston, were you aware that
 6        SullivanStrickler uploaded to the internet data
 7        copied from Coffee County's election system?
 8                     MR. DENTON:  Same objection.
 9                     THE WITNESS:  I don't know what
10        SullivanStrickler did.
11        BY MS. PORTER:
12              Q    This document in front of you is also
13        produced by Mr. Maggio.  If you look at it, you'll
14        see a list of who had access to the Coffee County
15        election software via the internet.
16                     Were you aware that many different
17        people downloaded those sensitive files and have
18        analyzed it?
19                     MR. DENTON:  Object to form.
20                     THE WITNESS:  No, I am not aware.
21                     MS. PORTER:  I'm moving on to Tab 14,
22        which will be Exhibit Number 7.
```

Page 50

1                    (Johnston Deposition Exhibit Number 7
2                    marked for identification.)
3                    MR. SPARKS:  I am now handing the
4          witness and her counsel what's been predesignated
5          as Tab 14 and will be marked as Exhibit 7.
6          BY MS. PORTER:
7                    Q     Please turn to the second page, the
8          paragraph numbered 9.  Do you know who Benjamin
9          Cotton is?
10                   A     I don't know Benjamin Cotton.
11                   Q     In the second page on paragraph 9,
12         Mr. Cotton, who is a cybersecurity expert and has
13         nothing to do with Georgia elections, testified in
14         June of this year that he had previously
15         forensically examined the Dominion Voting System in
16         Coffee County.
17                         Were you aware of Mr. Cotton's access
18         to the Coffee County system?
19                         MR. DENTON:  Object to form.
20                         THE WITNESS:  What page are you on?
21         BY MS. PORTER:
22                   Q     It's page 2, paragraph 9.

Page 51

```
 1              A     Oh.

 2              Q     And I will ask my question again.

 3      Were you aware that Mr. Cotton, who has nothing to

 4      do with Georgia elections, had access to Coffee

 5      County's system?

 6                    MR. DENTON:  I maintain my objection.

 7                    THE WITNESS:  I'm not aware of what

 8      Mr. Coffee -- Mr. Cotton did.

 9      BY MS. PORTER:

10              Q     Did you have any concerns that

11      Mr. Cotton had access to Coffee County's election

12      data?

13              A     I am concerned if anybody illegally

14      has access to any of our election equipment.

15              Q     And as a State Elections Board

16      member, does it also concern you that the

17      Plaintiffs in this case were the ones to uncover

18      this information --

19                    MR. DENTON:  Object to form.

20      BY MS. PORTER:

21              Q     -- rather than in a State

22      investigation?
```

Page 52

1                    MR. DENTON:  Same objections.

2                    THE WITNESS:  I don't know who or

3         what uncovered this information.

4                    MS. PORTER:  Okay.  We are going to

5         move on to Tab Number 16, which will be Exhibit 8.

6                    (Johnston Deposition Exhibit Number 8

7                    marked for identification.)

8                    MR. DENTON:  While Adam is grabbing

9         that, Dr. Johnston, it's fine for you to put the

10        exhibit numbers on there since they aren't

11        stickered here, but don't mark the exhibits beyond

12        that.

13                   THE WITNESS:  Okay.  Thank you.

14                   MR. SPARKS:  I am now handing the

15        witness and her counsel what's been predesignated

16        as Tab 16, now being marked as Exhibit 8.

17        BY MS. PORTER:

18             Q    Have you seen these e-mails before?

19             A    No.

20             Q    Are you aware a Coffee County

21        Election supervisor found Doug Logan's Cyber Ninjas

22        business card attached to the computer of the

Page 53

1      previous supervisor in the spring of 2021?

2                     MR. DENTON:  Object to form.

3                     THE WITNESS:  Ask your question

4      again, please.

5      BY MS. PORTER:

6           Q     Are you aware a Coffee County

7      Election supervisor found Doug Logan's Cyber Ninjas

8      business card attached to the computer of the

9      previous supervisor in the spring of 2021?

10                    MR. DENTON:  I maintain my objection.

11                    THE WITNESS:  I do not know what the

12     Coffee County supervisor found.

13     BY MS. PORTER:

14          Q     Are you familiar with Doug Logan or

15     his organization, Cyber Ninjas?

16                    MR. DENTON:  Object to form.

17                    THE WITNESS:  I do not know

18     Mr. Logan.

19     BY MS. PORTER:

20          Q     Have you heard anything in the press

21     about Doug Logan or Cyber Ninjas?

22                    MR. DENTON:  Object to form.

Page 54

```
 1                    THE WITNESS:  I know of Cyber Ninjas

 2        and Mr. Logan from the press.

 3        BY MS. PORTER:

 4               Q     Can you tell me what you know about

 5        them?

 6               A     I think they were involved in the

 7        Arizona audit.

 8               Q     Are you aware if they had any

 9        connection to Coffee County or the Georgia

10        election?

11               A     I --

12                    MR. DENTON:  Object to --

13                    THE WITNESS:  No.

14                    MR. DENTON:  Object to form.  Sorry.

15        BY MS. PORTER:

16               Q     Are you aware that Mr. Barnes

17        notified Chris Harvey of potential Cyber Ninjas'

18        involvement with the Coffee County voting equipment

19        in May of 2021?

20                    MR. DENTON:  Object to form.

21                    THE WITNESS:  No.

22
```

```
 1      BY MS. PORTER:
 2           Q      Do you see that Chris Harvey, the
 3      state election director at the time, directed
 4      Frances Watson, the head of the Secretary of
 5      State's investigative unit at the time, to
 6      investigate Cyber Ninjas' involvement with the
 7      Coffee County elections office in May of 2021?
 8           A      This is the first time that I've seen
 9      this e-mail.
10           Q      And you see that now?
11           A      I see this e-mail.
12           Q      Do you see Chris Harvey directing
13      Frances Watson to investigate Cyber Ninjas'
14      involvement?
15                  MR. DENTON:  Object to form.
16                  THE WITNESS:  I see the e-mail.
17      BY MS. PORTER:
18           Q      Do you know why that investigation
19      never occurred?
20                  MR. DENTON:  Object to form.
21                  THE WITNESS:  No.
22                  MS. PORTER:  I'm going to introduce
```

Page 56

1    Tab 47, which will be Exhibit 9.

2                 (Johnston Deposition Exhibit Number 9

3                 marked for identification.)

4                 MR. SPARKS:  I'm now handing the

5    witness and counsel what's been predesignated as

6    Tab 47.  And that will be marked as Exhibit 9.

7    BY MS. PORTER:

8         Q    And in that -- what we are handing

9    you is an excerpt from the deposition of James

10   Barnes, who was on the e-mail with Chris Harvey

11   that you just saw.

12                 If could please turn to page 164, it

13   should be the third page of the copy that you have

14   in front of you.

15        A    I'm sorry, what page?

16        Q    It's labeled 164.  It will be the

17   third page of your copy.  And I would direct your

18   attention to Line 8, where in response to the

19   question, "Did anyone ever follow up with you from

20   the State on this issue?"  Mr. Barnes says, "I

21   never heard anything back from anybody at the

22   State."

Page 57

```
 1                    Do you know why no State investigator
 2       ever contacted James Barnes or ever visited Coffee
 3       County's elections office while he worked there?
 4                    MR. DENTON:  Object to form.
 5                    THE WITNESS:  No.
 6       BY MS. PORTER:
 7            Q    Does it concern you that the
 8       investigation that Chris Harvey and Frances Watson
 9       initiated never occurred?
10                    MR. DENTON:  Object to form.
11                    THE WITNESS:  I don't know.
12       BY MS. PORTER:
13            Q    Does it concern you that there are
14       serious allegations of access to the Coffee County
15       election system and the State never investigated
16       them?
17                    MR. DENTON:  Object to form.
18                    THE WITNESS:  Would you repeat that,
19       please?
20       BY MS. PORTER:
21            Q    Does it concern you that there were
22       serious allegations of access to Coffee County's
```

Page 58

```
 1        election system and that the State never

 2        investigated them?

 3                    MR. DENTON:  I maintain my objection.

 4                    THE WITNESS:  I'm concerned about all

 5        allegations, Ms. Porter.

 6        BY MS. PORTER:

 7             Q     In the State Election Board's meeting

 8        yesterday, Judge Duffey, the new Chair, seemed to

 9        indicate that going forward, the State Election

10        Board will be more actively involved in

11        investigations conducted by the Secretary of State.

12                    Is that your understanding as well?

13                    MR. DENTON:  Objection to the form.

14                    You may answer.

15                    THE WITNESS:  I'm pleased to have

16        Judge Duffey on the election board.

17        BY MS. PORTER:

18             Q     And do you agree with his assessment,

19        that the State Election Board should take a more

20        active role in investigations?

21                    MR. DENTON:  Object to form.

22                    THE WITNESS:  The State Election
```

1        Board has the authority to conduct investigations.

2        BY MS. PORTER:

3            Q     And do you believe that they should

4        take a more active role in that?

5            A     I believe the State Election Board

6        does take an active role in investigations.

7            Q     Have you ever received any

8        information about events related to the

9        investigation of Coffee County election officials

10       from employees of the Secretary of State's office?

11           A     Repeat that.

12           Q     Have you ever received any

13       information about events related to the Coffee

14       County investigation from employees of the

15       Secretary of State's office?

16           A     I don't have an answer for that.

17           Q     Have you received information from

18       Secretary of State office employees about the

19       Coffee County investigation?

20           A     No.

21           Q     What about from Chairman Duffey?

22           A     The only information that I have is

Page 60

1     that there is an investigation into the Coffee

2     County issue now.

3           Q     Have you asked for more information

4     about this investigation?

5           A     Have I asked about more information?

6           Q     Yes.

7           A     I am willing to receive information

8     as it is appropriate to be given to us as a State

9     Election Board.

10          Q     But you have not sought out more

11    information?

12          A     What do you mean?

13          Q     Have you asked for more information

14    from the Secretary of State's office or other

15    people involved in the investigation?

16          A     No.

17                THE WITNESS:  I am going to move to

18    Tab 29, which will be Exhibit 10.

19                MR. SPARKS:  I am now handing the

20    witness and her counsel what's been predesignated

21    as Tab 29, now being marked as Exhibit 10.

22

Page 61

1              (Johnston Deposition Exhibit Number 10

2              marked for identification.)

3      BY MS. PORTER:

4              Q     Do you recognize this petition?

5                    MR. DENTON:  Object to form.

6                    THE WITNESS:  Yes.

7      BY MS. PORTER:

8              Q     Did you find it concerning that

9      political leaders, including office holders and

10     candidates, do not have faith in Georgia's current

11     voting equipment?

12                   MR. DENTON:  Object to form.

13                   THE WITNESS:  That sounds like your

14     opinion, Ms. Porter.

15     BY MS. PORTER:

16             Q     Do you agree that the extensive

17     breach of the Georgia voting system in Coffee

18     County raises important concerns about the security

19     of that system?

20                   MR. DENTON:  Object to form.

21                   THE WITNESS:  As I've said before,

22     I'm concerned about any voting system in Georgia.

Page 62

```
 1      BY MS. PORTER:

 2           Q     I will direct your attention on this

 3      petition to the final paragraph that begins with

 4      "Georgia voters'."  It says, "Georgia voters'

 5      confidence continues to deteriorate in the face of

 6      ongoing election problems caused by this complex

 7      system."

 8                 Do you find it concerning that

 9      political leaders', including office holders and

10      candidates, confidence in Georgia's system

11      continues to deteriorate?

12                      MR. DENTON:  Object to form.

13                      THE WITNESS:  I believe this e-mail

14      is from one person.  How can you extrapolate to so

15      many people?

16      BY MS. PORTER:

17           Q     This e-mail is signed from multiple

18      people.  The signature on the second page says it's

19      from Jeanne Dufort, Ryan Graham, and Salleigh

20      Grubbs, who are all leaders of political parties in

21      Georgia.

22                 Do you find it concerning that
```

Page 63

1          political leaders, including office holders and

2          candidates, do not have faith in the current

3          Georgia election system?

4                    MR. DENTON:  I maintain my same

5          objection to the same question.

6                    You may answer.

7                    THE WITNESS:  I don't see your

8          connection to leaders and other people.

9     BY MS. PORTER:

10              Q    I'm looking at the signature and I'm

11         seeing, "Jeanne Dufort, Morgan County Democratic

12         Committee, Ryan Graham, Chair, Libertarian Party of

13         Georgia, and Salleigh Grubbs, Chair of Cobb County

14         Republican Party."

15              A    Oh, okay.

16                    MR. DENTON:  Ms. Porter, I'll just

17         say since we're all -- you're virtual, we're here,

18         you referred to this as the final paragraph when

19         you directed her attention.  So I think we

20         didn't -- the witness may not have seen the second

21         page with the signatures that you are referencing

22         now.

Page 64

```
 1                    MS. PORTER:  Thank you.
 2                    THE WITNESS:  All right.  Ms. Porter,
 3        I -- I see these names, and I see that they've
 4        signed their names to this opinion in this e-mail.
 5        BY MS. PORTER:
 6             Q    And do you find it concerning that
 7        such political leaders have deteriorating faith in
 8        Georgia's election system?
 9                    MR. DENTON:  Object to form.
10                    THE WITNESS:  I find that electors
11        and people in Georgia frequently express their
12        concerns and opinions.
13        BY MS. PORTER:
14             Q    Given the broad range of serious
15        documented vulnerabilities and the extraordinary
16        Coffee County breach, do you have any concerns
17        about the security of Georgia's Dominion Election
18        System?
19                    MR. DENTON:  Object to form.
20                    THE WITNESS:  As I've said before,
21        I'm concerned about any voting system in Georgia
22        and anything in Georgia that has to do -- that may
```

Page 65

1         affect election integrity.

2         BY MS. PORTER:

3              Q    I'm going to ask you about some

4         specifics.

5                   Do you think that a system with

6         numerous serious vulnerabilities that has suffered

7         an expansive breach is a reliable election system?

8                   MR. DENTON:  Object to form.

9                   THE WITNESS:  Ms. Porter, that sounds

10        like your opinion.

11        BY MS. PORTER:

12             Q    I'm asking for your opinion.

13             A    You're asking for my opinion?

14             Q    Yes.

15                  Do you think that a system with

16        numerous vulnerabilities and an expansive breach is

17        a reliable election system?

18                  MR. DENTON:  The same objection to

19        the same question.

20                  THE WITNESS:  My opinion, as a member

21        of the State Election Board, is to work within the

22        framework of the Election Code and look at

Page 66

1    everything through the lens of election integrity,

2    no matter what the system is.

3    BY MS. PORTER:

4        Q    What I'm asking is if you personally

5    believe that a system with numerous documented

6    vulnerabilities that has suffered a breach is a

7    reliable election system.

8             MR. DENTON:  The same objection to

9    the same question.

10            THE WITNESS:  My opinion is that

11   there are vulnerabilities with any election system.

12   BY MS. PORTER:

13       Q    Okay.  Do you think that an election

14   system is reliable if that software has been

15   accessible on the internet for a year and a half?

16            MR. DENTON:  Object to form.

17            THE WITNESS:  That is a question for

18   computer experts.

19   BY MS. PORTER:

20       Q    You have no opinion on it?

21            MR. DENTON:  Object to form.

22            THE WITNESS:  I have not seen

1      evidence -- substantive evidence that the Georgia

2      election system has compromised -- has been

3      compromised.

4      BY MS. PORTER:

5            Q     I'm not asking you about Georgia's

6      election system.  I'm saying an election system

7      that has been on the internet for over a year and a

8      half, would you think that's reliable --

9                 MR. DENTON:  Object to form.

10     BY MS. PORTER:

11           Q     -- from a cybersecurity perspective?

12                MR. DENTON:  Same objection.

13                THE WITNESS:  There are always issues

14     and concerns about cybersecurity.  That's a given

15     in the world today.

16     BY MS. PORTER:

17           Q     Are you aware that the State Election

18     Board has the power to mandate emergency

19     hand-marked paper ballots for future elections?

20                MR. DENTON:  Object to form.

21                THE WITNESS:  No, I'm not aware of

22     that.

Page 68

1    BY MS. PORTER:

2          Q     Is this something the State Election

3    Board is looking into?

4          A     No.

5          Q     Why not?

6          A     There are ten duties in the Code of

7    Elections in Georgia prescribed to the State

8    Election Board.  None of those ten duties give the

9    authority of the State Election Board to choose the

10   voting system.

11         Q     In light of the circumstances that

12   we've discussed today, do you think that the State

13   Election Board should consider hand-marked paper

14   ballots?

15                MR. DENTON:  Object to form.

16                THE WITNESS:  As a State Election

17   Board member, it doesn't matter what my opinion is.

18   It's what the Georgia Election Code states.

19   BY MS. PORTER:

20         Q     Is it your testimony that as a State

21   Election Board member your opinion as to the form

22   of Georgia's voting system is not important?

Page 69

```
 1                    MR. DENTON:  Object to form.

 2                    THE WITNESS:  My duty is to work

 3       within the framework of the Georgia Election Code.

 4       BY MS. PORTER:

 5            Q    And did you say that the Georgia

 6       Election Code does not allow the State Election

 7       Board to mandate hand-marked paper ballots?

 8                    MR. DENTON:  Object to form.

 9                    THE WITNESS:  It's very clear in the

10       Code that the voting system used in Georgia shall

11       be uniform as determined by the State.

12       BY MS. PORTER:

13            Q    So it is your testimony that the

14       State Election Board cannot mandate hand-marked

15       paper ballots?

16                    MR. DENTON:  Object to form.

17                    THE WITNESS:  That is a question for

18       the State.

19       BY MS. PORTER:

20            Q    Not a question for a member of the

21       State Election Board?

22                    MR. DENTON:  I'm not sure if there's
```

1          a question there, but I will object if there is.

2          BY MS. PORTER:

3                  Q     As a member of the State Election

4          Board, is it your belief that you do not have the

5          authority to mandate hand-marked paper ballots?

6                       MR. DENTON:  Same objection to the

7          same question.

8                       THE WITNESS:  I referred to the

9          duties of the State Election Board before, and my

10         answer is the same.

11         BY MS. PORTER:

12                 Q     I'm asking if it is your testimony

13         that it is prohibited for the State Election Board

14         to mandate hand-marked paper ballots.

15                      MR. DENTON:  Same objection.

16                      THE WITNESS:  The authority for --

17         for using a voting system and providing a voting

18         system falls within the authority of the State, not

19         the State Election Board.

20                      MS. PORTER:  Okay.  I'm going to ask

21         that we take a quick break.

22                      VIDEOGRAPHER:  Going off the video

Page 71

1       record at 10:50 a.m.

2                   (Recess from 10:50 a.m. to 11:04 a.m.)

3                        VIDEOGRAPHER:  Back on the record at

4       11:04 a.m.

5                        MS. PORTER:  I have no further

6       questions, and I'm going to pass the time to

7       Mr. Brown.

8         EXAMINATION BY COUNSEL FOR COALITION PLAINTIFFS

9       BY MR. BROWN:

10                  Q    Dr. Johnston, my name is Bruce Brown,

11      and I represent the Coalition Plaintiffs.  And I'm

12      going to follow up on some of the questions that

13      Ms. Porter asked you this morning.

14                       And one thing that I appreciate about

15      your testimony is your testimony in response to one

16      of the last questions, that you view your

17      responsibilities within the framework of state law.

18                       And so what I wanted to do was to

19      address state law with respect to several different

20      topics; secret ballots, audits, investigations, and

21      secure elections, to get your information and

22      testimony on what the State Election Board is doing

1       to fulfill its duties.

2                   As to secret ballots, Dr. Johnston,

3       you're -- you're aware that the Georgia

4       constitution and Georgia State law require that

5       citizens be allowed to vote in absolute secrecy,

6       right?

7               A     Right.

8               Q     You're -- you've seen the

9       touchscreens and how big they are, correct?

10              A     Correct.

11              Q     Does the size of the touchscreens,

12      particularly in small voting places, give you any

13      concerns about whether the State is protecting the

14      right of citizens to vote in absolute privacy?

15              A     The -- the screens are large and the

16      counties are instructed to do -- to make

17      adjustments to provide for secrecy for the voter.

18              Q     Has the State Election Board done

19      anything to assess whether the counties are, in

20      fact, doing that; that is protecting the absolute

21      secrecy of voters using the BMD systems?

22              A     The counties have been instructed to

Page 73

1          make adjustments in the polling precincts to

2          provide for ballot secrecy.

3                Q      Apart from replacing the

4          ballot-marking devices with hand-marked paper

5          ballots, do you know of anything more that the

6          counties can or should do to protect the absolute

7          right of citizens to ballot secrecy?

8                          MR. DENTON:  Object to form.

9                          THE WITNESS:  I'm not sure I

10         understand your question.

11         BY MR. BROWN:

12               Q      I'll repeat it.

13                         Apart from replacing BMDs with

14         hand-marked paper ballots, do you know of anything

15         else that the counties can do to product the right

16         of Georgia citizens to absolute ballot secrecy?

17                         MR. DENTON:  Object to form.

18                         THE WITNESS:  The BMDs can be

19         positioned and placed so that this -- the ballot

20         secrecy can be maintained in polling precincts.

21         BY MR. BROWN:

22               Q      And is it your testimony that the

Page 74

```
 1          counties are, in fact, doing that or do you know

 2          one way or the other?

 3                  A       They should be doing that.

 4                  Q       And does the SEB have any role in

 5          investigating whether, in fact, they are doing that

 6          in your view?

 7                  A       The SEB will respond to complaints

 8          regarding ballot-secrecy issues.

 9                  Q       And has it responded to complaints

10          regarding ballot-secrecy issues in fact?

11                  A       I believe the counties have received

12          communications from the election division of the

13          Secretary of State giving them instruction on how

14          to arrange the polling precinct and the BMDs so

15          that the ballot secrecy to the voter can be

16          maintained.

17                  Q       You would agree that the State

18          Election Board is authorized to promulgate rules

19          about precertification audits, right?

20                  A       Yes.

21                  Q       You testified persuasively that you

22          had many concerns, and always will have concerns,
```

Page 75

1        about the security of elections in Georgia.

2                    Have any of those concerns led you,

3        as an SEB board member, to reconsider the audit

4        rules that are currently in place to make them more

5        robust?

6                    MR. DENTON:  Object to form.

7                    THE WITNESS:  Ask your question

8        again, please.

9        BY MR. BROWN:

10            Q     Has your concerns led you to

11       recommend or consider that the SEB change the audit

12       rules to make them more robust in light of, if you

13       believe them -- to have -- to address your

14       concerns?

15                   MR. DENTON:  Object to form.

16                   THE WITNESS:  The rule -- the rule --

17       the Georgia Election Code describes the audit

18       procedure for precertification audit.  As a State

19       Election Board member, and interest in election

20       integrity, but working within the framework of the

21       law, it is appropriate to understand the process of

22       the audit.  And -- and from time to time, the Board

Page 76

1          may make recommendations to the General Assembly

2          with regards to elections and election integrity

3          and audits.  So I'm not sure if that answered your

4          question.

5          BY MR. BROWN:

6                    Q     It does in part.

7                          But the -- you do understand that the

8          SEB has the jurisdiction and the authority to

9          promulgate rules about audits without the

10         legislature, correct?

11                         MR. DENTON:  Object to form.

12                         THE WITNESS:  The State Election

13         Board has the authority to promulgate rules and

14         regulations within the framework of the Georgia

15         Election Code.

16         BY MR. BROWN:

17                    Q     Right.

18                          One of the -- the way that -- the

19         purpose of this deposition, of course, is for this

20         litigation.  And I hope you can understand that the

21         Plaintiffs' position is that the -- I'm not asking

22         you to agree to this.  I'm just setting up my next

1      question.  The Plaintiffs' position is that the

2      BMDs, particularly already, but particularly given

3      the more recent threats and breaches, are too

4      insecure to use in Georgia elections, and that the

5      current audit procedure, even without these

6      advanced threats, is inadequate.

7                    And in response to that, we

8      anticipate that the State may take the position,

9      "Oh, the SEB is on that.  Don't worry about it,

10     Judge, they're going to make changes to the audits

11     to respond to this increased threat."

12                   I just want to know if that's the

13     case or not.  And if you're not -- if there's

14     nothing in the works, then there's nothing in the

15     works.

16                   MR. DENTON:  Objection to the form.

17                   THE WITNESS:  That was so long.  I'm

18     sorry, I lost track of your real question.

19     BY MR. BROWN:

20          Q    It was a real -- I didn't mean -- it

21     was long, but I don't think it was that hard, but

22     let me ask it more crisply perhaps.

Page 78

```
 1                     Isn't it true that the SEB is not
 2          doing anything with respect to the regulation of
 3          audits to address the concerns reflected in the
 4          CISA report, Dr. Halderman's report, the news from
 5          Coffee County?
 6                     MR. DENTON:  Object to form.
 7                     THE WITNESS:  I -- I cannot speak
 8          with regard to Coffee County.
 9                     MR. BROWN:  Okay.  That's
10          interesting.  That's not responsive.
11                     Can you repeat the question,
12          Ms. Court Reporter?
13                (The reporter read as requested.)
14                     THE WITNESS:  The State Election
15          Board is not reacting to the -- to the issue with
16          Coffee County at this time.
17          BY MR. BROWN:
18                Q    Is it reacting with respect to the
19          audits -- to the increased risk reflected by either
20          the CISA advisory or Dr. Halderman's report?
21                A    Mr. Brown, if the State Election
22          Board was compelled to respond to every bit of
```

Page 79

1           advice or allegation, we would be overwhelmed with

2           trying to make a kagillion changes.

3                    Q      Fair enough.

4                    And so part of the job of the SEB is

5           to separate serious threats that the SEB needs to

6           take action on and trivial, or not material,

7           complaints that it does not, correct?

8                    A      The SEB is charged with working

9           within the framework of the Georgia Election Code

10          and maintaining election integrity.

11                   Q      So I take it that your answer is no,

12          the Secretary of State -- I mean, I'm sorry, the

13          State Election Board is not doing anything

14          specifically to address the increased risk

15          occasioned by either the Coffee County breach,

16          Dr. Halderman -- or reflected in the Halderman

17          report or in the CISA advisory, correct?

18                         MR. DENTON:  Object to form.

19                         THE WITNESS:  Mr. Brown, I have not

20          seen the evidence about Coffee County yet.  How can

21          I react if I have not seen substantive evidence?

22

Page 80

1          BY MR. BROWN:

2                  Q      What evidence would it take you to

3          see for you to recommend that the SEB take decisive

4          action to protect the security of Georgia's

5          election system?

6                          MR. DENTON:   Object to form.

7                          THE WITNESS:   The State Election

8          Board takes every possible action to maintain

9          election integrity.

10         BY MR. BROWN:

11                 Q      Name one.

12                 A      The State Election Board investigates

13         complaints and refers those complaints to the

14         Attorney General's Office for further investigation

15         and reports the violation of Georgia Election Code.

16                 Q      Apart from referring complaints to

17         the Attorney General, name every possible action

18         the State Election Board has taken this year or

19         anticipates taking this year to protect the

20         security of Georgia's election system in light of

21         the evidence or suggestions of increased

22         vulnerabilities.

Page 81

```
 1                      MR. DENTON:  Object to form.

 2                      THE WITNESS:  I don't think it is

 3          appropriate to take action based on suggestions.

 4          BY MR. BROWN:

 5               Q     That's why I started this line of

 6          questioning with "What evidence do you want?  What

 7          do you need to see?"

 8               A     There's an investigation that is

 9          ongoing now.

10               Q     If -- if you had the perpetrator

11          admit to you, credibly, that the Coffee County

12          election system was copied and put on the internet

13          so that multiple people could have access to it

14          14 months ago, would that be enough, if you

15          believed it, to cause the SEB to take some action

16          to protect the security of Georgia's election

17          system?

18                      MR. DENTON:  Object to form.

19                      THE WITNESS:  That sounds like

20          speculation to me, if -- if and if I believe.

21          BY MR. BROWN:

22               Q     So I take it we cannot rely upon you
```

Page 82

```
 1        if you did hear that evidence, to take action,

 2        correct?

 3                     MR. DENTON:  Object to form.

 4                     THE WITNESS:  Are you asking if I --

 5        if I hear something, I should take action?

 6        BY MR. BROWN:

 7             Q     No.  I want to know what it would

 8        take for you to take action.

 9             A     You'll have to explain that further.

10             Q     Well, in court your lawyers are going

11        to say to the Judge, "Don't worry, if something bad

12        happens, we will take action."  Should we just say,

13        "No, that's speculation because they're not telling

14        us when or if they will ever take any action to

15        protect Georgia's voters"?

16                     MR. DENTON:  Object to form.

17                     THE WITNESS:  That sounds like a

18        legal question, a question for the lawyers and not

19        for me, a member of the State Election Board.

20        BY MR. BROWN:

21             Q     It's really not that hard.

22                     If you were -- if you were, for
```

Page 83

```
 1          example, in charge of bridges in Georgia, and the

 2          security of bridges, and somebody asked you, "What

 3          would it take for you to close that bridge down?"

 4          You would say, "Well, if I got a report from

 5          somebody that said it's unsafe, I would close it

 6          down."

 7                    But you're not willing to make that

 8          statement with respect to protecting people's right

 9          to vote and to have their vote counted accurately,

10          are you?

11                    MR. DENTON:  Object to form.

12                    THE WITNESS:  Mr. Brown, if you would

13          show me that a Georgia election, by real evidence,

14          has been altered votes -- or election outcomes have

15          been altered, I would appreciate it.

16          BY MR. BROWN:

17               Q    Okay.  You understand that I -- that

18          has nothing to do with my question or my line of

19          inquiry?  It's clever, but it has nothing to do

20          with my question.

21                    We're talking about future elections.

22          Are you with me?
```

Page 84

1           A     Well, you -- you be with me.  You're

2      being clever, too.

3           Q     I'm talking about future elections.

4                 Are you saying that to protect future

5      elections, you will do nothing unless you are

6      seeing evidence that a past election has been

7      disturbed?  Is that right?

8                 MR. DENTON:  Objection to form.

9      BY MR. BROWN:

10          Q     Is that what it will take?

11                MR. DENTON:  Same objection.

12                THE WITNESS:  Repeat your question.

13     BY MR. BROWN:

14          Q     Are you saying that you're not going

15     to do anything to protect future elections unless

16     you have been given proof that a past election has

17     been the subject of some sort of fraud?

18                MR. DENTON:  Object to form.

19                THE WITNESS:  As a member of the

20     State Election Board, I'm interested in the process

21     of elections and the adherence to the process of

22     elections.  And we learn from the past to inform us

Page 85

1       of what decisions or actions should be taken in the

2       future.

3       BY MR. BROWN:

4               Q       I know.  And it's a --

5               A       I don't think it's appropriate to act

6       on speculation.

7               Q       I agree.  I understand that.  And I

8       do understand your testimony that there -- you

9       haven't been shown any evidence that -- of a prior

10      act.  I get that.

11                      But you understand -- but what I'm

12      talking about is what the SEB is doing to protect

13      Georgians in future elections.  And you would agree

14      with me that there -- there could be some threats

15      that would be so severe to the integrity of the

16      election system, to the BMDs, that you would call

17      for them to be replaced, for example, with

18      hand-marked paper ballots, right?

19                      MR. DENTON:  Object to form.

20                      THE WITNESS:  Your question seems to

21      be editorializing a speculation about threats and

22      severity.  I -- I want to see evidence, concrete

1          evidence, that the BMD or the voting system has

2          been -- has altered Georgia elections or Georgia

3          outcome of elections.

4      BY MR. BROWN:

5              Q     And absent that, you're not prepared

6          to take any action to protect elections in the

7          future, even if the likelihood of future breaches

8          is of concern?

9                   MR. DENTON:  Object to form.

10                  THE WITNESS:  I'm always concerned

11         with a breach of any process or any part of

12         elections, whether it's the machines or the paper

13         ballots or the voter rolls or any other aspect of

14         the elections.

15     BY MR. BROWN:

16              Q     I'm with you.

17                  So to get back to the metaphor of the

18         bridge.  Unless that bridge has already fallen down

19         and killed people, you're not going to order it

20         closed for future passengers to go by, correct?

21                  MR. DENTON:  Object to form.

22                  THE WITNESS:  You have not, or

Page 87

```
 1      anything that I have seen to date, given me a
 2      compelling reason to have that opinion that you're
 3      asking me to agree to.
 4      BY MR. BROWN:
 5           Q    Let's get to the compelling evidence.
 6      And with that transition, I'm going to go to the
 7      authority and duty of the State Election Board to
 8      investigate.
 9                And you're aware that it is the duty
10      of the State Election Board to investigate or
11      authorize the Secretary of State to investigate,
12      correct?
13           A    Correct.
14           Q    And you -- you don't know how the
15      investigation of Coffee County was initiated,
16      correct?
17           A    I do not know.
18           Q    And for all you know, and for all I
19      know, the SEB did not authorize the Secretary of
20      State to conduct that investigation, correct?
21                MR. DENTON:  Object to form.
22                THE WITNESS:  I do not know.
```

 1          BY MR. BROWN:

 2               Q     And did you know that to date, or

 3          maybe as of about a week ago, neither the Secretary

 4          of State, the GBI or the FBI has contacted any,

 5          any, of the witnesses or people involved in the

 6          Coffee County breach?  Did you know that?

 7                    MR. DENTON:  Object to form.

 8                    THE WITNESS:  I do not know the

 9          details of the investigation.

10          BY MR. BROWN:

11               Q     Do you know at a high level, have

12          they talked to anybody?

13               A     I do -- I do not have that

14          information.

15               Q     They haven't talked to anybody, have

16          they, Dr. Johnston?

17                    MR. DENTON:  Object to form.

18                    THE WITNESS:  I do not have that

19          information.

20          BY MR. BROWN:

21               Q     They haven't talked to Misty Hampton.

22          They haven't talked to Jil Ridlehoover.  They

```
 1          haven't talked to Eric Chaney.  They haven't talked
 2          to Scott Hall.  They haven't talked to Paul Maggio.
 3                      They haven't talked to any of those
 4          people, have they?
 5                      MR. DENTON:  Object to form.
 6                      THE WITNESS:  I don't know.
 7          BY MR. BROWN:
 8                Q     Would it concern you, given how
 9          concerned you are, about the security of the
10          elections in -- don't -- I shouldn't -- let me back
11          up.
12                      What puzzles me is that I believe you
13          that you are concerned, but it doesn't look like
14          the Secretary of State is, because the Secretary of
15          State has not interviewed any of these people at
16          all.  And apparently, you did not know that he had
17          not done so, correct?
18                A     I do not know.
19                      MR. DENTON:  Object to form.
20                      I'm sorry.  Say again.
21                      THE WITNESS:  I do not know.
22
```

```
 1      BY MR. BROWN:

 2           Q     Does it concern you whether or not

 3      anybody from the State has ever talked to the

 4      people involved once?

 5                     MR. DENTON:  Object to form.

 6                     THE WITNESS:  I do not know the

 7      details of the investigation, Mr. Brown.

 8      BY MR. BROWN:

 9           Q     But you would agree that it is the

10      duty of the State Election Board under the

11      framework of state law to investigate, correct?

12           A     It is one of the duties of the State

13      Election Board to investigate.

14           Q     And you would agree with me that an

15      investigation that does not involve contacting any

16      of the citizens involved is not a genuine

17      investigation?  You would agree with me, right?

18                     MR. DENTON:  Object to form.

19                     THE WITNESS:  I'm not the

20      investigator, Mr. Brown.

21      BY MR. BROWN:

22           Q     I know, but you are the boss of the
```

Page 91

1          investigator.  Isn't it your duty to make sure that

2          the investigator is doing their job?

3                          MR. DENTON:  Object to form.

4                          THE WITNESS:  This is an ongoing

5          investigation, and I do not have all of the details

6          available.

7          BY MR. BROWN:

8               Q    It's ongoing, meaning something has

9          been investigated and it hasn't completed.  Fair to

10         say?

11              A    All I can say is that it's an ongoing

12         investigation.

13              Q    Right.

14                   And what has been -- ongoing, meaning

15         it started, right?  Or you don't know if it has

16         started or not?

17                          MR. DENTON:  Object to form.

18                          THE WITNESS:  I believe it has

19         started.

20         BY MR. BROWN:

21              Q    Okay.  What have they done to start

22         it besides sharpen their pencils?

1          A     You'll need to ask the people that

2     are investigating.

3          Q     You have not, I take it?

4          A     I am not an investigator.

5          Q     I didn't ask that.

6                You have not asked them what they

7     have done besides sharpen their pencils?

8                MR. DENTON:  Object to form.

9     BY MR. BROWN:

10         Q     You have not asked them what they've

11     done, correct?

12                MR. DENTON:  Object to form.

13     BY MR. BROWN:

14         Q     Dr. Johnston, this may change, and I

15     hope it changes, but as of this moment, isn't it

16     fair to say that the State Election Board has done

17     nothing to oversee the Secretary of State in its

18     investigation of the Coffee County breach?

19                MR. DENTON:  Object to form.

20                THE WITNESS:  Mr. Brown, all I know

21     is that there is an investigation that is ongoing.

22

Page 93

```
 1        BY MR. BROWN:
 2               Q     Now, the investigation --
 3                     MR. DENTON:  Sorry, Bruce, I don't --
 4        I don't mean to interrupt you, but I've got you
 5        about six minutes over your time.  Are we at a
 6        stopping point?
 7                     MR. BROWN:  Let me ask a couple more
 8        questions on this line of inquiry.
 9                     MR. DENTON:  Okay.
10        BY MR. BROWN:
11               Q     Well, I'm going to change subjects,
12        but I'll ask it very quickly.
13                     You testified that it's your
14        understanding of the authority of the State
15        Election Board that it doesn't have the authority
16        to mandate that counties switch from hand-marked
17        paper ballots -- switch to hand-marked paper
18        ballots from BMDs, correct?
19                     MR. DENTON:  Object to form.
20                     THE WITNESS:  The use of the voting
21        system in Georgia is clearly in the authority of
22        the State.
```

1    BY MR. BROWN:

2         Q    Do you mean -- I don't mean to

3    quibble, but do you mean the Governor or the SEB or

4    the Secretary of State?

5              MR. DENTON:  Object to form.

6              THE WITNESS:  Georgia Election Code

7    states that the uniformity and provision of the

8    voting system in Georgia is given to the State.

9    BY MR. BROWN:

10         Q    Now, the local counties have the

11    authority in emergencies to use hand-marked paper

12    ballots instead of the BMDs, correct?

13         A    Correct.

14         Q    And the SEB would have the authority

15    to promulgate rules that would either require or

16    recommend that they do so, correct?

17              MR. DENTON:  Object to form.

18              THE WITNESS:  That does not fall

19    within the authority of the State Election Board.

20    BY MR. BROWN:

21         Q    21-2-31-2 says that, "It shall be the

22    duty of the State Election Board to formulate,

Page 95

 1          adopt, and promulgate such rules for the orderly

 2          conduct of primaries and elections."

 3                     Are you aware of that?

 4          A     I am aware of that.

 5          Q     And that would include recommending

 6          in emergencies local election boards to use

 7          hand-marked paper ballots instead BMDs, correct?

 8                     MR. DENTON:  Object to form.

 9                     THE WITNESS:  I think you're making

10          an assumption as to that authority.

11          BY MR. BROWN:

12          Q     You -- you're not comfortable with

13          agreeing with that statement?

14                     I'm not -- I'm not going to fight you

15          on it.  I'm just -- I do want to get your --

16          your -- your understanding of the Board's authority

17          on that.

18          A     Well, define an emergency.

19          Q     Well, if the BMDs are vulnerable

20          beyond an acceptable point because their software

21          has been on the internet for 14 months.

22          A     So you're saying, in your opinion,

Page 96

1          there's a vulnerability --

2                 Q     No.  I --

3                 A     -- that provides no evidence that we

4          should -- that the State Election Board should

5          declare an emergency?  I don't think so.

6                 Q     That's -- that's a fair response.

7                       If there were sufficient, to your

8          mind, evidence that the BMDs were -- secure the

9          BMDs were compromised, then the SEB would have the

10         authority to recommend to the local counties to use

11         hand-marked paper ballots, correct?

12                      MR. DENTON:  Object to form.

13                      THE WITNESS:  You'll have to be more

14         specific about "compromised."

15         BY MR. BROWN:

16                Q     Compromised to the point that you

17         could not trust their -- their integrity.

18                      MR. DENTON:  I'm not sure if there's

19         a question, but I'll object to the form.

20                      MR. BROWN:  She asked me to define my

21         terms and I did so.

22

Page 97

```
 1      BY MR. BROWN:

 2            Q     And I'm not talking about

 3      Dr. Halderman's concern or Dr. Starks.  I'm talking

 4      about your concern that you've expressed.  And that

 5      if you were concerned about the vulnerability such

 6      that the integrity of the elections were at risk,

 7      according to you, not to anybody else, you would

 8      agree that you had the -- that the Board had the

 9      authority to at least recommend, if not mandate,

10      local counties to use hand-marked paper ballots

11      instead of BMDs, correct?

12                  MR. DENTON:  Object to form.

13                  THE WITNESS:  Mr. Brown, as I have

14      stated before, I have concerns about all aspects of

15      elections and election integrity.  And my concern

16      does not constitute an emergency.  It would not be

17      appropriate to declare or demand or recommend the

18      change that you're suggesting.

19      BY MR. BROWN:

20            Q     Okay.  Let me make it more simple.

21      But if you decided there were an emergency -- in

22      your view, not in my view, but in your view, that
```

Page 98

1       there was an emergency, jurisdictionally, the State

2       Election Board would have the authority to

3       promulgate rules or at least recommend to the local

4       counties that they switch from BMDs to hand-marked

5       paper ballots, correct?

6                    MR. DENTON:  Object to form.

7                    THE WITNESS:  Like I just said,

8       concern is not an emergency.

9                    MR. BROWN:  Okay.  I think my answer

10      and -- my question and your answer are sufficient

11      that you're not going to answer my question, but

12      I'll leave it at that since my time is up.  We

13      reserve the right to have adequate time to

14      investigate this witness.  Thank you.

15                   MR. SPARKS:  Before we go off the

16      record, Counsel, I can see that the witness has

17      made some notes during her deposition and possibly

18      a couple of markings on the exhibits, although I'm

19      not sure of that.  Will you provide us copies of

20      those?

21                   MR. DENTON:  We will.  I believe her

22      notes are just a list of who all was present today,

Page 99

```
 1           but we're happy to make a copy.
 2                     MR. SPARKS:  Okay.  That's fine.  Do
 3           you mind if I just make a copy before you leave?
 4                     MR. DENTON:  That would be fine.  Let
 5           me look at it first.
 6                     MR. SPARKS:  Yeah, of course.
 7                     MR. BROWN:  Thank you, Dr. Johnston,
 8           for your time today.  I appreciate it.
 9                     THE WITNESS:  Thank you, Mr. Brown.
10           Thank you.
11                     MR. SPARKS:  I'll make a copy and
12           return those to you.
13                     THE WITNESS:  And I put numbers on
14           these.
15                     MR. SPARKS:  That's fine.  And you
16           have the number of the exhibits?
17                     MR. DENTON:  Yes.
18                     MR. SPARKS:  So we'll leave those
19           there.  I've got copies if you want to look at them
20           in the future.
21                     MR. DENTON:  Ms. Porter, did you have
22           anything further?
```

Page 100

1                     We cannot hear you, you appear to

2          be muted in some way.

3                         MS. PORTER:  I was thanking

4          Dr. Johnston for her time today.

5                         THE WITNESS:  Thank you, Ms. Porter.

6                         VIDEOGRAPHER:  This is the end of the

7          deposition.  We are off the video record at

8          11:40 a.m.

9                         (Whereupon, at 11:40 a.m., the

10                        video-recorded deposition of JANICE W.

11                        JOHNSTON, M.D. was concluded; signature

12                        reserved.)

13

14

15

16

17

18

19

20

21

22

Page 101

1                    CERTIFICATE OF NOTARY PUBLIC

2        I, FELICIA A. NEWLAND, CSR, the officer before whom

3        the foregoing video-taped deposition was taken, do

4        hereby certify that the witness whose testimony

5        appears in the foregoing deposition was duly sworn

6        by me; that the testimony of said witness was taken

7        by me in stenotype and thereafter reduced to

8        typewriting under my direction; that said deposition

9        is a true record of the testimony given by said

10       witness; that I am neither counsel for, related to,

11       nor employed by any of the parties to the action in

12       which this deposition was taken; and, further, that

13       I am not a relative or employee of any counsel or

14       attorney employed by the parties hereto, nor

15       financially or otherwise interested in the outcome

16       of this action.

17

18

19       _____

20       FELICIA A. NEWLAND, CSR

         Notary Public

21

         My commission expires:

22       September 15, 2024