Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                    ATLANTA DIVISION

3

    DONNA CURLING, ET AL.,

4
                 Plaintiffs,
5                                CIVIL ACTION FILE
        vs.                      NO. 1:17-CV-2989-AT
6
    BRAD RAFFENSPERGER, ET AL.,

7
                 Defendants.
8

9

10

11          VIDEOTAPED ZOOM DEPOSITION OF
                   JAMES OLIVER
12
                 January 17, 2022
13                  8:09 A.M.

14

15       Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC

16

17

18

19

20

21

22

23

24

25

Page 2

```
 1                    APPEARANCES OF COUNSEL
 2                  (All appearances via Zoom)
 3
 4      On behalf of the Plaintiffs:
 5           DAVID D. CROSS, ESQ.
             MARY G. KAISER, ESQ.
 6           MORRISON & FOERSTER LLP
             2100 L Street, NW
 7           Suite 900
             Washington, DC 20037
 8           202.887.8795
             dcross@mofo.com
 9           mkaiser@mofo.com
10      - and -
11
             HALSEY G. KNAPP, JR., ESQ.
12           KREVOLIN HORST
             One Atlantic Center
13           1201 W. Peachtree Street, NW
             Suite 3250
14           Atlanta, Georgia  30309
             404.888.9700
15           hknapp@khlawfirm.com
16
        On behalf of Secretary of State and the State
17      Election Board:
18           DIANE F. LaROSS, ESQ.
             BRYAN P. TYSON, ESQ.
19           1600 Parkwood Circle, SE
             Suite 200
20           Atlanta, Georgia 30339
             678.336.7249
21           dlaross@taylorenglish.com
             btyson@taylorenglish.com
22
23
24
25
```

Page 3

1                    APPEARANCES OF COUNSEL

2

3      On behalf of Defendants Fulton County Voter
       Registration and Elections:

4

          DAVID LOWMAN, ESQ.

5         OFFICE OF THE FULTON COUNTY ATTORNEY
          141 Pryor Street, SW

6         Suite 4038
          Atlanta, Georgia 30303

7         david.lowman@fultoncountyga.gov

8

9

       Also Present:

10

          Jonathan Miller, Videographer

11        Grace Huff, Concierge Tech

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    INDEX OF EXAMINATION

2       WITNESS:   JAMES OLIVER

3       EXAMINATION                                PAGE

        By Mr. Cross                                8

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                     INDEX TO EXHIBITS
2       Plaintiffs'
          Exhibit           Description              Page
3
4       Exhibit 1    Org Chart, Bates No.              17
                     FORTALICE000254
5
        Exhibit 2    LinkedIn Profile of James         27
6                    Oliver, no Bates numbers
7       Exhibit 3    Fortalice Task Order              60
                     dated 3/11/21, Bates Nos.
8                    FORTALICE000001 through -2
9       Exhibit 4    Email Chain dated October         66
                     2018, Bates Nos.
10                   FORTALICE000995 through -998
11      Exhibit 5    Email Chain dated August          77
                     2016, Bates Nos.
12                   FORTALICE000002952 through
                     -2953
13
        Exhibit 6    2020 Rule 590-8.3                 81
14                   Attestation, Bates Nos.
                     STATE-DEFENDANTS-00182173
15                   through -182175
16      Exhibit 7    Email Chain dated April           90
                     2019, Bates No.
17                   STATE-DEFENDANTS-00104972
18      Exhibit 8    Email Chain dated                 98
                     October 2019, Bates Nos.
19                   STATE-DEFENDANTS-00112738
                     through -112740
20
        Exhibit 9    Email Chain dated July           102
21                   2019, Bates Nos.
                     STATE-DEFENDANTS-00113155
22                   through -113156
23      Exhibit 10   Email Chain dated April          112
                     2019, Bates Nos.
24                   STATE-DEFENDANTS-00126614
                     through -126616
25

Page 6

1                      INDEX TO EXHIBITS

2       Plaintiffs'
          Exhibit            Description              Page

3

4       Exhibit 11   Email dated 4/24/19            120
                     from James Oliver to Clark
5                    Rainer, Bates No.
                     STATE-DEFENDANTS-00146337

6

        Exhibit 12   Email Chain dated April        129
7                    2019, Bates Nos.
                     STATE-DEFENDANTS-00146363
8                    through -146371

9

10              (Original exhibits are attached to the

11           original transcript.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Deposition of JAMES OLIVER

            January 17, 2022

2

3          (Reporter disclosure made pursuant to

4     Article 8.B of the Rules and Regulations of the

5     Board of Court Reporting of the Judicial

6     Council of Georgia.)

7

8          VIDEOGRAPHER:  We are on the record

9     January 17, 2022, at approximately 8:09 a.m.

10    Eastern time.  This will be the videotaped

11    deposition of James Oliver.

12          Would counsel please identify themselves

13    and who they represent for the record.

14          MR. CROSS:  This is David Cross of

15    Morrison & Foerster on behalf of the Curling

16    plaintiffs.  And with me is my colleague, Mary

17    Kaiser, and Halsey Knapp.

18          MS. LaROSS:  This is Diane LaRoss and I

19    represent the State defendants.

20          MR. TYSON:  Bryan Tyson.  I also represent

21    the State defendants.  Good morning.

22          MR. LOWMAN:  David Lowman and I represent

23    the Fulton County defendants.

24          VIDEOGRAPHER:  Thank you, Counsel.

25          Would the court reporter please swear in

Page 8

1              the witness.

2              JAMES OLIVER, having been first duly sworn, was

3         examined and testified as follows:

4         EXAMINATION

5         BY-MR. CROSS:

6              Q.   Good morning, Mr. Oliver.

7              A.   Good morning.

8              Q.   Sorry to impose on you on a holiday.

9         Unfortunately, the timing was not of our making.

10                  Have you been deposed before?

11             A.   No.

12             Q.   So just briefly, do you have some

13        familiarity with the way the process works?  Has

14        anybody walked you through this?

15             A.   State -- State counsel kind of like walked

16        me through the process, yes.

17             Q.   Okay.  Did you meet with counsel for the

18        State before the deposition today?

19             A.   Virtually, yes.

20             Q.   And how many times did you meet with them?

21             A.   As far as meeting, just once.  Spoke with

22        them a couple times as far as, like, telephonically.

23             Q.   And about how many times did you speak

24        with them either by telephone or virtual or in

25        person?

Page 9

1          A.    Maybe a combination of maybe about three.

2          Q.    And about how much -- how much time did

3     that take?

4          A.    Encompassing everything, maybe a couple

5     hours.  I'd say about three hours.  Three, three and

6     a half hours, something like that --

7          Q.    Okay.

8          A.    -- overall, not continuously.

9          Q.    Understood.

10               When was that?

11         A.    Last week, Friday.  Today's Monday.  Last

12    week, Friday, and a couple of -- couple of times

13    telephonically prior to -- prior to -- and, I'm

14    sorry, that was Thursday.  Spoke with them

15    Thursday -- last time I spoke with them was on

16    Friday, but the actual brief was on Thursday, and I

17    think I spoke with them one time before the actual

18    brief.  So, like I said, I think it was a total of

19    three times altogether.

20         Q.    When you say "brief," what do you mean?

21         A.    Well, what I -- what I meant was just --

22    basically just explaining the process as to what to

23    expect as far as the deposition was concerned.

24               MS. LaROSS:  And we want to be careful

25          here.  We don't want to in any way infringe on

1          the attorney-client privilege or what was

2          discussed.

3     BY MR. CROSS:

4          Q.   Did you review any documents in any of the

5     meetings or phone calls with the State's counsel?

6          A.   No, I did not.

7          Q.   Did they describe or identify any

8     documents for you in those meetings or calls?

9          A.   No, they did not.

10         Q.   Did anyone other than counsel for the

11    State and yourself participate in any of those

12    discussions?

13         A.   No, not to my knowledge.

14         Q.   Have you discussed today's deposition with

15    anyone other than counsel for the State?

16         A.   No, I have not.

17         Q.   When did you first learn that we wanted to

18    depose you in this case?

19         A.   Not this past Friday, but the Friday

20    prior.  On January 7.

21         Q.   When you received the subpoena?

22         A.   Yes, I did.

23         Q.   When did you leave the Secretary of

24    State's office as an employee?

25         A.   I left there January 2020.  I'm sorry.

Page 11

1      Yeah, January 2020, correct.

2             Q.    So you've been gone about a year?

3             A.    Closer to two.

4             Q.    Oh, right.  Yes.  Trying to pretend like

5      the pandemic years have not happened.

6                   And do you live at the same home address

7      now that you did when you were at the Secretary of

8      State's office?

9             A.    I do.

10            Q.    Did the Secretary of State's office have

11     your home address on file when you were an employee,

12     to your knowledge?

13            A.    To my knowledge.  I would assume they did,

14     yes.

15            Q.    Do you have the same phone number now that

16     you had when you were an employee at the Secretary

17     of State's office?

18            A.    Yes.

19            Q.    Did anybody contact you last year letting

20     you know that we had asked to depose you as of at

21     least October?

22            A.    No.

23            Q.    Given the Secretary of State's office had

24     your home address and your phone number, do you have

25     any idea why the State's counsel told us just before

```
1      we subpoenaed you that they could not find you?
2                MS. LaROSS:  I object to the form --
3                THE WITNESS:  No.
4                MS. LaROSS:  -- of the question.
5                And I should note, David, we are reserving
6           all objections except those going to the form
7           of the question and responsiveness of the
8           answer until trial.
9                Is that correct?
10               MR. CROSS:  That's the default, yeah.
11     BY MR. CROSS:
12          Q.   I'm sorry.  You said the answer was "no,"
13     Mr. Oliver?
14          A.   I'm sorry.  I -- I -- I kind of lost -- I
15     kind of lost the question with -- with the dialogue
16     there.
17               What was the -- what was the question
18     again?
19          Q.   Right.  The question was, as you sit here,
20     do you know why the -- the State defendants' counsel
21     told us they could not locate you when you live at
22     the same home address and have the same phone number
23     you did when you were an employee of the State?
24               MS. LaROSS:  And the same objection.
25               You may go ahead and answer, Mr. Oliver.
```

 1              THE WITNESS:  And the answer to that was

 2        no.

 3    BY MR. CROSS:

 4        Q.   What were the circumstances of your

 5    departure from the Secretary of State's office in

 6    January of 2020?

 7        A.   I was basically dismissed.  And the reason

 8    for the dismissal that was on my termination papers

 9    was that they -- the State decided to go in a

10    different direction.

11        Q.   What does that mean?

12        A.   That, I cannot answer.  You would have to

13    ask the State that.

14        Q.   When you say "termination papers," what do

15    you mean?

16        A.   Well, like I said, basically, I was

17    terminated.  Basically, my services was no longer

18    required because of they -- like I said, the reason

19    that I was given was because the State desired to go

20    in a different direction.

21        Q.   And when you say "papers," was there --

22    were you given something in writing that indicated

23    you were terminated and the -- and the reason?

24        A.   Yes, I was.

25              MR. CROSS:  Diane, we'd ask for production

```
 1          of the termination papers.
 2     BY MR. CROSS:
 3          Q.   Was it a termination for cause?
 4          A.   When you say "for cause," you mean like --
 5     explain "cause."
 6          Q.   Yeah, good question.
 7               So I -- I guess I'm trying to understand,
 8     when you say that they told you they wanted to go in
 9     a different direction, did they give you any
10     information as to what that meant or why that was
11     leading to your termination?
12          A.   No.
13          Q.   Did you ask?
14          A.   Yes, I did.  That's -- I did ask why, and,
15     basically, like I said, the explanation that I was
16     given was that the State decided to go in a
17     different direction.  That was the extent of the
18     explanation.
19          Q.   Did you have any understanding as to what
20     that meant?
21          A.   Clearly, no.
22          Q.   Was it a surprise to you that you were
23     terminated?
24          A.   Yes, it was.
25          Q.   Why?
```

Page 15

1           A.    I'm sorry?

2           Q.    Why?

3           A.    Why was it -- why was it a surprise?

4    Well, pretty much it was -- it was a surprise

5    because, to me, other than -- other than the -- the

6    reasoning that I was given, I had not been informed

7    or -- nor did I -- was aware of any, I guess you

8    could say, mis- -- there was nothing on my conduct

9    or job performance that I felt that justified the

10   termination, justified termination.

11          Q.    When you were an employee of the Secretary

12   of State's office, did you receive periodic

13   evaluations of your performance?

14          A.    For the most part, yes.  Not every year,

15   but -- there was a year -- there was some that was

16   missed, but, yes, I did.

17          Q.    During that time, did you receive any

18   negative evaluations before your termination?

19          A.    No, I never received a negative

20   evaluation.

21          Q.    Do you know if your role still exists at

22   the Secretary's office?

23          A.    That, I'm not -- no, I don't.  No, I do

24   not.  I do not, because after I left, I basically

25   didn't try and track the performance or the

Page 16

1          structure of the company.

2               Q.   So you don't know whether someone filled

3          your role or took on your responsibilities?

4               A.   I don't know that factually, no.

5               Q.   Given the responsibilities you had, would

6          you expect that someone took those on at the

7          Secretary's office?

8               A.   I would --

9                    MS. LaROSS:   Object to the form.

10                   Go ahead, Mr. Oliver.

11                   THE WITNESS:   Oh.  I would expect, yes.

12         BY MR. CROSS:

13              Q.   Because those responsibilities were

14         important?

15              A.   I felt so, yes.

16              Q.   And what were your responsibilities in

17         your last position at the Secretary of State's

18         office?

19              A.   Basically, I was assigned the

20         responsibilities to assess and to recommend updates

21         that would reduce or mitigate any security --

22         cybersecurity risk to the -- to the Secretary of

23         State's office.

24              Q.   What was your title?

25              A.   The title was security manager.

```
 1            Q.   Do you have the Exhibit Share up in front
 2       of you, sir?
 3            A.   Are you referring to me?
 4            Q.   Oh, yeah, yeah.  Sorry, Mr. Oliver.
 5            Do you have the Exhibit Share where you
 6       can pull up exhibits?
 7            A.   No, I don't.  No, I don't.  Is that a --
 8       is that a separate --
 9            Q.   It is, but we can come back to that.  Let
10       me -- the one I have, I can share.  It's just one
11       page.  Let me figure out how I do that.  Let's see.
12            (Plaintiffs' Exhibit 1 was marked for
13            identification.)
14       BY MR. CROSS:
15            Q.   Can you see this document, Mr. Oliver?
16            A.   Yes, I can.  A little small, but I can see
17       it, yes.
18            Q.   Let me make it bigger.
19            Does that help?
20            A.   Yes, it did.
21            Q.   Okay.  So this is a document that was
22       produced to us by a company called Fortalice.
23            Are you familiar with Fortalice?
24            A.   Yes, I am.
25            Q.   Did you work with Fortalice at all when
```

1       you were at the Secretary's office responsible for

2       cybersecurity?

3              A.    Yes, I did.

4              Q.    What's your understanding of Fortalice's

5       role with respect to cybersecurity at the

6       Secretary's office?

7              A.    They were brought in to provide,

8       basically, security assessments and to provide any

9       solutions as far as updates or anything recommended

10      that could improve security.

11             Q.    And did you work with them directly at

12      periods -- at points in time when you were there?

13             A.    No, I wouldn't say directly.  Basically,

14      they was a third party that was hired to provide a

15      service, and at the conclusion of that service, they

16      would provide a -- a debrief or a brief.

17                   But as far as -- when you say working

18      directly with them, I didn't -- I didn't perform any

19      services collaboratively with them.  We just --

20      basically, they provide the service and provided us

21      with the results.

22             Q.    Did you have meetings -- well, strike

23      that.

24                   You mentioned, for example, they did

25      debriefs.

```
 1              Did you participate in any of those
 2     debrief meetings?
 3          A.   Yes, I did.
 4          Q.   Did you -- was it typically part of your
 5     responsibilities to participate in those debrief --
 6     debrief meetings with Fortalice?
 7          A.    Initially, yes.
 8          Q.   And that changed at some point?
 9          A.   Yes.
10          Q.   When did that change?
11          A.   The -- late -- 20- -- late 2018, 2019 --
12     early 2019.
13          Q.   And why did that change?
14          A.   That, I'm not sure.
15          Q.   So sometime around late 2018 or early
16     2019, you were no longer invited to the Fortalice
17     debriefs?
18          A.   I'm going to say yes.  I'm going to answer
19     that yes.  And the reason I -- the reason I say that
20     is because I -- I wasn't invited to every debrief.
21     I did -- I did attend some, but not all.
22          Q.   Did you ask anyone why you were no longer
23     invited to those debriefs?
24          A.   Yes, I did.
25          Q.   What were you told?
```

```
 1          A.   Basically, I really wasn't given a
 2     specific reason or answer.
 3          Q.   Given your role as manager of
 4     cybersecurity for the Secretary's office, did it
 5     surprise you that you were excluded from the
 6     debriefs with Fortalice, the Secretary's
 7     cybersecurity outside advisor?
 8              MS. LaROSS:  Object to the form of the
 9          question.
10              Go ahead, Mr. Oliver.
11              THE WITNESS:  Yes.
12     BY MR. CROSS:
13          Q.   And no one ever told you why that was?
14          A.   Not definitively, no.
15          Q.   What did you hear?  You said "not
16     definitively."  What understanding or -- did you
17     hear about why you were excluded?
18          A.   Well, and the reason I said -- and the
19     reason I answered that like that, I mean, no one --
20     no one actually -- I was not in a meeting where
21     someone just told me I was not invited because of A,
22     B, or C.
23          Q.   At some point they just stopped inviting
24     you but didn't tell you why; is that fair?
25          A.    That's fair.
```

Page 21

```
 1          Q.   So I have in front of you -- and we'll
 2     come back.  We'll talk a little more about
 3     Fortalice, but in front of you is Oliver Exhibit 1.
 4               And does this look to you like a fair and
 5     accurate representation of the -- the organizational
 6     structure of the information technology component of
 7     the Secretary's office from when you were there?
 8          A.   From when I was there, yeah, that looked
 9     fairly -- that looked fairly accurate, yes.
10          Q.   And here your title is "security manager";
11     right?
12          A.   That is correct.
13          Q.   And do I understand right you reported
14     directly to Merritt Beaver, the CIO?
15          A.   Yes, that is correct.
16          Q.   And does Mr. Beaver report directly to the
17     Secretary of State?
18          A.   That, I'm not sure of.  Based on the
19     structure, I would think that he supported [sic] to
20     the CIO, but I'm -- again, I'm not 100 percent sure
21     of that.
22          Q.   But you see --
23          A.   Not the CIO, but the COO, the position
24     that's now held by Mr. Sterling, I think.  I think
25     it was COO.
```

1          Q.    I see.

2                So you think -- you think the CIO might

3     report to the COO, who then reports to the

4     Secretary?

5          A.    Yes, correct.

6          Q.    Why do you think that?

7          A.    Well, that was just based to my -- my

8     understanding based on the organization structure

9     administratively from -- during the time that I was

10    there.

11         Q.    And given that as the manager of security

12    for the Secretary's office you reported directly to

13    the CIO, is it fair to say you were in a fairly

14    senior position?

15         A.    One would think, yes.

16         Q.    How long were you the security manager?

17         A.    I was in the position for just shy of six

18    years.

19         Q.    So around 2014 to January 2020; is that

20    about right?

21         A.    That is correct, yes.

22         Q.    You described your responsibilities in

23    that role earlier.

24                Did your responsibilities generally stay

25    the same over the course of those six years?

                                                          Page 23

1              A.    Yes.  For the most part, yes.

2              Q.    How long did you work at the Secretary's

3        office in any capacity?

4              A.    On just that -- I was in the Secretary's

5        office the entire time that I was with the State.

6              Q.    Sorry.  Let me ask -- ask a better

7        question.

8                    Did you work for the Secretary's office in

9        any capacity other than security manager?

10             A.    No.

11             Q.    So the only role you ever had in the -- in

12       the Secretary's office was the six years you were a

13       security manager?

14             A.    That is correct.

15             Q.    Did your responsibilities as security

16       manager encompass the election system as well, the

17       security of the election system?

18                   MS. LaROSS:  Object as to form.

19                   You can answer, Mr. Oliver.

20                   THE WITNESS:  Oh, okay.

21                   Initially, no.  At the end of my tenure,

22            there was some responsibility for elections.

23       BY MR. CROSS:

24             Q.    And what was that?

25             A.    Well, basically, the responsibilities for

1    the election came about once they left the Election

2    Center at Kennesaw State, which was, guesstimation,

3    somewhere around 2018 maybe.  And that's -- like I

4    said, again, I'm not exactly sure what date they

5    actually transferred to the -- under the Secretary

6    of State's control, but I'm -- I'm going to just

7    take a guess and say somewhere around 2018.

8        Q.   What responsibilities did you pick up with

9    that transfer from Kennesaw to the Secretary's

10   office?

11       A.   Basically, the election database came

12   under the control of the Secretary of State

13   infrastructure.

14       Q.   What's the election --

15       A.   So --

16       Q.   Sorry.  Go ahead.

17       A.   So, basically, that just meant kind of

18   being -- kind of having security oversight for

19   ensuring that that particular system came over as --

20   as secure as possible.

21       Q.   What's the election database?

22       A.   For the -- for the -- I'm going to say --

23   basically describe it from a technical standpoint.

24   Basically, a server.

25       Q.   And -- and you're talking about the -- the

1      server that Kennesaw State managed previously?  Is

2      that what you're referring to?

3           A.   Yes, that's the one that I'm referring to.

4      But not -- not that particular hardware, but the

5      same -- the same responsibility.

6           Q.   Okay.  The data on that hardware was

7      transitioned to a server system at the Secretary's

8      office; is that right?

9           A.   Yes.

10          Q.   And then your responsibilities at that

11     point included maintaining a secure environment for

12     that data and for that system as well?

13          A.   That is correct.

14          Q.   Did that continue until you left in

15     January of 2020?

16          A.   Yes.

17          Q.   Did your responsibilities as security

18     manager also encompass in any way the security of

19     election equipment, like DREs or BMDs, scanners,

20     printers?

21          A.   Under -- under the structure that I had

22     during my time there, no.

23          Q.   Who was responsible during your time for

24     the security of the election equipment?

25          A.   I'm -- I can't remember the name, but that

Page 26

1   basically -- they still had an election -- I'm going

2   to say an Election Center.  Even though it wasn't at

3   Kennesaw State, there was an Election Center or

4   office that managed that -- that equipment.

5       Q.   Was that managed by Michael Barnes?

6       A.   The name sounds familiar, yes.

7       Q.   Did you work with Mr. Barnes?

8       A.   No, I did not work with Mr. Barnes.  We --

9   we had several conversations, but we were not -- we

10   didn't work together, no.

11       Q.   Are you familiar with David Hamilton?

12       A.   I am.

13       Q.   David Hamilton was the CISO; is that

14   right?

15       A.   You know, I am not sure -- I am not sure

16   what Mr. Hamilton role was.  When I met

17   Mr. Hamilton, he was brought on as a contractor to

18   advise the Secretary of State and the security

19   offices on improvements or assessments of the

20   security posture of the State.

21       Q.   Did you ever report to him?

22       A.   No, I did not report to him, although I

23   did have -- I did work with him on that -- on -- on

24   the project that he was brought in -- where I met

25   him at.  The project that he was brought in, we

Page 27

1      did -- we did collaborate together.

2            Q.    One quick question on Exhibit 1 here.

3                  On your name, there's no one with a line

4      below you.

5                  Was there anyone that reported to you as

6      security manager?

7            A.    I was the -- no, I had no -- I had no -- I

8      had no -- no one reported to me.  No staff, no

9      employee reported to me.  I had no one working for

10     me, if that's the question.

11           Q.    Was there anyone in the Secretary's office

12     that you would turn to for support to meet your

13     responsibilities?

14                 MS. LaROSS:  Object to the form of the

15           question.

16                 Go ahead, Mr. Oliver.

17                 THE WITNESS:  I could -- as -- I could

18           turn to the CIO and the network team for

19           support.

20     BY MR. CROSS:

21           Q.    All right.  Mr. Oliver, I'm going to pull

22     up another document.

23                 (Plaintiffs' Exhibit 2 was marked for

24           identification.)

25

Page 28

1    BY MR. CROSS:

2        Q.    Can you see this?

3        A.    Yes, I can.  Thank you.

4        Q.    And so this is Exhibit 2.

5              And I'll just scroll through it so you can

6        take a look and tell me, does this look like a fair

7        and accurate copy of your LinkedIn profile?

8        A.    You're going -- you're going rather

9        quickly, but, yeah, that basically look -- that look

10       pretty much like a copy of my LinkedIn profile.  And

11       that's -- that's a living document, so it changes,

12       you know, periodically.

13       Q.    So, briefly, on your education, do you

14       have a degree -- I saw you have a bachelor of

15       science.

16             Do you have a degree in computer science

17       or what's your degree in?

18       A.    No.  My degree -- my -- my major was

19       business, with a minor in information systems.

20       Q.    So what education or training do you have

21       in cybersecurity?

22       A.    I was -- in the military I was -- that was

23       my MOS in the military, security, cybersecurity, and

24       that's where -- that's where my initial training

25       started.

```
 1              And I also had several certifications as
 2        far as cybersecurity is concerned, which may not
 3        necessarily be listed in that particular document
 4        that you're looking at.
 5              Q.    Okay.  So if we look in the first position
 6        you have from '95 to 2007, "SAIC, Information
 7        Technology Specialist," was that while you were in
 8        the military?
 9              A.    No, that's -- that's post military.  I
10        went to work for SAIC after the military as a
11        defense contractor.
12              Q.    Okay.  So what years were you in the
13        military?
14              A.    I was in the military from '75 to '95.
15              Q.    What was the highest rank that you
16        achieved in the military?
17              A.    Sergeant first class.
18              Q.    Was that Army?
19              A.    Army, yes.
20              Q.    Did you retire or how did you leave?
21              A.    Yes, I retired.
22              Q.    Is it fair to say it was an honorable
23        discharge?
24              A.    Honorable discharge, yes.
25              Q.    So your first position was SAIC, and then
```

```
 1      from there you went to Emergint Technologies from
 2      2007 to 2012; is that right?
 3          A.   Yes.  And I went to Emergint based -- I
 4      didn't change companies per se, but I was
 5      assigned -- I was assigned due to a merger -- a
 6      merger that -- I went to Emergint -- Emergint.
 7               Basically, Emergint was a -- what they
 8      considered a small business, and they were given a
 9      particular portion of the contract that SAIC had.
10      So -- and that -- part of that contract encompassed
11      my position that I was in at the time.
12          Q.   And did you have -- did you receive
13      cybersecurity training when you were at Emergint
14      Technologies?
15          A.   Yes, I did.
16          Q.   Did you also receive cybersecurity
17      training at SAIC?
18          A.   Yes.  And, basically, cybersecurity
19      training was ongoing while I was with the -- with
20      all of the companies prior to coming to the
21      Secretary of State.
22               Basically, DOD have a -- a mandatory
23      training and certification requirement for anyone
24      that's working cybersecurity within the DOD realm.
25      And I forget the exact number, but it's something
```

Page 31

```
1     like DOD2707 or something like that.

2              But, basically, they have a -- they have

3     an outline as to what the minimum requirements are

4     that you must maintain in order to -- to work

5     cybersecurity as well.

6         Q.   And you met those minimum requirements in

7     both positions; is that fair?

8         A.   In all of the positions, yes, I did.

9         Q.   So then in 2012 and 2013, you went to

10    TEKsystems in Charleston, South Carolina, at SPAWAR;

11    is that right?

12        A.   Well, again, I didn't really go to

13    TEKsystems.  TEKsystems -- I was still with SAIC,

14    but based on the position that I transferred to,

15    TEKsystems was the hiring agency.

16             And they were like -- you kind of like go

17    in on a temporary status or a -- I wouldn't say

18    temporary, but like a -- a -- a -- I'm going to say

19    a test status.  I forget the exact acronym.

20             But, basically, like for a particular

21    period, you're on, like, a temporary -- you're like

22    a temporary employee and then you're brought on on a

23    permanent status.

24             And that was more of a procedure issue

25    than -- than anything else.  It was just an
```

Page 32

1    administrative way to go when you -- when you change

2    positions.

3              In this case, I went to a new position.

4    So I was still with the company, but I just went to

5    a different -- a different organization.

6         Q.   Okay.  And then in 2013 to 2014, it

7    indicates you were at SAIC.

8              But just so I have it right, it sounds

9    like from April '95, when you left the military,

10   until February 2014, you were generally with SAIC,

11   but in different positions depending on the contract

12   work that was being done for the military or for the

13   government; is that about right?

14        A.   That's about right, yeah.  The only -- the

15   only time that I guess you could say that I really

16   was not with SAIC, but -- but I still was with SAIC

17   based on the fact that Emergint was a subcontractor

18   of SAIC, was that time that I was actually with

19   Emergint, which was a subcontractor on the contract

20   under SAIC.

21        Q.   In each of those positions, did you have

22   some responsibility for cybersecurity?

23        A.   Yes.  In each of those responsibilities,

24   basically, with the exception maybe of the first --

25   of the first year after leaving the military, I

1    worked in the cybersecurity space, but it was not my

2    responsibilities to actually conduct cybersecurity.

3            Basically, what I did when I -- in those

4    first year, year and a half, was to actually teach

5    cybersecurity and the -- the military system that

6    governed the control of military operations within

7    the continental U.S.

8        Q.   Okay.  And I forgot to ask you:  You said

9    cybersecurity was -- was part of your role when you

10   were in the -- the Army for 20 years.

11           Just generally, what responsibilities did

12   you have with respect to cybersecurity then?

13       A.   Well, basically, I was the -- and I'll

14   just -- I'll just kind of like recap the last -- the

15   last couple years.

16           But, basically, I was the noncommissioned

17   officer in charge of what they called the command

18   and control system.  And the last couple of years

19   prior to -- prior to retiring, I worked for a

20   organization called Third -- Third U.S. Army, which

21   was the organization that handled troop movement

22   within the Middle East.

23           So, basically, kind of like just to give a

24   summary, they handled the -- the first Gulf -- well,

25   they handled everything in the Middle East, but the

Page 34

1      first Gulf war was, like, one of the highlights of

2      their missions that came about while -- during my

3      time that -- while I was there.

4           So, basically, I managed -- I operated

5      the -- the system that managed those -- those assets

6      as -- as the troops deployed to that region.

7           Q.   Okay.  And thank you for your service,

8      Mr. Oliver.

9           A.   Thank you.

10           Q.   So I have in front of you now the -- the

11      description of your position at the Secretary of

12      State.  I'll pull it up so you can see it.  And if

13      you need me to scroll through any of this, just let

14      me know, but this is where it starts.

15           Is this a fair and accurate description of

16      your role at the Secretary of State's office over

17      the six years you were there?

18           And if you need me to scroll down so you

19      can read the whole thing, just let me know.

20           A.   And if you can scroll up just a little

21      bit.

22           Yes, that's -- that's an accurate summary

23      of -- of my duties, yes.

24           Q.   Okay.  And the last position --

25           A.   And I --

1          Q.   Oh, go ahead.

2          A.   No, and I -- and I should say

3     responsibilities.  Not necessarily duties, but

4     responsibilities.

5          Q.   Okay.  And the last -- most recent

6     position you have here is at J & J Solutions as a

7     cybersecurity consultant.

8               Is that your current position?

9          A.   When you say my current position, you mean

10    that I'm -- that I'm currently in today?

11         Q.   Yes.

12         A.   Yes, that is -- that is a current position

13    that I -- that I hold, yes.

14         Q.   And you took that position -- you went to

15    J & J Solutions right after leaving the Secretary's

16    office; is that right?

17         A.   Not directly after, but yes.

18         Q.   Okay.  Within about a month or so, it

19    looks like; is that right?

20         A.   Somewhere around there, yeah.

21         Q.   What are your -- well, you've got a

22    description here.

23              The description you have in Exhibit 2, is

24    that a fair and accurate description of your current

25    responsibilities at J & J?

```
 1         A.   Yes.  And that -- that position is project

 2    driven.  So, yes, those -- again, for the -- for the

 3    sake of LinkedIn, that is correct.  But depending

 4    on -- depending on what project I'm -- I'm on, those

 5    responsibilities can change.

 6         Q.   All right.  Does J & J -- is it a

 7    consultant for, like, individuals companies that are

 8    looking for cybersecurity assistance?

 9         A.   Yes, correct.

10         Q.   And so what are some of the companies that

11    you've worked with since you've been at J & J?

12         A.   Oh, wow.  I've -- I've did some consulting

13    work for a company called Iman & Associates.

14              I've done some other minor -- minor

15    consultants [sic] more like for independent tax --

16    tax offices, some physician offices, and I don't

17    have a -- I don't have a consolidated list as to

18    each and every company that -- that I've worked on

19    as far as from a project perspective.

20              (Court reporter clarification.)

21              THE WITNESS:  The company, it's an

22         accounting firm called Iman & Associates.  And,

23         like I said --

24              COURT REPORTER:  Can you spell that,

25         please?  I'm sorry.
```

Page 37

```
 1              THE WITNESS:  I-M-A-N.
 2              COURT REPORTER:  Thank you.  That's all I
 3         needed.  Thank you.
 4    BY MR. CROSS:
 5         Q.   Have you done any work for any government
 6    agencies since you've been at J & J?
 7         A.   No, no -- no government agencies, no.
 8         Q.   All right.  So let's come back to your
 9    position at the Secretary's office briefly.
10              You indicate here that you implemented a
11    Center for Internet Security.
12              What was that?
13         A.   No, no, no.  No, I didn't implement a
14    Center for Internet -- I -- basically, the Internet
15    security is a -- an organization that -- I'm going
16    to say managed or -- or set security best practices
17    for the industry worldwide.
18              And, basically, what I'm saying there is
19    that I imple- -- based on those guidelines is --
20    what I implemented within the Secretary of State's
21    office is I put those control -- put those controls
22    in or attempted best to put those controls in, which
23    is kind of like information security or IT best
24    practices.
25         Q.   Got it.  Okay.  Yeah, sorry, I misread
```

1    that initially.

2            And the controls and best practices that

3    you implemented with respect to the Center for

4    Internet Security, did any of that relate to

5    Georgia's election system?

6        A.   The part that -- they all did.  As far

7    as -- as far as the part that we took control of,

8    all of those -- all of those controls are related

9    to -- to the election system.

10       Q.   And then in the next paragraph, you

11   indicate that you "also deployed vulnerability and

12   risk management solutions," and then you give some

13   examples.

14           Do you see that?

15       A.   Yes, I do.

16       Q.   What are vulnerability and risk management

17   solutions with respect to cybersecurity?

18       A.   That would be like -- just as an example,

19   like your enterprise systems that scan for viruses,

20   that alert you of any illicit activity that's taking

21   place on a particular network or system.

22           So it basically is like a -- a scanning

23   network or a monitoring network for all systems that

24   detect viruses and malicious behavior.

25       Q.   And the solutions that you're -- that

```
 1      we're talking about, did those also extend to the
 2      election system?
 3              A.   Yes.  When -- once the election system
 4      came on our purview, that is correct, yes.
 5                   And let me -- if I -- if I may clarify,
 6      that is the election system that was connected to
 7      the infrastructure, not -- not the voting systems
 8      that are stand-alone systems.  We did not -- they
 9      were not -- they were not connected to this
10      particular system.
11              Q.   What's the distinction you're drawing
12      there?
13              A.   The distinction that I'm drawing there is,
14      like, the voting machines are not part of this
15      system, because they're not -- they're not connected
16      to this system.
17              Q.   What part of the election system does --
18      does the -- the infrastructure system you're talking
19      about here with respect to vulnerability and risk
20      management solutions, what does that encompass from
21      the election system?
22              A.   That would be like the -- and I don't
23      want -- I -- I don't want to misspeak, but,
24      basically, like the -- the My Voter's Page system --
25      I guess that would be a good way to put it -- would
```

Page 40

```
 1    be one of the -- would be one of the systems that
 2    are there, to my knowledge.
 3            But I don't -- I can't say definitively
 4    which election systems that -- is under that --
 5    under that -- under that umbrella because I just
 6    don't remember off the top of my head, being totally
 7    honest with you.
 8        Q.   The -- the system that you helped deploy
 9    vulnerability and risk management solutions for, did
10    that include the servers that have the election
11    management software?
12        A.   When you say the election management
13    software, elaborate on that for a minute.
14        Q.   Sure.
15            So under the prior election system that
16    used DREs, were you familiar with something called
17    GEMS?
18        A.   I'm familiar with the term, yes.
19        Q.   And did you understand GEMS was the
20    election management system that sat on some series
21    of servers to -- to manage the election system with
22    the voting equipment, with the DREs?
23            MS. LaROSS:  Object to the form.
24            THE WITNESS:  And, again, I -- I -- I'm
25        going to have to say I don't know, because,
```

Page 41

1           like I said, I didn't really -- I didn't really
2           work with the election systems per se.  That
3           was handled by -- like I said, they would -- by
4           Kennesaw State.
5                And then when we did get the -- when we
6           did get the portions of the election system, I
7           can't definitively tell you all of the systems
8           that came over.  So I -- I would be -- I don't
9           want to misspeak and tell you something came
10          over that -- that did not come over.  We had
11          some that come over, but I don't -- I don't
12          definitively remember exactly what they were.
13     BY MR. CROSS:
14          Q.   Okay.  When you say "deployed
15     vulnerability and risk management solutions," why is
16     it important to deploy vulnerability and risk
17     management solutions in a cybersecurity environment?
18               MS. LaROSS:  Object as to form.
19               THE WITNESS:  So can I answer that?
20               MS. LaROSS:  Yes, you may.
21               THE WITNESS:  Oh, okay.
22               Basically, that's -- that's important
23          because, basically, what you're doing is you're
24          putting in controls that will reduce or
25          mitigate any bad actor from accessing the data

1          that you're trying to protect, whether it be
2          election data or any other data that's on that
3          particular infrastructure.
4    BY MR. CROSS:
5          Q.   And why does it matter, from a
6    cybersecurity perspective, if a system like an
7    election system has vulnerabilities that a bad actor
8    could exploit?
9              MS. LaROSS:  Objection as to form.
10             You may go ahead and answer.
11             THE WITNESS:  Okay.  And could you repeat
12         that question again for me, please?
13   BY MR. CROSS:
14         Q.   Sure.
15             Why does it matter that a system like an
16   election system has vulnerabilities?  Why does that
17   matter from a cybersecurity perspective?
18             MS. LaROSS:  Objection --
19             THE WITNESS:  Well, that matters because
20         you want to try and guarantee the integrity of
21         the data as best as possible and also to
22         prevent any misuse of said -- said system.
23   BY MR. CROSS:
24         Q.   Why?
25         A.   Why would you want to do that?

Page 43

1      Q.   Yes.

2      A.   Well, you would want -- you would want to

3    do that to -- basically, to -- to ensure as best as

4    possible that the information that is on that system

5    is kept to the state in which you intended it to be.

6      Q.   All right.  If you look in front of you,

7    do you see the sentence that reads -- begins "I

8    successfully convinced..."?  Do you see that?

9      A.   "I successfully...."  Okay.  Yes, uh-huh.

10     Q.   And it reads "I successfully convinced the

11   Georgia Secretary of State C Suite to enroll and

12   participate in the state's cybersecurity insurance

13   program that reduced the organization's liability,

14   influenced managers to enforce industry compliance,

15   local security policies, and adopted framework

16   requirements."

17          Do you see that?

18     A.   Yes, I do.

19     Q.   Did that include any components of the

20   election system that the Secretary of State was

21   managing while you were there?

22          MS. LaROSS:  I object to the form of the

23       question.

24          THE WITNESS:  And you've got to forgive

25       me.  So, I mean, I can -- I can respond to

```
 1        that?
 2              MS. LaROSS:  Yes, go ahead.
 3              THE WITNESS:  Okay.
 4              Yes, it did.
 5    BY MR. CROSS:
 6        Q.   Sorry.  Go ahead.  You said, "Yes, it
 7    did"?
 8        A.   Yes.
 9        Q.   Sorry.
10              And I was going to tell you, Ms. LaRoss
11    may object -- well, she's objected.  So there will
12    be objections during the course of the day.  You
13    still answer the question unless she instructs you
14    not to, which should only be if it's a privilege
15    issue.  So whenever you hear the objection, you can
16    go ahead and answer unless she has told you not to
17    answer.
18              MS. LaROSS:  Yeah.  And I'll let you know,
19         Mr. Oliver.
20              THE WITNESS:  All right.  Thank you.
21    BY MR. CROSS:
22        Q.   And then in the next paragraph here in
23    your bio, Mr. Oliver, it reads that you "developed
24    the Incident Response Plan and led the Incident
25    Response Team."
```

Page 45

1           You see that?

2       A.    Yes, I do.

3       Q.    What did that involve?

4       A.    Basically, that involved designing the

5    plan and being a member of the plan, which means --

6    designing the plan, basically, is just a policy and

7    the procedures on what you do in the case of an

8    incident.

9           And the -- being a member of the team, as

10   security manager, basically, if you have an

11   incident, then you put a -- a process that you would

12   go through in order to contain any issues or make --

13   or mitigate the issue if there is one.

14       Q.    The responsibilities you describe here,

15   did that also encompass the election system with

16   respect to what the Secretary was managing while you

17   were there?

18           MS. LaROSS:  Object to the form of the

19       question.

20           Mr. Oliver, you can go ahead and answer.

21           THE WITNESS:  Yes.

22   BY MR. CROSS:

23       Q.    What is an "incident" in the context of

24   cybersecurity?

25       A.    An incident in the form of cybersecurity

1      can be many things.  But just to give you an

2      example, a -- a virus that gets on a desktop would

3      be an incident.  That's just -- that's just an

4      example.

5           Q.   So does an incident, in cybersecurity,

6      encompass identifying some sort of vulnerability

7      with a system?

8           A.   It can, yes.

9           Q.   And that could be, for example, like you

10     said, like you identify that malware may be on a

11     system.

12           That would be an example of a

13     cybersecurity vulnerability; is that fair?

14           A.   That is fair, yes.

15           Q.   Based on your experience and training,

16     would it be a sound practice to use an information

17     system, an IT system -- well, strike that.  Let me

18     ask a better question.

19           Based on your experience and training,

20     would it be a sound practice to use an electronic

21     system that had known vulnerabilities without first

22     remedying those vulnerabilities?

23           MS. LaROSS:  Object to the form of the

24          question.

25           You may go ahead and answer if you can,

```
 1            Mr. Oliver.
 2                 THE WITNESS:  And it depends on the
 3            purpose of the system.  There are incidents
 4            where a particular system is used because the
 5            technology at the time is not of such that you
 6            can mitigate a particular vulnerability and the
 7            system that you're -- the services that you're
 8            trying to provide would still function.
 9       BY MR. CROSS:
10            Q.   What if it was critical infrastructure,
11       like an election system?
12                 MS. LaROSS:  Object to the form of the
13            question.
14                 You can go ahead and answer, Mr. Oliver.
15                 THE WITNESS:  And, actually, it wouldn't
16            matter as far as the -- the status of the data.
17                 I mean, if you -- as an example, if you --
18            if you take a hospital and they have a system
19            that manages heart patient pacemakers and
20            that -- and the developer had only developed
21            the software to function on a antiquated
22            system, well, then you still have to manage
23            that pacemaker for the patient.
24                 So the vulnerability that exists in that
25            antiquated system, you can't just shut it off,
```

```
 1              because you would cause -- you would terminate
 2              the patient's life.  So you still have to --
 3              you still have to run that system with the
 4              vulnerability, knowing that the vulnerability
 5              is there.
 6     BY MR. CROSS:
 7              Q.   What if the vulnerability in your example
 8     was one where someone -- a bad actor could gain
 9     remote access and shut down a person's pacemaker.
10              Would you continue to use that system
11     without taking measures to eliminate that
12     vulnerability?
13              MS. LaROSS:  Object to the form of the
14              question.
15              You can go ahead and answer, Mr. Oliver.
16              THE WITNESS:  And, again, you would -- you
17              would take whatever -- whatever steps that you
18              could to mitigate that particular
19              vulnerability, but that's not to say that you
20              can eliminate the vulnerability 100 percent.
21              You still -- you still have to maintain --
22              allow the system to be functioning, but you
23              would -- you would take whatever precautions
24              that you could to reduce -- reduce it to a
25              minimum.
```

```
 1    BY MR. CROSS:
 2         Q.   So is it fair to say that reasonable
 3    practices in the cybersecurity field expect that if
 4    you identify a significant vulnerability with an
 5    electronic system, that reasonable measures will be
 6    taken to eliminate or mitigate that vulnerability?
 7              MS. LaROSS:   Object to the form of the
 8         question.
 9              You can go ahead and answer, Mr. Oliver.
10              THE WITNESS:   And the answer would be yes.
11    BY MR. CROSS:
12         Q.   During your -- looking back at your
13    responsibilities for the incident response plan and
14    team, during your time at the Secretary's office,
15    were there any incidents that arose that you were
16    involved with?
17         A.   Yes.
18         Q.   What were the incidents that arose --
19    cybersecurity incidents that arose while you were
20    there?
21         A.   In -- I can't remember specifically the
22    incidents that arose.   I mean, the -- the system's
23    automated, so it triggered -- it triggered -- it
24    triggered incident -- there -- how -- how -- how to
25    best describe it.
```

1            There were -- there were several incidents
2     that were triggered.  Not all -- not all turned out
3     to be incidents, but as -- from -- from a reporting
4     standpoint, the -- the system -- the system would
5     alert you of a particular abnormality that it
6     detected, which, from a cybersecurity standpoint, is
7     considered an incident.  And, basically, you
8     investigate -- you investigate to see if it's a
9     actual incident or if it's a non-incident.
10            So there were -- there were quite a few of
11     those that I was a part of.
12        Q.   About how many would you say over the six
13     years you were there, just approximately?
14        A.   Oh, wow.
15            MS. LaROSS:  Object to the form of the
16            question.
17            You can answer.
18            THE WITNESS:  Yeah.
19            And I really don't know, I mean, because,
20            like I said, without actually kind of like
21            refreshing myself on some of the -- on some of
22            the reports, it's hard to -- it's hard to give
23            a guesstimation.
24     BY MR. CROSS:
25        Q.   Were incidents as -- would you

1    characterize them as a regular occurrence or as a

2    rare occurrence?

3                    MS. LaROSS:  Object to the form.

4                    Go ahead and answer, Mr. Oliver.

5                    THE WITNESS:  And the incident -- the

6              incident that -- the incident alerting system

7              or the vulnerability system routinely alerted

8              us to certain abnormalities within the system.

9                    But as far as anything turning out to

10             actually be a true incident was not that -- not

11             that often.

12   BY MR. CROSS:

13        Q.   And when you say "a true incident," you

14   mean something where you -- a conclusion was reached

15   that there was an actual significant vulnerability?

16        A.    That is correct.

17        Q.   And when you say "not that often," did

18   that happen more than ten times over six years?

19        A.    No.  Based -- from what I can remember, it

20   was maybe two or three.  I'd say maybe about --

21   maybe roughly around three or so that turned out to

22   actually be an incident.

23        Q.   Tell me what you recall about each of

24   those three incidents.

25        A.    I'm sorry.  What do I recall about them?

Page 52

1          Q.   Yes, sir.

2          A.   I -- I can -- it's hard -- it's hard to

3     say right now.

4               The only -- the only -- the only one that

5     I can actually -- well, two that I can just actually

6     say that I could recall off the top of my head, one

7     was where a particular staff member attempted to

8     plug in a USB device, which was detected, which

9     triggered -- triggered an incident because it was

10    a -- what in the cybersecurity world was called a

11    rogue -- a rogue device.  And the system will alert

12    you when someone plug- -- plugs something in that

13    not typically should be allowed on the network.

14    That was one incident.

15              And the other incident that I can

16    remember, again, basically a user bringing in a --

17    bringing in a file or document and trying to access

18    it, which had a virus on it.

19              But that -- those are the -- those are the

20    only two that I can just recall right off the top of

21    my head.  I mean, we got -- like I said, we got --

22    we got alerts -- we got alerted on more than just

23    those two, but I can't really recall as to exactly

24    what they -- what it was for.

25         Q.   The USB incident, do you recall, was that

Page 53

1      in the first half or the second half of your six

2      years?

3              A.   I don't -- I don't really -- I don't

4      really recall whether it was first half or second

5      half.

6              Q.   Do you know when --

7              A.   Maybe midway.  I'm not -- I'm not

8      really -- I'm not really certain as to the timing,

9      the exact time frame.

10             Q.   Okay.  Do you know whether that related to

11     any components of the election system?

12                  MS. LaROSS:  Object to the form of the

13             question.

14                  Go ahead and answer.

15                  THE WITNESS:  No, it was not.  It was not

16             in the election department.

17     BY MR. CROSS:

18             Q.   And you mentioned another incident where

19     someone brought in a file or a document with a

20     virus.

21                  Do you recall roughly when that occurred?

22             A.   That was at the beginning of my -- my

23     tenure.

24             Q.   And did that incident relate in any way to

25     any aspect of the election system?

Page 54

1          A.    No.   That was prior -- that was prior to
2     the election system coming over.
3          Q.    In that one, was there any conclusion
4     reached on whether malware went onto any component
5     of the Secretary's information technology system?
6          A.    I'm sorry.   Repeat that question.
7          Q.    Yeah, sorry.
8               In the second incident involving malware,
9     do you know whether any conclusion was reached on
10    whether malware made it into any aspect of the
11    Secretary's IT system?
12         A.    No --
13              MS. LaROSS:   Object to the form.
14              THE WITNESS:   No, it didn't.
15              And, basically, what was -- what the
16              incident was was the mere fact that the staff
17              member had plugged in an authorized device, and
18              with the system that was deployed, basically,
19              it would not -- it would not allow access to a
20              particular device without administrative -- one
21              of the administrators giving -- giving
22              permission for that device to be on the
23              network.
24              So, basically, it alerts you that the
25              device is there, and then you take whatever

Page 55

```
 1              appropriate action's necessary.

 2         BY MR. CROSS:

 3              Q.   During your time -- well, strike that.

 4                   Are you aware of any time where malware

 5         infected any aspect of the information technology

 6         systems under the responsibilities of the

 7         Secretary's office?

 8                   MS. LaROSS:  Objection as to form.

 9                   You can go ahead and answer.

10                   THE WITNESS:  Not the entire system.  I

11              mean, a particular -- a particular workstation,

12              that's -- on a particular workstation, yes.

13                   Early -- early -- early on in my tenure,

14              there was a particular -- there was a -- a

15              workstation that had malware, but it was -- it

16              was not, like, at -- at a -- what we would call

17              a server level.  That was a -- a -- a user

18              level.

19         BY MR. CROSS:

20              Q.   What was the malware?

21              A.   I don't recall exactly what the malware

22         was.

23              Q.   Do you recall what type of malware it was?

24              A.   Not off the top of my head, no.

25              Q.   Just tell me generally everything you
```

Page 56

1     recall about that particular incident.

2          A.   Well, I mean, the only thing I recall

3     right now -- like I said, I recall the -- I -- I

4     have a -- I have a remem- -- a memory of the

5     incident happening, but it was not -- it did not

6     promulgate to any other system other than that

7     workstation.

8               So that workstation was, you know,

9     isolated and taken off of the network.  That's --

10    that was, like, one of the -- one of the steps that

11    was taken to mitigate it.  Basically, the user was

12    given a new -- given another system while that

13    particular system was sanitized.

14              That's -- that's pretty much the gist of

15    what happened, as best I can remember.

16         Q.   The workstation that was infected, do you

17    recall what the role or responsibilities were for

18    the user who had that workstation?

19         A.   Not particularly.  To best my knowledge, I

20    don't -- it was -- it was, like, one of the -- just

21    one of the -- I guess you could say one of the lower

22    staff persons.  I mean, it was not like -- it wasn't

23    in the election department, I do know that, but I

24    don't know what their role -- I don't know

25    specifically what their role was, no.

Page 57

1        Q.   Do you recall --

2        A.   I don't recall what they were --

3        Q.   Sorry.

4             Do you recall the name?

5        A.   The name of the person?

6        Q.   Yes, sir.

7        A.   No, I don't.

8        Q.   And you -- you said -- how, if at all, did

9    the Secretary's office confirm that the malware did

10   not make it beyond the particular workstation that

11   was infected?

12       A.   Basically, like I said, there are -- there

13   are systems that are -- was put in place to

14   determine when a particular system was infected with

15   any kind of vulnerability, like -- like malware

16   or -- or anything like that.  You -- you basically

17   get the alert and the system is disconnected from

18   the network.

19       Q.   What steps, if any, were taken beyond

20   disconnecting the workstation to determine whether

21   the malware made it beyond the workstation?

22       A.   Well, we scan -- the network was being

23   scanned daily, I mean, you know.  So if a

24   particular -- if a particular vulnerability had

25   mitigated from one source to another source, you

1      would -- you would -- the system -- the system that

2      were -- that was in place was designed to -- to pick

3      those -- to pick those up.

4              And there was no detection that there was

5      any pandemic or widespread infection of a -- of said

6      network.

7              MS. LaROSS:  David?

8              MR. CROSS:  Yes.

9              MS. LaROSS:  David, excuse me.  I'm sorry

10         to interrupt you.

11              I need to double-check, but my Internet

12         is -- seems to be freezing.  Could we take a

13         break now and -- to give me a chance to look at

14         that?

15              MR. CROSS:  Sure.

16              VIDEOGRAPHER:  The time is 9:17.  We're

17         off the record.

18              (Off the record.)

19              VIDEOGRAPHER:  The time is 9:26.  We're

20         back on the record.

21      BY MR. CROSS:

22         Q.   Mr. Oliver, before I forget, when we

23      talked earlier about the meetings and calls you had

24      with counsel for the Secretary of State's office,

25      did you first contact them or they contacted you?

Page 59

```
 1          A.    They contacted me.
 2          Q.    And so when you received the subpoena, did
 3    you contact anyone at the State's office,
 4    Secretary's office?
 5          A.    No, I did not.
 6          Q.    So you got the subpoena and then at some
 7    point after that, counsel for the State contacted
 8    you; is that right?
 9          A.    That's right.
10          Q.    And how did they contact you?  Was it --
11    they called you?
12          A.    Yes.
13          Q.    Sounds like they knew where to find you
14    when they wanted to; right?
15          A.    I'm sorry?
16          Q.    Sounds like they knew how to find you when
17    they wanted to; right?
18              MS. LaROSS:  Object to the form.
19              MR. CROSS:  Yeah, I'm sure you do.
20              MS. LaROSS:  Not necessary, David.
21              MR. CROSS:  Yeah, I think we can agree a
22          lot here was not necessary.  No reason
23          Mr. Oliver should have had to do this on a
24          holiday.
25
```

Page 60

```
 1      BY MR. CROSS:
 2           Q.   Okay.
 3                MS. LaROSS:  [Inaudible] for that reason.
 4                COURT REPORTER:  I'm sorry.  I didn't hear
 5           you.
 6                MS. LaROSS:  Yeah.  Mr. Oliver had
 7           requested to not have his deposition today
 8           because of the holiday.
 9      BY MR. CROSS:
10           Q.   All right.  Mr. Oliver, I'm going to pull
11      up another exhibit here for you.
12           A.   Okay.
13                (Plaintiffs' Exhibit 3 was marked for
14           identification.)
15                MR. CROSS:  This will be Exhibit 3.
16                MS. LaROSS:  Are you pulling this up in
17           Exhibit Share, David?
18                MR. CROSS:  Yes.
19                MS. LaROSS:  Okay.  Great.
20      BY MR. CROSS:
21           Q.   But I'll share it again so you can see it,
22      Mr. Oliver.
23                So can you see Exhibit 3, Mr. Oliver?
24           A.   Yes.
25           Q.   You'll see at the top it says "Fortalice"
```

Page 61

```
 1      and then "Task Order."

 2              You see that?

 3      A.    "Task Order" -- yes, "Task Order" and then

 4      the number.  Okay.  Yes, I do see that.

 5      Q.    You see this is dated March 11 of 2021?

 6      A.    Yes, I do.

 7      Q.    And then "Deliverables," it refers to

 8      "Monthly report including tasks accomplished by

 9      labor category."

10              Do you see that?

11      A.    Yes.

12      Q.    Have you seen documents like this with

13      Fortalice before?

14      A.    No.

15      Q.    Did you ever review or receive any monthly

16      reports from Fortalice on their work for the

17      Secretary's office?

18      A.    No, I did not.

19      Q.    Were you aware that they were providing

20      any kind of monthly reports to the Secretary's

21      office?

22      A.    No.

23      Q.    Okay.  To your knowledge, who was

24      responsible for managing the relationship with

25      Fortalice at the Secretary's office?
```

Page 62

1          A.    I'm sorry.  Say that again.

2          Q.    Do you know who was responsible for

3     managing the Fortalice relationship at the

4     Secretary's office?

5          A.    I don't -- I don't specifically know that.

6     In the inception of that, I -- I -- I introduced

7     Fortalice to the Secretary of State's office, but

8     initially I was in the process -- in that process,

9     myself and Mr. Beavers.  And then, like I said, at

10    some point I was not part of that process.

11         So I'm not sure -- I'm not sure who was

12    receiving or where was -- where the monthly reports

13    were going.  I would assume it would be the CIO, but

14    I don't -- I don't know that -- I don't know that

15    for sure.

16         Q.    And you said you introduced Fortalice to

17    the Secretary's office.

18         How did you do that?

19         A.    Well, as you -- as I searched for

20    solutions to various services and systems to secure

21    the network, as part of my networking, Fortalice

22    became aware to me.

23         And I reached out to them to request a

24    introduction as to the services that they provide,

25    and, basically, I raised -- I raised the initial --

Page 63

```
1       that initial introduction.
2            Q.   What was Fortalice's general
3       responsibilities once they were engaged by the
4       Secretary's office, to your knowledge?
5            A.   The initial engagements, to my knowledge,
6       was they were engaged to do a -- an assessment of
7       the network and basically -- when I say --
8       assessment -- basically to assess vulnerability, pen
9       tests, those kinds of IT services.
10           Q.   And did that include aspects of the
11      Georgia election system?
12                MS. LaROSS:  I object to the form of the
13           question.
14                You can go ahead and answer, Mr. Oliver.
15                THE WITNESS:  I'm going to -- at the -- at
16           the end -- at the end, I would say yes.
17                In the initial portion, I would say maybe
18           not, because the election system at that time
19           was not under my responsibilities at that time.
20           So I don't recall if they had the
21           responsibilities to -- to assess the election
22           system during the initial involvement.
23      BY MR. CROSS:
24           Q.   What responsibilities did they have with
25      respect to the election system once you became aware
```

Page 64

1    that they were [inaudible] they were --

2              MS. LaROSS:  [Inaudible.]

3              (Court reporter clarification.)

4              MR. CROSS:  Yeah, sorry.  Let me try that

5          again.

6              MS. LaROSS:  Yeah.  I'm sorry.

7    BY MR. CROSS:

8          Q.   What responsibilities did Fortalice have

9    with respect to the election system at any point, to

10   your knowledge?

11             MS. LaROSS:  Objection as to form.

12             THE WITNESS:  To my knowledge, they would

13         have the -- they would have had the same

14         responsibilities to those portions of the

15         election system that was connected to our

16         network, would be the same as any other system

17         that was connected to our network, to basically

18         provide an assessment.

19             And if -- if a pen test or any kind of

20         testing element was involved in that particular

21         engagement, then they would have -- that would

22         have included the election system as well.

23   BY MR. CROSS:

24         Q.   Did you ever receive any reports about any

25   work Fortalice did regarding the Georgia election

Page 65

1      system?

2              MS. LaROSS:  Objection as to form.

3              THE WITNESS:  And I don't recall.  I mean,

4          I received -- I received a -- I received a

5          report of engagement that they had done during

6          portions of the time that the election system

7          had been -- was under the Secretary of State's

8          control, but I don't -- I don't recall to what

9          extent.

10     BY MR. CROSS:

11         Q.   What can you tell me about what you recall

12     about any work Fortalice did with respect to the

13     Georgia election system?

14             MS. LaROSS:  Objection as to form.

15             THE WITNESS:  Right now, it's sketchy.

16         But, I mean, I know -- I know that they did

17         some assessment work as to -- when I say

18         "assessment," as far as reviewing the --

19         reviewing the infrastructure and making

20         recommendations as to what -- what should be

21         improved or what could be improved or

22         identifying any -- any weaknesses that they

23         felt needed to be strengthened.

24     BY MR. CROSS:

25         Q.   And what weaknesses, if any, did Fortalice

Page 66

```
 1       identify with the Georgia election system at any
 2       point, to your knowledge?
 3            A.   I don't recall.
 4            Q.   You just can't recall specifically what
 5       they were?
 6            A.   No, I can't recall specifically what they
 7       were, no.
 8            Q.   What recommendations or improvements did
 9       Fortalice recommend with respect to the weaknesses
10       with the Georgia election system?
11                 MS. LaROSS:  Objection as to form.
12                 THE WITNESS:  And I can't -- I can't say
13            that they recommended anything in regards to
14            the election system specifically.
15                 They made recommendations as to the
16            infrastructure -- to the infrastructure, which,
17            like I said, at some point included the --
18            certain portions of the election system.  But
19            it wasn't -- it wasn't -- to my knowledge, I
20            can't -- I don't recall of any specific
21            recommendations to the election system itself.
22       BY MR. CROSS:
23            Q.   All right.  Let me pull up the next
24       exhibit for you.
25                 (Plaintiffs' Exhibit 4 was marked for
```

Page 67

```
 1          identification.)

 2     BY MR. CROSS:

 3          Q.   Do you see Exhibit 4 here, Mr. Oliver?

 4          A.   Yes, I do.  It's an email.

 5          Q.   Yes.

 6               You see at the top this is an email that

 7     Zac Davis at Fortalice Solutions sent to -- you can

 8     see your name here on the "cc" line on October 26th.

 9          A.   Okay.

10          Q.   Do you see that?

11          A.   On -- October 2018.  Okay.  Uh-huh.

12          Q.   And did you work with Zac Davis from time

13     to time in your role at the Secretary's office?

14          A.    I don't recall Zac, no.  He may -- he may

15     have been in -- I may have sat in on a meeting that

16     he was providing some feedback, but I don't

17     recall -- I don't recall working with him

18     specifically, no.

19          Q.   Okay.  So we come down to the earliest

20     email -- I'll show you the whole document so you can

21     see here at the bottom.  The earliest email on this

22     thread is from Mr. Davis on October 23, 2018, to

23     Mr. Beaver, you, and others.

24               Do you see that?

25          A.   Yes, I do.
```

1          Q.   And you see here he writes right here, "We

2     have worked through the issues and messages are

3     being sent.  I will let you know if we get a hit."

4               Do you see that?

5          A.   I do.

6          Q.   And Mr. Beaver responds "Will do."

7               Do you see that?

8          A.   I do.

9          Q.   And then Mr. Davis sends a follow-up

10    email, "After sending 4 more emails on Wednesday for

11    a total of five, we waited through yesterday to see

12    if we got any hits."

13              And in the last sentence of that

14    paragraph, he writes "We got one hit for the message

15    and one hit for the document (From different IPs)

16    but we did not receive any remote connections."

17              Are you with me, Mr. Oliver?

18         A.   I'm with you, yes.

19         Q.   And then he goes on in the next paragraph

20    "At this point, I would like to move into the

21    assumed breach phrase ASAP."

22              Do you see that?

23         A.   I do.

24         Q.   Do you recall what this was about?

25         A.   I do -- I do not.

Page 69

```
 1            Q.   You don't have any recollection of this at
 2       all?
 3            A.   No, I do not have any recollection of
 4       that.
 5            Q.   Do you recall any situation where
 6       Fortalice was brought in to help with the -- a
 7       potential or actual breach of the IT systems that
 8       the Secretary handled?
 9                 MS. LaROSS:  Objection as to form.
10                 THE WITNESS:  Fortalice was --
11            Fortalice -- they were brought in on -- on --
12            on occasions, but they were -- they were on
13            contract, I guess, kind of like what -- I'm
14            having some trouble with answering this
15            particular question -- they were on -- they
16            were on contract to provide consultation
17            services, as well as assist in mitigation
18            services if needed.
19                 So to say that they were brought in for a
20            particular incident, I don't -- I don't recall
21            of a specific incident that they were brought
22            in.  I mean, I know they were -- I know they
23            were levied on several occasions for several
24            things that may have transpired on the network.
25                 But this particular incident -- this
```

1              particular situation here I don't recall.

2        BY MR. CROSS:

3              Q.    Were you aware --

4              A.    And --

5              Q.    Oh, go ahead.

6              A.    No, I was going to say and even though I'm

7        listed on the copy line, not -- that's not to say

8        that I was involved in this particular issue.

9              Q.    Are you aware of any situation where there

10       was any suspected hack of any aspect of any

11       information technology system that the Secretary of

12       State has responsibility for?

13                   MS. LaROSS:   Objection as to form.

14                   THE WITNESS:   The answer to the -- the

15              general answer to the question would be yes.

16              There -- there were incidents that we

17              investigated where we thought there may be a

18              hack or something going on.

19                   I -- and I know that they were

20              investigated and I -- I don't recall -- I -- I

21              don't recall of any particular -- or solution

22              to those investigations.

23                   But the general answer would be yes.

24       BY MR. CROSS:

25              Q.    Tell me everything you recall about each

Page 71

1      of those incidents.

2           A.   And that's -- that's -- that's kind of

3      what I alluded to.  At this point, I mean, I can't

4      really -- I can't really just go back and -- and --

5      and pinpoint a particular incident, you know, in --

6      in -- in -- in the role.

7                I mean, I just -- I know that -- I know

8      that they were communicated on, like I said, for

9      some things that could possibly have been an

10     incident, but I don't recall what they were and I

11     don't recall what was done to remediate the issue.

12          Q.   Do you know if anything was done to

13     remediate each and every one of those issues, or you

14     just weren't involved?

15          A.   Some -- the answer to your question, I

16     don't know -- I don't recall what was -- what was

17     done to mitigate the issues.  I wasn't involved in

18     every -- every incident that they were involved in.

19     I was involved in some, but I wasn't involved in

20     all.

21          Q.   When was the most recent of those,

22     approximately, the best time frame you can give me?

23               MS. LaROSS:  Object as to form.

24               THE WITNESS:  Wow, I -- I really -- I

25          really don't -- can't recall the most recent.

Page 72

1           Like I said, I mean, you know, things -- the

2           environment is a living environment.  I mean,

3           it's like things are happening on a daily

4           basis, so I can't -- I don't -- I can't recall

5           specifically what happened at any particular

6           time.  I mean, I -- I just don't recall at the

7           moment of -- of a -- I can't pinpoint and

8           recall a specific incident that -- that they

9           supported or collaborated on.

10   BY MR. CROSS:

11        Q.   Did any of those occur after the Secretary

12   took over responsibility for the election system

13   that Kennesaw had been managing?

14        A.   Yes.

15        Q.   And do you recall what aspects of the IT

16   infrastructure those hack incidents involved that

17   the Secretary was managing, like the specific

18   components of that IT infrastructure?

19        A.   No, I don't.

20        Q.   Do you know what the conclusions were of

21   any investigations that were reached regarding those

22   concerns about a potential hack, including whether a

23   hack was successful?

24           MS. LaROSS:  Objection as to form.

25           THE WITNESS:  I don't recall of any

```
 1            successful hacks of any -- of any -- of any of
 2            the situations that I was involved in.
 3      BY MR. CROSS:
 4            Q.   When you say "successful hack," what do
 5      you consider a successful hack?
 6            A.   And when I say a successful hack, I would
 7      mean that there was actually an alert triggered
 8      where there was a hack or you had believed
 9      something -- something triggered a -- something was
10      triggered to cause you to investigate that there was
11      or could have been a hack.
12                 I don't recall of anything like that that
13      had -- that was triggered and was identified as a
14      definite hack.
15            Q.   Well, there was at least the one situation
16      where malware was discovered on a -- on a
17      workstation; right?
18                 MS. LaROSS:   Objection as to form.
19                 THE WITNESS:   Yes, but malware -- malware
20            wouldn't be considered a hack.
21      BY MR. CROSS:
22            Q.   Why is that?
23            A.   Well, a malware is -- in the particular --
24      in this particular instance, was basically not like
25      a bad actor trying to -- to levy the system, but
```

1    more so of a staff member being unaware that there

2    was malware on a particular device or a file or

3    whatever, and they may have inadvertently inserted

4    that -- inserted that device or tried to access that

5    file and the malware was detected once it tried to

6    promulgate onto the -- onto a particular system.

7         Q.   But you don't know how the malware got

8    onto that device; right?

9              MS. LaROSS:  Objection as to form.

10             THE WITNESS:  I don't -- I don't recall

11        the specific circumstances of the incident.

12   BY MR. CROSS:

13        Q.   Are you aware of any incident where there

14   was unauthorized access to any aspect of the IT

15   infrastructure that the Secretary of State's office

16   manages, including the election system?

17             MS. LaROSS:  Objection as to form.

18             THE WITNESS:  I can't recall -- I can't

19        recall of -- I can't recall that right now, no.

20   BY MR. CROSS:

21        Q.   You just don't recall one way or the other

22   whether that happened?

23        A.   Right.  I don't -- I can't recall whether

24   that -- whether there was or wasn't at this point.

25        Q.   Okay.  Who was responsible for securing

1      the voting equipment itself?  So under the old
2      system, the DREs, the election management server;
3      the new system, the BMDs, printers, scanners, that
4      sort of thing.
5            A.   That would have came under the Election
6      Center or the election staff, which, to my
7      knowledge, the -- the equipment was stored at the
8      Election Center --
9            Q.   So that wasn't --
10           A.   -- or --
11           Q.   I'm sorry.  Go ahead.
12           A.   -- or -- or -- or a facility that was
13     controlled by the Election Center.
14           Q.   Okay.  Do you know whether there has ever
15     been any cybersecurity assessment done of the
16     State's voting equipment?
17               MS. LaROSS:  Object as to form.
18               THE WITNESS:  And the answer to that
19          question is I don't know.
20     BY MR. CROSS:
21           Q.   Is that something you would have expected
22     to learn when you were manager of security at the
23     Secretary's office had it been done?
24               MS. LaROSS:  David, I'm sorry.  I
25          missed -- I missed that.  Could you repeat it?

1          MR. CROSS:  Yeah.

2      BY MR. CROSS:

3          Q.   Is that something you would have expected

4      to learn about, had it been done, when you were the

5      manager for security at the Secretary's office?

6          MS. LaROSS:  Objection as to form.

7          THE WITNESS:  And the answer -- the answer

8              would be no, because, like I said, for a

9              great -- for a great period of that time, none

10             of the election equipment or -- or -- or

11             systems came under -- under my responsibility.

12             And when they did, I didn't -- I -- I -- I

13             didn't have the responsibility of the election

14             equipment itself.

15     BY MR. CROSS:

16         Q.   And your understanding is that was with

17     the Election Center; right?

18         A.   To my understanding, yes.

19         Q.   Are you familiar with Frances Watson?

20         A.   Yes, I am.

21         Q.   Did you ever work with her?

22         A.   Yes.

23         Q.   And how did your role and responsibilities

24     relate to hers?

25         A.   I basically interacted with her as far as

1    the investigator's -- I'm trying to think of what

2    they call it.

3              Basically, the office that she worked in

4    had a -- they had a software that I was the manager

5    of at the time, which was like the back -- the

6    Georgia and the federal background system.  We

7    interacted in that regard as far as that particular

8    system and also just regular cybersecurity systems

9    within her division.

10             MR. CROSS:  All right.  Let me mark the

11        next exhibit.

12             (Plaintiffs' Exhibit 5 was marked for

13        identification.)

14   BY MR. CROSS:

15        Q.   All right.  Can you see Exhibit 5 in front

16   of you, Mr. Oliver?

17        A.   Yes, I do.

18        Q.   So if you look at the bottom of the first

19   page, you'll see there's an email.  And I'll show

20   you -- I'll come to the bottom of the whole thing.

21             So the first email in the thread is this

22   email from Logan Lamb to Merle King on August 28,

23   2016.

24             Do you see that?

25        A.   Yes, I do.

Page 78

1          Q.   And the subject line has "IMPORTANT" in

2     all caps and then reads "concerning the security of

3     elections.kennesaw.edu."

4               Do you see that?

5          A.   Yes, I do.

6          Q.   Are you familiar with the situation here

7     where Logan Lamb, an independent cybersecurity

8     researcher, identified certain vulnerabilities with

9     certain aspects of the Kennesaw server -- election

10    server?

11         A.   Yes.

12         Q.   Tell me what you know about that

13    situation.

14         A.   Basically, I just pretty much know general

15    knowledge.  I know that Mr. Lamb, if I recall

16    correctly, it was identified by the researcher and

17    it was alerted to the Kennesaw State Election Center

18    that the researcher either had -- had knowledge of

19    or had accessed some specific system that he should

20    not have been able to access or see.

21              That's -- that's pretty much the extent of

22    that particular situation that I'm aware of.  Again,

23    like I said, I did not -- I did not work or

24    collaborate with the Kennesaw State Election Center.

25         Q.   So did you have any involvement in the way

Page 79

```
1        the Secretary of State's office handled this
2        particular situation involving Mr. Lamb?
3             A.   No, I did not have any association with --
4        with the way that particular situation was handled,
5        no.
6             Q.   So your understanding is that was handled
7        by the Election Center; is that right?
8             A.   Yes, that was handled by the Election
9        Center, that is correct.
10            Q.   Was there anything you did to ensure that
11       the vulnerabilities Mr. Lamb identified, that those
12       were remedied?
13               MS. LaROSS:  Objection as to form.
14               THE WITNESS:  And the -- the answer would
15           be a maybe.  I -- I didn't actually communicate
16           in a -- a work-related capacity with the
17           Election Center.
18               In this particular incident, I didn't
19           speak with -- I -- I spoke with one of the
20           technicians at the Kennesaw State Election
21           Center, and, basically, the only thing our
22           communications involved was suggestions as to
23           what -- pretty much what -- what -- what can
24           be -- what can be done to improve -- to improve
25           a particular system.
```

```
 1              Again, like I said, not -- not actually
 2         working there, those conversation -- I was
 3         only -- I -- I only worked in a advisory
 4         capacity in that particular incident.
 5    BY MR. CROSS:
 6         Q.   What suggestions were made?
 7         A.   I -- I don't recall exactly, because I
 8    don't really exactly remember what -- the system
 9    that Mr. Lamb revealed that had an issue.
10              And, like I said, I -- when I was talking
11    to the technician, I don't recall exactly what I
12    suggested that they do to either correct or mitigate
13    the particular issue that they had.
14         Q.   Is there anything you recall about this
15    situation that you can tell me?
16         A.   Other than the fact that it happened, like
17    I said, and the fact that, you know, I provided some
18    advisory information to the technical staff there,
19    that's pretty much it.  This is not a system -- this
20    was, like, a handoff system to me, because it didn't
21    fall under my umbrella of responsibility.
22         Q.   Do you have even a general recollection of
23    the advice that you provided regarding the
24    situation?
25         A.   Not -- no, not really, because, like I
```

1          said, I don't really recall exactly what -- what it

2          was that -- that the issue was.  I -- I vaguely

3          remember that it was a file or a system that the

4          researcher could navigate to, but I don't recall

5          what -- what was in the conversation as to what was

6          advised to do to mitigate that.

7               Q.   Do you know if anything was done to

8          mitigate the vulnerabilities that were identified,

9          or you just --

10               A.   That, I don't know.  I don't know what was

11          done or if it was done.  That, I can't answer to.

12                    MS. HUFF:  Excuse me, Mr. Cross.  This is

13               Grace.  I'm the Veritext concierge.  I just

14               want to let you know that I'm here if you need

15               my help with anything.

16                    MR. CROSS:  Oh, okay.  Thank you so much.

17                    MS. HUFF:  Uh-huh.

18          BY MR. CROSS:

19               Q.   All right.  Let me pull up the next

20          exhibit, Mr. Oliver.

21                    (Plaintiffs' Exhibit 6 was marked for

22               identification.)

23          BY MR. CROSS:

24               Q.   All right.  Let me show you Exhibit 6.

25                    Do you see Exhibit 6 in front of you,

Page 82

1        Mr. Oliver?

2             A.    Yes.

3             Q.    Okay.  And do you see this is a copy of

4       Rule 590-8-3 entitled "Security of Voter

5       Registration System" under the Georgia rules?

6             A.    Uh-huh.

7             Q.    "Yes"?

8             A.    Yes, I see it, yes.

9             Q.    And are you familiar with this rule?

10            A.    No.

11            Q.    Did you have -- well, let me just direct

12      you to one part of it.

13                  Do you see at Subsection (b) --

14            A.    Uh-huh.

15            Q.    -- it reads "Security of the Voter

16      Registration System is vital to the administration

17      of elections in Georgia.  As such, the system shall

18      be maintained in a manner that is consistent with

19      the following security standards."

20                  Do you see that?

21            A.    Yes, I do.

22            Q.    And then there are 27 standards identified

23      under that subsection.

24                  Do you see that?

25            A.    I see that.

Page 83

```
 1          Q.   And then the next subsection, (c),

 2     "Assessments," reads "The Secretary of State shall

 3     conduct or have conducted regular cybersecurity

 4     assessments of the Voter Registration System."

 5               Do you see that?

 6          A.   I do.

 7          Q.   Do you know whether those cybersecurity

 8     assessments identified there were performed?

 9               MS. LaROSS:  Objection as to form.

10               THE WITNESS:  No, I don't.  I don't know

11          if they were performed or not.

12     BY MR. CROSS:

13          Q.   Okay.  And then if you come down to

14     Subsection (d), you see where it reads

15     "Certification of Substantial Compliance"?

16          A.   I do.

17          Q.   And then it reads "No later than

18     December 31 of every calendar year, the Secretary of

19     State shall certify that:  A.  The Voter

20     Registration System is being maintained in a manner

21     consistent with the standards set forth in

22     Subsection (b) of this rule."

23               Do you see that?

24          A.   I do.

25          Q.   You understand that's the 27 standards we
```

Page 84

1      just looked at above; right?

2              A.   Uh-huh.

3              Q.   I'm sorry.  "Yes"?

4              A.   Yes, that's yes.

5              Q.   And then the certification also has to

6      certify "that the standards set forth in [that]

7      Subsection (b) have been reviewed to ensure that

8      they remain generally consistent with industry

9      standards."

10              Do you see that?

11              A.   I see that.

12              Q.   As the manager of security for the

13      Secretary's office, did you have any responsibility

14      with respect to the certification required here?

15              A.   I -- can you rephrase that?

16              Q.   Sure.  I'm just trying to understand --

17      there's a certification that's required under the

18      rule here that the -- the Voter Registration System

19      is being maintained in a manner consistent with

20      these 27 standards under Subsection (b).

21              What role, if any, did you have with

22      respect to the Secretary's office providing that

23      certification in any given year?

24              MS. LaROSS:  Objection as to form.

25              THE WITNESS:  None to little.

Page 85

1      BY MR. CROSS:

2           Q.   Okay.  What little involvement did you

3      have?

4           A.   The little -- the little part would be,

5      like I had stated before, when the portions -- when

6      certain portions of the election system became part

7      of the general Secretary of State infrastructure,

8      then I -- I did have the responsibility to ensure

9      that those systems was under -- under -- under the

10     standards, not necessarily the election standards,

11     but the standards as far as IT is concerned.

12          Q.   Okay.  And how did you determine that?

13          A.   As far as -- as far as the systems that --

14     if they met the IT standards?

15          Q.   Yes, the systems here that require

16     certification -- sorry.  Strike that.

17               The standards here that require

18     certification, how did you determine whether the

19     systems that you were handling met those standards?

20          A.   And, again, the particular document from

21     the election requirement, I -- I was -- I'm not

22     aware of this particular rule.  So, basically, I was

23     operating from a general IT cybersecurity standard.

24          Q.   Did you ever personally sign any

25     certification for the Secretary's office that it was

Page 86

```
 1      meeting particular standards -- cybersecurity
 2      standards?
 3           A.   I don't think so, no.
 4           Q.   Do you know who at the Secretary's office
 5      was responsible for the certification that's
 6      identified here in this rule?
 7           A.   The answer would be, no, I don't know who
 8      was responsible for that, no.
 9           Q.   Do you know whether the Voter Registration
10      System in Georgia actually complied with the 27
11      standards listed here while you were there?
12           A.   Again --
13                MS. LaROSS:  Objection as to form.
14                THE WITNESS:  Again, I'm not -- I'm not
15           familiar with the rule, so I can't -- I can't
16           say that I am aware that they did or didn't.
17      BY MR. CROSS:
18           Q.   Okay.  Did anyone at any point ever
19      threaten to hack Georgia elections?  Are you aware
20      of any such --
21                MS. LaROSS:  Objection.
22                THE WITNESS:  And I'm sorry, sir.  Can you
23           repeat that question?
24      BY MR. CROSS:
25           Q.   Sure.
```

Page 87

1              Are you aware of any incident where

2    someone contacted the Secretary -- the Secretary of

3    State's office and threatened to hack Georgia

4    elections?

5              MS. LaROSS:  Objection as to form.

6              THE WITNESS:  The answer would be, no, I

7         was not made aware of any particular threat

8         where someone actually physically contacted the

9         Secretary of State's office and threatened to

10        hack any -- any portion of the system.

11   BY MR. CROSS:

12        Q.   If something like that happened, would

13   that fall under your responsibilities or would that

14   fall to the Election Center or something else?

15        A.   If something like that happened, it should

16   have fell under both.  The -- the owner of the data,

17   that -- that being the election system, as well as

18   the -- myself as being the security manager, it

19   should have fell under both -- under both umbrellas.

20        Q.   And what would be the protocol, if

21   something like that happened, to respond to such an

22   incident?

23        A.   In general or in -- you're talking about

24   at the Secretary of State's office what was the

25   protocol?

1      Q.   Yes.  Sorry.  Thank you.  That's a good

2  clarification.

3      A.   When a -- when a -- that -- that process,

4  I'm going to say, was a divided process, I guess

5  would be the correct answer.

6      Q.   And just walk me through what that process

7  would entail, to your knowledge.

8      A.   Well -- and I answered that the way that I

9  did because, again, I was not privy to all of the --

10  I was not involved in all the communications in that

11  regard.

12          But the -- the ones that I were involved

13  in, to the best of my ability, met -- met whatever

14  standards that was -- I was operating under at the

15  time.  And that, for the most part, was the general

16  security, not necessarily trying to meet any

17  particular compliance or...

18      Q.   So what I'm trying to understand,

19  Mr. Oliver, is if the Secretary's office received a

20  direct threat of a hack to the election system --

21      A.   Uh-huh.

22      Q.   -- what would be -- what policies and

23  protocols are in place for responding to that?

24      A.   There -- the incident response -- the

25  incident response team or the incident response

1      policy should have been invoked.  And that would

2      have been notifying the incident response team, and

3      then that -- that team been a part of the process to

4      make a determination as to what should or should not

5      be done on a particular incident.

6           Q.   Who was on the incident response team?

7           A.   Myself, for one; Mr. Beavers, as CIO, was

8      another; Mr. Clark Rainer, which was the information

9      technology manager; and some other network --

10     network staff persons, as well as the legal -- there

11     was a legal component to it as well.  I think it was

12     Mr. Germany.

13          Q.   Okay.  And can you just walk me through

14     the steps?

15               So if that type of incident occurred, what

16     does the incident response protocol provide that are

17     the specific steps that would be taken by the

18     Secretary's office in response?

19               MS. LaROSS:  Objection as to form.

20               THE WITNESS:  And I -- I don't recall

21          exactly what the -- the incident response laid

22          out step by step, basic.

23               But in general, like I said, basically,

24          the incident response team should be notified,

25          and then within -- within the incident response

Page 90

```
 1              itself, it lay out the notification steps as to

 2              who should be notified.  Not necessarily what

 3              action they should take, but at least who

 4              should be notified.  It doesn't -- it doesn't

 5              really give a particular action as to, "You

 6              gotta do this, you gotta do that," but the

 7              response plan is mostly a roadmap that's

 8              telling you who to contact and what immediate

 9              action to take if it's -- if it's on a system

10              internal.

11     BY MR. CROSS:

12         Q.   All right.  Mr. Oliver, take a look at

13     Exhibit 7.

14              (Plaintiffs' Exhibit 7 was marked for

15              identification.)

16     BY MR. CROSS:

17         Q.   Can you see this?

18         A.   Yes, I do.

19         Q.   And do you see at the top there's an email

20     from Kevin Rayburn to Mr. Beaver, Mr. Clark Rainer,

21     Chris Harvey, and yourself, with a cc to Ryan

22     Germany.

23              Do you see that?

24         A.   Yes, I do.

25         Q.   And this is sent on April 5 of 2019;
```

Page 91

1      correct?

2            A.   The date on it is, yes, correct, April 5,

3      2019.  Yes.

4            Q.   And it's just one page, so you can see the

5      whole exhibit here.

6                 If you come down to the first email in the

7      thread, do you see that it's from an email address

8      Bret Hadley?

9                 Do you see that?

10           A.   Yes, I do.

11           Q.   Do you see that the actual address is

12     bretsolid@gmail.com?

13           A.   Yes, I do.

14           Q.   And it's sent April 4, 2019; correct?

15           A.   April 4, 2019, that is correct.

16           Q.   And then the recipient is

17     soscontact@sos.ga.gov.

18                Do you see that?

19           A.   I see that.

20           Q.   Are you familiar with that address at the

21     Secretary's office?

22           A.   Yes, I'm vaguely remember- --- familiar

23     with that address.

24           Q.   Is that some sort of general public

25     address that people can use to contact the Secretary

Page 92

1      of State's office?

2            A.    Yes.  That would be a -- kind of like a --

3      the answer's, yes, a general address where they can

4      contact the Secretary of State, yes.

5            Q.    Kind of like -- kind of like a customer

6      service email address for a company?

7            A.    That is correct.

8            Q.    And the subject here in this email reads

9      "I bet I can hack your electronic voting machines."

10                 Do you see that?

11           A.    Yes, I do.

12           Q.    And then the message itself reads "If you

13     don't want me to try and hack your elections, please

14     follow Oregon's lead and vote by mail, on paper.

15     You really DON'T" -- "DON'T" is in all caps -- "need

16     electronic voting machines, but if you insist, then

17     let the games begin.  Fair warning," and it's signed

18     "Mr. Robot."

19                 Do you see that?

20           A.    I see that.

21           Q.    Does this refresh your recollection that

22     there was at least one incident where someone

23     specifically threatened to hack Georgia election

24     machines?

25                 MS. LaROSS:  Objection to form.

Page 93

1      BY MR. CROSS:

2           Q.   You can go ahead.

3           A.   Again -- again, it -- it refreshes my

4      memory to a degree, but when it came to the election

5      systems itself -- I guess that would be a -- a good

6      way to state this -- I was not responsible -- it

7      was -- I was not given that responsibility for

8      the -- for the election system.

9                So unless there was a specific threat to

10     the system that came under my purview, I would not

11     have acted on this.  So, I mean, if they -- if they

12     were -- if they were alleging to -- alleging to the

13     Election Center or some type of election equipment,

14     that would have been -- that would have been handled

15     by the Election Division or the Election Center, the

16     way -- the way that daily operations went within the

17     IT department or -- at the Secretary of State's

18     office during my tenure.

19          Q.   So you're one of the people that received

20     notice of this threat.

21               What involvement did you have with

22     resolving this or addressing it?

23               MS. LaROSS:  Objection as to form.

24               THE WITNESS:  To my knowledge, like I

25          said, I don't recall this really, really being

Page 94

1          on my radar.

2               Again, like I said, I -- I may have been

3          on the email cc protocol, but I was not -- I

4          was not looped in to the main resolution of

5          this particular issue or -- or -- or -- or

6          the -- or the Election Center itself.

7     BY MR. CROSS:

8          Q.   Tell me everything you remember about this

9     incident.

10         A.   I don't.  Actually, I mean, now that

11    you -- now that I'm looking at the document and kind

12    of recalling the incident, there -- Mr. Rayburn may

13    have said something to the IT department.  I don't

14    recall him saying anything to me specifically.  Not

15    to say that he didn't, but I don't recall -- I don't

16    recall him coming to me individually or -- or -- or

17    in a group form in regards to this particular

18    threat.

19         Q.   So as you sit here, you just don't know

20    one way or the other what, if anything, was done in

21    response to this.

22         A.   I don't -- I don't know one way or the

23    other if anything was done to that.  I don't recall

24    being specifically involved in any investigation in

25    regards to this threat.

Page 95

```
 1           Q.   So the -- the threat indicates that if the
 2     State continues to use electronic voting machines,
 3     the writer writes "...then let the games begin,"
 4     indicating that they will actually try to hack the
 5     voting machines.
 6               Georgia did continue using electronic
 7     voting machines, and has since April of 2019;
 8     correct?
 9           A.   I'm sorry.  Repeat that question again
10     now.
11           Q.   You're aware that Georgia has continued
12     using electronic voting machines in the state since
13     receiving this threat; right?
14               MS. LaROSS:  Objection as to form.
15               THE WITNESS:  I see the -- I see the date
16          of the threat, and I -- I am aware that Georgia
17          used electronic voting machines.  But the
18          voting machines -- and when you're talking
19          about the machines that the constituents
20          actually vote on -- are not to be on the
21          Internet ever.
22     BY MR. CROSS:
23           Q.   But as you sit here, you don't have any
24     information you can provide on what efforts occurred
25     with respect to this hack, right, whether the hack
```

Page 96

1      occurred, what response there was, anything like
2      that; is that right, sir?
3              A.   That is correct, sir.
4              MS. LaROSS:  Object as to form.
5      BY MR. CROSS:
6              Q.   You said the voting machines are never
7      supposed to be on the Internet.
8              Do you know whether any of the voting
9      equipment that's currently used in Georgia has ever
10     been connected to the Internet, or you just don't
11     know one way or the other?
12             A.   I don't know one way or the other.
13             Q.   Are you aware of whether the election
14     management server that the Secretary of State
15     manages for the existing Dominion voting equipment,
16     are you aware of whether that's supposed to be air
17     gapped?
18             MS. LaROSS:  Objection as to form.
19             THE WITNESS:  And just in the general
20          state of the question, I would say, yes, that
21          it should be air gapped.
22     BY MR. CROSS:
23             Q.   And what does "air gapped" mean in the
24     cybersecurity context?
25             A.   Basically means that it doesn't -- it

Page 97

1    doesn't have access to the general Internet, meaning
2    that my -- my son sitting at home should not be able
3    to go on the Internet and access that system by any
4    means.
5         Q.   Do you know whether the election
6    management server that the Secretary of State has
7    is, in fact, air gapped?
8         A.   I -- I don't -- I don't recall.
9         Q.   Okay.  To ensure that it's air gapped, it
10   would have to be completely detached, disconnected
11   from other parts of the IT infrastructure that the
12   Secretary manages that do have Internet connections;
13   right?
14             MS. LaROSS:  Object as to form.
15             THE WITNESS:  In theory -- in theory, that
16        is correct, yes.
17   BY MR. CROSS:
18        Q.   Okay.  And given that you were the manager
19   for security and managed significant aspects of the
20   IT infrastructure, wouldn't you need to be involved
21   to ensure that the election management server itself
22   is air gapped?
23             MS. LaROSS:  Objection as to form.
24             THE WITNESS:  In general -- in general
25        theory, that should -- that would be correct,

1          yes.

2     BY MR. CROSS:

3          Q.   But do I understand correctly you were not

4     involved in any efforts one way or the other to

5     determine whether that -- that server is air gapped;

6     is that right?

7               MS. LaROSS:  Objection as to form.

8               THE WITNESS:  To my knowledge, no.

9     BY MR. CROSS:

10         Q.   Okay.  All right.  Let's take a look at

11    Exhibit 8, Mr. Oliver.  I'll pull it up here in just

12    a moment.

13              (Plaintiffs' Exhibit 8 was marked for

14         identification.)

15              MR. CROSS:  And by the way, I'm happy to

16         take a break whenever you want.  I was going to

17         keep going because I want to get you out of

18         here as quickly as we can on a holiday, but if

19         you want to take a break, just say the word.

20              THE WITNESS:  All right.

21              MR. CROSS:  All right.  Let me share this.

22         This is all a lot easier when you're in person.

23    BY MR. CROSS:

24         Q.   All right.  Can you see Exhibit 8 here?

25         A.   Yes, I see Exhibit 8, yes.

Page 99

1           Q.   Okay.  And Exhibit 8, you see this is an
2      email that Clark Rainer sent on October 30, 2019,
3      internally at the Secretary of State's office?
4           A.   Yes.
5           Q.   And you see you're one of the recipients
6      in the "cc" line?
7           A.   Yes.
8           Q.   Okay.  And then it begins with this email
9      from elections@msisac.org on October 28, 2019.
10               Do you see that?
11          A.   I see that.
12          Q.   Are you familiar with that organization?
13          A.   I am.
14          Q.   What is it?
15          A.   Basically, it is a -- I don't want to say
16     a federal -- but an independent organization that
17     provides standards for -- elections standards
18     throughout the continental U.S.
19          Q.   You see here it reads in the first
20     sentence of the alert, "EI-ISAC is opening the
21     Election Cyber Situational Awareness Room to state
22     and local election offices for the duration of the
23     November 5, 2019 General Election."
24               You see that?
25          A.   I see that.

Page 100

1          Q.   And then if we come up to Mr. Rainer's

2     email, the second paragraph, he indicates "Our

3     offices -- our office serves at the point for all

4     city and county governments who are EI-ISAC members,

5     and having this portal up from Monday through

6     Wednesday will give us visibility into any

7     threats --"

8          A.   I'm sorry.  Where are you reading -- where

9     are you reading that at?

10         Q.   I'm sorry.  This -- you see here in the

11    second paragraph (indicating)?

12         A.   Okay.  Okay.

13         Q.   So he goes on to say "...having this

14    portal up from Monday through Wednesday will give us

15    visibility into any threats being reported

16    throughout the state and country."

17              Do you see that?

18         A.   I do.

19         Q.   And what can you tell me about what this

20    portal is and the -- the situational awareness room

21    that's set up for elections like this, including in

22    Georgia?

23         A.   Kind of -- kind of without -- like I said,

24    my memory is kind of vague, but, basically, it is

25    a -- kind of like a cyber war room that's set up,

1    typically, at the -- I'm going to say the GBI, but I

2    might be -- I might be incorrect in that.  But -- I

3    think it's the G- -- I think it's ran by the GBI,

4    but don't -- like I said, I don't want to -- I don't

5    want to say that.

6          But, basically, there's a record -- a

7    cyber room that's managed by one of the law agencies

8    that set up a war room of various governments,

9    whether it be county, city, or whatever, to come

10   together and kind of like -- kind of like what they

11   call a SOC.

12         But, basically, all of the threat analysis

13   come into -- are -- are being fed to this particular

14   location, and they can look at and analyze any

15   particular threat and issue a warning or instruct

16   someone to take action on a particular issue that

17   they may or may not see.

18       Q.   Is at least part of the idea that if

19   another state, for example, experiences some threat

20   to their election, they can share that information

21   with cybersecurity folks in other states so that

22   everyone has an understanding of what sort of

23   threats may be happening?  Is that part of the --

24       A.   Yes, that's -- that is part of it, yes.

25       Q.   What was your involvement, if any, with

1      this particular process?

2           A.   I had -- I had some involvement, but

3      because of the -- basically, just because of the --

4      when you looked at -- if you go back to -- think

5      back to the organization chart, I had a -- I had a

6      department of myself.  So my -- my involvement was

7      only supported to the limits that one can -- one can

8      be present for.

9           Q.   What threats do you recall learning about

10     in your work with this organization on election day?

11          MS. LaROSS:  Objection as to form.

12          THE WITNESS:  Yeah, and I -- I can't

13          really -- I can't really say that I can recall

14          any particular threat that was identified

15          relating to the state of Georgia on election

16          day.

17          (Plaintiffs' Exhibit 9 was marked for

18          identification.)

19     BY MR. CROSS:

20          Q.   All right.  Let's take a look at

21     Exhibit 9.

22          A.   Okay.

23          Q.   Can you see Exhibit 9, Mr. Oliver?

24          A.   I do.

25          Q.   You see this is an email from John Hallman

Page 103

1      sent on July 3, 2019, at the Secretary's office?

2           A.   Yes.

3           Q.   And you see that you're the first in the

4      list of recipients there.

5                Do you see that?

6           A.   I see that.

7           Q.   And the other recipients are Merritt

8      Beaver, Chris Harvey, Kevin Rayburn, and Scherie

9      Jefferies; is that right?

10          A.   Uh-huh.

11          Q.   Is that "yes"?

12          A.   Yes, that is a yes.

13          Q.   Who is Scherie Jefferies?

14          A.   Scherie Jefferies is a -- she's an

15     employee of the Secretary -- well, she -- at the

16     time I was there, she was an employee of the

17     Secretary of State IT department.

18          Q.   So we come down -- the first email in the

19     thread here is from John Hallman on July 3, 2019, to

20     you, Mr. Beaver, Mr. Harvey, and Mr. Rayburn.

21               Do you see that?

22          A.   I see that.

23          Q.   And the subject is "Cloudflare Email

24     Obfuscation."

25               Do you see that?

Page 104

```
 1            A.    Uh-huh, I see that.
 2            Q.    Mr. Hallman writes to you and Mr. Beaver
 3      "I began receiving reports at the beginning of April
 4      that County registrars were unable to view the email
 5      address saved in ElectioNet."
 6            Do you see that?
 7            A.    I see that.
 8            Q.    What is ElectioNet?
 9            A.    Well, it's one of the election system.
10      Like I said, you gotta forgive me.  I'm trying to
11      recall.  But, basically, I'm thinking that it's a --
12      I'm thinking that it's a system where the counties
13      can view various voter information.  And voter
14      information may be -- let me rephrase that.  Not
15      necessarily voter information, but it's like -- I'm
16      going to say stats for a particular county.
17            But I don't -- I'm -- I'm -- I -- again,
18      I -- I didn't really work in elections.  I'm
19      familiar with the ElectioNet.  I know what the
20      network is.  I can't really specifically tell you
21      all of what it does.
22            Q.    Okay.  ElectioNet is sometimes referred to
23      as ENET; right?
24            A.    I would -- I would assume, yes.
25            Q.    And you see here it indicates "The user,"
```

Page 105

1        meaning someone at the County office, "The user

2        would see 'Email Protected' in the place of the

3        email address, and this message would be a

4        hyperlink."

5                You see that?

6        A.   I see that.

7        Q.   And then "Clicking on this link, would

8        take the voter to a webpage informing the user that

9        Cloudflare was preventing them from seeing the email

10       address."

11               Do you see that?

12       A.   I see that.

13       Q.   And then it goes on in the next paragraph.

14       "Over the next 3 months, our IT department

15       investigated the cause of the issue, which appears

16       to be a feature of Cloudflare called Email Address

17       Obfuscation.  It was determined that this is a

18       setting that can be turned off."

19               Do you see that?

20       A.   I see that.

21       Q.   He then goes on to explain, "However, when

22       we requested that this setting be turned off, that

23       request was denied by the two of you.  Could you

24       please explain this to me?"

25               Do you see that?

Page 106

1          A.    I see that.

2                And, again, in my limited memory,

3     basically, Cloudflare was a -- a service that we

4     were utilizing to limit or detect any suspicious

5     transactions over the mail system and, by turning

6     that on, would have disabled that protection.

7                So to the best of my recollection, that

8     was why it was denied.  Because even though it

9     prevented some services -- it prevented the easy

10    flow of services, it was a -- it was a protection

11    that was recommended for the safety of the network.

12         Q.    Recommended by whom?  You and Mr. Beaver?

13         A.    Yes.  And not -- I won't say -- it was in

14    this particular case recommended by me and

15    Mr. Beavers, but it was recommended based on the

16    Cloudflare recommendations and the way that

17    Cloudflare operates.

18         Q.    So you think this was a recommendation

19    from Cloudflare itself?

20         A.    It was a recommendation from Cloudflare

21    itself.  But even though -- even though it's a

22    recommendation from Cloudflare, you have to keep in

23    mind that Cloudflare provides services to all 50

24    states, basically.

25                And each state network is configured

1    differently, so what is feasible in one state may

2    not be feasible in another state.  And the way that

3    we were constructed, this provided us the best

4    solution possible at the time.

5         Q.   Okay.  So you should see in front of you

6    here your response to Mr. Hallman on July 3, 2019.

7              Do you see that?

8         A.   I do.

9         Q.   And if you go to the third sentence

10   beginning "Turning...."

11             Do you see that at the end of the second

12   line?

13        A.   Uh-huh.  Right.

14        Q.   And you wrote "Turning this feature does

15   create a security vulnerability, yes we can restrict

16   this to the Electionnet [sic] site but this is one

17   of the organizations [sic] critical sites."

18             Do you see that?

19        A.   I do see that.

20        Q.   So you're indicating to Mr. Hallman that

21   turning this feature off would create a security

22   vulnerability; is that right?

23        A.   To the best I can --

24             MS. LaROSS:  Object to the form.

25             THE WITNESS:  -- the best -- go ahead.

Page 108

1           I'm sorry.

2                 MS. LaROSS:  Go ahead, Mr. Oliver.

3                 THE WITNESS:  To the best I can recall,

4           and, again, without being -- not being in the

5           moment, to the best of my knowledge, I would

6           say, yes, that would be correct.

7     BY MR. CROSS:

8           Q.   And then Mr. Hallman asked you in his

9     response on the same day if you could explain the

10    security vulnerability that will be created by

11    turning this feature off.

12                Do you see that?

13          A.   I see that.

14          Q.   What is the security vulnerability that

15    would be created by turning this feature off, in

16    your view?

17          A.   I really -- I really don't know at this

18    point.  At the time, you know, I was abreast of what

19    that particular feature was protecting.  At this

20    point, it's a -- it's a -- it's a -- it's a fog in

21    my mind.  I can't remember what -- what was being

22    protected at the time or what turning it off would

23    have -- what vulnerability it would have presented.

24          Q.   Okay.  Do you know whether it was ever

25    turned off?

1          A.    That, I do not know.

2          Q.    Okay.  And when you wrote to Mr. Hallman

3     here in your email "...we can restrict this to the

4     Electionnet [sic] site but this is one of the

5     organizations [sic] critical sites," what did you

6     mean was one of the organization's critical sites?

7     Was that ElectioNet?

8          A.    I don't -- I don't really recall as to

9     what I meant specifically in that -- in that -- in

10    that email.

11         Q.    Is ENET considered one of the Secretary's

12    critical sites?

13         A.    I would -- I would --

14              MS. LaROSS:  Objection --

15              THE WITNESS:  -- assume it was -- I would

16         assume it was at the time, yes.

17              COURT REPORTER:  Ms. LaRoss, you might

18         want to repeat your objection.  It was cut off.

19              MS. LaROSS:  Yeah.  Objection as to form.

20         Thank you.

21    BY MR. CROSS:

22         Q.    Are you familiar with an organization

23    called Secureworks?

24         A.    Yes, I am.  Secureworks is a division of

25    Dell Enterprises.

1          Q.   A division of what Enterprises?

2          A.   Dell Enterprises.

3          Q.   Is that D-A-L-E?

4          A.   No.  D-E-L-L, Dell, like the computer

5     Dell.

6          Q.   Oh, Dell.  Sorry.  Got it.

7          A.   Yes.

8          Q.   Okay.  And did the Georgia Secretary of

9     State's office have some relationship with

10    Secureworks?

11         A.   They did.

12         Q.   What was that?

13         A.   Secureworks was just like a -- they

14    provide like a third-party SOC service.

15         Q.   Did they provide reports based on --

16         A.   Yes, they did.

17         Q.   How frequently did they provide those

18    reports?

19         A.   Daily.

20         Q.   Daily, you said?

21         A.   Yes, daily.

22         Q.   And those reports included cybersecurity

23    assessments?

24         A.   Not assessments, no.  It wasn't -- it

25    wasn't an assessment.  It provided information

Page 111

1       for -- for assessment, but it was not a -- an

2       assessment.  They did not do assessment.  It just

3       provided information that led to assessments.  It

4       was one of the pillars.

5            Q.   What -- what was -- just help me

6       understand, what was in the daily reports,

7       generally?

8            A.   Well, it was -- it was -- it was a

9       canned -- a set of canned reports.  And what I mean

10      by that is you can -- the user, whomever that be,

11      can set up to have whatever report they deem

12      important to them to be delivered or they can run --

13      or they can run it a la carte.

14              So as an example, if I wanted to see all

15      of the IPs that were reporting to a particular

16      system, I could -- I could run a report on demand

17      and get that information, or I could set it up where

18      it automatically ran that report and sent it to my

19      email on a daily, monthly, or semi- -- semi-monthly,

20      quarterly, whatever -- whatever interval that I so

21      desired.

22           Q.   Okay.  Did these reports include any

23      information on security vulnerabilities with the

24      system?

25           A.   They could, yes.

Page 112

1         Q.   If there was any kind of breach of the

2    State's electronic systems, would that be

3    captured -- would you expect that to be captured in

4    these reports?

5              MS. LaROSS:   Objection as to form.

6              THE WITNESS:   In -- in general, yes.

7    BY MR. CROSS:

8         Q.   Okay.  All right.  Let me share

9    Exhibit 10.

10             (Plaintiffs' Exhibit 10 was marked for

11             identification.)

12   BY MR. CROSS:

13        Q.   Do you see this, sir?

14        A.   Yes, I do.

15        Q.   Okay.  And do you see the most recent

16   email at the top is from Josh Hood to a number of

17   people at the Secretary of State's office on April 3

18   of 2019?

19        A.   I do see that, yes.

20        Q.   And you see you're one of the recipients

21   in the "cc" line?

22        A.   I do see that, yes.

23        Q.   Okay.  And Josh Hood's email indicates

24   he's at ellijay, E-L-L-I-J-A-Y, .com.

25             Do you see that?

Page 113

```
 1              A.   I see that.
 2              Q.   And if you look at his signature block,
 3         "Professional Services Tech, ETC," what's ETC?
 4              A.   That, I am not aware of.
 5              Q.   Okay.  All right.  If we come down to the
 6         start of this, you'll see there's an email from
 7         Clark Rainer to Steven Koonce at the Secretary of
 8         State's office April 3, 2019, subject line "Fannin
 9         County IP."
10              Do you see that?
11              A.   I do see that, yes.
12              Q.   And Fannin County, is that a county in
13         Georgia?
14              A.   Yes, it is.
15              Q.   What was Steven Koonce's role around this
16         time?
17              A.   Mr. Koonce was part of the network team.
18              Q.   And you see there's this IP address that's
19         included in Mr. Rainer's email.  Mr. Koonce sends a
20         response indicating, "This is one of several blocks
21         from this morning."
22              Do you see that?
23              A.   I see that, yes.
24              Q.   And do I read this right that it indicates
25         they're blocking this IP address in Mr. Rainer's
```

Page 114

1      email?

2          A.   Yes, based on -- looks like that's what

3      they're doing based on this -- on this portion of

4      the report that's in the email, yes.

5          Q.   Okay.  And in this portion of the report,

6      you can see the same IP address listed and then it

7      says "Action taken:  Block."

8              Do you see that?

9          A.   I see that, yes.

10         Q.   Under "Rule name," it says "Block High

11     Threats."

12             Do you see that?

13         A.   I see that, yes.

14         Q.   Is that just a rule that's intended to

15     block IP addresses that are perceived to be a high

16     threat?

17             MS. LaROSS:  Object as to form.

18             THE WITNESS:  Again, depending on what

19         you're trying to accomplish.  The rule can

20         block anything from a high threat to something

21         that you may want to just flag for whatever

22         reason.

23             Not necessarily saying that it's a threat,

24         but if you wanted to flag it or if you wanted

25         to manually allow or disallow a particular IP,

Page 115

```
1        you can -- you can set up a -- a rule to do

2        that.

3    BY MR. CROSS:

4        Q.   Okay.  And then we come to a more recent

5    email, still on April 3, 2019, from Mr. Koonce

6    regarding the same IP address.  It indicates "There

7    have been 66 times this rule has been triggered from

8    the IP address in question the last three days."

9             Do you see that?

10       A.   I see that, yes.

11       Q.   And there's another email the same day

12   from Mr. Rainer to Josh Hood, the person we saw

13   earlier who was at ETC.

14            Do you see that?

15       A.   I see that.

16       Q.   And he indicates in the second paragraph

17   to Mr. Hood, "We have identified the IP address and

18   the url fannincountyga.com as appearing on a number

19   of blacklists and potential reasons for this may

20   be:"

21            Do you see that?

22       A.   I see that.

23       Q.   And Mr. Hood responds "This is the first

24   notifications I have had on this.  I will look into

25   it and update you on what I find."
```

Page 116

1              With me?

2         A.    I see that, yes.

3         Q.    What do you recall about this situation?

4         A.    I don't.  As far as the flow of the email,

5    I understand what they're talking about, but I don't

6    recall this particular situation.

7         Q.    Okay.  You don't recall anything about

8    this "fannincountyga" IP address?

9         A.    I -- I remember there being an issue with

10   Fannin County.  And when I say an "issue," I'm

11   talking about where something like this happened

12   where a particular user or -- or system, something

13   like that, contacted our office and asked us to look

14   into something or something like that.

15             I do remember something like that with

16   Fannin County, but I don't recall the details of

17   what they were -- what they were asking or what we

18   did to resolve their situation.

19        Q.    Do you know whether any conclusion was

20   reached that the IP address here is not actually

21   associated with Fannin County in Georgia, whether

22   someone was pretending to be with Fannin County?

23        A.    I do not recall specifically what the

24   resolution was on that.

25             The only thing that I can really add to

Page 117

1    that is that when Mr. Rainer was referring to that

2    it -- it could be part of a bad IP, basically,

3    there's -- there's a MS -- MS -- MS-ISAC -- and I

4    forget what the acronym stands for -- but,

5    basically, they're like the government agency that

6    monitors IP sectors in the United States and

7    anything that's malicious.

8              And, basically, they send out a -- a list

9    of IPs that has been identified as a malicious IP or

10   the potential thereof, and you can add those to a

11   firewall or a email or protection system to flag or

12   block a particular IP.

13             And that's what appeared to be happening

14   here, is that a particular IP that they're referring

15   to was either flagged or blocked totally.

16        Q.   Would you expect a legitimate IP address

17   associated with a Georgia county to be flagged and

18   blocked in that way?

19        A.   It's possible, yes.

20             MS. LaROSS:   Object as to form.

21   BY MR. CROSS:

22        Q.   Why is that?

23        A.   Well, depending on -- again, these --

24   these systems are monitored -- a great part of them

25   are monitored automatically.   And depending on the

1    normality of the traffic that's being detected, if

2    it's out of range of what the filter is set up to

3    filter on, if it's out of that range, then it could

4    be flagged as a malicious -- a malicious IP or a

5    malicious activity.

6         Q.   In the reasons given in Mr. Rainer's email

7    to Mr. Hood of why the fannincountyga.com is

8    appearing on a number of blacklists, the last reason

9    indicates that Mr. Rainer had "just got an email

10   from MS-ISAC" --

11        A.   MS-ISAC.  Okay.

12        Q.   -- "with some more information" he

13   indicates he'll forward on in just a minute "also

14   showing you may have a malware infection."

15             Do you see that?

16        A.   I see that, yes.

17        Q.   And was there, in fact, a malware

18   infection in this incident?

19             MS. LaROSS:  Object --

20             THE WITNESS:  I don't recall.

21   BY MR. CROSS:

22        Q.   You just don't recall one way or the

23   other?

24        A.   I don't recall one way or the other,

25   correct.

1          Q.   Okay.  Do you recall any measures that

2     were taken to investigate whether malware had made

3     it into the Secretary of State's system?

4          A.   The answer would be no, but in general

5     practice, we would -- we would investigate that

6     based on -- on operating standards.  But I don't

7     recall specifically if anything was -- any

8     additional action was taken for this particular

9     issue.

10              COURT REPORTER:  Ms. LaRoss, please

11          restate your objection.  I didn't hear it.

12              MS. LaROSS:  Objection as to form.

13     BY MR. CROSS:

14          Q.   Do you know why Mr. Rainer reached out to

15     Josh Hood at ETC about this instead of reaching out

16     to someone at Fannin County?

17          A.   I would -- I don't know for sure, but I

18     would assume since Mr. Hood was the one that

19     notified the Secretary of State would be the reason

20     that Mr. Rainer replied to him specifically.

21          Q.   Yeah, I don't -- I mean, looking at the

22     email thread again, Mr. Oliver, I don't see where

23     Mr. Hood flags it.  It starts with an email between

24     Mr. Rainer and Mr. Koonce, another email between

25     Mr. Rainer and Mr. Koonce, another email between

Page 120

1     Mr. Rainer and Mr. Koonce, and then Mr. Rainer flags

2     it for Josh Hood.

3              You just don't -- you're just not aware

4     one way or the other why Mr. Rainer sent this to

5     Mr. Hood?

6          A.   I'm not -- I'm not aware.  I do remember

7     this incident happening, but I don't remember the

8     specifics as to the steps or -- or the procedures

9     and why they were happening.

10         Q.   And you don't recall any resolution; is

11    that right?

12         A.   No, I don't recall the resolution.  No, I

13    don't.

14         Q.   All right.  Let's look at Exhibit 11.

15              (Plaintiffs' Exhibit 11 was marked for

16              identification.)

17    BY MR. CROSS:

18         Q.   All right.  Do you see Exhibit 11 in front

19    of you, Mr. Oliver?

20         A.   No, I don't.  It look like -- my screen

21    disappeared.  Give me a second here.

22              Okay.  I see it.

23         Q.   Okay.  And it's just one page.  It's a

24    single email.

25              And do you see that this is an email that

Page 121

1      you sent internally at the Secretary's office on

2      April 24 of 2019?

3              A.   Yes.

4              Q.   And the subject line that you wrote was

5      "Vulnerability Prioritization."

6              Do you see that?

7              A.   Yes.

8              Q.   And then you address it to

9      "Infrastructure."

10              Is that how you refer to people here,

11     because they had responsibility for the IT

12     infrastructure?

13              A.   Yes.  Basically, that would be pretty much

14     the network team, yes.

15              Q.   And then you wrote "Please visit the

16     location below to access the spread sheet of the

17     prioritized vulnerabilities (Atlanta Servers) which

18     list the most vulnerable vulnerabilities based on

19     predictive prioritization order.  These

20     vulnerabilities are listed in order of priority,

21     please provide mitigation action or feedback."

22              Do you see that?

23              A.   I see that, yes.

24              Q.   Then there's a link to -- looks like a

25     folder on an H drive at the Secretary's office;

Page 122

1      right?

2           A.    That's correct.

3           Q.    What was the purpose of this

4      prioritization of vulnerabilities that you

5      distributed to the infrastructure team?

6           A.    The purpose of it was to give them a guide

7      as to which -- what was -- what was labeled as

8      vulnerabilities that needed to -- to be mitigated

9      first.  And that could be anything from a critical

10     patch from Microsoft or any other of the vendors

11     that we may have had their hardware or software

12     in -- in our network.

13          Q.    What efforts were undertaken at the

14     Secretary's office to identify these

15     vulnerabilities?

16          A.    We had several tools that we were running

17     to identify that -- those vulnerabilities, the --

18     the regular -- the regular Microsoft scans; if a

19     system wasn't Microsoft, the scans by that

20     particular vendor.

21                We also had -- ran independent scans based

22     on the procedure that was set up to run scans at --

23     at a particular interval, just to ensure that the

24     state of the system had not changed since the last

25     time a particular scan was ran.  So we ran -- we ran

Page 123

1      scans at certain intervals.

2           Q.   So was this a regular process reflected in

3      this email?

4           A.   That was a regular process, yes.  That --

5      that happened on a -- a regular interval.

6           Q.   And what interval was that?

7           A.   Typically, it was ran, like, on a weekly

8      basis.  This report was sent on a weekly basis.

9                You know, scans -- scans run every day,

10     but the report was -- only ran on a weekly basis.

11     And, basically, it was just to alert the

12     infrastructure staff if they needed to shift any

13     particular priority that they may have been working

14     to mitigate.

15          Q.   And when you write to the infrastructure

16     team "Please provide mitigation action or feedback,"

17     was your expectation that the members of this team

18     would provide for you the steps that they were

19     proposing to mitigate these vulnerabilities?

20          A.   Yes.

21               MS. LaROSS:  Objection to form.

22     BY MR. CROSS:

23          Q.   So when you refer to the "prioritization

24     order," how were -- how was the prioritization of

25     these vulnerabilities determined?

Page 124

1          A.   The prioritization was determined by a

2     score that was provided by the various tools that we

3     were utilizing or by a -- by the -- the software --

4     the software put a rating to it, and based on that

5     rating, that's how the priority was assigned.

6          Q.   And the mitigation action or feedback you

7     were requesting, did that typically come to you in

8     email?

9          A.   It could come in various forms.  It could

10    come in an email or it could -- there is a -- a form

11    that they could complete on the -- on the -- on the

12    network.

13               Something like -- something -- as an

14    example, like we had -- we had a tool called Jira,

15    which was like a collaboration tool.  They could go

16    into the collaboration tool and put whatever actions

17    or processes that had been taken to mitigate or, if

18    it couldn't be mitigated, as to what the reason it

19    was why it couldn't be mitigated.

20         Q.   And can you spell the name of that tool?

21         A.   Jira, J-I-R-A, if I'm not mistaken.

22         Q.   What's the reference to "Atlanta servers"

23    in parentheses next to "prioritized

24    vulnerabilities"?

25         A.   We had a data center in the -- there was a

Page 125

1          data center in the Atlanta location, and that's what
2          that was referencing.
3                  Q.   Why did you specifically call out that
4          data center next to "prioritized vulnerabilities"?
5                  A.   Well, we had -- we had several data
6          centers, and -- and that was just to give them a
7          specific location as to where I was -- what servers
8          I was referring to.
9                  Q.   Did the Atlanta servers there encompass
10         any components of the election system at this time?
11                  MS. LaROSS:   Objection.
12                  THE WITNESS:   In 2019, I would say yes.
13         BY MR. CROSS:
14                  Q.   Do you recall what sort of vulnerabilities
15         that came up in these weekly reports?
16                  A.   Not specifically, no.  Because like I
17         said, I mean, we get everything from just the
18         regular Microsoft vulnerabilities to Adobe.  I mean,
19         anything that -- anything that needed to be patched
20         or updated, to include the operating system.  I
21         mean, it could -- it -- once you ran a scan, it
22         identified all of those particular portions of a
23         particular system and it would give you a -- a
24         individual report for every system that you had on
25         your network that you scanned.

1      Q.   Why did you and others on the

2  infrastructure team go through this process each

3  week of identifying vulnerabilities?

4      A.   Well, that's -- that's just a standard --

5  from a security standpoint, that's just a standard

6  process, is that you continually monitor your

7  systems for vulnerabilities.

8           Just because a system is up to standard

9  today and doesn't have any vulnerabilities on it

10  doesn't mean that this time -- the same time next

11  week, that something is outdated or there has not

12  been an updated patch pushed out by the vendor.

13           So it was a process that -- which you

14  attempted to stay current or as current as possible

15  with your updates and security settings.

16      Q.   Why spend time looking for vulnerabilities

17  rather than just looking for actual breaches or

18  actual hacks or comprises?

19      A.   Well, vulnerabilities can allow -- if

20  not -- if not mitigated, can open the door or -- or

21  allow a weakness for a -- a hack.

22           As an example, if you -- when you -- when

23  you getting ready to -- when you getting ready to

24  travel -- and this is just an analogy -- but like if

25  you're getting ready to travel, you and your family,

1    you would -- you would do a survey of your home to

2    make sure that all of the windows were secured, all

3    of the doors were secured, there was no items left

4    on your patio or deck that could be used to

5    vandalize or break into your property.  So,

6    basically, you're just doing like a walk-through of

7    the area to ensure that there's no known issues that

8    are left that can become a issue while you're away.

9            And the last thing you do is turn -- turn

10    on your alarm system, which is basically what this

11    scan is doing.  It's just -- you turn on the alarm

12    system, and it's kind of like detecting if there's

13    any windows or doors open and it allows you to take

14    any actions.  If it -- if it comes back and say that

15    the front door is open, then you know that your

16    system -- you can't set your alarm until you go

17    secure the front door.

18            Did that -- did that make sense?  I

19    mean...

20        Q.    Yes.  Thank you, Mr. Oliver.

21        A.    Sure.

22        Q.    On the software ratings, can you explain

23    how that works?  Like, are there certain --

24    presumably there's some sort of assumptions built

25    behind -- built into the ratings in terms of

Page 128

1    determining what's a high priority and what's a low
2    priority; is that right?
3         A.   That is correct, yes.  And, basically,
4    that is provided by the -- the IT -- the global IT
5    world.  And as an example, I'll just say MS-ISAC is
6    one of the agencies that provide some of these
7    ratings.
8              If a -- if a particular issue has been
9    known to cause issues for various organizations,
10   then it may get a higher rating than an issue that
11   doesn't get any kind of rating or -- or that doesn't
12   affect any -- any company in a major way.
13        Q.   The software that you relied on for the
14   prioritization, was that prioritization process
15   tailored specifically to the Georgia Secretary of
16   State's office or was it relying on some sort of
17   standard risk assumptions?
18        A.   It is lined -- it is aligned with the
19   standards.  And, basically, unless there's something
20   change, what you're -- what you're -- what you're
21   looking to protect is the -- the framework of the --
22   of the system.  Because all of -- to include the
23   election system, from what I understand, they all
24   ride on a particular framework.  So what you want to
25   do is to ensure that that particular framework is as

Page 129

1      secure as possible.

2           Q.   All right.  Mr. Oliver, let's take a look

3      at Exhibit 12.

4                (Plaintiffs' Exhibit 12 was marked for

5           identification.)

6                THE WITNESS:  Okay.

7      BY MR. CROSS:

8           Q.   All right.  Do you see that this is an

9      email that Clark Rainer sent on April 9 of 2019?

10          A.   Yes.

11          Q.   And you see you're one of the recipients

12     in the "cc" line?

13          A.   Yes.

14          Q.   I'll come down to the start of it.

15               So it begins with an email from Brendan

16     Marshall at Fortalice Solutions on April 9 of 2019.

17               Do you see that?

18          A.   I see that, yes.

19          Q.   You see you're one of the recipients of

20     that original email?

21          A.   Yes.

22          Q.   And the subject line is "Scan Report."

23               Do you see that?

24          A.   I see that.

25          Q.   And then the email indicates that

Page 130

1       Mr. Marshall has "uploaded the new scan report to
2       Onehub at this link."
3                   Do you see that?
4           A.   I see that, yes.
5           Q.   It goes on to say "As discussed on the
6       call, it will be most effective to track
7       vulnerabilities by hosts."
8                   Do you see that?
9           A.   I see that, yes.
10          Q.   What's this scan report that's referenced
11      here by Mr. Marshall at Fortalice?
12          A.   Basically, Fortalice had the ability, as
13      part of their services, to run scans on -- on -- on
14      our network, whether it be the entire network or
15      just various segments of the network, and we'd
16      typically discuss those on a -- on a routine
17      schedule.  Normally -- normally we had a weekly
18      call, but depending on the criticality of what --
19      what may have been in a report as to whether or not
20      we needed to do -- do it any more frequently than
21      that.
22          Q.   What is Onehub?
23          A.   Onehub was, basically, a -- a secure
24      portal to -- kind of like Dropbox.  I mean,
25      that's -- it's not -- I mean, it's not open to the

1    public, but just to give you an example as to what

2    it's like, it's like a -- it's like a secure data

3    storage area.

4         Q.   So were these periodic reports or regular

5    reports that Fortalice Solutions did for the

6    Secretary's office on tracking -- tracking

7    vulnerabilities?

8         A.   I'm sorry.  Say the -- repeat the

9    question.

10        Q.   Oh, yeah.  Sorry.

11             The scan report that Mr. Marshall

12   mentions, was this a regular report that Fortalice

13   did to track vulnerabilities for the Secretary's

14   office?

15        A.   Depending on their engagement.  I mean,

16   the answer is yes, at the time that this was being

17   done, yeah, they had a -- they had a -- they had a

18   project where they would engage and scan the network

19   periodically for vulnerabilities, in -- in addition

20   to what we were already doing.

21        Q.   Okay.  So do you see here the

22   second-to-last email is from Roy Iversen at

23   Fortalice Solutions on April 9, 2019?

24        A.   Yes, I see that.  Okay.

25        Q.   And Mr. Iversen writes "Looking at the

Page 132

1    results with Brendan - per PCC almost all" -- and

2    "all" is italicized -- "the servers that we have

3    access to scan (and thus in the report) are public

4    facing one way or another, so it is not feasible to

5    triage that way.  I have asked Brendan to hold off

6    on sending you yet another spreadsheet, because I

7    don't think it would add more information."

8            It goes on.  "In terms of looking at the

9    vulnerabilities here are some thoughts on how to

10   best triage and make progress."

11           Do you see that?

12       A.   I see that, yes.

13       Q.   When he writes that almost all the servers

14   that they have access to scan are public facing,

15   "public facing" means that they have some sort of

16   connection to the Internet; is that right?

17       A.   Yes.

18       Q.   Okay.  And then "PCC," what does that

19   refer to?

20       A.   It's a -- a sub -- a suboffice of a vendor

21   that was in -- in contract with the Secretary of

22   State to provide services.

23       Q.   And did PCC's services include a voter

24   registration database?

25       A.   I'm not sure.  I don't remember.

Page 133

1      Q.    Okay.  Where Mr. Iversen provides thoughts

2   on how to best triage and make progress with the

3   vulnerabilities, in the first sentence of the first

4   bullet, he writes "The JBoss and Tomcat

5   vulnerabilities are by far the most critical."

6           Do you see that?

7      A.    I see that, yes.

8      Q.    What are those?

9      A.    They are vulnerabilities identified by the

10   cybersecurity world.  They're basically just the

11   name of a -- name of a -- the name of a

12   vulnerability.

13          Like you've heard of -- and this is

14   just -- this is just an example -- like the -- the

15   WannaCry virus.  This is just a name that was given

16   a particular vulnerability.

17      Q.    Do you recall what the specifics of those

18   vulnerabilities were?

19      A.    Not off the top of my head, no.

20      Q.    Okay.  And then he indicates in the last

21   sentence of that first bullet, "Relying on

22   Cloudflare is just a band-aid that will not prevent

23   a skilled attacker from getting in."

24          Do you see that?

25      A.    I see that, yes.

Page 134

1          Q.   Cloudflare was a service that the

2      Secretary of State's office relied on; right?

3               MS. LaROSS:   Objection.

4               THE WITNESS:   It was one of the services,

5          yeah.

6      BY MR. CROSS:

7          Q.   Do you recall whether the JBoss and Tomcat

8      vulnerabilities were remedied as suggested here?

9          A.   Yes, they were -- they were remedied.

10         Q.   And what measures were taken to remedy

11     those vulnerabilities?

12         A.   To the best of my recollection, we ran

13     several updates that mitigated those -- those

14     vulnerabilities.

15         Q.   So you didn't simply rely on Cloudflare;

16     is that fair?

17         A.   That is correct.   I mean, there were --

18     they -- we had a layered -- a layered -- a layered

19     solution, meaning that there was no one product that

20     provided everything inclusively.   So Cloudflare was

21     just a -- one layer that we had.

22         Q.   Okay.   And then Mr. Iversen indicates that

23     "second in importance I would focus on all the

24     Windows patches and .NET patches."

25               Do you see that?

Page 135

1          A.    I see that, yes.

2          Q.    In your experience and training in

3     cybersecurity, why are Windows patches important for

4     cybersecurity?

5          A.    Well, for one, Windows patches are known

6     worldwide.  So if there's a vulnerability in the

7     Windows operating system that's not patched, it

8     means a potential vulnerability for that particular

9     system.

10         Q.    So it's important to implement the Windows

11    patches to remedy those vulnerabilities; is that --

12    do I understand that right?

13         A.    That is correct, yes.

14         Q.    Do you know whether the Windows patches

15    that were recommended here by Fortalice were

16    implemented?

17         A.    I would -- I would say yes.  Basically, we

18    had a -- we had -- there was a -- there was a -- a

19    schedule to patch system.  There was a patch

20    schedule.  So systems were patched on a routine

21    basis.

22         Q.    And you're talking about the systems that

23    you had responsibility for; right?

24              MS. LaROSS:  Objection.

25              THE WITNESS:  That is correct.

Page 136

1    BY MR. CROSS:

2         Q.   Okay.  Then it goes on.  "After that most

3    of the Java vulnerabilities are concentrated on

4    servers where the old version has not been removed."

5              Do you see that?

6         A.   I see that.

7         Q.   It goes on in the third sentence.  "The

8    simple solution is to just uninstall the old

9    version.  If Java is no longer required on a server,

10   remove it completely."

11             Do you see that?

12        A.   I see that, yes.

13        Q.   What measures, if any, were taken with

14   respect to the Java vulnerabilities here?

15        A.   Java -- Java was updated.  And, again,

16   the -- the patch -- the patch process is a living --

17   is -- is a living process, so it changes day to day,

18   week to week, month to month.  And Java -- Java --

19   Java was part of the routine patches that we

20   implemented.

21        Q.   Okay.  So then back to the most recent

22   email from Mr. Rainer in response to Mr. Iversen's

23   suggestions, Mr. Rainer writes "This is helpful, and

24   as I mentioned earlier I will be talking with PCC

25   tomorrow to escalate the progress of getting these

```
 1      items addressed more aggressively than their typical
 2      cycles."
 3              Do you see that?
 4      A.   Uh-huh.
 5      Q.   Is that a "yes"?
 6      A.   That is a yes, yes.  And --
 7      Q.   I was just going to ask, Mr. Oliver --
 8      A.   Go ahead.
 9      Q.   -- why was there a need for PCC to
10      escalate the progress of getting these items
11      addressed more aggressively than their typical
12      cycles at this time?
13      A.   Well, and I'm -- again, it's been a --
14      it's been awhile since I actually looked at the
15      diagram for the network, but PCC was separate from
16      the Secretary of State itself.  It provided services
17      to the Secretary of State, but it was not -- it was
18      not physically on the Secretary of State -- in the
19      Secretary of State itself, if I'm -- if I'm -- if
20      I'm -- if you understand what I'm saying.  It was --
21      it was a -- it was a different location.
22      Q.   Yes, I understand that.
23              What I'm trying to understand is
24      Mr. Rainer indicates that there's some sort of
25      typical cycle that PCC has for addressing
```

1    vulnerabilities like this.

2         A.    Uh-huh.

3         Q.    He's going to ask them to escalate the

4    progress of getting these items addressed more

5    aggressively than the typical cycle.

6              What was it about these vulnerabilities

7    that required them to be addressed more aggressively

8    than in the typical cycle?

9         A.    I don't -- I don't know at this point.  I

10   mean, it could have came in with the higher rating

11   or an urgent rating, which would have probably made

12   Mr. Rainer opt to reach out to them in a more

13   expedient manner because the -- the -- that

14   particular vulnerability may have had a urgent

15   rating.

16        Q.    Was PCC slow at addressing vulnerabilities

17   at times?  Was that part of the concern?

18        A.    At times.

19        Q.    Okay.

20              VIDEOGRAPHER:  I apologize for the

21              interruption, Counsel.  This is the

22              videographer.  We're nearing two hours since

23              our last break and I need to take a break to

24              change media units if you don't mind.

25              MR. CROSS:  Okay.  Let's do that.  It's a

```
 1          good time.
 2               VIDEOGRAPHER:  The time is 11:25 a.m.
 3          We're off the record.
 4               (Off the record.)
 5               VIDEOGRAPHER:  The time is 11:45.  We're
 6          back on the record.
 7     BY MR. CROSS:
 8          Q.   Mr. Oliver, are you familiar with a
 9     professor at the University of Michigan named Alex
10     Halderman?
11          A.   Alex who?
12          Q.   Halderman, H-A-L-D-E-R-M-A-N.
13          A.   Not right off my head, no.
14          Q.   What is your understanding of what this
15     particular litigation is about that we're here for
16     today?
17          A.   Actually, I don't really have a clear -- a
18     clear understanding.  The only -- my understanding
19     is that there's -- there's a certain group of
20     individuals that levied a lawsuit against the
21     Secretary of State and the State of Georgia in
22     reference to the legitimacy of voting machines.
23     That's what I kind of understand.
24          Q.   Do you understand that my firm and
25     Mr. Knapp's firm represent three voters -- Georgia
```

Page 140

1    voters that have brought constitutional challenges,

2    claims that allege that the voting machines that are

3    used in Georgia are not constitutional because they

4    are too unreliable to guarantee the right to vote?

5              Do you understand that?

6         A.   I -- I understand the statement, yes, but

7    I was not aware that that's how the lawsuit had

8    instituted, no.

9         Q.   And are you aware that in this same

10   litigation, the judge actually entered an injunction

11   in 2019, August of 2019, preventing the State from

12   using the old DRE system?

13        A.   That, I am aware of.  I had received --

14   I -- I saw that -- I saw that in public forum.  I

15   was -- I didn't have any, like, official information

16   on that, but based on public forum, I knew that the

17   judge had made that ruling, yes.

18        Q.   And were you aware that that ruling was

19   based, in part, on testimony from our expert,

20   Dr. Alex Halderman?

21        A.   No, I was not aware of that, no.

22        Q.   Are you aware that Dr. Halderman has

23   analyzed the voting equipment that's used in Georgia

24   today, specifically the BMD, the scanner, the

25   printer that's used, to assess the reliability and

Page 141

1      security of that equipment?

2           A.   No, I was not.

3                MS. LaROSS:  Object to form.

4                Go ahead, Mr. Oliver.

5                THE WITNESS:  I think I -- I think I

6           got -- I think I answered it already.

7      BY MR. CROSS:

8           Q.   So you weren't aware that he issued a

9      detailed report finding that the current system

10     suffers from many significant vulnerabilities?

11     That's not something you heard before?

12          A.   No.

13               MS. LaROSS:  [Inaudible.]

14               COURT REPORTER:  I'm sorry.  I can't hear

15          the objections.  You're cutting out.

16          Ms. LaRoss, did you have an objection?  I'm

17          sorry, Ms. LaRoss, I did not hear your

18          objection.

19               MS. LaROSS:  Sure.  Objection as to form.

20          Thank you.

21     BY MR. CROSS:

22          Q.   Do you understand that the current BMD

23     system uses QR codes to tally votes?

24          A.   The answer to that would be yes, but only

25     because I'm a voter in the state of Georgia.

Page 142

1         Q.   Did you -- are you aware that the current

2    election equipment can be hacked in a way that QR

3    codes can be changed so that they don't reflect what

4    the voter actually intended when they voted on the

5    BMD?

6              MS. LaROSS:  Objection as to form of the

7         question.

8              THE WITNESS:  No, I -- I -- I was not

9         aware that that particular vulnerability

10        existed.

11   BY MR. CROSS:

12        Q.   As the former security manager for the

13   Secretary of State's office, if you were still in

14   that role today and had responsibility for the

15   voting equipment, would you take measures to

16   eliminate that vulnerability?

17             MS. LaROSS:  I object as to form of the

18        question.

19             THE WITNESS:  And ask that question for me

20        again.  I'm trying to formulate the answer

21        here.  Could you -- could you repeat that for

22        me?

23   BY MR. CROSS:

24        Q.   Yeah.

25             If you were -- if you were still with the

Page 143

1      Secretary's office today as the security manager and

2      had responsibility for the election systems,

3      including the voting equipment, and you learned that

4      QR codes could be changed so that they did not

5      capture the selections voters intended when they

6      voted on the BMD, would you take measures to

7      eliminate that vulnerability?

8                  MS. LaROSS:  I object to the form of the

9            question.

10                 THE WITNESS:  And my answer would be kind

11           of in two parts.

12                 Having the responsibility would be one

13           thing.  Having the authority to actual --

14           actually take actions to mitigate such a

15           vulnerability is another thing.

16                 Given the fact -- given that you had both

17           the responsibility and the authority to -- to

18           do so, then my answer would be, yes, I would

19           recommend.  Because as the security manager,

20           you can -- you -- your job is to recommend;

21           it's up to the owners of the data to take any

22           kind of mitigation action.  But would I

23           recommend various -- investigate and recommend

24           any solutions if there were any?  Yes.

25

Page 144

1    BY MR. CROSS:

2         Q.   Are you aware that there are

3    vulnerabilities with the BMD system in Georgia that

4    would allow a hacker to change the human-readable

5    portion of the ballot so that that also did not

6    reflect the actual selections the voter intended?

7              MS. LaROSS:   Object to the form of the

8         question.

9              THE WITNESS:   Again, I am -- I am aware

10        based on public knowledge.   I am not aware from

11        any official capacity that I have served in.

12   BY MR. CROSS:

13        Q.   And based on your experience and training

14   in cybersecurity and as the former security manager

15   at the Secretary's office, would it be best

16   practices for the State to remedy that vulnerability

17   as well?

18             MS. LaROSS:   Object to the form of the

19        question.

20             THE WITNESS:   If it -- if -- if feasible,

21        yes, I would -- I would recommend that that --

22        that be remedied if -- if at all possible.

23             Again, that's without knowing all of the

24        circumstances surrounding such a vulnerability.

25

```
 1    BY MR. CROSS:
 2         Q.   Are you aware that there are
 3    vulnerabilities with Georgia's BMD system that would
 4    allow attackers to forge or manipulate the smart
 5    cards that poll workers, technicians, use with the
 6    equipment during elections?
 7              MS. LaROSS:  Object to the form of the
 8         question.
 9              THE WITNESS:  The answer would be no.
10         As -- in my role, in the authority that I had,
11         I didn't -- I didn't interact with the election
12         software staff systems in any -- in any kind of
13         major capacity.
14    BY MR. CROSS:
15         Q.   If that vulnerability -- if you were aware
16    that that vulnerability existed, based on your
17    experience and training in cybersecurity and as the
18    former security manager for the Secretary's office,
19    would you expect steps to be taken to remedy that
20    vulnerability as well?
21              MS. LaROSS:  I object to the form of the
22         question.
23              THE WITNESS:  Based on the scenario that
24         you depicted, yes, I would recommend that they
25         look at a solution to -- to remedy such a
```

1          vulnerability, yes.

2      BY MR. CROSS:

3          Q.   Would it surprise you to learn that the

4      Secretary of State's office has taken no measures to

5      mitigate, much less eliminate, any of the

6      vulnerabilities Dr. Halderman has found with the

7      existing system?

8              MS. LaROSS:   Object to the form of the

9          question.

10              THE WITNESS:   No.

11      BY MR. CROSS:

12          Q.   Why not?

13              MS. LaROSS:   Again, I object to the form

14          of the question to the extent it relies on the

15          predicate question.

16              THE WITNESS:   I guess why not would be

17          kind of -- I would -- I would base it -- I

18          would -- the answer would be based on -- based

19          on my -- my experience as security manager in

20          the role at the Secretary of State.

21      BY MR. CROSS:

22          Q.   Can you explain that?

23          A.   Well, it would be -- not -- not all

24      recommendations -- not all recommendations were

25      accepted.

Page 147

1       Q.    Cybersecurity recommendations, you mean?

2       A.    Right, right.  Correct.

3             MR. CROSS:  All right.  I tell you what.

4       Let's -- I'm getting close to finished.  Let's

5       jump off the record just for a few minutes and

6       let me confer with my team, if that's okay,

7       Mr. Oliver.

8             THE WITNESS:  Sure, that's fine with me.

9             MR. CROSS:  Okay.

10            VIDEOGRAPHER:  The time is 11:58.  We're

11      off the record.

12            (Off the record.)

13            VIDEOGRAPHER:  The time is 12:01.  We're

14      back on the record.

15            MR. CROSS:  Mr. Oliver, thank you for your

16      time today.  I don't have any further

17      questions.  I know it was an imposition on the

18      holiday and we feel really bad about that, but,

19      unfortunately, we just couldn't find another

20      time to do this, after having sought to do it

21      over the last several months.

22            So I appreciate you doing it, and

23      hopefully we got you out of here in time to

24      enjoy the rest of the holiday.

25            THE WITNESS:  Sure.  Thank you.

Page 148

1           MR. CROSS:  That's all we've got.  Thank

2       you so much, Mr. Oliver.

3           COURT REPORTER:  Ms. LaRoss, you were

4       muted.

5           VIDEOGRAPHER:  This concludes --

6           COURT REPORTER:  Wait a minute, Jonathan.

7       You were muted, Ms. LaRoss.  I didn't hear

8       anything you said.

9           MS. LaROSS:  I was just thanking

10      Mr. Oliver.  I've got to hit the unmute button.

11      I'm sorry about that.  In this day and age

12      where -- I've got it on too much or too little.

13      Anyway, but I was just thanking Mr. Oliver for

14      his time.  We very much appreciate it.

15          We also will read and sign, Lee Ann, and

16      would like a rough transcript when it's ready.

17          VIDEOGRAPHER:  This concludes the

18      videotaped deposition.  The time is 12:02 p.m.

19      Eastern.  We're off the record.

20          (Deposition concluded at 12:02 p.m.)

21          (Pursuant to Rule 30(e) of the Federal

22      Rules of Civil Procedure and/or O.C.G.A.

23      9-11-30(e), signature of the witness has been

24      reserved.)

25

Page 149

C E R T I F I C A T E

STATE OF GEORGIA:

COUNTY OF FULTON:


I hereby certify that the foregoing transcript was
taken down, as stated in the caption, and the
questions and answers thereto were reduced to
typewriting under my direction; that the foregoing
pages represent a true, complete, and correct
transcript of the evidence given upon said hearing,
and I further certify that I am not of kin or
counsel to the parties in the case; am not in the
regular employ of counsel for any of said parties;
nor am I in anywise interested in the result of said
case.




*Lee Ann Barnes*

LEE ANN BARNES, CCR B-1852, RPR, CRR, CRC

Page 150

1                     COURT REPORTER DISCLOSURE
2
3          Pursuant to Article 10.B. of the Rules and
           Regulations of the Board of Court Reporting of the
4          Judicial Council of Georgia which states: "Each
           court reporter shall tender a disclosure form at the
5          time of the taking of the deposition stating the
           arrangements made for the reporting services of the
6          certified court reporter, by the certified court
           reporter, the court reporter's employer, or the
7          referral source for the deposition, with any party
           to the litigation, counsel to the parties or other
8          entity. Such form shall be attached to the
           deposition transcript," I make the following
9          disclosure:
10
11         I am a Georgia Certified Court Reporter. I am here
           as a representative of Veritext Legal Solutions.
12         Veritext Legal Solutions was contacted to provide
           court reporting services for the deposition.
13         Veritext Legal Solutions will not be taking this
           deposition under any contract that is prohibited by
14         O.C.G.A. 9-11-28 (c).
15
16         Veritext Legal Solutions has no contract/agreement
           to provide reporting services with any party to the
17         case, any counsel in the case, or any reporter or
           reporting agency from whom a referral might have
18         been made to cover this deposition. Veritext Legal
           Solutions will charge its usual and customary rates
19         to all parties in the case, and a financial discount
           will not be given to any party to this litigation.
20
21
22         *Lee Ann Barnes*
23         LEE ANN BARNES, CCR B-1852B, RPR, CRR, CRC
24
25

Page 151

1    Diane LaRoss, Esquire

2    dlaross@taylorenglish.com

3                         January 24, 2022

4    RE:    Curling, Donna  v. Raffensperger, Brad

5          1/17/2022, James Oliver (#5036132)

6          The above-referenced transcript is available for

7    review.

8          Within the applicable timeframe, the witness should

9    read the testimony to verify its accuracy. If there are

10   any changes, the witness should note those with the

11   reason, on the attached Errata Sheet.

12         The witness should sign the Acknowledgment of

13   Deponent and Errata and return to the deposing attorney.

14   Copies should be sent to all counsel, and to Veritext at

15   cs-midatlantic@veritext.com

16

17    Return completed errata within 30 days from

18   receipt of testimony.

19     If the witness fails to do so within the time

20   allotted, the transcript may be used as if signed.

21

22                    Yours,

23                    Veritext Legal Solutions

24

25

Page 152

1    Curling, Donna  v. Raffensperger, Brad

2    James Oliver (#5036132)

3                    E R R A T A   S H E E T

4    PAGE_____ LINE_____ CHANGE_____

5    _____

6    REASON_____

7    PAGE_____ LINE_____ CHANGE_____

8    _____

9    REASON_____

10   PAGE_____ LINE_____ CHANGE_____

11   _____

12   REASON_____

13   PAGE_____ LINE_____ CHANGE_____

14   _____

15   REASON_____

16   PAGE_____ LINE_____ CHANGE_____

17   _____

18   REASON_____

19   PAGE_____ LINE_____ CHANGE_____

20   _____

21   REASON_____

22

23   _____   _____

24   James Oliver                              Date

25

Page 153

1    Curling, Donna  v. Raffensperger, Brad

2    James Oliver (#5036132)

3               ACKNOWLEDGEMENT OF DEPONENT

4        I, James Oliver, do hereby declare that I

5    have read the foregoing transcript, I have made any

6    corrections, additions, or changes I deemed necessary as

7    noted above to be appended hereto, and that the same is

8    a true, correct and complete transcript of the testimony

9    given by me.

10

11   _____    _____

12   James Oliver                      Date

13   *If notary is required

14                   SUBSCRIBED AND SWORN TO BEFORE ME THIS

15                   _____ DAY OF _____, 20____.

16

17

18                   _____

19                   NOTARY PUBLIC

20

21

22

23

24

25