Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
 2                     ATLANTA DIVISION
 3
 4
    Donna Curling, et al.,
 5
                   Plaintiffs,
 6                                    CIVIL ACTION FILE
             vs.
 7                                    NO. 1:17-cv-02989-AT
    Brad Raffensberger, et
 8  al.,
 9             Defendants.
    ~~~~~~~~~~~~~~~~~~~~~~~~~
10
11
12
               VIDEO 30(b)(6) DEPOSITION OF
13                  SECRETARY OF STATE
                        THROUGH
14             ROBERT GABRIEL STERLING
15
16               October 12, 2022
17                   9:26 a.m.
18
19
            Suite 3250, One Atlantic Center
20              1201 W. Peachtree Street
                    Atlanta, Georgia
21
22
23
24
             S. Julie Friedman, CCR-B-1476
25
```

Page 2

```
 1                APPEARANCES OF COUNSEL
 2   On behalf of the Curling Plaintiffs:
 3        MORRISON & FOERSTER LLP
          DAVID D. CROSS, ESQ.
 4        VERONICA ASCARRUNZ, ESQ. (Via Zoom)
          JENNA CONAWAY, ESQ. (Via Zoom)
 5        HANNAH ELSON, ESQ. (Via Zoom)
          CAROLINE MIDDLETON, ESQ. (Via Zoom)
 6        DONNA PRICE, ESQ. (Via Zoom)
          Suite 900
 7        2100 L Street, NW
          Washington, DC  20037
 8        202.887.8795
          dcross@mofo.com
 9   AND
          KREVOLIN & HORST LLC
10        ADAM M. SPARKS, ESQ.
          HALSEY KNAPP, ESQ.
11        Suite 3250, One Atlantic Center
          1201 W. Peachtree Street NW
12        Atlanta, Georgia  30309
          404.835.8067
13        404.888.9577 Fax
          sparks@khlawfirm.com
14
     On behalf of the Coalition for Good Governance
15        Plaintiffs:
16        BRUCE P. BROWN LAW LLC
          BRUCE PERRIN BROWN, ESQ.
17        MARILYN MARKS, ESQ. (Via Zoom)
          Suite 6
18        1123 Zonolite Road
          Atlanta, Georgia  30306
19        404.386.6856
          bbrown@brucepbrownlaw.com
20
21
22
23
24
25
```

```
 1            APPEARANCES OF COUNSEL (CONTINUED)
 2   On behalf of the State Defendants:
 3        TAYLOR ENGLISH DUMA LLP
          BRYAN TYSON, ESQ.
 4        DIANE F. LaROSS, ESQ. (Via Zoom)
          BRYAN F. JACOUTOT, ESQ. (Via Zoom)
 5        Suite 200
          1600 Parkwood Circle
 6        Atlanta, Georgia  30339
          678.336.7228
 7        dlaross@taylorenglish.com
     AND
 8        ROBBINS ALLOY BELINFANTE LITTLEFIELD LLC
          ALEXANDER DENTON, ESQ. (Via Zoom)
 9        ANNA EDMONDSON, ESQ. (Via Zoom)
          DANIELLE HERNANDEZ, ESQ. (Via Zoom)
10        CAREY A. MILLER, ESQ. (Via Zoom)
          JAVIER PICO-PRATS, ESQ. (Via Zoom)
11        VINCENT R. RUSSO, ESQ. (Via Zoom)
          500 14th Street NW
12        Atlanta, GA  30318
          678.701.9381
13        cmiller@robbinsfirm.com
14
     Also Present:
15        Duncan Buell
          Donna Curling
16        Susan Greenhalgh
          Joseph Oluwasegun
17        Kevin Skoglund
          Danielle Stucchi, Paralegal
18         Krevolin & Horst LLC
          Ernestine Thomas-Clark
19        Scott Bridwell, Videographer
20
21
22
23
24
25
```

Page 4

```
 1                   INDEX OF EXAMINATIONS
 2    WITNESS:
      Robert Gabriel Sterling
 3                                                   Page
 4     CROSS-EXAMINATION                               11
       By Mr. Cross
 5
       CROSS-EXAMINATION                              361
 6     By Mr. Brown
 7
                      INDEX TO EXHIBITS
 8
 9      Exhibit        Description          Page
10      Exhibit 1    10-10-22 PLAINTIFFS' SEVENTH      12
                     AMENDED NOTICE OF  DEPOSITION OF
11                   OFFICE OF THE SECRETARY OF STATE
12      Exhibit 2    9-28-21 Report of Investigation   28
                     by Blanchard, SEB2020-250,
13                   CONFIDENTIAL, SOS-INV000136-143
14      Exhibit 3    Photograph from YouTube Video of  39
                     Post-it with Password
15
        Exhibit 4    Series of Tweets Beginning with   46
16                   3:51 PM Tweet by Sterling
                     Responding to Adida's Tweet
17
        Exhibit 5    2/10 Transcript of Secretary      51
18                   Raffensperger Interview labeled
                     "APC Raffensperger 20122
19
        Exhibit 6    Still Photo from The Carter       62
20                   Center, Restoring Confidence in
                     American Elections Panel 3 (April
21                   29, 2022), YouTube (May 9, 2022),
                     with a Quote from Sterling
22
        Exhibit 7    E-mail Chain Ending with Tuesday, 77
23                   5-11-21 4:25 PM E-mail, from
                     Watson, to Jones, Subject: Re:
24                   Coffee County, ATTORNEYS EYES
                     ONLY, SOS-INV000007-8
25
```

Page 5

1                  INDEX TO EXHIBITS
2

    Exhibit          Description          Page
3

    Exhibit 8    8-2-22 Letter, from Ellis, to        138
4                 Reynolds, GBI, Re: Request for
                  Assistance in Investigation
5

    Exhibit 9    E-mail Chain Ending with Friday,     195
6                 4-1-22 1:19:51 PM E-mail, from
                  Germany, to Ellis, Subject: RE:
7                 Server, ATTORNEYS EYES ONLY,
                  SOS-INV000053-55
8

    Exhibit 10   E-mail Chain Ending with Monday,     209
9                 8-1-22 10:00:50 PM E-mail, from
                  Sterling, to Miller, et al.,
10                Subject: Re: Curling v.
                  Raffensperger; 1:17-CV-2989 -
11                STATUTORY ELECTRONIC SERVICE,
                  ATTORNEYS EYES ONLY,
12                SOS-INV0000087-92
13  Exhibit 11   E-mail Chain Ending with Monday,     219
                  4-25-22 2:39:37 PM E-mail, from
14                Germany, to ORR Administration,
                  et al., Subject: RE: Open Records
15                request, SOS-INV000048-50
16  Exhibit 12   Monday, 11-16-20 19:24 UTC           225
                  Message # 155, from Hampton, to
17                Voyles, Subject: ORR
18  Exhibit 13   E-mail Chain Ending with Monday,     233
                  8-1-22 10:05:21 PM E-mail, from
19                Germany, to Tyson, et al.,
                  Subject: FW: GASOS ORR #22-360,
20                SOS-INV000060-66
21  Exhibit 14   E-mail Chain Ending with Tuesday,    233
                  7-12-22 1:12:37 PM E-mail, from
22                Koth, to Ellis, Subject: FW: Open
                  Records request, SOS-INV000014-17
23

    Exhibit 15   4-25-22 3:50 PM Printout of Case     237
24                Sheet for SEB2020-250-Coffee
                  County Misc
25

INDEX TO EXHIBITS

| Exhibit | Description | Page |
|---------|-------------|------|
| Exhibit 16 | 34 Interior Stills Taken From Video from Camera 1 | 240 |
| Exhibit 17 | Still Shots from Video of Coffee County Election Board Office Beginning with 12-11-20 10:31:07.148 AM | 243 |
| Exhibit 18 | 2-26-21 6:05 PM Tweet by Juha, Re: Mike Lindell's Plane Flights | 262 |
| Exhibit 19 | Excel Spreadsheet - IP Addresses that have Downloaded CC Data, 08122022-000137-161 | 280 |
| Exhibit 20 | E-mail Chain Ending with 4-27-21 8:25:34 PM E-mail, from Maggio, to Federalattorney, Subject: FW: Coffee County Forensics FEDEX Request, 08122022-000100-102 | 285 |
| Exhibit 21 | Wednesday, Jul 27, 2022, 2:53 PM E-mail, from Brown, to Belinfante, et al., Subject: JSON Format Cast Vote Records on the Internet | 291 |
| Exhibit 22 | E-mail Chain Ending with Tuesday, August 17, 2021 4:38:20 PM E-mail, from Johnson, to McClain, Subject:Re: SullivanStrickler / Spalding County Board of Elections : Forensic Collection Agreement, ATTORNEYS EYES ONLY, SOS-INV000103-128 | 297 |
| Exhibit 23 | Thursday, 3-10-22 Virtual Videotaped 30(b)(6) Deposition of Sanford Merritt Beaver, Volume II, excerpted pp 418 - 421 & 436 | 307 |
| Exhibit 24 | 10-12-22 "Rolling Stone" Article by Glawe, "Pro-Trump Georgia Officials Plotted to Swipe Voting Data.  We Caught Them | 335 |

Page 7

1                       INDEX TO EXHIBITS
2
         Exhibit          Description          Page
3
      Exhibit 25    11-17-20 Official Election        407
4                   Bulletin, RE: Open Records
                    Requests -- Security Information
5                   Exempt
6     Exhibit 26    12-9-20 Press Release - Secretary  409
                    of State's Office Opens
7                   Investigation into Coffee
                    County's Handling of Recount
8
      Exhibit 27    1-4-21 4:21:48 AM E-mail, from     411
9                   Favorito, to Harding, et al.,
                    Subject: Final Ballot Inspection
10                  Plan, 10102022-000141
11    Exhibit 28    5-5-21 Letter, to The Honorable    414
                    Karen Fann, President, Arizona
12                  State Senate, from Karlan, Civil
                    Rights Division, DOJ
13
      Exhibit 29    5-6-21 Dominion Voting, Customer   416
14                  Notification: Maintaining Secure
                    Chain of Custody for Your
15                  Dominion Voting System,
                    Confidential,
16                  STATE-DEFENDANTS-00101937
17    Exhibit 30    5-27-22 Press Release - The MITRE  421
                    Corporation, an Independent
18                  Federal Lab, finds Georgia
                    Election System Secure
19
      Exhibit 31    July 2022 MITRE Document -         421
20                  Independent Technical Review:
                    Security Analysis of Georgia's
21                  ImageCast X Ballot Marking
                    Devices
22
23
24
25

Page 8

1                    INDEX TO EXHIBITS

2

     Exhibit          Description            Page

3

   Exhibit 32   E-mail Chain Ending with          432

4                 Wednesday, 8-18-21 12:49 PM

                  E-mail, from Evans, to Johnson,

5                 et al., Subject: RE: Spalding

                  County Equipment

6

7       (Original Exhibits 1 through 32 have been

     attached to the original transcript.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           THE VIDEOGRAPHER:  Good morning.  We're
2    going on the record at 9:26 a.m., November the
3    12th, 2 -- October the 12th, 2022.
4           Please note that the microphones are
5    sensitive and may pick up whispering and private
6    conversations.  Please mute your phones at this
7    time.
8           Audio and video recording will continue to
9    take place unless all parties agree to go off
10   the record.
11          This is Media Unit 1 of recorded
12   deposition of the Office of the Secretary of
13   State, taken by the Plaintiff -- by counsel for
14   the Plaintiff, In The Matter of Donna Curling,
15   et al. versus Brad Raffensperger, et al., filed
16   In United States District Court of the Northern
17   District of Georgia, Atlanta Division, Case No.
18   1:17-CV-2989-AT.  The location of the deposition
19   is Krevolin & Horst, LLC.
20          My name is Scott Bridwell, representing
21   Veritext Legal Solutions.  I am your
22   videographer.  The court reporter is Julie
23   Friedman from the firm Veritext Legal Solutions.
24          I'm not authorized to administer an oath.
25   I'm not related to any party in this action, nor

1      am I financially interested in the outcome.

2           If there are any objections to this

3      proceeding, please state them at the time of

4      your appearance.

5           Counsel, and all present, including

6      remotely, will now state their appearance and

7      affiliations for the record, beginning with the

8      noticing attorney.

9           MR. CROSS:  David Cross of Morrison &

10     Foerster on the behalf of Curling Plaintiffs.

11          MR. BROWN:  Bruce Brown on behalf of the

12     Coalition Plaintiffs.

13          MR. SPARKS:  Adam Sparks for the Curling

14     Plaintiffs.

15          MR. KNAPP:  Halsey Knapp on behalf of the

16     Curling Plaintiffs.

17          MR. TYSON:  Brian Tyson on behalf of the

18     Secretary of State and the State Election Board.

19          MR. CROSS:  I don't think we need to go

20     through everyone on the Zoom.

21          THE VIDEOGRAPHER:  We don't?

22          You all agree on that?

23          MR. TAYLOR:  I agree.  Yeah.

24          THE VIDEOGRAPHER:  Okay.  There we go.  So

25     we're not going to do the Zoom.

1           Will the court reporter please swear in

2      the witness.

3           ROBERT GABRIEL STERLING, having been first

4      duly sworn, was examined and testified as

5      follows:

6           THE VIDEOGRAPHER:  Counsel, you may

7      proceed.

8      CROSS-EXAMINATION

9      BY MR. CROSS:

10     Q.    Good morning, Mr. Sterling.

11     A.    Good morning, Mr. Cross.

12     Q.    So do you understand your testimony today

13  as a representative of the Office of the Secretary of

14  State for Georgia.

15     A.    That's my understanding.  Yes.

16     Q.    And you understand that means that you're

17  testifying to the knowledge the Secretary's Office

18  has on a particular topic?

19     A.    Yes.

20     Q.    Okay.  Let me go ahead and hand you the

21  first exhibit, which is Tab 2, the notice.

22          If you could, share that with everybody

23  else.

24     A.    Is it the same thing here?

25     Q.    Yeah.

Page 12

```
 1       A.    Okay.
 2       Q.    No problem.
 3             (Exhibit 1 was marked for identification.)
 4             MR. TYSON:  Thank you.
 5             THE VIDEOGRAPHER:  Exhibit 1?
 6             MR. CROSS:  Exhibit 1.
 7             THE COURT REPORTER:  Oh, no.
 8             MR. CROSS:  And --
 9             THE COURT REPORTER:  Give me a second,
10       please.
11             MR. CROSS:  Sure.
12             THE COURT REPORTER:  The late attendees.
13             MR. CROSS:  Do we need to go off the
14       record?
15             THE COURT REPORTER:  Yeah.  We can for a
16       second.  I'm so sorry.
17             MR. CROSS:  That's okay.
18             THE VIDEOGRAPHER:  We're going off the
19       record at 9:30.
20             (Recess from 9:30 to 9:31 a.m.)
21             THE VIDEOGRAPHER:  We're on the record at
22       9:31.
23       Q.    (By Mr. Cross)  Mr. Sterling, before we
24  look at Exhibit 1, just you understand you're under
25  oath?
```

Page 13

1          A.     Yes.  I just took it.

2          Q.     Yeah.  And is there any reason you cannot

3    give full and complete testimony today?

4          A.     Not that I'm aware of.

5          Q.     Okay.  And have you ever been convicted of

6    or charged with any crime?

7          A.     No.

8          Q.     Okay.  All right.  Take a look --

9          A.     Wait.  Do speeding tickets count?

10         Q.     No.

11         A.     Okay.

12         Q.     Those are not crimes.

13                Take a look at Exhibit 1, if you would,

14   and turn to Page A-4 where it says, "AMENDED TOPICS."

15         A.     Yes, sir.

16         Q.     And you'll see that there's a topic there,

17   No. 1; and it continues on to the top of the next

18   page.

19                And are you prepared to testify to the

20   knowledge of the Secretary's Office on that topic

21   today?

22         A.     Yes.

23         Q.     Okay.  Now what did you do to prepare for

24   your testimony today?

25         A.     Interviewed several individuals in the

1  office and -- or -- and people who also left the

2  office.  Pam Jones left the office.  Chris Harvey's

3  left the office.  Frances Watson has left the office,

4  but I did --  I did interview all of them.

5          The current director in this investigation

6  is our chief investigator, Sara Koth.  Josh --  Oh,

7  what's the last name?  Can't think of it.  One of our

8  other investigators who was the main person on the

9  ground.  Blanchard, that's the last name.

10          Let's see.  Blake.  Talked to Blake Evans.

11          Conferred with counsel.

12          Read over my former -- what do you call

13  it -- deposition.  I read through Chris Harvey's

14  deposition.

15          I reviewed other documents, including

16  things from a Channel 11 interview, the video from

17  The Carter Center.

18          Let's see who else did I interview with.

19  Ryan Germany in my office.  I might have said that

20  already.  I apologize.

21          And generally reviewed my own memory of

22  some of the stuff since this took place over the last

23  two years, and I was in a position to really be aware

24  of or be a part of the decision making process on

25  most of these -- the situation surrounding Coffee

Page 15

```
 1    County and any of the other potential items that

 2    might have been -- where access might have been

 3    improperly given to somebody or allegation of -- of

 4    that kind.

 5            And I probably spent -- I --  I couldn't

 6    even put a number to how many hours.  I think

 7    probably about three weeks' worth of time, depending

 8    on my own time, doing it and doing the interviews and

 9    doing research and re-reviewing the documentation.

10        Q.    Did you review any documents beyond your

11    prior deposition testimony and Mr. Harvey's

12    deposition testimony?

13        A.    Yes.

14        Q.    What other docs?

15        A.    Should I repeat the ones I already stated

16    or --

17        Q.    No.  The only thing I heard from documents

18    was those two --

19        A.    I also --

20        Q.    -- last --

21        A.    -- looked at the transcript of the Channel

22    11 interview.

23        Q.    Oh, the Channel 11.  Okay.

24        A.    I looked at the video or part of the video

25    from my thing at The Carter Center.
```

1      Q.    Okay.

2      A.    Let's see.  I reviewed e-mails from

3  different people in and around this.  I reviewed

4  other e-mails from the investigative side; e-mails,

5  some from discovery from this case and -- and others

6  as well.

7            I looked over the -- the videos from

8  Coffee County by Misty Hampton.  I looked at her

9  statement or declaration that she did not commit

10  voter fraud.

11           I mean, I've --  I'll try to list

12  everything I can remember right now, but some may be

13  triggered by some of the questions.

14           Let's see.  What else.  The adjudication

15  guide, I reviewed it.  I'm not going to say I read

16  all 80 pages of it, but I reviewed big parts of that,

17  and that's the Dominion adjudication guide.

18           The adjudication --  I'm sorry.  The

19  Dominion bulletin which everybody telling to keep

20  your stuff secure and why.

21           The CISA item about different potential

22  vulnerabilities.

23           Those are the main -- main things come to

24  mind right now.

25      Q.    Okay.  The Dominion bulletin about keeping

Page 17

```
 1   equipment secure, is that the one that went out in
 2   May 2021 regarding Cyber Ninjas?
 3        A.    I believe it was May 6th, and now that
 4   Cyber Ninjas was part of the impetus behind this.
 5             THE COURT REPORTER:  I'm sorry.  I'm
 6        sorry?  I'm sorry.
 7             MR. CROSS:  You've got to slow down.
 8             THE COURT REPORTER:  Let's have the
 9        question again.
10             THE WITNESS:  Okay.
11             THE COURT REPORTER:  And then a pause and
12        the answer --
13             THE WITNESS:  Okay.
14             THE COURT REPORTER:  -- please.
15        Q.    (By Mr. Cross)  The Dominion bulletin
16   regarding keeping equipment secure, was that the one
17   that went out on May 6th, 2021 that related, in part,
18   to Cyber Ninjas?
19        A.    Correct.
20        Q.    Okay.  You said you reviewed a statement
21   or declaration from Misty Hampton saying she did not
22   commit voter fraud.  Can you describe that for me.
23        A.    It was a very short statement, David.  I
24   believe.
25             THE WITNESS:  Should I hold up for a
```

1      second, court reporter, on this?

2              THE COURT REPORTER:  Okay.

3              THE WITNESS:  Miss Friedman, thank you.

4              THE COURT REPORTER:  Yes.

5              THE WITNESS:  Now I forgot where I was.

6      If somebody can read back the last section

7      before this.

8              THE COURT REPORTER:  No.  I can't.

9              THE WITNESS:  Okay.  Oh.

10     Q.    (By Mr. Cross)  My question --

11     A.    No, no.

12     Q.    -- was that -- that you reference a

13     statement or declaration that Miss Hampton signed

14     saying she did not commit voter fraud, and my

15     question was can you tell me what -- about that.

16     A.    It was --  I believe it was on her

17     letterhead.  It was dated January 7th, 2021, where

18     she stated that she would never, have never, and

19     would not consider committing voter fraud, something

20     along those --  It was a very declarative statement,

21     but it was only like two sentences, so that's what

22     that was.

23     Q.    And what was the date of that?

24     A.    I believe it was dated January 7th.  It

25     came into the -- the Secretary's Office's possession

1   at the end of January.  I want to say January 26th.

2       Q.    It was dated January 7, 2021?

3       A.    Correct.  And it came into the Secretary's

4   Office possession through Investigator Blanchard on,

5   I believe, January 26, 2021.

6           MR. TYSON:  And, David, now that I

7       understand what the document is, that is one of

8       the exhibits to the report of investigation that

9       would was held based on investigative privilege,

10      so just to clarify.  That's --  That's why you

11      don't know what that is and haven't seen it

12      before.

13          MR. CROSS:  Okay.  I mean, if he reviewed

14      it for his testimony and relied on it, we'd ask

15      for production of that.

16          MR. TYSON:  Well, let us take a look at

17      that.

18          MR. CROSS:  Okay.

19          MR. TYSON:  Maybe we can figure that out.

20      It's short so --

21          MR. CROSS:  Sure.  Thanks.

22      Q.    (By Mr. Cross)  Okay.  So that was --

23   That was a statement that was prepared with respect

24   to the original SEB 2020-250 investigation in Coffee

25   County?

Page 20

```
 1        A.     Yes.
 2        Q.     Okay.  Got it.  That was not a statement
 3   that concerned the breach allegations that had come
 4   to light later involving January 7th?
 5        A.     Correct.
 6        Q.     Okay.
 7        A.     It was ironically dated that date, but
 8   that was the date she signed it.  Now this came
 9   from --
10        Q.     Maybe she was busy that day.
11        A.     This came from the visit on December 10th,
12   I believe, of Miss Watson, Pam, and Josh, along with
13   two Dominion representatives, Scott and Tom Feehan.
14   Scott's last name escapes me right now.
15             And basically said they would ask her,
16   well, did you commit any fraud, because this was
17   related to her videotape where she talked about where
18   it could it be done; and she --  They requested that
19   she put that in writing essentially, and that's when
20   Josh --
21             She had it down there.  They were bugging,
22   pestering her about it; and she finally say I have it
23   here; and Josh was down there anyway.  And we picked
24   it up on that date.
25        Q.     Got it.  Okay.  I think you said you
```

Page 21

1   reviewed a -- the CISA advisory that came out in June

2   of this year?

3        A.    I believe that was the date.  Correct.

4        Q.    Okay.  And have you reviewed Dr.

5   Halderman's July 2021 report?

6        A.    I have.

7        Q.    And you --

8        A.    That's another document.  I apologize.

9   Yes.

10        Q.    When did you first review that?

11        A.    I first reviewed it this weekend.

12        Q.    Was it the redacted or the unredacted?

13        A.    Well, I saw no redactions, so I assume it

14   was the unredacted.

15        Q.    Got it.  Okay.  And are you familiar

16   with --  Well, I think you've actually talked about

17   it publicly.  But are you familiar with the report

18   that MITRE prepared?

19        A.    Yes.  That's another one that I read as

20   well.  Sorry.

21        Q.    And just so we're talking about the same

22   thing, the MITRE report is one that Dominion

23   commissioned MITRE to do in relation to Dr.

24   Halderman's July 2021 report?

25        A.    Correct.

Page 22

1       Q.    When did you first read that?

2       A.    I would say probably a couple months ago.

3   I couldn't give you an exact time.

4       Q.    Okay.  Did you review a draft first or --

5   or a final form?

6       A.    Final form.  We weren't part of that

7   process.  That was completely between MITRE and

8   Dominion.

9       Q.    When did the -- and -- and --  Well, I'll

10  come back to that.

11            When did the Secretary's Office first

12  learn that Dominion had shared the Halderman report

13  with MITRE?

14            MR. TYSON:  David, I'm -- I'm just going

15        to pose a scope objection here.  I'm not sure.

16        I guess are we trying to get into how we're

17        related to topics on the knowledge of the

18        Secretary's Office between Dominion and MITRE?

19            MR. CROSS:  I'm not going to spend much

20        time on it.  He said he reviewed it for this

21        deposition, so I'm just --

22            MR. TYSON:  Yeah.

23            MR. CROSS:  -- following up.

24            THE WITNESS:  It would have been -- I'm

25        spit balling here -- probably sometime in the

Page 23

1        early summer of late spring of 2022.

2        Q.    (By Mr. Cross)   Okay.

3        A.    But I'm -- I would have to --  I'm not

4    exactly positive on when I first learned about the

5    final version of that.   Am I --

6             We learned they were doing it, I think;

7    and then I saw the final version, like I said,

8    sometime a couple months ago, so there was a scope of

9    window there when they were --  I knew they were

10   working on it, so obviously, they had to have given

11   the Halderman report over at some point.

12       Q.    Understood.   Okay.   And that timing in

13   your mind is sometime around early summer?

14       A.    I think.   Yeah.

15       Q.    Okay.   Did you interview or speak with any

16   SEB members for the deposition today?

17       A.    No.

18       Q.    What about any Coffee County employees?

19       A.    No.

20       Q.    Anyone on the Board of Elections there?

21       A.    No.

22       Q.    Any of their counsel?

23       A.    No.

24             Ryan Germany generally talks --  Since he

25   is our attorney, he talks to their attorney on stuff.

Page 24

1       Q.      Okay.

2       A.      Bless you.

3               MR. KNAPP:  Excuse me.  Thank you.

4       Q.      (By Mr. Cross)  Did you speak with Jim

5    Persinger, the State's consultant?

6       A.      I have spoken with Jim Persinger about

7    this, but only on one specific topic surrounding the

8    Poll Pads.

9       Q.      Okay.  So what steps, if any, did you take

10   to educate yourself on the Secretary's Office's

11   knowledge about any analysis done of the voting

12   equipment and devices that were taken from Coffee

13   County?

14      A.      The Persinger side, also, I was aware of

15   the steps that we took when we first learned about it

16   after the information withheld from us for nearly a

17   year that there was a potential this happened.

18              When it was brought up in our previous

19   deposition in late February of '22, went and

20   discussed it with Ryan Germany; and we then said,

21   okay, we already have the EMS in our possession

22   because of the issues surrounding the previous

23   password issue.

24              Now that being said, it goes into a

25   longer --  This is a long soap opera kind of thing in

Page 25

1   Coffee County, obviously; and I -- it --  I don't

2   know how deep you want to go into all these things.

3              But I mean, we started with that.  We

4   called Dominion.  Can you get into this particular

5   service?  I said it's already in our possession, and

6   we don't know the password.  It's difficult to do

7   that in some ways.

8              So they tried it, and then one of their

9   employees came down, and on April --  I want to say

10  April 11th, but it was sometime the week of April

11  11th on another item and came to --

12             And they tried to get into it working

13  their team remotely from Denver, and then they tried

14  another round of that.  I believe they tried imaging

15  it in March.  This was March into April and into May

16  trying, but they were trying to get into it, and they

17  were unsuccessful in doing so.

18             Then we decided this -- this path isn't

19  working, and the rationale behind that was we

20  understood already that some of the players involved

21  in Coffee County were not necessarily the most honest

22  in terms of telling us the truth about things.

23             Misty Hampton kind of showed already she

24  had --  She kind of held some disdain for the system.

25  Was not a fan of the office.

1          And from my interviews with Frances, Josh,

2    and Pam and Chris Harvey, there had always been

3    problems around her.  She was very dismissive of any

4    issues around this situation.  Said she wasn't

5    trained on things, when, in fact, we have records

6    that she likely had been trained.  She had options

7    and abilities to get trained, 'cause we looked up and

8    found on items on Firefly, which our communications

9    system we use with our counties.

10          So we knew it would be difficult and -- to

11    just go interview people, so it was decided

12    internally, mainly with Ryan Germany saying, look, we

13    know these people don't necessarily tell the truth.

14    We know, you know, Scott Hall, who was -- who -- who

15    was the one Miss Marks made the recording of, you

16    know, he signed an affidavit and I believe that

17    Sidney Powell or the Lin Wood's suit, one of the two.

18    They all kind of run together at the time.

19          THE COURT REPORTER:  All right.  Who?

20      Sidney Powell or --

21          THE WITNESS:  Lin Wood, L-I-N W-O-O-D,

22      lawsuit.

23          So we decided we needed to get binary

24      things we could prove, so when we questioned

25      them, we could hold them to account and know

Page 27

1    they weren't just -- have to follow up later on.

2    That was the intent of trying to get into the

3    server first.

4          So, finally, we decided that we have

5    Persinger, who is there as an expert; and he was

6    able to get into it; and that's when we

7    discovered --

8          He took possession of it from our Center

9    for Elections from Michael Barnes.

10          By the way, I did interview Michael Barnes

11    as well and Chris Bellew, both from our Center

12    for Elections.

13          That I think it was right before July 4th

14    we took possession of it; and then not long

15    after that, we discovered that somebody had

16    connected the device on that January 7th date, I

17    believe.

18          And at that point, we knew, yes, there was

19    some validity to this that we need to very much

20    track down; and that started the process, too,

21    of us understanding, okay, this may be a

22    discussion that needs to be had with the GBI.

23          So there was some beginning discussions

24    really starting from June when it first looked

25    like maybe there was something potentially here,

1      but for sure once we knew Persinger said, yes,

2      somebody plugged something in that wasn't

3      appropriate.

4           So those -- those are the main --  Those

5      are some of the things we did to try to discover

6      what was done on that front.

7      Q.    (By Mr. Cross)  Is it important for the

8   Secretary's Office to provide correct information to

9   voters regarding elections and election security?

10     A.    It's important to give them the best

11  information they have at any given time.  Yes.

12     Q.    And --  And to make sure that that

13  information is correct, right?

14     A.    There --  You always want to have the

15  most -- best information you have and have that be

16  correct, but that sometimes you have limited

17  information.  And you can sometimes make judgments,

18  and you can be incorrect, or you can be correct and

19  to correct it later.  That's just human nature; and

20  the way of the world, unfortunately.

21     Q.    All right.  Let me hand you Exhibit 2, and

22  this is Tab 1-A.

23           (Exhibit 2 was marked for identification.)

24           THE WITNESS:  Can I give -- put one to the

25      side now?  Are we done with this?

1       Q.      (By Mr. Cross)  Sure.

2       A.      Okay.

3               MR. CROSS:  I'll give those to Bruce.

4               THE WITNESS:  Okay.

5       Q.      (By Mr. Cross)  And if you look at Exhibit

6   2, do you recognize this as an investigative --

7   excuse me -- an investigative report for the SEB Case

8   2020, dash, 250?

9       A.      Yes.

10      Q.      And is this a document you've seen before?

11      A.      Yes.

12      Q.      And the report is dated September 28th,

13  2021, right?

14      A.      Yes.

15      Q.      And there are three different complaints

16  that are identified in here.  Do you see that?

17      A.      Yes.

18      Q.      The first is a complaint from the Coffee

19  County Board of Elections that they were unable to

20  repeatedly duplicate credible election results for

21  the November of 2020 election.

22              Do you see that?

23      A.      Yes.

24      Q.      And that complaint proved to be

25  inaccurate, right?

1      A.     Well, they couldn't do it, because they --

2    Misty had inappropriately batched her ballots, and

3    our investigators went down and showed that, so they

4    did a hand count to show that the election night

5    reporting results that were reported did match the

6    actual ballots.

7      Q.     Oh.

8      A.     So they couldn't do it, so that's not

9    incorrect to say that they -- they -- they were

10   incorrect in saying we can't certify because of this

11   issue.

12     Q.     Yeah.  And then the second complaint

13   involved a YouTube video that showed the Coffee

14   County elections supervisor Misty Martin discussing

15   the ways in which the election software could be

16   manipulated.  Do you see that?

17     A.     Yes.

18     Q.     And one of the things that came to light

19   was that in that video, there was a password for the

20   Dominion system that was apparent, right?

21     A.     Yes.  In fact, it was our Investigator

22   Blanchard who noticed in his reviewing the first

23   time.  Zoomed in.  Saw that it was the password.

24             THE COURT REPORTER:  And I'm sorry.

25             THE WITNESS:  I'm trying.

1          THE COURT REPORTER:  I've got to keep up

2     with you.

3          THE WITNESS:  I am doing my best, but I

4     will continue to try to slow down.

5          Do you want me to repeat the last one

6     again?

7          It was our Investigator Josh Blanchard who

8     discovered when reviewing the video that the

9     password was the password, in fact.  It was on a

10    small yellow Post-it note at the bottom of her

11    main EMS screen, and that's Election Management

12    System.

13    Q.    (By Mr. Cross)  And what was that password

14 for, what specific equipment?

15    A.    I believe just to sign into that EMS

16 itself.

17    Q.    The EMS server?

18    A.    Correct.

19    Q.    Okay.

20    A.    And further from the investigation itself,

21 it was discovered they only use one password for

22 their county, when the rule and operating practice is

23 each individual should have their own password to log

24 in.

25    Q.    To the EMS server?

1        A.     Correct.

2        Q.     Okay.  And then if you look at Complaint 3

3    in the top the next page, this was a complaint from a

4    voter concerning an absentee ballot, right?

5        A.     Correct.

6        Q.     So at the time of the investigative report

7    that was prepared on September 28, 2021, do I

8    understand correctly that this investigation did not

9    involve allegations of unauthorized access to the

10   system?

11       A.     Correct.  It was --  It was spurred by two

12   items, both the video and their claim that they could

13   not certify.

14       Q.     Got it.  So --

15       A.     And then, obviously, this third one, which

16   was a specific voter's complaint.

17       Q.     So this was a -- a -- a different set of

18   facts that was being investigated from what came to

19   light later regarding the unauthorized access on

20   January 7th; is that fair?

21       A.     Correct.  But that there was an issue with

22   this that comes to light, and that Coffee County

23   like --  So it's kind of a soap opera.

24              Because of the password situation, which

25   when Frances and the other investigators --  Our

Page 33

```
 1    chief investigator, Frances Watson, and the other
 2    investigators went to Coffee County.  She, at that
 3    point, is my understanding, still had not changed the
 4    password; and they basically directed her to do so,
 5    so they did that.
 6              I believe, December 14th was when the --
 7    it was changed in the system.
 8              Now going further out from there, Misty
 9    resigned in lieu of being fired -- I believe it was
10    for falsifying hourly pay wage items -- her and her
11    daughter and one other person, I believe.
12              The new director came in, James Barnes, so
13    I want to say that was March or April of '21.
14              Now there were no elections going on after
15    that, so he had no reason to touch the Election
16    Management System.  Come May of -- of 2021, he tries
17    to get in using the password that he thought he had.
18    He couldn't do it.  This is late May.
19              So he calls up to the Center for
20    Elections.
21         Q.   Can I just ask you one quick question.
22         A.   Yes.
23         Q.   The password that he was using, that --
24    was that the password that had been entered on
25    December 14 at the direction of the Secretary's
```

Page 34

1    Office?

2         A.    Apparently not --

3         Q.    Was that an issue?

4         A.    -- because the password he had was

5    ineffectively.

6              So I'll get --  I'm going to come around

7    to answer what you probably are trying to ask.

8              So he couldn't get in, and that was late

9    May.  He calls the Center for Elections and talks to,

10   I believe, either Chris Bellew or Michael Barnes

11   directly.  I think Michael Barnes on this phone call.

12   He gives them the password we have on file in our

13   little system there.  It's the same one.

14             He tries it.  It doesn't work.

15             So they said okay.  We cannot get into the

16   system right now.  So our standard operating

17   procedure would be if you're going to work on a

18   system, an EMS, you would take an EMS with you there

19   in case you can't get in to switch it out.

20             So Chris Bellew drove down there on

21   June --  I want to say it was 8th.  And went in.

22   Attempted to get in with the password they had and

23   the password that James Barnes had, and they couldn't

24   get in, so it was not the password that had been

25   changed on December 14th.

Page 35

1          Now we know that password was used,

2     because they ran the January 5th runoff, and it ran

3     properly.  They reported.  Everything went as was

4     expected.

5          So Misty and the collections of election

6     workers there had that password and ran the election.

7     She claimed after the fact that she didn't have the

8     password, and it hadn't been changed, and she

9     couldn't even do that.  I think at one point she

10    might have made a claim the State can do it; but, of

11    course, since the EMS is not connected to the

12    Internet, we wouldn't have the ability to do that

13    anyway.

14         So that's where this -- this came in.  The

15    password was changed.  It wasn't passed on to the new

16    employees.  It was a claim that there was no change,

17    which, obviously, through investigation, we

18    discovered there was and that they'd used the system

19    properly in the January 5th runoff election.  So it

20    was changed out on that January 8th date, and I

21    believe even the report --

22         Q.    June.

23         A.    Sorry.  June.  Pardon me.  Thank you.

24    June 8th.  Thanks for correcting me.

25              It was sometime on --  I believe it was

1    like 4:00 o'clock in the afternoon, 'cause we can

2    see.  They can --  They have a -- a record when they

3    first set it up, and there's paperwork showing that.

4              I didn't --  I didn't review it, but Chris

5    Bellew walked me through it in my interview with him,

6    and Chris Bellew is like the number two person

7    essentially at the Center for Elections.  And he

8    physically was the one who went to Coffee County for

9    that purpose.

10        Q.    Okay.  I don't think we've received any

11   records or paperwork regarding swapping out the EMS

12   server other than the logic and accuracy report.

13        A.    I think that's --  Well, I believe that's

14   what it is.

15        Q.    Oh, that's what it is.  Okay.

16        A.    Yes.

17              MR. TYSON:  Yeah.

18              THE WITNESS:  And it shows the time and

19        date when they did that.

20        Q.    (By Mr. Cross)  Got it.  Okay.  Okay.  So

21   just so I understand, are you saying that Miss

22   Hampton changed the password on the EMS server on

23   December 14, which the Secretary's Office had

24   directed her to do, because it was --  The original

25   password was -- was publicly released in the video,

Page 37

1   but then that password was not shared with the

2   incoming Elections Director James Barnes?

3         A.     Yes.

4               It's my understanding, too, that Chris

5   Harvey had told Miss Hampton to change the password

6   by phone call after the video was released; and,

7   apparently, she had not done that, so that is the

8   reason that the -- that EMS was taken back.

9               There was no indication that there was any

10  authorized access.  This was completely around

11  something we were aware of already, which was the

12  video, which, you know, showed the password.

13              Her reticence to do so.  She finally did

14  so, and then did not pass it on to -- to the new

15  incoming employees.

16              And I could not tell you why she said

17  that, and I could not tell you why she chose to say

18  she never changed the password.

19              Now there's one thing we can't show.  We

20  don't know if it was her herself who changed the

21  password, her -- another employee in the office,

22  because they didn't follow the rules of having

23  individualized passwords to do -- to do items for the

24  log files.

25        Q.     When did Miss Hampton say she did change

1   the password in December of 2020?

2       A.   I don't believe she ever did say she did

3   it.

4       Q.   No.  When did she say she did not?

5       A.   She said I never changed the password.

6   The password wasn't changed after she was let go when

7   we tried to call her.  Or not we.

8           Coffee County is my understanding tried to

9   call her.  Say what's the password?

10           Well, I never changed the password.  It

11   didn't happen.

12           So that would have been probably around

13   the time Mr. Barnes attempted to get into it.  That's

14   James Barnes, who was the new elections director for

15   Coffee County.

16       Q.   So someone from Coffee County contacted

17   Miss Hampton in the spring of 2021 and asked her for

18   the password, and she said she never changed it?

19       A.   Something along those lines, or it was

20   never changed, or I'm not aware of it.

21           I don't know her exact verbiage; but

22   basically, I don't have it is what she actually said.

23       Q.   Okay.

24       A.   But we know somebody in the office had to

25   have had it, because they ran the January 5th runoff.

Page 39

1        Q.    Right.  But how do you know what Miss
2   Hampton meant was that she didn't change it after the
3   January election as opposed to before?
4        A.    Well, no.  We were asking her we need the
5   password to get in.
6              I don't have a password to get in
7   essentially is what she was saying.
8              I --  I couldn't speak to dates or times
9   or anything else on those -- on those fronts, and I
10  think we only saw one change of password in the log
11  file, and that was at -- on December 14th.
12       Q.    Okay.  Let me hand you Exhibit 3.
13       A.    Are we done with this one?  Can I put it
14  away?
15       Q.    No.  Hang on to that.  We're going to come
16  back to it.
17             (Exhibit 3 was marked for identification.)
18       Q.    (By Mr. Cross)  So Exhibit 3 is Tab 5.
19       A.    Uh-huh.
20       Q.    Do you recognize Exhibit 3 as the password
21  on the Post-it note on the YouTube video we've been
22  talking about?
23       A.    Yes, sir.
24       Q.    Okay.  And so that --  The concern the
25  Secretary's Office had in December of 2020 was that

1    this was the password to the EMS server and that that

2    was released publicly, and so it needed to be

3    changed; is that right?

4         A.    Correct.

5         Q.    Okay.  Would it surprise you to learn that

6    that actually is not and has never been the password

7    to the EMS server in Coffee County?

8         A.    Yes.

9         Q.    Would it surprise you to learn that the

10   EMS server password isn't even that style of

11   password, the 16-digit alphanumeric?

12        A.    I don't know if it would surprise me or

13   not, but I'm curious as to what that would be a

14   password for then since it was on the EMS, but --

15        Q.    Are you --

16        A.    -- I see.

17        Q.    -- familiar with the election project

18   files that go out to the counties --

19        A.    Yes.

20        Q.    -- when there are elections?

21              THE COURT REPORTER:  And --

22              MR. CROSS:  Sorry.

23              THE WITNESS:  Sorry.

24        Q.    (By Mr. Cross)  Yeah.  Just get that

25   again.  Are you familiar with the election project

1   files that go out to the counties before elections?

2       A.    Yes.

3       Q.    And are you aware that those election

4   project files use 16 digit alphanumerics just like

5   the one in Exhibit 3?

6       A.    Yes.

7       Q.    Do you know what the basis was that the

8   Secretary's Office concluded that the password in

9   Exhibit 3 was for the EMS server as opposed to an

10  election -- election project file?

11      A.    The investigator looked at it.  Chris

12  called her about it.  She didn't deny it, so I assume

13  they thought it was correct.

14      Q.    But no one from the Secretary's Office

15  ever tried to enter that or have anyone in Coffee

16  County enter that password in the EMS server at the

17  time to see if it actually accessed the server?

18      A.    Not that I'm aware of.  Again, this goes

19  back to in real life Misty Hampton was a difficult

20  person to deal with.  She could have easily said,

21  guys, this is just this other thing.

22           But, also, she shouldn't have it out

23  there.  Let's be fair.

24           But, secondarily, she never said that.

25  When she was confronted with it by them, she never

Page 42

1   said that's what this is so --

2       Q.   And for that testimony, you're relying on

3   interviews with the investigators and Mr. Blanchard?

4       A.   Mr. Blanchard is an investigator.  Pam

5   Jones, an investigator; and then Frances Watson was

6   our chief investigator who went down there, because

7   we were taking this seriously to say you can't do

8   these things.

9            And instead of saying this wasn't the

10  password for that, she just said, well, we didn't --

11  There's nothing wrong here.  I don't understand why

12  you're here.  She was very combative.

13           The county attorney was also in there, and

14  I talked to him.

15           But from talking to the investigator that

16  said he was much more interested to hear, well, how

17  do we move forward --

18      Q.   That's right.

19      A.   -- how do we move forward in -- in a way

20  just to get us straight basically.

21           And Miss Hampton was not cooperative.  She

22  was combative.  Again, every investigator kind of

23  agreed on her demeanor and approach to the situation.

24           So, again, if we have a person who was

25  acting in good faith on this front, they would have

Page 43

1   said, no, guys.  This is something else.  Also,

2   something I shouldn't have publicly available,

3   because it does provide something you shouldn't have

4   out in the public, and so that's --  That's where we

5   stood at that point.

6          Q.    All right.  Take a look back at Exhibit 2,

7   if you would, please, the investigative report from

8   2021.

9          A.    What page?

10         Q.    Flip to Page 4, please.  And here, do you

11  see the heading in Complaint 2 --

12         A.    Yes.

13         Q.    -- which involves the YouTube video?

14         A.    Yes, sir.

15         Q.    Up at top of Page 5, if you look at the

16  end of the first paragraph, there's a reference to

17  Supervisor Jones said.

18               Do you see that?

19         A.    Yes.

20         Q.    That's Pam Jones?

21         A.    Yes.  Well, yes.  'Cause that was her

22  position.  Yes.

23         Q.    All right.  And so here it indicates that

24  Pam Jones said to Miss Hampton and whoever's in this

25  meeting that the video was misleading, referring to

1  the YouTube video, and asked why she failed to

2  provide instruction about the intended use of the

3  adjudication process.  Miss Martin did not have a

4  response.

5            Do you see that?

6      A.    Yes.  Uh-huh.

7      Q.    And then if you come into the middle of

8  the next paragraph, four lines down, do you see where

9  it says, "Supervisor Jones said..."?

10           You see that?

11     A.    Oh, yes.

12           I'm sorry.  I thought you were going to

13  read the rest of that.  I apologize.

14     Q.    Yeah.  I just want to make sure you're

15  with me.

16     A.    Yes.

17     Q.    It states, "Supervisor Jones said with

18  everything that is happening in our state and

19  country, she," meaning Miss Hampton, "should be

20  providing the citizens of the county with information

21  to instill confidence, not misleading information."

22           Do you see that?

23     A.    Yes.

24     Q.    Do you agree with that?

25     A.    Yes.

Page 45

1      Q.    The Secretary's Office is not always

2  provided correct information about the voting system

3  breach in Coffee County; is that fair?

4      A.    It depends on the time, but at the initial

5  phases of this, obviously.  I mean, even if you put

6  this in more context, Mr. Blanchard was down there in

7  January, our investigator; and Misty Hampton did not

8  say anything untoward or weird or odd or anything had

9  happened.

10         So yeah.  I --  I would say that's a

11  correct statement.  Now we obviously have more

12  information now.

13      Q.    Right.  But even just recently, the

14  Secretary's Office has disseminated information that

15  did not accurately characterize what happened in

16  Coffee County, right?

17      A.    To what are you referring?

18      Q.    Well, you personally did.

19      A.    I wouldn't call that recently.

20         The Carter Center, is that what you're

21  referring to?

22      Q.    No.

23      A.    Okay.

24      Q.    Let me hand you Exhibit 4.

25  ///

1          (Exhibit 4 was marked for identification.)

2          THE WITNESS:  Okay.

3          Oh, I'm sorry.  Give him.  Pass them down.

4     Q.    (By Mr. Cross)  This is Tab 1-B.

5          So this is --  Exhibit 4 is a Tweet that

6     you sent on October 1st of this year.

7          Do you see that?

8     A.    Yes.

9     Q.    And in here you write thank you Ben Adida

10    for being a rational expert in elections.  And he's

11    right.  The fear mongers need to stop.  The

12    statements undermine Americans' faith in elections,

13    the same outcome as Trump's stolen election claims.

14    Often they say the same thing and reinforce each

15    other.

16         Do you see that?

17    A.    Yes, sir.

18    Q.    So you tweeted out the thread that Mr.

19    Adida had posted, right?

20    A.    Yes, sir.

21    Q.    Did you actually read that before you put

22    it out before you re-tweeted it?

23    A.    I read his -- most of them.  I -- back and

24    forth for what while, but I didn't --  I don't know

25    the timing of when I tweeted versus when the replies

Page 47

1    might have been put on there, so I couldn't say.

2         Q.    Well, did you see that in his statement in

3    the -- the tweet that you re-tweeted, he stated that

4    the breach, the unauthorized access in Coffee County

5    lasted only a few hours; and that's why there's not

6    cause for concern?

7         A.    No.  I didn't see that part.

8         Q.    But that's not an accurate statement.

9    Right, sir?

10        A.    That is correct.

11        Q.    In fact, we know from the surveillance

12   video is that the unauthorized access lasted over a

13   period of -- of many days and many hours throughout

14   the month involving a variety of different people?

15        A.    Yes.  He also said on that particular item

16   that we have to operate as if they already have all

17   the source code already.  I believe it's the same

18   thread, but could have been a different thread, so

19   the length of it has less to do with, I think, from

20   my point of view and from --  I'm not going to speak

21   for Mr. Adida here.

22             But I don't believe that's misleading.

23   No.

24        Q.    To --  To tell the voters publicly that --

25   that the unauthorized access in Coffee County lasted

Page 48

1   only a few hours as opposed to -- five, six -- eight

2   days?

3        A.    Again, I don't find it to be --  That's

4   when Mr. Adida did, and I didn't necessarily see that

5   particular thing so --

6             But my point is the underlying part of

7   that is that he also said we have to act as if they

8   already have all this information already, so it

9   doesn't matter if it's eight hours or eight days in

10  terms of that situation.

11       Q.    But --  But even that is directly at odds

12  with the position that the Secretary's Office has

13  taken before this breach came to light, right?

14       A.    I'm not sure what you mean.

15       Q.    Do you recall -- if I can --  I can pull

16  it up if we need to.

17            Do you recall that Secretary Raffensperger

18  did an interview where he said that Dr. Halderman's

19  findings had no value in the real world, because he

20  got access to the equipment and the software in a way

21  that would never happen.

22            But now you're saying Mr. Adida says we

23  should just assume that.

24       A.    No.   Two different things about this, Mr.

25  Cross; and I don't want to verbally spar with you.

1           What he's talking about is in a real

2   election environment, which is the main way people

3   have access, the issue we have in all these

4   situations is if you have a bad actor, as is the case

5   of Coffee County, regardless of the system you use,

6   you can have negative outcomes and --

7           And all these breaches have to be taken

8   into account for the possibility of them, and we all

9   have been the lookout for bad actors who are not --

10  who are breaking the law essentially.  I mean, this

11  is not my decision to make; but from all appearances,

12  it seems like Miss Hampton, the people who went to

13  Coffee County violated Georgia law.

14          Now if they violated Georgia law, if there

15  was a hand-marked system, they could have done an --

16  an EMS on that.  If they violated Georgia law and had

17  access to punch cards, same kind of thing.

18  Regardless of the system, this particular attack

19  variable is negative for -- in any of them.

20          So, again, how I point out that this is

21  not misleading; and in the real world, it would be

22  difficult to do things that would be

23  self-replicating, pushing things out.

24          And the MITRE report, which you referenced

25  earlier, points out that most of these things would

1  be hard to be do at scale, most of the potential

2  vulnerabilities; and every system has

3  vulnerabilities.

4          When we are evaluating systems, we have a

5  few things we have to start out of the gate with.

6  The law in Georgia, HB 316, passed in 2019, stated

7  you must use a valid marking device as your universal

8  system in Georgia.  That is a state law.

9  Policymakers passed that.  The governor signed it.

10  There is no leeway on the execution of that law for

11  the Secretary of State's Office.  That is the law

12  so --

13      Q.    Mr. --

14      A.    -- we --

15      Q.    -- Sterling, I apologize.  We are --  We

16  are far afield from the question that I asked you.

17      A.    I --

18      Q.    I --

19      A.    -- don't --

20      Q.    I need you to answer the questions that

21  I'm asking.

22      A.    I believe I am answering the questions

23  you're asking, but you're asking me to basically say

24  in this one specific instance.  I'm saying you have

25  to look broader than this one specific instance, but

Page 51

```
 1    I'll leave it at that for now.
 2         Q.    Okay.  Let me hand you --
 3               MR. CROSS:  I think this is Exhibit 6?
 4               THE VIDEOGRAPHER:  Five.
 5               MR. CROSS:  Five.
 6               THE VIDEOGRAPHER:  Five.
 7               (Exhibit 5 was marked for identification.)
 8         Q.    (By Mr. Cross)  And this is an interview
 9    that I referenced a moment ago that Secretary
10    Raffensperger gave, I think, in February of this
11    year, if I remember the -- have the date right, if
12    you look at --
13         A.    Was it --
14         Q.    -- the top.
15         A.    -- this year, or was it --  It says,
16    "2/10."  But it doesn't have a year on it.
17         Q.    Right.  It could not have been 2/10 of the
18    prior year, because it talks about Dr. Halderman and
19    his report --
20         A.    Okay.
21         Q.    -- which came out in July of 2021.
22         A.    Thank you.
23         Q.    So turn to Page 13, if you would.
24         A.    (Witness complies with request of
25    counsel.)
```

1      Q.    If you look down towards the bottom, do

2  you see Mark Niesse with the AJC asked a question 39

3  minutes into the interview?

4      A.    39 minutes, 43 seconds --

5      Q.    Right.

6      A.    -- yes.

7      Q.    And then Secretary Raffensperger responds

8  by saying you're talking about the Halderman report.

9  And Halderman was given actually the security code,

10 so he had total access to the equipment; and he had

11 it for 12 weeks.  And he comes back with his points.

12 He said, well, if you have that kind of access, that

13 you can change things.

14            And Secretary says, well, Doug, yeah.

15 Just like the guy that's got to come in and work on

16 your server, your security system for your house, he

17 can have all the access codes.  Yeah.  I guess he can

18 come back maybe at 2:00 a.m.

19            The question I was asking you was --

20            Well, let me ask you one more foundational

21 question.  Are you aware that the Secretary of

22 State's Chief Information Officer, Merritt Beaver,

23 testified in his deposition as a 30(b)(6) witness, as

24 a corporate rep, that it's critically important to

25 protect the Dominion software because releasing it

1    provides a roadmap -- that was his word --

2        A.    Yeah.

3        Q.    -- a roadmap for hacking the system?

4        A.    Yes.

5        Q.    Do you disagree with that?

6        A.    No.

7        Q.    Okay.  So my question to you is:

8    You're --  You're citing that Adida is saying, well,

9    we should just assume that bad actors have not just

10   the software, but the source code, whereas Secretary

11   Raffensperger is saying no, no.  We don't even have

12   to worry about Dr. Halderman's findings because he

13   had access to the software.  How do you reconcile

14   those positions?

15               MR. TYSON:  I'll object to form.

16               THE WITNESS:  Two different ways.  Our

17         office has to run an entire election system, and

18         that's what Secretary Raffensperger is referring

19         to in terms of the overall system would still be

20         safe given these -- this level of access he had.

21       Q.    (By Mr. Cross)  Uh-huh.

22       A.    Coffee County itself had a breach.  Part

23   of the security of our system overall is there's 159

24   different jurisdictions.

25               And, again, I'm not a technical expert;

Page 54

1   but I can give the basics of how -- of my

2   understanding of it and -- and the scheme of all the

3   things we have to look at while we feel like this

4   system is still in the position to accurately take

5   people's votes and count them and accurately give the

6   results of the voters of Georgia.

7           Knowing that there's 159 different

8   counties, thousands of different ballot styles,

9   different passwords and codes for each county, giving

10  a roadmap makes it a -- there's a -- you have to take

11  into account, yes, all the time; which is why in our

12  contract, we were in a position to always be looking

13  to improve on our software and security around that

14  software.

15          We even had discussions with Dominion this

16  year to upgrade to 513.  We looked at doing a pilot.

17  We ran out of time to do that.

18          So we're investigating putting 517 on,

19  because this is going to be always an evolving

20  system.  We will learn every time we have an

21  election.  We will learn every time we do those

22  things.

23          Mr. Halderman's findings can be helpful

24  directions on some of these things in terms of things

25  that could be exploited, but nearly every system has

1    things that can be exploited obviously, and that's

2    true of every system, be it hand-marked, be it punch

3    card, be it -- be it a BMD.

4            We're following the law and following the

5    rules in that state, everything into account.  We've

6    got to take into account can this function in a

7    county.  Can a highly resourced county do this well.

8    Can a low-resource, low-education county do this well

9    with the volunteers and people that they have.  Can

10   we do training on all this.  And like I said,

11   security or processes and policies in place; and they

12   have to be followed.

13           And the issue in Coffee County

14   specifically is that they -- from --

15           The GBI's investigating, obviously, 'cause

16   it's now a criminal matter; and this will be left to

17   the judicial system and the criminal justice system

18   to decide what violations there were and why.  They

19   violated those procedures and policies, and that

20   could happen under any system.

21           Now it does provide some level; but, also,

22   I believe there's a version of it, of a system that

23   was released out of Michigan, potentially in Arizona

24   after Cyber Ninjas; and, again, all these things can

25   evolve; and I believe 517 will address many of the

1   items that were pointed out in Mr. Halderman's

2   report.

3            I guess part of the issue that I have and

4   part of the issue that the Secretary has is the

5   combative nature of the way these things are released

6   even; and instead of, yes, we went through the system

7   process.  Not arguing that point.  But there's ways

8   to do it that are constructive versus destructive,

9   and I think the way through parts of the way this

10  lawsuit have gone, it became underpinnings for

11  President Trump's own memos to seize machines.

12  It's --  All people involved have to act as

13  responsibly as they can, given their roles and the

14  information that they have.

15           Secretary Raffensperger's main point is to

16  do many of the things that Mr. Halderman points out,

17  you have to have physical access to the machines

18  themselves, not just machines for a period of time.

19  Those machines have been removed from Coffee County.

20           Now I think from the Secretary's point of

21  view and the Secretary's Office point of view is they

22  were not removed because we actually believe that

23  anybody put malware on there or that they did

24  anything like that.  It was to take the discussion

25  point off the table where people were undermining

 1   these people's confidence in the overall security,

 2   the safety of the system.  Now that is why that

 3   stuff, those items were removed.

 4          We had had a plan, and I was obviously the

 5   last one who wanted to do it.  Because I said if we

 6   give into the argument, then you're basically

 7   undermining every system in America that has a

 8   computer attached to it somewhere, which is the wrong

 9   thing to do in -- in our -- in our environment.

10          The EAC has certified this system just

11   like every other system that's used just about except

12   for I know there's -- there's some counties and

13   jurisdictions across America that don't use certified

14   systems, and that's okay.  That's their choice.

15          Policymakers make decisions.  We execute

16   those polices to the best of our abilities with the

17   resources that we have and the information we have.

18          What he's saying is the overall system in

19   Georgia is not -- it's --

20          Is it slightly more risk?  Yes.  I believe

21   it probably is.  But in the scheme of everything else

22   we have, it would be a bigger risk to try to change

23   to something else at this point.  I mean, I'm not --

24   We are not putting our head in the sand saying, oh,

25   gosh.  Nothing to see here.

Page 58

 1              But we've had so many claims, so many

 2      things that ended up not being real, I mean.

 3              And having seen Halderman's reports, yes.

 4      If you going to have that kind of access, many of the

 5      things he had in there like -- again, I don't want to

 6      get into the details of it like I saw.  I was looking

 7      through it, and he --

 8              THE COURT REPORTER:  I'm sorry.  But

 9          you're doing it again.

10              THE WITNESS:  I don't want to get into the

11          details of it; but like you saw a printer with

12          the back off the printer.  In most election

13          environments, that's going to get noticed; and

14          that's really what the Secretary is talking

15          about is examples like that.

16              And if you have an insider, yes.  Guess

17          what, you're going to have those things.

18              There's certain things now that we've

19          gotten past in Halderman's report.  Dominion is

20          not the sole creator of ballots now.  They

21          haven't been since the 2021 runoff in January of

22          2021.  It's been the Center for Elections with a

23          director and, number two, two ballot builders

24          and two contract ballot builders.  I mean,

25          they're the ones who do this now, so it's

1    separate system to a degree than what was even

2    there that Mr. Halderman was looking at.

3         We are always going to take steps to

4    increase training, do different things.  Like I

5    said, we're moving to 517.  We have an intention

6    to probably attempt to start doing that in

7    January, if possible.

8         So we're not saying nothing happened here,

9    obviously, because something did; and it was

10   terrible; and I --  I'm not going to say it

11   should put people under the jail, but that's my

12   personal belief, but we will let the criminal

13   justice system decide the outcome for that.

14        And one of the good outcomes from this is

15   now Misty Hampton has become a cautionary tale

16   to other elections directors to say you should

17   always be sacrosanct in how you deal with this

18   equipment, 'cause your life can be a living hell

19   afterwards if you are not or if you are being a

20   bad actor.

21   Q.   (By Mr. Cross)  All right.  Mr. Sterling,

22   we have a lot to cover; and if we have to continue

23   tomorrow, we will.  I --  I need you to be responsive

24   to the question.  Okay?

25             You keep --  There's a lot in there, and

Page 60

```
 1   we're going to go through a lot of that.
 2        A.    Let me ask a favor real quick.  Can we
 3   take a quick break so I can use the restroom, get
 4   some more water before you get into your next
 5   section.
 6        Q.    Do you mind if I ask one question --
 7        A.    If you're going to expect me to answer
 8   it --
 9              Go ahead.  Go ahead.  That's fine.
10        Q.    Well, if you need to take a break right
11   now, I just have one --
12        A.    No.  It's --  It's --
13        Q.    -- quick question.
14        A.    -- one question.  That's fine.
15        Q.    Okay.
16        A.    Yeah.
17        Q.    You --  You mentioned that MITRE report.
18        A.    Uh-huh.
19        Q.    I believe you said you read it, right?
20        A.    Uh-huh.
21        Q.    Yes?
22        A.    Yes.
23        Q.    And are you aware that MITRE makes clear
24   that all of its findings, every single finding it
25   reached is premised on a very specific assumption.
```

Page 61

1    MITRE's assessment of the researcher's proposed

2    attacks, referring by Dr. Halderman --

3         A.    Uh-huh.

4         Q.    -- assumes strict and effective controlled

5    access to the many election hardware and software.

6    Were you aware of that?

7         A.    Yes.

8         Q.    Okay.  Let's take a break.

9         A.    And -- and I'm going to follow -- expound

10   on that.  The attacks --  To get to a machine, you

11   have to access to that specific machine in most of --

12   of the things that are outlined in Mr. Halderman, and

13   just because you get to one machine does not mean

14   that you suddenly have the ability to affect other

15   machines in other jurisdictions with different pass

16   codes, different ballot styles, and so forth.

17              So it is specific to that.  Yes.  But that

18   does not apply to the entire statewide system.

19              MR. CROSS:  We'll follow up on that.

20        Let's take a break.

21              THE VIDEOGRAPHER:  We're going off the

22        record at 10:19.

23              (Recess from 10:19 a.m. to 10:31 a.m.)

24              THE VIDEOGRAPHER:  We are on the record at

25        10:31.

1      Q.   (By Mr. Cross)  All right.  Let me hand

2  you --

3          What are we, Exhibit 7?

4          THE VIDEOGRAPHER:  Six.

5          MR. CROSS:  Six.

6          (Exhibit 6 was marked for identification.)

7      Q.   (By Mr. Cross)  All right.  I'll hand you

8  Exhibit 6, and this is Tab 1-C.

9          Do you recognize Exhibit 6 as a screen

10  shot from a -- the -- I don't know if it's a panel or

11  speech that you did for The Carter Center in April of

12  this year?

13      A.   It was a panel at The Carter Center.  Yes.

14      Q.   Okay.  And we can --  I think we have the

15  video if you need it, but we just thought it would be

16  easier and faster.  We -- we --

17          Below is an excerpt of what you said.  In

18  this particular point about 36 minutes in, you said

19  so we're still dealing with that here, and we still

20  have to prove negatives in all these cases.

21          MR. SPARKS:  They cannot hear us.

22      Q.   (By Mr. Cross)  It's similar

23  across-the-board.

24          THE VIDEOGRAPHER:  Well, did you mute the

25      sound?

Page 63

```
 1              THE WITNESS:  No.
 2              THE COURT REPORTER:  Oh, geez.  I did.
 3        I'm so sorry.  Okay.
 4              THE WITNESS:  Wasn't me.
 5        Q.    (By Mr. Cross)  Okay.
 6              MR. KNAPP:  That's a familiar tune.
 7              MR. BROWN:  You want to start over?
 8              MR. CROSS:  Sure.
 9              THE VIDEOGRAPHER:  Can you repeat that
10        whole deal.
11              MR. CROSS:  I think so.
12        Q.    (By Mr. Cross)  So in this -- on --  On
13   this panel that you served on, on April 29th of 2022,
14   you said, "So we're still dealing with that here, and
15   we still have to prove negatives in all these cases.
16   It's similar across the board.  But like we had
17   claims... even recently there was people saying:  'We
18   went to Coffee County.  We imaged everything.'
19   There's no evidence of any of that.  It didn't
20   happen."
21              Do you see that?
22        A.    Yes.
23        Q.    How did the Secretary's Office reach the
24   conclusion as of April of this year that the breach
25   of the voting system in Coffee County did not happen?
```

1           MR. TYSON:  And I'll object to form.  It

2      was --

3           THE WITNESS:  At that point, everything we

4      saw pointed to the normal misinformation,

5      disinformation.  I mean, having Scott Hall

6      involved, having Miss Marks be involved, since

7      we didn't find either of them to be honest,

8      appropriate, trustworthy on this particular

9      front, because they both attack our office all

10     the time.  It was --

11          Then if you continue after this, it goes

12     we had the same kind in Ware County, which

13     turned out to be nothing.

14          So it was very similar kind of claims

15     especially around this going back to that same

16     timeline, and our office also was under the

17     impression in a general way that if somebody had

18     done that, if you'd seen the behaviors of the

19     people involved like the Cyber Ninjas and the

20     Trump team and Sidney Powells and the Lin Woods,

21     if they had gotten access, normally that the

22     modus operandi had been to wave a big red flag.

23     We got this.  We're in here.  We're doing those

24     things.

25          If you go back to the real time, the

1       former chairman of overstock.com is essentially

2       doing a running blog on all their attempts to

3       get into things; and they said we attempted to

4       get into Georgia; and we failed.

5               So this seemed like something that could

6       be related to the Ware County or the Coffee

7       County thing; and at this point, we had not been

8       able to get into that server, so we didn't have

9       any real evidence other than a claim from Scott

10      Hall that was withheld from us for nearly a year

11      by Miss Marks.  For whatever purpose, I'm not --

12      I won't speak to that.

13              And if we had had it in real time,

14      relative real time with people who care about

15      election security would normally have given it

16      to authorities, but I think even -- I'm sure --

17              It's my understanding from the attorneys

18      that even Miss Marks didn't believe this claim

19      originally, and I know that she had been going

20      back and forth on e-mails with people in Coffee

21      County.  We discovered this after the fact,

22      obviously.

23      Q.    (By Mr. Cross)  Mr. Sterling, again --

24      A.    Yes.

25      Q.    -- we're way far afield of the question.

1          Let me --  Let me just bring you back to

2     my question.

3          A.    I --  I'm telling you the answer to the

4     question, which is we had all the indications that it

5     looked like every other false claim; and this was

6     March.

7               Now we were still investigating, and I

8     should have put that caveat there, but I felt firm

9     enough to go like this probably didn't happen.

10    And -- and nearly every person --

11         Q.    Well, you didn't say probably.

12         A.    Okay.  You're right.  I just --  I

13    literally just said I shouldn't have been certain

14    when I said that.  I was wrong; and I've said this

15    publicly already, that I was wrong on this.

16         Q.    Okay.  So my question to you is what

17    investigation, if any, had been done by the

18    Secretary's Office or at its direction that -- that

19    led you to the point where you felt comfortable

20    saying the breach did not happen?

21         A.    Again, I'm going to repeat myself and what

22    I just --

23         Q.    I know.

24         A.    -- said, and --

25         Q.    And is it --

Page 67

1     A.     -- what I said was --

2     Q.     Is it what you just said?

3     A.     It's not just what I just said, but I'm

4  going to add to.  I'm going to try to expound on it,

5  'cause you cut me off.

6     Q.     'Cause you're going way beyond the

7  questions, Mr. Sterling.

8     A.     I don't believe I am.

9            MR. TYSON:  David, you're asking very

10        broad questions.  I think you're getting broad

11        answers.  If you want to ask a more tailored

12        question, I think --

13            MR. BROWN:  That's not --

14            MR. TYSON:  -- that can probably help with

15        this so --

16            MR. BROWN:  I object.  That's not fair.

17        In his response to a question about what he knew

18        in April --

19            MR. TYSON:  Uh-huh.

20            MR. BROWN:  -- he started talking about

21        Miss Marks' e-mails, which he discovered last

22        week.

23            THE WITNESS:  Which I just said that, too.

24            MR. BROWN:  But that has nothing to do

25        with your -- with the question, and we're going

1          to --  I know where you're mind going on this.

2               THE WITNESS:  Uh-huh.

3               MR. BROWN:  But it's not going to answer

4          the question asked.

5               THE WITNESS:  Okay.

6               MR. BROWN:  And we're going to be here for

7          days if this continues, and you're not going to

8          get your story out.

9               THE WITNESS:  Okay.  Well, here's the

10         thing --

11              MR. BROWN:  So --  So you did not know

12         anything about Miss Marks's e-mails when you

13         said this at The Carter Center.

14              THE WITNESS:  No.

15              MR. BROWN:  And so talking about it in

16         response to a question --

17              MR. TYSON:  Bruce --

18              MR. BROWN:  -- of why you said this --

19              MR. TYSON:  Bruce --

20              MR. BROWN:  -- is not appropriate.

21         I'm objecting.

22              MR. TYSON:  I think you made --

23              MR. BROWN:  Okay.

24              MR. TYSON:  -- your point.

25              MR. BROWN:  All right.

Page 69

1          MR. TYSON:  I think you made your point,

2      and we should start back at the question and

3      get --

4          MR. BROWN:  Yes.

5          MR. TYSON:  -- the answer.

6          MR. BROWN:  Sorry.

7      Q.   (By Mr. Cross)  Let's just be clear.  The

8  question is:  What investigation, if any, had been

9  done by the Secretary's Office or at its direction as

10 of the time that you said publicly in April of 2022

11 that the breach we now know happened of the voting

12 system in Coffee County, that it did not happen?

13     A.   At that point, we had attempted to get

14 into the server.  We had only a statement from --

15 what do you call it -- a statement from Scott Hall

16 and a snippet of a phone call that we'd eventually

17 gotten ahold of the entire thing by then, and this

18 was 90 seconds of an overall phone call.

19          We also had the previous investigation,

20 where none of this had come up.

21          At this point our office was also aware --

22 or had asked.  The question had been asked.  Did

23 anybody -- and this goes back to --

24          You go back to the e-mails from May of

25 '21.

Page 70

1      Q.    That's after what we're talking about

2    here, sir.

3      A.    No.  It's not.

4            MR. BROWN:  No.  '21.

5            THE WITNESS:  This is --  This is April of

6      twenty --

7      Q.    (By Mr. Cross)  Oh --

8      A.    -- one.

9      Q.    -- I'm sorry.  You said '21.

10     A.    Yes.

11     Q.    I --

12     A.    Yes.

13     Q.    -- apologize.

14     A.    Yes.

15     Q.    Go ahead.

16     A.    So if you go to the e-mails from our

17   investigators from April of '20 -- May -- sorry --

18   May of '21 -- you threw me off on the April thing --

19   where Josh had discussed with James Blanchard, who

20   had gone to the employees and the board members and

21   said --

22     Q.    Sorry.

23     A.    -- that they --

24     Q.    You got the names wrong.

25     A.    No, sir.

Page 71

1      Q.    James --

2      A.    James.

3      Q.    -- Barnes --

4      A.    Barnes.

5      Q.    -- discussed --

6      A.    Sorry.

7      Q.    That's good.

8      A.    B's and J's.

9      Q.    Go ahead.

10     A.    James Barnes had discussed with Josh
Blanchard that he had gone to ask every employee and
every board member if anybody had seen anybody come
to work on these things, if somebody from Cyber
Ninjas or anything else; and everybody had said no.

15           They said at that time, too, they were
going in to look into -- that he was going to go to
the IT department -- this is Mr. Barnes -- go to the
IT department to see if he could get Misty's old
e-mails to see if there was any -- any correspondence
with them, and they never came back to us after that.

21           And at that point, we had been left that
there was nothing to investigate.  Nothing had
happened here.

24           As I said, this was a long period of time
on these things; and in the public, people have

Page 72

1    conflated several of these items together, so those

2    are the things we absolute --

3              We knew we couldn't get in the server yet.

4    We knew that everybody there had already been asked

5    about this who you would normally interview anyway.

6              Misty had never brought it up when any of

7    our investigators were there, so there was -- so

8    there was no real --

9              And, also, in real time, overstock.com guy

10   was just sort of like the font all attempts to breach

11   as sent from the Trump world.  Was saying we couldn't

12   get into Georgia.

13             If you go back to the overstock.com thing

14   in July, I think is when he said something.  It

15   was --  It was the summer of '21, he had put out.

16   Basically said, we tried to get into Georgia.  We

17   couldn't, and maybe he was talking about another

18   area, but that's with all sort of conflated at the

19   same time.

20             I remember in my gut at the time.  I said

21   he's probably referring to Ware County, because that

22   was one claim we had had on those things.

23        Q.   So let's break that down a little bit.

24   You --  You said that there was no evidence of any

25   potential unauthorized access in Coffee County as of

Page 73

1    April of this year other than the snippet of a call

2    between Mr. Hall and Miss Marks.

3              But that's not true, is it, sir?

4         A.    I don't believe the business card's

5    evidence of breach.

6         Q.    But, well, let's look at it.

7         A.    But we investigated that.

8         Q.    Whoa, whoa.

9         A.    Sorry.  No.  Hold on.

10        Q.    Because Frances Watson and Chris Harvey

11   fundamentally disagreed with you.  So did James

12   Barnes.  Right.

13             Are you aware of that?

14        A.    David, if you're going to frame a question

15   that way --  And I don't want to argue.  I want to be

16   able to answer.

17             My point was they looked into it, and they

18   found nothing to investigate as they interviewed

19   everybody and said that, yes, they think it was

20   something concerning.  They all agree it's something

21   concerning.

22             They looked into it, and a business card

23   by itself doesn't do that.

24             If you look at the exhibits, they -- they

25   had James Barnes go ask every person --  Did anybody

Page 74

1   see this?

2            No.

3            Are you aware of anything along these

4   lines?

5            No.

6            Where do you go at that point on those

7   fronts?

8       Q.   Well, that's a great question, Mr.

9   Sterling.  Did --

10      A.   Oh, one of -- one of --

11      Q.   You were dealing --

12      A.   -- the things --

13      Q.   Well, let me answer your question.

14      A.   Go ahead.

15      Q.   You --  You were dealing with a county

16  that you had already found was unreliable where you

17  had an open investigation, a rogue county that

18  included members of the Coffee County Election Board

19  like Eric Chaney, right?

20      A.   Yes.

21      Q.   Okay.  So the Secretary's Office conducted

22  an investigation in May of 2021 relying, as I

23  understand it, largely, if not entirely on feedback

24  from a county where it already knew that members of

25  the Coffee County Election Board that were still

Page 75

1    there were not reliable people.  That's how you

2    reached the conclusion that this didn't happen was

3    you -- you asked the County, and the County that you

4    already said you couldn't trust.

5         A.    I didn't say --

6         Q.    And they said we didn't do it.

7         A.    Misty was the one we said we couldn't

8    definitely trust at all, because she had been

9    misleading already, obviously.

10             The secondary part of this, too, if I

11   remember correctly, it was discussed -- and this is

12   one of those things where it's not within a report;

13   this just kind of came up -- that Mr. Barnes was

14   going to try to pull the security tapes.

15   Unfortunately, this is where a left hand and a right

16   hand didn't seem to know which -- what each other

17   were doing.

18             He went to ask for the tapes around that

19   period of time.  They were no longer in the security

20   system on that side.  Unbeknownst to him, as I

21   understand it, Misty Hampton had done an ORR for

22   those tapes, I guess, to try to prove her innocence

23   on the question of the hourly timing of her --  I

24   don't know.  I can't -- as to why she did a ORR at

25   that period of time.  But they existed in another

1   system that Mr. Blanchard -- sorry -- that Mr.

2   Barnes was unaware of, so we knew --

3           Steps had been taken, and we discussed

4   that.  We had no reason to believe Mr. Barnes was

5   unreliable, 'cause he was new; and the county

6   attorney, like we said, had seemed to want to be

7   cooperative to get to that point as well.

8           So Misty, from the point of the

9   Secretary's Office, seemed to be the problem child

10  more than anything else; and she was sort of leading

11  the --  We had no reason at that point to have any

12  issues around potentially the board, 'cause she's

13  going to be leaving the board when she did that

14  videotape; and they were all, hmm, yes.  We get it,

15  but there was no reason to think that they were going

16  to mislead on those fronts.  Everybody --

17      Q.    Didn't you --  Didn't you know that the

18  video that was put up on YouTube was actually

19  authorized by the board?

20           Eric Chaney is there in the video.

21      A.    Yes.  But my point is:  In a normal

22  situation, you don't assume that every single person

23  is not going to tell the truth.  I mean --

24      Q.    Except it --

25      A.    -- that'd be a conspiracy that's a little

1  out of the norm from what we see in most of our

2  investigations, in most situations.

3             And no doubt having all the information we

4  have now versus when we have it then, we would have

5  acted differently probably; but that's the situation

6  we had at the time.

7             So it looked, had every hallmark of

8  misinformation, disinformation.  Had every hallmark

9  of every other claim.

10            So that was where --  That was the

11 information at the time; and I should have said

12 there's always a possibility, just like I normally

13 caveat things; but I was --  In my brain at that time

14 I was pretty sure this is another pile of garbage the

15 same way most of these other claims were piles of

16 garbage.  Most of the Trump claims -- let's all be

17 fair -- were piles of garage.

18      Q.    All right.  Let me hand you the next

19 exhibit.  It's Tab 58.

20      A.    Thanks.  I didn't hand it out.  Sorry.

21            THE COURT REPORTER:  Exhibit 7.

22            (Exhibit 7 was marked for identification.)

23

24

25

Page 78



Page 79



```
1
2
3
4
5
6
7
8
9
10
11
```

12      Q.    Okay.  The Secretary's Office is aware

13   that every county in this -- that every county

14   election office in the state has video surveillance,

15   right?

16          Let me --  Let me ask a better question.

17   You were aware that this county elections office has

18   video surveillance, right?

19      A.    Yes.

20      Q.    Okay.  Why didn't you ask for that?

21   Wouldn't that be step one?

22      A.    I believe I just explained to you that

23   James Barnes went to their --  As I understand it was

24   explained to us --  And this is verbal.  There's no

25   unfortunate --  There's no e-mail about this.

Page 81

1              He went to them and said, well, we did --
2      That's all been deleted by now.
3              He was unaware that Misty Hampton had done
4      an ORR.  Because like I said, the left hand and right
5      hand didn't know what they were doing.
6              So even if we had gone to ask them, we
7      would have gone through James Barnes, who would have
8      gone to the County and perhaps gone to the county
9      attorney; but that's a hypothetical at this point,
10     because he said it doesn't exist.
11     Q.    Wait.  But you guys are the -- are --
12     are --
13             You're the Secretary's Office.  You have
14     law enforcement authority to conduct an investigation
15     into election security breaches, right?
16     A.    Potential ones, yes.
17     Q.    Okay.  Why in the world would you rely on
18     James Barnes, who was brand new to the office,
19     instead of sending your investigator yourself to find
20     out whether that surveillance video existed?
21             Wouldn't that be the normal course of a --
22     of a -- of a sound investigation?
23     A.    If the person who --
24             MR. TYSON:  Object to form.
25             THE WITNESS:  If the person who reported

Page 82

1         it is dealing with their own internal people and
2         says the stuff you need doesn't exist, no.
3         Normally, you would not send somebody at that
4         point.  No.  That doesn't make any sense.
5                  We're going to not take your -- not --
6         You're new to this.  You reported this.  Now we
7         think you're going to try to cover it up, and
8         we're going to go deeper into it?
9         Q.    No, no.  I'm not suggesting that.  I --
10   I'm --  I'm asking a very different question.
11             James Barnes is brand new to the office at
12   this point.  He's been there about five to six weeks,
13   right?
14        A.    Correct.
15        Q.    Okay.  Instead of relying on someone brand
16   new to the office, no background there whatsoever,
17   why not send your investigator down to speak with the
18   members of the election board with people like Tracie
19   Vickers and others who -- who have at lot more
20   history and a lot more background on what might have
21   happened?
22        A.    Because the gentleman who reported it
23   says, I've looked.  I'm asking this.  Nobody's seen
24   anything.  We have no evidence.  We've asked for
25   videotapes.  They don't exist.

1          At that point what else are they going to

2     do, if those are the point?  So --

3          Q.    What we did --

4          A.    -- again, knowing --

5          Q.    -- ask for the video, which we did.

6                MR. TYSON:  Let him answer the question,

7          please.

8                THE WITNESS:  Wait.  David --

9          Q.    (By Mr. Cross)  Well, you asked --

10         A.    We --

11         Q.    -- a question.

12         A.    We asked a question for the videos.  They

13    said it didn't exist, because it wasn't in that

14    particular system.  It wouldn't occur to most people

15    to think if the security people in charge of this

16    tell us it doesn't exist, it's going to exist

17    somewhere else because a random person who's been

18    fired or resigned, due to be fired, did an ORR.  It

19    was a lucky for us and for y'all and unfortunate

20    thing for Misty now, because this is actually proof

21    that she did things that were not -- that were

22    untoward.

23                You can look back with perfect vision,

24    20/20, in the rear view mirror.  I get that.

25                But the situation we had is we had tons of

1   these kinds of claims everywhere; and, again, we were

2   trying to get into --  Actually, it's a different

3   time.  I apologize.

4          This looked like another one of those many

5   claims that there was nothing there, and somebody

6   might have tried to do something, but there's no

7   evidence that was coming to the surface that would

8   rise to that point.

9          And we had the videotape, and we had them

10  claiming they couldn't do certification.  We sent the

11  chief of investigations in there, 'cause there was

12  actual stuff we could that was wrong.

13

14

15

16

17         You don't then expend resources on things

18  where it looks like this is a dead end.  That's not

19  what you do and --

20      Q.    In a --  In a county that you already have

21  identified through an open investigation was not a

22  reliable county.  A county that literally had held up

23  the presidential election, because they refused to

24  certify election results, you -- you -- you guys

25  thought that that was a reliable county to just

Page 85

1   simply say, well, they say it didn't happen; and they

2   don't have video so that's the end of that?

3       A.    It's not --

4             MR. TYSON:  Object to form.

5             THE WITNESS:  It's not they said it didn't

6       that.  We handed to our investigators.  The

7       investigators, who are the law enforcement

8       people, make those decisions; and they basically

9       said there's nothing there.  We're moving on to

10      the next thing.

11            I mean, it's not like, again, with

12      hindsight being 20-20, yes.  You should go in to

13      go deeper on some of those things; but if we had

14      to spend resources on every single one of these

15      claims in a gajillion (ph.) ways in this

16      state --

17            I mean, I'm going to give you an example

18      just to put it in perspective for everything.

19      There was a claim of pristine ballots in Fulton

20      County.  I think we're all aware of that claim.

21      It was supposed to be in a particular batch.  We

22      had --  We sent two investigators down to that

23      batch.  They went through all of them.  I think

24      it was 20 man-hours, and they came back and said

25      there's nothing there.

1          They went back to the complainant, who

2      said, well, maybe there's a different batch.

3      It's this batch number.  It was a batch number

4      that didn't exist.  At that point, we were done.

5          My point is we expended resources and

6      time.  You have to triage these things; and,

7      again, hindsight being 20-20, we now know a lot

8      more than we did then, and we know a lot more

9      than we did then, in part, because of what y'all

10     were able to get the ORRs, so that's where we

11     stood.  That's where we stood at this time.

12     Q.   (By Mr. Cross)  The situation we're

13  talking about is one where it was publicly known that

14  Cyber Ninjas was trying to get access to voting

15  equipment across the country.  The Dominion alert

16  went out literally the day before, which is what

17  prompted Mr. Barnes's e-mail, right?

18     A.    Correct.

19     Q.    Okay.  You also had an election management

20  server, an EMS server that you couldn't even access.

21  That didn't raise any red flags?

22     A.    That's not --

23          MR. TYSON:  I'll object to form.

24          THE WITNESS:  As I stated before, we knew

25     the history of that.  We understood the history

1    of that.  We knew what had happened essentially.

2    We -- we --  Or we had good assumptions to what

3    had happened.

4         Misty was gone.  The EMS was changed out.

5    The bad --  The not-good-at-her-job elections

6    director was no longer there, so those were --

7    that was not --  We would not have put those

8    together.  No.  Because they're not related.

9         As you can see, we now know --  If you

10   want to go back into 2020, we know that password

11   was changed on December 14th, well before the

12   January 7th unauthorized access, so they're

13   unrelated items.

14   Q.   (By Mr. Cross)  Well, but you now know

15   they're unrelated items, because you've had access to

16   the server and seen that people had access to it.

17   A.    No.  I do not know that.  They're --

18   They're not --  They're unrelated items mainly

19   because it -- they --

20        It was changed out, because the password

21   was changed.  The password was changed before the

22   unauthorized access.  That makes them unrelated.

23        Now it's --  It's now a piece of evidence

24   that the unauthorized access occurred, but the reason

25   we had it had nothing to do with the unauthorized

Page 88

1    access.  So no.  You wouldn't just -- your brain

2    would not jump --  No normal process of -- of logic

3    would jump to that.

4         Q.    But let me just ask you candidly, Mr.

5    Sterling.  Do you --  Do you understand how a third

6    party looking at this says --

7         A.    Hold on one second.

8               I apologize, Mr. Cross.

9         Q.    It's okay.

10              Do you --  Do you understand how a third

11   party looking at this set of circumstances might

12   wonder in good faith whether the Secretary's Office

13   just didn't want to know the answer, because it would

14   be politically embarrassing to have to disclose that

15   a system that the Secretary had claimed cannot be

16   breached had been breached at an extraordinary level?

17              Do you understand how that might be a good

18   faith belief that reasonable people might take?

19        A.    No.

20              MR. TYSON:  And I'll -- I'll object to

21        form here.  This is outside what the Secretary's

22        Office knows.  We're now asking about what

23        reasonable people might think.

24        Q.    (By Mr. Cross)  You don't think that that

25   would be a reasonable view that anybody could take?

Page 89

1            MR. TYSON:  The same objection.

2            THE WITNESS:  No.  And let me tell you

3      why.

4      Q.    (By Mr. Cross)  Okay.

5      A.    Our office was wildly transparent.  We

6      investigated and traced down things left and right.

7      We brought in the SEB.  We literally stood up to the

8      President of the United States trying to pressure us

9      to do things, and yes.  It would be embarrassing.

10           But let me tell you how this office

11     manages problems like this.  You get ahead of them,

12     you disclose them, and then you address them.  Hiding

13     things was -- was not a good thing to do.

14           It's better to admit every system,

15     regardless of the system, if there is a bad actor who

16     allows a -- a unauthorized access to any system is a

17     problem.  It is a security problem.  It is a legal

18     problem.  It undermines people's faith in the

19     systems, and we get that.  That's why the people who

20     did this need to be held accountable.

21           And if we had known then, if we -- if we

22     had known earlier, we would have acted differently

23     more than likely and been able to do different

24     things.

25           But the situation is we didn't.  Again,

```
 1    knowing the level that we thought the likelihood of
 2    this was, we never stopped the investigation.  We
 3    kept on trying to get into that server until we
 4    advised that, okay, what we're doing isn't working.
 5    And then we finally said, okay.  Let's get to
 6    Persinger, who seems to have an expertise in this.
 7    We never stopped investigating once it became -- we
 8    became aware of it.
 9             So in the second we discovered it, I mean,
10    frankly, I was pissed, 'cause Misty broke the law;
11    and people did things that were stupid and dumb; and
12    again, hindsight, of course, we can look back and
13    say, wow, I really wish we'd dug further into that,
14    knowing what we know now.  But we didn't know what we
15    know now.
16        Q.    But, Mr. Sterling, you said that the
17    Office has been transparent about this.  But the
18    Office has given a lot of inconsistent information
19    about what it did, when it did it, and what it knew,
20    right?
21             MR. TYSON:  Object to form.
22             THE WITNESS:  I would say there have been
23        misstatements and conflated items and bad
24        questioning and bad answering.
25             And like I said earlier, it's been sort of
```

1           a soap opera with Coffee County, so it's easy

2           for people to get tripped up on their own words

3           and their own timeline when they're hearing

4           questions a certain way.

5           Q.    (By Mr. Cross)  But the Secretary himself

6      gave an interview just recently where he stated that

7      the Office began investigating these allegations very

8      soon after the breach happened, right?

9           A.    Yes.  And he was wrong.

10          Q.    Right.  Okay.  And --  And what's the

11     basis for your testimony that he was wrong about

12     that?

13          A.    Okay.  'Cause I've had discussions with

14     Secretary about this interview; because when I saw

15     the interview, I was, from my point, rightfully

16     irritated for two reasons.

17               One it was supposed to be exclusively an

18     interview about the action, so Mr. Richards, the

19     journalist sort of, for lack of a word, ambushed him;

20     so the Secretary wasn't briefed on any kind of

21     timelines we knew at that point or anything.

22               And the secondary thing I was irritated

23     about was, normally, the Secretary answers with it's

24     under investigation.  He was hearing the question of

25     like the stuff from back in December, and we did

Page 92

1   investigate that.  We did send investigators down.

2           Now he may not have asked the question

3   that way, but the Secretary is an engineer.  He's a

4   linear thinker, he's thinking from beginning to end,

5   so that was when I talked to him about it.

6           He goes, well, yeah.  That's --  Of

7   course, that's what I meant.  I was talking about

8   from when she posted the video, and we did that stuff

9   around certification.  That's what he was referring

10  to.

11          And, essentially, this entire interview,

12  he had his timing mangled, and Doug was asking broad

13  questions that weren't very specific, and it was --

14  It was a ambush interview that The secretary hadn't

15  been briefed on the specifics of stuff, even though

16  he knew the basics of it.

17          And like I said, he was right.  We did, as

18  soon as we saw that video, we started kicking off an

19  investigation; and we saw we couldn't certify.  We

20  sent people down there, so that was his mind of us

21  doing that.

22          So the -- the two were unrelated in terms

23  of timing, but they were obviously related now sort

24  of and from hindsight.

25          Q.    But --  But even in the course of that

Page 93

```
 1   interview and then follow-up in the Secretary's
 2   Office, conflicting information was given on when
 3   this investigation occurred.  Right.
 4            So he said it was very soon after.  I get
 5   your testimony that --
 6       A.    Uh-huh.
 7       Q.    -- that -- he was talking about the
 8   original investigation.
 9       A.    Yeah.
10       Q.    But within minutes of answering on that,
11   according to the station, an aide to Raffensperger
12   corrected the Secretary of State's response off
13   camera and offered May of 2021 as the correct date.
14       A.    Right.
15       Q.    Then --
16       A.    And that was wrong.  That was Mike
17   Hassinger.  He's new to the office, and he got '21
18   and '22 confused.
19       Q.    Help me understand.  Why is that wrong?
20   We --  We have just spent several minutes talking
21   about the investigation that, in fact, was done in
22   May of 2021 --
23       A.    Because we're talk --
24       Q.    -- hold on -- hold on -- into a potential
25   compromise.  Well, Chris Harvey himself said --
```

Page 94

1        A.    Uh-huh.

2        Q.    -- there might be a compromise in the

3    voting equipment.  We need to look into that.

4              So May 2021 is, in fact, the correct date

5    of when this investigation first began, based on what

6    we have, right?

7        A.    There's two different things about this.

8    There's the investigation number that was assigned

9    that was given in December.  It's got to be a new --

10             THE COURT REPORTER:  I --  I'm sorry.

11        There's an investigation --

12             THE WITNESS:  Number that's been assigned.

13        It was going back.  This is where I say this is

14        confusing.  The intent, I believe, Mr. Hassinger

15        was trying to talk about.  He didn't know about

16        those e-mails yet.  They didn't -- we hadn't --

17        We hadn't found them on our end yet about the

18        back-and-forth.

19        Q.    (By Mr. Cross)  So what was he talking

20    about for May?

21        A.    He was talking about 2022 is when we were

22    able to hand over --

23             Again, his dates were just wrong.  I don't

24    know why he said that, that date.  He was just wrong.

25    He's new to the office.  He was standing right there.

1          I found out about it after the fact.  I
2   yelled at him.  I said, "You gave him the wrong dates
3   for when we kicked off the -- the secondary
4   investigation, Mike."
5          Q.    Can I just clarify.  Are you saying he --
6   he meant to say May of 2022?
7          A.    I don't know what he meant to say.  It was
8   just wrong.  I said --
9              Okay.  He said, "Well, that's what I
10  thought."
11             I was like, "Well, no.  It's not, Mike."
12             So I --  I had a lot of yelling that day.
13         Q.    I guess what I'm getting hung up on, Mr.
14  Sterling, is why is it wrong to say that the
15  Secretary's Office was investigating a potential
16  compromise of the Coffee County election equipment as
17  of May of 2021, when we have now spent quite some
18  time looking at e-mails showing that that actually
19  did happen?
20         A.    Except what you're talking about -- here's
21  the thing -- from my point of view and what he was
22  thinking are two separate things.
23         Q.    All right.
24         A.    This -- now -- now --  Now you want me to
25  answer the question.  I'm answering your question,

Page 96

1    Mr. Cross.

2            They're two separate things.  There was a

3    thing that did happen in May of '21, and I don't

4    think we were aware of that back-and-forth until -- I

5    don't know -- the last couple of weeks or so when I

6    went to Sara Koth and had the interview with her, and

7    we --  And we found this e-mail subsequently, 'cause

8    she didn't know she had access to some of this.

9        Q.    Who --  Who is we?

10           Sara Koth works in your office.  Josh

11   Blanchard works in your office.  Pamela Jones --

12       A.    Okay.  When I say we, I'm referring to me

13   and Mike Hassinger right now.  Okay?

14       Q.    Okay.  But just understand --

15       A.    Stop.  I'm trying to answer your question.

16           Sara didn't know she had access to

17   Frances's e-mail at the time the first go-around on

18   this.  She subsequently found that out.

19           And I said do you have anything else on

20   this?

21           And that's when this came to light.  We

22   handed it over to y'all.

23       Q.    Right.  But that's --

24       A.    I mean, it's just, again --  Okay.  Bring

25   it all but --

Page 97

1      Q.    Right.  Mr.  --

2      A.    On May of 2021, he was just wrong; and I

3   said this interview, basically, everything in it is

4   conflated and -- and just incorrect, and that's why I

5   was so frustrated with the interview itself.

6      Q.    Okay.  So, remember, you're testifying

7   today not as you --

8      A.    Uh-huh.

9      Q.    -- but as Secretary's Office --

10      A.    Right.

11      Q.    -- right?

12            Okay.

13      A.    I was answering your question about what

14   Mike Hassinger and I knew specifically about that.

15      Q.    I --  I get that now.

16      A.    Okay.

17      Q.    So what I'm saying is, it is a fact that

18   the Secretary's Office, multiple individuals, from

19   Chris Harvey, to Michael Barnes, to Frances Watson,

20   to Pamela Jones, to Josh Blanchard, all of those

21   individuals were aware that the Secretary's Office

22   was investigating potential unauthorized access by

23   Cyber Ninjas to the Georgia voting system in Coffee

24   County in May of 2021.  Yes?

25            MR. TYSON:  Object to form.

1          THE WITNESS:  Yes.  In the specific way

2     you put that.

3          Now by this point, they're two separate

4     things.  Because at this point, it was like we

5     now understand that with given the videotapes

6     and everything.  I can't remember the date of

7     that.

8          But we really kicked it up into --  Okay.

9     Once we saw that something had happened and that

10    was in July, that was like a new --  Not new

11    investigation; but, again a new phase of the

12    investigation.  That's what I was referring to

13    as now we've -- we've real --  We've handed to

14    GBI.  We do those items, and that's kind of the

15    difference between those things.

16          I mean, there is a -- obviously, a

17    timeline, and we'll probably get into some of

18    those things.

19          But that interview was just simply wrong.

20    He was incorrect --

21    Q.    (By Mr. Cross)  Okay.

22    A.       -- when he made those statements, and he

23 didn't have a chance to get briefed up, because he

24 was also surprised, because he wasn't supposed to

25 be --  It was supposed to be a action feel good kind

Page 99

1  of thing.

2      Q.    Okay.  So come back to Exhibit 7, the

3  Frances Watson --

4      A.    Yes, sir.

5      Q.    -- e-mail thread.  We do not have from the

6  State that we've seen any further communications,

7  e-mails, documents of any type regarding this

8  investigation beyond Miss Watson's May 11th e-mail.

9      A.    Correct.

10     Q.    Okay.  So do I understand correctly that

11 the investigation into the Cyber Ninjas' potential

12 access in Coffee County, that that ended or paused?

13          It --  It didn't go any -- any further

14 than what's reflected in Exhibit 7, because the

15 feedback from Mr. Barnes was we've not found any

16 indication of an unauthorized access?

17     A.    That, plus the --  He was going to go to

18 the IT and see.  Since we never heard back, there

19 was, I think, an assumption made of, well, we didn't

20 find anything there; and I know there was a

21 conversation.  Of course, my understanding of the

22 conversation, which it will be --

23          We asked for videos, and the security team

24 says they don't have them for this period of time;

25 and, again, that was the right hand, left hand thing,

Page 100

1    not knowing what they were doing.

2         Q.    So when a representative of the

3    Secretary's Office told 11 Alive, the local news

4    station, that the Office did not know about or begin

5    investigating Coffee County until -- until July of

6    2022, that's -- that's not an accurate statement,

7    right, 'cause the --

8         A.    David --

9         Q.    -- Office itself was investigating this in

10   May of 2021.

11        A.    Two separate investigations based on two

12   different sets of information.

13        Q.    I get that --  I get it.

14        A.    So you're choosing to put them together.

15   We're viewing it as two separate entities.  This is

16   a --  It's a different way of looking at it, I

17   suppose.

18             You're right.  Our office did look at it.

19   There was nothing to pursue that they could see at

20   that time from the evidence they had as a

21   professional, POST-certified law enforcement

22   investigators.

23             Now we have extra information that came,

24   because we had Mr. Persinger able to get into the

25   system.  We see, yes, there actually was an outside

Page 101

1    device that was plugged in.  At that point, it took a

2    different direction.

3              Again, I keep saying this.  Hindsight is

4    20-20, and we never stopped the investigation once

5    the claim was made to us, I guess, at the end of

6    February.  When we got the snippet of Miss Marks's

7    recording.

8              So we started to try to do it then with --

9    with Dominion, with the resources we had; and part of

10   it was, you know, frankly, dollar bills.  How -- how

11   are we going to pay?  How are we going to afford to

12   get into this, and what can we do.

13             And that's, I think, June.  I said okay.

14   We need to get Persinger to try to get into this.

15   We've --  We've got to figure out binarily one way or

16   the other did anything like that happen; and because

17   we figured out we -- that Persinger might have the

18   skill set to do that.

19             I didn't know Persinger existed for a

20   period of time until probably May or June so -- of

21   '22.  Probably need to make that clear.

22        Q.   Mr. Sterling, I -- I get that -- that the

23   Secretary's Office has what you're characterizing as

24   a different investigation now into the unauthorized

25   access at Coffee County.

```
 1              But there's a very specific statement that

 2    was made by the Secretary's Office, which was the

 3    Office, not just you or Mr. Hassinger or anyone else,

 4    that the Office did not know about or begin

 5    investigating Coffee County until July 2022 with

 6    respect to a potential unauthorized access.  That's

 7    not an accurate statement, right?

 8              There --  The Secretary's Office had

 9    multiple investigators on that in May of 2021.

10         A.    And let's remember it was --

11         Q.    Isn't that right?

12         A.    Okay.

13         Q.    Yes or no?

14         A.    I'm going to say yes on this.

15              But let's remember something.  We knew

16    about SullivanStrickler before we knew about Cyber

17    Ninjas, obviously; and, again, thanks, in part, to

18    this case.  I get that.

19              The point is it's two different things in

20    the way we're looking at it.  I can even concede the

21    point.  Yes.  You're right.  Our office was looking

22    at a Cyber Ninja potential thing, and there no --

23    nothing --  No evidentiary items that allowed us to

24    say, yes, we should go dig deeper on that.  Again,

25    hindsight being 20-20, it doesn't.
```

Page 103

1            So I'm not going to say that --  They're

2    not the same investigation.  They're tied together

3    the same way that, I guess, you're trying to conflate

4    the server issue to this.  In hindsight, you can say

5    yes.  There might --  Might give you some pause on

6    that, but you --

7            In the real time, with the environment

8    that we were in, no.  It didn't seem that way, and

9    that's --  And we've treated as two different kinds

10   of things, 'cause, obviously, we have at lot more

11   information now that we've gotten into that server

12   and that EMS.

13       Q.    Well, and let me follow up on that, 'cause

14   I want to make sure we're on the same page on that.

15            You say you've treated it as two different

16   things.  It's different investigations.

17       A.    Uh-huh.

18       Q.    But the representations made to us and the

19   Court repeatedly was that this was all the same

20   investigation, that, in fact, the investigation

21   that's happened this year into the unauthorized

22   access of -- of the voting system in Coffee County

23   was all part of the original SEB 2020, dash, 250 as a

24   single investigation.

25       A.    Because they reopened the case there.

Page 104

```
 1    That case number was easy to get from the SharePoint
 2    system to do it that way.
 3         Q.    But --
 4         A.    I --  Yeah.
 5         Q.    -- doesn't that mean they're separate
 6    investigations?
 7         A.    But hold on.  I'm --
 8              You're talking in two different realms.
 9    You have legal world and SOS world.  I'm talking
10    about that particular interview is for the public and
11    everything, 'cause they were two very different kinds
12    of things.
13              One, we have a lot more evidence and a lot
14    more situational awareness now than we did in the May
15    turn; and then, obviously, going back, if you look
16    back in January, if someone had said something to us
17    then, who was down there.  I mean, we had an
18    investigator in the room.  They're talking to Misty
19    getting that statement.
20              I'm going to say this again.  Hindsight's
21    20-20.  This is all part of the same ark of problems;
22    and we use that investigation number, 'cause it was a
23    easy thing to do to -- to put it in that same
24    investigation number.
25              I think there's a new investigation number
```

Page 105

1 on it now.  I can't recall.  Remember that I said I

2 was looking at the -- in -- in the logs on that.

3          That was started on, I want to say --

4 There was an investigation in Coffee County started

5 9-20-something of 2022.

6          Or they gave it a new investigation number

7 I think.

8      Q.    I was going to ask you about that.  One of

9 the things we saw recently is that there is a new

10 investigation opened in September into --  I think it

11 just says something to the effect of server breach.

12          Is that Coffee County, or is something

13 that something else?

14      A.    That's Coffee County.  That's --  I think

15 they just gave it for --

16          MR. TYSON:  Well --

17          THE WITNESS:  -- clarity's sake.

18          Oh, was that Spalding County?

19          MR. TYSON:  May --  Could we check on that

20      before --

21          MR. CROSS:  Yeah.  'Cause I -- I -- I -- I

22      was --

23          MR. TYSON:  Maybe --

24          MR. CROSS:  -- going to ask --

25          MR. TYSON:  Yeah.

1          MR. CROSS:  -- whether that's actually

2     Spalding.

3          THE WITNESS:  That might be Spalding.

4          MR. TYSON:  Yeah.  I think it might be a

5     SullivanStrickler investigation.  I don't --

6     We --  We can check on this --

7          MR. CROSS:  Okay.

8          MR. TYSON:  -- for you, if you want us

9     to --

10          MR. CROSS:  Sure.  Sure.

11          MR. TYSON:  -- 'cause I think we can

12     clarify.

13          THE WITNESS:  I do know that we did open

14     one into Spalding's on that front --

15          MR. CROSS:  Okay.

16          THE WITNESS:  -- because of that e-mail

17     traffic that was found --

18          MR. CROSS:  Okay.

19          THE WITNESS:  -- or discovered.

20          MR. CROSS:  I -- I --  I was guessing.

21     That might be --

22          THE WITNESS:  Yeah.

23          MR. CROSS:  -- Spalding, but I wasn't

24     sure.

25          Okay.  Yeah.  If you could clarify whether

1       Coffee County's still under the original --

2               THE WITNESS:  The two five --

3               MR. CROSS:  -- two five two --

4               THE WITNESS:  -- zero.

5               THE COURT REPORTER:  I have to have one

6       person at a time.

7               MR. CROSS:  Sorry.  Okay.

8               THE WITNESS:  Let's call it 250 for ease

9       for everybody instead --

10              MR. CROSS:  Sure.

11              THE WITNESS:  -- of the whole rigamarole.

12              MR. CROSS:  Okay.

13              MR. TYSON:  And one point, David, that

14      might be helpful also is we had in verifying,

15      there's a difference in kind of big "C"

16      complaint versus like little "c" complaint.  I

17      think we have a similar thing here.  Like we

18      have complaints that lead to formal

19      investigation numbers; and then we have

20      complaints that lead to, hey, is everything

21      okay.  Hang up the phone.

22              MR. CROSS:  Okay.

23              MR. TYSON:  So I think there might be a

24      capital "I" investigation and a little "i"

25      investigation in terms of what we're talking

Page 108

1          about here with these so --
2                    THE WITNESS:  So like --
3                    MR. TYSON:  And I don't need to --
4                    THE WITNESS:  Okay.
5                    MR. TYSON:  I'm just trying to help
6          clarify for him.  He can ask you questions --
7                    THE WITNESS:  Okay.
8                    MR. TYSON:  -- about that.
9          Q.    (By Mr. Cross)  One of the things that
10    Secretary Raffensperger mentioned in the interview
11    we're talking about was he -- he suggested there was
12    testimony before a grand jury related to this that
13    was not truthful.
14                    Do you know what that was about?
15          A.    I think he was --  Not in front of the
16    grand jury.  I think he was referring to the State
17    Senate Committee.
18          Q.    'Cause he said grand jury.
19          A.    I know he did.
20          Q.    Okay.
21          A.    Again --
22          Q.    He was just mistaken?
23          A.    Well, let me rephrase my frustration with
24    the Secretary after this interview.
25                    Yes.  He was mistaken.  He was --

1     Q.     Okay.

2     A.     -- just putting those together so --

3     Q.     So there has not been a grand jury

4  convened by the State to investigate unauthorized

5  access of -- of the voting system?

6     A.     Not that I'm aware of.

7            Then, I mean, just to build on that, I

8  believe in context that was Misty who testified to

9  the State Senate Committee, the same one that Rudy

10  Giuliani and those guys --

11     Q.     Uh-huh.

12     A.     -- went to.

13     Q.     So fast-forwarding from 2021, February of

14  2022 is when the Secretary's Office gets the snippet

15  of the call with Miss Marks and Mr. Hall?

16     A.     Correct.

17     Q.     Okay.  And then that gets shared with Ryan

18  Germany, who calls for an investigation into those

19  allegations, right?

20     A.     Yes.  I think we didn't do that.  I'm not

21  sure of the time of this.  I've had a discussion

22  about it, but I don't know if we did an investigation

23  until we got the full audio of the full tape.  I'm

24  not sure of the timing on that.  Would have been

25  around --  It would have been kind of back-to-back,

Page 110

```
 1   so it would have been the same.  Within a week or
 2   two, I think, of that's when we -- when it was all
 3   produced.
 4        Q.   Right.  Ryan --
 5        A.   He was the one, though, who -- who said
 6   yes.  Let's open something on this.
 7        Q.   Yeah.  Mr. Germany called for an
 8   investigation into this in March of that year, right?
 9        A.   Correct.  And it --  Like I said, I don't
10   know if it predated us getting the full -- full audio
11   or postdated it, but it was --  They were all
12   within --
13        Q.   Sure.
14        A.   -- you know, a week or two of each other,
15   I believe.
16        Q.   Okay.  So now we're in a timeframe where
17   you've got the investigation -- we can say with a
18   little "i," if you want -- from May of 2021 involving
19   Cyber Ninjas.
20        A.   Uh-huh.
21        Q.   You've now got the call where Mr. Hall
22   says they imaged everything.
23        A.   Uh-huh.
24        Q.   You've got the EMS server and the ICC in
25   your possession.  You've now got an investigation
```

Page 111

1   opened into these allegations.

2          Why didn't the Secretary's Office at that

3   point obtain the surveillance video that we, the

4   Plaintiffs, later had to obtain months later?  Why

5   did it --  Why did we have to get that?

6       A.   I think, step one, we had decided kind of

7   internally was we wanted to get into the server first

8   to see what time this all -- so we could go back and

9   have binary questions we could ask the individuals.

10          Bob Guessum (ph.)?

11          MR. CROSS:  Bruce, you mean?

12          THE WITNESS:  Bruce.  Sorry.

13      Q.   (By Mr. Cross) Go ahead.  Go.

14      A.   I have a problem.  When I hear people

15   talking, I tend to try to listen; and it throws me

16   off.

17          MR. BROWN:  Okay.

18          THE WITNESS:  My problem not yours.

19          So Ryan and the chief investigator said

20      let's get into the server first before we start

21      trying to go down, start interviewing people who

22      we know.  Like Misty testified.  You're not

23      going to get good stuff out of them, so let's

24      get --  Let's get the actual evidence first and

25      see if something happened, so we start trying to

Page 112

1    get into that first.

2          And, again, I don't know how widespread it

3    was known, 'cause this all kind of runs together

4    timelinewise.  There have been discussions about

5    them trying to get that videotape before, and it

6    didn't exist, according to the people we had

7    talked to, because it was in a different system

8    that those people were not aware of, and the

9    people we would have talked to --

10         Now if it'd gone to the county attorney

11   maybe; but, again, hindsight being 20-20.

12         So we wanted to see, try to get in the

13   system.  We had a hard time getting in the

14   system, and, you know, we have --  We're doing

15   many other things.  So we --

16         Again, a representative from Dominion came

17   down to try to get in.  They couldn't get in, so

18   they sent somebody else, I believe, in the

19   middle of April.  They couldn't get in, so we're

20   trying to get through, through May.

21         And like I said, May, June, finally, okay.

22   This isn't working.  We've got to try find a way

23   to get into this thing, so we can yes or no know

24   what happened on that front.

25         And, again, our gut reaction is it

Page 113

1          still -- this kind of comports --  If you look

2          at all the plethora of information and stuff we

3          saw and the individuals involved, they weren't

4          viewed --

5               I mean, Scott Hall, like I said, he's an

6          election denier, who we didn't necessarily put a

7          lot of stock in what he said, because he was the

8          one who said there was thousands of, you know,

9          fake ballots that were there.  There were people

10         in the back room at the cafeteria at English

11         Street who were, you know, looking or counting

12         votes illegally.

13              And then, frankly, we have a litigant in

14         the case on the other end of that call, so

15         nothing -- and who attacks this office

16         constantly, so the baseline of it is like we --

17         we know we have to look at it.  But in all

18         likelihood, given all the information we have,

19         this looks just like all the other

20         misinformation, disinformation things we have;

21         but we're not stopping the investigation.

22              So we kept on doing it; and finally, like

23         I said, May, June was a discussion of we've got

24         to get Persinger on it.  I think there was a --

25         literally a question of the Department of

Page 114

1       Administrative Services and the slow pay on some
2       of things for Mr. Persinger, so we were a bit
3       concerned.  Will he be able to do it or not.
4       Not that they were intentionally doing it.  It's
5       just state government.  They pay slow sometimes.
6            So they were discussing about doing that,
7       and I think --  I don't know.  I wasn't involved
8       in any direct discussions, 'cause he was with
9       the -- with the attorneys.  I know that --
10           Like I said, I think the -- the week of
11      July 4th, before July 4th was when he took
12      possession of it; and by the following week, he
13      had --  That's when we discovered that that had
14      happened.
15           So the videotape, obviously, since I think
16      it was already been told to us it wasn't there,
17      we're not going to go chase something --
18      double-check on it, I guess would be, for lack
19      of a better word for that.
20           And we also had some turnover, and so
21      maybe Sara Koth might not have been aware of
22      that on the front end.  I --  I couldn't say for
23      certain.  This didn't occur on that point.
24           And I think the only reason that
25      particular video camera was there was for the

Page 115

1        drop box.  It was in the front section of that.

2        I believe that's why that one was placed on the

3        outside door.

4        Q.    (By Mr. Cross)  So the -- the GBI was not

5   called in to investigate until August of this year,

6   right?

7        A.    The official request made in August.  I

8   think the initial discussions with Steven Ellis were

9   at the end of June, early July.  And it definitely

10  kicked up after we discovered that there was a device

11  that was plugged in.

12       Q.    Which was when?

13       A.    After July 4th.  So July 6th or 7th, I

14  think is when we became aware of that, give or take.

15       Q.    Okay.

16       A.    So then Steven kicked up -- he's --  He's

17  basically the person who talks to the GBI.  He's our

18  deputy general counsel and elections counsel, Steven

19  Ellis.

20            And then they have discussions on how do

21  we do this.  Well, you've got to figure out

22  parameters.  We'll go start lining up people.  At

23  some point, you guys send an official letter.  So

24  that was kind of how it all went through.

25       Q.    As of August of this year, no one for the

Page 116

1   State had conducted any interviews of anyone involved

2   in the unauthorized access of the voting system in

3   Coffee County, right?

4       A.    Direct interviews other than with James --

5   James Barnes because he said he had talked to people,

6   and they said that it had happened in May.

7           Separately from this, as I said, it was an

8   investigative decision to get hard binary evidence

9   first, and we were working on a plan to

10  essentially -- because of the timing of this, we were

11  getting ready to send down our investigators with

12  Steven Ellis to like --  As an example, they were

13  going to go the pizza place that she had said she had

14  bought pizza for to see do they have credit card

15  receipts.

16          And we were looking for binary things that

17  could go to saying the credibility is -- is proper

18  for this witness, or it's not.  We can impeach them

19  or say they did know or they didn't know.  We were

20  trying to get those facts, and that was --  And

21  that's an investigatory decision that was made

22  starting in March.  We had to get into this first

23  before we interview anybody so that we can have more

24  information than they do basically was kind of --

25      Q.    (By Mr. Cross)  Who --

Page 117

1        A.     -- the plan.

2               Ryan Germany --

3               MR. TYSON:  Okay.

4               MR. CROSS:  -- was the main person.

5               MR. TYSON:  Slow down, if you can.

6               THE WITNESS:  Sorry.

7        Q.     (By Mr. Cross)  Who --  Who made that

8   investigative decision?

9        A.     Ryan Germany.

10       Q.     Okay.  And you said a number of times that

11  the Secretary's Office did not have access to the EMS

12  server, because of the password change; is that

13  right?

14       A.     Correct.

15       Q.     But that's --  Are you aware that's not

16  accurate?

17       A.     And --

18       Q.     Let --  Let me --

19       A.     No.

20       Q.     -- ask it this way.

21              Are --  Are you aware that the data that

22  sits on -- on an EMS server is not encrypted?

23       A.     No.  I'm not.

24       Q.     Okay.  So are --

25       A.     Let me say this.  We couldn't get into the

1    EMS server itself to look at it and get to the log

2    files is my understanding without that password.

3         Q.    Right.

4         A.    That -- That was the issue.  We couldn't

5    get to see what is there.  I think and --  Again, I

6    think Dominion attempted to image it; and they

7    couldn't come to any conclusions on it until we get

8    to Mr. Persinger, and he was able to do all the

9    proper things, 'cause that's his job.  He knows how

10   to do those items.

11        Q.    Dominion tried to image it in April,

12   right?

13        A.    I believe it was April.  Yeah.  April --

14        Q.    April?

15        A.    The third week of April, so seven --  They

16   first came down the 11th, and I think they came back

17   the following week.

18        Q.    Right.

19        A.    It was somewhere in that time range, yes,

20   of '22.

21        Q.    They tried to image the server, and they

22   could not?

23        A.    There was an issue with that, I believe.

24   Yes.

25   ███████████████████████████████████████████████

```
1
2
3
4
5
6
7
8
9
10
11
12
13
```

14        Q.    And --  And we all agree that it's

15   important to preserve whatever data, the log files

16   and other things, that are on that original EMS

17   server, right?

18        A.    Correct.

19        Q.    And that server is part of an ongoing

20   criminal investigation?

21        A.    Correct.

22        Q.    And --  And did the Secretary's Office

23   takes steps to preserve the data on the original EMS

24   server?

25        A.    By trying to image it and keep it.  I

Page 120

1    mean, we couldn't even get into it to do anything

2    extra -- to image it, take anything off, or molest it

3    in any way.  So the fact that we couldn't get into it

4    kind of preserved in its natural state from when it

5    was picked up originally.

6        Q.    Why didn't the Secretary's Office bring in

7    someone like Fortalice, which Mr. Beaver testified is

8    essentially serving as the CISO, the chief

9    information security officer.  What --

10             If Dominion couldn't get in and you

11   couldn't get in yourself, why not bring in Fortalice

12   or someone early on?

13       A.    Actually, he's not the CISO.  He's the

14   CIO.

15       Q.    No.  Beaver is.  But Mr. Beaver testified

16   in his --

17       A.    Oh, okay.

18       Q.    -- deposition that Fortalice is serving in

19   that CISO role.

20       A.    To a degree.  I think there's a question

21   of time and cost, basically.  I don't think -- it

22   didn't --  Wasn't actually said, hey, we're not going

23   to do it because of that.

24             Let's --  Let's go through Dominion first.

25             And then we said, well, we've got this

1   other person over here who might be better suited to

2   do it.  Honestly, that's -- that's kind of where it

3   was in terms of we know they can do that, so that's

4   Persinger's job.  They can do that.

5           Now Fortalice, there might have been a

6   discussion about that for a moment; but I -- I don't

7   recall one, honestly.

8       Q.   Okay.  So when was the decision made to

9   bring in Mr. Persinger?

10      A.   The discussions were late May, early June.

11  I think, like I said, there was a question because of

12  DOAS not necessarily paying quickly.  Would he be

13  willing to do something like that.

14      Q.   Uh-huh.

15      A.   And that got worked out, and he was able

16  to figure out how to get ahold of it in July, so it

17  was like within a couple of weeks of the decision

18  being made, it got -- it got executed.

19      Q.   All right.  Who made that decision to

20  bring him in?

21      A.   That would be basically Ryan and myself

22  more than anything.

23      Q.   Ryan Germany?

24      A.   Yes.

25      Q.   And what was Mr. Persinger's assignment?

1   What --   What's his role with respect to

2   investigating the unauthorized access of the -- of

3   the State's voting system in Coffee County?

4         A.     He was an expert retained by our attorneys

5   in this case.   I'm not sure in other -- other cases

6   or not.

7                And his portfolio in particular was get

8   into this server and look at the log files and see

9   what happened anywhere around this period of time.

10  If --   If there was any devices done incorrectly.

11  Was there anything where it looks odd.   Did anything

12  happen.   Basically, go in and find out and tell us.

13        Q.     It was the directive to him to make sure

14  that he preserved the data on that original EMS

15  server through his work?

16        A.     As I understand it --

17               MR. TYSON:  Oh --

18               THE WITNESS:  -- yes.

19               MR. TYSON:  -- okay.

20               THE WITNESS:  Got to be faster next time.

21        Q.     (By Mr. Cross)  And what is it that --

22  What can you share with me with respect to the

23  Secretary's Office's knowledge about any analysis

24  that's been done on that server and what's been

25  found?

```
 1          MR. TYSON:  And I'll just caution you
 2      here, Mr. Sterling, for Mr. Persinger's work
 3      product, for attorney issues, and then anything
 4      related to the active investigation that's
 5      ongoing.  I think you've already shared pretty
 6      much the details but --
 7          THE WITNESS:  And I can go over some of
 8      the specifics of it again.  There was --  We
 9      know that was there was a device that was
10      plugged in on January 7th.
11      Q.   (By Mr. Cross)  And that was a Samsung
12  device?
13      A.   We were hoping to keep that out for the
14  investigatory side of it but --  And I know it's
15  released to the public, so yes.  It was a Samsung
16  device, to my understanding.
17      Q.   Is there anything more you can share about
18  that device -- what it was, what was done with it?
19      A.   Not that I think I'd be willing to right
20  now under this investigation side, because, again
21  we're trying to be able to question people and see if
22  they know -- have actual knowledge or not, basically.
23          We also know the date of the password
24  change was 10-14.
25          MR. TYSON:  December.
```

Page 124

1           THE WITNESS:  That's right.  December

2       14th.  It's ten -- today.  December 14th of

3       2020.

4           And some of the other details, I -- I

5       couldn't speak to necessarily, 'cause that's --

6       The GBI is now leading on this --

7       Q.   (By Mr. Cross)  Uh-huh.

8       A.   -- as part of an active criminal

9  investigation, so I don't want to get too deep into

10  what the Office itself may know, because the GBI is

11  leading on that; and they can choose to keep us in

12  the loop or not.

13          They're not keeping us out of the loop,

14  but they're kind of keeping, you know --  They're

15  running lead, and they are the GBI.

16      Q.   Was there --  Does the Secretary's Office

17  have any indication of remote access to the EMS

18  server?

19      A.   Not that I'm aware of.

20      Q.   Is that something they looked for?

21      A.   I don't --  I don't know.

22      Q.   Okay.  Does the Secretary's Office, has it

23  looked for whether there is any sort of malware on

24  the EMS server?

25      A.   It's my understanding.  Yes.

Page 125

1      Q.    And that was Mr. Persinger?

2      A.    Yes.

3      Q.    And they did not find any?

4      A.    Not that I'm aware of.

5      Q.    Has his --  Has anybody from the

6  Secretary's Office examined whether any of the

7  software was altered in any way on that server?

8      A.    If I remember correctly from the

9  discussion, nobody from the Secretary's Office has.

10  This was all Mr. Persinger's --

11      Q.    Uh-huh.

12      A.    -- information on this.

13          MR. TYSON:  And I think that's as far as

14      you need to go --

15          THE WITNESS:  Okay.

16          MR. TYSON:  -- investigative work

17      productwise.

18          MR. CROSS:  Well, I guess we've asked --

19      Take that to the judge then.

20          You're not going to let him share what Mr.

21      Persinger has found?

22          MR. TYSON:  No.  Not at this --  Not at

23      this point.

24          Yeah.  I think he can testify whether

25      there -- they found malware or not.  I think we

1        can do that.

2               MR. CROSS:  Uh-huh.

3               MR. TYSON:  But I think beyond that, we're

4           going to have an issue.

5               MR. CROSS:  I mean, the e-mail I have from

6           you, Brian, is saying that he would share the

7           Secretary's Office about the EMS server.

8               MR. TYSON:  Uh-huh.  And he has.  He

9           shared a lot of details about the EMS server on

10          what it's found, and he can share whether or not

11          they found malware on the ES -- EMS server.

12              But if we're going to get further into

13          what analysis Persinger has done, that's where I

14          have an investigative and a -- and a work

15          product issue.

16              MR. CROSS:  All right.  I guess we'll have

17          to come back to that then.

18          Q.    (By Mr. Cross)  Do you know why the

19      Secretary's Office directed Mr. Persinger to change

20      the password on the original Coffee County EMS

21      server?

22              MR. TYSON:  And I'll object, and I -- I

23          think we're getting into work product on

24          specific things here.  We're here about the

25          events about the access.  I think we're pretty

Page 127

1        far afield from the knowledge of that; and,

2        plus, this gets into Persinger's process, so I

3        don't see where we're -- where we're within the

4        scope.

5               MR. CROSS:  That's a critical component of

6        understanding the scope of the unauthorized

7        access, what they did.

8               MR. TYSON:  What Persinger did to the

9        server?

10               MR. CROSS:  Well, because it affects --

11        You've altered the evidence that we are

12        ourselves relying on.

13               MR. TYSON:  I just think you're factually

14        incorrect on that.

15               MR. CROSS:  Well, you need to talk to your

16        consultant if you don't know the answer to that.

17               MR. TYSON:  Okay.

18        Q.    (By Mr. Cross)  Are you aware that Mr.

19   Persinger altered the password on the original the

20   EMS server?

21        A.    No.

22        Q.    You're not aware that he was directed to

23   do that by someone in the Secretary's Office?

24               MR. TYSON:  Again I'll object in terms of

25        direction from Secretary's Office and then work

1    product.

2         Q.    (By Mr. Cross)  Do you know one way or the

3    other whether he was directed to do that by someone

4    in the Secretary's Office?

5         A.    I do not.

6         Q.    So you can't share any insight into why he

7    would have done that?

8              MR. TYSON:  Again, object to form.  You're

9         assuming that he changed it.

10        Q.    (By Mr. Cross)  Do you --  Are you aware

11   when you change the password on a Dominion EMS

12   server that --

13             MR. KNAPP:  In Coffee County?

14             MR. CROSS:  What?

15             MR. KNAPP:  You talking about Coffee

16        County?

17             MR. CROSS:  No, no.  Just in general.

18             MR. KNAPP:  Okay.

19

20

21

22

23

24

25

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
```

```
12              MR. CROSS:  All right.  Why don't we --
13      Why don't we take a short break.  I think we've
14      been going over an hour.
15              THE WITNESS:  We have.
16              MR. CROSS:  Okay.
17              MR. TYSON:  Okay.
18              THE WITNESS:  I -- my timing -- my --
19      my --
20              MR. CROSS:  I figured you were going to
21      give me a heads-up on a break, but we can break
22      now.
23              THE WITNESS:  I'm doing okay.
24              MR. KNAPP:  Your biological clock.
25              THE WITNESS:  Yeah.
```

```
                                            Page 130

 1          MR. KNAPP:  Yes.
 2          THE VIDEOGRAPHER:  We're going off the
 3     record at 11:28.
 4          (Recess from 11:28 a.m. to 11:43 a.m.)
 5          THE VIDEOGRAPHER:  We are on record at
 6     11:43.
 7     Q.   (By Mr. Cross)  Mr. Sterling, are you
 8 aware of any changes made to the original EMS server
 9 after the Secretary's Office took possession from
10 Coffee County?
11     A.   The Coffee --  You mean the Coffee County
12 EMS, not --
13     Q.   Correct.
14     A.   -- made by Coffee County.
15          I am not aware of any changes that would
16 have been made to that.  No.
17     Q.   Okay.  And what about the ICC?
18     A.   Not that I'm aware of.
19     Q.   Okay.  The --  The Secretary's Office took
20 the EMS server from Coffee County in June of 2021, as
21 I understand it, because the password didn't work; is
22 that right?
23     A.   June 8th.  Yes.
24     Q.   Okay.  Why did the --  And sorry.  Just to
25 take a step back, are you aware that James Barnes
```

1 testified in his deposition that his understanding in

2 dealing with the folks who came there, Chris Bellew

3 and a Mr. Patel --

4   A. Uh-huh.

5   Q. -- his understanding that they were taking

6 the EMS server was because there was a concern about

7 a compromise per Mr. Harvey's e-mail?

8   A. No.

9   Q. But your testimony on behalf of the

10 Secretary's Office is that that server was taken and

11 that had nothing to do with any concern that it had

12 been compromised?

13   A. Correct.

14   Q. Okay.

15   A. Mr. Barnes also stated, I believe, in his

16 deposition that no one followed up with him after he

17 talked to Chris; and obviously, we have evidence to

18 show.

19     This is time differentials on these

20 things.

21   Q. Uh-huh.

22   A. So I don't think that anybody --

23   Q. Uh-huh.

24   A. I don't think anybody's misleading

25 anybody.  This --  This is my memory and

Page 132

1    understanding from a year out or something --

2         Q.    Uh-huh.

3         A.    -- like that.

4         Q.    The --  Why did the Secretary's Office

5    take the ICC when it took the EMS server?

6         A.    I think they're connected.  I don't know.

7         Q.    But you're aware that the password, the

8    ICC password still worked.  It was fully operational?

9         A.    Maybe it was.  I don't know.  I don't have

10   an understanding as to why they took both of them.

11        Q.    Okay.

12        A.    I think I said that they're --

13        Q.    Well, and I'm not asking you to

14   speculate --

15        A.    Okay.

16        Q.    -- if you don't know.

17        A.    I'm going to say one thing.  As I

18   understand it, their SOP is to just do that.  Like I

19   said --  Like I said, take it down there and replace

20   it, so that's -- I didn't --

21             Once they said they did that, I just kind

22   of left it at that.

23             MR. TYSON:  David, do you want us to check

24        with CES on a break on that point on what the --

25             MR. CROSS:  Sure --

Page 133

```
 1              MR. TYSON:  -- reason was?

 2              Okay.  For sure --

 3              MR. CROSS:  That's fine.

 4              MR. TYSON:  -- we can -- we can get into

 5         that.

 6              MR. CROSS:  Yeah.

 7         Q.    (By Mr. Cross)  Are you aware that the

 8    clock on the EMS server was changed, on the original

 9    Coffee County EMS server was changed in January of

10    2021?

11              MR. TYSON:  Object to form.

12              THE WITNESS:  No.

13         Q.    (By Mr. Cross)  And --  And you use

14    computers, right?

15              You can look at your computer, and you can

16    pull up a clock that tells you the date and time,

17    right?

18         A.    Yes.

19         Q.    Okay.  And you understand an EMS server

20    has that same function?

21         A.    Yes.

22         Q.    Okay.  So you had not heard before now

23    that when Doug Logan and Jim Persinger were there

24    accessing the system that --

25         A.    Jim Persinger?
```

Page 134

1        Q.      Sorry.  Let me get that right.

2        A.      So we can both do that.  It's okay.

3        Q.      Yeah.  No.

4        A.      It shows --

5        Q.      No.  Thank you.

6        A.      -- we're human.

7        Q.      They all start to run together.  Let me

8    try that again.

9                In January of 2021 when Jeff Lenberg was

10   there, you have not heard before now that the clock

11   on the EMS server was reset to November 5th so that

12   the server would think in that moment that it was

13   November 5th of 2020?

14       A.      No.

15       Q.      And have you heard that the clock on the

16   ICC in that same timeframe was reset to November 3rd,

17   2020, which was the election date?

18       A.      No.

19       Q.      So I gather you don't have any insight

20   from the Secretary's Office on any investigation why

21   that was done?

22       A.      Again, given the timing of it, we may not

23   have been aware of it.  GBI might be aware of it --

24       Q.      Okay.

25       A.      -- because of the -- the handoff and those

Page 135

1    things.

2        Q.    Okay.  But you are aware that Jeff Lenberg

3    spent the better part of each of five days in January

4    of 2021 in that office with access to the equipment?

5        A.    Yes.

6        Q.    And what, if anything, can you share with

7    me about what the Secretary's knowledge has about

8    what he was doing or might have been doing?

9        A.    Once we hand --

10            At that point, we had that information, I

11   believe.  GBI was taking the lead on that, so

12   Secretary's Office would not have specific knowledge.

13       Q.    Okay.  Who made the decision to -- to

14   replace the ICC and the EMS server in June of 2021?

15       A.    I wouldn't call it a decision.  It's a

16   standard operating procedure.  You couldn't get into

17   it, so change them out.  That's a State --

18            I guess Center for Elections did that,

19   'cause they took it down there, and they -- and

20   the --  They were hoping to be able to get into it,

21   but they had that so that they could run their

22   elections and do their items, so that was, like I

23   said, a normal standard operating procedure, so I

24   guess policy made the decision more than anything.

25       Q.    Is there a written policy or documentation

1    you can point us to that lays out that policy?

2         A.    No.  My discussions with Michael Barnes,

3    basically, that's just what we do; and it's always

4    what we did in the old systems, too, under the old

5    GEM system.  If some of that happened, they would

6    take the GEMS with them.

7         Q.    But, again, the ICC had no access issue.

8         A.    Again, I couldn't say why.

9         Q.    Okay.  And as I understand it, they came

10   down on June 8th, confirmed that the EMS server was

11   inaccessible, and they replaced both that day; is

12   that right?

13        A.    It's my understanding.  Yes.

14        Q.    Okay.  And do you have any insight into

15   why the decision was made not to replace any

16   additional voting equipment in that office at that

17   time?

18        A.    Because, again, there was no issue around

19   that.  They had an issue with a password getting into

20   the EMS.  That was the only thing that was in

21   contention.

22             Again, hindsight being 20-20, you can now

23   see these things potentially having been connected in

24   that -- in that -- in that --

25        Q.    Uh-huh.

Page 137

```
1        A.      -- kind of way.

2               But at the time, these were two CES guys.

3    These weren't investigators.  Like I'm going down

4    there to work on the EMS.  I'm going to change out

5    the EMS, 'cause we can't get into the EMS.

6               So they did a normal situation and a

7    normal office thing.  It's --  You know, it's just a

8    normal process.

9        Q.    On how many prior occasions has the State

10   replaced an EMS server for a county in the Dominion

11   system that was inaccessible?

12               MR. TYSON:  And I'll object to scope.  I'm

13          not sure that's within the scope of what we

14          tried to do.

15               But if you know, you can answer.

16               THE WITNESS:  Because of inaccessibility,

17          none that I'm aware of other than this one.

18          I --

19               Under the old system, I was under --

20          Michael's told me, yeah, it happened on

21          occasion; and I know we changed out one server

22          for Spalding, because there were concerns

23          because when the new board came in, they said

24          this door was unlocked.  We don't know who was

25          here.
```

Page 138

1              We said okay.  Let's take the question off

2         the table and replace the EMS there.

3         Q.    (By Mr. Cross)  When was that?

4         A.    Spring of 20 --  I don't want to go out.

5    I think it was spring of '21, I believe, 'cause a

6    new -- a new board had come in.  It was after they

7    passed the laws where they changed the board members

8    out on that one, so that's my understanding.

9         Q.    Okay.

10        A.    So it would have been at -- at a minimum

11   post-April, I believe, 'cause the governor had only

12   signed that into law to make that -- 'cause of local

13   legislation on that.

14              Mr. Cross, am I going to need these

15   anymore, you think?  May I get them out of the way?

16        Q.    I think you can set them to the side.

17        A.    Okay.  Thank you.

18              MR. CROSS:  We're --  Are we at seven?

19              THE VIDEOGRAPHER:  Eight.

20              MR. BROWN:  Eight.

21        Q.    (By Mr. Cross)  All right.  Let me hand

22   you Exhibit 8.

23              (Exhibit 8 was marked for identification.)

24              THE WITNESS:  Thank you.

25        Q.    (By Mr. Cross)  And this is at Tab 70.

Page 139

1          A.     Thank you.

2                 MR. CROSS:  Let me get one back.

3                 MR. BROWN:  Yeah.  Okay.  That's -- Okay.

4          Q.     (By Mr. Cross)  All right.  So Exhibit 70

5     (sic) is an e-mail from -- I'm sorry -- a letter,

6     sent via e-mail, from Steven Ellis in your office,

7     right?

8          A.     Correct.

9          Q.     And you said that he's the deputy general

10    counsel, and he oversees elections and

11    investigations?

12         A.     On the investigation side, it's general

13    elections investigations; but yes.

14         Q.     Okay.  And he --  This is a letter that he

15    sent to the GBI on August 2nd of 2022, right?

16         A.     It's the official request for the GBI to

17    get involved.  Yes.

18         Q.     In the second paragraph, he writes --

19    With respect to the -- the unauthorized access to the

20    State's voting system in Coffee County, he writes,

21    "The suspected unauthorized access took place

22    following the January 2021 runoff elections and the

23    possibly accessed system has not been used in an

24    election since that time."

25                Do you see that?

Page 140

1      A.    Yes, sir.

2      Q.    That's --  That's not actually accurate,

3  right, that the possibly accessed system has not been

4  used in an election since that time?

5      A.    I don't believe it was used in --  I don't

6  recall there being any special elections down there.

7      Q.    Well, there were three elections in Coffee

8  County since January of 2021, right; or you just

9  don't know?

10      A.    Well, I'm trying to think.  Well, the EMS

11  is what we're talking about specifically here.

12  That's the evidence we have of that at that time.

13           So there have been no elections done on

14  the EMS, and that's what he's referring to here.

15      Q.    Well, hang on.  There's been three

16  elections in Coffee County since June 8 of 2021,

17  right?

18      A.    Yeah.

19      Q.    Okay.

20      A.    Well, let's see.  There could have been.

21  I'm not positive.  I'm trying to think of dates in my

22  head where there have been specials, or just we had

23  the primary, primary runoff.  And what else?

24           MR. TYSON:  Municipal.

25           THE WITNESS:  Municipal's in 2019.  Okay.

1      MR. TYSON:  Twenty twenty --

2      THE WITNESS:  2021.  Yeah.

3      Q.    (By Mr. Cross)  Right.

4      A.    If they had any, 'cause not every county

5  has them, so I'll take your word for it that, yes,

6  there were three.

7           But, again, this is a discussion about the

8  EMS at that time.

9      Q.    Right.  But we now know from the

10  information obtained from Sullivan|Strickler, the

11  photos, that what was accessed would be on the EMS

12  server and the ICC, right?

13      A.    Correct.

14      Q.    It included a number of compact flash

15  drives, thumb drives, laptops.

16           You understand that, right?

17      A.    Yes.

18      Q.    And the Poll Pads?

19      A.    Yes, sir.

20      Q.    All of that equipment or at least some of

21  it, which wasn't just possibly accessed -- we know it

22  was accessed -- was used in multiple elections since

23  January of 2021 and since June 8 of 2021?

24      A.    Yes.  To --  To be clear, this is

25  referring to the EMS, 'cause that's the information

Page 142

1   we had at the time, so understand that as well.

2       Q.    Okay.

3       A.    'Cause we --  As Mr. Persinger pointed

4   out, we knew.  That's when we figured that out.

5   That's when we kicked this off.

6       Q.    So okay.  So I -- so the --

7             So Mr. Ellis's letter, when it says, "the

8   possibly accessed system," it's referring to EMS

9   server that was installed on June 8?

10      A.    Correct.

11      Q.    Okay.  Okay.  Thank you.

12            In a court hearing on September 9th of the

13  this year, your counsel stated, quote, the access

14  these people had to the system was that they wanted

15  access to show something and not necessarily alter

16  something from what we know.

17            What's the basis for the Secretary's

18  belief that the -- the individuals who had this

19  access, that was -- that they did not alter

20  something?

21      A.    I think in the context of the statement,

22  the goal of the people, their stated goal publicly in

23  November through December through January was to

24  prove the election was stolen.  That's what they were

25  attempting to do.  They're trying to say, look, we

1   have now found the fraud.  This is the machinery that

2   caused it.  This is the situation that occurred.

3   That was their -- from their --  That was their

4   stated intent.

5            So I think that's the basis of that

6   statement.  Their intent --  Their intention would

7   have been to prove the election was stolen; and if

8   they had, they probably would have a giant red flag

9   on a mountaintop waving it around.

10       Q.   Uh-huh.  But -- but --  So fair to

11   say this -- this is -- this is a guess about what

12   their intentions were.  You don't actually know what

13   their intentions were.

14       A.   I can't get into the mind of anybody,

15   obviously, who's not ourselves in our office; and

16   the --  It's based on their statements and based on

17   the environment at the time.

18            The goal was to prove that the election

19   was stolen from President Trump.  Like these election

20   deniers, conspiracy theorists all point --  There's

21   the fraud.  There it is, and this is why he should

22   still be president.

23       Q.   Well, and let's pause on that.  Because as

24   you pointed out earlier, the situation here is

25   actually quite different than what you refer to as

Page 144

1    their modus operandi.  Their modus operandi before

2    the breach in Coffee County was to be very public, as

3    you pointed out, right?  To say, look, we're doing

4    this.  We're getting access, and we're going to show

5    that the election was wrongly decided, right?

6         A.    Except in the other cases where they were

7    public, they were granted access by some authority

8    that seemed to be okay with it.  In -- In Arizona,

9    the State Senate, obviously.  In Michigan, I believe

10   there was, I believe, another group that did that.

11         So this goes back to looking back at what

12   we know now.  Misty and them all realized there were

13   violating laws and rules here.  Maybe we don't waive

14   a flag at this until we know for certain we found

15   something, so maybe they'd gotten more sophisticated,

16   'cause they'd gone through the November time period

17   and the December time period.  I can't remember where

18   the Arizona ridiculous thing was going on at that

19   point.

20         So, again, I can't get into their

21   mind-set, and you're right.  This seems a little bit

22   different; but the rationale behind it might have

23   been, hey, I don't want to go to jail.

24         Q.    Well, but you're drawing the distinction

25   that I'm -- I guess I'm having hard time to

Page 145

1    understand.

2            Because according to the folks that did

3    this -- Misty Hampton, SullivanStrickler -- they have

4    the same authorization they had in other

5    circumstances.  They had the authorization of the

6    elections director.  They had the authorization of

7    multiple members or at least one member of the Coffee

8    County Election Board, and they had Cathy Latham

9    holding herself out as an election official telling

10   them they were authorized.

11       A.    But she wasn't an election official.

12             MR. TYSON:  Object to form.

13       Q.    (By Mr. Cross)  Sure.  But -- but --

14       A.    My point is it wasn't a public kind of

15   thing on that front, so I think there's a --

16             I can't get in their mind-set.  You're

17   right.

18       Q.    Uh-huh.

19       A.    I can't know why they didn't do it that

20   way; but, again, everything we've seen shows that.

21   And, again, new information you just gave me as to

22   that, it looks like they were trying to see what was

23   the configuration with those dates, if something

24   different would happen.  That's why --  Maybe that's

25   why they moved those dates on those machines, if

1    that's actually the case.  I'm just taking your word

2    for it --

3         Q.    Uh-huh.

4         A.    -- right now.

5              So, again, these people were hired by

6    Sidney Powell essentially.  That was --  I guess

7    SullivanStrickler was hired by another law firm first

8    and transferred over to Sidney Powell, and they were

9    given the marching orders to potentially go forth and

10   find fraud.

11             And I think at this point, too, in

12   November and December, everybody was kind of

13   running a --  I say everybody.  The election deniers

14   were in a tumult.  They were --  They were very spun

15   up and very public about they were doing.  Lin Wood

16   was having rallies.  You know, Sidney Powell would go

17   to rallies and --

18        Q.    Including Robert Sinners.

19        A.    Including Robert Sinners.  I don't think

20   it was rallies or not; but he was, you know, on those

21   things.

22             So looking back on this now, I can't say

23   for certain; but there's two things I take away from

24   this.  One, they didn't find anything; and, two,

25   their -- their goal wasn't necessarily to add

Page 147

1    anything or do anything.  I don't know if they had

2    skill sets or not.

3            But you're --  You're right.  We can't

4    know that with suppositions based on what we've seen

5    and the evidence that we can get that I don't have

6    access to now, because the GBI is now in charge of

7    the investigation.

8            So I can't know for certain.  You are

9    correct.

10   Q.    So one -- one key difference here with

11   respect to the access in Coffee County versus others

12   is that they kept it quiet, despite having

13   authorization from local officials.  And I'm not

14   suggesting that's lawful authorization.

15   A.    Yeah.

16   Q.    They were authorized by local officials.

17           Another key difference is timing.  Right.

18   This is January 7th through the end of the month.

19   This is after Congress has already certified the

20   election and Biden is declared the winner.

21           So my question to you is:  Has your office

22   considered whether that -- those set of

23   circumstances, coupled with the amount of time they

24   spent there, the changes that they made to the EMS

25   server that we know of so far, whether any of that

Page 148

1    conveys to you that they actually were not just

2    looking historically, but looking prospectively?

3         A.    I think that we take any of these

4    unauthorized access seriously and have to take

5    that --  Not knowing means you have to at least look

6    and see if that's there, so I'm --

7              Again, since it's a little out of our

8    hands now, I'm hoping the investigators will look to

9    see if any -- anything was done along those routes,

10   so any of that kind of thing.

11             The reality of it is I still say looking

12   at it, looking back, you're assuming rational actors

13   on some of this thing.  The president's been --  You

14   know, the president's been certified.

15             There were people who -- to this day, who

16   on my Twitter, if you probably go -- you seem to like

17   it, you can go back and look -- are saying put

18   President Trump back, damn it.  Okay.  So there's

19   people who still believe if they showed enough, they

20   could go to -- go to a court somewhere and overturn

21   it.

22             Now I think that's obviously beyond the

23   pale; but, again, we can't get in the motivations of

24   people who believe in their heart of hearts that the

25   election was stolen, all these terrible things

Page 149

 1    happened, so I can't go to that.

 2              But we always have to take into account

 3    that there's a possibility they could have been

 4    saying let's undermine the next round.  I don't think

 5    SullivanStrickler's like that.  Cyber Ninjas maybe.

 6    Again, I don't know.

 7              But to take the question off the table, we

 8    took all that stuff out of there, obviously, 'cause

 9    I --  In the real world, I don't think that there's a

10    likelihood that it happened; but we have to take into

11    account that it might have, so that all been

12    remove --  That question's been taken off the table

13    now from our point of view and, hopefully, eliminates

14    the discussion points and reasonable questions of

15    reasonable doubts around those things.

16              So I get it, and I was the last one to

17    want to do that.  I said, basically, if we give in on

18    this particular point that the whole system's

19    compromised, then you're saying basically anything

20    with a computer in America could be -- could go this

21    route, which is not --  When we look at all the stuff

22    we have to do to run elections, that's just not a --

23    a rational place to be.

24              But yes.  You --  To answer your question,

25    we do take into account that could have happened, but

Page 150

1    the likelihood in our -- in our mind is probably not;

2    but again, that's kind of out of our hands until GBI

3    finishes everything on the criminal side.

4         Q.    It sounds like you had a concern that if

5    the Secretary's Office replaced additional voting

6    equipment in Coffee County, which it ultimately did,

7    that that might imply that the system's compromised.

8              But why -- why couldn't --  I guess I want

9    to understand why you have that concern.  Because

10   can't the Secretary's Office just convey to the

11   public that it's not aware of any compromise, but the

12   mere potential is enough to say we're not going to go

13   forward with this equipment, and we're going to

14   figure out a different system that voters can have

15   confidence in?

16        A.    There's two different things that you're

17   asking.

18             Again, our office doesn't believe that

19   there's actually likely any malware on those

20   machines.

21        Q.    Uh-huh.

22        A.    We had a plan.  We were going to send in

23   Pro V & V to potentially load a new golden record on,

24   review the hash values with third-party stuff, and I

25   know there are ways to potentially to get around

1    that, but it would have been a rational thing to do.

2              And I know it's going to come across oddly

3    as I try to talk slower.  I really am trying.

4              And secondarily --

5              THE COURT REPORTER:  And did you repeat we

6         had a plan and something about Pro V & V and

7         loading a golden record.

8              THE WITNESS:  Pro V & V to load the new

9         golden record, which would have been the

10        EAC-certified software on to all those things or

11        to assure that they were there and unmolested.

12             But this essentially takes everything off,

13        even hidden malware ideas and everything like

14        that.  This takes the discussion point away.

15             And taking the discussion point away was a

16        bigger part of attempting to show the general

17        public that the system overall isn't

18        compromised, so that -- that was the thought

19        process behind it, because there are people

20        making claims that the entire system is

21        compromised because of this, when we do not

22        believe that to be the case.

23             And people can --  Honest people can argue

24        about this, and I understand that, but our job

25        is to run an election and make sure that people

1       can have confidence in the outcomes, and the

2       election is run well.  That's the overall

3       rationale behind doing that.

4            I got a thumbs up from the court reporter,

5       People.  I was good.  I did good.

6            MR. KNAPP:  Now keep up your record.

7            THE WITNESS:  That's going to be hard.

8       Dave's going to ask me questions and get me

9       irritated, and I'll get ramped up again.

10      Q.    (By Mr. Cross)  Do you know whether anyone

11   has looked at any of the voting equipment taken from

12   Coffee County to determine whether any kind of

13   malware was tested on the system?

14      A.    Not yet.  I think we're discussing about

15   trying to --  I'm working on getting a long-term

16   contract, Pro V & V, through our procurement process

17   to allow for us to go, through, do investigations

18   like that.  Potentially, we had discussion about

19   potentially Fortalice coming in or some other

20   third-party group to look just to assure that; and

21   then if there is anything, loading a golden record;

22   and even if there's not any discussion about loading

23   a new golden record on.

24            And subsequently, as I mentioned before,

25   we're looking at moving to 5.17 on Democracy Suite

1  from Dominion; and they can be wiped and reloaded

2  with that afterwards, too.  So there's different ways

3  we can go about this; but I would like to --  I think

4  we would like to know if anything like that did

5  occur.

14      Q.    What --  Who made the decision to bring in

15  Mr. Persinger?

16          MR. TYSON:  I believe he's already

17      answered that.

18          THE WITNESS:  I did.

19      Q.    (By Mr. Cross)  Sorry.

20      A.    I said it was basically Ryan Germany and

21  myself.

22      Q.    Oh, I'm sorry.

23      A.    Yes.

24      Q.    You did.

25      A.    Right.

1    Q.    Sorry.  I couldn't remember that.  The

2    follow-up question I was going to ask is what was the

3    reason to bring in someone new, Mr. Persinger, as

4    oppose to using Fortalice?

5    A.    I just think he was there, and it was a --

6    He was an expert, and we were looking for some way to

7    get in.

8           That was -- it wasn't a --  It wasn't like

9    a Fortalice or him kind of thing.  I think it was

10   like we know this guy can do this.  We've spun our

11   wheels for a minute.  Let's try a different approach.

12   Q.    And what led to the decision to bring in

13   Mr. Persinger?  What --  What set of facts?

14   A.    I think I just answered that.  I'll do it

15   again.

16   Q.    No, no.  You were answering a different

17   question, I thought.  I asked you why -- why you --

18   you would -- you didn't bring in Fortalice.  What I'm

19   asking is a more specific question.

20           What were the circumstances that rose to

21   the level in your mind and Mr. Germany's mind, oh, we

22   should bring in a consultant?

23   A.    Oh.  When Bruce was writing a note to you,

24   I said we were spinning our wheels doing what we were

25   doing.  We had to go a different direction.

Page 155

1    That's --

2              And we basically said we need to -- we

3    need to know one way or the other.

4              Now, again, my gut reaction was it's

5    probably going to show nothing.  That was my --  But

6    I wanted to know.  I wanted the Secretary's Office to

7    be able to say, no, this didn't happen; or, yes, it

8    did; and then take the appropriate steps from there,

9    'cause we tried to work with Dominion.  And it was

10   just taking too long.  We weren't getting anywhere.

11             We made the decision we need to move on to

12   something else, some other way to do it; and

13   Persinger was available for that.

14        Q.   Okay.  So let me just make sure I

15   understand, 'cause I get that you said you were sort

16   of spinning your wheels and you wanted to know.

17             But I'm trying to dig down a little more

18   deeply to say was there some particular fact, some

19   revelation that led you to say, okay, we should bring

20   in a forensic consultant?

21             Does that question make sense?

22        A.   Oh, it makes sense; but there was -- there

23   was not a, oh, there's this new fact item we have to

24   do this.  It was sort of like this is taking too much

25   time.

1          And one of the things I want to just give

2    some context on, all of our lives are not focused on

3    this one thing, obviously.  We're doing lots of

4    different things, so this is part of a amalgam of

5    different things we're working with and trying to

6    deal with.

7          So Ryan and I were both kind of

8    frustrated, going I -- I wish we had an answer to

9    this already.  What do we need to do to change that,

10   so we can --

11         A lot of our time is spent trying to clear

12   things off the decks.  Like we try to clear SEB

13   investigations off the decks, 'cause we know that

14   2022 is going to have a lot of new claims that we're

15   going to have to investigate and do again.

16         So we didn't want this one just kind of

17   hanging out there as -- as a potential issue, so that

18   was --  That was part of the rationale; and again,

19   there wasn't a (indicating) this happened.  Let's go

20   do that kind of thing.

21         Q.    To your point about not wanting this sort

22   of hanging out there, why didn't the Secretary's

23   Office replace the EMS server and the ICC last month

24   when it replaced all the other equipment, given that

25   other equipment had been used with the new EMS server

Page 157

1    and ICC?

2        A.    Internally, we didn't think --  We said we

3    already replaced it, so that should take care of it

4    kind of thing.  There was an internal debate of like

5    let's just clear them all out.

6             And then there was, well, why?  I mean,

7    it's already been replaced since they woke us.  We

8    can give them another debate point, but it was

9    ultimately decided.

10            And then by the time we said, well, maybe

11   we should, LMA had already started.  We had to start

12   the election process over again, so it's now running,

13   so you couldn't, even if you wanted to, bar -- bar in

14   making that chaos.  But a lot more difficulty in

15   running the election.

16       Q.    Well, I guess help me understand that.

17            I mean, the -- the Secretary's Office was

18   able to replace the EMS server and the ICC in Coffee

19   County in June of last year in a single day with --

20   with -- according to Mr. Barnes, without any advance

21   notice they were going to do that.

22       A.    Uh-huh.

23       Q.    So it sounds like it's a pretty simple,

24   quick process.  Why couldn't they -- they do that as

25   part of the broader process in September of replacing

Page 158

1   the rest of the equipment?

2        A.    Well, like I said there were two different

3   discussions on this point.  We replaced all the

4   stuff.  We said we already replaced that, so it

5   didn't --  It wasn't a mind-set, too, like they

6   interacted with these things.

7              And, again, remember, from our point of

8   view, we don't believe that any malware is actually

9   probably there; but we'll --  To take the debate

10  point away and -- and take away the -- the -- the

11  fear mongering around it, said let's get them all out

12  of there.

13             It then came up at another point later on.

14  Said, well, these other two things have been

15  interacting with them.

16             And then there was a internal debate point

17  of like, well, we've already replaced this.

18             Oddly, Marilyn has her hand up.

19             We've already replaced this; and then we

20  said, well, maybe we should look at it; but by that

21  point, the election --  We're in the election window

22  now.  You've got to realize we sent UOCAVA ballots

23  out starting 49 days out, so that was seven weeks

24  from the election.

25             So when the internal debate got to the

1    point, well, maybe we should look at something like

2    that, again, when we run elections, we have to look

3    at everything we're doing, this just being one sliver

4    of the cybersecurity side.  You have to look at all

5    of the processes and thing -- and everything going

6    on.

7              So it would have been more chaotic and

8    more risky to then change it out at that -- by the

9    time it had reached that point; but there was an

10   internal debate about it, because, again, most people

11   are under the impression nothing else -- we -- we got

12   everything else out of there.  This is a new EMS, so

13   there shouldn't be any issue with that, so that was

14   kind of the -- the thought process behind it at the

15   time.

16             We were trying to act reasonably as we

17   could, given the situation we were in.

18        Q.   Well, what all did the Secretary's Office

19   replace in Coffee County last month?

20        A.   I believe, if memory serves, and if I --

21   This may not be completely --

22        Q.   Uh-huh.

23        A.   -- all of it; but I remember it was the

24   BMDs, the printers, the cords.  I believe we might

25   have changed out the battery supplies, but I don't

Page 160

1  recall for certain on that one.  The --  The

2  scanners.  The ICPs.  The memory cards, and I believe

3  the jump drives for everything.

4           In fact, we were originally going to

5  change all those out.  There never a question

6  internally that we were going to do that.  That was

7  going to be done, but then I think all of that was

8  changed out.

9           And then the Poll Pads.  Pardon me.  I

10  forgot.  Them as well.

11     Q.    I mean --

12     A.    And the cords and all their --

13     Q.    Right.

14     A.    All the parent --  All the parent-child

15  things within the system were changed out.

16     Q.    There are over a hundred BMDs in Coffee

17  County, right?

18     A.    Correct.  I --  I think it's just barely

19  over a hundred, but I believe that's correct.

20     Q.    Somewhere between a hundred and a hundred

21  twenty, I think, is what we --

22     A.    Something --

23     Q.    -- refer to.

24     A.    Yeah.  I think it was a hundred and nine,

25  if memory serves, but something like that.

1      Q.    So I guess where I'm kind of struggling is

2   why it would be more chaotic or difficult to just add

3   two more pieces of equipment when you're already

4   replacing over a hundred BMDs and dozens of thumb

5   drives and flash drives and Poll Pads and printers?

6            You're literally adding two additional

7   pieces of equipment that are core to that system that

8   have been used with equipment that you know had been

9   improperly accessed.

10     A.    You're conflate --  You're conflating two

11  different decisions.

12     Q.    Okay.

13     A.    We replaced everything; and from our point

14  of view, we already replaced those two pieces of

15  equipment.  Okay.  So we replaced everything else.

16           Now it came up later on.  Said, well,

17  since they interacted with this, maybe that could be

18  another secret -- super secret way that malware could

19  go from one thing to the other.

20           And we said, well, again, highly unlikely;

21  but by the time we kind of got to a point that maybe

22  we should do that, we had --

23           I remember I was in a Home Depot talking

24  to Ryan over the phone about this; and once we

25  decided, well, maybe we should look at that, at that

Page 162

1    point, the election was underway.

2              That's what I mean where the chaotic thing

3    would come in, because you can't change out those

4    particular core pieces in the middle of an already

5    running election.  We've already began the process of

6    logic and accuracy.

7         Q.    So okay.  So is -- is -- is it that --

8              There was a decision made at some point in

9    the last couple of months.  We'll replace all the

10   equipment that has not been replaced yet, so that's a

11   bunch of stuff other than the EMS server and the ICC.

12   That was on track.

13             And then at some point later, it occurred

14   to you guys, well, maybe we should replace everything

15   to just head off this argument that you should

16   replace everything; but at that point, it was too

17   late?

18        A.    Essentially.

19        Q.    Okay.

20        A.    And --  And, again, it was we have to deal

21   with all the moving pieces and parts of an actual

22   election being underway; and, again, from our point

23   of view, we're trying to take things off the table to

24   take away the debate point; and I believe the

25   Coalition reached out to people and said, hey, those

Page 163

1    are still there.  That's a -- that's a --  That's a

2    problem.

3              And, again, the reaction was, well, we

4    already replaced that; and then so there was other

5    discussions; but by that point, again, the election

6    was underway.

7         Q.    Uh-huh.

8         A.    And, you know, if we had more time and

9    known earlier about these all these things, all the

10   options would have been different and on the table.

11        Q.    I think we agreed in your prior

12   deposition.  Voter confidence, confidence in the

13   voting system is important.

14        A.    We did.

15        Q.    Okay.  Dr. Halderman's findings through

16   July 2021, vulnerabilities that were later validated

17   by CISA in June of this year, is it your

18   understanding that Dr. Halderman's concern is only

19   whether those vulnerabilities are exploited; or do

20   you also understand that part of his concern is that

21   the presence of those vulnerabilities allows folks

22   like the Sidney Powell group to undermine voter

23   confidence?

24              MR. TYSON:  And I'll object in terms of

25         scope in terms of what Dr. Halderman's report

1      means.

2              But you can answer, if you know.

3              THE WITNESS:  Okay.  I'm sorry.  Can you

4      restate it.  You guys threw me off.  I -- I

5      apologize.

6      Q.    (By Mr. Cross)  Sure.  Sure.

7              Is it your understanding that Dr.

8  Halderman's concern with vulnerabilities that he

9  found with the Dominion software, which, again,

10 validated by CISA, that his concern is only that

11 they're exploited; or do you also understand that

12 he's concerned that individuals like Sidney Powell

13 and others who will spread misinformation will use

14 those vulnerabilities, the presence, just the mere

15 presence to undermine voter confidence?

16             MR. TYSON:  Object to form and to scope.

17             THE WITNESS:  I won't necessarily go to

18     Mr. Halderman's mind-set; 'cause as I said

19     before, I can't know what's in anybody's mind.

20     However, your characterization is likely true

21     and accurate; but I mean, it's going to be a

22     personal opinion.  It sort of lacks

23     self-awareness in some ways that every system

24     has vulnerabilities, and you have to mitigate

25     with processes and procedures around every

1        system that exists.

2              So there's a level of vulnerability and a

3        level of processing around it, and we've seen

4        some of these things before, and there was one

5        specific thing that was exploited by the Trump

6        people in Antrim County where they --  A

7        election director made a mistake or a series of

8        five mistakes that led to incorrect outcomes

9        being displayed, and that was then obviously

10       exploited.

11             As we know, any claims need to be handled

12       responsibly and --  Excuse me.  Any claim can be

13       handled responsibly.

14             So yes.  I believe that's probably Mr.

15       Halderman's view is that by showing these, he's

16       heading off those things and trying to find ways

17       to mitigate them; and like I said, version 5.17

18       will go a long way towards doing many of those

19       things, I believe.

20             So my overall point is that, yes.  I

21       believe he's correct, to answer your question,

22       or that that's his mind-set.

23             But I also know that making the claims,

24       depending on how you do it and the way you do it

25       and the ways to achieve it responsibly and --

1    and this is going to --  Lawsuits in and of

2    themselves are adversarial, obviously; and it

3    becomes difficult in many ways sometimes to just

4    accept at face value what things are said versus

5    not.

6          And as you have a CISA process itself

7    allows -- basically says we strip away

8    everything around all the processes and

9    procedures, and we're just going to look just at

10   the cyber vulnerability itself or the potential

11   cyber vulnerability itself.  That is how the

12   CISA process works for these reviews, which is a

13   good thing, I think, and --  And allowing for

14   proper cyber investigation to make these reports

15   in such a way is a -- is not a bad thing.

16         Now I think sometimes it's not handled the

17   best in the world, and I think that there could

18   be improvements made to that federal system, but

19   I think the EAC's -- needs to be responsible in

20   these things, and they need to move a heck of a

21   lot faster than they have historically on them.

22         But, again, this is part of running a

23   responsible overall system, so there's a place

24   for all these pieces and parts to be done; and

25   Mr. Halderman's does have part of that as -- as

Page 167

```
 1        his rationale behind it.  I absolutely believe
 2        that you agree with that or believe that.
 3        Q.    (By Mr. Cross)  So you mentioned the CISA
 4   process sort of strips away or it doesn't look at the
 5   processes and procedures, things like physical
 6   safeguards that are in place.  It's looking at the
 7   software itself and saying are there software
 8   vulnerabilities, right?
 9        A.    And hardware, I think, I mean --
10        Q.    Right.
11        A.    -- 'cause you have to be able to do those
12   things.  Right.
13        Q.    But I mean, we --
14              Isn't it a fact that we now know that
15   the -- these other processes and procedures,
16   including the physical safeguards that you're relying
17   on in Georgia, that they're not adequate?
18              Doesn't the Coffee County breach, which
19   spanned eight days and involved -- I don't know --
20   somewhere north of half a dozen people, that those
21   safeguards just don't work?
22        A.    Well, Mr. Cross --
23              MR. TYSON:  I'll object to form and object
24        to scope.
25              Go ahead.
```

Page 168

1           THE WITNESS:  Mr. Cross to that point,
2       when you have bad actors, it doesn't matter what
3       your system is.  They --  They're all
4       exploitable at that point, a hundred percent
5       across-the-board, anything with a computer.
6           Even in -- in Dr. Halderman's report
7       itself, he says you can do things to the
8       scanners, which is part of your relief.
9           So basically, any --  All physical
10      security is reliant upon human beings of good
11      faith following their oath of office.  I think
12      part of the issue we have in all the stuff
13      around elections is every person involved
14      believes in their heart of hearts they are
15      saving American democracy from the bad guys on
16      the other side, and that's what they all believe
17      across-the-board.
18          There are those of us who actually --
19      actually have to run elections -- the county
20      elections workers, the poll workers, the
21      secretaries of state, the elections directors,
22      the poll managers, the boards of elections that
23      are stuck having to actually do things in the
24      real world to protect the election.
25              And when you have people in that group who

1           violate the law and violate the rules, that's

2           why we have criminal investigation right now;

3           and it is wrong; and like I said, I think Misty

4           Hampton now will act as a cautionary tale to

5           those who will -- who think that maybe I can get

6           around the system and prove that it's not doing

7           what it supposed to be doing.

8           Q.    (By Mr. Cross)  You keep talking about

9     Misty Hampton.  I mean, let's be clear.  It wasn't

10    just Miss Hampton.  It was Eric Chaney.  It was Cathy

11    Latham.  It was Ed Voyles.  There were a number of

12    folks that were part of this.

13          A.    And every single one of them believe

14    they're saving American democracy.  I mean, that's

15    the problem motivation on this is it's okay to

16    violate my oath, because I'm doing it for the right

17    reason.  It's okay to run to the press with things.

18    I'm doing it for the right reason.  It's just a

19    because they believe in their hearts of hearts doing

20    the right thing.

21          My point is us as election administrators

22    are stuck dealing with the fallout from those things,

23    and you can never -- if --  If laws always worked a

24    hundred percent of the time, there'd be no murders.

25    You know, there's --

Page 170

1          You can put safeguards and people in place

2   to try to hold them accountable, but it is --  You're

3   always, at the end of the day, reliant upon that.

4          I mean, one of the easiest hacks in the

5   world is if you have a person in the back room with

6   cast absentee ballots in Georgia right now who can do

7   an extra stray mark and overload it, and you would

8   never have a record of it.

9          In our adjudication module, which Misty

10  was showing off to her board, there's a record.

11  There's a log file, the whole thing; and she went out

12  of the bounds of the rules that was supposed to --

13         What she did wasn't really replicatable,

14  and that's --  And that was the reason we had that

15  statement from her, because we said you showed them

16  this.  Did you do this?

17         Well, no.  Of course, not.  I didn't do

18  this.  It's all the bad people.

19         If you look at that end of that videotape,

20  this is okay if you're honest.  But what you're if

21  not?

22         I mean, the motivation of these people are

23  what's at issue; and we're stuck as election

24  administrators dealing with the real world of trying

25  to run an election that, you know, 5 million people

Page 171

1  in Georgia voted in; and this time, probably four and
2  a half million; and claims and counterclaims and
3  noise and booyah is what --
4            I step out of the cube, and we also get
5  together and get really loud.  It's booyah.  I can't
6  spell booyah for you.  I'm sorry.
7            That causes these problems of undermining
8  faith in the elections.
9            And there --  Like you said, there's still
10  a percentage on the left and the right who, if you
11  look at what the polling commission says, they don't
12  believe these things, because of bad actors like in
13  Coffee County or because of claims of the Trump
14  people or because of claims of Russians flipping
15  votes in 2016.
16            So all those things are true.  It's the
17  environment in which we have to operate in.
18       Q.    You mentioned that every system has
19  vulnerabilities.  It -- it --  Wouldn't it be sound
20  policy in light of that to use the system that has
21  the least number of exploitable vulnerabilities and
22  those that are the -- the hardest to exploit?
23            MR. TYSON:  And I'll object to scope.
24       This has nothing to do with the events that
25       occurred.  This is theoretical.  It's --

```
 1              THE WITNESS:  It's theoretical, and what
 2         we did is when we did --
 3         Q.    (By Mr. Cross)  I'm not asking you a
 4    theoretical question.
 5         A.    You are.
 6         Q.    I'm asking you a practical, pragmatic --
 7    and I -- I'm --
 8              Let me ask it in this way.  The
 9    Secretary's Office is responsible for administering
10    elections across the state with the support of
11    counties; is that fair?
12              MR. TYSON:  Objection.
13              THE WITNESS:  Counties run elections, and
14         the State provides support.  That's the way I
15         would probably categorize it.
16         Q.    (By Mr. Cross)  Okay.  The Secretary's
17    Office has some level of responsibility for election
18    security, right?
19         A.    Yes.
20         Q.    And --  And given what we now know in
21    Coffee County, why wouldn't you want to adopt a
22    system that is as secure as it can be?
23              MR. TYSON:  I'll again object to scope.
24         That --  That has nothing to do with the
25         unauthorized access.  It's not what the --
```

Page 173

```
 1            MR. CROSS:  Literally --
 2            MR. TYSON:  -- policies should be.
 3       Q.    (By Mr. Cross)  I mean, he literally
 4   talked about it in the question, but --
 5       A.    Okay.
 6       Q.    -- go ahead.
 7       A.    To your point, we have a couple of
 8   constraints.  Not constraints.
 9            We can't just look at that and that alone.
10   We had a law that was passed, HB 316, that said the
11   State of Georgia will use a ballot-marking device
12   system.  We had four potential bidders.  Three of
13   them made it into the actual bid time, because one
14   didn't make it into the portal in time.
15            Two of them made it to the next round of
16   negotiation, and that was the incumbent provider,
17   ES&S, and Dominion Voting Systems.  They both were
18   using BMDs per the law and per the bid; and they were
19   evaluated on many, many things, including cost.
20   There were the big difference in cost, a little
21   difference in technicals.
22            So when we are running a system, it has to
23   not just be the most cyber secure system there is.
24   You would love to have it as your number one goal on
25   some of these things, and we had --  It's rated very
```

 1   highly with us.  We had a lot of security questions

 2   in that bid, if you go back and look at it, which I'm

 3   sure you have.

 4              We also have to worry about what -- how is

 5   this easy to train on?  Is it easy to run?  How does

 6   it function.  Is it going to work properly?  Again,

 7   can we train on it?

 8              But going further back from your question

 9   since you asked a practical question, we have to take

10   into account other things; and part of the reason the

11   policy decision was made, in part, by the legislation

12   for a BMD was there were issues going back on

13   hand-marked paper ballots that existed that BMDs took

14   care of -- overvotes potentially.  Cuts down on

15   undervotes, because it prompts you and -- and the

16   places --

17              I know that the response has been, well,

18   you can set the scanner to spit it back out to you if

19   there's an -- an overvote or a problem.  Go revote

20   it.

21              But what we see in places like New York,

22   in places where they do that --  And, second, it

23   causes line problems; but, also, it, oddly, can

24   discourage people from coming back to vote, because

25   they're embarrassed.  They look like, oh, like, I've

Page 175

1    got to go back and do it again.

2             This is a problem.  I mean, then their

3    lines are back around.  Somebody jumps back ahead.

4    There's other things we have to look at and take into

5    account when doing all these policies.

6             But the legislature passed a policy.  The

7    executive branch, under Secretary Raffensperger,

8    executed that policy.  We executed it going through a

9    DOAS bid process; and then we worked with the SEB to

10   put rules and processes around it, following best

11   practices we learned from other states and from the

12   vendor, in talking to counties.

13            And those rules and what we do around them

14   are always changing and -- and working to improve to

15   make them better; and working with the vendor, we've

16   moved on to the next 5.17, which eliminates many of

17   the things that Dr. Halderman talked about in his

18   report.

19            We are moving on to doing a pilot of new

20   Poll Pads to allow for -- for quicker transparency

21   and easier loading of issue.  It's always an evolving

22   system.

23            You can't just look at that as the one

24   thing.  It is a plethora of items that we have to

25   take into account, while following the law at the

1   same time, and trying to take into account voter

2   ease; and I would put our system up against any

3   system in the country in terms of voter experience

4   and our record turnout.  And our hand recount, hand

5   re-tally showed the system did what it was supposed

6   to do and that that's -- and I think that --

7            More than anything we did, going to paper

8   was a godsend, I think was a godsend for us.  Because

9   having those BMD ballots that were easy to recount

10  allowed us to eliminate a portion of the people

11  making the claims that Dominion voting systems were

12  flipping votes.  It -- it --  It took care,

13  especially at, to my mind, the electoral level, state

14  house and state senate members who were watching One

15  America news and listening to Lin Wood and Sidney

16  Powell and, you know, those people who gave them

17  information and supported them that the system itself

18  did it.

19            They said okay.  I get it.  That

20  particular one's crazy.

21            So I think the system we got is a very

22  good system.  It is a system that can move with the

23  time and has the ability to update those items.  I

24  just wish the EAC would move faster in -- in their

25  stuff.

1       Q.    Are --  Are you aware that Dr. Halderman

2   found that in some respects, the new Dominion system

3   is actually less secure than the -- the GEM system

4   that it replaced?

5       A.    I read that part of the report, and the

6   way I read it basically was it's an irony kind of

7   thing.

8           One of the most valuable people to hire,

9   one of our most expensive people to hire in the cyber

10  community right now is COBOL programmers, because

11  there's so few of them left, because it is an old

12  code.

13          One of the issues around the GEM system,

14  it was an old fricking code, and it was a lot

15  clunkier to get through.  More updated things --

16          Here's an irony.  We don't let these

17  components get hooked to the Internet, obviously; and

18  the way you update most new systems is through the

19  Internet.  We keep things moving and updating all the

20  time, so this falls behind.

21          But they've created the systems like in

22  the android platform and stuff to make the system

23  itself easier to work with, so you'd say it's --  I

24  won't say it's less secure.  I would say it's more

25  modern, which makes it easier in many ways.

```
 1   That's --
 2              You want to stop for a second.  We'll --
 3              THE WITNESS:  I saw you nodding.
 4              THE VIDEOGRAPHER:  Not me.  I'm like you,
 5       man.
 6       Q.   (By Mr. Cross)  Go ahead.
 7       A.   So I saw it being more --  The more modern
 8   systems in many ways are somewhat easier to get into,
 9   because there's certain policies and --
10              And way they built systems out, if you go
11   into the some of the old job scripts, the SQL stuff
12   is so ubiquitous.  It generally can make those things
13   easier to do, so you always have to be aware of those
14   things when you're roll -- rolling out a system.
15       Q.   But it's not just that this Dominion
16   software is more modern.  It has more vulnerabilities
17   in its design, including that some of it is just
18   off-the-shelf software.  It's not --  It's not secure
19   proprietary software in many respects, right?
20       A.   Which --
21              MR. TYSON:  And I'll object to form and
22       scope.
23              THE WITNESS:  And there's two ways of
24       looking at proprietary software, usually when
25       you have --
```

Page 179

1      Q.    (By Mr. Cross)  Well, hold on.  Just

2  answer my question.  Do you disagree with what I just

3  said?

4      A.    No.  I don't disagree.

5      Q.    Oh, okay.

6      A.    I'm -- I'm --  I'm pointing out that

7  there's more than just looking at that we have to

8  take into account.  The ability to update and change

9  and make things easier becomes easier when you're

10  using COTS, certified off-the-shelf.

11          I mean, one of the systems we have right

12  now is our voter registration system.  I'm using this

13  as an example to kind of show you the situation.  It

14  was a built-out system for Georgia, that Texas uses a

15  similar version from our vendor Civics.

16          One of the problems with proprietary

17  software, which is a big problem, is the programmers

18  who did it retire.  They move on.  You --  You have

19  your escrow, which is supposed to always be updated.

20  Some vendors don't always update their escrows, which

21  makes it difficult if you want to go back and do some

22  of those system changes.

23          So we're moving to a Salesforce-based

24  system built out on a more modern platform that will

25  be continually updated, because there's advantages to

Page 180

1     doing it that way.  There are disadvantages

2     potentially on that cybersecurity side.  I get that,

3     but that's why you have to put processes and policies

4     in place to try to mitigate against them and try to

5     use software development to attempt.

6             You're never going do stay fully ahead

7     with every potential threat on the cyber side.

8     It's --  It's physically impossible.  You need --

9     we -- we always --  We have to use computers to build

10    these things to -- to do counting in modern American

11    elections.

12            It would be impossible to do hand

13    counting.  I think everybody agrees.  Hand counting

14    is ineffective.  It's going to be wrong, because

15    human beings are much more fallible and flawed than

16    machines are.

17            THE WITNESS:  Can we stop for a second.  I

18        drank too much water.  I apologize.  Can we --

19        Can I break out for a second.  Run to the

20        restroom.  We're getting close to the time you

21        wanted to break for lunch.

22            MR. CROSS:  Can I ask you one quick

23        question before we do that?

24            THE WITNESS:  I think that's --  That's

25        your go-to before I go the bathroom.  Yes.

Page 181

1      Q.    (By Mr. Cross)  But do you agree that QR

2  codes are not needed for anything you're describing?

3            MR. TYSON:  And I'll object to scope.

4            THE WITNESS:  I'm not following your

5      question, sir.

6      Q.    (By Mr. Cross)  The --  What you've just

7  described in sort of your view or the Secretary

8  Office's view on administering elections, balancing a

9  variety of factors with election security, the QR

10  codes that are on the ballots used in Georgia, those

11  are not needed for anything you're describing, are

12  they?

13            MR. TYSON:  And, again, I'll object to

14      scope.  This has nothing to do with the breach

15      or anything else.

16            THE WITNESS:  But I'm --  Again, I'm not

17      really following your question, because there

18      has to be some coordinate down for the machine

19      to know what to count, 'cause the machine,

20      whether is a hand-marker ballot or a BMD ballot

21      doesn't read the human readable text at all.

22      It's reading a coordinate that then corresponds

23      to that so --

24      Q.    (By Mr. Cross)  I understand --  I

25  understand that.

1      A.    Again, I'm not following your question

2  then.

3      Q.    I understand the computer science

4  argument.  All I'm saying is the State uses QR codes.

5  You understand the Dominion system can scan the human

6  readable portion to tabulate ballots.  You know that,

7  right?

8      A.    No.  It can't.  5.5 cannot.  The only --

9  The only system that exists that can scan -- doing

10  OCR for those things is another vendor.

11      Q.    The Dominion system currently scans

12  hand-marked paper ballots that come in from absentee,

13  right?

14      A.    Correct.

15      Q.    Okay.  So you understand this system can

16  scan -- it does not have to --  It does not have to

17  scan QR codes to tabulate ballots.  You understand

18  that, right?

19      A.    Yes.  But my point is it doesn't -- it

20  has -- it's not reading --  It's not scanning human

21  readable text from the other thing.  It's scanning a

22  coordinate the QR code corresponds to.

23      Q.    I --  I get that.  My question is a very

24  simple question.

25            None of what you just described in terms

Page 183

1    of the factors of -- of having this particular

2    system, none of that requires a QR code, as opposed

3    to a ballot that does not have a QR code.  We're

4    agreed on that, right?  That's just not needed.

5           A.    I don't --  I'm not --

6                 MR. TYSON:  And I'll object.

7                 THE WITNESS:  -- agreeing on --

8                 MR. TYSON:  Oh.

9                 THE WITNESS:  -- this right now.

10                MR. TYSON:  So sorry.

11                Again, I'll object to form and scope.

12                THE WITNESS:  I'm not agreeing to that

13          necessarily, because that is the system that we

14          use right now.

15          Q.    (By Mr. Cross)  No, no.  I get the systems

16   you use.  But --  But that's just status quo.  That's

17   saying we need QR codes because we have QR code

18   system.

19                I'm asking you a different question, which

20   is:  To achieve all of the objectives you've just

21   described that the Secretary's Office considers, you

22   do not need QR codes on a ballot.

23          A.    We do right now.

24                MR. TYSON:  I object to.

25          Q.    (By Mr. Cross)  Or --

Page 184

1          MR. TYSON:  -- form and scope, and I
2     think --
3          THE WITNESS:  Let me -- let me answer your
4     question, David.
5          THE COURT REPORTER:  Now let's --
6          MR. TYSON:  Yeah.  Sorry.
7          THE COURT REPORTER:  -- have the full
8     objection, please.
9          MR. TYSON:  Objection as to form and
10    scope.  It has nothing to do with the breach or
11    improper access.
12         THE WITNESS:  Now allow me to answer your
13    question.
14         The 5.5 Democracy Suite requires a QR code
15    for a BMD ballot.  The law requires we use a
16    BMD.
17         Now I know that there is a potential to go
18    to a full-face ballot in the later versions of
19    these things.  Now there's a whole slew of
20    problems that come from that in terms of paper,
21    in terms of two-page ballots.  There's a --  And
22    the logistics and cost that are attached to
23    those as well, so, again, it's not just one
24    thing to look at.
25         You're right.  The --  The current system

1       can read a hand-marked paper ballot.  The

2       current system cannot produce a similar version

3       five -- out of the 5.5, so that is a system that

4       we have to use right now.

5              We were upgrading to one that could

6       potentially do that; but there other factors

7       like cost, training, auditing problems.  We have

8       to use two-page ballots.

9              We've had this discussion internally, so

10      we've tried to look at it as reasonably as we

11      can, and Dominion's --

12             Like we'd love to be able to do full-face

13      ballot take some of this QR code argument away,

14      I think; with right now, with the training we

15      have, with the contract we have for the 14-cent

16      ballots and not fully knowing how do you deal

17      with auditing those things.  What kind of

18      batching?  What kind of extra training do you

19      have to do on that front to move to that?

20             If we move to 5.17, that will be something

21      we could look at; but then we have to change out

22      the printers, which is another cost; and you

23      have to go to --

24             In a sense, many counties have different

25      size ballots from 14 inch to 21 inch or 22 inch,

1      that we would then have to -- how do you --  How

2      do you deal with that?  What are the problems

3      and -- and factors we have to -- if we're doing

4      something like that?

5            So, again, this is part of a plethora of

6      items we have to look at.

7      Q.    (By Mr. Cross)  But the current system

8 already prints all of the human readable selections.

9 It has the full-face ballot there.  It just also has

10 a QR code at the top.

11     A.    That is not correct, sir.

12     Q.    So how is that incorrect?

13     A.    Okay.  Let me walk you through how this

14 works on this front.  And I'm not trying to talk

15 down.  I'm just trying to say --

16     Q.    Okay.  Let me --  Can I just ask a quick

17 question first.

18     A.    Yeah.

19           May I please go to the bathroom.

20     Q.    Well, no.  Are you saying --  Are you

21 saying that when the ballot prints, it does not have

22 all of the human readable selections?

23     A.    No.  I'm not saying that.

24     Q.    Okay.

25     A.    What I'm saying is it is not capable of

Page 187

1    reading that.  Okay.

2         Q.    But no.  I get that.  I get that but --

3         A.    Well, it sounds like you're saying it can

4    read a BMD ballot that way.  If --  Or if it's a

5    hand-marked ballot, it can be read that way.  It

6    can't.

7              MR. TYSON:  Hey, David, when he's using

8         the term full faced --

9              MR. CROSS:  No.  I understand what he

10        means by that.

11             MR. TYSON:  Okay.

12             MR. CROSS:  I understood what he means by

13        that.

14             MR. TYSON:  Yeah.

15        Q.    (By Mr. Cross)  But you --  I thought you

16   were saying that -- that part of the challenge if you

17   were to go to a full-face ballot, meaning it does not

18   have --

19        A.    Uh-huh.

20        Q.    -- a QR code is you have to deal with,

21   well, they're printed at different sizes -- 14 inch

22   in one --

23        A.    Uh-huh.

24        Q.    -- different in other.

25             But my point is that the difference

Page 188

1   between that full-face ballot in terms of the human

2   readable selections that are on that ballot, aren't

3   those the same?  Doesn't the current ballot print the

4   human-readable selections that the voters have made?

5       A.    Frankly, David, I am so lost in your

6   question, right.  I'm not trying to be pedantic.

7   I -- I don't --  I'm just not following it.

8       Q.    Why don't you go to the bathroom?

9       A.    Okay.

10          MR. TYSON:  Yeah.

11      Q.    (By Mr. Cross)  'Cause I think we've lost

12  each other.

13      A.    Yeah.

14          THE VIDEOGRAPHER:  We're going off the

15      record at 12:35.

16          (Recess from 12:35 p.m. to 1:19 p.m.)

17          THE VIDEOGRAPHER:  We are on the record at

18      1:19.

19      Q.    (By Mr. Cross)  So, Mr. Sterling, I

20  understand you got some additional information on the

21  recent case number that was open in September and

22  what that entails.

23      A.    There was two different case numbers.

24      Q.    Oh.

25      A.    One was, in fact, Spalding County.  The

Page 189

1   other at the request of the State Election Board

2   Chairman and the State Election Board was to create a

3   new case number to basically put all the stuff having

4   to do with this current Coffee County investigation

5   into that.  It's been no new documentation on the

6   inside.  It's just basically a number for tracking

7   purposes.

8       Q.    What's the case number for Spalding; do

9   you know?

10      A.    Spalding is 2022-219, and it was open on

11  9-21-22; and Coffee is 2022-207, opened on 9-7 --

12      Q.    Thank you.

13      A.    -- 2022.

14      Q.    Okay.  Do you know what the reason was

15  to -- to create a new case for Coffee County, rather

16  than just continuing with what you were doing?

17      A.    It was the request of the State Election

18  Board Chairman.

19      Q.    But do you have any insight as to what led

20  to that request?

21      A.    He is a federal judge; and he had ways he

22  wanted to do it, so our form of regulation --

23      Q.    Yeah.

24      A.    -- he chose to do that.

25      Q.    Okay.  Okay.  And then I think the other

Page 190

1    question we had earlier was if you had any insight

2    into why the ICC was replaced in Coffee County in

3    June of 2021.

4         A.    It's been explained to me the password on

5    it was also not --  They couldn't into that one

6    either, so they had to change that one out as well.

7         Q.    And who said that?

8         A.    Michael Barnes.

9         Q.    Is he aware that James Barnes testified

10   that the ICC was fully operational and there was no

11   password problem?

12        A.    No.

13              Well, I -- I have no idea what Michael

14   knows.

15        Q.    Okay.  So you --  You spoke to Michael at

16   the break --

17        A.    Yeah.

18        Q.    -- Mr. Barnes?

19        A.    Actually, I didn't speak to Michael.

20   Through our attorneys --

21        Q.    Okay.

22        A.    -- he got back --

23        Q.    Okay.

24        A.    -- to me.

25        Q.    So okay.  But Mr. Barnes --  Michael

Page 191

1   Barnes's understanding is that the ICC password also
2   did not work?
3       A.    Correct.
4       Q.    And do you know what the basis of that
5   understanding is?
6       A.    I'm assuming Chris Bellew, who is down on
7   site, informed him of that.
8       Q.    Yeah.  And I don't want you to assume.
9   You --  You just don't know?
10      A.    I don't know.
11      Q.    Okay.  That's fair.
12      A.    But it's a good supposition.
13      Q.    Okay.  Well, maybe.  I mean, Mr. Barnes
14  seemed confident that the ICC password was not a
15  problem.
16      A.    He was also confident that the office
17  hadn't contacted him, when, in fact, we know they
18  had.  That's, again, it's a question of time more
19  than anything --
20      Q.    Uh-huh.
21      A.    -- I think.
22      Q.    Okay.  The circumstance that had come to
23  light with the unauthorized access to the State's
24  voting system in Coffee County, did that lead to any
25  discussions within the office on whether to -- to use

Page 192

1    emergency hand-marked paper ballots for elections?

2         A.    No.

3         Q.    Are you aware of any election security

4    expert who has examined any component of the State's

5    voting system since the Coffee County breach came to

6    light?

7         A.    I'm going to assume Mr. Persinger's had

8    the -- one part of that.

9              Since then, no.  We haven't had -- brought

10   anybody else in yet.  In fact, we're discussing

11   trying to go through our procurement process to get a

12   contract in place to allow for that for the long

13   term.

14        Q.    But Mr. Persinger, I assume, has forensic

15   expertise.  But he's not an election security expert,

16   right?

17        A.    Well, this becomes --  This comes into the

18   subjective idea of what an election security expert

19   is.

20        Q.    Well, is he --  Are you aware of any

21   proceeding in which he has offered opinions as an

22   expert on election security?

23        A.    I'm not.  No.

24        Q.    Are you aware of any work by Mr. Persinger

25   to examine voting equipment prior to the work he's

Page 193

1    doing now?

2         A.    Not that I'm aware of.  No.

3         Q.    Are you aware --

4               Well, back up.  You know Ben Adida?

5         A.    Yes.  Uh-huh.

6         Q.    Ben Adida is an expert who testified for

7    the State in this case; do you know that?

8         A.    He testified for us?

9         Q.    He did.  He testified at a hearing in

10   September of 2020.

11        A.    Okay.  Then yeah.  I'd forgotten that that

12   was the case.

13        Q.    Yeah.

14              MR. BROWN:  It was Zoom.

15              THE WITNESS:  Okay.

16              MR. BROWN:  Wasn't that by Zoom?

17              MR. CROSS:  It was.  I think everybody was

18        by Zoom.

19              THE WITNESS:  Okay.

20        Q.    (By Mr. Cross)  And Ben Adida, does he own

21   or he runs VotingWorks?

22        A.    Something.  I'm not sure how it works, but

23   I think he founded it, and it's like a nonprofit

24   thing so --

25        Q.    And VotingWorks is a company that the

Page 194

1    States contracts with for audit purposes?

2         A.    Correct.

3         Q.    Maybe among others.

4               Sorry.  You say correct?

5         A.    They are.  There are none among others,

6    but they are.  They are the ones we can contract

7    with.

8         Q.    Okay.  Are you aware that Ben Adida always

9    advises his clients to adopt hand-marked paper

10   ballots, plus, one BMD for disability purposes?

11              MR. TYSON:  And I'll object to form and

12        scope.

13              THE WITNESS:  I am not aware of that, but

14        that wouldn't --  I wouldn't find that

15        surprising from Ben.  No.

16        Q.    (By Mr. Cross)  Why?

17        A.    Because I believe that's his understanding

18   and belief; and of course, in Georgia, we have a law

19   that says we have to have BMDs for everything.

20        Q.    All right.  Let me hand you --

21              MR. CROSS:  Are we at nine?

22              THE WITNESS:  Nine, I think.

23              MR. CROSS:  Is it nine?

24              THE VIDEOGRAPHER:  Yes.

25        Q.    (By Mr. Cross)  Okay.  Let me hand you

Page 195

1    Exhibit 9.  This is Tab 50, five zero.

2              (Exhibit 9 was marked for identification.)

3              (Discussion ensued off the record.)

4         Q.   (By Mr. Cross)  All right.  So Exhibit 50,

5    do you see is an e-mail, from Ryan Germany, to Steven

6    Ellis, on April 1st of 2022?

7         A.   Yes.

8         Q.   And if you come to the start of the

9    e-mail --

10        A.   Oh, you mean like the first e-mail in

11   the --

12        Q.   Yes.

13        A.   -- sequence?  Okay.

14        Q.   Yeah.  Yeah.  So go in chronological order

15   from earliest in time.

16        A.   Uh-huh.

17        Q.   Bottom of the second page, you've got an

18   e-mail from Rachel Roberts, to --

19             Is it Pratik Patel?

20        A.   Pratik --

21        Q.   Pratik --

22        A.   Yes.

23        Q.   -- P-R-A-T-I-K, Patel.

24        A.   Correct.  Uh-huh.

25        Q.   And Miss Roberts in -- at least in April

1   of this year, was the Elections Director in Coffee
2   County, right?
3        A.    I believe that's correct.  Yes.
4        Q.    And Mr. Patel, does he work in CES?
5        A.    He does work at CES.  He's one of our --
6   one, two -- three main ballot builders before.  I
7   mean, that's right, I guess.
8        Q.    One of the ballot builders?
9        A.    Ballot builders and CES employees, yes.
10       Q.    I see.  So and I was going to ask you.
11  What is Mr. Patel's role or responsibilities in CES?
12       A.    He is a ballot builder.
13       Q.    Okay.  But Mr. Patel was also involved in
14  replacing the EMS server --
15       A.    Uh-huh.
16       Q.    -- and ICC in June of last year, right?
17       A.    Part of the role of CES is they kind of
18  become our in-house experts on the equipment and
19  ballot building and all -- all the processes around
20  it, so this would fall under the scope of that.  He
21  would do that.
22            It's just a internal term of art.  When
23  you work at CES, you're a ballot builder basically.
24  That's how we refer to them unless you're in the
25  warehouse.  You're a warehouse guy kind of thing.

1       Q.    How many ballot builders are there?

2       A.    If memory severs, there's four that are

3  State employees and two that are contract employees

4  right now.

5       Q.    Contract employees contracted by the

6  State?

7       A.    Correct.  And these contracts are direct,

8  are through a State contract.  They hired -- it's

9  a -- it's a --

10            There are two state contracts for

11  temporary employees specifically.  A third, if you

12  include IT employees; and they are paid through one

13  of those three.  I can't remember which one it is.  I

14  would I want to say it's --  It's either CAI or focus

15  or corporate.  But, again, they're just --

16            It's enough to say modeling used to -- for

17  accounting to pay for contract employees, as opposed

18  to making them full employees, because full employees

19  are very expensive because there's a 63 percent

20  burden on their --  For every dollar you spend on

21  their salary, it's 63 cents additional to employ

22  them.

23       Q.    Okay.  Do they do the ballot building

24  physically on site at the Secretary's Office or where

25  do they do it?

1      A.     They do it at the Center for Elections

2   office, which is near the Braves stadium up and off

3   Interstate 120.

4      Q.     So here Miss Roberts for Coffee County

5   reaches out in April of this year and says can you

6   please send me a letter on your letterhead stating

7   that your server is in your possession.  Please

8   include why and when it was changed out.  Do you see

9   that?

10      A.     Yes.

11      Q.     Do you know why Miss Roberts is reaching

12   out to the Secretary's Office for that letter on

13   April 1st of this year?

14      A.     I vaguely recall.  I -- I --  I don't want

15   to speculate.  I think it was something around their

16   elections board wanted to understand why.

17          And, also, they say their server.

18   Technically, they're all the State's servers; but

19   they are held and used by those counties.  I just

20   want to make that clarification.

21          I believe that's what it was; but, again,

22   this was April of '22.  And, again, it was no big

23   deal to say the password didn't work.  We changed it

24   out.  Normal processes.

25      Q.     When you say that the -- the -- the State

1   servers, but they're held and used by the counties,

2   what does that mean?

3       A.    The State retains ownership of all

4   equipment unless, as in some counties, some large

5   counties buy their own equipment.  They --  They own

6   that equipment, but we still have to have -- go

7   through state acceptance and certification on those

8   pieces of equipment.

9       Q.    So the EMS server that was taken and the

10  ICC in the summer of last year from Coffee County,

11  that is and has always been owned by the Secretary's

12  Office or by the State?

13      A.    Once it was purchased and accepted, yes.

14      Q.    Okay.  All right.  Is that true for the

15  new equipment?  The State owns that, too?

16      A.    Correct.  All the equipment, not just the

17  ICC and the --  Everything that we changed out, the

18  States retains ownership of those items.

19      Q.    Okay.  Do you know why this -- the Coffee

20  County office did not already have any documentation

21  on the EMS server and the ICC being replaced in June

22  of 2021?

23      A.    I don't know that they didn't, or they may

24  be not be able to find it since they went through

25  three elections directors -- I guess two elections --

Page 200

1    Oh, an initial director election passed this time, so
2    I don't know what they did or didn't have, but they
3    probably wanted to have this as a belt and
4    suspenders.
5              Again, I'm making a supposition, so I
6    apologize, but I --
7              MR. TYSON:  Yeah.  And don't --  Don't
8         guess.
9         Q.   (By Mr. Cross)  Yeah.  If you don't -- if
10   you don't know --
11        A.   Well, I -- I couldn't suppose for certain.
12        Q.   Sure.  Okay.  Well, do you know why the
13   Secretary's Office does not have any documentation
14   regarding replacing that server and the ICC other
15   than the logic and accuracy report that we received?
16        A.   And the logic and accuracy report, that's
17   all you really need to know.  It's changed out.  It's
18   a new piece of equipment there with the L&A on it.
19   It was put there.  We have the time.  We have the
20   date.
21        Q.   But the chain of custody of voting
22   equipment, maintaining that chain of custody is
23   critically important, right?
24        A.   Yes.
25        Q.   And so does the State not have any

Page 201

1   policies or practices to require documenting when it

2   replaces voting equipment in the county other than

3   just an L&A report?

4        A.    I don't know off the top of my head on

5   that one, quite honestly.  I mean, I did

6   demonstration for voting equipment for a media the

7   other day.  We had to sign all the paperwork to take

8   it from one building to another.

9             So, I mean, I know we do have paperwork on

10  those fronts; and I don't know if it would be the

11  same as it would for a complete switch out or not.  I

12  just don't know off the top of my head.

13       Q.    If you wanted to know, who would you ask?

14       A.    I would ask Michael Barnes.

15            MR. TYSON:  You want us to check on that

16       at a break?

17       Q.    (By Mr. Cross)  Sure.

18            MR. TYSON:  Okay.

19            MR. CROSS:  Thank you.

20       Q.    (By Mr. Cross)  And then if you come up to

21  the most recent e-mail where we started, Mr. --

22       A.    The first page on --

23       Q.    Yes.

24       A.    The first page.  Okay.

25       Q.    -- Mr. Germany's e-mail, to Steven Ellis,

Page 202

1   dealing with this request from the Coffee County

2   election director.

3          Mr. Germany writes, "Yes.  I just left a

4   message with Coffee County's attorney.  Let's work

5   through her."

6          Do you see that?

7   A.    Yes, sir.

8   Q.    Do you have any insight into why the

9   Secretary's Office wanted to work through the Coffee

10  County's Attorney just on providing documentation

11  that's requested by the County with respect to

12  replacing the server?

13  A.    I think because there was --  At this

14  point, we were in an investigatory posture on that --

15  on that front is my best guess, and we were --

16         Generally speaking, when it comes to these

17  kind of investigations, we like working with the

18  county attorney's offices so that they're kind of

19  there, 'cause they're going to be defending and

20  trying to understand, do this stuff.  It was like

21  when the investigators came down.  The county

22  attorney was there with Misty at that time.  That's

23  just a normal kind of practice.

24  Q.    And for Coffee County, when you say the

25  county attorney, it's actually an outside law firm

Page 203

1    that fills that role at Hall Booth?

2              MR. TYSON:  And I'll object to scope.

3              You can answer if you know.

4              THE WITNESS:  I believe that's correct.

5         Yes.

6         Q.    (By Mr. Cross)  For example, it was Tony

7    Rowell that was in the meeting with Misty Hampton

8    December of 2020.  Do you remember that?

9         A.    Yes.

10        Q.    And then it --  Here, it's a reference to

11   her.

12              Do you know if Mr. Germany reached out to

13   Jennifer Herzog?

14        A.    I believed that --  Prompting my memory --

15        Q.    Okay.

16        A.    -- that is name of the person whose

17   talking to.  Yes.

18        Q.    Has there been any consideration or

19   investigation either by or at the direction of the

20   Secretary's Office into whether any of the Coffee

21   County attorneys were aware of the -- the breach in

22   January of 2021 shortly after or -- or at the time

23   that it happened?

24              MR. TYSON:  I'll object to scope.

25              If --  If you know, and don't disclose

1          about the investigation.

2                    THE WITNESS:  I couldn't speak to that.

3          Q.     (By Mr. Cross)  'Cause --  'Cause you

4      don't know?

5          A.     I don't.

6          Q.     Okay.

7          A.     Yeah.  Sorry.  Yeah.

8          Q.     I just want to make sure it wasn't -- it

9      wasn't like a privilege thing.  You just don't know?

10         A.     I just don't know.

11         Q.     Okay.  If --  If you wanted to know, who

12     would you ask?

13         A.     One of three people, either Ryan Germany,

14     Steven Ellis, or Sara Koth.

15                   MR. TYSON:  Or the GBI?

16                   THE WITNESS:  Or the GBI.  But at this --

17         at this point, it would have been an earlier

18         period of time.  This was well before the GBI

19         was involved.

20         Q.     (By Mr. Cross)  Right.  Okay.  So we

21     talked about the password change that was changed on

22     December 14 and --  And that was a directive from the

23     Secretary's Office.

24                   Are --  Are you aware that James Barnes

25     testified that his understanding was that

Page 205

1    county-level officials actually don't have

2    administrative rights to change a password?

3         A.    I'm aware that was his testimony, but I

4    believe that is incorrect.

5         Q.    Okay.  So the password change that

6    occurred on December 14, is it the Secretary's Office

7    understanding that Misty Hampton did that, or they --

8    they don't know for sure who did it?

9         A.    We don't know.  We only know is that

10   someone in that office who had the existing password

11   went on and changed that password, so we can't speak

12   if it was Misty, her daughter, or some other

13   employee.

14        Q.    Since the Secretary's Office thought that

15   the password should be changed after the YouTube

16   video came, why wasn't it the practice of the

17   Secretary's Office to make that change itself or to

18   oversee that change with whoever would handle that?

19        A.    I couldn't speak to that specifically.

20             Generally speaking, the board of elections

21   directors.  Counties run elections and --

22        Q.    All right.

23        A.    And, generally speaking, the Secretary of

24   State's Office says to do something, they generally

25   do it, because they don't want to go before the State

Page 206

1    Election Board for having done something wrong.

2        Q.    Does the --  Since the Secretary's Office

3    owns the equipment in Coffee County in particular, is

4    the -- is -- is it supposed to have all of the

5    passwords to that equipment so that it has its own

6    access?

7        A.    Generally speaking, yes.

8        Q.    And is it my understanding that when the

9    password was changed on December 14 at the

10   Secretary's direction, is it your understanding

11   whatever that password became was ever shared with

12   your office?

13       A.    That is my understanding.  Yes.

14       Q.    And what is that based on?

15       A.    That when James Barnes called Michael

16   Barnes, no relation, to -- to see if you have a

17   different password than what I have sitting here, he

18   had the same one; and there has been --  There's no

19   indication that we ever got the information that it

20   was changed.

21       Q.    Do you know whether the password that

22   James Barnes was trying to use and that Michael

23   Barnes had -- was that what the Secretary's Office

24   believed to be the EMS server password prior to

25   December 14th?

Page 207

1      A.     That was my understanding.

2      Q.     Is that from Mr. Barnes?

3      A.     Well, from Michael, yes.

4      Q.     From Michael, yeah.

5             And so when --

6             THE WITNESS:  Hold on.

7             MR. CROSS:  Sorry.

8             THE COURT REPORTER:  Okay.

9      Q.     (By Mr. Cross)  And so when the

10  Secretary's Office took possession of the EMS

11  server -- took possession of the EMS server in June

12  of 2021, the password that Mr. -- that Michael Barnes

13  had did not work?

14     A.     Correct.

15     Q.     And at some point this year, the

16  Secretary's Office got access to that server through

17  Mr. Persinger's work?

18     A.     I wouldn't say the Secretary's Office got

19  access to it.  Mr. Persinger got access to it.

20     Q.     But he's working at the direction of the

21  Secretary's Office?

22     A.     Yes.  Well, through the attorney.  I don't

23  know how to define the relationship, but through the

24  attorneys' offices, yes.

25     Q.     And I know we talked about this before.

Page 208

1           But just to get more specific for you, do

2     I understand correctly, you were not aware that Mr.

3     Persinger installed a software program on the

4     original EMS server on the hard drive called

5     resetpassword.exe, an executable file?

6               MR. TYSON:  And I'll object to form.

7               THE WITNESS:  No.

8          Q.    (By Mr. Cross)  The --  I guess our

9     follow-up if you don't know.  But let me ask -- let

10    me ask the question, and you can tell me if you just

11    don't know.

12              Do you know why when CES came into the

13    Coffee County office in -- in May of 20 -- or

14    sorry -- I think it was June of --

15              Sometime in the May-June time period of

16

17

18

19

20

21

22

23

24

25

Page 209

1  ████████████████████████████████████████

2              So that was my understanding of it.

3              MR. CROSS:  All right.  Is this ten, I

4      think?

5              THE WITNESS:  Yes.

6              (Exhibit 10 was marked for

7      identification.)

8      Q.    (By Mr. Cross)  All right.  Let me hand

9  you what's been marked as Exhibit 10.  It's Tab 59.

10             So Exhibit 10 is an e-mail that you sent

11 to -- to outside counsel including -- and, plus, Ryan

12 Germany and Steven Ellis on August 1st of 2022.

13             Do you see that?

14     A.    Are we talking beginning back here, or

15 where are you on?

16     Q.    The -- the -- The most recent e-mail at

17 the top of the first page.

18     A.    Yeah.  It was basically take the

19 information I'd gotten from -- I don't remember

20 exactly what it was, but I --

21             Yeah.  It was from Nicole.  That what's

22 she told me.  Yeah.

23     Q.    Okay.  So come down to the second-to-last

24 page.  It ends in 91.

25     A.    Okay.

Page 210

1    Q.    And yeah.  You'll see there's a --

2          Excuse me.  Sorry.

3          There's an e-mail from the Ichter Davis

4    firm producing, you know, what's referred to as the

5    complete recording of the phone call with Scott Hall,

6    and that's on March 2nd, 2022.

7          Do you see that?

8    A.    Uh-huh.

9    Q.    Yes?

10         Sorry.  You have to say yes or no for her.

11   A.    So yes.  Sorry.

12   Q.    That's okay.  That's okay.

13         Then we come up.  If you come to the page

14   ending in 89 --

15   A.    Yes, sir.

16   Q.    -- the e-mails in between are redacted.

17   You get to an e-mail from Mr. Germany, to James

18   Calloway, Blake Evans, and yourself on March 14 of

19   2022.

20         Do you see that?

21   A.    Yes.

22   Q.    Who is James Calloway?

23   A.    At the time, he was our deputy chief of

24   investigations.

25   Q.    Is he no longer there?

Page 211

1       A.    He's passed away.

2       Q.    Okay.  I'm sorry.

3       A.    He -- He left first, and then he passed

4    away suddenly.

5       Q.    Okay.

6       A.    He was very young.  He was only 47.  He

7    had a heart attack.

8       Q.    Jesus.  That's terrible.  Okay.  Oh, I'll

9    need to be healthier.

10             Okay.  So and in this e-mail, Mr. Germany

11   writes, "... can you download the file below and pen

12   an investigation into below."

13             Do you see that?

14       A.    Yes.

15       Q.    And then Mr. Callaway responds, "I got it,

16   Ryan.  I'm clear."

17             Do you see that?

18       A.    Yes.

19       Q.    And then we come up to --  The most recent

20   e-mail is one that you're sending where you're

21   conveying information from Nicole at Dominion.

22             Do you see that?

23       A.    Yes.

24       Q.    Who was Nicole?

25       A.    Nicole Nollette who is their vice

Page 212

1    president of operations.

2         Q.    How do you spell her last name?

3         A.    I believe N-O-L-L-E-T-T-E.

4         Q.    And so when you're conveying this, is this

5    the text like from an e-mail or a text message or

6    something?

7         A.    Yes.

8         Q.    Okay.  Text message or e-mail?

9         A.    I don't recall.

10        Q.    Okay.  So she says, Gabe, you are right.

11   April 11th I was up there.  When I was at CES, I had

12   to go to Best Buy.  I just remembered this.  I looked

13   up my account, and the purchase was April 11.

14        A.    Yes.

15        Q.    And then you explain below she was working

16   to gain access to the server that had the password

17   change, right?

18        A.    Yes.

19        Q.    And that's the Coffee County server we've

20   been talking about?

21        A.    Correct.

22        Q.    What led the Secretary's Office to decide

23   to bring Dominion in, in the April timeframe of this

24   year to try to get access to that server?

25        A.    Well, we actually made the decision in

Page 213

1    March; but they already had a previously scheduled

2    trip, so it didn't seem logical to make them do an

3    additional trip down; and it was basically it's their

4    server.  They should be able to know how to get into

5    it through a -- if the password's been changed.

6              And they thought they might be able to.

7    They had a couple ways they were thinking about doing

8    it, and their engineers were working on it, so

9    that's --  It seemed a logical first step of doing

10   what we're trying to do, which was to figure out if

11   there had been any -- anything untoward on the

12   machine, was to go to them first.

13        Q.    Sorry.

14              But was it the --  The recording that you

15   received from Mr. Hall or the recording of Mr. Hall,

16   it -- it -- was that the impetus to say, okay, let's

17   go look at this server that we've had for a while?

18        A.    We had had some discussions about it, so

19   let's listen to the whole thing.  As I said earlier,

20   I wasn't sure of the timeframe.  I think it was post

21   getting the full thing or free.

22              We --  We already decided we've got to

23   figure out how we're going to do this, and I couldn't

24   tell you when we originally called either Tom Feehan

25   or Nicole Nollette to say, hey, we need to get into

Page 214

1   the server.  How do we do that.

2          So it was around --  They're all

3   contemporary to one another in that timeframe.

4       Q.    Did anybody come with Miss Nollette on

5   April 11th from Dominion?

6       A.    Not that I recall, but I -- I may not be

7   aware.

8       Q.    Okay.

9       A.    I know that she was talking to people

10  remotely in the Denver office about this from CES,

11  'cause we had discussions about that.

12      Q.    So is it your understanding that she's the

13  one who came up, and it was --  She's the one who

14  tried to get access to the server?

15      A.    And to a point where she'd gone to Best

16  Buy and said, hey, get this and see if this can help

17  you do that kind of thing.  That --  That was where

18  that came down from because we had an initial

19  discussion.

20         She --  In her brain, she thought it was

21  later that she'd come down in April; but I said no.

22  I'm pretty sure it was around this time.

23         And she went back and checked, and that's

24  how --  That was the impetus behind this particular

25  discussion on the e-mail.

Page 215

1      Q.    Do you know what it is she purchased from

2   Best Buy to try to help with that?

3      A.    I don't.

4      Q.    If you wanted to know that, who would you

5   ask?

6      A.    Nicole.

7      Q.    But whatever she bought, fair to say it

8   didn't work?

9      A.    Correct.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 216

1          So I don't know if that was stated or not.
2     It was not stated to me.
3          Q.    Mr. Barnes testified that --
4          A.    Michael or James?  Sorry.
5          Q.    Yes.  Thank you.  That's a good
6     correction.
7               James Barnes testified that when the
8     Secretary's Office swapped out the -- the EMS server
9     and the ICC in June of last year, he said it was Mr.
10    Patel and someone named Chris.
11               Was that Chris Bellew?
12         A.    Chris Bellew.  Correct.  And that's
13    spelled B-E-L-E-W (sic).
14         Q.    Is it two L's?
15         A.    I think it's just one.
16         Q.    Oh, okay.
17         A.    I could be wrong, but I'm pretty sure it's
18    just one.
19         Q.    Okay.  And just so I understand, your
20    knowledge is that the only documentation that exists
21    within the Secretary's Office about replacing the EMS
22    server and the ICC is that L&A testing report that we
23    received?
24         A.    As I sit here right here, yes.  We're
25    obviously going to check the next break.

Page 217

1    Q.    When the State opens an investigation and

2    creates what's called a case sheet, right?

3    A.    It's my understanding.  Yes.

4    Q.    Do you know whether there was a case sheet

5    created for the original 250 investigation in Coffee

6    County?

7    A.    My assumption is that if there was a case

8    that was open on 250, there would have been an

9    initial investigatory case sheet; and then I think it

10   would have been part of the -- what was presented to

11   the SEB.

12   Q.    Have you ever seen one?

13   A.    I --  I've seen so many of these now.

14   Q.    Okay.

15   A.    They kind of run together.  I believe I

16   saw the --  'Cause I've seen there's case logs.

17   There's investigatory logs, and the case sheet

18   specifically, I see the end product, which is the SEB

19   report of the investigation.  I've seen the download

20   or the screen capture from our SharePoint system,

21   which has these on there.

22          I don't know if I for sure have seen the

23   initial, very first case sheet from the SharePoint

24   drive of this particular case or not.  I may have,

25   but I can't recall specifically.

Page 218

1      Q.    Okay.

2            MR. TYSON:  David, are you talking about

3      the summary of investigation when you say case

4      sheet, or is it --  What are you referring to in

5      case sheet?

6            MR. CROSS:  No.  My understanding is --

7      And I thought Mr. Sterling was saying the same.

8      But when an investigation's opened, there's a

9      document called a case sheet that's created at

10     that time.

11           MR. TYSON:  Okay.

12           THE WITNESS:  I don't know if it's like

13     we've opened this file.  The case sheet's there.

14     I think it's a first step --

15     Q.    (By Mr. Cross)  Yeah.

16     A.    -- 'cause there's -- there's a SharePoint

17  system where we centrally keep all the documentation.

18     Q.    Right.

19     A.    But I don't think the SharePoint system

20  itself creates the case sheet.  The case sheet's just

21  sort of there.  It's like here's your starting point

22  for your notes and everything else that you do.

23           MR. CROSS:  Okay.  We --  We have not seen

24     a case sheet for the --

25           MR. TYSON:  Yeah.

Page 219

1          MR. CROSS:  -- 250 investigation, so we

2     would ask for that, if it exists.

3          MR. TYSON:  Okay.  I --  I don't think it

4     exists.

5          THE WITNESS:  I don't think it exists that

6     way.  It's in --

7          MR. TYSON:  Right.  I think it's --

8          MR. CROSS:  Well, let's look at --

9          All right.  So let's --

10          MR. TYSON:  Okay.

11     Q.    (By Mr. Cross)  Maybe WhatsApp's right.

12     A.    Okay.

13     Q.    Let me hand you --

14          MR. CROSS:  Is it 11, I think it is?

15          THE VIDEOGRAPHER:  Yes.

16          (Exhibit 11 was marked for

17     identification.)

18     Q.    (By Mr. Cross)  All right.  Exhibit 11.

19     This is Tab 107.

20          So Exhibit 11, the most recent is an

21     e-mail from Ryan Germany to folks at the Secretary's

22     Office on April 25th of 2022.

23          Do you see that, Mr. Sterling?

24     A.    Yes.

25     Q.    Okay.  Come to the start of it.  Go to the

Page 220

```
 1   third page ending in 50.
 2        A.    Okay.
 3        Q.    And if you look at, actually, the bottom
 4   of the second page, you'll see the whole e-mail.
 5             Do you see this starts with an e-mail from
 6   a reporter named Kate Brumback at the AP?
 7        A.    Yes, sir.
 8        Q.    And so she reaches out through Open
 9   Records on April 25th of 2022, and she says I'm
10   seeking any documents related to an investigation
11   into the handling of the EMS server in Coffee County
12   that was opened between February 24 of '22 -- 2022
13   and the present.
14             You see that?
15        A.    Yes, sir.
16        Q.    And then Open Records responds to her they
17   can't release any information because it's under
18   investigation.  They say you previously asked for a
19   cover sheet, and we sent that one we are using for
20   the investigation.
21             Do you see that?
22        A.    Yes, sir.
23        Q.    Do you know what they sent?
24        A.    Looking at this, I couldn't say for
25   certain.
```

Page 221

1      Q.    Okay.

2            MR. TYSON:  David, we could go on a break.

3      Let me see if I can find that, 'cause I have not

4      seen that document.

5            MR. CROSS:  Okay.

6            MR. TYSON:  So let us see if we can find

7      it.

8            MR. CROSS:  Sure.

9            MR. TYSON:  If there's something separate.

10     It may just be the SharePoint print.

11           MR. CROSS:  Okay.

12           MR. TYSON:  I don't know what it is, so

13     let me find out what that is, and we --

14           MR. CROSS:  That's fine.

15           MR. TYSON:  And we're happy to get it to

16     you, obviously.

17     Q.    (By Mr. Cross)  Okay.  And then if you

18     continue on in this thread, Mr. Sterling, you see

19     that Miss Brumback writes back.  She gives some more

20     information about what she's looking for.

21           Do you see that?

22           The bottom of the first page.

23     A.    Oh, yeah.  I'm reading --  I'm reading it

24     now.

25     Q.    Yeah.  And then Open Records forwards that

Page 222

1   on to Steven Ellis, Ryan Germany, and Paul Kokenes,

2   Kokenes?

3          A.     Kokenes.   Yeah.   That's Greek.

4          Q.     And who is the Paul Kokenes?

5          A.     He is a employee inside the elections

6   division, sort of --  He's our data guy.  It's for

7   lack of a better word.  He does various and sundry

8   other things.

9          Q.     What was his role with respect to the

10  investigation regarding the breach of the voting

11  system in Coffee County?

12         A.     None that I know of, other than he works

13  with Open Records a lot from elections, so he's sort

14  of the liaison between the Open Records Division or

15  Department, which is one person on the election side.

16  He's usually copied all those, kind to keep

17  everything in front of him.

18         Q.     And so then Mr. Germany responds and adds

19  Sara Koth.  Can someone send me the 2020 cover --

20  2020 Coffee County case sheet.

21             Do you see that?

22         A.     Yes.

23         Q.     And then he says, "Does that case sheet

24  reference the case as still open?  If it doesn't, we

25  should update that case sheet; but I don't think we

Page 223

1   need to open a new investigation into new allegations
2   around the same set of facts as that investigation.
3   I'll explain to Kate once someone sends me the 2020
4   case sheet."
5           Do you see that?
6   A.      Yes, sir.
7   Q.      Do you know whether --  And if you're not
8   familiar with the case sheet, maybe that answers
9   the question, but I'll ask it.
10          Do you know whether the original 2020 case
11  sheet that Mr. Germany requested here, whether that
12  was ever amended or updated, as he suggests, to
13  capture the breach investigation that began sometime
14  in early 2022?
15  A.      Given this context, I think what they're
16  probably referring to is the SharePoint system,
17  'cause they close and open things on there.
18          It may not be; but, in fact, that seems
19  like what he's talking about here; but I don't know
20  of a specific here's (indicating) a case sheet
21  document or not.
22  Q.      Okay.  The --  As we saw in one of the
23  earlier exhibits, we -- we looked at the -- the
24  report that came out of the original 250
25  investigation, and that report was from September of

Page 224

1    last year.

2            Do you remember that?

3        A.    Yeah.   For the presentation to the State

4    Election Board, yes.

5        Q.    Was that investigation, was that case

6    considered closed once that report came out?

7        A.    I believe --  I don't know the answer,

8    because they were presenting the three things that

9    were already done; but maybe it doesn't mean the

10    entire thing is closed.

11            And part of this was, as you saw, Mr.

12    Callaway said, I will open an investigation on this;

13    and it looks like one may not have officially begun,

14    even though we started taking all the normal

15    processes of doing that, as in going to the

16    SharePoint thing and -- and putting those things in.

17            So they sort of --  Again, Coffee County's

18    kind of a soap opera.   That's where it conflicts

19    together on that front.

20        Q.    Well, do you know as you sit here whether

21    the 250 investigation was ever closed?

22        A.    I don't know if it was totally -- I think

23    it was --  I think it was closed, but then reopened,

24    because it was the same set of facts.   I think that

25    was the turn of events on that.

Page 225

1       Q.    Oh, is the 250 investigation still open?

2       A.    I don't know the answer to that.  I know

3  that everything new is now that new case number we

4  discussed earlier.

5       Q.    All right.

6       A.    Everything's going to be new; but, of

7  course, now with GBI, so it's a different kind of

8  environment.

9       Q.    All right.  Let me hand you, I think,

10 Exhibit 12.

11            (Exhibit 12 was marked for

12       identification.)

13       Q.    (By Mr. Cross)  And, actually, before you

14 look at that, let me just ask you a threshold

15 question.

16            So you're obviously familiar with Robert

17 Sinners?

18       A.    Yes.

19       Q.    He works in your office?

20       A.    Correct.

21       Q.    And -- and he --  Is he the director of

22 communications?

23       A.    Yes.

24       Q.    Okay.  And you're familiar with Eric

25 Chaney and Misty Hampton?

Page 226

1      A.    Yes.

2      Q.    You know of them?

3      A.    Yes.

4      Q.    Yeah.  Do you --  Do you have any insight

5  into why Eric Chaney texted Misty Hampton Robert

6  Sinner's personal cellphone number on the night of

7  January 7, 2021, as they were finishing or had just

8  finished the copying and everything that occurred in

9  the office that day?

10     A.    No.

11           MR. TYSON:  I'll object to form and scope.

12           THE WITNESS:  No.

13     Q.    (By Mr. Cross)  Have you ever discussed

14  that with him?

15     A.    Yes.

16     Q.    And what can you share with me about that?

17     A.    When you say him, I think Robert Sinners.

18           Essentially said they must have done it

19  because my role before this was sort of head of, you

20  know -- not security -- there was a word for it --

21  election day operations, which then follows up on

22  these items for the Trump action.

23           Now when I discussed it with him, he said

24  at that point, the election's certified; I was

25  unemployed; and I was in Savannah engaging in adult

Page 227

1   beverages.  So he doesn't recall getting one.

2              I --  I asked him the question.

3              He goes I don't remember seeing one, and

4   he goes I never dealt with anything beyond that at

5   that point.

6              So that was where I --  I had asked him

7   about it, because it's a question.

8              And having worked on campaigns a big chunk

9   of my life, going to Savannah and engaging in adult

10  beverages after a loss is not an uncommon way to deal

11  with things after the fact.  It seemed logical.

12        Q.    Uh-huh.  Have you seen the text thread I'm

13  talking about where Mr. Chaney sends Mr. Sinner's

14  number to Ms. Hampton?

15        A.    I have not.

16        Q.    Okay.  He says at the same time

17  immediately after, he says let's switch to Signal.

18              Are you familiar with Signal?

19        A.    Yes.

20        Q.    And, again, you don't have any insight as

21  to why Mr. Chaney and Miss Hampton were having that

22  discussion at that time?

23        A.    No.

24              MR. TYSON:  And I'll object to scope and

25        form.

Page 228

1           THE WITNESS:  No, sir.

2      Q.    (By Mr. Cross)  And do you know whether

3   anyone either in the Secretary's Office or at their

4   direction has investigated that?

5      A.    No.

6           Bless you.

7           THE VIDEOGRAPHER:  Thank you.

8      Q.    (By Mr. Cross)  All right.  So grab

9   Exhibit 12, if you would.

10      A.    And that's the one message with No. 155 at

11   the top?

12      Q.    Yes.

13      A.    Okay.

14      Q.    So the cover page concerns an Open Records

15   Request.  You see it's from Misty Hampton, to Mr.

16   Voyles, Tracie Vickers, along with Coffee County.

17   It's dated November 16, 2020.

18           And it says please the attached for the

19   ORR.  This should complete both RR (sic).  I air

20   dropped the video to Ed Voyles.

21           Do you see that?

22      A.    Yes, sir.

23      Q.    And then if you come to the -- the very

24   last page, turn it over to the back.  Do you see that

25   there is an e-mail exchange that begins between Miss

Page 229

1    Hampton and it's Georgia EDO@donaldtrump.com (sic)?

2         A.    Yes, sir.

3         Q.    And you understand that e-mail address was

4    an e-mail address that Robert Sinners used for the

5    action?

6         A.    That's my understanding.  Yes.

7         Q.    In fact, if you come up, you can see.  He

8    asked Miss Hampton, "Have the minutes and audio been

9    approved?  Thank you!  Robert."

10             Do you see that?

11        A.    Uh-huh.  Yes.

12        Q.    Do you know why Robert Sinners was looking

13   for meeting minutes and audio and the other things he

14   requests in this from Coffee County in November of

15   2020?

16             MR. TYSON:  And I'll object to scope.

17             Answer, if you know.

18             THE WITNESS:  Given the timing of this,

19        this was around the time that they were kind of

20        going through their machinations of refusing to

21        certify, so I think in attempting for the Trump

22        action to find anything and everything that

23        could be thrown up as the election was tainted

24        somehow, this was one of those specific things

25        he was probably trying to collect.

1      Q.    (By Mr. Cross)  Do you know of any

2   investigation into whether Mr. Sinners had any

3   knowledge of the breach in Coffee County at or around

4   the time that it occurred?

5      A.    No.

6      Q.    Do you know of any investigation into

7   whether he was involved?

8      A.    No.

9      Q.    Do you know why he was hired into the

10  Secretary of State's Office immediately after,

11  literally days after Jeffrey Lenberg was last in that

12  office accessing the equipment?

13            MR. TYSON:  And I'll object to scope.

14       Personnel's not in the topics.

15            THE WITNESS:  And secondly --

16       Q.    (By Mr. Cross)  I'm just asking if you

17  know.  If you don't know, that's fine.

18       A.    Well --  well, you -- you --

19            You asked two questions.  You asked why he

20  was hired.  That's one question, and then you asked a

21  secondary question of why he was hire days after

22  Lenberg was there.

23            From the point of view of the Office, one

24  had nothing to do with the other, 'cause we had no

25  idea of the existence of Mr. Lenberg going to the

Page 231

```
 1   Coffee County office, so that's an unrelated question
 2   that has nothing to do with why Mr. Sinners was
 3   hired.
 4               Jordan, secretary --  Jordan Fuchs,
 5   F-U-C-H-S, the deputy secretary at the time, had been
 6   talking off and on to Mr. Sinners, who had expressed
 7   the fact that a lot of this stuff is getting stupid
 8   and crazy; and I think y'all are doing the right
 9   thing; and you're, you know, telling the truth.  And
10   I want to be able --
11               So I'm -- I'm boiling it down from
12   Jordan's relation to me of all this, because I myself
13   had misgivings about hiring somebody directly so
14   close to the Trump action at that period of time, but
15   I think he genuinely --
16               He also had insight into what the Trump
17   people were doing.  At that time, we were in the
18   middle of, for lack of better word, the fight of our
19   lives, trying to defend the integrity election
20   against, you know, Donald Trump, Sidney Powell, Lin
21   Wood and all the conspiracy theorists and election
22   deniers.
23               So having somebody who had an
24   understanding of that -- and there's a --  He spoke
25   Trump essentially.  Our office, we didn't really
```

Page 232

1    speak Trump.  We understood it somewhat, but it was

2    good to have somebody with that level of insight into

3    how they approach things and what they were doing and

4    what the claims were and where they came from.

5              So it wasn't tactically --  It was

6    tactically probably a smart idea but -- and I was --

7    I came around to the idea.

8              But yes.  That --  That was the timing and

9    the rationale behind hiring, because he understood

10   those things, he had a background of communications,

11   he could speak Trump, and we knew we have to --

12             Democrats all accepted the outcome.  The

13   people in Georgia that -- who didn't accept the

14   outcome were Republicans, and many of them were what

15   we call Trump Republicans, so it made logical sense

16   to a degree to hire somebody from -- from that world

17   who had a different point of view than that world at

18   that time, but understood where a lot of it came

19   from.

20        Q.    And then he was promoted to elections

21   direct --  Or sorry.  He was promoted to

22   communications director in the summer?

23        A.    That sounds about right.

24        Q.    All right.  Let me hand you 13, I think.

25        A.    One second.  I'm sorry.  Trying to keep

Page 233

1   some water way back.

2        Q.    Thank you.

3              (Exhibit 13 was marked for

4        identification.)

5        Q.    (By Mr. Cross)  13.  And that's Tab 60,

6   six zero; and if you look at the most recent e-mail,

7   this is an e-mail that you received from Ryan

8   Germany, along with Mr. Tyson, Carey Miller, Vincent

9   Russo, and Steven Ellis on August 1st of 2022.

10             Is that right?

11       A.    Yes.

12       Q.    All right.  You can put that aside.

13       A.    Okay.

14       Q.    Let me hand you Exhibit 14.

15             (Exhibit 14 was marked for

16       identification.)

17             MR. CROSS:  I'll ask if you want one.

18             MR. BROWN:  Thank you.

19       Q.    (By Mr. Cross)  So Exhibit 14, do you see

20   at the top?

21             This is an --  This is an e-mail that Sara

22   Koth sent to Steven Ellis on July 12th, 2022

23   regarding an Open Records Request.  Do you see that?

24       A.    Yes.

25       Q.    And if you turn to the second and third

Page 234

1    page, you'll see that this concerns the same Open

2    Records Request from Kate Brumback of the AP that we

3    were looking at a moment ago?

4         A.    Yes.

5         Q.    If you look at Mr. Germany's e-mail on the

6    first page, so he sends an e-mail to Open Records,

7    Steven Ellis, Paul Kokenes, Sara Koth, on April 25th

8    of 2022 at 3:06 p.m.

9              Do you see that?

10        A.    Yes.

11        Q.    And he says to Miss Koth, "... let's

12   reopen this case in investigations, and we can note

13   that it was re-opened to deal with new allegations

14   regarding the same event."

15             Do you see that?

16        A.    Yes.

17        Q.    Can you help me understand that, 'cause

18   how did the allegations of unauthorized access that

19   occurred in Coffee County in January of 2021

20   regarding the same event of what had already been

21   investigated under 250 -- aren't those --  Aren't

22   those vastly different events?

23        A.    I wouldn't call them vastly different, and

24   I know what Ryan's mind-set basically was, was we

25   have an investigation.  We have some of the same

Page 235

```
 1   people and -- and issues around this.

 2           Essentially, Misty --  We kind of tie it

 3   back to -- I think in his mind -- tie it back to the

 4   video, the failure to certify, all -- all these

 5   things are Misty Hampton acting badly essentially

 6   or -- or Misty and the Board, so that was kind of the

 7   thought process, that this is all -- this is her

 8   continuing to not do the right thing.

 9           Could you have opened a separate

10   investigation number?  Potentially.

11           But it -- it kind of made sense internally

12   at the time that let's just make it the same people

13   on it.  They already know some of these players.

14   It just makes --  It made sense to them at the time.

15       Q.    At some point in December of 2021, 250 was

16   referred by the SEB to the -- the AG's Office, right?

17       A.    That's correct.  I believe --  I believe

18   it was December.  Yes.  I knew at the end of 2021.

19       Q.    In reference --  The Secretary's Office,

20   at least through counsel, has said that that

21   investigation was referred back to the Secretary's

22   Office after the -- the call recorded of Mr. Hall

23   came to light.

24           Is there any documentation you're aware of

25   referring to the 250 investigation back to the
```

Page 236

```
 1    Secretary's Office?
 2         A.    No.
 3               THE WITNESS:  Can someone grab me some
 4         water.
 5               MR. CROSS:  Okay.  Do you need water?
 6               THE WITNESS:  Yeah.  I could use some.
 7               MR. CROSS:  Okay.
 8               THE WITNESS:  Thank you.  I'd normally
 9         gotten myself, but I don't think -- I shouldn't
10         be able to get up.
11               MR. TYSON:  Yeah.
12               (Discussion ensued off the record.)
13               MR. CROSS:  Oh, okay.
14               MR. TYSON:  It's a --  David, just for
15         reference, checked while we were working through
16         here; and the case sheet is what's printed out
17         in the SharePoint system, so it's not like a
18         document that exists.  It's a printout of the
19         status in the SharePoint system, so that's what
20         you have there.
21               If you want to mark that, we can work
22         through that, too, so --
23         Q.    (By Mr. Cross)  All right.  We can go do
24    that.  Is this just 14 or 15?
25               THE VIDEOGRAPHER:  15.
```

Page 237

1              MR. KNAPP:  15.

2              (Exhibit 15 was marked for

3       identification.)

4        Q.    (By Mr. Cross)  15.  All right.  Let me

5   hand you --

6        A.    Are we done with these now, David?

7        Q.    Yes.

8        A.    Okay.  And this one.

9        Q.    All right.  Let me hand you Exhibit 15.

10       A.    I need one more, David.

11             MR. TYSON:  That's all right.  I have one.

12             THE WITNESS:  Okay.  Thank you.

13             MR. CROSS:  I just realized --  Hold on.

14             MR. SPARKS:  I just sent those.

15             MR. CROSS:  Oh, you did?

16             MR. SPARKS:  Yeah.

17             MR. CROSS:  She has a copy of this?

18             MR. SPARKS:  She will have momentarily.

19             MR.  CROSS:  Okay.  Cool.  I was going to

20       do that.  Thank you, Adam.

21             MR. SPARKS:  You're welcome.

22        Q.    (By Mr. Cross)  All right.  What is

23   Exhibit 15?

24        A.    This is the item showing the status of

25   SEB2020, dash, 250 out of our SharePoint system.

Page 238

1          Q.    Is it your understanding that in the

2     e-mails we were looking at with Mr. Germany where he

3     refers to the case sheet, that this is -- this is the

4     type of document he's talking about?

5          A.    That is my understanding.

6          Q.    Have you seen this type of document before

7     now?

8          A.    Yes.

9          Q.    Okay.  And, again, just help me

10    understand.  You --  When it says that this is

11    generated from the system, what does that mean?

12         A.    For our investigations, there is a

13    SharePoint system that is built out.  It's basically

14    a document depository that we manage through an -- a

15    portal basically that's built out by a company called

16    ThreeWill, that they update and do these things; but

17    this is where we keep all the documents attached to

18    individual cases, so they can all be found in one

19    place.

20              So unfortunately, in the way of the world,

21    we have a high turnover of investigators, so we need

22    to have something to be able to share and keep

23    investigations going easily as opposed to stacks and

24    stacks of paper.  That's why this is built out.

25         Q.    Okay.  Well, it indicates that --  It says

Page 239

1    date presented to the Board, December 14, 2021.

2    That's the SEB, State Election Board?

3         A.    Correct.

4         Q.    And then it says case voted on December

5    14, 2021 for AG Office.  That's when it's --

6               Is that voted on to refer to the AG

7    Office?

8         A.    Reading that and knowing the outcome, yes.

9    That's --  That's that reference.

10        Q.    If an investigation is referred to the AG

11   Office, is that because the SEB thinks that there's a

12   prosecution required; or what's the --

13              Do you have insight into what leads the

14   SEB to refer an investigation to the AG Office?

15        A.    They --

16              MR. TYSON:  Object to scope.

17              You can answer.

18              THE WITNESS:  They --  They do that

19        essentially to push -- push it to the AG to see

20        is there a full violation here that can rise to

21        a higher level, but it's --

22              It's an odd system that I've never fully

23        been able to grasp, because the AG then doesn't

24        just take this and prosecute it.  They take it

25        before an administrative law judge, who then

Page 240

1       makes a decision.  Then sends it back to us for

2       some reason.

3             And then we can forward it on to local

4       prosecutors.  There's any number of things after

5       that.  It's a system that seems wildly

6       inefficient; but that's the way the law is set

7       up, I suppose, right now.

8       Q.    (By Mr. Cross)  Okay.  And when it says

9   date reassigned, April 25th of 2022, do you know what

10  that means?

11      A.    Well, it coincides, if you look at the

12  e-mails we were just looking at in the previous

13  exhibits, when Miss Koth said she was able to

14  essentially reopen that and say it's reassigned now

15  for continued investigation.

16      Q.    Okay.  Thank you.

17            All right.  Let me hand you Exhibit 16.

18            (Exhibit 16 was marked for

19      identification.)

20            THE WITNESS:  These are stapled.  You

21      threw me off.

22      Q.    (By Mr. Cross)  Oh, yeah.  Sorry.

23            So this is Tab 17.

24      A.    And I have a feeling we're going to go

25  through a long version of this stuff here real quick.

Page 241

```
1    Is there a way I can break out for one second before
2    we do that?
3              MR. CROSS:  Sure.
4              THE WITNESS:  Okay.  Coffee break.
5              THE VIDEOGRAPHER:  Go off the record.
6              THE WITNESS:  Yeah.  Five --  Ten minutes.
7              THE VIDEOGRAPHER:  We're going off the
8        record at 2:11.
9              (Recess from 2:11 p.m. to 2:19 p.m.)
10             THE VIDEOGRAPHER:  We're on the record at
11       2:19.
12        Q.   (By Mr. Cross)  All right.  So you should
13   have in front of you Exhibit 34 and --
14             MR. TYSON:  Exhibit 16.
15             THE WITNESS:  16.
16        Q.   (By Mr. Cross)  Sorry.
17        A.   I was like.  Wait.  Did I miss something?
18        Q.   It's Exhibit 16.  And do you recognize
19   this as photos from inside the Coffee County Election
20   Office?
21        A.   Yes, sir.
22        Q.   Have you seen these -- these photos --
23        A.   Yes.
24        Q.   -- before?
25             Have you seen the actual video of
```

Page 242

1   surveillance?

2        A.    I've seen.  I've not watched all of it.

3   I've seen piece -- pieces of it, but I've seen --

4   I've mainly been shown the individual images from

5   that.

6        Q.    Okay.  And when did you first see the

7   video surveillance?

8        A.    Oh, I could --  It's sometime within the

9   last 45 days, something like that, give or take.

10        Q.    And do I understand correctly that no one

11   on behalf of the State authorized any of the access

12   that we see in the surveillance videos from Coffee

13   County that occur in the elections office in the

14   month of 2021?

15        A.    Correct.

16        Q.    It's your understanding no one in the

17   Secretary's Office knew about that at the time that

18   it was happening?

19        A.    Correct.

20        Q.    All right.  Let me hand you --

21        A.    Mr. Cross, we done with 16 for now?

22        Q.    Yes.  You can put that away.

23             Some of that may be the same as this.  I'm

24   not sure why it got printed this way, but let me just

25   give you this.

Page 243

```
 1              MR. CROSS:  So this is going to be Exhibit
 2        17.
 3              (Exhibit 17 was marked for
 4        identification.)
 5        Q.    (By Mr. Cross)  You can ignore the cover
 6   sheet.  That's from my --
 7        A.    All right.
 8        Q.    -- prior deposition.
 9              So this is Tab 20, Exhibit 17.  So this is
10   a compilation of screenshots from video, some of
11   which is on the outside, some of which is on the
12   inside.
13        A.    Okay.
14        Q.    But if you look here, if you look to the
15   first page, you'll see that this is dated from
16   December 11, 2020.  Do you see that along --
17        A.    Yes.
18        Q.    -- the top?
19              And so this is the day where Frances
20   Watson and others from the Secretary's Office came in
21   and met with Misty Hampton, Tony Rowell, and others,
22   as part of that original 250 investigation.
23        A.    Yes, sir.
24        Q.    Okay.  And the individual there who's
25   coming in, he -- he's got a badge or a seal on his
```

Page 244

1   shirt, long-sleeve blue shirt.  Is that Josh

2   Blanchard?

3        A.    Correct.

4        Q.    Okay.  Mr. --

5        A.    And the one in front of him is Pam, and

6   the two behind are Tom Feehan and Scott -- I'm

7   totally blanking on his last name -- both from

8   Dominion.

9        Q.    So and I was going to ask.  So the woman

10  in front of him is Pamela Jones?

11       A.    Correct.

12       Q.    And then who's the one on the left behind

13  Blanchard?

14       A.    That's Scott.

15       Q.    Scott Tucker?

16       A.    Yes.  Thank you.  I couldn't remember his

17  last name to save my life.

18             And then Tom Feehan.

19       Q.    How do you spell Tom's last name?

20       A.    F-E-E-H-A-N.

21       Q.    They're both with Dominion?

22       A.    Correct.

23       Q.    And then if you come to the next page,

24  same day, 30 minutes later, that's Frances Watson at

25  the front door, right?

Page 245

1        A.      Correct.

2        Q.      Is it customary for your investigators to

3    come to an investigation like this carrying a

4    firearm?

5        A.      Absolutely.  They are --  They are sworn

6    officers.  They --  I have to buy ammunition and guns

7    for them through my COO.  They are always --  They

8    are always armed.

9        Q.      But Mr. Blanchard is not?

10       A.      I don't know.  He may --  He may have an

11   ankle on.  I couldn't tell you.

12       Q.      Okay.  All right.  Still in Exhibit 17 --

13       A.      What page number?  I can get there.

14       Q.      That's what I was going to get you to.  Go

15   to --  All right.  Go to Page 4.

16       A.      From January 18th, 2021?

17       Q.      Correct.

18       A.      Okay.

19       Q.      Do you recognize that individual?

20       A.      I think I've been told who he is, but no.

21   I don't personally recognize him.

22       Q.      Have --  Have you been told that's Doug

23   Logan?

24       A.      Okay.  That --  That comports what I was

25   told, I believe.

Page 246

1       Q.    Okay.  And so here we have a picture of
2   Doug Logan entering the office in Coffee County on
3   January 18 of '21.
4             You see that?
5       A.    Yes, sir.
6       Q.    And then shortly after he comes in, do you
7   recognize this individual entering the office as
8   Jeffrey Lenberg?
9       A.    Is this the one at 4:20 p.m. on the same
10  day?
11      Q.    Yes.  Blue jacket, gray hair?
12      A.    Is that blue?  He's carrying power aids?
13      Q.    Yes.
14      A.    Okay.  Then yes.  I was -- I've --  I've
15  been told that that was Mr. Lenberg.
16      Q.    Okay.  And then if you come to Page 6, you
17  can see that both Mr. Logan and Mr. Lenberg make it
18  inside the Coffee County Election Office into the --
19  the nonpublic area.
20            Do you see that?
21      A.    Okay.  What appears to be Misty holding
22  the door for them.
23      Q.    Yes.  And if you come to Page 9, we're
24  still on January 18 of '21, 7:38 p.m.  Do you see
25  Doug Logan standing in the doorway of Misty Hampton's

Page 247

1    office on the phone?

2         A.    I don't know that's Misty Hampton's

3    office, but I see Doug in an office door.  Yes.

4         Q.    Okay.  And then you see them.  On the next

5    page, you see the two of them, Mr. Logan and Mr.

6    Lenberg leaving around 8:00 p.m. on the 18th?

7         A.    Hold on.  I'm trying to get some water.  I

8    apologize.

9               Yes.  Both carrying their --

10              Okay.  Got it.

11        Q.    Yeah.  And then if you flip to Page 12,

12   the 19th, you see Mr. Lenberg come back to the

13   office?

14        A.    And it looks like Mr. Logan holding the

15   door, but I can't tell.

16        Q.    Yeah.  If you go to Page 13, you see the

17   two of them inside the elections --

18        A.    Okay.

19        Q.    -- office again?

20        A.    Yes, sir.

21        Q.    And then if you go on to Page 17, you see

22   them leave around 6:19 p.m. on January 19.  Do you

23   see that?

24        A.    Yes.

25        Q.    And then if you go to Page 18, the very

Page 248

1   next day, on January 20, we have Josh Blanchard

2   returning to the elections office.

3            Do you see that?

4       A.   Yes.

5       Q.   Why was Josh Blanchard in the elections

6   office on January 20?

7       A.   He was there to pick up the statements

8   that I referenced earlier from Misty Hampton, the

9   signed statement saying that I have, never did, never

10  will commit voter fraud.

11           So I see he comes in at 9:50 and leaves

12  9:52.  Then comes back in.  No.  That's at 9:59.

13  That's right.

14           Now back in.  There was your time period.

15  I don't know.

16           He was there on that day to get that

17  statement.  I talked to him directly about that.

18      Q.   Okay.  All right.  Flip to Page 35, if you

19  would, still on Exhibit 17.

20      A.   (Witness complies with request of

21  counsel.)

22      Q.   So we get to Page 35.

23      A.   Yes.

24      Q.   Do you see there's a screenshot of Jeffrey

25  Lenberg coming into the elections office on January

Page 249

1   26, 2021 at 7:35 a.m.?

2        A.    Yes.

3        Q.    Then on Page 36, you see him make it into

4   the nonpublic area and --

5        A.    On Page --  Is that Page 36?

6        Q.    36.

7        A.    So it's 10:35 a.m.

8        Q.    Right.

9        A.    Okay.

10       Q.    Yeah.  And then if you go to Page 37, half

11  an hour after Mr. Lenberg comes into the office, Josh

12  Blanchard shows up again.

13       A.    Uh-huh.

14       Q.    Do you see that?

15       A.    Yeah.  I'm trying to think now.  These

16  dates were so close together, 'cause I talked to Josh

17  about both of these items.

18            And I think the first one, he's supposed

19  to get it.  She didn't have it ready or something.

20  The second one's when he actually got it, so I think

21  in my mind it was the 26th when he actually picked it

22  up.

23            So I misspoke earlier, the 20 --  I think

24  his intent was to pick it up, because he was down

25  there; and they had been --

Page 250

1           When I talked to Pam and Frances, they had
2    been kind of badgering her to get that to them,
3    the -- the -- the wet-signature version of it versus
4    just anything else, which was her statement asking,
5    you know, never committed fraud ever before.
6        Q.    Okay.
7        A.    So maybe he didn't have it ready; or I
8    don't know what was going on, on the 20th; but I
9    think -- think the 26th, when he physically picked it
10   up.
11       Q.    Where --  Where does Mr. Blanchard live?
12   Where is he stationed?
13       A.    South of Atlanta, if memory serves; but he
14   does --  He goes through this area.  This is kind of
15   his go-to sort of route.
16           If you look at his logs which, you know,
17   they basically show where he drives and does stuff,
18   there was another case down here of -- I think, what
19   was it -- vote buying in Douglas that he was
20   investigating, so when he was doing that, he went
21   by and -- one of these two times for that purpose.
22       Q.    Okay.  So we have Mr. Blanchard.  He comes
23   in --
24           Is it Agent Blanchard?
25       A.    What did we call him?

Page 251

1            MR. TYSON:  Call him investigator.

2            THE WITNESS:  Investigator Blanchard.

3       Yes.

4            THE COURT REPORTER:  Oh, you're not on,

5       are you?

6            MR. CROSS:  What?

7            MR. TYSON:  Oh, we've been on the record.

8            THE WITNESS:  We've been on the record for

9       a while.

10            MR. TYSON:  Oh, yeah.

11            MR. CROSS:  You're kidding, right?

12            THE COURT REPORTER:  No.  I'm not.  It's

13       okay.  I'll pick it up.  I'll pick it up.  You

14       guys keep going.  Go on.

15            MR. CROSS:  How much did you not get?

16            THE VIDEOGRAPHER:  From 2:18 till now.

17            MR. CROSS:  What did you think we were

18       doing the last --

19            THE VIDEOGRAPHER:  I -- I --

20            MR. CROSS:  -- 10 minutes?

21            THE COURT REPORTER:  I don't know.  I'm --

22            THE WITNESS:  That's okay.

23            MR. KNAPP:  She --  She's been dealing

24       with a speed walker.

25            MR. BROWN:  It's my fault.  I distracted

Page 252

1          David there.
2                  It's all right.  It's all right.  We'll
3          keep it back.
4                  MR. CROSS:  All right.  But you have the
5          audio?
6                  All right.  We're good.  Okay.
7                  THE COURT REPORTER:  It will be there.
8                  MR. CROSS:  You're fine.
9                  MR. KNAPP:  We've got the Rock over here.
10                 MR. BROWN:  No.  That's all right.
11                 THE COURT REPORTER:  Geez.
12                 MR. BROWN:  We're good.
13                 THE WITNESS:  Can we smell what he's
14         cooking now?
15                 Did anybody get that Rock reference I
16         said?
17                 THE COURT REPORTER:  Oh, no.
18                 MR. CROSS:  You good?
19                 THE COURT REPORTER:  Yeah.
20                 MR. CROSS:  Okay.
21         Q.    (By Mr. Cross)  All right.  So let's just
22    pick up where we were.  So Page 37, Exhibit 17 --
23         A.    Yeah.
24         Q.    -- Josh Blanchard comes into the election
25    office around 11:07 a.m. on January 26th of 2021.

Page 253

1      A.      Uh-huh.

2      Q.      And then the next page.  About a minute

3   later, he makes it into the public area, where he's

4   talking to Misty Hampton.

5              Do you see that?

6      A.      Is that 11:08?

7      Q.      Yes.

8      A.      Okay.  Yeah.

9      Q.      So we can tell from Pages 35 to 37 on

10  through 38, 39, 40 that Josh Blanchard is in the

11  elections office at the very same time Jeffrey

12  Lenberg is there.

13     A.      Yes.

14     Q.      And if you go to Page 40 -- and --  And

15  you can see that Mr. Blanchard goes into Misty's

16  office with him on Page 40.

17              Do you see that?

18     A.      Yes.

19     Q.      And do you understand there's a window

20  from her office into that -- that main area?

21     A.      I know that only from the videotape.

22     Q.      All right.

23     A.      Yes.

24     Q.      And so then while Mr. Blanchard is sitting

25  in Misty Hampton's office with a window into this

Page 254

1    area, we see Jeffrey Lenberg walk out in that main

2    area on Page 41 --

3         A.    Uh-huh.

4         Q.    -- at January 26, 2021 at 11:08 a.m.

5               Do you see that?

6         A.    Yes.

7         Q.    So even though this spans several pages,

8    if you look at the timestamps, you can see it all

9    happens within a matter of seconds at 11:08 a.m.

10        A.    Yes.

11        Q.    And then Mr. Lenberg comes back in at Page

12   43, only about a minute later at 11:09 a.m.

13        A.    Okay.

14        Q.    And then Josh Blanchard leaves the office

15   at Pages 45 and 46 at 11:12 a.m.

16              Do you see that?

17        A.    I'm trying to get there.

18              I say 'cause I see Mr. Lenberg come back

19   through the office, but doesn't go to Misty's office.

20   He goes further back somewhere else.

21        Q.    Yes.

22        A.    And then about two and a half minutes

23   later, Mr. Blanchard walks out the other door.

24        Q.    Okay.  So did Mr. Blanchard not see

25   Jeffrey Lenberg when he was there?

Page 255

1     A.    I talked to him and asked him the

2    question.

3              He goes, I don't recall seeing anybody

4    there.

5              And I want to put some perspective on

6    this.  It's not like there's a wanted poster of

7    election deniers to be looking for, for our

8    investigators.  Our -- We weren't of that mind-set.

9    He was there to get a document from Misty so --

10             And, again, one thing I can't possibly

11   know is I don't know where he was standing with that

12   window.  He could have been standing with his back to

13   the door, to the window.  There's no --  There's no

14   telling on that front so --

15             But no.  He says he doesn't recall seeing

16   anybody; and if he does, he says it's --  I could

17   have seen somebody.  It's just been months ago.  I

18   don't remember anything standing out in my mind that

19   there was anything there.  Just bizarre happenstance.

20       Q.    So he --  So okay.  So but Mr. Blanchard

21   does not recall seeing Jeffrey Lenberg in the office

22   that day?

23       A.    No.

24       Q.    Okay.  And --

25       A.    And one of the things when I discussed it

Page 256

1    with him in the context --  This was recent

2    discussion.  He says I was there on the 20th or the

3    26th, and she didn't say anything to me about people

4    coming and looking at the stuff.

5              I mean, she thought she was okay when she

6    just mentions, hey, we're doing this stuff, too,

7    trying to prove the election was, you know,

8    fraudulent, so nothing like that.

9              And, again, it goes back to her being

10   relatively contentious with our office, I think.

11        Q.    Well, and yeah.  If you look at --  Go to

12   Pages 49 and 50.

13        A.    Okay.

14        Q.    So this is just three minutes after Mr.

15   Blanchard leaves at Page 49.

16        A.    Uh-huh.

17        Q.    You have Jeffrey Lenberg approaching the

18   door to the front vestibule from the main area.

19              Do you see that?

20        A.    And then looking out the window.

21        Q.    Right.  And then on Page 50, you can see

22   he's looking through that little window --

23        A.    Yes.

24        Q.    -- as if he's looking for someone, right?

25        A.    Yes.

Page 257

1          Q.    But we know from the surveillance video

2    that Mr. Blanchard was gone at that point?

3          A.    Correct.

4          Q.    Okay.

5          A.    Now I don't know if he's looking for Mr.

6    Blanchard or not, although that's a -- probably a

7    logical supposition.

8          Q.    Right.  Do you know whether when Chris

9    Harvey and Frances Watson called for an inquiry into

10   the Cyber Ninjas' potential access, whether anyone

11   thought more broadly about individuals who were

12   associated with that sort of circle or group -- Doug

13   Logan, Jeffrey Lenberg, and others?

14         A.    We call it --  What was the word you just

15   used?

16         Q.    Which one?

17         A.    You said like inquisition.  You didn't say

18   investigation.

19         Q.    Well, because I mean, earlier you guys

20   were kind of pushing back and --

21         A.    I was --

22         Q.    -- saying --

23         A.    I was --

24         Q.    -- investigation?

25         A.    Let's -- let's --  That's all right.

1           Say your words.

2       Q.    I said inquiry.  We can call it little "i"

3    investigation, as Brian said.  I --  I didn't want to

4    get tripped up with the wording.

5       A.    Yeah.  And that's -- that's kind of what I

6    was going towards.  The inquiry sounds even official

7    than an --

8       Q.    Oh.

9       A.    -- investigation --

10      Q.    No.

11      A.    -- to me so --

12      Q.    Okay.

13      A.    No.  I think it was --  I don't know if

14   they said Cyber Ninjas specifically, or did anybody

15   have access.  Did they do anything like this was sort

16   of the mind-set.  It wasn't exclusively related to

17   that.

18           And at the time, I had never heard the

19   Lenberg name except maybe in an article that I had to

20   my list of, you know, crazy people who thought the

21   election was stolen.

22      Q.    Uh-huh.  Okay.  If you look at Exhibit 17,

23   Page 53 --

24      A.    Is that --

25      Q.    It's what we just looking at.

Page 259

1      A.     Same one.  Okay.

2             I put it back together.  Sorry.

3      Q.     That's okay.  This is the last one.

4      A.     All right.

5      Q.     If you flip to Page 53 --

6      A.     Yes.

7      Q.     -- you see the picture of Jeffrey Lenberg

8   walking in, holding a box in front of his face?

9      A.     Yes.

10     Q.     And you notice that -- I don't know if you

11   can tell but that's a ring light.  Have you ever seen

12   a ring light?

13            There's actually --  There's actually one

14   in the office right in front of you.

15     A.     I see that there's a symbol of what looks

16   like a ring light, but I couldn't say for certain

17   that is a ring light.

18     Q.     Okay.  Well, sorry.  I was going to ask

19   you.  Are you aware of whether any investigation

20   that's been done into what Mr. Lenberg brought with

21   him that day and what he used it for?

22     A.     Not that I'm aware of specific.  It looks

23   like he used it as an umbrella right here, 'cause it

24   was raining.

25     Q.     Or maybe to hide his face from the camera;

Page 260

1   but you know, so --

2         A.    So many times, I doubt he was doing that.

3   Just, again, it's raining --

4         Q.    You're --

5         A.    -- so --

6         Q.    -- the one that said earlier they're not

7   rational actors.

8         A.    Okay.  Point taken.

9         Q.    But you're familiar with people using the

10  ring cameras to light up videos like a Zoom video?

11        A.    Yeah.  Usually, when they're talking to

12  the camera, that's what the ring is intended for.

13        Q.    Are you aware any investigation by the

14  State or anyone else to determine whether Mr. Lenberg

15  or anyone else created any kind of video while they

16  were in the Coffee County Election Office?

17        A.    I'm not specifically aware; but, again,

18  the GBI has taken lead on this, so they would be the

19  people to have the discussion with; and since it's an

20  active investigation, I doubt they'd answer.

21        Q.    Yeah.  Okay.  Now I probably know the

22  answer, but I'll ask it.

23              Are you aware of any investigation into

24  whether there was any kind of Internet-based

25  broadcast from the county -- Coffee County Elections

Page 261

1    Office in January of 2021, a video?

2         A.    Investigation of that time period?   Now --

3         Q.    Yes.

4         A.    -- at that time period?

5         Q.    Correct.

6         A.    Okay.   I'm not aware of one; but, again,

7    this is in GBI's hands right now, so I think that

8    would be something that would probably fall into that

9    purview.



Page 262

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 263



Page 264



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 265



1      Q.     (By Mr. Cross)  So are you aware that

2   SullivanStrickler took the data that they copied from

3   the election equipment in Coffee County in January of

4   2021 and loaded that onto a ShareFile site on the

5   Internet?

6      A.     It was an FTP, I believe.  That's my

7   understanding.  Yes.

8      Q.     Yeah.  It's --  It's a third-party company

9   that's provides a cloud service called ShareFile?

10     A.     Yeah.  Yes.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 267



18      Q.    Has the Secretary's Office, Mr. Persinger,

19  or otherwise examined the SullivanStrickler data to

20  determine what, if any, PII was on that -- that -- in

21  their data set?

22          MR. TYSON:  And I'm going to instruct you

23      not to answer as to work product anything that

24      the communications the attorneys and Mr.

25      Persinger.

Page 269

1            THE WITNESS:  Then I'm not comfortable
2       answering that at all, because I think --
3            We knew from our end the only thing
4       available would have been what I just described,
5       that there was no other thing on a Poll Pad to
6       give.  Only the Poll Pads only received that
7       stuff as they are separate and apart from the
8       voter registration system.
9            THE COURT REPORTER:  Give me a second.
10           MR. CROSS:  Sure.
11           THE COURT REPORTER:  Okay.
12           MR. CROSS:  Okay?
13           THE COURT REPORTER:  Okay.
14           THE WITNESS:  Duncan causing problems.
15      Q.   (By Mr. Cross)  Do you know whether anyone
16   has determined if dates of births for voters were
17   included in the SullivanStrickler dataset?
18      A.   I don't know if they had independently of
19   that, but the data on the Poll Pads would have had
20   the full date of birth.  That's the statement I'm
21   making.
22      Q.   Got it.  Okay.  And just to talk about the
23   encryption, you said there's an original encryption
24   that's on the Poll Pads themselves, right?
25      A.   It's native to the Poll Pad environment.

Page 270

1    Yes.

2         Q.    But you understand that Miss Hampton

3    provided the passwords for all of the equipment that

4    SullivanStrickler copied, right?

5         A.    Yes.

6         Q.    Okay.  And then you said there's a second

7    level of encryption from SullivanStrickler.  But you

8    understand that SullivanStrickler provided log-in

9    information to a variety of people?

10        A.    I have no way of knowing that.

11        Q.    You're not aware that SullivanStrickler

12   provided log-in information to Doug Logan and Jeff

13   Lenberg?

14        A.    When you say a number of people, I know

15   that they were part of that.  I'm using it --  I'm

16   using that as -- as a single unit, as opposed to --

17   In my mind, my big concern was out in the wild versus

18   people we already knew who have it kind of thing, and

19   they can break it down.

20             I --  I see what you're saying, but

21   essentially, my -- my --  I was asking the question

22   of:  Could Random Person X go get this and then get

23   into all that stuff who -- who might have even worse

24   intentions potentially?

25             That was like -- that was --  That was the

Page 271

1  nature of my questioning of Mr. Persinger on that

2  front.

3  Q.    You were talking to Mr. Persinger about

4  someone who would not have either the original

5  passwords for the Poll Pads or the SullivanStrickler

6  log-in credentials?

7  A.    The -- the --  The back-to-back part of

8  that, yes.

9  Q.    Okay.

10 A.    And all the --  I also had talked to David

11 Greenwalt, who's with Poll Pad, so we could all kind

12 of meet to --  I would be talking my election

13 administrative language.  He could talk technical

14 language, election administrative, and -- and

15 technical --

16 THE COURT REPORTER:  I'm sorry.

17 THE WITNESS:  -- to technical.

18 Sorry.

19 THE COURT REPORTER:  He could talk?

20 THE WITNESS:  He could talk --  Mr.

21 Persinger could talk technical language to Mr.

22 Greenwalt.  Mr. Greenwalt could translate

23 technical language to -- election kind of

24 technical language to my election understanding

25 so that we were not talking past one another.

Page 272

1      Q.    (By Mr. Cross)  Who is Mr. Greenwalt?

2      A.    He is --  He works for Poll Pad.  It's a

3  company called KNOWiNK --

4      Q.    KNOWiNK.  Right.

5      A.    -- out of St. Louis.  But he is stationed,

6  I believe, in metro Atlanta; or he travels here

7  enough to where it feels like he's stationed here.

8      Q.    And what is KNOWiNK's involvement in any

9  investigation that's been done or ongoing?

10     A.    I know that --

11           This could go to --  Yeah.

12           MR. TYSON:  Yeah.  Well, kind of --  I'm

13      trying to think how this fits, David.  I think

14      that this may touch on investigative privilege.

15      I think we could --

16           He can testify that they are involved to

17      some degree; but the specifics of how they're

18      involved, I don't --  I think we're going need

19      to do investigative privilege over that.

20           THE WITNESS:  And I couldn't even --

21           MR. TYSON:  Yeah.

22           THE WITNESS:  -- speak specifics.  I can

23      just say they are involved.

24           MR. TYSON:  Yeah.

25           THE WITNESS:  But they kind of work with

Page 273

1      Persinger.  Say this is what this does.  This is

2      what that does kind of thing.

3      Q.    (By Mr. Cross)  Okay.  What is Mr.

4  Greenwalt's first name?

5      A.    David.

6      Q.    David.  Can you tell me when KNOWiNK was

7  first alerted to the unauthorized access in Coffee

8  County?

9      A.    I can probably go back and look, but it

10  would have been around all the same time we finally

11  figured out, so probably July-August range in that --

12      Q.    Okay.

13      A.    -- I believe when they first would have

14  known.

15      Q.    Of this year?

16      A.    Yes.

17      Q.    Do you know when Dominion first learned

18  about the breach in Coffee County?

19      A.    Again, I'm making the assumption it'd be

20  around the similar time that we discovered it, which

21  would have been that July; and then it was coming off

22  of July 4th holiday; and then we had to confirm.  It

23  was somewhere in that range of probably mid to late

24  July.

25      Q.    Okay.

1      A.    Although I think it was relatively

2  quickly.  We said, guys, we --  There is a situation

3  that we've discovered from our own internals.  Look

4  at this.

5      Q.    Well, right, I mean, we -- we know --

6            I guess what I was trying to figure out

7  when -- when Nicole Nollette came in on April 11th,

8  was she there, in part because of the -- the

9  unauthorized access concerns that had come to light

10  with the Scott Hall call?

11     A.    She wasn't there because of that itself.

12  She added on something else to her trip.  She was

13  doing work with Fran Leathers, who had been hired

14  as -- as a Dominion rep, and they were going -- doing

15  some sales calls and stuff.

16            So she was there then.  While you're here,

17  can you see if you can get into this thing, because

18  of the claim that we saw in the -- come out of the

19  deposition that I did.

20     Q.    Do you know whether anyone in the

21  Secretary's Office or at their direction has talked

22  to Dominion about whether they were aware of the

23  breach earlier than that?

24     A.    I don't --  When we had discussions, I

25  mean, about this, as I said, starting from when it

Page 275

1   was first brought to us in February, at the end of

2   February, our position was given the people involved

3   and the claims involved, this seemed like it was

4   another false flag --

5       Q.      Uh-huh.

6       A.      -- fake pile of stuff.

7               So we said, hey, this claim is there.  Run

8   it up the flagpole, so, you know, it out there kind

9   of thing; but it was sort of a --  I will tell you

10  that we didn't think there was probably anything

11  there, given that the people involved and --

12              So we said be aware of it; but, again, we

13  need to go through the investigation to show this, so

14  that's why we need to get into the server.  So that

15  was kind of --  They were in that same timeframe.

16              It was like okay.  Let's look into this,

17  'cause this is a real thing.  We've got -- have to

18  look at it now, because it's been claimed publicly in

19  a way that's, you know, even though we know the

20  players here have -- have been historically full of

21  crap.  So it was Scott Hall and -- and then, of

22  course, with Miss Marks, and then knowing --

23              I didn't understand at the time; but,

24  again, our take on it was it's probably --  We have

25  to go through this investigation to show that nothing

1  happened and --  Or and if it did, then we need to

2  really know, so that was kind of our position we were

3  in at that point.

4       Q.    Right.  And sorry.  And I was asking a

5  narrower question, which is:  Do you know whether

6  anyone has -- anyone has spoken to anyone at Dominion

7  to determine whether they have any knowledge about

8  the potential breach before the Scott Hall call was

9  disclosed to you guys?

10      A.    I lost the script on that question.  My

11 point in saying it that way was we all kind of had

12 the same indication.

13           And I believe our relationship with

14 Dominion would be like, well, we had heard some --

15 They would have said something to us had they been

16 aware, but a specific question was not asked of like

17 have you heard about this before --

18      Q.    Uh-huh.

19      A.    -- because that's not how you communicate

20 something like that with a partner on something on

21 that sort of front.

22      Q.    No.  I -- I --  I get that you -- you

23 expect that they would have told you.  But I just

24 want to make sure that you're not aware of any

25 communications anyone for the Secretary's Office with

Page 277

1    anyone with Dominion asking the question -- did you

2    have any inkling or awareness of the breach before

3    the Scott Hall call?

4         A.    The specific question phrased that way in

5    that timeframe, no.  But I'm not going to say we were

6    laughing about it to a degree, but that's sort of the

7    tone.  You're saying like, god, it's another one of

8    these damn things.  At least that's sort of --  That

9    was sort of the tone of conversation.

10              And if it had been something different, I

11   believe it -- my --

12              If we asked the question and they had said

13   no, that would be one thing; but if we discussed it

14   and they said no, that would have been, if they did

15   know, then a lie by omission, because I believe --

16              But I don't --  I don't believe that is

17   the case, and so it didn't occur.  Say, hey, did you

18   know about this beforehand so --

19        Q.    Do you know whether Dominion has ever

20   threatened any litigation against Coffee County or

21   the Board of Elections involving the breach?

22        A.    I do not know.

23        Q.    Do you know whether there's been any --

24   any invest -- we --

25              Take a step back.  You were talking about

Page 278

1    earlier about whether there could be access to the --

2    the Coffee County data, the Dominion data that was

3    loaded to the SullivanStrickler ShareFile site.  You

4    talked that through with Mr. Persinger.

5              Are you aware of any investigation into

6    whether that type of access has occurred?

7         A.    Specifically, I talked to Persinger about

8    one specific part of that.  Not about all of it.

9              I've asked the question through our -- or

10   through legal counsel; and I said, well, if the --

11   If there was a level of encryption put around the

12   Poll Pad was it put around the other --

13             THE COURT REPORTER:  I think there was

14        a --

15             THE WITNESS:  A level of encryption put

16        around the Poll Pad data, could not have been

17        the same thing done for the other stuff.

18             And then they said we don't know.  That's

19        part of the overall look that's being done.

20        GBI's on this now, so at that point, I'm kind of

21        cut off from knowing anything beyond that.

22        Q.   (By Mr. Cross)  I see.  So as you sit here

23   today, you're not aware of any investigation that's

24   been done --

25             Putting aside whatever the GBI is doing,

1   you're not aware of any investigation that's been

2   done into whether the third parties, meaning someone

3   other than authorized by SullivanStrickler, so

4   someone other than SullivanStrickler saying here's

5   your log-in credentials --

6          A.     Uh-huh.

7          Q.     -- whether someone else gained access to

8   the Dominion software that sat on their shelf, I'll

9   say.

10                MR. TYSON:  Object to form.

11                You can answer.

12                THE WITNESS:  Not from our side.  But,

13         again, GBI's taking lead on this.

14         Q.     (By Mr. Cross)  Right.

15         A.     We're -- I don't --  Like we're kind of

16  like not supposed to be doing anything else on this

17  front, because they are the lead.

18         Q.     Okay.

19         A.     So even if we wanted to right now, there's

20  a process that's underway right now.

21         Q.     Have --  Has anyone at the Secretary's

22  Office examined the uploaded download file that

23  SullivanStrickler provided for that -- that ShareFile

24  site?

25                Have you seen that?

Page 280

```
 1        A.    I have not.

 2              And, again, you say the Secretary's

 3   Office.  I believe attorneys may have.  Mr.

 4   Persinger, who's obviously our person on that, may

 5   have; but I -- I --  I put a bright line between the

 6   people that we're -- like our attorneys and those

 7   guys doing it versus the Office doing it.

 8        Q.    All right.  Let me hand you --

 9              MR. CROSS:  We're at 19?

10              THE VIDEOGRAPHER:  Yes, sir.

11              THE WITNESS:  I believe that's correct.

12        Yeah.

13              MR. KNAPP:  Yeah.

14              (Exhibit 19 was marked for

15        identification.)

16        Q.    (By Mr. Cross)  Exhibit 19.  This is Tab

17   25.

18        A.    And you expect me to read this.

19        Q.    It is hard to see, but not really.  No.

20   I don't.

21

22

23

24

25
```

8          Q.     There's a lot of magic around that date,

9     the same day Misty Hampton's -- Jil Riddlehoover are

10    abruptly let go.  The same day Mike Lindell flies in.

11    I think it also may be the same day or pretty close

12    to the same day that the surveillance video ends; and

13    then, of course, this report ends.

14             Do you know whether anyone has

15    investigated what, if anything, may have happened

16    around or shortly after February 26th, for example,

17    whether somebody else got access to the office that

18    we don't yet know about?

19         A.     Not that I'm aware of yet.

20         Q.     Okay.

21         A.     And you --

22             MR. TYSON:  Go ahead.  Finish your answer.

23             THE WITNESS:  But, again, you -- you're

24    putting these dates together like they were

25    magic when sometimes they are coincidental.

1          I mean, it's one month from when Josh

2     Blanchard was there.  I mean, it's days from

3     when Grover Simmons (ph.) got hired.

4          I mean, some of these things don't -- they

5     are -- just because they're --

6          What's the phrase they say?  Just because

7     they're there doesn't mean they're related to

8     one another.  I can't remember the exact.

9     Q.    (By Mr. Cross)  Correlation is not

10   causation?

11   A.    Thank you.

12          So but I'm not aware of anything yet on

13   that front; but, again, handing this off to GBI sort

14   of sets us in a back seat on those things.

15   Q.    Yeah.

16   A.    So they may be look -- looking at that.  I

17   couldn't say.

18   Q.    Okay.

19          MR. TYSON:  And just to clarify, David,

20     they --  GBI does have all the SullivanStrickler

21     productions --

22          MR. CROSS:  Okay.

23          MR. TYSON:  -- as part of their

24     investigation.

25          THE WITNESS:  And was this all redacted on

1          the back or just happened to be black sheets?

2          Q.     (By Mr. Cross)  They're redactions.

3          A.     Okay.

4                 MR. BROWN:  I think it was.

5          Q.     (By Mr. Cross)  Yeah.  It involves other

6     areas.  I think principally Michigan.

7          A.     Okay.

8          Q.     And I guess one thing just to note.  If

9     you come down --  Come to the second page, if you can

10    grab Exhibit 19 again.

11         A.     Uh-huh.  The second page being the one

12    that ends in 138?

13         Q.     Yeah.  And then keep going --  Actually go

14    to the page that ends in 140.

15         A.     Okay.

16

17

18

19

20

21

22

23

24

25

19         So in fact, it may have been part of the

20    long-term thing, that the first thing, they would do

21    was to go down there, now that we've gotten some of

22    this information, and start trying to do that.

23         Q.    And that directive from the GBI, was

24    that -- was that in August of this year or September?

25         A.    It would have been probably August, I

1    think, because our initial plan was to go down.  If

2    memory serves, they were going to go down from August

3    8th to 11th, if memory serves from the discussions I

4    had, so it was after the request.

5              And basically, I said okay.  Y'all just --

6    We've got this now.

7    

8    

9    

10   

11   

12   

13        Q.    Let me hand you Exhibit 20.

14              (Exhibit 20 was marked for

15        identification.)

16        Q.    (By Mr. Cross)  And that is Tab 31.

17              So Tab 31 is one of the e-mails that Paul

18   Maggio produced to us pursuant to a order of the

19   Court; and if you'll look at the top, you'll see it

20   says Paul Maggio -- it's from Paul Maggio to

21   Federalattorney@protonmail, copying Greg Freemeyer,

22   also, SullivanStrickler on April 27th of 2021.

23              Do you see that?

24        A.    Yes, sir.

25        Q.    And if you come down to the middle of the

Page 286

```
 1    first page, do you see there's an e-mail from Paul

 2    Maggio addressed to Stefanie?

 3         A.    Yes, sir.

 4         Q.    And I will tell you that that

 5    Federalattorney@protonmail.com is a woman named

 6    Stefanie Lambert.

 7              Are you familiar with that name?

 8         A.    I've heard it before in connection with

 9    this kind of discussion.  Yes.

10         Q.    Yeah.  She's gained some notoriety or

11    perhaps infamy in Michigan.

12              So if you look, you'll see that --  Come

13    to the second page, the first e-mail in the thread.

14         A.    At the bottom?

15         Q.    Yes.

16         A.    Okay.

17         Q.    There's an mail from

18    jpcomms2020@protonmail.  Then you can see that's

19    signed by Jim Penrose, if you look at the top of the

20    next page.

21         A.    Yes, sir.

22         Q.    So Jim Penrose on April 22nd of 2021

23    directs SullivanStrickler to send all the forensics

24    material from Coffee County acquisition to the same

25    address as before via FedEx.
```

Page 287

```
 1          And then Mr. Maggio indicates he will do
 2  that.
 3          Do you see that?
 4     A.   Yes.
 5     Q.   And, again, just to explain the reason why
 6  I keep asking questions about the investigation; and
 7  I know the GBI's now doing their thing; but the --
 8          There's a window right between the Hall
 9  call coming to light in February of this year, the
10  e-mails from May of last year --
11          THE WITNESS:  And I'm going to beg your
12      indulgence on this one.  I've been trying to
13      hold it down till we got to a good stopping
14      point, but I have to go first.
15          MR. CROSS:  Sure.  No.  Go ahead.  That's
16      fine.  Take a break.
17          THE VIDEOGRAPHER:  We're off the record at
18      3:04.
19          (Recess from 3:04 p.m. to 3:11 p.m.)
20          THE VIDEOGRAPHER:  We're back on record at
21      3:11.
22          MR. CROSS:  We're on the record.
23          THE WITNESS:  Oh, that's just mean.
24          MR. CROSS:  That was fun.
25          THE COURT REPORTER:  We're having fun.
```

1          MR. CROSS:  That was funny.

2          THE COURT REPORTER:  We're having fun.

3          MR. CROSS:  Take your headphones off, and

4     I was like wait something's going on here.

5          All right.

6          THE WITNESS:  Did somebody just join or

7     did we lose somebody?  Again, we lost somebody

8     so --

9          MR. TYSON:  Lost somebody else.

10         THE WITNESS:  So someone's going to come

11    back.

12    Q.    (By Mr. Cross)  All right.  So on Exhibit

13    20 --  Oh, I -- I was saying to you --

14    A.    Yeah.

15    Q.    -- just so you understand the reason.

16    A.    Uh-huh.

17    Q.    So there's sort of a window of time before

18    the GBI begins their investigation.

19    A.    Uh-huh.

20    Q.    And I understand you guys are asserting

21    investigative privilege on that, so what I'm trying

22    to understand is what investigation was done into

23    certain things before whatever the GBI is doing.

24    That's the purpose of those questions.

25         And so I understand the GBI may be doing

1   things that you either don't know about or can't get

2   into, but that's just context for you.

3        A.    Well, what we were doing potentially --

4   I -- I touched on this for a moment -- was the chief

5   investigator and the chief investigative counsel,

6   Steven, like I said, they were setting up the

7   investigators to go down there August 8 through 11,

8   and kind of --

9        Q.    Uh-huh.

10       A.    They were putting together their plan.  So

11  this what we now specifically know.  This is what we

12  can do.  This is who we would need to interview.  So

13  those -- those kind of things were all getting done,

14  and they were preparing to go August 8th.  And,

15  again, all these things take time; and this isn't the

16  only thing all these people are doing.

17            The one thing I want to make clear is the

18  investigations isn't just elections investigations.

19  They do PLB, the Professional Licensing Board

20  investigations.  They do corporate things sometimes.

21  There are fraud things attached to some of the stuff

22  that we do, attached to security.

23            So I mean, so they do many, many things.

24  Now this is an important thing, but I just don't want

25  anybody coming away thinking this is their sole focus

1    in life.  They're doing all kinds of things, and

2    we're short-staffed in both the investigative side

3    and the legal counsel side, so what --

4              On the outside looking in, you might say,

5    well, it took you days to do this.  Coming off a

6    holiday.  Short-staffed.

7              How do we really want to do it the right

8    way, so you want to make sure your ducks are in a

9    row.  You just don't go off half-cocked.  So that's

10   why they're being very deliberate in their process as

11   we were moving forward.

12             And then by that point, once we're ready

13   to go, GBI had specifically gotten the request; and

14   we'd been talking to them; and like I said, we were

15   going to do our own thing on that.

16             And --  And the one though that sticks out

17   in my mind is going to verify they bought the pizzas,

18   which I thought was --  But it's a statement of fact.

19   They could line up or not line up with what you said

20   so --

21             But that's the kind of stuff that they

22   were doing; and then, obviously, August 2nd, the

23   official request is sent; and they're accepted; and

24   then we were --  They're basically saying don't do

25   anything while we figure this out.

1    Q.    Have you followed some of the press on

2    this, like "Washington Post," "New York Times," "The

3    Daily Beast" on the unauthorized access of Coffee

4    County?

5    A.    Now, obviously, I -- I read some of it.

6    Q.    Yeah.

7    A.    I don't --  If it's behind a pay wall, no;

8    but I've walked the basics of it, of course.

9    Q.    I think I --  My memory is that Jose

10   Pagliery at "Daily Beast" actually obtained copies of

11   the -- the pizza receipt from January 7th, 2021.

12   A.    That rings a bell vaguely on that thing;

13   but, again, having gone through this process now just

14   because somebody claims to have a specific thing --

15   Q.    Uh-huh.

16   A.    -- we have to independently verify those

17   kind of items, so that's the rationale for some of

18   those things.

19   Q.    All right.  Let me hand you Exhibit 21.

20   A.    Are we done with 20?

21   Q.    Yes.

22   A.    Okay.

23         (Exhibit 21 was marked for

24   identification.)

25   Q.    (By Mr. Cross)  Sorry.  I can't remember

Page 292

```
 1    if I asked you before the break.  Are you -- before
 2    whatever --
 3             Again, sort of putting aside the GBI
 4    investigation, whatever may be going on there --
 5        A.    Yeah.
 6        Q.    -- are you aware of any investigation into
 7    who the recipients were for any hard drives
 8    SullivanStrickler sent the Dominion data on?
 9        A.    No.  We haven't done that --
10        Q.    Okay.
11        A.    -- yet.
12        Q.    All right.  All right.  Take a look at
13    Exhibit 21, if you would; and this is Tab 26.
14             So this is an e-mail from my --
15             THE WITNESS:  Hold on a second.
16             MR. CROSS:  Oh.
17             THE WITNESS:  You got it?  Duncan causing
18        problems again.
19             MR. BROWN:  Mentor.  Mentor's things.
20        Q.    (By Mr. Cross)  But this is my --  This is
21    an e-mail from my mentor, the person that made me
22    what I am --
23             MR. CROSS:  You may not want to take
24        credit for this.
25             THE WITNESS:  Is that credit or blame?
```

Page 293

1      How do you spell --

2              MR. CROSS:  I know.

3              THE WITNESS:  -- it, right?

4              MR. CROSS:  Exactly.  He's going to regret

5      that.

6      Q.    (By Mr. Cross)  This is from Bruce Brown,

7  Exhibit 21, an e-mail sent to counsel on this case,

8  sent July 27, 2022.

9              And you'll see that he -- he indicates

10  that on a public Internet site, there appears to be

11  Coffee County's November 2020 cast vote records in

12  JSON format.  That's J-S-O-N.  Based on the file

13  date, the files appear to have been created --

14      A.    Hold on a second.  Okay.  You said

15  November.  I see January.  I don't see November.

16              Am I --

17      Q.    No, no.

18      A.    -- reading that right?

19      Q.    You're reading --  Does it say a date on

20  it?

21              Yeah.  So if you'll read the very first

22  paragraph.

23      A.    Okay.  'Cause I was looking at the date

24  sent.  I apologize.

25      Q.    Yeah, yeah.

Page 294

1       A.      Okay.

2       Q.      Sorry.

3       A.      Okay.  In JSON format.  All right.

4       Q.      Right.

5       A.      Yes, sir.

6       Q.      He goes on to say based on the file date,

7    the files appear to have been created and acquired

8    for publication long before JSON format Cast Vote

9    Records were permitted to be released as public

10   records by the Secretary of State.  The files dated

11   February 17, 2021 are posted at this has website.

12           Do you see that?

13      A.      Yes.

14      Q.      And, again, putting aside whatever the GBI

15   may be doing today, are you aware of any

16   investigation into these files, the providence,

17   access to them, anything about them?

18      A.      Me specifically on this, no.  I don't.

19      Q.      Okay.  Were you aware that individuals who

20   received log-in credentials for the ShareFile --  I'm

21   sorry.

22      A.      I'm sorry.  You can keep going with this

23   thing.

24      Q.      No.  I just --  Yeah.  Okay.

25           Were you aware that individuals who

Page 295

```
1    received log-in credentials from SullivanStrickler
2    for the ShareFile site that had the Dominion data on
3    there, that they would sometime share those log-in
4    credentials with other folks?
5                   Have you heard that before?
6                   MR. TYSON:  I'll object to form.
7                   THE WITNESS:  No.
8         Q.    (By Mr. Cross) So you've not heard --
9    You've not heard before today of a Ben Cotton --
10                  Well, let me back up.  Are you familiar
11   with Ben Cotton?
12        A.    Yes.
13        Q.    You understand Ben Cotton is someone who's
14   testified that he actually did analysis of the
15   Dominion software obtained from Coffee County?
16        A.    Yes.
17        Q.    And were you aware that he testified in
18   his deposition that he was provided SullivanStrickler
19   log-in credentials by Jim Penrose, meaning he said he
20   used Jim Penrose's credentials to get access to the
21   site?
22        A.    As a specific, I wasn't aware; but it
23   comports with what I understand.  Yes.
24        Q.    Okay.  So, again, putting aside whatever
25   the GBI may be doing, are you aware of any
```

1    investigation into the sharing of the log-in

2    credentials from SullivanStrickler with individuals

3    SullivanStrickler had not authorized to access that

4    site?

5         A.    Again, given the timing of this, no.

6         Q.    Okay.  So one of the things that occurred

7    in the -- the breach in January of 2021 was also

8    scanning of ballots, paper ballots.  Were you aware

9    of that?

10        A.    Yes.

11        Q.    And were you aware that an external

12   scanner, generic scanner was brought in to help with

13   that?

14        A.    No.  I was not aware of that.  Or I might

15   have been aware of it, but I don't recall being aware

16   of that.

17        Q.    Are you aware of any --

18              Again, putt aside the GBI, are you aware

19   of any investigation into the involvement of Cathy

20   Latham or anyone else to bring a generic scanner into

21   the office for the purpose of scanning ballots in

22   January of 2021?

23        A.    There --  In that time window there, I

24   believe that there was some discussion around that;

25   and going back to a -- a certain part of this, I do

```
 1   not --  I'm not sure that these were actual ballots.
 2   They were ballot types, or I don't know if they were
 3   the actual ballots from those things, because that
 4   would have required getting them at that point, since
 5   it should have already been transmitted, I believe --
 6   the timing's close -- to the Superior Court, so I
 7   don't know if they were live ballots or not.
 8            Similar like to the video that Misty had
 9   made where she used basically dummy ballots or
10   ballots of older elections to kind of show off some
11   of those things.
12            So, again, I don't know the answer to
13   that.
14            (Exhibit 22 was marked for
15       identification.)
16            MR. CROSS:  All right.  22?
17            THE VIDEOGRAPHER:  Yes.
18       Q.   (By Mr. Cross)  All right.  Let me hand
19   you Exhibit 22.  This is Tab 43.
20            Actually, sorry.
21       A.   Uh-huh.
22       Q.   Do you recognize -- sorry -- Exhibit 22 as
23   an e-mail, a cover e-mail attached to a -- a draft --
24   well, I don't know if it's a draft -- attached to an
25   engagement agreement for forensic collection and
```

Page 298

1    preservation in Spalding County for

2    SullivanStrickler?

3         A.    Yes, sir.

4         Q.    And the date on the agreement is August

5    17, 2021.

6              Do you see that?

7         A.    And it comports with the date of the

8    e-mail itself.  Yes.

9         Q.    Right.  What can you tell me about any of

10   investigation into the circumstances of

11   SullivanStrickler potentially being engaged to do

12   forensic collection of voting software and data in

13   Spalding County?

14        A.    An investigation has been opened.  Once

15   this was brought to light, it was sent to the State

16   Election Board Chairman.  He brought it to our

17   attention.  I believe we gave you the -- the case

18   number for it earlier when we checked in with our

19   office.

20             I know it is ongoing.  I don't want to

21   speak to where they are in it, 'cause I don't know

22   specifically to say yes or no.

23             But so far, says it doesn't appear that

24   anything happened at this point; and again, it's my

25   understanding that the county attorney basically, for

Page 299

1    lack of a word, put a kibosh on this once they were

2    kind of asked about it.  That's my understanding of

3    where it is, but they're going to verify and see who

4    saw all of this.

5         Q.    What's the name of that county attorney?

6         A.    I do not recall.

7         Q.    Okay.  When did the Secretary's Office

8    first learn about this effort?

9         A.    As I understand it, when it was sent to

10   the State Election Board Chairman; and he brought it

11   up.  I don't know if it was at --  It was before the

12   meeting, he informed us about the --  He had

13   questions about this, and so I couldn't speak to

14   exactly when it was, but it was sometime, give or

15   take a week or so, before --

16              I mean, it would have been in September

17   probably; or late August, early September would be my

18   understanding of how that occurred.

19        Q.    So how did -- how did the Secretary's

20   Office first learn that there was a -- a possible

21   compromise or breach in Spalding County?

22        A.    I don't think we did learn there's a

23   possible compromise or breach.

24              We learned that SullivanStrickler was

25   talking to the -- the elections board about this and

Page 300

1   their elections director.

2       Q.    Right.  And sorry.  I don't want to trip

3   over the language.  Let --  Let me just ask another

4   question.

5             Whatever is --  Whatever's contemplated in

6   Exhibit 22, with SullivanStrickler, however one wants

7   to describe it, how did the --  Well, how did the

8   Secretary's Office first learn about that?

9       A.    When the documentation was --  'Cause I

10  understand it was the documentation was sent to the

11  election board chairman.

12      Q.    How did the electric board chairman get

13  that documentation?

14      A.    Via e-mail, I believe.

15      Q.    From whom?

16      A.    I don't recall the individual, but it's

17  basically saying this is an issue I'm concerned with,

18  and he sent it up there.

19            We can find out.  I just --  I'm not sure

20  who it was.  It was someone in Spalding County,

21  obviously; but I couldn't tell you who exactly.

22      Q.    So someone alerted --  Is it Judge

23  Duffey --

24      A.    Yes.  Correct.

25      Q.    -- in -- in September of this year?

1      A.    Yeah.  I --  I couldn't speak when he got
2   it; but, I mean --
3      Q.    I see.
4      A.    -- it might have been late August, early
5   September; but I remember discussing it early
6   September, I believe, was the first time I heard
7   about it; but, again, the days are going to be kind
8   of tight up on each other for that.
9      Q.    Okay.  And so Judge Duffey received the
10  e-mails here and the cover and the engagement
11  agreement and then alerted the Secretary's Office and
12  the GBI, and there's now an investigation?
13     A.    I know he alerted our office.  I'll make
14  an assumption he alerted the GBI.
15     Q.    I see.
16     A.    I don't know.
17     Q.    Okay.  I was going to ask.
18           Do you know --  It's something you don't
19  know, but I'll ask.
20     A.    Uh-huh.
21     Q.    Do you know whether the GBI itself is also
22  investigating whatever circumstances were
23  contemplated in Exhibit 22?
24     A.    No, sir.
25     Q.    Okay.  You just don't know one way or the

Page 302

1    other?

2         A.    I just don't know one way or the other.

3         Q.    Okay.  It --  A couple quick questions on

4    this.

5         A.    Uh-huh.

6         Q.    If you look at the e-mail from Ben

7    Johnson, to Roy McClain --

8         A.    Is that the very first one on Page 1?

9         Q.    Yes, sir.

10        A.    Okay.

11        Q.    It states iPhones - retrievable but

12   costly - these would fall under litigation hold, but

13   as long as we don't wipe them or use them, the data

14   is there.

15            Do you understand that -- I mean, from

16   what we've been able to tell --  And you can go

17   through the e-mails.  Do you have any insight into --

18   into what litigation was pending against the County

19   for -- for the effort that was contemplated here?

20        A.    Honestly, I don't know.  I think

21   there's --

22            From from my reading of it, it looks like

23   they are comporting all state litigation.  There

24   should be litigation holds on everything, but they --

25            They look like they were referencing

1    something specific, but I don't know what it is.

2              I mean, on some levels, some of this looks

3    like legitimate discussions between elections board;

4    and it's kind of saying, well, how do we do what we

5    need to do in a proper way.

6              Well, these guys seem like they -- they

7    know what they're doing, and I don't know where that

8    relationship started.  I would love to be able to

9    know where that relationship started, on what side,

10   if somebody found a business card, or they had

11   reached out at some point.

12             But, again, I'll tell you my own -- in my

13   brain, I say this could have been somebody trying to

14   say how can we justify it properly to do something

15   like this; and that was where being around this stuff

16   and watching people act, that's my gut reaction; but

17   I --  I can't prove that one way or the other.  There

18   has to be an investigation, which our office is

19   doing.

20        Q.   For --  For a county to copy voting --

21   Dominion software from voting equipment, would it

22   require State authorization for that?

23             MR. TYSON:  I'll object to form.

24             Answer, if you know.

25             THE WITNESS:  I believe so, but I do know

Page 304

1       this.  That if they do something like that, it
2       could then interfere with a potential
3       warrantying of the --
4       Q.   (By Mr. Cross)  Uh-huh.
5       A.   -- equipment as well, which would be a not
6       smart thing to do.
7                 Whether it's a specific violation of SEB,
8       I think it is.  I'm pretty sure it is.
9                 But I --  I don't want to say it
10      specifically.  Yes.  Absolutely it is.
11                But sort of in the universe of data
12      security and EMS security, nobody, third party is
13      supposed to be brought into those things, into the
14      EMS area without authorization.
15                So yeah.  Yes.  I can --  I can say that
16      pretty straightforwardly.
17      Q.   And -- and --
18      A.   Sorry to talk myself through the process
19      to get there.
20      Q.   And fair to say that the events, as -- as
21      you know them currently that -- that played out in
22      Coffee County at the elections office in January of
23      2021, the access we know that was -- that occurred
24      there and the copying, all of that would have
25      required authorization by the State?

Page 305

1      A.    To have been done legally, yes.

2            Even then I still think we don't just get

3   to waive SEB rules or laws.  I mean, we --  You have

4   to say, SEB, can we allow something like this?

5            And they would have to say, yes, just in

6   this particular incidence; or there has to be an

7   investigatory rationale for doing something like that

8   through our -- through the open official

9   investigation as chief election officers

10  investigators.

11           There's --  There's paths to do it, but

12  there was no path available for the way it was done

13  from what everything I know right now.

14     Q.    I --  I think this might be clear, but

15  just to make sure.  Do I understand correctly that,

16  again, apart from whatever the GBI may now be doing

17  since it was formally brought in, in August, there

18  were not, at least prior to that time, any

19  investigative interviews of anyone about whether

20  there had been an unauthorized access in Coffee

21  County in the January 2021 timeframe?

22     A.    There had not yet.  As, again, I guess

23  going back -- I'm doing a call back to a previous

24  answer where Mr. Germany, in -- in discussions with

25  the office investigator, said let's get specific

Page 306

```
1    facts down first before we interview anybody, because
2    as we know already, Miss Hampton was prone to not
3    tell the truth.  So we wanted to have binary things
4    that she would either know or not know, and we could
5    verify or not verify what she knew when she was
6    discussing it.  Or any of the other people down there
7    who potentially be part of it.
8             As you --  As was you pointed out, at
9    least one of their election board members was on the
10   same front.  His name escapes me right now.
11        Q.    Eric Chaney.
12        A.    Thank you.  Eric Chaney, who's no longer
13   on the board, so interviews were not going to --
14            The plan from the beginning was we weren't
15   going to do interviews with them until we had
16   specific things to interview them about that we could
17   prove or disprove without their knowledge or would
18   their having to say yes or no on that, that they
19   can --  We can hold them to account.
20            As an example, we originally did not want
21   to know, have out in the world what device was
22   plugged in, so I'm not happy that that is now out in
23   the world, because now that's a specific thing we
24   can't use to leverage and say what was it that they
25   plugged in.  Those kind of things.  That was the
```

Page 307

1    intent behind that.

2            If they said it was a laptop, we would

3    have said, no, it wasn't a laptop.  It was it, or

4    whatever those kind of things are, you know, so --

5        Q.    So in -- in Mr. Beaver's deposition, he

6    talked about how the Secretary's Office has a

7    specific -- specific what he called incident response

8    plan for a breach like this.

9            Why wasn't that incident response plan

10   followed here, you know, once this was raised as a --

11   as a possible concern?

12           MR. TYSON:  And I'll object to form.

13           Do we have that we can put in front of

14      him, 'cause his answer and response have been

15      related to servers.  I'm trying to recall from

16      Merritt's testimony.

17           MR. CROSS:  Yeah.  You're welcome to look

18      at the testimony.

19           MR. TYSON:  Okay.

20           MR. CROSS:  We can mark it.

21           22?

22           THE VIDEOGRAPHER:  23.

23           (Exhibit 23 was marked for

24      identification.)

25           MR. CROSS:  23.

Page 308

```
 1              THE WITNESS:  Do you know what page I'm
 2       looking at, Mr. Cross?
 3       Q.    (By Mr. Cross)  Yes.  Pages 418 --
 4       A.    Do you know what line we're starting at?
 5       Q.    Yeah.  Start at 418 at the bottom at Line
 6       23.  It goes on to all of 419.  He talks through the
 7       incident response plan.
 8              MR. BROWN:  What tab is it?
 9       Q.    (By Mr. Cross)  So the question --
10              MR. BROWN:  What tab?
11              MR. CROSS:  Oh, sorry.  I'm in Tab 75.
12              MR. BROWN:  Thank you.
13       Q.    (By Mr. Cross)  So the question was:  Are
14       there protocols --
15       A.    Will you give me a moment to read, and I'm
16       I can catch up on it.
17       Q.    Yeah.  I was going to read it for the
18       record.  You can read along.
19              The question was:  "Are there protocols in
20       place at the Secretary of State if there is a
21       suspicion that there's been an unauthorized access of
22       election software?"
23              And then he goes on there to describe an
24       incident response plan.
25       A.    Well, it looks like everything was
```

Page 309

1   followed up to the point of where we're talking about

2   bringing Fortalice, 'cause we thought we could bring

3   in --  For us, an outside thing would have been all

4   we need to do was to get into that and look at the

5   log files.  That's the first thing we needed to do.

6           So he jumped to the next level basically

7   saying the outside thing, which we did with Persinger

8   in this case, so I would say we did essentially

9   follow what this says to do.

10          So I -- I disagree with the format of your

11  question.

12      Q.   So you think --

13      A.   I mean, essentially, we did this.  We

14  said --

15          First, we have to say something happened;

16  so we start to try to get in --  We try to get into

17  the server.  We try to get in the server.

18          Said this isn't working.  Let's bring in

19  Persinger.  We got in server.  We saw something

20  happened.

21          We informed.  You know, at this point, it

22  was going to be Blake, me, and Ryan did that.

23          And then we would start our investigation;

24  and the plan was, now that we know this, we can start

25  doing this; and we --  Steven and the --

1          Basically, we did all these things; and

2    Mr. Persinger was sort of the --

3          We flipped one of them, I think, only

4    because we knew that the people we were dealing with

5    down there may not be forthcoming on these items.

6          I mean, that's --  That's the way I'm

7    reading it, so it should go first thing we do is

8    collect information from that source.

9          So when Persinger got in, we did that.  We

10   got --  We found that.

11         Often, we'll go to directly to

12   investigation that was research.  Investigations

13   couldn't do research on a server like this.  They

14   didn't have that skill set at the time.  They

15   notified --

16         Gabe Sterling and Ryan Germany were

17   notified once Mr. Persinger said, yes, something was

18   done here.

19         Then we move on to the investigation side,

20   which, you know, we did that with hiring -- hiring

21   forensics with Mr. Persinger, and then we started

22   doing how do we get this stuff on the ground?  As I

23   pointed out, they were putting together an

24   investigation plan.  Steven Ellis, as I recall, were

25   working on -- kind of go through who do we interview,

Page 311

1  in what order, and how do we set the questioning up

2  so that we can make sure that they're telling the

3  truth or not telling the truth.  I mean, this was all

4  essentially followed so -- .

5           And then we have contact with GBI.  We

6  contacted GBI.  I mean, can you have some arguments

7  about timing and what took so long on some of these

8  things versus other stuff?  Sure.  But this looks to

9  me like it was essentially followed.

10           So you're saying we didn't follow it.  I'm

11  saying we did.

12      Q.    So when Chris Harvey learned about the

13  Cyber Ninjas card and ask for an investigation by

14  Miss Watson into whether there had been unauthorized

15  access at that time, were you or Mr. Germany alerted

16  to that?

17      A.    Not that I recall.  But, again, it was a

18  little "i" investigation, as we pointed out before.

19  Just kind of look into it and see what's there,

20  'cause you have to triage some of these things given

21  the volume of what we had.

22      Q.    We talked about Ben Cotton before.  He

23  also testified that he analyzed Dominion's software

24  from Fulton County.

25           Do you know what investigation, if any,

Page 312

1   has been done into how he obtained Dominion software
2   from Fulton County, assuming he's right about that?
3       A.    I know that there was discussions; and,
4   again, I don't know if it was little "i" or big "I"
5   investigation; but we think he was confusing Fulton
6   County, Georgia with Fulton County -- I think
7   Pennsylvania or Michigan.  I can't remember.  'Cause
8   it --  I think they did get access up there, but not
9   anything we saw in Fulton County, Georgia.
10          And, again, that was one of those.  It
11  wasn't --  It wasn't a case file set.  It was sort of
12  a discussion.  Like from everything we're seeing, it
13  looks like he's discussing this; and he just got
14  confused when he was discussing it.
15      Q.    Okay.  Okay.  Sorry.
16          Are you aware of any actual investigative
17  steps, like interviewing people; accessing, examining
18  equipment with respect to --
19      A.    It wasn't --
20      Q.    -- Fulton County?
21      A.    -- examining equipment; but there were, I
22  believe, discussions; and I couldn't speak to
23  specifically who was interviewed, because we asked do
24  we have any reason to believe this is the case.
25          And I can't remember exactly how that

1   process went, if Frances was still here or not, given

2   the timing of when Mr. Cotton make the claim

3   originally; but I remember we essentially came down

4   to he must be talking about Fulton County,

5   Pennsylvania; or I believe it was Pennsylvania but --

6           And I --  I can't speak to exactly why;

7   but the people, the lawyers of -- on our side, the

8   investigators essentially basically said this is what

9   it looks like they're discussing, so no need to look

10  into that any further; 'cause, again, we had no

11  reason to believe Fulton stuff had been -- had that

12  kind of thing happen to them.

13          And there was --  I believe there was some

14  press coverage that something had happened in Fulton

15  County, Pennsylvania, or Michigan, whichever that

16  was.

17          Now trust me.  I have a -- I have a

18  history of holding Fulton County to account when they

19  do something that's not helpful to the election

20  systems so --

21          Are we done with these two, Mr. Cross?

22      Q.    Yes.

23      A.    Okay.

24      Q.    You --  You mentioned earlier that there

25  is ongoing discussion about whether to update the

Page 314

1  Dominion Democracy Suite software to the new

2  forthcoming version --  Is it 5.17?

3       A.    Well, there's two separate things here.

4  We were looking at trying to do a pilot, but we just

5  didn't --  We ran out of time in one county with

6  5.13, which would have addressed a lot of these

7  things.  5.17 addresses --

8       Q.    Can I ask a quick question on that.

9       A.    Yea, sir.

10      Q.    5.13 does not use a QR code, right?

11      A.    No.  It's -- they both --  All their

12  systems may use a QR code.  This one, in the BMD

13  configuration, has the ability to produce the

14  full-face ballot, the full-face ballot being

15  basically mirroring what appears to be a hand-marked

16  paper ballot.

17      Q.    With no QR code?

18      A.    With no QR code.  It still has the bar

19  code in the corner, so the tick marks for the

20  computer to line up.  I think the same systems for

21  counting and tabulating as before, which the QR code,

22  again, does -- acts in the same manner.

23           So the 5.13 does not -- has the ability to

24  do both, and a 5.17 has the ability to do both.  And

25  5.13 addressed, I believe, most of the items

Page 315

1    highlighted in Dr. Halderman's report, and 5.17 does

2    that, plus a couple other bells and whistles I

3    couldn't speak to you right now.  I just know it had

4    some additional changes to it.

5         Q.    You said that there was discussion of

6    piloting 5.13.  When was that?  When was the

7    discussion?

8         A.    The discussion was in the summertime.  We

9    were talking about actually --  That was part of the

10   problem is we were talking about maybe piloting it in

11   a -- I believe, the primary originally.  We kind of

12   ran out of time on that.

13          And then we said the risk is too high for

14   a statewide general election to pilot anything like a

15   new Democracy Suite, so we'll put that off for a

16   minute; and then I remember having specific

17   heartburn, going I don't mind being the leading edge.

18   I don't want to be the bleeding edge on these things,

19   'cause bleeding edge tends to where you find

20   problems.  I'd rather have some other jurisdiction to

21   have done this.

22          And 5.13 has now been used I know for

23   certain in Chicago and in Cook County.  I think

24   Chicago City jurisdiction runs that.

25          5.17 just got submitted three weeks ago or

1   so to the EAC certification; and it's up to them to

2   make the decision whether they're going to read every

3   line of code again or just the changes to the lines

4   of code, I believe, is how that works, so we don't

5   have a timeline on that.

6            We're operating on the assumption we can

7   get it certified and -- but we can start the -- the

8   process of loading everything, you know, as soon as

9   we can, so we can have it in place for the March

10  specials and stuff.  Usually, on average, we have

11  about 40 counties have to run those things.  So when

12  we're -- we do this all the time in measuring risk in

13  looking at things.

14           Trying to push it out statewide in the

15  statewide general election with Stacey Abrams and

16  Bryan Kemp on top of the ballot and Herschel Walker

17  on top of the ballot with every county in the state,

18  the risk runs a lot lower if there's any issues

19  running it in special elections in 40 counties, and

20  we can have a controlled environment to look at all

21  those kind of things.

22           But we'd be loading this stuff before that

23  if everything -- but learning from that as we go and

24  make sure the protocols are in place and proper for

25  those things.

1    Q.    And are you talking about loading 5.13 or

2    5.17?

3    A.    5.17.  Because it is a big effort to get

4    to touch, essentially, every machine; and you want to

5    make sure your protocols are in place.  You don't

6    want to be rushed.  You want to be able to verify

7    things are done properly, so it's going to take a big

8    partnership with the counties, a big partnership with

9    Dominion, and the State kind of looking over the top

10   of these things to, you know, basically make sure

11   that everything's done properly.

12          It's all a big effort, obviously.  There's

13   33,000 plus ballot-marking devices, 3300 plus I --

14   ICP scanners.  You know, you've got to touch all of

15   them to get everything across.

16          And we have some counties that are better

17   organized than others; and, you know, we have to give

18   some of them a lot of lead time, in part, because

19   they're under resourced; but some are very resourced

20   but have a bad logistical history.

21          And -- and we even --  The State has

22   invested repeatedly to make sure those counties can

23   have the things they need to succeed.  In the 2020

24   election, we paid for a logistics company to go five

25   big counties -- Cobb, Fulton, DeKalb, Gwinnett, and

Page 318

1    Chatham; and I think that was a godsend for them to

2    help keeping them on the rails.

3              Like I say, we have to balance all the

4    stuff out.

5              So 5.17, there's not a written-out plan.

6    It's sort of an up-in-the-air plan right now of

7    trying to look and see if we can start doing that in

8    January.

9              Now at the same time, our elections team,

10   we're rolling out a new voter registration system.

11   Again, pushing that -- we have --  We've done it in

12   two phases.  The first half of that --

13             And, again, this is going to answer your

14   question of trying to push all these things out.

15             The training involved, we're doing January

16   training.  There ought not be, from my understanding

17   of 5.17, not a lot of difference in how counties have

18   to do anything on these items.  They should --  The

19   training should carry over, but we haven't verified

20   that yet.  We've been told that.  We want to make

21   sure.  So is there any steps in here that are any

22   different, so we can make sure we get those in check.

23             But right now, everybody's efforts, other

24   than my dozens and hundreds of hours getting ready

25   for this, is going towards the November 2020

Page 319

1   election, so that's where most -- but the counties

2   are working.  We're not going to throw anything like

3   that, so that's what we're working on.  Once we get

4   past that --

5            And hopefully, there won't be a runoff;

6   but if that's the voters' will, that's the voters'

7   will; and once we get past December, we're going to

8   refocus and get a -- a more written-out, formalized

9   plan of what we need to do.

10       Q.    And is there a -- a decision with respect

11  to 5.17, if you roll that out next year, to abandon

12  the QR code?

13       A.    There's no discussion of that just yet,

14  because, as I said, there's a whole new set of

15  problems that arise from that.  It gives us the

16  possibility of doing it in a way that could be

17  digestible; but, again, there's a lot of --

18            It's not as simple as, hey, let's just go

19  do it, 'cause I said you have paper issues.  You have

20  storage issues.  You have training issues.  You have

21  auditing issues, 'cause no one's explained to me yet

22  how you can do auditing on a two -- two page -- a two

23  physical page ballot on some of those items, because

24  they can get disconnected from one another, a single

25  ballot, when you're trying to audit a race.

Page 320

```
 1       Q.    Okay.  Can you hold there for a second,
 2   'cause I -- I got lost on that before.
 3       A.    Yeah.
 4       Q.    When the ballot -- when the ballot --
 5   The BMD prints the ballot without a QR code.  Why is
 6   the pagination any different than printing the ballot
 7   with a QR code?
 8       A.    Because the QR code allows you to put
 9   everything on an eight-and-a-half by eleven piece of
10   paper.  If you're going to mimic the --
11       Q.    Why --  Why is that?  I don't understand
12   that.  If it all --
13             If the QR code ballot has all of the same
14   human readable selections that the non-QR code ballot
15   will have so the voter can review all that --
16       A.    Uh-huh.
17       Q.    -- how does the QR code let you print it
18   on a smaller ballot?
19       A.    Okay.  Again, I'm not trying to be
20   pedantic here; but you've seen the -- the actual BMD
21   ballot.  It is eight and a half by eleven.  It can go
22   to a front and back, given the number of contests
23   that might be on there.
24             The QR code's at the top.  You just have
25   your choices on there.  Now --
```

Page 321

1      Q.     Oh, I see what you're saying.  I got it.

2      A.     Okay.

3      Q.     I see --  I see what you're saying,

4   because when it -- it -- when it --

5             MR. BROWN:  It's a summary.

6      Q.     (By Mr. Cross)  -- yeah -- it prints, it's

7   only your selection.  It doesn't have every

8   candidate, every option that's on there, so you can

9   print it more succinctly.

10     A.     And let me go further to this.  On the

11  sizes of these things, if we tried to keep the eight

12  and a half by fourteen, which the contract calls for

13  the 14 cent ballot for the counties which holds their

14  cost down, it's going to be ease -- that's an easier

15  thing to do and to manage, and you don't have to

16  worry about multiple-page pagination.

17            And then if you're running larger pieces

18  of paper, it's, again, a hard -- a little bit more

19  difficult thing to deal with; and every county has

20  different size ballots.  You can have 14-inch

21  ballots.

22            General election ballots tend to be

23  shorter than primary ballots, because we have those

24  ridiculous party questions they throw on the end of

25  those.  To give an example, we've said if we go to a

                                                  Page 322

 1    full-face ballot, we're going to have to go and just

 2    change the laws so -- so parties can't put those

 3    unnecessary questions on there, 'cause that's adding

 4    length and adding extra fail points on these systems.

 5              Like I said, we have to look at a pantheon

 6    of all the issues that go into this.  It would

 7    require different training.  It's not as simple as,

 8    hey, let's just go do that.

 9         Q.    So --

10         A.    And --  And a cost thing for these

11    counties as well.

12         Q.    So is it your understanding that 5.17 and

13    5.13 with the non-QR option, it prints what you're

14    calling a full-face ballot meaning it prints all of

15    the options as opposed to just the -- the voter

16    selection?

17         A.    Correct.  It has to, because you have to

18    realize the QR code is based on the coordinates from

19    a full-face ballot.  That's how that works.

20              The QR code, all it's saying is X37Y21 is

21    Donald Trump.  X37Y22 is Joe Biden.  That's what's in

22    the QR code.

23         Q.    I see.

24         A.    So that's why you can use the scanner to

25    scan either a BMD ballot or full-face hand-marked

Page 323

1   ballot, so that's what you're getting to on that

2   point, so that's how -- that's how that process is

3   done.  It is essentially tabulating the exact same

4   thing on either ballot, so the human readable text is

5   neither here nor there for either one of them --

6        Q.    Well, I will --

7        A.    -- for the -- for the computer processing.

8        Q.    Yes.  Okay.

9        A.    Yes.

10        Q.    Okay.  But clearly, a difference for the

11   voter, 'cause the voter can't read a QR code?

12        A.    Okay.  But I'll go back to you and say

13   they can't read what the coordinates are on those

14   things either, so if somebody hacks in -- in the

15   scanner, it's the same thing.

16        Q.    Yes.  But that --  On that argument, you

17   wouldn't even have faith in a human -- in hand-marked

18   paper ballot, but we have to have ballots in some

19   form, right?

20        A.    Okay.  Well, my point is we're having a

21   policy argument over whether you have faith in a

22   BMD-produced ballot or a hand-marked paper ballot.

23            My point is I believe the BMD ballot is

24   the best option in the state of Georgia right now.

25            With a QR code, it is also hand-marked

Page 324

1   ballots in and of themselves are more easily hackable

2   in terms of low tech ways of doing it, ballot

3   stuffing.

4           Part of the reason we got to a lot of

5   these computerized things, if you looked at the

6   history of why we went to voting machines is to avoid

7   those kind of situations.

8       Q.   But the scaleability --

9       A.   It's --

10      Q.   -- is massively different.  We agree on

11  that, right?

12      A.   It --

13      Q.   The scaleability of an attack on

14  hand-marked paper ballots --

15      A.   No.  I don't agree on that, 'cause, again,

16  if all -- all the suppositions in Dr. Halderman's

17  things essentially say a lot of if, then; if, then;

18  if, then to get to that point of huge scaleability.

19          My contention is it is much more

20  detectable, even with all those things.  There's so

21  many pieces and processes and the RLAs, and I know he

22  says we only have one mandated RLA every two years.

23          I think that's too few.  The Secretary

24  thinks that's too few.  We've tried to argue the last

25  two times in legislation we need more auditing in the

Page 325

 1   law.  We're trying to look at now can we do it by

 2   rule.  We're --  We're having a discussion.

 3         Q.    Well, can't the SEB or the Secretary do as

 4   many audits as they want?  It doesn't have to be

 5   mandated by --

 6         A.    The Secretary can't just tell a county to

 7   go do it.  You have to have some legal authorization

 8   to do it.

 9               So my point is we can't -- we can't --

10   the --  The chief elections officer can't just make

11   things up for them to do.  We can't just say from now

12   on, you're doing this.  You have to go through the

13   rule making.

14               So like I said, we're having discussions

15   about how do you construct an SEB rule to do this and

16   how do you structure it best, because my point on the

17   RLAs is I think it's crazy to only do one every two

18   years, because if you're doing ballot batching and

19   all the necessary steps for that.

20               If you do every two years just to do it;

21   you need to do it every single election, whether it's

22   a special, a primary -- I don't care -- a runoff.

23   You have to go through the process so you get the

24   muscle memory back.  There's enough human beings at

25   the county level to do those things.

Page 326

1            So this isn't a perfect universe versus

2       hell.  This is like a system that we know functions

3       versus a system that people can argue this a little

4       more secure, functions better.  This is a little more

5       secure, functions less.  It's a policy discussion.

6            And that's why, no, I don't believe that;

7       and I believe that the decisions that we've made

8       through several laws --

9            You've got to remember.  We procured this

10      using the State procurement law after the passage of

11      HB 316, and we're following the law.  We continue to

12      follow the law.

13           I mean, this Office now rather famously

14      said we follow the law and we follow the evidence and

15      we tell the truth about these things, and that's what

16      we're trying to do is to get to a system that works

17      that has -- provides the security that's necessary.

18           And there's never a hundred percent

19      security on any system.  I think we can all agree on

20      that.

21           You're right in your statement that there

22      might be scalable stuff; but if someone gets to

23      scanner --  If they can get to an EMS, they can get

24      to scanners, which is equally scaleable.  In fact, I

25      would argue that trying to go to BMDs is physically

Page 327

1    harder, 'cause most of the stuff requires physical
2    access to more devices.
3            If your --  If your attack vector is only
4    the scanner, that's the only thing you can go after
5    versus lots of BMDs in multiple jurisdictions, I
6    would argue it's actually easier to do a thing that
7    can affect 3,000 scanners versus 33,000 BMDs,
8    depending on how -- how one constructs it.
9            In reading one of his attack vectors, he
10   basically said one of the threat actors could be
11   Russia; and they could send agents, essentially, send
12   agents to all these multiple counties to do this.  I
13   don't --  Yes.  That is a possibility.  There's a
14   possibility I could buy a lottery ticket tomorrow and
15   win and -- and get out of all this.
16           But my point is we take into account all
17   of these things all the time, and that --  That's
18   kind of the way in which we look at it, but our main
19   guiding principle is the law, and then try to say
20   what we can we do to make the best voter experience
21   and provide enough security so that we can all feel
22   good about the outcome.  And I think the system we
23   have does that.
24       Q.    One thing you said, you said you think
25   having the BMDs provides fewer attack vectors than

Page 328

1    having just the scanners?

2           A.    Other way around.

3           Q.    Right.  Right.  If you didn't have the

4    BMDs, you'd have fewer attack vectors?

5           A.    If you didn't have BMDs, they could focus

6    everything on just the scanners if they were going to

7    go that route.

8           Q.    But that's fewer attack vectors.

9           A.    That's more.  Well, no.  Both say

10   having all --

11              It's easier to go after 3,000 things than

12   after 30,000 things.  Does that make sense?

13          Q.    But that assumes you have to go after all

14   of those 30,000 things.

15          A.    You still have to go through 159 counties,

16   and one of the things that I --  I don't want to get

17   into the detail, into the weeds in all this.  My

18   point is it's an easier target.

19              I mean, for me, since I got into the

20   office, my biggest fear of tactical targeting was the

21   voter registration system, 'cause it's one target;

22   and it is connected to the Internet, so that's --

23   That's the only thing that's always had me on pins

24   and needles.

25              I think all this discussion around

1    machines is sexy, and it provides fodder to

15            That's a real thing, and that's probably

16    the reason we're moving to another system now that

17    has, you know, people who are updating, constantly

18    looking at using the FedRAMP cloud.

19            This office takes all this seriously.  We

20    have to, because of the attacks not just in 2020, but

21    in 2018, in 2016, and then 2000 and 2004.  We have to

22    take it all into account.

23            And what I -- what I dislike about this

24    process is it looks like because of the adversarial

25    process, we're saying no, no.  You're a hundred

1    percent wrong.

2            No.   Obviously, there's things in here

3    that have to be looked at, which is why 5.17 and 5.13

4    both correct several of the things pointed out in Dr.

5    Halderman's report.  But you can't just on a dime

6    snap your fingers and say we can make it all happen

7    right now this way.  It's just impossible, because

8    it's too many moving parts, too many people.  How do

9    you do what you need to do in the best way possible

10   given the resources and time you have with the least

11   amount of risk.

12       Q.    Can you identify one election security

13   expert that agrees with what you've just said?

14            MR. TYSON:  I'll object to scope.

15            THE WITNESS:  And I'll go back to the

16       definition of election security expert.  There

17       are election cybersecurity experts who probably

18       would not, but they haven't run elections for

19       the most part.

20            If you talk to me about somebody who's run

21       an election and they're responsible and held

22       accountable for the outcomes of those elections,

23       been under SEB rules, been under a lot of this

24       vendor media scrutiny, been under their own

25       people looking at them who would disagree with

Page 331

1      what I said, I would think you'd have a hard
2      time finding anyone who does that who would
3      disagree with what I said.
4           And I have to use the restroom again.  I
5      apologize.
6           MR. CROSS:  Okay.  And I'm almost done, so
7      we can take a break.
8           THE WITNESS:  Okay.  Okay.
9           THE VIDEOGRAPHER:  We're going off the
10     record at 3:53.
11          (Recess from 3:53 p.m. to 4:13 p.m.)
12          THE VIDEOGRAPHER:  We're on the record at
13     4:13.
14     Q.    (By Mr. Cross)  Mr. Sterling, there were a
15 few things you were going to follow up on at the
16 break.  What can you share?
17     A.    The county attorney name in Spalding is
18 Stephanie Windham.
19     Q.    Uh-huh.
20     A.    Some further detail on Spalding.  When we
21 became aware of that in --  I think it was August
22 19th.
23          MR. TYSON:  August of 2021.
24          THE WITNESS:  August of 2021, Chris Bellew
25     got an e-mail from Kim Slaughter --

1          MR. TYSON:  Uh-huh.

2          THE WITNESS:  -- who's the elections

3     director.  The details were a little off to us

4     originally, 'cause that's -- we can't be ready

5     for certification next week.  Can we do it the

6     week after, 'cause we're bringing in an IT to

7     image all this stuff.

8          And Chris got that and sent it to Michael,

9     and Michael reached out.  No.  No.  You're not

10    doing that.  You can't do that.  It's like what

11    the hell are you talking about?

12         So --

13    Q.    (By Mr. Cross)  That's Michael --

14    A.    -- we were aware of that.

15    Q.    -- Michael Barnes?

16    A.    Michael Barnes.  So we were aware of that.

17         Now SullivanStrickler did not become a

18    thing until the SE -- sorry -- the SEB chairman knew

19    about that, and this was around the time --

20         We believe when she said certification in

21    her e-mail, she meant acceptance, essentially,

22    interchanging the two things.

23         Of the server, we were going to replace

24    because Ben Johnson, who was the chair down there,

25    had gotten on a phone call with Ryan and Michael as

Page 333

1   basically spouting a whole bunch of stuff; and they

2   both said okay.  Rather than try to --  We were going

3   to go down and recertify the one.  Rather than do

4   that, let's just change it out.  Take his talking

5   point away, and then move on to the next thing.

6            And the county attorney also, we believe,

7   Ryan talked to them; and they said yeah.  We're

8   not --  We're not going to do that.  No.  So it kind

9   of went away, so that was kind of off our radar a

10  while.

11           And SullivanStrickler was not in any of

12  that correspondence.  It was just an IT firm, so that

13  was where that came from.

14       Q.    Okay.

15            THE WITNESS:  Was there anything else we

16       were --

17            MR. TYSON:  Chain-of-custody forms.

18            THE WITNESS:  Oh, yeah.  Chain-of-custody

19       forms for transfers, for county transfers

20       started being used officially in September of

21       2022.  The first one was coming over to move

22       that stuff from that WSB interview that I did.

23       That was the first time they were required.

24            The forms existed, but they weren't

25       required before.  Now they are required, so they

Page 334

1          were used also for the Coffee County transfer as
2          well of all the equipment, besides the stuff
3          that was sent back in the previous summer.
4          Q.    (By Mr. Cross)  So the Secretary's Office
5     now has chain-of-custody forms that it completes when
6     it transfers or replaces voting equipment in the
7     state?
8          A.    Yes.
9          Q.    And that started last month?
10         A.    Yes.
11               Now we had the --  Well, actually, we had
12    documentation; but it wasn't the form that we use.
13    Now we're saying, hey, use the form; and we have the
14    other documentation as well.
15         Q.    The other documentation's is the L&A
16    testing?
17         A.    Correct.
18         Q.    And then did you mention --  You said you
19    did an interview?  You said something about an
20    interview.
21         A.    Oh, for the very -- the very first use of
22    the form was I was doing a interview for Channel 2 to
23    explain this is how the system works.  Then we had to
24    move stuff from the Sloppy Floyd Building over to the
25    Capitol Building to make -- to set -- to set it up

Page 335

```
 1   and use it for that.
 2           MR. CROSS:  Okay.  Okay.  Let me just go
 3       ahead and mark --
 4           Hand me another copy, if you will.
 5           MR. KNAPP:  Here's another copy from me.
 6       Q.    (By Mr. Cross) -- Exhibit 24.
 7           (Exhibit 24 was marked for
 8       identification.)
 9           MR. TYSON:  Okay.
10       Q.    (By Mr. Cross)  And this is an article.
11   It looks like it was just published by "Rolling
12   Stone" --
13       A.    Five hours ago.  Or when it was printed.
14       Q.    -- yeah -- concerning --
15       A.    Six hours ago.
16       Q.    -- concerning the Spalding County issue we
17   were talking about.  So the article's entitled,
18   Pro-Trump Officials Plotted to Swipe Voting Data.  We
19   Caught Them."  It's published by Justin Glawe,
20   G-L-A-W-E, in "Rolling Stone" today about five or six
21   hours ago.
22       A.    So I'm assuming this is not part of
23   production beforehand.
24       Q.    No.  No.  Mr. Knapp, as in the Internet
25   sleuth he is, found this today.
```

1          So I think you answered my questions,

2    because it sounds like you've got better information

3    than you had before.

4          A.    Uh-huh.

5          Q.    But if you turn to Page 3.

6          A.    The 3 of 9 marking?

7          Q.    Yes.

8          A.    Yes.

9          Q.    So if you look at the third full paragraph

10   begins in all caps, "IN AUGUST 2021..."

11         A.    Yes.

12         Q.    It states, "IN AUGUST 2021, a pair of

13   Spalding County officials were concerned about an

14   upcoming Georgia effort to verify that their election

15   system was in good order after the board discovered

16   security issues on county equipment.  A

17   representative sent by Secretary of State

18   Raffensperger was coming to Spalding County to test

19   the voting machines..."  And it goes on from there.

20              And then if you turn to --

21         A.    And let me stop you right there.  We read

22   this into the thing.  It says, "... after the board

23   discovered security issues on county equipment..."

24              That is not my understanding.  They had

25   security concerns because the door had been unlocked.

```
 1    They didn't know, and that's what we were going down

 2    there to look at and prove.

 3         Q.    I was going to ask you what the security

 4    issue were.  So that your understanding is the

 5    security issues that's addressed here that Spalding

 6    County had was that a door was unlocked in the county

 7    elections office?

 8         A.    And people could have access to it, and

 9    she -- I -- I believe --

10             I don't know how he knew this or what

11    he -- where this came from.  This is Ben Johnson,

12    their chair, basically saying that the previous

13    person left -- left it, you know, with password and

14    maybe --

15             He just didn't know.  That he knew it was

16    unlocked.  He knew there were people telling him

17    that, so he didn't know, and that was his concern.

18    I'm boiling down a lot of discussion, but that's the

19    main part of it.

20         Q.    So the concern was that public bad actors,

21    whomever could have had access, to the equipment, to

22    the passwords; but they didn't know for sure one way

23    or the other?

24         A.    Again, other doors were locked, so it

25    would have been county employees, but not county
```

Page 338

1    employees should necessarily have access.  That's my

2    understanding of how the discussion went.

3         Q.    If you turn to Page 5 of 9, there's a

4    sentence here.  There's quotes with the word "NOT" in

5    caps.  Do you see that?

6         A.    "'Do NOT..."  Okay.

7         Q.    Right.  And here it says do NOT allow an

8    IT company -- not is in all caps --

9         A.    Uh-huh.

10        Q.    -- to image or conduct any activity on

11   voting equipment, an office staffer told Slaughter on

12   August 18.  That is NOT allowed, not in all caps.

13             And if you read the preceding paragraph,

14   you'll see the office staffer there is referred to

15   the Secretary's Office.

16        A.    Yes.

17        Q.    Is it your understanding that -- that is a

18   message that came from Michael Barnes?

19        A.    From what I discussed, yes.

20        Q.    Yeah.  Okay.  Okay.

21             MR. TYSON:  Mr. Evans and Mr. Barnes.

22        Yeah.

23             THE WITNESS:  Was Mr. Evans?

24             Okay.  Both of them.  The director Blake

25        Evans and Michael Barnes.

1      Q.     (By Mr. Cross)  I see.

2      A.     They said don't do that.

3      Q.     Okay.

4      A.     And, again, our office had never heard the

5   name SullivanStrickler at this point --

6      Q.     Got it.

7      A.     -- so --

8      Q.     Okay.  If you look at the bottom of Page 3

9   of 9, going back to that --

10     A.     Yes, sir.

11     Q.     -- it indicates that three individuals at

12  Coffee County -- Johnson, McClain, and Slaughter --

13  claimed the illegal data breach was necessary due to

14  a security issue involving election equipment and

15  pending election lawsuits.

16          Again, just for the security issue,

17  there --

18     A.     Where am I reading at this point?  I'm

19  trying to find where you're --

20     Q.     The last paragraph, very bottom.

21     A.     They didn't respond to requests for

22  comments in e-mails.  Okay.  So that's a --

23          Okay.  Got it.  Now I'm there.

24     Q.     The security issue, this is the unlocked

25  door issue that we talked about before.  That's your

Page 340

 1   understanding?

 2          A.     Yes, sir.

 3          Q.     Okay.  All right.  I am just about done.

 4   A couple of follow-up questions.  We talked --

 5          A.     May I keep this, so I can read it.

 6          Q.     Sure.  Yeah.  Yeah.

 7                 We've talked about this before, but I want

 8   to come back to it briefly before I'm done.

 9                 You --  You've testified that -- that you

10   have confidence in the election system.  Well, what I

11   continue to struggle with is you have a voting system

12   that's used in the State of Georgia that no election

13   cybersecurity expert has endorsed and that every

14   expert -- election cybersecurity expert who has

15   spoken about it has advised against it, right?

16                 It's not just our experts in this case,

17   but Winky Lee, who was on the state commission, voted

18   against it vigorously.  Then Adida advises

19   hand-marked paper ballots with BMD.  Dr. Shaymus

20   (ph.) who was engaged by the State in this case said

21   don't use QR codes.

22                 Dr. Gilbert has so much concern about the

23   system that he has designed a whole new system that

24   he's got a patent on.  The very premise of that

25   patent is the BMDs are not reliable.

1              And so my question to you is:  Since we

2      all agree that voter confidence is important, why

3      does the State continue to use a system that no

4      election cybersecurity expert a has endorsed or ever

5      examined, apart from Dr. Halderman; and there's so

6      many election security experts, including those

7      engaged by the State, that say this is not the right

8      system to use?

9              MR. TYSON:  And I'll object to scope.

10         It's beyond the breach issue, and to form.

11             THE WITNESS:  I'll go back --  I'll be

12         repeating myself; but, again, you've asked this

13         question several different ways, and this is the

14         summation kind of question, I guess.

15             A, it's the law.  We have to use a BMD.

16     Q.    (By Mr. Cross)  Not QR codes.

17     A.    Okay.  The reality is you can't change the

18     system right now.  That's the reality we're in, and

19     we are taking steps to always upgrade.  5.13 and 5.17

20     are part of the long-term contract to make

21     improvements and make changes.  Like a lot of those

22     fixes were stuff they had identified prior to the

23     Halderman report, to my understanding, on some of

24     these things, so we have to deal with the system we

25     have in front of us.

1           And they --  We are looking at it

2    holistically.  As I pointed out before, it's not just

3    cybersecurity by itself.  It's cybersecurity and cost

4    and training and systems and processes, and not just

5    the initial cost of the system.  Cost of replacement.

6    Cost of training again.  Changing those things out.

7    We have a contract that locks in ballot costs for

8    counties.

9           It's not as easy as these five experts say

10   this is bad.  They're not looking at everything we

11   have to look at in order to make a system function.

12           We are operating rationally, making

13   risk-based decisions based on the laws we have, the

14   dollars we have, and the time we have.  And I think

15   that's all you can ask of election administrators.

16           And I've seen no proof that anything has

17   happened on this.  Yes.  Yes.  You pointed out

18   Dr. Halderman was saying the existence of these

19   vulnerabilities can lead to doubt, especially when

20   you have bad actors who are lying about some of these

21   things and trying to conflate.  Because the

22   vulnerability exists, therefore, the whole system

23   is -- is corrupted.

24           The vulnerability exists on all systems.

25   As we pointed out before, we are operating within the

Page 343

1    law we have in this state, following the laws we have
2    to procure a system, following the rules laid down by
3    the SEB, and we proved in 2020 that the system worked
4    and the outcome was correct.
5         Q.    For one election contest.  For one
6    election contest.
7         A.    Except for the fact that --  Just like we
8    proved it for that, because I don't think we have
9    enough audits.  I'm conceding that.  I would love to
10   have more audits.  I -- I --  In fact, I would love
11   to have to put the SEB --  We're in discussions, like
12   I said, right now.
13             But you can't just do that.  You have to
14   get some county buy-in.  When you're dealing with
15   this --
16             At one point, Secretary Kemp was having a
17   revolt among the counties over e-mail when they first
18   launched it, because they were completely wigged out.
19   It's different.  It's change.  You have to manage
20   change.
21             We have change management over our voter
22   registration system right now, and I said we're doing
23   that in phases and -- and doing the outward facing
24   stuff that already exists, and we're doing the inward
25   facing stuff starting with training in January.

1          Remember, multiple things at a time.  This

2     system has proven its mettle not just here, but

3     across the country in outcomes being correct.  They

4     audit us and other things.

5          You're right.  Not as many with QR codes.

6     I think Maryland's been moving to one, 'cause I think

7     they're unified.  I can't recall right now.

8          Louisiana would have been doing a similar

9     thing, but they've had their own drama around

10    election systems.

11         This office watches what happens in the

12    rest of the country as well.

13         I am around the system a lot; and I deal

14    with the county election workers; and like before, I

15    think there's a lot of problems with hand-marking of

16    ballots that the BMDs eliminate that I think are

17    important.

18         And, again, these are policy questions.

19    This isn't a question -- I mean, this is --  If

20    somebody wants to change what we do, get elected to

21    the legislature, argue it out, and then try to win

22    over 90 votes -- 91 votes in the House and 29 votes

23    in the Senate -- I think that's right -- yeah, 29 --

24    and have the governor sign it.

25         Election administration needs to be left

Page 345

1  to election administrators guided by the law and the

2  rules around them.

3          Yes.  There should be --  If there's real

4  vulnerabilities bring them, and there's a process for

5  doing that, and I think this gets us to that point.

6  I have faith in the system, because what I've seen in

7  the outcomes of these elections.

8          Look at what happened in DeKalb.  There

9  was a multiple set of things back to back to back

10  that will be very difficult to replicate, but it was

11  caught at the end.  They found this election outcome

12  that isn't right.  We know it's not right.  We can

13  see it's not right.  Let's go back to the paper

14  ballots and -- and get it counted up properly, and

15  that's what they did.

16          So the system, you'd love to catch

17  everything on the front end.  This did catch it on

18  the back end.  Even would an audit, they could see

19  that that was the situation there.  They had to hand

20  count those ballots for that county commission race.

21          So is any system perfect?  No.  Is any

22  system a hundred percent free of error and problems,

23  no.  There's humans beings involved in executing all

24  these pieces and parts.  Is the biggest threat to any

25  system a bad actor on the inside?  Yes.

Page 346

1            But I think the -- the level of scale --
2   If you'll go back to the MITRE report, it's
3   operationally feasible to do most of these things.
4   Even though it's the case, we are taking steps to try
5   to shore those up.
6            And you know what's going to happen?  In
7   two years, they're going to change again.  There's
8   going to be something else that can be done and seen.
9   There'll be ways, I'm sure, that they'll have a
10  tricorder from Star Trek that can talk to a machine
11  even if it's not connected to the Internet.  I mean,
12  we're always going to have to be on the lookout for
13  the future threats.
14           I think the Office has acted responsibly.
15  I think we do the right thing for the voters of
16  Georgia.  I think we protect the right to vote, and
17  we try to make -- provide easy access to voting; and,
18  again, to quote the governor or secretary, easy to
19  vote, hard to cheat on any level.
20      Q.   But you publicly stated that
21  Dr. Halderman's report was a joke?
22      A.   No.  I think my exact words -- it was full
23  of crap --
24      Q.   Right.
25      A.   -- before I read it.

1      Q.    But --  But you now understand from CISA's

2  advisory, it's very far from a full of crap.  I mean,

3  CISA came in and said these are serious

4  vulnerabilities and advised states to mitigate that,

5  right?

6      A.    Except --

7      Q.    Certainly, you wouldn't say today that his

8  report's full of crap?

9      A.    I would not say it's --  I wouldn't have

10  been as blithe about it.  I -- I've -- I've --  I've

11  matured in the last two years coming out of all this,

12  'cause there has been a highly partisan, you know,

13  attack across the board.

14            And did -- did I get flippant on that?

15  Yes.

16            Was I wrong to do it?  I would normally

17  say probably.  But I'll go ahead and say yes since

18  I'm under oath.  I shouldn't have said it that way.

19            But my point was nearly all of his

20  underlying assess -- assumptions are difficult to do

21  at scale.  I didn't need the MITRE report to tell me

22  that; but now I have nonpartisan, you know,

23  scientists looking at this and telling me your gut

24  reaction is correct, that these are very hard things

25  to do in real life, given the number of ballot

Page 348

1    styles, the number of units, the way you have to do.

2    It's not easy to do at scale.

3            Even Dr. Halderman, I think, admits in his

4    thing that it's not easy to do at scale.  It can be

5    done, and yes.  It can be done, and we are aware of

6    that.  We know that, but that's true of any system,

7    and anything that uses a computer.

8            So you can't just say we're not going to

9    use computers.  That belates all the risk.  You

10   create all kinds of other new risks on that side.

11       Q.    But you could use a lot fewer computers

12   and eliminate vector points.

13       A.    Except from my point of view, having a

14   diffuse system like we have --

15           I mean, I've had this question before.

16   Wouldn't it be better if we had a unified single

17   system in the United States of America?  No.  That is

18   a terrible idea.  Having different rules, different

19   systems, different laws, different ballot styles, all

20   those things provide an additional security.

21           So having fewer things, I think would be

22   potentially bad, depending on your viewpoint of how

23   you look at the reality of how some of these things

24   can be done.

25           But, again, these are policy questions

Page 349

1    that people can fundamentally and honestly disagree

2    on.

3         Q.    You agree today that the vulnerabilities

4    Dr. Halderman identified in July of last year that

5    CISA validated in June, those are serious

6    vulnerabilities that need to be mitigated; is that

7    fair?

8         A.    I'm not going to get into the word

9    "serious," because, as we said, the MITRE --

10        Q.    Well, that's fair.  That's fair.

11        A.    -- given all of them are operationally

12   infeasible.

13        Q.    That's fair.  Let me ask --

14        A.    They're all vulnerabilities.  Correct.

15        Q.    Let me ask a different question.

16              You agree that those -- that they are

17   vulnerabilities, however one wants the characterize

18   the magnitude, that should be mitigated as CISA

19   advised in June?  Do you we agree on that?

20              MR. TYSON:  I'll object to scope.

21              THE WITNESS:  I would agree to that; and

22        when we look through those lists, we do nearly

23        all of those things already for the physical

24        security and those kind of things.  Obviously,

25        we have a bad actor on one.

Page 350

 1          There is one in there that I think is

 2     functionally infeasible for CISA's side, where

 3     every poll worker needs to have a separate

 4     log-in.  There would be chaos.  There was no way

 5     that --

 6          I mean --  I want you to imagine Fulton

 7     County trying to have thousands of different

 8     passwords attached to thousands of different

 9     things.  It's difficult when they have a few

10     hundred just to get into the e-mail system right

11     now for early voting and doing that properly.

12     And that we got -- they -- kicking and screaming

13     on us not to do that.  They wanted to have one.

14          Well, no.  You're going to have separate

15     ones for each one, because we're going to keep

16     track of what people do on this.  This is very

17     difficult in the real world to do some of these

18     things that make sense in an academic

19     environment in the cybersecurity standalone

20     environment.  Then the actual functioning would

21     get in the way of the system actually working.

22     Q.   (By Mr. Cross)  You keep talking about the

23  MITRE report, but you gloss over that there -- there

24  are two critical assumptions that underlie those

25  findings.  When they say it's operationally

Page 351

1    infeasible, they made clear what they mean --
2         A.    Yes.
3         Q.    -- because they assume that no one can get
4    access to the equipment system.  But we know from
5    Coffee County that's -- that's a very poor
6    assumption, right?
7         A.    Well, I believe --  I think you're
8    characterizing it one way, but they may mean another,
9    and I may characterize it another way reading the
10   same words on a piece of paper.
11              Obviously, having access to machines can
12   give you a better roadmap mobility to do it.  You
13   still have to have access to nearly all of the
14   machines in most of the situations that were
15   described in Dr. Halderman's report.  You have to be
16   able to --
17        Q.    But not all of them.
18        A.    I didn't say all of them.  I said in most
19   of them.
20              So, again, even those would require --  If
21   we go to the umpteenth one was the top one, which is
22   now functionally incorrect, because Dominion is not
23   the --  There's not one person in Dominion doing the
24   ballot building now.  That was one of the main things
25   he said.  You could plant something there.

1          We have several different people; and
2    you're right.  If a bunch of human beings with the
3    right technical training and the right positioning
4    got into these things, it could potentially happen;
5    but that would happen even in what your relief is.
6    If you had people in that position, they can then
7    program all the standards to do the same thing.  You
8    have to look at what --
9          Most people are people of good faith.
10   Most people are doing their jobs and they're being
11   honest; and if you don't accept that on some level of
12   a premise, then you get into the election denial
13   situation we have where it says --
14         My best example.  I said the January 6th
15   Committee, when I know one of our people talked to an
16   attorney, a smart guy; and we walked him through.
17         This happened.
18         Okay.  I understand.  So that's -- that's
19   not a real thing.
20         This happened.
21         Okay.  Well, this is how --
22         Okay.  I understand.
23         And we went through like five of them; but
24   in the end, he goes I just know Fulton County
25   cheated.  I mean, you can't get around some of that.

1           And you've got to assume good intentions

2     for the most people, especially when they're in the

3     elections environment itself.  I mean, there's a lot

4     of peer pressure amongst these people now to make

5     sure you're doing a good job to protect the election

6     equipment.  Like I said, now Misty is a cautionary

7     tale on some of these people, because they see there

8     are real world consequences if you screw up, even if

9     you think you're doing the right thing.

10          There's a process to do that.  Go to

11    court.  Lay everything out.  Do it the proper way,

12    but that would be true for any system that exists.

13    Q.    Late to join.

14    A.    Well, people are coming out and coming

15    back in --

16    Q.    Yeah.

17    A.    -- is the problem.

18    Q.    Sorry.  I lost my train of thought for a

19    second.

20    A.    Was it my eloquence?

21    Q.    I think it was your length.

22    A.    I'm a recovering politician.

23    Q.    Oh.  So you said a number of times that to

24    scale the -- some of vulnerabilities in

25    Dr. Halderman's report, you -- you have to access

Page 354

1   these machines across the state, tens of thousands of

2   them; but that's not really right, right?

3          I mean, let -- let's just take the

4   presidential election from November of 2020.

5      A.    Okay.

6      Q.    You probably know better than anyone

7   except for maybe Secretary Raffensperger what a thin

8   margin that was, because I think you were --  I can't

9   remember if you were on the call, but we all know the

10  call.

11     A.    I -- I --

12     Q.    -- where there was a specific number of

13  votes called for.

14     A.    11,780 votes called for.  11,789 was

15  the -- was the final amount, and it was kind of

16  funny, because that number had shrunk from the -- the

17  recount because Fulton County had screwed up

18  something.  Either they had double-counted some

19  earlier votes or something.  So it actually shrank.

20         There was a joke that maybe if there were

21  nine more recounts maybe he would win, 'cause Fulton

22  would just lose ballots.

23     Q.    But there were, what, 6 million plus

24  votes?

25     A.    No.  There was 5,030,000 cast and about --

1  It was 4,990,000 something was actually cast in the

2  final version of the presidential election.  There

3  were about 28,000 people just skipped.  They voted

4  down ballot, but they skip that thing altogether.

5          Q.    How many votes in Fulton just roughly?

6          A.    I -- I --

7          Q.    Hundreds of thousands, right?

8          A.    There are probably --  It's going to be

9  around 10 percent of the overall, so get to spitball

10 it, I think it was a little under that, so I'm going

11 to say probably 450ish, something like that.

12         Q.    Cobb also tends to have hundreds of

13 thousands of votes, right?

14         A.    Cobb, Gwinnett, and DeKalb are, obviously,

15 our biggest ones.

16         Q.    Okay.  My point being when you say that

17 to -- to exploit some of the vulnerabilities of Dr.

18 Halderman's report, you have to have access across

19 the state, the reality is that there are counties in

20 the state that are large enough, that we're talking

21 about changing a number of votes certainly at the

22 statewide level, but even at the county level if it's

23 a rounding area.  Right.  11,000 votes to -- to -- to

24 affect the outcome of the presidential election where

25 Georgia was literally deciding the outcome of that

Page 356

```
 1   on -- on a nationwide level, we're talking about --
 2        A.    Well, actually, if Trump had won, he still
 3   would have lost.
 4        Q.    Well --
 5        A.    Let's be --
 6        Q.    Fair enough.
 7        A.    Let's not overinflate.
 8        Q.    Fair enough.  Fair enough.  Fair enough.
 9              Fair to say Georgia was an important part
10   of that election.  But point being we're -- we're
11   talking about this -- this can come down to such a
12   small number of votes, that it's a rounding error;
13   and you could do it in a single county.
14        A.    Except --
15              MR. TYSON:  And I object to scope.  Again,
16         we're -- we're deep in policy.
17              But you can answer, if you know.
18              THE WITNESS:  Except down to the point
19         where you say, yes, you can access a single
20         county.
21              All right.  The level of understanding,
22         sophistication would have to be extremely high,
23         because, again, I've done this for a very long
24         time.  A lot of election monitors have done this
25         for a very long time.
```

Page 357

1        If you had a precinct that suddenly went

2   cuckoo and we knew for years had been X amount.

3        And the situation in Fulton, as an

4   example, is having been a candidate for county

5   commission chairman, knowing that there's --

6   there's precincts in South Fulton where there

7   was 3,000 votes for Robb Pitts, 3200 for Keisha

8   Waits, and 4 for Gabriel Sterling, there's a lot

9   of behavioral things.

10        The main thing we're talking about is

11   things not being detected.  The level of

12   sophistication of trying to do what you could do

13   if you didn't know what's happening in the rest

14   of the state doing it in a single county without

15   being able to periodically know it was -- it's

16   just no easily understandable that it would be

17   done in a way that couldn't be detected if you

18   didn't know what the turnout was going to be

19   like otherwise.

20        'Cause let's face it.  There was many

21   people who were under the impression that Trump

22   was going to win Georgia, because it was between

23   behind South Carolina and Alabama.  We are a

24   different state.  People now have kind of seen

25   that.  Anybody watching that in 2018 knows that.

1            But not only do counties have behavioral

2       things, precincts have behavioral things you can

3       look at, but people want to say that looks

4       weird.  We probably need to look at that.

5       There's not a protocol for those things; but if

6       there was an election like that, there could be

7       election challenge.  I would expect somebody to

8       say we need to go look at this, because this is

9       behaviorally is different from the past.

10           It's all about will it be detected, and I

11      think it would be very difficult to do something

12      in such a way unless you knew beforehand what

13      the thing was going to be that you could do

14      that, and then at the same time, only to do

15      those specific races.

16           And one of the things that is interesting

17      about this is the different ballot styles in

18      different places, you have to know what each one

19      of those are.  Have to have passcode.  It's just

20      a Herculean effort.  It's not like one guy.

21           I think we're all spoiled to a degree now.

22      You know I grew up watching "War Games."  I'm 51

23      years old.  We all see people log in and change

24      their grade on stuff.  There's even a "Stranger

25      Things" in the last season.

1          Everybody thinks this is easy to do, but

2     Dr. Halderman, to his credit, he points out this

3     is not easy to do; but it can be done; but then

4     it's not just the ability to do it, it's the

5     ability to do it in the way that's undetected by

6     people who just watch these things.

7          Like you pointed out before, there was

8     people who walked -- watched where planes go.

9     We had a situation where we knew that Spalding

10    County -- I believe it was Spalding County --

11    was missing one of their batches -- it was Floyd

12    County -- was missing one of their batches

13    because a teenager --

14         I was looking at it.  I said this looks

15    weird, and he says it looks like they're missing

16    a --  I'm looking at this data.  It looks like

17    they're missing one of their early precincts.

18         I mean, so all eyes are on this; and

19    trying to do it in an undetected way just isn't

20    a --  Could it possibly happen?  Sure.  I can't

21    say anything's impossible, you know; but it's

22    not likely; and it's very difficult.  And the

23    risk reward attached to it of the amount of them

24    not getting detected is very difficult.

25         It just --  It just simply is in this --

Page 360

1          in the way we have to look at these things and

2          how they're executed.

3               MR. CROSS:  Okay.  I don't have any

4          further questions.

5               MR. BROWN:  Okay.  My name is Bruce Brown.

6          I've got a few questions, Mr. Sterling.

7               THE WITNESS:  I'm going to see you at

8          Moe's & Joe's later?

9               MR. BROWN:  Yes.

10              MR. TYSON:  Bruce, I'm sorry.  Before you

11         get rolling, David, we did identify the e-mail

12         that was referenced in the "Rolling Stone."

13         We'll ask the Secretary's Office to pull that,

14         and we -- we have it.  I think --

15              I don't know if we want to mark it as an

16         exhibit, just so we have that.

17              It wasn't in the Spalding investigative

18         file yet, so that's why it didn't come in with

19         the other Spalding investigative documents.

20              THE WITNESS:  And, Bruce, before you get

21         rolling, let's just be fair to each other.  I'm

22         going to run to the restroom real quick.

23              MR. BROWN:  Absolutely.

24              THE WITNESS:  And then we'll start off.

25         Okay?

Page 361

1              MR. BROWN:  Okay.

2              THE VIDEOGRAPHER:  We're going off the

3        record at 4:40.

4              (Recess from 4:40 p.m. to 4:45 p.m.)

5              THE VIDEOGRAPHER:  We're on the record at

6        4:45.  We're back on the record, sir you may

7        proceed.

8              MR. BROWN:  Thank you.  Very much.

9              THE WITNESS:  You've done this before,

10       right, Bruce?

11             MR. BROWN:  I actually have done this

12       before.

13             THE WITNESS:  Okay.

14       CROSS-EXAMINATION

15       BY MR. BROWN:

16       Q.    Mr. Sterling, I just have a few follow-up

17   questions; and I'm -- I'm going to go through my

18   notes; and it may not be in sequence to the earlier

19   testimony or chronologically.  So bear with me.

20       A.    Can we define a few before we start.  I'm

21   kidding.

22       Q.    Yeah.  20.

23             I want to take you what -- through what

24   might be described as a sluggish response by the

25   Secretary of State to the initial evidence of a

Page 362

1    breach in Coffee County.  Okay.  The --

2              You've testified that prior to your

3    deposition, you hadn't heard of any evidence of

4    breach that we're discussing now in Coffee County

5    where someone actually copied the equipment; fair to

6    say?

7         A.    Yes, sir.

8         Q.    And in your deposition, you -- you were --

9    you listened to, you were played a recording of a

10   conversation between Miss Marks and -- and Scott

11   Hall, right?

12        A.    Yes, sir.

13        Q.    And I believe you testified that that was

14   in February?

15        A.    February 25th or 24th, something like

16   that.

17        Q.    Right.  And then it was February, March,

18   April, May, June, July, five months until the

19   Secretary of State looked at the machine that was the

20   subject of that recorded, taped conversation to

21   determine whether or not there had, in fact, been

22   some sort of violation of it, correct?

23              MR. TYSON:  And I'll --

24              THE WITNESS:  No.

25              MR. TYSON:  -- object to form.

```
 1              THE WITNESS:  We had been attempting to
 2         get into that machine for several months.  Not
 3         long after that, like I said, we reached out to
 4         Dominion.  How can we do this?  Well, we're
 5         going to be down to here.
 6              Okay.  Come here.
 7              Now, again, when we look at what it was,
 8         our gut reactions were like this is probably
 9         another one of those many claims that Scott
10         Hall's involved with; and, again, Marilyn Marks
11         was part of this; and we have some parts of it;
12         and she's a litigant in these things.  So,
13         obviously, her feelings are like.
14         Q.    (By Mr. Brown)  Now let me -- let me stop
15    you there.
16         A.    Yeah.
17         Q.    How did Marilyn Marks' involvement --
18    What do you mean by involvement?
19         A.    She was the one who brought us this
20    evidence in a deposition, so I put less faith in what
21    she says and what she has on that.  I believe she
22    does, too.  She didn't trust like Scott Hall on top
23    of that, so this --  We had two people on top of that
24    that I didn't necessarily have faith in.
25         Q.    Right.  But --  But Miss Marks wasn't a
```

Page 364

1    witness.  She brought you the recording, right?

2         A.    Now --

3         Q.    She didn't say anything about the Coffee

4    County --

5         A.    But, again, to my --

6         Q.    -- caper issue --

7               THE COURT REPORTER:  Hold on.

8         Q.    (By Mr. Brown)  She did not make any

9    representations about the Coffee County caper, did

10   she?

11        A.    I couldn't say for sure; but she was part

12   of the phone call, which was daylighting it to us

13   from your point of view.

14        Q.    Now going back to --

15        A.    I'm asking your first question, sir.  I'm

16   going to answer your first question, which was a

17   sluggish response, which I'm disagreeing with.  I'm

18   going to go through my answer.

19               So we were trying to do it starting --

20               We had discussions with Dominion in March.

21   They came in April.  They were trying something

22   through May.

23               And in June, Ryan and I said okay.  We've

24   got to do something different, because this is not

25   working.  We do want to get to the answers.  And

1    that's when we, get with the lawyers, decided to go

2    to Mr. Persinger; and that was soon literally within

3    a couple -- a day or two of when he discovered it, we

4    did that; and that's when we knew that it occurred.

5         Q.    Okay.

6         A.    I wouldn't call it sluggish.  I would say

7    it was methodical; and, again, a lot of hindsight

8    being 20-20, go to DEF CON 1 now, because we now

9    know; but we didn't know that then.  And --  And the

10   indications were it had all the hallmarks of

11   misinformation, disinformation, like we'd seen so

12   often from Scott Hall and Sidney Powell and all of

13   the other people involved in the situation.

14             So I wouldn't call it sluggish to say,

15   okay, we're doing what we do given this level of

16   evidence we were doing with.

17        Q.    So we can expect the Secretary of State,

18   the next time this happens, to take about five months

19   to get to something like this?

20             MR. TYSON:  And I'll object to scope and

21        form.

22        Q.    (By Mr. Brown)  I mean, you understand my

23   question is that if it's that hard to detect it, why

24   is the next time going to be any different?

25        A.    Because I can tell you it's kind of like

1  the scanner itself.  When you first deploy a scanner,

2  it goes through.  It takes a while to find that first

3  ballot style dup, but the next time, it now knows.

4  Now we know --

5              THE COURT REPORTER:  Huh-uh.  No, no.

6              THE WITNESS:  Wait.  When the scanner

7        looks at a ballot for the first time, it has to

8        go through all the ballots that it has.  The

9        next time it does, it already has that one in

10       the queue ready to go.

11            So now we have a different situation.  We

12       know this has happened.  Before we were under

13       the impression nobody had gotten into Georgia,

14       because we had the situation where the guy from

15       overstock.com was saying we tried to get into

16       Georgia, and we failed.  No one had come forward

17       from any of the counties to say it had happened.

18            So, again, when you have people who --

19       That's the same guy.  Again, you have to take

20       into account his level of credibility.

21            Thousands of fake ballots.  No.

22            Counting in the back room.  No.

23            I mean, so we had that credibility level

24       on that; but we are still doing our due

25       diligence to get to it to find an answer.  If

1        we'd been discounted, we would have stopped

2        altogether; and like I said, Ryan and I were

3        working.  Let's try to get these things cleared

4        off, so we can get this stuff put to bed and

5        move on to the next thing.

6              So no.  I do not accept your supposition

7        that the next time it will be that way, 'cause

8        now we've seen it has happened; and now we have

9        some specific things we can go after and know

10       what to do, because it hadn't happened before.

11       Q.    (By Mr. Brown)  Now you -- you testified

12  that -- I may be mischaracterizing this, but let me

13  try to get it right -- is that the Hall recording

14  standing alone needed further evidence or further

15  corroboration for it to be taken seriously by your

16  office.  Fair to say?

17       A.    No.  What I was saying was we were sort of

18  dealing with it, 'cause we said this is a real thing

19  that's being claimed.  So we have in our possession

20  something that can say yes or no on that claim; but,

21  again, the claim itself, we said -- we thought didn't

22  have a lot of umph behind it; but we wanted --

23              Since we had that server in our possession

24  we wanted to be able to get into it to say yes or no

25  and get out it of the way.  I will say in my gut, I

Page 368

1    thought it wasn't real because of the way it came to

2    us and Scott Hall's involvement, 'cause there were so

3    many other things that we were told to investigate

4    and waste, time, effort and money on that wasn't

5    real.

6             We still were doing it.  We still did

7    those things, because there's just --  If we can do

8    it, we were trying to find a way to do it.  Going to

9    Dominion seemed the first logical step.

10            And when that didn't work, I don't know I

11   used the exact term, but I believe I said we're sort

12   of spinning our wheels.  We've got to do something

13   different.

14            And I don't know if Ryan initiated a

15   conversation with me, or I initiated it Ryan.

16       Q.    You said --

17       A.    I'm withdrawing my name so --

18       Q.    You said --  You said going to Dominion

19   was the first thing that you did?

20       A.    Uh-huh.

21       Q.    What do you mean by that?

22       A.    After we got the claim and we got -- like

23   I said, the timeline -- I feel like I'm repeating

24   myself -- but I mean, you're going over these same

25   things -- was we got the full tape so we can get full

Page 369

1   context.  Just hearing a snippet at that point was

2   all we had.

3       Q.    Tell me something.  You got the full tape

4   about three days after you asked for it, correct?

5       A.    I think it was the 25th.

6       Q.    I don't know.  You asked for it on the

7   27th.

8            MR. TYSON:  That's right.

9       Q.    (By Mr. Brown)  And you got it on the 2nd,

10  right?  February being a short month.  It's three

11  days.

12      A.    So five days.

13      Q.    Okay.

14      A.    Well, that's what you're saying.

15      Q.    Three --

16      A.    Either way, my point was we got that; and

17  I said I couldn't remember --  I said this, whether

18  it was post or before that we got that, listened to

19  whole thing.  Said okay.  We definitely need to do

20  something here.  I said Ryan was already inclined to

21  do it based on that.  But we didn't know.  What are

22  we looking for?

23           So we had --  That was our first starting

24  point was that, getting that full tape.

25      Q.    But the full tape actually, in fairness,

```
 1   would actually decrease the confidence you had in the
 2   small tape, wouldn't it?
 3        A.   It made it about the same, honestly --
 4        Q.   Right --
 5        A.   -- because --
 6        Q.   So you didn't learn anything new by the
 7   full tape, correct?
 8        A.   We --  Not that I'm aware of --
 9        Q.   Okay.
10        A.   -- other than the fact that Scott Hall can
11   say some gracious crap.  I mean, other than that.
12        Q.   So you wouldn't --  You wouldn't really
13   wouldn't blame Miss Marks for not believing it when
14   she heard it live, right --
15        A.   No.  But --
16        Q.   -- if you -- if you didn't believe it?
17        A.   I wouldn't, but my question --
18        Q.   And, therefore, you're not blaming her for
19   not believing it, right?
20        A.   I'm --  Here, let me ask this question.
21        Q.   I'm asking -- yes or no.
22        A.   No.  I'm not going to run with that but --
23        Q.   Wait, wait.  Slow down, because I didn't
24   hear you, I doubt this court reporter got it.  You're
25   not blaming her?
```

Page 371

1      A.      For not believing it.

2      Q.      For not believing it, 'cause you didn't

3   believe it either, right?

4      A.      In order, she didn't believe it.  She sat

5   on it for nearly a year.  Then played for us, and we

6   didn't believe it necessarily.

7            But we started the process, because we

8   were aware of it.  We started and said we have

9   something to prove this one way or the other that

10  exists, and we can investigate that.

11           In the situation, in reality, since you

12  were talking about my story earlier, and this is --

13  is that we didn't have this for a year.  Everything

14  would have been slightly different, more than likely,

15  if we had had it for that period of time.  We have

16  gotten into and seen it was done earlier.  All those

17  of things would have been different.

18           So and hindsight being 20-20, if we'd had

19  it earlier, we would have gotten to this point

20  earlier; and trying to claim we were dragging our

21  feet when somebody sat on it for a year is morally

22  wrong and attempting to undermine people's faith in

23  the elections and our investigations.

24           So I put yes.

25     Q.      Okay.  So you now jumped on it in February

Page 372

1   when you got it.  Okay.  And --

2        A.    March.  But yeah.

3        Q.    You heard it in February?

4        A.    Again, I'm going to parse this with you.

5   I said once we got the full recording.  We got that

6   okay.  Let's look --  What do we need to do to get

7   into this?

8              And that's when we called Dominion.  It

9   was in March of that time, 'cause I was --  We got

10  the full report in, so I wasn't sure of the full

11  timing on that; but, again, you're talking about

12  day's difference --

13       Q.    Okay.

14       A.    -- versus a year.

15       Q.    Right.  And you --  You knew when you

16  heard that recording that the SullivanStrickler

17  people were involved in the caper, didn't you?

18       A.    I didn't know anything, because we hadn't

19  been able to prove anything.  Nothing --

20       Q.    Mr. Hall mentioned -- said in the

21  recording that the same people who did this were the

22  people involved in Antrim, Michigan.  And it's public

23  record in February of '22 and much earlier that these

24  same people were in Michigan; isn't the right?

25       A.    By your standard, when Mr. Hall said there

Page 373

1   were fake ballots, that must be true because he said
2   it.  All I had was Mr. Hall on tape saying that.
3       Q.    Right.  Did you call up --  They're right
4   down the street.  Did you call up SullivanStrickler
5   and ask them were you involved in the Coffee County
6   caper like you were in Michigan?
7       A.    I didn't ask that because we had made an
8   investigatory decision with Ryan Germany saying let's
9   get what we can off that thing first to know if
10  anything happened at all.
11      Q.    And so unable to get anything off of the
12  server, you didn't really do anything for five
13  months --
14          MR. TYSON:  I'll object to form.
15      Q.    (By Mr. Brown)  -- to investigate it,
16  right?
17      A.    Okay.
18          MR. TYSON:  Object to form.
19          THE WITNESS:  You're not going to let this
20      go.  We've have a difference of opinion on us
21      doing things.
22      Q.    (By Mr. Brown)  A yes or no question.
23      A.    No.  It's not true, sir.  You are
24  misstating things that I have said in this --
25      Q.    Okay.

Page 374

1      A.     -- deposition.

2      Q.     What did you do --

3      A.     Are you going to talk over me?

4             MR. TYSON:  Guys, guys.  Whoa, whoa, whoa.

5      Okay.

6      Q.     (By Mr. Brown)  Go ahead.

7             MR. TYSON:  We need to answer the

8      question.

9      Q.     (By Mr. Brown)  I need for you to --

10            And when I ask you a yes-or-no answer, I'm

11     going to interrupt you if you do not answer it.

12            MR. TYSON:  Bruce.

13            THE WITNESS:  And I said no.

14            MR. TYSON:  Bruce, Bruce.

15            THE WITNESS:  Like my -- my starting

16     answer is no.

17            By going to Dominion and working with them

18     and trying to get this done, we couldn't get it

19     done.  We finally said we're not getting in this

20     way.  Let's change direction.

21            We did that.  You might think it was too

22     slow.  We do lots of things in the office.  I

23     get that.

24            I mean, so I understand the basis of your

25     question.  But I will state again.  If we had

1          known a year earlier, we would have gotten to

2          this point earlier and able to do -- address

3          this differently perhaps.  I don't know, because

4          it's a what if, and we can't know what if.

5               The one thing I do know is it was not

6          given to us until that case, until February

7          of -- late February of 2022.

8          Q.    (By Mr. Brown)  Okay.  You testified

9     that -- that there was something about the

10    unreliability about Miss Marks that led to you not

11    taking this as seriously as you might have otherwise.

12    What did you mean by that?

13              MR. TYSON:  I'll object to form.

14              THE WITNESS:  And it wasn't just Miss

15         Marks.  It was Miss Marks in combination with

16         Mr. Hall.

17         Q.    (By Mr. Brown)  Right.

18         A.    What I mean by that is she is a litigant

19    in this case.  She attacks this Office repeated over

20    and over again from our point of view unfairly.  I'm

21    that sure from her point of view very fairly.

22              But if you're getting -- if somebody's

23    trying to beat you in court and beat you in public

24    arenas and go to the press constantly on things

25    against you, you generally will not take things that

Page 376

1   they bring to you as -- as -- as a pure --

2   pure-hearted manner as it would if it was a

3   non-litigant, a regular citizen, or somebody who you

4   knew.

5           If somebody --  If an election director

6   had come to me with this, I would have had it higher

7   than if a random citizen had come to me with this.

8       Q.    I mean, the reason why it doesn't make any

9   sense is that it wasn't like it was a recording of

10  Marilyn Marks saying she went to Coffee County,

11  right?

12          It's not dependent upon her veracity.

13  It's dependent upon Scott Hall's veracity, and Miss

14  Marks's veracity would have nothing to do with it,

15  right?

16          MR. TYSON:  And I'll object to scope and

17      to form.

18          THE WITNESS:  Responding in a human way,

19      her being part of it definitely probably colored

20      part of my viewpoint, but yes --

21      Q.   (By Mr. Brown)  All right.

22      A.    -- because she is somebody who attempts to

23  undermine and attack our office and my boss

24  essentially every day, so yes.  That could be.

25          A human being cannot separate themselves

1   from that reaction, Mr. -- Mr. --  And I think you

2   know that, so I'm not saying it slowed us down.  I

3   said regardless of the veracity of either one

4   of them.

5            And you're right Mr. Hall's is the more

6   important one here.  No question.  And I think we all

7   agree.  He's not necessarily a font of wisdom when it

8   comes to elections.

9            We still were taking steps to investigate,

10  so we do a binary yes or no, something did happen or

11  something didn't happen.  My assumption was based on

12  mainly Mr. Hall, but I'm not going to -- you --

13           I'm being honest here in saying Miss

14  Marks's involvement would make me color it as not

15  necessarily as reliable.  We were still trying to get

16  that to point, and I would --  In situations, I would

17  like to be able to think sooner rather than later;

18  but, again, we were juggling many things at one time.

19           We have X number of dollars; and even when

20  we went to talk in June with the lawyers about

21  bringing on Mr. Persinger, there was a discussion

22  about, well, is DOS paying him, will he do it.  I

23  mean, so we were having those kind of discussions;

24  and we were saying is there any other backup at that

25  point.

Page 378

1           But at that point, we thought Mr.
2      Persinger would do it, so he couldn't get to it, I
3      think, until that first week of July.
4                And, again, hindsight 20-20, would I wish
5      we had got to that point faster internally?  Yes,
6      especially knowing what we know now; but we didn't.
7           Q.    Okay.  Now I think Mr. Cross asked this.
8      But I'm still confused on it.
9                You said there was no new information that
10     triggered you hiring Mr. Persinger.  It was simply
11     that you were unable to do it without him.  Is that
12     fair to say?
13          A.    We didn't know that he would be able to do
14     it, so we --  We had kind of higher faith that he
15     could.
16               I think, again -- again, I've said it a
17     few times in this deposition.  We were sort of
18     spinning our wheels and not getting anywhere.  We had
19     to do something different.  There was not a new piece
20     of information, a new thing that occurred, at least
21     to my recollection.
22               I mean, I remember us having a
23     conversation, what the hell.  We've got to get this
24     off our plate.  What do we need to do to get this
25     thing moving to find out If somebody got in there or

Page 379

1    not.

2         Q.    Can you turn to Exhibit 9.

3         A.    Ew, I'll give it my best shot.  Can you

4    describe to me what it is.

5         Q.    Yeah.  It is the Ryan Germany, to Steven

6    Ellis e-mail --

7         A.    One --

8         Q.    -- on April 1st, 2022.

9         A.    -- two, three.

10             MR. TYSON:  Just use that one.

11             THE WITNESS:  No wonder counsel's faster

12        than me getting those.

13             Go ahead.

14        Q.    (By Mr. Brown)  You --  To get this back

15   in kind, this is April 1st.  This is, you know,

16   several weeks after the Secretary of States (sic) has

17   the recording.

18        A.    Uh-huh.

19        Q.    It's in the timeframe in which I take

20   it --  I mean, you described you were sort of

21   laughing at that recording at first, not taking it --

22   not taking it extremely seriously.  To be --  I'll

23   just be real transparent.  Is it --

24             This e-mail looks like it's a much more

25   serious investigation by April 1st, because why would

Page 380

1    in a otherwise routine request from Coffee County for

2    information, which could easily have been given to

3    her without going through lawyers, why did you decide

4    to work through Hall Booth?

5         A.    Well, we didn't --

6         Q.    Or why would the secretary --

7         A.    Choose to work through.

8               MR. TYSON:  Let him finish his question.

9               THE WITNESS:  Okay.  That was --

10        Q.    (By Mr. Brown)  I'm sorry.  Did the

11   Secretary decide or your office decide to work

12   through Hall Booth?

13        A.    Well, because this was at issue with the

14   claim from them, so it was in litigation.  So it

15   would make normal sense in the normal course of

16   business to work through the county attorneys.

17               And generally speaking, when we were doing

18   investigations regardless, we normally loop the

19   county attorneys in on those things, because they

20   want to be kept apprized of that.  Hey, by the way,

21   we've got our law enforcement guys talking to your

22   folks that's a normal thing, Mr. Brown.

23               And, again, since this was April of 2022,

24   we were aware of this thing from February, into March

25   of 2022.  This on the heels of that would make

Page 381

1    perfect sense; and to try to say otherwise is just --

2              I --  I don't see why this would seem to

3    odd to you, sir.

4        Q.    Did you --  Did anyone ever answer Miss

5    Roberts's question?

6        A.    I believe that there was something sent to

7    them.  I don't know for certain, because we were

8    working through their attorney.  Maybe she didn't

9    need it after that.  I don't know the answer to that

10   question.

11       Q.    So do you not know if -- if her very

12   simple question about why it was picked up was never

13   answered?

14       A.    I do not know for certain it was.  I

15   believe that it was, but I don't want to state that

16   on the record.  I don't know for certain.

17             Because I remember I believe that we did

18   it, but I don't have a specific on this date this

19   person sent this letter to her explaining.

20             It was very straightforward, because the

21   password had been changed so --

22       Q.    Are you aware of any -- are you --  I'm

23   not challenging your -- your testimony.

24             But are you saying that based upon the

25   document you saw or based upon how you think it

Page 382

1    probably would have happened?

2        A.    I think it was discussions we had

3    internally; and, also, from this, I believe they had

4    Open Records Requests from people at this point; and

5    they wanted to have something from the State

6    explaining what had happened.

7            So I think that was the impetus behind her

8    asking for it and us going through the attorneys to

9    make sure, okay, let's dot our i's, cross all our

10   t's.  Here you go.  I believe that's how it went.

11       Q.    Okay.  Let me direct your attention to

12   Exhibit 15.

13           THE WITNESS:  You take that one back.

14           Which one was that one, sir?

15       Q.    (By Mr. Brown)  That is the case --

16           THE WITNESS:  You're too fast.

17       Q.    (By Mr. Brown)  -- the case report --

18       A.    Yeah.

19       Q.    -- the case cover sheet.  We received this

20   today and --  But it has a -- a print date, I think,

21   of April 25th, 2022.  Do you see that?

22       A.    It's down there on the corner.  Yeah.

23       Q.    That seems sort of odd.

24       A.    That might be the last time it was

25   touched.

Page 383

```
 1              MR. TYSON:  I think that might be.
 2              THE WITNESS:  But I couldn't tell you.
 3         We'd have to --  We'd have to check that.
 4              MR. TYSON:  I can check on that, Bruce, if
 5         you want me to.
 6              THE WITNESS:  Because the SharePoint
 7         system will show the last time things are done,
 8         so you can know the last time somebody was in
 9         the investigative file.
10         Q.    (By Mr. Brown)  All right.  And the most
11    recent date is, in fact, the date it was reassigned,
12    which is --
13         A.    Correct.
14         Q.    -- the same day.  Okay.
15         A.    So there's been --  I don't think you have
16    any change on this one since that point that's been
17    added or taken away from the file or changed.
18         Q.    Okay.  Let me --  This sounds more
19    adversarial than -- than I want it to be.
20              But you've described how the investigation
21    into the Coffee County incident is now sort of been
22    taken over by the GBI, right?  And --
23         A.    Not sort of, but taken over by the GBI.
24         Q.    Right.  And you have stated, I think,
25    quite appropriately, given the GBI has jurisdiction
```

```
 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
```

22     Q.   The -- As to this particular case, the --

23  the SEB voted to refer it directly to the GBI in

24  December 2021, right?

25     A.   I don't think that's how that works.  It

Page 385

1    was sent December 21 to the Attorney General's

2    Office.  Not to the GBI, sir.

3         Q.    Oh, what did I say?

4         A.    The GBI.

5         Q.    Okay.  So it was sent to the Attorney

6    General's Office?

7         A.    Yes.

8         Q.    I misspoke.  It was sent to the Attorney

9    General's Office.  How did you get it back from the

10   Attorney General's Office without some sort of SEB

11   authorization?

12        A.    Again, you're into the intricacies of

13   bureaucracy; and I don't know that we got it back

14   necessarily, because the three items that were there

15   had been essentially closed; and there was specific.

16   I think it had been sent over to them a particular

17   violation of law.

18             We reopened this, because the same actors

19   were involved essentially; and I don't think we have

20   to get it back from them to put our investigators

21   back on.  Here's new sets of facts with the same

22   actors kind of thing.  There's not --  You don't have

23   to, as I understand it, do anything to pull it back

24   or have them give it back to you.  It's 'cause it's

25   our investigation, so we're just using that same

1    shell --

2         Q.    Okay.

3         A.    -- essentially.

4         Q.    Okay.  So the -- the AG and the SO -- and

5    the Secretary of State could be more parallel than if

6    the GBI ever got involved --

7         A.    Yeah.

8         Q.    -- right?

9         A.    Yeah.  To a degree.  Because, again, as I

10   said, it's sort of an overly bureaucratic thing where

11   it goes to AG and if they decide something has to go

12   to the administrative law judge on the specific

13   things that were referred.  It's not the case

14   necessarily.  It is just the specific part of the

15   case, and here is the title violation that we're

16   investigating that we believe requires the AG to take

17   the next step.

18        Q.    What has been the AG's involvement in the

19   Coffee County incident, their office?

20        A.    The --

21              MR. TYSON:  Object to form.

22              THE WITNESS:  Okay.  When you say Coffee

23        County incident, are you referring to January

24        7th?

25        Q.    (By Mr. Brown)  Yes.

Page 387

1        A.    Okay.  As far as I know, none.

2        Q.    Okay.  I don't want to nitpick, but I

3    just -- I have to do this.  You -- you --

4        A.    I understand.

5        Q.    You -- you --  In response to a question

6    about Jeffrey Lenberg -- sorry -- yeah, Lenberg, you

7    said you didn't have any specific knowledge of -- of

8    what he was involved with.

9            And my question to you:  Do you have any

10    knowledge of what he was doing?

11        A.    Only from what we've seen from the press

12    and the situation now.  I mean, that he is part of

13    this group that was looking at election equipment.

14            Do we know specifics of this is his

15    specialty, or this is what he knows?  Nothing like

16    that.  So that's what I meant by specific knowledge.

17        Q.    Okay.  To get back to the -- to the

18    recording, just one question.  Mr. Hall mentions that

19    Antrim.  I mean, was the Secretary of State curious

20    to sort of put together the people that were involved

21    in Michigan and the people down here at any point at

22    all?

23            MR. TYSON:  I'll object to scope.

24            THE WITNESS:  I haven't discussed that

25        specific thing with the Secretary, but the

1        Office was looking at it and Antrim County was,

2        obviously, something to me that I understood,

3        because Antrim County was sort of the genesis of

4        most of the stolen election claims in the early

5        section of this, because, again, it's a rural

6        county in Michigan; and I was briefed up.

7              For good or for ill, I became sort of the

8        debunker on CNN, so I got briefed up on it to

9        try to get ahead of these kind of questions and

10       understand it.

11             So I did see that.  SullivanStrickler

12       didn't ring a bell to me.  I didn't know that

13       they were in Atlanta.  Just, again, we were

14       doing things.  We have this piece of equipment,

15       so it wasn't --  It did not click a bell or

16       click a light.

17             Antrim County, again, for me, when I heard

18       it in the context of Scott Hall talking about

19       it, it was him putting himself close to

20       something that was like we know this is where

21       the stuff is, and I am smart, and I got this.

22             That was kind of how I heard it when it

23       was discussed that way.  Like we got the same

24       guys who did it up there.  It was almost

25       braggadocious more than it seemed like this was

Page 389

1        a serious kind of conversation.

2              Again, it may be my own -- what's the

3        word -- prejudices based around Mr. Hall and

4        what he had done, but that was kind of how I

5        took it.

6              So my curiosity wasn't overly done.  It's

7        like, oh, he's trying to bolster his claim by

8        saying something actually happened and kind of a

9        being tangential to that.

10       Q.    (By Mr. Brown)  I've got just a few

11   documents here to go over.

12             Now before I go to some of those

13   documents, in response to what you've learned, given

14   what we know now about what happened in Coffee

15   County, has the Secretary issued any reports to the

16   counties relating to how they need to enhance their

17   security?

18       A.    Well, again, they don't --  I don't think

19   most counties need to enhance it I basically think

20   we -- for lack of a better word --

21       Q.    You're answering --  You're explaining a

22   no answer.

23       A.    Oh, sorry.  No.  I'm trying to get to it.

24   I'm trying to think of what we've done.  I know we've

25   done some -- not --  Not a report.

Page 390

1           A, no.  There's been no report.

2       Q.    Okay.  Please explain.

3       A.    Essentially, 'cause we're still

4   investigating, so we can't really do a report; but we

5   said, look.  And, again, this is from discussions

6   through the liaisons, through Blake Evans and those

7   guys.  Follow the law.  Use your logs.  Make sure

8   your stuff's secure.  Follow the rules we have in

9   place.

10          Because if Misty had followed the rules in

11  place and followed the law, we wouldn't be in the

12  situation, so there's not like a new thing other than

13  don't be sloppy, you know, 'cause sloppiness can lead

14  to some of the things.  But this wasn't sloppy.  This

15  was intentional.

16      Q.    I understand.  You're describing things

17  that might have been said to the counties.

18      A.    I believe --

19      Q.    What was told --

20      A.    Sorry.

21      Q.    -- to them?

22      A.    I believe that there was in a --  I know

23  in May of '21, so post this, I don't know if we've

24  done a buzzPost.  I think --  I have to go back and

25  check.  I believe there was some buzzPost, which is

Page 391

1    our -- on our fireplace system to discuss this.  I

2    could be wrong, but I believe there was.

3              I remember there was some discussion as do

4    we need to reinforce this to these guys; but as I

5    said now, she's become a cautionary tale for these

6    guys.  I know that there was discussions amongst

7    county --

8              We have like a 15 to 20 kind of working

9    group that comes to help us when we're making changes

10   and looking at pilots and doing that kind of stuff;

11   and they've talked amongst themselves, like we know

12   we have to do better at this, I mean.

13             So I -- I think there was some specific;

14   but, also, we had generalized knowledge, knowing the

15   counties are aware.

16             And have we gone through and said sign

17   this new thing saying you're really, really going to

18   follow the law?  No.  We haven't done something

19   beyond that, because, again, most these people are

20   doing their jobs properly.

21        Q.   You said that -- that Miss Hampton's a

22   cautionary tale, but it doesn't sound like you're

23   telling anybody that tale?

24             MR. TYSON:  Object to form.

25             THE WITNESS:  Again, I think we've done

Page 392

1      something on that; but we have conversations

2      with these guys all the time; and they -- they

3      understand.

4           If you went and interviewed any of them,

5      they would say, yes, the equipment is

6      sacrosanct.  We know that we shouldn't do that.

7           But --  But I think all understand that,

8      and I think telling them we can do another thing

9      saying follow the law, but they all take oaths

10     to follow the law.  You can't treat them like

11     children, but we can say always be mindful, be

12     careful, don't be stupid.

13          But, again, these are adults.  We can't

14     talk down to them.  We're managing relationships

15     at the same time on this.

16          I think we might have done something to

17     remind them of the law.  I believe there might

18     have been a buzzPost on that.  I can't say for

19     certain.  I'd have to check, and we can do that

20     in the off time.

21          I've got the check with Blake Evans.

22     He --  He is the person that puts those posts

23     together, usually in conjunction with Steve and

24     Ryan.

25          But, again, you know what the rules --

1      rules are, so really, really don't break the

2      rules.

3          Q.    (By Mr. Brown)  I understand.

4          A.    I mean, it's --

5          Q.    So in terms --

6          A.    Yeah.

7          Q.    -- of policies and procedures and training

8      and communications, because the county officials

9      already know the rules, you have done nothing

10     specifically in response to the Coffee County

11     incident?

12         A.    I said I think we've done one buzzPost, I

13     believe, on something around that; but I would have

14     to go back and check.  I just don't know for certain.

15     We can check on that in a break.

16         Q.    Have you considered additional testing of

17     the equipment, for example, logic and accuracy

18     testing that's in conformity with the law?

19         A.    We actually just did that for every piece

20     of equipment in the state, so that's already done.

21     It's already --

22             You're --  You're asking us to repeat

23     processes that we already do, and so that wouldn't

24     make sense for us to do necessarily.

25             We are trying to give, as I pointed out to

Page 394

1    Mr. Cross earlier, I'm trying to work on a process to

2    get a long-term contract, Pro V & V, to come and do

3    testing on the equipment pre- and post-election in

4    these situations, and not --  Not every piece of

5    equipment, but do a randomized set, that kind of --

6    That's the kind of the process we're working on right

7    now.

8              And we did that after the 2020 election,

9    and we were --  We're trying to find a way to

10   formalize it on that front, and we were discussing

11   that even before all of this.  We --  We figured

12   we've got to put as many processes in place.  That's

13   why I said we need to increase audits.  We're working

14   with the SEB on that.

15             We --  We know that we need to do some of

16   the general upgrades, and they're already called for

17   in the contract, which we're already in discussions

18   about doing that.

19             And we need to do the same things we did

20   after 2020 of reviewing the equipment.  I think we

21   can do that a little less often, because it's not

22   cheap; and there's no reason to believe, unless we

23   get information like Coffee County, that there's been

24   a real threat or breach done.

25             So we're -- we're acting as responsibly as

Page 395

1    we can with the resources we have, with the time we

2    have, working with people who we can't --

3            I think this there might be a fundamental

4    misunderstanding.  Secretary Raffensperger cannot

5    tell counties to do things beyond what's in a rule or

6    a law, so we have to work with now state election

7    board that we are not on that we used to chair, which

8    made it a lot easier, and try to set those things up,

9    so we -- it doesn't --  You cannot snap your fingers

10   and do those things.

11       Q.    All right.  There are limits to what the

12   Secretary of State can to prepare the counties.

13       A.    Not prepare the counties.  We can't direct

14   them to do things above and beyond.  We have limits

15   by the law and limits by time and limits by

16   relationships.

17            You --  You have to work with these

18   people, so you can't be a bully.  You can be a bull

19   in the china shop.  You can't say all you children,

20   now listen to us.  You can't do that.  They --  These

21   are grown adults, who are -- almost all of them

22   professionals.  There's always problem counties.

23            And I think one of the ironic things about

24   this is Coffee's usually a problem.  Usually have

25   things that come out of Spalding.  There's issue with

Page 396

1    Floyd.  There's issues with Hancock.  There's issues

2    with Fulton, and it's regardless of personnel.  It's

3    these same counties.  These cultures seem to have

4    these same problems.

5            So nothing is perfect, and you can do all

6    the training in world.  We trained Misty, and she

7    chose to ignore part of that training.  And you can't

8    control every person.

9    Q.    I'm with you on that.  On --  Specifically

10   on the logic and accuracy testing --

11   A.    Uh-huh.

12   Q.    -- you do not do logic and accuracy

13   testing for each permutation on the ballot, do you?

14           MR. TYSON:  I'll object to scope on that

15           one.

16           THE WITNESS:  I would have to go back.

17           They wouldn't do each permutation, 'cause that

18           would be an impossible amount of time.

19           However, I believe under the training on

20           it, you have to touch each part of the screen at

21           some point for that, which it on a single

22           screen, you make sure you have enough of those;

23           and they can probably figure out if it has to be

24           one or two pages.  They don't have to do every

25           permutation on it, but they have to do a touch

1          on each part of the screen to make sure that's

2          activating it properly.

3               So I don't think it's necessary to do a

4          permutation, because that, again, would --

5               On a primary ballot where we have a

6          Republican ballot, a Democrat ballot, and a

7          nonpartisan ballot, every permutation you're

8          running runs into --  I don't even want to do

9          the math.  I'm a liberal arts major, but it's a

10         lot.

11              And it would be very nearly impossible to

12         do a same rational logic and accuracy testing,

13         because you would have to have all the

14         permutations listed and then checked off as they

15         went.  By touching the screen to make sure it

16         does that and -- and reads it, then you know the

17         screen is operating as it's supposed to.

18         Q.    (By Mr. Brown)  You were asked a slightly

19    different question, but let me make sure I have it.

20    The --  Your understanding of the licenses with

21    Dominion is that the State is obligated to protect,

22    to some extent, to protect Dominion's intellectual

23    property, correct?

24         A.    Essentially, yeah.

25         Q.    Has Dominion made any sort of claim, small

Page 398

```
 1    "c" claim or complaint, small complaint to the State
 2    about the State's exposure for Coffee County's
 3    breach?
 4         A.    Not that I'm aware of.
 5         Q.    Okay.  Are you aware of any documents
 6    reflecting Misty Hampton's changing of her password
 7    in December of 2020?
 8              MR. TYSON:  So there's a document over
 9         which we've asserted investigative privilege.
10              MR. BROWN:  Okay.
11              MR. TYSON:  It was upheld.  Not to
12         short-circuit him, but that -- that there's one
13         single document --
14              MR. BROWN:  Oh, okay.
15              MR. TYSON:  -- that listed out so --
16              MR. BROWN:  That --  That it relates to
17         the password?
18              MR. TYSON:  Correct.
19              MR. BROWN:  Okay.
20              THE WITNESS:  And, again, you say Misty
21         Hampton changing it.  We don't know one way or
22         the other on that.  We know --  We know it was
23         changed on that date, and that's the document he
24         referred to.
25         Q.    (By Mr. Brown)  It was done during her
```

Page 399

1    tenure as the election director?

2         A.    Correct.

3         Q.    Fair enough?

4         A.    Yes, sir.

5         Q.    The --  Yeah.  I think you've already

6    testified to this.

7              But the Secretary of States is supposed to

8    have the passwords for each EMS in the state,

9    correct?

10        A.    I --  Again, supposed to.  We generally

11   did, because we sent them out with passwords

12   originally; and I think --  I don't think that it's a

13   rule, but more of a best practice that, hey, let CES

14   know you have a different password up here now; and,

15   you know, they're generally involved with the change

16   out and that kind of stuff.

17             So, again, I don't know that it's a rule;

18   but it'd be a best practice; and we would expect most

19   county election folks, hey, here's the --  In case I

20   get hit by a bus tomorrow, here's the password kind

21   of thing.

22        Q.    In that -- but the -- but the Secretary --

23   the -- the --  I guess it was CES, maybe -- I'm not

24   sure -- knew Misty had changed it at the time it

25   happened, right?

Page 400

1          A.    No.

2          Q.    Okay.

3          A.    We had --  I think she was originally told

4     by Chris Harvey to change it once the video came out.

5     She didn't do it.

6               And then on December 11th, I believe it

7     was, they came down and said you changed it.  No.

8     Change the password.

9               On the 14th, the password was changed, so

10    that's -- that's where it goes in for all these

11    things.  There's no way for CES to be remotely made

12    aware of that, because it's not connected to the

13    Internet.

14         Q.    Okay.  So she was told --  She was

15    recommended or told to change it.

16         A.    Uh-huh.

17         Q.    And then at some point after that, it was

18    changed.  Fair to say?

19         A.    Yes, sir.

20         Q.    Okay.  And at the time, the Secretary of

21    State was not made aware of the change?

22         A.    Correct, sir.

23         Q.    Okay.  And I guess didn't know it was

24    changed until the next spring.

25         A.    May, I believe, is when --

Page 401

1    Q.    When they picked it up.

2    A.    -- James Barnes --

3          Well, we became aware that there was an

4    issue when James Barnes first called, so that was

5    when we --  Something's gone on here.

6          And we --  Frankly, we couldn't know it

7    was changed.  The assumption is it was, because of

8    the situation that occurred previously; and so --

9    But we didn't know for certain it was changed and

10   what date until Mr. Persinger got into the machine to

11   look at the log file.

12   Q.    I want to make sure we have all the

13   documents, but you -- and to sort of source of your

14   knowledge on some of these things.

15   A.    Uh-huh.

16   Q.    You testified that James Barnes, after the

17   Cyber Ninja card was found --

18   A.    Yes, sir.

19   Q.    -- he sends it upstream.  He --  There's a

20   call back from, I guess, Pamela Jones; and the

21   information that came back was that he had spoken

22   with the board and the employees down there.  Was

23   that --

24   A.    Are you talk --  Like looking back, you

25   know, it's the basis of it.  We talked to people, and

Page 402

1  no one's aware of that, so that's -- I took it to
2  mean the people who would necessarily know.
3          Now he -- Was it followed up with? Well,
4  who did you specifically talk to? I -- I didn't get
5  to that point. I was reticent. Said okay. He did
6  his part. Our guys did their part.
7      Q.   Okay.
8      A.   He was going to go to the IT department to
9  see if there were any e-mails with any correspondence
10  with Cyber Ninjas, and we never heard back.
11          So, again, I'm talking to Mr. Barnes. He
12  goes I never heard back, so I figured that was -- I
13  mean, Mr. Blanchard. Pardon me. I never heard back
14  from Mr. Barnes, so that was kind of where we left
15  it --
16      Q.   Okay.
17      A.   -- with a little "i" investigation.
18      Q.   I'm not challenging that or criticizing
19  it, but the -- But the source of your information is
20  simply that e-mail chain that we saw with Barnes's
21  response -- talked to some of the people and nobody
22  said anything?
23      A.   And talking to Inspector -- Investigator
24  Blanchard, and I talked to Pam as well, and she was
25  less clear on it. She remembered being down there

Page 403

1   and having some of those discussions.

2              But it was mainly that e-mail and talking

3   to Mr. Blanchard.

4              THE WITNESS:  Does anyone validate here

5         for the parking?  Looking at you, host.

6              MR. KNAPP:  We can --  We can validate.

7              THE WITNESS:  Okay.  Making sure.

8              MR. KNAPP:  But you've got to slow down.

9              THE WITNESS:  Thanks for that.

10   Q.    (By Mr. Brown)  Has your office --

11              MR. CROSS:  That's the tradeoff.

12              THE WITNESS:  Understood.

13   Q.    (By Mr. Brown)  The -- the investigation

14   sort of --

15              A parallel investigation is what y'all are

16   doing, what we're doing.  Okay.  I think we can agree

17   on that.  We all want to try to get to the truth of

18   this.

19              We --  We see the local people involved

20   that you've testified to and connection with Sidney

21   Powell hiring -- directly or indirectly hiring

22   SullivanStrickler.

23              Has the Secretary's Office, before the GBI

24   got involved, made any connections in between those

25   steps of people who might have been involved in

Page 404

1    planning, paying for, or benefitting from the Coffee

2    County theft?

3                MR. TYSON:  I'll object to form.

4                THE WITNESS:  Were those steps being taken

5        to outline an investigation?  Yes.

6                But I think GBI came in beforehand; again,

7        'cause it goes in -- inside when the e-mails are

8        produced to us.  I can't remember the date of

9        that, of when we first saw those specific set of

10       e-mails.

11               Again, in a --  If we still had the

12       investigation, I would have a different kind of

13       answer right now.  We have --  We have more

14       briefing on it and understanding of it.

15               Like I said, they were --  They had a

16       plan, which was to go down there, start the

17       interviews and everything after we had done

18       the -- what I call the binary things.  The, yes,

19       this happened.  No, it didn't happen, what do

20       you know about this.

21               So I think the first thing would have been

22       we've identified everything out of the machine

23       that we can identify.  We've gone to people on

24       the ground.

25               I think then the next step would have been

1          the other -- 'cause I know -- there was -- there

2          was this whole discussion, well, how do we do

3          this?  But I don't think it got to that point

4          before the GBI came in.

5          Q.    (By Mr. Brown)  Okay.  Did you want enough

6   time in between the -- the -- the Maggio documents,

7   what I referred to?

8          A.    Yes, sir.

9          Q.    Okay.  And so the connection between

10  Powell and Hall and all of those people was not

11  apparent to you with enough time to investigate it

12  before the GBI got involved --

13         A.    Yes, sir.

14         Q.    -- you're saying?

15         A.    That's fair.

16         Q.    Have you talked with Mr. Sinners about

17  what he knows about -- about this or --

18         A.    About Coffee --

19         Q.    -- if -- if anything?

20         A.    About Coffee County --

21         Q.    Yeah.

22         A.    -- specifically?

23               I asked him, "Do you know anything?"

24               He was like, "No.  I've got nothing."

25               I said, "Are you sure?"

1          He goes, "Yes.  It was after I was gone
2     when all this stuff went down."
3          So now I did ask him specific questions.
4     That's basically what he told me.
5          And, again, in a --  Looking at the
6     reality of how a young man who just came off a action
7     who lost was put through a wringer, going to Savannah
8     and having -- indulging in adult --  It all tracked
9     with also me knowing him; and that seemed to all --
10    Q.    Okay.
11    A.    -- track, you know.
12    Q.    And there --  The Secretary as a
13    investigator had time to investigate any connection
14    between the fake elector group of people and the
15    Coffee County incident; is that right?
16          MR. TYSON:  I'll object to scope and form.
17          THE WITNESS:  Other than knowing that
18          Cathy Latham was one of the people who were on
19          that list of electors who claim to be the proper
20          ones and looking at anything beyond that, no.
21          There's been --  Again, they were going to go
22          down and interview everybody August 8th through
23          11th and that --  By that point, it was already
24          off of our plate.
25          MR. BROWN:  Okay.  This is going to be

Page 407

1      exhibit, I believe, 25.  Is that right?

2      A.    I think that's right but --

3            THE VIDEOGRAPHER:  Yes, sir.  That is

4      right.

5            (Exhibit 25 was marked for

6      identification.)

7            MR. TYSON:  Okay.  I can't even see that.

8      There you go.

9      Q.    (By Mr. Brown)  And for the record,

10   Exhibit --

11      A.    And --

12      Q.    -- 25 is --

13      A.    -- this is not --

14      Q.    -- not a tab.  I don't think it's a tab.

15            MR. KNAPP:  Do you need one?

16            THE VIDEOGRAPHER:  I was just going --

17      Q.    (By Mr. Brown)  But it is a November 17th,

18   2020 Official Election Bulletin, from Chris Harvey,

19   to county election officials and county registrars.

20            You see that?

21      A.    Yes, sir.

22      Q.    Do you know if there was some specific

23   Open Records Act request that triggered this

24   concern -- apparent concern by Mr. Harvey, or is this

25   part of the general post-election surge of

Page 408

1    difficulties?  Put it that way.

2              MR. TYSON:  And I'll object to scope.

3         There's no indication it involves a breach or an

4         unauthorized access.

5              THE WITNESS:  It was multiple counties.

6         It was -- we're --  We were in the time period

7         at this point where ORRs were being used to try

8         to get ahold of anything anybody could.

9              This was post the time -- and I'm doing --

10        I'm walking my mind through this.

11             The two centers called for Secretary

12        Raffensperger to resign.  The threat levels had

13        kind of increased for everybody internally, and

14        our county elections officials were being

15        swamped with stuff, so we --

16             For all the ones that called us during

17        this period of time, we were sure there were who

18        didn't who were receiving the same thing.  So we

19        said the better part of valor.  Let's

20        specifically remind them of the laws on this,

21        that they don't give any of this stuff over,

22        because basically it would be in violation of

23        state law.

24             And now there was not a specific, hey,

25        this particular one that did it.  It was like an

Page 409

1          avalanche of them from citizens and groups and

2          every -- everybody else you can think of.

3                   (Exhibit 26 was marked for

4          identification.)

5          Q.    (By Mr. Brown)  Let me hand you what has

6     been marked as Exhibit 26.

7                   And for the record, 26 is a December 9,

8     2020 --

9          A.    Do you have one more up for --

10         Q.    I do.

11         A.    -- counsel over here?

12         Q.    I may.

13               MR. TYSON:  Okay.

14               MR. KNAPP:  Trying not spill that.

15               MR. TYSON:  Thank you, sir.

16         Q.    (By Mr. Brown)  It looks like it's a press

17    release from your office; is that right?

18         A.    Yes, sir.

19         Q.    And this indicates that the Secretary of

20    State is opening an investigation into Coffee

21    County --

22         A.    Yes, sir.

23         Q.    -- correct?

24               And this has to do with the Coffee

25    County's inability to certify the election, unlike

Page 410

1    all the other counties in the state, right?

2        A.    Inability, slash, unwillingness, I would

3    call it that.

4        Q.    And did you make any determination as to

5    which was which or both?

6        A.    My gut reaction from talking to the

7    investigators and seeing how everything went down, a

8    little bit of both, I think; and Miss Hampton, by her

9    mishandling, couldn't make it work.  She was

10   predisposed to already dislike the system, because it

11   wasn't the system that she knew real well, the ES&S

12   system.

13           She had had a longstanding dislike of Mr.

14   Harvey.  So him directing her to do things didn't go

15   over well.

16           The investigation -- the investigators

17   themselves said she was standoffish, combative in the

18   investigation.

19           Claimed she wasn't trained.  I showed

20   everybody.  They had the documents.

21           All that together, they couldn't get to

22   it.  I think they were unable to, because they were

23   unwilling to do the things properly to get there.

24           And I think that's when the investigators,

25   they did that hand tally to show that it did match

Page 411

1    the election night reporting that was originally

2    loaded, so that the recount stuff was just thrown

3    off, because she had mishandled the batches, the

4    balloting.

5              As I said, Coffee County did have a soap

6    opera.

7       Q.    Right.  Let me hand you what has been

8    marked as 26.

9              (Exhibit 27 was marked for

10       identification.)

11             THE WITNESS:  Is this 27 now?

12             MR. CROSS:  27.

13             THE VIDEOGRAPHER:  27.

14             MR. BROWN:  27.

15             MR. KNAPP:  Yes.

16       Q.    (By Mr. Brown)  Like I said.

17       A.    Okay.

18             MR. KNAPP:  Thank you.

19             MR. TYSON:  There we go.

20       Q.    (By Mr. Brown)  27, for the record, is a

21   January 4, 2021 e-mail, from Garland Favorito, to a

22   cast, including Tom Harding, Preston Haliburton,

23   Robert Cheeley, Mr. Bundren, Paul Maggio, Greg

24   Freemeyer and --

25       A.    Sorry.

Page 412

```
 1        Q.     -- either Jo Van Hutton Pulitzer or --
 2        A.     It says Jovan --
 3               MR. TYSON:  Jovan.  Yeah.
 4               THE WITNESS:  -- Hutton Pulitzer.
 5        Q.     (By Mr. Brown)  Jovanhuttonpulitzer --
 6        A.     Yes.
 7        Q.     -- one word.
 8               MR. CROSS:  It sounds like a Marvel
 9        villain.
10               THE WITNESS:  To be fair, he did change
11        his name to that.
12               This is one of the gentlemen who testified
13        at the -- at the Senate hearing and claimed to
14        have hacked into voting machines in a live
15        voting environment.  He's also a treasure hunter
16        and had been on the treasures of Oak Island on
17        History Channel.
18               Obviously Garland Favorito is well-known
19        on that.  Bob Cheeley, same.
20               So yeah.  I recognize many of names on
21        this, sir.
22        Q.     (By Mr. Brown)  The --  Had you seen this
23   document before I gave it to you?
24        A.     I've not seen this particular e-mail.  No,
25   sir.  I have no recollection of it.
```

Page 413

1        Q.    Are you familiar with any connection

2    between Garland Favorito and the Coffee County

3    incident?

4        A.    No.  I am not.

5              In fact, let me read this real quick so --

6              Well, it says, "Fulton has requested a

7    delay, and we don't know whether or not the judge

8    will grant it."

9              I don't know if this was attached to the

10   Henry County Judge Brian -- oh, god, what's his name?

11   It was a -- an election challenge --

12       Q.    Amero.

13       A.    -- that had moved from Fulton to Henry

14   County.

15             Brian Amero was the judge on that, so this

16   might be attached to that.

17       Q.    Let me see the one you have.

18       A.    Okay.

19       Q.    I had two very similar documents.

20             Yeah.  That's correct.

21       A.    Okay.  Since it was Fulton County, there

22   was an election challenge that Garland had filed; and

23   it was in front of a judge, Judge Brian Amero in

24   Henry County; and him --  His reference here is -- I

25   don't know if we allow it or not.  I believe this is

Page 414

1    they were trying to get access to the physical

2    ballots, and he would not allow them.  He ended up

3    saying, no, you can't do that.

4              MR. BROWN:  This is going to be marked as

5         Exhibit 28.

6              (Exhibit 28 was marked for

7         identification.)

8         Q.    (By Mr. Brown)  Have you seen this

9    document or something like it?

10             This is a letter from Pamela Karlan with

11   the Department of Justice.

12        A.    No, sir.

13        Q.    You --

14        A.    I have not.

15        Q.    You have not?

16        A.    No, sir.

17        Q.    Okay.

18        A.    But, again, recognizing some of the people

19   who have cc'ed on this, so I -- I --

20        Q.    Well, I mean it's the -- I'll --  I'll tie

21   this together with some of the documents that are

22   coming.

23             A day later, Dominion has their

24   notification; and it might have been connected to

25   the -- to this warning here.  I don't know.  But

Page 415

1   you're not aware of --

2             Well, let me just show you Dominion's.

3        A.    I --  I'm aware of Dominion's May 6th

4   e-mail to them.

5        Q.    Right.

6        A.    Yes.  Or the document that was actually

7   the --

8        Q.    Okay.

9        A.    -- notice.

10            And that sort of prompted James Barnes to

11  then contact Chris Harvey.

12       Q.    That's -- that's what I'm -- just --  I'm

13  just getting the document in --

14       A.    Yeah.

15       Q.    -- make sure, so we have it all in one

16  place.

17       A.    I don't know if it -- this May 5th from

18  Civil Rights Division, to Karen Fann had anything to

19  do with that, or if Dominion even knew it existed,

20  'cause they're not cc'ed on this.

21       Q.    Okay.

22       A.    I think it may be a coincidence of timing.

23       Q.    Okay.  Yeah.  That's what --  It could

24  very well be.

25            Okay.  Let me show you what is No. 29.

Page 416

1          (Exhibit 29 was marked for

2      identification.)

3      Q.    (By Mr. Brown)   No. 29 is, in fact, the

4  document that we've been referring to; and that's the

5  May 6, 2021 customer notification from Dominion

6  Voting.

7          And you have seen that document before?

8      A.    Yes, sir.

9      Q.    And did -- did that document --  Is that

10  the notification that would have gone to Coffee

11  County and alerted Mr. Barnes of Coffee County that

12  he was referring to when he found the --

13      A.    Yes.

14      Q.    -- the card?

15          THE COURT REPORTER:   Okay.   That he found

16      the what?

17          THE WITNESS:   Card.

18          MR. BROWN:   Business card.   I didn't

19      finish my sentence.   Sorry.

20      Q.    (By Mr. Brown)   The --  Dominion is

21  appropriately expressing concern over the security of

22  their equipment.   What has Dominion's response to the

23  breach of that security been either formally or

24  informally with the Secretary since it became

25  apparent that their equipment was violated?

Page 417

1     A.    Obviously, they knew not long after the

2     audio clip was admitted.  Said this is the claim, and

3     then -- 'cause we were trying to get in with them.

4          They -- they were --  They put their

5     engineers on it.  They were trying to do stuff in a

6     responsible manner to try to get into that server to

7     see if such a thing had occurred, 'cause that was,

8     obviously, the heart of the whole system, so if you

9     get to that, you can kind of see what happened.

10          That was at least our intent internally on

11    that, so they worked with us.  I mean, their vice

12    president of operations was there trying to figure

13    out.  Went to Best Buy to get whatever she got to try

14    to get into it, working with her engineers in Denver.

15          So they were, you know, aware.  I don't

16    think it was --  It wasn't a five-alarm fire, but it

17    wasn't like we can't do it and who cares.  It was

18    somewhere in between, and I guess it depends on your

19    point of view how urgent or unurgent it was.

20          It was still there.  They were doing their

21    due diligence along with us trying to get to that

22    machine.

23          Now since the unauthorized access was,

24    obviously, confirmed on our side, we let them know

25    relatively quickly.  I couldn't say the same day

1   or --  It was probably within the same day or the

2   next day or something like that.

3            Again, they -- they felt like all right.

4   So this has happened.  And what do we need to do to

5   assure people the -- that the system's okay.

6            So we were talking about, you know, do we

7   send Pro V & V to go examine each one of these

8   machines.  That's what we --  We were talking about

9   some of that.  Do we need to track down everything.

10           The main thing is our discussions were

11  this is a bad actor, and the bad actor's gone, so

12  that's the main.  That was the step one, so there,

13  the --  Anything going forward at that point had

14  stopped with those pieces of machinery themselves

15  specifically.

16           We didn't necessarily --  Again, we had

17  the -- what did you call them, the Bollinger -- the

18  documents with the e-mails you had a word for them.

19  The e-mails from SullivanStrickler.

20      Q.    The Maggio documents?

21      A.    Maggio.  I was thinking of Bollinger.

22      Q.    No, it's Paul Maggio.

23      A.    You know why?  The problem was that that

24  Bollinger was the -- of course, the ref, who did the

25  terrible roughing-the-passer call this weekend.

Page 419

1    That's the -- still in my mind on that front.

2            So Maggio document came in; and, again,

3    I'm not sure of the timing of GBI taking over, us

4    seeing that, them being aware of it kind of thing.

5            And I believe they were --  At the end of

6    the day, finally said, take -- agree with you,

7    Secretary.  Let's take everything off the table.

8    Let's take the discussion point and change the

9    equipment out.  There --

10           And I remember I did have some discussions

11   with them; and I was pushing back more saying we

12   shouldn't change the equipment out, because we're

13   giving into the overall argument that everything's a

14   risk on doing that.

15           And they said, well, we know it's not; but

16   let's take the argument off the table; and, again, I

17   was the last one in our office to finally come around

18   to that point of view.

19       Q.    Do you know if Dominion --  Has Dominion

20   told you of anything that they're doing with their

21   equipment or their software or anything that would be

22   responsive to the fact that their software is in the

23   wild?

24       A.    Again, I don't know their software's fully

25   in the wild or not.  We had a track on where it is.

Page 420

1         But we already had the same software in

2    Antrim we believe is in the wild.  I believe there

3    was another imaging in Colorado and/or Arizona, and

4    it's always going to be out there.

5         Our next steps are we're moving -- we're

6    moving to 5.17.  That's going to be happening, but we

7    have to operate the election we have now; and they're

8    consistently always updating their software as they

9    go, as I mentioned before.

10        So even without this unauthorized access,

11   we were already looking at moving to the next thing.

12   So we were in our normal course of business doing

13   these things.

14        And we were -- we were changing out --

15   We're moving to the next generation of Poll Pad

16   irregardless of -- regardless of this so.

17        And the processes and procedures we have

18   in place, again, if they're followed like they're

19   supposed to be, help to do the mitigations on this

20   front.  When you have a bad actor, regardless of

21   system, this is the kind of situation you can see.

22        THE WITNESS:  While y'all discuss that,

23     I'm going to run to restroom real quick.

24        MR. BROWN:  Okay.

25        THE WITNESS:  Okay.

Page 421

1              MR. BROWN:  Sure.  And we have --  We've
2        got -- we're -- after the --
3              Please go to the bathroom.  It's only
4        about five more.
5              THE WITNESS:  Thank you.
6              MR. BROWN:  Okay.  Thank you.
7              THE VIDEOGRAPHER:  We're going off the
8        record at 5:43.
9              (Recess from 5:43 p.m. to 5:49 p.m.)
10             (Exhibits 30 and 31 were marked for
11        identification.)
12             THE VIDEOGRAPHER:  We're on the record at
13        5:49.
14             We're going to go ahead and put Exhibit
15        1 -- 30 and 31 -- Exhibit 30 and 31 on the
16        record at 5:49.
17        Q.    (By Mr. Brown)  Mr. Sterling, let me hand
18   to you what has been marked as Exhibit 30.
19             And this is something that your office
20   prepared, correct?
21        A.    It was a press release from my office --
22   MITRE Corporation, Independent Federal Lab, finds
23   Georgia Election System Secure.
24        Q.    And so -- and you're --  You are quoted in
25   this press release, correct?

Page 422

1      A.    Yes, sir.

2      Q.    And you say here, "We are pleased that

3   MITRE recognized that existing procedural safeguards

4   make it extremely unlikely for any bad actor to

5   actually exploit any vulnerabilities."

6            Would you still say that today?

7      A.    Yes.  In the context of what I discussed

8   with Mr. Cross earlier, that most of the items that

9   were discussed in Mr. Halderman's report showed

10  vulnerabilities still require physical access to

11  machines outside of the single county to have

12  widespread impact.

13           So yes.  It is a situation that this

14  provides an easier roadmap, given that they now have

15  somebody somewhere that may or likely does have the

16  software and -- and the root code.

17           But this still holds that I think you can

18  read this two different ways, and I understand people

19  can argue about this, and maybe we should have a

20  supplemental report from MITRE on this.

21           Having the access can increase the threat

22  of a particular type; but for the majority of the

23  things that were listed by Mr. Halderman --

24  Dr. Halderman, pardon me, you have to have physical

25  access to the machines on site in a county to do

Page 423

1    these -- to effectuate these things.

2              So that's -- that's --  That's what I mean

3    by I would still stand by the statement in the MITRE

4    report on that front.

5        Q.    And MITRE was engaged by Dominion, right?

6        A.    Yes, sir.

7        Q.    Okay.  So you didn't disclose that it was

8    Dominion's expert who concluded that Dominion's

9    system was secure, did you?

10       A.    No.  I -- No.  We didn't on that one.  I

11   mean, but it's the Secretary's working with --

12             I see what you're saying.  I guess from my

13   point of view, I didn't think about it that way.

14             But I mean, in the same way,

15   Dr. Halderman's report has been paid for by your

16   clients on these fronts, so I mean --

17       Q.    Which we disclosed.

18       A.    Again --

19       Q.    The --

20       A.    -- I don't think it's necessarily been

21   hidden, but I see what you're saying.

22       Q.    That's right.

23       A.    It wasn't in this particular press

24   release.

25       Q.    Fair enough.  The -- you --

Page 424

1           The report goes on to say, "It is MITRE's
2      expert opinion that it is operationally infeasible
3      that the Georgia election system 'could be
4      effectuated by malicious actors with very limited
5      time and access to the machines.'"
6           That's sort of a moot observation.  You
7      would agree, right?
8      A.    No.  I would not.
9           MR. TYSON:  Object.
10          THE WITNESS:  Going back to my --  Sorry.
11          MR. TYSON:  Object.
12     Q.    (By Mr. Brown)  Go ahead.
13     A.    No.  I would not.
14          Going back to my previous statement, most
15     of these things have to do with having physical
16     access to the machines, most of the vulnerabilities
17     to exploit.  Is there a higher likelihood now of an
18     issue based on some of that?  Yes.
19          But they still have to have access
20     somewhere else to do these things.  I keep on --
21     Q.    Okay.
22     A.    -- going back to that.
23          So yes.  I --  I believe that we are still
24     secure even in this environment.
25     Q.    Do you know if MITRE is going to do a

Page 425

1  supplemental report based upon, I mean, anything?

2       A.    No.   I do not know that.

3       Q.    Okay.   Has the State engaged MITRE

4  separately for other work, I think, on ballot

5  harvesting?

6       A.    We didn't --  I don't know if we engaged

7  with them, or they offered it to us.   They were doing

8  this because they took our data, and we did that.   I

9  don't think we paid MITRE for this -- that work.

10            We did also work with them on a

11  disinformation/misinformation reporting tool called

12  Squint that was essentially letting trusted people

13  like elections directors and state actors make

14  reports of misinformation and disinformation on

15  social media that then they would validate and get

16  into Facebook, Twitter, Tumblr, all those things with

17  the validation on them, so they can more quickly,

18  easily go after and identify who was actually

19  misinformation/disinformation.

20            And I don't know if we paid MITRE for

21  that, or it was a free service offer, because they

22  were a federal lab.   I just --  I don't recall.   I

23  don't believe we had them as a vendor.   I think they

24  gave us --  We gave them information.   They did

25  research and gave it back to us.

Page 426

1        Q.    Do you know how -- if --  If Mr. Cross

2   asked this, I apologize.

3              But do you know how MITRE got a copy of

4   the Halderman report, which was under seal?

5              MR. TYSON:  I object.  I'll object to

6        scope.

7              Go on.

8        Q.    (By Mr. Brown)  Let me hand you what's

9   been marked as Exhibit 31.

10             MR. TYSON:  It's this one?  Okay.

11             THE WITNESS:  Yeah.  I'm looking at it.

12             MR. TYSON:  Okay.

13             THE WITNESS:  Yeah.

14       Q.    (By Mr. Brown)  Do --  Do you know what

15   the context of this report was, the independent

16   technical review security analysis?

17       A.    This is the same review.  This is an

18   executive summary of that review.

19       Q.    So 31 is what 30 is based on?

20       A.    In part, yeah.

21             I mean, yes.  It is.

22       Q.    Okay.  Let me just pick on one thing

23   here --

24       A.    Sure.

25       Q.    -- on Exhibit 31.  If you look at the

1  next-to-the-last paragraph, it says --  The last

2  sentence of the next-to-last paragraph says --

3       A.   Okay.  Will you give me a second.  Next --

4  Next-to-last sentence of the next-to-last paragraph;

5  is that correct?

6       Q.   The last sentence of the next-to-the-last

7  paragraph.

8       A.   It starts with "Five"?

9       Q.   That's correct.

10       A.   Okay.

11       Q.   That's just incorrect.  I mean, it

12  describes the QR code as a nonauthoritative portion

13  of the Georgia ballot.  That's just factually

14  incorrect, right?

15            MR. TYSON:  I'll object to scope.

16            THE WITNESS:  I disagree with that.

17       The --  The paper ballot is the -- is the final

18       vote, but the human readable part of that is the

19       final part of that.

20       Q.   (By Mr. Brown)  Okay.  But the machine

21  treats the QR code as the authoritative vote,

22  correct?

23       A.   I think we're probably dancing on the head

24  of a pin here, because --

25       Q.   No.

1      A.     -- this is detected at their risk limiting

2   audit, so I think you can have an argument with them

3   about that, but I believe that what they're basically

4   saying is it's not authoritative in the final part of

5   the law.  The risk limiting audit looks into the

6   human readable portion of that, so that's what I

7   believe they're referring to.

8      Q.     All right.  Is -- is --  Maybe it

9   shouldn't be the authoritative one, but the Dominion

10  system treats it as the authoritative part of the

11  ballot, correct --

12          MR. TYSON:  I'll object to scope.

13     Q.     (By Mr. Brown) -- because it ignores the

14  human readable part of the thing?  We've already

15  established that.

16     A.     Again, I'm going to argue with you about

17  this until the cows come home that the law states

18  that the human readable part is that; and we are

19  allowed use of the human readable part.

20     Q.     Okay.  So modifications to the QR code

21  then don't concern you, I guess, because they're

22  nonauthoritative part of the ballot, right?

23          MR. TYSON:  I'll object to form and to the

24      scope.

25          THE WITNESS:  Going back, it would be

Page 429

1          detected except for through one particular thing
2          of miss -- Dr. Halderman's thing of his report.
3          That would be detected through an RLA; and as
4          I've already stated, the Office would like to
5          see more RLAs done to avoid those kind of
6          situations.
7          Q.    (By Mr. Brown)  But now the --  It says
8     five of the prosed -- proposed attacks involve
9     modifications to a printed ballot's QR code.
10          And what you're saying is since that's
11    nonauthoritative, then those attacks aren't as
12    germane, right?
13          A.    I'm not saying that.
14          MR. TYSON:  I'll object to form and to the
15          scope.
16          THE WITNESS:  I'm not saying that.
17          MITRE's saying that, and I'm saying under the
18          law, and the RLA's looking at those particular
19          parts of that, so that's what I mean by that,
20          and they're being the human readable portion of
21          that.  And we will --  This is a question of
22          interpretation, and we're simply not going to
23          agree.
24          Q.    (By Mr. Brown)  I mean, you know, the
25    attacks are to the QR code; and what you're saying is

Page 430

```
 1    the QR code attack aren't important.  Is that you're

 2    saying?

 3         A.    No.

 4              MR. TYSON:  And I'll object to scope.

 5         We're far beyond breaches.

 6              THE WITNESS:  No.  I'm going to keep on.

 7         We're --  Like I said, we're going to go back

 8         and forth, because I'm not saying it's not

 9         important.  I'm saying it's not the legal, final

10         ballot portion, which is the authoritative

11         portion at the and of this.

12              If there's a hand tally done, if there's

13         any of those things, that's what you always go

14         back to is that ballot and the handwritten

15         portion of it.  That is the final authoritative

16         thing under the law in the State of Georgia.

17         Q.    (By Mr. Brown)  I understand that that is

18    the way that the law reads --

19         A.    Uh-huh.

20         Q.    -- and that by treating the QR code as a

21    person's actual vote, the BMD system does not follow

22    the law, but that is what it reads right?

23              MR. TYSON:  And I'll object to form and to

24         scope.  Not involving a breach.

25              THE WITNESS:  Now when you go back to
```

Page 431

1          this, when it's reading a hand-marker ballot, it
2          is not reading the person's vote necessarily.
3          It's reading a coordinate.
4          Q.    (By Mr. Brown)  I asked you --
5          A.    So, again --  Sir, you said that it's a
6    not -- a nonpaper --
7               The coordinates are not --  That's just
8    being read by the computer.  That is not the
9    authoritative vote.  It is the cast ballot read --
10   the hand readable portion.  That's the authoritative
11   final part of the RLA process, and that is what the
12   law says.
13               So we will dance around the head of a pin.
14   We can get into arguments about this.  I'm just
15   telling you I'm not coming off of that point, 'cause
16   that's not my belief or understanding; and I'm not
17   saying this -- this is MITRE saying this.
18        Q.    Okay.  What --  What are the certified
19   election results based on for every election contest
20   in Georgia that is not subject to the -- period,
21   so --
22               MR. TYSON:  And I'll object to scope.
23        We're beyond access.  Object to form.
24        Q.    (By Mr. Brown)  What is the -- what's
25   the --  What are certified election results based on?

Page 432

1      A.    It's based upon the computer counts of a

2  combination of hand-marked paper ballots, reading the

3  coordinates, and BMD marked ballots reading the

4  coordinates based on a QR code that matches the human

5  readable portion, so they both do the same thing.

6      Q.    Okay.   That's --  That's what I needed.

7      A.    Uh-huh.

8            MR. BROWN:   You got anything else?

9            MR. CROSS:   Just get this one document in

10      the record that Brian gave us.

11            MR. TYSON:   Mark it as 32.

12            (Exhibit 32 was marked for

13      identification.)

14            MR. TYSON:   And just for purposes of the

15      record what we'll mark as 32 is the e-mail from

16      the Secretary's Office, to the Spalding

17      Elections Director related to --  That's

18      reference in the "Rolling Stone" article that

19      was Exhibit 24.

20            THE VIDEOGRAPHER:   So are we putting in

21      Exhibit 32 now --

22            MR. TYSON:   Yes, sir.

23            THE VIDEOGRAPHER:   -- in reference to

24      that?

25            Thank you.

Page 433

1           MR. CROSS:  And I --  I don't think we
2      have any questions on it.
3           THE WITNESS:  Okay.
4           MR. CROSS:  We're just marking --
5           THE WITNESS:  Just putting it in.
6           MR. CROSS:  -- it for the record.
7           MR. TYSON:  Yeah.
8           THE WITNESS:  It's been seven minutes
9      since you said five.
10          MR. TYSON:  Well, it's --
11          MR. BROWN:  You got any?
12          MR. TYSON:  No.  Nothing for me.
13          THE WITNESS:  Thank you, gentlemen.
14          MR. BROWN:  Thank you.
15          THE WITNESS:  And let's go Braves.
16          MR. BROWN:  Go Braves.  Good luck and --
17     with the election.
18          MR. KNAPP:  I hope the Braves listen to
19     you.  Are not sorry their game is till 7:30.
20     Would have ended your deposition earlier.
21          THE WITNESS:  Boom.
22          MR. SPARKS:  Let's go off the record.
23     Let's go off the record.
24          MR. BROWN:  Thank you.
25          THE VIDEOGRAPHER:  We're going off the

Page 434

1       record at 6:01.

2               THE COURT REPORTER:  Is he reading and

3       signing?

4               MR. TYSON:  He is.

5               THE COURT REPORTER:  Through you?

6               MR. TYSON:  Yes, ma'am.

7               THE COURT REPORTER:  You're ordering?

8               MR. TYSON:  Yes, ma'am.

9               THE COURT REPORTER:  Thank you.

10              And you're ordering?

11              MR. TYSON:  Yes.

12              THE COURT REPORTER:  Thank you.

13              MR. TYSON:  Yes.  Thanks to you.

14              THE COURT REPORTER:  You're welcome.

15              You guys are ordering?

16              MR. CROSS:  Yes.  I wouldn't bother with

17      the rough.  Just get us an expedited as soon as

18      possible.

19              (Whereupon, the deposition was concluded

20      at 6:03 p.m.)

21

22

23

24

25

Page 435

1                    C E R T I F I C A T E

2

3

4   STATE OF GEORGIA:

5   COUNTY OF FULTON:

6

7            I hereby certify the foregoing transcript

8       was taken down, as stated in the caption, and

9       the questions and answers thereto were reduced

10      to typewriting under my direction; that the

11      foregoing pages 1 through 434 represent a true,

12      complete, and correct transcript of the evidence

13      given upon said hearing, and I further certify

14      that I am not of kin or counsel to the parties

15      in the case; am not in the regular employ of

16      counsel for any of said parties; nor am I in

17      anywise interested in the result of said case.

18           This, the 17th day of October, 2022.

19

20

                  S. JULIE FRIEDMAN, CCR-B-1476

21

22

23

24

25

Page 436

1                    VERITEXT LEGAL SOLUTIONS
2
                   FIRM CERTIFICATE AND DISCLOSURE
3
4
    Veritext represents that the foregoing transcript as
5   produced by our Production Coordinators, Georgia
    Certified Notaries, is a true, correct and complete
6   transcript of the colloquies, questions and answers
    as submitted by the certified court reporter in this
7   case.  Veritext further represents that the attached
    exhibits, if any, are true, correct and complete
8   copy as submitted by the certified reporter,
    attorneys or witness in this case; and that the
9   exhibits were handled and produced exclusively
    through our Production Coordinators, Georgia
10  Certified Notaries.  Copies of notarized production
    certificates related to this proceeding are available
11  upon request to litsup-ga@veritext.com.
12  Veritext is not taking this deposition
    under any relationship that is prohibited by
13  OCGA 15-14-37(a)and(b).  Case-specific discounts are
    automatically applied to all parties, at such time as
14  any party receives a discount.  Ancillary services
    such as calendar and financial reports are available
15  to all parties upon request.
16
17
18
19
20
21
22
23
24
25

Page 437

1    TO:  Bryan Tyson, Esq.
2    Signature of Deponent Robert Gabriel Sterling
3    October 17, 2022
4
5    Greetings:
6    The deponent has reserved the right to read and sign.
     Please have the deponent review the attached PDF
7    transcript, noting any changes or corrections on the
     attached PDF Errata.  The deponent may fill out the
8    Errata electronically or print and fill out manually.
9
     Once the Errata is signed by the deponent and
10   notarized, please email it to the offices of Veritext
     cs-midatlantic@veritext.com within 30 days.
11
12   When the signed Errata is returned to us, we will
     forward it to the taking attorney to file with the
13   original transcript.
14
     If the signed Errata is not returned within the time
15   above, the original transcript may be filed with the
     Court without the signature of the deponent.
16
17
18
19
20
21
22
23
24
25

```
1   ERRATA
2   I, the undersigned, do hereby certify that I have read
    the transcript of my testimony, and that
3
4   ____ There are no changes noted.
5   ____ The following changes are noted:
6
    Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
7   Procedure and/or OCGA 9-11-30(e), any changes in form or
    substance which you desire to make to your testimony shall
8   be entered upon the deposition with a statement of the
    reasons given for making them.  To assist you in making any
9   such corrections, please use the form below.  If additional
    pages are necessary, please furnish same and attach.
10
11  Page _____ Line _____ Change_____
12  _____
13  Reason for change_____
14  Page _____ Line _____ Change_____
15  _____
16  Reason for change_____
17  Page _____ Line _____ Change_____
18  _____
19  Reason for change_____
20  Page _____ Line _____ Change_____
21  _____
22  Reason for change_____
23  Page _____ Line _____ Change_____
24  _____
25  Reason for change_____
```

Page 439

1   Page _____ Line _____ Change_____

2   _____

3   Reason for change_____

4   Page _____ Line _____ Change_____

5   _____

6   Reason for change_____

7   Page _____ Line _____ Change_____

8   _____

9   Reason for change_____

10  Page _____ Line _____ Change_____

11  _____

12  Reason for change_____

13  Page _____ Line _____ Change_____

14  _____

15  Reason for change_____

16  Page _____ Line _____ Change_____

17  _____

18  Reason for change_____

19

20          _____

                DEPONENT'S SIGNATURE

21

    Sworn to and subscribed before me this ____ day of

22  _____, _____.

23

    _____

24  NOTARY PUBLIC

25  My Commission Expires:_____

**Protective Order Designations for the 30(b0(6) Deposition of Robert Gabriel Sterling as Representative of the Office of the Secretary of State for Georgia Pursuant to Paragraph 6 of the Protective Order [Doc. 477]**

| Page/Line | Designation |
|---|---|
| 77:23-80:11 | Confidential |
| 84:13-16 | Confidential |
| 118:25 - 119:13 | Confidential |
| 128:19-25 129:1-11 | Confidential |
| 153:6-13 | Confidential |
| 208:16-25 209:1 | Confidential |
| 215:10-25 | Confidential |
| 261:10-265:25 | Confidential |
| 266:11-268:17 | Confidential |
| 280:21-281:7 | Confidential |
| 283:16-284:18 | Confidential |
| 285:7-12 | Confidential |
| 329:2-14 | Confidential |
| 384:1-21 | Confidential |