IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, *et al.*

     *Plaintiffs,*

v.

BRAD RAFFENSPERGER, *et al.*,

     *Defendants.*

CIVIL ACTION

NO. 1:17-CV-2989-AT

# STATE DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT ON CURLING PLAINTIFFS' CLAIMS

# TABLE OF CONTENTS

Introduction...................................................................................1

Argument.......................................................................................2

  I.   Curling Plaintiffs' DRE claims (Counts I–II) are moot. .......................2

  II.  Curling Plaintiffs lack Article III standing to bring any of their claims....................................................................................4

    A. Curling Plaintiffs have not demonstrated an injury-in-fact. ..........4

      1. There is no legally protected interest in "verifying" one's vote or in voting on a "reasonably secure" system......................6

      2. Curling Plaintiffs have not shown that the "risk" to their right to vote is certainly impending..............................................7

      3. Any "risk" to Curling Plaintiffs' right to vote is not traceable to or caused by State Defendants. .............................11

      4. Curling Plaintiffs asserted injuries are not particularized.......12

    B. Curling Plaintiffs' claims are not saved by the potential Article III standing of other parties..................................................13

  III. Curling Plaintiffs' claims fail on the merits. ........................................18

    A. There is no burden on Curling Plaintiffs' right to vote from speculative and unfounded risks of vote manipulation. .................18

    B. Curling Plaintiffs cannot rely on alleged government inaction or actions by third parties to sustain their claims..........................21

    C. There is no substantial burden where there are alternative methods of voting available to voters. ............................................23

  IV. State Defendants' interests justify the use of the BMD system. ........25

Conclusion .......................................................................................26

## INTRODUCTION

Like a weathervane turning with every shift in the breeze, Curling Plaintiffs change the central theory of their case at every opportunity. When State Defendants point out that there is no constitutional right to "verify" one's vote or vote on a "reasonably secure" voting system, Curling Plaintiffs stridently disclaim such a position, accuse State Defendants of building a "strawman," and instead claim that the BMD system deprives them of their right to actually vote (a claim belied by the multiple elections that have been successfully held on Georgia's Dominion voting system).But when State Defendants point out that any alleged injury to Curling Plaintiffs' rights to actually vote are wholly speculative and would depend on the independent actions of third parties, Curling Plaintiffs argue that the BMD system violates an asserted right to cast a "verified vote" or to vote on a "reasonably secure system."

All of this is enough to make one's head spin. And indeed, that seems to be the point. Recognizing that each theory of their case is fatally flawed, Curling Plaintiffs simply switch to whichever is most convenient to avoid the only justifiable result in this case: judgment in State Defendants' favor.

The time has come for Curling Plaintiffs' artful dodging to end. Whatever theory Curling Plaintiffs choose, their claims fail. Any claims based

on alleged rights to "verify" their votes, to vote on "reasonably secure" systems, or the like fail because there is no legally cognizable interest in those claims. And any claims based on theories of actual injury to the right to vote also fail as wholly speculative and neither traceable nor proximately caused by State Defendants. Despite six years of litigation, Curling Plaintiffs have not produced one iota of evidence establishing an immediate threat to Curling Plaintiffs' right to vote nor any action by State Defendants that would directly cause such injuries. That is all the Court needs to grant summary judgment in State Defendants' favor.

## ARGUMENT

### I.   Curling Plaintiffs' DRE claims (Counts I–II) are moot.

Curling Plaintiffs do not dispute that Georgia no longer uses the DRE machines and that there is no realistic possibility of them ever coming back into use. *See* Curling Ps.' Corrected Opp. to Defs.' Mot. for Summ. J. ("Opp."), Doc. 1625, at 35–37; July 30, 2020 Order on Defs.' Mots. to Dismiss ("MTD Order"), Doc. 751 at 20 (acknowledging that Georgia law "precludes the possibility of the DRE machines being used again in Georgia elections."). Indeed, Curling Plaintiffs' counsel previously acknowledged before this Court that the DRE claims were moot. SMF ¶ 34; Ex. 11, Nov. 19, 2021 Hearing Tr. at 73:10–13 (Curling Plaintiffs' counsel David Cross saying that "all parties

agree that [Counts I–II of the TAC, the DRE claims] are moot[.]").

Instead, Curling Plaintiffs argue that they have "compiled sufficient evidence of serious security failings in key aspects of *the BMD system* that carried over from the GEMS/DRE system," and that such carried-over "security failings" preclude summary judgment on the DRE claims. Opp. at 37. But even taking their supposed evidence of "security failings" seriously, it does not change the fact that their DRE claims are moot. As State Defendants noted in their opening brief and which Curling Plaintiffs cannot seriously dispute, these supposed problems would be problems *with the BMD system*, not the DRE system, regardless of where they allegedly originated. *See* Br. in Supp. of Mot. for Summ. J. on Curling Ps.' Claims ("Mot."), Doc. 1567-1, at 21.

The Eleventh Circuit has made clear that "[a]n issue is moot when it no longer presents a live controversy with respect **to which the court can give meaningful relief**." *JW ex rel. Tammy Williams v. Birmingham Bd. of Educ.*, 904 F.3d 1248, 1264 (11th Cir. 2018) (emphasis added). Because the State no longer uses the DREs, there is simply no further prospective relief related to the DREs this Court can grant. Accordingly, the DRE claims

(Counts I–II) are moot and should be dismissed.[1]

## II.   Curling Plaintiffs lack Article III standing to bring any of their claims.

### A. Curling Plaintiffs have not demonstrated an injury-in-fact.

Curling Plaintiffs cannot articulate a single consistent theory of injury-in-fact, let alone one which would satisfy Article III's standing requirements. Instead, Curling Plaintiffs speak out of two sides of their mouth, choosing whichever articulated injury is most convenient for responding to State Defendants' arguments in the moment.

In response to the fact that there is no constitutionally protected right to "verify" one's vote, Curling Plaintiffs accuse State Defendants of building a "strawman," and insist that their alleged injury not the inability to "verify" their votes, but rather "to their fundamental right to cast an effective vote (i.e., a vote that is accurately counted) in a reasonably reliable voting system and to have their vote treated equally to that of any other Georgia voters." Opp. at 43–44. But in addition to defying this Court's prior formulation of their injury, MTD Order at 38, Curling Plaintiffs repeatedly argue exactly

---

[1] If the Court decides the DRE claims somehow are not moot, the claims still fail for the same reasons the BMD claims fail.

the opposite throughout their brief:

- Voters "cannot review or *verify*" their ballots. Opp. at 42;

- "The system deprives each Plaintiff individually of the right to cast a *verified* vote[.]" *Id.* at 47;

- "The BMD system causes injury (even if it operates as designed) because voters *cannot even verify their ballots **for tabulation***." *Id.* at 49;

- "The system is inherently injurious to Curling Plaintiffs because it requires them to cast a vote *that cannot be verified* as reflecting their actual choices if they wish to vote in person." *Id.* at 52;

- Curling Plaintiffs have to choose between "cast[ing] a ballot they cannot *read or verify* … or forego their right to full and unfettered participation in their right to vote by voting absentee[.]" *Id.* at 64;

- The BMD system violates "Plaintiffs' right to a *verified* vote." *Id.* at 70.

Plaintiffs cannot have it both ways: they must articulate specifically how the BMDs impact their constitutional right to vote. Thus far, Curling Plaintiffs have articulated three different potential rights that are injured by the BMD system: (1) their right to "verify" their votes, (2) their right to vote "on a reasonably reliable" system, and (3) their actual right to vote and have it count. Whichever of these three they choose, however, Curling Plaintiffs simply cannot satisfy Article III's standing requirements.

### 1. There is no legally protected interest in "verifying" one's vote or in voting on a "reasonably secure" system.

If Plaintiffs' asserted injury is the supposed lack of "verification" or "security" in the BMD system, summary judgment is warranted because there is no legally protected interest in "verifying" one's vote or in voting on a "reasonably reliable" voting system. As State Defendants pointed out in their opening brief, the Constitution protects two rights related to voting: the right to vote and to have that vote count equally to others. *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1246 (11th Cir. 2020). There is no right to vote in a "specific manner," to have it "counted in a very particular way," or to vote on a particular type of voting machine. *See* Mot. at 26–27 (collecting cases).[2]

Curling Plaintiffs do not dispute this. At no point in their brief do they argue or cite any authority supporting the idea that there is a constitutional

_____

[2] Curling Plaintiffs fail to meaningfully distinguish the cases cited in State Defendants' brief. As an initial matter, Curling Plaintiffs do not even mention *Indiana Democratic Party*, which stated clearly that "there is no absolute constitutional right to vote in any specific manner an individual may desire[.]" 458 F. Supp. 2d at 820. As to *Nemes* and *Schulz*, Curling Plaintiffs do nothing more than describe the factual situations of those cases. They do not actually engage with the core principles driving those decisions: that "there is no constitutional right to vote in any particular … manner," *Nemes*, 467 F. Supp. 3d at 528, nor is there a right to have votes "counted in a very particular way[.]" *Schulz*, 2011 WL 2669456, at *5.

– 6 –

right to "verify" one's vote or to vote in a "reasonably reliable" voting system. Indeed, no system can be "voter-verifiable" in the way Plaintiffs' define the term. Even when using hand-marked paper ballots, voters cannot "verify" that their votes are being counted accurately by the equipment or poll workers actually tabulating their votes. In this way, there is no substantive difference between the current BMD system and the hand-marked paper ballots Curling Plaintiffs would prefer the State to use: both provide human-readable portions for voter review, and both are tabulated by someone or something other than the voter.

Because there is no constitutional right to "verify" one's vote, or to vote in a "reasonably reliable" system, Curling Plaintiffs cannot demonstrate the legally protected interest at issue necessary for Article III standing.

### 2. Curling Plaintiffs have not shown that the "risk" to their right to vote is certainly impending.

At most, Curling Plaintiffs might be able to argue that State Defendants' decision to use a system allegedly lacking the ability to satisfactorily "verify" a vote—or that has other "security failings"—creates a "risk" of harm to their right to vote. And at some points in their brief (only when convenient) that does appear to be what Curling Plaintiffs argue. *See* Opp. at 47 (seeking "an injunction to have their votes counted accurately.").

But this theory also fails because Curling Plaintiffs have not satisfied their burden of demonstrating an immediate, "certainly impending" injury to their right to vote. Curling Plaintiffs have not presented any evidence that any vote has been manipulated, that any software has actually been created or installed which could do so, or even that any bad actor has actually accessed Curling Plaintiffs' votes. At most, Curling Plaintiffs can call on evidence of "possible" injuries to their right to vote in the form of "possible" vote manipulation through hacking of the system. Indeed, Curling Plaintiffs repeatedly use chance-laden words like "potentially" and "could" to describe their asserted injuries. *See, e.g.*, Opp. at 27 ("BMD ballots are not trustworthy (even with proper custody procedures), because a malfunctioning or compromised BMD *could* print a human-readable text summary that does not reflect what the voter selected on the BMD.") (emphasis added). But as the Supreme Court and Eleventh Circuit have repeatedly stated, these sorts of "[a]llegations of *possible* future injury are not sufficient" to satisfy Article III. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (emphasis in original); *see also Tsao v. Captiva MVP Rest. Partners, LLC*, 986 F.3d 1332, 1338 (11th Cir. 2021) (same).

Curling Plaintiffs argue that they do not need this sort of evidence. Instead, they argue that the "BMD system causes injury even if it operates as

designed because voters *cannot even verify their ballots* **for tabulation.**"
Opp. at 49 (emphasis in original); *see also id.* at 52 ("[t]he system is
inherently injurious to Curling Plaintiffs because it requires them to cast a
vote that *cannot be verified*[.]") (emphasis added). But this directly
contradicts their earlier statement—just six pages earlier—that "Curling
Plaintiffs do not, as Defendants proclaim, allege that their injury-in-fact is
the inability to 'verify' that their ballots were correctly cast." *Id.* at 43.
Moreover, as discussed above, there is no constitutional right to "verify" one's
vote, so the inability to "verify their ballots for tabulation" does not constitute
a concrete injury sufficient for Article III standing. *Supra* at 6.

Curling Plaintiffs also claim that the "massive security breach" in
Coffee County and "persistent disregard toward cyber- and physical-security
measures" present an "imminent threat to Curling Plaintiffs' fundamental
right to vote."[3] Opp. at 49. But as the Eleventh Circuit made clear in *Tsao*—
issued **after** this Court last issued a substantive order on standing—
"[e]vidence of a mere data breach does not, standing alone, satisfy the
requirements of Article III standing." 986 F.3d at 1344. Nor does the mere

---

[3] While they repeatedly point to the Coffee County "breach," *none* of Curling
Plaintiffs are Coffee County residents. *See* SMF ¶¶ 53, 108, 140.

– 9 –

fact that information was "exposed," thereby "g[iving] criminals 'easy access' to it," give rise to an injury-in-fact. *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 927 (11th Cir. 2020). Rather, a plaintiff must demonstrate "specific evidence" of at least "*some* misuse" of the relevant data. *Id.* at 1343.[4] Without such evidence, a plaintiff's burden to show that a threatened harm of future manipulation is certainly impending "will be difficult to meet," and "most plaintiffs that have failed to offer at least some evidence of actual misuse ... have fared poorly in disputes over standing." *Id.*

Curling Plaintiffs can point to no such evidence in this case. At most, Curling Plaintiffs call on evidence of "possible" injuries to their right to vote in the form of "possible" vote manipulation through hacking of the system. Accordingly, they have failed to carry their Article III burden of demonstrating the harm of vote manipulation is "certainly impending."

_____

[4] Curling Plaintiffs' attempts to distinguish *Tsao* are unavailing. As an initial matter, they claim this argument is "recycled," but the Court has never substantively addressed *Tsao* and its impact on Curling Plaintiffs' standing. Moreover, Curling Plaintiffs allege that *Tsao* doesn't apply because, unlike *Tsao*, they are actually injured by their inability to "verify" their votes—the very argument they disclaim earlier in their brief. *Compare* Opp. at 43 *with id.* at 49. Curling Plaintiffs are similarly situated to those in *Tsao*—there is no evidence of anything actually happening to them as a result of any outside data exposure—and the result must be the same.

### 3. Any "risk" to Curling Plaintiffs' right to vote is not traceable to or caused by State Defendants.

Even if they could demonstrate a substantial risk of an injury to their rights to vote, Curling Plaintiffs have not presented any *evidence* that such injuries would be traceable to or caused by State Defendants' actions. Plaintiffs merely lean on this Court's prior rulings with regard to the traceability question. *See* Opp. at 53–54. But the Court's prior traceability analysis was based on an asserted injury that Curling Plaintiffs have now abandoned—the right to "verify" one's vote. *Compare* MTD Order at 39 ("Plaintiffs allege that the BMD system … does not provide a means by which completed ballots can be accurately *counted, tested, or verified*[.]") *with* Opp. at 43 ("Curling Plaintiffs do not … allege that their injury-in-fact is the inability to verify that their ballots were correctly cast."). Moreover, State Defendants have demonstrated why there is no constitutionally protected interest in "verifying" one's vote. *See supra* at 6.

In contrast to the arguments before the Court in those orders, Curling Plaintiffs now assert that their injury is to their right to *actually vote*. But any harm to that interest—via software-based vote manipulation or otherwise—would be caused by absent third-party hackers. As the Eleventh Circuit has held, "an injury is not fairly traceable to the actions of a

defendant if caused by the 'independent action of some third party not before the court[.]'" *Swann v. Secretary*, 668 F.3d 1285, 1288 (11th Cir. 2012) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). Thus, none of Curling Plaintiffs' asserted injuries are traceable to State Defendants.[5]

### 4. *Curling Plaintiffs asserted injuries are not particularized.*

Curling Plaintiffs likewise fail in their attempt to argue that their injuries are particularized. *First*, Curling Plaintiffs ignore the Eleventh Circuit's clear holdings in the post-2020 election cases: a plaintiff lacks an injury where there are multiple avenues to vote. *See Wood v. Raffensperger (Wood I)*, 981 F.3d 1307, 1315 (11th Cir. 2020). *Second*, they argue that the BMD system causes a particularized harm because it deprives them of their ability to "*verify their votes for tabulation*." Opp. at 49 (emphasis in original). Again, this contradicts their earlier denial of this theory, and as discussed above, there is no right to "verify" one's vote. *Supra* at 6. And *third*,

---

[5] Even if the Court were to find that the attenuated connection between the BMD system and some hypothetical future vote manipulation by an absent third party were enough to satisfy Article III's traceability requirement, Curling Plaintiffs' claims would still fail because Curling Plaintiffs cannot satisfy § 1983's proximate-causation requirement, as discussed in § III.B below. Thus, whatever the analytical path, there is no evidence that the BMD system *directly and proximately causes* any constitutionally cognizable injury as required to sustain a § 1983 claim.

Curling Plaintiffs argue they have a particularized interest in "protecting their right to vote," but they fail to demonstrate how the BMD system *actually harms* that right. Instead, they merely claim that they are "concerned" about the BMD system: Ms. Curling "lacks *confidence*" in the BMD system, Opp. at 28 (emphasis added); Ms. Price could not "verify her selections," and "*worries* that Georgia lacks RLAs that might help secure her right to vote," *id.* at 29 (emphasis added); and Mr. Schoenburg is "*concerned* that he will be disenfranchised[.]" *Id.* at 30. These are exactly the type of abstract, generalized grievances that courts have previously rejected.

The fact remains that Curling Plaintiffs cannot articulate how they are harmed in a way that every other voter is not. Accordingly, Curling Plaintiffs lack the particularized injury necessary to satisfy Article III.

### B. Curling Plaintiffs' claims are not saved by the potential Article III standing of other parties.

Having established that Curling Plaintiffs do not have standing themselves, Curling Plaintiffs cannot cure their lack of standing by relying on the potential standing of others. Citing the "One Plaintiff Rule," Curling Plaintiffs argue that they need not demonstrate their own standing because Coalition Plaintiffs have standing. Opp. at 40–41. Even assuming that

Coalition Plaintiffs do have standing,[6] that does not mean that Curling Plaintiffs have standing, nor does the One Plaintiff Rule mandate Curling Plaintiffs' continued presence in this lawsuit.

Standing is determined on a *per plaintiff* basis. "Article III does not give federal courts the power to order relief to any uninjured plaintiff[.]" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2207 (2021) (quotations omitted). Because "standing is not dispensed in gross," each plaintiff must demonstrate standing to receive individualized relief. *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017).

The One Plaintiff Rule is no exception to this basic constitutional requirement; it certainly does not "confer standing" on those who do not otherwise have it, as Curling Plaintiffs claim. Rather, the rule developed merely as a way to "encourage[ ] judicial efficiency by permitting a court to proceed to the merits of a case" where additional exploration of any individual plaintiff's standing was irrelevant to the outcome of the case because they all sought "identical," global relief. *See Thiebaut v. Colorado Springs Utilities*, 455 F. App'x 795, 802 (10th Cir. 2011). In other words, the

---

[6] As discussed in State Defendants' briefs regarding Coalition Plaintiffs' claims, Coalition Plaintiffs do not actually have standing.

One Plaintiff Rule stands for nothing more than the common-sense

conclusion that a court need not waste its time analyzing whether or not

redundant plaintiffs have Article III standing when they cannot gain

anything additional from the litigation.[7]

Importantly, however, the rule only applies when plaintiffs are seeking

"identical" relief. *Thiebaut*, 455 F. App'x at 802; *Town of Chester*, 581 U.S. at

439 ("a plaintiff must demonstrate standing for each claim he seeks to press

*and for each form of relief* that is sought") (emphasis added). Nor is the rule

mandatory. It stands "only for the proposition that a court 'need not' decide

the standing of each plaintiff seeking the same relief. But *it does not prohibit*

the court from paring down a case by eliminating plaintiffs who lack standing

or otherwise fail to meet the governing jurisdictional requirements." *M.M.V.*

*v. Garland*, 1 F.4th 1100, 1111 (D.C. Cir. 2021) (emphasis added) (quoting

*Doe v. Bolton*, 410 U.S. 179, 189 (1973)). Where an individual plaintiff's

─────────────────

[7] Plaintiffs' citation of *Fla. ex rel. Atty. Gen. v. U.S. Dep't of Health & Hum. Servs.*, 648 F.3d 1235, 1243 (11th Cir. 2011) and *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1170 (11th Cir. 2006) does not change this analysis. Both of these opinions were issued *before* the Supreme Court's decision in *Town of Chester*, which narrowed the traditional One Plaintiff Rule. And neither of those cases involved the potential for § 1988 awards. Thus, once one plaintiff had standing in those cases, it really did not matter whether other plaintiffs also had standing.

standing has an impact on the case in some manner, the One Plaintiff Rule does not apply. *FEC v. Nat'l Conservative Pol. Action Comm.*, 470 U.S. 480, 485–86 (1985) (expressly declining to apply the rule where allowing plaintiff without standing to continue would have collateral effects on the case).

The circumstances of this case demand a decision on standing for each Curling Plaintiff separate and apart from that of each of Coalition Plaintiffs. Contrary to Curling Plaintiffs' opposition brief, the two groups seek different relief and are proceeding on different complaints. Curling Plaintiffs seek an injunction preventing State Defendants from using "*any* systems or devices for voting, including, *but not limited to*, the DRE Voting System and the [BMDs] that do not fully satisfy" State Defendants' obligations under various provisions of Georgia law. TAC ¶ 142 (emphasis added). Such relief would cover not only the DREs and the BMDs, but also any other proposed system State Defendants might adopt. Coalition Plaintiffs, by contrast, limit their requested relief specifically to the DREs and BMDs, in addition to requiring hand-marked paper ballots and various types of pre-certification testing.[8]

---

[8] In their Opposition, Coalition Plaintiffs also now seek to expand the relief in their complaints to include reprogramming of precinct scanners and the use of USB sticks for pollbook backups. *See* Doc. 1624, pp. 35–36.

Coalition Ps.' Third Am. Compl., Doc. 226 at 67–68; Coalition Ps.' First Supp. Compl., Doc. 628 at 69–72. That alone precludes application of the One Plaintiff Rule.

Moreover, unlike many One Plaintiff Rule cases, Plaintiffs here are divided into two groups represented by separate counsel, with both groups seeking separate awards of attorneys' fees—millions of dollars' worth—pursuant to 42 U.S.C. § 1988. It would be fundamentally unjust (and beyond this Court's constitutional jurisdiction) to award attorney's fees to parties who never had Article III standing in the first place. And Plaintiffs were divided into two separate groups for the very reason that they disagree about the strategy and direction of this case. It hardly helps judicial economy—or the pocketbooks of Georgia taxpayers—to have plaintiffs without Article III standing take the case in different directions from those who do.

Thus, the "judicial economy" and jurisprudential justifications for the One Plaintiff Rule simply do not apply in this case. The Court will have to determine Curling Plaintiffs' Article III standing at some point. It would be far better to do it now than to allow Curling Plaintiffs to continue to add costs to the Court, State Defendants, and themselves.

### III. Curling Plaintiffs' claims fail on the merits.

Even if Curling Plaintiffs were to have Article III standing, their § 1983 claims would still fail on the merits because the "risk of manipulation" theory underpinning their claims is unsupported by law or fact. Opp. at 58.

*First*, any risk of vote manipulation is completely speculative, and the Eleventh Circuit has made clear that speculative risks cannot serve as the basis for an alleged constitutional violation. *Second*, even if Curling Plaintiffs had evidence establishing that the risk of manipulation was nonspeculative, Curling Plaintiffs cannot satisfy § 1983's proximate-causation requirement because any burden would come from the actions of non-governmental third parties, not State actors. *Third*, Curling Plaintiffs have not presented evidence establishing absentee voting as an unviable alternative, obviating any burden imposed by the BMD system.

### A. There is no burden on Curling Plaintiffs' right to vote from speculative and unfounded risks of vote manipulation.

Curling Plaintiffs claim that the evidence shows that Georgia's voting system is "hopelessly insecure, leaving Plaintiffs' right to vote unprotected and illusory." Opp. at 61. But alleged "vulnerabilities" are not enough to sustain their claims. As discussed above, the Eleventh Circuit has repeatedly held that mere unauthorized access of a system is not enough on its own to

– 18 –

constitute an Article III injury-in-fact, let alone a burden on Curling Plaintiffs' right to vote. *See supra* at 9; *Tsao*, 986 F.3d at 1344; *Muransky*, 979 F.3d at 927. And, as discussed in State Defendants' opening brief, the Eleventh Circuit and other courts have held that fears based on "potential" future occurrences are insufficient on their own to demonstrate a severe burden under *Anderson-Burdick. See New Georgia Project v. Raffensperger*, 976 F.3d 1278, 1281 (11th Cir. 2020) (criticizing the district court's logical leap from "potential" harms to "severe burden"); *Democratic Senatorial Campaign Comm. v. Detzner*, 347 F. Supp. 3d 1033, 1038 (N.D. Fla. 2018) (holding that the "potential" that a voter's vote would not be counted was minimal and outweighed by actual state interests).

Curling Plaintiffs do not substantively address this authority. Instead, they argue it would be "absurd" to require evidence of actual vote manipulation before finding a "severe" burden and claim that evidence demonstrating "manifestation" of their fears is enough to demonstrate a burden. Opp. at 62–63. They, of course, cite no authority for the claim that it would be "absurd" to require such evidence, nor what types of "important voting rights cases" such a standard would supposedly bar. But these "manifestations," even if true, are only manifestations of unauthorized *access*, *i.e.*, data breaches. And, as the Eleventh Circuit has said multiple times,

mere vulnerabilities, or breaches are not enough on their own to demonstrate an injury, let alone a "severe" burden on the right to vote. *See supra* at 9; *Tsao*, 986 F.3d at 1344; *Muransky*, 979 F.3d at 927. Rather, Curling Plaintiffs must produce evidence that there is a substantial risk that the alleged injury—here, the burden on the right to vote caused by third-party vote manipulators—(1) *will* occur (2) *to them* (3) *because of* these breaches.

After six years and extensive, wide-ranging discovery, Curling Plaintiffs have produced none of this type of evidence. At most, they have produced evidence of unauthorized access to Coffee County voting machines.[9] Opp. at 59–61. But none of the Curling Plaintiffs live in Coffee County, so even if their characterization of the Coffee County events were true, they do not demonstrate how there is any danger to *Curling Plaintiffs'* right to vote. Moreover, there is no evidence—in Coffee County or otherwise—that there is any actor or software poised to manipulate votes.

Instead, Curling Plaintiffs try to flip the burden, arguing that

---

[9] Curling Plaintiffs also point to the "Logan Lamb breach." Opp. at 63. But Logan Lamb's purported access only occurred during the era of the DREs. Since the DREs are no longer in use (and those claims are moot) Curling Plaintiffs' citation to such events are irrelevant. Despite having access to DREs and GEMS databases for years, Curling Plaintiffs notably do not rely on any malware or manipulation of that technology for their claims.

"*Defendants* do not even know if the Coffee County breach led to an infection of Georgia's voting system or alterations that could disenfranchise voters[.]" Opp. at 60 (emphasis added). But it is not State Defendants' burden to disprove Curling Plaintiffs' claims; it is Curling Plaintiffs' responsibility to produce *evidence* that there is a substantial, certainly impending risk to *their* right to vote by third-party manipulators that have infiltrated Georgia's voting system. They have not done that. As a result, they have not demonstrated any burden, let alone the severe one necessary to succeed on their claims.

### B. Curling Plaintiffs cannot rely on alleged government inaction or actions by third parties to sustain their claims.

But even if Curling Plaintiffs had produced evidence demonstrating that the risk from third-party manipulators was real, their claims would still fail for lack of state action and proximate causation. To succeed on a § 1983 due-process claim, Curling Plaintiffs must demonstrate state *action*; state *inaction* is not enough. *See, e.g.*, *Flagg Bros. v. Brooks*, 436 U.S. 149, 164 (1978). And they must demonstrate that this state action *caused* the burden on their right to vote. *Fair Fight Action, Inc. v. Raffensperger*, No. 1:18-CV-5391-SCJ, 2022 WL 4725887, at *50–51 (N.D. Ga. Sept. 30, 2022) (exhaustively analyzing Supreme Court and Eleventh Circuit precedent and

holding that § 1983 imposes a proximate-causation requirement in voting-rights cases).

Here, Curling Plaintiffs claim that State Defendants "have done nothing meaningful to protect voters against [unauthorized access] and potentially other breaches," thereby "leaving Plaintiffs' right to vote unprotected and illusory." Opp. at 59, 61. But even assuming all of this is true—and it is not—it shows nothing more than state *inaction*. The only state *action* Curling Plaintiffs can point to is the adoption of the BMD system itself. To achieve any manipulation of votes requires the independent, criminal actions of private third parties.

Absent a custodial relationship, however, the "Constitution does not protect a member of the public at large from the criminal acts of a third person, even if the state was remiss in allowing the third person to be in a position in which he might cause harm to a member of the public[.]" *Cornelius v. Town of Highland Lake, Ala.*, 880 F.2d 348, 353 (11th Cir. 1989), *overruled on other grounds*, 503 U.S. 115, 127 (1992); *see also White v. Lemacks*, 183 F.3d 1253, 1257 (11th Cir. 1999). Indeed, taken out of the context of Plaintiffs' tech-based fear mongering, one can imagine a third party engaging in all sorts of similarly criminal behavior—from all ends of the political spectrum—done with the intent to disrupt the act of voting. But

– 22 –

that does not mean that voters would then have a § 1983 action against the State for not providing armed security at polling locations.

Like the third-party counties in *Fair Fight Action*, the intermediary actions of Curling Plaintiffs' hypothetical third-party hackers necessary to complete Curling Plaintiffs' asserted injury to the right to vote destroys proximate causation. 2022 WL 4725887, at *50–51. Thus, Curling Plaintiffs' claims fail to demonstrate the state action required to succeed.

### C. There is no substantial burden where there are alternative methods of voting available to voters.

As the Eleventh Circuit made clear in *New Georgia Project*, the widespread availability of absentee voting to all voters including Curling Plaintiffs also dooms their claim. Curling Plaintiffs attempt to avoid this clear holding by distinguishing between "opportunities" and "methods" is nothing more than an exercise in semantics. *See* Opp. at 62. The central point of *New Georgia Project* was that, even if Georgia's absentee-voting procedures (in that case, the receipt deadline) might place a burden on voters, Georgia "has provided numerous avenues to mitigate chances that voters will be unable to cast their ballots," *including* "early in-person voting," and "vot[ing] in person on Election Day[.]" 976 F.3d at 1281. In other words, the ability of voters to self-select other options that would mitigate or avoid any alleged

burden undermines any constitutional claim. And if the ability to vote in-person removes any burden for absentee voting, surely the ability to vote absentee removes any burden for in-person voting.

Curling Plaintiffs' response to this is to attack Georgia's absentee-voting process as "onerous," "unreliable," "highly burdensome," and "full of severe burdens and risks, including disenfranchisement." Opp. at 2, 48, 62, 64. But this directly contradicts their argument (as well as the fundamental theory of their equal-protection claim) that absentee voters' are given greater weight than those who vote in person. TAC ¶¶ 108, 129. Either absentee voting is the exemplar alternative, or its "full of severe burdens and risks, including disenfranchisement"—Curling Plaintiffs can't have it both ways.

Nevertheless, Curling Plaintiffs' supposed "evidence" does not support the conclusion that Georgia's absentee-ballot process is an unconstitutional alternative. Far from it. The evidence demonstrates that Curling Plaintiffs have voted absentee on multiple occasions and intend to do so in the future. Opp. at 28–30. And in the three circumstances in which Curling Plaintiffs did not receive an absentee ballot—one each at the height of the COVID-19 pandemic—there is no evidence that failure to receive one was caused by the State, as opposed to their respective counties or the postal service. SAMF ¶¶ 413, 433, 442. Moreover, it would be reversible error to suggest that one

– 24 –

voter's failure to obtain an absentee ballot constitutes a severe burden on *all* voters. *New Georgia Project*, 976 F.3d at 1281 ("[A]s a legal matter, it is just not enough to conclude that if some ballots are likely to be rejected because of a rule, 'the burden on many voters will be severe.'").

Curling Plaintiffs have not argued, let alone produced evidence demonstrating, that a widespread, systemic problem with absentee voting exists which would somehow undermine the reasoning of *New Georgia Project*. Accordingly, the ready availability of absentee ballots—which are hand-marked paper ballots—removes any possible burden and dooms Curling Plaintiffs' claims.

## IV. State Defendants' interests justify the use of the BMD system.

Curling Plaintiffs' arguments about the State's justifications depend entirely, with the exception of one conclusory footnote, on having established a predicate severe burden. But here, there is no burden on their right to vote at all, let alone a severe one. Thus, State Defendants do not need to demonstrate a "compelling" governmental interest. A mere rational relationship to important state interests is sufficient. *Libertarian Party of Alabama v. Merrill*, 20-13356, 2021 WL 5407456, at *6 (11th Cir. Nov. 19, 2021). This is a standard State Defendants more than satisfy. Mot. at 46–49.

## CONCLUSION

For the reasons stated above, State Defendants respectfully request that the Court grant their motion for summary judgment in their favor on Curling Plaintiffs' claims.

Respectfully submitted, this 13th day of March, 2022.

/s/ Vincent R. Russo

Vincent R. Russo 242628
Josh Belinfante 047399
Carey A. Miller 976240
Alexander Denton 660632
Edward A. Bedard 926148
Javier Pico Prats 664717
Anna Edmondson 289667
ROBBINS ALLOY BELINFANTE
 LITTLEFIELD, LLC
500 14th St. NW
Atlanta, GA 30318
T: (678) 701-9381
F: (404) 856-3255
E: vrusso@robbinsfirm.com
 jbelinfante@robbinsfirm.com
 cmiller@robbinsfirm.com
 adenton@robbinsfirm.
 ebedard@robbinsfirm.com
 jpicoprats@robbinsfirm.com
 aedmondson@robbinsfirm.com

Bryan P. Tyson 515411
Diane F. LaRoss 430830
Bryan F. Jacoutot 668272
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
T: 678-336-7249

E: btyson@taylorenglish.com
  dlaross@taylorenglish.com
  bjacoutot@taylorenglish.com

*Counsel for State Defendants*

## LOCAL RULE 7.1(D) CERTIFICATION

I certify that this State Defendants' Reply Brief in Support of Their Motion for Summary Judgment on Curling Plaintiffs' Claims has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1. Specifically, this document has been prepared using 13-pt Century Schoolbook font and type.

*/s/ Vincent R. Russo*
Vincent R. Russo