IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| DONNA CURLING, *et al.*, | : | |
| Plaintiffs, | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 1:17-cv-2989-AT |
| BRAD RAFFENSPERGER, *et al.*, | : | |
| Defendants. | : | |

## QUESTIONS FOR ORAL ARGUMENT

The Court provides the following questions simply as a roadmap of matters that counsel for the parties should be prepared to be questioned about and/or should consider covering in the course of their remarks. However, the Court recognizes that many of these issues overlap and does not expect that counsel will be able to or need to address each issue and question raised.

## I. Standing

### A. Coalition Plaintiffs

1. How do Plaintiffs distinguish this case from *City of South Miami v. Governor of the State of Florida*, No. 21-13657, 2023 WL 2925180 (11th Cir. Apr. 13, 2023)?
2. From Defendants' perspective, why isn't the Eleventh Circuit's 2022 decision in this case controlling on the question of whether the Coalition Plaintiffs have standing?

### B. Curling Plaintiffs

1. How do the Curling Plaintiffs respond to the State Defendants' arguments that it would be inappropriate to apply the one-plaintiff rule in this case given that the two sets of Plaintiffs have

had disagreements over case strategy and are represented by different sets of attorneys (who could potentially recover separate attorney's fees)?

**C.    Common Issues – Legally Cognizable Injury**

1.    In Plaintiffs' view, what would be the burden on their individual voting rights if they are correct that the BMD system is insecure but their individual votes are still counted correctly?

2.    To the extent Plaintiffs are claiming injuries based on "concern" or lack of confidence in the election system, how are those injuries concrete? And is concern itself an injury?

3.    In their brief, the Curling Plaintiffs argue that "the Georgia election system violates their right to vote and to have that right be treated equally, *even if it operates as designed*" and that "the system is inherently injurious to Curling Plaintiffs because it requires them to cast a vote that cannot be verified as reflecting their actual choices if they wish to vote in person." (Doc. 1636 at 61.) Assuming the Court accepts that Plaintiffs have a right to have their vote counted as cast based on prior Supreme Court authority, what is Plaintiffs' authority for the proposition that they have an independent right to a specific procedure to "verify" that their votes are in fact counted as cast? To the extent Plaintiffs are relying on the HAVA and provisions of state law that are not cited in the operative Complaints, would a technical violation of any of these provisions constitute a burden on Plaintiffs' due process rights?

4.    To the extent that the Coalition Plaintiffs claim they have any other interests protected by the HAVA and statutory and constitutional provisions under state law that they have not included as independent Counts in their Complaints, is it the Coalition Plaintiffs' position that these alleged violations of federal and state law are encompassed within their due process and equal protection claims?

**D.    Common Issues – Speculative Harm**

1.    To the extent Plaintiffs' claims are premised on a "risk" of hacking or manipulation, do Plaintiffs disagree with the State Defendants' statement that "Curling Plaintiffs must produce evidence that there is a substantial risk that the alleged injury— here, the burden on the right to vote caused by third-party vote manipulators—(1) will occur (2) to them (3) because of these

breaches" (Doc. 1649 at 22)? Relatedly, do Plaintiffs agree that the Court is required to apply the "risk-of-harm analysis" articulated by the Eleventh Circuit in its *en banc* decision in *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917 (11th Cir. 2020), which entails "a more demanding standard" for evaluating standing than in cases involving evidence of direct harm and requires the Court to consider "the magnitude of the risk" and whether that risk is "material"?

2.   The State Defendants analogize the Coffee County breach to the data breach in *Tsao v. Captiva MVP Restaurant Partners, LLC*, 986 F.3d 1332 (11th Cir. 2021) and argue that *Tsao* stands for the proposition that the mere fact of a breach is insufficient to render an injury non-speculative.

> *For Defendants*: In *Tsao*, the Eleventh Circuit found the risk of injury to the plaintiff stemming from the data breach had been significantly reduced by the fact that the plaintiff had immediately cancelled his credit cards. Additionally, Plaintiffs in our case are not relying on the mere fact that there has been a breach as the basis for their injuries. Unlike the plaintiff in *Tsao*, Plaintiffs here have presented expert testimony from Dr. Halderman and Mr. Skoglund explaining why the specific facts of the Coffee County breach materially increase the risk of injury to Plaintiffs, particularly now that the Dominion software has been released to the public domain and provided malicious actors with a roadmap for hacking. Wouldn't that distinguish this case from *Tsao* and the Eleventh Circuit's prior decision in *Muransky* or at the very least create a question of fact as to whether the risk of harm to Plaintiffs has in fact been materially increased in this instance?

> *For Plaintiffs*: In *Tsao*, the Eleventh Circuit explained that "[g]enerally speaking, the cases conferring standing after a data breach based on an increased risk of theft or misuse included at least some allegations of actual misuse or actual access to personal data" and then explained that "without specific evidence of *some* misuse of class members' data, a named plaintiff's burden to plausibly plead factual allegations sufficient to show that the threatened harm of future identity theft was 'certainly impending'—or that there was a 'substantial risk' of such harm—will be difficult to meet." Here, at the summary

judgment phase, Plaintiffs have produced evidence that a breach of Coffee County's election system occurred wherein third parties copied election software and then uploaded the software to a cloud-based ShareFile site. However, Plaintiffs have not produced any evidence that any person's vote on a Georgia BMD system has been altered in the two years since the Coffee County breach. Given the lack of evidence that any votes have been changed since the Coffee County security breach, why isn't Plaintiff's risk of injury minimal or speculative?

3. If the parties disagree about the degree of the risks imposed by the State's current voting system, particularly in light of the Coffee County breach, why wouldn't the precise degree of the risk involved and the corresponding burdens it imposes on Plaintiffs' voting rights be a fact question to be resolved at trial? *See Muransky*, 979 F.3d at 927 ("If some degrees of risk are called sufficient, that means others must be insufficient. Although *Spokeo* did not trace a numerical line between the two, it did explain that the risk must be 'material.'").

## E.   Common Issues – Generalized Grievance

1. A number of other federal district courts across the country have found that other plaintiffs' claims about alleged risks of hacking in voting systems were generalized grievances, including the decisions in *Lake v. Hobbs*, No. CV-22-677,2022 U.S. Dist. LEXIS 154117 (D. Ariz. Aug. 26, 2022), *Pirtle v. Nago*, Civ. No. 22-381, 2022 U.S. Dist. LEXIS 209354 (D. Haw. Nov. 18, 2022), and *Soudelier v. Dep't of State of La.*, No. 22-2436, 2022 U.S. Dist. LEXIS 214216 (E.D. La. Nov. 29, 2022). Do Plaintiffs consider these cases to be factually distinguishable?

2. How do the State Defendants square their argument that Plaintiffs' claims are generalized grievances with Supreme Court authority in *Reynolds v. Sims*, 377 U.S. 533 (1964) stating that the right to vote is personal and individual in nature, the fact that Plaintiffs are seeking vindication of their own voting rights (i.e., to ensure that their own votes are counted as cast), and the Supreme Court's guidance in *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) that an injury is not generalized simply because it is widely shared? In *Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020), wasn't the issue that the plaintiff was not seeking to vindicate his own voting rights but was merely asserting a generalized interest in the State following the

law with respect to its treatment of other people's votes? Likewise, in *Gill v. Whitford*, 138 S. Ct. 1916 (2018), the Supreme Court found that the plaintiffs had standing to sue based on claims of partisan gerrymandering in their own legislative districts, but to the extent they sought to raise claims based on gerrymandering in other districts they were merely asserting a generalized interest in the State following the law with respect to its treatment of other voters' districts. Isn't this a case in which Plaintiffs are seeking to vindicate their own voting rights rather than merely asserting a generalized interest in the State following the law with respect to its treatment of other people's votes?

3. Even if all of the individual Plaintiffs' claims are generalized grievances, if the Coalition Plaintiffs have diverted resources in response to the State's conduct wouldn't that be an injury that is particular to the Coalition?

## F.  Common Issues – Traceability

1. The Fulton County Defendants argue that Plaintiffs' claims and alleged injuries in this litigation are wholly related to alleged vulnerabilities and issues with the BMD system. They further argue that the Plaintiffs have not provided any evidence establishing that the Fulton County Defendants play any role in selecting the statewide voting system of Georgia. Instead, the Fulton County Defendants argue that the Georgia Legislature selects and establishes the statewide voting system. Is each aspect of the Plaintiffs' equal protection and due process claims necessarily intertwined with the State's continued use of the BMD system or do some of Plaintiffs' factual "subclaims" (e.g., ballot secrecy, pollbook, and ICC scanner settings) stand on their own regardless of which election system the State implements? If the "subclaims" do not stand on their own, why is Fulton County a proper defendant in this lawsuit? To the extent that Plaintiffs' factual "subclaims" are not pleaded as independent claims in the Plaintiffs' operative complaints, should the Court treat them as separate claims?

2. The Curling Plaintiffs argue that Fulton County has substantial discretion with respect to its use of the BMD system, but how would Fulton County have discretion to abandon the voting system that is mandated by state law? To the extent that Curling Plaintiffs argue that Fulton County has discretion under the Georgia statute authorizing the use of paper ballots when "the

use of voting equipment is impossible or impracticable," what evidence do the Curling Plaintiffs have that the use of the BMD voting equipment is impossible or impracticable? O.C.G.A. § 21-2-281.

3. Are any of the Coalition Plaintiffs' subclaims (ballot secrecy, pollbook, and ICC scanner settings) more properly considered to be claims against Fulton County instead of against the State Defendants?

4. To the extent Plaintiffs' claims against Fulton County are properly before the Court and to the extent these claims involve conduct of local election officials (e.g., failure to secure equipment, failure to provide voters with provisional ballots when pollbooks malfunction, failure to ensure ballot secrecy based on layout of the polling place), how do Plaintiffs establish *Monell* liability against Fulton County for their Section 1983 claims?

5. If the BMD system is subject to a heightened risk of a compromise due to county election workers' failure to secure election equipment, is that an injury that is traceable to the State Defendants or to Fulton County or potentially some other County?  If not, could evidence of Fulton County election workers failing to secure election equipment be properly considered as part of a standalone claim against Fulton County? Or alternatively, does the record reflect that the State and County jointly acted in implementing the BMD system and handling election equipment and software?

6. The State Defendants argue that any injury to Plaintiffs stemming from hacking would be traceable to third-party hackers and not to the State. However, wouldn't Plaintiffs' injury be attributable to the State Defendants if the election system was vulnerable to hacking based on the acts or omissions of the State?

7. The State Defendants argue at (Doc. 1650 at 13 n.6) that if the only issue in this case is the use of BMDs, then the State Election Board has no role. Assuming that all of Plaintiffs' claims are properly before the Court, which claims do the State Defendants believe the State Election Board would have a role in?

### G.   Common Issues – Redressability

1.   Do Plaintiffs acknowledge that there are risks associated with paper ballots too? And even if there are some risks that apply to electronic voting but not paper ballots such that Plaintiffs' claims would be redressable, wouldn't there also be some risks that are associated with paper ballots that do not apply to electronic voting systems? If so, why wouldn't choosing between the relative benefits and burdens of paper and electronic voting systems simply be a legislative policy choice for the State?

## II.   Merits

### A.   Equal Protection

1.   The State Defendants and all Plaintiffs argue that the *Anderson-Burdick* framework should apply to Plaintiffs' equal protection claims. The State Defendants cite *New Georgia Project v. Raffensperger*, 976 F.3d 1278 (11th Cir. 2020) and *Democratic Executive Committee of Florida v. Lee*, 915 F.3d 1312 (11th Cir. 2019) in support of this proposition, but the Fourteenth Amendment claims at issue in both of those cases were specifically Fourteenth Amendment *due process* claims — neither of those cases actually involved equal protection claims. Further, the Eleventh Circuit's decision in *Lee* and its subsequent decision in *Jones v. Governor of Florida*, 15 F.4th 1062 (11th Cir. 2021) seem to suggest that a traditional equal protection analysis should apply to equal protection claims like the ones Plaintiffs raise here, which are premised on alleged disparate treatment of similarly situated groups. In *Jones*, the Eleventh Circuit indicated that *Lee* "distinguished between 'a traditional Equal Protection Clause claim,' which 'is cognizable in the voting context if the plaintiff alleges that discriminatory animus motivated the legislature to enact a voting law,' and a claim brought under 'the First and Fourteenth Amendments,' which prompts application of the *Anderson-Burdick* test." 15 F.4th at 1066. In contrast to the latter category of claims, the court explained that traditional equal protection claims "fall[ ] outside the scope of *Anderson- Burdick*." *Id.* Consistent with *Jones*, why wouldn't the Court apply *Anderson-Burdick* to Plaintiffs' Fourteenth Amendment due process claims, which are premised on alleged burdens on Plaintiffs' voting rights, and apply a traditional equal protection analysis to Plaintiffs'

Fourteenth Amendment equal protection claims, which are distinct claims based on the alternative theory that Defendants treat absentee voters more favorably than similarly situated in-person voters (and vice versa)?

2. Assuming that a traditional equal protection analysis applies to Plaintiffs' equal protection claims, do Plaintiffs have any evidence that Defendants have acted with discriminatory intent?

## B. Fundamental Right to Vote – *Anderson-Burdick* Step One

1. The State Defendants argue that there is no constitutional burden associated with the BMD system because Plaintiffs could just vote absentee as an alternative.  What do Plaintiffs claim are the specific burdens imposed by the absentee system that render absentee voting an inadequate alternative? Is it Plaintiffs' position that the absentee voting system as presently offered is unconstitutionally burdensome, and are there discrete aspects of the State's absentee voting system that Plaintiffs seek to challenge here in their capacity as absentee voters?

2. Do Plaintiffs have any evidence that the issues that voters such as Donna Curling and Donna Price experienced with absentee voting in the past continue to this day? Even if the Court accepts that Plaintiffs have experienced issues with absentee voting, what evidence do Plaintiffs have that issues with absentee voting are systemic?

3. How do the changes to the State's absentee voting procedures since the enactment of SB 202 affect that analysis, if at all, and *why or how* should the Court address the alleged burdens on absentee voting that are currently being litigated in the consolidated cases before Judge Boulee?

4. Plaintiffs argue that even when some individuals choose to vote absentee, their absentee ballot vote selections are still scanned and entered via the BMD system. For Defendants, does this practice apply to all absentee ballots or only a subset? If a subset, what subsets?

5. The hand count of the human-readable text in the 2020 Presidential election revealed a very small margin of error between the QR code count and the human-readable text count. The same was true of the Risk Limiting Audit of the 2022 Secretary of State election, which was based on a sampling approach instead of a full hand count. Wouldn't that suggest

that by and large the selections reflected in the human-readable text are accurately captured in the QR codes?

6.    Plaintiffs argue that "audits of BMD elections cannot detect whether computer errors or hacking altered votes or election results," and that even if the scanners were to tabulate the human-readable text instead of the QR codes "the rate at which voters check the human-readable text on ballots is nowhere near enough to detect a systematic problem." (Doc. 1622 at 10.) If voters fail to catch errors in the human-readable text because they neglect to verify their selections, wouldn't that simply be a self-inflicted wound?

7.    The State Defendants point out that the BMD system has been certified by the EAC and not all states even require EAC certification for their election systems. In Plaintiffs' view, why is the EAC certification process required by Georgia state law inadequate to ensure that the voting system the State selects satisfies minimum constitutional requirements?

8.    Is it Plaintiffs' position that only hand-marked paper ballots can be properly audited?  If not, what would Plaintiffs consider to be a sufficient audit procedure for an electronic voting system?

9.    The Court acknowledged in the October 2020 PI Order that "under O.C.G.A. § 21-2-498(e) the Secretary of State will be required to implement risk-limiting auditing for all statewide elections 'beginning not later than November 1, 2024.'"  How does the State intend to modify its auditing procedures between now and that November 1, 2024 statutory deadline?

10.    Does the following passage from *Jacobson v. Florida Secretary of State*, 574 F.3d 1236 (11th Cir. 2020) suggest that there is at least some burden on Plaintiffs' fundamental right to vote in this case given that, unlike the plaintiffs in *Jacobson*, Plaintiffs here argue that Defendants' practices make it more difficult for them to vote and to have their individual votes properly counted for the candidates of their choice?

> The statute at issue here is unlike any law that this Court or the Supreme Court has ever evaluated under *Anderson* and *Burdick*. The statute does not make it more difficult for individuals to vote, *see, e.g.*, *Crawford*, 553 U.S. at 198, 128 S.Ct. 1610 (plurality opinion) (photo-identification law); *Common Cause/Ga.*, 554 F.3d at 1354 (same), or to choose the candidate of their choice, *see Burdick*, 504 U.S. at 430, 112 S.Ct. 2059 (prohibition on write-in voting) . . . . And to state the obvious, the

statute certainly does not create the risk that some votes will go uncounted or be improperly counted. *See, e.g.*, *Lee*, 915 F.3d at 1318–20 (challenge to signature-match procedures for absentee and provisional ballots); *Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006) (challenge to manual-recount procedures under which some ballots might "receive a different, and allegedly inferior, type of review in the event of a manual recount"). All the statute does is determine the order in which candidates appear in each office block on the ballot.

*Id.* at 1261–62.

11.     The State Defendants heavily rely on the Eleventh Circuit's decision in *New Georgia Project* for its *Anderson-Burdick* analysis. However, the plaintiffs in *New Georgia Project* were arguing that the State's refusal to recognize a specific pandemic-related exception to a pre-existing, longstanding election deadline was what had imposed the alleged burdens in that case rather than a systemic feature of the State's election apparatus, which is what Plaintiffs are challenging here. In addition, in its *New Georgia Project* decision the Eleventh Circuit included the following language in the first footnote:

We note that we write only for the parties' benefit. As we recently held, because "orders concerning stays are not a final adjudication of the merits of the appeal," the "tentative and preliminary nature of a stay-panel opinion precludes the opinion from having an effect outside that case." *Democratic Exec. Comm. of Fla. v. Nat'l Republican Senatorial Comm.*, 950 F.3d 790, 795 (11th Cir. 2020) (internal quotation marks omitted).

*New Georgia Project*, 976 F.3d at 1280 n.1. Why should the Court treat the Eleventh Circuit's opinion in *New Georgia Project* as "having an effect outside that case" despite the Eleventh Circuit's express statement to the contrary, particularly in a case such as this one where the Plaintiffs are challenging systemic features of the State's election apparatus rather than simply claiming an entitlement to a pandemic-based exception on a unique set of facts?

12.     Is it proper for the Court to consider the MITRE report for purposes of summary judgment in light of Plaintiffs' objections

that the report is hearsay, that it was untimely produced, and that Plaintiffs have had no opportunity to perform discovery about it?

13.  If the Court were to apply an adverse inference about the conduct of the individuals involved in the Coffee County breach who refused to answer questions in their depositions on Fifth Amendment grounds, what would that inference be and how would it affect the Court's risk-of-harm analysis?

14.  Is the severity of the burden for purposes of *Anderson-Burdick* step one a question of fact in this case?

15.  Has the State implemented any of the changes proposed by CISA? If not, why?

## C.   Fundamental Right to Vote – *Anderson-Burdick* Step Two

1.  How do Plaintiffs account for the State Defendants' concern that hand-marked paper ballots are not accessible to people with disabilities and that if the State were to switch to the hand-marked paper ballot system Plaintiffs are requesting, it could potentially run afoul of the ADA and HAVA?

2.  The State Defendants argue that to the extent there is any discrepancy between the QR code tabulation and the tabulation of the human-readable text in an audit then the tabulation of the human-readable text will control. If that is the case, is there any rational basis for tabulating votes in non-audited elections based on the QR codes instead of based on the human-readable text?

3.  What is the State's justification for using the QR code system given that its own experts, including Dr. Shamos and Dr. Gilbert, appear to advise against using QR codes?

4.  Is there any rational basis for the State's not upgrading their BMD system to one such as that used in Colorado and other jurisdictions that do not use QR codes to record and print out the voters' electoral choices?

## D.   Coalition Plaintiffs' Subclaims

1.  If the Court were to deny Plaintiffs' broader challenge to the BMD system as a whole, could the Court still potentially allow any of the Coalition Plaintiffs' narrower subclaims to proceed — namely, the ballot secrecy claims, the paper backup request related to the pollbooks, and the request to modify the ICC

scanner settings — to the extent they implicate the Coalition Plaintiffs' due process and equal protection rights?

2. *Pollbook*: What is the Coalition Plaintiffs' argument for why their paper backup request related to the pollbooks should be considered properly within the scope of their operative Complaints?

3. *Pollbook*: For their paper backup claim, do the Coalition Plaintiffs have any new evidence indicating that printing paper backups closer to Election Day would be less of an administrative burden on the State than the Eleventh Circuit had suggested? Or, is the Coalition Plaintiffs' argument simply that the administrative burdens that the Eleventh Circuit articulated should now be deemed to be outweighed by the burdens on Plaintiffs based on new evidence that the burdens on Coalition Plaintiffs' exercise of the franchise are more significant than the Eleventh Circuit had thought?

4. *Scanner settings*: What is the Coalition Plaintiffs' argument for why their claim about the ICC scanner settings is within the scope of their operative Complaints?

5. *Scanner settings*: Assuming that the scanner settings claim is properly before the Court, can the Coalition Plaintiffs properly raise this claim against both the State Defendants and Fulton County if the Coalition Plaintiffs are correct that counties have discretion to adopt different scanner settings?

6. *Scanner settings*: Do the Coalition Plaintiffs have any new evidence since the Court issued its October 2020 PI Order regarding the effect of the State Election Board's new rule adjusting the scanner settings (i.e., the rule adjusting the settings to flag as ambiguous ballots in which at least 10% but less than 20% of the target area has been filled in)?

7. *Scanner settings*: Do the State Defendants have any additional evidence suggesting that further adjusting the scanner settings would create an administrative burden by causing an excess number of ballots to be erroneously flagged for review?

8. *Ballot secrecy*: From the Coalition Plaintiffs' perspective, even if someone has access to the timestamp of a ballot and a scanned ballot image, is it possible for that person to attach the ballot to a specific person? How would that process work?

## III.   DRE Claims – Mootness

1. Do Plaintiffs dispute that the specific Counts related to the DREs are moot and should be dismissed even if the factual allegations pertaining to the DRE system still have some

relevance to the Counts pertaining to the BMD system?  Do the Curling Plaintiffs and Coalition Plaintiffs have any disagreements on this point?

**IT IS SO ORDERED** this 1st day of May, 2023.

_____

**Honorable Amy Totenberg**
**United States District Judge**