# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

**DONNA CURLING, ET AL.,**
**Plaintiffs,**

**v.**

**BRAD RAFFENSPERGER, ET AL.,**
**Defendants.**

**Civil Action No. 1:17-CV-2989-AT**

## CURLING PLAINTIFFS' NOTICE OF FILING LIST OF EXHIBITS AS DIRECTED BY THE COURT AT THE MAY 2, 2023 HEARING

In addition to Curling Plaintiffs' own personal declarations (beyond those listed below) and deposition testimony[1] and the reports, declarations, and deposition testimony of certain experts (beyond those listed below),[2] Curling

---

[1] Dkt. 1552 (sealed); Dkt. 1557 (sealed); Dkt. 1559 (sealed); Dkt. 1598; Dkt. 1599; Dkt. 1633-26; Dkt. 1633-27; Dkt. 1633-28; Dkt. 1633-30; 1633-31; Dkt. 1633-32; Dkt. 1633-33; Dkt. 1633-34; Dkt. 1633-35; Dkt. 1633-36; Dkt. 1633-38; Dkt. 1634-23; 1634-24; 1634-25; 1634-43; Dkt. 1634-47; Dkt. 1634-48

[2] Dkt. 1131; Dkt. 1553 (sealed); Dkt. 1560 (sealed); Dkt. 1561 (sealed); Dkt. 1563 (sealed); Dkt. 1564 (sealed); Dkt. 1569-42; Dkt. 1569-44; Dkt. 1569-55; Dkt. 1569-59; Dkt. 1628-1; Dkt. 1628-3; Dkt. 1628-7; Dkt. 1628-14; Dkt. 1628-15; Dkt. 1628-18; Dkt. 1628-27; Dkt. 1628-7; Dkt. 1628-27; Dkt. 1630-4; Dkt. 1630-6; Dkt. 1630-7; Dkt. 1630-38; Dkt. 1630-39; Dkt. 1630-40; Dkt. 1630-43; Dkt. 1630-47; Dkt. 1630-49; Dkt. 1631-31; Dkt. 1632-31; Dkt. 1633-19; Dkt. 1633-20; Dkt. 1633-21; Dkt. 1633-22; Dkt. 1633-23; Dkt. 1633-24; Dkt. 1633-25; Dkt. 1634-14; 1634-51; Dkt. 1635-1 (sealed); Dkt. 1635-11 (sealed); Dkt. 1635-19 (sealed); Dkt. 1635-38 (sealed); Dkt. 1635-44 (sealed)

Plaintiffs submit the following list of exhibits for particular focus by the Court, per its directive to provide this list to the Court by Tuesday, May 9, 2023.  Curling Plaintiffs do not mean to suggest that the exhibits they filed with or cited in their summary judgment filings that are not on the list below are unimportant or nominally relevant.  Many highly relevant exhibits are not listed below because of the limit of up to 20 exhibits allowed for this list.  Curling Plaintiffs respectfully direct the Court to their full summary judgment filing for all the exhibits underlying their claims.

| Opp Ex. | ECF No. | Description | Available in Full at ECF No. |
|---|---|---|---|
|  | 1598-0 | February 2023 Declaration of Donna Curling | 1598-0 |
|  | 1599-0 | February 2023 Declaration of Donna Price | 1599-0 |
|  | 1131 (sealed) | July 1, 2021 Halderman Report | 1131 |
| 5 | 1635-2 (sealed) | Excerpt of July 19, 2019 Dr. Michael Shamos Dep. Tr. at 56:13-57:21 (electors cannot visually review and confirm whether the barcode accurately conveys their selections; State Defendants' expert Dr. Michael Shamos advised against barcode BMDs like those used in Georgia); 82:1-20 (malware has the potential to be installed by dishonest election workers (or what Defendants refer to as "insiders") or intruders who gain access to the machines during pre-election testing and at the polling place); 84:24-86:8 (none of Defendants' experts have conducted cybersecurity examinations of Georgia's Dominion voting equipment). | 554 |

| Opp Ex. | ECF No. | Description | Available in Full at ECF No. |
|---|---|---|---|
| 29 | 1628-29 | Excerpt of July 25, 2019 Preliminary Injunction Hearing Transcript (Day 1) at 38:5-40:5 (ENET had rampant security issues); 77:10-78:1, 101:3-19, 104:23-105:3, 106:1-6 (voter registration information was retrieved from ENET via USB drives to update the ExpressPoll pollbooks); 107:1-4 (USB drives used with the GEMS servers were formatted using SOS public-facing computers that are connected to the internet before being used directly with the GEMS system); 157:9-15 (a HMPB system would be much less expensive than Georgia's current BMD system because it would require less equipment production, upkeep, personnel, and delivery); 205:20-206:12 (U.S. and Georgia elections are targets of hackers seeking to disrupt the voting process and a U.S. election will certainly be hacked in the future); 209:9-14 (suppressing even a relatively small handful of votes, particularly in a local election with a small number of voters, could be enough to change the outcome of an election); 219:11-23, 225:1-226:4, 227:22-228:19 (Theresa Payton, CEO and Chief Advisor for Fortalice Solutions, and certain of her colleagues at Fortalice, found serious security failings with the SOS Office's IT networks); 226:1-227:8 (ENET security issues); 234:1-235:8 (Chris Harvey indicated that the voter registration databases is what Russian hackers would want to get into); 234:1-235:8 (Chris Harvey subsequently indicated to Fortalice that the PCC and the voter registration database was out of scope for the next Fortalice assessment in November 2018); 275:25-276:7 (Fortalice's risk assessments conducted for the SOS Office IT network did not include similar risk assessments for any of the 159 counties in Georgia) | 570 |

3

| Opp Ex. | ECF No. | Description | Available in Full at ECF No. |
|---|---|---|---|
| 31 | 1628-31 | Excerpt of Feb. 2, 2022 SOS 30b6 (Merritt Beaver) Dep. Tr. at 34:3-35:15 (Merritt Beaver, the SOS's long-running CIO, could not say for sure that no one in any of the counties connected any part of the system to the internet or internet-equipped devices); 42:7-18 (the State has not produced any evidence that any cybersecurity assessment of Georgia's voting equipment, including its BMDs, printers, ICCs, ICPs, and EMS servers, has been done); 71:18-72:23, 75:4-9, 159:16-24 (the SOS Office now does conference calls with Fortalice to discuss assessments rather than obtain written reports memorializing their findings after this Court issued its preliminary injunction Order in August 2019 relying in part on certain Fortalice reports finding serious security failings with the SOS Office IT network, the SOS Office directed Fortalice to stop sending written reports of cybersecurity assessments to the SOS Office because, purportedly, "they were taken out of context by the public"); 80:18-81:17; 83:4-84:4 (no significant findings from the 2020 and 2021 annual assessments done by Fortalice for the SOS Office IT network were raised to Merritt Beaver, the SOS Office longstanding CIO); 83:4-84:4 (the penetration testing conducted by Fortalice curiously only included the data centers where the voter registration system is, not the CES environment that has a critical role for Georgia's voting system and elections using that system); 164:25-167:8 (Mr. Beaver said his team received reports from Georgia counties on a regular basis that someone in the office clicked on something that introduced malware onto the computer system); 170:18-187:16 (in at least December 2020, Secretary Raffensperger certified that the "Voter Registration System is being maintained in a manner consistent | 1370-2 |

| Opp Ex. | ECF No. | Description | Available in Full at ECF No. |
|---|---|---|---|
| | | with the standards set forth in subsection (b) of this rule [SOS Rule 590-8.3]" despite warnings from the then-SOS Chief Information Security Officer that the voter registration system was unable to meet SOS rule requirements); 192:16-193:6 (the dissemination of the Dominion software taken from the Georgia voting system equipment used in Coffee County and all other Georgia counties by SS and others provides countless individuals and entities a "roadmap" to hack Georgia elections—and the January 2021 Coffee County breach confirms that access to the system is not hard to procure); 194:17-195:24 (Fortalice serves as CISO for the SOS); 246:16-247:8 (the SOS's legacy GEMS server was not shut down when it was replaced, and was located within the same room at the Elections Center as the current EMS server that runs Dominion's Democracy Suite) | |
| 48 | 1634-53 | Excerpt of Feb. 24, 2022 SOS 30b6 (Sterling) Dep. Tr. at 224:18-228:17 (absentee hand-marked paper ballots are sometimes replaced with BMD ballots by election workers which are then scanned and tabulated as BMD ballots instead of hand-marked paper ballots); 10:19-12:23 (there is no evidence the State took any actions to address the deficiencies in the voter registration database); 68:17-72:7 (Defendants have offered no evidence that they have taken steps to remediate the many serious vulnerabilities identified by Dr. Halderman with Georgia's BMD system); 79:5-15 (voter confidence in election systems is important); 118:1-120:8 (when asked who is responsible for the security of Georgia's voting equipment, including knowing whether counties were reusing removeable media devices, the SOS Office said that the counties were and that the | 1370-5 |

| Opp Ex. | ECF No. | Description | Available in Full at ECF No. |
|---|---|---|---|
| | | counties are supposed to coordinate with CISA to check the security of voting equipment, including physical security, at the county level); 250:19-15 (the SOS Office emphasized that "Physical security is . . . the front line of all cybersecurity.") | |
| 69 | 1635-15 (sealed) | Excerpt of Jan. 18, 2022 David Hamilton Dep. Tr. at 62:5-64:20 (a draft Fortalice Technical Assessment from May 2020 for the SOS Office IT network reported the findings of a penetration test from the perspective of a remote worker, which revealed several critical and high-risk vulnerabilities in the IT infrastructure, including two entirely separate routes to gain *administrative control of the entire SOS Office network*); 106:25-108:2 (the State has not produced any evidence that any cybersecurity assessment of Georgia's voting equipment, including its BMDs, printers, ICCs, ICPs, and EMS servers, has been done); 122:15-125:6 (data has moved into and out of what was supposed to be—but was not—an "air-gapped system" using removable media that were provided by the SOS's office and potentially other sources); 122:15-125:6 (Georgia's use of "commodity USBs" to move data into and out of the purportedly "air-gapped" election system was not a competent or safe security practice because, inter alia, the USBs were not made in the U.S. and could have had data or malware already stored on them); 122:15-125:6 (the SOS's Chief Information Security Officer, David Hamilton, recommended that the SOS adopt a more secure "managed USB" program through a vendor called Datalocker, but that had not been implemented by the time he left in 2021); 159:9-165:5 (Fortalice Report); 183:4-184:12 (the SOS Office's Chief Information Officer (Merritt Beaver), Chief | 1604 |

| Opp Ex. | ECF No. | Description | Available in Full at ECF No. |
|---|---|---|---|
| | | Operations Officer (Gabriel Sterling), Director of the Center for Election Systems (Michael Barnes), Security Manager (James Oliver), and Chief Information Security Officer (David Hamilton) had not read Dr. Halderman's July 2021 report at the time of their depositions and thus were unable to address his many serious findings, despite their responsibility related to Georgia's elections or the SOS Office's IT systems); 183:4-184:12, 189:5-193:22, 201:12-21 (as the CISO, David Hamilton would expect to have been made aware of Dr. Halderman's testimony that he was able to hack Georgia's BMD equipment in only three days and that is something Mr. Hamilton would have liked to have known about—but he did not know); 193:24-198:17 (Defendants have offered no evidence that they have taken steps to remediate the many serious vulnerabilities identified by Dr. Halderman with Georgia's BMD system, despite their unsupported public claims that "Georgia's election system is safe and secure"); 193:24-198:17 (when asked who within the SOS Office would have responsibility for ensuring that security vulnerabilities with Georgia's voting equipment were remediated, Mr. Hamilton testified probably the CISO, which was his role at SOS Office—and yet he was not informed of the security vulnerabilities Dr. Halderman found with the equipment, including those demonstrated for the Court during the September 2020 preliminary injunction hearing) | |
| 71 | 1635-17 (sealed) | Excerpt of Oct. 29, 2021 Dr. Juan Gilbert Dep. Tr. at 13:12-17 (admitting he has not examined any election equipment used in Georgia); 55:11-20, 57:19-25 (Defendants' expert Dr. Juan Gilbert has designed a new BMD for the very purpose of trying to remedy | 1602 |

| Opp Ex. | ECF No. | Description | Available in Full at ECF No. |
|---------|---------|-------------|------------------------------|
| | | the well-recognized, serious deficiencies with BMDs like the Dominion BMDs Georgia uses); 68:4-22 (none of Defendants' experts have conducted cybersecurity examinations of Georgia's Dominion voting equipment); 55:11-20 ("BMDs. . .in voting machines are often nontransparent, hackable, and overly complex"); 57:19-25, 74:15-75:15 (agreed it was possible to "manipulate the QR code and/or the human readable text" and that only a small number of voters would identify a human-readable change on their respective ballots); 89:7-13, 90:9-16 (Dr. Gilbert admitted that eliminating QR codes "would get rid of a lot of the issues" Dr. Halderman found with Georgia's BMD system, and "recommend[ed] not using [QR codes] to eliminate all these discussions and concerns around them"); 102:8-23 (such malware has the potential to be installed by dishonest election workers (or what Defendants refer to as "insiders") or intruders who gain access to the machines during pre-election testing and at the polling place); 134-35 (Dr. Gilbert did not dispute that altering hand marked paper ballots requires many hours to manually change ballots— and any alteration to a hand-marked paper ballot could occur only after the ballot is tabulated by the scanner); 143-44 (Dr. Gilbert testified that he is not a cybersecurity expert and thus lacks the expertise to evaluate the cybersecurity of Georgia's voting system); 144:7-17, 216-45 (Dr. Juan Gilbert, Defendants' own election expert, did not disagree with the many technical failings Dr. Halderman reported and even identified him as one of two election security experts he would rely on to assess the cybersecurity of voting equipment); 180:7-24 (when State Defendants' expert Juan Gilbert was asked in his deposition to look at a real, BMD-printed | |

| Opp Ex. | ECF No. | Description | Available in Full at ECF No. |
|---|---|---|---|
| | | ballot cast in Fayette County during the November 2020 election and *just identify the candidates selected who were not Republicans*, it took him *21 seconds* to be able to do so with just the one ballot) | |
| 75 | 1635-19 | November 2022 Declaration of J. Alex Halderman | 1635-19 |
| 85 | 1634-54 | Excerpt of Jan. 28, 2022 SOS 30b6 (Harvey) Dep. Tr. at 50:3-15, 52:11-53:19, 54.25-56:1 (Fulton County election workers used BMDs for the November 2020 election that, in violation of election policies, were found with the side doors of the voting machines that cover the machines' removable media ports open, unsealed, and unsecured; there is no evidence that an investigation occurred or that the Fulton County BMDs were tested for compromise or removed from future use, despite the fact that an election worker reported the incident to the SOS's Office with a complaint containing photo evidence of the unlocked machines in question; regulations require that voting machine discrepancies, for example a broken seal or another concerns, need to be resolved before use, and BMDs found unsealed before an election should not be used); 62:16-20 (In Hart County, "many voting machines were left unlocked" during the day while the polls were open for the November 2020 election; although the SOS's Office learned about this issue, there is no evidence it was ever investigated); 74:15-78:6 (Defendants have offered no evidence that they have taken steps to remediate the many serious vulnerabilities identified by Dr. Halderman with Georgia's BMD system); 105:15-25, 146:22-25 (the first line of defense in any system is physical security); 218:5-219:6 (in Fulton County during the November 2020 election, the election manager stopped at her house to take a shower in the middle of | 1370-1 |

| Opp Ex. | ECF No. | Description | Available in Full at ECF No. |
|---|---|---|---|
| | | transmitting completed ballots, leaving them unsecured in her personal vehicle for nearly 20 minutes); 218:21-219:6 (although known to the SOS, there is no evidence of any investigation of the incident involving the election manager who left ballots unsecured in her vehicle, including whether the election tabulation in Fulton County was affected) | |
| 105 | 1634-55 | Excerpt of Feb. 11, 2022 SOS 30b6 Michael Barnes Dep. Tr. at 11:9-13:20, 271:4-272:6 (the current consensus among election security experts is that BMDs, such as the Dominion ICX at issue, are not a secure method of voting due to fundamental flaws and that there is no known way of remedying those flaws other than to abandon BMDs except for those voters who cannot mark a paper ballot with a pen); 30:22-31:1 (the first line of defense in any system is physical security); 98:5-100:24 (Defendants have offered no evidence that they have taken steps to remediate the many serious vulnerabilities identified by Dr. Halderman with Georgia's BMD system); 218:13-219:3 (Georgia already has ability to print and tabulate HMPBs on a widespread scale; polling places print enough HMPBs for all voters in the event of an emergency that can be scanned by the ICP scanners that are in place at polling locations); 227:2-25 (the State has not produced any evidence that any cybersecurity assessment of Georgia's voting equipment, including its BMDs, printers, ICCs, ICPs, and EMS servers, has been done); 245:1-250:2 (discussing Opp. Ex. 164: Michael Barnes told multiple county elections supervisors to use BMDs for voting even though the BMD's seals had been removed or were missing); 285:4-14, 301:2-24 (unlike HMPBs, BMD ballots do not produce a | 1370-4 |

| Opp Ex. | ECF No. | Description | Available in Full at ECF No. |
|---|---|---|---|
| | | trustworthy paper record); 289:13-25 (there have been changes in Georgia law that make it more difficult to vote absentee, and therefore harder to vote on a hand-marked paper ballot); 296:5-297:11 (Michael Barnes could not identify any cybersecurity election expert that has endorsed the current Georgia voting system as reliable, and does not know why the SOS Office has not arranged for one to examine the election system); 296:9-17 (voter confidence in election systems is important) | |
| 146 | 1631-46 | CISA's ICS advisory, U.S. Dep't of Homeland Security, Cybersecurity & Infrastructure Security Agency, *Vulnerabilities Affecting Dominion Voting Systems ImageCast X*, ICS Advisory No. ICSA-22-154-01 (June 3, 2022), https://www.cisa.gov/uscert/ics/advisories/icsa-22-154-01. | |
| 149 | 1635-27 (sealed) | Excerpt of Oct. 12, 2022 SOS 30b6 (Sterling) Dep. Tr. at 11:12-13:22, 46:9-48:5 (on October 1, 2022, Gabriel Sterling re-tweeted a statement by Dr. Ben Adida, State Defendants' prior expert in this case and a SOS Office election consultant, that there was no cause for concern about the January 2021 Coffee County breach because it lasted only a few hours, even though the statement was inaccurate); 77:23-81:2 (the SOS Office's investigator spoke with James Barnes who said that he and his Board have not been able to locate anything showing where Cyber Ninjas did any consulting for Coffee County); 130:19-23 (State Defendants replaced only Coffee County's EMS server and ICC when the SOS Office learned in May 2021 about a potential compromise of the voting system there involving Doug Logan and his now- | 1562 |

| Opp Ex. | ECF No. | Description | Available in Full at ECF No. |
|---------|---------|-------------|------------------------------|
| | | defunct Cyber Ninjas organization); 144:24-145:11; 147:10-15 (in Coffee County, election officials were able to provide access to sensitive Georgia voting system equipment and software used in elections in Coffee County and the other 158 counties in Georgia, which all use the same Dominion election software and the same types of Dominion election equipment); 152:10-14 (State Defendants have provided no evidence that they ever actually analyzed any of the equipment they took from Coffee County in June 2021 and later September 2022 for malware, other compromises, or other alterations that could have affected how it operated in elections where it was used, nor were there any audits of those elections); 159:18-160:15 (State Defendants refused to replace the remainder of the equipment for over 18 months, until September 26, 2022); 160:1-15 (State Defendants have refused to replace the EMS server and ICC that were used with that potentially infected equipment for over 18 months, leaving voters still subject to that server and ICC in elections); 211:19-216:2 (Dominion reportedly failed to access its own equipment taken from Coffee County despite the ease with which the passwords on both could have been circumvented and the fact that at least the ICC password should have been known to the SOS Office given it was known to James Barnes in Coffee County when the SOS Office took it); 261:10-2 (in the late evening to early morning hours of February 25-26, 2021, Mike Lindell—a leading "election denier" associated with the Trump Campaign—mysteriously flew to Coffee County during the night after flying to DC and Mar-a-Lago that same day; the SOS Office asserted investigative privilege regarding its investigation into Mr. Lindell's involvement in | |

| Opp Ex. | ECF No. | Description | Available in Full at ECF No. |
|---|---|---|---|
| | | Coffee County); 325:3-25 (the SOS Office called the infrequent state election auditing required by Georgia law "crazy"); 349:16-21 (the SOS Office agreed that the vulnerabilities identified by CISA should be mitigated as CISA advised) | |
| 152 | 1632-2 | Article by Dr. Wenke Lee (sole cybersecurity expert selected by then-SOS Brian Kemp to serve on the SAFE Commission) (Oct. 8, 2018) (advising against the use of BMDs) | 615-2 |
| 179 | 1635-37 (sealed) | Sept. 2, 2022 SullivanStrickler 30b6 (Felicetti) Dep. Ex. 17 (SullivanStrickler upload/download log) | |
| 184 | 1632-34 | Excerpt of Nov. 21, 2022 Jeffrey Lenberg Dep. Tr. at 16-22, 116-119, 122-130, 178:13-22, 178:1-2, 187:16-188:7, 251:15-20, 260-263, 263:5-265:5, 289:9-18 (discussing Coffee County experiments in the operational environment, the data that they changed, and the ballots that they scanned) | 1613 |
| 209 | 1633-9 | Oct. 12, 2022 SOS 30b6 (Sterling) Dep. Ex. 17 (Coffee County surveillance video still shots of SOS, Mr. Logan and Mr. Lenberg's visits on December 11, 2020, and January 18-19 and 25-29, 2022;  showing Mr. Lenberg present in the Coffee County elections office on January 26, 2021, at the same time as an SOS investigator, while Mr. Lenberg was working in Ms. Hampton's office or in the EMS server room which is accessed from her office; the investigator did not appear to question Mr. Lenberg's presence or pursue the issue of unauthorized personnel being allowed in sensitive areas of the Coffee County elections office during his January 2021 visits) | 1489-11 |

| Opp Ex. | ECF No. | Description | Available in Full at ECF No. |
|---|---|---|---|
| 232 | 1633-32 | Declaration of Jeffrey H.E. Schoenberg In Support Of Brief On Standing | 1067-3 |
| 263 | 1635-46 (sealed) | SullivanStrickler 30b6 (Felicetti) Dep. Ex. 12 - All Photos - Maggio 08122022-000236 to 265 (SullivanStrickler Photos from inside the Coffee County elections office, including photos of the USB drives they made of the data, including the BMD installation software) | |

Respectfully submitted this 9th day of May, 2023.

 /s/ David D. Cross                                       /s/ Halsey G. Knapp, Jr.
David D. Cross (*pro hac vice*)              Halsey G. Knapp, Jr.
Mary G. Kaiser (*pro hac vice*)              GA Bar No. 425320
Caroline Middleton (*pro hac vice*)       Adam M. Sparks
Sonja N. Swanbeck (*pro hac vice*)       GA Bar No. 341578
Hannah R. Elson (*pro hac vice*)           KREVOLIN & HORST, LLC
Wail Jihadi (*pro hac vice*)                     1201 West Peachtree Street, NW
Oluwasegun Joseph (*pro hac vice*)       Suite 3250
MORRISON & FOERSTER LLP                   Atlanta, GA 30309
2100 L Street, NW, Suite 900                  (404) 888-9700
Washington, DC 20037
(202) 887-1500

*Counsel for Plaintiffs Donna Curling, Donna Price & Jeffrey Schoenberg*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

<u>*/s/ David D. Cross*</u>
David D. Cross

15

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER , ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on May 9, 2023, a copy of the foregoing **CURLING PLAINTIFFS' NOTICE OF FILING EXHIBITS AS DIRECTED BY THE COURT AT THE MAY 2, 2023 SUMMARY JUDGMENT MOTION HEARING** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

<u>/s/ David D. Cross</u>
David D. Cross

16