# EXHIBIT C

Fulton County Superior Court
***EFILED***SM
Date: 11/1/2023 9:21 AM
Che Alexander, Clerk

## IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

| | | |
|---|---|---|
| **STATE OF GEORGIA,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. <u>23SC188947</u>** |
| | ) | |
| **HARRISON FLOYD, et al** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

### DEFENDANT HARRISON FLOYD'S CONSOLIDATED
### <u>OPPOSITION TO MOTIONS TO QUASH SUBPOENAS</u>

Harrison Floyd files this consolidated opposition to the Motions to Quash Mr. Floyd's

Subpoena Duces Tecum ("Subpoena") filed by the Fulton County Clerk of Superior Court

("Clerk"), Fulton County Board of Registration and Elections ("Board"), and the Secretary of

State ("Secretary").[1] The information that Mr. Floyd seeks is relevant, vital, and crucial to his

defense.

### Introduction

Mr. Floyd intends to present as his defense, evidence that President Trump did not lose

the November 3, 2020 election in the State of Georgia. He intends to produce, for example,

evidence that more than **<u>41,079</u>** presidential votes should have been excluded from the final

Fulton County vote tally because they were not and cannot be reconciled or properly validated as

legitimate votes. If the 41,079 votes were not properly accounted for or verified, they should not

have been included in the final tally and President Trump would have won Georgia's election by

a net margin of at least **<u>3,886</u>** votes. *See* Exhibit A, Sample #11 Summary.

Mr. Floyd intends to show that these votes should not have been included in Fulton

County's final result because of pervasive and systemic failures to comply with the processes

---

[1] Mr. Floyd has consolidated this response for convenience because the objections allege identical grounds. The Clerk, Board, and Secretary may be collectively referred to as the "Non-Parties" in this opposition.

and rules promulgated by the State Election Board.[2] For example, there is evidence that hundreds of thousands of ballot images including the 41,079 sample above are missing, that ballots were counted two and three times, there are a lack of Scanner Recap sheets, missing tabulator sheets, missing tabulator system logs, the use of 10 tabulators that were not part of Fulton County's inventory and for which serial numbers do not exist, and the deletion of approximately 132,280 ".sha" files which are automatically created and produce a unique file identifier for each ballot image in order to authenticate ballots. *See* Exhibit B, Sample #11 Support.

While this small 41,079 sample may have other explanations, only compliance with the subpoena can assist Mr. Floyd's evaluation of this and other evidence that he intends to present to negate criminal intent, and to rebut the indictment's "knowing and willful" allegations and false statements. It is vital that Mr. Floyd be allowed to determine truth or falsity of these things. So it seems strange that the Non-Parties are all moving to quash Mr. Floyd's subpoenas on relevance grounds when the political indictment before this Court alleges:

- 17 times that President Trump lost the 2020 election including in Georgia and Fulton County;

- 49 times that the defendants engaged "knowingly" and "willfully" in various activities to overturn the 2020 election when they allegedly *knew* their statements about the election results were false;

- 113 times that there were attempts to "unlawfully" change the outcome of the election, including in Georgia;

- 145 times that the defendants sought to put the November 3, 2020 election results at issue with the implication that the results cannot be questioned; and

- 182 times that the RICO defendants engaged in "false statements" concerning "fraud" in and about the November 2020 elections;

---

[2] See, e.g., Ga. Comp. R. & Regs. § 183-1-14-.02.

The Non-Party objections are strange because this is a prime opportunity for them to show with complete transparency that the Fulton County election results in the 2020 election are inherently trustworthy, reliable, and true. It is an opportunity to discredit Mr. Floyd and all the defendants, including President Trump, who claim the election was stolen and to once and for all put the concerns of so-called "election deniers" to bed.

However, it is more likely that the Non-Parties objections constitute an effort to avoid putting on display, the legion of irregularities in Georgia's November 2020 election that clearly affected the result, especially with respect to Fulton County. It is Fulton County's untrustworthy process and gross irregularities that made the election results unreliable and fomented the lack of voter confidence. Governor Kemp wrote to the State Election Board about 36 errors in Fulton County's data and pointed to flaws in the County's audit, asserting that its 2020 audit report was "sloppy, inconsistent, and presents questions about what processes were used by Fulton County *to arrive at the result*." See Exhibit C, Gov. Kemp Letter to SEB dated November 17, 2021 (emphasis added). From the evidence in Mr. Floyd's possession, 35 of the 36 errors appear to favor President Biden.

As another example, the declaration of an expert employed by a Democrat plaintiff in the ongoing federal case, *Curling v. Raffensperger,*[3] shows why the information sought is relevant to Mr. Floyd's defense. Curling's expert, Professor Phillip Stark, is an internationally renowned statistician and Associate Dean of Mathematical and Physical Sciences at the University of California University, Berkely. He is literally the inventor of the risk limiting audit used by many governments and which Georgia claimed to employ. His conclusions in his 32-page 2019 declaration in the *Curling* litigation (reaffirmed in 2022) are startling. He opines that "[t]here is

---

[3] *Curling, et al. v. Brad Raffensperger, et al.,* No. 1:17-cv-2989-AT, (N.D. Ga. 2020.).

no trustworthy inventory of ballots to check the results against, because of Georgia's lax

canvass." Exhibit D, Prof. Philip B. Stark Report, ¶ 49 at 15. Professor Stark went on to state that

inventory was critical and what that meant:

> The ballot manifest must be based on physical inventories of the ballots, keeping track of where the ballots are and how they are organized. Absent that, ***it is impossible to account for votes reliably, and impossible to limit the risk that an incorrect electoral outcome will be certified***: applying risk-limiting audit procedures to an untrustworthy collection of ballots is "*security theater.*"

Ex. D, ¶ 87(g) at 31 (emphasis added). Even more compelling are Prof. Stark's conclusions about

Fulton's complete lack of organization and record keeping of election materials:

> Based on the observations in paragraphs 58 through 78, supra, it seems that Fulton County did not keep track of which ballots and BMD cards had been scanned and which had not, in both the original count and in the machine recount. . . . This is a surprising lack of tracking and protecting election materials: the most basic election safeguard is to check whether the number of voters who participated is equal to the number of ballots and BMD printout cards that were cast and to the number that were tabulated. Moreover, I would expect all electronic election materials to be backed up onsite and offsite, at least for the federally mandated retention period of twenty-two months, ***so the loss of hundreds of thousands of image files from the first machine count and of nearly 18,000 images from the second machine count is hard to fathom.***

Ex. D, ¶ 80 at 25-26 (emphasis added). On *behalf of a Democrat organization* and *Democrat*

*plaintiff*, Prof. Stark plainly states that Fulton County's election results are not to be trusted:

> ***Fulton County's chaotic, unaccountable curation and processing of cast ballots***, cast BMD printout, and electronic records make a true risk-limiting audit impossible. ***It is unreasonable for voters to trust that their votes were counted at all, much less counted correctly.*** Voters have good reason to believe that some votes counted more than others: some votes were included twice or thrice in the totals. There is no way to know how many votes were omitted from the tabulation, absent access to the physical ballots and BMD printout and evidence that the chain of custody is intact. ***From the records produced so far, it is impossible to determine whether malware, bugs, misconfiguration, or malfeasance disenfranchised voters or altered the election results.***

Ex. D, ¶ 82 at 26 (emphasis added).

And finally, from civil discovery obtained in the *Curling* matter, the County has made

glaring admissions which will impact the evidence in this case. For example, the County admits

that it has not preserved "the majority of ballot images from in-person voting for the November 3, 2020 election"; that it had not received from the Secretary, "instructions, guidelines, or recommended procedures for reconciling the discrepancies" in the recount; and, that it has "not been required by the Secretary to provide an explanation of audit tallies and machine tallies in the November 3, 2020 election." See Exhibit E, Defendant Fulton County Responses to Requests for Admissions, ¶1 at 1 and ¶¶23-24 at 8.

The Motions to Quash are, quite frankly, based on misstatements of law and fact. The requested documents and materials go to the heart of Mr. Floyd's defense—a defense necessitated by the indictment's claim that Mr. Floyd "willfully and knowingly" engaged in alleged crimes to overturn a valid and lawful election and engaged in false statements concerning the November 3, 2020 election. If Mr. Floyd's evidence, such as the County's inability to reconcile 41,079 suspicious votes, are true, then the State's indictment about many things including false statements evaporates—*instantly*. If Mr. Floyd's analysis of the produced evidence shows that the Fulton County election results are inconclusive, the State's indictment including false statements evaporates—*instantly*. If Mr. Floyd's evidence turns out to in fact be false, Mr. Floyd intends to assert an affirmative defense of  mistake of fact pursuant to O.C.G.A. § 16-3-5 (2022). In any case scenario, the information is highly relevant and completely necessary.

## MEMORANDUM OF LAW

### I.   *Overview of Criminal Discovery in Georgia*

A subpoena for documents or materials is allowed in criminal cases "insofar as consistent with the Constitution." *Coleman v. State*, 301 Ga. 720, 726 (2017); *see also,* O.C.G.A. § 24-13-20 (2022). Documents and materials requested must be relevant and "specific enough to the questions at issue" for which the items are procured. *Reese v. State*, 252 Ga. App. 650, 653

(2001) (emphasis added). Relevant evidence is defined as that "evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." O.C.G.A. § 24-4-401 (2022) (emphasis added). Mr. Floyd has the burden of showing relevance.

> When a motion to quash a subpoena is filed, the party serving the subpoena has the initial burden of showing the documents sought are relevant. Where the evidence sought in a subpoena duces tecum is demonstrably relevant and material to the defense, it is error for a trial court to quash the subpoena.

*Harris v. State*, 341 Ga. App 831 (2017). Additionally, the State, as the prosecuting agency, is required to "turn over evidence in its possession that is material to guilt or punishment and is favorable to the accused." *Bello v. State*, 300 Ga. 682, 683 n.3 (2017), citing *Brady v. Maryland*, 373 U.S. 83 (1963). Mr. Floyd asserts that the evidence in possession of the Non-Parties is material to issues related to his criminal culpability and to any punishment he might receive if convicted.

## II.    *The Amended Subpoena is not overly broad*

The Secretary claims that the subpoena is

> overly broad, generally lacking in a reasonable scope with respect to subject matter or time and seeks responses to multiple types of overbroad and unbounded requests that Georgia courts have repeatedly quashed, including requests for 'any and all documents' in varying mediums without any restriction of subject-matter, time, or any meaningful measure.

Sec'y of State Motion to Quash or Modify the Subpoena Served by Harrison Floyd ("Secretary's Motion"), at 3. Despite the fact that Mr. Floyd's amended subpoena limits the discovery to the November 3, 2020 election, the Secretary claims that this limitation is merely "a distinction without meaning, as explained below," yet fails to adequately explain why this oft-used phrase is somehow confusing or too broad in scope. *Id.* at 6.

The requested materials in the amended subpoena *track the same language* used by the prosecutor in the indictment. One has to wonder how this same language can be legally sufficient for the indictment, yet fail to be sufficient for a subpoena duces tecum used to defend against the indictment. The amended subpoena is also not general discovery, because the requests within the amended subpoena are specifically tailored to events related to the indictment. Neither is the amended subpoena a fishing expedition, for the requests are based on the Secretary's own response in that they state that they are in possession of a fair amount of material related to investigations of complaints of voter fraud (approximately 296 complaints) about the November 3, 2020, presidential election. Thus, the amended subpoena is neither overly broad nor does it lack in scope.

### III.  *The requested materials are relevant and material to Mr. Floyd's defense*

The indictment has swung the door wide open when it made whether former President Donald J. Trump won the state of Georgia in the 2020 presidential election a pivotal and material issue. If the material that Mr. Floyd seeks clearly supports Mr. Floyd's lack of criminal intent, then evidence of the election results are material and probative. As discussed above in the introduction, Mr. Floyd does not even have to prove that Trump won. It would be enough to show that the results are inconclusive *and should not have been certified.* If Mr. Floyd is denied the opportunity to review this evidence, then the State would likewise be barred from introducing any evidence concerning the election—including whether Trump lost. Yet, the State has made the election result a material issue throughout the indictment in the following allegations:

a)      acted "unlawfully" (Count 1 at 13);

b)      "knowingly and willfully joined a conspiracy to unlawfully change the outcome of the election in favor of Trump" (Count 1 at 14);

c)      "At these public hearings, members of the enterprise made false statements concerning fraud in the November, 3 2020, presidential election (Count 1, ¶1 at 16);

d)      that the purpose of these statements was to reject "lawful" electoral votes cast (Count 1, ¶1 at 16);

e)      "…to unlawfully appoint their own presidential electors…" (Count 1, ¶1 at 16);

f)      "by unlawfully changing the outcome of the November 3, 2020, presidential election in Georgia…" (Count 1, ¶2 at 16-17);

g)      "…to unlawfully change the outcome of the November 3, 2020, presidential election…" (Count 1, ¶3 at 17);

h)      "…to unlawfully change the outcome of the November 3, 2020, presidential election…" (Count 1, ¶4 at 17);

i)      Solicited the Vice President of the United States to violate the United States Constitution and federal law by unlawfully rejecting Electoral College votes cast in Fulton County, Georgia by the duly elected and qualified presidential electors from Georgia" (Count 1, ¶6 at 18);

j)      "falsely claimed voter fraud" (Count 1, Act 1 at 20);

k)      made "statements concerning fraud in the November 3, 2020, election in Fulton County, Georgia" (Count 1, Act 2 at 20);

l)      made "false statements concerning fraud in the November 3, 2020, presidential election in Georgia and elsewhere" (Count 1, Act 2 [sic] at 20);

m)      "knowingly, willfully, and unlawfully, making . . . false statements to the Georgia Senate" about mail-in ballots counted in the November 3, 2020, presidential election in Georgia (Count 1, Act 24 at 25);

n)      "knowingly, willfully, and unlawfully" making "false statements to the Georgia Senate" about felons illegally voting, underaged voters voting, unregistered voters voting, illegally registered voters voting, and dead voters voting, in the November 3, 2020, presidential election in Georgia (Count 1, Act 25 at 26);

o)      making "false statements concerning fraud in the November 3, 2020, presidential election in Georgia" (Count 1, Act 29 at 27);

p)      placing "a telephone call to Georgia Attorney General Chris Carr for the purpose of making false statements concerning fraud in the November 3, 2020, presidential election in Georgia and elsewhere" (Count I, Act 43 at 30);

8

q)      acting to appoint, instruct, or cast electoral votes of "Trump presidential elector nominees in Georgia . . . despite the fact that **DONALD JOHN TRUMP** lost the November 3, 2020, presidential election . . ." (Count I, Act 46 at 31 along with Acts 48 and 49 at 31);

r)      "knowingly, willfully, and unlawfully making . . . false statements to the Georgia House of Representatives about the November 3, 2020, presidential election in Georgia". (Count 1, Act 56 at 34);

s)      creating documents for presidential elector nominees in Georgia "despite the fact that **DONALD JOHN TRUMP** lost the November 3, 2020, presidential election in Georgia." (Count 1, Acts 61 at 35 and 71 at 38);

t)      The Indictment states specifically that an alleged co-conspirator stated that: "During the phone call **DONALD JOHN TRUMP** falsely stated that he won the November 3, 2020, presidential election in Georgia . . ." (Count 1, Act 93 at 44);

u)      "knowingly, willfully, and unlawfully" making false statements pertaining to the election results of the November 3, 2020, presidential election. (Count 1, Act 113 at 51);

v)      making "false statements concerning fraud in the November 3, 2020, presidential election . . ." (Count 1, Act 137 at 62);

w)      tweeting "States want to correct their votes, which they know were based on irregularities and fraud . . ." (Count 1, Act 139 at 63);

x)      knowingly, willfully, and unlawfully making the following false statement: "As stated to you previously, the number of false and/or irregular votes is far greater than needed to change the Georgia election result" (Count 1, Act 157 at 68) and;

y)      "knowingly and willfully making a false statement and representation concerning events at State Farm Arena in the November 3, 2020, presidential election in Georgia…" (Count 30 at 89).

Therefore, who actually won or lost in the 2020 election is material and relevant because it goes to the defendants' criminal intent. Mr. Floyd stands charged with Conspiracy to Solicit False Statements and Writings, among other offenses, in connection with the alleged election fraud surrounding the 2020 presidential election. What Mr. Floyd knew or believed regarding the alleged falsity of statements and/or writings is an element of the purported crime for which he

stands accused. The requested materials are exculpatory, because the materials will show that on January 4, 2021, Mr. Floyd's beliefs were not unreasonable based on the evidence in the Non-Parties' possession, custody, and control.

These materials will show that this Defendant did not knowingly make false statements or writings because the statements attributed to him in Count I were true. Alternatively, if the statements turn out to be in fact false, these materials can show that Mr. Floyd did not knowingly and willfully make false statements or writings—a mistake of fact defense. *See* O.C.G.A. § 16-3-5 (2022).

The amended subpoena clearly narrows the time frame concerning the requested materials to the relevant time period in which the Secretary of State received complaints regarding election fraud after the election, and it cannot be narrowed further. The time frame is relevant because it goes to reasonable belief, which negates criminal intent. The amended subpoena is certainly specific enough for the Non-Parties to discern what materials are being requested. The Secretary freely admits that his office opened investigations into approximately 296 complaints surrounding the 2020 primaries and elections, and *continues* to receive complaints regarding the November 3, 2020 election. *See* SOS Motion to Quash at 8-9. Mr. Floyd has narrowed this to include only the November 3, 2020 election and not primaries or other elections. For the Non-Parties to aver that the requested materials are not relevant, or that the requests were neither specific enough in their description (after identifying documents), or that the requested material would be too burdensome to produce, or any of the other myriad of excuses that the Non-Parties choose to use to justify their non-compliance are merely attempts to stonewall the defense.

***IV.***     ***Production of the Subpoenaed Materials is neither unreasonable nor oppressive***

Production of the requested materials should not be nearly as burdensome as claimed by the Secretary, and as such, the requests are neither unreasonable nor oppressive. If the provided materials of Requests 1 and 2 are any indication, the materials in Requests 3-7 of the amended subpoena are scanned and filed on a computer. Locating and copying such files to an external drive would not take the months of time or effort claimed by the Secretary by even the least tech-savvy employee of his office.

The Secretary attempts to inflate the time required to produce the requested materials by claiming that the files would need to be redacted prior to release. Such redaction is unnecessary. The Court can simply place a protective order on the documents and items produced and instruct Mr. Floyd not to divulge the contents of the documents to outside third parties. If Mr. Floyd wishes to introduce any of these documents in a hearing or at trial, the Parties can stipulate to an in-camera inspection of any materials prior to such a hearing or trial, to allow the Secretary to instruct what must redacted for said hearing. Further, the Court could order the information unsealed and provide it in accordance state law. The Georgia Bureau of Investigation, which has been unsurprisingly much more forthcoming in producing requested materials to a subpoena duces tecum, has agreed to such a stipulation. Therefore, it is a stretch of the imagination to think that the Secretary cannot do the same.

Instead of requesting a reasonable cost to produce the documents and materials, the Secretary attempts to outright deny this Defendant of the requested records. Georgia law allows for the Secretary to charge a reasonable cost to produce the requested materials. The Court may "[c]ondition denial of the motion upon the advancement by the person in whose behalf the subpoena is issued of the reasonable cost of producing the evidence." O.C.G.A. § 24-13-

23(b)(2). Although the Secretary has not proposed payment of a reasonable cost to produce the requested materials, this Defendant should be given the opportunity to pay a reasonable cost for the production of the requested documents before the Court rules on the Non-Parties' Motion to Quash.

## V.    *Conclusion*

This case is about the liberty interests of a Defendant charged with alleged activities surrounding an attempt to expose the fraud that he believed occurred in the election. The Non-Parties' contention that these subpoenas are not relevant is facially not true because the election result is relevant and probative to the material issues in the indictment.  Mr. Floyd has shown that the requested materials are relevant to his charges and he did not create the Non-Parties' concerns.

It is the State which put the outcome of the election front and center in the indictment, and what the Defendant knew or believed to be true concerning the outcome. This contention goes directly to Mr. Floyd's guilt or innocence. If the outcome was that Trump actually won the state of Georgia, then the Defendant did NOT knowingly make false statements and writings. If the outcome was that Trump did not win the state of Georgia, then that it supports a mistake of fact defense.

The requested documents and materials are not overly broad, unreasonable or oppressive. The requests are specifically tailored to events related to the indictment, and tracks the same language used in the indictment. If the language in the indictment is sufficient as written, then it stands to reason that the language used in the amended subpoena is also sufficient as written. The Defendant has shown that he is amenable to paying a reasonable cost to produce the materials and is willing to stipulate to a protective order of the Court. Therefore, there remains no valid

reason why the Non-Parties should not be ordered to produce the requested materials, much like

the Georgia Bureau of Investigation has already produced.

   Respectfully submitted this the <u>31st</u> day of October 2023.

         **HARDING LAW FIRM, LLC**

         Christopher I. Kachouroff, Esq.*
         **MCSWEENEY, CYNKAR & KACHOUROFF, PLLC**
         13649 Office Place, Suite 101
         Woodbridge, Virginia 22192
         (703) 365-9900

         Todd A. Harding, For the Firm
         Ga. Bar No.: 101562
         **HARDING LAW FIRM, LLC**
         Attorney at Law
         113 E. Solomon Street
         Griffin, Georgia 30223
         (770) 229-4578
         (770) 228-9111 facsimile


         * Admitted *Pro Hac Vice*
         Attorneys for Harrison Floyd

13

**IN THE SUPERIOR COURT OF FULTON COUNTY**
**STATE OF GEORGIA**

| | | |
|---|---|---|
| **STATE OF GEORGIA,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. <u>23SC188947</u>** |
| | ) | |
| **HARRISON FLOYD, et al** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this day I have served counsel of record with the foregoing **DEFENDANT HARRISON FLOYD'S CONSOLIDATED RESPONSE TO NON-PARTIES' MOTION TO QUASH SUBPOENA,** filed by electronic transmission addressed to the following:

> Fani T. Willis, DA
> 136 Pryor Street, SW
> 3rd Floor
> Atlanta, Georgia 30303

Respectfully submitted this the <u>31st</u> day of October 2023.

> **HARDING LAW FIRM, LLC**
>
> Christopher I. Kachouroff, Esq.*
> **MCSWEENEY, CYNKAR & KACHOUROFF, PLLC**
> 13649 Office Place, Suite 101
> Woodbridge, Virginia 22192
> (703) 365-9900
>
> Todd A. Harding, For the Firm
> Ga. Bar No.: 101562
> **HARDING LAW FIRM, LLC**
>
> * Admitted *Pro Hac Vice*
> Attorneys for Harrison Floyd

14

**EXHIBIT A**

**Summary of Vote Irregularity #11**

| | Biden Votes | Trump Votes | Source |
|---|---|---|---|
| Official 2020 Georgia Results | **2,473,633** | **2,461,854** | **Biden +11,779** |
| Missing Ballot Images | (13,390) | (4,319) | Note 1 below |
| Duplicate Ballots | (1,708) | (1,404) | Note 2 below |
| No Tabulators Tapes | (13,274) | (6,984) | Note 3 below |
| Total Irreconcilable Votes | <u>(28,372)</u> | <u>(12,707)</u> | **(41,079)** (See Notes 1, 2, and 3) |
| **Corrected Results** | <u>**2,445,261**</u> | <u>**2,449,147**</u> | |
| Corrected Margin of Victory | | **Trump +3,886** | |

Notes:

1.      Fulton County has confirmed **17,852** ballot images from the officially reported results (i.e., Machine Count 2) are "missing."  In the presidential race, **17,709** missing ballot images represent **13,390** Biden Votes and **4,319** Trump Votes.

2.      Through analysis of the Official Results (Machine Count 2), Cast Voter Records, and Ballot Images, there are an addition **3,125** ballots that have been scanned and counted multiple times). In the presidential race, **3,183** duplicate ballots represented **1,708** Biden Votes and **1,404** Trump Votes.

3.      Upon examining the Batches Loaded Report, Cast Vote Records, and in light of Fulton County's admission that ten Tabulator Tapes are non-existent, it is evident that **20,713** votes lack the necessary tabulator tapes detailing their counting process and timing. Within the presidential contest, of the **20,532** votes for which tapes are missing, **13,724** were cast for Biden and **6,984** for Trump. The required Tabulator Tapes, which should be dated and signed by the responsible tabulation personnel, are absent, calling into question the legitimacy of these votes, as evidenced by the Cast Vote Records.

        In light of the multiple tallying attempts, each marked by procedural discrepancies, validation issues, and inadequate documentation, it becomes apparent that the results may not endure scrutiny from an independent third-party auditor. While varied explanations were offered for these discrepancies, there were numerous instances where no justification was presented for the observed errors or lapses.

DEFENDANT'S
EXHIBIT

**A**

**Exhibit for Case No. 23SC188947**

**DEFENDANT HARRISON FLOYD'S CONSOLIDATED
<u>OPPOSITION TO MOTIONS TO QUASH SUBPOENAS</u>**

**EXHIBIT B**

**SUPPORT FOR SAMPLE 11**

**Summary:**

This document outlines sources of the included records and methods of the calculations described in the <u>Opposition to Motions to Quash Subpoenas</u>.

The data suggests that <u>41,079</u> votes from the Fulton County 2020 General Election (Presidential contest) weren't accurately verified or accounted for. Consequently, these votes should not have been counted in the official results.

These votes should have been omitted from the final count due to their unverified or unvalidated status.

**Fulton County 2020 Presidential Election Vote Totals**

|  | **Biden Votes** | **Trump Votes** | **Vote Totals** |
|---|---|---|---|
| A. Missing Ballot Images | (13,390) | (4,319) | (17,709) |
| B. Duplicate Ballots | (1,708) | (1,404) | (3,112) |
| C. No Tabulators Tapes | (13,274) | (6,984) | (20,258) |
| Not Properly Accounted For Votes | (28,372) | (12,707) | **(41,079)** |

The data represented in this analysis is from the Fulton County Original November 3rd, 2020 count ("Machine Count 1") - And from the Fulton County Official results for the Presidential Recount ("Machine Count 2").



DEFENDANT'S
EXHIBIT

**B**

## A. Missing Ballot Images

**17,852** ballot images are missing from the officially reported results (i.e., Machine Count 2)
In the presidential race, **17,709** missing ballot images represent **13,390** Biden Votes and
**4,319** Trump Votes.

- A total of 17,852 ballot images from the Official Results (Machine Count 2) are "missing."
- Fulton County has confirmed in recent filings in a pending Federal lawsuit that it does not have these **17,852** ballot images.
- These Votes were counted and included in the official recount results.

| Missing Ballot Images | Candidate |
|---|---|
| 13,390 | Biden |
| 4,319 | Trump |
| **17,709** | Total Duplicate Ballots |

**Analysis:**

The total number of votes as reported by Fulton County for Machine Count 2 exceeds the total number of ballot images by 17,852.

Upon examining the filenames of the ballot images supplied by Fulton County and cross-referencing them with the filenames mentioned in the Cast Voter Records (CVR) from the Machine Count 2 Audit, a list of absent filenames from the provided ballot images was compiled. Subsequently, the votes from the CVR for each candidate were tallied.

**Supporting Reference:**

In Prof. Stark's Declaration in the Curling vs. Raffensperger:

> *63. Fulton County did not produce the image file corresponding to every cast vote record. For the first machine count, production included images of ballots or BMD printout cards for only 168,726 of the 528,776 cast vote records: 376,863 image files are missing. For the second machine count, Fulton County's production included images of ballots or BMD printout cards for 510,073 of the 527,925 cast vote records: **17,852 image files are missing***

*64. Entire batches of images are missing from Fulton County's production, for example, images from Scanner 801 batch 117 and Scanner 801 batch 118 are referred to in the cast vote records for the second machine count but the images were not among the electronic records. Without additional discovery it is impossible to determine whether the missing images are missing because of human error, programming errors (bugs), or malware in Fulton County's election management system (EMS). Of course, those possibilities are not mutually exclusive.*

**Source:** Curling-Phllip-Stark-Declaration-2022-03-09.pdf
Curling v. Raffensperger
Civil Action File No: 1:17-cv-2989-AT

**Data Source:**
2020 Fulton County Machine Count 2 - Ballot Images
Curling v. Raffensperger
Civil Action File No: 1:17-cv-2989-AT

2020 Fulton County Machine Count 2 - Cast Vote Records (CVRs)

## B. Duplicate Ballots

Through analysis of the Official Results (Machine Count 2), Cast Voter Records, and Ballot Images, there are 3,125 ballots that have been scanned and counted multiple times). In the presidential race, **3,112** duplicate ballots represented 1,708 Biden Votes and 1,404 Trump Votes.

| Duplicates Votes | Candidate |
|---|---|
| 1,708 | Biden |
| 1,404 | Trump |
| **3,112** | Total Duplicate Ballots |

**Analysis:**
The analysis involved detecting duplicate ballot IDs in the same sequential order for corresponding batches of ballots using the Cast Vote Record. Upon identifying anomalies, both machine-based and visual examinations of the ballot images were conducted to ascertain if the ballots displayed characteristics indicating they were identical.

**Supporting Reference:**

In Prof. Stark's Declaration in the Curling vs. Raffensperger:

> *75. For Fulton County as a whole, Coalition plaintiffs gave me a list that identified images of 2,871 ballots and BMD printout cards that they believe were counted two or three times in the second machine count. Some were identified by visual inspection of the images; others were inferred to be duplicates because a sequence of cast vote records was identical (or reversed) for long portions of two scan batches. As mentioned in paragraph 72, supra, I confirmed that 214 of the purported duplicate scans of BMD cards were indeed duplicates. I understand that this list of 2,871 are a sample from a larger list of images of ballots and BMD printout cards that Coalition Plaintiffs assert were included in the tabulation twice or more. I confirmed that all 6,118 images in question were referenced in cast vote records in the second machine count, so all presumably contributed to the tabulation.*

**Source:** Curling-Phllip-Stark-Declaration-2022-03-09.pdf
Curling v. Raffensperger
Civil Action File No: 1:17-cv-2989-AT

*While Prof. Stark's analysis was limited by the time constraints of the trial, further examination revealed more duplicated ballot images. In Fulton County alone, at least 3,183 duplicate ballots were identified.[1] Subsequent reviews of other counties in Georgia also uncovered similar discrepancies.

In Duncan Buell's Declaration in the Curling vs. Raffensperger:

> *24. The JSON filename, tabulator, batch, and sequence numbers will (unless there is an extraordinary coincidence) be different for a ballot recorded in the original CVR when compared to a ballot in the recount CVR. However, one can view the rest of each line for a ballot as a "signature": in that precinct portion, with that ballot style, cast in that fashion, what the actual choices are recorded on the ballot image.*

> *I use the term "signature" of the ballot image to mean a index created in our analysis of the ballot images where we combine key attributes of the ballot (like precinct and style) with letter codes indicating the ballot choice in each contest. The combined codes create a pattern that gives us considerable information in one alpha-numeric string about each ballot. If there were say 35 ballots in a given precinct with exactly the same candidate*

---

[1] Analysis of the election records and identification of duplicate ballots continues. At the time of this writing 3,921 duplicate ballots have been identified.

*choices made we can verify that there should be 35 votes for each of the candidates chosen, coming from that particular pattern of choices made, and for the purpose of counting votes for candidates, and of matching ballots in the original with ballots in the recount.*

*This would be 35 instances of the "signature" for each such ballot. It is only necessary to match the count for each pattern (signature); if there are 35 instances of that pattern in that precinct, style, and counting group, in the original, but only 34 in the recount, then one of those ballot records is missing from the JSON files I am analyzing, and each candidate chosen in the original ballots has had their vote total diminished by one. The individual ballot content indices, the "signatures," are a fundamental analytical tool in detecting duplicate and ballots that cannot be matched from the original to the recount data.*

*28. By creating "signatures" for each ballot image available, Coalition Plaintiffs' analysts identified examples of ballot images that appeared to be duplicate and triplicate images of exactly the same ballot and presented them to me for review. While it is infeasible to visually review all ballot images, I reviewed a significant number of images which appear to me to be of duplicates or triplicates of the same ballot. I can confirm from the cast vote records that these identical ballot images were actually counted in the tabulation multiple times.*

*29. This is not a normal expected typical election administration error. It is completely unacceptable for a system to operate in a manner where widespread double- and triple-counting of ballots can occur undetected. Certainly this represents a failure of both the post election audit and the certification and canvassing process, although we do not know the root cause of the multiple counts of the same ballots.*

*33. The possibility of such malware or programming or configuration errors cannot be ruled out until the paper ballots and related electronic records are reviewed. In my opinion, it is imperative for Plaintiffs and State officials promptly to determine factual reasons for these mismatches and mitigate the unacceptable flaw in the voting system and processes. Whether the cause of the mismatches is physically different ballots being scanned in the two counts or conflicting electronic interpretation of voters, neither is an acceptable condition for a public election.*

**Source:** Curling-Duncan-Buell-Declaration-2022-01-22.pdf
Curling v. Raffensperger
Civil Action File No: 1:17-cv-2989-AT

**Data Source:**
2020 Fulton County Machine Count 2 - Ballot Images
     Curling v. Raffensperger
     Civil Action File No: 1:17-cv-2989-AT

2020 Fulton County Machine Count 2 - Cast Vote Records (CVRs)

## C. No Tabulators Tapes

Upon examining the Batches Loaded Report, Cast Vote Records, and in light of Fulton County's admission that ten Tabulator Tapes are non-existent, it is evident that **20,713** votes lack the necessary tabulator tapes detailing their counting process and timing. Within the presidential contest, of the **20,258** votes for which tapes are missing, **13,274** were cast for Biden and **6,984** for Trump. The required Tabulator Tapes, which should be dated and signed by the responsible tabulation personnel, are absent, calling into question the legitimacy of these votes, as evidenced by the Cast Vote Records as required by Georgia State Law.

### Batches Loaded Report From Machine Count 1
### of Tabulators that Do Not Have Poll Tapes

| Ballots | Tabulator Name | Tabulator ID | Loaded Date Time |
|---|---|---|---|
| 133 | AV-State Farm Arena ICP 3 | 303 | 11/9/2020 9:11:20 AM |
| 198 | AV-State Farm Arena ICP 10 | 311 | 11/9/2020 9:11:51 AM |
| 558 | AV-State Farm Arena ICP 11 | 312 | 11/9/2020 9:11:51 AM |
| 3,377 | AV-So Fulton Srvc Center ICP3 | 712 | 11/3/2020 10:11:22 PM |
| 2,252 | AV-Wolf Creek Library ICP4 | 714 | 11/4/2020 1:56:39 AM |
| 4,216 | AV-Park Place at Newtown ICP3 | 724 | 11/3/2020 7:59:33 PM |
| 2,511 | AV-Northeast Library ICP3 | 727 | 11/4/2020 1:57:07 AM |
| 1,830 | AV-Ponce De Leon Library ICP3 | 754 | 11/3/2020 8:31:23 PM |
| 1,396 | East Point Library ICP3 | 763 | 11/3/2020 8:39:58 PM |
| 4,242 | AV-Johns Creek ENV Campus ICP 2 | 2535 | 11/4/2020 1:53:39 AM |
| **= 20,713** | **No Tabulator Tapes (C)** | | |

**Analysis:**

Fulton County Open Records Request for Machine Count 1 provided 138 Tabulator Poll tapes, yet 148 Tabulators were reflected in the official results via the Batches Loaded Report and Cast Vote Records. The results from 10 unaccounted tabulators were discerned through an analysis of the Cast Vote Records.

**Machine Count 1 - Candidate Totals for President**
**From Tabulators without Poll Tapes from Cast Vote Records.**

| Tabulator ID | Biden | Trump |
|---|---|---|
| 303 | 125 | 8 |
| 311 | 183 | 15 |
| 312 | 496 | 51 |
| 712 | 3,109 | 216 |
| 714 | 2,099 | 109 |
| 724 | 1,676 | 2,427 |
| 727 | 1,072 | 1,373 |
| 754 | 1,407 | 369 |
| 763 | 1,234 | 122 |
| 2535 | 1,873 | 2,294 |
| **Total** | **13,274** | **6,984** |
| **Grand Total** | **20,258** | |

**Supporting Reference:**

In Moncla Rossi SEB Complaint; Case No. SEB-2023-025:

> *In addition to the problems detailed above, the original Election Night vote count includes results for ten (10) Advance Voting tabulators for which Fulton County has no records. That is, the tabulators do not exist – there are no poll open tapes, no daily status tapes and no poll closing tapes.. We submitted Open Records Requests to Fulton County*

*specifically seeking the 10 tabulator tapes, but Fulton County responded by saying that they had "No such records".*

*To follow up, we sent two emails to the Fulton County Records Department and the Fulton County Custodian of Records, Steve Rosenberg, seeking clarification to determine if the records were missing or if they exist; the Records Department replied, "The records do not exist." See attached emails and official certification of records.*

*These ten (10) tabulator tapes total 20,713 votes, all of which were included in Election Night results:*

**Source:** Moncla Rossi SEB Complaint; Case No. SEB-2023-025 - Page 10

*Two emails to the Fulton County Records Department and the Fulton County Custodian of Records, Steve Rosenberg, seeking clarification to determine if the records were missing or if they exist; the Records Department replied, "The records do not exist." See attached emails and official certification of records from Feb 4, 2022.*

**Source:**  Moncla Rossi SEB Complaint; Case No. SEB-2023-025 - Page 19

**Data Source:**

2020 Fulton County Machine Count 1 - Batches Loaded Report

2020 Fulton County Machine Count 1 - Cast Vote Records

List of Poll Tapes that were provided to determine which Poll Tapes were missing.
    ORR #: R008635-1201121 - Received 01/02/2022
    Request: All Tabulator Poll Tapes for the 11/3/2020 General Election, Advanced Voting
    File: 671461587-Fulton-2020-Av-Poll-Tapes-Certified.pdf

**D. Compromised Ballot Authentication: Missing and Deleted SHA Files**

Approximately **132,842** ".sha" files from Fulton County's 2020 Machine Count 1 were deleted. These files are automatically generated, producing a unique identifier for each ballot image to authenticate the ballots. A SHA file, a variation of MD5, is used for data hashing to ensure the ballot image remains unaltered.

**2020 Fulton County Machine Count 1 - Fulton Absentee by Mail Ballot Files Analysis**

| File Type | Count |
|---|---|
| Ballot Images (.tif) | 148,876 |
| Secure Hashing Algorithm (.sha) | 16,034 |
| **Ballot Images with missing SHA Files** | **132,842** |

In the 2020 Fulton County Machine Count 2, Ducan Buell highlighted that approximately **17,800** ballot images were missing their corresponding ".sha" files.

**Supporting Reference:**

In Duncan Buell's Declaration in the Curling vs. Raffensperger:

> 16. Coalition Plaintiff's attorneys' correspondence indicates the estimated number of electronic records missing. In Fulton County ballot images and their attached "AuditMark" tabulation interpretations are missing for approximately 360,000 BMD ballots and 6.4 million BMD votes they contain for in-person voting for the official certified count of all down ballot races. Approximately 17,800 images and the same number of .sha files are missing from the presidential recount. Approximately 11,000 .dvd files are missing from the presidential recount for Fulton's November 2020 election. Such electronic files are essential when testing the election records for consistency and accuracy. Significant numbers of missing files inhibits a complete authoritative analysis of causes or effects of potential impacts of malware, software bugs, equipment malfunction, human error or malfeasance by insiders.

> 20. The significance of the missing and unverified files cannot be overstated in the limitations they place on expert analysis. For example, while I worked extensively with Fulton's cast vote records, roughly 34% of the ballot images and often the .dvd and .sha related files were simply missing, preventing me from consulting those files for confirmation of the fidelity of the data with the image and its related files. It is my understanding that while Coalition Plaintiffs desire that I analyze Cobb County's cast vote records and other electronic records, a full 50% of the required records have not been preserved by Cobb County.

**Source:** Curling-Duncan-Buell-Declaration-2022-01-22.pdf
        Curling v. Raffensperger
        Civil Action File No: 1:17-cv-2989-AT

**Data Source:**

2020 Fulton County Machine Count 1 - Fulton Absentee by Mail Ballot Files
        File: Fulton-absentee-by-mail.7z
        Curling v. Raffensperger
        Civil Action File No: 1:17-cv-2989-AT



**STATE OF GEORGIA**

OFFICE OF THE GOVERNOR

ATLANTA 30334-0090

Brian P. Kemp
GOVERNOR

November 17, 2021

***VIA ELECTRONIC MAIL***

Ms. Rebecca N. Sullivan, Acting Chair          Ms. Sara Tindall Ghazal
200 Piedmont Avenue SE                         4880 Lower Roswell Rd
Suite 1804, West Tower                         Suite 165-328
Atlanta, Georgia 30334                         Marietta, Georgia 30068

Mr. Matthew Mashburn                           Ms. Anh Le
P.O. Box 451                                   P.O. Box 4008
Cartersville, Georgia 30120                    Decatur, Georgia 3003

Dear Members of the State Election Board,

I write to refer the following matter to the Board for its review and consideration. As you know, I called on Georgians with information about inconsistencies or complaints regarding the 2020 election to notify the proper state authorities. To date, the complaint outlined below is the only instance where a complainant has referred an issue to my office *and* provided all requested information for me and my staff to fully evaluate its veracity.

On September 3, 2021, Mr. Joseph Rossi, a retired executive from Houston County, Georgia, contacted my office. Mr. Rossi presented an analysis of the 2020 Risk-Limiting Audit Report ("RLA Report") data, noting 36 inconsistencies reported by Fulton County.[1] The analysis was created by him and attorney Jack James who volunteered their own time, without compensation, to review thousands of ballot images, audit tally sheets, and other data to double-check the work of the county. Their dedication to this immense task is commendable.

The 36 inconsistencies noted by Mr. Rossi are factual in nature, pose no underlying theories outside of the reported data, and could not be explained by my office after a thorough review detailed below. The purpose of this letter is to convey these inconsistencies to the Board and request them to be explained or corrected.

To be clear, this letter does not purport to dispute or contest the outcome of the 2020 election, but rather to highlight apparent inconsistencies discovered in the RLA Report data.

---

[1] Specifically, Mr. Rossi analyzed the document titled "Detailed Audit Report with Results from all Batch Sheets (Excel)" which is published on the Secretary of State website.

State Election Board
November 17, 2021
Page **2** of **2**

   Mr. Rossi requested my office review his findings and take whatever action may be appropriate to address his concerns. Mr. Rossi never alleged the outcome of the election was in question or asked me to act beyond my constitutional or statutory powers as Governor – the authority to oversee elections in Georgia lies with the State Election Board and the Secretary of State.

   To determine whether it was appropriate to refer Mr. Rossi's claims to you, my office tested the veracity of his work by independently repeating the research Mr. Rossi conducted on each of his 36 claims. My office analyzed each of Mr. Rossi's 36 claims against the RLA Report data. This process was extensive, required a manual review of thousands of ballot images and audit data, and took weeks to complete.

   Based on that analysis, as evidenced in the attached report, I believe a referral to the Board is warranted.

   The data that exists in public view on the Secretary of State's website of the RLA Report does not inspire confidence. It is sloppy, inconsistent, and presents questions about what processes were used by Fulton County to arrive at the result. Though reasons for, or explanations of, Mr. Rossi's concerns may exist, they are not apparent in the RLA Report data. In reviewing this matter, I believe the Board should consider the following actions:

1. Direct investigators to review Mr. Rossi's findings, just as my office has, and order corrective action as needed to address any verified errors.
2. Determine whether any changes should be made to the RLA Report. If so, the Board should determine whether such changes adversely impact the integrity of the RLA Report as originally reported.
3. Review the audit methodology used in counties across Georgia and create a prescriptive and uniform set of rules that ensure one process is followed by all counties that result in a clear presentation of data.

   As you know, I chaired this Board for nine years. During that time, we tackled many tough issues to ensure the integrity of Georgia's elections and make it easy to vote and hard to cheat. It is the responsibility of this Board to safeguard the confidence I and all my fellow Georgians must have in our elections. This is one issue where I believe this Board must act swiftly, and I urge you to do so in this case.

Sincerely,

Brian P. Kemp

CC:
Brad Raffensperger,
*Georgia Secretary of State*

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, et al.          )
                               )
Plaintiff,                     )
                               )
vs.                            )     CIVIL ACTION FILE NO.:
                               )     1:17-cv-2989-AT
BRAD RAFFENSPERGER, et al.     )
                               )
Defendant.                     )
                               )

## DECLARATION OF PHILIP B. STARK

**PHILIP B. STARK**  hereby declares as follows:

1.  This statement supplements my declarations of September 9, 2018; September 30, 2018; October 22, 2019; December 16, 2019; August 23, 2020; August 31, 2020; September 13, 2020; and August 2, 2021. I stand by everything in the previous declarations and incorporate them by reference. *This declaration includes and augments a declaration submitted on 11 January 2022. Aside from adding the italicized material in this paragraph and correcting minor typographical errors, the differences between the previous version and this version are confined to (new) paragraphs 58 through 84. Paragraphs  85 through 89 were in the earlier version but have been renumbered. Appendix 1 has been updated to the current version of my CV. Appendices 2, 3, and 4 are unchanged. Appendices 5 through 9 are new.*



DEFENDANT'S
EXHIBIT

**D**

## Qualifications and Background

2.  I am Professor of Statistics at the University of California, Berkeley, where I am also a faculty member in the Graduate Program in Computational Data Science and Engineering; a co-investigator at the Berkeley Institute for Data Science; principal investigator of the Consortium for Data Analytics in Risk; director of Berkeley Open Source Food; and affiliated faculty of the Simons Institute for the Theory of Computing, the Theoretical Astrophysics Center, and the Berkeley Food Institute. Previously, I was Associate Dean of Mathematical and Physical Sciences, Interim Regional Associate for the College of Chemistry and the Division of Mathematical and Physical Sciences, Chair of the Department of Statistics, and Director of the Statistical Computing Facility.

3.  I have published more than two hundred articles and books. I have served on the editorial boards of archival journals in physical science, Applied Mathematics, Computer Science, and Statistics. I currently serve on three editorial boards. I have lectured at universities, professional societies, and government agencies in thirty countries. I was a Presidential Young Investigator and a Miller Research Professor. I received the U.C. Berkeley Chancellor's Award for Research in the Public Interest, the Leamer-Rosenthal Prize for Open Social Science, and a Velux/Villum Foundation Professorship. I am a member of the Institute for Mathematical Statistics and the Bernoulli Society. I am a Fellow of the American Statistical Association, the Institute of Physics, and the Royal Astronomical Society.  I am professionally accredited as a statistician by the American Statistical Association and as a physicist by the Institute of Physics.

2

4.  I have consulted for many government agencies, including the U.S. Department of Justice, the U.S. Department of Agriculture, the U.S. Department of Commerce, the U.S. Department of Housing and Urban Development, the U.S. Department of Veterans Affairs, the Federal Trade Commission, the California Secretary of State, the California Attorney General, the California Highway Patrol, the Colorado Secretary of State, the Georgia Department of Law, the Illinois State Attorney, the New Hampshire Attorney General, and the New Hampshire Secretary of State. I currently serve on the Board of Advisors of the U.S. Election Assistance Commission and its Cybersecurity Subcommittee. (The opinions expressed herein are, however, my own: I am not writing as a representative of any entity.)

5.  I have testified before the U.S. House of Representatives Subcommittee on the Census; the State of California Senate Committee on Elections, Reapportionment and Constitutional Amendments; the State of California Assembly Committee on Elections and Redistricting; the State of California Senate Committee on Natural Resources; and the State of California Little Hoover Commission.

6.  I have been an expert witness or non-testifying expert in a variety of state and federal cases, for plaintiffs and for defendants, in criminal matters and a range of civil matters, including, *inter alia*: truth in advertising, antitrust, construction defects, consumer class actions, credit risk, disaster relief, elections, employment discrimination, environmental protection, equal protection, fairness in lending, federal legislation, First Amendment, import restrictions, insurance, intellectual property, jury selection, mortgage-backed securities, natural resources, product liability class actions, *qui tam*,

3

risk assessment, toxic tort class actions, trade secrets, utilities, and wage and hour class actions.

7. I have been qualified as an expert on statistics in federal courts, including the Central District of California, the Northern District of Georgia, the District of Maryland, the Southern District of New York, and the Eastern District of Pennsylvania.

8. I have also been qualified as an expert on statistics in state courts.

9. I have used statistics to address a wide range of questions in many fields.[1]

10. I served on former California Secretary of State Debra Bowen's Post-Election Audit Standards Working Group in 2007.

11. In 2007, I invented a statistical approach to auditing elections ("risk-limiting audits," referred to below as "RLAs") that has been incorporated into statutes in California (AB 2023, SB 360, AB 44), Colorado (C.R.S. 1-7-515), Rhode Island (RI Gen L §17-19-37.4 (2017)), Virginia (Code of Virginia 24.2-671.1), and Washington (RCW 29A.60.185), and which are in pending federal legislation (the PAVE Act of 2018 and S.1 of 2021). My election auditing methods have been used in roughly 20 U.S. States and in Denmark. (The State of Georgia has piloted some RLA procedures, but has not conducted an actual RLA, as I explain below.)

12. RLAs are widely viewed as the best way to check whether the reported winner(s) of an election really won. They have been endorsed by the Presidential Commission on

---

[1] For example, I have used statistics to analyze the Big Bang, the interior structure of the Earth and Sun, earthquake risk, the reliability of clinical trials, the accuracy of election results, the accuracy of the U.S. Census, the risk of consumer credit default, food safety, the causes of geriatric hearing loss, the effectiveness of water treatment, sequestration of carbon in agricultural soils, the fragility of ecological food webs, risks to protected species, the effectiveness of Internet content filters, high-energy particle physics data, and the reliability of models of climate, among other things.

Election Administration; the U.S. National Academies of Sciences, Engineering, and Medicine; the American Statistical Association; the League of Women Voters; Verified Voting Foundation; Citizens for Election Integrity Minnesota; and other groups concerned with election integrity.

13. I have worked closely with state and local election officials in California and Colorado to pilot and deploy RLAs. The software Colorado uses to conduct RLAs is based on software I wrote. All of the genuinely risk-limiting methods in VotingWorks "Arlo" software used by the State of Georgia were invented by me.[2]

14. I worked with Travis County, Texas, on the design of STAR-Vote, an end-to-end cryptographically verifiable voting system.

15. I testified as an expert witness in the general area of election integrity, including the reliability of voting equipment, in 2016 presidential candidate Jill Stein's recount suit in Wisconsin, and filed a report in her suit in Michigan.

16. I have testified as an expert in election auditing and the accuracy of election results in two election-related lawsuits in California.

17. I have testified to both houses of the California legislature regarding election integrity and election audits. I have testified to the California Little Hoover Commission about election integrity, voting equipment, and election audits.

18. I have advised the election commissions of Denmark, Mongolia, and Nigeria on issues related to election integrity, security, and audits.

---

[2] Arlo also implements a method that is not risk-limiting in practice.

19. I was a member of the three-person team that conducted a statutory forensic audit of the State Representative contest in Windham, NH, in 2021.[3]

20. Since 1988, I have taught statistics at the University of California, Berkeley, one of the top two statistics departments in the world (see, e.g., QS World University Rankings, 2014) and the nation (US News and World Reports, 2018). I teach statistics regularly at the undergraduate and graduate levels. I have created five new statistics courses at Berkeley. I developed and taught U.C. Berkeley's first for-credit online course in any subject, and among the first approved for credit throughout the ten campuses of the University of California system. I also developed and co-taught online statistics courses to over 52,000 students, using an online textbook and other pedagogical materials I wrote and programmed.

21. Appendix 1 is my current *curriculum vitae*, which includes my publications for the last ten years and all cases in the last four years in which I gave deposition or trial testimony.

## Opinions

22. I have been asked to assess whether the State of Georgia's current Dominion Ballot Marking Device ("BMD") voting system and the protocols for its use—including audits—provides reasonable assurance that voters' selections will be counted, and counted as cast. The answer is a clear "no."

**The 2020 "Audit"**

23. Georgia Secretary of State Brad Raffensperger has claimed, referring to the post-election audit of the November 3, 2020 presidential contest, "Georgia's historic first

---

[3] See https://www.doj.nh.gov/sb43/index.htm, last accessed 8 January 2022.

statewide audit reaffirmed that the state's new secure paper ballot voting system accurately counted and reported results."[4] And "[] we did a 100 percent risk-limiting audit with a hand recount which proved the accuracy of the count and also proved that the machines were accurately counting it, and that no votes were flipped."[5] VotingWorks Executive Director Ben Adida claimed "Georgia's first statewide audit successfully confirmed the winner of the chosen contest and should give voters increased confidence in the results."[6] Per the official report of the audit, "The audit confirmed the original result of the election, namely that Joe Biden won the Presidential Contest in the State of Georgia. The audit [] provides sufficient evidence that the correct winner was reported."[7] I shall explain why these claims about the audit are false.

24. There are many things the audit did not check (including the outcome), and the thing it was positioned to check—the tabulation of validly cast ballots—was not checked properly, as data from the audit itself show.

25. I shall start by listing some things the audit did not check. My statements are true and correct to the best of my knowledge, and they are consistent with the audit documentation available at the Secretary of State's website at the URL

https://sos.ga.gov/index.php/elections/2020_general_election_risk-limiting_audit (last accessed 9 January 2022).

---

[4] https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_result_of_presidential_race, last accessed 9 January 2022

[5] https://www.effinghamherald.net/local/raffensperger-spread-election-misinformation-bipartisan-endeavor/ last accessed 9 January 2022.

[6] Ibid.

[7] https://sos.ga.gov/admin/uploads/11.19_.20_Risk_Limiting_Audit_Report_Memo_1.pdf. last accessed 9 January 2022

7

26. The audit did not check whether BMDs correctly printed voters' selections. No audit can check that, as I have previously declared. (As a consequence, Secretary Raffensperger has no basis to assert that no votes were flipped.) The declarations and testimony of Prof. J. Alex Halderman establish that BMDs can be hacked, misprogrammed, or misconfigured to print votes that differ from voters' selections as confirmed onscreen or through audio. As Prof. Andrew Appel has testified and as elaborated in my declarations, only voters are in a position to check—but few do, and those who do check generally check poorly. To the best of my knowledge, the State of Georgia has no procedures in place to log, investigate, or report complaints from voters that BMDs altered votes, so it is not clear whether any voters did notice problems. My previous declarations also explain why logic and accuracy testing can never be adequate to establish that BMDs behave correctly in practice.[8]

27. The audit did not check whether every validly cast ballot was scanned exactly once. The audit could not check whether every validly cast ballot was scanned, because Georgia's rules for ballot accounting, pollbook and voter participation reconciliation, physical chain of custody, etc., are not adequate to ensure that every cast ballot is accounted for.

28. The audit did not check whether every memory card used in the election was accounted for, nor whether every memory card containing votes was uploaded to a

---

[8] See, e.g., Stark, P.B. and R. Xie, 2019. Testing Cannot Tell Whether Ballot-Marking Devices Alter Election Outcomes, ArXiV, https://arxiv.org/abs/1908.08144, last accessed 9 January 2022.

8

tabulator. The audit found that some had not been,[9] but to my knowledge, there has

been no check to confirm there are no other cards with votes outstanding.

29. The audit did not check whether any scans were duplicated, deleted, replaced or

altered.

30. The audit did not check whether QR code encoding the votes on BMD printout

matches the human-readable selections on any ballot.

31. The audit did not check whether the voting system correctly interpreted any ballot or

BMD printout. (Again, as a consequence, Secretary Raffensperger has no basis to

assert that no votes were flipped.)

32. The audit did not do a very good job of checking the tabulation, as I shall demonstrate.

I focus on Fulton County. I have not investigated other counties, but I have no reason

to believe the problems and errors are confined to Fulton County. I have been told by

Coalition Plaintiffs that similar problems occurred in other counties, but I have not

independently verified their findings.

33. I downloaded the detailed "audit spreadsheet" from the URL

https://sos.ga.gov/admin/uploads/audit-report-November-3-2020-General-Election-
2020-11-19.csv on 9 January 2022.

34. I downloaded images of the Fulton County RLA manual tabulation batch sheets

("Audit Board Batch Sheets", ABBSs henceforth) from

https://sos.ga.gov/admin/uploads/Fulton%20RLA%20Batches.zip on 9 January 2022.

That file contains five .pdf files, "Fulton Audit Documents 1_redacted.pdf," through

"Fulton Audit Documents 4_redacted.pdf," which contain images of ABBSs, and

---

[9] See notes 13 and 14, *infra.*

"Fulton Audit Documents 5.pdf" which contains images of "Vote Review Panel Tally Sheets."

35. My understanding is that ABBSs are filled in by hand by the counting teams who counted the votes from the paper ballots (including BMD printout). Each ABBS reflects the manual tally of votes from one physically identifiable batch of ballots. I understand that after the ABBSs were filled out, other workers transcribed data from the ABBSs into VotingWorks audit software "Arlo." My understanding is that every ballot validly cast in Fulton County in the 2020 Presidential Election should be reflected in exactly one ABBS, and data from every ABBS should have been entered exactly once into the database from which the audit spreadsheet was exported.

36. The four ABBS image files contain 349 pages, 636 pages, 578 pages, and 364 pages, respectively, a total of 1,927 ABBSs. But the audit spreadsheet contains only 1,916 rows of data for Fulton County. It appears that at least eleven ABBSs are entirely missing, not counting possible duplicate entries in the spreadsheet.[10] This sort of "sanity check" is simple to perform, but apparently was not performed by the auditors, the County, or the Secretary of State.

37. Many ABBSs were not completely filled in. The "Batch Type," signifying the mode of voting (absentee, election day, advance) was often blank, and many numbers were blank, presumably intended to denote zeros.

---

[10] However, I did see at least one ABBS marked "Dup" (presumably meaning "duplicate") for instance, page 11 of "Fulton Audit Documents 2_redacted.pdf." However, as the table after paragraph 38, *supra*, shows, there are at least 11 ABBSs that are not accounted for in the audit spreadsheet. Thus, there are presumably duplicated entries in the audit spreadsheet.

38. Coalition Plaintiffs have identified a sample of at least eleven ABBSs for Fulton

County that do not appear in the audit spreadsheet, and I have verified their work. The

software I wrote for that purpose is in Appendix 2.

39. The following table lists these examples; the final column indicates which page of

which ABBS image file contains the image (for instance, "4 at 162" means page 162

of "Fulton Audit Documents 4_redacted"). The fact that the vote data in the last two

rows are identical is suspicious, but the corresponding ABBS images are clearly

different; see Appendix 3. Regardless, neither appears in the audit spreadsheet.

| | Scanner | Batch | Mode of voting | Trump | Biden | Jorgensen | Write-In | Undervote or blank | Overvote | Image source |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 3 | 48 | absentee | 4 | 93 | 2 | 0 | 0 | 0 | 4 at 162 |
| 2 | 2 | 52 | absentee | 6 | 92 | 0 | 0 | 0 | 0 | 1 at 1 |
| 3 | 3 | 12–14 | ? | 12 | 83 | 1 | 0 | 0 | 0 | 4 at 128 |
| 4 | 3 | 239 | ? | 13 | 87 | 0 | 0 | 0 | 0 | 3 at 177 |
| 5 | 1 | 80–84 | ? | 118 | 329 | 3 | 2 | 2 | 1 | 3 at 519 |
| 6 | 3 | 260 | absentee | 30 | 66 | 0 | 0 | 0 | 0 | 4 at 355 |
| 7 | | AP01A-1 | election day | 84 | 62 | 6 | 2 | 1 | 0 | 1 at 170 |
| 8 | 3 | 179–181 | absentee | 85 | 224 | 5 | 1 | 2 | 0 | 4 at 293 |
| 9 | 2 | 239 | absentee | 4 | 42 | 0 | 0 | 0 | 0 | 2 at 153 |
| 10 | Chastain | 12 | advance | 613 | 605 | 24 | 7 | 4 | 0 | 3 at 351 |
| 11 | Chastain | 114 | advance | 613 | 605 | 24 | ? | 4 | 0 | 3 at 270 |

40. I searched the audit spreadsheet for tallies that matched the numbers in these missing

ABBSs. There are no data in the audit spreadsheet matching rows 4–11 of the table.

There are data that match rows 1, 2, and 3, but with distinctively different batch

identifiers.[11] It is plausible that these are genuinely different batches, and I have no

reason to believe otherwise: some identical counts in different batches are to be

---

[11] The data that match row 1 are identified as "Scanner 3 Ballot [sic] 162" rather than batch 48.
The data that match row 2 are identified as "Absentee Scanner 2 Batch 400" rather than batch 52.
The data that match row 3 are identified as Absentee Scanner 3 Batch 253 rather than batches
12–14.

expected. Indeed, in the entire audit spreadsheet, there are 16,807 rows that duplicate other ABBS vote counts within the same county, out of a total of 41,881 rows.

41. I checked vote totals for Donald J. Trump, Joseph R. Biden, and Jo Jorgensen derived by summing ABBS entries in the audit spreadsheet against the vote totals in the summary audit result spreadsheet posted by the Secretary of State at the URL https://sos.ga.gov/admin/uploads/Georgia%202020%20RLA%20Report.xlsx, which I downloaded on 9 January 2022. (The spreadsheet does not list write-ins, undervotes, or overvotes.) Both show Trump receiving 137,620 votes, Biden receiving 381,179, and Jorgensen receiving 6,494. Thus, the ABBSs that are missing from the audit spreadsheet are also missing from the audit's reported vote totals.

42. On the assumption that the ABBSs—the original source of the manual tally data entered into the audit spreadsheet—are correct, the omission of that sample of 11 ABBSs deprived Trump of 1,582 votes, Biden of 2,288, and Jorgensen of 65, not to mention write-ins. This sample alone has a total of over 3,900 votes that the audit tabulated but were not included in the audit's reported vote totals.

43. The original tabulation in Fulton County showed 524,659 votes; the reported audit results showed 525,293, a difference of 634 votes, about 0.12 percent.[12] Accounting for those 11 omitted ABBSs increases the apparent error of the first count from 634 votes to over 4,569 votes or 0.87 percent, far larger than the statewide margin of

---

[12] Data from https://sos.ga.gov/admin/uploads/Georgia%202020%20RLA%20Report.xlsx, last accessed 9 January 2022.

victory. It is also larger than 0.73 percent, which Secretary of State Raffensperger claimed was the maximum miscount in any Georgia county.[13]

44. However, there is no way to know whether including that sample of 11 ABBSs would make the audit tabulation a complete count of the votes in Fulton County. That is because Georgia's canvass is inadequate: many ballots might still remain untabulated. The proof that at least some of Georgia's jurisdictions do not keep adequate track of ballots, memory cards, and other election materials is reflected in the fact that thousands of ballots and scans were "discovered" during the audit.[14] There is no trustworthy inventory of ballots to check the results against, because of Georgia's lax canvass.

45. Governor Brian P. Kemp has pointed out similar flaws in the audit, saying the audit report was "sloppy, inconsistent, and presents questions about what processes were used by Fulton County to arrive at the result."[15] Governor Kemp's letter points out that

---

[13] Per Secretary Raffensperger, "[i]n Georgia's recount, the highest error rate in any county recount was 0.73%." https://sos.ga.gov/index.php/elections/2020_general_election_risk-limiting_audit, last accessed 9 January 2022.

[14] https://www.cbs46.com/news/floyd-county-election-director-fired-after-audit-reveals-2-600-votes-went-uncounted/article_bbd08d90-2aa2-11eb-9e4d-bf96ac56ad54.html, last accessed 10 January 2022. https://www.news4jax.com/news/georgia/2020/11/18/4th-georgia-county-finds-uncounted-votes-as-hand-count-deadline-approaches/, last accessed 10 January 2022. https://www.mdjonline.com/elections/cobb-elections-finds-350-uncounted-ballots-during-audit/article_0d93e26e-22bd-11eb-8bce-17067aceee33.html, last accessed 10 January 2022. https://www.11alive.com/article/news/politics/elections/fayette-county-election-results-ballots-uncovered-during-audit/85-f79dd838-a15c-4407-80b2-9dfbc2466188, last accessed 10 January 2022.

[15] Letter from Brian P. Kemp, Governor, to the Georgia State Election Board, dated 17 November 2021, addressing the work of Mr. Joseph Rossi; Review of Inconsistencies in the Data Supporting the Risk Limiting Audit Report, Office of Governor Brian P. Kemp, 17 November 2021. These documents are attached hereto as Appendix 4.

13

the audit data include duplicated entries, which I understand Coalition Plaintiffs have

verified. I have not tried to verify those findings.

**First Count, Audit, and Recount Differ Substantially**

46. I understand that Plaintiff Donna Curling votes in Fulton County precinct RW01. On

10 January 2022, I downloaded the official precinct-level results for the original

tabulation from

https://results.enr.clarityelections.com//GA/Fulton/105430/271723/reports/detailxls.zi

p and for the recount from

https://results.enr.clarityelections.com//GA/Fulton/107292/275183/reports/detailxls.zi

p to examine the results in that precinct.

47. The following table shows the counts of election-day votes in Fulton County precinct

RW01 for the three presidential candidates, according to the original machine count,

the machine recount, and the "audit," and vote-by-mail and advance votes for the

original election and the recount. (The audit did not report precinct-level results for

vote-by-mail or advance voting.)

| Count | Election Day | | | Advance | | | Absentee by Mail | | | Provisional | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Trump | Biden | Jorgensen | Trump | Biden | Jorgensen | Trump | Biden | Jorgensen | Trump | Biden | Jorgensen |
| Original | 193 | 88 | 11 | 1455 | 1003 | 23 | 619 | 833 | 15 | 9 | 4 | 1 |
| Recount | 162 | 73 | 9 | 1487 | 1015 | 25 | 619 | 809 | 15 | 5 | 3 | 1 |
| Audit | 243 | 88 | 11 | | | | | | | | | |

48. There are large, unexplained differences among these results.[16] I do not see how

Plaintiff Donna Curling can have reasonable confidence that her vote was counted at

all, much less counted as cast.

---

[16] There appears to be some cancellation of error, but I understand that the hand count kept
ballots cast in different ways (advance in-person, absentee by mail, and election day) separate. It

49. The Secretary of State attributed all differences between the audit and the original count to human counting error, citing a 2012 study that found hand-count error rates as high as 2 percent.[17] This is simplistic, unfounded, and disingenuous.

50. While human error almost certainly accounts for *some* of the difference, there is no evidence that it accounts for most of the difference, much less the entire difference, as Secretary of State Raffensperger claimed.

51. The original count and audit agree with each other (but not with the recount) regarding the number of election-day votes for Biden and Jorgensen. The audit found 50 more election-day votes for Trump than the original tally, and 81 more than the machine recount found: a difference of almost 50 percent. These differences have not been investigated and are unexplained. A hypothesized error rate of 2 percent in hand counts does not suffice.

52. A fact central to this case is that the differences might result from discrepancies between the QR-encoded votes and the human-readable votes on BMD printout and/or from misconfiguration, bugs, or malware on the scanners or tabulators. As discussed above, the audit checked none of these things. There is no basis whatsoever to conclude that the differences result entirely from human error without investigating the other possibilities.

---

is not clear how misclassification of the mode of voting would affect one candidate's totals much more than the other candidates. Regardless, these discrepancies are large and should be investigated, including inspecting the physical ballots.

17

https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_result_of_presidential_race, last accessed 10 January 2022.

53. The hand count could easily be more accurate than the machine count. Indeed, it is well known that hand counts of hand-marked paper ballots are often more accurate than machine counts, in part because human readers can interpret light, improper, and ambiguous marks better than machines can, even when the machines are working properly. Similarly, experience in Georgia in 2020 shows that Dominion's scanner settings (low resolution, black-and-white) can cause voters' selections not to appear at all in images of ballots, selections that human readers looking at the actual ballots can easily discern.[18]

54. Evidence that hand counts are more accurate than machine counts comes from recounts and studies of the "residual vote,"[19] the number of undervotes and overvotes. Hand counts generally find more valid votes than machine counts.[20]

55. Hand-count error rates are known to depend on many factors, including ballot design, the method for hand counting ("sort-and-stack" versus "read-and-mark"), and the size of each counting team. They presumably also depend on whether there are additional

---

[18] See, e.g., Judge Amy Totenberg's Opinion and Order of 11 October 2020 in the present matter, at 4, 30, 95, 101, 103, 114–135.

[19] Ansolabehere, S., and Reeves, A., 2004. Using Recounts to Measure the Accuracy of Vote Tabulations: Evidence from New Hampshire Elections 1946–2002, in *Confirming Elections: Creating Confidence and Integrity Through Election Auditing*, Alvarez, R.M., L.R. Atkeson, and T.E. Hall, eds., Palgrave MacMillan, NY. Alvarez, R.M., D. Beckett, D., and C. Stewart, 2013. Voting Technology, Vote-by-Mail, and Residual Votes in California, 1990–2010. *Political Research Quarterly*, 66(3), 658–670. https://doi.org/10.1177/1065912912467085. Alvarez, R.M., L.R. Atkeson, and T.E. Hall, 2013. *Evaluating Elections: A Handbook of Methods and Standards*, Cambridge University Press, NY.

[20] See, e.g., Ansolabehere, S., and C. Stewart, 2005. Residual Votes Attributable to Technology. *The Journal of Politics, 67(2)*, 365–389. https://doi.org/10.1111/j.1468-2508.2005.00321.x; Carrier, M.A., 2005. Vote Counting, Technology, and Unintended Consequences, *St. John's Law Review, 79(3)*, 645–687; Ansolabehere, S., B.C. Burden, K.R. Mayer, and C. Stewart III, 2018. Learninbg from Recounts, *Election Law Journal*, *17(2)*, 100–116, DOI: 10.1089/elj.2017.0440

16

quality control measures in place, such as checking sorted piles of ballots to ensure that each pile really has votes for just one candidate.

56. The study[21] cited by the Georgia Secretary of State is a laboratory study with 108 subjects and 120 ballots, each containing 27 contests with two candidates. It used three kinds of "ballots": printout from two kinds of DRE (direct-recording electronic) voting system and an optical scan ballot. The highest error rates were for thermal printout from DREs, which does not resemble Georgia's BMD printout nor Georgia's hand-marked paper ballots. The method with the highest error was the "sort-and-stack" tally method that Georgia chose to use in its audit. This study did not observe hand vote tabulation in a real election, nor did it involve BMD summary printout. To my knowledge, there is no study of the accuracy of counting votes from BMD summary printout.

57. Differences between the original count and the machine recount are also large and unexplained. The difference between the two machine counts of Biden's Absentee votes is almost 3 percent. Absent access to the physical ballots, software, and equipment, it is impossible to know what went wrong, nor whether the differences are primarily attributable to malware, bugs, misconfiguration, or human error.

---

**Pursuant to the Court's Order (Order Doc. 1322) permitting the supplementation of this report in the context of my engagement concerning the processes, adequacy, and quality of**

---

[21] Goggin, S.N., M.D. Byrne, and J.E. Gilbert, 2012. Post-Election Auditing: Effects of Procedure and Ballot Type on Manual Counting Accuracy, Efficiency, and Auditor Satisfaction and Confidence, *Election Law Journal: Rules, Politics, and Policy*, 36–51, DOI: 10.1089/elj.2010.0098

**Georgia's audit procedures, Paragraphs 58–84, *infra*, were added in the 9 March 2022 version.**

**The two machine counts in Fulton County**

58. I examined the internal consistency of the two machine counts (the original machine count and the machine recount) in Fulton County. I relied on election data provided in electronic form by Coalition Plaintiffs. I understand those data to be the election management system data for Fulton County for the two machine counts. A declaration from Marilyn Marks attesting to the provenance of the data is attached hereto as Appendix 5. The data include cast vote records, scanned images of ballots and BMD printout, and other files.

59. I analyzed the Fulton County election data using software I wrote, attached hereto as Appendix 6. I also relied on two spreadsheets provided by the Coalition Plaintiffs. Those spreadsheets purport to identify groups of images (among the Fulton County election materials) that appear to be repeated images of the same pieces of paper. I do not know in detail how those spreadsheets came to exist—but as described below, I checked the accuracy of those spreadsheets as part of this report.

60. To confirm that I had received the correct Fulton County election data from Coalition Plaintiffs and that I was reading it correctly, I counted the votes for Donald J. Trump,

Joseph R. Biden, and Jo Jorgensen. For both machine counts, I found the same totals officially reported for Fulton County:[22]

| Candidate | First machine count | Second machine count |
|---|---|---|
| Donald J. Trump | 137,240 | 137,247 |
| Joseph R. Biden | 381,144 | 380,212 |
| Jo Jorgensen | 6,275 | 6,320 |

61. The number of cast vote records (the voting system's record of the votes on each ballot or BMD printout card, from which the system tabulates results) in the two machine counts in Fulton County were rather different: 528,776 in the first count and 527,925 in the second count, a difference of 851. To my knowledge, Fulton County has not explained this discrepancy.

62. The number of cast vote records in the two machine counts should be equal. Differences might occur if (i) some ballots or BMD printout cards were misplaced or found between the two machine counts, so a different number pieces of paper was scanned in the two machine counts; (ii) malware, bugs, misconfiguration, or a bad actor added, deleted, or altered records in the election management system in one or both machine counts; (iii) Fulton County did not scan every validly cast ballot or BMD printout card exactly once in each machine count. Below, I present compelling evidence that (ii) or (iii) is true, but all three possibilities could be true simultaneously. In particular, without further discovery, it is impossible to rule out any of the possibilities.

---

[22] First machine count results:
https://results.enr.clarityelections.com/GA/Fulton/105430/web.264614/#/summary (last visited 8 March 2022) Second machine count results:
https://results.enr.clarityelections.com/GA/Fulton/107231/web.264614/#/detail/5000?county=Fulton (last visited 8 March 2022)

19

63. Fulton County did not produce the image file corresponding to every cast vote record. For the first machine count, production included images of ballots or BMD printout cards for only 168,726 of the 528,776 cast vote records: 376,863 image files are missing. For the second machine count, Fulton County's production included images of ballots or BMD printout cards for 510,073 of the 527,925 cast vote records: 17,852 image files are missing.

64. Entire batches of images are missing from Fulton County's production, for example, images from Scanner 801 batch 117 and Scanner 801 batch 118 are referred to in the cast vote records for the second machine count but the images were not among the electronic records. Without additional discovery it is impossible to determine whether the missing images are missing because of human error, programming errors (bugs), or malware in Fulton County's election management system (EMS). Of course, those possibilities are not mutually exclusive.

65. It is nonetheless possible to use the produced images to show that Fulton County's election results included many votes more than once in the reported tabulations. The full extent of this multiple-counting problem cannot be determined without additional discovery, but there is ample evidence that it added thousands of bogus votes to the reported machine-count results. That is, thousands of Fulton County voters' votes were included in the reported totals more than once. From the production so far, it is not possible to determine conclusively whether any voter's votes were omitted from the reported totals.

66. I now describe how I established that some votes were included in the reported totals more than once.

20

67. Repeatedly scanning the same piece of paper generally does not produce images that are bitwise identical, because of variations in the alignment of the paper, illumination within the scanner, dirt on scanner lenses, etc. Similarly, a single scan can be altered digitally to produce multiple images that look similar but are not bitwise identical.

68. Small variations in voters' marks (e.g., not filling an oval completely or straying outside the oval) on hand-marked paper ballots generally make it possible to tell whether two separate scans of hand-marked paper ballots that contain the same votes are scans of the same physical ballot.

69. It is not generally possible to tell whether two 200dpi black-and-white scans of BMD printout cards are scans of the same piece of paper simply by looking at those two scans, because BMD printout cards containing the same votes look the same at low resolution in black-and-white.[23] However, if both scans contain a rare write-in name or rare combination of write-in names, that is evidence of a duplicate. Similarly, if a series of votes is repeated in in the same order (or reverse order) in different scan batches of BMD printout, that is also evidence that they are repeated images of the same collection of paper. If the duplicated (or reversed) vote sequences are long and include rare write-in names, the evidence that they are scans of the same physical pieces of paper is particularly compelling.

70. As mentioned in paragraph 46, *supra*, I understand that plaintiff Donna Curling votes in Fulton County precinct RW01. In one of the spreadsheets mentioned in paragraph

---

[23] A sufficiently high-resolution scan might make it possible to identify differences in the arrangement of the paper fibers. See W. Clarkson, T. Weyrich, A. Finkelstein, N. Heninger, J. A. Halderman and E. W. Felten, 2009. Fingerprinting Blank Paper Using Commodity Scanners, *2009 30th IEEE Symposium on Security and Privacy*, 301–314, doi: 10.1109/SP.2009.7

21

58, *supra*, Coalition Plaintiffs identified 12 hand-marked ballots from Fulton County precinct RW01 that were scanned twice in the first machine count (the original election). The pairs of images are listed in the table below. The format of the numbers is

[scanner number]_[batch number]_[image number].

| pair | Image A | Image B |
|------|---------|---------|
| 1 | 05162_00234_000096 | 05162_00235_000057 |
| 2 | 05162_00234_000093 | 05162_00235_000054 |
| 3 | 05162_00234_000074 | 05162_00235_000036 |
| 4 | 05162_00234_000072 | 05162_00235_000034 |
| 5 | 05162_00234_000068 | 05162_00235_000030 |
| 6 | 05162_00234_000069 | 05162_00235_000031 |
| 7 | 05162_00234_000054 | 05162_00235_000014 |
| 8 | 05162_00234_000031 | 05162_00235_000090 |
| 9 | 05162_00234_000026 | 05162_00235_000085 |
| 10 | 05162_00234_000017 | 05162_00235_000076 |
| 11 | 05162_00234_000013 | 05162_00235_000072 |
| 12 | 05162_00234_000014 | 05162_00235_000073 |
| 13 | 05162_00234_000003 | 05162_00235_000062 |
| 14 | 05162_00234_000001 | 05162_00235_000060 |

71. I wrote a program to display ballot images of ballots side by side to check whether they look the same. The software is in Appendix 6. Appendix 7 shows these 14 pairs of repeated images. I confirmed that they are indeed duplicated scans by visually matching slight irregularities in the voters' marks in each pair.

72. Coalition Plaintiffs identified at least three BMD cards from precinct RW01 that each appear to have been scanned twice in the machine recount in RW01, based on the votes and the order in which they were scanned in two batches. In particular, Scanner 801, batches 43 and 44—both comprising scans of advance in-person BMD printout cards—start with images of 214 BMD cards that appear to be the same in both batches: the same sets of votes in the same order. The two batches were scanned within about five minutes of each other, according to the timestamps in the images.

22

Many of the images show write-in votes[24] or votes for third-party candidates, further evidence that the similarity was no coincidence. I visually inspected[25] all 214 pairs and confirmed that they match: compelling evidence that those BMD cards were scanned twice in the machine recount. The other 211 (214–3=211) duplicated scans are of BMD cards from other precincts in Fulton County.

73. Coalition Plaintiffs also identified one hand-marked paper ballot that was scanned twice in RW01 in the machine recount, and at least seven hand-marked paper ballots that were scanned thrice in RW01 in the machine recount. I used the software in Appendix 6 to check their work: the twenty-nine images indeed seem to represent only eleven distinct pieces of paper, even though they contributed twenty-nine votes to some contests, including the presidential contest. Appendix 8 shows the sets of images. The table below lists the pairs and triples.

| Multiple | Image A | Image B | Image C |
|---|---|---|---|
| 1 | 00801_00044_000168 | 00801_00043_000168 | |
| 2 | 00801_00044_000083 | 00801_00043_000083 | |
| 3 | 00801_00044_000042 | 00801_00043_000042 | |
| 4 | 05160_00074_000023 | 05160_00067_000008 | |
| 5 | 00794_00017_000024 | 00791_00026_000091 | 00791_00019_000010 |
| 6 | 00794_00017_000029 | 00791_00026_000086 | 00791_00019_000015 |
| 7 | 00794_00018_000001 | 00791_00026_000009 | 00791_00019_000092 |
| 8 | 00794_00018_000011 | 00791_00026_000019 | 00791_00019_000082 |
| 9 | 00794_00019_000002 | 00791_00026_000079 | 00791_00019_000022 |
| 10 | 00794_00019_000005 | 00791_00026_000076 | 00791_00019_000025 |
| 11 | 00794_00019_000006 | 00791_00026_000075 | 00791_00019_000026 |

---

[24] Write-ins included votes for "Anyone," "XXX," "Willie Nelson," and "Alexander Hamilton," as well as write-in votes for "Donald Trump" for District Attorney, Clerk of the Superior Court, Tax Commissioner, Sheriff, Solicitor General, and Surveyor.
[25] I used the software in Appendix 6 to facilitate the process.

74. To confirm that the duplicate and triplicate images were included in the reported vote tabulation, I searched the cast-vote records (CVRs) produced by Fulton County for each image identifier among the duplicates and triplicates of images of RW01 ballots and BMD printout cards. All twenty-four from the original count and all twenty-nine from the machine recount were among the CVRs. I conclude that the duplicate and triplicate votes were included in the reported machine tabulations, since the vote totals derived from the CVRs agree with the reported vote totals, as mentioned in paragraph 60, *supra.*

75. For Fulton County as a whole, Coalition plaintiffs gave me a list that identified images of 2,871 ballots and BMD printout cards that they believe were counted two or three times in the second machine count. Some were identified by visual inspection of the images; others were inferred to be duplicates because a sequence of cast vote records was identical (or reversed) for long portions of two scan batches. As mentioned in paragraph 72, *supra*, I confirmed that 214 of the purported duplicate scans of BMD cards were indeed duplicates. I understand that this list of 2,871 are a sample from a larger list of images of ballots and BMD printout cards that Coalition Plaintiffs assert were included in the tabulation twice or more. I confirmed that all 6,118 images in question were referenced in cast vote records in the second machine count, so all presumably contributed to the tabulation.

76. Nine hundred sixteen (916) of the 2,871 sets of images were identified as images of hand-marked paper ballots. I drew a random sample of 100 of those 916 using software in Appendix 6. I set the seed for the pseudo-random number generator using

24

ten rolls of ten-sided dice. Appendix 9 is an image of the dice with the digits they showed, in order: 8, 6, 2, 8, 9, 2, 2, 1, 8, 4.

77. Of the 100 sets of images in the sample, 46 contained triplicate images.

78. I examined the sets of images visually, aided by software in Appendix 6. I agreed with the Coalition Plaintiffs' determination for 98 of the 100 sets. I disagreed with the determination for one of the sets, and I was unable to verify one set. To be conservative, I treat this as 98 agreements in 100 checks. The resulting 95 percent lower confidence bound for the number of hand-marked paper ballots represented by two or more scans is 891 ballots. That is, there is 95 percent statistical confidence that at least 891 of the 918 claimed multiples are genuine multiples.

79. I did not have time to examine more purported replicate images of BMD printout beyond the 214 mentioned in paragraph 72, but I might examine more before trial.

80. Based on the observations in paragraphs 58 through 78, *supra*, it seems that Fulton County did not keep track of which ballots and BMD cards had been scanned and which had not, in both the original count and in the machine recount. Alternatively or additionally, the electronic records were altered accidentally or intentionally. The electronic records of the election are not intact. This is a surprising lack of tracking and protecting election materials: the most basic election safeguard is to check whether the number of voters who participated is equal to the number of ballots and BMD printout cards that were cast and to the number that were tabulated. Moreover, I would expect all electronic election materials to be backed up onsite and offsite, at least for the federally mandated retention period of twenty-two months, so the loss of

25

hundreds of thousands of image files from the first machine count and of nearly 18,000 images from the second machine count is hard to fathom.

81. Fulton County would have noticed these errors had they simply kept track of ballots and BMD printout cards and checked the total number against the number reported in the electronic tabulation. It seems that Fulton County does not know how many ballots and BMD printout cards were cast in the election, how many voters cast votes, or how many pieces of paper were scanned—nor how those numbers compare to each other. Absent basic ballot accounting, pollbook reconciliation, and counting of electronic records, it is unsurprising that the two machine tallies differ so much (see the table below paragraph 47, *supra*). The U.S. Election Assistance Commission has published best practices for chain of custody.[26]

82. Fulton County's chaotic, unaccountable curation and processing of cast ballots, cast BMD printout, and electronic records make a true risk-limiting audit impossible. It is unreasonable for voters to trust that their votes were counted at all, much less counted correctly. Voters have good reason to believe that some votes counted more than others: some votes were included twice or thrice in the totals. There is no way to know how many votes were omitted from the tabulation, absent access to the physical ballots and BMD printout and evidence that the chain of custody is intact. From the records produced so far, it is impossible to determine whether malware, bugs, misconfiguration, or malfeasance disenfranchised voters or altered the election results.

---

[26] https://www.eac.gov/sites/default/files/bestpractices/Chain_of_Custody_Best_Practices.pdf (last visited 9 March 2022)

83. Based on my review of the Fulton County post-election audit, it is clear that the audit planning, process, and controls did not detect the double and triple counting documented above. Even if Fulton County did not rely on ballot-marking devices for virtually all in-person voters, the lack of basic accounting controls makes it impossible to determine who really won an election contest, even by hand counting the votes: the record of the vote could easily be incomplete or adulterated. This remains true even if BMDs could be relied upon to print voters' selections accurately.

84. I have no reason to believe that problems of the kinds described above are limited to Fulton County, but because of time constraints, I have not yet investigated other counties. I might examine data from other Georgia counties before trial, including comparing the tabulations based on images and cast-vote records to the ABBSs, other RLA workpapers, and reported results.

**The paragraphs below were in the version of this report submitted 11 January 2022, but they have been renumbered.**

---

**Summary**

85. A rigorous audit can provide confidence that a well-run election found the true winner(s). But it cannot compensate for using untrustworthy technology to record votes or for a poorly run election; in such circumstances, it distracts attention from the real problems rather than improving election integrity and justifying confidence in electoral outcomes. Absent a trustworthy record of the votes, no procedure can provide affirmative evidence that the reported winner(s) really won. Georgia lacks such a

record, for many reasons, including the heavy reliance on BMDs and the lack of physical accounting of ballots, memory cards, and other election materials; lack of pollbook and voter participation reconciliation; etc.

86. By claiming to perform risk-limiting audits when its paper trail is not trustworthy, the State of Georgia is in effect adding stories to a building that needs its foundation replaced. First things first.

87. To provide reasonable assurance that every voter's selections are counted and counted accurately requires systematic improvements to how Georgia conducts elections:

a) For every voter to be assured the right to cast an accountable vote, every voter should have the opportunity to mark a ballot by hand, whether voting in person in advance, in person on election day, or absentee by mail.

b) The use of ballot-marking devices should be reduced to a minimum, for reasons I have explained in previous declarations. In particular:

i. BMDs do not necessarily print voters' selections accurately. They can be hacked or misconfigured, as explained in Prof. J. Alex Halderman's testimony.

ii. A growing body of empirical work shows that few voters check the BMD printout, and those who do rarely catch errors.

iii. There is no way for a voter to prove to an election official or anyone else that a BMD malfunctioned. Hence, there is no way to "close the loop" to ensure that malfunctioning devices are removed from service, even if some voters notice BMDs misbehaving. And even if a device is caught misbehaving, there is no way to reconstruct the correct election outcome.

28

iv. There is no way to test BMDs adequately prior to, during, or after an election to establish whether they altered votes, even if they altered enough votes to change electoral outcomes. [27]

c) Georgia must implement better procedures and checks on chain of custody of election materials, especially voted ballots. Currently, Georgia is not in a position to determine whether every validly cast ballot was included in the reported results, nor whether there was electronic or physical "ballot-box stuffing" or votes were altered.[28] Georgia needs better protocols for using and checking physical security seals on ballots and voting equipment—and demonstrating that it has followed those protocols. It needs to perform routine scrutiny of custody logs and surveillance video, and to institute other related security measures.

d) Internal consistency checks and physical inventories must be performed as part of Georgia's canvass, including, among other things:

i. Verifying that the number of ballots sent to each polling location (and blank paper stock for ballot-marking devices and ballot-on-demand printers) equals the number returned voted, spoiled, or unvoted. This must

---

[27] See note 8, *supra.*

[28] This is evidenced by the fact that the 2020 audit found thousands of untabulated ballots. See note 14, *supra.* Per the Secretary of State's office, "[t]he audit process also led to counties catching making mistakes they made in their original count by not uploading all memory cards." https://sos.ga.gov/index.php/elections/historic_first_statewide_audit_of_paper_ballots_upholds_r esult_of_presidential_race, last accessed 9 January 2022. Because of Georgia's inadequate physical accounting for voting materials, there is no way to know how many more votes validly cast in that election have not been included in any of the reported results. Moreover, the lax recordkeeping evidently resulted in scanning the same batches of ballots more than once. Similarly, some ABBSs were presumably entered more than once, and as shown above, some were not entered at all.

29

be a physical check based on manual inventories, not on reports from the voting system.

ii. Checking pollbooks and other voter participation records against the number of voted ballots received, including checking whether the appropriate number of ballots of each "style" were received.

iii. Checking whether the number of electronic vote records ("scans" and cast-vote records) agrees with the physical inventory of ballots of each style.

e) Georgia should conduct routine "compliance" audits, a necessary precursor to conducting risk-limiting audits. For a list of what compliance audits should include, see, for example, Appel, A., and P.B. Stark, 2020. Evidence-Based Elections: Create a Meaningful Paper Trail, Then Audit, *Georgetown Law Technology Review, 4*, 523–541.

f) Georgia should conduct routine, genuine,[29] risk-limiting audits of *every* contested race in every election. The audits must have the ability to correct the reported outcome if the outcome is wrong, before the outcome is certified. I understand that under current Georgia law, audits take place only every other year, for only one contest, and cannot change electoral outcome or trigger a recount—even if the audit finds that the outcome is wrong. No matter how rigorous an audit is, an audit of one or more contests provides no evidence that the outcome of any unaudited contest is correct. Errors and malware may affect some contests but not others.

---

[29] The pilots of RLA procedures in Georgia were not genuine RLAs, nor was the "full hand-count audit."

30

g) A genuine RLA requires far more than Georgia has yet attempted. First and foremost, it requires a trustworthy record of voter intent. Georgia's records are untrustworthy for a range of reasons, starting with the fact that all in-person voters are expected or required to use ballot-marking devices (BMDs). As discussed at length in previous declarations and in testimony by Prof. Andrew Appel and Prof. J. Alex Halderman, BMD printout is not a trustworthy record of the vote. There are also issues with Georgia's verification of voter eligibility and voter participation. But even if every voter used a hand-marked paper ballot and there were no issues with voter eligibility, Georgia simply does not keep track of their election materials well enough. As discussed in my previous declarations, the foundation for a risk-limiting audit is a *ballot manifest*, a physical inventory of the paper ballots describing in detail how they are stored. This must be derived without reliance on the voting system; otherwise, the audit is trusting the voting system to check itself. For example, if there are ballots that were never scanned or scans that were never uploaded (as discovered during the 2020 "audit"), they will be missing from a manifest derived from voting system reports. The ballot manifest must be based on physical inventories of the ballots, keeping track of where the ballots are and how they are organized. Absent that, it is impossible to account for votes reliably, and impossible to limit the risk that an incorrect electoral outcome will be certified: applying risk-limiting audit procedures to an untrustworthy collection of ballots is "security theater."

88. There are additional checks that could be performed to determine the root cause of the discrepancies among the first machine tabulation, hand count, and machine recount. Those checks require access to the physical ballots (for instance, to determine whether

31

every scan batch from the tabulators reflects a distinct collection of actual physical ballots) and access to the tabulators, software, and servers (by other experts in this matter).

89. I would like to supplement my report once the Plaintiffs have had the opportunity to review materials that Defendants have not yet produced or provided access to, including ballots, and to review Plaintiffs' experts' reports once they have inspected the hardware and software used in the November 2020 election.

I declare under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct.


Executed on this date, ~~11 January 2020~~ 9 March 2022,


_____

Philip B. Stark

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

DONNA CURLING, et al;           )
                                )
    Plaintiffs,          )
                                )
v.                              )   CIVIL ACTION
                                )   FILE NO: 1:17cv02989-AT
BRAD RAFFENSPERGER, et al.;     )
                                )
                                )
    Defendants.          )
                                )
                                )

## FULTON COUNTY DEFENDANTS' RESPONSE TO COALITION PLAINTIFFS' SECOND REQUESTS FOR ADMISSION

COME NOW, the Members of the Fulton County Board of Registration and Elections, and hereby respond to this Response to Plaintiffs' Second Request for Admission.

## REQUESTS FOR ADMISSION

1.  Admit that You did not preserve until the present time the majority of ballot images from in-person voting for the November 3, 2020 election original machine count.

**Response:**  **Admitted.**



DEFENDANT'S
EXHIBIT

**E**

2.      Admit that You did not preserve until the present time the majority of ballot images from in-person voting for the June 19, 2020 election.

**Response:   Admitted.**

3.      Admit that You did not preserve until the present time the majority of ballot images from in-person voting for the August, 2020 election.

**Response:   Admitted.**

4.      Admit that one of Your Dominion tabulating servers crashed during the machine recount of the November 3, 2020 election.

**Response:   Admitted.**

5.      Admit that the Dominion tabulating server crash was reported to the Fulton County Board of Registration and Elections during the recount of the November 3, 2020 election.

**Response:   Admitted.**

2

6.      Admit that the Dominion tabulating server crash during the machine recount of the November 3, 2020 election interrupted ballot tabulation.

**Response:   Admitted.**

7.      Admit that as mail ballots are scanned, the ballot scanner is ordinarily connected to the Dominion tabulating server.

**Response:   Denied.**

8.      Admit that, immediately after a mail ballot is scanned, the ballot image, including AuditMark, ordinarily may be accessed on the Dominion server.

**Response:   Denied.**

9.      Admit that in some Fulton County polling places, voters and other persons in the polling place during the November 3, 2020 election could have a line of sight permitting them to see selections being made on the touchscreen machines when other voters are voting on those machine.

**Response:   Denied.**

3

10. Admit that the privacy screens provided by the Georgia Secretary of State during the November 3, 2020 election did not always protect voters' ballot touchscreen selections from being seen by other people in the polling place.

**Response: Denied. No privacy screens were provided by the Secretary of State.**

11. Admit that the Georgia Secretary of State has not consistently enforced requirements for physically protecting voters' ballot secrecy when using the touchscreens on the Dominion BMDs in Fulton County.

**Response: Defendants are without knowledge sufficient to either or admit this request.**

12. Admit that You have received complaints from voters regarding the lack of voter privacy using the Dominion touchscreen machines.

**Response: Admitted.**

13. Admit that, in some polling places, the limited available space and the number of voting machines required at those polling places, makes it infeasible to provide absolute ballot secrecy for the voters using the touchscreens.

4

**Response:  Denied.**

14.    Admit that You do not require poll managers to arrange polling place equipment in a manner to provide absolute ballot secrecy.

**Response:  Denied.**

15.    Admit that in some polling places poll managers and poll workers can routinely see the display screens with voters' vote selections visible.

**Response:  Denied.**

16.    Admit that the Fulton County Board of Registration and Elections members have discussed during board meetings how the use of Dominion touchscreen BMD machines adversely impacts ballot secrecy.

**Response:  Admitted.**

17.    Admit that You have not deployed equipment in a manner that provides absolute ballot secrecy for voters using the touchscreen voting machines.

**Response:  Denied.**

18.     Admit that You were initially informed by the Georgia Secretary of State that the November 3, 2020 election hand-counted audit would also be an official recount.

**Response:   Denied.**

19.     Admit that You were initially informed by the Georgia Secretary of State that the official vote tallies for the November 3, 2020, election would be corrected as needed based on the results of the hand-counted audit.

**Response:   Denied.**

20.     Admit that the hand-counted audit tallies were not used as official results.

**Response:   Admitted.**

21.     Admit that, during the hand-counted audit of the November 3, 2020 election, duplicated ballots were counted without referencing or reviewing the original ballot.

**Response:   Denied.**

22.   Admit that You have not undertaken a reconciliation of the discrepancies between the original count, the hand-counted audit, and the official recount tallies in the November 3, 2020 election.

**Response:**  **Denied.**

23.   Admit that You received, from the Georgia Secretary of State, some instructions, guidelines, or recommended procedures for reconciling the discrepancies between the original count and the hand-counted audit in the November 3, 2020 election.

**Response:**  **Denied.**

24.   Admit that You have not been required by the Georgia Secretary of State to provide an explanation for discrepancies of audit tallies and machine tallies in the November 3, 2020 election.

**Response:**  **Admitted.**

25.     Admit that the ballot images delivered to Coalition for Good Governance on June 3, 2021 on two USB drives are true and correct copies of the original ballot images created during from the November 3, 2020 election.

**Response:   Upon information and belief, admitted.**

26.     Admit that in the Audit Report generated by the Arlo audit software for the November 3, 2020, election, the batches labeled "AbsenteeScanner3Batch174-178," "AbsenteeScanner3Batch175-176," and "AbsenteeScanner3Batch177" all count the same physical batch of ballots.

**Response:   Denied.**

27.     Admit that the one physical batch of ballots referenced in the immediately preceding Request was counted three times in the hand-counted audit.

**Response:   Denied.**

28.     Admit that in the Audit Report generated by the Arlo audit software for the November 3, 2020, election, the batches labeled "AbsenteeScanner2batch244-249" and "AbsenteeScanner2Batch244-249" each count the same physical batch of ballots.

8

**Response:  Denied.**

29.   Admit that the one physical batch of ballots referenced in the immediately preceding Request was counted twice in the hand-counted audit.

**Response:  Denied.**

30.   Admit that Fulton County's Dominion system user manuals are available to and accessible by Your technical staff.

**Response:  Admitted.**

31.   Admit that more than five of Your staff members have physical access to and authority to consult the Dominion user manuals.

**Response:  Admitted.**

32.   Admit that the Dominion server in the Election Preparation Center is configured to be connected to the internet if operators choose to do so.

**Response:  Denied.**

9

33.    Admit that Dominion has the ability to remotely access the Dominion server in the Election Preparation Center.

**Response:   Denied.**

34.    Admit that the operator of the Dominion server in the Election Preparation Center has administrative access to delete and edit Windows activities logs.

**Response:   Denied.**

35.    Admit that the Dominion server in the Election Preparation Center has been connected to the Internet on more than one occasion since the server's installation.

**Response:   Denied.**

36.    Admit that during November 2020 BMD Logic and Accuracy Testing, testing technicians did not test every candidate position and every contest in every configuration on each machine before the machines were installed in the polling places.

**Response:   Denied.**

37.     Admit that You did not perform your own county-directed acceptance testing of the Dominion BMDs purchased by Fulton County before using them in an election.

**Response:   Denied.**

38.     Admit that ballot scanning equipment was put into service in Fulton County without county-directed acceptance testing.

**Response:   Denied.**

39.     Admit that more than one public building used as a polling place in the January 2021 runoff in Fulton County had operational video surveillance cameras installed at the time of that election for use during the overnight storage of voting machines and during the voting process.

**Response:   Denied.**

40.     Admit that provisional voters were permitted to vote on the BMD machines at C. T. Martin Recreation Center polling place in January 2021 runoffs.

**Response: Denied**

11

41.   Admit that during the November 3, 2020 election more than 100 voted provisional ballots were rejected because the voter was not identified on the outer envelope.

**Response: Denied**

42.   Admit that some or all of the voters who did not place their name on the outer envelope of provisional ballots were not told by poll managers to do so.

**Response:   Denied.**

43.   Admit that You received no instructions from the Georgia Secretary of State regarding scanner settings for overvotes for the November 3, 2020 election.

**Response:   Admitted.**

44.   Admit that the default settings for the ICC scanners used during the November 3, 2020 election allowed overvotes to be counted as valid votes in some races.

**Response:   Denied.**

12

45. Admit that, in the November 3, 2020, election, some overvotes were counted as valid votes.

**Response:  Denied.**

46.   Admit that more than 50 people voted more than once in the November 3 election, and their extra votes were counted.

**Response:  Denied.**

47.   Admit that during the November 3, 2020 election, volunteers acting as absentee ballot clerks were permitted to have access to E-Net on their personal computers in the polling places.

**Response:   Admitted.**

48.   Admit that during certain days of early voting in October 2020, voter records were not promptly updated in E-Net and My Voter Page to show that voters had actually voted.

**Response:   Admitted.**

49.    Admit that the votes of at least two precincts were not counted in the original certification of the January, 2021 election.

**Response:    Admitted.**

50.    Admit that current board canvassing procedures do not always detect errors such as votes missing for whole precincts.

**Response:   Denied.**

51.    Admit that You did not make images or complete copies of the ballot scanner memory cards after each election in 2020.

**Response:    Admitted.**

52.    Admit that the memory cards used in the ballot scanners in elections in 2020 were reused and overwritten in subsequent elections.

**Response:   Admitted.**

53.   Admit that You did not received any instructions from the Secretary of State prior to November 1, 2020 for preserving Windows activities logs of the Dominion server in the Election Preparation Center.

**Response:   Admitted.**

54.   Admit that You did not preserve to the current time the Windows activities logs of the Dominion server in the Election Preparation Center for the period August 1, 2020 through February 1, 2021.

**Response:   Denied.**

55.   Admit that the mail ballot process used in Fulton County during the November 3, 2020 election included instructing workers to retain ballots and envelopes in matching sequential order.

**Response:   Admitted.**

56.   Admit that workers in Fulton County polling places have encountered malfunctions in the operation of the PollPads since their initial deployment.

**Response:   Admitted.**

15

57.     Admit that in the November 3, 2020 presidential contest recount, with respect to duplicated ballots, You did not review the original ballots to check the accuracy of the duplicated ballot for voter intent.

**Response:   Denied.**

58.     Admit that the Vote Review Panel did not maintain an independent paper audit trail reviewed by the vote review panels for votes adjudicated during 2020 elections.

**Response:   Admitted.**

59.     Admit that the Vote Review Panel did not review or approve an adjudication log of votes adjudicated after each adjudication decision in the 2020 elections.

 **Response:   Defendants are without knowledge sufficient to either or admit this request.**

60.     Admit that bi-partisan vote review panels did not adjudicate ballots earlier than 7 am during the days of election processing, in November 2020.

**Response:   Admitted.**

61.   Admit that no bi-partisan vote review panel adjudicated ballots later than 11pm during the days of election processing in November 2020.

**Response:  Admitted.**

62.   Admit that more than 50 ballots were adjudicated using the Dominion adjudication application without a bi-partisan vote review panel present.

**Response:   Denied.**

63.   Admit that You do not permit party-appointed monitors or watchers to have visual access to read the ICC scanner monitor screens or ICC public counters.

**Response:  Denied.**

64.   Admit that during Logic and Accuracy testing for some 2020 elections You prevented appointed poll watchers and members of the public from having visual access to the voting equipment display screens during the testing of the majority of the BMD and scanner units.

**Response:   Denied.**

65.    Admit that during Logic and Accuracy testing for some 2020 elections You prevented appointed poll watchers and members of the public from being in the same room as where the testing of the majority of the BMD and scanner units took place.

**Response:   Denied.**

66.    Admit that Richard Barron was told by the Secretary of State's office that it was not necessary to review hand-marked paper ballots for lightly marked votes or marginal marks for the June 9, 2020 election to determine if such votes had not been tabulated.

**Response:   Upon information and belief, admitted.**

67.    Admit that the Fulton County Board of Registration and Elections received a request from candidate Beth Beskin on or around June 18, 2020 for a review of the ballots with light marks and marginal marks.

**Response:   Upon information and belief, admitted.**

18

68.    Admit that the Fulton County Board of Registration and Elections did not discuss or vote on Beth Beskin's request prior to certification of the election.

**Response:   Defendants are without knowledge sufficient to either or admit this request.**

69.    Admit that You received complaints of hand marked votes not being counted by the scanners in the June 9, 2020 election.

**Response:   Denied.**

70.    Admit that You have not reviewed hand marked votes that were the subject of complaints You received about such votes not being counted by the scanners in the June 9, 2020 election.

**Response:   Denied.**

71.    Admit that You have not counted hand marked votes that were the subject of complaints You received about such votes not being counted by the scanners in the June 9, 2020 election.

**Response:   Denied.**

19

72.     Admit that during 2020 the Fulton Board of Elections conducted meetings (including electronic meetings by email) with a quorum of members without advance public notice.

**Response:   Denied.**

Respectfully submitted this 30th day of August, 2021.

<div style="margin-left:40%">

**OFFICE OF THE COUNTY ATTORNEY**

Cheryl Ringer
Georgia Bar Number: 557420
cheryl.ringer@fultoncountyga.gov
Kaye Burwell
Georgia Bar Number:   775060
kaye.burwell@fultoncountyga.gov
*/s/ David R. Lowman*
David R. Lowman
Georgia Bar Number: 460298
david.lowman@fultoncountyga.gov

ATTORNEYS FOR DEFENDANTS
ALEX WAN, VERNETTA KEITH
NURIDDIN, KATHLEEN RUTH,
AARON JOHNSON, AND MARK
WINGATE, AND THE FULTON
COUNTY BOARD OF
REGISTRATION & ELECTIONS

</div>

**OFFICE OF THE COUNTY ATTORNEY**
141 Pryor Street, S.W.
Suite 4038
Atlanta, Georgia 30303

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| DONNA CURLING, et al; | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION |
| | ) | FILE NO: 1:17cv02989-AT |
| BRAD RAFFENSPERGER, et al.; | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**RULE 5.2 CERTIFICATE OF SERVICE OF DISCOVERY**

I hereby certify that on this date I have electronically filed the foregoing

**FULTON COUNTY DEFENDANTS' RESPONSE TO COALITION
PLAINTIFFS' SECOND REQUESTS FOR ADMISSION** with the Clerk of

Court using the CM/ECF system, with the Clerk of Court using the CM/ECF

system, which will send email notification of such filing to all attorneys of

record.

This 30th day of August, 2021.

/s/ *David R. Lowman*
David R. Lowman
Georgia Bar Number: 460298
david.lowman@fultoncountyga.gov

21