# EXHIBIT 6

Page 1

1                IN THE UNITED STATES DISTRICT COURT

2              FOR THE NORTHERN DISTRICT OF GEORGIA

3                        ATLANTA DIVISION

4

     ──────────────────────────────
5

     DONNA CURLING, ET AL.,
6

                  Plaintiffs,          CIVIL ACTION FILE
7                                      NO. 1:17-CV-2989-AT

     vs.
8

     BRAD RAFFENSPERGER, ET AL.,
9

                  Defendants.
10   ──────────────────────────────

11

12            VIDEO-RECORDED 30(b)(6) DEPOSITION

13              TAKEN VIA VIDEOCONFERENCE OF

14          GEORGIA SECRETARY OF STATES' OFFICE

15              BY: SANFORD MERRITT BEAVER

16                          AND

17              SANFORD MERRITT BEAVER

18             IN HIS PERSONAL CAPACITY

19               (Taken by Plaintiffs)

20                 Atlanta, Georgia

21           Wednesday, February 2, 2022

22                    9:08 a.m.

23

24

              Reported stenographically by
25      V. Dario Stanziola, CCR (GA)(NJ), RPR, CRR

1   right?

2        A.   Correct.

3        Q.   And Fortalice found vulnerabilities

4   with each of those two systems.  But, again, no

5   evidence that data had been altered or extracted;

6   is that right?

7        A.   Correct.  And both were fixed.

8        Q.   Right.

9             And measures were taken by the

10  Secretary's office sometime in that weekend when

11  this issue came to light to -- to mitigate both

12  of those vulnerabilities; is that right?

13       A.   Yes.  My best -- well, I know we fixed

14  the stuff right away that weekend, so...

15       Q.   Okay.  Did you -- were you given an

16  opportunity to review any of the public

17  statements that the Secretary's office put out or

18  any communications with the press about those

19  incidence before those statements were made?

20       A.   Not that I recognize -- I mean,

21  remember.  I mean, I focus on the IT

22  infrastructure press releases and all that media

23  kind of stuff is handled by the Secretary's front

24  office.

25       Q.   Okay.  And was there ever a time in the

1    that would be the -- the problem we had with the

2    MVP page where you could increment the number and

3    see other peoples' documents that they had

4    pulled, you know, up until a point that the

5    server clears cache.

6         Q.   And was this -- sorry.  Was this

7    remediated?

8         A.   As far as I know, it was remediated

9    fairly quickly because we explained to them how

10   to fix it.

11        Q.   And what's the basis for your

12   understanding that it was remediated?

13        A.   It seems to me I had a conversation

14   with Dave afterwards that he had worked with them

15   to -- to understand -- you know, explain to them

16   what it was to fix.  I think they actually pulled

17   the page down until they could fix it.

18             (Exhibit 16: E-mail string with the top

19          from Chris Harvey dated 12/30/2020 marked

20           for identification, as of this date.)

21        Q.   Okay.  All right.  Grab Exhibit 16,

22   please.

23        A.   Chris Harvey, voter registration

24   certificate.

25        Q.   Yes.

Page 171

1          So this is an e-mail you can see that

2     Chris Harvey received on December 30th, 2020.

3          Do you see that from Ryan Germany?

4     A.    Yes, yes.

5     Q.    And if you come down the beginning of

6     the thread it begins with an e-mail that Dave

7     Hamilton sent on December 24, 2020.

8          Do you see that?

9     A.    Yes.

10    Q.    And he sends that to you and Mr.

11    Germany at the Secretary's office, right?

12    A.    Okay.

13    Q.    And the subject line is 2020 rule

14    590-8-3 attestation and assessment.

15         Do you see that?

16    A.    Yes.

17    Q.    And this concerns the assessment

18    attestation or certification that the Secretary's

19    office has to put out each year, it's a security

20    risk assessment that the Secretary has to attest

21    to each year, right?

22    A.    Yes.

23    Q.    And so Mr. Hamilton looks like was

24    handling the attestation in December of 2020.

25         Do you recall that?

1       A.   I know it gets done every year, so --

2  and it needs to be the done the first -- by the

3  end of the year or at least before -- you know,

4  early on.  I think the target is by the end of

5  December.

6       Q.   Okay.  So do you see here --

7       A.   I vaguely remember this.

8       Q.   Okay.  You see Mr. Hamilton writes

9  Civix just got me the last two artifacts for

10 this; do you see that?

11      A.   Yes.

12      Q.   What is Civix?

13      A.   Civix is PCC.  PCC changed their name

14 to Civix.

15      Q.   Okay.  And he goes on, They apparently

16 have never completed a security risk assessment.

17           Do you see that?

18      A.   Yes.

19      Q.   And do you have any reason to believe

20 that Mr. Hamilton was wrong about whether Civix

21 or PCC had ever completed a security risk

22 assessment?

23           MR. DENTON:  Objection.

24      A.   I can't speak to that.

25      Q.   Okay.

1      A.   I know he -- Dave was a hard-core

2  security person and he didn't like -- he was

3  basically -- was very much this is how he felt

4  things should be done.  People doing something a

5  different way rubbed him.  So this doesn't

6  surprise me.

7      Q.   And Hamilton was the chief information

8  security officer while he was at the Secretary's

9  office, right?

10     A.   Yes.

11     Q.   Okay.

12     A.   He did a good job.

13     Q.   If you come to the second paragraph, do

14 you see he writes, Hope this suffices.  I did my

15 level best to meet all of these items.  Not sure

16 how James ever signed this with a straight face.

17          Do you see that?

18     A.   Yep.

19     Q.   And by James he's referring to James

20 Oliver, the former security manager, right?

21     A.   Yes.

22     Q.   And did you share Mr. Hamilton's

23 concern about how James Oliver was able to sign

24 this attestation in prior years?

25     A.   As I said --

1           MR. DENTON:  Objection.

2        A.    -- Dave was a -- I'll say a

3    perfectionist.  He was very judgmental of other

4    people.  And if they didn't do things his way, he

5    wasn't satisfied.  There are lots of people in

6    the securities world.  Dave was a very hard-core

7    and that he had his vision of how things should

8    be done.  Not that his was the only way to do

9    something, but he had his way and he spoke his

10   mind.  Here he is speaking his mind.  Whether or

11   not James actually met the level of the law, I

12   felt he did.

13           Now, did Dave have a harder view on

14   things and drive the organization better?  Yeah,

15   he did.  That's why he essentially replaced

16   James.  But James did what he was supposed to do.

17   He worked within the legal law of what

18   requirements were.  Dave was unhappy with Civix

19   because he -- his view on security was one thing

20   and they had a different.  Security is a broad

21   topic.  Dave was very opinionated and he

22   basically would voice his opinion all the time.

23   So you're reading it.

24        Q.   And the concern that Dave Hamilton

25   expresses in this e-mail thread is that the --

Page 175

1    the Secretary of State is actually not in
2    compliance with the rule at this time because he
3    can't find the evidence, what he calls artifacts,
4    of that compliance, right?
5            MR. DENTON:  Objection.
6       A.   Yeah. He doesn't say here what the
7    artifacts are.  I know he and I have talked about
8    this on multiple occasions.  As I said, he was a
9    perfectionist.  The attestation applies only,
10   only to the voting -- voter registration system,
11   the election system.  Dave felt it should apply
12   to all things that the Secretary of State
13   managed.  But the attestation specifically only
14   applied to election.  So Dave was always on a --
15   on a course to say we should have things like
16   artifacts that cover everything, whether it's the
17   corporate registration system, whether it is the
18   security system, professional licensing system.
19   He felt all of them should fall under the same
20   level of security that elections did.  But the
21   attestation clearly does not include anything but
22   elections.  And that was always a rub to Dave.
23           Does that answer your question?
24      Q.   I think so.  I was going to grab
25   another exhibit for you.

1        A.   Oh, all right  I didn't -- one of those

2   pregnant pause moments --

3        Q.   Yes.  Sorry.

4             (Exhibit 17: E-mail string with the top

5              from Dave Hamilton dated 12/21/2020 marked

6              for identification, as of this date.)

7        Q.   All right.  Grab Exhibit 17.

8        A.   This looks like it's the same topic.

9        Q.   Yes, yes, a little bit earlier.  So I

10   wanted to -- a little more context.

11            So if you go to the top, you'll see

12   this is an e-mail that Dave Hamilton sent you on

13   December 21, 2020 regarding the rule 590 -- or

14   the 590 rule attestation, right?

15        A.   Okay.

16        Q.   If you come down in the earliest e-mail

17   of the thread is an e-mail that Mr. Hamilton

18   sends to you December 19, 2020 and he copies

19   itsecurity@sos.ga.gov.

20            Do you see that?

21        A.   Yes.

22        Q.   What is the IT security e-mail there?

23   Is that some sort of like team or group

24   distribution list?

25        A.   It's just an e-mail box that if we

1    have, like, vendors sending reports, like

2    Cybraics is one of our monitoring systems.  It

3    monitors network traffic between nodes inside the

4    network.  It sends out a regular e-mail of alerts

5    of activity and stuff like that.  Rather than

6    having it go to a specific security person, it

7    goes to a security -- IT security mailbox that

8    all of the security people see.

9         Q.   Okay.  Do you know whether that e-mail

10   in box was searched for relevant e-mails for this

11   case?

12        A.   If we do a search on 365, it's

13   included, which would be the answer is yes, it

14   was included.

15        Q.   Meaning if they did a search on 39- --

16   365 that it encompassed that e-mail advice?

17        A.   It should, yes.

18             MR. DENTON:  Objection.

19        Q.   Okay.  All right.  So Mr. Hamilton

20   writes here regarding this rule attestation in

21   the first sentence and started after the comma,

22   he writes, I really don't understand how my

23   predecessor was ever able to attest to meeting

24   the set of regulations.  I handled this just like

25   an assessment.  If we can't come up with an

Page 178

1    artifact that proves something is real, it

2    doesn't exist.

3              Do you see that?

4       A.   Yep.

5       Q.   And do you agree with Mr. Hamilton, the

6    former CISO's position, that for the attestation

7    provided by this rule, that if you cannot come up

8    with an artifact that proves that something is

9    real, it doesn't exist?

10      A.   This is the same response I gave the

11   last one, which is he had a view of an

12   attestation that was broader than the rule

13   actually is written for.  And he was trying to

14   position that we should cover all systems under

15   that attestation, thus find artifacts that

16   basically mark our -- you know, that we meet the

17   590 rule across every system.  Well, there are

18   things that are in 590 that the other systems

19   don't necessarily do.  I don't have that list.

20   But I know that that's part -- that was his big

21   rub.  And so that's -- he's -- this was probably

22   his -- one of his early sort of discoveries as

23   he's trying to go through that list and find

24   those artifacts.  And he's looking for them for

25   systems outside of what 590 truly covers, which

Page 179

1    is the election system, and he can't find them.

2    Because they don't exist because not everything

3    that's in 590 applies to all systems for

4    Secretary of State.  He wanted them to, but they

5    didn't.  So he was frustrated.

6         Q.   So if you come up to the e-mail that he

7    sent you on December 21 and come down towards the

8    bottom of the page, you see that paragraph that

9    begins on our part, we did everything?

10        A.   Yes.

11        Q.   And then the third line at the end he

12   writes, My plan was to produce an amendment

13   shortly after the first of the year.  Once E-Net

14   lands and I can verify the risk gaps are

15   minimized.

16             Do you see that?

17        A.   No.  I've lost you.  I'm down on the

18   first -- bottom of the first page.

19        Q.   Yeah, the paragraph that reads, on our

20   part.

21        A.   Oh, yeah.  Okay.  We did everything we

22   could to meet these rules.

23        Q.   Come to the end of the third line, the

24   sentence begins my plan.

25        A.   The one that says, My plan has to

Page 180

1    produce an amendment?

2         Q.   Yes.

3              Do you know what was meant by once

4    E-Net lands?

5         A.   No.

6         Q.   Was there any change contemplated with

7    E-Net at this time that you recall?

8         A.   No.  I don't know of any.

9         Q.   Okay.  And then he then goes on -- he

10   goes on to the third paragraph -- the next

11   paragraph -- two paragraphs after that.  You see

12   where it reads, the largest impact?  And he

13   writes, The largest impact can be made by getting

14   Civix to produce their part of this.  We can go

15   from 66 percent up to over 80 percent quickly.

16              Do you see that?

17        A.   Yep.

18        Q.   And what Mr. Hamilton found at this

19   time, was it looking only at PCC or what he

20   refers to here as Civix, the state was only --

21   only at 66 percent in compliance with what's

22   required under this rule, right?

23        A.   I don't know the context.

24        Q.   What do you mean you don't know the

25   context?  This is an e-mail that he sent to you?

Page 181

1      A.   Yes.  But he's saying we can go from 66

2    up to over 80 quickly.  I don't know whether he's

3    talking about the context of Civix in like --

4    like we talked earlier, fixing their code so that

5    they can't do sequel injection and things like

6    that so we don't have to use external tools to

7    remediate, that could very well be where he is.

8    Because that was also a big thing is he wanted

9    them to fix their code so it was a true fix, not

10   a remediation using a different solution.  That

11   could very well be where he's talking.  And if

12   you notice this date timeline is all around that

13   same time frame.

14      Q.   Okay.  But do you understand that the

15   concern he was expressing was that with respect

16   to what PCC was handling, the state was only in

17   compliance with 66 percent of the requirements

18   under the rule based on --

19           MR. DENTON:  Objection.

20      Q.   -- research he had done?

21      A.   I see that.  As I said, Civix code did

22   not meet some of the requirements that we had to

23   have from security inspection.  So we had to put

24   things in front of it to reach the level of

25   security we needed.  He was a truest.  He wanted

Page 182

1   the code to do it on its own.

2           So we've already talked about this

3   topic of Civix couldn't fix their code to do what

4   it is because it would break it.  And they would

5   have to do a major rewrite to do what really

6   needed to do to fix the sequel injection, the

7   cross-side scripting, those kind of things.

8           Q.   Okay.

9           A.   They didn't like the fact that we had

10  to use other tools like Cloudflare to fix

11  problems to meet our attestation levels.  He

12  wanted to see them -- like he said, we could

13  quickly get there if Civix would just fix this.

14  We knew that.  But we couldn't -- we -- get them

15  to fix it.

16          Q.   All right.

17          A.   It was a point of frustration for him.

18          Q.   The Secretary's office has announced

19  that they're actually moving away from E-Net,

20  right?

21          A.   Yes.

22          Q.   And why is that?

23          A.   It's an old system, to start with.

24  Civix has changed vendors -- or has been

25  purchased I think at least twice, maybe three

Page 183

1    times in the last four years, four or five years.

2        Q.    When was the decision made to move away

3    from E-Net?

4        A.    Last year.

5        Q.    Who made that decision?

6        A.    Front office.

7        Q.    And by front office who do you mean?

8        A.    Secretary.

9        Q.    Oh, Secretary Raffensperger?

10       A.    Yes.  Those kind of decisions, it comes

11   down to him to make the call.  We present

12   proposals and it's up to him to say yay, nay.

13       Q.    What --

14       A.    It's a big decision.

15       Q.    Sorry.

16       A.    Yeah, that was a big, big decision.

17       Q.    What were those specific reasons that

18   he decided to move -- to replace E-Net?

19       A.    One was the age, one was the ability

20   for us to get, like this, certain fixes put in

21   place that we wanted to see.  Some of it was

22   security related, some was just functionality

23   related.  The application was built I think like

24   in 2012 when we first purchased it.  And the --

25   but the actual application was probably built a

Page 184

```
 1    year or two before that.  So the core code was
 2    ten years old.  Getting very old.  Technology has
 3    changed.  So it was time to look at another
 4    solution.  We were in the process of also looking
 5    at some of our other systems and we decided to do
 6    basically an overall refit of everything.
 7         Q.   What's the new solution that you're
 8    bringing in in place of E-Net?
 9         A.   I think they've announced -- already
10    announced that it's Salesforce based.
11         Q.   And will that be a cloud solution
12    hosted by Salesforce?
13         A.   Yes.
14         Q.   Okay.  What's the process for migrating
15    data from E-Net to Salesforce; do you know?
16         A.   It hasn't been done yet.  We're in the
17    process of trying to come up with a migration
18    plan.
19              (Exhibit 18: 2020 Security of the voter
20           registration system artifacts and
21           attestation pursuant to Rule 590-8-3-.01
22           December 18, 2020 marked for
23           identification, as of this date.)
24         Q.   All right.  Grab Exhibit 18, please.
25         A.   2020 security of voter registration
```

Page 185

1    system, artifacts and attestation.

2        Q.   Yeah, so we're still on the same

3    subject of the same time frame of the e-mails we

4    were looking at between you and Mr. Hamilton

5    about this rule attestation.

6             Do you see that?

7        A.   Yes.

8        Q.   And this is dated December 18, 2020.

9    Do you see that on the front page?

10       A.   Yes, I've got it.

11       Q.   And if you come down to the bottom of

12   the cover page, do you see David Hamilton's

13   signature is there next to CISO?

14       A.   You're saying all the way to the

15   bottom?

16       Q.   If you just go to the bottom of the

17   first page.  Not the end of the whole document.

18       A.   Oh, bottom of the first page.  Sorry, I

19   went to the bottom of the document.

20       Q.   Yeah, sorry.

21            Bottom of the first page, you'll see

22   his signature there.

23       A.   Yeah.

24       Q.   So okay.  I'm sorry, you said yes?

25       A.   Yes, I did.

Page 186

1          Q.    And then have you seen this before?

2                Is this -- do you recall him

3    circulating this to you?

4          A.    He probably copied me on it.  I don't

5    know that I read it completely.  I can tell you

6    at 40 some pages I doubt I read the whole thing.

7          Q.    Okay.

8          A.    We probably talked through it.

9          Q.    If you come to page 6 of the PDF,

10   you'll see it says Executive Summary.

11               Do you have that?

12         A.    I'm looking for -- what year -- you

13   don't know what page that is, do you?

14         Q.    Page 6.  If you look in the bottom

15   right corner, it's page 6.  And at the top it

16   says, Executive Summary.

17         A.    Got it.  Yep.

18         Q.    And here in the second paragraph it

19   states, Currently our agency does not, not is in

20   all caps, meet the requirements of the rule.  Out

21   of the 38 requirements, we only meet 66 percent.

22   Most short falls are Civix related.  If we accept

23   their items, we are at 81 percent, which is

24   better.

25               Do you see that?

Page 187

1          A.   Yes.

2          Q.   And if you come down below that, do you

3     see the dashboard?

4          A.   Yes.

5          Q.   And under -- it's got a -- a subsection

6     of the rule, a description and then status,

7     whether it's met, fully met, partially met not

8     net or an exception.

9               Do you see that?

10         A.   Yes.

11         Q.   And am I reading this right that what

12    -- what's indicated in the dashboard below, that

13    indicates what Mr. Hamilton concluded about

14    whether some -- each particular subsection of the

15    rule is met at this time?

16         A.   Yes.  That's his perspective.

17         Q.   Okay.  All right.  We've been going a

18    while.  Why don't we take another short break,

19    Mr. Beaver, and then we'll -- we'll get you out

20    of.  Sorry, you need to leave by 4:15; is that

21    right?

22         A.   Yes.

23         Q.   Okay.  All right.  Let's take a short

24    break.

25              THE VIDEOGRAPHER:  The time is 2:24.

Page 256

```
 1                 REPORTER'S CERTIFICATE

 2

 3         I, V. Dario Stanziola, a Certified

 4   Court Reporter in the State of Georgia, duly

 5   commissioned and authorized to administer oaths

 6   and to take and certify depositions, do hereby

 7   certify that on Wednesday, February 2, 2022,

 8   Sanford Merritt Beaver, being by me personally

 9   duly sworn to tell the truth, thereupon testified

10   as above set forth as found in the preceding

11   pages, this examination being recorded

12   stenographically by me verbatim and then reduced

13   to typewritten form by me, that the foregoing is

14   a true and correct transcript of said proceedings

15   to the best of my ability and understanding; that

16   I am not related to any of the parties to this

17   action; that I am not interested in the outcome

18   of this case; that I am not of counsel nor in the

19   employ of any of the parties to this action.

20              IN WITNESS WHEREOF, I have hereto set

21   my hand, this the 8th day of February 2022.

22

23   _____

     V. DARIO STANZIOLA, CCR (GA)(NJ), RPR, CRR

24   Certification Number: 4531-3928-0743-6288

25
```

**SLIPSHEET**

Page 1

1            IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3

     DONNA CURLING, ET AL.,
4
                    Plaintiffs,
5                                      CIVIL ACTION FILE
         vs.                           NO. 1:17-CV-2989-AT
6
     BRAD RAFFENSPERGER, ET AL.,
7
                    Defendants.
8

9

10

11            VIDEOTAPED ZOOM DEPOSITION OF
                      MICHAEL BARNES
12
                   February 11, 2022
13                     9:04 A.M.

14

15        Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC

16

17

18

19

20

21

22

23

24

25

Page 33

1    and accuracy testing on the old DRE system.

2              Is there other testing that was done to

3    look for malware or some other compromise of the DRE

4    system, to your knowledge?

5         A.   I -- I do not recall at this moment.

6         Q.   Do you know why the Secretary's office

7    never performed any forensic examination of any of

8    the DRE voting equipment or the -- or the servers,

9    the GEMS servers?

10             MS. LaROSS:  Objection to the form of the

11        question.

12             THE WITNESS:  No, sir, I do not.

13   BY MR. CROSS:

14        Q.   Who would make that decision on whether to

15   conduct that type of examination?

16        A.   I believe that would be a decision that

17   would be made by the Secretary.

18        Q.   Do you know if there was ever discussion

19   or consideration of that type of examination of the

20   old system?

21        A.   I do not know.

22        Q.   Who would you ask if you wanted to know?

23        A.   I -- I would ask, most likely, our general

24   counsel.

25        Q.   Is that Ryan Germany?

Page 306

1                    COURT REPORTER DISCLOSURE
2
3        Pursuant to Article 10.B. of the Rules and
         Regulations of the Board of Court Reporting of the
4        Judicial Council of Georgia which states: "Each
         court reporter shall tender a disclosure form at the
5        time of the taking of the deposition stating the
         arrangements made for the reporting services of the
6        certified court reporter, by the certified court
         reporter, the court reporter's employer, or the
7        referral source for the deposition, with any party
         to the litigation, counsel to the parties or other
8        entity. Such form shall be attached to the
         deposition transcript," I make the following
9        disclosure:
10
11       I am a Georgia Certified Court Reporter. I am here
         as a representative of Veritext Legal Solutions.
12       Veritext Legal Solutions was contacted to provide
         court reporting services for the deposition.
13       Veritext Legal Solutions will not be taking this
         deposition under any contract that is prohibited by
14       O.C.G.A. 9-11-28 (c).
15
16       Veritext Legal Solutions has no contract/agreement
         to provide reporting services with any party to the
17       case, any counsel in the case, or any reporter or
         reporting agency from whom a referral might have
18       been made to cover this deposition. Veritext Legal
         Solutions will charge its usual and customary rates
19       to all parties in the case, and a financial discount
         will not be given to any party to this litigation.
20
21       _Lee Ann Barnes_
22
23       LEE ANN BARNES, CCR B-1852B, RPR, CRR, CRC
24
25