# Exhibit 5

The following is the PDF of an official transcript. Official transcripts may only be filed in CM/ECF by the Official Court Reporter and will be restricted in CM/ECF for a period of 90 days. You may cite to a portion of the attached transcript by the docket entry number, referencing page and line number, only after the Court Reporter has filed the official transcript; however, you are prohibited from attaching a full or partial transcript to any document filed with the Court.

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                        ATLANTA DIVISION

 3

 4   DONNA CURLING, ET AL.,            :
                                       :
 5           PLAINTIFFS,               :
     vs.                               :  DOCKET NUMBER
 6                                     :  1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,       :
 7                                     :
             DEFENDANTS.               :
 8

 9

10       TRANSCRIPT OF TELEPHONE CONFERENCE PROCEEDINGS

11           BEFORE THE HONORABLE AMY TOTENBERG

12          UNITED STATES DISTRICT SENIOR JUDGE

13                    JANUARY 27, 2022

14                       12:30 P.M.

15

16

17

18

19

20

21   MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                  TRANSCRIPT PRODUCED BY:

23

     OFFICIAL COURT REPORTER:         SHANNON R. WELCH, RMR, CRR
24                                     2394 UNITED STATES COURTHOUSE
                                       75 TED TURNER DRIVE, SOUTHWEST
25                                     ATLANTA, GEORGIA  30303
                                       (404) 215-1383
```

```
 1              A P P E A R A N C E S   O F   C O U N S E L

 2

 3    FOR THE PLAINTIFFS DONNA CURLING, DONNA PRICE, JEFFREY
      SCHOENBERG:

 4

 5         DAVID D. CROSS
           MARY KAISER
 6         MORRISON & FOERSTER, LLP

 7         ADAM M. SPARKS
           KREVOLIN & HORST, LLC
 8

 9

10    FOR THE PLAINTIFFS COALITION FOR GOOD GOVERNANCE, LAURA DIGGES,
      WILLIAM DIGGES, III, AND RICARDO DAVIS:

11

12         BRUCE BROWN
           BRUCE P. BROWN LAW
13
           ROBERT ALEXANDER McGUIRE, III
14         ROBERT McGUIRE LAW FIRM

15         CARY ICHTER
           ICHTER DAVIS LLC
16

17    FOR THE STATE OF GEORGIA DEFENDANTS:

18
           VINCENT ROBERT RUSSO, JR.
19         CAREY A. MILLER
           ROBBINS ROSS ALLOY BELINFANTE LITTLEFIELD, LLC
20

21         BRYAN P. TYSON
           TAYLOR ENGLISH DUMA
22

23    FOR THE FULTON COUNTY DEFENDANTS:

24
           DAVID LOWMAN
25         CHERYL RINGER
```

```
 1                  P R O C E E D I N G S

 2   (Atlanta, Fulton County, Georgia; January 27, 2022.)

 3              THE COURT:  Good afternoon.  This is Judge Totenberg

 4   here on a teleconference in Curling v. Raffensperger, et al,

 5   Case Number 1:17-CV-2989.

 6              I think -- well, I'm going to just go through --

 7   would the State of Georgia's counsel go ahead and identify who

 8   is present.

 9              MR. TYSON:  Good afternoon, Your Honor.  Bryan Tyson,

10   Vincent Russo, and Carey Miller.

11              THE COURT:  Okay.  And would the Curling counsel

12   indicate who is present.

13              MR. CROSS:  Good afternoon, Your Honor.  This is

14   David Cross for Curling plaintiffs.  I'm not sure who else is

15   on the conference.

16              MR. SPARKS:  Good afternoon, Your Honor.

17              MS. KAISER:  Good afternoon, Your Honor.  This is --

18   go ahead, Adam.

19              MR. SPARKS:  Adam Sparks also for Curling plaintiffs

20   also here.

21              MS. KAISER:  And this is Mary Kaiser as well.

22              THE COURT:  Mr. Cross, Ms. Kaiser, and Mr. Sparks;

23   right?

24              MR. CROSS:  Yes.  I believe so, Your Honor.

25              THE COURT:  All right.  And who is here for the
```

 1    Coalition?

 2            MR. ICHTER:  Cary Ichter here for the Coalition.

 3            MR. BROWN:  Bruce Brown for the Coalition.

 4            MR. McGUIRE:  And Robert McGuire.

 5            THE COURT:  Very good.

 6            And is there anyone present for Fulton County, and

 7    who is it?

 8            MS. RINGER:  Good afternoon, Your Honor.  Cheryl

 9    Ringer for Fulton County.

10            THE COURT:  Thank you, Ms. Ringer.

11            MR. LOWMAN:  David Lowman for Fulton County.

12            THE COURT:  Good.

13            All right.  We also -- I don't know whether they are

14    present or not.  But a number of reporters asked to be able to

15    sit in.  And that is fine.  Though if we end up in some section

16    of the hearing at the end that has -- that I have to do on a

17    confidential basis, I will excuse people accordingly.

18            I don't know whether there is anyone else other than

19    lawyers who are present.  But I do just want -- in case there

20    are, I just want to advise everyone that you are not authorized

21    to record the hearing.  A transcript will be made available

22    later on.  But you are not authorized to record the hearing.

23            So I mean, I would be doing this in open court but

24    for the circumstances and the need to move quickly on this.

25            I think I read everything that you -- the very large

1    volume of submissions regarding discovery disputes that have

2    been submitted.  And it seemed like there were seven major

3    disputes and many side disputes.  I mean, each one encompasses

4    many different things.

5          I don't know in the time that we have that we are

6    going to be able to converse about all of these issues.  And

7    I'm not sure they all need to be conversed about either.  But

8    that is why I asked you to please let me know your priorities.

9          I'm sorry that it was so much at the last moment.

10   But it wasn't until I fully understood at 2:30 in the morning

11   that we would never make progress if we had to go through all

12   of this that I decided, you know, I couldn't treat all of the

13   disputes as equal.

14         So I don't know because of the extra half an hour

15   whether the State has been able to add anything.  I know I've

16   got something at least from the plaintiffs.  But -- and -- I

17   don't think I have anything from any of the defendants at this

18   point.

19         If you've had any opportunity to think about that,

20   Counsel, let me know right now.  Otherwise, I'll just proceed

21   accordingly.

22         MR. TYSON:  Thank you, Your Honor.  This is Bryan

23   Tyson for the State defendants.  Mr. Miller was in Dr. Appel's

24   deposition this morning.  And we were trying to get our heads

25   together on the question for you.

```
1              THE COURT:  Yes.
2              MR. TYSON:  From our perspective, the remaining
3    discovery disputes that are top three, as you indicated, there
4    is a dispute about documents with the Coalition that is kind of
5    connected to the 30(b)(6) that has been pending for -- before
6    the Court as Number 1 on our list in Document 1280.
7              We also had a dispute with the Curling plaintiffs
8    about the documents and communications about the important and
9    time-sensitive issue that is addressed there as Number 2.
10             And then Number 6 regarding Dr. Halderman and the
11   production of documents, that is the other discovery dispute
12   for us that we believe is the top three from our perspective.
13             So Numbers 1, 2, and 6 in our -- and then also, Your
14   Honor, I think the experts that the Coalition has are going to
15   be contingent on the status of the supplemental expert reports.
16   We don't see that -- I mean, it is a connected issue.
17             But since you were asking us for specific discovery
18   disputes, those are the ones we see.
19             THE COURT:  All right.  Number 6, the Curling -- that
20   you mentioned as the Curling and the Halderman, is this the
21   request about underlying data?  Is that what you are speaking
22   about?
23             MR. TYSON:  Yes, Your Honor.  This is Bryan Tyson.
24   Yes, that is what it is regarding.  The document request of
25   Dr. Halderman for underlying data and some of the other pieces
```

1    of his analysis.

2              THE COURT:  Okay.

3              MR. CROSS:  Your Honor, this is David Cross.  I think

4    I can help us all -- Your Honor, this is David Cross.  I think

5    I can help us all.

6              THE COURT:  No.  Let me just hear -- let me hear

7    first from Fulton County.  And then I'll hear from you.

8              MR. CROSS:  Okay.

9              THE COURT:  Did Fulton County have any priorities?

10             MS. RINGER:  Your Honor, this is Cheryl Ringer for

11   Fulton County.

12             We did not ourselves have any priorities.  I

13   understand that the Coalition plaintiff has put forth three

14   items.  And I believe that there is not really as much of a

15   dispute as outlaid.  There is a need for us to supplement our

16   responses.  But we have advised that the county has provided

17   what we have.

18             With respect to the so-called intention to exclude

19   the 30(b)(6) witness, I think that is a mischaracterization.

20   Our understanding is that Mr. Brown was on the emails when we

21   were coordinating this with Mr. Sparks as far as the dates for

22   the 30(b)(6) deposition.  But we have not made any objections

23   if the Coalition plaintiffs feel like they need additional

24   time.

25             THE COURT:  Okay.  I'll have to get clear about what

```
1    that is about.  But that is fine.  We'll -- thank you.
2              MS. RINGER:  Okay.  Thank you.
3              THE COURT:  And this is relative to what the
4    Coalition wants from you -- is that right? -- as to 30(b)(6)?
5              MS. RINGER:  Yes, ma'am.  That's correct.  That's
6    correct.
7              THE COURT:  And which witness is it who is going to
8    be a 30(b)(6)?
9              MS. RINGER:  We actually have several.  So we have
10   three -- we have three individuals that are identified that
11   were supposed to be deposed last week.  We only got to two of
12   them.  The third person and the fourth person will be available
13   for deposition on Monday the 31st.
14             THE COURT:  So does the Coalition actually have any
15   issue then left about this?  Let me just sort of wrap that one
16   part up.
17             Who is going to be speaking for the Coalition?
18             MR. BROWN:  Mr. Ichter is.
19             MR. ICHTER:  Yeah.  I'm not exactly certain.  I
20   wasn't involved in the taking of the 30(b)(6) depositions --
21   Fulton depositions that have gone forward at this point.
22             Our issues, as I understand them, more specifically
23   deal with certain documents that have not been produced and
24   then relatedly to who Fulton County would propose to have
25   appear as a 30(b)(6) witness in connection with testifying
```

```
 1    about subjects related to those documents.
 2              THE COURT:  All right.  Well, I want to deal --
 3    partially also because Mr. Cross is going to -- I guess you
 4    have to disappear at 2:30, or do you -- or is the plane at
 5    2:30?
 6              MR. CROSS:  The plane is at 3:20.  So I have got some
 7    time.
 8              THE COURT:  All right.  What were you trying to add
 9    right now?
10              MR. CROSS:  Well, I was just going to say:  The
11    second item on Mr. Tyson's list I think could be resolved.  We
12    confirmed that we would produce those documents this week.  So
13    I don't think there is any issue there.
14              THE COURT:  Okay.
15              MR. TYSON:  Your Honor, this is Bryan Tyson.  If we
16    receive the documents, that does resolve it for us.  But that
17    is the main thing.  We just haven't gotten them yet.  So if
18    they are going be produced this week, we're good.
19              THE COURT:  Okay.  Thank you.  This has been helpful.
20    I want to start off with a few remarks.
21              A, while I realize there has been some delay because
22    documents were needed before 30(b)(6) depositions could be
23    taken, I remain committed to holding the line on the -- on a
24    deadline for discovery and not letting this roll.  As it is,
25    I'm self-critical that I have allowed it to go this long.
```

1    Though I understand it is a complex case.

2            But the intent here initially really was to have a --

3    you know, develop a necessary but limited record that would be

4    sufficient and updated for me to make some rulings on --

5    threshold rulings on standing.

6            And I realize that the merits issues sometimes

7    obviously are a part and parcel of that.  But this is

8    definitely when I look at this pile of disputes and the scope

9    of what we're dealing with beyond what I anticipated.  And I'm

10   just not going to let it mushroom any further.

11           So just to deal first with the Curling plaintiffs'

12   issues and to the extent that those are -- some of them may

13   also be overlapping obviously with the Coalition plaintiffs and

14   also related to perhaps what the State defendants have.  The

15   first issue was the state secrets privilege claim.

16           And I have reviewed the briefing on that.  I don't

17   think that there's much that has been established that really

18   is kind of really strictly in conformity with state secrets

19   that normally deal with military defense and national defense

20   and sometimes pursuant to a statute or something else.

21           Though I do think that the State made an important

22   point in referencing the way in which the critical

23   infrastructure under federal law is certainly a high value and

24   needs to be protected.  And critical infrastructure, as we

25   know, does include election structure -- the election system.

1    And we dealt with that a number of years ago just even in the

2    testimony about the significance of protecting critical

3    election infrastructure.

4         And so that is the closest it seems to me that we get

5    to really having legal authority about what the kind of

6    national significance is of maintaining and protecting the --

7    the functionality of the infrastructure of the election system,

8    which also can require protecting -- that it is not -- that it

9    is actually fully protected and we look at its vulnerabilities

10   also.

11        I thought that the -- all of that said, there is --

12   whether it is from Fortalice or from the State's own computer

13   folks and IT folks or the plaintiffs' own experts, everyone

14   works with confidential data that in the wrong hands, whether

15   that be foreign or otherwise, can be -- jeopardize the

16   integrity of the system.

17        And I thought that the offer that had been made by

18   the defendants to provide some form of redacted report from

19   Fortalice was perfectly reasonable.  There seemed to be some

20   hiccup about cost.  But why don't you -- I don't know why you

21   couldn't split the cost.

22        Is there any reason why we wouldn't proceed in that

23   way?  This is to Curling plaintiffs.

24        MR. CROSS:  Your Honor, this is David Cross.  We

25   certainly are fine with the redactions, and I did just want to

 1  make sure the record is clear.  We actually were the ones that

 2  proposed that back in November.

 3          THE COURT:  All right.  I saw that too.

 4          MR. CROSS:  So I just wanted to make sure.  The

 5  redaction -- it is hard for me to say in the abstract because I

 6  don't know the cost.  If it is a nominal cost, then I don't

 7  think I have a problem splitting it.

 8          But we do view this as party discovery because the

 9  State is the one that is asserting the privilege.  It is their

10  agent.  And even if you do it on a proportionality assessment,

11  these are highly, highly relevant documents.

12          And so it is not like we're asking for something that

13  is marginal here and you might shift the cost for that basis.

14  So I would respectfully ask that we don't bear any of the

15  costs.  But if it is a nominal expense, we won't litigate that.

16          MR. TYSON:  Your Honor, this is Bryan Tyson for the

17  State defendants.  Since we have got the email yesterday

18  evening asking for the cost estimate, we sent that immediately

19  to the counsel for Fortalice.  Their folks are working on that,

20  and we talked to them just before we got on the call here.

21          They indicate they will have an estimate of that by

22  tomorrow.  So that is -- we will have an estimate at that

23  point.  And then we'll know the answer.  And I apologize we

24  don't have that for you today.

25          Mr. Cross is correct.  And in talking to Fortalice,

1    the redactions -- we had remembered that being a redaction of

2    some different documents.  But I think that that is a

3    reasonable solution if we can get there.  And we should have

4    that cost estimate in place by tomorrow, according to what the

5    folks said -- Fortalice counsel have told us just a few minutes

6    ago.

7              THE COURT:  All right.

8              MR. CROSS:  Your Honor, if I may, I have one

9    follow-up question on that.

10             THE COURT:  Yes.

11             MR. CROSS:  In addition to cost, also timing.

12   Because we have the depositions coming up next week.  I mean,

13   we would be open to pushing those out by some short measure if

14   we had to.  But we do want to make sure we get these documents

15   before the 30(b)(6) testimony.

16             So, Bryan, I don't know if you have any insight as to

17   the timing.

18             MR. TYSON:  Again, Bryan Tyson.  I don't have any

19   insight into timing.  I think what the Fortalice folks -- and

20   folks here can correct me if I'm wrong.  What they described

21   they were working on was a proposal that would be basically

22   redacting the information from all of the documents where state

23   secret privilege was asserted, which is probably going to be

24   extremely expensive.  Because like one of the documents alone

25   is 19,000 pages long.

1           Doing a subset, such as the reports and the drafts

2      that were provided to the Court, is probably going to be

3      substantially less.  But we were trying to get estimates on all

4      of those universes so then we could make a call on that.

5           THE COURT:  Well, the 19,000-page report, which I did

6      not -- or whatever it was, was not -- must have been data

7      runs -- right? -- rather than -- because I read every single

8      report.

9           MR. TYSON:  Yes, Your Honor.

10          THE COURT:  Okay.

11          MR. TYSON:  Yes, Your Honor.  Bryan Tyson.  That is

12     some of the output from the data.  Those were included in the

13     assertion of state secrets privilege because they included IP

14     addresses and a variety of specific kind of computer routing

15     information about the Secretary's network.

16          THE COURT:  Okay.  So is it your plan to give

17     alternative estimates that include -- you know, if we include

18     this, it is going to be this much; if we include that, it will

19     be that much?

20          MR. TYSON:  Yes, Your Honor.  Bryan Tyson again.

21     That is our plan to have -- if you want to do all the documents

22     over which a state secret was asserted, if that is what the

23     plaintiffs are looking for, we'll have a number on that.  If it

24     is just the reports, that is obviously much quicker and easier.

25     The ones that you reviewed, that's much quicker and easier and

1   simpler and probably dramatically cheaper.  So we wanted to

2   have both of those options available.

3           THE COURT:  All right.  Good.  All right.  I'm going

4   to view that as resolved.

5           The Curling plaintiffs next listed other Fortalice

6   reports and related communications State defendants have not

7   produced.  I don't know what that means separate from Number 1.

8           MR. CROSS:  Yes, Your Honor.  This is David Cross.

9   It is possible it overlaps.  We just don't know because we

10  don't know what all is in the universe of Fortalice reports.

11          What we do know is that there were task orders, for

12  example, that the State produced that indicate what Fortalice

13  has done.  And I won't get into the specifics on that here.

14  But Fortalice has done some continuing cybersecurity consulting

15  work for them into 2020 and 2021.  And that for those projects,

16  there were monthly reports.

17          And we also know that Fortalice also did penetration

18  testing at least on an annual basis and it sounds like a

19  general cybersecurity assessment.  And there was at least an

20  email report for that.

21          We have been through the production from both

22  Fortalice and the State.  And we haven't found those reports.

23  And so we were trying to figure out if we're going to get them.

24          THE COURT:  I think the penetration testing is among

25  the reports that I reviewed.

```
 1              MR. CROSS:  Okay.  So maybe that overlaps.
 2              THE COURT:  Yeah.  I may be wrong.  I mean, I know it
 3    is.  But I don't know whether there is something else.
 4              All right.  Mr. Tyson, do you want to say anything
 5    more about this?
 6              MR. MILLER:  Your Honor, this is Carey Miller.  And
 7    I'll speak to this briefly.
 8              You know, from what I understand from the monthly
 9    reports, I'm not frankly entirely sure if they were reduced to
10    writing.  I do recall some testimony of Mr. Hamilton, the
11    Secretary of State's former CSO, talking to -- essentially that
12    the Secretary wasn't necessarily receiving the report.
13              I truly don't have enough personal knowledge to
14    answer that question.  But I have a strong suspicion that what
15    you are referring to is reflecting those reports.
16              THE COURT:  Okay.
17              MR. CROSS:  Your Honor, this is --
18              THE COURT:  Go ahead.
19              MR. CROSS:  This is David Cross.  I guess the only
20    thing I would just ask is that we -- if the State would commit
21    to follow up with their client and make sure that they have
22    searched and collected these.
23              I mean, I understand it may overlap with the stuff we
24    got from Fortalice.  But the State should also have these
25    documents.  And they have been operating through staff from
```

```
 1   Fortalice.
 2          And my understanding from the Hamilton deposition was
 3   that these were written reports that went to Mr. Beaver.  So if
 4   we could just get it from the State that they will make sure
 5   they search for whatever they have, then I think that resolves
 6   it.  And we want them before the 30(b)(6) depositions.
 7                    (There was a brief pause in the proceedings.)
 8          THE COURT:  Are you in a spot that you can speak more
 9   clearly?  The court reporter, Ms. Welch, is having trouble
10   catching everything you are saying.
11          MR. CROSS:  Sorry.  I'm in a car headed to the
12   airport.
13          Can you hear me okay?
14          THE COURT:  It is just that somebody else also is
15   speaking.
16          COURT REPORTER:  I think it is an echo.
17          MR. CROSS:  Yeah.  I think it is the Uber driver's
18   nav.  Sorry.
19                    (A discussion ensued off the record.)
20          THE COURT:  All right.  Well, I take it, Mr. Miller,
21   that you will check on that.  Is that --
22          MR. MILLER:  Yes, Your Honor.  We certainly will.
23   And frankly we'll probably also check directly with Fortalice,
24   which probably will be able to locate things a lot easier.
25          THE COURT:  I bet that is true.  Thank you.
```

```
 1            And I don't know which defense counsel of the State's
 2    counsel is going to respond to this.  But there is an alleged
 3    refusal to provide verification for the State's interrogatory
 4    answers.
 5            Is that a refusal, or you just haven't gotten around
 6    to it?
 7            MR. TYSON:  Your Honor, this is Bryan Tyson.  My --
 8    I'll rely on Mr. Russo and Mr. Miller.  They have better
 9    knowledge than I do on this.
10            But my recollection is it was a matter of we needed
11    verifications from the Curling plaintiffs, they needed
12    verifications from us, and that we just hadn't gotten around to
13    it.
14            I don't think we are refusing to provide
15    verifications to interrogatories.
16            MR. RUSSO:  That is true.  This is Vincent Russo,
17    Your Honor.  We're not refusing to provide verifications by any
18    means.
19            But we just wanted to make sure all parties are
20    providing them.  We hadn't received any in this case either.
21    So that was it.
22            THE COURT:  Okay.  Well, obviously everyone needs to
23    be providing verifications.  You-all should -- what is a
24    reasonable drop-dead date for verifications in your mind?  Is
25    it February 15?
```

```
 1              MR. CROSS:  Your Honor, this is David Cross.  We --
 2     I'm sorry.  This is David Cross.
 3                    (Unintelligible cross-talk)
 4              THE COURT:  Go ahead.
 5              MR. CROSS:  Because we wanted them before the
 6     depositions just so we know who is (unintelligible) --
 7              THE COURT:  All right.  Well, who is -- when is your
 8     next deposition?
 9              MR. CROSS:  We have Chris Harvey tomorrow.  And then
10     after that, the State's next deposition is February 2nd,
11     unless -- and I was going to raise this, Your Honor.  I realize
12     I didn't put this in our list of three because I didn't realize
13     this was a dispute until I read the State's filing on Jordan
14     Fuchs.
15              We designated -- we noticed her for deposition on
16     Monday.  I saw they objected to that in a filing to the Court.
17     So that is an important dispute that we need to resolve.
18              THE COURT:  Well, does Mr. Harvey -- was the State
19     planning to have Mr. Harvey sign any of the verifications?  And
20     I realize sometimes you have more than one person filing --
21     signing a verification on the interrogatories.
22              But is she --
23              MR. TYSON:  And, Your Honor, this is --
24              THE COURT:  Go ahead.
25              MR. TYSON:  I'm sorry.
```

```
 1                THE COURT:  Go ahead.

 2                MR. TYSON:  Your Honor, this is Bryan Tyson.  We were

 3      not planning to have Mr. Harvey verify.  He is no longer an

 4      employee of the Secretary's office.  So we're going to have to

 5      have kind of multiple most likely Secretary employees do those

 6      verifications.

 7                THE COURT:  Okay.  All right.  Well, then we don't

 8      have the problem for tomorrow, in other words.  But we have it

 9      for follow-up ones.  So I think then we really have -- people

10      have to move and get it done before the depositions of those

11      individuals.

12                And my understanding -- and this sort of relates to a

13      number of different things about the -- that all parties have

14      raised is the question of the number of individuals who have

15      been identified for 30(b)(6) depositions.

16                And I wasn't sure whether the Jordan Fuchs -- I'm

17      just -- imperfect recall now from looking at the materials.

18                Did the deletion of Jordan Fuchs come when the

19      plaintiffs asked for the potential deposition of Mr.

20      Raffensperger, from the State's perspective?

21                MR. CROSS:  No, Your Honor.  Those are unrelated.  We

22      had asked --

23                COURT REPORTER:  I'm sorry.  Who was that?

24                THE COURT:  Mr. Cross.

25                Go ahead.
```

```
 1              It is Mr. Cross speaking.

 2              MR. CROSS:  Sorry.  It is Mr. Cross.

 3              We had asked -- we had indicated I think back in 2020

 4   that we wanted -- we would need to take a deposition of

 5   Ms. Fuchs once we got the deposition discovery and has served

 6   some discovery specifically related to her as the State noted.

 7   So we had been seeking her deposition for quite some time.  It

 8   is unrelated to Secretary Raffensperger.

 9              THE COURT:  Well, what is Ms. Fuchs' scope of

10   responsibility?  And I'm going to ask the State defendants to

11   respond to that.

12              MR. TYSON:  Your Honor, this is Bryan Tyson.

13   Ms. Fuchs is the Deputy Secretary of State.  So a lot of her

14   stuff is more administrative in nature.

15              If you will recall, the issues involved with

16   Ms. Fuchs were a subpoena was served on her in the aftermath of

17   the 2020 election trying to secure documents from her.  And we

18   had a discovery dispute, which is 1026, which kind of

19   encapsulates everything there on what was being sought and what

20   the issues were.  So that is all filed on the docket there.

21              And we don't recall any -- her deposition ever being

22   raised.  What we recall is a -- when we discussed it, there was

23   a subpoena for records and those kind of things.  But we don't

24   recall when we met and conferred about it with the plaintiff

25   that we ever discussed a deposition.
```

1      And Mr. Miller may have something more to add on that

2  point.  But that is what I have.

3      MR. MILLER:  Your Honor, Mr. Tyson has largely hit

4  the nail on the head.  I think the issue was frankly we had a

5  conferral -- I can't recall the exact date off the top of my

6  head.  It was sometime around the first week of January -- that

7  actually discussed the discovery dispute related to the

8  important and time-sensitive issue and at plaintiffs' request

9  also included what we understood to be a comprehensive

10 discovery scheduling plan between the State defendants and the

11 Curling plaintiffs.

12     And at that point, Ms. Fuchs' deposition was not

13 raised, at least according to my recollection and my notes from

14 the call.  So we understood at that point Ms. Fuchs was off the

15 table.  And, frankly, I don't recall getting much communication

16 about this since around 2020.  Obviously a lot has happened in

17 this case.  I might have missed something.

18     But we would also raise, Your Honor, that at this

19 point, setting Ms. Fuchs aside, the Curling plaintiffs have now

20 either taken or scheduled the depositions of 11 different fact

21 witnesses.  And that includes those that are 30(b)(6)

22 representatives that we understand are also being deposed in

23 their 30(b)(1) capacity in a consolidated deposition.

24     And, of course, that goes beyond the rules as

25 required without leave of court.  Setting that aside, we

```
 1    just -- frankly, I'm not entirely sure what exactly Ms. Fuchs
 2    is going to testify that is relevant to this case as opposed to
 3    relevant to the discovery dispute that is pending on the docket
 4    at 1026.
 5              THE COURT:  All right.  Could -- Mr. Cross, what is
 6    the -- why are you seeking Ms. Fuchs' deposition?
 7              MR. CROSS:  Your Honor, she appears on a lot of key
 8    documents that have been produced because of her role at the
 9    Secretary's office, including documents that -- you know, I
10    won't get into the substance but address security issues
11    involving the election system.  And she obviously has a senior
12    prominent role there.
13              She also is the spokesperson for the Secretary's
14    office speaking on election security issues and speaking about
15    this litigation and our clients in particular.  So I think
16    she's right at the heart of what is relevant to this case.
17              I think it is going to be a short deposition.  No
18    more than a half day.
19                    **(Unintelligible cross-talk)**
20              THE COURT:  On the -- I'm just trying to square this
21    with document -- what was in Document 1026.  At that point, you
22    were seeking a very narrow and necessary discovery from her
23    that concerned public statements she made about this case which
24    related to just simply basically her perceptions of the case
25    that didn't have credibility.
```

 1                But why do I need -- why do you need to spend time on

 2     that?

 3                MR. CROSS:  Again, Your Honor, that would only be a

 4     very small piece of it.  That is probably five minutes out of

 5     the deposition.

 6                        **(Noise interference)**

 7                MR. CROSS:  It is more that she, again, is on key

 8     documents (unintelligible) once we can review their documents

 9     now.

10                THE COURT:  You are going to have to talk louder.

11                    **(There was a brief pause in the proceedings.)**

12                THE COURT:  Well, what are the other matters?

13                MR. CROSS:  Is this better?

14                THE COURT:  I mean, you are just saying she's a

15     signatory or CC person on this correspondence?

16                MR. CROSS:  Sorry, Your Honor.  Can you hear me now?

17                THE COURT:  Yes.  That is much better.

18                MR. CROSS:  Okay.  So she is on key documents.  I

19     mean, I can't really talk about those specific documents here.

20     So I guess I'm not sure how to answer that question.

21                Sorry, Your Honor.  Did you hear me?

22                THE COURT:  I did.  I just don't know what to do with

23     -- I have no idea what you are talking about.  It is a -- your

24     other 30(b)(6) witness -- is she a 30(b)(6) witness, or is she

25     something else?

```
 1              MR. CROSS:  She's not been designated as a 30(b)(6).

 2         Your Honor, I'll just make this easier because I know

 3    there is a lot that everyone has to deal with today.  We will

 4    park Ms. Fuchs and get through with the 30(b)(6) deposition.

 5    And if we have issues that we think we need to cover with her,

 6    we'll circle back to the State at that point.

 7              THE COURT:  Thank you.  Thank you.

 8         All right.  So then you have then Mr. Beaver,

 9    Mr. Sterling, and Mr. Barnes for the 30(b)(6) depositions.  And

10    that is not in contest, as I understand it?

11              MR. TYSON:  Your Honor, this is Bryan Tyson.  That's

12    correct.  Those are the designees, and I think we're good on

13    those.

14              THE COURT:  And Mr. Harvey also, I guess?

15              MR. TYSON:  Yes.  I think Mr. Harvey may have one or

16    two subtopics.

17              MR. MILLER:  Yes, Your Honor.  I don't want to spring

18    this on the Curling plaintiffs.

19              THE COURT:  And this is Mr. Miller?  Just for the

20    record, this is Mr. Miller speaking now?

21              MR. MILLER:  Yeah.  I'm sorry.  Yes.

22         I don't know that we can directly address

23    Mr. Harvey's deposition tomorrow.  We're assuming that is

24    intended to be the consolidated 30(b)(1) and 30(b)(6).  I did

25    just want to clarify that.  But like I said, I don't mean to
```

 1    spring that on anybody.

 2             MR. CROSS:  Yes.  This is David Cross.  I think what

 3    we had told the State was:  To the extent we had questions for

 4    any of these witnesses in their personal capacity, we would

 5    just run that in parallel with the 30(b)(6) and try to just get

 6    all that done in one day for each of them.

 7             THE COURT:  Okay.  As long as that is fine with the

 8    defense counsel.

 9             All right.  So those were your priority items.  And

10    I'm now just going to move to what the State has about the

11    Curling plaintiffs because, again, at some point I gather that

12    Mr. Cross needs to disappear.

13             It looked like the State's highest concern was --

14    relative to Curling was this Halderman underlying data -- and

15    the supplemental experts, were those all -- the supplemental

16    experts, those were of the Coalition, weren't they?

17             MR. MILLER:  This is Carey Miller, Your Honor.

18    That's correct.

19             THE COURT:  All right.  So my understanding was from

20    reading the materials that at some point plaintiffs offered for

21    representatives of the Secretary of State's office -- their

22    expert to come to Michigan and review underlying data and

23    software used by Dr. Halderman but now say, well, you know,

24    because of the passage of time, we're not willing to do that.

25             But it seems to me that that is a viable way of

1   proceeding.  I'm not sure other than everyone's own

2   intransigence and the dynamics of this case why we wouldn't try

3   to -- that seems like a reasonable way of proceeding without in

4   any way compromising security of the -- of the software and it

5   could give -- would give the State defendants the underlying

6   information it is looking for.

7        MR. TYSON:  Your Honor, this is Bryan Tyson.  Again,

8   I know a lot has happened in this case.  And I'm sure someone

9   will correct me if I'm wrong.

10       But I don't recall a post Dr. Halderman's report

11  before his deposition -- an offer for us to come and review

12  documents in his lab or anywhere else.  I know there was some

13  discussion of that when we were doing DREs and we were doing

14  GEMS and all that kind of thing.  I think that was like two

15  years ago when we were first talking about the GEMS databases

16  and those kind of things.

17       And Mr. Miller is signaling for me that he went up to

18  the University of Michigan at that time -- Morrison Foerster's

19  office -- I'm sorry -- in Washington.

20       But I think that's a workable solution if it is what

21  would work.  I mean, I think the objections that the Curling

22  plaintiffs made in Document 1246 were that we were too late and

23  it wasn't relevant kind of apart from this is super secret

24  stuff.  We just -- our experts, I think, need to be able to

25  test and look at these things.

1          And ultimately, Your Honor, we don't see a reason

2     though -- I mean, again, I think we have talked back and forth

3     about all of the different ways to handle secure information in

4     this case.  And if the only way we could do it is going to

5     Dr. Halderman's lab, that just also seems very far afield from

6     what would be necessary here to go and do that, especially

7     for -- we have consulting experts that are not disclosed that

8     we would want to have review this -- assist us in our

9     preparation.  Obviously their identity would be known if they

10    had to travel to Dr. Halderman's lab.

11          So for all those reasons, that is kind of where we

12    are on that, just looking at that issue.

13          THE COURT:  Well, I think -- I mean, I do understand

14    completely why the State says -- you can't just say, well, it

15    is either too late or you have to -- the State has a legitimate

16    interest in being able to understand the way in which

17    Dr. Halderman proceeded in his analysis and whether -- he

18    probably has some proprietary interest himself in whatever

19    software that he has used or his methodology though, just as

20    everyone else is trying to protect the security of their own

21    software.  But it is more so in the event it were to be in any

22    way loosely used.

23          So that is why in my view since you are not planning

24    to have -- I gather -- I mean, unless Dr. Gilbert is going to

25    be testifying -- I mean, that would have been an easy way if

```
 1    you told me Dr. Gilbert is testifying about this and he is --
 2    so provide the information to Dr. Gilbert.  I don't --
 3            MR. MILLER:  Your Honor, I apologize.  This is Carey
 4    Miller.  I don't mean to interrupt.
 5            THE COURT:  No.  That is all right.
 6            MR. MILLER:  The question you were posing there, just
 7    so I understand it, was that essentially is Dr. Gilbert going
 8    to be the one looking at this?  Is somebody else?  And is
 9    somebody going to be testifying to it?  Do I understand that
10    correctly?
11            THE COURT:  No.  Because I gather that no one is
12    testifying as to it because you have -- unless Dr. Gilbert
13    hasn't been -- unless there is still a supplemental affidavit
14    for Dr. Gilbert because you haven't identified another expert
15    that I recall that was --
16            MR. MILLER:  Your Honor, I apologize.  The State --
17    and this is Carey Miller again.  The State does not intend to
18    provide a supplemental report of Dr. Gilbert.
19            As the Court is aware from our position on the
20    Coalition plaintiffs' supplemental report, that is just begging
21    for an endless continuation of discovery.
22            THE COURT:  Right.
23            MR. MILLER:  However, the review and analysis will
24    directly go to cross-examination and litigation strategy of the
25    defendants.  And respectfully, Your Honor, I understand the
```

1    Curling plaintiffs' position to the extent they don't want to

2    be sandbagged with a supplemental report.  However, I don't

3    necessarily agree that the State is required to disclose their

4    litigation strategy.

5            MR. CROSS:  Your Honor, this is David Cross.  I think

6    what Mr. Miller is saying highlights our concern.  That Your

7    Honor set a schedule for expert discovery.  That closed the

8    first week of December, from what I recall.

9            We're talking about a report that they got, I think,

10   July 1 of last year.  And the purpose of expert discovery is

11   that each side is on notice of what the other side is going to

12   put into the record and, you know, what rebuttals they have to

13   each side's expert.

14           To say that now, you know, a few days before the

15   close of fact discovery, which was extended only for

16   supplemental stuff, they are going to bring in consultants that

17   we don't know about to look at information that includes

18   software that can hack elections and then they are going to use

19   that in the case, it just defeats the whole purpose of Rule 26

20   on expert disclosures.  And it defeats the purpose of the

21   schedule Your Honor entered last year.

22           THE COURT:  Let me stop you.  Let me stop you just

23   for one second.

24           All right.  All right.  I've got a little bit too

25   many documents in front of me at the moment.

1            But, see, the thing about it is yes, there was -- I

2   understood your argument why it was not timely.  But it is not

3   quite -- what it ignores is the fact that you have this double

4   asterisk that says -- in the table that is in Document 1238,

5   the consent basically extension, denotes that expert discovery

6   means discovery of matters contemplated by Rule 26(a)(2) and

7   (a)(4), in other words, discovery of facts and data that

8   experts considered or relied on for their opinions disclosed in

9   their reports and declarations.

10            And that particular one allowed for -- the double

11   asterisk one, which I don't think I have got the right one in

12   front of me -- allowed it to go, I think, until -- yes,

13   February 15, 2022.  And that was different from the earlier

14   date for defendants' expert rebuttals, if any, to plaintiffs'

15   supplemental expert reports and any guidelines for supplemental

16   reports.

17            So that is I think what they are really traveling on.

18   We're not trying to do an expert report.  We're just trying to

19   have -- basically understand what Dr. Halderman did so that we

20   can effectively cross-examine him, if this case goes to trial.

21            They can't use it in a summary judgment because they

22   don't have an expert who is going to testify about it.  They

23   could point out probably issues as to the mode of analysis.

24   But they can't -- there is not much more than that they can do.

25            But I don't understand -- I don't think it is

1    untimely from that perspective that they are entitled to know

2    what the data is that is the -- and programming that is the

3    basis of his analysis.

4           And I don't know how you run away from the double

5    asterisk in this November 24 filing of the consent extensions.

6           MR. CROSS:  Yeah.  I apologize.  I don't have that --

7    this is David Cross.  I don't have it in front of me.

8           My recollection of what we negotiated and agreed to

9    -- certainly what was intended because I do remember spending a

10   lot of time on this -- was that the only expert discovery that

11   could continue beyond December 6 or whatever the date was was

12   supplemental expert discovery on facts or data that were not

13   previously available to the parties.

14          And I think as I understand it, this is Mr. Miller's

15   objection to the reports that come in from the Coalition

16   plaintiffs.  I take no position on that issue.  But I don't

17   think they can have it both ways and say that they get to take

18   discovery on the report they got on July 1 where they say they

19   need facts and data.  They have already deposed him.  If this

20   is information they needed, they would have asked for it weeks

21   or months before his deposition, not just a couple of days

22   before his deposition and just a few -- shortly before the

23   expert cutoff.

24          So in our view, it is untimely.  And it certainly is

25   not at all what was intended in the supplemental expert

1    discovery.  We weren't waiving any objections on this.

2          And the last point I'll just make, Your Honor, is I

3    am very concerned about the prejudice.  Because what is going

4    to happen is exactly the sandbagging that Mr. Miller sort of

5    hinted at, which is they are going to file a summary judgment

6    brief and they may not have, you know, a new report from

7    Dr. Gilbert or anyone else.  But they are going to have

8    arguments in there that are going to be technical in nature and

9    they are going to say Dr. Halderman did this, that, or the

10   other thing.

11         The only way they can make those arguments is by

12   relying on their consulting experts, which they have admitted

13   because those are the ones they want to look at this underlying

14   data that they say they need to look at.  That means we're

15   going to get a summary judgment motion that is going to have

16   new arguments from undisclosed experts that we have never seen.

17   And we don't even get to depose the people who are doing the

18   analysis that they are going to rely on because they are hiding

19   them -- hiding is not -- that is not a fair word.  They are

20   designating them as consulting experts.

21         Whether that is deliberately or not, the result is we

22   don't get to question the people they admit they are going to

23   rely on to attack Dr. Halderman's report.  They designated two

24   experts in this case --

25         MR. MILLER:  Your Honor --

1          MR. CROSS:   -- Dr. Adida and Dr. Gilbert.   Those are

2    people that they are obligated to rely on for the evidence and

3    the arguments they are going to make.   That is not the role of

4    a consulting expert.

5          So I'm just -- I'm really worried about what we're

6    going to see in a summary judgment motion with no ability to

7    understand what is behind it for Dr. Halderman to be able to

8    respond to it.   And it is just going to push the schedule out

9    because we're going to be coming to Your Honor saying we can't

10   possibly respond to all of these new arguments about his expert

11   report in the window we have for summary judgment.

12         That is why we're supposed to be wrapping things up

13   and not doing things that should have happened last summer.

14         MR. MILLER:   Your Honor, this is Carey Miller.   If

15   the Court would allow me to address some of the arguments there

16   just briefly.

17         THE COURT:   All right.

18         MR. MILLER:   Respectfully, the discovery request was

19   served, as I understand it -- I think it was October 18 when we

20   took that deposition -- shortly before then -- shortly before

21   the deposition.   And, frankly, it doesn't even go with the

22   double asterisk.   It goes with the single asterisk in the

23   scheduling order which says -- provides for the resolution of

24   discovery disputes that are currently outstanding or may arise

25   upon the provision of the currently pending productions and

```
 1    responses.
 2            As I recall, we recognized that the dispute was out
 3    there because we got an objection from the Curling plaintiffs
 4    shortly before our November 19 hearing.  We convened the
 5    meet-and-confer shortly thereafter where we discussed whether
 6    Curling plaintiffs were intending to continue to rely on
 7    Dr. Appel.  Also discussed the discovery dispute and met and
 8    conferred before filing the discovery dispute.
 9            So, Your Honor, this is an issue that the State
10    served before the close of fact discovery, before -- excuse
11    me -- before the close of expert discovery before the Court's
12    order or most recent order extending the schedule.  So I really
13    don't believe the time limit arguments are accurate.
14            But with respect to summary judgment, as we
15    represented to Your Honor, I think Mr. Cross is right as to we
16    would be taking conflicting positions if we were to file a
17    supplemental report.  That is not what we're intending to do.
18            As to the use of summary judgment, I'm a little
19    confounded by that because to the extent there is a dispute of
20    material fact, which I have a hard time imagining this not
21    being a material fact, you know, it is truly not going to
22    matter with respect to summary judgment.  It is for trial.
23            And the Court will recall when we were permitted in
24    very short order to go to DC to review the infected memory card
25    that Dr. Halderman utilized in the hearing before Your Honor
```

```
 1    back in 2018, frankly, before State defendants' current counsel

 2    became a part of this case.  And, Your Honor, without

 3    disclosing too much on, you know, our strategy or on a public

 4    phone call, but the reality is that's simply not what it was

 5    purported to be.

 6          And for those reasons, Your Honor, the State will be

 7    severely prejudiced if we are not permitted to get the data

 8    that is underlying the expert witness who we understand to be

 9    essentially the foundation of plaintiffs' case as far as it

10    concerns the merits.

11          Your Honor, we respectfully think that we're going to

12    have this case resolved at summary judgment on jurisdictional

13    issues.  But we have to defend for all contingencies right now

14    and be prepared to go to trial on the merits.

15          THE COURT:  So would it be -- if I order the data --

16    underlying data and programming to be provided, would it be

17    provided to counsel directly and subject to some type of

18    protective order?  Is that what you envision?

19          MR. MILLER:  That is correct, Your Honor.  We would

20    have -- in fact, their consulting experts already have executed

21    the protective order agreement to be bound just in the event

22    something were to arise we need them to address.

23          But, Your Honor, counsel can receive it, or we can

24    have our consulting expert receive it.  But respectfully, Your

25    Honor, we don't -- we don't necessarily believe that we're
```

1    required to disclose the consulting experts.

2           And if it is something that the Court wants to be an

3    intermediary on, we could do that.  That is kind of where we

4    stand right now.

5           And one thing I forgot to mention earlier is that,

6    you know, when Dr. Halderman's report was filed after he had

7    about ten months to put it together, the State had 14 days to

8    respond.  We are again not intending to sandbag anybody here.

9    We're trying to prepare for trial on the merits in the event we

10   get there.

11          THE COURT:  Okay.  All right.  Well, I would like,

12   first of all, for the State to provide me what you are -- and

13   suggesting as an appropriate process and protective order for

14   this.  I mean -- and also obviously provide the Curling counsel

15   with it so that they can go over it also with Dr. Halderman.

16          And I would like to see this to happen ASAP for you

17   to share that with them.  And I will think about the question

18   of their being -- advising me about the consulting experts.

19   I'll get back to you about that.

20          But I would like to see, you know, basically an

21   appropriate chain of command.  I mean, we're talking about

22   Dr. Halderman's -- at this point as what he does is obviously

23   attempt to -- as we have heard about from other witnesses who

24   do this is they try to determine whether they can break into a

25   system and how they do that and examine it that way.

1          And that is a standard way -- that is what

2    penetration testing is in a different way that the Fortalice

3    group does.  And so it all is -- obviously needs to be

4    protected enough so that we can -- are not in any way

5    endangering the integrity of -- the functionality of the

6    election system whether here or other places.

7          So I would like to understand exactly how this is

8    going to work.  So just work on that and send it to Mr. Cross

9    and his co-counsel and --

10         MR. CROSS:  Your Honor, this is David Cross.  Could I

11   just ask one question?

12         Just put aside our timeliness objections and all

13   that.  The biggest concern we have on this is the software that

14   Dr. Halderman has developed that would actually hack votes on

15   the BMD equipment that is used here.  But Your Honor might

16   recall we had the same discovery issue come up with the DREs.

17   And what Your Honor ordered there was for the State's expert

18   who at the time was Theresa Payton from Fortalice to come and

19   inspect that in our office in DC.

20         You know, there are certain maybe underlying facts

21   and data that we could provide to the State.  And Dr. Halderman

22   and us -- we would be comfortable with sufficient protective

23   measures.  And we can discuss that with the State, as you said.

24         And the one thing that I just have to be really clear

25   about is, with all due respect, Your Honor, we are really not

1    comfortable providing vote hacking software to anyone, no

2    matter what the protective measures are.  And I would really

3    respectfully urge Your Honor to carve that out if you end up

4    requiring us to provide any additional --

5          THE COURT:  Well, why don't you propose how you think

6    that -- I mean, obviously they would prefer you not to know who

7    their consulting experts are.  But you need to make a proposal

8    as to how that -- even if it did mean you got to know who they

9    were -- but how that would be handled alternatively.

10         Because this is something that Dr. Halderman has

11   thought about.  He had other proposals obviously also for how

12   to deal with it.

13         But I think this obviously is a big issue.  So you

14   can -- you-all need to swap that ASAP so that we can get this

15   done.

16         MR. CROSS:  Okay.  Thank you, Your Honor.

17         THE COURT:  And, Mr. Miller, would you also -- you

18   were reminding me about the exchange about all of this in

19   October or November.

20         Would you just either now or, you know, tell me what

21   the document number where you first asked for this or send it

22   to Ms. Bradley, the number that I'm --

23         MR. MILLER:  Yes, Your Honor.  The discovery dispute

24   regarding Dr. Halderman is filed at Doc. 1246.  I do believe it

25   came sometime after the conferrals and objections were had.

1            But attached to that are the initial objections that
2    Curling plaintiff served and the supplemental objections they
3    served.
4            And, Your Honor, we can address this --
5            THE COURT:  All right.  I mean, I have the one from
6    January.  I'm just trying to figure out -- you were talking
7    about an October sequence.
8            MR. MILLER:  The timeline.  I understand.
9            THE COURT:  That's what I -- I mean, I understand
10   what you have got in 1246.  My problem is what is before that,
11   which you were referring to that you had done everything on a
12   timely basis and asterisk one applied.
13           So I'm just trying to really make sure I understand
14   that argument but without getting lost in the weeds.
15           MR. MILLER:  I understand, Your Honor.
16           MR. CROSS:  Your Honor, this is David Cross.
17           MR. MILLER:  I do think -- I do think I might have --
18   I think it was actually November or probably November 17.  I
19   think it was just a couple of days before the --
20           THE COURT:  Hearing?
21           MR. MILLER:  -- hearing.
22           THE COURT:  Right.
23           MR. MILLER:  And then --
24           MR. CROSS:  That's right.
25           MR. MILLER:  At that hearing, you know, Your Honor

1    directed the Curling plaintiffs to let us know whether they

2    were going to rely on Dr. Appel.  And then we separately had

3    this discovery dispute going -- well, anticipated discovery

4    dispute because we had objections and then were rolling right

5    into Thanksgiving.

6         So shortly after Thanksgiving, I believe Mr. Cross

7    had a trial that didn't settle, if I recall correctly.  But

8    shortly after Thanksgiving, we got on the phone.  And that is

9    where the -- that is when the conferral happened.

10        But I will look back through my calendar and emails

11   and piece those dates together.

12        THE COURT:  Okay.  And then send that to Ms. Bradley.

13   Thank you.

14        MR. MILLER:  Yes, Your Honor.

15        THE COURT:  And in case of confusion, they are two

16   different people.  Either one -- you can send to Mr. Palmer or

17   Ms. Bradley anything.  They will share it with each other.  I

18   just decided two people needed to replace Holly.

19        MR. MILLER:  For this case, two people is probably

20   the minimum required, Your Honor.

21        THE COURT:  So, anyway -- okay.  I think we're moving

22   forward with that.  But I would -- you know, I don't want this

23   to fester.

24        So I don't know -- do you think that we can get

25   this -- when do you think the earliest is I can get

1  something -- proposal from you that you have also circulated --

2  that you have also circulated to and talked about to Mr. Cross?

3         MR. MILLER:  Your Honor, I'll talk to our consulting

4  experts immediately.  I would expect that -- you know, by early

5  next week I would expect.

6         THE COURT:  All right.  Thank you.  Thank you.  I do

7  have a trial the following week unless it goes away.  The

8  schedule right now is extremely volatile because of it.  It

9  always is.  But it has gotten more so because of the fact that

10  any moment somebody may get COVID and throw the trial off.  But

11  we'll see.

12         So I think that is everything that related to the

13  Curling plaintiffs that was a high priority item because I

14  thought the State's other matters related to supplemental

15  experts.  That was the Coalition and the Coalition's documents.

16         And those didn't relate to the Curling folks; right?

17         MR. MILLER:  Your Honor, I believe the only item that

18  is remaining is Number 8 in our filing at Doc. 1280, as far as

19  high priority items, which is interrogatory responses for which

20  the Curling plaintiffs reserved responses until 30 days prior

21  to the close of discovery.

22         Your Honor, we can address that with the verification

23  issue.  But I think that is the only thing remaining.

24         THE COURT:  All right.  I mean, to the extent that

25  anyone is saying there is no more information about something

1   and that is needed, please take care of that.  Because I don't

2   know whether that was with the Coalition or that was with

3   Curling folks or -- but there was one -- at least one or two

4   spots where people said we have no more documents.  But they

5   hadn't been said -- and that was said only in the -- in the

6   statement to me, not in the actual supplement or --

7          MR. MILLER:  Yes.  Yeah, Your Honor.  This is Carey

8   Miller again.

9          I think what Your Honor may be referring to is the

10   dispute between the State and the Coalition plaintiffs.

11          THE COURT:  All right.

12          MR. MILLER:  We have separately had some discussions

13   with the Curling plaintiffs and left it at we'll get back to

14   you on revised responses.  And that is a high priority item at

15   this point.  But we just wanted to --

16          THE COURT:  That's fine.  I regret that Ms. Price is

17   ill.  It doesn't seem like you can take her deposition until

18   she is better, whatever the illness is.  But I don't think any

19   misrepresentation is being made.  So -- but you will get to

20   take it.

21          MR. MILLER:  Your Honor, this is Carey Miller again.

22   We certainly don't think any misrepresentations were being made

23   there.

24          We raised it not so much as a dispute, per se.  But

25   we viewed the Court's order as essentially saying give me your

1    checklist of what you need to wrap up discovery.

2              And the one issue there, Your Honor, is that without

3    her deposition I don't know how we -- how the State can move

4    for summary judgment, assuming she remains a plaintiff in the

5    case.

6              MR. CROSS:  Yes, Your Honor.  This is David Cross.

7    That is not an issue that is going to arise.  We understand --

8    we discussed that with them.  We understand the concern.  So

9    she will be deposed later this month or next month.

10             THE COURT:  Okay.  All right.

11             MR. MILLER:  Your Honor, to be clear, I didn't mean

12   to imply that Curling plaintiffs were obfuscating about it.

13   Frankly, I'm a concerned a bit on the scheduling issues.  I

14   don't have the full scheduling order in front of me right now

15   to actually move forward.

16             THE COURT:  All right.  Let's talk about the

17   Coalition.

18             Is there -- I know what -- anyway, as to the

19   Secretary of State, I'm not -- I would have to be persuaded to

20   allow the Secretary of State to be deposed.  And I would go

21   through the same type of analysis Judge Jones has provided.

22   And I don't have that information available.

23             So you don't even have that.  No one has it available

24   because we don't know what these other people are going to say.

25   So I'm completely deferring that because I'm not -- that is

```
 1   going to be the very last item.  And I'm not telling you I will
 2   let it happen without being -- it looked like lots of people
 3   were involved and not only the Secretary of State.  He has a
 4   lot going on.  So --
 5           MR. ICHTER:  Your Honor, this is Cary Ichter.  That
 6   is what we would have proposed.
 7           THE COURT:  So on -- as to the Coalition plaintiffs,
 8   let's just deal -- continue to deal with the State's and the
 9   Coalition's conflict rather than the Fulton County ones.
10           Is there -- there is something the Coalition
11   plaintiffs listed that they were concerned they were going to
12   be excluded from the Curling -- from the 30(b)(6) depositions.
13           And is that a real issue, or is that just an anxiety?
14           MR. ICHTER:  Your Honor, this is Cary Ichter.  I
15   would say it is an anxiety until they actually try to do it.
16   But it was initially noticed, as I recall, in June, I believe,
17   as a joint deposition.
18           And then there were subsequent -- as I understand it,
19   there were subsequent communications between Curling counsel
20   and the State about the scheduling of the depositions.  And to
21   a certain extent, we were not included in those.  But
22   nonetheless it was about scheduling a jointly noticed
23   deposition, and we fully expected to participate in it.
24           Then more recently, we sought to amend the notice of
25   deposition by including topics that from our perspective were
```

1    intended to drill down on the original topics and provide more

2    detail concerning what we were looking for.  We had understood

3    that in connection with 30(b)(6) depositions that were taken of

4    certain Fulton County witnesses that the preparation left

5    something to be desired.

6            And it was our thinking that if we were to provide

7    greater detail with respect to what we were looking for it

8    would better enable the State to prepare the witnesses so that

9    they could address the specific subjects we were interested in

10   and we would not have those subjects and this could be handled

11   more efficiently.

12           Instead, it appears as though the State interpreted

13   that as being a separate notice of deposition, which it was

14   never intended to be, but rather an amendment to the original

15   joint notice.  And we still think that it is a joint notice.

16           And to the extent that the topics are different, we

17   interpret that as being an effort to be more specific and

18   precise about what we're looking for.  So that is our position.

19           MR. MILLER:  Your Honor --

20           MR. ICHTER:  Whenever the deposition goes forward, we

21   want to participate and we want to be able to inquire about our

22   subjects.

23           MR. MILLER:  Your Honor, this is Carey Miller.  I

24   regret that I have to correct the record on this.  We have had

25   extensive communications negotiating these topics, scheduling

```
 1   dates, all of which to my knowledge the Coalition plaintiffs

 2   have been copied on throughout.

 3           As I recall, we actually had a scheduling or

 4   conferral call that Ms. Marks actually attended.  We have been

 5   motoring along either assuming that the Coalition plaintiffs

 6   weren't interested in taking a 30(b)(6) or that they thought

 7   they were going to get everything they needed out of the

 8   Curling topics or fall in line with it.

 9           But this joint notice was served back last summer.

10   And since then, we have had very, very, very extensive

11   communications and negotiations over the topics.  We have not

12   heard a peep from the Coalition plaintiffs on the topic, even

13   while we were trying to schedule their 30(b)(6).

14           Your Honor, to serve this at the last second of

15   discovery without so much as a phone call regarding it, it is

16   just astounding.  And the State defendants strenuously object

17   to providing witnesses for a second 30(b)(6) deposition in a

18   case where numerous depositions have already been taken.

19           And to my recollection, I'm not sure the Coalition

20   plaintiffs have taken a deposition so far.  The ones that I

21   have been involved in, they have had a plaintiff representative

22   there, who is not counsel propounding questions during the

23   depositions.

24           And I just -- I am frankly a little flabbergasted.

25   And so, Your Honor, for those reasons, we do not -- we
```

1  strenuously object to adding these additional topics into the

2  already scheduled 30(b)(6) dates.  I would suspect that the

3  Curling plaintiffs would strenuously object to us delaying the

4  30(b)(6) date for this last minute change of plans.  And we --

5  the State asked that an order of the Court overruling our

6  objection will not be providing witnesses on additional topics

7  on a separate date that were noticed at the very last minute of

8  discovery that frankly I assumed the 30(b)(6) deposition would

9  be the top priority they were seeking throughout discovery.

10          THE COURT:  So the --

11          MR. ICHTER:  Your Honor, may I address that?  Cary

12  Ichter.

13          THE COURT:  Just one second.  So what we're talking

14  about, just to make it clear on the record, is the -- the

15  Coalition provided an amended notice of 30(b)(6) topics on

16  June -- on January 24th, 2022, in Document 1271-2.

17          Is there anything else we are referring to in terms

18  of an amended notice?

19          MR. ICHTER:  No.

20          THE COURT:  All right.  All right.  Go ahead.  And

21  identify yourself when you are responding.

22          MR. ICHTER:  This is Cary Ichter, Your Honor.

23          First of all, I'm not exactly sure what we are

24  disagreeing about here.  Mr. Miller indicates that we have been

25  copied on all of these communications.

 1          All I was saying was I was understanding that there

 2    were communications also that we weren't copied on.  But to the

 3    extent that we were copied on all of them, I think that is

 4    consistent with what I initially said, which was it was a

 5    jointly noticed deposition.  And typically speaking, you would

 6    do that.  You would copy one of the parties who's noticed the

 7    deposition.

 8          And the amended notice, as I said, did not change the

 9    topics but rather attempted to define with great precision

10    exactly what we were looking for under the general umbrella of

11    the initial topics.

12          We don't think that there is anything really new in

13    the topics as they are defined in the amended notice.  We are

14    just telling them -- drilling down with respect to what the

15    subjects are.

16          So I don't know why Mr. Miller would be flabbergasted

17    or what the remedy for flabbergast is.  But in any event, you

18    know, we are entitled to participate in the notice -- I mean,

19    the deposition that we jointly noticed.

20          As far as this being last minute, you know, the last

21    time I checked, virtually every deposition that is currently

22    being teed up for the past two weeks has been noticed within

23    roughly the same time frame.  Half of these depositions are

24    occurring at the last minute.

25          So I'm not sure exactly what is unique about this

1   particular deposition versus the other 14 depositions being

2   taken in the last ten or so days of discovery.

3          MR. MILLER:  Your Honor, if I may, what is unique

4   about this is the fact that it is a 30(b)(6) deposition upon

5   which all these additional topics were noticed and in a

6   situation where the Coalition plaintiffs have failed to take

7   discovery through depositions to come in at the last minute and

8   frankly potentially blow up what their co-plaintiffs are trying

9   to proceed that we have agreed upon.

10          THE COURT:  Let me just ask you this.  I can't easily

11   identify right now what it is amending.  So I can see the

12   topics.

13          Do we have something -- can you refer me to a

14   document that has the original version?

15          MR. MILLER:  Your Honor, the original joint notice of

16   deposition is at 1276-2, I think is what --

17          THE COURT:  Because this is 1271-2.  So it is at --

18   all right.

19          MR. MILLER:  1276-2.

20          THE COURT:  So 1276-2.

21          MR. CROSS:  Your Honor, this is David Cross.  I think

22   there may be an easy fix.

23          Could I suggest something?

24          THE COURT:  Yes.

25          MR. CROSS:  So the depositions are scheduled --

1    right? -- for tomorrow with Chris Harvey and the other three

2    next week as 30(b)(6)s.

3              As I understand Cary Ichter, he is saying these are

4    subtopics within the topics that Vincent and I negotiated

5    before.

6              Why don't -- it doesn't sound like Carey is saying

7    they are not going to allow the Coalition to ask questions in

8    the deposition.  And we're prepared to split the time with the

9    Coalition.

10             Why don't we all just go forward with the depositions

11   as scheduled?  They will prepare the witnesses on the topics

12   that Vincent and I negotiated, which as I understand from Cary

13   Ichter captures their subtopics, just more precisely.  And if

14   something is -- if there is a gap when those depositions are

15   done, then the parties can confer and work that out or come

16   back to you.

17             But it doesn't sound like this is something Your

18   Honor needs to wade into, unless I have got any of the facts

19   wrong.

20             Cary and Carey should correct me.

21             MR. MILLER:  Your Honor, this is Carey Miller.  And I

22   disagree with Mr. Ichter's description of the topics being

23   consumed within the original notice.  The originally noticed

24   30(b)(6) is moving forward.

25             It is illogical and unproductive for the Coalition

52

1    plaintiffs at the last minute to come in and try and blow

2    things up with entirely new topics.  And what I fear, Your

3    Honor, is that we're going to get into these depositions and

4    we're going to be told that our clients are not prepared to

5    address the issues -- our 30(b)(6) representatives because we

6    have had at this point a little under a week to look at it.

7            We have been preparing on the topics noticed by the

8    Curling plaintiffs for several weeks, if not months, now.  And

9    it just -- Your Honor, that is -- I believe Your Honor --

10           THE COURT:  All right.  I've got it.  I've got it.

11           I think that Mr. Cross' proposal though is

12   reasonable.  And it seems to me that there are questions that

13   obviously will be follow-up questions from the ones that were

14   negotiated with Mr. Russo.

15           But if something is completely not -- isn't

16   reasonably within the rubric of it, then it is just going to

17   have to be reserved and the Coalition will have to bring that

18   to my attention.

19           That is why -- I don't know -- I can't even -- I

20   can't in the time I have here compare the Coalition's amendment

21   to 1276-2 with the degree of refinement that would be necessary

22   for me to see what exactly is different.  I think that I see

23   one that is very different.  But I'm not sure that it is a

24   reasonable outgrowth of what was negotiated as something

25   either.

```
 1              MR. MILLER:  Your Honor, if I may offer this.  If the
 2    Coalition plaintiffs want to participate in the 30(b)(6) on the
 3    topics that were noticed by the Curling plaintiffs, the State
 4    will not have an objection to that.
 5              I recognize Your Honor has been swamped with a load
 6    of filings right now.  And I certainly understand that there is
 7    not exactly a compare and contrast between the two notices.
 8              But if we proceed under the understanding that the
 9    Coalition plaintiffs' additional -- 30 additional topics and
10    subtopics are contained within the Curling plaintiffs probably
11    equally as large topics and subtopics but then we have been
12    negotiating on, I fear we will be seeing you on another
13    conference call very quickly.
14              THE COURT:  Well, I'm not looking for each of them to
15    be asked.  I'm looking for reasonable follow-up that is just --
16    that is -- there are ones here I can see that are distinctly
17    different.  But there are other ones that seem like just
18    regular follow-up questions.
19              And I think that is something, frankly, that
20    Mr. Ichter and Mr. Cross need to talk about how they want to
21    accommodate this and not have this deposition -- these
22    depositions blow up.
23              MR. ICHTER:  Your Honor, this is Cary Ichter.  We
24    agree with Mr. Cross' suggestion.  We think it is sensible, and
25    we are prepared to proceed in that manner.
```

54

1              THE COURT:  All right.  Very good.  I'm going to

2    consider this resolved then.

3              Then I know that the State was concerned that the

4    Coalition -- about the Coalition not having provided some

5    documents.

6              Was that a priority on the State's part?  I know that

7    the -- because I'm looking at -- almost all of the Coalition's

8    issues are relating to the Fulton County -- other issues.

9              MR. MILLER:  Yes, Your Honor.  The -- this is Carey

10   Miller.  I just received an email from Mr. Brown letting us

11   know that they do intend to produce some documents in fairly

12   short order.

13             But separate from the documents that -- where either

14   essentially the objection was withdrawn in the course of the

15   discovery dispute filing, there also remains before you the

16   discovery dispute, which is in multiple different filings.  And

17   we apologize to Your Honor for that.  But it is at Docs. 1245,

18   1257, and 1265.

19             And, Your Honor, a lot of these are items that we

20   have raised before, particularly with respect to the

21   individuals that the Coalition plaintiffs intend to rely upon

22   for their associational standing.

23             And what concerns me, Your Honor, is that -- Your

24   Honor has seen the State's position about not wanting to extend

25   discovery.  But I do fear that we're going to have no choice

```
 1    because I presume that the Coalition plaintiffs are going to

 2    have numerous individuals that they intend to rely on for

 3    associational standing.

 4              THE COURT:  I thought they had identified just one.

 5              MR. MILLER:  I'm sorry, Your Honor?

 6              THE COURT:  I had the sort of recollection they had

 7    only identified one.  But that is --

 8              MR. MILLER:  Your Honor, I think that was a response

 9    to an interrogatory actually.  I'm trying to jog my memory

10    right now.  I know we discussed it at the November hearing.

11              But it was essentially name the dates which the

12    membership began.  And we got back that Megan Missett is a

13    member who joined by oral agreement in 2017.

14              If that is all the Coalition plaintiffs are relying

15    on for their associational standing, we will move forward.

16              THE COURT:  Is that, in fact?  Because that is who I

17    remember.  Because she was the plaintiff in another case.  That

18    is why I could remember her name.

19              MR. BROWN:  Your Honor, this is Bruce Brown.

20              THE COURT:  Yes.

21              MR. BROWN:  This particular issue relates to

22    Interrogatory Number 12.  It is addressed in our Document 1257

23    and their dispute 1245.

24              We have agreed to give a list of members upon whom we

25    base associational standing.  They originally wanted
```

```
1   comprehensive membership lists, and we objected.  And we worked
2   out that, okay, if you just want to know the numbers who we are
3   relying upon, we will give you that list.
4            We will give that list.  We haven't done so yet.  We
5   need to do so.  I completely agree.  And we will follow-up our
6   interrogatory responses by February 2nd.  And we will verify
7   those.
8            And to the extent that requires additional discovery,
9   which I doubt -- but if it does, we will stipulate that that
10  would be reasonable for the State to do so.
11           THE COURT:  Does that address the State's concern?
12           MR. MILLER:  That addresses the State's concern with
13  respect to that interrogatory.
14           THE COURT:  Right.  I understand there are others.
15  But I just wanted to make sure it does as to that.
16           And then there was Request Number 2.  The State was
17  seeking documents showing the total number of contributors and
18  total number of contributions received as a result of fund
19  raising efforts concerning this litigation.
20           And as I understand, the Coalition now is maintaining
21  that there are not documents that basically identify that,
22  contributions earmarked specifically for litigation versus
23  general other efforts.
24           So you want them to amend their answer to be -- to be
25  clear about that?  I think that they did.  But maybe they
```

 1    didn't.  And this is only in the going back and forth.

 2            MR. MILLER:  Well, truth be told, Your Honor, this is

 3    an issue where we had written to the Coalition plaintiffs back

 4    in early December and never got a response, which is why you

 5    got the filing in multiple pages.

 6            With respect to Request Number 2, the way I read

 7    Coalition plaintiffs' response is that they have no responsive

 8    documents considering a narrow reading of the request.  Your

 9    Honor, the State framed this request so that we would not

10    unduly burden the Coalition plaintiffs' members.  We

11    specifically didn't ask for the names of contributors, when

12    they gave, who gave what amounts.

13            We're trying to get the information that we need for

14    the case without unduly burdening the Coalition members.  And

15    it is -- I regret to some extent not framing it like the

16    interrogatory that we always intended to draw back because this

17    is the fear that I have trying to be --

18            THE COURT:  Let me ask this:  Were there

19    solicitations that the Coalition made for support that

20    mentioned litigation, and was there any requirement that people

21    differentiate litigation from just simply support of the

22    organization's mission?

23            MR. BROWN:  This is Bruce Brown, Your Honor.  The

24    answer to that is no, that is not the way that the funds come

25    in.  They are not earmarked as such.

1          Our -- the frustration they have is that they are

2     trying to prove a point that they are never going to prove

3     because there is no evidence of contributions received by CGG

4     as a result of fund raising efforts concerning the litigation.

5          We're not saying necessarily -- we're not only saying

6     that that is not a reasonable request.  We're saying that even

7     if it were, as a practical matter, we don't have any documents

8     to produce.

9          Moreover -- and to take the approach that the Court

10    has taken with respect to a number of these other disputes, Ms.

11    Marks will be deposed.  And that is the best way for this

12    particular issue to be run to ground will be in the deposition.

13         And if there is any aftermath to that where there are

14    documents that are (unintelligible) that would give the State

15    more guidance on this issue, then that can be explored at that

16    time.

17         THE COURT:  All right.  Well, I'm willing to do that.

18    But then Ms. Marks has to be prepared to address the way she

19    does fund raising, what was -- how people know that they are --

20    what is being solicited.

21         I mean, it would be normal for all of the range of

22    activities of the organization to be identified for people when

23    they are raising funds.  And maybe they just simply get all the

24    money contributed and all the letters.  I mean, they can't --

25    if it can't be segregated, it can't be segregated.

```
 1              MR. BROWN:  Your Honor, she will be fully -- she will
 2     be fully knowledgeable of the answers to those questions.
 3              THE COURT:  All right.  And then if something comes
 4     up that requires a follow-up, you know, hour deposition, then
 5     that will happen.  That is what it is.
 6              MR. BROWN:  Absolutely, Your Honor.  Absolutely.
 7              THE COURT:  All right.
 8              MR. MILLER:  Your Honor, I'm sorry.  This is Carey
 9     Miller.  The State is fine with proceeding like that as to
10     Request Number 2.
11              We would, however, ask that an amended response be
12     provided because to get a response saying that there are no
13     responsive documents which was not the initial response to the
14     discovery request it is --
15              THE COURT:  I think you are due the amended response,
16     and it needs to be verified.  And --
17              MR. BROWN:  Of course, Your Honor.
18              THE COURT:  And it needs to be provided before Ms.
19     Marks' deposition.
20              MR. BROWN:  Okay, Your Honor.  We'll produce that.
21              THE COURT:  Then there is this other question --
22     Request Number 3 seeks communication between the Coalition
23     plaintiffs and individuals pursuing similar claims, Lin Wood,
24     Sidney Powell, et cetera, I gather.
25              I don't understand exactly what your theory of
```

1    relevance is here on this, Mr. Miller.  So I'm a little

2    confused.  I could understand perhaps because Mr. Favorito used

3    to be involved with the Coalition -- that one.  But I don't

4    understand why we would be extending this to Lin Wood, Sidney

5    Powell, and any other similarly situated people.

6                 MR. MILLER:  Yes, Your Honor.  I can address that.

7                 Your Honor obviously picked up that with respect to

8    Mr. Favorito.  I would also point out that, as we pointed out

9    in our initial filing, we have got some responsive

10   communications to this request.  We suspect there are a lot

11   more.

12                And with respect to the relevance aspect,

13   respectfully, Your Honor, I believe that the Coalition

14   plaintiffs have the cart ahead of the horse here asking us to

15   argue as to admissibility of the relevance.

16                Your Honor, Ms. Greenhalgh was previously the vice

17   president for the National Election Defense Coalition.  She has

18   filed multiple of these suits.  She held a conference and panel

19   with plaintiffs' experts in this case.  I think all of them,

20   off the top of my head.  I know at least Dr. Halderman was

21   there.  And I believe Mr. Skoglund was there as well.

22                Communications about that conference which were

23   related to the litigation both here and in North Carolina and

24   in other states are certainly relevant and very well could lead

25   to admissible evidence that could either go to impeachment and

1   most likely toward impeachment or substantive evidence that

2   goes to essentially these are the same generalized grievances

3   and policy positions that the State has maintained all along

4   are reasonable policy positions that are not constitutional

5   claims.

6           And, Your Honor, we attempted to limit these to

7   specifically identified individuals only concerning the

8   litigation.  And, Your Honor, I am at a bit of a loss as to how

9   the relevance and the context of the discovery, which simply

10  has to bear on or reasonably could lead to another matter that

11  could bear on an issue that is or may be in the case.  That is

12  the Eleventh Circuit precedence.

13          MR. BROWN:  Your Honor, we're not at a loss as to the

14  irrelevance of this or the lack of discoverability.  The

15  State's position -- and we have fought this and fought this

16  throughout this entire case.

17          If it says something about this litigation or about

18  DREs or about BMDs, therefore it is relevant.  That is not the

19  test.  The test is whether it is related to a fact that is of

20  consequence in determining the action.

21          And all we hear in response to the State are it

22  mentions this litigation.  They never go on to explain how that

23  evidence will ever be used.

24          Second, what Mr. Miller is reciting is information

25  that he already has.  He is talking about information that he

```
 1    has right in front of us about the statements.  Here are these
 2    statements.  Then he doesn't need it from us.
 3            And the idea that -- and he is -- I mean, I have had
 4    this fight before.  But he is misreading Rule 26.  And he
 5    doesn't explain how that evidence is going to lead to
 6    something.
 7            That is not what the rule says.  The rule says it has
 8    to be relevant.  It has to relate to some claim or defense.
 9    And you did not hear in Mr. Miller's response any claim or
10    defense that that evidence would relate to.  And --
11            MR. MILLER:  Your Honor --
12            MR. BROWN:  And in terms of trying to limit discovery
13    and get this stuff done, which we understand and agree with
14    Your Honor's position, this has got to stop.  I mean, it is the
15    same for the defendants and the same for the plaintiffs.  At
16    some point, we have to stop this endless drumbeat and discovery
17    on our communications with Lin Wood, seriously.
18            If they find the communications between us and Lin
19    Wood, which is vanishingly unlikely, how is that going to be
20    used in this lawsuit?  And if that is discoverable, what is
21    next?
22            So we just -- our position is we draw the line here.
23    It is just not discoverable.
24            THE COURT:  All right.  So you have provided
25    information on the communications with Ms. Greenhalgh?
```

```
 1            MR. MILLER:  No, Your Honor.  This is Carey Miller.
 2   The documents that are referenced in that discovery dispute
 3   filing were produced by the Curling plaintiffs, not by the
 4   Coalition plaintiffs.
 5            MR. BROWN:  Ms. Greenhalgh is a consulting expert,
 6   not a testifying expert, to CGG.  And the idea that -- this is
 7   an endless -- this is a (unintelligible) of relevancy that the
 8   State wants to suck us all into.  That is, if we have a general
 9   grievance, therefore we don't have standing, therefore if
10   anybody else in the country has the same grievance, that proves
11   that we don't have standing.
12            Now, that should show just how ridiculous their
13   standing argument is.  But also it is a limitless test of
14   discovery, and it will never get done.
15            MR. MILLER:  Your Honor, I respectfully disagree with
16   Mr. Brown.  We have had reasonable discussions on a lot of
17   these things.  I don't want the Court to think that we're just
18   trying to volley things back and forth just because.
19            We only recently understood when we requested a
20   deposition date from Ms. Greenhalgh -- because we weren't
21   entirely sure if she was a testifying -- or was going to be
22   providing a supplemental report.
23            The only reason we fully understood that
24   Ms. Greenhalgh was a consulting expert -- we knew that Your
25   Honor had ordered her be permitted to view attorneys' eyes only
```

1    material.  And what we found out shortly thereafter is that,

2    respectfully, she carried about a campaign to argue this case

3    elsewhere, rather than just before this Court.  Her own entity

4    has been dealing with the same claims.

5          And to Mr. Brown's point about relevance, Your Honor,

6    I cannot argue admissibility of evidence under Federal Rule of

7    Evidence 401 because I don't know what the document is.  The

8    only thing that you can argue at this point with respect to a

9    discovery request is if the request reasonably bears on matters

10   in the case.

11         And in this instance, the prime example of this is

12   with respect to frankly -- not so much the report of

13   Dr. Halderman but with respect to his participation in this

14   conference with respect to the coordination with the National

15   Election Defense Coalition, which has filed an amicus brief in

16   this case.

17         All that may not be there.  I don't know.  And that

18   is why the discovery rules are set up like they are, to simply

19   be reasonably calculated.

20         THE COURT:  All right.

21         MR. MILLER:  Your Honor, with respect to the entire

22   list, we will withdraw our request as to each individual, other

23   than Mr. Favorito and Ms. Greenhalgh.

24         And to the extent the communications with

25   Ms. Greenhalgh are privileged as a consulting expert, the

1    Coalition plaintiffs can put that on a privilege log, which as

2    we noted for another dispute we still have not received.

3              THE COURT:  I think that is a reasonable resolution,

4    and I agree with that.

5              MR. BROWN:  Favorito has not been a member -- I don't

6    have the exact dates.  But he has not been a member of the

7    Coalition for quite some time.

8              THE COURT:  Well, you provide communications up to

9    the point that he was a member.  But if Mr. Favorito -- let me

10   just say as a matter of -- if he -- he was obviously actively

11   both litigating, speaking on these issues -- and I can't

12   remember the last time he was appearing on the -- as a header

13   in any of these things.

14             But whatever -- as long as he was involved, it

15   certainly is realistic to have him -- the communications to be

16   made available.

17             MR. MILLER:  Your Honor, that is agreeable to us.  I

18   do want to raise that -- I understood the same thing as

19   Mr. Brown said is that Mr. Favorito has not been a member for

20   quite some time.

21             And I just wanted to clarify I wasn't sure if the

22   Court was saying communications up to the point Mr. Favorito

23   ceased becoming a member.  Because the documents that we do

24   have and that we do know about show that Mr. Favorito was

25   discussing actions and policy positions with the board of

```
 1   Verified Voting, that he was frankly discussing litigation
 2   strategy and the importance of certain wins in the litigation
 3   in documents that have been produced from the Curling
 4   plaintiffs.
 5          And so that is the only aspect I would raise, Your
 6   Honor, is that I respectfully don't --
 7          THE COURT:  I don't know what the board of Verified
 8   Voting is.
 9          Is that Ms. -- is that Ms. Price or Ms. Curling's
10   organization?
11          MR. MILLER:  Yes, Your Honor.  That's correct.
12          And Mr. Favorito has his own separate organization,
13   Voter GA.
14          THE COURT:  But you are making this request of -- I
15   mean, those two individuals we just identified are not part of
16   the Coalition.  So that is why I'm -- they are --
17          MR. MILLER:  I understand, Your Honor.
18          THE COURT:  So I don't know why that would be sent to
19   the Coalition then.
20          MR. MILLER:  I understand, Your Honor.
21          I'll answer that question.  First of all, we sent
22   these same discovery responses to both sets of plaintiffs.
23   But, second, those documents I was referring to also include
24   the executive director of CGG on the same documents.  So it is
25   not -- there is a little bit of overlap.
```

```
1              THE COURT:  I don't know.  I mean, he is a -- clearly
2     a long-term activist in this regard.  And you can subpoena him
3     for a deposition and get what you need from him.  I mean, I
4     just think it is sort of getting far afield, it seems to me.
5              It is one thing what you are -- it says about
6     Ms. Greenhalgh.  And we're going to protect the documents to
7     the extent they are part of his -- her conferring with counsel
8     in her consulting role.
9              I don't know that it makes any difference that
10    Mr. Favorito is still pursuing the same issues as always and
11    has talked to these other people.  It seems marginal to me.
12    But you take his deposition, and I don't know that I -- and you
13    can subpoena any -- he may have very organized files.
14             But I think let's focus on the -- that he should have
15    them then.  And if there is something you want from when he was
16    a member of CGG, if he has had a role in that in the last few
17    years, which he may or may not, then that should be produced.
18             But other than that, I'm not going -- we're not going
19    to chase this around.
20             MR. BROWN:  Thank you, Your Honor.
21             MR. MILLER:  Okay.  Thank you, Your Honor.
22             THE COURT:  Okay.  They were seeking communications
23    between the Coalition plaintiffs and anyone else except expert
24    witnesses relating to Dr. Halderman's report.
25             I'm not sure -- I mean, I'm not sure why that is
```

1   leading to relevant evidence.  I mean, I'm not talking about

2   admissibility.  But why is it --

3          All right.  So Joe Blow, who is concerned about

4   something, writes to the Coalition, can you tell me about

5   Dr. Halderman's report?  Why does that matter?

6          MR. MILLER:  Your Honor, I would rate that in two

7   contexts.

8          First of all, take Mr. Favorito for an example.  And

9   I don't want to single him out.  I know he is not -- I don't

10  suspect he is here right now.  But somebody was actively

11  involved in this litigation who has commented before, various

12  other filings and pleadings, who has previously discussed the

13  litigation strategy with the plaintiffs.  There may well be

14  communications there that say, look, I don't (electronic

15  interference).  It may not be the case.

16         But secondarily, Your Honor, frankly the main reason

17  we pressed this issue it may be (electronic interference) is

18  with respect to --

19         THE COURT:  Wait a second.  We've got two people

20  talking.  And whenever we do, we can't hear.

21         MR. MILLER:  I'm not sure where that is coming from.

22         THE COURT:  All right.  The main reason that you have

23  pursued this is?  That is where you left off.

24         MR. MILLER:  Your Honor, it is related to what we

25  state in Request Number 4.  As I recall -- and I don't have the

```
 1    requests and responses in front of me.  I only have the filings
 2    in front of me.
 3           But there is also a privilege claim made here, and we
 4    have yet to get a privilege log from the Coalition for Good
 5    Governance.  The State has produced a privilege log, which is
 6    not the Fortalice privilege log that Your Honor has.  And we
 7    have engaged with good faith discussion on questions that had
 8    arisen from the Curling plaintiffs.
 9           THE COURT:  All right.  Well, I gather the Coalition
10    plaintiffs have dropped their relevance objection to the
11    time -- important and time-sensitive issue that was in Request
12    Number 4 and will produce non-privileged information --
13    response to the request to the extent they have any.  I don't
14    know what that is.
15           MR. BROWN:  Yes.  Yes, Your Honor.  We have one
16    document in response to Request Number 4 that we will produce.
17           And Request Number 5 -- it may have been the audio.
18    This has to do with communications from the Coalition
19    plaintiffs and anybody else relating to Dr. Halderman's report.
20           I did not understand or maybe I just didn't hear
21    Mr. Miller's explanation for why that is relevant and
22    discoverable, I should say.
23           THE COURT:  That is what was getting blocked.
24           So how is that --
25           MR. MILLER:  Your Honor, Request Number 5 relates to
```

1   the extent that there is communication between -- again, this

2   is where I use the example of Mr. Favorito.  I don't

3   necessarily want to pick on him on a conference call.

4          But to the extent -- we already know he's had these

5   discussions about litigation strategy.  And if he is -- he may

6   well send an email to Ms. Marks or an agent of the Coalition

7   and say, hey, I don't think this makes a lot of sense.

8          I don't know if that is the case or not.  But --

9          THE COURT:  But if he is not a member of the

10  organization, why does it matter that somebody who is not a

11  member of the organization or not in the leadership of the

12  organization says I think this doesn't make sense?

13         I mean, I just don't know why that leads you

14  anywhere -- leads to relevant evidence.

15         MR. MILLER:  I understand, Your Honor.  And we're

16  willing to withdraw this request if we're resolving a lot of

17  the others here.

18         The fact of the matter is it was really more in the

19  sense of if the individuals who were believers in this cause,

20  you know, may have impeachable evidence as to something that

21  they disagree with, I believe that is valuable evidence in

22  terms of persuasion.

23         But, Your Honor, as I mentioned, we'll withdraw this

24  question.  So we appreciate the Court's attention.

25         THE COURT:  All right.  Good.

```
 1              Then there is a lot of concerns about -- I guess in 6
 2   and 11 for the State seeking documents reflecting -- what
 3   declarants or fact witnesses CGG intends to rely upon including
 4   at summary judgment.  And basically I think there was something
 5   comparable for this actually also for the -- as to the Curling
 6   plaintiffs' responses and -- except that was, I thought,
 7   please -- I thought that was closer to identify anyone who you
 8   might be relying on as a witness, not all their statements.
 9              And it is one thing to ask tell me who your witnesses
10   will be.  And they may not know all of the witnesses, and it
11   may be -- have to be amended multiple times.
12              But to the extent they know, I think that is
13   realistic and it should be identified.  Because, you know, I
14   mean, that is 101 of litigation.  If you know you have a
15   witness that might be somebody you might call or might be --
16   somebody else wants to interview, you have to identify them.
17              MR. BROWN:  Your Honor, this is Mr. Brown.  Typically
18   the way it is done, as you suggested, is that the parties ask
19   the other side state every person who has knowledge of this,
20   who has knowledge of this, or who has knowledge of this, which
21   is totally acceptable.  That has been done.  And I think there
22   are lists all over the place with respect to that.
23              This is a -- Question Number 6 is a disguised
24   interrogatory.  I guess they ran out of numbers.  Maybe they
25   didn't.  But they want documents reflecting communications
```

1     between the Coalition plaintiffs and all of those people.

2           And, you know, we don't know who we're going to rely

3     on at trial yet.  We have -- we have -- there are multiple

4     answers to interrogatories in which the Coalition has

5     identified persons with knowledge.

6           And I don't see what more is necessary.  There will

7     be a time when the parties are required to exchange, you

8     know -- we're not trying to hide anything.  It is just --

9           THE COURT:  Well, if there are people you think have

10    knowledge and they have asked you a witness interrogatory, I'm

11    expecting everyone to be clear.  You might not put that on your

12    list.  They can go and try to reach the people.

13          But, you know, it is just sort of like going back to

14    a typical personal injury case.  If you don't identify all the

15    people you know of who are witnesses at the scene of the

16    accident, then you can't suddenly put them -- have a -- be in

17    the position that you are identifying them as a central witness

18    in the summary judgment motion or at trial without having

19    identified them if you knew.

20          MR. BROWN:  Yes, Your Honor.  In terms of -- I

21    understand that you can't put a witness up that you haven't

22    identified in response to an interrogatory that asked that

23    question.  And we did that.

24          Interrogatory Number 11 asks for fact witnesses upon

25    which you rely at summary judgment.  Two things about that.

1    One, we don't have a motion for summary judgment now.  I

2    believe that the defendants are saying today that their summary

3    judgment motion will be limited to standing.  And I would think

4    that makes sense since Your Honor has already found that there

5    is a likelihood of success on the merits of many of these

6    issues, which for sure I would overtake a motion for summary

7    judgment.

8            If it is limited to standing, then we will provide

9    fact witnesses who we rely upon at summary judgment on the

10   issues.  And we will give that to them.  They already have

11   these names.  There may be another name in terms of what we

12   talked about before in terms of associational standing.  The

13   numbers we will answer to that extent.

14           We don't know if they are going to raise, you know, a

15   motion -- in their summary judgment motion they are going to

16   get into, you know, what other -- that they are going to

17   raise --

18           THE COURT:  I understand that.  I'm just saying you

19   identify -- I'm expecting you to -- both -- everybody to

20   identify the witnesses they know who might conceivably be

21   witnesses who have knowledge, as long as -- relevant knowledge,

22   even if you don't end up calling them as witnesses.

23           MR. BROWN:  Yes, Your Honor.

24           THE COURT:  I do want to clarify something.  It is

25   true back with the DREs I thought there was some -- there was a

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
 1   likelihood of success, and I indicated that.
 2            We are dealing with something else.  What I said in
 3   the most recent order -- and I know you have repeated it in
 4   this way -- is these are very serious issues and of real
 5   concern and weren't just simply made-up issues.  But I don't
 6   think I've made a finding of likelihood of success.
 7            It is just sort of -- it has over time been
 8   characterized in different ways.  Let me say that.  But I don't
 9   think I have made the same findings.  So --
10            MR. BROWN:  Thank you, Your Honor.  I understand.  I
11   didn't mean to --
12            THE COURT:  That's all right.  That's all right.  I
13   just didn't want -- I didn't feel like I could let it go by.
14            MR. MILLER:  Your Honor, I do just want to make clear
15   to the Court -- this is Carey Miller -- that we will not be
16   moving for summary judgment limited purely to standing issues.
17            I think Mr. Brown misconstrued my point earlier.  But
18   I didn't want the Court to be led to a sense otherwise because
19   we understood this to have moved beyond that.
20            And the last thing I will say with the request and
21   interrogatory, I believe Your Honor's resolution there is
22   reasonable.  And this is modeled after the exact same process
23   that we did in Fair Fight where the Fair Fight plaintiffs were
24   alleging a diversion of resources wherein they are spending
25   resources to essentially prevent a burden that is imposed on
```

1    others.

2         And, you know, truthfully if we could just get

3    limited to -- as far as all these declarations that are filed

4    in the hundreds of pages of notices of filings which ones they

5    intend to rely on and which ones are just old news.

6         MR. BROWN:  That goes way beyond what -- I don't know

7    what old news means.  We will get --

8         THE COURT:  You will get a list together.  All right.

9    Get a list together.  And the Curling people should as well.

10        I'm a little bit -- I think we have taken care of

11   this topic, unless somebody else says something else about

12   this.

13        I'm going to tell you what I thought were the

14   remaining major topics.  But you can obviously correct me.

15   There is the issue of the -- I thought the so-called

16   supplemental depositions or experts.  And maybe that is not a

17   big issue at this juncture.  But that the Coalition wants to --

18   is offering and which State defendants say this is not really

19   supplemental -- what has happened is sort of an end run, as I

20   understand what they are arguing.

21        And then the Coalition has all these issues relating

22   to Fulton County that -- and the reason why I have held that to

23   the back is just to make sure that we deal with everything

24   relating to the State first.

25        MR. MILLER:  Your Honor, on behalf of the State, we

1    do believe that is a serious issue to the extent we're -- it

2    may obviate the need to take these additional depositions.

3    And, Your Honor, we filed the notice of objection.  I believe

4    that actually came before or maybe it was right about the same

5    time Your Honor's order came out to kind of resolve all these

6    discovery disputes.

7              Our simple thought was we want to reserve our rights

8    here.  We will move to exclude if that is what the Court

9    prefers.  But the reality is that Dr. Stark relied solely on

10   publicly available information that was available at the time

11   his initial report was due.

12             Second, Dr. Buell has nothing to supplement.  He

13   filed no new declaration.  The last declaration he has is

14   simply related to the -- to the DREs back in 2018.  So there is

15   no report to supplement.

16             At least, Dr. Stark initially filed a rebuttal

17   report.  But never mind that the issues that he opines on as a

18   matter of supplementation are matters which should have been

19   addressed before, which is just a misuse of Rule 26(e).

20             And we had a back-and-forth with the plaintiff about

21   this when we were working out the proposed scheduling order,

22   which was making sure the State defendants had reserved their

23   rights to challenge any purported supplemental reports.

24             We understood Your Honor simply wanted to move the

25   case along and set a schedule.  And that is why we raised at

1    the discovery hearing that we couldn't necessarily say a

2    supplemental report without it being in the abstract.  But now

3    that we see it, it is.

4           And, lastly, Your Honor, the opinions of both

5    Dr. Stark and Dr. Buell are essentially we need more discovery.

6    That is not an opinion of an expert that goes to a matter at

7    issue in the case.  That is an affidavit to be filed along with

8    a discovery motion saying this is why I need it.  It is not a

9    supplemental report because it doesn't opine on anything

10   relevant or helpful.  It simply opines on we need more

11   discovery.

12           THE COURT:  Mr. Brown, do you want to respond?

13           MR. BROWN:  I think Mr. Ichter is going to respond to

14   this one.

15           Cary?

16           MR. ICHTER:  Yes.  Your Honor, we have tried to set

17   aside pretty much all other business over the course of the

18   past couple of days and give this as much attention as humanly

19   possible.

20           But the extent of what we have been able to do with

21   respect to this particular issue is at least for me to print

22   out the notice of objection from the other side.  And given the

23   importance of the issue, Your Honor, we would appreciate an

24   opportunity to study the other side's position and submit some

25   sort of written response to this because we have only had this

1    a short time.

2         I would note that, however, because it is signed, has

3    these depositions noticed and can take depositions both of

4    these gentlemen, learn anything that they want from them in

5    connection with the depositions, in connection with the

6    opinions that they have expressed up to this point.

7         There is no reason why this is a pressing issue at

8    this very moment.  And so I don't think it would prejudice

9    anybody to afford us an opportunity to provide a little more

10   fulsome analysis to the Court, the more we can do off-the-cuff.

11        THE COURT:  Well, I don't mind giving you a few more

12   days to respond.  But I will say it seemed -- the defendants'

13   point seemed to have some legitimacy.  I mean, Dr. Stark at

14   trial I guess could certainly testify regarding -- I guess not

15   certainly -- but certainly arguably testify regarding the full

16   affidavit he has provided in the past about -- if all of that

17   came -- if the trial came to pass and it was relevant to be

18   looking at audit methodology and data.

19        But I just -- I think -- I mean, I did print out his

20   affidavit.  Excuse me.  I unfortunately seem to have left it on

21   the bench when I was in this criminal proceeding before you.

22   But it seemed to me -- oh, I have it here.  I'm sorry.

23        Then Dr. Stark in his supplemental starts analyzing

24   what happened with various ballots and the tabulations in

25   his -- in part of his report and in his sort of -- but most of

```
 1    it is relating to his looking at the -- some of the returns and

 2    a lot about the audit -- the way the audit was done.

 3            It is conceivable that could be tacked on, I guess.

 4    But I'm not sure too what he has -- what was filed on the

 5    record.

 6            I just was surprised of it being filed this late.  I

 7    mean, it is not -- to the extent it is the other report, I

 8    could understand that you would be all ready for it.  I mean --

 9    I understand that you might not have had all of the ballots

10    before.

11            But I just -- I'm going to have to study this more

12    myself.  But I was surprised and concerned because I don't

13    think either of them had been identified as current witnesses.

14    They might have been in the past.

15            And this is -- and -- or at least expressly stated

16    that we are going to use Dr. Buell and Professor Stark anew.

17    And I don't have every single interrogatory answer.

18            So, you know, I think a serious presentation of why I

19    should allow this is appropriate rather than my trying to pull

20    it together at the last moment.  But I was concerned.

21            MR. MILLER:  Your Honor, this is Carey Miller for the

22    State.  And the State can file a formal motion as well.  You

23    know, frankly what we didn't want to have happen is we're

24    trying to wrap up discovery and you just see a motion for

25    sanctions come across and --
```

```
1              THE COURT:  Yeah.  And I don't know -- I don't know
2    that we want to do this -- you want to do this as a motion for
3    sanctions.  That raises the --
4              MR. MILLER:  Discovery sanctions for exclusion.
5              THE COURT:  For exclusion.  And I think that could be
6    appropriate.  But, you know, if the Coalition wants two days to
7    take -- you know, until Monday to look at this and call you and
8    say -- and offer something else, that is fine, before you start
9    working on a motion for exclusion, if they have something.
10             MR. ICHTER:  We would prefer that, Your Honor.
11             THE COURT:  All right.  Well, counsel for the
12   Coalition are then given that until Monday.  And then you are
13   directed to communicate with Mr. Miller about this so that you
14   can confirm the way you-all are proceeding with it.
15             If there is a resolution, great.  If there is not,
16   that you have -- that you provide a schedule for the motion to
17   exclude, et cetera.
18             MR. ICHTER:  We will do so.
19             THE COURT:  Okay.  Good.
20             Does that -- I mean, I know that there are other --
21   does that take care of the principal issues with the State and
22   the parties?  And then we'll go on to Fulton County.
23             MR. CROSS:  Your Honor, this is David Cross.  I'm
24   going to have to drop soon.  So there is one issue I wanted to
25   raise that is particularly time-sensitive.
```

1          In fact, the Secretary himself just issued a

2   statement minutes ago calling on our expert Dr. Halderman to

3   publicly release the sealed report.

4          And so all the parties agree at this point that at

5   least the redacted version of Dr. Halderman's report should be

6   released.  And I would ask Your Honor to revisit that in

7   particular because the Secretary himself has been quite vocal

8   over the last 24 to 48 hours with very personal attacks on

9   Dr. Halderman and on us.

10          I won't get into the substance.  Your Honor can read

11   them.  But suffice it to say that we're at a point now that as

12   long as this report stays sealed it is incredibly unfair and

13   prejudicial to us and it is hurting Dr. Halderman's

14   professional integrity and it is hurting our professional

15   integrity.

16          And given that the Secretary himself agrees that

17   election workers need to see this and that it should be public,

18   we would ask that Your Honor order that immediately.  I don't

19   see a basis to keep it sealed.  And all the parties agree that

20   the redacted version should be public.

21          And the personal attacks in the press need to stop.

22          MR. RUSSO:  Your Honor, this is Vincent Russo.  And I

23   just became aware of this press release that Mr. Cross is

24   referencing.

25          You know, I think that the State -- the protections

1    on the report of Dr. Halderman appear to some degree to have

2    been lost at this point.  And I think that is the Secretary's

3    concern.

4           That office has been contacted by reporters who seem

5    to have significant knowledge about the contents of

6    Dr. Halderman's report.  Our client has not seen the report

7    still at this time.  We were able to produce it to Dominion,

8    which is something we discussed at the hearing the last time.

9    And I do believe that those -- that Dr. Halderman had

10   discussions with Dominion.

11          But at this point, you know, I think the concern is

12   that if the report is not made public it may be doing more harm

13   than good.  And it is, you know, unfortunate that we're in this

14   position, quite honestly.  Because the State hasn't seen the

15   report, to begin with, and doesn't know what all is in the

16   report and, you know, had concerns about it -- about it --

17   about providing certain access to certain equipment, to begin

18   with.

19          So that is where the State is at at this point -- the

20   Secretary.  And, you know, otherwise, we leave it to the

21   Court's discretion, of course, of what to do going forward.

22          MR. CROSS:  Your Honor, this is David Cross.

23          Just briefly?

24          THE COURT:  Yes.

25          MR. CROSS:  I don't understand why Mr. Russo says the

1    State has not seen the report.  It has been clear for months

2    that the State is allowed to see the report.  We have not

3    designated it confidential.  I thought Your Honor was quite

4    clear in our last in-person hearing that the State could and

5    probably should read the report.

6           The reason this is happening now is because Governor

7    Kemp just issued a statement yesterday directing the Secretary

8    to finally take this report seriously and act on it.  So I

9    think we all know why we are here.

10          But in any event, the issue for the Court is simply

11   all the parties agree it needs to be publicly disclosed and

12   that serves everyone in a variety of ways.  And that should

13   happen quickly.

14          And I certainly also want to make clear for the

15   record there is no one associated with us that has violated the

16   protective order or disclosed anything to the press.  I don't

17   think Mr. Russo is suggesting that.  But I do want to be clear

18   that Dr. Halderman, my clients, my firm, my colleagues --

19   everyone has been very, very careful about this.

20          THE COURT:  Well, it is certainly not what I expected

21   to happen, to be raised as a further political football.  But

22   everything does.  So I mean, I perhaps shouldn't be surprised.

23   But I'm disappointed that it got raised this way and in a way

24   that only makes things more challenging.

25          And -- but that said, the affidavit report of

1    Dr. Halderman clearly indicated that he understood that some

2    issues and matters, in fact, were -- needed to be confidential

3    and were protected material and that there were -- there was a

4    way that the report could be redacted consistent with

5    professional norms in the tech industry for highly sensitive

6    information.

7             I don't know what he had in mind.  But I am not going

8    to release it without seeing what would be proposed as

9    redactions.  That is absurd.  I mean, we're chasing around -- I

10   mean, it has its own issues.  But so does -- and the State has

11   been vigilant about protecting testing of its infrastructure

12   and not releasing information regarding the test results and

13   properly so.

14            We have learned a great deal over the course of the

15   last number of years not just about election technology but

16   with the number of compromises of different data systems that

17   have affected Americans so that, you know, on one hand, we're

18   very concerned about it; on the other hand, we actually have to

19   have a reasonable way of addressing that, which isn't just

20   completely become -- make it a political football.

21            So if you-all agree on this, that is fine.  But I

22   need to see a proposed -- a revision of this that would be --

23   or redaction of this that would be one that would be

24   appropriate under the circumstances.

25            MR. CROSS:  Your Honor, this is David Cross.  We can

```
1    file that.  We provided a redacted version that Dr. Halderman
2    himself redacted I think back in November to the State.  My
3    understanding is they didn't have any additional redactions
4    themselves.  So we will get that for Your Honor.
5              THE COURT:  You don't need to file it.  I don't want
6    anyone else saying I want this versus that.  I just -- you can
7    go ahead and furnish it to chambers.
8              I'm unhappy with the way it got filed, in the first
9    place.  I'm unhappy about the course of now the political
10   treatment of the report and its use in other litigation so that
11   is -- it is out of hand.  So I will look at it.  And either I
12   will say it is okay or not.
13             And I would urge State's counsel to look at it as
14   well.  I don't want to have -- I don't want to have somebody
15   saying we would have released the full report but for Judge
16   Totenberg, that she's hiding something.
17             MR. CROSS:  Your Honor -- Your Honor, that actually
18   gets to what I was going to raise, which is -- and I'm glad you
19   gave that admonition.  Because part of the challenge that we've
20   had is the Secretary himself on multiple occasions with the
21   press in the last few weeks has said that he and his office
22   have not read it because Your Honor has ordered them not to.
23             And that is just not truthful.  It needs to stop.  It
24   needs to be clear that his office can read it.  Whether they
25   should have read it is a decision for them obviously.  But it
```

1     has been available to them for many months.  And they just need

2     to stop saying otherwise in the press.

3              We'll get you a hard copy -- chambers copy, Your

4     Honor, of the redacted version the State has.  And we'll go

5     from there.

6              I did also just want to apologize.  The reason we

7     filed the report initially was because there was a dispute over

8     who could get access to it, in particular regarding Dominion.

9     So we filed it because we thought the only way Your Honor could

10    rule on that was to see it.  And we just filed it under seal in

11    the normal course.

12             Maybe in retrospect we should have just given Your

13    Honor a chambers copy.  But we went through the formal filing

14    procedure.  But I apologize in retrospect if that was in any

15    way inappropriate.

16             MR. RUSSO:  Your Honor, this is Vincent Russo.  One

17    just quick clarification.

18             Are we able to share the redacted -- the currently

19    redacted version of the report with our client?

20             We have gone through transcripts and orders in this

21    case to make sure that -- we have been trying to figure out do

22    we have the ability to do that.  We saw that, you know, of

23    course, Dominion could see it.  And, you know, we think our

24    client should be able -- should be able to see it.

25             And it may be that it was never -- you know, there

 1    was never any intention to not allow the -- you know, the

 2    employees of the State, of course.  Counsel has seen it.  But

 3    the actual employees of the State to be able to see it or some

 4    individuals in that office, if it is restricted to certain

 5    people is fine too.

 6            But, you know, we just want to make sure that if we

 7    can provide it to the Secretary of State's office we would like

 8    to be able to do that because we agree that there is -- that

 9    that is important.

10            But at the same time, we also don't want to be, you

11    know, accused of violating the protective order and have that

12    come back.

13            THE COURT:  Well, I always assumed you were going to

14    basically identify people you want -- that you thought you

15    needed to communicate with it about, whether giving them --

16    whether just simply so we can tell you that you could describe

17    it to them because I don't know that people are going to sit

18    down and read a 95-page report or whatever it is.  And,

19    secondly, that if there was somebody you wanted actually to

20    read it, that you would and you would provide appropriate

21    confidentiality.

22            There was some -- it seemed to me -- but it was not

23    my business -- that you didn't seem to want your client -- you

24    didn't want to give it that level of acknowledgment.  That was

25    the inference I got from the way it was being handled.

1          But I'm not making any charge about that.  I'm just
2     saying that sort of seemed to be it.  Because I couldn't -- you
3     know, it seemed to me that the plaintiffs were constantly
4     asking could we meet with Dominion, can we show them, can we
5     deal with this because of their concerns about they wanted to
6     address some issues.
7          And I wasn't -- that really wasn't in my purview to
8     do one way or the other because it was -- Dominion was your
9     contractor and it was up to you and up to the State.  And
10    obviously other arrangements could have been made.
11         Now, this is -- it is sort of water over the dam.  In
12    terms of the redacted report, because I haven't seen the
13    redacted report, I mean, I certainly -- I can't really address
14    that.
15         I'm going to get it obviously.  I will look at it.
16    But if you want to talk with your clients -- your high-level
17    clients about what is in the report right now, go for it.  That
18    is fine.
19         But you are certainly allowed to consult with your
20    clients in terms of the redacted -- I would like to see the
21    redacted report.  Because they may distribute it to somebody
22    else.  So I need to know what is going to be out there.
23         I'm just -- it is a very unhappy circumstance the way
24    this has evolved because I have -- the entire purpose of having
25    hearings in which I did was to maximize transparency but at the

1    same time trying to be mindful of the risks involved of

2    exposure of critical infrastructure, which is what you, the

3    State, wanted as well.

4            So it is -- the State was always very concerned about

5    protecting the confidentiality of its critical infrastructure.

6    Understandably.  And so now we have this evolution that is

7    because of frankly the 2020 election obviously but anyway --

8    and the upcoming elections.

9            I don't want to get further into it than that though.

10   So if I can get -- if you have already done the redaction, the

11   Curling plaintiffs, they should send me it.  And I gather the

12   State already has it.  And I will get back to you by Monday, if

13   not sooner.

14           All right.  So I'm going to go briefly -- immediately

15   on -- one last thing.  Mr. Russo, I would appreciate your

16   talking with your clients about trying to allow you to work

17   this out in a reasonable way -- all right? -- without lots

18   of --

19           MR. RUSSO:  Yes, Your Honor, we will do that.

20           THE COURT:  -- a lot more drama in the press about

21   this -- okay? -- as much as I have a high regard for the press.

22   And you know that I do, so -- and the importance of coverage.

23           MR. RUSSO:  Yes, ma'am.  I will definitely do that,

24   Your Honor.

25           THE COURT:  All right.  So we're left with all of the

1   variety of things with Fulton County.  And can you just wait

2   one moment because I'm going to -- since I'm late to a judge's

3   meeting, I need to let --

4                **(There was a brief pause in the proceedings.)**

5              THE COURT:  I don't really understand everything that

6   the Coalition is doing about all these Fulton County documents,

7   frankly.

8              I need to understand a little -- I may have

9   misunderstood when I authorized any discovery.  But I don't

10  understand what you are trying to do.  So it is hard for me to

11  rule on this without my having any understanding of what the

12  Coalition's objectives are in going through all of these

13  documents.

14             MR. ICHTER:  Your Honor, this is Cary Ichter.  As you

15  may recall, the Coalition has made numerous attempts since

16  April of last year to obtain a full set of November 2020

17  original recount ballot images and related election project

18  packages.  And ultimately an order was entered.

19             We're not dealing with a discovery issue here.  We're

20  dealing with an enforcement of a previously entered court order

21  that was --

22             THE COURT:  Well, remind me what a project package

23  is.  I can't remember at this juncture.

24             MR. ICHTER:  A project package is:  Ultimately, once

25  the votes are in, a package is put together in what should be a

 1   zipped USB file that consists of ballot images, those being the

 2   scans of the millions of ballots and the AuditMark for each one

 3   of those ballots.  So each ballot is like three pages.

 4   Supposed to be an AuditMark document that summarizes what the

 5   specific inputs by the elector were in filling out the ballot.

 6           It also consists of a DVD file for every batch of

 7   ballots that is included.  And then something that is --

 8           THE COURT:  What is a DVD?  What is a DVD?

 9           MR. ICHTER:  DVD, the digital media for storing data.

10           THE COURT:  Okay.

11           MR. ICHTER:  And then something that is akin to claim

12   but something that I understand from the experts that we need,

13   which is the SHA files, S-H-A files, which are authentication

14   files that tell you if the original ballots have been modified

15   in some sort of way.

16           So that is what the election project files consist

17   of.  That is what we asked for.  That is what the Court's

18   ordered that Fulton County supply to us in its December 3rd

19   order.  And those items were required to be produced to us by

20   December the 8th.

21           We received a production of December the 8th.  But

22   nearly 18,000 ballot image files were missing from those files.

23   And we communicated with Fulton County and with the Secretary

24   of State's office multiple times with respect to that.  In as

25   early as in December we communicated with the Fulton County

1    staff and reported in a meeting that Ms. Marks had with

2    Mr. Lowman and others that the transmitted copies of the

3    packages for both the original and the recount were incomplete.

4    And the Fulton County staff indicated that those packages had

5    been transmitted to the Secretary of State's office in December

6    of 2020.

7           We also followed up, by the way, with Fulton County

8    in an email that I supplied to the Court this afternoon to

9    Ms. Ringer and Mr. Tyson and Mr. Lowman, I believe, in which we

10   described in very specific detail what the history of this

11   entire issue was.  And we have communicated a couple of more

12   times in January.

13          When we found out from Fulton County that their

14   position was that all of these files had been turned over to

15   the secure -- to the Secretary of State, we reached out to

16   Mr. Tyson on the subject of whether or not the Secretary's

17   office was in possession of the copy of the recount election

18   package zipped and unmodified from the December 2020

19   transmission from Fulton County.

20          And on December the 2nd of 2021, Mr. Tyson responded

21   that the Secretary's office was unable to locate any such

22   files.  As I said on December 21 then, over a month ago, we

23   requested to both Ms. Ringer and Mr. Tyson that they attempt to

24   locate where a complete recount election project file was so

25   that those items that had been the subject of the Court's order

1    could be delivered to us.  And to date, we have received

2    nothing in response to that request.

3            The importance of the files really can't be

4    exaggerated.  Although I would try to exaggerate it, if I

5    could.  It is already clear from the records that we received

6    and the detailed analysis that was conducted of the records we

7    received on December the 8th that there has been a substantial

8    amount of tabulation error in connection with the materials

9    that -- the ballots that we received and many of those from the

10   home precincts of the named plaintiffs in the case --

11           THE COURT:  All right.  So then why do you need more

12   than that?  If you have that and they are from the home

13   precincts, why -- and you are -- why -- I mean, I am --

14   frankly, I mean, there have been lawsuits about tabulation and

15   all this.  But this is not a tabulation case.

16           MR. ICHTER:  Well, Your Honor, I would say two things

17   to that.  Thing Number 1 is, when you are putting together a

18   puzzle -- and that is essentially what we're doing here -- and

19   you are missing 18,000 pieces, you are going to be missing a

20   substantial part of the picture.

21           The second part is, if there are 18,000 ballot images

22   that are missing and the ballot images we already have indicate

23   that there are significant discrepancies, double counting of

24   ballots, triple counting of ballots, it raises the question of,

25   well, what are they not showing us?  Why is it that these

1    18,000 have been separated and isolated from us?  What will

2    those show?

3         And to the extent that the answer to that is that

4    they are problematic for either Fulton County or the Secretary

5    of State or the State defendants, there are spoliation issues

6    that need to be considered because --

7         THE COURT:  All right.  Let me get back -- and

8    maybe -- maybe I erred on December 2nd or 3rd in ruling that

9    you could have it.

10        But I don't understand how this is connected to your

11   theory of the case.  I mean, I understand why it is connected

12   to the theory of people who were challenging the recount or

13   Mr. Favorito's lawsuit.

14        But I don't understand how it is -- how it is

15   directly related here.  I could understand it if it is a

16   precinct that you can -- where your theory has been Plaintiff A

17   is voting at that precinct and she gives an affidavit saying, I

18   really think -- I'm very uncomfortable whether my vote has been

19   counted.  And it is among the absentee ballots and/or it is

20   among the electronic ballots, you know, depending on what they

21   say.  So that precinct becomes relevant.

22        But I don't understand -- you know, you seem to be

23   taking us in a whole other direction.

24        MR. ICHTER:  Well, Your Honor, for one thing, with

25   respect to the Stark report, the opinion of Stark that has been

1    submitted, it shows that one of the worst precincts for

2    inaccuracies and mistabulations was Donna Curling's precinct,

3    which was the RWO1 precinct.  And with more detailed

4    information in hand, we can identify at precinct level

5    discrepancies and mistabulations to the point where the experts

6    are capable of testifying that there is no way to assure that

7    the voters' in those precincts votes were properly counted or

8    given the proper weight in connection with the outcome of the

9    elections.

10          And so to that extent, they have injury in fact on an

11   individual basis.  So --

12          THE COURT:  Yeah.  But that is not what you are

13   asking for at this point.  I mean, you are -- you are looking

14   for the -- you have a conspiracy theory about the 18,000

15   missing -- allegedly missing ballots.

16          There were observers who watched the recount of --

17   three times of the presidential race.  One of the things that

18   Mr. Stark talks about is -- or Dr. Stark is relating to

19   down-ballot voting.  And that is something different.

20          But that is -- you know, we have learned a lot in the

21   course of this litigation that mistakes not only are made here,

22   made all over the place and historically have been made on -- I

23   mean, it is a rough -- elections are rough at one level.

24          But I am -- but you are varying between -- you want

25   to know it for the entire state and you want to go through

1    every single one.  And I don't know what the problems were

2    in -- all of the problems that might have been in Fulton County

3    or some other county or whether they were typical or not.

4          But it seems to me that you were looking at this

5    ultimately for standing.  So now you are taking it way beyond

6    that.

7          MR. ICHTER:  Your Honor, first of all, I would let

8    you know that the order was entered by consent.  There was a

9    dispute concerning these documents.  And ultimately Fulton

10   County agreed to produce them.  And the content of the order

11   was essentially a consent order.

12         And then this is not a conspiracy theory because

13   we're not articulating a theory with respect to what happened

14   to those 18,000.  We want to know what happened.  And we have

15   got a real live version of hide-the-ball being played here

16   because we've got Fulton County who is supposed to originally

17   have the documents and by statute should have copies of all of

18   these documents and other election papers.  And they say they

19   don't.  They say they turned them over to the Secretary of

20   State.

21         And then the Secretary of State, having had the ball

22   passed to them, had it behind their back and saying, oh, we

23   don't have that.  We don't know if anybody has the ball.  We

24   don't know if the ball exists any more.  And if the ball

25   doesn't exist any more, that is something --

```
 1              THE COURT:  All right.  I'm not going there.  I'm not
 2   going there.  I'm not letting you take -- proceed that way
 3   either.
 4              I'm going to just simply ask the State and the Fulton
 5   County counsel to please confer regarding this and try to
 6   determine is there -- what has happened so I can get a proper
 7   response.
 8              MR. ICHTER:  (Unintelligible).
 9              THE COURT:  I know.  But you are adding -- I mean, I
10   don't need to add more rhetoric to the heat we're already
11   dealing with.
12              MR. ICHTER:  Okay.  And, Judge, please forgive me.
13   I'm not accusing anybody of anything.  We're just expressing --
14              THE COURT:  Well -- but you are.  You are.  So I'm
15   not -- I accept the excusing.  But I don't think we need to
16   make anything here more inflammatory.
17              So I don't -- we don't know your -- it is
18   speculation.  There no doubt are -- there is no doubt there
19   could be adding problems.  But that is something different than
20   the speculation that was going on.
21              So I would just simply ask counsel to try to -- for
22   both defendants to try to get to the bottom of this.  And you
23   can schedule a time to talk with me about it next week.
24              MR. LOWMAN:  This is David Lowman from Fulton County.
25   And I certainly hope nobody is accusing anybody at Fulton
```

```
 1    County of doing anything untoward.  But that's what it sounded

 2    like.

 3           But we will certainly take Your Honor's direction and

 4    confer with counsel for State defendants and make sure that we

 5    provide what we thought we already provided.

 6           Certainly we will make sure that we are able to

 7    locate and provide that .SHA and the .dvd files.  I understand

 8    that is something that plaintiffs claim that they don't have.

 9    We will go back and make sure we are in full compliance with

10    the December 3rd court order, which we certainly aim to do and

11    thought we had.

12           And so a lot of these accusations flying around are

13    pretty astonishing.  But we will do what Your Honor wishes and

14    confer with counsel for State defendants and make sure we have

15    provided that we should have provided.

16           THE COURT:  All right.  And, you know, you can all

17    call Mr. Martin and schedule a time to talk with me about

18    things.  But I would really -- I'm directing you-all not to --

19    not to make this bigger than it may be.

20           And let me hear what exactly -- what is in front of

21    me though is a narrower issue.  And I just want to know what

22    the production is and what the issues are and if there is a

23    problem that there is a problem.  I don't want to dramatize it

24    beyond that.

25           MR. ICHTER:  Understood.
```

1          MR. LOWMAN:  Understood, Your Honor.  Thank you.

2          THE COURT:  Are there any other major issues?  I know

3     there were other things lurking, but I'm --

4          MR. ICHTER:  Your Honor, there were the third

5     document requests that Coalition plaintiffs served on Fulton

6     County.  We have outlined in recent communications that were

7     resent to Fulton County today -- it was either today or -- they

8     are running together.  It was either today or yesterday --

9     where we identified, I believe, six requests for production of

10    documents that there were issues about that we had not received

11    appropriate documentation.  And we haven't heard back on that.

12    So I'm not really sure --

13         THE COURT:  Well, why don't you continue to talk with

14    them about it and when you-all -- and then when you make the

15    scheduled appointment to talk with me about these issues with

16    Fulton County's counsel and with the State's counsel, if they

17    are relevant in this, then provide me some outline of what

18    issues we're going to be looking at and make a joint -- do a

19    joint submission -- all right? -- in advance.

20         MR. ICHTER:  We will do that.

21         THE COURT:  All right.  Great.

22         All right.  Well, I hope everyone is well, despite

23    having to spend this many hours together on this phone call.

24    And be -- be careful.  And I'll be looking for the few things

25    that were going to be sent to me in the next number of days.

1          MR. ICHTER:  Thank you, Your Honor.

2          THE COURT:  Anything else from State counsel or

3    Curling counsel?

4          MR. RUSSO:  This is Vincent Russo, Your Honor.

5    Nothing further from the State.

6          THE COURT:  Okay.  Thank you very much.  This

7    concludes our conference then.  Be well.

8          MR. ICHTER:  Thank you.

9                    **(The proceedings were thereby concluded at 3:12**

10                   **P.M.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                C E R T I F I C A T E

 2

 3    UNITED STATES OF AMERICA

 4    NORTHERN DISTRICT OF GEORGIA

 5

 6         I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7    the United States District Court, for the Northern District of

 8    Georgia, Atlanta Division, do hereby certify that the foregoing

 9    100 pages constitute a true transcript of proceedings had

10    before the said Court, held in the City of Atlanta, Georgia, in

11    the matter therein stated.

12         In testimony whereof, I hereunto set my hand on this, the

13    28th day of January, 2022.

14

15

16

17    _____
      SHANNON R. WELCH, RMR, CRR
18    OFFICIAL COURT REPORTER
      UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT