# Exhibit 8

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

|  |  |
|---|---|
| **DONNA CURLING, ET AL.,** <br> **Plaintiffs,** <br><br> **v.** <br><br> **BRAD RAFFENSPERGER, ET AL.,** <br> **Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' OMNIBUS MOTION *IN LIMINE*

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................... 1

II.    ARGUMENT ............................................................................ 3

       A.    The Fifth Amendment Invocations of Former Georgia
             Elections Officials and Their Co-Conspirators Are
             Admissible ................................................................................3

       B.    The *LiButti* Factors Hinge on Facts to be Adduced at Trial
             and Do Not Preclude Admissibility Here ................................5

       C.    The Invocations are Relevant and Not Unduly Prejudicial ...............12

III.   Evidence of the Legality of the BMD System Is Relevant .............. 13

IV.    Plaintiffs Are Entitled to Call Brad Raffensperger ............................. 16

V.     Defendants' Motion Regarding Dr. Halderman's Discovery Is
       Improper ........................................................................................ 24

VI.    Plaintiffs Are Entitled to Admit Rule 30(b)(6) Deposition
       Testimony from Live Witnesses .................................................. 24

# TABLE OF AUTHORITIES

## Cases

*Andrews v. Autoliv Japan*,
   2021 U.S. Dist. LEXIS 172490 (N.D. Ga. Jan. 20, 2021) .....................................1

*Atl. J. & Const. v. City of Atl. Dep't of Aviation*,
   175 F.R.D. 347 (N.D. Ga. 1997) .........................................................18

*Benson v. City of Lincoln*,
   2023 WL 5627091 (D. Neb. Aug. 31, 2023)..........................................23

*Bonner v. City of Prichard, Ala.*,
   661 F.2d 1206 (11th Cir. 1981) .........................................................25

*Celentano v. Nocco*,
   2016 WL 4943939 (M.D. Fla. Sept. 16, 2016) ...................................18

*Coquina Invs. v. TD Bank, N.A.*,
   760 F.3d 1300 (11th Cir. 2014) ............................................... 3, 4, 5, 6

*Coughlin v. Capitol Cement Co.*,
   571 F.2d 290 (5th Cir. 1978) ...............................................................25

*Davis ex rel. J.D.D. v. Carroll*,
   2017 WL 11151858 (M.D. Fla. July 24, 2017)...................................23

*EEOC v. St. Joseph's/Candler Health Sys., Inc.*,
   2022 WL 17978822 (S.D. Ga. Dec. 28, 2022)....................................23

*Erie R. Co. v. Tompkins*,
   304 U.S. 64 (1938) ..............................................................................16

*Fair Fight Action, Inc. v. Raffensperger*,
   333 F.R.D. 689 (N.D. Ga. 2019) ...................................... 16, 18, 22, 23

*Fair Fight Action, Inc. v. Raffensperger*,
   599 F. Supp. 3d 1337 (N.D. Ga. 2022) ................................................9

*Gray v. Kohl*,
   2008 WL 1803643 (S.D. Fla. Apr. 21, 2008)......................................18

ii

*Greater Birmingham Ministries v. Merrill*,
    321 F.R.D. 406 (N.D. Ala. 2017) ........................................................................18

*In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*,
    681 F. Supp. 2d 141 (D. Conn. 2009) .................................................................4

*In re United States*,
    985 F.2d 510 (11th Cir. 1993) ..................................................................... 17, 23

*In re USA*,
    624 F.3d 1368 (11th Cir. 2010) ................................................................. 17, 23

*LiButti v. United States*,
    107 F.3d 110 (2d Cir. 1997) ................................................................. passim

*M'Culloch v. Maryland*,
    17 U.S. 316 (1819) ...........................................................................................16

*Merrell Dow Pharms., Inc. v. Thompson*,
    478 U.S. 804 (1986) .........................................................................................15

*Moore v. Harper*,
    600 U.S. 1 (2023) .............................................................................................15

*Mt. Hawley Ins. Co. v. Tactic Sec. Enf't, Inc.*,
    2018 WL 10690250 (M.D. Fla. Apr. 5, 2018) ..................................................25

*N.H. Ins. Co. v. Blue Water Off Shore, LLC*,
    2009 WL 792530 (S.D. Ala. Mar. 23, 2009).................................................6, 7

*Pinn, Inc. v. Apple, Inc.*,
    2021 WL 4775969 (C.D. Cal. Sept. 10, 2021)................................................23

*Redd v. N.Y. State Div. of Parole*,
    923 F. Supp. 2d 393 (E.D.N.Y. 2013)................................................................25

*SEC v. Melvin*,
    2014 WL 11829332 (N.D. Ga. Nov. 21, 2014)..................................................4

*United States v. White*,
    2023 WL 7001438 (N.D. Ga. Aug. 25, 2023)....................................................14

iii

*Wechsler v. Hunt Health Sys., Ltd.*,
   2003 WL 21998980 (S.D.N.Y. Aug. 22, 2003) ......................................................4

*Wilkinson v. Carnival Cruise Lines, Inc.*,
   920 F.2d 1560 (11th Cir. 1991) ..........................................................................10

*Woods v. United States*,
   200 F. App'x 848 (11th Cir. 2006)......................................................................13

**Statutes**

Ga. Code § 21-2-300(a)(1).........................................................................................9

**Rules**

Fed. R. Civ. P. 32(a)(3).......................................................................................24, 25

Fed. R. Evid. 403 ......................................................................................................25

Fed. R. Evid. 611 ......................................................................................................25

Fed. R. Evid. 801(d)(2)(D) .......................................................................................10

iv

## I.    INTRODUCTION

The Court advised the parties that motions *in limine* "would just take up time for you that is not necessary since it is a bench trial."   Doc. 1714 at 3:22-4:2. Courts in this district repeatedly have held that motions *in limine* are not necessary for bench trials and have "advised" courts to "deny motions *in limine* in non-jury cases."  *Andrews v. Autoliv Japan*, 2021 U.S. Dist. LEXIS 172490, at *2 (N.D. Ga. Jan. 20, 2021).  The reason is simple: "the rationale underlying pre-trial motions *in limine* does not apply in a bench trial, where it is presumed the judge will disregard inadmissible evidence and rely only on competent evidence."  *Id*.  That rationale is particularly applicable here given this Court's unusually deep familiarity with the key facts and evidence that will be offered at trial.  *See* Doc. 1714 at 20:16-20 ("I don't think that most judges who have a bench trial have as much familiarity with the facts as I have here so—or the evidence . . . .").

And yet, Defendants have raised what amounts to *five* motions *in limine*. They are all unnecessary, each presenting broad, improperly-unspecific evidentiary claims that—even if this were a jury trial—could not be resolved before trial.  And each is meritless.

*First*, Defendants seek to exclude any and all invocations of the Fifth Amendment by witnesses involved in the breach of Georgia's voting system in Coffee County.  But their argument hinges on factual predicates—for example, the

1

degree of connection the State has with Coffee County and the relevant witnesses—that must be resolved at trial. Plaintiffs are entitled to an opportunity to lay that foundation at trial, which they will do if permitted. This issue cannot be resolved as a general, sweeping ruling on a boundless motion *in limine*.

*Second*, Defendants seek to exclude any evidence regarding the enactment of HB 316 and the Dominion BMD system's compliance with State law as irrelevant. But they fail to identify the specific evidence they want to exclude, and the BMD system's legality is directly relevant to the issues in this case.

*Third*, Defendants mischaracterize the Court's prior deferral on whether Plaintiffs could depose Secretary Raffensperger as a *ruling that he could not be called as a witness at trial*. The Court reached no such ruling at any time. Further, Secretary Raffensperger has been the ultimate decision-maker for the Secretary of State's Office during the relevant time-period. And there are new facts the Court did not have when it was last presented with this issue, which show that he is the only witness who can explain *his* decisions and *his* many (inconsistent) statements concerning Plaintiffs' claims. Plaintiffs are entitled to examine him at trial.

*Fourth*, Defendants attempt to turn a discovery dispute entirely of their own making into a basis to exclude critically relevant—and devastating, unrefuted— testimony from Dr. Halderman. The dispute is fully briefed for the Court. Doc. 1716. Defendants' frivolous preclusion argument fails for *at least* the same

reasons as their deliberately untimely discovery demands.  This is the last gasp of desperate parties lacking any rebuttal to Dr. Halderman's dispositive findings.

*Fifth* and finally, Defendants seek to bar Plaintiffs from offering Rule 30(b)(6) deposition testimony from witnesses who also are called in their personal capacity at trial.  This directly defies the Federal Rules.  And cumulativeness objections can and should be resolved at trial.

## II.    ARGUMENT

### A.    The Fifth Amendment Invocations of Former Georgia Elections Officials and Their Co-Conspirators Are Admissible

At trial, Plaintiffs plan to present the depositions of several former Georgia elections officials who took part in a breach of Georgia's BMD election equipment, and their co-conspirators.[1]  These witnesses invoked their Fifth Amendment right against self-incrimination in response to some or all questions about those events, including who was there, what was done, on whose actual or apparent authority, when the State found out, and what the State did in response.

Whether this testimony is admissible, and the inferences the Court may draw, hinges on the application of four non-exclusive factors.  *Coquina Invs. v. TD Bank, N.A.*, 760 F.3d 1300, 1311 (11th Cir. 2014) (citing *LiButti v. United States*, 107 F.3d 110, 123 (2d Cir. 1997)).  Under these factors, the Court is to evaluate the

---

[1] Those witnesses include Cathy Latham, Eric Chaney, Misty Hampton, and Jill Ridlehoover (collectively the "Coffee County Witnesses").

sf-5686881

connection between the non-party witness and the opposing party, considering: (1) "the nature of the relevant relationships," (2) "the degree of control of the party over the nonparty witness," (3) the "compatibility" of their interests in the litigation, and (4) "the role of the non-party witness in the litigation." *Coquina*, 760 F.3d at 1311. Ultimately, the Court is to assess the "overarching concern" of "whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *Id.*

This analysis is highly fact specific. The factors need to be "applied flexibly" and on a case-by-case, *question-by-question* basis. *Id.* As a result, courts reserve judgment on the admissibility of such testimony until trial, where courts can assess the full scope of evidence regarding the relationship between the party and non-party witness and can evaluate *each specific inference* sought from *each specific question* offered. *See, e.g., SEC v. Melvin,* 2014 WL 11829332, at *3 n.8 (N.D. Ga. Nov. 21, 2014) (reserving judgement on admissibility of non-party witness's Fifth Amendment invocation until trial); *In re Ethylene Propylene Diene Monomer (EPDM) Antitrust Litig.*, 681 F. Supp. 2d 141, 153 (D. Conn. 2009) (citing *LiButti* factors and reserving decisions on the admissibility of the adverse inferences until trial); *Wechsler v. Hunt Health Sys., Ltd.*, 2003 WL 21998980, at *3 (S.D.N.Y. Aug. 22, 2003) (same).

4

Faced with no rebuttal for the devastating inferences—supported by extensive, corroborating evidence, such as surveillance video—Defendants ask the Court to depart from established practice and issue a sweeping ruling that all such evidence should be excluded in its entirety and that Plaintiffs are not entitled to *any* adverse inferences for *any* of these witnesses, most of whom Defendants chose not to question themselves during depositions.  Doc. 1723 at 2-7.  Defendants argue: (1) the *LiButti* factors counsel against adverse inferences here because there is no connection between the State and Coffee County; and (2) the testimony is irrelevant and unduly prejudicial.  Defendants are wrong on both counts.

> **B.    The *LiButti* Factors Hinge on Facts to be Adduced at Trial and Do Not Preclude Admissibility Here**

To be clear, Defendants ask the Court to resolve whether to admit Fifth Amendment invocations from four separate witnesses as a *general ruling* on the basis of the *LiButti* factors *without the evidence required to properly consider those factors*.  That puts the cart well before the horse.  This is a case-by-case, *question-by-question* analysis, not one that can be resolved as a general matter on a motion *in limine*.  *Coquina*, 760 F.3d at 1311.  The Court does not have in front of it a specific set of Fifth Amendment invocations Plaintiffs will seek to admit.  Nor does it have the evidence it is required to consider when evaluating the *LiButti* factors regarding those invocations.  It will have both at trial.  The Court should

5

follow the established practice of ruling on the admissibility of non-party Fifth Amendment invocations at trial with the necessary evidentiary record before it.

If the Court decides to weigh the *LiButti* factors now, it should deny Defendants' motion. All four factors support admitting the Coffee County Witnesses' invocations and allowing adverse inferences, which are "trustworthy under the circumstances and will advance the search for the truth." *Id*. at 1311.

*First,* the relationship between the State and these witnesses does not create reason to doubt the sincerity of the witnesses' Fifth Amendment invocations. The first *LiButti* factor is the "nature of the relevant relationships." *Coquina*, 760 F.3d at 1311. Defendants argue that this factor weighs against an adverse inference because the Coffee County Witnesses were not employed by the Secretary of State. Doc. 1723 at 3. But their superficial analysis sidesteps the thrust of this factor. The closeness of the relationship of the party and non-party witness is a proxy for the likelihood that the non-party would render testimony to *purposefully damage* the objecting party. *LiButti*, 107 F.3d at 123. This factor turns on whether the relationship between the non-party and the objecting party evidences a likelihood that the non-party would "*falsely claim the Fifth Amendment* in order to torpedo [the party's] case." *N.H. Ins. Co. v. Blue Water Off Shore, LLC*, 2009 WL 792530, at *8 (S.D. Ala. Mar. 23, 2009) (emphasis added).

Defendants offer no evidence suggesting that is likely here, nor is there any.

6

On the contrary, at the time of their depositions, each Coffee County Witnesses'
involvement in the breach was documented in the press.[2]  The ensuing
investigations by the Fulton County District Attorney were highly publicized.[3]
Every witness invoked the Fifth Amendment on the advice of counsel.  Ex. 1,
Chaney Dep. Tr. at 19:17-19:20; Hampton Dep. Tr. at 54:20-55:6; Ridlehoover
Dep. Tr at 69:1-69:9; Latham Dep. Tr. at 18:2-18:18.  And Ms. Hampton and Ms.
Latham have since been indicted for their involvement.  *See Georgia v. Trump et
al.*, 23SC188947 (Fulton Cnty. Super. Ct. Aug. 14, 2023); Doc. 1705 at 69.  The
witnesses had nothing to gain from false invocations of the Fifth Amendment, nor
is there any evidence whatsoever suggesting they took the Fifth to torpedo
Defendants' case.  Every indication is that they invoked the Fifth Amendment
because they were genuinely concerned about incriminating themselves—*and for
good reason*.  Those invocations are inherently trustworthy.  *See N.H. Ins. Co.*,
2009 WL 792530, at *8 (adverse inference against employer based on former

---

[2] Emma Brown & Amy Gardner, *Georgia county under scrutiny after claim of
post-election breach*, Washington Post, (May 13, 2022),
https://www.washingtonpost.com/investigations/2022/05/13/coffee-county-misty-
hampton-election/; Jose Pagliery, *Texts Reveal GOP Mission to Breach Voting
Machine in Georgia*, Daily Beast (June 5, 2022),
https://www.thedailybeast.com/how-a-coffee-county-gop-chair-coordinated-a-
voting-machine-breach.
[3] *See* Tamar Hallerman, *Why Fulton Prosecutors Are Interested in Coffee County
Data Breach,* Atlanta Journal-Constitution (Sept. 8, 2022),
https://www.ajc.com/politics/why-fulton-prosecutors-are-interested-in-a-coffee-
county-data-breach/QDZMSXCAGBHLPLLBEVL4W7FSMM/.

employee's invocation of Fifth Amendment was trustworthy because witness's

invocation was made on advice of counsel and on concern of real prosecution, not

"fanciful future prosecution").  This factor strongly supports admissibility.

*Second,* Defendants had sufficient control over Mr. Chaney, Ms. Hampton,

and Ms. Ridlehoover to attribute their statements to the State.[4]  The pertinent

question under the second *LiButti* factor is "the degree of control which the party

has vested in the non-party witness in regard to the key facts and general subject

matter of the litigation."  *LiButti*, 107 F.3d at 123.  The question is intended to

inform "the trial court whether the assertion of the privilege should be viewed as

akin to testimony approaching admissibility under Fed. R. Evid. 801(d)(2) and may

accordingly be viewed … as a vicarious admission."  *Id.*

There is an unrefuted connection between Defendants in this case and

county election officials like Mr. Chaney, Ms. Hampton, and Ms. Ridlehoover, and

the routine control Defendants exercise over them.  As the Court already stated,

Defendants are responsible for selecting the uniform voting system, maintaining its

functionality, and ensuring that any vulnerabilities to the system are mitigated.

---

[4] Plaintiffs do not contend here that Defendants exercised control over Ms. Latham, who was not employed by Coffee County.  Nevertheless, the *LiButti* factors must be applied flexibly and no one factor is dispositive.  The underlying question for *each* of the factors is whether the invocation of privilege is trustworthy.  Each of the other factors suggests so with respect to Ms. Latham too.  And the fact that she was subsequently indicted for her conduct in Coffee County further establishes that her invocation was no sham and can be trusted.

8

Doc. 1705 at 98. Under Georgia law, the State provides the counties with the election equipment. Ga. Code § 21-2-300(a)(1). And it depends in part on them for the "physical security of their own election equipment." Doc. 1705 at 98. It also controls how the counties operate the equipment during elections. *See* Ex. 2 (PX407 and PX265). County officials frequently contact the State for direction on how to handle issues relating to election equipment. *See, e.g.*, Ex. 3 (PX 103, PX 104, PX 232). *And the State has told Georgia counties that they may not take any actions related to the voting system that are not authorized by Defendants.* Ex. 4 (PX194). The evidence shows that counties answer to the State regarding election security and procedures. Ex. 5 (Oct. 12, 2022 SOS 30b6 (Sterling) Dep. Tr. at 205:14-206:1 ("[G]enerally speaking, [if] the Secretary of State's Office says to do something, [the counties] generally do it, because they don't want to go before the State Election Board for having done something wrong.")).

In short, Defendants set the parameters within which county officials, including the Coffee County Witnesses, are required to operate regarding their handling of Georgia's voting system and its components and relied on them to execute their duties according to Defendants' rules and direction. That satisfies the second factor for admissibility of their invocations here. *See, e.g.*, *Fair Fight Action, Inc. v. Raffensperger*, 599 F. Supp. 3d 1337, 1341 (N.D. Ga. 2022) (the "relevant inquiry" for whether a non-party should be considered a party's "agent"

9

under Rule 801(d)(2)(D) "is whether [the witness] was authorized to act for his principal … concerning the mater about which he allegedly spoke." (citing *Wilkinson v. Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1566 (11th Cir. 1991))).

*Third*, the interests of these witnesses and Defendants are compatible. Instead of arguing this factor, Defendants merely offer the conclusory remark that "[i]f any alignment of interests with respect to the outcome of the litigation is present between these non-party witnesses and the parties to this case, it is an alignment with Plaintiffs' interests in prohibiting use of the Dominion BMD System." Doc. 1723 at 5. That claim is nonsensical and irrelevant. This factor assesses whether *the assertion of privilege* advances the interests of both the non-party witness and the affected party in the outcome of the litigation—not whether the party and non-party are theoretically aligned on a potential *outcome* of the litigation. *LiButti*, 107 F.3d at 123.

Here, Defendants and the Coffee County Witnesses are indeed aligned with respect to the invocations. Mr. Chaney, Ms. Hampton, Ms. Ridlehoover, and Ms. Latham would have little reason to take the Fifth Amendment if their actions were truly beyond legal scrutiny. Their exposure to criminal liability for their breach of the voting system is in lockstep with Defendants' own exposure to civil liability for their failure to secure the system against that and similar breaches, both before the breach occurred and after by failing to hold the offenders accountable. By

10

asserting the privilege and limiting their exposure to criminal liability, these witnesses also limited the scope of evidence that could be used to document Defendants' failure to properly safeguard Georgia's elections and the breach confirming that failure.  This strongly supports admissibility of the invocations.

*Fourth,* the Coffee County Witnesses are core to this case.  The fourth *LiButti* factor asks the Court to consider whether the non-party witnesses are "key figures" playing "controlling role[s] in respect to any … underlying aspect[]" of the case.  107 F.3d at 123.  This is indisputable.  In denying Defendants' summary judgment motions, the Court described the Coffee County breach as "[p]erhaps the most significant development since the 2020 PI phase of this case."  Doc. 1705 at 49.  Indeed, the breach was a watershed moment in confirming Defendants' failure to adequately safeguard Georgia elections.  It will be featured prominently at trial.  And Mr. Chaney, Ms. Hampton, Ms. Ridlehoover, and Ms. Latham are key actors in the breach.  This factor also strongly supports admissibility of their invocations.

In sum, all four factors strongly support admissibility.   In addition, there are numerous other assurances that an adverse inference from specific questions about the Coffee County breach directed at these witnesses will be trustworthy and will advance the search for the truth.  The inferences are supported by direct evidence that each witness took part in an unlawful breach.  For example, there is security footage from the event, as well as logs showing that data was actually exfiltrated

sf-5686881

from Coffee County and provided to other unauthorized persons.  *See, e.g.*, S.J. Opp. Ex. 176, Doc. 1632-26; S.J. Opp. Ex. 179, Doc. 1635-37.  Scott Hall and Sidney Powell have pleaded guilty in the criminal case brought by the Fulton County District Attorney regarding their direct involvement in the Coffee County breach.[5]  Doc. 1728 at 10-11.  As the Court stated on summary judgment, Mr. Hall, Ms. Latham, Ms. Hampton, and others "directed" the work done by SullivanStrickler, and Sidney Powell paid for it.  Doc. 1705 at 52.

There will be ample evidence at trial supporting the trustworthiness of the Coffee County Witnesses' invocations of the Fifth Amendment.  The Court should deny this motion or at least wait until that evidence is introduced at trial to decide this issue.  If it is inclined to decide it now, the *LiButti* factors as well as additional admissible evidence strongly support admissibility of the invocations.

### C.      The Invocations are Relevant and Not Unduly Prejudicial

Defendants' argument that this testimony and any related adverse inferences would be irrelevant and unduly prejudicial fares no better.  First, Defendants argue they would be prejudiced by being unable to cross examine these witnesses.  Doc. 1723 at 6.  This is highly misleading.  Defendants had a *full and fair opportunity* to

---

[5] Kenneth Chesebro and Jenna Ellis also have pleaded guilty in the Fulton County Case.  Tamar Hallerman & David Wickert, *Disavowing Trump, a tearful Jenna Ellis pleads guilty in Fulton election probe*, Atlanta Journal-Constitution (Oct. 24, 2023), https://www.ajc.com/politics/fourth-defendant-negotiates-plea-deal-with-fulton-prosecutors/S3SO4MZ3MBGCJD6YD47ZE4MYQE/.

sf-5686881

examine *each* of the Coffee County Witnesses at their depositions.[6]  That they

chose not to do so for some witnesses was their own decision, and they must live

with that decision at trial.  Second, the Court already has decided this evidence is

relevant.  In its summary judgment order, it detailed the events surrounding the

Coffee County breach, including the role each of the Coffee County Witnesses

played.  Doc. 1705 at 49-60.  These witnesses' testimony about what happened—

and their invocation of the Fifth Amendment in response to questions about the

same—underscores how deficient Defendants are in safeguarding Georgia's

elections.  The breach in Coffee County is exactly the sort of threat that Plaintiffs

warned Defendants about for years.  That they not only failed to stop it, but when it

came to light, opted to bury their heads in the sand and try to conceal it is highly

relevant to Plaintiffs' claims.  That this evidence hurts Defendants' case does not

make it unduly prejudicial—particularly where there is no jury to be prejudiced.

*Woods v. United States*, 200 F. App'x 848, 853 (11th Cir. 2006) ("the part of Rule

403 that authorizes exclusion of evidence because of its unfair prejudicial impact

has no logical application to bench trials").  This evidence should be admitted.

## III.  EVIDENCE OF THE LEGALITY OF THE BMD SYSTEM IS RELEVANT

Defendants' motion relating to HB 316 seeks to exclude two different

---

[6] Defendants are free to counter-designate portions of the deposition testimony, including questions by their own counsel or counsel for Defendants.

categories of evidence, neither well defined: evidence "challenging the legislature's passage of HB 316" and evidence relating to the "Dominion BMD System's compliance with State law."  Doc. 1723 at 7-8.

First, Defendants make an incomprehensible argument that the Court should exclude any evidence relating to "the enactment of HB 316" because it is "extraneous" and inadmissible.  *Id*. at 7-8.  But they make no attempt to give Plaintiffs, or the Court, any description of what such evidence would constitute or how it could be extraneous or inadmissible.  That alone is reason to deny the motion.  *See United States v. White*, 2023 WL 7001438, at *1 n.2 (N.D. Ga. Aug. 25, 2023) (denying motion *in limine* for failing to identify specific pieces of evidence to which party objected).

Second, Defendants state that "the Dominion BMD System's compliance with State law is irrelevant" because Plaintiffs have no state law claim.  Doc. 1723 at 7.  Defendants conflate two concepts: claims that arise under state law, on the one hand, and the relevancy of state law to claims that arise under federal law, on the other.  Defendants argue strenuously (as if there were some doubt) that Plaintiffs have no "state law claim."  This much is obvious: Plaintiffs each assert two claims arising under the U.S. Constitution and no claims arising under state law.  But then Defendants' argument runs off the rails: because there is no claim arising under state law, Defendants argue, state laws are irrelevant to Plaintiffs'

14

federal law claims. Defendants offer no legal authority for this *non sequitur*, and it is dead wrong: federal constitutional cases frequently turn on questions of state law.[7] Plaintiffs do not need to have a state law count for Defendants' compliance with state law to be relevant to this case.

In fact, Defendants themselves concede the relevance of state law by citing their alleged compliance with state law as a defense to Plaintiffs' federal constitutional claims. For example, Defendants claim that "the State [] has a compelling interest in complying with state laws as they are written." Doc. 1567-1 at 48. Defendants cannot assert this interest and then preclude evidence that they are *not* "complying with state laws as they are written." And this Court has already confirmed the relevance of this evidence by discussing in detail how Defendants are *not* complying with state law. *See*, *e.g.*, Doc. 964 at 51-55 (discussing the state's failure to comply with state laws relating to Logic and Accuracy testing). Defendants' argument that evidence regarding the system's

---

[7] In a recent Elections Clause case, Chief Justice Roberts cites case after case in which state law is relevant to the determination of claims arising under the federal constitution. *Moore v. Harper,* 600 U.S. 1, 35-37 (2023). In each of these cases, the absence of a "state law claim" had nothing to do with the relevance of state law to the federal question, and the presence or a state law issue, even a dispositive one, did not convert the federal claim into a state law claim. The reverse also is true. Federal law is frequently relevant—even dispositive—to a state law claim, but that does not convert the claim into one arising under federal law. *Merrell Dow Pharms., Inc. v. Thompson,* 478 U.S. 804, 815-17 (1986).

compliance with state law is "irrelevant" is therefore completely without merit.[8]

## IV. PLAINTIFFS ARE ENTITLED TO CALL BRAD RAFFENSPERGER

High-ranking officials should be required to testify where they possess

unique knowledge of a challenged policy and its implementation or have made

statements concerning the facts at issue that only they can explain. *See, e.g. Fair*

*Fight Action, Inc. v. Raffensperger*, 333 F.R.D. 689, 695-67 (N.D. Ga. 2019).

Defendants misconstrue this Court's prior holding regarding a deposition of

Secretary Raffensperger. The Court did not "reject" the request, but rather

"defer[ed]" the issue because the record regarding Secretary Raffensperger's

unique knowledge of critical issues was not yet fully developed. Doc. 1723 at 10;

Doc. 1295 at 44:18-45:4. It is now clear that Secretary Raffensperger has unique

knowledge of several categories of highly relevant information to which only he

can testify, including at least (i) an alleged 2021 investigation into the Coffee

---

[8] Defendants also make two radical statements on the limits of federal court
jurisdiction in this section of their motion *in limine*: (1) whether the Dominion
BMD System "is compliant with *state* law is a matter for the *state* courts of
Georgia," and (2) that any argument or claim that the Dominion BMD System fails
to comply with state law is "barred by the Eleventh Amendment and state
sovereign immunity." Doc. 1723 at 7-9. It is unclear how either statement pertains
to Defendants' motion. But both statements are wrong. It is black letter law that
federal courts can interpret state law. *See Erie R. Co. v. Tompkins,* 304 U.S. 64,
78-79 (1938) (federal courts must apply state law in federal diversity case);
*M'Culloch v. Maryland,* 17 U.S. 316, 432-37 (1819) (early example of a federal
court interpreting state law and declaring it unconstitutional). And this Court and
the Eleventh Circuit repeatedly have rejected Defendants' claims concerning
sovereign immunity and the Eleventh Amendment. Doc. 751 at 25.

County breach; (ii) ~~his own statements about this litigation and the issues involved~~ ~~in it; and (iii) his own decisions about what, if anything, the State is doing to~~ ~~maintain and secure its voting system.~~  None of the other deponents from his office could answer questions about those topics.  In fact, when asked, they repeatedly deferred to the Secretary.  *See* note 11, *infra.*  His testimony cannot be "cumulative" of testimony that other witnesses cannot provide, and Defendants' suggestion that it would be a waste of time is dead wrong.

The Eleventh Circuit has held that "to protect officials from the constant distraction of testifying in lawsuits, courts have required that [parties] show a special need or situation compelling such testimony."  *In re United States*, 985 F.2d 510, 512 (11th Cir. 1993); *see also In re USA*, 624 F.3d 1368, 1372 (11th Cir. 2010) ("We must review the record to determine whether it supports a finding of extraordinary circumstances or a 'special need' for compelling the appearance of a high-ranking officer in a judicial proceeding.").  District courts in the Eleventh Circuit have found a "special need" where the official has made statements or decisions relevant to the case, since only the official can explain what they meant by their statements or what informed their decisions.

For example, in *Fair Fight*, Judge Jones found the "special need" was met to depose Governor Kemp because (1) he "directed all relevant activities of the SEB" and was the only one who could explain why the SEB failed to take certain action,

17

and (2) he was the only one who could "explain what he actually meant" when making statements about the Secretary of State's Office, the SEB, and voter participation in the State.  333 F.R.D. at 695-67.  That decision is consistent with those of other courts around the country that have applied the same standard of a "special need" or "extraordinary circumstances" and permitted the testimony of high-ranking government officials on that basis.[9]  The balance of the cases suggests that where the official possesses unique knowledge of a challenged policy

---

[9] *See Atl. J. & Const. v. City of Atl. Dep't of Aviation*, 175 F.R.D. 347, 347-48 (N.D. Ga. 1997) (permitting deposition of Atlanta mayor, assuming "extraordinary circumstances" were required to do so, because the mayor likely possessed "pertinent, admissible, discoverable information which can be obtained only from him" concerning the "origin of the [challenged] ordinance," "its implementation," and Atlanta's relationship with Coca-Cola, which may have led to the creation of the policy at issue); *Greater Birmingham Ministries v. Merrill*, 321 F.R.D. 406, 413 (N.D. Ala. 2017) (permitting deposition of then-Secretary of State John Merrill in a case challenging Alabama's voter identification law, "because he has been personally involved in implementing the law, such as by restructuring staff responsibilities for election fraud complaints, personally answering questions posed by county registrars with regard to interpretation of the law, deciding the content of advertising campaigns regarding the law, and making numerous public statements regarding its rationale and effects, sometimes asserting facts that no one else has asserted."); *Gray v. Kohl*, 2008 WL 1803643, at *1-2 (S.D. Fla. Apr. 21, 2008) (permitting deposition of sheriff even though sheriff "disavow[ed] any knowledge concerning policy making" and the "enforcement and interpretation" of the challenged statute, as the sheriff would likely have personal knowledge given his "executive oversight and high level leadership and command responsibility" and "may not so casually disavow his knowledge over matters such as policy making that typically occur at an executive level within an organization."); *Celentano v. Nocco,* 2016 WL 4943939, at *2 (M.D. Fla. Sept. 16, 2016) (holding sheriff was entitled to "heightened protection afforded to high ranking officials" but permitting deposition because the sheriff "may indeed possess unique personal knowledge of the facts and issues being litigated").

and its implementation, or has made statements concerning the facts at issue, they should be required to testify.

That is precisely the situation here.  First, Secretary Raffensperger has ultimate responsibility for the actions (or inactions) of his Office and directed activities central to this litigation.  *See* S.J. Opp. Ex. 78, Doc. 1630-28 (Raffensperger press release discussing the Secretary's involvement in implementing the BMD system); Ex. 6, Feb. 2, 2022 SOS 30b6 (Beaver) Dep. Tr. at 170:18-187:16 (Beaver discussing the Secretary's attestation of compliance under Rule 590-8-3).[10]  In their depositions, other members of Secretary Raffensperger's office repeatedly made clear that he is the ultimate decision-maker and that they cannot speak to the deliberations and reasoning of the decisions made by Secretary Raffensperger.[11]  He, and he alone, can explain those decisions.

---

[10] *See also* Ga. Sec'y of State, *About Secretary Raffensperger* https://sos.ga.gov/page/about-secretary-raffensperger (last visited Dec. 11, 2023) ("As Secretary of State, Raffensperger delivered the largest implementation of voting machines in the history of this country, on time and on budget.").

[11] *See, e.g.*, Ex. 6, Feb. 11, 2022 SOS 30b6 (M. Barnes) Dep. Tr. at 33:6-33:17 (decision whether to examine voting equipment or servers "would be a decision that would be made by the Secretary"); Feb. 2, 2022 SOS 30b6 (Beaver) Dep. Tr. at 108:15-108:24, 183:2-12 (did not review and could not explain public statements by Secretary because "all that media kind of stuff is handled by the Secretary's front office"), 183:2-183:16 ("front office" refers to "Secretary Raffensperger" and decisions to move away from one voting system to another are made by Secretary Raffensperger because "[t]hose kind of decisions, it comes down to him to make the call.  We present proposals and it's up to him to say y[ea], nay.").

19

Second, Secretary Raffensperger has offered a multitude of statements as Secretary of State concerning the facts in this case.  For example, in January 2022, he stated that Dr. Halderman's report is "not an objective, academic study by a non-biased actor" but rather "assertions by an individual who is paid to espouse opinions supporting the elimination of electronic voting systems to help a lawsuit brought by liberal activists."[12]  And in June 2023, he castigated Plaintiffs and dismissed Professor Halderman's report publicly to the General Assembly while insisting Georgia's election systems were secure because there is "punishment for those who break our laws."[13]  Only Secretary Raffensperger can explain what he meant and considered when he made statements like those and others—e.g.:

- "The Halderman report was the result of a computer scientist having complete access to the Dominion equipment and software for three months in a laboratory environment."  *Id.*

- "The 'critics of Georgia's election security' you've probably seen quoted in the media are from one of only two groups: election-denying conspiracy theorists or litigants in the long-running Curling lawsuit. These two groups make ever-shifting but always baseless assertions that Georgia's election system is at risk because bad actors might hack the system and change the result of an election."  *Id.*

---

[12] Ga, Sec'y of State Press Release, *Secretary Raffensperger Calls on J. Alex Halderman to Agree to Release "Secret Report" and Pre-Election Testimony* (Jan. 27, 2022), https://sos.ga.gov/news/secretary-raffensperger-calls-j-alex-halderman-agree-release-secret-report-and-pre-election.
[13] Secretary Brad Raffensperger, *Remarks to the General Assembly: Setting the Election Security Record Straight* (June 20, 2023), https://sos.ga.gov/news/setting-election-security-record-straight.

20

- "We have layers of security protocols and procedures to physically protect ballots, the system, the software, and the results. We have tests and audits to verify results." *Id.*

- "[The Halderman report] identified risks that are theoretical and imaginary. . . ." *Id.*

- "It's more likely that I could win the lottery without buying a ticket" than that bad actors could install malware on all 35,000 pieces of equipment systems to change election outcomes. *Id.*

Just days ago, Secretary Raffensperger again made statements concerning the purported security of Georgia's voting system, saying "we commit to publicly affirming the security and integrity of elections" including by having in place "practices such as testing all voting machines to ensure they are secure, conducting audits of ballots after every election to confirm the accuracy of the results, and storing paper ballots in secure facilities to maintain a paper trail."[14]  Plaintiffs should be able to test such assertions, especially if Defendants rely on such steps.

Secretary Raffensperger has also made contradictory statements concerning his Office's awareness and mitigation of the Coffee County breach.  As the Court noted, "He initially stated that the Secretary of State's Office knew of the breach in January of 2021, but within minutes of so stating, an aide corrected the Secretary of State's response off camera and offered May of 2021 as the correct date."  Doc.

---

[14] Ga. Sec'y of State Press Release, *Secretary Raffensperger Joins Colleagues in Calling for Restored Trust in Electoral Systems* (Dec. 6, 2023), https://sos.ga.gov/news/secretary-raffensperger-joins-colleagues-calling-restored-trust-electoral-systems.

1705 at 66 n.45.  Later, "a representative with the Secretary of State's Office
clarified that the office did not know about or began investigating Coffee County
until July 2022." *Id.*  The Secretary, on one hand, commented that "the individuals
the Secretary of State's investigators had interviewed had not been truthful,"
justifying the statement of COO Gabriel Sterling that the Coffee County breach
simply "didn't happen"; yet he "simultaneously maintained that the Secretary's
office learned about the breach early on and had been continuing to investigate the
matter." *Id.* at 66.  Secretary Raffensperger's testimony on what he and his Office
knew about Coffee County and when is highly relevant to Plaintiffs' claims.

Defendants' claim that Secretary Raffensperger's testimony would be
"cumulative" could not be more wrong.  Doc. 1723 at 10.  None of the other
potential witnesses Defendants identify can explain what the Secretary meant by
*his own statements*, what he considered for those claims, and what exactly he
contends his Office has done to mitigate the severe election risks identified in this
case, including by Dr. Halderman.  Only Secretary Raffensperger can do that.

While this Court did not have the sort of information it needed to "go
through the same type of analysis [as] Judge Jones [in *Fair Fight*]" in January
2022, Doc. 1295 at 44:20-22, that information now exists.  As in *Fair Fight*, the
question before the Court is whether Secretary Raffensperger has unique personal
knowledge in relation to this case.  In *Fair Fight*, unlike Governor Kemp, he

22

apparently did not: the case was "primarily based on conduct that occurred prior to Secretary Raffensperger being sworn in."  333 F.R.D. at 697.  This time, he does. Secretary Raffensperger has been in office since the BMD system was selected and implemented in every Georgia county.  This time, he made many key decisions. And this time, he repeatedly—and inconsistently—tried to explain and defend those decisions to the public.  Defendants' own cases where courts denied motions to compel the official to testify prove the point: in none of them did the official have unique personal knowledge of a disputed policy or decision, or make statements pertaining to the facts at issue.[15]  Secretary Raffensperger is the only person who can explain his decisions and statements.  That easily establishes a "special need" for his testimony.  Plaintiffs should be permitted to call him at trial.

---

[15] *See In re United States*, 985 F.2d at 512-13 (denying deposition of FDA Commissioner who did not take office until years after the investigation occurred about which defendants sought to depose him); *In re USA*, 624 F.3d at 1373 (denying testimony of official who was not "the primary official responsible" for the decisions at issue and permitting the testimony of the official that was); *Davis ex rel. J.D.D. v. Carroll*,  2017 WL 11151858, at *2 (M.D. Fla. July 24, 2017) (temporarily stopping deposition of top departmental official because no 30(b)(6) depositions had been conducted for that department while reserving that a showing requiring his deposition could be made later); *Benson v. City of Lincoln*, 2023 WL 5627091, at *5-7 (D. Neb. Aug. 31, 2023) (testimony of mayor who had no involvement in the investigation of plaintiff's complaint or the decision to terminate her and no other "special knowledge" could be excluded); *EEOC v. St. Joseph's/Candler Health Sys., Inc.*, 2022 WL 17978822, at *8 (S.D. Ga. Dec. 28, 2022) (testimony of top official should be excluded because the witness was not disclosed in discovery); *Pinn, Inc. v. Apple, Inc.*, 2021 WL 4775969, at *3 (C.D. Cal. Sept. 10, 2021) (same).

23

## V. DEFENDANTS' MOTION REGARDING DR. HALDERMAN'S DISCOVERY IS IMPROPER

Only six weeks before trial, Defendants claimed that they needed expansive discovery regarding Dr. Halderman's report, despite *willfully* missing every deadline to obtain that discovery in the last two and a half years. Plaintiffs already showed that Defendants are *not* entitled to additional discovery at this very late stage. Doc. 1716. This new effort to preclude Dr. Halderman's testimony at trial is premised on the same meritless arguments, as Defendants admit, and thus it fails for the same reasons. Moreover, granting this motion not only would reward Defendants admittedly-deliberate decision not to pursue the discovery they now claim they need literally for years, but incentivize the same sort of gotcha-gamesmanship in other cases. Defendants must live with their admittedly-deliberate decision to forgo the discovery underlying their exclusion argument.

## VI. PLAINTIFFS ARE ENTITLED TO ADMIT RULE 30(B)(6) DEPOSITION TESTIMONY FROM LIVE WITNESSES

Defendants request that the Court preclude Plaintiffs from calling live at trial witnesses for whom Plaintiffs also intend to offer designated deposition testimony provided under Rule 30(b)(6). Plaintiffs have no intention of offering cumulative testimony. But they have a right to present deposition testimony from witnesses designated under Rule 30(b)(6) for "any purpose," even if those individuals testify live. As Rule 32(a)(3) states: "An adverse party may use for any purpose the

24

deposition of a party or anyone who, when deposed, was the party's officer, director, managing agent, or designee under Rule 30(b)(6) or 31(a)(4)."

Defendants' motion would rewrite the Federal Rules. Courts repeatedly have held that a party "may introduce the deposition of an adversary as part of his substantive proof *regardless of the adversary's availability to testify at trial*." *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 308 (5th Cir. 1978) (emphasis added) (construing an earlier version of Rule 32(a)(3));[16] *see also Mt. Hawley Ins. Co. v. Tactic Sec. Enf't, Inc.*, 2018 WL 10690250, at *1 (M.D. Fla. Apr. 5, 2018) (same under current version of Rule 32(a)(3). Indeed, Rule 32(a)(3) is supposed to be "liberally construed." *Redd v. N.Y. State Div. of Parole*, 923 F. Supp. 2d 393, 408 (E.D.N.Y. 2013). Although the Court retains discretion to "exclude parts of the deposition that are unnecessarily repetitious" pursuant to Federal Rules of Evidence 611 and 403, "it may not refuse to allow the deposition to be used merely because the party is available to testify in person." *Id.* Plus, that is not a decision that can be made before trial. The parties should be required to timely disclose specific designations during trial. The Court then can resolve any cumulativeness objections based on the evidence in the record at trial.

---

[16] In *Bonner v. City of Prichard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit rendered prior to the close of business on September 30, 1981.

sf-5686881

Respectfully submitted this 12th day of December, 2023.

*/s/ David D. Cross*
David D. Cross (*pro hac vice*)
Mary G. Kaiser (*pro hac vice*)
Matthaeus Martino-Weinhardt
(*pro hac vice*)
Ramsey Fisher (*pro hac vice*)
Aaron Scheinman (*pro hac vice*)
Benjamin Campbell (*pro hac vice*)
Wail Jihadi (*pro hac vice*)
Oluwasegun Joseph (*pro hac vice*)
MORRISON & FOERSTER LLP
2100 L Street, NW, Suite 900
Washington, DC 20037
(202) 887-1500
dcross@mofo.com

*/s/ Halsey G. Knapp, Jr.*
Halsey G. Knapp, Jr.
GA Bar No. 425320
Adam M. Sparks
GA Bar No. 341578
Jessica G. Cino
GA Bar No. 577837
KREVOLIN & HORST, LLC
1201 West Peachtree Street, NW
Suite 3250
Atlanta, GA 30309
(404) 888-9700
hknapp@khlawfirm.com

*/s/ Christian G. Andreu-von Euw*
Christian G. Andreu-von Euw
(*pro hac vice*)
THE BUSINESS LITIGATION GROUP, PC
150 Spear Street
San Francisco, CA 94105
(415) 765-6633
christian@blgrp.com

*Counsel for Plaintiffs Donna Curling, Donna Price & Jeffrey Schoenberg*

*/s/ Bruce P. Brown*
Bruce P. Brown
Georgia Bar No. 064460
BRUCE P. BROWN LAW LLC
1123 Zonolite Rd. NE
Suite 6
Atlanta, Georgia 30306
(404) 881-0700

*/s/ Robert A. McGuire, III*
Robert A. McGuire, III
Admitted Pro Hac Vice
 (ECF No. 125)
ROBERT MCGUIRE LAW FIRM
113 Cherry St. #86685
Seattle, Washington 98104-2205
(253) 267-8530

*/s/ Russell T. Abney*
Russell T. Abney
Georgia Bar No. 000875
WATTS GUERRA, LLP
4 Dominion Drive, Building 3

26

Suite 100
San Antonio, TX 78257
(404) 670-0355

    *Counsel for Plaintiff Coalition for Good Governance*

<u>*/s/ Cary Ichter*</u>
Cary Ichter
Georgia Bar No. 382515
ICHTER DAVIS LLC
3340 Peachtree Road NE
Suite 1530
Atlanta, Georgia 30326
(404) 869-7600

    *Counsel for Plaintiffs William Digges III, Laura Digges, & Megan Missett*

27

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, using font type of Times New Roman and a point size of 14.

*/s/ David D. Cross*
David D. Cross

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER , ET AL.,**<br>**Defendants.** | **Civil Action No. 1:17-CV-2989-AT** |

## CERTIFICATE OF SERVICE

I hereby certify that on December 12, 2023, a copy of the foregoing **PLAINTIFFS' OPPOSITION TO DEFENDANTS' OMNIBUS MOTION *IN LIMINE*** was electronically filed with the Clerk of Court using the CM/ECF system, which will automatically send notification of such filing to all attorneys of record.

*/s/ David D. Cross*
David D. Cross

29