# EXHIBIT 2

```
1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF GEORGIA
2                              ATLANTA DIVISION

3

4    DONNA CURLING, ET AL.,              :
                                          :
5              PLAINTIFFS,               :
     vs.                                  :   DOCKET NUMBER
6                                         :   1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,         :
7                                         :
               DEFENDANTS.               :
8

9

10        TRANSCRIPT OF BENCH TRIAL - VOLUME 6A PROCEEDINGS

11            BEFORE THE HONORABLE AMY TOTENBERG

12            UNITED STATES DISTRICT SENIOR JUDGE

13                     JANUARY 17, 2024

14

15

16

17

18

19

20

21    MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED

22                    TRANSCRIPT PRODUCED BY:

23

     OFFICIAL COURT REPORTER:          SHANNON R. WELCH, RMR, CRR
24                                      2394 UNITED STATES COURTHOUSE
                                        75 TED TURNER DRIVE, SOUTHWEST
25                                      ATLANTA, GEORGIA  30303
                                        (404) 215-1383
```

 1                    MR. BROWN:  Not from us, Your Honor.

 2                    THE COURT:  Anything from the defense?

 3                    MR. BELINFANTE:  No, Your Honor.

 4                    THE COURT:  And who is the next witness?

 5                    MR. FISHER:  It would be Paul Maggio.

 6                    THE COURT:  Very good.  All right.  We'll start then.

 7    Thank you.

 8                    COURTROOM SECURITY OFFICER:  All rise.

 9                    **(A lunch break was taken.)**

10                    THE COURT:  Well, are you going to be, I assume,

11    questioning this witness about these -- do you want to get --

12                    MR. FISHER:  It is also going to be on the screen,

13    Your Honor, when I ask some questions about it.  But --

14                    THE COURT:  The problem is it's right now here.  Is

15    he going to be testifying initially about matters other than

16    the Coffee County players?

17                    MR. FISHER:  No.  I mean, he's going to be testifying

18    about Coffee County from the second he sits down.

19                    THE COURT:  All right.  That's fine then.

20                    Has -- have all the other counsel had an opportunity

21    to look at this?

22                    MR. BOYLE:  Well, we did see it in opening, Your

23    Honor.  But thank you.  Let me just take a quick look.

24                    MR. FISHER:  Your Honor, plaintiffs call Paul Maggio.

25                    COURTROOM DEPUTY CLERK:  Please raise your right

```
 1    hand.
 2                    (Witness sworn)
 3             COURTROOM DEPUTY CLERK:  All right.  Please have a
 4    seat.
 5             If you would, state your name and spell your full
 6    name for the record.
 7             THE WITNESS:  My name is Paul Maggio.
 8        Whereupon,
 9                            PAUL MAGGIO,
10        after having been first duly sworn, testified as follows:
11                        DIRECT EXAMINATION
12    BY MR. FISHER:
13    Q.   Good afternoon, sir.
14    A.   Good afternoon.
15    Q.   Thanks for being here.
16         Sir, have we met before?
17    A.   No, sir.
18    Q.   Have we ever talked on the phone?
19    A.   No, sir.
20    Q.   Okay.  And are you here pursuant to a subpoena?
21    A.   Yes, sir.
22             THE COURT:  Why don't you introduce yourself.
23    BY MR. FISHER:
24    Q.   My name's Ramsey Fisher.  I'm an attorney for the
25    plaintiffs in this case.  Good to meet you.
```

1       Are you currently employed?

2   **A.**   Yes, sir.

3   **Q.**   Where?

4   **A.**   I'm chief operating officer for SullivanStrickler.

5   **Q.**   What is SullivanStrickler?

6   **A.**   It is a data archive, forensics, e-discovery firm in

7   Atlanta.

8   **Q.**   And what are some of the -- your roles and

9   responsibilities as chief operating officer?

10  **A.**   Day-to-day operations.  Financial responsibilities.

11  Managing projects.  Also be involved in -- in projects as well.

12  And in the data archive, e-discovery, and forensic space.

13  **Q.**   Do you also coordinate with your clients that -- who have

14  hired you to perform that work?

15  **A.**   Yes, sir.

16  **Q.**   Have you ever performed forensic collection work in Coffee

17  County, Georgia?

18  **A.**   Yes, sir.

19  **Q.**   All right.  Let's talk about that.

20       Who engaged you?

21  **A.**   We were initially engaged to go there and we have a signed

22  statement of work by Sidney Powell.

23  **Q.**   Sidney Powell.

24       Who is Sidney Powell?

25  **A.**   She was an attorney that hired us.

1   **Q.**   Okay.  Do you know anything else about her at the time she

2   hired you?

3   **A.**   At the time we were hired, other than she was an attorney

4   with a law firm, no.

5   **Q.**   What about now?

6   **A.**   Obviously there has been a lot more information that has

7   become available, and I do know more about her now.

8   **Q.**   Is that -- you see the board there.  Is she on that board?

9   **A.**   Yes, sir.

10  **Q.**   Where is she?

11  **A.**   In the upper right-hand corner.

12  **Q.**   Okay.  You have two binders in front of you.  We're going

13  to be referring to them quite a bit today.  So one of them says

14  your name on it.  Can you pull that binder up --

15  **A.**   Yes, sir.

16  **Q.**   -- and go to Tab 1?

17       All right.  Let's go to Page 15 and 16.  There are some

18  page numbers on the bottom there.

19  **A.**   Okay.

20  **Q.**   See that bottom email there is from Jim Penrose?

21  **A.**   On bottom of Page -- yes, I see it.

22  **Q.**   Okay.  Who is Jim Penrose?

23  **A.**   Jim Penrose is the person who initially called us about

24  this type of work.  He -- we didn't know much about him when he

25  called, other than from his email address he worked for --

1    well, he said email domain of "Fight Back Law."

2    **Q.**    Okay.  And he says that he's connecting you with the lead

3    attorney in NV, Jesse Binnall.

4          Do you see that?

5    **A.**    Yes, sir.

6    **Q.**    All right.  First, who is Jesse Binnall?

7    **A.**    Jesse Binnall was another attorney.  And this was an

8    opportunity where we went to Nevada.

9    **Q.**    Nevada.

10         Is that what NV stands for in that email?

11   **A.**    Yes, sir.

12   **Q.**    Okay.  And he was connecting you with Mr. Binnall.

13         Had you ever met Mr. Binnall before?

14   **A.**    No, sir.

15   **Q.**    Okay.  I believe you said Jim -- what did you know about

16   Jim Penrose before he connected you with Jesse Binnall?

17   **A.**    I didn't know much, if anything.  He called in to the

18   office, and I talked to him initially when he called in our

19   place of work.

20   **Q.**    What did he say?

21   **A.**    That he was representing -- asked me if we could do work

22   doing collections of election machines.  He had worked for a --

23   different attorneys and -- who were looking to do collections

24   of this type of computers.

25   **Q.**    Okay.

1   Q.   Thank you.

2        All right.  What about Jennifer Jackson?  Who is she?

3   A.   She is our chief relationship officer at the company.

4   Q.   And what does she do?  What are her roles and

5   responsibilities?

6   A.   Her main responsibility is customer relations, sales and

7   marketing, and the relationships with our main clients.

8   Q.   And she was on site at Coffee County?

9   A.   Yes, sir.

10  Q.   Okay.  What role did she perform on site at Coffee County?

11  A.   Predominantly she performed the role of logging and

12  itemizing the items that were collected.

13  Q.   Okay.  How did she do that?

14  A.   Everything from taking pictures to making labels and

15  keeping an updated spreadsheet with the items that were

16  collected.

17  Q.   Okay.  Take a look at Tab 13.  It is PX 347.

18       It is an email from Ms. Jackson to you?

19  A.   That is correct.

20  Q.   All right.  And you see there's an attachment to this

21  email?

22  A.   Correct.

23  Q.   Turn to three -- Tab 14, the next one.

24            MR. FISHER:  You can take that down, Tony.

25

1  BY MR. FISHER:

2  **Q.**   Is this that spreadsheet that you were talking about?

3  **A.**   Yes, sir.

4  **Q.**   The one that Ms. Jackson created?

5  **A.**   Yes, sir.

6  **Q.**   Okay.  She created that in the ordinary course of her

7  roles?

8  **A.**   Yes, sir.

9        MR. FISHER:  Your Honor, we offer PX 348, which is

10  the attachment, and PX 347, the original email.

11        THE COURT:  It is admitted.

12        MR. BOYLE:  We have no objection, Your Honor.

13        MR. FISHER:  All right.  Can you put up Slide 34

14  again, that first one we were looking at?

15        Go back.  Perfect.

16  BY MR. FISHER:

17  **Q.**   Karuna -- I don't know how to pronounce her last name.

18  How do you --

19  **A.**   Naik.

20  **Q.**   Naik.  Okay.

21        What was her role?

22  **A.**   She was -- she performed the majority of the collections

23  along with Jim Nelson.

24  **Q.**   Okay.  Did she have a particular collection that she was

25  in charge of?

1    **A.**   She probably touched most of them.  She was probably the

2    main collector.  She is the one with the most experience.

3    So -- but it would have ranged from the thumb drives to the EMS

4    server to the other computers that were there as well.

5          MR. FISHER: All right.  You can take this down.

6    BY MR. FISHER:

7    **Q.**   Jim Nelson, what about him?

8    **A.**   Him and Karuna did basically the same items.  Karuna was

9    the lead, and Jim also did collections as well.

10   **Q.**   Sorry.  I didn't hear that last part.  What did you say?

11   **A.**   Jim did collections as well.

12   **Q.**   Okay.  All right.  Where is SullivanStrickler based?

13   **A.**   We have a -- our office, our main office, our business

14   office is in Atlanta.  And we have a lab that we're in -- a

15   vault that is in Forest Park, Georgia.

16   **Q.**   How did you guys get from Atlanta or where the lab is down

17   to Coffee County?

18   **A.**   We drove.

19   **Q.**   So you, Ms. Naik, Mr. Nelson, and Ms. Jackson drive down

20   from Atlanta the morning -- the morning of January 7th?

21   **A.**   We drove down the morning; correct.

22   **Q.**   Okay.  Who were you coordinating the details of your

23   arrival with?

24   **A.**   Cathy Latham.

25   **Q.**   Who is Cathy Latham?

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1    A.    She was the name we were given as a person who was from
2    the election office in Coffee County.
3    Q.    Someone told you she was from the elections office?
4    A.    Somebody told us that she was the person to coordinate
5    with.
6    Q.    Okay.  Did they say she was from the elections office?
7    A.    I do not recall.
8    Q.    Did you think she was from the elections offices?
9    A.    That was the impression I was given.  Or that was
10   impression that I had that she worked at the -- runs the
11   election office.
12   Q.    Got it.
13         Okay.  Did you coordinate with Scott Hall?
14   A.    He was also involved.  But the primary contact was Cathy,
15   but I also had Scott Hall's text information and we -- and I
16   communicated with him briefly.
17   Q.    Okay.  Who is Scott Hall?
18   A.    He was another name we were given to coordinate with.
19   Other than that, I wasn't given any details in terms of what
20   his background or overall role was.  But it was -- it was our
21   impression that he was somebody that was in charge and
22   responsible.
23   Q.    Your impression was he was in charge of the elections
24   office or --
25   A.    That he was in charge of coordinating the collection.

1    Q.    Okay.  The collection within the elections office?

2    A.    Yes, sir.

3    Q.    But he wasn't your client?

4    A.    He was not our client, correct.

5    Q.    So did you think he was associated with the elections

6    office?

7    A.    We did not know.  We were to get -- two names we were

8    given was Scott Hall and Cathy Latham.

9    Q.    Who gave you those names?

10   A.    Jim Penrose and Doug Logan.

11   Q.    Okay.  Are Scott Hall and Cathy Latham on that board

12   there?

13   A.    Yes, they are.

14   Q.    Okay.  Where are they?

15   A.    They are in the upper right-hand group on the upper left

16   and the upper middle of the right-hand group.

17   Q.    I want to go through the details of this day.  We have

18   some videos from surveillance footage to help us with that.

19            MR. FISHER:  So let's pull up Clip 3.

20            You can just go ahead and play it, Tony.

21              **(Playing of the videotape.)**

22   BY MR. FISHER:

23   Q.    Who is that?

24   A.    That is Cathy Latham.

25   Q.    Okay.  Here she's going in.

1      What building is she going into?

2   **A.**   Well, looking right there, the elections and registration.

3                **(Playing of the videotape.)**

4   BY MR. FISHER:

5   **Q.**   Okay.  Is that the door that you remember going into that

6   day as well?

7   **A.**   Yes, sir.

8   **Q.**   Okay.  And did they arrive before or after you?

9   **A.**   She arrived before us.

10  **Q.**   Okay.

11        MR. FISHER:  All right.  Let's go to Clip 4.

12                **(Playing of the videotape.)**

13        MR. FISHER:  You can go ahead and play it.

14  BY MR. FISHER:

15  **Q.**   Is this your team arriving here?

16  **A.**   Yes, sir.

17        MR. FISHER:  Pause it, Tony.

18  BY MR. FISHER:

19  **Q.**   Who is that in the sort of pink coat?

20  **A.**   That is Jennifer Jackson.

21  **Q.**   Okay.  And who is behind Jennifer Jackson over there?

22  **A.**   That is Jim Nelson and myself.

23  **Q.**   Which one is which?

24  **A.**   Okay.  Jim Nelson is in the blue short sleeve shirt.  And

25  I'm in the gray pullover.

1    **Q.**   Great.

2          Okay.  What about Ms. Naik?  She's not on screen here?

3    **A.**   She came in a separate car.

4    **Q.**   Came in a separate car.  Okay.

5          Now, do you know approximately when you arrived at the

6    elections office?

7    **A.**   Approximately between 11:00 A.M. and noon.

8    **Q.**   Okay.  Would it refresh your recollection to look at the

9    timestamp of this video?

10   **A.**   That would be great.

11   **Q.**   Okay.  Go ahead and take a look.  Look up at me when

12   you're done.

13   **A.**   There you go.  11:43.  Right between 11:30 and noon.

14   Correct.

15          MR. FISHER:  All right.  Go ahead and play it.

16                    **(Playing of the videotape.)**

17   BY MR. FISHER:

18   **Q.**   So at this point when Ms. Latham opens the door for you,

19   literally opens the door for you, at that point was it your

20   impression that she worked for the elections office?

21   **A.**   Whatever impression I had, nothing was changed by her

22   letting us in.

23   **Q.**   Okay.  So did you have that impression before you arrived?

24   **A.**   Yes, sir.

25   **Q.**   Okay.  So where did you get that impression?

1   A.   Between -- we were given her name as the person in charge

2   to coordinate with.  And the fact that she let us in.  And then

3   when I -- we communicated with her, she responded back, here is

4   the office.  Here's where you're going to come in.  So she was

5   definitely familiar with the environment.

6   Q.   Did you ever ask her what her role was?

7   A.   No, sir.

8   Q.   Did you ever ask Scott Hall what his role was?

9   A.   No, sir.

10  Q.   Okay.

11        MR. FISHER:  Let's pull up Clip 5.

12            **(Playing of the videotape.)**

13  BY MR. FISHER:

14  Q.   Where is this video taking place?

15        MR. FISHER:  You can pause it here.

16        THE WITNESS:  This is inside that elections office

17  that we just saw us walking in the front door.

18        MR. FISHER:  Okay.  Go ahead and play it.

19            **(Playing of the videotape.)**

20  BY MR. FISHER:

21  Q.   All right.  I want to go through and identify some of

22  these other people.

23        So who is wearing the sort of camo sweatshirt thing?

24  A.   I do not know his name.

25  Q.   You don't know -- okay.

1          Well, he was -- did you meet him that day?

2    **A.**    Yes, we did.

3    **Q.**    Okay.  You don't know his name?

4    **A.**    I don't remember his name.

5    **Q.**    Would it refresh your recollection to look at the board?

6    **A.**    I don't want to misname him.  That's where I'm at.  I have

7    heard a lot of names.  I know I'm shaking his hand right now.

8    And I'd just be -- I'll just be guessing.

9    **Q.**    That's fine.

10         Did you think he worked for the elections office?

11   **A.**    No, I did not.

12   **Q.**    Okay.  What did you think -- why did you think he was

13   there?

14   **A.**    He was there as part of the group that was letting us in,

15   that was welcoming us.  I didn't -- did not have -- besides

16   Misty, I did not have any concrete information of who actually

17   worked there or didn't.

18   **Q.**    Okay.  So did it cross your mind that people who had

19   nothing to do with the elections office may have been there on

20   the date you were doing your forensic collection of election

21   equipment?

22   **A.**    It did not cross my mind that these two people had nothing

23   to do with the election office.  They had something to do with

24   the election office.  I just didn't know that.

25   **Q.**    Okay.  And you didn't ask?

 1   **A.**   Correct.

 2   **Q.**   Okay.  But you thought he had something to do with the

 3   elections office?

 4   **A.**   Yes, sir.

 5   **Q.**   Okay.  Who is the person shaking Ms. Jackson's hand in

 6   this video?

 7   **A.**   I'm going to have to -- I don't -- do not remember his

 8   name either.

 9   **Q.**   Okay.  Did you think he had something to do with the

10   elections office?

11   **A.**   Yes, sir.

12   **Q.**   What was that?

13   **A.**   He was there when we walked in.

14   **Q.**   Okay.  So suffice it to say, do you know what all of these

15   people's roles were when you -- did you know that when you

16   showed up?

17   **A.**   No, sir.

18   **Q.**   Okay.

19          MR. FISHER:  Can we play this a little longer, Tony,

20   or is this it?

21              **(Playing of the videotape.)**

22          MR. FISHER:  All right.  You can pause it there.

23   BY MR. FISHER:

24   **Q.**   We'll see her in plenty other videos, but this person

25   standing in the doorway, who is that?

1    **A.**    That is Misty Hampton.

2    **Q.**    Okay.  What did you understand her role to be?

3    **A.**    Our understanding, her role was that she worked in the

4    election office because she had an office and a desk in the

5    elections office.

6    **Q.**    Got it.

7          Where was that office and a desk?

8    **A.**    Probably right behind where she's standing.  She

9    probably -- she is standing in a doorway of what I believe to

10   be her office.

11   **Q.**    Okay.  Do you know, was there election equipment that you

12   had to image that was behind that doorway?

13   **A.**    Yes, there was.

14   **Q.**    What was that election equipment?

15   **A.**    There was at least the EMS server and other computers as

16   well as thumb drives that were back there.

17          MR. FISHER:  All right.  Let's go to Clip 7.

18          Go ahead and press play.

19                **(Playing of the videotape.)**

20   BY MR. FISHER:

21   **Q.**    What is happening here?

22   **A.**    We're bringing in our equipment.

23   **Q.**    Okay.

24          MR. FISHER:  Let's pause for a second.

25

1    BY MR. FISHER:

2    **Q.**    That was a big black box.  What equipment was in there?

3    **A.**    In that Pelican case, we would have brought in our

4    computers.  We would have brought in hard drives to copy the

5    images to.  We also would have had different wiring and

6    connections to connect our equipment to the election -- the

7    election equipment.

8         That's probably the majority of it.

9    **Q.**    Okay.  You said you would have brought your computers.

10   What do you mean by "computers"?

11   **A.**    So a lot of times when we would connect to their computer,

12   to a computer we're going to collect via a wire or a fiber

13   connection or some sort of connection through the back of the

14   computers, then we would initiate the commands through our

15   computers, as opposed to logging on to theirs.

16        And then we also do a lot of audit checking and verifying

17   on our computers.

18   **Q.**    Got it.

19        Okay.  Understanding that there's sort of slightly

20   different processes that you use to image different election

21   equipment, at a high level can you just teach us the basic

22   steps you use to image a piece of election equipment?

23   **A.**    Okay.  Essentially we would connect to it either via a

24   thumb drive, our own thumb drive, our own computers.  We would

25   plug into their computer and then initiate a command that would

1  not impact the host computer and the host hard drive, and we

2  would essentially make a bit-for-bit copy of an -- in terms of

3  an image of the destination computer onto a blank source drive.

4  **Q.**   Okay.  So let's break that down.

5     You mentioned that you use your own drive that you plug

6  into their computer; is that right?

7  **A.**   That's correct.  Yes.

8  **Q.**   Okay.  What is on your own drive?

9  **A.**   It would be some software that -- some forensic software

10  that would initiate the commands to kick off that collection.

11  For example, think of a thumb drive or another connection that

12  we would attach to the computer and the internal computer would

13  be the C drive, so to speak.  And then we would copy that to

14  another external drive.

15  **Q.**   Okay.  Is that first drive we're talking about, the one

16  that you plug in, is that something you would have brought with

17  you?

18  **A.**   Yes, sir.

19  **Q.**   Okay.  And is that something you would have used at other

20  collections?

21  **A.**   That specific one, yes, sir.

22  **Q.**   Okay.  And then the computer that we're talking about that

23  you plug that first drive into, is that something that you

24  brought with you or is that something that you picked up in

25  Coffee County?

```
 1   video?
 2   A.    He's coming from Misty's office.
 3   Q.    Okay.
 4             MR. FISHER:  Go ahead and press play.
 5                  (Playing of the videotape.)
 6   BY MR. FISHER:
 7   Q.    Do you know what he has got in his hand there?
 8   A.    No, I do not.
 9   Q.    Let's just wait a moment.
10                  (Playing of the videotape.)
11             MR. FISHER:  Pause it there.
12   BY MR. FISHER:
13   Q.    Now do you know?
14   A.    I can guess.  That would be purely a guess.
15   Q.    I don't want you to speculate, but --
16   A.    Well, then I do not know what it is.
17   Q.    Let me ask you this:  Did you ever see any ballots on that
18   day when you were in the elections office?
19   A.    Yes, sir.
20   Q.    Okay.  What were you guys doing with ballots?
21   A.    We had worked with Misty to scan some of the ballots.
22   Q.    Real ballots from real elections?
23   A.    Yes, sir.
24   Q.    Okay.  Do you know which election?
25   A.    The one that occurred on November of 2020.
```

```
1   Q.    And did you take those scanned ballots with you?

2   A.    Not the physical ballots, no.  We took the scanned images

3   with us, yes.

4   Q.    How many ballots did you scan?

5   A.    Several hundred.  And it was Misty who scanned them.  But

6   we took the PD -- we scanned them to a PDF and then we took

7   that -- those PDFs with us.

8   Q.    Did you ever see this person in the video holding a

9   ballot?

10  A.    Since I was in the room when this was happening, then yes,

11  I would have seen him hold the ballot.

12  Q.    Okay.  And you don't know whether he works for the

13  elections office?

14  A.    I do not know.

15  Q.    Okay.  And he doesn't work for your team?

16  A.    He does not work for our team.

17  Q.    To this day do you know who this person is?

18  A.    I know that I met him on -- over two years ago.  But I

19  don't remember his name.

20  Q.    All right.

21        MR. FISHER:  Go ahead and -- could we go back to Clip

22  10 for a second.

23              **(Playing of the videotape.)**

24        MR. FISHER:  Pause it there.

25
```

```
 1   BY MR. FISHER:
 2   Q.   Now, this person wearing camo, would it refresh your
 3   recollection to see a Twitter profile?
 4   A.   I'm not sure it would refresh my memory, but --
 5   Q.   Do you think it would refresh your recollection of who
 6   this person is if you saw a Twitter profile?
 7   A.   If I saw a picture of him with his name behind it.
 8              MR. FISHER:  Your Honor, permission to approach?
 9              THE COURT:  Yes.
10              MR. BOYLE:  Your Honor, we object to this as improper
11   refreshing recollection.  I'm not sure the -- I don't believe I
12   heard the witness say that he did know the person's identity,
13   but has forgotten, but rather maybe he never knew the witness's
14   identity.  I think counsel may just be suggesting something to
15   him improperly with this document.
16              THE COURT:  I think he's entitled to determine
17   whether the witness is able to give us any further information
18   about the individual or if he recognizes him.
19   BY MR. FISHER:
20   Q.   Does that refresh your recollection of who this person is?
21   A.   This person looks -- that has Eric Chaney on the Twitter
22   profile is -- looks very similar to the person in the camo
23   right now.
24        And I did meet him.  And I know I met an Eric Chaney.
25   Putting two and two together this would be Eric Chaney.
```

1    Q.   Got it.

2         MR. FISHER:  All right.  Let's go to Clip 13.

3              **(Playing of the videotape.)**

4    BY MR. FISHER:

5    Q.   All right.  Now, this -- the time on this clip is

6    2:43 P.M.

7         Are you with me?

8    A.   Yes, sir.

9    Q.   All right.  And who is in this video?

10   A.   Misty Hampton and myself.

11   Q.   This is about two hours after you arrived at the county

12   elections office?

13   A.   Yes, sir.  Or no, three.

14   Q.   Three hours.

15        MR. FISHER:  All right.  Go ahead and press play.

16             **(Playing of the videotape.)**

17   BY MR. FISHER:

18   Q.   What is Misty doing in this video?

19   A.   She is clipping -- cutting a -- looks like a tie off of

20   the polling pad case.

21   Q.   Okay.  And do you know why she was cutting a tie off a

22   polling pad case?

23        MR. FISHER:  Go ahead and pause it.

24        THE WITNESS:  That was the only way I was going to

25   get into the polling pad was if those were cut.

1   BY MR. FISHER:

2   **Q.**   And you were going to image the polling pad; right?

3   **A.**   Correct.

4   **Q.**   And you see there is a large stack of polling pads on the

5   ground there.  She went in and cut the tags on every single one

6   of them?

7   **A.**   Yes, sir.

8   **Q.**   Okay.  So I want to walk through the process you used to

9   image these Poll Pads.

10  **A.**   Okay.

11  **Q.**   So is that different from the process we described -- you

12  described earlier for imaging election equipment in general?

13  **A.**   At a high level, no.  But it is -- essentially a polling

14  pad is very similar to a phone.  Actually, the polling pads are

15  very similar to iPads.  So it is like collecting an Apple

16  phone.

17  **Q.**   How do you do it?

18  **A.**   My computer there in front, it has -- it has a couple of

19  USB ports, and I would plug in through the USB port to the

20  iPad.  I have software on my computer.  It would initiate the

21  collection, and it would copy the collection to a hard drive

22  that is through my computer.

23  **Q.**   Okay.

24          MR. FISHER:  Let's pull up Clip 14.

25                  **(Playing of the videotape.)**

```
1    BY MR. FISHER:

2    Q.   What is the time on this clip?

3    A.   It is three minutes later at 2:46.

4    Q.   Great.  Okay.

5         MR. FISHER:  And go ahead and press play.

6              (Playing of the videotape.)

7         MR. FISHER:  Pause it.

8    BY MR. FISHER:

9    Q.   So you are putting a Poll Pad back in the case?

10   A.   That is correct.

11   Q.   Is that after you had completed imaging it?

12   A.   Yes, sir.

13   Q.   So how long did it take you to image a Poll Pad?

14   A.   It only took three minutes.

15   Q.   Okay.

16        MR. FISHER:  Go ahead and press play.

17             (Playing of the videotape.)

18        MR. FISHER:  Pause it.

19   BY MR. FISHER:

20   Q.   What is Ms. Jackson doing?

21   A.   She is just putting the -- closing up the case that

22   contains the Poll Pad that I just imaged.

23   Q.   Okay.

24        MR. FISHER:  Go ahead and press play, Tony.

25             (Playing of the videotape.)
```

1  define the phrase January 2021 Coffee County breaches, and what

2  I'm referring to are three separate things.  The first was what

3  we would call a breach led by the SullivanStrickler team on

4  January 7, 2021.  The next was by Doug Logan and Mr. Lenberg on

5  January 18 and 19, 2021.  And the third is Mr. Lenberg,

6  January 25th to January 29, 2021.

7        So the way we're characterizing those is three separate

8  but they are all a part of what I'm going to call the

9  January 21 Coffee County breaches.

10       Are you with me?

11 **A.**    Yes, sir.

12 **Q.**    When did you first learn anything about the January 2021

13 Coffee County breaches?

14 **A.**    It was assigned, I believe -- a case was opened with the

15 Investigations Division for the Secretary of State in 2022.  I

16 believe it was April of 2022.

17 **Q.**    And had you not heard about anything about any of these

18 breaches before that case was assigned in April of 2022?

19 **A.**    Not in our office, no, sir.

20 **Q.**    Outside of the office?

21 **A.**    I may have heard something in the media.  I'm not

22 100 percent sure on that.

23 **Q.**    Do you recall the media that you saw it in or the

24 newspaper?

25 **A.**    It would have probably been an internet news source.  I

1    don't really watch a lot of media.

2    **Q.**   And would that have been shortly before it was assigned to

3    you as a case in April of '22?

4    **A.**   Around about, yes, sir.

5    **Q.**   Okay.  Do you recall the case number that the Coffee

6    County breaches was assigned?

7    **A.**   Originally, it was assigned to a case that had already

8    been closed.  It was SEB 2020-250.  That case was originally

9    assigned to me in 2020, but it had nothing to do with those

10   allegations.  And later on it was -- a new case number was

11   created as 2022-207, I believe.

12   **Q.**   And was a report of investigation ever issued for

13   2020-250, the first one?

14   **A.**   The report of investigation was, but it was totally

15   separate allegations.  It was something that happened in 2020.

16   **Q.**   Was there ever a report associated with Case Number 207?

17   **A.**   It is still an open case.  It has actually been handed

18   over to the GBI.

19   **Q.**   So no report from the Secretary of State on the case

20   involving the January 2021 Coffee County breaches; correct?

21   **A.**   No, sir.  Not at this time.

22   **Q.**   When you -- in April of 2020 -- I'm sorry.  In April of

23   2022, when you first learned of the Coffee County breaches, who

24   assigned the matter to you?

25   **A.**   That would have been my direct supervisor, Glenn Archie.

1    Q.    And did Mr. Archie describe to you what you were supposed

2    to do?

3    A.    At that particular time, we were told to hold off.

4    Q.    Did he tell you why you were supposed to hold off?

5    A.    I believe they were doing an analyst -- or they were

6    analyzing the Coffee County server, I believe.

7    Q.    And what was the relation between them analyzing the

8    server and you doing your normal investigative work?  Why did

9    that hold you up?

10   A.    That particular time we didn't have a lot of information

11   that was given to us.

12   Q.    You didn't have enough -- you didn't have enough

13   information to do much of an investigation in April of 22 --

14   2022?

15   A.    I was told to hold off moving forward with an

16   investigation.

17   Q.    And who told you to hold off?

18   A.    That came from our supervisors.  It would have been Glenn

19   Archie and above.

20   Q.    And when you say above, what do you mean?

21   A.    It was someone within the election division.  I got the

22   information from Glenn Archie.  And he had spoken with Sara

23   Koth.

24   Q.    And who had she spoken to, if you know?

25   A.    I do not.

235

```
 1              THE COURT:  Sara Calg is C-A-L-G?  How do you spell
 2   her name?  How do you spell Ms. Koth's last name?
 3              THE WITNESS:  Koth, K-O-T-H.
 4              THE COURT:  K-O-T-H.
 5   BY MR. BROWN:
 6   Q.   Mr. Blanchard, I'm going to hand to you a copy of Curling
 7   Plaintiffs' Exhibit 40.
 8              MR. BROWN:  Your Honor, this may already be admitted
 9   into evidence.  But I'm going to go ahead and start asking him
10   questions on it just in case.
11   BY MR. BROWN:
12   Q.   What is Exhibit 40, Mr. Blanchard?
13   A.   It is a report of investigation of SEB 2020-250.
14   Q.   And this was written by you; is that correct?
15   A.   That is correct.
16   Q.   And I believe you testified earlier that the matters that
17   are in this particular bucket of complaints does not include
18   the Coffee County January 2021 breaches; correct?
19   A.   No, sir.
20   Q.   And it is your understanding that the Coffee County
21   breaches were originally put into this or put under this matter
22   number but then carved out; is that right?
23   A.   This case was originally -- I'm sorry.  It was originally
24   submitted for the election board, I believe, in 2021.  And it
25   was then later reopened and that allegation was -- was put
```

1    under this case number originally.

2    **Q.**   And do you know why it was put into a case number that had

3    already been closed?

4    **A.**   I do not.

5    **Q.**   And then at some point it got its own case number;

6    correct?

7    **A.**   That's correct.

8    **Q.**   And you drafted Exhibit 40; correct?

9    **A.**   I did, yes, sir.

10   **Q.**   And this reflects the work and the investigation that you

11   did to respond to complaints that arose in 2020; correct?

12   **A.**   Yes, sir.

13   **Q.**   And I'm not being critical or anything.  But do you recall

14   why it took nine months to complete the report?

15   **A.**   We have quite a large caseload.  I was working other

16   cases.

17   **Q.**   Okay.  In this investigative report, you make some

18   comments on your visit to Coffee County in December of 2020.

19       Do you recall that?

20   **A.**   I do.

21   **Q.**   And when you went to Coffee County, you met with Misty

22   Hampton; correct?

23   **A.**   That's correct.

24   **Q.**   And was a Dominion representative with you in the first

25   meeting then?

1    took over the case.

2    **Q.**   So you really never had an active investigation into

3    Coffee County?

4    **A.**   Myself, no, sir.  I initially assisted somewhat.  But that

5    is an open case with the GBI currently.

6    **Q.**   Okay.  But tell me everything you did on the

7    investigation.

8    **A.**   That is an open case -- criminal case with the GBI.

9    **Q.**   Okay.  Are you not answering --

10           THE COURT:  Let me just say:  You have been asked

11   about what you did prior to the GBI taking over.

12           THE WITNESS:  I apologize.

13           MR. TYSON:  Your Honor, I think the concern is since

14   there's still an open investigation, there may be investigative

15   privilege over what Mr. Blanchard did.  I think given the fact

16   the GBI report, at least in redacted form, has been released,

17   it would be okay for him to discuss that, if he is comfortable

18   with that.

19           But I think that is the issue we're dealing with

20   right now from his perspective.  I'm guessing.

21   BY MR. BROWN:

22   **Q.**   Can you answer my question?

23         What did you do to investigate Number 207, the Coffee

24   County 2021 breaches?

25   **A.**   What I did to assist the GBI was I provided some

1    background as far as like TLO searches, which is a search

2    program.  It is TLO.  And then also a program we used to use

3    called eNet, which I provided.  And he asked for, you know,

4    updated addresses and phone numbers, if I knew of any.  So that

5    is what I provided him.

6    **Q.**    Okay.  So some addresses and what was the other?

7    **A.**    It was two programs called eNet and TLO, which is a -- I

8    don't remember the exact name of the program.  But it is

9    basically a program we use to help locate potential addresses

10   and phone numbers and stuff like that.

11   **Q.**    Did you give them any actual information?

12   **A.**    No, sir.

13   **Q.**    Okay.  So --

14            THE COURT:  I just want to be clear.  Is that in

15   April of '22?  Did you do anything -- any investigation then?

16            THE WITNESS:  No, sir -- I mean, no, ma'am.

17   Apologies.

18            THE COURT:  When did you start doing any

19   investigation?

20            THE WITNESS:  I didn't investigate.  It was turned

21   over to the GBI.

22            THE COURT:  All right.  When did you start assisting

23   the GBI?

24            THE WITNESS:  That would have been probably around

25   September or a little thereafter.

```
1    BY MR. BROWN:
2    Q.   So is it fair to say that you were never actively
3    investigating the Coffee County breaches?
4    A.   Not the actual -- no, sir.
5    Q.   That is not a true statement?
6    A.   No.  No, sir.  I never investigated the breaches --
7    actively investigated.
8    Q.   Okay.  So it is a true statement that you never actively
9    investigated it?
10   A.   Yes, sir.
11   Q.   Okay.  Thanks.
12        And to your knowledge, did anyone else in the Secretary of
13   State's office actively investigate the Coffee County 2021
14   breaches?
15   A.   Not that I'm aware of.
16   Q.   And when was the case sent over to the GBI?
17   A.   I don't recall the exact date.  But it would have been
18   after September.
19   Q.   Okay.  After September '22?
20   A.   Yes.  Yes, sir.
21   Q.   Okay.
22        MR. BROWN:  Your Honor, it will actually speed things
23   up if I can take a break and collect my notes --
24        THE COURT:  All right.  Fine.
25        MR. BROWN:  -- and speak with my --
```

1          THE COURT:  You need five minutes?

2          MR. BROWN:  Five minutes would be great.

3          Thank you, Your Honor.

4          COURTROOM SECURITY OFFICER:  All rise.  Court stands

5    in recess.

6               **(A brief break was taken at 5:05 PM.)**

7          THE COURT:  Have a seat.

8          MR. BROWN:  Thank you, Your Honor.

9          As predicted, it did save some time to be able to go

10   over notes.  And we have no further questions, except for

11   housekeeping.  I wanted to make sure that -- well, I wanted to

12   get Exhibit 45 into evidence.  And that is the one -- that is

13   the email from James Barnes to Mr. Blanchard dated August 24,

14   2021, that contains the memo from James Barnes about the

15   condition of the Coffee County office when he got there after

16   Misty Hampton left.

17         THE COURT:  Well, I think there is a standing

18   objection to it, but -- that was asserted.  So how are you

19   wanting to address that, or are you wanting Mr. Barnes to come

20   back to authenticate it?  I mean, I don't know what --

21         MR. BROWN:  Well, let me just ask you again.

22   BY MR. BROWN:

23   **Q.**   Do you -- after going through --

24         MR. BROWN:  Let me ask the witness again.

25

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

```
 1   BY MR. BROWN:

 2   Q.   Mr. Blanchard, after talking about the issues involving

 3   Exhibit 45, do you recall receiving this?

 4   A.   I do not recall receiving it, but I recall having the

 5   conversation generally about some of the stuff.  That is it.

 6             MR. BROWN:  Okay.  Your Honor, I'll withdraw it.

 7             THE COURT:  Mr. Barnes?

 8             THE WITNESS:  Yes, ma'am.

 9             THE COURT:  And was that conversation in or around

10   the summer of 2021?

11             THE WITNESS:  It possibly could have been.  I'm not

12   exactly sure.

13             MR. BROWN:  Your Honor, I would move to admit in

14   terms of the weight of this evidence.  Of course, that is up to

15   Your Honor.

16             MR. TYSON:  Same objection, Your Honor.

17             THE COURT:  Well, you've gotten in that there was a

18   conversation.  I mean, I'm going to -- I would allow you to

19   re-call Mr. Barnes if you wanted to to verify that this was

20   sent.  I can't -- I don't know that he can indicate -- I don't

21   know whether he has the facts to indicate it.  I have no reason

22   to disbelieve him.  But I at least need to have him testify to

23   that.  But you could do that, if you wanted, by Zoom so he

24   wouldn't have to drive.

25             MR. BROWN:  Thank you, Your Honor.  We'll proceed if
```

C E R T I F I C A T E


UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA


    I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of the United States District Court, for the Northern District of Georgia, Atlanta Division, do hereby certify that the foregoing 276 pages constitute a true transcript of proceedings had before the said Court, held in the City of Atlanta, Georgia, in the matter therein stated.

    In testimony whereof, I hereunto set my hand on this, the 17th day of January, 2024.



_____
SHANNON R. WELCH, RMR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT