# EXHIBIT 3

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION
Civil Action No. 1:17-cv-02989-AT

DONNA CURLING, et al.,

　　　　Plaintiffs,

vs.

BRAD RAFFENSPERGER, et al.

　　　　Defendants.


VIDEOTAPED DEPOSITION OF

CATHLEEN LATHAM


August 8, 2022

10:15 a.m.


Warner Robins, Georgia



Laura M. MacKay, RPR, CCR-B-1736

(Appearing remotely)

Page 16

1   Q. So the address you gave me earlier in
2   Douglas, is that the only address you've ever lived
3   at in Georgia?
4   A. Except for a temporary rental house and I
5   do not remember that address.
6   Q. When did you retire teaching?
7   A. May 2021.
8   Q. So you taught in Georgia. When you went to
9   Troy, did you take time off from teaching for that
10  or did you do them both at the same time?
11  A. I did them both at the same time.
12  Q. Do I understand you taught economics?
13  A. Yes.
14  Q. Are you currently employed?
15  A. I just teach adjunct. Right now I'm not
16  working.
17  Q. Where do you teach adjunct?
18  A. Georgia Virtual.
19  Q. And sorry, what is Georgia Virtual?
20  A. Virtual school for Georgia.
21  Q. Virtual school for Georgia high schools?
22  A. Uh-huh.
23  Q. Sorry. Is that a "yes"?
24  A. Yes, I'm sorry.
25  Q. That's okay.

1          And these are public schools, private or
2    both?
3          A.  It's for the Department of Education of
4    Georgia.
5          Q.  And you do that virtually from Texas?
6          A.  I can do it virtually from anywhere.
7          Q.  And is that economics?
8          A.  Yes.
9          Q.  Have you been employed by anyone in Georgia
10   other than teaching at Coffee County department of
11   education?
12         A.  No.
13         Q.  Have you had any other jobs since
14   graduating college beyond the teaching jobs you
15   described?
16         A.  I was a nanny, I was a stay-at-home mom.
17   These are all while I was in Pennsylvania.  I just
18   did odd jobs trying to be a stay-at-home mom, and I
19   also did substitute teaching.
20         Q.  No other jobs in Georgia?
21         A.  No.  Not -- no.
22         Q.  You were at some point the Coffee County
23   Republican Party chair; is that right?
24         A.  Yes.
25         Q.  How long did you serve as the chair?

Page 18

1  MR. CHEELEY: You know what to --
2      A.  On the advice of lawyers, I respectfully
3  decline to answer on the basis of my rights and
4  privileges under Article 1, Section 1, Paragraph 16
5  of the Georgia Constitution, the Fifth Amendment of
6  the United States Constitution and Georgia law.
7           As the United States Supreme Court has
8  stated, the privilege against testifying protects
9  everyone, including innocent people from answering
10 questions if the truth might be used to help create
11 a misleading impression that they were somehow
12 involved in improper conduct.
13          I was previously labelled as a witness of
14 another investigation and agreed to cooperate, but
15 the District Attorney's Office has now labelled me a
16 target, and so I very reluctantly follow the advice
17 of my counsel and I decline to testify or answer
18 questions in this deposition.
19 BY MR. CROSS:
20      Q.  Ms. Latham, are you worried that indicating
21 the dates that you served as the chair of the Coffee
22 County Republican Party may incriminate you?
23      A.  On the advice of counsel, I decline to
24 testify for the reasons I've previously stated.
25 Thank you.

1    Q.  Ms. Latham, do you understand that when you
2    assert a Fifth Amendment in a civil litigation the
3    court can infer that you are -- that you did in fact
4    commit whatever offense you are concerned about?
5    A.  On the advice of counsel, I decline to
6    testify for the reasons I previously stated.
7    Q.  How did you obtain your position as Coffee
8    County Republican Party chair?
9    A.  On the advice of counsel, I decline to
10   testify for the reasons I previously stated.
11           MR. CROSS:  Just to make this go faster,
12       Mr. Cheeley, if she's going to assert a
13       response to all of the questions, if she just
14       says "Fifth Amendment invocation," that will
15       encompass her prior statement.  Is that okay?
16           MR. CHEELEY:  Very well.
17   BY MR. CROSS:
18   Q.  Ms. Latham, did you previously serve as the
19   Georgia GOP under 80,000 caucus chair?
20   A.  Fifth Amendment.
21   Q.  And when did you serve as that chair?
22   A.  Fifth Amendment.
23   Q.  What is the role of the caucus -- of that
24   caucus in the state -- in the Republican Party of
25   Georgia?

```
 1      A.   Fifth Amendment.
 2      Q.   How did you obtain that position?
 3      A.   Fifth Amendment.
 4      Q.   What is the role of the caucus chair?
 5      A.   Fifth Amendment.
 6      Q.   In your time serving as the caucus chair,
 7  did you ever hear about problems with the Dominion
 8  voting system in Georgia?
 9      A.   Fifth Amendment.
10      Q.   Did you at any point report or convey any
11  problems to any election officials in the state of
12  Georgia?
13      A.   Fifth Amendment.
14      Q.   Did you at any point serve on a state
15  Republican executive committee?
16      A.   Fifth Amendment.
17      Q.   What was your role on that committee?
18      A.   Fifth Amendment.
19      Q.   When did you leave that position?
20      A.   Fifth Amendment.
21      Q.   How long did you serve in that position?
22      A.   Fifth Amendment.
23      Q.   Do you know someone named Burt Jones?
24      A.   Fifth Amendment.
25      Q.   Do you have any relationship with
```

1  "I don't know."  What did you mean by that?
2       A.  I've never seen this until it was in the
3  subpoena.  So therefore, I don't know who prepared
4  it.  I've never seen it.  I don't even know what
5  it's talking about until I read it the very first
6  time, period.
7  BY MR. CROSS:
8       Q.  Okay.  Mrs. Latham, grab Exhibit 2 again if
9  you would.  It's the document subpoena from the
10 Coalition.
11      A.  The thick one?
12      Q.  Yes, ma'am.
13      A.  Yes, sir.
14      Q.  If you turn to the back, you will see
15 Exhibit 1 is the December 16, 2020, draft executive
16 order we just looked at.  Do you see that?
17      A.  Uh-huh.
18      Q.  And then if you turn a few pages in to that
19 you will see where there's a date at the top
20 December 17, 2020?
21      A.  Yeah.
22      Q.  And so you'll see here there's a second
23 document entitled, "Presidential Findings to Seize,
24 Collect, Preserve and Analyze National Security
25 Information Regarding the 2020 General Election."

Page 66

1    A.   Where -- where are you reading?
2    Q.   The title just under December 17 [sic],
3 2020?
4    A.   Oh, sorry, okay.
5    Q.   That's okay.  Do you see that?
6    A.   I was looking for that paragraph.
7    Q.   Do you see where I'm at?
8    A.   Yes, I do.
9    Q.   Had you seen this document before you
10 received the subpoena?
11   A.   No, sir.
12   Q.   Do you have any -- is there any information
13 you can tell me about how this document was
14 prepared?
15   A.   No, sir.
16   Q.   Did you have any involvement with anyone
17 who might have been involved in preparing this
18 document?
19   A.   No, sir.
20        MR. CROSS:  All right.  Why don't we
21     take a quick break.  We'll go off the record.
22        THE VIDEOGRAPHER:  Off the video record
23     at 11:41 a.m.
24        (Recess 11:42 a.m.-12:09 p.m. )
25        THE VIDEOGRAPHER:  Back on the video

Page 67

1           record at 12:09 p.m.
2      BY MR. CROSS:
3           Q.  Mrs. Latham, do you understand you're still
4      under oath?
5           A.  Yes, sir.
6           Q.  You were in Washington DC on or around
7      December 17 of 2020, correct?
8           A.  I don't remember what days I went.
9           Q.  Do you recall being in DC in December of
10     2020, right?
11          A.  Yes.
12          Q.  And you spent some time at the Willard
13     Hotel while you were there?
14          A.  That's where I slept, yes.
15          Q.  And your attorney Preston Haliburton was
16     there with you, correct?
17          A.  No.  Not at the Willard.
18          Q.  Mr. Haliburton was never at the Willard in
19     December of 2020 with you?
20          A.  No, sir.  Not that I can recall, no.
21          Q.  But you're aware that there was a war room
22     set up at the Willard Hotel in December of 2020 by
23     individuals associated with the Trump campaign to
24     look for evidence of election fraud; is that right?
25               MR. CHEELEY:  Counsel, I have an e-mail

Page 68

1  from -- here from last week where it said
2  that the questions today would only be
3  relating to the January 2021 runoff election
4  and nothing to do with November 2020. So are
5  you not going to honor that?
6      MR. CROSS: Well, you're reading it much
7  more narrow. That's not what we said.
8      MR. CHEELEY: It is what you said.
9      MR. CROSS: It's not, and this relates
10 to potentially the Coffee County intrusion
11 which is what I'm trying to understand. But
12 I also say that that deal was offered in
13 exchange for substantive testimony.
14     We showed up here today incurring
15 thousands of dollars in expense for you to
16 tell me that she's now going to assert the
17 Fifth.
18     MR. CHEELEY: No, I always told you that
19 she would assert the Fifth.
20     MR. CROSS: Absolutely did not. I'm not
21 going to argue with you now. If she was
22 going to assert the Fifth, we didn't need to
23 negotiate scope at all. And so she may end
24 up paying our fees and costs today, but we'll
25 deal with that later.

1           MR. CHEELEY:  No, she won't.
2           MR. CROSS:  We'll deal with that later.
3   BY MR. CROSS:
4       Q.  Ms. Latham, my question to you is, you were
5   aware that there was a war room set up by
6   individuals associated with the Trump campaign at
7   the Willard Hotel purportedly looking for election
8   fraud, right?
9       A.  Fifth Amendment.
10      Q.  Were you ever in that war room?
11      A.  Fifth Amendment.
12      Q.  What IT individuals did you meet with while
13  you were in DC in December of 2020?
14      A.  Fifth Amendment.
15      Q.  Do you remember telling Marilyn Marks on
16  December 17, 2020, that you were in DC meeting with
17  IT?
18      A.  Fifth Amendment.
19      Q.  Who were those individuals you were meeting
20  with at that time?
21      A.  Fifth Amendment.
22      Q.  So you were in DC staying at the Willard
23  Hotel on or around December 17, 2020, the same day
24  that one of the two executive order -- draft
25  executive orders was drafted and you're saying today

1  that you can't tell us anything about your
2  involvement with that; is that right?
3       A.   Fifth Amendment.
4       Q.   Who else was with you in DC in December of
5  2020?
6       A.   Fifth Amendment.
7       Q.   Bill Ligon was there, right?
8       A.   Who?
9       Q.   L-I-G-O-N.  Is it Ligon, Ligon
10 [pronouncing], Bill Ligon?
11      A.   Fifth Amendment.
12      Q.   Ms. Latham -- Mrs. Latham, are you or have
13 you been under investigation by any federal or state
14 authorities?
15      A.   Fifth Amendment.
16      Q.   Are you being or have you been called to
17 testify in any federal or state grand jury
18 proceeding?
19      A.   Yes, that's why I'm claiming my Fifth
20 Amendment.
21      Q.   What is that proceeding?
22      A.   Fifth Amendment.
23      Q.   How does that proceeding relate to this
24 case?
25      A.   Fifth Amendment.

Page 71

1  Q. Do you know whether that proceeding relates
2  to this case?
3  A. Fifth Amendment.
4  Q. When were you called to testify before a
5  federal or state grand jury proceeding?
6  A. Fifth Amendment.
7  Q. Is it a federal or state proceeding?
8  A. Fifth Amendment.
9  Q. When did you first learn of that
10 proceeding?
11 A. Fifth Amendment.
12 Q. Have you provided testimony already?
13 A. Fifth Amendment.
14 Q. Has anyone offered you any sort of immunity
15 in exchange for cooperation with any investigation?
16 A. Fifth Amendment.
17 Q. Have you sought immunity?
18 A. Fifth Amendment.
19 Q. Are you cooperating with any federal or
20 state investigation?
21 A. Fifth Amendment.
22 Q. Have you been charged with any crime
23 regarding any matter in which you claim Fifth
24 Amendment privilege today?
25 A. Fifth Amendment on my Fifth Amendment.

1      Q.  Has anyone suggested to you you might be
2  charged with a crime with respect to any topic we've
3  covered that you have asserted the Fifth Amendment
4  to today?
5      A.  Fifth Amendment.
6      Q.  Why were you in DC in December of 2020?
7      A.  Fifth Amendment.
8      Q.  Can't tell me anything at all about why you
9  were there?
10     A.  Fifth Amendment.
11     Q.  Were you there to commit a crime?
12     A.  Fifth Amendment.
13     Q.  Did you commit a crime while you were in DC
14  in December of 2020?
15     A.  Fifth Amendment.
16     Q.  Are you aware of anyone who committed a
17  crime in December of 2020 in DC?
18     A.  Fifth Amendment.
19     Q.  How did you assist individuals associated
20  with the Trump campaign to find aborted evidence of
21  election fraud involving the November of 2020
22  election?
23     A.  Fifth Amendment.
24     Q.  Why did you assist with that?
25     A.  Fifth Amendment.

```
 1                      CERTIFICATE
     STATE OF GEORGIA:
 2   COUNTY OF FULTON:
                    I hereby certify that the foregoing
 3   transcript was taken down, as stated in the caption,
     and the colloquies, questions and answers were
 4   reduced to typewriting under my direction; that the
     transcript is a true and correct record of the
 5   evidence given upon said proceeding.
                    I further certify that I am not a
 6   relative or employee or attorney of any party, nor
     am I financially interested in the outcome of this
 7   action.
                    I have no relationship of interest in
 8   this matter which would disqualify me from
     maintaining my obligation of impartiality in
 9   compliance with the Code of Professional Ethics.
                    I have no direct contract with any
10   party in this action and my compensation is based
     solely on the terms of my subcontractor agreement.
11                  Nothing in the arrangements made for
     this proceeding impacts my absolute commitment to
12   serve all parties as an impartial officer of the
     court.
13                  This the 11th day of August 2022.
14
15
16                       _____
                         LAURA M. MACKAY, CCR-B-1736
17
18
19
20
21
22
23
24
25
```