# EXHIBIT 7

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, ET AL.,

       Plaintiffs,
                      CIVIL ACTION FILE
vs.                 NO. 1:17-CV-2989-AT

BRAD RAFFENSPERGER, ET AL.,

       Defendants.


REMOTE VIDEOTAPED ZOOM DEPOSITION OF
DAVID HAMILTON

January 18, 2022
10:06 A.M.

Lee Ann Barnes, CCR-1852B, RPR, CRR, CRC

```
 1          A.   Right.
 2          Q.   This is an email from you to Nick Salsman,
 3     Ronnell Spearman, and Derek Hawkins.
 4               Do you see that?
 5          A.   Correct.  Those are the three security
 6     people on my team.
 7          Q.   And you say, "Guys, I would like to see if
 8     the other big counties have similar sites that have
 9     this vulnerability."
10               Do you see that?
11          A.   Yes.
12          Q.   You ask them, "Would you nose around
13     Fulton, Gwinnett, DeKalb, Forsyth, et cetera and see
14     if this developer possibly sold the same app to
15     them?"
16               Do you see that?
17          A.   Correct.
18          Q.   Do you know if your -- these team members
19     did that review?
20          A.   They did.
21          Q.   What did they find?
22          A.   None of the counties they tested had the
23     same vulnerability.
24          Q.   Did you only test these about five
25     counties?
```

1    A.   Right.  Because we have 159 counties in
2    Georgia.  Right.  It would be a manual test.
3    Q.   So you didn't --
4    A.   You'd have to go find out every single
5    test and -- but usually it's only the big counties
6    that have the money to do their own site instead of
7    just forwarding it to the MVP or the OLVR.
8         So I just told them to hit the big ones
9    just to make sure.  And that was just a -- truly a
10   community thing.  We just wanted to make sure that
11   everybody was safe, not just us.
12   Q.   Were there -- was anything else done to
13   ensure that other counties didn't have this same
14   vulnerability?
15   A.   No, I think that was it.  We just -- I had
16   the guys do some vetting of those sites, and if --
17   if one of them had come up, we would have done the
18   same thing that we did with Cobb.  We would have
19   reached out and said, "You need to down your site
20   until you get this fixed."
21   Q.   Previously, Mr. Hamilton, you gave some
22   answers about the fact that, you know, security is a
23   journey --
24   A.   Yeah.
25   Q.   -- not a destination and it involves, you

Page 97

1    know, prioritizing certain remedies and that kind of
2    thing.  I just wanted to go back to that for one
3    minute.
4         A.   Sure.
5         Q.   You would agree that the --
6         A.   Sure.
7         Q.   -- Secretary of State is responsible for
8    what's considered critical infrastructure, including
9    the election system, would you not?
10        A.   Yes.
11             MR. MILLER:  Objection.  Lack of
12        foundation.  Calls for speculation.
13   BY MS. KAISER:
14        Q.   And do you agree that all reasonable
15   measures should be made to secure such critical
16   systems?
17             MR. MILLER:  Same objection.
18             THE WITNESS:  Reasonable, right, yep,
19        reasonable and appropriate.  It's all based on
20        judgment.
21   BY MS. KAISER:
22        Q.   So you were not suggesting that it's
23   appropriate to leave significant vulnerabilities
24   unmitigated when you're dealing with --
25             (Cross-talk.)

Page 98

```
 1          A.   Not at all.
 2          Q.   -- critical infrastructure?
 3               MR. MILLER:  Objection.
 4               THE WITNESS:  Not at all.
 5   BY MS. KAISER:
 6          Q.   And you were not suggesting it's
 7   appropriate to take no measures to mitigate
 8   significant vulnerabilities with critical
 9   infrastructure systems?
10               MR. MILLER:  Same objection.
11               THE WITNESS:  Correct, I was not.  If we
12          can't fix it one way, there's usually other
13          compensating controls that we can do.  So...
14   BY MS. KAISER:
15          Q.   I have a couple of questions about
16   Georgia's prior election system, by which I mean the
17   DRE voting system.
18          A.   Oh, yeah.  I probably won't be much --
19          Q.   Are you aware of any --
20          A.   -- help there, but --
21          Q.   Are you aware of any efforts made by
22   anyone in the Secretary of State's office to
23   determine whether malware was located on any
24   component of the -- of the prior DRE system?
25               MR. MILLER:  I'm going to note an
```

Page 99

1       objection on relevance here.
2               And, Mary, if you'll just allow me the --
3       humor me to have a running objection on this
4       line of questions for the old system.
5               THE WITNESS:  Yeah, I wasn't around then,
6       so I just don't have any personal knowledge.
7   BY MS. KAISER:
8       Q.   What components of the DRE system were
9   carried over or used at any point in time with the
10  new voting system, the BMD system?
11              MR. MILLER:  The same objection.  Lack of
12      foundation.
13              THE WITNESS:  I -- I don't really know
14      what was there before; I can only tell you what
15      was there when I got there.  So...
16  BY MS. KAISER:
17      Q.   So you don't have any knowledge about
18  whether equipment or servers were reused?
19      A.   I think initially they probably reused the
20  servers while they were waiting to put in the new
21  ones.  But that's just a piece of hardware.  So...
22              At -- at one point, PCC, the company, had
23  the responsibility for the operations side, and when
24  that transferred to the Secretary of State, there
25  was a big refresh of hardware that came with it.

Page 208

1              COURT REPORTER DISCLOSURE
2
3      Pursuant to Article 10.B. of the Rules and
       Regulations of the Board of Court Reporting of the
4      Judicial Council of Georgia which states: "Each
       court reporter shall tender a disclosure form at the
5      time of the taking of the deposition stating the
       arrangements made for the reporting services of the
6      certified court reporter, by the certified court
       reporter, the court reporter's employer, or the
7      referral source for the deposition, with any party
       to the litigation, counsel to the parties or other
8      entity. Such form shall be attached to the
       deposition transcript," I make the following
9      disclosure:
10
11     I am a Georgia Certified Court Reporter. I am here
       as a representative of Veritext Legal Solutions.
12     Veritext Legal Solutions was contacted to provide
       court reporting services for the deposition.
13     Veritext Legal Solutions will not be taking this
       deposition under any contract that is prohibited by
14     O.C.G.A. 9-11-28 (c).
15
16     Veritext Legal Solutions has no contract/agreement
       to provide reporting services with any party to the
17     case, any counsel in the case, or any reporter or
       reporting agency from whom a referral might have
18     been made to cover this deposition. Veritext Legal
       Solutions will charge its usual and customary rates
19     to all parties in the case, and a financial discount
       will not be given to any party to this litigation.
20
21     *Lee Ann Barnes* (signature)
22
23     LEE ANN BARNES, CCR B-1852B, RPR, CRR, CRC
24
25