# EXHIBIT 3

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

DONNA CURLING, ET AL., )
)
Plaintiffs, )
) Civil Action No.
vs. )
) 1:17-CV-2989-AT
BRAD RAFFENSPERGER, ET AL., )
)
Defendants. )

VIRTUAL VIDEOTAPED 30(b)(6) DEPOSITION OF
SANFORD MERRITT BEAVER
Thursday, March 10, 2022
9:09 a.m.
VOLUME II (Pages 260 - 439)

Robin K. Ferrill, CCR-B-1936, RPR

VIRTUAL VIDEOTAPED 30(B)(6) DEPOSITION OF
SANFORD MERRITT BEAVER
Thursday, March 10, 2022

THE VIDEOGRAPHER: We are on the record March 10th, 2022 at approximately 9:09 a.m. Eastern time. This will be Volume II to the 30(b)(6) videotaped deposition of the Office of Secretary of State. Representative today will be Sanford Merritt Beaver.

Would counsel please identify themselves and who they represent for the record.

MR. DENTON: Morning. This is Alexander Denton, here on behalf of the State Defendants.

I'll also announce at this time, because I believe his microphone is not connected, that Mr. Pico-Prats, also with our firm, is here on behalf of the State Defendants.

MR. CROSS: David Cross of Morrison & Foerster on behalf of Curling Plaintiffs.

MR. HAVIAN: Eric Havian, Constantine Cannon on behalf of Coalition for Good Governance.

MS. MARKS: This is Marilyn Marks. I'm a Plaintiff's representative for Coalition for Good Governance.

MR. TYSON: Good morning. Bryan Tyson for the State Defendants.

MR. MILLER: This is Carey Miller, also here for the State Defendants.

MR. LOWMAN: This is David Lowman for the Fulton County Defendants.

MS. GREENHALGH: Susan Greenhalgh, consultant to Coalition for Good Governance.

MS. CONNORS: This is Jill Connors, paralegal for Ichter Davis for Coalition Plaintiffs.

THE VIDEOGRAPHER: Thank you.

Would the court reporter please swear in the witness.

SANFORD MERRITT BEAVER,

called as a witness, having been duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION

BY MR. CROSS:

Q. Good morning, Mr. Beaver.

A. Morning.

(Plaintiffs' Exhibit 1, Fortalice Solutions Technical Assessment Prepared for Secretary of State Georgia, DRAFT - May 19, 2020, Bates

deposition?

A. I went through the different documents that were sent to me. There was 20 of them. Nineteen were of the same document but different versions, apparently. My guess, different versions. I'm guessing they were all working copies of whoever was building this document.

So I went through them. I didn't do a comparison, but I did go up through most of them. After -- after a while they all looked similar.

And then there was one other document, which was the red hat report.

Q. What's the red hat report?

A. A red hat report is basically a report from Fortalice where they take the stance of a malicious attacker to use whatever resources they have to try to breach our system.

Q. And do you remember the date, timing of that report?

A. I would have to go look at it. I do not.

Q. What do you remember about that report?

A. Essentially, they talked a lot through their -- the different steps they went through to breach the system from the outside. After going through -- and they documented a number of different

approaches they took.

At, I think, on the end of -- I think it was Page 6, they defined that they were not able to breach the system with any resources or expertise that they had, and so they moved on to a admitted breach. Admitted breach, meaning we gave them access to a machine as if they were able to breach so they could go into a Phase II to look into moving around our system.

Q. When you say "gave them access to a machine," how did you do that?

A. We gave them username and password to a computer that was on our network.

Q. And why did you give them that access?

A. Because they could not get into our system. And the next level of testing was to simulate a breach that had -- potentially had happened, what the potential person could do if they were able to get in. But since they weren't able to breach the system, we make the assumption that "Okay. Let's assume that you are able to get in. Let's give you access as if you were able to breach and then see what you can do." It's a typical exercise when you do red hat.

Q. Sorry. You said it's a typical exercise

when you do that, and I think I interrupted you. What do you mean by that?

A. So red hat is testing basically all your layers of defense in security. If we stop them on the outside so they can't get in, then all we know about our system is that we have got a really good external security layer.

But over time things change. People find -- and systems find other vulnerabilities. And if somebody was able to exploit a vulnerability that nobody knew about, then they might be able to get into the system. We still want to know if somebody got into the system what could happen.

So we allow somebody a red hat test to get in as if they did breach the system so that they could go to the next level of testing to see, once they got in, what it would look like.

Q. And you said this is a typical type of testing. What do you mean it's typical?

A. We do an assessment every year. And this is the typical -- there is something called a blue hat, a red hat and a purple hat. Those are security terms for the types of external testing. Red hat is the most aggressive attack.

Q. What's a blue hat test?

A. That is a -- basically where we give them access to different points ahead of time so they can test, but they know ahead of time how to get in.

Q. What's a purple hat test?

A. It's a blend of the two.

Q. Is the idea with these different types, the red hat and the others, to try to simulate realistic circumstances? You have some sense of vulnerabilities in the real world with your actual system. Is that kind of the idea?

A. Yes.

Q. The red hat report you said you looked at, is there anything else you remember about it?

A. Not off the top of my head, no.

Q. Okay. And you said, if I understood you right, so you looked at 20 documents. One was the red hat report. The other 19 looked to be different versions of the same report, which looks to be Exhibit 1; is that right?

A. Correct. Exhibit 1 is an early version of the -- an early draft. It's on the 19th. I think the drafts go as far forward, if I remember, as the 25th.

Q. Of May? 25th of May?

A. Yes, I think it was.

A. That's a broad question. Voting system is a lot of different pieces and parts. Which one -- what are you specifically asking about?

Q. (By Mr. Cross) So one of the responses the State has made in response to this July 1 report from Dr. Halderman is that, you know, some of the vulnerabilities he finds, like, for example, the ability to upload malware through a USB port on the voting equipment, are you aware of any measures taken by the Secretary's Office or by a county to increase security around access to those ports or to the machines?

A. I'm not aware. That doesn't mean it hasn't been done.

Q. Are you aware of any measures taken by Dominion to address vulnerabilities with their own voting equipment since July of 2021?

A. I'm not aware.

Q. Do you know whether anyone at the Secretary's Office has discussed Dr. Halderman's report with anyone at Dominion? This report?

A. I'm not aware.

Q. If you wanted to know the answer to that, who would you ask?

A. I might start with Gabe Sterling or Michael

Barnes.

Q. Do you know whether Secretary Raffensperger has reviewed this July 1 report?

A. No, I am not aware.

Q. If you wanted to know, who would you ask?

A. I might ask him.

Q. Okay.

Okay. Do you know whether Jordan Fuchs has reviewed the July 1 report from Dr. Halderman?

A. I'm not aware of anything about this report with anybody at SOS.

Q. So as you sit here, you are not aware of anyone at the Secretary's Office -- you can't identify anyone who has read this report; is that fair?

A. That's fair.

Q. Have you -- well, I guess to give it some context, do you understand that this report has gone to CISA at DHS?

A. (Unintelligible.)

Q. I'm sorry. There's some static.

A. I said other than you just telling me that.

Q. Can you hear me?

A. Can you hear me?

THE VIDEOGRAPHER: I'm getting some really

should be public? Publicly released?

A. I don't think that's my decision.

Q. Okay. But you are the Chief Information Officer for the Secretary's Office. Do you have a view from a cybersecurity perspective on whether this report, which purports to identify numerous vulnerabilities with the voting system, whether it should be released publicly?

A. Anything that can adversely effect security, in my opinion, shouldn't be released. You are only reducing Georgia's ability to secure their equipment and systems whenever security information about an existing system is released. In my mind, it's bad practice and just, you know, being ignorant of cybersecurity.

Q. Last couple questions or couple points.

What are the industry-recognized benchmarks that the Secretary's Office attempts to adhere to for cybersecurity for the voting system, if any?

MR. DENTON: Object to form.

A. That is way too broad of a question.

MR. CROSS: Fair enough. Let me narrow it down. Let's just focus on the Dominion equipment, the BMDs, the printers, the scanners.

Q. (By Mr. Cross) What, if any,

than a day.

Q. (By Mr. Havian) So until yesterday, you were not aware of Topic Number 10 at all; is that correct?

MR. DENTON: Object to form.

Q. (By Mr. Havian) Just so I clarify, by Topic 10, I'm referring to Topic Number 10 that's stated in Exhibit 11 that you are looking at now.

A. Correct.

Q. Okay. So after you learned about Topic Number 10 yesterday, you didn't have -- is it fair to say you just didn't have sufficient time to speak with others in the Georgia Secretary of State's Office to see if anyone else might have information on that topic? Is that fair?

A. That would be fair.

Q. If you did have more time to inquire, who would you speak to about Topic Number 10 to find out what the Georgia Secretary of State's Office knew about it?

A. I would speak to probably the head of the elections group, Blake Evans. Probably would speak to my security person, although if he had heard of anything -- I say person, my security manager -- if he had heard something, he would have probably told

me.

So the fact that I didn't hear anything from him, I know his answer. I might talk to Gabe Sterling. I might talk to Michael Barnes. Those would be my starting points.

Q. And who is the security person that you are referring to?

A. Kevin Fisk.

Q. All right. So let me ask you a few other questions, more general questions about Coffee County.

First of all, are you aware that Mr. Gabriel Sterling gave a deposition in this matter as well?

A. I just heard about it. I have no details on it.

Q. I'm going to read to you something that Mr. Sterling said in his deposition and ask you whether you agree with his statement or not.

Mr. Sterling testified, quote, "Physical security is the -- obviously, the frontline of all cybersecurity. And that's one of our main things we have to worry about at all times. That's why we -- we work with the counties to make sure they have these things in under lock and key," close quote.

event?

A. It depends on where it happens. If it happens in the counties, Chris Harvey might have heard of it. But he worked with the county to find out what happened.

I mean, we will get messages from counties saying that e-mails have been compromised and they don't know whether or not they have hacked into the system. And so the county level will go through and send Chris Harvey a message saying this is what they are doing to evaluate it. And then when they have resolved what happened, they will let him know. And if it doesn't deem that it was impacting our system, he wouldn't let me know.

Q. All right. So -- and again, just so I understand this correctly, if something happens at the county level but it's an incident that is deemed -- or rises to the level of an incident and involves election security --

A. I will hear about it.

Q. What's that?

A. I will hear about it.

Q. You will hear about it. So in other words, it can't just -- something that I've just described can't be resolved properly at the county level and

the state has to get involved; is that fair?

MR. DENTON: Object to the form.

A. Traditionally, in the past, I have heard about it if it -- if it truly has happened.

Q. (By Mr. Havian) Okay. And when you say -- I think you mentioned that you were describing the process that Investigations gets involved. Can you -- is there a specific department that you were referring to there?

A. So we have an Investigation Department. Frances -- Ms. Frances was heading that department. So she -- she might get pulled in. If it is something that needs more technical investigation, that's why we use Fortalice to do our forensics work there.

It all depends on the type of investigation. It may be just something that department heads can work through. If it's a county level, the county is going to have to go through. They're the ones that basically manage and own their process.

Q. Okay.

Let's go back to Exhibit 13, the Harvey memo for a moment.

A. Yes.

C E R T I F I C A T E

STATE OF GEORGIA )

) ss.:

FULTON COUNTY )

I, Robin Ferrill, Certified Court Reporter within the State of Georgia, do hereby certify:

That MERRITT BEAVER, VOLUME II, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 25th day of March, 2022.

____________________________

ROBIN K. FERRILL, RPR