1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE NORTHERN DISTRICT OF GEORGIA

3                 ATLANTA DIVISION

4

   _____

5

DONNA CURLING, ET AL.,

6

            Plaintiffs,        CIVIL ACTION FILE

7                              NO. 1:17-CV-2989-AT

vs.

8

BRAD RAFFENSPERGER, ET AL.,

9

            Defendants.

10 _____

11

12       VIDEO-RECORDED 30(b)(6) DEPOSITION

13         TAKEN VIA VIDEOCONFERENCE OF

14      GEORGIA SECRETARY OF STATES' OFFICE

15          BY: SANFORD MERRITT BEAVER

16                    AND

17          SANFORD MERRITT BEAVER

18        IN HIS PERSONAL CAPACITY

19          (Taken by Plaintiffs)

20           Atlanta, Georgia

21      Wednesday, February 2, 2022

22               9:08 a.m.

23

24

         Reported stenographically by

25    V. Dario Stanziola, CCR (GA)(NJ), RPR, CRR

Page 4

1                    INDEX OF EXAMINATIONS
2
3
    By Mr. Cross                         PAGE    7
4
5
                     INDEX OF EXHIBITS
6
    NUMBER           EXHIBIT                  MARKED
7
    Exhibit 1: Curling Plaintiffs' Second    10
8   Amended Notice of Deposition of
    Office of the Secretary of State
9
    Exhibit 2: Declaration of Merritt        23
10  Beaver
11  Exhibit 3: Declaration of S. Merritt     68
    Beaver
12
    Exhibit 4: LinkedIn Printout of          94
13  Merritt Beaver's profile page
14  Exhibit 5: Atlanta                       112
    Journal-Constitution article entitled
15  Case files discredit Kemp's
    accusation that democrats tried to
16  hack Georgia election
17  Exhibit 6: E-mail string with the top    115
    from Kevin Robertson dated 7/1/2020
18
    Exhibit 7: E-mail string with the top    129
19  from Kay Stimson dated 12/2/2020
20  Exhibit 8: ImageCast X ballot marking    135
    device document
21
    Exhibit 9: Document entitled             141
22  Information Technology Security
    Program Charter
23
    Exhibit 10: Document entitled            146
24  Fortalice Solutions Web Vulnerability
    Remediation Checks Secretary of State
25  Georgia Draft - July 14, 2020

Page 5

1    Exhibit 11: E-mail string with the         152
     top from Dave Hamilton dated
2    7/10/2020
3    Exhibit 12: E-mail string with the         156
     top from Chris Furtick dated
4    11/2/2020
5    Exhibit 13: E-mail string with the         159
     top from Kevin Rayburn dated 4/5/2019
6
     Exhibit 14: E-mail string with the         162
7    top from Josh Hood dated 4/3/2019
8    Exhibit 15: E-mail string with the         167
     top from Dave Hamilton dated
9    8/13/2020
10   Exhibit 16: E-mail string with the         170
     top from Chris Harvey dated
11   12/30/2020
12   Exhibit 17: E-mail string with the         176
     top from Dave Hamilton dated
13   12/21/2020
14   Exhibit 18: 2020 Security of the           184
     voter registration system artifacts
15   and attestation pursuant to Rule
     590-8-3-.01 December 18, 2020
16
     Exhibit 19: E-mail from Dave Hamilton      188
17   dated 8/21/2020
18   Exhibit 20: E-mail string with the         189
     top from Angelos Keromytis dated
19   12/31/2020
20   Exhibit 21: E-mail string with the         201
     top from Terry Jones dated 9/17/2020
21
     Exhibit 22: Document entitled              203
22   Fortalice Rules Of Engagement For
     Georgia Secretary of State Memorandum
23
     Exhibit 23: E-mail string with the         209
24   top from Dave Hamilton dated
     7/29/2020
25

Page 6

1     Exhibit 24: E-mail string with the        214
      top from Merritt Beaver dated
2     11/12/2020
3     Exhibit 25: E-mail from Jason              220
      Matthews dated 11/3/2020
4
      Exhibit 26: E-mail string with the        224
5     top from Kevin Robertson dated
      8/14/2020
6
      Exhibit 27: E-mail string with the        226
7     top from Merritt Beaver dated
      3/3/2019
8
      Exhibit 28: E-mail from Nick Salsman       240
9     dated 8/14/2020
10    Exhibit 29: Document entitled              250
      Election Office Notes: 10 am
11    6/15/2020 Meeting
12
13
14
15
16
17
18
19
20
21
22
23
24
25

```
 1            THE VIDEOGRAPHER:  We are on the record
 2       February 2nd, 2022 at approximately
 3       9:08 a.m. Eastern time.  This will be
 4       volume II to the 30(b)(6) videotaped
 5       deposition of the Secretary of State's
 6       office.  The representative today will be
 7       Merritt Beaver.  Will counsel please
 8       identify themselves and who they represent
 9       for the record.
10            MR. CROSS:  This is David Cross of
11       Morrison & Foerster for the Curling
12       plaintiffs.
13            MR. DENTON:  This is Alexander Denton
14       of Robbins Alloy Belinfante Littlefield for
15       the state defendants.
16            THE VIDEOGRAPHER:  Will the court
17       reporter please swear in the witness.
18            (OATH ADMINISTERED.)
19              SANFORD MERRITT BEAVER,
20  having first been duly sworn, was examined and
21  testified as follows:
22                      EXAMINATION
23  BY MR. CROSS:
24       Q.   Good morning, Mr. Beaver.
25            Are we picking you up okay?
```

Page 9

```
 1          Q.   Have you been deposed before?
 2               Sorry, did you say yes?
 3               Yeah, we're not getting that.
 4               Yeah, let's go off the record.  Your
 5     mic's not working.
 6               THE VIDEOGRAPHER:  The time is 9:11.
 7          We're off the record.
 8               (A DISCUSSION WAS HELD OFF THE RECORD.)
 9               THE VIDEOGRAPHER:  The time is 9:13.
10          We're back on the record.
11     BY MR. CROSS:
12          Q.   All right.  Good morning, Mr. Beaver.
13     We'll try this again.
14          A.   Good morning again.
15          Q.   And I think you said you have or have
16     not been deposed before?
17          A.   I have been deposed before.
18          Q.   Okay.  All right.  And did you meet
19     with counsel before your deposition today?
20          A.   Yes.
21          Q.   Okay.  So do you understand that you're
22     testifying today not just in your personal
23     capacity, but as a representative of the
24     Secretary of State's office on particular topics?
25          A.   Yes, I do.
```

1          Q.    And do you understand that means that

2     you're testifying as to the knowledge and

3     information that the Secretary's has on those

4     topics?

5          A.    Yes, I do.

6          Q.    Okay.  So do you have exhibit share up

7     in front of you?

8          A.    No.  I need to click on something?

9          Q.    Oh.

10              MR. CROSS:  Let's go off the record

11          again.

12              THE VIDEOGRAPHER:  The time is 9:14

13          We're off the record.

14              (A DISCUSSION WAS HELD OFF THE RECORD.)

15              THE VIDEOGRAPHER:  The time is 9:17.

16          We're back on the record.

17              (Exhibit 1: Curling Plaintiffs' Second

18          Amended Notice of Deposition of Office of

19          the Secretary of State marked for

20          identification, as of this date.)

21     BY MR. CROSS:

22          Q.    Mr. Beaver, do you have Exhibit 1 in

23     front of you?

24          A.    I do.

25          Q.    Have you seen this document before?

Page 14

1   there was malware on it, if it at any way managed

2   to get to a new platform, it would be inert,

3   meaning it would have no capabilities in the new

4   environment.  Because based on this question, the

5   malware was targeting the old election system,

6   which was Windows-based using access database

7   application.

8            One of the smartest things that the

9   Georgia Secretary of State did was we moved to a

10  system that was completely different, meaning it

11  didn't use the same operating system, did not use

12  the application prior used, which means that

13  anything that was targeting that system would be

14  inert in a new system.  But even knowing that, we

15  did make sure that it didn't exist.

16       Q.   Okay. Let me -- we'll come back to that

17  answer.  But let me come back to the question I

18  asked you.  What did you do to prepare to testify

19  on topic 1A?

20       A.   I validated with my team that we built

21  out a whole different system not connected at any

22  reason or physically or electronically to the old

23  system.  We had no components of the old system,

24  no software, no data, no anything.  And the

25  reason was the two systems were so different

1   there was absolutely nothing in the old system

2   that was useful in the new system.  So there was

3   no reason to move any of that stuff over there.

4   The old system was old equipment.  We didn't need

5   to use any old equipment.  We started fresh.  And

6   there was nothing on the old system that was

7   needed in the new system.  So there was no effort

8   to even try to connect the two.  Because it would

9   have made no value, added no value.

10          Q.    When you say you validated this with

11  your team what did you do to validate that?

12          A.    I met with my team, met with the people

13  that were actually hands on doing it, the work,

14  and validated this is the process we follow.

15          Q.    When did you do that?

16          A.    Probably at least two or three weeks

17  ago.  Well -- and I -- we did it a long time ago

18  when we actually did the move.  We met and talked

19  about how we were going to do it.  That was back

20  when we actually built out the new system.  We

21  did a whole plan as to how we would built --

22  would build it out.  There was conversation of is

23  there anything needed from the old system?  The

24  answer was no.  Do we need any of the data on the

25  system?  No.  So there was no effort to even try

1   to do anything with the old system.  When we

2   finished using the old system we just turned it

3   off.

4        Q.    When did that happen?

5        A.    We walked away from it.

6        Q.    When did that happen?

7              When did you turn off the old system?

8        A.    It was -- I'd have to go back and look.

9   I mean, I'd be guessing right now.

10       Q.    Do you have any time frame?

11             Was it 2019 when you rolled out the new

12  system or was it 2020?

13       A.    We had the old system still on -- I'll

14  say turned on.  But we essentially -- we call it

15  put it over in the corner because nobody was

16  using it for about six months just in case there

17  was any questions about something that was done

18  in that system.  So it would be somewhere towards

19  the end of '19, probably into early 2000 that we

20  literally unplugged it.

21       Q.    And did servers from the old system sit

22  in the same environment as the new system at any

23  point?

24       A.    Nope.  They were in totally different

25  racks.  In fact, the rack was on wheels.  When we

1   finished we literally rolled it into a caged area

2   that was locked, pulled all the cables off of it

3   and left it in a secure area.  So it -- nobody

4   could accidentally get into it.  It would have

5   taken somebody from my group to go reset it up.

6        Q.   Okay.  Who did you meet with you said

7   about two or three weeks ago to validate this for

8   the system?

9        A.   Who did I meet with?  My director of

10  technology.  My -- a couple of the people that

11  work with him.

12       Q.   What's his name?

13       A.   Jason Matthews.

14       Q.   You said Jason Matthews?

15       A.   Yeah, Jason Matthews.

16       Q.   And who else did you meet with?

17            What are their names?

18       A.   Ronnell Spearman and Kevin Fitts.

19       Q.   And they are report to the director of

20  technology?

21       A.   Yes.

22       Q.   And were they the ones that were

23  responsible for setting up the -- the new system

24  and turning off the old one?

25       A.   Ronnell was involved in that group,

1   were brand new.  We started clean, fresh.  We did

2   not take any chances by introducing anything old.

3       Q.   And how do you -- I'm sorry.  Go ahead.

4       A.   We did not share any of the networking

5   infrastructure.  That was all new.

6       Q.   And are you saying -- you're also

7   saying that there is no data in the old system

8   that's used with the new system?

9       A.   Correct.  As I said, it's not

10  compatible.

11      Q.   So how does that work for the data in

12  E-Net?  Doesn't --

13      A.   So -- so for the new system, we had to

14  go back to E-Net and get new data and bring it

15  over to the new system.

16      Q.   All right.  So how did you do that?

17          I thought you said there's no data from

18  the old system used in the new system?

19      A.   The old system -- there are multiple

20  systems.  Their E-Net is not the voter -- the

21  votering balloting system.  The question that

22  this test talks about is all of the ballot and

23  voting system, not the voter registration system.

24  So when you're speaking of the system, I need you

25  to tell me which system you're talking about.  So

1    voter registration system is different than the

2    ballot generation system that feeds the -- the

3    vote-taking system, the voting system.  It's two

4    complete environments.  Two totally different

5    systems.

6         Q.   So you don't --

7         A.   The only thing that comes from one to

8    the other is E-Net will export information about

9    candidates over to the balloting system.

10        Q.   Do you not consider Georgia's voter

11   registration system part of the state's election

12   system?

13        A.   That is an umbrella statement.  And

14   when you say the election system, there are

15   numerous systems.  They're not tied together.

16   They're all independent systems that are run and

17   managed independently.  So you can't apply

18   something about one system to the other system.

19   Operating systems are different, applications are

20   different.  The actual users are different.

21        Q.   So let me -- let me just make sure I

22   understand.  I just want to see -- so does

23   Georgia's election system include the voter

24   registration database or that's something

25   separate?

Page 23

1        Q.   Okay.  So answer to my question is yes,
2    the election system includes the voter
3    registration database; are we agreed on that or
4    not?
5              MR. DENTON:  Objection.
6        A.   The election system is a umbrella which
7    I consider covers many systems where the voter
8    registration system is one of those systems under
9    what we call the elections system.
10             (Exhibit 2: Declaration of Merritt
11              Beaver marked for identification, as of
12              this date.)
13        Q.   All right.  Mr. Beaver, grab Exhibit 2.
14    We'll come back to Exhibit 1.  So you may want to
15    leave that up, if you can.
16        A.   Is that -- is there something new in
17    here that I've got to look at?
18        Q.   Yeah.  And you have to -- sometimes you
19    have to refresh.  So if you just refresh your
20    screen, it will pull up the next exhibit.  It
21    will be Exhibit 2.  Just let me know when you
22    have it.
23        A.   All right.  That's the one that says
24    0002?
25        Q.   Yes, sir.

1    Q.   The definition you have for your

2  election system, is the only thing that's

3  different today is that in lieu of the DRE voting

4  machines used for casting ballots, you now have

5  the BMDs?  Was there anything --

6    A.   So what's under those systems, like the

7  air gap system for building ballots, it's a

8  totally different air gap environment for

9  building ballots, running a different application

10  than this point.  But we still have an air gap

11  system for building ballots today.  It's just got

12  a different application inside of it.

13    Q.   Understood.

14    A.   The voter information page is the same,

15  the election night reporting page is the same.

16  Like you said, the DRE is replaced -- replaced

17  with a different system.  And all those fall

18  under the election system umbrella.

19    Q.   And when you say election system

20  includes numerous other components, what are

21  those other components?

22    A.   Those could be networked environments,

23  the securities applications that protect it,

24  things like that.

25    Q.   What networked environments are

Page 27

1   included in the election system today?

2       A.   So they -- at the data center where the

3   election system is held there is a whole network

4   environments which components for security and

5   basically segmenting networks, the actual

6   environment itself.   Each of our environments

7   have those kind of components in it.   They're not

8   necessarily the same.   They're different based on

9   the system that it's protecting and the system

10  it's supporting.

11      Q.   Anything else, any other components?

12      A.   I'm sure there's other more detailed --

13  I mean, depending on how granular we want to get

14  into defining what an environment is holding.

15  But those are the high level things.

16      Q.   Okay.  What interactions are there, if

17  any, between the Dominion air gaps election

18  system that you talked about earlier that you

19  said is air gapped and the voter registration

20  database or E-Net?

21      A.   Well, there is not necessarily

22  interaction between the two.  There is a data

23  transfer that happens for each election where

24  somebody from the election center will download a

25  file from E-Net, it will go through numerous

1    on that drive that they didn't know about, we

2    don't trust it.  We clean it.

3         Q.   Are ballot definition files stored on

4    the state EMS for each election?

5         A.   On the state EMS?  What do you mean?

6         Q.   The state EMS server, are ballot

7    definition files uploaded to that server each

8    year or for each election?

9              MR. DENTON:  Objection.

10        A.   I don't know the term EMS.

11        Q.   Election management system, the

12   Dominion -- the state server that we're talking

13   about.

14        A.   Oh, the ballot building system.

15        Q.   Yes.  Yes.  They're -- let's just back

16   up, make sure we're talking about the same thing.

17   What we've been talking about is a server that

18   the state uses that has the Dominion software on

19   it to run elections, right?

20        A.   Yes, that's the ballot building system.

21        Q.   Okay.

22        A.   So when you say EMS, now I understand

23   what you're saying.

24        Q.   Right.

25              And have you heard the term election

1    nobody's ever seen or proved existed, but if it

2    did exist, did we put steps in place to make sure

3    that malware couldn't jump on the new

4    Android-based system?  The question is why would

5    you ask that question?  Since we -- everyone

6    knows malware that's targeted at a Windows-based

7    access program is inert in an access database.

8    Once again, we have to follow the two tenets of

9    programming is the laws of physics and

10   programming logic.

11       Q.   Mr. Beaver, let me -- I'm going to have

12   to help you out here, okay?  You have to ask the

13   questions I -- you have to answer the questions I

14   ask and only what I'm asking.  I'm going to get

15   all of my questions in no matter what.  We can do

16   ten hours a day, we can do 12 hours, we can break

17   it up into multiple days, but it's going to

18   happen.  And if you continue to give these

19   speeches, then we'll just -- we'll either call

20   the court and let the judge explain to you how

21   this works or we'll just go for many, many days.

22            So I'm going to ask you again.  I'm

23   asking you simple yes or no questions, okay?  My

24   question is simply this:  Do I understand

25   correctly that you're not aware of any

1   investigation done by the state to determine

2   whether flash drives or desktops or laptop

3   computers or iPads, any equipment used at the

4   county level with the old election system that

5   would include the DREs, their GEMS servers, their

6   poll pads, whatever -- we don't have poll pads.

7   The GEMS servers and -- and the DREs and their

8   elections, there's no investigation you're aware

9   of by the state to ensure that every county

10  replaced all of that equipment when transitioning

11  to the Dominion system; is that true, yes or no?

12          MR. DENTON:  Objection.

13      Q.  You can answer.

14          Is it true, yes or no?

15      A.  My understanding is a notice was sent

16  out to the counties that they should not reuse

17  the equipment.  I do not know whether or not the

18  counties bought all new equipment or not.

19      Q.  Okay.  Thank you.

20          Oh, I'm sorry, I should have asked from

21  the start.  And I'm not suggesting you are.

22  Since we're on an online forum both sides ask

23  these questions.

24          Do you have anything open other than

25  the Zoom and the exhibit share on your computer,

1    Basically the industry cut their teeth on

2    security with HIPAA, specifically targeted at

3    medical records.  So I have a number of years,

4    over ten years, experience in programming in that

5    environment.

6         Q.   So my question was have you consulted

7    any election security experts on the

8    understanding of your software about malware?

9              MR. DENTON:  Objection.

10        A.   Now, I -- I don't know election

11   security, that specific title.  Anybody of that

12   -- with that title.

13        Q.   So, for example, Fortalice is a company

14   that you guys rely on for -- to help with

15   securing the election system; is that fair?

16        A.   Yes.

17        Q.   Did you discuss with Fortalice the view

18   that malware potentially could be embedded in the

19   old GEMS system, that it would be inert in the

20   Dominion system?

21        A.   No.

22        Q.   Did you discuss that with the state's

23   expert, Dr. Juan Gilbert?

24        A.   Ron Gilbert?  I don't know Ron Gilbert.

25        Q.   Juan Gilbert, J-U-A-N.

Page 41

1        A.    I don't know Juan Gilbert.

2        Q.    Okay.  All right.  Come back to

3    Exhibit 1, if you would, please, and back to

4    topic 1A.

5        A.    Do you do that by going back and

6    reopening it or is there a --

7        Q.    Yeah.  Yeah, I think -- if you closed

8    it, you'll have to go back and reopen it.

9        A.    Okay.

10        Q.    And just let me know you've got that

11    up.

12        A.    1A.  I'm there.

13        Q.    Okay.  So just so we're clear, it's my

14    understanding that, to your knowledge,

15    representing the state on this topic, there is no

16    evidence of any malware infecting the components

17    of Georgia's current election system; is that

18    right?

19        A.    Correct.

20        Q.    And what investigation was undertaken

21    to get to that conclusion?

22        A.    Of the current system or the old system

23    are you asking?

24        Q.    The current system.

25        A.    So when we built out the system, we

Page 42

1    built it out, as I said, as a clean system.  We

2    did not use anything that was tied to the

3    Internet where malware can come into it, get in,

4    infect it.  We have only entered the information

5    that has been scanned for malware into that

6    environment.

7         Q.   So no one, to your knowledge, has

8    actually gone in and done any kind of forensic

9    analysis of any of the BMDs or the Dominion

10   servers at the state or county level to see if

11   they are infected with malware; is that right?

12        A.   I'm not aware of that.

13        Q.   Do you know why that has not been done

14   even on a sampling basis, for example?

15        A.   Not aware that there's any sign that

16   there is any malware on it.  That's usually the

17   first trigger to look for malware.  That would be

18   it.

19        Q.   Well, you understand malware can

20   successfully operate in the background without

21   giving an indication that it's there, right?

22             MR. DENTON:  Objection.

23        A.   Yes, I do.  But then I follow back to

24   the tenet we talked earlier is that malware has

25   to somehow physically get onto that environment

Page 43

1    and have programming logic that is compatible

2    with the environment that it's in.

3         Q.   Right.

4              And I understand that, Mr. Beaver.

5         A.   Okay.

6         Q.   But -- okay.  I get it.  Thank you.

7              All right.  Take a look at topic 1 B,

8    please.  Just let me know when you're there.

9         A.   Yes.  Yes, I'm there.

10        Q.   This is any efforts made to air gap a

11   components of Georgia's current election system

12   and the success or failure of any such efforts.

13        A.   The answer -- the answer is yes.

14        Q.   Right.

15             And so what are those efforts?

16        A.   So Secretary of State's IT group,

17   department built an air gapped environment based

18   on NIST standards using NIST protocols to hold

19   the Dominion ballot building environment.  And

20   continues to maintain that air gapped environment

21   per the NIST protocols.

22        Q.   And that was built sometime in 20- --

23        A.   '19.

24        Q.   Oh, 2019?

25        A.   I think it was -- yes.

1    Q.   All right.  And this was what you were
2    talking about earlier that it's all new
3    equipment, even new wires in the wall?
4    A.   Yes.
5    Q.   Okay.
6    A.   It does not share anything with any
7    other network environment.  It does not
8    cohabitate in any racks or environment.
9    Q.   Right.
10   But it does share data with the voter
11   registration system, though, right?
12   A.   Yes.  And that data is transferred
13   using the NIST protocol.
14   Q.   Okay.  Who at the Secretary's office is
15   actually responsible for transferring that data?
16   A.   That would be Michael Barnes's group.
17   Q.   Okay.  Who is responsible for uploading
18   any data or files to the state EMS server for any
19   given election?
20   Is there anyone on your team that does
21   that or is that also Mr. Barnes's group?
22   A.   That's Mr. Barnes.
23   Q.   Okay.  All right.  Take a look at topic
24   1 C, please.
25   A.   Okay.

Page 45

1      Q.    And here it is any connections of any

2  components of Georgia's current election system

3  to the Internet, telephone lines, cable lines,

4  satellites or other third-party system or

5  network.

6            Do you see that?

7      A.    Yes.

8      Q.    And do you -- what connections in that

9  topic are you aware of today?

10      A.    So when -- when we say the election

11  system, remember that's numerous environments.

12  So are we talking about the Dominion air gapped

13  environment or are we talking about the voter

14  registration system or one of the other systems?

15      Q.    So I -- I would use the definition that

16  was in your -- well, strike that.  Because I want

17  to be fair.

18            We have a particular system -- we have

19  a particular definition here, right?  So if you

20  come to the first page of the topics.

21      A.    Is that going up or down?  Am I

22  scrolling --

23      Q.    Yeah, going up.  Go up back to the top.

24  There's topic 1.  Do you see that?  And here you

25  do you see at the bottom the definition of

Page 46

1    component?

2          A.   Oh, hold on.

3          Q.   It's for the --

4          A.   Component list limited to the following

5    equipment for election...

6               So this all looks like it's speaking to

7    the current Dominion environment, meaning the

8    ballot building device --

9          Q.   Yes.

10         A.   -- environment.

11         Q.   Yes, that's right.

12         A.   It doesn't speak to any of the voter

13   registration system, the my voter page, the

14   online registration page.   It's just the Dominion

15   environment.

16         Q.   Correct.  Yeah.

17         A.   Okay.

18         Q.   And so let's --

19         A.   So now --

20         Q.   Yeah, let's start with that.  So take a

21   look at -- with that definition in mind, are you

22   aware of any connections to the Internet,

23   telephone lines, cable lines, satellites or other

24   third-party system or network for any of the

25   components identified in footnote two for the

1    scanners used to scan ballots, servings --

2    servers containing election management system --

3         A.   So you're talking about the actual

4    equipment that's in the field?

5         Q.   Correct.  That's part of it.  Yeah.

6              And so you don't -- so you don't know

7    as you sit here whether any of the 159 counties

8    in Georgia has ever connected any of that

9    equipment to the Internet or to a third-party

10   system, right?

11        A.   No.  I mean, there's some of the stuff

12   that can't be connected, like the BMDs don't have

13   a network connection to go into that.  Now, a

14   laptop, I'm not sure what a laptop -- what they

15   would use a laptop for, a desktop computer, not

16   sure how that would be involved in this whole

17   environment.  So I can't speak to those things.

18   Smart phones, same thing, like I -- it's -- it's

19   listed in this list, but it isn't necessarily

20   used in the Dominion environment.

21             So this is a very large list of things,

22   but not all of them have anything to do with the

23   Dominion environment.  But I can't speak to, you

24   know, what the counties have done with these

25   kinds of things.

1      Q.   All right.   The Dominion BMDs used in
2  Georgia have a standard USB port on them, right?
3      A.   Yes.
4      Q.   In fact, the detached printer that
5  prints the ballot connects to the BMDs with
6  standard USB port, right?
7      A.   Yes.
8      Q.   And are you aware that the Dominion BMD
9  USB ports are not sealed, meaning that a voter,
10  for example, has access to plug in a USB drive to
11  a BMD used in an election?
12      A.   I don't believe that's true.   It was a
13  term it's sealed.   It's not sealed.   I have never
14  seen an environment where it's not sealed.   So
15  I'm not sure where that comes from.   So I guess I
16  can't answer that that would be true.   I am not
17  aware that that -- that system is not sealed.
18      Q.   So what is the basis for your
19  understanding that the USB port on each of the
20  30,000 BMDs in Georgia is sealed?
21      A.   I've seen them and they're sealed.   And
22  that is our protocol is to keep it sealed.
23      Q.   Well, I assume you haven't seen all
24  30,000 BMDs, right?
25      A.   No, I -- yeah, I haven't seen 30,000

1   BMDs.  But, as I said, the protocol is to keep

2   them sealed.  And when I say sealed, they're

3   locked -- locked away.  They have a sealing

4   device that will show tampering if somebody

5   unseals it.  So I have not heard of any counties

6   that have had an issue with BMDs being unsealed.

7   I have not heard that.

8        Q.   Okay.  And is that something you would

9   expect to know as the state CIO?

10       A.   I would have heard it.  It isn't the

11   counties report to me.  You could probably ask

12   Mr. Michael Barnes if he's heard it.  I think

13   he's more in touch with the counties than I am.

14       Q.   And why is sealing the BMDs important?

15       A.   Many type of layers of security.

16   Security is not just one thing.  It is a layer

17   approach.  Sealing the BMD is just one of the

18   many security aspects to that -- verifying that

19   we have a very secure system.  Sealing is a piece

20   of it.

21       Q.   But what is the sealing of a BMD

22   intended to protect against?

23       A.   Just what you described, somebody

24   having access to do something to it that's

25   unknown.

Page 74

```
 1   coming, when they're doing the assessment to
 2   basically try to catch us off guard.  Then they
 3   come back and essentially give us a results of
 4   what they they've discovered, things that they
 5   found that -- that we should look at.
 6        Q.   Okay.  And do I understand right,
 7   beginning in the last couple years they're now
 8   directed to convey that orally in a conference
 9   meeting as opposed to in writing?
10        A.   Yes.
11        Q.   Okay.  Fortalice in addition to the
12   cybersecurity assessment, the annual assessment,
13   Fortalice has been tasked with doing other sort
14   of narrower, more discrete assessments from time
15   to time for the Secretary's office; is that
16   right?
17        A.   Yes, it is.
18        Q.   And when it does that, one of the
19   requirements the Secretary's office typically has
20   is to require monthly reporting from Fortalice on
21   that work; is that right?
22        A.   It has in the past, yes.
23        Q.   But those monthly --
24        A.   We haven't done any of that type of
25   activity probably in the last year and a half.
```

Page 75

1          Q.    Why not?

2          A.    We didn't have any events or incidents

3     that required it.

4          Q.    The monthly reporting, is that

5     typically in writing or is that also now not in

6     writing?

7          A.    Not in writing.   And in the -- we're

8     not necessarily having any monthly reporting for

9     a while, probably for almost the last year.

10          Q.    So Fortalice did an annual

11     cybersecurity assessment of CES in 2020; is that

12     right?

13          A.    Yes.

14          Q.    And the findings that came out of that,

15     those were conveyed in -- in a conference meeting

16     with your team and others; is that right?

17          A.    Yes.

18          Q.    What -- what exactly was the scope of

19     work that Fortalice did for that assessment in

20     2020?

21          A.    Okay.   I was not in that meeting.   So I

22     can't tell you.   I don't know.

23          Q.    Who would you ask?

24          A.    I know Bill Warwick was involved.   But

25     he no longer works here.   I forget who else?

Page 83

1    Fortalice has not been able to penetrate the

2    networks.  We've had to let them in in order for

3    them to continue their testing.

4         Q.   So you anticipate where I was going to

5    go.  The 2020 and 2021 assessments included

6    penetration testing, right?

7         A.   Yes.

8         Q.   And do I understand correctly, it's

9    your understanding that the penetration testing

10   by Fortalice failed in both 2020 and 2021?

11        A.   My understanding is that it failed.

12        Q.   Okay.  All right.  What --

13        A.   When you say penetration testing, that

14   means them trying to get access into our system.

15        Q.   And what systems were they -- strike

16   that.

17             You may not know because I think you

18   said you didn't know the scope.  But let me just

19   be sure.  What specific systems at the

20   Secretary's office were within the scope of the

21   penetration testing in 2020?

22        A.   The only one that they could actually

23   do potentially penetration testing is our data

24   centers where the voter registration system is,

25   the SOS, other applications such as corporations,

Page 84

1    POB, securities applications are in -- e-mail

2    environment, those.   Has not -- they can't do

3    penetrations testing on any of the CES

4    environment, the -- a Dominion environment.

5         Q.    Why not?

6         A.    It is not tied to any network, whether

7    it be Wi-Fi or hard wire that they could come

8    through.   It is completely isolated out.

9         Q.    Have you had them test that?

10        A.    We had them -- I think -- when we first

11   built it, I believe that was one of the tests.

12   But I'd have to go validate that to see whether

13   or not there was a connection out.

14        Q.    Okay.  So as you sit here today, you

15   don't recall any specific test Fortalice has done

16   to penetrate the CES network; is that right?

17             MR. DENTON:  Objection.

18        A.    I don't know.

19        Q.    Okay.  All right.  Come to paragraph 13

20   of your 2019 declaration, if you would.

21   Exhibit 2.

22             MR. DENTON:  Sorry, David, is this

23        Exhibit 2 or 3?

24             MR. CROSS:  Oh, good question.  Maybe

25        it's Exhibit 3.  Let's see.

1   that also the same process today with Dominion

2   and the poll pad software that's used?

3        A.   That would be a Michael Barnes

4   conversation.

5        Q.   Okay.  Is it your belief that logic and

6   accuracy testing done on BMDs provide

7   cybersecurity assessments for those machines?

8        A.   It is one of the layers we use.

9   Remember I said that security is not one thing,

10   it's one of many layers.  It's an important to

11   valid validate that the software that's on there

12   is what you expect to be on there and there's

13   nothing else on that system.  So yes, it is one

14   of the layers.

15        Q.   And is it your understanding that logic

16   and accuracy testing actually validates the

17   software that's on a given BMD?

18        A.   It validates that it matches a hash

19   test.  Means if you hash the file, you will get a

20   respondent hash.  If you hash a file that has

21   been modified at all or is of a different

22   structure, meaning something hiding there with

23   the same name, it will come back a different

24   hash.  And it will fail.

25        Q.   But do you understand that it's common

Page 92

1   with malware to design malware so that it defeats

2   the hash test, meaning it will spit back the same

3   hash that you're looking for when you're doing

4   something like logic and accuracy testing?

5               MR. DENTON:  Objection.

6         A.    I don't have any -- any document that

7   says that.

8         Q.    That's not something you've heard

9   before?

10        A.    Nope.

11        Q.    Okay.  All right.  Take a look at

12  paragraph 18, please.

13              Do you have that in front of you?

14        A.    Yes, I do.

15        Q.    And here you wrote, State defendants

16  also conducted parallel testing on election day

17  for a copy of an actual county GEMS database is

18  used with a voting machine set up in the

19  Secretary of State's office and set an election

20  mode for a specific real county precinct.

21              Do you see that?

22        A.    Yes.

23        Q.    Is that same sort of parallel testing

24  done today with the Dominion system?

25        A.    I'm not aware of that.

Page 133

1        A.   Yes.

2        Q.   Do you have an understanding as to

3   whether the Dominion BMD system is software

4   independent?

5        A.   I'm not sure I understand your

6   question.  It's software independent.

7        Q.   Sorry.  The question is just that do

8   you have -- do you have any understanding as to

9   whether the Dominion BMD system used in Georgia,

10  whether it's considered software independent?

11             MR. DENTON:  Objection.

12        A.   I've never heard that term.

13        Q.   Okay.  Where she goes on to say that

14  the system must be auditable and its tabulation

15  record cannot be based solely on its software, do

16  you have an understanding of whether the

17  tabulation record in Georgia with the DM -- the

18  BMD system is based on the software?

19             MR. DENTON:  Objection.

20        A.   I can tell you there's no voting on a

21  BMD system.  All you're doing is marking a

22  ballot.  So if somebody says you are maliciously

23  changing votes, there are no votes counted on a

24  BMD.  So I am -- you know, I can only speculate

25  here.  But the whole conversation is sideways.

Page 134

1   Because we don't count ballots on BMDs.  It's

2   counted over on the scanner, which runs different

3   software completely than what's on the BMD.

4        Q.   All right.  The software on the scanner

5   tabulates a QR code on the ballot in the current

6   system, right?

7        A.   I believe that's correct.

8        Q.   And are you aware of any research or

9   testing of the Dominion BMD system by any

10  election security experts who found that the QR

11  code can be changed so that it doesn't actually

12  match what the voter intended when they voted on

13  the BMD?

14       A.   No, I'm not.

15       Q.   Is that -- assuming that were a

16  vulnerability with this system, that that could

17  -- that that were doable, is that -- or that was

18  a finding that was reached, is that something you

19  would expect to know?

20       A.   I don't know.  No, apparently not.  If

21  it was a finding and I don't know.

22       Q.   Okay.  Would you expect measures to be

23  taken to mitigate any vulnerability like that?

24            MR. DENTON:  Objection.

25       A.   I'd -- I'd have to know more about it.

1    that would be the -- the problem we had with the

2    MVP page where you could increment the number and

3    see other peoples' documents that they had

4    pulled, you know, up until a point that the

5    server clears cache.

6         Q.   And was this -- sorry.  Was this

7    remediated?

8         A.   As far as I know, it was remediated

9    fairly quickly because we explained to them how

10   to fix it.

11        Q.   And what's the basis for your

12   understanding that it was remediated?

13        A.   It seems to me I had a conversation

14   with Dave afterwards that he had worked with them

15   to -- to understand -- you know, explain to them

16   what it was to fix.  I think they actually pulled

17   the page down until they could fix it.

18             (Exhibit 16: E-mail string with the top

19        from Chris Harvey dated 12/30/2020 marked

20        for identification, as of this date.)

21        Q.   Okay.  All right.  Grab Exhibit 16,

22   please.

23        A.   Chris Harvey, voter registration

24   certificate.

25        Q.   Yes.

Page 171

1            So this is an e-mail you can see that

2     Chris Harvey received on December 30th, 2020.

3            Do you see that from Ryan Germany?

4     A.    Yes, yes.

5     Q.    And if you come down the beginning of

6     the thread it begins with an e-mail that Dave

7     Hamilton sent on December 24, 2020.

8            Do you see that?

9     A.    Yes.

10    Q.    And he sends that to you and Mr.

11    Germany at the Secretary's office, right?

12    A.    Okay.

13    Q.    And the subject line is 2020 rule

14    590-8-3 attestation and assessment.

15           Do you see that?

16    A.    Yes.

17    Q.    And this concerns the assessment

18    attestation or certification that the Secretary's

19    office has to put out each year, it's a security

20    risk assessment that the Secretary has to attest

21    to each year, right?

22    A.    Yes.

23    Q.    And so Mr. Hamilton looks like was

24    handling the attestation in December of 2020.

25           Do you recall that?

1      A.   I know it gets done every year, so --

2  and it needs to be the done the first -- by the

3  end of the year or at least before -- you know,

4  early on.  I think the target is by the end of

5  December.

6      Q.   Okay.  So do you see here --

7      A.   I vaguely remember this.

8      Q.   Okay.  You see Mr. Hamilton writes

9  Civix just got me the last two artifacts for

10 this; do you see that?

11     A.   Yes.

12     Q.   What is Civix?

13     A.   Civix is PCC.  PCC changed their name

14 to Civix.

15     Q.   Okay.  And he goes on, They apparently

16 have never completed a security risk assessment.

17          Do you see that?

18     A.   Yes.

19     Q.   And do you have any reason to believe

20 that Mr. Hamilton was wrong about whether Civix

21 or PCC had ever completed a security risk

22 assessment?

23          MR. DENTON:  Objection.

24     A.   I can't speak to that.

25     Q.   Okay.

Page 174

1          MR. DENTON:  Objection.

2      A.    -- Dave was a -- I'll say a

3  perfectionist.  He was very judgmental of other

4  people.  And if they didn't do things his way, he

5  wasn't satisfied.  There are lots of people in

6  the securities world.  Dave was a very hard-core

7  and that he had his vision of how things should

8  be done.  Not that his was the only way to do

9  something, but he had his way and he spoke his

10  mind.  Here he is speaking his mind.  Whether or

11  not James actually met the level of the law, I

12  felt he did.

13          Now, did Dave have a harder view on

14  things and drive the organization better?  Yeah,

15  he did.  That's why he essentially replaced

16  James.  But James did what he was supposed to do.

17  He worked within the legal law of what

18  requirements were.  Dave was unhappy with Civix

19  because he -- his view on security was one thing

20  and they had a different.  Security is a broad

21  topic.  Dave was very opinionated and he

22  basically would voice his opinion all the time.

23  So you're reading it.

24      Q.    And the concern that Dave Hamilton

25  expresses in this e-mail thread is that the --

1  the Secretary of State is actually not in

2  compliance with the rule at this time because he

3  can't find the evidence, what he calls artifacts,

4  of that compliance, right?

5          MR. DENTON:   Objection.

6      A.    Yeah. He doesn't say here what the

7  artifacts are.   I know he and I have talked about

8  this on multiple occasions.   As I said, he was a

9  perfectionist.   The attestation applies only,

10 only to the voting -- voter registration system,

11 the election system.   Dave felt it should apply

12 to all things that the Secretary of State

13 managed.   But the attestation specifically only

14 applied to election.   So Dave was always on a --

15 on a course to say we should have things like

16 artifacts that cover everything, whether it's the

17 corporate registration system, whether it is the

18 security system, professional licensing system.

19 He felt all of them should fall under the same

20 level of security that elections did.   But the

21 attestation clearly does not include anything but

22 elections.   And that was always a rub to Dave.

23          Does that answer your question?

24     Q.    I think so.   I was going to grab

25 another exhibit for you.

1          A.   Oh, all right  I didn't -- one of those
2     pregnant pause moments --
3          Q.   Yes.  Sorry.
4               (Exhibit 17: E-mail string with the top
5           from Dave Hamilton dated 12/21/2020 marked
6           for identification, as of this date.)
7          Q.   All right.  Grab Exhibit 17.
8          A.   This looks like it's the same topic.
9          Q.   Yes, yes, a little bit earlier.  So I
10    wanted to -- a little more context.
11              So if you go to the top, you'll see
12    this is an e-mail that Dave Hamilton sent you on
13    December 21, 2020 regarding the rule 590 -- or
14    the 590 rule attestation, right?
15         A.   Okay.
16         Q.   If you come down in the earliest e-mail
17    of the thread is an e-mail that Mr. Hamilton
18    sends to you December 19, 2020 and he copies
19    itsecurity@sos.ga.gov.
20              Do you see that?
21         A.   Yes.
22         Q.   What is the IT security e-mail there?
23    Is that some sort of like team or group
24    distribution list?
25         A.   It's just an e-mail box that if we

1      A.   Yes.  But he's saying we can go from 66

2  up to over 80 quickly.  I don't know whether he's

3  talking about the context of Civix in like --

4  like we talked earlier, fixing their code so that

5  they can't do sequel injection and things like

6  that so we don't have to use external tools to

7  remediate, that could very well be where he is.

8  Because that was also a big thing is he wanted

9  them to fix their code so it was a true fix, not

10  a remediation using a different solution.  That

11  could very well be where he's talking.  And if

12  you notice this date timeline is all around that

13  same time frame.

14      Q.   Okay.  But do you understand that the

15  concern he was expressing was that with respect

16  to what PCC was handling, the state was only in

17  compliance with 66 percent of the requirements

18  under the rule based on --

19           MR. DENTON:  Objection.

20      Q.   -- research he had done?

21      A.   I see that.  As I said, Civix code did

22  not meet some of the requirements that we had to

23  have from security inspection.  So we had to put

24  things in front of it to reach the level of

25  security we needed.  He was a truest.  He wanted

1    the code to do it on its own.

2              So we've already talked about this

3    topic of Civix couldn't fix their code to do what

4    it is because it would break it.  And they would

5    have to do a major rewrite to do what really

6    needed to do to fix the sequel injection, the

7    cross-side scripting, those kind of things.

8         Q.   Okay.

9         A.   They didn't like the fact that we had

10   to use other tools like Cloudflare to fix

11   problems to meet our attestation levels.  He

12   wanted to see them -- like he said, we could

13   quickly get there if Civix would just fix this.

14   We knew that.  But we couldn't -- we -- get them

15   to fix it.

16        Q.   All right.

17        A.   It was a point of frustration for him.

18        Q.   The Secretary's office has announced

19   that they're actually moving away from E-Net,

20   right?

21        A.   Yes.

22        Q.   And why is that?

23        A.   It's an old system, to start with.

24   Civix has changed vendors -- or has been

25   purchased I think at least twice, maybe three

1    times in the last four years, four or five years.

2          Q.    When was the decision made to move away

3    from E-Net?

4          A.    Last year.

5          Q.    Who made that decision?

6          A.    Front office.

7          Q.    And by front office who do you mean?

8          A.    Secretary.

9          Q.    Oh, Secretary Raffensperger?

10         A.    Yes.   Those kind of decisions, it comes

11   down to him to make the call.   We present

12   proposals and it's up to him to say yay, nay.

13         Q.    What --

14         A.    It's a big decision.

15         Q.    Sorry.

16         A.    Yeah, that was a big, big decision.

17         Q.    What were those specific reasons that

18   he decided to move -- to replace E-Net?

19         A.    One was the age, one was the ability

20   for us to get, like this, certain fixes put in

21   place that we wanted to see.   Some of it was

22   security related, some was just functionality

23   related.   The application was built I think like

24   in 2012 when we first purchased it.   And the --

25   but the actual application was probably built a

1    year or two before that.  So the core code was

2    ten years old.  Getting very old.  Technology has

3    changed.  So it was time to look at another

4    solution.  We were in the process of also looking

5    at some of our other systems and we decided to do

6    basically an overall refit of everything.

7         Q.   What's the new solution that you're

8    bringing in in place of E-Net?

9         A.   I think they've announced -- already

10   announced that it's Salesforce based.

11        Q.   And will that be a cloud solution

12   hosted by Salesforce?

13        A.   Yes.

14        Q.   Okay.  What's the process for migrating

15   data from E-Net to Salesforce; do you know?

16        A.   It hasn't been done yet.  We're in the

17   process of trying to come up with a migration

18   plan.

19             (Exhibit 18: 2020 Security of the voter

20        registration system artifacts and

21        attestation pursuant to Rule 590-8-3-.01

22        December 18, 2020 marked for

23        identification, as of this date.)

24        Q.   All right.  Grab Exhibit 18, please.

25        A.    2020 security of voter registration

Page 192

1    whole technology team.

2         Q.    All right.  Can you come back, if you

3    would, please, to Exhibit 19, which was the cover

4    e-mail for the remediation task list.

5         A.    Got it.

6         Q.    And so in Mr. Hamilton's e-mail to you

7    he writes, How much do we want to share of this?

8    Normally how we prioritize and what we are

9    working on is not ever meant for public eyes.

10   And then he goes on to say, This level of detail

11   I don't think we should give anyone outside the

12   agency because it can be used to pinpoint where

13   our holes are and give a road map to bad actors.

14              Do you see that?

15        A.    Yep.

16        Q.    Did you share his concern that if you

17   were going to make public the attachment that it

18   could be used to pinpoint where holes were in the

19   Secretary's network and give a road map to bad

20   actors?

21        A.    I think anytime you reveal any security

22   information about an organization, you give a

23   road map to bad actors.  That is -- that is like

24   the number one thing that bad actors look for is

25   any public information about how a system's

1   designed, known information about it.  That's why
2   bad actors typically scan sites all the time
3   looking for holes.  So anytime you give them
4   something, that's not good.  You're just
5   basically making it even more difficult on
6   yourself to protect your system.
7        Q.   If you can pull up Exhibit 20 again.
8        A.   Yes.
9        Q.   Are there any specific risks in here
10   that you can identify as an example where it --
11   you would be concerned about making them public
12   because of the road map concern?
13        A.   I don't know that I can answer that.  I
14   -- any risk -- this is what you hear in the paper
15   all the time that, you know, Adobe has no risk.
16   Well, more than likely nobody knows about it but
17   maybe a researcher someplace.  But as soon as you
18   open it up, now people can say oh, let me go look
19   over there.  I mean, the Internet is a wide
20   field.  As soon as you start to point to well,
21   here is a potential area, it let's people focus
22   on that and you would become more exposed.
23        That doesn't mean that the risk it --
24   probability of somebody actually penetrating it
25   is very high at all.  Because somebody still has

```
 1   to find that needle out in that field.  But if
 2   someone says it's right there, you make it much
 3   easier.  Not necessarily they can penetrate or
 4   breach you, but it gives them a target.
 5          So I wouldn't speak of any of these
 6   over another because each one of them are -- are
 7   risks that need to be looked at.  Now, what's the
 8   probability that somebody will find them?
 9   Hopefully very low.  Probably very low
10   considering we've never had a breach.  The --
11   we're running pretty good.  But Dave's job was to
12   find all of those pins in the field.  And he was
13   -- he was relentless.  That's why he was good.
14   My stand on security people is if they're not a
15   total pain in your ass, they're not doing their
16   job.
17        Q.   Who has Dave Hamilton's
18   responsibilities now as the CISO?
19        A.   So it's tied between Kevin Fitts and
20   Fortalice.  Dave is hard to replace.
21        Q.   How long has Kevin Fitts been with your
22   office?
23        A.   About eight years.
24        Q.   And he reports to you?
25        A.   Yes.
```

1       Q.    And what responsibilities does

2   Fortalice have for filling in part of the CISO

3   role?

4       A.    So the key strategic where do we go,

5   what are the core elements that we need to work

6   on, Kevin Fitts does not have that level of

7   experience of a CISO.  He is not a CISO.  He's a

8   manager, he's certified in security.  But he

9   doesn't have the years of experience Dave had.

10  So until we figure out how to replace Dave, Kevin

11  is helping me fill in the position of helping to

12  manage the day-to-day.

13           I mean, so for like risk registers,

14  once it's been identified where the issues are,

15  we need to start working -- working a plan on

16  each of these.  And each of these could take

17  months to fix.  And some of them that are what

18  are considered high risk maybe probability is

19  someone actually attacking it is really low.  But

20  if they were to find it, it would cause a

21  problem.

22           So his task is working with Fortalice

23  to identify all right, let's work on these five

24  things first.  Because you can only do so much at

25  a time.  It's a working environment.  This is not

1      Q.   Okay.

2      A.   The important thing here is we track

3   what our weaknesses are and we work toward fixing

4   them.  Too many organizations that I've seen do

5   turn a blind eye to try to keep track of this.

6   This is what's made our organization strong

7   security-wise is we keep track of it, we hold

8   ourselves accountable.

9      Q.   And sorry, Mr. Beaver, if I asked you

10  this earlier, but I can't remember.  We talked

11  about, you know, possible forensic examination of

12  voting equipment like BMDs and printers and

13  scanners.  Do you know why that has not been done

14  in Georgia?

15              MR. DENTON:  Objection.

16      A.   No.  I have not been involved in a

17  question about doing that.  So I don't have -- I

18  couldn't answer you either way.

19      Q.   So that's not something you've proposed

20  as the CIO; is that fair?

21      A.   That is fair.

22      Q.   Okay.  And are you aware of any

23  discussion or consideration at the Secretary's

24  office about doing that or you've just not heard

25  anything like that?

1        A.    Correct.   I have not heard anything.

2        Q.    Okay.   Who would have the authority to

3   make the decision to do that type of analysis?

4        A.    It would be between the election

5   center, the elections department, Gabe Sterling

6   and the Secretary.  If an issue bubbled up that

7   pointed to a risk, meaning it's verified that

8   something has happened that shows that something,

9   you know, has happened, yeah, we probably would

10  act on it.  If we get an e-mail from somebody

11  saying I'm going to start hacking your system,

12  beware, that's probably not enough information to

13  jump on, oh, let's run a test on all the stuff.

14       Q.    Okay.

15       A.    And you've seen it.

16       Q.    Are you familiar with something called

17  the SolarWinds hack?

18       A.    Yes.

19       Q.    And do you recall that nine Georgia

20  counties, there was evidence that they may have

21  downloaded malware related to that hack in

22  February of 2021?

23       A.    I didn't know the count.  I knew that

24  there were some counties that were vulnerable.

25       Q.    Were you involved in any investigation

1   servers so I could have multiple servers.  And

2   what we did was create virtual desktops for the

3   people to use so, actually, code doesn't transfer

4   over the network to that PC that's on their

5   desktop.  They use a browser window into a

6   virtual desktop that sits on the server.  It's

7   just the configuration we did.

8          Q.   How are the PCs that access the EMS

9   server -- what is the -- what are the mechanics

10  of connecting to that server?

11         A.   It's an Ethernet hard-wired cable.

12         Q.   And so when people are working on those

13  PCs, are they sitting in a room physically with

14  the server or where are they sitting?

15         A.   No.  In their desks.  That's why we had

16  to run new wires in the wall.

17         Q.   Oh, I see.  So the people who have

18  access to the EMS server, they work from their

19  offices on a PC that's hard-wired to the server

20  and that server sits in some room somewhere; is

21  that correct?

22         A.   A caged room.

23         Q.   Okay.

24         A.   Elsewhere in the building.

25         Q.   Okay.

1      A.   So the typical configuration of the
2  office is you have a desk on one side, you turn
3  one way and you're working on your PC for daily
4  e-mail and stuff and it's tied to the Internet.
5  And you turn around and you face the opposite
6  direction and you're working on PC that's on the
7  air gap network.
8      Q.   Got it.
9           Okay.  And so I may have said this
10  before.  How many people have those PCs in their
11  offices?  Just approximately.
12      A.   Oh, five, maybe eight.  It's depending
13  on -- I think at the beginning when we had a big
14  push we had as many as eight.  But I think
15  they're down to about five now.
16      Q.   Okay.  And then if you come to where --
17  see where it says supports SQL Express and Win
18  10, do you see that, just where we were?
19      A.   Yes.
20      Q.   And then below that it reads, Windows
21  10 running XP guest to access old system.
22           Do you see that?
23      A.   Yes.
24      Q.   Do you know what that refers to?
25      A.   So we were still -- remember we were

1    running in parallel in a different environment,

2    the old GEMS system.  Because we hadn't

3    completely switched over.  So they were -- as

4    part of the project they had to make sure that

5    they had the machines that could run the old

6    system, they had machines that could run the new

7    system.  The old system had to run XP because the

8    GEMS application run -- ran with XP.

9        Q.   All right.

10       A.   Two totally different environments.

11       Q.   And just so I understand, when you say

12   two totally different environments, the Dominion

13   EMS server you said was locked in the cage

14   somewhere.  Was the old GEMS system, whatever

15   servers it was still running on, was that locked

16   in a different cage somewhere?

17       A.   It was in a different rack.  A

18   different rack.  You know what a rack is?

19       Q.   Yes, yes, yes.  So it's all in the same

20   locked cage?

21       A.   Locked area.

22       Q.   But it's on a different server rack?

23       A.   Yes.

24       Q.   Got it.

25            And you're saying there were no -- no

Page 256

1                    REPORTER'S CERTIFICATE

2

3            I, V. Dario Stanziola, a Certified

4     Court Reporter in the State of Georgia, duly

5     commissioned and authorized to administer oaths

6     and to take and certify depositions, do hereby

7     certify that on Wednesday, February 2, 2022,

8     Sanford Merritt Beaver, being by me personally

9     duly sworn to tell the truth, thereupon testified

10    as above set forth as found in the preceding

11    pages, this examination being recorded

12    stenographically by me verbatim and then reduced

13    to typewritten form by me, that the foregoing is

14    a true and correct transcript of said proceedings

15    to the best of my ability and understanding; that

16    I am not related to any of the parties to this

17    action; that I am not interested in the outcome

18    of this case; that I am not of counsel nor in the

19    employ of any of the parties to this action.

20            IN WITNESS WHEREOF, I have hereto set

21    my hand, this the 8th day of February 2022.

22    

23    _____

      V. DARIO STANZIOLA, CCR (GA)(NJ), RPR, CRR

24    Certification Number: 4531-3928-0743-6288

25