Page 260

1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
2                      ATLANTA DIVISION

3
     DONNA CURLING, ET AL.,                )
4                                          )
          Plaintiffs,                      )
5                                          )  Civil Action No.
     vs.                                   )
6                                          )  1:17-CV-2989-AT
     BRAD RAFFENSPERGER, ET AL.,           )
7                                          )
          Defendants.                      )
8

9

10        VIRTUAL VIDEOTAPED 30(b)(6) DEPOSITION OF

11                SANFORD MERRITT BEAVER

12             Thursday, March 10, 2022

13                    9:09 a.m.

14          VOLUME II (Pages 260 - 439)

15

16        Robin K. Ferrill, CCR-B-1936, RPR

17

18

19

20

21

22

23

24

25

Page 263

```
 1                          INDEX
 2        VIRTUAL VIDEOTAPED 30(b)(6) DEPOSITION OF
 3                  SANFORD MERRITT BEAVER
 4                  Thursday, March 10, 2022
 5     EXAMINATION BY                              PAGE
 6     By Mr. Cross                                 268
 7     By Mr. Havian                                394
 8     By Mr. Denton                                433
 9
                   DESCRIPTION OF EXHIBITS
10
       EXHIBIT            IDENTIFICATION           PAGE
11
12     Exhibit 1   Fortalice Solutions Technical    268
13                 Assessment Prepared for Secretary
14                 of State Georgia, DRAFT - May 19,
15                 2020, Bates labeled
16                 FORTALICE003593 - FORTALICE003624
17     Exhibit 2   Fortalice Solutions Firmware      311
18                 Comparison and Configuration
19                 Analysis, Secretary of State
20                 Georgia, DRAFT - July 9, 2020,
21                 Bates labeled FORTALICE003807 -
22                 FORTALICE003811
23
24
25
```

Page 264

1                        INDEX CONTINUED

2                     DESCRIPTION OF EXHIBITS

3      EXHIBIT              IDENTIFICATION              PAGE

4      Exhibit 3   Fortalice Solutions Technical        332

5                  Assessment Prepared for Secretary

6                  of State Georgia, DRAFT - August

7                  25, 2020, Bates labeled

8                  FORTALICE003692 - FORTALICE003704

9      Exhibit 4   Fortalice Solutions Technical        345

10                 Assessment Prepared for Secretary

11                 of State Georgia, DRAFT - August

12                 25, 2020, Bates labeled

13                 FORTALICE003625 - FORTALICE 003639

14     Exhibit 5   Fortalice Solutions Technical        352

15                 Assessment Prepared for Secretary

16                 of State Georgia, DRAFT - August

17                 25, 2020, Bates labeled

18                 FORTALICE003678 - FORTALICE003691

19     Exhibit 7   Secretary of State Georgia, Fulton   359

20                 County Laptop Forensic Review,

21                 November 25, 2020

22     Exhibit 8   E-mail string Bates labeled          361

23                 FORTALICE001209 - FORTALICE001212

24

25

Page 265

1                    INDEX CONTINUED

2                 DESCRIPTION OF EXHIBITS

3     EXHIBIT            IDENTIFICATION              PAGE

4     Exhibit 9   E-mail string Bates labeled        369

5                 STATE-DEFENDANTS-00104972

6     Exhibit 10  Security Analysis of Georgia's      373

7                 ImageCast X Ballot Marking

8                 Devices, Expert Report Submitted

9                 on Behalf of Plaintiffs Donna

10                Curling, et al., authored by Prof.

11                J. Alex Halderman, Ph.D. with the

12                assistance of Prof. Drew

13                Springall, Ph.D., dated July 1,

14                2021

15    Exhibit 11  Curling Plaintiffs' Fifth Amended   396

16                Notice of Deposition of Office of

17                the Secretary of State

18    Exhibit 12  CGG Recording                       405

19

20

21

22

23

24

25

Page 266

1                    INDEX CONTINUED

2                 DESCRIPTION OF EXHIBITS

3    EXHIBIT  IDENTIFICATION                        PAGE

4

5    Exhibit 13  Official Election Bulletin, dated    413

6                November 17, 2020, from Chris

7                Harvey, Elections Division

8                Director, to County Election

9                Officials and County Registrars,

10               RE:  Open Records Requests -

11               Security Information Exempt

12

13

14          (Original exhibits attached to the Original

15       transcript.)

16

17

18

19

20

21

22

23

24

25

1          MR. TYSON:  Good morning.  Bryan Tyson for

2      the State Defendants.

3          MR. MILLER:  This is Carey Miller, also

4      here for the State Defendants.

5          MR. LOWMAN:  This is David Lowman for the

6      Fulton County Defendants.

7          MS. GREENHALGH:  Susan Greenhalgh,

8      consultant to Coalition for Good Governance.

9          MS. CONNORS:  This is Jill Connors,

10     paralegal for Ichter Davis for Coalition

11     Plaintiffs.

12          THE VIDEOGRAPHER:  Thank you.

13          Would the court reporter please swear in

14     the witness.

15  SANFORD MERRITT BEAVER,

16          called as a witness, having been duly sworn

17  by a Notary Public, was examined and testified as

18  follows:

19  EXAMINATION

20  BY MR. CROSS:

21     Q.   Good morning, Mr. Beaver.

22     A.   Morning.

23          (Plaintiffs' Exhibit 1, Fortalice Solutions

24     Technical Assessment Prepared for Secretary of

25     State Georgia, DRAFT - May 19, 2020, Bates

Page 275

1      Q.   Okay.

2      A.   I would have to verify that.

3      Q.   So were there any other documents you

4  looked at beyond those 20 to prepare for today?

5      A.   No.

6      Q.   Was there anyone you spoke with or met with

7  to prepare for today?

8      A.   With counsel.

9      Q.   Anyone other than counsel?

10      A.   Not in specific to prepare for this.

11      Q.   All right.  Take a look at Exhibit 1, if

12  you would, please, the May 19 Technical Assessment.

13      A.   Okay.

14      Q.   And turn to Page 1 under the Executive

15  Summary, please.

16      A.   Okay.

17      Q.   And this provides, with the Background and

18  Tasks, just a high-level overview.  It indicates that

19  "In April of 2020, Secretary of State Georgia

20  contracted with Fortalice Solutions Offensive

21  Cybersecurity Operations team to perform a

22  penetration test from the perspective of a remote

23  worker during COVID-19 adjustments.  Fortalice

24  conducted testing in May of 2020."

25           Do you see that?

1        A.    Yes.

2        Q.    Is that a generally accurate overview of

3   what the purpose of this particular assessment was?

4        A.    Yes.

5        Q.    And then if you come under, you see

6   Offensive Cybersecurity Assessment Approach & Results

7   and then Remote User Assessment.

8             Do you see that?

9        A.    Yes.

10        Q.    And then below that, it reads "The goal of

11   the remote user penetration testing scenario was to

12   identify any issues with the configuration of

13   technology or services that a malicious user could

14   exploit to gain further access into, and potentially

15   take control of, the network."

16             Do you see that?

17        A.    Yes.

18        Q.    And do I understand correctly when it

19   refers to "remote user assessment" or "remote user

20   penetration testing," do I understand you correctly

21   that Fortalice was doing this remotely?  They were

22   not physically on site with whatever network they

23   were trying to penetrate; is that right?

24        A.    Correct.  That is correct.

25        Q.    And did they do this from their offices or

1   do you know where they were located when they did it?

2        A.   No.   I don't know where they are doing it

3   from.

4        Q.   Did it matter?

5        A.   No, it's the Internet.   You can do it from

6   anywhere around the world.

7        Q.   All right.   Take a look at -- if you come

8   further down the first page under Commentary, it

9   reads "The report provides findings and action plans

10  for those findings.   However, across the components

11  of penetration testing, six overarching trends

12  surfaced.   Fortalice recommends that Secretary of

13  State Georgia address these themes in order to

14  quickly protect itself should an actual breach

15  occur."

16            Do you see that?

17       A.   Yes.

18       Q.   And then those six overarching findings are

19  listed below in Figure 1, right?

20       A.   Yes.

21       Q.   And each of those in Figure 1 is identified

22  as a Critical or High Vulnerability.

23            Do you see that beneath Figure 1?

24       A.   Yes.

25       Q.   And the first one of these is Multi-Factor

1        A.    No.

2        Q.    And do I understand correctly, when I was

3    reading through this report, I didn't see anything

4    that indicated that part of what Fortalice was doing

5    was to determine whether any of the vulnerabilities

6    they identified had been exploited.   That was not

7    part of the scope of this work; is that right?

8        A.    Correct.

9        Q.    After these vulnerabilities were

10   identified, did the Secretary's Office task Fortalice

11   or anyone else with that type of assessment to

12   determine whether any of these vulnerabilities had

13   been exploited?

14       A.    We did not ask anybody, a third party to do

15   anything.

16       Q.    And no one internal at the Secretary's

17   Office undertook that assessment, right?

18       A.    Correct.   There was no evidence that there

19   was an exploitation, thus there was no forensics

20   requested.

21       Q.    Right.   But there was also no effort made

22   by the Secretary's Office to look for that evidence,

23   right?

24       A.    Correct.   We don't look for evidence of

25   something that we -- nobody has ever identified that

1    there was an issue.

2         Q.   Okay.

3              All right.   If you look at -- still on

4    Page 1 of Exhibit 1, this May 2020 Technical

5    Assessment, the next one down, the next critical

6    finding refers to Insecure File Shares.

7              Do you see that?

8         A.   Yes.

9         Q.   And here reads "Fortalice discovered that

10   open file shares existed on the network to which all

11   domain users had access."

12        A.   I --

13        Q.   Right.   Sorry.

14             And then it goes on.   "The affected shares

15   introduced varying degrees of information disclosure,

16   and in at least one instance exposed the username and

17   password of an administrative account."

18             Do you see that?

19        A.   Yes.

20        Q.   An administrative account in this context

21   is an account that gives broad access and control to

22   whoever has access to that account over the

23   corresponding network; is that right?

24        A.   Administrative access to a specific system.

25   This system happened to be an internal web server,

1  which was our Intranet site.  So the administrative

2  access would be able to look at documents that our

3  professional licensing group gives.

4       Q.   An administrative account would also have

5  the ability to add, delete, alter documents in that

6  environment, right?

7       A.   For professional licensing.

8       Q.   And when you say "professional licensing,"

9  what does that mean?

10      A.   We, Secretary of State, is in charge of

11  four agencies:  Elections, Corporations Registration,

12  Professional Licensing and Securities.  Professional

13  Licensing handles 40 boards, including nursing,

14  electrical -- electricians, landscaping, a number of

15  different -- cosmetology.

16      Q.   Was there anything else on this Intranet

17  regarding the insecure file shares beyond

18  professional licensing materials?

19      A.   That was the area that this specifically

20  targeted.

21      Q.   Turn to Page 11, if you would, please.

22  Just let me know when you have that.

23           MR. DENTON:  David, to confirm, this is the

24       numbered Page 11, not Page 11 of the PDF?

25           MR. CROSS:  This is the page at the bottom

1    it's exposed to the outside.

2           We have many layers.  And some layers, some

3    vulnerabilities we can't fix.  So you put over things

4    on top of it to protect.  And as it said in our red

5    hat, we haven't had enough layers to protect somebody

6    from getting into our system.

7           So this is an internal website.  So

8    somebody would have had to breach into the system

9    first to be able to navigate to this.  The red hat

10   test did show that we had sufficient layers of

11   security to keep people out.

12          So yes, we are addressing it, but it's a

13   two-year effort to fix this problem.

14        Q.   Okay.

15        A.   We are in the process now of going to a new

16   system.

17        Q.   Take a look at Page 2, if you would, in

18   that Figure 1.  At the top it reads Administrative

19   Password Reuse.

20        A.   Yes.

21        Q.   And here Fortalice reports that it observed

22   a -- "Fortalice observed a solution in place to

23   prevent administrative password reuse at Secretary of

24   State Georgia, but the implementation seems

25   incomplete.  Until this task is finished, the risk

1   remains for attackers to reuse administrative

2   credentials across some machines."

3           Do you see that?

4       A.   Yes.

5       Q.   What's the risk associated with users

6   reusing administrative credentials?

7       A.   What is the risk?

8       Q.   Yes.  Why is reuse of administrative

9   credentials considered a security risk?

10      A.   Well, this specific thing was speaking to

11  the administrative password used to set up a laptop.

12  So what they are speaking is that reusing

13  administrative passwords, if you have -- somebody

14  discovers that administrative password that you can

15  potentially get on to a laptop.

16      Q.   Right.  But why is reusing that password a

17  security risk?  Meaning having multiple

18  administrative accounts having the same password, why

19  is that a problem?

20      A.   Well, again, if somebody was to discover

21  that password, they could get into the system -- into

22  a laptop.  So reuse -- security has different, I'll

23  say, levels.  You can put such security on a system

24  that you can't use it because it's so secure.  It

25  could have no security and everybody can use it, but

1   then it's open.

2            So this is -- remember, I said earlier,

3   these are cut and paste for these kinds of things.

4   Setting up laptops, everyone having its own unique

5   administrative password, although it would be very,

6   very, very secure, would become then a problematic to

7   actually being able to maintain your laptop across

8   the business.

9            So it's a risk balance.  You can -- if

10  you -- somebody has a problem with their computer and

11  every single laptop has its own administrative

12  password, you now go out to try to fix it and the

13  person trying to fix it wouldn't necessarily be able

14  to get on to that machine if they didn't know the

15  unique password that was set up for administrative

16  password.

17           Fortalice is telling us here, there is --

18  you know, by reusing it you have an exposure.  But I

19  can tell you from my prior experience and talking to

20  other organizations, this is what every organization

21  I know does is they set up an administrative password

22  for a setup setting up laptops.  Yes, there is a

23  potential risk.  There's risk with everything.  This

24  is a measured risk.  Organizations have gone this

25  direction because of support issues.  In order to

1    support your laptops, they use the same

2    administrative password on all of them.

3              That is not unique to Secretary of State.

4    That is pretty much an industry -- the way the

5    industry is.  And you could probably query numerous

6    businesses and ask do they use the same

7    administrative password for setting up every laptop,

8    probably the answer is yes.  Is that a risk?  Yes.

9    It's a measured risk.

10        Q.   But the administrative password that's used

11   in that context to set up a laptop, that's a password

12   that's specific to a particular administrative

13   account, correct?

14        A.   For setting up laptops.  It's specifically

15   for setting up laptops.  Not to be used anywhere

16   else.

17        Q.   Right.  But it's not a password that's

18   specific to a particular laptop.  It's a password

19   that's used for an administrative account that

20   whoever is responsible for that account or has access

21   to that account can then use that access to set up

22   any number of laptops; is that right?

23        A.   Correct.

24        Q.   Okay.  And it is commonly understood in

25   cybersecurity that the more a particular password is

1    reused across accounts, the greater risk that it is

2    disclosed or it's leaked in some way, right?

3              MR. DENTON:  Object to form.

4              You can answer, Merritt.

5         A.    Okay.  So the answer to that is yes.  But

6    that's not what that -- this is talking about here.

7    This is not talking about using the same

8    administrative password for setting up laptops as for

9    accessing servers.  This is strictly the password for

10   setting up laptops.

11        Q.    (By Mr. Cross) And then if you come to the

12   last vulnerability in Figure 1, here it reads

13   "Fortalice discovered a domain administrator username

14   and password in cleartext.  If the machine housing

15   this file was compromised, it could result in the

16   immediate compromise of the entire domain."

17             Do you see that?

18        A.    Yes.

19        Q.    What is cleartext?

20        A.    Unencrypted.  So that means the password

21   was stored unencrypted.  And the system it's talking

22   about here, the domain it's talking about here is our

23   BOSS Ticketing System.  So if somebody was to

24   compromise it, the domain would be our Ticketing

25   Environment.  So somebody could come in, if they were

1   able to figure out how to get into this system, see

2   all tickets that were submitted.

3        Q.   Sorry.  What was the first -- did you say

4   BOSS Ticketing System?

5        A.   Yes.  BOSS is the company, Business

6   Automation System, something like that.

7        Q.   How do you spell that?

8        A.   So the ticketing system is -- B-o-s-s.

9        Q.   Oh, okay.  Just like the word.  And --

10  sorry, what you were going to say, what's the

11  ticketing system?

12       A.   Ticketing is how users, SOS users

13  internally can submit a help desk ticket for support.

14       Q.   And when you say help desk, you mean IT?

15       A.   Yes.  Yes.

16       Q.   And what, if anything, was done to address

17  the cleartext password disclosure vulnerability

18  there?

19       A.   I don't know.  I did not hear what -- that

20  was done.  It's a fairly low-risk system, so it's

21  probably on a -- I can only guess.

22       Q.   And I'm not asking you to guess.  Do you

23  know whether steps were actually taken or you don't

24  know one way or another?

25       A.   I don't know one way or another.

1     Q.   Coming back up to the administrative

2     password reuse vulnerability we just looked at, do

3     you know what, if any, steps were taken to remedy

4     that?

5     A.   No, I don't.

6     Q.   Okay.  If you wanted to know the answer to

7     that question who would you ask?

8     A.   Well, the person's -- it would probably be

9     either Jason Matthews or Bill Warwick, but they don't

10    work here anymore.  But they were here at the time,

11    back in 2020.  They might know whether or not that

12    was changed.

13    Q.   Anyone who currently works at the

14    Secretary's Office or Fortalice you think would know

15    the answer?

16    A.   I doubt it.  If they changed it, it would

17    have just been part of our regular routine password

18    maintenance.  And so whether or not it was changed as

19    part of this or changed as part of our regular

20    process, the existing people probably wouldn't know

21    the distinction.

22    Q.   All right.

23         Turn to Page 5, please.  And we are still

24    looking at this May 19, 2020 Technical Assessment.

25         Do you see the heading 2.1 Remote VPN User

Page 308

```
 1     assessment we were just talking about?
 2          A.   A prior assessment, yes.  That we talked
 3     about before, yes.
 4          Q.   And -- sorry.  But when you say that they
 5     did a prior assessment of the balloting system and
 6     the voting machines, were those part of the same
 7     specific assessment?  They were not separate
 8     assessments for Fortalice; is that right?
 9          A.   Yes, there was only one.
10          Q.   The election results are communicated to
11     the State from the counties through the election
12     night reporting system, right?
13          A.   Yes.
14          Q.   And those are communicated via the
15     Internet, right?
16          A.   Yes.
17          Q.   Why not have Fortalice do a security
18     assessment of that system given it's Internet
19     connected?
20          A.   That is a cloud service that we buy from a
21     third party vendor.  So it's not in our network
22     domain.
23          Q.   Who is the cloud service provider for that?
24          A.   I think it's Scytl, S-c-y-t-l.  May be an
25     "E" on the end.
```

1    Q.   So you rely on the Scytl for the security

2    of that system; is that right?

3    A.   Yes.

4    Q.   And do you require Scytl to conduct annual

5    cybersecurity assessments of the ENR system?

6    A.   We, as part of our contract, give them a

7    security requirements document that they sign off

8    that they have completed and maintain.

9    Q.   But that's a document they send back to

10   you, what, each year?

11   A.   I don't see a document from them each year.

12   I do get a report from -- I will say from time to

13   time I have seen a report that they have submitted.

14   But I wouldn't say that I get an annual report.

15   Q.   How often does that report come in?

16   A.   As I said, I don't recall.

17   Q.   Do you recall at any point any of those

18   reports identifying any election -- or, I'm sorry,

19   strike that.

20        Do you recall any of those reports at any

21   point identifying any security vulnerabilities or

22   concerns of any kind?

23   A.   No.

24   Q.   But that's not something you reviewed for

25   today; is that right?

1    Office would you expect those reports to be

2    maintained, if at all?

3        A.   I don't have a specific place that I would

4    know to go look.

5        Q.   What are the specific security requirements

6    the State has for Scytl?

7        A.   There's a document that we give all

8    vendors.  It's part of our contracting process.

9        Q.   Do you know what the security requirements

10   are in that document?

11       A.   I would have to go review it.  And over

12   time that document changes as more security things

13   are identified.  So back when it was given to them, I

14   don't know -- I couldn't tell you what the document

15   looked like compared to the one that we use now.

16            MR. CROSS:  All right.  Take a look at

17       Exhibit 2, if you would, please.

18            (Plaintiffs' Exhibit 2, Fortalice Solutions

19       Firmware Comparison and Configuration Analysis,

20       Secretary of State Georgia, DRAFT - July 9,

21       2020, Bates labeled FORTALICE003807 -

22       FORTALICE003811, marked for identification.)

23       Q.   (By Mr. Cross) Just let me know when you

24   have it, sir.

25       A.   I have got it.

1      Q.    Do you see that this is entitled Fortalice

2   Solutions Firmware Comparison and Configuration

3   Analysis Secretary of State Georgia, Draft - July 9,

4   2020?

5            Do you see that?

6      A.    Yes.

7      Q.    Is this a document you recall seeing

8   before?

9      A.    No.

10     Q.    Do you remember having any involvement with

11   Fortalice when they prepared -- or did the underlying

12   analysis for this report?

13     A.    No.

14           Was this one of the 20 documents you sent?

15     Q.    I didn't send any documents, so I'm not

16   sure what you mean.  We got documents from Fortalice,

17   and this is -- if you look at the bottom, you can see

18   this is one of the documents they produced to us.

19     A.    So I have not seen this document before.

20     Q.    Sorry.  And one quick question for you.

21   The Exhibit 1 that we looked at, that Technical

22   Assessment, also the one here in Exhibit 2, we went

23   through the State's production and we couldn't find

24   copies of these or versions of these.  Do you know

25   why the State would not have these documents itself?

Page 313

1    Why only Fortalice would have them?

2                 MR. DENTON:  Object to the form.

3         A.    Fortalice -- Fortalice did not send them to

4    us.

5         Q.    (By Mr. Cross) Oh, I'm sorry.  Why is that?

6         A.    We chose to just review outcomes in a

7    conference call.

8         Q.    Oh, is this -- okay.  So is this what you

9    talked about earlier in a prior deposition that

10   beginning sometime in 2019, you instructed Fortalice

11   not to put stuff in writing?  That you guys now rely

12   on, I think you said, oral meetings?

13        A.    Yes.

14                MR. DENTON:  Object to form.

15        Q.    (By Mr. Cross) All right.  Take a look at

16   Exhibit 2, if you would, please, and look at the top

17   of Page 2.

18                Again, I'm using the pagination numbers on

19   the document.  And at the top it says Assessment

20   Report, Background and Tasks.

21                Do you see that?

22        A.    Yes.

23        Q.    Here writes "In May of 2020, as part of an

24   ongoing relationship with Secretary of State Georgia,

25   Fortalice Solutions conducted a system review of

1    network assets and critical systems.  The Fortalice

2    team performed testing and reviews during the months

3    of May and June 2020.  The objectives of these tasks

4    were to identify weaknesses in the configuration of

5    equipment on Secretary of State Georgia's networks

6    and produce the following documents."

7           And then below, you see there's two

8    documents indicated there.  The first is a

9    "configuration review report," the second is a "set

10   of recommendation workbooks."

11          Do you see that?

12      A.   Yes.

13      Q.   Do you recall receiving those reports or

14   documents?

15      A.   No.

16      Q.   Would you have expected to or would you

17   have expected them just to hold on to those

18   internally and communicate them orally?

19      A.   Orally.

20      Q.   If you come to the next paragraph, here

21   Fortalice wrote "Securely configuring assets is an

22   important part of defense in depth and can limit the

23   extent of a compromise in the event a vulnerability

24   is exploited.  Adhering to an industry-recognized

25   benchmark avoids the need to create one and makes it

1   easier to measure adherence during internal tracking

2   and when proving security posture to an auditor."

3          Do you see that?

4      A.   Yes.

5      Q.   Do you agree with that?

6      A.   I think it's an okay statement, yes.  It is

7   an ideal situation.

8      Q.   Why is it important to adhere to an

9   industry-recognized benchmark for cybersecurity?

10     A.   When going through the process of setting

11  up cybersecurity, if you use industry standard

12  processes, it's easier to go through one to validate

13  what your security levels look like, and it's easier

14  to identify, you know, areas that you might be

15  missing or need to work on.

16     Q.   And how do you determine what an

17  industry-recognized benchmark is in the cybersecurity

18  context?

19     A.   Well, for example, NIST is a standard --

20  industry-standard organization.  And they do a number

21  of industry-standard security measures to help you --

22  basically help guide you on what levels of security

23  and what layer -- you know, security is a variable

24  thing.

25          Take passwords is a good example of

1  security.  As an individual organization, if you try

2  to determine by yourself what level of password

3  strength should be, you may or may not be doing

4  something that's sufficient or you may be overly

5  sufficient.  NIST has identified that 16 characters

6  of any kind is sufficient, that it would take a

7  lifetime to break.

8          Now, if we went out on our own, we might

9  say "Oh, let's do 64 characters."  Well, that would

10  be really strong, but we would put an undue burden on

11  our users to try to remember a 64-character password,

12  when NIST helps us understand that, for right now,

13  password length, 16 characters of any character is

14  sufficient.

15          So that's why they are saying here using an

16  industry-recognized benchmark so that we don't have

17  to do all of the analysis ourselves.

18      Q.   When Fortalice indicates here that

19  "Adhering to an industry-recognized benchmark makes

20  it easier to measure adherence when proving security

21  posture to an auditor," what does that mean, "proving

22  security posture to an auditor"?

23      A.   Let's use the same example I used before.

24  Password.  If an auditor comes in and we are saying

25  "Well, we are using eight characters but they must

1    have this structure" versus the auditor says "Well,

2    I'm using NIST, who says you should have 16

3    characters of any structure," it makes it easier if

4    we follow an industry standard process for us

5    defining how we set passwords.

6           So the auditor isn't left to go figure out

7    "Okay.  If I've got eight characters what they can

8    use, capitals, lower-cased, numbers, symbols," is

9    that equivalent to using 16 characters that are all,

10   let's say, lower case?  Somebody then has to go do

11   research to determine what are the possibilities with

12   eight -- with all these variables versus 16 with

13   those lower set of variables.  It just takes work.

14          So for an auditor to understand, following

15   an industry's recognized benchmark makes it simpler

16   to assess is what we're saying.

17          Does that answer your question?

18     Q.   It does, yes.  Thank you.  It's very

19   helpful.

20          Does "auditor" in that context, does that

21   include, like, the red team audit that Fortalice does

22   here?

23     A.   We did not have audits done.  We had

24   assessments done.

25     Q.   That's what I want to understand.  So, in

1            We have had to come up with our own way of

2    managing those passwords that won't tie into our

3    central management system.  Every business is like

4    that.  We are not unique.

5            Q.   You agree that strong authentication

6    mechanisms are important, though, right?

7            A.   I would say yes.

8            Q.   Why is that important?

9            A.   Authentication is an example as we used

10   before with NIST.  They define -- help us define what

11   a good, strong password would be.  If you -- the

12   weaker the password, the better -- the more likely

13   that password could be breached or guessed.

14           Q.   Right.

15           Turn to the next page if you would.  At the

16   top it says Logging Policies.

17           A.   Yes.

18           Q.   And here reads "Current logging

19   configurations could cause difficulty if an incident

20   occurred.  In order to collect useful logs, devices

21   should log all messages except debug level messages,

22   and offload these messages to a remote logging

23   server."

24           Do you see that?

25           A.   Yes.

1        Q.    Okay.   And just so I understand, you are

2    not aware of any investigation done by anyone at the

3    Secretary's Office to determine whether what's listed

4    here as a finding by Fortalice, whether there were,

5    in fact, devices that had FTP and HTTP enabled; is

6    that right?

7        A.    That is correct.   And that probably would

8    have been brought up.   I know in prior years, back in

9    the probably 2015 timeframe, we ran into a number of

10   HTTP web services and file transfer protocol folders

11   on servers that we had to fix.   And it was rather

12   vocal conversations going on back and forth on doing

13   that.

14            So I think the team knew that that was

15   something that if we found that going on, I probably

16   would have heard about it.

17       Q.    Do you agree that a commonly accepted

18   cybersecurity practice is to disable unnecessary

19   services on devices?

20       A.    Yes.

21       Q.    And why is that?

22       A.    If you are not using basically a port or a

23   feature, don't leave it on.   Because it potentially,

24   potentially could eventually become a vulnerability.

25       Q.    And then if you look in this -- the next

1   sentence after we just read, it goes on to say "These

2   services should be reviewed to ensure that any

3   non-essential services are disabled in order to

4   reduce Secretary of State Georgia's attack surface."

5          Do you see that?

6      A.   Yes.

7      Q.   Why is it important, as a general matter,

8   to reduce the Secretary's attack surface?

9      A.   Part of security is to eliminate the

10  vectors of attack.

11     Q.   And vectors, you mean -- sorry.  Just in

12  sort of nontechnical speak, sort of the

13  vulnerabilities that you guys have, Fortalice and

14  others, assessed.  Is that what you mean?  Because

15  "vector" is another word for vulnerability.

16     A.   Basically, if you eliminate the number of

17  points a potential attacker could attack.

18     Q.   Sorry.  Just in layman terms, when you say

19  vectors is a technical term, do you mean

20  vulnerabilities?

21          MR. DENTON:  Object to form.

22     A.   Vulnerability would be one, a vector.

23     Q.   (By Mr. Cross) All right.  And then if you

24  come further down the page, do you see security

25  Updates?

1      A.    Yes.

2      Q.    And here it reads "Based on the current

3   configurations, the Palo Alto firewalls are

4   potentially set to not automatically install

5   updates."

6          Do you see that?

7      A.    Yes.

8      Q.    As a general matter, why is it important to

9   use up-to-date software for cybersecurity purposes?

10         MR. DENTON:  Object to form.

11     A.    There's numerous reasons to update and

12  other reasons to not update.  So updating isn't

13  always the best path.

14     Q.    (By Mr. Cross) Can you tell me --

15     A.    So -- so updates, many times a manufacturer

16  will find a vulnerability or a feature enhancement in

17  part of their patches.  A vulnerability is something

18  that somebody has identified -- and it may be

19  themselves, it may be a third party company who is

20  paid to go look for stuff or it could be a hacker --

21  has identified a vulnerability.  And a company will

22  go in and basically fix the problem so that

23  vulnerability goes away.

24          Enhancements are things or features such

25  that somebody -- a company would do to enhance their

1  product or make their product better.  Doing

2  automatic updates is a risk.  Because until you

3  assess whether that update will adversely impact your

4  security environment, you may be introducing new

5  problems.

6           So on one hand, you could say that

7  automatically doing updates is good if you just have

8  no ability to go look at those patches to see whether

9  or not they are going to affect you adversely.  So

10  it's a measured risk.

11      Q.   As a general matter, is it accepted

12  practice, accepted cybersecurity practice to

13  implement updates that are offered to patch

14  vulnerabilities in a system?  As opposed to what I

15  think you referred to as, like, a feature

16  enhancement?

17           MR. DENTON:  Object to form.

18      A.   There are different types of updates.

19  There are different types of updates.  Some are more

20  automated, such as blacklisted IP addresses.  Those,

21  typically, you automate those.  But patches for

22  vulnerabilities, that -- that has to be assessed in

23  your specific environment, whether or not you really

24  want to do that or not.

25      Q.   (By Mr. Cross) Under what circumstances

1  would you envision not accepting a patch for a

2  vulnerability in the software?

3      A.   Well, patches don't necessarily come in

4  saying "This is for a vulnerability."  It just says

5  "patch."

6      Q.   So you may not know that a patch coming in

7  includes a vulnerability patch.  Is that the idea?

8      A.   Not until you research it.

9      Q.   If you look back at Page 3 under Results,

10  very bottom of the page, do you see the second

11  sentence reads "The workbooks included alongside this

12  report will allow Secretary of State Georgia to

13  review any configuration in question to increase the

14  security of the organization's baseline."

15          Do you see that?

16      A.   Yes.

17      Q.   And do I understand correctly that there

18  would not have been workbooks provided in writing

19  because of the directive you talked about earlier

20  given to Fortalice?

21      A.   Correct.  So once again, this kind of shows

22  you that this was probably a cut and paste.

23      Q.   And as you sit here today, I may know the

24  answer to this because you said you weren't familiar

25  with the report, but just to be sure, as you sit

1    here, are you aware of any efforts undertaken by

2    anyone in the Secretary's Office to address any of

3    the findings in this report?

4         A.   No.

5         Q.   All right.  Let me grab the next exhibit.

6    And if you want to take a break at any point,

7    Mr. Beaver, just say the word.

8              MR. CROSS:  Okay.  This is going to be

9         Exhibit 3.

10             All right.  You should be able to grab

11        Exhibit 3 now.

12             (Plaintiffs' Exhibit 3, Fortalice Solutions

13        Technical Assessment Prepared for Secretary of

14        State Georgia, DRAFT - August 25, 2020, Bates

15        labeled FORTALICE003692 - FORTALICE003704,

16        marked for identification.)

17        A.   Okay.  Technical Assessment.

18        Q.   (By Mr. Cross) Yes.  And so this one is

19    labeled Fortalice Solutions Technical Assessment

20    Prepared for Secretary of State Georgia and it's

21    dated August 25th of 2020.

22             Do you see that?

23        A.   Yes.

24        Q.   And if you look on this -- by the way, you

25    will see on the cover page and at the bottom, there's

1     Q.   Do you see the second paragraph, the first

2    full paragraph begins "The overall theme"?

3     A.   Yes.

4     Q.   And here Fortalice wrote "The overall theme

5    Fortalice discovered throughout the test was a lack

6    of secure coding principles."

7          Do you see that?

8     A.   Yes.

9     Q.   And why is it important to adhere to secure

10   coding principles when doing coding?   Like, creating

11   software?

12          MR. DENTON:   Object to form.

13     A.   Secure coding principles -- without

14   following good, secure coding principles, you leave

15   code open to attacks, such as SQL injection and

16   cross-site scripting.   Those are two common examples.

17          So it looks like they were looking at the

18   code, and it identified the code had potential

19   weaknesses.   Now, because we know the code has

20   potential weaknesses, we use a layer on top of this

21   that blocks those kinds of attacks.   We have a system

22   that we route all requests through, which basically

23   scour the web requests and look for any types of

24   non-basically direct use of the system, where

25   somebody is trying to inject code because we know

1    that these -- the code has these issues.

2         So this is -- what we talked about earlier

3    of you putting layers of security to protect any

4    known vulnerabilities.

5         Q.   (By Mr. Cross) And the layer you are

6    talking about now, that would protect against SQL

7    injection, right?

8         A.   Yes.

9         Q.   And just so we are clear, SQL injection --

10   I guess maybe it's easier to put it this way.  SQL

11   injection can occur when a user goes to, like, a

12   website, for example, where they can do a search.

13   And instead of conducting a legitimate search, they

14   put in various terms that causes the system to return

15   information that it shouldn't if it has a

16   vulnerability that allows that.  Is that generally

17   right?

18        A.   That's -- that's pretty close.

19        Q.   Right.

20        A.   So our system looks at if you are trying to

21   put in a date field for birth date and you put

22   something else in there, it blocks it.  If you have

23   your name, put your name here, and you put in

24   something, a SQL call, it blocks it.  And there

25   aren't too many SQL calls that start with Merritt

1      Q.   And the situation you are talking about is

2   one I think we talked about in the prior deposition

3   that went back -- that came to light shortly before

4   the 2018 election, right?

5      A.   Yes.  Yes.

6      Q.   And so that anticipates the question I was

7   going to ask you.  Given whatever measures were taken

8   to address that situation in 2018, do you have any

9   insight as to why Fortalice found the vulnerability

10  found here with the absentee ballot system almost two

11  years later in August of 2020, or do you just not

12  know one way or the other?

13     A.   As I stated earlier, a lot of the stuff is

14  in the code, can't be changed.  So even though we had

15  identified it, we had put some defense -- or

16  basically defenses, some layers of security to keep

17  the problem from being -- getting worse or doing what

18  they are saying.

19          But the code in itself was -- still had the

20  weakness in it.  So if you can't change the code, you

21  put layers of security around it to reduce the risk.

22  What they have done here is they have reidentified

23  the same problem that we knew we had.  But we have

24  put other defenses to basically support this.

25          So it doesn't get rid of the problem.  It's

Page 345

1    known.  It's existing.  We just now mitigated the
2    issue in a different way.
3           Q.   All right.  Let me grab the next exhibit.
4           MR. CROSS:  This should be Exhibit 4, I
5    believe.  Yes.
6           (Plaintiffs' Exhibit 4, Fortalice Solutions
7    Technical Assessment Prepared for Secretary of
8    State Georgia, DRAFT - August 25, 2020, Bates
9    labeled FORTALICE003625 - FORTALICE 003639,
10   marked for identification.)
11          Q.   (By Mr. Cross) You should be able to pull
12   that up now, Mr. Beaver.
13          A.   Okay.  Is this the same one?  This is
14   Technical Assessment.  Was the last one a Technical
15   Assessment?
16          Q.   Yes, but they are -- hold on.  Let me look
17   real quick.
18          They were prepared the same day but are
19   different reports.  You can confirm this for
20   yourself.  There are going to be three documents for
21   you to look at.  They are all Technical Assessments
22   dated August 25, 2020.  It looks to me like there
23   were three different reports that were drafted
24   looking at three different things as part of this
25   assessment.  We'll kind of walk through them now if

Page 346

1    that's wrong.

2              So this is another August 25th, 2020 draft

3    Technical Assessment from the Secretary's Office.

4              Do you see that?

5         A.   Yes.

6         Q.   And if you come to Page 2, this gives the

7    overview for this report.  And here you can see

8    it's -- it's similar to the overview for the last

9    one, but here it talks about performing a web

10   application assessment against the My Voter Page

11   site.

12             Do you see that?

13        A.   Yes.

14        Q.   And so --

15        A.   Which I think the last one was an

16   assessment of the My Voter Page also.

17        Q.   Well, I guess that's what I'm going to

18   raise with you, because as I read these, that's not

19   right.  So if you need to go back to Exhibit 3 and

20   grab that, Exhibit 3 refers to the ballot request and

21   ElectioNet sites, which are distinct from the My

22   Voter Page site, correct?

23        A.   I think you can get -- your ballot request

24   is on -- is a tab on the My Voter Page.

25        Q.   Okay.  So is it your -- are you guessing

1     to.  I can't be positive, but that makes sense.

2     Because that was when Fortalice got involved to look

3     at this and when we put measures in place to block

4     it.

5               And as I said, the code's still there.  We

6     just have security measures that block that kind of

7     activity since we can't change the code.

8          Q.   All right.

9               MR. CROSS:  Let me -- you should be able to

10         pull up Exhibit 5 now, which is -- you'll see

11         it's the third assessment I mentioned before.

12         It's the same date.

13               (Plaintiffs' Exhibit 5, Fortalice Solutions

14         Technical Assessment Prepared for Secretary of

15         State Georgia, DRAFT - August 25, 2020, Bates

16         labeled FORTALICE003678 - FORTALICE003691,

17         marked for identification.)

18         Q.   (By Mr. Cross) Just let me know when you

19    have that.

20         A.   I've got it.

21         Q.   And if you come to Page 2 of this Technical

22    Assessment, also dated August 25th, 2020, you see

23    where the Executive Summary is?

24         A.   Yes.

25         Q.   And here, the Executive Summary is similar

1    to the prior two August 25th, 2020 overviews except

2    you see here this one is an assessment of the Online

3    Voter Registration site?

4         A.   Yes.   It looks like they are changing the

5    text between different documents of the same thing.

6    So your Online Voter Registration site is your MVP

7    page.   So my -- and if you notice, we are still

8    talking about cross-site scripting.   So it's -- to

9    me, it looks like it's just different versions of the

10   same document from his same assessment, but the

11   person is updating it with more current information.

12   And since it says Draft, you are probably looking at

13   different versions of when -- you know, when he has

14   updated to get more -- from his cut and paste -- to

15   get more accurate information.

16             That -- but I didn't build this document,

17   so I can only speculate.   But from what it looks

18   like, it looks like the same assessment, just

19   different versions of the document.

20        Q.   So you have not seen this report before

21   either; is that right?

22        A.   Correct.   I can only speculate.

23        Q.   I will not ask you to do that.

24             I do have a question, though.   If you turn

25   to Page 8 -- and you can look at Page 7 and 8

1   that came out of this report or just other types of

2   security things we do on a general basis.

3        Q.   So again, this report is dated July 1 of

4   last year.  Are there any specific security measures

5   that you are aware of that the Secretary's Office

6   implemented since July of 2021, last year, to protect

7   against vulnerabilities with the voting equipment?

8             MR. DENTON:  Object to form.

9        A.   I am not aware of it.

10        Q.   (By Mr. Cross) Sorry.  You said you are not

11   aware?

12        A.   I am not aware, but that doesn't mean none

13   happened.  I'm just not aware.  Understand, counties

14   manage the equipment, not the Secretary of State's

15   Office.

16        Q.   And are you aware of any measures taken by

17   any county of Georgia since July of 2021 to address

18   vulnerabilities with the voting equipment?

19             MR. DENTON:  Object to form.

20        A.   I'm not aware.

21        Q.   (By Mr. Cross) Are you aware of any

22   measures taken by the Secretary's Office to address

23   vulnerabilities with the voting system more broadly

24   since July of 2021?

25             MR. DENTON:  Object to form.

1          A.    That's a broad question.  Voting system is

2      a lot of different pieces and parts.  Which one --

3      what are you specifically asking about?

4          Q.    (By Mr. Cross) So one of the responses the

5      State has made in response to this July 1 report from

6      Dr. Halderman is that, you know, some of the

7      vulnerabilities he finds, like, for example, the

8      ability to upload malware through a USB port on the

9      voting equipment, are you aware of any measures taken

10     by the Secretary's Office or by a county to increase

11     security around access to those ports or to the

12     machines?

13         A.    I'm not aware.  That doesn't mean it hasn't

14     been done.

15         Q.    Are you aware of any measures taken by

16     Dominion to address vulnerabilities with their own

17     voting equipment since July of 2021?

18         A.    I'm not aware.

19         Q.    Do you know whether anyone at the

20     Secretary's Office has discussed Dr. Halderman's

21     report with anyone at Dominion?  This report?

22         A.    I'm not aware.

23         Q.    If you wanted to know the answer to that,

24     who would you ask?

25         A.    I might start with Gabe Sterling or Michael

1   should be public?  Publicly released?

2        A.   I don't think that's my decision.

3        Q.   Okay.  But you are the Chief Information

4   Officer for the Secretary's Office.  Do you have a

5   view from a cybersecurity perspective on whether this

6   report, which purports to identify numerous

7   vulnerabilities with the voting system, whether it

8   should be released publicly?

9        A.   Anything that can adversely effect

10  security, in my opinion, shouldn't be released.  You

11  are only reducing Georgia's ability to secure their

12  equipment and systems whenever security information

13  about an existing system is released.  In my mind,

14  it's bad practice and just, you know, being ignorant

15  of cybersecurity.

16       Q.   Last couple questions or couple points.

17            What are the industry-recognized benchmarks

18  that the Secretary's Office attempts to adhere to for

19  cybersecurity for the voting system, if any?

20            MR. DENTON:  Object to form.

21       A.   That is way too broad of a question.

22            MR. CROSS:  Fair enough.  Let me narrow it

23  down.  Let's just focus on the Dominion

24  equipment, the BMDs, the printers, the scanners.

25       Q.   (By Mr. Cross) What, if any,

1   industry-recognized benchmarks does the Secretary's

2   Office try to adhere to for securing that equipment?

3        A.   Once again, you are -- it's a very broad

4   question.   You would have to be very specific.

5   Everything from physical to software to wireless and

6   hard networks, there's a whole range of attack

7   vectors to take into consideration.   We use that

8   word.   It's a common term in cybersecurity.

9             So when you say what avenues, I mean,

10  someone could talk for days on the attack vectors

11  that one should look at.   So I can't be specific with

12  it, that broad of a question.

13       Q.   And why should one look at the attack

14  vectors of that equipment?

15       A.   Basically attack vectors are where systems

16  can be compromised.   And so reducing attack vectors

17  is always your first defense.   And then once you have

18  vectors that you can't get rid of, then what do you

19  do on those vectors?

20       Q.   If I wanted to understand -- or strike

21  that.

22            If I wanted to understand what the

23  industry-recognized benchmarks are that the

24  Secretary's Office attempts to adhere to with the

25  voting equipment that we -- just the Dominion

1          MR. DENTON:  Yes, I saw the application.  I

2     just haven't seen anything further.

3          Thank you.

4          MR. HAVIAN:  You are welcome.

5          (Plaintiffs' Exhibit 11, Curling

6     Plaintiffs' Fifth Amended Notice of Deposition

7     of Office of the Secretary of State, marked for

8     identification.)

9     Q.    (By Mr. Havian) Okay.  Mr. Beaver, let's

10    jump right in.  I would like to have you take a look

11    at Exhibit 11.

12    A.    Okay.

13    Q.    Which is a Notice of Deposition.  And the

14    pages, at least on my copy, do not appear to be

15    numbered.  But if you could -- if you could scroll

16    down to Topic Number 10, which is about

17    three-quarters of the end of the document.

18    A.    Does it start with any instance in 2020 and

19    2021?

20    Q.    Correct.  That says "Any instance in 2020

21    or 2021, within the knowledge of the Secretary of

22    State's Office, when a person or entity other than an

23    authorized election worker or Georgia state or county

24    official obtained voting data from a Georgia election

25    or images of voting equipment used in a Georgia

1    election."

2              Do you see that?

3        A.   Yes.

4        Q.   That's going to be the primary area of my

5    focus today.  Are you prepared to address that issue

6    today?

7        A.   I can answer to my knowledge.

8        Q.   Have you taken any steps to gather

9    knowledge of any other persons in the Georgia

10   Secretary of State's Office about this issue?

11       A.   No.

12       Q.   Okay.  I believe it was yesterday or

13   perhaps the evening before yesterday, Mr. Bruce

14   Brown, counsel for the Coalition, sent an e-mail to

15   Mr. Russo and Mr. Miller asking that you, in

16   particular, focus on a particular aspect of Issue

17   Number 10.  And I'll read that to you.  It says "That

18   examination will focus primarily on the events

19   discussed in the audio recording marked as Exhibit 12

20   and played at the deposition of Gabriel Sterling

21   involving the imaging of election hardware and

22   software in Coffee County.  Please ensure that the

23   witness is prepared to address that aspect as well as

24   the other aspects of Issue 10."

25              I guess my question is, are you aware --

Page 401

1   me.

2           So the fact that I didn't hear anything

3   from him, I know his answer.  I might talk to Gabe

4   Sterling.  I might talk to Michael Barnes.  Those

5   would be my starting points.

6       Q.   And who is the security person that you are

7   referring to?

8       A.   Kevin Fisk.

9       Q.   All right.  So let me ask you a few other

10  questions, more general questions about Coffee

11  County.

12          First of all, are you aware that

13  Mr. Gabriel Sterling gave a deposition in this matter

14  as well?

15      A.   I just heard about it.  I have no details

16  on it.

17      Q.   I'm going to read to you something that

18  Mr. Sterling said in his deposition and ask you

19  whether you agree with his statement or not.

20          Mr. Sterling testified, quote, "Physical

21  security is the -- obviously, the frontline of all

22  cybersecurity.  And that's one of our main things we

23  have to worry about at all times.  That's why we --

24  we work with the counties to make sure they have

25  these things in under lock and key," close quote.

1              Do you understand the sentence I just read
2    to you about physical security?
3         A.   Yes, I do.
4         Q.   Do you agree with Mr. Sterling's testimony?
5         A.   I do.
6         Q.   Can you explain why physical security is so
7    important in election security?
8         A.   Physical security is one vector of attack
9    for someone who is trying to do some malicious damage
10   to the environment.  So protecting physical access is
11   one avenue that you have to go after to make sure
12   that the system is secure.
13        Q.   To your knowledge, has the Secretary of
14   State taken any steps since the 2020 Presidential
15   election to investigate the physical security of the
16   election hardware and software in Coffee County?
17        A.   In Coffee County?  I -- specifically, that
18   county, I can't speak to.  I know that we do a number
19   of things to monitor all counties, so Coffee would be
20   included in that.
21             So -- but I don't know of anything
22   specifically targeting Coffee County.  Coffee would
23   be included in the -- in the monitoring for physical
24   security that is done across all counties.
25        Q.   Okay.  Do you know -- can you describe for

1    us the activities taken across all counties to

2    investigate the physical security of the hardware and

3    software in the election system?

4              MR. DENTON:  Object to form.

5         A.   Yes.  I don't have the specific

6    requirements for each county.  Each of them are

7    required to store all the equipment in a secure

8    location that is locked and monitored.  Monitor is

9    either -- you know, includes video and surveillance,

10   like, Security checking on it on a regular basis.

11             But I don't have any specific document that

12   I can point to that says here's what all the counties

13   do.  That -- you would have to talk to somebody in

14   the Elections Department and -- to see what are some

15   of the common things that are identified for counties

16   to do.  That's not my role.

17        Q.   (By Mr. Havian) Would the copying or

18   imaging of data, election data or election software

19   or hardware, would that be a violation of the

20   physical security requirements if done by anyone

21   other than an authorized election worker?

22             MR. DENTON:  Object to form.

23             You can answer if you understood the

24   question, Merritt.

25        A.   I think the question is obvious that yes,

Page 404

1  that would be a breach of security, although I have

2  yet to hear of any breach, although we do get many

3  people who claim to do breaches that have never been

4  proved.  I would suspect that if there is such a

5  claim right now, until someone can actually prove

6  that that was done, that it would be in question as

7  to the actual reality of that actually happening.

8       Q.     (By Mr. Havian) So --

9       A.     Has anybody tested that?

10      Q.     Well, I'm not allowed to answer questions

11  you ask me, although sometimes I would really enjoy

12  doing that, but that violates the rule.  So I'm

13  afraid I'll have to leave you in suspense on that

14  question.

15             I take it from your answer, is it fair to

16  say that imaging election software or other election

17  data is a serious, serious breach of security --

18             MR. DENTON:  Object to form.

19      Q.     (By Mr. Havian) -- if it happened?

20      A.     It is a breach of security.

21      Q.     Do you consider it a very serious breach of

22  security if it, in fact, occurred?

23      A.     Breach of security is serious.  It's not

24  something I would ever want to happen.

25      Q.     Okay.  And I take it from your testimony

1          A.   Never heard that name before.

2               MR. DENTON:   Object to form.

3          Q.   (By Mr. Havian) The events described on

4     this audio recording, if those events really

5     occurred, would they constitute a violation of

6     Georgia election rules as you understand them?

7               MR. DENTON:   Object to form.

8          A.   Yes.   But his comments kind of lead me to

9     believe that he's not very technical and really

10    doesn't know what he's talking about.   So I would be

11    highly suspect of anything he's saying.

12         Q.   (By Mr. Havian) Did you understand him to

13    be saying that he did something technical himself as

14    opposed to observing others doing technical things?

15         A.   He was observing others doing technical

16    things and was not able to very accurately reflect

17    what potentially could have happened.

18         Q.   Can you explain further what you mean by

19    that?

20         A.   Poll pads don't have a hard drive.   Yet he

21    said they imaged the hard drive on a poll pad.   I

22    would guess he doesn't know what he's talking about.

23         Q.   Can --

24         A.   So that kind of puts the whole conversation

25    in question as to really did he know what he was

1   seeing going on.

2           So I would definitely would want somebody

3   who actually understood technology and understood

4   what was potentially going on there to do before I

5   jumped to any conclusions.  Sounded like somebody was

6   trying to brag and get somebody's attention.

7       Q.   So I -- you're at somewhat of a

8   disadvantage because I have an informal writeup of

9   what he said on the audiotape.  And I apologize we

10  didn't have a transcript for you.  But I don't recall

11  him saying that the poll pad was imaged.

12      A.   He said he imaged everything.

13           MR. DENTON:  Merritt, let Mr. Havian finish

14  his question before you start to answer.

15      Q.   (By Mr. Havian) My question is, did you

16  hear him specifically say that he imaged the poll

17  pad?

18           MR. DENTON:  Object to form.

19      A.   I heard him say he imaged everything.

20      Q.   (By Mr. Havian) Okay.

21      A.   And then he referenced poll pads.

22      Q.   If it turns out that you misheard and he

23  didn't say he -- that they imaged the poll pad or

24  didn't mean that, would that affect your view about

25  whether he was a suspect person providing this

1    information?

2        A.   Just the whole conversation sounded suspect

3    to me.  I would want -- I would want somebody

4    technically competent to go assess before I jump to

5    any conclusions.

6        Q.   Okay.

7        A.   I have seen too many people brag that they

8    could do something in this job only to find out they

9    weren't even close to doing what they said they were

10   doing.

11       Q.   Okay.

12           Getting back to the specifics of the

13   conversation, aside from the comment about imaging

14   the poll pad, was there anything else that he said in

15   the conversation that struck you as not plausible?

16       A.   I would have to listen to it a few times.

17   But the fact that he even said that he was -- that

18   somebody in the department gave them access to image

19   the equipment, first would be who would have done

20   that?  I would ask to go back to Coffee County and

21   talk to the elections people there and say "Did you

22   actually do this" or "Is this guy" -- so until you

23   can tell me that you have got corroborating evidence

24   from somebody else there, I would hold this whole

25   conversation in suspect.

1    Q.   Yes.  And I take it from your demeanor it's

2  fair to say this is such an absurdly grotesque

3  invasion of security that it's hard for you to

4  imagine it actually happened; is that fair?

5    A.   Yes.

6         MR. DENTON:  Object to the form.

7    Q.   (By Mr. Havian) During Mr. Sterling's

8  deposition, he testified that events in Coffee County

9  were investigated in connection with the Presidential

10 election of 2020.

11        Are you aware of any such investigation?

12   A.   No.

13   Q.   You are not aware of any investigation of

14 events during the Presidential election of 2020 that

15 occurred in Coffee County at all; is that right?

16        MR. DENTON:  Object to form.

17   A.   Correct.  I am not aware.

18   Q.   (By Mr. Havian) So I don't want to beat a

19 dead horse.  To the extent that Mr. Sterling

20 testified that there was an investigation, you are

21 just not familiar with what he's alluding, referring

22 to; is that right?

23   A.   Correct.  If there was an investigation

24 with a issue, it most likely would have come to me.

25 But if it was an investigation where it was found

Page 412

1    Q.   (By Mr. Havian) Okay.

2         Again, focusing on Coffee County, do you

3    recall ever hearing anything about a password being

4    shared improperly in Coffee County, a password to the

5    EMS system?

6         A.   I have heard no security questions that

7    came out of Coffee County about any topic.

8         Q.   Were you aware that in Coffee County, as in

9    other counties, they did a machine recount following

10   the 2020 Presidential election?

11        A.   Not particularly.  I think there was

12   recounts in numerous counties, and I didn't -- I

13   don't get involved with the actual voter tabulation

14   process.  I focus on the systems at the state level.

15        Q.   So were you aware that in Coffee County,

16   the machinery count produced a discrepancy?

17        A.   Okay.  I'll restate.  I know nothing

18   specific about Coffee County election-wise.

19        Q.   Do you recall hearing about machine recount

20   discrepancies in any counties in Georgia in

21   connection with the 2020 Presidential election?

22        A.   I recall hearing accusations.  I never

23   heard of any actual proven issues.

24        Q.   Okay.  Do you recall anything more specific

25   about the accusations you heard?

Page 413

1           A.   No.  It was quite a while back.

2           Q.   I'm going to ask you to take a look at the

3      next exhibit, which will be Exhibit 13.

4                MR. HAVIAN:  Joe, can you upload the

5                November 2020 memo, please?

6                (Plaintiffs' Exhibit 13, Official Election

7                Bulletin, dated November 17, 2020, from Chris

8                Harvey, Elections Division Director, to County

9                Election Officials and County Registrars, RE:

10               Open Records Requests - Security Information

11               Exempt, marked for identification.)

12          Q.   (By Mr. Havian) And while we are doing

13     that, do you recall any information about Coffee

14     County declining to certify their results after a

15     machine recount?

16          A.   As I stated before, I have no knowledge of

17     anything that was tied to Coffee County.  Prior to

18     this conversation, I can't tell you I have ever even

19     heard anything about Coffee County as the county.

20          Q.   Okay.  Can you please pull up Exhibit 13?

21          A.   Election Bulletin, November 17?

22          Q.   Correct.  And you may need to enlarge it on

23     your screen in order to read it.

24          A.   Yes.

25          Q.   Let me know when you've got it to the point

Page 414

 1    where it's legible.  Sorry about that.

 2         A.   I can see it.

 3         Q.   Okay.  So first of all, take a look at this

 4    memo, which is from Chris Harvey, Elections Division

 5    Director, to County Election Officials and County

 6    Registrars, dated November 17th, 2020.  And I would

 7    like to ask you if you recognize this memo.

 8         A.   No.

 9         Q.   You don't believe you have seen it before?

10         A.   I know I haven't seen it before.

11         Q.   I would like to ask you a few questions to

12    see if some of these things are familiar to you, even

13    though I appreciate you haven't read the memo before.

14              First of all, do you know Mr. Harvey?

15         A.   Yes.

16         Q.   And who is he?

17         A.   He was the Director for Elections.

18         Q.   And do you know generally what his

19    responsibilities were as Director of Elections?

20         A.   So he was responsible for running the

21    state-level responsibilities for running elections.

22    So that means managing the voter registration system,

23    collecting anything that was tied to the voter

24    registration system.  They managed the election

25    ballot count collection process.

1           Counties actually are responsible, by law,

2   to actually run the elections and actually run the

3   machines.  So he did not manage that.  But he did act

4   as an adviser to the counties on the election law.

5           Q.   Okay.  So I would like to have you look at

6   this memo and I would like to read a couple of short

7   parts of it to you.

8           First, I want to start in the second

9   paragraph --

10          A.   Yes.

11          Q.   -- where Mr. Harvey says "Several counties

12  have also received Open Records Requests for the

13  information contained in the log files of the KNOWiNK

14  poll books."

15          Do you see that?

16          A.   Yes.

17          Q.   And then he's -- going down a couple of

18  paragraphs, in the second to last paragraph, he says

19  "Under the Open Records Act, providing copies of

20  software, software updates, or thumb drives

21  containing software or software updates is not

22  subject to open records requests."

23          Do you see that?

24          A.   Yes.

25          Q.   And then later at the bottom of the first

1    page, there's the last couple lines -- well, actually

2    it's a fairly long sentence there.  But basically, he

3    says he cannot give out software or databases except

4    upon the order of a court of competent jurisdiction.

5              Do you see that?

6         A.   Yep.

7         Q.   Do you know why -- do you know of any

8    reason why Mr. Harvey sent out a memo warning people

9    about turning over copies of software, election

10   software at this particular moment in November 2020?

11        A.   Based on the first paragraph, it sounds

12   like a lot of counties were getting requests for

13   copies.  So I think he -- my guess is he was

14   reiterating to make sure that everybody knew the

15   rules.

16        Q.   Do you recall, in your role as Chief

17   Information Officer, that there was quite a bit of

18   discussion around this time period about people

19   trying to get ahold of copies of election software?

20        A.   Yes.

21        Q.   What do you recall about those discussions?

22        A.   Just that we had moved to a new system.

23   There were people out that had gotten a copy of

24   similar systems of our old and tried to prove that

25   you could breach them, although nobody was ever

1    actually able to prove that.  We have never found
2    anything in the old system, and I think people now
3    that they have a new system, they were just going to
4    try to redo the same exercises of trying to prove
5    that you could breach the new system.
6          Q.   Can you explain what are the reasons that
7    election software is not released to the public?  I
8    think you've already touched on this quite a bit in
9    your earlier testimony.
10         A.   It's pretty obvious.  You don't expose
11   your -- basically your system to the public because
12   they -- basically you're giving them a road map to
13   how to basically get in and access the system.  So
14   the best defense of any system is keeping everything
15   secret about that system.
16         Q.   Has your department ever issued
17   recommendations to physically secure software against
18   unauthorized use or copying?
19         A.   My department, you mean the IT Department?
20         Q.   Yes.
21         A.   We have had conversations with both our
22   counsel and the Elections Department in general of
23   how to communicate different types of security
24   measures to the county.  Often Chris Harvey would
25   come to us and say "Hey, I have got to talk to the

1    counties about this issue, it could be a security

2    issue' or something like that and ask how to phrase

3    it to make sure that it complies with, you know, best

4    practices.  Things like that.

5              Is that what you are asking?

6         Q.   That's among them, yes.  And do you recall

7    any such conversations shortly after the 2020

8    election?

9         A.   I don't recall anything.  It doesn't mean

10   it didn't happen because Chris sent messages out to

11   the counties all the time, and he would come consult

12   with me on occasion to help word his messages.

13             So he may have.  I don't keep track or

14   records of them.  It was just -- they were

15   conversations.

16        Q.   Did they have any particular urgency, those

17   conversations, in the aftermath of the 2020 election?

18        A.   I don't have any record of that.

19        Q.   Are there protocols in place at the

20   Secretary of State if there is a suspicion that

21   there's been an unauthorized access of election

22   software?

23        A.   We have an Incident Response Plan that we

24   walk through, basically if something comes up that we

25   will walk through to collect information to determine

1    whether we had an event.

2         Q.   Can you describe briefly for us the steps

3    of that Incident Response Plan?

4         A.   Essentially, first, is to go collect -- you

5    know, collect information initially of what the event

6    was.  So, for example, the Fulton County laptop

7    issue, it was -- it was an event.  It then turned out

8    it was not an incident.  They are different.

9         So the first thing to do is you collect

10   information from that source.  Often we will go

11   directly to, like, Investigations to help us do the

12   research.  We will notify the department head, like,

13   that would have been Chris Harvey.  We'd have

14   notified Gabe Sterling of it and Ryan Germany, so the

15   key leadership structure, that this is going on.

16        And then we would start our investigation.

17   In some situations when it seems that we need more

18   high-end forensics, we will bring in an outside

19   source.  So we have a company called Fortalice that

20   helps us do forensics work if it's specifically that

21   type of work.  And we will go through and collect

22   that.

23        Oftentimes we will reach out to -- we have

24   contacts at both Homeland Security and FBI and GBI,

25   for Georgia Bureau of Investigation, and we will work

1   with -- so we have direct contacts to them.  They are

2   used to us contacting them on events like this and

3   they go through their process for helping us research

4   it to determine whether this is -- this is really

5   something, an issue or just more of a scare.

6        Q.   You mentioned that there is a distinction

7   between an incident and an event.  What's that

8   distinction?

9        A.   Well, when somebody first declares "Oh,

10  this is a problem," we don't call it an incident.

11  It's an event.  So we have to basically find out is

12  it real?  Is it something -- because once it gets to

13  an incident, then you've got to figure out and start

14  establishing a recovery plan and damage control.  But

15  we don't jump into all of those things until we

16  actually can prove that this was real.

17          So it's -- we have lots of events.

18  Incidents rarely, if ever, happen.

19       Q.   So is it fair to say, then, that something

20  being elevated from an event to an incident is a

21  matter of how much proof there is that you find when

22  you look at it initially?

23       A.   That's essentially how you transition.

24  Someone could say that, that they hacked the system.

25  Okay.  So we have this -- we all go do an

Page 427

1   imaged or exported, it's just simply that you don't

2   know whether that's true or not; is that fair?

3        A.    That's fair.

4              MR. DENTON:  Object to form.

5              MR. HAVIAN:  Can we go off the record for a

6        bit?  I just want to gather my final thoughts

7        and then I will wrap up.  So can we just take a

8        five-minute break?

9              THE VIDEOGRAPHER:  The time is 12:59.  We

10       are off the record.

11             (WHEREUPON, a recess was taken.).

12             THE VIDEOGRAPHER:  The time is 1:04.  We

13       are back on the record.

14       Q.    (By Mr. Havian) Mr. Beaver, just one last

15   area.

16             If someone were to obtain an image of the

17   election software, can you give some examples of some

18   of the bad things that someone who had malintent

19   could do with that?

20             MR. DENTON:  Object to form.

21       A.    It will be speculation only.  But if

22   somebody has a copy of software, you could

23   essentially go through and get a better understanding

24   of how it works, and basically practice defeating its

25   security.  Because no software is someone can walk up

1    to it without any prior knowledge to it and just

2    defeat it.

3              So you would have to have -- if you want to

4    defeat a piece of software, you are going to have to

5    have a copy of it.  It's kind of like an operating

6    system.  To defeat the security in an operating

7    system, you will have to practice defeating it and

8    coming at -- and using the words I used before,

9    "different vectors" to see which ones could actually

10   do it.

11             So that if somebody had a copy, then they

12   would give them the ability to go find the different

13   vectors to come at it to defeat it.

14        Q.   (By Mr. Havian) And if someone were able to

15   defeat the software security, can you explain what

16   the -- kind of a worst case scenario would be of

17   someone gaining access?

18        A.   So -- and could you tell me which piece of

19   equipment you are talking about?

20        Q.   Election machinery.

21        A.   Okay.  And that's a broad spectrum.

22             MR. DENTON:  Object to form.

23        A.   So election machinery includes lots of

24   pieces and parts.  Are you talking about the ballot

25   marking device, the scanner --

Page 436

1                    C E R T I F I C A T E

2       STATE OF GEORGIA   )

3                          ) ss.:

4       FULTON COUNTY      )

5

6           I,  Robin Ferrill, Certified Court Reporter within

7       the State of Georgia, do hereby certify:

8               That MERRITT BEAVER, VOLUME II, the witness

9       whose deposition is hereinbefore set forth, was duly sworn

10      by me and that such deposition is a true record of the

11      testimony given by such witness.

12              I further certify that I am not related to any

13      of the parties to this action by blood or marriage; and

14      that I am in no way interested in the outcome of this

15      matter.

16              IN WITNESS WHEREOF, I have hereunto set my

17      hand this 25th day of March, 2022.

18

19          _____

20              ROBIN K. FERRILL, RPR

21

22

23

24

25