Page 1

1           IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION
3      DONNA CURLING, ET AL.,      )
                                   )
4           Plaintiffs,            )
                                   )
5      vs.                         )    CIVIL ACTION NO.
                                   )
6      BRAD RAFFENSPERGER, ET      )    1:17-CV-2989-AT
       AL,                         )
7                                  )
            Defendants.            )
8
9
10
11
12
13     VIDEOTAPED 30(b)(6) DEPOSITION OF ERIC B. CHANEY
14                  (Taken by Plaintiffs)
15                   August 15, 2022
16                     10:20 a.m.
17
18
19
20
21
22
23
24
25     Reported by:   Debra M. Druzisky, CCR-B-1848

Page 4

1                    INDEX TO EXAMINATION
2        Witness Name:                                    Page
3        ERIC B. CHANEY
4            By Mr. Cross                                   8
5            By Mr. Brown                                 179
6            By Mr. Pico-Prats                            185
7
8
9
10                  INDEX TO PLAINTIFF'S EXHIBITS
11         No.                 Description               Page
12      Exhibit 1      6-30-22, Subpoena to Produce       21
                       Documents, Information or
13                     Objects or to Permit Inspection
                       of Premises in a Civil Action to
14                     Eric B. Chaney re: The
                       above-captioned action.
15
        Exhibit 2      8-5-22, Subpoena to Produce         23
16                     Documents, Information or
                       Objects or to Permit Inspection
17                     of Premises in a Civil Action to
                       Eric B. Chaney re: The
18                     above-captioned action.
19      Exhibit 3      8-14-22, Chaney Response to CGG     24
                       Subpoena for Production of
20                     Documents re: Curling v. Kemp.
21      Exhibit 4      State Defendants 202100 thru        34
                       103, 9-28-21, State of Georgia
22                     Secretary of State,
                       Investigations Division Summary
23                     re: Coffee County.
24      Exhibit 5      Color photograph of                38
                       computer/keyboard with Post-It
25                     note.

INDEX TO PLAINTIFF'S EXHIBITS (Continued.)

| No. | Description | Page |
|---|---|---|
| Exhibit 6 | Latham 24 thru 53, Compilation exhibit re: Coffee County Board of Elections documents. | 40 |
| Exhibit 7 | 10-6-20 thru 5-3-22, Coffee County Board of Elections and Registration Regular Monthly Meeting Minutes. | 44 |
| Exhibit 8 | 4-12-22, E-mail string from Jennifer Dorminey Herzog to Ryan Germany re: Response to 4-12-22 Emma Brown Washington Post inquiry. | 88 |
| Exhibit 9 | 3-15-18 thru 3-1-21, text message string between Eric Chaney and Misty Hampton. | 101 |
| Exhibit 10 | 8122022-34 thru -53, 1-8-21, E-mail string from Paul Maggio to Sidney Powell re: Jim Penrose-Coffee County GA forensics engagement agreement. | 137 |
| Exhibit 11 | 6-3-22, ICS Advisory re: Vulnerabilities affecting Dominion Voting Systems ImageCast X. | 160 |
| Exhibit 12 | LinkedIn Web page print-out re: Robert A. Sinners. | 171 |
| Exhibit 13 | 12-12-20, Verified Petition for Emergency Injunctive and Declaratory Relief re: Still v. Raffensperger. | 182 |

- - -

1                    ERIC B. CHANEY,

2    having been first duly sworn, was examined and

3    testified as follows:

4              THE VIDEOGRAPHER:  Thank you.  We may

5         proceed.

6                    EXAMINATION

7    BY MR. CROSS:

8         Q.   Good morning, Mr. Chaney.

9         A.   Good morning.

10         Q.   Appreciate you being here.  You are here

11    pursuant to a subpoena; right?

12         A.   Yes.

13         Q.   And can you just give me your full name

14    again for the record?

15         A.   Eric Brandon Chaney.

16         Q.   And where do you currently live?

17         A.   1044 Mallard Point Drive, Douglas,

18    Georgia.

19         Q.   Okay.  And how long have you been at that

20    address?

21         A.   A couple months.

22         Q.   And where were you before that?

23         A.   512 Pine Needle Road, Douglas, Georgia.

24         Q.   And how long were you there?

25         A.   Two years.

1      A.    Fifth Amendment.

2      Q.    Have you complied with that obligation?

3      A.    Fifth Amendment.

4      Q.    Take a look at request two in Exhibit 3,

5  if you would, please, on the first page.   This one

6  asks for:

7            "All communications, including

8       text messages with Misty Hampton

9       related to, referencing or regarding

10      Coffee County election matters,

11      including election records, election

12      activities or election system

13      components."

14           Do you see that?

15      A.    I do.

16      Q.    And Misty Hampton is the -- is a former

17  elections supervisor in Coffee County; right?

18      A.    Correct.

19      Q.    And she left in February of 2021; right?

20      A.    I don't know the exact date.

21      Q.    Does that sound about right?

22      A.    I don't know.

23      Q.    Well, do you recall that she left in the

24  spring of 2021?

25      A.    I do.

1      Q.    Okay.  And she served in that position,

2      was it about nine years?

3      A.    I don't know.

4      Q.    She was in that position the whole time

5      you were on the board; right?

6      A.    Yes.

7      Q.    Okay.  And so do I understand right that,

8      in response to the request number two here, you had

9      absolutely no documents to provide us that in any

10     way relate to, or any communications with the

11     former elections supervisor that in any way relate

12     to Coffee County election matters?

13     A.    That's correct.

14     Q.    Even though you're required to preserve

15     those by law?

16     A.    I don't have any documents.

17     Q.    When did you destroy those?

18           MR. DELK:  Object to the form.

19     BY MR. CROSS:

20     Q.    When did you destroy those documents?

21     A.    Fifth Amendment.

22     Q.    Why did you destroy those documents?

23     A.    Fifth Amendment.

24     Q.    You destroyed every communication you ever

25     had with Misty Hampton, even those regarding Coffee

1      Q.    Okay.  So Exhibit 4 is an official summary

2    from the Secretary of State's office about an

3    investigation involving Coffee County; is that

4    fair?

5      A.    Yes.

6      Q.    And what involvement, if any, did you have

7    with this investigation?

8      A.    None that I recall.

9      Q.    So did anybody from the State interview

10   you as a member of the board?

11     A.    Not that I recall.

12     Q.    Did anyone from the State provide a report

13   to any -- to you as a member of the board other

14   than what's written here?

15     A.    Not that I recall.

16     Q.    Okay.  So if we look at Exhibit 4, look at

17   complaint two on Page 1.  Do you see that?

18     A.    I do.

19     Q.    And it reads:

20           "A video surfaced on YouTube where

21      it showed Coffee County election

22      supervisor Misty Martin discussing the

23      ways in which the election software

24      could be manipulated."

25           Do you see that?

 1      A.    I do.

 2      Q.    And Misty Martin is the same person as

 3   Misty Hampton?

 4      A.    Yes.

 5      Q.    Okay.  So we're talking about the, at this

 6   time, the Coffee County election supervisor; right?

 7      A.    Yes.

 8      Q.    Okay.  And are you familiar with that

 9   YouTube video?

10      A.    Yes.

11      Q.    You filmed that video; right?

12      A.    Fifth Amendment.

13      Q.    The video that's referenced there, that

14   was filmed during an official meeting of the Coffee

15   County election board in the Coffee County

16   office -- election office; right?

17      A.    Fifth Amendment.

18      Q.    All right.  Turn to the third page, if you

19   would.  Do you see where it has Findings at the

20   top?

21      A.    Yes, sir.

22      Q.    And then Complaint Two referencing that

23   same complaint.  Do you see that?

24      A.    Yes.

25      Q.    And under the findings here, the State

Page 37

1    reports:

2             "Ms. Martin, along with Coffee

3         County Board of Election member Eric

4         Chaney, made two videos claiming the

5         Dominion system election software

6         could be manipulated."

7             Do you see that?

8    A.    I do.

9    Q.    Do you disa -- dispute that finding?

10   A.    Fifth Amendment.

11   Q.    It then goes on, if you come to the third

12   sentence, four lines down in the middle, do you see

13   where it reads, "Ms. Martin never"?

14   A.    I do.

15   Q.    And it -- and the finding here is:

16            "Ms. Martin never once during the

17         videos explained the intended use of

18         the adjudication process.

19            "The video was very misleading and

20         seemed its purpose was simply to

21         create doubt and public mistrust in

22         the Dominion Voting System."

23            Do you see that?

24   A.    Yes.

25   Q.    Was it your purpose in creating this video

1    to create doubt and public mistrust in the Dominion

2    Voting System?

3              MR. DELK:  Object to the form.

4              THE WITNESS:  Fifth Amendment.

5    BY MR. CROSS:

6         Q.   What was the purpose of the video?

7         A.   Fifth Amendment.

8         Q.   As you sit here, do you have any reason to

9    believe creating the video was criminal?

10        A.   Fifth Amendment.

11        Q.   Do you believe that video being released

12   to the public was criminal?

13        A.   Fifth Amendment.

14        Q.   If you come down to the second paragraph,

15   do you see where there's discussion of a password

16   that was taped to the bottom of the computer screen

17   Ms. Martin was using?

18        A.   Yes.

19             (Whereupon, a discussion ensued

20        off the record.)

21                      (Whereupon, Plaintiff's

22                       Exhibit 5 was marked for

23                       identification.)

24   BY MR. CROSS:

25        Q.   I'll hand you Exhibit 5.  And just tell me

Page 39

1    if you recognize Exhibit 5, please.

2         A.    Not specifically, I don't.

3         Q.    So Exhibit 5 is a screenshot that we took

4    from the video that's referenced in this complaint

5    of a Post-It note there and the password.

6               Does that help you recognize what that is?

7         A.    I don't -- I mean, I see something there,

8    but I don't know if it's a password or what it is.

9         Q.    Okay.  But do you re -- looking at Exhibit

10   5, do you recall that portion of the video where

11   there was a screen -- the computer screen in the

12   elections office that had a Post-It note with some

13   digits written on it?  Do you recall that?

14        A.    Fifth Amendment.

15        Q.    Okay.  In the findings here, the Secretary

16   of State reports in the last sentence:

17               "It was later discovered the

18         password was used to access the

19         Dominion Voting System."

20               Do you see that?

21        A.    I do.

22        Q.    Do you disagree with that finding?

23        A.    Fifth Amendment.

24        Q.    Do you know whether that password was used

25   to access the E.M.S. server computer or if it was

1    instead used to access a particular election

2    database for the November 2020 election that the

3    County received on a hard drive from the State?

4         A.    Fifth Amendment.

5         Q.    Did you, yourself, ever log in to the

6    E.M.S. server desktop in the Coffee County election

7    office?

8         A.    No.

9         Q.    Do you know what the password was?

10        A.    No.

11        Q.    Do you know if anyone ever changed that

12   password?

13        A.    I do not.

14             (Whereupon, a discussion ensued

15          off the record.)

16                        (Whereupon, Plaintiff's

17                         Exhibit 6 was marked for

18                         identification.)

19   BY MR. CROSS:

20        Q.    All right.  Let me hand you what's been

21   marked as Exhibit 6.

22             (Whereupon, the document was

23          reviewed by the witness.)

24             THE WITNESS:  Okay.

25   BY MR. CROSS:

Page 60

```
 1    Mr. Lindell as associated with former President
 2    Trump?
 3         A.    Bits and pieces, I have.
 4         Q.    When was Mr. Lindell in the Coffee County
 5    election office?
 6         A.    To my knowledge, he's never been in the
 7    elections office.
 8         Q.    You're not aware of Mr. Lindell being in
 9    Coffee County in around February, late February or
10    early March 2021?
11         A.    No, sir.
12         Q.    What about Doug Logan?
13         A.    No recollection of the name.
14         Q.    You're not aware of Doug Logan being in
15    the Coffee County election office?
16         A.    No.
17         Q.    What about Paul Maggio?
18         A.    I don't recognize the name.
19         Q.    Not aware of him in that office?
20         A.    Not that I'm aware of.
21         Q.    What about Chris -- sorry.   What about
22    Scott Hall?
23         A.    I don't know the name.
24         Q.    Not aware of him in that office?
25         A.    No, sir.
```

Page 61

1    Q.   Do you know Robert Sinners?

2    A.   I know the name.

3    Q.   Who is that?

4    A.   Just an attorney in the -- I know the name

5    of Robert Sinners, but I don't know Robert Sinners.

6    Q.   He works for the Secretary of State's

7    office; right?

8    A.   No idea.

9    Q.   You don't know Robert Sinners who started

10   working for the Secretary of State's office in

11   20 -- February of 2021?

12   A.   I do not.

13   Q.   Is there a reason why you have his phone

14   number?

15   A.   As I said, I don't know Robert Sinners.  I

16   knew he's an attorney, but I don't -- past that, I

17   don't know Robert Sinners.

18   Q.   Okay.  All right.  Look at the meeting

19   minutes from June 8th, 2021.

20   A.   Okay.

21   Q.   I'm sorry.  Before we turn to that, the

22   video surveillance that you reviewed when

23   Ms. Hampton was asked to resign, did you see in any

24   of that video anyone in the Coffee County elections

25   office that wasn't supposed to be there?

1      A.    Correct.

2      Q.    Did you convey the truth of what happened

3   to your counsel or did you lie to your counsel,

4   too?

5          MR. DELK:  Object to the form.

6      That's privileged.

7          THE WITNESS:  Fifth Amendment.

8   BY MR. CROSS:

9      Q.    Why did you write this dishonest E-mail in

10  response to the inquiry from the Washington Post?

11         MR. DELK:  Object to the form.  Asked

12     and answered.

13         THE WITNESS:  Fifth Amendment.

14  BY MR. CROSS:

15     Q.    In the days leading up to January 7 of

16  2021, you reached out to Misty Hampton and asked if

17  she'd be willing to work with folks to get access

18  to the voting equipment in her elections office;

19  right?

20         MR. DELK:  Object to the form.

21         THE WITNESS:  Fifth Amendment.

22  BY MR. CROSS:

23     Q.    You had multiple conversations with her

24  about that; right?

25     A.    Fifth Amendment.

Page 100

1      Q.   You told her specifically that one of
2   those individuals would be a man named Scott Hall;
3   right?
4      A.   Fifth Amendment.
5      Q.   Cathy Latham was one of the key
6   individuals who helped organized this with Scott
7   Hall; right?
8      A.   Fifth Amendment.
9      Q.   You and Ms. Latham worked together to
10   organize this; correct?
11      A.   Fifth Amendment.
12      Q.   On the morning of January 7, 2021, you
13   were aware that Scott Hall and others arrived in
14   the Coffee County election office specifically for
15   the purpose of copying ballots and copying data
16   from the voting equipment; right?
17      A.   Fifth Amendment.
18      Q.   Did you send any text messages about that?
19      A.   Fifth Amendment.
20      Q.   Do you use Signal?
21      A.   Fifth Amendment.
22      Q.   It's incriminating whether you use Signal
23   at all?
24      A.   Fifth Amendment.
25      Q.   I take it you use Signal only to commit

Page 101

1    crimes?

2         A.    Fifth Amendment.

3              MR. DELK:   Object to the form.

4    BY MR. CROSS:

5         Q.    You were in the Coffee County elections

6    office on January 7, 2021 yourself; right?

7         A.    Yes.

8         Q.    Ms. Latham was also there; right?

9         A.    Fifth Amendment.

10        Q.    You were there when Scott Hall walked into

11   the door; right?

12        A.    Fifth Amendment.

13                        (Whereupon, Plaintiff's

14                         Exhibit 9 was marked for

15                         identification.)

16   BY MR. CROSS:

17        Q.    All right.   Mr. Chaney, I've handed you

18   what's been marked as Exhibit 9.   Take a moment to

19   read through it.   But do you recognize that these

20   are text messages that you exchanged with Misty

21   Hampton?

22              (Whereupon, the document was

23          reviewed by the witness.)

24              THE WITNESS:   I recognize this as a

25         text thread, but I'm not -- I mean, I

1   County.

2        Q.   And you're aware that, during at least one

3   election, Ms. Hampton's daughter was able to use a

4   poll pad to watch Netflix during the election;

5   right?  Ms. Hampton conveyed that to you?

6        A.   Fifth Amendment.

7        Q.   Then if you come down to the bottom,

8   there's still -- just so you can see, we're still

9   on December 30 of 2020.  That spills over to the

10  top of Page 20, and there's an additional photo.

11       So this is still December 30.  Do you see

12  that?

13       A.   Yes.

14       Q.   And there's a card game that's depicted on

15  a computer screen in that one; right?

16       A.   Yes.

17       Q.   And here Ms. Hampton wrote to you:

18       "This is the computer that the

19       I.C.C. scanner is connected to."

20       Right?

21       MR. DELK:  Object to the form.

22       THE WITNESS:  Fifth Amendment.

23  BY MR. CROSS:

24       Q.   And then she sends you another photo.  Do

25  you see that below?

Page 123

1      Q.    She responds to you:

2            "No.  I am going to finish it

3       tomorrow."

4            Do you see that?

5      A.    I do.

6      Q.    And then you responded with an E-mail

7   address for Preston Haliburton.  Do you see that?

8      A.    I do.

9      Q.    Why did you give her Preston Haliburton's

10  E-mail address?

11     A.    Fifth Amendment.

12     Q.    Okay.  Are you aware that Mr. Haliburton

13  represents Cathy Latham?

14     A.    Fifth Amendment.

15     Q.    All right.  Come to Page 22 of 24.  If you

16  come down in the middle, do you see there's a text

17  January 6th of 2021 at 4:26 p.m.?

18     A.    I do.

19     Q.    And on that day, Ms. Hampton wrote to you:

20            "Scott Hall is on the phone with

21       Cathy about wanting to come scan our

22       ballots from the general election like

23       we talked about the other day.  I am

24       going to call you in a few."

25            Do you see that?

Page 124

1       A.    I do.

2       Q.    "Cathy" refers to Cathy Latham; right?

3       A.    Fifth Amendment.

4       Q.    So you were aware, at least as of January

5    6th of 2021, that Scott Hall was coming in to the

6    Coffee County election office at least to access a

7    copy, to scan ballots; right?

8       A.    Fifth Amendment.

9       Q.    So when you testified earlier that your

10   only familiarity with Scott Hall was through an

11   open records request, that was a lie; right, sir?

12            MR. DELK:  Object to the form.

13            THE WITNESS:   Fifth Amendment.

14   BY MR. CROSS:

15      Q.    Are you aware that lying under oath is a

16   felony?

17      A.    Fifth Amendment.

18      Q.    Do you know who Javier represents?

19      A.    I do.

20      Q.    The Secretary of State's office; right?

21      A.    I do.

22      Q.    Do you understand the Secretary of State's

23   office has a lawyer sitting in this room in which

24   you just lied?

25            MR. DELK:  Object to the form.

Page 127

1     Q.   And you don't dispute that Ms. Latham was

2    in the office that day; right?

3     A.   Fifth Amendment.

4          (Whereupon, Ms. Curling joined the

5        deposition.)

6    BY MR. CROSS:

7     Q.   You don't dispute that Jil Ridlehoover was

8    in the office that day; right?

9     A.   Fifth Amendment.

10    Q.   If you come to the top of the next page,

11   January 7 of 2021 at 7:24 p.m., you send a phone

12   number to Ms. Hampton.

13        Do you see that?

14    A.   I do.

15    Q.   Whose phone number is that?

16    A.   I don't know.

17    Q.   Why did you send her that number?

18    A.   I don't know.

19    Q.   Nothing you can tell me about that phone

20   number?

21    A.   Fifth Amendment.

22    Q.   That phone number is for Robert Sinners,

23   S-I-N-N-E-R-S; right?

24    A.   I'm not sure.

25    Q.   You sent a phone number to Ms. Hampton on

Page 128

1    January 7, 2021 and you have no idea whose number

2    it is?

3        A.    Fifth Amendment.

4        Q.    I'm going to ask you again, Mr. Chaney.

5    You are aware that that phone number is registered

6    to Robert Sinners; right?

7        A.    Fifth Amendment.

8            MR. DELK:  Object to the form.

9    BY MR. CROSS:

10       Q.    What was Mr. Sinners' involvement in a

11   team coming into the Coffee County elections office

12   on January 7, 2021 to copy ballots and copy

13   proprietary data off of the Dominion voting

14   equipment?

15           MR. DELK:  Object to the form.

16           THE WITNESS:  Fifth Amendment.

17   BY MR. CROSS:

18       Q.    Did you personally communicate with

19   Mr. Sinners?

20       A.    Fifth Amendment.

21       Q.    Were you asking Ms. Hampton to communicate

22   with Mr. Sinners about those events?

23       A.    Fifth Amendment.

24       Q.    Who in the Secretary of State's office to

25   your knowledge was aware of what happened on

```
 1    January 7th, 2021 involving Mr. Hall and Mr. Maggio
 2    and others?
 3         A.   Fifth Amendment.
 4              MR. DELK:  Object to the form.
 5    BY MR. CROSS:
 6         Q.   When did they become aware?
 7         A.   Fifth Amendment.
 8         Q.   Immediately after you send her this phone
 9    number, you write to her:
10              "Let's switch to Signal."
11              Right?
12         A.   Fifth Amendment.
13         Q.   Well, it's written here in front of us.  I
14    mean, we can get that much right.  You wrote to
15    her:
16              "Let's switch to Signal."
17              Right?
18              MR. DELK:  Object to the form.  Asked
19         and answered.
20              THE WITNESS:  Fifth Amendment.
21    BY MR. CROSS:
22         Q.   You wanted to switch to Signal because you
23    wanted to make sure you could delete the messages
24    you guys were exchanging; right?
25         A.   Fifth Amendment.
```

1          Q.   She then writes to you on January 19, 2021
2    at 10:35 a.m.:
3               [As read]   "If you happen to be in
4          town, the guys measuring my desk are
5          still" there -- "are still here."
6               Do you see that?
7          A.   I do.
8          Q.   That was a code that you and Ms. Hampton
9    worked out regarding individuals being in the
10   office copying voting equipment; right?
11               MR. DELK:  Object to the form.
12               THE WITNESS:   Fifth Amendment.
13   BY MR. CROSS:
14          Q.   There was no one there actually measuring
15   her desk; isn't that right?
16          A.   Fifth Amendment.
17          Q.   Because not only did individuals copy
18   voting equipment on January 7, but they came back,
19   some of the same people and some different people
20   came back on the 19th to do some additional
21   copying; right?
22               MR. DELK:  Object to the form.
23               THE WITNESS:  Fifth Amendment.
24   BY MR. CROSS:
25          Q.   Doug Logan was there on January 19, wasn't

Page 165

```
 1      seen it.
 2   BY MR. CROSS:
 3      Q.   As a member of the Coffee County election
 4   board, would you expect the Secretary's office to
 5   advise a -- the county election boards that a
 6   federal agency had identified serious
 7   vulnerabilities with the Dominion equipment you
 8   were tasked with using?
 9           MR. DELK:  Object to the form.
10   BY MR. CROSS:
11      Q.   You'd expect them to let you know that;
12   right?
13      A.   I would.
14      Q.   If you look at the heading here, do you
15   see number one, Summary?
16      A.   I do.
17      Q.   It says:
18           "This advisory identifies
19        vulnerabilities affecting versions of
20        the Dominion Voting Systems Democracy
21        Suite ImageCast X..."
22           Do you see that?
23      A.   I do.
24      Q.   And the ImageCast X, that's the B.M.D.;
25   right?  You're aware of that?
```

 1          A.    I'm not.

 2          Q.    Okay.  That's -- it goes on:

 3                "The ImageCast X can be configured

 4           to allow a voter to produce a paper

 5           record or to record votes

 6           electronically."

 7                So we're talking about the B.M.D. here.

 8     Are you with me?

 9          A.    Okay.

10          Q.    And then if you come to the end of this

11     document, turn to the second-to-last page, do you

12     see there's a heading in bold, number three,

13     Mitigations at the bottom?

14          A.    Yes.

15          Q.    And here it reads:

16                "C.I.S.A. recommends election

17           officials continue to take and further

18           enhance defensive measures to reduce

19           the risk of exploitation of these

20           vulnerabilities."

21                Do you see that?

22          A.    I do.

23          Q.    "Specifically, for each election,

24           election officials should."

25                And then you see there's about a dozen

1  bullets that continue on to the top of the next

2  page?

3       A.    I do.

4       Q.    Are you aware of any communication by the

5  Secretary's office to the Coffee County election

6  board or anyone with responsibility for Coffee

7  County elections to ensure that any of these

8  mitigation measures were taken?

9       A.    I'm not personally aware.

10       Q.    Are you aware of any effort by Coffee

11  County to implement these mitigation measures?

12            MR. DELK:  Object to the form.

13            THE WITNESS:  I'm not aware.

14  BY MR. CROSS:

15       Q.    And you're not aware that anybody ever

16  told anyone at Coffee County they needed to

17  implement these measures; right?

18       A.    I'm not personally aware, no, sir.

19       Q.    And as a member of the Coffee County

20  election board, if mitigation measures as serious

21  as those here were being implemented in the county,

22  you would expect to have received a report on that

23  as a member of the board; right?

24            MR. DELK:  Object to the form.

25            THE WITNESS:  Can you state that

1          MR. CROSS:  He's got it.

2     BY MR. BROWN:

3          Q.   Let me refer you to Exhibit 8, and

4     specifically your E-mail to Jennifer Herzog at the

5     bottom of the first page of Exhibit 8.

6               Are you with me?

7          A.   I am.

8          Q.   You'll see that you say I don't know Scott

9     Hall.  Is that still your testimony today?

10         A.   Fifth Amendment.

11         Q.   And then you say in the next line:

12              [As read]  "...nor was I present

13          at the Coffee County Board of

14          Elections and registration office when

15          anyone illegally accessed the server."

16         A.   Fifth Amendment.

17         Q.   If I change that to say when anyone

18    accessed the server, would that still be your

19    position, that you were not there when anyone

20    accessed the silver -- server, whether it was

21    illegal or not?

22              MR. DELK:  Object to the form.

23              THE WITNESS:  Fifth Amendment.

24    BY MR. BROWN:

25         Q.   Let me drop down to the bottom sentence in

Page 189

1                  VERITEXT LEGAL SOLUTIONS
2                FIRM CERTIFICATE AND DISCLOSURE
3
4              Veritext represents that the foregoing
      transcript as produced by our Production
5     Coordinators, Georgia Certified Notaries, is a
      true, correct and complete transcript of the
6     colloquies, questions and answers as submitted by
      the certified court reporter in this case.
7
               Veritext further represents that the
8     attached exhibits, if any, are a true, correct and
      complete copy as submitted by the certified
9     reporter, attorneys or witness in this case;
10             And that the exhibits were handled and
      produced exclusively through our Production
11    Coordinators, Georgia Certified Notaries.  Copies
      of notarized production certificates related to
12    this proceeding are available upon request to
      litsup-ga@veritext.com.
13
               Veritext is not taking this deposition
14    under any relationship that is prohibited by OCGA
      15-14-37(a) and (b).  Case-specific discounts are
15    automatically applied to all parties at such time
      as any party receives a discount.  Ancillary
16    services such as calendar and financial reports are
      available to all parties upon request.
17
18
19
20
21
22
23
24
25

1        R E P O R T E R   C E R T I F I C A T E

2    STATE OF GEORGIA )

     COBB COUNTY      )

3

4         I, Debra M. Druzisky, a Certified Court
     Reporter in and for the State of Georgia, do hereby

5    certify:

          That prior to being examined, the witness

6    named in the foregoing deposition was by me duly
     sworn to testify to the truth, the whole truth, and

7    nothing but the truth;

          That said deposition was taken before me

8    at the time and place set forth and was taken down
     by me in shorthand and thereafter reduced to

9    computerized transcription under my direction and
     supervision.  And I hereby certify the foregoing

10   deposition is a full, true and correct transcript
     of my shorthand notes so taken.

11        Review of the transcript was requested.
     If requested, any changes made by the deponent and

12   provided to the reporter during the period allowed
     are appended hereto.

13        I further certify that I am not of kin or
     counsel to the parties in the case, and I am not in

14   the regular employ of counsel for any of the said
     parties, nor am I in any way financially interested

15   in the result of said case.

          IN WITNESS WHEREOF, I have hereunto

16   subscribed my name this 18th day of August, 2022.

17

18

19

20        _____

          Debra M. Druzisky

21        Georgia CCR-B-1848

22

23

24

25